EXHIBIT 1 (Part 3 of 3)

# EXHIBIT W

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Marc Skapof
Email: mskapof@bakerlaw.com
Marc D. Powers
Email: mpowers@bakerlaw.com
Eric R. Fish
Email: efish@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>     Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL)<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF<br><br>     Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>     Plaintiff, | Adv. Pro. No. _____ (BRL) |

v.

TREMONT GROUP HOLDINGS, INC.;
TREMONT PARTNERS, INC.; TREMONT
(BERMUDA) LIMITED; RYE SELECT BROAD
MARKET FUND, L.P.; RYE SELECT BROAD
MARKET PRIME FUND, L.P.; RYE SELECT
BROAD MARKET PORTFOLIO LIMITED; RYE
SELECT BROAD MARKET INSURANCE
PORTFOLIO, LDC; RYE SELECT BROAD
MARKET INSURANCE FUND, L.P.; RYE
SELECT BROAD MARKET XL FUND, L.P.;
RYE SELECT BROAD MARKET XL
PORTFOLIO LIMITED; TREMONT
ARBITRAGE FUND, L.P.; TREMONT
ARBITRAGE FUND IRELAND; TREMONT
EMERGING MARKETS FUND – IRELAND;
TREMONT EQUITY FUND – IRELAND;
TREMONT INTERNATIONAL INSURANCE
FUND, L.P.; TREMONT LONG/SHORT
EQUITY FUND, L.P.; TREMONT MARKET
NEUTRAL FUND, L.P.; TREMONT MARKET
NEUTRAL FUND II, L.P.; TREMONT MARKET
NEUTRAL FUND LIMITED; TREMONT
OPPORTUNITY FUND LIMITED; TREMONT
OPPORTUNITY FUND II, L.P.; TREMONT
OPPORTUNITY FUND III, L.P.; RYE SELECT
EQUITIES FUND; TREMONT MULTI
MANAGER FUND; LIFEINVEST
OPPORTUNITY FUND LDC; OPPENHEIMER
ACQUISITION CORP.; MASSMUTUAL
HOLDING LLC; MASSACHUSETTS MUTUAL
LIFE INSURANCE CO.; SANDRA L. MANZKE
AND ROBERT I. SCHULMAN,

Defendants.

palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

h.      SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such customers, collectively, "Accountholders"). SIPC has expressly conferred upon the Trustee the power to enforce its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

i.      The Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

## THE DEFENDANTS

### A.    The Rye Funds

35.     Defendant Rye Select Broad Market Fund, L.P. ("Broad Market Fund") is a Delaware limited partnership organized in May 1994 under its original name of "American Masters Broad Market Fund, LP." The Broad Market Fund's principal place of business during the relevant period was located at 555 Theodore Fremd Avenue, Rye, New York 10580.

36.     The Broad Market Fund, which had a stated objective of seeking long term capital growth through, *inter alia,* investments primarily in securities through selected investment advisers, had a direct account with BLMIS that opened in 1994, with account number 1T0027. During all relevant times, almost all of the monies invested in the Broad Market Fund were given to Madoff and deposited with BLMIS. For all intents and purposes, upon information and belief, the Broad Market Fund is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.

-14-

investments. Manzke also personally benefitted from Oppenheimer's acquisition of Tremont Group in 2001.

59. Robert I. Schulman ("Schulman") is an individual who, upon information and belief, resides at 18 Green Valley Road, Armonk, New York 10504. Schulman joined Tremont in 1994. He served as President, co-CEO, and then sole CEO until he left the organization in July 2008. Schulman also served as Director for Tremont Group, Tremont Partners, and Tremont Bermuda. Significantly, Schulman also headed Tremont Group's Rye Investment Management division, which was responsible for managing single manager funds, including the Rye Funds that invested almost exclusively with BLMIS. Schulman was largely responsible for the Tremont Group's relationship with BLMIS, which steadily grew over time. He generally would meet with Madoff at least once or twice a year. Schulman also personally benefitted greatly from the fees Tremont charged to their clients for their Madoff investments, as well as from Oppenheimer's acquisition of Tremont Group in 2001.

60. Manzke and Schulman, who operated Tremont in and intentionally took advantage of the benefits of conducting transactions in the State of New York, have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

**F.   XL Funds**

61. The Rye Select Broad Market XL Fund, L.P. ("XL LP") is a Delaware limited partnership formed on July 13, 2006, with its principal place of business during the relevant period located at 555 Theodore Fremd Avenue, Rye, NY 10580. Tremont Partners acted as the General Partner of XL LP and was responsible for its day-to-day operations and investment management. XL LP sought to provide investors with long-term growth and a return linked to a three times levered exposure to the economic performance of the Broad Market Fund. XL LP

sought to obtain this return through synthetic investments in Broad Market Fund provided by swap transactions with financial institutions.

62.     Rye Select Broad Market XL Portfolio Limited ("XL Portfolio") is a Cayman Islands exempted company that was incorporated with limited liability in the Cayman Islands on February 10, 2006. XL Portfolio's registered office during the relevant period was located at Walkers SPV Limited, Walker House, KY1-9002, Mary Street, George Town, Grand Cayman, Cayman Islands. Tremont Partners acted as the investment manager for XL Portfolio. Similar to the domestic XL LP, XL Portfolio sought to provide investors with capital growth through exposure, on an approximate three times levered basis, to the Portfolio Limited Fund. Also like XL LP, XL Portfolio sought to achieve this return through synthetic investments in Portfolio Limited Fund provided by swap transactions with financial institutions. The XL Funds were managed and overseen by the same individuals at Tremont responsible for the Rye Funds. For all intents and purposes, upon information and belief, the XL Funds are insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.

63.     Upon information and belief, Madoff would not allow BLMIS customers to utilize leverage, or margin, directly in their accounts at BLMIS. As a result, the XL Funds entered into total return swaps with other financial institutions such as Lehman Brothers, HSBC, Fortis Bank, Scotia Bank, and ABN Amro, which provided a synthetic investment for XL LP in the Broad Market Fund and for XL Portfolio in the Portfolio Limited Fund. Both Broad Market Fund and Portfolio Limited Fund invested substantially all of their capital with BLMIS.

64.     Every transfer made by BLMIS that made its way to XL LP and XL Portfolio is a recoverable subsequent transfer of stolen BLMIS customer property. In addition, upon information and belief, Prime Fund transferred approximately $285 million to XL LP over the

life of the swap... To the extent the money transferred by Prime Fund to XL LP originated directly or indirectly from BLMIS, it too is a recoverable subsequent transfer of stolen BLMIS customer property.

66. XL LP and XL Portfolio, which were managed in and intentionally took advantage of the benefits of conducting transactions in the State of New York, have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

**G.    Tremont Funds**

66. Tremont Arbitrage Fund, L.P. ("Arbitrage Fund"), Tremont Arbitrage Fund Ireland ("Arbitrage Ireland"), Tremont Emerging Markets Fund – Ireland ("Emerging Markets – Ireland"), Tremont Equity Fund – Ireland ("Equity Fund – Ireland"), Tremont International Insurance Fund, L.P. ("International Insurance Fund"), Tremont Long/Short Equity Fund, L.P. ("Long/Short Fund"), Tremont Market Neutral Fund, L.P. ("Market Neutral Fund"), Tremont Market Neutral Fund II, L.P. ("Market Neutral II Fund"), Tremont Market Neutral Fund Limited ("Market Neutral Limited"), Tremont Opportunity Fund Limited ("Opportunity Limited"), Tremont Opportunity Fund II, L.P. ("Opportunity II Fund"), Tremont Opportunity Fund III, L.P. ("Opportunity III Fund"), Rye Select Equities Fund ("Equities Fund"), Tremont Multimanager Fund ("Multimanager Fund"), and LifeInvest Opportunity Fund LDC ("LifeInvest") are all funds of funds managed, advised, and/or overseen by Tremont Partners in Rye, New York, which were invested with BLMIS through the Rye Funds and/or XL Funds and accepted subsequent transfers through the Rye Funds and/or XL Funds.

67. Collectively, the Arbitrage Fund, Arbitrage Ireland, Emerging Markets – Ireland, Equity Fund – Ireland, Long/Short Fund, Market Neutral Fund, Market Neutral II Fund, Market Neutral Limited, Opportunity Limited, Opportunity II Fund, Opportunity III Fund, Equities Fund, Multimanager Fund, and LifeInvest shall be referred to herein as the "Tremont Funds."

EXHIBIT X

# RYE SELECT BROAD MARKET XL FUND, L.P.
## SUBSCRIPTION AGREEMENT

### Amount of Subscription: $ _22,950,000_

Rye Select Broad Market XL Fund, L.P.
c/o BNY Alternative Investment Services, Inc.
101 Barclay Street, 20th Floor
New York, New York 10286

**Re:**  **Rye Select Broad Market XL Fund, L.P. (the "Partnership")**
**Issuance of Class A and Class B Limited Partnership Interests ("Interests")**

**Investor Information** (*please print or type*):

Name of Investor (*no initials please*):

**Lakeview Investment, LP**

Nationality of Investor (if natural person)/
Jurisdiction of organization (if entity):

**Delaware**

Social Security or taxpayer identification number:

████8879

Date of birth (if natural person):

**Investor Type** (*please check one*):

__ Individual
__ Joint Tenants
__ Tenants in Common
XX Partnership
__ Corporation
__ Limited Liability Company
__ Trust
__ Foundation
__ Endowment
__ Employee Benefit Plan
(complete Exhibit A attached hereto)
__ Keogh Plan
(complete Exhibit A attached hereto)
__ Individual Retirement Plan
(complete Exhibit B attached hereto)
Other: (specify):

Name of person exercising investment discretion for investor
(trustee or fiduciary, etc.):

**Austin G. Bosarge - Vista Management, Co.**

**Subscription Information** (*please print or type*):

Amount of Subscription: U.S.$ _22,950,000_

Class of Interests: Class A _XXX_    Class B _____

[787693-1]

5

Name of the bank from which your payment to the Fund is being wired

(the "Wiring Bank"): Wells Fargo Bank

Bank Account Number: ████5028

Bank Address: 1203 Fourth Street, San Rafael, CA 94901


Is the Wiring Bank located in a FATF Country[*]? YES ☒  NO ☐


Are you a customer of the Wiring Bank? YES ☒  NO ☐ *(Please have your financial institution provide a letter in the form of Exhibit E attached hereto. Additionally, if you are an entity investor, please provide an Incumbency Certificate in the form of Exhibit C attached hereto.)*


**You must wire the payment from an account in your name.**

**FOR NATURAL PERSONS:**

<u>Education</u>

| <u>College or University</u> | <u>Degree and Year</u> | <u>Major Concentration</u> |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |

---

[*]   As of the date hereof, countries that are members of the Financial Action Task Force on Money Laundering (each, a "FATF Country") are:  Argentina, Australia, Austria, Belgium, Brazil, Canada, Denmark, Finland, France, Germany, Greece, Hong Kong, Iceland, Ireland, Italy, Japan, Luxembourg, Mexico, Kingdom of the Netherlands, New Zealand, Norway, Portugal, Singapore, Spain, Sweden, Switzerland, Turkey, United Kingdom and the United States.

L4279

☐ An incumbency certificate attesting to the title of the individual executing the Anti-Money Laundering Supplement on behalf of the prospective investor (a sample Incumbency Certificate is attached hereto as <u>Exhibit C</u>) and a photocopy of a government issued form of picture identification (*e.g.*, a passport or driver's licence) of such an individual.

☐ A letter of reference from a local office of a reputable bank or brokerage firm which is incorporated, or has its principal place of business located, in a FATF Country certifying that the prospective investor maintains an account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective investor's integrity (a sample Letter of Reference is attached hereto as <u>Exhibit E</u>).

☐ If the prospective investor is a privately-held entity, a completed copy of <u>Exhibit F</u> listing the name of each person who directly, or indirectly through intermediaries, is the beneficial owner of 10% or more of any voting or non-voting class of equity interests of the prospective investor.

☐ If the prospective investor is a trust, a completed copy of <u>Exhibit E</u> listing the current beneficiaries of the trust that have, directly or indirectly, 10% or more of any interest in the trust, the settlor of the trust and the trustees.

**FOR U.S. TAX-EXEMPT INVESTORS ONLY:**

If applicable, please indicate the basis on which the Investor is exempt from U.S. federal income taxation and please attach to this Subscription Agreement, when submitted to the General Partner, applicable written evidence of the tax-exempt status for purposes of U.S. federal income taxation of the intended investor:

_____

_____

_____

_____

**FOR INVESTMENT COMPANIES ONLY:**

Is the Investor an investment company, or a company that is excluded from the definition of investment company solely by reason of the provisions of either Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act of 1940, as amended (the "Company Act")?

Yes <u>X</u>   No <u>___</u>

If the answer to the question above is yes, please indicate which:   <u>Section 3(c)(1)</u>

If the answer to the question above is yes, please state the number of the Investor's beneficial owners:
<u>10</u>

L4280

**COMMUNICATIONS:**

Residence or Principal Place of Business Address:

Vista Management, Co.          abosarge@turningpointlaw.com
Name                          E-Mail Address:

100 Smith Ranch Road, Suite 116
Street

San Rafael, CA 94903
City, State, Zip Code

Attn: Austin G. Bosarge

( 415) 492-2041
Telephone No.

( 415) 492-2108
Facsimile No.

Mailing Address (*if different from above*)

_____
_____
_____
_____

Please send confirmation of a subscription for an interest, a copy of this Subscription Agreement and any other communications (including distribution, if any, and withdrawal proceeds checks) to *(initial one)*:

AGB          residence or principal business address above;
*(Initial)*

_____          mailing address above.
*(Initial)*

Special instructions regarding communication:

_____
_____
_____

[787693-1]                          10

L4281

**AUTHORIZATION OF AGENT(S):**

Set forth below are the names of persons authorized by the Investor to give and receive instructions between the Partnership and the Investor, together with their respective signatures. Such persons are the only persons so authorized until further notice to the Partnership signed by one or more of such persons.

*(Please attach additional pages if needed)*

Name                                    Signature

Richard M. Glantz

Austin G. Bosarge

L4282

**WIRING INSTRUCTIONS:**

Until further written notice to the Partnership signed by one or more of the persons listed above, funds may be wired to the Investor using the following instructions:

| | |
|---|---|
| Bank name: | **Wells Fargo Bank** |
| Bank address: | **1203 Fourth Street, San Rafaelm CA 94901** |
| ABA or CHIPS number: | **121-000-248** |
| Account name: | **Lakeview Investment, LP** |
| Account number: | ████**5028** |
| For further credit: | |

L4283

Ladies and Gentlemen:

The offer and sale of Class A and Class B limited partnership interests (the "Interests") in Rye Select Broad Market XL Fund, L.P., a Delaware limited partnership (the "Partnership"), to each Investor has not been registered under the Securities Act of 1933, as amended (the "Securities Act") or the securities laws of any jurisdiction, but rather is being made privately by the Partnership pursuant to the private placement exemption from registration provided in Section 4(2) of the Securities Act and Rule 506 of Regulation D ("Regulation D") promulgated thereunder by the United States Securities and Exchange Commission (the "SEC") on the basis of the Confidential Private Placement Memorandum of the Partnership, as the same may be updated, amended or modified from time to time (the "Memorandum").

The information requested in this Subscription Agreement is needed in order to ensure compliance with the applicable regulations and to determine whether (1) an investment in the Partnership by the Investor is suitable in light of the Investor's financial position, (2) the Investor meets certain minimum net worth tests to be deemed an "accredited investor" as defined in Regulation D and a "qualified purchaser" as defined in the Investment Company Act of 1940, as amended (the "Company Act"), and (3) has such knowledge and experience in financial and business matters that is capable of evaluating the merits and risks of the investment.

The Investor also understands and agrees that, although the Partnership will use its best efforts to keep the information provided in the answers to this Subscription Agreement strictly confidential, the Partnership may present this Subscription Agreement and the information provided in answers to it to such parties as it deems advisable if called upon to establish the availability under any applicable law of an exemption from registration of the Interests, the compliance with applicable law and any relevant exemptions thereto by the Partnership, the General Partner and their affiliates, if the contents thereof are relevant to any issue in any action, suit, or proceeding to which the Partnership, the General Partner or any of their affiliates is a party or by which it is or may be bound or if such information is otherwise required by the agents or employees of the General Partner or any of their affiliates in rendering services to the Partnership.

