# EXHIBIT 22

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>         Plaintiff, <br><br>     v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>         Defendant. | 12-mc-00115 (JSR) <br><br> ECF Case <br><br> Electronically Filed |
| In re: <br><br> MADOFF SECURITIES | |

**DECLARATION OF MARCO E. SCHNABL IN SUPPORT OF THE**
**EXTRATERRITORIAL DEFENDANTS' MOTION TO DISMISS**

Pursuant to 28 U.S.C. § 1746, Marco E. Schnabl declares:

1. I am a member of the bar of this Court and a member of the law firm

Skadden, Arps, Slate, Meagher & Flom LLP.

2. I am counsel to Defendants UniCredit S.p.A., Pioneer Global Asset

Management S.p.A, and Pioneer Alternative Investment Management Ltd., but submit this

declaration in support of the motion made by all Extraterritorial Defendants[1] to dismiss with

---

[1] As defined in the Memorandum of Law in Support of the Extraterritorial Defendants' Motion to Dismiss, dated July 13, 2012, filed contemporaneously herewith.

prejudice the claims seeking recovery against such Extraterritorial Defendants on grounds that

certain statutory provisions on which the plaintiff relies have no extraterritorial reach.

        3.        I hereby place before the Court true and correct copies of the following

documents:

| | |
|---|---|
| Exhibit A | Extraterritoriality Order, *SIPC v. Bernard L. Madoff Inv. Sec. LLC* (In re Madoff Sec.), No. 12-mc-0115, (S.D.N.Y. June 7, 2012), ECF No. 167. |
| Exhibit B | Consent Order, *SIPC v. Bernard L. Madoff Inv. Sec. LLC* (In re Madoff Sec.), No. 12-mc-0115, (S.D.N.Y. June 26, 2012), ECF No. 203. |
| Exhibit C | Judgment, Eastern Caribbean Court of Appeal, Territory of the Virgin Islands, *Quilvest Finance Ltd. et al. v. Fairfield Sentry Ltd. (In Liquidation)*, HCVAP 2011/Q41 *et al.* (entered June 13, 2011). |
| Exhibit D | Trustee's Memorandum of Law in Opposition to Primeo Fund's Motion to Withdraw the Reference, *Picard v. HSBC*, 11-civ-06524 (JSR) (S.D.N.Y. Dec. 7, 2011), ECF No. 18. |
| Exhibit E | Trustee's Memorandum of Law in Opposition to Defendant's Motion to Withdraw the Reference, *Picard v. Banco Bilbao Vizcaya Argentaria, S.A.*, 11-civ-07100 (JSR) (S.D.N.Y. Jan. 31, 2012), ECF No. 15. |
| Exhibit F | Trustee's Memorandum of Law in Opposition to Defendants' Motions to Withdraw the Reference, *Picard v. Oreades Sicav*, 11 Civ. 07763 (JSR) (S.D.N.Y. Feb. 21, 2012), ECF No. 17. |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 13, 2012 in New York, New York.

                                          */s/ Marco E. Schnabl*
                                           Marco E. Schnabl

Case 1:12-mc-00115-JSR Document 236-1 Filed 07/16/12 Page 1 of 23

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES INVESTOR PROTECTION
CORPORATION,

Plaintiff,

v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

Defendant.

12-MC-0115

**ORDER**

In re:

MADOFF SECURITIES

**(Relates to consolidated proceedings
on Extraterritoriality Issues)**

PERTAINS TO CASES LISTED IN EXHIBIT A

JED S. RAKOFF, U.S.D.J.:

  WHEREAS:

   A. Pending before the Court are various adversary proceedings commenced by Irving

H. Picard, as trustee ("Trustee"), in connection with the substantively consolidated liquidation

proceedings of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of

Bernard L. Madoff under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*

("SIPA"), in which the Trustee has sought to avoid or recover certain transfers made by BLMIS

in the 90 day, two year, six year and/or longer period(s) preceding December 11, 2008 (the

"Transfers"). In these proceedings, certain defendants (the "Extraterritoriality Defendants") have

sought withdrawal of the reference from the Bankruptcy Court to this Court, among other

grounds, for the Court's determination of the Extraterritoriality Issue as defined below.

B.     Exhibit A hereto, prepared by the Trustee's counsel, identifies the single cases or, in certain instances, the lead case of related adversary proceedings where defendants are represented by common counsel, in which Extraterritoriality Defendants have filed motions to withdraw the reference (or joined in such motions, which joinders are deemed included in the scope of this Order unless expressly stated otherwise on Exhibit A) from the Bankruptcy Court to this Court to determine whether SIPA and/or the Bankruptcy Code as incorporated by SIPA apply extraterritorially, permitting the Trustee to avoid the initial Transfers that were received abroad or to recover from initial, immediate or mediate foreign transferees (the "Extraterritoriality Issue"). Such cases and joinders are referred to herein as the "Adversary Proceedings."

C.     The Court, over the objections of the Trustee and the Securities Investor Protection Corporation ("SIPC"), previously withdrew the reference from the Bankruptcy Court to consider issues concerning whether the Trustee may avoid or recover Transfers that BLMIS made to certain defendants abroad. _See_ Primeo Fund, et al., No. 12 MC 0115 (S.D.N.Y. Order dated May 15, 2012) [ECF No. 97] (the "Extraterritoriality Withdrawal Ruling").

D.     Pursuant to Extraterritoriality Withdrawal Ruling, the Court has decided to consolidate briefing on the merits of the Extraterritoriality Issue, and the resolution of this issue will govern all pending motions to withdraw the reference and those pending motions to dismiss that have not yet been fully briefed and argued. See Extraterritorial Withdrawal Ruling, p. 10-11; SIPC v. Bernard L. Madoff Inv. Secs. LLC (In re Madoff Secs.), No. 12 MC 0115 (S.D.N.Y. Order dated Apr. 19, 2012) [ECF No. 22] (the "Common Briefing Order"). The Court's Extraterritoriality Withdrawal Ruling also directed counsel for the Trustee to convene a

conference among the Extraterritoriality Defendants and to schedule consolidated proceedings no later than May 23, 2012.

E.      On May 23, 2012 counsel for the Trustee, SIPC, and the Extraterritoriality Defendants convened a conference call with the Court, and the Court thereafter ordered that the parties submit by no later than June 6, 2012 a proposed order agreed to by the parties for withdrawal and briefing of a consolidated motion to dismiss related to the Extraterritoriality Issue.

BASED ON THE FOREGOING, IT IS HEREBY ORDERED AS FOLLOWS:

1.      The reference of the Adversary Proceedings listed in Exhibit A is withdrawn, in part, from the Bankruptcy Court to this Court solely with respect to the Extraterritoriality Defendants for the limited purpose of hearing and determining whether SIPA and/or the Bankruptcy Code as incorporated by SIPA apply extraterritorially, permitting the Trustee to avoid the initial Transfers that were received abroad or to recover from initial, immediate or mediate foreign transferees.  Except as otherwise provided herein or in other orders of this Court, the reference to the Bankruptcy Court is otherwise maintained for all other purposes.

2.      The Trustee and SIPC are deemed to have raised, in response to all pending motions for withdrawal of the reference based on the Extraterritoriality Issue, all arguments previously raised by either or both of them in opposition to all such motions granted by the Extraterritoriality Withdrawal Ruling, and such objections or arguments are deemed to be overruled, solely with respect to the Extraterritoriality Issue, for the reasons stated in the Extraterritoriality Withdrawal Ruling.

3.      All objections that could be raised by the Trustee and/or SIPC to the pending motions to withdraw the reference in the Adversary Proceedings, and the defenses and

300245889                                              3

responses thereto that may be raised by the affected defendants, are deemed preserved on all
matters.

4.      On or before July 13, 2012, the Extraterritoriality Defendants shall file a single
consolidated motion to dismiss pursuant to Fed. R. Civ. P. 12 (made applicable to the Adversary
Proceeding by Fed. R. Bankr. P. 7012) and a single consolidated supporting memorandum of
law, not to exceed forty (40) pages (together, the "Extraterritoriality Motion to Dismiss").

5.      The Trustee and SIPC shall each file a memorandum of law in opposition to the
Extraterritoriality Motion to Dismiss, not to exceed forty (40) pages each, addressing the
Extraterritoriality Withdrawal Ruling Issue (the "Trustee's Opposition") on or before August 17,
2012.

6.      Young Conaway Stargatt & Taylor, LLP, which is conflicts counsel for the
Trustee, and Windels Marx Lane & Mittendorf, LLP, which is special counsel to the Trustee,
each may file a joinder, not to exceed two (2) pages (excluding exhibits identifying the relevant
adversary proceedings), to the Trustee's Opposition, on behalf of the Trustee in certain of the
adversary proceedings listed on Exhibit A hereto on or before August 17, 2012. In either case,
the respective joinders may only specify what portions of the Trustee's Opposition are joined and
shall not make or offer any additional substantive argument.

7.      The Extraterritoriality Defendants shall file one consolidated reply brief, not to
exceed twenty (20) pages, on or before August 31, 2012 (the "Reply Brief"). In the event the
Trustee files an amended complaint (the "Amended Complaint") in any of the Adversary
Proceedings after the Extraterritoriality Motion to Dismiss is filed, the Reply Brief shall include
a reference (by civil action number and docket number only) to a representative Amended
Complaint filed by the Trustee against Extraterritoriality Defendants. Any further requirement

300245889                                           4

that the Amended Complaints subject to the Extraterritoriality Motion to Dismiss be identified or filed is deemed waived and satisfied. In the event the Trustee files an Amended Complaint, he shall, at the time the Amended Complaint is filed, provide the Extraterritoriality Defendants a blackline reflecting the changes made in the Amended Complaint from the then operative complaint.

8.    The Court will hold oral argument on the Extraterritoriality Motion to Dismiss on September 21, 2012, at 4:00 p.m. (the "Hearing Date").

9.    On or before August 31, 2012, the Extraterritoriality Defendants shall designate one lead counsel to advocate their position at oral argument on the Hearing Date, but any other attorney who wishes to be heard may appear and so request.

10.    The caption displayed on this Order shall be used as the caption for all pleadings, notices and briefs to be filed pursuant to this Order.

11.    All communications and documents (including drafts) exchanged between and among any of the defendants in any of the adversary proceedings, and/or their respective attorneys, shall be deemed to be privileged communications and/or work product, as the case may be, subject to a joint interest privilege.

12.    This Order is without prejudice to any and all grounds for withdrawal of the reference (other than the Extraterritoriality Issue) raised in the Adversary Proceedings by the Extraterritoriality Defendants and any matter that cannot properly be raised or resolved on a Rule 12 motion, all of which are preserved.

13.    Nothing in this Order shall: (a) waive or resolve any issue not specifically raised in the Extraterritoriality Motion to Dismiss; (b) waive or resolve any issue raised or that could be raised by any party other than with respect to the Extraterritoriality Issue, including related issues

300245889                                                5

that cannot be resolved on a motion under Fed. R. Civ. P. 12; or (c) notwithstanding Fed. R. Civ. P. 12(g)(2) or Fed. R. Bankr. P. 7012(g)(2), except as specifically raised in the Extraterritoriality Motion to Dismiss, limit, restrict or impair any defense or argument that has been raised or could be raised by any Extraterritoriality Defendant in a motion to dismiss under Fed. R. Civ. P. 12 or Fed. R. Bankr. P. 7012, or any other defense or right of any nature available to any Extraterritoriality Defendant (including, without limitation, all defenses based on lack of personal jurisdiction or insufficient service of process), or any argument or defense that could be raised by the Trustee or SIPC in response thereto.

14.     Nothing in this Order shall constitute an agreement or consent by any Extraterritoriality Defendant to pay the fees and expenses of any attorney other than such defendant's own retained attorney. This paragraph shall not affect or compromise any rights of the Trustee or SIPC.

15.     This Order is without prejudice to and preserves all objections of the Trustee and SIPC to timely-filed motions for withdrawal of the reference currently pending before this Court (other than the withdrawal of the reference solely with respect to the Extraterritoriality Issue) with respect to the Adversary Proceedings, and the defenses and responses thereto that may be raised by the affected defendants, are deemed preserved on all matters.

16.     The procedures established by this Order, or by further Order of this Court, shall constitute the sole and exclusive procedures for determination of the Extraterritoriality Issue in the Adversary Proceedings (except for any appellate practice resulting from such determination), and this Court shall be the forum for such determination. To the extent that briefing or argument schedules were previously established with respect to the Extraterritoriality Issue in any of the Adversary Proceedings, this Order supersedes all such schedules solely with respect to the

300245889                        6

Extraterritoriality Issue. To the extent that briefing or argument schedules are prospectively established with respect to motions to withdraw the reference or motions to dismiss in any of the Adversary Proceedings, the Extraterritoriality Issue shall be excluded from such briefing or argument and such order is vacated. For the avoidance of doubt, to the extent any of the Extraterritoriality Defendants have issues other than the Extraterritoriality Issue or issues set forth in the Common Briefing Order that were withdrawn, those issues will continue to be briefed on the schedule previously ordered by the Court. Except as stated in this paragraph, this Order shall not be deemed or construed to modify, withdraw or reverse any prior Order of the Court that granted withdrawal of the reference in any Adversary Proceeding for any reason.

SO ORDERED.

Dated: New York, New York
        June 6, 2012

                                        JED S. RAKOFF, U.S.D.J.

**EXHIBIT A**

| | | | |
|---|---|---|---|
| 1. | *Picard v. Primeo* | 11-cv-06524-JSR | Morrison & Foerster LLP<br>Gary S. Lee<br>(glee@mofo.com)<br>Joel C. Haims<br>(jhaims@mofo.com)<br>LaShann M. DeArcy<br>(ldearcy@mofo.com)<br>Kiersten A. Fletcher<br>(kfletcher@mofo.com) |
| 2. | *Picard v. ABN AMRO Bank N.V. (presently known as the Royal Bank of Scotland, N.V.), et al.* (as filed by Rye Select Broad Market XL Portfolio Ltd.) | 11-cv-06848-JSR | Morrison & Foerster LLP<br>Gary S. Lee<br>(glee@mofo.com)<br>Joel C. Haims<br>(jhaims@mofo.com)<br>LaShann M. DeArcy<br>(ldearcy@mofo.com)<br>Kiersten A. Fletcher<br>(kfletcher@mofo.com) |
| 3. | *Picard v. ABN AMRO Bank N.V. (presently known as the Royal Bank of Scotland, N.V.), et al.* (as filed by ABN AMRO Incorporated, ABN AMRO Bank, N.V.) | 11-cv-06878-JSR | Allen & Overy LLP<br>Michael S. Feldberg<br>(michael.feldberg@allenovery.com)<br>Bethany Kriss<br>(bethany.kriss@allenovery.com) |
| 4. | *Picard v. ABN AMRO (Ireland) Ltd. (F/N/A Fortis Prime Fund Solutions Bank (Ireland) Ltd.), et al.* (as filed by Rye Select Broad Market XL Portfolio Ltd.) | 11-cv-06849-JSR | Morrison & Foerster LLP<br>Gary S. Lee<br>(glee@mofo.com)<br>Joel C. Haims<br>(jhaims@mofo.com)<br>LaShann M. DeArcy<br>(ldearcy@mofo.com)<br>Kiersten A. Fletcher<br>(kfletcher@mofo.com) |

| 5. | *Picard v. ABN AMRO (Ireland) Ltd. (F/N/A Fortis Prime Fund Solutions Bank (Ireland) Ltd.,), et al.,* (as filed by ABN AMRO Custodial Services (Ireland) Ltd., ABN AMRO Bank (Ireland), Ltd.) | 11-cv-06877-JSR | Latham & Watkins<br>Christopher Harris<br>(christopher.harris@lw.com)<br>Cameron Smith<br>(cameron.smith@lw.com) |
| --- | --- | --- | --- |
| 6. | *Picard v. Banco Bilbao Vizcaya Argentaria, S.A.* | 11-cv-07100-JSR | Shearman & Sterling LLP<br>Heather Kafele<br>(hkafele@shearman.com)<br>Joanna Shally<br>(jshally@shearman.com) |
| 7. | *Picard v. Federico Ceretti, et al.* (as filed by Federico Ceretti, Carlo Grosso, FIM Limited and FIM Advisers LLP) | 11-cv-07134-JSR | Paul Hastings LLP<br>Jodi Kleinick<br>(jodikleinick@paulhastings.com)<br>Barry Sher<br>(barrysher@paulhastings.com)<br>Mor Wetzler<br>(morwetzler@paulhastings.com) |
| 8. | *Picard v. Oreades Sicav, et al.* (as filed by BNP Paribas Investment Partners Luxembourg S.A., BGL BNP Paribas S.A. and BNP Paribas Securities Services S.A.) | 11-cv-07763-JSR | Cleary Gottlieb Steen & Hamilton LLP<br>Lawrence B. Friedman<br>(lfriedman@cgsh.com)<br>Breon S. Peace<br>(bpeace@cgsh.com) |
| 9. | *Picard v. Equity Trading Portfolio Ltd, et al.* (as filed by BNP Paribas Arbitrage SNC) | 11-cv-07810-JSR | Cleary Gottlieb Steen & Hamilton LLP<br>Lawrence B. Friedman<br>(lfriedman@cgsh.com)<br>Breon S. Peace<br>(bpeace@cgsh.com) |
| 10. | *Picard v. BNP Paribas Arbitrage SNC* | 12-cv-00641-JSR | Cleary Gottlieb Steen & Hamilton LLP<br>Lawrence B. Friedman<br>(lfriedman@cgsh.com)<br>Breon S. Peace |

| | | | (bpeace@cgsh.com) |
|---|---|---|---|
| 11. | *Picard v. Barclays Bank (Suisse) S.A., et al* | 12-cv-01882-JSR | Hogan Lovells US LLP<br>Marc J. Gottridge<br>(marc.gottridge@hoganlovells.com)<br>Andrew M. Behrman<br>(andrew.behrman@hoganlovells.com) |
| 12. | *Picard v. ABN AMRO Bank N.V. (presently known as The Royal Bank of Scotland, N.V.), et al* | 12-cv-01939-JSR | Allen & Overy LLP<br>Michael S. Feldberg<br>(michael.feldberg@allenovery.com)<br>Bethany Kriss<br>(bethany.kriss@allenovery.com) |
| 13. | *Picard v. Kohn, et al.* (as filed by UniCredit Bank Austria) | 12-cv-02161-JSR | Sullivan & Worcester LLP<br>Franklin B. Velie<br>(fvelie@sandw.com)<br>Jonathan Kortmansky<br>(jkortmansky@sandw.com)<br>Mitchell C. Stein<br>(mstein@sandw.com) |
| 14. | *Picard v. HSBC Bank, plc, et al.* (as filed by UniCredit Bank Austria) | 12-cv-02162-JSR | Sullivan & Worcester LLP<br>Franklin B. Velie<br>(fvelie@sandw.com)<br>Jonathan Kortmansky<br>(jkortmansky@sandw.com)<br>Mitchell C. Stein<br>(mstein@sandw.com) |
| 15. | *Picard v. HSBC Bank, plc, et al.* (as filed by UniCredit S.p.A. and Pioneer) | 12-cv-02239-JSR | Skadden, Arps, Slate, Meagher, & Flom LLP<br>(susan.saltzstein@Skadden.com)<br>Marco E. Schnabl<br>(Marco.Schnabl@Skadden.com) |

| No. | Case | Case No. | Counsel |
|-----|------|----------|---------|
| 16. | *Picard v. Kohn, et al.* (as filed by UniCredit S.p.A. and Pioneer) | 12-cv-02240-JSR | Jeremy A. Berman (jeremy.berman@Skadden.com) Jason C. Putter (jason.putter@skadden.com) Skadden, Arps, Slate, Meagher, & Flom LLP Susan L. Saltzstein (susan.saltzstein@Skadden.com) Marco E. Schnabl (Marco.Schnabl@Skadden.com) Jeremy A. Berman (jeremy.berman@Skadden.com) Jason C. Putter (jason.putter@skadden.com) |
| 17. | *Picard v. Bank Julius Baer & Co., Ltd.* | 12-cv-02311-JSR | McKool Smith P.C. John P. Cooney, Jr. (jcooney@mckoolsmith.com) Eric B. Halper (ehalper@mckoolsmith.com) Virginia I. Weber (vweber@mckoolsmith.com) |
| 18. | *Picard v. Lion Global Investors Limited* | 12-cv-02349-JSR | Proskauer Rose LLP Gregg M. Mashberg (gmashberg@proskauer.com) Richard L. Spinogatti (rspinogatti@proskauer.com) |
| 19. | *Picard v. Grosvenor Investment Management Ltd., et al.* | 12-cv-02351-JSR | Proskauer Rose LLP Richard L. Spinogatti (rspinogatti@proskauer.com) |
| 20. | *Picard v. Inteligo Bank Ltd. Panama Branch f/k/a/ Blubank Ltd. Panama Branch* | 12-cv-02364-JSR | Shearman & Sterling LLP Heather Kafele (hkafele@shearman.com) Joanna Shally (jshally@shearman.com) Jessica Bartlett |

| | | | (jessica.bartlett@shearman.com) |
|---|---|---|---|
| 21. | *Picard v. Banca Carige, S.P.A.* | 12-cv-02408-JSR | Kasowitz, Benson, Torres, & Friedman LLP<br>David J. Mark<br>(dmark@kasowitz.com) |
| 22. | *Picard v. Somers Dublin Limited, et al.* | 12-cv-02430-JSR | Cleary Gottlieb Steen & Hamilton LLP<br>Evan A. Davis<br>(edavis@cgsh.com)<br>Thomas J. Moloney<br>(tmoloney @cgsh.com) |
| 23. | *Picard v. HSBC Bank, plc, et al.* (as filed by the HSBC Defendants) | 12-cv-02431-JSR | Cleary Gottlieb Steen & Hamilton LLP<br>Charles J. Keeley<br>(cjkeeley@cgsh.com)<br>Tom Moloney<br>(tmoloney@cgsh.com)<br>Evan Davis<br>(edavis@cgsh.com)<br>David Brodsky<br>(dbrodsky@cgsh.com) |
| 24. | *Picard v. Banco Itau Europa Luxembourg S.A., et al* | 12-cv-02432-JSR | Shearman & Sterling LLP<br>Heather Kafele<br>(hkafele@shearman.com)<br>Joanna Shally<br>(jshally@shearman.com) |
| 25. | *Caceis Bank Luxembourg, et al.* | 12-cv-02434-JSR | Kelley Drye & Warren LLP<br>Thomas B. Kinzler<br>(tkinzler@kelleydrye.com)<br>Daniel Schimmel<br>(dschimmel@kelleydrye.com)<br>Jaclyn M. Metzinger<br>(jmetzinger@kelleydrye.com) |

| # | Case | Docket | Counsel |
|---|---|---|---|
| 26. | *Picard v. Banque Privee Espirito Santo S.A.* | 12-cv-02442-JSR | Flemming Zulack Williamson Zauderer LLP<br>Elizabeth A. O'Connor (eoconnor@fzwz.com)<br>John F. Zulack (Jzulack@fzwz.com)<br>Megan Davis (mdavis@fzwz.com) |
| 27. | *Picard v. Nomura International PLC* | 12-cv-02443-JSR | Shearman & Sterling LLP<br>Brian H. Polovoy (bpolovoy@shearman.com)<br>Christopher R. Fenton (Cfenton@shearman.com)<br>Andrew Z. Lipson (alipson@shearman.com) |
| 28. | *Picard v. Nomura Bank International PLC* | 12-cv-02446-JSR | Shearman & Sterling LLP<br>Brian H. Polovoy (bpolovoy@shearman.com)<br>Christopher R. Fenton (Cfenton@shearman.com)<br>Andrew Z. Lipson (alipson@shearman.com) |
| 29. | *Picard v. The Sumitomo Trust and Banking Co., Ltd.* | 12-cv-02481-JSR | Becker, Glynn, Melamed & Muffly LLP<br>Zeb Landsman (zlandsman@beckerglynn.com)<br>Jordan E. Stern (jstern@beckerglynn.com)<br>Michelle Mufich (mmufich@beckerglynn.com) |
| 30. | *Picard v. UBS AG, et al.* (M&B Capital Advisers Sociedad de Valores, S.A., M&B Capital Advisers Gestion SGIIC, S.A. - | 12-cv-02483-JSR | Cravath, Swaine & Moore LLP<br>David Greenwald (dgreenwald@cravath.com)<br>Richard Levin |

| | Moving Parties) [Amended Motion to Withdraw] | | (rlevin@cravath.com) |
|---|---|---|---|
| 31. | *Picard v. Unifortune Asset Management SGR SPA, et al.* | 12-cv-02485-JSR | Cravath, Swaine & Moore LLP<br>David Greenwald<br>(dgreenwald@cravath.com)<br>Richard Levin<br>(rlevin@cravath.com) |
| 32. | *Picard v. Trincaster Corporation* | 12-cv-02486-JSR | Cravath, Swaine & Moore LLP<br>David Greenwald<br>(dgreenwald@cravath.com)<br>Richard Levin<br>(rlevin@cravath.com) |
| 33. | *Picard v. Banque Syz & Co., SA* | 12-cv-02489-JSR | Cravath, Swaine & Moore LLP<br>David Greenwald<br>(dgreenwald@cravath.com)<br>Richard Levin<br>(rlevin@cravath.com) |
| 34. | *Picard v. Square One Fund Ltd., et al.* | 12-cv-02490-JSR | Tannenbaum Helpern Syracuse & Hirschtritt LLP; Brune & Richard LLP.<br>Tannenbaum Helpern Syracuse & Hirschtritt LLP<br>Tammy P. Bieber<br>(bieber@thsh.com)<br><br>Brune & Richard LLP<br>David Elbaum<br>(delbaum@bruneandrichard.com)<br><br>Bernfeld, DeMatteo & Bernfeld, LLP |

| | | | David Bernfeld (davidbernfeld@bernfeld-dematteo.com) |
|---|---|---|---|
| 35. | *Picard v. Credit Agricole (Suisse) S.A., et al.* | 12-cv-02494-JSR | Cleary Gottlieb Steen & Hamilton LLP Lawrence B. Friedman (lfriedman@cgsh.com) |
| 36. | *Picard v. SNS Bank N.V., et al* | 12-cv-02509-JSR | Wilmer Cutler Pickering Hale and Dorr LLP Andrea J. Robinson (andrea.robinson@wilmerhale.com) Charles C. Platt (charles.platt@wilmerhale.com) George W. Shuster, Jr. (george.shuster@wilmerhale.com) |
| 37. | *Picard v. Quilvest Finance Ltd.* | 12-cv-02580-JSR | Jones Day Thomas E. Lynch (telynch@jonesday.com) Scott J. Friedman (sjfriedman@jonesday.com) |
| 38. | *Picard v. Arden Asset Management, Inc., et al.* | 12-cv-02581-JSR | Seward & Kissel LLP M. William Munno (munno@sewkis.com) Mandy DeRoche (deroche@sewkis.com) Michael B. Weitman (weitman@sewkis.com) |
| 39. | *Picard v. Banque J. Safra (Suisse) SA* | 12-cv-02587-JSR | Sullivan & Cromwell LLP Robinson B. Lacy (lacyr@sullcrom.com) Joshua Fritsch (fritschj@sullcrom.com) Angelica M. Sinopole (sinopolea@sullcrom.com) |

| 40. | *Picard v. Vizcaya Partners Limited, et al.* | 12-cv-02588-JSR | Sullivan & Cromwell LLP (for Bank J. Safra (Gibraltar) Limited) Robinson B. Lacy (lacyr@sullcrom.com) Joshua Fritsch (fritschj@sullcrom.com) Angelica M. Sinopole (sinopolea@sullcrom.com)<br><br>Katten Muchin Rosenman LLP (for Zeus Partners Ltd) Anthony L. Paccione (anthony.paccione@kattenlaw.com) |
| --- | --- | --- | --- |
| 41. | *Picard v. Abu Dhabi Investment Authority* | 12-cv-02616-JSR | Quinn Emanuel Urquhart & Sullivan, LLP Peter E. Calamari (petercalamari@quinnemanuel.com) Marc L. Greenwald (marcgreenwald@quinnemanuel.com) Eric M. Kay (erickay@quinnemanuel.com) David S. Mader (davidmader@quinnemanuel.com) |
| 42. | *Picard v. Fairfield Sentry Limited, et al.* (as filed by Chester Global Strategy Fund Limited, Chester Global Strategy Fund, LP, Irongate Global Strategy Fund Limited, Fairfield Greenwich Fund | 12-cv-02619-JSR | Simpson Thacher & Bartlett LLP Mark G. Cunha (mcunha@stblaw.com) Peter E. Kazanoff (pkazanoff@stblaw.com)<br><br>Wollmuth Maher & Deutsch LLP |

| (Luxembourg), Fairfield Investment Fund Limited, Fairfield Investors (Euro) Ltd., and Stable Fund LP) | | Frederick R. Kessler (fkessler@wmd-law.com) Paul R. DeFilippo (pdefilippo@wmd-law.com) Michael P. Burke (mburke@wmd-law.com) |
|---|---|---|
| | | Debevoise & Plimpton LLP Mark P. Goodman (mpgoodman@debevoise.com) |
| | | O'Shea Partners LLP Sean F. O'Shea (soshea@osheapartners.com) Michael E. Petrella (mpetrella@osheapartners.com) |
| | | White & Case LLP Glenn M. Kurtz (gkurtz@whitecase.com) Andrew W. Hammond (ahammond@whitecase.com) |
| | | Covington & Burling LLP Bruce A. Baird (bbaird@cov.com) |
| | | Kasowitz, Benson, Torres & Friedman LLP Daniel J. Fetterman (dfetterman@kasowitz.com) |
| | | Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C. Edward M. Spiro (espiro@maglaw.com) |

| | | | |
|---|---|---|---|
| 43. | *Picard v. Fairfield Sentry Limited, et al. (Joint Memorandum filed by various defendants)* | 12-cv-02638-JSR | Dechert LLP<br>Andrew J. Levander<br>(andrew.levander@dechert.com)<br>David S. Hoffner<br>(david.hoffner@dechert.com)<br><br>Simpson Thacher & Bartlett LLP<br>Mark G. Cunha<br>(mcunha@stblaw.com)<br>Peter E. Kazanoff<br>(pkazanoff@stblaw.com)<br><br>Wollmuth Maher & Deutsch LLP<br>Frederick R. Kessler<br>(fkessler@wmd-law.com)<br>Paul R. DeFilippo<br>(pdefilippo@wmd-law.com)<br>Michael P. Burke<br>(mburke@wmd-law.com)<br><br>Debevoise & Plimpton LLP<br>Mark P. Goodman<br>(mpgoodman@debevoise.com)<br><br>O'Shea Partners LLP<br>Sean F. O'Shea<br>(soshea@osheapartners.com)<br>Michael E. Petrella<br>(mpetrella@osheapartners.com)<br><br>White & Case LLP<br>Glenn M. Kurtz<br>(gkurtz@whitecase.com)<br>Andrew W. Hammond<br>(ahammond@whitecase.com) |

| | | | Covington & Burling LLP<br>Bruce A. Baird<br>(bbaird@cov.com)<br><br>Kasowitz, Benson, Torres & Friedman LLP<br>Daniel J. Fetterman<br>(dfetterman@kasowitz.com)<br><br>Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C.<br>Edward M. Spiro<br>(espiro@maglaw.com)<br><br>Dechert LLP<br>Andrew J. Levander<br>(andrew.levander@dechert.com)<br>David S. Hoffner<br>(david.hoffner@dechert.com) |
| 44. | *Picard v. Plaza Investments International Limited, et al.* | 12-cv-02646-JSR | Debevoise & Plimpton LLP<br>Joseph P. Moodhe<br>(Jpmoodhe@debevoise.com)<br>Shannon Rose Selden<br>(srselden@debevoise.com) |
| 45. | *Picard v. Defender Limited, et al* (Defender Limited, Reliance Management (BVI) Limited, Reliance Management (Gibraltar) Limited and Tim Brockmann — Moving Parties) | 12-cv-02800-JSR | Klestadt & Winters LLP<br>Tracy L. Klestadt<br>(tklestadt@klestadt.com)<br>Brendan M. Scott<br>(bscott@klestadt.com) |
| 46. | *Picard v. UBS AG, et al.* (Reliance Management (BVI) Limited and Reliance Management (Gibraltar) Limited | 12-cv-02802-JSR | Klestadt & Winters LLP<br>Tracy L. Klestadt<br>(tklestadt@klestadt.com)<br>Brendan M. Scott |

| | – Moving Parties) | | (bscott@klestadt.com) |
|---|---|---|---|
| 47. | *Picard vs. The Estate of Doris Igoin, et al.* | 12-cv-02872-JSR | Kelley Drye & Warren LLP<br>Jonathan K. Cooperman<br>(Jcooperman@KelleyDrye.com)<br>Seungwhan Kim<br>(skim@kelleydrye.com) |
| 48. | *Picard v. KBC Investments Limited,* | 12-cv-02877-JSR | Sidley Austin LLP<br>Alan M. Unger<br>(aunger@sidley.com)<br>Bryan Krakauer<br>(bkrakauer@sidley.com) |
| 49. | *Picard v. Meritz Fire & Marine Insurance Co. Ltd.* | 12-cv-02878-JSR | Steptoe & Johnson LLP<br>Kristin Darr<br>(kdarr@steptoe.com)<br>Seong H. Kim<br>(skim@steptoe.com) |
| 50. | *Picard v. Leon Flax, et al.* | 12-cv-02928-JSR | Katten Muchin Rosenman LLP<br>Anthony L. Paccione<br>anthony.paccione@kattenlaw.com<br>Brian L. Muldrew<br>brian.muldrew@kattenlaw.com |
| 51. | *Picard v. Orbita Capital Return Strategy Limited* | 12-cv-02934-JSR | Dechert LLP<br>Gary Mennitt<br>(gary.mennitt@dechert.com) |
| 52. | *Picard v. Atlantic Security Bank* | 12-cv-02980-JSR | Arnold & Porter LLP<br>Scott B. Schreiber<br>(Scott.Schreiber@aporter.com)<br>Andrew T. Karron<br>(Andrew.Karron@aporter.com) |

| 53. | *Picard v. Cardinal Management Inc., et al* | 12-cv-02981-JSR | Clifford Chance US LLP<br>Jeff E. Butler<br>(jeff.butler@cliffordchance.com) |
|-----|---------------------------------------------|-----------------|----------------------------------------------------------------------------|
| 54. | *Picard v. Radcliff Investments Limited, et al.* | 12-cv-02982-JSR | Clifford Chance US LLP<br>Jeff E. Butler<br>(jeff.butler@cliffordchance.com) |
| 55. | *Picard v. Pictet et Cie* | 12-cv-03402-JSR | Debevoise & Plimpton LLP<br>Michael E. Wiles<br>(mewiles@debevoise.com) |
| 56. | *Picard v. Merrill Lynch International* | 12-cv-03486-JSR | Arnold & Porter LLP<br>Pamela A. Miller<br>(Pamela.Miller@aporter.com)<br>Kent A. Yalowitz<br>(Kent.Yalowitz@aporter.com) |
| 57. | *Picard v. Merrill Lynch Bank (Suisse) SA* | 12-cv-03487-JSR | Arnold & Porter LLP<br>Pamela A. Miller<br>(Pamela.Miller@aporter.com)<br>Kent A. Yalowitz<br>(Kent.Yalowitz@aporter.com) |
| 58. | *Picard v. Fullerton Capital PTE. Ltd.* | 12-cv-03488-JSR | Arnold & Porter LLP<br>Pamela A. Miller<br>(Pamela.Miller@aporter.com)<br>Kent A. Yalowitz<br>(Kent.Yalowitz@aporter.com) |
| 59. | *Picard v. Cathay United Bank, et al.* | 12-cv-03489-JSR | Baker & McKenzie LLP<br>David W. Parham<br>(david.Parham@bakermckenzie.com) |

| 60. | *Picard v. Standard Chartered Financial Services (Luxembourg) S.A., et al* | 12-cv-04328 | Sullivan & Cromwell LLP<br>Robinson B. Lacy<br>(lacyr@sullcrom.com)<br>Sharon L. Nelles<br>(nelless@sullcrom.com)<br>Patrick B. Berarducci<br>(berarduccip@sullcrom.com) |
|---|---|---|---|

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION,
CORPORATION,

                Plaintiff,

       v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                Defendant.

In re:

MADOFF SECURITIES

12 MC 0115

**CONSENT ORDER**



PERTAINS TO CASES LISTED IN EXHIBIT A

JED S. RAKOFF, U.S.D.J.:

On consent of (i) the defendants listed herein and on Exhibit A hereto (collectively, the "Defendants"), (ii) Irving H. Picard, as Trustee (the "Trustee") for the substantively consolidated liquidation proceedings of Bernard L. Madoff Investment Securities LLC under the Securities Investor Protection Act, and (iii) the Securities Investor Protection Corporation ("SIPC", together with the Defendants and the Trustee, the "Parties"), the Parties agree as follows:

1. *Picard v. Legacy Capital Ltd., et al.,* No. 11-cv-07764 (JSR) (the "Legacy Capital Action"), and *Picard v. Natixis,* No. 11-cv-09501 (JSR) (the "Natixis Action") were inadvertently excluded from Exhibit A to the Order dated June 6, 2012; No. 12 MC 0115 (S.D.N.Y. June 7, 2012) (ECF No. 167) (the "Extraterritoriality Order"). The Trustee, SIPC and the moving Defendants in the Legacy Capital Action and the Natixis Action hereby agree that

300251725

the Extraterritoriality Order as entered shall apply to the Legacy Capital Action and Natixis Action *nunc pro tunc* to June 7, 2012. The Legacy Capital Action and Natixis Action will be covered by the Extraterritoriality Order in all respects.

2.  *Picard v. Sarl Investment Company, Inc., et al.*, No. 12-cv-02754 (JSR) (the "Sarl Investment Action") was inadvertently excluded from the Exhibit A to the Order dated May 16, 2012, No. 12 MC 0115 (S.D.N.Y. May 15, 2012) (ECF No. 107) (the "Antecedent Debt Order"). The Trustee, SIPC and the moving Defendants in the Sarl Investment Action hereby agree that the Antecedent Debt Order as entered shall apply to the Sarl Investment Action *nunc pro tunc* to May 15, 2012. The Sarl Investment Action will be covered by the Antecedent Debt Order in all respects.

