Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-01789-smb

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   SECURITIES INVESTOR PROTECTION CORPORATION,

6                   Plaintiff,

7           v.

8   BERNARD L. MADOFF INVESTMENT SECURITIES, L.L.C.,

9                   Defendants.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11  Adv. Case No. 10-04292-smb

12  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13  IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

14  MADOFF INVESTMENT SECURITIES LLC,

15                  Plaintiff,

16          v.

17  ROBERT ROMAN,

18                  Defendants.

19  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20

21

22

23

24

25

1               U.S. Bankruptcy Court

2               One Bowling Green

3               New York, NY  10004

4

5               June 29, 2017

6               11:02 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  K. SU

Page 3

1   Hearing re:   08-01789-smb Conference re Form of Order

2   Applying Discovery Arbitrator's Orders to Other Cases

3

4   Hearing re:   08-01789-smb Conference re Madoff Day 2

5   Deposition Topics

6

7   Hearing re:   08-01789-smb Notice of Agenda for Matters

8   Scheduled for Hearing on June 29, 2017

9

10   Hearing re:   10-04292-smb Trustee's Motion to Compel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:   Sonya Ledanski Hyde

Page 4

1   A P P E A R A N C E S :

2

3   MCDERMOTT WILL & EMERY LLP

4        Attorneys for

5        340 Madison Avenue

6        New York, NY 10173

7

8   BY:  MICHAEL R. HUTTENLOCHER

9

10  CHAITMAN LLP

11       Attorneys for

12       465 Park Avenue

13       New York, NY 10022

14

15  BY:  HELEN DAVIS CHAITMAN, ESQ.

16

17  BAKER HOSTETLER

18       Attorneys for the Trustee

19       45 Rockefeller Plaza

20       New York, NY 10111

21

22  BY:  STACEY A. BELL

23       MAXIMILLIAN S. SHIFRIN

24       EDWARD J. JACOBS

25       DAVID J. SHEEHAN

```
 1   DENTONS US LLP

 2         Attorneys for

 3         1221 Avenue of the Americas

 4         New York, NY 10020

 5

 6   BY:  CAROLE NEVILLE

 7

 8   SCHULTE ROTH & ZABEL LLP

 9         Attorneys for Picower Parties

10         919 Third Avenue

11         New York, NY 10022

12

13   BY:  MICHAEL KWON

14

15   HUNTON & WILLIAMS LLP

16         Attorneys for

17         200 Park Avenue

18         New York, NY 10166

19

20   BY:  ROBERT A. RICH

21

22

23

24

25
```

1    ALSO PRESENT TELEPHONICALLY:

2

3    KEVIN H. BELL

4    JAMES H. BURBAGE

5    NICHOLAS J. CREMONA

6    PATRICK MOHAN

7    DAVID J. SHEEHAN

8    CATHERINE E. WOLTERING

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                  P R O C E E D I N G S

2                CLERK:  All rise.  Please be seated.

3                THE COURT:  Good morning again.  Madoff?

4                MR. SHIFRIN:  Which one do you want first, Your

5        Honor?  We've got Roman, we have second day --

6                THE COURT:  Well, what I would do is, let's leave

7        the second day deposition topics for last.  Let's do Roman

8        and then the motion.

9                MR. SHIFRIN:  Thank you, Your Honor.

10               THE COURT:   All right.

11               MR. SHIFRIN:  Good morning, Your Honor.  Max

12       Shifrin on behalf of the Trustee.  We are here on the

13       Trustee's Motion to Compel certain specific communications

14       exchanged between the Defendant, Robert Roman, on the one

15       hand, and Bernard Madoff on the other, which the Defendant

16       is withholding and arguing properly on the basis of the work

17       product privilege.

18               Now, as we state in our papers, Your Honor, our

19       position is simple because the Defendant voluntarily

20       disclosed work product to Bernard L. Madoff, an independent

21       third-party witness with whom the Defendant shares no common

22       interests, he has effectively waived the work product

23       privilege over those materials.  This is consistent and

24       based on straightforward application and Second Circuit

25       precedent, which holds that if a litigant deliberately,

Page 8

1    affirmatively and selectively discloses work product to a

2    third party with whom he does not share common interests,

3    the privilege is waived.  That is exactly what happened

4    here.  And therefore, the Trustee's motion should be

5    granted.

6            THE COURT:  But Roman has cited cases, and I

7    looked at one, Judge Castel's case, which said that if you

8    send an affidavit to a witness and the witness doesn't sign

9    it, it doesn't become disposable work product.

10           MR. SHIFRIN:  Your Honor, we're not challenging

11   the fact or disputing the fact that a draft declaration in

12   and of itself is work product.  However, when that draft

13   declaration is shared with a third-party witness with whom

14   the disclosing party does not share common interests, that's

15   a waiver, and nothing in Judge Castel's opinion says

16   otherwise.

17           The issue in that case, Your Honor, there were

18   basically two propositions that that case stands

19   (indiscernible).  One is that draft declaration is work

20   product, which again, the Trustee does not dispute.  And

21   two, that the filing of final executed declaration does not

22   waive privileged assertions over the drafts.  We don't

23   dispute either of those propositions, and they're just

24   completely inapposite to the issue before the Court, and

25   that is sharing a draft declaration with a third-party

Page 9

```
 1   witness with whom you do not have common interests

 2   constitutes a waiver.

 3           And I think the line of cases that the Trustee

 4   sites from the Second Circuit are all very much applicable

 5   and basically command an answer in the affirmative, Your

 6   Honor -- the Gupta case, the Medinol case, the Ryko case.

 7   And what Defendant is effectively trying to do here is steer

 8   the Court's attention away from that standard to the

 9   underlying work product itself.  And what the cases teach us

10   --

11           THE COURT:  So, any time a lawyer sends a draft

12   statement or declaration to a witness, that become

13   disposable?

14           MR. SHIFRIN:  If there are no common interests

15   between the disclosing party --

16           THE COURT:  I didn't see that limitation in Judge

17   Castel's decision.

18           MR. SHIFRIN:  Your Honor, Judge Castel's decision

19   does not address the operative waiver standard in the Second

20   Circuit.  It's not the case that this Court should be

21   focusing on.  The cases that this Court should be focusing -

22   -

23           THE COURT:  So, you're saying he decided this

24   wrongly?

25           MR. SHIFRIN:  No, no.  I'm saying that case is not
```

Page 10

1    --

2              THE COURT:  You can say that.

3              MR. SHIFRIN:  I don't think he decided it wrongly

4    because he didn't address the issue that's before the Court.

5    In that case, he held that because a final declaration was

6    filed, that didn't wave privilege assertions over the drafts

7    that -- we don't know whether they were shared or not.  But

8    that argument that we're making here, that sharing the draft

9    with a third-party witness is actually it's a waiver, was

10   not addressed by Judge Castel.  So, I have no problems with

11   Judge Castel's opinion.  I'm just saying it's inapposite.

12   The cases -- the operative standard for --

13             THE COURT:  But wait a second.  The issue there

14   was whether or not a lawyer had to disclose two affidavits

15   and other materials exchanged between counsel and two non-

16   party affiants?

17             MR. SHIFRIN:  That's correct.

18             THE COURT:  So how is that different from what

19   happened here?

20             MR. SHIFRIN:  Well, Your Honor, if you look at the

21   opinion and where it says what argument the party that was

22   pursuing the documents was making, their argument was that

23   the draft declarations were discoverable because there was a

24   final that was filed.  We're not making that argument here.

25   They didn't make the argument we're making, and frankly, I

Page 11

1    think they think they made the wrong argument.  And also,

2    Judge Castel, that opinion predates Gupta, and Gupta, I

3    think, does a really good job of cataloguing comprehensively

4    the Second Circuit third-party waiver cases.  And Gupta

5    dealt specifically with a third-party witness.

6            And in that case, as I explained to you last time

7    we were here, Your Honor, the government voluntarily met

8    with an independent third-party witness in anticipation and

9    preparation for a deposition, disclosed a whole bunch of

10   work product, and then attempted to assert the privilege

11   over it.  And Judge Rakoff said no, that's not how it works.

12   If you do not have common interests with the third-party,

13   you can't disclose the work product to them and expect it to

14   be privileged.

15           And the important point I want to make here, Your

16   Honor, because this is the position that Defendant takes, is

17   that it doesn't matter what the underlying work product is.

18   Waiver is waiver, irrespective of the underlying work

19   product.  And the cases that I cite, Your Honor, has some

20   examples of work product that are the type that courts in

21   general are more reluctant to find discoverable as -- you

22   know, attorney mental processes and litigation strategy.

23           But even if what Defendant shared with Bernard

24   Madoff was a memo that said, you know, attorney mental

25   processes concerning litigation strategy, so long as that's

Page 12

1   a waiver, it's waived.  It doesn't matter what it is.  And

2   certainly, a declaration doesn't warrant any specific

3   protection.  And certainly, anything that's being sent to

4   and from Bernard Madoff in prison should not be subject to

5   any privilege whatsoever.  The world has an interest in

6   knowing what exactly Bernard Madoff has to say about the

7   subjects relevant to this litigation.

8           THE COURT:  Well, I'm not sure the world's

9   interested to test.

10          MR. SHIFRIN:  Well, certainly our world does.  And

11  certainly, the parties that are participating in the Madoff

12  deposition do.  Certainly, the Trustee does.  And there's

13  just no interest from the standpoint of --

14          THE COURT:  I thought that there were supposed to

15  be letters in addition to affidavits in this case?

16          MR. SHIFRIN:  That's correct, Your Honor.  So, as

17  far as we know, the communications at issue are letters that

18  the Defendant wrote to Bernard Madoff in prison at the

19  behest of Ms. Chaitman, asking Bernard Madoff to execute the

20  draft declaration.  He presumably revised it, sent revisions

21  back to the Defendant, and as far as we know, based on

22  Defendants deposition testimony, those are the extent of the

23  communications he's had with Bernard Madoff.

24          And importantly, that's the extent of the

25  communications we're targeting here.  We have no interest in

1   Ms. Chaitman's work product.  We have no interest in her

2   mental processes.  All we want are the communications that

3   were exchanged with the critical fact witness in this case

4   from the standpoint of the Defendants and the participating

5   parties who are participating in the Madoff deposition.  I

6   think we're entitled to that.

7            THE COURT:  Ms. Chaitman?

8            MS. CHAITMAN:  Judge, we've cited a long line of

9   cases for the proposition that the drafts of an affidavit or

10  declaration are --

11           THE COURT:  Okay.  But what about the stuff that

12  Madoff is sending back either to Roman or to you?

13           MS. CHAITMAN:  Well, just to put this in context,

14  Your Honor, you may recall that I was not able to

15  communicate with Madoff directly and I did it through Robert

16  Roman, who is --

17           THE COURT:  All right.  Well, let's say he sent it

18  back to you directly.  Let's cut Roman out of this and just

19  assume that you sent him an affidavit and he marks it up and

20  he sends it back, maybe with some comments.  I don't know

21  what happened here, but --

22           MS. CHAITMAN:  Okay.  So, drafts that --

23           THE COURT:  -- so why wouldn't --

24           MS. CHAITMAN:  That clearly falls within the line

25  of cases that we've cited, which is that drafts of

Page 14

1    affidavits are not discoverable.  They're work product, even

2    if they're shared with someone who is not a client.

3          THE COURT:  What about his comments to the

4    affidavit?

5          MS. CHAITMAN:  If they're in -- that's the draft

6    of an affidavit.  That's a draft -- he's exchanging with me

7    a draft of an affidavit.

