UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>-against-<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | **DISCOVERY ORDER** |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>-against-<br><br>STANLEY I. LEHRER, in his capacity as administrator of the Stanley I. Lehrer and Stuart M. Stein, J/T WROS, et al.,<br><br>Defendants. | Adv. Pro. No. 10-5259 (SMB) |

Irving H, Picard, the Trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated estate of Bernard L. Madoff ("Madoff"), individually, has moved to compel defendant Stanley I. Lehrer ("Mr.

Lehrer") to respond to discovery requests propounded by the Trustee which Mr. Lehrer has declined to answer on Fifth Amendment grounds.

For the reasons set forth below, I conclude that Mr. Lehrer's Fifth Amendment claim does not entitle him to refrain from answering the Trustee's inquiries. Accordingly, Mr. Lehrer is directed to comply with the directives in this Discovery Order within two weeks.

I. Factual and Procedural Background

This discovery dispute was referred to me for resolution pursuant to the parties' stipulation dated April 20, 2017, which was "so ordered" by Judge Bernstein the following day. (See ECF No. 194). The Trustee then served his letter-motion to compel on April 28, 2017. By letter dated May 5, 2017, Mr. Lehrer responded to the Trustee's application. I then held a telephonic arbitration hearing on June 16, 2017.

As set forth in the parties' papers and discussed during the hearing, Mr. Lehrer is a retired attorney who was a partner in the law firm of Squadron, Ellenoff, Plessant & Lehrer before its merger into a larger firm. In or around 1978, Howard Squadron ("Squadron"), one of the firm's other named partners, learned of Madoff's alleged success as a trader and arranged to open a joint trading account ("Joint Account") for the benefit of a handful of Squadron Ellenoff partners. Squadron and partner Allen A. Stein were originally designated as the joint tenant owners of the Joint Account; following Allen A. Stein's death, Mr. Lehrer became a joint tenant owner; and, in 1992, Mr. Lehrer and Stuart M. Stein ("Stein") became the joint tenant owners. Two persons were named as joint tenants on the account documents at all times so that trading of the Joint Account could continue even if one of the joint tenants died.

Although the Joint Account was styled as a joint tenancy account, it actually operated as a joint venture. Thus, the joint venture had its own tax identification number, filed tax returns, and issued Schedule K-1 forms to the joint venturers. Over time, the joint venturers included other partners at Squadron Ellenoff as well as non-partners, including Mr. Lehrer's wife, Eunice Chervony Lehrer, who invested through her IRA account. In his capacity as a joint tenant owner, Mr. Lehrer engaged in the purchase and sale of certain joint venture interests, often through the mails and across state lines, even though he (and evidently the joint venture itself) never registered with the SEC in any capacity.

As might be expected, trading through the Joint Account came to an abrupt halt in December 2008 after Madoff's fraudulent activities came to light. Since then, Mr. Lehrer has attempted to recoup his losses in various ways, including the filing of tax returns in which he unsuccessfully claimed loss carryovers. Although he ceased to be an active member of the New York State bar some sixteen years ago, Mr. Lehrer also has provided advice to other joint venturers concerning means by which they might be able to recoup some or all of their losses.

In 2010, the Trustee commenced this "good faith" avoidance proceeding against Mr. Lehrer and his wife, as well as Stein and others. After the filing of the original complaint, Mr. Lehrer evidently was granted a discontinuance in his individual capacity on hardship grounds. The Second Amended Complaint ("SAC"), filed in early 2016, consequently named Mr. Lehrer solely in capacity as "administrator of the Stanley I. Lehrer and Stuart M. Stein, J/T WROS [account]" – i.e., not individually. By stipulation and order dated August 9, 2016, the Trustee discontinued the proceeding as against Stein and a second defendant named Roni L. Stein (presumably his wife) following their payment of an undisclosed sum.[1] The claims against

[1] Pursuant to an order entered by Judge Bernstein on November 12, 2010 (Dkt. No. 08-1789, ECF No. 3181), the Trustee is authorized to enter into a settlement agreement without first securing a court order in proceedings in

other defendants have also been dismissed. Most recently, the Trustee has reached a settlement with defendant Evelyn Fisher. As a consequence, Mrs. Lehrer is the only remaining defendant still named in the SAC in an individual capacity. The Trustee alleges that Mr. Lehrer transferred Joint Account funds to Mrs. Lehrer, making her a subsequent transferee. According to Mr. Lehrer, Stein, Roni Stein, and their counsel bear some animus against him based upon the fact that he was able to escape individual liability.

