# EXHIBIT 2

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-1789-smb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    SECURITIES INVESTOR

7    PROTECTION CORPORATION,

8            Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 09-1182-smb

11   PICARD

12   v.

13   MERKIN, et al.

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15                        United States Bankruptcy Court

16                        One Bowling Green

17                        New York, New York

18                        July 18, 2017

19                        2:00 p.m.

20

21

22   B E F O R E:

23   HON. STUART M. BERNSTEIN

24   U.S. BANKRUPTCY JUDGE

25   ECRO:  UNKNOWN

Page 2

1   HEARING RE Trustee's Motion to Exclude Evidence on the Actions

2   or Inactions of the SEC

3

4   HEARING RE Trustee's Motion to Exclude Exhibits Not Produced

5   During Discovery

6

7   HEARING RE Defendants' Motion to Exclude Testimony and Exhibits

8   Related to Whether Investors were Misled About Gabriel and

9   Ariel Funds' Exposure to BLMIS

10

11  HEARING RE Defendants' Motion to exclude Testimony of Meaghan

12  Schmidt

13

14  HEARING RE Defendants' Motion to Exclude Others' Purported

15  Suspicions About Madoff Not Expressed to Defendants

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Theresa Pullan

1   A P P E A R A N C E S :

2

3   BAKER HOSTETLER

4         Attorneys for the Trustee

5         45 Rockefeller Plaza

6         New York, NY  10111

7   BY:   LAN HOANG, ESQ.

8         BRIAN W. SONG, ESQ.

9         DAVID J. SHEEHAN, ESQ.

10

11  NORTON ROSE FULBRIGHT

12        Attorney for the Receiver for Ascot Partners

13        1301 Avenue of the Americas

14        New York, NY  10019

15  BY:   JUDITH ARCHER, ESQ.

16        SARAH E. O'CONNELL, ESQ.

17

18  DECHERT

19        Attorneys for the Merkin Defendants

20        1095 Avenue of the Americas

21        New York, NY  10036

22  BY:   ANDREW J. LEVANDER, ESQ.

23        NEIL STEINER, ESQ.

24        MARIEL BRONEN, ESQ.

25

Page 45

1    necessarily imparted to Merkin, and I don't know if that's

2    really that much different than the SEC report that came out in

3    2009 and said nobody knew.  I mean it's almost like an

4    objective standard -- if this person knew, then Merkin must

5    have known.  Again, they can testify to the conversations, what

6    he said and didn't say, and I'll make a conclusion based upon

7    what I hear.  But I don't need to hear what other people

8    thought.

9         MR. SONG:  Understood.  Thank you, Your Honor.

10        THE COURT:  Anything else?

11        MS. ARCHER:  Your Honor, there's another issue that

12   I'd like to raise with the Court that we believe may impact the

13   trial.

14        In conjunction with the pretrial motions and

15   preparation, it has become apparent that the trustee has

16   changed his longstanding position, which we believe the Court

17   agrees with, that equitable subordination is a red herring here

18   because it will be mooted if the defendants pay any judgment on

19   fraudulent transfer claim.

20        As Your Honor will recall, in numerous court filings,

21   including the motion to dismiss, the motion for summary

22   judgment, as well as in response to Your Honor's extensive

23   questioning and the argument on summary judgment, the trustee

24   has admitted that if he recovers on his fraudulent transfer

25   claim and Ascot pays a judgment, that his claim for equitable

1    subordination is moot, irrelevant.

2            As Your Honor has made clear in this case and in

3    others, the trustee cannot obtain equitable relief if he

4    recovers on his legal claim.  The trustee now seems to be

5    taking the position contrary to this Court's holdings that if

6    he recovers on fraudulent transfer, then he can either refuse

7    to take Ascot's money and refuse to let Ascot satisfy a legal

8    judgment, or can then go ahead and subordinate Ascot's

9    (indiscernible) claim or net equity claim.  We don't believe

10   that's the court holding in the past decisions.  We don't

11   believe that's the law long established in the Second Circuit.

12   And we believe it would be helpful as we move toward trial to

13   have the Court address the issue of whether the trustee may

14   recover doubly on both of those claims.

15           THE COURT:  Well, it's not really an issue before me

16   today, but I just always thought equitable subordination was

17   another remedy and if you recovered your judgment, then you got

18   everything you're entitled to.

19           MR. SHEEHAN:  Your Honor --

20           THE COURT:  And I'm not deciding anything today,

21   but --

22           MR. SHEEHAN:  I wouldn't think you would today.  But

23   the point is that we've raised this in the context of going

24   back and forth in settlement discussions.  And one of the

25   issues came about as a result of Your Honor's decision which

1   the Court will recall with regard to a motion to dismiss at

2   which point you did grant motion to dismiss on the actual

3   tenet, but we do go forward on willful blindness.

