DENTONS US LLP
Carole Neville
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
carole.neville@dentons.com

Hearing Date:  October 25, 2017
Hearing Time:  10:00 a.m.

Objection Deadline: October 18, 2017

*Attorneys for the David R. Markin Estate*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05224 (SMB) |
| Plaintiff, | |
| v. | |
| DAVID R. MARKIN, individually and as trustee of the David Markin Charitable Remainder Unitrust #1, and David R. Markin Charitable Remainder Unitrust #2, SOUTHPAC INTERNATIONAL TRUST LTD., as trustee of the David R. Markin 2003 Trust, DAVID R. MARKIN 2003 TRUST, DAVID MARKIN CHARITABLE REMAINDER UNITRUST #1, DAVID R. MARKIN CHARITABLE REMAINDER UNITRUST #2, | |
| Defendants. | |

**DECLARATION OF CAROLE NEVILLE**
**IN SUPPORT OF MOTION TO DISMISS AND TO COMPEL PAYMENT**

I, Carole Neville, declare pursuant to 28 U.S.C. Section 1746 that the following is true:

1.        I am a Senior Counsel of the law firm, Dentons US LLP, counsel for the Estate of David R. Markin (the "Markin Estate").  I am admitted to practice law in the State of New York and the Southern District of New York.

2.        I submit this Declaration in support of the Markin Estate's Motion to Dismiss the Trustee's First Amended Complaint and to compel payment of the undisputed claim held by the Markin Estate against Bernard L. Madoff Investment Securities LLC.

3.        Attached hereto are true and correct copies of the following exhibits:

(a)        Exhibit A is a copy of the Amended Complaint setting forth the Trustee's claims against the named defendants with exhibits.

(b)        Exhibit B is a true and correct copy of the document establishing the David R. Markin Charitable Remainder Unitrust #1 ("CRUT#1").

4.        In February 2010, I sent Mary Bittance, then an attorney with Baker Hostetler assigned to the Markin adversary proceeding, a copy of the CRUT#1 documents including the CRUT agreement, tax returns, copies of canceled checks.  I also sent Ms. Bittance a copy of the Internal Revenue Ruling approving the transactions and the termination of the CRUT#1.

5.        In June 2010, I sent copies of the same documents to Nathan Ware, then an attorney in Baker Hostetler's Cleveland office, copies of the same documents in the furtherance of settlement discussions.

Executed this 25th day of August at New York, New York.

_/s/ Carole Neville_
Carole Neville

104563953

# **EXHIBIT A**

Estate of David R. Markin - Amended Complaint

08-01789-cgm   Doc 16563-2   Filed 08/25/17   Entered 08/25/17 13:51:57
Case 1:11-cv-07602-JSR   Document 6   Filed 01/25/12   Page 1 of 37
Declaration of Carole Neville   Pg 4 of 92

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                Plaintiff,<br><br>v.<br><br>DAVID R. MARKIN, individually and as trustee of the David Markin Charitable Remainder Unitrust #1, and David R. Markin Charitable Remainder Unitrust #2, SOUTHPAC INTERNATIONAL TRUST LTD., as trustee of the David R. Markin 2003 Trust, DAVID R. MARKIN 2003 TRUST, DAVID MARKIN CHARITABLE REMAINDER UNITRUST #1, DAVID R. MARKIN CHARITABLE REMAINDER UNITRUST #2<br><br>                Defendants. | Adv. Pro. No. 10-5224 (BRL)<br><br>11 Civ. 7602 (JSR)<br><br>Consolidated Case No.<br>11 Civ. 4936 (JSR) |

RECEIVED
[illegible stamp]

## AMENDED COMPLAINT

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*Bernard L. Madoff*

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L.

Madoff individually ("Madoff"), by and through his undersigned counsel, for his amended

complaint (the "Amended Complaint"), states as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Madoff.  Over the course of the scheme, there were more than 8,000 client accounts at BLMIS.

In early December 2008, BLMIS generated client account statements for its approximately 4,900

open client accounts.  When added together, these statements purport that clients of BLMIS had

approximately $65 billion invested with BLMIS.  In reality, BLMIS had assets on hand worth a

small fraction of that amount.  On March 12, 2009, Madoff admitted to the fraudulent scheme

and pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in prison.

2.      Defendants David R. Markin, in his capacity as trustee of the David Markin

Charitable Remainder Unitrust #1 and David R. Markin Charitable Remainder Unitrust #2,

SouthPac International Trust, Ltd., in its capacity as trustee of the David R. Markin 2003 Trust,

David R. Markin 2003 Trust, David Markin Charitable Remainder Unitrust #1, and David R.

Markin Charitable Remainder Unitrust #2 ("Defendants") were beneficiaries of Madoff's Ponzi

scheme.  The Trustee's investigation has revealed that between December 11, 2002 and

December 11, 2008, Defendants received $14,801,414 in fictitious profits from the Ponzi

scheme, meaning that Defendants withdrew more than they had invested in their BLMIS

accounts.  Accordingly, Defendants received $14,801,414 of other people's money.  The

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

transfers of fictitious profits to or for the benefit of Defendants constitute avoidable transfers and

are recoverable by the Trustee. Upon information and belief, Defendant David R. Markin

("Subsequent Transferee Defendant") received subsequent transfers of the avoidable transfers

referenced above. To the extent the funds transferred from BLMIS were for the benefit of the

Subsequent Transferee Defendant, Subsequent Transferee Defendant is the initial transferee of

such transfers and is included in the definition of Defendants for purposes of the allegations

herein. This action is brought to recover the transfers of fictitious profits so that this customer

property can be equitably distributed among the holders of allowed claims in this SIPA

proceeding.

3.      This adversary proceeding is brought pursuant to sections 78fff(b), 78fff-1(a) and

78fff-2(c)(3) of SIPA, sections 105(a), 544, 548(a), 550(a) and 551 of title 11 of the United

States Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York

Debtor and Creditor Law § 270 *et seq.* (McKinney 2001) ("DCL")), and other applicable law, for

avoidance of fraudulent obligations and conveyances in connection with certain transfers of

property by BLMIS to or for the benefit of Defendants. The Trustee seeks to set aside such

obligations and transfers and preserve and recover the property for the benefit of the BLMIS

estate.

## JURISDICTION AND VENUE

4.      This is an adversary proceeding commenced before the same Court before which

the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is

pending. The SIPA Proceeding was originally brought in the United States District Court for the

Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff*

*Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has

been referred to the Bankruptcy Court. The reference was thereafter partially withdrawn by this

Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and

15 U.S.C. §§ 78eee(b)(2)(A), (b)(4) and N.Y. C.P.L.R. 302(a) (McKinney 2010).

5.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O).

6.    Venue in this district is proper under 28 U.S.C. § 1409.

### DEFENDANTS

7.    Upon information and belief, Defendant and Subsequent Transferee Defendant

David R. Markin maintains his residence in Palm Beach, Florida. Upon information and belief,

Defendant acts as trustee for the David R. Markin Charitable Remainder Unitrust #1 and David

Markin Charitable Remainder Unitrust #2 with both account addresses reported in Palm Beach,

Florida. Upon information and belief, Defendant and Subesquent Transferee Defendant David

Markin is a beneficiary of David R. Markin 2003 Trust, David R. Markin Charitable Remainder

Unitrust #1 and David Markin Charitable Remainder Unitrust #2.

8.    Defendant SouthPac Trust International, Inc. is a corporation formed under the

laws of the Cook Islands. Its principal place of business is located at ANZ House, Main Road,

Avarua, Rarotonga, Cook Islands. Defendant, in its capacity as trustee for David R. Markin

2003 Trust, holds a BLMIS account in the name "David R. Markin 2003 Trust," with the account

address reported as ANZ House, Main Road, Avarua, Rarotonga, Cook Islands.

9.    Defendant David R. Markin 2003 Trust is the beneficial owner of a BLMIS

account in the name "David R. Markin 2003 Trust," with the account address reported as ANZ

House, Main Road, Avarua, Rarotonga, Cook Islands. Upon information and belief, Defendant

David R. Markin 2003 Trust is a trust that was formed under the laws of the state of Florida.

Upon information and belief, it maintains an address in Palm Beach, Florida.

10.    Defendant David R. Markin Charitable Remainder Unitrust #1 is the beneficial

owner of a BLMIS account in the name "David R. Markin Charitable Remainder Unitrust #1,"

with the account address reported in Palm Beach, Florida.  Upon information and belief, Defendant David R. Markin Charitable Remainder Unitrust #1 is a trust that was formed under the laws of the state of Florida.  Upon information and belief, it maintains an address in Palm Beach, Florida.

11.    Defendant David R. Markin Charitable Remainder Unitrust #2 is the beneficial owner of a BLMIS account in the name "David R. Markin Charitable Remainder Unitrust #2," with the account address reported as in Palm Beach, Florida.  Upon information and belief, Defendant David R. Markin Charitable Remainder Unitrust #2 is a trust that was formed under the laws of the state of Florida.  Upon information and belief, it maintains an address at in Palm Beach, Florida.

## BACKGROUND, THE TRUSTEE AND STANDING

12.    On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") filed a complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS.  The District Court Proceeding remains pending in the District Court.  The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

13.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of BLMIS.

---

[2] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding

08-01789-cgm Doc 16563-2 Filed 08/25/17 Entered 08/25/17 13:51:57
Case 1:11-cv-07002-JSR Document 63 Filed 01/25/12 Page 6 of 37
Declaration of Carole Neville    Pg 9 of 92

14.     On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC

consented to a combination of its own action with an application of the Securities Investor

Protection Corporation ("SIPC").  Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC

filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its

obligations to securities customers as they came due and, accordingly, its customers needed the

protections afforded by SIPA.

15.     Also on December 15, 2008, Judge Stanton granted the SIPC application and

entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

a.     appointed the Trustee for the liquidation of the business of BLMIS

pursuant to section 78eee(b)(3) of SIPA;

b.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to

section 78eee(b)(3) of SIPA; and

c.     removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

16.     By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of

BLMIS.

17.     At a Plea Hearing on March 12, 2009, in the case captioned *United States v.*

*Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information

filed against him by the United States Attorneys' Office for the Southern District of New York.

At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment

---

was commenced." 15 U.S.C. § 78*lll*(7)(B).  Thus, even though the application for a protective decree was filed on
December 15, 2008, the Filing Date in this action is December 11, 2008.

advisory side of [BLMIS]." Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

18.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a Plea Hearing on August 11, 2009 in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the fictitious scheme had begun at BLMIS since at least the 1980s. Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11).

19.    As the Trustee appointed under SIPA, the Trustee is charged with recovering and paying out customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway. However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers who received preferences, payouts of fictitious profits and/or other avoidable obligations and transfers, to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

20.    Pursuant to section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA section 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA.

21.    Pursuant to sections 78fff(b) and 78*lll*(7)(B) of SIPA, the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

22.    The Trustee has standing to bring these claims pursuant to applicable provisions of SIPA, including sections 78fff-1(a), 78fff(b) and 78fff-2(c)(3), and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

(a)    BLMIS incurred losses as a result of the claims set forth herein;

(b)    the Trustee is a bailee of customer funds entrusted to BLMIS for investment purposes;

(c)    the Defendants received "Customer Property" as defined in SIPA § 78*lll*(4);

(d)    SIPC has not reimbursed, and will not fully reimburse, the customers for their losses;

(e)    the Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim filing customers, collectively, "Accountholders").  To the extent the Trustee has received express assignments of certain BLMIS customer claims, which they could have asserted, the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a distinct and palpable loss for which the Trustee is entitled to seek monetary damages;

(f)    SIPC has expressly conferred upon the Trustee enforcement of its rights of

subrogation with respect to payments it has made and is making to customers of BLMIS from

SIPC funds; and

(g)    the Trustee has the power and authority to avoid obligations, and avoid and

recover transfers, pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code,

applicable state law including the DCL, and applicable provisions of SIPA, including §§ 78fff(b)

and 78fff-2(c)(3).

## THE FRAUDULENT PONZI SCHEME

23.    Founded in or around 1959, BLMIS began operations as a sole proprietorship of

Madoff and later, effective January 2001, formed as a New York limited liability company

wholly owned by Madoff.  Since in or about 1986, BLMIS operated from its principal place of

business at 885 Third Avenue, New York, New York.  Madoff, as founder, proprietor, chairman,

and chief executive officer, ran BLMIS together with several family members and a number of

additional employees.  BLMIS was registered with the SEC as a securities broker-dealer under

section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).  By that registration,

BLMIS is a member of SIPC.  BLMIS had three business units: investment advisory (the "IA

Business"), market making and proprietary trading.

