BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for*
*the substantively consolidated SIPA liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and estate of Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> BNP PARIBAS S.A., BNP PARIBAS ARBITRAGE SNC, BNP PARIBAS BANK & TRUST (CAYMAN) LIMITED, BNP PARIBAS SECURITIES SERVICES S.A., <br><br> Defendants. | Adv. Pro. No. 12-01576 (SMB) <br><br> **AMENDED COMPLAINT** |

## TABLE OF CONTENTS

<u>Page</u>

I.     NATURE OF THE ACTION ............................................................... 1

II.    JURISDICTION AND VENUE ............................................................ 4

III.   BACKGROUND .............................................................................. 5

IV.    BLMIS, THE PONZI SCHEME, AND THE SSC STRATEGY ..................... 8

    A.    BLMIS ................................................................................... 8

    B.    The Ponzi Scheme ................................................................... 9

    C.    Madoff's Investment Strategy .................................................. 10

    D.    The Collapse of the Ponzi Scheme ........................................... 11

V.     DEFENDANTS ............................................................................. 12

VI.    PERSONAL JURISDICTION ............................................................ 13

VII.   BNP PARIBAS CORPORATE STRUCTURE ......................................... 14

    A.    The Fund Derivatives Group ................................................... 14

    B.    The Securities Services Group ................................................. 15

    C.    The Asset Management Group ................................................. 16

    D.    BNP Paribas Committees ........................................................ 16

VIII.  DEFENDANTS' LONGSTANDING RELATIONSHIPS WITH MADOFF,
      BLMIS, AND THE BLMIS FEEDER FUNDS ...................................... 18

    A.    BNP Paribas Loans Madoff Tens of Millions of Dollars ................... 18

    B.    BNP Paribas Creates and Services the BLMIS Feeder Fund Oreades ............... 19

    C.    BNP Paribas Closes Oreades Because It Recognizes Fraud Risks at
        BLMIS ................................................................................. 22

    D.    BNP Paribas Liquidates Oreades After Madoff Refuses to Address BNP
        Paribas's Concerns ................................................................. 24

    E.    Key Individuals within BNP Paribas Would Not Allow Investments with
        Madoff ................................................................................. 25

IX.    BNP PARIBAS FUELS THE PONZI SCHEME BY BECOMING A GLOBAL
      LEVERAGE PROVIDER TO THE BLMIS FEEDER FUNDS ..................... 27

    A.    Through the ZCM Acquisition, BNP Paribas Expands Its Structured
        Products Group and Acquires a Credit Facility for a Fund Invested with
        Harley ................................................................................. 27

    B.    BNP Paribas and SocGen Conduct Due Diligence on ZCM and SocGen
        Rejects ZCM After Discovering Evidence of Fraud at BLMIS ................... 29

## TABLE OF CONTENTS
### (continued)

C.  Defendants Deviated from Their Standard Practices in order to Shield Themselves from Additional Information Confirming that BLMIS Was a Fraud ....................................................................................... 32

D.  BNP Paribas Expands the Credit Facility with Santa Barbara ........................... 35

E.  BNP Paribas Takes Control of Legacy Capital's BLMIS Account .................... 37

F.  BNP Paribas and Renaissance Conduct Due Diligence on Legacy Capital and Renaissance Discovers Evidence of Fraud at BLMIS ................................ 38

G.  BNP Paribas Executes a Credit Facility with Tremont ....................................... 39

H.  BNP Paribas Executes Option and Swap Agreements with Multiple BLMIS Feeder Funds ........................................................................................ 41

I.  BNP Paribas Creates Structured Products for BNP Paribas Clients that Reference Investments in the BLMIS Feeder Funds ........................................... 42

X.  DEFENDANTS KNEW OF FRAUD SURROUNDING BLMIS ................................. 44

A.  Defendants Knew BLMIS's Operational Structure Was Vulnerable to Fraud Because it Subverted Checks and Balances ............................................... 44

B.  BLMIS's Outdated Trade Reporting Practices Were Vulnerable to Fraud ......... 45

C.  BLMIS's Small, Unknown Auditor Was Neither Qualified nor Capable of Auditing BLMIS .................................................................................................. 47

D.  BLMIS's Fee Structure Indicated Fraud ............................................................. 48

E.  Madoff Operated BLMIS with No Meaningful Transparency and BNP Paribas Helped to Shield BLMIS from Scrutiny ................................................ 48

XI.  DEFENDANTS KNEW OF IMPOSSIBILITIES AND OTHER INDICIA OF FRAUD ABOUT BLMIS'S PERFORMANCE ........................................................... 49

A.  The SSC Strategy BLMIS Purported to Employ Could Not Yield the Results Reported on the BLMIS Account Statements ......................................... 50

B.  BLMIS's Executed Trades Outside the Daily Price Range ................................. 53

C.  BLMIS's Volume of Assets under Management Was Too Large to Execute the SSC Strategy ................................................................................... 54

D.  BLMIS's Misreported Investment Accounts and Assets Under Management ........................................................................................................... 55

E.  The Timing of BLMIS's Purported Trades Was Impossible ............................... 56

F.  BLMIS Account Statements Reflected Impossible Option Trading Volumes ............................................................................................................... 58

G.  BLMIS's Purported OTC Option Trades Were Impossible ................................ 59

## TABLE OF CONTENTS
### (continued)

<u>Page</u>

H.    BLMIS Deviated from the SSC Strategy ............................................................ 60

I.    BLMIS Reported Settlement Anomalies in Option Transactions ....................... 62

J.    The Dividend Activity Shown on Customer Statements Was Impossible .......... 63

XII.    THE TRANSFERS .......................................................................................... 64

A.    TREMONT FUNDS ............................................................................. 65

1.    Initial Transfers from BLMIS to Prime Fund .......................................... 66

2.    Tremont Initial Transfers to Broad Market Fund ................................... 67

3.    Subsequent Transfers to XL LP and Subsequently to Defendant BNP Paribas Cayman .................................................................. 68

4.    Initial Transfers from BLMIS to Insurance Portfolio Fund .................... 69

5.    Subsequent Transfers from Insurance Portfolio Fund to Defendants BNP Paribas Arbitrage and BNP Paribas ................................................. 70

6.    Subsequent Transfers from Insurance Portfolio Fund to XL Portfolio ........................................................................................ 71

7.    Initial Transfers from BLMIS to Portfolio Limited Fund ....................... 71

8.    Subsequent Transfers from Portfolio Limited Fund to Defendants BNP Paribas Cayman and BNP Paribas Securities Services ................. 72

9.    Subsequent Transfers from Portfolio Limited Fund to XL Portfolio ...... 72

10.    Subsequent Transfers from XL Portfolio and Subsequently to Defendants BNP Paribas Arbitrage and BNP Paribas Cayman .............. 73

11.    The Tremont Subsequent Transfers Are Domestic ................................. 73

a.    The Tremont Funds' Principal Place of Business and Operations Were in New York .................................................. 73

b.    The Events Relating to the Transfers Received by the BNP Defendants from the Tremont Funds Occurred in New York ............................................................................................ 76

B.    ASCOT ................................................................................................ 77

1.    Ascot Initial Transfers ............................................................................ 77

2.    Subsequent Transfers from Ascot to Defendants BNP Paribas Cayman and BNP Paribas ...................................................................... 78

COUNT ONE
    RECOVERY OF SUBSEQUENT TRANSFERS  FROM DEFENDANT BNP PARIBAS CAYMAN UNDER 11 U.S.C. §§ 105(a) AND 550(a) ................................. 79

# TABLE OF CONTENTS
## (continued)

**Page**

COUNT TWO
    RECOVERY  FROM DFENDANT BNP PARIBAS ARBITRAGE UNDER 11
    U.S.C. §§ 105(a) AND 550(a) ......................................................................................... 80

COUNT THREE
    RECOVERY FROM BNP PARIBAS  UNDER 11 U.S.C. §§ 105(a) AND 550(a) ....... 81

COUNT FOUR
    RECOVERY FROM BNP PARIBAS SECURITIES SERVICES UNDER 11
    U.S.C. §§ 105(a) AND 550(a) ......................................................................................... 82

## GLOSSARY

| | |
|---|---|
| Access | **Access International Advisors:**  Investment management company that managed Oreades, Luxalpha, and Groupement. |
| Ascot | **Ascot Partners, L.P.:**  BLMIS Feeder Fund managed by Gabriel Capital Corp. |
| BGL BNP Paribas | **BNP Paribas Luxembourg S.A. d/b/a BGL BNP Paribas Luxembourg S.A.:**  Subsidiary of BNP Paribas, successor to BNP Paribas (Luxembourg) S.A. and Banque Nationale de Paris (Luxembourg) S.A., and member of BNP Paribas's Asset Management Group. |
| BNP Paribas | **Defendant BNP Paribas S.A.:**  Banking and financial services parent company and its immediate predecessors. |
| BNP Paribas Arbitrage | **Defendant BNP Paribas Arbitrage SNC:**  Subsidiary of BNP Paribas and member of BNP Paribas's Fund Derivatives Group. |
| BNP Paribas Cayman | **Defendant BNP Paribas Bank & Trust (Cayman) Limited:**  Subsidiary of BNP Paribas and member of BNP Paribas's Securities Services Group. |
| BNP Paribas Securities Corp. | **BNP Paribas Securities Corp.:**  Subsidiary of BNP Paribas and member of BNP Paribas's Fund Derivatives Group. |
| BNP Paribas Securities Services | **Defendant BNP Paribas Securities Services S.A.:**  Subsidiary of BNP Paribas and member of BNP Paribas's Securities Services Group. |
| BNP Paribas (Suisse) | **BNP Paribas (Suisse) S.A.:**  Subsidiary of BNP Paribas and member of BNP Paribas's Asset Management Group. |
| BLMIS Feeder Funds | **BLMIS Feeder Funds:**  Investment funds with a principal or primary purpose of investing all or virtually all of their assets with the BLMIS IA Business, including Ascot, Broad Market Fund, Equity Trading, Fairfield Sentry, Groupement, Harley, Insurance Portfolio Fund, Kingate Euro, Kingate Global, Legacy Capital, Luxalpha, Oreades, Portfolio Limited Fund, and Prime Fund. |
| Broad Market Fund | **Rye Select Broad Market Fund, L.P.:**  BLMIS Feeder Fund managed by Tremont. |
| Equity Trading | **Equity Trading Portfolio Limited:**  BLMIS Feeder Fund managed by Essex Asset Management. |
| Fairfield Sentry | **Fairfield Sentry Limited:**  BLMIS Feeder Fund managed by FGG. |
| Fairfield Sigma | **Fairfield Sigma Limited:**  Hedge fund managed by FGG and wholly invested in Fairfield Sentry. |

| | |
|---|---|
| FAM | **Fix Asset Management:**  Investment management company that managed Harley, Santa Barbara, and Santa Clara. |
| FGG | **Fairfield Greenwich Group:**  A *de facto* partnership consisting of a group of related entities that managed Fairfield Sentry and Fairfield Sigma. |
| FIM | **FIM Advisers LLP and its Related Entities:**  Investment management company that managed Kingate Global and Kingate Euro, pursuant to a consultancy agreement with fund manager, Kingate Management Limited. |
| FundQuest | **Primonial FundQuest:**  Asset management company specializing in hedge fund investments and, during the relevant time period, a subsidiary of BNP Paribas. |
| Gabriel Capital Corp. | **Gabriel Capital Corporation:**  Investment management company that managed Ascot. |
| Groupement | **Groupement Financier Ltd.:**  BLMIS Feeder Fund managed by Access. |
| Harley | **Harley International (Cayman) Limited:**  BLMIS Feeder Fund managed by FAM. |
| Insurance Portfolio Fund | **Rye Select Broad Market Insurance Portfolio LDC:**  BLMIS Feeder Fund managed by Tremont. |
| Inter Conseil | **Inter Investissements S.A.:**  Investment adviser and asset manager for Oreades and, during the relevant time period, a subsidiary of BNP Paribas. |
| Kingate Euro | **Kingate Euro Fund Ltd.:**  BLMIS Feeder Fund managed by FIM. |
| Kingate Global | **Kingate Global Fund Ltd.:**  BLMIS Feeder Fund managed by FIM. |
| Legacy Capital | **Legacy Capital Ltd.:**  BLMIS Feeder Fund managed by Kronos LLC. |
| Luxalpha | **Luxalpha SICAV:**  BLMIS Feeder Fund managed by Access. |
| Oreades | **Oreades SICAV:** BLMIS Feeder Fund managed by Access and BNP Paribas and its affiliates. |
| Portfolio Limited Fund | **Rye Select Broad Market Portfolio Limited:** BLMIS Feeder Fund managed by Tremont. |
| Prime Fund | **Rye Select Broad Market Prime Fund L.P.:**  BLMIS Feeder Fund managed by Tremont. |

| | |
|---|---|
| Santa Barbara | **Santa Barbara Holdings Ltd.:**  Hedge fund managed by FAM and wholly invested in Harley. |
| Santa Clara | **Santa Clara Holdings Ltd.:**  Hedge fund managed by FAM and wholly invested in Harley. |
| Tremont Enhanced Market Fund | **Tremont Enhanced Market Neutral Fund L.P.**: A domestic fund of funds managed by Tremont that indirectly invested with BLMIS. |
| Tremont | **Tremont Group Holdings, Inc.:** Investment manager that managed several investment funds that directly and indirectly invested with BLMIS. |
| XL LP | **Rye Select Broad Market, L.P.:**  A domestic fund of funds managed by Tremont that indirectly invested with BLMIS. |
| XL Portfolio | **Rye Select Broad Market XL Portfolio Limited:**  An offshore fund of funds managed by Tremont that indirectly invested with BLMIS. |

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa *et seq.* ("SIPA"), and substantively consolidated estate of Bernard L. Madoff

("Madoff"), through the Trustee's undersigned counsel, for his Amended Complaint against

defendants BNP Paribas, BNP Paribas Arbitrage, BNP Paribas Cayman, and BNP Paribas

Securities Services (collectively, "Defendants"), states:

## I.      NATURE OF THE ACTION

1.      Defendants comprise a global and sophisticated financial enterprise with a

longstanding relationship with Madoff, BLMIS, and the BLMIS Feeder Funds.  Each Defendant

had its own role in working together to exploit BLMIS's fictional returns, and each Defendant

knew of signs of fraud at BLMIS but purposely ignored those signs in order to profit off BLMIS.

2.      In 1997, BNP Paribas created and sponsored Oreades, one of the earliest BLMIS

Feeder Funds.  BNP Paribas's subsidiaries opened Oreades's investment accounts with BLMIS

and served as investment manager, administrator, and custodian to Oreades, and as fiduciaries to

its investors.  As required by Madoff, BNP Paribas's subsidiaries entered into secret agreements

with BLMIS to delegate their investment management and custodial duties to BLMIS.

3.      During an audit and compliance review conducted on Oreades by BNP Paribas's

Group Risk Management department, it became clear that the validity of the trades BLMIS

reported could not be verified, and that because of BLMIS's outdated trade reporting practices

and BLMIS's hidden roles as Oreades' investment manager and custodian, Madoff was able to

fabricate trades post hoc.  BNP Paribas Securities Services, on behalf of BNP Paribas,

questioned BLMIS's fraudulent practices but never found answers that assuaged their growing

concerns.  Eventually, BNP Paribas closed Oreades because of the risk of fraud associated with

Madoff and BLMIS, and the potential liability BNP Paribas and its subsidiaries faced as
fiduciaries to Oreades's investors.

4.      After taking steps to close Oreades in 2003, Defendants went "all in" on trying to
leverage Madoff's fraud from a more shielded position as non-fiduciaries.  Defendants devised a
new company-wide business strategy to profit from BLMIS:  BNP Paribas, through its Fund
Derivatives Group in New York, built a business based on providing billions of dollars in
leverage to the BLMIS Feeder Funds and their investors.  These billions helped support
Madoff's Ponzi scheme and exacerbated the wide-ranging effects of his fraud.

5.      Madoff's returns had become its own, highly coveted "product" that sophisticated
banks like BNP Paribas sought to exploit for their own profit.  However, until 2003, BNP
Paribas lacked the resources of its rivals, such as Société Générale ("SocGen"), that BNP Paribas
needed to partake in the BLMIS "market."

6.      In 2003, BNP Paribas purchased Zurich Capital Markets, Inc. ("ZCM").  This
acquisition was central to Defendants' business plan because it provided the infrastructure and
personnel necessary to create and market credit facilities and structured products that leveraged
and exploited BLMIS's fictional returns.

7.      From 2003 through 2008, BNP Paribas directed Defendants to make exceptions to
their internal due diligence policies and standard business practices for Madoff and BLMIS in
order to avoid confirming their suspicions of BLMIS's fraud.

8.      The due diligence team in New York for BNP Paribas's Fund Derivatives Group
had the right and responsibility to investigate, and then accept or reject, each transaction
considered.  However, BNP Paribas stripped the due diligence team's ability to reject Madoff-
related transactions.  Transactions with the BLMIS Feeder Funds were purportedly reviewed and

approved by BNP Paribas committees, but the review was a "rubber stamp" and approval was a

foregone conclusion.

