**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-01789 (SMB) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-04488 (SMB) |
| v. | |
| SOUTH FERRY BUILDING COMPANY, a New York limited partnership, EMANUEL GETTINGER, ABRAHAM WOLFSON, and ZEV WOLFSON, | |
| Defendants. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-04350 (SMB) |
| v. | |
| SOUTH FERRY #2, EMANUEL GETTINGER, AARON WOLFSON, and ABRAHAM WOLFSON, | |
| Defendants. | |

|  |  |
|---|---|
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>                Plaintiff,<br><br>        v.<br><br>UNITED CONGREGATIONS MESORA,<br><br>                Defendant. | Adv. Pro. No. 10-05110 (SMB) |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard,
Trustee for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Estate of Bernard L.
Madoff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................. 3

I.      LEGAL STANDARDS ................................................................................. 3

        A.    Summary Judgment Standard ............................................................. 3

II.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FAILS
        BECAUSE DEFENDANTS DID NOT TAKE THE TRANSFERS FOR
        VALUE ........................................................................................................ 4

        A.    Defendants Cannot Satisfy Section 548(c)'s "For Value"
              Requirement ..................................................................................... 4

        B.    As a Matter of Law, Defendants' Value Defense Under Section
              548(c) Fails ...................................................................................... 5

        C.    It Is Well Settled Defendants Must Disgorge Their Net Winnings
              Within Two-Year Period .................................................................. 8

              1.    The Second Circuit's *Silverman* Decision Is Applicable
                    Authority ................................................................................ 11

              2.    There Is No Basis To Treat Equity Investors And Retail
                     Customers Differently ........................................................... 13

              3.    The Sixth Circuit's *Visconsi* Decision Is Not Applicable
                     Authority ................................................................................ 15

        D.    Defendants' Receipt Of Fictitious Profits Did Not Satisfy An
              Obligation Or Provide Value Under Section 548(c) Of The
              Bankruptcy Code ............................................................................. 16

              1.    Section 548(c) Of The Bankruptcy Code Does Not Limit
                     The SIPA Trustee's Avoidance Powers .................................. 17

                     (a)    Defendants' "At The Time Of Transfer" Argument
                             Has No Relevance In A Ponzi Scheme ........................... 18

                     (b)    Defendants' Section 548(c) Defense Amounts To
                               Claims Against SIPA's Customer Property Estate .......... 19

                2.    The *Greiff* And *Antecedent Debt Decisions* Remain Law Of
                     The Case And Applicable To Defendants ................................. 21

# TABLE OF CONTENTS
### (continued)

**Page**

(a)    The Value Defense Was Raised Multiple Times By Defendants And Rejected Each Time .............................. 21

(b)    The *Section 546(e) Decision* Did Not Overrule *Greiff* Or The *Antecedent Debt Decision* ........................ 22

3.    Defendants' Purported Federal And State Law Claims Or Obligations Do Not Constitute "Value" Under Section 548(c) ................................................................................ 24

(a)    The *Section 546(e) Decision* Has No Bearing on the Value Defense ................................................................ 24

(b)    Defendants' Federal Securities And State Tort Claims Cannot Provide Value Against the Customer Property Estate ................................................................ 25

(c)    Madoff's Purported Obligations To Defendants Do Not Provide Value Nor Does The Trustee Have To Avoid Such Obligations ................................................. 26

(d)    Permitting Enforcement of Unenforceable Contracts Pursuant to Federal Securities Law Would Dilute The Fund Of Customer Property ...................................... 27

III.    THE TRUSTEE'S NETTING METHOD AND VALUE CALCULATIONS ARE WHOLLY CONSISTENT WITH THE SECTION 548(A) REACH-BACK PERIOD ...................................... 29

A.    Avoidance Liability Is Calculated In The Same Manner As Net Equity ................................................................ 30

B.    The Court Should Follow the Well-Reasoned Decisions of the District Court and Second Circuit Approving of the Trustee's Netting Method ................................................... 32

C.    The Trustee's Netting Method Is Consistent With The U.S. Supreme Court's *CalPERS* Decision. ...................................... 37

CONCLUSION ........................................................................ 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re A.R. Baron Co., Inc.*,
226 B.R. 790 (Bankr. S.D.N.Y. 1998)...................................................................21

*In re Asia Global Crossing Ltd.*,
333 B.R. 199 (Bankr. S.D.N.Y. 2005).................................................................27

*Balaber–Strauss v. Sixty–Five Brokers* (*In re Churchill Mortg. Inv. Corp.*),
256 B.R. 664 (Bankr. S.D.N.Y. 2000).............................................................9, 12

*Baldi v. Lynch (In re McCook Metals, LLC)*,
319 B.R. 570 (Bankr. N.D. Ill. 2005) .................................................................19

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*,
362 B.R. 624 (Bankr. S.D.N.Y. 2007).............................................................4, 9

*In re Bennett Funding Grp., Inc.*,
253 B.R. 316 (Bankr. N.D.N.Y. 2000) ...............................................................15

*In re Bernard L. Madoff Inv. Sec. LLC*,
424 B.R. 122 (Bankr. S.D.N.Y. 2010) (*"Bankruptcy Court Net Equity Decision"*)......................................................................................................10

*In re Bernard L. Madoff Inv. Sec. LLC*,
654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom.* ......................................... *passim*

*In re Bernard L. Madoff Inv. Sec. LLC*,
No. 16-413-BK(L), 2017 WL 2376567 (2d Cir. June 1, 2017) ..............7, 10, 13, 27

*In re Bernard L. Madoff Inv. Secs. LLC*,
No. 15 Civ. 1151 (PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016)...........31, 34, 35, 36, 37

*Boston Trading Grp. v. Burnazos*,
835 F.2d 1504 (1st Cir. 1987)...............................................................................9

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*,
No. 06-12737 (SMB), 2009 WL 3806683 (Bankr. S.D.N.Y. Nov. 10, 2009)........................19

*California Public Employees' Ret. Sys. v. ANZ Sec., Inc.*,
137 S.Ct. 2042 (2017)..............................................................................37, 38

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).................................................................................................3

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC* (*In re Bayou Grp. LLC*),
439 B.R. 284 (S.D.N.Y. 2010)..................................................................4, 7, 35

*Commodity Futures Trading Comm'n v. Hanover Trading Corp.*,
34 F. Supp. 2d 203 (S.D.N.Y. 1999).....................................................28

*Commodity Futures Trading Comm'n v. Walsh*,
17 N.Y.3d 162 (2011) ...........................................................................9

*Cox v. Nostaw (In re Central Ill. Energy Coop.)*,
526 B.R. 786 (Bankr. C.D. Ill. 2015).....................................................27

*Daly v. Parete (In re Carrozzella & Richardson)*,
270 B.R. 92 (Bankr. D. Conn. 2001) .....................................................9

*Dicello v. Jenkins (In re Int'l Loan Network, Inc.)*,
160 B.R. 1 (Bankr. D.D.C. 1993) ..........................................................28

*Dobin v. Hill (In re Hill)*,
342 B.R. 183 (Bankr. D.N.J. 2006) ........................................................19

*Domenikos v. Roth*,
288 F. App'x 718 (2d Cir. 2008) ...........................................................29

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) ....................................................10, 14, 34

*Donell v. Mojtahedian*,
976 F.Supp.2d 1183 (C.D. Cal. 2013) ..............................................34, 35

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
639 F.3d 557 (2d Cir. 2011)..................................................................3

*Finn v. Alliance Bank*,
860 N.W.2d 638 (Minn. 2015).............................................................15

*Found. Ventures, LLC v. F2G, LTD.*,
No. 08 Civ. 10066 (PKL), 2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010).............28

*Freeman v. Marine Midland Bank-N.Y.*,
419 F. Supp. 440 (E.D.N.Y. 1976) ........................................................28

*Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*,
452 B.R. 391 (Bankr. S.D.N.Y. 2011) ...................................................9

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Hedged–Invs. Assocs., Inc.*,
   84 F.3d 1286 (10th Cir. 1996) ................................................................10, 13, 35

*Jahn v. Char (In re Incentium, LLC)*,
   473 B.R. 264 (Bankr. E.D. Tenn. 2012) ................................................................27

*Janvey v. Brown*,
   767 F.3d 430 (5th Cir. 2014) ................................................................10, 11, 28

*Janvey v. Golf Channel*,
   487 S.W.3d 560 (Tex. 2016) ................................................................19

*Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*,
   310 F.3d 796 (5th Cir. 2002) ................................................................19

*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros.
   Holdings Inc.)*,
   469 B.R. 415 (Bankr. S.D.N.Y. 2012) ................................................................27

*In re Matter of Bernard L. Madoff Inv. Sec., LLC*,
   No. 16-0413-bk(L) (2d Cir. May 31, 2016), ECF No. 155 ................................................................35

*McHenry v. Dillworth (In re Caribbean Fuels Am., Inc)*,
   No. 16-15786, 2017 WL 2703541 (11th Cir. June 22, 2017) ................................................................19

*Merrill v. Abbott (In re Indep. Clearing House Co.)*,
   77 B.R. 843 (D.Utah 1987) ................................................................28

*Merrill v. Allen (In re Universal Clearing House Co.)*,
   60 B.R. 985 (D. Utah 1986) ................................................................19

*Mills v. Electric Auto-Lite Co.*,
   396 U.S. 375 (1970) ................................................................28

*Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.)*,
   309 F.3d 1325 (11th Cir. 2002) ................................................................19

*Picard v. Cohen*,
   550 B.R. 241 (Bankr. S.D.N.Y. 2016) aff'd No. 16 Civ. 4462 (LAP)
   (S.D.N.Y. Nov. 2, 2016) ................................................................21, 22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Picard v. Cohen*,
  Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
  25, 2016) ................................................................................................................. *passim*

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
  454 B.R. 317 (Bankr. S.D.N.Y. 2011) ............................................................7, 9, 12

*Picard v. Fairfield Greenwich Ltd.*,
  762 F.3d 199 (2d Cir. 2014)......................................................................................18

*Picard v. Greiff*,
  476 B.R. 715 (S.D.N.Y. 2012)......................................................................... *passim*

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011).....................................................................................5

*Redmond v. SpiritBank (In re Brooke Corp.)*,
  541 B.R. 492 (Bankr. D. Kan. 2015) .........................................................................19

*Schneider v. Barnard*,
  508 B.R. 533 (E.D.N.Y. 2014) ...................................................................................4

*Scholes v. Lehmann*,
  56 F.3d 750 (7th Cir. 1995) ........................................................................10, 11, 13

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard Madoff)*,
  531 B.R. 439 (Bankr. S.D.N.Y. 2015)............................................................. *passim*

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  499 B.R. 416 (S.D.N.Y. 2013)........................................................................ *passim*

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  773 F.3d 411 (2d Cir. 2014)...........................................................................23, 25, 27

*Sedona Corp. v. Ladenburg Thalman & Co.*,
  No. 03 Civ. 3120 (LTS), 2005 WL1902780 (S.D.N.Y. Aug. 9, 2005) ...................29

*Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Invs.
  Assocs.)*,
  48 F.3d 470 (10th Cir. 1995) .........................................................................14, 15

