UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br>v.<br><br>KEN-WEN FAMILY LIMITED PARTNERSHIP; KENNETH W. BROWN, in his capacity as a General Partner of the Ken-Wen Family Limited Partnership; and WENDY BROWN,<br><br>        Defendants. | Adv. Pro. No. 10-04468 (SMB) |

### DECLARATION OF JUSTIN P. DUDA IN SUPPORT OF THE TRUSTEE'S MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT AND FOR RELATED RELIEF

    I, Justin P. Duda, hereby declare as follows:

    1.    I am an associate attorney at the law firm of Young Conaway Stargatt & Taylor, LLP, counsel to Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* and the substantively consolidated chapter 7 estate of Bernard L. Madoff.

01:21868323.2

2. The Trustee has made numerous attempts to obtain the Defendants' consent to the filing of an amended complaint, substantively in the form of the First Amended Complaint. Most recently, on July 24, 2017, my colleague, Michael S. Neiburg, sent a draft stipulation concerning the proposed amendment via email to the Defendants' counsel. We received no response or feedback from the Defendants' counsel. Thereafter, on August 17, 2017 and August 30, 2017, Mr. Neiburg and I made further inquiries concerning the proposed stipulation. The Defendants, however, did not respond to any of the latest inquiries and thus have not provided their consent, necessitating the filing of the Motion by the Trustee.

3. Attached hereto as <u>Exhibit A</u> is a true and correct copy of the Trustee's First Amended Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 25, 2017

                                                            YOUNG CONAWAY STARGATT &
                                                            TAYLOR, LLP

                                                           By: */s/ Justin P. Duda*
                                                           Matthew B. Lunn
                                                           Justin P. Duda
                                                           Rockefeller Center
                                                           1270 Avenue of the Americas, Suite 2210
                                                           New York, New York 10020
                                                           Telephone: (212) 332-8840
                                                           Facsimile: (212) 332-8855
                                                           Email: jduda@ycst.com

# **EXHIBIT A**

**Young Conaway Stargatt & Taylor, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Justin P. Duda

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and for the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>  Plaintiff-Applicant,<br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>  Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>  Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>  Plaintiff,<br>v.<br><br>KEN-WEN FAMILY LIMITED PARTNERSHIP; KENNETH W. BROWN, in his capacity as a General Partner of the Ken-Wen Family Limited | Adv. Pro. No. 10-04468 (SMB) |

Partnership; and WENDY BROWN, in her capacity as a General Partner of the Ken-Wen Family Limited Partnership,

Defendants.

# FIRST AMENDED COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L. Madoff individually ("Madoff"), by and through his undersigned counsel, for his amended complaint (the "Amended Complaint") against the Ken-Wen Family Limited Partnership ("Ken-Wen"), Kenneth W. Brown, in his capacity as a General Partner of Ken-Wen, and Wendy Brown, in her capacity as a General Partner of Ken-Wen (collectively, the "Defendants"), states as follows:

## NATURE OF PROCEEDING

1. This adversary proceeding arises from the massive Ponzi scheme perpetrated by Madoff. Over the course of the scheme, there were more than 8,000 client accounts at BLMIS. In early December 2008, BLMIS generated client account statements for its approximately 4,900 open client accounts. When added together, these statements purport that clients of BLMIS had approximately $65 billion invested with BLMIS. In reality, BLMIS had assets on hand worth a small fraction of that amount. On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in prison.

2. The Defendants were beneficiaries of Madoff's Ponzi scheme. The Trustee's investigation has revealed that between December 11, 2006 and December 11, 2008, the Defendants received $3,850,000 in fictitious profits from the Ponzi scheme (collectively, the

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

01:17196194.5

2

"<u>Transfers</u>"), meaning that the Defendants withdrew more than was invested in Ken-Wen's BLMIS account (*see* **Exhibit B**, Column 8).  Accordingly, the Defendants collectively have received $3,850,000 of other people's money.  The Transfers of fictitious profits to the Defendants constitute avoidable transfers and are recoverable by the Trustee.  This action is brought to recover the Transfers so that this customer property can be equitably distributed among the holders of allowed claims in this SIPA proceeding.

3. This adversary proceeding is brought pursuant to sections 78ffff(b) and 78fff-2(c)(3) of SIPA, sections 105(a), 548(a), 550(a) and 551 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and other applicable law, for avoidance of fraudulent conveyances in connection with certain transfers of property by BLMIS to or for the benefit of the Defendants. The Trustee seeks to set aside such transfers and preserve and recover the property for the benefit of the BLMIS estate.

