**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Ona T. Wang
Tracy Cole
M. Elizabeth Howe
David M. McMillan

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>            Plaintiff-Applicant, <br><br>      v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>            Defendant. | Adv. Pro. No. 08-01789 (SMB) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>            Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br>            Plaintiff, <br><br>      v. <br><br> MAGNIFY INC.; PREMERO INVESTMENTS LTD.; STRAND INTERNATIONAL INVESTMENTS LTD.; THE YESHAYA HOROWITZ ASSOCIATION; YAIR GREEN; and EXPRESS ENTERPRISES INC., <br><br>            Defendants. | Adv. Pro. No. 10-05279 (SMB) <br><br> <u>**SECOND AMENDED COMPLAINT**</u> |

## SECOND AMENDED COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"),[1] and the substantively consolidated estate of Bernard L. Madoff individually ("Madoff"), by the Trustee's undersigned counsel states as follows:

## I.    INTRODUCTION

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by Madoff through BLMIS.  With the assistance of individuals both inside and outside BLMIS, Madoff defrauded many hundreds of customers who had invested in BLMIS's investment advisory business (the "IA Business") out of billions of dollars.

2.      The avoidable transfers in this case stem from a partnership between Albert Igoin ("Igoin"), a French banker who was one of Madoff's oldest and largest customers,[2] and Israeli attorney Defendant Yair Green ("Green").  Igoin created Defendant Magnify Inc. ("Magnify") in 1983, and handed control of Magnify over to Green in 1989.  For the next two decades, Green and several other defendants used Magnify's BLMIS accounts as a fountain of "free money."

3.      The six BLMIS accounts at issue in this proceeding (the "Accounts") are unique. Because the Defendants knew BLMIS was a fraud, Madoff eventually stopped bothering to create the façade of securities trading that was the hallmark of his Ponzi scheme, even as he delivered almost $150 million in fictitious profits to Defendants.

---

[1] Future references to SIPA will not include "15 U.S.C."

[2] Igoin and his family maintained personal accounts with BLMIS for the benefit of his wife, Doris Igoin, who died in 2005, his only daughter, Laurence Apfelbaum, and his only granddaughter, Emilie Apfelbaum. Mrs. Igoin's estate, Laurence Apfelbaum, and Emilie Apfelbaum were defendants in a separate action by the Trustee, *Picard v. Estate (Succession) of Doris Igoin, et al.,* No. 10-04336 (SMB) (Bankr. S.D.N.Y. 2010), arising from their withdrawals from separate BLMIS accounts held by or for the benefit of the Igoin family, which has since settled.

1

4.      Igoin deposited just over $3 million into Magnify's first BLMIS account in 1983.
Over the next twenty-five years, virtually no money was ever deposited in either of the two
Accounts held by Magnify, and only about $2 million more in real cash would ever be deposited
into any of the Accounts.  Yet the Defendants collectively withdrew more than $150 million
from the Accounts, the vast majority of which consisted of fictitious profits from the Ponzi
scheme. *See* Exhibits A & B.

5.      Through withdrawals from the Accounts, Green pocketed several million dollars
and distributed millions more to his entities and family members both directly and through bank
accounts in Switzerland and Israel.  But most of the money, including more than $120 million in
fictitious profits, was transferred from Magnify to Defendant Yeshaya Horowitz Association's
("YHA") Account, and then distributed by Green and others to prominent organizations
throughout Israel.

6.      On paper, the Accounts purported to accumulate enormous value over time,
sometimes growing by more than $100 million in a single year.  Over the course of the Magnify
Accounts' 25-year history, Igoin's initial cash deposit of approximately $3 million purportedly
grew to more than $750 million—over and above the transfers and withdrawals at issue in this
action.

7.      During the time BLMIS created records of fake securities trades for the Magnify
Accounts, the most egregious fabrications were dated September 1990.  Just months after Igoin
transferred Magnify to Green's control in 1989, BLMIS purported to create the second Magnify
Account and "fund" it with proceeds from several blatantly backdated trades.  BLMIS reported
generating nearly $120 million of purported value in the new account by "buying" securities
before the Account was opened, without any assets with which to buy them, and "selling" them

2

at a profit, again before the Account was opened.  As the person in control of Magnify and its

Accounts at the time, Green knew from the face of the September 1990 Magnify customer

statement that BLMIS was not trading real securities.

8.      Using his control over Magnify and its Accounts, Green directed more than $126

million in inter-account transfers from the Magnify Accounts to YHA's Account.  Withdrawals

from YHA's Account financed YHA's "donations" to prominent hospitals, universities, and

research institutions in Israel.  In return, Green received accolades and honors for his perceived

largesse.  For example, YHA gave Bar Ilan University and Ben Gurion University grants totaling

more than $28 million.  Afterward, Green received honorary doctorates from both institutions,

and was appointed to Ben Gurion University's investment and management committees.  Green

was also elected to the board of trustees of the Weizmann Institute in Israel, which received more

than $13.5 million from YHA. YHA's board benefitted from Green's generous funding: Hebrew

University, which employed two YHA board members, received more than $36 million from

YHA.  While directing multimillion dollar transfers from the Magnify Accounts to YHA's

Account, Green also skimmed millions off the top for himself in the form of purported

investment management fees, and also used certain Accounts to transfer millions of dollars to

family members, other entities he controlled, and foreign investments.

9.      Eventually, Madoff was able to stop even pretending to trade in securities in the

non-YHA Accounts because Green was actively participating in the fraud.  Within a few years of

Green assuming control, the Magnify Accounts stopped receiving monthly customer statements.

Instead, Green personally met with Madoff two or three times a year to discuss the Accounts and

received abbreviated account records dubbed "Portfolio Evaluations": single sheets of paper

showing a list of Magnify's supposed holdings and their value as of the mid- or year-end period

closing immediately before the meetings. BLMIS employees would create draft Portfolio

Evaluations in preparation for Green's meeting with Madoff, and they would only be finalized

after Green met with Madoff and BLMIS employee Frank DiPascali ("DiPascali").

10.    These Portfolio Evaluations did not reflect any trading activity, withdrawals,

deposits, or any other information by which one could determine anything about how the non-

YHA Accounts were supposedly achieving their value. With the exception of YHA, which was

regulated by law and subject to reporting requirements, these scant Portfolio Evaluations were

the only BLMIS account records received by any of the Defendants from the mid-1990s on. No

other BLMIS customer received the type of Portfolio Evaluation created by Green and Madoff

for the non-YHA Accounts. The history of these Accounts demonstrates Green's actual

knowledge of—and participation in—BLMIS's fraud.

## II.    <u>JURISDICTION AND VENUE</u>

11.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78lll(4), that was stolen as part of Madoff's

massive Ponzi scheme. It was commenced in the same Court before which the main underlying

SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending. The SIPA

Proceeding was originally brought in the United States District Court for the Southern District of

New York as *Securities and Exchange Commission v. Bernard L. Madoff Investment Securities

LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been removed to this

Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and

SIPA § 78eee(b)(2)(A), (b)(4).

12.    This case is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and

(O). The Trustee consents to the entry of final orders or judgment by this Court if it is

4

determined that consent of the parties is required for this Court to enter final Judgment consistent

with Article III of the U.S. Constitution.

13.     Venue in this district is proper under 28 U.S.C. § 1409.

14.     This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b), 78fff-1(a) and

78fff-2(c)(3), 11 U.S.C. §§ 105(a), 510(c), 544, 547, 548(a), 550(a) and 551, the New York

Fraudulent Conveyance Act (N.Y. Debt. & Cred. §§ 270 *et seq*. (McKinney 2001) ("DCL")), and

other applicable law.

## III.    BACKGROUND, THE TRUSTEE, AND STANDING

15.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for violation of the criminal securities laws, including securities fraud, investment adviser fraud,

and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission

("SEC") commenced the District Court Proceeding.  On December 15, 2008, under SIPA §

78eee(a)(4)(A), the SEC consented to combining its own action with an application by the

Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B),

SIPC filed an application in the District Court alleging, among other things, that BLMIS was not

able to meet its obligations to securities customers as they came due and its customers needed the

protections afforded by SIPA.

16.     On December 15, 2008, Judge Stanton granted SIPC's application and entered an

order pursuant to SIPA, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS
        pursuant to SIPA § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
        SIPA § 78eee(b)(3); and

(c)     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

5

17.    By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

18.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, this Court substantively consolidated the Chapter 7 estate of Madoff into

the SIPA Proceeding.

19.    As the Trustee appointed under SIPA, the Trustee is charged with assessing

claims, recovering and distributing customer property to BLMIS's customers holding allowed

customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its

creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and

recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and

others to the detriment of defrauded, innocent customers whose money was consumed by the

Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the

claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

20.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy

trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant

to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of Chapter 7 of the Bankruptcy

Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

21.    The Trustee has standing to bring the avoidance and recovery claims under SIPA

§ 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b),

544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover

transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-

1(a) and 78fff-2(c)(3).

22.     The Trustee has standing to object to customer and creditor claims under SIPA § 78fff-1(a) and 78fff(b), and 11 U.S.C. § 502(a), because the Trustee has the power and authority to discharge obligations to a customer to the extent they are established to the satisfaction of the Trustee under SIPA §§ 78lll(2) and 78fff-2(b).  By his objection, the Trustee seeks disallowance of any customer and general creditor claims that are unenforceable against the Debtors or their property under (i) SIPA § 78fff-2(b), because such claims have not been established to his satisfaction; (ii) SIPA § 78lll(2), because such claims are not entitled to a distribution *pari passu* with other customers; and (iii) 11 U.S.C. § 502(b)(1), because such claims are otherwise unenforceable under applicable law.

## IV.    THE PONZI SCHEME

23.     Founded by Madoff in or around 1960 initially as a sole proprietorship, in 2001, BLMIS became a New York Limited Liability Company.  Madoff controlled the company throughout its existence first as sole member, and thereafter as chairman and chief executive.  On the operational side of the business, Madoff was assisted by several family members and a small number of other employees.  For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City.

24.     In compliance with 15 U.S.C. § 78*o*(b)(1) and SEC Rule 15B1-3, and regardless of its business form transitioning from sole proprietorship to limited liability company, BLMIS operated as one broker-dealer from 1960 through 2008.  The public records maintained by the Central Registration Depository ("CRD") of the Financial Industry Regulatory Authority, Inc. reflect that BLMIS was registered continually as a securities broker-dealer from January 1, 1960 through December 31, 2008, assigned CRD No. 2625 throughout that period.  The Membership Management System database maintained by SIPC ("MMS") reflects that BLMIS also was registered with the SEC as a securities broker-dealer on January 19, 1960 to December 31, 2008.

7

SIPC membership is contingent on registration of the broker-dealer with the SEC.  The MMS

also reflects that BLMIS became a member of SIPC on December 30, 1970, and continued

thereafter without any change in status until the Filing Date.

25.    On March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-

CR-213 (DC), Madoff pleaded guilty to an eleven-count criminal information filed against him

by the United States Attorney's Office for the Southern District of New York.  At the plea

hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side

of [BLMIS]."

26.    On August 11, 2009, in the case captioned *United States v. DiPascali*, No. 09-CR-

764 (RJS), DiPascali pleaded guilty to a ten-count criminal information charging him with

participating in and conspiring to perpetuate the Ponzi scheme.  Among other things, DiPascali

admitted that no purchases or sales of securities took place in connection with BLMIS customer

accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

27.    At a plea hearing on November 21, 2011, in the case captioned *United States v.

Kugel*, Case No. 10-CR-228 (LTS), David Kugel ("Kugel"), another former BLMIS employee,

pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying

the records of BLMIS, conspiracy, and bank fraud.  At his plea hearing, Kugel admitted to

helping create fake, backdated trades in BLMIS customer accounts beginning in the early 1970s.

28.    On March 14, 2014, former BLMIS employees Annette Bongiorno

("Bongiorno"), Daniel Bonventre, Jo Ann Crupi, George Perez and Jerome O'Hara were

convicted of fraud and other crimes in connection with their participation in the Ponzi scheme.

Bongiorno and DiPascali, among others, supervised the Accounts at various times.

