# Exhibit D

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - x

4    SECURITIES INVESTOR PROTECTION

5    CORPORATION

6    v.                              CASE NO. 08-01789-smb

7    BERNARD L. MADOFF INVESTMENT

8    SECURITIES, LLC, et al,

9            Debtors.

10   - - - - - - - - - - - - - - - - - - x

11   IRVING H. PICARD, TRUSTEE FOR THE

12   LIQUIDATION OF BERNARD L. MADOFF,

13           Plaintiff,              ADV. PROC.

14   v                               CASE NO. 10-051430-smb

15   MARILYN BERNFELD TRUST, ET AL.,

16           Defendants.

17   - - - - - - - - - - - - - - - - - - x

18   IRVING H. PICARD, TRUSTEE FOR THE

19   LIQUIDATION OF BERNARD L. MADOFF,

20           Plaintiff,              Adv. Proceeding

21   v                               CASE NO. 10-05390-smb

22   1096-1100 RIVER ROAD ASSOCIATION,

23           Defendant.

24   - - - - - - - - - - - - - - - - - - x

25

```
                                                      Page 2

  1    - - - - - - - - - - - - - - - - - - x

  2    IRVING H. PICARD, TRUSTEE FOR THE

  3    LIQUIDATION OF BERNARD L. MADOFF,

  4          Plaintiff,                     ADV. PROCEEDING

  5    v                                    CASE NO. 10-04283-smb

  6    MENDELOW, ET AL.,

  7          Defendants.

  8    - - - - - - - - - - - - - - - - - - x

  9    IRVING H. PICARD, TRUSTEE FOR THE

 10    LIQUIDATION OF BERNARD L. MADOFF,

 11          Plaintiff,                     ADV. PROCEEDING

 12    v                                    CASE NO. 10-05286-smb

 13    LEGACY CAPITAL, LTD., ET AL.,

 14          Defendants.

 15    - - - - - - - - - - - - - - - - - - x

 16                     U.S. Bankruptcy Court

 17                     One Bowling Green

 18                     New York, New York

 19                     October 28, 2015

 20                     10:02 AM

 21    B E F O R E :

 22    HON. STUART M. BERNSTEIN

 23    U.S. BANKRUPTCY JUDGE

 24

 25    ECRO:  Unidentified
```

Page 3

1   Adversary proceeding: 10-05143-smb Irving H. Picard, Trustee

2   for the Liquidation of Bernard L. Madoff Investment

3   Securities LLC, and Bernard L. Madoff v. Marilyn Bernfeld

4   Trust et al Discovery Conference Pursuant to Local

5   Bankruptcy Rule 7007-l(b) (also applies to Adv. P. Nos. 10-

6   5143 & 10-4841)

7

8   Discovery Conference Pursuant to Local Bankruptcy Rule 7007-

9   1 (b)

10

11   Adversary proceeding: 10-04283-smb Picard, as Trustee for

12   the Liquidation of Bernard v. Mendelow et al

13   Discovery Conference pursuant to Local Bankruptcy Local

14   7007-1 (b)

15

16   Defendants' Motion for Judgment on the Pleadings

17

18   Adversary proceeding: 10-05286-smb Irving H. Picard, Trustee

19   for the Liquidation of Bernard v. Legacy Capital Ltd. et al

20   Defendant Khronos Motion to Dismiss

21

22   Defendant Legacy Capital's Motion to Dismiss

23

24

25

Page 4

1    Adversary proceeding: 08-01789-smb Securities Investor

2    Protection Corporation v. Bernard L. Madoff Investment

3    Securities, LLC. et al

4    Trustees Motion and Memorandum to Affirm His Determinations

5    Denying Claims of Claimants' Holding Interests in 1973

6    Masters Vacation Fund, Bull Market Fund, and Strattham

7    Partners

8

9    Adversary proceeding: 10-04283-smb Picard, as Trustee for

10   the Liquidation of Bernard v. Mendelow et al

11   Pre-Trial Conference

12

13   Adversary proceeding: 10-05286-smb Irving H. Picard, Trustee

14   for the Liquidation of Bernard L. Madoff Investment

15   Securities LLC, and Bernard L. Madoff v. Legacy Capital Ltd.

16   et al

17   Pre-Trial Conference

18

19

20

21

22

23

24

25

Page 5

```
 1   A P P E A R A N C E S :

 2   BAKER HOSTETLER

 3        Attorneys for BLMIS, Trustee

 4        45 Rockefeller Plaza

 5        New York, NY  10111

 6

 7   BY:  JONATHAN B. NEW, ESQ.

 8        GEORGE KLIDONAS, ESQ.

 9        OREN WARSHAVSKY, ESQ.

10        ROBERTSON D. BECKERLEGGE, ESQ.

11        AMY W. VANDERWAL, ESQ.

12        FERVE OZTURK, ESQ.

13        FARRELL A. HOCHMUTH, ESQ.

14        PETER B. SHAPIRO, ESQ.

15        TATIANA MARKEL, ESQ.

16

17   DICKSTEIN SHAPIRO, LLP

18        Attorneys for Khronos, LLC

19        1633 Broadway

20        New York, New York 10019

21

22   BY:  ERIC B. FISHER, ESQ.

23        LINDSAY A. BUSH, ESQ.

24

25
```

Page 6

1   SECURITIES INVESTOR PROTECTION CORPORATION

2        For SiPC

3        1667 K Street, N.W.

4        Suite 1000

5        Washington, DC  20006

6

7   BY:  NATHANAEL S. KELLEY, ESQ.

8

9   STEVENS & LEE, P.C.

10        Attorneys for Legacy Capital

11        485 Madison Avenue, 20th Floor

12        New York, New York 10022

13

14   BY:  NICHOLAS F. KAJON, ESQ.

15

16   WEDEEN & KAVANAGH

17        Attorneys for Unspecified Party

18        41 Union Square West

19        Suite 325

20        New York, New York 10010

21

22   BY: TIMOTHY WEDEEN, ESQ.

23

24

25

1    ARKIN SOLBAKKEN, LLP

2          Attorneys for Mendelow, et al.

3          750 Lexington Avenue

4          New York, New York 10022

5

6    BY:   STANLEY S. ARKIN, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    allegation in the complaint that Legacy ever made a transfer

2    to Montpellier.

3              MR. FISHER:  No, there's not, Your Honor.

4              THE COURT:  All right.  Thank you very much.

5              MR. FISHER:  Thank you.

6              THE COURT:  I'll reserve decision.

7              Let's take a ten minute recess and then I'll hear

8    the argument in the other matter.

9         (Recess from 11:10 a.m. until 11:24 a.m.)

