# Exhibit E





UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-99000-smb

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

ADMINISTRATIVE CASE RE: 08-01789 (SECURITIES INVEST- ADVERSARY PROCEEDING),

Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Adv. Case No. 10-04995-smb

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

Plaintiff,

v.

TRUST u/art FOURTH o/w/o ISRAEL WILENITZ,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x





Adv. Case No. 10-05184-smb

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

Plaintiff,

v.

LAURA ANN SMITH REVOCABLE LIVING TRUST et al,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Adv. Case No. 10-04352-smb

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

Plaintiff,

v.

RAR ENTREPRENEURIAL FUND. LTD. et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

U.S. Bankruptcy Court
One Bowling Green
New York, NY 10004

May 17, 2016
10:51 AM

B E F O R E :
HON STUART M. BERNSTEIN
U.S. BANKRUPTCY JUDGE

Hearing re: 10-04995-smb, 10-05184-smb, 10-04352-smb The Trustee's Request For Leave To File A Motion For a Protective Order in Wilentiz.

Transcribed by: Sonya Ledanski Hyde

A P P E A R A N C E S :

WINDELS MARX LANE & MITTENDORF, LLP

Special Counsel to Irving H. Picard, as Trustee

156 West 56th Street

New York, NY 10019

BY: KIM M. LONGO

JOHN J. TEPEDINO

BAKER HOSTETLER

Attorney for the Trustee

45 Rockefeller Plaza

New York, NY 10111

BY: EDWARD J. JACOBS

NICHOLAS J. CREMONA

CHAITMAN LLP

Attorney for Defendants

465 Park Avenue

New York, NY 10022

BY: HELEN DAVIS CHAITMAN, ESQ.

ALSO PRESENT TELEPHONICALLY:

KEVIN H. BELL

P R O C E E D I N G S

THE COURT: Madoff. Wait, I have one more...

MR. JACOBS: Good morning, Your Honor. Edward Jacobs on behalf of the Trustee. I believe we're here this morning to discuss our April 6th letter seeking a protective order concerning certain discovery served by the defendant in the Wilenitz matter. Just to avoid any confusion from the start, there are 19 discovery requests at issue, but in the version served by the Defendant they're numbered 1 through 18, and one of them is unnumbered. So, by my count there are 19 requests in total. And they span a number of various topics, and I'm prepared to go through them each specifically today as briefly as I can.

But before I do, I would like to just provide a little bit of context to the Court, which I think would be helpful about what's been happening in discovery in this case. The Wilenitz matter is a case with a demand amount of, approximately, $280,000. To be fair, Ms. Chaitman has told us that she intends to serve this identical discovery in all of her over 100 cases, so that would obviously implicate a number of other defendants with various demand amounts.

So, we feel that it's critically important that we have the issues resolved as quickly as possible so we don't needlessly have to duplicate litigation by arguing about

these same things in all of those cases.

What the Trustee has done in discovery in this case is quite remarkable, and I believe unprecedented, and we're very proud of it. Without even receiving a discovery request, we provide every single defendant with what we refer to as their core account documents, which are their customer statements, the cash activity of their accounts, their correspondence files with all of their correspondence to and from BLMIS over the life of their account; the account opening and closing documents; and in addition to that all of the applicable financial statements from BLMIS's financial institutions showing the bank transfer records from those independent third parties with respect to the cash activity in each and every single account.

Where we don't have a complete set of customer statements, we produce portfolio management reports, which contain exactly the same information of the cash activity over the life of the account. Where we don't have those, we produce spiral notebooks where various employees over time at BMOIS kept meticulous notes of that cash transaction activity.

And we provide that to every defendant. Wilenitz is no exception. We produced, I believe, approximately, 19,000 records that we've indexed to make it easy for the defendant to navigate exactly what's in that --

THE COURT: 19,000 records for Wilenitz?

MR. JACOBS: For the Wilenitz accounts, correct, over the life of their accounts. And that includes all of the items that I just discussed.

In addition to that, obviously, it is the Trustee's burden of proof to prove that BLMIS was operating a fraudulent Ponzi scheme and was insolvent. So, as the Court I believe --

THE COURT: Why do you have to prove insolvency? You don't have to prove insolvency for an intentional fraudulent transfer. These are good faith cases.

MR. JACOBS: Right. Well, that is, I believe, our burden in the bad faith actions as well.

THE COURT: Why? To prove insolvency in an actual fraudulent transfer claim -- I've never heard of that.

MR. JACOBS: Well, that may very well be correct, Your Honor, but nonetheless, we have endeavored to make all of BMOIS's financial records available.

THE COURT: Let me ask, Ms. Chaitman, do you think that insolvency is an issue in these cases? Since their limited to intentional fraudulent transfers?

MS. CHAITMAN: I do, Your Honor.

THE COURT: Why?

MS. CHAITMAN: If, in fact, they could only recover transfers made within the last two years, then the

insolvency wouldn't be an issue. However, they are going back to the 1980s...

THE COURT: But not in the good faith cases.

MS. CHAITMAN: ...to calculate...

THE COURT: Oh, but those aren't -- I see what you're saying. But, you know, we've been through that one already. And those aren't transfers in the sense that we've been talking about. And I think the District Court judge agreed that those weren't transfers in the sense that the Court's own conveyance laws mean transfers.

MS. CHAITMAN: Here's my thinking, Judge, and perhaps you'll disagree with me, but the Trustee makes a determination of what each defendant's net equity is.

THE COURT: Right.

MS. CHAITMAN: He does that by going back to the inception of the original account. In my opinion, he has to establish that Madoff was insolvent in 1980 because otherwise, how can he invalidate a position that the Defendant or the Defendant's grandfather had in 1980? I think he has to prove -- I think the Trustee has to prove that Madoff was insolvent and operating a Ponzi scheme for the entire period for which he's netting out --

THE COURT: Well, I agree that he has to prove he was operating a Ponzi scheme because the transfers have be made in connection with the Ponzi scheme to get the Ponzi

scheme assumption, but it doesn't sound to me like he's got to prove that Madoff was insolvent to compute net equity by going back and figuring out what was really in the transferor's account in the amount that was actually credited to the transferee account. And, again, I use transfer, and transferor, and transferee -- not in the sense used in the Bankruptcy Code; just to describe what happened. But, all right.

MR. JACOBS: Well, Your Honor, back in 2009, as I'm sure you're aware, we negotiated with a large group of defendants a procedures order that governs all of the good faith actions; and in connection with that there was an order entered that I refer to as the procedures order that allows the Trustee to make available large amounts of data through an electronic data room and could submit a summary report of that information concerning relevant topics through a summary or an expert report.

That's exactly what we've done with respect to the Ponzi. As Ms. Chaitman knows, we have an expert named Mr. Dubinsky, who offers a very comprehensive report on that subject, and all of the data that he considered and utilized in connection with his opinions have been made available to every defendant through an electronic data room that contains, approximately, 4 million records.

That report has not yet been served in the

Wilenitz matter, but a copy of that report has been served to Ms. Chaitman on behalf of some of her other clients in different proceedings. And in Section 4C of the procedures order, that permits the Trustee to handle the voluminous nature of discovery that's potentially relevant in this case in that fashion.

THE COURT: Well, does Ms. Chaitman or any other -- clients or any other defendant have the ability to look at the same documents that your expert looked at and draw their own conclusions?

MR. JACOBS: Absolutely. Every single document -- what we've endeavored to do, Your Honor, is that what we refer to as Electronic Data Room 1 contains all of the underlying documents considered by Mr. Dubinsky and we're also building upon that in including documents that our other experts who we may offer to prove transactions and who do other functions, all of those documents as well. So, that's approximately 4 million records. Not pages, but records.

And it's an enormous amount of data that I believe is unprecedented, at least in my career, and for that reason we've structured the data room in a very organized fashion with issue trees. So if you're a participant who's accessing the data room, you'll see something that you might be familiar with already in terms of like, an Outlook email

folder tree that has topics, broken down documents, financials, third party records; and then each of those trees can be broken down further to drill down to J.P. Morgan statements. You know, Chicago Options Trading information, Depository Trust Clearing Corporation documents; all of those types of things. It's also searchable.

So, absolutely the Defendant has the ability to conduct whatever investigation they believe is relevant to the claims of their defenses, the same that our expert did, and they have access to all the same information that our expert did. And we did that to be transparent and to provide any data that any litigant believes that they should have access to.

So, that's the starting point of where we are in discovery. And then because Section 4C of the procedures order allows us to provide a summary report, we do that. And Mr. Dubinsky painstakingly analyzes the Ponzi scheme and the IA business specifically, but also the other aspects of BLMIS's businesses as well. And issues of insolvency are also part of his analysis to the extent they may bear on the Ponzi scheme or on other proofs we may have, or have had at some point in our cases.

But all of the financials are considered, the Ponzi scheme is considered, the stock-trading activity or

lack thereof in the IA business is considered, in addition to the activities of House Five proprietary trading function of BLMIS and the market-making function of BLMIS.

As the Court, I'm sure, is aware, Rule 26 of the Federal Rules of Civil Procedure governs discovery and our actions, and that rule was recently amended in December of 2015. The standard that discovery must be reasonably calculated to lead to admissible evidence no longer exists in the rule. It was specifically eliminated. And it was replaced with language that says that discovery served must be relevant and proportionate to the needs of the case. And what does proportionate mean?

