

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, Plaintiff, | Adv. Pro. No. 10-05355 (SMB) |
| v. | |
| ABN AMRO BANK (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED), and ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), | **TRUSTEE'S PROFFERED ALLEGATIONS PERTAINING TO THE EXTRATERRITORIALITY ISSUE AS TO ABN AMRO (IRELAND) LTD. AND ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD.** |
| Defendants. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L.

Madoff ("Madoff"), individually, under the Securities Investor Protection Act ("SIPA"), 15

U.S.C. §§ 78aaa *et. seq.*, by and through the undersigned counsel, for these Proffered Allegations

Pertaining to the Extraterritoriality Issue as to Defendant ABN AMRO Bank (Ireland) Ltd. (f/k/a

Fortis Prime Fund Solutions Bank (Ireland) Limited) ("FPFS Bank") and Defendant ABN

AMRO Custodial Services (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Custodial Services

(Ireland) Ltd.) ("FPFS Services" and together with FPFS Bank, "Defendants"), alleges the

following:

## I.    INTRODUCTION

1.    The Trustee seeks recovery of more than $330 million in subsequent transfers of

BLMIS customer property made to Defendants (the "Fortis Subsequent Transfers") pursuant to

§ 550 of the Bankruptcy Code.

2.    Defendants received nearly $150 million of those transfers (the "Kingate Global

Subsequent Transfers") from a single BLMIS feeder fund, Kingate Global Fund Ltd. ("Kingate

Global"). The remaining transfers sought by the Trustee in his Amended Complaint (the

"Tremont Subsequent Transfers") were received by Defendants from Feeder Funds Rye Select

Broad Market LP ("Broad Market Fund"), Rye Select Broad Market XL Fund LP ("XL Fund"),

and Rye Select Broad Market Prime Fund LP ("Prime Fund") (the "Tremont Feeder Funds"),

which had their principal place of business in New York.

3.    Defendants received transfers as shareholders in both Kingate Global and the

Tremont Feeder Funds. Defendants entered into these transactions with the purpose of deriving

revenue from BLMIS's purported investment in the U.S. securities markets in New York, and

Defendants received transfers from Kingate Global in Defendant FPFS Bank's account at

Northern Trust International Bank ("Northern Trust Bank") in New York.

     4.     Defendants were part of a larger global financial institution ("Fortis") that

provided a breadth of financial services to customers in the United States and around the world,

including administration, custodial, banking, and financing services to the fund industry.  For

more than a decade, the Fortis organization, working collectively through Defendants, Fortis

Financial Services LLC and Fortis Prime Fund Solutions (USA) LLC (together, "FPFS USA")

and other affiliates, entered into transactions with Kingate Global, the Tremont Feeder Funds,

and at least twenty-six other Feeder Funds and investors.  Fortis provided services to the Feeder

Funds, structured financial products for them, and/or directly invested in them with the deliberate

intent of profiting from transactions that were all centered around BLMIS in New York and a

U.S.-based investment strategy.

     5.     Fortis worked as a single entity to transact business with the Feeder Funds, which

Fortis recognized as "identical products" that provided access to BLMIS.

     6.     Defendants knew that, like the Tremont Feeder Funds and other Feeder Funds

with which Fortis transacted, Kingate Global delegated its investment advisory duties to Madoff.

Fortis was expressly aware that its investments in Kingate Global would be managed by BLMIS

in New York and that its investment returns (or losses) directly depended on Madoff's success in

purported trading in U.S. securities, options, and treasuries.

     7.     The Fortis entities recognized that BLMIS in New York was at the center of all

transactions they entered into with the Feeder Funds.  Fortis referred to the Feeder Funds

collectively as one group—"structures with exposure to Madoff."

8.      Fortis did not differentiate among the funds based upon their jurisdiction of

formation, nominal foreign affiliations, structure, or the like.  Instead, Fortis purposefully

targeted investments centered on BLMIS and recognized them as identical and fungible

gateways to Madoff and his purported "exemplary" returns.  Fortis evaluated, continually

analyzed, and strategically increased its own stake with BLMIS through its loans to and

investments in the Feeder Funds.

