# EXHIBIT A

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Keith R. Murphy
Tatiana Markel
Ferve Khan

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | Adv. Pro. No. 08-01789 (SMB) SIPA LIQUIDATION (Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>ESTATE OF DAVID R. MARKIN, MITCHELL D. SCHEPPS, as personal representative of the Estate of David Markin, and DAVID R. MARKIN CHARITABLE REMAINDER UNITRUST #1,<br><br>                    Defendants. | Adv. Pro. No. 10-05224 (SMB) |

## SECOND AMENDED COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll* ("SIPA"),[1] and the consolidated chapter 7 estate of Bernard L. Madoff ("Madoff"), individually, by and through his undersigned counsel, for the Trustee's second amended complaint (the "Complaint"), states as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by Madoff. Over the course of the scheme, there were more than 8,000 client accounts at BLMIS. In early December 2008, BLMIS generated client account statements for its approximately 4,900 open client accounts. When added together, these statements purport to show that clients of BLMIS had approximately $65 billion invested with BLMIS. In reality, BLMIS had assets on hand worth a small fraction of that amount. On March 12, 2009, Madoff admitted to the Ponzi scheme and pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in prison.

2.      Defendants were beneficiaries of this Ponzi scheme. On December 16, 1996, David R. Markin ("Markin") created, as the maker, or "Settlor," the David Markin Charitable Remainder Unitrust #1 ("CRUT #1"). As the Settlor of CRUT #1, Markin named himself as the trustee.

3.      Markin also named himself as the beneficiary of CRUT #1 and named two charities as the "Charitable Remaindermen."

4.      Under the terms of the trust, Markin, as the Settlor, had the power during his life to "amend or revoke all or any portion of the interest of any one or more Charitable Remaindermen and to appoint a remainder interest in this trust to one or more substitute or additional Charitable

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

Remaindermen in such amounts in such amounts and in such proportion as [the Settlor] deem appropriate."

5.       Upon information and belief, Markin, did amend the Charitable Remaindermen at least 5 times, pursuant to: (i) Amendment of Charitable Beneficiary Designation, dated March 14, 1997; (ii) Second Amendment of Charitable Beneficiary Designation, dated October 29, 1997, (c) Instrument Comprising (1) Third Amendment of Charitable Beneficiary Designation and (2) Direction to Trustee as to Partial Acceleration of Charitable Remainder, dated September 10, 1999; (d) Instrument Comprising (1) Fourth Amendment of Charitable Beneficiary Designation and (2) Direction to Trustee as to Acceleration of Entire Charitable Remainder, dated April 12, 2000; and (e) Instrument Comprising Fifth Amendment and irrevocable designation of Charitable Beneficiary Designation, dated July 20, 2004.  The July 20, 2004 irrevocable designation was to Markin's own foundation, David R. Markin Foundation, Inc.

6.       Under the terms of the trust, as trustee, Markin had full administrative and investment powers, and had the power to commence and defend litigation on behalf of CRUT #1.

7.       In January 1997, Markin opened a BLMIS account bearing the number 1M0091 (the "Account") in the name of CRUT #1.  Markin executed the account opening documents in his own name and contributed $4,000,000 to the Account.  All correspondence with BLMIS in connection with the Account was signed by Markin individually, without designation that he was acting as trustee for CRUT #1.

8.       On August 17, 2004, Markin wrote to the IRS seeking an early termination of CRUT #1.  Markin asked for a ruling that, among other things, CRUT #1's early termination would not constitute an act of self-dealing under the Internal Revenue Code, and that any proceeds Markin personally received upon termination would be treated as long term capital gains.

9.      On March 27, 2007, the IRS responded to Markin that his early termination of CRUT #1 would still provide him with the favorable tax treatment that he sought, provided he distributed the assets to the beneficiaries based on a certain formula set forth in the Internal Revenue Code.

10.     On March 29, 2007, Markin wrote a letter to BLMIS seeking the termination of the Account and the withdrawal of all funds.

11.     From December 11, 2006 to December 11, 2008, BLMIS transferred $16,107,533 to Markin, as the trustee of CRUT #1.  Of that amount, the Trustee's investigation has revealed that $12,107,533 (the "Two-Year Transfers") represented fictitious profits from the Ponzi scheme.

12.     Markin exercised dominion and control over CRUT #1's assets and the Two-Year Transfers.

13.     As the beneficiary of CRUT #1, Markin was also the the person for whose benefit the Two-Year Transfers were made.

14.     Upon receipt of the Two-Year Transfers, Markin made three transfers of the proceeds to himself, as follows: (i) $9,475,604.32 on or around March 30, 2007; (ii) $198,552.97 on or around April 11, 2007; and (iii) $49,148.09 on our around June 7, 2007 (the "Markin Transfers").  The balance of the Two-Year Transfers were transferred to various charities.

