**Opposition Due: September 25, 2017**
**Replies Due:  October 25, 2017**

**Related ECF Nos. 78, 79, 80, 81 and 86**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

| | |
|---|---|
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04387 (SMB) |
| Plaintiff, | |
| v. | |
| JAMES LOWREY, individually and in his capacity as general partner of Turtle Cay Partners, in his capacity as personal representative of the Estate of Marianne Lowey, and in his capacity as successor partner of Coldbrook Associates Partnership, *et al.*, | |
| Defendants. | |

## TRUSTEE'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ........................................................................................ 3

I.     The Antecedent Debt Decision Has *Stare Decisis* Effect on Defendants' Avoidance Action ................................................................. 3

    A.    The Rejection Of Defendants' Arguments Was Law of the Case Even Before The *Cohen Decision* ...................................... 3

    B.    The *Antecedent Debt Decision* Addressed The Same Issues Now Raised Again By Defendants Before This Court ...................... 6

        1.    Defendants' Alleged Claims Under Federal Securities And State Law Were Previously Considered And Rejected ................. 6

        2.    Trustee's Alleged Failure To Avoid Obligations Owed To Defendants Was Also Considered And Rejected .......................... 8

        3.    Defendants' "At The Time Of Transfer" Value Defense Is Another Recycled And Rejected Argument ................................. 9

        4.    Section 548(a) As A Purported Statute Of Repose Prohibiting Avoidance of BLMIS's Obligations And Debts Was Previously Rejected ............................................. 10

        5.    Defendants' Allegations That The Trustee Improperly Expanded His Bankruptcy Powers Were Unfounded ................. 10

    C.    Defendants Are Collaterally Estopped By The *Antecedent Debt Decision* ................................................................. 11

    D.    The Trustee Is Not Estopped By The *Cohen Decision* ........................... 12

II.    DEFENDANTS' STRAINED READING OF THE SECTION 546(e) DECISION IS WITHOUT MERIT ................................................ 13

    A.    Defendants Improperly Invoke The Mandate Rule ................................. 13

        1.    The Section 546(e) Decision Did Not Determine The Enforceability Or Validity Of BLMIS Customers' Securities Contracts And Settlement Payments ...................... 14

        2.    The Section 546(e) Decision Did Not Hold That The Trustee's Avoidance Action Was Solely Governed By The Bankruptcy Code ............................................... 16

# TABLE OF CONTENTS
## (continued)

**Page**

        3.     The Section 546(e) Decision Did Not Make Any Ruling About Defendants' Value Defense ............................................... 17

III.     BLMIS'S OPERATION AS A PONZI SCHEME IS BOTH LEGALLY SIGNIFICANT AND FATAL TO DEFENDANTS' ATTEMPTS TO RETAIN FICTITIOUS PROFITS ....................................................................... 19

     A.     The Ponzi Scheme Terminology Applied Here Has Been Endorsed By The District Court and The Ponzi Scheme Principals Governing This Case Are Universal .......................................................................... 19

     B.     There Is No Basis To Treat Equity Investors And Contractual Customers Differently............................................................................. 24

CONCLUSION....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.R. Baron Co., Inc.*,
226 B.R. 790 (Bankr. S.D.N.Y. 1998) ...................................................................................7

*Balaber–Strauss v. Sixty–Five Brokers (In re Churchill Mortg. Inv. Corp.)*,
256 B.R. 664 (Bankr. S.D.N.Y. 2000) ................................................................................22

*Ball v. A.O. Smith Corp.*,
451 F.3d 66 (2d Cir. 2006) ...............................................................................................11

*In re Bernard L. Madoff Inv. Sec. LLC*,
654 F.3d 229 (2d Cir. 2011) .....................................................................................7, 14, 22

*In re Bernard L. Madoff Inv. Sec. LLC*,
No. 16-413-BK(L), 2017 WL 2376567 (2d Cir. June 1, 2017) ..................................14, 15, 22

*Cunningham v. Brown*,
265 U.S. 1 (1924) .............................................................................................................21

*Day v. Moscow*,
955 F.2d 807 (2d Cir. 1991) ..............................................................................................14

*Eby v. Ashley*,
1 F.2d 971 (4th Cir. 1924) .................................................................................................21

*Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*,
452 B.R. 391 (Bankr. S.D.N.Y. 2011) ................................................................................21

*In re Hechinger Inv. Co. of Del., Inc., v. Universal Forest Prods., Inc. (In re Hechinger Inc. Co. of Del., Inc.)*,
489 F.3d 569 (3d Cir. 2007) ................................................................................................6

*Kerman v. City of New York*,
374 F.3d 93 (2d Cir. 2004) ..................................................................................................4

*In re Madoff Sec.*,
No. 12 Misc. 0115 (JSR) (S.D.N.Y. May 16, 2012), ECF No. 107 ................................. *passim*

*Montana v. United States*,
440 U.S. 147 (1979) .........................................................................................................11

*New Hampshire v. Maine*,
532 U.S. 742 (2001) .........................................................................................................11

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Picard v. Cohen*,
    Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr.
    25, 2016) ................................................................................................ *passim*

*Picard v. Cohen*,
    550 B.R. 241 (Bankr. S.D.N.Y. 2016) ...................................................................4

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) .................................................................21

*Picard v. Greiff*,
    476 B.R. 715 (S.D.N.Y. 2012) ............................................................... *passim*

*Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    721 F.3d 54 (2d Cir. 2013) ....................................................................8, 19, 20

*Randall v. Sorrell*,
    548 U.S. 230 (2006) .............................................................................................6

*Scholes v. Lehman*,
    56 F.3d 750 (7th Cir. 1995 ..................................................................................23

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015) ..................................................... *passim*

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    499 B.R. 416 (S.D.N.Y. 2013) ............................................................... *passim*

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    773 F.3d 411 (2d Cir. 2014) ................................................................... *passim*

*Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Invs. Assocs.)*,
    48 F.3d 470 (10th Cir. 1995) ..............................................................................24

*Silverman v. Cullin (In re Agape World, Inc.)*,
    633 F. App'x. 16 (2d Cir. Feb. 4, 2016) ...............................................13, 18, 22

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) ...........................................................................................11

*In re Teligent, Inc.*,
    380 B.R. 324 (Bankr. S.D.N.Y. 2008) ..................................................................5

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Langley,*
    62 F.3d 602 (4th Cir. 1995) ................................................21

*United States v. Uccio,*
    940 F.2d 753 (2d Cir.1991).................................................14

*Estate of Wood v. C.I.R.,*
    909 F.2d 1155 (8th Cir. 1990) .............................................21

*Wyly v. Weiss,*
    697 F.3d 131 (2d Cir. 2012)................................................11

