**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for the BNP Paribas Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br> -against-<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br> v.<br><br>BNP PARIBAS S.A., BNP Paribas Arbitrage SNC, BNP Paribas Bank & Trust (Cayman) Limited, BNP Paribas Securities Services S.A.<br><br>    Defendants. | Adv. Pro. No. 12-01576 (SMB) |

**MEMORANDUM OF LAW IN SUPPORT OF THE BNP PARIBAS
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ...................................................................... 1

RELEVANT PROCEDURAL HISTORY ........................................................ 4

STATEMENT OF FACTS ............................................................................. 5

    I.  The BNPP Defendants And The Alleged Transfers ................................. 6

    II.  Additional Non-Defendant BNPP Entities ............................................. 7

    III. The BNPP Entities' Purported Madoff-Related Activities ...................... 8

ARGUMENT ............................................................................................... 11

    I.  The Amended Complaint Should Be Dismissed Because It Was
       Improperly Filed .................................................................................. 12

    II.  The Amended Complaint Should Be Dismissed Because It Is Futile ...... 13

       A. Section 546(e) Bars All Claims Other Than Those Under Section
          548(a)(1)(A) ..................................................................................... 14

       B. Section 550(b) Bars The Trustee's Claims Under Section 548(a)(1)(A)............ 16

          *1.  None Of The BNPP Defendants Was Willfully Blind To The Madoff
               Fraud* ...................................................................................... 16

               *a.  The Trustee Has Not Shown That The BNPP Defendants
                  Subjectively Believed That There Was A High Probability That
                  Madoff Was Operating A Fraud* ........................................... 17

                    *i.  The Trustee's Narrative Regarding The BNPP Defendants'
                        Madoff-Related Activities Is Wholly Implausible*............................ 18

                    *ii.  The Laundry List Of "Indicia of Fraud" Cannot Support A
                       Finding That The BNPP Defendants Themselves Knew Of
                       A Fraud* ........................................................................ 19

                    *iii. Nor Can The Trustee's Other Allegations Support A
                       Finding That The BNPP Entities Had The Requisite
                       Subjective Belief* ............................................................ 21

                      *a)  The Trouvain Allegations Are Insufficient* ................................ 21

                      *b)  The Gianferrara Allegations Are Insufficient* ............................ 24

c) The Allegations Regarding Downside Protections Are Insufficient .............................................................. 25

d) The Supposed Concerns Of Certain Non-BNPP Entities Are Irrelevant And Insufficient ................................. 26

b. The BNPP Defendants Did Not Turn A Blind Eye Towards The Madoff Fraud ...................................................... 28

i. The Trustee's "Blind-Eye" Narrative Is Fundamentally Implausible ...................................................... 29

ii. The Trustee Repeatedly Alleges That The BNPP Defendants Conducted Diligence .................................... 29

iii. The Trustee's Conclusory Assertions Of Deviation From Standard Diligence Practice Do Not Salvage His Pleadings ........... 31

2. The BNPP Defendants Gave Value For All The Transfers They Allegedly Received ...................................................... 33

C. Many Of The Trustee's New Claims Are Time-Barred .................................... 34

D. The Court Lacks Personal Jurisdiction Over BNPP Cayman And The Other BNPP Defendants ...................................................... 35

1. The Court Lacks Personal Jurisdiction Over BNPP Cayman ...................... 36

2. The Court Lacks Personal Jurisdiction Over The Other BNPP Defendants ...................................................... 37

E. None Of The BNPP Defendants Was Properly Served ...................................... 38

1. The Trustee Never Attempted To Serve BNPP SS And BNPP Cayman ...................................................... 38

2. The Attempted Service On BNPP SA And BNPP Arbitrage Was Improper ...................................................... 39

CONCLUSION ...................................................... 40

ii

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Rules and Statutes</u>

11 U.S.C. § 546(e) .................................................................................................... 14

11 U.S.C. § 548(c) .................................................................................................... 34

11 U.S.C. § 550(b)(1) ............................................................................................... 16, 34

Fed. R. Bankr. P. 7004 .............................................................................................. 40

Fed. R. Civ. P. 15(a) ................................................................................................. 12

N.Y. C.P.L.R. § 312-a ............................................................................................... 40

### <u>Cases</u>

*Andrews v. Metro N. Commuter R.R. Co.*,
882 F.2d 705 (2d Cir. 1989) ..................................................................................... 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................. 13, 29

*Azkour v. Bowery Residents' Comm. Inc.*,
No. 13-CV-5878, 2017 WL 4221456 (S.D.N.Y. Sept. 22, 2017) ...................................... 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................. 14, 18

*Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*,
No. 11 CIV. 8921, 2013 WL 6670584 (S.D.N.Y. Mar. 29, 2013) .................................... 7

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
No. 12-cv-1667, 2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014) ......................................... 17

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014) ................................................................................................ 36

*Defer LP v. Raymond James Fin., Inc.*,
654 F. Supp. 2d 204 (S.D.N.Y. 2009) ........................................................................ 24

*Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund*,
No. 08 CIV. 11117, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013) ................................ 19, 28

iii

*Ferring B.V. v. Allergan, Inc.*,
932 F. Supp. 2d 493 (S.D.N.Y. 2013)................................................................. 27

*Giar v. Centea, a Div. of KBC Bank, NV*,
No. 02 CIV. 7916 (LLS), 2003 WL 1900836 (S.D.N.Y. Apr. 16, 2003) ......... 39

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)................................................................................... 16–17

*Hill v. HSBC Bank plc*,
207 F. Supp. 3d 333 (S.D.N.Y. 2016)................................................................. 36

*Holmes v. Caliber Home Loans, Inc.*,
No. 16-CV-3344 (KMK), 2017 WL 3267766 (S.D.N.Y. July 31, 2017) ......... 38, 40

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot.
Grp., PLC*,
783 F.3d 383 (2d Cir. 2015) ............................................................................. 13

*In re 360networks (USA) Inc.*,
367 B.R. 428 (Bankr. S.D.N.Y. 2007) ............................................................. 35

*In re Agape Litig.*,
773 F. Supp. 2d 298 (E.D.N.Y. 2011)................................................................. 32

*In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*,
991 F. Supp. 2d 479 (S.D.N.Y. 2014)................................................................. 17

*In re Bozel S.A.*,
549 B.R. 446 (Bankr. S.D.N.Y. 2016) ............................................................. 38

*In re Enron Corp.*,
370 B.R. 583 (Bankr. S.D.N.Y. 2007) ............................................................... 9

*In re Merrill Lynch & Co.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003)................................................................. 13

*In re Metzeler*,
66 B.R. 977 (Bankr. S.D.N.Y. 1986) ............................................................... 35

*In re Teligent Inc.*,
485 B.R. 62 (Bankr. S.D.N.Y. 2013) ........................................................... 38–39

*J. McIntyre Mach., Ltd. v. Nicastro,*
564 U.S. 873 (2011) .............................................................................................. 36

*Jean-Laurent v. Lawrence,*
No. 12 Civ. 1502, 2013 WL 1129813 (S.D.N.Y. Mar. 19, 2013) .................................... 9

*Khan v. Khan,*
360 F. App'x 202 (2d Cir. 2010) ................................................................................ 38

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,*
424 F.3d 195 (2d Cir. 2005) .................................................................................... 24

*Majad ex rel. Nokia Ret. Sav. & Inv. Plan v. Nokia, Inc.,*
528 F. App'x 52 (2d Cir. 2013) ................................................................................ 24

*Meridian Horizon Fund, LP v. KPMG (Cayman),*
487 F. App'x 636 (2d Cir. 2012) .............................................................................. 23

*MLSMK Inv. Co. v. JP Morgan Chase & Co.,*
431 F. App'x 17 (2d Cir. 2011) .......................................................................... 15, 17

*Oei v. Citibank, N.A.,*
957 F. Supp. 492 (S.D.N.Y. 1997) ........................................................................... 24

*Picard v. Avellino,*
557 B.R. 89 (Bankr. S.D.N.Y. 2016) ........................................................................ 16

*Picard v. Bureau of Labor Ins.,*
480 B.R. 501 (Bankr. S.D.N.Y. 2012) ...................................................................... 34

*Picard v. Ida Fishman Revocable Tr.,*
773 F.3d 411 (2d Cir. 2014) .................................................................................... 14

*Picard v. Legacy Capital Ltd.,*
548 B.R. 13 (Bankr. S.D.N.Y. 2016) ................................................................. *passim*

*Picard v. Mendelow,*
560 B.R. 208 (Bankr. S.D.N.Y. 2016) ...................................................................... 18

*Picard v. Merkin,*
515 B.R. 117 (Bankr. S.D.N.Y. 2014) ................................................................ 15, 33

*Picard v. Merkin,*
563 B.R. 737 (Bankr. S.D.N.Y. 2017) ............................................................ 16, 26–27

*RCC Ventures, LLC v. Brandtone Holdings Ltd.*,
No. 1:17-CV-1585-GHW, 2017 WL 3638202 (S.D.N.Y. Aug. 23, 2017) ....................... 39

*Saregama India, Ltd. v. Mosley*,
No. 11-MC-84-P1, 2012 WL 955520 (S.D.N.Y. Mar. 20, 2012)..................................... 40

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
501 B.R. 26 (S.D.N.Y. 2013) ......................................................................................... 35

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
516 B.R. 18 (S.D.N.Y. 2014) ......................................................................................... 19–20

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
No. 12 MC 115(JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) .............................. 14–15

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) .................. 4, 5, 12

*Shanghai Weiyi Int'l Trade Co. v. Focus 2000 Corp.*,
No. 15-CV-3533, 2016 WL 5817009 (S.D.N.Y. Oct. 4, 2016).......................................... 13

*Stephenson v. Citco Grp. Ltd.*,
700 F. Supp. 2d 599 (S.D.N.Y. 2010)............................................................................... 19

*Sunward Elecs., Inc. v. McDonald*,
362 F.3d 17 (2d Cir. 2004) ............................................................................................. 36, 38

*To v. HSBC Holdings PLC*,
No. 15-CV-3590 (LTS), 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) .............................. 37

*Vasquez v. Reilly*,
No. 15-CV-9528 (KMK), 2017 WL 946306 (S.D.N.Y. Mar. 9, 2017) ........................... 13

*Vaughn v. Strickland*,
No. 12 Civ. 2696, 2013 WL 3481413 (S.D.N.Y. July 11, 2013) ..................................... 9

*Walden v. Fiore*,
134 S. Ct. 1115 (2014) ................................................................................................... 36, 37

*Waldman v. Palestine Liberation Org.*,
835 F.3d 317 (2d Cir. 2016) ........................................................................................... 36

## Other Authorities

BGL BNP Paribas, <u>History</u>, https://www.bgl.lu/en/bank/pages/about-bgl-bnp-
paribas/knowing-us/presentation/history.htm................................................................... 7

European Commission, <u>Case No COMP/M.5384 - BNP Paribas/Fortis Regulation (EC)</u>
<u>No. 139/2004 Merger Procedure</u> (Mar. 12, 2008), http://ec.europa.eu/competition/
mergers/cases/decisions/m5384_20081203 _20212_en.pdf ............................................ 7

Heath P. Tarbert & Liangshun Qian, *The Perils and Promise of Correspondent Banking*,
133 BANKING L.J. 53, 55–56 (2016)............................................................................. 37

Nelson D. Schwartz, <u>European Banks Tally Losses Linked to Fraud</u>, New York Times
(Dec. 16, 2008), http://www.nytimes.com/2008/12/17/business/worldbusiness/
17exposure.html............................................................................................................. 11

Defendants BNP Paribas S.A. ("BNPP SA"), BNP Paribas Arbitrage SNC ("BNPP Arbitrage"), BNP Paribas Securities Services S.A. ("BNPP SS"), and BNP Paribas Bank & Trust (Cayman) Limited ("BNPP Cayman") (collectively, the "BNPP Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the amended complaint filed in this proceeding (the "Action") by plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), which seeks to recover subsequent transfers to the BNPP Defendants allegedly made by Rye Select Broad Market Portfolio Limited ("Portfolio Limited"), Rye Select Broad Market Insurance Portfolio LDC ("Insurance Portfolio"), Rye Select Broad Market XL Fund L.P. ("XL LP"), Rye Select Broad Market XL Portfolio Limited ("XL Portfolio," and, together with Portfolio Limited, Insurance Portfolio, and XL LP, the "Rye Funds"), and Ascot Partners L.P. ("Ascot"). Am. Compl., *Picard v. BNP Paribas S.A.*, Adv. Pro. No. 12-01576 (Bankr. S.D.N.Y. Aug. 30, 2017), ECF No. 100 (hereinafter, "Amended Complaint" or "Am. Compl.").[1]

## PRELIMINARY STATEMENT

The Amended Complaint must be dismissed because it is both procedurally and substantively deficient. Procedurally, the Trustee filed the Amended Complaint without obtaining the BNPP Defendants' consent or leave of the Court, thereby disregarding Federal Rule of Civil Procedure 15 and the Court's scheduling order. Indeed, the Court's scheduling order made clear that the Trustee could not file an amendment (such as the Amended Complaint) related to the issue of good faith without further leave of the Court, which he has not obtained. Because the filing of the Amended Complaint contravenes both Rule 15 and the Court's scheduling order, it should be dismissed.

