# EXHIBIT E

1

\*\* C O N F I D E N T I A L \*\*

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---

In re:

BERNARD L. MADOFF INVESTMENT        SIPA LIQUIDATION
SECURITIES LLC,                      No. 08-01789(BRL)

    Debtor.

---

IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff
Investment Securities LLC,

    Plaintiff,

v.                                   Adv. Pro. No.
                                     10-05279 (BRL)
MAGNIFY, INC., et al.,

    Defendants.

---

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
of KURT BRUNNER
on Wednesday, November 7, 2012


Taken at:
Taylor & Wessing LLP
5 New Street Square
London, England



Before Susan A. McIntyre, CSR, RPR, CRR, MBIVR


VOLUME 1
(Pages 1 - 164)

PICARD v. MAGNIFY            CONFIDENTIAL            KURT BRUNNER 11/7/12

2

1                    A P P E A R A N C E S:

4    FOR THE PLAINTIFF IRVING H. PICARD:
          ONA WANG and DAVID McMILLAN
5         BAKER & HOSTETLER
          45 Rockefeller Plaza
6         New York, NY  10111
          owang@bakerlaw.com   212.589.4254
7         dmcmillan@bakerlaw.com   212.847.2838

10   FOR THE DEFENDANTS MAGNIFY, INC. ET AL. AND
     DR K. BRUNNER:
11        MICHAEL WEXELBAUM, ESQ.
          DAVIDOFF HUTCHER & CITRON LLP
12        605 Third Avenue
          New York, NY  10158
13        mw@dhclegal.com   212.557.7200

16   FOR LAURENCE and EMELIE APFELBAUM:
          JONATHAN K. COOPERMAN, ESQ.
17        KELLEY, DRYE & WARREN
          101 Park Avenue
18        New York, NY  10178
          jcooperman@kelleydrye.com   212.808.7534

21   IN ATTENDANCE:
          Ms Ulrike Dehmel, Interpreter
22        Mr Graham Pelham, Videographer
          Ms Susan McIntyre, Court Reporter

1    THE VIDEOGRAPHER: Going off the
2    record, the time is 4:06.
3        (Recess taken at 4:06 p.m.)
4        (Resumed at 4:37 p.m.)
5        THE VIDEOGRAPHER: Back on the
6    record. This marks the beginning of tape number
7    four. The time is 4:37.
8    BY MS WANG:
9        Q. Dr Brunner, I think I have found
10   something that might refresh your recollection
11   about the December 14, 1989, meeting. So you have
12   what's been marked as Brunner Exhibit 14, which is
13   your responses to our discovery request, is that
14   right?
15       A. Yes.
16       Q. Turning to page 15 of Brunner
17   Exhibit 14, I believe that your response discusses
18   a meeting between you, Mr Igoin and Mr Green on
19   December 14, 1989. Can you take a look at
20   page 15, and if it refresh your recollection, can
21   you tell me about the meeting between Mr Green,
22   Mr Igoin and yourself?
23       A. I had thought from my recollection
24   that the meeting must have been in the '90s, and
25   then I mentioned 14 or 18 December '89; but now,

PICARD v. MAGNIFY          CONFIDENTIAL          KURT BRUNNER 11/7/12

92

1    seeing this, then there was this meeting between
2    Mr Igoin, myself and Mr Green on the date you
3    mentioned.
4         Q.   This was the first time that you had
5    met Mr Green; is that right?
6         A.   That's correct.
7         Q.   Can you tell me everything that you
8    can remember about the meeting between the three
9    of you, you, Mr Green and Mr Igoin, and what, in
10   particular, was discussed?
11        A.   As far as I recall it was a
12   continuation of what happened six years before,
13   what Mr Igoin mentioned then.  Mr Igoin was sort
14   of quite advanced in age and in '83 in Zürich he
15   already reflected on what should happen with his
16   money in case he died.  And then, on 14 December
17   1989, Mr Igoin mentioned it in more concrete terms
18   and then took the steps that the shares were then
19   transferred from Magnify to Horowitz, Yeshaya
20   Horowitz Foundation.  And, if I recall correctly,
21   then this Horowitz Foundation is active for youth,
22   but I've done so many testaments, wills, that I'm
23   not sure.  But as I remember they also were acting
24   with regard to health of youth, but I can't be
25   sure.

