**Davidoff Hutcher & Citron LLP**
605 Third Avenue, 34th Floor
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Michael Wexelbaum
E-mail: mw@dhclegal.com
Larry Hutcher
E-mail: lkh@dhclegal.com
Michael Katz
E-mail: mdk@dhclegal.com

*Attorneys for Defendants Magnify Inc., Premero
Investments Ltd., Strand International Investments
Ltd., The Yeshaya Horowitz Association, Yair Green,
and Express Enterprises Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-05279 (SMB) |
| v. | |
| MAGNIFY INC., PREMERO INVESTMENTS LTD., STRAND INTERNATIONAL INVESTMENTS LTD., THE YESHAYA HOROWITZ ASSOCIATION, YAIR GREEN, and EXPRESS ENTERPRISES INC., | |
| Defendants. | |

## AFFIDAVIT OF YAIR GREEN IN SUPPORT OF DEFENDANTS' MOTION
## TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

STATE OF NEW YORK     )
                              ) ss:
COUNTY OF NEW YORK    )

**YAIR GREEN,** being duly sworn, deposes and says:

1.     I am one of the defendants named in the above-entitled adversary proceeding, and make this Affidavit in support of the motion of the defendants Magnify Inc. ("Magnify"), Premero Investments Ltd. ("Premero"), Strand International Investments Ltd. ("Strand"), The Yeshaya Horowitz Association ("YHA"), Yair Green ("Green"), and Express Enterprises Inc. ("Express") (collectively, the "Defendants," and each individually, a "Defendant") to dismiss the Second Amended Complaint ("SAC")[1] filed by the plaintiff Irving H. Picard ("Plaintiff" or "Trustee") in his capacity as Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure* ("*Fed.R.Civ.P.*"), made applicable to this matter by Rule 7012 of the *Federal Rules of Bankruptcy Procedure* ("*Fed.R.Bankr.P.*").

2.     I am fully familiar with the facts and circumstances hereinafter set forth.

3.     I am a resident and citizen of the State of Israel and have been a practicing attorney and reputable member of the Israeli bar since 1970. I am not a financial adviser, money manager, securities broker, or financial professional of any sort. I have an impeccable and unblemished record as an attorney and my reputation had been untarnished until the Trustee asserted his scandalous and scurrilous accusations against me in this proceeding, which became a matter of public knowledge in Israel.

4.     During the course of my legal career, I have been the recipient of three honorary degrees that were bestowed upon me by the prestigious academic institutions Ben-Gurion University of the Negev (an honorary doctorate granted in 2006), Bar Ilan University (an honorary

---

[1]   Capitalized terms not otherwise defined herein have the same meanings ascribed to them in the SAC.

589954v.8

doctorate granted in 2008), and the Jerusalem Academy of Music and Dance (an honorary Trusteeship in 2015).[2]  In addition, I previously served as a member of the Planning and Budgeting Committee of The Council for Higher Education of Israel.

5.    I respectfully submit that the Trustee's unfounded allegations accusing me of complicity in the monumental fraud perpetrated by Bernard L. Madoff ("Madoff") through what is now known as the BLMIS Ponzi scheme are designed and intended to besmirch my character before this Court in an effort to poison the Court's opinion of me and to distract it from the issues raised by the instant motion, *inter alia*, the issues of "actual knowledge" and "willful blindness."

6.    I deem it imperative for the Court to note that the overwhelming bulk of the funds that the Trustee seeks to recover in this proceeding – over $126 million of the almost $154 million sued for by the Trustee – constitute monies that were transferred by Magnify to YHA and thereafter disbursed by YHA as charitable donations for the promotion and enhancement of scientific and medical research in Israel.[3,4]  Those charitable contributions had universal implications for the betterment of mankind. Among the beneficiaries of those bequests were: The Hebrew University of Jerusalem; Ben-Gurion University of the Negev; Weizmann Institute of Science; Tel Aviv University; Bar Ilan University; The Israel Technion; Haifa University; Hadassah Medical Organization; Rambam Hospital, Haifa; Schneider Children's Hospital; and

---

[2]    In ¶ 8 of the SAC, the Trustee acknowledges my honorary degrees, albeit he has the audacity to denigrate the honors bestowed upon me by conclusorily alleging that they were bestowed upon me "[i]n return" for the charitable endeavors of YHA.

[3]    The Trustee acknowledges the charitable nature of the activities conducted by YHA and the fact that approximately five-sixths of the monies that the Trustee seeks to recover herein (i.e., as alleged by the Trustee, "most of the money, including more than $120 million") was "transferred from Magnify to Defendant Yeshaya Horowitz Association's ('YHA') Account, and then distributed . . . to prominent organizations throughout Israel." SAC ¶ 5. YHA's charitable contributions of monies donated to it by Magnify are thereafter repeatedly referred to in the SAC. *See id.* ¶¶ 8, 53, 54, 59, 60, 66, 67, 142, 143, 144.

[4]    As is hereinafter set forth, the balance of those monies was used for legitimate purposes, as approved by Albert Igoin and Doris Igoin for Magnify and Strand and by Shimon Katz for Premero.

Sheba Medical Center. In addition, some of the donations were used to establish and fund the Center for the Study of Rationality within the Hebrew University, which has been the professional "home" of Professor Robert Aumann, whose research at that facility earned him a Nobel Prize in economics.

7.    Despite knowing full well that the overwhelming majority of the funds that the Trustee seeks to "clawback" from the Defendants were used for charitable purposes and good works throughout Israel, the Trustee attempts to create a "bad faith" scenario herein by claiming, without any true factual basis or support, that I was the architect of a fraudulent scheme devised to benefit me and my family and friends. However, as is conclusively demonstrated by the documentary evidence hereinafter referred to and upon which much of the SAC is based, those allegations are false and are known to be false by the Trustee. In addition, even if true, which I adamantly and strenuously deny, those allegations do not suffice to adequately plead that I had "actual knowledge" that BLMIS was perpetrating a Ponzi scheme and was not actually engaged in the trading of securities.

8.    I am advised by counsel that upon a motion such as this, the court is required to consider (a) documents attached to the complaint as an exhibit, (b) documents incorporated into the complaint by reference, (c) documents integral to the complaint, (d) documents that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit and that the plaintiff relied on in bringing suit, and (e) matters of which a court may take judicial notice. In addition, counsel has also advised me that where the complaint cites or quotes from a document, the court may consider other parts of the same document on a motion to dismiss. Furthermore, I am informed by counsel that where a plaintiff seeks to evade the import of a document and attempts to conceal it from the court because the contents thereof "give the lie" to a false factual

3

presentation in the complaint, the defendant may present the document to the court and such a document may properly be considered on a motion to dismiss. I respectfully submit that all of the documents referred to below and annexed as Exhibits hereto fall within the aforesaid parameters and may, and should, be considered by this Court in determining the motion now being made.

9.    Attached hereto as **Exhibit A** is a true and correct copy of the Second Amended Complaint that was filed in the above-entitled adversary proceeding on September 29, 2017.

10.    Attached hereto as **Exhibit B** is a true and correct copy of the plea allocution of Madoff in *U.S. v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009), which is referred to in ¶ 25 of the SAC for the Trustee's contention that at his plea hearing "Madoff admitted that he 'operated a Ponzi scheme through the investment advisory side of BLMIS.'" SAC ¶ 25 (*quoting* Ex. B at 23). What the Trustee fails to note is that in his plea allocution, Madoff represented to the Judge before whom he was entering his guilty plea that "[t]o the best of my recollection, my fraud began in the early 1990s." Ex. B at 25. I am advised by counsel for the Defendants that in other proceedings before this Court it has been brought to the Court's attention that Madoff contends, and has stated under oath, that his BLMIS Ponzi scheme did not begin until 1992, and I submit that the Court may take judicial notice of Madoff's position on that issue.

11.    Attached hereto as **Exhibit C** is a true and correct copy of the plea allocution of Frank DiPascali, Jr. ("DiPascali") in *U.S. v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), which is referred to in ¶ 26 of the SAC to support the Trustee's contention that "DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s." In making that allegation, the Trustee ignores DiPascali's representations to the Judge before whom he was entering his plea that "from the early 1990s . . . I helped Bernie Madoff . . . carry out the

fraud," (Ex. C at 44), "[b]y 1990 or so Bernie Madoff was a mentor to me" and "[b]y the early 1990s Bernie Madoff had stable clients whose accounts he managed as an investment advisor," (*id*. at 45), "[f]rom at least the early 1990s . . . there was one simple fact that Bernie Madoff knew, that I knew . . . but that we never told the clients nor did we tell the regulators like the SEC. No purchases of (sic) sales of securities were actually taking place in their accounts. It was all fake. It was all fictitious[,]" (*id*. at 46), and "[b]etween the early '90s . . . at Bernie Madoff's direction, . . . I . . . took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place," (*id*. at 47). Rather than acknowledge that DiPascali repeatedly stated that the fraud at BLMIS began in "the early 1990s," the Trustee relies upon DiPascali's inconclusive response to the Judge's inquiry as to when he realized that no securities trading was actually taking place, to which DiPascali responded "[i]n the late '80s or early '90s," (*id*. at 46), to support the Trustee's allegation that DiPascali purportedly admitted "that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s." SAC ¶ 26. Obviously, as set forth above, DiPascali made no such admission, and if anything, the weight of his statements to the Judge before whom he entered his plea was to the effect that the BLMIS Ponzi scheme did not begin until "the early 1990s" rather than "since at least the 1980s." DiPascali's plea allocution does not support the Trustee's contention that the BLMIS fraud began prior to the 1990s, and as DiPascali is now deceased, no further testimony can be taken to elaborate on what he previously said.

