# EXHIBIT A

**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Dean D. Hunt
Email: dhunt@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC
and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04335 (SMB) |
| Plaintiff, | |
| v. | |
| ASPEN FINE ARTS, CO. and MELVIN W. KNYPER, | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"),[1] and the substantively consolidated estate of Bernard L. Madoff individually ("Madoff"), by and through his undersigned counsel, for his Second Amended Complaint (the "Second Amended Complaint"), states as follows:

## I.    NATURE OF PROCEEDING

1.    This adversary proceeding arises from the massive Ponzi scheme perpetrated by Madoff. Over the course of the scheme, there were more than 8,000 client accounts at BLMIS. In early December 2008, BLMIS generated client account statements for its approximately 4,900 open client accounts. When added together, these statements purport that clients of BLMIS had approximately $65 billion invested with BLMIS. In reality, BLMIS had assets on hand worth a small fraction of that amount. On March 12, 2009, Madoff admitted to the Ponzi scheme and pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in prison.

2.    Aspen Fine Arts, Co. ("Aspen"), and its President, Melvin Knyper ("Kyper" and collectively "Defendants") received avoidable transfers from BLMIS. Knyper was the person for whose benefit the transfers were made. Between December 11, 2006 and December 11, 2008, Defendants received $1,600,000 in fictitious profits from the Ponzi scheme, meaning that Defendants withdrew more than they invested in the BLMIS account held in the name of "Aspen Fine Arts Co c/o Knyper."

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

## II.    JURISDICTION AND VENUE

3.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

4.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

5.      Venue in this district is proper under 28 U.S.C. § 1409.

6.      This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), 548(a), 550(a) and 551, and other applicable law.

## III.    DEFENDANTS

7.      Defendant Aspen is a corporation formed under the laws of the state of Colorado on February 20, 1998. In April 1998, Knyper, through Aspen, opened BLMIS account 1EM381 ("the Account") held in the name "Aspen Fine Arts Co. c/o Knyper," with the account address reported at 150 White Horse Springs Lane, Aspen, Colorado.  Aspen has appeared through counsel and answered the Trustee's First Amended Complaint dated December 14, 2011 [Doc. No. 15].

8.      Defendant Knyper maintained his residence at the same address as Aspen, 150 White Horse Springs Lane, Aspen, Colorado, until it was sold on or about October 19, 2016.  Upon

information and belief, Knyper still resides in Colorado.  Knyper was included as a subsequent

transferee defendant in the Trustee's First Amended Complaint, but was dismissed without

prejudice pursuant to the Order Granting in Part and Denying in Party Defendants' Motions to

Dismiss.  [Doc. No. 47]  The Trustee's ongoing investigation has revealed that Knyper exercised

complete dominion and control over the Account and that the transfers from BLMIS were made

for Knyper's benefit.

## IV.    <u>BACKGROUND, THE TRUSTEE AND STANDING</u>

9.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission

("SEC") commenced the District Court Proceeding.

10.      On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court

alleging, among other things, that BLMIS could not meet its obligations to securities customers as

they came due and its customers needed the protections afforded by SIPA.

11.      Also on December 15, 2008, Judge Stanton granted SIPC's application and entered

an order pursuant to SIPA, which, in pertinent part:

(a)      appointed the Trustee for the liquidation of the business of BLMIS pursuant
to SIPA § 78eee(b)(3);

(b)      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
SIPA § 78eee(b)(3); and

(c)      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

12.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

13.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

14.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

15.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

16.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

17.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their

participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

18.       As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

19.       Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

20.       The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## V.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### 1.  BLMIS

22.       Madoff founded BLMIS in 1960 as a sole proprietorship.  In 2001, Madoff registered BLMIS as a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

23.       In compliance with 15 U.S.C. § 78*o*(b)(1) and SEC Rule 15b1-3, and regardless of

its business form, BLMIS operated as a single broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer from January 19, 1960 through December 31, 2008. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database ("MMS") also reflects BLMIS's registration with the Securities and Exchange Commission ("SEC") as a securities broker-dealer from January 19, 1960 through December 31, 2008. On December 30, 1970, BLMIS became a member of SIPC and continued its membership without any change in status until the Filing Date. SIPC membership is contingent on registration of the broker-dealer with the SEC.

