**MILBERG LLP**
Matthew A. Kupillas
One Pennsylvania Plaza
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229

*Attorneys for Stephen R. Goldenberg*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04946 (SMB) |
| Plaintiff, | |
| v. | |
| STEPHEN R. GOLDENBERG, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO**
<u>**TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 4

I.     Defendant's Value Defenses Under Section 548(c) Defeat the Trustee's
Claims ........................................................................................................ 4

     A.    SIPA Does Not Expand a Trustee's Avoidance Powers or Reduce a
Customer's Defenses ...................................................................... 5

     B.    The *Section 546(e) Decision* Established That Defendant's
Withdrawals Were Enforceable Settlement Payments and/or
Payments in Connection With a Securities Contract ................................ 8

          1.    The Trustee has not avoided the contractual obligations that
BLMIS owed to Defendant ............................................................ 10

          2.    The Trustee is prevented by the *in pari delicto* doctrine from
avoiding BLMIS' contractual obligations, whether through
common law remedies or the federal securities laws.................... 13

     C.    The Transfers Were Also Made in Satisfaction of Valid Tort Claims
That Defendant Held Against BLMIS ...................................................... 13

          1.    Defendant is entitled to retain the value of his federal fraud
and misrepresentation claims ...................................................... 14

          2.    Defendant is also entitled to retain the value of his state fraud
and breach of fiduciary duty claims against BLMIS ................... 16

II.    *Cohen* and Other Prior Madoff-Related Decisions Rejecting the Value
Defense Are Manifestly Erroneous...................................................................... 17

     A.    *Cohen* is Not *Stare Decisis* on Defendant's Affirmative Defenses .......... 18

          1.    *Cohen* cannot be *stare decisis* because, to the extent that
*Cohen* limited the value defense in a manner inconsistent with
the mandate of the *Section 546(e) Decision*, it is manifestly
erroneous ...................................................................................... 18

          2.    *Cohen* cannot be *stare decisis* because it did not decide key
legal issues raised by Defendant .................................................. 22

          3.    The Trustee is estopped from arguing that *Cohen* controls
Defendant's defenses .................................................................... 23

B.      The Decisions That Measure Value by Reference to the Impact on the
        SIPA Customer Fund Are Erroneous and Should Be Rejected ................ 24

C.      The Ponzi Scheme Investor Cases Are Irrelevant and Inapplicable ......... 29

        1.      "Ponzi scheme" has no meaning under SIPA or the
                Bankruptcy Code .......................................................... 30

        2.      The after-the-fact "Ponzi scheme" label cannot be used against
                Defendant because Section 548(c) measures value from the
                *transferee's* perspective *at the time of the transfer.* ...................... 31

        3.      The "Ponzi scheme investor" cases do not apply because
                Defendant is not an investor in the business of BLMIS but a
                brokerage customer ...................................................... 32

III.    The Two-Year Statute of Repose in Section 548(A) Limits the Trustee's
        Avoidance Power and Permits Him Only to Avoid Obligations and Transfers
        Arising After December 10, 2006 ....................................................... 34

        A.      Section 548(a) is a Statute of Repose that Bars the Avoidance of Any
                Obligation or Transfer That Occurred More Than Two Years Before
                the Petition Date ...................................................................... 35

        B.      The Court Cannot Equitably Toll or Disregard the Statute of Repose ..... 38

        C.      The Trustee's Avoidance Claim Calculation Violates the Statute of
                Repose .................................................................................... 39

CONCLUSION .......................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*105 E. Second St. Assocs. v. Bobrow*,
    573 N.Y.S.2d 503 (N.Y. App. Div. 1991) ...............................................................16

*Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*,
    189 F.3d 1017 (9th Cir. 1999) .............................................................................15

*American Gen. Ins. Co. v. Equitable Gen. Co.*,
    493 F. Supp. 721 (E.D. Va. 1980) ........................................................................15

*In re Asia Global Crossing, Ltd.*,
    333 B.R. 199 (Bankr. S.D.N.Y. 2005)...................................................................11

*Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*,
    18 N.Y.3d 341 (N.Y. 2011) ..................................................................................16

*Balaber-Strauss v. Sixty-Five Brokers  (In re Churchill Mortg. Inv. Corp.)*,
    256 B.R. 664 (Bankr. S.D.N.Y. 2000)...................................................................25

*Balaber-Strauss v. Lawrence*,
    264 B.R. 303 (S.D.N.Y. 2001)..............................................................................25

*Baldi v. Lynch (In re McCook Metals, L.L.C.)*,
    319 B.R. 570 (Bankr. N.D. Ill. 2005) ...................................................................26

*Bass v. Janney Montgomery Scott, Inc.*,
    152 F. Appx. 456 (6th Cir. 2005)..........................................................................15

*In re Bennett Funding Group, Inc.*,
    No. 98-61376, 1999 Bankr. LEXIS 1843 (Bankr. N.D.N.Y. Apr. 29, 1999) ...................14, 33

*In re Bennett Funding Grp., Inc.*,
    253 B.R. 316 (Bankr. N.D.N.Y. 2000) ..................................................................32

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011), *cert denied*, 133 S. Ct. 24 (2012) .............................28

*Big Apple Car, Inc. v. City of New York*,
    611 N.Y.S.2d 533 (N.Y. App. Div. 1994) ........................................................16, 17

*Brick v. Dominion Mortg. & Realty Trust*,
    442 F. Supp. 283 (W.D.N.Y. 1977) ......................................................................15

iii

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.),*
 Case No. 06-12737 (SMB), 2009 Bankr. LEXIS 3606 (Bankr. S.D.N.Y. Nov. 10, 2009) ......................................................................................................................25, 31

*Burrell v. United States,*
 467 F.3d 160 (2d Cir. 2006)........................................................................................20

*Butner v. United States,*
 440 U.S. 48 (1979)........................................................................................................28

*Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.,*
 137 S. Ct. 2042 (2017)........................................................................36, 37, 38, 40

*Cant v. A.G. Becker & Co., Inc.,*
 384 F. Supp. 814 (N.D. Ill. 1974) ..............................................................................15

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986)......................................................................................................4

*CFTC v. Hanover Trading Corp.,*
 34 F. Supp. 2d 203 (S.D.N.Y. 1999)............................................................................9

*Cox v. Nostaw (In re Central Ill. Energy Coop.),*
 526 B.R. 786 (Bankr. C.D. Ill. 2015)........................................................................11

*CTS Corp. v. Waldburger,*
 134 S. Ct. 2175 (2014)................................................................................................35

*Cunningham v. Brown,*
 265 U.S. 1 (1924)........................................................................................................30

*Daly v. Fusco (In re All-Type Printing, Inc.),*
 274 B.R. 316 (Bankr. D. Conn. 2002) .......................................................................12

*DeLong Corp. v. Morrison-Knudsen Co., Inc.,*
 244 N.Y.S.2d 859 (N.Y. App. Div. 1963) .................................................................17

*Dobbin v. Hill (In re Hill),*
 342 B.R. 183 (Bankr. D.N.J. 2006)) ..........................................................................26

*Donell v. Kowell,*
 533 F.3d 762 (9th Cir. 2008) ...............................................................................39, 40

*Donovan v. Bierwirth,*
 754 F.2d 1049 (2d Cir. 1985).....................................................................................16

*In re Estate of Newhoff*,
    435 N.Y.S.2d 632 (N.Y. Surr. Ct. 1980) ...........................................................................16

*FDIC v. Giammettei*,
    34 F.3d 51 (2d Cir. 1994).....................................................................................................4

*FDIC v. Hirsch (In re Colonial Realty Co.)*,
    980 F.2d 125 (2d Cir. 1992)................................................................................................7

*Finn v. Alliance Bank*,
    860 N.W.2d 638 (Minn. 2015)...........................................................................................32

*Foundation Ventures, LLC v. F2G, Ltd.*,
    No. 8-cv-10066 (PKL), 2010 U.S. Dist. LEXIS 81293 (S.D.N.Y. Aug. 11, 2010) .................9

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
    353 U.S. 222 (1957)..............................................................................................................6

*Freeman v. Marine Midland Bank-New York*,
    419 F. Supp. 440 (E.D.N.Y. 1976) .......................................................................................9

*Gabelli v. SEC*,
    133 S. Ct. 1216 (2013)........................................................................................................37

*Grede v. FCStone LLC*,
    Nos. 16-1896 & 16-1916, 2017 U.S. App. LEXIS 15025 (7th Cir. Aug. 14, 2017). .............20

*Hayes v. Jimmy Swaggart Ministries (In re Hannover Corp.)*,
    310 F.3d 796 (5th Cir. 2002) .......................................................................................26, 31

*In re Hedged Invs. Assocs., Inc.*,
    84 F.3d 1286 (10th Cir. 1996) ...........................................................................................33

*Helvering v. Hallock*,
    309 U.S. 106 (1940)............................................................................................................18

*Indus. Enters. of Am., Inc. v. Burtis*,
    No. 09-11475, 11-51868, 2012 Bankr. LEXIS 325 (Bankr. D. Del. Jan. 24, 2012) ...36, 38, 40

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
    534 U.S. 124 (2001)..............................................................................................................6

*Jahn v. Char (In re Incentium, LLC)*,
    473 B.R. 264 (Bankr. E.D. Tenn. 2012) .............................................................................11

*Janvey v. Golf Channel, Inc.*,
    487 S.W.3d 560 (Tex. 2016)................................................................................................26

*Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*,
    561 U.S. 89 (2010)........................................................................................6

*Law v. Siegel*,
    134 S. Ct. 1188 (2014)...............................................................................29

*Lehman Bros. Holding v. JP Morgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*,
    469 BR 415 (Bankr. S.D.N.Y. 2012) .....................................................10

*Lowenbraun v. L.F. Rothschild*,
    685 F. Supp. 336 (S.D.N.Y. 1988) .........................................................16

*Lutz v. Chitwood (In re Donahue Secs., Inc.)*,
    304 B.R. 797 (Bankr. S.D. Ohio 2003)....................................................7

*Mallis v. Bankers Trust Co.*,
    717 F.2d 683 (2d Cir. 1983).....................................................................17

*Marshall v. Picard*,
    740 F.3d 81 (2d Cir. 2014).........................................................................8

*McHenry v. Dillworth (In re Caribbean Fuels of Am.)*,
    No. 16-15786, 2017 U.S. App. LEXIS 11043 (11th Cir. June 22, 2017)...............................26

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006).....................................................................................14

*Merrill v. Allen (In re Universal Clearing House Co.)*,
    60 B.R. 985 (D. Utah 1986)......................................................................25

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970)....................................................................................9

*Morales v. Trans World Airlines*,
    504 U.S. 374 (1992)....................................................................................6

*Morton v. Mancari*,
    417 U.S. 535 (1974)....................................................................................6

*National Union Fire Ins. Co. v. Camp (In re Government Secs. Corp.)*,
    972 F.2d 328 (11th Cir. 1992) ...................................................................6

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)...................................................................................24

*NML Capital v. Republic of Argentina*,
    17 N.Y.3d 250 (2011) ...............................................................................16

*Official Comm. of Unsecured Creditors v. Pardee (In re Stanwich Fin. Servs. Corp.)*,
    291 B.R. 25 (Bankr. Conn. 2003) ...........................................................................................36

*Ogle v. JT Miller, Inc. (In re HDD Rotary Sales, LLC)*,
    512 B.R. 877 (Bankr. S.D. Tex. 2014) ..................................................................................11

*Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.)*,
    309 F.3d 1325, 1332 (11th Cir. 2002) ..................................................................................25

*Pa. Dep't of Pub. Welfare v. Davenport,,*
    495 U.S. 552 (1990)...............................................................................................................26

*Payne v. Tennessee*,
    501 U.S. 808 (1991)........................................................................................................18, 22

*Picard v. Cohen*,
    Adv. Pro. No. 10-04311 (smb), ECF No. 13162 (Bankr. S.D.N.Y. Apr. 25, 2016)........ *passim*

*Picard v. Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014).............................................................................................7, 8, 27

*Picard v. Greiff*,
    476 B.R. 715 (S.D.N.Y. 2012)...................................................................................... *passim*

*Picard v. Ida Fishman Rev. Trust*,
    773 F.3d 411 (2d Cir. 2014).......................................................................................... *passim*

*Picard v. JP Morgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    721 F.3d 54 (2d Cir. 2013)................................................................................................10, 13

*Picard v. Merkin*,
    440 B.R. 243 (Bankr. S.D.N.Y. 2010) ....................................................................................7

