1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Lead BK Case: 08-99000-smb

4    Lead BK Titles: Administrative Case Re: 08-01789

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    ADMINISTRATIVE CASE RE: 08-01789 (SECURITIES INVESTOR

9    PROTECTION CORPORATION),

10

11            Debtor.

12    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13

14                    United States Bankruptcy Court

15                    One Bowling Green

16                    New York, NY   10004

17

18                    November 9th, 2017

19                    2:10 PM

20

21    B E F O R E :

22    HON STUART M. BERNSTEIN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  MICHELLE BROWN

Page 2

1    HEARING re Omnibus "Profit Withdrawal" Proceeding: Pre-Trial

2    Conference

3

4    HEARING re Discovery Conference re Warehouse and Microfilm

5    Indices

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    BAKERHOSTETLER

 4         Attorneys for the Trustee

 5         45 Rockefeller Center

 6         New York, NY 10111

 7

 8    BY:  SEANNA R. BROWN

 9         CARA MCGOURTY

10         AMY E. VANDERWAL

11

12    CHAITMAN LLP

13         Attorney for Defendants

14         465 Park Avenue

15         New York, NY 10022

16

17    BY:  GREGORY M. DEXTER

18

19

20

21

22

23

24

25
```

Page 4

1                    P R O C E E D I N G S

2           MS. BROWN:  Good afternoon, Your Honor.  We have

3   two matters on today.  I don't know if you have a preference

4   as to which one you'd like to deal with first.

5           THE COURT:  Why don't we deal with the issue with

6   the Excel spreadsheets first.

7           MS. BROWN:  Okay, I'm going to let my colleague,

8   Cara, speak.

9           THE COURT:  Okay.

10          MR. DEXTER:  It's our letter, so, I'll take it.

11          THE COURT:  Okay.

12          MR. DEXTER:  Your Honor --

13          THE COURT:  Would you speak into the microphone so

14  we can pick you up?

15          MR. DEXTER:  Sure.  In reviewing the letters again

16  today, it looks to me --

17          THE COURT:  Stand at the podium, because the

18  microphone will pick you up better then.

19          MR. DEXTER:  Okay.

20          THE COURT:  That's the podium.

21          MR. DEXTER:  Didn't see that there is a microphone

22  here.

23          THE COURT:  There's a microphone, trust me.

24          MR. DEXTER:  Thank.  (indiscernible) only saw that

25  one.

1                THE COURT:  Go ahead.

2                MR. DEXTER:  In reviewing the letters today it

3      looks like it's merely a matter of how a trustee defines

4      work product, as compared to we define work product.  It

5      really seems be as simple as that.  And the Trustee is

6      attempting to assert the work product privilege over things

7      that are not work product, because they're simply facts,

8      such as when a certain consultant reviewed something.  And

9      that's really all we're seeking the disclosure of.

10               We're not seeking the consultant's opinions on

11     what he saw, or anything of that nature.  Really, all we

12     want is the part of the spreadsheet that shows the fact that

13     the consultant reviewed and (indiscernible) on a certain

14     day, or saw --

15               THE COURT:  Well, there's a little more to it than

16     that, and I reviewed the columns.  Yes, a lot of the columns

17     refer to who looked at what file on what day and say nothing

18     else, but there are other columns or other notations.  I

19     don't want to necessarily say what they are until the work

20     product issue is resolved.

21               So, obviously, there's more to it than just who

22     looked at what on a particular day -- which I agree, it's

23     not work product, because it's something that would go in

24     the time record.  Then the logical extension of that would

25     be that we'd have to file those time records under seal and

Page 6

1    all fee applications under seal.  But there's other stuff

2    there.

3              But this is really the Trustee's issue. Let me

4    hear from the Trustee.  Let me just make sure I understand

5    one thing.  You're not arguing that somehow the Trustee

6    waived the work product privilege (indiscernible) producing

7    this stuff, are you?

8              MR. DEXTER:  I don't think we need to get there.

9              THE COURT:  Okay.

10             MR. DEXTER:  I don't think we need to get there.

11   If we need to get there, I'd like to reserve the opportunity

12   to address that.

13             THE COURT:  Now is a good time.

