**Baker & Hostetler LLP**

45 Rockefeller Plaza

New York, New York 10111

Telephone: (212) 589-4200

Facsimile: (212) 589-4201

David J. Sheehan

Email: dsheehan@bakerlaw.com

Seanna R. Brown

Email: sbrown@bakerlaw.com

Heather R. Wlodek

Email: hwlodek@bakerlaw.com

Hearing Date: January 31, 2018

Hearing Time: 10:00 A.M. (EST)

Objection Deadline: January 24, 2018

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |

**MOTION FOR AN ORDER APPROVING NINTH ALLOCATION OF PROPERTY TO**
**THE FUND OF CUSTOMER PROPERTY AND AUTHORIZING NINTH INTERIM**
**DISTRIBUTION TO CUSTOMERS**

# TABLE OF CONTENTS

**Page**

I.    EXECUTIVE SUMMARY ................................................................................................1

II.    THE LIQUIDATION PROCEEDING ............................................................................6

III.    ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA ............8

    A.    Allocation of Property................................................................................................8

    B.    Distributions Under SIPA ........................................................................................10

    C.    Allocation Of Assets To The Customer Fund And Related Reserves .................11

        i.    Assets in Trustee's Possession as of November 30, 2017 .........................15

        ii.    Madoff Family ...........................................................................................16

        iii.    Lagoon/Thema Funds ................................................................................16

        iv.    Thema International ....................................................................................16

        v.    Other Recoveries to the BLMIS Estate Since The Eighth
            Allocation and Eighth Interim Distribution ..............................................17

    D.    Determination Of Allowable Net Equity Claims & Related Reserves .................17

IV.    CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR
     NINTH ALLOCATION AND NINTH INTERIM DISTRIBUTION..............................18

    A.    No Interim Distribution Of General Estate ........................................................21

V.    MISCELLANEOUS ......................................................................................................22

    A.    Notice........................................................................................................................22

    B.    Record Date ..............................................................................................................22

VI.    CONCLUSION................................................................................................................22

300456809.4

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa *et seq.* ("SIPA"),[1] and the substantively consolidated Chapter 7 case of Bernard

L. Madoff ("Madoff") (collectively, "Debtor"), respectfully submits this motion (the "Motion")

pursuant to SIPA §§ 78*lll*(4), 78fff(a)(1)(B), 78fff-2(b), and 78fff-2(c)(1), and Rule 9013 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") seeking entry of an order (1)

approving the ninth allocation of property ("Ninth Allocation") to the fund of customer property

("Customer Fund"); and (2) authorizing a ninth pro rata interim distribution ("Ninth Interim

Distribution") to customers whose claims for customer protection under SIPA have been allowed

for amounts exceeding the SIPA statutory advance limits and which have not already been fully

satisfied by the first through eighth pro rata interim distributions.  This Court has jurisdiction

over this Motion pursuant to SIPA §§ 78eee(b)(2), 78eee(b)(4), 28 U.S.C. §§ 157 and 1334, and

Bankruptcy Rule 5005.  This Motion is based upon the law set forth below as well as the facts set

forth in the affidavit of Vineet Sehgal ("Sehgal Aff."), filed herewith.  In support of this Motion,

the Trustee represents as follows:

I.    **EXECUTIVE SUMMARY**

1.    In order to protect customers of an insolvent broker-dealer such as BLMIS,

Congress established a statutory framework pursuant to which customers of a debtor in a SIPA

liquidation are entitled to preferential treatment in the distribution of assets from a debtor's

estate.  The mechanism by which customers receive preferred treatment is through the creation

of a fund of "customer property" as defined in SIPA § 78*lll*(4), which is distinct from a debtor's

---

[1] For convenience, subsequent references to sections of the Act shall follow the form: "SIPA § __."

general estate.    Customers holding allowable claims are entitled to share pro rata in the

Customer Fund based on each customer's "net equity" as of the filing date, to the exclusion of

general creditors.  SIPA § 78fff-2(c).

2.      In order to make distributions from the Customer Fund, the Trustee must

determine or be able to sufficiently estimate: (a) the total value of customer property available

for distribution, or the "numerator" (including reserves for disputed recoveries), and (b) the total

net equity of all allowed claims, or the "denominator" (including reserves for disputed claims).

The Trustee calculates reserve amounts on a "worst-case" basis, such that the ultimate

resolution of disputed amounts will not adversely affect any customers' allowed or disputed net

equity distributions.

3.      In this case, for purposes of determining each customer's "net equity," the Trustee

credited the amount of cash deposited by the customer into his BLMIS account, less any

amounts already withdrawn from that BLMIS customer account (the "cash in, cash out method"

or the "Trustee's Net Investment Method").    Some claimants argued that the Trustee was

required to allow customer claims in the amounts shown on the November 30, 2008 customer

statements (the "Last Statement Method," creating the "Net Equity Dispute").    Litigation over

the Net Equity Dispute proceeded through this Court,[2] the Second Circuit,[3] and the Supreme

Court of the United States (the "Supreme Court").[4]    The Trustee's Net Investment Method was

upheld.

---

[2] *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010).

[3] *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "Net Equity Decision").

