# EXHIBIT 2

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
IRVING H. PICARD,                     :
          Plaintiff,                  :
                                      :
            -v-                       :      11 Civ. 5223 (JSR)
                                      :
FLINN INVESTMENTS, LLC and LAWRENCE   :
FLINN, JR.,                           :
          Defendants.                 :
------------------------------------- x
IRVING H. PICARD,                     :
          Plaintiff,                  :
                                      :
            -v-                       :      11 Civ. 3775 (JSR)
                                      :
JAMES GREIFF,                         :
          Defendant.                  :
------------------------------------- x
IRVING H. PICARD,                     :
          Plaintiff,                  :
                                      :
            -v-                       :      11 Civ. 4293 (JSR)
                                      :
GERALD BLUMENTHAL,                    :
          Defendant.                  :
------------------------------------- x
IRVING H. PICARD,                     :
          Plaintiff,                  :
                                      :
            -v-                       :      11 Civ. 4959 (JSR)
                                      :
KARA FISHBEIN GOLDMAN and STEVEN      :
GOLDMAN,                              :
          Defendants.                 :
------------------------------------- x
IRVING H. PICARD,                     :
          Plaintiff,                  :
                                      :
            -v-                       :      11 Civ. 4936 (JSR)
                                      :
HAROLD J. HEIN,                       :
          Defendant.                  :      MEMORANDUM ORDER
------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

Each of the defendants in the above captioned cases seeks mandatory withdrawal of the reference to the bankruptcy court of the underlying adversarial proceeding brought against each of them respectively by plaintiff Irving H. Picard, the trustee appointed pursuant to the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa et seq. Because these motions raise identical questions of law, albeit in different combinations, the Court issues this one Memorandum Order to decide which aspects of the underlying proceedings will be withdrawn, and which not. Moreover, in three of these cases, Greiff, Flinn, and Blumenthal, the Court has already issued "bottom-line" orders identifying the issues on which it will and will not withdraw the reference. This Memorandum Order explains the Court's reasons for its bottom-line orders in Greiff, Flinn, and Blumenthal and applies that same reasoning to the motions in Goldman and Hein.[1]

District courts have original jurisdiction over bankruptcy cases and all civil proceedings "arising under title 11, or arising in or

---

[1] At the initial conference in Greiff, counsel for Greiff indicated she wished any withdrawal that was granted to Greiff to also be granted to 120 or more similarly situated defendants she also represented. The Court advised her that she would first have to file withdrawal motions on behalf of these other defendants. At a subsequent hearing on November 10, 2011 (arguing the merits of the issues withdrawn by the bottom-line order in Greiff), Greiff's counsel stated that "we have [now] filed 121 motions to withdraw the reference," see transcript, 11/10/11, at 4, and the Court then inquired of Trustee's counsel whether "we should treat this as argument for all those cases," to which Trustee's counsel responded, "That's fine, your Honor. Because I believe that the facts would be the same for each." Id. at 18. But in a phone conference a few days after the hearing, Greiff's counsel revealed that withdrawal motions had not in fact been filed yet in about 40 of those cases, while the Trustee's counsel sought to condition any consolidation on various provisos. If, as both sides keep claiming, they are anxious to move these cases along, they should "get their act together" and arrange, by stipulation presented to the Court in the next few days, for the prompt consolidation of Greiff with the other similarly situated cases.

2

related to cases under title 11." 28 U.S.C. § 1334. Pursuant to 28 U.S.C. § 157(a), the district court may refer actions within its bankruptcy jurisdiction to the bankruptcy judges of the district. The Southern District of New York has a standing order that provides for automatic reference.

Notwithstanding the automatic reference, the district court may, on its own motion or that of a party, withdraw the reference, in whole or in part, in appropriate circumstances. Withdrawal is mandatory "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d). Notwithstanding the plain language of this section, however, the Second Circuit has ruled that mandatory "[w]ithdrawal under 28 U.S.C. § 157(d) is not available merely whenever non-Bankruptcy Code federal statutes will be considered in the bankruptcy court proceeding, but is reserved for cases where substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." In re Ionosphere Clubs, Inc., 922 F.2d 984, 995 (2d Cir. 1990).

