**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for*
*the substantively consolidated SIPA liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Estate of Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>v.<br><br>BNP PARIBAS S.A., BNP PARIBAS ARBITRAGE SNC, BNP PARIBAS BANK & TRUST (CAYMAN) LIMITED, and BNP PARIBAS SECURITIES SERVICES S.A.,<br><br>    Defendants. | Adv. Pro. No. 12-01576 (SMB) |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

LEGAL STANDARDS ........................................................................................................5

I.    General Standards on a Motion to Dismiss...........................................................5

II.    Pleading Lack of Good Faith for Subsequent Transfers Claims........................5

ARGUMENT ........................................................................................................................6

I.    The Trustee Sufficiently Alleges Willful Blindness .............................................6

    A.    Actual Knowledge Is Not the Correct Legal Standard for this Case ......................6

    B.    The Trustee Sufficiently Pleads that Defendants Suspected Fraud ........................7

        1.    BNP Paribas and BNP Securities Services Aided BLMIS in Misleading Regulators ...............................................................................8

        2.    BNP Paribas and BNP Securities Services Suspected BLMIS's Trades Were Not Valid ..................................................................................9

        3.    Defendants Knew of Indicia of Other Fraud at BLMIS ...........................13

        4.    Defendants Knew of Affiliates' Concerns that BLMIS Was a Fraud .......16

        5.    Similarly Situated Entities Suspected Fraud at BLMIS...........................17

    C.    The Trustee Adequately Alleges that Defendants Turned a Blind Eye to Madoff's Fraud ............................................................................................19

        1.    Defendants Took Deliberate Acts to Look the Other Way......................20

        2.    Defendants' Purported Diligence Is Consistent with Willful Blindness ...21

        3.    Defendants' "Economic Irrationality" Argument Fails ............................22

        3.    Dismissal in Another Proceeding Has No Relevance Here .......................25

III.    Section 546(e)'s Safe Harbor Is Inapplicable to this Adversary Proceeding....................25

IV.    Defendants Insufficiently Assert a Value Affirmative Defense ........................27

V.    The Trustee Sufficiently Pleads a Basis for Personal Jurisdiction over Defendants .........27

    A.    The Trustee Pleads Sufficient Minimum Contacts for Specific Jurisdiction.........28

1.      Defendants Purposefully Directed Activities into New York....................28

2.      BNP Cayman Purposefully Directed Activities into New York................29

3.      Other Defendants Purposefully Directed Activities into New York .........32

B.      The Underlying Cause of Action Arises Out of Defendants' Activities ...............33

C.      The Trustee Pleads Specific Minimum Contacts for General Jurisdiction............33

D.      Jurisdiction Over Defendants in this Case is Reasonable ......................................34

E.      Jurisdictional Discovery........................................................................................35

VI.     Defendants' Procedural Arguments Fail as a Matter of Law ............................................35

A.      Defendants Were Properly Served.........................................................................35

B.      The Trustee Had the Court's Permission to File the Amended Complaint ...........36

C.      The Trustee's Claims Are Timely..........................................................................37

VII.    CONCLUSION..................................................................................................................39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
   624 F. Supp. 2d 292 (S.D.N.Y. 2009) ........................................................................37, 38, 39

*Al Rushaid v. Pictet & Cie*,
   28 N.Y.3d 316 (2016) ...........................................................................................................29, 30

*Anwar v. Fairfield Greenwich Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010) ............................................................................... *passim*

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .....................................................................................................................5

*Bickerton v. Bozel S.A. (In re Bozel S.A.)*,
   434 B.R. 86 (Bankr. S.D.N.Y. 2010) .......................................................................................34

*BNP Paribas, et al. v. MBIA Inc.*,
   No. 601475-2009 (N.Y. Sup. Ct.) ............................................................................................33

*BNP Paribas v. Bank of N.Y. Tr. Co., N.A.*,
   No. 11-cv-350-PGG-HBP (S.D.N.Y.) ......................................................................................33

*BNP Paribas v. Nat'l Rest. Mgmt., Inc. (In re Nat'l Rest. Mgmt., Inc.)*,
   No. 00-cv-6624-DLC, 00-cv-6625-DLC (S.D.N.Y.) ................................................................33

*BNP Paribas v. Republic of Arg.*,
   No. 06-cv-14339-LAP (S.D.N.Y.) ............................................................................................33

*BNP Paribas v. Wayzata Opportunities Fund II, L.P. et al.*,
   No. 09-cv-5351-DLC (S.D.N.Y.) .............................................................................................33

*Boyer v. Crown Stock Distrib., Inc. (In re Crown Unlimited Mach., Inc.)*,
   Adv. Pro. No. 04-1085, 2006 WL 6401548 (Bankr. N.D. Ind. Oct. 13, 2006) ......................27

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ...................................................................................................................28

*Correspondent Servs. Corp. v. J.V.W. Invs. Ltd.*,
   120 F. Supp. 2d 401 (S.D.N.Y. 2000) ......................................................................................32

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014) .................................................................................................................28

*Doyaga v. Steamfitters' Indus. Pension Fund (In re Smith)*,
   204 B.R. 358 (Bankr. E.D.N.Y. 1997)...................................................................37

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015)....................................................................23

*Foundry, A Print Commc'ns Co. v. Trade Secret Web Printing, Inc.*,
   No. 11-cv-9553-ALC-KNF, 2012 WL 3031149 (S.D.N.Y. July 25, 2012) ...........................31

*Goel v. Bunge, Ltd.*,
   820 F.3d 554 (2d Cir. 2016).............................................................................23

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011)....................................................................................28

*Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*,
   916 F.2d 528 (9th Cir. 1990) ..........................................................................27

*Hill v. HSBC Bank plc*,
   207 F. Supp. 3d 333 (S.D.N.Y. 2016)...................................................................30

*Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Luxembourg) II SCA)*,
   524 B.R. 488 (Bankr. S.D.N.Y. 2015) ...............................................................28, 34

*In re J.P. Jeanneret Assocs., Inc.*,
   769 F. Supp. 2d 340 (S.D.N.Y. 2011)...................................................................11

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005)...................................................................14

*Licci v. Lebanese Canadian Bank, SAL*,
   20 N.Y.3d 327 (2012) ..................................................................................32

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013)............................................................................33

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)............................................................................13

*Mallis v. Bankers Tr. Co.*,
   717 F.2d 683 (2d Cir. 1983)............................................................................16

*Markowski v. SEC*,
   274 F.3d 525 (D.C. Cir. 2001) .........................................................................25

*Metzeler v. Bouchard Transp. Co. (In re Metzeler)*,
   66 B.R. 977 (Bankr. S.D.N.Y. 1986)................................................................38, 39

*Motown Record Co. v. iMesh.com, Inc.*,
　　No. 03-cv-7339-PKC, 2004 WL 503720 (S.D.N.Y. Mar. 12, 2004).......................................32

*Motrade v. Rizkozaan, Inc.*,
　　No. 95-cv-6545-DC, 1998 WL 108013 (S.D.N.Y. March 11, 1998) ......................................25

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*,
　　No. 02-cv-0767-LBS, 2002 WL 31819207 (S.D.N.Y. Oct. 10, 2002) ...................................24

*Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. Pirelli*
　　*Commc'ns Cables & Sys. USA LLC (In re 360networks (USA) Inc.)*,
　　367 B.R. 428 (Bankr. S.D.N.Y. 2007) .................................................................................39

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
　　874 F. Supp. 2d 341 (S.D.N.Y. 2012) ...................................................................................14

*In re Parmalat Sec. Litig.*,
　　501 F. Supp. 2d 560 (S.D.N.Y. 2007) ...................................................................................17

*Partell v. Fidelity Nat'l Title Ins. Servs.*,
　　No. 12-cv-376S, 2012 WL 5288754 (W.D.N.Y. Oct. 24, 2012)............................................36

*Patel v. L-3 Commc'ns Holdings Inc.*,
　　No. 14-cv-6038-VEC, 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016).............................13, 17

*Picard v. Avellino (In re BLMIS)*,
　　557 B.R. 89 (Bankr. S.D.N.Y. 2016) ......................................................................................6

*Picard v. Bureau of Labor Ins. (SIPC v. BLMIS)*,
　　480 B.R. 501 (Bankr. S.D.N.Y. 2012) ..............................................................................31, 32

*Picard v. Bureau of Labor Ins. (SIPC v. BLMIS)*,
　　Adv. Pro. No. 11-2732 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22,
　　2016) ..................................................................................................................................1, 36

*Picard v. Ceretti (In re BLMIS)*,
　　Adv. Pro. No. 09-1161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11,
　　2015) .......................................................................................................................... *passim*

*Picard v. Chais (In re BLMIS)*,
　　440 B.R. 274 (Bankr. S.D.N.Y. 2010) .................................................................................31

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
　　418 B.R. 75 (Bankr. S.D.N.Y. 2009)................................................................................33, 34

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
　　454 B.R. 317 (Bankr. S.D.N.Y. 2011) .............................................................................17, 38

*Picard v. Estate of Mendelow (In re BLMIS)*,
    560 B.R. 208 (Bankr. S.D.N.Y. 2016) ......................................................................13, 17, 37

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011) ..................................................................................................7

*Picard v. Legacy Capital Ltd. (In re BLMIS)*,
    548 B.R. 13 (Bankr. S.D.N.Y. 2016) ............................................................................ *passim*

*Picard v. Maxam Absolute Return Fund, L.P. (SIPC v. BLMIS)*,
    460 B.R. 106 (Bankr. S.D.N.Y. 2011) ...................................................................................35

*Picard v. Merkin (In re BLMIS)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ........................................................................... *passim*

*Picard v. Peter Madoff (In re BLMIS)*,
    468 B.R. 620 (Bankr. S.D.N.Y. 2012) ...........................................................................37, 38

*Roe v. Arnold*,
    502 F. Supp. 2d 346 (E.D.N.Y. 2007) ...................................................................................31

*In re S. African Apartheid Litig.*,
    643 F. Supp. 2d 423 (S.D.N.Y. 2009) ....................................................................................35

*S. New Eng. Tel. Co. v. Glob. NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010) ............................................................................................27, 28

*Sayles v. Pac. Eng'g & Constructors, Ltd.*,
    No. 08-cv-676S, 2012 WL 895944 (W.D.N.Y. Mar. 15, 2012) ............................................35

*SEC v. Dunn*,
    587 F. Supp. 2d 486 (S.D.N.Y. 2008) ....................................................................................23

*SEC v. George*,
    426 F.3d 786 (6th Cir. 2005) .................................................................................................25

*SIPC v. BLMIS (In re Madoff Sec.)*,
    516 B.R. 18 (S.D.N.Y. 2014) ...................................................................................................5

*Sullivan v. Barclays PLC*,
    No. 13-cv-2811-PKC, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ......................................23

*U.S. Lines, Inc.* v. *GAC Marine Fuels Ltd. (In re McLean Indus. Inc.)*,
    68 B.R. 690 (Bankr. S.D.N.Y. 1986) .....................................................................................34

*Weisel Partners LLC v. BNP Paribas*,
    No. C 07-6198 MHP, 2008 WL 3977887 (N.D. Cal. Aug. 26, 2008) ....................................33

*Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*,
    389 B.R. 721 (9th Cir. B.A.P. 2008)......................................................................26

**Statutes**

11 U.S.C. § 101 ...............................................................................................................27

11 U.S.C. § 544 ...............................................................................................................26

11 U.S.C. § 545 ...............................................................................................................26

