# BakerHostetler

Baker&Hostetler LLP

45 Rockefeller Plaza
New York, NY 10111

T 212.589.4200
F 212.589.4201
www.bakerlaw.com

December 20, 2017

Keith R. Murphy
direct dial: 212.589.4686
kmurphy@bakerlaw.com

**VIA ECF AND EMAIL**
Honorable Stuart M. Bernstein
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Room 723
New York, New York  10004-1408
Bernstein.chambers@nysb.uscourts.gov

Re:  *Picard v. South Ferry Building Company et. al,* Adv. Pro. No. 10-04488 (SMB)
*Picard v. South Ferry #2, et. al,* Adv. Pro. No. 10-04350 (SMB)
*Picard v. United Congregations Mesora*, Adv. Pro. No. 10-05110 (SMB)
*Picard v. James Lowrey, et al*, Adv. Pro. No. 10-04387 (SMB)

Dear Judge Bernstein:

On December 6, 2017, counsel for the Trustee, for the Securities Investor Protection Corporation ("SIPC"), and for the Defendants in the above-captioned actions participated in a consolidated hearing on summary judgment motions filed by the Trustee and by the Defendants. During the course of argument, the Court raised two questions, and following colloquy thereon, requested that the parties each brief the following two issues[1] in a five-page letter brief to be submitted to the Court:

1. Whether and to what extent a broker-dealer pre-SIPA pre-liquidation can or cannot use customer property to pay debts of a brokerage?

2. Whether, aside from fraudulent transfer statutes, a broker has the right to recover payments that the broker made of customer funds to satisfy general obligations of the brokerage in a non-bankruptcy or pre-SIPA situation?

**1. A Broker-Dealer May Not Use Customer Property to Pay Debts of a Brokerage**

   **a. Securities Regulations Prohibit Broker-Dealers from Using Customer Property to Pay Any Expenses of the Firm, Including Operational Expenses**

In 1970, when Congress enacted SIPA, Congress amended section 15(b) of the Securities Exchange Act of 1934 to provide that the Securities and Exchange Commission ("SEC") shall enact a rule regarding the acceptance of custody and use of customers' securities and the

---

[1] The issues are set forth in the Transcript of the Hearing held on December 6, 2017 at pages 64, 65, and 70, and counsel for the parties have agreed upon the above recitation of the two questions.

carrying and use of customers' deposits or credit balances.  Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et. seq.* ("SIPA"), 84 Stat. 1653; Public Law 91-598 sec. 7(d) (1970).  The rule that was enacted, the "Customer Protection Rule," or "Rule 15c3-3," requires that a securities broker-dealer maintain: (1) physical possession or control of fully paid and excess margin securities held for customers, *see* 17 C.F.R. §§ 240.15c3-3(b)-(d), and (2) "at all times" with a bank a "special reserve" account that holds cash or "qualified securities" in an amount equal to the firm's net cash obligations to customers.  *See* 17 C.F.R. §§ 240.15c3-3(e)(1), 240.15c3-3a.

The SEC enacted the Customer Protection Rule, among other reasons, "(iii) [t]o accomplish a separation of the brokerage operation of the firm's business from that of its firm activities such as underwriting and trading." Broker-Dealers; Maintenance of Certain Basic Reserves, Exchange Act Release No. 34-9856, 1972 WL 125352 at *2 (Nov. 13, 1972), attached as Exhibit A to the Declaration of Kevin H. Bell, dated December 20, 2016 ("Bell Decl.").  It "eliminat[ed] the use by broker-dealers of customer funds and securities to finance firm overhead and such firm activities as trading and underwriting through the separation of customer related activities from other broker-dealer operations." Customers' Securities and Funds, Exchange Act Release No. 9775, 1972 WL 125434, at *1 (Sept. 14, 1972), attached as Exhibit B to the Bell Decl.; *see also* 11 LOUIS LOSS, JOEL SELIGMAN, TROY PAREDES, SECURITIES REGULATION 81 (5th ed. 2014) (quoting Exchange Act Release No. 22,499, 34 SEC Docket 266, 267 (1985), explaining that Rule 15c3-3 "makes it unlawful for a broker-dealer to accept or use customer funds to finance any part of its proprietary business activities"), attached as Exhibit C to the Bell Decl.  In a recent case against Merrill Lynch, the SEC makes clear that Rule 15c3-3 "forbids" a broker-dealer from utilizing customer assets to finance any part of their business not related to servicing customers. Order Instituting Administrative and Cease-And-Desist Proceedings, *In the Matter of Merrill Lynch, Pearce, Fenner & Smith Inc.*, Exchange Act Release No. 78,141, 2016 WL 4363431, at *3 (June 23, 2016) (internal quotations omitted). ("Merrill Lynch Order"), attached as Exhibit D to the Bell Decl. "In broad strokes, a broker-dealer cannot use customer assets to finance the business activities of the firm, and it cannot place customer assets in locations or accounts that make them vulnerable to claims made against the broker-dealer by third parties." *Id.* at *1.  With respect to securities, the rule prohibits a broker-dealer from using a customer's fully paid and excess margin securities in any aspect of its business, and thus a broker-dealer cannot sell them without customer authorization, lend them to others, use them to deliver against short sales, or use them as collateral for a loan.  *See* STEVEN LOFCHIE, LOFCHIE'S GUIDE TO BROKER-DEALER REGULATION 481 (2005), attached as Exhibit E to the Bell Decl.

