# EXHIBIT D

08-01789-cgm    Doc 17065-4    Filed 12/20/17    Entered 12/20/17 19:16:34    Exhibit D
Pg 2 of 18

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

Release No. 78141 (S.E.C. Release No.), Release No. 34-78141, 2016 WL 4363431

S.E.C. Release No.
Securities Exchange Act of 1934

SECURITIES AND EXCHANGE COMMISSION (S.E.C.)

IN THE MATTER OF MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
AND MERRILL LYNCH PROFESSIONAL CLEARING CORP. RESPONDENTS.

Administrative Proceeding File No. 3-17312
June 23, 2016

**ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER**

**I.**

**\*1** The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S") and Merrill Lynch Professional Clearing Corp. ("MLPro") (collectively, "ML" or "Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted an Offer of Settlement that the Commission has determined to accept. Respondents admit the facts set forth in Sections III. A, III.B., ELD., and III.E. below, acknowledge that their conduct violated the federal securities laws, admit the Commission's jurisdiction over them and the subject matter of these proceedings, and consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondents' Offer of Settlement, the Commission finds [1] that:

**Summary**

Broker-dealers are required to be diligent stewards of the cash and securities entrusted to them by their customers. This basic principle is embodied in Exchange Act Rule 15c3-3, known as the Customer Protection Rule ("Rule"). The Rule requires broker-dealers to safeguard both the cash and securities of their customers so that customer assets can be quickly returned if the firm fails. In broad strokes, a broker-dealer cannot use customer assets to finance the business activities of the firm, and it cannot place customer assets in locations or accounts that make them vulnerable to claims made against the broker-dealer by third parties.

This matter arises from significant violations of the Customer Protection Rule that began during the Financial Crisis and, in certain respects, continued until this year. The violations were twofold. First, ML used cash belonging to its customers to fund its own business activities through a series of increasingly complex trades. Second, at the same time

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

08-01789-cgm    Doc 17065-4    Filed 12/20/17    Entered 12/20/17 19:16:34    Exhibit D
Pg 3 of 18

and continuing for years due to poor oversight and weak controls, MLPF&S allowed certain of its clearing banks to hold general liens over tens of billions of dollars of securities owned by its customers.

***2** The first set of violations concerns trades devised by ML that were known internally as the Leveraged Conversion Trades ("Trades"). From 2009 to 2012, ML used the Trades to reduce the amount of cash it was required to deposit in a customer reserve account that it maintained pursuant to Rule 15c3-3(e). Margin loans extended to finance customer positions can properly reduce the amount a broker-dealer is required to deposit; however, ML made billions of dollars in margin loans to finance riskless trades that lacked defined terms and economic substance which ML structured and then executed with newly-created counterparty entities. Through these trades, ML improperly reduced by billions of dollars the amount it was required to deposit in its customer reserve account. These Trades evolved over time and, in their final iteration, became instantaneous roundtrips structured to provide financing for ML's activities rather than in response to customer trading objectives.

ML used these Trades to remove up to $5 billion of customer cash week over week from its customer reserve account. ML then used these funds to finance its business activities. Had ML failed when the Trades were in use, its customers would have been exposed to a shortfall of customer cash in the customer reserve account.

The second set of violations involved the custody of customer securities from 2009 until this year. Rule 15c3-3(c) requires broker-dealers like MLPF&S to hold customer securities that are not collateralizing margin loans in a segregated account free of liens. The purpose of this requirement is to protect customer securities from claims by a failed broker-dealer's creditors. From June 2009 to April 2015, MLPF&S held up to $58 billion of customer securities in a clearing account that was subject to a general lien by one of its clearing banks. In addition to this account, until as recently as this year MLPF&S held approximately $1.38 billion in customer securities in 6 other clearing accounts in Europe and Asia as of the end of 2015 that also were subject to liens and approximately $4.8 billion in 48 other accounts in Europe, Asia, and Australia as of the end of 2015 that lacked documentation establishing that they were not subject to liens. Had MLPF&S failed during this period, these liens, and the resultant uncertainty, would have hindered or prevented MLPF&S's customers from retrieving their securities and could have significantly further damaged public confidence in the U.S. brokerage and securities industries during or after the Financial Crisis.

The significant penalties and other relief imposed in this Order in connection with ML's violations of the Customer Protection Rule reflect the seriousness with which the Commission views failures to comply with this Rule.

**A. Respondents**

1. Merrill Lynch, Pierce, Fenner & Smith Incorporated, headquartered in New York, New York, is dually-registered with the Commission as a broker-dealer and investment adviser. It is a wholly-owned subsidiary of Bank of America Corporation.

***3** 2. Merrill Lynch Professional Clearing Corp., headquartered in New York, New York, is registered with the Commission as a broker-dealer. It is a direct, wholly-owned subsidiary of MLPF&S.

**B. Other Entities and Individuals**

3. Bank of America Corporation ("BAC") is a bank holding company incorporated in Delaware and a financial services holding company under the Gramm-Leach-Bliley Act. BAC's common stock is registered with the Commission under Section 12(b) of the Exchange Act and trades on the New York Stock Exchange under the symbol "BAC." BAC's principal offices are located in Charlotte, North Carolina.

4. William Tirrell ("Tirrell"), age 61, is a resident of Lawrenceville, NJ and an associated person of broker-dealer and investment adviser MLPF&S. From 2004 until April 2016, he was the Financial and Operations Principal ("FinOp") and Head of the Regulatory Reporting Department for MLPF&S and in that role oversaw regulatory reporting for MLPF&S and MLPro. Concurrent with that role, Tirrell was the Acting CFO of MLPF&S from August 2014 to April 2016. He holds a Series 27 License.

5. SEFT Trader was a Managing Director at MLPF&S who worked on its Structured Equity Financing & Trading ("SEFT") desk from 2005 to 2012.

## Background

**C. The Customer Protection Rule**

6. Rule 15c3-3 of the Exchange Act is designed to protect broker-dealer customers in the event a broker-dealer becomes insolvent. The intent and objective of the Rule is:

> the elimination of the use by broker-dealers of customer funds and securities to finance firm overhead and such firm activities as trading and underwriting through the separation of customer related activities from other broker-dealer operations.

Rule 15c3-3 Adopting Release, Exch. [Rel. No. 9775, 1972 WL 125434, at \*1 (Sept. 14, 1972)](); *see also id.* (one objective of the Rule was to "inhibit the unwarranted expansion of a broker-dealer's business through the use of customers' funds by prohibiting the use of those funds except for designated purposes"); [Exch. Act Rel. No. 21651](), [50 FR 2690-01 at 2690 (Jan. 18, 1985)]() (Rule "forbid[s] brokers and dealers from using customer assets to finance any part of their businesses unrelated to servicing securities customers; *e.g.*, a firm is virtually precluded from using customer funds to buy securities for its own account").