The Investor hereby agrees as follows:

## I. SUBSCRIPTION FOR AN INTEREST

The Investor agrees to become a limited partner of the Partnership (a "Limited Partner") and in connection therewith subscribes for and agrees to purchase an Interest in and to make a capital contribution ("Capital Contribution") to the Partnership on the terms provided for herein and in the Memorandum and in the limited partnership agreement of the Partnership (the "Partnership Agreement"). The minimum initial investment is U.S.$500,000, subject to the General Partner's discretion to reduce such amount. The Investor agrees to, and understands, the terms and conditions upon which the Interests are being offered, including, without limitation, the risk factors referred to in the Memorandum.

The Investor understands and agrees that the Partnership reserves the right to reject this subscription for an Interest for any reason or no reason, in whole or in part and at any time prior to acceptance thereof. In the event of rejection of this subscription, this Subscription Agreement shall have no force or effect. Upon acceptance of this subscription by the Partnership, the Investor shall be a Limited Partner. The Investor hereby agrees that by its execution of this Subscription Agreement and upon acceptance hereof by the Partnership, it shall become a party to the Partnership Agreement. The Investor shall sign and date the Limited Partner Signature Pages attached to the Partnership Agreement and promptly return them to the General Partner.

[787693-1]                                13

## II. ELIGIBILITY REPRESENTATIONS OF THE INVESTOR

**(A)** **General:**

*Initial one and complete blanks*

The Investor hereby warrants and represents that:

**AGB**
*(Initial)*

**(1)** If the Investor is an employee benefit plan, an endowment, a foundation, a corporation, partnership, trust or other legal entity, it is:

- organized under the laws of: **Delaware**

- has its principal place of business in: **California**

OR

_____
*(Initial)*

**(2)** If the Investor is an individual or if beneficial ownership of the Investor is held by an individual (for example, an Individual Retirement Account or Keogh Plan), such individual is of legal age and is a:

- citizen of:
- resident of:
- approximate net worth of the Investor: _____

**(B)** **Accredited Investor Status:**

*Initial all appropriate spaces on the following pages indicating the basis upon which the Investor qualifies as an accredited investor under Regulation D.*

*For Individual Investors Only*

_____
*(Initial)*

**(1)** The Investor hereby certifies that he/she is an accredited investor because he/she has an individual net worth, or with his/her spouse has a joint net worth, in excess of $1,000,000. *For purposes of this questionnaire, "net worth" means the excess of total assets at fair market value, including home, home furnishings and automobiles, over total liabilities.*

_____
*(Initial)*

**(2)** The Investor hereby certifies that he/she is an accredited investor because he/she has individual income (exclusive of any income attributable to his/her spouse) of more than $200,000 in each of the past two years, or joint income with his/her spouse in excess of $300,000 in each of those years, and such investor reasonably expects to reach the same income level in the current year.

_____
*(Initial)*

**(3)** The Investor hereby certifies that he/she is an accredited investor because he/she is a director, executive officer or general partner of the Partnership, or any director, executive officer or general partner of a general partner of the Partnership.

[787693-1]

14

*For Corporations, Foundations, Endowments, Partnerships, Limited Liability Companies, Limited
Partnerships or Limited Liability Partnerships*

AGB
*(Initial)*

(4) The Investor hereby certifies that it is an accredited investor because it has total assets
in excess of $5,000,000 and was not formed for the specific purpose of acquiring the
securities offered.

_____
*(Initial)*

(5) The Investor hereby certifies that it is an accredited investor because all of its equity
owners are accredited investors. *The General Partner, in its sole discretion, may
request information regarding the basis on which such equity owners are accredited.*

*For Employee Benefit Plans (Please complete Exhibit A attached hereto)*

_____
*(Initial)*

(6) The Investor hereby certifies that it is an accredited investor because it is an employee
benefit plan within the meaning of the United States Employee Retirement Income
Security Act of 1974, as amended ("ERISA"), and the decision to invest in the
Partnership was made by a plan fiduciary (as defined in Section 3(21) of ERISA),
which is either a bank, savings and loan association, insurance company or registered
investment adviser. The name of such plan fiduciary is:

_____

_____
*(Initial)*

(7) The Investor hereby certifies that it is an accredited investor because it is an employee
benefit plan within the meaning of ERISA and has total assets in excess of $5,000,000.

_____
*(Initial)*

(8) The Investor hereby certifies that it is an accredited investor because it is a plan
established and maintained by a state, its political subdivisions, or any agency or
instrumentality of a state or its political subdivisions for the benefit of its employees,
and has total assets in excess of $5,000,000.

*For Individual Retirement Accounts (Please complete Exhibit B attached hereto), Self-Directed
Benefit Plans and Keogh Plans (Please complete Exhibit A attached hereto)*

_____
*(Initial)*

(9) The Investor hereby certifies that it is an accredited investor because it is a self-
directed plan (i.e., a tax-qualified defined contribution plan in which a participant may
exercise control over the investment of assets credited to his or her account) in which
all persons directing the investment in the Partnership are accredited investors because
each participant has a net worth of at least $1,000,000 or has had an individual income
of at least $200,000 (or a joint income with spouse of at least $300,000) in each of the
last two years. *The General Partner, in its sole discretion, may request information
regarding the basis on which such participants are accredited.*

Total number of participants of the plan directing an investment in the Partnership: _____

[787693-1]                                                    15

L4286

**For Trusts**

_____
(Initial)

(4)    The Investor hereby certifies that it is a qualified purchaser because it was not formed for the specific purpose of acquiring Interests, and the trustee or other authorized person making decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in Items (1), (3) or (8) of this Section.

**For Employee Benefit Plans**

_____
(Initial)

(5)    The Investor hereby certifies that it is a qualified purchaser because it is an employee benefit plan that (i) owns not less than $25,000,000 in investments and (ii) does not permit its participants to decide whether and how much to invest in particular investment alternatives.

**For Qualified Institutional Buyers**

_____
(Initial)

(6)    The Investor hereby certifies that it is a qualified purchaser because it is a "qualified institutional buyer" as defined in Rule 144A under the Securities Act, acting for its own account, the account of another qualified institutional buyer, or the account of a qualified purchaser, _provided that_ (i) a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25,000,000 in securities of issuers that are not affiliated persons of the dealer; and (ii) a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

**For Knowledgeable Employees**

_____
(Initial)

(7)    The Investor hereby certifies that he/she is a qualified purchaser because he/she is an individual who is a "knowledgeable employee" as defined in Rule 3c-5 under the Company Act including, but not limited to, a director, executive officer, trustee, general partner, advisory board member, or an employee of the Partnership, the General Partner (other than an employee performing solely clerical, secretarial or administrative functions) who has participated in investment activities of the Company or a similar entity for at least twelve (12) months.

**For Other Entities**

A G B
(Initial)

(8)    The Investor hereby certifies that it is a qualified purchaser because it was not formed for the specific purpose of investing in the Company and is acting for its own account or for the accounts of other qualified purchasers for which it owns and invests on a discretionary basis not less than $25,000,000 in investments.

OR

The Investor hereby certifies that is a qualified purchaser because each beneficial owner of the Investor's securities is a qualified purchaser.

[787693-1]                                                18

L4287

**Plus, For all Investors Other Than Individuals**

_____
(Initial)
(9) The Investor is not an entity that is excepted from the definition of an "investment company" under the Company Act pursuant to Section 3(c)(1) or Section 3(c)(7); or

AGB
(Initial)
(10) The Investor is a 3(c)(1) or 3(c)(7) Company and does not have any direct "beneficial owners" that have held an interest in the Investor from on or before April 30, 1996 (a "Pre-April 30 Holder"); or

_____
(Initial)
(11) The Investor is a 3(c)(1) or 3 (c)(7) Company and has obtained consent to its treatment as a qualified purchaser from all of its Pre-April 30 Holders.

If the Investor is described in Item (3) or (4), the Investor may initial Item (12) instead of Item (11)

AGB
(Initial)
(12) The Investor is a 3(c)(1) or 3(c)(7) Company and has obtained consent to its treatment as a qualified purchaser from all of its directors, general partners or trustees.

If the Investor has initialed Item (10) or Item (11), the Investor must also respond to Item (13)

AGB
(Initial)
(13) No direct or indirect beneficial owner of the Investor is itself a 3(c)(1) or 3(c)(7) company which controls, is controlled by, or is under common control with the Investor.

If the Investor cannot initial Item (13) because it has a control relationship with a beneficial owner and is itself a 3(c)(1)/3(c)(7) Company, the Investor may be required to obtain consent from the security holders of such owners.

Note: In determining whether the $5 million or $25 million thresholds are met, investments can be valued at cost or market value as of a recent date provided that in the case of Commodity Interests, the amount of Investments shall be the value of the initial margin or option premium deposited in connection with such Commodity Interests and in each case, if investments have been acquired with indebtedness, the amount of indebtedness must be deducted in determining whether the threshold has been met.

**(D)      Foreign/Non-Foreign Status:**

_For U.S. Individuals_

_____
(Initial)
(1) The Investor hereby certifies that it is not a non-resident alien for purposes of income taxation (as such term is defined in the Internal Revenue Code of 1986, as amended, and Income Tax Regulations).

[787693-1]

19

L4288

*For U.S. Entities*

**AGB**
_____
*(Initial)*

(2)    The Investor hereby certifies that is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code of 1986, as amended, and Income Tax Regulations).

*For Foreign Individuals or Entities*

_____
*(Initial)*

(3)    The Investor certifies that it is a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code of 1986, as amended, and Income Tax Regulations).

**(E)    Benefit Plans Investor Status:**

*Please initial the following certifications as appropriate:*

_____
*(Initial)*

(1)    The Investor, an affiliate of the Investor, or the person or entity for which the Investor is acting is not a "benefit plan investor" as defined in 29 C.F.R. 2510.3-101(f)(2) (the "Plan Asset Regulation"). For purposes of illustration, "benefit plan investors" are pension plans, profit-sharing plans, or other "employee benefit plans" as defined in ERISA, regardless of whether the plans are subject to ERISA, and plans defined in Section 4975 of the Internal Revenue Code of 1986. "Benefit plan investors" also include simplified employee pension plans, KEOGH plans, individual retirement accounts, health insurance plans, life insurance plans, church or other charitable plans, governmental plans, and foreign plans. "Benefit plan investors" also include entities deemed under Department of Labor regulations to hold "plan assets" due to investments made in the entity by employee benefit plans and other such plans.

If the Investor is an entity, the Investor certifies that less than 25% of the value of each class of equity interests in the Investor (excluding any equity interests held by an individual or entity with discretionary authority or control over the equity interests of the Investor) is held by "benefit plan investors."

*Or*

_____
*(Initial)*

(2)    The Investor, an affiliate of the Investor, or the person or entity for which the Investor is acting is a "benefit plan investor" as defined in the Plan Asset Regulation.

If the Investor is a "benefit plan investor," please indicate whether the Investor is a plan defined in Section 4975 of the Internal Revenue Code of 1986 (e.g., an individual retirement account, Coverdell account, etc.):

_____          _____
     Yes                  No

[787693-1]                                   20

L4289

*(Initial)*

(3) The Investor is a life insurance company. Please indicate the relative percentages of the Investor's interest in the Interest being acquired with the assets of the Investor's general account and separate accounts:

_____ % is being acquired with the assets of the general account

_____ % is being acquired with the assets of one or more separate accounts

(4) If the Investor indicated in question (3) above that general account assets are being used to acquire the Investor's interest in the Interests, please complete the following:

_____ % of such general account assets used to acquire Interests represent "plan assets" within the meaning of the Plan Asset Regulation

*(Initial)*

(5) The Investor is a person who has discretionary authority or control[3] with respect to the assets of the Partnership or provides investment advice to the Partnership for a fee, direct or indirect, with respect to such assets or any affiliate of any such person[4] (a "Controlling Person").

**The Investor understands and agrees that the information supplied above will be utilized to determine whether benefit plan investors own less than 25% of the value of the Interests, as determined under the Plan Asset Regulation, both upon the original issuance of Interests and upon subsequent transfer of Interests.**

(F)     **General - For All Investors:**

*RGB*
*(Initial)*

The Investor hereby agrees that if any of the information in this Item II changes, the Investor will notify the General Partner within 10 days thereof. The Investor understands that the information contained in this Item II may be disclosed to the Internal Revenue Service by the Partnership and that any false statement contained in this Item II could be punished by fine, imprisonment or both.

## III.     REPRESENTATIONS AND COVENANTS OF THE INVESTOR

(A)     The Investor agrees that it will not sell or otherwise transfer the Interest without registration under the Securities Act or an exemption therefrom, and fully understands and agrees that it must bear the economic risk of its investment for an indefinite period of time (subject to limited rights of withdrawal provided in the Partnership Agreement) because, among other reasons, the Interest has not been registered under the Securities Act or under the securities laws of certain states and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless it is subsequently registered under the Securities Act and under applicable securities laws of such states or an exemption from such registration is available. The Investor acknowledges

---

[3] For purposes of this question, "control" means, with respect to a person other than an individual, the power to exercise a controlling influence over the management or policies of such person.

[4] For purposes of this question, "affiliate of a person" includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person.

L4290

that it is aware and understands that the Partnership is under no obligation to register the Interest on its behalf or to assist it in complying with any exemption from such registration under the Securities Act. The Investor also acknowledges that it is aware and understands that sales or transfers of the Interest are further restricted by the provisions of the Partnership Agreement and state securities laws. The Investor further acknowledges that it is aware and understands that the Partnership is not registered as an investment company under the Company Act, in reliance upon an exemption from such registration.

(B)     The Investor represents that it has received and read a copy of the Memorandum and the Partnership Agreement outlining, among other things, the organization and investment objectives and policies of, and the risks and expenses of an investment in, the Partnership and the Investor hereby adopts all provisions therein. The Investor represents that in making a decision to subscribe for an Interest, that it has relied solely upon the Memorandum, the Partnership Agreement and its own independent investigations. The Investor represents that it understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Partnership. The Investor represents that its investment in the Interest is consistent with its investment purposes and objectives and cash flow requirements and that its investment will not adversely affect its overall need for diversification and liquidity. The Investor represents that it is not subscribing pursuant hereto for any Interest as a result of or subsequent to (a) any advertisement, article, notice or other communications published in any newspaper, magazine or similar media or broadcast over television or radio, or (b) any seminar or meeting whose attendees, including the Investor, had been invited as a result of, subsequent to or pursuant to any of the foregoing.

(C)     The Investor represents that it has not reproduced, duplicated or delivered the Memorandum or this Subscription Agreement to any other person, except its own professional advisors or as instructed by the General Partner.

(D)     The Investor represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Interest and that it is able to bear such risks, and has obtained, in its judgment, sufficient information from the Partnership or the Partnership's authorized representatives to evaluate the merits and risks of such investment. The Investor represents that it has evaluated the risks of investing in the Interest and has determined that the Interest is a suitable investment for it.

(E)     The Investor represents that it can afford a partial or complete loss of its investment in the Interest, can afford to hold the investment in the Interest for an indefinite period of time and acknowledges that it is aware and understands that distributions may be paid in cash or in kind.

(F)     The Investor represents that it is acquiring the Interest subscribed for herein for its own account, for investment purposes only and not with a view to distribute or resell such Interest, either as a whole or in part.

(G)     The Investor acknowledges that it is aware of and understands the method of compensation of the General Partner by the Partnership as set forth in the Partnership Agreement. The Investor acknowledges and agrees that the Partnership Agreement constitutes an arm's length arrangement with respect to the receipt of net cash proceeds which may create an incentive for the General Partner to cause the Partnership to make investments that are riskier or more speculative than would be the case if this allocation were not made.

[787693-1]                                    22

L4291

(H)     The Investor acknowledges that it understands and is aware that the General Partner has the authority to allocate transaction costs to obtain research, investment management related services and equipment as set forth in the Memorandum. The Investor acknowledges that it understands that by signing this Subscription Agreement that it expressly consents to any arrangement pursuant to which the General Partner obtains such products and services.