3.  *Picard v. Lloyds TSB Bank PLC,* No. 12-cv-04722 (the "Lloyds Action") was excluded from Exhibit A to the Extraterritoriality Order, Exhibit A to the Antecedent Debt Order, Exhibit A to the Stern Order, and Exhibit A to the Order dated May 15, 2012, No. 12 MC 0115 (S.D.N.Y. May 16, 2012) (ECF No. 119) (the "Section 546(e) Order") because the Trustee served the Summons and Complaint in the Lloyds Action after the April 2, 2012 deadline for filing Motions to Withdraw the Reference to the Bankruptcy Court established pursuant to the *Administrative Order Establishing Deadline for Filing Motions to Withdraw the Reference*, Adv. Pro. No. 08-01789 (BRL) (Bank. S.D.N.Y. Mar. 5, 2012) (ECF No. 4707) (the "Withdrawal Motion Deadline"), and the relevant Motion in the Lloyd Action was filed on June 12, 2012. The Trustee, SIPC and the moving Defendants in the Lloyds Action hereby agree that the Extraterritoriality Order as entered shall apply to the Lloyds Action *nunc pro tunc* to June 7, 2012; the Antecedent Debt Order as entered shall apply to the Lloyds Action *nunc pro tunc* to May 15, 2012; the Stern Order as entered shall apply to the Lloyds Action *nunc pro tunc* to April

300251725

13, 2012; and the Section 546(e) Order as entered shall apply to the Lloyds Action *nunc pro tunc* to May 16, 2012. The Lloyds Action will be covered by the Extraterritoriality Order, Antecedent Debt Order, <u>Stern</u> Order, and Section 546(e) Order in all respects.

    4.    *Picard v. Brown Brothers Harriman & Co.*, No. 12-cv-04723 (JSR) (the "Brown Brothers Action") was excluded from Exhibit A to the Antecedent Debt Order, Exhibit A to the <u>Stern</u> Order, and Exhibit A to the Section 546(e) Order because the Trustee served the Summons and Complaint in the Brown Brothers Action after the Withdrawal Motion Deadline, and the relevant Motion in the Brown Brothers Action was filed on June 12, 2012. The Trustee, SIPC and the moving Defendants in the Brown Brothers Action hereby agree that the Antecedent Debt Order as entered shall apply to the Brown Brothers Action *nunc pro tunc* to May 15, 2012; the <u>Stern</u> Order as entered shall apply to the Brown Brothers Action *nunc pro tunc* to April 13, 2012; and the Section 546(e) Order as entered shall apply to the Brown Brothers Action *nunc pro tunc* to May 16, 2012. The Brown Brothers Action will be covered by the Antecedent Debt Order, <u>Stern</u> Order, and Section 546(e) Order in all respects.

    5.    *Picard v. Clariden Leu AG (f/k/a Clariden Bank AG), et al.*, No. 12-cv-04724 (the "Clariden Action") was excluded from Exhibit A to the <u>Stern</u> Order and Exhibit A to the Section 546(e) Order because the Trustee served the Summons and Complaint in the Clariden Action after the Withdrawal Motion Deadline, and the relevant Motion in the Clariden Action was filed on June 15, 2012. The Trustee, SIPC and the moving Defendants in the Clariden Action hereby agree that the <u>Stern</u> Order as entered shall apply to the Clariden Action *nunc pro tunc* to April 13, 2012; and the Section 546(e) Order as entered shall apply to the Clariden Action *nunc pro tunc* to May 16, 2012. The Clariden Action will be covered by the <u>Stern</u> Order and Section 546(e) Order in all respects.

300251725

6.     *Picard v. Schroder & Co. Bank AG,* No. 12-cv-04749 (the "Schroder Action")
was excluded from Exhibit A to the Extraterritoriality Order, Exhibit A to the Antecedent Debt
Order, Exhibit A to the <u>Stern</u> Order, and Exhibit A to the Section 546(e) Order because the
Trustee will have served the Summons and Complaint in the Schroder Action after the
Withdrawal Motion Deadline, and the relevant Motion in the Schroder Action was filed on June
15, 2012. The Trustee, SIPC and the moving Defendant in the Schroder Action hereby agree
that the Extraterritoriality Order as entered shall apply to the Schroder Action *nunc pro tunc* to
June 7, 2012; the Antecedent Debt Order as entered shall apply to the Schroder Action *nunc pro
tunc* to May 15, 2012; the <u>Stern</u> Order as entered shall apply to the Schroder Action *nunc pro
tunc* to April 13, 2012; and the Section 546(e) Order as entered shall apply to the Schroder
Action *nunc pro tunc* to May 16, 2012.   The Schroder Action will be covered by the
Extraterritoriality Order, Antecedent Debt Order, <u>Stern</u> Order, and Section 546(e) Order in all
respects.

7.     *Picard v. Multi-Strategy Fund Ltd., et al.,* No. 12-cv-04840 (the "Multi-Strategy
Action") was excluded from Exhibit A to the Extraterritoriality Order, Exhibit A to the <u>Stern</u>
Order, and Exhibit A to the Section 546(e) Order because the Trustee served the Summons and
Complaint in the Multi-Strategy Action after the Withdrawal Motion Deadline, and the relevant
Motion in the Multi-Strategy Action was filed on June 20, 2012. The Trustee, SIPC and the
moving Defendants in the Multi-Strategy Action hereby agree that the Extraterritoriality Order as
entered shall apply to the Multi-Strategy Action *nunc pro tunc* to June 7, 2012; the <u>Stern</u> Order
as entered shall apply to the Multi-Strategy Action *nunc pro tunc* to April 13, 2012; and the
Section 546(e) Order as entered shall apply to the Multi-Strategy Action *nunc pro tunc* to May

16, 2012. The Multi-Strategy Action will be covered by the Extraterritoriality Order, Stern Order, and Section 546(e) Order in all respects.

8.    *Picard v. Credit Agricole Corporate And Investment Bank D/B/A Credit Agricole Private Banking Miami, F/K/A Calyon S.A. D/B/A Credit Agricole Miami Private Bank, Successor in Interest to Credit Lyonnais S.A.,* No. 12-cv-04867 (the "Credit Agricole Action") was excluded from Exhibit A to the Antecedent Debt Order, Exhibit A to the Stern Order, and Exhibit A to the Section 546(e) Order because the Trustee commenced the Summons and Complaint in the Credit Agricole Action after the Withdrawal Motion Deadline, and the relevant Motion in the Credit Agricole Action was filed on June 20, 2012. The Trustee, SIPC and the moving Defendants in the Credit Agricole Action hereby agree that the Antecedent Debt Order as entered shall apply to the Credit Agricole Action *nunc pro tunc* to May 15, 2012; the Stern Order as entered shall apply to the Credit Agricole Action *nunc pro tunc* to April 13, 2012; and the Section 546(e) Order as entered shall apply to the Credit Agricole Action *nunc pro tunc* to May 16, 2012. The Credit Agricole Action will be covered by the Antecedent Debt Order, Stern Order, and Section 546(e) Order in all respects.

9.    *Picard v. Royal Bank of Canada, et al.,* Adv. Proc. No. 12-01669 (BRL) (the "Royal Bank Action") was excluded from Exhibit A to the Extraterritoriality Order, Exhibit A to the Antecedent Debt Order, Exhibit A to the Stern Order, and Exhibit A to the Section 546(e) Order because the Trustee commenced the Royal Bank Action after the Withdrawal Motion Deadline, and the relevant Motion in the Royal Bank Action was filed on June 21, 2012. The Trustee, SIPC and the moving Defendants in the Royal Bank Action hereby agree that the Extraterritoriality Order as entered shall apply to the Royal Bank Action *nunc pro tunc* to June 7, 2012; the Antecedent Debt Order as entered shall apply to the Royal Bank Action *nunc pro tunc*

to May 15, 2012; the Stern Order as entered shall apply to the Royal Bank *nunc pro tunc* to April 13, 2012; and the Section 546(e) Order as entered shall apply to the Royal Bank Action *nunc pro tunc* to May 16, 2012. The Royal Bank Action will be covered by the Extraterritoriality Order, Antecedent Debt Order, Stern Order, and Section 546(e) Order in all respects.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Date:   New York, New York
        June 25 2012

**EXHIBIT A**

| District Court Action | Docket No. | Counsel for Moving Defendants | Relevant Consolidated Briefing Order |
|---|---|---|---|
| ***Picard v. Legacy Capital Ltd., et al.*** (as filed by Legacy Capital, Ltd., Montpellier Resources Ltd., Khronos LLC, Khronos Capital Research LLC, Rafael Mayer, David Mayer, and Issac Jimmy Mayer) | 11-cv-07764-JSR | Stevens & Lee, P.C. (for Legacy Capital, Ltd.)<br>Nicholas F. Kajon<br>(nfk@stevenslee.com)<br><br>Butzel Long (Montpellier Resources Ltd.)<br>Peter D. Morgenstern<br>(morgenstern@butzel.com)<br>Regina M. Alter<br>(alter@butzel.com)<br>Joshua E. Abraham<br>(abraham@butzel.com)<br><br>Dickstein Shapiro LLP (for Rafael Mayer, David Mayer, Khronos LLC & Khronos Capital Research LLC)<br><br>Eric Fisher<br>(fishere@dicksteinshapiro.com)<br>Barry N. Seidel<br>(seidelb@dicksteinshapiro.com)<br>Stefanie Birbrower Greer<br>(greers@dicksteinshapiro.com)<br>Shaya M. Berger<br>(bergers@dicksteinshapiro.com)<br><br>Stearns Weaver Miller Weissler Alhadeff & Sitterson, PA (for Jimmy Mayer)<br>Eugene E. Stearns<br>(estearns@stearnsweaver.com) | (1) Extraterritoriality Order |

| | | | |
|---|---|---|---|
| | | Harold D. Moorefield, Jr.<br>(hmoorefield@stearnsweaver.com)<br>Carlos J. Canino<br>(ccanino@stearnsweaver.com) | |
| **Picard v. Natixis** | 11-cv-09501-JSR | Davis & Gilbert LLP<br>Joseph Cioffi<br>(jcioffi@dglaw.com)<br>Bruce M. Ginsberg<br>(bginsberg@dglaw.com)<br>Howard J. Rubin<br>(hrubin@dglaw.com)<br>James R. Serritella<br>(jserritella@dglaw.com)<br><br>Freshfields Bruckhaus Deringer LLP<br>David Onorato<br>(david.onorato@freshfields.com)<br>Cheryl Howard<br>(cheryl.howard@freshfields.com)<br>Susan Higgins<br>(susan.higgins@freshfields.com) | (1) Extraterritoriality Order |
| **Picard v. Sarl Investment Company, Inc., et al** | 12-cv-02754-JSR | Cole, Scott, & Kissane, P.A.<br>Jonathan Vine, Esq.<br>(Jonathan.Vine@csklegal.com)<br><br>Meyer, Suozzi, English & Klein, P.C.<br>Jessica Gittle Berman<br>(jberman@msek.com) | (1) Antecedent Debt Order |
| **Picard v. Lloyds TSB Bank PLC** | 12-cv-04722 | Katten Muchin Rosenman LLP<br>Anthony L. Paccione<br>(anthony.paccione@kattenlaw.com)<br>Brian M. Sabados<br>(brian.sabados@kattenlaw.com) | (1) Extraterritoriality Order<br>(2) Antecedent Debt Order<br>(3) Stern Order<br>(4) Section 546(e) Order |

| | | | |
|---|---|---|---|
| *Picard v. Brown Brothers Harriman & Co.* | 12-cv-04723 | Katten Muchin Rosenman LLP<br>Anthony L. Paccione<br>(anthony.paccione@kattenlaw.com)<br>Brian M. Sabados<br>(brian.sabados@kattenlaw.com) | (1) Antecedent Debt Order<br>(2) Stern Order<br>(3) Section 546(e) Order |
| *Picard v. Clariden Leu AG (f/k/a Clariden Bank AG), et al* | 12-cv-04724 | O'Melveny & Myers LLP<br>William J. Sushon<br>(wsushon@omm.com)<br>Shiva Eftekhari<br>(seftekhari@omm.com) | (1) Stern Order<br>(2) Section 546(e) Order |
| *Picard v. Schroder & Co. Bank AG* | 12-cv-04749 | Ropes & Gray LLP<br>Robert S. Fischler<br>(robert.fischler@ropesgray.com)<br>Stephen Moeller-Sally<br>(ssally@ropesgray.com) | (1) Extraterritoriality Order<br>(2) Antecedent Debt Order<br>(3) Stern Order<br>(4) Section 546(e) Order |
| *Picard v. Multi-Strategy Fund Ltd., et al* | 12-cv-04840 | Friedman Kaplan Seiler & Adelman LLP<br>Robert J. Lack<br>(rlack@fklaw.com)<br>Gregory W. Fox<br>(gfox@fklaw.com) | (1) Extraterritoriality Order<br>(2) Stern Order<br>(3) Section546(e) Order |
| *Picard v. Credit Agricole Corporate And Investment Bank D/B/A Credit Agricole Private Banking Miami, F/K/A Calyon S.A. D/B/A Credit Agricole Miami Private Bank, Successor in Interest to Credit Lyonnais S.A.* | 12-cv-04867 | Cleary Gottlieb Steen & Hamilton LLP<br>Lawrence B. Friedman<br>(lfriedman@cgsh.com) | (1) Antecedent Debt Order<br>(2) Stern Order<br>(3) Section 546(e) Order |
| *Picard v. Royal Bank of Canada, et al.* | | Katten Muchin Rosenman LLP<br>Anthony L. Paccione<br>(anthony.paccione@kattenlaw.com)<br>Brian M. Sabados<br>(brian.sabados@kattenlaw.com)<br>Mark T. Ciani<br>(mark.ciani@kattenlaw.com) | (1) Extraterritoriality Order<br>(2) Antecedent Debt Order<br>(3) Stern Order<br>(4) Section 546(e) Order |

Case 1:12-mc-00115-JSR    Document 236-2    Filed 07/19/12    Page 31 of 1

# EXHIBIT C

EASTERN CARIBBEAN SUPREME COURT
TERRITORY OF THE VIRGIN ISLANDS

## IN THE COURT OF APPEAL

HCVAP 2011/041

On appeal from the Commercial Division

BETWEEN:

### QUILVEST FINANCE LIMITED

Appellant/Defendant

and

### FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/042

BETWEEN:

[1] CAJA DE AHORROS Y MONTE DE PIEDAD DE MADRID
[2] DEUTSCHE BANK (SUISSE) SA

Appellants/Defendants

and

### FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/043

BETWEEN:

### SNS GLOBAL CUSTODY BV

Appellant/Defendant

and

### FAIRFIELD SENTRY LIMITED (In Liquidation)

Respondent/Claimant

1

HCVAP 2011/044

BETWEEN:

## DEUTSCHE BANK TRUST COMPANY AMERICAS

Appellant/Defendant

**and**

## FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/045

BETWEEN:

[1] **BANK JULIUS BAER & CO LIMITED**
[2] **LLOYDS TSB BANK**
[3] **MARTELLO NOMINEES LIMITED (formerly MEESPIERSON NOMINEES (GUERNSEY) LIMITED)**
[4] **ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED (formerly FORTIS (ISLE OF MAN) NOMINEES LIMITED)**

Appellants/Defendants

**and**

## FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/046

BETWEEN:

## WISE GLOBAL FUND LIMITED

Appellant/Defendant

**and**

## FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

2

**HCVAP 2011/047**

**BETWEEN:**

**[1] LOMBARD, ODIER, DARIER, HENTSCH & CIE**
**[2] MIRABAUD & CIE**

Appellants/Defendants

and

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

Respondent/Claimant

**HCVAP 2011/048**

**BETWEEN:**

**[1] SG PRIVATE BANKING (SUISSE) SA**
**[2] LOMBARD, ODIER, DARIER, HENTSCH & CIE**

Appellants/Defendants

and

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

Respondent/Claimant

**HCVAP 2011/049**

**BETWEEN:**

**[1] EFG BANK SA**
**[2] EFG BANK EUROPEAN FINANCIAL GROUP SA**
**[3] PICTET & CIE**
**[4] SG PRIVATE BANKING (SUISSE) SA**

Appellants/Defendants

and

**FAIRFIELD SENTRY LIMITED (in Liquidation)**

Respondent/Claimant

3

HCVAP 2011/050

BETWEEN:

[1] EFG BANKS SA
[2] SG PRIVATE BANKING (SUISSE) SA

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (In Liquidation)

Respondent/Claimant

HCVAP 2011/051

BETWEEN:

PICTET & CIE

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/052

BETWEEN:

CREDIT SUISSE LONDON NOMINEES LIMITED

Appellant/Defendant

and

FAIRFIELD SENTRY LIMITED (In Liquidation)

Respondent/Claimant

4

HCVAP 2011/054

BETWEEN:

### [1] CREDIT SUISSE LONDON NOMINEES LIMITED
### [2] BUCKMORE NOMINEES LIMITED

Appellants/Defendants

**and**

### FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/055

BETWEEN:

### CREDIT SUISSE LONDON NOMINEES LIMITED

Appellant/Defendant

**and**

### FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/056

BETWEEN:

### CREDIT SUISSE LONDON NOMINEES LIMITED

Appellant/Defendant

**and**

### FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

5

HCVAP 2011/058

BETWEEN:

[1] UBS AG NEW YORK
[2] UBS (CAYMAN) LIMITED

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/059

BETWEEN:

[1] UBS (CAYMAN) LIMITED
[2] UBS (LUXEMBOURG) SA

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/060

BETWEEN:

[1] UBS (CAYMAN ISLANDS) LIMITED
[2] UBS AG NEW YORK
[3] UBS (CAYMAN) LIMITED

Appellants/Defendants

and

FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

6

HCVAP 2011/061

BETWEEN:

### UBS (LUXEMBOURG) SA

Appellant/Defendant

and

### FAIRFIELD SENTRY LIMITED (in Liquidation)

Respondent/Claimant

HCVAP 2011/062

BETWEEN:

### FAIRFIELD SENTRY LIMITED (In Liquidation)

Appellant/Claimant

and

[1] ALFREDO MIGANI & 22 others
[2] BANCO GENERAL SA/BANCA PRIVADA & 30 others
[3] BANK JULIUS BAER & CO LTD & 26 others
[4] BANK JULIUS BAER & CO LTD and others
[5] ARBITRAL FINANCE INC and 23 others
[6] BANK JULIUS BAER & CO LTD & 33 others
[7] WISE GLOBAL FUND LIMITED
[8] CREDIT SUISSE LONDON NOMINEES LIMITED

Respondents/Defendants

Before:
The Hon. Mde. Janice M. Pereira          Justice of Appeal
The Hon. Mr. Davidson Kelvin Baptiste      Justice of Appeal
The Hon. Mr. Don Mitchell              Justice of Appeal [Ag.]

Appearances:
Mr. Mark Hapgood, QC, with him, Mr. Phillip Kite, Mr. Kissock Laing and Ms. Colleen Farrington, for the Harney Westwood & Riegels Appellants/Respondents
Mr. David Lord, QC, with him, Mr. Robert Foote and Ms. Claire Goldstein, for the Ogier Appellants/Respondents

7

Mr. Dominic Chambers, QC, with him, Ms. Arabella Di Iorio, for the Maples &
Calder Appellants/Respondents

Mr. David Railton, QC, with him, Mr. Paul Webster, QC and Ms. Nadine Whyte, for
the O'Neal Webster Appellants/Respondents

Mr. Michael Brindle, QC, with him, Mr. Andrew Westwood, Mr. William Hare and
Mr. Robert Nader, for Fairfield Sentry Limited

---

2012: January 17, 18;
June 13.

---

*Civil appeal – Commercial – Net Asset Value – Ponzi scheme – Trial of Preliminary Issues
– What constitutes a certificate as to Net Asset Value per Share and Redemption Price
within the meaning of Article 11(1) of Articles of Association of Fairfield Sentry – Mistake –
Whether NAV per Share should be revalued – Contract – Mutual mistake – Common
mistake – Whether surrendering shares was good consideration for payment of the
Redemption Price – Whether contract voidable in equity or common law – Whether
restitutionary claim available*

Fairfield Sentry Limited ("Sentry") had invested a substantial amount of its funds with
Bernard L. Madoff Investment Securities LLC ("BLMIS") on behalf of its shareholders
between 1997 and 2008. BLMIS collapsed shortly thereafter when its proprietor, Bernard
L. Madoff, admitted that it had been run as a Ponzi scheme. Both companies
subsequently went into liquidation, BLMIS in the United States, and Sentry in the Territory
of the Virgin Islands.

Sentry commenced a number of proceedings in the Virgin Islands against various former
shareholders who had redeemed their shares in the company. The Articles of Association
of Sentry stipulated that the price at which the shares were to be redeemed was to be
calculated by reference to the company's Net Asset Value ("NAV"). Article 11 also
provided that: "Any certificate as to the Net Asset Value per Share or as to the ...
Redemption Price therefor given in good faith by or on behalf of the Directors shall be
binding on all parties."

Sentry argued that in redeeming the shares, the NAV had been calculated under a mistake
since BLMIS was in fact operating a Ponzi scheme and Sentry's investments in BLMIS
were lost from the date of their investment in the company. Accordingly, its NAV was at all
times either nil or a nominal value, so that the aggregate redemption sums should have
been either nil or nominal. Sentry therefore contended that the former shareholders had
been unjustly enriched at its expense and were liable to make restitution to the company of
the amounts paid to them when the shares were redeemed.

8

The former shareholders (the defendants in the court below), in their pleaded defences contended, in essence, that the redemption proceeds had been paid out under a certificate as to the NAV pursuant to Article 11 and as such was conclusive and binding on Sentry. They relied on various documents comprising emails, contract notes, monthly statements as well as computer screen shots ("the Documents") as constituting certificates for the purposes of Article 11. They also contended that in surrendering their shares they gave good consideration for the payment of the Redemption Price and as such this was a complete defence to Sentry's claim.

The Article 11 Defence and the Good consideration Defence formed the basis of preliminary issues which were tried by the court below. The trial judge found in favour of Sentry in respect of the Article 11 Defence but found in favour of the former shareholders on the Good Consideration Defence. He subsequently, pursuant to a summary judgment application made by one of the former shareholders, dismissed Sentry's claims. The former shareholders appealed the judge's findings in respect of the Article 11 Defence. Sentry appealed against the judge's findings in relation to the Good Consideration Defence and in respect of the summary judgment given against it dismissing its claims.

**Held**: dismissing the appeals against the learned trial judge's findings in relation to the Article 11 Preliminary Issues and upholding his finding on the Article 11 Defence; awarding one set of costs to Fairfield Sentry to be in two-thirds of the amount assessed below, and dismissing the appeal against the learned trial judge's finding in relation to the Good Consideration defence and the grant of Summary Judgment and awarding costs to the former shareholders (as one set of costs) to be fixed at two thirds of the amount as assessed below, that:

1. Article 11(1) does not require that a certificate be signed. If this was the case, then the Article would have expressly so stated. The absence of a signature on a Document would not necessarily preclude it from being deemed a certificate for the purpose of Article 11(1).

    **North Shore Ventures Ltd. v Anstead Holdings Inc. and Others** [2011] 3 W.L.R. 628 distinguished.

2. The learned trial judge was right in holding that none of the Documents could have amounted to certificates. Firstly, the plain wording of the Article is that there can be a determination published without it having been certified. Secondly, the function that the Directors had delegated to Fairfield Greenwich and Citco was that of calculation; there is nothing in the documentation that indicates a delegation of either determination or certification. Thirdly, there is no reason why under Article 11 there cannot be an uncertified determination which is not binding; the plain meaning of the wording of the Article is that not every determination is intended to be binding on the parties. Fourthly, the mere stating of a precise price will not suffice for any Document to amount to a certificate. The learned trial judge was correct to find that a certificate must be something more than a simple statement.

9

Lastly, the certificate must have been issued either by the Directors or by some agency to whom the power to certify was delegated. The Documents were not issued by the Directors, nor was there any delegation of the power to certify.

3. A claimant may be entitled to restitution if he can show that a defendant was unjustly enriched at his expense. However, this payment may be irrecoverable where the claimant was required to pay by contract. In the present case, there were specified contractual obligations to be fulfilled by both Sentry and former shareholders by virtue of Article 10 of Sentry's Articles of Association. The former shareholders fully performed all their obligations under the contract. Upon a request by them for redemption of their shares, Sentry was contractually bound to pay the Redemption Price for the shares, the Redemption Price having been determined by the Directors of Sentry. Sentry, in paying the Redemption Price did so in the discharge of its debt obligations to the redeeming shareholders pursuant to Sentry's Articles which remained perfectly valid and in force.

**Goff & Jones: The Law of Unjust Enrichment** (8th edn., Sweet & Maxwell 2011) considered.

4. The alleged mistaken calculation of the NAV does not undermine the legal obligation which required that Sentry pay the Redemption Price to the former shareholders upon their request. Sentry's contractual obligations gave rise to a debt obligation whatever the value of the shares and the surrender of the rights to the shares by the former shareholders was good consideration which would defeat Sentry's restitutionary claim.

5. The fact that BLMIS was operating as a Ponzi scheme did not render the contract between Sentry and the former shareholders impossible to perform. The subject matter of the subscription contract was the shares; as such the subject matter existed. The contract for the shares was with Sentry and not with BLMIS, and therefore it mattered not what the value of Sentry's investment in BLMIS was as this did not form part of the contract. It was clearly possible for Sentry to redeem or purchase the shares at a price which was fixed by its own Directors. Essentially, there remained a contract between Sentry and the former shareholders which was never invalidated. On the true construction of the contract it was still possible to be performed.

**Deutshe Morgan Grenfell Group plc v Inland Revenue Commissioners and another** [2007] 1 A.C. 558 applied; **Bell and Another v Lever Brothers, Limited** [1932] A.C. 161 applied.

6. Mistake as to a quality of the thing contracted for would not affect assent unless it was the mistake of both parties, and was as to the existence of some quality which made the thing without the quality essentially different from the thing as it was believed to be. It cannot be said that there existed a common mistake for the alleged mistaken calculation of the NAV was solely a mistake of Sentry's. Likewise it cannot be said that there was anything essentially different about the subscription contract when it became known that BLMIS was operating as a Ponzi scheme, for the subscription contract was for the shares and the redemption payment was for the surrender of the shares. Thus, Sentry's payment for the redeemed shares based on Sentry's alleged mistaken calculation of the NAV did not nullify Sentry's obligation to pay on redemption.

**Bell and Another v Lever Brothers, Limited** [1932] A.C. 161 applied; **Great Peace Shipping Ltd v Tsavliris Salvage (International) Ltd** [2003] Q.B. 679 applied.

7. Applicants for summary judgment are entitled to have their applications dealt with on the facts as they are, not as they might be. The adjournment sought by Sentry in the hope of turning up information which may assist or strengthen its case was rightly refused.

### JUDGMENT

[1] **MITCHELL, JA [AG.]:** Fairfield Sentry Limited ("Sentry") was the largest of the 'feeder funds' which invested monies with Bernard L. Madoff Investment Securities LLC ("BLMIS") on behalf of its shareholders between 1997 and 2008. BLMIS collapsed in December 2008 when its proprietor, Bernard L. Madoff, admitted that it had been run as a Ponzi scheme. BLMIS is now in liquidation in the United States. Sentry was placed in liquidation in the Virgin Islands on 21st July 2009. It has commenced a number of proceedings in the Virgin Islands ("the Clawback Actions") against various shareholders who redeemed their shares in Sentry. The total amount claimed by Sentry in the Clawback Actions is more than US$1 billion.

[2] Sentry's Articles of Association ("the Articles") stipulated that the price at which the shares were to be redeemed should be calculated by reference to the Net Asset Value ("NAV") of Sentry. The Articles contained detailed provisions as to how the NAV was to be calculated. The claim made by Sentry in each of the Clawback

11

Actions is identical and is based on an alleged mistake in the calculations of the
NAV of the shares redeemed by Sentry at the request of the shareholder in
question.

[3]     Sentry alleges that the NAV was calculated under a mistake as BLMIS was in fact
operating a Ponzi scheme, and Sentry's investments in BLMIS were lost from the
date of their investment in BLMIS. As a result, Sentry alleges, its NAV was at all
times either nil or a nominal value, so that the aggregate redemption sums should
have been either nil or nominal. The consequence was that the defendants to the
Clawback Actions have been unjustly enriched at its expense. The defendants are
liable to make restitution to Sentry of the amounts paid to them when Sentry
redeemed their shares.

[4]     The defendants to the Clawback Actions have all served defences. Broadly
speaking, the individual defences are similar. Some are factually intensive. If a
full trial had been held of all the matters raised in the defences it would have been
a lengthy and expensive exercise. In order to try to avoid that, some of the
defendants (the "P I Defendants") proposed that preliminary issues be tried in
relation to two of the pleaded defences, the Article 11 Defence and the Good
Consideration Defence.     The learned trial judge accepted this proposal and
formulated the preliminary issues himself. The preliminary issue trial related to a
total of eight of the Clawback Actions. There were two issues, the first of which
related to the Article 11 Defence and the second, to the Good Consideration
Defence. They were:[1]

> "(1)     Whether any (and, if so, which) of the documents copies of which
> are exhibited at pages 2 to 17 inclusive of exhibit PRK-1 to the
> affidavit of Phillip Kite sworn in the proceedings the short title and
> first reference to which is Fairfield Sentry Limited (in liquidation) -
> v- Bank Julius Baer & Co Limited and others BVIHC(COM)
> 30/2010 on 8 March 2011 (or copies of any further documents
> which may be exhibited to any witness statement made in

---

[1] See "Schedule of Preliminary Issues to be tried" which forms part of the order of Bannister J. dated 20th
April 2011.

connection with this issue) ("the documents") is a certificate within the meaning of Article 11(1) of the Articles of Association of the Claimant ("Article 11(1)", "the Articles");

(2)     If the answer to (1) is yes, whether any (and, if so, which) of the documents is:

        (a) a certificate as to the Net Asset Value per share ('NAV'); or

        (b) a certificate as to Redemption Price within the meaning of the Articles;

(3)     If the answer to (2)(a) or (b) is yes:

        Whether the publication or delivery by the Claimant

        (a) as a matter of information only, or

        (b) in connection with a redemption request

of a document containing substantially the same items of information as a document identified as falling within (2)(a) or (b) above to a redeeming or redeemed Member of the Claimant precludes the Claimant from asserting that money paid to that redeeming or redeemed Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member.

For the purposes of this issue 'document' includes emails and materials accessible on a website maintained by the Claimant or Citco Fund Services (Europe) BV or Fairfield Greenwich Group.

(4)     Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price and, if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member."

### The Article 11 Defence

[5]     The Article 11 Defence refers to Article 11 of the Articles which makes provision for the determination of the NAV. The Article provides:

"11. (1) The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net asset Value per Share has been suspended under the provisions of paragraph (4) of this Article), on such

13

other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares then in issue or deemed to be in issue and by adjusting for each class of Shares such resultant number to take into account any dividends, distributions, assets or liabilities attributable to such class of Sharers pursuant to paragraph (2) of Article 4, all determined and calculated as hereinafter provided.

Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties."

There is no definition in the Articles as to the meaning of the word 'certificate' in the last paragraph of this Article.

[6] The first paragraph of Article 11(1) provides that the NAV per Share shall be determined by Sentry's Directors at the close of business on each Valuation Day and it stipulates how the NAV is to be calculated. The P I Defendants' position was that the above provision was satisfied when their shares in Sentry were redeemed. The legal effect is to prevent Sentry from attempting to go behind, disturb or recalculate the NAV.

[7] Some of the documents referred to in the Preliminary Issues (the "Documents") were issued by Fairfield Greenwich (Bermuda) Ltd. ("Fairfield Greenwich"). Fairfield Greenwich was Sentry's investment manager, to which the Directors had contractually delegated the day to day management of the fund. These Documents included e-mails stating the NAV per Share. The P I Defendants submitted that these were given with the actual and/or ostensible authority of the Directors, and so constituted 'certificates' within the meaning of Article 11(1). Sentry's witness, Albertus Lokhorst, formerly a Senior Account Manager employed by Citco, said in paragraph 7 of his witness statement that Citco was authorised by Fairfield Greenwich to issue monthly statements to registered shareholders.

14

"Citco" refers to Citco Fund Services (Europe) BV. Citco was the manager of Sentry under an Administration Agreement between Citco and Sentry dated 20th February 2003. In those circumstances, the P I Defendants submitted, Fairfield Greenwich itself must have had actual authority to send e-mails on behalf of the Directors containing the same information as to the NAV per Share as the monthly statements. Alternatively, and at the very least, Fairfield Greenwich had ostensible authority to send those e-mails by virtue of its position as Sentry's investment manager. This is the Article 11 Defence.

[8]     The P I Defendants also alleged that, irrespective of the NAV per Share, they gave good consideration for Sentry's payment of the Redemption Price for the shares and that also provides them with a complete defence to Sentry's claims (the "Good Consideration Defence") which is dealt with by my learned sister Pereira J.A. whose judgment I have had the opportunity to read and with which I entirely agree and have nothing further to add.

[9]     A number of points are to be noted about the structure and terms of Article 11(1):

        (a)    The first sub-paragraph provides for the *determination* by the Directors of Sentry of the NAV per Share at the close of business on each Valuation Day;

        (b)    The second sub-paragraph provides how the NAV per Share is to be *calculated* at the time of each determination;

        (c)    The third sub-paragraph then provides that *any certificate* as to the NAV per Share given in good faith by or on behalf of the Directors of Sentry is binding on the parties.

[10]    The argument on the Article 11 Defence before the learned trial judge turned on whether or not there had been the requisite *certification* of the NAV by or on behalf of the Directors. The significance of the certification issue for the P I Defendants, they argued, was that once the NAV had been certified by or on behalf of the

15

Directors given in good faith it would be binding on all parties, and the Clawback
Actions must fail.

[11]     It is common ground that, by the Administration Agreement, Citco was obliged,
         subject to the orders, instructions and directions of the Directors, to calculate and
         publish the NAV per Share and to deal with all correspondence and
         communications in relation to the redemption of Shares.   The P I Defendants
         submitted that, in consequence of this Agreement, Citco had actual and/or
         ostensible authority to issue certificates on behalf of the Directors within the
         meaning of the Articles, and the Documents issued by Citco constituted
         certificates "given ... on behalf of the Directors" within the meaning of Article 11(1).
         A certificate can be given not only by the Directors but by another on their behalf.
         Sentry submitted that none of the Documents amounted to a certificate, and the
         judge was right so to find. While the Directors had delegated to Citco the power to
         *calculate* the NAV they had not similarly delegated the power to *determine* or the
         power to *certify*.

[12]     The judge's findings were as follows:

         "[29]    The question, therefore, is whether any of the documents relied
                  upon by the Defendants on this application is a certificate 'as to'
                  the Net Asset Value and/or Redemption Price which has been
                  signed by or on behalf of the Directors.

         "[30]    The contract notes cannot, in my judgment, be certificates within
                  the meaning of Article 11(1).  Not only are they unsigned, but their
                  purpose was not to certify a determination made by the Directors
                  but to evidence the terms upon which Sentry itself was
                  purchasing the shares of the redeeming member.   They are
                  documents produced on behalf of Sentry, not on behalf of the
                  Directors as the body responsible for determining the NAV.

         "[31]    The monthly statements certainly contain, within the section
                  headed 'Fund Net Asset Values,' the information which one would
                  expect to find in a certificate given by or on behalf of the
                  Directors, but that does not, in my judgment, make them
                  certificates signed by or on behalf of the Directors under Article
                  11.  They are documents from which the inference may be drawn

                                    16

that the Directors have arrived at the valuation contained in the relevant section of the statement but that is not, in my judgment, the same as a certificate 'given' by or on behalf of the Directors. The statements are not signed by or on behalf of the Directors. If the question is asked whether the monthly statements, or any particular parts of the monthly statements, are certificates given on behalf of the Directors as to their valuation of the fund at any particular date, the answer must, in my judgment, be 'No'. They are documents distributed by the fund administrators informing investors, among other things, of the NAV determined, it is to be inferred by the recipient, by or on the instructions of the Directors at given dates. That does not make them certificates given by or on behalf of the Directors. Chesterton's letter of 21 March 1974[15] [*Campbell v Edwards [1976] 1 WLR 403*] was a certificate. The monthly statements, in my judgement, are not.

"[32]   For the same reasons, none of the emails (certainly not the emails from [Fairfield Greenwich]) can be regarded as a certificate given by or on behalf of the Directors. The same goes for the screenshot.

"[33]   The documents relied upon by the Defendants are compelling evidence of the NAV determined by the Directors as at particular Valuation Days but they are not, in my judgment, certificates within the meaning of Article 11(1)."

[13]   The judge handed down his judgment on 16th September 2011. By the above, he, in effect, determined the Article 11 issue in favour of Sentry. In essence, the judge found simply that there was no 'certificate' given by or on behalf of the Directors. He held that none of the documents relied on by the P I Defendants was a 'certificate' within the meaning of Article 11(1) and therefore there was nothing that was binding on Sentry and the P I Defendants. It is the judge's finding in relation to the Article 11 issue that constitutes the appeals listed as HCVAP 2011/41-52, 54-56, and 58-61 brought by the P I Defendants ("from now on referred to as the "P I Appellants") in this matter.

### The Argument

17

[14]   The P I Appellants submitted that while the judge correctly recognised that, in determining whether any of the Documents relied upon by the P I Appellants was a certificate, he had to consider Article 11(1) "against the background of the commercial purposes which Sentry's Articles of Association were intended to regulate". However, having recognised that the commercial purposes background was determinative, the judge did not identify those purposes and failed to take any such purposes into account.

[15]   The P I Appellants submitted that the evidence which the judge failed to take into account came from Mr Peter Füglistaller, the Head of Special Mandates in Hedge Fund Execution at Credit Suisse (Zurich) AG at paragraph16 of his witness statement:

> "In my experience the confirmation of the NAV and Redemption Prices by these documents [that is, the documents relied upon by the Appellants as being "certificates"] is perfectly standard in the funds industry. Regular and accessible information on the NAV figure is clearly vital for an investor and investors rely on administrators, in this case Citco, to confirm the NAV."

[16]   The P I Appellants submitted that the background facts which the judge failed to take into account included the following:

(1)   The central importance of the calculation of the monthly NAV to Sentry's entire business operations, and in particular to the price of its shares for subscription and redemption purposes;

(2)   The wide-ranging and far-reaching decisions made by investors and others in reliance on the NAV as determined in accordance with the Articles;

(3)   The importance of certainty and finality in all commercial dealings, but especially so in the context of redeeming shares in Sentry because many of the shareholders were acting as nominees and would therefore have to account to their clients for the proceeds of redemption.