8          THE COURT:  I understand what you're sending him

9    may be work product.  I'm talking about what he --

10          MS. CHAITMAN:  But if he sends it back to me, then

11    what he's doing is marking up a draft of the affidavit,

12    which is ultimately filed with the court.  And that falls

13    completely within this line of cases.

14          THE COURT:  What about his markings, his

15    handwriting on the affidavit?

16          MS. CHAITMAN:  I think that that falls with --

17    that's a draft of an affidavit.  I --

18          THE COURT:  But that's if he drafted it.  He can't

19    -- he doesn't have a work product privilege.  That's what

20    I'm asking.

21          MS. CHAITMAN:  But it's protected by my work

22    product.  It's as if I had the ability to meet with him and

23    discuss the draft of the affidavit.  Had things been

24    different, I would've had him in my office, I would've

25    discussed the draft, he would've said this has to be changed

Page 15

1    to this, and that's not discoverable.  And the Gupta case is

2    a case dealing with the SEC in an enforcement proceeding

3    where Judge Rakoff was clearly concerned with the government

4    overreaching and taking advantage of its position.  That has

5    no relevance here.

6         And the other thing I would say, Your Honor, is

7    the Trustee has had a number of affidavits prepared in this

8    case.  Mr. Dubinsky prepared an affidavit; Mr. Looby

9    prepared an affidavit.  And if Your Honor is going to rule

10   that drafts of affidavit or comments from the affiant are

11   not protected, then I would simply ask that that will be

12   applied across the board because --

13        THE COURT:  First of all, we're not dealing with

14   that today.  And Dubinsky and the others are experts hired

15   by the Trustee, and certainly, the Trustee can exchange that

16   kind of information with his experts without waiving the

17   third-party -- without waiving the work product privilege.

18   The issue here is that it was sent to a non-party witness,

19   who wasn't an agent or representative of the Trustee.  And

20   that basically, the Trustee, as I remember, sending it to

21   someone like Dubinsky is like the Trustee sending it to

22   someone else in his law office.

23        But look, I'll reserve decision, but I want a

24   privilege log.  It doesn't sound like it's very onerous.

25   I'm particularly interested in what Madoff sent to you and

Page 16

1    if it's something other than affidavits.

2            MS. CHAITMAN:  If I may, Your Honor --

3            THE COURT:  Yep.

4            MS. CHAITMAN:  -- if you recall when we had that

5    ignominious proceeding --

6            THE COURT:  Yes.

7            MS. CHAITMAN:  -- last year where I was accused of

8    falsifying Mr. Madoff's affidavit, I served upon the Court

9    in-camera --

10           THE COURT:  Right.

11           MS. CHAITMAN:  -- two documents which I did not

12   deliver to the Trustee, and I disclosed that in the papers.

13   If you have that, those are the two documents --

14           THE COURT:  I don't have that anymore.  But I also

15   want a log because I want to know if there's anything else.

16           MS. CHAITMAN:  Okay.  That was all --

17           THE COURT:  And I want to know what Madoff sent to

18   you and then I'll look at it and I'll make a determination.

19           MS. CHAITMAN:  Okay.  Okay.

20           THE COURT:  All right.  And I'll reserve decision

21   on the motion.

22           MS. CHAITMAN:  Okay.

23           THE COURT:  Okay.

24           MR. SHIFRIN:  Your Honor, may I briefly raise one

25   other point?

Page 17

1           THE COURT:  Yes.

2           MR. SHIFRIN:  Thank you.  The one thing I want to

3    -- a couple things I want to say, Your Honor.  I apologize.

4    One is that the Ryko case expressly holds that document sent

5    from a third-party witness to an attorney are not work

6    product.

7           THE COURT:  Mm hmm.

8           MR. SHIFRIN:  So, I think that case is squarely on

9    point and really disposes of Ms. Chaitman's argument that

10   somehow anything that Mr. Madoff sent back to Mr. Roman is

11   entitled to the privilege.

12          The other thing, Your Honor, is that there's a way

13   to harmonize the cases that Ms. Chaitman cites and the

14   Second Circuit waiver standard that are reflected in the

15   cases that we cite.  So long as there is a common interest

16   between a disclosing party and a third-party, then

17   communications on draft declarations and the drafts

18   themselves would presumably be protected.

19          THE COURT:  You know, my recollection, though, is

20   work product is a little different from attorney-client

21   privilege, and as long as you are disclosing to someone with

22   an expectation that they're not going to disclose it to

23   anybody else, that may not be a waiver.  So, it's --

24          MR. SHIFRIN:  Your Honor, it's not a, precisely,

25   expectation.  The common interest standard is the standard

Page 18

1    that you're referring to.  So long as there are common

2    interests, then you can expect that the material that you

3    disclose is not going to make its way to an adversary.  But

4    if there are no common interests, what the cases say is that

5    you have no basis to assume that anything you disclose is

6    not going to make its way to --

7                 THE COURT:  Well, that's why I want a privilege

8    log also.  I want to see what Madoff sent to you and what

9    you sent to Madoff.  And I assume it's only a couple of

10   documents, so you can deliver them in-camera, if that's --

11                MS. CHAITMAN:  My recollection is it was two, and

12   I --

13                THE COURT:  All right.

14                MS. CHAITMAN:  -- I will -- I gave --

15                THE COURT:  Well, you have to speak to your

16   client, because it's not just you.  I don't know if your

17   client has anything else.

18                MS. CHAITMAN:  The client sent me everything that

19   --

20                THE COURT:  All right.

21                MS. CHAITMAN:  -- the client had.  But Your Honor,

22   in terms of common interest, of course we're aligned with

23   Madoff.  We're trying to expose what actually happened here,

24   and that is a common interest.

25                THE COURT:  I don't think that's what they mean by

Page 19

1    common interest, but I hear you.  Okay.

2            MR. SHIFRIN:  Thank you, Your Honor.

3            THE COURT:  Why don't we do that order extending

4    Judge Maas's order to the cases, other cases.

5            MR. SHIFRIN:  Okay.

6            MS. CHAITMAN:  If I may, Your Honor --

7            THE COURT:  As I understand it with this one, the

8    real dispute is what is going to trigger timing-wise the

9    obligation to either stipulate or produce, right?

10           MS. CHAITMAN:  Right.  And when we were in court

11   and Your Honor asked me if I would agree that these could

12   apply, it didn't occur to me that the Trustee was going to

13   take the position that -- even where the Trustee had not yet

14   served any discovery.

15           THE COURT:  So, in those cases -- let me break it

16   down into two types of cases.  In those cases, we are --

17   your obligation to respond to whatever the discovery is --

18   I'm assuming the document requests or interrogatories -- has

19   already expired.  That's the same kind of factual situation

20   that was before Judge Maas, right?  In other words, the

21   discovery deadline -- the deadline to respond had expired.

22           MS. CHAITMAN:  Let me just say this, Judge.  There

23   were, I think, seven or eight or nine or 10 cases that were

24   before our Magistrate, Judge Maas.  And his order applied to

25   all of those cases.  The minute we got that order, we

1    voluntarily applied it to all of our other cases that were

2    in the same stage.

3            THE COURT:  Okay.  Well, that's what I'm getting

4    at.  To the extent any of your other cases are encompassed

5    in this order, where the deadline to respond has run --

6            MS. CHAITMAN:  We --

7            THE COURT:  -- then whatever the deadline was that

8    Judge Maas instituted should be the deadline.  With respect

9    to those cases where your obligation to comply with

10   discovery hasn't run, then, you know, I guess either by the

11   day or the deadline, you either have to submit the

12   stipulation or (indiscernible).

13           MS. CHAITMAN:  That's all I'm asking for.

14           THE COURT:  Is there any dispute about that?

15           MR. SHIFRIN:  Excuse me, Your Honor.  I have no

16   dispute with that conceptually.  The language that she

17   suggested in the proposed order does not capture that.  It

18   says considerably more.  That's not an issue of the case

19   management.

20           THE COURT:  Yeah, I know.

21           MR. SHIFRIN:  Okay.

22           THE COURT:  I was just dealing with the timing

23   issue because it struck me that that was the overriding

24   issue.  I know that there are language issues also, and will

25   go through them.

1          MR. SHIFRIN:  Right.  Let me just say, we have no

2    interest --

3          THE COURT:  So, with respect to that issue, if the

4    deadline to respond to the discovery has run, then the

5    timing set forth by Judge Maas applies in those cases.  If

6    the timing hasn't run yet in any of your cases and it starts

7    from the date that the deadline occurs --

8          MR. SHIFRIN:  Right.  We have no interest in

9    forcing Ms. Chaitman to respond sooner than she has to under

10   the rules.  Right?  Okay.

11         THE COURT:  Let me just correct something I said.

12   That by the deadline, she's either got to submit the

13   stipulation in those second category of cases, or provide

14   the discovery, which is what you would have to do anyway.

15         MS. CHAITMAN:  And that's what we've done.

16         THE COURT:  Okay.  Now let's go through the other

17   issues.

18         MS. CHAITMAN:  Do you want to hear from me, Judge?

19         THE COURT:  Well, I'm going through the order.  I

20   have your redline.

21         MS. CHAITMAN:  Okay.  So, in the first ordinal

22   paragraph, I just -- based on what Your Honor had ruled, you

23   had ruled that the discovery and the staging of the

24   depositions of the trading, the former traders, were they --

25   I thought it should apply to everyone who is participating

Page 22

1    in that procedure.

2              THE COURT:  First of all, this order just related

3    to you because we were seeking -- the Trustee was seeking

4    your consent, acquiescence, in applying the schedule to your

5    clients.  So, the first change in the second line should be,

6    it applies to adversary proceedings in which you are

7    representing the Defendant.

8              MS. CHAITMAN:  Okay.

9              THE COURT:  All right.  With respect to the second

10   change, what I said was at the end of Madoff's deposition,

11   we'll review the issue of further discovery and the

12   scheduling.  I didn't say you could take anybody's

13   deposition or not take anybody's deposition.  All I said was

14   we'll review it at the end.

15             MS. CHAITMAN:  Okay.

16             THE COURT:  Okay?

17             MS. CHAITMAN:  Just may I ask you something on

18   that, Judge?

19             THE COURT:  Sure.

20             MS. CHAITMAN:  There are other traders that we

21   would like to subpoena.  Do you have any objection if we

22   serve the subpoenas so long as we don't -- the Trustee was

23   horrified that we might actually get documents --

24             THE COURT:  Well, are they on the same issue?  I

25   remember part of the discussion was everybody's going to

Page 23

1    want to -- as a group, as to which discovery was still open,

2    and they want to take the same deposition.  Or is this a

3    different issue?

4              MS. CHAITMAN:  Well, the thing is that I don't

5    want to be caught with an argument that I didn't serve the

6    subpoenas within the fact discovery period in each case

7    management order and therefore, I'm barred.

8              THE COURT:  Okay.  Why don't you serve the

9    subpoenas, but hold them in abeyance --

10             MS. CHAITMAN:  Okay.

11             THE COURT:  -- so there's no question.

12             MS. CHAITMAN:  Okay.

13             THE COURT:  And we'll talk about that afterwards.

14   So, you can say that you can serve the subpoenas, provided

15   that they're held in abeyance.

16             MS. CHAITMAN:  Right.  And instruct the people

17   that they should not produce any documents until the Court -

18   -

19             THE COURT:  Right, don't do anything.

20             MR. SHIFRIN:  Your Honor, if I could say something

21   to that?