On March 8, 2017, the Trustee served Mr. Lehrer with requests for the production of documents, interrogatories, and document requests (collectively, the "Discovery Requests"). On April 3, 2017, Mr. Lehrer responded to each of the Discovery Requests with the same boilerplate response: "I invoke my right under the Fifth Amendment not to answer or respond, on the grounds that I may incriminate myself." Mr. Lehrer repeated this mantra separately with respect to each of the interrogatories and document requests. Faced with the considerably more extensive requests for admissions, Mr. Lehrer resorted to a single response in which he blanketly invoked that right with respect to all of the Trustee's requests. Mr. Lehrer has stated that he invoked his privilege even with respect to seemingly innocuous requests in an effort to ensure that he did not waive his rights as to subjects that could lead to his criminal prosecution.

Mr. Lehrer has advanced three justifications for his refusal to answer the Discovery Requests. First, Mr. Lehrer suggested in his response to the Trustee's letter-motion that his blanket assertion of his privilege against self-incrimination was proper because he bought and sold interests in the Joint Account through the mails and across state lines without having registered with the SEC, thereby giving rise to a legitimate concern that he could be prosecuted on that ground. Second, during the hearing, Mr. Lehrer indicated that he had

---

which the face value of an avoidable transfer is less than $7.5 million. Consequently, the amounts of such settlements are not reflected on the docket sheets of avoidance proceedings.

provided assistance and advice to other joint venturers, which could possibly be construed as the rendering of legal services, thereby subjecting him to criminal penalties for the unauthorized practice of law.[2] Finally, Mr. Lehrer noted in his letter response (and reiterated during the hearing) that some of his original co-defendants had "expressed bitter resentment" after he escaped any individual liability in this proceeding, indicating that they consequently might seek to interest a prosecutor in pursuing criminal charges against him for any wrongdoing associated with the joint venture.

II. Applicable Fifth Amendment Law

The Fifth Amendment provides, insofar as relevant, that "no person shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Although the amendment expressly addresses only criminal cases, the privilege against self-incrimination clearly also extends to civil cases. See Baxter v. Palmigiano, 425 U.S. 308, 316 (1976). Moreover, the privilege is not just applicable to "compelled oral testimony;" it also protects individuals from the compelled production of their personal papers and effects. Bellis v. United States, 417 U.S. 85, 87 (1974). A witness is nevertheless unable to "rely upon the privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if those records might incriminate him personally." Id. at 88.

A witness may properly invoke the Fifth Amendment privilege whenever he "reasonably believes that [the information sought] could 'furnish a link in the chain of evidence needed to prosecute him' for a crime." Estate of Fisher v. Comm'r, 905 F.2d 645, 648 (2d Cir.

[2] Under sections 478 and 485 of the New York Judiciary Law, it is a misdemeanor for a non-lawyer to render legal services or hold himself out as an attorney. See N.Y. Jud. Law §§ 478, 485; see also People v. Jakubowitz, 710 N.Y.S.2d 844, 845 (Sup. Ct. Bronx County 2000) (observing that Section 478 of the Judiciary Law is "not a model of clarity"). In more recent years, Mr. Lehrer has been a Florida resident. Accordingly, Florida law also may be applicable. Under section 454.23 of the Florida Statutes, it is a misdemeanor to "practice law" without being properly licensed or authorized by the Florida Supreme Court.

1990) (quoting Hoffman v. United States, 341 U.S. 479, 486 (1951)) (emphasis added). Often, of course, the danger the witness faces is readily apparent. When it is not, the burden of establishing that there is a basis to invoke the privilege rests on the person seeking its protection. Id, at 649. Moreover, "[t]he danger of self-incrimination must be real, not remote or speculative." Id. A witness's mere conclusory declaration of danger is therefore not enough to sustain his evidentiary burden. United States v. Edgerton, 734 F.2d 913, 919 (2d Cir. 1984). The witness must instead provide some facts to support his claim of potential incrimination.

A witness's decision to respond to a request for incriminatory information without asserting his Fifth Amendment privilege may constitute a waiver of his privilege with respect to all inquiries concerning the same subject matter. See Rogers v. United States, 340 U.S. 367, 373 (1951); Klein v. Harris, 667 F.2d 274, 287 (2d Cir. 1981). Thus, the witness must tread carefully to ensure that the disclosures that he makes in an effort to establish his right not to answer do not effect a broad waiver of his Fifth Amendment privilege. As the Second Circuit has recognized, when the potential prejudice to a witness is not clear from the surrounding circumstances, the burden on the witness "forces [him] to come dangerously close to doing that which he is trying to avoid." Edgerton, 734 F.2d at 919. Negotiating the difficult course between the Scylla of waiver and the Charybdis of an inadequate showing is nonetheless an obligation that a witness seeking to rely on the privilege against self-incrimination must undertake.