4           And at the end you also dealt with issues of

5   equitable subordination.

6           THE COURT:  The same way Judge Rakoff did.

7           MR. SHEEHAN:  Yeah, exactly, and Judge Rakoff's

8   standard of willful blindness.  But the issue becomes this,

9   which I don't think is necessarily answered by Your Honor,

10  although our adversary suggested is a holding (indiscernible)

11  it's an observation by Your Honor, but an issue that should be

12  addressed, I have no problem addressing it.

13          I was thinking we could do it in another context, but

14  if we do it here, it's fine.  And that is this.  We believe the

15  law is such that we could literally take the money and still

16  subordinate their claim.  And the reason we believe we could do

17  that is, is that equitable subordination is a separate remedy,

18  remedying another harm.  The two harms are different.  One is

19  remediating the estate and putting somebody back where they

20  should have been in terms of money back in the estate.  The

21  other half of that is is that should they, particularly when

22  you're talking about preferred customer status, share after

23  that finding, finding of willful blindness leading to them

24  paying the amount, should they send, be able to share and stand

25  shoulder to shoulder with others who did not engage in that

Page 48

1   kind of activity or they should be, they be relegated to being

2   paid at the end of the day when everybody else who in that

3   customer status and did not act with willful blindness, gets

4   fully reimbursed.   And they then get paid after that.

5          THE COURT:  If they made their peace by making

6   payment for their wrong, why should they be in a different

7   position than anybody else?

8          MR. SHEEHAN:  Well --

9          THE COURT:  Unless you have some theory that they

10   don't have a 502(h) claim, for example.

11          MR. SHEEHAN:  Well, I think a 502(h) claim is also a

12   part of this equation in this sense, though.  There's no

13   guarantee of a 502(h) claim.  It's a question that they can

14   file one.  We believe that Your Honor could find, I'm not

15   suggesting what Your Honor would find, but that Your Honor

16   could find that the conduct of the defendants in this situation

17   was such that notwithstanding the fact that they paid their

18   claim as they should have paid, right, that they are not

19   entitled, entitled to act in a preferred status as a customer.

20   And Your Honor could decide that.  Not that they don't have a

21   claim.   We're talking about subordination.

22          THE COURT:  Well, let's talk about an allowable

23   claim.

24          MR. SHEEHAN:  Should they have an allowable claim as

25   a customer if they have been willfully blind to the conduct of

Page 49

1    Mr. Madoff?

2           THE COURT:  I'm not ruling on it, but it sounds like

3    you're trying to get a double, two remedies for the same

4    (indiscernible).

5           MR. SHEEHAN:  Well, I understand that, Your Honor.

6           THE COURT:  Once they repay their money, they're in

7    the same position as everybody else.  Whether or not they have

8    a 502(h) claim is a different question because that's designed

9    to put people back in the status quo that existed before the

10   transfer was made.  And if they wouldn't have had a claim

11   before the transfer was made, of course (indiscernible) saying

12   they stole the money.  I'm not saying that's the case, but in

13   that situation, if a thief repays money they don't get a 502(h)

14   claim because there was no underlying debt to begin with.

15          MR. SHEEHAN:  But --

16          THE COURT:  I think you would --

17          MR. SHEEHAN:  The flip side to that is is that why

18   would they ever settle?

19          THE COURT:  Well, so that they can be treated like

20   everybody else.

21          MR. SHEEHAN:  No, no.  My point is they've got a

22   free --

23          THE COURT:  Why would they -- in a settlement --

24          MR. SHEEHAN:  As far as they're concerned, they have

25   a free ride here.  They can win, right, and get their 235,000.

1          THE COURT:  235 million.  But if they --

2          MR. SHEEHAN:  Sorry, I lost track of that.

3          THE COURT:  But if they write you a check for $235

4    million, then why shouldn't they be treated as other creditors?

5          MR. SHEEHAN:  If we settle the case along those

6    lines, that would be one thing.

7          THE COURT:  Well, if you get a judgment, and the

8    judgment --

9          MR. SHEEHAN:  But should they be able to try the

10   case, win, and then therefore they get a free ride?  There's no

11   leverage on them to settle this case.  None.

12         THE COURT:  But, if they win, they haven't done

13   anything wrong.

14         MS. ARCHER:  And even if we lose, Your Honor, and we

15   pay the money, the estate is in the same position as it was in.

16   I mean Mr. Sheehan may lose track of 235 million, which is our

17   net equity --

18         THE COURT:  That's why I said it sounds like they're

19   trying to get two remedies for the (indiscernible).