24.    For certain accounts in the IA Business, BLMIS purported to participate in a

capital appreciation/depreciation strategy, depending on whether the customer sought to generate

gains or losses.  For example, the strategy was executed by either purporting to purchase small

groups of securities near lows and then purporting to sell those same securities at highs, or by

purporting to short-sell securities near highs and then purporting to repurchase those securities

near lows.

25.    For other accounts, Madoff described the IA Business' strategy as a "split-strike conversion" strategy. Madoff promised these clients that their funds would be invested in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest U.S. publicly traded companies. The basket of stocks would be intended to mimic the movement of the S&P 100 Index. Madoff asserted that he would carefully time purchases and sales to maximize value, but this meant that the clients' funds would intermittently be out of the market, at which times they would purportedly be invested in U.S. issued securities and money market funds. The second part of the split-strike conversion strategy was the hedge of such purchases with option contracts. Madoff purported to purchase and sell S&P 100 Index option contracts that closely corresponded with the stocks in the basket, thereby controlling the downside risk of price changes in the basket of stocks.

26.    Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in – or had been traded through – their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication. The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious. At his Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts. *See* Plea Allocution of Bernard L. Madoff at 3, *United States v. Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients other than Defendants, there is no record of BLMIS having cleared any purchase or sale of securities on behalf of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions.

27.    Prior to his arrest, Madoff assured clients and regulators that he conducted all trades on the over-the-counter market after hours.  To bolster that lie, Madoff periodically wired tens of millions of dollars to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity substantially owned by Madoff and his family.  There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients.

28.    Additionally, based on the Trustee's investigation to date, there is no evidence that BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased and sold.

29.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff and his co-conspirators concealed the ongoing fraud in an effort to hinder, delay or defraud other current and prospective customers of BLMIS.  The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to – or payments on behalf of – other investors.  The money sent to BLMIS for investment, in short, was simply used to keep the scheme going and to enrich Madoff, his associates and others, including Defendants, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

30.    The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud.  The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors and to lure other investors into the Ponzi scheme.

31.     During the scheme, certain investors requested and received distributions of the so-called "profits" listed for their accounts that were nothing more than fictitious profits. Other investors, from time to time, redeemed or closed their accounts, or removed portions of purportedly available funds, and were paid consistently with the statements they had been receiving. Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

32.     When payments were made to or on behalf of these investors, including Defendants, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains. In reality, BLMIS had not invested the investors' principal as reflected in customer statements. In an attempt to conceal the ongoing fraud and thereby hinder, delay or defraud other current and prospective investors, BLMIS paid to or on behalf of certain investors the inflated amounts reflected in the falsified financial statements, including principal and/or fictitious profits.

33.     BLMIS used the funds deposited from new investments to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers. Due to the siphoning and diversion of new investments to fund redemptions requested by other investors, BLMIS did not have the funds to pay investors on account of their new investments. BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

34.     In an effort to hinder, delay, or defraud authorities from detecting the fraud, BLMIS did not register as an investment adviser until September 2006.

35.     In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration. The application represented, *inter alia*, that BLMIS had 23

customer accounts and assets under management of approximately $17.1 billion. In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $65 billion under management.

36.     Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New York. Of the two accountants at the firm, one was semi-retired and living in Florida for many years prior to the Filing Date.

37.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS. At all relevant times, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## THE ACCOUNT AGREEMENTS

38.     According to BLMIS's records, multiple accounts (Nos. 1C1324, 1M0091 and 1M0094) (collectively the "Accounts") were maintained with BLMIS as set forth on Exhibit A. Upon information and belief, for the Accounts, a "Customer Agreement," an "Option Agreement," and/or a "Trading Authorization Limited to Purchases and Sales of Securities and Options" (collectively, the "Account Agreements") were executed and delivered to BLMIS at its headquarters at 885 Third Avenue, New York, New York. Additionally, there were periodic customer statements, confirmations, and other communications made by BLMIS or Madoff and sent to some or all Defendants (together with the Account Agreements, the "Account Documents").

39.     The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Accounts were

held in New York, New York, and Defendants sent funds to BLMIS and/or to BLMIS's account

at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New

York, New York for application to the Accounts and the purported conducting of trading

activities.  Between the date the Accounts were opened and the Filing Date, Defendants made

deposits to BLMIS through checks and/or wire transfers into the BLMIS Bank Account and/or

received inter-account transfers from other BLMIS accounts.

## THE OBLIGATIONS

40.    To the extent BLMIS or Madoff incurred obligations to the Defendants in

connection with the Account Documents or any statements or representations made by BLMIS

or Madoff, such obligations (collectively, the "Obligations") are avoidable under sections 105(a),

544(b) and 548(a) of the Bankruptcy Code, applicable provisions of DCL sections 273-279, and

applicable provisions of SIPA, including §§ 78fff(b) and 78fff-1(b).  BLMIS or Madoff incurred

the Obligations as an integral part of and in furtherance of BLMIS's Ponzi scheme.

41.    To the extent BLMIS or Madoff incurred the Obligations to the Defendants, such

Obligations were incurred with actual intent to hinder, delay, or defraud then existing and/or

future creditors.

42.    To the extent BLMIS or Madoff incurred the Obligations, such Obligations were

incurred when BLMIS was insolvent, had unreasonably small capital, and/or was unable to pay

its debts as they matured.  BLMIS was a massive Ponzi scheme, which, as a matter of law, was

insolvent from its inception and, therefore, never capable of fulfilling its obligations to its

creditors.

## THE TRANSFERS

43.    During the six years prior to the Filing Date, BLMIS made transfers (collectively,

the "Transfers") to Defendants of $14,801,414.  The Transfers were made to or for the benefit of

Defendants and are set forth in Columns 10 and 11 on Exhibit B annexed hereto.

44.    The Transfers constitute fictitious profits supposedly earned in the Accounts, but, in reality, were other people's money.

45.    The Transfers that occurred between December 11, 2002 and December 11, 2008 are referred to hereafter as the "Six Year Transfers." The Six Year Transfers are avoidable and recoverable under sections 544(b), 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and DCL sections 273-279, and total $14,801,414. *See* Exhibit B, Column 11. The Six Year Transfers are also avoidable to the extent they were made on account of the avoidable Obligations.

46.    The Transfers that occurred between December 11, 2006 and December 11, 2008 are referred to hereafter as the "Two Year Transfers." The Two Year Transfers are avoidable and recoverable under sections 548(a), 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and total $12,112,969. *See* Exhibit B, Column 10. The Two Year Transfers are also avoidable to the extent they were made on account of the avoidable Obligations.

47.    On information and belief, some or all of the Transfers were subsequently transferred by Defendants to Subsequent Transferee Defendant David R. Markin (collectively, the "Subsequent Transfers").

48.    The Subsequent Transfers, or the value thereof, are recoverable from Subsequent Transferee Defendant David R. Markin pursuant to §550(a) of the Bankruptcy Code

49.    The Trustee's investigation is ongoing and the Trustee reserves the right to (i) supplement the information regarding the Obligations and the Transfers and any additional or subsequent transfers and (ii) seek recovery of such additional transfers.

50.    To the extent that any of the avoidance and/or recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

## CUSTOMER CLAIMS

51.    On or about February 19, 2009, Defendant SouthPac International Trust, Ltd. on behalf of the David R. Markin 2003 Trust filed a customer claim with the Trustee which the Trustee has designated as Claim # 002656 (the "Customer Claim").

52.    On or about October 19, 2009 the Trustee issued a Notice of Trustee's Determination of Claim to Defendant (the "Determination") with respect to the Customer Claim. A copy of the Determination is attached hereto as Exhibit C.

53.    On or about November 16, 2009, Defendant David R. Markin 2003 Trust filed an objection to the Determination with the Court (the "Claims Objection").

54.    Defendant David R. Markin holds another BLMIS account in the name "David R. Markin," designated as BLMIS account number 1M0211 (the "Related Account"). Upon information and belief, the Defendant is the absolute owner of the Related Account and/or has a beneficial or equitable interest in the Related Account.

55.    On or about February 17, 2009 a customer claim was filed with the Trustee which the Trustee has designated as Claim # 002690, and on or about June 1, 2009 a duplicate customer claim was filed with the Trustee which the Trustee has designated as Claim # 009175 (the "Related Account Customer Claims"). The Trustee has yet to issue a determination with respect to the Related Customer Claim and/or make distributions on the Related Account Customer Claims.

56.    On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief

("Claims Procedures Order"; Docket No. 12). The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating. The Trustee intends to resolve the Customer Claim, the Related Account Customer Claims and Claims Objection to the Trustee's determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

**COUNT ONE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS – 11 U.S.C. §§ 548(a)(1)(A), 550(a)**
**AND 551**

57. To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

58. Each of the Two Year Transfers was made on or within two years before the Filing Date.

59. Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

60. Each of the Two Year Transfers and the Obligations was made or incurred by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing and/or future creditors.

61. Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Defendants pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

62. The Obligations are avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and applicable provisions of SIPA including sections 78fff(b) and 78fff-1(b).

63. As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a) and 551 of

-17-

the Bankruptcy Code and sections 78fff(b), 78fff-1(b), and 78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Two Year Transfers, (b) avoiding the Obligations, (c) directing that the Two Year Transfers and Obligations be set aside, and (d) recovering the Two Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

## COUNT TWO
## FRAUDULENT TRANSFERS AND OBLIGATIONS – 11 U.S.C. §§ 548(a)(1)(B), 550(a) AND 551

64.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

65.     Each of the Two Year Transfers was made on or within two years before the Filing Date.

66.     Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

67.     BLMIS received less than reasonably equivalent value in exchange for each of the Two Year Transfers and the Obligations.

68.     At the time of each of the Two Year Transfers and at all times relevant to the Obligations, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfers.

69.     At the time of each of the Two Year Transfers and at all times relevant to the Obligations, BLMIS was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with BLMIS was an unreasonably small capital.

70.     At the time BLMIS made each of the Two Year Transfers, and at all times relevant to the Obligations, BLMIS had incurred, was intending to incur, or believed that it

would incur debts beyond its ability to pay them as the debts matured.

71.     Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from Defendants pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

72.     The Obligations are avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and applicable provisions of SIPA including sections 78fff(b) and 78fff-1(b).

73.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Two Year Transfers, (b) avoiding the Obligations, (c) directing that the Two Year Transfers and Obligations be set aside, and (d) recovering the Two Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

## COUNT THREE
## FRAUDULENT TRANSFERS AND OBLIGATIONS – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551

74.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

75.     At all times relevant to the Six Year Transfers and Obligations, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

76.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

77.     Each of the Six Year Transfers and Obligations was made by BLMIS with the

actual intent to hinder, delay, or defraud then existing and/or future creditors of BLMIS. BLMIS made each of the Six Year Transfers and incurred the Obligations to or for the benefit of Defendants in furtherance of a fraudulent investment scheme.

78.    As a result of the foregoing, pursuant to DCL sections 276, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and (d) recovering the Six Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFERS AND OBLIGATIONS – NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551

79.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

80.    At all times relevant to the Six Year Transfers and Obligations, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

81.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

82.    BLMIS did not receive fair consideration for any of the Six Year Transfers or the Obligations.

83.    BLMIS was insolvent, or became insolvent as a result of the Six Year Transfers or the Obligations.

84.    As a result of the foregoing, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and (d) recovering the Six Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

## COUNT FIVE
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551

85.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

86.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

87.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

88.    BLMIS did not receive fair consideration for any of the Six Year Transfers.

89.    At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

90.    As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year

08-01789-cgm Doc 16563-2 Filed 08/25/17 Entered 08/25/17 13:51:57
Case 1:11-cv-07603-JSR Document 8-12 Filed 01/25/12 Page 22 of 37
Declaration of Carole Neville    Pg 25 of 92

Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

**COUNT SIX**
**FRAUDULENT TRANSFERS AND OBLIGATIONS – NEW YORK DEBTOR AND**
**CREDITOR LAW §§ 275, 278 AND/OR 279 AND 11 U.S.C. §§ 544(b), 550(a) AND 551**

91.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

92.    At all times relevant to the Six Year Transfers and Obligations, there have been and are one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

93.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

94.    BLMIS did not receive fair consideration for any of the Six Year Transfers or Obligations.

95.    At the time BLMIS made each of the Six Year Transfers or incurred the Obligations, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

96.    As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279 and sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b), and 78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and (d) recovering the Six Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS.