9.       Defendants also had a strict policy against entering into credit facilities with

single managers because they carried a much greater risk of fraud.  Defendants purposefully

deviated from this policy when it came to Madoff.

10.      During the relevant time period here, Defendants knew of many facts indicating

fraud at BLMIS to which they deliberately turned a blind eye:

    a)    Madoff was not executing the split strike conversion trading strategy (the "SSC Strategy") on behalf of the BLMIS Feeder Funds and he was lying about how he generated BLMIS's purported returns;

    b)    BLMIS's consistently positive, double-digit returns year-after-year—even in volatile markets—were impossible to achieve using the SSC Strategy, which was supposed to be correlated with the Standard & Poor's 100 Index (the "S&P 100 Index");

    c)    BLMIS trade confirmations, which Defendants received and reviewed in real time from multiple BLMIS Feeder Funds, reflected that Madoff purportedly executed trades outside of the stocks' daily price range (*i.e.*, he purchased and sold stocks at prices that did not exist);

    d)    The billions of dollars in assets BLMIS purportedly managed were too large for the SSC Strategy to deliver Madoff's purported returns;

    e)    Madoff lied about the number of BLMIS investment accounts and assets under management ("AUM");

    f)    BLMIS purported to purchase and sell stocks with near perfect timing, almost always purchasing stocks in the lower half of the daily trade range and almost always selling stocks in the upper half of the daily trade range;

    g)    BLMIS's purported options trading greatly exceeded the entire volume of options traded on the Chicago Board Options Exchange (the "CBOE");

    h)    Madoff did not take industry-standard management and performance fees, voluntarily foregoing hundreds of millions, if not billions, of dollars in favor of the managers of the BLMIS Feeder Funds;

    i)    No independent third party confirmed the legitimacy of BLMIS's purported trades, as BLMIS served as the investment adviser, prime broker, and custodian for BLMIS investment accounts;

j)      BLMIS purported to execute speculative and unhedged option trades and individual equity trades that on their face contravened the SSC Strategy;

k)      BLMIS account statements and trade confirmations reflected option trades that were settled outside the industry standard time frame;

l)      BLMIS only provided outdated paper statements and trade confirmations to its customers, with no real-time access to investment account information; and

m)      BLMIS was purportedly audited by Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), a three-person accounting firm based in a strip mall in Rockland County, New York, wholly incapable of auditing a firm like BLMIS with billions of dollars under management.

11.      Confronted with so many facts evidencing fraud at BLMIS, Defendants chose to look the other way in order to grow BNP Paribas's leverage business and continue to profit off the BLMIS Feeder Funds and their investors.

12.      Prior to Madoff's arrest on December 11, 2008 (the "Filing Date"), Defendants and their affiliates received approximately $1.4 billion in fraudulent transfers of BLMIS customer property, as defined by SIPA § 78*lll*(4), from the fourteen BLMIS Feeder Funds.

13.      By this action, the Trustee seeks to recover approximately $156 million in fraudulent transfers of BLMIS customer property that Defendants received from the Tremont and Ascot Funds, prior to the Filing Date.  These fraudulent transfers are recoverable from Defendants and should be returned to the Trustee for equitable distribution to BLMIS customers.[1]

## II.      JURISDICTION AND VENUE

14.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (SMB) (the "SIPA Proceeding"), is

---

[1] The Bankruptcy Court has dismissed the Trustee's claims to recover approximately $1.2 billion in fraudulent transfers that Defendants received from other BLMIS Feeder Funds.  *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016).  The Trustee has appealed the orders dismissing those claims and reserves the right to amend this complaint to re-allege those claims if the appeal is successful.

pending.  The SIPA Proceeding was originally brought in the United States District Court for the

Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff*

*Investment Securities LLC et al.*, No. 08 CV 10791 and has been referred to this Court.  This

Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and

15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

15.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O).  The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

16.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

17.    This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-

2(c)(3), 11 U.S.C. §§ 105(a), 544(b), 548(a), 550(a), and 551, the New York Fraudulent

Conveyance Act (N.Y. Debt & Cred. §§ 270 *et seq.* (McKinney 2001)), the New York Civil

Practice Law and Rules (McKinney 2003) ("N.Y.C.P.L.R."), and other applicable law.

### III.    BACKGROUND

18.    On the Filing Date, Madoff was arrested by federal agents for criminal violations

of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire

fraud.  Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced

the District Court proceeding.

19.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities

customers as they came due and its customers needed the protections afforded by SIPA.

20.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    a)      appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    b)      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

    c)      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

21.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

22.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

23.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

24.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Mr. Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

25.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), Mr. David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

26.     On March 24, 2014, Mr. Daniel Bonventre, Ms. Annette Bongiorno, Ms. Jo Ann Crupi, Mr. George Perez, and Mr. Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

27.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtor to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

28.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

29.     The Trustee has standing to bring avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b),

544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover

transfers under Bankruptcy Code sections 544, 547, 548, and 550(a), and 551, and SIPA

§§ 78fff-1(a) and 78fff-2(c)(3).

## IV.   BLMIS, THE PONZI SCHEME, AND THE SSC STRATEGY

**A.   BLMIS**

30.     Madoff founded BLMIS in 1960 as a sole proprietorship.  In 2001, Madoff

registered BLMIS as a New York limited liability company.  At all relevant times, Madoff

controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

31.     BLMIS purportedly operated as a single broker-dealer from 1960 through 2008.

During that time, BLMIS was continually registered with the SEC.  On December 30, 1970,

BLMIS became a member of SIPC and continued its membership without any change in status

until the Filing Date.

32.     For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker-dealer operation, and the IA Business.

33.     BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced

Madoff to register.

34.     For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

8

35.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment

Adviser Registration) with the SEC, reporting that BLMIS's IA Business had 23 customer

accounts with total assets under management of $11.7 billion.  BLMIS filed its last Form ADV

in January 2008, reporting that its IA Business still had only 23 customer accounts with total

assets under management of $17.1 billion.  In reality, Madoff grossly understated these numbers.

In 2008, BLMIS had over 4,900 active customer accounts with a purported value of

approximately $68 billion in assets under management.  At all times, BLMIS's Form ADVs were

publicly available.

**B.    The Ponzi Scheme**

36.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using

money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had

no legitimate business operations and produced no profits or earnings.  Madoff was assisted by

several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David

Kugel, Annette Bongiorno, Joanne Crupi, and others, who pleaded to, or were found guilty of,

assisting Madoff in carrying out the fraud.

37.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent

activity.  It was funded, in part, by money taken from the IA Business customer deposits, but

fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial

statements and other regulatory reports filed by BLMIS.  The proprietary trading business was

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required

fraudulent infusions of cash from the IA Business to continue operating.

38.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed

Friehling & Horowitz as its auditor, which accepted BLMIS's fraudulently reported trading

revenues and/or commissions on its financial statements and other regulatory reports that BLMIS

filed.

39.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling

& Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for

Madoff and others.  BLMIS's available SEC Form X-17A-5 included copies of these fictitious

annual audited financial statements prepared by Friehling & Horowitz.

**C.    Madoff's Investment Strategy**

40.    From 1992 forward, Madoff told IA Business customers that he employed the

SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its

IA Business customers.  All funds received from IA Business customers were commingled in a

single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not

used to trade securities, but rather to make distributions to, or payments for, other customers, to

benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

41.    BLMIS reported falsified trades using backdated trade data on monthly account

statements sent to IA Business customers that typically reflected substantial gains on the

customers' principal investments.

42.    The SSC Strategy purported to involve: (i) the purchase of a group or basket of

equities (the "basket") intended to highly correlate to the S&P 100 Index, (ii) the purchase of

out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P Index

call options.

43.    The put options were to control the downside risk of price changes in the basket.

The exercise of put options could not turn losses into gains, but rather could only put a floor on

losses.  By definition, the exercise of a put option would entail a loss for BLMIS.

44.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to outperform the market, because in a rising market, calls would be exercised by the counterparty.

45.    The simultaneous purchase of puts and calls to hedge a securities position is commonly referred to as a collar.  The purpose of the collar is to limit exposure to volatility in the stock market and flatten out returns on investment.

46.    For the SSC Strategy to be deployed as Madoff claimed, the total value of each of the puts and calls purchased for the basket had to equal the notional value of the basket.  For example, to properly implement a collar to hedge the $11.7 billion of assets under management that Madoff publicly reported in 2006 would have required the purchase of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

47.    Moreover, at all times that BLMIS reported its total assets under management, publicly available information about the volume of exchange-traded options showed that the volume of options contracts necessary to form the collar and implement the SSC Strategy exceeded the available options.

48.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

**D.    The Collapse of the Ponzi Scheme**

49.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

50.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

51.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.     DEFENDANTS

52.     <u>BNP Paribas</u> is incorporated and organized under the laws of France and maintains offices at, among other places, 16 Boulevard des Italiens, 75009 Paris, France and 787 Seventh Avenue, New York, New York 10019.

53.     <u>BNP Paribas Arbitrage</u> is a general partnership incorporated and organized under the laws of France as a *societe en nom collectif*.  It is a wholly owned subsidiary of BNP Paribas and maintains offices at 16 Boulevard des Italiens, 75009 Paris, France and 787 Seventh Avenue, New York, New York 10019.  BNP Paribas is the Managing Director of BNP Paribas Arbitrage.

54.     <u>BNP Paribas Cayman</u> is incorporated and organized under the laws of the Cayman Islands.  It is a wholly owned subsidiary of BNP Paribas and maintains an office at Royal Bank House, Shedden Road, George Town, Grand Cayman KY1-1006, Cayman Islands.

55.     <u>BNP Paribas Securities Services</u> is incorporated and organized under the laws of France.  It is a wholly owned subsidiary of BNP Paribas and maintains offices at: 3 Rue d'Antin, 75002 Paris, France; 787 Seventh Avenue, New York, New York; 33 rue de Gasperich, L-5826 Hesperange, Luxembourg; and Royal Bank House, Shedden Road, George Town, Grand Cayman KY1-1006, Cayman Islands.

## VI.    PERSONAL JURISDICTION

56.    Defendants are subject to personal jurisdiction in this judicial district under New York Civil Practice Law & Rules §§ 301 and/or 302 (McKinney 2001) and Federal Rule of Bankruptcy Procedure 7004.  Defendants knowingly accepted the rights, benefits, and privileges of conducting and profiting from business and/or transactions in the United States and New York and should reasonably expect to be subject to New York jurisdiction.

57.    Defendants purposely availed themselves of the laws and protections of the United States and New York State by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the BLMIS Feeder Funds.

58.    BNP Paribas conducts business in the United States.  According to its website, "BNP Paribas has been present in the United States since the late 1800s, and currently has over 16,000 employees in North America.  The region is a key hub for the Bank's global network of 75 countries and nearly 190,000 employees."  Currently, BNP Paribas has over 10,000 employees and more than 700 retail branches in the United States.

59.    BNP Paribas, BNP Paribas Securities Services and BNP Paribas Arbitrage each maintain offices in New York at 787 Seventh Avenue and thus maintain sufficient contacts with the United States and New York in connection with the claims alleged herein.

60.    BNP Paribas Cayman knowingly invested in and received transfers from Fairfield Sentry, XL Portfolio, Portfolio Limited Fund, XL LP, Kingate Global, and Ascot.  Fairfield Sentry, XL Portfolio, Portfolio Limited Fund, XL LP, and Ascot were each managed out of FGG's, Tremont's, and Gabriel Capital Corp.'s respective offices in New York.  BNP Paribas Cayman and/or its agents received and wired funds through banks in New York and regularly communicated with FGG and Tremont employees in New York.

## VII.    BNP PARIBAS CORPORATE STRUCTURE

61.    BNP Paribas operates several business groups that provide retail banking, corporate and investment banking, and other services, such as asset management and private wealth management.

62.    Among BNP Paribas's business groups, the Fund Derivatives Group, the Securities Services Group, and the Asset Management Group each played an important role in building and maintaining Defendants' relationships with Madoff, BLMIS, and the BLMIS Feeder Funds.

63.    Defendants collectively operated BNP Paribas's Madoff business as directed by BNP Paribas.  In particular, BNP Paribas Arbitrage, BNP Paribas Securities Services, and BNP Paribas Cayman were subject to common BNP Paribas management and the same BNP Paribas committee oversight relating to BNP Paribas's Madoff business.  Defendants and BNP Paribas Securities Corp. also shared the same offices, employees, contact information, and bank accounts relating to BNP Paribas's Madoff business.

## A.    The Fund Derivatives Group

64.    The Fund Derivatives Group is a business group within BNP Paribas's Global Equity & Derivatives Division.  Among other things, the Fund Derivatives Group creates, markets, and services credit facilities and derivative financial instruments such as swaps, notes, and other structured products.  These products generally offered BNP Paribas's customers "leverage," which allowed them the opportunity to earn multiples of the returns generated by the underlying reference asset without large up-front outlays of capital.  In return, BNP Paribas and its subsidiaries received tens of millions of dollars in fees and interest payments from their customers.

65.     The fraudulent transfers of customer property received by Defendants were derived from products and investments made possible in large part by the Fund Derivatives Group in New York.

66.     The Fund Derivatives Group is comprised of employees of BNP Paribas and certain of its branches and subsidiaries, including BNP Paribas Arbitrage and BNP Paribas Securities Corp.

67.     Through the operations of the Fund Derivatives Group, BNP Paribas provided capital to fund the credit facilities and structured products; BNP Paribas Arbitrage created and managed most, if not all, of the credit facilities and structured products; and BNP Paribas Securities Corp. marketed and monitored the credit facilities and structured products.

68.     BNP Paribas Arbitrage and BNP Paribas Securities Corp. also served as BNP Paribas's calculation agent or collateral agent for the credit facilities and structured products.  In its role as calculation agent, for example, BNP Paribas Securities Corp. calculated the amounts that BNP Paribas should invest or redeem from the BLMIS Feeder Funds and corresponded regularly with the BLMIS Feeder Funds and their administrators.

**B.     The Securities Services Group**

69.     The Securities Services Group is a business group within BNP Paribas's Investment Solutions Unit.  Among other things, the Securities Services Group provided administrative banking services to clients of the Fund Derivatives Group who invested with the BLMIS Feeder Funds.

70.     The Securities Services Group is comprised of employees of certain BNP Paribas branches and subsidiaries, including BNP Paribas Cayman and BNP Paribas Securities Services.

15

71.     BNP Paribas Cayman and BNP Paribas Securities Services functioned as arms of BNP Paribas in their respective roles within the Securities Services Group.  Each facilitated transfers in and out of the relevant BLMIS Feeder Funds, as directed by BNP Paribas.

**C.      The Asset Management Group**

72.     The Asset Management Group is a business group within BNP Paribas's Investment Solutions Unit.  Among other things, the Asset Management Group oversees and facilitates the investment strategies of BNP Paribas customers.

73.     The Asset Management Group, working with the Fund Derivatives Group, marketed and sold investment products that referenced BLMIS Feeder Funds to BNP Paribas's clients.

74.     The Asset Management Group's private wealth offices also invested in the BLMIS Feeder Funds.

**D.      BNP Paribas Committees**

75.     Business transactions for the Fund Derivatives Group, the Securities Services Group, and the Asset Management Group were subject to the review and approval of various BNP Paribas committees and groups.

76.     The Transaction Approval Committee ("TAC"), the Credit Facility Committee ("Credit Committee"), and the Executive Position Committee ("EPC") were special committees within BNP Paribas that were responsible for approving large credit and Madoff-related transactions entered into by the Fund Derivatives Group.  The TAC, Credit Committee, and EPC consisted of senior management at BNP Paribas.

77.     The TAC's review and approval were required for transactions involving structured products proposed by the Fund Derivatives Group.  During TAC meetings, BNP Paribas senior sales employees and relationship managers presented proposed transactions to

16

representatives from BNP Paribas's legal, compliance, accounting, operations, credit risk, market

risk, and trading groups for the TAC's review and approval.  During TAC meetings, BNP

Paribas executives discussed concerns they had arising out of Defendants' transactions with the

BLMIS Feeder Funds.

78.     The Credit Committee's review and approval was required for all transactions

involving credit facilities.

79.     The EPC's review and approval was required for large and complex transactions,

including ones arising from pre-existing business relationships.

80.     In contrast to other transactions, the TAC, Credit Committee, and EPC

automatically approved without substantive consideration the Fund Derivatives Group's

transactions involving the BLMIS Feeder Funds.

81.     The TAC, Credit Committee, and EPC were subject to oversight by BNP

Paribas's Group Risk Management department, which was comprised of, *inter alia*, senior

management members of BNP Paribas.  The Group Risk Management department established

and enforced strict guidelines for monitoring and managing overall risk to BNP Paribas, but

instituted an exception to such guidelines for Madoff-related transactions.

82.     Each business group of BNP Paribas, including the Fund Derivatives Group,

Securities Services Group, and Asset Management Group, was responsible for monitoring and

managing investment risks.  The Group Risk Management department had an overarching

responsibility to review and approve any proposed transaction.