*In re Sharp Int'l Corp.*,
  403 F.3d 43 (2d Cir. 2005).........................................................................................9

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Silverman v. Cullin* (*In re Agape World, Inc.*),
    633 Fed. Appx. 16 (2d Cir. Feb. 4, 2016) ..................................................... *passim*

*Silverman v. Cullin*,
    No. 14 Civ. 4248 (JMA), 2015 WL 1509583 (E.D.N.Y. Mar. 31, 2015) ...............................12

*In re Stanwich Fin. Servs. Corp.*,
    291 B.R. 25 (Bankr. D. Conn. 2003) .......................................................................31

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016) ..................................................................................10

*United Transp. Union v. Nat'l R.R. Passenger Corp.*,
    588 F.3d 805 (2d Cir. 2009) ....................................................................................4

*Visconsi v. Lehman Bros.*,
    244 F. Appx. 708 (6th Cir. 2007) ......................................................................15, 16

**Statutes**

28 U.S.C.A. 1658(b) .............................................................................................29

11 U.S.C. § 546(e) ......................................................................................22, 23, 27

11 U.S.C. § 547(c)(2) ...........................................................................................14

11 U.S.C. § 547(c)(2)(C) .......................................................................................14

11 U.S.C § 548 .......................................................................................................9

11 U.S.C. § 548(a) ........................................................................................ *passim*

11 U.S.C. § 548(a)(1)(A) .......................................................................................23

11 U.S.C. § 548(a)(1)(B) .......................................................................................12

11 U.S.C. § 548(c) ........................................................................................ *passim*

15 U.S.C. § 78aaa–*lll* ..............................................................................................1

15 U.S.C. § 78cc(b) ...............................................................................................27

15 U.S.C. § 78fff–1(a) ...........................................................................................17

15 U.S.C. § 78fff–2(c)(3) ..................................................................................17, 18

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

15 U.S.C. § 78fff(b) .................................................................................................................17

15 U.S.C. § 78*lll*(4) ...............................................................................................................18

New York Debtor and Creditor Law § 272 ...........................................................................12

New York Debtor and Creditor Law § 273 ...........................................................................12

Cal. Civ. Code § 3439.09(c) ..................................................................................................34

**Rules**

Fed. R. Bankr. P. 7056 .............................................................................................................3

Fed. R. Civ. P. 56(a) ...............................................................................................................3

**Other Authorities**

17 C.F.R. § 240.10b-5............................................................................................................28

Irving H. Picard (the "Trustee"), trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa–*lll*, and the Chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, respectfully submits this memorandum of law in opposition to the Motion for Summary Judgment (the "Motion") filed by defendants ("Defendants") in the above-captioned actions ("Avoidance Actions").[1]  The facts underlying the Motion are set forth in the Joint Statements of Undisputed Material Facts (the "Joint Statements")[2] submitted by the Trustee and Defendants (together, the "Parties"), and so ordered by this Court on May 31, 2017 and June 6, 2017.

## PRELIMINARY STATEMENT

The sole issue in Defendants' Motion is whether the Defendants provided value for transfers in amounts exceeding their principal investments in the Madoff Ponzi scheme.  For all of its length, Defendants' Motion amounts to a repackaging of theories which have been considered and rejected.  No theory, including the ones put forth by the Defendants, justifies

---

[1] This includes (i) defendants South Ferry Building Company ("South Ferry"), Emanuel Gettinger, Abraham Wolfson, and Zev Wolfson (together with South Ferry, the "South Ferry Defendants") in the South Ferry Action; (ii) defendants South Ferry #2, Emanuel Gettinger, Aaron Wolfson, and Abraham Wolfson (the "South Ferry #2 Defendants") in the South Ferry #2 Action; and (iii) defendant United Congregations Mesora ("Mesora") in the Mesora Action.  The South Ferry Defendants, South Ferry #2 Defendants, and Mesora are hereinafter collectively known as the "Defendants."

[2] *See* South Ferry Joint Statement of Undisputed Material Facts ("South Ferry Joint Statement"), South Ferry Action, ECF No. 83; South Ferry #2 Joint Statement of Undisputed Material Facts ("South Ferry #2 Joint Statement"), South Ferry #2 Action, ECF No. 90; Mesora Joint Statement of Undisputed Material Facts ("Mesora Joint Statement"); Mesora Action, ECF No. 57.  The South Ferry Joint Statement, South Ferry #2 Joint Statement, and Mesora Joint Statement are collectively referred to herein as the "Joint Statements." True and correct copies of the Joint Statements were attached as Exhibits A-C to the Declaration of Keith R. Murphy (the "Murphy Declaration") in support of the Trustee's Motion For Summary Judgment.  *See Picard v. South Ferry Bldg. Co.,* Adv. Pro. No. 10-04488 (SMB) (Bankr. S.D.N.Y. July 21, 2017), ECF No. 88 (the "South Ferry Action"); *Picard v. South Ferry #2, et al.,* Adv. Pro. No. 10-04350 (SMB) (Bankr. S.D.N.Y. July 21, 2017), ECF No. 97 (the "South Ferry #2 Action"); *Picard v. United Congregations Mesora,* Adv. Pro. No. 10-05110 (SMB) (Bankr. S.D.N.Y. July 21, 2017), ECF No. 62 (the "Mesora Action").  The South Ferry Action, South Ferry #2 Action, and Mesora Action are hereinafter collectively known as the "Avoidance Actions."

enabling the Defendants to further profit from a fraud, which is exactly what Defendants are trying to do here.  Giving credence to Defendants' arguments would be tantamount to validating the machinations of the fraudster, which is precisely what the Second Circuit has unequivocally refused to do on multiple occasions.  The Defendants' arguments have already been rejected by this Court as insufficient as a matter of law, and should be rejected again.

In the context of the Madoff Ponzi scheme, the Second Circuit has made it clear that the SIPA statute was not designed to provide full protection against *all* losses incurred by victims of a brokerage's collapse, but to facilitate the pro rata distribution of customer property actually held by the broker-dealer.  SIPA does not provide that customers—regardless of their knowledge of the fraud—may keep fictitious profits, particularly when those amounts rightfully belong to those customers who have yet to fully recover their principal investment.

Notwithstanding this authority, Defendants argue that they provided value under section 548(c) for the transfers of fictitious profits the Trustee is seeking to recover because BLMIS owed "obligations" to them that were satisfied by the payment of those fictitious profits. However, the notion that the fraudulent securities transactions listed on the customers' account statements that Madoff purported to execute—but in actuality did not—could give rise to a valid and enforceable "obligation" within the meaning of section 548(c) has been considered and rejected in this liquidation proceeding numerous times.  The Defendants' repackaged "antecedent debt" argument fails for the same reasons previously articulated by this Court and the District Court in at least four prior reported decisions.  In short, the Defendants' receipt of fictitious profits was not offset by any further investments with BLMIS, and only reduced BLMIS's funds to the detriment of other BLMIS customers.  This is especially true in a SIPA liquidation, where SIPA establishes a separate customer property fund for priority distribution to customers

according to their "net equities."  Thus, any amount that Defendants retain above their principal investment depletes, dollar-for-dollar, the fund of customer property available to satisfy net equity claims of less fortunate customers who never fully withdrew their deposits of principal from BLMIS.

Defendants' only "new" argument is found in their renewed effort to challenge the Trustee's methodology of calculating avoidance liability—a method approved, upheld, and reinforced by this Court and the District Court—by asserting that the section 548(a) reach-back period is a "statute of repose."  True to form, Defendants merely recycle their previously rejected "Reset to Zero" argument from a different angle in the hopes of resuscitating yet another dead issue.  More to the point, however, even if section 548(a) operated as a statute of repose—which it does not—the Trustee's methodology does not seek to avoid and recover transfers or obligations beyond the two-year period between December 11, 2006 and December 11, 2008. Rather, the Trustee's methodology is designed to provide an accurate accounting of the financial circumstances of this case.

Defendants have failed to discharge their burden on summary judgment.  Accordingly, the Motion should be denied.

## ARGUMENT

## I.    LEGAL STANDARDS

### A.    Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure (made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure) provides that summary judgment is appropriate only if the court determines that "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d

557, 566 (2d Cir. 2011).   "A dispute about a genuine issue exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir. 2009) (internal quotations and citations omitted).

The only issues in this case are two questions of law relating to (1) value under Bankruptcy Code § 548(c), and (2) a purported "statute of repose" under Bankruptcy Code § 548(a), neither of which can be resolved in Defendants' favor.

## II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FAILS BECAUSE DEFENDANTS DID NOT TAKE THE TRANSFERS FOR VALUE

### A.   Defendants Cannot Satisfy Section 548(c)'s "For Value" Requirement

Defendants bear the burden of establishing that they received the transfers at issue for value and in good faith.  *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC* (*In re Bayou Grp. LLC*), 439 B.R. 284, 308 (S.D.N.Y. 2010) ("*Bayou IV*") (citing 11 U.S.C. § 548(c)) (placing burden of proving affirmative defense on transferee in trustee's motion for summary judgment); *Schneider v. Barnard*, 508 B.R. 533, 551 (E.D.N.Y. 2014) ("Because Bankruptcy Code § 548(c) is an affirmative defense, the transferee bears the burden of establishing all elements of the…defense."); *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("*Bayou I*") ("The good faith/value defense provided in Section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense.").  Defendants cannot satisfy the "for value" requirement here.

The Parties stipulated that each Defendant made each of its withdrawals "in good faith, believing that it was entitled to these funds and lacking any knowledge of the Ponzi scheme." (South Ferry Joint Statement ¶ 27; South Ferry #2 Joint Statement ¶ 27; Mesora Joint Statement

¶ 29).  Yet, fictitious profits "may [still] be recovered regardless of the customers' good faith," because "transfers made by Madoff Securities to its customers in excess of the customers' principal—that is, the customers' profits—. . . were in excess of the extent to which the customers gave value." *Picard v. Katz*, 462 B.R. 447, 453 (S.D.N.Y. 2011) (internal quotations omitted); *see also Picard v. Greiff*, 476 B.R. 715, 722-24 (S.D.N.Y. 2012); Post-Trial Proposed Findings of Fact and Conclusions of Law, *Picard v. Cohen,* Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at \*5 (Bankr. S.D.N.Y. Apr. 25, 2016), ECF No. 90 (the "*Cohen Decision*"), adopted mem., No. 16 Civ. 05513 (LTS) (S.D.N.Y. Feb. 24, 2017), ECF No. 24 (Memorandum Order Adopting Proposed Findings of Fact and Conclusions of Law; hereinafter "*Cohen District Court Decision*").

Defendants cannot establish that they took the transfers of fictitious profits "for value" because such false profits were not on account of a valid antecedent debt.  Pursuant to the Joint Statements, there is no dispute that Defendants received fictitious profits or "withdrew . . . in excess of deposits" from their BLMIS accounts with the investment advisory business, which was a Ponzi scheme.  (South Ferry Joint Statement ¶¶ 10, 13, 25-26; South Ferry #2 Joint Statement ¶¶ 10, 13, 25-26; Mesora Joint Statement ¶¶ 10, 13, 26, 28).