## JURISDICTION AND VENUE

4. This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "<u>SIPA Proceeding</u>"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.,* No. 08 CV 10791 (the "<u>District Court Proceeding</u>") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4).

5. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

6. Venue in this district is proper under 28 U.S.C. § 1409.

7. This adversary proceeding is brought pursuant to sections 78ffff(b) and 78fff-2(c)(3) of SIPA, sections 105(a), 548(a), 550(a) and 551 of the Bankruptcy Code, and other applicable law

## DEFENDANTS

8. Defendant Ken-Wen is a Limited Partnership that was formed under the laws of the State of Florida. Its principal place of business is located at 230B South County Road, Palm Beach, Florida 33480. Defendant Ken-Wen's registered agent in the State of Florida is Doris Shaw, 230B South County Road, Palm Beach, Florida 33480. Defendant Ken-Wen holds a BLMIS account in the name, "Ken-Wen Family LP LTD."

9. Defendant Kenneth W. Brown is a general partner of Defendant Ken-Wen and, upon information and belief, maintains his residence in Lantana, Florida.

10. Defendant Wendy Brown is a general partner of Defendant Ken-Wen and, upon information and belief, maintains her residence in Lake Worth, Florida.

## BACKGROUND, THE TRUSTEE AND STANDING

11. On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

12. On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

13. Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

   a. appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;

   b. appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

   c. removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

14. By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

15. On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

16. At a plea hearing on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an eleven-count criminal information filed against him by the United States Attorney for the Southern District of New

York. At the plea hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

17. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

18. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

19. On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

20. As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the

Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

21. Pursuant to section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to section 78fff(b) of SIPA. Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to section 78fff(b) of SIPA.

22. The Trustee has standing to bring these claims pursuant to applicable provisions of SIPA, including sections 78fff-1(a) and 78fff-2(c)(3), and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers, pursuant to section 548, 550(a), and 551 of the Bankruptcy Code, and applicable provisions of SIPA, including § 78fff-2(c)(3).

## THE FRAUDULENT PONZI SCHEME

23. Madoff founded BLMIS in or about 1960 as a sole proprietorship. On January 1, 2001, Madoff continued BLMIS as a sole member limited liability company under the laws of the State of New York. BLMIS's ownership and control did not change since its formation in 1960. During that time, BLMIS had been continually registered with the SEC, and remained a SIPC member since its formation in late 1970. For most of its existence, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, sole owner, chairman, and chief executive officer, operated BLMIS with several family members and other employees, including DiPascali and Kugel.

24. At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings.

25. BLMIS purported to execute two primary investment strategies for IA Business customers: the convertible arbitrage strategy and the split strike conversion strategy ("SSC strategy"). At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

26. The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of IA Business accounts.

27. Madoff claimed his SSC strategy would produce steady returns without the volatility in the stock market or other high return investment strategies. Madoff generally indicated that investors' funds would be invested in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100 Index"), which is a collection of the 100 largest publicly traded companies, as determined by Standard & Poor's Index Committee. The basket of stocks was designed to correlate to the movement of the S&P 100 Index. The second part of the SSC strategy involved purporting to sell call options and buy put options on the S&P 100 Index; this is commonly referred to as a "collar." Madoff purported to purchase and sell option contracts to control the downside risk of price changes in the basket of stocks correlated to the performance of the S&P 100 Index. All options relating to the companies within the S&P 100

Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

28. BLMIS commingled all of the funds received from IA Business investors in a single BLMIS account maintained at JPMorgan Chase Bank.

29. Because Madoff claimed that he would carefully time purchases and sales to maximize value, customer funds would intermittently be out of the market. During those times, Madoff claimed that the funds were invested in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills. There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy. At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business as a Ponzi scheme.

30. The money received from IA Business customers was used primarily to make distributions to, or payments for, other customers. The falsified trades reflected in monthly account statements made it appear that the IA Business accounts included substantial gains on customers' principal investments. The Ponzi scheme collapsed in December 2008, when the requests for redemptions overwhelmed the flow of new investments with BLMIS's IA Business.

31. Since at least 1983, BLMIS financial reports filed with the SEC fraudulently omitted the existence of the billions of dollars of customer funds held by BLMIS.