29.     Madoff operated three principal business units within BLMIS: a proprietary

trading desk, a broker dealer operation, and the IA Business.  At all relevant times, the IA

Business was operated as a Ponzi scheme. BLMIS commingled all of the funds received from IA

Business investors in a single BLMIS account maintained at JPMorgan Chase Bank.  The money

received from IA Business customers was used primarily to make distributions to, or payments

for, other customers.  BLMIS provided falsified monthly account statements which made it

appear that the IA Business accounts included substantial gains on customers' principal

investments.  The Ponzi scheme collapsed in December 2008, when the requests for redemptions

overwhelmed the flow of new investments with BLMIS's IA Business.

30.     For most accounts in the IA Business, Madoff purported to engage in the fictitious

convertible arbitrage strategy in the 1970s and 1980s, followed by the fictional split-strike

conversion ("SSC") strategy beginning in the early 1990s.  For certain special accounts, Madoff

purported to execute a capital appreciation/depreciation strategy that would provide a guaranteed

rate of return by purporting to purchase groups of securities near lows and then purporting to sell

those same securities years later at highs, or by purporting to short-sell securities near highs and

then purporting to cover those short positions near lows.

31.     The Accounts at issue here, however, were unique.  While the YHA Account

purported to engage in a fictitious SSC strategy, the other Magnify-related Accounts engaged in

no consistent strategy throughout the 1980s, and abandoned any trading strategy whatsoever in

the 1990s.  To the extent trading activity was reported in the non-YHA Accounts at all, they

achieved gains through capital appreciation: minimal growth in the 1980s, the spontaneous

generation of more than $120 million of value in 1990, followed by unexplained but consistently

positive purported rates of return (with no negative periods) through BLMIS's collapse in 2008.

From the mid-1990s until BLMIS's collapse in 2008, BLMIS stopped reporting the purchase or

sale of securities in all Magnify-related Accounts other than YHA's. As detailed below in

Section VII, BLMIS simply generated semi-annual snapshots of purported securities holdings as

of a specified date, showing consistent growth in each portfolio with no indication of how it was

achieved. Of the thousands of accounts involved in the BLMIS fraud, the non-YHA Accounts

were the only ones in which Madoff did not even bother to report fake securities trading.

32.     For its IA Business customers generally, since at least the 1970s, BLMIS

fraudulently claimed to engage in securities trades that did not occur. Basic market data reveals

that those purported trades did not, and could not have taken place as reported on BLMIS

customer statements. For example, there are many instances where the total number of shares of

a particular security purportedly traded by BLMIS significantly exceeded the entire reported

market volume for that particular security on that particular day. Even where BLMIS

purportedly traded securities within normal market volumes, there are many instances where the

prices of those trades were outside the daily market price range for that security. In many other

examples, BLMIS account statements reported trades of a particular security when actual market

reports show that particular security simply did not change hands in the market on that reported

date.

33.     Since at least 1983, BLMIS financial reports filed with the SEC fraudulently

omitted the existence of the billions of dollars of customer funds held by BLMIS. BLMIS did

not register as an investment adviser with the SEC until August 2006. At that time, BLMIS filed

a Form ADV (Uniform Application for Investment Adviser Registration) with the SEC

representing, among other things, that BLMIS had 23 customer accounts and assets under

management of $11.7 billion. Thereafter, BLMIS annually filed a Form ADV with the SEC, the

last of which was filed in January 2008. In that filing, BLMIS represented that it had 23

customer accounts with assets under management of $17.1 billion. In fact, at that time, BLMIS

had over 4,900 active customer accounts with a purported value of approximately $68 billion

under management.

34.    BLMIS's auditor was Friehling & Horowitz, CPA, P.C. ("Friehling &

Horowitz"), a three-person accounting firm in Rockland County, New York. Of the three

employees at the firm, one employee was an administrative assistant and one was a semi-retired

accountant living in Florida. On or about November 3, 2009, David Friehling, the sole

proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and

filing false tax returns for Madoff and others.

35.    At all relevant times, BLMIS was insolvent because: (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.    THE DEFENDANTS AND THE ACCOUNTS

36.    The Defendants in this action are a group of individuals and entities that invested

with or received transfers from BLMIS. Defendant entities Magnify and YHA were created in

the 1980s, followed by Premero Investments Ltd. ("Premero"), Strand International Investments

Ltd. ("Strand"), and Express Enterprises Inc. ("Express"). Green operated each of these entities

pursuant to a fraudulent scheme in order to, among other things, obtain money and benefits for

himself, and his personal and business pursuits.

### A.    Green directed transfers to the Defendants.

37.    Defendant Green is an individual residing in Jerusalem, Israel. As discussed

further below, Green had full control of the Magnify Accounts beginning around December

1989. Green was the mastermind behind the operation of Magnify and Strand, which he used to

11

pursue his own agenda, and to profit personally and professionally throughout Israel. Indeed, Green, Magnify and Strand shared such a unity of interest and control that the individuality and separateness of Green, Magnify and Strand ceased to exist.

38.    Defendant Magnify is a corporation incorporated under the laws of Panama on or about June 21, 1983, with a registered agent and address in Panama City, Panama. As of December 2008, Magnify held two accounts at BLMIS (Nos. 1FN024 and 1FN025[3]). In 1995, Green had non-party Kurt Brunner ("Brunner") appoint him Magnify's Managing Director and grant him a general power of attorney. Through Green's control of Magnify from at least 1989 forward, Green diverted millions of dollars to himself, his family, and other contacts, and to Swiss and Israeli bank accounts.

39.    Magnify's legal and organizational documents were executed by Brunner, a Swiss attorney who was retained by Igoin in or around 1983 to serve as the formal director of Magnify, and later by Green for Strand, Express and Premero. Brunner did not exercise control or have any substantive decision-making authority over their affairs. Until approximately April 2016, Brunner was Magnify's Director and Chairman. In or around April 2016, Magnify named Ayala Nahir ("Nahir"), Igoin's niece, its new Chairperson and Director, appointed Green as Director and Treasurer, and appointed Green's son, Amir Green, as Director and Secretary.

40.    Defendant YHA is an Israeli association registered with the Israeli Registrar of Associations on or about December 20, 1988. YHA's most recent known address is in Jerusalem, Israel, at the home address of non-party Nahir, who is YHA's Treasurer and

---

[3] The Magnify Accounts initially had different account numbers, which were renumbered by BLMIS in or around May 1992. Account no. 1FN024 (the "Magnify I Account") was initially account no. 1-05105-3-0, and account no. 1FN025 (the "Magnify II Account"), was initially account no. 1-05123-3-0.

Magnify's Chairperson and Director. Defendant YHA held an account at BLMIS (No. 1FN037[4])

in the name "The Yeshaya Horowitz Assoc Attn: Ayala Nahir [home address redacted]."

Defendant Green was the co-founder and legal counsel of YHA and at all relevant times had *de

facto* control over YHA and controlled the flow of funds into its Account. *See* Section VI,

below.

41.    Defendant Premero is a company formed under the law of the British Virgin

Islands (BVI) on or about December 30, 1992, with the company's registered office address

listed as HWR Services Limited of Craigmuir Chambers, P.O. Box 71, Road Town, Tortola,

BVI. Defendant Green founded Premero, served as the company's managing director and

supervised its BLMIS portfolio. On information and belief, Green created Premero as an

investment vehicle for himself and/or one of his clients. At all relevant times, Brunner was

Premero's "Sole Director." Premero held two accounts at BLMIS (Nos. 1FN073, the "Premero I

Account," and 1FN097, the "Premero II Account") in the names "Premero Investment Ltd." and

"Premero Investment Ltd. II," respectively, with no account address listed for the accountholder.

At all relevant times, Green was Premero's sole representative and dealt directly with Madoff on

Premero's behalf and for its benefit.

42.    Defendant Strand is a company formed under BVI law on or about September 3,

1998, with the company's registered office address listed as HWR Services Limited of Craigmuir

Chambers, P.O. Box 71, Road Town, Tortola, BVI. At all relevant times, Brunner was Strand's

"Sole Director." Strand held an account with BLMIS (No. 1FR051) in the name of "Strand

International Investment Ltd.," with no address listed for the accountholder. Defendant Green

---

[4] The YHA Account initially had a different account number, which was renumbered by BLMIS in or around May
1992. Account no. 1FN037 was initially account no. 1-05119-3-0.

founded Strand, served as the company's "Managing Director and/or authorized representative"
and supervised its BLMIS portfolio.  At all relevant times, Green was Strand's sole
representative and dealt directly with Madoff on Strand's behalf and for its benefit.  In filings
with this Court, Strand has represented that it is a wholly owned subsidiary of Magnify.

43.    Defendant Express is a company formed under BVI law at Green's direction on or
about February 3, 1992.  Green is Express's "Managing Director and/or authorized
representative."  On information and belief, Green created Express as an investment vehicle for
himself and/or one of his clients.  At Green's direction, Express received direct wire transfers
from BLMIS from Strand's Account and the Magnify I Account, despite never investing
anything in BLMIS or ever opening an account with BLMIS.  Express's registered agent is HWR
Services of Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands.

44.    The following sets forth the dates of formation, BLMIS account numbers (if any),
and types of account records received (if any) for each entity Defendant:

|  | YHA | Magnify | Premero | Strand | Express |
|---|---|---|---|---|---|
| **Established** | 1988 | 1983 | 1992 | 1998 | 1992 |
| **BLMIS Account Nos.** | **1FN037** (Opened 1989) | **1FN024** (Opened 1983) <br><br> **1FN025** (Opened 1990) | **1FN073** (Opened ca.1995) <br><br> **1FN097** (Opened ca. 1996) | **1FR051** (Opened 1999) | *No BLMIS account* |
| **Account Records Received from BLMIS** | Monthly Statements and Trade Confirmation Slips | Monthly Statements and Trade Confirmation Slips (initially) → Biannual Portfolio Evaluations (mid-1990s forward) | Biannual Portfolio Evaluations ONLY | Biannual Portfolio Evaluations ONLY | *No account records* |

14

**B.      This Court has personal jurisdiction over the Defendants.**

45.      This Court has personal jurisdiction over the Defendants under Bankruptcy Rule 7004 and the United States Constitution, as well as N.Y. C.P.L.R. § 302.  All Defendants have maintained minimum contacts with New York and the United States in connection with the claims alleged herein through actions including, but not limited to, the following:

          a.      Magnify, YHA, Strand and Premero were customers of BLMIS and had accounts with BLMIS in New York;

          b.      Magnify, YHA, Strand, Premero, Green and Express received transfers directly from BLMIS;

          c.      Green communicated regularly with Madoff, DiPascali and others regarding BLMIS and made personal visits to BLMIS's headquarters regarding Magnify's, YHA's, Strand's and Premero's Accounts with Madoff;

          d.      Magnify, Strand and Premero filed customer claims in the SIPA Proceeding, signed by Brunner and prepared and submitted by Green, seeking to recover funds that they allegedly lost on purported investments with BLMIS, whereby they submitted to the jurisdiction of this Court;

          e.      YHA also filed a customer claim prepared and submitted by Nahir and another YHA board member, seeking to recover funds that YHA allegedly lost on purported investments with BLMIS, whereby YHA submitted to the jurisdiction of this Court.

46.      Moreover, the Defendants received funds from BLMIS in New York, through New York banks, and have purposefully availed themselves of the laws of the United States and New York by undertaking significant commercial activities in New York and receiving customer property for their benefit.

47.     Accordingly, the Defendants have intentionally taken full advantage of the rights, benefits and privileges of conducting business and/or transactions in the United States and New York.

## VI.   GREEN TAKES OVER FOR IGOIN AND CONSOLIDATES CONTROL OVER IGOIN'S NETWORK OF COMPANIES AND ACCOUNTS

### A.     Igoin founds Magnify to invest with BLMIS.

48.     Albert Igoin was a French resident who died in January 1995.  Igoin was associated with Madoff on a business and/or social level since at least the late 1970s.

49.     In 1983, Igoin sought to move certain of his Swiss assets to BLMIS, insisting over his banker's expressed skepticism that Madoff would guarantee him 25% or 30% annual returns. The banker asked Brunner to organize a Panamanian company as an investment vehicle for Igoin and on or around June 21, 1983, Brunner founded Magnify.

50.     On that same day, Magnify's registered agent in Panama signed and issued two share certificates representing the corpus of Magnify.  According to its articles of incorporation, Magnify was authorized to issue 500 shares, which could be issued either to the bearer or in the name of the owner of the shares.