10             THE COURT:  Please be seated.  Next, Mendelow.

11             MR. ARKIN:  Good morning, Your Honor.

12             THE COURT:  Good morning.

13             MR. REISEN:  You want to speak first?

14             MR. ARKIN:  I just want to say I'm Stanley Arkin.

15             THE COURT:  How do you do?

16             MR. ARKIN:  I appear for Mr. Mendelow.  And my

17   colleague, Alex Reisen, who will be speaking mainly to --

18             THE COURT:  Right.

19             MR. ARKIN:  -- (indiscernible) here.

20             THE COURT:  Okay.  Go ahead.

21             MR. REISEN:  Alex Reisen from Arkin Solbakken

22   representing defendants, Steven Mendelow, Nancy Mendelow,

23   Cara Mendelow, Pam Christian and C&P Associates, Ltd. and

24   Inc.

25             I'm sure we're going to talk about the actual

1    knowledge exception.  I just wanted to bring to the Court's

2    attention certain language in Ida Fishman that actually

3    raises the question about whether even an actual knowledge

4    exception still could persist.  And that -- in the

5    beginning, the third and fourth paragraph of that, they

6    define the class of people that they're trying to claw back

7    from as people that profited from Madoff's Ponzi scheme,

8    whether knowingly or not.  And then they define the question

9    -- they don't define the class as we all know it's -- you

10   know, good faith defendants.  But -- and also, they define

11   the question as whether they can claw back, whether the

12   types of transfers are the type that are securities.

13            And then at the last paragraph, they talk about

14   Congress' balance between finality and equity and that you

15   have to respect Congress' balance.  And then there's this

16   wording, cannot go past two years at all.

17            So I just want to raise that.  I don't think we'll

18   have to reach it.  It's an alternative --

19            THE COURT:  That's in (indiscernible) with the

20   safe harbor, though.

21            MR. REISEN:  Yes.  And that's what we're talking

22   about, the safe harbor, the 546(e) safe harbor.

23            THE COURT:  Are you saying -- are you arguing that

24   even if the defendants had actual knowledge that Madoff was

25   conducting a Ponzi scheme that the trustee can't go back

Page 68

1    more than two years?

2              MR. REISEN:  I'm saying that potentially you can

3    read Ida Fishman that way.  That is -- we all understand

4    that those were good faith plaintiffs, what Cohmad says.  I

5    understand what can -- I understand what was just argued.  I

6    just want to bring that language to the Court's attention.

7    I haven't seen it argued that way.

8              THE COURT:  I thoroughly -- I'm familiar with the

9    language.

10             MR. REISEN:  Fair enough.  Okay.  Very good.  So

11   you're also quite familiar clearly with the strictness of

12   the Cohmad standard.  It is at a minimum so it's not an

13   exemplar.  Actual knowledge is the high degree of certainty

14   beyond high probability of known securities trades.  So

15   extraordinarily high standard.

16             Then I think, really, the key message here is that

17   we are cabined in by Merkin.  I think this decision really

18   could be a one-word decision.  It could be Merkin, motion

19   granted.  And I think the key difference between Merkin is

20   that he -- in the words that Your Honor used.  He developed

21   an understanding and appreciation of what the red flags

22   could mean.  That is, that indicated a potential Ponzi

23   scheme.  He said this appears to be a Ponzi scheme.  He was

24   aware of the impossibility of trades.  He was told of the

25   possibilities.

Page 69

1            THE COURT:  Is this really a red flags case?  This

2     sounds like --

3            MR. REISEN:  Can it --

4            THE COURT:  The sense I get from the complaint is

5     it's almost an allegation of an aiding and abetting type.

6            MR. REISEN:  Solely red flags.  No allegations of

7     any subjective interpretation of the red flags.  And, in

8     fact, to the extent that you want to say what is a

9     reasonable inference, they're sort of -- and I understand

10    that this is not in the complaint but, as Your Honor knows,

11    when you judge whether something's plausible, you use all

12    your experience and things like that.

13           We have this funny thing.  We're actually

14    Preet Bharara.  And Judge Swain from the southern district

15    actually say that Paul Konigsberg comes out and files in the

16    southern district of New York, someone who has all the red

17    flags that Mendelow had, guaranteed rates of return,

18    referral fees, paybacks and more.  He had (indiscernible) in

19    fraudulent transaction and he personally backdated options

20    trade.  Both of them come out.  It's totally in an

21    unsurprised and conclusion.  They don't feel the need to

22    explain themselves.  That -- he had known we're at zero.

23    High degree of certainty, high probability, known suspicion

24    of a Ponzi scheme.  So Mendelow was actually less than zero

25    to some extent.

1            THE COURT:  So you're saying that Mendelow -- I

2     mean, Madoff got together and said let's really cook up

3     these account statements so I can make money.  That's not an

4     indication that they knew that.  No actual securities were

5     being traded.

6            MR. REISEN:  Where is that allegation?

7            THE COURT:  I'm asking you a hypothetical

8     question.  I do that.

9            MR. REISEN:  Of course.  If they got together and

10    -- can you ask the question again?

11           THE COURT:  Yeah.  Mendelow and Madoff got

12    together and said let's create some fictional account

13    statements so that that will justify more payments to me.

14    That wouldn't support an inference that he knew that Madoff

15    is not engaged in the trading of securities?

16           MR. REISEN:  I don't even think that would be a

17    high degree of certainty of (indiscernible).  But --

18           THE COURT:  I think we have a basic disagreement

19    on the state of the law.  But --

20           MR. REISEN:  Okay.

21           THE COURT:  -- with all due respect to the U.S.

22    attorney.

23           MR. REISEN:  Fair enough.  Fair enough.  But let's

24    talk about the one big move that they make in their motion

25    which is that they say that Mendelow personally directed --

1    personally participated in the fraud by directing --

2            THE COURT:  It's all in paragraph 94 of the

3    complaint.  So why isn't paragraph 94 -- why isn't that

4    sufficient to -- and you can get a copy of the complaint.

5            MR. REISEN:  Sure.  That would be great.

6            THE COURT:  But why isn't that a sufficient

7    allegation to support --

8            MR. REISEN:  Well, what --

9            THE COURT:  -- the -- let me -- please, let me

10   finish.

11           MR. REISEN:  Sure.  I'm sorry.

12           THE COURT:  Why isn't that a sufficient allegation

13   to support the conclusion for purposes of the motion to

14   dismiss that the complaint pleads that Mendelow directed

15   BLMIS to create fictitious trades to catch up with the

16   shortfall between he was promised and what the statements

17   showed.

18           MR. REISEN:  Right.  So what is actually alleged

19   is three things.  He calculated what he was owed in referral

20   fees, a straight percentage of what he referred from

21   Telfran; that he looked at his account balance at the end of

22   the year, or whatever, do I get my 230 grand.  And if he

23   didn't, he calls him and says can you make this up.  No

24   allegation (indiscernible) he did it by trading, that they

25   did it by fake trading.  In fact, it's just the opposite.