Section B1 actually lists factors that the Court should consider in determining whether discovery is proportionate, and those include, and I quote, "the importance of the issues at stake in the litigation, the amount in controversy, the parties' relative access to information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweigh its likely benefit.

We submit, Your Honor, that upon an examination of all 19 of these requests, the overwhelming majority of them to begin with have no relevance to this litigation or these claims.

THE COURT: Which ones do?

MR. JACOBS: There is a group of requests that arguably have relevance to... And in discussions with Ms. Chaitman yesterday I know that she believes they have relevance to whether or not BLMIS was operating a Ponzi scheme, and those are 13, 14, 15, 16, 17, and 18.

In addition to that there are three requests that ask for the Trustee to identify any instance of a factual error in any of BLMIS's books and records over any time period, which are objectionable for a number of reasons I would like to discuss with the Court Further -- but those may arguably have relevance as well. Those are 2, 3, and 5.

But with respect to those requests in particular, I would state for the Court that the Defendant in this action submitted an affidavit in connection with her claim stating that she had done a reconciliation of her customer statements with her own bank accounts and that those bank accounts confirmed that the customer statements for the relevant accounts were accurate.

So, the issue of whether BLMIS's books and records are accurate or inaccurate with respect to cash activity is not an issue in dispute in this case.

THE COURT: Well, it is, though. It is. Because at the end of the day, you have to prove the amount of the fictitious profits, basically -- the extent of liability.

And that involves transfers that occurred long before the two-year period. Were there transfers from other accounts in this case? Interaccount transfers?

MR. JACOBS: There were interaccount transfers in this case, Your Honor.

THE COURT: All right. You would have to prove that the Trustee -- or those account transfers were correctly computed.

MR. JACOBS: From a net equity perspective, we absolutely agree, yes.

THE COURT: Yeah. So, all I'm saying is although the claim only reaches back two years, you still have to compute whether you call it net equity or fictitious profits, that still has to be demonstrated so that you know the scope of the liability.

MR. JACOBS: That's correct, Your Honor. And as you may recall from the (indiscernible) trial, we submit experts whose specific function is to do that.

THE COURT: Okay, but the Defendants are entitled to see the data --

MR. JACOBS: That's absolutely right. And we have already produced in this litigation, without even having received a document request, 100 percent of that data. So the Defendants have all of those records that we intend to rely upon in order to prove both the net equity and to trace

the transfers.

THE COURT: So, you produce the records of other accounts, for instance, the transferor accounts?

MR. JACOBS: We do, Your Honor. We call that our initial disclosure production. In every case where there's an interaccount transfer, we replicate our production of the CADs, which I described earlier, for any related accounts. And by related accounts, to be clear, in our mind that means any account that transferred money to the sued upon account. We do provide all of that documentation.

And also, the only additional possible discovery that I believe would be relevant to the issues of transfers and net equity are the Defendants' own bank records. And as Your Honor I know is aware, this Defendant in addition to others, have vigorously contested our right to those documents. The Court has rejected those objections. That's no longer an issue in this case, although I think we're going to be talking about that in some others again later.

But in any event, our position is that the bank records have limited utility. Our experts will submit reports that detail exactly why BLMIS's books and records are accurate and reliable for the cash activity, transaction activity for every relevant account over the life of the account. Those reports have not yet been submitted but I can promise the Defendant and the Court that they will be

forthcoming in the expert phase of discovery in this case.

If it pleases the Court, I just would like to turn to some of the other categories of request that are at issue today. Well, first, let me finish my response to the request that the Court asked about -- the small handful of requests, maybe -- I'm bad at math on the spot but 6 to 8 that actually would potentially go to issues of the Ponzi scheme.

THE COURT: You didn't list that as your arguably relevant criteria.

MR. JACOBS: I'm sorry?

THE COURT: I asked you which of the requests were arguably relevant.

MR. JACOBS: Right.

THE COURT: You told me 13 through 18 and maybe 2, 3, and 5 with a caveat.

MR. JACOBS: Correct. And to specifically further address 13, 14, 15, 16, 17, and 18, there is one request that asks for the Trustee in an interrogatory response to set forth the basis of -- that BLMIS was insolvent over every year going back to, I believe, 1982. Obviously, we don't believe that is an appropriate request. The burden clearly would not outweigh any likely benefit, given the fact that --

THE COURT: Well, the Trustee has to prove...

Apparently, you agree with Ms. Chaitman that the Trustee has to prove --

MR. JACOBS: To be clear on the record, I don't agree with her characterization of our burdens of proof. But Mr. (indiscernible) does address issues of insolvency in BLMIS's financials in his report in painstaking detail. So, to the extent that information is relevant or would be relevant at any point in time, it's something that we provided through the summary report, which the procedures order allows us to do. And we've also made available all of the underlying documentation that's referenced in that report.

THE COURT: Okay. Have you produced the report, the insolvency report?

MR. JACOBS: Not in this case, Your Honor. Not yet. We are not yet in expert discovery. But Ms. Chaitman does have a copy from other cases that are further advanced and substantively the report --

THE COURT: It sounds like the basis of the Trustee's opinion is the expert report.

MS. CHAITMAN: Do you want me to...?

THE COURT: Well, why don't you finish and then we'll hear from you.

MR. JACOBS: Okay. So, that request, in essence, we're saying is burdensome to the extent that she's asking

us to prematurely provide our report, we will provide our report. Ms. Chaitman will have an opportunity to consider all of the records our expert considers. She'll have an opportunity to depose Mr. Dubinsky, although she hasn't yet deposed him in any other case. And at a minimum, the Defendants should have to start with the voluminous discovery we've already provided before more is demanded. And I think that is a principle that is expressly baked into Rule 26, particularly in light of the recent amendment, where the purpose of the amendment is to ensure that litigants don't get to engage in endless and abuse of discovery. And I think that that request falls into that category of needless abuse of discovery, particularly given everything we've already provided.

The same is true within that group of requests -- there are several requests that ask for stock trading records for the market-making side of the business, and the proprietary trading side of the business, and the IA side of the business. However, our contention is there were no stocks ever traded for any IA investment advisory customer. And that request asks for that documentation going back to, I believe, 1982.

Your Honor, the Wilenitz accounts were opened in 2003, so how can any stock trading activity for any part of the business, however unconnected it may be to this

Defendant's IA account, have any relevance beyond 2003 as an initial matter? But even with respect to the documents post-2003, again, our expert report does a very comprehensive analysis of how the AI business was conducting a Ponzi scheme when those docs were traded.

THE COURT: Are you arguing that the requests are irrelevant or that they're premature because they're really expert discovery type requests?

MR. JACOBS: Both, Your Honor. I think that while the relevance issue is murky -- I'm not contesting that that request may be relevant; what I'm contesting is that the request is not proportionate to the needs of the case. The Defendant should have to make an explicit showing as to how or why that particular discovery is needed. And, first and foremost, they need to review and consider the voluminous discovery precisely on that topic we've already provided.

So, for example, on my call with Ms. Chaitman yesterday we tried to resolve some of these issues to hopefully not burden the Court and we couldn't. But we discussed that in 2014, we produced to Ms. Chaitman all of the DTCC records that we had showing daily stock positions at BLMIS -- any part of the business going back to 2002. She has that information.

Apparently that didn't satisfy her, so she's served this request, which clearly under the proportionality

standards of Rule 26, we should not have to answer. Because it is the burden of the requesting party to show the relevance of the request after an objection has been made. So we're objecting that it's disproportionate to the needs of the case, it's burdensome, it's of questionable relevance because there's been no showing as to how that would further the Defendant's ability to defend against our claims.

THE COURT: All right, let me hear from Ms. Chaitman generally and then we'll go through each of the requests. It's just easier to do it that way.

MS. CHAITMAN: Sure. If I can just begin, Your Honor, by explaining one thing: I had proposed to Baker & Hostetler a couple of months ago that we enter into a consent order with respect to all of my cases -- it's a little bit less than 100 -- that discovery served in one case would be applicable in all cases. In other words, I said, don't force me to serve 100 discovery demands that are identical in all of my cases. Let's just agree that I can serve them in any case but the demands and the responses and any court rulings relating to those, unless there's a reason to distinguish one defendant from another, would be applicable in all cases.

They didn't get back to me on this. This would simplify all of this a great deal. Otherwise, Your Honor, we're all going to be burdened, you most of all. It's just

silly. And, you know, what I tried to do with this -- with Wilenitz -- yes, every account is different, but the fact of the matter is I represent defendants in 100 cases and we ought to be able to do this in a reasonable way.

THE COURT: I don't disagree with you. I don't want to do this 100 times. And nobody does, so...

MS. CHAITMAN: Exactly. So, may I submit to --

THE COURT: Well, have the same discovery requests been served in every case?

MS. CHAITMAN: I haven't done it yet because I had asked for a conference with you to try to resolve this.

THE COURT: Well, why don't we go through these discovery requests and maybe we can pare down what you're entitled to ask for in future cases, and this'll provide some guidance in all the cases. The results can be the same unless some case has a nuance -- like Wilenitz only goes back to 2003; maybe some other case goes back to 1986 or whatever.