## II.      RELEVANT PARTIES TO THE TRANSACTIONS

### A.      Defendants and the Global Fortis Organization

9.      Fortis provided its fund services through a network of entities that were part of the

Fortis Prime Fund Solutions ("FPFS") network.  In 2005, Fortis announced to shareholders that it

had formalized the coordination of its services, stating that it had "bundled all Fortis's fund

services – both onshore and offshore – to form a single unit called Prime Fund Solutions" that

offered the fund industry "a combination of administration, custody, banking and financing

capabilities."  Fortis explained that this was an effort to "limit the amount of service providers

with which [clients] must liaise *to one – Fortis.*"  Prime Fund Solutions included and relied upon

the U.S.-incorporated and N.Y.-headquartered FPFS USA.

10.     Defendant FPFS Bank is a commercial bank formally incorporated under the laws

of Ireland.  At all relevant times, Defendant FPFS Bank was part of Fortis's global network of

banks and financial service providers.

11.     Defendant FPFS Services is a financial service provider formally incorporated

under the laws of Ireland.  At all relevant times, Defendant FPFS Services was also a member of

Fortis's global network of banks and financial service providers.

12.     At all relevant times, Defendants and the other Fortis entities operated as one unit

in order to provide operational support to, invest in, and provide financing to the Feeder Funds

3

and to maintain the funds' relationships with BLMIS in New York and investments in the U.S. securities markets.

13.    Defendants and other Fortis entities, especially FPFS USA, regularly met and corresponded, shared information, conducted due diligence together, carried out each other's administrative responsibilities, directed funds into and out of the same New York bank account, and apportioned the financing Fortis made available to products ultimately invested in Madoff amongst themselves.

14.    In particular, Defendants, Fortis Prime Funds Solutions (Asia) Limited ("FPFS Asia"), Fortis Services (Cayman) Limited ("FPFS Cayman"), and FPFS USA worked as one global entity particularly through operations in New York to manage Fortis's transactions with Kingate Global. For example, FPFS Asia received the Kingate Global Audited Financial Statements on Defendant FPFS Services' behalf and Defendant FPFS Bank and FPFS Asia monitored the purported success generated by BLMIS's management of the funds through their receipt of monthly NAV statements on the performance of Kingate Global.

15.    In addition to Defendants, at least FPFS Cayman, Fortis Netherlands, Fortis Fund Services (Guernsey) Limited, Fortis Prime Fund Solutions (IOM) Limited and Fortis (Isle of Man) Nominees Limited (together, "FPFS IOM"), and FPFS Asia similarly engaged in transactions with Kingate Global during the relevant period.

**B.    The Feeder Funds and Related Entities with Which Defendants Transacted Business and From Which They Received Subsequent Transfers**

16.    Kingate Global is a British Virgin Island-registered Feeder Fund that invested 100% of its assets with BLMIS in New York. Defendants were shareholders in Kingate Global, from which FPFS Bank received over $63 million and FPFS Services received over $84 million in subsequent transfers of BLMIS customer property.

4

17.    Kingate Global was co-managed by Tremont (Bermuda) Limited ("Tremont Bermuda") for approximately ten years, from 1995 to 2005. Although Tremont Bermuda was registered in Bermuda, it was managed from offices in Rye, New York by employees of Tremont Partners, Inc. ("Tremont Partners"), a related Connecticut corporation registered with the SEC under the Investment Advisers Act of 1940. Tremont Bermuda and Tremont Partners' parent company was Tremont Group Holdings, Inc., a Delaware corporation, ("Tremont Holdings" and together with Tremont Bermuda and Tremont Partners, "Tremont"). During this period, Kingate Global was managed by the same Tremont employees and executives that controlled, operated, and managed the Tremont Feeder Funds from Tremont's offices in New York.

18.    Defendants and Fortis entered into multiple leverage transactions and investment transactions with the Tremont Feeder Funds and related entities. These included Broad Market Fund, XL Fund, and Prime Fund, direct and indirect Feeder Funds incorporated in Delaware, and Rye Select Broad Market Portfolio Ltd. ("Portfolio Fund") and Rye Select Broad Market XL Portfolio Fund Ltd. ("XL Portfolio Fund"), direct and indirect Feeder Funds incorporated in the Cayman Islands. At all relevant times, employees of Tremont in Rye, New York controlled, operated, and managed all of the Tremont Feeder Funds.