15.     Markin died on May 30, 2013.  The Trustee therefore seeks to avoid and recover the Two-Year Transfers, inclusive of the Markin Transfers, from the Estate of David R. Markin ("Markin Estate") through its personal representative, Mitchell D. Schepps ("Personal Representative").

## JURISDICTION AND VENUE

16.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and sections 78eee(b)(2)(A) and (b)(4) of SIPA.

17.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

18.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

19.    This adversary proceeding is brought pursuant to sections 78fff(b) and 78fff-2(c)(3) of SIPA, sections 105(a), 502(d), 548(a), 550(a) and 551 of title 11 of the United States Code (the "Bankruptcy Code"), and other applicable law.

## DEFENDANTS

20.    CRUT #1 was a trust organized under the laws of the State of Florida.

21.    The Markin Estate is an estate being administered in the Circuit Court for Palm Beach County, Florida under File Number 502013CP002790.

22.    Mitchell D. Schepps was appointed as personal representative of the Markin Estate on June 13, 2013. Mr. Schepps maintains an address for service of process in West Palm Beach, Florida.

## BACKGROUND, THE TRUSTEE AND STANDING

23.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

24.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

25.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

        a.      appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

        b.      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

        c.      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

26.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

27.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

28.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against

him by the United States Attorney for the Southern District of New York. At the plea hearing,

Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

29.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

30.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

31.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

32.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.

Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

33.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

34.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b) and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

35.    The Trustee has standing to object to customer and creditor claims under SIPA § 78fff-1(a) and 78fff(b), and 11 U.S.C. § 502(a), because the Trustee has the power and authority to discharge obligations to a customer to the extent they are established to the satisfaction of the Trustee under SIPA §§ 78*lll*(2) and 78fff-2(b).  By his objection, the Trustee seeks disallowance of any customer and general creditor claims that are unenforceable against the Debtors or their property under (i) SIPA § 78fff-2(b), because such claims have not been established to his satisfaction; (ii) SIPA § 78*lll*(2), because such claims are not entitled to a distribution *pari passu* with other customers;  and (iii) 11 U.S.C. § 502(b)(1), because such claims are otherwise unenforceable under applicable law.

## BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### I.    BLMIS

36.    Madoff founded BLMIS in 1960 as a sole proprietorship.  In 2001, Madoff registered BLMIS as a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

37.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer from January 19, 1960 through December 31, 2008. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database ("MMS") also reflects BLMIS's registration with the Securities and Exchange Commission ("SEC") as a securities broker-dealer from January 19, 1960 through December 31, 2008. On December 30, 1970, BLMIS became a member of SIPC and continued its membership without any change in status until the Filing Date. SIPC membership is contingent on registration of the broker-dealer with the SEC.

38.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

39.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

40.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

41.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total assets under management of $17.1 billion. In reality, Madoff grossly understated these numbers. In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in assets under management. At all times, BLMIS's Form ADVs were publicly available.

## II.    THE PONZI SCHEME

42.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, Joanne Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

43.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

44.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one

was a licensed CPA, one employee was an administrative assistant, and one was a semi-retired accountant living in Florida.

45.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

*Madoff's Investment Strategy*

46.     BLMIS purported to execute two primary investment strategies for IA Business customers:  the convertible arbitrage strategy and the split strike conversion strategy ("SSC strategy").  For a limited group of IA Business customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

47.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of IA Business accounts.

48.     From 1992 forward, Madoff began telling IA Business customers that he employed the SSC strategy for their accounts, even though in reality BLMIS never traded any securities for its IA Business customers.  All  funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not

used to trade securities, but rather to make distributions to, or payments for, other customers, to

benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

49.     BLMIS reported falsified trades using backdated trade data on monthly account

statements sent to IA Business customers that typically reflected substantial gains on the

customers' principal investments.

50.     The SSC strategy purported to involve: (i) the purchase of a group or basket of

equities (the "Basket") intended to highly correlate to the Standard & Poor's 100 Index (the "S&P

100 Index"), (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale

of out-of-the-money S&P Index call options.

51.     The put options were to control the downside risk of price changes in the Basket.

The exercise of put options could not turn losses into gains, but rather could only put a floor on

losses.  By definition, the exercise of a put option would entail a loss for BLMIS.

52.     The sale of call options would partially offset the costs associated with acquiring

puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would

make it difficult, if not impossible, for BLMIS to outperform the market, because in a rising

market, calls would be exercised by the counterparty.

53.     The simultaneous purchase of puts and calls to hedge a securities position is

commonly referred to as a "collar."  The purpose of the collar is to limit exposure to volatility in

the stock market and flatten out returns on investment.