**Statutes**

11 U.S.C.A. § 741(7)(A)(i) .....................................................5

11 U.S.C. § 546(e) ................................................15, 16, 17

15 U.S.C. § 78aaa–*lll* ..............................................................1

15 U.S.C. § 78fff(b) ..............................................................17

Bankruptcy Code § 548(a)(1)(A)...................................16, 17

Bankruptcy Code § 548(c) ........................7, 8, 17, 18, 22

**Rules**

Bankruptcy Rule 9033 ........................................................13

**Other Authorities**

*Black's Law Dictionary* 1443 (8th ed. 2004)........................11

Irving H. Picard (the "Trustee"), trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa–*lll*, and the Chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, respectfully submits this reply memorandum of law in further support of the Trustee's motion in the above-captioned adversary proceeding ("Avoidance Action") for summary judgment (the "Trustee's Motion"), on Count Two of the Trustee's complaint to avoid and recover as fraudulent transfers the amounts BLMIS fraudulently transferred to defendants James Lowrey, the Estate of Marianne Lowrey, Turtle Cay Partners, and Coldbrook Associates Partnership ("Defendants").[1]  Summary judgment should be granted because the Trustee has established that the transfers at issue were fraudulent and Defendants have failed to establish that they provided value in exchange for the transfers.[2]  The facts underlying the Trustee's Motion are set forth in the Joint Statement of Undisputed Material Facts (the "Joint Statement")[3] submitted by the Trustee and Defendants (together, the "Parties"), and so ordered by this Court on June 27, 2017 (ECF No. 75).

## PRELIMINARY STATEMENT

Defendants' assertion that they are raising "important legal issues" that have not been decided before is belied by prior decisions and orders in this proceeding.  Defendants fail to acknowledge that the District Court previously withdrew the reference to the Bankruptcy Court and decided the same "important legal issues" they now reference.  Not only did Defendants

---

[1] Unless otherwise defined, terms capitalized herein shall have the meaning ascribed to them in the Trustee's Motion.  *See* ECF No. 79.

[2] On August 11, 2017, Defendants filed their own motion for summary judgment (the "Defendants' Motion").  *See* ECF Nos 83 and 84.  On September 25, 2017, the Trustee filed his opposition to Defendants' Motion (the "Trustee's Opposition").  *See* ECF No. 87

[3] A true and correct copy of the Joint Statement was attached as <u>Exhibit A</u> to the Murphy Declaration in support of the Trustee's Motion.  *See* ECF No. 80.

agree to participate in consolidated briefings before the District Court on the issues they raise again here, but they also *explicitly* waived their rights to revisit these arguments when their cases were returned to the Bankruptcy Court. Pursuant to the District Court's "Order Relates to Consolidated Briefings on Antecedent Debt Issues," Defendants were expressly included as participants (as joinders to a lead case's motion to withdraw the reference), the scope of the antecedent debt and value issues were defined, and those issues were decided by the District Court on the merits. *In re Madoff Sec.*, No. 12 Misc. 0115 (JSR) (S.D.N.Y. May 16, 2012), ECF No. 107 ("Antecedent Debt Order").[4] That Court specifically stated that "a customer may only seek the protections of section 548(c) to the extent of investments of principal." *Antecedent Debt Decision*, 499 B.R. at 426. That should end the inquiry.

Instead, by recycling the same arguments—however reworded or repackaged—and seeking reconsideration of the Withdrawn Antecedent Debt Issue (as defined in the Antecedent Debt Order and below), Defendants are disregarding the Antecedent Debt Order and *Antecedent Debt Decision* and are trying to have yet another bite at the apple. Defendants are estopped from doing so based on the law of the case.

In an attempt to evade the straightforward precedent that Defendants agreed to be bound by, they have twisted the holdings of intervening decisions, including the *Section 546(e)* Decision. However, the authority upon which they rely does not further their cause. To the contrary, all relevant precedent continues to confirm that Defendants are not entitled to profit from the fraud, and giving credence to their arguments would be tantamount to validating the machinations of the fraudster, which courts within this Circuit have unequivocally refused to do

---

[4] For this Court's convenience, a true and correct copy of the Antecedent Debt Order as filed with the District Court, is attached hereto as <u>Exhibit A</u>.

on multiple occasions.    The District Court previously rejected Defendants' arguments as insufficient as a matter of law.    This time, this Court should additionally reject Defendants' arguments as barred based on the law of the case because Defendants all participated in the litigation resulting in the *Antecedent Debt Decision*, and had ample opportunity to fully litigate the issues raised in their briefs.

## ARGUMENT

I.    **THE ANTECEDENT DEBT DECISION HAS *STARE DECISIS* EFFECT ON DEFENDANTS' AVOIDANCE ACTION**

   A.    **The Rejection Of Defendants' Arguments Was Law of the Case Even Before The *Cohen Decision***

As an initial matter, Defendants argue that the Court's decision in *Picard v. Cohen,* Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016), ECF No. 90 (the "*Cohen Decision*"), cannot have a *stare decisis* effect on the Avoidance Action because it "did not decide important legal issues that [they] now raise." (Opposition at 15).    However, given the commonality in the stipulated facts entered in the *Cohen* proceeding and the Avoidance Action, Mr. Cohen and Defendants have the same factual predicate, making the application of the *Cohen Decision* appropriate here.    *Compare Cohen Decision*, 2016 WL 1695296, at *2-3, with Joint Statement.    Defendants have no basis for their argument that the Court should deviate from the precedent set in the *Cohen Decision.*

More importantly, while the law of the case doctrine does have application in these proceedings, the relevant law is found in *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 499 B.R. 416 (S.D.N.Y. 2013) ("*Antecedent Debt Decision*"), not *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, (In re Madoff Sec.*), 773 F.3d 411, 418-19 (2d Cir. 2014) ("*Section 546(e) Decision*"))*.*    Defendants fail to acknowledge that they were part of the underlying briefings for the District Court's *Antecedent Debt Decision*, and are thus bound

3

by it for all legal issues expressly and impliedly addressed therein.[5]   The *Antecedent Debt Decision* remains the law of the case and Defendants' attack on the decision should be rejected. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 531 B.R. 439, 469-70 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*").

As this Court earlier observed, defendants in this liquidation proceeding "have had several opportunities to present their antecedent debt/value arguments, those arguments have been rejected, and hearing them again will not add value to the disposition of the antecedent debt/value defense in this Court." *Picard v. Cohen*, 550 B.R. 241, 255 (Bankr. S.D.N.Y. 2016). Thus, "the rejection of their antecedent debt/value defense is already *stare decisis* and in most instances law of the case." *Id.; see also Omnibus Good Faith Decision,* 531 B.R. at 465 (stating that defendants "have had their day in court and Judge Rakoff's decisions are law of the case").[6]

In connection with the *Antecedent Debt Decision,* the District Court ordered consolidated briefings after granting motions to withdraw the reference to the Bankruptcy Court filed by Defendants, among others in approximately 600 adversary proceedings, to determine:

> whether and to what extent (i) transfers made by Madoff Securities that the Trustee seeks to avoid were made in exchange for value, such as antecedent debts that Madoff Securities owed to the Antecedent Debt Defendants at the time of the transfers; and (ii) obligations incurred by Madoff Securities may be avoided by the Trustee, including whether they were exchanged for value, such as antecedent debts owed to the Antecedent Debt Defendants (the "Withdrawn Antecedent Debt Issue").