---

[1]    All terms which are not defined herein have the definitions stated in the Amended Complaint.

Substantively, the Amended Complaint still fails to plead that the BNPP Defendants, who are alleged to be subsequent transferees, actually knew of or were willfully blind to the Madoff fraud, and it therefore must be dismissed under Sections 546(e) and 550(b) of the Bankruptcy Code.  The Amended Complaint makes no effort to plead "actual knowledge," which is unsurprising given that the BNPP Defendants are not alleged to have formed part of Madoff's inner circle or even to have held accounts directly with BLMIS.  Instead, it attempts to plead the BNPP Defendants' "willful blindness" to the Madoff fraud largely by recycling an oft-cited laundry list of "indicia" of fraud.  As this Court determined in the *Legacy* matter, these indicia of fraud say nothing about the *subjective* belief of the BNPP Defendants themselves, and thus cannot sustain a showing of willful blindness.

The Trustee's other allegations similarly fail to support the inference that the BNPP Defendants harbored a subjective belief that Madoff was probably a fraud.  The centerpiece of the Amended Complaint's allegations revolves around misleading snippets from a 2003 email exchange between former BNPP SS employee Lionel Trouvain and employees of Access International Advisors ("Access"), which allegedly co-managed the Oreades SICAV feeder fund ("Oreades") with BNPP SS.  However, when viewed in its entirety, the exchange clearly demonstrates that Trouvain believed BLMIS was actually engaged in trading securities. Although Trouvain noted the difficulty of confirming that securities acquired by BLMIS were posted to the correct client accounts, there is no basis to infer that Trouvain believed that there was a high probability that Madoff was operating a Ponzi scheme.  In fact, the Trustee has tacitly conceded the legal insufficiency of the Trouvain-related allegations by electing to voluntarily dismiss, *with prejudice*, BNPP SS from a separate proceeding predicated on substantially similar allegations.

2

The Trustee's other allegations, relating to stray comments supposedly made by employees of BNP Paribas ("BNPP") entities that are not defendants in this matter, or the purported decision of Société Générale ("SocGen") and Dresdner Kleinwort ("Dresdner") not to invest with BLMIS, similarly fail to allege that these entities *subjectively* believed that Madoff was probably a fraud, much less that any such subjective belief should be imputed to the BNPP *Defendants*. At most, the allegations suggest that these other entities *themselves* questioned certain aspects of BLMIS's structure and business strategy. The Trustee's attempt to establish the BNPP Defendants' subjective belief in this manner runs afoul of the District Court's clear injunction that inquiry notice–style pleading is not enough to negate a transferee's good faith.

The Amended Complaint also fails to allege facts showing that the BNPP Defendants deliberately took steps to avoid learning that Madoff was likely a fraud. Notwithstanding the conclusory claim that the BNPP Defendants deviated from their ordinary due diligence practices when deciding upon BLMIS-related investments, the Amended Complaint repeatedly concedes that the BNPP Defendants conducted due diligence, which rebuts any allegation of willful blindness. For instance, the Amended Complaint pleads that BNPP SA conducted diligence when a line of credit was extended to Madoff in 1988; BNPP SA conducted due diligence on BLMIS again in 2003; and BNPP's Fund Derivatives Group conducted an on-site diligence visit to BLMIS in March 2008. As in the *Legacy* matter, these affirmative steps to conduct diligence on BLMIS preclude a finding of willful blindness.

At bottom, the overall narrative painted by the Amended Complaint is fundamentally implausible. The Amended Complaint essentially claims that, after the BNPP group became aware that Madoff was probably a fraud, the group elected to become a global leverage provider that offered credit facilities and swap agreements to its clients in return for a fee, and accepted

3

BLMIS feeder fund shares as collateral or hedges. This story makes no sense. Had the BNPP

Defendants suspected Madoff was a fraud, they would have believed that BLMIS feeder fund

shares were worthless and would have never accepted them as collateral or hedges, especially

because they stood only to earn fees and could not benefit from any appreciation in the value of

the shares. The BNPP group posted a publicly-reported loss of $500 million in the days

following the public revelation of the Madoff Ponzi scheme. The Trustee's theory that the BNPP

group would risk loss of this magnitude in order to earn relatively minor fees is simply absurd.

Instead, the only plausible inference from these facts is that the BNPP Defendants, like many

other market participants, did not suspect Madoff was a fraud.

Because the Amended Complaint is procedurally improper and, in any event, fails to

plead that the BNPP Defendants were willfully blind to the Madoff fraud, and the other elements

of Section 550(b) are clearly met, the Amended Complaint should be dismissed. Even were that

not the case, the Amended Complaint should be dismissed for the independent reasons that the

Court lacks personal jurisdiction over the BNPP Defendants and the BNPP Defendants were not

properly served. Moreover, certain of the claims alleged are time-barred under Section 550(f).

## RELEVANT PROCEDURAL HISTORY

On May 4, 2012, the Trustee filed his initial complaint in this matter, seeking to recover

approximately $22.3 million of transfers from Portfolio Limited, XL LP, and XL Portfolio (the

"Original Rye Funds") to four BNPP entities: BNPP Arbitrage, BNPP SS, BNPP Cayman, and

BNP Paribas Bank & Trust (Canada) ("BNPP Canada").[2]  The matter was consolidated for

---

[2]        Compl., *Picard v. BNP Paribas S.A.*, Adv. Pro. No. 12-01576 (Bankr. S.D.N.Y. May 4, 2012), ECF No. 1
(hereinafter, "Original Complaint" or "Original Compl."). The Original Complaint also sought recovery of transfers
from Fairfield Sentry, Fairfield Sigma, Kingate Global, and Kingate Euro, but these claims were later dismissed.
*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (SMB), 2016 WL 6900689 (Bankr.
S.D.N.Y. Nov. 22, 2016) ("*Extraterritoriality Decision*"). The Trustee also voluntarily dismissed BNPP Canada
with prejudice over two years ago. Notice Voluntary Dismissal Def. BNP Paribas Bank & Trust (Canada)
Prejudice, *Picard v. BNP Paribas S.A.*, Adv. Pro. No. 12-01576 (Bankr. S.D.N.Y. July 13, 2015), ECF No. 66.

pretrial briefing purposes with several other clawback proceedings and, in July 2012, the BNPP

Defendants (along with various other foreign defendants named in separate clawback

proceedings) filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for

reasons of extraterritoriality or, in the alternative, comity.  Extrat. Defs.' Notice Mot. Dismiss,

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 1:12-mc-00115

(S.D.N.Y. Jul. 13, 2012), ECF No. 234.

On November 22, 2016, this Court issued an opinion dismissing the majority of the

claims against the BNPP Defendants and granting the Trustee leave to amend his Original

Complaint in order to plead certain extraterritoriality-related facts concerning the Original Rye

Funds, which had been included in an extraterritoriality proffer[3] submitted by the Trustee.[4]  The

permissibility of an amendment regarding all other issues, including whether the BNPP

Defendants had acted in good faith, was reserved for later briefing.[5]  Nonetheless, on August 30,

2017, without obtaining the BNPP Defendants' consent or leave of the Court, the Trustee filed

the Amended Complaint and included hundreds of paragraphs of new allegations relating to

various BNPP entities' purported knowledge of the BLMIS fraud, as well as claims involving

Insurance Portfolio and Ascot (two feeder funds never mentioned in the Original Complaint).

## STATEMENT OF FACTS

For the purposes of this motion, the facts set forth below are drawn from the allegations

contained in the Amended Complaint, which the BNPP Defendants neither admit nor concede.

---

[3]      Trustee's Proffered Allegations, *Picard v. BNP Paribas S.A.*, Adv. Pro. No. 12-01576 (Bankr. S.D.N.Y. June 27, 2015), ECF No. 64 (hereinafter, "Proffer").

[4]      *Extraterritoriality Decision*, 2016 WL 6900689, at *12–16, *30.

[5]      Order Concerning Further Proceedings Extrat. Mot. ¶¶ 3, 8, 14, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Dec. 10, 2014), ECF No. 8800 (hereinafter, the "Extraterritoriality Scheduling Order").

## I.    The BNPP Defendants And The Alleged Transfers

The BNPP group is comprised of *190,000* employees spread across various distinct legal entities and *75* countries.  Am. Compl. ¶ 58.  Although the Trustee refers misleadingly to "BNP Paribas" at various points throughout the Amended Complaint, he seeks recovery of transfers made to four legally-distinct BNPP entities.

BNPP SA is incorporated under the laws of France and is alleged to maintain offices in both Paris and New York.  *Id.* ¶ 52.  The Amended Complaint seeks to recover $39,628,385 in transfers from Insurance Portfolio to BNPP SA pursuant to a newly-added claim.  *Id.* ¶ 367.

BNPP Arbitrage is incorporated under the laws of France and is alleged to maintain offices in both Paris and New York.  *Id.* ¶ 53.  The Amended Complaint in total seeks to recover $6,485,771 in transfers to BNPP Arbitrage, including $6,452,906 allegedly transferred by XL Portfolio to BNPP Arbitrage and a newly-added $32,865 in alleged transfers from Insurance Portfolio to BNPP Arbitrage.  *Id.* ¶¶ 367, 381.

BNPP Cayman is incorporated under the laws of, and maintains its offices in, the Cayman Islands.  *Id.* ¶ 54.  The Amended Complaint does not—because it cannot—allege that BNPP Cayman maintains an office in New York, nor is BNPP Cayman purported to have conducted any business in New York.  BNPP Cayman is alleged to have received $77,148,678 in total transfers, including $57,190,550 from Ascot (all of which is newly added to the Amended Complaint), $2,987,824 from XL LP ($1,000,0000 of which is new to the Amended Complaint), $14,470,304 from Portfolio Limited ($6,208,420 of which is new to the Amended Complaint), and $2,500,000 from XL Portfolio.  *Compare* Am. Compl. ¶¶ 358, 377, 381, 420, *with* Original Compl. ¶¶ 98, 107; *compare* Am. Compl., Exs. E, H, *with* Original Compl., Exs. W, AA.