PICARD v. MAGNIFY                CONFIDENTIAL                KURT BRUNNER 11/7/12

93

```
 1              And I understood the visit of
 2   Mr Igoin, that he wanted to introduce me --
 3   introduce to me the person that then would deal
 4   with the fate of Magnify.  And that was obviously
 5   Mr Green.  I cannot say if it was just a
 6   lawyer/him relationship or if there was a trusting
 7   friendly relationship.
 8              And I believe I then prepared a
 9   resolution in terms of Mr Green who then would
10   tell me what happens with Magnify instead of
11   Mr Igoin.  I thought I had found it, M11, but
12   there must be a document which sets out the
13   resolution as regards this.
14        Q.   When you say "sets out the
15   resolution as regards this," by this do you mean
16   taking instruction from Mr Green with regard to
17   Magnify?
18        A.   (In English) Yes, I think so.  There
19   must be a paper, but I can't -- I looked through
20   it.
21        Q.   Okay, yeah, because that's what
22   we've been trying to understand also.
23        A.   (In English)  But for me was --
24             (Through the interpreter)  And for
25   me it was clear that with Mr Igoin's visit, that
```

94

1   that was the last contact, because he also said
2   farewell to this business.  By transferring the
3   shares from Magnify to Horowitz he acted contrary
4   to the intention or will beforehand in terms that
5   his wife and daughter could replace him, also with
6   regard to the mandate agreement.
7           (In English) Exhibit Brunner 6.
8        Q.  But as far as you remember there was
9   no similar agreement or corresponding agreement
10  executed between you and Mr Green in 1989 as
11  Brunner 6 was executed in 1983 with you and
12  Mr Igoin?
13       A.  No, this does not exist.  It would
14  have -- it would exist between me and the Horowitz
15  foundation.
16          (In English) "Should."
17       Q.  I guess I'm not understanding
18  something here, so maybe you can clarify this for
19  me.
20          I thought at the December 14, 1989,
21  meeting between you, Mr Green and Mr Igoin,
22  Mr Igoin said, in essence:  "Now you take
23  instructions regarding Magnify from Mr Green as
24  well."  So I'm asking if there is any document or
25  any writing that shows that intent?

1      MR COOPERMAN: Objection.

2      THE WITNESS: No, what I mean, what

3  has been done has only been done in 1998.

4      (In English) M23.

5  BY MS WANG:

6      Q. Okay. So going back to the

7  December 14, 1989, meeting, until that point your

8  understanding was that the heirs or the

9  beneficiaries of the agreement regarding Magnify

10 were Mrs Doris Igoin and Miss Laurence Igoin; is

11 that right?

12     A. That's wrong.

13     Q. Okay, how am I wrong?

14     A. In the document Exhibit Brunner 6

15 there is, under the number five, paragraph two --

16 or second paragraph -- there it's laid out that

17 I am obliged to take instructions from Doris Igoin

18 and Laurence Igoin (maiden name of Doris [sic]

19 Apfelbaum), and it's not laid out as regards

20 Magnify.

21     Under Article 4 it says that I had

22 to transfer all rights to Albert Igoin, and he was

23 the shareholder, and to him and nobody else. For

24 me it was clear that in 1983 Mr Igoin, he included

25 his wife and daughter as regards instructions with

PICARD v. MAGNIFY           CONFIDENTIAL           KURT BRUNNER 11/7/12

116

1  nothing.
2        Q.  Back to documents you produced.
3        (Exhibit 20 marked for identification)
4           MS WANG:  Dr Brunner, the reporter
5  has handed you what has been marked as Brunner
6  Exhibit 20 which is a single page with the Bates
7  stamp Brunner 0076.
8  BY MS WANG:
9        Q.  Can you please look at Exhibit 20
10 and tell me what it is.
11       A.  Well, before you said that I had
12 produced it.  I did sign it but I did not write
13 it.  This document has been drafted by Mr Green
14 and it was given to me on 26 July 1996 for me to
15 sign.  The contents of this says that Magnify, Inc
16 transfers to Mr Green all authorisations,
17 decisions, regarding the monies of Magnify to
18 Madoff in New York.  It also says that with regard
19 to Madoff, all policies are laid out, all
20 management of the portfolio.  It also says that
21 Mr Green will receive commission 0.63 percent of
22 the value of the shares.  For me this is quite
23 normal.  I had several companies where there was a
24 trustee, which means that then commission would be
25 paid.  In Switzerland it's normal between half and

PICARD v. MAGNIFY          CONFIDENTIAL          KURT BRUNNER 11/7/12

117

1  one percent.
2      Q.  So where you say you had several
3  companies where there was a trustee who would
4  normally be paid a commission between half and one
5  percent, you were not the trustee, right; there
6  was a separate trustee who was being paid a
7  commission?
8      A.  Sorry, "trustee" is the wrong word,
9  it is the portfolio manager.
10     Q.  So to clarify, you were the director
11 of several companies where there was a portfolio
12 manager who would be paid a commission?
13     A.  (In English)  That is correct.
14     Q.  Going to the first paragraph of this
15 letter, where it says:
16         "Further to discussions concerning
17 management and supervision of the monies of
18 Magnify, Inc, which duties you undertook as of
19 January 1995, and following the discussion on your
20 share in the Company's portfolio profits...."
21         Do you understand that to mean
22 discussions between you and Mr Green regarding
23 Magnify, Mr Green's duties and Mr Green's share in
24 the portfolio profits?
25     A.  Well, this was written by Mr Green.