12.   Attached hereto as **Exhibit D** is a true and correct copy of a Judgment rendered by a Justice of the High Court of Justice of England, which is cited on pages 2-4 of Defendants' Memorandum of Law submitted herewith and which is annexed hereto for the convenience of the Court. The Court may take judicial notice thereof. The purpose of this submission is to bring

589954v.8

before the Court another Judge's findings and conclusions regarding the public perception of Madoff prior to his fall from grace, and the impact of that widespread perception of Madoff, which I shared, in evaluating the issue of whether I had "actual knowledge" of the BLMIS Ponzi scheme prior to Madoff's arrest and the public disclosure of his massive fraud.

13.    Attached hereto as **Exhibit E** is a true and correct copy of relevant portions of the transcript of the deposition of Kurt Brunner ("Brunner") conducted by the attorneys for the Trustee on November 7, 2012.  Throughout the time period at issue herein, Brunner was the Sole Director of Magnify. *See infra* ¶¶ 22, 24; SAC ¶ 39. Brunner was named as a defendant in the Trustee's initial Complaint and First Amended Complaint, but this proceeding has since been dismissed as against him pursuant to a settlement that he entered into with the Trustee (which to date the Trustee has failed to disclose to the Defendants despite demands for the terms and conditions thereof, that being an issue for another day). The Trustee quotes from Brunner's deposition testimony in support of the repetitive allegation that I was in charge of Magnify and its BLMIS Accounts beginning in 1989. The Trustee predicates this baseless and false allegation upon a snippet of Brunner's testimony quoted completely out of context in ¶ 56 of the SAC, wherein it is alleged: "At a December 14, 1989 meeting at Brunner's office in Switzerland, Igoin [the founder of Magnify] introduced Green to Brunner as 'the person that would then deal with the fate of Magnify.'" As the Trustee's claim that I had actual knowledge of the BLMIS Ponzi scheme is predicated in large part upon the Trustee's false contention that I took over control of Magnify in 1989, when in fact I was nothing more than Magnify's Israeli attorney until after Igoin passed away in 1995, it is important to examine Brunner's testimony both before and after he made the statement quoted by the Trustee in the SAC. The language quoted by the Trustee appears on page 93 of the transcript annexed hereto as Exhibit E. However, the Trustee ignores

the following testimony by Brunner both before and after making the statement quoted by the

Trustee:

A.    On pages 91-93 of the transcript annexed hereto as Exhibit E, Brunner gave the

following testimony:

> Q.    Dr. Brunner, I think I have found something that might refresh your recollection about the December 14, 1989, meeting. So you have what's been marked as Brunner Exhibit 14, which is your responses to our discovery request, is that right?

> A.  Yes.

> Q.    Turning to page 15 of Brunner Exhibit 14, I believe that your response discusses a meeting between you, Mr. Igoin and Mr. Green on December 14, 1989. Can you take a look at page 15, and if it refresh [sic] your recollection, can you tell me about the meeting between Mr. Green, Mr. Igoin and yourself?

> A.    I had thought from my recollection that the meeting must have been in the '90s, and then I mentioned 14 or 18 December '89; but now, seeing this, then there was this meeting between Mr. Igoin, myself and Mr. Green on the date you mentioned.

> Q.  This was the first time that you had met Mr. Green; is that right?

> A.  That's correct.

> Q.  Can you tell me everything that you can remember about the meeting between the three of you, you, Mr. Green and Mr. Igoin, and what, in particular, was discussed?

> A.    As far as I recall it was a continuation of what happened six years before, what Mr. Igoin mentioned then. <u>Mr. Igoin was sort of quite advanced in age and in '83 in Zurich he already reflected on what should happen with his money in case he died. And then, on 14 December 1989, Mr. Igoin mentioned it in more concrete terms</u> . . . .

>     <u>And I understood the visit of Mr. Igoin, that he wanted to introduce me -- introduce to me the person that then would deal with the fate of Magnify.</u> And that was obviously Mr. Green. I cannot say if it was just a lawyer/him relationship or if there was a trusting friendly relationship.

7

(emphasis added).

Thus, Brunner's testimony makes clear that when he made the statement quoted in the SAC, he did so in the context of what he was told would happen only after Igoin's death, whenever that might occur, and not what was to happen in 1989 when the meeting about which Brunner was testifying took place.

B.    Following the aforesaid testimony, Brunner testified as follows on pages 94-95 of the transcript annexed hereto as Exhibit E:

> Q.    But as far as you remember there was no similar agreement or corresponding agreement executed between you and Mr. Green in 1989 as Brunner 6 was executed in 1983 with you and Mr. Igoin?
>
> A.    No, this does not exist. . . .
>
> Q.    I guess I'm not understanding something here, so maybe you can clarify this for me.
>
> I thought at the December 14, 1989, meeting between you, Mr. Green and Mr. Igoin, Mr. Igoin said, in essence: "Now you take instructions regarding Magnify from Mr. Green as well." So, I'm asking if there is any document or any writing that shows that intent?
>
> MR. COOPERMAN:  Objection.
>
> THE WITNESS:  No, what I mean, <u>what has been done has only been done in 1998</u>.[5]

(emphasis added).

Thus, Brunner testified that there was no document setting forth my authority to give instructions to Brunner regarding Magnify until after Igoin had passed away in January 1995.

---

[5]    Actually Brunner misspoke here and overlooked an earlier corporate resolution of Magnify dated June 23, 1995. *See infra* ¶ 23, Ex. Q; SAC ¶ 38.

589954v.8

C.    On pages 116-25 of the transcript annexed hereto as Exhibit E, Brunner testified as

follows with respect to the management and supervision of Magnify's Accounts with

BLMIS:

> MS. WANG:  Dr. Brunner, the reporter has handed you what
> has been marked as Brunner Exhibit 20 which is a single
> page with the bates stamp Brunner 0076.

BY MS. WANG:

Q.  Can you please look at Exhibit 20 and tell me what it is.

A.  Well, before you said that I had produced it. I did sign it but I did
not write it. This document has been drafted by Mr. Green and it was
given to me on 26 July 1996 for me to sign. The contents of this says
that Magnify, Inc. transfers to Mr. Green all authorisations [sic],
decisions, regarding the monies of Magnify to Madoff in New York. It
also says that with regard to Madoff, all policies are laid out, all
management of the portfolio. It also says that Mr. Green will receive
commission 0.63 percent of the value of the shares. For me this is
quite normal. I had several companies where there was a trustee,
which means that then commission would be paid. In Switzerland it's
normal between half and one percent.

Q.   So where you say you had several companies where there was a
trustee who would normally be paid a commission between half and
one percent, you were not the trustee, right; there was a separate
trustee who was being paid a commission?

A.  Sorry, "trustee" is the wrong word, it is the portfolio manager.

Q.   So to clarify, you were the director of several companies where
there was a portfolio manager who would be paid a commission?

A. (In English) That is correct.

Q.  Going to the first paragraph of this letter, where it says:

> "Further to discussions concerning management and supervision
> of the monies of Magnify, Inc., which duties you undertook as of
> January 1995, and following the discussion on your share in the
> Company's portfolio profits . . . ."

Do you understand that to mean discussions between you and Mr.

9

Green regarding Magnify, Mr. Green's duties and Mr. Green's share in the portfolio profits?

A.  Well, this was written by Mr. Green. I have never discussed with Mr. Green, as regards Magnify, its investment policy or also with regard to the engagement with Madoff.

Q.  Understanding that Mr. Green wrote this letter for your signature, what do you think he meant when he said "further to discussions" and "following the discussions" in the first sentence of that letter?

A.  (In English) What he meant? He meant that he wants to have money back to January '95.

Q.  But were there real discussions between the two of you?

A.  (In English) No.

Q.  In the letter you approve Mr. Green's appointment as supervisor of the company's investment portfolio. Was there ever a supervisor of the company's investment portfolio before this letter was drafted?

A.  Before there was Mr. Igoin who monitored everything. . . . I do now assume that he [Igoin] transferred the shares to Horowitz and that he then still continued some duties as regards administration or the portfolio investment -- but I assume this, I do not know.

Q.  When you say he continued certain duties, do you mean Mr. Igoin or do you mean Mr. Green?

A.  I mean Mr. Igoin.

Tr. at 116-19 (emphasis added).

* * *

BY MS. WANG:

Q.  In the second paragraph of the letter that starts: "In the framework of your duties you will be responsible for the following," and then it lists five responsibilities, was it your understanding that before this letter was issued that if it was anybody's responsibility it was Mr. Igoin's responsibility?