24.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

25.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

26.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

27.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management of $11.7 billion. BLMIS filed its last Form ADV in January 2008,

reporting that its IA Business still had only 23 customer accounts with total assets under management of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in assets under management.  At all times, BLMIS's Form ADVs were publicly available.

## 2. THE PONZI SCHEME

28.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, Joanne Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

29.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

30.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one employee was an administrative assistant, and one was a semi-retired accountant living in Florida.

31.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### *Madoff's Investment Strategy*

32.    BLMIS purported to execute two primary investment strategies for IA Business customers:  the convertible arbitrage strategy and the split strike conversion strategy ("SSC strategy").  For a limited group of IA Business customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

33.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of IA Business accounts.

34.    From 1992 forward, Madoff began telling IA Business customers that he employed the SSC strategy for their accounts, even though in reality BLMIS never traded any securities for its IA Business customers.  All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

35.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected substantial gains on the customers' principal investments.

36.    The SSC strategy purported to involve: (i) the purchase of a group or basket of equities (the "Basket") intended to highly correlate to the Standard & Poor's 100 Index (the "S&P 100 Index"), (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P Index call options.

37.    The put options were to control the downside risk of price changes in the Basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option would entail a loss for BLMIS.

38.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to outperform the market, because in a rising market, calls would be exercised by the counterparty.

39.    The simultaneous purchase of puts and calls to hedge a securities position is commonly referred to as a "collar."  The purpose of the collar is to limit exposure to volatility in the stock market and flatten out returns on investment.

40.    For the SSC strategy to be deployed as Madoff claimed, the total value of each of the puts and calls purchased for the Basket had to equal the notional value of the Basket.  For example, to properly implement a collar to hedge the $11.7 billion of assets under management that Madoff publicly reported in 2006 would have required the purchase of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

41.     Moreover, at all times that BLMIS reported its total assets under management, publicly available information about the volume of exchange-traded options showed that the volume of options contracts necessary to form the collar and implement the SSC strategy exceeded the available options.

### BLMIS's Fee Structure

42.     BLMIS charged commissions on purportedly executed trades rather than management and performance fees based on the value of assets under management, but by using a commission-based structure, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### BLMIS's Market Timing

43.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he achieved market timing by intermittently taking customer funds out of the market.  During those times, Madoff purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.

44.     BLMIS's market timing, as reported on its customer statements, showed an uncanny ability to buy low and sell high, an ability so uncanny, that any sophisticated or professional investor, including the Defendant[s], could see it was statistically impossible. BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every quarter and year end.

45.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets

and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win every time. Yet this is precisely what BLMIS's customer statements reported.

46.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the SSC strategy, which relied on holding long positions rather than on short-term speculative trading.

47.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

48.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

### The Collapse of the Ponzi Scheme

49.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

50.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

51.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## VI.    THE TRANSFERS TO DEFENDANTS

52.    On April 2, 1998, a $1,500,000 wire transfer was made by Aspen to BLMIS to open Account 1EM381 held in the name "Aspen Fine Arts Co c/o Knyper."  Knyper executed, as President of Aspen, a Customer Agreement, an Option Agreement, and a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements").  Knyper and his wife, Marlene (together referred to as the "Knypers"), also entered into a Corporate Resolution dated March 17, 1998 on BLMIS stationery, certifying that Aspen was permitted to deal in stocks, bonds, and other securities, and resolving that Knyper and Marlene had the power to (1) give orders for the Account, (2) deliver to and receive from BLMIS securities, (3) sign for correctness of all statements for the Account, and (4) make any necessary written endorsements to effectuate authority.