*Purcell v. Long Island Daily Press Publ'g Co.*,
    9 N.Y.2d 255 (N.Y. 1961) ....................................................................................................17

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986)...............................................................................................................15

*Randall v. Sorrell*,
    548 U.S. 230 (2006)...............................................................................................................22

*Redmond v. SpiritBank (In re Brooke Corp.)*,
    541 B.R. 492 (Bankr. Kan. 2015) ..........................................................................................26

*Reinbold v. Kohansieh (In re Sandburg Mall Realty Mgmt. LLC)*,
    563 B.R. 875 (Bankr. C.D. Ill. 2017)...............................................................................36, 38

*Rolf v. Blyth, Eastman Dillon & Co.*,
    637 F.2d 77 (2d Cir. 1980)............................................................15

*Schnorr v. Schubert*,
    2005 WL 2019878 (W.D. Okla. Aug. 18, 2005) ...................................14

*Schlossberg v. Abell (In re Abell)*,
    549 B.R. 631 (Bankr. D. Md. 2016) .................................................36

*Schott v. Maidsville Coal Min. P'ship*,
    1979 WL 1245 (S.D.N.Y. Sept. 7, 1979)............................................15

*SEC v. Zandford*,
    535 U.S. 813 (2002)....................................................................14

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    499 B.R. 416 (S.D.N.Y. 2013)....................................................5, 27

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015) ..............................................12

*Sender v. Nancy Elizabeth R. Heggland Family Trust  (In re Hedged-Invs. Assocs.), Inc.*,
    48 F.3d 470 (10th Cir. 1995) .........................................................32

*Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest.)*,
    337 B.R. 495 (Bankr. S.D.N.Y. 2006) ..............................................11

*SIPC v. Charisma Secs. Corp.*,
    506 F.2d 1191 (2d Cir. 1975)...........................................................7

*Smith v. Am Founders Fin. Corp.*,
    365 B.R. 647 (S.D. Tex. 2007) .......................................................38

*Taylor v. Sturgell*,
    553 U.S. 880 (2008)....................................................................23

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*,
    549 U.S. 443 (2007).................................................................7, 29

*United States v. Ben Zvi*,
    242 F.3d 89 (2d Cir. 2001).............................................................20

*United States v. Gaudin*,
    515 U.S. 506 (1993)....................................................................18

*United States v. Minicone*,
    994 F.2d 86 (2d Cir. 1993).............................................................20

*USPS v. Phelps Dodge Refining Corp.*,
    950 F. Supp. 504 (E.D.N.Y. 1997) ...................................................................16

*Westinghouse Elec. Corp. v. '21' Intern. Holdings, Inc.*,
    821 F. Supp. 212 (S.D.N.Y. 1993) ...................................................................15

*Wolf v. Rand*,
    685 N.Y.S.2d 708 (N.Y.App Div. 1999) ...........................................................16

## STATUTES AND RULES

11 U.S.C. § 101(12) ...................................................................................................26

11 U.S.C. § 541(a)(3) ................................................................................................27

11 U.S.C. § 548(a)(1)(A) .....................................................................................1, 4, 10

11 U.S.C. § 548(c) ............................................................................................. *passim*

11 U.S.C. § 548(d)(2) ............................................................................................4, 26

11 U.S.C. § 550(a) .....................................................................................................27

11 U.S.C. § 555 ...........................................................................................................6

11 U.S.C. § 559 ...........................................................................................................6

11 U.S.C. § 726 .........................................................................................................27

15 U.S.C. § 77*l*(a)(2) .................................................................................................15

15 U.S.C. § 78bb(a)(2) .................................................................................................8

15 U.S.C. § 78cc(b) ...............................................................................................9, 15

15 U.S.C. § 78bbb .......................................................................................................5

15 U.S.C. § 78fff-1(a) ..................................................................................................5

15 U.S.C. § 78fff-2(c)(1) ............................................................................................27

15 U.S.C. § 78fff–2(c)(3) .........................................................................................5, 27

15 U.S.C. § 78fff(b) .....................................................................................................7

15 U.S.C. § 1501(c)(3) .................................................................................................6

N.Y. C.P.L.R. § 5001(a) ............................................................................................17

N.Y. C.P.L.R. § 5004 ................................................................................................................17

Securities Act of 1933 ............................................................................................................15

Securities Exchange Act of 1934 ....................................................................................... *passim*

## SECONDARY AUTHORITIES

5 COLLIER ON BANKRUPTCY ¶ 548.03 ...................................................................................26

6 MOORE'S FEDERAL PRACTICE § 24.03[3][b] (3d ed. 2003) .......................................................23

RESTATEMENT (SECOND) OF CONTRACTS § 354(1) (1981) ...........................................................15

RESTATEMENT (SECOND) OF TORTS § 874 cmt. ...........................................................................16

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 53(4) (2010) ...................15

x

Defendant Stephen R. Goldenberg ("Defendant") respectfully submits this memorandum of law in opposition to the Motion for Summary Judgment (the "Motion", ECF No. 60) filed by Irving H. Picard (the "Trustee"), trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa-lll, and the estate of Bernard L. Madoff ("Madoff"). The facts relevant to this memorandum are set forth in the Joint Statement of Undisputed Material Facts (the "SUMF", ECF No. 58) submitted by Defendant and the Trustee (together, the "Parties"), and so ordered by this Court on August 16, 2017, and the Declaration of Matthew A. Kupillas dated November 16, 2017.

## PRELIMINARY STATEMENT

Defendant is an innocent former customer of BLMIS. Defendant is being sued by the Trustee for the avoidance and recovery of allegedly avoidable transfers of funds that Mr. Goldenberg withdrew from his brokerage account at BLMIS within two years before the filing date. The Trustee's sole remaining claim against Defendants is his claim for the avoidance of allegedly intentionally fraudulent transfers under Section 548(a)(1)(A).

The Trustee alleges (and Defendant does not dispute) that BLMIS was secretly running a Ponzi scheme. However, Defendant had no knowledge of Madoff's scheme; as the Trustee acknowledges, Defendant believed that BLMIS was a legitimate, regulated broker-dealer. Accordingly, Defendant deposited money into his account at BLMIS, believing that BLMIS was investing those funds in blue-chip securities on his behalf, and periodically withdrew funds from his account based on the monthly account statements he received from BLMIS. Despite Defendant's good faith reliance, and his injuries from Madoff's fraud, the Trustee seeks to recover funds that Defendant withdrew from his account in the two years before Madoff's fraud was revealed.

The primary basis for denying the Trustee's Motion is the value defense codified in Section 548(c) of the Bankruptcy Code. That section imposes a fundamental limitation on the Trustee's exercise of his avoidance power. Specifically, Section 548(c) allows good faith defendants like Mr. Goldenberg to retain each transfer to the extent that, at the time each transfer took place, it satisfied a then-existing antecedent debt or obligation. Section 548(c) and its purpose are plain, and the fact that this is a SIPA proceeding does not expand the Trustee's avoidance powers or reduce Defendant's defenses under the Bankruptcy Code. As the Second Circuit instructed in the *Section 546(e) Decision*, Bankruptcy Code defenses apply to this SIPA proceeding, and the fact that BLMIS was operating a Ponzi scheme does not support the application of judicially created rules that contradict the plain terms of the Bankruptcy Code.

Defendant's withdrawals from his account were transfers made in satisfaction of obligations owed by BLMIS at the time of those transfers. As the *Section 546(e) Decision* recognized, a brokerage customer has an indisputable right to the full amount of his brokerage account balance shown on trade confirmations and account statements. Thus, Defendant may retain all payments made to him by BLMIS in satisfaction of his reported securities entitlements.

Defendant also may retain transfers that, at the time of each withdrawal, satisfied his right to payment on his unliquidated state and federal tort claims against BLMIS. This includes the federal securities fraud claims and state fraud and breach of fiduciary duty claims that every innocent BLMIS customer held from the inception of the customer-broker relationship.

The Trustee failed to avoid these obligations through his avoidance powers under the Code. Although the Trustee amended his initial complaint to add claims for the avoidance of obligations, those claims were dismissed by this Court. Neither can the Trustee avoid these obligations under common law remedies or under the federal securities laws, as he is *in pari*

*delicto* with BLMIS. Thus, because Defendant's withdrawals from his BLMIS account discharged these unavoided obligations, he may retain those withdrawals under Section 548(c).

Prior rulings of this Court and the District Court did not discuss or anticipate the defenses advance herein by Defendant, and should be revisited. In any event, those prior rulings are not supported by the law and are inconsistent with subsequent Second Circuit case law. Those rulings erred by accepting the Trustee's argument that value under Section 548(c) can only be measured by the impact of transfers on the SIPA priority distribution scheme, in disregard of clear case law holding that value must be measured from the transferee's perspective at the time of each transfer. These prior rulings also improperly assumed that a customer may not enforce its securities contract with BLMIS if the agreement was fraudulently procured by the broker. Further, those rulings applied a judicially created "Ponzi scheme exception" from cases involving equity investors, which, whatever their merit, are inapplicable to innocent brokerage account customers like Defendant.

Irrespective of any other defense, the two-year statute of repose found in Section 548(a) bars the Trustee from avoiding any obligations or transfers that arose prior to December 11, 2006 (two years before the petition filing date). As a statute of repose, this provision cannot be equitably tolled or disregarded. However, the Trustee's method for calculating liability disregards the statute of repose by ignoring the pre-existing obligations of BLMIS that existed at the beginning of that two-year period. This calculation method disregards the statute of repose on equitable grounds, a practice foreclosed by Supreme Court precedent and reiterated in the last term in *CalPERS*. Application of the statute of repose in Section 548(a) results in the complete negation of the Trustee's claims against Defendant.

For these reasons, as explained further below, the Trustee's motion should be denied.

## ARGUMENT

**I.     DEFENDANT'S VALUE DEFENSES UNDER SECTION 548(C) DEFEAT THE TRUSTEE'S CLAIMS**

The Trustee's summary judgment motion must fail because he has not met his burden of negating Defendant's affirmative defenses, specifically the value defense. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Defendant does not dispute that the Trustee has met the burden of establishing his *prima facie* case. However, on a motion for summary judgment, the plaintiff bears the burden of not only establishing his *prima facie* case but also demonstrating that all affirmative defenses are unsupported by the record or fail as a matter of law. *See FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994). The parties stipulated to all necessary facts supporting Defendant's affirmative defenses and to Defendant's good faith. Therefore, the Trustee's motion for summary judgment must fail unless he carries his burden of establishing that, as a matter of law, Defendant did not give value (as that term is defined in the Bankruptcy Code) to BLMIS at the time of the Transfers.

Bankruptcy Code Section 548(a)(1)(A) allows the Trustee to avoid fraudulent transfers of debtor property and debtor obligations made or incurred within two years before the filing of the petition. 11 U.S.C. § 548(a)(1)(A). Where a trustee sues to avoid such a transfer, Section 548(c) permits a good faith transferee to retain the transfer to the extent that he gave value to the debtor in exchange at that time. "Value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor ...." *Id.* § 548(d)(2)(A). Thus, a transfer is an exchange for value where the debtor owes the transferee a debt or obligation, including an existing contractual obligation or tort liability on a claim. *See id.* §§ 101(5), (12) (definitions).

The value defense in Section 548(c) preserves state law rights and remedies for a defendant against a debtor by authorizing the defendant to retain or offset any amounts received

based on valid rights to payment existing at the time of the transfer. This value defense is a critical limitation on the Trustee's exercise of the federal authority granted him under Section 548(a). Here, Defendant had undisputed state law rights to enforce his securities entitlements reported to him by him by BLMIS, his broker, and each transfer to Defendant satisfied lawful obligations of BLMIS to Defendants due at the time of the transfers.  The Trustee has not exercised his bankruptcy powers to avoid these obligations as a fraud on creditors, and they are otherwise enforceable by Defendant and other innocent victims of Madoff's fraud.

### A.      SIPA Does Not Expand a Trustee's Avoidance Powers or Reduce a Customer's Defenses

When it enacted SIPA, Congress did not diminish the statutory rights available to a good-faith customer in an avoidance action. Contrary to the rulings in *Picard v. Greiff*, 476 B.R. 715 (S.D.N.Y. 2012) and *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 499 B.R. 416 (S.D.N.Y. 2013) ("*Antecedent Debt Decision")*, SIPA cannot be read to displace the value defense.