14             MR. DEXTER:  Well, as a threshold matter, you can

15   only assert work product privilege or you can only assert

16   clawback over things that are first work product and --

17             THE COURT:  That goes to your argument that it's

18   not work product.  If it is work product, are you arguing

19   that the Trustee waive the work product privilege by

20   disclosing it?

21             MR. DEXTER:  I think that -- yeah, I think that

22   has been waived.

23             THE COURT:  I thought that there was a litigation

24   protective order which said that if work product or

25   attorney-client privilege was inadvertently produced, that

1    there was no waiver.

2             MR. DEXTER:  Yeah, that has to do with information

3    that's actually inadvertently produced.

4             THE COURT:  Right.

5             MR. DEXTER:  But not information that you produce

6    and you wait several years and then you decide you want to

7    make a redaction.  That deals with -- and the language is a

8    little confusing.  There's two paragraphs in the LPO that

9    are a bit ambiguous.

10            THE COURT:  Well, this is a discovery issue, and I

11   thought there was a particular paragraph that talked about

12   turning other materials in discovery, I guess,

13   inadvertently, that included work product or privileged

14   materials, and that that didn't constitute a waiver.  You're

15   arguing that they didn't inadvertently do it, that they did

16   it on purpose?

17            MR. DEXTER:  Exactly.  And now they're trying to

18   re-designate it as work product.

19            THE COURT:  Well, I agree that they turned over

20   the files on purpose, but do you think they turned over the

21   privilege materials on purpose so that they could wait

22   several years to then get it back?

23            MR. DEXTER:  I don't know if was intentional, but

24   that's not the standard for showing of inadvertence.  It was

25   something that they filed and used on multiple occasions,

Page 8

1    and for several years --

2            THE COURT:  But they didn't use it in the native

3    format.  I thought they used it in PDF format, which didn't

4    include these columns.  That's what they say.

5            MR. DEXTER:  I don't know specifically --

6            THE COURT:  Is that wrong, what they say?  That

7    when they used it, it was in the native format and didn't

8    include -- not the native format, the PDF -- and didn't

9    include the columns?

10           MR. DEXTER:  I don't know how to answer that

11   question, Your Honor.

12           THE COURT:  You're the one who's made that charge,

13   or Ms. Chaitman did.

14           MR. DEXTER:  Well, we've made the charge that they

15   have represented, number one, that the Trustee never had

16   possession of any trading records.

17           THE COURT:  Let's get off of that.  Let's talk

18   about the Excel spreadsheets.  One of the arguments that was

19   made in the letter was that these spreadsheets were already

20   used in other court proceedings, and that implied that what

21   was used in the other court proceedings included the

22   information that the Trustee is now saying is privileged.

23   The Trustee came back and said, hey, wait a minute, what we

24   used in these other proceedings were the PDF copies of these

25   documents, which didn't include the columns that we're now

Page 9

1    talking about.  Are you saying that that's not true?

2            MR. DEXTER:  Your Honor, quite honestly, I don't

3    know.  Our letter didn't address that.

4            THE COURT:  No, your letter raised that issue.

5            MR. DEXTER:  I think our letter said that they

6    have raised the fact that they were never in possession of

7    any Madoff trading records.

8            THE COURT:  No, no, no.  We're not talking about

9    that.  Hold on. Let me try to get them.  Do you know what

10   I'm referring to?

11           MS. MCGOURTY:  Yes.

12           THE COURT:  here is it in the letter?

13           MS. MCGOURTY:  Your Honor, I believe it's on page

14   two of the September 8th letter to Your Honor, the first

15   full paragraph beginning, "However, even if the indices ..."

16           THE COURT:  Yeah, it's right there, saying Ms.

17   Chaitman accused them of using these same documents that

18   he's now trying to clawback.  But that's ... and then the

19   Trustee came back and said that's not what happened.  Did

20   you go and check to see what was used in the proceeding

21   before Judge (indiscernible)?

22           MR. DEXTER:  What this paragraph, with "However