[4] Two petitions for writ of certiorari were denied by the Supreme Court of the United States on June 25, 2012.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Ryan v. Picard*, 133 S.Ct. 24 (2012); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (In re Bernard L. Madoff Inv. Sec., LLC), 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654

4.       Through pre-litigation and other settlements, the Trustee has successfully recovered approximately $12.789 billion through November 30, 2017—nearly 73% of the currently estimated principal lost in the Ponzi scheme by those who filed claims—for the benefit of all BLMIS customers with allowed claims.[5]

5.       The Trustee previously filed eight motions seeking entry of orders approving allocations of property to the Customer Fund and authorizing pro rata interim distributions of Customer Property.  This Court entered orders approving those motions:

---

F.3d 229 (2d Cir. 2011), *cert. denied sub nom. Velvel v. Picard*, 133 S.Ct. 25 (2012).  A third petition for writ of certiorari was dismissed.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Inv. Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd and reh'g and reh'g en banc denied*, 654 F.3d 229 (2d Cir. 2011), *cert. dismissed sub nom. Sterling Equities Assocs. v. Picard*, 132 S.Ct. 2712 (2012).

[5] Over $20 billion of principal was lost in the Ponzi scheme in total.  Of the $20 billion, approximately $17.5 billion of principal was lost by those who filed claims.

300456809.4

| No. of Distribution | Date of Distribution | Amount Allocated | Amount Distributed | Percentage Distributed | ECF No. for Motion | ECF No. for Order |
|---|---|---|---|---|---|---|
| 1 | 10/05/2011 | $2.618 billion | $768.551 million | 4.602% | 4048 | 4217 |
| 2 | 09/19/2012 | $5.501 billion | $5.585 billion | 33.556% | 4930 | 4997 |
| 3 | 03/29/2013 | $1.198 billion | $781.692 million | 4.721% | 5230 | 5271 |
| 4 | 05/05/2014 | $477.504 million | $525.752 million | 3.180% | 6024 | 6340 |
| 5 | 02/06/2015 | $756.538 million[6] | $453.032 million | 2.743% | 8860 | 9014 |
| 6 | 12/04/15 | $345.472 million[7] | $1.358 billion | 8.262% | 9807 and 11834 | 12066 |
| 7 | 06/30/16 | $247.013 million | $213.815 million | 1.305% | 13405 | 13512 |
| 8 | 02/02/17 | $342.322 million | $282.794 million | 1.729% | 14662 | 14836 |

6.    On July 24, 2017 this Court approved an approximately $23 million settlement between the Trustee and the United States Attorney's Office for the Southern District of New York (the "Government), on the one hand, and the Estate of Mark D. Madoff, the Estate of Andrew H. Madoff and Stephanie Mack (a/k/a/ Stephanie Madoff), on the other hand. *Picard v. Andrew H. Madoff et al.*, Adv. Pro. No. 09-01503 (SMB) (Bankr. S.D.N.Y.) (ECF No. 303). Under the terms of the settlement, the Trustee and the Government will receive more than $23 million in cash and other assets from the Estate of Mark D. Madoff, the Estate of Andrew H. Madoff and Stephanie Mack, with the total recovery being split evenly between the Trustee and the Government.  To date, the Trustee has received approximately $12.347 million.

[6] The total amount allocated in the Fifth Allocation Motion was $704,395,951.58.  Between the filing of that motion and the Fifth Interim Distribution date, an additional $52,142,279.87 was recovered and included in the numerator.

[7] This represents the amount allocated to the Customer Fund in the Supplemental Sixth Allocation and Sixth Interim Distribution Motion filed on October 20, 2015.  The original Sixth Allocation and Sixth Interim Motion filed on April 15, 2015 did not allocate any additional recoveries to the Customer Fund; the Trustee simply re-allocated $1,448,717,625.26 of funds that had previously been allocated to the Customer Fund for the Time-Based Damages Reserve.

4

300456809.4

7.      On July 24, 2017 this Court approved an approximately $240 million settlement between the Trustee, Lagoon Investment Limited, and Hermes International Fund Limited. *Picard v. HSBC Bank plc, et al.*, Adv. No. 09-01364 (SMB) (Bankr. S.D.N.Y.) (ECF No. 459). On July 24, 2017 this Court approved an approximately $130 million settlement between the Trustee, Thema Fund Limited and Thema Wise Investments Ltd.   *Picard v. HSBC Bank plc, et al.*, Adv. No. 09-01364 (SMB) (Bankr. S.D.N.Y.) (ECF No. 460).  Together the two settlements delivered approximately $370 million to the Customer Fund.

8.      On October 19, 2017 this Court approved an approximately $687 million settlement between the Trustee and Thema International Fund plc ("Thema International"). *Picard v. HSBC Bank plc, et al.*, Adv. Pro. No. 09-01364 (SMB) (ECF No. 478).  The Trustee allowed the claim of Thema International upon receipt of the payment.

9.      With these and other additional funds, the Trustee stands ready to make a ninth significant distribution to customers with allowed claims—approximately 3.585% on each allowed claim.  The practical effect of this determination is to permit a ninth interim distribution to customers whose claims have not been fully satisfied because the net equity of their respective accounts as of the Filing Date[8] exceeded the statutory SIPA protection limit of $500,000 and were not satisfied by the First through Eighth Interim Distributions.

10.     Thus, by way of this Motion, the Trustee seeks to distribute approximately $584.5 million (with an additional $88.7 million available for distribution to certain "net loser" accounts in litigation, if the claims relating to their accounts become allowed prior to the time

---

[8] In this case, the Filing Date is the date on which the Securities and Exchange Commission commenced its suit against BLMIS, December 11, 2008, which resulted in the appointment of a receiver for the firm.  *See* SIPA § 78*lll*(7)(B).