The defendants in these cases identify many issues that they believe require "substantial and material consideration" of non-bankruptcy federal laws regulating organizations or activities affecting interstate commerce, including important unresolved issues under SIPA itself, a statute that has both bankruptcy and non-bankruptcy aspects and purposes. See In re Bernard L. Madoff

3

Investment Securities, 654 F.3d 229, 235 (2d Cir. 2011) ("SIPA serves dual purposes: to protect investors, and to protect the securities market as a whole."); Picard v. HSBC Bank PLC, 450 B.R. 406, 410 (S.D.N.Y. 2011). The Court considers defendants' contentions in turn.[2]

First, Greiff argues that the Trustee cannot bring avoidance actions under SIPA because that statute permits him to do so only "[w]henever customer property is not sufficient to pay in full the claims." 15 U.S.C. § 78fff-2(c)(3). Greiff claims that, as a factual matter, the Trustee has already recovered enough customer property to pay all the claims he has recognized and thus cannot avail himself of avoidance powers, which SIPA bestows contingently. But it has long been held that "the fund of customer property shall be valued for the purposes of 15 U.S.C. § 78fff-2(c)(3) as of [the filing date]," In re Bevill, Bresler & Schulman, Inc., 83 B.R. 880, 898 (Bankr. D.N.J. 1988), and no "substantial and material consideration of non-Bankruptcy Code federal statutes" is required to see why this is so: any different interpretation of § 78fff-2(c)(3) would cause the

---

[2] The Trustee and SIPC oppose any withdrawal whatsoever on the ground that defendants have waived their right to withdraw by submitting proofs of their own claims to the bankruptcy court. See Katchen v. Landy, 382 U.S. 323, 334 (1966) ("[A] creditor who offers a proof of claim and demands its allowance is bound by what is judicially determined."). Here, however, unlike in Katchen, the Bankruptcy Court has not "determined" any of the claims that defendants seek to withdraw. Moreover, the Trustee and SIPC do not explain how a litigant's conduct can relieve the Court of a statutory obligation presented by Congress. See 28 U.S.C. § 157(d) ("The district court shall . . . withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States." (emphasis added)). Thus, this Court follows others in holding that mandatory withdrawal must be made even where defendants have submitted proofs of claims. See, e.g., In re Dana Corp., 379 B.R. 449, 463

4

Trustee's powers to fluctuate, leading to a "logistical nightmare." Id. at 893. The Trustee might file a meritorious claim, but find himself unable to pursue it later for reasons wholly unrelated to the claim itself. Moreover, if the Trustee does avoid more than he needs to satisfy customer claims, SIPA provides that a recipient of an avoided transfer "shall be deemed to have been a creditor," allowing her to recover at least some of what the Trustee avoided. 15 U.S.C. § 78fff-2(c)(3). Accordingly, the Court concludes that, even assuming arguendo that this issue implicates non-bankruptcy aspects of SIPA, only simple application of SIPA is required to resolve the issue Greiff presents, and thus that the issue does not warrant withdrawal. See City of New York v. Exxon Corp., 932 F.2d 1020, 1026 (2d Cir. 1991) (mandatory withdrawal required only where "a bankruptcy court judge [is required] to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes").

Second, Blumenthal and Hein argue that SIPA does not empower the Trustee to avoid fraudulent transfers in disregard of the securities customers' legitimate expectations that the brokerage statements they received from Madoff reflected real transactions. However, in In re Bernard L. Madoff Investment Securities, the Second Circuit noted that such brokerage statements command little deference where they are not "reflections of reality." 654 F.3d at 242; see also In re New Times Sec. Servs., Inc., 463 F.3d 125, 130 (2d Cir. 2006) (refusing to defer

---

(S.D.N.Y. 2007).

5

to customers' expectations predicated on illusory transactions where doing so "would lead to . . . absurdity"). While neither opinion cited above addressed whether the Trustee could avoid transfers as fraudulent, and while the narrowness of the Second Circuit's actual holding in In re Bernard L. Madoff Investment Securities may lessen its applicability to other parts of this litigation, it seems reasonably apparent from both opinions that fraudulent brokerage statements cannot be the talisman that determines automatically what a customer's reasonable expectations consist of or that requires courts to credit the defrauder's misrepresentations. Accordingly, defendants' second issue does not require the "substantial and material consideration" of non-bankruptcy law that would mandate withdrawal.