11 U.S.C. § 546(e) ..........................................................................................................26

11 U.S.C. § 547 ...............................................................................................................26

11 U.S.C. § 548(a)(1)(A) ................................................................................................26

11 U.S.C. § 548(a)(1)(B) ................................................................................................26

11 U.S.C. § 548(b) ..........................................................................................................26

11 U.S.C. § 548(c) ........................................................................................................5, 6

11 U.S.C. § 550 ............................................................................................................6, 26

11 U.S.C. § 550(a) ............................................................................................................5

11 U.S.C. § 550(a)(2) ......................................................................................................26

11 U.S.C. § 550(b) ..............................................................................................5, 6, 7, 27

11 U.S.C. § 550(b)(1) ..................................................................................................5, 27

15 U.S.C. §§ 78aaa *et seq.* ..............................................................................................1

**Rules**

Fed. R. Bankr. P. 7015 ....................................................................................................37

Fed. R. Civ. P. 8 ...............................................................................................................5

Fed. R. Civ. P. 8(a) ..........................................................................................................5

Fed. R. Civ. P. 8(a)(2) ......................................................................................................5

Fed. R. Civ. P. 9 ..........................................................................................................5, 18

Fed. R. Civ. P. 9(b) ..........................................................................................................5

Fed. R. Civ. P. 12 .............................................................................................................5

Fed. R. Civ. P. 15 ..................................................................................................................37, 38

Fed. R. Civ. P. 15(c)(1) ..............................................................................................................37

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff ("Madoff"), by and through the Trustee's undersigned counsel, respectfully submits this memorandum of law in opposition to the motion ("Motion") brought by defendants BNP Paribas S.A. ("BNP Paribas"), BNP Paribas Arbitrage SNC ("BNP Arbitrage"), BNP Paribas Securities Services S.A. ("BNP Securities Services"), and BNP Paribas Bank and Trust (Cayman) Limited ("BNP Cayman") (collectively, "Defendants") to dismiss the Trustee's amended complaint ("Complaint") seeking recovery of subsequent transfers made from Ascot Partners, L.P. ("Ascot") and funds managed by Tremont Group Holdings, Inc. ("Tremont").[1]

## PRELIMINARY STATEMENT

In 2003, Defendants used BLMIS as a means to enter the lucrative business of structured finance. In the years following, Defendants engaged in excess of one billion dollars in transactions with over a dozen BLMIS Feeder Funds,[2] exploiting Madoff's fictional performance, and creating an entire business around the market for BLMIS-related deals. This Complaint seeks to recover $156 million in subsequent transfers that were received by Defendants from Tremont and Ascot as part of that business.[3] The Complaint sets forth specific

---

[1] These include Rye Select Broad Market Portfolio Limited, Rye Select Broad Market Insurance Portfolio LDC, Rye Select Broad Market XL Fund LP, and Rye Select Broad Market XL Portfolio.

[2] As used herein, a "BLMIS Feeder Fund" is a fund with a principal or primary purpose of investing all or nearly all of its assets with BLMIS, including Ascot and Tremont, Oreades SICAV ("Oreades"), Equity Trading Portfolio Limited ("Equity Trading"), Fairfield Sentry Limited ("Fairfield Sentry"), Groupement Financier Ltd., Harley International (Cayman) Limited ("Harley"), Kingate Euro Fund Ltd., Kingate Global Fund Ltd. (the two together, "Kingate"), Legacy Capital Ltd. ("Legacy Capital"), and Luxalpha SICAV.

[3] Defendants in fact received in excess of $1.3 billion in transfers; however, the Court dismissed transfers from Harley, Fairfield Sentry, and Kingate on comity grounds. *See Picard v. Bureau of Labor Ins. (SIPC v. BLMIS)*, Adv. Pro. No. 11-2732 (SMB), 2016 WL 6900689, at *15-16 (Bankr. S.D.N.Y. Nov. 22, 2016) ("*Comity Decision*"). The Trustee is appealing that issue. *See* Compl. at 4 n.1.

allegations that describe a banking conglomerate that deliberately turned a blind eye to Madoff's fraud in order to build a global structured-finance enterprise.

The Complaint first alleges how Defendants BNP Paribas and BNP Securities Services helped Madoff avoid regulatory scrutiny during their operation of Oreades, the BLMIS Feeder Fund created by BNP Paribas and purportedly serviced by BNP Securities Services. These two Defendants misled investors and regulators by entering into secret agreements to delegate Oreades's custodial and advisory responsibilities to BLMIS. Compl. ¶¶ 97-112. In 2003, BNP Paribas and BNP Securities Services developed suspicions about Madoff's legitimacy, and BNP Paribas commissioned an internal review of Oreades. *Id.* ¶ 113. The resulting audit and compliance report evidenced indicia of fraud at BLMIS, including the lack of segregated accounts, concerns regarding the custody of client assets, inexplicably outdated modes of posting "trades," and the fact that the bank had "no opportunity to consider the true validity of the orders" on which BLMIS's improbable returns were based. *Id.* ¶¶ 113-17, 241-253. BNP Paribas and BNP Securities Services attempted to alleviate their concerns by asking Madoff for real-time access to trade confirmations and by seeking Madoff's permission to disclose to government regulators BLMIS's role as investment advisor and custodian. *Id.* ¶¶ 119-21. Madoff refused their requests without explanation. *Id.* Based on the substantial liability faced as a fiduciary to Oreades investors, and in light of possible fraud, BNP Paribas shut down Oreades. *Id.* ¶¶ 118-25.

The closure of Oreades marked a change in Defendants' relationship with BLMIS, but not its end. Defendants devised a new bank-wide business strategy to profit from BLMIS in a different, more shielded, and more substantial way. *Id.* ¶¶ 138-40. For the next five years, Defendants worked together to create, market, and service a new leverage business based on

BLMIS-tied credit facilities and structured products, which funneled billions of dollars into BLMIS. *Id.* ¶¶ 139, 147-51. BNP Paribas directed and oversaw the operation through various committees and its Group Risk Management department. *Id.* ¶¶ 4, 62-67, 75-83. BNP Paribas was also the managing director of its subsidiary Defendant BNP Arbitrage, which serviced the credit facilities and acted as the calculation or collateral agent for leverage-related transactions. *Id.* ¶¶ 53, 67-68. Defendant BNP Securities Services was the administrator for BNP Paribas's leverage clients. *Id.* ¶¶ 69-71. Defendant BNP Cayman sold structured products to BLMIS Feeder Funds, purchased subscriptions in and redeemed shares from BLMIS Feeder Funds, and facilitated relevant fund transfers for itself and BNP Paribas clients, as directed by BNP Paribas. *Id.* ¶¶ 60, 71, 222-23, 233.

As part of their BLMIS-related business, each Defendant recognized compelling signs of fraud at BLMIS but deliberately avoided confronting their suspicions in order to continue to build their leverage business. *Id.* ¶¶ 7-9, 165-179. Defendants, among other things, deviated from their own best practices and procedures by: (i) directing their diligence team not to perform standard reviews when it came to Madoff, BLMIS, or BLMIS Feeder Funds; (ii) eliminating the team's ability to recommend, reject, or veto proposed BLMIS-related transactions; (iii) removing their internal prohibition against single-manager transactions for BLMIS transactions, and (iv) rubber-stamping credit facilities and structured products with BLMIS Feeder Funds. *Id.* By indiscriminately pursuing BLMIS-related transactions in this way, Defendants ultimately received over one billion dollars from BLMIS Feeder Funds, received tens of millions of dollars in related fees, and, most critically, established their place as global leader in the fund derivatives market. *Id.* ¶¶ 12, 64, 151, 340

3

In their Motion, Defendants fail to confront the Trustee's allegations directly.  Instead, they use incorrect legal standards to argue that the Complaint's "narrative" is implausible. Defendants repeatedly assert that the Trustee failed to establish that they "actually knew that BLMIS was running a Ponzi scheme," despite the fact that, because this is a recovery action for subsequent transfers only, the actual knowledge standard does not apply.  When Defendants do acknowledge the willful blindness standard, which does apply, they erroneously posit that it can only be met if the Trustee pleads that Defendants believed there was a high probability that Madoff was specifically running a Ponzi scheme.  Not so.  This Court and others have repeatedly held that willful blindness is pleaded by alleging Defendants' belief in a probability of fraud generally, coupled with deliberate actions taken to avoid confronting that belief.

Defendants' jurisdictional and procedural arguments also fail.  This Court has personal jurisdiction over each Defendant because of their contacts with the United States.  Defendants' entire BLMIS-related leverage business was based in New York, where three of the four Defendants had offices and employees.  Defendants were properly served, as they explicitly acknowledged in two stipulations filed with the Court.  The Complaint was properly filed pursuant to this Court's November 2016 decision, which granted leave to amend.  The Trustee's claims are timely, because all claims relate back to the same occurrences and transactions set forth in the original pleading.

For these reasons, and those set forth below, the Trustee respectfully requests that the Motion be denied.

## LEGAL STANDARDS

### I.    General Standards on a Motion to Dismiss

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a motion to dismiss under Rule 12 of the Federal Rules of Civil Procedure, the court must liberally construe all claims in the complaint, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor.[4] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *see also Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 137 (Bankr. S.D.N.Y. 2014) ("[T]he court should give all 'well-pleaded factual allegations' an assumption of veracity and determine whether, together, they plausibly give rise to an entitlement of relief.") (quoting *Iqbal*, 556 U.S. at 679).

### II.    Pleading Lack of Good Faith for Subsequent Transfers Claims

Section 550(a) provides that the Trustee may recover, for the benefit of the estate, subsequent transfers of avoidable property. 11 U.S.C. § 550(a). Section 550(b) carves out an exception to Section 550(a), precluding recovery of transfers when the transferee takes "for value" and "in good faith." 11 U.S.C. § 550(b)(1). Although normally an affirmative defense, the district court has held that the Trustee must allege a lack of good faith at the pleading stage. *See SIPC v. BLMIS (In re Madoff Sec.)*, 516 B.R. 18, 24 (S.D.N.Y. 2014). To meet this requirement, the Trustee must allege that Defendants willfully blinded themselves to a high probability of fraud at BLMIS. *See Legacy*, 548 B.R. at 38 ("The District Court equated lack of good faith under Bankruptcy Code § 548(c) with willful blindness, and stated that the same

---

[4] Defendants' invocation of Rule 9 of the Federal Rules of Civil Procedure, (*see, e.g.,* Def. Br. at 15, 27), and its heightened pleading standards is misplaced because the Trustee is seeking recovery of subsequent transfers only. *See Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 35-36 (Bankr. S.D.N.Y. 2016) ("Rule 9(b) . . . governs the portion of a claim to avoid an initial intentional fraudulent transfer, but Rule 8(a) governs the portion of a claim to recover the subsequent transfer.") (internal citations omitted).

standard applies to non-investors as well as investors under sections 548(c) *and 550(b)*.")
(emphasis added, internal citation omitted).   To plead willful blindness, the Trustee must allege
that (1) Defendants possessed "strong suspicion but *some* level of doubt or uncertainty of the
existence" of fraud at BLMIS, and (2) they deliberately acted in a manner to avoid confronting
their doubts.  *Merkin*, 515 B.R. at 139-40 (emphasis in original).