Customer funds are also protected.  Broker-dealers must maintain cash in a sufficient amount to satisfy customer obligations in a special reserve account.  Rule 15c3-3(e)(1); Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1095-96 (2002) ("Jamroz"), attached as Exhibit F to the Bell Decl.[2]  The calculation involves comparison of a broker-dealer's credits and debits. Rule 15c3-3(e)(3); *see* Jamroz at 1098-99.  "While the formula itself is somewhat complex, it embodies a simple concept for the responsible stewardship of customer cash: if a broker-dealer owes more to its customers than its customers owe to it, the broker-dealer

---

[2] Jamroz is a well-known and recognized authority on the Customer Protection Rule and the Net Capital Rule, as defined below.  He worked at the SEC for 13 years in the division that regulates broker-dealers, now called the Division of Trading and Markets.

2

must set aside at least an amount equal to that difference so that it is readily available to repay customers." Merrill Lynch Order at *4. Thus, a broker-dealer violates Rule 15c3-3 if it makes a transfer which causes or worsens a deficiency in the assets required to be segregated under Rule 15c3-3. *See, e.g.*, *In re Lehman Bros. Inc.*, 478 B.R. 570, 595 (S.D.N.Y. 2012) ("Transferring assets from outside the Reserve Bank Account that clearly were debited to it would violate Rule 15c3-3's requirement that the Reserve Bank Account hold a specified amount 'at all times.'"), *aff'd sub nom. In re Lehman Bros. Holdings Inc.*, 761 F.3d 303 (2d Cir. 2014), and *aff'd sub nom. In re Lehman Bros. Holdings Inc.*, 590 F. App'x 92 (2d Cir. 2015).

To further ensure that customer funds remain protected, the SEC also requires broker-dealers to maintain a minimum level of net capital (meaning highly liquid capital) as all times. 17 C.F.R. § 240.15c3-1 (the "Net Capital Rule"). The purpose of the Net Capital Rule is to provide a cushion of assets in case a firm fails, to prevent losses to customers, and to increase the chances that a firm can self-liquidate instead of needing SIPC to step in. *See* Michael P. Jamroz, *The Net Capital Rule*, 47 Bus. Law. 863, 864-65 (1992). The Net Capital Rule requires that a firm maintain liquid assets sufficient to satisfy the firm's aggregate indebtedness, including customer assets, plus a cushion, "at all times." *Id.* at 864-66; Rule 15c3-1(a). A broker-dealer would also violate the Net Capital Rule if it improperly transfers assets that belong to customers while lacking sufficient assets to satisfy the Net Capital Rule. *See* Rule 15c3-1(a).