7. Rule 15c3-3 requires a broker-dealer that maintains custody of customer securities and cash (a "carrying broker-dealer") to take two primary steps to safeguard these assets. The steps are designed to protect customers by segregating their cash and securities from the broker-dealer's business activities. If the broker-dealer fails financially, the securities and cash should be readily available to be returned to the customers. In addition, if the failed broker-dealer is liquidated in a formal proceeding under the Securities Investor Protection Act, the securities and cash should be isolated and readily identifiable as customer property and, consequently, available to be distributed to customers ahead of other creditors. *See* [15 U.S.C. 78aaa]() *et seq.*

*Customer Protection Rule Requirements for Customer Cash*

**\*4** 8. The Rule requires a carrying broker-dealer to maintain a reserve of funds and/or certain qualified securities in an account at a bank ("Reserve Account") that is at least equal in value to the net cash owed to customers. [17 CFR 240.15c3-3(e)]().

9. The amount of net cash owed to customers is computed pursuant to a formula set forth in Exhibit A to Rule 15c3-3 ("Reserve Formula"), which most carrying broker-dealers calculate on a weekly basis. [17 CFR 240.15c3-3a](). Under the Reserve Formula, the carrying broker-dealer adds up customer credit items that it owes its customers (*e.g.*, cash in customer securities accounts) and then subtracts from that amount customer debit items that its customers owe it (*e.g.*, margin loans). *See [id.]()* If credit items exceed debit items, that net amount must be deposited, or already be on deposit, in the Reserve Account in the form of cash and/or qualified securities. [2] [17 CFR 240.15c3-3(e)](). A broker-dealer generally cannot make a withdrawal from the Reserve Account until the next computation and even then only if the computation

shows that the reserve requirement has decreased. *Id.* The broker-dealer must make a deposit into the Reserve Account if the computation shows an increase in the reserve requirement.

10. While the formula itself is somewhat complex, it embodies a simple concept for the responsible stewardship of customer cash: if a broker-dealer owes more to its customers than its customers owe to it, the broker-dealer must set aside at least an amount equal to that difference so that it is readily available to repay customers.

11. FINRA's Interpretations of Financial and Operational Rules handbook includes an update, first issued in 1989, which states that the Commission staff has advised that any "device, window dressing or restructuring of transactions made solely to reduce an excess of credits over debits in the Rule 15c3-3 formula computation and not otherwise a normal business transaction" may be considered a circumvention of the Rule. FINRA Interpretations of Financial and Operational Rules, Rule 15c3-3(e)(2)/02 ("Interp. 15c3-3(e)(2)/02") *formerly* N.Y.S.E. Interpretation Handbook, Vol. II, Interpretation Memo No. 89-10, Aug. 23, 1989 (Commission Staff to NYSE) (No. 89-11, 1989 WL 1169979, Oct. 9, 1989).

12. To facilitate the Commission's oversight of broker-dealers, Rule 15c3-3(i) imposes a self-reporting requirement. If a broker-dealer fails to maintain the minimum required amount in its customer reserve account, it must immediately notify the Commission and FINRA of this failure.

*Customer Protection Rule Requirements for Customer Securities*

 **\*5** 13. Rule 15c3-3 also protects customer securities from the risks broker-dealers take in running their business and from the dangers that would arise if a broker-dealer fails. Specifically, the Customer Protection Rule requires a carrying broker-dealer to promptly obtain and thereafter maintain physical possession or control over customers' fully paid and excess margin securities. 17 CFR 240.15c3-3(b). Physical possession or control generally means that the broker-dealer must hold these securities in one of several locations specified in the Rule and that they be held free of liens or any other interest that could be exercised by a third-party to secure an obligation of the broker-dealer. [3] 17 CFR 240.15c3-3(c). Permissible locations include a bank, as defined in Section 3(a)(6) of the Exchange Act, and a clearing agency. *Id.*

**D. ML Improperly Reduced Its Reserve Account**

14. From 2009 to 2012, ML executed a series of trades that reduced the balance of its Reserve Account by billions of dollars and then used those freed-up funds to finance firm inventory and thereby finance its business activities.

15. To efficiently manage the firm's capital, ML requires its trading desks to finance the securities they hold. ML makes capital available to its trading desks so that the desks can purchase securities, but it charges an interest rate on this capital, known as the firm's treasury rate, that typically is higher than the interest that external third parties charge. To avoid being assessed the more expensive internal financing rate, a trading desk can finance its positions externally through a repurchase agreement, stock loan, or other means. Taking a repurchase agreement as an example, a ML trading desk can pledge its securities to another firm as collateral for a loan that is roughly equivalent to the market value of the securities. As part of this repurchase agreement, the ML trading desk pays interest on this loan. The ML trading desk can then use the funds obtained through the repurchase agreement to pay for the firm securities it posted as collateral or use the funds to engage in more trading activity. As described below, the Trades used interest-free funds obtained through reductions to the Reserve Account balance, rather than repurchase agreements, to finance its business activities.

16. In 2008, ML sought to reduce the amount of cash it was required to deposit in the Reserve Account that it maintained for the benefit of MLPF&S's and MLPro's customers. MLPF&S's SEFT desk developed a trade designed to introduce customer debits into the Reserve Formula through soliciting customers to enter into conversion trades that would include margin loans that would decrease dollar-for-dollar the amount ML was required to maintain in the Reserve Account.

To ensure that it would operate as desired and did not run afoul of the Rule, the SEFT desk developed the trade in consultation with MLPF&S's Regulatory Reporting Department, which is responsible for performing the Reserve Formula calculation each week and maintaining the minimum required amount in its Reserve Account.

**\*6** 17. SEFT Trader conceived of the trade and was responsible for structuring it. During 2008 to 2012, William Tirrell was the Head of MLPF&S's Regulatory Reporting Department and its FinOp. While developing the trade, the SEFT desk consulted with Tirrell about the Trades' potential impact on the Reserve Formula.

18. In August 2008, the SEFT desk obtained internal approval for Trades, known as the Leveraged Conversion Trades. In their initial form, the Leveraged Conversion Trades were conversion trades that used listed options financed by customers through margin loans extended by MLPF&S or MLPro. This margin loan introduced a customer debit into the Reserve Formula that reduced the minimum amount ML was required to maintain on deposit in ML's Reserve Account.