(I)     The Investor acknowledges that it understands that the General Partner may open "average price" accounts with brokers, in which purchase and sale orders placed during a trading day on behalf of the Partnership and other clients or affiliates of the General Partner and its affiliates are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

(J)     If the Investor is an employee benefit plan (a "Plan"), the fiduciary executing this Subscription Agreement on behalf of the Plan (the "Fiduciary") represents and warrants to the Partnership that:

(1)     the Plan is not a participant-directed defined contribution plan unless each participant directing an investment in the Company is an accredited investor and a qualified purchaser;

(2)     the Fiduciary has considered a number of factors with respect to the Plan's investment in the Interest and has determined that, in view of such considerations, the purchase of the Interests is consistent with the Fiduciary's responsibilities under ERISA. The Fiduciaries of such Plan represent and warrant that they have been informed of and understand the Partnership's investment objectives, policies and strategies and that the decision to invest such Plan's assets in the Interests was made with appropriate consideration of relevant investment factors with regard to such Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA. Such factors include, but are not limited to:

(a)     the role such investment or investment course of action plays in that portion of the Plan's portfolio that the Fiduciary manages;

(b)     whether the investment or investment course of action is reasonably designed as part of that portion of the portfolio managed by the Fiduciary to further the purposes of the Plan, taking into account both the risk of loss and the opportunity for gain that could result therefrom;

(c)     the composition of that portion of the portfolio that the Fiduciary manages with regard to diversification;

(d)     the liquidity and current rate of return of that portion of the portfolio managed by the Fiduciary relative to the anticipated cash flow requirements of the Plan;

(e)     the projected return of that portion  of the portfolio managed by the Fiduciary relative to the funding objectives of the Plan;

(f)     an investment in the Partnership is permissible under the documents governing the Plan and the Fiduciary; and

(g)     the risks associated with an investment in the Partnership.

[787693-1]                                              23

L4292

(3)     the Fiduciary (a) is responsible for the decision to invest in the Partnership; (b) is independent of the Partnership, the General Partner or any of their affiliates; and (c) is qualified to make such investment decision and

(4)     it will promptly dispose of its Interests in a manner consistent with the Partnership's restrictions on transfer if it is becoming a benefit plan investor or a controlling person and it has been notified that its ownership of the Interests would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Interests being held by benefit plan investors.

(K)     If the Investor is, or is acting on behalf of, a benefit plan investor (as defined in the Plan Asset Regulation), the Investor represents and warrants that, its purchase, ownership and disposition of the Interests will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental or church plan, any similar federal, state or local law) for which an exemption is not available.

(L)     The Investor represents that it has consulted with its own advisors and is fully informed as to the legal and tax requirements within the Investor's own country (countries) and U.S. tax considerations applicable to Investor's purchase of the Interests.

(M)     The Investor acknowledges that it is aware and understands that:

(1)     no federal or state agency has passed upon the Interests or made any findings or determination as to the fairness or merits of this investment;

(2)     there are risks of loss of investment incidental to the purchase of the Interest, including those summarized in the Memorandum; and

(3)     the General Partner and each of its affiliates may provide similar services to investment funds and managed accounts in which the Investor will have no interest and there are other potential conflicts as described in the Memorandum.

(N)     The Investor represents that the execution, delivery and performance by the Investor of this Subscription Agreement are within the powers of the Investor, have been duly authorized and will not constitute or result in a breach or default under, or conflict with, any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which the Investor is a party or by which the Investor is bound, and, if the Investor is not an individual, will not violate any provisions of the incorporation papers, by-laws, indenture of trust or partnership agreement, as may be applicable, of the Investor. The Investor represents that the signature on this agreement is genuine, and the signatory, if the Investor is an individual, has legal competence and capacity to execute the same, or, if the Investor is not an individual, the signatory has been duly authorized to execute the same, and this Subscription Agreement constitutes a legal, valid and binding obligation of the Investor, enforceable in accordance with its terms.

(O)     The Investor acknowledges that it is aware and understands that Tannenbaum Helpern Syracuse & Hirschtritt LLP acts as counsel to the Partnership and as counsel to the General Partner and their respective affiliates. The Investor also acknowledges that it is aware and understands that, in connection with this offering of Interests and subsequent advice to the Partnership, Tannenbaum Helpern Syracuse & Hirschtritt LLP will not be representing Investors in the Partnership, including the Investor, and no independent counsel has been retained by the Partnership to represent Investors in the Partnership.

[787693-1]                                                24

(P)    The Investor understands that the Partnership intends to comply with Section 3(c)(7) of the Company Act, which will permit private investment companies (such as the Partnership) to sell their interests, on a private placement basis, to an unlimited number of "qualified purchasers" as defined in Section 2(a)(51) of the Company Act. The Investor understands that, for this reason, the General Partner, in its discretion, may offer Interests only to Investors that it believes will meet the definition of qualified purchaser.

(Q)    The Investor covenants to advise the General Partner in writing if any warranty or any information contained herein becomes untrue.

(R)    The Investor has received a copy of the General Partner's Form ADV Part II a minimum of 48 hours prior to entering into this Agreement.

## IV.    GENERAL

(A)    The Investor agrees to indemnify and hold harmless the Partnership, the General Partner, the Administrator and their respective officers, directors, employees, agents and shareholders, and each other person, if any, who controls or is controlled by any thereof, within the meaning of Section 15 of the Securities Act, against any and all loss, liability, claim, damage, cost and expense whatsoever (including, but not limited to, legal fees and disbursements and any and all other expenses whatsoever incurred in investigating, preparing for or defending against any litigation, arbitration proceeding, or other action or proceeding, commenced or threatened, or any claim whatsoever) arising out of or in connection with, or based upon or resulting from, (a) any false representation or warranty or breach or failure by the Investor to comply with any covenant or agreement made by the Investor in this Subscription Agreement or in any other document furnished by the Investor to any of the foregoing in connection with this transaction or (b) any action for securities law violations instituted by the Investor which is finally resolved by judgment against the Investor. Notwithstanding anything to the contrary, the foregoing shall not be construed so as to relieve (or attempt to relieve) the General Partner of any liability to the extent (but only to the extent) such liability may not be waived, modified or limited under applicable law (including liability under U.S. securities laws which, under certain circumstances, impose liability even on persons acting in good faith), but shall be construed so as to effectuate the foregoing provisions to the fullest extent permitted by law.

(B)    The Investor, as principal, hereby appoints the General Partner as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, acknowledge, swear to and file:

(1)    any partnership certificate, business certificate, fictitious name certificate, amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Partnership, or required by any applicable federal, state, or local or foreign law;

(2)    the Partnership Agreement of the Partnership and any amendment duly approved as provided therein; and

(3)    any and all instruments, certificates and other documents which may be deemed necessary or desirable to effect the winding-up and termination of the Partnership (including, but not limited to, a notice of dissolution of the Partnership).

This power of attorney is coupled with an interest, is irrevocable, and shall survive and shall not be affected by the subsequent death, disability, incompetence, termination, bankruptcy, insolvency or dissolution of the Investor, *provided, however,* that this power of attorney will terminate upon the substitution of another

[787693-1]                                                      25

Limited Partner for all of the Investor's investment in the Partnership, upon the withdrawal of the Investor from the Partnership or upon the redemption of all of the Interest owned by the Investor.

(C)     This Subscription Agreement (i) shall be binding upon the Investor and the heirs, legal representatives, successors, and permitted assigns of the Investor and shall inure to the benefit of the Partnership and its successors and assigns, (ii) shall be governed, construed and enforced in accordance with the laws of Delaware, regardless of the conflicts of law provisions thereof, (iii) shall survive the acceptance of the Investor as a limited partner of the Partnership and (iv) shall, if the Investor consists of more than one person, be the joint and several obligation of each of such persons.

(D)     The Investor hereby irrevocably agrees that any suit, action or proceeding with respect to this Subscription Agreement and any or all transactions relating hereto and thereto may be brought in U.S. federal and state courts in the State of New York. The Investor hereby irrevocably submits to the jurisdiction of such courts with respect to any such suit, action or proceeding and agrees and consents that service of process as provided by U.S. federal and New York law may be made upon the Investor in any such suit, action or proceeding brought in any of said courts, and may not claim that any such suit, action or proceeding has been brought in an inconvenient forum. The Investor hereby further irrevocably consents to the service of process out of any of the aforesaid courts, in any such suit, action or proceeding, by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to the Investor at the address of the Investor then appearing on the records of the Partnership. Nothing contained herein shall affect the right of the Partnership to commence any action, suit or proceeding or otherwise to proceed against the Investor in any other jurisdiction or to serve process upon the Investor in any manner permitted by any applicable law in any relevant jurisdiction.

(E)     If any provision of this Subscription Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such applicable law. Any provision hereof which may be held invalid or unenforceable under any applicable law or in any particular instance shall not affect the validity or enforceability of any other provisions hereof or of such provision in any other instance, and to this extent the provisions hereof shall be severable.

## V.     TRUSTEE, AGENT, REPRESENTATIVE, NOMINEE OR OTHER THIRD PARTIES

If the Investor is acting as trustee, agent, representative or nominee for a subscriber (a "Beneficial Owner"), the Investor understands and acknowledges that the representations, warranties and agreements made herein are made by the Investor with respect to the Investor *and* with respect to the Beneficial Owner. The Investor further represents and warrants that it has all requisite power and authority from said Beneficial Owner to execute and perform the obligations under this Subscription Agreement. The Investor also agrees to indemnify the Partnership, the General Partner and their officers and agents for any and all costs, fees and expenses (including legal fees and disbursements) in connection with any damages resulting from the Investor's misrepresentation or misstatement contained herein, or the assertion of the Investor's lack of proper authorization from the Beneficial Owner to enter into this Subscription Agreement or perform the obligations hereof.

If the Investor enters into a swap, structured note or other derivative instrument, the return from which is based in whole or in part on the return of the Partnership (the "Swap") with a third party (a "Third Party"), the Investor represents and warrants that with respect to a Third Party entering into a Swap: (a) the Third Party is authorized under its constitutional documents (e.g., certificate of incorporation, by-laws, partnership agreement or trust agreement) and applicable law to enter into the Swap and would also be so authorized to invest directly into the Partnership; (b) the Third Party has received and reviewed a copy of the Memorandum, the Limited Partnership Agreement and the Subscription Agreement; (c) the Third Party acknowledges that

L4295

the Partnership and its affiliates are not responsible for the legality, suitability or tax consequences of the Swap and that the Investor is not an agent of the Partnership; and (d) the Third Party is a "qualified eligible participant" under the Commodity Exchange Act, as amended, an "accredited investor" under Regulation D and a "qualified purchaser" under the Company Act. The Investor also agrees to indemnify the Partnership, the General Partner and their officers and agents for any and all costs, fees and expenses (including legal fees and disbursements) in connection with any damages resulting from the Investor's misrepresentation or misstatement contained herein. Nothing herein constitutes an agreement or statement by the Partnership as to the legality of a Swap or the suitability of a Swap for the Third Party.

## VI.   ADDITIONAL INFORMATION AND SUBSEQUENT CHANGES IN THE FOREGOING REPRESENTATIONS

The General Partner and/or the Administrator may request from the Investor such additional information as it may deem necessary to evaluate the eligibility of the Investor to acquire an Interest, and may request from time to time such information as it may deem necessary to determine the eligibility of the Investor to hold an Interest or to enable the General Partner and the Administrator to determine the Partnership's compliance with applicable regulatory requirements or tax status, and the Investor shall provide such information as may reasonably be requested.

Each person acquiring an Interest must satisfy the foregoing investor eligibility criteria both at the time of subscription and at all times thereafter until such person ceases to be a Limited Partner of the Partnership. Accordingly, the Investor agrees to notify the General Partner and the Administrator promptly if there is any change with respect to any of the foregoing information or representations and to provide the General Partner and the Administrator with such further information as the General Partner and/or the Administrator may reasonably require. In addition, the Investor agrees that at any time in the future at which the Investor may acquire additional Interests, the Investor shall be deemed to have reaffirmed, as of the date of such acquisition of additional Interests, each and every representation made by the Investor in this Subscription Agreement, except to the extent modified in writing by the Investor and consented to by the Partnership.

The Subscription Agreement and the Partnership Agreement constitute the entire arrangement and understanding between the parties hereto regarding its subject matter, and supersede any prior or contemporaneous agreements, arrangements and understandings, written or oral, between the parties regarding the same.

## VII.   ANTI-MONEY LAUNDERING REPRESENTATIONS

(A)     The Investor represents that all evidence of identity provided in connection with the Subscription Agreement is true and correct and all related information furnished is genuine and accurate.

(B)     The Investor agrees to provide any information deemed by the Partnership, the Administrator and/or the General Partner, from time to time and in its sole and absolute discretion, necessary to comply with any anti-money laundering program that the Partnership, the Administrator and/or the General Partner may, either presently or in the future, adopt and any related responsibilities. The Investor agrees and acknowledges that in the event of delay or failure by the Investor to produce any information requested in this Subscription Agreement or required for verification purposes, the Partnership or the Administrator on the Partnership's behalf may refuse to accept the subscription.

(C)     The Investor represents and covenants that neither it, nor any person controlling, controlled by, or under common control with it, nor any person having a beneficial interest in it, is an individual, organization, or entity listed on the List of Specially Designated Nationals and Blocked Persons (the

[787693-1]                                            27

L4296

"OFAC Control List") maintained by the U.S. Office of Foreign Assets Control ("OFAC")[5], and that it is not investing and will not invest in the Partnership on behalf of or for the benefit of any individual, organization, or entity listed on the OFAC Control List.

(D)     The Investor represents that (i) the amounts contributed by it to the Partnership were not and are not directly or indirectly derived from activities that contravene U.S. federal or state laws or regulations and international laws and regulations, including anti-money laundering laws and regulations, and (ii) the proceeds from the Investor's investment in the Partnership will not be used to finance any illegal activities.

(E)     The Investor agrees and acknowledges (i) that additional subscriptions by the Investor may be refused and/or (ii) that requests for withdrawals may be delayed or declined if the General Partner reasonably believes it does not have satisfactory evidence of the Investor's identity.

(F)     The Investor agrees and acknowledges that, if, following its subscription in the Partnership and/or, the General Partner reasonably believes that the Investor is listed on the OFAC Control List or has otherwise breached its representations and covenants as to its identity, the General Partner may be obligated to block the Investor's investment in accordance with applicable law, and the Investor shall have no claim against the General Partner for any form of damages as a result of blocking the investment.

(G)     If the Investor is a "fund of funds" or an entity that invests on behalf of others, the Investor, in addition to and not by way of limiting the foregoing, represents and certifies that it is aware of the requirements of the USA PATRIOT Act of 2001, and rules and regulations promulgated thereunder and other applicable anti-money laundering measures in any jurisdiction (collectively, the "AML Rules") and that it has adopted anti-money laundering policies and procedures in place reasonably designed to verify the identity of its beneficial owners or underlying investors, as the case may be, and their respective sources of funds. Such policies and procedures are properly enforced and are consistent with such AML Rules. The Investor represents and certifies that to the best of its knowledge, the beneficial owners or investors, as the case may be, are not individuals, entities, or countries that may subject the Partnership or any of its affiliates to criminal or civil violations of any AML Rules. The Investor agrees and acknowledges that it is to furnish a copy of its anti-money laundering policies and procedures to the Partnership when requested. Among its other obligations hereunder, the Investor agrees to promptly notify the Partnership if the foregoing representation and certification becomes inaccurate.

(H)     Investor represents that:

(1)     it is not a Senior Foreign Political Figure[6], a member of a Senior Foreign Political Figure's Immediate Family[7], and/or any Close Associate[8] of a Senior Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been

---

[5] Available at http://www.ustreas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf

[6] The term "senior foreign political figure" is defined to mean a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation.

[7] The term "immediate family" is defined to mean the parents, siblings, spouse, children and in-laws of a senior foreign political figure.

[8] The term "close associate" is defined to mean a person who is widely and publicly known to maintain an unusually close relationship with a senior foreign political figure.

[787693-1]                                28

L4297

designated by the U.S. Treasury as warranting special measures due to primary money laundering concerns;

(2) it is <u>not</u> a <u>former</u> Senior Foreign Political Figure residing in a non-cooperative country or territory or a jurisdiction that has been designated as warranting special measures due to primary money laundering concerns;

(3) it is <u>not</u> resident in, or organized or chartered under the laws of a jurisdiction that has been designated by the U.S. Secretary of Treasury under Sections 311 and 312 of the USA PATRIOT Act as warranting special measures due to primary money laundering concerns;

(4) it is <u>not</u> a Foreign Shell Bank as the term is defined in the USA PATRIOT Act; and

(5) its subscription funds do not originate from, nor will they be routed through, an account maintained at a Foreign Shell Bank, an "offshore bank,"[9] or a bank organized or charted under the laws of a jurisdiction deemed to be a non-cooperative country or territory ("NCCT")[10].