18

[17] The P I Appellants relied on a number of Documents as being certificates within the meaning of Article 11(1). These included: (a) the contract notes; (b) the monthly statements; (c) the e-mails; and (d) the screenshot. The judge wrongly held, they submitted, that the contract notes were not certificates within the meaning of Article 11. The *contract notes* were sent out by Citco on behalf of the Directors. They evidenced the terms on which Sentry was purchasing the redeemed shares. The terms on which Sentry was purchasing the shares were dictated by the determination of the NAV and the Redemption Price made by the Directors. The *monthly statements* were issued by Citco and contained the NAV per Share as determined by Citco. They were issued by Citco under express authority from the Directors. They contained the NAV per Share as calculated by Citco under the express authority of the Directors. The judge held that they were not certificates. The *e-mails* were from Citco and Fairfield Greenwich to various customers. They showed the final NAV per Share on Valuation Days. The *screenshots* were captures taken from Citco's online pricing service website. They also showed the NAV per Share on Valuation Days, and were similarly, they submitted, wrongly held by the judge not to be certificates.

[18] Mr. Brindle, QC, on behalf of Sentry, submitted that the learned trial judge was correct to hold that none of the Documents amounted to a certificate as described in Article 11. None of the *contract notes* called itself a certificate or certified anything. It was not signed by anyone. In the box it said that the transaction has been effected "In accordance with your instructions". It was no more than a note recording a transaction, a contract. It went on to say "For more information ... please contact Citco." If it was a certificate it would be final, clear and binding, and there would be no suggestion that further information might be forthcoming. This was a Citco document, and there was no indication that it was issued on behalf of the Directors. Similarly, he submitted, the *monthly statements* consisted principally of a summary of activities during a particular month. While a part of it did contain a statement of the NAV, it was principally designed to be a record or

19

account of monthly activities. It was not signed, nor did it call itself a certificate.
Mr. Brindle, QC submitted that these characteristics were indicators but were not
conclusive of their being certificates. The *e-mails* were signed but they appeared
to be designed to give information. The phrase, "Please be advised ..." suggested
the e-mail conveyed information, gave advice, not that it certified anything. They
were entirely Citco documents and did not possess any degree of formality or
certification, nor did they suggest they were given for or on behalf of the Directors
of Sentry. Some of them were headed "Pricing information", so that is what they
were. They ended with words to the effect, "If you do not wish to receive periodic
messages such as this one in future, please unsubscribe by clicking here." This
was not what one would expect from a certificate. The *screenshots*, he submitted,
were grabs from the Citco website where information was stored. Such a
screenshot could not possibly be held to be a certificate.

[19]    The P I Appellants further submitted that the judge was wrong to hold in paragraph
27 of his judgment that in order for a document to be a certificate it needed to be
signed by the Directors or on their behalf. He was wrong to hold that an unsigned
certificate is a contradiction in terms.    The absence of a signature is not
determinative of the question whether a document is a certificate.  By giving an
unduly technical and narrow construction to the word 'certificate', Sentry seeks to
exclude all the documents that would normally be issued in the course of
processing redemption requests.

[20]    Sentry, in response, submitted that the judge was right to find as he did.  The
absence of a signature is not a trump point, but an indication point.  While a
document is not required to be signed to qualify as a 'certificate', it would be some
indication as to whether the document had the requisite degree of formality.  None
of the Documents has either the necessary formality or attests to the truth of the
matters contained in it.  In any event, Sentry submitted, even if one or more of the
Documents was a 'certificate', it does not follow that any action based on mistake
is thereby precluded.  The phrase "binding on all parties" was designed to ensure

20

they could not argue over the calculation of the NAV, not to prevent restitution in a
case of fundamental mistake.

[21]   The P I Appellants further submitted that the judge was wrong to hold in paragraph
27 of his judgment that "all parties" in the context of the Articles must mean all
parties bound by those Articles.   These would be the members as among
themselves, and each member on the one hand and Sentry on the other.   The
judge failed to appreciate the distinction between the NAV per Share and the
Redemption Price.   The last paragraph of Article 11(1) refers to a certificate as to
the NAV per Share or as to the Subscription or Redemption Price.   A certificate as
to the Subscription or Redemption Price would only ever be issued to the
subscriber or redeemer in question (as opposed to all shareholders).   Accordingly,
the judge should have held, it was submitted that the phrase "all parties" in Article
11(1) means, in relation to the Subscription Price and the Redemption Price, all
parties to the certificate (as opposed to all parties bound by the Articles).

[22]   The P I Appellants further submitted that the learned trial judge was wrong to hold
in paragraph 28 of his judgment that a document will fall within the final paragraph
of Article 11(1) only when it is a certificate given by or on behalf of the Directors in
their character as the body responsible for determining the NAV under Article 11.
That adds, they submitted, an unnecessary and unwarranted requirement which is
not found in the words of Article 11(1) which merely requires the certificate to be
given "by or on behalf of the Directors".   The Article makes no distinction between
different characters in which the Directors may act when they exercise the powers
and fulfil the responsibilities given to them as Directors.   The judge should have
held that the correct question to ask was simply whether the Documents relied
upon by the P I Appellants as constituting certificates were issued "by or on behalf
of the Directors".

[23[   The P I Appellants further submitted that the judge was wrong at paragraph 30 of
his judgment to discount the possibility of the contract notes being certificates on

21

the ground that their purpose was not to certify a determination made by the Directors but to evidence the terms upon which Sentry itself was purchasing the shares of the redeeming members. This, they submitted, was an unsustainable distinction, because under Article 10(2) the Redemption Prices that the shareholders were entitled to receive were based on the NAV determinations made by the Directors. Any formal communication of a Redemption Price necessarily was a certification of the determination of both the NAV and the Redemption Price, i.e., the terms on which the shares of the redeeming members were being purchased by Sentry. The question was one of formality, but this was not dealt with by the judge.

[24]    In any event, it was submitted, the judge should have held that, whatever other purposes the Documents may or may not have served, each of them fulfilled the purpose of being a certificate within the meaning of Article 11(1), and the fact that a Document may have served other purposes did not prevent it from being a certificate.

### The Law

[25]    No conclusive authority, lexicographical, judicial, or statutory, on the qualities required for a document to be a 'certificate' has been produced for the assistance of the Court. The P I Appellants offered the case of **The Queen v The Vestry of St Mary, Islington**.[2] This concerned a statutory provision for the costs of maintaining disused churchyards to be "repaid ... upon the certificate of the ... churchwardens". The churchwarden sent a letter asking for payment of £500 before he had entered into a contract for the works. He then entered into the contract and incurred liability for an amount in excess of £500. The Court held that he was entitled to be "repaid" even though he was not yet out of pocket. Pollock B. held at page 527 that the requirement for a certificate was "amply satisfied by the letter".

---

[2] (1890) L.R. 25 Q.B.D. 523.

22

[26]     The P I Appellants also offered **Rexhaven Ltd. v Nurse and Another**.[3]   This
         concerned forfeiture of a lease for non-payment of the service charge.  The lease
         required the management company to estimate the costs for the next quarter and
         to send the lessee:

> "... a certificate of the amount so estimated and of the proportion thereof
> to be contributed by the lessee and the lessee shall be liable to contribute
> as aforesaid and such certificates shall be binding and conclusive and the
> amount so certified shall be paid by the lessee to the Management
> Company on demand".

[27]     By the time of the disputed events, the amounts due in respect of the service
         charge had become payable directly to the landlord.  The landlord's agents wrote
         a letter to the lessee, expressed as a request for payment of £190 under the lease
         in respect of the interim service charge, and a further letter giving a detailed
         breakdown of "our estimate of service charge expenditure".  Judge Colyer, QC,
         sitting in the Chancery Division, held that the second letter was a certificate.  He
         said:[4]

> "I accept, however, the propositions that Mr Neuberger has relied upon
> and in these circumstances I find that the letter of October 27, which of
> course was precise as to its figures, did satisfy the requirement for "a
> certificate", by which word I see the draftsman of this lease was requiring
> nothing more or less than a formal statement in writing of the precise
> amount or amounts.  I would observe, but this is *obiter dicta*; that if the
> figures had been scribbled on the back of an envelope and handed in a
> highly informal manner to the tenant, in my view that would not be enough.
> Some degree of solemnity or formality is needed for a document to satisfy
> the requirement of this lease.  It is not enough that it be scribbled down
> casually.  It has to be written down and it has to be written down with
> precision; but here it was.  I therefore see no hope of success in the
> defence that there was no good certificate in this case."

The P I Appellants rely on these two cases as authority for the proposition that a
certificate is  not required to contain the word 'certificate' for it to amount to such.

---

[3] (1996) 28 H.L.R. 241 at 244.
[4] At p. 250.

23

[28]    The dictionaries provide little assistance in determining whether any of the Documents relied on in this case amount to a 'certificate'. **Osborn's Concise Law Dictionary**[5] defines the word as meaning "A statement in writing by a person having a public or official status concerning some matter within his knowledge or authority". The definition in **Jowitt's Dictionary of English Law**[6] is identical, while giving examples of the principal varieties of certificates relating to legal matters taken from the cases and statutes. **Daniel Greenberg: Stroud's Judicial Dictionary of Words and Phrases**[7] gives various examples of the use of the word from the cases and statutes, and defines it as follows: "A 'certificate', ex vi termini [from the force of the term], imports that the party certifying knows the fact that he certifies", and cites Kenyon C.J. in **Farmer v Legg**.[8] What is certain is that the document is not required to be headed with the word "certificate". Further, the document would import that the party issuing it was certifying that he knows the fact that the document certifies.

[29]    There are very few decisions in the West Indies of assistance. **Re Stewardship Credit Arbitrage Fund Ltd.**[9] was a decision of the Commercial Court in Bermuda. In this case, the company's bye-laws included a 'certificate' provision that was materially identical to that in Article 11(1). The company argued that the particular NAV was wrong because 70% of the assets had been lost to a Mr. Petters who had been charged with fraud in the United States (the "Petters fraud") and there was no realistic prospect that the company would recover value from the assets. In delivering his judgment refusing to recalculate the NAV, Bell J. emphasised the enormous practical difficulties of recalculating the NAV. He said:

> "[47]    This argument ignores at least two factual matters. First, it ignores the provisions of bye-law 19.2 which provides:

---

[5] 11th edn., Sweet & Maxwell 2012.
[6] 3rd edn., Sweet & Maxwell 2012.
[7] 7th edn., Sweet & Maxwell 2012.
[8] 7 T.R. 191.
[9] (2008) 73 WIR 136.

'Any certificate as to Net Asset Value, a Class NAV, a Series NAV or the Net Asset Value per Participating Share of any Class or Series or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Board shall be binding on all parties.'

For the company, it was suggested that there was no evidence that a certificate had been provided by the NAV calculation agent, who was identified in the prospectuses. Any such certificate would of course have been available to the company, but not to the Gottex funds. One would have expected that if the company wished to run this argument, it would have furnished evidence as to the position in relation to the production of a certificate.

[48]    But that point apart, it is perfectly apparent that there are enormous difficulties in determining the true position, even if such an argument were to be accepted. There is no logic in simply recalculating the NAV at the redemption date for the Gottex funds of 31 March 2008, when the Petters fraud was not discovered until some months later; there would also be a need to effect a recalculation of the position when the Gottex funds first invested, and no doubt also in relation to all other redemptions and subscriptions. As Mr Potts put it, it would be necessary to unravel the entire operation of the fund and the magnitude of such a task cannot be over emphasised. It also seems to me that to do the exercise properly, the company would need to know the true position in relation to the value of the underlying loan collateral for each revision date, or, put another way, the extent of the Petters fraud in relation to each such collateral, a truly impossible task. No doubt that is precisely why the relevant bye-law contained the provision which it did, making for certainty once the NAV had been determined."

From the judgment of Bell J., a number of principles can be extracted. One, it is clear that the parties proceeded on the assumption that no certificate had been issued. It was accepted that a certificate would have barred the requested revaluation. The company itself wished to revalue the NAV. It would not have been in its interest to produce a certificate shutting it out from such a revaluation. But, neither did the other party argue that the issuing of contract notes and other documentation quoting the NAV amounted to a certificate. So, the point was not decided by Bell J.

25

[30]     **In the Matter of Livingston International Fund Ltd. (In Liquidation)**[10] was a
         decision of Rawlins J. (as he then was) in the High Court in the Territory of the
         Virgin Islands. The Fund was being wound up. Interested parties had concerns
         and positions that were contrary to some of the recommendations that the
         Liquidator made in his Reports. The concerns related mainly to the calculation of
         the NAV and the payment dates for valuations for unpaid redemptions and
         outstanding redemption requests that preceded the suspension of redemption
         payments. The Liquidator recommended that the NAV should be recalculated for
         a particular period. Parties that would be adversely affected by a recalculation did
         not agree with this recommendation. The Liquidator referred the issues to the
         Court for determination. Regulation 69 of the Articles of Association provided,
         according to paragraph [74] of the judgment, that the NAV for the purpose of
         issuing and redeeming shares shall be determined by or under the direction of the
         Directors as at each applicable Valuation Date. It also stated that if the Directors
         and the auditors disagreed on the NAV and were unable to arrive at an agreement,
         the Directors should make the final determination. Further, Regulation 72 provided
         that any valuations made pursuant to the Articles shall be binding on all parties.
         Rawlins J. decided:

> "[84]     ... Regulation 72 of the Articles of Association of the Fund is
>           intended to promote certainty and business efficacy. Investors,
>           particularly significant investors in private Funds, make far
>           reaching decisions and, in turn, incur significant financial
>           obligations on the basis of reported NAV's. ... For purposes of
>           business efficacy in this case, I see no good reason to find that
>           the published NAV's are not binding under Regulation 72."

This case can be distinguished from ours as a certificate was not required by the
Articles before the NAV would be binding on the parties. This judgment gives us
no assistance in identifying what could amount to a certificate.

---

[10] British Virgin Islands Claim No. BVIHCV 2002/197 (delivered 19th May 2004, unreported).

[31]    **Minster Trust Ltd. v Traps Tractors Ltd. and Others**,[11] relied on by Sentry is
equally unhelpful. Here, a seller had let out plant and machinery on hire to
contractors by a contract which provided that:[12]

> "On the completion of the hire each machine will be ... reconditioned by
> you ... under the supervision and to the satisfaction of the Hunt
> Engineering Company and the hire will cease on ... the issuance of their
> certificate that the machines have been satisfactorily overhauled on a fully
> reconditioned basis".

While the work of reconditioning was being carried out under the supervision of
Hunts and before their final reports had been made, the seller sold the machinery
by a contract of sale which provided that all the machines were to be supplied with
the Hunt Engineering Certificate that they have been fully reconditioned to their
satisfaction. Hunt's standard was a recognised standard in the industry. The final
reports on each machine forwarded by Hunts to the seller, and tendered by the
seller to the buyers as certificates under the contract of sale, were headed
"Inspection report". These reports stated, among other things, that the unit in
question "was accepted as reconditioned to the required standards". By this,
Hunts meant the standard required by the contract with the firm that did the
reconditioning, not up to their own standard. The parties intended that there
should be a certificate from Hunts that the machines had been reconditioned up to
an objective Hunts' standard.    The reconditioning of the machines was
subsequently found to be unsatisfactory, and the buyers claimed damages against
the seller for breach of contract. Hunts did not consider themselves as certifying in
terms of the contract of sale, but as reporting to their customer for whom alone the
report was intended on the satisfactory completion of the reconditioning contract.
It was held by Devlin J. in the Queen's Bench Division that the 'inspection reports'
were not a compliance with the contract of sale and were not conclusive as to the
standard of reconditioning, and the seller was, accordingly, in breach of contract. I
do not think that there is anything in this judgment that can offer assistance on the

---

[11] [1954] 1 W.L.R. 963.
[12] See p. 964 of the judgment.

27

issues raised in this case, save that it is clear that the document did not have to call itself a certificate. It is the nature of the document that matters.

### Conclusion

[32] Applying the law as expressed above, it would seem, in my judgment, that there is no requirement in Article 11(1) for a certificate to be signed. The Article merely says that a certificate must be "given" by or on behalf of the Directors. I accept the argument of the P I Appellants that if the Article required a certificate to be signed it would have said so.[13]

[33] However, I am satisfied that the learned trial judge was right to reject all of the Documents as amounting to a certificate for the following reasons. Article 11 deals with the different issues of determination, calculation and certification. The plain wording of the Article is that there can be a determination published without it having been certified. The wording "any" certificate suggests that it was not obligatory that there always be a certification on each occasion that the NAV is published. There is nothing in the Article to suggest that every publication of the NAV amounts to a certification as to its accuracy.

[34] The function that the Directors had delegated to Fairfield Greenwich and Citco was the function of calculation. There is nothing in the documentation that indicates a delegation of either of determination or of certification. While the Directors were entitled by the wording of the Article to delegate the function of certifying, there is nothing to indicate that they did in fact do so. It cannot be right that every statement of a precise NAV given in good faith by Citco or Fairfield Greenwich on behalf of Sentry whether in a contract note, in an email, or on a website amounts to a certification by or on behalf of the Directors. There would then, as in the **Livingston** case, be no need to expressly require that a calculation may be

---

[13] In North Shore Ventures Ltd. v Anstead Holdings Inc. and Others [2011] 3 W.L.R. 628 the relevant provision expressly stated that the certificate was to be "signed by North Shore".

certified. All published calculations once determined by the Directors would be automatically certified.

[35] There is no reason why under Article 11 there cannot be an uncertified determination which is not binding. The entire process of calculation of the NAV and its determination operates well and the process goes forward subject to the fact that it is not binding until it is certified by or on behalf of the Directors. The plain meaning of the wording of our Article 11 is that, unlike in the **Livingston** case, not every determination is intended to be binding on the parties.

[36] The mere stating of a precise price will not suffice for any document to amount to a certificate, as urged by the P I Appellants. The learned trial judge was correct to find that a certificate must be something more than a simple statement. It must be a document which contains some formal stamp to the truth of the matter in issue. In the case of a certificate as required by Sentry's Articles, the document must not merely state the NAV but purport to certify the Directors' determination of it.

[37] Further, according to Article 11 the certificate must have been issued either by the Directors or by some agency to whom the power to certify was delegated. The documents were not issued by the Directors, nor was there any delegation either in the Administration Agreement or elsewhere of the power to certify. I am satisfied that the learned trial judge was correct to find that none of the Documents relied on by the P I Appellants as constituting a certificate amounts to the requisite certificate.

[38] The commercial purpose point urged by the P I Appellants and relating to the finality and certainty of the NAV is attractive. However, while the re-calculation of the NAV might on occasion be burdensome and difficult, it does not appear from the language of Article 11 or from the authorities that this exercise should never be possible. There would otherwise be no point in providing for the possibility of the NAV being certified so as to bring finality to any question as to the accuracy of its

29

calculation. In any event, Sentry is not seeking in this case to have the NAV recalculated. No recalculation is required on the basis of the claims made by Sentry. Sentry is seeking to have the NAV revalued and declared of nil or of nominal value. This is purely a legal issue and does not involve any complex mathematical recalculation.

[39]     The learned trial judge's finding at paragraph 27 that "all parties" in the context of the Articles must mean all parties bound by the Articles is neither here nor there. This conclusion of his does not go to the merit or substance of his finding. The clause was inserted into the Articles to provide that once a certificate had been issued by or on behalf of the Directors, no party to a particular document could argue over the calculation of the NAV. None of the Documents amounted to the requisite certificate for the issue to develop any significance.

[40]     The fact that the learned trial judge found that the monthly statements and other Documents served other purposes than that of certifying the NAV is not of any significance. It is clear from his judgment that a certificate can perform additional roles such as giving information. What he found was that none of the Documents met the key element of putting a formal and binding stamp to the NAV.

[41]     For all these reasons I would dismiss the appeals against the learned trial judge's findings in relation to the Article 11 Preliminary Issues, and I would uphold his finding on the Article 11 Defence, even if for different reasons. I would award costs (as one set) to Sentry to be in two thirds of the amount assessed below.

Don Mitchell
**Justice of Appeal [Ag.]**

Janice M. Pereira
**Justice of Appeal**

Davidson K. Baptiste
**Justice of Appeal**

I concur.

I concur.

30

### The Good Consideration Issue

[42]     **PEREIRA, JA:**  The second preliminary issue determined by the learned trial
         judge was whether a redeeming member of Sentry in surrendering its shares gave
         good consideration for the payment by Sentry of the Redemption Price and, if so,
         whether that precludes Sentry from asserting that the money paid to that member
         on redemption exceeded the true Redemption Price and as such is recoverable as
         to the excess from such redeeming member.

[43]     This second issue shares a common background to the Article 11 issue and is
         quite adequately set out by my learned brother Mitchell JA [Ag.] in his judgment
         and need not be repeated.  The learned trial judge determined this issue against
         Sentry and this is the subject of Sentry's appeal in Appeal No. 62 of 2011.

[44]     Sentry's claim is that the total NAV of the redemptions sought by the P I
         Respondents was calculated at various times and they were paid
         US$135,405,694.70 upon the redemption of their shares.   The NAV was
         calculated under a mistake of fact as, unbeknown to the Sentry, BLMIS was in fact
         operating a Ponzi scheme and Sentry's investments in BLMIS were therefore lost
         from the date of Sentry's investments.  The NAV was at all times either nil or a
         nominal sum.  In the circumstances, the P I Respondents have been unjustly
         enriched at the expense of Sentry and are liable to make restitution.  Further or
         alternatively, Sentry is entitled to set aside the redemptions on the ground that the
         payment of the Redemption Price was effected under a mutual mistake.

[45]     The defences are all broadly similar.  First, the redemption proceeds were paid to
         discharge a debt owed to each of the P I Respondents.  Once Sentry had
         accepted the P I Respondents' requests to redeem the shares, Sentry became
         indebted to each of them for the amount of the Redemption Price.  Sentry, in
         consideration of each of the P I Respondents redeeming its shares and
         relinquishing its rights as a shareholder in accordance with the Articles, discharged

31

the debt which it owed to each P I Respondent by paying to it the Redemption
Price for its shares.  Each P I Respondent gave good consideration for Sentry's
payment so that they have not been unjustly enriched at Sentry's expense.  Their
position is that, irrespective of the NAV per share, they gave good consideration
for Sentry's payment of the redemption price for the shares and that provides them
with a complete defence to Sentry's claims.  This is described as the Good
Consideration Defence.

[46]     The conflicting interests in our case are stark.  Do the Good Consideration
Defence and the common law rule on mutual mistake, among other factors,
prevent Sentry from recovering the Redemption Price paid out to the earlier
redeemers who were, as a consequence of the way the fraud was designed, paid
excessive sums allegedly the proceeds of investments in Bernie Madoff's Ponzi
scheme?  Does the need for certainty in business transactions trump the right of a
payer who has mistakenly paid sums of money in excess of the sums that were
actually due to recover the excess?  Or, is a feeder fund company entitled to claw
back all sums which it had received from a Ponzi scheme that was masquerading
as an investment scheme and which it had then paid out to some of its investors,
so that all its duped investors who had lost their investment and received little or
nothing may be repaid their investment funds pro rata?

[47]     The learned trial judge on the Good Consideration Issue found as follows:

"[34]     Left to myself I would have held that the redemption of shares in
this case amounted to a bargain and sale for which the
consideration received by Sentry was the surrender of the rights
of the redeeming shareholder.     I cannot see how the
subsequently discovered fact that BLMIS was a Ponzi scheme
can be said to have vitiated that bargain so as to entitle Sentry to
recover the redemption money/purchase price any more than
could the discovery that a planning authority had not in fact
granted consent for residential development vitiate a contract for
the purchase of building plots by reason of the purchaser's own
mistaken assumption that it had. [16] [See per Lord Scott in Deutsch
Morgan Grenfell Group plc v IRC [2006] UKHL 49 at paragraphs
84, 85.]  I further fail to understand how Sentry can recover the

32

redemption price in circumstances in which *restitutio in integrum* is no longer possible.

[35]    I was referred to **Aiken v Short.**[17] [*(1856) 1 H&N 210*] and **Barclays Bank Ltd v WJ Simms Son & Cooke Southern Ltd.** [18] [*[1980] QB 677*] Neither case involved a sale and purchase. In the first, a bank paid off a debt due by a customer to a third party in the mistaken belief that the debt was secured on property which stood as security for the customer's account. It was held that the third party creditor had given good consideration by accepting the payment as discharging the debt due to her from the bank's customer. In his short judgement Pollock CB said:

> 'Suppose it was to be announced that there was to be a dividend on the estate of a trader, and persons to whom he was indebted went to an office and received instalments of the debts due to them, could the party paying recover back the money if it turned out he was wrong in supposing that he had the funds in hand?'

That appears to me to expose the fallacy upon which the present case is founded. **Barclays Bank v Simms**[19] [(supra)] takes the matter no further. It decided that payment on a cheque made by a bank in breach of mandate was ineffective to discharge the drawer's obligation on it and the bank was thus entitled to recover, in contradistinction to the situation in **Aiken v Short.**[20] [(supra)]. The cases are authority for the proposition that a party will not be able to recover a payment made by mistake where the payer has received consideration from the payee.

[36]    In my judgment, therefore, it is not open to Sentry now to seek to recover the price which it paid for the purchase of the shares of redeeming investors simply because it calculated the NAV upon information which has subsequently proved unreliable for reasons unconnected with any of the redeemers."

[48]    Another of the issues between the parties was the question whether the process of redemption created a new contract by way of sale. The learned trial judge found that it did. He held that the redemption of shares by the defendants amounted to a fresh bargain and sale for which the consideration received by Sentry was the surrender of the share rights of the redeeming shareholders and that Sentry would

33

not be able to recover a payment made by mistake where the payer had received any consideration from the payee. He was unable to see how the subsequently discovered fact that BLMIS was a Ponzi scheme could be said to have vitiated that bargain, i.e., the purported bargain for the redemption of shares, so as to entitle Sentry to recover the Redemption Price paid to the redeeming shareholder.

[49] The learned trial judge, (notwithstanding his misgivings[14]) having been persuaded to deal with the second issue as being one of pure law, framed the question in relation to the Good Consideration Defence in this way:

> "Whether a redeeming Member of the Claimant in surrendering its shares gave good consideration for the payment by the Claimant of the Redemption Price, and if so, whether that precludes the Claimant from asserting that the money paid to that Member on redemption exceeded the true Redemption Price and as such is recoverable as to the excess from such redeeming Member."

[50] It is trite that the approach which must then be adopted in determining the question as a preliminary issue is on the assumption that the case, as pleaded, is true.

[51] A useful starting point, in my view, is by referring to Sentry's pleaded case in relation to the Good Consideration issue. Sentry pleaded at paragraphs 9, 10, 11 and 12 of its statement of claim as follows:

> "9.   The NAV was calculated under a mistake of fact as, unbeknown to the Claimant, BLMIS was in fact operating a ponzi scheme and its investments in BLMIS were therefore lost from the date of the Claimant's investment.
>
> 10.   In the premises, the NAV of the Claimant at all times was nil or a nominal value and the Aggregate Redemption Sum should, accordingly have been nil, or in the alternative, a nominal sum.
>
> 11.   In the circumstances, the Defendants have been unjustly enriched at the expense of the Claimant, and the Defendants are liable to make restitution to the Claimant in the aggregate sum of US$135,

---

[14] See para. 3 of the judgment.

34

405,694.70, or in the alternative the difference between that sum
and the said nominal amount.

12.    Further or alternatively, the Claimant is entitled to set aside the
redemption of the Defendants' shares on the ground that the
payment of the Aggregate Redemption sum was effected under a
mutual mistake."

[52]    The learned judge was criticised, in my view unfairly, for holding that surrendering
of the shares and the payment of the redemption price amounted, in effect, to a
new contract. This assumption may no doubt have had its origin in the way Sentry
pleaded its case which no doubt had a bearing on the framing of the question for
determination.

### A new or existing contract?

[53]    On appeal, the argument advanced by Sentry relying on the House of Lords
decision in **Harvela Investments Ltd. v Royal Trust Company of Canada (C.I.)
Ltd. and Others**,[15] is that the surrendering of the Shares and the payment of the
Redemption Price did not amount to a new contract; rather that this took place
pursuant to an existing contract which was contained in Article 10 of Sentry's
Articles. Sentry says that this was simply (mistaken) performance of an existing
contract. Sentry, pursuant to the contract contained in the Articles was obliged to
redeem the shares and was already bound to pay pursuant to Article 10. It had no
option. Likewise, as the P I Respondents point out, the request once received by
Sentry, could not be withdrawn without the consent of Sentry's directors. Both
Sentry and a redeeming shareholder would at that point become bound to fulfil
certain obligations each to the other.

[54]    In **Harvela**, the first defendant, a Jersey trust company was one of the trustees of
a settlement and the registered holder on behalf of the trustees of shares in a
company in which the plaintiff and the second defendant and his family also

---

[15] [1986] A.C. 207; [1985] 3 W.L.R. 276; [1985] 2 All E.R. 966.

owned shares. Whichever of the latter two groups acquired the trustees' shares would gain control of the company. Offers were made by both, and the first defendant decided to invite them to submit revised offers on identical terms and conditions. They invited each to submit any revised offer that it might wish to make by sealed tender by a certain date and time. The first defendant bound itself to accept the highest offer that complied with the terms. The plaintiff's offer was for a certain price. The second defendant's offer was for a specified amount in excess of any other offer, i.e., the price would be determined by reference to the price in any other offer. The first defendant informed both offerors that in the circumstances they were bound to accept and did accept the second defendant's offer. In an action by the plaintiff claiming the shares the High Court gave judgment in their favour. The Court of Appeal allowed an appeal. On appeal to the House of Lords it was held that the undertaking to accept the highest offer only invited fixed bids. The invitation on its true construction had created a fixed bidding sale and the second defendant had not been entitled to submit, and the first defendant had not been entitled to accept, a referential bid. The first defendant's acceptance of the second defendant's offer had been sent with the intention of fulfilling what they thought was their existing obligation due to their mistaken belief that they were bound to accept the second defendant's referential bid, not of creating any new obligation, and, accordingly, no second contract independent of the invitation had come into existence as a result of that message.

[55]    I am satisfied on the facts of **Harvela**, that the conclusion arrived at by the House of Lords was correct in principle. I do not consider however, for the reasons which will unfold in this judgment that the ruling in that decision is of any particular relevance here.

[56]    An issue arose on the appeal as to whether we should assume that the redeemed shares and associated rights had any value. At the hearing before the learned trial judge the parties had agreed to proceed on the basis that, even if the shares are valueless, on the mere fact they were delivered the good consideration defence

36

would apply. I have already stated above the assumption which must be made in relation to the pleaded cases, as this is an appeal from the determination of a preliminary issue based on the cases of the parties as pleaded. No evidence has been led.

[57]   The law generally regards the surrendering of contractual rights as constituting good consideration. A very clear example of this is provided by the case of **Bell and Another v Lever Brothers, Limited**.[16]  Lever Brothers employed the two defendants who committed serious breaches of their contracts of employment, which would have justified their summary dismissal. In Ignorance of this fact, Lever Brothers entered into agreements with them to terminate their services on terms that they would receive substantial sums in compensation. The defendants themselves did not have in mind, when these agreements were concluded, that they could have been dismissed without compensation. The agreements were concluded under a common mistake as to the respective rights of the parties. When Lever Brothers discovered the directors' wrongdoing it claimed rescission of the agreements and repayment of the compensation.

[58]   Justice Wright at first instance found that the mistake or misapprehension was as to the substance of the whole consideration and went "to the root of the whole matter". He concluded that the court, as a court of equity, could do all that justice required to constitute a restitutio in integrum. He ordered repayment of the money paid under the agreement. The Court of Appeal upheld this judgment. Scrutton L.J. held that the principle to be applied was the same as that applicable in the case of frustration. Either the contract was void because of an implied term that its validity shall depend on the existence at the time of the contract, and during its term of performance, of a particular state of facts, or that there is a mutual mistake of the parties, who have made the contract believing that a particular foundation to it exists, which is essential to its existence. In either case the absence of the

---

[16] [1932] A.C. 161.

37

assumed foundation made the contract void. Greer L.J. in concurring was of the
view that a mistake as to the fundamental character of the subject matter of the
contract was one which, if mutual, the law would regard as rendering the contract
void.

[59]     On appeal, the House of Lords, by a majority, reversed this decision. Lord Atkin
held that mistake would only nullify consent where the parties contracted under the
common mistaken assumption that the subject matter of the contract existed
when, in fact, this was not the case. Mistake as to a quality of the thing contracted
for would not affect assent unless it was the mistake of both parties, and was as to
the existence of some quality which made the thing without the quality essentially
different from the thing as it was believed to be. He held that it was wrong to
decide that an agreement to terminate a definite specified contract was void if it
turned out that the agreement had already been broken and could have been
terminated otherwise. The contract released was the identical contract in both
cases, and the party paying for release got exactly what he bargained for. It
seemed immaterial that he could have got the same result in another way, or that
if he had known the true facts he would not have entered into the bargain. From a
commercial standpoint, the contracts of employment which the two directors
surrendered might have been worthless because both directors were liable to
instant dismissal without compensation. But, in the eyes of the law, the surrender
of those contracts was sufficient consideration to support the large compensation
payments which the directors were paid.

[60]     Sentry concedes, based on the legal principles derived from the case law that if
there was a new or separate redemption contract Sentry would not be able to
recover the sums. On that basis it accepts that it would fall under the **Bell v Lever
Brothers** principle where the parties had in fact made a fresh contract. However,
Sentry says there was no new 'redemption contract' here - the only contract being
the subscription contract contained in the Articles.

38

[61]   Sentry says that there could be no good consideration given by the P I
       Respondents as the redeemable shares and the rights attached to them were, in
       essence, worthless.   This is so, argues Mr. Brindle, QC on behalf of Sentry,
       because:

               (a)    The overwhelming majority of funds placed by the P I
                      Respondents with Sentry for investment were invested in BLMIS;

               (b)    At all material times BLMIS was run as a Ponzi scheme and thus
                      as a fraudulent scheme was, as a matter of law insolvent from
                      inception;[17]

               (c)    Sentry's investments in BLMIS were therefore lost from the date
                      they were made;

               (d)    Accordingly, the NAV of Sentry was at all material times nil, or
                      alternatively, a nominal sum;

               (e)    Thus the shares surrendered to Sentry were of nominal or no
                      value.

[62]   The central plank in Sentry's argument is that Sentry owed no debt to the P I
       Respondents and therefore the mistaken payment to them could not be said to be
       made in discharge of a debt obligation of Sentry. This is so, says Sentry, because
       its true NAV was nil or nominal and thus the P I Respondents (as redeemers) were
       entitled to nothing. In essence, that here, the P I Respondents cannot justify their
       enrichment since they had no legal right to receive it.

[63]   Sentry relies on the latest edition of **Goff & Jones: The Law of Unjust
       Enrichment**.[18]  So does Mr. Hapgood, QC on behalf of the P I Respondents.
       Chapter 2 sets the stage for a claim based on unjust enrichment. It says:

               "English law provides that a claimant will be entitled to restitution if he can
               show that a defendant was enriched at his expense, and that the
               circumstances are such that the law regards this enrichment as unjust.
               For example, a claimant will have a prima facie right to restitution where

---

[17] See Re Titan Investments Limited Partnership, Judicature Act, 2005 ABQB 637.
[18] 8th edn., Sweet & Maxwell 2011, p. 21, para. 2-01.

39

he has transferred a benefit to a defendant by mistake, under duress, or for a basis that fails. Nevertheless, the defendant can escape liability if another legal rule entitles him to keep the benefit, and this rule overrides the rule generated by the law of unjust enrichment which holds that the defendant should make restitution. For example, a claimant may have paid money to a defendant by mistake, **but the payment may be irrecoverable if the claimant was required to pay by statute or by contract**. Although the claimant has a prima facie claim in unjust enrichment, the defendant's enrichment is justified by the statute or contract, with the result that the claimant's right to restitution is nullified.[1] *[Kleinwort Benson Ltd v Lincoln CC [1999] 2 A.C. 349 at 407-408, per Lord Hope, followed in Test Claimants in the F.I.I Litigation v HMRC [2010] EWCA Civ 103; [2010] S.T.C 1251 at 181], per Arden L.J.].* (My emphasis).

[64]  Sentry therefore says, in reliance upon the texts **Goff & Jones: The Law of Restitution**[19] and **Graham Virgo: The Principles of the Law of Restitution**,[20] that it does not matter whether there was or was not consideration given when the relevant contract (namely the subscription contract contained in the Articles) was entered into, provided that at the time when restitution is sought it can be said that any such initial consideration has turned out to be valueless or of nominal value. Further, if there was some value in the shares then it operates pro tanto.

[65]  Mr. Hapgood, QC made the general point that contract almost always trumps restitution. He relies also on the passage cited at paragraph 63 above from **Goff & Jones**. He put forward four propositions on behalf of the P I Respondents:

      (i)      A sum paid in discharge of a contractual debt cannot generally be recovered;

      (ii)     Redemption payments were paid to discharge a contractual debt unless Sentry's Article 10 obligation was void;

      (iii)    That the one contract, two-contracts theories are irrelevant to proposition (ii); and

---

[19] 7th edn., Sweet & Maxwell 2007, para. 41-002.
[20] 2nd edn., Oxford University Press 2006, p. 171.

(iv)     Even if wrong on (ii) and (iii) the redeemers in any event gave
         good consideration such as to defeat a restitutionary claim.

### The Law

[66]    It is common ground that the case at bar is a two party case. The learned trial
        judge in his judgment referred to the cases of **Aiken v Short**[21] and **Barclays
        Bank Ltd v W. J Simms Son & Cooke (Southern) Ltd. and Another**.[22] These
        were three party cases. The text writers **Goff & Jones**[23] and **Professor Virgo**[24]
        distinguish between two-party and three party cases. **Goff & Jones** at para. 29-
        19 state as follows:

> "In two- party cases, where a claimant pays money to a defendant to
> discharge a legal obligation that he owes the defendant, any claim to
> recover the money could be met by the response that the defendant's
> enrichment is justified by the legal right that he had to receive the
> money....Moreover, even if that were not enough to bar the claim, the
> defendant would also be entitled to rely on the change of position
> defence...having released his legal obligation against the claimant in
> exchange for the payment."

[67]    The **Barclays Bank Ltd v W. J Simms** case, even though it concerned a tri-partite
        situation, dealt with the principles under which money paid under a mistake of fact
        is recoverable. It may be considered as a classic statement of the law on mistake.
        It was concerned with a payment made by the claimant bank which payment
        discharged (or was alleged to have discharged) an obligation owed to the
        defendant by a third party.  In the tripartite situation there is no contractual
        relationship between the claimant and the defendant.  Barclays Bank claimed a
        sum of money from the first defendant and the second defendant, the receiver of
        the first defendant. The bank claimed it had paid the money under a mistake of fact
        when the second defendant presented a cheque drawn on the bank in favour of the

---

[21] (1856) 1 Hurlstone & Norman 210.

[22] [1980] Q.B. 677.

[23] Supra note 18.

[24] Supra note 19.