22             THE COURT:  Yes.

23             MR. SHIFRIN:  I feel like that's somewhat putting

24   the cart before the horse because we don't know who's going

25   to be participating in that proceeding.  She's going to

Page 24

1    serve that subpoena in connection with all of our cases.

2            THE COURT:  Well, she's concerned -- unless you're

3    agreeing that as long as discovery was still open on July

4    7th, 2016 -- and it's still open in those cases -- any

5    subpoena she serves is timely, whenever it's done.

6            MR. JACOBS:  Your Honor, Edward Jacobs for the

7    Trustee.  I think we agree with that.  There is discovery

8    with regard to the case-wide fraud issue that we would like

9    to take as well that we are holding in abeyance in

10   anticipation of a procedural order that will call for a

11   discovery period for the exchange of expert reports in

12   connection with that specific issue.  So, we're asking that

13   Ms. Chaitman hold off on serving any additional discovery

14   until we've had a chance to vet that procedural order with

15   her in court.

16           THE COURT:  The only question is, she's concerned

17   you're going to turn around and say, ah ha, you didn't serve

18   your subpoenas and discovery has run there.

19           MR. JACOBS:  On issues regarding the case-wide

20   issues of the fraud, that is not our position, and we won't

21   take the position that its untimely.  We expressly are

22   asking the Court to put that discovery on both sides on --

23           THE COURT:  What about other issues?

24           MR. JACOBS:  -- on hold.  Well, that's another

25   issue.  That's another -- what we'd suggested at the pass

Page 25

1    conference, Your Honor, is that we bifurcate discovery on

2    case-specific issues, transfers --

3            THE COURT:  No, let's serve these subpoenas and

4    hold them in abeyance.

5            MS. CHAITMAN:  Okay.

6            THE COURT:  All right?

7            MS. CHAITMAN:  Thanks.

8            THE COURT:  And then we'll talk about whether or

9    not subject matters -- witnesses may have testimony on

10   different subject matters, whether particular subject

11   matters are (indiscernible) or not.  Right?

12           MR. JACOBS:  Okay.  Thank you.

13           THE COURT:  Next, I think 3, we've dealt with the

14   timing issue?

15           MS. CHAITMAN:  Yes.  As long as you put in the

16   language that you want, Judge.

17           THE COURT:  Well, I'm going to ask somebody to be

18   traffic this order.

19           MS. CHAITMAN:  Okay.

20           MR. SHIFRIN:  We're happy to do it, Your Honor.

21           THE COURT:  And it's the same -- I think the same

22   timing issue in 4?

23           MS. CHAITMAN:  In 4, it's the same issue.

24           THE COURT:  Now, you added something in 5.  You

25   added a new -- you produced a new order?

Page 26

1          MR. SHIFRIN:  That's correct, Your Honor.

2          THE COURT:  -- extending more additional orders by

3    Judge Musk.  Have you reviewed those orders, Ms. Chaitman?

4          MS. CHAITMAN:  What they --

5          THE COURT:  This is the new Paragraph 5.  I don't

6    know, it came with an email dated June 13th.

7          MR. SHIFRIN:  This is what we originally

8    (indiscernible), yeah.

9          MS. CHAITMAN:  Oh, it's this.  Okay.  So, what

10   Shifrin just pointed to me, what I had said was that we take

11   out the 10-day requirement because...  Okay, so three

12   business days before the Defendant is deposed, the Trustee

13   has to serve pre-marked copies of the exhibits, both

14   electronically and in a binder.

15          And then the second part of that was, within 10

16   days of the entry of the stipulation and order, counsel for

17   the Defendant shall advise the Trustee which of the

18   Defendants will stipulate to the accuracy and completeness

19   of Columns 1 through 5.  And again, that should just be --

20          THE COURT:  It's the same timing issue?

21          MS. CHAITMAN:  It's the same timing issue.  It

22   shouldn't be...  There are cases in which we haven't gotten

23   any discovery demands.

24          THE COURT:  Okay.

25          MR. SHIFRIN:  Your Honor, to the extent there are

1     any conflicts there of that nature, that's fine.  But it is

2     imperative for us to put Chaitman on the clock to let us

3     know whether she --

4               THE COURT:  Then serve discovery requests with

5     deadlines.

6               MR. SHIFRIN:  I'm sorry?

7               THE COURT:  Then all you have to do is serve

8     discovery requests with deadlines.

9               MR. SHIFRIN:  Right.  And I don't think this

10    relates to discovery served.  She has to let us know whether

11    she's willing to stipulate.  That's the --

12              THE COURT:  But it's the same issue.  In other

13    words, as to those cases where discovery hasn't been served

14    --

15              MR. SHIFRIN:  Right.

16              THE COURT:  -- but it will be served --

17              MR. SHIFRIN:  Right.

18              THE COURT:  -- she has to let you know by the

19    deadline to respond.

20              MR. SHIFRIN:  Right.

21              THE COURT:  Or she has to, by the deadline to

22    respond, either stipulate or produce the discovery.  That's

23    the same issue --

24              MR. SHIFRIN:  That's the language -- go ahead.

25              THE COURT:  Isn't that the same issue we've been

Page 28

1    talking about?

2            MR. JACOBS:  Yes, Your Honor.  The issue was that

3    in the overwhelming majority of cases discovery was served

4    in upwards of almost two years ago, and we still haven't

5    received compliance.

6            THE COURT:  If the times to respond to the

7    discovery has run --

8            MR. JACOBS:  Right.

9            THE COURT:  -- then the 10 days applies.

10           MS. CHAITMAN:  Okay.

11           MR. SHIFRIN:  If that language is encapsulated

12   there, I don't think we have a problem.

13           MR. JACOBS:  Okay.  Can we maybe add that language

14   into the order, Your Honor, to be clear?

15           THE COURT:  Well, as an incorporation...

16           MR. JACOBS:  Because that would -- from the entry

17   of the order, that would start a 10-day clock running in

18   most of her cases, which I think was Judge Maas's intent.

19           THE COURT:  You're going to have a lot of work to

20   do in your cases, from what I'm getting, within the next 10

21   days, or whenever this order is entered.  Do you understand

22   that?

23           MS. CHAITMAN:  Well, Judge, I'd have to go back.

24   I mean, I think I've dealt with these in the discovery

25   responses.  I mean, we've had requests to admit, we've had

1    interrogatories, we that second interrogatories.  I've dealt

2    with all of these issues.

3              THE COURT:  Well, you haven't stipulated, as I

4    recall, so then the question is whether you've complied with

5    all of the discovery.

6              MS. CHAITMAN:  Well, I've complied with the

7    discovery and I can send a blanket letter saying that we are

8    not going to stipulate, except to the extent that our

9    answers concede --

10             MR. JACOBS:  If that's Ms. Chaitman's position,

11   then we would like to immediately move for an order

12   compelling all outstanding discovery, because we have

13   requests that have been pending for almost two years now --

14             THE COURT:  What's still outstanding?

15             MR. JACOBS:  -- where discovery isn't complete.

16             THE COURT:  I don't know what's still outstanding.

17             MR. JACOBS:  In some cases, we're still waiting on

18   dates for depositions.  In other cases, there have been no

19   discovery provided with respect to the factual basis of

20   affirmative defenses.  There are interrogatory requests

21   outstanding in which she hasn't supplied sufficient answers

22   in compliance with the rules.  There are document requests

23   where we haven't received --

24             THE COURT:  Whether answers are sufficient is a

25   different question --

Page 30

1           MR. JACOBS:  Right.

2           THE COURT:  -- from whether no discovery has been

3     --

4           MR. JACOBS:  Well, there are just -- essentially,

5     there have been objections served and no substantive

6     responses.  And the objections, we believe, are

7     inappropriate and without basis.  So, we're happy to just

8     immediately move to compel on a case-wide basis and we can

9     identify for the Court specifically what we're asking for.

10          It's nothing controversial.  These are categories

11    of discovery that we vetted with Your Honor and with Judge

12    Maas on many occasions regarding the most basic issues in

13    the case, two-year transfers, receipt of transfers, value,

14    tax payments, and net equity.  There's nothing that we're

15    seeking the on those very narrow topics that are authorized

16    by the procedures order that governs these cases.

17          MS. CHAITMAN:  It's no surprise to Your Honor that

18    I can't agree with anything that's just been said.  But the

19    thing is that we have been scheduling one or two depositions

20    a day in the last couple of months.  Many times, we schedule

21    a day and the Trustee wants to change it and it gets put

22    off.  That's not our fault.  We've been churning these

23    things out.  If they have -- if they don't -- they may not

24    like my discovery responses, but they're our discovery

25    responses.

1          MR. JACOBS:  Well, I mean --

2          MS. CHAITMAN:  If they want to make a motion to

3     compel, in any case, let them do it and I'll respond on a

4     case-by-case basis.

5          THE COURT:  I take it that you've met and

6     conferred already and have reached a (indiscernible)?

7          MR. JACOBS:  We have, and we also arbitrated at

8     length with Judge Maas.  And we were hoping that that would

9     provide a universal solution across these cases so we could

10    move beyond case-specific discovery.  But at the conclusion

11    of those orders, in which he very generously gave Ms.

12    Chaitman yet another opportunity to stipulate, she refused

13    and took the position that those orders didn't apply to all

14    of her cases, only the handful in which -- that were

15    specifically named in the stipulations agreeing to

16    arbitrate.

17         THE COURT:  Now we know they apply to all of the

18    cases.  It sounds like she's going to say she won't

19    stipulate, so she'll have to provide the discovery if the

20    deadlines have run.

21         MR. JACOBS:  Right.

22         THE COURT:  And you've met and conferred and --

23         MR. JACOBS:  Right.

24         THE COURT:  -- I guess you can make a motion.

25         MR. JACOBS:  Thank you, Your Honor.

Page 32

1          MS. CHAITMAN:  Thank you.

2          THE COURT:  All right.  Settle a proposed order on

3    notice with the modifications.

4          MR. JACOBS:  Thank you.

5          THE COURT:  The last matter of the dates being

6    topics.

7          MS. CHAITMAN:  Judge, I would forgive you if you

8    haven't had time to review this.

9          THE COURT:  Well, I reviewed all the pleadings.

10   In all honesty, I haven't reviewed both of the last two days

11   of the depositions of Mr. Madoff.  But I'm sure both of you

12   have given me the highlights.

13         MS. CHAITMAN:  I don't know that I have, but I

14   think that the most important fact, which has been stunning,

15   I think, to everyone on our side of the case, that is the

16   Defendant's side of the case, is that after the Trustee

17   repeatedly represent to the Court that the Trustee had

18   produced all of the documents, all the trading records.

19   They were all in the eData room.

20         We heard eulogies about what a brilliant job the

21   Trustee did in equipping the Defendants with everything they

22   could possibly need to know about Madoff's operations.

23   We've now learned not only that in fact Madoff did trade --

24         THE COURT:  But everybody knew he traded, right?

25         MS. CHAITMAN:  He traded the investment advisory

Page 33

1    customers' money.

2              THE COURT:  Sure.  He stole and he traded it.

3              MS. CHAITMAN:  No, he bought --

4              THE COURT:  Didn't he buy the stuff for his own

5    account?

6              MS. CHAITMAN:  No, he bought the very same

7    securities that show up on the customers' statements.