Determining whether there is a realistic danger of incrimination requires a particularized inquiry by the tribunal assessing the privilege claim. Hoffman, 341 U.S. at 487 ("The trial judge . . . 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'") (quoting Ex Parte Irvine, 74 F. 954, 960 (C.C.S.D. Ohio 1896)).

Despite the risk of a waiver, "[t]he mere existence of the privilege [does not give a witness a] license to employ a 'ritualistic assertion of the Fifth Amendment' and indiscriminately withhold even non-incriminating information." Cartier, a Div. of Richemont N. Am., Inc. v. Micha, Inc., No. 06-CV-4699, 2008 WL 2061386, at *4 (S.D.N.Y. May 12, 2008) (Chin, D.J.) (citing OSRecovery, Inc. v. One Groupe Int'l, Inc., 262 F. Supp. 2d 302, 307 (S.D.N.Y. 2003)).

## III. Application of Law to Facts

### A. Fifth Amendment Privilege

Prior to the telephonic hearing in this matter, I raised, by letter, the potential effect of the applicable statutes of limitations on Mr. Lehrer's claim that any information that he might provide in response to the Discovery Requests could lead to his criminal prosecution. I noted, by way of example, that "the general statute of limitations for federal crimes is five years from the commission of the offense." [3] (See letter from the Discovery Arbitrator to Mr. Lehrer and John J. Tepedino, Esq., dated June 2, 2017, at 1). As Mr. Lehrer himself noted during the hearing, the general New York statute of limitations for criminal activity is similarly five years "after the commission thereof." N.Y. Penal Law § 30.10(2)(b).[4] Misdemeanors, such as the unauthorized practice of law, are, however, subject to a two-year statute of limitations. Id. § (2)(c).

Mr. Lehrer advances three principal arguments in an effort to suggest that he reasonably fears prosecution despite the passage of time. First, he suggests that his purchase and

[3] The only other potentially applicable federal statute establishes a six-year maximum limitations period for tax offenses. See 26 U.S.C. § 6531.

[4] As noted previously, Mr. Lehrer now resides in Florida. The record does not reflect when he moved there. In any event, even if Florida law were applicable, the general Florida statute of limitations for a non-violent felony is "[four] years after it is committed." Fla. Stat., tit. XLVI, §775.15(2)(a). Additionally, an offense involving the breach of a fiduciary obligation must result in the filing of an indictment or information within one year after its discovery, but this exception to the general statute of limitations may not extend the applicable period by more than three years. Id. § 12(a).

sale of joint venture interests across state lines "raises questions involving SEC registration requirements." (See letter from Mr. Lehrer to the Discovery Arbitrator, dated May 5, 2017 ("May 5 Letter"), at 2). Even if that is correct, nearly a decade has passed since law enforcement and the public first learned of Madoff's massive Ponzi scheme. It further has been more than six years since the Trustee commenced this proceeding against Mr. Lehrer and others by filing his complaint in the Bankruptcy Court. Mr. Lehrer obviously could not have bought or sold any interests in the Joint Account after the Madoff fraud became public knowledge and the Trustee was appointed, both of which occurred in late 2008. Accordingly, even if one were to assume that Mr. Lehrer's failure to register with the SEC before engaging in such transactions somehow could give rise to a criminal charge, his misconduct, if any, necessarily would have occurred before BLMIS's demise. Given the passage of nearly ten years since BLMIS ceased to conduct business (and possibly even longer since Mr. Lehrer bought or sold a participation in the joint venture), no reasonable person in Mr. Lehrer's position could fear prosecution based on his failure to register properly with the SEC. It follows that this theory of criminal exposure does not permit Mr. Lehrer to rely on his Fifth Amendment privilege against self-incrimination as a basis for refusing to respond to the Discovery Requests.

Next, Mr. Lehrer represents that in the period after BLMIS ceased doing business, he has provided advice to certain joint venture account participants, including codefendants in this proceeding. He further posits that this could be deemed the unauthorized practice of law. Significantly, Mr. Lehrer has made no proffer indicating that any advice he gave to others could reasonably be construed as legal advice or that he improperly held himself out as a currently-licensed attorney. He therefore has failed to meet his evidentiary burden.