20         MS. ARCHER:  We agree, Your Honor, and having at the

21   summary judgment --

22         THE COURT:  I emphasize I'm not deciding that.

23         MR. LEVANDER:  I understand you're not deciding it

24   today, you're not making a ruling.  But the (indiscernible)

25   case in the Second Circuit which I think is 281 F.2d if I

Page 51

1    recall correctly, the court specifically said that if you had a

2    debtor which had intended to defraud the other creditors and

3    got caught in that action, and after judgment paid the

4    judgment, they still get the springing claim and so I don't

5    think there's any difference in this circumstance.

6            THE COURT:  Well, for once I probably agree with the

7    Second Circuit.  Or they agree with me.

8            MR. SHEEHAN:  I'm not so sure I agree with the

9    rendition that was just announced by Mr. Levander.  And I

10   didn't lose track of the claim, Your Honor.  I lost track of

11   the fact that sometimes millions and thousands --

12           THE COURT:  If you want to have a settlement

13   conference and you want me to do it, I'll be happy to do it.  I

14   understand you might not want to do it before the Judge is

15   going to try the case, but --

16           MR. SHEEHAN:  I see no purpose in having a conference

17   before Your Honor.  I would have an in limine motion on it.  I

18   think that quite frankly the better law is in our favor on

19   this.  I know what Your Honor's (indiscernible)

20   jurisprudential.  My gut reaction would be the same as yours.

21   Right?

22           THE COURT:  Well, you see, we agree.

23           MR. SHEEHAN:  Well, yes, I agree.  But the thing

24   that's fascinating is, how many times do we actually deal with

25   equitable subordination in a real context like this?  We don't,

Page 52

1    but we start to look at it.  What I'm talking about here is is

2    that you know what Mr. Levander said --

3              THE COURT:  Can I give you an example of why you may

4    prefer equitable subordination and withdraw your claim for

5    money damages?  Let me just -- they have a one dollar

6    fraudulent, you have a one dollar fraudulent transfer claim

7    against them and they have a $500 million net equity claim in

8    your case.  You just seek equitable subordination.  You don't

9    even bother to ask them for the $1 back.

10             MR. SHEEHAN:  Well, it would depend on how that was

11   achieved, that one dollar.  Because what we're talking about

12   here is that what Mr. Merkin did over the course of two decades

13   was to allow this Ponzi scheme to go on, he helped it, he

14   fostered it, that's what we intend to prove.

15             THE COURT:  You don't have to respond to that.

16             MR. SHEEHAN:  That thousands and thousands were hurt.

17   These are allegations; I'm not suggesting they're facts.

18             THE COURT:  I understand.

19             MR. SHEEHAN:  But we will prove them to be facts.  My

20   point being is that if someone hurts the estate for that long a

21   period of time, do they simply then pay up and walk away and

22   get paid over $500 million when that will actually hurt the

23   estate?  In other words, we have an obligation here.  It's not

24   a part of the argument.  We have an obligation here, right now,

25   if we just -- they didn't get any money at all from them, and

Page 53

1   just subordinate it, the customer fund does that.

2           THE COURT:  So you withdraw your claim for money

3   damages and just prove that they have a claim that's disallowed

4   under 502(d).  That's the example I was using where it may make

5   more --

6           MR. SHEEHAN:  If you think I can do that, I will do

7   that.

8           THE COURT:  I don't know why you can't withdraw a

9   claim for money damages.

10          MR. SHEEHAN:  Well, I don't, in this context, the law

11  is murky, it's not as clear as everyone would like it to be.

12          THE COURT:  Do you have any objection to his

13  withdrawing a claim for $235 million?

14          MS. ARCHER:  That claim, he's trying to claim 280

15  million.

16          MR. SHEEHAN:  Well, 280 --

17          THE COURT:  How much is the claim for in this case?

18          MS. ARCHER:  The fraudulent transfer is 280.  If the

19  trustee would like to communicate that to us, we will respond.

20          THE COURT:  Why don't you say, look, I'll withdraw it

21  and I'll just go for the, you know, I'll just go to seek to

22  disallow your claim under 502(d) without any recovery.

23          MS. ARCHER:  Your Honor, if I --

24          MR. SHEEHAN:  But if they win --

25          THE COURT:  Well, if they win, they win.

Page 54

1          MR. SHEEHAN:  They get their 235, right?  Give that

2    about 24 hours, but okay.  I think I'm ready to take a shot at

3    that.

4          THE COURT:  All right.

5          MS. ARCHER:  Your Honor, if I can respond.

6          Mr. Sheehan seems to have forgotten that the

7    allegations that he seems to believe are still in the case

8    relate to actual knowledge of fraud and those have been

9    dismissed.  So we're talking about willful blindness.  And

10   we're not talking about anyone who participated in fraud.