08-01789-cgm    Doc 16563-2    Filed 08/25/17    Entered 08/25/17 13:51:57
Case 1:16-cv-07002-JSR    Document 8-2    Filed 01/25/22    Page 23 of 37
Declaration of Carole Neville    Pg 26 of 92

## COUNT SEVEN
## RECOVERY OF SUBSEQUENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 278 AND/OR 279 AND 11 U.S.C. §§ 544, 548, 550(a) AND 551

97.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

98.    Each of the Transfers is avoidable under sections 544 and 548 of the Bankruptcy Code, DCL sections 273, 274, 275 and/or 276 and section 78fff-2(c)(3) of SIPA.

99.    On information and belief, the Subsequent Transfers were transferred by Defendants David R. Markin 2003 Trust, David Markin Charitable Remainder Unitrust #1, and David R. Markin Charitable Remainder Unitrust #2 to Subsequent Transferee Defendant.

100.    Each of the Subsequent Transfers was made directly or indirectly to Subsequent Transferee Defendant.

101.    Subsequent Transferee Defendant is an immediate or mediate transferee of the Subsequent Transfers from Defendants David R. Markin Trust 2003, Markin Charitable Remainder Unitrust #1, and David R. Markin Charitable Remainder Unitrust #2.

102.    As a result of the foregoing and the avoidance of the within Transfers, pursuant to DCL sections 278 and/or 279, sections 544(b), 548(a), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Subsequent Transferee Defendant (a) avoiding and preserving the Subsequent Transfers, (b) directing that the Subsequent Transfers be set aside, and (c) recovering the Subsequent Transfers, or the value thereof, from Subsequent Transferee Defendant for the benefit of the estate of BLMIS.

## COUNT EIGHT
## DISALLOWANCE OF RELATED ACCOUNT CUSTOMER CLAIM

103.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

Case 1:16-cv-07002-JSR   Document 8-2   Filed 11/29/22   Page 24 of 37

104. Defendant David R. Markin is a beneficiary of the Related Account. Upon information and belief, Defendant David R. Markin is the absolute owner of the Related Account or has a beneficial or equitable interest in the Related Account.

105. The Related Account Customer Claims should not be allowed pursuant to section 502(d) of the Bankruptcy Code. Defendant David R. Markin is the recipient of Transfers of BLMIS's property which are avoidable and recoverable under section 78fff-2 (c) (3) of SIPA and sections 544, 547, 548 and/or 550 of the Bankruptcy Code, DCL sections 273, 274, 275, and 276 and section 78fff-2 (c) (3) of SIPA, and Defendant David R. Markin has not returned the Transfers to the Trustee.

106. The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating. As a result of the foregoing, the Trustee intends to resolve the Related Account Customer Claims and any related objections through the mechanisms contemplated by the Claims Procedures Order.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendants as follows:

i. On the First Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) avoiding the Obligations, (c) directing that the Two Year Transfers and Obligations be set aside, and (d) recovering the Two Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS;

ii. On the Second Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) avoiding the Obligations, (c) directing

that the Two Year Transfers and Obligations be set aside, and (d) recovering the Two Year

Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS;

      iii.      On the Third Claim for Relief, pursuant to DCL sections 276, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the

Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and

(d) recovering the Six Year Transfers, or the value thereof, from Defendants for the benefit of the

estate of BLMIS;

      iv.      On the Fourth Claim for Relief, pursuant to DCL sections 273, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the

Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and

(d) recovering the Six Year Transfers, or the value thereof, from Defendants for the benefit of the

estate of BLMIS;

      v.      On the Fifth Claim for Relief, pursuant to DCL sections 274, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA:

(a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set

aside, and (c) recovering the Six Year Transfers, or the value thereof, from Defendants for the

benefit of the estate of BLMIS;

      vi.      On the Sixth Claim for Relief, pursuant to DCL sections 275, 278 and/or 279,

sections 544(b), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b), 78fff-1(b) and

78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) avoiding the

Obligations, (c) directing that the Six Year Transfers and Obligations be set aside, and

08-01789-cgm   Doc 16563-2   Filed 08/25/17   Entered 08/25/17 13:51:57
Case 1:14-cv-07002-JSR   Document 8   Filed 01/25/12   Page 28 of 37
Declaration of Carole Neville   Pg 29 of 92

(d) recovering the Six Year Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS;

      vii.     On the Seventh Claim for Relief as a result of the avoidance of the within Transfers, pursuant to DCL section 278 and/or 279, sections 544(b), 548, 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Subsequent Transfers; (b) directing that the Subsequent Transfers be set aside; and (c) recovering the Subsequent Transfers, or the value thereof, from Subsequent Transferee Defendant for the benefit of the estate of BLMIS.

      viii.     On the Eighth Claim for Relief, the Related Account Customer Claims should not be allowed pursuant to section 502(d) of the Bankruptcy Code unless and until the Transfers are paid or turned over;

      ix.     On all Claims for Relief, pursuant to federal common law and N.Y. CPLR 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

      x.     On all Claims for Relief, establishing a constructive trust over the proceeds of the Transfers in favor of the Trustee for the benefit of BLMIS's estate;

      xi.     On all Claims for Relief, assigning of income tax refunds of Defendants from the United States, state and local governments paid on fictitious profits during the course of the scheme;

      xii.     On all Claims for Relief, awarding the Trustee all applicable interest, costs, and disbursements of this action; and

08-01789-cgm    Doc 16563-2    Filed 08/25/17    Entered 08/25/17 13:51:57
Case 1:16-cv-07002-JSR    Document 8    Filed 01/25/12    Page 27 of 37
Declaration of Carole Neville    Pg 30 of 92

xiii.    On all Claims for Relief, granting the Trustee such other, further, and different

relief as the Court deems just, proper and equitable.

Date:    January 25, 2012
         New York, New York

By:    _____

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Oren J. Warshavsky
Email:  owarshavsky@bakerlaw.com
Tatiana Markel
Email:  tmarkel@bakerlaw.com

Of Counsel:

**BAKER & HOSTETLER LLP**
12100 Wilshire Boulevard, 15th Floor
Los Angeles, California  90025
Telephone: (310) 820-8800
Facsimile: (310) 820-8859
Matthew I. Bobb
Email: mbobb@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*

08-01789-cgm    Doc 16563-2    Filed 08/25/17    Entered 08/25/17 13:51:57
Case 1:12-cv-07002-JSR    Document 8    Filed 01/25/12    Page 28 of 37
Declaration of Carole Neville    Pg 31 of 92

**Exhibit A**

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| SOUTHPAC TST INTERNATIONAL INC TRUSTEE OF THE DAVID R MARKIN 2003 TRUST | 1C1324 |
| DAVID R MARKIN CHARITABLE REMAINDER UNITST #1 CHAIRMENS CLUB | 1M0091 |
| DAVID MARKIN CHARITABLE REMAINDER TRUST #2 CHAIRMENS CLUB | 1M0094 |

MADC1025_00000001

08-01789-cgm    Doc 16563-2    Filed 08/25/17    Entered 08/25/17 13:51:57
Case 1:11-cv-07802-JSR    Document 8    Filed 01/25/12    Page 29 of 37
Declaration of Carole Neville    Pg 32 of 92

Exhibit B

BLMIS ACCOUNT NO. 1C1324 - SOUTHPAC TST INTERNATIONAL INC TRUSTEE OF THE DAVID R MARKIN 2003 TRUST

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |
| 8/8/2003 | TRANS FROM 1M014830 (1M0148) | 7,237,016 [1] | | | 3,025,000 | | 3,025,000 | - | - | - |
| | CHECK WIRE | | 4,000,000 | | | | 7,025,000 | - | - | - |
| 10/14/2003 | TRANS FROM 1M014830 (1M0148) | 3,287 [2] | | | | | 7,025,000 | - | - | - |
| 12/24/2003 | CHECK WIRE | (500,000) | | (500,000) | | | 3,025,000 | - | - | - |
| | CHECK WIRE | (3,025,000) | | | | (3,025,000) | 3,025,000 | - | - | - |
| 11/18/2005 | CHECK WIRE | (3,265,343) | | (3,265,343) | | | (3,265,343) | - | - | (265,343) |
| | CHECK WIRE | | | | | | (265,343) | - | - | (265,343) |
| | Total: | | $ 7,000,000 | $ (7,265,343) | $ 3,025,000 | $ (3,025,000) | $ (265,343) | $ - | $ - | $ (265,343) |

[1] Although BLMIS statements reflect that a larger transfer was made into the account on this date, a portion of the "transferred" funds consisted of fictitious profits which were never achieved and thus could not have been transferred. Accordingly, only the principal remaining in the originating account was transferred into this account on this date.

[2] Although BLMIS statements reflect that funds were transferred into this account on this date, these funds consisted entirely of fictitious profits which were never achieved and thus no funds were actually transferred into the account on this date. Accordingly, the account balance has remained unchanged.

[3] Although BLMIS statements reflect that a larger transfer was made out of the account on this date, a portion of the "transferred" funds consisted of fictitious profits which were never achieved and thus could not have been transferred. Accordingly, only the principal remaining in the account was transferred out of the account on this date.

MADC1025_00000002

08-01789-cgm    Doc 16563-2    Filed 08/25/17    Entered 08/25/17 13:51:57
Case 1:12-cv-07002-JSR    Document 8    Filed 11/25/12    Page 30 of 37
Declaration of Carole Neville    Pg 33 of 92

Exhibit B

MADC1025_00000003

BLMIS ACCOUNT NO. 1M0091 - DAVID R MARKIN CHARITABLE REMAINDER UNITST #1 CHAIRMEN'S CLUB

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Conveyances |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/21/1997 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 4,000,000 | - | - | - |
|  | CHECK | (48,447) |  | (48,447) |  |  | (12,107,533) |  | (48,447) | (48,447) |
| 5/31/2007 | CHECK | (48,447) |  | (48,447) |  |  | (12,107,533) |  | (48,447) | (48,447) |
|  | Total: | $ 4,000,000 |  | $ (16,107,533) | $ - | $ - | $ (12,107,533) |  | $ (12,107,533) | $ (12,107,533) |

08-01789-cgm Doc 16563-2 Filed 08/25/17 Entered 08/25/17 13:51:57
Case 1:12-cv-07002-JSR Document 8 Filed 11/25/12 Page 31 of 37
Declaration of Carole Neville    Pg 34 of 92

Exhibit B

BLMIS ACCOUNT NO. 1M0094 – DAVID MARKIN CHARITABLE REMAINDER TRUST #2 CHAIRMENS CLUB

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Conveyances |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/29/1997 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 1,000,000 | - | - | - |
| | CHECK | (5,436) | | (3,428,538) | | | (2,428,538) | | (5,436) | (2,428,538) |
| 4/11/2007 | CHECK | (5,436) | | (5,436) | | | (2,428,538) | | (5,436) | (5,436) |
| | Total: | | $ 1,000,000 | $ (3,428,538) | $ - | $ - | $ (2,428,538) | $ - | $ (5,436) | $ (2,428,538) |

Page 1 of 1 - 1M0094

MADC1025_00000004

08-01789-cgm   Doc 16563-2   Filed 08/25/17   Entered 08/25/17 13:51:57
Case 1:12-cv-07002-JSR   Document 8   Filed 11/25/12   Page 32 of 37
Declaration of Carole Neville    Pg 35 of 92

Exhibit B

MADC1025_00000004

BLMIS ACCOUNT NO. 1M0094 - DAVID MARKIN CHARITABLE REMAINDER TRUST #2 CHAIRMENS CLUB

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Conveyances |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/29/1997 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 1,000,000 | - | - | - |
|  | CHECK | (5,436) |  | (3,423,102) |  |  | (2,423,102) |  | (5,436) | (2,423,102) |
| 4/11/2007 | CHECK | (5,436) |  | (5,436) |  |  | (2,428,538) |  | (5,436) | (5,436) |
| Total: |  |  | $ 1,000,000 | $ (3,428,538) | $ - | $ - | $ (2,428,538) | $ - | $ (5,436) | $ (2,428,538) |

08-01789-cgm Doc 16563-2 Filed 08/25/17 Entered 08/25/17 13:51:57
Case 1:12-cv-07002-JSR Document 8 Filed 11/25/12 Page 33 of 37
Declaration of Carole Neville Pg 36 of 92

Exhibit B

MADC1025_00000003

BLMIS ACCOUNT NO. 1M091 - DAVID R MARKIN CHARITABLE REMAINDER UNITST #1 CHAIRMENS CLUB

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Conveyances |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/21/1997 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 4,000,000 | - | - | - |
| | CHECK | | | | | | | | | |
| 5/31/2007 | CHECK | (48,447) | | (48,447) | - | - | (12,107,533) | | (48,447) | (48,447) |
| | Total: | | $ 4,000,000 | $ (16,107,533) | $ - | $ - | $ (12,107,533) | $ - | $ (12,107,533) | $ (12,107,533) |

Page 1 of 1 - 1M091

08-01789-cgm   Doc 16563-2   Filed 08/25/17   Entered 08/25/17 13:51:57
Case 1:17-cv-06021-SHS   Document 8-1   Filed 01/25/12   Page 34 of 37
Declaration of Carole Neville   Pg 37 of 92

**BERNARD L. MADOFF INVESTMENT SECURITIES LLC**

In Liquidation

**DECEMBER 11, 2008**[1]

**NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM**

October 19, 2009

David R. Markin 2003 Trust
Capital Security Bank Ltd., Trustee
P.O. Box 11
Rarotonga, Cook Islands

Dear David R. Markin 2003 Trust:

**PLEASE READ THIS NOTICE CAREFULLY.**

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claims on BLMIS Account No. 1C1324 designated as Claim Number 002656 and Claim Number 009174 (the latter of which is duplicative of Claim Number 002656) and are combined ("Combined Claim") for purposes of this determination. This letter shall serve as the Trustee's determination with respect to the Combined Claim:

Your Combined Claim for securities is **DENIED**. No securities were ever purchased for your account.