83.     The Group Risk Management department worked with the Fund Derivatives

Group to conduct due diligence on transactions involving hedge funds, including Defendants'

transactions with, and investments in, the BLMIS Feeder Funds.  The Group Risk Management

department and the Fund Derivatives Group would meet monthly to discuss these transactions, and the Group Risk Management department would then report its findings directly to the executive management of BNP Paribas, whose Chairman and Chief Executive Officer had ultimate authority for lending decisions.

## VIII.    DEFENDANTS' LONGSTANDING RELATIONSHIPS WITH MADOFF, BLMIS, AND THE BLMIS FEEDER FUNDS

### A.    <u>BNP Paribas Loans Madoff Tens of Millions of Dollars</u>

84.    Defendants' relationship with Madoff began in or around November 1988, when BNP Paribas provided Madoff with a $15 million personal line of credit, which increased to $30 million by May 1995, and to $75 million by October 1996.  As collateral for these loans, Madoff pledged securities it held on behalf of BLMIS customers.  Although in Madoff's personal name, BNP Paribas knew that the loan was both received and repaid by BLMIS.

85.    In connection with this line of credit, BNP Paribas conducted due diligence on Madoff and BLMIS, which included a review and analysis of BLMIS's Financial Operating and Combined Uniform Single ("FOCUS") Reports and audited financial statements as well as meetings between BNP Paribas employees and Madoff at BLMIS's offices in New York.

86.    The FOCUS Reports reviewed by BNP Paribas made plain that Friehling & Horowitz purported to audit BLMIS.

87.    BLMIS's FOCUS Reports and financial statements contained material misrepresentations and omissions.  For example, the financial statements BNP Paribas reviewed did not disclose the assets held or money received from BLMIS's IA Business.

88.    BLMIS relied on this revolving credit facility from BNP Paribas to finance and grow Madoff's Ponzi scheme.

18

**B.**     **BNP Paribas Creates and Services the BLMIS Feeder Fund Oreades**

89.     In 1997, BNP Paribas, through its Securities Services Group, partnered with Access to create Oreades, a BLMIS Feeder Fund incorporated in Luxembourg that invested exclusively with BLMIS.

90.     BNP Paribas, through its subsidiaries, purported to service Oreades, while Access recruited investors.

91.     In January 1998, BNP Paribas's subsidiary BNP Paribas Fund Administration S.A. (then known as Inter Management Services S.A.) opened Oreades's first investment account with BLMIS (No. 1FR032), and in March 1998, opened a second (No. 1FR036).

92.     Two BNP Paribas subsidiaries served as administrators of Oreades:  BNP Paribas Fund Administration S.A. (from 1997 to 2002) and BNP Paribas Securities Services (2002-2004).

93.     When purportedly servicing Oreades, BNP Paribas and its subsidiaries made Madoff-only exceptions to their standard business practices.

94.     As administrators of Oreades, BNP Paribas Fund Administration S.A. and BNP Paribas Securities Services were responsible for processing subscriptions into and redemptions from Oreades, and frequently corresponded with BLMIS employees, including DiPascali, to direct transfers in and out of Oreades's IA accounts.

95.     While acting as Oreades's administrator, BNP Paribas Fund Administration S.A. and BNP Paribas Securities Services received all of BLMIS's account statements and trade confirmations for Oreades, and were responsible for calculating Oreades's reported monthly net asset value based on those numbers.

96.     By 2003, BNP Paribas's standard practice was to receive account statements and trade confirmation in electronic format via email.  In May 2003, BNP Securities Services

19

requested that BLMIS follow this requirement and send the Oreades account statements and

trade confirmations in that format.  BLMIS refused.  BNP Paribas created an exception to its rule

in order to retain its relationship with BLMIS and continued to accept late, paper statements, and

confirmations from Oreades.

97.    From the time Oreades was formed, BNP Paribas worked with Access to hide the

fact that BLMIS was Oreades's actual investment adviser and custodian, so that BNP Paribas

and its affiliates could benefit financially, and so that BLMIS's dual roles, which Defendants

knew were unlawful under Luxembourg and U.S. law, would be hidden.

98.    Oreades represented that two BNP Paribas subsidiaries served as its official

custodians: BGL Paribas (from 1997 to 2002) and BNP Paribas Securities Services (2002-2004).

These representations were false.

99.    BGL BNP Paribas delegated all custodial authority to BLMIS through an

undisclosed Sub-Custodian Agreement with BLMIS—a secret pre-condition that Madoff

demanded, which conflicted with BNP Paribas's standard business practices, but was permitted

for Madoff-related transactions only.

100.    Because BLMIS did not charge any fees or other remuneration for acting as

Oreades's custodian, BGL BNP Paribas and BNP Paribas Securities Services could and did

charge and receive custodial fees, despite not performing any of those corresponding services.

101.    Oreades represented to investors and to Luxembourg's financial regulator, the

Commission de Surveillance du Secteur Financier ("CSSF"), that BNP Paribas's affiliate, Inter

Conseil, served as the official investment adviser and manager of Oreades.  Like Oreades's

representations about its custodians, these representations were false.

102.    Inter Conseil delegated all of its advisory and management duties to BLMIS through an undisclosed Sub-Advisory and Management Agreement with BLMIS—another secret pre-condition that Madoff demanded, which conflicted with BNP Paribas's standard business practices, but was permitted for Madoff-related transactions only.

103.    Inter Conseil was wholly owned by BGL BNP Paribas until 2000, and half-owned by BNP Paribas Securities Services from 2000 until Oreades's closing in 2004.

104.    BNP Paribas executives served as directors of Inter Conseil and held a majority of seats on Oreades's board of directors.

105.    Inter Conseil received over $25 million in management and performance fees from Oreades, for essentially doing nothing more than feeding money to BLMIS.  BNP Paribas, through its subsidiaries, shared in the management and performance fees charged by Oreades for management services performed by BLMIS for free.

106.    BNP Paribas's compliance rules at the time required a "strict separation" between a fund's investment adviser and custodian.  The rules stemmed, in part, from industry practices that required an independent third-party to verify the existence and value of a fund's reported assets, especially in circumstances where BNP Paribas subsidiaries served as the fund's sponsor and custodian.

107.    The wholesale delegation of BGL BNP Paribas's and BNP Paribas Securities Services' custodian duties not only deviated from BNP Paribas's own compliance rules and standard business practices, it violated Luxembourg law.

108.    BNP Paribas knew that only a Luxembourg-regulated entity could lawfully serve as Oreades's custodian, but BLMIS was not regulated by the CSSF.

109.    Luxembourg law required that Oreades's investment manager and custodian be disclosed, which they were not.  BNP Paribas and its affiliates deliberately omitted any mention of BLMIS from Oreades's offering materials.

110.    Luxembourg law required BGL BNP Paribas and BNP Paribas Securities Services, as Oreades's purported custodians, to supervise the day-to-day administration of Oreades's assets and to verify the actions taken by BLMIS as the investment manager of Oreades.  Because BNP Paribas admittedly had no ability to verify trades purportedly executed by BLMIS, BNP Paribas and its subsidiaries knew that they were violating Luxembourg law (in addition to their own internal compliance rules).

111.    Because BLMIS's relationship with Oreades ran afoul with Luxembourg law, BNP Paribas required that Inter Conseil's management agreement with BLMIS "must remain 'private' that is, the CSSF … must remain unaware of it."

112.    BNP Paribas and BNP Paribas Securities Services also knew that BLMIS was not then registered as an investment adviser with the SEC, as required under U.S. law.

**C.    BNP Paribas Closes Oreades Because It Recognizes Fraud Risks at BLMIS**

113.    On or about July 10, 2003, a senior executive at BNP Paribas Securities Services, Lionel Trouvain, reviewed a BNP Paribas internal audit and compliance report on Oreades prepared by the Group Risk Management department and became concerned "that the risk [to] BNP Paribas is very extensive."

114.    Trouvain communicated with Access and identified as a fraud risk BLMIS's outdated and delayed method for reporting trades (which allowed BLMIS to fabricate trades with hindsight).  Trouvain also echoed concerns that BNP Paribas had no opportunity to confirm the validity of BLMIS's purported trades:

> [N]o reference is ever made to the method of sending the [trading] deals carried out by 'BLMIS'.  As you undoubtedly know, the trades are sent by mail after 7 or 8 days and are then posted after the fact by our settlement department.  Market practices are really different today and it would seem that B. Madoff does not ever want to improve its order transmission methods.

> In practice [today], orders are sent by fax or via SWIFT by the manager on the day of the deal (along with the broker confirmation if the orders are not pre-matched).  They are then coded by the depository bank and the operation is then carried out on the Settlement date (D+1;2;3) according to the markets.  It would be appropriate to put this type of order transmission in place between us and B. Madoff because in current practice, we have no opportunity to consider the true validity of the orders. .... This is a point that our risk and ethics departments found during their internal audit and I have to contribute a source of improvement.

(Emphasis added.)

115.    Trouvain also flagged that because BLMIS acted as Oreades's custodian, broker-dealer, and investment manager, neither Madoff nor BLMIS met the CSSF's requirements that an investment manager be registered and disclosed to investors.

116.    Trouvain communicated that BNP Paribas would be ultimately held responsible for the misrepresentations and omissions regarding BLMIS's undisclosed roles as investment manager and custodian for Oreades:

> In my opinion, if there is a management problem with [BLMIS], the entire responsibility for management would lie … in the last resort, with the promoter, namely BNP Paribas … In the eyes of the CSSF, B. Madoff does not exist.

117.    Trouvain also flagged concerns about the location of the securities that were being held on behalf of the Oreades shareholders:

> I get the impression that Bernard Madoff is not a bank and I would therefore like to know where the US Treasury Bills held in the Oreades USD and EUR portfolios are held.  The same thing for the futures positions, who is the clearing broker used and in what establishment are the contracts recorded?  At the contractual level, B. Madoff is our sub-depository and so the securities should be kept there.  If that is not the case, we have to review the subdepositary contract.

D.    **BNP Paribas Liquidates Oreades After Madoff Refuses to Address BNP Paribas's
Concerns**

118.    In August 2003, Trouvain and other BNP Paribas employees met with Access's

management to discuss whether it was possible to bring their expanding relationship with

BLMIS into standard compliance with BNP Paribas's internal rules.  According to meeting

minutes, BLMIS's hidden role as both custodian and investment adviser for Oreades was

"unconscionable" and violated BNP Paribas's internal "security rules" and Luxembourg law.  As

such, BNP Paribas wanted "to be released from liability it ha[d] incurred as a 'sponsor' (initiator

of the creation) manager, and custodian of the fund."

119.    Communicating through Access, BNP Paribas requested that Madoff allow it to

disclose him to the CSSF.  Madoff refused.  Access told BNP Paribas that Madoff's refusal

stemmed (at least) in part from the fact that BLMIS was not registered as an investment adviser

in the United States and deliberately wanted to avoid regulatory scrutiny.

120.    One BNP Paribas employee warned that "if the CSSF asks me about the precise

role of Inter Conseil and of BNP in Oreades, I will have to tell the truth."

121.    As an alternative, BNP Paribas requested that BNP Paribas Securities Services or

Access be able to confirm the validity of BLMIS's purported trades with real-time access to

BLMIS's trade confirmations.  Madoff refused.

122.    By November 2003, BNP Paribas was deliberately measuring the liability it could

face as Oreades's sponsor, administrator, and custodian "in the event of a default on the part of

Madoff."

123.    BNP Paribas decided to close the BLMIS accounts and liquidate Oreades because

of the high probability of fraud at BLMIS and its fear that, due to its subsidiaries' roles as

24

purported administrator, purported custodian, and sponsor to Oreades, it could be held liable to

the CSSF or Oreades's investors.

124.    In March 2004, BNP Paribas Securities Services closed Oreades's investment

accounts with BLMIS.

125.    In May 2004, BNP Paribas, through Inter Conseil, placed Oreades into liquidation

in Luxembourg.

126.    Years later, in January 2008, an employee of Access recounted the story behind

BNP Paribas's liquidation of Oreades, stating that BNP Paribas did not want to be liable to

Oreades's investors and believed it had to exit or "destroy" Oreades.

**E.**    **Key Individuals within BNP Paribas Would Not Allow Investments with Madoff**

127.    At the time BNP Paribas closed Oreades, other key individuals at BNP Paribas

were rejecting investments with BLMIS and the BLMIS Feeder Funds.

128.    For example, Mr. Paolo Gianferrara, a senior executive within BNP Paribas,

would not approve any transactions with the BLMIS Feeder Funds for private banking clients.

Gianferrara served as the Head of Hedge Funds for BNP Paribas Private Wealth in Paris and

Geneva, from 2000 to 2006.  According to FGG, Gianferrara was "the gate keeper" for BNP

Paribas's private banking business.

129.    In trying to meet with Gianferrara, FGG employees discussed how he "hate[d]"

and "always had a problem with Madoff," and how BNP Paribas's private banking business

would "not even consider[]" investments in FGG's Madoff-related funds.

130.    Additionally, Fauchier Partners, a partner to BNP Paribas, refused to invest with

BLMIS or BLMIS feeder funds.

131.    Fauchier Partners was a London-based fund of funds manager that joined with

BNP Paribas Asset Management in 2004 to create BNP Paribas Fauchier Partners Ltd.  This joint

25

venture was designed to combine the distribution capacity of BNP Paribas Asset Management with the investing expertise of Fauchier Partners.

132.    Fauchier Partners was founded by Mr. Patrick Fauchier.  He also oversaw the BNP Paribas Hedge Fund Centre, a "leading academic authority and focal point for teaching in the hedge fund arena in Europe" led by BNP Paribas, BNP Paribas Securities Services, and BNP Paribas Asset Management, together with the London Business School.

133.    In June 2008, Fauchier told Access that he had never invested in a fraud, that his due diligence team required a fund to be "legitimate," and that he had squarely rejected BLMIS.

134.    Fauchier stated that he was concerned that the SEC would not allow BLMIS to continue as a business and that he, like many others, found it suspicious Madoff was not paid for managing investments.

135.    Fauchier also flagged that BLMIS's FOCUS reports disclosed only 23 investment accounts, when he, as well as BNP Paribas, knew that Madoff was managing many more than 23 separate accounts.  The BLMIS Feeder Funds, from which Defendants themselves received transfers, collectively held at least 15 separate investment accounts with BLMIS.

136.    Upon information and belief, as a member of BNP Paribas's Asset Management Group, Fauchier Partners shared its knowledge that Madoff was illegitimate, as well as its prohibitions against investing with Madoff, with other senior officials at BNP Paribas.

137.    On December 17, 2008, the former head of research from Fauchier Partners and a manager at the BNP Paribas Hedge Fund Centre, told the *New York Times* that SocGen "was not the only financial firm to think Mr. Madoff's unfailing records was too good to be true," and that "experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is a Ponzi scheme."

## IX.   BNP PARIBAS FUELS THE PONZI SCHEME BY BECOMING A GLOBAL LEVERAGE PROVIDER TO THE BLMIS FEEDER FUNDS

138.    The closing of Oreades was the beginning, not the end, of BNP Paribas's exploitation of the Madoff fraud.  Despite knowing facts indicating fraud, which led to Oreades closing, and despite the blacklist of BLMIS within BNP Paribas's own organization, BNP Paribas aggressively pursued a strategy to become a global leverage provider for investments with Madoff.

139.    BNP Paribas developed a new, multi-billion dollar business to profit off BLMIS by providing leverage to nearly a dozen domestic and foreign BLMIS Feeder Funds and their respective investors.  In addition to generating lucrative fees for BNP Paribas and its subsidiaries, BNP Paribas's Madoff business allowed Defendants to establish their reputation as a leverage provider in a highly-competitive market, to grow the brand of BNP Paribas's Fund Derivatives Group, to compete with its biggest rival, SocGen, and to cross-sell services to BNP Paribas's institutional clients.

140.    BNP Paribas was able to profit off BLMIS and the BLMIS Feeder Funds' fictional performance while minimizing its risks because, unlike during its relationship to Oreades, BNP Paribas and its subsidiaries no longer served as a fiduciary to shareholders or investors.  This structure allowed BNP Paribas and its subsidiaries to deliberately blind themselves to the fraud concerns that existed prior to shutting Oreades down.

### A.   Through the ZCM Acquisition, BNP Paribas Expands Its Structured Products Group and Acquires a Credit Facility for a Fund Invested with Harley

141.    In the early 2000s, BNP Paribas lacked the infrastructure and personnel necessary to create and offer credit facilities and structured products to clients at the level of rival banks.

142.    In 2003, Zurich Financial offered to sell the assets of ZCM, Zurich Financial's leverage business unit that was headquartered in New York and incorporated in Delaware.

27

ZCM's assets included sixty ZCM employees in New York and a portfolio linked to investment funds.

143.    BNP Paribas conducted due diligence on ZCM's portfolio of business, including a multi-million dollar credit facility with Santa Barbara—one of the levered sub-funds that was managed by FAM and was entirely invested with the BLMIS Feeder Fund, Harley.

144.    The credit facility with Santa Barbara stood apart from the rest of ZCM's portfolio because Harley invested exclusively with BLMIS and was a single-manager fund, managed by BLMIS.  BNP Paribas had a strict policy against investing in or entering into transactions with single-manager funds.  Despite that policy, and despite already being aware of numerous facts indicating fraud at BLMIS, BNP Paribas decided to proceed with the purchase.