With no facts in dispute, Defendants try to concoct various legal theories in an attempt to create the illusion of value.  At its core, however, Defendants' argument is that they should be allowed to benefit from Madoff's Ponzi scheme and keep money that belongs to other customers.

## B.    As a Matter of Law, Defendants' Value Defense Under Section 548(c) Fails

Having failed with their "antecedent debt" argument in prior briefings before this Court and the District Court, Defendants now argue not that BLMIS made the transfers to Defendants on account of antecedent debt created by the fraudulent transactions reflected on their account statements, but rather that the payment of fictitious profits satisfied valid legal "obligations"

under section 548(c).  As a result, according to Defendants, the fictitious profits were received

for "value" under section 548(c) of the Bankruptcy Code.  This is a distinction without a

difference.

In any event, Defendants completely ignore multiple decisions of the District Court—

which are law of this case—rejecting this exact argument.  Specifically, the District Court

rejected Defendants' contention that the pre-reach-back-period account statements constitute

binding "obligations" of BLMIS to its customers that the Trustee must avoid.  *See Antecedent

Debt Decision*, 499 B.R. at 421 n. 4.  In fact, the District Court noted that it previously rejected

this same argument in *Greiff*, in which the court found that "the account statements were not

merely avoidable but were in fact invalid and thus entirely unenforceable." *Id.* (citing *Greiff,*

476 B.R. at 726).  In *Greiff,* the District Court stated that "[a]ny entitlement defendants had to a

return on their investment, then, depended on a representation that Madoff Securities had in fact

generated a profit [but] [t]he complaints allege that Madoff Securities' representations in this

regard were wholly fraudulent." 476 B.R. at 726.  Moreover, because the Defendants have

conceded that BLMIS operated a Ponzi scheme at all times relevant to this adversary proceeding

and that BLMIS did not make the trades, they have waived the ability to assert that the fraudulent

securities transactions reflected in the very account statements used to perpetrate the Ponzi

scheme could give rise to valid, legal and binding obligations.

This argument is clearly just the antecedent debt argument under a different name, and it

fails for the same reasons.  Indeed, after an exhaustive review of the relevant case law, this Court

set forth two simple rules of law that govern fraudulent transfer litigation in Ponzi scheme

cases—each of which squarely rejects the value defense repeatedly raised by Defendants. *See

Cohen Decision,* 2016 WL 1695296, at *10-11.

6

The first rule of law applies in SIPA and non-SIPA Ponzi scheme cases alike and can be summarized in one sentence: "A transferee does not give value beyond his deposits of principal." *Id.* at \*10 (citing *Silverman v. Cullin* (*In re Agape World, Inc.*), 633 F. Appx. 16, 17 (2d Cir. Feb. 4, 2016) (finding that "the prevailing view in the district and bankruptcy courts in this Circuit" is that "payments of 'interest' to Ponzi scheme investors should be treated as fraudulent transfers, because 'fair consideration' is not present in the context of such schemes"); *see also In re Bernard L. Madoff Inv. Sec. LLC*, No. 16-413-BK(L), 2017 WL 2376567, at \*1, 3 (2d Cir. June 1, 2017) (*"Second Circuit Inter-Account Decision"*).

Indeed, it is universally accepted that when investors invest in a Ponzi scheme, "any payments that they receive in excess of their principal investments can be avoided by the Trustee as fraudulent transfers." *Picard v. Cohmad Sec. Corp.* (*In re BLMIS*), 454 B.R. 317, 333 (Bankr. S.D.N.Y. 2011); *see also Cohen Decision,* 2016 WL 1695296, at \*11 ("Net winners cannot argue that the payment of fictitious profits satisfied an antecedent debt or obligation and provided value within the meaning of Bankruptcy Code § 548(c)."). In fact, "virtually every court to address the question has held *unflinchingly* that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers." *Bayou IV*, 439 B.R. at 337 (emphasis added) (internal quotations omitted); *see also Greiff*, 476 B.R. at 725 ("It is not surprising…every circuit court to address this issue has concluded that an investor's profits from a Ponzi scheme are not 'for value'"). Indeed, this Court recently reiterated that the value "issue's been litigated" before; "[i]n every Ponzi scheme case that [this Court has] seen, SIPA and non-SIPA, fictitious profits are just not valued." Tr. of Hearing at

41:25-42:7, *Picard v. Trust u/art Fourth o/w/o Israel Wilenitz, et al.,* Adv. Pro. No. 10-04995 (SMB) (Bankr. S.D.N.Y. May 17, 2016).[3]

The second rule of law applies in a SIPA case involving fraudulent transfers made in connection with a Ponzi scheme. *Cohen Decision*, 2016 WL 1695296 at *11. This Court found that in such schemes, net winners are unable to assert that the payment of fictitious profits satisfied an antecedent debt or obligation and provided value within the meaning of § 548(c) because "SIPA creates two estates and grants net losers—those with net equity claims—priority in the customer property estate." *Id.* And "[p]ermitting a net winner to offset a non-net equity claim against the trustee's claim for the return of customer property effectively allows the net winner to recover his non-SIPA claim from customer property at the expense of the net losers in violation of SIPA's priority rules." *Id.; see also Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, (*In re Madoff Sec.*), 499 B.R. 416, 423 (S.D.N.Y. 2013) ("*Antecedent Debt Decision*") (quoting *Greiff,* 476 B.R. at 727) ("To allow defendants, who have no net equity claims, to retain profits paid out of customer property on the ground that their withdrawals satisfied creditor claims under state law would conflict with the priority system established under SIPA by equating net equity and general creditor claims.").

Based on these two simple rules, Defendants' value defense fails as a matter of law.

### C.    It Is Well Settled Defendants Must Disgorge Their Net Winnings Within Two-Year Period

Defendants reject the rule of law that a transferee does not give value beyond their deposits of principal, arguing "it is based on flawed reasoning that is directly contrary to

---

[3] A true and correct copy of the court hearing transcript in *Picard v. Trust u/art Fourth o/w/o Israel Wilenitz, et al.,* Adv. Pro. No. 10-04995 (SMB) (Bank. S.D.N.Y. May 17, 2016), was attached as Exhibit F to the Murphy Declaration. *See South Ferry Action*, ECF No. 88, South Ferry #2 Action, ECF No. 97, Mesora Action, ECF No. 62.

established principles of fraudulent transfer law." (Motion at 33). Defendants argue that the fact

that BLMIS was a Ponzi scheme is "irrelevant," because it does not alter the law governing the

avoidance of obligations, or their purported value defense under section 548. (Motion at 34, 48)

("The Court cannot, as the Trustee demands, rewrite Section 548 merely because Madoff

Securities operated a Ponzi scheme of long duration.").[4]

Defendants are wrong. As this Court held, it is a "well-settled rule in Ponzi scheme cases

that net winners must disgorge their winnings." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv.*

*Sec. LLC* (*In re Bernard L. Madoff*), 531 B.R. 439, 462 (Bankr. S.D.N.Y. 2015) ("*Omnibus*

*Good Faith Decision*"). "[I]nvestors may retain distributions from an entity engaged in a Ponzi

scheme to the extent of their investments, while distributions exceeding their investments

constitute fraudulent conveyances which may be recovered by the Trustee." *Balaber–Strauss v.*

*Sixty–Five Brokers* (*In re Churchill Mortg. Inv. Corp.*), 256 B.R. 664, 682 (Bankr. S.D.N.Y.

2000); *accord Bayou I,* 362 B.R. at 635-36; *Cohmad,* 454 B.R. at 333; *Gowan v. The Patriot*

*Grp., LLC* (*In re Dreier LLP*), 452 B.R. 391, 440 n. 44 (Bankr. S.D.N.Y. 2011) ("The Court's

conclusion that the Defendants did not provide 'reasonably equivalent value' for the payments in

excess of principal is consistent with those courts that have held that investors in a Ponzi scheme

are not entitled to retain the fictitious profits they received.").

---

[4] Defendants' argument that section 548(c) permits them to retain transfers that "satisfied a valid then-existing antecedent debt or obligations" is based on false assumptions. (Motion at 2). It is precisely because the Defendants cannot establish any "valid" antecedent debts or obligations that their section 548(c) defense fails as a matter of law. Resorting to inapposite case law does nothing to alter this outcome. (Motion at 34-35) (citing *Commodity Futures Trading Comm'n v. Walsh*, 17 N.Y.3d 162, 168-77 (2011) (discussing NYDCL in the context of equitable distribution of marital assets); *In re Sharp Int'l Corp.*, 403 F.3d 43, 46-49 (2d Cir. 2005) (involving a fixed loan as the debt at issue); *Boston Trading Grp. v. Burnazos*, 835 F.2d 1504, 1506 (1st Cir. 1987) (debtor's fraudulent transfer claims did not emanate from Ponzi activity); *Daly v. Parete (In re Carrozzella & Richardson)*, 270 B.R. 92, 97-98 (Bankr. D. Conn. 2001) (payments to Ponzi investors were made in satisfaction of debtor's contractual obligation to pay interest)). As the District Court carefully explained, the transfers made by BLMIS diminished the assets available to customers by "extending the life of the Ponzi scheme." *Greiff*, 476 B.R. at 723 n. 8.

9

In this context, it is not surprising that the Second Circuit "continues to refuse" to "treat[
] fictitious and arbitrarily assigned paper profits as real" and to give "legal effect to Madoff's
machinations." *Second Circuit Inter-Account Decision,* 2017 WL 2376567, at *3 (citing *In re
Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 235 (Bankr. S.D.N.Y. 2010) (*"Bankruptcy
Court Net Equity Decision"*)). The *Second Circuit Inter-Account Decision* only reinforces the
rule that a transferee does not give value beyond his deposits of principal and therefore must
disgorge net winnings, as the Second Circuit further stated that it "will not lend its power to
assist or protect a fraud." *Id.* (citing *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset
Mgmt.,* 843 F.3d 561, 568 (2d Cir. 2016)); *see also Silverman*, 633 F. App'x. at 17. This is also
a well-settled rule among other Circuits, as the Fifth Circuit articulated in *Janvey v. Brown*, "To
allow an [investor] to enforce his contract to recover promised returns in excess of his
undertaking would be to further the debtors' fraudulent scheme at the expense of other
[investors] . . .[because] any award of damages would have to be paid out of money rightfully
belonging to other victims of the Ponzi scheme." 767 F.3d 430, 441 (5th Cir. 2014); *see also
Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008); *In re Hedged–Invs. Assocs., Inc.*, 84 F.3d 1286
(10th Cir. 1996); *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995).

Defendants attempt to argue that *Janvey* "is readily distinguishable as the receiver's relief
from the *in pari delicto* doctrine turned in part on the lack of innocence of the insolvent entities
against which he had standing to seek relief" (Motion at 36, n.11). But *Janvey* does not even
mention, let alone address the *in pari delicto* doctrine. In fact, this Court previously endorsed the
relevance of *Janvey,* making clear that while "courts often permit innocent plaintiffs to enforce
contracts that are against public policy," Ponzi scheme payments were an exception because such
"enforcement would further none of the policies generally favoring enforcement by an innocent

party to an illegal bargain. . . [A]ny award of damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme." *Omnibus Good Faith Decision,* 531 B.R. at 463 (quoting *Janvey*, 767 F.3d at 442 (internal quotation omitted)).