01:17196194.5

9

32. BLMIS did not register as an investment adviser with the SEC until August 2006. At that time, BLMIS filed with the SEC a Form ADV (Uniform Application for Investment Adviser Registration) representing, among other things, that BLMIS had 23 customer accounts and assets under management of $11.7 billion. Thereafter, BLMIS filed a Form ADV annually with the SEC, the latest of which was filed in January 2008. It represented that BLMIS had 23 customer accounts with assets under management of $17.1 billion. In fact, at that time, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion under management.

33. Contrary to standard practice in the investment advisory industry, BLMIS did not charge the IA Business customers a fee for investment advisory services. Madoff knew others that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts, charged hundreds of millions of dollars for investment advisory services attributed to BLMIS. Instead of investment advisory fees, BLMIS purported to accept commissions for the purported trades, as reflected in the fraudulent IA Business customer statements.

34. BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), a three-person accounting firm in Rockland County, New York. Of the three employees at the firm, one employee was an administrative assistant and one was a semi-retired accountant living in Florida. On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.

35. At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## THE ACCOUNT AGREEMENTS

36.  According to BLMIS's records, an account (No. 1EM226) (the "Account") was maintained with BLMIS in the name of Ken-Wen, as set forth on **Exhibit A**. Upon information and belief, for the Account, a "Customer Agreement," an "Option Agreement," and/or a "Trading Authorization Limited to Purchases and Sales of Securities and Options" (collectively, the "Account Agreements") were executed and delivered to BLMIS at its headquarters at 885 Third Avenue, New York, New York. Additionally, there were periodic customer statements, confirmations, and other communications made by BLMIS or Madoff and sent to one or more of the Defendants.

37.  The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Account was held in New York, New York, and the Defendants sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Account and the purported conducting of trading activities. Between the date the Account was opened and the Filing Date, the Defendants made deposits to BLMIS through checks and/or wire transfers into the BLMIS Bank Account and/or received inter-account transfers from other BLMIS accounts.

## THE TRANSFERS

38.  During the two years prior to the Filing Date, BLMIS made Transfers to the Defendants of $3,850,000. The Transfers were made to or for the benefit of the Defendants and are set forth in Column 9 on **Exhibit B** annexed hereto.

39.  The Transfers constitute fictitious profits supposedly earned in the Account, but, in reality, they were other people's money.

01:17196194.5

11

40. The Transfers are avoidable and recoverable under sections 548(a), 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3) of SIPA, and total $3,850,000. *See* **Exhibit B**, Column 9.

41. The Trustee's investigation is ongoing and the Trustee reserves the right to (i) supplement the information regarding the Transfers and any additional or subsequent transfers and (ii) seek recovery of such additional transfers.

## COUNT ONE
## FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(A)(1)(A), 550(A) AND 551

42. To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

43. Each of the Transfers was made on or within two years before the Filing Date.

44. Each of the Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

45. Each of the Transfers was made or incurred by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing and/or future creditors.

46. Each of the Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

47. As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and sections 78fff-1(a) and 78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against the Defendants: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, and (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

i.  On the Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and sections 78fff(b) and 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, and (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

ii.  On the Claim for Relief, pursuant to federal common law awarding the Trustee prejudgment interest from the date on which the Transfers were received;

iii.  On the Claim for Relief, establishment of a constructive trust over the proceeds of the Transfers in favor of the Trustee for the benefit of BLMIS's estate;

iv.  On the Claim for Relief, assigning the Defendants' income tax refunds from the United States, state and local governments paid on fictitious profits during the course of the scheme;

v.  On the Claim for Relief, awarding the Trustee all applicable interest, costs, and disbursements of this action; and

vi.  On the Claim for Relief, granting Plaintiff such other, further, and different relief as the Court deems just, proper, and equitable.

| | |
|---|---|
| Dated: September 25, 2017<br>New York, New York | YOUNG CONAWAY STARGATT &<br>TAYLOR, LLP<br><br>*/s/ Matthew B. Lunn*<br>Matthew B. Lunn<br>Justin P. Duda<br>Rockefeller Center<br>1270 Avenue of the Americas, Suite 2210<br>New York, New York 10020<br>Telephone: (212) 332-8840<br>Facsimile: (212) 332-8855<br>Email: *mlunn@ycst.com*<br>          *jduda@ycst.com*<br><br>*Attorneys for Plaintiff Irving H. Picard,<br>Trustee for the Liquidation of Bernard L.<br>Madoff Investment Securities LLC* |

**Exhibit A**

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| KEN-WEN FAMILY LP LTD | 1EM226 |