51.     In or around June 28, 1983, Igoin and Brunner executed an agreement that appointed Brunner Magnify's chairman and director.  Under that agreement, Brunner promised to carry out his duties exclusively according to Igoin's instructions.  Shortly after Magnify was created, Igoin instructed Brunner to transfer the corpus of one of Igoin's Swiss bank accounts (approximately $3,136,150) to BLMIS to fund the Magnify I Account.

52.     Without any account opening documents on file, BLMIS made an exception for Magnify, accepted Igoin's deposit and created the Magnify I Account.  The Account listed Brunner as the account contact and his law office as the account address.  Although Igoin, and

not Brunner, communicated with Madoff concerning Magnify and Igoin's accounts and

investments, Igoin's name did not appear anywhere in connection with the Magnify I Account

(or the Magnify II Account, as detailed below).

**B.     Igoin and Green establish YHA.**

53.     Igoin's charitable acts in Israel brought him to Green's attention and the two

became acquainted in the late 1980s.  Shortly thereafter, Igoin asked Green to create and register

an Israeli association to handle Igoin's planned charitable contributions in Israel.  Green filed

YHA's registration papers with the Israeli Registrar of Associations on or around May 4, 1988.

Green opened an account at BLMIS for YHA, which was funded by an inter-account transfer of

$3 million from the Magnify I Account on March 17, 1989.

54.     In YHA's registration documents, Green classified YHA as a "research

association," and named seven founders, including Igoin and his niece, Nahir. YHA's stated

aims in its articles of incorporation were "[to] promote and support research in Israel, with

particular attention paid to applied science; to finance the research and development of applied

scientific ideas at primary stages, when commercial help is not available; [and] to help young

and promising scientists interested in applied research."  In the same papers, Green represented

that YHA's income would be derived from "special donations secured through Mr. Albert

Igoin—hereinafter referred to as 'THE DONOR'."  Despite this initial disclosure, YHA later

kept Igoin's name out of its affairs, despite multiple requests by the Registrar to confirm the

identity of YHA's donor.

55.     In addition to incorporating YHA, Green served as its "legal representative" or

legal counsel from its inception.  Green also held himself out as a co-founder of YHA, who

"guided the organization's activities and . . . contributed significant sums for scientific and

medical research throughout Israel."

17

C.    **Igoin transfers Magnify to YHA, relinquishing control of both entities to Green.**

56.    At a December 14, 1989 meeting at Brunner's office in Switzerland, Igoin introduced Green to Brunner as "the person that then would deal with the fate of Magnify."  At Igoin's direction, Brunner then prepared board minutes and an "Assignment of Transfer," transferring ownership of Magnify to YHA by delivering Magnify's bearer shares to Green. After that meeting, Brunner received no further contact from Igoin on any matter, and dealt only with Green concerning Magnify.

57.    That same day, Green used his authority to open an account for Magnify at Bank Hapoalim, B.M. in Jerusalem, Israel ("Bank Hapoalim").

58.    From the time Magnify's shares were transferred to YHA in 1989, Green exercised full control over Magnify, which was the sole funding source for YHA.  Thus, while YHA appointed officers and a board of directors, it was Green who controlled the purse strings. Notably, as discussed below, Green controlled Magnify in dual capacities: as the Managing Director and investment manager for Magnify, and on behalf of YHA.

59.    Green presented himself at all times, both privately and publicly, as controlling YHA's "donations," which, as described further below, all originated from transfers from the Magnify Accounts to YHA's own Account.

60.    In addition to negotiating, drafting and signing YHA's grant agreements, Green often personally delivered YHA's funding checks to organizations and institutions, and gave speeches on behalf of YHA.  Green ensured that he was inseparable from YHA as a source of largesse.

61.    From December 1989 forward, YHA owned Magnify, and Green dominated and controlled both Magnify and YHA. As discussed below, Green directed the transactions within

18

the Magnify Accounts, founded additional entities and directed transfers to them, as well as

directed transfers to himself, his family members, and other personal interests.  He also pledged a

Magnify bank account as collateral for a personal debt and held himself out to another bank as

YHA's owner.

### D.    Green creates additional, related entities to hold BLMIS accounts and receive funds from BLMIS.

62.    Beginning in the early 1990s, Green began meeting with Madoff personally two

to three times per year to discuss Magnify's (and later Premero's and Strand's) Accounts.

63.    In 1992 and 1998, respectively, Green created new entities, Premero and Strand,

whose only purpose was to receive funds from BLMIS. Green ultimately opened three new

BLMIS accounts for these entities, two for Premero and one for Strand.  As detailed in Section

VII.C. below, Premero and Strand received only Portfolio Evaluations.  As set forth in Section

VIII, Green—and only Green—controlled Strand, and directed BLMIS to make inter-account

transfers of fictitious profits from the Magnify I Account to Strand's Account.  Green also used

Strand (which he represented that he beneficially owned) as collateral to obtain a mortgage to

buy his daughter a home in Maryland, and used a withdrawal from Strand's Account to buy an

apartment in Israel for a business associate.

64.    In addition, in or around 1992, Green directed Brunner to create a third company,

Express. Express received $1 million directly from BLMIS as redemptions from Strand's and

Magnify's Accounts.

### E.    After Igoin's death, Green boosts YHA's funding and influence, and dramatically increases withdrawals to third parties.

65.    Over the years, YHA's account was funded entirely by inter-account transfers

from the Magnify Accounts.  *See* Exhibit B. Virtually the only deposit into the Magnify

Accounts, in turn, was Igoin's initial deposit of $3,136,150 in July 1983.  The remaining

19

transfers to YHA were all the result of the artificial creation of value in the Magnify Accounts.

66.     After Igoin's death in 1995, Green dramatically escalated the volume and magnitude of inter-account transfers from the Magnify Accounts to YHA's Account.  The marked increase in available funds in YHA's Account correspondingly increased YHA's ability to withdraw funds to make significant donations.



67.     Unsurprisingly, YHA's redemptions from its Account also increased dramatically following Igoin's death in virtually the same manner as the above-described inter-account transfers from the Magnify Accounts to YHA's Account.  YHA then distributed these redemptions to grantees in Israel at a correspondingly increasing magnitude:



68.    Green also directed transfers of fictitious profits from the Magnify Accounts to be used for the benefit of certain individuals associated with YHA, including Nahir. Beginning at least by 1992 and continuing through 1999, Green directed transfers totaling nearly $3 million from the Magnify Accounts to accounts in Israel for the benefit of Nahir and her family.  At least $2.5 million of these transfers occurred after Igoin's death.  Beginning in 2002, Green also transferred a total of $300,000 from the Magnify Accounts to the widow of one of YHA's founding directors.

**F.** **Green formalizes his role as Magnify's investment manager, collects millions of dollars in "fees" and withdraws millions more to his personal benefit.**

69.    After Igoin's death in 1995, Green formalized in writing the control he had exercised for years before, but with a bolder twist.  Green drafted an agreement (the "Fee Agreement") between himself and Magnify appointing himself the manager and supervisor of Magnify's investment portfolio, which consisted solely of its Accounts, in exchange for a percentage of Magnify's purported profits.  At Green's request, Brunner signed the Fee Agreement on Magnify's behalf.  Brunner understood Green to be the only person from whom he could take direction with respect to Magnify.  Green then appended his own signature "consent[ing]" to the Fee Agreement that he had drafted.  Although the Fee Agreement was dated July 26, 1996, in it, Green represented that he undertook his duties under the agreement "as of January 1995," making the fees retroactive to that date.

70.    In addition to receiving fees for management duties for Magnify that Green failed to perform, he structured the arrangement so that there would be no oversight of his dealings with BLMIS.

71.    Green admits only to receiving a single BLMIS transfer of $3.15 million in 2002, and claims it was pursuant to the Fee Agreement executed in 1996.  Records demonstrate, however, that Green profited far more from the Accounts throughout the relevant period.

72.    Specifically, Green withdrew approximately $15 million from Magnify and Strand, which he directed to entities and individuals that benefitted himself, his family, and others having no relationship to YHA.  This included nearly $1.5 million that Green transferred directly from Strand's Account to his children, other individuals affiliated with Green in Israel, and an investment fund in the Cayman Islands.

73.    Green transferred almost all of the remainder of the $15 million to bank accounts in Magnify's and Strand's names in Israel and Switzerland.  Bank records show that Green made personal use of these funds, including the transfer of approximately $3 million to offshore investment funds, and hundreds of thousands of dollars to Green's children, his secretary and other affiliates.

74.    In addition, between February of 1996 and May of 2000, Green periodically wrote to BLMIS requesting withdrawals totaling at least $1,070,000 from the Magnify Accounts to finance Magnify's "ongoing activities."  Because Magnify was a shell investment vehicle with minimal operating expenses, these withdrawals could not have been used for any such purpose.

## VII.    GREEN KNEW THAT BLMIS WAS A FRAUD AND NOT ENGAGED IN REAL SECURITIES TRADING

75.    As discussed below, after Green took control of Magnify and YHA at the end of 1989, the Magnify Accounts began to show blatant fictitious trades and Green eventually came to participate with Madoff in the creation of Portfolio Evaluations reflecting no trades at all.

76.    Starting in July 1983, BLMIS generated and issued monthly customer account statements for the Magnify I Account using its centralized computer system.  From its inception until at least 1989, Magnify held only one Account, in which BLMIS engaged in little reported trading activity.  During this period, and with few exceptions, the value of the Account rose and fell based on the fluctuation in share price of the securities purportedly held in the Account.  All of this changed within months after Magnify was transferred to YHA and placed under Green's control.

### A.    After Green assumes control, BLMIS creates more than $120 million in value through blatantly fictitious trading and creation of a new account.

77.    After YHA (and Green) took control of Magnify in 1989, BLMIS created significant value—most dramatically, it generated more than $120 million out of thin air—with

23

patently backdated transactions in securities that were "purchased" without assets in a not-yet-existing BLMIS account.

78.    As of 1990, the Magnify I Account was still administrated through BLMIS's central computer system, which maintained records of fake securities trading for Magnify in the same manner as other BLMIS accounts.  As with other BLMIS customer accounts, employees entered falsified data reflecting fake purchases and sales of securities into the computer system, which BLMIS used to generate reports including monthly internal customer ledgers and corresponding customer statements.  The data contained in the customer ledgers was entered manually by BLMIS employees to then populate the corresponding fields on the customer statements.

79.    In 1990, the Magnify I Account customer ledgers began to reflect anomalous activity, including the sudden creation of several subaccounts for the purpose of generating apparent value through various trading strategies.  Between June and August of 1990, in one of the newly created subaccounts, BLMIS purported to short sell securities that were held in the Magnify I Account.  These purported sales were created with the benefit of hindsight—because they reflect trading at or near quarterly, monthly and daily highs—to lock in approximately $17 million in purported gains before closing the subaccounts shortly thereafter.

80.    In addition to these gains in the Magnify I Account, BLMIS apparently created the Magnify II Account in September 1990 without any initial deposit of principal or any account opening documents.[5]

---

[5] For a typical BLMIS customer account, BLMIS required the customer to sign a standard Customer Agreement, Options Agreement, and Trading Authorization Limited to Purchases and Sales of Securities and Options.  Green knew BLMIS required these agreements from customers because he executed them on YHA's behalf.

81.     Although the Magnify II Account was opened with no money, BLMIS created

more than $120 million in value using a slew of patently backdated trades.

82.     The Magnify II Account's first customer ledger, dated September 1990, and

shown here in its entirety, reflects backdated trades which are fraudulent on their face:



83.     The "NO BALANCE FORWARD" notation indicates that there is no cash in the

Account as of the opening date of the ledger: as of September 1, 1990, the balance in the

Account was zero.  Nor were there any securities: all of the positions reflected on the ledger

appear to have been "achieved" in that month's ledger, which is further evidence that this is the

first ledger for the Account.  Yet the September ledger impossibly reflects purported securities

trades in May and October.

84.    Moreover, these backdated trades create approximately $120 million of purported value from a zero balance without any deposit.  First, two purchases totaling 3,290,000 shares of MCI Communications stock at 6-7/8 were supposedly made on October 21, even though there were no assets in the account that could have been used to purchase them.  Because the ledger is dated September 30, this purchase must have been made at least 11 months before the Magnify II Account was purportedly opened.