1    They allege that they did it secretly and independently.

2    The Schupt process which they did it for dozens of people

3    and it was handwritten.

4              Now let me -- if I can make --

5              THE COURT:  Can I ask you a question?

6              MR. REISEN:  Sure.

7              THE COURT:  And it's not in the complaint but how

8    did -- how was Mendelow paid his commissions?  You know,

9    through a voting clients or customers, whatever.

10             MR. REISEN:  In this case, it is alleged that --

11             THE COURT:  I'm asking how it really happened.  In

12   other words, normally, I would think that if somebody was

13   earning a commission for referring investors --

14             MR. REISEN:  Right.

15             THE COURT:  -- they receive a check --

16             MR. REISEN:  Right.

17             THE COURT:  -- at some point.

18             MR. REISEN:  Right.

19             THE COURT:  The complaint seems to say that the

20   way Mendelow was compensated was that value --

21             MR. REISEN:  That's exactly right.

22             THE COURT:  -- was added to his account.  Now I

23   suppose that that could be done legitimately by --

24             MR. REISEN:  Yeah.  Well, they allocate winning

25   trades.

Page 73

```
 1              THE COURT:  Let me --

 2              MR. REISEN:  I'm sorry.

 3              THE COURT:  I suppose that could be done

 4    legitimately by putting money into the account or putting

 5    securities into the account.  Is that the way he was

 6    compensated, though, through his accountant?

 7              MR. REISEN:  Exactly right.  Exactly right.  So he

 8    just looked at it and that's where the (indiscernible) are.

 9    And you could see that he has an injunction from the SEC

10    saying do not trade securities.  Do not refer securities

11    without a registered -- so -- and I think Mr. Warshavsky

12    actually said --

13              THE COURT:  Isn't that an unusual way to

14    compensate somebody?

15              MR. REISEN:  Is it unusual.

16              THE COURT:  In other words, unless you actually

17    see somebody putting cash in -- a cash deposit were the

18    deposit of securities, how do you get compensated by -- how

19    do you get compensated?  I don't understand.

20              MR. REISEN:  Yes.  I agree it's not maybe the

21    usual way.  Does it lead to any sort of -- one single

22    factual allegation that he recognized this as unusual, that

23    he went from high degree of probability to a certainty or

24    actual knowledge that he's not trading securities.  And Mr.

25    Warshavsky said he'll see something strange, the Volkswagen.
```

1    You don't immediately see it's the thing but you start

2    conversing (indiscernible).  If you have a strange way of

3    paying referral fees, you don't say, oh, I'm absolutely

4    certain that this is a totally implausible thing that's

5    never happened before that it's been doing for 20 years with

6    billions of dollars, no one's figured it out, that's not

7    good, it's not plausible that that's a -- the

8    non-speculative strong imprints that's pled with

9    particularity.  Whereas in Merkin, you have a subjective

10   interpretation of such an unusual thing.  You know, one

11   after the other.  He actually talks to Bernie Madoff and

12   says what about these daily trades, the (indiscernible)

13   trades?  What about the lack of self-clearing.  He's told

14   that it's impossible.  He has all of that stuff and even

15   Merkin does not reach the actual knowledge.  So Mendelow

16   doesn't even reach Merkin.  He never forms any suspicion

17   about that this is unusual.  Yes, it's inquiry notice,

18   that's correct.  It is an unusual way to do it.

19            THE COURT:  Go ahead.

20            MR. REISEN:  Okay.  So the big -- and this is

21   their big move.  And so, they're asking to infer from those

22   facts checks and balances, it's not enough.  Give it back.

23   It's analogous to if Mendelow looks at his drying cleaning

24   bill and says, oh, you've been overcharging me 200 dollars.

25   I'm going to call up the dry cleaner and says, hey, pay me

Page 75

1    back 200 dollars; you overcharged me.  Now unbeknownst to

2    Mendelow, the dry cleaner is a drug addict.  She's been

3    stealing from the till and overcharging customers.  She goes

4    out on the street and knifes someone to death for

5    (indiscernible) 200 dollars and pays back Mendelow.  Did

6    Mendelow personally participate in the street murder by

7    personally directing him to commit street murder?  Of course

8    not.  But that's exactly the trustee's logic.

9            So that's the jump.  So we're cabined in by

10   Merkin.  We're cabined in by Konigsberg.  We're less than

11   zero.  And the other allegations are referral fees

12   generally.  We already know that Judge Stanton says no

13   indication of fraud.  And in general, you have guaranteed

14   rates of returning the same way of paying you back at the

15   end of the year.  You get up to the percentage by basically

16   allocating you winners, I suppose.  If it was even alleged

17   that Mendelow looked and saw that it was trades being done -

18   - he just looked at his balances, right?

19           So that -- again, if we guaranteed rates of return

20   matter, the SEC would have known when they looked at the

21   Telfran thing.  They knew the guaranteed rates which were --

22           THE COURT:  Well, obviously, the SEC was wrong.

23           MR. REISEN:  Yes, clearly.  Right.  But I guess

24   the question is was it a plausible inference.  And they even

25   think of it as for a second.

1       And we have in both Prickett and in Merkin, highly

2   -- impossibly high rates and consistent rates.  Still,

3   unless

4   you --

5       THE COURT:  Well, I think it's a difference

6   between generally performing at an unusually high rate and

7   you guarantee those rates.

8       MR. REISEN:  Yes.  Well, let's talk about that.  I

9   guess the idea is that, yes, if you're -- if at the end of

10  the year you're at 16 percent, I'm going to bring you up to

11  17 percent, right, by allocating you trades.  It's not --

12  it's

13  a -- the plausible non-speculative imprint is not that Steve

14  Mendelow suddenly had actual knowledge that it's the thing

15  that's never happened before.  And again, there's not even

16  any -- even if that was, there's no -- again, it's inquiry

17  knowledge.  There's no allegation that he ever interpreted

18  this and had an understanding and appreciation, the words

19  that Your Honor used.

20      And this is the same language used in Prickett.

21  You never even get to the middle level of requisite.

22      THE COURT:  Bridget?

23      MR. REISEN:  Prickett.  It's actually a 10(b)(5)

24  in the Madoff context.  But it's the same thing in the --

25  the Court there said that you don't -- unless you interpret

1    such a red flag with a high degree to have -- be some sort

2    of subjective indication.  Unless you translate it, you

3    don't even get to recklessness.  It's not probative.