MS. CHAITMAN: If I can say, Your Honor -- I'm happy to go through these with you now, but I would like to make a formal motion because --

THE COURT: A formal motion for what? To compel discovery?

MS. CHAITMAN: Yes. Because it's important for the record to contain an order. I mean, these go to

affirmative defenses that we have in the case. If, in fact, the Court is not going to permit discovery on some of the affirmative defenses, then in a sense, the Court is striking an affirmative defense. And I think that in order to protect the record, we ought to be able to go through the process of a motion, briefing, and then a formal order.

THE COURT: Well, I'm not going to tell you can't make a motion to compel discovery, but that said, maybe we can go through these and we can talk about them.

MS. CHAITMAN: Okay.

THE COURT: Some of the argument that I'm getting from Jacobs seems to suggest that discovery may be relevant but it's really expert discovery. And that you should take the deposition of the expert, ask he or she what she relied on, and then ask for those documents, I guess. Although it sounds like they've been produced or made available anyway.

MS. CHAITMAN: What I'm trying to flesh out, Your Honor -- I think --

THE COURT: But the Trustee's not going to do your work.

MS. CHAITMAN: I'm not asking the Trustee --

THE COURT: Well, but you are. For example, one of these or maybe a couple of these said, "Identify every instance in which there was an error in any account," putting aside the relevancy of that. You could do the same

analysis that the Trustee did and come up with --

MS. CHAITMAN: I couldn't possibly do it. What I'm asking the Trustee to do, as you know from the profit withdrawal issues, there's a great deal of question as to the accuracy of the records. And the Trustee's own expert has said that these records are riddled with fraud and that they're not reliable. That was the basis of the Second Circuit's ruling.

THE COURT: Now that the dollars are in and the dollars are out, it would deem reliable by the Second Circuit, because that was the basis of the net decision.

MS. CHAITMAN: But there was no factual record before the Court. There was certainly no --

THE COURT: Let me ask the question -- putting aside the profit withdrawal issue, if the records were riddled with fraud but your records are right, your clients' records are right, what difference does it make? Do you think I'm going to draw an inference -- do you think I'm going to try in every single case whether or not as a general matter the records were accurate in every sense?

MS. CHAITMAN: Judge, here's the problem: Let's just review the --

THE COURT: And Wilenitz agreed that he received the --

MS. CHAITMAN: No, no, no, but Mr. Jacobs didn't

clarify what he was saying. For the period from 2000 on, she had the bank records. And her SIPA claim said she compared her bank records to the statements. But the account predated that. This was --

MR. JACOBS: The accounts were opened in 2003, Your Honor.

MS. CHAITMAN: But it was a successor account. It had transfers into it from other accounts.

THE COURT: But they would've only occurred after 2003, right?

MS. CHAITMAN: No, the prior accounts were in the 1990s.

THE COURT: All right.

MS. CHAITMAN: So, if I can just explain...

THE COURT: I said, you are entitled to go back... Any information relating to the computation of the amount of fictitious profits. And if that involved transfers in old accounts that went back to the 1980s, you're entitled to see that. I don't dispute that.

MS. CHAITMAN: Right. But here's my point, Your Honor: The DTC of trading records exists from 2002 on. There is no evidence either way of trading prior to that. No documentary evidence. With respect to third party bank records, the J.P. Morgan Chase account records, the Trustee has those from December 1998 on.

So, again, we have a vacuum of any third party records which, in my opinion, are more reliable than Madoff's records, for any transfers predating December 1998. Now, the clients don't have these. First of all, a lot of these clients received this money from someone else, through an interaccount transfer, so it's not even that they can say with personal knowledge that they recall or don't recall something.

THE COURT: But I thought Mr. Jacob said -- basically, all of the data that you would need to answer these interrogatories or I guess document requests, whichever, have been provided.

MS. CHAITMAN: Your Honor, here's the thing: There are, whatever, 4 million pages of documents in the e-data room, but I want the Trustee to commit in writing to a position which I can then use to either move to dismiss the complaint because there'll be an utter failure or proof, or whatever. I'm entitled to know whether...

First of all, he has no records other than Madoff's own records. If in the course of his work as a Trustee there have been 150 instances where he has concluded that there were factual errors in the reports, you don't think that that's important for you to know? Not necessarily for Wilenitz but...

THE COURT: But if we're trying the Wilenitz case

and there are no factual errors vis-a-vis Wilenitz...

MS. CHAITMAN: But there are, because how does the Trustee --

THE COURT: Well, fine. No, he could find that out.

MS. CHAITMAN: No, no, no, but how does the Trustee... The Trustee's going to come in and say that for the period prior to December 1998, I'm relying on Madoff's internal records.

THE COURT: Right.

MS. CHAITMAN: And he's refusing to tell me whether he's found that Madoff's internal records are reliable. We know, for example, one of his profit withdrawal experts said that... Forgive me, but I don't remember the exact number. I think the expert concluded that there were 47 entries which were inconsistent with the conclusion that he reached. And he concludes that that was simply a mistake.

Well, okay. So, how many times in the records, in Madoff's internal records were there mistakes?

THE COURT: Ms. Chaitman, I hear what you're saying but I'm saying that unless the mistakes are in the account of the particular adversary proceeding at issue, the fact that there are mistakes in other accounts or other records doesn't matter.

MS. CHAITMAN: But if you have no one with personal knowledge, putting aside the rules of evidence, which I think the Trustee can't even deal with, I don't think the Trustee can even prove anything based on the rules of evidence. But let's assume that you let it in, just for the weight of it, okay? Let's say that -- how is Evelyn Berezin Wilenitz, who inherited this account from her deceased husband, how is she supposed to know whether he realized there was a mistake in 1983 or whatever the year was? It's impossible.

THE COURT: But you get the records...

MS. CHAITMAN: But what do we compare them against?

THE COURT: How would we know there's a mistake unless he's got two sets of records for the same transaction, which indicates a mistake?

MS. CHAITMAN: What I'm saying is that the profitable withdrawal expert for the Trustee concluded that there were 47 or whatever it was mistakes in Madoff's account records.

THE COURT: Were there any in the Wilenitz account?

MS. CHAITMAN: No, because he was looking at a different issue. But what I'm saying to you is that if these reports were generated by people who were careless,

incompetent to do the job, deliberately motivated to misrepresent what was going on in the transactions, that's relevant.

THE COURT: So you can ask him at a deposition. That sounds like expert discovery.

MS. CHAITMAN: No, because I'm... If the Trustee -- if it's been brought to his attention that the internal records are full of factual errors, I think he has an obligation to disclose that.

THE COURT: I think I disagree. Let's go through the request... As I said, you can make a motion to compel. I can't tell you that you can't --

MS. CHAITMAN: Yeah, I'd like to at the end of this, just so we have a clear record of what the rulings are.

THE COURT: All right. With respect to one, list the name and address... Well, I don't have to read it. It's in there.

MS. CHAITMAN: Yeah.

THE COURT: I'm looking at Document 63-1.

MR. JACOBS: Right.

THE COURT: Is there an objection to that?

MR. JACOBS: Yes, Your Honor. This request is like the other... As the Court pointed out with respect to other requests, this request is essentially seeking our work

product.

THE COURT: That was my reaction when I saw it.

MR. JACOBS: And I explained to Ms. Chaitman on the phone yesterday that, as she knows, there are potentially upcoming depositions of BLMIS employees happening in the PW context. She has a right to transcripts of those depositions or to participate.

THE COURT: Does she have the right to ask you who you spoke to? Forgetting about what they said.

MR. JACOBS: She absolutely doesn't. That's our investigatory work product. And any mental impressions, or memos, or notes that we took during our investigation are work product that are shielded from discovery.

THE COURT: Certainly, when you asked for witness statements, that sounded like Hickman v. Taylor, which was the issue in that case.

MS. CHAITMAN: You know what, Judge? The reason I want to brief that issue is that a SIPA trustee has specific obligations to investigate the debtor and report to the creditor body on what he finds. And I think that there's a very strong issue there. This is not a typical adversary. This is an adversary who's appointed pursuant to a federal statute, which was intended to protect the customers.

THE COURT: Well, the same is true of a trustee, as a representative of the estate.

MS. CHAITMAN: I know, but there are SIPA overlays here. Let's just hypothesize that the Trustee has come to realize that Madoff's internal records are completely unreliable. Is he then allowed to conceal that information from the Defendants and pursue discovery, asking the Court to rely upon documents that the Trustee has already determined are completely unreliable?

THE COURT: Isn't it really for me to determine whether or not the records... I assume the Trustee is going to try and prove the cases through the records, whether or not the records are credible.

MS. CHAITMAN: Yes, but wouldn't you be -- you wouldn't be influenced by the fact that the Trustee comes in and says, I've determined -- I found 1,000 errors in this body of documents?

THE COURT: Is it your position that the Trustee can make no mistake in this case?

MS. CHAITMAN: It's not the Trustee's mistake; it's the Madoff records...

THE COURT: No. No. Yes, the Trustee has statutory duties under SIPA, but the Trustee is also a litigant. And I don't think that either as a claim determining person, who's certainly following an objection, or as a plaintiff in an adversary proceeding, that the Trustee has additional duties beyond the ordinary litigation

duties to bear his soul and to file a complaint and say, you know, I really don't think that I have a claim here but I'm going to file it.