19.    Defendant FPFS Bank and Fortis also entered into multiple transactions to provide administrative services to Harley International (Cayman) Limited ("Harley"). Harley was a Feeder Fund that was wholly directly invested with BLMIS. Harley was also operated and controlled by entities and persons in New York, namely Fix Asset Management Services Inc. ("FAM").

20.    Kingate Global, Harley, and the Tremont Feeder Funds were only a few of the dozens of Feeder Funds and investors with which Fortis transacted business. During the relevant

period, various Fortis entities worked together to provide services to, invest in, and/or otherwise

transact with at least twenty-six additional Feeder Funds and/or Feeder Fund investors, including

among others: (i) Striker Fund Ltd. ("Striker Fund"); (ii) Reliance Multi-Advisor Fund Limited

("Multi-Advisor Fund"); (iii) Platinum All Weather Fund Limited ("Platinum") and Odyssey;

(iv) Mistral Equity Market Neutral Segregated Portfolio ("Mistral"); (v) Kingate Euro Fund Ltd.;

(vi) Alternative Strategies II Fund ("Alternative Strategies II"); (vii) Square One Fund ("Square

One"); (viii) White Orchard Investments, Ltd. ("White Orchard"); (ix) Fairfield Sentry Fund

Limited ("Fairfield Sentry"); and (x) Fairfield Sigma Fund Limited.

21.     At all relevant times, Fortis, including Defendants, knew that these services,

investments, and transactions—and the Fortis Subsequent Transfers that resulted from them,

including the Kingate Subsequent Transfers—were centered in New York around BLMIS and

the U.S. securities markets.  Fortis knowingly and purposefully facilitated the Feeder Funds'

relationships with BLMIS by, among other things, transferring the funds' assets to and from

BLMIS, conducting due diligence on BLMIS in New York, and providing services to certain of

the funds' investors.

## III.    THE TRANSFERS AND COMPONENT EVENTS OF DEFENDANTS' TRANSACTIONS WITH KINGATE GLOBAL WERE PREDOMINANTLY DOMESTIC

### A.    The Documents Governing Fortis's Shareholder Agreement with Kingate Global Made It Clear that BLMIS in New York Was at the Center of the Investment Transaction

22.     Documents governing Defendants' transactions with Kingate Global confirmed—

as Defendants also knew through due diligence into and transactions with BLMIS and other

Feeder Funds—that these transactions were centered in New York.

23.    Kingate Global's internal documents identify Defendants as shareholders that
received redemption payments from Kingate Global—including subsequent transfers of BLMIS
customer property at issue—from at least 2002 to 2008.

24.    All subscribers in Kingate Global, such as Defendants, were required to execute
subscription agreements affirming that they had "received, reviewed and understood" the terms
set forth in the Information Memorandum.  Internal emails of Kingate Global's administrator,
dated October 2006, specifically identify Defendant FPFS Services' receipt of the Information
Memorandum in connection with a redemption request on October 1, 2006, indicating that "[t]he
funds will be transferred in due course in accordance with the Offering Memorandum
[Information Memorandum]."

25.    From at least 1998 to 2005, Kingate Global's annual Information Memorandum
disclosed to investors such as Defendants that the Fund's assets were wholly managed by a
single NASD-registered broker dealer based in New York who also acted as the investment
advisor and actual custodian.  The Kingate Global Information Memorandum also disclosed that
the investment manager executed a split-strike conversion strategy through the purchase and sale
of thirty to forty S&P 100 stocks and options as well as the purchase and sale of U.S.
government obligations.  The Information Memorandum was clear that the New York
Investment Manager had full discretion over the fund's investments, stating that "the overall
success of the Fund depends initially upon the ability of the initial Investment Advisor to be
successful in his own strategy . . . ."

26.    At all relevant times, Defendants knew that the "Investment Advisor" referenced
in Kingate Global's Information Memorandum was BLMIS.  As subscribers in Kingate Global,
Defendants also received the fund's audited financial statements, which were provided to

7

Kingate Global shareholders at least from 1998 forward. These audited financial statements, at

least as early as December 2001, informed investors like Fortis that the single investment

manager was, in fact, BLMIS.

27.    The Information Memorandum also explicitly informed Defendants that any

profits that would be earned for Kingate Global would come from purported investments in the

U.S. securities markets as would redemptions of those purported investments. For example,

Kingate Global's September 30, 1998 Information Memorandum made clear to investors such as

Defendants that BLMIS in New York could need to liquidate the fund's U.S. securities positions

to pay investors' redemptions requests, and that investors' redemptions were subject to

suspension if the fund was "unable to liquidate securities positions in an orderly manner."