54.     For the SSC strategy to be deployed as Madoff claimed, the total value of each of

the puts and calls purchased for the Basket had to equal the notional value of the Basket.  For

example, to properly implement a collar to hedge the $11.7 billion of assets under management

that Madoff publicly reported in 2006 would have required the purchase of call and put options

with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

55.    Moreover, at all times that BLMIS reported its total assets under management, publicly available information about the volume of exchange-traded options showed that the volume of options contracts necessary to form the collar and implement the SSC strategy exceeded the available options.

56.    Sophisticated or professional investors knew that Madoff could not be using the SSC strategy because his returns drastically outperformed the market.  Not only did BLMIS regularly show gains when the S&P 100 Index was down (at times significantly), it would also post gains that exceeded (at times, significantly) the S&P 100 Index's performance.  Such results were impossible if BLMIS had actually been implementing the SSC strategy.

*BLMIS's Fee Structure*

57.    BLMIS charged commissions on purportedly executed trades rather than management and performance fees based on the value of assets under management, but by using a commission-based structure, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

*BLMIS's Market Timing*

58.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he achieved market timing by intermittently taking customer funds out of the market. During those times, Madoff purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.

59.     BLMIS's market timing, as reported on its customer statements, showed an uncanny ability to buy low and sell high, an ability so uncanny, that any sophisticated or professional investor, including the Defendant[s], could see it was statistically impossible. BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every quarter and year end.

60.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win every time.  Yet this is precisely what BLMIS's customer statements reported.

61.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the SSC strategy, which relied on holding long positions rather than on short-term speculative trading.

62.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

63.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing

Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

*The Collapse of the Ponzi Scheme*

64.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

65.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

66.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## THE TRANSFERS

67.     According to BLMIS's records, the Account was maintained with BLMIS, as set forth on Exhibit A. For the Account, a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements") were executed and delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

68.     The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Account was held in New York, New York, and Markin caused funds to be sent to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York. Between the date the Account was opened and the Filing Date, Markin caused deposits to be made into the Account at BLMIS through checks and/or wire transfers to the BLMIS Bank Account for the purpose of BLMIS investing the funds.

69.     During the two years prior to the Filing Date, BLMIS made the Two-Year Transfers to CRUT #1 for the benefit of Markin, as Settlor and beneficiary of CRUT #1.  The Two-Year Transfers were made under Markin's direction and exclusive control.  The Two-Year Transfers constitute non-existent profits supposedly earned in the Account, but, in reality, they were other people's money. The Two-Year Transfers are set forth in Columns 10 and 11 on Exhibit B annexed hereto.

70.     Of the Two-Year Transfers (totaling $12,107,533), Markin directed the Markin Transfers (totaling $9,723,305.35) be transferred to him personally.  Markin directed that the remainder of the Two-Year Transfers be disbursed to various charities.

71.     The Two-Year Transfers are avoidable and recoverable under sections 548(a), 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). See Exhibit B, Column 10.

72.     The Two-Year Transfers, or the value thereof, are recoverable from the Defendants pursuant to SIPA section 78fff-2(c)(3) and section 550(a) of the Bankruptcy Code.

73.     The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the transfers; and (ii) seek avoidance and recovery of such transfers.

## CUSTOMER CLAIMS FOR RELATED ACCOUNT

74.     In addition to the Account, Markin held another BLMIS account in the name "David R. Markin," bearing BLMIS account number 1M0211 (the "Related Account").

75.     On or about February 17, 2009, a customer claim was filed with the Trustee which the Trustee has designated as Claim # 002690, and on or about June 1, 2009, a duplicate customer claim was filed with the Trustee which the Trustee has designated as Claim # 009175 (the "Related Account Customer Claims"). Because the Two-Year Transfers are avoidable and recoverable from

the Markin Estate and the Personal Representative, as Markin's successors, the Related Account

Customer Claims are temporarily disallowed under 11 U.S.C. § 502(d).

## COUNT ONE

## FRAUDULENT TRANSFERS – 11 U.S.C. §§ 105(a), 548(a)(1)(A), 502(d), 550(a) AND 551

76.    To the extent applicable, the Trustee incorporates by reference the allegations

contained in the previous paragraphs of this Complaint as if fully rewritten herein.

77.    Each of the Two-Year Transfers was made within two years before the Filing Date.

78.    Each of the Two-Year Transfers constituted a transfer of an interest of BLMIS in

property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section

78fff-2(c)(3) of SIPA.

79.    Each of the Two-Year Transfers was made by BLMIS with the actual intent to

hinder, delay or defraud some or all of BLMIS's then existing and/or future creditors.

80.    Markin was the initial transferee of each of the Two-Year Transfers to CRUT #1,

because (i) the Two-Year Transfers were made for his  benefit, as Settlor and beneficiary; (ii)

Markin directly received the Two-Year Transfers as trustee of CRUT #1; and (iii) Markin

exercised dominion and control over CRUT #1 and its assets.