---

[5] *See* Memorandum Of Law In Support of Motion to Withdraw Reference to the Bankruptcy Judge, ECF No. 27.  *See also* Antecedent Debt Order at Exhibit A.

[6] Defendants' active participation in the antecedent debt and *Cohen* proceedings within this SIPA proceeding is unlike the circumstances presented in *Picard v. Roman*, Adv. Pro. No. 10-04292, where the Court declined to hold that *stare decisis* applied to decisions involving unrelated cases by other district court judges in this district. *See* Memorandum Decision and Order Granting in Part and Denying in Part Trustee's Motion to Compel Discovery, *Picard v. Roman*, Adv. Pro. No. 10-04292 ECF No. 107.  Here, the same parties are litigating the same issue.

Antecedent Debt Order at 4.  The Antecedent Debt Order further provided (and all participating parties agreed) that "the resolution of these issues will govern all pending motions to withdraw the reference and those pending motions to dismiss that have not yet been fully briefed and argued." *Id.* at 2.  The participating parties also agreed that Exhibit A to the Antecedent Debt Order identified "the lead case of related adversary proceedings where defendants are represented by common counsel, in which [defendants] have filed motions to withdraw the reference (or joined in such motions, which joinders are deemed included in the scope of this Order. . .)" based on the Withdrawn Antecedent Debt Issue.  *Id.*  Here, all Defendants were party to, and are bound by, the Antecedent Debt Order and subsequent *Antecedent Debt Decision.*

Crucially, the Antecedent Debt Order expressly provided that "the procedures established by this Order, or by further Order of this Court, *shall constitute the sole and exclusive procedures for determination of the Withdrawn Antecedent Debt Issue in the Adversary Proceedings* (except for any appellate practice resulting from such determination), and this Court shall be the forum for such determination."  Antecedent Debt Order at 7 (emphasis added). Moreover, the District Court made clear that once the *Antecedent Debt Decision* was issued, all affected actions would "be returned to the Bankruptcy Court for further proceedings *consistent with this Opinion and Order.*"  *Antecedent Debt Decision,* 499 B.R. at 416 (emphasis added) *cert. denied*, 987 F.Supp.2d 309 (S.D.N.Y. Dec. 2013).  As a result, each time Defendants attempt to re-litigate the Withdrawn Antecedent Debt Issue, as they are doing here, they are doing so in direct violation of the Antecedent Debt Order.  Such tactics should not be condoned.[7]

---

[7] Notwithstanding the fact that Defendants agreed to a procedure whereby the Withdrawn Antecedent Debt Issue would be fully and finally decided on the merits in these "Adversary Proceedings" over five years ago by voluntarily participating in the drafting of, and agreeing to be bound by, the Antecedent Debt Order, Defendants are rearguing these very same issues for at least the fifth time before this Court. Such delays at the expense of the net loser victims—who have not yet recovered their full principal

**B.    The *Antecedent Debt Decision* Addressed The Same Issues Now Raised Again By Defendants Before This Court**

As Defendants admit, *stare decisis*, literally to "stand by things decided," is "the basic legal principle that commands judicial respect for a court's earlier decisions and the rules of law they embody." *Randall v. Sorrell*, 548 U.S. 230, 243 (2006).  *Stare decisis* thereby "avoids the instability and unfairness that accompany disruption of settled legal expectations." *Id.*  For this reason, the rule of law demands that adhering to the prior decisions in this liquidation proceeding be the norm.  *See Black's Law Dictionary* 1443 (8th ed. 2004) (*stare decisis* is "[t]he doctrine of precedent, under which it is necessary for a court to follow earlier judicial decisions when the same points arise again in litigation").  Here, Defendants argue that their contentions relating to the antecedent debt/value defense are not subject to any *stare decisis* effect, but the District Court exhaustively considered and settled these same issues in the *Antecedent Debt Decision.*[8]

**1.    Defendants' Alleged Claims Under Federal Securities And State Law Were Previously Considered And Rejected**

The District Court rejected Defendants' arguments that the transfers of profits from BLMIS satisfied alleged antecedent debts and thus provided "value" for the profits received from BLMIS.  *Antecedent Debt Decision,* 499 B.R. at 423.  The District Court explained that even if BLMIS customers held valid claims under federal or state law, those claims did not provide

---

investments with BLMIS—is further basis to award prejudgment interest in favor of the Trustee for the reasons this Court articulated in *In re Teligent, Inc.,* 380 B.R. 324, 344 (Bankr. S.D.N.Y. 2008) (Bernstein, C.J.) (citing *In re Hechinger Inv. Co. of Del., Inc., v. Universal Forest Prods., Inc. (In re Hechinger Inc. Co. of Del., Inc.),* 489 F.3d 569, 579-80 (3d Cir. 2007).  As noted previously, the Trustee reserves his right to request a post-judgment hearing before this Court to determine the appropriate rate to apply to the calculation of such interest.

[8] Defendants make these same arguments not only in their moving papers herein, but also in their prior consolidated brief before the District Court pursuant to the Antecedent Debt Order.  *See* Consolidated Memorandum Of Law In Support of Motion To Dismiss Regarding Antecedent Debt Issues On Behalf On Withdrawal Defendants As Ordered By The Court On May 12, 2012, *In re Madoff Sec.,* No. 12 Misc. 0115 (JSR) (S.D.N.Y. June 25, 2012), ECF No. 199 ("Antecedent Debt Brief").

value under SIPA against the separate BLMIS customer property estate, which was "created as a priority estate intended to compensate customers only for their net-equity claims." *Id.* at 423-24; *see also id.* 422 n. 6.  According to the District Court:

> To the extent that defendants' state and federal law claims allow them to withhold funds beyond their net-equity share of customer property, those defendants are, in effect, making those damages claims against the customer property estate. Because their damages claims are not net-equity claims (or any other payments that are permitted to be made in SIPA's priority scheme), allowing such claims to be drawn out of the customer property estate would violate SIPA.  It is for this reason that only a defendant's investment of principal may count as "value" with respect to the customer property estate for purposes of section 548(c).

*Id.* (citing *Picard v. Greiff,* 476 B.R. 715, 728 (S.D.N.Y. 2012)) ("[W]hen determining whether a transferee provides value, SIPA requires consideration not only of whether the transfer diminishes the resources available for creditors generally, but also whether it depletes the resources available for the satisfaction of customers' net equity claims and other priority claims.").  To the extent that Defendants may have any state and federal law claims, those claims run against BLMIS's general estate, not the customer property estate.  *Id.*  (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011) ("*Second Circuit Net Equity Decision*")); *see also*, *In re A.R. Baron Co., Inc.*, 226 B.R. 790, 796 (Bankr. S.D.N.Y. 1998).  The District Court concluded that "it would significantly undo the SIPA scheme to allow customers to recast amounts received as something other than what they were—fictitious profits—and treat them as a claim for antecedent debts beyond the customer's net equity."  *Antecedent Debt Decision*, 499 B.R. at 425.  Therefore, under SIPA, "a customer may only seek the protections of section 548(c) to the extent of investments of principal, and federal and state law claims cannot be used to increase the amount to which a customer is entitled from the customer property estate."  *Id.* at 426.