6

BNPP SS is incorporated under the laws of France and is alleged to maintain offices in

Paris, New York, Luxembourg, and the Cayman Islands. Am. Compl. ¶ 55. The Trustee seeks

to recover $32,716,801 in transfers from Portfolio Limited to BNPP SS, $29,618,807 of which

results from new claims. *Compare* Am. Compl. ¶ 377, *with* Original Compl. ¶ 109; *compare*

Am. Compl., Ex. H, *with* Original Compl., Ex. AB.

## II.    Additional Non-Defendant BNPP Entities

Non-defendant BNP Paribas Securities Corp. ("BNPP Sec. Corp.") is alleged to be a

subsidiary of BNPP SA, which is purported to have marketed and monitored credit facilities and

structured products and served as the collateral agent and/or calculation agent for various

Madoff-related transactions. Am. Compl. ¶¶ 66–68, 184, 195, 215, 410.

Non-defendant BGL BNP Paribas ("BGL BNPP") is a subsidiary of BNPP SA that

allegedly served as a custodian of Oreades from 1997 to 2002, but delegated its custodial duties

to BLMIS through an undisclosed sub-custodian agreement. *Id.* ¶¶ 98–99, 107, 110. This entity

only became an affiliate of BNPP SA when BNPP SA acquired Fortis Banque Luxembourg, a

process that commenced in December 2008.[6]

The Trustee also includes conclusory allegations related to "several business groups" that

the BNPP group operates. Am. Compl. ¶¶ 61–74. Specifically, the Fund Derivatives Group is

alleged to have structured leveraged products referencing Madoff investments, *id.* ¶ 64; the

Securities Services Group of BNPP's Investment Solutions Unit is alleged to have provided

administrative banking services, *id.* ¶ 69; and the Asset Management Group of BNPP's

---

[6]    *See* European Commission, Case No COMP/M.5384 - BNP Paribas/Fortis Regulation (EC) No. 139/2004 Merger Procedure (Mar. 12, 2008), http://ec.europa.eu/competition/mergers/cases/decisions/m5384_20081203 _20212_en.pdf (last visited Oct. 6, 2017); BGL BNP Paribas, History, https://www.bgl.lu/en/bank/pages/about-bgl-bnp-paribas/knowing-us/presentation/history.htm (last visited Oct. 6, 2017). "The Court generally has the discretion to take judicial notice of internet material." *Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*, No. 11 CIV. 8921, 2013 WL 6670584, at *1 n.1 (S.D.N.Y. Mar. 29, 2013).

Investments Solutions Unit is alleged to have overseen and facilitated investment strategies of certain customers, *id.* ¶ 72.

### III.    The BNPP Entities' Purported Madoff-Related Activities

The Amended Complaint purports to chronicle several BNPP entities' supposed contacts with Madoff and BLMIS over a 20-year period in an apparent (but failed) effort to demonstrate that the BNPP Defendants, many of which are not alleged to have participated in or even known about such contacts, were willfully blind to the Madoff fraud. To that end, the Amended Complaint often refers indiscriminately to "BNP Paribas," glossing over the distinctions between the various BNPP entities and failing to tie allegations to the specific BNPP Defendants from which recovery is sought. It is also rife with conclusory and implausible allegations that need not be credited even on a motion to dismiss. The Trustee's implausible narrative is as follows.

In the late '90s and early '00s, Oreades operated as a BLMIS feeder fund, which BNPP SS allegedly co-managed with Access. Am. Compl. ¶¶ 113–17. In its capacity as co-manager, BNPP SS supposedly owed Oreades's customers fiduciary duties. *Id.* ¶ 140. In July 2003, BNPP SS employee Lionel Trouvain purportedly made inquiries to Access regarding BLMIS's undisclosed role as administrator and manager of Oreades, including the possible implications under Luxembourg law of such an arrangement. *Id.* ¶¶ 115–16, 118–20. Allegedly unsatisfied with the responses to those inquiries, BNPP SS liquidated Oreades in 2004 in order to mitigate any legal risk associated with BLMIS's undisclosed dual role. *Id.* ¶ 125. Although the Trustee selectively quotes portions of emails to support his conclusory allegation that Trouvain believed that "the validity of the trades BLMIS reported could not be verified" and that "Madoff was able to fabricate trades post hoc," *id.* ¶ 3, the portions of these emails that the Amended Complaint disingenuously omits clearly show that Trouvain believed BLMIS was trading securities and was

8

only inquiring whether "the deals carried out on behalf of" BLMIS customers were "correctly indexed to these same clients." Compl. ¶ 56, *Picard v. Oreades SICAV*, Adv. Pro. No. 10-05120 (Bankr. S.D.N.Y. Dec. 2, 2010), ECF No. 1 (hereinafter, "Oreades Complaint" or "Oreades Compl.").[7]

After the liquidation of Oreades, "BNP Paribas" supposedly "devised a new company-wide business strategy to profit from BLMIS" by becoming a "global leverage provider" for BLMIS-related investments. Am. Compl. ¶¶ 4, 138. The genius of becoming a "global leverage provider," on the Trustee's narrative, lay in the fact that BNPP entities would be able to obtain BLMIS exposure without taking on any fiduciary duties to feeder fund investors. *Id.* ¶ 140.

As part of the alleged "business strategy," in 2004, certain BNPP entities supposedly bought the assets of Zurich Capital Markets ("ZCM"), which had in its portfolio a single transaction that involved Madoff. *Id.* ¶¶ 138, 141–51. Thereafter, certain BNPP entities agreed to provide leverage for counterparty investments in the Legacy fund and some Rye funds, with a view to becoming a global leverage provider for investments with Madoff. *Id.* ¶¶ 196, 214, 227.

The Trustee claims conclusorily that the BNPP entities took these steps while aware, through BNPP SS's experience with Oreades, of a high probability that Madoff was a fraud. *Id.* ¶ 138. That claim cannot be squared with the allegation that, as a global leverage provider, these BNPP entities *chose to take* feeder fund shares as collateral for loans or as hedges against swaps. *Id.* ¶¶ 183, 408. Nor can the Trustee's claim of willful blindness be reconciled with the allegation that the BNPP entities received merely "fees and interest payments"—such as interest

---

[7]    It is well-established that a court may examine a plaintiff's prior allegations at the motion to dismiss stage and may strike "changed and inconsistent factual allegations." *Jean-Laurent v. Lawrence*, No. 12 Civ. 1502, 2013 WL 1129813, at *7 n.10 (S.D.N.Y. Mar. 19, 2013); *Vaughn v. Strickland*, No. 12 Civ. 2696, 2013 WL 3481413, at *6 (S.D.N.Y. July 11, 2013). "The amendment of a pleading does not make it any the less an admission of the party." *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989). In fact, courts "may refuse to allow an amendment where, by omitting allegations from the previously filed complaint, the plaintiff seeks to 'erase' admissions that are contained in it." *In re Enron Corp.*, 370 B.R. 583, 597 (Bankr. S.D.N.Y. 2007).

of 170 basis points above LIBOR—and chose not to share in any upside from the appreciation of the value of the feeder fund shares. *Id.* ¶¶ 64, 149, 183. Although the Trustee distractingly alleges that BNPP SA protected itself from some of the downside risk by entering into a $70 million put option with HSBC, *id.* ¶ 190, that option protected only a very small portion of the billions of dollars the Trustee alleges BNPP entities had invested in BLMIS feeder funds in connection with transactions with BNPP clients, *id.* ¶ 4, leaving these BNPP entities very much exposed in the event they believed there was a high chance that Madoff was a fraud.

The Amended Complaint also implausibly alleges that these BNPP entities took affirmative steps to avoid learning the value of the collateral and hedges they had taken on in the form of feeder fund shares. In particular, although the Amended Complaint details numerous instances in which BNPP entities conducted due diligence, *e.g.*, *id.* ¶¶ 77, 83, 85–86, 143, 163, 174, 181, 208, it also conclusorily alleges that the BNPP Defendants turned a blind eye to the Madoff fraud, in that: (1) the due diligence team of the Fund Derivatives Group did not adhere to certain internal operating procedures, *id.* ¶¶ 7, 168–73; (2) the BNPP Defendants chose to invest in BLMIS even though they had policies against investing in single-manager transactions and funds that did not have a strict separation between the investment manager and custodian, *id.* ¶¶ 9, 106, 144, 178, 241; and (3) the relevant "BNP Paribas" committees "pre-approved" or "rubber-stamp[ed]" proposed Madoff-related transactions, *id.* ¶¶ 8, 80, 168, 231. The Trustee also claims, with the benefit of hindsight, that the BNPP Defendants deliberately opted not to use their feeder fund account statements in order to divine that, among other things, (1) BLMIS's SSC returns were too good to be true and not correlated with the S&P 100 Index; (2) BLMIS executed trades outside the daily price range; and (3) BLMIS's assets under management were too large to execute the SSC strategy. *Id.* ¶¶ 241–339.

Additionally, the Amended Complaint suggests that the BNPP Defendants ignored a handful of ambiguous and vague concerns about Madoff expressed by third parties. These allegations include that Fairfield Greenwich Group employees once remarked that an employee of non-defendant BNPP Private Wealth "hate[d]" and "always had a problem with Madoff," *id.* ¶¶ 128–29; a partner in a joint-venture with BNPP Asset Management purportedly told Access in June 2008 that "he had squarely rejected BLMIS," *id.* ¶¶ 133–36; and Renaissance Technologies Corp. wrote a report about Madoff-related concerns in 2003, *id.* ¶¶ 200–11, which no BNPP Defendant is alleged to have seen.[8] Similarly, the Trustee alleges that two entities that are wholly unrelated to any member of the BNPP group, SocGen and Dresdner, conducted due diligence that revealed concerns about certain Madoff-related transactions. *Id.* ¶¶ 153–61, 218.

The absurdity of the Trustee's narrative is underscored by the ultimate course of events: When Madoff's fraud was revealed, the BNPP group lost a well-publicized $500 million in the fraud. *See* Nelson D. Schwartz, <u>European Banks Tally Losses Linked to Fraud</u>, New York Times (Dec. 16, 2008), http://www.nytimes.com/2008/12/17/business/worldbusiness/17exposure.html (last visited Oct. 16, 2017) (cited at Am. Compl. ¶ 137).

## ARGUMENT

The Amended Complaint should be dismissed both because its filing was procedurally improper and because it fails to satisfy the good faith pleading standards.[9] As the Trustee neither obtained the BNPP Defendants' consent nor the Court's leave to file the Amended Complaint, its filing violated Federal Rule of Civil Procedure 15(a) and the Court's scheduling order.

---

[8]    In fact, the Trustee has affirmatively alleged in the past that the Renaissance Report was never shared with the BNPP entity that had once been party to the *Legacy* proceeding, let alone with any BNPP Defendant. Trustee Opp. Mot. Dismiss at 32–33, *Picard v. Legacy Capital Ltd.*, Adv. Pro. No. 10-05286 (Bankr. S.D.N.Y. Aug. 27, 2015), ECF No. 122 ("Neither the Renaissance Proposal nor the Meritage Oversight Committee's subsequent findings were disclosed to BNP when Legacy sought to secure its funding.").

[9]    For the reasons set forth below, the Original Complaint should also be dismissed in its entirety.

Moreover, the Amended Complaint fails to cure the pleading deficiencies in the Original

Complaint regarding the crucial issue of good faith.  Accordingly, even if the filing of the

Amended Complaint were construed as a request for leave to amend, leave should be denied as

futile.

## I.    The Amended Complaint Should Be Dismissed Because It Was Improperly Filed

Under Federal Rule of Civil Procedure 15(a) (made applicable to the Action by Federal

Rule of Bankruptcy Procedure 7015), the Trustee was not permitted to file the Amended

Complaint as of right because it was not filed (1) within 21 days of serving the Original

Complaint, which was filed on May 4, 2012, or (2) within 21 days after service of the BNPP

Defendants' motion to dismiss on the basis of extraterritoriality and/or comity, which was filed

on July 13, 2012.  Fed. R. Civ. P. 15(a).[10]  Thus, the Trustee may amend the Original Complaint

only "with the opposing party's written consent or the court's leave," Fed. R. Civ. P. 15(a)(2),

neither of which he obtained here.