118

1   I have never discussed with Mr Green, as regards
2   Magnify, its investment policy or also with regard
3   to the engagement with Madoff.
4          Q.   Understanding that Mr Green wrote
5   this letter for your signature, what do you think
6   he meant when he said "further to discussions" and
7   "following the discussion" in the first sentence
8   of that letter?
9          A.   (In English)  What he meant?  He
10  meant that he wants to have money back to
11  January '95.
12         Q.   But were there real discussions
13  between the two of you?
14         A.   (In English)  No.
15         Q.   In the letter you approve Mr Green's
16  appointment as supervisor of the company's
17  investment portfolio.  Was there ever a supervisor
18  of the company's investment portfolio before this
19  letter was drafted?
20         A.   Before there was Mr Igoin who
21  monitored everything.  If I now see this letter
22  91 [sic] to Mr Igoin, I do now assume that he
23  transferred the shares to Horowitz and that he
24  then still continued some duties as regards
25  administration or the portfolio investment -- but

PICARD v. MAGNIFY            CONFIDENTIAL            KURT BRUNNER 11/7/12

119

1    I assume this, I do not know.
2            Q.   When you say he continued certain
3    duties, do you mean Mr Igoin or do you mean
4    Mr Green?
5            A.   I mean Mr Igoin.
6            Q.   At the top of the letter it says
7    "Hand Delivered"; did Mr Green visit you in Glarus
8    around July 1996?
9            A.   (In English)  It might be that --
10                (Through the interpreter)  It's
11   possible that I saw him in Zürich, that
12   I physically met him, otherwise it wouldn't say
13   "Hand Delivered"; but I cannot say if it was in
14   Zürich or Glarus, I do not know.
15           Q.   But you believe that there was a
16   meeting with you and Mr Green in Switzerland
17   around that -- around July 1996?
18                THE INTERPRETER:  Not "Igoin,"
19   sorry, "Green."
20                THE WITNESS:  I have met Mr Green
21   approximately once a year and most of the times he
22   came to Zürich, sometimes to Glarus, and then we
23   would have lunch together.  Sometimes he was
24   accompanied by a lady; I'm not sure if it was his
25   wife or not.

BENDISH REPORTING, INC.
877.404.2193

PICARD v. MAGNIFY        CONFIDENTIAL        KURT BRUNNER 11/7/12

120

1              (In English)  I didn't ask.
2              (Through the interpreter)  And this
3    document must have been signed when there was a
4    visit, otherwise I couldn't explain that.
5              MR WEXELBAUM:  Meaning that phrase
6    "hand delivered"?  Couldn't explain that?
7              THE WITNESS:  (In English)  Yes.
8    BY MS WANG:
9         Q.  In the second paragraph of the
10   letter that starts:  "In the framework of your
11   duties you will be responsible for the following,"
12   and then it lists five responsibilities, was it
13   your understanding that before this letter was
14   issued that if it was anybody's responsibility it
15   was Mr Igoin's responsibility?
16        A.  Well, it was Mr Igoin's assets and
17   so it was his responsibility, that was my
18   understanding.
19        Q.  So Mr Igoin never asked you or
20   directed you to set any investment policies with
21   respect to Magnify?
22        A.  That's right.  That's what it means.
23   BY MS WANG:
24        Q.  And Mr Igoin never asked you or
25   directed you to manage the portfolio at Madoff or

BENDISH REPORTING, INC.
877.404.2193

PICARD v. MAGNIFY         CONFIDENTIAL         KURT BRUNNER 11/7/12

121

1  safeguard the company funds invested in Madoff; is
2  that right?
3        A.  That's correct.
4        Q.  Mr Igoin never asked you or directed
5  you to follow up on actual implementation of
6  investment policies of the Magnify funds; is that
7  right?
8        A.  That's right.
9        Q.  Mr Igoin never asked you or directed
10 you to examine the earnings of Magnify at any
11 point in time; is that right?
12       A.  That's right.
13       Q.  Mr Igoin never asked you or directed
14 you to supervise the movement of funds in the
15 portfolio either; is that right?
16       A.  That's right.
17       Q.  Is it fair to say that Mr Green, in
18 drafting this letter, created and undertook to
19 take on these responsibilities that had not been
20 done by anybody before July of 1996?
21            MR WEXELBAUM:  Objection.  The
22 witness has said it's his belief that Mr Igoin was
23 doing all of this.
24            Do not answer this question.
25 I don't think it is a proper question at all.