A.  Well, it was Mr. Igoin's assets and so it was his responsibility, that was my understanding.

Q. So Mr. Igoin never asked you or directed you to set any investment policies with respect to Magnify?

A. That's right. That's what it means.

Tr. at 120 (emphasis added).

* * *

Q. Okay. Before July 1996, Mr. Igoin never told you that he was setting investment policies with regard to Magnify's portfolio in Madoff, did he?

A. He did not, because he wanted his money and not my money.

Q. I'm not understanding the "because he wanted his money and not my money"?

A. Mr. Igoin, he managed his own money. It was his own money so it was not my money, so he didn't have to discuss it with me.

Tr. at 124 (emphasis added).

* * *

Q. Okay, so -- I understand.

So before July of 1996 then, if Magnify's investments with BLMIS are being managed or supervised, they were the responsibility of Mr. Igoin, and then after this letter, Brunner Exhibit 20, they become the responsibility of Mr. Green; is that right?

A. As far as I am concerned this is right, but I do not know what kind of agreements Mr. Green and Mr. Igoin had.

Tr. at 125 (emphasis added).

The foregoing testimony by Brunner confirms the truth, which is that I had absolutely nothing to do with the BLMIS Accounts of Magnify until after Igoin's death in 1995, which is why I drafted the Fee Agreement providing for the payment of my fees "concerning management and supervision of the monies of Magnify Inc., which duties [I] undertook as of January 1995." *See infra* Ex. EE. Prior to his death, Igoin executed sole

11

and exclusive control over Magnify's BLMIS Accounts. I played no role in the management or supervision thereof, and did not assume those duties until after Igoin had died. Thus, when taken as a whole rather than in an out-of-context snippet, Brunner's testimony "gives the lie" to the Trustee's repeated assertion in the SAC that I was in control of Magnify, and in particular Magnify's BLMIS Accounts, from 1989 onwards. That repetitive allegation is patently untrue, and the Trustee's reliance upon one skimpy out-of-context excerpt from Brunner's testimony to support that false contention is completely misplaced.[6]

14.    Attached hereto as **Exhibit F** is a true and correct copy of the Customer Claim filed by YHA in the liquidation proceeding of BLMIS, which includes as an attachment thereto the customer statement dated 11/30/08 issued to YHA by BLMIS. This Customer Claim is referred to in ¶ 45e, ¶ 168, and ¶ 232 of the SAC. YHA's Customer Claim serves to refute the Trustee's outrageous allegation in ¶ 89 of the SAC that I lied to a reporter about YHA's losses in the BLMIS fraud. The Trustee wrongfully alleges in ¶ 89 that: "Indeed, when asked by a reporter after BLMIS's fraud came to light whether YHA's losses exceeded $800 million, Green dismissed this number as 'fantastical' and stated that the amount was far smaller." Thus, the Trustee besmirches my honesty and integrity and endeavors to damage my credibility before this Court by implying that I lied when I told a reporter that YHA's losses in the BLMIS matter were

---

[6]    The SAC alleges repetitively that I commenced meeting with Madoff two to three times a year beginning in the early 1990s. Those conclusory statements are false and without any factual basis or support whatsoever. In fact, I was never in the United States from 1986 until 1993. I met Madoff for the first time in 1993 at a brief social meeting. I met Madoff again in 1994 at another brief social meeting, during which Madoff did ask me to have a new "customer agreement" form signed by YHA. See *infra* Ex. KK. My third meeting with Madoff was in February 1995, after Igoin had passed away, and that was the very first time that I discussed the business of Magnify with Madoff. My semi-annual business meetings with Madoff did not commence until 1996, and my social meetings with Madoff and his wife Ruth Madoff took place on just three or four occasions. Also relevant to this issue is the fact that after I assumed the management and supervision of Magnify's BLMIS Accounts in 1995, whenever I desired a transfer or withdrawal therefrom I sent Madoff or BLMIS a letter requesting that such a transaction be implemented. By way of example, *see infra* letters attached hereto as Exhibits CC and DD. The Trustee refers to all of my correspondence with Madoff and BLMIS throughout the SAC, but he cannot refer to or produce a single such letter from me prior to Igoin's death in 1995. The Trustee cannot produce any such letters because they do not exist.

far smaller than $800 million. In point of fact, and as is well known to the Trustee, YHA's paper

losses in its BLMIS Account were in the sum of $51,543,614.10 as of November 30, 2008, just a

few days before the collapse of BLMIS came to light. That amount is reflected in both the YHA

Customer Claim and the attached customer statement dated 11/30/08 issued on YHA's Account,

and those documents have been in the Trustee's possession since they were filed by YHA with

the Trustee on or about March 2, 2009, as alleged in ¶ 168 of the SAC. The sum of

approximately $51.5 million is obviously far smaller than the sum of $800 million. Thus, I did

not lie to or mislead the reporter in any way. Rather, it is the Trustee who is playing fast and

loose with the "facts" set forth in the SAC despite knowing that the allegations set forth therein

are false.

15.    In ¶ 91 of the SAC, it is also falsely alleged that I saw the customer statements that

were sent to YHA by BLMIS and was familiar therewith. That conclusory allegation is patently

false, as I never saw those customer statements until after the collapse of BLMIS. On the other

hand, in ¶ 141 of the SAC it is alleged that "Green largely avoided providing personal direction

to BLMIS regarding withdrawals from YHA's Account." As is well-known to the Trustee from a

multitude of correspondence that has previously been produced by YHA and has been in the

Trustee's possession for years before the drafting of the SAC, whenever YHA desired to

withdraw or transfer funds from its BLMIS Account, a letter was submitted to BLMIS on the

letterhead of YHA and those letters were signed by authorized representatives of YHA (directors

and/or officers thereof), and not by me. *See* correspondence from YHA to Madoff and

corresponding debit memos from BLMIS to YHA attached hereto collectively as **Exhibit G**. If I

ever submitted such a letter on behalf of YHA as its attorney, that was an outlier, and not the

general practice.

589954v.8

16.    Attached hereto as **Exhibit H** is a true and correct copy of the September 1990 Magnify

customer statement that is referred to in ¶ 7 and ¶ 88 of the SAC and compared to the Magnify II

Account customer ledger dated September 1990 incorporated into ¶ 82 of the SAC and the trade

confirmations incorporated into ¶ 85 of the SAC. The Trustee relies upon these documents to

support his contention that the Magnify II Account was created fraudulently with a fake deposit

of 3,290,000 shares of stock of MCI Communications ("MCI") having a value of approximately

$120 million. The issue of the legitimacy of that transaction is a question for another day, as the

determination of that issue in conjunction with the determination of the issue of when the Ponzi

scheme began will determine Magnify's net equity in its BLMIS Accounts based on the "cash

in/cash out" method of determining net equity and impact the determination of whether Magnify

is liable for Two-Year Transfers of fictitious profits or the Trustee is liable to Magnify for its net

losses. With respect to that issue, the Trustee's allegation that the Magnify Accounts combined

25-year history shows growth from $3.14 million (the initial deposit used to open the Magnify I

Account in 1983) to approximately $750 million is also predicated upon the alleged illegitimacy

of the MCI stock transaction. If $120 million of MCI stock was in fact deposited into the

Magnify II Account in 1990, then the reported growth to $750 million over the next 18 years

(1990-2008) is not that astonishing. But again, that is a question for another day. I simply note at

this juncture that the Trustee's contention that the MCI stock transaction was fraudulent is

predicated upon the implausible assumption that Madoff simply gave Magnify, an

accountholder, a "gift" of approximately $120 million. Madoff was a crook. He is known for

stealing from his accountholders, and not for his largesse, and certainly not for simply giving

away $120 million to an accountholder. However, for purposes of this motion, what is relevant is

that I never saw the September 1990 Magnify customer statement until after it was produced by

the Trustee in this litigation. It was not addressed to me (although the name and address on that document has been redacted, I am confident that it was addressed to Brunner at his office address in Switzerland) and it was never given to me or shown to me by Igoin, Brunner, or anyone else. Thus, it cannot be legitimately or plausibly argued that the MCI stock transaction questioned by the Trustee serves in any way to establish my "actual knowledge" of the BLMIS Ponzi scheme/fraud. The Court will also note that both the Magnify II Account customer ledger dated September 1990 incorporated into ¶ 82 of the SAC and the trade confirmations incorporated into ¶ 85 of the SAC all bear the name and address of Brunner in Switzerland. My name and address appear nowhere in those documents. There is a cogent reason for that: In 1990, I had absolutely nothing to do with Magnify's Accounts with BLMIS. The management and control of those Accounts was vested in Igoin at that time and continuously thereafter until his death in January 1995. *See supra* ¶ 13; Ex. E. As aforesaid, I never even met or spoke to Madoff until 1993. *See supra* p. 12 n. 6. In addition, (a) the customer ledger was an internal business record of BLMIS and thus it cannot be the basis for plausibly alleging my "actual knowledge" that BLMIS was not actually engaged in the trading of securities, since it was never issued to me and I never saw it, (*see infra* ¶ 21; SAC ¶¶ 10, 108), and (b) the trade confirmations addressed to Brunner, if they were ever issued by BLMIS, were not issued to me and I never saw them, and thus they likewise cannot serve as a basis for plausibly alleging that I knew about the BLMIS Ponzi scheme/fraud.