53.    The Account Agreements were performed in New York, New York through securities trading activities that took place in New York, New York. The Account was held in New York, New York, and Defendants sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Account and the purported conducting of trading activities.

54.    Defendants made deposits to BLMIS through checks and wire transfers from "Aspen Fine Arts Co c/o Knyper" into the BLMIS Bank Account.  In February, March and August 2000, Knyper transferred the balance of $3,096,812[2] from his personal BLMIS Account 1EM322

---

[2] As shown on Exhibit B  annexed  hereto, only $475,868 of the $3,096,812 was principal.

held in the name "Melvin Knyper W" to Account 1EM381 with instructions to "consolidate my personal account…into my corporate account…"

55.     Over the life of the Account, Defendants withdrew $7,460,000 from the Account, $4,543,132 of which was more than was deposited into the Account.

56.     During the two years prior to the Filing Date ("Two Year Transfer Period"), BLMIS made transfers from the Account to Defendants (the "Transfers") totaling $1,600,000 in fictitious profit from the Ponzi scheme.

57.     The Transfers received by Defendants constitute non-existent profits supposedly earned in the Account, but in reality, they were other people's money. The Transfers, as discussed in detail below, were made to Aspen for for the benefit of Knyper and are set forth in in Column 10 on Exhibit B annexed hereto.

58.     The Transfers are avoidable and recoverable under sections 548(a) and 550(a) of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3). *See* Exhibit B, Column 10.

59.     To the extent that any of the avoidance and/or recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

## VIII.    THE TRANSFERS WERE MADE FOR THE BENEFIT OF KNYPER

60.     Aspen was formed on February 20, 1998, and opened its BLMIS Account soon after on April 2, 1998.

61.     On February 1, 1998, Knyper appointed himself President and his wife Marlene Secretary/Treasurer of Aspen. Upon information and belief, no other person has held an executive role with Aspen and it has never had any employees.

62.     That same day, the Knypers issued 1000 shares of Aspen's common stock to Knyper, who was the sole shareholder of Aspen until December 1, 2007. Between December 1, 2007 and December 1, 2008, Knyper allegedly transferred his shares of Aspen to the Melvin Knyper Revocable Trust and the Marlene E. Knyper Revocable Trust.

63.     Aspen's office address was 150 Whitehorse Springs Lane, Aspen, CO 81611. This was also the Knypers' personal residence until it was sold on or about October 19, 2016. Upon information and belief, Aspen had no other business address at any point in time.

64.     In its Application for a Federal Employer Identification, Knyper indicated that the purpose of Aspen and its principal activity was the sale of fine arts. Upon information and belief, Aspen has never engaged in the sale of fine arts.

65.     According to its Articles of Reinstatement, Aspen was dissolved on December 1, 2002. It remained dissolved until July 14, 2008, when it filed Articles of Reinstatement with the Colorado Secretary of State.

66.     Upon information and belief, Aspen's capital was largely personal funds provided by Knyper, including the inter-account transfer made to "consolidate" Knyper's personal BLMIS account into the Account.  Aspen was used, not for the purpose of engaging in the sale of fine arts, but rather as an investment vehicle for Knyper's personal finances.

67.     Aspen was also used as a source of funds for Knyper to pay his and his family's personal expenses.  During the Two Year Transfer Period, Defendants withdrew $1,600,000 from the Account. According to documents produced in discovery by Aspen and Aspen's Certified Public Accountant, those Transfers were made for the benefit of Knyper because the funds were used to make:

a.      transfers to Knyper's personal bank account;

b.      cash withdrawals;

c.      a monthly allowance to the Knypers' son Gregory, and transfers to Gregory

Knyper's San Diego, CA scuba diving business;

d.      transfers or payments to relatives of the Knypers;

e.      personal home mortgage expenses;

f.      health care expenses;

g.      life insurance;

h.      homeowners, art, and umbrella insurance;

i.      personal credit card bills;

j.      New York luxury hotel (Bristol Plaza) expenses;

k.      attorneys' fees, including a California family law attorney and a Colorado

personal injury attorney;

l.      Pitkin County, Colorado property tax;

m.      country club membership for the Knypers;

n.      home maintenance and upgrades;

o.      home utilities;

p.      charitable contributions; and

q.      federal and state taxes.