SIPA is part of the Securities Exchange Act of 1934.  SIPA § 2, 15 U.S.C. § 78bbb. SIPA does not create an avoidance power for trustees in broker-dealer liquidations; instead, it explicitly borrows the Bankruptcy Code's avoidance provisions, giving a SIPA trustee "the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under title 11."  SIPA § 7, 15 U.S.C. § 78fff-1(a).  A SIPA trustee may recover *customer* property transferred by the debtor "if and to the extent that such transfer is voidable or void under the provisions of title 11."  SIPA § 8(c)(3), 15 U.S.C. § 78fff–2(c)(3); *Greiff*, 476 B.R. at 722 n.7 ("SIPA expressly incorporates the limitations Title 11 places on [a] trustee's powers…..").  This plain language supports only one interpretation: In SIPA, Congress adopted the Bankruptcy Code's limitations on avoidance powers, which

necessarily include Section 548(c) defenses.

The significance of this express limitation is underscored by the fact that where Congress intended to exempt SIPA liquidations from particular Bankruptcy Code provisions, it did so expressly. *See* 11 U.S.C. §§ 555, 559 (excluding liquidation rights of stockbrokers and repo participants from automatic stay unless "such order is authorized under the provisions of [SIPA]"); *id.* § 1501(c)(3) (excluding from cross-broker bankruptcy jurisdiction "an entity subject to a proceeding under [SIPA]").

Courts have a duty to reconcile provisions in related federal statutes, not search for a conflict between them. *Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 108 (2010) (statutes should be construed to be consistent with one another where the text permits); *see also National Union Fire Ins. Co. v. Camp (In re Government Secs. Corp.)*, 972 F.2d 328, 330 (11th Cir. 1992) (in testing consistency of SIPA and Bankruptcy Code provisions, "a court should interpret a statute so as to give effect to each of its provisions.") (citations omitted). Only in an extreme case where it is impossible to reconcile two statutes may a court conclude that one is preferred over the other. *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141–42 (2001) (implied repeal is permissible only where statutes are irreconcilable); *Morton v. Mancari*, 417 U.S. 535, 550 (1974) (same).

"However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment." *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228 (1957); *accord*, *Morales v. Trans World Airlines*, 504 U.S. 374, 384–85 (1992) ("the specific governs the general"). SIPA commands that its liquidations "shall be conducted in accordance with, and as though it were being conducted under" provisions of the Bankruptcy Code, "[t]o the extent consistent with the provisions of

[SIPA]."  SIPA § 6(b), 15 U.S.C. § 78fff(b).  The "to the extent" clause does not prohibit a defendant from raising specific statutory defenses laid out in Section 548(c).  Congress did not draft two irreconcilable statutes; instead, it specifically made a SIPA trustee's avoidance of transfers of customer property dependent on the extent to which such transfers are avoidable under the Bankruptcy Code.  If Congress wished to limit Section 548(c) defenses in SIPA avoidance actions, it could have done so.  *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 453 (2007) ("[W]here Congress has intended to provide exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly") (internal citation omitted).

"[A] provision is 'inconsistent' with SIPA if it conflicts with an explicit provision of the Act."  *SIPC v. Charisma Secs. Corp.*, 506 F.2d 1191, 1195 (2d Cir. 1975).  Because SIPA *explicitly and unconditionally* incorporates the Bankruptcy Code's detailed avoidance provisions, the general caveat in SIPA Section 6(b) is consistent with Section 548(c) defenses.  *See Lutz v. Chitwood (In re Donahue Secs., Inc.)*, 304 B.R. 797, 798 (Bankr. S.D. Ohio 2003) ("[I]t is not inconsistent with SIPA to hold that a SIPA trustee is vested with the same rights as a bankruptcy trustee ...").  SIPA Section 6(b) does not otherwise alter the avoidance process, and does not establish a presumption that every transfer of customer property is recoverable.  Indeed, fraudulently conveyed property is not "considered property of the estate until it is recovered." *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 131 (2d Cir. 1992); *accord, Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 207 n.7 (2d Cir. 2014) ("*Fairfield*") (transferred property is *not* property of the SIPA estate unless and until the transfer is properly avoided).

Likewise, SIPA Section 8(c)(3) only "creates a fiction that grants the trustee standing to bring avoidance actions."  *Picard v. Merkin*, 440 B.R. 243, 272 (Bankr. S.D.N.Y. 2010).  Section 8(c)(3) expands the kinds of *property* that a SIPA trustee may seek to recover; it does not

7

otherwise alter the avoidance process, as *Fairfield* explicitly confirmed:

> [B]ecause money held by a broker on behalf of its customers is not the broker's property under state law, it would not be recoverable by a trustee in an ordinary bankruptcy.  SIPA circumvents this problem through a statutorily created legal fiction that confers standing on a SIPA trustee by treating customer property as though it were "property of the debtor" in an ordinary liquidation.

762 F.3d at 212-13 (citations omitted); *see also Marshall v. Picard*, 740 F.3d 81, 90 n.11 (2d Cir.

2014) (transferee "entitled to a 'good faith' defense").

> **B.**    **The *Section 546(e) Decision* Established That Defendant's Withdrawals Were Enforceable Settlement Payments and/or Payments in Connection With a Securities Contract**

In its *Section 546(e) Decision*, the Second Circuit established this important rule: when

BLMIS sent trade confirmations and account statements to its customers, those customers had

the right to receive the full amount of money reflected in those statements.  *Picard v. Ida*

*Fishman Rev. Trust*, 773 F.3d 411, 421-23 (2d Cir. 2014) ("*Section 546(e) Decision*").

Section 28(a)(2) of the Securities Exchange Act of 1934 (the "1934 Act"), of which SIPA

is a part, expressly preserves all of a customer's rights and remedies arising under state law.  15

U.S.C. §78bb(a)(2).  The Second Circuit held that a brokerage customer has a state law right to

recover from his stockbroker the full amount of the securities positions shown on his trade

confirmations and brokerage account statements:

> Each time a customer requested a withdrawal from BLMIS, he or she intended that BLMIS dispose of securities and remit payment to the customer.  *See* N.Y.U.C.C. § 8-501(b)(1) & cmt. 2 (broker's written crediting of securities to a customer's account creates an enforceable securities entitlement).…  [I]f I instruct my broker to sell my shares of ABC Corporation and remit the cash, that payment is a "settlement" even if the broker may have failed to execute the trade and sent me cash stolen from another client.…  [B]ecause the customer granted BLMIS discretion to liquidate securities in their accounts to the extent necessary to implement their sell orders or withdrawal requests, each transfer in respect of such an order or request constituted a settlement payment.

*Section 546(e) Decision,* 773 F.3d at 422–23.  Thus, as framed in the *Section 546(e) Decision*,

8

each time a customer requested a withdrawal from BLMIS, he or she intended that BLMIS dispose of securities and remit payment to the customer. The securities entitlements that every broker's customer holds are unqualified obligations under New York law. As a matter of law, and as specifically confirmed by the Second Circuit, an innocent customer's withdrawals from a brokerage account are "settlement payments" that satisfy an enforceable state law securities entitlement, a valid claim under state law. *Id.*

The fraudulent nature of Madoff's scheme does not change this analysis. Under Section 29(b) of the 1934 Act, an innocent party like Defendant has the right to choose whether to void a contract procured by fraud or to enforce it. *See*, *e.g.*, *Freeman v. Marine Midland Bank-N.Y.*, 419 F. Supp. 440, 453 (E.D.N.Y. 1976) (citations omitted) (under Section 29(b), "the investor, at his option, [may choose] to void the contract as a defense to a lender's suit, to sue on the contract for damages, to enforce the contract, or to seek rescission."). The 1934 Act is explicit that only the wrongdoer is prohibited from enforcing a securities contract procured by fraud:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . the performance of which involves the violation of . . . any provision of this chapter or any rule or regulation thereunder, shall be void (1) *as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract. . . .*

15 U.S.C. § 78cc(b) (emphasis added).

Section 29(b) has been definitively construed to permit an innocent counter-party to enforce a fraudster's securities contract obligations. *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387–88 (1970) (collecting cases); *accord*, *CFTC v. Hanover Trading Corp.*, 34 F. Supp. 2d 203, 206 (S.D.N.Y. 1999) ("[C]ontracts made in violation of the securities laws, and thus subject to Section 29(b) . . . are merely voidable at the option of the innocent party."); *Found. Ventures, LLC v. F2G, Ltd.*, No. 8-cv-10066 (PKL), 2010 U.S. Dist. LEXIS 81293, at *18–20 (S.D.N.Y.

Aug. 11, 2010) (citations omitted) ("Contracts made in violation of section 29(b) are . . . 'voidable at the option of the innocent party.' Only an unwilling innocent may seek to rescind a contract under section 29(b).").

When BLMIS sent account statements to Defendant, BLMIS obligated itself to pay Defendant the securities entitlements reported in those statements. It matters not from an innocent customer's perspective that BLMIS did not actually purchase the securities reported in those statements.

The *Section 546(e) Decision* makes it clear that the broker's payment is a settlement payment and a payment in connection with a securities contract – *i.e.*, that BLMIS' payments to good faith customers discharged legally enforceable obligations owed by BLMIS to customers at the time of the transfers. This result should end any inquiry as to whether such payments provided value to BLMIS under Section 548(c).

### 1. The Trustee has not avoided the contractual obligations that BLMIS owed to Defendant

The Trustee has express powers to avoid, not only transfers, but also obligations of the debtor that were incurred with actual intent to hinder, delay or defraud other creditors. 11 U.S.C. § 548(a)(1)(A). However, although the Trustee seeks to avoid the Transfers made to Defendant, he has not avoided the enforceable obligations underlying those Transfers. The Trustee's failure to avoid those obligations is fatal to his case. There is no basis to disregard the mandatory steps for avoidance of such obligations set out in the Bankruptcy Code.

Where a trustee wishes to avoid a debtor's transfer that was supported by an existing obligation for the payment, he must avoid the underlying obligation. This interplay between an antecedent obligation and an ensuing transfer was explained in *Lehman Bros. Holding v. JP Morgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415 (Bankr. S.D.N.Y.

2012). The incurrence of an obligation "is a preliminary aspect of a transactional process that must occur prior to or as a condition of transferring property or an interest in property." *Id.* at 444. Where that legal predicate exists, the transfer relates back to the predicate obligation and therefore satisfies that obligation, *i.e.*, an exchange for "value" occurs between the parties. *Id.* at 444–45. Where the debtor transferred property because he was legally obligated to do so, a trustee cannot recover the transfer unless and until he timely avoids the debtor's underlying obligation. *In re Asia Global Crossing Ltd.*, 333 B.R. 199, 203-05 (Bankr. S.D.N.Y. 2005) (Bernstein, J.) (an obligation is a formal binding agreement to pay a certain amount or do a certain thing, and typically will impose a "debt" on the obligor and give a "claim" to the obligee; an obligation is a chose in action and not a "transfer" as defined in the Bankruptcy Code) (citations omitted).

The need to avoid the obligation that supports a transfer is well-established in avoidance law. Where a trustee fails to avoid the obligation, the unavoided obligation necessarily provides the transferee with a value defense for the ensuing transfer:

> [W]here a debtor makes prepetition payments on a contractual debt, in order for those payments to be avoidable as constructively fraudulent, it is necessary for the trustee to first avoid the underlying contract as a fraudulently incurred obligation. Absent avoidance of the underlying contract, the payments discharge the obligation and are, by definition, for reasonably equivalent value.

*Cox v. Nostaw (In re Central Ill. Energy Coop.)*, 526 B.R. 786, 791 (Bankr. C.D. Ill. 2015) (citations omitted).[1]  Thus, when the Trustee seeks to avoid fraudulent transfers like the

---

[1] For example, in *Jahn v. Char (In re Incentium, LLC)*, 473 B.R. 264, 272 (Bankr. E.D. Tenn. 2012), the court relied on Section 548(c) when rejecting a trustee's attempt to avoid payments in satisfaction of a severance obligation incurred outside of the lookback period because "[t]he transfers of severance pay to the defendant satisfied the prior, unavoidable severance obligation, so the debtor received 'value' in exchange for the transfers."; *accord*, *Ogle v. JT Miller, Inc. (In re HDD Rotary Sales, LLC)*, 512 B.R. 877, 886 (Bankr. S.D. Tex. 2014) ("transfers are not avoidable because they were transfers made in satisfaction of unavoidable obligations."); *Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest.)*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006) (same, as to guaranty and rent recapture).