23   ...," it refers to, yes, the indices being used in front of

24   Judge (indiscernible), have I checked whether the Trustee's

25   assertion was correct or not?  No, I haven't checked yet.

Page 10

1  We've never come back and represented to this Court that the

2  Trustee was wrong in that assertion.

3         THE COURT:  But I thought you were arguing that

4  use of these documents in another court proceeding was,

5  essentially, a waiver of the privileges.  Are you no arguing

6  that now?

7         MR. DEXTER:  No, I am.  And I think it absolutely

8  is it has information that the Trustee is now attempting to

9  clawback.

10         THE COURT:  Okay.  And the Trustee came back and

11  said, what we used in these other proceedings was not --

12  didn't contain the privileged information.  And my question

13  is, did you go and check to see what was used in these other

14  proceedings?  In other words, did you seek to confirm the

15  veracity of what the trustee said in reply to what was in

16  the September 8th letter?

17         MR. DEXTER:  No, I already admitted that I have

18  not.

19         THE COURT:  All right.

20         MR. DEXTER:  The Trustee, I mean if the Trustee

21  had proof of that, then I agree, completely.

22         THE COURT:  Well, the Trustee says that, and I

23  don't hear you refuting it.  You think I should have a trial

24  on comparing what the Trustee gave to Judge (Indiscernible)

25  and what the information is there?  Let me hear from the

1    Trustee.

2             MS. MCGOURTY:  Good afternoon, Your Honor.

3             THE COURT:  Good afternoon.

4             MS. MCGOURTY:  Cara McGoutry for the Trustee.  I

5    guess I'll start by addressing some of the issues that just

6    came up.  One is that the Trustee has not used the native

7    Excel version.

8             THE COURT:  That seems to be an issue that's no

9    longer an issue.

10            MS. MCGOURTY:  This situation is basically the

11   exact reason we have clawback agreements, and why there's a

12   federal rule of evidence (indiscernible).

13            THE COURT:  Let me ask you a question.  I looked

14   at the materials.  As Mr. Dexter said, a lot of the

15   information your claiming is work product, or whatever,

16   simply identifies who looked at what box on what day.  Tell

17   me why that's work products?

18            MS. MCGOURTY:  It goes into kind of the behind-

19   the-scenes analysis.

20            THE COURT:  There was no analysis.  It's the kind

21   of information you have in a time record, if an attorney had

22   done it.  So, why is that work product?

23            MS. MCGOURTY:  Some of that might be a bit of a

24   borderline.

25            THE COURT:  Well, you're asserting, in a privilege

Page 12

1    log, which doesn't give me a lot of information, frankly,

2    that that's work product.

3            MS. MCGOURTY:  We voluntarily disclosed these

4    indices, and we did so to provide information of the dataset

5    that we have, what we have, where it came from, when it was

6    restored, the amount.  We didn't intend ... that was what

7    we, of course, intentionally disclosed.

8            THE COURT:  Okay.  You disclosed it.  And the

9    issue now is whether it's work product, which you would have

10   a burden to show.  I asked you about some specific entries,

11   which don't appear to be work product, because they just say

12   who looked at what box on what day; the type of information

13   defined, and time records.  There are other entries which,

14   frankly, I don't understand their relevance.  So, to save

15   time, if you're going to insist -- and by the way, the

16   categories of material are very small.  They repeat, but

17   there's, you know, maybe five or six categories of material.

18   You're going to have to explain to me in an in camera

19   affidavit -- you can give Ms. Chaitman and Mr. Dexter a copy

20   of it, since they know it's in the documents, to explain why

21   these categories are work product.  You also allege

22   attorney-client now, I understand, attorney-client

23   privilege.

24           MS. MCGOURTY:  Some of the entries in the

25   spreadsheet, are a method of communicating between our --

1          THE COURT:  Well, you know what the elements of an

2    attorney-client privilege are and you can show me how they

3    were communicated for the purpose of getting legal advice.

4    But you have to prove it.  You can't just give me a

5    privilege log with, essentially, two entries saying notes

6    and comments and things like that, because that doesn't do