5

the distribution is made, or reserved, if not yet allowed).[9]  The Ninth Interim Distribution, when combined with the First through Eighth Interim Distributions, will provide no less than 63.683% of each customer's allowed claim amount, plus the SIPC advance of up to $500,000. The proposed distribution will be paid on claims relating to 926 BLMIS accounts.  The average payment amount to those 926 BLMIS accounts will be $631,198.93.  Fifteen payments will go to claimants who qualified for hardship status under the Trustee's claims Hardship Program.  If approved, and when combined with the SIPC payment and the amounts from the First through Eighth Interim Distributions, 1,386 accounts (relating to 1,604 claims) will be fully satisfied (all accounts with a net equity of up to $1,375,000.00).

11.    The Trustee proposes to continue maintaining a general reserve of $200,000,000.00 for unknown contingencies.

12.    The proposed Ninth Allocation and Ninth Interim Distribution are interim in nature.  The Trustee anticipates recovering additional assets through litigation and settlements. Final resolution of certain disputes will permit the Trustee to reduce the reserves he is required to maintain, which will allow him to make additional distributions to customers in the future. The Trustee will seek authorization for these further allocations and distributions upon the recovery of additional funds and the resolution of significant disputes.[10]

## II.    THE LIQUIDATION PROCEEDING

13.    Section 78fff(b) of SIPA provides that a SIPA liquidation proceeding "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5

---

[9] If all of these "net loser" accounts were allowed prior to the distribution, the total distribution to claimants would be approximately $673.223 million ($673,222,950.93), based on the net equity amount for deemed determined accounts.

[10] The Trustee seeks permission to include in the Ninth Interim Distribution those claims that are allowed between the time an order is entered on this Motion and the date of the Ninth Interim Distribution.

6

and subchapters I and II of chapter 7 of title 11" to the extent these provisions are consistent with SIPA.

14.     SIPA affords special protection to "customers," as defined in SIPA § 78*lll*(2), who receive preferential treatment by having their claims satisfied ahead of general creditors. *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) (recognizing that a "person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment").    The amounts owed to each customer are determined by valuing his or her "net equity," defined in SIPA § 78*lll*(11), as of the Filing Date.

15.     The Trustee has received 16,519 customer claims.  (Sehgal Aff. ¶ 4).  To date, the Trustee has determined 16,479 of those claims.    (*Id*. ¶ 4).    The remaining 40 claims are discussed in Paragraph 15 below.  To date, the Trustee has allowed 2,625 claims and committed to pay $842,850,652.98 million in funds advanced to him by SIPC.  (*Id*.).  To date, the allowed claims total approximately $16.892 billion.    (*Id*.).    The Trustee denied 2,696 claims by customers who had accounts with BLMIS and 10,732 claims purporting to be customer claims but were in fact claims filed on behalf of third parties or indirect investors who had no account at BLMIS.  Twelve other claims were filed that asserted no claim.  Another 414 claims have been withdrawn.  *(Id*.).

16.     Forty claims (relating to 30 accounts)[11] are currently categorized as "deemed determined," meaning that the Trustee has instituted litigation against those claimants.  (*Id*. ¶ 5). The complaints filed by the Trustee in those litigations set forth the express grounds for

---

[11] This includes one net winner accounts (1 claim) that will not be eligible to participate in the Trustee's interim distributions.

300456809.4

disallowance of customer claims under section 502(d) of the Bankruptcy Code. Accordingly,

such claims will not be allowed until the avoidance action is resolved by settlement or otherwise

and any judgment rendered against the claimant in the avoidance action is satisfied.

17.    To date, the Trustee has received 428 timely and 22 untimely filed secured

priority and unsecured non-priority general creditor claims totaling approximately $1.7 billion.

The claimants include vendors, taxing authorities, employees, and customers filing claims on

non-customer proof of claim forms. Of these 450 claims, 95 are general creditor claims and 49

are broker-dealer claims, which together total approximately $265 million of the $1.7 billion.[12]

(*Id.* ¶ 6).

18.    1,887 docketed objections have been filed to the Trustee's claims determinations

relating to 3,444 claims, which will be noticed for hearing as necessary. (*Id.* ¶ 7). These 1,887

objections relate to 834 BLMIS accounts. (*Id.*). The objections raise various issues, including

the proper interpretation of "net equity" (now resolved), the right to interest or time value of

money (now resolved), and whether the Trustee's calculation of allowed claims amounts are

correct. 1,332 of the 1,887 docketed objections have been fully resolved. 555 objections are

still subject to court review.

## III.    ALLOCATION OF PROPERTY & DISTRIBUTION SCHEME UNDER SIPA

### A.    Allocation of Property

19.    SIPA sets forth a bipartite statutory framework that gives customers priority over

general creditors of the broker-dealer. Pursuant to SIPA § 78fff-2(c)(1)(B), all customers with

---

[12] The 450 secured, priority, and non-priority general claims are explicit "general creditor" claims, such as vendor and service claims. (Sehgal Aff. ¶ 6). They do not include "customer" claims, even though each "customer" claim—both those allowed and denied—has a "general creditor" component. All BLMIS creditors, including customers whose claims were allowed, customers whose claims were denied, and general creditors, may have claims as general creditors against BLMIS for misrepresentation, fraud, and breach of contract (assuming they filed claims). Customers who filed customer claims need not have specifically filed claims as general creditors to protect such rights.

allowed claims share ratably in the fund of customer property. Pursuant to SIPA § 78fff-2(c), general creditors and customers, to the extent of their respective unsatisfied net equities, share in any general estate. Estate property not allocable to the fund of customer property is distributed in the order of priority established in section 726 of the Bankruptcy Code. SIPA § 78fff(e). Any property allocated to the fund of customer property that is not necessary to satisfy customer and other priority claims will become part of the general estate. SIPA § 78fff-2(c).