Third, various defendants argue that the Trustee cannot avoid transfers that, under applicable securities laws, satisfied antecedent debts. While superficially similar in some respects to the argument discussed in the previous paragraph, it is, for withdrawal purposes, different in significant respects. The Bankruptcy Code provides a defense against many fraudulent transfer actions to those who received a transfer "for value and in good faith." 11 U.S.C. § 548(c). The same provision defines "value" to include "satisfaction . . . of a present or antecedent debt of the debtor." § 548(d)(2)(A). The defendants argue that, under applicable securities laws, Bernard L. Madoff Investment Securities LLC ("Madoff Securities") owed them antecedent debts, and transfers from Madoff Securities, even if

6

fraudulent, satisfied these debts. If accepted, this argument would lead to the conclusion that the defendants took for "value" under §§ 548(c) & (d)(2)(A).

Resolution of the issues this argument raises requires "significant interpretation" of the securities laws. On the one hand, in accordance with securities law, Madoff Securities regularly sent reports to the defendants updating them on their investments' performances. See 17 CFR § 240.10b-10 (requiring brokers like Madoff Securities to disclose information regarding trades to investors). At the time of the challenged transfers, the defendants could have enforced these reports against Madoff Securities. Moreover, the occurrence of fraud does not, by itself, mean that the securities laws do not apply. See SEC v. Zandford, 535 U.S. 813, 819 (2002) ("[A] broker who accepts payment for securities that he never intends to deliver . . . violates § 10(b) and Rule 10b-5."); see generally In re Bernard L. Madoff Securities, 654 F.3d at 236 ("While SIPA does not — and cannot — protect an investor against all losses, it 'does . . . protect claimants who attempt to invest through their brokerage firm but are defrauded by dishonest brokers.' (quoting In re Primeline Sec. Corp., 295 F.3d 1100, 1107 (10th Cir. 2002))). On the other hand, because Madoff Securities' reports reflected only Madoff's imagination, recognizing these reports as antecedent debts would allow "the whim of the defrauder" to control how investments in the fraud are distributed among its many admittedly innocent victims. In re Bernard L. Madoff Inv. Secs., 654 F.3d at 241. This is a difficult

7

question, and the Court withdraws the reference to the bankruptcy court in order to undertake the "significant interpretation" of securities law necessary to resolve it.

Fourth, the defendants further argue that § 546(e) of the Bankruptcy Code prevents the Trustee from avoiding transfers as fraudulent except under § 548(a)(1)(A) of that Code. The Court has already discussed this fully-withdrawable issue at length in Picard v. Katz, 2011 WL 4448638 at *2-*3 (S.D.N.Y. Sept. 27, 2011). "By restricting a bankruptcy trustee's power to recover payments that are otherwise avoidable under the Bankruptcy Code, the safe harbor [in § 546(e)] stands 'at the intersection of two important national legislative policies on a collision course — the policies of bankruptcy and securities law.'" Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V., 651 F.3d 329, 334 (2d Cir. 2011) (quoting In re Resorts Int'l, Inc., 181 F.3d 505, 515 (3rd Cir. 1999)).

Whether § 546(e) applies depends on how a Court resolves numerous questions of securities law. For example, the Second Circuit has held not only that § 546(e) applies where a transfer completes a securities transactions, but also that completion of such a transaction need not involve a "purchase or sale" of securities. Id. at 336-37. Thus, to determine whether § 546(e) applies to these cases, a court must determine, among other things, whether transfers from Madoff Securities completed securities transactions even though Madoff Securities never purchased or sold securities on these defendants' behalves. The Bankruptcy Code provides little guidance on such a

8

question, and a court must undertake "significant interpretation" of securities law in order to resolve it. Similarly, § 546(e) uses the phrase "in connection with" when discussing securities contracts. While the Bankruptcy Code does not define "in connection with," this phrase is common, and frequently interpreted, in the securities laws, though its interpretation often varies with context. What it means in the instant context requires novel and significant interpretation of the securities law. Providing additional evidence of the difficulty of the questions raised by § 546(e), the judges of this District have arguably resolved those questions differently. Accordingly, as in Katz, the Court withdraws the reference to the bankruptcy court of the question of § 546(e)'s application.