## ARGUMENT

## I.    <u>The Trustee Sufficiently Alleges Willful Blindness</u>

### A.    **Actual Knowledge Is Not the Correct Legal Standard for this Case**

Defendants' Motion reflects fundamental confusion about the applicable legal standards
in this matter.  Defendants repeatedly argue that the Complaint should be dismissed because the
Trustee did not plead that Defendants "actually knew" BLMIS was a Ponzi scheme.  *See, e.g.,*
Def. Br. at 15 (asserting that the Trustee "must advance specific, particularized allegations
showing that *each* BNPP Defendant had 'direct and clear knowledge' of Madoff's Ponzi
scheme") (emphasis in original); *id.* at 2, 14, 16 (same).   <u>This is the incorrect legal standard</u>.
Because the Complaint seeks to recover subsequent transfers under Section 550, the Trustee need
only plead that Defendants were willfully blind to fraud in order to state a claim for relief.  *See,
e.g., Picard v. Avellino (In re BLMIS),* 557 B.R. 89, 125-26 (Bankr. S.D.N.Y. 2016) (actual
knowledge standard applies only to avoidance of initial transfers outside the two year period).

Even when Defendants reference the willful blindness standard, they conflate it with
actual knowledge and assert that the first prong of willful blindness is met only if the Trustee
alleges facts that each Defendant "subjectively believed that there was a high probability *that
Madoff was operating a Ponzi scheme or otherwise not engaged in securities trading*."  Def. Br.
at 16 (citing and quoting *Legacy*, 548 B.R. at 29) (quotation marks and brackets omitted,
emphasis added).   <u>This is also the incorrect legal standard.</u>

Willful blindness simply requires suspicions of "fraud," not belief of an actual Ponzi scheme. This Court's decision in *Legacy*, which Defendants misleadingly misquote, provides as such. *Compare* Def. Br., *supra*, at 16, *with Legacy*, 548 B.R. at 29 (the first prong of willful blindness is met when the Trustee pleads that the defendant "'subjectively believe[s] that there is a high probability that a fact exists' . . . . 'a high probability *of fraud*'") (emphasis added). *See also id.*, 548 B.R. at 38 (defense under Section 550(b) overcome when "a transferee possesses knowledge of facts that *suggest* a transfer *may* be fraudulent") (emphasis added, internal quotation omitted). In *Legacy*, this Court found that the first prong of willful blindness was met, notwithstanding the Court's finding that defendants thought Madoff may have been trading securities. *See Legacy*, 548 B.R. at 31 (noting that defendants suspected that Madoff was "cherry picking," which would have involved actual trading); *see also Picard v. Katz*, 462 B.R. 447, 454-55 (S.D.N.Y. 2011) (willful blindness sufficiently pleaded where the Trustee alleged that "the defendants willfully blinded themselves to the fact that Madoff Securities was involved in some kind of fraud" rather than that "the defendants knowingly invested in a Ponzi scheme").

## B.    The Trustee Sufficiently Pleads that Defendants Suspected Fraud

The Trustee's allegations, taken together, establish the first prong of willful blindness – that each Defendant suspected fraud at BLMIS. The Trustee alleges that beginning in 2003, BNP Paribas and BNP Securities Services conducted an internal inquiry and audit of Oreades that indicated fraud at BLMIS. Compl. ¶¶ 113-17. Later, each Defendant separately knew of facts that further indicated fraud at BLMIS through its review of countless account statements and trade confirmations, and meetings and communications with one another pursuant to their interwoven roles in their BLMIS-related leverage business. *Id.* ¶¶ 63-83, 219-339.

7

1.    **BNP Paribas and BNP Securities Services Aided BLMIS in Misleading Regulators**

During the seven years of operating Oreades, BNP Paribas and BNP Securities Services repeatedly acquiesced to Madoff's unlawful demands for secrecy. *Id.* ¶¶ 97-126. Madoff insisted that BNP Paribas and BNP Securities Services not disclose BLMIS's role as Oreades's custodian and investment manager. *Id*. ¶¶ 97-119. To appease him, these Defendants knowingly misled regulators, made secret agreements with BLMIS to delegate custodial and advisory responsibilities, and refused to make accurate disclosures. *Id.* ¶¶ 97-112. In 2003, BNP Paribas and BNP Securities Services admitted that their actions in misleading regulators about BLMIS were "unconscionable." *Id.* ¶ 118. They subsequently asked Madoff for permission to comply with the law, but he refused. *Id.* ¶ 119. BNP Paribas and BNP Securities Services knew that these practices and Madoff's demands indicated fraud. *Id.* ¶¶ 113-14, 123, 126. They understood Madoff's refusal stemmed from his desire to avoid regulatory scrutiny in the United States, particularly because he did not want to register BLMIS as an "investment adviser" with the U.S. Securities and Exchange Commission ("SEC"). *Id.* ¶¶ 112, 118-19. They also understood that by not registering BLMIS as an investment adviser, Madoff could hide the true nature of BLMIS's investment advisory business ("IA Business") from the SEC and other regulators. *Id.* ¶ 119.

In their Motion, Defendants' fail to address these allegations, that standing alone (which they do not) state a claim for relief. *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 406-11 (S.D.N.Y. 2010). In *Anwar*, a securities class action involving one of the largest BLMIS Feeder Funds, plaintiffs alleged that certain defendants knowingly misled the SEC about the IA Business at Madoff's behest. *Id.* at 408. The district court there found those allegations stated "deliberately illegal behavior" and, therefore, plaintiffs had pleaded scienter. *Id.* at 408-

8

09; *see also id.* at 443 (finding willful blindness due in part to defendants' knowledge of Madoff's lack of transparency into his operations); *Merkin*, 515 B.R. at 144-45 (allegations akin to scienter under the federal securities laws are sufficient to establish the first prong of willful blindness); *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-1161 (SMB), 2015 WL 4734749, at *14-15 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*") (denying motion to dismiss where the Trustee alleged that defendants shielded Madoff and BLMIS from public scrutiny).

### 2. BNP Paribas and BNP Securities Services Suspected BLMIS's Trades Were Not Valid

BNP Paribas and BNP Securities Services also suspected fraud because they knew that BLMIS's trades were unverifiable and therefore not "valid[]." Compl. ¶¶ 114, 121, 253. After years of exploiting BLMIS's returns, BNP Paribas's Group Risk Management department conducted an internal review of Oreades, and drafted an audit and compliance report (the "Report") detailing facts that gave rise to serious concerns about Madoff's legitimacy. *Id.* ¶ 113. The Report was reviewed by BNP Paribas and BNP Securities Services. *Id.* ¶¶ 113-23. The Report described how BLMIS reported trades on a seven-day delay, meaning that there was "no opportunity to consider the true validity of the orders" that BLMIS purported to execute on Oreades's behalf. *Id.* ¶ 114. BLMIS's practice of sending paper confirmations was outdated and contrary to the standard industry practice of the time, which was to send confirmation on the same day the trade occurred. *Id.* One BNP Securities Services executive commented that "it would seem that B. Madoff does not ever want to improve its order transmission methods." *Id.*

The Report also confirmed that there was no independent verification of BLMIS's trades because the IA Business was not audited (unlike BLMIS's broker/dealer business), was completely unregulated, and Madoff offered no transparency into it. *Id.* ¶¶ 114-16. There were questions as to how BLMIS could even maintain custody over the securities it purported to trade.

9

*Id.* ¶ 117 ("Bernard Madoff is not a bank and I would therefore like to know where the US Treasury Bills held in the Oreades USD and EUR portfolios are held. The same thing for the futures positions, who is the clearing broker used and in what establishment are the contracts recorded?"). After reading the Report, BNP Securities Services executive Mr. Lionel Trouvain explained that, because BNP Paribas was a fiduciary to Oreades investors, BNP Paribas bore the risk of potential fraud at BLMIS and "the risk [to] BNP Paribas is very extensive." *Id.* ¶ 113; *see also id.* ¶ 116 ("if there is a management problem with [BLMIS], the entire responsibility for management would lie . . . in the last resort, with the promoter, *namely BNP Paribas*") (emphasis added). After the Report was issued, BNP Paribas and BNP Securities Services executives met and decided to ask Madoff to allow them to disclose BLMIS's roles to the relevant regulatory authorities or, at the very least, give BNP Paribas access to the IA Business's operations so that trades could be confirmed by their compliance team. *Id.* ¶¶ 118-21. Madoff refused. *Id.* Due to these known fraud concerns, and potential liability as a fiduciary to Oreades's investors, BNP Paribas closed Oreades. *Id.* ¶¶ 125-26.

This Court has credited similar allegations in related adversary proceedings. In *Merkin,* this Court held that the Trustee sufficiently alleged willful blindness by alleging that defendants had real-time concerns that "BLMIS cleared its own trades and did not use a third party custodian." 515 B.R. at 141. Likewise, in *Legacy,* this Court held that the Trustee sufficiently alleged the first prong of willful blindness based, in part, on the defendants' real-time "suspicions regarding how Madoff did what he said he did" and BLMIS's lack of "monitoring by regulators/auditors." 548 B.R. at 29-31, 35. In *Kingate,* this Court found scienter was adequately alleged where the Trustee pleaded that they knew that BLMIS was reporting impossible transactions and took steps to prevent any inquiry. 2015 WL 4734749, at *15.

Similarly, in *In re J.P. Jeanneret Assocs., Inc.*, the court denied a motion to dismiss various securities fraud claims, holding that plaintiffs adequately alleged scienter based, in part, on allegations that the defendants understood that "Madoff's rules" prevented adequate due diligence on BLMIS. 769 F. Supp. 2d 340, 366 (S.D.N.Y. 2011). The same result should follow here.

The Trustee's allegations about BNP Paribas's audit of Oreades, the review of the Report by BNP Paribas and BNP Securities Services, and the discussion and measures taken in response thereto, establish these Defendants' belief that there was a high probability that fraud existed at BLMIS. *Id.* ¶ 123. Nevertheless, Defendants argue that these allegations detailing suspicions of fraud actually support their Motion. Their argument centers around the following excerpt from one of Mr. Trouvain's emails:

> It would be appropriate to put this type of order transmission in place between us and B. Madoff because in current practice, we have no opportunity to consider the true validity of the orders. As Broker/Dealer, B. Madoff was audited and it seems that everything is correctly posted but since there is no B. Madoff management company, it is surely very difficult for the auditors to verify that all the deals carried out on behalf of the clients of B. Madoff are correctly indexed to these same clients. This is a point that our risk and ethics departments found during their internal audit and I have to contribute a source of improvement.

Def. Br. at 22 (emphasis removed).

Relying on an actual knowledge standard, Defendants assert that the above excerpt "make[s] plain that [Defendants] took [it] as a given that BLMIS was trading securities." Def. Br. at 21-22. First, this self-serving characterization asks the Court to inappropriately weigh evidence at the motion to dismiss stage. *See Anwar*, 728 F. Supp. 2d at 403 ("The task of the court in ruling on a motion to dismiss is to 'assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"). Second, Defendants' theory is undermined by the fact that BNP Paribas and BNP Securities Services

11

closed and liquidated Oreades after the Report was issued – even though Oreades was significantly outperforming the bear market of the early 2000's. *See* Compl. ¶¶ 125, 277-78.