### b. Enforcement of the Securities Regulations

The SEC and broker-dealer self-regulatory organizations such as the Financial Industry Regulatory Authority ("FINRA") enforce the Customer Protection Rule by taking enforcement actions against firms, and by making referrals to SIPC when firms cannot meet their obligations to customers. A broker-dealer who uses customer funds in violation of Rule 15c3-3 to pay operational expenses violates the most fundamental broker-dealer regulations. *See, e.g.,* FINRA Sanction Guidelines, at *36, *available at* https://www.finra.org/sites/default/files/Sanctions_Guidelines.pdf (last visited Dec. 20, 2017) (recommending a permanent ban). For example, in a disciplinary action against executives from Kisch & Co., a firm that was in a SIPA liquidation, the SEC barred brokers for their improper withdrawals from the Rule 15c3-3 accounts that were used to pay operating expenses. *In the Matter of Peter J. Kisch*, Admin. Proc. Rulings Release No. 3-5950, 3-6082, 1982 SEC LEXIS 1038, *18, 47 S.E.C. 802, 809-810 (Aug. 24, 1982) (noting that the business "depends so heavily on investor confidence and the integrity of those who are entrusted with customers' funds"); *see also In the Matter of Richard L. Goble*, Admin. Proc. Rulings Release No. 3-14390, 2011 SEC LEXIS 3492, *7-8 (Oct. 5, 2011) (barring a broker because the firm would regularly liquidate customer securities to pay operating expenses); *In re Ralph M. Nordstrom*, Admin. Proc. Rulings Release No. 3-4481, 1975 SEC LEXIS 2543, at *13-14 ALJ (Feb. 21, 1975) (barring a broker because the firm fraudulently transferred securities to a third party in violation of Rule 15c3-3).

Securities regulators have taken actions in the last several years that demonstrate the seriousness of failing to comply with Rule 15c3-3. For example, the SEC settled actions against Merrill Lynch for $415 million[3] and against Morgan Stanley for $7.5 million[4] regarding, among

---

[3] Press Release, SEC, Merrill Lynch to Pay $415 Million for Misusing Customer Cash and Putting Customer Securities at Risk (June 23, 2016), available at https://www.sec.gov/news/pressrelease/2016-128.html, see also Merrill Lynch Order, Bell Decl. Ex. B.

[4] Press Release, SEC, SEC Charges Morgan Stanley with Customer Protection Rule Violations (Dec. 20, 2016), available at https://www.sec.gov/news/pressrelease/2016-269.html.

other things, their use of transactions to artificially reduce the amounts they were required to hold in their special reserve accounts under Rule 15c3-3.

Enforcement of Rule 15c3-3 is not the only penalty faced by a broker-dealer who fails to protect customer property. The SEC and FINRA have also used general conduct rules to discipline individuals who misappropriated client funds. *See, e.g.*, *West v. SEC*, 641 F. App'x. 27, 29 (2d Cir. 2016) (upholding a permanent bar on the broker because he used client funds to pay personal and business expenses, violating NASD Conduct Rule 2110, now FINRA Rule 2010). SEC administrative actions have also relied on NASD Rule 2330, now FINRA Rule 2150, which prohibits the improper use of customer property. *See, e.g., In the Matter of Mission Secs. Corp.*, Admin. Proc. Rulings Release No. 3-13841, 2010 SEC LEXIS 4053, *53-55 (Dec. 7, 2010) (barring the broker and expelling a firm that improperly sold customer property, without notice, and used it to pay firm expenses).

### c. Rule 15c3-3 and SIPA

Rule 15c3-3's protections for customers find direct applicability in a SIPA liquidation. When a firm fails to comply with the Customer Protection Rule or the Net Capital Rule, SIPA may file a protective decree seeking to place the firm into a liquidation. *See* SIPA § 78eee(b)(1)(C). In a SIPA liquidation, the Rule 15c3-3 customer reserve bank accounts and customer securities held by the firm form the corpus of the customer property for distribution to customers. *See* SIPA § 78*lll*(4). Thus, Rule 15c3-3 is designed to ensure that in the event of a broker-dealer failure, all cash and securities owed by a broker-dealer to its customers are available for return to them. *See* Jamroz at 1071-74. In practice, when a firm violates Rule 15c3-3, the firm must either replace the customer assets (and potentially be subject to disciplinary action) or it will be placed into a SIPA liquidation proceeding. *See* SIPA § 78eee(b)(1)(C).

### 2. An Adequately-Capitalized Broker-Dealer Would Have No Reason to Recover Payments Paid to a Trade Creditor

The Court's second question involves whether, aside from fraudulent transfer law, a broker-dealer could recover, in a non-bankruptcy / pre-SIPA liquidation scenario, customer funds improperly used to pay general obligations of the brokerage. Practically speaking, however, this situation would not arise without the institution of a bankruptcy or SIPA proceeding. The reason for this is as follows. If a broker-dealer paid a trade creditor using customer funds and, thereby, failed to maintain at all times the amount required in its Rule 15c3-3 special reserve account, but nonetheless has sufficient non-customer assets to meet that deposit requirement, the broker-dealer would not need to commence an action against a trade creditor in order to replace those assets. Instead, the broker-dealer could use non-customer assets to remedy the violation. Regardless, if the broker-dealer was not in compliance with Rule 15c3-3 "at all times," the broker-dealer would be subject to potential enforcement action.