19. In this listed conversion trade, a customer would buy a put and sell a call on a stock with the same strike price and expiration date. The customer would also purchase on margin the stock to cover the call. Because the options fully hedged the customer's stock purchase, it was insulated from market risk provided that the customer could fully cover the short position created by his call option. In addition to this stock borrow risk, the trade presented other risks because it was exposed to the market, such as pin risk, dividend risk, and early exercise risk. [4]

20. The original version of the trade, as presented by the SEFT desk to internal reviewers in a one page handout, expressly proposed that the trade be used to provide "synthetic financing" to ML through which the firm's inventory would be used in the Trades and financed through the reductions to the amount deposited into the Reserve Account caused by the extension of the margin loan to a customer. A Leveraged Conversion Trade using listed options cannot finance firm inventory in situations where other market participants on the exchange are able to step in to take the other side of the customer's put and call options. If the customer long position in that scenario is sourced from ML's inventory, ML would lose that inventory when the counterparty to the conversion trade exercised his in-the-money put or call. To avoid that, under the trade proposed by the SEFT desk, ML would ensure that it always was the counterparty to the customer's conversion trade and thereby was guaranteed to retain the inventory it used in a Leveraged Conversion Trade.

21. Through this proposed Trade, the SEFT desk was proposing to finance a customer - through the extension of a margin loan - so that the customer could then use the loan it received to provide that same financing back to ML - through the customer's purchase of ML inventory used to cover the short. While this reciprocal financing cancels itself out, the margin loan extended to the customer would reduce the Reserve Account and those funds could be used - on an interest-free basis - to finance the firm inventory used in the Trade.

**\*7** 22. Internal reviewers rejected this proposal but agreed to a modified one in which firm inventory may be financed incidentally through a customer-driven trade, but cannot be the driver for the conversion trade or the terms or securities used in a trade. As reflected in a revised handout (i) the Trades would be exposed to the market, (ii) ML could take the other side of the Trades, but floor traders could also step in and take all or part of the Trades, and (iii) the customer's long position used to cover the short would be sourced as all customer shorts typically were sourced, through either a borrow from an external lender, firm inventory, or some combination of the two. The following is the handout revised to reflect limitations imposed by internal reviewers:

**Leveraged Conversion**

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
23. After executing Leveraged Conversion Trades according to the limitations imposed by internal reviewers, the SEFT desk in early 2009 renewed their request to use the Trades to finance firm inventory. The SEFT desk also requested to

scale the Trades up so that they could reduce the minimum amount required to be maintained in the Reserve Account by a greater amount.

24. ML, which by that time had recently been acquired by BAC, sought to discuss the Leveraged Conversion Trades with securities regulators for two reasons. First, because this sizeable decrease in the Reserve Account balance would be observable in monthly reports submitted to the Financial Industry Regulatory Authority ("FINRA"), ML requested to meet with staff from FINRA and the Commission's Division of Trading and Markets ("T&M") to discuss the Trades. Second, it was perceived within ML that using customer money to finance firm inventory moved the Trades into an area of regulatory uncertainty. As stated above, one of the primary objectives of the Reserve Account requirement in Rule 15c3-3 is to prevent broker-dealers from using customer assets to finance firm activities.

*ML Presented an Early Iteration of the Leveraged Conversion Trades to Its Regulators*

25. Tirrell and SEFT Trader presented the Trades at a meeting with FINRA and T&M in August 2009. Despite being an impetus for the meeting, ML did not inform FINRA and T&M, either at the August 2009 meeting or subsequently, that the primary purpose of the Leveraged Conversion Trades was to finance firm inventory. Tirrell, using the revised handout shown above, presented the Trades to regulators. In addition to explaining the bullets on the slide concerning market exposure and the use of only actively traded large cap stocks, Tirrell told regulators that ML's customers took on real risk, which in Tirrell's view made the Trades like any other conversion trade. Based on the revised handout and the discussions at the meeting concerning the presence of real risk, the fact that these were standard conversion trades - which were to be customer and not firm driven - and the perceived economic substance of all of the trade components, the regulators did not object to the version of the Leveraged Conversion Trades that was presented. While they did not object to the Trade as presented, the regulators limited them by advising ML that the Trades collectively could not exceed a notional value of $3 billion for any given calculation period.

 **\*8** 26. Over the next year, the Leveraged Conversion Trades would lose each of the key attributes that had been presented to regulators.

27. Shortly after ML met with regulators, it began using the Leveraged Conversion Trades to finance firm inventory. ML chose stocks that it had in inventory and that it otherwise would be seeking to finance through a more costly repurchase agreement or other means. ML then advised floor traders that it intended to take the other side of the trade and that they need not locate counterparties on the exchange. The margin loan extended to customers in each trade created a debit that reduced the required amount to be deposited into the Reserve Account by hundreds of millions and, collectively, billions of dollars. The cash freed from ML's Reserve Account through this debit was used to finance the security sold to the Leveraged Conversion Trade customers as part of the Trades.

28. ML considered the difference between the cost of financing the position through traditional means and through a Leveraged Conversion Trade as profit. The SEFT desk was credited with approximately half of the profit generated by the Leveraged Conversion Trades, and the trading desk that supplied the inventory was credited with the residual.

*ML Did Not Keep Regulators Apprised in Regular Reports*

29. At the August 2009 meeting with FINRA and T&M, and in a subsequent email confirming the takeaways from that meeting, ML agreed to provide details on executed Leveraged Conversion Trades in its Financial and Operational Combined Uniform Single ("FOCUS") Reports that MLPF&S and MLPro each submit monthly to FINRA, which in turn provides them to the Commission.

08-01789-cgm    Doc 17065-4    Filed 12/20/17    Entered 12/20/17 19:16:34    Exhibit D
Pg 8 of 18

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

30. MLPF&S did not, however, provide details relating to its Leveraged Conversion Trade activity in any monthly FOCUS Reports filed in 2009, 2010, or 2011. And, aside from one FOCUS Report filed in September 2009, MLPro similarly failed to provide this information from 2009 to 2012.

*Leveraged Conversion Trade Counterparties*

31. Once ML began using the Leveraged Conversion Trades to finance firm inventory, ML's financing needs wholly dictated the terms of the Trades. As a result, the customer debits created by the Trades became purely firm driven. A significant portion of the Leveraged Conversion Trades were done with limited liability companies ("LLCs") that were set up at ML's behest, were told they would receive fixed profits, and had no meaningful input into the Trades.

32. In mid-2010, SEFT Trader solicited three former options traders who, at the time, were not ML customers, to participate in the Trades. SEFT Trader advised them to create LLCs to execute Leveraged Conversion Trades, from which they would earn a fixed rate of return of up to 15% on the total amount they deposited to capitalize the LLC. Specifically, SEFT Trader advised each of them to open portfolio margin accounts at MLPF&S in the name of the newly-created LLC and to deposit at least $5 million in cash or securities into the account. The LLCs were offered significant leverage; for every dollar in cash or securities an LLC deposited into a portfolio margin account, ML allowed the LLC to purchase on margin up to $100 of securities. Although a fixed 1% margin rate was ostensibly applied to the margin loans extended, the Leveraged Conversion Trades would generate fixed profits sufficient to pay all interest owed in addition to the predetermined return.