- **Investors who are natural persons from non-FATF member jurisdictions must complete and return EXHIBIT E to the General Partner along with the Investor's signed Subscription Agreement.**

- **Investors who are entities from non-FATF member jurisdictions must complete and return EXHIBITS C, E, F (if privately held) and G (if a trust) to the General Partner along with the Investor's signed Subscription Agreement.**

- **Investors who are funds of funds from non-FATF member jurisdictions must complete and return EXHIBITS C, E, F (if privately held) and G (if a trust) to the General Partner along with the Investor's signed Subscription Agreement.**

- **Investors who are entities from FATF member jurisdictions must complete and return EXHIBITS C and D (if an entity subscribing on behalf of third parties) to the General Partner along with the Investor's signed Subscription Agreement.**

- **Investors who are funds of funds from FATF member jurisdictions must complete and return EXHIBITS C and D to the General Partner along with the Investor's signed Subscription Agreement.**

---

[9] The term "offshore bank" refers to a foreign bank that is barred, pursuant to its banking license, from conducting banking activities with the citizens of, or with the local currency of, the country that issued the license.

[10] The Financial Action Task Force on Money Laundering ("FATF") has designated certain countries or territories as NCCTs. The list of countries or territories deemed to be NCCTS is available at: http://www1.oecd.org/fatf.

L4298

IN WITNESS WHEREOF, the Investor has executed this Subscription Agreement as of the date set forth below under penalties of perjury.

Date: ___July 25___ ,2007

*For Individual Investors:*

_____
Signature

_____
(Please Type Name)

*For Investors other than Individuals:*

__Lakeview Investment, LP__
(Please Type or Print Name of Investor)

By: _____
Signature

__Austin G. Bosarge__
(Please Type or Print Name of Signatory)

Title: __Vice President – Vista Management, CC__
                                    __General Partner__

*Name of Trustees or Other Fiduciaries Exercising Investment*
*Discretion with Respect to Benefit Plan or Trust*

| *Signature* | *Printed Name* | *Title* |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

The undersigned, being the custodian of the above named individual retirement account, hereby accepts and agrees to this subscription.

By: _____
Signature of Authorized Signatory

_____
Name of Custodian (Print)

_____
Name of Authorized Signatory (Print)

IN WITNESS WHEREOF, the Investor has executed this Subscription Agreement as of the date set forth below under penalties of perjury.

Date: ___July 25_____, 2007

*For Individual Investors:*

_____
Signature

_____
(Please Type Name)

*For Investors other than Individuals:*

Lakeview Investment, LP
_____
(Please Type or Print Name of Investor)

By: _____
Signature

Austin G. Bosarge
_____
(Please Type or Print Name of Signatory)

Title: Vice President - Vista Management,Co
_____
General Partner

*Name of Trustees or Other Fiduciaries Exercising Investment*
*Discretion with Respect to Benefit Plan or Trust*

| *Signature* | *Printed Name* | *Title* |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

The undersigned, being the custodian of the above named individual retirement account, hereby accepts and agrees to this subscription.

By: _____        _____
Signature of Authorized Signatory                Name of Custodian (Print)

_____
Name of Authorized Signatory (Print)

SET 1 OF 2

## RYE SELECT BROAD MARKET XL FUND, L.P.

### LIMITED PARTNERSHIP AGREEMENT

### LIMITED PARTNER SIGNATURE PAGE

By its signature below, the undersigned hereby agrees that effective as of the date of its admission to Rye Select Broad Market XL Fund, L.P. as a Limited Partner it shall (i) be bound by each and every term and provision of the Limited Partnership Agreement of Rye Select Broad Market XL Fund, L.P., as the same may be duly amended from time to time in accordance with the provisions thereof, and (ii) become and be a party to said Limited Partnership Agreement of Rye Select Broad Market XL Fund, L.P.

Lakeview Investment, LP
(Type or Print Name)

(Signature)

Austin G. Bosarge, Vice President
Vista Management, Co - General Partner
(Representative capacity, if any)

July 25, 2007
Date

*(Page 1 of 2)*

L4301

SET 2 OF 2

## RYE SELECT BROAD MARKET XL FUND, L.P.

### LIMITED PARTNERSHIP AGREEMENT

### LIMITED PARTNER SIGNATURE PAGE

By its signature below, the undersigned hereby agrees that effective as of the date of its admission to Rye Select Broad Market XL Fund, L.P. as a Limited Partner it shall (i) be bound by each and every term and provision of the Limited Partnership Agreement of Rye Select Broad Market XL Fund, L.P., as the same may be duly amended from time to time in accordance with the provisions thereof, and (ii) become and be a party to said Limited Partnership Agreement of Rye Select Broad Market XL Fund, L.P.

Lakeview Investment, LP
_____
(Type or Print Name)

_____
(Signature)
Austin G. Bosarge –Vice President
Vista Management, Co – General Partner
_____
(Representative capacity, if any)

July 25, 2007
_____
Date

*(Page 2 of 2)*

L4302

**ACKNOWLEDGMENT**

State of California )
              ss.:
County of Marin )

On this 25th day of July , 2007, before me personally appeared
Austin Bosarge
who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to or who executed the foregoing instrument in his/her personal or authorized capacity, and who duly acknowledged to me that execution of the same is his/her own free act and deed and made with appropriate authority.

My Commission Exp.

DECHEN LAMA
Commission # 1667690
Notary Public - California
Marin County
My Comm. Expires Aug 13, 2010

Notary Public

*Notary: Please complete state, county, date and names of all persons signing and affix notarial seal.*

---

**For Partnership Use Only**

**Do not write below this point**

**Pursuant to the Partnership Agreement, the subscription is hereby accepted in the amount set forth below and the Investor is hereby admitted as a Limited Partner as of _____, _____.**

Rye Select Broad Market XL Fund, L.P.

Accepted Subscription Amount $

By:     Tremont Partners, Inc.
         General Partner

By:     _____
         Name:
         Title:

**EXHIBIT A**

**Employee Benefit Plans**

To:    **Tremont Partners, Inc. (the "General Partner")**

Re:    **Letter of Independent Investment Powers**
        **Rye Select Broad Market XL Fund, L.P.**

I (or we as applicable) certify that the individual or individuals named below are the trustees of, the named fiduciaries of or the investment managers of the _____ (the "Plan"). The undersigned have sole and absolute discretion to make investment decisions on behalf of the Plan and assume full responsibility for such investment decisions.

The Plan has not given discretionary authority or control respecting the management of the Plan to the General Partner or any of their agents. None of the General Partner or any of its agents are fiduciaries as to the Plan, nor do they exercise any authority or control respecting management or disposition of the Plan assets.

The responsibility and authority for investment decisions, including the decision to enter into the Subscription Agreement is solely that of the undersigned. I represent that I have made the decision only after receiving and reviewing the Memorandum, that the decision to enter into this investment is freely and independently made by me and that I accept full fiduciary responsibility with respect thereto. All fiduciaries are to sign and date below.

I/we certify that I/we am/are authorized to execute this letter of Independent Investment Powers on behalf of the Plan indicated above.

Name of Fiduciary_____

Capacity _____

Address _____

Phone Number _____

Signature _____ Date _____

**EXHIBIT B**

**to be Executed by IRA Beneficiary**

To:    Tremont Partners, Inc. (the "General Partner")

Re:    Letter of Independent Investment Powers
        Rye Select Broad Market XL Fund, L.P.

I certify that the individual named below is the sole beneficiary of the IRA custodied at
_____ (the "IRA"), which is making an investment
in the Partnership. The undersigned has sole and absolute discretion to make investment decisions on behalf
of the IRA and assumes full responsibility for such investment decisions.

The IRA Beneficiary has not given discretionary authority or control respecting the management of the IRA
to the General Partner or any of its agents. None of the General Partner or any of its agents are fiduciaries as
to the IRA, nor do they exercise any authority or control respecting management or disposition of the IRA
assets.

The responsibility and authority for investment decisions, including the decision to enter into the
Subscription Agreement for Interests of the Partnership is solely that of the undersigned. I represent that I
have made the decision only after receiving and reviewing the Memorandum, that the decision to enter into
such investment is freely and independently made by me and that I accept full fiduciary responsibility with
respect thereto.

Name of IRA Beneficiary_____

Address _____

Phone Number _____

Signature _____ Date _____

## EXHIBIT C

## FORM OF INCUMBENCY CERTIFICATE

The undersigned, being the President of Vista Management, Co, a corporation organized under the laws of California (the "Company"), does hereby certify on behalf of the Company that the persons named below are directors and/or officers of the Company and that the signature at the right of said name, respectively, is the genuine signature of said person and that the persons listed below are each an authorized signatory for the Company.

| Name | Title | Signature |
|------|-------|-----------|
| Richard M. Glantz | President | |
| Austin G. Bosarge | Vice President | |

*IN WITNESS WHEREOF, the undersigned has hereunto set his hand as of the* 25th *day of* July ,2007.

Name: Richard M. Glantz
Title: President

THE UNDERSIGNED, Austin G. Bosarge, a duly authorized Vice President of the Company, does hereby certify that Richard M. Glantz is a duly authorized Officer of Vista Management, Co. and that the signature set forth above is his true and correct signature.

IN WITNESS WHEREOF, the undersigned has executed this certificate as of the 25th day of July ,2007.

Name: Austin G. Bosarge
Title: Vice President

L4306

**EXHIBIT F**

**BENEFICIAL OWNERSHIP INFORMATION**

**To Be Completed By Entity Investors That Are Privately Held Entities**

**Instructions:** Please complete and return this <u>EXHIBIT F</u> and provide the name of every person who is directly, or indirectly through intermediaries, the beneficial owner of 10% or more of any voting or non-voting class of equity interests of the Investor. If the intermediary's shareholders or partners are not individuals, continue up the chain of ownership listing their 10% or more equity interest holders until individuals are listed. If there are no 10% beneficial owners, please write none.

| Full Name | If Shareholder is an Individual, Insert Name and Address of Principal Employer and Position | Citizenship (for Individuals) or Principal Place of Business (for Entities) |
|---|---|---|
| David Lustig | Retired | US |
| | | |
| | | |
| | | |
| | | |

# EXHIBIT Y

# Wire Transfer Confirmation



**Date**
JULY 31, 2007

**Account number**
⬛⬛⬛⬛5028

LAKEVIEW INVESTMENT LP
100 SMITH RANCH RD STE 116
SAN RAFAEL CA  94903-1979

Page        1

---

*For Questions or Address Corrections, Please Contact Your Store or Account Officer*

| Transactions Description | Debit | Credit |
|---|---|---|

FWO: 0731I1B7039R002277
AZC: D/⬛⬛⬛⬛5028        TRN: 20070731-072854          $22,950,000.00
VALUE DATE: 07/31/2007       CURRENCY CODE: USD
TIME: 13:17:15.06            CURRENCY RATE:

BBK: BANK OF NEW YORK one wall st, new york, ny 10286
NEW YORK                                 NY
BNFACCT: ⬛⬛⬛⬛0-523
BNF: rye select broad market xl fund, LP 101 barclay st
new york, ny 10286
RFB: FW00531211483331

|  | SUMMARY OF WIRES: |  |
|---|---|---|
| TYPE | NUMBER | TOTAL |
| DEBITS | 1 | $22,950,000.00 |
| CREDITS | 0 | $.00 |

L4272

# EXHIBIT Z

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina L. Griffin
Thomas L. Long
Kathryn M. Zunno
Catherine E. Woltering

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated)<br><br>Adv. Pro. No. 10-05354 (BRL) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>ABN AMRO BANK N.V. (presently known as THE ROYAL BANK OF SCOTLAND, N.V.), and RYE SELECT BROAD MARKET XL FUND, LP,<br><br>Defendants. | 11 Civ. 06878 (JSR)<br><br>**AMENDED COMPLAINT** |

RECEIVED
2012 AUG -8 P 4: 21
US DISTRICT COURT SDNY

08-01789-smb Doc 16273-3 Filed 04/03/17 Entered 04/03/17 18:34:40 Exhibit W -
(part 3) Pg 42 of 95
Case 1:11-cv-06878-JSR Document 32 Filed 08/08/12 Page 21 of 126

$318,000 of these funds to Rye XL Portfolio.[8] The Insurance Portfolio Fund transfers to Rye XL

Portfolio are set forth below. (*See also* Exhibit N.)



**B.      Defendant Rye XL LP's Onshore Swap Agreement with Defendant ABN/RBS**

70.      Defendant Rye XL LP promised its investors returns that were three times the

return of Broad Market. At various times from inception through December 11, 2008, Defendant

Rye XL LP made independent decisions to use the proceeds of investors' subscription and/or

other assets to fund swap agreements with third party leverage providers, including, but not

limited to, ABN/RBS. These swap agreements provided Defendant Rye XL with three times the

returns of Broad Market, the swaps' so-called "reference asset."

71.      On November 1, 2007, Defendant Rye XL LP and Defendant ABN/RBS entered

into one such swap agreement (the "Onshore Swap"). Similar to a traditional loan, the Swap

required Rye XL LP to post collateral with ABN/RBS. On November 1, 2007, Defendant Rye

XL LP provided ABN/RBS with $7.5 million of initial collateral. Upon information and belief,

Defendant Rye XL LP used BLMIS customer property subsequently transferred to it from Prime

Fund and/or Broad Market to fund this $7.5 million of initial collateral.

72.      As discussed more fully below, between February 2007 and August 2008, Rye

XL LP transferred a total of $80 million in additional collateral to ABN/RBS. Upon information

and belief, Defendant Rye XL LP used BLMIS customer property subsequently transferred to it

from Prime Fund and/or Broad Market to fund the $80 million of additional collateral. Under

the Onshore Swap, ABN/RBS agreed to provide Defendant Rye XL LP with an amount equal to

---

[8] The Trustee expressly reserves his right to amend, revise, or supplement this transfer information upon further
investigation and discovery.

three times the return on a hypothetical investment in Broad Market. As such, the Onshore Swap provided Defendant Rye XL LP with a return equal to three times the return it would have received had it invested the collateral directly in Broad Market.

73.    For structuring the Onshore Swap with Defendant Rye XL LP, Defendant ABN/RBS earned significant revenue in the form of fees and interest, which included, but was not limited to: (1) the spread on the floating interest rate charged to Rye XL LP above that charged internally for funding costs; and (2) an early termination fee on any reduction in the Equity Notional in the first 18 months of the transaction.

**C.    Defendant ABN/RBS's Proprietary Decision to Hedge the Onshore Swap by Investing in Broad Market**

74.    Under the Onshore Swap, ABN/RBS was free to generate the returns owed to Defendant Rye XL LP as it saw fit. It could have invested the collateral in other hedge funds, bonds, or even its own operations.

75.    ABN/RBS, however, chose to generate the returns owed to Defendant Rye XL LP by using the collateral received from Defendant Rye XL LP, together with its own funds equaling two times Defendant Rye XL LP's collateral, to purchase partnership interests in Broad Market.

76.    Accordingly, in November 2007, ABN/RBS made the proprietary and voluntary decision to hedge its risk under the Onshore Swap by investing three times the collateral it received from Defendant Rye XL LP in Broad Market (the "Onshore Hedge"). As a result, ABN/RBS had a perfect hedge against what it owed to Defendant Rye XL LP under the Onshore Swap.

77.    As part of its Onshore Hedge, ABN/RBS was simply another investor in Broad Market, and was free to redeem its Broad Market shares as it wished. The investments in and

21

08-01789-smb    Doc 15673    Filed 04/03/17    Entered 04/03/17 18:39:40    Exhibit 1 -
(part 3 of 3) Pg 46 of 95
Case 1:11-cv-06878-JSR    Document 32    Filed 08/08/12    Page 23 of 126

redemptions from Broad Market made by RBS as part of the Onshore Hedge were a proprietary

trading position, and were not required or mandated by the Onshore Swap.

78.    Below is a chart showing the Onshore Swap and the Onshore Hedge:



**D.    The Onshore Subsequent Transfers at Issue**

      **1.    The Subsequent Transfers from Defendant Rye XL LP to Defendant ABN/RBS**

79.    Pursuant to the terms of the Onshore Swap, Defendant Rye XL LP could increase

or "upsize" the value of the swap transaction by providing ABN/RBS with additional collateral.