41

first defendant. The bank had overlooked its customer's instructions to stop
payment on the cheque.

[68] Goff J. conducted an extensive review of the authorities dealing with the principles
on which money paid under a mistake of fact is recoverable. He stated his
conclusions as follows:

> "From this formidable line of authority certain principles can, in my
> judgment, be deduced: (1) If a person pays money to another under a
> mistake of fact which causes him to make the payment, he is prima facie
> entitled to recover it as money paid under a mistake of fact. (2) His claim
> may however fail if (a) the payer intends that the payee shall have the
> money at all events, whether the fact be true or false, or is deemed in law
> so to intend; or (b) the payment is made for good consideration, in
> particular if the money is paid to discharge, and does discharge, a debt
> owed to the payee (or a principal on whose behalf he is authorised to
> receive the payment) by the payer or by a third party by whom he is
> authorised to discharge the debt; or (c) the payee has changed his
> position in good faith, or is deemed to have done so."[25]

Goff J. added a footnote to principle 1. He said:

> "Of course, **if the money was due under a contract** between the payer
> and the payee, there can be no recovery on this ground **unless the
> contract itself is held void for mistake** (as in Norwich Union Fire
> Insurance Society Ltd. v. Wm. H. Price Ltd. [1934] A.C. 455) or **is
> rescinded** by the plaintiff." (My emphasis).

These statements in my view lend credence to Mr. Hapgood, QC's contention and
are well recognised by Goff & Jones, on which Sentry places heavy reliance, that
contract will ordinarily, defeat a restitutionary claim. This proposition holds true
even under the modern law of restitution in recognition of the sanctity of
contractual obligations.

[69] Principle 2(b) encapsulates the defence of good consideration. The defence may
fail if the payer's mistake was induced by the payee, or possibly where the payee,
being aware of the payer's mistake, did not receive the money in good faith. For

---

[25] Supra note 20, p. 695.

42

the present purposes, neither of these situations arise in this case (as no such allegations have been made), and we can assume that the defendants acted throughout entirely innocently.

[70]     Goff J. referred to two circumstances in which the defence of good consideration would or might fail because the transaction in which the consideration was given itself fell to be set aside (i.e. where the mistake was induced by the payee or bad faith by the payee). Similarly, Lord Scott in the **Deutsche Morgan Grenfell plc v Inland Revenue Commissioners and another**[26] case below, in addressing the situation in which the parties are in a contractual relationship, referred to the possibility that the defence would fail because the mistake enabled the contract to be set aside, or because the contract was void from the outset, or was avoided before payment.

[71]     In **Deutshe Morgan Grenfell Group plc** the House of Lords considered a bipartite situation. The House did not disapprove of what Goff J. said in **Barclays Bank v W. J Simms**. Lord Scott of Foscote in considering the question whether money paid or property transferred under a mistake is necessarily recoverable said that, "It surely all depends on the part played by the mistake, whether of fact or law, in the sequence of events that has led to the payment or transfer."[27] After giving an example he then referred to the three circumstances set out by Goff J. in **Barclays Bank v W. J Simms** in which a restitutionary claim may fail. He then referred to the fundamental difference between the first and third circumstance on the one hand, and the second circumstance on the other. He then had this to say:

> "... Neither of these types of case [referring to the first and third circumstances] invalidates Robert Goff J's general proposition that if a mistake of fact causes a payment to be made that would not have been made but for the mistake, the payer will have a cause of action for its recovery. They are not true exceptions. The second however, does invalidate that proposition. If a contract has been entered into that would not have been entered into but for a mistake, but the contract is then

---
26 [2007] 1 A.C. 558.
27 Ibid, para. 84.

43

completed by a payment of the price for the goods or services that the payee has supplied, the payment cannot be recovered unless the contract can be set aside. The proposition seems such an obviously correct one that it may seem pointless to ask why it is that it is correct. But I think the question does need to be asked for the answer casts, in my opinion, valuable light on the nature of the restitutionary remedy for the recovery of money paid under a mistake.

85. The reason, it seems to me, why the proposition is correct is that the mistake does not necessarily undermine the legal obligation which required the payment of the money or for the discharge of which the money was paid. If the mistake does enable the contract to be set aside then, subject to a change of position defence, the money should be recoverable. **If the contract was void from the outset (as in the "swaps" cases) or had been avoided before the payment was made, the money should be recoverable. But if the legal obligation under which the money was paid cannot be, or has not been, invalidated, then, in my opinion, whether or not it can be shown that "but for" the mistake in question the money would not have been paid, a restitutionary remedy for the recovery of the money would not be available."** (My emphasis).

[72]     The leading modern authority on the law of mutual or common mistake in England is the decision of the Court of Appeal in **Great Peace Shipping Ltd v Tsavliris Salvage (International) Ltd**,[28] where Lord Phillips MR handed down the judgment of the Court. Tsavliris was commissioned to salvage the Cape Providence. It contacted an information service to enquire about ships near enough to the stricken ship to assist with the salvage and was told that the Great Peace was only 35 miles away from the Cape Providence. Tsavliris therefore chartered the Great Peace from its owners for five days. It sought no warranty or further information from the owners as to its position. In fact, unbeknown to both parties, the Great Peace was 410 miles away from the Cape Providence and would take several extra days to get to her. On discovering this, Tsavliris chartered another, nearer ship, cancelled the charter with the Great Peace, and refused to pay anything. The owners of the Great Peace sued for five days charter. Tsavliris defended by

---

[28] [2003] Q.B. 679.

alleging that the charter contract was either void at common law or, alternatively, voidable in equity, for common mistake. The trial judge applied the construction approach and gave judgment for the claimants. He held that while there was an implied condition precedent that the Great Peace was close enough to provide the specified service, this condition was satisfied, so the contract was valid.

[73]   On appeal, Lord Phillips MR considered the history of the development of the law of common mistake and of frustration of contracts. He rejected the theory of the implied term as being unrealistic. He continued:

> "73     ...Where a fundamental assumption upon which an agreement is founded proves to be mistaken, it is not realistic to ask whether the parties impliedly agreed that in those circumstances the contract would not be binding. The avoidance of a contract on the ground of common mistake results from a rule of law under which, if it transpires that one or both of the parties have agreed to do something which it is impossible to perform, no obligation arises out of that agreement.
>
> [74]    In considering whether performance of the contract is impossible, it is necessary to identify what it is that the parties agreed would be performed. This involves looking not only at the express terms, but at any implications that may arise out of the surrounding circumstances. In some cases it will be possible to identify details of the "contractual adventure" which go beyond the terms that are expressly spelt out, in others it will not.
>
> [75]    Just as the doctrine of frustration only applies if the contract contains no provision that covers the situation, the same should be true of common mistake. If, on true construction of the contract, a party warrants that the subject matter of the contract exists, or that it will be possible to perform the contract, there will be no scope to hold the contract void on the ground of common mistake.
>
> [76]    If one applies the passage from the judgment of Lord Alverstone CJ in Blakeley v Muller & Co 19 TLR 186, which we quoted above, to a case of common mistake, it suggests that the following elements must be present if common mistake is to avoid a contract: (i) there must be a common assumption as to the

45

existence of a state of affairs; (ii) there must be no warranty by
either party that that state of affairs exists; (iii) the non-existence
of the state of affairs must not be attributable to the fault of either
party; (iv) the non-existence of the state of affairs must render
performance of the contract impossible; (iv) the state of affairs
may be the existence, or a vital attribute, of the consideration to
be provided or circumstances which must subsist if performance
of the contractual adventure is to be possible."

While the decision does not bind this court, it is undoubtedly a correct statement of
the law of common mistake in the Eastern Caribbean.

[74]    Sentry has not sought to say that the subscription contract is to be set aside or
avoided. Indeed as the P I Respondents point out and as noted by the trial judge,
Sentry could not seek this as it is quite clear that restitutio in integrum is no longer
possible. Rather, say the P I Respondents, what Sentry seeks to say is that the
contracts between itself and its shareholders were void ab initio – in short that
there was no contractual relationship at all.   However, during the course of oral
argument Mr. Brindle, QC made clear that Sentry was not seeking to void the
contract in the Articles of Association. He says there was no contract induced by
the mistake.  He further contended that there was no need to set aside the
subscription contract in order to recover.

### What was the contract?

[75]    With the legal principles extracted from the cases firmly in mind I return to the
question: what was the contract here? Accepting that there was one existing
contract namely the subscription contract as contained in Sentry's Articles then
that contract calls for examination and then to consider the part played by the
mistake in the sequence of events leading to the payment by Sentry.

[76]    A proper starting point is the Private Placement Memorandum ("PPM"). The PPM
is the source of the offer to subscribe. It sets out the rules for investment and for
the redemption of the resulting shares. There is an entire section therein entitled

46

'Risk Factors'[29] which makes it clear that the purchase of shares in the Fund
(Sentry) involves substantial risks that are incident to the Fund's allocation of
assets to different types of investments. It then set out various risk factors.
Included among them is this risk at paragraph 17:

> "**Possibility of Misappropriation of Assets.** When the Fund invests
> utilizing the "split strike conversion" strategy or in a Non–SSC Investment
> Vehicle, it will not have custody of the assets invested. Therefore there is
> always the risk that the personnel of any entity with which the Fund
> invests could misappropriate the securities or funds (or both) of the Fund."

The PPM also stated that the Split Strike Conversion strategy is implemented by
BLMIS.[30] This makes it clear that Sentry was investing its shareholders
subscription monies with full awareness of the risk of misappropriation. The
shareholder was similarly aware of that risk. The shareholder, pursuant to the
subscription agreement took the shares pursuant to the terms of the subscription
agreement, the PPM and Sentry's Memorandum and Articles of Association. The
PPM clearly stated that the shares were being issued only on the basis of the
information contained in the PPM. The P I Respondents accordingly contend that
Sentry must be deemed to have accepted the risks; and that the risks were on
both sides. I agree. The P I Respondents say that the risk described at paragraph
17 of the PPM is precisely what happened here as the employees of BLMIS
misappropriated the monies.

[77]   The contractual obligations arising under Sentry's Articles must then be
considered. Article 9 deals with the issuance of shares in Sentry following
payment of the subscription price which is in turn based on the NAV as determined
pursuant to Article 11. Article 10 then provides for the redemption of shares. In
essence, on receipt of a redemption request Sentry is then obliged to redeem or
purchase the shares.[31] The redemption or purchase of the shares is then effected

---

[29] See Record of Appeal Tab 11 pp. 130-135 or the Private Placement Memorandum pp. 17-22.

[30] See Record of Appeal p. 122 or Private Placement Memorandum p. 9.

[31] Unless there has been a suspension as permitted under the Articles, a circumstance not relevant to this
case.

47

at the redemption price which is the NAV per share. The NAV is determined in accordance with Article 11. Article 11 says that the NAV is determined by the Directors of Sentry and goes on further to say how the NAV is to be calculated. Upon the redemption or purchase of the shares the redeeming member's entitlement to any rights in the shares ceases.

[78] Under the subscription contract then, what were the obligations of the parties? For the shareholder it may be said firstly to subscribe for the shares by payment of the subscription price based on the NAV. Sentry's obligation on receipt of the subscription price was to issue to the subscriber, the shares for which payment was made. These obligations of the contract were here performed by the P I Respondents and Sentry. Sentry then took the subscription monies and invested them with BLMIS fully aware of the risks. The investment may yield a good return or it may be lost. The next stage contemplated by the contract was the redemption of the shares. To trigger this process, the shareholder submits a redemption request. On receipt of the redemption request, Sentry's obligation to redeem the shares and pay the redemption price based on the NAV as determined, (not by the redeeming shareholder but by Sentry) was activated. Indeed the redemption request could not be withdrawn without Sentry's consent.

[79] I agree with the P I Respondents that even within the context of the Article 10 contract it is clear to me that the exercise by a shareholder of his right of redemption would trigger contractual obligations on the part of Sentry, which were to redeem or purchase the shares and pay the redemption price as determined by it. I am also in full agreement with the P I Respondents that whether it was the existing Article 11 contract or whether the redemption request may be said to have brought about a new redemption contract is, to my mind wholly irrelevant. The simple fact is that the Article 10 contract clearly provided for the shareholder to redeem his shares, and that on the receipt of a redemption request given pursuant to the provisions of the Article, Sentry's obligation to redeem the shares and to pay the redemption price based on the NAV (whatever Sentry determined the NAV to

48

be) had been called in. The mistake here in terms of the sequence of events, may be said to have occurred at the point of the determination of the NAV by Sentry. Sentry's obligation to pay had already arisen. Put another way, Article 10 gave rise to a debt obligation on the part of Sentry in favour of the subscribing shareholder who had in fact performed all its obligations under the Article 10 contract and the redemption payment was made to discharge that debt obligation. Sentry by payment of the redemption price which was required for the performance of its side of the bargain, did exactly that – a redemption on its part and a payment to the redeeming shareholder to which the shareholder was entitled.

[80] I accordingly reject Mr. Brindle, QC's argument that no debt was due because due to the Ponzi scheme run by BLMIS, Sentry's NAV was nil or a nominal sum. I agree with the P I Respondents that Sentry's contractual obligations gave rise to a debt obligation whatever the value of the shares and the surrender of the rights to the shares by the P I Respondents, in my view, having fully performed their part of the contract, gave good consideration which defeats Sentry's restitutionary claim.

[81] The facts of this case falls to me squarely within the principle 2(b) as set out by Goff J. in **Barclays Bank v W. J Simms** and further expounded upon in the **Deutsche Morgan Grenfell** decision. I do not consider that the mistake here undermined the legal obligation placed upon Sentry under the contract which required it to pay the redemption price by way of discharging its obligations on the redemption of the shares. The subject matter of the contract was the shares. The contract for the shares was with Sentry and not with BLMIS, and therefore it mattered not what was the value of Sentry's investment in BLMIS. This did not form part of the contract. It was Sentry who had to determine the value of the payment for the redeemed shares but making that determination or having mistakenly so determined it, does not nullify the obligation to pay on redemption. The initial consideration was the subscription monies. I do not consider that it was of no value. The initial consideration was also fixed by reference to Sentry's NAV.

49

Sentry, clearly obtained something of value when it issued the shares pursuant to the Article 10 contract. On the payment of the redemption price Sentry got precisely what it paid for - the shares. Sentry was not carrying on a fraudulent Ponzi scheme. Indeed in the context of the subscription contract and Article 10 Sentry got all that it bargained for. This was not a contract where it can be said that the subject matter either did not exist, or ceased to exist or where the performance of the terms were impossible. It cannot be said that it was impossible for Sentry to redeem or purchase the shares at a price to be fixed solely by Sentry. Indeed the mistake as to Sentry's NAV cannot be said to be a common mistake but Sentry's. As was said by Lord Atkin in **Bell v Lever Brothers**, mistake as to a quality of the thing contracted for would not affect assent unless it was the mistake of both parties, and was as to the existence of some quality which made the thing without the quality essentially different from the thing as it was believed to be. The subscription contract was for the shares, and the redemption payment for the surrender of the shares and not for a specific value of any interest or investment in BLMIS.

[82]     In relation to **Bell v Lever Brothers**, Lord Phillips in **Great Peace Shipping** stated that it is generally accepted that the principles of the law of common mistake expounded by Lord Atkin were based on the common law. The issue, he said was whether there subsists a separate doctrine of common mistake founded in equity which enables the court to intervene in circumstances where the mistake does not render the contract void under the common law principles. The Court answered this question in the negative. The Court held that:

> "There was no equitable jurisdiction to grant rescission for common mistake in circumstances that fell short of those in which the common law held a contract void; that it was not possible to distinguish between a mistake or common misapprehension which was fundamental in equity and one which had a quality which made the thing contracted for essentially different from the thing that it was believed to be at common law..."

50

[83]   Another passage of Lord Phillips' judgment in **Great Peace Shipping** bears recital.
At paragraph 85 he states thus:

> "...Supervening events which defeat the contractual adventure will
> frequently not be the responsibility of either party. Where, however, the
> parties agree that something shall be done which is impossible at the time
> of making the agreement, it is much more likely that, on the true
> construction of the agreement, one or the other will have undertaken the
> responsibility for the mistaken state of affairs. This may well explain why
> cases where contracts have been found to be void in consequence of
> common mistake are few and far between."

Here, the risk factors were spelled out, in relation to the shares in the PPM which
formed part of the terms under which the shares were subscribed under the
subscription agreement. It is not alleged that the subscription agreement (Article
10 contract) was void or ought to be set aside. There was an allocation of risks. It
was contemplated that if the Fund (Sentry) did well then shareholders benefited
from a higher yield on a return of their investments on redemption. If the Fund lost
the investments then likewise the shareholder would take the loss. This was the
risk understood and accepted by both sides. Accordingly it cannot be said that
because Sentry mistakenly calculated its NAV at the time of redemption due to
BLMIS's Ponzi scheme, that it made the contract as between Sentry and its
shareholders essentially different from what it was believed to be.

[84]   **Goff & Jones**[32] at para. 3-16 has this to say:

> "The general principle that no claim in unjust enrichment is permitted
> where a contract governing the benefit in question is still in force between
> the parties is today justifiable on the basis that the law should give effect
> to the parties' own allocations of risk and valuations, as expressed in the
> contract, and should not permit the law of unjust enrichment to be used to
> overturn those allocations or valuations."

[85]   The P I Respondents make the general point in response to Sentry's restitution
claim, that allowing such a claim is a recipe for uncertainty and confusion in
commercial transactions. They rely on the dictum of Lord Goff in **Scandinavian**

---

[32] Supra note 16.

Trading Tanker Co AB v Flota Petrolera Ecuatoriana (The Scaptrade),[33] where
he said:

> "It is of the utmost importance in commercial transactions that, if any
> particular event occurs which may affect the parties' respective rights
> under a commercial contract, they should know where they stand. The
> court should so far as possible desist from placing obstacles in the way of
> either party ascertaining his legal position, if necessary with the aid of
> advice from a qualified lawyer, because it may be commercially desirable
> for action to be taken without delay, action which may be irrevocable and
> which may have far-reaching consequences. It is for this reason, of
> course, that the English courts have time and again asserted the need for
> certainty in commercial transactions – for the simple reason that the
> parties to such transactions are entitled to know where they stand, and to
> act accordingly."

[86] I am happy to adopt this statement. It cannot be doubted that certainty is key in
commercial transactions. Many modern day commercial transactions have a global
dimension with far reaching consequences. Parties must be able to know what
their legal position is and to make decisions based on that knowledge. It is
therefore not surprising that throughout all the case law and the modern treatises
on restitutionary remedies that such remedies invariably always give way to
contractual obligations once ascertained or has led to the view that the law of unjust
enrichment is a means of adjusting the relationships between parties 'whose rights
are not met by some stronger doctrine of law" (such as the law of contract) and that
the courts award restitution as a means of resolving "residual" problems.[34]

[87] For these reasons, albeit via a different route, I agree with the ultimate conclusion
arrived at by the learned trial judge that the P I Respondents gave good
consideration for the surrender of their shares and Sentry's restitutionary claim
would be defeated. It is simply not open to Sentry to recover the redemption prices
which it paid for the purchase of the redeemed shares because it has now been

---

[33] [1983] Q.B. 529, p. 540.
[34] See Niru Battery Manufacturing Co and Another v Milestone Trading Ltd and Others [2003] EWCA Civ
1446; [2004] Q.B. 985 at [192]; and discussed by Goff & Jones – The Law of Unjust Enrichment (8th edn.
Chapter 2).

discovered that it determined its NAV on unreliable or erroneous information from BLMIS which had nothing to do whatsoever with any of Sentry's shareholders. The shareholders fully performed all their obligations under the contract. Sentry, in paying the redemption price, did so in the discharge of its debt obligations to the redeeming shareholders pursuant to Sentry's Articles which remained perfectly valid and in force. Accordingly, I would dismiss Sentry's appeal on this issue.

### The Summary Judgment

[88]    Following delivery of the 16th September judgment, ABN Amro applied for summary judgment. The learned trial judge in his decision handed down on 10th October 2011 dismissed Sentry's claim against that defendant and granted summary judgment. He ordered that Sentry pay the costs of the application, such costs to be assessed if not agreed. He also ordered Sentry to pay 75% of the P I Respondents' costs of the trial of the Preliminary Issues, to include the costs of the application for preliminary issues, such costs to be assessed if not agreed.

[89]    At paragraph 17 of his judgment, after considering the decision in **Great Peace Shipping** and the principles expounded therein went on to say as follows:

> "If one applies these principles to the present case, the question is whether the fact, contrary to the assumed understanding of both parties, that BLMIS was a Ponzi scheme, means that Sentry was unable to perform the contract which arose when a redemption notice was served in accordance with its Articles of Association. Sentry contracted to invest its members' money and return its product when demanded on the basis of a rateable proportion of Sentry's NAV. The fact that a fund in which it invested and which...was mistakenly believed by Sentry and ABN Amro to have been genuine, turned out to have been run fraudulently had no impact whatsoever upon Sentry's ability to perform these obligations. The fact, if true that upon redemption by ABN Amro, Sentry's directors should have declared a nil NAV does not make the contract void...Sentry's case on common mistake confuses (1) a shared mistaken assumption the truth of which is a necessary condition for the performance of a particular contract with (2) a shared mistaken assumption about the background against which it is expected that the contract will be performed. The

53

> former case will mean that no contract can as a matter of law, be concluded. The latter will not."

With these observations I entirely agree.

[90] The learned judge went on to make the point that Sentry's claim as pleaded appears to treat the contract between Sentry and a redeemer as liable to be rescinded rather than void and referred to **Great Peace** as being 'clear authority that there is no jurisdiction in equity to rescind a contract binding in law on the grounds of common mistake. I have already referred to this at paragraph 82 above. He again reiterated that rescission is not available in circumstances as here where restitutio in integrum is impossible. He accordingly concluded that either way the claim made at paragraph 12 of Sentry's case, coupled with his decision on the good consideration point was bound to fail. With this conclusion I also agree. The learned judge quite rightly, could only deal with the case as pleaded.

[91] On the adjournment issue sought by Sentry in the hope that they may turn up information which may show knowledge of BLMIS's Ponzi scheme or bad faith on the part of redeemers, I need only repeat paragraph 22 of the learned judge's judgment with which I entirely agree:

> "...Applicants for summary judgment are entitled to have their applications dealt with on the facts as they are, not as they might be, and I have never heard of a summary judgment application being adjourned to give the unsuccessful party an opportunity to improve his position by searching for material upon which to make fresh allegations."

He, in my view, quite rightly refused the adjournment.

54

**Conclusion**

[92]   For the reasons which I have given, I would dismiss Sentry's appeal on all points. I
       would award costs on this appeal to the P I Respondents (as one set of costs) to be
       fixed at two thirds of the amount as assessed below.

Janice M. Pereira
Justice of Appeal

I concur.

Davidson K. Baptiste
Justice of Appeal

I concur.

Don Mitchell
Justice of Appeal [Ag.]

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendants. | |
| In re BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-1364 (BRL) |
| Plaintiff, | |
| v. | |
| HSBC BANK PLC, *et al.* | 11-CV-06524 (JSR) |
| Defendants. | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**PRIMEO FUND'S MOTION TO WITHDRAW THE REFERENCE**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ......................................................................................................................... 3

ARGUMENT .............................................................................................................................. 6

I.    PRIMEO'S MOTION CANNOT MEET THE REQUIREMENTS FOR
      MANDATORY WITHDRAWAL ..................................................................................... 7

      A.    Section 157(d) Has Been Narrowly Construed in the Second Circuit ................... 8

      B.    The Trustee Has Standing to Assert Bankruptcy Causes of Action ...................... 9

      C.    *Stern v. Marshall* Does Not Require or Otherwise Warrant Withdrawal ............ 10

      D.    Interpretation of Section 546(e) of the Bankruptcy Code Does Not
            Warrant Mandatory Withdrawal .......................................................................... 12

      E.    The Bankruptcy Court's Interpretation of Bankruptcy Code Section 548(c)
            Does Not Warrant Mandatory Withdrawal ........................................................... 14

      F.    Interpretation of SIPA's Extraterritorial Application Does Not Warrant
            Mandatory Withdrawal ......................................................................................... 15

II.   PRIMEO HAS FAILED TO DEMONSTRATE CAUSE FOR PERMISSIVE
      WITHDRAWAL ............................................................................................................. 17

      A.    The Bankruptcy Counts in the Trustee's Complaint Are All Core ...................... 18

      B.    Primeo's Motion is Nothing More than Blatant Forum Shopping ....................... 19

      C.    Withdrawal Would Impede Judicial Efficiency and Uniform
            Administration of the SIPA Bankruptcy Proceeding ............................................ 20

CONCLUSION ......................................................................................................................... 21

## TABLE OF AUTHORITIES

Page

**Cases**

*Carter Day Indust., Inc. v. EPA (In re Combustion Equip. Assoc.)*, 67 B.R. 709 (S.D.N.Y. 1986) ................................................................................................................................................. 8

*City of New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir. 1991) ..................................................... 9

*Deak & Co.. Inc. v. Jr. R.M.P. Soedjono (In re Deak & Co., Inc.)*, 63 B.R. 422 (Bankr. S.D.N.Y. 1986).............................................................................................................................................. 16

*Diaz-Barba v. Kismet Acquistion, LLC*, 2010 WL 2079738 (S.D. Cal. May 20, 2010)............... 16

*Enron Corp. v. J.P. Morgan Sec. (In re Enron Corp.)*, 388 B.R. 131 (S.D.N.Y. 2008) ................ 9

*Enron Power Mktg., Inc. v. Holcim, Inc. (In re Enron Corp.)*, 2004 WL 2149124 (S.D.N.Y. Sept. 23, 2004).............................................................................................................................................. 19

*French v. Liebmann (In re French)*, 440 F.3d 145 (4th Cir. 2005) ............................................... 17

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 343 B.R. 63 (S.D.N.Y. 2006)................................................................................................................................................... 8

*Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 185 B.R. 680 (S.D.N.Y. 1995).. ........................................................................................................................................................... 8

*In re Am. Bus. Fin. Servs., Inc.*, 2011 WL 3240596 (Bankr. D. Del. July 28, 2011) ................... 11

*In re Ambac Fin. Grp., Inc.*, 2011 WL 4436126 (Bankr. S.D.N.Y. Sept.23, 2011)..................... 11

*In re Ames Dep't Stores*, 1991 WL 259036 (S.D.N.Y. Nov. 25, 1991). ...................................... 18

*In re Ben Cooper, Inc.*, 896 F.2d 1394 (2d Cir. 1990)................................................................... 19

*In re Bernard L. Madoff Inv. Sec. LLC*, 2011 WL 4434632 (Bankr. S.D.N.Y. Sept. 22, 2011).. 13

*In re Fairfield Sentry Ltd.*, 2010 WL 4910119 (S.D.N.Y. Nov. 22, 2010) .................................. 19

*In re Heller Ehrman LLP*, 2011 WL 4542512 (Bankr. N.D. Cal. Sept. 28, 2011)....................... 11

*In re Interbulk. Ltd.*, 240 B.R. 195 (Bankr. S.D.N.Y. 1999) ....................................................... 17

*In re Johns-Manville Corp.*, 63 B.R. 600 (S.D.N.Y. 1986)............................................................ 9

*In re Laventhol & Horwath*, 139 B.R. 109 (S.D.N.Y.1992).......................................................... 21

*In re Olde Prairie Block Owner, LLC*, 2011 WL 3792406 (Bankr. N.D. Ill. Aug. 25, 2011) ..... 11

# TABLE OF AUTHORITIES
## (Continued)

Page

*In re Rajapakse*, 346 B.R. 233 (Bankr.N.D.Ga. 2005) ................................................................. 16

*In re Safety Harbor Resort and Spa*, 2011 WL 3240596 (Bankr. M.D .Fla. Aug. 30, 2011) ....... 11

*In re Salander O'Reilly Galleries*, 453 B.R. 106 (Bankr. S.D.N.Y. July 18, 2011) ..................... 10

*J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011). ........................................................ 7

*Kelley v. JPMorgan Chase & Co., et al.*, 2011 WL 4403289 (D. Minn. Sept. 21, 2011) ............ 11

*Maxwell Commc'n Corp. PLC v. Societe General PLC (In re Maxwell Commc'n Corp. PLC)*, 170
B.R. 800 (Bankr. S.D.N.Y. 1994) ............................................................................................ 17

*Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010), ........................................................ 15

*Nakash v. Zur (In re Nakash)*, 190 B.R. 763 (Bankr. S.D.N.Y. 1996) ......................................... 17

*Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir.
1993) ......................................................................................................................................... 18

*Picard v. Chais*, 440 B.R. 274 (Bankr. S.D.N.Y. 2010) ............................................................... 16

*Picard v. Kohn*, 11 Civ. 1181 (JSR) (S.D.N.Y. Sept. 6, 2011) .................................................... 15

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243 (Bankr. S.D.N.Y.
2010), *leave to appeal denied*, 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011) ......................... 13

*Picard v. Trotanoy, et al.*, 11. Civ. 7112 (JSR) (S.D.N.Y. Dec. 6, 2011) ...................................... 7

*Rahl v. Bande*, 316 B.R. 127 (S.D.N.Y. 2004) ............................................................................ 19

*Schneider v. Riddick (In re Formica Corp.)*, 305 B.R. 147 (S.D.N.Y. 2004) .............................. 19

*Shugrue v. Airline Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984 (2d Cir. 1990).
..................................................................................................................................................... 8

*Stern v. Marshall*, 131 S. Ct. 2594 (2011) .................................................................. 10, 11, 12, 18

*U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. and Indem. Ass'n., (In re U.S. Lines, Inc.)*, 197
F.3d 631 (2d Cir. 1999) ............................................................................................................ 18

*Walker, Truesdel, Roth & Assocs., et al. v. The Blackstone Group, L.P., et al. (In re Extended
Stay, Inc.)*, 2011 WL 5532258 (S.D.N.Y. November 10, 2011) ......................................... 13, 21

*Wedtech Corp. v. Banco Popular de Puerto. Rico (In re Wedtech Corp.)*, 94 B.R. 293 (S.D.N.Y.
1988) ......................................................................................................................................... 21

**Statutes**

# TABLE OF AUTHORITIES
## (Continued)

Page

11 U.S.C. § 541(a) .................................................................................................................... 16

15 U.S.C. § 78aaa ...................................................................................................................... 1

15 U.S.C. § 78eee-(b)(4) ........................................................................................................... 3

15 U.S.C. § 78fff(b) ................................................................................................................... 3

15 U.S.C. § 78fff-1 ..................................................................................................................... 3

15 U.S.C. § 78fff-2(c)(3) ......................................................................................................... 4, 7

28 U.S.C. § 1334(e)(1) ............................................................................................................... 16

28 U.S.C. § 157(a). ..................................................................................................................... 8

28 U.S.C. § 157(b)(2)(F) ............................................................................................................ 10

28 U.S.C. § 157(b)(2)(H) ............................................................................................................ 10

28 U.S.C. § 157(d) .......................................................................................................... 8, 9, 14, 18

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation proceedings of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"),[1] 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, each a "Debtor" and collectively, the "Debtors"), by and through his undersigned counsel, hereby submits this memorandum of law in opposition to Primeo Fund's Motion to Withdraw the Reference (the "Motion") and supporting Memorandum of Law (the "Mem. of Law") filed in *Picard v. HSBC Bank PLC, et al.,* Adv. Pro. No. 09-1364 (Bankr. S.D.N.Y.) (BRL),[2] No. 11-CV-06524 (S.D.N.Y.) (JSR) (ECF No. 1).

## PRELIMINARY STATEMENT

Primeo Fund ("Primeo") is seeking to invoke this Court's jurisdiction in a full-on assault to deprive the Bankruptcy Court of its central role in this SIPA liquidation. Indeed, Primeo has recently asserted in a court abroad that it intended to challenge this Court's jurisdiction and this forum, and does not intend to request that this Court address the substantive issues it raises herein—undermining the very need for withdrawal of the reference.

In a parallel proceeding before the Grand Court of the Cayman Islands, Financial Services Division (the "Grand Court"), Primeo asserted that the New York courts have no jurisdiction over this dispute. Primeo further urged that the Grand Court should address many, if not all, of the issues in the current Motion, including the safe harbor provision of the Bankruptcy Code and the extraterritorial application of SIPA. Recognizing this tension, Primeo subtly concedes here that it intends to move for dismissal on grounds of personal jurisdiction and/or

---

[1] The Securities Investor Protection Act ("SIPA") is found at 15 U.S.C. §§ 78aaa *et seq*. For convenience, subsequent references to SIPA will omit "15 U.S.C."

[2] A copy of the complaint (cited as "Compl.") filed by the Trustee against Primeo among other parties, including HSBC Bank PLC, is annexed to the Declaration of Oren J. Warshavsky, Esq. ("Warshavsky Decl.") as Exhibit 1.

forum non conveniens. Mem. of Law at 3, n.1. Thus, Primeo seeks to reserve its right to make threshold arguments challenging this Court's jurisdiction while at the same time seeking what amounts to an advisory opinion on substantive law. This is clearly improper and a waste of this Court's time. Primeo should be required to choose between participating in the proceedings here (and waiving its jurisdictional and forum/venue-based challenges) or raising all threshold issues in the Bankruptcy Court.

This is forum shopping. Primeo aims to have both this Court and the Grand Court consider and make rulings on "core" bankruptcy causes of action; indeed, Primeo, by filing a counterclaim with the Grand Court, has requested recognition of what would be the equivalent of a customer claim, more than two years after the same were due in the BLMIS liquidation. In essence, Primeo has fashioned its own dual escape hatch: one in the Cayman Islands, where it contends that it is has no intent of proceeding substantively in the United States, and the other, here, where it seeks a determination of issues of core bankruptcy law.

Finally, Primeo's request to have this court consider the application of 546(e) is premature for another reason. Primeo is not an innocent bystander to the Madoff Ponzi scheme. Primeo is a professional investor—a feeder fund, that funneled money into the Madoff Ponzi scheme despite glaring indicia of fraud. For example, Madoff claimed that his options transactions took place on the Chicago Board Options Exchange (the "CBOE"). Yet, more than one third of the time, the purported options trading in Primeo's BLMIS account exceeded the *total* worldwide reported volume of comparable options contracts traded on the CBOE.[3] There were *two hundred seventy five* impossible options transactions in Primeo's account; even a single "impossible" options trade should have caused Primeo to investigate further. *See* Compl. ¶ 158.

---

[3] The volume of options contracts which BLMIS reported to Primeo exceed the total volume of contracts for options traded on the CBOE by almost thirty-eight percent. *See* Compl. ¶ 175.

The Bankruptcy Court, however, is the proper forum for litigating questions of bankruptcy law and claims against the Debtors in this SIPA proceeding.[4] And it is the Bankruptcy Court that should determine, in the first instance, both the existence of the safe harbor under section 546(e) and the appropriate standard to be applied under Bankruptcy Code section 548(c)—fundamental questions of bankruptcy law that require nothing more than construction and application of the Bankruptcy Code. Primeo's blatant forum shopping should not be countenanced, and its Motion should be denied.

## BACKGROUND

### A.    Commencement of the SIPA Liquidation

Having adjudicated various Madoff liquidation matters, this Court's familiarity with the background of this matter is presumed.

### B.    SIPA Authorizes the Trustee to Pursue Avoidance Actions

SIPA § 78fff(b) grants the Trustee authority to conduct a SIPA liquidation proceeding "in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11." SIPA § 78fff(b); *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 231 (2d Cir. 2011) (the "*Second Circuit Net Equity Decision*") ("Pursuant to SIPA, Mr. Picard has the general powers of a bankruptcy trustee, as well as additional duties, specified by the Act, related to recovering and distributing customer property.") (citing SIPA § 78fff-1). SIPA § 78fff-2(c)(3) expressly incorporates the Bankruptcy Code and authorizes a

---

[4] Here, the Trustee seeks to avoid and recover fraudulent transfers that Primeo, among the other named Defendants, received from BLMIS prior to the commencement of the SIPA proceeding. SIPA § 78fff-2(c)(3) expressly incorporates the Bankruptcy Code and specifies that a SIPA proceeding is to "be conducted in accordance with, and as though it were being conducted under" the Bankruptcy Code and governed by relevant provisions of Title 11. Moreover, SIPA § 78eee-(b)(4) specifically requires that "[u]pon the issuance of a protective decree and appointment of a trustee . . . the court *shall* forthwith order the removal of the entire liquidation proceeding to the court of the United States in the same judicial district having jurisdiction over cases under title 11." SIPA § 78eee-(b)(4) (emphasis added).

3

SIPA Trustee to recover any fraudulent transfers, including those to customers. SIPA § 78fff-2(c)(3); *Second Circuit Net Equity Decision*, 654 F.3d at 241 n.10 ("SIPA and the Code intersect to . . . grant a SIPA trustee the power to avoid fraudulent transfers for the benefit of customers.") (quoting *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 136 (Bankr. S.D.N.Y. 2010) (the "*Net Equity Decision*").

## C.    The Trustee's Avoidance Litigation Against Primeo

On July 15, 2009, the Trustee filed a complaint ("the Initial Complaint") against Primeo in Bankruptcy Court. Primeo defaulted when it failed to respond to the Initial Complaint as it did not acknowledge service or file any defense. The Trustee subsequently dismissed without prejudice the Initial Complaint. Primeo was then joined to a consolidated complaint against various parties, including HSBC Bank plc, for which an amended complaint was filed on December 5, 2010.

The Trustee's present action against Primeo involves a total of 61 individuals, feeder funds, and financial institutions that facilitated and furthered Madoff's fraud (the "HSBC Action"). The complaint alleges nine bankruptcy-related causes of action against Primeo, seeking to avoid intentional and/or constructive fraudulent transfers, as well as subsequent transfers, of customer property from BLMIS to Primeo, as provided for in the Bankruptcy Code. *See* Warshavsky Decl. Ex. 1. Specifically, the Trustee seeks to avoid from Primeo, transfers of approximately $145 million, the entirety of which are avoidable and recoverable under bankruptcy law as fraudulent transfers of customer property. *See* Compl. ¶ 57.