8              THE COURT:  Let me tell you the issue I have.  I

9    understand what I'll call the tardy production.  The

10   question for me is are you going to get anything more out of

11   Madoff on this?

12             MS. CHAITMAN:  Absolutely, because we now -- first

13   of all, I just learned last Sunday that the Trustee is

14   sitting on 5300 reels of microfilm that had never previously

15   been disclosed, of which the Trustee has only now produced,

16   it says -- he says -- 600 reels.  So, we have 47 reels of

17   microfilm that had never been produced.  You know what's on

18   the microfilm?  I mean, it's massive to go through this,

19   Judge, but we're pouring through it.  We are able to match

20   up convertible bond trades of specific customers with

21   positions that Madoff held.

22             THE COURT:  I'm not disagreeing with that.  I'm

23   just saying, what is Madoff really going to tell you about

24   that?  You know --

25             MS. CHAITMAN:  He's going to explain to us the

Page 34

1    records, because a lot of the records are not -- the

2    Trustee's position is, well, first we forgot to tell you

3    about these records, but it doesn't matter because they're

4    all phony anyway.

5              THE COURT:  But didn't he ask -- didn't somebody

6    ask him about records?  In other words, you don't have to

7    ask him about every single piece of paper.

8              MS. CHAITMAN:  You don't have to go through 500 --

9    it's 4.5 million pages of documents.

10             THE COURT:  I understand that.

11             MS. CHAITMAN:  But the point is, they fall into

12   categories.  There are various kinds of records.  Madoff

13   testified that he had custodial accounts with about 10

14   different institutions.  We're now finding records which

15   seem to indicate that these are the securities that were

16   held at these various custodial accounts.

17             We want to be able to sit down with Madoff and

18   say, okay, we have 500,000 documents which all say National

19   Bank of North America, or they say NSCC, or they say

20   NatWest.  We want his testimony as to what those records

21   reflected.  What was the --

22             THE COURT:  I thought he said, in substance, the

23   proprietary trading in the money market business bought

24   securities using investment advisory money, but none of it

25   was ever allocated, at least by him.  I thought that's what

Page 35

1     he said.

2                MS. CHAITMAN:  No.

3                THE COURT:  Now, I understand your argument.

4                MS. CHAITMAN:  No, that's --

5                THE COURT:  You're going to say, well, it really

6     was allocated.  But he's not going to help you --

7                MS. CHAITMAN:  No, no, no.  First of all, let's

8     just focus on different periods, because we also have proof

9     of securities purchased after 1992.  But let's focus on the

10    period --

11               THE COURT:  Securities purchased by the IA

12    business?

13               MS. CHAITMAN:  Yes, with 703 account money, which

14    the Trustee had never disclosed.  We now have documents

15    proving this.  But let's just focus on the 1980s because --

16               THE COURT:  But I know he testified that he used

17    that money to buy treasuries and to buy commercial paper

18    because he didn't want to leave it in cash, but that --

19               MS. CHAITMAN:  More than that, Judge.  These

20    treasuries -- he testified that these treasuries were

21    purchased with 703 account money --

22               THE COURT:  Right.

23               MS. CHAITMAN:  -- for the benefit of the

24    investment advisory customers.  And if I can show a specific

25    security that shows up on my client's statement, my client

Page 36

1    is entitled to credit for that security.

2              THE COURT:  I understand that, but I just don't

3    think Mr. Madoff, who is in prison and who has been

4    testifying for three days now, is really going to be able to

5    make that kind of connection for you.

6              MS. CHAITMAN:  Not -- look, nobody could -- we're

7    talking going back so many years.  But the point is, he can

8    talk in general.  He's given us a tremendous amount of

9    information already, and frankly, with the additional

10   information we have it's going to make it that much easier

11   for us to be able to confirm all of this.  We've been

12   dealing with a fraud since 2008.  We now have access to the

13   truth because we had these documents.  We need to have an

14   opportunity to question him about them.  This is a massive

15   change in the case.  It totally, totally changes the entire

16   case.

17             THE COURT:  Weren't these trading records turned

18   over though earlier?

19             MS. CHAITMAN:  No, they were deliberately

20   concealed.

21             THE COURT:  I know that there are more trading

22   records, but weren't the same types of trading records --

23             MS. CHAITMAN:  Judge --

24             THE COURT:  -- turned over?

25             MS. CHAITMAN:  Judge, Mr. Dubinsky, a third of his

Page 37

1    report is that Madoff never traded, right?  Now we have

2    trading records going back into the 1970s, okay?  We have

3    trading records in the 1980s.  We can show the arbitrage

4    positions that are reflected on client statements and --

5            THE COURT:  Dubinsky said he never traded, even in

6    the arbitrage and money market, and the convertible bond

7    department?

8            MS. CHAITMAN:  If you recall, Judge, there were

9    times when the Trustee's counsel would not concede that

10   Madoff ever did any trading.  But what I'm saying to you now

11   is we have documents which -- and I don't have 4700 reels of

12   microfilm.  God knows what's on those.  But we are now being

13   able to put together documentary evidence that Madoff

14   purchased and sold at the corresponding times, as reflected

15   on the investment advisory customer statements, the very

16   securities and convertible bonds that are shown on those

17   statements.

18           This is explosive information and it completely

19   contradicts what the Trustee has represented to this Court,

20   to the Second Circuit, to the public, since late 2008.  And

21   they deny that they've had these records.  Judge, it was

22   more than a year ago that I was asking that the Trustee

23   produce all trading records, and you said if they haven't

24   done it already, they have to do it and put them in the

25   eData room.  They did nothing.

1          Then I filed a motion to compel.  We agreed to

2     have it heard by Magistrate Judge Maas.  He entered an order

3     on January 7th, and low and behold, we get a production

4     which they represent -- Mr. Jacobs, represented was

5     complete.  And now, last Sunday, after pressing them, I

6     learn there are 4700 reels of microfilm that I haven't been

7     told about, and that they haven't deigned to convert because

8     it's too expensive.

9          We're into this case for $1.3 billion or whatever

10    it is, and it's too expensive for them, having paid Dubinsky

11    $30 million, to not look at any trading records?  And now

12    it's too expensive for them to convert 4700 reels?  I don't

13    think so, Judge.

14          THE COURT:  All right.  Okay, that's the new

15    information.

16          MS. CHAITMAN:  Right.

17          THE COURT:  But there are a lot of -- there are

18    categories here which it just seems to me are, you know, the

19    first day -- the day one topics.

20          MS. CHAITMAN:  We're done with the day one topics.

21    The date to topics relate to specific accounts.  For example

22    --

23          THE COURT:  Well, that's what I -- see, that's --

24          MS. CHAITMAN:  Yes.

25          THE COURT:  What I had contemplated when this

Page 39

1    started was day one would be the general stuff.

2              MS. CHAITMAN:  Right.

3              THE COURT:  And then day to, you could go and

4    asked specific questions about your clients that were still

5    in this discovery phase.

6              MS. CHAITMAN:  For example, if I now am able to

7    match up --

8              THE COURT:  Yeah.

9              MS. CHAITMAN:  -- you know, a specific position

10   with this, I want to be able to say to Madoff, okay, look at

11   Blucker's statement -- because I can now confirm his trades

12   -- look at Blucker's statement for April 1985 and then let's

13   look at the NSCC statement or National Bank of North

14   America, whatever it is.  Were you buying the securities

15   that you sold to Blucker?  He's going to say yes or no.  And

16   he's going to tell me how you can say that, based on the

17   documents.

18              But there are specific issues with a lot of the

19   clients.  It's not simply on this issue.  I mean, for

20   example, the Sages submitted a letter to Your Honor where

21   they had directed specific purchases and sales of

22   securities.  And they're finding now evidence in the

23   documents in the --

24              THE COURT:  Mm hmm.

25              MS. CHAITMAN:  -- few reels that have been

Page 40

1    produced.  We're finding proof of those.

2              THE COURT:  So, are you arguing that -- are you

3    saying that you want day two discovery to ask him questions

4    about the accounts of your specific -- or the transactions

5    or the relationship with your specific clients as to which

6    discovery has not closed?

7              MS. CHAITMAN:  Yes.

8              THE COURT:  Good.

9              MS. CHAITMAN:  Yeah.

10             THE COURT:  Because some of the stuff I've seen,

11   and it may not be from you, is a little broader and a little

12   more general.  All right.

13             MS. CHAITMAN:  That was my contemplation, that it

14   would be specific to transactions --

15             THE COURT:  That's what I had contemplated a year

16   ago, but --

17             MS. CHAITMAN:  Right.

18             THE COURT:  Anyone else?

19             MS. NEVILLE:  Good morning, Your Honor.  Carole

20   Neville, from Dentons.  I think I'm one of the people who

21   said -- who may have listed some of the broader topics.  As

22   a gentleman before said, the world is waiting to hear what

23   Mr. Madoff says.  And one of the things that we learned in

24   the deposition, which has gotten a little bit muddy, is what

25   Mr. Madoff had between say 2001 and 2008 to satisfy customer

Page 41

1   claims.

2              Dubinsky matched $80 million, or tried to match

3   $80 million worth of treasury bills to our client

4   statements.  Mr. Madoff testified that he had up to $6

5   billion worth of treasuries, which it sounds like from the

6   testimony, and it did get monied, was --

7              THE COURT:  So why didn't you clear it up at the

8   time?

9              MS. NEVILLE:  Pardon me?  I'm not there.

10             THE COURT:  Well?

11             MS. NEVILLE:  We delegate.  We can only have one

12  person there.

13             THE COURT:  Okay, but you have --

14             MS. NEVILLE:  And so, there were some follow-up

15  things.  That's all I'm saying is that there are specific

16  follow-up things, like whether or not those treasuries were

17  then transferred from the proprietary trading side to the

18  customer side.  They were purchased with 703 money.

19             THE COURT:  But the day one topics -- first of

20  all, we established a procedure for one person sort of

21  representing everybody on the day one topics, because it's a

22  prison and it's a small room and you can't have everybody in

23  there.  And unless somebody tells me different, and I

24  noticed at the end of the second day, April 27th, Mr.

25  Goldman wired a question?

Page 42

1          MS. NEVILLE:  Yeah.

2          THE COURT:  What was he going to question him

3     about, rehabilitating?

4          MS. NEVILLE:  I guess so.  I don't know.  Oh, you

5     know, Your Honor, we did --

6          THE COURT:  It seems like if topics were missed,

7     they were missed, for whatever reason.  This is a procedure

8     we established.  I'm not saying you can't go in there and

9     ask him about a specific entry or entries on your client's

10    customer statements and whether they match up with purchases

11    that he made with IA money, ostensibly, from one of the

12    other divisions in the business.  But, from my view, these

13    day one topics are done.

14         MS. NEVILLE:  Well, but you know, Your Honor,

15    you're never really specifies that day two topics have to

16    relate solely to this specific account.

17         THE COURT:  Well, let me put it --

18         MS. NEVILLE:  I understand there was colloquy

19    about that.

20         THE COURT:  Certainly, if he testified about

21    something and for whatever reason that wasn't followed up,

22    it wasn't followed up, the entire purpose of the procedure

23    was to have a representative go in for the reasons I've

24    stated.  Everybody couldn't go in and, you know...

25         MS. NEVILLE:  And we did collaborate.

1            THE COURT:  All right.

2            MS. NEVILLE:  We spent a lot of time trying to

3    focus on those topics that we were all interested in.  But

4    things happened in the deposition that we didn't have an

5    opportunity to then follow up on.

6            THE COURT:  I understand.

7            MS. NEVILLE:   And one of them --

8            THE COURT:  I've never walked out of a deposition

9    thinking, gee, I asked every question I --

10           MS. NEVILLE:   Right.

11           THE COURT:  -- ever wanted to ask.

12           MS. NEVILLE:   But the fact of the matter is, if

13   Mr. Madoff had $6 billion worth of treasuries that he was

14   holding for the IA customers, he had a $6 billion margin

15   account from one of the four families, and he had other

16   securities of $3 or $4 billion, it doesn't seem to me that

17   we have a classic Ponzi scheme.