Furthermore, even if the conduct upon which Mr. Lehrer relies occurred recently enough not to be time barred, and could conceivably form the basis for a criminal charge, there has been no showing that the information that he has been asked to provide could "furnish a link in the chain of evidence needed to prosecute him for a crime." Estate of Fisher, 905 F.2d at 648. Since the Madoff fraud was discovered, Mr. Lehrer has lived in New York and Florida. He has not suggested that there is any reason to believe that any other state's statute governing the unauthorized practice of law would apply to his conduct. Under both the New York and Florida statutes, the gravamen of that crime is that someone either rendered legal advice or held himself out as an attorney without being admitted to the practice of law. See N.Y. Judiciary Law § 478; Fla. Stat. § 454.23. There is no need to establish the validity of the facts underlying the advice rendered. Indeed, common sense suggests that a non-lawyer could violate both statutes by giving legal advice based upon factual representations by a client that are utterly untrue. It follows that Mr. Lehrer's alleged rendition of legal advice in the period following the Trustee's appointment is not a basis upon which he can refuse to provide the Trustee with essentially unrelated historical information concerning the purported trading in, or actual distributions from, the Joint Account in the period before BLMIS ceased doing business as a going concern.

Finally, Mr. Lehrer evidently fears that certain former codefendants who were not able to escape individual liability (or their counsel) might take any information that he discloses to "Federal and/or State prosecutors with demands that [he] be charged with violations of criminal laws." (May 5 Letter at 3). The fact that others may bear him ill will, even if established, does nothing to bolster the viability of his Fifth Amendment privilege claim. Simply put, if there is no reasonable prospect that a prosecutor might seek to bring criminal charges against him, the fact that others might relish that outcome is irrelevant.

This aspect of Mr. Lehrer's justification for asserting his privilege against self-incrimination is also wholly speculative. For example, there is no evidence, other than Mr. Lehrer's conjecture, that his former co-defendants or their counsel have a continuing interest in securing his criminal conviction. Additionally, Mr. Lehrer assumes that his former co-defendants or their counsel will have an opportunity to obtain the information he discloses and, therefore, be able to reveal it to others. There has been no showing that this is so. Indeed, at least some of the information that the Trustee seeks may qualify as "Confidential Material" within the meaning of the omnibus Litigation Protective Order entered by the Bankruptcy Court with respect to all adversary proceedings related to the main BLMIS action, including this proceeding. (See Adv. Pro. No. 08-1789 (BRL), ECF No. 4137). If so, the disclosure of that information will be subject to restrictions that make it even less likely that Mr. Lehrer's co-defendants and their counsel will be able to use it against him.

In sum, each of the rationales that Mr. Lehrer has proffered for his assertion of a Fifth Amendment privilege claim fails to withstand scrutiny. To ensure that there are no further disputes with regard to the Trustee's Discovery Requests, I nevertheless will consider each category of documents that the Trustee seeks to determine if his motion to compel is in any way objectionable.

B. The Trustee's Requests

Turning first to the Trustee's document requests, I note that Mr. Lehrer presently is named in this proceeding solely in his representative capacity, as an administrator of the Joint Account. For that reason, as a matter of law, there is no valid Fifth Amendment privilege that Mr. Lehrer could assert with respect to the request for the books and records of the joint venture. See Bellis, 417 U.S. at 88.

Mr. Lehrer stated during the hearing that he has no responsive documents because Stein was the sole record keeper for the joint venture. Unfortunately, the hearing was not stenographically recorded. For that reason, I will require that Mr. Lehrer represent in writing and under oath that he has no documents in his representative capacity that relate to the Joint Account. Assuming that Mr. Lehrer complies with that directive, there will be no basis to grant the Trustee any further relief with respect to his present document requests.[5]

The Trustee also has served eleven interrogatories which seek information for a lengthy period ending on December 31, 2009, approximately one year after the Madoff scheme was exposed, but has since withdrawn Interrogatory No. 9. Interrogatory Nos. 1 through 8 and 10 seek information concerning deposits into the Joint Account, initial transfers from BLMIS to the Joint Account or any person or entity acting on its behalf, subsequent transfers to other persons or entities, any persons or entities who were recipients of subsequent transfers, any persons or entities that received management or similar fees in connection with the Joint Account, and the identities of anyone who assisted in responding to the interrogatories. Mr. Lehrer has failed to establish how his responses to these interrogatories in his representative capacity could form a link in a chain of evidence that would expose him to criminal prosecution for the unauthorized practice of law. He therefore must respond to these interrogatories.