11         THE COURT:  I'm not sure I can articulate the

12   difference to you, but I guess there is a difference.

13         MR. SHEEHAN:  Yeah, I don't disagree with that

14   observation either.

15         MS. ARCHER:  There is certainly a difference which is

16   the authority that he kept bringing it back in and that he

17   referred to, Your Honor, were situations where people --

18         THE COURT:  I guess he said willful blindness is bad

19   enough anyway.

20         MR. SHEEHAN:  That's the standard enunciated by Judge

21   Rakoff.

22         THE COURT:  I understand.

23         MR. SHEEHAN:  I think that the context of these are

24   the same.  In other words, I think the evidence that we will

25   need to prove willful blindness would, we believe, is enough to

Page 55

1    prove actual intent.  Your Honor, we respectfully understand

2    your position.

3            We also want to take an appeal from that, this would

4    be a great case to take an appeal from on that issue because I

5    think the standard enunciated by Judge Raycoff is wrong, it's

6    not in a statute, it doesn't exist, he made it up.  There's

7    lots of things we want to do with regard to that.  But this

8    case is one that we've always wanted to try --

9            THE COURT:  Right.

10            MR. SHEEHAN:  -- because it's a case we want to take

11    up.  There's no better facts on actual intent than Mr. Merkin.

12            THE COURT:  Getting back to the issue that started

13    this non-motion, it just doesn't sound --

14            MR. SHEEHAN:  I didn't bring it up.

15            THE COURT:  I know.  You did.  It just doesn't sound

16    right to me that you can get essentially two remedies for the

17    same wrong.  If they pay you whatever it is, the $280 million,

18    the estate is made whole and they're like every other creditor.

19            MR. SHEEHAN:  You're identifying a single wrong, the

20    wrong being that they owe us $235 million.  That's not the only

21    wrong they engaged in here.  They engaged in activity that over

22    a long period of time enhanced a Ponzi scheme, let it go on,

23    get it there, made it worse.

24            THE COURT:  But that's not a claim in this case.

25            MS. ARCHER:  No, it is not.

1           THE COURT:  Sounds like an aiding and abetting claim

2      and that's not a claim in this case.  This is simply a

3      fraudulent transfer case.  And, you know, if they pay the

4      judgment, then that eliminates at least the 502(d) disallowed

5      aspect of it.  They seem to get a 502(h) claim.  I'm not aware

6      of any authority that would permit you to also, or any logic

7      that would also permit you to subordinate the 502(h) claim

8      after they made the estate whole for the injury that you've

9      sued them.

10          MR. SHEEHAN:  I realize that Your Honor.

11          THE COURT:  It sounds like you're trying to start a

12     second trial to disallow or subordinate their 502(h) claim

13     based on entirely, you know, a different theory that they aided

14     and abetted a 20 year fraud or something like that.

15          MS. ARCHER:  And theories that are not present in

16     this case.

17          THE COURT:  Having nothing to do necessarily with

18     their withdrawal, but and I just --

19          MR. SHEEHAN:  No, I think that they're the same.  I

20     think you prove one you prove the other.  But that's my point.

21     Your Honor, I understand, doesn't understand my position.

22          THE COURT:  No, I'm just saying if it's the same

23     claim, it sounds like you got one remedy.

24          MR. SHEEHAN:  I think there are two separate claims,

25     but that's --

Page 57

```
 1              THE COURT:  All right.

 2              MS. ARCHER:  We don't believe it is, and whatever the

 3    trustee decides, you're still going to have to establish,

 4    satisfy the high standard of equitable subordination on which

 5    he has the burden of proof.

 6              THE COURT:  Well, what he's saying though is if he

 7    could prove willful blindness he can establish equitable

 8    subordination.  And he may be right on that.

 9              MS. ARCHER:  We don't agree with that, Your Honor.

10    We think that was decided on a motion to dismiss and it's not

11    here.  But, in addition that the burden of proof is different.

12              THE COURT:  I denied the motion, the motion to

13    dismiss on equitable subordination.

14              MS. ARCHER:  I'm sorry?

15              THE COURT:  I denied the motion to dismiss on

16    equitable subordination.

17              MS. ARCHER:  Yes, you did.  But he was referring to

18    the Katz (phonetic) which was also a motion to dismiss.  There

19    hasn't been a decision at trial and in any event, the trustee

20    would bear the burden of proof on equitable subordination, it's

21    a different burden, and a much higher line and the case law

22    would show that.

23              MR. SHEEHAN:  I wasn't referring to Katz.

24              THE COURT:  Thank you very much.  Thank you for

25    raising it.
```