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

MADC1025_00000005

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $10,290,343.40), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities (total of $10,025,000.00). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

As reflected in Table 1, certain of the transfers into or out of your account have been adjusted. As part of the Trustee's analysis of accounts, the Trustee has assessed accounts based on a money in/money out analysis (i.e., has the investor deposited more or less than he or she withdrew from BLMIS). This analysis allows the Trustee to determine which part of an account's balance is originally invested principal and which part is fictitious gains that were fabricated by BLMIS. A customer's allowed claim is based on the amount of principal in the customer's account.

When ever a customer requested a transfer from one account to another, the Trustee analyzed whether the transferor account had principal in the account at the time of the transfer. The available principal in the account was transferred to and credited in the transferee account. Thus, the reason that the adjusted amount of transferred deposits in Table 1 is less than the purported transfer amount is that the transferor account did not have sufficient principal available to effectuate the full transfer. The difference between the purported transfer amount and the adjusted transfer amount is the amount of fictitious gain that was transferred to or from your account. Under the money in/money out analysis, the Trustee does not give credit for fictitious gains in settling your allowed claim.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($265,343.40) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your Combined Claim is **DENIED** in its entirety.

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after October 19, 2009, the date on which the Trustee mailed this notice.

MADC1025_00000006

08-01789-cgm    Doc 16563-2    Filed 08/25/17    Entered 08/25/17 13:51:57
Case 1:16-cv-07002-GBD    Document 8    Filed 01/25/12    Page 38 of 37
Declaration of Carole Neville    Pg 39 of 92

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

Clerk of the United States Bankruptcy Court for
the Southern District of New York
One Bowling Green
New York, New York 10004

and

Irving H. Picard, Trustee
c/o Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10011

Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities LLC

cc:    Carole Neville
       Sonnenschein Nath & Rosenthal LLP
       1221 Avenue of the Americas, 25th Floor
       New York, NY 10020

08-01789-cgm    Doc 16563-2    Filed 08/25/17    Entered 08/25/17 13:51:57
Case 1:11-cv-07802-JSR    Document 8    Filed 01/25/12    Page 37 of 37
Declaration of Carole Neville    Pg 40 of 92

| Table 1 | | | |
|---|---|---|---|
| **DEPOSITS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 8/8/2003 | TRANS FROM 1M014830 | $7,237,016.31 | $3,025,000.00 |
| 8/21/2003 | CHECK WIRE | $4,000,000.00 | $4,000,000.00 |
| 10/14/2003 | TRANS FROM 1M014830 | $3,287.40 | $0.00 |
| 5/24/2006 | CHECK WIRE | $3,000,000.00 | $3,000,000.00 |
| **Total Deposits:** | | $14,240,303.71 | $10,025,000.00 |
| **WITHDRAWALS** | | | |
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** | **ADJUSTED AMOUNT** |
| 12/15/2003 | CHECK WIRE | ($3,500,000.00) | ($3,500,000.00) |
| 12/24/2003 | CHECK WIRE | ($500,000.00) | ($500,000.00) |
| 1/10/2005 | TRANS TO 1M021130 | ($5,556,417.08) | ($3,025,000.00) |
| 11/18/2005 | CHECK WIRE | ($3,265,343.40) | ($3,265,343.40) |
| **Total Withdrawals:** | | ($12,821,760.48) | ($10,290,343.40) |
| **Total deposits less withdrawals:** | | $1,418,543.23 | ($265,343.40) |

# **<u>EXHIBIT B</u>**

Estate of David R. Markin - Charitable Remainder Unitrust #1

# The David R. Markin
# Charitable Remainder Unitrust #1
# Article One
# Creation of my Trust

## Section 1.   My Trust

This is my Charitable Remainder Unitrust #1, dated December 16, 1996, by
DAVID R. MARKIN, the Trustmaker, and DAVID R. MARKIN, my initial
Trustee.  The following is my Independent Special Trustee:

### ALLAN R. TESSLER

This trust agreement is intended to create a Charitable Remainder Unitrust
within the meaning of Section 5 of Rev. Proc. 90-31, Section 664(d)(2) and (3)
of the Internal Revenue Code of 1986, as amended (hereinafter referred to
as the "Code"), and applicable United States Treasury Department Federal
Tax Regulations (hereinafter referred to as the "Regulations") governing
Charitable Remainder Unitrusts.

All references to "my trust" or "trust," unless otherwise stated in this
agreement, shall refer to this Charitable Remainder Unitrust.

All references to "Trustee" shall refer to the initial Trustee(s) or any successor
Trustee(s), and my Independent Special Trustee, where applicable.

When the term "Trustmaker" is used, it shall have the same meaning as
"Donor" as used in the Code, and applicable Regulations governing Charitable
Remainder Unitrusts, and it shall also have the same legal meaning as
"Grantor," "Trustor," "Settlor," or any other term referring to the maker of a
trust.

## Section 2.   The Name of My Trust

For convenience, my trust shall be known as the:

1-1

DAVID R. MARKIN CHARITABLE REMAINDER UNITRUST
#1, dated December 16, 1996.


For purposes of beneficiary designations and transfers directly to my trust, my trust shall be referred to as:


DAVID R. MARKIN, Trustee, or his successors in trust, under the DAVID R. MARKIN CHARITABLE REMAINDER UNITRUST #1, dated December 16, 1996.


In addition to the above descriptions, any description for referring to my trust shall be effective to transfer title to my trust or to designate my trust as a beneficiary as long as that format includes the date of this trust, the name of at least one initial or successor Trustee, and any reference that indicates that assets are to be held in a fiduciary capacity.


## Section 3.   The Date of My Trust

The commencement date of my trust for federal and state tax reporting purposes shall be the date when the assets described in Schedule "A" are transferred to my Trustee.


## Section 4.   The Taxable Year of My Trust

The first taxable year of my trust shall commence with the date the trust is first funded with property and shall end at the close of that calendar year. The trust's subsequent tax years shall be on a calendar year basis.


## Section 5.   The Irrevocability of My Trust

My trust is irrevocable and may not be altered, amended, or terminated in any respect unless specifically authorized by this agreement.

I retain no power to control and direct payments, to remove trust property, or to alter, amend, revoke, or terminate my trust, either in whole or in part,

1-2

except as specifically provided in this agreement.

My Trustee shall have the power and duty, in its sole and absolute discretion, to amend or reform this agreement in any manner that is required for the sole purpose of ensuring that it qualifies and continues to qualify as a Charitable Remainder Unitrust with the meaning of Section 664(d)(2) and (3) of the Code.

1-3

# Article Two
## Funding My Trust

## Section 1.    Initial Funding

I shall deliver the trust property listed in Schedule "A" to my Trustee to be held, administered, and distributed by my Trustee as provided in this agreement.

### a.    Reliance by Third Parties

All third parties shall rely on this transfer and all other transfers of my property to my trust, and follow all of my Trustee's instructions without risk of incurring any liability to me, my Trustee, or my beneficiaries.

### b.    Additional Transfers of Property

My trust may be funded additionally with appropriate property interests by me or by any other person, whether by inter vivos or testamentary transfer.

All property interests assigned, conveyed, or delivered to my Trustee must be acceptable to my Trustee.

All such property interests assigned or otherwise transferred or conveyed to my Trustee in trust shall be:

Absolute and irrevocable.

Subject to all of the terms and conditions set forth in this agreement.

## Section 2.    Acceptance of Property by My Trustee

My Trustee agrees to accept, hold and administer the trust property and to

2-1

perform the duties of Trustee, subject to the terms and conditions contained in this agreement.

My Trustee accepts such title to the trust property as is conveyed or transferred to my Trustee without liability or responsibility for the conditions or validity of such title.

My Trustee acknowledges that all property transferred to the trust must be held and administered solely for the uses and purposes stated in this agreement.

2-2

# Article Three
# The Unitrust Amount

## Section 1.  Calculation of the Unitrust Amount

The annual "Unitrust Amount" shall be an amount equal to the smaller of:

   a.   The trust income for any taxable year as defined in Section
        643(b) of the Code, and

   b.   A "fixed percentage" of **ten** percent of the net fair market value
        of the trust assets valued as of the first business day of the first
        calendar month in each taxable year of the trust hereinafter
        called the "Valuation Date".

The Unitrust Amount for any year shall also include any amount of trust
income for such year that is in excess of the amount required to be distributed
under (b) (above) to the extent that the aggregate of the amounts paid in
prior years was less than the aggregate of the amounts computed as the fixed
percentage of the net fair market value of the trust assets on the valuation
dates.

## Section 2.  Proration of the Unitrust Amount for a Short Year or On Death

In determining the amount to be paid under this Article, my Trustee shall
prorate the same on a daily basis for a short taxable year in accordance with
Regulation § 1.664-3(a)(1)(v)(a), and, for the taxable year of the death of the
last surviving Trust Beneficiary, as defined in Article Thirteen of this trust
agreement, in accordance with Regulation § 1.664-3(a)(1)(v)(b).

## Section 3.  Adjustments Made During Life

In any taxable year in which an additional contribution or contributions are
made to the trust by an *inter vivos* transfer, the amount to be paid (and

3-1

valuation to be made) as described in this Article shall be computed in accordance with Regulation § 1.664-3(b).

## Section 4.   Adjustments for Testamentary Contributions

If any additional contributions are made in the form of testamentary transfers by Will, Trust or otherwise, the obligation to pay the Unitrust Amount with respect to such additional contributions shall commence with the date of death of the person whose death caused the additional contribution to be made, but payment of such amount may be deferred from such date of death until the end of the taxable year of this trust in which occurs the complete funding of the additional contribution.  Within a reasonable period after such time, the Trustee must pay to the current Trust Beneficiary (or the estate of such beneficiary) in the case of an underpayment, or must receive from the current Trust Beneficiary (or the estate of such beneficiary) in the case of an overpayment, the difference between:

    a.   The Unitrust Amount with respect to such additional contribution that is actually paid, plus interest, compounded annually, computed for any period at the rate of interest that the Regulations under Section 664 of the Code prescribe for the trust for such computation for such period, and

    b.   The Unitrust Amount with respect to such additional contribution that is payable, determined under the method described in Section 1.664-1(a)(5)(ii) of the Regulations.

3-2

# Article Four
# Payments to Trust Beneficiaries

## Section 1.   Payment of the Unitrust Amount

In each taxable year of this trust, my Trustee shall pay the Unitrust Amount outright and free of this trust, wholly to me during my lifetime and, upon my death, wholly to SUSAN MARKIN during her lifetime. For purposes of this agreement, a reference to "Trust Beneficiaries" shall be to me and SUSAN MARKIN collectively and as "Trust Beneficiary" when one of us is referred to individually.

## Section 2.   Power to Revoke an Income Interest

I hereby retain the testamentary power, exercisable by Will and only if I am a Trust Beneficiary at the time of my death, to revoke or terminate the income interest of any Trust Beneficiary designated herein, beginning upon or after my death. If I exercise this power to revoke or terminate the income interest of a Trust Beneficiary, the Trust Beneficiary whose interest is revoked shall be treated as having predeceased me.

## Section 3.   Frequency of Payments

The Unitrust Amount for each taxable year shall be paid in equal quarterly installments, as soon as administratively possible, at the end of each quarter of such year.