145.    In July 2003, BNP Paribas approved the acquisition of ZCM's assets ("the ZCM Acquisition").  The ZCM Acquisition was led by Stephane Liot, the head of BNP Paribas's Fund Derivatives Group, and Yann Gerardin, the head of the Equities and Derivatives Division at BNP Paribas.

146.    The ZCM Acquisition was central to BNP Paribas's plan to expand its derivatives business, because it would provide BNP Paribas with the infrastructure and personnel necessary to create and market credit facilities and structured products to clients.

147.    Because of the ZCM Acquisition, BNP Paribas was able to build a structured products business and provide credit facilities for BLMIS Feeder Funds, including Harley, Legacy, Insurance Portfolio Fund, and Equity Trading, as well as swaps, certificates, and/or notes that referenced BLMIS Feeder Funds managed by FGG, FIM, Access, Gabriel Capital Corp., and Tremont.

148.    These credit facilities enabled BNP Paribas and its affiliates to profit from

BLMIS, but with more distance from BLMIS and therefore with less risk than existed during the

relationship with Oreades.

149.    From these transactions, BNP Paribas received substantial fees and interest

payments from the BLMIS Feeder Funds.  The fees BNP Paribas received were higher than what

it ordinarily received for leveraging what was purported to be a conservative strategy that

produced bond-like returns.

150.    The interest rate spread off credit facilities and other structured products enabled

BNP Paribas to profit handsomely off BLMIS's purported returns.  According to one former

ZCM employee, FAM was one of BNP Paribas's most lucrative clients.  And given the incentive

compensation arrangements typical in the financial services industry, these transactions were

extraordinarily profitable for the BNP Paribas employees who turned a blind eye to Madoff's

fraud.

151.    The ZCM Acquisition also enabled BNP Paribas to gain a strategic foothold in the

competitive structured-products market and to compete with its rival SocGen.  News reports

reported the ZCM Acquisition as a "blow" to SocGen and a boon for BNP Paribas.  Indeed, BNP

Paribas hailed the ZCM Acquisition, asserting at the time that it "raised [BNP Paribas] to the

position of world leader in the fast-moving fund derivatives market" and responded to

"increasingly demanding clients and escalating competition."

**B.**    **BNP Paribas and SocGen Conduct Due Diligence on ZCM and SocGen Rejects ZCM After Discovering Evidence of Fraud at BLMIS**

152.    Prior to BNP Paribas's ZCM Acquisition, SocGen itself considered acquiring

ZCM.  However, based on SocGen's due diligence into the purchase, which was conducted with

similar information as was reviewed by BNP Paribas, SocGen declined to make the purchase because of obvious risks of fraud associated with Harley.

153.    SocGen had assembled a due diligence team to evaluate ZCM's assets, with three team members focused on Harley and BLMIS.  In conducting simple "routine" due diligence, SocGen's team looked at the credit risk posed by Madoff and BLMIS and quickly flagged indicia of fraud relating to Madoff and BLMIS.

154.    In an effort to understand BLMIS's SSC Strategy, SocGen asked FGG for Fairfield Sentry's trade confirmations from the early 2000s.  FGG did not provide trade confirmations but instead provided a chart showing Fairfield Sentry's investment returns of over 8% from 2000 to 2002.  On the basis of this chart alone, it was "readily apparent" to SocGen that Madoff's returns were "impossible," especially given the burst of the technology bubble and its effect on the stock market during this same time period.

155.    From BLMIS's trade confirmations, which BNP Paribas already had and which SocGen eventually received, SocGen knew BLMIS purported to consistently buy below a stock's average price and sell above a stock's average price by 50-100 basis points, thereby substantially, and impossibly, outperforming the market nearly 90% of the time.

156.    Madoff also represented that BLMIS would trade securities throughout a given trading day.  This further confirmed that BLMIS's ability to outperform the market was impossible, because if BLMIS had purchased stocks at intervals throughout the day, then the average price BLMIS reported on trade confirmations would have trended toward that stock's midpoint or volume weighted average price.

157.    SocGen, like BNP Paribas, was active in the options market but never saw

BLMIS trading in this market, which was impossible given the massive volume of options

BLMIS would need to implement its SSC Strategy.

158.    SocGen was also suspicious because BLMIS did not charge customary

management and performance fees on the investment accounts.  SocGen roughly calculated that

Madoff would have made a minimum of $300 million if BLMIS had received customary fees of

2% of AUM and 20% of profits.  SocGen had never seen an investment manager forego

management fees, let alone hundreds of millions of dollars in such fees.

159.    SocGen also flagged as suspicious that BLMIS acted as its own custodian and that

no independent third parties verified BLMIS's purported trades or valued the purported assets in

BLMIS investment accounts.

160.    SocGen sought basic investment strategy and financial information directly from

Madoff.  SocGen sent Madoff a list of questions to prepare for a scheduled meeting, but Madoff

abruptly canceled the meeting without answering SocGen's questions.

161.    Based on these impossibilities and indicia of fraud, SocGen offered to purchase

all of ZCM's assets, except for the credit facility tied to BLMIS.  ZCM declined SocGen's offer.

SocGen chose not to purchase ZCM and thereafter blacklisted investments with BLMIS.

SocGen's blacklist of BLMIS was well known within the industry and was specifically known to

BNP Paribas.

162.    When BNP Paribas chose to purchase ZCM's assets, it knew of the same signs of

fraud inherent to ZCM's investment with BLMIS through Harley.  BNP Paribas also knew that

SocGen walked away from the ZCM transaction because BLMIS.  According to one former

ZCM employee, he communicated SocGen's concerns regarding Madoff to BNP Paribas

executives during negotiations over the ZCM Acquisition. A Tremont employee also later

confirmed to a member of BNP Paribas's Fund Derivatives Group that SocGen would not "do

Bernie Madoff financing."

163.    Like SocGen, BNP Paribas conducted due diligence in connection with acquiring

ZCM and knew of the same impossibilities and other indicia of fraud at BLMIS. ZCM provided

BNP Paribas with the same due diligence information it had provided to SocGen. And because

of its prior credit facility to Madoff and its administration of Oreades, BNP Paribas had more

information about BLMIS than SocGen at the time of the ZCM Acquisition. For example, BNP

Paribas had met with Madoff and possessed BLMIS's audited financial statements, customer

account statements, and trade confirmations.

164.    In acquiring ZCM's assets, BNP Paribas willfully chose to ignore fraud at BLMIS

in an attempt to compete with SocGen, grow the Fund Derivatives Group in the structured

products market, expand the BNP Paribas brand, and otherwise profit from BLMIS's fraudulent

returns.

**C.      Defendants Deviated from Their Standard Practices in order to Shield Themselves
         from Additional Information Confirming that BLMIS Was a Fraud**

165.    Following the ZCM Acquisition, BNP Paribas took steps to remove BLMIS from

customary due diligence processes, thereby shielding BNP Paribas and its subsidiaries from

facing further confirmation that BLMIS was a fraud.

166.    BNP Paribas deviated from its standard operating procedures with respect to

Madoff-related transactions because the Fund Derivatives Group would not have been a

profitable business but for Madoff.

167.    The due diligence team did not have the authority to reject Madoff-related transactions.  If the team rejected one proposed transaction because of Madoff, it would have had to reject all Madoff-related transactions.

168.    Following the ZCM Acquisition, customer demand for leverage and credit on Madoff-related transactions was very high, and senior BNP Paribas management was eager to take on more Madoff deals in order to profit off the high demand.  Consequently, senior management already had pre-approved the Madoff-related transactions in order to grow the Fund Derivatives Group.  According to the Fund Derivatives Group, expanding the bank's relationship with Madoff through the BLMIS Feeder Funds was a foregone, and mandatory, conclusion.

169.    Typically, the Fund Derivatives Group's due diligence team was charged with conducting due diligence on fund managers referenced in an ongoing or potential transaction. The due diligence team's standard operating procedure was to collect all relevant public documents, financial documents for the preceding five years, offering memoranda, subscription agreements, account statements, trade confirmations, and all other documents relating to the fund manager's investment strategy.

170.    When the transaction would result in significant exposure to BNP Paribas, it was standard operating procedure for the due diligence team to conduct on-site visits and memorialize the information learned from them in a memorandum.  On-site visits were important because the visits led to increased transparency into the operations and strategy of the underlying fund manager.

171.    The Fund Derivatives Group's due diligence team tracked BNP Paribas's exposure to different fund managers through a periodic report called the "Heat Map."  The Heat Map ranked fund managers according to a risk score assigned by the due diligence team.

172.    For the purpose of assessing risk and tracking BNP Paribas's exposure to Madoff, all Madoff-related transactions were aggregated into a single "Madoff" category, regardless of which BLMIS Feeder Funds was involved.

173.    Madoff was always listed at the top of the Heat Map, because BNP Paribas's exposure to Madoff was significantly greater than any other fund manager.

174.    With respect to Madoff-related transactions, however, senior management within the Fund Derivatives Group instructed the due diligence team not to contact Madoff or anyone from BLMIS to arrange an on-site due diligence visit.

175.    The Fund Derivatives Group apparently made only one site visit to BLMIS, which occurred in March 2008, years after the ZCM Acquisition, and no on-site memorandum was ever drafted to memorialize the visit.

176.    When the Fund Derivatives Group's sales team proposed a new transaction it was also standard operating procedure for the due diligence team to submit a memorandum that summarized all the due diligence information relevant to the proposed transaction.

177.    The due diligence team typically did not submit due diligence memoranda or make any diligence-based recommendations regarding proposed Madoff-related transactions.

178.    By taking on billions of dollars of Madoff-related deals, Defendants disregarded BNP Paribas's strict policy against taking on exposure to single manager trades—an exception made for Madoff only.

179.    BNP Paribas deviated from its standard operating procedures with respect to Madoff-related transactions because the Fund Derivatives Group would not have been a profitable business but for Madoff.

D.     **BNP Paribas Expands the Credit Facility with Santa Barbara**

180.    On or about February 27, 2004, BNP Paribas, through its Fund Derivatives Group, entered into another credit facility with Santa Barbara.

181.    The TAC, the Credit Committee, the EPC, and the Group Risk Management department were responsible for reviewing and approving the Santa Barbara credit facility.

182.    Trouvain, the BNP Paribas Securities Services employee who had previously sounded the alarms about BNP Paribas's inability to verify BLMIS's purported trades, BLMIS's dual role as custodian and investment adviser of Oreades, conflicts with the CSSF, and BLMIS's delayed reporting of trades, worked on BNP Paribas's credit facility transaction with Santa Barbara.

183.    The credit facility agreement called for BNP Paribas to make senior secured loans to Santa Barbara for levered investments with Harley and explicitly referenced Harley's "Madoff Account" with BLMIS, which served as collateral for the credit facility.  In exchange, Santa Barbara paid BNP Paribas above-market monthly and yearly fees and interest payments, which, as of 2004, totaled 170 basis points above LIBOR.

184.    BNP Paribas authorized and directed its subsidiary BNP Paribas Securities Corp. to operate as the collateral agent for BNP Paribas.  As the collateral agent, BNP Paribas Securities Corp. provided operational support to BNP Paribas, including requesting redemptions and ensuring that correct loan valuations were communicated to FAM.

185.    BNP Paribas authorized and directed BNP Paribas Arbitrage to operate as the calculation agent for BNP Paribas.  As the calculation agent, BNP Paribas Arbitrage calculated the facility's interest rates, fees, and loan-to-value ratio, and notified BNP Paribas and FAM of these calculations.  BNP Paribas Arbitrage also calculated the fair market value of Harley's investment with BLMIS.

35

186.    As part of the credit facility, BNP Paribas, BNP Paribas Arbitrage, and/or BNP

Paribas Securities Corp. communicated directly with BLMIS and received and reviewed

Harley's BLMIS account statements and trade confirmations.

187.    Under the express terms of the credit facility, BNP Paribas took control over

Harley's BLMIS account, such that Harley could not withdraw funds from BLMIS without BNP

Paribas's consent.

188.    In entering into the credit facility with Santa Barbara, BNP Paribas deliberately

violated its internal policy against entering into transactions where the underlying collateral was

invested with a single manager.

189.    Leveraging investments held with a single manager employing a single market

strategy without any diversification is highly atypical in the structured products market,

especially for a manager as opaque as BLMIS.

190.    BNP Paribas took steps to protect itself should BLMIS fail.  In 2007, BNP Paribas

entered into an option agreement with HSBC Bank USA, N.A. ("HSBC"), with Harley as the

underlying reference fund, because it was concerned about its overall exposure to BLMIS.  The

option enabled BNP Paribas to hedge losses sustained by Harley by requiring HSBC to pay BNP

Paribas for any losses sustained by Harley greater than a fixed percentage of the fund's net asset

value.  The notional amount of the trade totaled $70 million, which increased to $90 million in

2008.  The swap agreement with HSBC was a *de facto* disaster insurance policy on BLMIS.

191.    During negotiations over the option agreement, the head of trading for the Fund

Derivatives Group told a former BNP Paribas employee, who at the time was working at HSBC,

that he was unable to reconcile the trading statements BNP Paribas had received from BLMIS.

192.    Between 2003 and 2008, BNP Paribas's relationship with FAM, Santa Barbara, and Harley grew substantially and so did the size of the credit facility.  By the time of Madoff's arrest, BNP Paribas Arbitrage had received transfers of approximately $975 million of customer property from Harley's BLMIS investment account.

**E.    BNP Paribas Takes Control of Legacy Capital's BLMIS Account**

193.    In July 2004, BNP Paribas entered into a $100 million credit facility with Legacy Capital, an investment company that held a BLMIS customer account (No. 1FR071) and invested exclusively with BLMIS.

194.    The TAC, the Credit Committee, the EPC, and the Group Risk Management department were responsible for reviewing and approving the Legacy credit facility.

195.    Under the terms of the credit facility, BNP Paribas designated BNP Paribas Securities Corp. as its collateral agent and BNP Arbitrage as its calculation agent.  Both agents were authorized to act on BNP Paribas's behalf with respect to the credit facility.

196.    Legacy Capital pledged all of its capital stock to BNP Paribas Securities Corp. and granted a security interest in Legacy Capital's BLMIS account.  BNP Paribas Securities Corp. was given exclusive signatory authority over Legacy Capital's BLMIS account, which meant that BNP Paribas Securities Corp. had the authority to close the account or transfer funds in and out of the account.

197.    In connection with the Legacy Capital credit facility, BNP Paribas, BNP Paribas Arbitrage, and/or BNP Paribas Securities Corp. communicated directly with BLMIS and received and reviewed Legacy's BLMIS account statements and trade confirmations.

198.    In September 2006, the credit facility was increased to a maximum of $120 million.

199.    BNP Paribas, BNP Paribas Securities Corp., and BNP Paribas Arbitrage maintained the Legacy Capital credit facility through the Filing Date and directed the withdrawal of approximately $175 million of customer property from BLMIS.

**F.    BNP Paribas and Renaissance Conduct Due Diligence on Legacy Capital and Renaissance Discovers Evidence of Fraud at BLMIS**

200.    In late 2003, Renaissance Technologies Corp. ("Renaissance"), a New York hedge fund management company, identified facts strongly suggesting fraud at BLMIS.  These facts mirror those previously identified by SocGen and deliberately ignored by BNP Paribas in the ZCM Acquisition.

201.    In June 1999, a Renaissance sub-fund, Meritage, had entered into a total return swap through which it received returns equal to those paid on an equivalent amount of the counterparty's own investment with BLMIS via Legacy Capital's BLMIS account.

202.    Sometime in 2003, Renaissance became concerned that BLMIS's returns did not correlate with the volatility found on the S&P 100 Index.  Renaissance subsequently analyzed BLMIS trade confirmations and account statements and found multiple indicia of fraud relating to BLMIS's purported returns and options trading volumes.

203.    Renaissance found that Madoff's market timing was nearly impossible and that the prices at which BLMIS purportedly bought and sold equities could not be a result of a legitimate trading strategy.

204.    Renaissance analyzed the strike prices on BLMIS trade confirmations and public information suggesting that BLMIS had anywhere between $5 billion and $15 billion in AUM. From this analysis, Renaissance concluded that BLMIS's purported returns were impossible because there simply were not enough available options in any known market.

205.    Just like SocGen, Renaissance knew that Madoff did not accept industry-standard management or performance fees, Madoff did not use a well-known auditor, and Madoff's family held key positions at BLMIS.

206.    Renaissance directed Meritage to begin unwinding its investment with BLMIS, and Legacy Capital began looking for another investor to replace Meritage.

207.    In 2004, Legacy Capital approached BNP Paribas about providing a line of credit that Legacy Capital could use to replace the Meritage investments unwound by Renaissance.

208.    BNP Paribas conducted due diligence with respect to Legacy Capital's BLMIS account, and received and reviewed similar information from which Renaissance identified impossibilities and indicia of fraud at BLMIS.

209.    In July 2004, BNP Paribas entered into the $100 million credit facility with Legacy Capital.

210.    When asked about BLMIS after Madoff's arrest, a Renaissance principal explained that "we couldn't figure out how [BLMIS] was making such consistent returns.  It just didn't make sense" and that "[a]nyone could have looked and seen that something was screwy."