The rationale for applying this rule to Defendants is simple: they did not provide any value to BLMIS in exchange for the fictitious profits they received from the Ponzi scheme. *See id.* at 463. As the Seventh Circuit explained in Scholes, the "injustice in allowing [a defendant] to retain [its] profit at the expense of the defrauded investors" could be circumvented <u>only</u> if it "was offset by an equivalent benefit to the estate." 56 F.3d at 757. But there was no such offset. Defendants' receipt of fictitious profits was not offset by anything of value—certainly not by any further investments of principal with BLMIS—and only depleted BLMIS's fund of customer property further.

Accordingly, Defendants did not give value beyond their deposits of principal with BLMIS and "should not be permitted to benefit from a fraud at their expense merely because [they were] not [themselves] to blame for the fraud." *Id.* All Defendants are "being asked to do is to return the net profits of [their] investment" within two years of December 11, 2008; "the difference between what [they] put in at the beginning and what [they] had at the end." *Id.* at 757-58.

### 1. The Second Circuit's *Silverman* Decision Is Applicable Authority

Defendants argue that this Court's reliance on *Silverman* is wholly "misplaced" (Motion at 35), but this is untrue. This Court thoroughly analyzed the relevant case law to adopt the simple rule that, "A transferee does not give value beyond his deposits of principal." *Cohen Decision*, 2016 WL 1695296 at *10. This Court stated that this rule was "recently reinforced" in *Silverman*, in which a trustee sued a transferee in Bankruptcy Court under New York's constructive fraudulent conveyance law, and successfully recovered the amount of the net gain

the transferee had received from a Ponzi scheme.  *See id.* (citing *Silverman v. Cullin,* 633 F. App'x 16, 17 (2d Cir. 2016)).

The District Court considering the *Silverman* appeal agreed, noting that in Ponzi scheme cases "many courts have concluded that such statutes allow those investors to retain their principal, but not any profits or interest." *Silverman v. Cullin*, No. 14 Civ. 4248 (JMA), 2015 WL 1509583, at *2 (E.D.N.Y. Mar. 31, 2015) (collecting cases).  The Second Circuit similarly affirmed, stating "other courts of appeals have held that payments of 'interest' to Ponzi scheme investors should be treated as fraudulent transfers, because 'fair consideration' is not present in the context of such schemes."[5] *Silverman*, 633 Fed. Appx. at 17 (collecting cases)).  The Second Circuit acknowledged that it had not yet addressed this issue, but made clear that "the prevailing view in the district and bankruptcy courts in this Circuit has agreed with this consensus." *Id.* (citing *Omnibus Good Faith Decision*, 531 B.R. at 462-64 (collecting cases)).

Consistent with its ruling in *Silverman,* the Second Circuit most recently affirmed that BLMIS customers cannot be credited for inter-account transfers of fictitious profits between BLMIS accounts because the "paper profits reflected in an inter-account transfer are equivalent to the paper profits reflected in a BLMIS customer's last account statement—any amount greater than the invested principal was 'wholly the contention of Madoff' and is properly excluded from calculation of a customer's 'net equity.'" *Second Circuit Inter-Account Decision,* 2017 WL

---

[5] Section 273 of the New York Debtor and Creditor Law ("NYDCL") provides that "[e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." NYDCL § 273.  "Fair consideration is given for property, or obligation, . . .[w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied...." *Id.* § 272.  Fair consideration in the NYDCL has "the same fundamental meaning" as "reasonably equivalent value" in section 548(a)(1)(B) of the Bankruptcy Code.  *Cohmad,* 454 B.R. at 333 (citing *In re Churchill Mortg. Inv. Corp.,* 256 B.R. 664, 677 (Bankr. S.D.N.Y 2000)).

2376567, at *1 (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 237-38 (2d Cir.

2011) ("*Second Circuit Net Equity Decision*") (affirming the Trustee's net equity methodology,

as applied to inter-account transfers (the "Inter-Account Method"), and noting that the court

cannot give credence to transfers of "fictitious profits reflected in [a] transferor's BLMIS

account statement").[6]

Thus, *Silverman* supports the conclusion that Defendants did not give value beyond their

principal investments with BLMIS.

### 2.    There Is No Basis To Treat Equity Investors And Retail Customers Differently

Unlike equity investors in other types of Ponzi schemes, Defendants assert that BLMIS

customers are "retail customers" of a broker dealer and are subject to "all the customer

protections enacted by Congress and enforced by the SEC."  (Motion at 32-33).  As a result,

Defendants claim the courts improperly relied upon Ponzi scheme cases involving equity

investors, arguing that Defendants "did not invest in the business of Madoff Securities, but only

deposited funds with their broker acting as a fiduciary for the purpose of purchasing securities."

(Motion at 32).  Defendants specifically argue that the District Court in *Greiff* "improperly

viewed Madoff's ostensible investment scheme as if it placed brokerage customers at a risk

comparable to that of ordinary equity investors in a business."  (Motion at 32).

However, Defendants cite no explicit authority for treating equity investors and retail

customers differently.  (Motion at 31-36).[7]  And there is none.  As the District Court noted,

---

[6] As discussed in Section III (A) below, the calculations of net equity and avoidance liability are "two sides of the same coin." *Antecedent Debt Decision,* 499 B.R. at 420.

[7] Defendants assert that cases like *Donell, Scholes,* and *Hedged-Investments* are not relevant because they did not involve customers of a registered broker-dealer (Motion at 36), but none of these cases make any suggestion that equity investors and retail customers should be treated differently. *See generally Donell*, 533 F.3d 762; *In re Hedged–Invs. Assocs., Inc.*, 84 F.3d 1286; *Scholes*, 56 F.3d 750.

Defendants' parsing "is a distinction without a difference" because Defendants "faced the same

risks as equity investors." *Greiff*, 476 B.R. at 726.  Specifically, the District Court stated:

> Any entitlement defendants had to a return on their investment, then,
> depended on a representation that Madoff Securities had in fact generated
> a profit.  The complaints allege that Madoff Securities' representations in
> this regard were wholly fraudulent.  Thus, defendants, in effect, ask the
> Court to enforce the fraud on the ground that the vehicle of this particular
> Ponzi scheme, in contrast to others, styled itself as a stockbroker.  Such a
> distinction pays only lip service to the underlying realities of the Ponzi
> scheme, and the Court rejects it.

*Id.* at 726-27.  As a result, whether Defendants were an "equity investor" or "retail customer" is

immaterial—they are not entitled to retain the fictitious profits received from BLMIS.

Defendants further assert that *Greiff* imported a judicially created "Ponzi exception" from

cases involving equity investors in Ponzi schemes to this case (Motion at 4), when "none of

those cases cite any language or legislative history in support of" a Ponzi-scheme exception.

(Motion at 33, n. 9) (quoting *Sender v. Nancy Elizabeth R. Heggland Family Trust (In re

Hedged-Invs. Assocs.)*, 48 F.3d 470 (10th Cir. 1995)).  However, Defendants' reliance on *Sender*

is incredibly misleading, as the exception referenced therein is not a Ponzi scheme exception at

all but refers to Bankruptcy Code § 547(c)(2) which states a trustee may not avoid a transfer that

is "made in the ordinary course of business or financial affairs of the debtor and the transferee."

*Id.* at 475 (citing 11 U.S.C. § 547(c)(2)).  Not only is *Sender* addressing an exception under the

preference transfer avoidance statute, but is also referring to an exception "to apply only to

transfers by legitimate business enterprises." *Id.*  Thus, "the literal terms of § 547(c)(2)(C)

preclude application of the ordinary course of business defense to transfers made to investors in

the course of a Ponzi scheme." *Id.  Sender* further specifies it is intended to "protect recurring,

customary credit transactions that are incurred and paid in the ordinary course of business of the

debtor and the debtor's transferee," including telephone services provided by a phone company.

14

*Id.* at 476.  This exception does not benefit Defendants, who received fraudulent transfers from an enterprise that was far from legitimate.[8]

Defendants' reliance on cases involving legitimate businesses and transactions is particularly misplaced here where Defendants have stipulated to the fact that the purported securities transactions that they claim give rise to antecedent debts or obligations were wholly fraudulent and made with the actual intent to defraud in furtherance of a Ponzi scheme—not a legitimate business enterprise.  (South Ferry Joint Statement ¶¶ 10, 13, 34; South Ferry #2 Joint Statement ¶¶ 10, 13,34; Mesora Joint Statement ¶¶ 10, 13, 36).

### 3.    The Sixth Circuit's *Visconsi* Decision Is Not Applicable Authority

Defendants rely primarily on *Visconsi v. Lehman Bros.*, 244 F. Appx. 708 (6th Cir. 2007) to rebut the Trustee's Ponzi scheme cases, noting that "the Sixth Circuit upheld the award of $10 million in excess of the amounts withdrawn, flatly rejecting the argument that customers were limited to recovery of their net principal deposits."  (Motion at 36).  However, the District Court has already reviewed and correctly distinguished *Visconsi* "in three important respects."  *See Greiff*, 476 B.R. at 725-27.

First, unlike in *Visconsi*, the Bankruptcy Court has "no reliable basis on which to determine how [D]efendants would have benefited from their bargains with Madoff Securities." *Id.* at 725.  In *Visconsi,* the fictitious statements issued by Lehman Brothers, Inc. and Lehman Brothers Holdings, Inc. (collectively referred to as "Lehman") "were designed to track Plaintiffs' funds as if they had been properly invested" and "indicate[d] that Plaintiffs' accounts would have grown to more than $37.9 million (even accounting for the withdrawal of more than $31.3

---

[8] The same is true for Defendants' reliance on *In re Bennett Funding Grp., Inc.,* 253 B.R. 316 (Bankr. N.D.N.Y. 2000) (addressing the same preferential transfer exception and involved legitimate purchases and leases of equipment), and *Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015) (involved defendants who purchased interests in actual loans to real borrowers).

million).” 244 F. Appx. at 713. Here, however, Defendants’ account statements from BLMIS “‘did not track [D]efendants’ funds as if they had been properly invested,’ but instead constituted an integral part of the fraud, consistently representing favorable returns based on trading that could not have occurred.” *Greiff,* 476 B.R. at 725 (quoting *Visconsi,* 244 F. Appx. at 713).

Second, the *Visconsi* court compared innocent investors with defendant Lehman, which, although not the perpetrator of fraud, “was aware of significant irregularities in [the perpetrator’s] practices at the time…and purchased [the business] despite this knowledge.” 244 F. Appx. at 714 n. 2. Here, in contrast, the court considers the Defendants relative to other investors, many of whom were equally innocent. “Conferring the benefit of the bargain where a more culpable party bears the cost” differs from doing so “where similarly situated investors, who have no hope of realizing the benefits of their bargains, bear that cost.” *Greiff,* 476 B.R. at 726.