**BLMIS ACCOUNT NO. 1EM226 - KEN-WEN FAMILY LP LTD**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 |
|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Amount as Reported in Customer Statement | Deposits | Withdrawals | Transfers In | Transfers Out | Balance of Principal | 2-Year Fraudulent Transfers | 2-Year Principal Transfers |
| 1/4/1993 | TRANS FROM E & M 2 *(1E0002)* | 535,163 [1] | - | - | 340,000 | - | 340,000 | - | - |
| 8/31/1993 | CHECK | 30,000 | 30,000 | - | - | - | 370,000 | - | - |
| 11/9/1993 | CHECK | 25,000 | 25,000 | - | - | - | 395,000 | - | - |
| 2/7/1994 | CHECK | 75,000 | 75,000 | - | - | - | 470,000 | - | - |
| 7/13/1994 | CHECK | 25,000 | 25,000 | - | - | - | 495,000 | - | - |
| 8/29/1994 | CHECK | 25,000 | 25,000 | - | - | - | 520,000 | - | - |
| 11/21/1994 | CHECK | 74,000 | 74,000 | - | - | - | 594,000 | - | - |
| 5/22/1995 | CHECK | 35,000 | 35,000 | - | - | - | 629,000 | - | - |
| 9/8/1995 | CHECK | 25,000 | 25,000 | - | - | - | 654,000 | - | - |
| 10/16/1995 | CHECK | 75,000 | 75,000 | - | - | - | 729,000 | - | - |
| 1/11/1996 | CHECK | 25,000 | 25,000 | - | - | - | 754,000 | - | - |
| 7/18/1996 | CHECK | 34,000 | 34,000 | - | - | - | 788,000 | - | - |
| 9/6/1996 | CHECK | 50,000 | 50,000 | - | - | - | 838,000 | - | - |
| 4/18/1997 | CHECK | 55,000 | 55,000 | - | - | - | 893,000 | - | - |
| 6/10/1997 | CHECK | 35,000 | 35,000 | - | - | - | 928,000 | - | - |
| 7/10/1997 | CHECK | 100,000 | 100,000 | - | - | - | 1,028,000 | - | - |
| 8/14/1997 | CHECK | 100,000 | 100,000 | - | - | - | 1,128,000 | - | - |
| 10/9/1997 | CHECK | 100,000 | 100,000 | - | - | - | 1,228,000 | - | - |
| 2/26/1998 | CHECK | 50,000 | 50,000 | - | - | - | 1,278,000 | - | - |
| 5/26/1999 | CHECK | (450,000) | - | (450,000) | - | - | 828,000 | - | - |
| 4/28/2000 | CHECK WIRE | (501,000) | - | (501,000) | - | - | 327,000 | - | - |
| 1/23/2004 | CHECK | (375,000) | - | (375,000) | - | - | (48,000) | - | - |
| 2/10/2004 | CHECK | (55,000) | - | (55,000) | - | - | (103,000) | - | - |
| 5/7/2004 | CHECK | (450,000) | - | (450,000) | - | - | (553,000) | - | - |
| 2/16/2005 | CHECK | (220,000) | - | (220,000) | - | - | (773,000) | - | - |
| 12/2/2005 | CHECK | (250,000) | - | (250,000) | - | - | (1,023,000) | - | - |
| 2/16/2006 | CHECK | (250,000) | - | (250,000) | - | - | (1,273,000) | - | - |
| 4/17/2006 | CHECK WIRE | (600,000) | - | (600,000) | - | - | (1,873,000) | - | - |
| 6/26/2007 | CHECK | (150,000) | - | (150,000) | - | - | (2,023,000) | (150,000) | - |
| 12/31/2007 | CHECK WIRE | (500,000) | - | (500,000) | - | - | (2,523,000) | (500,000) | - |
| 1/24/2008 | CHECK WIRE | (3,000,000) | - | (3,000,000) | - | - | (5,523,000) | (3,000,000) | - |
| 11/17/2008 | CHECK | (200,000) | - | (200,000) | - | - | (5,723,000) | (200,000) | - |
| | Total: | | $ 938,000 | $ (7,001,000) | $ 340,000 | $ - | $ (5,723,000) | $ (3,850,000) | $ - |

[1] Although BLMIS Customer Statements reflect that a larger transfer was made into the account on this date, a portion of the "transferred" funds consisted of fictitious profits which were never achieved and thus could not have been transferred. Accordingly, only the applicable principal was transferred into this account on this date.