85.    BLMIS even generated fake trade confirmations purporting to show that these purchases took place on October 21, 1986.  Notably, the fake trade confirmations are fraudulent on their face because BLMIS did not move to its Third Avenue location until 1987:





86.      Much of the MCI stock (2,820,000 shares) was then purportedly sold on May 18,

1990, at least four months before the Magnify II Account was opened, at 42-3/8, (Transaction 17

on the above customer ledger), for almost $120 million, generating a purported profit of over $97

million.[6]

---

[6] BLMIS's records state that the "sale" of the MCI stock at the historical "sale" price of 42-3/8 for MCI occurred on May 18, 1990, five months before the Magnify II Account was "opened." Notably, the trades would have been impossible even if the account had been opened and funded in time to make them: the number of shares supposedly purchased on October 21, 1986 exceeded the total number of shares actually traded on that day and the number of shares purportedly sold on May 18, 1990 constituted 98% of the total volume of MCI stock actually traded on that day.



87.    With the "proceeds" of the MCI purchase and sale, BLMIS purported to purchase

more than $80 million in securities over three days (Transactions 3-16 on the above customer

ledger), which also were backdated to May 21, 22 and 23.

88.    As the person in control of Magnify at that time, Green knew from the face of the

September 1990 Magnify customer statement, which contained the same data as the customer

ledger reproduced above, that the purported trades generating over $100 million in value in the

account were fake.

89.    From then on, over the course of the Magnify Accounts' combined 25-year

history, the initial cash deposits of approximately $3.14 million in the Magnify I Account

purportedly grew to more than $750 million, according to BLMIS correspondence with Green

despite Green's pattern of large withdrawals and transfers from the Magnify Accounts.  Even

ignoring the purported withdrawals and transfers from the Magnify Accounts, had the trading in

the Magnify Accounts been real, BLMIS would have had to deliver a 20% rate of return *every year over 25 years*—without any withdrawals or transfers at all—to reach a final purported account balance of over $750 million. As the person in control of Magnify, Green knew this was impossible and did not reflect real securities trading. Indeed, when asked by a reporter after BLMIS's fraud came to light whether YHA's losses exceeded $800 million, Green dismissed this number as "fantastical" and stated that the amount involved was far smaller.

**B.    Beginning in the 1990s, Green begins participating in the fraud by meeting with Madoff personally to create value in the Magnify-related Accounts.**

90.    By the early-1990s, Madoff began treating the Magnify Accounts (and later Accounts opened for Strand and Premero) differently. Instead of providing monthly customer account statements for those Accounts, BLMIS began providing Green with biannual "Portfolio Evaluations." These Portfolio Evaluations were manually generated on a BLMIS employee's desktop computer. As discussed below, they contained no historical information or any transaction details for any security allegedly bought or sold for the relevant Accounts, such as trade dates, settlement dates or trade prices.

91.    Green knew what the typical BLMIS customer statements looked like because he saw the statements sent to YHA. The Portfolio Evaluations were different: they listed purported securities holdings without reflecting any deposits, withdrawals, or securities trading. Madoff's employees personally provided these statements to Green at his meetings with Madoff.

92.    By 1993, if not earlier, Green began meeting with Madoff personally two to three times per year to discuss Magnify's (and later Premero's and Strand's) Accounts. These meetings usually occurred roughly one to two months after the dates listed on the Portfolio Evaluations generated for Magnify, Premero and Strand, which were dated "as of" June 30 or December 31 of each year.

29

93.    Green often wrote to Madoff, seeking more frequent meetings, indicating that it was "imperative" that they meet regularly regarding Magnify's portfolio and their "mutual interests."

94.    Green was treated with special care by Madoff and BLMIS's employees on his visits to BLMIS.  While typical investors were not permitted direct access to Madoff, Green called and met with Madoff regularly.  Green's special treatment—particularly his access to Madoff himself—perplexed even BLMIS's employees.  Often, while in New York, Green met socially with Madoff as well, sometimes including their wives.

95.    By the mid-1990s, during his regular meetings with Madoff, Green participated in the preparation and revision of the Portfolio Evaluations.  In the few days before Green's visits, a BLMIS employee typed up Portfolio Evaluations for Magnify, Strand and Premero on the employee's desktop computer, separate from the central computer system used to generate typical BLMIS customer records.  Green knew that these Portfolio Evaluations were not generated in real time but rather were prepared specifically for him in anticipation of his scheduled visits.  The Portfolio Evaluations for Premero were stamped "draft" until after Green's review.

96.    To prepare the Portfolio Evaluations, the BLMIS employee reviewed copies of the previous period's Portfolio Evaluations and computed a projected account value based on an expected rate of return.  From the projected or expected account value, the BLMIS employee then backed into a fictitious portfolio of holdings to reach the promised amount, and typed the resulting list as a document saved only to the employee's desktop computer.

97.    Upon Green's arrival, Green would meet behind closed doors with Madoff and DiPascali.  DiPascali would emerge from these meetings with changes to certain of the Portfolio

Evaluations that, on information and belief, were directed by Green. In particular, before the meetings, the fictional holdings for Premero's two Accounts were aggregated on a single draft Portfolio Evaluation, which was not allowed to leave BLMIS's premises. DiPascali would exit the meeting with Green and arrange for the single evaluation to be split into two separate Portfolio Evaluations, dividing the fictitious holdings between Premero's two Accounts according to directions from Green and/or Madoff at the meeting. The employee would enter the requisite changes into the document saved on the employee's desktop computer, and Green would take the resulting Portfolio Evaluations with him when he left. Green knew that the allocation of shares reflected on the draft Portfolio Evaluations as of a date one to two months prior to his meetings did not reflect actual securities trading.

98.     On information and belief, when Madoff and Green met, they discussed the rate of return in the Magnify, Strand, and Premero Accounts, and reached or reconfirmed an agreement or understanding regarding the portfolios' promised rate of return. After the meeting, Madoff often directed Green to Madoff's secretary to dictate letters requesting withdrawals or transfers from the Magnify, Strand, and Premero Accounts. At Green's request, Madoff's secretary prepared letters of instruction to BLMIS and printed these documents on Green's law firm's own letterhead. Madoff's secretary was then instructed to delete and leave no electronic record of these letters after they were generated. On information and belief, on at least one occasion, Green and Madoff agreed to backdate a letter typed by Madoff's secretary so that the letter would appear to pre-date their meeting.

**C.    The Portfolio Evaluations provided to Green for the non-YHA Accounts demonstrate that Green and Madoff were simply generating fictitious "value" in these Accounts and not trading in securities.**

99.     The Portfolio Evaluations tailor-made for and reviewed by Green confirm that Green's arrangement with Madoff was for BLMIS to create an ever-increasing equity value that

would be at Green's disposal.  While for most of the 1990s, the Portfolio Evaluations itemized a

list of various stocks similar to those supposedly traded in other customer accounts, BLMIS

eventually abandoned even this effort.  By 1999, the information contained in the Portfolio

Evaluations was limited to identifying U.S. Treasury Bills or Fidelity money market mutual

funds, rather than stocks or other equities:



**BERNARD L. MADOFF**
**Investment Securities**
885 Third Avenue New York, NY 10022-4834

212 230-2424
800 334-1343
Telex 235130
Fax 212 486-8178

Magnify Inc.
Yair Green, Attorney at Law
24 Ramban Street
Jerusalem 92422
Israel

Dear Attorney Green:

Please be advised that as of 12/31/99 the Magnify Inc. portfolio evaluation is as follows:

Securities Held for the Account of
"Magnify Inc."
Account # :1FN025-30 as of 12/31/99

**Securities held "as of"**

| SECURITY | NUMBER OF SHARES | CLOSING PRICE 12/31/99 | NET MARKET VALUE 12/31/99 |
|---|---|---|---|
| FIDELITY SPARTAN SBI | 1,203 | 1 | 1,203.00 |
| U.S. TREASURY BILL DUE 04/20/00 | 65,000,000 | 0.9839 | 63,953,500.00 |
| U.S. TREASURY BILL DUE 04/27/00 | 65,000,000 | 0.9827 | 63,875,500.00 |
| U.S. TREASURY BILL DUE 05/04/00 | 65,000,000 | 0.9815 | 63,797,500.00 |
| U.S. TREASURY BILL DUE 05/11/00 | 65,000,000 | 0.9803 | 63,719,500.00 |
| U.S. TREASURY BILL DUE 05/18/00 | 70,000,000 | 0.9792 | 68,544,000.00 |
| U.S. TREASURY BILL DUE 05/25/00 | 70,000,000 | 0.9781 | 68,467,000.00 |
| U.S. TREASURY BILL DUE 06/01/00 | 70,000,000 | 0.9770 | 68,390,000.00 |
| U.S. TREASURY BILL DUE 06/08/00 | 70,000,000 | 0.9758 | 68,306,000.00 |
| U.S. TREASURY BILL DUE 06/15/00 | 72,000,000 | 0.9749 | 70,192,800.00 |

| | |
|---|---|
| **Net Market Value of Open Security Positions** | $ 599,247,003.00 |
| **Cash Balance** | 0.92 |
| **Total Equity** | $ 599,247,003.92 |

*27*

Affiliated with:
Madoff Securities International Limited
12 Berkeley Street, Mayfair, London W1X 5AD. Tel 0171-493 6222

MAGNIFY 00221

100.    The gains reflected on the Portfolio Evaluations by merely holding Treasury bills to maturity or investing in Fidelity mutual funds were impossible on their face because the instruments themselves were incapable of generating the yields reflected.

101.    BLMIS never provided missing details concerning deposits or withdrawals, or any purported trading activity to Magnify, Premero or Strand.  The Portfolio Evaluations were the only records of the activity in and the value of these Accounts.  The Defendants have admitted that they never examined—nor had the "opportunity" to examine—individual trades in the non-YHA Accounts.

102.    Under his Fee Agreement with Magnify, Green was responsible for:  (i) setting investment policies; (ii) "management of portfolio and safeguarding of [Magnify's] funds invested in it"; (iii) "follow-up of actual implementation of investment policies"; (iv) examination of Magnify's earnings; and (v) supervision of "movement of funds" in Magnify's portfolio.  The Portfolio Evaluations did not provide sufficient information for Green to carry out those responsibilities.  That Green nonetheless articulated these responsibilities and paid himself for performing them further demonstrates his knowledge that no investments were taking place.

103.    While Green could theoretically set an investment policy with BLMIS, he could not implement it with only the information found in the Portfolio Evaluation. Green also could not supervise the "movement of funds" in Magnify's portfolio nor safeguard them, and could not examine Magnify's so-called earnings.  Once the Portfolio Evaluations became the sole account records provided for the Magnify Accounts, Green never requested—and BLMIS did not provide—confirmation of any of the transfers or any other cash activity in these Accounts. Green therefore could not ascertain whether Magnify had purported cash available to support the supposed transfers to YHA.  Even though it was impossible for Green to perform his

management responsibilities from the sparse information contained in the Portfolio Evaluations he received, Green collected more than $3 million in fees for these services.

104.    Green's complicity in the failure to provide better account records also prevented verification of Magnify's tax liabilities.  Although BLMIS purported to make deductions for the payment of foreign withholding tax on certain dividends for other customers, BLMIS stopped reporting to Green any dividend or withholding transactions, provided no basis for him to know whether such transactions were even occurring, stopped making payments to the IRS on Magnify's behalf for foreign withholding tax, and gave Green no records to assess Magnify's potential tax liability.

105.    Green knew and participated in the fraudulent reporting of the Magnify Accounts as reflected in the Portfolio Evaluations.  By virtue of the Portfolio Evaluations, which were the only account information he received, Green knew that the gains reflected in the Magnify, Strand, and Premero Accounts were not created by securities trading and BLMIS obviously had no records of such trades.

106.    Green also knew other BLMIS customers received monthly customer statements detailing all the securities trading information missing in the Portfolio Evaluations.  At all relevant times, YHA received standard form monthly customer statements and trade confirmations for its Account.  Importantly, as an association registered with the Israeli Registrar of Associations, YHA was required to provide and file annual financial reports.  YHA's account records were therefore subject to review or audit by the Israeli government and others unaffiliated with YHA or BLMIS.  Green did not bother to ask for the same monthly statements for Magnify, Premero and Strand because no one, much less any government regulator, was monitoring the non-YHA BLMIS investments.