4            So -- and then we have the Fifth Amendment

5    imprints, which we've already looked at Judge Stanton.  It

6    says you don't even need it to draw the inference.  If you

7    do, it's weak.  Everyone was thought to be brought into a

8    criminal vogue.  In this case, I suppose if you were going

9    to think of, well, what was Mendelow thinking, he was

10   probably afraid of criminal contempt on the injunction

11   perhaps.  But, again, it's not -- the trustee offered

12   nothing that could ever make such a jump.  I plead the

13   Fifth.  All of a sudden, he had actual knowledge that Bernie

14   Madoff never traded any securities.

15           And this is also distinguishable -- I think the

16   line that Your Honor has brought in is in the Kingate and

17   Surretti (ph) case.  And the difference there is that not

18   only did they not have a subjective interpretation of Merkin

19   but now in Surretti, they actually do the comparison, figure

20   out he's doing fictitious trades, talk to each other about

21   how it's a scam and all the reasons for it.  And then make

22   up stories.  Try and keep other people out.  Right?  I mean,

23   they list all the different things.  What are they going to

24   ask?  What stories are they going -- you going to tell?

25   They fabricate the stories.  They don't go and investigate.

1          So -- and, of course, there's -- I mean, the

2     relationship of both Merkin, very close inner circles,

3     Surretti, Mendelow.  The sole allegation of his special

4     access is he can refer clients.  He can get them in contact,

5     you know, give him his phone number, type of thing.  Not

6     inner circle.  Not a special access type of case.

7          So that's Surretti.  That's -- I believe that's

8     all of the allegations of actual knowledge.

9          And then I guess we've asked that Your Honor not

10    give them the leave to amend.  I think we have delay.  We

11    have futility.  They're not even close.  They haven't even

12    offered a possible new allegation.  They've had tons of

13    discovery.  They've had all of our documents for five years.

14    There's nothing that they can add.

15          THE COURT:  Well, this complaint is obviously

16    drafted before these various cases came down explaining the

17    standard.

18          MR. REISEN:  Yes.

19          THE COURT:  Why not give him another chance to

20    plead in accordance with the standard that's now been

21    established?

22          MR. REISEN:  Yes.  If it wouldn't be futile, of

23    course.

24          THE COURT:  Well, how do I know if --

25          MR. REISEN:  If they could offer an allegation.

1    But there isn't -- there's no facts.  We know that there's

2    no facts.  They have the documents.  They've been doing

3    discovery that no plaintiff has ever dreamed of --

4              THE COURT:  Well, maybe --

5              MR. REISEN:  -- for five years.

6              THE COURT:  Maybe when they drafted this

7    complaint, they thought that what they drafted was

8    sufficient and what they thought the state of the law was

9    then.

10             MR. REISEN:  Oh, I think they did.  I think that's

11   right.  But I think the problem is that they -- you need to

12   actually propose a fact that would make it not futile,

13   right?  They had represented to this Court even after Ida

14   Fishman that they're not thinking of amending.  Now if they

15   thought

16   actual -- remember, back in when Katz was decided, if they

17   knew this was an actual knowledge case, they could have just

18   gone ahead.  Why did they give us four years of extensions

19   if Katz wasn't going to matter, if they were pleading actual

20   knowledge anyway?  They could have just gone ahead.  We're

21   going to be prejudiced.  We thought we were going to have to

22   do objective notice which is essentially the only reason a

23   person would have done.  Now all of a sudden, we've got to

24   go back five years.  How are we going to prove subjective

25   state of mind.  Totally different set of evidence.  We are

1    prejudiced.

2              THE COURT:  Why didn't you move to dismiss the

3    complaint four years ago?

4              MR. REISEN:  Well, because -- that's a great

5    question.  Because we didn't want to waste the resources.

6    What if Katz and Ida Fishman goes the other way?  It's

7    useless.  The whole point is -- our whole understanding was

8    that we're waiting to see -- of course, you're not --

9              THE COURT:  Well, can't you make the same argument

10   as to why they didn't amend the complaint?  If you're

11   waiting before you make the motion to dismiss, why isn't it

12   fair for them to wait in order to make a decision to amend

13   the complaint?  For instance, the court of appeals could

14   have said (indiscernible) notice was enough.

15             MR. REISEN:  Well, they -- yes.  They thought that

16   they were going under actual -- they're claiming to believe

17   that they've always had actual knowledge.  If they had

18   actual knowledge, they could have gone ahead and -- anyway,

19   there would have been no reason to wait if they thought they

20   had actual knowledge.

21             Now -- and either way, the point is that it's

22   their burden to plead.  It's not our burden to inform or

23   move to dismiss when it's going to be a waste of time.

24             THE COURT:  So why not let them re-plead and see

25   if they can re-plead the complaint?

1          MR. REISEN:  Well, because we're prejudiced.

2     Because --

3          THE COURT:  How are you prejudiced?

4          MR. REISEN:  Because we're not -- mostly because

5     of the time that we've been forced -- we won't be able to go

6     and get subjective evidence.

7          THE COURT:  What do you mean?

8          MR. REISEN:  Evidence as -- it's a totally

9     different set of evidence that -- we're on notice five years

10    ago that their complaint is -- they never even claimed

11    (indiscernible) any subjective notice at all.  There's no

12    facts at all.  We've never been -- so we're waiting -- we're

13    trying to get evidence on, I guess, object of notice.  All

14    of a sudden, five years down the line, we've got -- oh, it's

15    a totally different thing.

16         THE COURT:  But you knew that was the standard at

17    the test.  Didn't you start to gather that evidence?

18         MR. REISEN:  We're not on notice that there's any

19    possibility that we could ever even face a claim.  There's

20    not even a conclusory statement of anything like actual

21    knowledge --

22         THE COURT:  So what kind of evidence would you

23    have to gather?

24         MR. REISEN:  -- let alone facts.

25         THE COURT:  What kind of evidence would you have

Page 82

1    gathered that you can no longer gather?

2              MR. REISEN:  Well, I suppose everyone's testimony,

3    everyone's memory, what did Steve tell you, what was his

4    thoughts, subjective thoughts about this.  His memory fades.

5    People -- I mean, for example, DiPasceli is now dead, right?

6    We want to ask, well, were there any conversations that

7    Mendelow --

8              THE COURT:  Did he have any conversations with --

9              MR. REISEN:  I think --

10             THE COURT:  -- DiPasceli?

11             MR. REISEN:  I don't believe so but --

12             THE COURT:  So --

13             MR. REISEN:  But we could ask DiPasceli did you

14   ever have any conversations with Mendelow, right?

15             THE COURT:  Well, Mendelow will say I didn't and

16   they won't be able to say anything else, will they?