But in any event, I agree that Number 1 sounds like it's work product, assuming it's material prepared in anticipation of litigation, and I realize the Trustee has certain SIPA duties to do this without regard to litigation, but also has litigation duties and it's...

MS. CHAITMAN: All right, so I'd like to brief that issue, Your Honor. And Number 2 goes to the same issue.

THE COURT: Let me just read this. I think Number 2 is irrelevant and goes beyond the proportionality standards -- the new rules. If the records in your case are right, it doesn't matter if the other records are wrong. And if the records in your case are wrong, it doesn't matter that all the other records are right. It's about your case that we're trying.

MS. CHAITMAN: But, Your Honor --

THE COURT: And I don't think that under the federal rules of evidence I can draw -- infer a pattern and practice of negligence or improper record-keeping, which is really what you're asking me to do.

MS. CHAITMAN: Well, I think what I'd like to do is put this in a motion and lay out the rules of evidence.

Because when you compare what the rules of evidence permit with -- it's unusual in my experience for a trustee to be relying upon records that go back as far as these records, that were prepared in connection with a Ponzi scheme by people who were either obviously criminals or paid to overlook what they were seeing.

THE COURT: You know -- and maybe this motion that you're contemplating would be a good way to narrow the overall scope of discovery... By the way, again, I come back to the point that I don't think solvency is relevant. And if you want to set up some sort of omnibus procedure and maybe we can just cut those -- not out of all these cases. I may be wrong but this is an intentional fraudulent transferred case; solvency or insolvency is simply not relevant. It's not an element of the claim.

MR. JACOBS: Right. Your Honor, may I confer internally with my colleagues, and can we get back to the Court about that proposal, which makes perfect sense?

THE COURT: Yeah, I'm just throwing that one out. Three, again, it's the same thing -- it's errors in other persons' accounts. And it sounds to me that at the end of the day, the Trustee has produced all this information anyway. So, you can do the same analysis, can't you?

MS. CHAITMAN: How would we know, Your Honor, if there was a mistake in a statement that was prepared in

1983?

THE COURT: Well, how would the Trustee know?

MS. CHAITMAN: Because he might have found conflicting evidence. In fact, as I said, as one example, his expert on the profit withdrawal issue said that there were, I think, 47 entries which were inconsistent, and he's concluded that those were mistakes.

THE COURT: Right. So, the expert's -- and you'll get all of the entries the expert looked at and you'll get the account statements, and you can do the same analysis.

MS. CHAITMAN: But that's limiting... Then I'm only getting what the expert got. And there may be a whole body of evidence which disproves the expert's conclusions.

THE COURT: That's speculative. But I think that maybe in response to the motion I have to understand what's in the data room, and what's being produced. I know that you've told me it many times.

MR. JACOBS: Yes.

THE COURT: And it kind of rolls over my head sometimes. But I mean, the bottom line is if you can do the same analysis with the same data, because --

MS. CHAITMAN: I can't.

THE COURT: Let me just finish. Then why does the Trustee have to do this? Putting aside the relevance questions.

MS. CHAITMAN: Because the Trustee is in a unique position to have investigated the Debtor with, you know, hundreds of millions of dollars of expert assistance, and he has unique access to the employees, and he has the ability to know information that there's no way I could ever duplicate.

THE COURT: Like what? I mean, it might take time and money, I understand that, but I just don't understand --

MS. CHAITMAN: Like someone coming in and saying, you know, we falsified these entries. We just made them up. Because some of these --

THE COURT: Well, obviously, they're all false.

MS. CHAITMAN: Well, you're saying the deposits and withdrawals --

THE COURT: Right, those are not.

MS. CHAITMAN: Okay. But what I'm saying to you is it may very well be... I happen to believe, based on what people have told me, certainly with respect to the profit withdrawals, that these were not received. They may have been received by somebody else but they weren't received by the customers.

THE COURT: Well, then the customer denies that they received it. I just... You know, you're certainly entitled to know whether the records regarding the particular defendant are correct, but if there was a mistake

or a phony record on somebody else's account in 1986, I just don't... It's just not relevant. And, as I said, you can probably do the same analysis anyway.

Number 4 is the same thing. A lot of this is in, what is it, the Calura report or the Greenblatt report?

MR. JACOBS: Well, both of those reports cross-reference each other, so I tend to view it, personally at least, as a comprehensive report. But the issue with PW here, Your Honor, is that obviously the request is seeking that documentation across the entire body of customer accounts, right, at all periods in time, and as a --

THE COURT: Let me ask you a question, though, on this one. Does Wilenitz have any profit withdrawal...?

MR. JACOBS: It does not. Not in this --

THE COURT: Well, how can you ask for that in this case?

MS. CHAITMAN: I think that, first of all, what I intended to do, Your Honor, was have one set of interrogatories that would cover all of my clients.

THE COURT: But in this case -- you're telling me you're going to make a motion to compel.

MR. JACOBS: Right.

THE COURT: Are you going to make a motion to compel on Question Number 4, where there are no PW entries in this particular defendant's...?

MS. CHAITMAN: I need to go back. I don't recall at this moment whether the predecessor account had PW entries.

THE COURT: Okay, fair enough.

MR. JACOBS: The predecessor accounts did not have any PW actions. I checked that in preparation for this hearing.

THE COURT: All right. Well, she's entitled to check that and --

MR. JACOBS: But, Your Honor --

THE COURT: (indiscernible) have been made available.

MR. JACOBS: But this illustrates nicely the exact reason why a standing order allowing discovery served by Ms. Chaitman to apply in every single case just can't possibly be workable.

THE COURT: Well, I don't want to go through this 100 times.

MR. JACOBS: I agree, Your Honor. And if I may, you know, the protective order that Your Honor issued in the Nelson cases regarding discovery served, which is at issue here as well, concerning the Trustee's compensation, is a perfect example. And I had a call with Ms. Chaitman yesterday where I said, I understand you want to preserve that issue in all of your cases. We'll stipulate to that so

that it doesn't need to be re-litigated. But we're litigating in two District Courts. We've litigated it here. We've litigated it before Judge (indiscernible). We've litigated it before Judge Rakoff. There has to be an end at some point to litigation on the same issue.

So, we're happy to stipulate as orders are entered, and I understand the Defendant's desire to want to preserve their right to appeal. We have no objection to that. But we can't have a standing order that everything in one case applies to the other.

I also asked Ms. Chaitman, based on my representation that we would stipulate to that effect, that she withdraw this discovery and she refused. So here we are having yet another hearing.

THE COURT: Why don't we get back to the requests?

MS. CHAITMAN: Which one are you up to now?

THE COURT: Five.

MS. CHAITMAN: You're up to five?

THE COURT: I mean, I don't even know what that means. But it's more of this kind of all of the records type thing. I'll decide whether or not the records accurately prove that the Trustee has to prove in a particular --

MR. JACOBS: In this request, Your Honor, Ms. Chaitman raises this "riddled with fraud" accusation in

various contexts.

THE COURT: It's (indiscernible)...

MR. JACOBS: I have no idea.

MS. CHAITMAN: It's from the original Dubinsky report.

MR. JACOBS: I checked that report. I was not able to find it there. So, to me, this request --

THE COURT: You can't do a text search? It's text searchable, isn't it?

MR. JACOBS: It is. It's a PDF text-searchable report. I checked both the earlier report and the current report, which has been revised. I couldn't find it. But I mean, this request to me is also in addition objectionable for that reason. It's just nonsensical. I mean, how do I even respond to this?

THE COURT: I agree. Number 6...why do you have to know every customer whose claim has not been paid? Ms. Chaitman?

MS. CHAITMAN: I have a series of questions which go to this issue, Your Honor.

THE COURT: Well, I understand the argument, although I've dealt with it already, about the Trustee's standing. Is that what this is going to?

MS. CHAITMAN: No. The net equity decision was rendered without any factual record. And I want to have in

the record the facts with respect to, as of this point in time, what claims have been paid in full, what claims have not been paid in full, and what claims have been sold.

THE COURT: How is that relevant to the Wilenitz case?

MS. CHAITMAN: Well, it's relevant to all of the cases because --

THE COURT: Well, let's deal with Wilenitz. This is a discovery request. And in every case, even if you use the same discovery, it's going to have to be relevant for that particular case.

MS. CHAITMAN: Right.

THE COURT: So, how is that relevant to Wilenitz?

MS. CHAITMAN: It's relevant to all the cases because I think that the net equity decision was based upon certain misconceptions of what the factual record would ultimately show. We have never had an opportunity to go to the Second Circuit with a developed factual record, and I'm anticipating that we will have that opportunity at the end of these adversary proceedings.

THE COURT: Well, you're not going to use this adversary proceeding to create a record to go back and seek... It's probably too late now, but some sort of reconsideration --

MS. CHAITMAN: No, but certainly with respect to

whether it's appropriate to allow a SIPA trustee to claw back from innocent customers. That is an issue the Second Circuit has not yet determined, and I think that it's relevant for the Second Circuit to know the facts about who the claimants are, how many claims have been sold and are owned by hedge funds or other speculative organizations...

THE COURT: Why is that relevant to whether or not Wilenitz is liable for fraudulent transfer?