28.    Defendants knew BLMIS in New York had full discretion over the fund's

investments and that the fund's potential profit or loss was wholly dependent on Madoff.

Investors such as Fortis were informed that "the overall success of the Fund will initially depend

on the ability of the Investment Advisor to be successful in his strategy."

29.    The Information Memorandum further disclosed that neither the fund in the

British Virgin Islands nor its investment manager in the Bahamas had any control, influence, or

liability for the fund's assets, to the extreme that it told investors like Fortis that "there can be no

assurance that . . . assets entrusted to the Investment Advisors [BLMIS] will be protected."

Instead, the investment manager had delegated all investment management duties and full

discretion of the trading strategy to BLMIS and retained no liability in connection with BLMIS's

activities because "[t]he Co-Managers are entitled to rely on such information (provided they do

so in good faith) and are *not required to undertake any due diligence to confirm the accuracy

thereof.*" Because all management duties had been delegated, the New York manager could

8

"*abscond with those assets*" and supply "*inaccurate or even fraudulent*" account information

without liability to the fund or its service providers.

    **B.**    <u>Defendants Received the Subsequent Transfers of BLMIS Customer Funds
in Defendants FPFS Bank's New York Bank Account</u>

    30.    Defendants received transfers of customer property, in the form of the Kingate

Subsequent Transfers, in Defendant FPFS Bank's New York bank account.  The funds

Defendants transferred to and received from Kingate Global in connection with their transactions

were made through Defendant FPFS Bank's bank account in New York at Northern Trust Bank,

at the direction of Defendant FPFS Bank, Defendant FPFS Services, and/or other Fortis entities.

    31.    At least four other Fortis entities designated Defendant FPFS Bank's New York

bank account at Northern Trust Bank as the situs for subscriptions into and redemptions out of

Kingate Global and other Feeder Funds, including: (i) Fortis Bank (Nederland) N.V. ("Fortis

Netherlands"); (ii) FPFS IOM; (iii) Fortis Prime Fund Solutions (BVI) Limited; and (iv) FPFS

Cayman.

    **C.**    <u>Defendants Received Transfers From Kingate Global, Which Conducted Its
Operations in Large Part in New York</u>

    32.    Defendants received their transfers from Kingate Global, which in large part was

operated and managed from New York in connection with its BLMIS investments.  At all

relevant times, Kingate Global's investment managers—including Tremont— consultants and

other service providers operated in whole or in substantial part in New York to manage the

fund's investments with BLMIS.  Defendants' investments with BLMIS through Kingate Global

thus were managed in whole or in substantial part in New York.

IV.    **THE FORTIS ENTITIES' TRANSACTIONS WITH OTHER FEEDER FUNDS
CONFIRMED THAT BLMIS IN NEW YORK WAS THE EPICENTER OF THE
FUNDS' BUSINESS**

A.    **Fortis's Transactions with the Domestic Tremont Feeder Funds Confirmed
that All of the Feeder Funds, Including Kingate Global, Were Centered
Around BLMIS in New York**

33.    Fortis received at least $180 million in transfers from the Tremont Feeder Funds.

The transactions underlying these transfers took place in New York. For example, Defendants

and Fortis entered into multiple leveraged transactions with the Tremont Feeder Funds. Among

those transactions were leveraged swap transactions with XL Fund, Broad Market Fund, XL

Portfolio Fund, and Portfolio Fund. Defendants directly and independently invested in the

Tremont Feeder Funds to hedge their exposure.

34.    Fortis, working collectively through its affiliates—including Defendants, FPFS

USA, Fortis Netherlands and Fortis S.A./N.V. UK Branch—conducted extensive due diligence

on the Tremont Feeder Funds in 2006 and 2008 in anticipation of its transactions with the funds.

Fortis's entities exchanged hundreds of emails and dozens of comprehensive credit memoranda,

risk management reports and other internal work product discussing the Tremont Feeder Funds

and BLMIS, including BLMIS's purported operations and strategy.