81.    Each of the Two-Year Transfers constitutes a fraudulent transfer avoidable by the

Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Defendants

CRUT #1, the Markin Estate, and the Personal Representative pursuant to section 550(a) of the

Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

82.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(A),

550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a

judgment: (a) avoiding and preserving the Two-Year Transfers; (b) directing that the Two-Year

Transfers be set aside; (c) recovering the Two-Year Transfers, or the value thereof, from the

CRUT, the Markin Estate, and/or the Personal Representative for the benefit of the BLMIS estate; (d) disallowing the Related Account Customer Claims until such time as the Two-Year Transfers are repaid to the Trustee pursuant to 502(d) of the Bankruptcy Code; and (e) awarding any other relief the Court deems just and appropriate.

## COUNT TWO

## RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 105(a), 502(d) AND 550(a)

83.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

84.     Each of the Two-Year Transfers is avoidable under section 548(a)(1)(A) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

85.     Markin directed the Markin Transfers to be transferred from CRUT #1 to himself and, as such, the Markin Transfers are recoverable from the Markin Estate and the Personal Representative.

86.     The Markin Estate and the Personal Representative are immediate or mediate transferees of the Markin Transfers.

87.     As a result of the foregoing, pursuant to sections 105(a), 502(d) and 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Markin Estate and the Personal Representative: (a) recovering the Markin Transfers, or the value thereof, from the Markin Estate and the Personal Representative for the benefit of the BLMIS estate; (b) disallowing the Related Account Customer Claims until such time as the Markin Transfers are repaid to the Trustee; and (c) awarding any other relief the Court deems just and appropriate.

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

17

i.      On the First Claim for Relief, pursuant to sections 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, judgment: (a) avoiding and preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside; (c) recovering the Two-Year Transfers, or the value thereof, from the Defendants for the benefit of the BLMIS estate; (d) disallowing the Related Account Customer Claims until such time as the Two-Year Transfers are repaid to the Trustee; and (e) awarding any other relief the Court deems just and appropriate;

ii.     On the Second Claim for Relief, pursuant to sections 105(a), 502(d), and 550(a) of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) recovering the Markin Transfers, or the value thereof, from the Markin Estate and the Personal Representative, for the benefit of the BLMIS estate; (b) disallowing the Related Account Customer Claims until such time as the Markin Transfers are repaid to the Trustee; (c) awarding any other relief the Court deems just and appropriate;

iii.    On All Claims for Relief, impressing the Defendants' property or the proceeds, product and offspring of such property, with an equitable lien and/or a constructive trust in favor of the Trustee for the benefit of the estate, to the extent that the Transfers were used, in whole or in part, to purchase, improve and/or maintain such property;

iv.     On All Claims for Relief, establishing a constructive trust over all the Transfers and their proceeds, product and offspring in favor of the Trustee for the benefit of the estate;

v.      On All Claims for Relief, pursuant to federal common law, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

vi.      On All Claims for Relief, awarding the Trustee all applicable interest, costs and

disbursements incurred in this proceeding; and

vii.     On All Claims for Relief, granting the Trustee such other, further, and different

relief as the Court deems just, proper, and equitable.

Date:   October 18, 2017
        New York, New York

By: */s/ Keith R. Murphy*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Tatiana Markel
Email: tmarkel@bakerlaw.com
Ferve Khan
Email: fkhan@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and the Estate of
Bernard L. Madoff*

Exhibit A

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| DAVID R MARKIN CHARITABLE REMAINDER UNITST #1 CHAIRMENS CLUB | 1M0091 |

**BLMIS ACCOUNT NO. 1M0091 - DAVID R MARKIN CHARITABLE REMAINDER UNITST #1 CHAIRMENS CLUB**

| | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Date | Transaction Description as Reported in Customer Statement | Amount as Reported in Customer Statement | Deposits | Withdrawals | Transfers In | Transfers Out | Balance of Principal | 90-Day Preferential Initial Transfers | 2-Year Fraudulent Transfers | 2-Year Principal Transfers | 2-Year Initial Transfers |
| | 1/21/1997 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 4,000,000 | - | - | - | - |
| | 3/30/2007 | CHECK WIRE | (16,059,086) | - | (16,059,086) | - | - | (12,059,086) | - | (12,059,086) | (4,000,000) | (16,059,086) |
| | 5/31/2007 | CHECK | (48,447) | - | (48,447) | - | - | (12,107,533) | - | (48,447) | - | (48,447) |
| | | Total: | | $ 4,000,000 | $ (16,107,533) | $ - | $ - | $ (12,107,533) | $ - | $ (12,107,533) | $ (4,000,000) | $ (16,107,533) |