### 2.    Trustee's Alleged Failure To Avoid Obligations Owed To Defendants Was Also Considered And Rejected

Defendants also assert purportedly new arguments that the payment of fictitious profits satisfied valid legal "obligations" under section 548(c).  (*See* Opposition at 16).  However, this is simply the antecedent debt argument under a different name, and it fails for the same reasons the District Court set forth in the *Antecedent Debt Decision*.

In particular, the District Court rebuffed claims that BLMIS's account statements constituted binding, enforceable obligations of BLMIS to its customers, as the amounts reported thereon were not "antecedent debts" that BLMIS owed to its customers.  *Id.* at 421 n. 4.  The District Court "reject[ed] defendants' contention that [BLMIS's] pre-reach-back-period account statements constitute[d] binding obligations of [BLMIS] to its customers that the Trustee must avoid."  *Id.*  The District Court found that the amounts reported on BLMIS account statements were "invalid and thus entirely unenforceable."  *Id.* (citing *Greiff*, 476 B.R. at 726) (stating "[a]ny entitlement defendants had to a return on their investment, then, depended on a representation that Madoff Securities had in fact generated a profit [but] [t]he complaints allege that Madoff Securities' representations in this regard were wholly fraudulent").  Such amounts therefore could not create valid obligations used to offset liabilities. [9] *Id.*

---

[9] Defendants' argument that the Trustee is "collaterally estopped" from avoiding obligations because of the *in pari delicto* doctrine is a red herring. (Opposition at 34-35) (citing *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013)).  There are, as discussed, no enforceable obligations to avoid.  Additionally, the doctrine does not apply to the Avoidance Action, because the Trustee set forth only statutory causes of actions under the Bankruptcy Code. *Cf. JPMorgan,* 721 F.3d at 63 (finding the Trustee's four common law claims of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, unjust enrichment, and money had and received, to be barred by the doctrine of *in pari delicto*); *see also Omnibus Decision*, 531 B.R. at 449-50.

### 3.    Defendants' "At The Time Of Transfer" Value Defense Is Another Rejected And Recycled Argument

Defendants further maintain that they raise new arguments that "value" must be measured at the time of transfer and from the transferee's perspective, and that they should not be precluded from raising the arguments now. (Opposition at 16). But the District Court did in fact consider and reject this line of argument in the *Antecedent Debt Decision* four years ago. This issue was expressly outlined in the Antecedent Debt Order, which provided that the District Court would hear and determine "whether and to what extent . . . transfers made by Madoff Securities that the Trustee seeks to avoid were made in exchange for value, such as antecedent debts that Madoff Securities owed to the Antecedent Debt Defendants *at the time of the transfers* . . ." Antecedent Debt Order, at 8 (emphasis added). The District Court also made it clear in its subsequent *Antecedent Debt Decision* that "even if defendants held legitimate discretionary brokerage accounts with Madoff Securities, they would have been entitled only to the securities in their accounts on the date of demand, and therefore older statements would have been unenforceable in any case." 499 B.R. at 421 n. 4.

Moreover, Defendants have conceded BLMIS was operating a Ponzi scheme at all relevant times, which means that if there were no legitimate trades of securities in Defendants' BLMIS accounts, then the only thing Defendants were supposedly giving "value" for was fictitious profits.[10] (Joint Statement ¶ 10).

---

[10] This also moots Defendants' argument that they may "retain the amounts due to them at the time of transfer based on their undisputed tort claims." (Opposition at 35-36). Such claims, even if they existed, would at most only qualify as claims against the general estate.

4.    **Section 548(a) As A Purported Statute Of Repose Prohibiting Avoidance of BLMIS's Obligations And Debts Was Previously Rejected**

Another purportedly new argument put forth by Defendants is that the Trustee's methodology for determining avoidance liability violates a purported statute of repose under section 548(a). However, this very same argument was raised by Defendants in their Antecedent Debt Brief. *See e.g.,* Antecedent Debt Brief, at *39-40 ("Like statutes of limitations, reach-back periods are statutes of repose established by legislatures in recognition of the fact that it would be unfair and unreasonable to force a person to litigate a particular issue more than a certain number of years after the occurrence giving rise to the claim.") (citation omitted).

The argument, which is nothing more than an effort to revive the "Reset to Zero" approach, was firmly rejected by the District Court in the *Antecedent Debt Decision.* 499 B.R. at 426-427, n.7. (rejecting Defendants' method in favor of the Trustee's netting approach); *see also* Trustee's Opposition at 29-38.

5.    **Defendants' Allegations That The Trustee Improperly Expanded His Bankruptcy Powers Are Unfounded**

Finally, Defendants repeat their claim that the Trustee is seeking "to expand his powers beyond the confines of avoidance provisions of the Bankruptcy Code" (Opposition at 6). Once again, the District Court rejected this argument in the *Antecedent Debt Decision.*

"[W]hile SIPA provides that a SIPA trustee is 'vested with the same powers and title with respect to the debtor and the property of the debtor … as a trustee in a case under Title 11,'" the District Court explained that under SIPA "the provisions of the Bankruptcy Code apply only '[t]o the extent consistent with the provisions of this chapter.'" 499 B.R. at 423. The District Court found that the Trustee's powers to avoid transfers under the Code "must be interpreted

10

through the lens of SIPA's statutory scheme." *Id.*   Given Defendants' participation in the antecedent debt proceeding, this Court should reject Defendants' argument as barred.

### C.    <u>Defendants Are Collaterally Estopped By The *Antecedent Debt Decision*</u>

Even if the *Antecedent Debt Decision* did not have *stare decisis* effect, then Defendants at the very minimum are collaterally estopped from challenging the same issues they have previously raised and addressed before the District Court in the Antecedent Debt proceedings.

Collateral estoppel, or "issue preclusion," bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment," even if the issue is presented in the context of a different claim in a subsequent suit.  *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001).  By "preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate," this doctrine protects against "the expense and vexation attending multiple lawsuits, conserv[es] judicial resources, and foste[rs] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *Montana v. United States,* 440 U.S. 147, 153–154 (1979); *see also Wyly v. Weiss*, 697 F.3d 131, 141 (2d Cir. 2012).