Although the Court granted the Trustee leave to amend the Original Complaint, that leave

was limited to adding the extraterritoriality-related facts that the Trustee had previously

proffered.  *Extraterritoriality Decision*, 2016 WL 6900689, at *12–16, *30.  Indeed, the schedule

ordered by this Court expressly contemplated that the parties would later brief the issue of

whether the Trustee would be permitted to amend previously-filed complaints to add, among

other things, allegations related to the good faith issue, such as those that have been included in

the Amended Complaint.  Extraterritoriality Scheduling Order ¶¶ 8, 14.[11]

---

[10]    "Rule 15(a)(1) does not allow a party to retain a one-time option to 'amend . . . as a matter of course' in perpetuity, but limits that option to the 21-day window set forth in Rule 15(a)(1)(B)." *Azkour v. Bowery Residents' Comm. Inc.*, No. 13-CV-5878, 2017 WL 4221456, at *2 (S.D.N.Y. Sept. 22, 2017).

[11]    The Extraterritoriality Scheduling Order was amended three times by mutual consent of the parties, but the Trustee never sought to alter the procedure of briefing the extraterritoriality issue first and scheduling proceedings on leave to amend to add allegations relevant to other issues later.  Stip. Order Modifying Order, *Sec. Inv'r Prot.*

Although no such briefing has occurred, the Trustee nevertheless filed the Amended

Complaint in blatant disregard of the Federal Rules of Civil Procedure and this Court's

scheduling order. The Amended Complaint accordingly should be dismissed as procedurally

improper and therefore invalid.[12] *Cf. Shanghai Weiyi Int'l Trade Co. v. Focus 2000 Corp.*,

No. 15-CV-3533, 2016 WL 5817009, at *3 (S.D.N.Y. Oct. 4, 2016) (holding that "if the court

gives permission to make only specific amendments to a pleading, changes outside of the scope

of that permission violate Rule 15(a), and are therefore invalid" (internal quotation marks

omitted)), *report and recommendation adopted*, No. 15-CV-3533 (S.D.N.Y. Oct. 4, 2016), ECF

No. 145.

## II.    The Amended Complaint Should Be Dismissed Because It Is Futile

Even if the filing of the Amended Complaint were not dismissed as procedurally

improper, but instead were deemed a request for leave to amend, that request should be denied as

futile. The "standard for denying leave to amend based on futility is the same as the standard for

granting a motion to dismiss." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v.*

*Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015). "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory

---

*Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Jan. 14, 2015), ECF No. 8990;
Second Stip. Order Modifying Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-
01789 (Bankr. S.D.N.Y. Feb. 24, 2015), ECF No. 9350; Third Stip. Order Modifying Order, *Sec. Inv'r Prot. Corp.*
*v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Apr. 1, 2015), ECF No. 9720.

[12]    Moreover, any such dismissal should be with prejudice because defendants "are generally not required to
defend against a 'moving target.'" *Vasquez v. Reilly*, No. 15-CV-9528 (KMK), 2017 WL 946306, at *12 (S.D.N.Y.
Mar. 9, 2017); *see also In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 390 (S.D.N.Y. 2003) (plaintiffs should not
be entitled to a "third bite at the apple"). The Trustee's gamesmanship in improperly filing the Amended Complaint
should not be rewarded by permitting him to further augment the Amended Complaint, after having learned of the
arguments and defenses that the BNPP Defendants raise in the instant motion to dismiss.

statements and "formulaic recitation[s] of the elements of a cause of action" are not entitled to a

presumption of truth.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Here, it is plain from the face of the Amended Complaint that the transfers the Trustee

seeks to recover from the BNPP Defendants are "settlement payments" covered by the safe

harbor contained within Section 546(e) of the Bankruptcy Code.  Because the Trustee has not

even tried to plead that the BNPP Defendants "actually knew" that BLMIS was operating a

Ponzi scheme, Section 546(e) bars the Trustee's claims except those premised on Section

548(a)(1)(A) of the Bankruptcy Code.  Moreover, for the reasons set forth below, the Trustee's

claims under Section 548(a)(1)(A) are barred because he has failed to plead sufficiently that the

BNPP Defendants did not receive the relevant transfers in good faith and for value.

These amendments are also futile for the additional and independent reasons that (1) the

new claims are time-barred because they were not brought within one year of the avoidance of

the initial transfers; (2) the Court lacks personal jurisdiction over the BNPP Defendants; and

(3) the Trustee has not properly served the BNPP Defendants.

## A. Section 546(e) Bars All Claims Other Than Those Under Section 548(a)(1)(A)

Section 546(e) of the Bankruptcy Code prohibits the Trustee from "avoid[ing] a transfer

that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . financial institution

[or] financial participant . . . in connection with a securities contract . . . except under section

548(a)(1)(A) of this title."  11 U.S.C. § 546(e).  Section 546(e) applies to initial transfers

originating from BLMIS, such as those at issue in the Amended Complaint, as they constitute

"settlement payments" made "in connection with a securities contract."  *Picard v. Ida Fishman*

*Revocable Tr.*, 773 F.3d 411 (2d Cir. 2014).  Moreover, the Trustee may not recover any such

transfers from subsequent transferees, such as the BNPP Defendants, except as permitted under

section 548(a)(1)(A). *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC

115(JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*").

The *only* way that the Trustee can escape the application of Section 546(e) here is by

pleading with particularity and plausibility that the BNPP Defendants actually knew of the

Madoff Ponzi scheme. *Picard v. Legacy Capital Ltd.*, 548 B.R. 13, 28 (Bankr. S.D.N.Y. 2016)

(citing *Cohmad*, 2013 WL 1609154, at *4). To do so, he must advance specific, particularized

allegations showing that *each* BNPP Defendant had "direct and clear knowledge" of Madoff's

Ponzi scheme, resulting in "a high level of certainty and absence of any substantial doubt

regarding the existence" of the scheme. *Picard v. Merkin*, 515 B.R. 117, 139 (Bankr. S.D.N.Y.

2014); *see also MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 431 F. App'x 17, 18 (2d Cir. 2011)

(plaintiff must meet the particularity requirements of Rule 9(b) in pleading bad faith with respect

to the Madoff fraud).

The Trustee has not even tried to meet this burden. Indeed, the Trustee only alleges that

the BNPP Defendants received the subsequent transfers at issue "while willfully blind to

circumstances suggesting a high probability of fraud at BLMIS," Am. Compl. ¶¶ 359, 368, 378,

382, 421, rather than pleading, as he does with the initial transfers, that they may have been

received "with *knowledge* of fraud at BLMIS," *id.* ¶¶ 349, 355, 365, 375, 418 (emphasis added).

In any event, as described below, the Amended Complaint fails even to meet the lesser standard

of willful blindness, and thus cannot satisfy the more exacting actual knowledge standard.

Therefore, all claims other than those for fraudulent transfers under Section 548(a)(1)(A)

must be dismissed under Section 546(e). Specifically, Section 546(e) requires dismissal of the

Trustee's claims for: (1) $3,587,310 of alleged transfers from Insurance Portfolio to BNPP SA,

*id.* Ex. F; (2) $2,800,000 of alleged transfers from Portfolio Limited to BNPP Cayman, *id.* Ex. H;

and (3) $29,618,808 of alleged transfers from Portfolio Limited to BNPP SS, *id.* Ex. H.

### B. Section 550(b) Bars the Trustee's Claims Under Section 548(a)(1)(A)

The Trustee cannot recover from subsequent transferees (such as the BNPP Defendants)

under Section 548(a)(1)(A) of the Bankruptcy Code where the "transferee . . . takes for value . . .

in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C.

§ 550(b)(1). The burden of pleading that a transferee did not take in good faith rests with the

Trustee. *Picard v. Avellino*, 557 B.R. 89, 126 (Bankr. S.D.N.Y. 2016). To satisfy that hefty

burden, the Trustee must plead specific allegations showing that the transferee (1) knew of the

BLMIS fraud or was willfully blind to it, or (2) did not provide value for the transfers that were

received. *Picard v. Merkin*, 563 B.R. 737, 749 (Bankr. S.D.N.Y. 2017). As discussed above, the

Trustee has not even attempted to plead that the BNPP Defendants "actually knew" of the

Madoff fraud. Moreover, for the reasons below, the Amended Complaint insufficiently pleads

that the BNPP Defendants were willfully blind to the Madoff fraud or did not provide value.

### 1. None Of The BNPP Defendants Was Willfully Blind To The Madoff Fraud

To plead willful blindness, the Trustee must allege specific facts demonstrating *both* that

each BNPP Defendant (1) "subjectively believe[d] that there [was] a high probability" that

Madoff was operating a Ponzi scheme or otherwise not engaged in securities trading, *and*

(2) "t[ook] deliberate actions to avoid learning of" the scheme. *Legacy*, 548 B.R. at 29 (citing

*Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)) (emphasis added). As the

Trustee himself recognizes,[13] the bar for willful blindness is high. *See Glob.-Tech*, 563 U.S. at

769 ("[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a

---

[13]    Letter Br. Burdens Proof Persuasion at 6, *Picard v. Merkin*, Adv. Pro. No. 09-00182 (Bankr. S.D.N.Y.
Sept. 29, 2017), ECF No. 419 (describing the good faith requirement as subject to "heightened pleading standards").

high probability of wrongdoing and who can almost be said to have actually known the critical

facts."). He plainly has not met that bar here.

> a. *The Trustee Has Not Shown That The BNPP Defendants Subjectively Believed*
> *That There Was A High Probability That Madoff Was Operating A Fraud*

Significantly, the first prong of the willful blindness analysis focuses on the *subjective*

beliefs of the specific transferee. *Legacy*, 548 B.R. at 29. Thus, it is not enough to allege that

the transferee was on inquiry notice or should have known that there was a high probability of

fraud. *See MLSMK*, 431 F. App'x at 18 (requiring bad faith allegations in Madoff-related cases

to be pleaded with particularity). Nor is it sufficient to rely upon group pleading, whereby

allegations of knowledge are made against affiliated entities, without an effort to parse

specifically what each of the individual transferees themselves knew. *See Concord Assocs., L.P.*

*v. Entm't Props. Tr.*, No. 12-cv-1667, 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014)

("Group pleading, by which allegations are made against families of affiliated entities[,] is

simply insufficient to withstand review on a motion to dismiss."); *In re Bank of N.Y. Mellon*

*Corp. Forex Transactions Litig.*, 991 F. Supp. 2d 479, 501 (S.D.N.Y. 2014) (same).

Here, the overall narrative advanced by the Amended Complaint requires a level of

economic irrationality that is fundamentally implausible, and therefore, it should not be

countenanced. In addition, the Trustee's willful blindness–related allegations consist of tired

recitations of the same inquiry notice–type facts that this Court has previously deemed

insufficient, combined with a handful of allegations that cannot be attributed to the BNPP

Defendants and, in any event, also fall far short of showing that any BNPP entity (defendant or

not) believed there was a high probability that Madoff was operating a Ponzi scheme.

17

*i.    The Trustee's Narrative Regarding The BNPP Defendants' Madoff-
Related Activities Is Wholly Implausible*

The Trustee's entire narrative of the case is completely implausible and therefore cannot

be credited. *Twombly*, 550 U.S. at 570 (holding that a court need only credit pleadings that are

plausible on their face). At bottom, the Trustee claims that, while co-managing Oreades, BNPP

SS discovered facts that would suggest a high probability that BLMIS was operating a Ponzi

scheme, liquidated Oreades, and, *because* of these concerns, the BNPP group structured its

business model to become a global leverage provider directly exposed to the risk of loss on

BLMIS feeder fund shares, but without the corresponding upside if those shares' value

appreciated. Am. Compl. ¶¶ 138–40. This claim makes no sense.