BENDISH REPORTING, INC.
877.404.2193

1    MS WANG:   State your basis for your
2    objection.
3    MR WEXELBAUM:   I already did.
4    MS WANG:   What, that it's improper?
5    MR WEXELBAUM:   Read the question and
6    read my comment.
7    MS WANG:   I'll read the answer.  The
8    answer was:
9    "Well it was Mr Igoin's assets and
10   so it was his responsibility, that was my
11   understanding."
12   That does not mean necessarily that
13   anybody, including Mr Igoin or anybody else, was,
14   in fact, undertaking any of these duties before --
15   MR WEXELBAUM:   Now read your
16   question, please.
17   MS WANG:   (To the interpreter)  Did
18   you just translate the objection?
19   THE INTERPRETER:   I translated the
20   objection then what you said.
21   MS WANG:   I'll read the question
22   again, which was:
23   "Is it fair to say that Mr Green, in
24   drafting this letter, created and undertook to
25   take on these responsibilities that had not been

PICARD v. MAGNIFY          CONFIDENTIAL          KURT BRUNNER 11/7/12

123

1  done by anybody before July of 1996?"
2              MR WEXELBAUM:  I object.  You're
3  assuming a fact not in evidence.
4              MS WANG:  Well, you can -- that's
5  not a proper ground to instruct a witness not to
6  answer.
7              MR WEXELBAUM:  I'm instructing him
8  not to --
9              I think you should rephrase the
10  question and ask him whether anyone prior to this
11  was doing any of this to his knowledge.
12             MS WANG:  I think it's still an
13  improper ground for objection and an improper
14  ground for an instruction not to answer.
15             MR WEXELBAUM:  That's okay.
16  BY MS WANG:
17       Q.   Okay, Mr Brunner, are you going to
18  follow your counsel's instruction?
19       A.   (In English)  I can answer the
20  question.
21             As I don't know an answer to your
22  question, I just can assume or suggest, but I --
23  I'm here as a testimony, so I can -- I haven't
24  seen it, I have no idea whether he did or he
25  didn't.  That is my answer.

BENDISH REPORTING, INC.
877.404.2193

PICARD v. MAGNIFY           CONFIDENTIAL           KURT BRUNNER 11/7/12

124

1    Q.  Okay.  Before July 1996, Mr Igoin
2  never told you that he was setting investment
3  policies with regard to Magnify's portfolio in
4  Madoff, did he?
5    A.  He did not, because he wanted his
6  money and not my money.
7    Q.  I'm not understanding the "because
8  he wanted his money and not my money"?
9    A.  Mr Igoin, he managed his own money.
10 It was his own money so it was not my money, so he
11 didn't have to discuss it with me.
12   Q.  And it was not your job or your
13 responsibility as director of Magnify to undertake
14 any of the responsibilities listed in the second
15 paragraph of Brunner Exhibit 20?
16   A.  I used to be the trustee director,
17 and if then the shareholder introduces other
18 measures, then there I do not have to say
19 anything.
20   Q.  I'm not understanding where you say
21 "if then the shareholder introduces other
22 measures."
23   A.  If I am a trustee, then I have to do
24 whatever the person who enables the trust or the
25 shareholder wants me to do.  So if the person

PICARD v. MAGNIFY        CONFIDENTIAL        KURT BRUNNER 11/7/12

125

1    enabling the trust or the shareholder then issues
2    a measure to be introduced, then for me as a
3    trustee there is no place also to do that.
4          Q.   Okay, so -- I understand.
5               So before July of 1996 then, if
6    Magnify's investments with BLMIS are being managed
7    or supervised, they were the responsibility of
8    Mr Igoin, and then after this letter, Brunner
9    Exhibit 20, they become the responsibility of
10   Mr Green; is that right?
11         A.   As far as I'm concerned this is
12   right, but I do not know what kind of agreements
13   Mr Green and Mr Igoin had.
14         Q.   Once Mr Green undertook the
15   responsibility set out in the second paragraph of
16   Brunner Exhibit 20, you also did not have any
17   responsibility to supervise or oversee what
18   Mr Green was doing; is that right?
19         A.   Already on 23 June '95, so one year
20   before this paper, I had to make the decision that
21   Mr Green was managing director and also had the
22   power of attorney.  And if Mr Green was the
23   managing director and not the trustee, then for me
24   there was no space for any more duties as set out
25   here.