17.    Attached hereto collectively as **Exhibit I** are true and correct copies of the semi-annual Portfolio Evaluations issued by BLMIS for the Magnify I Account, Account No. 1FN024-30, from 12/31/92 - 6/30/08, and attached hereto as **Exhibit J** are true and correct copies of the semi-annual Portfolio Evaluations issued by BLMIS for the Magnify II Account, Account No. 1FN025-30, from 12/31/92 - 6/30/08. These Portfolio Evaluations for the two

589954v.8

Magnify Accounts are referred to in, *inter alia*, ¶¶ 9, 10, 90, 91, 92, 95, 96, and 97 of the SAC.

Although the Magnify I Account was opened in 1983 and the Magnify II Account was opened in

1990, (*see* SAC ¶ 44), the very first Portfolio Evaluations for those two Magnify Accounts that I

ever saw were the Portfolio Evaluations dated 12/31/92, which reflected a total equity of

$31,518,997.95 in the Magnify I Account and a total equity of $222,089,196.13 in the Magnify

II Account. Thus, according to those Portfolio Evaluations, as of 12/31/92, the equity in the two

BLMIS Accounts of Magnify totaled in excess of $253,000,000. When Igoin showed me those

two Portfolio Evaluations in 1993, that was the first time that I had any knowledge as to the how

much was on deposit in the two BLMIS Accounts of Magnify. At the time when Igoin first

showed me the Magnify Portfolio Evaluations dated as of 12/31/92, he explained to me that such

was the manner in which Madoff/BLMIS reported to him on those two Accounts. Igoin never

mentioned customer statements to me, and I have no knowledge as to whether Igoin ever

received any such customer statements from Madoff/BLMIS. The Court will also note from

Exhibit I and Exhibit J that all of the Portfolio Evaluations through those dated as of 12/31/96

were addressed to Brunner at his Switzerland address, and that thereafter, commencing with the

Portfolio Evaluations dated as of 6/30/97, those documents were addressed to me at my address

in Israel. It was not until after Igoin passed away that BLMIS provided me with the Magnify

Portfolio Evaluations. This is consistent with the fact that after the death of Igoin in 1995, I took

over the management and supervision of the Magnify Accounts, albeit the change of address on

the Portfolio Evaluations was not implemented until the first half of 1997. After Igoin passed

away and I assumed management and supervision of the Magnify Accounts at BLMIS, (*see*

*supra* ¶ 13; Ex. E), I continued with the procedure that had been explained to me by Igoin, to wit,

that semi-annual Portfolio Evaluations was the manner in which Madoff/BLMIS reported the

holdings in the two Magnify Accounts. I respectfully submit that my continuing with the procedure that was already in effect, as explained to me by Igoin, does not in any way support the Trustee's contention that I had "actual knowledge" that BLMIS was not actually engaged in the trading of securities and that the reported holdings in the Magnify Accounts were in any way fictitious. In addition, it is imperative to note that the two Magnify Portfolio Evaluations dated as of 12/31/94, just before Igoin's death in January 1995, reflect a total equity of $428,276,629.28 ($31,229,745 in the Magnify I Account and $397,046,884.28 in the Magnify II Account). Thus, in the fourteen years during which the BLMIS Accounts of Magnify were under my stewardship, they only grew from $428,276,629.28 as of December 31, 1994, to $769,273,550.49 ($1,145,805.83 in the Magnify I Account and $768,127,744.66 in the Magnify II Account) as of June 30, 2008.[7] Finally, it must be noted that ¶ 9 of the SAC, which deals solely and exclusively with the Magnify Portfolio Evaluations, is false to the extent that it alleges that with respect to those Portfolio Evaluations, "BLMIS employees would create draft Portfolio Evaluations in preparation for Green's meetings with Madoff, and they would only be finalized after Green met with Madoff and BLMIS employee Frank DiPascali ('DiPascali')." No draft Portfolio Evaluations were ever created for the BLMIS Accounts of Magnify. This fact is acknowledged later in the SAC, wherein in ¶ 95 it is correctly alleged, after referring to the Portfolio Evaluations for the BLMIS Accounts of Magnify, Strand, and Premero, that: "The Portfolio Evaluations for Premero [but not for Magnify or Strand] were stamped 'draft' until after Green's review." That is true, and there was a reason for that, as will be explained below. *See infra* ¶¶ 20-

---

[7]  These numbers are skewed slightly, as they do not take into account approximately $119,000,000 in withdrawals/ transfers from the Magnify Accounts from 1995-2008. (This number is taken from the Trustee's Tables attached to the Trustee's two Notices of Trustee's Determination of Claim for the two Magnify Accounts, which are affixed to the SAC as part of Exhibit C attached thereto.) But even after adding in those withdrawn/transferred funds of approximately $119,000,000, the growth in the Magnify Accounts over the fourteen-year period went from approximately $428,000,000 to approximately $888,000,000, not an outlandish appreciation over that fourteen-year period, and the annual rates of return over that period were not consistent.

21. However, what is not true is that I was ever presented with draft Portfolio Evaluations for the Accounts of Magnify or Strand, and the Portfolio Evaluations for those Accounts were never changed in any way during my meetings with Madoff (and DiPascali). In addition, ¶ 98 of the SAC falsely alleges that after my meetings with Madoff I often dictated letters of instruction to Madoff's secretary to be typed up on my law firm letterhead. That happened only once or twice, and there was nothing improper about my doing so. However, what has no basis in fact is the allegation, set forth "[o]n information and belief," that "on at least one occasion, Green and Madoff agreed to backdate a letter typed by Madoff's secretary," (SAC ¶ 98), and contrary to the Trustee's conclusory allegation, I never participated in any instructions to delete those letters and leave no electronic record thereof.

18.    Attached hereto collectively as **Exhibit K** are true and correct copies of the semi-annual Portfolio Evaluations issued by BLMIS for the Strand Account, Account No. 1FR051-30, from 6/30/99 - 6/30/08. The Strand Account was opened in 1999. *See* SAC ¶ 44. These Portfolio Evaluations for the Strand Account are referred to in, *inter alia*, ¶¶ 10, 90, 91, 92, 95, 96, and 97 of the SAC. After I caused Strand to be created, as a wholly-owned subsidiary of Magnify, I opened the Strand Account with BLMIS, and Madoff suggested and I agreed to implement the same method of reporting the holdings in the Strand Account as was already in effect for Magnify, to wit, the semi-annual Portfolio Evaluations. Thus, the fact that I determined to proceed in that manner with respect to the Strand Account does not in any way plausibly support the Trustee's contention that I had "actual knowledge" that BLMIS was a fraud and was not actually engaged in the trading of securities. In addition, those Portfolio Evaluations for Strand, when reviewed in conjunction with the withdrawals from Strand's BLMIS Account set forth in the Trustee's Notice of Determination of Claim for the Strand Account attached to the SAC as

589954v.8

part of Exhibit C thereto, establish that the annual rates of return on the Strand Account were neither exorbitant nor consistent.

19.    Attached hereto collectively as **Exhibit L** are true and correct copies of the semi-annual Portfolio Evaluations issued by BLMIS for the Premero I Account, Account No. 1FN073-30, from 12/31/95 - 6/30/08, and attached hereto as **Exhibit M** are true and correct copies of the semi-annual Portfolio Evaluations issued by BLMIS for the Premero II Account, Account No. 1FN097-30, from 6/30/96 - 6/30/08. The Premero I Account was opened in 1995 and the Premero II Account was opened in 1996. *See* SAC ¶ 44. I opened those accounts with BLMIS on behalf of my client Premero, in my capacity as the trustee of the Trust that owns that company and in accordance with the instructions of Shimon Katz ("Katz"), the beneficiary of that Trust. With respect to Premero, as with Strand, Madoff suggested and I agreed that the same manner of reporting the holdings in the Magnify Accounts would be implemented with respect to the Premero Accounts, to wit, the semi-annual Portfolio Evaluations. As with the Portfolio Evaluations for the BLMIS Accounts of both Magnify and Strand, the Portfolio Evaluations for the two BLMIS Accounts of Premero, when analyzed in conjunction with the withdrawals therefrom set forth in the Trustee's Notices of Determination of Claim for those two Accounts attached to the SAC as part of Exhibit C thereto, establish that the annual rates of return on those Accounts were not exorbitant or consistent.