68.      During the Two Year Transfer Period, Aspen received deposits of Social Security

funds from Knyper and Marlene.

69.      Upon information and belief, Aspen conducted no business apart from investing

and managing Knyper's personal funds at Knyper's direction.

70.    Aspen and Knyper ignored corporate formalities and no corporate veil can be maintained between them.  Aspen did not have any employees or a payroll. It did not have an independent office—its business address was Knyper's personal residence. Upon information and belief, Aspen did not hold corporate meetings after its first meeting in February 1998, and Aspen's corporate records do not indicate it conducted any business apart from passive investments.

71.    Knyper exercised complete dominion and control over Aspen, co-mingled his personal funds in Aspen's bank account, and co-mingled Aspen's funds in his personal bank account. Knyper used Aspen as a mere instrument to facilitate his personal interests and those of his family members.

72.    Knyper was the person who benefitted from the Transfers, and as such, Knyper is personally liable for each of Aspen's debts and obligations, including the Two Year Transfers received from BLMIS.

## IX.    CUSTOMER CLAIM

73.    On or about June 8, 2009, "Aspen Fine Arts c/o Knyper" filed a customer claim with the Trustee which the Trustee has designated as Claim # 9406 (the "Customer Claim").

74.    On or about October 19, 2009, the Trustee issued a Notice of Trustee's Determination of Claim to Defendant (the "Determination") with respect to the Customer Claim. A copy of the Determination is attached hereto as Exhibit C.

75.    On or about November 10, 2009, Aspen filed an objection to the Determination with the Court (the "Claims Objection").

## X.    COUNT ONE
## FRAUDULENT TRANSFERS—11 U.S.C. § 105(a), 548(a)(1)(A), 550(a) AND 551

76.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

77.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

78.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

79.    Each of the Two Year Transfers was made or incurred by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing and/or future creditors.

80.    Each of the Two Year Transfers was made to or for the benefit of the Defendants.

81.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee recoverable from Defendants pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

82.    As a result of the foregoing, pursuant to section 550(a)of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, as applicable, the Trustee is entitled to a judgment against Defendants: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, (c) recovering the Two Year Transfers, or the value thereof, from Defendants, for the benefit of the estate of BLMIS, and (d) awarding any other relief the Court deems just and appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendant as follows:

i.      Pursuant to sections 105(a), 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside, (c) recovering the Two Year Transfers, or the value thereof, from Defendants, for the benefit of the estate of BLMIS; and (d) awarding any other relief the Court deems just and appropriate.

ii.     Awarding the Trustee prejudgment interest from the date on which the Transfers were received;

iii.    Establishing  a constructive trust over the proceeds of the Transfers in favor of the Trustee for the benefit of BLMIS's estate;

iv.     Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

v.      Granting the Trustee such other, further, and different relief as the Court deems just, proper and equitable.

Date:    November 8, 2017
         New York, New York

| | |
|---|---|
| Of Counsel:<br><br>**BAKER & HOSTETLER LLP**<br>811 Main St., Suite 1100<br>Houston, Texas 77002<br>Telephone: (713) 751-1600<br>Facsimile: (713) 751-1717<br>Dean D. Hunt<br>Email:  dhunt@bakerlaw.com<br>Farrell A. Hochmuth<br>Email: fhochmuth@bakerlaw.com | By: _/s/ Nicholas J. Cremona_<br><br>**BAKER & HOSTETLER LLP**<br>45 Rockefeller Plaza<br>New York, New York 10111<br>Telephone: (212) 589-4200<br>Facsimile: (212) 589-4201<br>David J. Sheehan<br>Email:  dsheehan@bakerlaw.com<br>Nicholas J. Cremona<br>Email:  ncremona@bakerlaw.com<br><br>*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff* |