Transfers to Defendant at issue in this litigation, he cannot unilaterally declare the transfers void. Instead, the Trustee must first properly allege claims for the avoidance of the obligations underlying those transfers, and must ultimately prove that those obligations are subject to avoidance under the Bankruptcy Code – he must "avoid the underlying contract." *Id.*

However, the Trustee has failed to take the necessary steps to avoid the enforceable obligations that BLMIS owed to Defendant. The Trustee did assert claims in his Complaint seeking to avoid BLMIS' pre-petition obligations to Defendant; indeed, the fact that the Trustee amended his initial complaint to *add* claims seeking the avoidance of obligations shows the Trustee's own recognition that if he is to avoid the Transfers at issue, he must first avoid the obligations underlying those Transfers. However, the Trustee's "obligations" claims were dismissed by this Court because they were not pleaded with the requisite particularity under the Federal Rules of Civil Procedure.[2] Following that dismissal, the Trustee did not amend his complaint to re-assert claims for the avoidance of obligations owed by BLMIS to Defendant.

The Trustee was required to allege valid claims for the avoidance of obligations owed to Defendant, and to prove that those obligations were avoidable, in order for the Trustee to be entitled to judgment on his claims against Defendant. *See*, *e.g.*, *Daly v. Fusco (In re All-Type Printing, Inc.)*, 274 B.R. 316, 324 (Bankr. D. Conn. 2002) ("Simply put, in order to have a chance of prevailing . . . the Trustee needed to seek to avoid the *incurring* of an *obligation*—the Retirement Debt—as well as the *transfer* of *property*—the Payments.") (emphasis in original). But here, the Trustee has failed to adequately *allege* (much less prove) claims for the avoidance of BLMIS' obligations to Defendant.

---

[2] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 531 B.R. 439, 477 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*") ("[T]he intentional fraudulent obligation claims do not satisfy Fed. R. Civ. P. 9(b), . . . and the constructive fraudulent obligations do not meet the requirements of Rule 8(a) . . . ."); Order Granting In Part And Denying In Part Defendants' Motions To Dismiss, ECF No. 42 (applying the *Omnibus Good Faith Decision* to the instant action against Defendant).

2.    **The Trustee is prevented by the *in pari delicto* doctrine from avoiding BLMIS' contractual obligations, whether through common law remedies or the federal securities laws**

The Second Circuit has already established that, in this SIPA liquidation case, because the Trustee is the successor to BLMIS, the *in pari delicto* doctrine bars him from using either common-law remedies or federal securities laws to avoid the broker's contractual obligations. In *Picard v. JP Morgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013), the Trustee argued that the *in pari delicto* doctrine should not apply to him because, in essence, he was attempting to recover assets for a good cause. The Second Circuit expressly rejected that plea; "despite the trustee's urging that proceeds would benefit blameless unsecured creditors . . . and shareholders," the Second Circuit dismissed the Trustee's common-law claims. *Id.* at 64 n.12 (internal marks omitted) (ellipsis in original). The Second Circuit then blocked the Trustee from avoiding BLMIS' otherwise enforceable contractual obligations. *Id.* at 64. Thus, the Trustee is collaterally estopped by the *JP Morgan* decision from asserting any common law or other equitable basis to avoid BLMIS' obligations to its customer at the time of the transfers.

BLMIS' enforceable obligations to Defendant (obligations explicitly confirmed by the *Section 546(e) Decision*) underlie all of the Transfers at issue. The satisfaction of those obligations in exchange for the Transfers falls squarely within the definition of value. The Trustee's failure and inability to avoid the obligations owed to Defendant by BLMIS is dispositive: the Transfers remain valid payments for enforceable obligations to Defendant, and Section 548(c) provides Defendant a complete defense against the avoidance of those Transfers.

C.    **The Transfers Were Also Made in Satisfaction of Valid Tort Claims That Defendant Held Against BLMIS**

The Trustee's motion also must fail because, under the value defense of Section 548(c),

13

Defendant can retain the amount due to him at the time the Transfers took place based on tort remedies available to Defendant. Defendant, like every other innocent BLMIS customer, has the right to the return of his principal based on the Trustee's admissions of widespread fraud by the broker-dealer. It is undisputed that such principal is value under Section 548(c). But value is not limited to a customer's principal deposits. In addition to BLMIS' obligations to Defendant for the amounts shown on his monthly account statements, Defendant also held rights to payment under non-bankruptcy state and federal law *at the time of each withdrawal*. These rights are "claims" that fall squarely within the definition of value under Section 548(c).[3]

### 1. Defendant is entitled to retain the value of his federal fraud and misrepresentation claims

Defendant held a federal securities claim against BLMIS from the inception of the broker-customer relationship, which itself was procured by fraud. The Trustee has stipulated that BLMIS received customer payments from Defendant intended for the purchase and sale of securities but did not purchase any securities, instead sending false brokerage statements to Defendant. *See* SUMF ¶¶ 15, 32. These facts establish that Defendant held a federal securities fraud claim against BLMIS for relief under Rule 10b-5 and Section 10(b) of the 1934 Act from the time of his first deposit of funds.[4] The remedies for securities fraud (and, therefore, the value of Defendant's claim against BLMIS) include rescission, recovery of principal, *and*

---

[3] *See In re Bennett Funding Group, Inc.*, No. 98-61376, 1999 Bankr. LEXIS 1843, at *25–26 (Bankr. N.D.N.Y. Apr. 29, 1999) (alleged Ponzi operators "would have faced contingent liability to Defendant (on theories ranging from fraud to restitution) from the moment they were entrusted with his money," accordingly, transfers that "incidentally served to satisfy Defendant's unasserted, undiscovered, and possibly unimagined tort rights—operated as the satisfaction of an antecedent debt, and hence as an exchange for value under Code § 548(c).") (citations omitted).

[4] "[A] broker who accepts payment for securities that he never intends to deliver ...violates § 10(b) and Rule 10b-5." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 n.10 (2006); *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (same). The defrauded customer has a claim whether or not the broker actually purchases securities, in part because the customer has no means to confirm a transaction other than the brokerage account statement. *Schnorr v. Schubert*, 2005 WL 2019878, at *5 (W.D. Okla. Aug. 18, 2005) ("[*U*]*nfulfilled* promises to purchase securities qualify as *actual* purchases") (emphasis in original).

14

compensation for the loss of the time value of money, expressed as interest.[5]

Likewise, the Securities Act of 1933 ("1933 Act") provides for rescission and interest in the case of misrepresentation in connection with the sale of securities.  Section 12(a)(2) of that Act provides that a victim may recover the "consideration paid for such security with interest thereon, less the amount of any income received thereon . . . ."[6]  15 U.S.C. § 77l(a)(2).  Rule 10b-5 must be construed consistently with the express remedy in the 1933 Act, thus rescission with interest is a remedy for Rule 10b-5 violations.  *Randall v. Loftsgaarden*, 478 U.S. 647, 661–63 (1986) (same).[7]  Section 29(b) of the 1934 Act also permits customers to void their brokerage contracts in favor of ancillary remedies.[8]  15 U.S.C. § 78cc(b).  Where Section 29(b) is invoked, the available remedy is rescission, including return of the consideration paid and "interest thereon."

Accordingly, any determination of the value provided by Defendant in exchange for the

---

[5]  *See Rolf v. Blyth, Eastman Dillon & Co.*, 637 F.2d 77, 87 (2d Cir. 1980) ("In view of the high inflation rates that beset this period [during which defendant held the defrauded plaintiff's investment], a damage award without prejudgment interest … would not give [Plaintiff] full compensation for the losses he suffered at the hands of his fiduciary.").

[6]  In adopting Section 12(a)(2), Congress borrowed from existing common law, which included interest and return of principal as part of rescission.  *See Schott v. Maidsville Coal Min. P'ship*, 1979 WL 1245, at *4 (S.D.N.Y. Sept. 7, 1979) (plaintiff is entitled to the purchase price of the securities, less any distributions made, plus interest on § 12(a)(2) claim); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 53(4) (2010) ("Liability in restitution ... normally includes prejudgment interest (a) from the date of payment to a conscious wrongdoer [or] a defaulting fiduciary ..."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 354(1) (1981) ("If the breach consists of a failure ... to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance ....").

[7]  *See, e.g., Bass v. Janney Montgomery Scott, Inc.*, 152 F. Appx. 456, 458 (6th Cir. 2005) (rescission in Rule 10b-5 case includes return of consideration with interest); *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1031 (9th Cir. 1999) (same); *see also Brick v. Dominion Mortg. & Realty Trust*, 442 F. Supp. 283, 303–04 (W.D.N.Y. 1977) (New Jersey blue sky statute providing for recovery of consideration plus 6% interest effectively provides same recovery as Rule 10b-5); *Westinghouse Elec. Corp. v. '21' Intern. Holdings, Inc.*, 821 F. Supp. 212, 220 (S.D.N.Y. 1993) ("[T]he legal standards to be applied in determining whether an injured party is entitled to rescission for violation of Rule 10b-5 and §§ 12(a)(2) and 17 are essentially the same as the standards developed in the common law fraud cases.") (citations omitted).

[8]  *See, e.g., Am. Gen. Ins. Co. v. Equitable Gen. Co.*, 493 F. Supp. 721, 767–68 (E.D. Va. 1980) (plaintiffs entitled to rescission and prejudgment interest under Section 29(b) from time of initial fraudulent activity); *Cant v. A.G. Becker & Co., Inc.*, 384 F. Supp. 814, 816 (N.D. Ill. 1974) ("A failure to assess interest ... [permits wrongdoers] to speculate with the funds of innocent persons, without fully compensating such victims for the unlawful use of their assets.").

Transfers should take into account the rescission claim (including the right to interest) that Defendant held against BLMIS at the time the Transfers took place.

### 2.      Defendant is also entitled to retain the value of his state fraud and breach of fiduciary duty claims against BLMIS

New York courts recognize that fraud victims are entitled to recover consequential damages. *See, e.g., Big Apple Car, Inc. v. City of New York*, 611 N.Y.S.2d 533, 534 (N.Y. App. Div. 1994). Likewise, breach of fiduciary duty claims carry lost opportunity damages.[9] In an analogous scenario, the Second Circuit applied the Restatement (Second) of Trusts, concluding that "[o]ne appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) (breach of ERISA fiduciary duties). All such damages claims are value under Section 548(c).

Defendant held claims against BLMIS for breach of fiduciary duty from the inception of the broker-customer relationship.[10] These claims entitled Defendant to interest in addition to principal. *See, e.g.*, *Wolf v. Rand*, 685 N.Y.S.2d 708, 710 (N.Y. App. Div. 1999); *USPS v. Phelps Dodge Refining Corp.*, 950 F. Supp. 504, 518 (E.D.N.Y. 1997); *In re Estate of Newhoff*, 435 N.Y.S.2d 632, 637 (N.Y. Surr. Ct. 1980). In New York, compensation from the tortfeasor for loss of the time value of money is mandatory. *NML Capital v. Republic of Argentina*, 17 N.Y.3d

---

[9]  *See, e.g., 105 E. Second St. Assocs. v. Bobrow*, 573 N.Y.S.2d 503, 504 (N.Y. App. Div. 1991) (damages for breach of fiduciary duties include "lost opportunities for profit ... by reason of the faithless fiduciary's conduct"). *See also* RESTATEMENT (SECOND) OF TORTS § 874 cmt. b (1979) (remedies for breach of fiduciary duty may include "tort damages for harm caused by the breach," "restitutionary recovery," and "profits that result to the fiduciary from his breach of duty").

[10]  New York recognizes common law claims for breach of fiduciary duty in the securities context. *See Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.*, 18 N.Y.3d 341, 351 (N.Y. 2011). In New York, a broker's failure to invest in securities, thereby "abusing the position as broker-agent to gain profits at the client's expense," gives rise to a damages claim against the faithless fiduciary. *Lowenbraun v. L.F. Rothschild*, 685 F. Supp. 336, 343 (S.D.N.Y. 1988).