7    it.  As you can see, we've already isolated certain

8    information which, you're going to be hard pressed to

9    convince me is work product.  Okay?  When can you can do

10   that?

11         MS. MCGOURTY:  How long would you like?

12         THE COURT:  It's your information that's out

13   there.

14         MS. MCGOURTY:  A week?

15         THE COURT:  Okay, a week from today?  Week from

16   today.

17         MS. MCGOURTY:  Would you like me to discuss what

18   the inadvertence versus intentional disclosure, to Mr.

19   Dexter?

20         THE COURT:  Yeah, thank you.  I haven't had a good

21   reason as to why the Trustee would produce this stuff,

22   inadvertently, if the Trustee thought it was work product.

23   I'm also familiar with how you collapse the columns on the

24   spreadsheet.

25         MS. MCGOURTY:  I assure you, I'm very familiar

Page 14

1    with that as well, at this point.

2             THE COURT:  All right.  I'll adjourn this to

3    August 29th -- August, November 29th.

4             MS. BROWN:

5             MS. MCGOURTY:  Thank you, Your Honor.

6             THE COURT:  This does seem to be a big to-do about

7    nothing, I have to tell you.  All right, next.  The PW

8    proceeding.

9             MS. BROWN:  Your Honor, who would you like to hear

10   from first?

11            THE COURT:  Well, my question is, aren't we ready

12   for trial?

13            MS. BROWN:  Seanna Brown, on behalf of the

14   Trustee.  Your Honor, we have reviewed the transcript from

15   the motion of limine hearing back in August -- April, sorry.

16   And our position is that there are now pending motions that

17   require --

18            THE COURT:  Well, that's a question I had because

19   I was reading the Trustee's most recent status report, and

20   paragraph 90 says, "No decisions as to the remaining motions

21   in the limine have been issued."  I thought I had decided

22   everything, either from the bench or in a written decision.

23   So, what did that paragraph mean?

24            MS. BROWN:  I guess I'd have to say that that

25   paragraph was an error, maybe it was based on an old

Page 15

1    (indiscernible) report.

2           THE COURT:  Mr. Dexter, do you think that there

3    are any unresolved motions in limine?

4           MR. DEXTER:  Do I think there are any pending

5    motions in limine?

6           THE COURT:  In other words, the question I had is,

7    the Trustee's most recent status report implied that there

8    may be some unresolved questions regarding the motions in

9    limine as they concern the PW proceeding.  Ms. Brown just

10   said there aren't any.

11          MR. DEXTER:  Their letter was accurate, not what

12   is being represented today; that there are pending motions.

13          THE COURT:  What hasn't been decided?

14          MR. DEXTER:  The motions that were filed by the

15   Blums that --

16          THE COURT:  Well, the Blums are out of the case

17   now.

18          MR. DEXTER:  Right, but we filed joinders to those

19   motions, so those motions are still pending.

20          THE COURT:  Okay, but the -- some had to do with

21   the Blums' own expert, but ... and I don't see how you can

22   make the Blums' expert testify.  But I went through the

23   transcript also.  And the only two motions seem to be the

24   admissibility of the Collura and Greenblatt flat reports as

25   to which there's no formal order, and the issue with Mr.

Page 16

1   Blecker.  Are there any others?

2           MR. DEXTER:  Yes, there are.

3           THE COURT:  What?  Which ones are they?

4           MR. DEXTER:  There are issues relating to the

5   exclusion of certain records of the Trustee on the grounds

6   of those records being inadmissible hearsay.

7           THE COURT:  But didn't I overrule all of the

8   objections relating to Collura and Greenblatt with the

9   exception of I wouldn't let, hear them say that if the

10  missing records existed they would support the conclusion.

11  Didn't I say that?

12          MR. DEXTER:  I don't know how to answer that.

13  I'll defer that to (indiscernible).

14          THE COURT:  All right, so, let me read from page

15  42 and 43 of the transcript of April 17th.  This is after

16  the extended argument.  I copied the wrong page.  It's on

17  page 41 and 42.  And, essentially, what I said was I wanted

18  to hear from the Collura and Greenblatt, about what it is

19  they did, since it was a bench trial I was not particularly

20  concerned about hearsay because I could understand -- I know

21  what hearsay is and I'm not going to be prejudiced.  You