20.    According to SIPA § 78*lll*(4), "customer property" consists of "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

21.    Among the assets that comprise "customer property" are "any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers . . ." SIPA § 78*lll*(4)(D). Under SIPA § 78*lll*(4)(D), a trustee is permitted to look to the property of the debtor to rectify the actions taken by the debtor that resulted in a shortfall in customer property. *See Ferris, Baker, Watts v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 132 (Bankr. D. Minn. 2002) ("Application of the plain meaning of 15 U.S.C. § 78*lll*(4)(D) provides a means to rectify any actions taken by, or with respect to, the debtor, that results in such a shortfall. . . . Thus, if the debtor failed to set aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78*lll*(4)(D) would require the trustee to correct the debtor's error.").

22.    Thus, if a trustee determines that there is a shortfall in assets such that customer property is insufficient to satisfy net equity claims, then he may look to other assets of the debtor and allocate property to the fund of customer property.

300456809.4

23.    SIPA liquidations generally take a broad and inclusive customer-related approach to the allocation of property. For example, in *In re Park South Securities, LLC*, 99% of the debtor's estate was allocated to customer property. See Order, No. 03-08024A (Bankr. S.D.N.Y. Oct. 30, 2008) (ECF No. 201).[13] Consistent with prior liquidations, the Trustee expects to allocate the vast majority of the BLMIS estate to the Customer Fund, inasmuch as here, recovered property either belonged to customers or was derived from the misuse of customer property.

**B.    Distributions Under SIPA**

24.    The SIPA distribution scheme, while complex, can be distilled to a simple equation. Each customer is entitled to his or her pro rata share of customer property. To determine the percentage that each allowed customer will receive from the fund of customer property in an interim distribution, the aggregate amount collected to date by the Trustee and allocated to customer property is divided by the aggregate amount of net equity claims allowable by the Trustee. The percentage result is then to be applied to each net equity claim to determine a customer's pro rata share. The equation is as follows:

$$\frac{\text{Fund of Customer Property ("Numerator")}}{\text{Allowable Customer Net Equity Claims ("Denominator")}} = \text{Customer Pro Rata Share}$$

---

[13] *Accord SIPC v. Lehman Brothers, Inc.*, Adv. Pro. No. 08-01420, Motion for Order Approving Allocation of Property of the Estate at 27-28, n.33 (Bankr. S.D.N.Y. Oct. 5, 2009) (ECF No. 1866) (allocating "most" of debtor's assets to customer property); *In re Vision Inv. Grp., Inc.*, Adv. Pro. No. 97-1035B, Order Approving Third and Final Report and Final Accounting of the Securities Investor Protection Corporation (Bankr. W.D.N.Y. Dec. 13, 2005) (allocating 95% of debtor's estate to customer property); *In re Klein Maus & Shire, Inc.*, Adv. Pro. No. 00-8193A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of Fund of Customer Property, Finding of No Distribution to General Creditors (Bankr. S.D.N.Y. Dec. 15, 2004) (allocating 99% of debtor's estate to customer property); *In re MJK Clearing*, 286 B.R. at 132 (allocating 100% the debtor's assets as customer property); *In re A.R. Baron & Co., Inc.*, Order Approving Final Report and Account and Related Relief, Adv. Pro. No. 96-8831A (Bankr. S.D.N.Y. Feb. 10, 2004) (allocating 99% of the debtor's assets to customer property); *In re Hanover, Sterling & Co.*, Adv. Pro. No. 96-8396A, Order Approving Trustee's Final Report and Account, Approving Allocation of Property and Distribution of the Fund of Customer Property (Bankr. S.D.N.Y. Aug. 21, 2002) (allocating 75% of debtor's estate to customer property).

300456809.4

25.    SIPA § 78fff-2(c)(1) establishes the order of distribution of customer property. The second and third priorities of distribution are relevant here.    The second priority is to distribute customer property among customers based on their filing date net equities.    SIPA § 78fff-2(c)(1)(B).    The third priority is to distribute customer property to SIPC as subrogee. SIPA § 78fff-2(c)(1)(C).    Thereafter, any customer property remaining becomes part of the general estate.

26.    The amount advanced by SIPC to the Trustee in full or partial satisfaction of a customer claim is based on the difference between the customer's net equity and his share of customer property, subject to the $500,000 limit of SIPA's statutory protection.    The SIPC advance does not reduce the customer's net equity or his claim against customer property.    If the sum of the amount of a customer's SIPC advance and any subsequent distribution of customer property exceeds the customer's net equity, SIPC has the right to recoup its advance from the excess.    In effect, SIPC becomes subrogated to the claims of customers to the extent it has made advances but cannot seek recovery from customer property as to any individual customer until the customer has been fully satisfied.    SIPA §§ 78fff-3(a), 78fff-2(c)(1).

C.    **Allocation Of Assets To The Customer Fund And Related Reserves**

27.    As the Court previously found in its Net Equity Decision, and as numerous courts in civil and criminal proceedings have also found, Madoff did not engage in securities trading on behalf of BLMIS customers.    Madoff used customer funds to support operations and fulfill requests for redemptions to perpetuate a Ponzi scheme.    Thus, payment of "profits" to any one customer in fact came from another customer's deposit of funds.    In essence, all of the funds withdrawn by BLMIS customers were simply other people's money.