Fifth, Blumenthal and the Goldmans argue that SIPA requires the Trustee to apply a constant dollar approach - which would take inflation into account - when calculating what he can recover as fictitious profits. In support of this proposition, however, they cite, not provisions of SIPA, but instead a brief the Securities and Exchange Commission submitted in a different part of this liquidation proceeding. A constant dollar approach admittedly would affect whether certain defendants took "for value" within the meaning of 11 U.S.C. § 548(c), but in the absence of a specific provision of SIPA or other non-bankruptcy law that even arguably commands this approach, the Court does not see any reason why the Bankruptcy Code would not control. In the absence of non-bankruptcy law requiring significant interpretation, the Court declines to withdraw on this question.

9

Sixth, Blumenthal and Hein claim that provisions of the Internal Revenue Code that effectively require withdrawals from IRAs necessarily prevent the Trustee from avoiding the required withdrawals as fraudulent. Specifically, 26 U.S.C. § 401(a)(9) requires minimum distributions from individual retirement accounts ("IRAs") beginning when the beneficiary reaches the age of 70 ½, and § 4974(a) imposes a tax of 50% on any portion of the minimum amount that the IRA fails to distribute. According to Blumenthal and Hein, the joint operation of these provisions and those permitting avoidance of fraudulent transfers creates a dilemma: the intended recipient of a fraudulent transfer from an IRA will either pay a 50% tax or face an avoidance suit. While the Trustee offers significant arguments why the alleged dilemma fails to provide a defense against a fraudulent avoidance claim, Blumenthal's and Hein's argument requires a determination of how to integrate bankruptcy and non-bankruptcy law. This integration, in turn, requires significant interpretation of the Internal Revenue Code, and the Court accordingly withdraws the reference to the bankruptcy court on this issue.

Seventh, Flinn argues that the Supreme Court's decision in <u>Stern v. Marshall</u>, 131 S. Ct. 2594 (2011), prevents the bankruptcy court from finally resolving fraudulent transfer actions because resolution of such actions requires exercise of the "judicial Power" reserved for Article III courts. To determine whether Congress may assign claims to administrative or legislative rather than Article III courts, the Supreme Court has historically examined whether claims assert public

10

or private rights. E.g., Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 51 (1989). Congress may assign actions that assert public rights — i.e., rights that are "closely integrated into a public regulatory scheme," such as rights under the Internal Revenue Code — to administrative agencies or legislative courts. Id. at 51-55 (citation omitted). Conversely, "[i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court." Id. at 54-55. In Granfinanciera, the Court held that a Trustee's right to recover a fraudulent transfer is "more accurately characterized as a private rather than a public right" because suits to avoid fraudulent transfers are "quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." Id. at 55-56.

Against this background, the Supreme Court held in Stern v. Marshall that Congress improperly vested judicial power in a non-Article III judge when it allowed bankruptcy courts "to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." 131 S. Ct. 2594, 2620 (2011). The bankruptcy court could not decide the counterclaim because the debtor in Stern had "failed to demonstrate that her counterclaim falls within one of the 'limited circumstances' covered

by the public rights exception." Id. at 2618 (quoting N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 61 n.12 (1982)). This was true even though the counterclaim was a "core" bankruptcy proceeding. Id. at 2604. The Court further noted that Granfinanciera held that actions to avoid fraudulent transfers did not assert public rights. Id. at 2614.

Flinn argues that, because actions to recover fraudulent transfers do not fall within the "public rights exception," bankruptcy courts cannot "enter a final judgment" without usurping the "judicial Power" reserved for Article III courts.[3] Resolution of this argument requires "significant interpretation" of both Article III and the Supreme Court precedent analyzing it. The answer is by no means