Third, Defendants' interpretation contradicts the excerpt's plain language, and is hardly the most compelling inference. The excerpt makes clear that Mr. Trouvain, the Group Risk Management department, BNP Paribas, and BNP Securities Services recognized that the audit of BLMIS covered only its broker/dealer operations. Def. Br. at 22 ("As Broker/Dealer, B. Madoff was audited . . ."). The excerpt also makes clear that BNP Paribas and BNP Securities Services recognized that the audit did not cover BLMIS's IA Business, which concerned them because Oreades was investing with the IA Business, not the broker/dealer side of BLMIS. *See also* Compl. ¶¶ 32, 36, 87, 97 (explaining Defendants' involvement with and knowledge about the IA Business). This is significant because it shows that BNP Paribas and BNP Securities Services recognized that no reputable third party was independently reviewing the IA Business's operations to, among other things, verify the existence of the assets. At the very least, the excerpt makes plain that BNP Paribas and BNP Securities Services knew that Madoff's trading on behalf of Oreades was unverifiable, which deepened their suspicions of fraud at BLMIS. These suspicions provide an adequate basis for this Court's finding of willful blindness. *Merkin*, 515 B.R. at 140-41 (finding willful blindness where defendant had suspicions that "something was not right with BLMIS," but not that BLMIS was a Ponzi scheme).

Defendants' further argument that the concerns of a senior executive at BNP Securities Services cannot be "attributed" to any Defendant is baseless. Def. Br. at 23. For one, BNP Paribas and BNP Securities Services knew and understood these fraud risks directly. The Report was drafted by BNP Paribas, shared with BNP Securities Services, and discussed at their subsequent meetings. Compl. ¶¶ 113, 118-23. Furthermore, Mr. Trouvain was a senior

12

executive at BNP Securities Services (*id.* ¶ 113); his suspicions are imputed to BNP Securities

Services as a matter of law. *See, e.g., Picard v. Estate of Mendelow (In re BLMIS)*, 560 B.R.

208, 228-29 (Bankr. S.D.N.Y. 2016) (imputing knowledge of a corporate officer to the

corporation); *Patel v. L-3 Commc'ns Holdings Inc.*, No. 14-cv-6038-VEC, 2016 WL 1629325, at

*12-15 (S.D.N.Y. Apr. 21, 2016) (same).

### 3.    Defendants Knew of Indicia of Other Fraud at BLMIS

The Trustee also sets forth detailed allegations that each Defendant was aware of specific

indicia of fraud at BLMIS through its daily business operations, including contemporaneous

reviews of BLMIS Feeder Fund account statements and trade confirmations, and meetings and

communications with one another about their BLMIS-related leverage business.

The Trustee alleges how from 2003 through 2008, Defendants routinely worked

collectively to create, market, and service credit facilities and structured products that allowed

clients to earn multiples on their BLMIS-related investments.[5]    Compl. ¶¶ 4-6, 61-83.

Defendants collectively operated two business groups – the Fund Derivatives Group and the

Securities Services Group – that enabled BNP Paribas to become the premier leverage provider

for BLMIS Feeder Funds and their investors.    *Id.*   A principal member of the Fund Derivatives

Group was BNP Arbitrage, a wholly owned subsidiary of BNP Paribas for which BNP Paribas

was also managing director.    *Id.* ¶¶ 53, 66.   As managing director, BNP Paribas directly shared

knowledge with BNP Arbitrage, and its knowledge is imputed to BNP Arbitrage as a matter of

law.  *See, e.g.,  Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78

(2d Cir. 2015) (scienter was adequately pleaded against corporate defendant whose managing

---

[5] For example, the Trustee details one particular deal in 2004 in which BNP Paribas, the Fund Derivatives Group, and BNP Securities Services (where Mr. Trouvain, who had flagged probable fraud at BLMIS after reviewing the Oreades Report, continued to serve as a senior executive) worked together on a credit facility with a BLMIS Feeder Fund that they green-lit despite known signs of fraud.  Compl. ¶¶ 180-89.

director knew or should have known that omitting certain information from offering documents would be misleading); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority."); *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (attributing managing director's knowledge that certain transactions were not bona fide to corporate defendant).    BNP Arbitrage managed the credit facilities and served as the calculation or collateral agent for billions of dollars of leverage-related transactions.    Compl.    ¶¶ 67-68, 183-85, 192, 195-99.

The Securities Services Group included both BNP Securities Services and BNP Cayman, both wholly owned by BNP Paribas.    *Id.* ¶¶ 63, 69-71. BNP Securities Services acted as administrator for BNP Paribas's leverage clients.    *Id.* ¶¶ 69-71.    BNP Cayman sold the structured products to BLMIS Feeder Funds, attended meetings with the other Defendants to review and approve transactions, and facilitated fund transfers.    *Id.* ¶¶ 63, 71, 222-23, 233.

Each group was responsible for monitoring and managing investment risk for the bank's credit facilities and structured products.    *Id.* ¶ 82.    BNP Paribas directed and oversaw the enterprise through various internal committees and its Group Risk Management department.    *Id.* ¶¶ 75-83.    The Fund Derivatives Group and Securities Services Group were required to meet with the Group Risk Management department to review and approve proposed transactions.    *Id.* ¶¶ 82, 83.

The Trustee alleges Defendants' awareness of quantitative indicia of fraud concerning BLMIS.    Defendants received and reviewed account statements and trade confirmations for at least fifteen different BLMIS accounts from which they received transfers.    *Id.* ¶¶ 10, 169, 186, 197, 216, 223, 229.    Through their review, Defendants (composed of highly sophisticated

14

financial professionals) knew that: (i) Madoff's split strike trading strategy ("SSC Strategy") could not yield the results reported on BLMIS account statements; (ii) BLMIS purported to execute trades outside the daily price range; (iii) BLMIS's volume of assets under management was too large to execute the SSC Strategy; (iv) BLMIS misreported investment accounts and assets under management; (v) the timing of BLMIS's purported trades was impossible; (vi) BLMIS's account statements reflected impossible option trading volumes; (vii) BLMIS's purported over-the-counter trades were impossible; (viii) BLMIS deviated from the SSC Strategy; (ix) BLMIS reported settlement anomalies in option transactions; and (x) the dividend activity shown on account statements was impossible. *Id.* ¶¶ 267-339.

The Trustee also alleges Defendants' awareness of qualitative indicia of fraud concerning BLMIS. Each Defendant knew that BLMIS simultaneously acted as investment adviser and custodian, which Defendants recognized as a hallmark of fraud. *Id.* ¶¶ 241-45. Each knew that even though BLMIS purported to manage BLMIS Feeder Funds, Madoff inexplicably allowed others to collect the hundreds of millions of dollars that BLMIS could have collected as performance and management fees. *Id.* ¶¶ 258-60. Each knew that BLMIS's auditor was a three-person accounting firm in a Long Island strip-mall and was unqualified and incapable of performing the required domestic and international functions for BLMIS. *Id.* ¶¶ 254-57.

Defendants argue that these allegations are insufficient to state a claim for relief. Def. Br. at 26. This Court has held otherwise. In *Merkin*, this Court found that the Trustee's allegations of numerous "red flags" that defendants "saw . . . understood . . . and purposely ignored" established willful blindness to BLMIS's fraud. 515 B.R. at 144. As in this case, the Trustee alleged that defendants were aware "that the volume of options transactions that Madoff reported [was] impossible and exceeded the total volume of option trades in the market." *Id.* at 141. The

Trustee alleged that the defendants "knew that BLMIS' returns were too good to be true and lacked any correlation to the performance of the S&P 500." *Id.* The Trustee alleged that defendants knew that "BLMIS used an unusual fee structure," that "BLMIS cleared its own trades and did not use a third party custodian," and that Madoff "refused to answer" diligence-related questions. *Id.*

Like Defendants do now, the *Merkin* defendants argued that these "red flag" allegations can never establish culpability. *Id.* at 143-44. This Court rejected that argument, and held that such allegations <u>are</u> sufficient so long as they allege real-time awareness of facts, as opposed to fraud by hindsight. *Id.* at 144-45; *see also Legacy*, 548 B.R. 33, 35 (finding first prong of willful blindness sufficiently pleaded due to Trustee's allegations of defendants' awareness of red flags). Similarly, in *Kingate*, the Court specifically relied on allegations of known red flags to find that the Trustee adequately pleaded defendants' actual knowledge that BLMIS was a fraud. 2015 WL 4734749, at *14-15; *see also Anwar*, 728 F. Supp. 2d at 408-411 (scienter adequately pleaded in complaint that alleged defendants had access to and reviewed BLMIS trade confirmations and other documents reflecting trading impossibilities and other indicia of fraud).

### 4.    Defendants Knew of Affiliates' Concerns that BLMIS Was a Fraud

Defendants knew of at least two other BNP Paribas-affiliated entities that openly suspected fraud at BLMIS. The Trustee has set forth sufficient allegations to attribute the knowledge of these affiliates to Defendants. *See Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 689 n.9 (2d Cir. 1983) ("It is a basic tenet of the law of agency that knowledge of an agent, or for that matter a partner or joint venturer, is imputed to the principal.").

Fauchier Partners ("Fauchier") was a fund of funds manager that operated an investment joint venture with BNP Paribas between 2004 and 2008. Compl. ¶ 131. Fauchier suspected that BLMIS was a fraudulent operation long before Madoff's arrest and had blacklisted BLMIS-

related investments because BLMIS was not "legitimate." *Id.* ¶¶ 133-36. Fauchier explained

that it was nonsensical for BLMIS to leave billions of dollars of management fees on the table,

and that it knew that BLMIS's IA Business managed more than the 23 investment accounts

BLMIS reported to the SEC. *Id.* After BLMIS's fraud became public, Fauchier's head of

research stated that Fauchier and other "experienced people" had long suspected Madoff of fraud

– BLMIS's reported performance "was too good to be true." *Id.* ¶ 137. Defendants' contention

that Fauchier's suspicions about BLMIS cannot be imputed to BNP Paribas, (Def. Br. at 27), is

wrong. *See, e.g., In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 590 (S.D.N.Y. 2007)

("Knowledge of a joint adventurer is imputed to its co-adventurers."). Moreover, the Trustee is

entitled to the reasonable inference that Fauchier communicated its suspicions of fraud directly

to BNP Paribas, given their joint venture. *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R.

317, 328, 342 (Bankr. S.D.N.Y. 2011) ("*Cohmad II*") (recognizing that plaintiff is entitled to "all

reasonable inferences" on a motion to dismiss and denying motion to dismiss because the

Trustee pleaded "valid *prima facie* claims").

Similarly, a senior executive at BNP Paribas who ran BNP Paribas's Private Wealth

Group from 2000 to 2006, Mr. Paolo Gianferrara, "hate[d]" and "always had a problem with

Madoff." Comp. ¶¶ 128. BNP Paribas's Private Wealth Group effectively blacklisted BLMIS-

related products. *Id*. ¶ 129. As a BNP Paribas senior executive at all relevant times, (*id.* ¶ 128),

Mr. Gianferrara's suspicions of fraud can be imputed to BNP Paribas at the pleading stage. *See*

*Mendelow*, 560 B.R. at 228-29 ("[T]he knowledge of a corporate officer will be imputed to the

corporation."); *Patel*, 2016 WL 1629325, at *14-15 (same).