On the other hand, if a broker-dealer paid a trade creditor using customer funds and, thereby, failed to maintain at all times the amount required in its Rule 15c3-3 special reserve account, and did not have sufficient non-customer assets in order to remedy the violation (also violating the Net Capital Rule by failing to maintain sufficient assets to satisfy the firm's indebtedness), the firm likely would be placed immediately into a SIPA liquidation and the SIPA trustee would then have the obligation to seek to recover the money. *See, e.g.*, *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 114 (Bankr. S.D.N.Y. 1999), *aff'd*, 263 B.R. 406 (S.D.N.Y. 2001) (entering judgment for the SIPA trustee against another broker for avoidance of

4

transfers of customer property). When a broker-dealer cannot repay "customers," SIPC may place the firm in a SIPA liquidation. *See* SIPA § 78eee(a). Violation of the Customer Protection Rule or the Net Capital Rule are also grounds for commencing a SIPA liquidation. *See* SIPA § 78eee(b)(1)(C). In a SIPA liquidation, SIPA defines "customer property" to include "any other property of the debtor which, upon compliance with applicable laws, rules and regulations, would have been set aside or held for the benefit of customers . . . ." SIPA § 78*lll*(4)(D); *see also Ferris, Baker, Watts v. Stephenson (In re MJK Clearing, Inc.)*, 286 B.R. 109, 132 (Bankr. D. Minn. 2002) ("Application of the plain meaning of 15 U.S.C. § 78*lll*(4)(D) provides a means to rectify any actions taken by, or with respect to, the debtor, that results in such a shortfall . . . . Thus, if the debtor failed to set aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78*lll*(4)(D) would require the trustee to correct the debtor's error.") *aff'd*, No. 01-4257 (RJK), 2003 WL 1824937 (D. Minn. Apr. 7, 2003), *aff'd*, 371 F.3d 397 (8th Cir. 2004).

    **a. Allowing Creditors to Maintain Customer Property Improperly Conveyed Would Violate SIPA's Statutory Scheme**

As set forth in the Trustee's briefing in this matter, District Court Judge Jed. S. Rakoff held that the payment of fictitious profits did not satisfy the "value" requirement of Bankruptcy Code section 548(c):

> To the extent that defendants' state and federal law claims allow them to withhold funds beyond their net equity share of customer property, those defendants are, in effect, making those damages claims against the customer property estate. Because their damages claims are not net equity claims (or any other payments that are permitted to be made in SIPA's priority scheme), allowing such claims to be drawn out of the customer property estate would violate SIPA. It is for this reason that only a defendant's investment of principal may count as "value" with respect to the customer property estate for purposes of section 548(c).

*SIPC v. BLMIS (In re Madoff Securities)*, 499 B.R. 416, 424 (S.D.N.Y. 2013) (the "Antecedent Debt Decision").

    **b. The Defendants Are Not Permitted to Further Argue, or to Re-Argue, Issues Relating to Value in Violation of the Antecedent Debt Order**

The modified arguments, the rearguments, and further protestations to this Court by the Defendants are improper and contrary to the direction of the District Court's Antecedent Debt Decision. *See id., see also Picard v. Cohen*, 550 B.R. 241, 255 (Bankr. S.D.N.Y. 2016) (noting that Defendants' "antecedent debt/value arguments . . . have been rejected, and hearing them again will not add value to the disposition of the antecedent debt/value defense in this Court."); *SIPC v. BLMIS (In re BLMIS)*, 531 B.R. 439, 470 (Bankr. S.D.N.Y. 2015). It is disappointing that five years after that decision, the Defendants continue to try to rewrite the past. Each time Defendants re-argue these matters, they do so in violation of the extant order of the District Court. *See* Order, *In re Madoff Sec.*, No. 12 Misc. 0115 (JSR) (S.D.N.Y. May 16, 2012), ECF No. 107, at ¶ 16 (setting forth the sole and exclusive procedures "for determination of the Withdrawn Antecedent Debt Issue . . . ."). These re-arguments also prejudice the Trustee and the net loser customers he seeks to compensate through these repetitive actions and delays. Defendants' arguments on value and obligations are foreclosed and have been for years.

SIPC has authorized the Trustee to represent to the Court that SIPC joins in this letter.

5

                Respectfully,

                */s/ Keith R. Murphy*

                Keith R. Murphy

cc:   Richard Kirby, Esq.
      Kevin H. Bell, Esq.