**\*9**  33. SEFT Trader advised the prospective counterparties that ML would take the other side of these Trades, *i.e.*, that the put and the call for the conversion trade would be between the LLC and ML, and that ML would sell the LLC the underlying stock needed, and that as a result the trades were virtually riskless.

34. In a typical conversion trade, a customer attempts to profit from pricing inefficiencies in the options market, and as part of the trade, purchases stock on margin. However, the Leveraged Conversion Trades designed by ML did not generate potential profits from a traditional leverage conversion strategy, but instead provided a fixed rate of return on cash or securities held in the LLC's account. If one leaves aside the gains ML made from reducing the balance in its Reserve Account, the trades themselves, which were not with the market but with ML, were zero sum: customers made money on the trades in the exact amount by which ML lost money.

35. The prospective counterparties did not question why ML would effectively pay them to engage in trades in which ML would lose money every time. Presented with an offer of a virtually riskless return on their capital, they agreed to create LLCs. They each then opened portfolio margin accounts at ML in the name of their respective LLCs and transferred stocks they were holding at other broker-dealers into the accounts.

36. For each Leveraged Conversion Trade executed by an LLC, ML devised the terms of the trade, and the LLC offered no meaningful input. ML chose when to do the trades, the underlying stock to be used and its purchase price as well as the price, strike price, and expiration date of the options. ML did not negotiate these terms with the LLC, but requested that the LLC give ML an order for this pre-packaged trade. After receiving an order, ML would execute the trade.

37. SEFT Trader made a similar solicitation to an options trading firm, which also engaged in a significant number of Leveraged Conversion Trades with ML as its counterparty from 2010 through 2012. Like the LLCs, this entity did not question the rationale for the Trades and had little input into the terms and structure of the Trades.

38. The purported customer debits generated by the Leveraged Conversion Trades were tracked in internal reports under the heading, "non-client debit." Also, internally ML referred to the net amount a counterparty received for completing a Leveraged Conversion Trade not as its profit, but as a fee that ML paid the counterparty.

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

08-01789-cgm    Doc 17065-4    Filed 12/20/17    Entered 12/20/17 19:16:34    Exhibit D
Pg 9 of 18

*The Trades Morphed*

39. Any unexpected loss in a Leveraged Conversion Trade would result in the counterparty receiving an amount that fell short of the fixed rate of return it was advised it would receive. Any unexpected gain would result in a windfall to the counterparty that ML would be required to pay. In 2009, an unexpected dividend resulted in a windfall to an LLC. The LLC's principal offered to return the windfall to ML. SEFT Trader declined to accept it, but resolved to avoid dividend and all other risks going forward.

***10** 40. Following this unexpected loss, SEFT Trader sought to modify the Leveraged Conversion Trades so that the SEFT desk had total control over each leg of each trade. By exclusively using firm inventory, ML eliminated the risk relating to the acquisition of the underlying stock.

41. To achieve this, the SEFT desk sought to use unlisted, over-the-counter ("OTC") options. OTC options, which are bilateral contracts directly between the LLC and ML, eliminate exposure to the listed option market and the risks that come with it. Because the prices used for OTC options are not reported and are not exposed to the market, ML could depart from the prevailing market price of the securities and reverse engineer prices that yielded the precise "fee" owed to the customer participating in the Trades. ML also drafted the OTC contracts to remove dividend risk. Because this iteration of the Leveraged Conversion Trades was effectively riskless, ML removed the Leveraged Conversion Trades from its risk monitoring systems.

42. In addition, by moving to OTC options, which can be written on any security, ML diverged from its presentation to regulators that ML would use only actively traded stocks. As discussed below, using OTC options allowed ML to use customer money to finance certain of its less liquid positions, the financing costs for which were higher than those associated with large cap stocks.

43. In December 2009, Tirrell emailed FINRA staff to advise them that the SEFT desk "would like to [] use unlisted options as it provides greater flexibility." "I don't see this as a material change to the current arraingement [sic]," Tirrell stated in the email, "but wanted to ensure you are in agreement." In January 2010, FINRA staff communicated to Tirrell that the regulators' non-objection did not extend to unlisted options and requested that ML describe, in writing, the difference in transaction structure, the regulatory impacts, and the rationale for why this version of the Leveraged Conversion Trades should be allowed to have a similar impact on the Reserve Formula.

44. Tirrell did not provide the requested information. The SEFT desk obtained internal approval from Tirrell and others for Leveraged Conversion Trades using OTC options. However, it is not apparent that, at the time, anyone within ML other than Tirrell knew about FINRA staff's questions posed in the January 2010 email.

45. Later in January 2010, the regulators granted ML's request to expand the size of the Leveraged Conversion Trades, as they understood them based on the August 2009 meeting, from $3 billion to $5 billion.

46. In September 2010, the SEFT desk began executing Leveraged Conversion Trades using OTC options. The SEFT desk used the counterparties described above to execute these trades.

47. The following is an example of an OTC Leveraged Conversion Trade:
 ***11** a. In February 2011, ML identified a block of 310,000 shares of Google common stock in firm inventory that at the time were worth approximately $189 million. ML determined that cost savings could be achieved through a Leveraged Conversion Trade because the fee paid to an LLC to obtain customer money from the Reserve Account was much less than the interest that would be charged in a repurchase agreement or other means of financing.

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

08-01789-cgm    Doc 17065-4    Filed 12/20/17    Entered 12/20/17 19:16:34    Exhibit D
Pg 10 of 18

b. The SEFT desk informed the LLC's principal that it intended to do a Leveraged Conversion Trade using 310,000 Google shares in the LLC's name. ML set all of the terms of the trade, and the LLC offered no input.

c. On February 7, 2011, the SEFT desk executed a Leverage Conversion Trade in which (i) the LLC purchased 310,000 shares of Google, (ii) simultaneously sold them back at $612 with a delayed settlement date of April 6, 2011, and (iii) and purchased from ML an OTC put on the Google shares and sold to ML an OTC call for these shares that both had the same strike price, $612, and expired that day. [5] The effect of this delayed settlement was to keep the margin loan for this one day trade - and the resulting customer debit in the Reserve Formula - open for months. Because the LLC sold the shares back to ML at the same moment it purchased them, the put and the call between the LLC and ML were not necessary to hedge market risk once the trade was put on and, in fact, there is no evidence that ML or the LLC accomplished the instantaneous sale and repurchase through the exercise of the in-the-money put or call. Moreover, as described below, ML and the LLC did not execute an OTC contract for these one-day options until over a year after they expired.