80. Upon information and belief, in 2008, Defendant Rye XL LP transferred the BLMIS customer property it received from Prime Fund and/or Broad Market, as detailed above, to ABN/RBS to increase the collateral and, therefore, the overall size of the Onshore Swap.

81. From February 1, 2008 to August 1, 2008, Defendant Rye XL LP increased the Onshore Swap from the original $7.5 million to $87.5 million through subsequent transfers of BLMIS customer property received from Prime Fund and/or Broad Market to ABN/RBS, as set forth below. (*See also* Exhibit O.)[9]

| | |
|---|---|
| 11/1/2007 | $7,500,000 |
| 2/1/2008 | $15,000,000 |
| 3/26/2008 | $15,000,000 |
| 6/2/2008 | $25,000,000 |
| 8/1/2008 | $25,000,000 |

## 2. Defendant ABN/RBS's Independent Redemption from Broad Market of a Portion of its Onshore Hedge

82. On November 3, 2008, ABN/RBS made the proprietary decision to redeem $1.4 million from Broad Market.[10] Upon information and belief, in order to fulfill ABN/RBS's redemption request, Broad Market used funds from redemptions out of its BLMIS account, and subsequently transferred $1.4 million of BLMIS customer property to ABN/RBS.

83. Below is a chart showing the subsequent transfers from the Tremont Feeders to Rye XL LP and then to ABN/RBS as part of the investment of the Onshore Swap, as well as the subsequent transfers to ABN/RBS as part of the Onshore Hedge.

---

[9] The Trustee expressly reserves his right to amend, revise, or supplement this transfer information upon further investigation and discovery.

[10] The Trustee expressly reserves his right to amend, revise, or supplement this transfer information upon further investigation and discovery.

# EXHIBIT AA

08-01789-smb Doc 15673 Filed 04/03/17 Entered 04/03/17 16:39:40 Exhibit V -
(part 3 of 3) Pg 49 of 95
Case 1:11-cv-06877-JSR Document 33 Filed 07/03/12 Page 1 of 54

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Regina L. Griffin
Thomas L. Long

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (BRL) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) <br><br> Adv. Pro. No. 10-05355 (BRL) |
| In re: <br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> ABN AMRO BANK (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED), <br><br> ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), and <br><br> RYE SELECT BROAD MARKET XL FUND, LP, <br><br> Defendants. | 11 Civ. 06877 (JSR) <br><br> **AMENDED COMPLAINT** |

RECEIVED 2012 JUL -3 P 6:36 U S DISTRICT COURT SDNY

08-01789-smb Doc 16273-3 Filed 06/27/17 Entered 06/27/17 10:32:40 Exhibit W -
(part 3 of 3) Pg 50 of 95
Case 1:11-cv-06877-JSR Document 33 Filed 07/03/12 Page 18 of 54

C.     Defendant Rye XL LP's Swap Agreement with Defendant AA Bank

61.     Defendant Rye XL LP promised its investors returns that were three times the
return of Broad Market.   At various times from July 2007 through December 11, 2008,
Defendant Rye XL LP made independent decisions to use the proceeds of investors' subscription
and/or other assets to fund swap agreements with third party leverage providers, including, but
not limited to, AA Bank.   These swap agreements provided Defendant Rye XL with three times
the returns of Broad Market, the swaps' so-called "reference asset."

62.     On May 2, 2007, Defendant Rye XL and Defendant AA Bank entered into one
such swap agreement (the "Swap").   Similar to a traditional loan, the Swap required Rye XL LP
to post collateral with AA Bank.   On May 2, 2007, Defendant Rye XL LP provided AA Bank
with $10 million of initial collateral.   Upon information and belief, Defendant Rye XL LP used
BLMIS Customer Property subsequently transferred to it from Prime Fund and/or Broad Market
to fund this $10 million of initial collateral.

63.     Under the Swap, AA Bank agreed to provide Defendant Rye XL LP with an
amount equal to three times the return on a hypothetical investment in Broad Market.   As such,
the Swap provided Defendant Rye XL LP with a return equal to three times the return it would
have received had it invested the collateral directly in Broad Market.

64.     For structuring the Swap with Defendant Rye XL LP, Defendant AA Bank earned
significant revenue in the form of fees and interest, which included, but was not limited to: (1)
the spread on the floating interest rate charged to Rye XL LP; (2) the fee charged to Rye XL LP
if the actual Equity Notional is below the Minimum Equity Notional Amount (as defined in the
Swap documentation); and (3) an early termination fee on the Equity Notational Amount (less
collateral) or Minimum Equity Notional Amount (less collateral) upon elective termination by
Rye XL LP, thereby allowing the Defendant AA Bank to collect the spread over the entire period

17

08-01789-smb   Doc 16273-3   Filed 06/27/17   Entered 06/27/17 18:34:40   Exhibit W -
Case 1:11-cv-06877-JSR   Document 33   Filed 07/03/12   Page 19 of 54
(part 3 of 3)   Pg 51 of 95

of the Swap, even if Rye XL LP terminated the agreement early. For example, each time Defendant AA Bank allowed the notional amount of the Swap to increase, its fees increased. At the peak of the Swap, Defendant AA Bank earned millions of dollars in fees on the spread of the floating interest rate alone.

### D.   Defendant AA Bank's Proprietary Decision to Hedge the Swap Agreement by Investing in Broad Market

65.   Under the Swap, AA Bank was free to generate the returns owed to Defendant Rye XL LP as it saw fit. It could have invested the collateral in other hedge funds, bonds, or even its own operations.

66.   AA Bank, however, chose to generate the returns owed to Defendant Rye XL LP by using the collateral received from Defendant Rye XL LP, together with its own funds equaling two times Defendant Rye XL LP's collateral, to purchase partnership interests in Broad Market.

67.   Accordingly, in May 2007, AA Bank made the proprietary and voluntary decision to hedge its risk under the Swap by investing three times the initial collateral it received from Defendant Rye XL LP in Broad Market (the "Hedge"). As a result, AA Bank had a perfect hedge against what it owed to Defendant Rye XL LP under the Swap.

68.   AA Bank purchased the Broad Market partnership interests for its own use but used AA Custodian to hold the Broad Market partnership interests.

69.   Below is a chart showing the Swap and the Hedge:

08-01789-smb   Doc 15673   Filed 04/03/17   Entered 04/03/17 18:34:40   Exhibit 1 -
(part 3 of 3)   Pg 52 of 95
Case 1:11-cv-06877-JSR   Document 33   Filed 07/03/12   Page 20 of 54



E.   **The Subsequent Transfers at Issue**

    1.   **The Subsequent Transfers from Defendant Rye XL LP to Defendant AA Bank**

70.   Upon information and belief, after entering the Swap, Defendant Rye XL LP subsequently and independently made the decision to use the subscription payments and subsequent transfers it received from its investors, including, but not limited to, the BLMIS Customer Property it received from Prime Fund and/or Broad Market, to fund the Swap with AA Bank.

71.   Pursuant to the terms of the Swap, Defendant Rye XL LP could increase or "upsize" the value of the swap transaction by providing AA Bank with additional collateral.

72.     Upon information and belief, in 2007 and 2008, Defendant Rye XL LP transferred the BLMIS Customer Property it received from Prime Fund and/or Broad Market, as detailed above, to AA Bank to increase the collateral and, therefore, the overall size of the Swap.

73.     From May 2, 2007 to May 1, 2008, Defendant Rye XL LP increased the Swap from the original $10 million to $235.5 million through subsequent transfers of BLMIS Customer Property received from Prime Fund and/or Broad Market to AA Bank, as set forth below. (*See also* Exhibit H.)

| | |
|---|---|
| 5/2/2007 | 10,000,000 |
| 6/1/2007 | 9,500,000 |
| 7/2/2007 | 6,000,000 |
| 8/1/2007 | 35,000,000 |
| 8/1/2007 | 10,000,000 |
| 9/4/2007 | 35,000,000 |
| 3/26/2008 | 100,000,000 |
| 3/26/2008 | 25,000,000 |
| 5/1/2008 | 5,000,000 |

### 2.     AA Bank's Independent Redemption from Broad Market of a Portion of its Hedge

74.     As part of its Hedge, AA Bank was simply another investor in Broad Market, and was free to redeem its Broad Market shares as it wished. The investments in and redemptions from Broad Market made by AA Bank and/or AA Custodial[5] as part of the Hedge were a proprietary trading position, and were not required or mandated by the Swap.

---

[5]     As part of the Hedge, AA Custodial entered into a subscription agreement with Broad Market on behalf of AA Bank. While AA Custodial was the registered subscriber of Broad Market partnership interests, the owner was AA Bank. Further, even though the Broad Market partnership interests were held in the name of AA Custodial, all subscription funds were wired from AA Bank's Northern Trust Bank NY account.

EXHIBIT BB

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement"), dated as of July 25, 2011, is made by and among IRVING H. PICARD (the "Trustee"), in his capacity as Trustee for the liquidation under the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa, et. seq., as amended ("SIPA"), of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated Chapter 7 case of Bernard L. Madoff ("Madoff"), pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); TREMONT GROUP HOLDINGS, INC. ("Tremont Group"); TREMONT PARTNERS, INC. ("Tremont Partners"); TREMONT (BERMUDA) LIMITED ("Tremont Bermuda"); RYE SELECT BROAD MARKET FUND, LP ("Broad Market Fund"); RYE SELECT BROAD MARKET PRIME FUND, L.P. ("Prime Fund"); RYE SELECT BROAD MARKET PORTFOLIO LIMITED ("Portfolio Limited") (Broad Market Fund, Prime Fund, and Portfolio Limited collectively shall be referred to herein as the "Rye Funds"); RYE SELECT BROAD MARKET INSURANCE FUND, L.P. ("Rye Insurance"); RYE SELECT BROAD MARKET XL FUND, L.P. ("XL LP"); TREMONT ARBITRAGE FUND, L.P.; TREMONT ARBITRAGE FUND IRELAND; TREMONT EMERGING MARKETS FUND – IRELAND; TREMONT EQUITY FUND – IRELAND; TREMONT INTERNATIONAL INSURANCE FUND, L.P.; TREMONT LONG/SHORT EQUITY FUND, L.P.; TREMONT MARKET NEUTRAL FUND, L.P.; TREMONT MARKET NEUTRAL FUND II, L.P.; TREMONT MARKET NEUTRAL FUND LIMITED; TREMONT OPPORTUNITY FUND LIMITED; TREMONT OPPORTUNITY FUND II, L.P.; TREMONT OPPORTUNITY FUND III, L.P.; RYE SELECT EQUITIES FUND; TREMONT MULTI MANAGER FUND; LIFEINVEST OPPORTUNITY FUND LDC (the foregoing entities not otherwise defined collectively shall be referred to herein as the "Tremont Funds"); OPPENHEIMER ACQUISITION CORP. ("Oppenheimer"); MASSMUTUAL HOLDING LLC

("MassMutual Holding"); MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY ("MassMutual") (Oppenheimer, MassMutual Holding, and MassMutual collectively shall be referred to herein as the "Parent Defendants"); ROBERT I. SCHULMAN ("Schulman") (Tremont Group, Tremont Partners, Tremont Bermuda, the Rye Funds, Rye Insurance, XL LP, the Tremont Funds, and Schulman collectively shall be referred to herein as the "Tremont Defendants"); and RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC ("Insurance Portfolio LDC"). The Tremont Defendants, the Parent Defendants, and Insurance Portfolio LDC collectively shall be referred to herein as the "Settling Defendants." Each of the Settling Defendants and the Trustee shall be referred to herein from time to time as a "Party" and, collectively, as "Parties".

## BACKGROUND

A.    BLMIS and its predecessor were registered broker-dealers and members of the Securities Investor Protection Corporation ("SIPC").

B.    On December 11, 2008 (the "Filing Date"), the Securities and Exchange Commission (the "Commission") filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against BLMIS and Madoff. On December 12, 2008, the District Court entered an order which, among other things, appointed a receiver for the assets of BLMIS (No. 08-CV-10791 (LSS)).

C.    On December 11, 2008, Madoff was arrested by federal agents for criminal securities laws violations including securities fraud, investment adviser fraud, and mail and wire fraud. At a plea hearing on March 12, 2009 in the case captioned United States v. Madoff, Case No. 09-CR-213 (DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York and admitted that he

2

"operated a Ponzi scheme through the investment advisory side of [BLMIS]" and engaged in fraud in the operation of BLMIS. On June 29, 2009, Madoff was sentenced to 150 years in prison.

D.    On December 15, 2008, pursuant to section 5(a)(4)(A) of SIPA, the Commission consented to a combination of its own action with the application of SIPC. Thereafter, SIPC filed an application in the District Court under section 5(a)(3) of SIPA alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA. On December 15, 2008, the District Court granted the SIPC application and entered an order under SIPA, which, in pertinent part, appointed the Trustee to liquidate the business of BLMIS under section 5(b)(3) of SIPA, discharged the receiver, and removed the case to the Bankruptcy Court under section 5(b)(4) of SIPA, where it is currently pending as Case No. 08-01789 (BRL) (the "SIPA Proceeding"). The Trustee is duly qualified to serve and act on behalf of both the estate of BLMIS and the estate of Madoff pursuant to the substantive consolidation order of the Bankruptcy Court entered on June 9, 2009.

E.    Pursuant to Section 78fff-1(a) of SIPA, Trustee has the general powers of a bankruptcy trustee in a case under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") as well as the powers granted pursuant to SIPA. Chapters 1, 3, 5 and subchapters I and II of Chapter 7 of the Bankruptcy Code apply to this SIPA proceeding to the extent consistent with SIPA.

F.    Under SIPA, the Trustee is charged with the responsibility to marshal and liquidate the assets of BLMIS for distribution to BLMIS customers and others in accordance with SIPA in satisfaction of allowed claims, including through the recovery of avoidable transfers such as preference payments and fraudulent transfers made by BLMIS.

G.    Broad Market Fund was a customer of BLMIS and maintained BLMIS customer account number 1T0027 commencing in or around 1994. The Trustee alleges that between the opening of the account and the Filing Date, on an overall basis, Broad Market Fund deposited in its BLMIS customer account One Billion Six Hundred Forty-Seven Million Six Hundred Eighty-Seven Thousand Six Hundred Twenty-Five Dollars ($1,647,687,625.00) in excess of the amount of withdrawals that Broad Market Fund made during the life of its account (the "Broad Market Fund Net Loss"); Broad Market Fund withdrew Forty Million Dollars ($40,000,000.00) from its BLMIS account within ninety days of the Filing Date and an additional Two Hundred Twelve Million Dollars ($212,000,000.00) during the period more than ninety days, but less than six years, before the Filing Date from its BLMIS customer account; and in total, Broad Market Fund withdrew Two Hundred Fifty-Two Million Dollars ($252,000,000.00) from BLMIS account 1T0027 during the period less than six years before the Filing Date and Three Hundred Eighty-Four Million One Hundred Forty Thousand Dollars ($384,140,000.00) during the life of its BLMIS customer account.

H.    Prime Fund was a customer of BLMIS and maintained BLMIS customer account number 1C1260 commencing in or around 1997. The Trustee alleges that between the opening of the account and the Filing Date, on an overall basis, Prime Fund withdrew from its BLMIS customer account a total of Two Hundred Ten Million Nine Hundred Fifty-Five Thousand Dollars ($210,955,000.00) in excess of the amount of deposits that Prime Fund made during the life of its account (the "Prime Fund Net Gain"); Prime Fund withdrew Nine Hundred Forty-Five Million Dollars ($945,000,000.00) during the period less than six years before the Filing Date; and in total, Prime Fund withdrew One Billion Ten Million Dollars ($1,010,000,000.00) during the life of its BLMIS customer account.

4

I.      Portfolio Limited was a customer of BLMIS and maintained BLMIS customer account 1FR080 commencing in or around 2001. The Trustee alleges that between the opening of the account and the Filing Date, on an overall basis, Portfolio Limited deposited in its BLMIS customer account Four Hundred Ninety-Eight Million Four Hundred Ninety Thousand Ninety Dollars and Eighty-Eight Cents ($498,490,090.88) in excess of the amount of withdrawals that Portfolio Limited made during the life of its account (the "Portfolio Limited Net Loss"); Portfolio Limited withdrew Two Hundred Seventy-Five Million Six Hundred Eighty-Nine Thousand One Hundred Three  Dollars and Two Cents ($275,689,103.02) from its BLMIS customer account during the period within ninety days of the Filing Date and an additional Three Hundred Forty-Two Million Two Hundred Fifty-Five Thousand Three Hundred Eighty-Nine Dollars and Ninety-Seven Cents ($342,255,389.97) during the period more than ninety days but  less than six years before the Filing Date from its BLMIS customer account; and in total, Portfolio Limited withdrew Six Hundred Seventeen Million Nine Hundred Forty-Four Thousand Four Hundred Thirty-One Dollars and Ninety-Nine Cents ($617,944.431.99) from BLMIS account 1FR080 during the period less than six years before the Filing Date and Six Hundred Twenty-Eight Million Two Hundred Thirty-One Thousand Nine Hundred Nine Dollars and Twelve Cents ($628,231,909.12) during the life of its BLMIS customer account.