## D.    The Cayman Litigation

As Primeo defaulted and previously indicated that it would not proceed in the United States, as a precautionary measure, the Trustee commenced on December 9, 2010 parallel

4

proceedings against Primeo before the Grand Court (the "Cayman Litigation"). On August 17, 2011, after seeking a second extension of time to respond to the Trustee's complaint in this action, Primeo sought to expedite the Cayman proceedings by filing a "Defence and Counterclaim," in which Primeo asked the Grand Court to decide whether the provisions relied upon by the Trustee "apply extraterritorially as a matter of United States law" and the applicability of the safe harbor provision of section 546(e).[5] Further, while Primeo did not file a customer claim in the BLMIS liquidation, it did file a counterclaim in the Cayman Litigation, demanding damages in the amount invested and lost to BLMIS, and argued the Trustee's fraudulent transfer and preference claims were subject to mandatory "set-off" against the sums allegedly due to Primeo.[6]

The current Motion was filed on September 19, 2011, and a schedule for this matter was approved by this Court on November 11, 2011. Yet, Primeo has asserted before the Grand Court, both at the Case Management Conference on September 1, 2011 *and on November 18, 2011*, that this Court does not have jurisdiction over this dispute and will not address the substantive issues raised by Primeo's Motion. In that November 18, 2001 phone court conference, Primeo's counsel denied that it is seeking to litigate in New York on the merits as follows (for reference: "SR" refers to the Trustee's counsel, Stephen Robins QC, "MJJ" refers to

---

[5] *See* Primeo Defence & Counterclaim ¶ 51(1)-(2), (4)-(5), *Picard v. Primeo,* Cause No. FSD 275 of 2010 (AJJ), (Grand Court of Cayman Islands, August 17, 2011) (asserting that the provisions relied upon by the Trustee including section 547(b), 550(a)(1), or 551 of the Bankruptcy Code or SIPA section 78fff-2(c)(3) "do not apply extraterritorially as a matter of United States law. . ." and that "the Safe Harbor will prevent the trustee from avoiding transfers to Herald and Alpha Prime," from which Primeo allegedly received BLMIS funds). A copy of Primeo's Defence and Counterclaim is annexed as Exhibit 2 to the Warshavsky Decl.

[6] *See* Primeo Defence & Counterclaim ¶¶ 78-79.

Mr. Justice Andrew J. Jones QC who presided over the hearing, and "MC" refers to Primeo's

counsel, Michael Crystal QC):

> SR:    Well, My Lord, we have always tried to keep our evidence
> entirely factual and it's going to explain precisely what it is that
> Primeo is seeking to do in the New York litigation, which we say
> involves an attempt to litigate in New York matters which are
> already before this Court. And that is the basis on which we say,
> that if that is what Primeo is doing, then this litigation should be
> stayed to allow those matters to be determined in New York. So it
> is going . . .
>
> MC:    That is going to be highly controversial My Lord, if that is
> really what they are really going to say.
>
> MJJ:   Well . . .
>
> MC:    Because it's not true.[7]

## ARGUMENT

It should be noted at the outset that Primeo seeks nothing more than an advisory opinion

from this Court. While moving substantively before the Court, Primeo has announced its intent

to escape this Court's jurisdiction by moving to dismiss the Trustee's complaint for lack of

personal jurisdiction. Mem. of Law at 3, n.1. Primeo should not be permitted to appear before

this Court and participate in substantive motion practice while challenging the threshold issue of

personal jurisdiction—which it interposed—only to later argue that this Court did not have the

authority to rule in the first instance. As the Supreme Court has recently emphasized, the

question whether a court can properly exercise personal jurisdiction over a defendant is of

paramount importance because "whether a judicial judgment is lawful depends on whether the

sovereign has the authority to render it." *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780,

---

[7] *See* Transcript of Court Conference, *Picard v. Primeo*, Cause No. FSD 275 of 2010 (AJJ),
(Grand Court of the Cayman Islands, Financial Services Division, November 18, 2011), at 27. A
copy of the Transcript of the Case Management Conference in the Cayman Litigation is annexed
as Exhibit 3 to the Warshavsky Decl.

2789 (2011). If this Court lacks personal jurisdiction as Primeo asserts (and the Trustee disagrees with this assertion) then Primeo is merely requesting an impermissible advisory opinion from this Court.

Primeo simply cannot have it both ways—allowing the Court to rule on a substantive motion and all the while maintaining that the Court has no authority to render such a ruling. Rather, the Trustee submits that the Court should hold the instant Motion in abeyance pending resolution of the threshold personal jurisdiction issues—which Primeo has put before this Court.[8]

I.      **PRIMEO'S MOTION CANNOT MEET THE REQUIREMENTS FOR MANDATORY WITHDRAWAL**

Primeo contends that this Court must withdraw the reference of the HSBC Action pursuant to section 157(d), but does not and cannot demonstrate any of the exceptional circumstances required for mandatory withdrawal. Rather, the HSBC Action requires nothing more than adjudication of avoidance actions under the Bankruptcy Code to recover customer property. In pursuing these bankruptcy claims against Primeo, the Trustee is not violating SIPA. Rather, SIPA expressly authorizes the Trustee to avoid transfers that are void and voidable pursuant to Title 11. There is no exception in SIPA that precludes avoidance of transfers to customers; to the contrary, the recovery of transfers "to or on behalf of customers" is expressly contemplated in SIPA § 78fff-2(c)(3). *See also Second Circuit Net Equity Decision,* 654 F.3d at 242, n. 10.

None of these issues, however, require withdrawal of the reference as there is no conflict between Title 11 and other federal non-bankruptcy laws, nor has Primeo identified one.

---

[8] Indeed, this Court has stayed a similar motion to withdraw the reference as to certain defendants who contested personal jurisdiction because such threshold issues should ordinarily be resolved at the outset. Order, *Picard v. Trotanoy, et al.*, 11. Civ. 7112 (JSR) (S.D.N.Y. Dec. 6, 2011) at 1-2.

## A.    Section 157(d) Has Been Narrowly Construed in the Second Circuit

The scope of bankruptcy jurisdiction over all matters affecting a debtor and its property is broadly construed. *Shugrue v. Airline Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 994 (2d Cir. 1990). All cases and proceedings arising under, arising in, or related to a bankruptcy case, including SIPA liquidations, are automatically referred to the bankruptcy court. *See* 28 U.S.C. § 157(a). For the bankruptcy court to proceed efficiently and within the bounds of its broad grant of jurisdiction, the reference to the bankruptcy court may be withdrawn only in limited circumstances, as provided in section 157(d) of Title 28. *In re Ionosphere Clubs, Inc.*, 922 F.2d at 993. The Second Circuit has consistently held that section 157(d) must be "construed narrowly," *see, e.g., id.* at 995, and is not to be used as an "escape hatch through which most bankruptcy matters [could] be removed to a district court." *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 343 B.R. 63, 66 (S.D.N.Y. 2006) (quoting *Carter Day Indust., Inc. v. EPA (In re Combustion Equip. Assoc.)*, 67 B.R. 709, 711 (S.D.N.Y. 1986)) (internal quotation omitted). A narrow reading of the mandatory withdrawal provisions is necessary so as not to "eviscerate much of the work of the bankruptcy courts." *Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 185 B.R. 680, 683 (S.D.N.Y. 1995).

Mandatory withdrawal "is not available merely because non-Bankruptcy Code federal statutes will be considered in the bankruptcy court proceeding." *In re Ionosphere Clubs, Inc.*, 922 F.2d at 995. Rather, as the Second Circuit has held, mandatory withdrawal "is reserved for cases where *substantial and material consideration* of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." *Id.* at 995 (emphasis added). "Substantial and material consideration" requires a bankruptcy judge to "engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes." *City of New*

*York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991); *Enron Corp. v. J.P. Morgan Sec.* (*In re Enron Corp.*), 388 B.R. 131, 136 (S.D.N.Y. 2008). Indeed, the "substantial and material consideration" standard excludes from mandatory withdrawal those cases that involve only the routine application of non-Title 11 federal statutes to a particular set of facts. *See In re Johns-Manville Corp.*, 63 B.R. 600, 602 (S.D.N.Y. 1986).

Primeo cannot meet the standard for withdrawal of the reference to resolve the Trustee's claims because no material interpretation of non-bankruptcy federal statutes is required to resolve the issues at hand, nor is there any potential conflict between the Bankruptcy Code and other non-bankruptcy federal statutes. On its face, SIPA mandates removal to the bankruptcy court in the first instance. SIPA is routinely interpreted by bankruptcy courts, as it was originally derived from a bankruptcy statute and specifically incorporates the Bankruptcy Code. Primeo's allegation that SIPA cannot be analyzed and applied by the Bankruptcy Court is simply wrong, as evidenced by, *inter alia*, the *Net Equity Decision* and the Second Circuit's determination thereof.

## B.    The Trustee Has Standing to Assert Bankruptcy Causes of Action

All of the claims at issue in this case are either brought under bankruptcy law or the New York State Debtor Creditor law which is incorporated therein. There is no need to look beyond SIPA and bankruptcy law for the Trustee's standing to bring each of the claims asserted by the Trustee in this proceeding. In its Net Equity decision, the Second Circuit recognized that SIPA grants the Trustee the power to avoid fraudulent transfers. *See Second Circuit Net Equity Decision*, 654 F.3d at 241 n.10. The Second Circuit emphasized that a SIPA liquidation is "a hybrid proceeding" and a SIPA trustee "shall be vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under Title 11." *Id.* citing 15 U.S.C. § 78fff-1(a). It is then

9

indisputable that the Trustee has standing to bring avoidance actions pursuant to SIPA and bankruptcy law.

### C.    *Stern v. Marshall* Does Not Require or Otherwise Warrant Withdrawal

Primeo next seeks refuge in the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  Primeo attempts to draw a parallel between the Trustee's avoidance action and the counterclaim addressed by the *Stern* Court, arguing that the bankruptcy court would be limited and could not issue a final judgment against Primeo.  Mem. of Law at 7-8.  However, Primeo misinterprets *Stern*'s "narrow" ruling that does not "meaningfully change[ ] the division of labor" between bankruptcy courts and district courts. *Stern*, 131 S. Ct. at 2620.

*Stern* did not involve straightforward bankruptcy law claims for fraudulent transfers but instead concerned a creditor's claim for defamation and a state law counterclaim by the debtor for tortious interference.  More importantly, *Stern* did not interpret 28 U.S.C. §§ 157(b)(2)(F) or 157(b)(2)(H), which identify as core proceedings those that "determine, avoid or recover" preferences and fraudulent conveyances, respectively.

Primeo's effort to relate these two completely distinct matters fails, because *Stern* did not hold that actions seeking to avoid and recover fraudulent transfers cannot be decided by non-Article III judges.  As recently recognized by a court interpreting the decision,

> *Stern* is replete with language emphasizing that the ruling should be limited to the unique circumstances of that case, and the ruling does not remove from the bankruptcy court its jurisdiction over matters directly related to the estate that can be finally decided in connection with restructuring debtor and creditor relations. . .

*In re Salander O'Reilly Galleries*, 453 B.R. 106, 115-16 (Bankr. S.D.N.Y. July 18, 2011). *See, e.g., Stern*, 131 S. Ct. at 2611 ("Here Vickie's claim is a state law action independent of the federal bankruptcy law"); *id.* at 2620 ("We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the

current statute . . . the question presented here is a 'narrow' one"); *In re Heller Ehrman LLP*, 2011 WL 4542512, at \*4 (Bankr. N.D. Cal. Sept. 28, 2011) ("[T]he Supreme Court did not hold in Stern that bankruptcy judges lack authority to render final judgments on fraudulent transfer claims."). Indeed, courts considering *Stern* have declined to give it the expansive scope that Primeo requests.[9]

In contrast to the state law tortious interference counterclaim at issue in *Stern*, the Trustee has brought traditional avoidance actions against Primeo that the Bankruptcy Code specifically and exclusively authorizes bankruptcy trustees to pursue under Bankruptcy Code sections 544, 547, and 548. *See, e.g.*, *In re Extended Stay*, 2011 WL 5532258 at \*7-8; *Kelley v. JPMorgan Chase & Co., et al.*, 2011 WL 4403289, at \*6 (D. Minn. Sept. 21, 2011); *Michigan State Hous. Dev. Auth. v. Lehman Brothers, et al.*, No. 11-CV-3392 (S.D.N.Y., Sept. 14, 2011) (JGK). In short, *Stern* is fairly read as limited to state law counterclaims with no relationship to federal bankruptcy law. *Id.* at 2611.

Despite the narrow holding of *Stern*, Primeo claims that the Bankruptcy Court may no longer be permitted to hear fraudulent conveyance claims like those asserted in the complaint. Mem. of Law at 7. This sweeping interpretation of *Stern* is inconsistent with the decision itself and would deprive district courts of the specialized expertise of the bankruptcy courts to handle such claims. As Justice Roberts observed, this specialized expertise was not needed in the adjudication of the common law tort counterclaim addressed in *Stern. See Stern,* 131 S. Ct. at 2615 ("The 'experts' in the federal system at resolving common law counterclaims such as Vickie's are the Article III courts, and it is with those courts that her claim must stay.").

---

[9] *See In re Extended Stay*, 2011 WL 5532258 at \*6; *In re Ambac Fin. Grp., Inc.*, 2011 WL 4436126, at \*8 (Bankr. S.D.N.Y. Sept.23, 2011); *In re Heller Ehrman LLP*, 2011 WL 4542512, at \*1; *In re Safety Harbor Resort and Spa*, 2011 WL 3240596, at \*10 (Bankr. M.D .Fla. Aug. 30, 2011); *In re Olde Prairie Block Owner, LLC*, 2011 WL 3792406, at \*5 (Bankr. N.D. Ill. Aug. 25, 2011); *In re Am. Bus. Fin. Servs., Inc.*, 2011 WL 3240596, at \*2 (Bankr. D. Del. July 28, 2011).

However, specialized bankruptcy expertise is critical to the efficient administration of fraudulent transfer actions brought under the Bankruptcy Code, especially in this case where the Bankruptcy Court is administering over 1,000 related cases involving avoidance actions. Hence, *Stern's* treatment of a generic state law tort counterclaim, which was "in no way derived from or dependent upon bankruptcy law," but rather was "a state law tort action that exists without regard to any bankruptcy proceeding" is inapplicable to the Trustee's avoidance actions emanating from quintessential bankruptcy law and pending before Judge Lifland. *Id.* at 2618.

## D.     Interpretation of Section 546(e) of the Bankruptcy Code Does Not Warrant Mandatory Withdrawal

Primeo also asserts that the Court should withdraw the reference because the Trustee and SIPC are interpreting Bankruptcy Code section 546(e) in a manner that conflicts with SIPA. Mem. of Law at 10-15. However, withdrawal of the reference is not appropriate as to this issue because its resolution involves only straightforward application and interpretation of Bankruptcy Code provisions. This issue presents no interpretive or complicated issues of first impression under non-Title 11 federal laws, nor does Primeo try to assert one.

As indicated above, Primeo is not an innocent bystander to Madoff's Ponzi scheme, and thus the application of 546(e) is at least a question of fact—not a question of law. Primeo knowingly funneled investors' money into the Madoff Ponzi Scheme to reap unparalleled profits. Primeo, a professional investor, cannot credibly maintain that it was unaware of the: (i) unfeasible options volume trading in its account (*see* Compl. at 56); (ii) two hundred seventy five impossible options transactions in its account (*see id.* at 158); (iii) settling of trades in its account outside industry norms that did not comply with standard trading practices (*see id.* ¶¶ 221-22); and (iv) unauthorized margin trading in its account (*see id.* at 66). There are other indicia of fraud noted in the complaint, but these alone show that Primeo received fraudulent transfers in

12

the face of various indicia that BLMIS was not engaged in legitimate securities trading—any one of which is sufficient to demonstrate that Primeo cannot assert that there is not, at the very least, a factual issue as to whether it could have reasonably believed that BLMIS was engaged in legitimate trading activity.

Clearly then, this is nothing more than a transparent attempt to "escape" the Bankruptcy Court's prior decisions holding that, *inter alia*, section 546(e) is inapplicable in the context of a Ponzi scheme—especially when applied to bad-faith actors that knowingly participated in the fraud such as Primeo, who should not be granted the "safe harbor" of section 546(e). *See e.g., Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010), *leave to appeal denied*, 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011), *aff'd,* 2011 WL 3897970 (S.D.N.Y. Aug 31, 2011); *In re Bernard L. Madoff Inv. Sec. LLC*, 2011 WL 4434632, at *16 (Bankr. S.D.N.Y. Sept. 22, 2011) (holding that "the application of section 546(e) must be rejected as contrary to the purpose of the safe harbor provision"). As a Court in this District recently explained in another case involving the securities industry, "avoiding an unfavorable decision is a not a proper basis for withdrawal of the reference." Transcript of Oral Argument, *Michigan State Hous. Dev. Auth. v. Lehman Brothers, et al*., No. 11-CV-3392 (JGK) (S.D.N.Y., Sept. 14, 2011), at 65 (annexed to the Warshavsky Decl. as Exhibit 4).

More importantly, in a recent case in this judicial district, the Court did not find that the application of a defense under section 546(e) warranted mandatory withdrawal of the reference. *In re Extended Stay, Inc*., 2011 WL 5532258, at *7. In particular, the *In re Extended Stay* Court noted that whether section 546(e) of the Bankruptcy Code precluded certain claims under the Fair Debt Collections Practices Act or certain securities laws, could not overcome "the 'narrow' scope this Circuit gives to mandatory withdrawal under section 157(d)" because the movants

13

failed to point to any federal statute requiring "significant interpretation" rather than mere application to a particular set of facts. *Id.* (citations omitted).

Finally, Primeo, like other various defendants, urges that the "securities laws" must be considered in connection with the application of section 546(e). Yet, neither Primeo nor any other defendant has ever pointed to a single securities law at issue. Bankruptcy Code section 546(e) *explicitly refers* to definitions in the Bankruptcy Code itself. Simply put, there is no additional law that needs to be interpreted outside of the Bankruptcy Code, nor has Primeo cited to any. As such, the determination of whether and how Bankruptcy Code section 546(e) should be applied requires only simple interpretation and application of the Bankruptcy Code. Accordingly, mere application of Title 11 is not a basis for mandatory withdrawal of the reference to the Bankruptcy Court pursuant to 28 U.S.C. § 157(d).

### E.   The Bankruptcy Court's Interpretation of Bankruptcy Code Section 548(c) Does Not Warrant Mandatory Withdrawal

Attempting to exempt themselves from the fraudulent conveyance laws and their obligation to demonstrate good faith to retain the fraudulent transfers they received from Madoff, Primeo claims that the Court must withdraw the reference because of the Trustee's allegedly "novel" interpretation of SIPA to "retroactively" impose a due diligence obligation on brokerage customers. Mem. of Law at 16-17.

Again, Primeo's attempt to manufacture a conflict between the Bankruptcy Code and SIPA wholly misses the mark. First, Primeo is not an innocent investor, but rather it is a sophisticated, professional investor. Second, any due diligence obligation that Primeo had upon becoming aware of facts that imputed inquiry notice of Madoff's fraud has nothing at all to do with any interpretation of SIPA or other non-bankruptcy federal law. Rather, Primeo's due diligence (or, in this case, lack thereof) is relevant only in the context of whether Primeo can

establish a good faith defense to the Trustee's avoidance claims under section 548(c) of the
Bankruptcy Code and analogous state fraudulent conveyance laws.    It is *not* a pleading
requirement.    As such an analysis requires nothing more than a straight-forward application of
the Bankruptcy Code itself, as well as established case law interpreting the good faith defense
under the Bankruptcy Code.

### F.      Interpretation of SIPA's Extraterritorial Application Does Not Warrant Mandatory Withdrawal

As part and parcel of its previewed jurisdictional and forum arguments, Primeo now urges
that pursuant to the Supreme Court ruling in *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869
(2010), withdrawal is needed to determine whether SIPA has extraterritorial reach.  However,
Primeo misconstrues *Morrison,* the pre-*Morrison* body of law, and this Court's decision in
*Picard v. Kohn*, 11 Civ. 1181 (JSR) (S.D.N.Y. Sept. 6, 2011), which addressed the extraterritorial
application of the RICO statutes.  There is no "substantial and material" interpretation of non-
bankruptcy federal law that warrants mandatory withdrawal.

First, to be clear, *Morrison* dealt with the extraterritorial application of the 1934
Exchange Act, and more specifically with Australian nationals who invested in an Australian
company, which traded on an Australian exchange.  This is a bankruptcy liquidation in the
United States and fraudulent business transactions that took place in New York, and an
professional investor—Primeo—that invested directly into BLMIS, and into other feeder funds
that were affiliated with Primeo and established for the sole purpose of investing into BLMIS.
There is no apparent reason—and certainly no good reason—why the Trustee cannot avoid and
recover the fraudulent transfers to Primeo simply because Primeo is incorporated in the Cayman
Islands.

Primeo fails to cite to any specific securities law that would make *Morrison* applicable.

That is because such laws are designed to protect United States citizens from fraudulent schemes, not investors who chose to avail themselves of New York law and transfer money in and out of a New York bank account. Primeo is incorrect in asserting that SIPA has no clear indication of an extraterritorial application. SIPA specifically incorporates the Bankruptcy Code, making applicable almost all of the liquidation provisions that apply to ordinary bankruptcy liquidations. And those provisions, which include the power to avoid fraudulent transfers and preferences, may be applied both in the United States and beyond. *See Picard v. Chais*, 440 B.R. 274, 281 (Bankr. S.D.N.Y. 2010).

In fact, both the plain language and congressional intent underlying the Bankruptcy Code reveal a clear intent that the Code has extraterritorial application. While drafting the Code, Congress expressly recognized that a debtor's assets and interests would sometimes lie outside of the United States. Indeed, section 541(a) of the Code explicitly states that the commencement of a bankruptcy case creates an estate comprised of property "wherever located and by whomever held," 11 U.S.C. § 541(a). This clause echoes the worldwide jurisdictional language of 28 U.S.C. § 1334(e)(1), which states that "the district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." *See Deak & Co. Inc. v. Jr. R.M.P. Soedjono (In re Deak & Co., Inc.)*, 63 B.R. 422, 427 (Bankr. S.D.N.Y. 1986) ("Congress inserted this language to 'make clear that a trustee in bankruptcy is vested with the title of the bankrupt in property which is located without, as well as within, the United States.'"); *In re Rajapakse*, 346 B.R. 233 (Bankr. N.D. Ga. 2005); *Diaz-Barba v. Kismet Acquistion, LLC*, 2010 WL 2079738, at *10 (S.D. Cal. May 20, 2010) (noting the court may exercise jurisdiction over all property of the bankrupt estate, even if located outside the United

States, because the provisions of the Code as they relate to property of the estate apply extraterritorially). *See also French v. Liebmann (In re French)*, 440 F.3d 145, 152 (4th Cir. 2005) (holding that since section 548 allows the avoidance of transfers of the debtor in property "wherever located," the presumption against extraterritoriality did not prevent the use of the court's avoidance powers).[10] The Trustee has the right, ability and fiduciary obligation to pursue property of the estate, wherever it is located, including from defendants like Primeo.

Primeo cites to two pre-*Morrison* cases holding that Congress did not intend the avoidance statutes to apply extraterritorially. These cases are inapposite, as both involve foreign debtor corporations that attempted to apply United States laws in an effort to recover foreign transfers. In contrast, the BLMIS liquidation is being conducted in the United States, and the fraudulent transfers in dispute are transactions involving the conveyance of customer property from the United States to Primeo. In fact, the same judge that issued a decision in *Maxwell Commc'n Corp. PLC v. Societe General PLC (In re Maxwell Commc'n Corp. PLC)*, 170 B.R. 800, 814 (Bankr. S.D.N.Y. 1994), later found, under circumstances similar to the instant case— where there is no concurrent bankruptcy proceeding by the debtor in a foreign country and the agreement underlying the challenged transfer was negotiated in New York—that Bankruptcy Code section 547 can be used to recover assets located abroad. *See In re Interbulk. Ltd.*, 240 B.R. 195 (Bankr. S.D.N.Y. 1999)

## II.   **PRIMEO HAS FAILED TO DEMONSTRATE CAUSE FOR PERMISSIVE WITHDRAWAL**

This Court may permissively withdraw the reference to Bankruptcy Court pursuant to

---

[10] Case law also demonstrates that the automatic stay under section 362 of the Code, which is one of the fundamental debtor protections provided by bankruptcy laws, applies extraterritorially. *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) (finding that the stay exists to protect the estate from "a chaotic and uncontrolled scramble for the Debtor's assets in a variety of uncoordinated proceedings in different courts.").

section 157(d), but Primeo must show "cause" for such withdrawal. To determine whether such "cause" exists, this Court must first evaluate whether the claim is core or non-core, and then "weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993). As the movant, Primeo bears the burden of proving "cause" to warrant withdrawal. *See In re Ames Dep't Stores*, 1991 WL 259036, at *2 (S.D.N.Y. Nov. 25, 1991).

Primeo has failed to meet its burden. Its argument that withdrawal of the reference "will promote judicial efficiency, prevent delay, and limit costs to the parties" is completely bare and based entirely on the assertion that the *Stern* case will result in "protracted motion practice" concerning the Bankruptcy Court's authority to enter final judgments. Mem. of Law at 8. However, Primeo has done nothing more than raise the specter of *Stern*. It plainly has not analyzed the impact of *Stern* on a claim-by-claim basis with respect to the Trustee's complaint. And Primeo wholly fails to identify any material, incremental delay, or inefficiency that would result in light of *Stern*. None of the *Orion* factors warrant withdrawal.

## A. The Bankruptcy Counts in the Trustee's Complaint Are All Core

Primeo does not challenge that the Trustee's Bankruptcy claims are all core proceedings, because it cannot do so. Pursuant to section 157, a proceeding may be core if it is "unique to or uniquely affected by the bankruptcy proceedings" or "directly affect[s] a core bankruptcy function." *U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. and Indem. Ass'n., (In re U.S. Lines, Inc.)*, 197 F.3d 631, 637 (2d Cir. 1999). In enacting section 157, Congress intended core proceedings to be interpreted broadly and that "95 percent of the proceedings brought before bankruptcy judges would be core proceedings." *In re Ben Cooper, Inc.*, 896 F.2d 1394, 1398 (2d

Cir. 1990). A finding that claims are core "weighs against permissive withdrawal." *In re Leslie Fay Cos., Inc. v. Falbaum*, 1997 WL 555607, at *2 (S.D.N.Y. Sep. 4, 1997). Here, all of the Trustee's fraudulent conveyance and preference transfer claims against Primeo are brought pursuant to 11 U.S.C. §§ 544, 547, and 548, and therefore "arise under" Title 11.[11] *See Rahl v. Bande*, 316 B.R. 127, 131 (S.D.N.Y. 2004) (holding that claims under § 544(b) "arise under" Title 11 and are therefore core). Such avoidance actions are core claims according to the non-exhaustive list of core proceedings set forth in sections 157(b)(2)(F) and (b)(2)(H) of the Bankruptcy Code. *See* 28 U.S.C. §§ 157(b)(2)(F) (defining core matters to include "proceedings to determine, avoid, or recover preferences.") and 157(b)(2)(H) (defining core matters to include "proceedings to determine, avoid, or recover fraudulent conveyances.").

## B.   Primeo's Motion is Nothing More than Blatant Forum Shopping

As previously indicated, one of the important *Orion* factors is the curtailing of possible forum shopping by parties who perceive the Bankruptcy Court as an unfavorable forum in which to litigate their claims. This Court previously noted in *Schneider v. Riddick (In re Formica Corp.)* that "courts should employ withdrawal 'judiciously in order to prevent it from becoming just another litigation tactic for parties eager to find a way out of bankruptcy court.'" 305 B.R. 147, 151 (S.D.N.Y. 2004) (quoting *Kenai Corp. v. Nat'l Union Fire Ins. Co. (In re Kenai Corp.)*, 136 B.R. 59, 61 (S.D.N.Y. 1992)); *see also In re Fairfield Sentry Ltd.*, 2010 WL 4910119, at *4 (S.D.N.Y. Nov. 22, 2010) (to "allay" concerns of forum-shopping "'courts in this Circuit have construed section 157(d) narrowly in order to prevent an 'escape hatch' out of bankruptcy court'" (quoting *Enron Power Mktg., Inc. v. Holcim, Inc. (In re Enron Corp.)*, 2004 WL 2149124, at *5 (S.D.N.Y. Sept. 23, 2004)).

---

[11] *See* Exhibit 1.

Primeo clearly is engaging in forum shopping and is seeking only an advisory opinion from this Court. It has stated in a foreign court that it is not substantively proceeding here and there can be no clearer sign of forum shopping. While Primeo may argue that this Court is the more appropriate forum to address the substantive issues involving the extraterritoriality of SIPA and the application of Bankruptcy Code section 546(e), Primeo has raised these exact same issues in the Cayman Litigation.[12] There, Primeo filed a "Defence and Counterclaim" requesting that the Grand Court decide whether the provisions relied upon the Trustee "apply extraterritorially as a matter of United States law" and the applicability of the safe harbor provision of section 546(e).[13] More significantly, as stated, Primeo has asserted before the Grand Court, both at the Case Management Conference on September 1, 2011 and on November 18, 2011, that the New York courts have no jurisdiction over this dispute and will not address the substantive issues raised, including the safe harbor provision and extraterritoriality of SIPA. If Primeo never anticipates for this Court to interpret and analyze issues of "substantial and material" non-bankruptcy law pursuant to section 157(d), then the present Motion is moot, a blatant effort in judicial delay and forum shopping, and thus, should be wholly denied.

## C.     Withdrawal Would Impede Judicial Efficiency and Uniform Administration of the SIPA Bankruptcy Proceeding

The other *Orion* considerations weigh against withdrawal. The Bankruptcy Court has been administering the SIPA bankruptcy proceeding for nearly three years. Judicial economy would only be promoted by allowing the specialized Bankruptcy Court, already familiar with the

---

[12] Given that it is entirely inappropriate and duplicative for Primeo to be raising the same points before this Court as it is seeking to argue before the Grand Court in the Cayman Islands, the Trustee requested the Grand Court institute a stay of the Cayman Litigation until further notice. The stay request will be fully briefed by January 13, 2012.

[13] *See* Primeo Defence & Counterclaim at ¶ 51(1)-(2), (4)-(5).

extensive record and proceedings in the BLMIS case, to initially adjudicate this case. *See Wedtech Corp. v. Banco Popular de Puerto Rico (In re Wedtech Corp.)*, 94 B.R. 293, 296 (S.D.N.Y. 1988); *In re Laventhol & Horwath*, 139 B.R. 109, 116 (S.D.N.Y.1992). It is the more efficient and appropriate course, as "[a]llowing the bankruptcy courts to consider complex questions of bankruptcy law before they come to the district court for de novo review promotes a more uniform application of bankruptcy law." *In re Extended Stay*, 2011 WL 5532258 at *10 (finding that preserving bankruptcy court's ability to determine claims that implicated section 546(e) of the Bankruptcy Code weighed against withdrawal of the reference).

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests the court deny the Motion.

Date: New York, New York
December 7, 2011

/s/ Oren J. Warshavsky
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Oren J. Warshavsky
Email: owarshavsky@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Anat Maytal
Email: amaytal@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05351 (BRL) |
| Plaintiff, | 11 Civ. 07100 (JSR) |
| v. | |
| BANCO BILBAO VIZCAYA ARGENTARIA, S.A., | |
| Defendant. | |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1

ALLEGATIONS IN THE COMPLAINT ..................................................................... 3

BACKGROUND ........................................................................................................... 6

SUMMARY OF ARGUMENT ..................................................................................... 7

ARGUMENT ................................................................................................................. 8

I.     THE DEFENDANT'S MOTION TO WITHDRAW THE RECOVERY ACTION
     CANNOT MEET THE REQUIREMENTS FOR MANDATORY
     WITHDRAWAL .................................................................................................. 8

     A.    Section 157(d) Has Been Narrowly Construed in the Second Circuit ................. 8

     B.    *Stern v. Marshall* Does Not Require or Otherwise Warrant Withdrawal ........... 10

     C.    The Safe Harbor Protections Under 546(e) Are Inapplicable Here and Do
         Not Warrant Mandatory Withdrawal .................................................................. 13

     D.    Interpretation of the Extraterritoriality of SIPA and the Bankruptcy Code
         Does Not Warrant Mandatory Withdrawal .......................................................... 16

     E.    Bankruptcy Code Section 548(c) Is Inapplicable Here and Does Not
         Warrant Mandatory Withdrawal ......................................................................... 19

II.    THE DEFENDANT HAS FAILED TO DEMONSTRATE CAUSE FOR
     PERMISSIVE WITHDRAWAL ......................................................................... 20

     A.    The Bankruptcy Counts in the Trustee's Complaint Are All Core ..................... 21

     B.    Defendant's Motion is Nothing More than Blatant Forum Shopping ................ 21

     C.    The Jury Trial Issue Is Premature and Does Not Warrant Withdrawal of
         the Reference ....................................................................................................... 22

     D.    Withdrawal Would Impede Judicial Efficiency and Uniform
         Administration of the SIPA Bankruptcy Proceeding ........................................... 24

CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

Page

**Cases**

*Carter Day Indust., Inc. v. EPA (In re Combustion Equip. Assoc.)*, 67 B.R. 709 (S.D.N.Y. 1986) ........................................................................................................................................... 8

*City of New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir. 1991) ...................................................... 9

*Deak & Co.. Inc. v. Jr. R.M.P. Soedjono (In re Deak & Co., Inc.)*, 63 B.R. 422 (Bankr. S.D.N.Y. 1986)............................................................................................................................................ 17

*Diaz-Barba v. Kismet Acquisition, LLC*, 2010 WL 2079738 (S.D. Cal. May 20, 2010).............. 17

*Enron Corp. v. J.P. Morgan Sec. (In re Enron Corp.)*, 388 B.R. 131 (S.D.N.Y. 2008) ................ 9

*Enron Power Mktg., Inc. v. Holcim, Inc. (In re Enron Corp.)*, 2004 WL 2149124 (S.D.N.Y. Sept. 23, 2004)............................................................................................................................................. 22

*Field v. Lindell (In re The Mortgage Store, Inc.)*, 2011 WL 5056990 (D. Haw. Oct. 5, 2011) ... 11

*French v. Liebmann (In re French)*, 440 F.3d 145 (4th Cir. 2005) ................................................ 18

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 343 B.R. 63 (S.D.N.Y. 2006).............................................................................................................................................. 8

*Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 185 B.R. 680 (S.D.N.Y. 1995) 9

*In re Am. Bus. Fin. Servs., Inc.*, 457 B.R. 314 (Bankr. D. Del. 2011).......................................... 11

*In re Ambac Fin. Grp., Inc.*, 2011 WL 4436126 (Bankr. S.D.N.Y. Sept.23, 2011) ..................... 11

*In re Ames Dep't Stores*, 1991 WL 259036 (S.D.N.Y. Nov. 25, 1991). ....................................... 20

*In re Ben Cooper, Inc.*, 896 F.2d 1394 (2d Cir. 1990)................................................................... 21

*In re CNB Intern.*, Inc., 393 B.R. 306 (Bankr. W.D.N.Y. 2008).................................................. 19

*In re Custom Contractors, LLC*, 2011 WL 6046397 (Bankr. S.D. Fla. Dec. 5, 2011)................. 11

*In re Enron Corp.*, 295 B.R. 21 (S.D.N.Y. 2003)......................................................................... 23

*In re Enron Corp.*, 318 B.R. 273 (S.D.N.Y. 2004)....................................................................... 23

*In re Enron Corp.*, 333 B.R. 205 (Bankr. S.D.N.Y. 2005)........................................................... 19

*In re Fairfield Sentry Ltd.*, 2010 WL 4910119 (S.D.N.Y. Nov. 22, 2010) ........................... 22, 23

## TABLE OF AUTHORITIES
### (Continued)

Page

*In re Interbulk. Ltd.*, 240 B.R. 195 (Bankr. S.D.N.Y. 1999) ....................................................... 18

*In re Johns-Manville Corp.*, 63 B.R. 600 (S.D.N.Y. 1986)............................................................. 9

*In re Laventhol & Horwath*, 139 B.R. 109 (S.D.N.Y.1992)........................................................... 24

*In re Olde Prairie Block Owner, LLC*, 2011 WL 3792406 (Bankr. N.D. Ill. Aug. 25, 2011) ..... 11

*In re Rajapakse*, 346 B.R. 233 (Bankr.N.D.Ga. 2005)................................................................. 17

*In re Safety Harbor Resort & Spa*, 456 B.R. 703 (Bankr. M.D. Fla. 2011) ................................. 11

*In re Salander O'Reilly Galleries*, 453 B.R. 106 (Bankr. S.D.N.Y. July 18, 2011)...................... 10

*In re Schick*, 223 B.R. 661 (Bankr. S.D.N.Y. 1998)...................................................................... 19

*Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805 (9th Cir. 2008)................................................. 14

*Kelley v. JPMorgan Chase & Co.*, 2011 WL 4403289 (D. Minn. Sept. 21, 2011) ...................... 11

*Kipperman v. Circle Trust F.B.O. (In re Grafton Partners)*, 321 B.R. 527 (9th Cir. BAP 2005) 14

*Kirschner v. Agoglia (In re Refco Inc.)*, 2011 WL 5974532 (Bankr. S.D.N.Y. Nov. 30, 2011)…
.................................................................................................................................... 11, 13

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248 (1st Cir. 1991)............. 20

*Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010) ...................................................... 7, 16

*Nakash v. Zur (In re Nakash)*, 190 B.R. 763 (Bankr. S.D.N.Y. 1996) ......................................... 18

*Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir.
1993).................................................................................................................................... 20

*Picard v. Chais*, 440 B.R. 274 (Bankr. S.D.N.Y. 2010) ............................................................... 17

*Picard v. Katz*, 11 Civ. 03605 (JSR) (S.D.N.Y. Jan. 17, 2012).................................................... 14

*Picard v. Katz*, 2011 WL 4448638 (S.D.N.Y. Sept. 27, 2011)...................................................... 14

*Picard v. Kohn*, 11 Civ. 1181 (JSR) (S.D.N.Y. Sept. 6, 2011)...................................................... 16

*Picard v. Madoff*, Adv. Pro. No. 09-1503, 2011 WL 4434632 (Bankr. S.D.N.Y. Sept. 22, 2011).
.................................................................................................................................... 14

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 2011 WL 3897970 (S.D.N.Y. Aug.
31, 2011)............................................................................................................................... 14

# TABLE OF AUTHORITIES
## (Continued)

Page

*Schneider v. Riddick (In re Formica Corp.),* 305 B.R. 147 (S.D.N.Y. 2004) .............................. 21

*Shugrue v. Airline Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.),* 922 F.2d 984 (2d Cir. 1990). ...................................................................................................................................... 8, 9

*Stern v. Marshall,* 131 S. Ct. 2594 (2011) ..................................................................... 7, 10, 12, 20

*U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. and Indem. Ass'n., (In re U.S. Lines, Inc.),* 197 F.3d 631 (2d Cir. 1999) ....................................................................................................... 21

*Walker, Truesdel, Roth & Assocs. v. The Blackstone Group, L.P. (In re Extended Stay, Inc.),* 2011 WL 5532258 (S.D.N.Y. Nov. 10, 2011) ........................................................ 11, 14, 15, 24

*Wedtech Corp. v. Banco Popular de Puerto Rico (In re Wedtech Corp.),* 94 B.R. 293 (S.D.N.Y. 1988)............................................................................................................................... 23, 24

*Wider v. Wooton,* 907 F.2d 570 (5th Cir. 1990) ............................................................................ 14

**Statutes**

11 U.S.C. § 541(a) ......................................................................................................................... 17

11 U.S.C. § 546(e) ............................................................................................................... 13, 14, 15

11 U.S.C. § 550............................................................................................................................... 14

11 U.S.C. § 550(a) ...................................................................................................................... 2, 19

15 U.S.C. § 78aaa ............................................................................................................................. 1

15 U.S.C. § 78eee-(b)(4)................................................................................................................... 3

15 U.S.C. § 78fff(b) .......................................................................................................................... 6

15 U.S.C. § 78fff-1 ........................................................................................................................... 6

15 U.S.C. § 78fff-2(c)(3) .................................................................................................................. 6

28 U.S.C. § 1334(e)(1)..................................................................................................................... 17

28 U.S.C. § 157(a). ........................................................................................................................... 8

28 U.S.C. § 157(b)(2)(F)................................................................................................................. 10

28 U.S.C. § 157(b)(2)(H)................................................................................................................. 10

28 U.S.C. § 157(d) ...................................................................................................................... 8, 20

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation
proceedings of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities
Investor Protection Act ("SIPA"),[1] 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L.
Madoff ("Madoff," and together with BLMIS, each a "Debtor" and collectively, the "Debtors"),
by and through his undersigned counsel, hereby submits this memorandum of law in opposition
to the Motion to Withdraw the Reference (the "Motion") and accompanying Memorandum of
Law ("Mem. of Law") filed in the following action: *Picard v. Banco Bilbao Vizcaya Argentaria,
S.A.,* Adv. Pro. No. 10-05351[2] (Bankr. S.D.N.Y.) (BRL), No. 11 Civ. 07100 (JSR) (S.D.N.Y.)
(ECF No. 1).