18           We definitely have a fraud, but I think the whole

19   thrust of my request to the Court was to be able to follow

20   up on the fact that we really had a story told to us about

21   no trading, Ponzi scheme right from the beginning,

22   hopelessly insolvent.  And now we're finding out that he had

23   maybe $18 billion, or access to $18 billion of value up

24   until the last weeks of 2008.  That, to me, is a fraud.

25           I know he committed a fraud.  I'm not trying to

Page 44

1   exonerate Mr. Madoff.  It's different than a Ponzi scheme.

2   And it really makes a difference to us because there's been

3   a kind of knee-jerk application of all the Ponzi scheme

4   cases where the only remedy is rescission, with this is a

5   securities fraud.  It's straight out and out securities

6   fraud, and there's a whole other panoply of cases that are

7   applicable to this decision.

8          So, where Your Honor and other courts have

9   rejected the value defense, which is really a straight

10  securities law defense --

11         THE COURT:  Well, nobody is rejecting them.  They

12  just said file a proof of claim, you know, in the general

13  estate.  Of course there's a securities fraud here.  He said

14  he was taking your money to buy securities.

15         MS. NEVILLE:  Yes, but you know, Your Honor, we're

16  not actually looking at it from the point of view of

17  asserting a claim for recovery.  We are looking at it as

18  asserting a claim for a defense.  That we have a claim that

19  satisfies --

20         THE COURT:  You still have the problem --

21         MS. NEVILLE:   -- the value difference.

22         THE COURT:  You still have a -- even if it weren't

23  a Ponzi scheme, you'd still have the problem with the SIPA

24  statute in the way it's set up and this priority estate

25  within the general estate.  That's --

Page 45

1          MS. NEVILLE:   Yeah, but in the meantime, the

2     502(h) claims are getting added to net equity.  It seems to

3     me that those are general unsecured claims.  In every

4     settlement, the Trustee is whopping the 502(h) claim

5     settlement.

6          THE COURT:  Well, but that's the settlement he

7     makes.  You can make a settlement.

8          MS. NEVILLE:  Well, so --

9          THE COURT:  They're coming up with a number.

10    Settlement is a lot different from litigation.

11         MS. NEVILLE:  It's not the number, it's the

12    treatment of the resulting claim.

13         THE COURT:  Okay.

14         MS. NEVILLE:  But, you know, will continue to

15    argue it.  My point primarily is we really have learned in

16    the last -- in those April depositions, that Mr. Madoff had

17    access to quite a lot of value in the last few years of this

18    fraud, which we never knew about and the Trustee has kind of

19    denied for years.  I mean, the Dubinsky report is hopelessly

20    insolvent from day one.

21         THE COURT:  And the Trustee didn't produce

22    documents of trading in these other divisions of the

23    business?

24         MS. NEVILLE:  You know --

25         THE COURT:  I thought he did.  But, you know, I

Page 46

1    don't know.  Or made them available?

2              MS. NEVILLE:  We didn't know what they meant.

3              THE COURT:  Well, but that's --

4              MS. NEVILLE:  I mean, that's why you had to talk

5    to --

6              THE COURT:  That's why you hire an expert --

7              MS. NEVILLE:  That's why we had to talk to Mr.

8    Madoff.

9              THE COURT:  -- early in the case.

10             MS. NEVILLE:  But the expert was not -- the expert

11   didn't know what to do with them either.

12             THE COURT:  Okay.

13             MR. HUTTENLOCHER:  Just briefly, Your Honor.  Mike

14   Huttenlocher from McDermott Will & Emery for the Sage

15   Defendants.  I just wanted to make clear with respect to our

16   application on the day two topics that those really are

17   focused to our clients' account questions, which it sounds

18   to me from where Your Honor has said before was part of the

19   intention of the original procedural order that was set up.

20   So, we just wanted to make that clear for our Defendants.

21             And just one other point, just I want to make sure

22   that it maybe doesn't get lost, with respect to the

23   microfilms, or some of these productions with respect to the

24   trading records is that the Trustee has taken the position

25   that the documents that will be produced, as far as I

Page 47

1    understand, will only be for verifiable trading activity, as

2    verified by the Trustee.  That's prejudging the point and

3    basically usurping the role of the fact finder there, as

4    we're trying to discover hear and understand what was the

5    verifiable trading activity.

6                THE COURT:  Right.

7                MR. HUTTENLOCHER:  And that will impact my clients

8    with respect to the directed trading that the Sages have

9    strongly put forth in example in the letter that my partner,

10   Andrew Kratenstein, had sent to the Court the other day, as

11   well as with respect to the convertible bond trading.  So, I

12   just wanted to make sure those points were clear.

13               THE COURT:  Okay.  Thank you.  Anybody else on

14   that side want to be heard?

15               DAVID SHEEHAN:  Your Honor, a lot of things have

16   been said about the Trustee and his counsel here.  And I

17   don't intend to reply --

18               THE COURT:  A lot hasn't been said but it's in the

19   papers also.

20               DAVID SHEEHAN:  Indeed.

21               THE COURT:  But what I'm --

22               DAVID SHEEHAN:  I've been around 48 years, I've

23   been accused of everything over time.

24               THE COURT:  Why don't we deal with the day two

25   topics?

1          DAVID SHEEHAN:  I don't intend to get into that.

2          THE COURT:  Okay.

3          DAVID SHEEHAN:  But I do think -- and I ask Your

4    Honor for a little latitude, because I wouldn't even raise

5    this except for the fact that behind all this rhetoric, is a

6    misstatement of facts, a misunderstanding of what's going

7    on.  The people that have not done their homework, quite

8    frankly, they don't know what they're talking about because

9    they haven't done the work.

10          I ask for a little latitude, because I'd like to

11   do a little bit of history here --

12          THE COURT:  Go ahead.

13          DAVID SHEEHAN:  -- that's verified by the record.

14   So, we arrive the fifth day after he confesses.  There's

15   nobody there.  Frank DiPascali went out for coffee; never

16   came back.  Bernie Madoff wasn't talking to us.  The next

17   day he did talk to the US attorney.  Somehow, he doesn't

18   remember those conversations, which is fascinating, and I

19   agreed that we will have --

20          THE COURT:  He seemed to remember pretty well what

21   he told them and what he didn't tell them.

22          DAVID SHEEHAN:  Yeah, he's seeing pictures, but

23   not telling them when he started the fraud.  The point is

24   that we had no help, right?  So, we are -- no one's around.

25   You're looking at a 40-year fraud.  What do you do?  What do

Page 49

1    you do?  You go out and you hire the best accountants you

2    can find, best forensic experts you could find, right?

3           Day one, we looked at the customer statements that

4    Ms. Chaitman thinks she should just pay in full.  There are

5    over $64 billion worth of customer securities and cash that

6    are supposed to be held by Mr. Madoff.  A quick survey

7    demonstrated that we had a total of $300 million in the

8    estate.

9           Working with FINRA, we found that while we were

10   supposed to be long over 200 million shares of Microsoft, we

11   were long less than a thousand.  And that went on and on and

12   on.  These are in the opening days of this massive fraud,

13   with no one assisting us or telling us, and we're trying to

14   put it together.  So, what do we do?

15          We're bankruptcy lawyers.  So, let's go back six

16   years.  Let's see what we can find.  It's a good place to

17   start.  And as we start doing that, we realize that we

18   actually have records that go back 10 years.  For some

19   reason, Mr. Madoff actually kept the banking records and

20   other records there, so we could tick and tie every one of

21   those things together.

22          So, we looked at all of the customer statements.

23   We looked certainly at House 5.  Peter Madoff was there for

24   the first --

25          THE COURT:  House 5 is the --

Page 50

1          THE COURT:  Right.

2          THE COURT:  Is what?

3          DAVID SHEEHAN:  House 5 is -- I'm sorry.  It is a

4   combination.  They used House 5 for the proprietary trading

5   and the market making operation.  So, we looked at both of

6   those and we found, as you might suspect...  Let me talk

7   about trading records for a little bit.  There are trading

8   records, then and later, for House 5.  What you see on those

9   is an immediate trade.

10         In other words, what is a market making operation?

11  It isn't the New York Stock Exchange.  You can't make things

12  up.  There is indeed a counterparty.  There is

13  instantaneously, and it shows up on DTCC, he had a 646

14  account, one account only.  And as he said, on December

15  16th, 2008, "I never had a trade go through DTCC for the

16  investment advisory business."  We knew that then.  We had a

17  representative there, told us that.  That gets incorporated

18  into the mix.  Why would we believe he wouldn't tell the

19  truth when he's negotiating on a proffer agreement for a

20  deal?  One would think that's the moment in time when he's

21  going to be truthful.

22         So, we took that and made that into the mix.  We

23  took those and we looked at those statements, realized that

24  those are legitimate.  You can tick and tie every one of

25  those House 5 investment -- I'm sorry -- market making and

Page 51

1   proprietary, to trading records that are third-party trading

2   records.  That's what we are talking about, verifiable.

3   Verifiable doesn't mean the Trustee says so.  The Trustee

4   doesn't know anything.  They keep wanting to take his dep;

5   he has no idea of what happened prior to 2008.  He can talk

6   in detail about what he did afterwards, but the better

7   people to talk about that are the people who actually did

8   the work.

9          All right, so, we go through and we find out that

10  for 10 years, we can tick and tie all of the purchases and

11  sales of those House 5 accounts to banks, to the DTCC and

12  other third-party sources.  What does it also tell us?  We

13  look, look in detail.  There are no trades.  There are no

14  trades that purport to relate to any of the House 17 or

15  investment advisory business.  None.  Zero.  No money

16  carrying out a 703, no money -- notwithstanding what Ms.

17  Chaitman's trying to tell you here today, that's just not

18  true.  All right?  And if she went out and got an expert and

19  had him at her elbow, she'd find out that she's spewing a

20  lot of misstatement of facts here.

21          Let me tell you what she already has.  She has all

22  the trading records.  She doesn't know it because she

23  doesn't know what she's looking at.  What do you think a

24  trading record is?  Do you think it's just something he made

25  up over the quarter?  No.  He knew from running a legitimate

Page 52

1    business that when he does a trade, he has a record, and

2    then it gets confirmed by (indiscernible), DTCC, et cetera.

3    But it creates a trading record.  He has a blotter, whatever

4    you want to call it.  They have different terms for it.  But

5    you want to keep track, and your trading room does that.

6          Okay, so now you're going to have a fraud.  You

7    don't need a trading record.  Even though you're not -- why

8    do you need a trading record?  You're not trading stocks.

9    Why would you have a trading record?  And what's going on to

10   the customer statement?  Do you think the customer statement

11   gets made up?  No.

12         Let's talk about computers here.  There's an AS400

13   running this thing.  He creates a trading record using

14   historical data.  There were tens of thousands of Wall

15   Street Journals in our records.  Why do you think they kept

16   all those?  Because they were making it up.  They'd go back

17   and make up the trades, create a trading record.  It says

18   trading record.  That doesn't mean there were any trades.