---

[5] During the hearing, there were indications that the Trustee may also be seeking Mr. Lehrer's personal records concerning the joint venture account. The Trustee since has confirmed that this is his intent. (See letter from Mr. Tepedino to the Discovery Arbitrator, dated July 21, 2017, at 1). Since Mr. Lehrer is not named in the Second Amended Complaint in his individual capacity, those documents can be obtained from him only by means of a subpoena duces tecum. Assuming that such a subpoena is served, Mr. Lehrer could withhold his personal records concerning the account only if he were able to show that they could furnish a link in the chain of evidence required to prosecute him on a possible criminal charge. Estate of Fisher, 905 F.2d at 648. For the reasons noted above, Mr. Lehrer cannot make that required showing with respect to any documents created prior to BLMIS' demise. It follows that he would have to produce such documents.

The eleventh interrogatory seeks information concerning the bases for and persons knowledgeable about Mr. Lehrer's affirmative defenses.[6] If Mr. Lehrer were able to avoid answering this interrogatory he could shield from discovery relevant evidence about issues that he himself has interjected into this case. This is plainly improper. See United States v. Rylander, 460 U.S. 752, 758 (1983) ("[A party cannot] convert the privilege from the shield against compulsory self-incrimination which it was intended to be into a sword whereby a claimant asserting the privilege would be freed from adducing proof in support of a burden which would otherwise have been his."); see also Brown v. United States, 356 U.S. 148, 155-56 (1958) (witness who voluntarily testifies on direct examination "cannot reasonably claim that the Fifth Amendment gives him . . . an immunity from cross-examination on the matters he himself has put in dispute").

The remedy for failing to answer this interrogatory, however, need not be the compulsion order that the Trustee requests. Instead, the Discovery Arbitrator need only caution Mr. Lehrer that his refusal to answer will lead (in Bankruptcy Judge Bernstein's discretion) to an order either striking his affirmative defenses or precluding him from offering any evidence in support of them. See SEC v. Benson, No. 84 Civ. 2262, 1985 WL 1308, at *2 (S.D.N.Y. Apr. 9, 1985) (Leval, D.J.) (precluding defendant from offering evidence in support of his denials and affirmative defenses because a party asserting his Fifth Amendment privilege is "appropriately precluded from offering evidence in support of the positions whose basis he refused to disclose."); United States v. One Parcel of Real Prop. Commonly Known as 901 N.E. Lakewood Drive, Newport, Or., 780 F. Supp. 715, 722 (D. Or. 1991) ("Although striking [the defendant's] .

[6] Mr. Lehrer asserts nine affirmative defenses, ranging from boilerplate assertions that the SAC fails to state a claim and is barred by the doctrines of in pari delicto, unclean hands, waiver, estoppel, and laches, to allegations that the administrators of the Joint Account acted as mere conduits with no financial interest in the accounts of any other joint venturer.

. . affirmative defense . . . is a harsh remedy, I can find no lesser sanctions which would preserve the [plaintiff's] right to discovery and cross-examination."). If Mr. Lehrer wishes to avoid the entry of such an order essentially eviscerating his affirmative defenses, he must answer the Trustee's eleventh interrogatory.

Finally, the Trustee has served 88 requests for admissions. The Trustee recently has withdrawn Requests for Admission Nos. 82 through 88, which relate to subsequent transfers of Joint Account funds, because Mrs. Lehrer, the only remaining individual defendant, has admitted her receipt of those funds in her answer to the SAC. The remaining requests for admission ask Mr. Lehrer, inter alia, to: (a) authenticate numerous deposits into and withdrawals from the Joint Account for the benefit of initial transferees; (b) concede that $36 million more was withdrawn from, than was deposited into, the Joint Account; and (c) admit that BLMIS was a Ponzi scheme. All of the financial transactions about which the Trustee has inquired apparently occurred in or before December 2008. Here again, Mr. Lehrer has not shown how admissions concerning the transfer of Joint Account funds to the initial transferees or that BLMIS was operating a Ponzi scheme could serve as a link in a chain of evidence that could lead to his conviction on a criminal charge. Accordingly, Mr. Lehrer will also be required to respond to the Trustee's requests for admissions.

## IV. Conclusion

For the foregoing reasons, the Trustee's motion to compel is granted in part. Mr. Lehrer is directed to provide the following within two weeks:

(a) a notarized statement that he has retained no documents in his representative capacity that are responsive to the Trustee's discovery requests;

(b) the information that the Trustee seeks through his requests for admission and Interrogatory Nos. 1 through 8 and 10; and

(c) unless he is willing to suffer the adverse consequences of failing to respond, the information that the Trustee seeks through Interrogatory No. 11.

SO ORDERED.

Dated: New York, New York
July 24, 2017

Frank Maas
Discovery Arbitrator