## Section 4.   Payments on the Disability of a Trust Beneficiary

If a Trust Beneficiary should become disabled, my Trustee shall make all payments in accordance with the *Methods of Distribution to Disabled Trust Beneficiaries* as provided in Article Six.

4-1

## Section 5.   Earnings in Excess of the Unitrust Amount

Income generated during a taxable year that exceeds the amount required to be distributed currently shall be accumulated and added to the principal of the trust.

## Section 6.   Payment Obligation in Year of the Death of a Trust Beneficiary

The obligation of my Trustee to pay the Unitrust Amount to a Trust Beneficiary shall terminate on the death of the last of the Trust Beneficiaries to die, provided, however, that any Unitrust Amount accrued but not paid for the short taxable year, if any, immediately preceding the death of a Trust Beneficiary shall be paid to either the Personal Representative of that Trust Beneficiary's estate or the Trustee of any revocable living trust established by that Trust Beneficiary as long as the revocable living trust was solely for the benefit of the Trust Beneficiary while the Trust Beneficiary was living and provided that such revocable living trust is a permissible recipient as defined in accordance with Regulation § 1.664-3(a)(3)(i).

## Section 7.   Valuation of Trust Assets

In computing the net fair market value of the trust assets, there shall be taken into account all of the trust's assets and liabilities as of the date of such computation without regard to whether particular items are taken into account in determining the income or the principal of the trust.  All such determinations of net fair market value shall be made exclusively by the Trustee, the decision of whom, reached in good faith, shall be binding upon all persons interested in the trust.

If the net fair market value of the trust assets is incorrectly determined, the Trustee shall pay to the current Trust Beneficiary then receiving the Unitrust Amount (or the estate of such beneficiary) in the case of an undervaluation, or shall collect from the current Trust Beneficiary then receiving the Unitrust Amount (or the estate of such beneficiary) in the case of an overvaluation, an amount equal to the difference between the Unitrust Amount that the Trustee should have paid if the correct value had been used and the Unitrust Amount that the Trustee actually paid, each such adjustment to be made within a reasonable period after the final determination of such value.

4-2

If necessary to maintain this trust as a tax-exempt charitable remainder unitrust under Section 664 of the Code, our Trustee shall, only for purposes of determining the Unitrust Amount and not any other reason:

    a.   Treat as a liability on each annual valuation date the sum of any accrued but unrealized gain on the hypothetical sale or exchange of any capital asset held in the trust to the extent this sum is less than or equal to any deficiency account balance (determined under the last paragraph of Article Three Section 1): and,

    b.   Subtract such liability from the fair market value of the trust assets on such date when computing the Unitrust Amount.

## Section 8.   Limitation on Payments

No amount other than distributions of the Unitrust Amount or an amount transferred for full and adequate consideration may be paid to or for the use of any person other than a Qualified Organization as defined in Article Thirteen of this agreement.

4-3

# Article Five
## Distribution to Charitable Remainderman

### Section 1.   Outright Distribution of Trust Property

Upon the death of the survivor of the Trust Beneficiaries, my trust shall terminate and my Trustee shall distribute all of its principal and income, other than any amount then due to the surviving Trust Beneficiary or the surviving Trust Beneficiary's estate, revocably to the following Charitable Remainder-men in the percentages specified as follows:

| | |
|---|---|
| KALAMAZOO COLLEGE, a Michigan corporation, located in Kalamazoo, Michigan | 50% |
| BRADLEY UNIVERSITY, an Illinois, not-for-profit corporation, located in Peoria, Illinois | 50% |

### Section 2.   Power to Amend Charitable Beneficiary Designations

While I am living, I reserve the right to amend or revoke all or any portion of the interest of any one or more Charitable Remaindermen and to appoint a remainder interest in this trust to one or more substitute or additional qualified Charitable Remaindermen in such amounts and in such proportions as I deem appropriate.

This right may only be exercised in a writing delivered to my Trustee.

Such amendment or revocation shall refer to this agreement by reference, and must be brought to the attention of the Trustee and the Trust Administrator, if any, within 6 months following my death.  If more than one written instrument is delivered to the Trustee, the written instrument bearing the latest date shall control unless the most recent one shall provide otherwise.

Following my death, during any period of time that SUSAN MARKIN is a Trust Beneficiary, she shall have the right to amend or revoke all or any portion of the interest of any one or more Charitable Remaindermen.

5-1

Article Thirteen of this agreement.

## Section 4.    Power to Appoint Undesignated Charitable Remaindermen

In the event that any portion of the remainder interest remains undesignated upon the death of the last surviving Trust Beneficiary, such undesignated portion shall be transferred to one or more Qualified Organizations, the selection of which shall be in the sole discretion of the Trustee. However, if the Trustee shall be unable or unwilling to make the selection for any reason, the Trust Administrator, if any, shall do so.

## Section 5.    Power to Substitute for Ineligible Charitable Remainderman

In the event that a charitable remainderman named in accordance with this agreement is not a Qualified Organization when any principal or income of the trust is to be distributed to it or in the event a charitable organization named in this agreement cannot or will not use the funds left to it for the particular purpose designated by me in writing as provided in this agreement, the amount which would have been transferred to such charitable remainderman shall instead be transferred in equal shares to the remaining Qualified Organizations named in or in accordance with this agreement. However, if there are no named Qualified Organizations, the distributions shall be made to one or more Qualified Organizations, the selection of which shall be in the sole discretion of the Trustee. If the Trustee shall be unable or unwilling to make the selection for any reason, the Trust Administrator, if any, shall do so.

## Section 6.    Acceleration of Charitable Remainder Distribution

My Trustee may distribute currently a portion of the trust assets to such Qualified Organizations as selected by me if I provide the Trustee with written instructions to that effect.

If any named charitable organization is not a Qualified Organization, any such distribution shall lapse, and the property shall remain in this trust.

With regard to "in-kind distributions", the adjusted basis of the distributed

property must be fairly representative of the adjusted basis of any property available for payment on the payment date.

The Unitrust Amount shall thereafter be calculated based on the remaining net fair market value of the trust assets as of the next succeeding valuation date subsequent to any payments made under this Section.

# Article Six

## Methods of Distribution to
## Disabled Trust Beneficiaries

### Section 1.    General Guidelines for Distribution

Whenever a distribution is authorized or required by a provision of this agreement to any Trust Beneficiary who is disabled, such distribution may be made by my Trustee:

Without continuing court supervision or the intervention of a guardian, conservator, or any other legal representative.

Without giving or requiring any bond or surety on bond.

Pursuant to any of the methods authorized under this Article.

My Trustee shall obtain a receipt from the person, corporation, or other entity receiving a distribution.

### Section 2.    Methods of Payment

My Trustee may make distributions to disabled beneficiaries in any one or more of the following ways:

Directly to the Trust Beneficiary.

To persons, corporations, or other entities for the use and benefit of the Trust Beneficiary.

To the Trustee of any revocable living trust established by a Trust Beneficiary as long as the revocable living trust is solely for the benefit of the Trust Beneficiary while the Trust Beneficiary is living, provided that such revocable living trust is a permissible recipient as defined in accordance with Regulation § 1.664-3(a)(3)(i).

6-1

To the holder of an effective Durable Power of Attorney from the disabled Trust Beneficiary, which Power is valid under the laws of the domicile of the Trust Beneficiary.

To an account in a commercial bank or savings institution in the name of the Trust Beneficiary, or in a form reserving the title, management, and custody of the account to a suitable person, corporation, or other entity solely for the use and benefit of the Trust Beneficiary.

To any conservator or other person deemed by my Trustee to be financially responsible who has assumed the responsibility of caring for the affairs of a Trust Beneficiary, and who will agree to apply the distribution solely for the benefit of the Trust Beneficiary.

6-2

# Article Seven
# The Resignation, Replacement, and
# Succession of My Trustees

## Section 1.  The Resignation of a Trustee

A Trustee may resign by giving 60 days written notice to the remaining Trustees, and in their absence to the Trustmaker and the Trust Administrator, if any.  If there is no Trustee then serving and the Trustmaker is disabled or deceased, then such notice shall be given to all Charitable Remaindermen named in accordance with this agreement at that time.

A resignation shall only become effective upon the relinquishment and delivery of all trust property to the successor Trustee.

## Section 2.  The Removal of a Trustee

Any Trustee may be removed as follows:

### a.    Removal by the Trustmaker

If I, as the Trustmaker, am a current Trust Beneficiary, then I can remove a Trustee at any time.

### b.    Removal by the Other Trust Beneficiary

After my death or disability, or if I am not a current Trust Beneficiary, then the other Trust Beneficiary may remove a Trustee at any time.

### c.    Notice of Removal

Neither I nor the other Trust Beneficiary need give a Trustee being removed any reason, cause, or ground for such removal.

7-1

## Section 3.  Replacement of a Trustee

If the initial Trustee dies, resigns, becomes disabled, is removed, or is otherwise unable or unwilling to serve, that Trustee's position shall be filled by the following successor Trustees in the order named:

> First, ALLAN R. TESSLER, then
>
> Second, SUSAN MARKIN

## Section 4.  Replacement of a Successor Trustee

In the event there is no successor Trustee able to serve, I shall name a successor Trustee.  If I fail to make such an appointment, then the other Trust Beneficiary, if any, shall appoint a successor Trustee.  If neither I nor the other Trust Beneficiary name a successor Trustee, the Trustee of any revocable trust established by me shall name a corporate fiduciary, a Charitable Remainderman, or any combination thereof as replacement successor Trustees.

### a.  Replacement by the Trust Administrator

If the Trustee of any revocable living trust established by me fails to replace a Trustee as called for in this agreement, the Trust Administrator, if any, shall make the necessary appointments.

### b.  Replacement by a Court

If either the Trustee of any revocable trust established by me or the Trust Administrator cannot, will not, or is unable or unwilling to appoint a successor Trustee as provided in this Section, then any Charitable Remainderman can petition a court of competent jurisdiction, ex parte, to designate a corporate fiduciary as a Trustee.

The court that designates the successor Trustee shall not acquire any jurisdiction over this trust except to the extent necessary to name a corporate fiduciary as a successor Trustee.

7-2

## Section 5.  Corporate Fiduciaries

Any corporate fiduciary named in or in accordance with this agreement or appointed by a court of competent jurisdiction as a Trustee must be a bank or trust company having assets of not less than 100 million dollars, and shall be located within and authorized to conduct trust business in the United States under all applicable federal and state laws.

## Section 6.  Powers of Successor Trustees

Any successor Trustee, whether corporate or individual, shall have all of the rights, powers, discretion, obligations, immunities and privileges, and be subject to all of the obligations and duties, both discretionary and ministerial, that are given to the original Trustee.  Any successor Trustee shall be subject to all restrictions imposed on the original Trustee.

## Section 7.  Liabilities of Successor Trustees

No successor Trustee shall in any way be responsible to the beneficiaries for any act or omission to act on the part of any former Trustee in the administration of the trust property.  A successor Trustee shall not be required to audit or investigate the accounts, records or administration of any former Trustee.

A successor Trustee shall not have any duty to take action to obtain redress for breach of trust by a former Trustee, unless requested to do so in writing by a beneficiary having a present beneficial interest under this agreement.

A successor Trustee shall be accountable and responsible solely for those assets or properties record title to which was in the name of the prior Trustee at the date on which the successor Trustee assumed its trusteeship, and the possession of which has been delivered to the successor Trustee, and those assets or properties subsequently acquired by the successor Trustee.

A successor Trustee may receive from me, if I am competent to act, instruments in writing releasing my Trustee from liabilities which may have arisen from the acts or omissions of a former Trustee, and such instruments shall be conclusive as to all parties who may have an interest in the trust.

7-3

# Article Eight
## Independent Special Trustees

### Section 1.    Appointment of an Independent Special Trustee

In the event a Trustmaker or a person who is a related or subordinate party is acting as a Trustee, an Independent Special Trustee shall serve whenever the trust holds any assets that do not have a readily ascertainable fair market value.  These types of assets may include, but are not limited to, real estate, stock in a closely-held corporation, patents, or similar intangible property.

### a.    Valuation and Investment Decisions

The Independent Special Trustee shall take title to and solely make all valuations of those assets that do not have a readily ascertainable fair market value.

The Independent Special Trustee shall make all investment decisions regarding any asset that does not have a readily ascertainable fair market value.  These decisions include the determination of whether to dispose of such asset and, if so, under what terms.

### b.    Grantor Trust Provisions

At any time that a Trustmaker is serving as a Trustee and the Trustee has been granted any power in this trust agreement that would result in this trust being treated as a grantor trust under Subpart E of the Code, then the Independent Special Trustee shall exercise such power.