211.    Unlike Renaissance, BNP Paribas, again, deliberately chose to ignore the impossibilities and indicia of fraud at BLMIS and went forward with the Legacy Capital investment.

### G.      BNP Paribas Executes a Credit Facility with Tremont

212.    After entering into credit facilities with Harley and Legacy Capital, BNP Paribas expanded its leverage business to even more BLMIS Feeder Funds.  In August 2005—over 16 years after it first began working with BLMIS—BNP Paribas entered into a $100 million credit facility with Tremont's Insurance Portfolio Fund.

213.    The TAC, Credit Committee, EPC, and Group Risk Management department
were responsible for reviewing and approving the Insurance Portfolio Fund credit facility.

214.    As collateral for the credit facility, Insurance Portfolio Fund pledged the
purported assets held in its BLMIS investment account (No. 1FR010) to BNP Paribas.

215.    As authorized and directed by BNP Paribas, BNP Paribas Securities Corp.
operated as the collateral agent and calculation agent for the Insurance Portfolio Fund credit
facility.

216.    BNP Paribas received and reviewed Insurance Portfolio Fund's BLMIS account
statements and trade confirmations.  One BNP Paribas employee in New York called Madoff
directly to request account statements that BNP Paribas required under the credit facility.  In
February 2006, May 2006, August 2006, September 2006, January 2007, December 2007, and
March 2008, multiple BNP Paribas employees contacted Tremont to request BLMIS account
statements it was supposed to—but had not—received.

217.    With the Insurance Portfolio Fund credit facility, BNP Paribas continued to
disregard indicia of fraud at BLMIS that had caused at least one other leverage provider—one
with far less experience and history with BLMIS—to  question the credit facility.

218.    Before entering into the credit facility with BNP Paribas, Tremont had discussed a
similar facility with the investment bank Dresdner Kleinwort.  In March 2005, Dresdner
Kleinwort "raised a variety of concerns about Madoff" and asked Tremont:  (a) whether BLMIS
segregated its investment accounts; (b) whether an independent, third-party verified the assets
held by BLMIS; (c) how BLMIS received compensation for its roles with respect to Tremont's
investments; and (d) about Madoff's secrecy regarding BLMIS's operations.  In light of these

concerns, Tremont instead decided to pursue a transaction with BNP Paribas—which knew the futility of asking such questions.

**H.    BNP Paribas Executes Option and Swap Agreements with Multiple BLMIS Feeder Funds**

219.    Equity Trading was a BLMIS Feeder Fund managed by Essex Asset Management, which opened an investment account with BLMIS (No. 1FR124) in December 2005.

220.    That same month, BNP Paribas entered into an option agreement to provide leverage to Equity Trading Fund, Ltd., a fund that invested exclusively in Equity Trading.

221.    The agreement called for another transaction (the "Equity Trading Option"), wherein BNP Paribas sold Equity Trading Fund, Ltd. a structured option to leverage Equity Trading's investments with BLMIS.

222.    As collateral for the Equity Trading Option, BNP Paribas Arbitrage and BNP Paribas Cayman, acquired a direct ownership interest in Equity Trading.

223.    Pursuant to the Equity Trading Option, BNP Paribas, BNP Paribas Arbitrage, and BNP Paribas Cayman received and reviewed Equity Trading's BLMIS account statements and trade confirmations.

224.    In October 2006, BNP Paribas Securities entered into an option agreement to leverage Tremont (Bermuda) Ltd., a fund of funds managed by Tremont that invested with BLMIS.

225.    Under the agreement, BNP Paribas sold Tremont (Bermuda) Ltd. a structured option (the "Tremont Option"), to leverage certain reference investment funds, including the Portfolio Limited Fund, which maintained an investment account at BLMIS (No. 1FR080).

226.    In practical terms, the Tremont Option meant that BNP Paribas would provide Tremont (Bermuda) Ltd. with increased returns on its BLMIS investments.

227.    Later in January 2007, BNP Paribas entered into a swap agreement (the "Tremont Swap") to provide leverage to Tremont Enhanced Market Fund, a fund of funds controlled by Tremont that invested with BLMIS.

228.    The Tremont Swap called for a total return swap transaction linked to various reference funds, including Prime Fund, Broad Market Fund and XL LP.

229.    Pursuant to the Tremont Option and the Tremont Swap, BNP Paribas and BNP Paribas Securities Corp. received and reviewed Tremont's BLMIS account statements and trade confirmations.

230.    Around this same time period, in December 2006, Liot, the head of the Fund Derivatives Group, said that the Fund Derivatives Group had informed BNP Paribas's Global Risk Management department that it would conduct due diligence on BLMIS and the BLMIS Feeder Funds.

231.    The Fund Derivatives Group's review of these BLMIS account statements was perfunctory and designed merely to "check the box" on transactions that BNP Paribas executives, like Liot, already had pre-approved.

I.    **BNP Paribas Creates Structured Products for BNP Paribas Clients that Reference Investments in the BLMIS Feeder Funds**

232.    BNP Paribas not only provided leverage to the BLMIS Feeder Funds, BNP Paribas also provided leverage to their investors, to whom BNP Paribas touted its "extensive experience" in Madoff-related transactions.

42

233.    In 2006, BNP Paribas began providing leverage to clients who invested in Ascot in exchange for fees and interest payments.  By these leveraged transactions, BNP Paribas Cayman redeemed shares and ultimately received transfers of customer property from Ascot.

234.    BNP Paribas marketed and sold structured products that referenced some of Madoff's largest feeder funds: Fairfield Sentry and Fairfield Sigma (the "Fairfield Funds"), Kingate Global and Kingate Euro (the "Kingate Funds"), and Groupement and Luxalpha (the "Access Funds").

235.    Fairfield Sentry was the largest BLMIS Feeder Fund.  It had four customer accounts with BLMIS (Nos. 1FN0012, 1FN0045, 1FN0069, and 1FN0070), investing substantially all of its assets with BLMIS.  Fairfield Sigma was a currency fund that accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of the money in Fairfield Sentry.  The Fairfield Funds were created, operated, and controlled by FGG, in New York.

236.    The Kingate Funds invested exclusively with BLMIS through two BLMIS customer accounts (Nos. 1FN086 and 1FN061), and were marketed and managed by FIM, under the consultancy agreement FIM had with Kingate Management Limited.

237.    Similarly, the Access Funds invested all of their assets with BLMIS through two BLMIS customer accounts (Nos. 1FR096 and 1FR108), and were marketed and managed by Access.  In May 2008, members of the Fund Derivatives Group contacted Access to discuss "rumors" they heard about Madoff.  In subscription agreements for investments in Groupement, dated June 2008, BNP Paribas Arbitrage noted: "Due to internal issues, we have to monitor these operations as close as possible."

238.    Under its "Hedge Elite" brand, BNP Paribas structured a variety of products that referenced the Fairfield, Kingate, and Access Funds.  For example, BNP Paribas created and marketed a three-year term note that referenced Fairfield Sentry, among other funds, and paid note purchasers a levered return based on Fairfield Sentry's performance.

239.    In the notes sold to investors, BNP Paribas took steps to protect itself from Madoff's fraud while trying to profit from it.  For example, under the terms of the note that referenced Fairfield Sentry, BNP Paribas did not have to pay investors any returns if the net asset value of Fairfield Sentry's shares decreased by more than 30%, which the shares did following Madoff's arrest.

240.    In addition to the structured products sold to BNP Paribas clients, certain BNP Paribas offices also sold shares in the BLMIS Feeder Funds to BNP Paribas clients.  This was a very profitable business line because BNP Paribas received fees from both its clients and the BLMIS Feeder Funds.

## X.    DEFENDANTS KNEW SIGNS OF FRAUD SURROUNDING BLMIS

### A.    Defendants Knew BLMIS's Operational Structure Was Vulnerable to Fraud Because it Subverted Checks and Balances

241.    Defendants knew that BLMIS's operational structure deviated from standard industry practices and BNP Paribas's own compliance rules, which required a "strict separation" between a fund's investment adviser and custodian.

242.    Defendants further knew BLMIS's operational structure was vulnerable to fraud because no independent broker or custodian verified the existence or the value of the assets that BLMIS purported to purchase on behalf of its customers.  This is because: (i) BLMIS in New York acted as the investment adviser that implemented the SSC Strategy; (ii) BLMIS was the

broker that executed the trades pursuant to the SSC Strategy; and (iii) BLMIS was the custodian
of the BLMIS Feeder Funds' IA accounts.

243.    It was standard industry practice for an independent third-party custodian to hold
the actual funds and/or securities and for an independent third-party broker to execute the
transactions.  This is why investment advisers, like Madoff, traditionally hire reputable
independent prime brokers to act as both the broker and custodian.  This way, even though the
investment adviser is deciding how best to invest client funds, the securities and the funds are
custodied by an independent third party.

244.    Defendants are part of one of the most sophisticated global banks in the world and
knew full well that a third-party broker and custodian serve as a necessary check on the
investment adviser.  If there is a third-party custodian, client assets are safe even if the
investment vehicle becomes insolvent.  But if the investment adviser represents himself as the
custodian, the relationship is rife with the possibility of fraud, in that the adviser could misreport
or misappropriate assets.

245.    Knowing that BLMIS's structure did not allow anyone to independently verify
that the assets were actually being held with BLMIS, Defendants deliberately turned a blind eye
to fraud at BLMIS.

**B.    BLMIS's Outdated Trade Reporting Practices Were Vulnerable to Fraud**

246.    Defendants knew Madoff's use of delayed paper statements and their own lack of
real-time access to account information was atypical and indicative of fraud at BLMIS.

247.    BLMIS provided only paper trade confirmations to the BLMIS Feeder Funds,
often seven to eight days after trades purportedly occurred.

248.    BLMIS's practice of not providing real-time, electronic access to account
information deviated from standard industry practice, which allows clients to obtain account

45

statements, balances, and other details through the Internet.  By at least June of 2000, the practice

of granting clients electronic access to their accounts was mainstream.

249.     Defendants knew of Madoff's reputation in the media as a global leader in the use

of technology.  Publications like *Securities Week*, *The New York Times*, and *Wall Street &*

*Technology* touted Madoff's reputation.  Further, BLMIS's marketing materials highlighted its

abilities in this area, specifically stating:

250.     Madoff Securities' computerized transaction processing means that the firm can

customize client reports and deliver them electronically in whatever format best meets the needs

of customers.

251.     Defendants knew the lack of real-time access to account data or electronic

statements provided Madoff with the opportunity to manufacture fictitious trades and manipulate

and/or adjust reported prices based on hindsight.

252.     In May 2003, BLMIS refused a request from BNP Paribas Securities Services for

electronic copies of Oreades's account information sent via email.  BNP Paribas Securities

Services subsequently wrote to Madoff to notify him that BLMIS's untimely reporting of trades

ran afoul of BNP's obligations to supervise BLMIS's day-to-day administration of Oreades's

assets.

253.     In July 2003, Trouvain noted BLMIS's reporting practices provided BNP Paribas

with "no opportunity to consider the true validity" of the trades BLMIS purported to make on

behalf of Oreades.  Trouvain further noted this was a red flag raised by BNP Paribas's risk and

ethics departments during their internal audit of Oreades.

**C.    BLMIS's Small, Unknown Auditor Was Neither Qualified nor Capable of Auditing BLMIS**

254.    Defendants knew BLMIS had billions of dollars under management, but was purportedly audited by Friehling & Horowitz, a three-person accounting firm located in a strip-mall in Rockland County, New York.  Of the three employees at the firm, one employee was an administrative assistant and one was a semi-retired accountant living in Florida.  Employees of BNP Paribas communicated directly with Friehling & Horowitz.

255.    The purpose of an auditor is to review the financial statements of the audited firm and determine their legitimacy in accordance with generally accepted accounting, corporate, and government policies and principles.  Auditors, consistent with industry custom and practice, act as a safeguard against fraud by providing independent verification of assets and financial transactions.

256.    Information about Friehling & Horowitz's limited size, lack of professional qualifications, and the nature of services they provided was known to Defendants.  All accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program.  This program involves having experienced auditors assess a firm's audit quality each year.  The results of these peer reviews are on the public portion of the AICPA.  Friehling & Horowitz never appeared on the public peer review list because Friehling had notified the AICPA that he did not perform audits.

257.    Defendants knew BLMIS's auditor was unqualified and incapable of performing the required domestic and international auditing functions for BLMIS.

D.      **BLMIS's Fee Structure Indicated Fraud**

258.    Defendants knew BLMIS used an atypical fee structure, whereby Madoff inexplicably walked away from hundreds of millions of dollars in management and performance fees that investment managers traditionally charge their investors.

259.    Investment managers typically charge two types of fees for managing a client's assets:  management fees and performance fees.  These fees compensate managers for successfully managing the portfolio.  The management fee is usually a percentage of the total AUM, while the performance fee is based on the profits that are realized, compensating the manager for successful performance.

260.    Instead of charging a customary 1%-2% management fee and a customary 10%-20% performance fee, BLMIS purportedly charged a transaction-based commission for trades: $0.04 per share on stock transactions and $1.00 per option contract.  This was a major red flag because Madoff was leaving well over a billion dollars in fees on the table between 2001 and 2008.

E.      **Madoff Operated BLMIS with No Meaningful Transparency and BNP Paribas Helped to Shield BLMIS from Scrutiny**

261.    Defendants knew Madoff hid his own role as investment adviser for the BLMIS Feeder Funds in order to shield BLMIS from scrutiny.

262.    As early as 1997, BNP Paribas and its subsidiaries assisted Madoff in hiding from scrutiny by secretly delegating all custodian and investment advisory and management authority for the Oreades fund to BLMIS.  By so doing, BNP Paribas took affirmative steps to prevent meaningful inquiry into BLMIS's operations.

263.    For example, in December 2007, BNP Paribas was negotiating an option agreement referencing the feeder fund Senator Fund SPC, which was administered by HSBC.

HSBC expressly told BNP Paribas Securities Corp. to delete any reference to Madoff or BLMIS from the option agreement; BNP Paribas Securities Corp. complied, and all references were removed.

264.    In September 2008, Mr. Guy de La Tour du Pin Verclause ("Verclause") of Access told BNP Paribas's subsidiary FundQuest to remove any reference to BLMIS from FundQuest's marketing materials for products invested in Luxalpha.  FundQuest deleted all references to Madoff and deliberately destroyed FundQuest's old marketing materials.

265.    Verclause stressed that the public disclosure of Madoff's role in Luxalpha was a "very sensitive" subject and asked if there were any other documents that might similarly disclose Madoff.  A FundQuest employee replied to Verclause: "You should now no longer be able to find any traces of the two files either on the internet or elsewhere.  I am confirming that we will be extremely careful in the future not to mention either 'Luxalpha' or 'Bernie Madoff.'"

266.    Defendants knew that the requirement to hide Madoff's identity and role in the management of billions of dollars was indicative of fraud, but ceded to Madoff's demands of secrecy in order to continue to profit financially from working with the Feeder Funds.

## XI.    DEFENDANTS KNEW OF IMPOSSIBILITIES AND OTHER INDICIA OF FRAUD ABOUT BLMIS'S PERFORMANCE

267.    Likewise, Defendants knew and appreciated the significance of various impossibilities regarding BLMIS's purported trading and performance.  Based on any one of these impossibilities, Defendants knew that BLMIS could not possibly have been implementing the SSC Strategy and was therefore engaged in fraud.  These impossibilities are not facts "suggestive" of fraud or "warning signs" that should have led to further inquiry—they are quantitative evidence demonstrating that BLMIS was reporting non-existent securities transactions and that Madoff had been lying about how he was achieving BLMIS's performance.

268.    In addition to objective trading impossibilities, Defendants recognized other

indicia of fraud relating to Madoff's misrepresentations and deviations from the SSC Strategy.

In servicing Oreades and in providing leverage to the BLMIS Feeder Funds and their clients,

Defendants deliberately chose to ignore these impossibilities and other indicia of fraud.

A.    **The SSC Strategy BLMIS Purported to Employ Could Not Yield the Results**
      **Reported on the BLMIS Account Statements**

269.    Defendants knew Madoff was not executing the SSC Strategy because BLMIS's

purported returns were too good to be true, reflecting a pattern of abnormal consistency and

profitability that was impossible.

270.    The SSC Strategy involved acquiring a basket of common stocks selected from

the S&P 100 Index.  The basket of stocks was designed to correlate to the movement of the S&P

100 Index.  The SSC Strategy also involved the purchase and sale of S&P 100 Index put and call

options to "collar" the underlying securities holdings.  The put options hedged the downside risk

of price changes in the underlying basket of stocks.  The sale of call options, which limited

potential gains, largely offset the purchase of the puts.

271.    Defendants knew that the SSC Strategy could not have eliminated market

volatility.  At best, the strategy would have smoothed out peaks and valleys in the returns

generated by the basket of S&P 100 stocks, but the strategy's performance would have been

strongly correlated to the S&P 100 Index when BLMIS was in the market.