Third, the *Visconsi* court did not focus on investors’ status as creditors when giving them the benefit of the bargain, but instead on “the harm suffered.” 244 F. Appx. at 713. As the District Court noted, the “Defendants have undoubtedly suffered harm as a result of investing with Madoff Securities, but they have not shown that this harm in any way corresponds to the amounts reflected on customer statements.” *Greiff,* 476 B.R. at 726. Accordingly, there is “no reason to depart from the general rule that investors in a Ponzi scheme did not receive their profits ‘for value.’” *Id.*

### D.    Defendants’ Receipt Of Fictitious Profits Did Not Satisfy An Obligation Or Provide Value Under Section 548(c) Of The Bankruptcy Code

Although stated and restated in different ways in their Motion, Defendants challenge the Bankruptcy Court’s second rule of law that applies in SIPA cases involving fraudulent transfers from a Ponzi scheme—that net winners cannot argue that the payment of fictitious profits

satisfies an obligation or provides value within the meaning of section 548(c), because doing so

in inconsistent with SIPA's priority scheme.  *See Cohen Decision*, 2016 WL 1695296 at *11.

Defendants' arguments fail as a matter of law.

> **1.    Section 548(c) Of The Bankruptcy Code Does Not Limit The SIPA Trustee's Avoidance Powers**

Defendants argue that SIPA neither expands the Trustee's avoidance powers beyond

those of an ordinary bankruptcy trustee, nor modifies the value defense under section 548(c).

(Motion at 16-19).  The District Court and the Bankruptcy Court each considered and rejected

this argument.  In the *Antecedent Debt Decision*, the District Court explained while SIPA

provides that a SIPA trustee is "vested with the same powers and title with respect to the debtor

and the property of the debtor, including the same rights to avoid preferences, as a trustee in a

case under Title 11," citing 15 U.S.C. § 78fff–1(a), it also provides that the provisions of the

Bankruptcy Code apply only "[t]o the extent consistent with the provisions of this chapter."  499

B.R. at 423 (citing 15 U.S.C. § 78fff(b)).  Consequently, the Trustee's authority to avoid

transfers as a bankruptcy trustee "must be interpreted through the lens of SIPA's statutory

scheme." *Id.*

For example, under the Bankruptcy Code, a trustee may avoid and recover transfers of a

debtor/broker's property, but not property held by the debtor and owned by the debtor's

customers, because "[m]oney held by the broker on behalf of its customers is not property of the

broker under state law, and in an ordinary bankruptcy, a trustee cannot avoid and recover a

transfer of non-debtor property." *Omnibus Good Faith Decision*, 531 B.R. at 448 (citing *Picard*

*v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014)).  However, SIPA circumvents this

problem by treating customer property as though it were "property of the debtor in an ordinary

liquidation." *Id.* at 449 (citing SIPA § 78fff–2(c)(3) (internal quotations omitted)).  SIPA

expressly empowers a trustee to avoid and recover customer property held by the customers of

the debtor broker-dealer.  *Id.* at 448-49.  This includes not only "cash and securities . . . at any

time received, acquired, or held by or for the account of a debtor from or for the securities

accounts of a customer, and the proceeds of any such property transferred by the debtor,

including property unlawfully converted, SIPA § 78*lll*(4)," but also "property recovered by the

Trustee pursuant to SIPA § 78fff–2(c)(3)."  *Id.* at 448.

Defendants argue that section 548(c) "imposes a fundamental limitation on the Trustee's

exercise of his avoidance power" allowing Defendants "to keep each transfer that—at the time of

transfer—satisfied a valid then-existing or antecedent debt or obligation."   (Motion at 2).

Defendants misconstrue how section 548(c) operates in this case.

### (a)    Defendants' "At The Time Of Transfer" Argument Has No Relevance In A Ponzi Scheme

Defendants' argument that value under section 548(c) "is to be determined at the time of

each transfer, not at some later time, and from the perspective of the transferee, not the debtor"

(Motion at 50), is irrelevant because Defendants have conceded BLMIS was operating a Ponzi

scheme at all times relevant to the Avoidance Actions.  (South Ferry Joint Statement ¶ 10; South

Ferry #2 Joint Statement ¶ 10; Mesora Joint Statement ¶ 10).  Defendants further conceded that

the investment advisory business (the "IA Business") through which they were invested "did not

actually trade securities for customers and did not generate any legitimate profits for customer

accounts."  (South Ferry Joint Statement ¶ 13; South Ferry #2 Joint Statement ¶ 13; Mesora Joint

Statement ¶ 13).  Defendants also stipulated that "[a]t all times, BLMIS defrauded [Defendants]

by intentionally misrepresenting the purported securities transactions in the Account.  These

misrepresentations . . . were an integral and essential part of the fraud, and were made to avoid

detection of the fraud, retain existing investors, and to lure other investors into the Ponzi

scheme." (South Ferry Joint Statement ¶ 34; South Ferry #2 Joint Statement ¶ 34; Mesora Joint

Statement ¶ 36). If there were no legitimate trades of securities in Defendants' BLMIS accounts

at all relevant times, then there can be no "valid" antecedent debts and/or obligations for BLMIS

to have satisfied "at the time of" each fraudulent transfer of other people's money to Defendants

regardless of whose perspective is employed.[9]

As a result, not a single transfer Defendants received as BLMIS customers satisfied a

"valid" debt or obligation, as *all* of the transfers are presumptively fraudulent, as in the case of a

Ponzi scheme." *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M.*

*Fabrikant & Sons, Inc.),* No. 06-12737 (SMB), 2009 WL 3806683, at *13 n. 19 (Bankr.

S.D.N.Y. Nov. 10, 2009) (emphasis added) (originally cited by Defendants as support for its "at

the time of transfer" theory, but Defendants failed to note the court's explicit Ponzi scheme

exception therein).[10]

> **(b)     Defendants' Section 548(c) Defense Amounts To Claims
> Against SIPA's Customer Property Estate**

Second, the Defendants' mischaracterization of section 548(c) as a "limitation on the

Trustee's avoidance powers" improperly "conflates two separate concepts." *Antecedent Debt*

---

[9] Defendants inserted a lengthy string-cite of cases in support of their position that the value defense is calculated at the time of transfer (Motion at 20-21), but the cases fail to support Defendants' argument because they all addressed real transactions or the exchange of real goods and/or services, which is clearly not applicable here. *See e.g., McHenry v. Dillworth (In re Caribbean Fuels Am., Inc),* No. 16-15786, 2017 WL 2703541 (11th Cir. June 22, 2017) (lease of home); *Janvey v. Golf Channel,* 487 S.W.3d 560 (Tex. 2016) (paid media advertising); *Redmond v. SpiritBank (In re Brooke Corp.),* 541 B.R. 492 (Bankr. D. Kan. 2015) (option agreement/certificate of deposit); *Dobin v. Hill (In re Hill),* 342 B.R. 183 (Bankr. D.N.J. 2006) (division of marital property); *Baldi v. Lynch (In re McCook Metals, LLC),* 319 B.R. 570 (Bankr. N.D. Ill. 2005) (smelting plant); *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.),* 310 F.3d 796, 802 (5th Cir. 2002) (real estate property option); *Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.),* 309 F.3d 1325 (11th Cir. 2002) (percentage-based commissions); *Merrill v. Allen (In re Universal Clearing House Co.),* 60 B.R. 985 (D. Utah 1986) (sales agents' commissions).

[10] The District Court also rejected this line of argument in the *Antecedent Debt Decision,* making clear that "even if defendants held legitimate discretionary brokerage accounts with Madoff Securities, they would have been entitled only to the securities in their accounts on the date of demand, and therefore older statements would have been unenforceable in any case." 499 B.R. at 421 n. 4.

*Decision*, 499 B.R. at 423.  As the District Court stated, "Section 548(a)(1) empowers a trustee to avoid the entirety of a fraudulent transfer, while section 548(c) provides an affirmative defense that allows a defendant to retain portions of that otherwise entirely avoidable transfer." *Id.*  However, SIPA "does not necessarily imply that section 548(c)'s affirmative defense must apply in the same way to the customer property estate as it would to the general estate."  *Id.* at 424.  More importantly, "the definition of net equity and the definition of claims that can provide 'value' to the customer property estate are inherently intertwined where the customer property estate is created as a priority estate intended to compensate customers only for their net-equity claims." *Id.*

To the extent Defendants' purported value defense could permit them "to withhold funds beyond [their] net-equity share of customer property," Defendants are effectively "making those damages claims against the customer property estate" and allowing such claims "to be drawn out of the customer property estate would violate SIPA."  *Id.* (citing *Greiff*, 476 B.R. at 728 ("[W]hen determining whether a[] transferee provides value, SIPA requires consideration not only of whether the transfer diminishes the resources available for creditors generally, but also whether it depletes the resources available for the satisfaction of customers' net equity claims and other priority claims.")).   Indeed, "[t]he satisfaction of non-net equity claims from the customer property estate would defeat the priority that SIPA intended customers to have against the separate and distinct customer property estate."  *Id.* at 424–25; *c.f. In re A.R. Baron Co., Inc.*, 226 B.R. 790, 796 (Bankr. S.D.N.Y. 1998) ("It is well established that claims based on a debtor's failure to execute securities trades are not 'customer' claims which a trustee may satisfy with SIPC funds or Customer Property.  Rather, these claims are general unsecured breach of contract claims.").

Thus, under SIPA, Defendants may only seek the protections of section 548(c) to the extent of investments of principal.

### 2. The *Greiff* And *Antecedent Debt Decisions* Remain Law Of The Case And Applicable To Defendants

#### (a) The Value Defense Was Raised Multiple Times By Defendants And Rejected Each Time

As an initial matter, Defendants "urge" the Court to revisit the District Court's prior *Greiff* and *Antecedent Debt Decision* rulings, insisting those rulings "did not discuss or anticipate the defenses advanced by the [Defendants], or the facts supporting those defenses." (Motion at 3-4). However, this Court has made clear that the value defense is an issue that "has been litigated and expressly or impliedly rejected" in decision after decision issued in this liquidation proceeding.[11] *Cohen Decision,* 2016 WL 1695296, at *5. Indeed, this Court earlier observed that defendants in this liquidation proceeding—including Defendants themselves—"have had several opportunities to present their antecedent debt/value arguments, those arguments have been rejected, and hearing them again will not add value to the disposition of the antecedent debt/value defense in this Court." *Picard v. Cohen*, 550 B.R. 241, 253 (Bankr. S.D.N.Y. 2016) aff'd No. 16 Civ. 4462 (LAP) (S.D.N.Y. Nov. 2, 2016) (denying motion to intervene in the *Cohen* proceeding on the antecedent debt/value issue, noting "virtually all" of the proposed intervenors and "all" of the law firms representing them "have raised and lost the antecedent debt/value argument in this Court, the District Court, or both. Thus, the rejection of their antecedent debt/value defense is already *stare decisis* and in most instances law of the case");[12]

---

[11] *See generally Greiff,* 476 B.R. 715; *Antecedent Debt Decision,* 499 B.R. 416; *Omnibus Good Faith Decision,* 531 B.R. 439; *Cohen Decision,* 2016 WL 1695296, adopted mem. *Cohen District Court Decision.*

[12] Defendants assert that they were "excluded from participating as intervenors in dispositive merits proceedings in avoidance cases by the Trustee against other customers," including the *Cohen* matter