107.    Notably, when BLMIS stopped providing information to Green about purported purchases or sales of securities in Magnify, Premero and Strand's Accounts, it also abandoned its ability to show the records of such purported trading, should those records ever be demanded. As discussed above, the Portfolio Evaluations were not generated by the BLMIS computer system, but rather manually created in a stand-alone document by an individual employee. Therefore, the data that would support the supposed securities positions reflected on the documents was no longer entered into the main computer system.  This meant that BLMIS had no fake records on hand to support the fictitious equity values on the Portfolio Evaluations; if anyone had ever demanded to see records supporting the reported values, BLMIS would have had to create years' worth of information on the spot.

108.    The lack of documentation extended to deposits and withdrawals.  Even after BLMIS stopped entering data reflecting fake securities trading in its computer system, it still recorded deposits into and withdrawals from the Magnify, Premero and Strand Accounts, and usually remembered to record inter-account transfers.  While BLMIS kept track of its cash flow in order to perpetuate its Ponzi scheme, it did not share those records with Green, and did not correct or generate records until necessary for BLMIS's own balance sheet.

109.    For example, Green sought to fund the Premero II and Strand Accounts with inter-account transfers from other of the Accounts.  BLMIS did not record these transfers.  It was only some time later, when Green requested cash withdrawals from these Accounts, that BLMIS opened these Accounts in its computer system and created records of the withdrawals. BLMIS never recorded the initial inter-account transfers and they were not confirmed by Green.

110.    Green did not even receive confirmation of the few actual deposits into Strand's and Premero's Accounts that he supervised.  In fact, multiple deposits intended for the Premero

36

II Account were instead credited by BLMIS to the Premero I Account and never corrected, because deposits and withdrawals were not reflected on the Portfolio Evaluations.

111.    Beginning in the early 2000s, BLMIS gradually cleared the Magnify Accounts of any reported holdings lingering in its computer system from the mid-1990s when BLMIS ceased reporting fake trading in the Magnify Accounts.

112.    The only reason Madoff could delete BLMIS's records of its customers' purported holdings with no explanation is because there was no need to maintain the pretense of securities trading when the person in control of the Accounts knew that no securities were being traded.

## VIII.    GREEN IS THE ALTER EGO OF MAGNIFY AND STRAND

113.    As fully discussed herein, Green so dominated, influenced, and controlled Magnify and Strand, their business, property, affairs, and purported investments that no corporate veil should be maintained between them.  As the main decision maker for Magnify and Strand, Green actively directed and controlled their daily activities for his benefit and advantage, including dealings with Madoff and BLMIS.  The entities acted in unison to allow him the full ability to exert authority and control over their Accounts, for Green's personal benefit and for the purpose of profiting from Madoff's fraud.  As such, Green's domination and control renders both Magnify and Strand alter egos of Green and of each other.

114.    Green wrongly used Magnify, Strand and their collective assets as mere instrumentalities to further his own, and his family's, personal interests and to profit from BLMIS, which Green knew was a fraud.

37

A.    **Green dominated and controlled Magnify and Strand to benefit from Madoff's fraud.**

115.    Beginning in 1989, Green gained complete control over Magnify when Igoin delivered Magnify's shares to YHA (and thus Green) and introduced Brunner to Green as the person who would control Magnify from that point on.  *See* Section VI.C., above.  Thereafter, there is no evidence that anyone other than Green acted within the Magnify Accounts.  In September 1990, just months after the transfer of control of Magnify to Green, the Magnify Accounts saw approximately $120 million appear as a result of fraudulent, backdated trades.  *See* Section VII.A., above.  Such dramatic increases in the Magnify Accounts allowed Green to escalate the volume of intra-BLMIS transfers from Magnify to YHA, in order to make substantial donations to organizations and institutions throughout Israel, thereby increasing Green's philanthropic profile in Israeli society.  *See* Section VI.E., above.

116.    In 1993, Green began meeting with Madoff on at least a biannual basis to discuss the Magnify Accounts and to direct (at Green's sole discretion) millions of dollars to YHA, Green's family members, his affiliates, his offshore investment interests, and to or for the benefit of certain individuals associated with YHA, including Nahir.  In 1995, Green had Brunner appoint him Magnify's Managing Director and grant him a general power of attorney, formalizing Green's exclusive authority to act without any oversight.  In 1996, Green drafted his Fee Agreement, appointing himself supervisor and manager of Magnify's portfolio and entitling him to management fees.  Green also created and solely controlled accounts in Israel and Switzerland in Magnify's name through which he diverted fictitious profits from BLMIS for personal uses.

117.    In 1998, Green created Strand for the sole purpose of funneling money out of BLMIS for his benefit, and the benefit of his family members, and his various offshore

38

investment interests.  Although Brunner was at all relevant times Strand's "Sole Director," Green managed Strand's Account and dealt directly with BLMIS on all Account activity. Green opened bank accounts for Strand in Switzerland and Israel through which he diverted fictitious profits from BLMIS for personal uses.

118.    Green had ultimate responsibility for Magnify's and Strand's operation, affairs, and management, including the authority to make investment decisions and withdraw capital. Green used this authority to exploit Magnify's and Strand's Accounts for his own personal gain. He had the ultimate responsibility for Magnify's and Strand's operation, affairs, and management, including the authority to make investment decisions and withdraw capital.

### B.    Green used Magnify and Strand for personal ends.

119.    Green collected at least $3.15 million in fees under his self-serving Fee Agreement, and directed millions more in withdrawals from Magnify's Accounts to family members and other Defendant entities, including Strand and Express.  *See* Sections VI.D. & F., above.  Green also directed approximately $1.5 million worth of transfers from Strand's Account to various offshore destinations, including $500,000 to an investment fund in the Cayman Islands, $300,000 to his children's personal bank accounts in the United States, and $130,000 to his secretary (and the co-founder of Green's charitable foundation).  Green requested the transfer of nearly $12 million of fictitious profits from Magnify's and Strand's Accounts to those entities' Credit Suisse accounts.  *See* Section VI.F., above.

120.    Green used Magnify's account at Bank Hapoalim as collateral for a personal debt. Green also held himself out as Strand's owner, including representing to HSBC that he was Strand's beneficial owner in order to obtain a mortgage to buy his daughter a home in Maryland. He also used a withdrawal from Strand's Account to buy an apartment in Israel for one of his business associates.  *See* Sections VI.D. & E., above.

### C. Magnify and Strand's other officers and directors had no independent role or function.

121.    Brunner had the same role for Magnify and Strand: to be a director in name only. He functioned solely to execute paperwork delivered to him by those empowered to act on behalf of Magnify and Strand.  From 1989 forward, the only person to direct Brunner was Green. Green authored all corporate resolutions entered by Brunner from the time Green assumed control over Magnify and Strand.  Magnify's other nominal officers and directors prior to BLMIS's collapse, had no function other than to sign corporate documentation when necessary, and had no involvement with the Magnify Accounts.

### D. Magnify and Strand had no employees, independent offices or principal places of business.

122.    Although Magnify and Strand each have a registered agent in their respective jurisdictions and a Swiss director, neither has employees, physical offices or actual places of business.  The only other addresses provided by Magnify or Strand are "care of" Green at the addresses of his law office in Israel.

### E. Magnify and Strand were undercapitalized.

123.    Both Magnify and Strand were capitalized by fictitious profits from the Ponzi scheme at BLMIS.  The Magnify Accounts were funded by initial deposits of only approximately $3.14 million, which were depleted in 1989 with the first transfer to YHA.  *See* Exhibit B.  Strand was funded solely by fictitious profits transferred from the Magnify Accounts. In filings with this Court, both Magnify and Strand have stated that they are insolvent in the wake of BLMIS's collapse.

### F. Strand lacked financial independence.

124.    Strand has represented that it is a wholly-owned subsidiary of Magnify.  Only $500,000 was ever deposited from an outside source into Strand's Account.  The Account's only

40

other "funding" consisted of two $5 million transfers of fictitious profits from the already

depleted Magnify I Account, which were made at Green's direction. Strand does not appear to

have any assets beyond what it reaped from the Ponzi scheme, and thus relied entirely on the

inflow of fictitious profits from the Magnify Accounts.

125.    In the wake of the Trustee's action, Green has attempted to re-characterize his

involvement with Magnify, Strand, and YHA. He has alternatively asserted that he was a mere

trustee of Magnify, or that YHA was the trustee, by virtue of a trust agreement with Albert Igoin.

In public filings, however, YHA board members, including Nahir, have admitted that Green

could not legally have been Igoin's trustee after his death in 1995. YHA has also disclaimed in

Israel that it was trustee over Magnify, notwithstanding its corporate disclosure statement in this

action that it was.

126.    As the alter ego of Magnify and Strand, which are alter egos of each other, Green

is personally liable for the debts and obligations of those entities, including the fraudulent

transfers these entities received from BLMIS, as set forth herein.

## IX.    GREEN'S KNOWLEDGE MUST BE IMPUTED TO ALL DEFENDANTS

127.    For the reasons described above, Green knew that Madoff was engaged in a fraud

and not trading actual securities, and knowingly participated in that fraud. This knowledge must

be imputed to all Defendants.

### A.    Imputation as to Magnify.

128.    From at least December 1989, Green was the agent of Magnify, acting on

Magnify's behalf with its consent and for its benefit. Green dominated, influenced, and

controlled Magnify, its affairs, and investments, including the Magnify Accounts.

129.    From that point in time forward, Green had control of Magnify. Ultimately,

Green was the only person from whom Brunner would accept direction, and as Magnify's sole

41

Managing Director and investment portfolio supervisor, Green had ultimate responsibility for the operations, affairs, and management of Magnify, including the authority to make investment decisions and overseeing Magnify's portfolio.

130.    Green maintained a close personal and business relationship with Madoff, meeting with him at least twice a year from 1993 until BLMIS's collapse in 2008.  Green reviewed the Portfolio Evaluations for the Magnify Accounts, which were hand delivered to him by Madoff during Green's visits to BLMIS.  On information and belief, Green met with Madoff to come to an agreement or understanding regarding Magnify's rate of return, and made all decisions relating to Magnify's investments with BLMIS, including directed inter-account transfers and withdrawals from the Magnify Accounts.

131.    As the control person, Managing Director, legal representative, and agent of Magnify, Green's knowledge that BLMIS was not trading securities is imputed to Magnify.

**B.    Imputation as to Premero.**

132.    Since Green founded Premero in 1992, Green has been the agent of Premero, acting on Premero's behalf with its consent and for its benefit.  Green dominated, influenced, and controlled Premero, its affairs, and investments, including Premero's two Accounts.

133.    From their inception, Green had exclusive control over Premero's Accounts.  He actively directed and controlled Premero's dealings with Madoff and BLMIS and had the authority to make investment decisions and to oversee Premero's BLMIS portfolio. Green met with Madoff at least twice a year since Premero's first Account was formed in 1995 regarding Premero's portfolio.  Green reviewed the Portfolio Evaluations for Premero's Accounts, which were addressed to him and hand delivered by Madoff during Green's visits to BLMIS.  Green met with Madoff to come to an agreement or understanding regarding Premero's rate of return, directed inter-account transfers and withdrawals from Premero's Accounts, and autonomously

42

divided Premero's BLMIS holdings amongst its two accounts during his closed-door meetings with Madoff.

134.    As the control person, managing director and agent of Premero, Green's knowledge that BLMIS was not trading securities is imputed to Premero.

### C.    Imputation as to Strand.

135.    At all times relevant herein, Green was the agent of Strand, acting on Strand's behalf with its consent and for its benefit. Green dominated, influenced, and controlled Strand, its affairs, and investments, including Strand's account.

136.    At all times since Green founded Strand, Green had exclusive control of and was the sole decision maker for Strand, and actively directed and controlled Strand's dealings with Madoff and BLMIS.  Green met with Madoff at least twice a year since the creation of Strand's Account regarding Strand's portfolio.  Green reviewed the Portfolio Evaluations for the Strand Account, which were addressed to him and hand delivered by Madoff during Green's visits to BLMIS.  Green made all decisions relating to Strand's investments with BLMIS, including directing transfers to and from Strand's Account.

137.    As the control person, managing director and agent of Strand, Green's actual knowledge that BLMIS was not trading securities is imputed to Strand.