17             MR. REISEN:  Well, I suppose that's right.  But

18   the bottom line, I guess, is that they've had so much

19   evidence.  They've made this motion that we believe is

20   actually -- there's no basis for.  We've had to defend

21   against it.  They claim that they're not going to amend it.

22   They don't even have a basis to amend.  They still don't

23   even propose in their complaint what they could possibly

24   add.  So how can we even argue futility.  And the case law

25   actually says that you can infer that it's going to be

1    futile.

2            And again, we're not even close.  We're way down

3    below zero.  They've got to get up to 99.  They've got to

4    pass Konigsberg and Merkin, all the way up.  What are they

5    going to allege?  There's nothing -- there's no facts --

6            THE COURT:  Let's find out.

7            MR. REISEN:  Very good.  Very good.  Thank you.

8            MR. ARKIN:  You want to mention Konigsberg?

9            MR. REISEN:  I think we did speak about

10   Konigsberg, is that correct?  Konigsberg and Preet Bharara

11   and about how he had more red flags and still be --

12           THE COURT:  Well, but that's what the U.S.

13   attorney says.

14           MR. REISEN:  Fair enough.  Fair enough.

15           THE COURT:  Okay.

16           MR. REISEN:  It just goes --

17           THE COURT:  We may disagree on that.

18           MR. REISEN:  Fair enough.

19           MR. ARKIN:  Why do you say, Your Honor --

20           THE COURT:  Sure.  Speak into the microphone,

21   please.

22           MR. ARKIN:  I'm sorry.  I should be closer.  I

23   just want to say Preet is the U.S. attorney.

24           THE COURT:  Yes.  I understand --

25           MR. ARKIN:  A responsible public official for law

1    enforcement, a man who had a number of these cases passed

2    through its office.  He comes out and he says what he says.

3    And in the period of time we've had this case in our office,

4    five years, six years, there's been nothing coming from them

5    remotely suggesting actual knowledge on the part of our

6    clogged (indiscernible).  He was getting commissions for

7    clients or investors he -- starting in 1993 he recommended

8    to the company, New York (indiscernible).  There was

9    nothing, six years, which has emerged which shows what

10   Merkin and Konigsberg demonstrate actual knowledge is on the

11   part of Mr. Mendelow.  Just nothing.

12            THE COURT:  Thank you.

13            MR. NEW:  Good morning, Your Honor.  Jonathan New

14   from Baker Hostetler for the trustee.  With me at counsel

15   table this morning is Robertson Beckerlegge also of Baker

16   Hostetler.

17            THE COURT:  How do you do?

18            MR. NEW:  Your Honor, as I think the standard has

19   been clearly set out here.  The standard to overcome the

20   546(e) safe harbor is the complaint has to plausibly allege

21   facts suggesting that the defendants had actual knowledge

22   that there were no legitimate securities transactions

23   occurring in the accounts.  And while I am prepared to

24   discuss, Your Honor, I think there are several different

25   facts in this complaint that support that allegation going

Page 85

1    all the way back to his relationship with Telfran and the

2    SEC action through the guaranteed rates of return.

3              THE COURT:  Yeah.  I read all that.  And I read

4    the Avellino again in his motion.  I don't know what that

5    has to do with actual knowledge there were no securities

6    being traded.

7              MR. NEW:  Your Honor, I think it's context.  And

8    it goes to what their state of mind was at the time that

9    they did enter into the transactions that Your Honor

10   (indiscernible) which is what is the key fact here, which is

11   what's alleged in paragraphs 94 through 96 of the complaint.

12             THE COURT:  See, the way I read paragraph 94,

13   Mendelow says there's a shortfall.  You owe me money.  Make

14   it up.  That's all that paragraph 24 (sic) alleges.  And

15   then -- 94.  And then it goes on to allege in the last

16   sentence that the way BLMIS did it is it created fictitious

17   trades in the accounts.  But unlike some of the other cases

18   we've seen where -- and I'll use Cohmad as an example that

19   the defendant

20   Jaffe -- he actually participated in directing the creation

21   of fictitious and backdated trades.  That's not -- I don't

22   read 94 to allege that.  Can you allege in words or

23   substance that Mendelow actually got together with

24   representatives of BLMIS, whether it's Madoff or somebody

25   else, and said, you know what, I want you to create these

1    fictitious trades as a way to compensate me?  Can you make

2    that allegation?

3              MR. NEW:  Well, Your Honor, what we do allege --

4    and then --

5              THE COURT:  I guess the answer is no.

6              MR. NEW:  No.  Your Honor, I think we can in the

7    sense that I think it's here.  And I'm stuck to what's in

8    the complaint.

9              THE COURT:  I don't agree that it is.  I just

10   don't see it.

11             MR. NEW:  Your Honor, may I proceed?

12             THE COURT:  Go ahead.

13             MR. NEW:  I think first you have to understand

14   what is the nature of these -- what we call fraudulent side

15   payments but they were co-worker (indiscernible) --

16             THE COURT:  They're -- you can call them

17   fraudulent side payments.  And that's --

18             MR. NEW:  But I think, Your Honor --

19             THE COURT:  -- you know, that's an inflammatory

20   phrase.  I didn't -- it looks like they're commissions.

21             MR. NEW:  Your Honor, if you prefer to call them

22   commissions --

23             THE COURT:  Well --

24             MR. NEW:  -- you can call them commissions but --

25             THE COURT:  If you want to call it fraudulent side

Page 87

1    payments --

2              MR. NEW:   But --

3              THE COURT:   -- go ahead.

4              MR. NEW:   But the key issue is the nature of them.

5    And I think Your Honor had this colloquy with Mr. Reisen as

6    to exactly how they occurred every year, every December, in

7    the accounts that he was monitoring.   And so, from the very

8    beginning when he first started receiving these commissions,

9    if you'd like to call them that, they weren't payments.

10   They weren't checks.   They weren't cash.   They weren't

11   securities deposited into the accounts.   They weren't, as

12   Mr. Reisen seems to suggest, some allocation of winning

13   transactions from someplace else in BLMIS.

14              What were they?   They were trades in these

15   accounts based upon the principal supposedly in those

16   accounts that yielded the magic pre-determined amount every

17   single time.   And it was done through these options

18   transactions.   The allegations here are that Mr. Mendelow

19   knew that he was receiving them, that he tracked his

20   accounts, he monitored whether he received it, he was

21   looking at his accounts.   He would not have seen any other

22   way he was receiving these fees other than through such

23   fictitious transactions.

24              So with that as background, when you get to the

25   point that he tracks and monitors those accounts, does a

1    calculation which is based upon his understanding of a 17

2    percent guaranteed return and also the amounts of these

3    transactions.  And he says that should have been my return,

4    my yield on my account.  And then he compares that to what

5    he actually got as returns on the account.  And then he says

6    no, you need to make it up to me.  There's no other way that

7    that could have been made up to him given his knowledge of

8    what's been going on in these accounts other than through

9    these fictitious transactions.