MS. CHAITMAN: Because, in my opinion, the Ponzi scheme exception to the affirmative defense, which has existed in fraudulent transfer law since Elizabeth I -- that is that you cannot recover an intentional fraudulent transfer from a creditor who takes in good faith on account of an antecedent debt.

THE COURT: And for value.

MS. CHAITMAN: And for value. And it's indisputable that a customer of an SEC regulated broker is a creditor of the broker -- just as if you have a bank account at Chase Manhattan Bank, that you have a debtor creditor --

THE COURT: No question your clients would probably defraud it.

MS. CHAITMAN: No, no, no, it's not a question defraud it. They were good faith creditors who took withdrawals on account of an antecedent debt.

THE COURT: Well, but that issue's been litigated,

and in every --

MS. CHAITMAN: But --

THE COURT: Let me finish. In every Ponzi scheme case that I've seen, SIPA and non-SIPA, fictitious profits are just not valued. So, even if there was an obligation to restore the principal or whatever, you don't pay value for fictitious profits.

MS. CHAITMAN: Well, there are two comments on that, Your Honor. I think that you may be grouping together cases where someone was an equity investor in a Ponzi scheme and cases where someone was a good faith creditor of a Ponzi schemer. And I think that the law should be different with respect to those two categories. And I think that the first statute, Elizabeth in 1571, recognized that difference. That difference is incorporated into the Bankruptcy Code, it's incorporated into the state fraudulent transfer -- the Uniform Fraudulent Transfer Law. And, in fact, both the Minnesota Supreme Court and the Texas Supreme Court have now held that it doesn't matter whether it's a Ponzi scheme; if the creditor has given value and takes the money in good faith, it's not recoverable as a clawback.

THE COURT: If you're talking about the (indiscernible) case in the Supreme Court in Texas, I rode that decision, and that's a creditor who provided dollar for dollar value in terms of advertising for whatever it was

paid, and it happened to be paid in a Ponzi scheme. But you don't provide dollar for dollar value for fictitious profits, and that's the difference.

But look, I hear you. Make your motion. I'm probably going to deny it because it's not relevant to whether or not Wilenitz is liable for a fraudulent transfer. Okay? Number 7. This is a similar type of request.

MR. JACOBS: Yes, Your Honor. I think 6, 7, 8, and 9 all relate to the claims activities. Some of the requests purport to demand us to produce documentation on behalf of the Madoff Victims Fund, which is separately administered by the Department of Justice. The Trustee has no legal responsibility for the administration of that fund, which goes well beyond claims of SIPA customers. So that obviously is completely objectionable, and we couldn't comply even if we were ordered.

And, generally, I do believe that these requests, 6, 7 -- the unnumbered request, and 8 and 9...

THE COURT: Which is unnumbered? What page is it?

MR. JACOBS: It's between 7 and 8.

THE COURT: Oh, I see, I see. Yeah, between 7 and 8.

MR. JACOBS: I do believe that these are seeking discovery and furtherance of the standing issue that this court rejected in omnibus decisions on the motions to

dismiss --

THE COURT: Well, that's what I thought.

MR. JACOBS: And discovery should additionally be prohibited on that basis as well, Your Honor. You analyzed the law very meticulously, and I believe you didn't reach the issue of whether the sufficiency of the customer fund is determined as of the filing date for purposes of the statute. However, you did note that there is controlling law in this jurisdiction stating that it is. And, furthermore, you found it's a factual --

THE COURT: Oh, I was adding (indiscernible)...

MR. JACOBS: Correct. Persuasive law.

THE COURT: Judge Rakoff adopted it.

MR. JACOBS: Right. And in addition to that, as a factual matter, you did find that the Trustee does have insufficient funds. And I can reiterate to you, as I believe you recently heard in our last omnibus update, to date we've recovered, approximately, 11.1 billion.

THE COURT: Well, you can certainly tell her the aggregate number because it's in the report. I think it's... Let me just see. You can give her the aggregate number of assets you had, and claims you paid, and unpaid claims because it's arguably relevant. I didn't really decide the issue; I just... Based on everything I had seen, it looked like -- and even the Second Circuit agreed that it

looked like the estate was insolvent.

MR. JACOBS: Right. I understand, Your Honor. And, in fact, I think there's public interest in that information as well. And as we respond in each and every discovery request --

THE COURT: And it's in your report anyway.

MR. JACOBS: It's in our reports. It's also on our website, which is regularly updated, madofftrustee.com.

THE COURT: And so you agree she could get that information. Let's move on to... Let's get off of what we agree with.

MR. JACOBS: All right.

THE COURT: The question regarding Picard's compensation we dealt with already.

MS. CHAITMAN: Yeah, okay, but see, here's another thing, Your Honor. Unless and until we have an order saying --

THE COURT: There is an order. It was the omnibus motion order in all these adversary proceedings. We covered that issue. You preserve that issue.

MS. CHAITMAN: Okay. But, for example, with the subpoenas we're having the same issue. We don't have an order which says, I've held in the Sarah Lawrence case that -- there's no defense to the subpoenas, and that's applicable in all these other cases. I need to have that in

the record.

THE COURT: It's applicable to all the cases.

MS. CHAITMAN: Okay, can I submit an order on that?

THE COURT: It's already embodied in the order in the omnibus motion, isn't it?

MS. CHAITMAN: I don't believe so, Your Honor.

MR. JACOBS: I think Ms. Chaitman is raising an additional issue. The Rule 45 bank subpoenas that we litigated in Wilenitz and Sarah Lawrence --

THE COURT: Well, I was talking about this issue with Mr. Picard's company --

MR. JACOBS: That is absolutely correct. I agree with Your Honor. It is made applicable to every proceeding by your decision in the omnibus proceeding.

THE COURT: Well, the only thing I would say with the bank --

MS. CHAITMAN: But the Trustee objected --

THE COURT: Stop. The only thing I would say with the bank subpoenas is if a defendant admits that they received the particular transfers and the amounts are accurate, then I might conclude that there's no entitlement to the bank records based on the position the Trustee's taken. But every one of these responses to requests for admission say, it's accurate but we didn't receive it, or

it's accurate to the extent it agrees with the records of our accountants, and those are not answers.

That's the issue I have. If you just say, yeah, they're accurate, then they're accurate.

MS. CHAITMAN: You allowed subpoenas to be served in cases where there were blanket admissions as to --

THE COURT: That is not correct.

MR. JACOBS: That is factually incorrect, Your Honor.

THE COURT: You can show me and I will reconsider it, but --

MS. CHAITMAN: Well, the documents have been produced but --

THE COURT: I went through every one of those requests and Sarah Lawrence was in a different position because Sarah Lawrence said, they're right to the extent they agree with the reference my account takes.

MS. CHAITMAN: Right.

THE COURT: Others said, yes, they accurately reflect what I put in, or something like that, and what came out, but I didn't receive them. You know, it was that kind of stuff.

MR. JACOBS: That was the Wilenitz matter.

THE COURT: That was in a lot of them; it wasn't just Wilenitz. And then, you know, it just makes it more

difficult.

MS. CHAITMAN: So you want to do those on a one by one basis?

THE COURT: Well, if you are... I'll continue to go through them one on one, but I will tell you that if I see those kind of answers, that's going to be the end of it. All right, next is --

MS. CHAITMAN: Can we go to one other thing, if I can just interject?

THE COURT: Sure.

MS. CHAITMAN: Because this came up with a lot of the subpoenas. You had entered an order in Sarah Lawrence that if there was a subpoena to which I objected, I would ask for a meet and confer, and the subpoena would not be served until you -- if the meet and confer was unsuccessful, which of course it would be, we would then ask for a conference and until you resolved it, the Trustee would not serve the subpoena.

THE COURT: No, these were subpoenas that were served already because you were seeking protection from the subpoenas. The Trustee said he was going to serve subpoenas; he was concerned about (indiscernible). And then the original, I don't want to say agreement, but the original proposal that either before or after these were served, the Trustee would send either a request for

admission or proposed stipulations regarding the withdrawals and the deposits into the account during, I guess, the two-year period or the three-year period, whatever it was. You weren't being asked to stipulate to all of the withdrawals and deposits.

And if you admitted that they were accurate, then that was it; he didn't need the records. But if you didn't admit that they were accurate or there was some issue relating to an affirmative defense, then he would need the records.

In terms of the procedure that I thought was being set up, you'd confer -- and that just seems to be futile at this point because we're not getting anywhere with conferring. If it couldn't be resolved, you'd immediately write me a letter and hold a conference like this, and I'd resolve it. But that just wasn't working.

MS. CHAITMAN: But what's happened is that the Trustee is now serving subpoenas before he even serves discovery demands, or at the same time that he serves discovery demands, so that my clients are not even given an opportunity to admit or deny the transfer...

MR. JACOBS: Your Honor, may I address that?

THE COURT: Yes.

MR. JACOBS: The Defendants have an opportunity to admit to the transfers in their answer. And any day of the

week we will accept an amended answer that admits to those factual issues. There is no obligation in the federal rules that discovery be served in any particular order. Given the history, as the Court very aptly notes, with Ms. Chaitman on these cases and the needless litigation that has occurred on this issue, yes, we are serving bank subpoenas at the earliest possible date. Because these are delay tactics, it's causing unnecessary litigation, and the documents are being destroyed. And I know that the Defendants will use the destruction of those documents against us, as Ms. Chaitman has alluded to earlier today, and making allegations we can't prove our cases.