35.    In conducting its diligence on the Tremont Feeder Funds, the Fortis entities

specifically focused on the impact of U.S. securities laws and financial regulations on Fortis's

potential and/or actual transactions with the Feeder Funds. According to the Credit Committee

meeting notes dated December 2006 and a memorandum prepared by Defendant FPFS Bank,

Fortis knew that the domestic nature of the proposed transactions with the Tremont Feeder

Funds, in particular Defendants' proposed transactions with the Tremont Feeder Funds, made it

necessary to monitor and understand the U.S. securities laws.

36.    In its decision-making related to the Tremont Feeder Funds, Fortis, like Tremont, did not distinguish between those funds that were registered in the United States, such as Broad Market Fund and XL Fund, and those, such as Portfolio Fund and XL Portfolio Fund, that were registered offshore.

37.    As Defendant FPFS Bank expressly highlighted to Fortis Netherlands, FPFS USA, and other Fortis entities, regardless of whether the Tremont Feeder Funds were incorporated in the United States or abroad, "they are identical products" with the sole difference being whether they were marketed to onshore or offshore investors. Or, as one employee at FPFS USA put it—the performance of the Tremont Feeder Funds was "ultimately the performance of Madoff."

38.    Fortis had considered Madoff so central to potential transactions with the Tremont Feeder Funds that employees of its predecessor entity met with Madoff to conduct due diligence in BLMIS's operations. In May 2003, Fortis's predecessor entity in the Netherlands—MeesPierson—was considering investments with Tremont's Portfolio Fund. Noting that BLMIS in New York was the investment manager of the Tremont Feeder Funds and central to its potential transactions with the funds, Fortis sent MeesPierson employees to New York to conduct due diligence. On May 15, 2003, Theo Nijssen, Director of Hedge Fund Activity, and Reinoud van Ieperen, Analyst, met with Madoff himself and senior Tremont officials at Tremont's offices in New York.

39.    This meeting with Madoff resulted in a detailed memorandum summarizing the information Nijssen and van Ieperen learned about BLMIS, the Feeder Funds (including Tremont, Fairfield and Kingate funds), and, more specifically, BLMIS's conduct and operations.

40.    This memorandum confirms that Fortis was very much aware that the Kingate,
Fairfield, and Tremont Feeder Funds were wholly centered on BLMIS and the U.S. financial
markets. Specifically, the Fortis employees noted in this memorandum that Madoff served the
same "investment adviser" role "to Tremont's Broad Market Fund and Broad Market Prime
Fund (together about USD 1bn), Fairfield Sentry (ca USD 3.5 bn), Kingate (ca USD 2 bn) and
other[s]." Fortis, including Defendant FPFS Bank and FPFS USA, shared the information
contained in this memorandum amongst themselves.

**B.    In Connection with Services Fortis Provided to Harley, Fortis Dealt Directly
with Madoff and Key BLMIS Employees**

41.    Another source of Fortis's knowledge of the central role Madoff played in the
Feeder Funds was the due diligence and other services it collectively performed for another
Feeder Fund, Harley, through Defendant FPFS Bank, FPFS USA, and other Fortis entities.

42.    The relationship between Harley and the Fortis entities that served as Harley's
administrators were managed during much of the relevant period by Rhonda Eldridge, a
Managing Director of Fortis Financial Services, LLC, located in New York, who worked with
employees of FPFS USA.

43.    On behalf of Harley, Fortis employees conducted due diligence on BLMIS from
Fortis's offices in New York. This included inquiries into BLMIS's role with Harley as well as a
"thorough examination of Harley's account" with BLMIS.

44.    As part of this due diligence, Fortis employees in New York inquired about
mispriced option trades purportedly made by BLMIS. Eldridge and other Fortis employees met
with Madoff and BLMIS employee Frank DiPascali at BLMIS's office in New York, and
regularly spoke with Madoff, DiPascali, and BLMIS employee Joanne Crupi regarding Harley's
investments with BLMIS.

45.    John Roche, who was employed in the risk management division of Defendant

FPFS Bank, conducted in-person due diligence at BLMIS with Gordon Shaw, the Head of

Strategy and Global Head of Relationship Management of Fortis Netherlands.

46.    Harley due diligence questionnaires obtained by Fortis confirmed that Harley's

assets in BLMIS purportedly were invested in S&P 100 Index stocks and U.S. treasuries, and

that the split-strike conversion strategy was executed by Madoff in his full discretion.