Collateral estoppel requires that "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits."  *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (citation omitted).   In the Avoidance Action, (1) Defendants' antecedent debt/value arguments are "identical" to those previously articulated in their Antecedent Debt Brief; (2) the issues were "actually litigated and decided" in the *Antecedent Debt Decision* as outlined above in Section I(B); (3) Defendants had multiple, fair opportunities to litigate the issues before this Court and/or the District Court; and (4) the Antecedent Debt

Order specified that by participating in the *Antecedent Debt Decision* consolidated briefings, Defendants were effectively "wav[ing] any issues raised or that could be raised…with respect to the Withdrawn Antecedent Debt Issue" in subsequent motion practice. Antecedent Debt Order at 6. As a result, Defendants are collaterally estopped by the *Antecedent Debt Decision.*

### D.    The Trustee Is Not Estopped By The *Cohen Decision*

As an argument of last resort, Defendants insist that the Trustee is estopped from arguing that the *Cohen Decision* binds Defendants because he "achieved his desired goal of litigating solely against the underfunded Mr. Cohen and barring the [Defendants] from participating in the *Cohen* proceeding." (Opposition at 18). However, Defendants are disingenuous concerning the extent of their involvement in the *Cohen* proceeding. While barred from formally intervening, defense counsel for Andrew H. Cohen revealed that he "received assistance from counsel for the proposed intervenors in connection with the trial and in preparing submissions to the Bankruptcy Court." *See* Memorandum of Law in Support of Motion to Withdraw as Counsel at 4 n.1, *Picard v. Cohen*, 16 Civ. 05513 (LTS) (S.D.N.Y. July 19, 2016), ECF No. 8; *see also* Order at 26, *Picard v. Cohen,* 16 Civ. 04462 (LAP) (S.D.N.Y. Nov. 2, 2016), ECF No. 24. Thus, not only did Cohen have his own counsel representing him in the trial and post-trial submissions, but Defendants' counsel also assisted him behind the scenes with his arguments and his written submissions. Defendants simply cannot claim their antecedent debt/value arguments were not previously raised before this Court in the *Cohen* proceeding, and in turn, assert the *Cohen Decision* is not relevant to their Avoidance Action. *See generally Cohen Decision,* 2016 WL 1695296. To the contrary, the *Cohen* proceeding is so similar, it is simply not possible to reach a different result, as discussed earlier in Section I(A). It would be otherwise unjust and would permit Defendants to incessantly circumvent the rulings in this liquidation proceeding.

## II.   DEFENDANTS' STRAINED READING OF THE SECTION 546(e) DECISION IS WITHOUT MERIT

Defendants assert that the Trustee's reliance on this Court's ruling in *Picard v. Cohen* (reviewed *de novo* and adopted by the District Court pursuant to Bankruptcy Rule 9033) and other decisions in this liquidation,[11] is inconsistent with the *Section 546(e) Decision* because the rationale thereof "disregards the mandate of the *Section 546(e) Decision.*"  (*See e.g.,* Opposition at 4, 13-14) (citing *Section 546(e) Decision*, 773 F.3d 411, 418-19 (2d Cir. 2014)).   However, Defendants' attempt to stretch the bounds of the *Section 546(e) Decision* to assist them in manufacturing a new legal defense is unsustainable.  As this Court has held, the *Section 546(e) Decision* does not alter the treatment of fictitious profits in this Ponzi scheme.  *Cohen Decision*, 2016 WL 1695296, at *12-13; *see also Silverman v. Cullin* (*In re Agape World, Inc.*), 633 F. App'x. 16, 17 (2d Cir. Feb. 4, 2016).

### A.    Defendants Improperly Invoke The Mandate Rule

Defendants incorrectly assert that the Trustee's position regarding value cannot be reconciled with the mandate of the *Section 546(e) Decision,* and that the Trustee cannot reargue key legal issues they claim were "expressly" decided: (1) the contracts between BLMIS and its customers are "valid, enforceable securities contracts;" (2) the transfers were "valid settlement payments;" and (3) these proceedings are "governed by the plain language of the Bankruptcy

---

[11] This includes but is not limited to: Post-Trial Proposed Findings of Fact and Conclusions of Law, *Cohen Decision,* Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016), ECF No. 90, adopted mem., No. 16 Civ. 05513 (LTS) (S.D.N.Y. Feb. 24, 2017), ECF No. 24 (Memorandum Order Adopting Proposed Findings of Fact and Conclusions of Law; hereinafter "*Cohen District Court Decision*"); *Omnibus Good Faith Decision*, 531 B.R. 439 (Bankr. S.D.N.Y. 2015); *Antecedent Debt Decision Sec*, 499 B.R. 416 (S.D.N.Y. 2013)*; Picard v. Greiff*, 476 B.R. 715 (S.D.N.Y. 2012).

Code avoidance provisions." (Opposition at 9-10).[12] However, the *Section 546(e) Decision* resolved none of these issues and accordingly, creates no Second Circuit mandate relevant to these Avoidance Action.[13]

### 1. The Section 546(e) Decision Did Not Determine The Enforceability Or Validity Of BLMIS Customers' Securities Contracts And Settlement Payments

The mandate rule provides that "[w]here issues have been explicitly or implicitly decided on appeal, . . . the law-of-the-case doctrine obliges the district court on remand to follow the decision of the court of appeals . . . ." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (citing *Day v. Moscow*, 955 F.2d 807, 812 (2d Cir. 1991) (quoting *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir.1991)). Defendants, however, mislead this Court as to what the Second Circuit "expressly or implicitly" decided in the *Section 546(e) Decision.* Defendants maintain that the Second Circuit determined that—even where BLMIS defrauded his customers by not trading securities—Defendants "held enforceable rights and claims against the broker for their securities entitlements, and received their payments in consideration of their account agreements and as settlement payments." (Opposition at 15). In fact, the Second Circuit never stated that the contracts between BLMIS and its customers were "enforceable" securities contracts or that the transfers BLMIS customers received were "valid" settlement payments. (*See e.g.,* Opposition at 9-15). Significantly, the Second Circuit did not include customer

---

[12] Defendants assert that the *Cohen Decision* did not address the purported "mandate" of the *Section 546(e) Decision* (Opposition at 16), but Cohen did argue that the *Section 546(e) Decision* "changed controlling law," and that "the decision in the Antecedent Debt matter should and must be revisited." *Cohen Decision,* 2016 WL 1695296, at *12. However, the Court rejected this argument.

[13] If any applicable principles may be derived from the Second Circuit, they come from the Second Circuit's decisions affirming the Trustee's methodologies for purposes of calculating net equity and addressing inter-account transfers. *See Second Circuit Net Equity Decision*, 654 F.3d 229 (2d Cir. 2011); *In re Bernard L. Madoff Inv. Sec. LLC*, No. 16-413-BK(L), 2017 WL 2376567 (2d Cir. June 1, 2017) (*"Second Circuit Inter-Account Decision"*).

statements when it considered whether BLMIS entered into agreements with customers. Instead, its analysis related to customers' account opening documents. *Section 546(e) Decision,* 773 F.3d at 418.