As global leverage providers, the BNPP Defendants supposedly took BLMIS feeder fund

shares as collateral for loans or as hedges for swap agreements, intentionally exposing

themselves to a risk of loss in the event that the feeder fund shares depreciated significantly in

value. *Id.* ¶ 183 (feeder funds' accounts with BLMIS "served as collateral for the credit

facility"); *id.* ¶ 408 (BNPP Defendants made investments in Rye Funds to hedge swap and

option agreements). In return for providing leverage, the BNPP Defendants allegedly received

"fees and interest payments," but did not share in any upside if the value of the feeder fund

shares increased. *Id.* ¶¶ 64, 149, 183.[14] If the BNPP Defendants subjectively believed that there

was a high probability that BLMIS was a Ponzi scheme, they would not have structured their

deals as they did because they would have foreseen the ultimate outcome: a loss of $500 million

when the Madoff fraud rendered the group's collateral and hedges worthless. *Cf.* Am. Compl.

---

[14]    These alleged fees paled in comparison to the amounts received by proprietary investors in BLMIS or
BLMIS feeder funds. *Compare Picard v. Mendelow*, 560 B.R. 208, 215 (Bankr. S.D.N.Y. 2016) (noting that
Mendelow received a 17% guaranteed annual rate of return for BLMIS investments, meaning he would have
received $17 million annually for every $100 million invested), *with* Am. Compl. ¶ 183 (alleging that BNPP SA
earned fees and interest payments totaling only 170 basis points above LIBOR—that is, a mere $170,000 above the
cost of funds annually for every $100 million invested).

18

¶ 64 (alleging that the BNPP group received "*tens* of millions of dollars in fees and interest payments" as a result of the structured products (emphasis added)); *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 621 (S.D.N.Y. 2010) (noting the implausibility of auditor ignoring Madoff fraud, as "it is economically irrational to risk your professional reputation" and "legal liability" in exchange for alleged fees); *Legacy*, 548 B.R. at 32 (holding implausible that rational, professional investors would put money into "a Ponzi scheme that is doomed to collapse").

The only plausible inference is that the BNPP Defendants chose to structure and hedge their investments as such because they did not suspect Madoff was a fraud. *See Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund*, No. 08 CIV. 11117, 2013 WL 5179064, at *6 (S.D.N.Y. Sept. 16, 2013) ("[T]he more compelling inference is that [defendant] recognized that an investment with Madoff presented a combination of risks and benefits and genuinely chose to continue its relationship with Madoff.").

### ii. The Laundry List Of "Indicia of Fraud" Cannot Support A Finding That The BNPP Defendants Themselves Knew Of A Fraud

The Trustee has utterly failed to allege facts that would support his fanciful thesis. The bulk of the Amended Complaint consists of nothing more than a laundry list of familiar inquiry notice–type allegations, rebranded as "indicia of fraud," Am. Compl. ¶ 268, such as that (1) Madoff's SSC returns were too good to be true; (2) BLMIS executed trades outside the daily price range; (3) BLMIS's reported assets under management were too large to execute the SSC strategy; et cetera. *Id.* ¶¶ 241–339.[15]

Courts have repeatedly deemed the list insufficient to allege willful blindness. *See Sec.*

---

[15]      The Trustee further alleges that BLMIS's operational structure was vulnerable to fraud, Am. Compl. ¶¶ 241–45; trade reporting was outdated, *id.* ¶¶ 246–53; auditor was small and unqualified, *id.* ¶¶ 254–57; fee structure forwent billions of dollars, *id.* ¶¶ 258–60; Form ADVs underreported the assets under management, *id.* ¶¶ 296–303; options trading was implausibly high in light of the CBOE volumes and unaccountability of OTC trading, *id.* ¶¶ 311–21; trading deviated from the SSC strategy, *id.* ¶¶ 322–330; trades settled later than the industry standard, *id.* ¶¶ 331–35; and reports showed Fidelity Spartan dividends that did not occur, *id.* ¶¶ 336–39.

*Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. 18, 21 (S.D.N.Y. 2014). The *Legacy* decision is particularly instructive in this respect. There, the court made clear that these types of "red flag" allegations, standing alone, cannot satisfy the willful blindness standard because they "amount[] to pleading fraud by hindsight." *See Legacy*, 548 B.R. at 33. The Trustee was only able to clear the first prong of the willful blindness hurdle because he alleged with particularity that the *Legacy* defendants had contemporaneously received a report highlighting the red flags and concluding that BLMIS's claimed trading activity was an *impossibility*,[16] and had exchanged emails betraying their awareness of, and *anxiety* over, those findings.[17] *See Legacy*, 548 B.R. at 18–19.

Here, by contrast, there is no non-conclusory allegation that any of the BNPP Defendants was subjectively aware of these "red flags" before BLMIS went bankrupt. In this regard, the Trustee's claim that the BNPP Defendants received certain feeder-fund account statements and could have deciphered the existence of "red flags," Am. Compl. ¶¶ 285, 322, is pure inquiry notice pleading that falls far short of alleging the sort of contemporaneous, subjective awareness that could support a finding of willful blindness. *Legacy*, 548 B.R. at 29. Accordingly, the Amended Complaint's familiar list of "red flags" cannot support a finding of willful blindness.

---

[16]    The Trustee has conceded that no BNPP entity—much less the BNPP Defendants—received this report. *See supra* note 8 and accompanying text.

[17]    For example, *compare* Am. Compl. ¶¶ 254–57 (alleging that BLMIS's auditor was unequipped to audit the large volumes that Madoff was trading), *with* Am. Compl. ¶ 110, *Picard v. Legacy Capital Ltd.*, Adv. Pro. No. 10-05286 (Bankr. S.D.N.Y. July 2, 2015), ECF No. 112 (hereinafter, "Legacy Am. Compl.") (alleging that Simons emailed Rafael Mayer regarding his concern that Madoff's auditor was insufficiently independent and unqualified); *compare* Am. Compl. ¶¶ 269–84 (alleging that BLMIS's returns did not correlate to the S&P 100 Index and were too good to be true), *with* Legacy Am. Compl. ¶¶ 42–47 (alleging that Renaissance performed an analysis that came to this conclusion and presented the information to Rafael Meyer).

  iii. *Nor Can The Trustee's Other Allegations Support A Finding That The*
    *BNPP Entities Had The Requisite Subjective Belief*

Once the Amended Complaint is stripped of its generic "indicia of fraud" pleadings, it is woefully sparse on allegations relevant to the willful blindness analysis. The remaining allegations relate to: (1) inquiries allegedly made by BNPP SS employee Lionel Trouvain regarding BLMIS during the period when BNPP SS acted as co-manager of Oreades; (2) one-off comments supposedly made by BNPP Private Wealth employee Paolo Gianferrara, at an unstated time; (3) the alleged purchase of a put option and negotiation of certain contractual provisions to protect a small portion of BNPP SA's downside risk on its BLMIS holdings in late 2007 and late 2008; and (4) decisions allegedly made by non-BNPP entities to abstain from investing with BLMIS. None of these allegations—taken alone or together—is sufficient to show that the BNPP Defendants subjectively believed that Madoff likely operated a fraud.

    *a)  The Trouvain Allegations Are Insufficient*

The Trustee's allegations about Lionel Trouvain are insufficient to show that even Trouvain himself believed there was a high probability that Madoff was a fraud, let alone that any belief that Trouvain may have had should be imputed to the BNPP Defendants.

Although the Trustee claims that Trouvain "identified as a fraud risk BLMIS's outdated and delayed method for reporting trades (which allowed BLMIS to fabricate trades with hindsight)," Am. Compl. ¶ 114, that claim is based on a misleadingly selective excerpt from Trouvain's July 7, 2003 email to Access. The Trustee's selective excerpt is particularly notable, given that he previously included a fuller excerpt in a complaint filed in a separate proceeding, from which he voluntarily dismissed BNPP SS with prejudice. *See* Oreades Compl. ¶¶ 53–59. As the Trustee originally pleaded, Trouvain was not questioning whether BLMIS fabricated trades, but rather whether the trades were being correctly recorded among clients:

21

"It would be appropriate to put this type of order transmission in place between us and B. Madoff because in current practice, we have no opportunity to consider the true validity of the orders. *As Broker/Dealer, B. Madoff was audited and it seems that everything is correctly posted but since there is no B. Madoff management company, it is surely very difficult for the auditors to verify that all the deals carried out on behalf of the clients of B. Madoff are correctly indexed to these same clients.* This is a point that our risk and ethics departments found during their internal audit and I have to contribute a source of improvement."

*Id.* ¶ 56 (emphasis on allegations omitted from Amended Complaint). Accordingly, the omitted portions of Trouvain's email exchange make plain that he took as a given that BLMIS was trading securities—"B. Madoff was *audited* and it seems that *everything is correctly posted*," *id.* (emphasis added)—but was unsure as to whether the correct trading amounts were reflected in each BLMIS client account.

Other aspects of the Trustee's Trouvain narrative confirm that Trouvain believed BLMIS was engaged in the trading of securities. For instance, Trouvain's alleged inquiry regarding where the underlying BLMIS assets in the Oreades accounts were held demonstrated that he believed BLMIS was, in fact, trading securities. *Compare* Am. Compl. ¶ 117 (Trouvain inquiring where the underlying BLMIS securities for Oreades's accounts were held), *with Legacy*, 548 B.R. at 31 ("In fact, the Meritage Committee members' anxiety about cherry picking showed the opposite; cherry picking involved actual, albeit fraudulent, trading.").

Similarly, Trouvain allegedly requested from BLMIS on August 7, 2003, "independent verification" as to "[Oreades's] assets and its two underlying accounts" with BLMIS, which was then provided by Frank DiPascali of BLMIS and Friehling & Horowitz (BLMIS's auditor), who confirmed that they were "independent" with respect to BLMIS "under [the] requirements of [the American Institute of CPAs]." Oreades Compl. ¶¶ 57–59.

In fact, at no point does Trouvain question whether BLMIS is actually engaged in the trading of securities. While his inquiries about BLMIS's delayed paper reporting, Am. Compl.

¶ 114, suggest that he believed BLMIS used outdated technology, they fall far short of showing

he believed BLMIS's operation was a sham.  Likewise, his alleged concern about the

implications under Luxembourg law of BLMIS's "hidden role as both custodian and investment

advisor for Oreades," *id.* ¶¶ 118–20, 126, at most shows that he—like many others who invested

with BLMIS—was aware of certain idiosyncrasies in the way BLMIS feeder funds were

structured.  *See, e.g.*, *Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 F. App'x 636, 641

(2d Cir. 2012) (noting that Madoff's business model wherein he served as custodian, investment

manager, and administrator was well known by "investors in and auditors of" various feeder

funds, "and the SEC").  Similarly, Trouvain's purported concern that BNPP SA, as "promoter,"

could be held liable if there were "management problem[s]" at BLMIS, Am. Compl. ¶¶ 116, 123,

138, suggests, at most, that Trouvain had questions about BLMIS's structure, not suspicions that

BLMIS was a fraud.