20.    As is set forth above, ¶ 95 of the SAC correctly alleges that "[t]he Portfolio Evaluations for Premero were stamped 'draft' until after Green's review." That fact is further substantiated by ¶ 97 of the SAC that alleges that "certain of the Portfolio Evaluations . . . [i]n particular . . . the . . . holdings for Premero's two Accounts were aggregated on a single draft Portfolio Evaluation" and that "DiPascali would emerge from these meetings with changes to certain of

the Portfolio Evaluations . . . . DiPascali would exit the meeting with Green and arrange for the single evaluation to be split into two separate Portfolio Evaluations . . . ." BLMIS persisted in preparing a single draft Portfolio Evaluation for the two Premero Accounts despite the fact that the Premero I Account had been divided into two accounts pursuant to my letter dated March 18, 1996, to Madoff, a true and correct copy of which is attached hereto as **Exhibit N**, wherein I instructed Madoff to "divide the total sum of the equity into two and transfer half to the Premero I account and the other half to the Premero II account" and requested that Madoff "continue to manage both the Premero I and the Premero II accounts to generate proceeds at the same rate, as if they were one account." Thereafter, whenever I instructed Madoff or BLMIS to transfer money out of the Premero Accounts or advised them that a deposit would be made into those Accounts, I sent a letter to Madoff or BLMIS specifying from which Premero Account the requested transfer was to be made or into which Premero Account the deposit was to be made, as evidenced by true and correct copies of letters dated April 14, 1996, March 23, 1997, April 29, 1997, March 25, 1998, April 22, 1998, October 16, 1998, and July 21, 2008, attached hereto collectively as **Exhibit O**. Thus, as Madoff and BLMIS were complying with my request that the two Premero Accounts be managed "to generate proceeds at the same rate, as if they were one account," they prepared a single "draft" Portfolio Evaluation for Premero for each semi-annual meeting with me and at each of my semi-annual meetings with Madoff the "draft" Portfolio Evaluation was broken down into two separate Portfolio Evaluations based upon the real-time instructions for withdrawals and deposits from those two Accounts that I had requested in my letters to Madoff and BLMIS during the period covered by the Portfolio Evaluations being reviewed at each such meeting.[8] DiPascali attended those meetings solely for the purpose of

---

[8]    None of my meetings with Madoff (and DiPascali) were held behind closed doors. Moreover, the SAC does not even allege that any of those meetings took place on the infamous 17th floor of BLMIS. In fact, I was never even on

going over those adjustments with me, and then he would leave the meeting to implement those changes.

21.    Contrary to the conclusory allegations of the SAC, those adjustments had nothing to do with achieving a promised or agreed upon rate of return. There was no such promised or agreed upon rate of return. The adjustments that were made were made to conform with my prior letters of instruction regarding the two Premero Accounts. The letters attached hereto as Exhibits N and O are integral to the SAC, have been in the Plaintiff's possession for years, having been produced as part of Premero's initial disclosures, in response to the Plaintiff's document requests, and in response to the Plaintiff's First Set of Interrogatories, and the Plaintiff knew of them when drafting the SAC. Nevertheless, the Trustee conceals the existence of those letters from the Court despite the fact that ¶ 45c of the SAC acknowledges that I "communicated regularly with Madoff," ¶ 74 of the SAC recites that I "periodically wrote to BLMIS," ¶ 89 of the SAC refers to "BLMIS correspondence with Green," and ¶ 93 of the SAC notes that I "often wrote to Madoff," thereby referring to my correspondence with Madoff and BLMIS throughout the SAC. Finally, although ¶ 110 of the SAC alleges that "multiple deposits intended for the Premero II Account were instead credited by BLMIS to the Premero I Account and never corrected," it was always my understanding and belief that such corrections had been made internally when the "draft" Portfolio Evaluations were broken down into the two final Portfolio Evaluations that I received after the adjustments called for by my prior written instructions had been made. If the internal records of BLMIS were not corrected to reflect those adjustments, that was unknown to me, as I was never privy to the internal records of BLMIS, and my knowledge was solely based upon the Portfolio Evaluations. This is confirmed in ¶ 10 of the SAC, wherein it is alleged that "[w]ith the exception of YHA, . . . these scant Portfolio Evaluations were the

---

that 17th floor.

only BLMIS account records received by any of the Defendants from the mid-1990's on," and ¶ 108 of the SAC, wherein it is acknowledged that although there were internal records that BLMIS "kept . . . in order to perpetuate its Ponzi scheme, it did not share those records with Green . . . ." In other words, the SAC acknowledges that after I assumed the management and supervision of the Magnify Accounts with BLMIS upon Igoin's death in 1995, the reporting system that had been put in place by and between Madoff and Igoin for Magnify, and had been adopted by Madoff and me for Premero and Strand, was kept in place.

22.    The SAC correctly alleges that Magnify is a corporation incorporated under the laws of Panama in June 1983, (SAC ¶ 38), that Magnify's "legal and organizational documents were executed by Brunner, a Swiss attorney who was retained by Igoin in or around 1983," (*id.* ¶ 39), and that Igoin "asked Brunner to organize a Panamanian company as an investment vehicle for Igoin," (*id.* ¶ 49). Attached hereto collectively as **Exhibit P** are true and correct copies of the Agreement dated June 28, 1983, entered into by and between Brunner and Igoin with respect to the organization of Magnify (in French), the English translation thereof produced by the Trustee at Brunner's deposition, and Brunner's letter dated July 18, 1983, to Madoff providing him with a copy of that Agreement. That Agreement evidences Igoin's retention of Brunner to organize Magnify as a Panamanian corporation, as referred to in ¶¶ 38, 39, and 49 of the SAC. In addition, that Agreement is specifically referred to in ¶ 51 of the SAC, wherein it is alleged: "In or around June 28, 1983, Igoin and Brunner executed an agreement that appointed Brunner Magnify's chairman and director. Under that agreement, Brunner promised to carry out his duties exclusively according to Igoin's instructions. Shortly after Magnify was created, Igoin instructed Brunner to transfer the corpus of one of Igoin's Swiss bank accounts (approximately $3,136,150) to BLMIS to fund the Magnify I Account."

22

23.   In 1983, when Igoin retained Brunner to organize Magnify, I did not know either Igoin or Brunner, and I had nothing to do with the creation of Magnify, and was not, and never became, a shareholder of Magnify. See SAC ¶ 53, wherein it is acknowledged that Igoin and I "became acquainted in the late 1980s," and SAC ¶ 56, wherein it is further acknowledged that "[a]t a December 14, 1989 meeting at Brunner's office in Switzerland, Igoin introduced Green to Brunner." As is further alleged in ¶ 38 of the SAC, Brunner did not appoint me as Magnify's Managing Director until 1995, after Igoin had died, at which time I was assuming the duties Igoin had asked me to assume upon his death. Attached hereto as **Exhibit Q** is a true and correct copy of the corporate resolution of Magnify pursuant to which Brunner appointed me as the Managing Director of Magnify in June 1995, as referred to in SAC ¶ 38.

24.   In ¶ 39 of the SAC, reference is made to the fact that until April 2016, Brunner was Magnify's Director and Chairman, and that at that time Magnify appointed Igoin's niece, Ayala Nahir ("Nahir"), as its new Chairperson and Director, me as a Director and Treasurer, and my son, Amir Green ("Amir"), as a Director and Secretary. Attached hereto collectively as **Exhibit R** are true and correct copies of the documents filed in Panama to effectuate those changes in the corporate officers and directors of Magnify, as referred to in SAC ¶ 39. As alleged in the SAC, those changes were made in 2016, some six years after this adversary proceeding was commenced.  Those changes were made because Brunner, having been sued by the Trustee and entered into a settlement with the Trustee (the terms and conditions of which the Trustee has to date refused to disclose), no longer wanted himself and his family members, Philipp Brunner and Gertrude Brunner, to remain as officers and directors of Magnify. Therefore, for purposes of maintaining Magnify as an existing entity under the laws of Panama, Nahir, Amir, and I agreed to become the officers and directors of Magnify. There was nothing sinister about that change in

23

the officers and directors of Magnify, and nothing should be inferred from those changes having been made.

25.    The SAC alleges correctly that YHA is an Israeli association that was registered with the Israeli Registrar of Associations in 1988, and refers to my filing of "YHA's registration papers with the Israeli Registrar of Associations." SAC ¶¶ 40, 53. Prior thereto, Igoin had retained me as his attorney, and had instructed me to form YHA as an Israeli association. *Id.* ¶ 53. However, the SAC falsely alleges, in completely conclusory fashion, that I was "the co-founder and legal counsel of YHA and at all relevant times had *de facto* control over YHA." *Id.* ¶ 40. I am the attorney for YHA, and have been its legal counsel since its inception. However, I was not a "co-founder" of YHA and have never been a member of YHA or one of its directors or officers. I do not control YHA and I never have. The Trustee's allegations to the contrary are completely conclusory and have no basis in fact. In addition, the SAC itself contains allegations to the contrary, as in ¶ 53 of the SAC it is alleged, correctly, that "Igoin asked Green to create and register an Israeli association to handle Igoin's planned charitable contributions in Israel" and in ¶ 54 of the SAC it is further correctly alleged that "[i]n YHA's registration documents, Green classified YHA as a 'research association,' and named seven founders, including Igoin and his niece, Nahir." All of that is true, and it is noteworthy that it is not alleged therein that I was one of the named seven founders, which I was not. What is true is that "[i]n addition to incorporating YHA, Green served as its 'legal representative' or legal counsel from its inception." SAC ¶ 55. There is a distinct difference between being an attorney for a client and being the management that controls the client. With respect to the foregoing, attached hereto collectively as **Exhibit S** are true and correct copies of the previously produced registration documents (in Hebrew) filed by YHA naming the seven founders thereof, as referred to in ¶¶ 53

24

and 54 of the SAC, and English translations of those documents, all of which have been relied

upon by the Trustee in drafting the SAC. Those documents establish that I was not a "co-

founder" of YHA, and that the Trustee's conclusory allegations to the contrary have no basis in

fact.