250, 265–66 (2011).[11] "It has been the settled rule that interest must be allowed as a matter of right on recoveries for intentional tort with respect to property and property rights." *DeLong Corp. v. Morrison-Knudsen Co., Inc.*, 244 N.Y.S.2d 859, 862 (N.Y. App. Div. 1963); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 694 (2d Cir. 1983); *see also Purcell v. Long Island Daily Press Publ'g Co.*, 9 N.Y.2d 255, 257–58 (N.Y. 1961); N.Y. C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded ... because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property").[12]

As a component of the federal securities laws, SIPA includes recognition of these rights through Section 28(a)(2) of the 1934 Act. Here, BLMIS' tortious conduct occurred every time BLMIS accepted a deposit from Defendant without intending to trade in securities, or issued a fraudulent account statement to Defendant. Any determination of the value given by Defendant in exchange for the Transfers should take into account the tort claims held by Defendant at the time the Transfers took place.

## II.     *COHEN* AND OTHER PRIOR MADOFF-RELATED DECISIONS REJECTING THE VALUE DEFENSE ARE MANIFESTLY ERRONEOUS

The Trustee argues that consideration of Defendant's value defense is foreclosed because that defense has been rejected "in at least five previous decisions issued in this liquidation proceeding." Trustee Mem. at 17. However, those decisions are inconsistent with the mandate of the *Section 546(e) Decision* and therefore not good law. To the extent that the Court's ruling in *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), ECF No. 13162 (Bankr. S.D.N.Y. Apr. 25, 2016) ("*Cohen*") and other prior decisions rejected the application of the value defense to the

---

[11] New York's statutory interest rate is 9%. N.Y. C.P.L.R. § 5004.

[12] New York has long recognized that fraud victims are entitled to either (i) disaffirm the contract by rescission; or (ii) stand on the contract and maintain an action at law for damages. *Big Apple Car*, 611 N.Y.S.2d at 534.

Trustee's claims against Defendant, those decisions were manifestly erroneous and should be rejected.

### A.    *Cohen* is Not *Stare Decisis* on Defendant's Affirmative Defenses

The Trustee erroneously contends that this Court's *Cohen* decision on the merits constitutes *stare decisis* precluding relitigation of the value defense, and the prior Madoff-related decisions addressing the value defense resolve all issues that Defendant could raise.  But those decisions are inconsistent with the mandate of the *Section 546(e) Decision* and therefore not good law.  Further, because *Cohen* did not address multiple issues raised by Defendant, the *stare decisis* doctrine has no place here.  Moreover, the Trustee is estopped from arguing that *Cohen* is *stare decisis* on Defendant's defenses, as the Trustee previously argued that *Cohen* will not interfere with Defendant's ability to litigate the value defense in his own avoidance action.

### 1.    *Cohen* cannot be *stare decisis* because, to the extent that *Cohen* limited the value defense in a manner inconsistent with the mandate of the *Section 546(e) Decision*, it is manifestly erroneous

Those portions of the *Cohen* ruling that addressed certain of Defendant's arguments cannot be followed because they are permeated with errors and should be revisited.  The Supreme Court has consistently held that *stare decisis* "is not an inexorable command; rather, it is a principle of policy and not a mechanical formula." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), citing *Helvering v. Hallock*, 309 U.S. 106, 119 (1940) (cautioning against blindly applying stare decisis when adhering to precedent would "involve[] collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience").  Thus, "when governing decisions are unworkable or are badly reasoned," courts must not feel "constrained to follow precedent.'" *Payne*, 501 U.S. at 827 (quoting *Smith v. Allwright*, 321 U.S. 649, 665 (1944)); *United States v. Gaudin*, 515 U.S. 506, 521 ("*stare decisis* cannot possibly be

18

controlling when . . . the decision in question has been proved manifestly erroneous, and its underpinnings eroded by subsequent decisions of this Court").

*Cohen* disregards BLMIS' undisputed legal obligations to Defendant which existed at the time of the transfers, as established in the *Section 546(e) Decision*. The Court permitted the Trustee simply to sidestep those obligations without seeking their formal avoidance, and refused to consider whether those unavoided obligations constituted value for purposes of Section 548(c). *See Cohen* at 30, n. 17 (stating that "the argument that payment in satisfaction of an unavoided obligation provides value misses the point."). This is impermissible.

As discussed above, the Second Circuit recognized in the *Section 546(e) Decision* that a "broker's written crediting of securities to a customer's account creates an enforceable securities entitlement" under New York law. *Section 546(e) Decision,* 773 F.3d at 422–23 (citing N.Y.U.C.C. § 8-501(b)(1) & cmt. 2). The Court held there that from the customers' perspective the fraudulent BLMIS contracts were enforceable for purposes of the bankruptcy avoidance provisions, notwithstanding Madoff's fraud. If the contracts between the customers and BLMIS are enforceable settlement payments and/ or payments in connection with securities contracts for purposes of the avoidance provisions of the Bankruptcy Code, they cannot also be unenforceable contracts in later proceedings involving the *same* customers and *same* contracts.

The Second Circuit decided precisely whether fraudulent payments — made by BLMIS to good-faith customers like Defendant — should be enforceable after the Ponzi scheme was exposed and crumbled. The Court ruled from the perspective of the customer, holding these fraudulent payments are valid notwithstanding Madoff's Ponzi scheme. The Second Circuit explained:

19

> [I]f I instruct my broker to sell my shares of ABC Corporation and remit the cash,
> that payment is a "settlement" *even if the broker may have failed to execute the*
> *trade and sent me cash stolen from another client*. . . . [B]ecause the customer
> granted BLMIS discretion to liquidate securities in their accounts to the extent
> necessary to implement their sell orders or withdrawal requests, each transfer in
> respect of such an order or request constituted a settlement payment.

*Id.* at 422–23 (emphasis added).

As a party to the Second Circuit decision, Defendant may rely on the mandate from that

Court to bar the Trustee from arguing otherwise and forecloses any contrary decision by this

Court. *See, e.g., Burrell v. United States*, 467 F.3d 160, 165 (2d Cir. 2006); *Grede v. FCStone*

*LLC*, Nos. 16-1896 & 16-1916, 2017 U.S. App. LEXIS 15025, at *16 (7th Cir. Aug. 14, 2017).

The mandate rule holds "that where issues have been explicitly or implicitly decided on appeal,

the [lower] court is obliged, on remand, to follow the decision of the appellate court." *United*

*States v. Minicone*, 994 F.2d 86, 89 (2d Cir. 1993); *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d

Cir. 2001) ("The mandate rule . . . forecloses relitigation of issues expressly or impliedly decided

by the appellate court.") (citations omitted). A bankruptcy court is therefore "barred from

considering or modifying any of its prior decisions that have been ruled on by the court of

appeals." *Minicone*, 994 F.2d at 89 (citation omitted). This prohibition applies not only to the

specific dictates of the remand order but also the "broader 'spirit of the mandate.'" *Ben Zvi*, 242

F.3d at 95. This Court accordingly is bound by that decision on the legal issue *expressly* decided

– the contracts between BLMIS and its customers are valid enforceable contracts for purposes of

application of the Bankruptcy Code avoidance provisions in Defendant's case. Any argument

that purports to limit or modify this holding is foreclosed. Defendant was a party to the *Section*

*546(e) Decision* and is entitled to enforce its mandate.

But the Second Circuit did not just decide that the fraudulent securities contracts were

legally enforceable by the innocent customers. A necessary part of its ruling is that there are no

special avoidance rules in SIPA cases; rather, the statutory avoidance provisions of the Bankruptcy Code must be applied according their terms. The decision on this point was explicit. In rejecting the Trustee's contention that there should be a special rule in SIPA cases because of Madoff's fraud, the Court stated that in adopting the provisions of the Bankruptcy Code, "Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality." *Section 546(e) Decision*, 773 F.3d at 423. The trustee and the court are precluded by this decision from taking the position that the value defense in the Bankruptcy Code does not operate in a SIPA case to permit Defendant to retain payments on account of an unavoided or unavoidable obligation of the debtor. Even if the Court ruling had not been specific on this point, the result would be the same. The mandate rule applies not only to explicit rulings by the court, but also "implicit" ones, and those within the "spirit" of the ruling. There is no reading of the *Section 546(e) Decision* which leaves open to question the application of the Bankruptcy Code avoidance provisions according to their terms. Any decision to the contrary is manifestly erroneous.

The foregoing conclusion about the mandate rule extends to any analysis of the continuing vitality of *Greiff* and the *Antecedent Debt Decision*. Those decisions rested on two premises explicitly rejected by the *Section 546(e) Decision*: (i) that BLMIS' fraudulent securities contracts were not enforceable by innocent customers, and (ii) that a special rule in SIPA cases precludes giving effect to the value defense under Section 548(c) beyond a customer's principal deposits. Neither principle can withstand scrutiny under the mandate rule as applied to Defendant. The Bankruptcy Code avoidance provisions must be applied according to their terms. To the extent that this Court in *Cohen* felt constrained by *Greiff* and *Antecedent Debt*

21

*Decision* to reject the value defense, that decision must be revisited because it is manifestly erroneous and contrary to the mandate of the *Section 546(e) Decision*.

Thus, the only open question left to the Trustee is whether the so-called Ponzi cases involving equity investors can be extended to these facts. As explained in Section II.C.3, *infra*, the gravamen of the reasoning of the *Greiff* decision extending the Ponzi scheme cases limiting equity investors to their principal is that the investors in those prior cases had no enforceable contractual rights to the profits received whether their claims were based on debt instruments or equity rights. But this aspect of *Greiff* is now foreclosed by the mandate of the *Section 546(e) Decision*. Unlike the investors in those other cases, the Second Circuit has determined that Defendant has an enforceable claim against BLMIS for his securities entitlements, which he is entitled to rely on as part of the value defense. For this reason, and because the Trustee has stipulated that Defendant was not an investor in the business of BLMIS, those prior Ponzi scheme cases are inapposite to facts of this action. *See* Section II.C, *infra*.

## 2. *Cohen* cannot be *stare decisis* because it did not decide key legal issues raised by Defendant

*Cohen* also cannot have a *stare decisis* effect on Defendant's defenses because *Cohen* did not decide important legal issues Defendant now raises. *Stare decisis,* literally to "stand by things decided," is necessarily limited to the legal principles actually decided by previous courts. The doctrine of *stare decisis* promotes judicial economy and stability by encouraging courts to follow the legal reasoning employed by earlier courts when examining the same legal issues or principles.[13] Because *stare decisis* focuses on the underlying legal principles espoused in a

---

[13] *Payne*, 501 U.S. at 827 (examining the legal "rationale" employed by prior opinion to determine *stare decisis* effect). *See also Randall v. Sorrell*, 548 U.S. 230, 244 (2006) (defining *stare decisis* as the "basic legal principle commanding judicial respect for a court's earlier decisions *and their rules of law*" and analyzing the underlying legal "principles") (emphasis added).

court's ruling, it cannot be used to imply a decision on a point not discussed.[14]  In other words, if the prior decisions did not address the specific rule or principle at issue, then there simply is no reasoning to extract or prior relevant principle to employ and there can be no *stare decisis* effect.

This Court's ruling in *Cohen* failed to consider four of the key contentions pressed by Defendant: (1) Section 29(b) of the 1934 Act allows Defendant to enforce his securities contracts notwithstanding Madoff's fraud; (2) because of this legal principle, the Trustee must avoid the resulting obligations of BLMIS to its customers under his bankruptcy avoidance power, something that the Trustee failed to do in this action; (3) the value defense *must* be measured at the time of the transfer and from the perspective of the transferee, not in hindsight; and (4) the statute of repose prohibits the Trustee from avoiding (or ignoring) BLMIS' pre-existing obligations to Defendant incurred prior to December 11, 2006.  *Cohen* does not control the answers to these arguments advanced by Defendant because it made no mention of them.

### 3.    The Trustee is estopped from arguing that *Cohen* controls Defendant's defenses

The Trustee's assertion that *Cohen* controls Defendant's defenses directly contradicts the Trustee's prior representations to this Court.  In order to protect their rights, Defendant and other similarly situated customers sought to intervene in the *Cohen* proceeding (or, in the alternative, appear as *amici*).  The Trustee opposed Defendant's intervention and opposed his participation as an *amicus*.  In doing so, the Trustee represented to this Court that any decision in *Cohen* would not prejudice Defendant's ability to raise his defenses in his own case, stating:

---

[14]  *See, e.g.* 6 *Moore's Federal Practice* § 24.03[3][b] at 24-42.1 (3d ed. 2003) ("Under the doctrine of *stare decisis*, a legal precedent is established when a court expressly decides a specific issue of law. . . .); *Black's Law Dictionary* 1414 (7th ed. 1999) (defining "stare decisis" as "[t]he doctrine of precedent, under which it is necessary for a court to follow earlier judicial decisions when the same points arise again in litigation").