22  wouldn't be prejudiced.  I know what I can use and not use.

23  And that the only thing I wouldn't do is allow them to

24  testify that if the missing records weren't missing they

25  would support, you know, they would further support the

Page 17

1    conclusion that they were arguing for.  So, that was

2    resolved that way, wasn't it?  Did you read the transcript

3    before you came here?

4              MR. DEXTER:  That transcript (indiscernible) ...

5              THE COURT:  Because that's what we're talking

6    about.

7              MR. DEXTER:  Your Honor, quite honestly, I haven't

8    read that in quite a while.  And today we're going to have a

9    discussion about whether or not the motions that we filed a

10   joinder for, whether that joinder is actually going to be

11   effective because of a transcript in April, I'm not prepared

12   to have that conversation, unfortunately.

13             THE COURT:  All right, I dealt with Collura and

14   Greenblatt.  I said that I would hear their testimony,

15   except for the conclusion that I mention, the record is so

16   ordered.  What other motions are there, that were

17   unresolved.

18             MR. DEXTER:  Our letter, on October 17, 2017; this

19   is a doc ID:  16-788.

20             THE COURT:  Yeah.

21             MR. DEXTER:  So, we joined in every single aspect

22   of the --

23             THE COURT:  Just tell me -- don't tell me what you

24   joined.  It was a universe of motions, which ones weren't

25   decided?

1          MR. DEXTER:  Which ones ...?

2          THE COURT:  Were not decided.  We've dealt within

3    your third paragraph of the letter of October 17th, the

4    Collura and Greenblatt aspect of the Blum motion. I've just

5    told you how it's resolved.  What else?

6          MR. DEXTER:  Well, there were multiple aspects of

7    that motion.  That's --

8          THE COURT:  I denied the motion, except for the

9    conclusion.  Are there any other motions besides the Collura

10   and Greenblatt motions?  I want to hear them testify.

11         MR. DEXTER:  I know that within those motions,

12   whether they're on ... that there are different aspects to

13   those motions --

14         THE COURT:  What?

15         MR. DEXTER:  -- whether they're separate motions

16   or not.

17         THE COURT:  What?  What isn't decided?

18         MR. DEXTER:  For example, that the Trustee cannot

19   rely on the ancient records exception for hearsay, things of

20   that nature.  I don't see how any of that was decided.

21         THE COURT:  Everything was decided.  I said, and

22   I'm repeating myself now, I want to hear what Collura and

23   what Greenblatt did.  The issue in this case is how to

24   compute the net equity of the participating claimants, which

25   I guess are your clients now.  The Trustee is entitled to

Page 19

1    rely upon the books and records of the SIPA debtor or

2    whatever else is out there -- I'm paraphrasing -- that would

3    enable him to determine the net equity claims.  So, I don't

4    know what these various hearsay exceptions have to do with

5    it.  You can argue that the records are unreliable, that

6    they're incomplete.  And you can ask, obviously, the experts

7    on the stand.  But I have to hear what they have to say.

8    So, what else is not decided?

9            MR. DEXTER:  But even if you hear what they have

10   to say, doesn't it then it become a matter of whether the

11   books and records are themselves admissible or not?

12           THE COURT:  No.  No, the Trustee is trying to

13   determine from the books and records and any other evidence

14   he has, what the net equity claim is.  There's no

15   requirement that the records have to be admissible.  It may

16   go to the weight that they're inaccurate or they're

17   incomplete, or something like that.  But this is what the

18   Trustee relied on to determine net equity.

19           MR. DEXTER:  The rules of hearsay are not are

20   matter of weight --

21           THE COURT:  Look, I've heard enough.  You're just

22   arguing with me.  I told you how I ruled.  Aside from

23   Collura and Greenblatt, is there anything else?

24           MR. DEXTER:  If I may, would you mind if we just

25   send a followup letter on this issue tomorrow?

1          THE COURT:  No.  Today is the day.  I'm scheduling

2     -- is this case ready for trial?

3          MS. BROWN:  Yes, Your Honor.

4          THE COURT:  Scheduling a trial.  How long is it

5     going to take to try the case?

6          MS. BROWN:  To try the case we anticipate it would

7     take five days.