11

28.    BLMIS had an obligation to set aside sufficient assets to cover its statutory obligations to customers. *See* Securities Exchange Act Rule 15c3-3; 17 C.F.R. § 240.15c3-3.[14] At this time, the assets of BLMIS and Madoff are insufficient to cover those obligations.

29.    For these reasons, and because it is not uncommon for almost all property available to a broker-dealer to be deemed "customer property," the Trustee seeks the Court's approval to allocate to the Customer Fund virtually all cash and cash equivalents currently in his possession that was not previously allocated -- $1,302,865,670.54. ECF Nos. 4217, 4997, 5271, 6340, 9014, and 12066; *see also First Fed. Sav. & Loan Assoc. of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 362-66 (D.N.J. 1986) (describing and approving SIPA allocation and distribution scheme similar to that proposed by Trustee).

---

[14] SIPA's definitional paragraphs were amended in 1978 to incorporate in the "customer property" definition any other property of the debtor's estate which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers. Thus, to the extent that prior to the Filing Date BLMIS failed to maintain cash and securities in compliance with the Net Capital Rule issued by the SEC (Rule 15c3-1), as affected by the Customer Protection Rule (Rule 15c3-3) (both issued pursuant to the Exchange Act, 15 U.S.C. § 78*o*(c)(3)(A)), the Trustee is required to allocate property as necessary to remedy such non-compliance. The Customer Protection Rule effectively requires that a broker-dealer maintain control of all property that would have to be delivered to customers in the event of a liquidation: either the securities themselves or their value in the form of cash (or equivalents), and cash sufficient to pay net cash obligations to customers.

12

30.    The Trustee previously sought and obtained approval to allocate the following

amounts to the Customer Fund:

| No. of Allocation | Amount Allocated | Percentage Distributed | ECF No. for Motion | ECF No. for Order |
|---|---|---|---|---|
| 1 | $2.618 billion | 4.602% | 4048 | 4217 |
| 2 | $5.501 billion | 33.556% | 4930 | 4997 |
| 3 | $1.198 billion | 4.721% | 5230 | 5271 |
| 4 | $477.504 million | 3.180% | 6024 | 6340 |
| 5 | $756.538 million[15] | 2.743% | 8860 | 9014 |
| 6 | $345.472 million[16] | 8.262% | 9807 and 11834 | 12066 |
| 7 | $247.013 million | 1.305% | 13405 | 13512 |
| 8 | $342.322 million | 1.729% | 14662 | 14836 |

31.    The amounts previously distributed as outlined in each of the First through Eighth

Allocation Motions change as additional accounts are determined.  Below is a summary of the

amounts allocated and distributed:

---

[15] The total amount allocated in the Fifth Allocation Motion was $704,395,951.58.  Between the filing of that motion and the Fifth Interim Distribution date, an additional $52,142,279.87 was recovered and included in the numerator.

[16] This represents the amount allocated to the Customer Fund in the Supplemental Sixth Allocation and Sixth Interim Distribution Motion filed on October 20, 2015.  The original Sixth Allocation and Sixth Interim Motion filed on April 15, 2015 did not allocate any additional recoveries to the Customer Fund; the Trustee simply re-allocated $1,448,717,625.26 of funds that had previously been allocated to the Customer Fund for the Time-Based Damages Reserve.

13

| No. | Amount Allocated | Reserve From Previous Allocations[17] | Funds Received After Eighth Interim Distribution Used for Springing Claims | Amount Available for Distribution | Allocation for Allowed Claims[18] | Allocation for Deemed Determined Claims[19] | SIPC Subrogation | Other Reserves[20] |
|---|---|---|---|---|---|---|---|---|
| 1 | $2.618 billion | N/A | $44.995 million | $2.663 billion | $768.551 million | $114.109 million | $8.802 million | $1.772 billion |
| 2 | $5.501 billion | $1.772 billion | $328.083 million | $7.601 billion | $5.585 billion | $832.038 million | $82.678 million | $1.101 billion |
| 3 | $1.198 billion | $1.101 billion | $46.158 million | $2.345 billion | $781.692 million | $117.060 million | $15.762 million | $1.430 billion |
| 4 | $477.504 million | $1.430 billion | $31.091 million | $1.939 billion | $525.752 million | $78.850 million | $11.402 million | $1.323 billion |
| 5 | $756.538 million[21] | $1.323 billion | $26.819 million | $2.106 billion | $453.032 million | $68.014 million | $10.305 million | $1.575 billion |
| 6 | $345.472 million[22] | $1.575 billion | $80.779 million | $2.001 billion | $1.358 billion | $204.861 million | $37.316 million | $400.885 million |
| 7 | $247.013 million | $400.885 million | $12.759 million | $660.657 million | $213.815 million | $32.358 million | $6.621 million | $407.863 million |
| 8 | $342.322 Million | $407.863 million | $16.905 million | $767.090 million | $282.794 million | $42.871 million | $9.262 million | $432.162 million |

32.    As reflected in the table above, the amount reserved through the Eighth Interim

Distribution is $432,162,309.97.  This previously reserved amount, plus the $1,302,865,670.54

that the Trustee seeks to allocate in this Motion, less the $587,589,612.78 in aggregate catch-up

---

[17] Reserve from Previous Allocations represents amounts that were reserved in prior allocations.