---

[3] The Trustee cites In re Extended Stay, Inc. for the proposition that "the question of whether the bankruptcy court has authority to enter a final judgment does not implicate the regulation of organizations or activities affecting interstate commerce." 2011 WL 5532258 at *6 (S.D.N.Y. 2011). According to Extended Care, "[a]lthough Congress could have provided for mandatory withdrawal where resolution of claims requires consideration of constitutional issues, it did not do so." Id. This argument, however, ignores the history of 28 U.S.C. § 157. "Congress enacted 28 U.S.C. § 157 in response to" the Supreme Court's holding "that Congress' broad grant of jurisdiction to the bankruptcy courts in the Bankruptcy Act of 1978 was an impermissible vesting of the judicial power of Article III courts in Article I adjuncts." In re Gaston & Snow, 173 B.R. 302, 304 (S.D.N.Y. 1994). If mandatory withdrawal protects litigants' constitutional interest in having Article III courts interpret federal statutes that implicate the regulation of interstate commerce, then it should also protect, a fortiori, litigants' interest in having the Article III courts interpret the Constitution. This conclusion follows from the Constitution, if not from 28 U.S.C. § 157 itself. Cf. N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 83-84 (1982) ("[P]rovisions [that Congress has enacted] do . . . affect the exercise of judicial power, but they are also incidental to Congress' power to define the right that it has created. No comparable justification exists, however, when the right being adjudicated is not of congressional creation."). In any event, under 28 U.S.C. § 157(d), the Court has full discretion to withdraw the reference, on its own initiative, for "cause shown," and the Court finds that the litigants' interest in having an Article III court resolve a difficult constitutional issue constitutes

obvious. For example, the Supreme Court in Stern suggested that its holding applied only narrowly to state law counterclaims and did not "meaningfully change[] the division of labor" between district and bankruptcy courts. 131 S. Ct. at 2620. Moreover, the Supreme Court's argument that the "'experts' in the federal system at resolving common law counterclaims . . . are the Article III courts" seemingly does not apply to actions to avoid fraudulent transfers. Id. at 2615. Given the difficulty of this question, the Court withdraws the reference to bankruptcy court on this issue for the purpose of determining whether final resolution of claims to avoid transfers as fraudulent requires an exercise of "judicial Power" that the bankruptcy court lacks.

It should be noted, in this regard, that even if the bankruptcy court cannot finally resolve fraudulent transfer actions, it may still have the power with respect to those actions to recommend findings of fact and conclusions of law to Article III courts. But see In re Blixseth, 2011 WL 3274042 at *12 (Bankr. D. Mont. Aug. 1, 2011) ("Unlike in non-core proceedings, a bankruptcy court has no statutory authority to render findings of fact and conclusions of law for core proceedings that it may not constitutionally hear."). Assuming arguendo that the bankruptcy court may not finally resolve fraudulent transfer actions, what powers the bankruptcy court has to recommend findings of fact and conclusions of law may determine the timing and extent of withdrawal. Thus, the Court also withdraws the reference to address whether, if the bankruptcy court cannot finally resolve the

---

adequate cause.

13

fraudulent transfer claims in Flinn, it has the authority to render findings of fact and conclusions of law before final resolution occurs.

Eighth, Greiff argues that the Trustee's fee arrangement deprives Greiff of his right to due process. According to Greiff, the Trustee retains a percentage of the fees that SIPC pays to his law firm, giving him an interest in bringing more claims. But this allegation does not raise any issues that are not familiar to bankruptcy courts called upon to assess alleged "conflicts" in the representation of parties before them. Accordingly, the Court declines to withdraw this question.

For the foregoing reasons, the Court withdraws the reference of these cases to the bankruptcy court for the limited purposes of deciding: (i) whether the Trustee may, consistent with non-bankruptcy law, avoid transfers that Madoff Securities purportedly made in order to satisfy antecedent debts; (ii) whether, in light of this Court's decision in Picard v. Katz, 11 U.S.C. § 546(e) applies, limiting the Trustee's ability to avoid transfers; (iii) whether provisions of the Internal Revenue Code that heavily tax undistributed portions of IRAs prevent the Trustee from avoiding IRA distributions that would otherwise be taxed; (iv) whether, after the United States Supreme Court's recent decision in Stern v. Marshall, 131 S. Ct. 2594 (2011), final resolution of claims to avoid transfers as fraudulent requires an exercise of "judicial Power," preventing the bankruptcy court from finally resolving such claims; and (v) whether, if the bankruptcy

14

court cannot finally resolve the fraudulent transfer claims in this case, it has the authority to render findings of fact and conclusions of law before final resolution. In all other respects, the motions to withdraw are denied. The parties in Goldman and in Hein should convene a separate conference call for each case no later than December 1, 2011 to schedule further proceedings. The parties to the other cases should abide by previous arrangements. The Clerk of the Court is hereby ordered to close document number 1 on the docket of each case.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       November 28, 2011