### 5.    Similarly Situated Entities Suspected Fraud at BLMIS

Allegations that Defendants suspected fraud at BLMIS are buttressed by the fact that

entities similarly situated to Defendants, with access to the same information, also had the same

suspicions. The Trustee alleges how, in 2003, BNP Paribas purchased the assets of a New York-based leverage business unit Zurich Capital Markets, Inc. ("ZCM"), in order to gain entry into the structured-products market from which it had been excluded. Compl. ¶¶ 141-51, 163-64. The purchase included a multi-million dollar credit facility tied to a BLMIS Feeder Fund, Harley. *Id.* ¶ 143. Rival banks passed on the ZCM sale specifically because of the fraud risk that BLMIS posed. For example, the Trustee alleges that when Société Générale S.A. ("SocGen") considered purchasing ZCM, SocGen reviewed essentially the same documents as BNP Paribas. *Id.* ¶¶ 152-64. SocGen's review revealed that: (i) it was "readily apparent" that BLMIS's returns were "impossible" given Madoff's purported SSC Strategy; (ii) BLMIS's purported option trading was irreconcilable with SocGen's knowledge about the actual volume of option trading; and (iii) Madoff's forfeit of hundreds of millions of dollars of fees, and (iv) Madoff's custody requirement of customer funds was inexplicable. *Id.* ¶ 153-61. SocGen tried to meet with Madoff about these concerns, but he refused. *Id.* ¶ 160. SocGen then passed on the ZCM purchase due to suspicions of fraud and blacklisted BLMIS. *Id.* ¶ 161. Here, not only does the Trustee allege that Defendants reviewed the same information that led SocGen to these suspicions and actions, he specifically alleges that a former ZCM employee communicated SocGen's concerns regarding BLMIS to BNP Paribas executives during negotiations over the ZCM acquisition. *Id.* ¶¶ 162, 163.[6]

The Trustee alleges that in late 2003, Renaissance Technologies Corp. ("Renaissance"), a hedge fund management company, reviewed Legacy Capital account statements and trade confirmations. Through this review, Legacy Capital uncovered serious red flags concerning the IA Business, and ultimately unwound its investment in Legacy Capital as a result. Compl.

---

[6] Defendants complain that these allegations do not sufficiently "identify the who, what, when, and how" (Def. Br. at 27), but this heightened level of specificity, required in fraud cases under Rule 9, is not required here. *See Legacy*, 548 B.R. at 35-36. Defendants are on ample notice of the Trustee's allegations.

¶¶ 200-06.  Legacy Capital then approached BNP Paribas to provide a line of credit to replace Renaissance's capital.  *Id.* ¶¶ 206-07.  Like Renaissance, BNP Paribas, BNP Arbitrage, and BNP Securities Services reviewed the Legacy Capital statements and trade confirmations that showed the same red flags.  *Id.* ¶¶ 67, 75-83, 197-99, 207-08.  Unlike Renaissance, Defendants deliberately ignored the red flags and pushed forward with the transaction based on a bank-wide policy to rubber stamp BLMIS-related deals.  *Id.* ¶¶ 208-11.

The Trustee also alleges that investment bank Dresdner Kleinwort passed on a credit facility with Tremont due to a variety of fraud concerns regarding Madoff, including: (i) whether BLMIS segregated its investment accounts; (ii) whether an independent, third party verified the assets held by BLMIS; (iii) how BLMIS received compensation for its roles with respect to Tremont's investments; and (iv) about Madoff's secrecy regarding BLMIS's operations.  *Id.* ¶ 218.  In contrast, Defendants purposely asked fewer questions, ignored the indicia of fraud that spawned them, and went forward with the Tremont credit facility.  *Id.* ¶¶ 212-17.

Defendants' repeated disregard of recognizable signs of fraud in order to grow a business centered on BLMIS bolsters the Trustee's willful blindness claim.  *See, e.g.*, *Kingate,* 2015 WL 4734749, at *9, *14 (defendants' knowledge of other banks' decision not to invest in BLMIS Feeder Fund because of fraud concerns helped establish defendants' actual knowledge that BLMIS was a fraud); *Anwar*, 728 F. Supp. 2d at 411 (defendants' unwillingness "to recognize what other similarly situated financial firms were able to do with the same information" helped establish that defendants possessed the requisite scienter for securities fraud).

### C.   The Trustee Adequately Alleges that Defendants Turned a Blind Eye to Madoff's Fraud

The Trustee establishes the second prong of willful blindness by pleading specific, deliberate actions taken by Defendants to avoid confirming that BLMIS was a fraud.  After

Oreades was shut down due to fraud concerns, instead of blacklisting Madoff as other banks had,

Defendants pivoted to a new lucrative leverage enterprise built around BLMIS, in which they

excepted BLMIS from their standard due diligence policies and business practices.

### 1.    Defendants Took Deliberate Acts to Look the Other Way

From 2003 through 2008, while building their leverage business, Defendants took

deliberate, affirmative steps to weaken bank-wide diligence procedures and make exceptions to

standard policies and procedures when it came to BLMIS-related deals.    Compl. ¶¶ 165-79.

Normally, Defendants employed state-of-the-art diligence procedures designed to identify and

address risks of fraud, but Defendants did not apply these policies and practices to BLMIS,

because the Fund Derivatives Group would not have been a profitable business but for Madoff.

*Id.*  The diligence team normally vetted proposed transactions, memorialized their findings about

those transactions, and submitted detailed, analytical memoranda to relevant oversight

committees.  *Id.* ¶ 176.  When it came to BLMIS, however, the diligence team deviated from

these practices.  *Id.* ¶ 177.  Defendants stripped the diligence team's ability to recommend, reject,

or veto BLMIS-related deals.  *Id.* ¶ 167.  Defendants normally had a strict policy against any deal

that exposed BNP Paribas to single-manager investments because of, *inter alia*, an increased risk

of exposure to fraud, but disregarded this policy for BLMIS-related deals.  *Id.* ¶¶ 9, 144, 178.

Defendants typically visited managers on a regular basis to collect information about them and

their operations, in order to deliver a comprehensive diligence assessment.  *Id.* ¶¶ 171-75.

However, Defendants instructed their due diligence team never to contact Madoff or anyone

from BLMIS, and not to otherwise arrange on-site diligence visits at BLMIS.  *Id.* ¶ 174.

Throughout Defendants' relationship with BLMIS, the Fund Derivatives Group apparently made

one belated site visit to BLMIS in March 2008; the purpose of the visit is unclear, and there was

no memorandum drafted to memorialize the visit. *Id.* ¶ 175. All of these allegations establish how Defendants intentionally chose to blind themselves to Madoff's fraud.

### 2. Defendants' Purported Diligence Is Consistent with Willful Blindness

Defendants argue that allegations related to their so-called diligence is inconsistent with willful blindness. Def. Br. at 28-33. Not true. This Court already has held that watered-down diligence is not only consistent with willful blindness, it can be a component of it. *Merkin*, 515 B.R. at 141. In *Merkin*, the Trustee alleged that defendants compiled diligence on Madoff that contained significant red flags suggesting a high probability of fraud at BLMIS. *Id.* Rather than confront suspicions about Madoff, defendants ignored them. *Id.* at 141-42. The Trustee alleged that defendants ignored internal diligence policies and procedure only when it came to Madoff. *Id.* at 141-42. The Court found willful blindness sufficiently pleaded. *Id.* at 141. Similarly, in *Kingate,* the Court found that the Trustee sufficiently alleged the requisite scienter because "[a]lthough the due diligence was wanting, [defendants] closely monitored the performance of the [BLMIS Feeder Funds] on a regular basis, and their review disclosed impossible trades." 2015 WL 4734749, at *14.

Conversely, in *Legacy*, this Court found that defendants suspected that Madoff was a fraud, 548 B.R. at 29-31, but the Court then found that rather than turning a blind eye to their suspicions, defendants investigated their concerns further by hiring a third party to conduct a more rigorous due diligence review of BLMIS, and by preparing pointed questions for Madoff. *Id.* at 19-20, 29. The Court ultimately held that while the first prong of willful blindness was pleaded, the second was not. *Id.* at 35. By contrast, Defendants here did not investigate their suspicions further. Like in *Merkin* and *Kingate,* Defendants diluted their own best practices and diligence standards specifically in order to avoid confirming their suspicions of fraud at BLMIS. Compl. ¶¶ 165-79, 231.

21

### 3.   Defendants' "Economic Irrationality" Argument Fails

Unable to overcome the totality of the Trustee's factual allegations directly, Defendants turn to rhetoric and argue that the Trustee's "fanciful thesis" should "not be countenanced" because it would be "economically irrational" for Defendants to build a leverage business around a known Ponzi scheme.  Def. Br. at 17-19.  This argument fails for multiple reasons.

First, this argument is based on an actual knowledge standard, which does not apply to the Trustee's claims.  *Id*. at 18-19 (arguing that if Defendants believed that Madoff was running a Ponzi scheme, they would not have structured deals around BLMIS).  This Court should decline Defendants' repeated invitation to conflate two legally distinct pleading standards.  Moreover, it is not implausible for a bank like BNP Paribas to take on fraud risk in exchange for potential financial and professional gain, especially when the bank only suspects fraud, but may not know the exact nature of the fraud or when the fraud might be discovered and shut down.[7]  *See*, *e.g.*, *Merkin*, 515 B.R. at 142-43, 145 (finding a plausible inference that defendants' "personal exposure" to the BLMIS Ponzi scheme was "overcome by the fees they earned," leading them to "turn[ ] a blind eye to obvious signs of fraud").

Second, Defendants minimize the Trustee's allegations about their motive for willful blindness as solely one for "relatively minor fees."  Def. Br. at 4; *see also id.* at 18-19.  As an initial matter, the Trustee alleges that Defendants received tens of millions of dollars in fees, which were "higher than what [was] ordinarily received."  Compl. ¶¶ 64, 139, 149, 150.  These fees were not "relatively minor" to Defendants or their employees whose bonuses depended on them.  *Id.*  As this Court found in *Merkin*, financial compensation can provide a compelling motive for willful blindness.  *Merkin*, 515 B.R. at 143.  More critically, the Trustee also alleges

---

[7] Taken to its logical end, Defendant's argument is that there can never be willful blindness to financial fraud.

that Defendants' foray into the leverage business – which they were able to accomplish because

of their BLMIS-related transactions – allowed them to establish a global presence in a highly

competitive market, to grow the BNP brand, and to cross-sell to BNP Paribas's institutional

clients.  Compl. ¶¶ 4-6, 138-40.  These benefits were invaluable to Defendants, and serve as a

strong motive for ignoring fraud.  *See Kingate*, 2015 WL 4734749, at *16 (a corporation benefits

from an "aura of profitability" that enables it to attract more clients).

Third, the public record contradicts Defendants' argument that the Complaint is "absurd"

because a news article reported that the "BNPP group" allegedly lost $500 million <u>after</u> Madoff's

fraud was uncovered.[8]  Def. Br. at 11.  There are other examples of BNP Paribas intentionally

employing a risky business strategy that ended up costing the bank money.  For example, in

2014, BNP Paribas agreed to pay $8.9 billion in criminal forfeiture and penalties, and pleaded

guilty to violating numerous state and federal laws for illegally processing billions of dollars

through the U.S. financial system.[9]   BNP Paribas admitted that, among other criminal

misconduct, it processed over $1.7 billion on behalf of sanctioned Cuban entities, despite

---

[8] Because this article is outside of the four corners of the Complaint, Defendants' use of it in their Motion is improper and should be disregarded.  *SEC v. Dunn,* 587 F. Supp. 2d 486, 505 (S.D.N.Y. 2008).