d. To finance the LLC's purchase of the Google shares, ML extended a portfolio margin loan to the LLC in the amount of approximately $189 million. Other than the securities transferred into the LLC's portfolio margin account against which ML extended margin, the LLC did not contribute any funds toward this trade. The rate on the margin loan was 1%. This margin loan introduced a customer debit in the Reserve Formula and reduced the amount of customer money to be deposited into that account by the same amount. ML would then use the money it otherwise would have been required to deposit into the Reserve Account to finance the Google shares. The trading desk that controlled these Google shares could then use these funds in its trading activities.

e. Although the price of Google shares on the trade date ranged from $613 to $625, the SEFT desk reverse engineered the $610.98 purchase price and the $612 strike price to yield a total profit to the LLC that was equal to the sum of the LLC's costs to do the trade and the fixed rate of return the LLC's principal was told he would receive. The SEFT desk calculated the cost of the purchase of the stock and the OTC put, the profit from the sale of the OTC call, the total interest that would be charged on the margin loan, and the cost of regulatory fees and then chose a strike price that ensured the total profits were sufficient to cover the sum of these costs and the rate of return the LLC expected on the value of the stock it deposited into its portfolio margin account.

*12 f. The April 6 settlement date was a placeholder, and the SEFT desk had no expectation that the trade would be settled then. If ML could benefit from financing its Google shares through this trade past April 6, it would delay the settlement to an even later date by requesting that the LLC agree to a new settlement date that ML unilaterally determined. With this trade, after receiving approval from the LLC, ML extended the settlement date to May 4, 2011. This further extended the time that the margin loan would be open and the accompanying customer debit would stay in the Reserve Formula.

g. Extending the settlement date altered the economics of the trade. ML would continue to charge a margin interest rate of 1% until the trade was settled, and the interest charged from the original settlement date of April 6 to the new settlement date of May 4 would have eliminated the customer profit on the trade. To avoid this, ML changed the economics of the trade. Although the trade had been fully completed months before, ML went into the closed trade and increased the strike price of the expired put and the expired call from $612 to $612.499. While this could have no effect on the trade because it happened months before, ML used it as a justification to increase the buyback price of the Google shares to $612.499 and thereby increase the customer's profits. ML arrived at this new strike price for these expired options by reverse engineering the amount of profits needed for this Leveraged Conversion Trade taking into account all of the items previously mentioned as well as the additional margin interest charged as a result of the new delayed settlement date. ML informed the LLC of this modification and requested an order from it, which the LLC provided.

h. From March to October 2011, ML modified the February 7, 2011 Google trade ten times. Through these modifications, ML extended the settlement date to December 7, 2011 and increased the buyback price from $612.499 to $616.3934. During this period, however, the actual share price of Google common stock was declining and fell to as low as $474.40.

i. In late October, ML sought to unwind the trade before the December 7 extended settlement date that it had set just a few weeks before. On October 31, 2011, ML revised the trade by shortening the settlement date to the next day and decreasing the buyback price from $616.3934 to $615.745.

j. On November 1, 2011, the Google shares settled in ML's account. ML applied the cash it paid for the shares to the LLC's margin loan, which closed it out. The total gross profits from this trade to the customer were approximately $1.8 million and the net amount ML paid to the LLC, after taking into account its margin interest and other costs, was $71,585. This fee offered the fixed return on the value of the stock the LLC held with ML and was much less than the interest payments ML would have been required to make if it had financed these shares through other means.

**\*13** 48. ML's systems recognized this version of the Leveraged Conversion Trades as a nullity and automatically cancelled them. To avoid these cancellations, ML personnel manually overrode these systems.

49. Like the early version of the Trade that used actively traded large cap stocks, the OTC version of the Trade was used to finance large cap equity securities. However, unlike the listed version, the OTC version also was used to finance less liquid positions, such as convertible bonds and stock warrants that were more difficult and more expensive to finance than large cap equities. This shift to illiquid securities departed from the trade structure presented to regulators.

50. In the OTC iteration of the Trades, which lasted from approximately September 2010 to April 2012, ML reduced the minimum amount required in its Reserve Account by up to $5 billion per week through Leveraged Conversion Trades. During this period, ML's Reserve Account balance ranged from approximately $7.6 to $12.8 billion; therefore, although no customers were harmed, ML put them at risk by reducing the customer money it was required to deposit into its Reserve Account by approximately 28% to 40%.

*ML Halted All Leveraged Conversion Trades*

51. In early 2012, a new co-head of the business unit that included the SEFT desk learned of the Leveraged Conversion Trades and became concerned about whether they complied with the Customer Protection Rule. After he discussed the OTC version of the Trades with the SEFT desk and others within ML, the firm retained external counsel to conduct a review of the Leveraged Conversion Trades.

52. ML thereafter changed two practices associated with the Trades. First, ML had the LLCs sign OTC contracts for all of their OTC Leveraged Conversion Trades that attempted to retroactively create the OTC options that had expired many months ago and that were used in Trades that had already been fully executed. Second, after years of failing to report Leveraged Conversion Trades in FOCUS Reports, both MLPF&S and MLPro began submitting the required information in their respective FOCUS Reports for the months January 2012 through April 2012.

53. In April 2012, ML prohibited the SEFT desk from executing any new Leveraged Conversion Trades. ML did not provide any information relating to the circumstances of its discontinuation of the Leveraged Conversion Trades in 2012 to the regulators.

*The Effect of the Leveraged Conversion Trades*

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

08-01789-cgm    Doc 17065-4    Filed 12/20/17    Entered 12/20/17 19:16:34    Exhibit D
Pg 12 of 18

54. ML conceived of and executed the Leveraged Conversion Trades during an extremely precarious period of time in the financial markets. Several months after ML began the trades, Lehman Brothers collapsed, and ML was sold to BAC. Based on the market's assessment of ML's risk of default, as reflected in the spread of credit default swaps referencing ML or, following the date of the merger announcement, BAC, the risk of a ML or BAC default remained heightened throughout the life of the Trades.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**\*14** 55. Had ML or its parent failed, the funds ML set aside in its Reserve Account would have been distributed to customers in a liquidation administered by the Securities Investor Protection Corporation ("SIPC"). By improperly reducing its Reserve Account by up to $5 billion to finance its business activities, ML failed to maintain the required minimum amount in its Reserve Account. During this period, the SIPC Fund, which SIPC maintains to cover shortfalls, was less than $2 billion, and prior to the adoption of the Dodd-Frank Act, SIPC, through the Commission, was authorized to obtain a loan from Treasury of only an additional $1 billion.