J.      Rye Insurance was a customer of BLMIS and maintained BLMIS account number 1R0252 commencing in or around 2008 with a deposit of Forty Million Dollars ($40,000,000.00) ("Rye Insurance Net Loss") to its customer account. Rye Insurance made no withdrawals from its BLMIS customer account.

K.      Insurance Portfolio LDC was a customer of BLMIS and maintained BLMIS customer account number 1FR010 commencing in or around 1997. The Trustee alleges that

between the opening of the account and the Filing Date, on an overall basis, Insurance Portfolio LDC deposited in its BLMIS customer account Sixty Two Million Three Hundred Seven Thousand Eight Hundred Twenty-Three Dollars and Thirteen Cents ($62,307,823.13) in excess of the amount of withdrawals that Insurance Portfolio LDC made during the life of its account (the "Insurance Portfolio LDC Net Loss"); Insurance Portfolio LDC withdrew Eight Million Nine Hundred Thirteen Thousand Two Hundred Twenty-Eight Dollars and Two Cents ($8,913,228.02) from its BLMIS customer account during the period within ninety days of the Filing and an additional Eighty Five Million Nineteen Thousand Sixty One Dollars and Fifty-Three Cents ($85,019,061.53) during the period more than ninety days but less than six years before the Filing Date; and in total, Insurance Portfolio LDC withdrew Ninety Three Million Nine Hundred Thirty Two Thousand Two Hundred Eighty Nine Dollars and Fifty-Five Cents ($93,932,289.55) from BLMIS account 1FR010 during the period less than six years before the Filing Date and One Hundred Thirty Million One Hundred Fifty-Two Thousand One Hundred Seventy-Six Dollars and Eighty-Seven Cents ($130,152,176.87) during the life of its BLMIS customer account. Insurance Portfolio is currently in liquidation in the Grand Court of the Cayman Islands, and Messrs. Richard Fogerty and James Cleaver of Zolfo Cooper have been appointed as official liquidators.

L.    Each of the Rye Funds, Rye Insurance, and Insurance Portfolio LDC had direct accounts with BLMIS. Below is a chart that summarizes the alleged 90-Day Preferential Transfers, 2-Year Fraudulent Transfers, 6-Year Fraudulent Transfers, and Full History Fraudulent Transfers (as such terms are defined below) made from BLMIS to Broad Market Fund, Prime Fund, Portfolio Limited, Rye Insurance, and Insurance Portfolio LDC which the Trustee seeks to avoid and recover in the Adversary Proceeding (as defined below).

6

| Account Number | Account Name | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
|---|---|---|---|---|---|
| 1T0027 | RYE SELECT BROAD MARKET FUND, LP | 40,000,000 | 60,000,000 | 252,000,000 | 384,140,000 |
| 1C1260 | RYE SELECT BROAD MARKET PRIME FUND, LP | - | 495,000,000 | 945,000,000 | 1,010,000,000 |
| 1FR080 | RYE SELECT BROAD MARKET PORTFOLIO LIMITED | 275,689,103 | 354,571,757 | 617,944,432 | 628,231,909 |
| 1R0252 | RYE SELECT BROAD MARKET INSURANCE FUND LP | - | - | - | - |
| 1FR010 | RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC | 8,913,228 | 50,060,603 | 93,932,290 | 130,152,177 |
| | Total: | $324,602,331 | $959,632,359 | $1,908,876,722 | $2,152,524,086 |

M.     On December 7, 2010, the Trustee brought an adversary proceeding in the Bankruptcy Court under the caption Picard v. Tremont Group Holdings, *et al.*, Adv. Pro. No. 10-05310 (the "Adversary Proceeding") against the Tremont Defendants, the Parent Defendants, Insurance Portfolio LDC, and two other defendants not parties to this Agreement.     In the Adversary Proceeding, the Trustee asserts a number of claims against the Settling Defendants, including claims that certain of the Settling Defendants are liable to the BLMIS estate under 11 U.S.C. § 544, 547, 548, 550, SIPA § 78fff(2)(c)(3), and the New York Debtor and Creditor Law § 270-281 for approximately $2.1 billion in avoidable transfers from BLMIS to them during the history of their relationship with BLMIS ("Full History Fraudulent Transfers"), including a total of approximately $1.9 billion within six years of the Filing Date ("6-Year Fraudulent Transfers"), $959.63 million within two years of the Filing Date ("2-Year Fraudulent Transfers"), and $324.6 million within 90 days of the Filing Date ("90-Day Preferential Transfers").     In the Adversary Proceeding, the Trustee has asserted, among other things, that the Rye Funds and Insurance Portfolio LDC are liable to the BLMIS estate under 11 U.S.C.  § 547 and 550 for all 90-Day Preferential Transfers.  The Trustee also has asserted that the Rye Funds and Insurance Portfolio LDC are liable to the BLMIS estate under 11 U.S.C. § 548 and 550 for their 2-Year Fraudulent Transfers.  In addition, the Trustee has asserted that the Rye Funds and Insurance Portfolio LDC

7

are liable to the BLMIS estate under 11 U.S.C. § 544(b) and 550 and the New York Fraudulent
Conveyance Act (New York Debtor and Creditor Law § 270-281) for their 6-Year Fraudulent
Transfers, as well as their Full History Fraudulent Transfers. In the Adversary Proceeding, the
Trustee also has alleged that certain Settling Defendants were unjustly enriched due to their
investments with BLMIS and the fees generated by those investments.

     N.     In the Adversary Proceeding, the Trustee has asserted that Tremont Partners, as the
general partner for Broad Market Fund and Prime Fund, is liable for the debts of Broad Market
Fund and Prime Fund. Moreover, the Trustee has asserted that Tremont Group, Tremont Bermuda,
Oppenheimer, MassMutual Holding, and MassMutual are jointly and severally responsible for the
liabilities of all of the Rye Funds, as well as Insurance Portfolio LDC.

     O.     In the Adversary Proceeding, the Trustee also has asserted that XL LP, the Tremont
Funds, Oppenheimer, MassMutual Holding, MassMutual, and Schulman are liable to the Trustee
as subsequent transferees of transfers made by BLMIS to the Rye Funds and Insurance Portfolio
LDC, and thus as recipients of customer property that allegedly was transferred from BLMIS
through transfers avoidable under 11 U.S.C. § 544, 547, 548, and/or the New York Debtor and
Creditor Law § 273-281, and recoverable under 11 U.S.C. § 550.

     P.     All claims of the Trustee under 11 U.S.C. §§ 544, 547, 548 or 550 and the New
York Debtor and Creditor Law §§ 270-281 shall be referred to herein as the "Avoiding Power
Claims."

     Q.     The Settling Defendants have disputed any wrongdoing or liability to the BLMIS
estate. The Rye Funds and Insurance Portfolio LDC have asserted that they took all withdrawals
or redemptions from BLMIS for value, in good faith, and without knowledge of their voidability.
The Tremont Funds and XL LP also assert that any withdrawals or redemptions from the Rye

8

Funds or Insurance Portfolio LDC were for value, in good faith, and without knowledge of their voidability.

R.      Schulman denies that he received any subsequent transfers and asserts that any withdrawals or fees earned by him were for value, in good faith, and without knowledge of their voidability.

S.      The Parent Defendants dispute that they received, directly or indirectly, any voidable transfers or that they have any liability for the actions of any of the other Settling Defendants or the other defendants in the Adversary Proceeding.

T.      Broad Market Fund filed a customer claim in the SIPA Proceeding (assigned claim number 6237) (the "Broad Market Fund SIPA Claim") alleging a loss of One Billion Six Hundred Thirty-Nine Million One Hundred Seventy-One Thousand Six Hundred Twenty-Five Dollars ($1,639,171,625.00). The Broad Market Fund SIPA Claim asserts Broad Market Fund is entitled to an allowance of a customer claim in the SIPA Proceeding in an amount reflected on Broad Market Fund's BLMIS account statement for the period ending November 30, 2008.

U.      Prime Fund filed a customer claim in the SIPA Proceeding (assigned claim numbers 11041 and 13043) (the "Prime Fund SIPA Claim") alleging a loss of Four Million Forty-Five Thousand Dollars ($4,045,000.00). The Prime Fund SIPA Claim asserts Prime Fund is entitled to an allowance of a customer claim in the SIPA Proceeding in an amount reflected on Prime Fund's BLMIS account statement for the period ending November 30, 2008. The Prime Fund, SIPA Claim was denied in a Letter of Determination dated October 8, 2010. The Prime Fund did not file an objection to that Letter of Determination.

V.      Portfolio Limited filed a customer claim in the SIPA Proceeding (assigned claim number 6238) (the "Portfolio Limited SIPA Claim") alleging a loss of Five Hundred Seven

9

Million Seven Hundred Twenty-Two Thousand Dollars ($507,722,000.00). The Portfolio Limited SIPA Claim asserts Portfolio Limited is entitled to an allowance of a customer claim in the SIPA Proceeding in an amount reflected on Portfolio Limited's BLMIS account statement for the period ending November 30, 2008.

W.    Rye Insurance filed a customer claim in the SIPA Proceeding (assigned claim number 6255) (the "Rye Insurance SIPA Claim") alleging a loss of Forty Million Dollars ($40,000,000.00). The Rye Insurance SIPA Claim asserts Rye Insurance is entitled to an allowance of a customer claim in the SIPA Proceeding in an amount reflected on Rye Insurance's BLMIS account statement for the period ending November 30, 2008.

X.    Insurance Portfolio LDC filed a customer claim in the SIPA Proceeding (assigned claim number 6230) (the "Insurance Portfolio LDC SIPA Claim") alleging a loss of Fifty-One Million Four Hundred Sixty Thousand Dollars ($51,460,000.00). The Insurance Portfolio LDC SIPA Claim asserts Insurance Portfolio LDC is entitled to an allowance of a customer claim in the SIPA Proceeding in an amount reflected on Insurance Portfolio LDC's BLMIS account statement for the period ending November 30, 2008.

Y.    In the Adversary Proceeding, the Trustee sought to equitably subordinate certain of the filed claims in the SIPA Proceeding.

Z.    While the Trustee believes that he would prevail at trial in recovering all initial transfers from BLMIS and subsequent transfers to the Tremont Funds or from the other Settling Defendants, he also recognizes that there is in any adversary proceeding litigation risk, risk of collection, and delay in payment associated with his Avoiding Power Claims.

AA.    While the Settling Defendants believe they have complete defenses to a number of claims asserted by the Trustee, the Settling Defendants recognize that there is litigation cost and

10

risk associated with the Avoiding Power Claims and have decided to settle with the Trustee prior to engaging in expensive and time-consuming litigation in the action brought against them by the Trustee.

BB.    Based on the foregoing, the Trustee and the Settling Defendants wish to settle their disputes about the matters described above without the expense, delay and uncertainty of litigation. The Settling Defendants are entering into this Agreement to fully resolve these matters and without any concession of fault or liability on the part of any defendant.

CC.    As part of resolving this litigation, the Trustee and the Bankruptcy Court, upon approval of this Agreement, will allow the Broad Market Fund, SIPA Claim, the Portfolio Limited, SIPA Claim, the Rye Insurance SIPA Claim, and the Insurance Portfolio LDC SIPA Claim against the BLMIS estate in the SIPA Proceeding (collectively, the "Customer Claims"), without any subordination of the Customer Claims. As a condition to settling all disputes between the Trustee and the Settling Defendants, and in accordance with the terms of this Agreement set forth below, the Trustee shall allow the Customer Claims and shall agree that the Customer Claims shall not be subordinated in priority to any other allowed customer claims in the SIPA Proceeding.

DD.    In determining to settle the disputes, which involves releasing claims against the Settling Defendants and the allowance of the Customer Claims in favor of Broad Market Fund, Portfolio Limited, Rye Insurance, and Insurance Portfolio LDC in the SIPA Proceeding, the Trustee conducted a comprehensive investigation. The investigation included the review of all BLMIS-related transaction histories for the Tremont Defendants and Insurance Portfolio LDC, interviews of witnesses, account statements, correspondence, other records, Bankruptcy Rule 2004 examinations and substantial review and analysis of records and documents produced by the Tremont Defendants and third parties.

11

EE.   Should this Agreement be approved by the Bankruptcy Court, there will be only two defendants remaining in the Adversary Proceeding: Rye Select Broad Market XL Portfolio Limited and Sandra L. Manzke.

NOW, THEREFORE, in consideration of the foregoing, of the mutual covenants, promises and undertakings set forth herein, and for good and valuable consideration, the mutual receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

TERMS

1.   <u>Submission to Bankruptcy Court Jurisdiction</u>.  Each Settling Defendant hereby submits to the jurisdiction of the Bankruptcy Court for the purpose of the Adversary Proceeding and the approval and enforcement of this Agreement.   The Settling Defendants' submission to the jurisdiction of the Bankruptcy Court under this paragraph does not constitute an agreement, admission or denial that any Settling Defendant is subject to the Bankruptcy Court's jurisdiction for any other purpose.

2.   <u>Cash Payment</u>.  The Settling Defendants other than Insurance Portfolio LDC shall cause One Billion Dollars ($1,000,000,000) (the "Tremont Settlement Payment") in cash to be paid to the Trustee for the benefit of the BLMIS estate at the Closing (as defined in Paragraph 10 below).

3.   <u>Cash Payment by Insurance Portfolio LDC</u>.  Insurance Portfolio LDC shall cause Twenty-Five Million Dollars ($25,000,000) (the "Insurance Portfolio LDC Settlement Payment," and, together with the Tremont Settlement Payment, the "Settlement Payments") in cash to be paid to the Trustee for the benefit of the BLMIS estate at the Closing (as defined in Paragraph 10 below). Insurance Portfolio LDC and the Trustee shall issue a joint payment instruction to The Bank of New York Mellon to transfer all cash balances held in accounts in the name of Insurance Portfolio LDC to the Trustee in partial satisfaction of the Insurance Portfolio LDC Settlement Payment.

12

4.    <u>Effect of Settlement Payments</u>.  It is expressly understood between the Parties that the Settlement Payments shall not, and are not, intended to release, waive, prejudice, or limit the Trustee's rights and ability to pursue any actions or claims, including, but not limited to, recovery actions under Section 544, 547, 548 and 550 of the Bankruptcy Code, available to him against any non-party to this Agreement, including, but not limited to, any of the entities specifically set forth at Exhibit A to this Agreement which is expressly incorporated by reference herein.

5.    <u>Allowance of Customer Claims: Broad Market Fund, Portfolio Limited, and Rye Insurance</u>. Effective as of the Closing, and notwithstanding Section 502(d) of the Bankruptcy Code, the following Customer Claims against the BLMIS estate shall be deemed conclusively allowed:  (a) the Broad Market Fund SIPA Claim shall be allowed in the amount of One Billion Six Hundred Forty-Seven Million, Six Hundred Eighty-Seven Thousand Six Hundred Twenty-Five Dollars ($1,647,687,625.00); (b) the Portfolio Limited SIPA Claim shall be allowed in the amount of Four Hundred Ninety-Eight Million Four Hundred Ninety Thousand Dollars and Eighty-Eight Cents ($498,490,000.88); and (c) the Rye Insurance SIPA Claim shall be allowed in the amount of Forty Million Dollars ($40,000,000.00) (the total allowed amount of all such Customer Claims collectively is referred to as the "POC Amount").  Upon payment of the Tremont Settlement Payment in accordance with Paragraph 10, the allowed amount of the Broad Market Fund SIPA Claim and the Portfolio Limited SIPA Claim shall be increased by the aggregate amount of Eight Hundred Million Dollars ($800,000,000.00) (the "Additional Claim Amount").  The Additional Claim Amount shall be allocated fairly and equitably by the Tremont Defendants between Broad Market Fund and Portfolio Limited.  For the avoidance of doubt, after payment of the Tremont Settlement Payment in accordance with Paragraph 10, the aggregate allowed POC Amount shall be Two Billion Nine Hundred Eighty-Six Million One Hundred Seventy-Seven Thousand Seven

13

Hundred Fifteen Dollars and Eighty-Eight Cents ($2,986,177,715.88) (the "Total Allowed Claims Amount") and the aggregate allowed amount of the Broad Market SIPA Claim and the Portfolio Limited SIPA Claim shall be Two Billion Nine Hundred Forty-Six Million Eight Hundred Ninety-Three Thousand Six Hundred Twenty-Five Dollars ($2,946,893,625.00). None of the claims allowed pursuant to this paragraph may be subordinated in any respect to any other allowed customer claim in the SIPA Proceeding. Under no circumstances will the Total Allowed Claims Amount be increased. For the avoidance of doubt, subject to Paragraph 5b., if the Trustee recovers additional funds arising from transfers made by the Tremont Defendants to third party subsequent transferees, there shall not be any increase of the Total Allowed Claims Amount.