## PRELIMINARY STATEMENT

Through this procedural gamesmanship, Banco Bilbao Vizcaya Argentaria, S.A.
("Defendant" or "BBVA") is perverting section 157(d). Indeed, this is precisely the type of
conduct against which courts in this Circuit have routinely cautioned. Attempting to jam a
square peg into a round hole—and latch onto the parade of other motions to withdraw the
reference filed with this Court—BBVA asks this Court, *inter alia*, to apply various provisions of
title 11 of the United States Code (the "Bankruptcy Code") which, by their express terms, are
plainly inapplicable to the case at bar. BBVA fails to recognize that the Trustee's action here is
a **recovery** action under Bankruptcy Code section 550—not an *avoidance* action—which does
not implicate the Bankruptcy Code provisions BBVA desperately seeks to invoke.

---

[1] The Securities Investor Protection Act ("SIPA") is found at 15 U.S.C. §§ 78aaa *et seq*. For
convenience, subsequent references to SIPA will omit "15 U.S.C."

[2] A copy of the complaint filed by the Trustee against BBVA in the referenced action is annexed
to the Declaration of Oren J. Warshavsky, Esq. ("Warshavsky Decl.") as Exhibit 1.

Rather, the Trustee's action here—unlike any of the *avoidance* actions already before this

Court—seeks to **recover** BLMIS customer property that was subsequently transferred to BBVA

pursuant to section 550.[3] BBVA nevertheless seeks shelter under the safe harbor provision of

section 546(e),[4] which does <u>not</u> apply to **recovery** actions under section 550.[5] Likewise, BBVA

heavily relies on certain prior decisions of this Court withdrawing the reference to consider the

implications of applying sections 548(c) and 546(e) in the context of *avoidance* actions, which

have no application to the Trustee's *recovery* action presently before the Court. In the face of

clear Second Circuit precedent narrowly construing section 157(d) and giving deference to

bankruptcy courts to address purely core matters, withdrawal is unwarranted.

---

[3] Bankruptcy Code § 550(a) provides:

> Except as otherwise provided in this section, to the extent that a transfer is
> avoided under section 544, 545, 547, 548, 549, 553 (b), or 724 (a) of this title, the
> trustee may *recover*, for the benefit of the estate, the property transferred, or, if
> the court so orders, the value of such property, from—
> (1) the initial transferee of such transfer or the entity for whose benefit such
> transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a) (emphasis added). It is a well-established principle that avoidance and
recovery are separate and distinct concepts under the Bankruptcy Code. S. Rep. No. 95-989, at
90 (1978) (Section 550 "enunciates the separation between the concepts of avoiding a transfer
and recovering from transferee . . . or from any immediate or mediate transferee. . ."). Section
550 empowers the Trustee to recover property transferred, or the value thereof, to an initial or
subsequent transferee of an avoidable transfer.

[4] *See* 11 U.S.C. § 546(e).

[5] As recently recognized by this Court, "Section 546(e) … does not address avoidance under §
550(a). Section 550(a) permits avoidance of a subsequent transfer 'to the extent that a[n initial]
transfer is avoided under section … 548.'"). Opinion and Order, *Picard v. Katz*, 11 Civ. 03605
(JSR) (S.D.N.Y. Jan. 17, 2012) at 13.

In short, the bankruptcy court is the proper forum for litigating questions of bankruptcy

law in this SIPA proceeding.[6] And it is the bankruptcy court that should determine, in the first

instance, the meaning, scope and reach of the provisions of the Bankruptcy Code as applied in

this SIPA bankruptcy liquidation proceeding—fundamental questions of bankruptcy law that

require nothing more than construction and application of the Bankruptcy Code.

## ALLEGATIONS IN THE COMPLAINT

BBVA is not an innocent bystander to Madoff's Ponzi scheme. Rather, BBVA is a

highly sophisticated financial institution that funneled money into the Madoff Ponzi scheme

despite seeing and then ignoring indicia of fraud. Specifically, BBVA received at least $45

million in subsequent transfers of BLMIS customer property in connection with its redemption

of shares it held in Fairfield Sentry Limited ("Sentry"), the flagship Madoff Feeder Fund

managed by Fairfield Greenwich Group ("FGG"), which had direct investment accounts with

BLMIS. *See* Complaint, Adv. Pro. No. 10-05351 (hereinafter referred to as "Compl.") (¶ 29-30,

66.) In fact, with knowledge of red flags of possible fraud, BBVA created leveraged investment

products specifically designed for the same purpose: to exploit Madoff's low volatility and

fictional "success" for its own institutional gain.

As early as May 2006, and prior to investing in the Madoff feeder funds or participating

in any leveraged transaction referencing feeder funds, BBVA had identified several critical red

flags regarding Sentry and BLMIS, putting it on notice of possible fraudulent activities at

BLMIS. (Compl. ¶ 70.) For example, in a May 2006 e-mail among members of FGG, it was

---

[6] SIPA § 78fff-2(c)(3) expressly incorporates the Bankruptcy Code and specifies that a SIPA
proceeding is to "be conducted in accordance with, and as though it were being conducted
under" the Bankruptcy Code and governed by relevant provisions of title 11. Moreover, SIPA §
78eee-(b)(4) specifically requires that "[u]pon the issuance of a protective decree and
appointment of a trustee … the court *shall* forthwith order the removal of the entire liquidation
proceeding to the court of the United States in the same judicial district having jurisdiction over
cases under title 11." SIPA § 78eee-(b)(4).

reported that BBVA had "very strong reservations as to the Madoff counter-party risk." (Compl.
¶ 70-71.) BBVA had further requested that FGG confirm that Madoff was properly segregating
assets, which suggest BBVA recognized that it was possible that Madoff could commingle or
misappropriate investor assets. (*Id.*) BBVA also had expressed concerns with the lack of
transparency at BLMIS and Madoff's secrecy concerning the options counterparties to the
options that were supposedly being entered into by the feeder funds. (*Id.*)

Despite the numerous indicia of fraud at BLMIS, BBVA failed to perform any
independent, meaningful due diligence of BLMIS in light of these concerns. BBVA's failure to
act is illustrated by the fact that BBVA created internal documents exhibiting factual
inaccuracies concerning BLMIS and Sentry which any meaningful due diligence would have
detected. For example, an internal document circulated within BBVA on May 17, 2006, referred
to in the Complaint as the "Sales Memo," stated BLMIS served as both broker-dealer and
custodian for the Sentry assets under management. (*Id.* ¶ 79, 123-24.) Such an arrangement was
atypical and unusual in the hedge fund industry as it resulted in a lack of checks and balances
because no independent entity could verify the existence of the assets. (*Id.*) The Sales Memo
also stated that Sentry's annual earnings were based on a 1% management fee and a 20%
performance fee, which meant that Sentry, as opposed to BLMIS, was being rewarded with the
type of fees that BLMIS should have charged for executing its purported split-strike conversion
strategy. (*Id.* ¶ 82.) Madoff forfeited literally hundreds of millions, if not billions, of dollars, by
allowing feeder funds like Sentry to "earn" the normal management fees based on assets under
management and the performance of the fund. (*Id.*) Madoff's unusual fee structure did not go
unnoticed by other investment professionals, and was aberrational when compared to the fees
charged by most investment funds.

4

While BBVA was only an indirect investor in BLMIS, it had access to both public and non-public information that made BBVA aware of several red flags of possible fraud at BLMIS. For example, in terms of public information, Madoff claimed that his options transactions took place on the Chicago Board Options Exchange (the "CBOE"). Yet, the purported options trading volume reported to have been traded by BLMIS for the Sentry accounts *alone* would have exceeded the total options available on the CBOE nearly **97.6%** of the time. (*Id.* ¶ 105.) If BBVA had performed minimal due diligence and simply checked the number of listed options in the Sentry accounts against the number of same options actually traded on the CBOE, it would have been abundantly clear that Madoff's trading strategy was impossible due to market volume alone. (*Id.* ¶ 104.)

In terms of non-public information, BBVA had access to the Sentry Monthly Tear Sheets ("Tear Sheets") showing rates of return and the Sharpe ratio for the fund. (Compl. ¶101.) These Tear Sheets revealed that Sentry and BLMIS maintained consistent and impossibly positive rates of return during events—*i.e.*, the burst of the dotcom bubble in 2000, the September 11, 2011 terrorist attack, and the housing crisis of 2008—that otherwise devastated the S&P 100 Index. (*Id.* ¶¶ 128-129.) In fact, between 1996 and 2008, Sentry and its sister fund, Fairfield Sigma Limited, did not experience a *single* quarter of negative returns. (*Id.* ¶ 128.) Sentry outperformed the S&P 100 Index by 20 to 40 percent in each instance where the S&P 100 Index suffered double-digit losses. (*Id.* ¶ 129.)

Moreover, for a 13-year period, Sentry had a higher Sharpe ratio than money managers Warren Buffett, George Soros, Bruce Kovner and John Paulson in all but 6 of 52 quarters between 1995 and 2007. The probability of Sentry's Sharpe ratio outperforming these star money managers in almost every quarter for nearly 13 years is approximately **1 in 200,000,000**.

*(Id.* ¶ 104.) BBVA knew or should have known that BLMIS produced returns that were simply too good to be true, reflecting a pattern of abnormal profitability, both in terms of consistency and amounts that were simply not credible. (*Id.* ¶ 125.) Yet, BBVA never once made any inquiries as to any of the abnormalities and instead, opted for finding ways to exploit Madoff's unusually high returns. (*Id.* ¶ 72.)

## BACKGROUND

### A. Commencement of the SIPA Liquidation

Having adjudicated various Madoff liquidation matters, this Court's familiarity with the background of this matter is presumed.

### B. SIPA Authorizes the Trustee to Pursue Bankruptcy Causes of Action

SIPA § 78fff(b) grants the Trustee authority to conduct a SIPA liquidation proceeding "in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11." SIPA § 78fff(b); *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 231 (2d Cir. 2011) (the "*Second Circuit Net Equity Decision*") ("Pursuant to SIPA, Mr. Picard has the general powers of a bankruptcy trustee, as well as additional duties, specified by the Act, related to recovering and distributing customer property.") (citing SIPA § 78fff-1). SIPA § 78fff-2(c)(3) expressly incorporates the Bankruptcy Code and authorizes a SIPA Trustee to recover any fraudulent transfers, including those to customers. SIPA § 78fff-2(c)(3); *Second Circuit Net Equity Decision*, 654 F.3d at 241 n.10 ("SIPA and the Code intersect to . . . grant a SIPA trustee the power to avoid fraudulent transfers for the benefit of customers.") (quoting *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 136 (Bankr. S.D.N.Y. 2010) (the "*Net Equity Decision*").

C.     **The Trustee's Recovery Action Against The Defendant**

The Trustee's complaint against BBVA alleges various causes of action, all "core" matters arising under the Bankruptcy Code or the New York Fraudulent Conveyance Act (New York Debtor and Creditor Law § 270 *et seq.* (McKinney 2001) ("DCL")). *See* Warshavsky Decl. Ex. 1. Specifically, the Trustee seeks to recover the proceeds of certain avoided or avoidable initial transfers subsequently transferred to BBVA under Bankruptcy Code sections 550(a) and the DCL.

## SUMMARY OF ARGUMENT

The Motion should be denied because none of the issues raised by BBVA require "substantial and material" interpretation of non-bankruptcy federal law warranting mandatory withdrawal under section 157(d). First, BBVA seeks withdrawal based upon the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011). BBVA misinterprets *Stern*'s narrow ruling which has no effect on the bankruptcy court's authority to finally adjudicate the Trustee's recovery actions.

Next, BBVA attempts to shield itself from the Trustee's recovery action by invoking section 546(e), one of the Bankruptcy Code's "safe harbor" provisions. However, section 546(e) is plainly inapplicable to the Trustee's recovery action under section 550 and, thus, cannot provide any basis for withdrawal.

BBVA also argues that withdrawal is also necessary to determine whether SIPA and the Bankruptcy Code have extraterritorial reach under *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010). Yet, BBVA ignores the Bankruptcy Code's language and the body of law interpreting it providing for the Code to apply to those who reside outside the United States.

In addition, BBVA alleges that withdrawal is required because of what BBVA characterizes as SIPA's retroactive due diligence obligation under section 548(c) for brokerage

7

customers. BBVA, a sophisticated institutional investor is not and was not a customer of the

BLMIS broker dealer business or the investment advisory business. BBVA is a subsequent

transferee from whom recovery is properly sought under the Bankruptcy Code.

Finally, BBVA failed to establish the requisite "cause" for permissive withdrawal

pursuant to section 157(d)—all of the *Orion* factors militate against withdrawal. Without any

mandatory or permissive grounds to withdraw the reference, the Motion should be denied.

## ARGUMENT

## I. THE DEFENDANT'S MOTION TO WITHDRAW THE RECOVERY ACTION CANNOT MEET THE REQUIREMENTS FOR MANDATORY WITHDRAWAL

### A. Section 157(d) Has Been Narrowly Construed in the Second Circuit

The scope of bankruptcy jurisdiction over all matters affecting a debtor and its property is

broadly construed. *Shugrue v. Airline Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d

984, 994 (2d Cir. 1990). All cases and proceedings arising under, arising in, or related to a

bankruptcy case, including SIPA liquidations, are automatically referred to the bankruptcy court.

*See* 28 U.S.C. § 157(a). For the bankruptcy court to proceed efficiently and within the bounds of

its broad grant of jurisdiction, the reference to the bankruptcy court may be withdrawn only in

limited circumstances as provided in section 157(d) of title 28. *In re Ionosphere Clubs, Inc.*, 922

F.2d. at 995. The Second Circuit has consistently held that section 157(d) must be "construed

narrowly," *see, e.g., id.*, and is not to be used as an "escape hatch through which most

bankruptcy matters [could] be removed to a district court." *Gredd v. Bear, Stearns Sec. Corp.

(In re Manhattan Inv. Fund Ltd.)*, 343 B.R. 63, 66 (S.D.N.Y. 2006) (quoting *Carter Day Indust.,

Inc. v. EPA (In re Combustion Equip. Assoc.)*, 67 B.R. 709, 711 (S.D.N.Y. 1986)) (internal

quotation omitted). A narrow reading of the mandatory withdrawal provisions is necessary so as

8

not to "eviscerate much of the work of the bankruptcy courts." *Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 185 B.R. 680, 683 (S.D.N.Y. 1995).

Mandatory withdrawal "is not available merely because non-Bankruptcy Code federal statutes will be considered in the bankruptcy court proceeding." *In re Ionosphere Clubs, Inc.*, 922 F.2d at 995. Rather, as the Second Circuit has held, mandatory withdrawal "is reserved for cases where *substantial and material consideration* of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." *Id.* at 995 (emphasis added). "Substantial and material consideration" requires a bankruptcy judge to "engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes." *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991); *Enron Corp. v. J.P. Morgan Sec. (In re Enron Corp.)*, 388 B.R. 131, 136, 139 (S.D.N.Y. 2008). Indeed, the "substantial and material consideration" standard excludes from mandatory withdrawal those cases that involve only the routine application of non-title 11 federal statutes to a particular set of facts. *See In re Johns-Manville Corp.*, 63 B.R. 600, 602 (S.D.N.Y. 1986).

BBVA cannot meet the standard for withdrawal of the reference to resolve the Trustee's claims because no material interpretation of non-bankruptcy federal statutes is required to resolve the issues at hand, nor is there any potential conflict between the Bankruptcy Code and other non-bankruptcy federal statutes. On its face, SIPA mandates removal to the bankruptcy court in the first instance. SIPA is routinely interpreted by bankruptcy courts as it was originally derived from a bankruptcy statute and specifically incorporates the Bankruptcy Code. BBVA's allegation that SIPA cannot be analyzed and applied by the bankruptcy court is simply wrong, as evidenced by, *inter alia*, the *Net Equity Decision* and the Second Circuit's determination thereof.

9

## B. *Stern v. Marshall* Does Not Require or Otherwise Warrant Withdrawal

BBVA seeks refuge in the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct.

2594 (2011). BBVA strains to draw a parallel between the Trustee's traditional recovery actions

under the Bankruptcy Code and the counterclaim addressed by the *Stern* Court. BBVA argues

that the bankruptcy court here would somehow be limited and could not issue a final judgment

against BBVA . *See* Mem. of Law at 7-9. Not so. BBVA wildly misconstrues *Stern*'s "narrow"

ruling which makes clear that it does not "meaningfully change[ ] the division of labor" between

bankruptcy courts and district courts. *Stern*, 131 S. Ct. at 2620.

*Stern* did not involve straightforward bankruptcy law claims for recovery of avoided or

avoidable initial transfers from subsequent transferees but instead concerned a creditor's claim

for defamation and a state law counterclaim by the debtor for tortious interference. *Stern* did not

interpret 28 U.S.C. §§ 157(b)(2)(F) or 157(b)(2)(H), which identify as core proceedings those

that "determine, avoid or recover" preferences and fraudulent conveyances.

BBVA's effort to relate these two completely distinct matters fails. *Stern* does not hold,

nor even suggest, that actions seeking to avoid and recover fraudulent and/or preferential

transfers are not properly the province of and rightly decided by non-Article III judges. As

recently recognized by this district:

> *Stern* is replete with language emphasizing that the ruling should
> be limited to the unique circumstances of that case, and the ruling
> does not remove from the bankruptcy court its jurisdiction over
> matters directly related to the estate that can be finally decided in
> connection with restructuring debtor and creditor relations. . .

*In re Salander O'Reilly Galleries*, 453 B.R. 106, 115-16 (Bankr. S.D.N.Y. July 18, 2011). *See,*

*e.g., Stern*, 131 S. Ct. at 2611 ("Here Vickie's claim is a state law action independent of the

federal bankruptcy law"); *id.* at 2620 ("We do not think the removal of counterclaims such as

Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the

10

current statute . . . the question presented here is a 'narrow' one"); *Kirschner v. Agoglia (In re Refco Inc.)*, 2011 WL 5974532, at \*4 (Bankr. S.D.N.Y. Nov. 30, 2011) ("Clearly several of [the Court's] rationales argue that *Stern* does not preclude the bankruptcy court from issuing a final judgment on a fraudulent transfer claim"). Indeed, courts considering *Stern* have routinely declined to give it the expansive scope that BBVA requests.[7]

In contrast to the state law tortious interference counterclaim at issue in *Stern*, in the present case the Trustee has brought traditional bankruptcy causes of actions to recover the proceeds of avoided or avoidable transfers from BBVA that the Bankruptcy Code specifically and exclusively authorizes bankruptcy trustees to pursue under Bankruptcy Code section 550. *See, e.g.*, *In re Extended Stay, Inc.*, 2011 WL 5532258, at \*7-8; *Kelley v. JPMorgan Chase & Co.*, 2011 WL 4403289, at \*6 (D. Minn. Sept. 21, 2011); *Michigan State Hous. Dev. Auth. v. Lehman Brothers, et al.*, No. 11 Civ. 3392 (S.D.N.Y., Sept. 14, 2011) (JGK). In short, *Stern* is fairly read as limited to state law counterclaims with no relationship to federal bankruptcy law. *Id.* at 2611.

Despite the narrow holding of *Stern*, BBVA claims the bankruptcy court cannot finally

---

[7] *See In re Safety Harbor Resort & Spa*, 456 B.R. 703, 717 (Bankr. M.D. Fla. 2011) (finding that a bankruptcy court has jurisdiction to hear fraudulent transfer claims and "that nothing has changed" as a result of *Stern*); *In re Custom Contractors, LLC*, 2011 WL 6046397, at \*6 (Bankr. S.D. Fla. Dec. 5, 2011) (This Court's job is [to apply *Stern*'s holding,] not to extend *Stern* to fraudulent transfer actions based on Supreme Court *dicta*, and in so doing, upend the division of labor between district and bankruptcy courts that has been in effect for nearly thirty years."); *In re Extended Stay, Inc.*, 2011 WL 5532258, at \*6 ("Withdrawing the reference simply due to the uncertainty caused by *Stern* is a drastic remedy that would hamper judicial efficiency on the basis of a narrow defect in the current statutory regime identified by *Stern*."); *Field v. Lindell (In re The Mortgage Store, Inc.)*, 2011 WL 5056990, at \*6–7 (D. Haw. Oct. 5, 2011) (determining not to withdraw the reference even if *Stern* applied to fraudulent transfer proceeding because "[w]ithdrawal of the reference at this stage would result in this court losing the benefit of the bankruptcy court's experience in both the law and the facts, resulting in an inefficient allocation of judicial resources"). *See also In re Ambac Fin. Grp., Inc.*, 2011 WL 4436126, at \*8 (Bankr. S.D.N.Y. Sept.23, 2011); *In re Olde Prairie Block Owner, LLC*, 2011 WL 3792406, at \*5 (Bankr. N.D. Ill. Aug. 25, 2011); *In re Am. Bus. Fin. Servs., Inc.*, 457 B.R. 314, 319-320 (Bankr. D. Del. 2011).

determine fraudulent conveyance and preferential transfer claims like those which underlay the

Trustee's recovery action asserted in the case at issue in the instant action. *See* Mem. of Law at

7-9. Such a sweeping interpretation of *Stern* is inconsistent with the decision itself, would

deprive district courts of bankruptcy courts' specialized expertise to handle such claims, and

would have the practical effect of eliminating bankruptcy courts permanently.

As Justice Roberts observed, the bankruptcy court's specialized expertise was not needed

in the adjudication of the common law tort counterclaim addressed in *Stern. See Stern,* 131 S.

Ct. at 2615 ("The 'experts' in the federal system at resolving common law counterclaims such as

Vickie's are the Article III courts, and it is with those courts that her claim must stay."").

However, specialized bankruptcy expertise is critical to the efficient administration of avoidance

and recovery actions brought under the Bankruptcy Code, especially in this case where the

bankruptcy court is administering over 1,000 related cases and thousands of objections.

The importance of this particularized framework utilizing the bankruptcy court's

expertise is magnified in a Ponzi scheme case, such as this case, where the majority of the

debtor's assets were fraudulently transferred to third parties before BLMIS's bankruptcy

resulting in the transferees receiving money stolen from other investors. As a consequence, the

Bankruptcy Court must manage both the allowance of claims to those who were defrauded as

well as recovery of fraudulent transfers in order to pay the allowed claims. This distinctive

relationship is succinctly set forth in Judge Drain's *Refco* opinion:

> Since the enactment of the Bankruptcy Code, the management and
> determination of statutory avoidance claims has been a primary
> function of the bankruptcy courts. Such claims often play a
> prominent role in bankruptcy cases, either because of their sheer
> numbers or because of the effect that the potential avoidance of a
> transfer, lien, or obligation may have on creditors' recoveries.
> This is particularly so in cases where most, if not all, of the
> debtor's estate was transferred to third parties pre-bankruptcy, such

> as the many Ponzi-scheme driven cases of recent years, requiring a
> coordinated response overseen by one judge on behalf of a host of
> creditor-victims. The ability to manage efficiently the investigation
> and litigation of such claims, and their possible global settlement,
> decreases if handled on a piecemeal basis by different judges no
> matter how talented.

*Id.* at *5.

Judge Drain emphasizes the necessity of maintaining ties between the recovery action

against BBVA and BLMIS's claims allowance process. It further makes clear the difference

between *Stern's* treatment of a generic state law tort counterclaim, which was "in no way derived

from or dependent upon bankruptcy law," but rather was "a state law tort action that exists

without regard to any bankruptcy proceeding" *(Stern,* 131 S.Ct. at 2618) and the Trustee's

recovery actions which "flow from a federal statutory scheme" and is "completely dependent

upon adjudication of a claim created by federal law." *In re Refco Inc.,* 2011 WL 5974532, at *4

(quoting *Stern,* 131 S.Ct. at 2614) (concluding that bankruptcy courts have constitutional power

to issue final judgments in fraudulent transfer actions even where the defendant had not filed a

proof of claim in the bankruptcy).

## C. The Safe Harbor Protections Under 546(e) Are Inapplicable Here and Do Not Warrant Mandatory Withdrawal

BBVA also asserts that the Court should withdraw the reference because interpretation of

Bankruptcy Code section 546(e)[8] implicates "certain principles of securities law." *See* Mem. of

---

[8] Bankruptcy Code § 546(e) provides in pertinent part:

> Notwithstanding sections 544, 545, 547, 548 (a)(1)(B), and 548 (b) of this title,
> the trustee may not *avoid* a transfer that is a margin payment, as defined in section
> 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or
> 741 of this title, made … in connection with a securities contract, as defined in
> section 741(7), commodity contract, as defined in section 761 (4), or forward
> contract, that is made before the commencement of the case, except under section
> 548 (a)(1)(A) of this title.

13

Law at 15. However, the plain language of Bankruptcy Code section 546(e) provides that safe

harbor protections do not apply to recovery actions against subsequent transferees under

Bankruptcy Code section 550. In fact, this Court recently recognized that section 546(e) does

not address recovery under section 550(a). *See* Opinion and Order, *Picard v. Katz*, 11 Civ.

03605 (JSR) (S.D.N.Y. Jan. 17, 2012) at 13 (reinstating the Trustee's count seeking recovery

from subsequent transferees under Bankruptcy Code section 550(a) notwithstanding the

application of section 546(e)).

Rather, Section 546(e), to the extent applicable to these cases,[9] may only limit the

Trustee's ability to *avoid* transfers under sections 544, 545, 547, 548(a)(1)(B) and 548(b) of the

Bankruptcy Code. Section 546(e) does not, however, limit the Trustee's ability to *recover*

subsequent transfers under section 550. Just as Congress declined to include section 550 within

the ambit of the safe harbors of section 546(e), so too should this Court decline BBVA's

---

11 U.S.C. § 546(e) (emphasis added) (expressly excluding section 550 of the Bankruptcy Code
and having no effect on a trustee's ability to recover property transferred or the value of such
property under section 550).

[9] The Trustee continues to preserve and assert his position that the mere invocation of
Bankruptcy Code section 546(e) by defendants such as BBVA does not provide a proper basis
for mandatory withdrawal of the reference. Likewise, the Trustee reasserts his position that the
same section of the Bankruptcy Code is inapplicable here, notwithstanding this Court's ruling in
*Picard v. Katz*, No. 11 Civ. 3605, 2011 WL 4448638 at *2-3 (S.D.N.Y. Sept. 27, 2011). No other
court has found that section 546(e) provides a basis for mandatory withdrawal of the reference
under 28 U.S.C. § 157(d), *see Walker, Truesdell, Roth & Assocs. v. The Blackstone Group, L.P.
(In re Extended Stay, Inc.)*, 2011 WL 5532258, at *7 (S.D.N.Y. Nov. 10, 2011), or that section
546(e) is properly extended to fictional transactions pursuant to a Ponzi scheme. *See, e.g., See
Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 819 (9th Cir. 2008); *Kipperman v. Circle Trust
F.B.O. (In re Grafton Partners)*, 321 B.R. 527, 541 (9th Cir. BAP 2005) (applying section 546(e)
to payments made in connection with a Ponzi scheme "would amount to an absurd contradiction
of the securities laws"); *Wider v. Wooton*, 907 F.2d 570, 573 (5th Cir. 1990) (rejecting
application of section 546(e) defense in a Ponzi scheme context so as not to "implicitly authorize
fraudulent business practices through an unjustified extension of the stockbroker defense");
*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 2011 WL 3897970, at *12 (S.D.N.Y.
Aug. 31, 2011); *Picard v. Madoff*, Adv. Pro. No. 09-1503, 2011 WL 4434632, at *15-16 (Bankr.
S.D.N.Y. Sept. 22, 2011).

invitation to re-write the law to BBVA's liking. To do as BBVA requests would contradict the clear language of the Bankruptcy Code and grant subsequent transferees defenses Congress never directed or intended. At bottom, the Trustee's power to seek recovery of subsequent transfers from BBVA via section 550 can in no way be limited by section 546(e).

Even if section 546(e) was somehow applicable to the Trustee's claims, in a recent case in this district, the Court found that the application of an affirmative defense under section 546(e) did not warrant mandatory withdrawal of the reference. *In re Extended Stay, Inc.*, 2011 WL 5532258, at *7. In particular, the *In re Extended Stay* Court noted that the issue of whether or not section 546(e) of the Bankruptcy Code precluded certain claims under the Fair Debt Collections Practices Act or certain securities laws could not overcome "the 'narrow' scope this Circuit gives to mandatory withdrawal under section 157(d)" because the movants failed to point to any federal statute requiring "significant interpretation" rather than mere application to a particular set of facts. *Id.* (citations omitted).

Finally, BBVA urges that "securities law implications" must be considered in connection with the application of section 546(e). *See* Mem. of Law at 15. Yet, BBVA has not pointed to a single securities law at issue in the case at bar. Bankruptcy Code section 546(e) *explicitly refers* to definitions in the Bankruptcy Code itself. Simply put, there is no additional law that needs to be interpreted outside of the Bankruptcy Code, nor has BBVA cited to any. As such, the determination of whether and how Bankruptcy Code section 546(e) should be applied requires only simple interpretation and application of the Bankruptcy Code—determination which rests with the Bankruptcy Court.

## D. Interpretation of the Extraterritoriality of SIPA and the Bankruptcy Code Does Not Warrant Mandatory Withdrawal

BBVA also asserts that pursuant to the Supreme Court ruling in *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010) withdrawal is needed to determine whether SIPA and the Bankruptcy Code have extraterritorial reach. *See* Mem. of Law at 16-17. However, in doing so BBVA misconstrues *Morrison,* the pre-*Morrison* body of law, and this Court's decision in *Picard v. Kohn*, 11 Civ. 1181 (JSR) (S.D.N.Y. Sept. 6, 2011), which addressed the extraterritorial application of the RICO statute. There is no "substantial and material" interpretation of non-bankruptcy federal law in the present case which warrants mandatory withdrawal. Indeed, BBVA is asking how *Morrison* applies, if at all, to the Trustee's claims under the Bankruptcy Code.

First, *Morrison* dealt with the extraterritorial application of the 1934 Exchange Act, and more specifically with Australian nationals who invested in an Australian company, which traded on an Australian exchange. The present case is a SIPA liquidation in the United States based on fraudulent business transactions that took place in New York, involved sophisticated entities—such as BBVA—that invested into feeder funds that were largely established for the sole purpose of investing with BLMIS. There is no apparent reason—and certainly no good reason—why the Trustee cannot recover the subsequent transfers of fraudulent and/or preferential transfers to BBVA simply because BBVA is incorporated outside the United States.

BBVA is also wrong when asserting that SIPA has no clear indication of an extraterritorial application and that this is an issue of first impression requiring mandatory withdrawal. *See* Mem. of Law at 16. SIPA specifically and expressly incorporates the Bankruptcy Code making applicable almost all of the liquidation provisions that apply to ordinary bankruptcy liquidations. And those provisions, which include the power to avoid and

16

recover fraudulent transfers and preferences may be applied both in the United States and

beyond. *See Picard v. Chais*, 440 B.R. 274, 281 (Bankr. S.D.N.Y. 2010) (stating "[t]he United

States has a strong interest in applying the provisions of the Bankruptcy Code" and holding that

the exercise of personal jurisdiction over a foreign defendant was reasonable since the Trustee's

claims arise under U.S. bankruptcy laws and are brought on behalf of all creditors and customers

in this SIPA proceeding).

In fact, both the plain language and congressional intent underlying the Bankruptcy Code

make it clear the Code does in fact have clear and unmistakable extraterritorial application.

While drafting the Bankruptcy Code, Congress expressly recognized that a debtor's assets and

interests would sometimes lie outside of the United States. Indeed, section 541(a) of the

Bankruptcy Code explicitly states that the commencement of a bankruptcy case creates an estate

comprised of property "wherever located and by whomever held," 11 U.S.C. § 541(a) (emphasis

added).

Section 541(a) echoes the worldwide jurisdictional language of 28 U.S.C. § 1334(e)(1),

which states that "the district court in which a case under title 11 is commenced or is pending

shall have exclusive jurisdiction of all the property, wherever located, of the debtor as of the

commencement of such case, and of property of the estate." *See Deak & Co. Inc. v. Jr. R.M.P.

Soedjono (In re Deak & Co., Inc.)*, 63 B.R. 422, 427 (Bankr. S.D.N.Y. 1986) ("Congress inserted

this language to 'make clear that a trustee in bankruptcy is vested with the title of the bankrupt in

property which is located without, as well as within, the United States.'"); *In re Rajapakse*, 346

B.R. 233 (Bankr. N.D. Ga. 2005); *Diaz-Barba v. Kismet Acquisition, LLC*, 2010 WL 2079738, at

*10 (S.D. Cal. May 20, 2010) (noting the court may exercise jurisdiction over all property of the

bankrupt estate, even if located outside the United States, because the provisions of the Code as

they relate to property of the estate apply extraterritorially). *See also French v. Liebmann (In re French)*, 440 F.3d 145, 152 (4th Cir. 2005) (holding that since section 548 allows the avoidance of transfers of the debtor in property "wherever located," the presumption against extraterritoriality did not prevent the use of the court's avoidance powers).[10] The Trustee has the right, ability and fiduciary obligation to pursue property of the estate, wherever it is located, including from BBVA.

BBVA's *Morrison* argument ignores the two sided process involved in bankruptcy and SIPA proceedings. In effect, BBVA argues the Bankruptcy Code's avoidance and recovery provisions cannot be applied to BBVA simply because it is based in Spain. If this Court accepts BBVA's argument, then it is also the result that no foreign national could make a claim in a bankruptcy or SIPA proceeding pending in the United States. Such an absurd result was never intended by Congress nor has it ever been countenanced by a court in this country.

In short, BBVA's *Morrison* argument fails to provide any justification for mandatory withdrawal of the reference. Bankruptcy courts are called upon by the Bankruptcy Code to hear and determine cases seeking the recovery of property wherever it is found. BBVA's foreign status is nothing unique. The bankruptcy court is fully empowered to hear these cases and there is no material and substantial issue of federal non-bankruptcy law requiring the withdrawal of the reference. As a result, under *Morrison* there is no basis for mandatory withdrawal of the reference.

---

[10] Case law also demonstrates that the automatic stay under section 362 of the Code, which is one of the fundamental debtor protections provided by bankruptcy laws, applies extraterritorially. *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) (finding that the stay exists to protect the estate from "a chaotic and uncontrolled scramble for the Debtor's assets in a variety of uncoordinated proceedings in different courts.").

E.    **Bankruptcy Code Section 548(c) Is Inapplicable Here and Does Not Warrant Mandatory Withdrawal**

In yet another attempt to seize upon this Court's prior rulings, BBVA seizes on defenses afforded to initial transferees under 548(c) as a basis for withdrawal of the reference. In so doing, BBVA ignores the fact 548(c) does not apply to actions to recover avoided or avoidable initial transfers. Despite emphasizing that it is not a BLMIS customer, BBVA seeks to assert defenses of the customer-initial transferees. BBVA does so in order to attempt to shoehorn itself into this Court's prior rulings in *Katz* by seeking to withdraw the reference to determine what BBVA characterizes as the Trustee's novel interpretation of SIPA to retroactively impose a due diligence obligation on brokerage customers. *See* Mem. of Law at 14-15.[11] BBVA's burden to prove the affirmative defense that it received BLMIS customer property in good faith is expressly delineated in Bankruptcy Code section 550(b),[12] which applies to the Trustee's *recovery* actions—not under Bankruptcy Code section 548(c), which is applicable to *avoidance* actions.

Bankruptcy Courts routinely apply the good faith defense standard to recovery actions under Bankruptcy Code section 550. *See, e.g.*, *In re Enron Corp.*, 333 B.R. 205, 232-33 (Bankr. S.D.N.Y. 2005); *In re Schick*, 223 B.R. 661, 664-65 (Bankr. S.D.N.Y. 1998); *In re CNB Intern., Inc.*, 393 B.R. 306, 329-30 (Bankr. W.D.N.Y. 2008); *Max Sugarman Funeral Home, Inc. v.*

---

[11] So the record does not suggest assent to this characterization, the Trustee seeks neither a novel interpretation, nor seeks any retroactive due diligence.

[12] Bankruptcy Code § 550(b) provides in pertinent part:

> (b) The trustee may not recover under section (a)(2) of this section from—
> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(b).

*A.D.B. Investors*, 926 F.2d 1248, 1256 (1st Cir. 1991). As such, the good faith defense requires nothing more than a straightforward application of the Bankruptcy Code itself, as well as established case law interpreting the defense under the Bankruptcy Code. Thus, there is no basis for mandatory withdrawal of the reference.

## II.     THE DEFENDANT HAS FAILED TO DEMONSTRATE CAUSE FOR PERMISSIVE WITHDRAWAL

This Court may permissively withdraw the reference to bankruptcy court pursuant to section 157(d), but the Defendant must show "cause" for such withdrawal. To determine whether such "cause" exists, this Court must first evaluate whether the claim is core or non-core, and then "weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993). As the movant, the Defendant bears the burden of proving "cause" to warrant withdrawal. *See In re Ames Dep't Stores*, 1991 WL 259036, at *2 (S.D.N.Y. Nov. 25, 1991).