19         What he had to do was create a trading record that

20   would become part of that database from which an application

21   program would draw that trading record into what?  The

22   customer statement, customer statements that they have gone

23   all the way back, which we produced eons ago, have all the

24   trading records in them.  They just didn't know it.  What do

25   you think it is, different?  Do you think the trading

Page 53

1    records that they say we've been hiding, all right, are

2    different?  They're old.  We didn't make up any trading

3    records.  The data had was the data we got.  All right?  And

4    to start suggesting that somehow something was missing?

5    Give you another example.  They're talking all about the --

6                THE COURT:  Why does it -- what is this microfilm

7    that I've been hearing --

8                DAVID SHEEHAN:  Well, what happens is this, all

9    right?  I'm glad you brought that up, because we walk in

10   there and we've got data like you can't believe.  And we've

11   disclosed this to them, that we have 20,000 pieces of media.

12   And everybody's known this -- there used to be 19,000; we

13   keep finding more -- that we can't even count the terabytes.

14   We've looked at it, we can tell you what it is.  A lot of it

15   is crap, like -- sorry, excuse me, Your Honor -- but a lot

16   of it's detritus, you know, and for example, the Wall Street

17   Journals and all that other stuff.  So, we don't look at it.

18   We've got to make a decision.

19                They're right; we've spent a lot of money.  I

20   think the thousands of people who got defrauded and deserve

21   to get their money back, really should have had us look

22   really, really hard at those records, find out what was

23   going on, and we did.  And we did.  But that doesn't mean

24   that you just take 20,000 pieces of media with unknown

25   terabytes in it.  What we did do, we put together 27

Page 54

1    terabytes.  That's a lot of bytes.  All right?  And those

2    records then became the basis upon which we then created the

3    database that was made available to them.  All right?

4            So, you could question whether or not we should

5    have done the microfilm, but that was a decision we made.

6    We felt, based on the records that we had ticked and tied

7    that were solid and then went back, and of course, bank

8    records fritter away.  Some of the other ETC records fritter

9    away.

10           THE COURT:  What do you mean, fritter away?

11           DAVID SHEEHAN:  Well, they're not there anymore.

12   We don't have them.  He didn't keep them.  We can't get

13   them.  Third parties can't recreate them.  So, to the extent

14   we had them, we used them; to the extent we didn't, we

15   didn't.

16           But what we also found was that all these

17   anomalies -- which I respectfully think are still red flags

18   -- but in any event, those anomalies that are all in the

19   training records for those 10 years we have all the data,

20   all right, like trading on Sunday and Saturday outside the

21   range of trades, notwithstanding what's been said about Mr.

22   Dubinsky's report, all the trades that couldn't have been

23   taking place because of the volumes, et cetera.

24           You know, there's one little bit of that, and I do

25   want to address it when we get to the -- and I will get

Page 55

1    these, I promise -- the second day deposition topics.  But

2    at the end of the day, all those things kept showing up as

3    we went back.

4            Now, Your Honor one time wondered aloud, why would

5    Mr. Madoff lie.  Respectfully --

6            THE COURT:  Well, that's about certain things.

7            DAVID SHEEHAN:  I understand.  Well, he lied for a

8    living, as I thank Ms. Neville for point that out for me, he

9    did lie for a living.  I wasn't badgering him.  I think a

10   guy who steals billions of dollars and ruins people's lives

11   can't get badgered, quite frankly.  Can't ask him a tough

12   enough question.  And I'd asked him that and he admitted it.

13   He didn't even flinch.

14           So, the point is that we're looking at all of

15   those records and we're putting them all together, and yes,

16   we made decisions.  But we didn't hide anything.  All this

17   rhetoric roaring around this courtroom, telling us that we

18   hid stuff and that we're horrible people and that we've been

19   lying to the Circuit is absurd.  If they had not been --

20   they wasted the last -- the first seven years of this doing

21   what?

22           And Your Honor participated and saw what they were

23   doing.  Raising antecedent debt five times.  Raising value,

24   10 times.  Running back and forth at NPWRs on all kinds of

25   issues that have all since been rejected by the Circuit,

Page 56

1      except for 546(e), which they did not raise, Katz/Wilpon

2      did.  All right?  And I still would like to re-argue that

3      motion.

4             But in any event, the bottom line is at the end of

5      the day, they were looking at other stuff.  They were -- so,

6      all of a sudden, a year and a half, two years ago, after an

7      effort was made by Ms. Chaitman, she tried to get the DTC

8      records and do what she's doing here today.  You know what?

9      I found that there were 50,000 shares of AT&T and in my

10     customer account, I had 5000.  There it is, tick and tie.

11     It doesn't tick and tie.

12            What you'll find is -- and we've done this, and

13     we'll show them -- if you look at those records, there's no

14     real correlation between them at all, all right?  You think

15     we didn't look at that?  You know, in the very early days, I

16     had an enormous -- I realize I'm testifying a little bit

17     here, but I think Your Honor has to hear it -- an oral

18     meeting with Alex and FTI because there was some concern

19     about what Mr. Madoff said -- I'm sorry, I apologize for

20     that -- Ms. Chaitman said.  But the bottom line is that they

21     were saying, wait a minute, there's some stock here, you

22     know, that's showing up in the DTC account that is in this

23     investment advisory account.  So, we had a big meeting and

24     went through it and realized that they were just anomalies.

25     There was no purchase that corresponded to any of the

Page 57

1    purchases that would have been reflective of IA trading.

2    You know, it's no big surprise that in the trading that he

3    was doing -- and he was a major market maker; I agree with

4    that; nine to 10, 12 percent of the market -- that in there

5    would be probably all the transactions, right?

6           So, when people say that, you know, trading

7    records -- first of all, let's be more disciplined about how

8    we use that word -- let's recognize where trading records

9    come forth from the IA business, that they were made up by

10   him.  There is not one iota of evidence that any of those

11   trades resulted in a purchase.

12          THE COURT:  Yeah, but let me just stop you.  You

13   know, you've put a qualifier on a verifiable trading records

14   or actual trading records.  You know, that's one of the

15   issues in the case.

16          DAVID SHEEHAN:  Yeah, I agree with that.  And I

17   think they're entitled to get discovery.  I never said that.

18   What I'm saying is, stop it.  Stop what you're doing.  We

19   don't lie, we don't cheat, we turn over all the evidence

20   that we can.  I ask them to do their job, all right?

21   Relying on Madoff, who quite frankly -- and now I'll get to

22   the second day topics -- he contradicts himself within the

23   deposition.

24          For example, the Sage Defendants take the

25   position, and they should be able to explore it -- don't

Page 58

1    disagree with that -- and if they want to ask him about it,

2    we're going to be going down there anyway to talk about the

3    302, they can't.

4           But here's what he says.  Ms. Chaitman trying to

5    bring out that there is directed trades asked them, and they

6    said no.  I never allowed that.  All my customer statements,

7    customer agreements, account opening documents, give him

8    complete discretion.

9           He wouldn't take an order from you.  If you look

10   at how people took money in and out, you know, again,

11   available, take a look at it.  Nobody calls up and says sell

12   my 10,000 shares.  They say give me 50 grand, or Picower,

13   give me $250 million, all right?  Those things were going

14   on.

15          By the way, when we settled with Jeffrey Picower -

16   - it's public record -- those statements went back to 1983.

17   Think he would have paid us back in 1983 if convertible

18   arbitrage strategy in the 80s was viable?  We're talking

19   about hundreds and hundreds of millions of dollars that he

20   paid us.  Why?  Because he knew it wasn't viable.

21          All of the other people that worked there, except

22   for Madoff, Annette Bongiorno, you know, Kugel, Lipkin,

23   they've all testified either at criminal trials, under oath

24   with their liberty at stake.  No trading; all made up.  But

25   we're going to spend a lot of time, money and effort based

Page 59

1    on one man who's trying to rehabilitate himself, trying to

2    say, I was a good guy for 32 years.  Those four guys came in

3    and twisted my arm.

4           Wait a minute.  Your Honor has read the first day.

5    What did he say happened?  He says what happened is, you

6    know, we had this long strategy, 87 hits, they're losing

7    money.  And they come to him and say, look, we don't want to

8    take the hit.  And he said, okay, I'll cover you.  Wait a

9    minute.  This is a legitimate brokerage house this is

10   happening in.  Can you imagine going to Merrill Lynch guy,

11   your Credit Suisse guy, and say, you know, I had all this

12   trading, I've made hundreds and hundreds of millions of

13   dollars, now I'm going to lose a couple hundred million, you

14   gotta cover me.  And he says, you got it.  No brokerage

15   house does that.

16          Billion dollars, supposedly, under these non-

17   existent agreements they keep looking for.  Billion dollars.

18   What brokerage house would ever do that if they were clean?

19   So, he indicts himself with his own story of trying to make

20   up something as to what transpired that led to this split-

21   strike conversion strategy in 1992.  Doesn't even really old

22   up to scrutiny.

23          In terms of asking him about records, I asked him,

24   I showed him the same Blucker statement that Ms. Chaitman

25   had.  It was mid-80s.  In it is a convertible arbitrage

Page 60

1   transaction.  I asked in the foundation questions, did they

2   know what the discount arb was?  Do you know what the

3   premium arb was?  Do you know how these transactions made or

4   lost money?  Said he did.

5           I don't need to get into this in any great detail,

6   but the bottom line is that he said that, you know, you get

7   the -- you have a fractional share when you convert, and

8   this is true -- when you convert, you're always going to end

9   up with a piece of it, a stub, that doesn't quite match up

10  to the stock that you're covering in the short.  So, what

11  they do is they give you cash, because there are no 36

12  shares.  People don't have odd lots anymore.  That can only

13  happen after you convert the arb.

14          Well, on the day he buys the arb, he's showing the

15  fractional share in that, right?  And at the end of the day,

16  he's says the customer still long the arb.  It's impossible,

17  so I ask him about that.  There's a guy they're going to ask

18  about the books and records, all right?  And he can't

19  understand it.  Doesn't know how it happened, must have been

20  my back office, but I don't know anything about the back

21  office.  You can read the dep, all right?

22          This is not a man who had his fingertips on this

23  stuff.  Why did he hire David Kugel?  He claims he's a

24  convertible arbitrage genius.  Only when you listen to his

25  testimony, and let Your Honor draw your own conclusion,

Page 61

1    doesn't sound like one.  Not Kugel, because Kugel knew what

2    he was doing.  Even in the industry beforehand, he knew

3    about convertible arbs, right?  His testimony, which we want

4    to take in our case because it's a great testimony that he

5    gave in the federal trial of the five people, we want to get

6    that, because at the end of the day he will demonstrate that

7    there was no trading going or et cetera.

8         THE COURT:  Let's get to the day two topics.

9         DAVID SHEEHAN:  Well, okay, the day two topics.

10   So, let's go through each one of those, if I could.  The

11   first one is bought, sold, held and showed on customer

12   statements.  Your Honor, if they want to ask about that, I

13   think it's a waste of time.  I think it's unreliable and I

14   think Your Honor can draw your own conclusion.  And you

15   would say, well, if it's unreliable, you can point that out.

16   It's true, but I think we're wasting time.  That's all I'm

17   saying.

18        As I said earlier, we're going to go back down

19   there.  I bring these up to Your Honor's attention for the

20   reason that -- because I think we do have to talk about the

21   302 more, because at the time I did not have the redacted

22   version of it from the government.  I just didn't get it in

23   time.  And I think he deserves the right to be confronted.

24   It's time.

25        So, we're going -- I can see Your Honor saying,

Page 62

1    well, what's the harm in doing some of these?  I do want to

2    point out to you, though, that you know, used customer funds

3    to purchase securities shown on the customer statements.  He

4    said he didn't do that, all right?  What he's saying is --

5    and we already had that testimony -- is he did do the

6    convertible arb strategy.  I don't know what more he's going

7    to say about that.  But they can ask him, I guess.