### c.    Limitations on the Powers of Other Trustees

No Trustee, other than the Independent Special Trustee, shall have the power, duty, right, or obligation with respect to valuations of assets that do not have a readily ascertainable fair market value.

No Trustee, other than the Independent Special Trustee, shall make investment decisions regarding assets that do not have a readily ascertainable fair market value.

### d.   Acquisition of an Annuity Contract

At any time that the trust acquires or holds an annuity contract ("Annuity Contract") of any type which gives the holder the right to exercise *any* ownership rights or *any* discretion with respect to the Annuity contract, then all discretion and rights with respect to the Annuity Contract shall be exercised solely by the Independent Special Trustee. My Trustee may, however, make decisions as to the allocation of funds held in such Annuity Contract among any investment options available to the owner of the Annuity Contract. Other than this, my Trustee shall have no power, duty, right, or obligation with respect an Annuity Contract.

## Section 2.   Independence of My Independent Special Trustee

An Independent Special Trustee and any successor shall be an "independent" Trustee. An "independent" Trustee must be one or more persons other than me, no more than half of whom are "Related or Subordinate Parties", as defined in Section 672(c) of the Code, who are subservient to my wishes within the meaning of Section 674(c) of the Code.

My Trustee shall, to the extent that it is reasonable, obtain the advice and counsel of the Trust Administrator, if any, with respect to naming a qualified Independent Special Trustee.

## Section 3.   The Resignation of an Independent Special Trustee

An Independent Special Trustee may resign by giving 60 days written notice to my Trustees, and, in their absence, to the Trustmaker, and the Trust Administrator, if any. If there is no Trustee then serving and the Trustmaker is disabled or deceased, then such notice shall be given to all Charitable Remaindermen named in accordance with this agreement at that time.

A resignation shall only become effective upon the relinquishment and delivery of all trust property to the successor Independent Special Trustee.

8-2

## Section 4.    The Removal of an Independent Special Trustee

Any Independent Special Trustee may be removed as follows:

### a.    Removal by the Trustmaker

If I, as the Trustmaker, am a current Trust Beneficiary, then I can remove an Independent Special Trustee at any time.

### b.    Removal by the Other Trust Beneficiary

After my death or disability, or if I am not a current Trust Beneficiary, then the other Trust Beneficiary can remove an Independent Special Trustee at any time.

### c.    Notice of Removal

Neither I nor the other Trust Beneficiary need give an Independent Special Trustee being removed any reason, cause, or ground for such removal.

## Section 5.    Replacement of an Independent Special Trustee

If an Independent Special Trustee dies, resigns, becomes disabled, is removed, or is otherwise unable or unwilling to serve, then I may appoint an Independent Special Trustee to serve.  If I fail to make such an appointment, then the appointment shall be made as follows:

### a.    Appointment by My Trustee

If I fail to appoint an Independent Special Trustee, then the appointment may be made by my Trustee.

### b.    Appointment by the Other Trust Beneficiary

If my Trustee fails to make such an appointment, then the other Trust Beneficiary, if any, shall appoint an Independent Special Trustee.

8-3

### c.    Appointment by the Trust Administrator

If the other Trust Beneficiary fails to make such an appointment, then the Trust Administrator, if any, shall appoint an Independent Special Trustee.

### d.    Appointment by a Court

If either I, my Trustee, the other Trust Beneficiary, or the Trust Administrator cannot, will not, or is unable or unwilling to appoint a successor Independent Special Trustee as provided in this Section, then any Charitable Remainderman can petition a court of competent jurisdiction, ex parte, to designate a corporate fiduciary as the Independent Special Trustee.

The court that designates the successor Independent Special Trustee shall not acquire any jurisdiction over this trust except to the extent necessary to name a corporate fiduciary as a successor Independent Special Trustee.

## Section 6.    Powers of Independent Special Trustee

The Independent Special Trustee shall only have the powers, duties, or liabilities with respect to matters described in this Article.

## Section 7.    Powers of Successor Independent Special Trustee

Any successor Independent Special Trustee shall have the same limited powers, duties and responsibilities as any Independent Special Trustee.

## Section 8.    Accounting Requirements

My Independent Special Trustee shall provide my Trustee and the Trust Administrator, if any, with accountings at least quarter-annually, and a final accounting upon resignation or termination, showing all receipts, disbursements, and distributions regarding any assets over which it has authority.

8-4

My Independent Special Trustee may accept the accounting records of its predecessors without investigation, and without incurring any liability to any beneficiary or other person.

In the absence of specific objections raised by my Trustee or any beneficiary hereunder with regard to the accountings of my Independent Special Trustee, such accountings shall be deemed settled and approved, and my Independent Special Trustee shall be discharged and released from all liability thereto, unless such beneficiary, the Trustee, or the Trust Administrator shall deliver a written objection to the Independent Special Trustee or the Independent Special Trustee's legal representatives within 90 days of receipt of the Independent Special Trustee's account.

## Section 9.    Liability of Independent Special Trustee

Any Independent Special Trustee named in accordance with this agreement shall not be liable to any beneficiary or to any person for its acts or failure to act, except for intentional and willful misconduct, negligence, bad faith, or reckless indifference to all beneficiaries' interests.

## Section 10.    Employment of Experts

Any Independent Special Trustee shall have the power to employ and make reasonable use of appraisers, actuaries, accountants, and other agents in fulfilling its duties, and may rely on expert advice as long as it does so in good faith.

Unless in conflict with applicable state law, all reasonable expert fees and costs shall be paid from the assets of the trust estate and shall be charged to income first.  However, if the income is insufficient they shall be charged to principal.

## Section 11.    Limitations on Independent Special Trustee

My Independent Special Trustee shall only have those powers specifically enumerated within this agreement.

An Independent Special Trustee shall not jeopardize in any manner the

8-5

continuing status of this trust as a Charitable Remainder Unitrust as defined in Section 664 of the Code.

Whenever my trust acquires an annuity contract by gift or purchase, any annuity payment option provided in the annuity contract must be elected by my Independent Special Trustee so as to guarantee the payment to the trust of an amount at least equal to the surrender value of the annuity contract as of the day before the day the annuity payments commence.

## Section 12. A Majority of Independent Special Trustees Required to Control

When more than two Independent Special Trustees are acting, the concurrence and joinder of a majority of them shall control in all matters pertaining to the administration hereunder.

If only two Independent Special Trustees are acting, the concurrence and joinder of both shall be required.

When more than two Independent Special Trustees are acting, any dissenting or abstaining Independent Special Trustee may be absolved from personal liability by registering a written dissent or abstention with the records of the trust. The dissenting Independent Special Trustee shall thereafter act with the other Independent Special Trustees in any manner necessary or appropriate to effectuate the decision of the majority.

# Article Nine

## General Matters and Instructions
## with Regard to the Trusteeship

### Section 1.   Requirement to Furnish Bond

Any Trustee named in this agreement, whether an Independent Special Trustee or successor Trustee, shall not be required to furnish any bond for the faithful performance of its duties.

### Section 2.   Court Supervision Not Required

This trust agreement shall be administered free from the active supervision of any court.

Any proceedings to seek judicial instructions or a judicial determination shall be initiated by my Trustee in the appropriate court having original jurisdiction of those matters relating to the construction and administration of trusts.

### Section 3.   Accountings

My Trustee shall provide an accounting to the current Trust Beneficiary at least annually.  An accounting shall also be rendered by any Trustee within 60 days following resignation.

My Trustee shall not be required to furnish trust records or documentation to any individual, corporation, or other entity who is not a beneficiary, does not have my express written approval of the current Trust Beneficiary, or is not requesting such pursuant to a court order.

### Section 4.   Use of Substitute Trustee

If my Trustee is unwilling or unable to act as to any trust property, my Trustee shall designate, in writing, an individual, bank trust department, or trust

company to act as a substitute Trustee with regard to such property.

The property being administered by the substitute Trustee, as well as the net income therefrom, shall be distributed or remitted as directed by the delegating Trustee consistent with all of the terms of this agreement.

Each substitute Trustee shall exercise all of the fiduciary powers granted by this agreement unless expressly limited by the delegating Trustee in the instrument appointing such substitute Trustee, or by any provision within this Section.

Any substitute Trustee may resign at any time by delivering written notice to my Trustee to that effect.

## Section 5.    Trustee's and Trust Administrator's Fees

Any Trustee, Independent Special Trustee, Trust Administrator, if any, or other agents shall be entitled to fair and reasonable compensation for services rendered as a fiduciary or agent. The amount of compensation shall be an amount equal to the customary and prevailing charges for services of a similar nature during the same period of time and in the same geographic locale.

My Trustee, Independent Special Trustee, and Trust Administrator, if any, shall be reimbursed for the reasonable costs and expenses incurred in connection with their performance, including legal, accounting, custodial, investment expenses, insurance, and filing costs.

## Section 6.    Waiver of Fees and Limitations

Any fiduciary may waive any fee at any time. Fee waivers must be provided in writing to my Trustee and the Trust Administrator, if serving.

Notwithstanding any provision of this agreement to the contrary, no fee shall be paid to me if I am serving as a Trustee or to the other Trust Beneficiary if that Trust Beneficiary is serving as a Trustee. However, I or the other Trust Beneficiary, if serving as a Trustee, shall be entitled to reimbursement from trust assets for reasonable expenses incurred in administering the trust.

9-2

## Section 7.  Accounting for Fees

All fees shall be charged to income first.  However, if the trust income is insufficient, the excess shall instead be charged to principal.

## Section 8.  A Majority of Trustees Required to Control

When more than two Trustees are acting, the concurrence and joinder of a majority of Trustees shall control in all matters pertaining to the administration hereunder.

If only two Trustees are acting, the concurrence and joinder of both shall be required.

When more than two Trustees are acting, any dissenting or abstaining Trustee may be absolved from personal liability by registering a written dissent or abstention with the records of the trust.  The dissenting Trustee shall thereafter act with the other Trustees in any manner necessary or appropriate to effectuate the decision of the majority.

## Section 9.  Successor Corporate Fiduciaries

If any bank or trust company succeeds to the trust business of any corporate fiduciary serving as a Trustee under this agreement, whether because of a name change, or any other form of reorganization, or if such corporate fiduciary ever transfers all of its existing business to any other bank or trust company, the successor shall thereupon, without any action being required, succeed to the Trusteeship hereunder as if originally named.

# Article Ten
## My Trustee's Administrative and Investment Powers

### Section 1.    Introduction to Trustee's Powers

Except as otherwise provided in this agreement, my Trustee shall have both the administrative and investment powers enumerated under this Article and any other powers granted by the laws of the State or states having jurisdiction over the construction and administration of this agreement.

Subject to any limitation expressly set forth herein, my Trustee shall have full power and authority to do all such acts and exercise all such rights and privileges in the management of the trust property as if it were an individual and the absolute owner thereof, but only in its fiduciary capacity and with the obligation to treat all current and future beneficiaries equitably.

### Section 2.    Powers to be Exercised in the Best Interests of the Beneficiaries

My Trustee shall exercise the following administrative and investment powers without the order of any court, as my Trustee determines in its sole and absolute discretion to be in the best interests of the beneficiaries.

Notwithstanding anything to the contrary in this agreement, my Trustee shall not exercise any power in a manner inconsistent with the beneficiaries' right to the beneficial enjoyment of the trust property in accordance with the general principles of the law of trusts.

### Section 3.    Trustee Held to Standard of Ordinary Prudence

In investing, reinvesting, purchasing, acquiring, exchanging and selling property for the benefit of my trust, my Trustee shall exercise the judgment and care, under the circumstances then prevailing, which persons of prudence, discretion and intelligence exercise in the management of their own affairs not in regard to speculation, but in regard to the permanent disposition of their funds,

10-1

considering the probable income as well as the probable safety of their capital.

Within the limitations of the foregoing standard, my Trustee is authorized to acquire every kind of property, real, personal or mixed, and every kind of investment, specifically including but not limited to participation in any common trust funds administered by my Trustee, corporate obligations of every kind and stocks, preferred or common, which persons of prudence, discretion and intelligence acquire for their own account.

Such property may be held or purchased regardless of any laws or rules of law governing the investment of trust funds, the holding of underproductive property or the diversification of trust funds, if the Trustee reasonably deems it to be in the best interests of all the beneficiaries.

## Section 4. Administrative and Investment Powers

In administering this trust, any Trustee (and to the extent of its enumerated duties and powers, the Independent Special Trustee) shall have all of the trustee powers and discretion conferred upon it by the laws of the State of Florida except as otherwise provided herein.