272.    It was impossible for BLMIS's investors to obtain any gains on their investments,

let alone double-digit gains, when the S&P 100 Index was down significantly.  This is because

downswings in the market were hedged only by put options.  BLMIS could not have turned

investment losses into double-digit gains by exercising put options—they could only have

created a floor for their losses.  Defendants knew this.

273.     Similarly, it was impossible for the SSC Strategy to outperform the S&P 100 Index during a major upswing, as the call options BLMIS sold would have been exercised during a significant market upswing, putting a ceiling on gains.  Incredibly, based on the account statements and trade confirmations received and reviewed by BNP Paribas, not a single counterparty ever exercised a single call option with BLMIS, not even when BLMIS's returns outperformed the S&P 100 Index.

274.     Defendants knew the purported returns of the BLMIS Feeder Funds varied drastically from the S&P 100 Index.  For example, Fairfield Sentry's reported yearly returns showed little correlation to the S&P 100 Index, as shown in the table below:

| Year | Fairfield Sentry Rate of Return | S&P 100 Index Rate of Return |
|---|---|---|
| 1990 (Nov.–Dec.) | 2.77% | 1.54% |
| 1991 | 17.64% | 24.19% |
| 1992 | 13.72% | 2.87% |
| 1993 | 10.75% | 8.28% |
| 1994 | 10.57% | (0.19%) |
| 1995 | 12.04% | 36.69% |
| 1996 | 12.08% | 22.88% |
| 1997 | 13.10% | 27.77% |
| 1998 | 12.52% | 31.33% |
| 1999 | 13.29% | 31.26% |
| 2000 | 10.67% | (13.42%) |
| 2001 | 9.82% | (14.88%) |
| 2002 | 8.43% | (23.88%) |
| 2003 | 7.27% | 23.84% |
| 2004 | 6.44% | 4.45% |
| 2005 | 7.26% | (0.92%) |
| 2006 | 9.38% | 15.86% |
| 2007 | 7.34% | 3.82% |
| 2008 (Jan.–Oct.) | 4.50% | (33.11%) |

275.     Other BLMIS Feeder Funds, which Defendants invested in or leveraged, reported rates of return that were similarly uncorrelated to the returns of the S&P 100 Index.

276.    Based on marketing materials received and reviewed from the BLMIS Feeder Funds, Defendants also knew the BLMIS Feeder Funds had significantly fewer months with negative returns than the S&P 100 Index.

277.    From January 1996 through November 2008, the S&P 100 Index experienced a total of 65 months of negative returns.  During that same time period, the BLMIS Feeder Funds experienced 5 months of negative returns, which were less than 1% of the total number of months that the BLMIS Feeder Funds were invested with BLMIS.

278.    BLMIS's purported returns were almost always positive despite drastic market fluctuations, such as those due to the burst of the dot-com bubble in 2000 or the September 11, 2001 terrorist attacks.

279.    Based on the collar, Defendants knew that the SSC Strategy could limit losses in a down market but could not transform the market's double-digit losses into positive gains.  For example, if the S&P 100 Index fell, the SSC Strategy collar could protect the equity positions from sizeable losses, but could not generate substantial profits.

280.    Based on the impossibility of BLMIS's purported returns, Defendants knew BLMIS was not making the trades it claimed.  Defendants deliberately chose to ignore what they knew to leverage Madoff's fictional performance.

281.    Similarly, Defendants knew BLMIS could not have been making trades using the SSC Strategy because the BLMIS Feeder Funds' "Sharpe ratios" were impossible.

282.    One of the key metrics used by sophisticated hedge fund investors in assessing a fund's performance is the fund's Sharpe ratio.  The Sharpe ratio, developed by Nobel Prize winning economist, William Sharpe, measures how well a trading strategy compensates an investor for risk.  It is calculated by taking the average return of the fund, subtracting the current

risk-free rate of return, then dividing by the standard deviation.  The higher the ratio, the better the returns produced versus the relative risk being taken.

283.    The Sharpe ratios for the Feeder Funds remained high for an impossibly consistent amount of time.  For example, in every monthly tear sheet, which Defendants reviewed, the Fairfield Funds reported their Sharpe ratios from inception as well as the Sharpe ratio of the S&P100 Index.  Because the SSC Strategy was to be highly correlated to the S&P 100 Index, the Sharpe ratios should have also been correlated.

284.    Throughout their history, the Fairfield Funds, month in and month out, reported Sharpe ratios that were nearly seven times that of the S&P 100 Index.  The BLMIS Feeder Funds reported Sharpe ratios that were impossible if Madoff had been trading as he claimed under the SSC Strategy.

**B.      BLMIS's Executed Trades Outside the Daily Price Range**

285.    Defendants received and reviewed account statements and trade confirmations reflecting execution prices outside the daily price range of reported trades.  In other words, Defendants routinely saw transactions on BLMIS account statements and trade confirmations that literally did not and could not have occurred.

286.    Across the BLMIS Feeder Funds for which Defendants received trade confirmations, there were at least 314 separate equity transactions executed at a fabricated price above the daily high or below the daily low for the purportedly traded security.

287.    BLMIS trade confirmations also documented options transactions outside the daily price range reported on the CBOE.  From 2000 through 2008, BLMIS also reported over 2,000 trades of U.S. Treasury securities ("Treasury Bills"), of which over 200 trades were outside the daily price range publically reported by Bloomberg.

288.    Based on the impossibility of the reported trades on the BLMIS Feeder Funds'

account statements and trade confirmations, Defendants knew BLMIS could not be making the

securities trades it claimed to be making.

**C.    BLMIS's Volume of Assets under Management Was Too Large to Execute the SSC
Strategy**

289.    BLMIS publicly disclosed through its Form ADV and annual amendments filed

with the SEC that it was managing approximately $11.7 billion as of July 2006, $13.2 billion as

of December 2006, and $17.1 billion as of December 2007.

290.    Defendants knew that in the financial markets, scalability is the ability of an

investment strategy to handle higher trading volumes or increased AUM.  Defendants knew that

as AUM increased for BLMIS, it would become more difficult for Madoff to find opportunities

of a scale proportional to the increasing AUM.

291.    Madoff's SSC Strategy, which purportedly capitalized on inefficiencies in the

market, was limited because there were fewer opportunities for inefficiencies with the most

efficiently traded and tracked stocks on the S&P 100 Index.

292.    Defendants knew that the SSC Strategy was not scalable for the assets BLMIS

purported to manage.  For example, to execute the SSC Strategy with $11 billion in AUM,

BLMIS would have needed approximately $11 billion in notional value of call options.

Defendants knew that there were not enough options in the entire market to implement Madoff's

purported SSC Strategy.

293.    Defendants also knew that, despite the large trading volumes reported, Madoff's

SSC Strategy did not leave any "footprint" in the market.

294.    BLMIS traded billions of dollars' worth of S&P 100 Index stocks, and at times

BLMIS reported trades in S&P 100 Index stocks that represented nearly the entire volume of

trades made in the market.  BLMIS also purported to enter and exit the market six to eight times

every year, each time over the span of just a few days.  BNP Paribas knew Madoff's entry and

exit from the market would materially impact the average price of the S&P 100 Index stocks he

purported to trade.  But there was no noticeable impact on market prices from Madoff's

purported trading activity.

295.    Based on how the SSC Strategy was not scalable for the assets BLMIS purported

to manage and the lack of any observable market reaction to BLMIS's purported trading,

Defendants knew BLMIS could not be making the trades it claimed.

**D.    BLMIS's Misreported Investment Accounts and Assets Under Management**

296.    Defendants knew Madoff underreported BLMIS's AUM on its Form ADV from

2006 to 2008.

297.    On its December 2006 Form ADV, Madoff reported that BLMIS had over $13

billion in total AUM.

298.    By December 2006, Defendants knew that the BLMIS Feeder Funds, with whom

Defendants transacted, had approximately $15 billion invested with BLMIS, which comprised an

impossible 114% of BLMIS's reported total AUM.

299.    On its December 2007 Form ADV, Madoff reported that BLMIS had over $17

billion in total AUM.

300.    By December 2007, BNP Paribas knew that the same BLMIS Feeder Funds had

approximately $20 billion invested with BLMIS, which represented an impossible 119% of

BLMIS's reported total AUM.

301.    In addition, Madoff reported on BLMIS's Form ADV submissions from 2006

through 2008 that BLMIS maintained a total of 23 client accounts.

302.    The BLMIS Feeder Funds from which Defendants received transfers made up at least 15 of BLMIS's purported 23 client accounts, but, from their involvement in the industry amongst other ways, Defendants knew that Madoff maintained more than eight other BLMIS client accounts.

303.    Based on Madoff's misrepresentations as to BLMIS's total number of investment accounts and AUM, Defendants knew BLMIS was not making the trades it claimed.

**E.    The Timing of BLMIS's Purported Trades Was Impossible**

304.    The stock prices reflected on BLMIS trade confirmations received and reviewed by Defendants demonstrated the impossibility of BLMIS's market timing.

305.    With unbelievable consistency, when BLMIS purportedly purchased shares, the reported average purchase price was almost always in the lower half of the daily price range, and when selling shares, the reported average sale price was almost always in the upper half of the daily price rage.

306.    Madoff represented to investors that BLMIS was "time-slicing," that is, purchasing or selling stocks at specific intervals over the course of a trading day.  If BLMIS was purchasing or selling stocks throughout a trading day, the reported prices necessarily would have gravitated toward the daily midpoint.  The prices reported to Defendants instead almost always reflected an optimal price point—an impossibility if BLMIS was trading as Madoff claimed.

307.    Across all the BLMIS Feeder Funds from which Defendants received trade confirmations, a comparison of BLMIS's purported purchase or sale price to those stocks' daily midpoint trading price reveals the following:

| Time Period | BLMIS Feeder Funds | Percentage of Buys Below Midpoint | Percentage of Sells Above Midpoint |
|---|---|---|---|
| 2005-2008 | Equity Trading | 81.53% | 69.91% |
| 2004-2008 | Harley | 82.50% | 76.43% |
| 2005-2008 | Insurance Portfolio Fund | 83.24% | 71.95% |
| 2000-2008 | Legacy Capital | 85.29% | 76.88% |
| 1997-2004 | Oreades | 76.37% | 72.66% |
| 1998-2004 | Oreades | 76.26% | 72.44% |
| 2006-2008 | Portfolio Limited Fund | 78.21% | 68.85% |
| 2007-2008 | Prime Fund | 78.21% | 69.51% |
| 2007-2008 | Broad Market Fund | 80.33% | 60.76% |
| *Total* | | **80.71%** | **72.67%** |

308.    Achieving these statistics while trading even a single equity is impossible, but Madoff claimed to trade in baskets containing between 35-40 equities.  To achieve these results, which were reported on the BLMIS Feeder Fund account statements, Madoff would have had to enter and exit the market at the optimal time of the day, not just for one equity, but for 35 or 40 equities simultaneously.

309.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.  Yet this is precisely what BLMIS's customer statements reported.

310.    Based on the impossibility of BLMIS's market timing, Defendants knew and ignored that BLMIS was not making the trades it claimed.

F.    **BLMIS Account Statements Reflected Impossible Option Trading Volumes**

311.    Defendants knew it was impossible for Madoff to execute the number of option

contracts required by the SSC Strategy because the volume of put and call options purportedly

bought and sold by BLMIS were beyond the daily volume of the CBOE, the only exchange on

which such options are traded.

312.    The trade confirmations Defendants received and reviewed had Committee on

Uniform Security Identification Procedures ("CUSIP") numbers.  These numbers uniquely

identify a company, issuer, and type of security, and indicate that the options reflected were

traded on the CBOE.

313.    On thousands of separate occasions, the options volume reported to the BLMIS

Feeder Funds greatly exceeded the total volume of comparable option contracts traded on the

CBOE.

314.    For each of the BLMIS Feeder Funds from which Defendants received trade

confirmations, the volume of option contracts supposedly traded by Madoff routinely exceeded

the total volume of contracts for options with the same purchase date, strike price, and expiration

date traded on the CBOE:

| Time Period | BLMIS Feeder Funds | Total Transactions Over Volume | Total Transactions | Percentage of Transactions Over Volume |
|---|---|---|---|---|
| 2007-2008 | Broad Market Fund | 134 | 151 | 88.74% |
| 2005-2008 | Equity Trading | 111 | 253 | 43.87% |
| 2004-2008 | Harley | 353 | 432 | 81.71% |
| 2005-2008 | Insurance Portfolio Fund | 145 | 295 | 49.15% |
| 2000-2008 | Legacy Capital | 118 | 379 | 31.13% |
| 1997-2004 | Oreades | 78 | 415 | 18.08% |
| 1998-2004 | Oreades | 99 | 409 | 24.21% |
| 2006-2008 | Portfolio Limited Fund | 142 | 173 | 82.08% |
| 2007-2008 | Prime Fund | 127 | 151 | 84.11% |
| | *Total* | **1,307** | **2,658** | **49.17%** |

315.    In 2008, the purported trades of S&P 100 Index options across the BLMIS Feeder

Funds' accounts was, on average, 12,000% greater than the volume traded on the CBOE.

316.    Based on the impossibility of BLMIS executing sufficient options contracts to

hedge the SSC Strategy, Defendants knew BLMIS was not making the trades it claimed.

**G.    BLMIS's Purported OTC Option Trades Were Impossible**

317.    At times, Madoff claimed BLMIS executed OTC option trades with a network of

counterparties he refused to identify, claiming that their identities were proprietary.  At other

times, he claimed the OTC counterparties were large, European financial institutions (like BNP

Paribas).

318.    Options trades in the OTC market are entered by private contract between a party

and a counterparty.  This would have required BLMIS to enter into private, individually

negotiated, arm's length contracts with willing counterparties.  If the counterparty failed to

perform, the BLMIS customer bore the risk.  Madoff claimed counterparties deposited Treasury

Bills as collateral for performance.  But no such agreements were ever provided to BLMIS

customers, nor did Madoff ever provide confirmation of where and how those Treasury Bills

were posted.

319.    Madoff's claim that BLMIS traded with counterparties in the OTC market was

facially implausible.  When the entire CBOE did not trade the volume necessary to hedge

Madoff's SSC Strategy, Madoff could not have found individual counterparties who were

willing to trade tens of billions of dollars in S&P 100 Index options.

320.    Based on trade confirmations received and reviewed, Defendants also knew

BLMIS did not trade OTC options because:  (a) trade confirmations reflected CUSIP numbers

for CBOE traded options; (b) in the OTC market, option counterparties are typically identified

on trade confirmations, and none of the option trade confirmations received by Defendants

identified the counterparty; and (c) trading options in the OTC market is more expensive than

trading on the CBOE and that no such costs were reflected on BLMIS trade confirmations.

321.    Further, BNP Paribas traded in the OTC marketplace and never saw anyone

executing option trades with BLMIS in the OTC marketplace.

## H.    BLMIS Deviated from the SSC Strategy

322.    BLMIS account statements Defendants received and reviewed often showed

short-term option trades that did not hedge any existing equity investment.  Because these trades

were purely speculative, they were facially inconsistent with the SSC Strategy in that they

created precisely the market exposure the SSC Strategy was supposed to avoid.  The trades were

also inconsistent with the BLMIS Feeder Funds' offering memoranda, prospectuses, and

marketing materials received by Defendants.

323.    Under the SSC Strategy, options trades were intended to hedge the underlying

equities, not generate profit.  The BLMIS account statements Defendants received for Harley

showed the opposite.

324.    For the BLMIS Feeder Funds for which Defendants were known to have received

account statements, BLMIS purported to engage in speculative option transactions, generating

approximately a hundred million dollars in reported profits.

| Time Period | BLMIS Feeder Funds | Total Speculative Option Trades | Net Gain or Loss |
|---|---|---|---|
| 2005-2008 | Equity Trading | 6 | $2,986,259 |
| 2004-2008 | Harley | 20 | $41,017,054 |
| 2005-2008 | Insurance Portfolio Fund | 6 | $3,017,163 |
| 2000-2008 | Legacy Capital | 8 | $1,547,632 |
| 1997-2004 | Oreades | 32 | $13,040,690 |
| 2006-2008 | Portfolio Limited Fund | 4 | $9,956,897 |
| 2007-2008 | Prime Fund | 4 | $5,325,265 |
| 2007-2008 | Broad Market Fund | 4 | $20,354,553 |
|  | *Total* | **84** | **$97,245,513** |

325.    Defendants knew that any speculative option transaction deviated from the SSC Strategy and left the BLMIS Feeder Funds (and their own investments with those funds) exposed to downside risk.

326.    BLMIS also appeared to engage in option transactions that were unbalanced because BLMIS failed to adjust corresponding hedges when it purportedly sold a stock before the rest of the basket. Defendants knew that unbalanced hedges similarly deviated from the SSC Strategy.

327.    In the Oreades accounts alone, there were 32 instances in which BLMIS executed an early sale of the trading basket but failed to adjust the hedge. As an example, in January 2004, Madoff purported to purchase two baskets of S&P 100 Index stocks for Oreades, each of which included shares of Texas Instruments Inc. According to account statements, BLMIS purported to sell the shares of Texas Instruments Inc. on January 16, 2004, but did not purport to sell the remaining stocks in the basket until February 25, 2004. Despite the early sale of the Texas Instruments Inc. shares, BLMIS never purported to change the corresponding option hedges. In light of this early sale of Texas Instruments shares, the corresponding option hedges should have been rebalanced to protect against exposure to market risk. No such adjustment was reflected in the customer statements or trade confirmations.