*see also Omnibus Good Faith Decision,* 531 B.R. at 466 (noting that the District Court's

extensive consideration of the antecedent debt/value issue "would normally foreclose further

argument in this Court" because defendants "have had their day in court and Judge Rakoff's

decisions are law of the case").[13]

        **(b)**        **The *Section 546(e) Decision* Did Not Overrule *Greiff* Or The**
                        **Antecedent Debt Decision**

        In an effort to rebut the rule of law that fictitious profits do not satisfy an obligation, or

provide value under section 548(c), Defendants argue throughout the Motion that the Second

Circuit's *Section 546(e) Decision* effectively overruled the District Court's holdings in *Greiff* and

the *Antecedent Debt Decision*.  (*e.g.,* Motion at 26) (citing *Sec. Investor Prot. Corp. v. Bernard

L. Madoff Inv. Sec. LLC,* (*In re Madoff Sec.*), 773 F.3d 411 (2d Cir. 2014) ("*Section 546(e)

Decision*")).  However, neither *Greiff* nor the *Antecedent Debt Decision* has been overruled.[14]

This Court, in rejecting this very argument, first explained that *Section 546(e) Decision* affirmed

---

[13] (Motion at 4), but defense counsel for Andrew H. Cohen revealed that he "received assistance from counsel for the proposed intervenors in connection with the trial and in preparing submissions to the Bankruptcy Court."  *See* Memorandum of Law in Support of Motion to Withdraw as Counsel at 4 n.1 *Picard v. Cohen,* 16 Civ. 05513 (LTS) (S.D.N.Y. July 19, 2016), ECF No. 8; *see also* Order at 26, *Picard v. Cohen,* 16 Civ. 4462 (LAP) (S.D.N.Y. Nov. 2, 2016), ECF No. 24. Thus, not only did Mr. Cohen have his own counsel representing him in the trial and post-trial submissions, but Defendants' counsel also assisted him behind the scenes with his arguments and his written submissions. Defendants cannot claim their antecedent debt/value arguments were not previously raised before this Court.

[13] Defendants were subject to the *Antecedent Debt Decision*, as they moved to withdraw the reference to the Bankruptcy Court to determine "[w]hether the Trustee can avoid transfers that constitute payments on account of antecedent debts under federal and state law," as joinders to the Motion to Withdraw the Reference to the Bankruptcy Court filed in *Picard v. Wolfson Equities,* No. 11 Civ. 9447 (JSR) (S.D.N.Y. Dec. 22, 2011), ECF No. 2.  *See* Joinder In Memorandum Of Law In Support of Motion to Withdraw the Reference, South Ferry Action, ECF No. 26; South Ferry #2 Action, ECF No. 20; Mesora Action, ECF No. 17.  In addition, Defendants' counsel at Baker & McKenzie LLP (formerly of K&L Gates LLP) represented other similarly-situated defendants subject to the *Antecedent Debt Decision and Omnibus Good Faith Decision. See, e.g., Picard v. Lowery,* Adv. Pro. No. 10-04387 (SMB) (Bankr. S.D.N.Y.), No. 12 Civ. 02510 (JSR) (S.D.N.Y.).

[14] Defendants fail to acknowledge that the District Court issued the *Antecedent Debt Decision* on October 15, 2012, months *after* its own decision on section 546(e) on April 30, 2012, which the Second Circuit subsequently upheld in the *Section 546(e) Decision.  See e.g., Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 476 B.R. 715 (S.D.N.Y. 2012), supplemented (May 15, 2012), aff'd sub nom. 773 F.3d 411 (2d Cir. 2014).

that payments to customers were subject to the safe harbor of section 546(e), which limited the

Trustee to recovering fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) made within two years

of December 11, 2008 (the "Filing Date").  *Omnibus Good Faith Decision*, 531 B.R. at 469

(citing *Section 546(e) Decision,* 773 F.3d at 417-23).  However, "it does not follow . . . that the

defendants paid value in exchange for the fictitious profits they received."  *Id.*  The Second

Circuit neither addressed "the question of value" nor disturbed the general rule that a "trustee can

recover fictitious profits because transferees in a Ponzi scheme do not give 'value' within the

meaning of the Bankruptcy Code beyond what they pay into the scheme."  *Omnibus Good Faith*

*Decision*, 531 B.R. at 469-70.  As this Court explained, "[f]ictitious profits are not profits at all

but distributions of other people's money based on an arbitrary allocation of fraudulent

bookkeeping entries.  The [*Section 546(e) Decision*] did not address this rule and it remains the

majority view." *Id.* at 470.[15]

　　While the *Section 546(e) Decision* discussed "the distinction between the SIPA and the

Bankruptcy Code in the context of the express statute of limitations incorporated into

Bankruptcy Code § 546(e)," the two statutory regimes "were not so easily separated with respect

to other aspects of fraudulent transfer litigation" including section 548(c) of the Bankruptcy

Code.  *Cohen Decision*, 2016 WL 1695296 at *10, 13.  This is because, unlike the statute of

limitations embedded in the section 546(e) safe harbor, there was "no clear statutory direction

that the satisfaction of claims against the general estate provides value" for the receipt of

fictitious profits from a Ponzi scheme.  *Id.* (citing *Omnibus Good Faith Decision*, 531 B.R. at

470); *see also Greiff*, 476 B.R. at 725 (concluding that the fraudulent transfers from BLMIS were

---

[15] In fact, there was no dispute in the *Section 546(e) Decision* that the payments at issue were fraudulent
transfers.  773 F.3d at 422 ("Certainly SIPC and the Trustee are correct that these transfers were also
made 'in connection with' a Ponzi scheme and, as a result, were fraudulent.").

not "for value," because "[u]nlike the situation under § 546(e), Congress has here created no 'safe harbor' to shelter receipts that might otherwise be subject to avoidance."). Thus, the *Section 546(e) Decision* did not change the rule of law that Defendants may only seek the protections of section 548(c) to the extent of their principal investments with BLMIS. *Id*.

### 3. Defendants' Purported Federal And State Law Claims Or Obligations Do Not Constitute "Value" Under Section 548(c)

Throughout the Motion, Defendants argue that the fictitious profits received from the BLMIS Ponzi scheme satisfied an obligation owed by BLMIS because of their purported federal or state law claims against BLMIS, and consequently the fictitious profits received were "for value" under section 548(c). (*e.g.,* Motion at 37-41). Since the District Court decided *Greiff* on April 30, 2012, net winners like Defendants have continued to press this same line of argument, but it is even less persuasive now than it was when the District Court first rejected it.

### (a) The *Section 546(e) Decision* Has No Bearing on the Value Defense

Defendants specifically argue that because the Second Circuit determined in the *Section 546(e) Decision* that the transfers made by BLMIS to its customers were made in connection with a securities contract or were "settlement payments" within the meaning of section 546(e) of the Bankruptcy Code, then it necessarily means that the transfers "satisfy an enforceable state law securities entitlement, a valid claim under state law." (Motion at 26) (citing *Section 546(e) Decision,* 773 F.3d at 422-23). However, their conclusion simply does not follow from the Second Circuit's decision, which did not rule that the transfers underlying the securities contract or settlement payments were made for "value" at the time of the transfer, pursuant to section 548(c) of the Code.

As discussed above, the Second Circuit did not even consider the question of value. *See generally Section 546(e) Decision,* 773 F.3d 411. Two years later in Silverman, the Second

Circuit specifically stated that "it ha[d] not addressed this issue" but noted "the prevailing view in the district and bankruptcy courts in this Circuit has agreed" that payments above deposits of principal to Ponzi scheme investors should be treated as fraudulent transfers. 633 F. Appx. at 17 (citing *Omnibus Good Faith Decision*, 531 B.R. at 462-64 (collecting cases)).

**(b)     Defendants' Federal Securities And State Tort Claims Cannot Provide Value Against the Customer Property Estate**

In any event, "even if the defendants had enforceable claims," under federal or state law, "a conclusion that satisfaction of those claims gave 'value' to [BLMIS] would conflict with SIPA." *Greiff,* 476 B.R. at 727*; see also Antecedent Debt Decision*, 499 B.R. at 422 n.6 (holding federal and state law claims "cannot provide value as against the [BLMIS] customer property estate under SIPA"); *Omnibus Good Faith Decision*, 531 B.R. at 476 n.26. This is because SIPA "prioritizes net equity claims over general creditor claims." *Greiff*, 476 B.R. at 727. *See Second Circuit Net Equity Decision,* 654 F.3d at 233 ("In a SIPA liquidation, a fund of 'customer property,' separate from the general estate of the failed broker-dealer, is established for priority distribution exclusively among customers.").

And to allow customers like Defendants, who have no net equity claims, to retain fictitious profits of customer property on the ground that these profits satisfied their purported claims, would deplete the customer fund available for distribution according to customers' "net equities." *Greiff,* 476 B.R. at 728; *see also Omnibus Good Faith Decision*, 531 B.R. at 466. Indeed, this Court recently reiterated, "[e]very offset against the trustee's avoidance claim based on a non-SIPA claim under state or federal law diminishes the SIPA trustee's recovery." *Cohen Decision,* 2016 WL 1695296, at *13. "Neither bankruptcy law nor state law require the Court to disregard SIPA in this fashion." *Greiff*, 476 B.R. at 728. As a result, to the extent that Defendants have valid federal or state law claims and payment on those claims theoretically

could discharge an antecedent debt, "that debt runs against [the BLMIS] general estate, not the customer property estate, and therefore cannot be the basis of the retention of customer property under section 548(c)." *Antecedent Debt Decision*, 499 B.R. at 424.

> **(c)   Madoff's Purported Obligations To Defendants Do Not Provide Value Nor Does The Trustee Have To Avoid Such Obligations**

Notwithstanding the numerous prior rulings, Defendants continue to argue that "[b]ecause the broker's payments derived from its contractual and legal obligations to [Defendants], the Trustee cannot confine the value defense to the amount of their principal deposits without first successfully avoiding Madoff Securities' pre-existing obligations to its customers" which the Trustee has failed to do.  (Motion at 27-28).  However, any argument that Defendants' receipt of fictitious profits were "for value" against purported contractual and brokerage obligations, or that the Trustee's failure to avoid any purported obligations warrants summary judgment in favor of Defendants, fails.

In both *Greiff* and the *Antecedent Debt Decision,* the District Court held that BLMIS's account statements do not create enforceable obligations owed by BLMIS.  In the *Antecedent Debt Decision*, the District Court rejected "defendants' contention that [BLMIS's] pre-reach-back-period account statements constitute binding obligations of Madoff Securities to its customers that the Trustee must avoid."  499 B.R. at 421 n. 4; *see also Omnibus Good Faith Decision*, 531 B.R. at 476 n. 26.  Likewise in *Greiff*, the District Court found that the amounts reported on account statements were wholly fraudulent and therefore unenforceable.  476 B.R. at 726-27.  Most recently, this Court made it clear that any "argument that payment in satisfaction of an unavoided obligation provides value misses the point . . . payments in excess of principal

are avoidable and recoverable (in all Ponzi scheme cases) and violate the priority rules of SIPA

(in SIPA Ponzi scheme cases)." *Cohen Decision,* 2016 WL 1695296, at *12 n.17.[16]

    Although Defendants argue otherwise, the *Section 546(e) Decision* only reinforces the

District Court's holdings, as the Second Circuit made clear it "would be 'absurd' to calculate

customers' net equity using BLMIS's fictitious account statements, because that would 'have the

. . . effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal

effect to Madoff's machinations.'"  773 F.3d at 423 (citing *Second Circuit Net Equity Decision*,

654 F.3d at 235); *see also Second Circuit Inter-Account Decision*, 2017 WL 2376567, at *3

(same).