### D.    Imputation as to Express.

138.    As Express's legal advisor and its self-professed "Managing Director and/or authorized representative," Green had ultimate responsibility for the operations, affairs, and management of Express. Green was the agent of Express, acting on Express's behalf with its consent and for its benefit.

139.    Green actively directed and controlled Express, including directing transfers from BLMIS to Express as redemptions from Magnify and Strand's supposed investments. Green had sole signatory authority for Express's account at Bank Hapoalim.

140.    As control person and agent of Express, Green's actual knowledge that BLMIS was not trading securities is imputed to Express.

### E.    Imputation as to YHA.

141.    At all times discussed herein, Green was the agent of YHA, acting on YHA's behalf with its consent and for its benefit.  Green dominated and influenced YHA, its affairs, and investments.  Green largely avoided providing personal direction to BLMIS regarding withdrawals from YHA's Account.  This may well have been an attempt to maintain the fiction that Green was not controlling the "deposits" into YHA's Account (which were all directed by him from the Magnify Accounts), which Green portrayed as donations from an anonymous donor.

142.    The universities and corporations that received donations from YHA acknowledge that Green played a significant role in YHA's decisions to give grants to particular organizations, and often presented project proposals to YHA's board.  Organizations would also go directly to Green to request funding.  After a proposal was agreed to by YHA's board, Green—and only Green—was responsible for negotiating and drafting the agreements governing any funds YHA chose to give.  Doing so enabled Green to have ultimate control over the terms and conditions of any YHA agreements that provided funding.

143.    Green also signed many of these grant agreements himself, and not in his capacity as YHA's attorney.  Instead, many grant agreements were framed as an agreement between the recipient and Green as the "trustee" for an anonymous donor, who had discretion over the terms

44

and amount of the grant on the donor's behalf. This effectively removed YHA from the terms of

the agreements and solidified the perception that Green controlled the money.

144. As the co-founder of YHA and its legal counsel, Green had ultimate responsibility

for the operations, affairs, and management of YHA, including managing the investment

portfolio that served as the sole source of the "donations" funding YHA's operations. Green

drafted and signed the agreements directing the grant of YHA's monies. Green also was largely

responsible for selecting and appointing the members of YHA's board who joined after YHA's

initial formation. As the "supervisor" for Magnify's portfolio, Green directed frequent inter-

account transfers from the Magnify Accounts to YHA's Account in order to finance YHA's

donations in Israel, and dramatically increased the amount of transfers after Igoin's death. Green

was the face of YHA, and consistently and publicly held himself out to be its trustee.

145. As control person, founder, legal counsel and agent of YHA, Green's knowledge

that BLMIS was not trading securities is imputed to YHA.

## X.   THE TRANSFERS

146. According to BLMIS's records, Magnify, Premero, Strand and YHA maintained

the Accounts (Nos. 1FN024, 1FN025, 1FN037, 1FN073, 1FN097, and 1FR051) as set forth on

Exhibit A.

147. The Accounts were held in New York, New York, and Magnify, Strand, Premero,

and YHA  and/or their representatives sent funds to BLMIS and/or to BLMIS's account at

JPMorgan Chase & Co., Account #xxxxxxxxxxxx703 (the "BLMIS Bank Account") in New

York, New York for application to the Accounts. Between July 1983 and the Filing Date,

Magnify, Premero, Strand and YHA made deposits to BLMIS through checks and/or wire

transfers into the BLMIS Bank Account and/or received inter-account transfers from other

BLMIS accounts.  Magnify, Premero, Strand and YHA also filed customer claims with the Trustee regarding their Accounts.

148.    The Defendants were each beneficiaries of Madoff's scheme, receiving exorbitant sums of other people's money from BLMIS over the lifetime of the Accounts.  *See* Exhibit A and Exhibit B, columns 5 & 9-12, for each of the Accounts, and Exhibit D.  In total, BLMIS transferred at least $153,722,070 to the Defendants from the Accounts prior to the Filing Date, as set forth in Exhibits A, B, and D, under circumstances that demonstrate that Green and the other Defendants knew the transfers were fraudulent.  Of this amount, $148,285,290 constituted non-existent fictitious profits supposedly earned in the Accounts (the "Fictitious Profits"), and $5,436,780 constituted the return of principal.  *See* Exhibit A and Exhibit B, columns 5 & 9-12, for each of the Accounts.  The Trustee seeks to avoid and recover $147,254,192 in Fictitious Profits and $5,436,780 in principal redeemed from the Accounts (the "Transfers").[7]

149.    The Transfers are avoidable and recoverable under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3), and applicable provisions of DCL sections 273-279 (McKinney 2001) and N.Y. C.P.L.R. 203(g) and 213(8) (McKinney 2001) .

150.    As set forth herein, Magnify and Strand are the alter egos of Green.

151.    Through Green, at all relevant times, all Defendants knew that BLMIS was a fraud and that no securities were being traded.

---

[7] On May 27, 2014, the Trustee entered into a settlement agreement with former defendants Robert H. Book and R.H. Book LLC and Defendant Premero to settle liability in connection with an initial transfer of $2.5 million from the Premero I Account made on July 23, 2008 (the "Book Settlement Agreement").  Of the $2.5 million, the Trustee alleges that $1,468,902 consisted of a return of principal deposited into the Premero I Account and $1,031,098 consisted of Fictitious Profits from the Ponzi scheme.  Pursuant to the Book Settlement Agreement, the Trustee acknowledges that, under Section 550(a) of the Bankruptcy Code, the Trustee has been deemed to have recovered the amount of $1,031,098.00 with respect to the 1FN073 account for the benefit of the consolidated BLMIS estate. The Trustee is not seeking to recover this amount from the Defendants.

152.    Magnify, Strand, Premero, and YHA were initial transferees of avoidable transfers from BLMIS redeemed from the Accounts.  *See* Exhibit B, Columns 9-12.  Over the life of the Accounts, each withdrew millions of dollars in Transfers from BLMIS:

a.    BLMIS made Transfers of at least $12,349,371 to or for the benefit of Magnify from Account Nos. 1FN024 and 1FN025, $12,029,199 of which consisted of fictitious profits;

b.    BLMIS made Transfers of at least $3,152,836 to or for the benefit of Premero from Account Nos. 1FN073 and 1FN097, $1,352,888 of which consisted of fictitious profits;

c.    BLMIS made Transfers of at least $11,730,019 to or for the benefit of Strand from Account No. 1FR051, $11,230,019 of which consisted of fictitious profits; and

d.    BLMIS made Transfers of at least $126,489,846 to or for the benefit of YHA from Account No. 1FN037, $123,673,185 of which consisted of fictitious profits and all of which originated from the Magnify Accounts.

153.    Of the Transfers to Magnify and Strand identified above, certain Transfers were paid directly to Green and Express at Green's direction.  *See* Exhibit B, Columns 9-11, and Exhibit D.  The Transfers to Green and Express include the following:

a.    BLMIS made a Transfer of $3,150,000 to Green from Account No. 1FN025 (Magnify II), all of which consisted of fictitious profits.

b.    BLMIS made a Transfer of $500,000 to Express from Account No. 1FN024 (Magnify I), all of which consisted of fictitious profits;

c.    BLMIS made a Transfer of $500,000 to Express from Account No. 1FR051 (Strand), all of which consisted of fictitious profits;

47

154.    During the six years prior to the Filing Date, BLMIS made Transfers to Magnify

totaling $2,600,000, all of which represented Fictitious Profits from the Ponzi scheme (the

"Magnify Six Year Transfers").  *See* Exhibit B, Column 10.

### A.    The Six Year Transfers

155.    During the six years prior to the Filing Date, BLMIS made Transfers on behalf of

Premero totaling $2,500,000, $1,468,902 of which constituted a return of principal deposited into

the Premero I Account (the "Premero Six Year Principal Transfers") and $1,031,098 of which

represented Fictitious Profits from the Ponzi scheme.  Pursuant to the Book Settlement

Agreement, the Trustee does not seek recovery of the $1,031,098 in Fictitious Profits from

Premero.  *See* Exhibit B, Column 10.  *See* note 8, *supra*.

156.    During the six years prior to the Filing Date, BLMIS made Transfers to Strand

totaling $4,800,000, all of which represented Fictitious Profits from the Ponzi scheme (the

"Strand Six Year Transfers").  *See* Exhibit B, Column 10.

157.    During the six years prior to the Filing Date, BLMIS made Transfers to YHA

totaling $77,580,000, all of which represented Fictitious Profits from the Ponzi scheme (the

"YHA Six Year Transfers").  *See* Exhibit B, Column 11.

158.    The Magnify Six Year Transfers, the Premero Six Year Principal Transfers, the

Strand Six Year Transfers and the YHA Six Year Transfers are referred to collectively as the

"Six Year Transfers."  The Six Year Transfers are avoidable and recoverable under sections 544,

550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section

78fff-2(c)(3) and applicable provisions of DCL sections 273-279.

### B.    The Two Year Transfers

159.    During the two years prior to the Filing Date, BLMIS made Transfers to Magnify totaling $700,000, all of which represented Fictitious Profits from the Ponzi scheme (the "Magnify Two Year Transfers").  *See* Exhibit B, Column 9.

160.    During the two years prior to the Filing Date, BLMIS made Transfers on behalf of Premero totaling $2,500,000, $1,468,902 of which constituted a return of principal deposited into the Premero I Account (the "Premero Two Year Principal Transfers") and $1,031,098 of which represented Fictitious Profits from the Ponzi scheme.  Pursuant to the Book Settlement Agreement, the Trustee does not seek recovery of the $1,031,098 in Fictitious Profits from Premero.  *See* Exhibit B, Column 9. *See* note 7, *supra*.

161.    During the two years prior to the Filing Date, BLMIS made Transfers to Strand totaling $2,600,000, all of which represented Fictitious Profits from the Ponzi scheme (the "Strand Two Year Transfers").  *See* Exhibit B, Column 9.

162.    During the two years prior to the Filing Date, BLMIS made Transfers to YHA totaling $24,000,000, all of which represented Fictitious Profits from the Ponzi scheme (the "YHA Two Year Transfers").  *See* Exhibit B, Column 10.

163.    The Magnify Two Year Transfers, the Premero Two Year Principal Transfers, the Strand Two Year Transfers and the YHA Two Year Transfers are referred to collectively as the "Two Year Transfers."  The Two Year Transfers are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

### C.    The Ninety-Day Transfers

164.    During the ninety days prior to the Filing Date, BLMIS made Transfers totaling $1,900,000, to or for the benefit of YHA (the "Ninety Day Transfers").  *See* Exhibit B, Column

9. To the extent the Ninety Day Transfers were made for or on account of unreturned principal, they are avoidable and recoverable under sections 547(b) and 550(a) of the Bankruptcy Code applicable provisions of SIPA, particularly section 78fff-2(c)(3) of SIPA.

## XI.    <u>CUSTOMER CLAIMS</u>

165.    On or about March 9, 2009, Green filed on Magnify's behalf a customer claim signed by Brunner for the Magnify I Account, which has been designated by the Trustee as Claim #007928.  Also on or about March 9, 2009, Green filed on Magnify's behalf a customer claim signed by Brunner for the Magnify II Account, which has been designated by the Trustee as Claim #007382.  On or about August 23, 2010, the Trustee issued to Magnify a Notice of Trustee's Determination of Claim with respect to Claim #007928 and a Notice of Trustee's Determination of Claim with respect to Claim #007382 denying these claims (collectively, the "Magnify Determinations").  Copies of the Magnify Determinations are included in Exhibit C, attached hereto.  Magnify filed objections to the Magnify Determinations on January 19, 2011 and the Trustee has agreed not to oppose Magnify's objections on untimeliness grounds.

166.    On or about March 2, 2009, Green filed on Premero's behalf a customer claim signed by Brunner for the Premero I Account, which the Trustee has designated as Claim #004773, and a customer claim signed by Brunner for the Premero II Account, which the Trustee has designated as Claim #004772.  On or about October 19, 2009, the Trustee issued to Premero a Notice of Trustee's Determination of Claim with respect to Claim #004773 and a Notice of Trustee's Determination of Claim with respect to Claim #004772 denying these claims (collectively, the "Premero Determinations").  Copies of the Premero Determinations are included in Exhibit C, attached hereto.  On or about November 23, 2009 and November 18, 2009, respectively, Premero filed with the Court objections to the Trustee's determinations with respect to each of their customer claims.