10           THE COURT:  Well, but, you know, your brief in

11   several places says that Mendelow directed BLMIS and Madoff

12   to do this.  He may have acquiesced to it but I don't see

13   where he directed --

14           MR. NEW:  Your Honor --

15           THE COURT:  -- Madoff to do certain things other

16   than make up the shortfall.

17           MR. NEW:  Your Honor, that's a straight quote

18   practically from paragraph 96 which says "The fact that

19   Mendelow was able to direct the value of his accounts at

20   BLMIS based upon his own calculations and to ensure he

21   received specific amounts through fictitious options

22   transactions is indicative of his knowledge of fraudulent

23   trading activity."

24           THE COURT:  I don't read 94 as directing the value

25   in his accounts.  Again, it's just saying you owe me money,

Page 89

1    make up the shortfall.  And then it says the way BLMIS did

2    it is it added these fictitious trades to the account to

3    generate the "profits" necessary to make up the difference.

4          MR. NEW:  Well, Your Honor, in ways --

5          THE COURT:  That's really what is alleged.

6          MR. NEW:  Well, I think it alleges that but there

7    is -- if it's not explicit, and I think it is more explicit

8    than that, but there is the inference of how was that done

9    because if he's looking at his accounts before, as we say

10   he's closely monitoring them, and he sees that the only way

11   he's getting these gains is through securities transactions

12   and then he says make it up to me, and it's corrected, and

13   he looks back at his accounts and he sees there's no inflows

14   of money, there's no inflows of securities.  (Indiscernible)

15   fictitious options transactions.

16         THE COURT:  Okay.  But there were options

17   transactions listed in the statements which generated the

18   profits, right -- the shortfall?

19         MR. NEW:  Correct.  The exact amounts of profits.

20         THE COURT:  So why isn't it plausible for him to

21   assume that Madoff gave to these transactions, allocated

22   them and that's how he made up the difference?

23         MR. NEW:  Well, Your Honor, I think there's

24   several reasons why that's not plausible.  I think, first of

25   all, the fact that he's engaging in speculative options

Page 90

1    transactions over a number of years that always hits on a

2    pre-determined amount is not plausible.

3            Second, he has various accounts that he's

4    monitoring.  Some of these accounts, for his daughters, for

5    example, do not receive these fictitious options

6    transactions.  All these accounts are supposedly engaging in

7    the same strategy.  If Madoff is able to invest his funds in

8    such a way to get a return of 20 percent or more in his

9    accounts, why isn't he doing that in all the accounts?  It's

10   not plausible to imagine that a broker could go out in the

11   securities market and always, in the same month, in every

12   year engage in securities transactions that only -- that

13   always yield the pre-determined amounts.

14           THE COURT:  Actually, you just raised an issue

15   about the other accounts.  Don't -- doesn't the liability of

16   some of those account holders depend on the imputation of

17   Mendelow's knowledge?

18           MR. NEW:  That's correct, Your Honor.

19           THE COURT:  All right.  I understand

20   (indiscernible) C&P.  But as to the other transferees, where

21   are the allegations it's (indiscernible) imputation?

22           MR. NEW:  Your Honor, the other allegations with

23   regard to (indiscernible) C&P are that, effectively, that

24   Mr. Mendelow acted as their agent.

25           THE COURT:  That's a conclusion.  What are the --

1          MR. NEW:  Yes, Your Honor.  The only allegation in

2     the complaint -- and again, you know, we pled this at a

3     time, Your Honor, when we did not believe we had factual

4     knowledge for all the defendants.

5          THE COURT:  Do you want to re-plead your

6     complaint?

7          MR. NEW:  Well, Your Honor, we think it's

8     sufficient.

9          THE COURT:  All right.

10          MR. NEW:  But if it's not, we were going to ask

11     for leave to re-plead.

12          I would point, Your Honor, to paragraph 6 of the

13     complaint which says that all the BLMIS accounts basically

14     were managed and overseen by Mr. Mendelow.

15          THE COURT:  That's -- that just sounds like a

16     conclusion to me.

17          MR. NEW:  It may be, Your Honor.  It --

18          THE COURT:  I've had other cases where, for

19     example, the principal or the agent is getting all the

20     account statements and reviewing all the account statements

21     and giving directions relating to all the account

22     statements.  And that's not in this complaint.

23          MR. NEW:  It's not, Your Honor, quite frankly,

24     because we didn't, at the time, believe we needed to plead

25     that.  If we do need to plead that, Your Honor, we can re-

Page 92

1    plead and include allegations --

2           THE COURT:  But don't think you have to plead

3    that?  I mean, this -- the entire complaint is sprinkled

4    with knew or should have known and know or should know, but

5    that's not the standard.  At least for now.

6           MR. NEW:  That's correct, Your Honor.

7           THE COURT:  All right.

8           MR. NEW:  Although it does say "knew" so there is

9    --

10          THE COURT:  Well --

11          MR. NEW:  --  an alternative.  It is an

12   alternative argument.

13          THE COURT:  But then again, that's a conclusion

14   that something knew something.  You'd have to allege facts.

15          MR. NEW:  Yes, Your Honor.  And I believe, as we

16   are -- we've been discussing the facts there are to support

17   that knowledge.

18          The one thing we haven't touched on, Your Honor,

19   is the guaranteed rates of return which, similarly, the

20   allegations in the complaint are that he knew he was going

21   to be receiving a guaranteed return on his accounts of at

22   least 17 percent.  He obviously knew before that in Telfran

23   that he was getting a guaranteed return from Madoff as well.

24   And when you're dealing with securities transactions in the

25   market, it is just implausible for anyone to believe that

Page 93

1    you can get a guaranteed return.  And that's what he was

2    guaranteed here.  And not only did he know that, he was

3    tracking it.  So it wasn't that he was hopeful that he would

4    get it or that he was monitoring.  He expected to get it.

5    And when he didn't get it, that was part of what he asked

6    them to correct.

7           So again, that goes to the fact that he had actual

8    knowledge that they were not securities transactions that

9    were occurring in his account.  And I think it also goes

10   without saying, Your Honor, although it's not an independent

11   basis to conclude this that when Mr. Mendelow was deposed on

12   these issues, he was specifically asked about the fraudulent

13   side payments and the guaranteed rates of return and other

14   things, he did invoke his Fifth Amendment rights and refused

15   to answer.

16           THE COURT:  All he's told me is that he invoked

17   the Fifth Amendment right.  So I don't know what he was

18   asked as to which he invoked his Fifth Amendment privilege.