THE COURT: I'm not going to tell the Trustee that he can't serve subpoenas. If there's a subpoena served, there's nothing that stops you from amending the answer or just submitting an affidavit that says, yeah, I agree that these are the deposits, and these are the withdrawals, and either the schedule that's attached to the complaint or whatever paragraph it's alleged in.

MR. JACOBS: And I will reiterate, we are happy to receive that on an unambiguous stipulation or omitted answer any day of the week and we will scale a discovery.

THE COURT: It just hasn't worked and I don't want to go through that again. It just hasn't worked. Ten relates to the Court's compensation arrangement, 11 relates

to the Court's compensation...

MS. CHAITMAN: Right, and 12 does.

THE COURT: Well, 12 relates to other attorneys' compensation. And I go with that in the omnibus decision --

MS. CHAITMAN: Right. Okay. So, 13...

THE COURT: I think that the Trustee supplied the list, didn't you?

MR. JACOBS: We did supply --

MS. CHAITMAN: He supplied the list but it was a list of all the employees; it didn't break it down by what...

MR. JACOBS: That's not correct, Your Honor. We responded to this... I don't believe we had to --

THE COURT: Where is that attached?

MR. JACOBS: It's attached to our responses to these requests that we attached to our letter, which is dated May 4th. That's the list that has every employee that we could identify making a reasonable search --

THE COURT: Do you have a list that -- not creating a list, but do you have a list that breaks down which of the divisions the employee worked for?

MR. JACOBS: We do and we've provided it specifically.

THE COURT: Where?

MR. JACOBS: And here's the issue: I don't

believe it's before the Court in any of the party's filings, but all of that documentation is in the data room, which is our objection to having to even respond to the request.

THE COURT: Well, if it's in the data room -- I mean, even if she makes a motion to compel, if you'd convince me that it's been turned over or made available --

MR. JACOBS: It has. We endeavored to specifically -- we identified for Ms. Chaitman the payroll records for January 2008 that list all of the employees, which was part of the request; we identified an internal BLMIS list, which breaks out each employee by their division; and then she objected that we hadn't given her addresses and phone numbers, so we endeavored to compile the list that you see attached to our responses and our May 4th letter, which is before you now. That's a list we were able to create upon a reasonable search to the best of our knowledge.

THE COURT: And as I understand it, you provided a list, which identifies which of the employees work for which division?

MR. JACOBS: We did. It already was in the data room and always available to Ms. Chaitman. We reproduced it and identified it by Bates Number.

THE COURT: Ms. Chaitman, you've got to look at this stuff before you --

MS. CHAITMAN: Yeah, I did. I will go back and look at it again. I do not believe that it broke it down that way, but I will look at it.

THE COURT: All right. 14 I think is permissible. That goes back to the computation of net equity, which is basically the same as the computation of fictitious profits.

MR. JACOBS: Right.

THE COURT: And, you know, she's entitled to inquire to how you computed the net equity in a particular account. Now, it may make sense -- I don't know how you're going to do this with one expert and however many cases you have at this point, but she's certainly entitled to ask how did you compute the next equity in the transferor account back in whenever it was.

MR. JACOBS: I don't disagree, Your Honor. That's a subject of expert reports that will be proffered in expert discovery. There are three.

THE COURT: Yeah, I mean, some of this may be relevant but premature. That's all I'm suggesting.

MS. CHAITMAN: But why do I have to wait for an expert report? This is a factual issue. I don't even think --

THE COURT: But you've gotten the information already.

MR. JACOBS: We've produced 100 percent of the

underlying documentation.

THE COURT: It's been produced. If you want to go and do it... My response is if it's been produced and you can make this determination, then go ahead and make it.

MS. CHAITMAN: It hasn't been, Your Honor. Again, we're dealing with the period prior to December 1998, when there are no checks. So, how can an expert testify that something was deposited --

THE COURT: But that's his problem. He can only produce what he has.

MS. CHAITMAN: But the point is -- he didn't say here that he's not producing it because he doesn't have it. If that were in the record, it would be different. He's objecting to producing it.

MR. JACOBS: I'm objecting to this request in its current form as being burdensome under the proportionality standards of Rule 26 when, by court order, we are permitted to provide all of the underlying documentation and an expert summary report on this exact issue, which we have done and we will do.

THE COURT: As I had said, if you have provided the information or provided access to the information, that's --

MS. CHAITMAN: Right, and if Ms. Chaitman believes there are holes in the records or incomplete analyses, she

is more than able to examine those experts and conduct expert discovery on those exact issues at that time. But until she has raised a bona fide dispute, I don't believe that Rule 26 entitles defendants to blanket discovery on broad issues like this without a demonstration of the need under the proportionality standards of the rule.

MS. CHAITMAN: Judge?

THE COURT: Yeah?

MS. CHAITMAN: This is not proportionality. The Trustee's going to come in and say that even Berezin Wilenitz has a negative net equity based on transactions which occurred prior to December 1998...

THE COURT: I agree with you. But he's saying he's produced that information.

MS. CHAITMAN: But no, they don't have the information. What he's saying is his expert is going to say, you know, I conclude --

THE COURT: Does he have to tell you what he doesn't have, or does he have to simply say, I will produce everything that I have that's responsive to this request? And then you ask the expert at a deposition, you know, what records did you review? Did you review -- did you compare the account statements in 1998 with bank statements? And he'll say, well, I didn't have any bank statements. And then you can raise that at trial -- that his report, in

terms of the computation of net equity in the transfer account is not accurate and, therefore, you can't know what the fictitious profits were, if any, that he's suing for in this case.

MS. CHAITMAN: Okay. I mean, it just delays the process. Because I believe that I would be entitled to dismiss all of the complaints where the Trustee has no third party records to prove... Just as a matter of the rules of evidence, you can't prove a payment to someone through an expert report.

THE COURT: Well, I don't know how the expert... If the expert had no records, I don't know how the expert came up with the report. So, obviously, the expert has some records and is probably extrapolating --

MS. CHAITMAN: The expert has Madoff statements.

THE COURT: I agree with you... Let me just finish it off on this. I agree with you that you were entitled to inquire into the computation of fictitious profits, which may go back to the beginning of time. On the other hand, the Trustee can only produce what he has. I'm told the Trustee has made that available. And then the next step is to ask the expert what he relied on and what he didn't have to determine what the gaps are in the evidence if you can't determine it from what the Trustee's produced.

If you are concerned that the Trustee is suddenly

going to show up with records that he didn't produce, you know, that's true in every case. And then I guess we'll have a fight over whether or not these documents were ever made available to you. Let's move on.

15 is this insolvency issue. And maybe in response to the motion to compel...well, I guess there are other lawyers involved on this issue.

MR. JACOBS: Yes. And I would...

THE COURT: Maybe it's a good omnibus issue.

MR. JACOBS: Yes, I believe that you suggested that earlier and I think we would love to confer about that.

THE COURT: Except in certain streamlined cases, if insolvency is irrelevant. I remember when I saw this issue, it just struck me that it's irrelevant in an intentional fraudulent transfer case.

MS. CHAITMAN: Okay, so, 16, Your Honor, goes to the issue that I had raised with you once and you said you were familiar with --

THE COURT: I thought that information has been provided already, though. Didn't you provide the DTC records?

MR. JACOBS: We have, Your Honor, going back to 2002 -- maybe it was 2003; I'd need to check, but one of those two years for sure.

THE COURT: Is that the last year or the first

year that you have records?

MR. JACOBS: Yeah. So, what we did -- because I think it's helpful, I'd love to explain very briefly -- we did rule 2004 subpoena DTC. They produced records to us. Ms. Chaitman has copies of those productions. We also restored all of the live data on the active DTC terminal that BLMIS used. Ms. Chaitman has all of that data.

DTC had also made a similar production to the SEC; Ms. Chaitman also has a copy of that production. And, collectively, those records show daily trading positions going back to 2002.

THE COURT: So, what more do you need?

MS. CHAITMAN: Your Honor, let's just hypothesize we're talking about someone whose net equity is calculated over a period beginning in 1982, okay? The only way, in my opinion, that the Trustee could conceivably be entitled to this Ponzi scheme presumption, which would allow him to void transfers going back to 1982, is if Madoff was operating a Ponzi scheme in 1982.

THE COURT: Right.

MS. CHAITMAN: And I'm entitled -- let's assume, for example, that he had 200 employees, six of them were involved in the Ponzi scheme, 194 of them were involved in a legitimate trading business, and the legitimate trading business did $16 trillion, and the Ponzi scheme in 1982 did

half a million.

THE COURT: Mm hmm.

MS. CHAITMAN: You could very reasonably determine that the Ponzi scheme presumption cannot apply to that year.

THE COURT: Okay. I'm not arguing with you but I thought that whatever records they had had been turned over.

MS. CHAITMAN: No, they have internal records that they have not turned over. They have monthly reports as to what the trading volume was in the market making unit, in the investment advisory unit, and in the --

THE COURT: Well, the investment advisory but there's no trader.

MS. CHAITMAN: Excuse me, I mean the market making and the proprietary trading.