47.    Fortis employees received Harley's BLMIS trade confirmations and account

statements at Fortis's offices in New York, and reviewed the trade confirmations and account

statements, which purported to show trading in U.S. securities, to calculate Harley's net asset

value. Fortis did not independently validate the trade information provided by BLMIS, but

rather relied on information provided by the "manager of underlying fund investments"—

BLMIS in New York.

48.    Employees of Fortis also met with Charles Fix, the head of Fix Asset

Management, and Harley investors in Fix Asset Management's New York office.

49.    Defendant FPFS Bank received fees on Harley's assets, and Defendant FPFS

Bank's New York account was used to send subscriptions to and receive redemptions from

BLMIS.

**C.    Defendants' Transactions with Other Feeder Funds Reflect the Domestic
Nature of the Funds**

50.    At least nine of the entities in Fortis's global network worked together to provide

fund services in New York to several Feeder Funds. These entities included: (i) Defendant FPFS

Bank; (ii) Defendant FPFS Services; (iii) FPFS USA; (iv) Fortis Netherlands; (v) FPFS IOM;

(vi) FPFS Cayman; (vii) Fortis Fund Services (Curaçao) N.V.; (viii) Fortis Fund Services

(Bahamas) Limited; and (ix) Fortis Prime Fund Solutions Administration Services Ireland Ltd.

("FPFS Administration").

51.     These entities provided administrative, custodial, or other services to at least six

other Feeder Funds and Feeder Fund investors including: (i) Striker Fund; (ii) Reliance Multi-

Advisor Fund; (iii) Platinum and Odyssey; (iv) Mistral; (v) White Orchard; and (vi) Square One.

Through these transactions, Fortis entities, including Defendants and FPFS USA, continued to

increase their wealth of knowledge about BLMIS and the Feeder Funds and to share that

knowledge, as well as their resources in New York, across the Fortis network.

52.     In carrying out their duties on behalf of these various Feeder Funds, the Fortis

entities collectively: (i) worked together to meet with Madoff and other BLMIS employees in

New York and/or to correspond with BLMIS employees in New York; (ii) submitted fund

subscription and redemption requests to BLMIS in New York; (iii) maintained New York bank

accounts from which they transferred funds to and from BLMIS, and subsequently transferred

funds to investors; (v) transferred funds to and from BLMIS's New York bank account; and (vi)

received customer statements, trade confirmations and other due diligence from BLMIS on

behalf of the Feeder Funds.

53.     For example, in their roles as the custodian and administrator of Multi-Advisor

Fund, Defendant FPFS Services and FPFS Administration received weekly portfolio statements

and risk reports for Defender Ltd., a Feeder Fund through which Multi-Advisor Fund was wholly

invested.  Likewise, in its roles as agents for Odyssey and Platinum, FPFS IOM executed

subscription agreements, received trade tickets, and the PPM for Fairfield Sentry, a Feeder Fund

that was wholly invested in BLMIS and operated, controlled, and managed by Fairfield

Greenwich Group in New York.

V.    **FORTIS RECOGNIZED THE ECONOMIC REALITY THAT THE FEEDER
FUNDS, INCLUDING KINGATE GLOBAL, WERE FUNGIBLE GATEWAYS TO
THE "MADOFF STRATEGY" IN NEW YORK AND MANAGED THEIR
COLLECTIVE EXPOSURE TO MADOFF**

54.    Fortis knew from its extensive experience with the Feeder Funds and its own due
diligence directly with BLMIS that the funds were wholly or substantially invested with BLMIS,
deferred all investment management decisions to BLMIS, and were, simply, passive investment
vehicles to BLMIS.

55.    Internally, Fortis recognized the central role BLMIS played in all of the Feeder
Funds. In fact, they referred to all of the Feeder Funds collectively as one group—"structures
with exposure to Madoff." Fortis purposefully targeted investments centered on BLMIS and
recognized them as identical and fungible gateways to BLMIS and its purported "exemplary"
returns.

56.    For purposes of BLMIS related investments, Fortis evaluated the operations of
BLMIS itself. Fortis implemented a "Madoff policy" that encompassed all of Fortis's offices,
including Defendants and FPFS USA, and all of the Feeder Funds and fund investors with which
Fortis invested and/or transacted business.