The Second Circuit did not state anywhere in its decision that each purported settlement payment to Defendants "thus satisfied unavoided obligations owed by the broker, and, in doing so, conferred value to Madoff Securities at the time of each transfer." (*See* Opposition at 3). As explained further below, the Second Circuit made no such ruling relating to Defendants' value defenses as it applied to purported obligations owed by the BLMIS estate. More importantly, nowhere does the Second Circuit assert such "securities contracts" and/or "settlement payments" were valid, real securities transactions as reflected on Defendants' BLMIS account statements. In fact, the Second Circuit most recently affirmed that it "continue[s] to refuse, however, to treat[] fictitious and arbitrarily assigned paper profits as real" and to give "legal effect to Madoff's machinations… This "court of equity will not lend its power to assist or protect a fraud." *Second Circuit Inter-Account Decision*, 2017 WL 2376567, at *3.

Instead, the Second Circuit simply affirmed that BLMIS's payments to its customers were subject to the safe harbor of section 546(e) because: (1) the customers' account opening documents constituted "agreements by which BLMIS [would] 'acquire or dispose of securities' on behalf of its customers," and thus "f[e]ll within the statute's broad definition of 'securities contracts'" and (2) the securities transactions contemplated by the customers' account opening documents were also "settlement payment[s]." *Section 546(e) Decision,* 773 F.3d at 417-19 (citing 11 U.S.C.A. § 741(7)(A)(i)). The Second Circuit also stated those payments were made "in connection with" a "Ponzi scheme and, as a result, were fraudulent." *Id.* at 422.

15

The *Section 546(e) Decision* has limited reach and does not foreclose the Trustee from avoiding and recovering transfers of fictitious profits in this case. As the Second Circuit held, section "546(e) is expressly inapplicable to claims of actual fraud brought under § 548(a)(1)(A)…" *Id.* at 416. Notably, the Second Circuit stated that there is a "low bar for the required relationship between the securities contract and the transfer sought to be avoided." *Id.* at 422. As a result, transferees are able to shield transfers much more easily under section 546(e) than under section 548(a)(1)(A). Fatally for Defendants however, by exempting section 548(a)(1)(A) from section 546(e), Congress determined that obtaining "an equitable result for the debtor and its creditors" is "paramount" with regard to actual fraudulent transfers. *See*, *id.* at 423. Accordingly, the mandate rule is inapplicable here.

## 2. The Section 546(e) Decision Did Not Hold That The Trustee's Avoidance Action Was Solely Governed By The Bankruptcy Code

The Second Circuit also never stated that this adversary proceeding is solely "governed by the plain language of the Bankruptcy Code avoidance provisions." (Opposition at 9) (citing *Section 546(e) Decision,* 773 F.3d at 423).

Defendants make this broad—and incorrect—inference based on a distinction made in the *Section 546(e) Decision* between the SIPA and the Bankruptcy Code, in the context of the express statute of limitations incorporated into Bankruptcy Code § 546(e). The Second Circuit explained that where a conflict exists between SIPA (*i.e.,* its goal of maximizing the recovery of customer property) and the Bankruptcy Code (*i.e.,* the statute of limitations articulated in section 546(e)), if "Congress has made a clear choice, a court must enforce Congress's will." *Section 546(e) Decision,* 773 F.3d at 423. In this case, the Second Circuit determined that "by enacting § 546(e), Congress provided that, for a very broad range of securities-related transfers, the interest

in finality is sufficiently important that they cannot be avoided by a bankruptcy trustee at all,
except as actual fraudulent transfers under § 548(a)(1)(A)." *Id.*

Putting aside the fact that actions brought under section 548(a)(1)(A) are exempt from the
operation of section 546(e), the two statutory regimes of SIPA and the Bankruptcy Code are not
"so easily separated with respect to other aspects of fraudulent transfer litigation" including
section 548(c) of the Bankruptcy Code. [14]  *Cohen Decision*, 2016 WL 1695296 at *10.  This is
because, unlike the statute of limitations embedded in the section 546(e) safe harbor, there is "no
clear statutory direction that the satisfaction of claims against the general estate provides value"
for the receipt of fictitious profits from a Ponzi scheme.  *Id.* (citing *Omnibus Good Faith
Decision*, 531 B.R. at 470); *see also Greiff*, 476 B.R. at 725 (concluding that the fraudulent
transfers from BLMIS were not "for value," because "[u]nlike the situation under § 546(e),
Congress has here created no 'safe harbor' to shelter receipts that might otherwise be subject to
avoidance.").  Thus, the *Section 546(e) Decision* did not change the rule of law that Defendants
may only seek the protections of section 548(c) to the extent of their principal investments with
BLMIS.  *Id.*  The Court should reject Defendants' misapplication of the *Section 546(e) Decision*.

### 3.    The Section 546(e) Decision Did Not Make Any Ruling About Defendants' Value Defense

The Second Circuit made no ruling, explicit or implicit, about the question of value.  *See
generally Section 546(e) Decision,* 773 F.3d 411.  In the *Section 546(e) Decision,* the Second
Circuit never ruled that BLMIS's payments to its customers underlying the securities contract or
settlement payments were made for "value" at the time of transfer pursuant to section 548(c).
*See Omnibus Good Faith Decision*, 531 B.R. at 469 (citing *Section 546(e) Decision,* 773 F.3d at

---

[14] SIPA expressly incorporates chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy
Code "to the extent consistent with SIPA." 15 U.S.C. § 78fff(b).

417-23) (stating that the Second Circuit did not rule "that the defendants paid value in exchange for the fictitious profits they received" in connection with their securities contract or settlement payments).

The Second Circuit did not disturb the general rule that a "trustee can recover fictitious profits because transferees in a Ponzi scheme do not give 'value' within the meaning of the Bankruptcy Code beyond what they pay into the scheme." *Omnibus Good Faith Decision*, 531 B.R. at 469-70.  As this Court explained, "[f]ictitious profits are not profits at all but distributions of other people's money based on an arbitrary allocation of fraudulent bookkeeping entries.  The [*Section 546(e) Decision*] did not address this rule and it remains the majority view." *Id.* at 470. Two years later, the Second Circuit explicitly stated that "it ha[d] not addressed this issue" and noted "the prevailing view in the district and bankruptcy courts in this Circuit has agreed" that payments above deposits of principal to Ponzi scheme investors should be treated as fraudulent transfers.  *Silverman*, 633 F. App'x. at 17 (citing *Omnibus Good Faith Decision*, 531 B.R. at 462-64 (collecting cases)).

Given that Defendants incorrectly identify and interpret the purportedly "key" issues decided in the *Section 546(e) Decision,* their arguments relating to the mandate rule have no application.  That decision has no impact on the validity of the *Cohen Decision,* nor on the precedential effect of earlier Madoff-related decisions, including *Greiff* and the *Antecedent Debt Decision.*[15]

---

[15] Defendants also fail to acknowledge that the District Court issued the *Antecedent Debt Decision* on October 15, 2012, months *after* its own decision on section 546(e) on April 30, 2012, which the Second Circuit subsequently upheld in the *Section 546(e) Decision*.