Not only has the Trustee failed to plead that Trouvain himself subjectively believed that

BLMIS was likely a fraud, but he has also failed to plead facts that would permit the attribution

of any concerns Trouvain may have had to all of the BNPP Defendants.  Although the Trustee

often engages in group pleading, using the term "BNP Paribas" to refer to all entities within the

BNPP group generally—*compare, e.g.*, Am. Compl. ¶ 113 (describing Lionel Trouvain as "a

senior executive at BNP Paribas Securities Services"), *with id.* ¶ 118 (referencing "Trouvain and

other BNP Paribas employees")—there is no non-conclusory allegation that supports the

assertion that Trouvain shared any of his supposed concerns with BNPP SA, BNPP Arbitrage, or

BNPP Cayman.  Moreover, the Trustee's conclusory allegations regarding the purported

structure of the BNPP corporate family, including that certain groups within BNPP worked with

one another in relation to Madoff-related transactions, *id.* ¶¶ 61–83, are insufficient as a matter

of law to impute the knowledge of an employee of one BNPP entity to another BNPP entity. *See Majad ex rel. Nokia Ret. Sav. & Inv. Plan v. Nokia, Inc.*, 528 F. App'x 52, 56 (2d Cir. 2013) (knowledge of one entity should not be imputed to a foreign affiliate).[18]

Further confirmation that the Trustee's Trouvain-related allegations fall far short of showing willful blindness can be found in the Trustee's own actions. Although the Trustee initially sued BNPP SS seeking to recover Oreades subsequent transfers based on similar Trouvain-related allegations, he subsequently voluntarily dismissed BNPP SS with prejudice, apparently recognizing that those allegations could not establish willful blindness. Stip. Dismissing BGL BNP Paribas S.A. & BNP Paribas Securities Services S.A., *Picard v. Oreades SICAV*, Adv. Pro. No. 10-05120 (Bankr. S.D.N.Y. Jan. 19, 2017), ECF No. 98.

### b)    *The Gianferrara Allegations Are Insufficient*

The Amended Complaint's allegations related to Paolo Gianferrara, allegedly employed by non-party BNPP Private Wealth, are also plainly insufficient. That Gianferrara supposedly commented that he "hate[d]" and "always had a problem with Madoff," Am. Compl. ¶¶ 128–29, does not show that Gianferrara himself subjectively believed that Madoff was likely a fraud.[19] Gianferrara's alleged refusal to do business with BLMIS similarly could have been based on any number of reasons unrelated to the possibility that Madoff was a fraud. Moreover, because the Trustee never alleges that Gianferrara's views were shared with the BNPP Defendants, there is no plausible basis for attributing Gianferrara's dislike of Madoff to the entirely separate BNPP

---

[18]    *See also LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 209 (2d Cir. 2005) (corporate relationship that "is essentially one of two siblings" "does not support the imputation of notice or knowledge"); *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009) (a subsidiary's knowledge is not generally imputed to a parent); *Oei v. Citibank, N.A.*, 957 F. Supp. 492, 519 (S.D.N.Y. 1997) (to impute knowledge between "related" entities requires evidence that the court "should pierce the corporate veil").

[19]    The allegation that Gianferrara refused to do business with Madoff is also implausible because the Trustee himself pleads that the very private banking business purportedly led by Gianferrara invested in Madoff-related funds. Am. Compl. ¶¶ 74, 128–29.

Defendants, nor could that personal disdain possibly support an inference that any BNPP Defendant believed that Madoff probably operated a Ponzi scheme.

### c)  The Allegations Regarding Downside Protections Are Insufficient

The Trustee's references to two isolated instances in which BNPP SA allegedly entered into a $70 million put option in connection with the Santa Barbara credit facility or included a contractual provision in certain Fairfield-related notes that provided BNPP SA with downside protection in the event that Fairfield shares declined in value similarly cannot demonstrate that BNPP SA, much less any other BNPP Defendant, was subjectively aware of a high probability that Madoff was a fraud.[20]  Am. Compl. ¶¶ 190, 239.  First, the Trustee never alleges that these downside protections were negotiated *because* BNPP SA believed Madoff was likely a fraud, as opposed to protecting against the risk that his firm might post negative results.  Second, the Trustee does not allege that these downside protections were anything but standard provisions in credit facilities (in the case of Santa Barbara) or in note contracts (in the case of the Fairfield-related notes).  Third, there is no allegation that BNPP SA shifted all or even the majority of its risk by these activities.  In particular, the put option provided only $70 million in protection and the contractual provisions in certain Fairfield-related notes only protected certain of BNPP SA's risk in those specific notes.  Had BNPP SA subjectively believed Madoff was likely a fraud, it is implausible that BNPP SA would not have obtained far greater protection or sought to exit the investments.  In fact, the only plausible inference from the $500 million loss that the BNPP group suffered, which dwarfed the purported protections, is that the BNPP Defendants did not subjectively believe Madoff was probably a fraud.

---

[20]    While the Trustee also mentions that, during the negotiation of the option agreement, the unnamed head of trading for the Fund Derivatives Group told a *former* "BNP Paribas employee . . . that he was unable to reconcile the trading statements BNP Paribas had received from BLMIS," Am. Compl. ¶ 191, the Trustee fails even to specify what this former employee was struggling to reconcile the statements against, for what fund, or during what time period, much less that the former employee held any subjective beliefs about Madoff.

> d)  *The Supposed Concerns Of Certain Non-BNPP Entities Are Irrelevant
>     And Insufficient*

The Trustee's allegations about purported concerns raised by *non-BNPP third-party entities*—such as SocGen, Dresdner, and Fauchier Partners—and those entities' *independent* decisions not to transact with Madoff or BLMIS feeder funds are legally irrelevant and wholly insufficient to show that the BNPP Defendants had the requisite subjective belief about Madoff.

*First*, the Trustee fails to plead even that third-party entities SocGen, Dresdner, and Fauchier Partners *themselves* had the requisite subjective belief that Madoff was a fraud.  For example, the Trustee's allegations with respect to SocGen consist mainly of a recitation of the laundry list of the "indicia of fraud" that have been asserted against all defendants, Am. Compl. ¶¶ 152–61, which are plainly insufficient to show that SocGen subjectively believed Madoff was likely a fraud.  *See supra* at pp. 19–20.  That SocGen blacklisted BLMIS due to these factors, or otherwise decided not to invest based on their internal risk calculus, does not establish that they believed that Madoff was probably operating a Ponzi scheme.  *Id.*  Similarly, the Trustee's bald assertion that Dresdner "raised a variety of concerns about Madoff," Am. Compl. ¶ 218, in determining whether to enter into a Tremont credit facility does not betray a subjective belief that Madoff was probably a fraud.  Nor does the Trustee's allegation that Fauchier said he never invested with Madoff support the conclusion that Fauchier subjectively believed that Madoff returns were "impossible" or that Madoff was likely operating a Ponzi scheme.  *Id.* ¶¶ 133–36.

*Second*, the Trustee fails to plead with the requisite particularity that these entities shared their specific concerns with any of the BNPP Defendants.  In order to predicate the BNPP Defendants' *subjective* belief on concerns raised by *other* parties, the Trustee must identify the who, what, when, and how the BNPP Defendants became aware of those concerns.  *Cf. Merkin*, 563 B.R. at 745–48 (finding that Ezra Merkin was aware of high probability of fraud because

26

Victor Teicher warned Merkin of irregularities and advised Merkin not to invest; investor Joel Ehrenkranz told Merkin that Madoff's returns were "almost impossible"; etc.).

Here, although the Trustee conclusorily claims that ZCM informed unnamed "BNP Paribas executives" that SocGen refused to acquire ZCM due to its concerns about Madoff, the Trustee fails to identify which specific concerns were relayed, when they were relayed, to whom at the BNPP Defendants those concerns were relayed, or from whom they originated. There is accordingly no plausible basis to infer that the BNPP Defendants formed a subjective belief that Madoff was a fraud based on SocGen's supposed concerns. Similarly, the Trustee's conclusory allegation that "[u]pon information and belief, . . . Fauchier Partners shared its knowledge that Madoff was illegitimate . . . with other senior officials at BNP Paribas," Am. Compl. ¶ 136, fails to identify the specific information that Fauchier Partners allegedly shared and when they shared it, or whether the BNPP Defendants (as opposed to unnamed "senior officials at BNP Paribas") ever received such information. "[B]asing allegations of knowledge and fraudulent intent upon information and belief without anything more will not satisfy the pleading requirements under Rule 9(b)." *Ferring B.V. v. Allergan, Inc.*, 932 F. Supp. 2d 493, 511 (S.D.N.Y. 2013) (internal quotation marks omitted). By the same token, the Trustee never alleges that any BNPP entity, let alone any BNPP Defendant, was ever made aware of Dresdner's alleged "concerns," the fact that Dresdner had any involvement whatsoever with Tremont, or that any BNPP entity ever received the information based on which Dresdner elected not to invest with Tremont. Am. Compl. ¶ 218.

Given the Trustee's failure to identify the who, what, when, and how by which third parties allegedly made the BNPP Defendants aware of any specific concerns that Madoff was a fraud, the Trustee's allegations fail to support a finding that the BNPP Defendants subjectively

27

believed that Madoff was probably a fraud. Indeed, permitting the Trustee to rely on these vague allegations regarding third parties would effectively lower the good faith standard to the very inquiry notice standard that the District Court has rejected—that the BNPP Defendants *should have known* that these "red flags" existed simply because other market players may have.

In light of the foregoing, the Trustee's allegations, whether viewed individually or taken as a whole, fail to plausibly plead that the BNPP Defendants subjectively believed there was a high probability that Madoff was a fraud.

### b. *The BNPP Defendants Did Not Turn A Blind Eye Towards The Madoff Fraud*

The Trustee has also failed to plead sufficient facts demonstrating that the BNPP Defendants took "deliberate actions to avoid learning of that fact." *Legacy*, 548 B.R. at 29. As this Court held in the *Legacy* matter, the Trustee cannot meet his burden of pleading that a defendant deliberately "turned a blind eye" to the Madoff fraud if the defendant took steps to conduct due diligence on BLMIS or BLMIS feeder funds. *See id.* at 35 ("[The complaint] does not allege the second prong, that Legacy turned a blind eye to its suspicions. Instead, it alleges that Legacy hired Khronos to conduct due diligence regarding Madoff's trades for Legacy's account."). In this regard, the diligence required to defeat a claim of willful blindness need not have been so comprehensive that the underlying Madoff scheme would have necessarily been revealed. *See Elendow*, 2013 WL 5179064, at *3 (rejecting plaintiff's contention that "because Tremont . . . made the decision to invest with Madoff, one must conclude that, when it came to Madoff, Tremont's due-diligence practices were all but suspended in favor of blind reliance on Madoff's reputation").

In this case, the Trustee's core theory of the case is premised on an impossible level of economic irrationality. Moreover, although the Amended Complaint contains certain conclusory allegations suggesting that the BNPP Defendants altered their ordinary due diligence procedures

28

with respect to BLMIS investments, the Trustee's allegations in fact demonstrate that the BNPP

Defendants conducted sufficient due diligence to preclude a showing that they deliberately

"turned a blind eye" to the Madoff fraud.

> i.     *The Trustee's "Blind-Eye" Narrative Is Fundamentally Implausible*

The Trustee's "blind-eye" narrative makes no sense, in light of his allegations that the

BNPP Defendants, while acting as "global leverage providers," took BLMIS feeder fund shares

as collateral for loans or as hedges for swap agreements.  Am. Compl. ¶¶ 183, 408.  In particular,

the Amended Complaint contains no allegations explaining why the BNPP Defendants, holding

feeder fund shares as collateral or hedges (rather than as standalone proprietary investments

whose value might increase), would have deliberately taken steps to avoid knowledge that

Madoff may have been a fraud and that the BNPP Defendants' collateral and hedges were

accordingly worthless.  Nor does common sense or logic afford any conceivable motive.  *Iqbal*,

556 U.S. at 679 (a court should draw on "common sense" to determine "whether a complaint

states a plausible claim for relief").