26.    In ¶ 41 of the SAC, it is correctly alleged that Premero is a company formed under the

laws of the British Virgin Islands. However, that same ¶ 41 alleges incorrectly that I "founded"

Premero and "supervised its BLMIS portfolio." The SAC then goes on to further allege

conclusorily in ¶ 41 that "[o]n information and belief, Green created Premero as an investment

vehicle for himself and/or one of his clients." As is well known to the Trustee from the

documents that have been produced in this proceeding, Premero was founded as an investment

vehicle for its owner, which is a Trust of which I am the trustee and Katz is the beneficiary.  In ¶

41, the SAC refers to my relationship with Premero and Brunner's position as Premero's Sole

Director. In making that allegation, the Trustee relies upon a letter dated August 23, 1993, that I

sent to Brunner and the three enclosed corporate resolutions referred to therein, true and correct

copies of which are attached hereto collectively as **Exhibit T**. My letter dated August 23, 1993,

advising Brunner of his appointment as Premero's Sole Director, begins with the sentence: "As

we discussed in our telephone conversation, my client wishes to appoint you as director in the

company he is establishing in the British Virgin Islands." Thus, that letter makes clear that I was

acting as an attorney on behalf of a client with respect to the organization of Premero, and that I

was not the principal thereof. The principal of Premero was the Trust, and I caused Premero to

be created at the request of Katz as the beneficiary thereof. The three corporate resolutions that

are referred to in that letter and are part of Exhibit T defined the duties that I was initially

assigned to perform on behalf of Premero. Those documents further establish that Premero was

formed several years prior to the opening of the two Premero BLMIS Accounts in 1995 and 1996 respectively. *See supra* ¶ 19; SAC ¶ 44.

27.    In ¶ 42 of the SAC, it is alleged correctly that Strand is a company formed in September 1998 under the laws of the British Virgin Islands, that Brunner was its Sole Director, and that I served as its Managing Director and supervised its BLMIS portfolio. It is also alleged in ¶ 42 that "Strand has represented that it is a wholly owned subsidiary of Magnify." That "representation" is a fact. The fact that Strand is a subsidiary of Magnify, Brunner's status as Strand's Sole Director, and my authority to act on behalf of Strand, are evidenced by minutes of a Magnify Board meeting held on July 21, 1998, and two corporate resolutions of Strand dated the 26th day of October, 1998, true and correct copies of which are attached hereto collectively as **Exhibit U**. Those documents have previously been produced and have been in the Trustee's possession since long before the drafting of the SAC and were obviously relied upon in drafting the SAC.

28.    In ¶ 43 of the SAC, it is alleged correctly that Express was formed under the laws of the British Virgin Islands in February 1992. However, it then goes on to allege, on information and belief and in a completely conclusory manner, that I purportedly "created Express as an investment vehicle for himself and/or one of his clients." It is completely untrue that I created Express for myself. I caused Express to be created at the instance and request of Katz, who is the beneficiary of the Trust that owns Express (which is the same Trust that owns Premero). I have never had any ownership interest in Express.

29.    In the SAC, it is alleged that the shares of Magnify were transferred to YHA in 1989, and that from that time onward, YHA was purportedly the "owner" of Magnify. *See* SAC ¶¶ 56, 58, 61, 115. That contention is false and is known to be false by the Trustee pursuant to

documents referred to in the SAC and other documents related thereto. Attached hereto collectively as **Exhibit V** are true and correct copies of a cover letter dated December 18, 1989, sent to me by Brunner, two Board minutes of Magnify dated December 14, 1989, and an "Assignment of Transfer" dated December 14, 1989, that is referred to in ¶ 56 of the SAC. Those documents refer to the physical transfer of the share certificates of Magnify to YHA. Attached hereto as **Exhibits W, X, Y, Z**, and **AA** respectively are true and correct copies of the following documents which establish that YHA was never the "owner" of Magnify. All of these documents relate directly to the "trust agreement with Albert Igoin" under which "YHA was the trustee," as referred to in ¶ 125 of the SAC. The "trust agreement" referred to in ¶ 125 was a Deed of Trust pursuant to which the shares of Magnify were deposited with YHA to be held in trust as set forth in that document. Unfortunately, that trust instrument was stolen from my law office when the wall safe in which it was being held was taken from my office in a burglary that took place in 1997.[9] The documents directly related to that Deed of Trust, all of which have previously been produced and provided to the Trustee years before the drafting of the SAC and are integral thereto, are as follows:

> A.    Exhibit W – My letter dated April 12, 1990, to Igoin acknowledging that I was holding the Deed of Trust dated November 16, 1989, and the original certificates of Magnify's shares, and noting the appointment of YHA "as Trustee," and YHA's letter dated May 18, 1990, to me confirming YHA's awareness of and familiarity with the Deed of Trust signed by Igoin on November 16, 1989, consenting to the terms thereof, and noting that Igoin retained the right to make revisions thereof.

---

[9]   Although not referred to in the SAC, by way of background and in confirmation of the theft of the Deed of Trust, attached hereto collectively as **Exhibit BB** are the English translation and original Hebrew version of the Israeli police report on that burglary, which duly notes the theft of my office safe containing, *inter alia*, "office documents," the English translation and original Hebrew version of the insurance adjuster's report noting that the stolen safe contained, *inter alia*, "many documents such as clients' deeds of trust," an Affidavit dated June 5, 1997, that I executed with respect to that burglary and noted therein the theft of the two original stock certificates of Magnify, and a corporate resolution of Magnify dated July 2, 1997, referring to my Affidavit and the stolen stock certificates and authorizing the issuance of replacement certificates.

B.   Exhibit X – Fiduciary Agreement entered into in May 1990, between YHA and Brunner, reciting that YHA "is the sole shareholder (in trust) of the shares of Magnify Inc."

C.   Exhibit Y – English translation and Hebrew version of my contemporaneous handwritten notes dated September 13, 1990, of a meeting that I had with Igoin on September 13, 1990, at which I gave him YHA's aforesaid letter dated May 18, 1990, and also noting (a) that "Igoin asked that the future of his niece, Ayala Nahir, be assured and if she should die before him, her children should be looked after," (b) that "[a]t this stage, it is Igoin who will decide on the donations to [YHA]," and (c) that "[a]fter his death, up to one-half of the revenue generated in the Magnify account with Madoff which Igoin is managing will be directed to donation to [YHA] and the other half of revenue is for his wife and daughter."

D.   Exhibit Z – Typed (for ease of reference) and handwritten versions of three amendments to the Deed of Trust sent to me by Igoin, those three amendments being dated September 14, 1990, October 24, 1991, and December 13, 1991, respectively. The first amendment is dated September 14, 1990, one day after my meeting with Igoin on September 13, 1990, and my handwritten notes of that meeting attached hereto as Exhibit Y. That first amendment specifies that upon the death of both Igoin and his wife Doris Igoin ("Doris"), the revenues of Magnify were to be divided 25% to his daughter, 25% to his granddaughter, and 50% to YHA "in trust for donations for the purposes specified in the articles of [YHA]." The second amendment dated October 24, 1991, states that after Igoin's demise, his rights and powers under the Deed of Trust were to pass to the beneficiary of the Trust, that being his wife Doris during her lifetime. The third amendment dated December 13, 1991, recites that "[t]he 500 shares of [Magnify] shall be held in trust by the Trustee [YHA] for the following Beneficiaries," those being his wife Doris, his daughter, and his granddaughter.

E.   Exhibit AA – My letter dated February 4, 1992, to Igoin, acknowledging receipt of his third amendment dated December 13 1991.

I submit that the foregoing documents establish that YHA never became the "owner" of Magnify, but rather that it was entrusted with Magnify's shares "in trust," and that YHA was an "income beneficiary" of that trust arrangement, but not the owner of the corpus thereof. The Trustee has wrongfully excluded referring to those documents in the SAC as they clearly

contradict the false contention that YHA was the "owner" of Magnify.

30.    Despite falsely alleging that "[f]rom December 1989 forward, YHA owned Magnify and Green dominated and controlled Magnify and YHA," (SAC ¶ 61), the Trustee goes on to allege that after Igoin's death, I "dramatically escalated the volume and magnitude" of the transfers by Magnify to YHA, (*id.* ¶ 66), and "YHA's redemptions from its Account also increased dramatically following Igoin's death," (*id.* ¶ 67). Those allegations are obviously inherently inconsistent with the Trustee's unfounded claim that I, rather than Igoin, was in control of both Magnify and YHA from 1989 onward. With respect to the increases in Magnify's distributions to YHA, and YHA's use of those funds for its charitable purposes, suffice to say that those transfers and charitable donations were all well within the permissible framework of YHA's entitlement to one-half of the revenues generated in the Magnify Accounts with BLMIS.