This is in contrast to the doctrine of claim preclusion, which considers the *effect* of the prior adjudication. *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (claim preclusion "forecloses 'successive litigation of the very same claim . . . '"). Since Defendant was not a party to the *Cohen* action, claim preclusion does not arise.

> Movants will have an opportunity to argue the appropriateness of the Purported
> Value Defenses as applied to their own BLMIS accounts and transfers, in their
> individual adversary proceedings, consistent with the Litigation Procedures Order,
> *i.e.*, after discovery and mediation of their individual cases. As a result, the Cohen
> Proceeding will not sufficiently impede Movants' interests in their own actions.

*Picard v. Cohen*, Tr. Opp. to Motion to Intervene, ECF No. 11926 (Oct. 29, 2015) at 17.

The Trustee's about-face at this stage must be foreclosed.  Having achieved his desired goal of litigating solely against Mr. Cohen and shutting out other innocent customers of BLMIS, he cannot now take a contrary position and assert that the *Cohen* decision binds Defendant.  Such a result would be unjust and inconsistent, and would encourage litigants to make misleading representations to the Court.  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (estoppel applies when the later inconsistent position creates "the perception that either the first or the second court was misled" and impose an unfair detriment on the opposing party).

### B.    The Decisions That Measure Value by Reference to the Impact on the SIPA Customer Fund Are Erroneous and Should Be Rejected

The Trustee's central contention is that only "value" that would also be recognized as a SIPA customer claim can qualify as a defense under Section 548(c). Thus, according to the Trustee, unless the factual basis for a customer's value defense would also permit an allowed customer-property net-equity claim in a subsequent SIPA liquidation, Section 548(c) does not apply. This contention is directly contrary to the statutory scheme: the value defense measures value at the time of the transfer, not years afterward in light of the unforeseen possibility that the broker-dealer later collapses and is liquidated in a SIPA proceeding. None of the definitional provisions in the Bankruptcy Code support the Trustee's argument; indeed, there appears to be no statutory basis for it whatsoever. Instead, the Trustee's contention is based on a false equivalence. To the extent that such a false equivalence has been embraced by prior decisions in related Madoff cases, that was clear error and should be corrected.

24

Value for purposes of Section 548(c) is measured at the time of the transfer — not at the time of some potential future broker-dealer liquidation.

> [A] transferee or obligee of such a transfer or obligation that *takes for value* and in good faith has a lien on or *may retain any interest transferred or may enforce any obligation incurred*, as the case may be, to the extent such transferee or obligee *gave* value to the debtor in exchange for *such* transfer or obligation.

11 U.S.C. § 548(c) (emphasis added). The plain terminology of this provision in describing the transfer exchange confirms Congress' intent to measure value at the time of the transfer, or when the obligation was incurred, and not at the time of a subsequent liquidation of the debtor.

This is consistent with the many cases that have interpreted the value defense. The "value" inquiry focuses on the exchange between the transferee and the debtor at the time of the underlying transfer:

> The statutes are quite clear. The focus of the inquiry in both [§ 548(c) and New York Debtor and Creditor Law] is the *specific transaction* the trustee seeks to avoid, i.e., the *quid pro quo exchange between the debtor and transferee*, rather than an analysis of the transactions overall value to a debtor as it relates to the welfare of the debtor's business. . . . Value is present if the debtor receives a fair equivalent in exchange for its property or obligation.

*Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000) (internal citation omitted) (emphasis added) (legitimate brokerage services rendered to fraudster company were value for purposes of defense), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303, 308 (S.D.N.Y 2001) ("The significance or consequence of the Broker-Debtor transaction as it relates to the Debtor's overall Ponzi scheme is of no relevance here.").[15]

---

[15] *See also Orlick v. Kozyak (In re Fin. Federated Title & Trust, Inc.)*, 309 F.3d 1325, 1332 (11th Cir. 2002) (rejecting the assertion that "services [which] deepened the debtors insolvency and furthered a fraudulent scheme . . . were without legally cognizable value") (quoting *Merrill v. Allen (In re Universal Clearing House Co.)*, 60 B.R. 985, 1000 (D. Utah 1986)) ("We conclude that a determination of whether value was given under Section 548 should focus on the value of goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise."); *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, Case No. 06-12737 (SMB), 2009 Bankr. LEXIS 3606, at *39 (Bankr. S.D.N.Y. Nov. 10, 2009) (Bernstein, J.)

This conclusion also follows from the cases that hold that value is measured from the transferee's perspective, not that of future creditors:

> Received property can be retained "to the extent" that the "transferee . . . gave value to the debtor." The provision looks at value from the perspective of the transferee: How much did the transferee "give"? The concern here, quite properly, is for the transferee's side of the exchange, not the transferor's gain.

> Read in combination, §§ 548(a) and (c) are perfectly complementary. The first section affords creditors a remedy for the debtor's fraudulence . . . the second protects the transferee from his unfortunate selection of business partners.

*Hannover*, 310 F.3d at 802.[16]

Value is measured as of the time of the transfer or when the obligation was incurred; it is not measured in hindsight by the value that the trustee retroactively ascribes to the transfer as of the time of the liquidation of the broker-dealer — an event that, at the time of the transfer, was a wholly unforeseen and unanticipated development. Particularly in the case of Defendant, who was wholly ignorant of any fraud, there is no basis for such revisionism.

Likewise, the term "debt" as codified in the Bankruptcy Code supports only one reading: that the reference to "present or antecedent debt" in Section 548(d)(2)(A) that defines value for purposes of Section 548 means any "liability on a claim." *See* 11 U.S.C. § 101(12). The bankruptcy concepts of "debt" and "claim" include the broadest possible circumstances. *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558 (1990). Thus, the definition of "debt" in Section 548 cannot be read as limited only to priority customer-property debts.

---

("The fraudulent nature of each transfer, including the value that the transferor received, must be determined at the time of the transfer without the benefit of hindsight.") (quoting *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002))); *Redmond v. SpiritBank (In re Brooke Corp.)*, 541 B.R. 492, 510–11 (Bankr. D. Kan. 2015)) ("The fraudulent nature of each transfer, including the value that the transferor received, must be determined at the time of the transfer without the benefit of hindsight."); *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 589 (Bankr. N.D. Ill. 2005) ("Equivalent value must be measured as of the time of the transfer"); see 5-548 Collier on Bankruptcy 548.03 (transfer "valued as of the date of the transfer").

[16] *See also McHenry v. Dillworth (In re Caribbean Fuels of Am.)*, No. 16-15786, 2017 U.S. App. LEXIS 11043, at *10–11 (11th Cir. June 22, 2017) (reversing lower courts for failure to evaluate objective consideration given by transferee); *Dobbin v. Hill (In re Hill)*, 342 B.R. 183, 203–04 (Bankr. D.N.J. 2006); accord, *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560 (Tex. 2016) (same under Texas Uniform Fraudulent Transfer Act).

The fact that SIPA (like the Bankruptcy Code) contains its own priority system for claims against the estate has absolutely no bearing on the statutory defenses to the avoidance of transfers. Both SIPA and the Bankruptcy Code separate the distribution of estate property from the recovery of avoidable transfers.[17] Like Bankruptcy Code Section 726, SIPA Section 8(c)(1) contains a priority scheme for distribution of those recovered funds. These distribution processes are conceptually similar, providing for payment of administrative expenses and priority claims before payment of unsecured claims. But these provisions cannot be read to control the avoidance process, when the statutes separate formal avoidance from what happens to the proceeds once they are avoided. As emphasized by the Court in *Fairfield*, to read the statute any other way puts the cart before the horse. See *Fairfield*, 762 F.3d at 210–13.

The prior district court rulings on Section 548(c) defenses, which purport to limit a customer's value defenses, are not good law in this Circuit. *Cohen* relies on two prior decisions holding that SIPA empowers a trustee to ignore the debtor's antecedent debts and obligations for purposes of the value defense if: (1) the SIPA estate lacks sufficient funds to satisfy customer claims, and (2) the underlying antecedent debt would not have the same priority as "customer property" if it had been asserted as a net equity claim against the SIPA customer estate. *See Antecedent Debt Decision*, 499 B.R. at 423–25; *Greiff*, 476 B.R. at 727–28.

The reasoning that SIPA's priority-distribution scheme for claims limits the Section 548(c) value defenses is unsupportable. Those earlier decisions fail to come to grips with the contrary language of the avoidance statute itself, which measures value at the time of the transfer, not a later time. Likewise, the decisions fail to address the distinction in the statutes between a

---

[17] *Compare* SIPA § 8(c)(1), 15 U.S.C. § 78fff-2(c)(1) *with* 11 U.S.C. § 726. Under the Code, a transfer avoided under Section 548 and then recovered under Section 550 becomes the property of the estate available for later distribution to creditors. *See* 11 U.S.C. §§ 541(a)(3), 550(a). Similarly, under SIPA, a transfer of customer property that the SIPA trustee avoids and recovers becomes part of the separate SIPA fund of customer property. *See* SIPA § 8(c)(3), 15 U.S.C. § 7fff-2(c)(3).

trustee's recovery of property from innocent parties, and the later distribution of property to claimants. More particularly, the decisions credit the Trustee's improper attempt to equate treatment of the value defense in bankruptcy with net-equity claims in SIPA. The *Section 546(e) Decision* and *Fairfield* have invalidated the reasoning of these earlier decisions.

*Fairfield*, discussed above, admonished against judicial deviations from the Bankruptcy Code to effectuate a court's perceived policy goals.  The *Section 546(e) Decision* followed closely on the decision in *Fairfield*, and emphasized that "clawback defendants ... have every right to avail themselves of all the protections afforded to the clients of stockbrokers, *including* the protection offered by § 546(e)."  773 F.3d at 420 (italics added).

Specifically, the *Section 546(e) Decision* highlighted the distinction between a trustee's avoidance claim and a customer's SIPA net equity claim. The Second Circuit confirmed that statutory defenses apply to the Trustee's avoidance actions just as they do in any other bankruptcy avoidance proceedings. In so holding, the Circuit made clear that its earlier *Net Equity Decision* does not control these issues:

> In our earlier [*Net Equity*] decision, we interpreted "net equity" in a manner that would harmonize it with the SIPA statutory framework as a whole. Section 546(e), however, is part of the Bankruptcy Code, not SIPA . . . .  This is important because, in enacting the Bankruptcy Code, Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality. . . . We are obliged to respect the balance Congress struck among these complex competing considerations.

*Section 546(e) Decision*, 773 F.3d at 423 (discussing *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011), *cert denied*, 133 S. Ct. 24, 25 (2012)) (internal citations omitted). The distinction between the computation of customer claims under SIPA and the avoidance of transfers under the Bankruptcy Code applies equally to Section 548(c) defenses.  In an ordinary bankruptcy case, debts or obligations existing in favor of a transferee at the time of a transfer are

satisfied by those transfers, providing value under Section 548(c), regardless of any priority they might hold in a later bankruptcy proceeding. So, too, in SIPA proceedings, Section 548(c) measures value at the time of the transfer, while customer net equity claims are calculated only as of the commencement of a later SIPA liquidation.

To conclude that a valid statutory defense to avoidance is abrogated by equitable considerations in cases where the later SIPA estate lacks sufficient property to satisfy all other customer claims turns the statutes on their heads. To the extent that earlier decisions relied on such equitable considerations as justification for disregarding the value defense, their rationale does not square with the statutes or Supreme Court jurisprudence limiting the equitable powers of bankruptcy courts and requiring strict textual application of the bankruptcy statutes. *See*, *e.g.*, *Butner v. United States*, 440 U.S. 48, 55–56 (1979); *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014); *Travelers*, 549 U.S. at 453 ("[W]here Congress has intended to provide . . . exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly") (citations omitted).

### C.    The Ponzi Scheme Investor Cases Are Irrelevant and Inapplicable

The Trustee's summary judgment motion is based on a flawed premise — that Madoff's particular choice of fraudulent scheme has any relevance at this stage of the proceeding.