8          THE COURT:  I also said that I would try Mr.

9     Blecker's issue.

10          MS. BROWN:  We're anticipating that that would be

11     part of it.  So, Your Honor, what we had in mind was two

12     days for experts, two days for fact witnesses, and maybe a

13     half day to do closing arguments if Your Honor permits, and

14     any cleanup.  So, one of the requests that we would like to

15     make is, if it would be possible to schedule the experts on

16     consecutive days, even if we could never -- I doubt that

17     Your Honor has five full days for us.

18          THE COURT:  No, I don't.

19          MS. BROWN:  But if there is any way to accommodate

20     having the experts testify close in time, and perhaps even

21     on consecutive days, that would be incredibly beneficial.  I

22     do want to mention to Your Honor, that we, the parties have

23     not yet started the negotiation of the pretrial order.  So,

24     we would need --

25          THE COURT:  You don't need a pretrial order in

1   this.  I've heard so much about this.

2           MS. BROWN:  The only thing that I would say that

3   the --

4           THE COURT:  And it's just going to

5   (indiscernible).

6           MS. BROWN:  Okay.

7           THE COURT:  And cause more letter writing and

8   litigation in discovery.  I understand what the PW issue is,

9   I understand what the objections are to it.  I assume that

10  Collura and/or Greenblatt are going to testify as to what

11  they did and how they came to the conclusion that PW meant

12  whatever it meant.  You know, I'll decide whether or not

13  that's correct.  I think, at the end of the day, at best,

14  you're going to have, in every individual case, after we get

15  done with Mr. Blecker, is maybe you've satisfied your

16  initial burden of going forward or whoever's got the burden

17  of proof.  Maybe it's some evidence.

18          MS. BROWN:  I mean, we od, obviously, have

19  (indiscernible) numbered and approved, but we could address

20  it in post-hearing briefing if that would be more helpful to

21  Your Honor.  We don't have to do it in a pretrial order.

22          THE COURT:  There's no way to do this other than

23  for you to go first (indiscernible) this issue.

24          MS. BROWN:  Correct.  We are planning on going

25  first.  But just because we go first doesn't necessarily

Page 22

1    mean we have the ultimate burden of proof.  And if I could

2    be very specific about what I'm talking about, I'm not

3    speaking about the omnibus issue.  As to Mr. Blecker, I

4    think that SIPA is clear, that it's the Claimant's burden.

5    And so, I think that there's a distinction between the

6    omnibus and the individual claims proceeding.

7              THE COURT:  Listen, Mr. Blecker is going to say,

8    "I never got a single distribution from this account."  And

9    you're going to say, "Mr. Blecker, you testified that this

10   account, this investment was so good that I wouldn't take

11   any money out of it for 15 years."  And when he did take

12   money out of it, he only took out $6,000 more than he put

13   int.  That's what it's going to be, right?  Plus, he's got

14   these handwritten notations --

15             MS. BROWN:  Yes.

16             THE COURT:  -- which I previously said I would

17   receive.

18             MS. BROWN:  You did.

19             THE COURT:  I don't know if you ever got the

20   doctor's note that was promised by Ms. Chaitman.

21             MS. BROWN:  We have not.  The position that Ms.

22   Chaitman has taken is that because Your Honor did not order

23   her to produce it, she's not going to.

24             THE COURT:  Okay, fine.  I will probably accept

25   ... you know, if you tell me that those handwritten

Page 23

1    notations were in the documents when you received them,

2    without anything else, I'm just, you know, going to receive

3    it as that -- no; probably accept whatever explanation you

4    think they merit.

5         MS. BROWN:  Okay.  Thank you, Your Honor.

6         THE COURT:  All I'm saying is this argument,

7    there'll be burden of proof.  He's going to testify he

8    didn't get it.  And we're going to go from there.  And I'm

9    either going to believe him or not believe him.

10        MS. BROWN:  Okay.

11        THE COURT:  Let me see if I can find you a couple

12   of days.

13        MS. BROWN:  Your Honor?

14        THE COURT:  Yes?

15        MS. BROWN:  We are talking currently about the

16   experts testifying.  But, as you know, we did depose several

17   of (indiscernible) employees.  We do have, we've offered to