[18] Allocation for Allowed Claims represents the amount allocated for claims that have been allowed.

[19] Allocation for Deemed Determined Claims represents amounts allocated and reserved for claims that are currently in litigation with the Trustee.

[20] Other Reserves represents all monies that are reserved for various issues.

[21] The total amount allocated in the Fifth Allocation Motion was $704,395,951.58.  Between the filing of that motion and the Fifth Interim Distribution date, an additional $52,142,279.87 was recovered and included in the numerator.

[22] This represents the amount allocated to the Customer Fund in the Supplemental Sixth Allocation and Sixth Interim Distribution Motion filed on October 20, 2015.  The original Sixth Allocation and Sixth Interim Motion filed on April 15, 2015 did not allocate any additional recoveries to the Customer Fund; the Trustee simply re-allocated $1,448,717,625.26 of funds that had previously been allocated to the Customer Fund for the Time-Based Damages Reserve.

14

payments from post-eighth interim distribution recoveries, constitutes the total amount available

for distribution.  Therefore, the total amount available for the Ninth Interim Distribution will be

$1,147,438,367.73.   Of this amount, $252,859,897.40 must be held in reserve for the non-

preference related settlement payments for accounts with net equity clauses, as well as certain

other settlements, leaving a total of $894,578,470.33 available for distribution.

33.     The Trustee will maintain a general reserve of $200,000,000.00, bringing the

amount available for the Ninth Interim Distribution to $694,578,470.33.

34.     Of the $694,578,470.33 numerator, $584,490,208.99 will be distributed as part of

the Ninth Interim Distribution to allowed accounts, and SIPC subrogation for allowed accounts

in the amount of $21,053,129.31[23] will be released to SIPC.  For deemed determined accounts,

$88,891,906.47 will be reserved.  (Sehgal Aff. ¶ 16).

35.     The Trustee does not seek to allocate any funds to the General Estate at this time.

### i.    Assets in Trustee's Possession as of November 30, 2017

36.     The Form SIPC 17 completed by the Trustee each month lists all of the recoveries

and assets in the Trustee's possession.  In the Trustee's Form SIPC 17 for the period ending on

November 30, 2017 ("November 30 SIPC 17 Form"), attached hereto as Exhibit A, the Trustee

reports that he has recovered approximately $12.789 billion.[24]   These funds were primarily

derived from the following sources: (a) the transfer of BLMIS bank accounts to the BLMIS

estate; (b) pre-litigation and litigation settlements; (c) customer preference recoveries; (d) the

sale of assets; (e) refunds; and (f) earnings on the Trustee's investment and money market

accounts.

---

[23] An additional $21,686.52 of SIPC subrogation associated with the Ninth Interim Distribution for accounts that
have not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.
[24] In addition, the Trustee has in his possession a *de minimis* amount of unliquidated assets.

37.     To the extent additional settlements are reached and/or become final prior to the entry of an order on this Motion, the Trustee will allocate and distribute those recoveries in accordance with the formula set forth herein.

### ii.     Madoff Family

38.     On July 24, 2017 this Court approved an approximately $23 million settlement between the Trustee and the United States Attorney's Office for the Southern District of New York (the "Government), on the one hand, and the Estate of Mark D. Madoff, the Estate of Andrew H. Madoff and Stephanie Mack (a/k/a/ Stephanie Madoff), on the other hand. *Picard v. Andrew H. Madoff et al.*, Adv. Pro. No. 09-01503 (SMB) (Bankr. S.D.N.Y.) (ECF No. 303). Under the terms of the settlement, the Trustee and the Government will receive more than $23 million in cash and other assets from the Estate of Mark D. Madoff, the Estate of Andrew H. Madoff and Stephanie Mack, with the total recovery being split evenly between the Trustee and the Government.  To date, the Trustee has received approximately $12.347 million.

### iii.     Lagoon/Thema Funds

39.     On July 24, 2017 this Court approved an approximately $240 million settlement between the Trustee, Lagoon Investment Limited, and Hermes International Fund Limited. *Picard v. HSBC Bank plc, et al.*, Adv. No. 09-01364 (SMB) (Bankr. S.D.N.Y.) (ECF No. 459). On July 24, 2017 this Court approved an approximately $130 million settlement between the Trustee, Thema Fund Limited and Thema Wise Investments Ltd.   *Picard v. HSBC Bank plc, et al.*, Adv. No. 09-01364 (SMB) (Bankr. S.D.N.Y.) (ECF No. 460). Together the two settlements delivered approximately $370 million to the Customer Fund.

### iv.     Thema International

40.     On October 19, 2017 this Court approved an approximately $687 million settlement between the Trustee and Thema International Fund plc ("Thema International").

16

*Picard v. HSBC Bank plc, et al.*, Adv. Pro. No. 09-01364 (SMB) (ECF No. 478). The Trustee

allowed the net equity claim of Thema International upon receipt of the payment.