[9] Press Release, Dep't of Justice, Office of Public Affairs, BNP Paribas Agrees to Plead Guilty and to Pay $8.9 Billion for Illegally Processing Financial Transactions for Countries Subject to U.S. Economic Sanctions (June 30, 2014), *available at* https://www.justice.gov/opa/pr/bnp-paribas-agrees-plead-guilty-and-pay-89-billion-illegally-processing-financial (last accessed Dec. 20, 2017). This Court may take judicial notice of BNP Paribas's admissions in criminal and regulatory proceedings that are relevant here in order to rebut Defendants' attempt to cast doubt on the plausibility of the Trustee's well-pleaded allegations.  *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 588 n.4 (S.D.N.Y. 2015) (taking judicial notice of settlements and penalties involving various foreign and domestic regulators); *accord Sullivan v. Barclays PLC*, No. 13-cv-2811-PKC, 2017 WL 685570, at *20-21 (S.D.N.Y. Feb. 21, 2017) (taking judicial notice on motion to dismiss of European Commission, DOJ, and CFTC press releases to reflect fines, penalties, and deferred prosecution agreements with certain defendants).  If Defendants insist on relying on information outside the four corners of the Complaint to support their claim that they are net losers in their dealings with Madoff, this Court should allow the parties to take discovery on this issue and revisit it at summary judgment or trial.  *See, e.g., Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (defendants can only challenge the "substantive merits" of the plaintiff's allegations at summary judgment after discovery).

knowing that the credit facilities underlying the transfers were illegal.[10]    BNP Paribas also

admitted that "high-level business managers at [the Paris office of BNP Paribas] overruled

explicit concerns from compliance personnel in order to allow the Cuban business to continue,

valuing the bank's profits and business relationships over adherence to U.S. law."[11]    Notably, the

admitted misconduct and that alleged in the Complaint occurred during the same time period

(2004-2008), and coincided with BNP Paribas's business initiative to expand its leverage

business.    Compl. ¶¶ 141-151.    Both involve billion-dollar credit facilities that were authorized

by BNP Paribas senior executives and administered through New York.    *Id.* ¶¶ 1-13, 60, 65.    In

both situations, BNP Paribas recognized potentially illegal activity but nonetheless provided

billions of dollars of credit facilities relating to that illegal activity, and then took steps to conceal

its misconduct.[12]    Compl. ¶¶ 67, 68, 148-50, 267-339.

Fourth, that the "BNPP group" may have lost money when Madoff's fraud ended, does

not preclude the Trustee from adequately alleging willful blindness.[13]    *See, e.g.*, *Nanopierce*

*Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02-cv-0767-LBS, 2002 WL 31819207, at *4

& n.7 (S.D.N.Y. Oct. 10, 2002) (denying motion to dismiss because scienter sufficiently pleaded

and noting: "Even if it turns out that Defendants ultimately lost money on their investment, that

---

[10] Statement of Facts, *United States v. BNP Paribas, S.A.*, ¶¶ 49, 59-65 (S.D.N.Y. June 30, 2014) ("DOJ Statement of Facts"), *available at* https://www.justice.gov/sites/default/files/opa/legacy/2014/06/30/statement-of-facts.pdf (last accessed Dec. 20, 2017).

[11] DOJ Statement of Facts, ¶ 51.

[12] DOJ Statement of Facts, ¶¶ 66-70.

[13] Although Defendants make several assertions that the "BNPP group" lost $500 million in its dealings with BLMIS-related transactions (Def. Br. at 4, 11, 25), they never identify which entities comprise of the "BNPP group," making it impossible to understand how, if at all, this has any bearing to this action.    More importantly, their factual assertions are contrary to the Trustee's well-pleaded allegations, which state that Defendants: (i) "developed a new, multi-billion dollar [leverage] business" that primarily targeted BLMIS Feeder Funds and that allowed BNP Paribas to cross-sell its services to new clientele and compete, for the first time, with rival banks in the increasingly important leverage industry (Compl. ¶¶ 139-51); (ii) received approximately $1.4 billion in transfers from BLMIS Feeder Funds (*id.* ¶ 12); (iii) received tens of millions of dollars in management and performance fees from Oreades (*id.* ¶¶ 97-105); and (iv) "received substantial fees and interest payments from the BLMIS Feeder Funds" as part of Defendants' leverage business (*id.* ¶ 149).

fact might not be dispositive to a finding of scienter"); *SEC v. George*, 426 F.3d 786, 793-95 (6th

Cir. 2005) (affirming finding of scienter for involvement with Ponzi scheme even where

defendant had lost money).  In related adversary proceedings, this Court has held that even so-

called "net losers" can be held liable.  *See, e.g., Kingate*, 2015 WL 4734749, at *2, *13-15

(finding the Trustee adequately alleged scienter, notwithstanding defendants' purported loss of

$800 million).  Simply put, ultimately losing money at the end of a Ponzi scheme is not a defense

to willful blindness to fraud.  *Cf. Markowski v. SEC*, 274 F.3d 525, 529 (D.C. Cir. 2001) (finding

scienter and noting, "[j]ust because a manipulator loses money doesn't mean he wasn't trying").

### 3.    Dismissal in Another Proceeding Has No Relevance Here

Finally, Defendants' contention that the Trustee cannot establish willful blindness

because of his voluntary dismissal of BNP Securities Services in a different adversary

proceeding is a non sequitur.  *See, e.g.,* Def. Br. at 24 (citing nothing, and charging that the

Trustee dismissed this Defendant "apparently recognizing that those allegations could not

establish willful blindness").  The Trustee's exercise of statutory discretion in deciding which

claims to pursue is of no moment, and, moreover, it is well settled that resolution of a claim does

not preclude underlying issues from being raised in subsequent litigation unless the issues were

actually decided in the first.  *See Motrade v. Rizkozaan, Inc*., No. 95-cv-6545-DC, 1998 WL

108013, at *5 (S.D.N.Y. March 11, 1998) ("To have a preclusive effect on specific issues or

facts, however, a voluntary dismissal also must be accompanied by specific findings sufficient

for a subsequent court to conclude that certain matters were actually decided.").

## III.    Section 546(e)'s Safe Harbor Is Inapplicable to this Adversary Proceeding

In his Complaint, the Trustee seeks to recover approximately $35 million in subsequent

transfers Defendants received in 2004 and 2005 from Tremont funds.  Compl., Exs. F, H.

Defendants concede the initial transfers from BLMIS to the Tremont funds were previously

25

"avoided."  Def. Br. at 35 ("On September 26, 2011, the Court approved a settlement agreement between the Trustee and the Tremont Group, including Insurance Portfolio and Portfolio Limited, *which avoided the initial transfers* underlying the New Claims.") (emphasis added). Nevertheless, Defendants argue Section 546(e) provides a safe harbor for the recovery of these subsequent transfers from Defendants, claiming: "The *only* way that the Trustee can escape the application of Section 546(e) here is by pleading with particularity and plausibility that the BNPP Defendants actually knew of the Madoff Ponzi scheme."  Def. Br. at 15 (emphasis in original).

Defendants' argument fails because Section 546(e) does not provide an independent safe harbor for the recovery of transfers under Section 550(a)(2) based on the purported good faith of a subsequent transferee.  By its plain language, Section 546(e) provides a safe harbor for the avoidance of certain initial transfers made outside the two-year period referenced in Section 548(a)(1)(A).  *See* 11 U.S.C. § 546(e) ("Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not *avoid a transfer* . . . except under section 548(a)(1)(A) of this title.") (emphasis added).  In an attempt to create a second safe harbor for the recovery of avoided transfers, Defendants conflate recovery under Section 550 with the avoidance provisions enumerated in Section 546(e).  However, it is well established that "[t]he concepts of avoidance and recovery are separate and distinct."  *Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 733 (9th Cir. B.A.P. 2008).  Defendants' attempt to read Section 550 into the "notwithstanding sections" listed in Section 546(e) fares no better.  This Court should reject Defendants' attempt to depart from the plain language and/or conflate the avoidance and recovery provisions of the Bankruptcy Code.

## IV.    Defendants Insufficiently Assert a Value Affirmative Defense

Because the Trustee sufficiently pleads Defendants' lack of good faith, their Motion should be denied.  Independently, the Motion also fails because they cannot avail themselves of the "for value" affirmative defense under Section 550(b)(1).  Parties such as Defendants, that receive subsequent transfers in the form of equity distributions from entities in which they hold an ownership interest, provide no value in exchange for those transfers for purposes of Section 550(b) because payments on account of equity interests are not repayments of debt.  *See, e.g., Boyer v. Crown Stock Distrib., Inc. (In re Crown Unlimited Mach., Inc.)*, Adv. Pro. No. 04-1085, 2006 WL 6401548, at *15 (Bankr. N.D. Ind. Oct. 13, 2006) (shareholders had no Section 550(b)(1) defense because they gave no "value" recognized by the Bankruptcy Code – transfers were given "not in return for some exchange of property or services, or the payment of an antecedent debt, but solely on account of [the defendants'] status as shareholders in the company").[14]  Moreover, to what extent, if any, value was given is by its nature a highly fact-intensive inquiry and inappropriate at this stage of litigation.  *See, e.g., Merkin,* 515 B.R. at 152 (rejecting value defense argument raised in motion to dismiss because it "is not supported by the pleadings and goes outside the record that the Court may consider" at this stage).

## V.    The Trustee Sufficiently Pleads a Basis for Personal Jurisdiction over Defendants

Where, as here, the court is adjudicating a motion to dismiss based on the pleadings, and not a full-blown evidentiary hearing, plaintiffs need only make a prima facie showing of personal jurisdiction.  *See S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir.

---

[14] *Aff'd*, *Boyer v. Crown Stock Distrib., Inc.*, No. 06-cv-409RM, 2009 WL 418275 (N.D. Ind. Feb. 17, 2009), *aff'd in relevant part*, *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 796 (7th Cir. 2009) (affirming analysis of Section 550(b) defense because "the individual defendants gave nothing in exchange for their distributions"); *see also Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528, 540 (9th Cir. 1990) (limited partners that received subsequent transfers from initial transferee partnership provided no value because partnership interests are "equity security" under 11 U.S.C. § 101 and were not made "on account of debt or property transferred to the partnership in exchange for the distribution").

2010).  The court must construe the pleadings in the light most favorable to plaintiffs, resolving all doubts in their favor.  *Id*.  In bankruptcy proceedings, the jurisdictional forum is the United States (not any particular, individual state), and the Bankruptcy Court may assert jurisdiction over a defendant if the exercise of jurisdiction satisfies due process, that is: (1) the defendant has minimum contacts with the United States; and (2) the exercise of jurisdiction would be reasonable.  *See, e.g.*, *Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Luxembourg) II SCA)*, 524 B.R. 488, 504, 506 (Bankr. S.D.N.Y. 2015).  Specific personal jurisdiction subjects a defendant only to claims that arise from the defendant's conduct in the forum.  *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472-73 (1985).  A plaintiff sufficiently pleads a basis for specific jurisdiction by alleging (1) the defendant purposefully directed its activities into the forum, and (2) the underlying cause of action arises out of or relates to those activities.  *Id.* at 472.  General personal jurisdiction subjects a defendant to suits on all claims.  *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014).  General jurisdiction over foreign corporations comports with due process "when their affiliations with the [forum] are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

## A.      The Trustee Pleads Sufficient Minimum Contacts for Specific Jurisdiction

The Trustee adequately pleads a basis for specific jurisdiction over each Defendant.

## 1.      Defendants Purposefully Directed Activities into New York

The heart of Defendants' BLMIS-related leverage business was in New York.  The Fund Derivatives Group primarily operated out of here – BNP Paribas, BNP Arbitrage, and BNP Securities Services each maintained and worked out of a permanent office at 787 Seventh Avenue in Manhattan, as did non-Defendant BNP Paribas Securities Corp., another BNP Paribas wholly owned subsidiary that worked with Defendants on BLMIS-related transactions.  Compl.