56. Taking the Leveraged Conversion Trade using Google shares summarized above, ML reduced the minimum amount it was required to maintain in its Reserve Account by approximately $189 million in a trade that involved 310,000 shares of Google common stock. Given that these LLCs had under $15 million in cash and/or securities in their respective accounts, they could not have repaid the portfolio margin loans extended to them. If ML failed financially, the Reserve Account it maintained to make customers whole would be underfunded. The underlying long (in this example, the 310,000 shares of Google common stock) may be used to reduce that shortfall, but these efforts would not fully protect customers. Even assuming that these shares could be liquidated and applied toward the customer debits introduced by the margin loan to the counterparty, ML's customers would be exposed to significant market risk if ML failed. Indeed, these Google shares dropped in value during this trade and at one point were worth approximately $33 million less than the margin loan. In addition, market conditions during the failure of a large broker-dealer typically are poor. Selling these shares in the midst of those conditions likely would have exposed customers to potential losses much greater than $33 million.

57. The Leveraged Conversion Trades involving convertible bonds further increased the market risk to which ML's other customers were exposed. During this period, the convertible bond market was especially illiquid. Liquidating these securities would have taken a period of time during which customers would not have been able to access their accounts. Also, a liquidation of a large amount of convertible bonds into an already illiquid market would likely be achieved only by selling them at a significant discount.

58. By using customer cash to finance firm inventory, ML made approximately $50 million in profits through the Leveraged Conversion Trades, which represents the amount the firm saved by using customer money to finance its inventory rather than doing so through other means such as repurchase agreements.

**E. MLPF&S Improperly Allowed Liens on Customer Securities**

59. From June 2009 to April 2015, MLPF&S allowed tens of billions of dollars' worth of its customers' fully paid and excess margin securities to be held in a clearing account subject to a general lien by its domestic clearing bank (the ""Clearing Bank"). These customer securities were held in an account at the Clearing Bank for securities that can be transferred through the Federal Reserve Fedwire Funds Transfer System and consisted of Treasuries and mortgage backed securities (collectively, "Fedwire securities"). The total market value of the Fedwire securities in this account during this period ranged from approximately $30 to $60 billion; approximately 98% of the securities in the account were customer securities, and the remainder was firm securities. Pursuant to the Clearing Bank's lien, if MLPF&S went bankrupt or defaulted on any debt it owed to the Clearing Bank, the Clearing Bank had the legal right to assert a security interest in those customers' securities.

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

08-01789-cgm    Doc 17065-4    Filed 12/20/17    Entered 12/20/17 19:16:34    Exhibit D
Pg 13 of 18

*MLPF&S - Clearing Bank September 2008 Clearing Agreement*

**\*15** 60. In September 2008, MLPF&S and the Clearing Bank executed a securities clearing agreement which provided the Clearing Bank with a general lien on what would become MLPF&S's Fedwire clearing account ("Fedwire Clearing Account"). The lien was established pursuant to the following provision (with MLPF&S being the "Customer" of the Clearing Bank "Bank"):

> Section 3.04 <u>Collateral Security</u>. As security for the repayment of Loans and for the payment of interest thereon and *all other Customer obligations to Bank*, Customer hereby grants Bank a security interest in any and *all Securities* which may now or hereafter be held in the Account…" (emphasis added)

61. Under these terms, the Clearing Bank's lien provided the Clearing Bank with a broad security interest against the repayment of any obligations of MLPF&S to the Clearing Bank, whether or not arising from the Fedwire clearing relationship. Furthermore, the lien applied to any security - whether owned by MLPF&S or not - that was held in the relevant clearing account. Other provisions of the agreement allowed MLPF&S to transfer securities from the Fedwire Clearing Account to a separate segregated account, free of this lien, if MLPF&S met certain conditions.

62. One of the services provided by the Clearing Bank is to extend its clearing clients intraday loans to facilitate the daily purchase of securities into the account. If MLPF&S or one of its customers seeks to purchase a security, and if there is not sufficient cash in the clearing account to cover that purchase, the Clearing Bank will extend a loan to enable that transaction. Particularly if the securities purchases on a given day exceed securities sales, the balance of these loans from the Clearing Bank can rise into the billions or even tens of billions of dollars. The loan is typically paid back by the clearing customer at the end of the trading day.

63. Given the credit risk inherent in making loans to a clearing client, the Clearing Bank required a lien on any "street-facing account," - *i.e.*, any account for which securities can be freely delivered out to or in from third-parties without the Clearing Bank's review - for which it extends intraday credit. However, under the September 2008 securities clearing agreement, MLPF&S could have instructed the Clearing Bank to transfer customer fully-paid and excess margin securities from the Fedwire Clearing Account to a lien-free account if MLPF&S met certain conditions.

*MLPF&S Moved Fedwire Clearing Account to the Clearing Bank*

64. In late 2008, around the time of the acquisition of MLPF&S by BAC, MLPF&S decided to migrate its Fedwire Clearing Account from a different clearing bank, where it had not been subject to a lien, to the Clearing Bank.

65. Pursuant to the clearing agreement reached months earlier, the Clearing Bank would have a lien on all securities held in a street-facing, non-segregated account such as the Fedwire Clearing Account. MLPF&S, however, did not then have the capability to segregate Fedwire securities from the Fedwire Clearing Account by transferring them into a separate, lien-free account after they had cleared. Operations personnel recognized that using an account with a lien to hold customers' fully paid and excess margin securities without the ability to transfer them to a no-lien account, or to otherwise resolve the lien, was a violation of Rule 15c3-3's possession and control requirement.

**\*16** 66. To address this problem, operations personnel drafted a proposal to create information technology systems within MLPF&S that would allow it to transfer customer fully paid and excess margin securities to a segregated no-lien account at the close of every trading day. As of the end of May 2009, it was estimated that this project could only be completed by October 2009.

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

08-01789-cgm    Doc 17065-4    Filed 12/20/17    Entered 12/20/17 19:16:34    Exhibit D
Pg 14 of 18

67. Due to insufficient processes concerning the identification, escalation and resolution of potential violations of Rule 15c3-3, MLPF&S failed to identify that proceeding with the migration to the Fedwire Clearing Account despite the existence of a lien without first implementing systems to segregate customer securities would violate Rule 15c3-3. Although the Rule 15c3-3 concern was raised internally, managers in MLPF&S's operations group did not correctly understand how the Clearing Bank lien would work. One manager, for instance, wrongly believed that the Clearing Bank lien would only apply up to the amount of net intraday debt MLPF&S had to the Clearing Bank. Based on this misunderstanding, which the manager discussed with many others in his department and other departments, that manager and others erroneously concluded that the Clearing Bank's lien would not extend to customer Fedwire securities, particularly if MLPF&S prefunded the account and paid back all loans at the end of each trading day.