5a.    SIPA Advances. At the Closing, Broad Market Fund, Portfolio Limited, and Rye Insurance shall each receive from the Trustee Five Hundred Thousand Dollars ($500,000.00) as an advance from SIPC under Section 9 of SIPA, which amounts may be paid by set off against the Tremont Settlement Payment.

5b.    Potential Recalculation of Customer Claims. Notwithstanding any other language in this Agreement, in the event that, as a result of a final, non-appealable judicial determination the amount of BLMIS customer claims are ultimately calculated based on the amounts reflected on a customer's BLMIS account statement for the period ending November 30, 2008, or to include other amounts beyond the difference between cash deposits into and cash withdrawals from the customer's BLMIS account (including, for example, if customers are entitled to receive interest on their deposits with BLMIS), the Customer Claim of each of Broad Market Fund, Portfolio Limited, and Rye Insurance shall be calculated in the same manner as all other nonsubordinated allowed customer claims in the SIPA

14

Proceeding. The Settlement Order (as defined below) shall provide for the allowance of the Customer Claim of each of Broad Market Fund, Portfolio Limited, and Rye Insurance as provided in this paragraph.

5c.    Allocation to the Funds.    For purposes of this Agreement, the Tremont Defendants covenant that they will cause all payments received from the Trustee in respect of the Total Allowed Claims Amount to be fairly and equitably allocated among Broad Market Fund, Portfolio Limited, Rye Insurance, and their respective partners and/or investors.    The Settling Defendants expressly agree on their own behalf, as well as on behalf of their shareholders, partners or investors, that the BLMIS estate, SIPC, the Trustee, the Trustee's agents, attorneys, accountants, and representatives, Schulman, and the Parent Defendants shall have no responsibility to insure the proper or correct payments to any investor, shareholder, member and/or partner in any fund managed by any of the Tremont Defendants.

5d.    Single Agent for Customer Claims.    The Tremont Defendants shall appoint one single agent (the "Appointed Agent") for purposes of receiving distributions from the Trustee on behalf of the allowed Customer Claims of Broad Market Fund, Portfolio Limited Fund, and Rye Insurance.    For each distribution made by the Trustee from the BLMIS estate in which Broad Market Fund, Portfolio Limited Fund, and Rye Insurance are entitled to participate, the Trustee shall make one aggregate payment to the Appointed Agent.    In accordance with Paragraph 5c., the Trustee shall have no responsibility for allocating such distributions beyond making such single payment.

15

6.    <u>Allowance of Customer Claims: Insurance Portfolio LDC</u>.  Effective as of the Closing, and notwithstanding Section 502(d) of the Bankruptcy Code, the Trustee shall allow a customer claim against the BLMIS estate in the amount of Seventy Seven Million Three Hundred Seven Thousand Eight Hundred Twenty Three Dollars and Thirteen Cents ($77,307,823.13) to Insurance Portfolio LDC.  Under no circumstances will the amount of the allowed Insurance Portfolio LDC Customer Claim be increased or in any manner subordinated to any other allowed customer claim.  For the avoidance of doubt, if the Trustee recovers additional funds arising from transfers made by Insurance Portfolio LDC to third party subsequent transferees, there shall not be any increase of the allowed Insurance Portfolio LDC customer claim.

6a.    <u>SIPA Advance</u>.  At the Closing, Insurance Portfolio LDC shall receive Five Hundred Thousand Dollars ($500,000.00) from the Trustee as an advance under Section 9 of SIPA, which amount may be paid by set off against the Insurance Portfolio LDC Settlement Payment.

6b.    <u>Potential Recalculation of Customer Claim</u>.  Notwithstanding any other language in this Agreement, in the event that, as a result of a final, non-appealable judicial determination the amount of BLMIS customer claims are ultimately calculated based on the amounts reflected on a customer's BLMIS account statement for the period ending November 30, 2008, or to include other amounts beyond the difference between cash deposits into and cash withdrawals from the customer's BLMIS account (including, for example, if customers are entitled to receive interest on their deposits with BLMIS), the Insurance Portfolio LDC customer claim shall be calculated in the same manner as other allowed customer claims.  The Bankruptcy Court's order approving this Agreement shall provide for

16

the allowance of the Insurance Portfolio LDC customer claim as provided in this paragraph.

7.     Agreement by Tremont Group, Tremont Partners, and Tremont Bermuda to Forego Any Profits .  As part of this Agreement, Tremont Group, Tremont Partners, and Tremont Bermuda agree they shall not be entitled to any fees, profits, or expenses for their management or administration of any funds received, either directly or indirectly, or on behalf of, Broad Market Fund, Portfolio Limited, Rye Insurance, or Insurance Portfolio LDC, from the BLMIS estate.  In addition, except with respect to amounts needed to pay reasonable and necessary expenses associated with accounting, tax, legal, regulatory and other costs of winding up Tremont Group and its subsidiaries, all amounts received by Tremont Group, Tremont Partners, or Tremont Bermuda, either directly or indirectly, from any distribution made by the BLMIS estate to the Rye Funds, shall be distributed solely to investors in the Rye Funds and the Tremont Funds or as directed by the Tremont Group (other than to Tremont Group, Tremont Partners, or Tremont Bermuda), and shall not be paid or retained by Tremont Group, Tremont Partners, or Tremont Bermuda.

8.     Release by Trustee. In consideration for the covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to any rights arising under this Agreement and the Escrow Agreement, all of which are reserved, effective as of the Closing, the Trustee, in his capacity as such and on behalf of BLMIS, the BLMIS estate, and the Madoff estate, releases, remises and forever discharges (i) each Settling Defendant from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and claims whatsoever, asserted or unasserted, known or

17

unknown, existing as of the date of the Closing, that are, have been, could have been or might in the future be asserted by the Trustee, BLMIS, the BLMIS estate, and/or the Madoff estate for all acts or omissions that were or could have been alleged in the Adversary Proceeding, the XL LP Adversary Proceedings (as defined in Paragraph 12b. below), or any other action or proceeding or that otherwise concern, relate to or arise out of any investments, direct or indirect, with BLMIS, or Madoff, either directly or indirectly made by or through any of the Settling Defendants, and (ii) all past or present directors, officers, employees, principals, successors, assigns, agents, representatives, accountants, administrators, liquidators, and attorneys of each Settling Defendant from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and claims whatsoever, asserted or unasserted, known or unknown, existing as of the date of the Closing, that are, have been, could have been or might in the future be asserted by the Trustee, BLMIS, the BLMIS estate, and/or the Madoff estate for all acts or omissions that were or could have been alleged in the Adversary Proceeding, the XL LP Adversary Proceedings (as defined in Paragraph 12b. below), or any other action or proceeding or that otherwise concern, relate to or arise out of any investments, direct or indirect, with BLMIS or Madoff, either directly or indirectly made by or through any of the Settling Defendants. The release contained herein shall become effective Ninety One (91) days after the payment of the Settlement Payment into the escrow account established at the Closing without any further action by any of the Parties and without being subject to any further obligations of the Settling Parties under the terms of this Agreement.

9.    <u>Release of Trustee by Settling Defendants</u>. In consideration for the covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, except with respect to rights arising under this

18

Agreement and the Escrow Agreement, including without limitation the allowance of the Customer Claims hereunder, all of which rights are reserved, effective as of the Closing, each of the Settling Defendants hereby releases, acquits and absolutely discharges the Trustee and the Trustee's attorneys, professionals, agents and consultants, BLMIS and its consolidated estate, from any and all past, present or future claims or causes of action (including any suit, petition, demand, or other claim in law, equity or arbitration) and from any and all allegations of liability or damages (including any allegation of duties, debts, reckonings, contracts, controversies, agreements, promises, damages, responsibilities, covenants, or accounts), of whatever kind, nature or description, direct or indirect, in law, equity or arbitration, absolute or contingent, in tort, contract, statutory liability or otherwise, based on strict liability, negligence, gross negligence, fraud, breach of fiduciary duty or otherwise (including attorneys' fees, costs or disbursements), known or unknown, existing as of the date of the Closing, arising out of or in any way related to BLMIS, Madoff, the Rye Funds' or Insurance Portfolio LDC's BLMIS customer accounts.

10.  Closing. The closing (the "Closing") shall occur on a business day no later than seven (7) days after an order entered by the Bankruptcy Court approving this Agreement and the Escrow Agreement (as defined below) (the "Settlement Order") becomes a final order. The Settlement Order shall become a final order on the later of (a) the fifteenth (15th) day following entry thereof by the Bankruptcy Court, in the event no appeal therefrom has been noticed to a court of competent jurisdiction, or (b) on the date all timely appeals have been conclusively resolved upholding the Settlement Order. The Closing shall take place at the offices of Trustee's counsel in New York, New York. At the Closing: (a) the Parties shall execute a separate escrow agreement (the "Escrow Agreement") substantively in the form attached hereto as Exhibit B; (b) pursuant to the terms and conditions of the Escrow Agreement, the Settling Defendants shall cause the Settlement Payments

19

for the benefit of the Trustee to be made on the same day to a mutually agreed escrow agent ("Escrow Agent") appointed by the Parties under the Escrow Agreement; (c) pursuant to the terms and conditions of the Escrow Agreement, the Trustee shall cause to be paid on the same day to the Escrow Agent for the benefit of each of Broad Market Fund, Portfolio Limited, Rye Insurance and Insurance Portfolio LDC, respectively, (i) Five Hundred Thousand Dollars ($500,000.00) in SIPC advances under Section 9 of SIPA on account of each of their Customer Claims (aggregating to Two Million Dollars ($2,000,000.00)), and (ii) any *pro rata* distribution that would have been made on account of each of their Customer Claims had such claims been allowed in the Total Allowed Claims Amount at the time the Trustee had made any distribution to customers in the SIPA Proceeding, which amounts set forth in (i) and (ii) above may be paid by set off in whole or in part against the Tremont Settlement Payment and/or the Insurance Portfolio LDC Settlement Payment, as applicable (the "Set-Off Option"); and (d) the Settling Defendants shall be deemed to have delivered to the Escrow Agent each of the releases set forth in this Agreement. In the event the Settling Parties do not elect the Set-Off Option, as long as the Escrow Agreement is in effect, the Trustee shall, contemporaneously with any pro rata distributions that he makes after the Closing to customers holding allowed customer claims in the SIPA Proceeding, deposit with the Escrow Agent the amount of any pro rata distributions that the Trustee would have distributed to each of Broad Market Fund, Portfolio Limited, Rye Insurance, and Insurance Portfolio LDC on account of their respective Customer Claims in the Total Allowed Claims Amount, if such distributions were not subject to the terms of the Escrow Agreement. In the event the Settling Parties elect the Set-Off Option, as long as the Escrow Agreement is in effect, the Trustee shall, contemporaneously with any pro rata distributions that he makes after the Closing to customers holding allowed customer claims in the BLMIS SIPA proceeding, provide written instructions to

20

the Escrow Agent to release and distribute the specific dollar amount of any pro rata distributions that the Trustee would have distributed to each of Broad Market Fund, Portfolio Limited, Rye Insurance, and Insurance Portfolio LDC on account of their respective Customer Claims in the Total Allowed Claims Amount, if such distributions were not subject to the terms of the Escrow Agreement, to the Appointed Agent for the benefit of Broad Market Fund, Portfolio Limited, and Rye Insurance and to the official liquidators of Insurance Portfolio LDC for the benefit of Insurance Porffolio LDC.

11.    <u>Termination of the Escrow.</u>

11a.    If neither Broad Market Fund nor Portfolio Limited has voluntarily sought relief for protection, filed for liquidation, or is subject to a petition for involuntary relief under the Bankruptcy Code or any other similar laws as of the ninetieth (90th) day following the Closing or if either Broad Market Fund or Portfolio Limited becomes subject to a petition for involuntary relief under the Bankruptcy Code or any other similar laws and such petition is dismissed as of the ninetieth (90th) day following the Closing, the Escrow Agent shall deliver the payments, and be deemed to have delivered the escrowed releases  to the respective beneficiaries thereof contemplated by this Agreement on the ninety-first (91st) day following the Closing without any further action of the Parties; and all of such releases shall become effective in accordance with their terms.

11b.    If either Broad Market Fund or Portfolio Limited has voluntarily sought relief for protection or filed for liquidation at any time prior to ninety (90) days following the Closing, or if either Broad Market Fund or Portfolio Limited becomes subject to a petition for involuntary relief under the Bankruptcy Code or

21

any other similar laws and such petition is not dismissed as of the ninetieth (90th)
day following the Closing, then this Agreement (other than this paragraph and
Paragraphs 23 and 24) shall terminate and become void, all of the releases,
statements, consents, and agreements contained in the Agreement (other than in
this paragraph and Paragraphs 18 and 19) shall become void, the Escrow Agent
shall return all sums paid pursuant to the Escrow Agreement to the applicable
Parties entitled thereto in accordance with the Escrow Agreement, and none of the
Parties may use or rely on any such release, statement, consent, or agreement in any
public statement or litigation involving the SIPA Proceeding, any case or
proceeding relating to the SIPA Proceeding or any case or proceeding relating to
BLMIS or Madoff; *provided that*, the Parties may, by a writing executed by all of
them, and without the necessity for further notice or hearing before the Court, elect
to waive this Paragraph 11b., and cause the settlement to become effective
notwithstanding the occurrence of one or more conditions precedent to termination
of this Agreement. Notwithstanding the foregoing, (i) the Trustee and Insurance
Portfolio LDC may, by a writing and without further consent from the Tremont
Defendants or the Parent Defendants, and without the necessity for further notice or
hearing before the Court, elect to waive this Paragraph 11b., and cause the
settlement to become effective as to Insurance Portfolio LDC notwithstanding the
occurrence of one or more conditions precedent to termination of this Agreement
and (ii) the Trustee and the Settling Defendants other than Insurance Portfolio LDC
may, by a writing and without further consent from Insurance Portfolio LDC, and
without the necessity for further notice or hearing before the Court, elect to waive

22

this Paragraph 11b., and cause the settlement to become effective as to the Settling

Defendants other than Insurance Portfolio LDC notwithstanding the occurrence of

one or more conditions precedent to termination of this Agreement.

12.   <u>Dismissal of Adversary Proceeding Claims with Prejudice.</u>

12a.   Within one (1) business day following the termination of the Escrow

pursuant to Paragraph 11a., the Trustee shall file a notice of dismissal dismissing

the Adversary Proceeding with prejudice as to each Settling Defendant and without

cost to any of the Parties. From the date of this Agreement through the termination

of the Escrow, the Adversary Proceeding shall be stayed as to each Settling Party

and no further actions may be taken by any of the Parties hereto.

12b.   Within one (1) business day following the termination of the Escrow

pursuant to Paragraph 11a., the Trustee shall file a notice of dismissal dismissing

the adversary proceedings commenced by the Trustee in the Bankruptcy Court

under the captions Picard v. ABN AMRO Bank N.A. (presently known as The

Royal Bank of Scotland, N.V.), *et al.*, Adv. Pro. No. 10-05354, and Picard v. ABN

AMRO Bank (Ireland) Ltd. (f/n/a Fortis Prime Fund Solutions Bank (Ireland)

Limited), *et al.*, Adv. Pro. No. 10-05355 (collectively, the "XL LP Adversary

Proceedings"), with prejudice as to XL LP and without cost to any of the Parties.

From the date of this Agreement through the termination of the Escrow, the XL LP

Adversary Proceedings shall be stayed as to XL LP and no further actions may be

taken by the Trustee or XL LP.