BBVA has failed to meet its burden. BBVA's argument that withdrawal of the reference will promote judicial efficiency, prevent delay, and/or limit cost to the parties is completely bare and based entirely on the assertion that the *Stern* case will result in protracted motion practice concerning the bankruptcy court's authority to enter final judgments. *See* Mem. of Law at 9-12. However, BBVA has done nothing more than raise the specter of *Stern*. BBVA has not analyzed the impact of *Stern* on a claim-by-claim basis with respect to the Trustee's complaint. And BBVA wholly fails to identify any material, incremental delay, or inefficiency that would result in light of *Stern*. None of the *Orion* factors warrant withdrawal.

## A.    The Bankruptcy Counts in the Trustee's Complaint Are All Core

While BBVA attempts to assert that the Trustee's seven bankruptcy claims are not core,

pursuant to section 157, a proceeding may be core if it is "unique to or uniquely affected by the

bankruptcy proceedings" or "directly affect[s] a core bankruptcy function." *U.S. Lines, Inc. v.*

*Am. S.S. Owners Mut. Prot. and Indem. Ass'n., (In re U.S. Lines, Inc.)*, 197 F.3d 631, 637 (2d

Cir. 1999). In enacting section 157, Congress intended core proceedings to be interpreted

broadly and that "95 percent of the proceedings brought before bankruptcy judges would be core

proceedings." *In re Ben Cooper, Inc.*, 896 F.2d 1394, 1398 (2d Cir. 1990). A finding that claims

are core "weighs against permissive withdrawal." *In re Leslie Fay Cos., Inc. v. Falbaum*, 1997

WL 555607, at *2 (S.D.N.Y. Sep. 4, 1997). Here, all of the Trustee's claims against BBVA are

brought pursuant to 11 U.S.C. § 550 and therefore "arise under" title 11.[13] While BBVA insists

otherwise, recovery actions are core claims according to the non-exhaustive list of core

proceedings set forth in sections 157(b)(2)(F) and (b)(2)(H) of the Bankruptcy Code. *See* 28

U.S.C. §§ 157(b)(2)(F) (defining core matters to include "proceedings to determine, avoid, or

recover preferences.") and 157(b)(2)(H) (defining core matters to include "proceedings to

determine, avoid, or recover fraudulent conveyances.").

## B.    Defendant's Motion is Nothing More than Blatant Forum Shopping

As previously indicated, one of the important *Orion* factors is the curtailing of possible

forum shopping by parties who perceive the bankruptcy court as an unfavorable forum in which

to litigate their claims. This Court previously noted in *Schneider v. Riddick (In re Formica*

*Corp.)* that "courts should employ withdrawal 'judiciously in order to prevent it from becoming

just another litigation tactic for parties eager to find a way out of bankruptcy court.'" 305 B.R.

147, 151 (S.D.N.Y. 2004) (quoting *Kenai Corp. v. Nat'l Union Fire Ins. Co. (In re Kenai Corp.)*,

---

[13] *See* Exhibit 1.

136 B.R. 59, 61 (S.D.N.Y. 1992)); *see also In re Fairfield Sentry Ltd.*, 2010 WL 4910119, at *4

(S.D.N.Y. Nov. 22, 2010) (to "allay" concerns of forum-shopping "'courts in this Circuit have

construed section 157(d) narrowly in order to prevent an 'escape hatch' out of bankruptcy

court'" (quoting *Enron Power Mktg., Inc. v. Holcim, Inc. (In re Enron Corp.)*, 2004 WL

2149124, at *5 (S.D.N.Y. Sept. 23, 2004)).

BBVA's Motion seeks, *inter alia*, to invoke sections of the Bankruptcy Code that are

plainly inapplicable to their cases in a desperate attempt to manufacture a basis for withdrawal of

the reference. As set forth above, by their express language, sections 546(e) and 548(c)—on

their face—have no effect whatsoever on the Trustee's ability to recover subsequent transfers

from BBVA under Bankruptcy Code section 550. Given the Bankruptcy Court's prior ruling on

many of the issues that raised in the Motion—including finding that section 546(e) does not

apply—BBVA is seeking to transfer its case to this Court, which BBVA perceives to be a more

favorable forum, in the hope of getting a better outcome than in the bankruptcy court. Such

outright forum shopping should not be countenanced.

## C.     The Jury Trial Issue Is Premature and Does Not Warrant Withdrawal of the Reference

BBVA argues in favor of withdrawal of the reference based on its inchoate right to

demand a jury trial. *See* Mem. of Law at 11-12. However, any such right does not require

withdrawal of the reference until the case is ready to proceed to trial. *In re Formica Corp*, 305

B.R. at 150. As this Court stated in *In re Kenai Corp.*:

> A rule that would require a district court to withdraw a reference
> simply because a party is entitled to a jury trial, regardless of how
> far along toward trial a case may be, runs counter to the policy
> favoring judicial economy that underlies the statutory scheme
> governing the relationship between the district courts and
> bankruptcy courts.

136 B.R. at 61 (*citing In re Adelphi Inst., Inc.*, 112 B.R. 534, 538 (S.D.N.Y. 1990)). *See In re*

*Fairfield Sentry, Ltd.*, 2010 WL 4910119 at *3 (S.D.N.Y. Nov. 22, 2010) (denying motion to withdraw the reference to the bankruptcy court because it was premature and "[d]istrict courts 'are generally unreceptive to motions to withdraw references where the underlying action is in its preliminary stages.'"); *In re Enron Corp.*, 318 B.R. 273, 275 (S.D.N.Y. 2004) ("Even if the Bankruptcy Court determines that the proceeding is non-core, and thus this Court concludes that [the defendant] is entitled to a jury trial on its claims, the Court would still not withdraw the reference of the case to the Bankruptcy Court until the case is trial-ready."). Accordingly, to the extent that the reference may be withdrawn so that a jury trial may be conducted in the District Court, this may be done if and only when the case is ready for trial.

In fact, courts have consistently denied motions to withdraw the reference in spite of a valid demand for a jury trial, where judicial economy weighed in favor of maintaining the reference for pre-trial matters. *See In re Enron Corp.,* 295 B.R. 21, 28 (S.D.N.Y. 2003) ("Courts have also recognized that it serves the interests of judicial economy and efficiency to keep an action in Bankruptcy Court for the resolution of pre-trial, managerial matters, even if the action will ultimately be transferred to a district court for trial"). In *Wedtech Corp. v. Banco Popular de Puerto Rico (In re Wedtech Corp.),* the court stated that "the defendant's right to a jury trial would not be disturbed by allowing [the bankruptcy judge] to continue to oversee the pre-trial supervision of this case, until such time as the case is ready for trial or dispositive motions." 94 B.R. 293, 298 (S.D.N.Y. 1988). The bankruptcy judge's "expressed familiarity with the present action, as well as the factual overlap with the numerous cases before him, present[ed] a unique and compelling opportunity *to promote judicial economy and swift resolution,* to the benefit of both of the parties." *Id.* (emphasis added).

23

**D.** **Withdrawal Would Impede Judicial Efficiency and Uniform Administration of the SIPA Bankruptcy Proceeding**

The other *Orion* considerations weigh against withdrawal. The bankruptcy court has been administering the SIPA bankruptcy proceeding for over three years. Judicial economy would only be promoted by allowing the specialized bankruptcy court, already familiar with the extensive record and proceedings in the BLMIS case, to initially adjudicate these cases. *See In re Wedtech Corp.*, 94 B.R. at 296; *In re Laventhol & Horwath*, 139 B.R. 109, 116 (S.D.N.Y.1992). It is the more efficient and appropriate course, as "[a]llowing the bankruptcy courts to consider complex questions of bankruptcy law before they come to the district court for de novo review promotes a more uniform application of bankruptcy law." *In re Extended Stay, Inc.*, 2011 WL 5532258 at *10 (finding that preserving bankruptcy court's ability to determine claims that implicated section 546(e) of the Bankruptcy Code weighed against withdrawal of the reference).

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests the court deny the Motion.

Date:  New York, New York          /s/ Oren J. Warshavsky
       January 31, 2012            _____
                                   Baker & Hostetler LLP
                                   45 Rockefeller Plaza
                                   New York, New York 10111
                                   Telephone: (212) 589-4200
                                   Facsimile: (212) 589-4201
                                   David J. Sheehan
                                   Email: dsheehan@bakerlaw.com
                                   Oren J. Warshavsky
                                   Email: owarshavsky@bakerlaw.com
                                   Mark A. Kornfeld
                                   Email: mkornfeld@bakerlaw.com
                                   Thomas L. Long
                                   Email: tlong@bakerlaw.com
                                   Nicholas J. Cremona
                                   Email: ncremona@bakerlaw.com
                                   Anat Maytal
                                   Email: amaytal@bakerlaw.com

                                   *Attorneys for Irving H. Picard, Trustee for the
                                   Substantively Consolidated SIPA Liquidation
                                   of Bernard L. Madoff Investment Securities
                                   LLC and Bernard L. Madoff*

Case 1:12-mc-00115-JSR   Document 136-6   Filed 07/18/12   Page 1 of 37

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendants. | |
| In re BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05120 (BRL) |
| Plaintiff, | |
| v. | 11 Civ. 07763 (JSR) |
| OREADES SICAV represented by its liquidator INTER INVESTISSEMENTS S.A., INTER INVESTISSEMENTS S.A. (F/K/A INTER CONSEIL S.A.), BNP PARIBAS INVESTMENT PARTNERS LUXEMBOURG S.A. (F/K/A BNP PARIBAS ASSET MANAGEMENT LUXEMBOURG S.A., F/K/A PARVEST INVESTMENT MANAGEMENT COMPANY S.A.), BGL BNP PARIBAS S.A., and BNP PARIBAS SECURITIES SERVICES S.A., | |
| Defendants. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04457 (BRL) |
| Plaintiff, | |
| v. | 11 Civ. 07810 (JSR) |
| EQUITY TRADING PORTFOLIO LIMITED, | |

EQUITY TRADING FUND, LTD., BNP PARIBAS
ARBITRAGE, SNC,

              Defendants.

## TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTIONS TO WITHDRAW THE REFERENCE

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 2

ALLEGATIONS IN THE COMPLAINTS ................................................................ 3

BACKGROUND ........................................................................................................ 7

ARGUMENT ............................................................................................................. 8

I.   THE MOVANTS' MOTIONS TO WITHDRAW THE AVOIDANCE ACTION
     CANNOT MEET THE REQUIREMENTS FOR MANDATORY
     WITHDRAWAL ................................................................................................ 8

     A.   Section 157(d) Has Been Narrowly Construed in the Second Circuit ................. 10

     B.   Interpretation of Section 546(e) of the Bankruptcy Code Does Not
          Warrant Mandatory Withdrawal ................................................................... 11

     C.   *Stern v. Marshall* Does Not Require or Otherwise Warrant Withdrawal ........... 14

     D.   Interpretation of the Extraterritoriality of SIPA and the Bankruptcy Code
          Does Not Warrant Mandatory Withdrawal ................................................... 18

     E.   Substantial Consideration of SLUSA Is Neither Required Nor Applicable
          in the Avoidance Actions ........................................................................... 21

     F.   Unjust Enrichment, Conversion, and Money Had and Received Are New
          York State Law Claims That Do Not Warrant Mandatory Withdrawal ............. 23

II.  THE MOVANTS HAVE FAILED TO DEMONSTRATE CAUSE FOR
     PERMISSIVE WITHDRAWAL ......................................................................... 25

     A.   The Trustee's Claims Are Core and/or Are "Related to" Core Claims ............... 25

          1.   The Three State Law Claims Brought by the Trustee Are Core
               Because They Are Inextricably Tied to the Bankruptcy Claims ............. 26

          2.   The Bankruptcy Court May Preside Over Non-Core Claims
               Related to Underlying Action .................................................... 27

     B.   Movants' Motions Are Nothing More Than Blatant Forum Shopping ............... 28

     C.   Withdrawal Would Impede Judicial Efficiency and Uniform
          Administration of the SIPA Bankruptcy Proceeding ...................................... 28

CONCLUSION ......................................................................................................... 29

## TABLE OF AUTHORITIES

*Page*

**Cases**

*Adelphia Recovery Trust v. FLP Group, Inc.*, No. 11 Civ. 06847 (PAC) (S.D.N.Y. Jan. 30, 2012) ........................................................................................................................................ 18

*Carter Day Indust., Inc. v. EPA (In re Combustion Equip. Assoc.)*, 67 B.R. 709 (S.D.N.Y. 1986) ................................................................................................................................................ 10

*Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186 (2d Cir. 2003) ........................................... 27

*City of New York v. Exxon Corp.*, 932 F.2d 1020 (2d Cir. 1991) ................................................. 10

*Deak & Co., Inc. v. Jr. R.M.P. Soedjono (In re Deak & Co., Inc.)*, 63 B.R. 422 (Bankr. S.D.N.Y. 1986) .............................................................................................................................................. 20

*Diaz-Barba v. Kismet Acquisition, LLC*, 2010 WL 2079738 (S.D. Cal. May 20, 2010) ............. 20

*Enron Corp. v. J.P. Morgan Sec. (In re Enron Corp.)*, 388 B.R. 131 (S.D.N.Y. 2008) .............. 10

*Enron Power Mktg., Inc. v. City of Santa Clara (In re: Enron Power Mktg.)*, 2003 WL 68036 (S.D.N.Y. Jan. 8, 2003) ............................................................................................................. 27

*Enron Power Mktg., Inc. v. Holcim, Inc. (In re Enron Corp.)*, 2004 WL 2149124 (S.D.N.Y. Sept. 23, 2004) ................................................................................................................................. 28

*Field v. Lindell (In re The Mortgage Store, Inc.)*, 2011 WL 5056990 (D. Haw. Oct. 5, 2011) ... 15

*French v. Liebmann (In re French)*, 440 F.3d 145 (4th Cir. 2005) .............................................. 20

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 343 B.R. 63 (S.D.N.Y. 2006) ........................................................................................................................................... 10

*Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 185 B.R. 680 (S.D.N.Y. 1995) ................................................................................................................................................ 10

*In re Am. Bus. Fin. Servs., Inc.*, 457 B.R. 314 (Bankr. D. Del. 2011) ......................................... 15

*In re Ambac Fin. Grp., Inc.*, 57 B.R. 299 (Bankr. S.D.N.Y. 2011) .............................................. 15

*In re Ames Dep't Stores*, 1991 WL 259036 (S.D.N.Y. Nov. 25, 1991). ...................................... 25

*In re Ben Cooper, Inc.*, 896 F.2d 1394 (2d Cir. 1990)............................................................. 26, 27

*In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011) ........................... 12

*In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) .................................... 7, 8, 9

**TABLE OF AUTHORITIES**
(Continued)

Page

*In re Builders Capital and Services, Inc.*, 317 B.R. 603 (Bankr.W.D.N.Y. 2004)....................... 27

*In re Custom Contractors, LLC*, 2011 WL 6046397 (Bankr. S.D. Fla. Dec. 5, 2011)................ 15

*In re Fairfield Sentry Ltd.*, 2010 WL 4910119 (S.D.N.Y. Nov. 22, 2010) ............................ 27, 28

*In re Interbulk. Ltd.*, 240 B.R. 195 (Bankr. S.D.N.Y. 1999) ....................................................... 21

*In re Johns-Manville Corp.*, 63 B.R. 600 (S.D.N.Y. 1986)........................................................... 11

*In re Kaiser*, 722 F.2d 1574 (2d Cir. 1983) ................................................................................. 27

*In re Laventhol & Horwath*, 139 B.R. 109 (S.D.N.Y.1992)........................................................ 29

*In re Millenium Seacarriers, Inc.*, 419 F.3d 83 (2d Cir. 2005).................................................... 27

*In re Neumann Homes, Inc.*, 414 B.R. 383 (ND Ill. 2009)........................................................... 27

*In re Olde Prairie Block Owner, LLC*, 457 B.R. 692 (Bankr. N.D. Ill. 2011) ............................ 15

*In re Rajapakse*, 346 B.R. 233 (Bankr.N.D.Ga. 2005)................................................................. 20

*In re Safety Harbor Resort & Spa*, 456 B.R. 703 (Bankr. M.D. Fla. 2011) ................................. 15

*In re Salander O'Reilly Galleries*, 453 B.R. 106 (Bankr. S.D.N.Y. 2011) ................................. 15

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406 (S.D.N.Y. 2001)........ 9

*Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805 (9th Cir. 2008)................................................ 12

*Kelley v. JPMorgan Chase & Co., et al.*, 2011 WL 4403289 (D. Minn. Sept. 21, 2011) ............ 16

*Kipperman v. Circle Trust F.B.O. (In re Grafton Partners)*, 321 B.R. 527 (9th Cir. BAP 2005) 12

*Kirschner v. Agoglia (In re Refco Inc.)*, 461 B.R. 181 (Bankr. S.D.N.Y. 2011).................... 15, 17

*LaSala v. UBS, AG*, 510 F. Supp. 2d 213 (S.D.N.Y. 2007)......................................................... 22

*Michigan State Hous. Dev. Auth. v. Lehman Brothers*, No. 11 Civ. 3392 (JGK) (S.D.N.Y., Sept. 14, 2011)................................................................................................................................. 16

*Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010) ....................................................... 18

*Nakash v. Zur (In re Nakash)*, 190 B.R. 763 (Bankr. S.D.N.Y. 1996) ........................................ 21

*Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir. 1993)........................................................................................................................................ 25

# TABLE OF AUTHORITIES
## (Continued)

Page

*Picard v. Chais*, 440 B.R. 274 (Bankr. S.D.N.Y. 2010) ................................................................. 20

*Picard v. Katz*, 11 Civ. 03605 (JSR) (S.D.N.Y. Jan. 17, 2012) .................................................... 12

*Picard v. Katz*, 2011 WL 4448638 (S.D.N.Y. Sept. 27, 2011) ..................................................... 11

*Picard v. Maxam Absolute Return Fund, L.P. (In re Bernard L. Madoff Inv. Sec. LLC)*, 460 B.R. 106 (Bankr. S.D.N.Y. 2011) ...................................................................................................... 21

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243 (Bankr. S.D.N.Y. 2010), leave to appeal denied, 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011) .......................... 12

*Picard v. Taylor (In re Park South Sec., LLC)*, 326 B.R. 505 (Bankr. S.D.N.Y. 2005) ................. 9

*Schneider v. Riddick (In re Formica Corp.)*, 305 B.R. 147 (S.D.N.Y. 2004) .............................. 28

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010) ...................................................................................... 7

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293 (Bankr. S.D.N.Y. 1999) ...... 24

*Shugrue v. Airline Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984 (2d Cir. 1990). ............................................................................................................................................... 10

*Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distribs., Inc.)*, 387 B.R. 365 (Bankr. E.D.N.Y. 2008) ..................................................................................................................................... 24, 25

*SIPC v. S.J. Salmon*, No. 72 Civ. 560, 1973 U. S. Dist. LEXIS 15606 (S.D.N.Y. Aug. 8, 1973) . 9

*Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir. 2005) .................................................... 22

*Stern v. Marshall*, 131 S. Ct. 2594 (2011) ................................................................. 14, 15, 16, 17

*U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. and Indem. Ass'n., (In re U.S. Lines, Inc.)*, 197 F.3d 631 (2d Cir. 1999) ............................................................................................................ 26

*Walker, Truesdell, Roth & Assocs. v. The Blackstone Group, L.P. (In re Extended Stay, Inc.)*, 2011 WL 5532258 (S.D.N.Y. Nov. 10, 2011) ....................................................... 11, 13, 15, 16

*Wedtech Corp. v. Banco Popular de Puerto Rico (In re Wedtech Corp.)*, 94 B.R. 293 (S.D.N.Y. 1988) ..................................................................................................................................... 27, 29

*Wider v. Wooton*, 907 F.2d 570 (5th Cir. 1990) ......................................................................... 12

**Statutes**

11 U.S.C. § 541(a) ..................................................................................................................... 20

## TABLE OF AUTHORITIES
### (Continued)

Page

11 U.S.C. § 546(e) .......................................................................................................... 11, 13, 14

11 U.S.C. § 550 ............................................................................................................................ 12

15 U.S.C. § 77p ............................................................................................................................ 22

15 U.S.C. § 78aaa ......................................................................................................................... 1

15 U.S.C. § 78bb(f)(5)(D) ............................................................................................................ 22

15 U.S.C. § 78eee-(b)(4) ............................................................................................................... 3

15 U.S.C. § 78fff(b) ...................................................................................................................... 7

15 U.S.C. § 78fff-1 ....................................................................................................................... 7

15 U.S.C. § 78fff-2(c)(3) ........................................................................................................... 7, 9

28 U.S.C. § 1334(e)(1) ................................................................................................................ 20

28 U.S.C. § 157(a). ..................................................................................................................... 10

28 U.S.C. § 157(b)(2)(A) ............................................................................................................ 26

28 U.S.C. § 157(b)(2)(E) ............................................................................................................ 26

28 U.S.C. § 157(b)(2)(F) ............................................................................................................. 14

28 U.S.C. § 157(b)(2)(H) ............................................................................................................ 14

28 U.S.C. § 157(c)(1) .................................................................................................................. 28

28 U.S.C. § 157(d) ................................................................................................................. passim

**Other Authorities**

Amended Standing Order of Reference, *In the Matter of Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) ............................................................................. 18

S. Rep. 105-182, 1998 WL 226714 (May 4, 1998) ..................................................................... 23

v

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation proceedings of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"),[1] 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff," and together with BLMIS, each a "Debtor" and collectively, the "Debtors"), by and through his undersigned counsel, hereby submits this memorandum of law in opposition to the Motions to Withdraw the Reference (the "Motions")[2] and accompanying Memoranda of Law ("Mem. of Law") filed in the following actions: *Picard v. Oreades Sicav, et al.*, Adv. Pro. No. 10-05120 (Bankr. S.D.N.Y.) (BRL), No. 11 Civ. 07763[3] (JSR) (S.D.N.Y.) (ECF No. 1) (the "BNP Paribas Action"); *Picard v. Equity Trading Portfolio Limited, et al.*, Adv. Pro. No. 10-

---

[1] The Securities Investor Protection Act ("SIPA") is found at 15 U.S.C. §§ 78aaa *et seq.* For convenience, subsequent references to SIPA will omit "15 U.S.C."

[2] Pursuant to a chambers conference on January 5, 2012, the Court consolidated the two Motions in the above-captioned cases for briefing purposes and permitted the Trustee to file one brief in opposition to the Motions, not to exceed 30 pages.

[3] This is one of two related Motions filed in this action (hereinafter, the "BNP-Oreades Motion"), on behalf of the following subsequent transferee defendants: BNP Paribas Investment Partners Luxembourg S.A., BGL BNP Paribas S.A., and BNP Paribas Securities Services S.A. (collectively the "BNP Paribas Entities"). On February 17, 2012, Inter Investissements S.A., another subsequent transferee defendant, separately filed a joinder to the BNP-Oreades Motion in the above-referenced civil action, No. 11 Civ. 07763 (ECF No. 13). To the extent the Court deems this joinder to have been properly filed, the Trustee respectfully requests that the Court consider this response to be in opposition to the joinder as well.

[3] This is the other of the two related Motions filed in this action (hereinafter, the "BNP-Equity Motion"), on behalf of the subsequent transferee defendant, BNP Paribas Arbitrage, SNC (together with the BNP Paribas Entities, the "Subsequent Transferee Defendants."). Equity Trading Portfolio Limited and Equity Trading Fund, Ltd. (collectively, the "Equity Trading Defendants") separately filed a joinder to the Equity Trading Motion in the above-referenced civil action, No. 11 Civ. 07810 (together with the Subsequent Transferee Defendants and the BNP Paribas Entities, the "Movants").

04457 (Bankr. S.D.N.Y.) (BRL), No. 11 Civ. 07810 (JSR) (S.D.N.Y.) (ECF No. 1.) ("Equity Trading Action").[4]

## PRELIMINARY STATEMENT

Through the Motions, the Movants have inappropriately sought to invoke this Court's jurisdiction while seeking to deprive the bankruptcy court of its central role of ensuring the ratable distribution of customer property to all customers—who have filed over 16,000 customer claims—in the largest SIPA liquidation in history. The Movants are blatantly engaging in forum shopping by seeking to bypass the bankruptcy court and withdraw actions involving quintessentially "core" bankruptcy causes of action that Congress intended the bankruptcy courts to hear and determine in the first instance.

The Movants have seized upon certain narrow rulings by this Court, and seek to convert section 157(d) into an "escape hatch" out of the bankruptcy court. Through this procedural gamesmanship, the Movants are perverting the meaning of section 157(d). Indeed, this is precisely the type of conduct against which courts in this Circuit have routinely cautioned. Movants' efforts to use section 157(d) to escape the bankruptcy court's jurisdiction should not be permitted in the face of clear Second Circuit precedent narrowly construing section 157(d) and giving deference to bankruptcy courts to address purely core matters. None of the issues raised in the Motions require *substantial and material consideration* of non-bankruptcy federal law.

In short, the bankruptcy court is the proper forum for litigating questions of bankruptcy law and claims against the Debtor in this SIPA proceeding.[5] And it is the bankruptcy court that

---

[4] A copy of the complaints that the Trustee filed against the defendants in the above-captioned actions is annexed to the Declaration of Oren J. Warshavsky, Esq. ("Warshavsky Decl.") as Exhibit 1.

[5] Here, the Trustee seeks to avoid and recover fraudulent transfers that the Movants received from BLMIS preceding the commencement of the SIPA proceeding. SIPA § 78fff-1(b) expressly

should determine, in the first instance, the meaning and scope of the provisions of the Bankruptcy Code as applied in this SIPA bankruptcy liquidation proceeding—fundamental questions of bankruptcy law that require nothing more than construction and application of the Bankruptcy Code. Accordingly, the Motions should be denied.

## ALLEGATIONS IN THE COMPLAINTS

The Movants are not innocent bystanders to Madoff's Ponzi scheme. The Movants—highly sophisticated financial institutions and feeder funds—knew or should have known they were benefiting from fraudulent transactions in their BLMIS accounts or via subsequent transfers, and that the activity in such accounts was inconsistent with legitimate trading activity and credible returns. Instead, the Movants deliberately chose to ignore the numerous indicia of fraud and continued to invest and funnel investors' money into the Madoff Ponzi scheme, all in an effort to reap enormous profits and unearned management fees.

### A.     The BNP-Oreades Action

Oreades SICAV ("Oreades") maintained two accounts with BLMIS, account nos. 1FR032 and 1FR036 (collectively, the "Oreades Accounts"). (*See* Complaint, Adv. Pro. No. 10-05120 (hereinafter referred to as "BNP-Oreades Compl.") (¶ 42).) From the very start of Oreades's investments with BLMIS in 1997, a host of entities affiliated with BNP Paribas S.A. provided crucial infrastructure for those investments through the Oreades Accounts at BLMIS. These entities included the BNP Paribas Entities. (*Id.*) Upon information and belief, the BNP Paribas Entities together provided services to Oreades by serving as its manager, administrator,

---

incorporates the Bankruptcy Code and specifies that a SIPA proceeding is to "be conducted in accordance with, and as though it were being conducted under" the Bankruptcy Code and governed by relevant provisions of title 11. Moreover, SIPA § 78eee(b)(4) specifically requires that "[u]pon the issuance of a protective decree and appointment of a trustee … the court *shall* forthwith order the removal of the entire liquidation proceeding to the court of the United States in the same judicial district having jurisdiction over cases under title 11."

and custodian, and received substantial fees consisting of "Customer Property" for serving in these roles. (*Id.*)  In addition to being subsequent transferees of Customer Property, the BNP Paribas Entities facilitated Madoff's fraud by funneling hundreds of millions of dollars of investors' money into BLMIS while ignoring troubling indicia of fraud at BLMIS. (*Id.*)

From the inception of the Oreades Accounts until March 2002, BGL BNP Paribas S.A. (as successor in interest to BNP Paribas (Luxembourg) S.A.) received Oreades's account statements from BLMIS and regularly corresponded with BLMIS to direct and conduct transactions in the Oreades Accounts, noting specific irregularities in dealing with BLMIS. (*Id.* ¶ 47.)  For example, on December 23, 1997, Olivier Nolin, of BNP Paribas (Luxembourg) S.A., sent a fax to Madoff regarding one of the Oreades Accounts inquiring as to why "we have not received any cash statement since the 30th of [N]ovember.  Is it normal?  Did you see if it was possible to receive the cash statement on a daily or weekly basis." (*Id.* ¶ 48.)  A copy of this fax contained within BLMIS's files bears a handwritten note from an unknown author, "BLM & I spoke to Nolin. All OK." (*Id.*)  Another inquiry was made on August 17, 1999, when Dazy Renald of BNP Paribas (Luxembourg) S.A. sent a fax to BLMIS, asking whether BLMIS participated in a tender offer involving shares of DuPoint de Nemours & Co. (*Id.* ¶ 49.)  BLMIS simply responded that they did not participate because, "it is our position that the nature of this offer was not consistent with the investment strategy." (*Id.*)

Upon information and belief, BNP Paribas (Luxembourg) S.A. did not further investigate.  (*Id.* ¶ 50.)  Had it chosen to press BLMIS further about its delayed account statements or its counterintuitive decision to forego participation in a potentially advantageous tender offer, it likely would have discovered that BLMIS was not, in fact, holding any DuPont shares, let alone engaging in any securities transactions.  (*Id.*)

4

On or about March 20, 2002, BNP Paribas (Luxembourg) S.A. transferred responsibility for the Oreades Accounts to BNP Paribas Securities Services, which noticed other irregularities in dealing with BLMIS. (*Id.* ¶¶ 51-52.) For example, on July 10, 2003, Lionel Trouvain of BNP Paribas Securities Services sent an email to Patrick Littaye of Access International Advisors LLC ("Access"), which, on information and belief, had introduced Oreades to BLMIS. (*Id.* ¶ 53.) After reviewing a legal opinion on BLMIS that Littaye received from Access's outside counsel, Trouvain sent his July 10, 2003 e-mail in which he raised a number of troubling issues concerning Madoff. (*Id.*) First, with regard to the management of Oreades's assets, Trouvain noted that neither Madoff nor BLMIS met the requirements for serving as a manager under the rules established by the Commission de Survelliance du Secteur Financier ("CSSF"), the Luxembourg regulator. Trouvain wrote, "In the eyes of the CSSF, B. Madoff does not exist." (*Id.* ¶ 54.) With regard to the use of BLMIS as a sub-custodian for the assets of Oreades, Trouvain stated: "I get the impression that Bernard Madoff is not a bank and I would therefore like to know where the US Treasury Bills held in the Oreades USD and EUR portfolios are held." (*Id* ¶ 55.) Finally, with regard to BLMIS's method for reporting trades and confirmation of those reports, Trouvain noted that "the trades are sent by mail after 7 or 8 days and are posted after the fact . . . Market practices are really different today and it would seem that B. Madoff does not ever want to improve its order transmission methods." (*Id.* ¶ 56.) However, despite the subsequent exchanges with BLMIS, which included a letter from Trouvain's manager regarding the lack of any independent verification of assets (*see id.* ¶ 57), neither BNP Paribas Securities Services nor any other BNP Paribas Entities took any further steps to address their questions and concerns regarding BLMIS and the purported securities transactions reported by BLMIS. (*Id.* ¶ 60.)

## B.    The BNP-Equity Action

Defendant Equity Trading Portfolio Limited ("Equity Trading")[6] had access to a vast amount of information about BLMIS that was not available to the public. *See* Complaint, Adv. Pro. No. 10-04457 (hereinafter referred to as "BNP-Equity Compl.") (¶ 41.) The account statements and trade confirmations received from BLMIS showed that BLMIS was likely a fraud, but Equity Trading ignored these indicia of fraud and/or irregular trading. (*Id.*)

For example, Madoff claimed his options transactions took place on the Chicago Board Options Exchange (the "CBOE"). Yet, on many occasions, the purported options trading in Equity Trading's account (the "Equity Trading Account") exceeded the total daily reported volume of comparable options contracts traded on the CBOE. (*Id.* ¶ 42.) In fact, forty-three percent of all options trades in the Equity Trading Account could not have occurred. (*Id.*) If Equity Trading had performed minimal due diligence and simply checked the number of listed options in the Equity Trading Account against the number of the same options actually traded on the CBOE, it would have been abundantly clear that Madoff's trading strategy was impossible due to market volume alone. (*Id.* ¶¶ 42-43.) Equity Trading also ignored the inordinately high percentage of purported options transactions in its account that did not comply with standard trading practices, settling in a time frame outside of industry norms. (*Id.* ¶ 45.)

Equity Trading was aware of other aberrations. For instance, on six separate occasions covering seven days, the Equity Trading Account had a negative cash balance with BLMIS. (*Id.* ¶ 48.) In other words, transactions occurred in the Equity Trading Account *even* when the cash necessary to execute those transactions was not available. (*Id.*) Equity Trading did not have a margin agreement or an interest charge. No legitimate financial institution could have or would

---

[6] Defendant Equity Trading Fund, Ltd ("ETF") was a shareholder in Equity Trading, and upon information and belief, was the beneficial owner and creator of Equity Trading. *See* BNP-Equity Compl. ¶ 12.

6

have advanced the amount of money necessary to cover these negative balances without either of
these mechanisms in place. (*Id.*) Moreover, BLMIS forfeited literally millions of dollars of
interest on these extensions of credit. (*Id.*) This unusual fee structure did not go unnoticed by
other investment professionals and was at the very least aberrational when compared to the fees
charged by most non-BLMIS investment funds. However, in keeping with its *modus operandi*,
Equity Trading did not ask questions. Rather, Equity Trading deliberately ignored the glaring
indicia of fraud to unjustly benefit from its relationship with BLMIS. (*Id.*)

## BACKGROUND

### A.     Commencement of the SIPA Liquidation

Having adjudicated various Madoff liquidation matters, this Court's familiarity with the
background of this matter is presumed.

### B.     SIPA Authorizes the Trustee to Pursue Avoidance Actions

SIPA § 78fff(b) grants the Trustee authority to conduct a SIPA liquidation proceeding "in
accordance with, and as though it were being conducted under chapters 1, 3, and 5 and
subchapters I and II of chapter 7 of title 11." SIPA § 78fff(b); *In re Bernard L. Madoff Inv. Sec.
LLC*, 654 F.3d 229, 231 (2d Cir. 2011) (the "*Second Circuit Net Equity Decision*") ("Pursuant to
SIPA, Mr. Picard has the general powers of a bankruptcy trustee, as well as additional duties,
specified by the Act, related to recovering and distributing customer property.") (citing SIPA §
78fff-1). SIPA § 78fff-1(b) expressly incorporates the Bankruptcy Code and authorizes a SIPA
Trustee to recover any fraudulent transfers, including those to customers. SIPA § 78fff-1(b);
*Second Circuit Net Equity Decision*, 654 F.3d at 242 n.10 ("SIPA and the Code intersect to . . .
grant a SIPA trustee the power to avoid fraudulent transfers for the benefit of customers.")
(quoting *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Bernard L. Madoff Inv.
Sec. LLC)*, 424 B.R. 122, 136 (Bankr. S.D.N.Y. 2010) (the "*Net Equity Decision*").

7

C.    **The Trustee's Avoidance Actions Against The Movants**

The Trustee's complaints in the BNP-Oreades and BNP-Equity Actions allege various

causes of action, all of which are "core" matters arising under the Bankruptcy Code or the New

York Fraudulent Conveyance Act (New York Debtor and Creditor Law § 270 *et seq.* (McKinney

2001) ("DCL")). *See* Warshavsky Decl. Ex. 1. Specifically, the Trustee seeks to avoid certain

transfers as (i) actual fraudulent transfers under Bankruptcy Code sections 548(a)(1)(A), 550(a),

and 551 and the DCL; (ii) constructive fraudulent transfers under Bankruptcy Code sections 544,

548(a)(1)(B), 550(a), and 551 and the DCL; and (iii) preferential transfers under sections 547(b),

550 and 551.    As a natural extension of his bankruptcy claims, the Trustee also seeks the

disgorgement of all Customer Property by which Movants were unjustly enriched, wrongly

converted, and currently hold.

**ARGUMENT**

I.    **THE MOVANTS' MOTIONS TO WITHDRAW THE AVOIDANCE ACTION
CANNOT MEET THE REQUIREMENTS FOR MANDATORY WITHDRAWAL**

The Movants contend that this Court must withdraw the reference pursuant to section

157(d), but do not and cannot demonstrate any of the exceptional circumstances required for

mandatory withdrawal. Rather, the BNP-Oreades and BNP-Equity Actions require nothing more

than adjudication of core avoidance and recovery actions under the Bankruptcy Code to recover

Customer Property. In pursuing these bankruptcy claims against the Movants, the Trustee is not

violating SIPA.[7] Rather, SIPA expressly authorizes the Trustee to avoid and recover transfers

that are void and voidable pursuant to title 11. There is no exception in SIPA that precludes

---

[7] *See* Background, Section B *supra*. The Second Circuit noted "[a] SIPA liquidation is a hybrid
proceeding" and that a SIPA trustee is conferred with the general powers of a bankruptcy trustee,
as well as additional duties, including the ability to pursue fraudulent transfer actions on behalf
of customers. *Second Circuit Net Equity Decision*, 654 F.3d at 231, 242 n. 10.

8

avoidance of transfers to customers; to the contrary, the recovery of transfers "to or on behalf of customers" is expressly contemplated in SIPA § 78fff-2(c)(3) and one of the main purposes of SIPA is to distribute Customer Property.

The Second Circuit recently confirmed that a SIPA trustee is conferred with the ability to pursue fraudulent transfer actions on behalf of customers. *Second Circuit Net Equity Decision,* 654 F.3d at 231, 242 n. 10. In fact, courts uniformly have held that a trustee may sue customers in SIPA cases for fraudulent transfers. *See, e.g., Picard v. Taylor (In re Park South Sec., LLC)*, 326 B.R. 505, 512-13 (Bankr. S.D.N.Y. 2005) (holding that the trustee had standing to bring fraudulent transfer claims against customers); *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 496 (S.D.N.Y. 2001) (affirming bankruptcy court's judgment that fraudulent transfers to customers were avoidable); *see also SIPC v. S.J. Salmon*, No. 72 Civ. 560, 1973 U. S. Dist. LEXIS 15606, at *31 (S.D.N.Y. Aug. 8, 1973) ("SIPA was not intended to make the fraudulent transfer provisions of the Bankruptcy Act inoperative as to stockbroker-debtors in SIPA proceedings."). In fact, the Trustee is pursuing his avoidance claims so that the salutary purposes of the statute may be affected. *See Second Circuit Net Equity Decision*, 654 F.3d at 242 n. 10. (Second Circuit noting that "in the context of this Ponzi scheme – the Net Investment Method is nonetheless more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud, *see* 11 U.S.C. § 548(a)(1)(A), and 'avoid[s] placing some claims unfairly ahead of others,' *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 463 (Bankr. S.D.N.Y. 2001)."). None of these issues, however, require withdrawal of the reference as there is no conflict between title 11 and other federal non-bankruptcy laws. They merely require the application of such laws.