8            The indemnification agreements.  Ms. Chaitman

9    asked him about those agreements and he couldn't come up

10   with anything.  I then told him, yeah, we've been looking

11   for those and we can't find them in all of our records.  All

12   right?  And we did look, thoroughly, all right?

13           Could it be then the 20,000 media they're stuck

14   there?  I don't think so.  We've got pretty good search

15   techniques.  We know what we're looking for.  We've been

16   doing this a long time.  When I asked him, I said, can you

17   help me out, where could I find them?  He said, well the

18   last guy that had them maybe was this account, but he's

19   dead.  That was it.  Oh, if you want to ask more about that,

20   we can, but I think we've already exhausted the topic.

21           Then we asked him about personnel, you know, and

22   we went back and forth.  You can ask again about that, but

23   he has asked and answered that question more than once about

24   what different people did at different jobs, whether it was

25   Bongiorno and what she did and how he trained her, what

Page 63

1    Kugel did when he hired him, or Frank DiPascali did when he

2    hired him.  If there are other people they want to ask

3    about, Jodi Crupi and others, I'm pretty sure he's commented

4    on all of those, but I think it's asked and answered.  I

5    don't know what FISERV is going to help us with.

6                   THE COURT:  What is FISERV?

7                   DAVID SHEEHAN:  FISERV is the organization that

8    runs the accounts for the IRS, all right?  And it's an issue

9    in the case, that I heartily agree with.  But I don't know

10   what he's going to add to that.  They don't necessarily tell

11   us why.

12                  Then they want to add -- I guess if she wants to

13   ask about the documents we just produced, she has a right to

14   do that.  We did just produce them over the last year and a

15   half, so if she wants to do that.

16                  But my point in coming here today was to point out

17   that I do think that we are wasting a good deal of time

18   doing this again.  But I also want to represent to the Court

19   that we fear no discovery here.  If they want to continue to

20   do this, I don't think we're going to have a fruitful

21   exercise here.  This case has gone on far too long.  Extra-

22   territoriality alone has taken over six years and we still

23   don't have a decision from the Circuit whether they're going

24   to take it.

25                  THE COURT:  Which case?

Page 64

1           DAVID SHEEHAN:  ET, Extra --

2           THE COURT:  Oh.

3           DAVID SHEEHAN:  Extra-territoriality.  That

4    started in 2010.  And you know, we're not trying to prolong

5    things here, Your Honor.  We've gotten rid of over almost

6    800 cases.  We announced a settlement yesterday.  You know,

7    I realize this is anecdotal, but it can't be ignored, for

8    $370 million, with a major fund, and with good counsel.  And

9    they know everything that's going on here.  They're not

10   jumping on this bandwagon because they've done their

11   homework.  They've looked at this and they know what they're

12   up against.

13          I leave it to Your Honor as to what we do.  I know

14   we're going to go back down, but I trust Your Honor's

15   judgment as to what we should do in the end.

16          THE COURT:  All right.

17          MR. KWON:  Your Honor, may I be heard on behalf of

18   the Picower parties?

19          THE COURT:  Yes.

20          MR. KWON:  Michael Kwon, from Schulte Roth &

21   Zabel, on behalf of the Picower parties?  We are here today

22   on two very limited objections.  First, with regard to the

23   proposed A2 topic concerning the indemnification or hold

24   harmless agreements that Madoff purportedly had with the

25   four families, as Your Honor knows, those four families

Page 65

1   includes Mr. Picower.  And as Mr. Sheehan has pointed out,

2   Madoff on several occasions has already testified as to

3   these purported hold harmless agreements.  And so, we don't

4   see how having another day of testimony when he's already

5   testified about the sum and substance of those agreements

6   would be fruitful at all.  And in none of the submissions by

7   the Defendants do the explain, you know, the relevance or

8   the need for additional testimony with regard to those

9   agreements.  So, for those reasons, we ask that Your Honor

10  not permit additional questioning about those hold harmless

11  agreements.

12          The second objection that we want to raise is, you

13  know, as Your Honor points it out, really the purpose of the

14  second day deposition is to get into the specific account

15  statements of the particular Defendants.  And so, to the

16  extent that Your Honor permits the day two depositions to be

17  about account statements, we ask that it be limited to the

18  Defendants' account statements or, at the very least, to

19  specifically prohibit questions about the Picower parties'

20  account statements.

21          You know, Ms. Chaitman has represented here today

22  that she also wants in the day two topics to kind of limit

23  them to the Defendants' account statements, so there really

24  should be no problem with prohibiting questions about the

25  Picower parties' account status.

1           Thank you, Your Honor.

2           MS. CHAITMAN:  Your Honor --

3           THE COURT:  Let's stick to the day two topics.

4           MS. CHAITMAN:  Okay.  I just want to say one

5    thing.  Mr. Sheehan said that he doesn't know what we were

6    doing, we were looking at other stuff for the last eight

7    years.  We were looking at the stuff in the eData room the

8    Trustee chose to put there.  There are 4700 reels of

9    microfilm that we need to see so that we can --

10          THE COURT:  How long will it take you to look

11   through them?

12          MS. CHAITMAN:  First, I have to get them.  We're

13   doing a Herculean job reviewing what has been produced, but

14   the thing is, the Trustee has to produce these things.

15   Believe me, I want to get to Mr. Madoff as quickly as

16   possible.  He's in his late 70s, he's not healthy.  But the

17   thing is, it's not fair to us when the Trustee has withheld

18   these documents for us to be going and deposing him when

19   just the few reels they produced have been such a massive

20   goldmine for us.

21          DAVID SHEEHAN:  Make her make a motion, Your

22   Honor.

23          THE COURT:  You're not going to produce these

24   reels?

25          DAVID SHEEHAN:  Well, Your Honor, I think --

Page 67

1              THE COURT:  Why not?  I thought you were directed

2      --

3              DAVID SHEEHAN:  I'm not talking about money.

4              THE COURT:  -- by me and Judge Maas to produce

5      this stuff?

6              DAVID SHEEHAN:  Pardon?

7              THE COURT:  I thought you were already directed to

8      produce these documents.

9              DAVID SHEEHAN:  Well, I think he found that what

10     we have done to date is more than satisfactory, as a matter

11     of fact.

12             THE COURT:  That's correct.  I saw a decree in a

13     paragraph in one of his orders --

14             MS. CHAITMAN:  He said they had to produce

15     everything, and you said they had to produce everything.

16     He's never made a finding that they -

17             THE COURT:  These documents are not relevant are

18     you telling me?

19             DAVID SHEEHAN:  Your Honor, what we know at this

20     point about those records is that everything and then is

21     duplicative of what we have already know.  If we want to do

22     that again, it's going to -- you know, and I'm not worried

23     about the cost, but they -- until they can make...  Let me

24     put it this way.  I don't think Your Honor has had a good-

25     faith offering by any of them to justify any of the

1    discovery they're getting because they use conclusory, we

2    didn't get this, we didn't get that.  They're --

3            THE COURT:  We're talking --

4            DAVID SHEEHAN:  Your Honor, do you know for a fact

5    what's in those?  I don't.  Right?

6            THE COURT:  Well, I think you should look at them.

7            DAVID SHEEHAN:  I know I've looked at 27 terabytes

8    of data and I know that there's no evidence of trading that

9    this woman keeps talking about that we've been hiding.  And

10   she hasn't presented one iota of evidence to suggest to you

11   that that's true, other than conclusions.

12           THE COURT:  So you're -- but then you can't tell

13   me whether or not these microfilms are relevant or not if

14   you haven't looked at them.

15           DAVID SHEEHAN:  No, we've looked at them enough to

16   do searches of them, but we have -- and can I say what I --

17           THE COURT:  Let me ask you a question.

18           DAVID SHEEHAN:  Yes.

19           THE COURT:  What's involved in just producing the

20   information?  Maybe I don't understand.

21           DAVID SHEEHAN:  Well, it's going to be a lot of

22   time and effort, a lot of money.

23           THE COURT:  What's involved?  I mean --

24           DAVID SHEEHAN:  Well, I would say it's a -- it

25   took half a million dollars to do 300 --

1              THE COURT:  What do you have to do to make them

2     available?

3              DAVID SHEEHAN:  We have to send them out.  The

4     microfilm itself, all right --

5              THE COURT:  Mm hmm.

6              DAVID SHEEHAN:  -- it's not like -- it's like an

7     endless stream.

8              THE COURT:  It's like the old library microfilm --

9              DAVID SHEEHAN:  Yeah, exactly, you just go through

10    it.  And then you've got to find a cut off, right, what they

11    call -- I forget the phrase they use, but you've got to

12    break it down so you get the right documents together.  Some

13    are one page, some are 100, we've got to do that.  So, we

14    have to send that out to a third party to --

15             THE COURT:  Why can't you just produce it as is or

16    have it have it copied --

17             DAVID SHEEHAN:  I'd be happy to give them a copy

18    of the tapes and then they can do with it what they want.

19             THE COURT:  How does that sound?

20             MS. CHAITMAN:  If they can give it to us right

21    away.

22             THE COURT:  Well, but it's -- they've got 4700

23    reels.

24             MS. CHAITMAN:  Forty-seven hundred -- 4700 tapes.

25             THE COURT:  Well, whatever it takes --

Page 70

 1              DAVID SHEEHAN:  We'll expedite the reproduction of

 2      the tapes --

 3              THE COURT:  Just give it to them.  Let them look

 4      at it.

 5              DAVID SHEEHAN:  Right.  Be happy to do it.

 6              THE COURT:  Okay.  You don't have to do anything

 7      more than that.

 8              DAVID SHEEHAN:  Okay.  Thank you, Your Honor.

 9              MS. CHAITMAN:  So, I think --

10              THE COURT:  So, do you want to hold off on day two

11      before you review all this stuff?

12              MS. CHAITMAN:  Yes, because otherwise -- unless

13      you want to let us do one day two and then we'll do another

14      day two.  We can't --

15              THE COURT:  I can't keep going down to prison to

16      take this guy's --

17              MS. CHAITMAN:  I agree with you.

18              THE COURT:  -- testimony.

19              MS. CHAITMAN:  I agree with you, but I don't want

20      to do this --

21              THE COURT:  The only thing -- let me -- so, you

22      know where we're going with this.  As far as I'm concerned,

23      unless there's something that you discover that's uniquely

24      different from the stuff that's already been produced, in

25      other words, it can't be just another month of the same

Page 71

1    statements from the same custodian.

2            The day one topics are done and the purpose of day

3    two was to allow people to ask about their specific

4    participating Defendants.  I can give you a certain amount

5    of time to review this stuff if you want.  My sense is he's

6    not going -- Mr. Madoff is not going to be able to give you

7    the kind of information that you're looking for.  It may be

8    that the stuff is nonetheless relevant and you can match a

9    purchase by one of the other divisions with something on a

10   customer statement.  I don't know.  But I don't think that

11   Madoff's going to be able to do that for you.

12           MS. CHAITMAN:  Well, I don't --

13           THE COURT:  You're going to need someone to do

14   what Mr. Sheehan said they did early on, which is go through

15   all of the House 5 records and see if you can match

16   purchases with all of the House 17 records.