Such powers include, but are not limited to, the power to sell, exchange or otherwise dispose of any asset held in my trust at either public or private sale, for cash or on credit, and to invest and reinvest the funds of the trust in any kind of property, real or personal or mixed, and every kind of investment, specifically including by way of example and not limitation, corporate and government obligations of every kind, stocks of any class, general partnerships, limited partnerships, shares or interests in common trust funds, regardless of any laws or rules of law governing the investment of trust funds, mutual funds, commodities, options, annuity contracts, and life insurance policies. My Trustee is authorized to continue to hold or to acquire such property, especially when such unproductive property is appreciating or may appreciate in value, and carrying charges for such property shall be paid first out of income and then out of principal, and upon the sale of such property, my Trustee shall allocate fiduciary income and principal as set for in paragraph j. of this Section.

Furthermore, no provision of this agreement shall be construed to restrict any Trustee from investing the trust property in a manner that could result in the annual realization of a reasonable amount of income or gain from the sale or disposition of such property.

10-2

My Trustee is also hereby granted the following administrative and investment powers:

### a. Environmental Powers

My Trustee shall have the power to inspect any trust property to determine compliance with any environmental law affecting such property or to respond to any environmental law affecting property held by my Trustee.

My Trustee shall have the power to refuse to accept property if my Trustee determines that there is a substantial risk that such property is contaminated by any hazardous substance or has previously, or is currently, being used for any activities directly or indirectly involving hazardous substances which could result in liability to the trust assets.

My Trustee shall have the power to take any necessary action to prevent, abate, clean up or otherwise respond to any actual or threatened violation of any environmental law affecting trust property prior to or after the initiation or enforcement of any action by any governmental body.

My Trustee may disclaim or release any power granted to it or implied by any document, statute, or rule of law which the Trustee determines may cause the Trustee to incur liability under any environmental law.

My Trustee may charge the cost of any inspection, review, prevention, abatement, response, cleanup, or remedial action authorized under this power against the trust property.

My Trustee shall not be liable to any beneficiary or to any other party for any decrease in value of the trust property by reason of my Trustee's compliance with any environmental law, specifically including any reporting requirement under such law.

### b. Securities Powers

In addition to those other securities powers granted under state law, my Trustee may retain, exercise, or sell rights of conversion or subscription with respect to any securities held as part of the trust

10-3

property.

My Trustee may vote or refrain from voting at corporate meetings either in person or by proxy, whether general or limited, and with or without substitutions.

My Trustee may join in any plan of lease, mortgage, consolidation, reorganization, or foreclosure of any corporation, trust or organization, or the property or assets thereof, including the deposit of bonds, securities, and stock with any bondholders, stockholders, or protective committee in which the trust may hold stocks or bonds or other securities, and to take and hold any securities issued under such plan and to pay assessments thereunder.

### c.   Investments in Mutual Funds

My Trustee may invest trust funds in shares of registered investment companies, commonly called mutual funds.

### d.   Loans

My Trustee shall have the power to loan, reloan, invest and reinvest the trust property or any part thereof, including loans to any Charitable Remainderman hereunder, which are adequately secured and which bear a reasonable and prudent rate of interest as determined by my Trustee.  My Trustee, however, shall not have the power to make loans to a Trustmaker, a member of a Trustmaker's family, or to any other disqualified person as defined in Code § 4946.

### e.   Nominee Powers

My Trustee may hold any trust property in the names of my Trustee, or in the name of a nominee, and may enter into agreements to facilitate holding such property.  It may accomplish such with or without disclosing my Trustee's fiduciary capacity, but in the event trust assets are held in my Trustee's own name or in the name of a nominee or nominees, suitable designation is to be made upon the books and records of my Trustee that indicate said assets are so held as part of my trust.

**f.   Self-Brokerage**

My Trustee may enter into contracts with one or more individuals, stock brokerage firms, associations, or corporations acting as broker, investment advisor or otherwise, in such form and on such terms as my Trustee in its sole and absolute discretion shall determine.

**g.   Hire Employees and Independent Contractors**

My Trustee may employ accountants, attorneys, investment advisors, agents, including administrative agents, depositories and employees and may pay the expenses of their employment.

**h.   Employment of Investment Manager**

My Trustee may retain and compensate a professional investment manager, delegate investment authority to such professional investment manager, and monitor the investment decisions of such professional investment manager.

**i.   Distribution Powers**

My Trustee is specifically authorized to make divisions and distributions of the trust property either in cash or in kind, or partly in cash and partly in kind, or in any proportion or fraction it deems advisable, provided, however, that if distributions are made in kind, the adjusted basis of the property distributed must be fairly representative of the adjusted basis of the property available for payment on the date of payment.

**j.   Income and Principal Powers**

Except as otherwise specifically provided in this agreement, the determination of all matters with respect to what is principal and what is income of the trust, and the apportionment and allocation of receipts and expenses between these accounts, shall be governed by the following authorities in the following order of preference:

> First, any express provision of this Agreement that is directly on point, but if there is no applicable provision, then,

10-5

Second, the laws of the state in which the Trust Admin-istrator, if any, has its principal place of business, but if there is no applicable rule or law directly on point, or if there is no Trust Administrator then serving, then,

Third, by the laws of the State of Florida.

Notwithstanding any other provisions herein to the contrary, if any pronouncements of the United States Treasury Department or the Internal Revenue Service shall require allocations between principal and income different from those provided by the laws of the State whose laws then apply to this trust, my Trustee shall nevertheless make allocations between principal and income in accordance with said pronouncements.

My Trustee may set aside from the trust income reasonable reserves for taxes, assessments, insurance premiums (other than premiums on life insurance policies insuring my life), repairs, depreciation, obsolescence, depletion, and for other expenses of the trust to maintain the status of the trust as a Charitable Remainder Unitrust.

My Trustee shall set aside a reserve or allowance from trust income for the depreciation of any real property transferred to or invested in by the trust if required by law.

My Trustee shall have the power, in its sole and absolute discretion, to apportion and allocate trust receipts and expenses between income and principal accounts, provided that no pre-gift appreciation shall be allocable to fiduciary income, and to treat as fiduciary income the increase in value of an obligation for the payment of money, payable at a future time in accordance with a fixed, variable or discretionary schedule of appreciation in excess of the fair market value on the date of contribution or the price at which it was issued, or the increase in value of an interest in a partnership or other investment in excess of fair market value on the date of contribution or the price paid, as the case may be, including but not limited to a bond, a zero coupon bond, an annuity contract before annuitization, a life insurance contract before the death of the insured, or an interest in a common trust fund as defined under Section 584 of the Code. Such increase in value of an obligation for the payment of money or the increase in value of an interest in a partnership or other investment shall be available for distribution only when my Trustee receives cash on account of the obligation, partnership interest or other investment.

10-6

In applying Section 643(b) of the Code and the Principal and Income Laws to the administration of my trust, distributable trust income shall not include any amount that is ordinary income for federal income tax purposes with respect to an annuity contract or a life insurance policy except when and to the extent such amounts are actually distributed to the trust.

In applying Section 643(b) of the Code and the Principal and Income Laws to the administration of my trust, the term "income" shall mean the return in money or property derived from the use of principal and any net realized, but in no event unrealized, gain from the sale or exchange of a capital asset. However, "income" shall not include any net realized gain on the sale or exchange of any capital asset contributed to the trust to the extent such gain would have been realized had the asset been sold on the date of its contribution to the trust.

Any premiums paid from the trust by my Trustee on a policy of life insurance shall be charged solely to the trust's principal account and, notwithstanding any statute, rule, or convention to the contrary, no part of any such premiums shall be charged to the trust's income account (as income is defined for purposes of Section 677(a)(3) of the Code only).

### k.    Insurance

My Trustee may procure and carry at the expense of the trust property insurance of such kind, and in such form and amount, as my Trustee deems advisable to protect my Trustee and the trust property against any hazard.

### l.    Commence or Defend Litigation

My Trustee may commence or defend at the expense of the trust any litigation with respect to any such trust or trust property as my Trustee may deem advisable.

### m.    Engage Ancillary Trustee or Agent

My Trustee may engage and compensate an ancillary Trustee or agent in connection with the management and administration of out-

10-7

of-state property.

**n.    Settlement Powers**

My Trustee may compromise, adjust, arbitrate, release with or without consideration, or otherwise adjust or alter the terms of, or abandon any claim in favor of or against any trust created under this agreement, and may take deeds in lieu of foreclosure.

**o.    Trust Addition and Retention Powers**

My Trustee is authorized to receive additional trust property, whether by gift, will, or otherwise. Upon receipt of any additional property, my Trustee shall administer and distribute the same as part of the trust property.

My Trustee may retain, without liability for depreciation or loss resulting from such retention, all property constituting the trust estate at the time of its creation or thereafter received from other sources.

**p.    Power of Reformation**

This trust is irrevocable. However, my Trustee shall have the power, acting alone, to amend the trust in any manner required for the sole purpose of ensuring that the trust qualifies and continues to qualify as a Charitable Remainder Unitrust within the meaning of Section 664 of the Code and applicable Regulations. Such amendment shall be accomplished by attaching to this agreement a written addendum, setting forth such amendment, executed solely by my Trustee before a notary public.

No technical corrections made by my Trustee shall in any way affect the irrevocable nature of transfers made to the trust by the Trust-maker or any other party. Any reformation, including the power to reform my trust, shall be null and void and of no further effect in the event such reformation or the existence of the power to reform the trust operates to frustrate the original intentions of the Trustmaker that the trust qualify as a Charitable Remainder Unitrust under the Code.

In addition to all of the powers specifically granted my Trustee in this Article, my Trustee may perform every act reasonably necessary to administer this agreement.

Each power conferred upon my Trustee under this Article, or upon Trustees in general by applicable state or federal statutes, shall be subject to any express limitations or contrary directions contained in this agreement.

## Section 5.   Conditional Right to Encumber Future Interest

My Trustee shall have the power to guarantee loans made by third parties to one or more of charitable remaindermen as long as they are irrevocably named as beneficiaries under this agreement. My Trustee may also pledge assets as collateral to secure such loans. In the event of a default by an irrevocably designated charitable remainderman, my Trustee shall have the power to sever the pledged assets from the trust for the use of the said irrevocable charitable remainderman and to deliver the pledged assets to the creditor on behalf of the charitable remainderman.

## Section 6.   Limitations on the Conditional Right to Encumber Future Interests

No guarantee or pledge to encumber assets shall occur without the written consent of all current and contingent Trust Beneficiaries.

Notwithstanding anything to the contrary, no more than 50 percent of the trust assets may be so encumbered or pledged.

## Section 7.   Limitations on Trustee's Powers

The following shall be limitations on the Trustee's powers:

### a.   Section 664 of the Code and its Regulations

Notwithstanding anything to the contrary contained herein, my Trustee is specifically prohibited from exercising any power or discretion that would be inconsistent with the continuing qualification

10-9

of this trust under Section 664 of the Code and its Regulations.

**b.   Annuity Contracts**

Whenever my trust acquires an annuity contract by gift or purchase, any annuity option provided in the annuity contract must be elected by my Trustee so as to guarantee the payment to the trust of an amount at least equal to the surrender value of the annuity contract as of the day before the day the annuity payments commence.

**c.   Prohibited Acts**

Except for the payment of the Unitrust Amount to the Trust Beneficiary(ies), my Trustee is specifically directed, if and to the extent required by the Code and applicable Regulations, not to:

> Engage in any act of self-dealing as defined in Section 4941(d) of the Code;
>
> Retain any excess business holdings as defined in Section 4943(c) of the Code;
>
> Make any investment which jeopardizes the trust's charitable purposes as defined in Section 4944 of the Code; or
>
> Make any taxable expenditure as defined in Section 4945(d) of the Code.

If the trust is continued after the termination of all non-charitable interests, my Trustee shall distribute amounts sufficient to avoid federal tax liability imposed by Section 4942(a) of the Code.

**d.   Grantor Trust Powers Prohibited**

At no time and under no circumstance shall a Trustmaker serving as a Trustee exercise any power that would result in this trust being treated as a grantor trust under Subpart E of the Code.

# Article Eleven
# Non-Apportionment and Payment of Taxes

## Section 1.   Taxes Not to be Paid by My Trustee

No gift, legacy, succession, inheritance, estate, or generation-skipping transfer taxes shall be paid by my Trustee by reason of a Trust Beneficiary's interest in this trust.

## Section 2.   Trustmaker as Trust Beneficiary Shall Provide for Taxes

I, as Trustmaker and a Trust Beneficiary, agree on my behalf and on behalf of my heirs, legal representatives, successors, and assigns, to provide for payments of any such taxes from sources other than property held by this trust and to indemnify and hold harmless any Trustee from any and all liability for such taxes.