328.    BLMIS's exits from the market also did not comport with the SSC Strategy. Various SEC reporting requirements are triggered when securities are invested in the market at either quarter-end or year-end. To evade those reporting requirements, BLMIS purported to liquidate all investments at those times and invested the proceeds in Treasury Bills, and BLMIS account statements reported investments only in Treasury Bills at quarter-end and year-end.

329.    BLMIS's practice of exiting the market according to calendar, rather than market or economic indicators, was a badge of fraud.  Defendants knew that Madoff touted "market timing" as a cornerstone of the SSC Strategy and that BLMIS's practice of exiting the market at quarter-end and year-end contravened that strategy because it locked BLMIS into prevailing market conditions, regardless of whether they were favorable.  The SSC Strategy, based on long positions hedged by options contracts, themselves subject to expiration, could not be implemented effectively under these circumstances.

330.    Based on BLMIS's deviations from the SSC Strategy, including its speculative and unbalanced options transactions and its yearly and quarterly exits from the market, Defendants knew Madoff was misrepresenting how he executed the SSC Strategy and achieved BLMIS's performance.

## I.    BLMIS Reported Settlement Anomalies in Option Transactions

331.    Common industry practice for option trades is to settle on the business day following execution, referred to as "T+1."

332.    BLMIS trade confirmations Defendants received and reviewed regularly showed option transactions that purportedly settled as much as three days after execution, which allowed Madoff time to fabricate trades days after they purportedly took place.

333.    For example, Harley's BLMIS trade confirmations indicate that out of 388 option transactions purportedly entered into on behalf of Harley's BLMIS account, only 155 settled on the industry standard T+1.  Accordingly, 60% of the purported options activity in Harley's account did not comply with standard trading practices.

334.    As shown below, the trade confirmations Defendants received and reviewed showed that the options transactions BLMIS purported to make regularly deviated from industry practice:

| Time Period | BLMIS Feeder Funds | Options - Trades not Settling T+1 | Options - Percentage not Settling T+1 |
|---|---|---|---|
| 2006-2008 | Broad Market Fund | 150 | 96.15% |
| 2005-2008 | Equity Trading | 230 | 87.12% |
| 2004-2008 | Harley | 295 | 50.34% |
| 2005-2008 | Insurance Portfolio Fund | 229 | 75.33% |
| 2000-2008 | Legacy Capital | 233 | 60.05% |
| 2006-2008 | Portfolio Limited Fund | 180 | 96.77% |
| 2006-2008 | Prime Fund | 194 | 97.00% |
| *Total* | | **1,511** | **72.50%** |

335. Based on the repeated settlement anomalies throughout BLMIS's purported option transactions, Defendants knew BLMIS was not making the trades it claimed.

**J.    The Dividend Activity Shown on Customer Statements Was Impossible**

336. During periods that BLMIS was purportedly out of the market, BLMIS claimed to invest in the Fidelity Spartan U.S. Treasury Money Market Fund (the "Fidelity Spartan Fund"). BLMIS purported to do so notwithstanding the fact that the Fidelity Spartan Fund changed its name in August 2005. Nevertheless, from the end of 2005 until Madoff's arrest in 2008, the BLMIS Feeder Funds' account statements that Defendants received continued to show transactions with a fund that no longer existed under the name reported on customer statements.

337. The Fidelity Spartan Fund issued dividend payments only once a month, either at month's beginning or end. But the BLMIS Feeder Funds' account statements often reported multiple dividend payments by the Fidelity Spartan Fund in a calendar month, on dates that did not correspond with published dividend payments. In February 2007, for example, Harley's BLMIS account statements reported seven dividend payments from the Fidelity Spartan Fund.

338. As set forth in the following table, the BLMIS Feeder Funds' account statements, which Defendants received and reviewed, almost always showed fictitious dividend payments:

| Time Period | BLMIS Feeder Funds | Total Money Market Fund Dividend Payments | Improper Money Market Dividend Payments |
|---|---|---|---|
| 2007-2008 | Broad Market Fund (1T0027) | 56 | 56 |
| 2005-2008 | Equity Trading (1FR124) | 87 | 86 |
| 2004-2008 | Harley (1FN094) | 124 | 123 |
| 2005-2008 | Insurance Portfolio Fund (1FR010) | 101 | 98 |
| 2000-2008 | Legacy Capital (1FR071) | 113 | 111 |
| 1997-2008 | Oreades (1FR032) | 82 | 78 |
| 1998-2008 | Oreades (1FR036) | 75 | 70 |
| 2006-2008 | Portfolio Limited Fund (1FR080) | 69 | 66 |
| 2006-2008 | Prime Fund (1C1260) | 69 | 68 |
| | *Total* | **776** | **756** |

339.    Based on the impossibility of BLMIS's dividend payments, as well as the too good to be true returns, the trades executed outside the daily price range, the enormous option volumes, the incredible market timing, and the settlement anomalies, Defendants knew BLMIS was not making the trades it claimed and that Madoff's reported performance was not the result of the SSC Strategy.

## XII.    THE TRANSFERS

340.    Based on the Trustee's investigation to date, approximately $1.4 billion in customer property was transferred by the BLMIS Feeder Funds directly or indirectly to Defendants and two affiliates, BNP Paribas Suisse, and BGL BNP Paribas (collectively, the "BNP Entities").  A complete list of all the known transfers from the BLMIS Feeder Funds to the BNP Entities is attached as Exhibit A.

FLOW OF CUSTOMER PROPERTY FROM BLMIS TO BNP ENTITIES



341.    By this action, the Trustee seeks to recover approximately $156 million in fraudulent transfers of BLMIS customer property that Defendants received from the Tremont and Ascot Funds.  A complete list of these transfers is attached as Exhibit B.

342.    The initial transfers to Prime Fund, Broad Market Fund, Insurance Portfolio Fund, and Portfolio Limited Fund were avoided when these BLMIS Feeder Funds settled with the Trustee.  The Trustee also has filed complaints demonstrating the avoidability of the initial transfers from these funds as well as those from Ascot.

A.    **TREMONT FUNDS**

343.    The Trustee commenced a separate adversary proceeding against Broad Market Fund, Portfolio Limited Fund, XL LP, XL Portfolio, and other defendants in the Bankruptcy

Court under the caption, *Picard v. Tremont Group Holdings, Inc. et al*, Adv. Pro. No. 10-05310

(SMB) (the "Tremont Avoidance Action"), seeking to avoid and recover initial transfers of

customer property from BLMIS in the approximate amount of $2,140,297,364 (the "Tremont

Initial Transfers").  The Trustee incorporates by reference the allegations contained in the

Tremont Avoidance Action Complaint as if fully set forth herein.  *Id.* at ECF 1.  *See also*

Proffered Second Amended Complaint, *Picard v. HSBC Bank PLC, et al*, Adv. Pro. No. 09-1364

(SMB) at ECF 399 (detailing Tremont's relationship with BLMIS).

344.    Under the Bankruptcy Court's September 22, 2011 order, the Bankruptcy Court

approved a settlement among the Trustee and more than a dozen domestic and foreign

investment funds, their affiliates, and a former chief executive associated with Tremont Group

Holdings, Inc. (the "Tremont Settlement Agreement").  As part of the Tremont Settlement

Agreement, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment in

the amount of $1,025,000,000.

345.    Tremont Group Holdings, Inc., a Delaware corporation ("TGH"), and its U.S.

management arm, Tremont Partners, Inc., a Connecticut corporation ("Tremont Partners," and

together with TGH, "Tremont"), managed a number of funds that were directly or indirectly

invested with BLMIS, including Prime Fund, Broad Market Fund, Insurance Portfolio Fund, XL

LP Fund, and XL Portfolio (collectively, the "Tremont Funds").

**1.    Initial Transfers from BLMIS to Prime Fund**

346.    Of the Tremont Initial Transfers, $945,000,000 was transferred to Prime Fund,

Account Number 1C1260, in the six years preceding the Filing Date (the "Prime Fund Six Year

Initial Transfers").  A chart setting forth these transfers is included in the attached Exhibit C, at

pages 1-2.  The Prime Fund Six Year Initial Transfers are avoidable under section 544 of the

Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law §§ 273-279, and of

SIPA, particularly § 78fff-2(c)(3).

347.    Of the Prime Fund Six Year Transfers, approximately $495,000,000 was

transferred to Prime Fund during the two years preceding the Filing Date (the "Prime Fund Two

Year Initial Transfers").  The Prime Fund Two Year Initial Transfers are avoidable under section

548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

348.    The Prime Fund Six Year Initial Transfers and the Prime Fund Two Year Initial

Transfers are collectively defined as the "Prime Fund Initial Transfers."

349.    Prime Fund received the Prime Fund Initial Transfers with knowledge of fraud at

BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at

BLMIS.

350.    The Prime Fund Initial Transfers were and continue to be customer property

within the meaning of 15 U.S.C. § 78*lll*(4).

### 2.    Tremont Initial Transfers to Broad Market Fund

351.    Of the Tremont Initial Transfers, $252,000,000 was transferred to Broad Market

Fund, Account Number 1T0027, in the six years preceding the Filing Date (the "Broad Market

Fund Six Year Initial Transfers").  A chart setting forth these transfers is included as Exhibit C,

at pages 3-7.  The Broad Market Fund Six Year Initial Transfers are avoidable under section 544

of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly

§§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

352.    Of the Broad Market Fund Six Year Transfers, approximately $60,000,000 was

transferred to Broad Market Fund during the two years preceding the Filing Date (the "Broad

Market Fund Two Year Initial Transfers").  The Broad Market Fund Two Year Initial Transfers

are avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

353.    Of the Broad Market Fund Two Year Initial Transfers, approximately $30,000,000 was transferred to Broad Market Fund during the 90 days preceding the Filing Date (the "Broad Market Fund Preference Period Transfers").  The Broad Market Fund Preference Period Transfers are avoidable under section 547 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

354.    The Broad Market Fund Six Year Initial Transfers, the Broad Market Fund Two Year Initial Transfers, and the Broad Market Fund Preference Period Initial Transfers are collectively defined as the "Broad Market Fund Initial Transfers."

355.    Broad Market Fund received the Broad Market Fund Initial Transfers with knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

356.    The Broad Market Fund Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

**3.    Subsequent Transfers to XL LP and Subsequently to Defendant BNP Paribas Cayman**

357.    Prior to the Filing Date, Broad Market Fund subsequently transferred at least $48,387,616 of the Broad Market Fund Initial Transfers directly to XL LP, and Prime Fund subsequently transferred at least $292,472,765 of the Prime Fund Initial Transfers directly to XL LP (together, the "XL-LP Transfers").  Charts setting forth these transfers is included in the attached Exhibit D.

358.     Thereafter, XL LP subsequently transferred at least $2,987,824 of the XL-LP

Transfers to BNP Paribas Cayman (the "XL LP-BNP Paribas Cayman Subsequent Transfers").

A chart setting forth these transfers is included in the attached Exhibit E.

359.     BNP Paribas Cayman received the XL LP-BNP Paribas Cayman Subsequent

Transfers while willfully blind to circumstances suggesting a high probability of fraud at

BLMIS.

360.     The XL LP-BNP Paribas Cayman Subsequent Transfers are recoverable from

BNP Paribas Cayman under section 550(a) of the Bankruptcy Code.

**4.     Initial Transfers from BLMIS to Insurance Portfolio Fund**

361.     Of the Tremont Initial Transfers, $90,650,000 was transferred to Insurance

Portfolio Fund, Account 1FR010, in the six years preceding the Filing Date (the "Insurance

Portfolio Fund Six Year Initial Transfers").  A chart setting forth these transfers is included in

the attached Exhibit C, at pages 8-31.  The Insurance Portfolio Fund Six Year Initial Transfers

are avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y.

Debt. & Cred. Law §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

362.     Of the Insurance Portfolio Fund Six Year Transfers, approximately $48,750,000

was transferred to Insurance Portfolio Fund during the two years preceding the Filing Date (the

"Insurance Portfolio Fund Two Year Initial Transfers").  The Insurance Portfolio Fund Two Year

Initial Transfers are avoidable under section 548 of the Bankruptcy Code and applicable

provisions of SIPA, particularly § 78fff-2(c)(3).

363.     Of the Insurance Portfolio Fund Two Year Initial Transfers, approximately

$8,750,000 was transferred to Insurance Portfolio Fund during the 90 days preceding the Filing

Date (the "Insurance Portfolio Fund Preference Period Transfers").  The Insurance Portfolio

Fund Preference Period Transfers are avoidable under section 547 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

364.    The Insurance Portfolio Fund Six Year Initial Transfers, the Insurance Portfolio Fund Two Year Initial Transfers, and the Insurance Portfolio Fund Preference Period Initial Transfers are collectively defined as the "Insurance Portfolio Fund Initial Transfers."

365.    Insurance Portfolio Fund received the Insurance Portfolio Fund Initial Transfers with knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

366.    The Insurance Portfolio Fund Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

### 5.    Subsequent Transfers from Insurance Portfolio Fund to Defendants BNP Paribas Arbitrage and BNP Paribas

367.    Prior to the Filing Date, Insurance Portfolio Fund subsequently transferred at least $32,865 of the Insurance Portfolio Fund Initial Transfers to BNP Paribas Arbitrage (the "Insurance Portfolio Fund-BNP Paribas Arbitrage Subsequent Transfers"), and transferred at least $39,628,385 of the Insurance Portfolio Fund Initial Transfers to BNP Paribas (the "Insurance Portfolio Fund-BNP Paribas Subsequent Transfers," together, the "Insurance Portfolio Transfers").  A chart setting forth these is included in the attached Exhibit F.

368.    BNP Paribas Arbitrage and BNP Paribas received the Insurance Portfolio Transfers while willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

369.    The Insurance Portfolio Transfers are recoverable from BNP Paribas Arbitrage and BNP Paribas under section 550(a) of the Bankruptcy Code.

6. **Subsequent Transfers from Insurance Portfolio Fund to XL Portfolio**

370.   Prior to the Filing Date, Insurance Portfolio Fund transferred at least $318,000 of the Portfolio Limited Fund Initial Transfers to XL Portfolio (the "Insurance Portfolio-XL Portfolio Transfer"). A chart setting forth this transfer is included in the attached Exhibit G.

7. **Initial Transfers from BLMIS to Portfolio Limited Fund**

371.   Of the Tremont Initial Transfers, $609,000,000 was transferred to Portfolio Limited Fund, Account Number 1FR080, in the six years preceding the Filing Date (the "Portfolio Limited Fund Six Year Initial Transfers"). A chart setting forth these transfers is included in the attached Exhibit C, at pages 32-48. The Portfolio Limited Fund Six Year Initial Transfers are avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

372.   Of the Portfolio Limited Fund Six Year Transfers, approximately $350,000,000 was transferred to Portfolio Limited Fund during the two years preceding the Filing Date (the "Portfolio Limited Fund Two Year Initial Transfers"). The Portfolio Limited Fund Two Year Initial Transfers are avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

373.   Of the Portfolio Limited Fund Two Year Initial Transfers, approximately $275,000,000 was transferred to Portfolio Limited Fund during the 90 days preceding the Filing Date (the "Portfolio Limited Fund Preference Period Transfers"). The Portfolio Limited Fund Preference Period Transfers are avoidable under section 547 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

374.   The Portfolio Limited Fund Six Year Initial Transfers, the Portfolio Limited Fund Two Year Initial Transfers, and the Portfolio Limited Fund Preference Period Initial Transfers are collectively defined as the "Portfolio Limited Fund Initial Transfers."

375.   Portfolio Limited Fund received the Portfolio Limited Fund Initial Transfers with knowledge of fraud at BLMIS, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

376.   The Portfolio Limited Fund Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

### 8.   Subsequent Transfers from Portfolio Limited Fund to Defendants BNP Paribas Cayman and BNP Paribas Securities Services

377.   Prior to the Filing Date, Portfolio Limited Fund transferred $14,470,304 of the Portfolio Limited Fund Initial Transfers to BNP Paribas Cayman (the "Portfolio Limited Fund-BNP Paribas Cayman Subsequent Transfers") and transferred $32,716,801 of the Portfolio Limited Fund Initial Transfers to BNP Paribas Securities Services ("Portfolio Limited Fund-BNP Paribas Securities Services Subsequent Transfers," together, the "Portfolio Limited Transfers"). A chart setting forth these transfers is included in the attached Exhibit H.

378.   BNP Paribas Cayman and BNP Paribas Securities Services received the Portfolio Limited Transfers while willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

379.   The Portfolio Limited Transfers are recoverable from BNP Paribas Cayman and BNP Paribas Securities Services under section 550(a) of the Bankruptcy Code.