> **(d)**      **Permitting Enforcement of Unenforceable Contracts Pursuant to Federal Securities Law Would Dilute The Fund Of Customer Property**

    Defendants next argue that courts have interpreted Section 29(b) of the Securities

Exchange Act of 1934 (the "1934 Act") as establishing a rule of voidability such that fraud does

not render a "fraudster's securities contract obligations" to be unenforceable.  (Motion at 26)

(citing 15 U.S.C. § 78cc(b)).  Rather, Defendants assert that under Section 29(b), Defendants, as

---

[16] The cases cited by the Defendants in support of their argument that they are entitled to keep fictitious profits because the transfers were made in satisfaction of "undisputed obligations" (Motion at 25) are inapplicable.  Unsurprisingly, the cases do not involve Ponzi schemes nor do they involve SIPA liquidations and thus provide no assistance in the instant case where the relevant body of caselaw instead involves how to divide a limited fund of customer property for priority distribution to customers.  *See e.g.*, *In re Asia Global Crossing Ltd.*, 333 B.R. 199 (Bankr. S.D.N.Y. 1999) (proof of claim objection based on the debtor's entry into a guaranty of certain obligations of its affiliate); *Cox v. Nostaw (In re Central Ill. Energy Coop.)*, 526 B.R. 786 (Bankr. C.D. Ill. 2015) (denying motion for reconsideration of decision granting creditor's summary judgment motion based on issues determined by Illinois law in the context of a construction contract); *Jahn v. Char (In re Incentium, LLC)*, 473 B.R. 264  (Bankr. E.D. Tenn. 2012) (granting summary judgment for former officer and dismissing trustee's adversary proceeding seeking to avoid the separation agreement between the debtor and the former officer and avoid severance payments); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415 (Bankr. S.D.N.Y. 2012) (involving allegations that defendant bank improperly used its position to extract additional collateral from the debtor shortly before the debtor filed for bankruptcy protection.)

innocent parties, have "the right to choose whether to void a contract procured by fraud or to enforce it," including those account agreements with BLMIS.[17]   (*Id.*).    However, this Court previously examined this issue and concluded that "courts often permit innocent plaintiffs to enforce contracts that are against public policy, but here, such enforcement would further none of the policies generally favoring enforcement by an innocent party to an illegal bargain," because "any award of damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme." *Omnibus Good Faith Decision*, 531 B.R. at 463 (quoting *Janvey*, 767 F.3d at 442 (internal quotations omitted)); *see also Dicello v. Jenkins (In re Int'l Loan Network, Inc.),* 160 B.R. 1, 15 (Bankr. D.D.C. 1993) (refusing to enforce investors' restitution claims in Ponzi scheme on public policy grounds, stating that "on public policy grounds, the defendants ought not be rewarded for having been lucky enough to be amongst the few coming in at the start of the pyramid scheme"); *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 858, 870 (D.Utah 1987) (same, stating "the contracts involved in this case were unenforceable to the extent they purported to give the defendants a right to payments in excess of their undertaking" and "to enforce the contract as to fictitious profits would only further the debtors' fraudulent scheme").

Defendants further assert that they held federal securities fraud claims against Madoff from the time of the first deposit of funds.   (Motion at 38) (citing 17 C.F.R. § 240.10b-5).

---

[17] The cases Defendants cite in support are wholly irrelevant because none of them concern the receipt of fictitious profits from a Ponzi scheme. *See e.g, Freeman v. Marine Midland Bank-N.Y.,* 419 F. Supp. 440 (E.D.N.Y. 1976) (declaratory relief action on ground that bank had extended credit in violation of federal margin requirements); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 (1970) (action to set aside corporate merger achieved via use of materially false or misleading proxy statement); *Commodity Futures Trading Comm'n v. Hanover Trading Corp.,* 34 F. Supp. 2d 203 (S.D.N.Y. 2002) (disgorgement action for employee-earned commissions)*; Found. Ventures, LLC v. F2G, LTD.,* No. 08 Civ. 10066 (PKL), 2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010) (action for breach of contract and unjust enrichment relating to contract to identify qualified investors to provide equity financing).

However, they neglect to note that the statute of limitations has run for at least those claims under section 10b of the Exchange Act and Rule 10b-5. *See Domenikos v. Roth*, 288 F. App'x 718, 720 (2d Cir. 2008) ("Section 804(b) of SOX extended the limitations period for securities fraud actions to the lesser of two years from discovery accomplished of the fraud or five years from the date of the fraud."); *Sedona Corp. v. Ladenburg Thalman & Co.,* No. 03 Civ. 3120 (LTS), 2005 WL1902780, at *7 (S.D.N.Y. Aug. 9, 2005) (stating that under 28 U.S.C.A. 1658(b) "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of . . . the [federal] securities laws . . . may be brought not later than the earlier of: (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation").

Thus, Defendants' purported federal and state law claims against BLMIS—whether phrased as an "obligation" owed by BLMIS or otherwise—simply do not create any antecedent debts or provide value under section 548(c) for the fictitious profits retained by Defendants.

## III.    THE TRUSTEE'S NETTING METHOD AND VALUE CALCULATIONS ARE WHOLLY CONSISTENT WITH THE SECTION 548(A) REACH-BACK PERIOD

To determine a BLMIS customer's claim against the customer property fund, the Trustee looks to the deposits into the customer's BLMIS account over the life of the account and nets any withdrawals.  A customer has "net equity" and a corresponding claim against the customer property fund to the extent deposits of principal exceed withdrawals.  *See Second Circuit Net Equity Decision*, 654 B.R. 229 (approving the Trustee's "Net Investment Method").  The same calculation is used to determine a BLMIS customer's avoidance liability, provided that the customer had no knowledge of the fraud.  Specifically, the Trustee nets life-to-date deposits against life-to-date withdrawals.  If the customer has negative net equity and received any withdrawals from BLMIS in the two years before the Filing Date, the amount of those

29

withdrawals constitutes the customer's avoidance liability. *See Antecedent Debt Decision,* 499 B.R. at 430 (endorsing the Net Investment Method underlying the Trustee's avoidance liability calculations).  The Trustee's Net Investment Method has been upheld by the Second Circuit, and his corresponding methodology to determine avoidance liability have been approved in multiple decisions by this Court and the District Court, despite repeated challenges by various BLMIS customers, including customers represented by counsel for the Defendants.

Notwithstanding this overwhelming legal authority, Defendants reassert their failed challenge to the Trustee's methodology for determining avoidance liability and attempt to revive the rejected Reset to Zero approach (which ignores the customer's investment history prior to December 11, 2006), by arguing that the section 548(a) reach-back period is a statute of repose. (Motion at 41-50).  Defendants incorrectly argue that the Trustee's methodology violates section 548(a), because deposits and withdrawals are netted over the life of the account.[18]

Defendants' statute of repose argument is nothing more than a red herring.  Even if the section 548(a) reach-back period were construed as a statute of repose, which based on the law in this jurisdiction it is not, the Trustee's methodology is wholly consistent with section 548(a) because it does not seek to avoid and recover transfers made before the reach-back period, nor does it apply equitable tolling to extend the period in which avoidance actions could be commenced.

## A.    <u>Avoidance Liability Is Calculated In The Same Manner As Net Equity</u>

Defendants attempt to evade the straightforward fact that the same calculation, repeatedly upheld by the courts, is used to determine whether a customer has a net equity claim against the

---

[18] Defendants' argument that section 548(a) requires the Trustee to credit "obligations" of the debtor in the form of securities entitlements allegedly owned to BLMIS customers (Motion at 41-42) is, for the reasons discussed in Section II(3)(c) above, entirely meritless.

customer property estate or whether the customer owes money that must be returned to that estate. As the District Court recognized in the *Antecedent Debt Decision*, the determination of net equity and avoidance liability are "two sides of the same coin." 499 B.R. at 420. In an effort to muddy the waters, Defendants conflate the calculation of avoidance liability with the recovery of transfers and argue that the Trustee has improperly extended his avoidance powers. However, that is simply not the case.

As an initial matter, Defendants' statute of repose argument, which forms the basis for reviving the widely discredited Reset to Zero methodology Defendants favor, fails in two regards. First, Defendants have provided no authority from this jurisdiction suggesting that the reach-back period in section 548(a) can even be considered a statute of repose. Indeed, relevant authority suggests the opposite. *See e.g., In re Stanwich Fin. Servs. Corp.,* 291 B.R. 25 (Bankr. D. Conn. 2003) (section 548(a) reach-back period subject to equitable tolling and thus not a statute of repose). However, even if section 548(a) operated as a statute of repose, the Trustee's method of determining avoidance liability is entirely proper.

The Trustee is simply not seeking to avoid any fraudulent transfers or purported "obligations" beyond the two-year reach-back period, and has limited his claims against Defendants to seek the avoidance and recovery of transfers made only on and after December 11, 2006. In addition, as the cases relied upon by Defendants indicate, the relevance of the statute of repose designation largely relates to whether a limitation period can be tolled. The Trustee's methodology does not involve the equitable tolling of any statutory period: the Trustee's methodology does not permit the Trustee to stop the clock from running on his avoidance actions. In contrast to an action to avoid and recover such transfers, the Trustee's calculation methodology "us[es] past transactions as part of the process of calculating a customer's net

equity." *See In re Bernard L. Madoff Inv. Secs. LLC*, No. 15 Civ. 1151 (PAE), 2016 WL 183492, at *17 (S.D.N.Y. Jan. 14, 2016) (the *"District Court Inter-Account Decision"*). Distinct from equitable tolling, it does not give the Trustee greater power to claw back transfers beyond the two-year reach-back period. Rather, it is a straightforward application of section 548(a) to the Trustee's net equity calculation, as repeatedly affirmed by three levels of courts.

**B.    The Court Should Follow the Well-Reasoned Decisions of the District Court and Second Circuit Approving of the Trustee's Netting Method**

This Court and District Court have specifically approved the Trustee's method to determine avoidance liability, including the Net Investment Method, and rejected the Reset to Zero method. *See e.g., Greiff,* 476 B.R. at 729 (endorsing Trustee's netting method and rejecting the Reset to Zero method); *Antecedent Debt Decision*, 499 B.R. at 430 (same; rejecting the similarly named "Replenishment Credit Method").