167.    On or about March 2, 2009, Green filed on behalf of Strand a customer claim signed by Brunner for Account no. 1FR051, which the Trustee has designated as Claim #004799. On or about May 25, 2010, the Trustee issued a Notice of Trustee's Determination of Claim to Strand (the "Strand Determination") denying that claim. A copy of the Strand Determination is included in Exhibit C, attached hereto. On or about June 28, 2010, Strand filed with the Court an objection to the Trustee's determination with respect to its customer claim.

168.    On or about March 2, 2009, Nahir filed on behalf of YHA a customer claim for Account no. 1FN037, which the Trustee has designated as Claim #005611. On or about August 23, 2010, the Trustee issued a Notice of Trustee's Determination of Claim to YHA (the "YHA Determination") denying that claim. A copy of the YHA Determination is included in Exhibit C, attached hereto. YHA filed an objection to the YHA Determination on January 19, 2011, and the Trustee has agreed not to oppose YHA's objection on untimeliness grounds.

169.    On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claim; and Providing Other Relief ("Claims Procedures Order"; Docket No. 12). The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating. The Trustee intends to pursue resolution of Magnify, Premero, Strand, and YHA's customer claims, their objections and any related objections to the Trustee's determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

## COUNT ONE
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a), AND 551
### Against Magnify, Strand, Premero, YHA, and Green

170.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

51

171.    Each of the Two Year Transfers was made on or within two years before the

Filing Date.

172.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in

property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and under

section 78fff-2(c)(3) of SIPA.

173.    Each of the Two Year Transfers was made by BLMIS with the actual intent to

hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made

the Two Year Transfers to or for the benefit of Magnify, Strand, Premero, YHA, and Green in

furtherance of a fraudulent investment scheme.

174.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the

Trustee under section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Magnify,

Strand, Premero, YHA, and Green, under section 550(a) of the Bankruptcy Code and section

78fff-(2)(c)(3) of SIPA.

175.    As a result of the foregoing, under sections 105(a), 502(d), 548(a)(1)(A), 550(a),

and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment:  (i) avoiding and

preserving the Two Year Transfers; (ii) directing that the Two Year Transfers be set aside; (iii)

recovering the Two Year Transfers, or the value thereof, from Magnify, Strand, Premero, YHA,

and Green for the benefit of the estate of BLMIS; (iv) directing Green, to the extent allowable by

law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees

or other compensation and/or remuneration received by Green related to or arising from, or

concerning the Two Year Transfers from BLMIS to Magnify, Strand, Premero, YHA, and

Green; (v) disallowing any claim that Magnify, Strand, Premero, YHA, and Green may have

against the Debtors until such time as the Two Year Transfers are repaid to the Trustee; (vi)

awarding attorneys' fees and costs from Magnify, Strand, Premero, YHA, and Green; and (vii)

awarding any other relief the Court deems just and appropriate.

## COUNT TWO
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(B), 550(a), AND 551
### *Against Magnify, Strand, Premero, YHA, and Green*

176.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

177.    Each of the Two Year Transfers was made on or within two years before the

Filing Date.

178.    Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in

property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and under

section 78fff-2(c)(3) of SIPA.

179.    BLMIS received less than reasonably equivalent value in exchange for each of the

Two Year Transfers.

180.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became

insolvent as a result of the Two Year Transfer in question.

181.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business

or a transaction, or was about to engage in a business or a transaction, for which any property

remaining with BLMIS was an unreasonably small capital.

182.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or

believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts

matured.

183.    BLMIS made the Two Year Transfers to or for the benefit of Magnify, Strand,

Premero, YHA, and Green in furtherance of a fraudulent investment scheme.

184.    Each of the Two Year Transfers constitute fraudulent transfers avoidable by the

Trustee under section 548(a)(1)(B) of the Bankruptcy Code and recoverable from Magnify,

Strand, Premero, YHA, and Green under section 550(a) and section 78fff-(2)(c)(3) of SIPA.

185.    As a result of the foregoing, under sections 105(a), 502(d), 548(a)(1)(B), 550(a),

and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment:  (i) avoiding and

preserving the Two Year Transfers; (ii) directing that the Two Year Transfers be set aside; (iii)

recovering the Two Year Transfers, or the value thereof, from Magnify, Strand, Premero, YHA,

and Green for the benefit of the estate of BLMIS; (iv) directing Green, to the extent allowable by

law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees

or other compensation and/or remuneration received by Green related to or arising from, or

concerning the Two Year Transfers from BLMIS to Magnify, Strand, Premero, YHA, and

Green; (v) disallowing any claim that Magnify, Strand, Premero, YHA, and Green may have

against the Debtors until such time as the Two Year Transfers are repaid to the Trustee; (vi)

awarding attorneys' fees and costs from Magnify, Strand, Premero, YHA, and Green; and (vii)

awarding any other relief the Court deems just and appropriate.

### COUNT THREE
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
### §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551
### *Against Magnify, Strand, Premero, YHA, and Green*

186.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Second Amended Complaint as if fully rewritten herein.

187.    At all times relevant to the Six Year Transfers, there have been and are one or

more creditors who hold matured or unmatured unsecured claims against BLMIS that are

allowable under section 502 of the Bankruptcy Code or that are not allowable only under section

502(e) of the Bankruptcy Code.

188.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

189.    Each of the Six Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of Magnify, Strand, Premero, YHA, and Green in furtherance of a fraudulent investment scheme.

190.    Each of the Six Year Transfers was received by Magnify, Strand, Premero, YHA, and Green with actual intent to hinder, delay or defraud creditors of BLMIS existing at the time of each of the Six Year Transfers and/or future creditors of BLMIS.

191.    As a result of the foregoing, under DCL sections 276, 276-a, 278 and/or 279, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Magnify, Strand, Premero, YHA, and Green:  (i) avoiding and preserving the Six Year Transfers; (ii) directing that the Six Year Transfers be set aside; (iii) recovering the Six Year Transfers, or the value thereof, from Magnify, Strand, Premero, YHA, and Green for the benefit of the estate of BLMIS; (iv) directing Green, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Green related to or arising from, or concerning the Six Year Transfers from BLMIS to Magnify, Strand, Premero, YHA, and Green; (v) disallowing any claim that Magnify, Strand, Premero, YHA, and Green may have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from Magnify, Strand, Premero, YHA, and Green; and (vii) awarding any other relief the Court deems just and appropriate.

**COUNT FOUR**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551**
*Against Magnify, Strand, Premero, YHA, and Green*

192.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Second Amended Complaint as if fully rewritten herein.

193.    At all times relevant to the Six Year Transfers, there have been and are one or

more creditors who hold matured or unmatured unsecured claims against BLMIS that are

allowable under section 502 of the Bankruptcy Code or that are not allowable only under section

502(e) of the Bankruptcy Code.

194.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined

under DCL section 270.

195.    BLMIS did not receive fair consideration for the Six Year Transfers.

196.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the

alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

197.    BLMIS made the Six Year Transfers to or for the benefit of Magnify, Strand,

Premero, YHA, and Green in furtherance of a fraudulent investment scheme.

198.    As a result of the foregoing, under DCL sections 273, 278 and/or 279, sections

105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of

SIPA, the Trustee is entitled to a judgment against Magnify, Strand, Premero, YHA, and Green:

(i) avoiding and preserving the Six Year Transfers; (ii) directing that the Six Year Transfers be

set aside; (iii) recovering the Six Year Transfers, or the value thereof, from Magnify, Strand,

Premero, YHA, and Green for the benefit of the estate of BLMIS; (iv) directing Green, to the

extent allowable by law, to disgorge to the Trustee all profits, including any and all management

fees, incentive fees or other compensation and/or remuneration received by Green related to or

56

arising from, or concerning the Six Year Transfers from BLMIS to Magnify, Strand, Premero, YHA, and Green; (v) disallowing any claim that Magnify, Strand, Premero, YHA, and Green may have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from Magnify, Strand, Premero, YHA, and Green; and (vii) awarding any other relief the Court deems just and appropriate.

**COUNT FIVE**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
§§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551**
*Against Magnify, Strand, Premero, YHA, and Green*

199.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Second Amended Complaint as if fully rewritten herein.

200.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

201.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

202.    BLMIS did not receive fair consideration for the Six Year Transfers.

203.    At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

204.    BLMIS made the Six Year Transfers to or for the benefit of Magnify, Strand, Premero, YHA, and Green in furtherance of a fraudulent investment scheme.

205.    As a result of the foregoing, under DCL sections 274, 278 and/or 279, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of

SIPA, the Trustee is entitled to a judgment against Magnify, Strand, Premero, YHA, and Green: (i) avoiding and preserving the Six Year Transfers; (ii) directing that the Six Year Transfers be set aside; (iii) recovering the Six Year Transfers, or the value thereof, from Magnify, Strand, Premero, YHA, and Green for the benefit of the estate of BLMIS; (iv) directing Green, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Green related to or arising from, or concerning the Six Year Transfers from BLMIS to Magnify, Strand, Premero, YHA, and Green; (v) disallowing any claim that Magnify, Strand, Premero, YHA, and Green may have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from Magnify, Strand, Premero, YHA, and Green; and (vii) awarding any other relief the Court deems just and appropriate.

## COUNT SIX
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW
## §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551
### *Against Magnify, Strand, Premero,YHA, and Green*

206.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Second Amended Complaint as if fully rewritten herein.

207.    At all times relevant to the Six Year Transfers, there have been and are one or more creditors who hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

208.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

209.    BLMIS did not receive fair consideration for the Six Year Transfers.

58

210.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

211.    BLMIS made the Six Year Transfers to or for the benefit of Magnify, Strand, Premero, YHA, and Green in furtherance of a fraudulent investment scheme.

212.    As a result of the foregoing, under DCL sections 275, 278 and/or 279, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against Magnify, Strand, Premero, YHA, and Green: (i) avoiding and preserving the Six Year Transfers; (ii) directing that the Six Year Transfers be set aside; (iii) recovering the Six Year Transfers, or the value thereof, from Magnify, Strand, Premero, YHA, and Green for the benefit of the estate of BLMIS; (iv) directing Green, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Green related to or arising from, or concerning the Six Year Transfers from BLMIS to Magnify, Strand, Premero, YHA, and Green; (v) disallowing any claim that Magnify, Strand, Premero, YHA, and Green may have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from Magnify, Strand, Premero, YHA, and Green; and (vii) awarding any other relief the Court deems just and appropriate.

## COUNT SEVEN
## RECOVERY OF ALL FRAUDULENT TRANSFERS – NEW YORK CIVIL PRACTICE LAW AND RULES 203(g), 213(8) AND NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 105(a), 502(d), 544, 550(a), AND 551
### *Against Green, Magnify, Strand, Premero, Express, and YHA*

213.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

214.     At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

215.     At all times relevant to the Transfers, there have been and are one or more creditors who hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

216.     Each of the Transfers prior to the six years before the Filing Date constituted a conveyance by BLMIS as defined under DCL section 270.

217.     Each of the Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of Defendants in furtherance of a fraudulent investment scheme.

218.     Each of the Transfers was received by Green, Magnify, Strand, Premero, YHA, and Express with the actual intent to hinder, delay, or defraud creditors of BLMIS existing at the time of each of the Transfers and/or future creditors of BLMIS.

219.     As a result of the foregoing, under N.Y. C.P.L.R. 203(g), 213(8), DCL sections 276, 276-a, 278 and/or 279, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA section 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (i) avoiding and preserving the Transfers; (ii) directing that the Transfers be set aside; (iii) recovering the Transfers, or the value thereof, from Green, Magnify, Strand, Premero, Express and YHA for the benefit of the estate of BLMIS; (iv) directing Green, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Green related to or arising from, or concerning the Transfers from BLMIS to Magnify, Strand, Premero, YHA, Express and Green;

60

(v) disallowing any claim that Magnify, Strand, Premero, YHA, Express and Green may have against the Debtors until such time as the Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from Magnify, Strand, Premero, YHA, Express and Green; and (vii) awarding any other relief the Court deems just and appropriate.