19           MR. NEW:  Well, there is an allegation, and it is

20   general, Your Honor, that he was asked questions

21   specifically about fraudulent side payments and about the

22   guaranteed returns and about Avellino and Bienes and he

23   refused to answer those questions.

24           Again, Your Honor, this complaint --

25           THE COURT:  I don't know what it says.  Anybody

1   who was being deposed or questioned by the U.S. attorney or

2   the SEC at the time might very well have invoked the Fifth

3   Amendment privilege even though it had -- they had no

4   participation or level of participation that's needed to

5   support an inference of actual knowledge.

6          MR. NEW:  Your Honor, again, it's a permissible

7   inference; it's not a mandatory inference.  We would suggest

8   that that is not by itself enough, but given the other facts

9   that we have alleged that show actual knowledge, that

10  factually it's the fraudulent side payments, the facts

11  allege the guaranteed rates of return, that given that, his

12  refusal to answer is sufficient to add to that inference

13  that we've pled enough to meet the actual knowledge

14  standard.

15         And with regard to leave to re-plead, Your Honor,

16  obviously, we believe that the complaint is sufficient.  If

17  it's not, we would ask for leave to re-plead.  Some of the

18  issues that we've discussed this morning, Your Honor, are

19  things that could be addressed if necessary in an amended

20  complaint.  And --

21         THE COURT:  So why don't you just re-plead the

22  complaint if you think you can make those allegations?

23         MR. NEW:  Your Honor, quite honestly, we think

24  that it's sufficient and it would be a waste of not only

25  judicial resources but our own resources --

Page 95

1           THE COURT:  Got it.

2           MR. NEW:  -- to file an amended complaint and go

3    through another briefing schedule if this complaint is

4    sufficient.

5           Also, Your Honor, at this time, we don't have the

6    ability to amend as of right.  Given the way that the

7    defendants have proceeded in this case, we would need to

8    seek leave of Court to amend.

9           THE COURT:  So why don't you make a motion for

10   leave to amend and attach your proposed complaint.  And

11   they'll argue it's few words not (indiscernible) and deal

12   with it that way.

13          MR. NEW:  Again, Your Honor, we could do that but

14   it would be a waste -- we think it would be a waste of

15   resources.

16          THE COURT:  Well, I think it's -- I'm not

17   convinced that this is a sufficient complaint.  And I think

18   it's a waste of resources to have to go through this

19   exercise to then grant you leave to amend and then go

20   through the exercise a second time.  But all right.

21          Certainly, there are valid claims, I think, under

22   the first claim which is just a fictitious profits claim

23   (indiscernible).  I wouldn't dismiss that claim.

24          MR. NEW:  Yes, Your Honor.  Well, we believe it's

25   sufficient on all the counts.

Page 96

1          THE COURT:  All right.  I got it.

2          MR. NEW:  If Your Honor is inclined, we would seek

3     to make a motion for leave to amend.

4          THE COURT:  I just think it'll save a lot of time.

5     If you think that you can make -- if you can allege that he

6     actually knew or maybe he willfully blinded himself, because

7     that's another distinction that has arisen over the last

8     four years, that you should allege it.  But this complaint

9     replete with knew or should have known.  It was just -- and

10    I understand why it was done.  It was done when everybody

11    thought that's what the state of the law was.

12          All I'm suggesting is when I review this, I'm

13    probably going to conclude that except for the first claim

14    for relief, it probably is insufficient the way it's pleaded

15    under the old standard.  And it'll expedite things if you

16    just make a motion for leave to amend and attach the

17    complaint that it meets the pleading standards

18    (indiscernible).

19          MR. NEW:  Your Honor, we will definitely do that.

20    Should we -- do we need to, at this time, address a briefing

21    schedule on that or should we discuss it with the parties?

22          THE COURT:  I think you should just -- well, you

23    can discuss it with your colleague but I just think that's

24    the best way to handle this.  And if you can really plead

25    it, then you can plead it and we'll deal with that complaint

Page 97

1   'cause most of the complaints I've seen have been amended to

2   comply with the pleading requirements that have been

3   enunciated in the various cases.  This one wasn't for some

4   reason.  And I understand that the defendant didn't answer

5   until November 2014, I think.  And they said they didn't

6   want to waste my time.  But, you know, at the same token, I

7   understand you don't want to waste the time.  But just

8   judging from what's pleaded here, I think it would make

9   sense to seek leave to re-plead.  But you don't have to.  I

10  will decide this.

11          MR. NEW:  Your Honor, I think we will be seeking

12  leave to re-plead.

13          THE COURT:  Can we leave it at that?  You'll make

14  a motion, you'll attach an amended complaint, and you can

15  argue that you're prejudiced or it's futile or there's been

16  an undue delay although for the reasons I've discussed,

17  you've already told me you wanted to wait.  So, you know, I

18  suppose they're entitled to wait.

19          MR. NEW:  We can make that argument in the

20  briefing but, yes, that's fine.

21          THE COURT:  'Cause you haven't convinced me about

22  prejudice.  You may have to put in --

23          MR. NEW:  Fair enough.

24          THE COURT:  -- some affidavit explaining

25  somebody's died or some evidence has been destroyed and you

1    can't defend the action for that reason.

2              MR. NEW:  Okay.

3              THE COURT:  And if I deny the motion for leave to

4    re-plead then maybe I'll decide this motion.  All right.

5    Does that make sense?

6              MR. ARKIN:  Makes sense.

7              THE COURT:  Okay.  So I will hold this one in

8    abeyance and I look forward to your motion.

9              MR. ARKIN:  Only one thing --

10             MR. NEW:  Thank you, Your Honor.

11             MR. ARKIN:  -- Your Honor.

12             THE COURT:  Yes, sir?

13             MR. ARKIN:  Somebody used the word "imagine".

14             THE COURT:  Pardon?

15             MR. ARKIN:  Somebody used the word "imagine" just

16    a few moments ago.  I think Mr. New.  No imaginary

17    allegations.

18             THE COURT:  Well, we can't sensor what they plead

19    beforehand.  Only after, I guess.  So we'll see what they

20    say.