MR. JACOBS: We have turned over everything that we have. We scoured the ends of the earth, we have been in discussion with DTC to try to find out if there are more documents. Ms. Chaitman subpoenaed DTC. She obviously has subpoena power. She can go out into the world and conduct third-party discovery...

THE COURT: Okay, but she's entitled also to ask you what documents you have.

MR. JACOBS: Your Honor, we didn't make 4 million records available because we're trying to hide anything. We have made everything we have available within the parameters

of what is readily accessible and reasonable under the federal rules of civil procedure. Well beyond that. But we have made everything on this issue that we have available.

And, again, Mr. Dubinsky in his report, as Ms. Chaitman knows, again, it hasn't been served here yet -- goes through a painstaking analysis of how the IA business never conducted trades. It also goes through a painstaking analysis of how cash infusions from the Ponzi scheme propped up House Five, which is the --

THE COURT: Right, but she's still entitled to the records.

MR. JACOBS: She has all of the records.

THE COURT: All right, then if she has them, she has them.

MS. CHAITMAN: Well, why can't he -- if he claims that there are monthly reports for the legitimate trading units, why can't he just give me the Bates Numbers? Why do I have to go on a fishing expedition through 4 million pages of documents and then come back and say, they're not here?

THE COURT: Wouldn't he have to do the same thing?

MR. JACOBS: That's exactly what this is, Your Honor, a fishing expedition.

MS. CHAITMAN: They know where they are.

MR. JACOBS: One of the exact criteria under Rule 26B2 is she has equal access to the records that we do.

THE COURT: And, again, this comes back to my understanding of the records. If you have tables of content or indices...

MR. JACOBS: I do.

THE COURT: I don't want to see them now.

MR. JACOBS: Okay.

THE COURT: If you have those things and somebody can look at them and see the subject matter of what they want to look at, figure out what to look at, fine.

MR. JACOBS: There is a subfolder in Data Room 1 that is called DTC that has all of those records.

MS. CHAITMAN: I'm not asking for -- I have the DTC records.

THE COURT: She wants other non-DTC records.

MR. JACOBS: To the extent we have them in addition to publicly available information that we obtain, it's all in the data room clearly labeled.

THE COURT: You'll have to show me when the time comes. 17 -- these are the number of employees that work for each unit.

MR. JACOBS: Yes, Your Honor. And as I had mentioned before, we provided a specific chart that contains this exact information, even though I believe we're not obligated to because it had already been made available in the data room and could've been found with the click of a

mouse.

MS. CHAITMAN: I've asked for each year of the operation. I have it only for the last year.

MR. JACOBS: To the extent we have it, again, the Defendant has equal access to those documents. We shouldn't have to do their work for them.

THE COURT: And how would she know who's working for which division each year?

MR. JACOBS: Your Honor, how would we know? The Trustee doesn't have personal knowledge. We would have to do an investigation, which is what the Defenders would do.

THE COURT: This is interrogatory. How would you do that investigation?

MR. JACOBS: We would do exactly what Ms. Chaitman would have to do and start searching through the document repository to find supporting documentation that would answer those questions based on our best ability, without personal knowledge of having been present at the time.

THE COURT: Well, you know, that's an aspect of the case. Nobody really has personal knowledge, who's involved in the case at this point.

MR. JACOBS: Right.

THE COURT: Everything is through records.

MR. JACOBS: But also, Your Honor, what's the relevance? What is the relevance?

THE COURT: Well, her argument, though, is that it wasn't a Ponzi scheme if, of the 200 employees, 190 were working for the so-called legitimate divisions of BLMIS, and those divisions were generating a lot of money. Now, that's probably not the case...

MR. JACOBS: Right.

THE COURT: ...in terms of generating money; I don't know about the number of employees, from everything I've seen. But, you know, I guess it's relevant to whether or not there was a Ponzi scheme on the date of a transfer.

MR. JACOBS: Well, all of the financial information concerning the House Five's operations is in the data room in a folder...in various folders. That's available to the Defendants -- as it's discussed in the report of Mr. Dubinsky.

THE COURT: I didn't understand 19.

MS. CHAITMAN: You didn't understand the interrogatory?

THE COURT: Yeah. I just had a note here, I didn't understand. Let me read it again.

MR. JACOBS: Well, Your Honor --

THE COURT: Let me just read it.

MR. JACOBS: Okay.

THE COURT: Oh, the reason I guess I didn't understand it is I didn't think BLMIS held any stock.

MS. CHAITMAN: Well, it was Madoff until 2001, and then nit was BLMIS. There were times when Madoff did trades equal to 10 percent of the daily volume on the New York Stock Exchange. He had a huge portfolio of securities.

So, what I'm asking is -- I mean, let's assume that every security which was listed on the split strike conversion customer statements was actually held in huge volumes by Madoff at the time. It simply wasn't allocated to the investment advisory --

THE COURT: But I thought it wasn't held. I thought he never engaged in a securities transaction.

MS. CHAITMAN: Only -- what the Trustee has said, he never engaged in securities transactions in the investment advisory business.

THE COURT: Right.

MS. CHAITMAN: He had huge stock positions with the same securities... I mean, I've been able to do this with the DTC records. I can show that every security that was listed on an investment advisory customer statement was held by Madoff at that time.

THE COURT: Mm hmm.

MS. CHAITMAN: But the point is, I can't go back before 2002, and I'm asking the Trustee if he has the records to give that to me.

THE COURT: So, how is this interrogatory

different from, I think it was 16 he was talking about? 16 doesn't ask to identify the specific stock but...

MS. CHAITMAN: I'm just getting the volume. Because one of the arguments will be that the investment advisory volume was X percent of the total and, therefore, this was not a Ponzi scheme.

THE COURT: And what does 18 relate to?

MS. CHAITMAN: 18 relates to the specific securities. In other words, the Trustee's position is that Madoff did not own the securities that were shown on the statements. And, in fact, I've already established that Madoff did own the securities that were shown on the statement; not in the volume that was on the statement.

THE COURT: Owned them in its own name?

MS. CHAITMAN: Madoff's or BLMIS. Yeah, for that period it's BLMIS, yes. Yeah, they held securities. They were a huge securities dealer. So then how do you decide whose securities they were?

THE COURT: Well, BLMIS held it in its own name, right?

MS. CHAITMAN: Yeah. But the thing is if you buy 100 shares of IBM today from Merrill Lynch, they don't have to actually get the securities and stick them in your pigeonhole. They have them on account; they owe it to you.

THE COURT: And how is this relevant to the

lawsuit?

MS. CHAITMAN: Because there's no... The basis of the Trustee's argument is that there were no securities ever purchased. There was one entity, whether it was Madoff as the sole proprietor or BLMIS, there was one entity operating a company with 200 employees, of which a very small percentage were involved in the investment advisory business. If that entity held securities positions, who's to say that they couldn't have been allocated to Mrs. Wilenitz?

MR. JACOBS: I think that is a tenuous assertion at best. And Ms. Chaitman again needs to make a showing that those securities were actually held on behalf of the IA business customer and her defendant, I think, in order to show an entitlement to discovery.

THE COURT: How would she show the allocation, or how would you show that they weren't --

MR. JACOBS: Well, I mean, Ms. Chaitman says she's done an inventory of the DTC records and it looks like there might've been a stock held at some point in connection with some function of BLMIS that matches the name of a stock appearing on a customer statement. That's not proof that the stock was ever bought or sold on behalf of that customer for their account.

THE COURT: But what would you have to show to

prove that? I'm assuming in the best of circumstances you have BLMIS owning 100 shares of IBM.

MR. JACOBS: Right.

THE COURT: And the Wilenitz account statement showing 50 shares of IBM.

MR. JACOBS: Right. Well, as is discussed at length in our expert report, one example is that many of the customer statements reflect purported stock trades that couldn't have been possible given the price and the amount purported to have been sold as reflected on the customer statements.

THE COURT: But she's saying something different on this one. She's saying there was an actual trade and BLMIS owned an actual stock from one of its other businesses.

MR. JACOBS: Right.

THE COURT: One of the (indiscernible) divisions.

MR. JACOBS: Right.

THE COURT: And then she's saying, you know what? I realize this is supposition at this point. The Wilenitz account statement shows the same stock.

MR. JACOBS: Right.

THE COURT: So, there was actually a purchase, and who's to know whether or not that purchase or a portion of that purchase was allocated to Wilenitz? In my example,

BLMIS bought 100 shares of IBM and 50 shares show up on Wilenitz.

MR. JACOBS: Right.

THE COURT: Who's to say he didn't actually own that stock?

MR. JACOBS: I would love to be able to --

THE COURT: Which I guess would be relevant to his net equity claim or his claim in the SIRA case.

MR. JACOBS: I wish I could give you a satisfactory answer but in the time that we have today, I can't replicate the report of our expert, which, in painstaking detail goes through all of the reasons why we believe there was never a security traded in connection with the fraudulent Ponzi scheme being operated and the IA business.

THE COURT: So, how does she test that conclusion?

MR. JACOBS: She tests that conclusion the same way our expert does, by examining the underlying records. All of those records again have been made available to Ms. Chaitman. They're in the data room. Those other records are expert reports.

THE COURT: Maybe that's the answer. If there are records -- because they do have the DTC records, at least from the period when Wilenitz was investing. If the records show that BLMIS actually owned something, and the same stock

shows up in Wilenitz's account statement, you can make the argument that he actually owned that stock. But you can do that (indiscernible) and the information has been made available to you.