57.    For example, Fortis evaluated its Madoff exposure in December 2006 when John
Roche, Risk Management at Defendant FPFS Bank, proposed to increase Fortis's "Madoff
Exposure" to $1.25 billion. Considering all BLMIS-related investments, Fortis's Credit
Committee opined that "the concentration on Madoff is too high" and it created a "threat" that
Fortis was "increasingly exposed to activity of a single broker, Madoff."

58.    Fortis again reevaluated its total exposure to Madoff through the Feeder Funds
when in November 2007 Defendants proposed providing leverage to the Feeder Fund, Striker
Fund. The Fortis Credit Committee application stated that:

There is an overall PFS policy with regards to investing in the Madoff strategy.
At the beginning of 2007, it was proposed to set an overall limit of 10% of FPFS
Total Approved Limits for FPFS exposure to the Madoff strategy. Based on a
lending book of USD15bio, this equates to USD1.5bln for exposure to this
strategy. This has been sub-divided into buckets of USD 500mil for 2X, 3X and
4X leverage. Currently the 3X and 4X buckets have been fully allocated to
clients and there is USD 375mio remaining in the 2X bucket before this limit is
considered.

59.    In early 2008, FPFS USA internally circulated charts illustrating Fortis's $1.5

billion global exposure to the "Madoff strategy" through various Feeder Funds, including

Tremont Feeder Funds and Striker Fund. The charts' headers are entitled "Details of Credit

Facilities Offered to Funds which Ultimately Invest Into Accounts with Bernard L. Madoff

LLC." The charts listed funds formed both on and offshore because as demonstrated by Fortis's

own words, Fortis knew that the Feeder Funds were identical.

60.    Regardless of their place of incorporation, Fortis itself recognized that in

economic reality, all of its transactions with, or proposed transactions with, the Feeder Funds

were centered entirely around BLMIS in New York. Defendants entered into those transactions

with Kingate Global and the Tremont Feeder Funds intending that those transactions, including

transfers of customer property from Kingate Global, derived from that New York center and

investments in U.S. securities.

## VI.    THE KINGATE GLOBAL TRANSFERS ARE DOMESTIC

61.    Kingate Global was a feeder fund that invested exclusively with BLMIS in New

York. BLMIS transferred approximately $398,797,047 of customer property to Kingate Global

during the life of its account prior to December 11, 2008.

62.    Kingate Global filed a customer claim in the SIPA liquidation.

16

**A.**     **Kingate Global Invested with BLMIS to Make Money From a New York-Based Investment Operation**

63.     Kingate Global, together with its purported investment manager, consultant, service providers, and others that received subsequent transfers of customer property, formed an enterprise with a single economic purpose: to make money from a New York-based investment operation.

64.     Despite having a registered address in the BVI, Kingate Global had no physical offices, no employees, and transacted no meaningful business there.

65.     Tremont (Bermuda) Limited served as the co-manager of Kingate Global for approximately 10 years. Tremont (Bermuda) Limited was formed in Bermuda, but was itself managed from New York by employees of Tremont Partners, Inc., a Connecticut corporation. Tremont (Bermuda) Limited's and Tremont Partners, Inc.'s parent company was Tremont Group Holdings, Inc., a Delaware corporation.

66.     Kingate Global's manager, consultant, and other service providers, regardless of where they were organized, wholly or in substantial part operated in New York to manage the fund's investments with BLMIS.

67.     Kingate Global's sole business was centered in New York and all deposits with, and withdrawals from, BLMIS were made in New York and Kingate Global profited from its exclusive business relationship with BLMIS in New York.

**B.**     **The Operative Legal Documents Were New York-Based**

68.     Kingate Global executed a Customer Agreement and other account opening documents, and delivered the agreements to BLMIS in New York.

69.     Each Customer Agreement expressly states that it is governed by U.S. law and all of the transactions in the Customer's Account are subject to the provisions of the Securities

Exchange Act of 1934 and to the rules and regulations of the SEC, the Board of Governors of the
Federal Reserve System and the Commodities Futures Trading Commission.

70.    Kingate Global agreed that all disputes arising under the Customer Agreement
with BLMIS would be resolved by arbitration under the Federal Arbitration Act, to be conducted
in the United States before the American Arbitration Association, or "an arbitration facility
provided by any other exchange of which the broker is a member, or the National Association of
Securities Dealers, Inc. or the municipal securities rule-making board and in accordance with the
rules obtaining of the selected organization."