III.    **BLMIS'S OPERATION AS A PONZI SCHEME IS BOTH LEGALLY
SIGNIFICANT AND FATAL TO DEFENDANTS' ATTEMPTS TO RETAIN
FICTITIOUS PROFITS**

    A.    <u>**The Ponzi Scheme Terminology Applied Here Has Been Endorsed By The
District Court and The Ponzi Scheme Principals Governing This Case Are
Universal**</u>

In their opposition, Defendants protest the Trustee's references to now well-known terms

terms such as "Ponzi scheme," "other people's money," "fictitious profits," "net winner" and

"net loser," not because such terminology has no relevance, but because the terms so precisely

describe Defendants and their position in this liquidation proceeding.  Defendants would have to

admit that they are in fact "net winners" that received "fictitious profits" (another term for

fraudulent transfers), and withdrew amounts in excess of deposits from their BLMIS accounts

with the IA Business, and that the IA Business did not actually trade securities for customers and

did not generate any legitimate profits for customer accounts.  Defendants would have to further

admit that they received "other people's money"—or money belonging to "net losers" who did

not withdraw in excess of deposits from their BLMIS accounts.

Defendants did <u>in fact</u> make these admissions in their Joint Statement with the Trustee,

and in their opposition they absurdly attempt to walk back these admissions by claiming these

terms do not mean what the Trustee or this Court think they mean.  And because Defendants

have no defense to the Trustee's claims under Ponzi scheme law, they seek to attack it by

arguing that it is somehow inconsistent with SIPA or the Bankruptcy Code (Opposition at 18-

22).  Defendants even go so far as to state that the Trustee is trying to avoid the Second Circuit's

ruling in *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721

F.3d 54 (2d Cir. 2013) ("*JP Morgan Decision*") and "expand his powers beyond the confines of

avoidance provisions of the Bankruptcy Code." (Opposition at 6).  This is simply untrue.  The

19

Trustee is asserting only those statutory claims that he is empowered to bring pursuant to SIPA

and the Bankruptcy Code.

SIPA expressly authorizes a trustee to assert a claim for the avoidance and recovery of

fraudulent transfers under sections 548(a)(1)(A) and 550(a) of the Bankruptcy Code.[16]    The

claims the Trustee is asserting against Defendants are specifically enumerated under those

provisions of the Bankruptcy Code.  Defendants are conflating the use of certain terminology

with the assertion of equitable powers in an attempt to pigeonhole this case into the parameters

of the *JPMorgan Decision*.  However, as stated by this Court in the *Omnibus Decision*, the *JP*

*Morgan Decision* "is inapposite because it addressed the Trustee's lack of standing to assert the

creditors' own *common law* claims against third parties who allegedly conspired with Madoff

and BLMIS to defraud BLMIS, and ultimately, the customers of BLMIS.  The Trustee is not

---

[16] Any argument that the law applying to claims, customer property distribution and net equity is inapplicable to avoidance actions is mistaken.  While Defendants merely hint at this argument in their Opposition (*see* Opposition at 2), their attorneys raise the argument in detail in related cases that are being contemporaneously briefed. *See e.g.*, South Ferry Customers' Joint Reply Memorandum in Further Support of Motions for Summary Judgment, *Picard v. South Ferry Building Co., et al.*, Adv. Pro. 10-04488 (SMB) (Bankr. S.D.N.Y. Oct. 5, 2017) (ECF No. 103) ("South Ferry Brief").  In particular, the defendants in the South Ferry case cite the Second Circuit's decision in *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014) for the proposition that the Trustee is attempting to treat "unavoided transfers as customer property by purportedly engrafting provisions regarding the administration of customer property into the bankruptcy avoidance process." South Ferry Brief at 11.  This is both a misinterpretation of the Second Circuit's decision and a distortion of the Trustee's position. *Fairfield Greenwich* arose out of the Trustee's request to enjoin settlements between feeder funds, their related entities and persons associated with the funds, and the feeder funds' investors. *Id.* at 202.  The case did not involve an analysis of the relationship between the customer property estate and the calculation of value as a defense to an avoidance action.  In contrast, this relationship was specifically considered and resolved, in the *Antecedent Debt Decision*. *See Antecedent Debt Decision*, 499 B.R. at 423-24 ("only a defendant's investment of principal may count as 'value' with respect to the customer property estate for purposes of section 548(c).")  Moreover, this Court previously considered and rejected this very argument.  First, this Court rejected the notion that *Fairfield Greenwich* was "intervening authority" that "undercut Judge Rakoff's analysis of value in a SIPA case." *Omnibus Decision*, 531 B.R. at 468.  Second, after fully analyzing *Fairfield Greenwich*, this Court concluded that the decision did not address the question of value in any respect.  Lastly, the Court reiterated the well-settled law of this case that the "Trustee can recover fictitious profits because transferees in a Ponzi scheme do not give 'value' within the meaning of the Bankruptcy Code beyond what they pay into the scheme… The three Second Circuit decisions did not address this rule and it remains the majority view." *Id.* at 469-70.

asserting any common law claims that belonged to the creditors under nonbankruptcy law." *Id.* at 450 (*citing Caplin v. Marine Midland Grace Trust Co. of N.Y.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972)).

Defendants seek to avoid the application of Ponzi scheme terms and principles by arguing that they are equitable, instead of part of a well-settled body of bankruptcy law, and are also seeking to undo nearly a century of settled precedent. Ponzi scheme jurisprudence predates both SIPA and the Bankruptcy Code by several decades. Ponzi scheme law is part of the law of fraudulent transfers. Indeed, the Supreme Court decided *Cunningham v. Brown,* 265 U.S. 1 (1924) (involving investors' claims to assets of Charles Ponzi in the aftermath of his eponymous fraud scheme), more than forty-five years before Congress enacted SIPA and more than fifty years before Congress enacted the Bankruptcy Code.[17]

The core principle that a transferee does not provide value in exchange for a transfer in excess of an investment in a Ponzi scheme was actually established almost a century ago. For instance, in 1924, in *Eby v. Ashley*, 1 F.2d 971 (4th Cir. 1924), the Fourth Circuit upheld a decision in favor of a trustee, requiring the recipient of "profits" from a Ponzi scheme to return the payments. *Id.* at 972. Notably, the Court ruled that:

> It follows that on October 13, 1922, when Young paid Ashley $3,000 as a full return of the principal, Young actually owed him $1,423.32. Consequently, of the

---

[17] Congress, knowing of Ponzi scheme law, is presumed to have intended for it to apply to SIPA liquidations. "It is firmly entrenched that Congress is presumed to enact legislation with knowledge of the law; that is with the knowledge of the interpretation that courts have given to an existing statute." *United States v. Langley*, 62 F.3d 602, 605 (4th Cir. 1995) (citing cases). Unless Congress clearly indicates a "contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction." *Id.* (quoting *Estate of Wood v. C.I.R.*, 909 F.2d 1155, 1160 (8th Cir. 1990)). This is particularly evident here because Congress expressly precluded certain provisions of the Bankruptcy Code from applying in a SIPA liquidation. Had Congress intended to prevent Ponzi scheme law from applying in a SIPA liquidation, it would have legislated accordingly.