> ii.    *The Trustee Repeatedly Alleges That The BNPP Defendants Conducted
>         Diligence*

When his particular allegations are parsed, the Trustee has—fatally for him—consistently

pleaded that the BNPP Defendants conducted diligence with respect to BLMIS or BLMIS feeder

funds.  For instance, in the Amended Complaint, the Trustee concedes that BNPP SA conducted

diligence when a line of credit was extended to Madoff in 1988.  Am. Compl. ¶ 85 ("BNP

Paribas conducted due diligence on Madoff and BLMIS, which included a review and analysis of

BLMIS's Financial Operating and Combined Uniform Single . . . Reports and audited financial

statements as well as meetings between BNP Paribas employees and Madoff at BLMIS's offices

in New York.").  The Amended Complaint further alleges that BNPP SA conducted diligence on

29

BLMIS in connection with the ZCM acquisition in 2003.  *Id.* ¶ 143 ("BNP Paribas conducted

due diligence on ZCM's portfolio of business, including" Santa Barbara, an entity wholly

invested in Harley); *id.* ¶ 163 (noting that "BNP Paribas conducted due diligence in connection

with acquiring ZCM" and had previously gathered "BLMIS's audited financial statements,

customer account statements, and trade confirmations").  As part of that diligence, BNPP SA

convened meetings of its Transaction Approval Committee, Credit Committee, Executive

Position Committee, and Group Risk Management department—all of which were composed of

"senior management," *id.* ¶ 76—in order to review the Santa Barbara transaction.  *Id.* ¶ 181.

Additionally, the Fund Derivatives Group allegedly conducted a due diligence review of BLMIS

account statements in December 2006, *id.* ¶ 230, as well as an on-site diligence visit to BLMIS

in March 2008, *id.* ¶ 175.  The Amended Complaint further notes that the Fund Derivative

Group's due diligence team consistently tracked BNP Paribas's exposure to different fund

managers, including BLMIS, on a "Heat Map." *Id.* ¶¶ 171–74.

Accordingly, although the Amended Complaint contains conclusory allegations that the

BNPP Defendants deviated from their normal due diligence procedures in assessing BLMIS, the

*detailed* allegations clearly show that the BNPP Defendants in fact performed due diligence on

BLMIS.  Much like the complaint in the *Legacy* matter, the Amended Complaint theorizes that

the BNPP Defendants conducted extensive diligence, and learned facts through this diligence

that gave rise to the subjective belief that Madoff was operating a Ponzi scheme, but then tries to

distance itself from the allegations of due diligence in order to show that the BNPP Defendants

"turned a blind eye" to the Madoff fraud.  *Legacy*, 548 B.R. at 38 ("In fact, the Amended

Complaint rests on the theory that Khronos conducted extensive diligence, and through its

30

diligence, acquired actual knowledge that BLMIS was a Ponzi scheme.").  That sort of gamesmanship should be rejected.

Not only is the Amended Complaint replete with references to the BNPP Defendants' due diligence efforts, but the Trustee's prior pleadings against the BNPP Defendants also consistently claim that the BNPP Defendants conducted due diligence.  For example, the Oreades Complaint describes additional diligence performed by Trouvain, which the Amended Complaint artfully omits.  Not only did Trouvain allegedly contact BLMIS to request an "independent verification" of Oreades's trading activity, Oreades Compl. ¶ 57, but he received the requested verification from BLMIS's independent auditor, *id.* ¶ 59.  Similarly, the Trustee has previously alleged in his proffered extraterritoriality allegations that various BNPP entities (including the BNPP Defendants), as well as several feeder fund management companies, conducted due diligence on Madoff and Madoff feeder funds.  *See* Proffer ¶ 13 ("The Fund Derivatives Group . . . conducted initial and *ongoing* due diligence on BLMIS and BLMIS feeder funds." (emphasis added)).[21]

These allegations of due diligence are fatal to the Trustee's claim of willful blindness.

> ### iii.    The Trustee's Conclusory Assertions Of Deviation From Standard Diligence Practice Do Not Salvage His Pleadings

The Trustee's allegations that certain BNPP entities purportedly deviated from their standard due diligence procedures are insufficient to cure the Trustee's deficient pleadings.

*First*, the due diligence deviations alleged by the Trustee are insufficient to show that the

---

[21]    *See also* Proffer ¶ 61 (BNPP Sec. Corp. "conducted due diligence" on the ZCM assets); *id.* ¶ 86 (BNPP Sec. Corp. "conduct[ed] due diligence" on the Tremont credit facility); *id.* ¶ 145 ("due diligence materials" on the Kingate Funds were sent "to BNP" at "duediligence@americas.bnpparibas.com").  The Trustee also alleged that the entities that managed the feeder funds undertook diligence.  *See id.* ¶¶ 39, 42, 52 (Fix Asset Management and Fortis conducted diligence on Harley and BLMIS); *id.* ¶ 69 (Tremont conducted due diligence for all the Tremont Funds); *id.* ¶¶ 135–37 (FIM was hired by Kingate Management Limited to conduct due diligence on BLMIS); *id.* ¶ 157 (Capital E was employed to oversee due diligence on Equity Portfolio).

BNPP Defendants "turned a blind eye" to the Madoff fraud because they do not negate the

substantial due diligence steps that were taken by the BNPP Defendants, as described in the

preceding section.  The Trustee identifies as due diligence deviations that (1) the BNPP

Defendants did not comply with their general policy not to invest in single-manager funds or

funds that did not have a strict separation between the investment manager and custodian, Am.

Compl. ¶¶ 9, 106, 144, 178, 188–89, 241; (2) Madoff-related transactions were "pre-approved"

and therefore did not undergo certain procedures that may otherwise apply, *id.* ¶ 168; and (3) a

diligence memorandum was not drafted following the March 2008 diligence visit with Madoff,

*id.* ¶¶ 175–76.  The allegations that the BNPP Defendants elected to invest in assets that did not

comport with their standard guidelines do not show that the BNPP Defendants chose to avoid

learning that Madoff was a fraud, but at most suggest that the BNPP Defendants may have

decided to take the permissible business decision to adopt specific procedures applicable to

Madoff investments.  Similarly, that the BNPP Defendants allegedly failed to draft a memo after

conducting a March 2008 on-site visit with BLMIS does not change the fact that the diligence

visit was conducted, or otherwise show that they ignored what they learned during the visit.

*Second*, the Trustee has failed to show that any of the BNPP Defendants' alleged due

diligence deviations could be explained by a belief that Madoff may have been running a Ponzi

scheme.  This is significant because, to plead willful blindness, the Trustee must allege deliberate

steps designed to avoid learning that Madoff was a fraud.  *In re Agape Litig.*, 773 F. Supp. 2d

298, 320 (E.D.N.Y. 2011) (plaintiffs must show willful blindness by referencing actions "to

avoid knowledge of [a Ponzi scheme] specifically, as opposed to account fraud generally").

*Merkin* is instructive in this regard.  Merkin created a checklist "for specific indicators of

fraud" to detect Ponzi schemes, including where a fund "had a self-owned broker-dealer," a

"questionable auditing firm" or "an unusual pricing or fee structure," but then deliberately elected not to apply this checklist, which was *designed to find fraud*, to BLMIS. *Merkin*, 515 B.R. at 141–42. By contrast, the Amended Complaint alleges that the Fund Derivative Group's due diligence team visited BLMIS and consistently used its "Heat Map" to track BNPP SA's exposure to different fund managers, including BLMIS. Am. Compl. ¶¶ 171–74.

Likewise, the Trustee's allegations that (1) HSBC requested that non-party BNPP Sec. Corp. remove references to Madoff from an option agreement in December 2007, *id.* ¶ 263, and (2) an Access employee requested that non-party FundQuest remove references to Madoff in LuxAlpha marketing materials, *id.* ¶¶ 264–65, fail to support an inference that the BNPP *Defendants* took deliberate steps to avoid learning that Madoff was a fraud. To begin, these alleged requests did not originate with any BNPP entity and accordingly are not reflective of any deliberate efforts by them. Furthermore, the Trustee never alleges that the purpose of these removals was to conceal the Madoff fraud nor that the BNPP Defendants (as opposed to other BNPP entities) participated in the alleged removals of references of BLMIS in the relevant materials. *Cf. Merkin*, 515 B.R. at 141–42 (Merkin himself directing a third party not to ask Madoff any questions). Thus, neither allegation suggests that any of the BNPP Defendants took steps to prevent themselves from learning of the Madoff fraud.

Accordingly, the Trustee's allegations, whether viewed individually or taken as a whole, fail to plausibly plead that the BNPP Defendants took deliberate steps to avoid learning that Madoff was a fraud and consequently fail to meet the willful blindness test.

### 2. The BNPP Defendants Gave Value For All The Transfers They Allegedly Received

The "'value' that a subsequent transferee must provide under Section 550(b)(1) is 'merely consideration sufficient to support a simple contract,'" rather than the reasonably

equivalent value that an initial transferee must provide. *Legacy*, 548 B.R. at 37.[22]  Here, the

Amended Complaint concedes that all of the BNPP Defendants gave value for the subsequent

transfers at issue.  Specifically, when they redeemed their feeder fund shares, they surrendered

the shares and all rights that attached to them, as well as any rights that they may have had

against the counterparties to which they provided leverage.  Am. Compl. ¶¶ 233, 395, 407.

In light of the foregoing, the Amended Complaint clearly shows that the BNPP

Defendants gave value, in good faith, and "without knowledge of the voidability of the

transfers," and therefore, all of the Trustee's claims—whether for principal amounts or fictitious

profits—must be dismissed under Section 550(b).

### C. Many Of The Trustee's New Claims Are Time-Barred

The Amended Complaint includes certain Rye Funds–related claims that were not

included in the Original Complaint.  These claims are for the recovery of newly alleged transfers

from (1) Insurance Portfolio to BNPP Arbitrage in the amount of $32,865; (2) Insurance

Portfolio to BNPP SA in the amount of $39,628,385; (3) Portfolio Limited to BNPP SS in the

amount of $29,618,807; and (4) Portfolio Limited to BNPP Cayman in the amount of $6,208,420

(the "New Claims").[23]  All of these New Claims are time-barred.

Under 11 U.S.C. § 550(f), claims for recovery against subsequent transferees must be

brought within one year of the avoidance of the initial transfers.  For limitations purposes, a

settlement agreement whereby an initial transferee agrees to return all or part of an initial transfer

to the Trustee "avoids" the initial transfer.  *Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 522

---

[22]    *Compare* 11 U.S.C. § 548(c) (barring the Trustee's avoidance of an initial transfer, among other things, "*to the extent that* [the initial] transferee . . . gave value"), *with* 11 U.S.C. § 550(b)(1) (barring the Trustee's recovery of a subsequent transfer where "a transferee . . . takes [the transfer] *for value*") (emphasis added).

[23]    Critically, these New Claims do not merely enlarge existing transfers.  *Compare, e.g.*, Original Compl., Ex. AB (seeking three specific transfers from 2007–08 from Portfolio Limited to BNPP SS), *with* Am. Compl., Ex. H (seeking these three transfers as well as fourteen additional transfers from 2004–06).

(Bankr. S.D.N.Y. 2012); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26,

32 (S.D.N.Y. 2013). On September 26, 2011, the Court approved a settlement agreement

between the Trustee and the Tremont Group, including Insurance Portfolio and Portfolio

Limited, which avoided the initial transfers underlying the New Claims. Hr'g re Mot. Entry

Order Pursuant Section 105(a), *Picard v. Tremont Grp. Holdings, Inc.*, Adv. Pro. No. 10-05310

(Bankr. S.D.N.Y. Sept. 28, 2011), ECF No. 39; *see also* Mot. Approving Settlement, Ex. A-1

(Settlement Agreement Between Trustee and Settling Defendants) at 17–18, *Picard v. Tremont

Grp. Holdings, Inc.*, Adv. Pro. No. 10-05310 (Bankr. S.D.N.Y. July 28, 2011), ECF No. 17-1.