31.    In ¶ 68 of the SAC, it is alleged that monies from the Magnify Accounts with BLMIS were used "for the benefit of certain individuals associated with YHA, including Nahir" and "the widow of one of YHA's founding directors." That widow ("Mrs. Amir") had been the wife of YHA founder Yitzhak Amir ("Amir"). SAC ¶ 68 goes on to refer to "transfers totaling nearly $3 million from the Magnify Accounts . . . for the benefit of Nahir and her family" and notes that "[a]t least $2.5 million of these transfers occurred after Igoin's death." In addition, SAC ¶ 68 goes on to allege that "Green also transferred a total of $300,000 from the Magnify Accounts to [Mrs. Amir]." Those allegations are true, but as is set forth below, there was nothing sinister, nefarious, or inappropriate about any of those transfers, all of which were authorized by Igoin during his lifetime and approved by Doris during her lifetime, and all of which were made from the Igoin family's one-half share of the revenues generated by the BLMIS Accounts of Magnify.

32.    With respect to Nahir, Igoin was raised by Nahir's mother and was extremely close to

Nahir and her family. Thus, Igoin wanted to make certain that they were taken care of financially, and during his lifetime he commenced that process by providing Nahir with approximately $500,000, as is alleged in ¶ 68 of the SAC. Thereafter, in accordance with Igoin's instructions, and as approved by Doris after Igoin's death, I proceeded to distribute another approximately $2.5 million to Nahir and her children. Attached hereto collectively as **Exhibit CC** are true and correct copies of documents evidencing the transfers to Nahir and her family referred to in ¶ 68 of the SAC. All of those documents have previously been produced and the Trustee clearly relied upon them in drafting the SAC. These documents consist of (a) four Receipts (in Hebrew) and the English translations thereof, that I issued to Igoin in 1992 for monies totaling $345,000 ($50,000 + $120,000 + $100,000 + $75,000) to be used for the benefit of Nahir, and (b) letters and Receipts (in Hebrew) and English translations thereof, issued by me to Madoff in 1996, 1998, and 1999, covering in total the sum of $2.5 million ($500,000 + $500,000 + $1,000,000 + $500,000) distributed from Magnify's Accounts for the benefit of Nahir and her family. All of these documents are integral to the aforesaid allegations of the SAC regarding the distributions to Nahir and her family and were relied upon by the Trustee in drafting the SAC. Those distributions were made from the Igoin family's share of Magnify's revenues in compliance with Igoin's prior instructions, and included as part of Exhibit CC are my letters to Madoff dated January 22, 1996, September 2, 1996, May 19, 1998, and May 27, 1999, referring to the payments to Nahir and her children and Doris' approval thereof.

33.    With respect to Mrs. Amir, during Igoin's lifetime her husband was terminally ill, and Igoin directed me to provide Mrs. Amir with some financial relief if and when Amir passed away. After Amir died, I followed Igoin's instructions, which were approved by Doris, and instructed Madoff to transfer $150,000 to Mrs. Amir in 2002 and another $150,000 to Mrs. Amir

in 2004. Attached hereto collectively as **Exhibit DD** are true and correct copies of three letters that I sent to Madoff with respect to the payments totaling $300,000 made to Mrs. Amir from the Igoin's family's one-half share of the revenues generated by Magnify's BLMIS Account. The Trustee has been in possession of these letters, two of which were produced by Magnify and one of which was produced by the Trustee, for years, and this correspondence was relied upon by the Trustee in drafting the SAC and is integral thereto.

34.   In ¶¶ 69-71 of the SAC, the Trustee refers to my "Fee Agreement" with Magnify. A true and correct copy of that "Fee Agreement" is attached hereto as **Exhibit EE**. That "Fee Agreement" was not conceived by me in a vacuum. Rather, it had its genesis in a meeting that I had with Igoin on November 23, 1994. Attached hereto collectively as **Exhibit FF** are true and correct copies of my contemporaneous handwritten notes of that meeting (in Hebrew) and the English translation thereof. Upon comparing the "Fee Agreement" to my contemporaneous notes of my meeting with Igoin during which my compensation arrangement was discussed and agreed to, the Court will note that my fee arrangement of 0.63% of the increase in the value of the BLMIS investment portfolio of Magnify and the management and supervision duties set forth in the "Fee Agreement," were all discussed and agreed to during my meeting with Igoin on November 23, 1994. With respect to the payment of $3.15 million made to me under that "Fee Agreement" in 2002, which is referred to in ¶ 71 of the SAC, attached hereto collectively as **Exhibit GG** are true and correct copies of my letter dated November 14, 2002, to Madoff thanking him for informing me as to the amount of the payment due to me for the period commencing April 1, 1995, and instructing him to wire those funds to my bank account in New York, and two letters dated November 18, 2002, sent to me by Madoff, both of which reflect the fact that the payment of $3,150,000 was for the period 4/1/95-11/14/02, to wit, the period

commencing approximately 2-3 months after Igoin's death. With respect to the computation of

my fees at the rate of 0.63% of the increase in the value of Magnify's investment portfolio with

BLMIS, as indicated in ¶ 13C of this Affidavit and on pages 116-17 of Exhibit E attached hereto,

Brunner found that fee arrangement to be reasonable, testifying as follows with respect thereto:

> It [the "Fee Agreement"] also says that with regard to Madoff, all
> policies are laid out, all management of the portfolio. It also says
> that Mr. Green will receive commission 0.63 percent of the value
> of the shares. For me this is quite normal. . . . In Switzerland it's
> normal between half and one percent.

In this case, my commission was actually far less, as it was 0.63% of the *increase* in the value of

the portfolio, rather than 0.63% of the value of the entire portfolio. The documents attached

hereto as Exhibits FF and GG are integral to the SAC, as they relate directly to the "Fee

Agreement" attached hereto as Exhibit EE, which is specifically referred to in the SAC. All of

these documents have previously been produced and have been in the Trustee's possession for

years prior to the drafting of the SAC and the Trustee excludes mention thereof in the SAC

because those documents refute the Trustee's contention that I unilaterally created the terms and

conditions of that "Fee Agreement."

35.    With respect to the Trustee's allegations that I did not properly perform my duties

under the "Fee Agreement," suffice to say that I vigorously dispute those allegations and am in

possession of, and have previously produced, documents that support my refutation thereof.

However, with the exception of the letters referred to in ¶ 37, *infra*, those documents are not

referred to or relied upon in the SAC, and thus I shall not submit them to the Court upon the

instant motion. For purposes of this motion, it is sufficient to note that the Trustee is not a party

to the "Fee Agreement" and has no standing to challenge the sufficiency of my performance

thereunder. Whether or not I performed my duties adequately under the "Fee Agreement" does

not in any way serve to establish that I had "actual knowledge" that BLMIS was engaged in a Ponzi scheme and was not actually trading securities.

36.    In ¶¶ 72, 73, and 119 of the SAC, reference is made to transfers from Magnify and Strand to "an investment fund in the Cayman Islands," (¶ 72), "the transfer of approximately $3 million to offshore investment funds," (¶ 73), and "transfers from Strand's Account to various offshore destinations, including $500,000 to an investment fund in the Cayman Islands," (¶ 119), that purportedly benefited me and my family and were allegedly for my personal use. In making those unfounded allegations, the Trustee is referring to a $500,000 investment by Strand in an entity known as Special Situations Cayman Fund L.P. ("Special Situations")[10] and a $2,500,000 investment by Premero (not Magnify or Strand) in an entity known as R.H. Book LLC ("R.H. Book").[11] In making these allegations, the Trustee has relied upon (a) a letter dated December 22, 2003, that I sent to Madoff asking him to transfer the sum of $500,000 from Strand's BLMIS Account to the bank account of Special Situations and a letter dated November 16, 2009, that I sent to Brunner and the Resolution dated November 18, 2009, adopted by Brunner pursuant thereto with respect to the redemption of Strand's investment in Special Situations, true and correct copies of which are attached hereto collectively as **Exhibit HH**, and (b) a letter dated July 21, 2008, that I sent to Madoff instructing him to transfer from one of Premero's BLMIS Accounts the sum of $2.5 million to R.H. Book, a true and correct copy of which is attached hereto as **Exhibit II**. The documents attached hereto as Exhibits HH and II were all produced by

---

[10]    Special Situations was named as a defendant in this proceeding in both the initial Complaint and the First Amended Complaint, but the Trustee withdrew and discontinued its claim against that entity when the "safe harbor" was established for transfers beyond the Two-Year Transfer period.

[11]    R.H. Book was also named as a defendant in this proceeding in both the initial Complaint and in the First Amended Complaint, but as is indicated in Footnote 7 on page 46 of the SAC, the Trustee's claim against R.H. Book has been settled, and all that remains of the Two-Year Transfer claim arising from Premero's investment in that entity is the portion thereof that constitutes Premero's principal, and no part thereof is comprised of Fictitious Profits.