Specifically, the Trustee assumes that payments to a good faith customer in satisfaction of otherwise valid debts existing at the time are not exchanges of "value" if it is later revealed that the fraudster made these transfers to perpetuate a Ponzi scheme. This is wrong. The scope of the Trustee's power to unwind a transfer to an innocent customer is not determined by the label courts ultimately use to describe the fraudulent scheme. Instead, the Trustee's sole power to avoid the transfers to Defendant arises under the Bankruptcy Code's statutory avoidance procedures; the Bankruptcy Code does not even *mention* Ponzi schemes, much less set out special avoidance rules for Ponzi schemes. Applying this *post hoc* Ponzi scheme label to

29

characterize transfers made to customers who had no knowledge of the Ponzi scheme violates a salient feature of the Bankruptcy Code that "value" must be measured *at the time of the transfer* and from the *transferee's perspective*. Even if the Trustee could amend the statutory scheme and consider the transfer from Madoff's perspective (which he cannot), the "Ponzi scheme investor" cases he cites have no bearing on an innocent *brokerage customer's* affirmative defenses.

### 1. "Ponzi scheme" has no meaning under SIPA or the Bankruptcy Code

The Trustee's thesis that Madoff's decision to employ a "Ponzi scheme" enhances his powers to defeat Defendant's value defense is not grounded in any statute. SIPA gives the Trustee no special powers to avoid transfers; instead it borrows intact the well-established Bankruptcy Code avoidance power with its limitations. *See* Section I.A, *supra*. Neither SIPA nor the Code carves out exceptions for fraudulent transfers supporting Ponzi schemes. In fact, both statutes are conspicuously silent with respect to any of the variety of fraudulent schemes that may be employed by a debtor to defraud its creditors and make no mention of "Ponzi schemes."

Congress's silence regarding the underlying types of fraud is significant because it demonstrates that Congress intended to treat all fraudulent transfers under the same statutory framework. There can be little doubt that Congress was aware of Ponzi schemes when it drafted SIPA. Since Charles Ponzi's infamous scheme first was revealed in the 1920's, Congress has been well aware of the dangers (and potential inequities) of Ponzi schemes. *See Cunningham v. Brown*, 265 U.S. 1, 7 (1924). Thus, had Congress wanted to prescribe a unique treatment for Ponzi scheme transfers, it would have done so by enacting a specific provision in SIPA governing this species of fraud. Congress took the opposite approach, merely importing the Code's well-established avoidance provisions. In so doing, Congress demonstrated its intent that the federal fraudulent transfer remedy adequately addresses those types of fraudulent payments

30

which a successor to a debtor may recapture.  To that end, it left intact the value defense which permits a good faith defendant to retain payments made in satisfaction of present or antecedent debts owed by the debtor at the time of the transfers.

The reason Congress did not carve out a special "Ponzi-exception" for adversary proceedings is simple: A Ponzi scheme is nothing special; rather, it is merely one of many fraudulent schemes that a fraudster can employ against his victims.  Once the machinations of Madoff's complex fraud are stripped away, Madoff's scheme becomes like any other fraudulent misrepresentation scheme.  What Congress elected to provide in SIPA cases is the same remedy employed for centuries in ordinary bankruptcy cases: the familiar fraudulent transfer remedy with its well-established limitations.  No statute says otherwise.

> ### 2. The after-the-fact "Ponzi scheme" label cannot be used against Defendant because Section 548(c) measures value from the *transferee's* perspective *at the time of the transfer.*

The Trustee's "Ponzi scheme" argument is not grounded in any defensible principle. Instead, the Trustee's insistence that Madoff's decision to employ a Ponzi scheme against BLMIS' good faith customers expands his own power is a basic misunderstanding that permeates his brief.  As discussed in Section II.B, *supra*, value in an avoidance case is *not* measured from the perspective of the SIPA customer fund or with the benefit of hindsight.

It is well-established that value is measured *at the time of the* transfer and *from the transferee's* perspective.  *See, e.g., Buchwald Capital Advisors*, 2009 Bankr. LEXIS 3606, at *39 ("The fraudulent nature of each transfer, including the value that the transferor received, must be determined at the time of the transfer without the benefit of hindsight.") (quoting *Hannover*, 310 F.3d at 802); *Hannover*, 310 F.3d at 802 (explaining that Section 548(c)'s focus on the transferee's perspective "protects the transferee from his unfortunate selection of business partners")).  Applying a Ponzi scheme exception (or treating Defendant as an equity investor)

turns that rule upside-down because it measures the transfer with the benefit of hindsight, not from the innocent transferee's perspective at the time of the transfer.

### 3. The "Ponzi scheme investor" cases do not apply because Defendant is not an investor in the business of BLMIS but a brokerage customer

The Trustee improperly assumes that rulings limiting a "Ponzi scheme investor's" value to his deposit are also relevant to Defendant's affirmative defenses. This approach ignores the now-undisputed fact that Defendant was not an *investor* in BLMIS, but a customer of a broker-dealer acting as a fiduciary investment adviser. Therefore, the underlying logic of Ponzi scheme investor cases does not apply to the instant case.

Whatever the merits of the so-called Ponzi scheme investor cases,[18] they do not apply to a case involving a customer of a broker-dealer. Indeed, Defendant is not aware of any case law prior to the Madoff proceedings that makes such a connection. It is one thing to limit the claims of investors who place their funds at risk as investment capital in a business enterprise (even if it ultimately turns out to have been a hoax); it is quite another thing to say that innocent brokerage customers who deposit funds with a regulated fiduciary for investment in publicly traded securities are limited in their avoidance defenses absent an express act of Congress.

Whether or not "investors" in a Ponzi scheme can give value beyond their principal is immaterial because Defendant is not such an investor. Courts that have limited an investor's recovery to his principal have relied upon logic that is necessarily limited to equity investors. Specifically, these courts have relied on their interpretation of two related points: *investors* do not have a legally cognizable right to expect specific profits, but only a restitution right to their

---

[18] *See Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Invs. Assocs.)*, 48 F.3d 470, 475 (10th Cir. 1995) (it is "[s]triking" [in preference context] that "none of those cases cite any language or legislative history in support of" a Ponzi-scheme exception, and that "[r]ather, it appears to us that this bright line rule has developed solely from precedent that does not support it."); *accord*, *In re Bennett Funding Grp., Inc.*, 253 B.R. 316, 322 (Bankr. N.D.N.Y. 2000) (same); *see also Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015) ("The word 'Ponzi' does not appear in the Minnesota Statutes, and [Minnesota's UFTA] does not address 'schemes.'").

principal and profits that are actually realized; and contracts between an equity investor and a Ponzi scheme fraudster are unenforceable to the extent they seek to recover profits.[19]

In prior rulings, the district court relied on cases limiting equity Ponzi investors to retention of their principal. *See Greiff*, 476 B.R. at 725 ("[A]n investor's profits from a Ponzi scheme, whether paper profits or actual transfers, are not 'for value'."). The prior Rule 12(b)(6) rulings that bought into the Ponzi scheme investor line of cases had to assume that this investor-specific analysis would also apply to Defendant because the Trustee pleaded that it did. *See* Complaint at ¶¶ 25-29 (referring to Defendant and other BLMIS customers as "investors"). On a motion to dismiss, the court had to take these allegations as true. It did not and could not consider the then-unproven facts supporting the affirmative defenses that are now in the record.

*The Trustee stipulated that Defendant is not an investor in BLMIS.* (*See, e.g.*, SUMF ¶ 21: "Mr. Goldenberg did not invest in BLMIS, either as a partner, shareholder, or other equity stake holder. At no time did Mr. Goldenberg purport to own a share of, or have a financial stake in, the business of BLMIS.").[20] Instead, Defendant is an innocent customer of a broker-dealer.

The resulting contractual entitlements that arise from the broker-customer relationship between BLMIS and Defendant were expressly recognized by the Second Circuit in the *Section*

---

[19]  *See, e.g.*, *In re Hedged-Invs. Assocs.*, 84 F.3d 1286, 1290 (10th Cir. 1996) (cited in *Greiff*) ("Because [the *investor*] had no claim against HIA Inc. for damages in excess of her original investment, HIA Inc. had no debt to her for those amounts. Therefore, the transfers could not have satisfied an antecedent debt of HIA Inc., which means HIA Inc. received no value in exchange for the transfers."). In other words, since the investor cannot enforce his contract to recover promised profits, the investor does not have a right to those funds and cannot give any value beyond the release of his restitution claim, *i.e.*, recovery of his deposit.

*But see In re Bennett Funding Group, Inc.*, 1999 Bankr. LEXIS 1843, at *25–26 (alleged Ponzi operators "would have faced contingent liability to Defendant (on theories ranging from fraud to restitution) from the moment they were entrusted with his money,"; accordingly, transfers that "incidentally served to satisfy Defendant's unasserted, undiscovered, and possibly unimagined tort rights—operated as the satisfaction of an antecedent debt, and hence as an exchange for value under Code § 548(c).") (citations omitted).

[20] The Trustee also stipulated to other facts that, on their own, conclusively establish that Defendant was a customer of a broker-dealer and investment adviser. For instance, the Trustee stipulated that BLMIS was an investment adviser with investment discretion (SUMF ¶¶ 7, 18); the IA Business did not actually trade securities (SUMF ¶ 12); and BLMIS gave monthly customer account statements reporting the purchase and sale of securities on their behalf and the resulting securities entitlements arising from such reports (SUMF ¶ 32).

*546(e) Decision* to provide contractual rights to the customers, *i.e.*, rights to settlement payments on liquidation demand or payments in connection with a securities contract. These rights are fundamentally different from the rights that might accrue to ordinary equity investors.

Accordingly, Defendant's rights are not coterminous with the rights of equity *investors*. His claims are not limited to the return of principal because his right to payment arose from his position as a *customer* of a broker-dealer and investment adviser and the corresponding established rights and obligations thereto. The Trustee is barred by the mandate rule to argue otherwise as to Defendant. *See* Section II.A.1, *supra*.

## III. THE TWO-YEAR STATUTE OF REPOSE IN SECTION 548(A) LIMITS THE TRUSTEE'S AVOIDANCE POWER AND PERMITS HIM ONLY TO AVOID OBLIGATIONS AND TRANSFERS ARISING AFTER DECEMBER 10, 2006[21]

The Trustee's ability to bring an avoidance proceeding is constrained by two temporal limitations: the statute of limitations and the statute of repose. The former is set out in Section 546(a)(1) of the Bankruptcy Code and permits the trustee to commence an avoidance action until two years after the petition date, *i.e.*, December 11, 2010. The Trustee met this deadline.

Under Section 548(a)(1), however, the Trustee's power to avoid any obligation or transfer is limited to those made within the two-year period before the December 11, 2008 petition date. Therefore, any transfer made or obligation incurred prior to this two-year window necessarily falls outside the Trustee's avoidance powers and may not be challenged or considered under Section 548(a)(1). In his cash-in-minus-cash-out computation, the Trustee seeks to avoid transfers within the two-year period, but ignores the corresponding pre-existing debtor obligations extant at the beginning of the period. His calculation method asks this Court to disregard Congress's unambiguous intent in enacting a statute of repose in Section 548.

---

[21] Defendant raised and preserved defenses based on the untimeliness of the Trustee's avoidance claims. *See* Defendant's Answer to Amended Complaint (ECF No. 43), Fifteenth and Twenty-sixth Affirmative Defenses.

Assuming *arguendo* that the Trustee could avoid obligations within the two-year period (claims which he has abandoned here), any calculation of the customer's exposure must take into account the value of the unavoidable obligations to the customers for securities entitlements credited to them by the broker as of December 11, 2006. The Trustee then must take into account any deposits made after that date, netting them against withdrawals after that date. This completely negates the Trustee's claims here, without regard to any other defense.

Application of the Section 548 statute of repose to Defendant results in the negation of any claim against Defendant. According to the BLMIS account statement sent to Defendant, as of November 30, 2006, Defendant's account had a net value of $8,520,583. Defendant made no deposits, and withdrew $4,000,000 from his account, after November 30, 2006. Because Defendant's net statement value as of November 30, 2006 exceeded his net withdrawals after that date, the Trustee cannot prevail on any avoidance claims against Defendant.[22]

### A. Section 548(a) is a Statute of Repose that Bars the Avoidance of Any Obligation or Transfer That Occurred More Than Two Years Before the Petition Date

Statutes of limitations and statutes of repose serve different purposes and dictate different outcomes for barring claims. Statutes of limitations encourage plaintiffs to diligently prosecute known claims and, therefore, begin to run when the cause of action accrues. *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2182 (2014). They may be subject to equitable tolling, which suspends the limitations period when extraordinary circumstances prevent the potential plaintiff from bringing a timely action. *Id.* at 2183. In contrast, statutes of repose place an outer limit on the plaintiff's remedy; they are measured from the date of the last culpable act or omission of the defendant. *Id.* The statute of repose operates to "cut off" the defendant's liability for that action, irrespective of when the claim actually accrued. *Id.* at 2182. To that end, statutes of repose are

---

[22] The complete computation methodology under the statute of repose is set forth in Appendix A hereto.

strictly enforced; they "generally may not be tolled, even in cases of extraordinary circumstances beyond the [plaintiff's] control." *Id.* at 2183.