18   Ms. Chaitman, to try to see if we could work out that we

19   would submit their testimony by deposition designation, so

20   as to avoid having multiple fact witnesses come into this

21   courtroom.  We think that's very efficient.  The depositions

22   were pretty narrow on this one issue.  To bring them in here

23   I think could really delay and lengthen the trial.  So, that

24   was one issue that we'd like to have resolved.

25        THE COURT:  You can talk about it, but I'm

Page 24

1    scheduling the trial because, as I said, every time you try

2    to work things out, it just delays it.

3           MS. BROWN:  Okay.

4           THE COURT:  You could certainly -- look, if you

5    want to agree to cross-designate depositions, that's fine.

6           MS. BROWN:  I guess the issue is, we're unlikely

7    to get an agreement based on prior history.  So, I would ask

8    that we --

9           THE COURT:  What does Rule 32 say about the --

10          MS. BROWN:  Rule 32 -- I will be honest with you,

11   Your Honor, I think under Rule 32, probably the only one of

12   the Trustee's fact witnesses that would be unavailable

13   within the meaning of that rule, would be Ms. Bongiorno, who

14   is currently incarcerated in Florida.  And, obviously, we

15   have the Blecker issue about whether or not he's

16   unavailable.  The other fact witnesses are within --

17          THE COURT:  He's unavailable because he's outside

18   of subpoena (indiscernible), although he's --

19          MS. BROWN:  No --

20          THE COURT:  -- (indiscernible) claim.

21          MS. BROWN:  He is.  The other witnesses are within

22   the jurisdiction of the Court.

23          THE COURT:  All right.  So, you know, I don't know

24   how I can force anybody as to those witnesses, to agree to

25   cross-designate.  And you're probably not going to be able

1    to get an agreement, so, let's just schedule a trial.

2          MS. BROWN:  Okay, Your Honor.

3          THE COURT:  How about January 4th and 5th?

4          MS. BROWN:  Your Honor, the only issue I have with

5    that date is our actually territoriality appellate brief is

6    due like January 11th and I do work on that.  But if that's

7    the only dates that Your Honor has --

8          THE COURT:  Well, no, I have after that, I have a

9    lot of dates.

10         MS. BROWN:  Okay, that would be better if there

11   was any way to accommodate that.

12         THE COURT:  Let's make it Thursday, the 18th of

13   January and Friday the 19th.  We'll start with those two

14   days for the experts.

15         MS. BROWN:  And based on what we've discussed here

16   today, Your Honor, the Trustee will plan to put his witness

17   on first.

18         THE COURT:  Yes.  I'm sure they don't have any

19   witnesses.  I'm assuming, Mr. Dexter, you don't have any

20   witnesses on the omnibus issue; you have witnesses in your

21   individual cases.  Is that right?

22         MR. DEXTER:  I don't think we're intending on

23   calling anyone in the omnibus issue.

24         THE COURT:  What I say --

25         MS. BROWN:  On Mr. Blecker's pretrial disclosures

Page 26

1    they did also list as witnesses the smattering of BLMIS that

2    we disposed.

3                    THE COURT:  Why don't we do this then?  Let's say

4    that by November 30th, the parties exchange witness lists

5    and exhibit lists.  And to the extent you haven't produced

6    the exhibits, produce the exhibits that are on your exhibit

7    list, okay?

8                    MS. BROWN:  Your Honor, does that deadline allow

9    the parties -- I think the parties should be required to

10   stick to the witness list that they previously submitted.

11                   THE COURT:  I don't remember the schedule.

12                   MS. BROWN:  We did.  We already exchanged witness

13   lists and exhibit lists.  We don't really need to do that.

14                   THE COURT:  If it's done already, that's fine.

15                   MS. BROWN:  We did that last fall.

16                   THE COURT:  Okay.  All right, see you at 10

17   o'clock on January 18th.  I may have some other matters on

18   the calendar because it's a regular calendar day.  So, we'll

19   just start the trial after that.

20                   MS. BROWN:  And, Your Honor, as I mentioned

21   before, the Trustee was not planning on doing any opening

22   arguments.

23                   THE COURT:  Are the witnesses', the experts'

24   direct testimony simply going to be their reports?

25                   MS. BROWN:  You mean, would we submit the reports

Page 27