**v.      Other Recoveries to the BLMIS Estate Since The Eighth Allocation
and Eighth Interim Distribution**

41.      In the Motion on the Eighth Allocation and Eighth Interim Distribution, the

Trustee reported total recoveries of $342,321,897.89 that were not previously allocated. When

combined with recoveries of $247,012,857.10 reported in the Seventh Allocation and Seventh

Interim Distribution, recoveries of $345,472,293.08 reported in the Sixth Allocation and Sixth

Interim Distribution, recoveries of $756,538,231.45 reported in the Fifth Allocation and Fifth

Interim Distribution, recoveries of $477,503,824.33 reported in the Fourth Allocation and

Fourth Interim Distribution, recoveries of $1,198,067,071.04 reported in the Third Allocation

and Third Interim Distribution, recoveries of $5,501,375,994.66 reported in the Second

Allocation and Second Interim Distribution, and recoveries of $2,617,974,430.26 reported in the

First Allocation and First Interim Distribution, the total recoveries as of the Eighth Allocation

and Eighth Interim Distribution were $11,486,266,599.81. The Trustee has recovered

additional funds for the estate from multiple parties and sources since that time.

42.      The Trustee has recovered approximately $1,302,865,670.54 since the Eighth

Allocation and Eighth Interim Distribution as a result of litigation and pre-litigation settlements,

interest income, and other miscellaneous recoveries. (Sehgal Aff. ¶ 10). Therefore, the Trustee

seeks approval to allocate the full amount of these recoveries to the Customer Fund.

**D.      Determination Of Allowable Net Equity Claims & Related Reserves**

43.      For distribution purposes, the Customer Fund numerator is only one half of the

equation. In order to calculate each customer's pro rata share of customer property, the Trustee

also needs to establish the denominator, or the amount of allowable net equity claims.

17

300456809.4

44.    If the Trustee had determined all customer claims and his determinations were final either through the passage of time or judicial determination, the denominator would simply equal the amount of allowed claims.    Because the Trustee seeks to make a Ninth Interim Distribution prior to a final determination of all customer claims and certain disputes are pending, the Trustee cannot use as the denominator the amount of allowed claims as of this date.    Doing so could result in an uneven distribution to customers, in violation of SIPA and the Bankruptcy Code, because there could be insufficient funds to distribute to claimants whose claims are allowed in the future.    Instead, the Trustee must project as to the amount of all allowable net equity claims and establish sufficient reserves to ensure that all possibly eligible claimants receive a pro rata distribution, should their claims be allowed.    In order to do so, he must maintain sufficient reserves.

45.    Certain accountholders decided against filing a claim in this proceeding, even though they may have had allowable net equity claims.    The statutory bar date to file claims was July 2, 2009.    SIPA § 78fff-2(a)(3).    Thus, a failure to file a claim by that date means that there is no distribution that can be made to these accounts.    No reserves are maintained for these accounts.

46.    Further, certain accountholders have entered into final settlements not contingent on the Net Equity Dispute.    No reserves are maintained for these accounts.

IV.    **CALCULATION OF PRO RATA SHARE OF CUSTOMER FUND FOR NINTH ALLOCATION AND NINTH INTERIM DISTRIBUTION**

47.    SIPA § 78fff-2(c)(1) establishes, in pertinent part, that a customer is to receive his ratable share from the fund of customer property.    To the extent the customer's share has been fully satisfied through an advance of funds by SIPC, SIPC steps into the shoes of the customer as subrogee and receives that customer's share of customer property.    In that manner, a

18

customer does not receive a double recovery on his claim that was already fully satisfied by the SIPC advance.

48.     As set forth above and in the Sehgal Affidavit, the Trustee proposes to allocate $1.303 billion to the Customer Fund at this time and release $584.490 million for distribution.

49.     Of the $694,578,470.33 numerator, $584,490,208.99 will be distributed as part of the Ninth Interim Distribution to allowed accounts and SIPC subrogation for allowed accounts in the amount of $21,053,129.31 [25] will be released to SIPC.  For deemed determined accounts, $88,891,906.47 will be reserved.  (Sehgal Aff. ¶ 16).

50.     The Denominator is $19,371,183,569.17.  (Sehgal Aff. ¶ 19).  To determine the percentage of each allowed customer net equity claim that can be satisfied from the Customer Fund, the Net Customer Fund is divided by the Denominator, resulting in the following percentage:

$$\frac{\$694,578,470.33}{\$19,371,183,569.17} = 3.585\%$$

51.     Under this scenario, a total of 926 accounts will receive a distribution up to 3.585% of their net equity claims.  (Sehgal Aff. ¶ 20).  Of these 926 accounts (relating to 1,076 claims), 47 accounts (relating to 56 claims) will become fully satisfied, bringing the total of fully satisfied account holders to 1,386 (all accounts with a net equity of up to $1,375,000.00).  Eight hundred and seventy-nine accounts will remain partially satisfied and will be entitled to participate in future distributions.  (*Id*.).

---

[25] An additional $21,686.52 of SIPC subrogation associated with the Ninth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance was held in reserve.

300456809.4

52.     An additional 29 accounts[26] (relating to 39 claims) that are currently "deemed determined" could receive a distribution if and when the status of their claims moves from "deemed determined" to allowed.  (*Id*. ¶ 21).   Fourteen of the 29 accounts would be fully satisfied by the SIPC advance.  The remaining 15 accounts would receive both a SIPC advance and a distribution in accordance with the Trustee's Motion and the Ninth Allocation and Ninth Interim Distribution.  (*Id*.).  Two of the remaining 15 accounts would be fully satisfied by the First through Ninth Interim Distributions.  (*Id*.).