¶¶ 52, 53, 55, 63.   The general, day-to-day operation of their Madoff business, including communicating and working with BLMIS Feeder Funds, conducting purported due diligence, and working with BNP Cayman to facilitate transfers through New York, was run out of this midtown Manhattan office.  Compl. ¶¶ 4, 8, 65, 71, 142, 151, 216, 408-12.  Tremont and Ascot were both based in New York, and Defendants sent their subscription agreements here.  *Id.* ¶¶ 60, 411-12.  Nearly all of the subsequent transfers sought in the Trustee's Complaint were routed through New York bank accounts.[15]  Compl. ¶¶ 57, 60, 384-412.

## 2.    BNP Cayman Purposefully Directed Activities into New York

This Court has personal jurisdiction over BNP Cayman due to: its repeated, purposeful use of the New York banking system; its working with New York affiliates and New York BLMIS Feeder Funds in facilitating Defendants' New York-centered Madoff leverage business; its appointment of New York agents; and its direct ownership of BLMIS Feeder Funds' shares.

BNP Cayman received $95 million in subsequent transfers that originated at BLMIS in New York. *Id.* Ex. A.  BNP Cayman facilitated transfers to and from BLMIS Feeder Funds, as directed by BNP Paribas.  Compl. ¶ 71.  BNP Cayman repeatedly wired subscription payments to BLMIS Feeder Funds from New York bank accounts and instructed the funds to send redemption payments for BNP Cayman to New York bank accounts, including an account held by BNP Paribas in New York.  *Id.* ¶ 60; Calvani Decl. Ex. 1, at 11, 12; *id.* Ex. 2; *id.* Ex. 3, at NYGAA0020960, NYGSAA0020981.

The New York Court of Appeals has found that far less pervasive New York banking activity can support personal jurisdiction over a foreign defendant with far fewer ties to New York.  *See Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 326-27 (2016).  In *Al Rushaid,* a Saudi

---

[15] All transfers from Ascot, and all transfers from Tremont after July 2006 were routed out of New York.  Ex. 3 (reflecting Ascot's Morgan Stanley account in New York); Compl. ¶¶ 60, 233, 384-399.  Without discovery, the Trustee cannot determine whether pre-2006 Tremont transfers were routed through New York.

Arabian plaintiff alleged that a Swiss bank defendant assisted in a fraudulent scheme based in Saudi Arabia by routing at least $4 million from Saudi Arabia, through a New York correspondent bank account, to bank accounts in Geneva, as directed by a foreign client. *Id.* at 319-22. The court found that "repeated, deliberate use" of a New York correspondent account demonstrates "volitional activity" that may constitute "purposeful availment" for jurisdictional purposes. *Id.* at 326-28. The court then held that because the foreign defendant was "actively engaged in a cycle of banking transactions" through New York, and because the New York bank account was crucial to the course of repeated banking activity at issue in the complaint, there was a sufficient basis for personal jurisdiction over the foreign bank. *Id.* at 327-30.[16] BNP Cayman's New York banking activity likewise provides a basis for this Court's jurisdiction. *Id.*

BNP Cayman's activities with its New York affiliates and New York BLMIS Feeder Funds further supports personal jurisdiction. Compl. ¶¶ 60, 71 (BNP Cayman worked with, communicated with, and facilitated financial transfers for the other three Defendants). As part of its role in BNP Paribas's New York-based BLMIS leverage business, BNP Cayman represented that its principal place of business was in New York, ostensibly in the other Defendants' midtown Manhattan office. *See* Calvani Decl. Ex. 1, at 11, ¶ 30(e). Both Defendant BNP Paribas Securities Services and non-party BNP Paribas Securities Corp. would communicate to BLMIS Feeder Funds on behalf of BNP Cayman, from their New York Office. Calvani Decl. Exs. 1, 3, 4. BNP Cayman used its affiliates' New York address for correspondence related to

---

[16] Defendants' reliance on *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 339 (S.D.N.Y. 2016) as their primary support for their jurisdictional argument is unavailing. Def. Br. at 36. In *Hill*, the court found that the transmission of information and funds by foreign HSBC affiliates to BLMIS was insufficient to support specific jurisdiction under the CPLR for plaintiffs' aiding and abetting claims. 207 F. Supp. 3d at 338-41. Notably, the *Hill* decision was issued before the New York Court of Appeals' decision in *Al Rushaid*, and *Hill* relies on the Appellate Division's *Al Rushaid* decision, which was reversed. *See id.* at 339. Regardless, *Hill* is distinguishable from both the Trustee's case and *Al Rushaid* because the payments in *Hill* were deemed to be merely passive, incidental acts, from which no wrongful activity arose, and that otherwise lacked any nexus to the claims at issue. *Id.* at 339-40 & n.7.

Defendants' leverage business. *Id.* Ex. 3, at NYGSAA0020972. BNP Cayman regularly communicated with employees of BLMIS Feeder Funds in New York, including Tremont employees. Compl. ¶ 60. These New York activities support the exercise of personal jurisdiction. *See Foundry, A Print Commc'ns Co. v. Trade Secret Web Printing, Inc.,* No. 11-cv-9553-ALC-KNF, 2012 WL 3031149, at *5 (S.D.N.Y. July 25, 2012) (finding personal jurisdiction over Canadian corporation whose principal solicited transactions by telephone with New York entity that "had its center of gravity inside New York" because "a single communication may be considered a 'business transaction' where it was 'related to some transaction that had its center of gravity inside New York, into which a defendant projected himself"); *Roe v. Arnold,* 502 F. Supp. 2d 346, 348, 350-51 (E.D.N.Y. 2007) (finding personal jurisdiction over foreign defendant whose "essential operations" were supported by New York office and who earned approximately one-third of his income from national accounts having their origin in New York).

A separate jurisdictional basis exists because of BNP Cayman's appointment of BNP Paribas Securities Corp. (a domestic corporation), to serve as its New York agent (*see. e.g.,* Calvani Decl. Ex. 2). *See Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 279-80 (Bankr. S.D.N.Y. 2010) (foreign defendant's appointment of agent in New York for BLMIS account a factor in finding basis for personal jurisdiction over foreign defendant).

Personal jurisdiction is also proper because BNP Cayman had direct ownership interests in BLMIS Feeder Funds, regularly reviewed their New York BLMIS account statements and trade confirmations, and knowingly invested in, and received transfers from, six BLMIS Feeder Funds that were managed out of New York. Compl. ¶¶ 60, 71. This Court has asserted personal jurisdiction in similar circumstances. For example, in *Picard v. Bureau of Labor Ins. (SIPC v.*

*BLMIS)*, this Court found personal jurisdiction where the defendant purposefully availed itself of the benefits and protections of New York laws because its investments in a BLMIS Feeder Fund "did not merely 'end up' in an account at BLMIS as a result of happenstance or coincidence," but rather the defendant intended and knew that "the substantial majority of funds invested in [the BLMIS Feeder Funds] would be transferred to BLMIS in New York to be invested in the New York securities market." 480 B.R. 501, 517 (Bankr. S.D.N.Y. 2012); *see also id.* at 516-18 (when foreign defendant invested tens of millions of dollars in a BLMIS Feeder Fund with the specific purpose of having funds invested in BLMIS in New York, and profiting from this U.S. based investment, defendant cannot claim a due process violation from having to defend itself in New York in a suit arising from those activities).

### 3.     Other Defendants Purposefully Directed Activities into New York

As with BNP Cayman, the subsequent transfers to BNP Paribas, BNP Arbitrage, and BNP Securities Services that the Trustee seeks to recover were routed through New York, and personal jurisdiction is permissible for this reason alone. *See* pp. 29-30, *supra*; *see also Correspondent Servs. Corp. v. J.V.W. Invs. Ltd.*, 120 F. Supp. 2d 401, 405 (S.D.N.Y. 2000) (where New York bank account was "at the very root of the action in this case," the defendant was subject to personal jurisdiction in New York); *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 329 (2012) (allegations of foreign bank's repeated use of New York bank account show purposeful use of New York's banking system, U.S. currency, and New York and U.S. legal systems). Personal jurisdiction is also appropriate because, as explained above, these Defendants worked out of their permanent New York offices in conducting and executing the business from which the Trustee's claims arise. *See Motown Record Co. v. iMesh.com, Inc.*, No. 03-cv-7339-PKC, 2004 WL 503720, at *2 (S.D.N.Y. Mar. 12, 2004) (when assessing personal

jurisdiction over a foreign corporation, "courts have focused on such indicia as whether the company has an office, bank accounts or other property in the state").

### B.    The Underlying Cause of Action Arises Out of Defendants' Activities

An adversary proceeding "arises out of" defendants' contacts with the United States if, but for those contacts, the plaintiff's claim would not have arisen.  *See, e.g., Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 418 B.R. 75, 80 (Bankr. S.D.N.Y. 2009) ("*Cohmad I*").  Because the Trustee seeks to recover subsequent transfers of property that both consist of and arise from Defendants' New York-centered activities, the Trustee has adequately alleged sufficient minimum contacts to establish specific personal jurisdiction.  *Id.* (second prong of specific jurisdiction inquiry met because but for defendants' financial transaction to and from their New York accounts, there could be no fraudulent transfer claim against defendants).  *See also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168-69 (2d Cir. 2013) (for the second prong of specific personal jurisdiction to be met, the plaintiff must allege a relatedness between the activity and the legal claim such that the legal claim is not "completely unmoored" from the activity).

### C.    The Trustee Pleads Specific Minimum Contacts for General Jurisdiction

The Trustee also adequately pleads a basis for general personal jurisdiction over BNP Paribas, BNP Arbitrage, and BNP Securities Services because of their extensive contacts with the forum.  BNP Paribas has availed itself of the U.S. court system,[17] and has admitted to being subject to general jurisdiction in the United States.  *See, e.g., Weisel Partners LLC v. BNP Paribas*, No. C 07-6198 MHP, 2008 WL 3977887, at *5 (N.D. Cal. Aug. 26, 2008) ("BNP

---

[17] More than 15 lawsuits have been filed by BNP Paribas.  *See, e.g., BNP Paribas v. Wayzata Opportunities Fund II, L.P. et al.,* No. 09-cv-5351-DLC (S.D.N.Y.); *BNP Paribas v. Republic of Arg.*, No. 06-cv-14339-LAP (S.D.N.Y.); *BNP Paribas v. Bank of N.Y. Tr. Co., N.A.*, No. 11-cv-350-PGG-HBP (S.D.N.Y.); *BNP Paribas v. Nat'l Rest. Mgmt., Inc. (In re Nat'l Rest. Mgmt., Inc.)*, No. 00-cv-6624-DLC, 00-cv-6625-DLC (S.D.N.Y*.); BNP Paribas, et al. v. MBIA Inc.*, No. 601475-2009 (N.Y. Sup. Ct.).

Paribas does not dispute that the court has general personal jurisdiction over it"). BNP Paribas has been present in the United States since the late 1800s, and has thousands of employees and more than 700 retail branches here. Compl. ¶ 58. Like their parent BNP Paribas, BNP Arbitrage and BNP Securities Services also have a substantial number of employees and a permanent office in New York. *Id.* ¶¶ 53, 55, 63. Because these three Defendants are "at home" in the United States, sufficient grounds for this Court's general jurisdiction exist. *See Hellas,* 524 B.R. at 507-08 (foreign bank was "at home" in the United States for general jurisdiction purposes because even though its place of incorporation and principal place of business were outside the United States, New York was a "critical hub" for the bank, it had a large, expensive New York office with over 1,000 employees, and its presence in the United States was "more than merely transitory").