68. On June 22, 2009, MLPF&S migrated its Fedwire securities to the Fedwire Clearing Account at the Clearing Bank without having implemented a process to segregate customer fully-paid and excess margin securities after clearing. Shortly after this migration, MLPF&S terminated the project to create systems capable of handling the segregation of customer fully paid and excess margin securities. At the time these actions were taken, MLPF&S had failed to identify the fact that the Fedwire Clearing Account did not comply with the possession or control requirements of Rule 15c3-3 because of the Clearing Bank's lien.

69. MLPF&S held customer securities in the Fedwire Clearing Account subject to the Clearing Bank's lien from June 2009 until SEC Enforcement staff informed MLPF&S of the issue in March 2015. MLPF&S resolved the issue in the following weeks. No customers suffered any losses or other harm as a result of the lien.

*Additional Segregation Violations*

70. After remedying the Clearing Bank's lien, MLPF&S conducted a comprehensive review of all its third-party custodial accounts containing customer fully-paid securities and excess margin securities. Based on that review, MLPF&S identified certain additional instances of noncompliance with the "no-lien" requirements of Rule 15c3-3(c) involving foreign custodians, which it reported to the Commission staff. These additional instances of failures to properly maintain possession and control of customer securities involved 6 accounts in Europe and Asia. The aggregate value of securities subject to a lien in these accounts was approximately $1.38 billion as of the end of 2015. In addition, MLPF&S identified 48 other accounts in Europe, Asia, and Australia for which it could not locate contemporaneous documentation affirmatively establishing that the accounts satisfied the "no-lien" requirements of Rule 15c3-3(c). The aggregate value of securities in these accounts without such documentation was approximately $4.8 billion as of the end of 2015. In each instance, MLPF&S promptly resolved any question of compliance.

**F. MLPF&S's Improper Confidentiality Provisions**

 **\*17**  71. On August 12, 2011, the Commission adopted Rule 21F-17, which provides in relevant part, that "[n]o person may take any action to impede an individual from communicating directly with the Commission staff about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement … with respect to such communications."

72. After the Commission adopted this Rule, MLPF&S used language in certain of its policies, procedures, and agreements with employees that unduly limited the disclosure of confidential information. For example, MLPF&S used language in a severance agreement for certain departing employees based on a standard template that prohibited them from disclosing any aspect of the confidential information or trade secrets of MLPF&S or any of its subsidiaries or affiliates to any person or entity outside these entities except pursuant to formal legal process or unless the former employee first obtained the written approval of an authorized MLPF&S representative. While the agreement expressly permitted an individual to disclose confidential information pursuant to an order or other requirement of a court,

08-01789-cgm    Doc 17065-4    Filed 12/20/17    Entered 12/20/17 19:16:34    Exhibit D
Pg 15 of 18

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

administrative agency, or other authority, it did not permit an individual to voluntarily disclose confidential information to such bodies.

73. Further, in 2014, MLPF&S added a clause to its form severance agreement advising the departing employee that the severance agreement did not prohibit initiating communications directly with the Commission or other authorities, but limiting the types of information that could be conveyed to information relating to the severance agreement itself or "its underlying facts and circumstances."

74. Though we are unaware of any instances in which (i) an MLPF&S employee was in fact prevented from communicating directly with the Commission about potential securities law violations, or (ii) MLPF&S took action to enforce the form confidentiality agreement to prevent such communications with the Commission, the language found in certain of the MLPF&S policies, procedures, and agreements operated to impede such communications by prohibiting employees from voluntarily providing information to the Commission without prior approval from MLPF&S.

**G. Cooperation and Remedial Actions**

*Customer Protection Rule*

75. In determining to accept ML's Offer, the Commission considered remedial acts promptly undertaken by ML and substantial cooperation afforded the Commission staff during the course of its investigation. Prior to the entry of this Order, ML retained an independent consultant (the "IC") to (i) evaluate ML's review of each third-party custodial account containing fully paid and excess margin customer securities to ensure that it is not subject to a lien, (ii) review controls relating to Rule 15c3-3, and (iii) review regulatory reporting to the Commission and FINRA regarding Rule 15c3-3. The IC has provided ML and the Commission staff with its preliminary findings and recommendations, and ML has implemented or is in the process of implementing such recommendations. In accordance with the terms of the IC's engagement, the IC will submit, once per year for two years following the issuance of his final report, a report to the Commission staff concerning the status of ML's implementation of the recommendations set forth in the final report and whether changes in the law or ML's business operations requires the updating or amendment of those recommendations. The terms of the IC's engagement require ML to cooperate fully with the IC and give him reasonable access to files, books and records, and personnel as reasonably requested and required.

*Rule 21F-17*

**\*18** 76. In determining to accept ML's Offer, the Commission considered the substantial remedial acts promptly undertaken by ML to address the Rule 21F-17 violation arising from ML's policies, procedures and agreements, and the substantial cooperation afforded the Commission staff during the course of its investigation. MLPF&S has agreed to modify the confidentiality provision contained in its policies, procedures, and agreements. For example, the language in its form severance agreements has been revised so that information beyond the underlying facts and circumstances of those agreements can be conveyed to the Commission and other regulatory authorities. This updated language, which MLPF&S as well as its parent, BAC and other BAC subsidiaries ("BAC Entities") have used since January 2016, states that, with the exception of information that is protected from disclosure by any applicable law or privilege, nothing in the agreement prohibits or limits the employee or his counsel from initiating communications directly with, responding to any inquiry from, volunteering information to, or providing testimony before, among others, the Commission in connection with any reporting of, investigation into, or proceeding regarding suspected violations of law. The language also makes clear that the employee is not required to advise or seek permission from any of the BAC Entities before engaging in any such activity.

77. In addition, as of January 2016, the BAC Entities now provide all employees with mandatory yearly trainings that includes a summary of and link to a document entitled, "Notice Concerning Your Rights to Report Possible Violations

08-01789-cgm    Doc 17065-4    Filed 12/20/17    Entered 12/20/17 19:16:34    Exhibit D
Pg 16 of 18

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

of Law" ("21F-17 Notice"). The 21F-17 Notice sets forth an employee's rights to (i) report potential violations of law to the Commission or other government or self-regulatory authorities without permission from or notice to his or her employer, (ii) report possible violations anonymously and to provide disclosures that are protected or required under whistleblower laws, and (iii) cooperate voluntarily with or respond to any inquiry from the Commission or other federal or state agencies or self-regulatory organizations. The 21F17 Notice also summarizes several of the rights the employee possesses under the Commission's Whistleblower Program and states that employees have the right to not be retaliated against for reporting possible securities law violations.