13.   <u>Representations.</u> In connection with the Tremont Defendants' cash payment of One Billion

Dollars ($1,000,000,000.00) at the time of Closing, each of Oppenheimer, MassMutual, and

23

MassMutual Holding represents that it will not cause, encourage, approve, or participate in the commencement of any insolvency or winding up proceeding by or against any Tremont Defendant, including without limitation under the Bankruptcy Code, nor otherwise seek to recover, directly or indirectly, from the Trustee any amounts paid pursuant to this Agreement, whether as a preference, fraudulent conveyance or other avoidable transfer. If the Trustee is ever legally compelled to return the Tremont Settlement Payment as a result of a breach of the representations in this paragraph 13, the release of Oppenheimer, MassMutual and MassMutual Holding provided in Paragraph 8 shall be withdrawn and of no force and effect. In such event, the Trustee reserves the right to pursue all of his rights and remedies, including, but not limited to, seeking disallowance of any claims in the SIPA Proceeding, and seeking the recovery of the payment amount, or any portion thereof, interest, and reasonable attorneys' fees and costs.

14.    Bankruptcy Court Approval, Effective Date, Termination. Subject to Paragraph 11b., this Agreement is subject to, and shall become effective, irrevocable and binding on the Parties only following (a) the Bankruptcy Court's approval of this Agreement and the Escrow Agreement and the entry of the Settlement Order, (b) the Settlement Order becoming a final order; and (c) the Closing. The form of the Settlement Order and the form of the Rule 9019 Motion (as defined below) shall be subject to the Settling Defendants' reasonable approval. The Trustee shall file a motion under Fed. R. Bankr. P. 9019 (the "Rule 9019 Motion") seeking approval of this Agreement and the Escrow Agreement and otherwise use his reasonable efforts to obtain entry of the Settlement Order as promptly as practicable after the date of this Agreement. If the Settlement Order has not been entered by the Bankruptcy Court within ninety (90) days after the filing of the Rule 9019 Motion or within such additional time as mutually agreed upon by the Parties, (a) this Agreement (other than this paragraph and Paragraphs 23 and 24) shall terminate and become void,

24

(b) all of the statements, consents and agreements contained in the Agreement (other than in this
paragraph and Paragraphs 18 and 19) shall become void, and (c) none of the Parties may use or
rely on any such statement, consent, or agreement in any public statement or litigation involving
the SIPA Proceeding, any case or proceeding relating to the SIPA Proceeding or any case or
proceeding relating to BLMIS or Madoff. There shall be no other basis for termination of this
Agreement by any Party except under the provisions of Paragraph 11b. and this paragraph.

15.    <u>Parties' Authority</u>. Each of the Settling Defendants that is not a natural person represents
and warrants to the Trustee that, as of the date hereof, each of them is duly organized, validly
existing, and in good standing under the laws of its jurisdiction of formation; that each of them has
the full power, authority and legal right and has obtained any necessary consents, to execute and
deliver, and to perform its respective obligations under, this Agreement; and has taken all
necessary action to authorize the execution and delivery of, and the performance of its respective
obligations under, this Agreement. The Trustee represents and warrants to each Settling
Defendant that, as of the date hereof, and subject to the approval of the Bankruptcy Court as set
forth in Paragraph 14 above, he has the full power, authority, and legal right to execute and deliver,
and to perform his obligations under this Agreement and has taken all necessary action to authorize
the execution, delivery and performance of his respective obligations under this Agreement.

16.    <u>No Admission</u>. This Agreement and all negotiations, statements, and proceedings in
connection therewith are not, will not be argued to be, and will not be deemed to be a presumption,
concession or admission by any Party of any fault, liability or wrongdoing whatsoever. This
Agreement and any matter relating thereto may not be offered or received in evidence or otherwise
referred to in any civil, criminal, or administrative action or proceeding as evidence of any fault,
liability or wrongdoing whatsoever as against the Settling Defendants. It is expressly agreed by

25

the Tremont Defendants and the Parent Defendants that the transfers from BLMIS to each of the Rye Funds as set forth in Exhibit C to this Agreement, which is expressly incorporated by reference herein, are deemed avoided.

17.     Further Assurances. The Trustee and each of the Settling Defendants shall execute and deliver any document or instrument reasonably requested by any of them after the date of this Agreement to effectuate this Agreement.

18.     Entire Agreement. This Agreement and the Escrow Agreement constitute the entire agreement and understanding between and among the Parties and together supersede all prior agreements, representations, and understandings concerning the subject matter hereof.

19.     Amendments, Waiver. This Agreement may not be terminated, amended, or modified in any way except in a writing signed by all of the Parties, including, without limitation, a writing executed in accordance with Paragraph 11b. No waiver of any provision of this Agreement shall be deemed to constitute a waiver of any other provision herein, whether or not similar, nor shall such waiver constitute a continuing waiver.

20.     Assignability. No Party hereto may assign its rights under this Agreement without the prior written consent of the other Parties hereto.

21.     Successors Bound. This Agreement shall be binding upon and inure to the benefit of each of the Parties and their successors and permitted assigns.

22.     No Third Party Beneficiary. Except as expressly provided in this Agreement, the Parties do not intend to confer any benefit by or under this Agreement upon any person or entity other than the Parties hereto and their respective successors and permitted  assigns.

26

23.    <u>Governing Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of New York, without regard to the application of New York's conflict of laws provisions.

24.    <u>Jurisdiction</u>. The Parties agree that the Bankruptcy Court shall have jurisdiction over any action to enforce this Agreement, or any provision thereof, and the Parties hereby consent to and submit to the jurisdiction of the Bankruptcy Court for any such actions. The Parties agree that no party shall bring, institute, prosecute, or maintain any action or proceeding pertaining to the enforcement of any  provision of this Agreement in any court other than the Bankruptcy Court, unless and to the extent the Bankruptcy Court lacks jurisdiction over any such action or proceeding.

25.    <u>Captions and Rules of Construction</u>. The captions in this Agreement are inserted only as a matter of convenience and for reference and do not define, limit, or describe the scope of this Agreement or the scope or content of any of its provisions. Any reference in this Agreement to a paragraph is to a paragraph of this Agreement. The use of the phrases "includes" and "including" are not limiting.

26.    <u>Counterparts, Electronic Copy of Signatures</u>. This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same document. The Parties may evidence their execution of this Agreement by delivery to the other Parties of scanned or faxed copies of their signatures with the same effect as the delivery of an original signature.

27.    <u>Termination of Agreements with BLMIS and the Trustee</u>. Effective as of the Closing, but subject to Paragraph 11b., except for this Agreement and the Escrow Agreement, each contract or

27

other agreement between any of the Settling Defendants and BLMIS or the Trustee shall terminate and shall have no force or effect, with no Party having liability thereunder to any other Party.

28.    <u>Notices</u>.  Any notices under this Agreement shall be in writing, shall be effective when received and may be delivered only by hand, by overnight delivery service, by fax, or by electronic transmission to:

If to the Trustee:

Irving H. Picard, Esq.
Email: ipicard@bakerlaw.com
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York  10111
Fax: (212) 589-4201

With copies to:

David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc D. Powers
Email: mpowers@bakerlaw.com
Baker & Hostetler LLP
45 Rockefeller Center, Suite 1100
New York, New York 10111
Tel: (212) 589-4200
Fax: (212) 589-4201

If to Tremont Defendants:

James G. McCormick
Email: jmccormick@tremont.com
Tremont Group Holdings, Inc.
555 Theodore Fremd Avenue
Rye, New York  10580
Tel: (914) 925-1143
Fax: (914) 925-4043

With copies to:

Seth M. Schwartz, Esq.
Email: seth.schwartz@skadden.com
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York  10036-6522
Tel: (212) 735-2710
Fax: (917) 777-2710

If to the Broad Market Fund, Prime Fund,
Portfolio Limited, Rye Insurance, XL LP, and/or
each of the individual Tremont Funds:

James G. McCormick
Email: jmccormick@tremont.com
Tremont Group Holdings, Inc.
555 Theodore Fremd Avenue
Rye, New York  10580
Tel: (914) 925-1143
Fax: (914) 925-4043

With copies to:

Jamie B.W. Stecher, Esq.
Email: Stecher@thshlaw.com
Ralph A. Siciliano, Esq.
Email: Siciliano@thshlaw.com
Tannenbaum Helpern Syracuse & Hirschtritt LLP
900 Third Avenue
New York, New York  10022
Tel: (212) 508-6738
Fax: (212) 937-3621

29

If to Oppenheimer Acquisition Corporation:

Robert G. Zack
Vice President, Secretary and General Counsel
Oppenheimer Acquisition Corp.
225 Liberty Street
New York, New York 10281-1008
Email: bzack@oppenheimerfunds.com
Tel: (212) 323-0250
Fax: (212) 323-4070

With copies to:

William K. Dodds, Esq.
Email: William.dodds@dechert.com
Dechert LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Tel: (212) 698-3557
Fax: (212) 698-3599

If to MassMutual Holding and/or Massachusetts
Mutual Life Insurance Company:

David S. Allen, Esq.
Email: dallen5@massmutual.com
Massachusetts Mutual Life Insurance Company
1295 State Street
Springfield, MA 01111
Tel: (413) 744-6414
Fax: (413) 226-2074

With copies to:

Joseph L. Kociubes, Esq.
Email: joe.kociubes@bingham.com
Bingham McCutchen LLP
One Federal Street
Boston, Massachusetts 02110-1726
Tel: (617) 951-8337
Fax: (617) 428-6334

If to Insurance Portfolio LDC:

Gary S. Lee
Email: glee@mofo.com
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104-0050
Tel: (212) 468-8042
Fax: (212) 468-7900

With copies to:

30

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be
executed as of the date first above written.

IRVING H. PICARD, Trustee

_____

TREMONT GROUP HOLDINGS, INC.

_____

Name:

Title:

TREMONT PARTNERS, INC.

_____

Name:

Title:

TREMONT (BERMUDA) LIMITED

_____

Name:

Title:

RYE SELECT BROAD MARKET FUND, L.P.

_____

Name:

Title:

31

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

IRVING H. PICARD, Trustee

_____

TREMONT GROUP HOLDINGS, INC.

_____
Name: Lynn Keeshan

Title:  President

TREMONT PARTNERS, INC.

_____
Name: Lynn Keeshan

Title:  President

TREMONT (BERMUDA) LIMITED

_____
Name: Lynn Keeshan

Title:  President

RYE SELECT BROAD MARKET FUND, L.P.

_____
Name: Lynn Keeshan

Title:   President, Tremont Partners, Inc., Gen. Part.

31

RYE SELECT BROAD MARKET PRIME FUND, L.P.

Name: Lynn Keeshan

Title:   President, Tremont Partners, Inc., Gen. Part.


RYE SELECT BROAD MARKET PORTFOLIO
LIMITED

Name: Darren Johnston

Title:   Director


RYE SELECT BROAD MARKET INSURANCE FUND,
L.P.

Name: Lynn Keeshan

Title:   President, Tremont GP, Inc., Gen. Part.


RYE SELECT BROAD MARKET XL FUND, L.P.

Name: Lynn Keeshan

Title:   President, Tremont Partners, Inc., Gen. Part.


TREMONT ARBITRAGE FUND, L.P.

Name: Lynn Keeshan

Title:   President, Tremont GP, Inc., Gen. Part.


32

TREMONT CAPITAL MANAGEMENT (IRELAND)
LIMITED for and on behalf of its sub-fund TREMONT
ARITRAGE FUND

_Lynn Keeshan_
Name: Lynn Keeshan

    Title:  Director

TREMONT CAPITAL MANAGEMENT (IRELAND)
LIMITED for and on behalf of its sub-fund TREMONT
EMERGING MARKETS FUND

_Lynn Keeshan_
Name: Lynn Keeshan

    Title:  Director

TREMONT CAPITAL MANAGEMENT (IRELAND)
LIMITED for and on behalf of its sub-fund TREMONT
EQUITY FUND

_Lynn Keeshan_
Name: Lynn Keeshan

    Title:  Director

TREMONT INTERNATIONAL INSURANCE FUND,
L.P.

_Lynn Keeshan_
Name: Lynn Keeshan

    Title:  President, Tremont Partners, Inc., Gen. Part.

33

TREMONT LONG/SHORT EQUITY FUND, L.P.

Name: Lynn Keeshan

Title: President, Tremont Partners, Inc., Gen. Part.


TREMONT MARKET NEUTRAL FUND, L.P.

Name: Lynn Keeshan

Title: President, Tremont Partners, Inc., Gen. Part.


TREMONT MARKET NEUTRAL FUND II, L.P.

Name: Lynn Keeshan

Title: President, Tremont Partners, Inc., Gen. Part.


TREMONT MARKET NEUTRAL FUND LIMITED

Name: Darren Johnston

Title: Director


TREMONT OPPORTUNITY FUND LIMITED

Name: Darren Johnston

Title: Director


34

TREMONT OPPORTUNITY FUND II, L.P.

Name: Lynn Keeshan

Title: President, Tremont Partners, Inc., Gen. Part.

TREMONT OPPORTUNITY FUND III, L.P.

Name: Lynn Keeshan

Title: President, Tremont Partners, Inc., Gen. Part.

RYE SELECT EQUITIES FUND

Name: Lynn Keeshan

Title: President, Tremont Partners, Inc., Gen. Part.

WALKERS SPV LIMITED, SOLELY IN ITS CAPACITY
AS TRUSTEE OF TREMONT MULTI MANAGER
FUND, A CLASS OF TREMONT ALTERNATIVE
INVESTMENT UNIT TRUST

Name:

Title:

LIFEINVEST OPPORTUNITY FUND LDC

Name:

Title:

35

TREMONT OPPORTUNITY FUND II, L.P.

Name: Lynn Keeshan

Title:   President, Tremont Partners, Inc., Gen. Part.

TREMONT OPPORTUNITY FUND III, L.P.

Name: Lynn Keeshan

Title:   President, Tremont Partners, Inc., Gen. Part.

RYE SELECT EQUITIES FUND

Name: Lynn Keeshan

Title:   President, Tremont Partners, Inc., Gen. Part.

WALKERS SPV LIMITED, SOLELY IN ITS CAPACITY
AS TRUSTEE OF TREMONT MULTI MANAGER
FUND, A CLASS OF TREMONT ALTERNATIVE
INVESTMENT UNIT TRUST

Name:                     Michelle Wilson-Clarke

Title:                       Authorised Signatory

LIFEINVEST OPPORTUNITY FUND LDC

Name:

Title:

35

TREMONT OPPORTUNITY FUND II, L.P.

_____
Name:

Title:


TREMONT OPPORTUNITY FUND III, L.P.

_____
Name:

Title:


RYE SELECT EQUITIES FUND

_____
Name:

Title:


TREMONT MULTI MANAGER FUND

_____
Name:

Title:


LIFEINVEST OPPORTUNITY FUND LDC

Name: _Alan Milgate_

Title: _Director_

35

MASSMUTUAL HOLDING LLC

_____

Name:

Title:


MASSACHUSETTS MUTUAL LIFE INSURANCE CO.

_____

Name:

Title:


ROBERT I. SCHULMAN

_____

Name:


RYE SELECT BROAD MARKET INSURANCE
PORTFOLIO, LDC

_____

Name:

Title:

35

OPPENHEIMER ACQUISITION CORP.

Name: *WILLIAM F. GLAVIN, Jr.*

Title: *CHIEF EXECUTIVE OFFICER
PRESIDENT + MANAGING DIRECTOR*

MASSMUTUAL HOLDING LLC

Name:

Title:

MASSACHUSETTS MUTUAL LIFE INSURANCE CO.

Name:

Title:

ROBERT I. SCHULMAN

Name:

Title:

RYE SELECT BROAD MARKET INSURANCE
PORTFOLIO, LDC

Name:

Title:

36

OPPENHEIMER ACQUISITION CORP.

_____

Name:

Title:

MASSMUTUAL HOLDING LLC

Name: JOSEPH L. KOCIUBES

Title: AUTHORIZED ATTORNEY

MASSACHUSETTS MUTUAL LIFE INSURANCE CO.

Name: JOSEPH L. KOCIUBES

Title: AUTHORIZED ATTORNEY

ROBERT I. SCHULMAN

_____

Name:

Title:

RYE SELECT BROAD MARKET INSURANCE
PORTFOLIO, LDC

_____

Name:

Title:

36