9

## A.    Section 157(d) Has Been Narrowly Construed in the Second Circuit

The scope of bankruptcy jurisdiction over all matters affecting a debtor and its property is broadly construed. *Shugrue v. Airline Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 994 (2d Cir. 1990). All cases and proceedings arising under, arising in, or related to a bankruptcy case, including SIPA liquidations, are automatically referred to the bankruptcy court. *See* 28 U.S.C. § 157(a). For the bankruptcy court to proceed efficiently and within the bounds of its broad grant of jurisdiction, the reference to the bankruptcy court may be withdrawn only in limited circumstances, as provided in section 157(d) of title 28. *In re Ionosphere Clubs, Inc.*, 922 F.2d at 993. The Second Circuit has consistently held that section 157(d) must be "construed narrowly," *see, e.g., id.* at 995, and is not to be used as an "escape hatch through which most bankruptcy matters [could] be removed to a district court." *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 343 B.R. 63, 66 (S.D.N.Y. 2006) (quoting *Carter Day Indust., Inc. v. EPA (In re Combustion Equip. Assoc.)*, 67 B.R. 709, 711 (S.D.N.Y. 1986)) (internal quotation omitted). A narrow reading of the mandatory withdrawal provisions is necessary so as not to "eviscerate much of the work of the bankruptcy courts." *Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 185 B.R. 680, 683 (S.D.N.Y. 1995).

Mandatory withdrawal "is not available merely because non-Bankruptcy Code federal statutes will be considered in the bankruptcy court proceeding." *In re Ionosphere Clubs, Inc.*, 922 F.2d at 995. Rather, as the Second Circuit has held, mandatory withdrawal "is reserved for cases where *substantial and material consideration* of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." *Id.* at 995 (emphasis added). "Substantial and material consideration" requires a bankruptcy judge to "engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes." *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991); *Enron Corp. v. J.P. Morgan Sec. (In*

10

*re Enron Corp.*), 388 B.R. 131, 136 (S.D.N.Y. 2008). Indeed, the "substantial and material

consideration" standard excludes from mandatory withdrawal those cases that involve only the

routine application of non-title 11 federal statutes to a particular set of facts. *See In re Johns-*

*Manville Corp.*, 63 B.R. 600, 602 (S.D.N.Y. 1986).

The Movants cannot meet the standard for withdrawal of the reference to resolve the

Trustee's claims because no material interpretation of non-bankruptcy federal statutes is required

to resolve the issues at hand, nor is there any potential conflict between the Bankruptcy Code and

other non-bankruptcy federal statutes. On its face, SIPA mandates removal to the bankruptcy

court in the first instance. SIPA is routinely interpreted by bankruptcy courts, as it was originally

derived from a bankruptcy statute and specifically incorporates the Bankruptcy Code. The

Movants' allegation that SIPA cannot be analyzed and applied by the bankruptcy court is simply

wrong, as evidenced by, *inter alia*, the *Net Equity Decision* and the Second Circuit's affirmance

thereof.

**B.    Interpretation of Section 546(e) of the Bankruptcy Code Does Not Warrant
       Mandatory Withdrawal**

The Movants assert that the Court should withdraw the reference because the Trustee and

SIPC are interpreting Bankruptcy Code section 546(e) in a manner that conflicts with SIPA. *See*

BNP-Oreades Motion at 8-11; BNP-Equity Motion at 8-11. However, withdrawal of the

reference is not appropriate as to this issue because its resolution involves only straightforward

application and interpretation of Bankruptcy Code provisions.[8]    This issue presents no

---

[8] The Trustee continues to preserve and assert his position that the mere invocation of
Bankruptcy Code section 546(e) by defendants, such as the Movants here, does not provide a
proper basis for mandatory withdrawal of the reference. Likewise, the Trustee reasserts his
position that the same section of the Bankruptcy Code is inapplicable here, notwithstanding this
Court's ruling in *Picard v. Katz*, 2011 WL 4448638 at *2-3 (S.D.N.Y. Sept. 27, 2011). No other
court has found that section 546(e) provides a basis for mandatory withdrawal of the reference
under 28 U.S.C. § 157(d) , *see In re Extended Stay, Inc.*, 2011 WL 5532258, at *7, or that section

11

interpretive or complicated issues of first impression under non-title 11 federal laws, nor do the
Movants try to assert one.

More importantly, the plain language of Bankruptcy Code section 546(e) provides that
safe harbor protections do not apply to recovery actions against subsequent transferees, like those
against the Subsequent Transferee Defendants here, under Bankruptcy Code section 550. In fact,
this Court recently recognized that section 546(e) does not address recovery under section
550(a). *See* Opinion and Order, *Picard v. Katz*, 11 Civ. 03605 (JSR) (S.D.N.Y. Jan. 17, 2012) at
13 (reinstating the Trustee's count seeking recovery from subsequent transferees under
Bankruptcy Code section 550(a) notwithstanding the application of section 546(e)). Section
546(e) does not limit the Trustee's ability to *recover* subsequent transfers under section 550. Just
as Congress declined to include section 550 within the ambit of the safe harbors of section
546(e), so too should this Court decline the Subsequent Transferee Defendants' invitation to
legislate and re-write the law to their liking. To do as the Subsequent Transferee Defendants
request would contradict the clear language of the Bankruptcy Code and grant subsequent
transferees defenses Congress never directed or intended. At bottom, the Trustee's power to
seek recovery of subsequent transfers from the Subsequent Transferee Defendants via section
550 can in no way be limited by section 546(e).

---

546(e) is properly extended to fictional transactions pursuant to a Ponzi scheme. *See, e.g.*, *See
Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 819 (9th Cir. 2008); *Kipperman v. Circle Trust
F.B.O. (In re Grafton Partners)*, 321 B.R. 527, 541 (9th Cir. BAP 2005) (applying section 546(e)
to payments made in connection with a Ponzi scheme "would amount to an absurd contradiction
of the securities laws"); *Wider v. Wooton*, 907 F.2d 570, 573 (5th Cir. 1990) (rejecting
application of section 546(e) defense in a Ponzi scheme context so as not to "implicitly authorize
fraudulent business practices through an unjustified extension of the stockbroker defense");
*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 2011 WL 3897970, at *12 (S.D.N.Y.
Aug. 31, 2011); *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 116-17 (Bankr. S.D.N.Y.
2011).

As for the Equity Trading Defendants, they are not innocent bystanders to Madoff's Ponzi scheme, and thus the application of 546(e) is at least a question of fact—not a question of law. The Equity Trading Defendants, given their high level of financial sophistication, cannot credibly maintain that they were unaware of the numerous red flags contrary to industry standards, including questions about Madoff's reported options volume, positive returns that were suspiciously consistent for too many years, and discrepancies in the time between trade dates and settlement dates as reflected on trade confirmations. There are other indicia of fraud noted in the complaint, but these alone demonstrate that the Equity Trading Defendants received fraudulent transfers of Customer Property—other people's money—in the face of various indicia that BLMIS was not engaged in legitimate securities trading and show that the Equity Trading Defendants cannot assert that there is not, at the very least, a factual issue as to whether they could have reasonably believed that BLMIS was engaged in legitimate trading activity.

Moreover, in a recent case in this district, the Court found that the application of an affirmative defense under section 546(e) did not warrant mandatory withdrawal of the reference. *In re Extended Stay, Inc.*, 2011 WL 5532258, at *7. In particular, the *In re Extended Stay* court noted that the issue of whether or not section 546(e) of the Bankruptcy Code precluded certain claims under the Fair Debt Collections Practices Act or certain securities laws could not overcome "the 'narrow' scope this Circuit gives to mandatory withdrawal under section 157(d)" because the movants failed to point to any federal statute requiring "significant interpretation" rather than mere application to a particular set of facts. *Id.* (citations omitted).

Finally, the Movants urge that the "securities laws" must be considered in connection with the application of section 546(e). Yet, the Movants have not pointed to a single securities law at issue. In fact, in support of their argument, the Movants cited to no statute other than

13

Bankruptcy Code section 546(e), which *explicitly refers* to definitions in the Bankruptcy Code itself. *See* BNP-Oreades Motion at 9; BNP-Equity Motion at 9. Simply put—and as demonstrated in the Movants' initial papers—no additional law needs to be interpreted outside of the Bankruptcy Code. As such, the determination of whether and how Bankruptcy Code section 546(e) should be applied requires only simple interpretation and application of the Bankruptcy Code. Accordingly, mere application of title 11 is not a basis for mandatory withdrawal of the reference to the bankruptcy court pursuant to 28 U.S.C. § 157(d).

## C.    *Stern v. Marshall* **Does Not Require or Otherwise Warrant Withdrawal**

The Movants attempt to argue that the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011) is cause for withdrawal. In their Motions, the Movants strain to draw a parallel between the Trustee's traditional avoidance action under the Bankruptcy Code and the counterclaim addressed by the *Stern* Court. The Movants argue that the bankruptcy court here would somehow be limited and could not issue a final judgment in either the BNP-Oreades or BNP-Equity Actions. *See* BNP-Oreades Motion at 11-12; BNP-Equity Motion at 11-12. Not so. The Movants wildly misconstrue *Stern*'s "narrow" ruling which makes clear that it does not "meaningfully change[ ] the division of labor" between bankruptcy courts and district courts. *Stern*, 131 S. Ct. at 2620.

*Stern* did not involve straightforward bankruptcy law claims for avoidance and recovery of fraudulent transfers, but instead concerned a creditor's claim for defamation and a state law counterclaim by the debtor for tortious interference. *Stern* did not interpret 28 U.S.C. §§ 157(b)(2)(F) or 157(b)(2)(H), which identify as core proceedings those that "determine, avoid or recover" preferences and fraudulent conveyances.

The Movants' efforts to relate these two completely distinct matters fail. *Stern* neither holds nor even suggests that actions seeking to avoid and recover fraudulent transfers are not

14

properly the province of and rightly decided by non-Article III judges. As recently recognized by this district:

> *Stern* is replete with language emphasizing that the ruling should be limited to the unique circumstances of that case, and the ruling does not remove from the bankruptcy court its jurisdiction over matters directly related to the estate that can be finally decided in connection with restructuring debtor and creditor relations. . . .

*In re Salander O'Reilly Galleries*, 453 B.R. 106, 115-16 (Bankr. S.D.N.Y. 2011). *See, e.g., Stern*, 131 S. Ct. at 2611 ("Here Vickie's claim is a state law action independent of the federal bankruptcy law"); *id.* at 2620 ("We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute . . . the question presented here is a 'narrow' one"); *Kirschner v. Agoglia (In re Refco Inc.)*, 461 B.R. 181 (Bankr. S.D.N.Y. 2011) ("Clearly several of [the Court's] rationales argue that *Stern* does not preclude the bankruptcy court from issuing a final judgment on a fraudulent transfer claim."). Indeed, courts considering *Stern* have routinely declined to give it the expansive scope that the Movants request.[9]

In contrast to the state law tortious interference counterclaim at issue in *Stern*, the Trustee

---

[9] *See In re Safety Harbor Resort & Spa*, 456 B.R. 703, 717 (Bankr. M.D. Fla. 2011) (finding that a bankruptcy court has jurisdiction to hear fraudulent transfer claims and "that nothing has changed" as a result of *Stern*); *In re Custom Contractors, LLC*, 2011 WL 6046397, at *6 (Bankr. S.D. Fla. Dec. 5, 2011) (This Court's job is [to apply *Stern*'s holding,] not to extend *Stern*) to fraudulent transfer actions based on Supreme Court *dicta*, and in so doing, upend the division of labor between district and bankruptcy courts that has been in effect for nearly thirty years."); *In re Extended Stay, Inc.*, 2011 WL 5532258, at *6 ("Withdrawing the reference simply due to the uncertainty caused by *Stern* is a drastic remedy that would hamper judicial efficiency on the basis of a narrow defect in the current statutory regime identified by *Stern*."); *Field v. Lindell (In re The Mortgage Store, Inc.)*, 2011 WL 5056990, at *6–7 (D. Haw. Oct. 5, 2011) (determining not to withdraw the reference even if *Stern* applied to fraudulent transfer proceeding because "[w]ithdrawal of the reference at this stage would result in this court losing the benefit of the bankruptcy court's experience in both the law and the facts, resulting in an inefficient allocation of judicial resources"). *See also In re Ambac Fin. Grp., Inc.*, 57 B.R. 299, 308 (Bankr. S.D.N.Y. 2011); *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 698 (Bankr. N.D. Ill. 2011); *In re Am. Bus. Fin. Servs., Inc.*, 457 B.R. 314, 319-320 (Bankr. D. Del. 2011).

15

has brought traditional avoidance actions against the Movants that the Bankruptcy Code specifically and exclusively authorizes bankruptcy trustees to pursue under Bankruptcy Code sections 544, 547, 548 and 550. *See, e.g.*, *Walker, Truesdell, Roth & Assocs. v. The Blackstone Group, L.P. (In re Extended Stay, Inc.)*, 2011 WL 5532258, at *7-8 (S.D.N.Y. Nov. 10, 2011); *Kelley v. JPMorgan Chase & Co., et al.,* 2011 WL 4403289, at *6 (D. Minn. Sept. 21, 2011); *Michigan State Hous. Dev. Auth. v. Lehman Brothers*, No. 11 Civ. 3392 (JGK) (S.D.N.Y., Sept. 14, 2011). In short, *Stern* is fairly read as limited to state law counterclaims with no relationship to federal bankruptcy law. *Id*. at 2611.

Despite the narrow holding of *Stern*, the Movants claims the bankruptcy court cannot finally determine fraudulent conveyance and preference claims like those asserted in the Complaints. *See* BNP-Oreades Motion at 11-12; BNP-Equity Motion at 11-12. Such a sweeping interpretation of *Stern* is inconsistent with the decision itself, would deprive district courts of bankruptcy courts' specialized expertise to handle such claims, and would have the practical effect of eliminating bankruptcy courts permanently.

As Chief Justice Roberts observed, the bankruptcy court's specialized expertise was not needed in the adjudication of the common law tort counterclaim addressed in *Stern*. *See Stern,* 131 S. Ct. at 2615 ("The 'experts' in the federal system at resolving common law counterclaims such as Vickie's are the Article III courts, and it is with those courts that her claim must stay."). However, specialized bankruptcy expertise is critical to the efficient administration of fraudulent transfer and preference actions brought under the Bankruptcy Code, especially in this case where the bankruptcy court is administering over 1,000 related cases and thousands of objections.

The importance of this particularized framework utilizing the bankruptcy court's expertise is magnified in a Ponzi scheme case, such as this case, where the majority of the

16

debtor's assets were fraudulently transferred to third parties before BLMIS's bankruptcy, resulting in the transferees receiving money stolen from other investors. As a consequence, the bankruptcy court must manage both the allowance of claims to those who were defrauded as well as recovery of fraudulent transfers in order to pay the allowed claims. This distinctive relationship is succinctly set forth in Judge Drain's *Refco* opinion:

> Since the enactment of the Bankruptcy Code, the management and determination of statutory avoidance claims has been a primary function of the bankruptcy courts. Such claims often play a prominent role in bankruptcy cases, either because of their sheer numbers or because of the effect that the potential avoidance of a transfer, lien, or obligation may have on creditors' recoveries. This is particularly so in cases where most, if not all, of the debtor's estate was transferred to third parties pre-bankruptcy, such as the many Ponzi-scheme driven cases of recent years, requiring a coordinated response overseen by one judge on behalf of a host of creditor-victims. The ability to manage efficiently the investigation and litigation of such claims, and their possible global settlement, decreases if handled on a piecemeal basis by different judges no matter how talented.

*In re Refco Inc.*, 461 B.R. at 188.

Judge Drain emphasizes the necessity of maintaining ties between the avoidance action against the Movants and BLMIS's claims allowance process. The *Refco* decision further makes clear the difference between *Stern's* treatment of a generic state law tort counterclaim, which was "in no way derived from or dependent upon bankruptcy law," but rather was "a state law tort action that exists without regard to any bankruptcy proceeding" (*Stern,* 131 S. Ct. at 2618), and the Trustee's avoidance actions which "flow from a federal statutory scheme" and are "completely dependent upon adjudication of a claim created by federal law." *Id.* at 187 (quoting *Stern,* 131 S. Ct. at 2614) (concluding that bankruptcy courts have constitutional power to issue final judgments in fraudulent transfer actions even where the defendant had not filed a proof of claim in the bankruptcy).

17

Even if the bankruptcy court did not have constitutional authority to finally adjudicate the

Trustee's claims against the Movants, which it does, withdrawal is not warranted based on the

clear mandate set forth in the recently entered Amended Standing Order of Reference, which

provides:

> If a bankruptcy judge or district judge determines that entry of a
> final order or judgment by a bankruptcy judge would not be
> consistent with Article III of the United States Constitution in a
> particular proceeding referred under this order and determined to
> be a core matter, the bankruptcy judge *shall* . . . hear the
> proceeding and submit proposed findings of fact and conclusions
> of law to the district court.

Amended Standing Order of Reference, *In the Matter of Standing Order of Reference Re: Title*

*11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (emphasis added). In light of this directive, a Court

in this district recognized that this "explicit authority to issue proposed findings and conclusions

in connection with core matters that are found to fall within the *Stern* holding[]" dictated

maintaining the reference to the bankruptcy court. *See* Opinion & Order, *Adelphia Recovery*

*Trust v. FLP Group, Inc.*, No. 11 Civ. 06847 (PAC) (S.D.N.Y. Jan. 30, 2012) at 10 (denying a

motion to withdraw the reference predicated on *Stern* and the issue of whether a bankruptcy

court may adjudicate fraudulent transfer claims to final judgment). As such, the bankruptcy

court is required to hear the BNP-Oreades and BNP-Equity Actions pursuant to the Amended

Standing Order of Reference, and if it is later determined that entry of a final judgment by the

bankruptcy court would be inconsistent with Article III, then this Court may treat such judgment

as proposed findings of fact and conclusions of law. *See id.*

### D. Interpretation of the Extraterritoriality of SIPA and the Bankruptcy Code Does Not Warrant Mandatory Withdrawal

Movants also assert that pursuant to the Supreme Court ruling in *Morrison v. Nat'l Austl.*

*Bank Ltd.*, 130 S. Ct. 2869 (2010), withdrawal is required to determine whether SIPA and the

Bankruptcy Code have extraterritorial reach. *See* BNP-Oreades Motion at 17-19; BNP-Equity Motion at 17-19. However, there is no "substantial and material" interpretation of non-bankruptcy federal law in the present case which warrants mandatory withdrawal. Indeed, Movants are asking how *Morrison* applies, if at all, to the Trustee's claims under the Bankruptcy Code.

*Morrison* dealt with the extraterritorial application of the 1934 Exchange Act, and more specifically with Australian nationals who invested in an Australian company, which traded on an Australian exchange. The present case is a SIPA liquidation in the United States based on fraudulent business transactions that took place in New York, involved sophisticated entities—such as Movants—that either invested directly with BLMIS or invested in feeder funds that were largely established for the sole purpose of investing with BLMIS. There is no apparent reason—and certainly no good reason—why the Trustee cannot recover the initial or subsequent transfers of fraudulent and/or preferential transfers of Customer Property to Movants simply because Movants are incorporated outside the United States.

Movants also wrongly assert that SIPA expresses no clear indication of extraterritorial application and that this is an issue requiring mandatory withdrawal. *See* BNP-Oreades Motion at 17-18; BNP-Equity Motion at 17-18. SIPA specifically and expressly incorporates the Bankruptcy Code, making applicable almost all of the liquidation provisions that apply to ordinary bankruptcy liquidations. And those provisions, which include the power to avoid and recover fraudulent transfers and preferences, may be applied both in the United States and beyond. *See Picard v. Chais*, 440 B.R. 274, 281 (Bankr. S.D.N.Y. 2010) (stating "[t]he United States has a strong interest in applying the provisions of the Bankruptcy Code" and holding that the exercise of personal jurisdiction over a foreign defendant was reasonable since the Trustee's

claims arise under U.S. bankruptcy laws and are brought on behalf of all creditors and customers in this SIPA proceeding).

In fact, both the plain language and congressional intent underlying the Bankruptcy Code make it clear that the Code does in fact have clear and unmistakable extraterritorial application. While drafting the Bankruptcy Code, Congress expressly recognized that a debtor's assets and interests would sometimes lie outside of the United States. Indeed, section 541(a) of the Bankruptcy Code explicitly states that the commencement of a bankruptcy case creates an estate comprised of property "wherever located and by whomever held," 11 U.S.C. § 541(a) (emphasis added).

Section 541(a) echoes the worldwide jurisdictional language of 28 U.S.C. § 1334(e)(1), which states that "the district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." *See Deak & Co., Inc. v. Jr. R.M.P. Soedjono (In re Deak & Co., Inc.)*, 63 B.R. 422, 427 (Bankr. S.D.N.Y. 1986) ("Congress inserted this language to 'make clear that a trustee in bankruptcy is vested with the title of the bankrupt in property which is located without, as well as within, the United States.'"); *In re Rajapakse*, 346 B.R. 233 (Bankr. N.D. Ga. 2005); *Diaz-Barba v. Kismet Acquisition, LLC*, 2010 WL 2079738, at *10 (S.D. Cal. May 20, 2010) (noting the court may exercise jurisdiction over all property of the bankrupt estate, even if located outside the United States, because the provisions of the Code as they relate to property of the estate apply extraterritorially). *See also French v. Liebmann (In re French)*, 440 F.3d 145, 152 (4th Cir. 2005) (holding that since section 548 allows the avoidance of transfers of the debtor in property "wherever located," the presumption against

20

extraterritoriality did not prevent the use of the court's avoidance powers).[10] The Trustee has the right, ability and fiduciary obligation to pursue property of the estate, wherever it is located, including from Movants.

Movants' *Morrison* argument ignores the two-sided process involved in bankruptcy and SIPA proceedings. In effect, Movants argue the Bankruptcy Code's avoidance and recovery provisions cannot be applied to Movants simply because they are based outside the United States. If this Court accepts Movants' argument, the result would be that no foreign national could make a claim in a bankruptcy or SIPA proceeding pending in the United States. Such an absurd result was never intended by Congress nor has it ever been countenanced by a court in this country.

In short, Movants' *Morrison* argument fails to provide any justification for mandatory withdrawal of the reference. Bankruptcy courts are called upon by the Bankruptcy Code to hear and determine cases seeking the recovery of property wherever it is found. Movants' foreign status is nothing unique. The bankruptcy court is fully empowered to hear these cases and there is no material and substantial issue of federal non-bankruptcy law requiring the withdrawal of the reference. As a result, under *Morrison*, there is no basis for mandatory withdrawal.

## E.    Substantial Consideration of SLUSA Is Neither Required Nor Applicable in the Avoidance Actions

Movants also argue that mandatory withdrawal is necessary because the BNP-Oreades

---

[10] Case law also demonstrates that the automatic stay under section 362 of the Code, which is one of the fundamental debtor protections provided by bankruptcy laws, applies extraterritorially. *Nakash v. Zur (In re Nakash)*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) (finding that the stay exists to protect the estate from "a chaotic and uncontrolled scramble for the Debtor's assets in a variety of uncoordinated proceedings in different courts."); *Picard v. Maxam Absolute Return Fund, L.P. (In re Bernard L. Madoff Inv. Sec. LLC)*, 460 B.R. 106, 114 (Bankr. S.D.N.Y. 2011) (finding "that based upon the applicable Code sections, other indicia of congressional intent and case law in this district, the automatic stay applies extraterritorially.") (quoting *In re Nakash*, 190 B.R. at 768)).

21

and BNP-Equity Actions involve "significant interpretation" of federal securities law, including

the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). *See* BNP-Oreades Motion

at 14-17; BNP-Equity Motion at 14-17. This argument is a gross exaggeration and

misrepresentation. Despite Movants' contentions, SLUSA simply does not preclude the

Trustee's common law claims here and has no applicability. The determination of whether or

not SLUSA applies does not rise to a "substantial" level of consideration compelling mandatory

withdrawal.

SLUSA was enacted in 1998 to prevent claims based on state securities laws from

circumventing the strict pleading requirements of the federal securities laws set forth in the

PSLRA. *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 234 (S.D.N.Y. 2007). SLUSA requires the

dismissal of: (i) a "covered class action"; (ii) based on state law; and (iii) alleging "an untrue

statement or omission of a material fact in connection with the purchase or sale of a covered

security" or that "the defendant used or employed any manipulative or deceptive device or

contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p; *see*

*also LaSala*, 510 F. Supp. 2d at 234.

The plain language of SLUSA, as well as all salient case law, dictates that SLUSA has no

bearing on the Trustee's actions against Movants. First, neither the BNP-Oreades Action nor the

BNP-Equity Action is a "covered class action" under SLUSA.[11] Second, that more than 50

---

[11] SLUSA, itself states that:

> a corporation, investment company, pension plan, partnership, or other entity,
> shall be treated as one person or prospective class member, but only if the entity is
> not established for the purpose of participating in the action.

15 U.S.C. § 78bb(f)(5)(D) (emphasis added). Both the plain language and legislative history of
SLUSA confirm the Trustee is an "entity" exempt from the preemptive reach of the statute. *Lee
v. Marsh & McLennan Cos., Inc.*, No. 06 Civ. 6523, 2007 WL 704033, at *4 (S.D.N.Y. March 7,
2007) (citing *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1008 (9th Cir. 2005)); S. Rep. 105-

22

persons may receive distributions of Customer Property does not transform the BNP-Oreades or BNP-Equity Actions into covered class actions.[12] Finally, the allegations made against Movants are not preempted by SLUSA because they are not based on untrue statements or omissions of material fact in connection with the purchase of covered securities. The Trustee's allegations are instead based on Movants' receipt of Customer Property as a result of fraudulent and/or preferential transfers. As such, SLUSA is inapplicable.

The minimal analysis—if any—of SLUSA required by Movants' assertions presents neither a conflict with the Bankruptcy Code nor a novel issue of first impression. There is no conflict between SLUSA and the Bankruptcy Code. Movants do not and cannot point to a "conflict" between SLUSA and title 11, nor do they point to anything requiring "interpretation" of SLUSA.

### F. Unjust Enrichment, Conversion, and Money Had and Received Are New York State Law Claims That Do Not Warrant Mandatory Withdrawal

Movants also argue that the action should be withdrawn because the BNP-Oreades Action involves three common law claims, including unjust enrichment, conversion, and money had and received, and the BNP-Equity Action involves the common law claim of money had and

---

182, 1998 WL 226714 at *7 (May 4, 1998) (explaining preclusion of a trustee's claims pursuant to SLUSA "could potentially deprive many bankruptcy trustees of the ability to pursue state-law securities fraud claims on behalf of an estate. Nothing in SLUSA suggests that Congress intended to work such a radical change in the bankruptcy laws").

[12] The fact that the Trustee's efforts will ultimately benefit the many customers of BLMIS does not transform the Trustee's efforts on behalf of BLMIS into a class action on behalf of BLMIS's customers. BLMIS's SIPA liquidation was not designated for the sole purpose of initiating litigation: the Trustee has been involved in liquidating the BLMIS estate determining over 16,000 customer claims, bringing more than 1,000 other actions, resolving many thousands of claims for billions of dollars, and administering the allocation of Customer Property among the customers and, ultimately, the general creditors of the consolidated BLMIS estate. As such, the Trustee is not an "entity" and the BNP-Oreades and BNP-Equity Actions are not class actions "on behalf of more than 50 people."

23

received. *See* BNP-Oreades Motion at 12-14; BNP-Equity Motion at 12-14. However, withdrawal is not necessitated here because these claims are all state law claims, which will not "require[] consideration," much less "substantial and material consideration" of non-bankruptcy **federal** statutes. 28 U.S.C. § 157(d); *In re Ionosphere Clubs, Inc.*, 922 F.2d at 995.

In Count Six of the BNP-Oreades Compl., the Trustee alleges that the BNP Paribas Entities were unjustly enriched at the expense of BLMIS customers. ( ¶¶ 115-119.) The BNP Paribas Entities received millions of dollars of other people's money from BLMIS that rightfully belongs to BLMIS customers. (*Id.*). These allegations do not involve federal statutory violations and are sufficient to state a claim for unjust enrichment. *See Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distribs., Inc.)*, 387 B.R. 365, 412-13 (Bankr. E.D.N.Y. 2008) (analyzing a New York common law unjust enrichment claim).

In Count Seven of the BNP-Oreades Compl., the Trustee alleges that the BNP Paribas Entities converted funds in which the customers had a possessory interest. (*Id.* ¶¶ 120-123). The BNP Paribas Entities exercised dominion and control over those funds, in a manner inconsistent with BLMIS customers' rights, when they continued to allow Madoff to use their services and BLMIS customers' money to fund the Ponzi scheme. (*Id.*) These allegations state a claim for conversion under New York law and do not involve violations of federal statutes. *See Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 327–28 (Bankr. S.D.N.Y. 1999) (analyzing a conversion claim under New York state law).

In Count Eight of the BNP-Oreades Compl., the Trustee alleges the BNP Paribas Entities are currently in possession of Customer Property that they have no lawful or equitable right to, having obtained the monies through fraudulent means. (*Id.* ¶¶ 124-126). In Count Ten of the BNP-Equity Compl., the Trustee makes similar allegations as to all defendants named. (¶¶165-

24

167.)  These allegations state a claim for money had and received under New York law and do not involve violations of federal statutes. *See In re Allou Distribs., Inc.*, 387 B.R. at 412-13 (analyzing a money had and received claim under New York state law).  Thus, there is no basis for mandatory withdrawal of the reference.

## II.   THE MOVANTS HAVE FAILED TO DEMONSTRATE CAUSE FOR PERMISSIVE WITHDRAWAL

This Court may permissively withdraw the reference to bankruptcy court pursuant to section 157(d), but the Movants must show "cause" for such withdrawal.  To determine whether such "cause" exists, this Court must first evaluate whether the claim is core or non-core, and then "weigh questions of efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors." *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993).  Movants bear the burden of proving "cause" to warrant withdrawal. *See In re Ames Dep't Stores*, 1991 WL 259036, at *2 (S.D.N.Y. Nov. 25, 1991).

Movants have failed to meet their burden.  Their argument that withdrawal of the reference will promote judicial efficiency, prevent delay, and/or limit cost to the parties is completely bare, contained in a footnote, and based primarily on the assertion that the *Stern* case will result in protracted motion practice concerning the bankruptcy court's authority to enter final judgments. *See* BNP-Oreades Motion at 12, n.5; BNP-Equity Motion at 12, n.7.  None of the *Orion* factors warrant withdrawal.

### A.   The Trustee's Claims Are Core and/or Are "Related to" Core Claims

The Trustee's bankruptcy claims against the Movants are core pursuant to section 157.  A proceeding may be core if it is "unique to or uniquely affected by the bankruptcy proceedings" or "directly affect[s] a core bankruptcy function." *U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot.*

*and Indem. Ass'n., (In re U.S. Lines, Inc.)*, 197 F.3d 631, 637 (2d Cir. 1999). In enacting section

157, Congress intended core proceedings to be interpreted broadly and that "95 percent of the

proceedings brought before bankruptcy judges would be core proceedings." *In re Ben Cooper,*

*Inc.*, 896 F.2d 1394, 1398 (2d Cir. 1990). A finding that claims are core "weighs against

permissive withdrawal." *In re Leslie Fay Cos., Inc. v. Falbaum*, 1997 WL 555607, at *2

(S.D.N.Y. Sep. 4, 1997).

Here, the Trustee's bankruptcy claims against Movants are brought pursuant to 11 U.S.C.

§§ 544, 547, 548 and 550 and therefore "arise under" title 11.[13] While Movants may insist

otherwise, avoidance and recovery actions are core claims according to the non-exhaustive list of

core proceedings set forth in sections 157(b)(2)(F) and (b)(2)(H) of the Bankruptcy Code. *See*

28 U.S.C. §§ 157(b)(2)(F) (defining core matters to include "proceedings to determine, avoid, or

recover preferences.") and 157(b)(2)(H) (defining core matters to include "proceedings to

determine, avoid, or recover fraudulent conveyances").

### 1.    The Three State Law Claims Brought by the Trustee Are Core Because They Are Inextricably Tied to the Bankruptcy Claims

Likewise, the Trustee's state law claims for unjust enrichment, conversion, and money

had and received, affect the bankruptcy estate and fall within the definition of core proceedings

under the Bankruptcy Code. *See* 28 U.S.C. §§157(b)(2)(A) and (E) ("matters concerning the

administration of the estate" and "orders to turn over property of the estate" are deemed core

proceedings). The Trustee's state law claims are intertwined with his bankruptcy law claims and

may be routinely handled by the bankruptcy court.

As the Second Circuit has emphasized, "bankruptcy courts are not precluded from

adjudicating state-law claims when such claims are at the heart of the administration of the

---

[13] *See* Exhibit 1.

bankrupt estate." *In re Ben Cooper, Inc.*, 896 F.2d at 1399. *See also In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 99 (2d Cir. 2005) (quoting *Cent. Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 191 (2d Cir. 2003). The Trustee's common law claims are embedded in his core bankruptcy claims and seek to impose a remedy to recover certain transfers of Customer Property for the benefit of BLMIS's customers as established under federal bankruptcy law.[14] These causes of action clearly should remain in the bankruptcy court.

### 2.    The Bankruptcy Court May Preside Over Non-Core Claims Related to Underlying Action

Even if this Court finds the state law claims do "not fall within the statute's definitional ambit of 'core' under §157(c)," that does not necessarily warrant permissive withdrawal. *See, e.g., In re Fairfield Sentry Ltd.*, 2010 WL 4910119, at *2 (S.D.N.Y. Nov. 22, 2010) (denying motion to withdraw without addressing core/non-core determination, "which is not singularly dispositive" to motion); *Wedtech Corp. v. Banco Popular de Puerto Rico (In re Wedtech Corp.)*, 94 B.R. 293, 295 (S.D.N.Y. 1988) (non-core determination does not end the inquiry and automatically require withdrawal). The bankruptcy court may still exercise non-core jurisdiction during the pre-trial phase if the proceeding "is clearly a matter which is 'otherwise related' to the bankruptcy proceeding." *Enron Power Mktg., Inc. v. City of Santa Clara (In re: Enron Power Mktg.)*, 2003 WL 68036, at *6 (S.D.N.Y. Jan. 8, 2003) (quoting *Keene Corp. v. Williams Bailey*

---

[14] In other words, the Trustee's common law claims could not have been brought if not for the subsequent transfers made avoidable by the federal bankruptcy laws. They are "inextricably tied to the creation of the estate in bankruptcy for the benefit of [BLMIS]'s creditors; there would be no cause of action without the federal bankruptcy statutes that authorize it." *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) (affirming bankruptcy court's imposition of constructive trust because retention of the property would result in unjust enrichment to the detriment of the creditors of the estate); *In re Builders Capital and Services, Inc.*, 317 B.R. 603, 609 (Bankr. W.D.N.Y. 2004) (same; bankruptcy court addressing imposition of constructive trust where Ponzi-scheme perpetrator unjustly enriched by the transfers of its customers). *See also In re Neumann Homes, Inc.*, 414 B.R. 383, 388 (ND Ill. 2009) (denied motion to withdraw action that included common law claims such as unjust enrichment, stating that such claims "are all premised upon the underlying action to avoid the preference and fraudulent conveyances.").

& Weisner, L.L.P. (In re Keene Corp.), 182 B.R. 379, 384 n. 3 (S.D.N.Y. 1995)).

Section 157(c)(1) provides that "a bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise *related* to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court [to enter] any final order or judgment. . ." 28 U.S.C. § 157(c)(1) (emphasis added).  Given that the Trustee's common law claims are intertwined with and are legally and factually "related to" the bankruptcy counts in the complaint, the BNP-Oreades and BNP-Equity Actions belong in the bankruptcy court.

### B.    Movants' Motions Are Nothing More Than Blatant Forum Shopping

As previously indicated, one of the important *Orion* factors is the curtailing of possible forum shopping by parties who perceive the bankruptcy court as an unfavorable forum in which to litigate their claims.  This Court previously noted in *Schneider v. Riddick (In re Formica Corp.)* that "courts should employ withdrawal 'judiciously in order to prevent it from becoming just another litigation tactic for parties eager to find a way out of bankruptcy court.'" 305 B.R. 147, 151 (S.D.N.Y. 2004) (quoting *Kenai Corp. v. Nat'l Union Fire Ins. Co. (In re Kenai Corp.)*, 136 B.R. 59, 61 (S.D.N.Y. 1992)); *see also In re Fairfield Sentry Ltd.*, 2010 WL 4910119, at *4 (S.D.N.Y. Nov. 22, 2010) (to "allay" concerns of forum-shopping "'courts in this Circuit have construed section 157(d) narrowly in order to prevent an 'escape hatch' out of bankruptcy court'" (quoting *Enron Power Mktg., Inc. v. Holcim, Inc. (In re Enron Corp.)*, 2004 WL 2149124, at *5 (S.D.N.Y. Sept. 23, 2004)).

### C.    Withdrawal Would Impede Judicial Efficiency and Uniform Administration of the SIPA Bankruptcy Proceeding

The other *Orion* considerations weigh against withdrawal as well.  The bankruptcy court has been administering this SIPA bankruptcy proceeding for over three years.  Judicial economy

would only be promoted by allowing the specialized bankruptcy court, already familiar with the extensive record and proceedings in the BLMIS case, to initially adjudicate these cases. *See In re Wedtech Corp.*, 94 B.R. at 296; *In re Laventhol & Horwath*, 139 B.R. 109, 116 (S.D.N.Y.1992). It is the more efficient and appropriate course, as "[a]llowing the bankruptcy courts to consider complex questions of bankruptcy law before they come to the district court for *de novo* review promotes a more uniform application of bankruptcy law." *In re Extended Stay, Inc.*, 2011 WL 5532258 at *10 (finding that preserving bankruptcy court's ability to determine claims that implicated section 546(e) of the Bankruptcy Code weighed against withdrawal of the reference).

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests the court deny the Motions.

Date: New York, New York
February 21, 2012

/s/ Oren J. Warshavsky
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Oren J. Warshavsky
Email: owarshavsky@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Anat Maytal
Email: amaytal@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*