17           MS. CHAITMAN:  Judge, I know that from the 600

18   reels they did produce pursuant to Magistrate Judge Maas's

19   order, I do have very specific questions for Mr. Madoff,

20   which will --

21           THE COURT:  About your clients?

22           MS. CHAITMAN:  Absolutely.

23           THE COURT:  Or about...?

24           MS. CHAITMAN:  Absolutely, but the point is that I

25   need a period of time to review the 4700 --

Page 72

```
 1              THE COURT:  Okay.

 2              MS. CHAITMAN:  -- microfilm reels.

 3              THE COURT:  How long do you think you're going to

 4    need?

 5              MS. CHAITMAN:  I'm not in a position today to say,

 6    Judge.

 7              THE COURT:  Okay.

 8              MS. CHAITMAN:  I have no idea --

 9              THE COURT:  Why don't we do this.  You make them

10    available.

11              DAVID SHEEHAN:  Well, I don't have my technical

12    staff here.

13              THE COURT:  All right.

14              DAVID SHEEHAN:  I don't know that we can just copy

15    them.  I represented to Your Honor I would, and if I can, I

16    well, all right?  I'll have to process them.  The 600 tapes

17    took us months to do that, so it's not simple, but --

18              THE COURT:  Well, what I'm suggesting is, like the

19    old library, is it a microfiche machine with a crank and you

20    can look at them.

21              DAVID SHEEHAN:  Happy to make them available, Your

22    Honor.

23              THE COURT:  So, when can you do that?

24              DAVID SHEEHAN:  As soon as I get back to the

25    office, we'll find out technically how we can do that.
```

1    Everybody's probably back there saying, what the heck is

2    Sheehan offering up there?  But, you know, I will find out.

3              My goal here is this, all right, is to stop this.

4    Stop it.  That what's happening here is not accomplishing

5    anything except exactly what they're looking for.

6              THE COURT:  Well, you see, the --

7              DAVID SHEEHAN:  Delay --

8              THE COURT:  The problem I have --

9              DAVID SHEEHAN:  Your -- yeah.

10             THE COURT:  -- is nobody has looked at these

11   documents.  You've admitted you haven't looked at these.

12             DAVID SHEEHAN:  Right.

13             THE COURT:  Nobody knows what's in them.  Yeah,

14   but there's 20,000 pieces of media.  You want us to produce

15   those?  The rule that Your Honor's engaging in here today

16   is, hey, we find something, give it to them.  Well, you

17   know, do you want to spend --

18             THE COURT:  If you told me --

19             DAVID SHEEHAN:  -- another couple billion dollars?

20             THE COURT:  If you told me they were not relevant,

21   or you told me that there was something in there that was

22   not in there, that's one thing.  But you're saying I never

23   looked at them.  If you want to look at them and make that

24   representation, fine.  I think the easier thing is just let

25   them look at them.

Page 74

1                DAVID SHEEHAN:  It sounds easy.

2                THE COURT:  All right.

3                DAVID SHEEHAN:  But we've been doing that for a

4     year and a half with Ms. Chaitman.

5                MS. CHAITMAN:  That is untrue.

6                THE COURT:  No, no, stop.  I don't know what's in

7     there, you don't know what's in there, and on that basis,

8     you can't say I'm not going to turn it over.

9                DAVID SHEEHAN:  Yeah, but she hasn't shown to you

10    what she's saying is true.

11               THE COURT:  There are two orders directing you --

12               DAVID SHEEHAN:  But why does she get discovery

13    when she can't even prove what she's saying?

14               THE COURT:  There are two orders directing you to

15    turn over the documents.  You haven't told me that they're

16    not relevant.  You --

17               DAVID SHEEHAN:   I'm going to look at it, and if I

18    don't think they are, I'm going to tell Your Honor that.

19               THE COURT:  You haven't made a motion for a

20    protective order, and there are two orders to turn over the

21    documents.

22               DAVID SHEEHAN:  I'd like the protective order.

23    Well, I do.

24               MS. CHAITMAN:  Well, Judge, you know --

25               DAVID SHEEHAN:  It's about time she put up or shut

Page 75

1     up.

2             THE COURT:  I don't have a motion before me.

3     She's asked for documents.

4             DAVID SHEEHAN:  Based on what?

5             THE COURT:  She's (indiscernible) the documents.

6     She's defending clients.

7             DAVID SHEEHAN:  I'd like to be 6' 5" and 210.  But

8     that's not going to happen.  She --

9             THE COURT:  You know, Mr. Sheehan, that's not

10    helpful.

11            DAVID SHEEHAN:  Well, you know what's not helpful,

12    Your Honor is that back -- I've been doing this for 48

13    years.  I've never encountered a situation where there is in

14    a good faith basis for anything they're asking for, not a

15    shred of it.  And Your Honor is ordering us to do this and

16    do that.  She has shown you nothing.

17            THE COURT:  There is evidence in this case --

18            DAVID SHEEHAN:  Yes.

19            THE COURT:  -- that Mr. Madoff, of the LMIS, was

20    actually purchasing securities.  Right?

21            DAVID SHEEHAN:  For who?

22            THE COURT:  Listen.  He testified that it was for

23    his own account.  They want to argue that when he purchases

24    a security and that same security shows up on a customer's

25    statement, that is a purchase allocated to the customer.

Page 76

1    They may lose that argument, but it seems to me they're

2    entitled to make that argument.

3              DAVID SHEEHAN:  If they had a good faith basis.

4    What have they shown you?  When you say there's evidence,

5    yesterday -- or they submitted this affidavit from the

6    (indiscernible), they submitted this.

7              THE COURT:  But I'm not talking about that.  I'm

8    talking about the business records.  My recollection was

9    that Ms. Chaitman showed certain entries from some custodian

10   -- I don't remember the name, National or something I think

11   -- and corresponding entries on other accounts, or she

12   alleged that they were there.  What does she have to show?

13             MS. CHAITMAN:  Judge --

14             DAVID SHEEHAN:  National Westminster Bank was a

15   dummy account.  She never looked at that.  You look at those

16   records, what those records will show you is that they're

17   the counterparty.  That's how they used them.  And I'll --

18   you want to go back down to there -- I'll prove that.  She

19   has those records.  Those records are available to her.  She

20   doesn't want to do the work.

21             THE COURT:  You can tell me --

22             DAVID SHEEHAN:  Well, that's why I'm going to move

23   for a protective order.

24             THE COURT:  Let me -- stop interrupting.

25             DAVID SHEEHAN:  Yes.

Page 77

1          THE COURT:  Sit down.

2          DAVID SHEEHAN:  I will.

3          THE COURT:  If you can tell me that you've looked

4     at these 4000 reels of microfilm and make it -- let me

5     finish -- and they consist of documents that have already

6     been turned over, and they're simply duplicates, fine.  But

7     you can't say that.  That's the problem I'm having with your

8     argument.  You're telling me she's not entitled to it and

9     you can't even tell me whether there's 4000 smoking guns in

10    there.

11         DAVID SHEEHAN:  Well, it would be impossible to --

12         THE COURT:  Let me know how long it takes to

13    produce them.  I'll give you a time period within which to

14    review it, if that's how you want to spend your time.  And

15    then we'll figure out the day to topics, which are going to

16    be limited to the specific cases that are involved -- that

17    are remaining.  Unless there's something in there, as I

18    said, that wholly -- you know, is a wholly new disclosure

19    and not just another document, it's the same stuff that's

20    been turned over before.

21         MS. CHAITMAN:  Okay.  But Judge, it's a little bit

22    late for the Trustee, having concealed the existence of

23    these reels.

24         DAVID SHEEHAN:  We did not.

25         THE COURT:  Let us stop.

1              DAVID SHEEHAN:  I'm tired of it, Your Honor.

2              THE COURT:  All right.  Well, go argue out in the

3     hall.

4              DAVID SHEEHAN:  I am.

5              THE COURT:  All right.

6              DAVID SHEEHAN:  I'm sick and tired of what these

7     people say about us.

8              THE COURT:  When are you --

9              DAVID SHEEHAN:  It' not even true.

10             THE COURT:  Mr. Sheehan, when are you going to let

11    me know when you're going to make these available and the

12    manner in which you will --

13             DAVID SHEEHAN:  Well, we do have an Independence

14    Day holiday.  A few people in my office deserve a day off.

15             THE COURT:  I understand.

16             DAVID SHEEHAN:  I'd say about two weeks.

17             THE COURT:  All right.  So, two weeks from --

18             DAVID SHEEHAN:  Today.

19             THE COURT:  Let's say two weeks from tomorrow.

20    Tomorrow is Friday.  All right.

21             DAVID SHEEHAN:  I want to reserve the right to

22    make a protective order, Your Honor, once I do that.

23             THE COURT:  You can always make a motion for a

24    protective order.

25             DAVID SHEEHAN:  Pardon?

1           THE COURT:  You can always make a motion for a

2     protective order.

3           DAVID SHEEHAN:  Thank you, Your Honor.

4           THE COURT:  But you're going to have to tell me

5     something about what's in those documents.

6           DAVID SHEEHAN:  That's exactly what the order will

7     be based on.

8           THE COURT:  All right.  I know that, so you've got

9     to look at them between now and Friday.

10          DAVID SHEEHAN:  Your Honor, you've been very

11    clear.  My hearing is good.  My emotions are not in check.

12          THE COURT:  That's all right.

13          DAVID SHEEHAN:  I apologize.

14          THE COURT:  All right.  Your vocal cords a very

15    good too, Mr. Sheehan.

16          DAVID SHEEHAN:  Well, fire with fire.  Thank you,

17    Your Honor.

18          THE COURT:  Don't go yet.

19          DAVID SHEEHAN: Oh, okay.

20          THE COURT:  Schedule a conference for about four

21    weeks from now, then you're going to tell me how long you

22    need to look at them, and that's going to be based on, I

23    hope, some sample that you've looked at and explain to me

24    why there something in there --

25          MS. CHAITMAN:  Okay.

Page 80

1              THE COURT:  -- that's unique and has never been in

2      the documents that have been produced.

3              MS. CHAITMAN:  Okay.  So, do you want us --

4              THE COURT:  What I'm saying is if it's another

5      month of records that they've already produced, that's not

6      going to move me.

7              MS. CHAITMAN:  I have no idea what's in them,

8      Judge.

9              THE COURT:  Well, okay.  Let me schedule another

10     conference for July 27th.  Do you have an omnivorous day?

11             DAVID SHEEHAN:  I think we do.  Might on the --

12             CLERK:  July 26th.

13             DAVID SHEEHAN:  Oh, July 26th.  Yeah, that's

14     another omnivorous day.  I always rely upon your clerk.

15             THE COURT:  So do I.

16             MS. CHAITMAN:  So, it's July 26th?

17             DAVID SHEEHAN:  Yeah, that's a regular omnibus

18     day.  I'm sure you'll be here on something else, Ms.

19     Chaitman.  Hope springs eternal.

20             THE COURT:  All right.

21             MS. CHAITMAN:  Take a pill.

22             DAVID SHEEHAN:  Why don't you take one?

23             THE COURT:  Children, that's enough.

24             DAVID SHEEHAN:  (indiscernible)

25             THE COURT:  Mr. Sheehan.

Page 81

1          DAVID SHEEHAN:  Yes.  (indiscernible)

2          THE COURT:  Mr. Sheehan, that's enough.

3          DAVID SHEEHAN:  Sorry.

4          THE COURT:  It's not helping.

5          DAVID SHEEHAN:  Forty-eight years (indiscernible).

6          THE COURT:  Thank you very much.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 82

C E R T I F I C A T I O N

    I, Sonya Ledanski Hyde, certified that the foregoing

transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde,
o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2017.07.03 16:25:44 -04'00'

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  July 3, 2017