## Section 3.   Other Trust Beneficiary's Responsibilities

If the payment of any taxes referred to in this Article has not been made from property held outside this trust, then the other Trust Beneficiary named in Article Four of this agreement shall provide for payment of such taxes that may arise as a result of his or her interest in this trust from sources other than property held by this trust.

The Trust Beneficiary's failure to pay these taxes from sources other than property held by this trust shall cause his or her income interest to terminate as if the surviving Trust Beneficiary predeceased the Trust Beneficiary whose death precipitated such tax liability.

11-1

# Article Twelve

# Administrative Agents and Investment Managers

## Section 1.    Appointment of Administrative Agent

If my Trustee or Independent Special Trustee is unwilling or unable to act with respect to specific trust assets as, for example, real estate located in another jurisdiction, then either my Trustee or my Independent Special Trustee shall appoint in writing a qualified person or corporation to act as an administrative agent or ancillary Trustee to act with respect to such property.

## Section 2.    Resignation of Administrative Agent

Any administrative agent may resign at any time by giving notice to the appropriate Trustee.

## Section 3.    Limitations on Administrative Agent

Administrative agents shall exercise only those powers that are specifically authorized by my Trustee or Independent Special Trustee.

All administrative agents shall provide the appointing Trustee and the Trust Administrator with quarterly accountings showing all receipts, disbursements, and distributions regarding any assets over which the agent has authority.

If assets are sold while under the authority of an agent, it shall promptly remit all proceeds of sale along with an accounting to the appropriate Trustee.

## Section 4.    Authority to Retain Investment Manager

My Trustee is authorized, but not required, to retain the services of professional investment managers. An investment manager may be retained for the purposes specified herein even if my Trustee is a bank or trust company with internal investment management capability.

## Section 5.   Resignation of Investment Manager

Any investment manager may resign at any time by giving 90 days notice to my Trustee before such resignation shall take effect.  My Trustee shall have the power and authority to appoint a successor investment manager in its sole and absolute discretion.

## Section 6.   Replacement of Investment Manager

My Trustee shall periodically review the investment performance of all investment managers, and shall have the right to remove an investment manager at any time, with or without cause.

## Section 7.   Limitation of Liability of Successor Investment Manager

A successor investment manager shall not be liable for any negligent or wrongful acts or omissions of its predecessors, but shall promptly report any such act or omission of which it has actual knowledge to my Trustee.

## Section 8.   Investment Manager's Affiliation with Trustee

The investment manager may be affiliated with my Trustee.

# Article Thirteen
# Definitions and General Provisions

## Section 1.   Definitions

For purposes of this agreement, the following words and phrases shall be defined as follows:

### a.   Disability

For purposes of this agreement, "disability" shall be defined as follows:

#### 1.   The Opinion of Two Licensed Physicians

A person shall be disabled during any period when, in the written opinion of two licensed physicians, he or she is incapacitated or disabled because of illness, age, or any other cause which results in the person's inability to effectively manage his or her property or financial affairs.

When, in the written opinion of any two licensed physicians, a person can effectively manage his or her property or financial affairs, that person shall no longer be disabled.

#### 2.   Court Determination

A person shall be disabled upon the determination of a court of competent jurisdiction that he or she is incompetent, incapacitated, or otherwise legally unable to effectively manage his or her property or financial affairs.

#### 3.   Disappearance or Absence

A person shall be disabled upon the unexplained disappearance or absence of that person. A person shall also be disabled if he or she is being detained under duress and is

13-1

unable to effectively manage his or her property or finan-
cial affairs.

**b.    Environmental Law**

"Environmental Law" shall mean any federal, state, or local law, rule,
regulation, or ordinance relating to protection of the environment or
of human health.

**c.    Hazardous Substance**

"Hazardous substance" shall mean any substance defined as hazard-
ous or toxic by any federal, state, or local law, rule, regulation, or
ordinance.

**d.    Income and Principal**

The definitions of income and principal, and the rules governing how
and when a given trust receipt or item of expense is to be allocated
between income and principal, shall be governed by the following
authorities in the following order of preference:

> First, any express provision of this Agreement that is
> directly on point, but if there is no applicable provision,
> then,

> Second, the laws of the state in which the Trust Adminis-
> trator, if any, has its principal place of business, but if there
> is no applicable rule or law directly on point, or if there is
> no Trust Administrator then serving, then,

> Third, by the laws of the State of Florida.

**e.    Internal Revenue Code**

The Code shall be defined as the Internal Revenue Code of 1986, as
amended from time to time.

**f.  Personal Representative**

For the purposes of this agreement, the term "Personal Representative" shall include an executor, administrator, guardian, custodian, conservator, Trustee, or any other form of personal representative.

**g.  Qualified Organization**

A "Qualified Organization" as used in this agreement must be an organization of a type described in each of Sections 170(b)(1)(A), 170(c), 2055(a) and 2522(a) of the Code and the Regulations thereunder.

**h.  The Unitrust Amount**

The "Unitrust Amount" is that amount as provided in Article Three of this agreement.

**i.  Trust Administrator**

My Trustee may at any time name a Trust Administrator who is responsible for the accounting and administration of my trust, and the duties as set forth in various sections of this agreement.

**j.  Trust Beneficiary**

The Trust Beneficiary, or Trust Beneficiaries if more than one, is that person or persons named in Article Four of this trust agreement who shall receive payments of the Unitrust Amount.

A current Trust Beneficiary is a person who is presently entitled to all or part of the Unitrust Amount. A contingent or other Trust Beneficiary is a person who has or may have a right to all or part of the Unitrust Amount sometime after the current Trust Beneficiary no longer is entitled to all or part of the Unitrust Amount.

The term Trust Beneficiary or Trust Beneficiaries shall have the same legal meaning and effect as the term "Recipient" as used in the Code and applicable Regulations.

13-3

## Section 2.  Amendment

During the duration of my trust, I shall have no power to alter, amend or revoke this agreement except as provided herein in Article Five Section 2. My Trustee shall forever have the power to amend this trust for the sole purpose of complying with the requirements of Code § 664 and Regulation §§ 1.664-1 and 1.664-3.

## Section 3.  Limitations on Liens and Encumbrances

The interest of a Trust Beneficiary in principal or income of this trust shall not be subject to the claims of any creditor, including any spouse for alimony or support, or to legal process.  Furthermore, a Trust Beneficiary's interest shall not be voluntarily encumbered or alienated, other than by assignment by the Trust Beneficiary of the income interest hereunder to the charitable remaindermen designated in accordance with this agreement.

## Section 4.  Charitable Intent

In creating this Charitable Remainder Unitrust, I intend to obtain the full benefit of any income, gift and estate tax charitable contribution deductions to which I or my estate may be entitled under the Code.

## Section 5.  General Matters

The following general matters of construction shall apply to the provisions of this agreement:

### a.  Construction

Unless the context requires otherwise, words denoting the singular may be construed as denoting the plural, and words of the plural may be construed as denoting the singular.  Words of one gender may be construed as denoting another gender as is appropriate within such context.

13-4

**b.    Headings of Articles, Sections, and Paragraphs**

The headings of Articles, Sections, and Paragraphs used within this agreement are included solely for the convenience and reference of the reader.  They shall have no significance in the interpretation or construction of this agreement.

**c.    Notices**

All notices required to be given in this agreement shall be made in writing by either:

>   Personally delivering notice to the party requiring it, and securing a written receipt, or

>   Mailing notice by certified United States mail, return receipt requested, to the last known address of the party requiring notice.

The effective date of the notice shall be the date of the written receipt or the date of the return receipt.

The guardian or conservator of the estate of a beneficiary under legal disability, or the parents or surviving parent or guardian of the person of a minor beneficiary for whose estate no guardian has been appointed, may, in carrying out the provisions of this agreement, act and receive notice for such beneficiary and sign any receipt for such beneficiary.

**d.    Delivery**

For purposes of this agreement "delivery" shall mean:

>   Personal delivery to any party, or

>   Delivery by certified United States mail, return receipt requested to the party making delivery.

13-5

The effective date of delivery shall be the date of personal delivery or the date of the return receipt.

### e.    Applicable State Law

The validity of this trust shall be determined by reference to the laws of the state of Florida, except as provided to the contrary in this agreement.

My Trustee and any Independent Special Trustee are prohibited from exercising any power or discretion granted under said laws that would be inconsistent with the qualification of the trust under Section 664 of the Code.

The foregoing shall apply regardless of the situs of trust assets or the home or principal place of business of the Trustmaker or of any beneficiary.

### f.    Duplicate Originals

This agreement may be executed in several counterparts; each counterpart shall be considered a duplicate original agreement.

### g.    Severability

If any provision of this agreement is declared by a court of competent jurisdiction to be invalid for any reason, such invalidity shall not affect the remaining provisions of this agreement. The remaining provisions shall be fully severable, and this agreement shall be construed and enforced as if the invalid provision had never been included in this agreement.

I, as Trustmaker, acknowledge that I have read this agreement and that I agree that it correctly states the terms and conditions under which the trust property is to be held, managed, and disposed of by my Trustee.

I approve this agreement in all particulars, and request my Trustees to execute it.

13-6

The Trustmaker and the Trustees have executed this agreement effective the day and year first written above.


_DAVID R. MARKIN_, signature

DAVID R. MARKIN, TRUSTMAKER


_DAVID R. MARKIN_, signature

DAVID R. MARKIN, TRUSTEE


STATE OF FLORIDA              )
                                        )    ss.
COUNTY OF                   )


The foregoing DAVID R. MARKIN CHARITABLE REMAINDER UNITRUST #1 was acknowledged before me on December 16, 1996, by DAVID R. MARKIN, as Trustmaker and as Trustee, who personally appeared before me, is personally known to me, and did not take an oath.

Witness my hand and official seal.

My commission expires: _____.


_Mary Ann Bassignani_, signature

Mary Ann Bassignani, Notary Public

MARY ANN BASSIGNANI
MY COMMISSION # CC 386429
EXPIRES: June 23, 1998
Bonded Thru Notary Public Underwriters

13-7

_[signature]_

ALLAN R. TESSLER
INDEPENDENT SPECIAL TRUSTEE


STATE OF WYOMING    )
                    ) ss.
COUNTY OF _TETON_   )


The foregoing DAVID R. MARKIN CHARITABLE REMAINDER UNITRUST #1 was acknowledged before me on _December 16_, 1996, by ALLAN R. TESSLER, as Independent Special Trustee, who personally appeared before me, is personally known to me, and who did not take an oath.


Witness my hand and official seal.

My commission expires: _Aug. 14, 2000_.


_[signature]_
Notary Public

ALLAN R. TESSLER
INDEPENDENT SPECIAL TRUSTEE


STATE OF WYOMING          )
                          )    ss.
COUNTY OF                 )


The foregoing DAVID R. MARKIN CHARITABLE REMAINDER
UNITRUST #1 was acknowledged before me on _____, 1996,
by ALLAN R. TESSLER, as Independent Special Trustee, who personally
appeared before me, is personally known to me, and who did not take an
oath.


Witness my hand and official seal.

My commission expires: _____.



_____
Notary Public

13-8

## WITNESS ATTESTATION

The foregoing Charitable Remainder Trust #1 was, on the day and year written above, signed by DAVID R. MARKIN in our presence. We, in his presence and at his request, and in the presence of each other, have attested the same and have signed our names as attesting witnesses.

We declare that at the time of our attestation of this Trust, DAVID R. MARKIN was, according to our best knowledge and belief, of sound mind and memory and under no undue duress or constraint.


DAVID K. CAHOONE, WITNESS

Address:
2 N. Tamiami Trail, Suite 606
Sarasota, FL  34236


RENNO L. PETERSON, WITNESS

Address:
2 N. Tamiami Trail, Suite 606
Sarasota, FL  34236


13-9

## WITNESS ATTESTATION

The foregoing Charitable Remainder Trust #1 was, on the day and year written above, signed by DAVID R. MARKIN in our presence. We, in his presence and at his request, and in the presence of each other, have attested the same and have signed our names as attesting witnesses.

We declare that at the time of our attestation of this Trust, DAVID R. MARKIN was, according to our best knowledge and belief, of sound mind and memory and under no undue duress or constraint.


DAVID K. CAHOONE, WITNESS

Address:
2 N. Tamiami Trail, Suite 606
Sarasota, FL  34236


RENNO L. PETERSON, WITNESS

Address:
2 N. Tamiami Trail, Suite 606
Sarasota, FL  34236

13-9