### 9.   Subsequent Transfers from Portfolio Limited Fund to XL Portfolio

380.   Prior to the Filing Date, Portfolio Limited Fund subsequently transferred at least $74,298,573 of the Portfolio Limited Fund Initial Transfers directly to XL Portfolio (together with the Insurance Portfolio-XL Portfolio Transfer, the "XL Portfolio Transfers"). A chart setting forth these transfers is included in the attached Exhibit G.

10.     **Subsequent Transfers from XL Portfolio and Subsequently to Defendants BNP Paribas Arbitrage and BNP Paribas Cayman**

381.    XL Portfolio transferred at least $6,452,906 of the XL Portfolio Transfers to BNP Paribas Arbitrage (the "XL Portfolio-BNP Paribas Arbitrage Subsequent Transfers") and $2,500,000 to BNP Paribas Cayman ("XL Portfolio-BNP Paribas Cayman Subsequent Transfers," together, the "XL-BNP Transfers").  A chart setting forth these transfers is included in the attached Exhibit I.

382.    BNP Paribas Arbitrage and BNP Paribas Cayman received the XL-BNP Transfers while willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

383.    The XL-BNP Transfers are recoverable from BNP Paribas Arbitrage and BNP Paribas Cayman under section 550(a) of the Bankruptcy Code.

11.     **The Tremont Subsequent Transfers Are Domestic**

384.    The Tremont Funds Insurance Portfolio and Portfolio Limited invested all of their assets with BLMIS in New York and received approximately $700,000,000 in transfers of customer property from BLMIS within six years of December 11, 2008.

a.      The Tremont Funds' Principal Place of Business and Operations Were in New York

385.    XL LP was incorporated in Delaware, and Insurance Portfolio, Portfolio Limited, and XL Portfolio were incorporated in the Cayman Islands (together, the "Cayman Registered Funds").

386.    Tremont managed and conducted due diligence for all the Tremont Funds from its offices in Rye, New York.

387.    BLMIS would mail copies of trade tickets and account statements for Insurance Portfolio and Portfolio Limited to Tremont's New York office.

388.     The reported investment manager for XL Portfolio was in fact Tremont Partners in New York.

389.     The reported investment manager for Insurance Portfolio and Portfolio Limited was Tremont (Bermuda) Limited; however, Tremont (Bermuda) Limited delegated its management duties to Tremont Partners in New York.

390.     Tremont (Bermuda) Limited provided no management services and relied on Tremont Partners in New York to manage the funds.

391.     Bank of New York in New York served as the nominal custodial bank for each of the Tremont Funds.

392.     Tremont Partners or Bank of New York, each in New York, served as the purported administrator for the Tremont Funds.

393.     Investors, including BNP Paribas, BNP Paribas Arbitrage, BNP Paribas Cayman, BNP Paribas Securities Services, sent subscription agreements for investments in the Tremont Funds to either Tremont Partners or a Bank of New York entity in New York.

394.     Pursuant to the subscription agreements, investors wired funds in U.S. dollars to Bank of New York in New York.

395.     Pursuant to the subscription agreements, investors also sent redemption requests to Tremont Partners or Bank of New York and received redemption payments in U.S. dollars from Bank of New York in New York.

396.     Investors' subscriptions and redemptions of shares in the Tremont Funds were approved by Tremont employees in New York.

397.    The marketing and sale of shares in the Tremont Funds were performed by Tremont employees in New York.  Employees in Tremont's New York office communicated directly with investors and potential investors regarding all of the Tremont Funds.

398.    From 2006 forward, the published materials for all the Tremont Funds, including prospectus statements and marketing materials, directed potential investors to contact Tremont's employees in New York.

399.    Tremont employees in New York also signed BLMIS Customer Agreements and other account opening documents on behalf of Insurance Portfolio and Portfolio Limited, and the Customer Agreements expressly stated that they were governed by New York law and that all disputes arising under the Customer Agreement would be resolved by arbitration under New York law.

400.    The Cayman Registered Funds did not have any real offices or operations in the Cayman Islands.  Insurance Portfolio, Portfolio Limited had their registered office at a P.O. Box address in the Cayman Islands, care of a company that is in the business of providing local addresses to companies.  XL Portfolio similarly had its registered address at an international law firm in the Cayman Islands.

401.    The Cayman Registered Funds were registered as exempted companies under the Cayman Islands Companies Law and were not permitted to do business in the Cayman Islands.

402.    Under the Companies Law, "[a]n exempted company shall not trade in the Islands with any person, firm, or corporation except in furtherance of business of the exempted company carried on outside the Islands."

403.    The Cayman Registered Funds were further prohibited from accepting investment

funds from members of the public in the Cayman Islands and paid no taxes in the Cayman

Islands.

404.    Investment research and sales were performed by Tremont employees in New

York.

405.    Letters sent to Tremont investors on Tremont Bermuda letterhead came from

Tremont employees in New York.

406.    In July 2006, Tremont formalized what was previously a *de facto*, New York-

based operation and closed its Bermuda office and consolidated the administration of all its funds

in New York.

407.    Beginning in the fall of 2006, every redemption payment made by Tremont to an

investor, including Defendants BNP Paribas, BNP Paribas Arbitrage, BNP Paribas Cayman, and

BNP Paribas Securities Services, came out of Tremont's New York-based bank account at the

Bank of New York.

            b.    The Events Relating to the Transfers Received by the BNP Defendants
                  from the Tremont Funds Occurred in New York

408.    As discussed above, the transfers from the Tremont Funds arise out of levered

transactions—credit facilities, swaps, and option agreements with the Tremont Funds—that were

created, marketed, operated, and supervised by members of BNP Paribas's Fund Derivatives

Group in New York.

409.    The credit agreement, the option agreement, and the swap agreement were each

governed by New York law.

410.    Under each agreement, BNP Paribas Securities Corp. acted as the collateral agent and the calculation agent, and the Tremont counterparties were to provide notice to BNP Paribas Securities Corp. in New York.

411.    BNP Paribas or BNP Paribas Securities Corp. employees in New York executed the credit, option, and swap agreements, as well as certain of the subscription agreements with the Tremont Funds.

412.    Pursuant to the credit agreement and subscription agreements, BNP Paribas received transfers from the Tremont Funds at BNP Paribas's bank account in New York.

**B.    ASCOT**

413.    The Trustee commenced a separate adversary proceeding against Ascot and other defendants in the Bankruptcy Court under the caption, *Picard v. Ezra Merkin, et al.*, Adv. Pro. No. 09-01182 (SMB) (the "Merkin Avoidance Action"), seeking to avoid and recover initial transfers of customer property from BLMIS to Ascot in the approximate amount of $560,000,000 (the "Ascot Initial Transfers"). The Trustee incorporates by reference the allegations contained in the Merkin Avoidance Action Third Amended Complaint as if fully set forth herein. *Id.* at ECF No. 151.

**1.    Ascot Initial Transfers**

414.    Of the Ascot Initial Transfers, approximately $461,000,000 was transferred to Ascot, Account Number 1A0058, during the six years prior to the Filing Date (the "Ascot Six Year Transfers"). A chart setting forth these transfers is included as Exhibit J. The Ascot Six Year Transfers are avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

415.    Of the Ascot Six Year Initial Transfers, at least $280,000,000 was transferred to Ascot during the two years preceding the Filing Date (the "Ascot Two Year Initial Transfers"). The Ascot Two Year Initial Transfers are avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

416.    Of the Ascot Two Year Initial Transfers, at least $35,000,000 was transferred to Ascot during the 90 days preceding the Filing Date (the "Ascot Preference Period Transfers"). The Ascot Preference Period Transfers are avoidable under section 547 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

417.    The Ascot Six Year Initial Transfers, the Ascot two Year Initial Transfers, and the Ascot Preference Period Transfers are collectively defined as the "Ascot Initial Transfers."

418.    Ascot received the Ascot Initial Transfers with knowledge of fraud at BLMIS, or with willful blindness to facts suggesting a high probability of fraud at BLMIS.

419.    The Ascot Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

### 2.    Subsequent Transfers from Ascot to Defendants BNP Paribas Cayman and BNP Paribas

420.    Prior to the Filing Date, Ascot subsequently transferred $57,190,550 of the Ascot Initial Transfers to BNP Paribas Cayman (the "Ascot-BNP Paribas Cayman Subsequent Transfers"). A chart setting forth these transfers is attached as Exhibit K.

421.    BNP Paribas Cayman and BNP Paribas received the Ascot Transfers while willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

422.    The Ascot Transfers are recoverable from BNP Paribas Cayman and BNP Paribas under section 550(a) of the Bankruptcy Code.

## COUNT ONE

### RECOVERY OF SUBSEQUENT TRANSFERS
### FROM DEFENDANT BNP PARIBAS CAYMAN
### UNDER 11 U.S.C. §§ 105(a) AND 550(a)

423.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

424.    BNP Paribas Cayman is an immediate or mediate transferee of Prime Fund Initial

Transfers, Broad Market Fund Initial Transfers, Insurance Portfolio Fund Initial Transfers,

Portfolio Limited Fund Initial Transfers, and Ascot Initial Transfers.

425.    BNP Paribas Cayman received the following subsequent transfers: (1) the XL LP-

BNP Paribas Cayman Subsequent Transfers, totaling $2,987,824; (2) the Portfolio Limited Fund-

BNP Paribas Cayman Subsequent Transfers, totaling $32,716,801; (3) the XL Portfolio-BNP

Paribas Cayman Subsequent Transfers, totaling $2,500,000; and (4) the Ascot-BNP Paribas

Cayman Subsequent Transfers, totaling $57,190,550 (collectively the "Cayman Subsequent

Transfers").

426.    Each of the Cayman Subsequent Transfers was made directly or indirectly to BNP

Paribas Cayman.

427.    Each of the Cayman Subsequent Transfers is recoverable from BNP Paribas

Cayman under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

428.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

BNP Paribas Cayman: (a) recovering the Cayman Subsequent Transfers, or the value thereof,

from BNP Paribas Cayman for the benefit of the estate of BLMIS; (b) directing BNP Paribas

Cayman, to the extent allowable by law, to disgorge to the Trustee all profits, including any and

all fees received by BNP Paribas Cayman related to or arising from, or concerning the Cayman

Subsequent Transfers; (c) awarding any other relief, including attorneys' fees and costs, the

Court deems just and appropriate.

## COUNT TWO

**RECOVERY
FROM DFENDANT BNP PARIBAS ARBITRAGE
UNDER 11 U.S.C. §§ 105(a) AND 550(a)**

429.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

430.     BNP Paribas Cayman Arbitrage is an immediate or mediate transferee of

Insurance Portfolio Fund Initial Transfers and Portfolio Limited Fund Initial Transfers.

431.     BNP Paribas Arbitrage received the following subsequent transfers: (1) the

Insurance Portfolio Fund-BNP Paribas Arbitrage Subsequent Transfers, totaling $32,865; and (2)

the XL Portfolio-BNP Paribas Arbitrage Subsequent Transfers, totaling $6,452,906 (together, the

"Arbitrage Subsequent Transfers").

432.     Each of the Arbitrage Subsequent Transfers was made directly or indirectly to

BNP Paribas Arbitrage.

433.     Each of the Arbitrage Subsequent Transfers is recoverable from BNP Paribas

Arbitrage under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

434.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the

BNP Paribas Arbitrage: (a) recovering the Arbitrage Subsequent Transfers, or the value thereof,

from BNP Paribas Arbitrage for the benefit of the estate of BLMIS; (b) directing BNP Paribas

Arbitrage, to the extent allowable by law, to disgorge to the Trustee all profits, including any and

all fees received by BNP Paribas Arbitrage related to or arising from, or concerning the

Arbitrage Subsequent Transfers; (c) awarding any other relief, including attorneys' fees and

costs, the Court deems just and appropriate.

## COUNT THREE

### RECOVERY FROM BNP PARIBAS
### UNDER 11 U.S.C. §§ 105(a) AND 550(a)

435.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended and Consolidated Complaint as if fully rewritten herein.

436.    BNP Paribas is an immediate or mediate transferee of Insurance Portfolio Fund

Initial Transfers and Ascot Initial Transfers.

437.    BNP Paribas received the Insurance Portfolio Fund-BNP Paribas Subsequent

Transfers, totaling $39,628,385 (the "BNP Paribas Subsequent Transfers").

438.    Each of the BNP Paribas Subsequent Transfers is recoverable from BNP Paribas

under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

439.    Each of the BNP Paribas Subsequent Transfers was made directly or indirectly to

BNP Paribas.

440.    As a result of the foregoing, pursuant sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

BNP Paribas: (a) recovering the BNP Paribas Subsequent Transfers, or the value thereof, from

BNP Paribas for the benefit of the estate of BLMIS; (b) directing BNP Paribas, to the extent

allowable by law, to disgorge to the Trustee all profits, including any and all fees received by

BNP Paribas related to or arising from, or concerning the BNP Paribas Subsequent Transfers; (c)

awarding any other relief, including attorneys' fees and costs, the Court deems just and

appropriate.

81

## COUNT FOUR

### RECOVERY
### FROM BNP PARIBAS SECURITIES SERVICES
### UNDER 11 U.S.C. §§ 105(a) AND 550(a)

441.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended and Consolidated Complaint as if fully rewritten herein.

442.    BNP Paribas Securities Services is an immediate or mediate transferee of the

Portfolio Limited Fund Initial Transfers.

443.    BNP Paribas Securities Services received the Portfolio Limited Fund-BNP

Paribas Securities Services Subsequent Transfers, totaling $32,716,801 (the "Securities Services

Subsequent Transfers").

444.    Each of the Securities Services Subsequent Transfers is recoverable from BNP

Paribas Securities Services under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-

2(c)(3).

445.    Each of the Ascot Subsequent Transfers was made directly or indirectly to the

Ascot Defendants.

446.    As a result of the foregoing, pursuant sections 105(a) and 550(a) of the

Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the

BNP Paribas Securities Services: (a) recovering the Securities Services Subsequent Transfers, or

the value thereof, from BNP Paribas Securities Services for the benefit of the estate of BLMIS;

(b) directing BNP Paribas Securities Services, to the extent allowable by law, to disgorge to the

Trustee all profits, including any and all fees received by BNP Paribas Securities Services related

to or arising from, or concerning the Securities Services Subsequent Transfers; (c) awarding any

other relief, including attorneys' fees and costs, the Court deems just and appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendants as follows:

(a)     On the First Claim for Relief pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), judgment against BNP Paribas Cayman (a) recovering the Cayman Subsequent Transfers, or the value thereof, from BNP Paribas Cayman for the benefit of the BLMIS estate; (b) directing BNP Paribas Cayman to the extent allowable by law, to disgorge to the Trustee all profits, including any and all fees received by Paribas Cayman related to or arising from, or concerning the Cayman Subsequent Transfers; and (c) awarding any other relief, including attorneys' fees and costs, the Court deems just and appropriate;

(b)     On the Second Claim for Relief pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), judgment against BNP Paribas Arbitrage (a) recovering the Arbitrage Subsequent Transfers, or the value thereof, from BNP Paribas Arbitrage for the benefit of the BLMIS estate; (b) directing the BNP Paribas Arbitrage to the extent allowable by law, to disgorge to the Trustee all profits, including any and all fees received by BNP Paribas Arbitrage related to or arising from, or concerning the BNP Paribas Arbitrage Subsequent Transfers; and (c) awarding any other relief, including attorneys' fees and costs, the Court deems just and appropriate;

(c)     On the Third Claim for Relief pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), judgment against BNP Paribas (a) recovering the BNP Paribas Subsequent Transfers, or the value thereof, from BNP Paribas for the benefit of the BLMIS estate; (b) directing BNP Paribas to the extent allowable by law, to disgorge to the Trustee all profits, including any and all fees received by BNP Paribas related to or arising from,

or concerning the BNP Paribas Subsequent Transfers; and (c) awarding any other relief, including attorneys' fees and costs, the Court deems just and appropriate;

(d)     On the Fourth Claim for Relief pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), judgment against BNP Paribas Securities Services (a) recovering the Securities Services Subsequent Transfers, or the value thereof, from BNP Paribas Securities Services for the benefit of the BLMIS estate; (b) directing Securities Services BNP Paribas to the extent allowable by law, to disgorge to the Trustee all profits, including any and all fees received by BNP Paribas Securities Services related to or arising from, or concerning the Securities Services Subsequent Transfers; and (c) awarding any other relief, including attorneys' fees and costs, the Court deems just and appropriate;

(e)     On all Claims for Relief, if Defendants challenges the avoidability of the BLMIS Feeder Funds Initial Transfers to Defendants, the Trustee seeks a judgment under Fed.R.Bankr.P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, to recover the Cayman Subsequent Transfers, the Arbitrage Subsequent Transfers, the BNP Paribas Subsequent Transfers, and the BNP Paribas Securities Services Subsequent Transfers pursuant to 11 U.S.C. § 550(a).

(f)     Awarding the Trustee all applicable fees, pre-judgment interest, costs, and disbursements of this action; and

(g)     Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated:  August  30, 2017
       New York, New York

/s/ *David J. Sheehan*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Mark A. Kornfeld
Email:  mkornfeld@bakerlaw.com
Torello H. Calvani
Email:  tcalvani@bakerlaw.com
Joanna F. Wasick
Email:  jwasick@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for
the substantively consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and estate of Bernard L.
Madoff*