In the *Antecedent Debt Decision*, the District Court addressed the Defendants' argument that pre-December 11, 2006 transactions should be ignored, and explicitly "reject[ed] defendants' assertion that deposits of principal in the reach-back period should be netted against withdrawals in the same period in calculating their fraudulent-transfer liability," 499 B.R. at 430. The District Court found the Defendants' argument to be "based on the faulty assumption that the value of the customer property estate is somehow set in stone at the beginning of the two-year reach-back period, such that any investment of principal enriches the estate." *Id.* at 427. The District Court explained that "[j]ust as defendants are entitled to net-equity claims for amounts of principal invested before the reach-back period that they never withdrew; so too must withdrawals before the reach-back period be considered to determine whether a given transfer in fact compensated a given defendant for a claim it would otherwise have had." *Id.* As a result, the District Court found that a "straight netting method—subtracting total withdrawals from total

deposits of principal—is the appropriate way to calculate not only net equity but also a defendant's fraudulent-transfer liability." *Id.* The District Court further recognized that the Trustee's methodology is the only workable method in light of the long-running history of the Ponzi scheme, and is the only method that "most reflects the reality of these transfers and that treats all investors as equitably as possible," regardless of when they decided to withdraw or deposit funds. *Id.* at 429; *see also Second Circuit Net Equity Decision,* 654 F.3d at 235 (stating the Trustee's "selection of the Net Investment Method was more consistent with the statutory definition of 'net equity' than any other method advocated by the parties or perceived by [the Second Circuit]").

By contrast, the proposed Reset to Zero method advanced by Defendants would "'arbitrarily' allow[] a Madoff Securities investor who withdrew all of his funds in November 2006 to keep the entirety of his 'profits', while a similarly situated investor who withdrew those funds only a month later would not have the same right." *Antecedent Debt Decision*, 499 B.R. at 429.[19] As "law of the case," these decisions bind Defendants and Defendants cannot have yet another "day in court" to challenge them. *See Omnibus Good Faith Decision,* 531 B.R. at 466 (further making clear that even if Defendants did not previously move on these issues—which they did—the "persuasive force of Judge Rakoff's decisions lead [the Bankruptcy Court] to the same conclusions").[20]

Nevertheless, Defendants argue that the *Antecedent Debt Decision* and *Greiff* were flawed because they failed to analyze the section 548(a) reach-back period as a statute of repose,

---

[19] If Defendants are instead seeking credit for all pre-December 11, 2006 deposits but not allowing for corresponding offsets for withdrawals during that same period, that is equally contrary to the history of decisions in this liquidation proceeding and grossly inequitable.

[20] *See supra* n. 14.

instead assuming the section created a statute of limitations. (Motion at 48-50). However, as discussed above, because the Trustee's methodology is not an exercise in equitable tolling, it is consistent with section 548(a) whether or not the reach-back period operates as a statute of repose.[21]

Further, Defendants contend that the District Court in *Greiff* improperly analogized to the Ninth Circuit's decision in *Donell,* 533 F.3d 762, which Defendants argue interpreted a statute of limitations in the California Uniform Fraudulent Transfers Act (UFTA) and not a statute of repose. (Motion at 48-49) (citing *Greiff*, 476 B.R. at 729). But cases relying on *Donell* and applying its reasoning to a statute of repose in the California UFTA have used the same netting method as the Trustee. For example, in *Donell v. Mojtahedian*, 976 F.Supp.2d 1183 (C.D. Cal. 2013) ("*Mojitahedian*"), the receiver for a Ponzi scheme investment fund brought an action under the California UFTA against a fund investor, seeking to recover the investor's alleged profit from the investment. The defendant sought to limit her liability to withdrawals in the seven-year period set out in Cal. Civ. Code sec. 3439.09(c), as netted against her life-to-date principal investment. *Mojtahedian*, 976 F. Supp. 2d at 1189. Relying on *Donell*, the court held that defendant was incorrect and required netting to consider not just the defendant's life-to-date deposits but also her life-to-date withdrawals. *Id.* Recognizing that section 3439.09(c) is a statute of repose and the section interpreted by *Donell* was a statute of limitations, the court

---

[21] Defendants also argue that the *Antecedent Debt Decision* "improperly adopted the false equivalence between value determined for avoidance purposes and the net equity method for calculating SIPA claims" that was purportedly rejected by the Second Circuit in the *Section 546(e) Decision* (Motion at 50)*,* but in a subsequent decision, the District Court explained "that § 548(a)(1)'s two-year reach-back on avoidance of fraudulent transfers is distinct from § 548(c), and therefore that two-year restriction does not apply to or limit the use of the [Net Investment Method] for calculating value under that provision." *District Court Inter-Account Decision,* 2016 WL 183492, at *14.

nevertheless advised "[t]here is no reason to believe the Ninth Circuit's ruling on the statute of limitations does not also apply to the statute of repose." *Id.*

Here, too, there is no basis to challenge the Trustee's netting method even if the section 548(a) reach-back period is construed as a statute of repose. Indeed, the ruling in *Mojtahedian* is consistent with non-Madoff cases that have approved netting methods referring to life-to-date withdrawals and deposits of principal, as recognized in the *Antecedent Debt Decision*. *See e.g., Hedged-Inv. Assocs.*, 84 F.3d at 1288-90 (calculating the amount received in excess of principal deposited over the life of the defendant's investment for purposes of determining defendant's avoidance liability); *In re Bayou Grp., LLC*, 439 B.R. 284, 338-39 (S.D.N.Y. 2010) (in Ponzi scheme case, affirming bankruptcy court decision determining avoidance liability based on deposits of principal and withdrawals made over the investment relationship).

The *District Court Inter-Account Decision*, which upheld the Trustee's treatment of inter-account transfers between BLMIS customer accounts, is also illustrative. In the *District Court Inter-Account Decision*, certain BLMIS customers[22] argued that the section 548(a) reach-back provision barred the Trustee from looking beyond the two-year period to determine defendants' avoidance liability in connection with transfers between their BLMIS accounts. The District Court held that the Inter-Account Method "faithfully extends—and inexorably follows from— the Net Investment Method as approved by the Circuit" and is a "necessary corollary" to the Net Investment Method. *District Court Inter-Account Decision,* 2016 WL 183492, at *9-10. The District Court rejected defendants' argument that the Inter-Account Method was tantamount to an avoidance action because it effectively allowed the Trustee to indirectly unwind transfers. *Id.*

---

[22] Counsel for the Defendants intervened in the Inter-Account dispute. *See e.g.*, Brief for Amici Curiae in Support of Appellants, *In re Matter of Bernard L. Madoff Inv. Sec., LLC*, No. 16-0413-bk(L) (2d Cir. May 31, 2016), ECF No. 155.

at *11.  As the District Court stated, "the two-year reach-back limit applicable to attempts to avoid fraudulent transfers does not apply to a Trustee's calculation of net equity" because "[n]othing in the text of section 548(a)(1) indicates that the two-year restrictions applies to anything other than an avoidance action for fraudulent transfers."  *Id.* at *12.  The District Court further reasoned that the *Second Circuit Net Equity Decision* expressly contemplates that the Trustee will reduce a customer's net equity for withdrawals from a BLMIS account that occurred beyond the reach-back period, and thus "implicitly but definitively" rejects the defendants' argument that section 548(a) bars the Trustee from using transfers before the reach-back period to reduce a customer's net equity.  *Id.* at *13.

The Trustee's method for determining avoidance liability is not tantamount to an avoidance action because it does not seek to unwind transfers beyond the reach-back period.  The Trustee's methodology involves two steps: first, the customer's net equity is determined using the Net Investment Method, and second, for customers with negative net equity, the Trustee seeks to avoid and recover withdrawals in excess of deposits from their BLMIS accounts in the two-year reach-back period.  As they did with the Trustee's Inter-Account Method, Defendants are making a "false equation" of the Trustee's method to determine avoidance liability with a statutory avoidance action.  *District Court Inter-Account Decision*, 2016 WL 183492, at *18.  Because the Second Circuit Net Equity Decision "expressly contemplates" that the Trustee will reduce a customer's net equity for withdrawals from a BLMIS account that occurred beyond the reach-back period, it "implicitly but definitively" rejects the Defendants' argument that section 548(a) bars the Trustee from using transfers before the reach-back period to reduce a customer's net equity for purposes of determining his or her avoidance liability.  *Id.* at *13.

C.    **The Trustee's Netting Method Is Consistent With The U.S. Supreme Court's** *CalPERS* **Decision.**

Rather than attempt to reconcile the Reset to Zero method with this well-settled law of the case, Defendants look to the inapposite decision of the United States Supreme Court in *California Public Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S.Ct. 2042 (2017) ("*CalPERS*"). However, *CalPERS*, which did not address section 548(a), does not apply and, even if it did, the Trustee's netting method is entirely consistent with it.

In *CalPERS*, the Supreme Court held that the three-year time period within which an action under Section 13 of the Securities Act could be brought is a statute of repose and thus, is not tolled by a class action filing. 137 S.Ct. at 2049-50. *CalPERS* recognized the difference between statutes of limitations and statutes of repose, particularly that limitations periods begin to run "when the cause of action accrues," whereas repose periods begin to run on "the date of the last culpable act or omission of the defendant." *Id.* at 2049 (internal citations omitted). *CalPERS* also recognized that courts cannot extend repose periods based on equitable principles because statutes of repose implement "a legislative decisio[n] that as a matter of policy there should be a specific time beyond which a defendant should no longer be subjected to protracted liability." *Id.* at 2051 (internal citation omitted). The *CalPERS* court further reasoned that the three-year period in Section 13 was a statute of repose because it "impose[d] an outside limit" on a defendant's liability, and concluded that tolling did not apply. *Id.* at 2050-51.

Based on the Supreme Court's reasoning in *CalPERS*, Defendants insist that the section 548(a) reach-back period is a statute of repose. (Motion at 45-46). But, regardless of whether section 548(a) operates as a statute of repose, the Trustee's netting method to determine avoidance liability is entirely consistent with *CalPERS*. As discussed above, the Trustee's methodology does not involve the application of equitable tolling or any other type of tolling that

would extend the Trustee's right to avoid and recover transfers beyond the reach-back period.

Thus, it does not implicate any of the finality concerns raised by *CalPERS* by subjecting the

defendants to "protracted liability" in contravention of the legislative policies underlying section

548(a). *See CalPERS*, 137 S.Ct. at 2051 (internal citation omitted). Even if section 548(a) was

construed as a statute of repose, and thus subject to the reasoning set out in *CalPERS*, the

Trustee's method to determine avoidance liability is entirely in line with the decision. As a

result, Defendants' reliance on *CalPERS* is misplaced.

## CONCLUSION

Defendants have failed to meet their burden on the Motion. For the reasons discussed

above, the Trustee respectfully requests that the Motion be denied in its entirety.

Dated: New York, New York
      September 5, 2017


Of Counsel:

BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
Telephone: (202) 861-1500
Facsimile: (202) 861- 1783
Kendall E. Wangsgard
Email: kwangsgard@bakerlaw.com

BAKER & HOSTETLER LLP

By: /s/  Keith R. Murphy
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com

Heather J. McDonald
Email: hmcdonald@bakerlaw.com
Anat Maytal
Email: amaytal@bakerlaw.com
Maximillian S. Shifrin
Email: mshifrin@bakerlaw.com

Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC and
the Estate of Bernard L. Madoff