### COUNT EIGHT
### PREFERENTIAL TRANSFER – 11 U.S.C. §§ 105(a), 502(d), 547(b), 550, AND 551
### *Against YHA*

220.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

221.    In the alternative to the causes of action pled above, to the extent the Ninety Day Transfers were made for or on account of unreturned principal, they are avoidable and recoverable under sections 547(b) and 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

222.    At the time of each of the Ninety Day Transfers made by or for the benefit of YHA, YHA was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and under section 78fff-2(c)(3) of SIPA.

223.    Each of the Ninety Day Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) and 547(b) of the Bankruptcy Code and under section 78fff-2(c)(3) of SIPA.

224.    Each of the Ninety Day Transfers was to or for the benefit of YHA.

225.    To the extent the Ninety Day Transfers were made for or on account of unreturned principal, each of the Ninety Day Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

226.    Each of the Ninety Day Transfers was made while BLMIS was insolvent.

227.    Each of the Ninety Day Transfers was made within ninety days of the Filing Date.

61

228.    Each of the Ninety Day Transfers enabled YHA to receive more than the YHA would receive if:  (i) this case was a case under Chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) YHA received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

229.    To the extent the Ninety Day Transfers were made for or on account of unreturned principal, each of the Ninety Day Transfers constituted a preferential transfer avoidable by the Trustee under section 547(b) of the Bankruptcy Code and recoverable from YHA pursuant to section 550(a) and section 78fff-2(c)(3) of SIPA.

230.    As a result of the foregoing, under sections 105(a), 502(d), 547(b), 550, and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against YHA:  (i) avoiding and preserving the Ninety Day Transfers; (ii) directing that the Ninety Day Transfers be set aside; (iii) recovering the Ninety Day Transfers, or the value thereof, for the benefit of the estate of BLMIS; (iv) disallowing any claim that YHA may have against the Debtors until such time as the Ninety Day Transfers are repaid to the Trustee; (v) awarding attorneys' fees and costs from the YHA; and (vi) awarding any other relief the Court deems just and appropriate.

### COUNT NINE
### EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS –
### 11 U.S.C. §§ 105(a) and 510(c)
### *Against Magnify, Premero, Strand, and YHA*

231.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

232.    Magnify, Premero, Strand, and YHA filed customer claims with the Trustee.

233.    Magnify, Premero, Strand, and YHA, through Green, engaged in inequitable conduct, including behavior described in this Amended Complaint, which enabled Madoff to

62

prolong the Ponzi scheme that resulted in injury to the customers and creditors of the estate and

has conferred an unfair advantage on Magnify, Premero, Strand, and YHA.

234.    Based on Magnify, Premero, Strand and YHA's inequitable conduct as described

above, the customers of BLMIS have been misled as to the true financial condition of the debtor,

customers have been induced to invest without knowledge of the actual facts regarding BLMIS's

financial condition, and/or customers and creditors are less likely to recover the full amounts due

to them because of the conduct of Magnify, Premero, Strand, and YHA.

235.    Prior to the Filing Date, Magnify, Premero, Strand, and YHA benefited by the

withdrawal of approximately $153,722,070 from BLMIS.  But for these withdrawals, there

would have been additional customer property available on the Filing Date for distribution.

236.    The Court should exercise the full extent of its equitable powers to ensure that

claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by

Magnify, Premero, Strand and YHA directly or indirectly against the estate—and only to the

extent such claims are allowed—are subordinated for distribution purposes under sections

510(c)(1) and 105(a) of the Bankruptcy Code to the allowed claims of all other customers and

creditors of BLMIS.

237.    Equitable subordination as requested herein is consistent with the provisions and

purposes of the Bankruptcy Code.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor

of the Trustee and against Defendants as follows:

(i)    On the First Claim for Relief, under sections 105(a), 502(d), 548(a)(1)(A),

550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, judgment:

(i) avoiding and preserving the Two Year Transfers; (ii) directing that the Two Year Transfers be

63

set aside; (iii) recovering the Two Year Transfers, or the value thereof, from Magnify, Strand,

Premero, YHA, and Green for the benefit of the estate of BLMIS; (iv) directing Green, to the

extent allowable by law, to disgorge to the Trustee all profits, including any and all management

fees, incentive fees or other compensation and/or remuneration received by Green related to or

arising from, or concerning the Two Year Transfers from BLMIS to Magnify, Strand, Premero,

YHA, and Green; (v) disallowing any claim that Magnify, Strand, Premero, YHA, and Green

may have against the Debtors until such time as the Two Year Transfers are repaid to the

Trustee; (vi) awarding attorneys' fees and costs from Magnify, Strand, Premero, YHA, and

Green; and (vii) awarding any other relief the Court deems just and appropriate;

(ii)    On the Second Claim for Relief, under sections 105(a), 502(d),

548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, judgment:  (i) avoiding and preserving

the Two Year Transfers; (ii) directing that the Two Year Transfers be set aside; (iii) recovering

the Two Year Transfers, or the value thereof, from Magnify, Strand, Premero, YHA, and Green

for the benefit of the estate of BLMIS; (iv) directing Green, to the extent allowable by law, to

disgorge to the Trustee all profits, including any and all management fees, incentive fees or other

compensation and/or remuneration received by Green related to or arising from, or concerning

the Two Year Transfers from BLMIS to Magnify, Strand, Premero, YHA, and Green; (v)

disallowing any claim that Magnify, Strand, Premero, YHA, and Green may have against the

Debtors until such time as the Two Year Transfers are repaid to the Trustee; (vi) awarding

attorneys' fees and costs from Magnify, Strand, Premero, YHA, and Green; and (vii) awarding

any other relief the Court deems just and appropriate;

(iii)    On the Third Claim for Relief, under DCL sections 276, 276-a, 278 and/or

279, sections 105(a), 502(d), 544(b), 550(a), and 551 of the Bankruptcy Code and section 78fff-

2(c)(3) of SIPA, judgment:  (i) avoiding and preserving the Six Year Transfers; (ii) directing that

the Six Year Transfers be set aside; (iii) recovering the Six Year Transfers, or the value thereof,

from Magnify, Strand, Premero, YHA, and Green for the benefit of the estate of BLMIS; (iv)

directing Green, to the extent allowable by law, to disgorge to the Trustee all profits, including

any and all management fees, incentive fees or other compensation and/or remuneration received

by Green related to or arising from, or concerning the Six Year Transfers from BLMIS to

Magnify, Strand, Premero, YHA, and Green; (v) disallowing any claim that Magnify, Strand,

Premero, YHA, and Green may have against the Debtors until such time as the Six Year

Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from Magnify, Strand,

Premero, YHA, and Green; and (vii) awarding any other relief the Court deems just and

appropriate;

(iv)    On the Fourth Claim for Relief, under DCL sections 273, 278 and/or 279,

sections 105(a), 502(d), 544(b), 550, and 551 of the Bankruptcy Code and section 78fff-2(c)(3)

of SIPA, judgment:  (i) avoiding and preserving the Six Year Transfers; (ii) directing that the Six

Year Transfers be set aside; (iii) recovering the Six Year Transfers, or the value thereof, from

Magnify, Strand, Premero, YHA, and Green for the benefit of the estate of BLMIS; (iv) directing

Green, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all

management fees, incentive fees or other compensation and/or remuneration received by Green

related to or arising from, or concerning the Six Year Transfers from BLMIS to Magnify, Strand,

Premero, YHA, and Green; (v) disallowing any claim that Magnify, Strand, Premero, YHA, and

Green may have against the Debtors until such time as the Six Year Transfers are repaid to the

Trustee; (vi) awarding attorneys' fees and costs from Magnify, Strand, Premero, YHA, and

Green; and (vii) awarding any other relief the Court deems just and appropriate;

(v)    On the Fifth Claim for Relief, under DCL sections 274, 278 and/or 279, sections 105(a), 502(d), 544(b), 550, and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, judgment:  (i) avoiding and preserving the Six Year Fraudulent Transfers; (ii) directing the Six Year Transfers be set aside; (iii) recovering the Six Year Transfers, or the value thereof, from Magnify, Strand, Premero, YHA, and Green for the benefit of the estate of BLMIS; (iv) directing Green, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Green related to or arising from, or concerning the Six Year Transfers from BLMIS to Magnify, Strand, Premero, YHA, and Green; (v) disallowing any claim that Magnify, Strand, Premero, YHA, and Green may have against the Debtors until such time as the Six Year Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from Magnify, Strand, Premero, YHA, and Green; and (vii) awarding any other relief the Court deems just and appropriate;

(vi)    On the Sixth Claim for Relief, under DCL sections 275, 278 and/or 279, sections 105(a), 502(d), 544(b), 550, and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, judgment:  (i) avoiding and preserving the Six Year Transfers; (ii) directing that the Six Year Transfers be set aside; and (iii) recovering the Six Year Transfers, or the value thereof, from Magnify, Strand, Premero, YHA, and Green for the benefit of the estate of BLMIS; (iv) directing Green, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Green related to or arising from, or concerning the Six Year Transfers from BLMIS to Magnify, Strand, Premero, YHA, and Green; (v) disallowing any claim that Magnify, Strand, Premero, YHA, and Green may have against the Debtors until such time as the Six Year

Transfers are repaid to the Trustee; (vi) awarding attorneys' fees and costs from Magnify, Strand,

Premero, YHA, and Green; and (vii) awarding any other relief the Court deems just and

appropriate;

(vii)    On the Seventh Claim for Relief, under N.Y. C.P.L.R. 203(g) and 213(8),

DCL sections 273-279, sections 105(a), 502(d), 544(b), 550(a) and 551 of the Bankruptcy Code

and section 78fff-2(c)(3) of SIPA, judgment:  (i) avoiding and preserving the Transfers; (ii)

directing that the Transfers be set aside; (iii) recovering the Transfers, or the value thereof, from

Magnify, Strand, YHA, Premero, Green, and Express for the benefit of the estate of BLMIS; (iv)

directing Green to the extent allowable by law, to disgorge to the Trustee all profits, including

any and all management fees, incentive fees or other compensation and/or remuneration received

by Green related to or arising from, or concerning the Transfers from BLMIS to Magnify,

Strand, Premero, YHA, Express and Green; (v) disallowing any claim that Magnify, Strand,

Premero, YHA, Express and Green may have against the Debtors until such time as the Transfers

are repaid to the Trustee; (vi) awarding attorneys' fees and costs from Magnify, Strand, Premero,

YHA, Express and Green; and (vii) awarding any other relief the Court deems just and

appropriate;

(viii)    On the Eighth Claim for Relief, under sections 105(a), 502(d), 547,

550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, judgment:  (i)

avoiding and preserving the Ninety Day Transfers; (ii) directing that the Ninety Day Transfers be

set aside; (iii) recovering the Ninety Day Transfers, or the value thereof, from YHA for the

benefit of the estate of BLMIS; (iv) disallowing any claim that YHA may have against the

Debtors until such time as the Ninety Day Transfers are repaid to the Trustee; (v) awarding

attorneys' fees and costs from the YHA; and (vi) awarding any other relief the Court deems just and appropriate;

(ix)    On the Ninth Claim for Relief, that Magnify, Premero, Strand, and YHA's customer claims, to the extent allowed, be subordinated for purposes of distribution to all allowed claims of BLMIS's customers and creditors due to Defendants' inequitable conduct under sections 510(c)(1) and 105(a) of the Bankruptcy Code, such that no claim of Defendants is paid ahead of the allowed claim of any customer or creditor of BLMIS;

(x)    On all Claims for Relief, imputing Green's knowledge to the Defendants;

(xi)    On all Claims for Relief, impressing the Defendants' property, or the proceeds, product and offspring of such property, with an equitable lien and/or a constructive trust in favor of the Trustee for the benefit of the estate, to the extent that the Transfers were used, in whole or in part, to purchase, improve and/or maintain such property;

(xii)    On all Claims for Relief, under federal common law and N.Y. C.P.L.R. 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

(xiii)    On all Claims for Relief, establishment of a constructive trust over the proceeds of the Transfers in favor of the Trustee for the benefit of BLMIS's estate;

(xiv)    Awarding the Trustee's attorneys' fees, all applicable interest, costs, and disbursements incurred in this proceeding; and

(xv)    Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Date:    September 29, 2017
         New York, New York

By: */s/ Ona T. Wang*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Ona T. Wang
Tracy Cole
M. Elizabeth Howe
David M. McMillan

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the Estate of Bernard L. Madoff*