21             MR. NEW:  Your Honor, we --

22             MR. ARKIN:  It's a prayerful admonition.

23             MR. NEW:  Your Honor, we are mindful --

24             THE COURT:  I join in that.  These complaints are

25    very long.

```
 1            MR. NEW:  Your Honor, we're mindful of Rule 11

 2    and, obviously, we're not going to make any imaginary

 3    allegations.

 4            THE COURT:  No.  No.  I -- okay. Thank you very

 5    much.

 6            MR. NEW:  Your Honor, there is also a discovery

 7    issue --

 8            THE COURT:  Yes.

 9            MR. NEW:  -- in this.

10            THE COURT:  Let me just mark -- make a note of

11    that that's --

12            MR. ARKIN:  Good morning, Your Honor.

13            THE COURT:  Thank you very much.

14            MR. ARKIN:  Thank you very much.

15            THE COURT:  You're excused.  You're welcome to

16    stay but you're excused.

17            MR. NEW:  Your Honor, the discovery dispute

18    includes that as well.

19            THE COURT:  Oh, okay.  Yeah.  Why don't we take

20    yours -- well, it's really tied up -- and I understand that

21    they didn't understand or maybe they should move for a

22    protective order.  I didn't see the -- did you file an

23    objection?

24            MR. REISEN:  We didn't -- oh, sure.  We objected.

25    And then we want to move for a stay if we needed to.  But I
```

1   think the hope is that we will just wait and see whether

2   they --

3           THE COURT:  Doesn't the objection -- don't you

4   have to do something if they object to the document request

5   like make a motion compel discovery?

6           MR. NEW:  Well, Your Honor, that's what we

7   actually noted -- notified the Court --

8           THE COURT:  Yeah.

9           MR. NEW:  -- that it was a pre-motion conference

10  and a motion to compel.

11          THE COURT:  Doesn't it make sense to see if the

12  complaint survives in this case?

13          MR. NEW:  Your Honor, the complaint is going to

14  survive, as you said, at least with respect to one count.

15  They --

16          THE COURT:  So you want to take discovery on that

17  one count?

18          MR. NEW:  Well,  Your Honor, I think --

19          THE COURT:  It's almost a strict liability count.

20          MR. NEW:  Well, Your Honor, they're refusing to

21  provide any discovery at all.

22          THE COURT:  Right.  Well, you --

23          MR. NEW:  They refuse to answer any of the

24  interrogatories.  And with regard to the documents that

25  they've previously produced, they won't stipulate to the

Page 101

1   fact that they can be used in this case.  So we don't have

2   any documents other than eight pages of documents that

3   they've produced.  And no interrogatory responses at all.

4            THE COURT:  But at the --

5            MR. REISEN:  Your Honor --

6            THE COURT:  -- end of the day, the only case may

7   be the case that's alleged in Count I.

8            MR. REISEN:  We've given all discovery on Count I.

9   In fact, we produced it all.  That shows all of the two-year

10  transfers.  We'll wait completely.  And we're willing to do

11  that.  We can --

12           THE COURT:  My suggestion is that rather than get

13  involved in discovery before we know whether we have a

14  sufficient -- legally sufficient complaint that we determine

15  that first.

16           MR. NEW:  Your Honor --

17           THE COURT:  And you're right.  You can take

18  discovery on the first claim and then if, as you -- when you

19  seek more discovery, they're going to say, hey, wait a

20  minute.  You know, this is becoming -- they're onerous --

21  you're seeking discovery in stages.

22           MR. NEW:  Your Honor, I would simply ask that they

23  actually comply with the local rule and respond to the

24  interrogatory requests that were sent to them.  They gave no

25  responses to any of the interrogatory requests.

Page 102

1             THE COURT:  Oh, you didn't object?

2             MR. REISEN:  Oh, we did.  Sure.  We objected --

3             THE COURT:  In the interrogatory responses?

4             MR. REISEN:  Yes.

5             MR. NEW:  It was a general objection, Your Honor.

6             MR. REISEN:  We're happy to give all objections if

7    they want.  We just think that that would be extra work.

8             THE COURT:  Well --

9             MR. REISEN:  And we may actually move for a stay.

10   But we're perfectly willing to give discovery on

11   (indiscernible).  We already have.

12            THE COURT:  My concern is if you're taking

13   discovery before you have a legally sufficient claim and

14   might argue we use that discovery to bolster the allegations

15   which is exactly what you're not supposed to do.

16            MR. NEW:  Except, Your Honor, the only thing I

17   would point out is if this case does not arrive -- what's

18   present before Your Honor is not a motion to dismiss.

19   What's present before Your Honor is a motion for judgment on

20   the pleadings.  There is a case management order in place in

21   which they agreed to proceed on discovery.  We would have

22   had -- if they had not been obstructionists, we would have

23   actually had the benefit of that discovery to use going

24   forward.

25            This -- and even in a motion to dismiss, Your

Page 103

1    Honor, the state of the law is generally a stay is not

2    appropriate.  And there needs to be good cause for a stay.

3    In this case, we don't think that they've established good

4    cause.  And they haven't even moved for a stay, Your Honor.

5    And they have entered into a case management order in which

6    they agreed to proceed with discovery.

7           MR. REISEN:  If I could, Your Honor, as I

8    understand that we're contemplating dismissing everything

9    but Count I in the -- and we're having --

10          THE COURT:  Well --

11          MR. REISEN:  -- to give discovery on the one count

12   that's legally sufficient.  And then if they get to plead,

13   of course give discovery on that as well.

14          THE COURT:  Well, but he's saying, look, you know,

15   it's a case management order.  The motion itself doesn't

16   stay discovery.  And you were required to give discovery a

17   long time ago and you never did it.

18          MR. REISEN:  Well, for what it's worth, actually,

19   we've given them essentially everything five years ago.  But

20   -- in the 2004.  But for what it's worth, it's my

21   understanding that, yes, we will give full discovery on

22   everything that's still a valid pleading on file which will

23   be just that one --

24          THE COURT:  But there is a valid pleading on file.

25          MR. REISEN:  That's right.  Count I.

Page 104

```
 1              THE COURT:  Well, no.  There's a valid pleading.
 2   And all I suggested was, if you want, I'll decide this
 3   pleading and then I'll grant the leave to re-plead.  If I
 4   dismiss it, all I'm suggesting is to cut through that
 5   because I do have questions about the sufficiency of the
 6   pleading and have them make a motion to re-plead and then
 7   you can make your futility and delay and prejudice
 8   arguments.
 9              MR. REISEN:  Yeah.  So -- but at that point, the
10   only -- you will have dismissed --
11              THE COURT:  I'm not dismissing their complaint.
12              MR. REISEN:  Fair enough.  Well, I guess the idea
13   would be that you would dismiss all but Count I and then you
14   would see whether they have a right to re-plead and at that
15   point, we'll give full discovery on the one count that's
16   remaining.  And then if you give them lead to re-plead,
17   we'll, of course, give discovery on that as well.
18              THE COURT:  Look, I'm going to hold the discovery
19   in abeyance.  Let's just see if you have a valid complaint
20   or if it's just a claim for fictitious profits which is a
21   much different claim from the type of claim you're trying to
22   plead.
23              MR. NEW:  Yes, it is, Your Honor.  Thank you, Your
24   Honor.
25              MR. REISEN:  Thank you, Your Honor.
```