And the sense I'm getting -- and I understand that it's a lot of work -- is you want the Trustee to do this for you, but you're going to have to do this yourself if this stuff is available.

MS. CHAITMAN: You know, Judge, with 4 million pages of documents, the least the Trustee could do is specify the specific Bates Numbers. Because I don't want to be in a position where we go to trial... I mean, for all I know, the data room is updated constantly and new documents are added. How am I going to prove at trial that certain documents were not made available to me? I mean, it's impossible. Why can't the Trustee be bound to tell me these are the documents responsive to this request?

THE COURT: But that doesn't solve your problem... Well, if the Trustee has additional documents, he's got to supplement the disclosure or the production, which he does by adding them to the data room, and maybe you have a continuing duty to check the data room.

But part of the problem is you've thrown such a broad net over what you're looking for, instead of the specific documents relevant -- that I think seem to be

relevant to this particular case, that you run into a situation where there may be documents added about something but they have nothing to do with Wilenitz.

MR. JACOBS: And, Your Honor, specifically to respond to Ms. Chaitman's concern about the data room being voluminous, and I understand that 4 million records is overwhelming, but that's the reason why the procedures order permits us to provide an expert summary report to support our claims and to satisfy our burdens of proof, which specifically discusses all of that data, identifies all of the Bates Numbers of the documents that are used to support various conclusions -- and at a minimum, Ms. Chaitman is free to depose those experts and to test and challenge any of those analyses based on any of the documents they've relied upon or that she has access to in discovery.

And no one's challenging her right to do that. What we're saying is that we shouldn't have to do more than what we've already done because we have invested enormous amounts of resources and time in finding a way to make all of those information available to all litigants in order for them to conduct their own investigations and have access to the same information that we do.

THE COURT: Well, you know, I started out by saying, I can't tell you not to make a motion to compel, but I think that if you go back, for example, and look at the

omnibus decision last June, for instance, it talks about the compensation issue -- it's certainly applicable to all the cases which are involved. I think you preserve that issue.

And I'm sure the Trustee, so the Trustee doesn't have to respond to all these things, will agree, yeah, you preserve the issue but you're not entitled to discovery on these issues for that reason. But there just seems to be very little communication, and I don't know what the answer to that is.

Okay, you had raised some other issues and Mr. Dexter raised some issues in a letter...

MS. CHAITMAN: I think that had to do with the subpoenas, and I'm going to have to deal with that separately.

THE COURT: Well, what was that issue? Have we resolved all of the issues raised by the Trustee?

MR. JACOBS: Yes, except for, Your Honor, I'd like to clarify that we would also like to submit a motion for a protective order on this discovery.

THE COURT: Well, she's going to make a motion to compel. I'll just stay it until I resolve the motion to compel.

MR. JACOBS: Okay.

THE COURT: I don't need a motion for a protective order and a motion to compel on the same discovery.

MR. JACOBS: Right. Well, we did ask for the relief first and I believe from a fairness -- we should be entitled to make --

THE COURT: Do you want to wait for them to make a motion for --

MS. CHAITMAN: It doesn't matter. If he wants to make the motion...

MR. JACOBS: I'm trying to avoid unnecessary duplicate briefing.

THE COURT: All I'm saying is -- maybe this is wishful thinking, but if she makes the motion to compel, on reflection she might not ask about Picard's compensation, for example.

MR. JACOBS: Okay.

THE COURT: And that will save everybody the job of dealing with that issue. But I don't know if that's going to be the case.

MS. CHAITMAN: Judge, on Picard's compensation, I understand you ruled on that and it's applicable to every case. I'm not...

THE COURT: Well, if you're concerned -- I'm not going to rule on it again. If you're concerned -- if the record is preserved, it's preserved. But that doesn't seem to have any effect on these cases, if I rule on something. That's my only point. It goes both ways, by the way. Don't

smirk.

MR. JACOBS: No smirk here.

THE COURT: Yeah, it seems that everybody seems to ignore prior rulings in this case when we litigate things. All right, what else from the Trustee?

MR. JACOBS: That is it from our perspective, Your Honor.

THE COURT: Are there any other issues?

MS. CHAITMAN: That's it.

THE COURT: What did Mr. Dexter raise?

MS. CHAITMAN: He was raising the Rule 45 subpoena issue, but I want to go back...

THE COURT: And what is that issue?

MS. CHAITMAN: The issue is whether the Sarah Lawrence order as to the procedure is going to go forward. You clarified that you don't feel it's appropriate and that the Trustee can serve the subpoenas. But you're telling me that if, in fact, people can stipulate to the records...I mean, I just want to clarify that because --

THE COURT: You know, the devil is in the details. And it sounded so easy to resolve it that way but it just hasn't gotten resolved.

MS. CHAITMAN: No, I appreciate that. I agree with you.

THE COURT: What I will not do is stay discovery

pending, you know, a meet and confer, anything like that. If you get discovery and you think -- or you get a notice of a subpoena on a bank, and you can unconditionally say that the records are the records...

MS. CHAITMAN: Well, the records are the records for the period covered by the bank documents. People cannot possibly stipulate to transfers ten years ago.

THE COURT: Well, but then if you can't, I guess he's entitled to the bank documents. And if the answer is... We talked about this, whether there were periods that could be carved out. Even that wasn't answered clearly in the...

MS. CHAITMAN: But if a bank only has records going back to 2006, why is the price of protecting those records that you have to concede to all the transfers going back to 1982?

THE COURT: Yeah, but you can concede to all the transfers going back to 2006 in your example.

MS. CHAITMAN: We did that, and that was --

THE COURT: That was not my recollection.

MS. CHAITMAN: All right.

THE COURT: Go back and look at your responses to the nine or so cases that we dealt with, and every one of them retracts or has a caveat to what is essentially an admission. And remember what we're trying to accomplish

here. You know, cut down on the issues that have to be tried. And if they don't do that, then they don't serve their purpose and everybody goes about and takes discovery, that's all. All right.

MS. CHAITMAN: Okay.

MR. JACOBS: Your Honor, there were also objections to subpoenas in three cases handled by my colleague, Ms. Longo, as conflicts counsel for the Trustee.

MS. CHAITMAN: It's the same issue, and at this point I understand Your Honor's position so...

THE COURT: Well, Wilenitz is one of them.

MS. CHAITMAN: They have those documents already.

MR. JACOBS: Right. Wilenitz was part of the --

THE COURT: And the RAR...

MR. JACOBS: RAR is our case, and if Ms. Chaitman is withdrawing the objection, we've served the subpoena...

THE COURT: I haven't seen the responses to the admissions or whatever.

MS. CHAITMAN: With RAR we will stipulate to the deposits and withdrawals for the period that --

THE COURT: That's all well and good. When you send him the -- whatever it is -- the stipulation or the affidavit that proves that or requires that, then ask him to withdraw the subpoena. And I guess we'll have to deal with that again if he refuses to withdraw the subpoena.

And the reason I say that is I've seen the responses in the other cases and the non-responses. That would compel to withdraw --

MS. CHAITMAN: I'm saying on the record that we will stipulate to the deposits and withdrawals for the period covered by the bankruptcy.

THE COURT: And what I'm saying on the record is when that is writing in a satisfactory form, then we'll deal with it, okay?

MS. CHAITMAN: Okay.

THE COURT: Is there anything else?

MS. LONGO: So, just to clarify, Your Honor, I'm sorry, with respect to the two cases that are handled by Wilenitz, is there a withdrawal of the objection in those?

THE COURT: She's not withdrawing the objections.

MS. CHAITMAN: I'm not withdrawing the objections.

MS. LONGO: You'll go back and check...I understand.

THE COURT: She's going to go back and see if she can stipulate to the withdrawals -- either all the withdrawals and deposits or for whatever period it is.

MS. CHAITMAN: Right.

THE COURT: And then you may be entitled to records before that, although you're only asking, I think, for three years anyway.

MR. JACOBS: All of our subpoenas are different depending on how long we --

THE COURT: Every one I've seen is the two years before the filing date and one year after.

MS. CHAITMAN: Now they're going back to 2001.

MR. JACOBS: Well, there are some cases --

THE COURT: Well, I'm surprised they haven't. I'll tell you. Because, you know, this issue with fictitious profits is the same. And you can't just look at the two years. You've got to go all the way back to the beginning of the account. And I was surprised when they limited it to two years for that reason. I was also surprised about the insolvency issue but...life is full of surprises. How was Barcelona? Was it good?

MS. CHAITMAN: Oh, my God, I loved it.

THE COURT: All right, anything else?

MS. LONGO: I was just going to say, to be clear, our two do go back further than the two years. So I think the stipulation would have to cover all of those transfers.

THE COURT: Whatever it is. I mean, it sounds to me that if you go far back enough, you're going to get a response from the bank that says, we don't have the records, you know, but so be it.

MS. CHAITMAN: Thank you very much.

THE COURT: All right.

MR. JACOBS: Thank you, Your Honor.

(Whereupon these proceedings were concluded at 12:17 PM.)

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o, ou, email=digital1@veritext.com, c=US
Date: 2016.05.19 16:30:11 -04'00'

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: May 19, 2016