### C.    BLMIS Had Full Authority to Make and Execute Investment Decisions

71.    Kingate Global's Trading Authorization Agreement authorized BLMIS to be the
fund's "agent and attorney in fact," giving BLMIS full discretion over Kingate Global's invested
assets and to buy, sell and trade in securities for Kingate Global.

72.    As with each of the other Feeder Funds, BLMIS in New York acted as Kingate
Global's investment manager and purported to invest exclusively according to Madoff's split-
strike conversion strategy, which involved the purchase of U.S. securities traded only on
domestic exchanges.

73.    BLMIS acted as Kingate Global's executing broker in purporting to purchase
securities on Kingate Global's behalf, and acted as the fund's custodian for the securities
purportedly held on the fund's behalf.

### D.    Kingate Global Was Managed From New York

74.    During Tremont's tenure as co-manager of Kingate Global, and thereafter while it
continued to introduce investors to the fund in return for fees, it was a valuable contributor in
New York to the success of the fund.

75.     Tremont performed its co-management duties for Kingate Global in New York.
Suzanne Hammond, based in New York, signed a co-manager agreement entered into on
Tremont's behalf with Kingate Management Limited ("Kingate Management") and Kingate
Global.

76.     Under that agreement, Kingate Management and Tremont were obligated to
evaluate and monitor BLMIS, arrange accounting and administrative services and provide all
other necessary management services to Kingate Global.

77.     Kingate Global was also co-managed by Kingate Management, a management
entity formed by the founders of Kingate Global, Frederico Ceretti and Carlo Grosso.  Kingate
Management operated through its agents in New York.

78.     Kingate Management's New York-based director, Michael Tannenbaum, Esq.,
performed certain executive functions for Kingate Management, such as signing the co-manager
agreement with Tremont on Kingate Management's behalf.

79.     Kingate Management also appointed BLMIS as its agent, giving Kingate
Management itself a presence in New York

80.     Kingate Management engaged a consultant, FIM Limited and later FIM Advisers
LLP (together, "FIM") to perform due diligence on BLMIS.

81.     Although FIM had a London address, Eric Lazear, FIM's head of due diligence
for feeder fund investments, such as Kingate Global's investments with BLMIS, was located in
New York and worked with FIM's affiliate, FIM (USA) Inc. ("FIM (USA)").

82.     FIM (USA) was the hub for FIM's feeder fund due diligence.  From New York,
FIM (USA) performed monitoring, research, and investor solicitation services for Kingate
Global.

83.    Kingate Management and the FIM entities actively participated in Kingate

Global's business with BLMIS and knew BLMIS purported to invest U.S. securities traded over

U.S. exchanges in New York.

**E.    Kingate Global Used Banks in New York**

84.    Kingate Global used New York banks to deposit funds with BLMIS, transferring

investor funds to, and obtaining money from, the BLMIS account at JPMorgan Chase & Co.

85.    Kingate Management also engaged HSBC Bank N.A. ("HSBC"), a major

international financial institution doing business in the United States as Kingate Global's

custodian.

86.    In its role as Kingate Global's custodian, HSBC consistently used New York

banks in carrying out its duties for Kingate Management and Kingate Global relating to

investments with BLMIS.

87.    FIM also directed fee payments to be routed through a bank account in New

York.

88.    The Trustee incorporates by reference the allegations of the Fourth Amended

Complaint filed in *Picard v. Frederico Ceretti, et al.*, Adv. Pro. No. 09-01161 (SMB), Dkt. No.

100 (Bankr. S.D.N.Y. Mar. 17, 2014).

Dated: June 26, 2015          /s/ Tracy L. Cole
        New York, New York    **Baker & Hostetler LLP**
                              45 Rockefeller Plaza
                              New York, New York 10111
                              Telephone:  (212) 589-4200
                              Facsimile:  (212) 589-4201
                              David J. Sheehan
                              Regina L. Griffin
                              Tracy L. Cole
                              Loura Alaverdi
                              A. Mackenna Mosier
                              Samuel M. Light

                              *Attorneys for Irving H. Picard, Trustee*
                              *for the Substantively Consolidated SIPA*
                              *Liquidation of Bernard L. Madoff Investment*
                              *Securities LLC and the Estate of Bernard L.*
                              *Madoff*