> $3,000 paid to Ashley on October 13, 1922, $1,576.68 was entirely without consideration . . . In other words the payment of $1,576,68 of the $3,000 was a gratuitous payment, for which Ashley gave no consideration, and was therefore a fraud on Young's creditors.

*Id.* at 973.

As this Court reiterated in the *Omnibus Good Faith Decision,* it is then a "well-settled rule in Ponzi scheme cases that net winners must disgorge their winnings." *Omnibus Good Faith Decision*, 531 B.R. at 462. Defendants "may retain distributions from an entity engaged in a Ponzi scheme to the extent of their investments," but "distributions exceeding their investments," which constitute "fraudulent conveyances" or "other people's money," may be recovered by the Trustee in an avoidance action. *Balaber–Strauss v. Sixty–Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 682 (Bankr. S.D.N.Y. 2000); *Picard v. Cohmad Sec. Corp. (In re BLMIS),* 454 B.R. 317, 333 (Bankr. S.D.N.Y. 2011); *Gowan v. The Patriot Grp., LLC (In re Dreier LLP),* 452 B.R. 391, 440 n. 44 (Bankr. S.D.N.Y. 2011) ("The Court's conclusion that the Defendants did not provide 'reasonably equivalent value' for the payments in excess of principal is consistent with those courts that have held that investors in a Ponzi scheme are not entitled to retain the fictitious profits they received."). In this context, it is not surprising that the Second Circuit made it clear that "the BLMIS customer statements reflect impossible transactions and the Trustee is not obligated to step into the shoes of the defrauder or treat the customer statements as reflections of reality." *Second Circuit Net Equity Decision*, 654 F.3d at 242; *see also Second Circuit Inter-Account Decision*, 2017 WL 2376567, at *3; *Silverman*, 633 F. App'x. at 17. This is not a case involving legitimate payments under a contract nor legitimate interest payments. The only funds at issue here are transfers of fictitious profits.

Defendants also insist the Ponzi scheme presumption is only relevant for the Trustee to establish his *prima facie* case, and has no bearing on their affirmative defenses (Opposition at

22-23, 28).    However, the District Court already determined that Defendants' purportedly "legally recognized claims, debts, and obligations" did not in fact, constitute "value" within the meaning of section 548(c) to the extent they would be used to withhold "artificial transfers designed to further the fraud, rather than any true return on investments." *Antecedent Debt Decision,* 499 B.R. at 421 (quoting *Greiff,* 476 B.R. at 725); *see also Omnibus Good Faith Decision,* 531 B.R. at 463.[18]

As the Seventh Circuit further explained in *Scholes v. Lehman*, 56 F.3d 750, 757 (7th Cir. 1995) the "injustice in allowing [a defendant] to retain [its] profit at the expense of the defrauded investors" could be circumvented <u>only</u> if it "was offset by an equivalent benefit to the estate." But there was no such offset.  Defendants' receipt of fictitious profits was not offset by anything of value—certainly not by any further investments of principal with BLMIS—and only depleted BLMIS's fund of customer property further.    After all, Defendants previously effectively stipulated that they are "net winners" that received "fictitious profits" in a Ponzi scheme, or as viewed by Defendants, customers that withdrew in excess of deposits from their BLMIS accounts with the IA Business, which did not actually trade securities for customers and did not generate any legitimate profits for customer accounts.  (Joint Statement at ¶¶ 10-16).

Accordingly, Defendants did not give value beyond their deposits of principal with BLMIS and "should not be permitted to benefit from a fraud at their expense merely because [they were] not [themselves] to blame for the fraud." *Scholes*, 56 F.3d at 757.  All Defendants are "being asked to do is to return the net profits of [their] investment" within two years of

---

[18] Defendants insist the key question is not whether there were fraudulent transfers, but whether "*at the time of the transfer*, did the [Defendants], give "value" to the debtor" but the District Court already contemplated and answered this question in the *Antecedent Debt Decision. See* Section I(B)(3).

December 11, 2008; "the difference between what [they] put in at the beginning and what [they] had at the end." *Id.* at 757-58.

Defendants have repeatedly stated that the Bankruptcy Code must be followed. The Trustee agrees. As evidenced by the overwhelming judicial authority, the Bankruptcy Code does not permit the frustration of its fraudulent transfer provisions by transferees who seek to keep false Ponzi scheme profits. Accordingly, Defendants' value arguments must fail and summary judgment should be granted in the Trustee's favor.

### B.    There Is No Basis To Treat Equity Investors And Contractual Customers Differently

Unlike equity investors in other types of Ponzi schemes, Defendants assert that they are "customers of a federally-regulated broker-dealer also acting as a fiduciary investment advisor," and are entitled to "fundamentally" different rights from those "that might accrue to ordinary equity investors." (Opposition at 24, 27). As a result, Defendants claim the courts improperly relied upon Ponzi scheme cases involving equity investors, arguing that Defendants "were never 'investors' in Madoff Securities," but only "entrust[ed] their funds to a regulated fiduciary to whom they gave investment discretion for the purpose of implementing a securities trading program, as represented." (Opposition at 27).

However, Defendants cite no applicable authority that supports treating "equity investors" and "contractual customers" differently. (Opposition at 24-27).[19] And there is none. As the District Court noted, Defendants' parsing "is a distinction without a difference" because Defendants "faced the same risks as equity investors." *Greiff*, 476 B.R. at 726. As a result,

---

[19] Defendants do cite to *Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Invs. Assocs.)*, 48 F.3d 470 (10th Cir. 1995), but that case does not distinguish between equity investors or retail customers of a brokerage firm.

whether Defendants were "equity investors" or "contractual customers" is immaterial—they are not entitled to retain the fictitious profits received from BLMIS.

## **CONCLUSION**

For all of the foregoing reasons, the Trustee's motion for summary judgment should be granted.[20]

Dated:  New York, New York
   October 25, 2017

         BAKER & HOSTETLER LLP

         By: /s/ *Keith R. Murphy*
         Baker & Hostetler LLP
         45 Rockefeller Plaza
         New York, New York 10111
         Telephone: (212) 589-4200
         Facsimile: (212) 589-4201
         David J. Sheehan
         Email: dsheehan@bakerlaw.com
         Keith R. Murphy
         Email: kmurphy@bakerlaw.com
         Nicholas J. Cremona
         Email: ncremona@bakerlaw.com
         Elyssa S. Kates
         Email: ekates@bakerlaw.com
         Anat Maytal
         Email: amaytal@bakerlaw.com

         *Attorneys for Irving H. Picard, Trustee for the*
         *Substantively Consolidated SIPA Liquidation of*
         *Bernard L. Madoff Investment Securities LLC and*
         *the Chapter 7 Estate of Bernard L. Madoff*

---

[20] The Trustee reiterates his entitlement to prejudgment interest on the fraudulent transfers (Trustee's Motion at 3, n.4); *see supra* n. 7.