Accordingly, the limitations period for the filing of the New Claims expired on September 26,

2012—over five years ago—and the New Claims therefore must be dismissed as untimely.

 In a case such as this one, involving non-periodic transfers from the bankrupt entity, each

individual transfer that the Trustee seeks to recover should be treated as a separate and distinct

transaction. Thus, the fact that recovery of other transfers from certain of these feeder funds was

sought in the Original Complaint does not make any of the New Claims timely. *Cf. In re

360networks (USA) Inc.*, 367 B.R. 428, 434 (Bankr. S.D.N.Y. 2007) ("[E]ach potential

preferential transfer is a separate and distinct transaction: a preference action based on one

transfer does not put defendant on notice of claims with respect to any other unidentified

transfers."); *In re Metzeler*, 66 B.R. 977, 984 (Bankr. S.D.N.Y. 1986) ("[R]elation back is to be

ordered on the ground that [different transactions] arise from similar conduct. Courts have

consistently treated preferential transactions as separate and distinct . . . .").

## D. The Court Lacks Personal Jurisdiction Over BNPP Cayman And The Other BNPP Defendants

 The Action must also be dismissed because the Trustee has failed to demonstrate that the

Court can exercise personal jurisdiction over any of the BNPP Defendants. The Trustee bears

the burden of establishing that this Court has either general or specific personal jurisdiction over

each defendant, *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 334 (2d Cir. 2016), and

"with respect to *each* claim asserted," *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d

Cir. 2004).  Here, the Trustee has not shown that the Court can exercise general jurisdiction over

the BNPP Defendants because he does not allege that any BNPP Defendant is incorporated or

has its principal place of business in the United States.  *See Daimler AG v. Bauman*, 134 S. Ct.

746, 760–62 (2014); Am. Compl. ¶¶ 52–55.  Moreover, for the reasons set forth below, the Court

lacks "specific" jurisdiction over the BNPP Defendants because the Trustee has failed to

adequately allege that (1) each BNPP Defendant has a "substantial connection" to New York or

"purposefully" directed its actions to New York and (2) the claims "arise out of" such contacts.

*Walden v. Fiore*, 134 S. Ct. 1115, 1121–22 (2014).

### 1.   *The Court Lacks Personal Jurisdiction Over BNPP Cayman*

The *only* jurisdictional allegation against BNPP Cayman is that it communicated

information and monies to and from New York–based funds.  Am. Compl. ¶¶ 57, 60.  But this

very jurisdictional allegation has already been deemed insufficient to support the exercise of

personal jurisdiction.  *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339 (S.D.N.Y. 2016)

(allegations that foreign defendants "communicated with and transmitted information and funds

to and from BLMIS located in New York" do not constitute a purposeful availment of the laws

of New York).  Nor may personal jurisdiction be predicated on the claim that BNPP Cayman

knowingly intended to make investments in feeder funds that then, in turn, invested in a New

York–based firm, which is nothing more than a variant of the stream of commerce theory of

jurisdiction rejected by the Supreme Court.  *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S.

873, 882 (2011) ("[I]t is not enough that the defendant might have predicted that its [money] will

36

reach the forum State."). BNPP Cayman is not alleged to have any offices or engaged in any

business activities in New York, and the Amended Complaint is wholly devoid of any

allegations specifying the locus of the "leveraged transactions," Am. Compl. ¶ 233, that may

have given rise to the transfers to BNPP Cayman. Under the circumstances, there is no basis for

asserting personal jurisdiction over BNPP Cayman.

### 2.   *The Court Lacks Personal Jurisdiction Over The Other BNPP Defendants*

The allegations levied against the other BNPP Defendants are also insufficient to

establish personal jurisdiction. The allegation that the BNPP Defendants used U.S. bank

accounts to receive transfers from BLMIS feeder funds only applies to BNPP SA, Am. Compl.

¶ 412, and thus provides no jurisdictional basis as to any other BNPP Defendant. Moreover,

BNPP SA's bank account usage was merely incidental to its investment in foreign feeder funds,

and thus insufficient. *Cf. To v. HSBC Holdings PLC*, No. 15-CV-3590 (LTS), 2017 WL 816136,

at *6–7 (S.D.N.Y. Mar. 1, 2017) (contacts with U.S. banking system were "insufficient to

'project' the Foreign Defendants into New York" as they were "incidental consequences of

fulfilling a foreign contract").[24] Indeed, given that BNPP SA had "no choice but to rely upon

correspondent relationships to clear U.S. dollar denominated payments," Heath P. Tarbert &

Liangshun Qian, *The Perils and Promise of Correspondent Banking*, 133 Banking L.J. 53, 55–56

(2016), exercising jurisdiction on this basis would raise serious policy and due process concerns

by opening the door to federal jurisdiction every time a foreign party receives U.S. dollars.

Critically, the Trustee also has failed to adequately plead that his claims arise out of the

BNPP Defendants' purported contacts with the forum. *Walden*, 134 S. Ct. at 1122. While the

Trustee alleges that BNPP SA conducts business in New York and that BNPP SA, BNPP SS, and

---

[24]      *Tremont's* decision to use U.S. bank account to transfer money to the BNPP Defendants is also
jurisdictionally irrelevant because specific jurisdiction requires "contacts that the 'defendant *himself*' creates with
the forum State," rather than contacts created by "third parties." *Walden*, 134 S. Ct. at 1122.

BNPP Arbitrage maintain offices in New York, Am. Compl. ¶¶ 58–59, that BNPP SA (or non-party BNPP Sec. Corp.) employees executed agreements with the Rye Funds in New York, *id.* ¶ 411, and generally that "the transfers from the Tremont Funds arise out of" levered transactions with ties to New York, *id.* ¶¶ 408–11, he fails to establish the requisite connection between specific transfers and any of these contacts. *Sunward*, 362 F.3d at 24. Indeed, some of the transactions that the Amended Complaint cites appear wholly unrelated to his clawback claims, as they involve feeder funds and BNPP entities from which transfers are not sought in the Action. *See, e.g.*, Am. Compl. ¶¶ 227–28 (describing Tremont Swap that involved BNPP SA and XL LP, while never alleging that there were any transfers from XL LP to BNPP SA).

Therefore, this matter must be dismissed for lack of personal jurisdiction.

### E. None Of The BNPP Defendants Was Properly Served

Where, as here, defendants have raised insufficient service of process as a ground for dismissal under Federal Rule 12(b)(5), made applicable to the Action by Federal Rule of Bankruptcy Procedure 7012, "the plaintiff bears the burden of establishing that service was sufficient." *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010). The Trustee cannot meet this burden and, given the five years without proper service since the filing of the Original Complaint, this case should be dismissed. *In re Bozel S.A.*, 549 B.R. 446, 450 (Bankr. S.D.N.Y. 2016) (finding two-year delay before proper service of process unreasonable).

#### 1.  The Trustee Never Attempted To Serve BNPP SS And BNPP Cayman

Each defendant in an action must be served separately, even if they all share the same agent for service. *Holmes v. Caliber Home Loans, Inc.*, No. 16-CV-3344 (KMK), 2017 WL 3267766, at *12 (S.D.N.Y. July 31, 2017) (because only one copy of the complaint and summons was mailed to two defendants, both could not have been served); *In re Teligent Inc.*,

485 B.R. 62, 69 (Bankr. S.D.N.Y. 2013) (noting that serving a common service entity for

multiple defendants was only effective as to addressed defendant).  Here, although the Trustee

purported to serve BNPP SA and BNPP Arbitrage,[25] he has never even *attempted* service on

BNPP SS or BNPP Cayman.  Given that the Trustee has not pleaded that BNPP SA or BNPP

Arbitrage had the necessary "control" over BNPP SS and BNPP Cayman, his attempts to serve

BNPP SA and BNPP Arbitrage are insufficient to cover BNPP SS and BNPP Cayman.[26]  What is

more, the Trustee's efforts to serve BNPP SA and BNPP Arbitrage were deficient for the reasons

discussed below.  Thus, BNPP SS and BNPP Cayman must be dismissed from the Action

pursuant to Rule 12(b)(5).

    2. *The Attempted Service On BNPP SA And BNPP Arbitrage Was Improper*

   Because the Trustee purported to serve BNPP SA and BNPP Arbitrage by "First Class

US Mail" *within the United States*, Aff. Service at 2, he has abjured reliance on any rules

applicable to the service of process on corporations *abroad*, such as Federal Rule of Civil

Procedure 4(f).  Instead, the propriety *vel non* of the Trustee's chosen method of service is

governed by Bankruptcy Rule 7004, which authorizes only three methods of serving

corporations domestically: (1) service authorized by certain provisions of Rule 4; (2) New

York's service of process laws made applicable to the Action through Rule 4(h); and (3) service

by mail as authorized by Rule 7004(b)(3).  The Trustee failed to use any of these authorized

methods of service.

---

[25]  Aff. Service at 3, *Picard v. BNP Paribas S.A.*, Adv. Pro. No. 12-01576 (Bankr. S.D.N.Y. May 8, 2012), ECF No. 4 (hereinafter "Aff. Service").

[26]  *Giar v. Centea, a Div. of KBC Bank, NV*, No. 02 CIV. 7916 (LLS), 2003 WL 1900836, at *1 (S.D.N.Y. Apr. 16, 2003) (service on domestic office of foreign parent entity insufficient to serve subsidiary because there were only conclusory allegations of ownership, and no "pervasive control"), *aff'd sub nom. Giar v. Centea*, 86 F. App'x 461 (2d Cir. 2004); *see also RCC Ventures, LLC v. Brandtone Holdings Ltd.*, No. 1:17-CV-1585-GHW, 2017 WL 3638202, at *4 (S.D.N.Y. Aug. 23, 2017) ("[T]he law respects separate corporate identities even where one corporation may wholly own another. . . ." (internal quotation marks and citation omitted)).

*First*, Federal Rule of Civil Procedure 4(h) regarding service upon corporations does not itself authorize the Trustee's attempt of service by certified mail. *Saregama India, Ltd. v. Mosley*, No. 11-MC-84-P1, 2012 WL 955520, at *2 (S.D.N.Y. Mar. 20, 2012) ("[N]othing in Rule 4(h)(1)(B) provides that service by certified mail constitutes adequate service of process.").

*Second*, the New York C.P.L.R. authorizes service by mail on a corporation "only if [the summons and complaint is] accompanied by two copies of a statement of service by mail and acknowledgment of receipt (in a specified form), with a return envelope, postage prepaid, addressed to the sender." *Holmes*, 2017 WL 3267766, at *11; N.Y. C.P.L.R. § 312-a. The Trustee failed to demonstrate compliance with these procedures. Aff. Service at 2.

*Third*, Rule 7004's own provision permitting service by mail is similarly unavailing. Rule 7004 permits service of process via U.S. mail only by letter addressed to the "attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process[,]" Fed. R. Bankr. P. 7004, which the Trustee's affidavit of service plainly shows was not done. Aff. Service at 2–3 (listing the parties purportedly served as "BNP PARIBAS S.A." and "BNP PARIBAS ARBITRAGE SNC" without including the address to which the papers were delivered, nor listing any person to whom they were directed).

Thus, the Trustee has not properly served *any* of the BNPP Defendants, and the Original and Amended Complaints must be dismissed under Rule 12(b)(5).

## CONCLUSION

For the foregoing reasons, the BNPP Defendants respectfully request that the Court dismiss the Action with prejudice.

Dated: New York, New York
      October 25, 2017

Respectfully submitted,

**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**


By:   */s/ Breon S. Peace*_____

Breon S. Peace
Ari D. MacKinnon
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for the BNP Paribas Defendants*