589954v.8

the Defendants and in the possession of the Trustee for years prior to the drafting of the SAC, and were relied upon by the Trustee and are integral to the aforesaid allegations of the SAC. I respectfully submit that these documents establish that the $3 million that was invested in Special Situations ($500,000) and R.H. Book ($2.5 million) was invested by and for the benefit of Strand and Premero respectively. Those investments were not made for the benefit of me or my family.

37. In ¶¶ 45c, 74, 89, and 93 of the SAC, reference is made to my frequent correspondence with Madoff, including my requests "seeking more frequent meetings, indicating that it was 'imperative' that [we] meet regularly regarding Magnify's portfolio and [our] 'mutual interests.'" SAC ¶ 93. Attached hereto collectively as **Exhibit JJ** are true and correct copies of some of the letters that I sent to Madoff scheduling meetings with him and containing the following comments: (a) letter dated January 29, 1996, scheduling a meeting for February 26, 1996, requesting that the "financial accounts of the status of the investments in Magnify Inc. and Premero Investments" be prepared and expressing "my confidence in you and your abilities"; (b) letter mis-dated January 3, 1999 (should be January 3, 2000), congratulating Madoff "for being honored by the financial industry in the U.S. and by the Jewish community"; (c) letter dated April 13, 2000, thanking Madoff "for reassuring me that, despite the volatility of the stock market in New York, the portfolios which you manage on our behalf have not been jeopardized" and requesting a transfer of money from Magnify to YHA that "will reflect the recent approval granted by the Foundation's members for a number of very important scientific-medical projects in Israel"; (d) letter dated December 31, 2000, noting that "(w)ith considerable trepidation, I have been following the volatility of the stock market over the past several months. . . . I hope that the market will begin to calm down. I make these remarks notwithstanding my complete

34

confidence in your ability to manage the funds in your care despite the complicated situation, both because I trust your skills and competencies, and because the funds are managed as hedge funds"; (e) letter dated December 19, 2001, advising that "[d]espite the difficult economic situation in Israel and the rest of the world this past year, [YHA] was very active and assumed a number of new and important projects, which we hope will advance scientific and medical research in Israel"; (f) letter dated July 21, 2002, stating that "I have been following stock market events these past few months with some trepidation. I'm sure that last weeks abrupt downward slide in the Dow Jones and Nasdaq set a record. Because I have great faith in your abilities, and on the basis of your periodic assurances, I have every confidence that these drops are not significantly affecting the portfolios you manage for us. Still, I am quite concerned, in particular because of the scope of these portfolios, even though the shares comprising them are hedged. This will be one of the things we discuss when at our scheduled meeting . . . . I would also appreciate it if you had the semi-annual financial reports for Magnify, Premero and Strand ready for me by then";[12] and (g) letter dated June 20, 2007, expressing that "I hope . . . that business is at least as good as the equity market these days. It has been quite some time since we met or spoke. I hope we can rectify this situation . . . . I hope you agree with me – that it is imperative for our mutual interest that we meet face to face at least two or three times a year." I respectfully submit that, contrary to the unfounded insinuations of the Trustee, my frequent correspondence with Madoff does not in any way, shape, or form serve to support the contention that I had "actual knowledge" of the BLMIS Ponzi scheme, but rather, my aforesaid letters to Madoff, all of which are integral to the SAC, substantiate that I believed that BLMIS was a legitimate enterprise that was actually engaged in the trading of securities.

---

[12]    My semi-annual meetings with Madoff covered all of the portfolios of Magnify, Premero, and Strand that were then in existence at the time of each such meeting, and those meetings lasted no more than 1-1.5 hours each.

38.    In the SAC, the Trustee makes much of the fact that commencing in 1999, the semi-annual Portfolio Evaluations provided to me by BLMIS reflected only U.S. Treasury Bills and Fidelity money market mutual funds, rather than stocks or other equities, in the BLMIS Accounts of Magnify, Premero, and Strand, (SAC ¶¶ 99-101, 105), and alleges that because YHA received monthly customer statements, I purportedly "knew other BLMIS customers received monthly customer statements detailing all the securities trading information missing in the Portfolio Evaluations," (*id.* ¶ 106). The Trustee's conclusory allegation that I was familiar with YHA's monthly customer statements is false. I never saw those customer statements and was not aware of their existence. In addition, as is noted in SAC ¶ 106, "as an association registered with the Israeli Registrar of Associations, YHA was required to provide and file annual financial reports. YHA's account records were therefore subject to review or audit by the Israeli government and others unaffiliated with YHA or BLMIS," whereas "for Magnify, Premero and Strand . . . no one, much less any government regulator, was monitoring the non-YHA BLMIS investments." Because of YHA's reporting requirements, by letter dated March 29, 1994, that I sent to Madoff in my capacity as the attorney for YHA, a true and correct copy of which is attached hereto as **Exhibit KK**, I asked that Madoff "furnish me with authorization from a CPA regarding [YHA's] financial statements for 1992 and 1993. We need these documents for submission to the Israeli tax authorities . . . ." Thereafter, at the beginning of each year the accountants for BLMIS, Friehling & Horowitz, CPA's, P.C. ("Friehling & Horowitz"), would provide YHA with written confirmations of the holdings in YHA's BLMIS Account at December 31st of the preceding year. Attached hereto collectively as **Exhibit LL** are true and correct copies of the confirmations issued to YHA by Friehling & Horowitz for the years ending 12/31/02, 12/31/03, 12/31/04, 12/31/05, 12/31/06, and 12/31/07. The Court will note therefrom that despite the fact that YHA's

monthly customer statements may have reflected detailed securities trading, the year-end confirmations issued by the accountants for BLMIS reflected only U.S. Treasury Bills and Fidelity money market funds as at December 31st of each year. Exhibits KK and LL have all been produced by the Defendants and have been in the possession of the Trustee for years prior to the drafting of the SAC. However, the existence of those documents is deceptively omitted from the SAC. As was explained to me by Madoff, BLMIS would periodically close out its securities positions and invest the proceeds in Treasury Bills and Fidelity money market funds in the short term and then re-invest in the securities market during the ensuing period. Furthermore, as is well-known to the Trustee, the reporting of such holdings by BLMIS was not unique to the Defendants in this proceeding. This is evidenced by this Court's Memorandum Decision in *Picard v. Ceretti (In re BLMIS)*, Nos. 08-01789, 09-01161, 2015 WL 4734749, at *7 (Bankr. S.D.N.Y. Aug. 11, 2015) *("Kingate")*, wherein this Court took note of the Trustee's allegations that: "Various SEC reporting requirements are triggered when securities are invested in the market at either the end of the quarter or the end of the year. Madoff purported to liquidate all investments at those times, regardless of market conditions, and invest the proceeds in Treasury Bills to evade these reporting requirements." Thus, the liquidation of all investments at the end of each quarter was not unique to Magnify, Premero, and Strand. It obviously extended to YHA, and from the *Kingate* decision, it appears to have been extended to many, if not all, of the BLMIS accounts of those who invested with BLMIS.

39.    Although the SAC contains a number of other egregious conclusory allegations attacking my honesty and integrity and accusing me of self-dealing, none of those unfounded allegations are supported by any evidentiary showing and they are not the subject of any of the

documents referred to in the SAC.[13] Accordingly, although I vehemently deny the Trustee's allegations, with respect thereto I simply submit that even if true, none of those scurrilous accusations suffice in any way to plausibly allege that I knew that BLMIS was operating a Ponzi scheme and had "actual knowledge" that BLMIS was not actually engaged in the trading of securities.

40.    With respect to the issue of "actual knowledge," I respectfully submit that it is simply implausible for me to have known that BLMIS was a fraudulent enterprise operating a Ponzi scheme, and to have nevertheless allowed a client such as Premero to invest with BLMIS or to have Magnify leave its entire investment of approximately $770,000,000 with BLMIS knowing that it, like all Ponzi schemes, was doomed to eventual failure and collapse.

41.    As is demonstrated above, all of my actions with respect to the BLMIS Accounts at issue in this proceeding were entirely justified and completely authorized, and were carried out with the highest degree of honesty and devotion to duty, and in good faith.

WHEREFORE, it is respectfully submitted that the Defendants' motion to dismiss the SAC should be granted in its entirety.

_____
YAIR GREEN

Sworn to before me this
___ day of October, 2017

_____
Notary Public

MARGARET L. CONNAUGHTON
NOTARY PUBLIC
STATE OF NEW YORK
NO. 01CO4972568
QUALIFIED IN WESTCHESTER COUNTY
COMMISSION EXPIRES OCTOBER 01, 2018

---

[13]    Just by way of example, in ¶ 120 of the SAC, the Trustee alleges that I represented to HSBC that I was the beneficial owner of Strand "in order to obtain a mortgage to buy [my] daughter a home in Maryland," when in fact my daughter never purchased any home in Maryland.

589954v.8