Section 548(a) of the Bankruptcy Code is a statute of repose and it restricts the transactions that may be challenged. Section 548(a) "establishes the lookback period" that determines which transfers or obligations may be avoided. *Reinbold v. Kohansieh (In re Sandburg Mall Realty Mgmt. LLC)*, 563 B.R. 875, 896 (Bankr. C.D. Ill. 2017) (the two-year lookback period of Section 548(a) is a statute of repose not subject to equitable tolling).

Although courts in this district have not addressed the interplay between Section 546 and 548, bankruptcy courts elsewhere have declined to characterize Section 548(a) as a statute of limitations subject to equitable tolling.[23]  Courts that have allowed tolling of Section 548 claims have improperly treated the section as a statute of limitations rather than a statute of repose. *See, e.g.*, *Official Comm. of Unsecured Creditors v. Pardee (In re Stanwich Fin. Servs. Corp.)*, 291 B.R. 25, 28 (Bankr. D. Conn. 2003) (rejecting argument that Section 548 fixes a window for avoidable transfers ).

Any doubt that Section 548(a) is a statute of repose was recently clarified by the Supreme Court in *Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017) ("*CalPERS*"). In *CalPERS*, the Court considered Section 13 of the Securities Act, concluding that it was a statute of repose not subject to tolling and, thus, petitioner's untimely claim for relief must be

---

[23] *See Sandburg Mall*, 563 B.R. at 896 (citing *In re Petters Co.*, 557 B.R. 711, 722-23 (Bankr. D. Minn. 2016); *In re Pitt Penn Holding Co.*, 2012 Bankr. LEXIS 325 (Bankr. D. Del.); *In re Maui Indus. Loan & Fin. Co.*, 454 B.R. 133 (Bankr. D. Haw. 2011); *In re Lyon*, 360 B.R. 749 (Bankr. E.D.N.C. 2007); *In re Davis*, 138 B.R. 106 (Bankr. M.D. Fla. 1992)) ("Of the bankruptcy courts that have addressed whether the lookback period under section 548 is a statute of limitations that is subject to equitable tolling, the clear majority hold that it is not." (emphasis in original)); *In re Bethune*, 18 B.R. 418 (Bankr. N.D. Ala. 1982)); *Schlossberg v. Abell (In re Abell)*, 549 B.R. 631, 657–59 (Bankr. D. Md. 2016) ("Many courts have confronted this issue and rejected the idea that §548(a)(1) is a statute of limitations subject to equitable tolling . . . Here, the text of §548 does not provide a specified time period to pursue a claim. Rather, the time limitation by which a trustee must commence an avoidance action is provided in §546."); *Indus. Enters. of Am., Inc. v. Burtis*, Nos. 09-11475, 11-51868, 2012 Bankr. LEXIS 325, at *14 (Bankr. D. Del. Jan. 24, 2012) ("The two-year look-back period in § 548 is not a statute of limitations that may be equitably tolled; rather, it is a substantive element of a § 548 claim.").

dismissed. *Id.* at 2052. The Court based its holding on a finding that the time limits in Section 13 provided for two different time bars — a one-year statute of limitations and a three-year statute of repose. *Id.* at 2049-50.

This first sentence of Section 13 stated: "No action shall be maintained . . . unless brought within one year after the discovery of the untrue statement. . . ." The Court held that this language created a statute of limitations because it ran from the time the plaintiff discovered the securities-law violation. *Id.* The second sentence of Section 13 provided: "In no event shall any such action be brought to enforce a liability created under [Section 11] more than three years after the security was bona fide offered to the public." *Id.* Relying on the plain text of this sentence and the overall structure of the section, the Court held that the three-year provision operated as a statute of repose for two reasons. First, the statute "runs from the defendant's last culpable act (the offering of the securities), not from the accrual of the claim (the plaintiff's discovery of the defect in the registration statement)." *Id.* at 2045. Second, such a "pairing of a shorter statute of limitations and a longer statute of repose is a common feature of statutory time limits." *Id.*; *see also Gabelli v. SEC*, 133 S. Ct. 1216, 1224 (2013) ("[S]tatutes applying a discovery rule in the context of Government suits often couple that rule with an absolute provision for repose, which a judicially imposed discovery rule would lack.").

The same is true of the statutory time limits found in Sections 546 and 548, and the reasoning in *CalPERS* controls this case. These sections contain the same two categories of time restrictions for bringing avoidance actions: the limitations period on commencing an avoidance action in Section 546(a) and the longer lookback limit of Section 548(a). Section 546(a), entitled "Limitations on avoiding powers," dictates the time frame within which the Trustee must "commence" an adversary proceeding which, like the statute of limitations in *CalPERS*, begins

to run when a cause of action accrues (here the commencement of the SIPA proceeding). *See Indus. Enters. of Am., Inc.*, 2012 Bankr. LEXIS 325 at *11–12. On the other hand, Section 548(a) looks back two years from the petition date and says nothing about the accrual of the claim. *See In re Sandburg Mall Realty Mgmt.*, 563 B.R. at 896; *see also Smith v. Am. Founders Fin. Corp.*, 365 B.R. 647, 678 (S.D. Tex. 2007) (section 24.005 of Texas's fraudulent transfer act is a statute of repose and section 548 "is a near mirror image of most states' fraudulent-transfer acts").[24]

### B.     The Court Cannot Equitably Toll or Disregard the Statute of Repose

Because Section 548 operates as a statute of repose, the provision is not subject to equitable tolling.  A statute of repose is a time period fixed by the legislature "beyond which the liability will no longer exist and will not be tolled for any reason." *CTS Corp.*, 134 S. Ct. at 2183; *see CalPERS*, 137 S. Ct. at 2051-052 (the legislative decision "to grant complete peace to defendants, supersedes the application of a tolling rule based on equity."). It mandates that there will be no cause of action for conduct that occurred outside of certain measuring points, even if no cause of action has yet accrued. *CTS Corp.*, 134 S. Ct. at 2187. Therefore, any equitable tolling of Section 548(a) would be inconsistent with the repose period that the legislature enacted to provide protection to defendants for actionable transactions after a time certain. *In re Sandburg Mall Realty Mgmt.,* 563 B.R. at 896.

The Court cannot rewrite Section 548 merely because BLMIS operated a Ponzi scheme of long duration. The Supreme Court instructed in *CalPERS* that courts are not free to disregard judgments made by Congress as to statutes of repose. *CalPERS*, 137 S. Ct. at 2053-54 (the Court lacks the authority to rewrite the statute of repose or "ignore its plain import"). The courts must

---

[24] Structurally, it makes no sense for the Bankruptcy Code to have two separate limitations periods for the same potential claim. "Interpreting the two year look back period in § 548 as a statute of limitations would make § 546 superfluous, running counter to the cannons of statutory construction." *Petters*, 557 B.R. at 723, n.16. Instead, Sections 546 and 548 work together to provide a post-petition statute of limitations for the Trustee to bring claims against the defendant, and a two-year statute of repose to cut off any potential liability for transfers or obligations that preceded the two-year pre-petition lookback period.

give force to a Congressional choice to cut off all liability at the end of the repose period — to allow more certainty and reliability "in a marketplace where stability and reliance are essential components or valuation and expectation for financial actors." *Id.* at 2055. The Bankruptcy Code statute of repose is unambiguous in this regard, and no court can ignore or rewrite it.

### C. The Trustee's Avoidance Claim Calculation Violates the Statute of Repose

The statute of repose in Section 548(a) limits the Trustee to avoidance of transfers made and obligations incurred between December 11, 2006 and the petition date (December 11, 2008). The Trustee calculates the amount of his avoidance claim by excluding all obligations owed by BLMIS — *e.g.*, the securities entitlements owed to the customer regardless of the date they were fixed by the broker's crediting them to the customer — and by subtracting all withdrawals from the account regardless of when they were made. This approach negates the purpose of the statute of repose by ignoring the unavoidable obligations incurred and the related unavoidable transfers made outside the statute of repose. Irrespective of other defenses, any obligation of BLMIS to Defendant that existed before December 11, 2006, cannot be avoided, and the Trustee's claim must be narrowed by taking into account the face value of such obligations. To do otherwise would circumvent the statute of repose fixed by Congress.

In *Greiff*, the district court endorsed the trustee's current computation methodology based on the decision in *Donell v. Kowell,* 533 F.3d 762 (9th Cir. 2008). *See Greiff*, 476 B.R. at 729. But *Donell* did not address the effect of a statute of repose. Rather, the court only addressed the effect of the applicable statute of limitations in California's Uniform Fraudulent Transfer Act. *See Donell*, 533 F.3d at 773. The Ninth Circuit concluded that "the appropriate statute of limitations restricts the payments the Ponzi scheme investor may be required to disgorge. Only transfers made within the limitations period are avoidable." *Id.* at 772. But, because only a statute of limitations was at issue, the court was able to invoke equitable considerations in

39

calculating the amounts owed to the trustee. This departs from the rule of *CalPERS*, under which the effect of a statute of repose "is to override customary tolling rules arising from the equitable powers of courts." *CalPERS*, 137 S. Ct. at 2051. Here, the statute of repose of Section 548 bars the court from applying equitable considerations to the Trustee's calculations of liability.

In extending *Donell* to the Trustee's claim calculation methodology, the District Court in *Greiff* did not address the effect of a statute of repose on preexisting obligations of the debtor, nor did the defendants advance this argument. *Greiff* incorrectly assumed that Section 548(a) was a statute of limitations rather than a statute of repose. *See Greiff*, 476 B.R. at 729. This clear error requires this Court to revisit and disregard that portion of the decision.[25] As *Greiff* correctly acknowledges, "SIPA expressly incorporates the limitations Title 11 places on trustee's powers . . . ." *Id.*. at 722 n.7. Thus, fraudulent transfer claims asserted under SIPA necessarily incorporate the time limits of transactions that may be avoided as mandated in Section 548(a).

For the reasons stated, *Greiff* and related decisions upholding the trustee's calculation methodology are flawed. Their reasoning should be disregarded based on the clear and controlling jurisprudence that a court has no power to ignore a statute of repose. This Court must reject the Trustee's computation methodology that disregards the Section 548(a) statute of repose for earlier obligations.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully submits that the Trustee's motion for summary judgment should be denied in its entirety.[26]

---

[25] *See, e.g., Indus. Enters. of Am., Inc.*, 2012 Bankr. LEXIS 325, at *15 (declining to follow a prior court decision that equitably tolled section 548, noting "the [prior] court did not consider, as this Court and others have, if the look-back period is a statute of limitations or is instead a substantive element of a § 548 claim, nor did it address the effect of that distinction on equitable tolling").

[26] This memorandum raises substantially the same legal arguments as raised in recent summary judgment briefing by the defendants in *Picard v. South Ferry Building Co.*, Adv. Pro. No. 10-04488 (SMB). *See* ECF Nos. 90, 97, and

Dated:    New York, New York
        November 16, 2017

                        *s/ Matthew A. Kupillas*
                        MILBERG LLP
                        Matthew A. Kupillas
                        E-mail: mkupillas@milberg.com
                        One Pennsylvania Plaza
                        New York, NY 10119
                        Telephone: (212) 594-5300
                        Facsimile: (212) 868-1229

                        *Attorneys for Stephen R. Goldenberg*

740200v3

---

103.  To the extent they are not already reflected in this memorandum, Defendant hereby incorporates the legal arguments in those submissions as if fully set forth herein.

# APPENDIX A

### Section 548 Statute of Repose - Net Withdrawals

### Stephen R. Goldenberg

| Account Obligations / Net Withdrawals | Account Value (USD) |
|---|---|
| Market value of securities net – 11/30/2006 statement . . . . . . . . . . . | 8,524,623.24 |
| Net options - balance – 11/30/2006 statement . . . . . . . . . . . . . . . . . | (4,040) |
| **Net statement value – 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . .** | **8,520,583.24** |
| Deposits after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - |
| Withdrawals after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,000,000.00 |
| 11/30/2006 obligations in excess of Net withdrawals . . . . . . . . . . . | $4,520,583.24 |

42