1    as their direct and only allow cross?  Your Honor, we have

2    talked about that.  I do think there is some benefit to the

3    Court hearing their testimony and hearing their process.

4    So, I --

5              THE COURT:  Can't you do that by declaration?

6              MS. BROWN:  We certainly could if that would make

7    it easier for the Court.

8              THE COURT:  Well, I'd like to hear the live

9    testimony but I'm just wondering whether that will expedite

10   the --

11             MS. BROWN:  It could expedite but then you would

12   only hear the cross examination.  And I do think there's a

13   benefit to you hearing their processes, since you haven't

14   heard them testify yet in this case.

15             THE COURT:  All right.

16             MS. BROWN:  Thank you, Your Honor.

17             THE COURT:  See you on January 18th.

18             MS. BROWN:  Great.  Thank you.

19             MR. DEXTER:  Thank you, Your Honor.

20             THE COURT:  Now, let me jus add one thing.  We're

21   not going to do Mr. Blecker on January 18th.  Can I ask a

22   question?  The man is 106 or 107 or something.

23             MS. BROWN:  He's 106.

24             THE COURT:  Does it make sense to do his case

25   first and then work in this other testimony?

1        MS. BROWN:  The thing that's difficult about this

2   proceeding, and probably has been since the beginning, since

3   we've been talking about it, I mean a lot of the evidence is

4   overlapping.  So, I don't know how we just try -- are you

5   suggesting maybe Mr. Blecker --

6        THE COURT:  His personal case.  I mean, I would

7   still have to hear the PW omnibus proceeding.  Why don't I

8   do that?  I'll leave it up to the parties to discuss it.

9   But think about, since he is so elderly, trying his part of

10  the case first, let him get up and testify that he never

11  withdrew any money from his $200,000 account, which is

12  (indiscernible) issue I think.

13       MS. BROWN:  Yes.

14       THE COURT:  You can question him about the

15  handwritten notations.  Just think about it.  And then we

16  can do the rest of the stuff, and (indiscernible) decision.

17       MS. BROWN:  Is Your Honor suggesting that we have

18  Mr. Blecker testify in the courtroom?

19       THE COURT:  Well, he's got to be unavailable.

20  This is his case, you know, talking about his own claim

21  objection, his own claim determination as an objection to

22  that determination.  So, unless I have evidence that he

23  can't testify -- I guess he's not here, he doesn't come to

24  his own trial.

25       MS. BROWN:  Okay.  I mean there is case law that

Page 29

1    you can't just site the age, you have to provide --

2              THE COURT:  No, I understand.  I'm saying --

3              MS. BROWN:  So, I guess the only thing I'm a

4    little confused about, is in order for Your Honor to resolve

5    his claim you'd have to understand how the Trustee

6    determined net equity overall, which is what we were

7    planning on presenting through the experts on the omnibus

8    decision.

9              THE COURT:  I wouldn't resolve his claim until the

10   end of the day, after all the evidence is in.  But since he

11   is 106 or 107, I was just suggesting that maybe we try his

12   case first.

13             MS. BROWN:  Okay.  Just as long as Your Honor

14   wasn't planning on issuing a decision immediately after he

15   stepped out.

16             THE COURT:  No.

17             MS. BROWN:  Because we'd, obviously, like to

18   present the full picture to Your Honor about what we've done

19   and --

20             THE COURT:  I will leave that up to counsel to see

21   if they can agree to that, if they want to agree to that.  I

22   don't know.

23             MS. BROWN:  Agree to having Mr. Blecker's case

24   first?

25             MR. DEXTER:  We'll take it under advisement.

Page 30

1     Thank you, Your Honor.

2              THE COURT:   Okay.   Otherwise, we'll start on the

3     18th.

4              MR. DEXTER:   Thank you

5              MS. BROWN:   Thank you.

6

7        (Whereupon these proceedings were concluded at 2:44 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 31

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya
                                Digitally signed by Sonya Ledanski
                                Hyde
7    Ledanski Hyde               DN: cn=Sonya Ledanski Hyde, o, ou,
                                email=digital1@veritext.com, c=US
                                Date: 2017.11.10 16:20:44 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 10, 2017