53.     SIPC is entitled to receive repayment as to any given customer to the extent the customer's claim was fully repaid by a combination of the SIPC advance and the Trustee's distributions. *See In re Bell & Beckwith*, 104 B.R. 842, 852-55 (Bankr. N. D. Ohio 1989), *aff'd*, 937 F.2d 1104 (6th Cir. 1991).  SIPC, as subrogee, is entitled to receive partial repayment of its cash advances to the Trustee pursuant to SIPA § 78fff-3(a)(1).  A SIPC subrogation payment was made on March 29, 2013 in the amount of $102,805,012.23, on May 5, 2014 in the amount of $11,299,366.89, on February 6, 2015 in the amount of $11,226,253.72, on January 6, 2016 in the amount of $38,193,864.82, on June 30, 2016 in the amount of $7,309,329.92, and on February 2, 2017 in the amount of $10,335,452.50 for a total of $181,169,280.08 in subrogation payments to SIPC.  Based on the "net loser" accounts that have been allowed and have returned a signed Partial Assignment and Release (PAR) through this Ninth Interim Distribution, SIPC's subrogation claim is approximately $21.669 million ($21,669,487.88).  The $21.669 million is comprised of $21.053 million ($21,053,129.31)[27] of SIPC subrogation from the Ninth Interim

---

[26] This does not include one  net winner accounts (1 claim) that will not be eligible to participate in the Trustee's interim distributions.

[27] An additional $385,233.61 of SIPC subrogation associated with the First through Ninth Interim Distribution for accounts that have not returned the necessary paperwork required to receive their SIPC advance will be held in reserve.

Distribution and $616,358.57 of SIPC subrogation associated with the First through Eighth
Interim Distributions (this $616,358.57 represents SIPC subrogation for accounts determined
after the February 2, 2017 payment was made). This amount will be released to SIPC.

54.     Unless otherwise noted, the numbers contained herein are based on recoveries and
claims allowed as of November 30, 2017. To the extent additional claims are allowed, the
Trustee will distribute funds consistent with the formulas set forth in this Motion.

> A.     **No Interim Distribution Of General Estate**

55.     Under SIPA § 78fff(e), funds from the general estate satisfy the administrative
costs and expenses of a Debtor's estate and a liquidation proceeding. To the extent the general
estate is insufficient, SIPC makes advances to the Trustee for the payment of such costs and
expenses. SIPA § 78fff-3(b)(2). All administrative advances made by SIPC are recoverable
from the general estate under section 507(a)(2) of the Bankruptcy Code. SIPA
§§ 78eee(b)(5)(E), 78fff(e). The general estate is distributed in accordance with section 726 of
the Bankruptcy Code, with section 507(a)(2) expenses receiving second priority.[28] SIPA
§ 78fff(e).

56.     As noted previously, the Trustee has received 428 timely and 22 untimely filed
secured priority and unsecured non-priority general creditor claims totaling approximately $1.7
billion. The claimants include vendors, taxing authorities, employees, and customers filing
claims on non-customer proof of claim forms. Of these 450 claims, 95 are general creditor
claims and 49 are broker-dealer claims which together total approximately $265.4 million of the
$1.7 billion. Inasmuch as the Trustee proposes to allocate no assets to the General Estate, there
are no funds in the General Estate from which to make a distribution to general creditors at this

---

[28] There are no § 507(a)(1) expenses in this liquidation proceeding.

time.  Accordingly, "[no] purpose would be served" by the examination of or the institution of actions seeking to disallow such claims.  See 11 U.S.C. § 704(5).

## V.    MISCELLANEOUS

### A.    Notice

57.    Pursuant to Bankruptcy Rules 2002(a)(6), 2002(f)(8), and 2002(h), the Trustee has given notice of the hearing on the Trustee's Motion by first class mail, postage prepaid, to all claimants that filed a claim.  Pursuant to the Order Establishing Notice Procedures (ECF No. 4650), the Trustee has given notice of the hearing on the Trustee's Motion via email and/or U.S. Mail to (i) SIPC; (ii) the SEC; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; and (v) all persons who have filed notices of appearance in the BLMIS proceeding.  The Trustee believes that no further notice need be given of this or any further matter in the proceeding.

### B.    Record Date

58.    The Ninth Interim Distribution will be made to all record holders as of January 31, 2018.

## VI.    CONCLUSION

59.    This Motion and the relief requested by the Trustee are consistent with the policy and purposes underlying SIPA and are in the best interests of the customers of BLMIS, the Estate, and its creditors.

60.    No prior application for the relief sought herein has been made to this or any other Court.

22

**WHEREFORE,** the Trustee respectfully requests that this Court enter an order (a) approving: (i) the proposed Ninth Allocation of Property to the Customer Fund and to the General Estate; (ii) the proposed Ninth Interim Distribution of the Customer Fund; and (b) granting such other and further relief as may be deemed just and proper.

Dated: December 18, 2017
      New York, New York

                                 Respectfully submitted,

                                 */s/ David J. Sheehan*
                                 **Baker & Hostetler LLP**
                                 45 Rockefeller Plaza
                                 New York, New York  10111
                                 Tel: (212) 589-4200
                                 Fax: (212) 589-4201
                                 David J. Sheehan
                                 Email: dsheehan@bakerlaw.com
                                 Seanna R. Brown
                                 Email: sbrown@bakerlaw.com
                                 Heather R. Wlodek
                                 Email: hwlodek@bakerlaw.com

                                 *Attorneys for Irving H. Picard, Trustee*
                                 *for the Substantively Consolidated SIPA*
                                 *Liquidation of Bernard L. Madoff Investment*
                                 *Securities LLC and Estate of Bernard L. Madoff*

300456809.4