### D.    Jurisdiction Over Defendants in this Case is Reasonable

Cases in which jurisdiction is so unreasonable as to defeat a showing of minimum contacts are rare, occurring only where the defendant presents a "compelling case" that the burden of litigating in the forum is so serious it clearly outweighs the interests of the plaintiff and forum in adjudicating in the selected court. *See Bickerton v. Bozel S.A. (In re Bozel S.A.)*, 434 B.R. 86, 100 (Bankr. S.D.N.Y. 2010). Here, the United States has a strong interest in applying the fraudulent transfer and preference provisions of its Bankruptcy Code. *See U.S. Lines, Inc.* v. *GAC Marine Fuels Ltd. (In re McLean Indus. Inc.)*, 68 B.R. 690, 699 (Bankr. S.D.N.Y. 1986). The Trustee also has a strong interest in litigating in the United States because BLMIS was a New York corporation with its files here, and the BLMIS liquidation proceeding is before this Court. *Cohmad I*, 418 B.R. at 82 (finding personal jurisdiction over Defendants because "'the most efficient resolution of the controversy' would be in the United States, where the inextricably-related BLMIS liquidation is ongoing before this Court"). Any burden Defendants

would have litigating in New York is minimal: Defendants are large financial institutions with substantial resources; three Defendants are permanently present in New York; all Defendants are represented by the same New York counsel; and each has a U.S. nexus to its economic activities. *See Picard v. Maxam Absolute Return Fund, L.P. (SIPC v. BLMIS)*, 460 B.R. 106, 119-20 (Bankr. S.D.N.Y. 2011) (exercise of personal jurisdiction is reasonable because defendant's counsel was in New York, there was a U.S. nexus to defendant's economic activities, and modern communication and transportation mitigate potential hardship due to geographic distance).

### E.    Jurisdictional Discovery

If the Court finds that the Trustee has not made a prima facie showing of jurisdiction over any Defendant, the Court should permit jurisdictional discovery on related issues, including, for example, whether BNP Cayman was acting as a mere department of its parent, BNP Paribas. *See In re S. African Apartheid Litig.*, 643 F. Supp. 2d 423, 431 (S.D.N.Y. 2009) ("Allowance of jurisdictional discovery is committed to the discretion of the district court."); *Sayles v. Pac. Eng'g & Constructors, Ltd.*, No. 08-cv-676S, 2012 WL 895944, at *4-5 (W.D.N.Y. Mar. 15, 2012) (permitting jurisdictional discovery to "inform [plaintiff's] 'mere department' theory of personal jurisdiction").

## VI.    <u>Defendants' Procedural Arguments Fail as a Matter of Law</u>

Defendants' arguments that the Complaint be dismissed for procedural reasons also fail.

### A.    Defendants Were Properly Served

In two stipulations filed with this Court, Defendants unequivocally accepted service and agreed to waive any service defenses:

- "Undersigned counsel for Stipulating Defendants[18] agrees to accept service of the summons and Complaint on behalf of Stipulating Defendants and hereby waives any defenses based on insufficiency of process or insufficiency of service of process on behalf of Stipulating Defendants." *Picard v. BNP Paribas S.A. (In re BLMIS)*, Adv. Pro. No. 12-01576 (BRL) (Bankr. S.D.N.Y.), ECF 5, at 3 (Calvani Decl. Ex. 5, at 3).

- "Undersigned counsel for Defendants[19] agrees that service of the summons and Complaint has been completed and hereby waives any defenses based on insufficiency of process or insufficiency of service of process on behalf of Defendants." *Id.*, ECF 6, at 2; (Calvani Decl. Ex. 6, at 2).

Defendants' argument for dismissal based on insufficiency of service is wholly without merit.

### B.    The Trustee Had the Court's Permission to File the Amended Complaint

Defendants' argument that the Complaint was improperly filed is equally deficient. In November 2016, this Court explicitly granted leave to amend claims in this adversary proceeding: "the motions to dismiss the claims included in Table 6 [listing this adversary proceeding] are denied and leave to amend is granted to the extent of these claims." *See Comity Decision*, 2016 WL 6900689, at *30. Despite this clear language, Defendants argue that the Court was only permitting the Trustee leave to amend to add facts regarding extraterritoriality that had previously been provided to the Court. Def. Br. at 12. Defendants further argue that this interpretation is required under a 2015 scheduling order, which, *inter alia*, made reference to briefing of future amendments in this and other adversary proceedings. *Id*. at 12 n.11. However, an order's mention of certain briefing in 2015 does not preclude the Court from later issuing a broader leave to amend, as it did here.[20]

---

[18] "Stipulating Defendants" was defined as BNP Paribas S.A., BNP Paribas Arbitrage SNC, BNP Paribas Bank & Trust Cayman Limited, BNP Paribas Securities Services S.A., and other related entities. *Picard v. BNP Paribas S.A. (In re BLMIS)*, Adv. Pro. No. 12-01576 (BRL) (Bankr. S.D.N.Y.), ECF 5, at 3 (Calvani Decl. Ex. 5, at 3).

[19] "Defendants" had the same definition as "Stipulating Defendants" in the previous stipulation. *Id.*, ECF 6, at 2; (Calvani Decl. Ex. 6, at 2).

[20] Further, any conflict between the scheduling order and this Court's decision should be resolved according to the plain language of the latter. *Partell v. Fidelity Nat'l Title Ins. Servs.*, No. 12-cv-376S, 2012 WL 5288754, at *2 (W.D.N.Y. Oct. 24, 2012) (scope of court's decision is defined by its plain language).

If the Trustee has misinterpreted the Court's ruling, he respectfully requests that leave to amend be granted *nunc pro tunc*. Amendments are favored because they "tend to facilitate a proper decision on the merits"; leave to amend is to be "freely given" when justice requires absent a substantial reason such as undue delay, bad faith, or undue prejudice to the opposing party. *Mendelow*, 560 B.R. at 221. Given the pre-discovery stage of this proceeding, and given Defendants' concession that the standards and analysis for briefing on a motion for leave to amend and this motion are identical, Def. Br. at 13, they have suffered no prejudice by the Complaint's filing. *See Doyaga v. Steamfitters' Indus. Pension Fund (In re Smith)*, 204 B.R. 358, 363 (Bankr. E.D.N.Y. 1997) (permitting trustee leave to amend complaint *nunc pro tunc* and add additional transfers, because doing so would not cause the defendants undue prejudice).

## C.     The Trustee's Claims Are Timely

The Complaint seeks the recovery of additional subsequent transfers Defendants received from Tremont. The Trustee's claims to recover additional transfers are timely because they "relate back" to the claims in the original complaint. Under Rule 15 (applicable here under Rule 7015 of the Federal Rules of Bankruptcy Procedure), "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading[.]" Fed. R. Civ. P. 15(c)(1). "Accordingly, new fraudulent transfer claims relate back to existing ones if the former were part of the same 'course of conduct.'" *Picard v. Peter Madoff (In re BLMIS)*, 468 B.R. 620, 633 (Bankr. S.D.N.Y. 2012) (quoting *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 334 (S.D.N.Y. 2009)). Rule 15 "does not set a high bar for relation back, so long as the claims attempted to be asserted in the new complaint share a reasonable measure of common ground with the allegations of the original pleading." *Id.* The "principal inquiry" is whether the "'general fact situation alleged in the original pleading'

provides 'adequate notice' to the opposing party 'of the matters raised in the amended pleading.'" *Id.*

In *Adelphia*, the amended complaint added $95 million of allegedly fraudulent transfers to the existing fraudulent transfers pleaded in the original pleading. 624 F. Supp. 2d at 333. The defendants in *Adelphia* argued that the claims were time-barred and cited *Metzeler* – the same case that Defendants rely on here, *see* Def. Br. at 35 – to support the proposition that fraudulent transfer claims cannot relate back. *Adelphia*, 624 F. Supp. 2d at 334 (citing *Metzeler v. Bouchard Transp. Co. (In re Metzeler),* 66 B.R. 977, 983, 984 (Bankr. S.D.N.Y. 1986)). The court rejected this argument, noting that fraudulent transfers often involve a common scheme to defraud which provides a nexus for relation back. *Id.* The new claims related back because they and those pleaded in the original complaint "arose out of the same conduct, at the same time, and involved the same [financial products]." *Id.* Likewise, in *Peter Madoff*, the Court granted the Trustee's motion for leave to add transfers to an amended pleading "because they were part of the same course of conduct as the transfers alleged in the Original Complaint, which provided adequate notice to the [defendants]." 468 B.R. at 633. In particular, the Court noted that the Trustee set forth the transfers under the same legal theories as the ones set forth in the original complaint and "allegations in the Original Complaint of Madoff's Ponzi scheme gave reasonable notice that the Trustee was still uncovering additional transfers and seeking any amounts that may have been transferred as part of that scheme[.]" *Id.*[21]

Defendants do not dispute that the "general fact situation" of the original complaint provided "adequate notice," or that the amended claims arose from the same "course of

---

[21] The Court has repeatedly recognized that pleadings evolve in cases such as this. *Merkin*, 515 B.R. at 151 (acknowledging that the details of subsequent transfers may change from those in the initial pleading because "the subsequent transfer claim must ultimately be proved through the books and records of the defendants"); *Cohmad II*, 454 B.R. at 329 (finding the Trustee should be afforded latitude in pleading because of his lack of personal knowledge compounded with complicated issues and transactions that extend over lengthy periods of time).

conduct." Instead, they rely solely on two cases, *Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. Pirelli Commc'ns Cables & Sys. USA LLC (In re 360networks (USA) Inc.)*, 367 B.R. 428 (Bankr. S.D.N.Y. 2007), and *Metzeler*, in which the court held that certain preferential transfers should be treated as separate and distinct transactions. *See* Def. Br. at 35. This reliance ignores precedent: "Preference actions stand in contrast to actions to avoid fraudulent transfers, which often involve a common scheme to defraud which provides a nexus for relation back." *See Adelphia*, 624 F. Supp. 2d at 334. Moreover, in both cases, the original complaints failed to put defendants on notice of the new claims. *See Metzeler*, 66 B.R. at 983-84 (denying additional preferential transfers because they occurred years earlier than those initially alleged and were "not claimed to be part of the [same] scheme"); *In re 360networks*, 367 B.R. at 434 (defendant not on notice that additional transfers might be pursued later, where original complaint reflected that no other claims were being contemplated).

The instant matter is distinguishable because the Trustee's initial pleading (plus years of active litigation in this and related adversary proceedings) provided Defendants notice that the Trustee intended to recover all fraudulent transfers of BLMIS customer property that Defendants received from BLMIS Feeder Funds. Because Defendants had more than adequate notice, they cannot claim undue prejudice or surprise now.

## VII.   <u>CONCLUSION</u>

For the reasons above, Defendants' Motion should be denied in its entirety.

Dated:  December 20, 2017
        New York, New York

Respectfully submitted,

By:  */s/ David J. Sheehan*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Mark A. Kornfeld
Email:  mkornfeld@bakerlaw.com
Torello H. Calvani
Email:  tcalvani@bakerlaw.com
Joanna F. Wasick
Email:  jwasick@bakerlaw.com
Marco Molina
Email:  mmolina@bakerlaw.com
Jonathan A. Forman
Email:  jforman@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*substantively consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*Estate of Bernard L. Madoff*

40