78. The BAC Entities have updated their Code of Conduct as well as other relevant agreements, policies, and procedures to ensure that employees understand that there is no restriction on their rights under Rule 21F-17.

### IV. Violations

79. As a result of the conduct described above, MLPF&S and MLPro willfully [6] violated Section 15(c)(3) of the Exchange Act and Rule 15c3-3 thereunder which, *inter alia*, require carrying broker-dealers to maintain a reserve of funds or qualified securities in an account at a bank that is at least equal in value to the net cash owed to customers, and MLPF&S further violated Section 15(c)(3) of the Exchange Act and Rule 15c3-3 thereunder, which also requires that carrying broker-dealers maintain physical possession or control over customers' fully paid and excess margin securities.

*19  80. As a result of the conduct described above, MLPF&S and MLPro willfully violated Section 17(a)(1) of the Exchange Act and Rule 17a-3(a)(10) thereunder which, *inter alia*, require a broker or dealer to maintain and keep accurate records, including records relating to all puts or calls in which the broker or dealer has any interest.

81. As a result of the conduct described above, MLPF&S and MLPro willfully violated Section 17(a)(1) of the Exchange Act and Rule 17a-5(a) thereunder, which, *inter alia*, require certain brokers or dealers to file monthly FOCUS Reports.

82. As a result of the conduct described above, MLPF&S willfully violated Section 17(a)(1) of the Exchange Act and Rules 17a-5(d)(3) (as it existed prior to amendments to Rule 17a-5 in 2014), 17a-5(d)(2)(ii), 17a-5(d)(3), and 17a-11(e) thereunder which, *inter alia*, require certain brokers or dealers to file compliance and other reports and supporting schedules with the Commission and to notify the Commission of material weaknesses relating to compliance with the Customer Protection Rule.

83. As a result of the conduct described above, MLPF&S willfully violated Exchange Act Rule 21F-17, which prohibits any action impeding an individual from communicating directly with Commission staff about a possible securities law violation.

### V.

In view of the foregoing, the Commission deems it appropriate, in the public interest, and for the protection of investors to impose the sanctions agreed to in Respondents' Offer.

Accordingly, pursuant to Sections 15(b) and 21C of the Exchange Act, it is hereby ORDERED that:

A. MLPF&S cease and desist from committing or causing any violations and any future violations of Sections 15(c)(3) and 17(a)(1) of the Exchange Act and Rules 15c3-3, 17a-3(a)(10), 17a-5(a), 17a-5(d)(2)(ii), 17a-5(d)(3), 17a-11(e), and 21F-17 thereunder; and MLPro cease and desist from committing or causing any violations and any future violations of Sections 15(c)(3) and 17(a)(1) of the Exchange Act and Rules 15c3-3, 17a-3(a)(10) and 17a-5(a) thereunder.

B. MLPF&S and MLPro are censured.

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

08-01789-cgm    Doc 17065-4    Filed 12/20/17    Entered 12/20/17 19:16:34    Exhibit D
Pg 17 of 18

C. MLPF&S and MLPro shall, within 14 days of the entry of this Order, pay, jointly and severally, disgorgement of $50,000,000 and prejudgment interest of $7,000,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.

D. MLPF&S shall, within 14 days of the entry of this Order, pay a civil money penalty in the amount of $358,000,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to [31 U.S.C. § 3717](https://).

Payment must be made in one of the following ways:

**\*20** (1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payment from a bank account via Pay.gov through the Commission website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center

Accounts Receivable Branch

HQ Bldg., Room 181, AMZ-341

6500 South MacArthur Boulevard

Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying MLPF&S and MLPro as Respondents in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Michael Osnato, Unit Chief, Complex Financial Instruments Unit, Division of Enforcement, Securities and Exchange Commission, Brookfield Place, 200 Vesey Street, Suite 400, New York, NY 10281.

E. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, MLPF&S agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of its payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, MLPF&S agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against MLPF&S by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.    16

08-01789-cgm   Doc 17065-4   Filed 12/20/17   Entered 12/20/17 19:16:34   Exhibit D
Pg 18 of 18

IN THE MATTER OF MERRILL LYNCH, PIERCE,..., Release No. 78141...

By the Commission.
Brent J. Fields
Secretary

Footnotes

1 The findings herein are made pursuant to Respondents' Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

2 Customer cash is a balance sheet item of the carrying broker-dealer (*i.e.*, the amount of cash received from a customer increases the amount of the carrying broker-dealer's assets and creates a corresponding liability to the customer). The Reserve Formula is designed to isolate these broker-dealer assets so that an amount equal to the net liabilities to customers is held as a reserve in the form of cash or U.S. government securities. The reserve requirement is designed to prevent the carrying broker-dealer from using customer funds for business activities. The goal is to put the carrying broker-dealer in a position to be able to meet its cash obligations to customers by requiring the firm to make deposits of cash and/or U.S. government securities into the Reserve Account in the amount of the net cash owed to customers.

3 Customer securities held by the carrying broker-dealer are not assets of the firm. Rather, the carrying broker-dealer holds them in a custodial capacity and the possession and control requirement is designed to ensure that the carrying broker-dealer treats them in a manner that allows for their prompt return.

4 Pin risk arises when the market price of the underlying stock at the time of the put and call's expiration is close to the strike price. If this occurs, there is a risk that options may not be exercised and the customer is left with a large, undesired, and unhedged stock position. Dividend risk occurs when a dividend on the underlying stock is unexpectedly cancelled or lowered. Because the pricing of a conversion trade takes into account the anticipated dividend amount, any dividends paid that are less than this anticipated amount will result in a loss to the customer. Early exercise risk materializes when the owner of the call or put option exercises the option prior to its expiration date.

5 Due to systems limitations, ML was unable to execute a Leveraged Conversion Trade using OTC options that expired past the trade date. To account for this limitation, SEFT Trader considered a trade structure that simply involved a sale and simultaneous repurchase of stock with a delayed settlement of the repurchase, but he recognized that an instantaneous roundtrip would be inappropriate from a regulatory perspective. The SEFT desk, with the involvement and approval of Tirrell and others at ML, settled on a trade structure that involved these same components but also included a put and a call that expired on the trade date.

6 A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC,* 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC,* 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "'also be aware that he is violating one of the Rules or Acts.'" *Id.* (quoting *Gearhart & Otis, Inc. v. SEC,* 348 F.2d 798, 803 (D.C. Cir. 1965)).

Release No. 78141 (S.E.C. Release No.), Release No. 34-78141, 2016 WL 4363431

**End of Document**　　　　　　　　　　　　© 2017 Thomson Reuters. No claim to original U.S. Government Works.