# EXHIBIT F

57 Bus. Law. 1069

Business Lawyer
May, 2002

Article
Michael P. Jamroz [a1]

Copyright ( c ) 2002 by American Bar Association; Michael P. Jamroz

# THE CUSTOMER PROTECTION RULE

**OVERVIEW**

A broker-dealer required to register with the Securities and Exchange Commission ("Commission") [1] must comply with the Commission's Customer Protection Rule ("Customer Protection Rule"). [2] The Customer Protection Rule is an integral part of the Commission's financial responsibility program, which is designed to protect customers who entrust their investment assets to registered broker-dealers from monetary losses and delays that can occur when that firm fails. [3] Generally, those rules require registered broker-dealers to maintain adequate liquid assets, to keep current and accurate books and records, and to safeguard the investment assets under their control such that when they face financial distress, they are able to liquidate without a legal proceeding.

**\*1070** The practical impact to a customer of a securities firm of the Customer Protection Rule and the other financial responsibility rules is seen most readily in the event of the collapse of a securities firm. Although, as discussed below, the Securities Investor Protection Corporation (SIPC) protects the claims of customers up to a statutory limit, SIPC liquidations may be time-consuming and costly to administer. [4] In some cases, the customer of the failed firm may be unable to access his or her investment assets during the period of the proceeding, which may be six months or more. In a self-liquidation, however, the customer is likely to enjoy uninterrupted access to his or her investment assets. In almost all self-liquidations, customer accounts (and the sales representatives) are transferred to another securities firm.

Lawyers that have a regulatory or enforcement practice involving securities firms should be familiar with the Customer Protection Rule. The rule impacts any issue involving the handling and custody of customer funds and securities. The rule often affects how transactions of the firm and its customers are structured and is frequently the subject of administrative actions brought by the Commission or a self-regulatory organization. The rule can be difficult for many business lawyers to apply, however, because some knowledge of broker-dealer accounting and operations is required to gain a full understanding of the application of the rule. This Article will discuss the history of the rule and its interpretations. The Article will further explain the broker-dealer operational and accounting concepts necessary for an understanding of the rule.

The Customer Protection Rule plays a primary role in the Commission's financial responsibility program by safeguarding and restricting the use of customer investment assets by the broker-dealer in its business activities. The rule, which can be loosely described as a "segregation" rule, divides the customer and proprietary activities of the firm. [5] The rule protects customer funds, by requiring, in accordance with a prescribed formula, the broker-dealer to deposit into a separate bank account the net amount of funds derived from customer activities. [6] To protect customer securities, the rule requires

the broker-dealer to obtain possession or control of securities that the customer has paid for, and prohibits the broker-dealer from pledging them, or otherwise using them in its proprietary business activities. [7]

## *1071 HISTORY AND PURPOSE OF THE RULE

Although the adopting release numerates eight specific reasons for the adoption of the rule, [8] the primary purpose of the Customer Protection Rule is to ensure that customer property in a failed brokerage firm is available to satisfy the claims of customers. [9] The rule was adopted by the Commission in response to a mandate by Congress when it adopted section 7(d) of the Securities Investor Protection Act (SIPA). [10] SIPA created a separate federal bankruptcy scheme [11] to be used in **\*1072** cases where a broker-dealer that is a member of the SIPC [12] is determined by the SIPC to have failed or be in danger of failing under the parameters set forth in SIPA. [13] Because Rule 15c3-3 is designed to ensure that the customer property in a failed broker-dealer is adequate to satisfy the claims of customers, the staff of **\*1073** the Commission's Division of Market Regulation ("Division") places considerable weight on the treatment of the proposed transactions under SIPA when contemplating staff positions and amendments of Rule 15c3-3. Indeed in many instances, the Division will consult with SIPC staff prior to rendering interpretive advice.

The Customer Protection Rule plays an integral role in assuring that customer property held by failed securities firms will be sufficient to satisfy customer claims in a self-liquidation or a proceeding under SIPA. The Customer Protection Rule and other financial responsibility rules also limit the exposure of the SIPC fund [14] and ultimately the U.S. Treasury, to claims resulting from the payment of advances to customers of a failed estate, and administrative expenses associated with the proceeding. [15] While the Customer Protection Rule and other financial responsibility rules promote more orderly SIPC liquidations, those rules are designed to promote self-liquidations because they are less costly to administer and less burdensome to the customers of the broker-dealer. In an SIPC liquidation, the general estate, and thereafter the SIPC fund must pay the costs associated with a legal proceeding that is conducted pursuant to a statutory procedure. [16] The investment positions of the firm's customers may be frozen for months while the court administers the proceeding. [17] In many self-liquidations, however, the customer accounts are promptly transferred to another firm and the customers may access their investment property without interruption.

Although the Customer Protection Rule plays a primary role in the Commission's effort to promote orderly liquidations of securities firms, the objectives of the rule are not limited to this role. SIPA and the amendment to Exchange Act section 15(c)(3) were responses to the events that occurred between 1968 and 1970 ("Paperwork Crisis"), [18] when among other things, because many securities processing systems were manually intensive and firms did not devote adequate resources to those systems, many firms experienced difficulty processing the marked increase in transactions that occurred during that period. [19] According to **\*1074** the *Study of Unsafe and Unsound Practices of Brokers and Dealers of the Securities and Exchange Commission* [20] ("Unsafe Study"), "[t]here was an absence of control of securities traffic to provide assurance for prompt deliveries of securities and remittances of payments." [21] These circumstances resulted in a virtual breakdown in many firms of the control over the possession, custody, location, and delivery of securities, and the payment of money obligations to customers, all of which exposed customers to the risk of the loss of their cash and securities.

In light of the problems experienced by the industry when the rule was adopted, many of the provisions of the rule are specifically designed to encourage firms to maintain accurate records and promptly settle securities transactions. One example, which will be discussed in more detail later, is the money required to be segregated in a special bank account related to suspense items and record keeping differences.

As the rule serves multiple purposes, it is important for the practicing lawyer to recognize what the rationale is for the provision under analysis. The provisions in the rule designed to promote operational efficiency are commingled with those that deal with satisfying liquidation claims. As stated earlier, most of the rule is designed to ensure that sufficient customer property is maintained to satisfy all customers of a liquidated firm, and as such, when considering a question involving those provisions, the Division gives heavy weight to how the matter would be treated in an SIPC liquidation. If the inquiry involves a provision that relates to operational efficiency and accuracy, the staff will be more concerned about whether its response will promote the prompt clearance and settlement of securities transactions in a well-controlled operational environment for the firm and ultimately, for the industry, as opposed to SIPC or other liquidation-related concerns.

## WHO MUST COMPLY WITH THE RULE?

Generally, broker-dealers that have responsibility for custody of funds or securities of "customers" have obligations under the rule. [22] The rule includes three self-operative exemptive provisions, [23] discussed below, but includes no specific exemption for firms that simply have nothing to do with customer assets. Those firms while not specifically exempt do not have any obligations under the rule.

**\*1075** Generally all three exemptions limit the amount of contact that the broker-dealer may have with customer funds and securities. The exemptions may allow the broker-dealer to temporarily receive customer funds and securities, but they require the broker-dealer to "promptly transmit[] all [customer] funds and deliver[] all securities" [24] that are received in connection with its activities as a broker or dealer to third parties such as clearance brokers and escrow agents. The exemptions further prohibit the broker-dealer from otherwise holding funds or securities for, or owing money or securities to, customers.

The three exemptions can be summarized as follows. The first allows firms that limit their activities to certain mutual fund or life insurance products to briefly handle customer funds, but not maintain indefinite custody of funds or securities. [25] The second and third exemptions are frequently confused by first-time readers of the rule. The second is popularly referred to by its paragraph reference, or the "(k)(2)(i)" exemption. [26] That exemption applies to broker-dealers that clear their transactions on what is known as a receive versus payment/delivery versus payment (RVP/DVP) basis and relies on the fact that the broker-dealer, in an RVP/ DVP settlement, conducts simultaneous exchanges of an equal value of funds for securities and should not be holding any residual customer funds or securities. [27] The final exemption is popularly known as "clearing fully-disclosed." [28] That exemption also allows the broker-dealer to temporarily handle customer funds and securities, but requires the "introducing broker" (i.e., the one seeking the exemption) to establish separate accounts in the name of each customer at another "clearing broker" and have its customers maintain custody of their funds and securities in those accounts. [29] Each exemption is discussed in more detail below.

In addition to the provisions governing the handling of customer property, the first exemption, paragraph (k)(1), is available only to broker-dealers that conduct certain limited mutual fund and insurance-related activities. [30] More specifically, paragraph (k)(1) applies to firms whose activities as a dealer for his own account

> are limited to the purchase, sale, and redemption of redeemable securities of registered investment companies or of interests or participations in an insurance company separate account, ... [and whose activities as a] broker (agent) are limited to ... sale and redemption of redeemable securities of **\*1076** registered investment companies or of interests or participations in an insurance company separate account, ... the solicitation of share accounts for savings and loan associations insured by an instrumentality

**WESTLAW**  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

of the United States; and ... the sale of securities for the account of a customer to obtain funds for immediate reinvestment in redeemable securities of registered investment companies .... [31]

Paragraph (k)(1) also includes an exemption for insurance companies that comply with the above-described provisions and must register as broker-dealers because their insurance business activities include purchasing, selling, or holding securities for or on behalf of its general and separate accounts. [32]

The next exemption is designed for securities firms that do not carry margin accounts and deliver securities purchased by their customers to the customers' custodian after cash payment has been made. [33] Although this exemption was originally intended to accommodate small broker-dealers, [34] it is now employed by some large firms that conduct their activities on an RVP/DVP basis, where delivery of the securities is as simultaneous with the payment of cash as can be achieved given the limitations imposed by current clearance and settlement systems. As written, paragraph (k)(2)(i) exempts broker-dealers that carry no margin accounts, promptly transmit all customer funds and securities received in connection with its activities as a broker or dealer, and effectuate all transactions through one or more bank accounts designated as "Special Account for the Exclusive Benefit of Customers of (*name of the broker-dealer*)." [35]

The third exemption is available to those broker-dealers that employ another broker-dealer to maintain custody of the investment property of those customers. [36] Those broker-dealers are known to introduce customer accounts to another broker-dealer that clears those accounts on a "fully-disclosed basis." [37] "A fully-disclosed introducing arrangement should be distinguished from an omnibus clearing arrangement where the clearing firm maintains one account for all the customer transactions of the introducing firm." [38] In an omnibus relationship, the introducing firm's customers are generally cleared through one account at the clearing firm, which does not know the identity of the customers of the introducing firm. [39] "In a fully-disclosed clearing arrangement, the clearing firm knows the names, addresses, securities positions, and other relevant data as to each  **1077**  customer." [40] To fall within the exemptive provisions of paragraph (k)(2)(ii) the introducing broker-dealer must

> [p]romptly transmit[] all customer funds and securities to the clearing broker or dealer which carries all of the accounts of such customers and maintains and preserves such books and records pertaining thereto pursuant to the requirements of §§ 240.17a-3 and 240.17a-4 of this chapter, as are customarily made and kept by a clearing broker or dealer. [41]

## WHO IS A CUSTOMER?

As mentioned above, because of its role in ensuring that sufficient customer property is available to distribute to customers in a SIPA or other liquidation, in interpreting the Customer Protection Rule, the Division considers the SIPA treatment of the matter under deliberation. This comparison is particularly important in deciding what persons should be afforded customer status under the rule.

As defined in Rule 15c3-3 (a)(l), the term "customer" means "any person from whom or on whose behalf a broker or dealer has received or acquired securities or holds funds or securities for the account of that person." [42] The term does not include general partners, directors or principal officers, or persons, whose claim for property or funds is subordinated

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

to the claims of creditors or is part of the capital of the broker-dealer "by contract, agreement or understanding, or by operation of law." [43]

Despite the statutory foundation and purpose of the rule, it is surprising to note that the definitions of the term "customer" in SIPA [44] and in the rule differ. Both definitions exclude subordinated lenders and owners, to the extent of their ownership interest. Rule 15c3-3 excludes directors and principal officers, but **\*1078** SIPA excludes persons whose transactions arise from a foreign subsidiary of an SIPC member. [45] Unlike Rule 15c3-3, SIPA treats broker-dealers that have securities accounts at the defunct firm as customers. [46] Those broker-dealers may thus obtain a pro-rata share of customer property, however, broker-dealers are not eligible for advances from the SIPC fund. [47] The fact that the Customer Protection Rule does not treat broker-dealers as customers has the potential to cause shortfalls in SIPC liquidations, as the SIPC could be required to pay claimants whose property was not available because it was not required to be set aside under the rule. The Division addressed this problem to some extent with the issuance of the so-called "PAIB Letter" which is discussed in detail below. [48] That letter, however, does not address accounts of foreign broker-dealers, which are also treated as customers under SIPA and continues to raise the potential for liquidation shortfalls. [49]

In addition, under the Customer Protection Rule, foreign banks that establish a separate dealer account may be treated as a noncustomer provided the broker-dealer obtains a written agreement in which the foreign bank acknowledges that all transactions in the account are proprietary transactions of the bank and that SIPC coverage is not available to the account. [50] Although the Division required a "waiver" as a condition to excluding foreign banks from the definition of customer, the staff has informally taken the position that customers cannot unilaterally waive their rights under the Securities Exchange Act of 1934, and therefore cannot waive customer status without the consent of the Division. Likewise, SIPA does not contain a provision that enables customers to waive their rights. The waiver of SIPC protection required by the Division in the case of foreign banks may not in fact be effective in the event of an SIPC proceeding as foreign banks that are not subordinated lenders to the failed firm fall within the definition of customer under SIPA. Accounts of affiliated entities, such as the parent corporation or other related entities, are treated as customers under SIPA and the rule; but again, under Rule 15c3-3, affiliated entities that are broker-dealers would fall outside the definition **\*1079** of customer. [51] Affiliates and other insiders of the broker-dealer may subordinate their account, and thereby be excluded from the definition of customer under the rule. The insiders and affiliates should be notified of the absence of SIPC coverage, and again, consent to use the securities in the account should be obtained in writing. In addition, those insiders and affiliates must represent to the broker-dealer that their accounts do not contain fund and securities of U.S. customers. The broker-dealer must also obtain an opinion of counsel that the affiliated entity executing the agreement is legally authorized to make subordinated loans of funds or securities and obtain the approval of the Designated Examining Authority (DEA) of the broker-dealer. [52]

In at least two instances the Commission has apparently agreed with the SIPC in its view that certain persons are not customers, but has provided protection nevertheless. The SIPC takes the position that counter parties to repurchase agreements are not customers [53] and the Commission has not considered them as such under the rule. As discussed later in the text, however, the rule renders protection to those repurchase agreement counter parties that leave their collateral with the broker-dealer. [54] Counter parties to securities borrowed and loan transactions are also not considered customers by the SIPC, [55] but as also discussed later, Rule 15c3-3 includes certain disclosure and collateral delivery requirements with respect to those transactions. [56]

**PROTECTION OF CUSTOMER SECURITIES**

As stated earlier, paragraph (b) of the Customer Protection Rule requires the broker or dealer to promptly obtain and thereafter maintain possession or control of all fully-paid and excess margin securities [57] carried by a broker or dealer for **1080** the account of customers. [58] The term "margin securities" as defined in paragraph (a)(4) specifically excludes securities in a cash account for which a customer already made payment. [59] This, however, does not preclude a broker-dealer from obtaining a security interest in those securities or withholding delivery in the event of default. Paragraph (*l*) of the rule states that:

> Nothing stated in this section shall be construed as affecting the absolute right of a customer of a broker or dealer to receive in the course of normal business operations following demand made on the broker or dealer, the **1081** physical delivery of certificates for: (1) Fully-paid securities to which he is entitled .... [60]

The Division staff has informally interpreted the term "to which he is entitled" to mean only those instances where the customer does not owe the broker-dealer funds from a cash, margin account, or otherwise. If the customer owed the broker-dealer an unsecured balance in a margin account, the broker-dealer would not be required to deliver fully-paid securities to that customer to the extent the value of those securities was reasonably related to the amount owed.

In interpreting the possession or control provisions of the rule, the staff, of course, is primarily concerned with ensuring that adequate securities are available to satisfy customer claims in the event of a liquidation. In addition to liquidation concerns, the staff is also aware that the broker-dealer's custodial responsibilities are not limited to the requirements of the rule. The staff understands that if a broker-dealer willfully does not obtain and maintain possession or control of fully-paid customer securities, that broker-dealer may be committing the tort of conversion. In certain circumstances that conversion may be considered a fraud. [61] From the staff's point of view, by virtue of account statements and other information sent to the customer the broker-dealer impliedly represents to the customer that it is holding the customer's securities for it and has an obligation (perhaps a fiduciary one) to do so. For this reason, the staff has been hesitant to issue no-action positions in this area. For example, in instances where the industry has proposed the segregation of funds in lieu of obtaining possession or control of securities that the customer has purchased, the staff frequently declines the request because of its belief that the firm has represented to the customer that it is holding securities and not funds for the customer. In those instances where the staff has not required the broker-dealer to maintain possession or control, the staff almost always requires the broker-dealer to make disclosures to the customer. [62]

Because of the staff's concern regarding its view of the broker-dealer's custodial responsibilities, it is important to note that in order to satisfy the possession or control requirement of the Customer Protection Rule, the broker-dealer must have in its possession or control the securities that are in fact the same as the securities that the customer is holding. [63] For example, if a customer is holding shares of freely tradable class A common stock, the broker-dealer must hold that particular class and issue to satisfy the possession or control requirement. If the stock was restricted, the broker-dealer would have to maintain possession or control of **1082** a security with the same restriction as the customer purchased. Similarly, if the broker-dealer holds an instrument that is convertible or exchangeable into the securities that the customer holds, the possession or control requirement is not satisfied.

An exception from the general rule that the broker-dealer must hold the securities purchased by the customer was created to accommodate market-making activities. In connection with those activities, broker-dealers may sell securities short to broker-dealers and others. [64] As persons other than broker-dealers are customers under the rule, full payment by them for the securities would trigger a possession or control requirement. However, if the broker-dealer purchases the securities to satisfy that requirement, it would no longer be short, as it originally was intended to be. Therefore, if the broker-dealer sold the securities short to its customer, it may satisfy its obligations under the Customer Protection Rule by including a credit item in the Reserve Formula for the market value of the securities sold short so that in a liquidation, funds should

be available to purchase the securities for the customer. [65] It is not clear whether the staff considered requiring the firm to borrow the security to hold for the customer. Although borrowing securities raises the cost of the transaction, it is normal for firms to borrow securities in connection with a short sale. [66]

Paragraph (d) of the rule sets forth procedures for the broker-dealer to follow to obtain possession or control of customer securities. That paragraph requires the broker-dealer to "[n]ot later than the next business day ... determine from his books or records the quantity of fully paid securities and excess margin securities in his possession or control and the quantity of fully paid securities and excess margin securities not in his possession or control." [67] If the books and records indicate that the broker-dealer does not have possession or control of securities as required under the rule, the broker-dealer must take certain actions within certain time frames that depend on where the securities needed are located. [68] If securities that are required to be in possession or control are subject to a lien (such as collateralizing a bank loan), or have been loaned out to another broker-dealer, the broker-dealer must issue instructions for the release of the securities from the lien or return no later than one business day following the day the determination was made. [69] In the case of securities subject to a lien, the broker-dealer must obtain possession or control of the securities within two business days following the day the instructions were issued. [70] In the case of securities **\*1083** loaned, the broker-dealer has five business days to obtain the securities. [71] In the case of securities purchased from another broker-dealer on behalf of a customer whom the computing broker-dealer has failed to receive, the broker-dealer has thirty calendar days to obtain them. [72] The broker-dealer, no later than the business day following the determination day, must take "prompt steps" to obtain the security through a buy-in procedure or otherwise. [73] When buy-in procedures are used to obtain securities that the firm failed to receive, those procedures must be initiated not later than the business day following the thirtieth calender day. [74] Finally, if the broker-dealer has securities receivable from a stock dividend, stock split, or similar distribution for more than forty-five days, the broker-dealer must take "prompt steps" to obtain the security through a buy-in procedure or otherwise. [75]

### THE STOCK RECORD

The primary tool used by the broker-dealer in making its daily determination of whether the appropriate amount of customer securities is under its possession or control is the securities or "stock record." [76] The stock record is the broker-dealer's record of custody and movements of securities. The "long" side of the stock record is a record that the brokerage firm uses to account for its responsibility for securities that it receives. Common examples of "long side" entries are securities received from customers (fully-paid/excess margin and margin securities are shown separately), securities owned by the firm, securities borrowed, and securities that the broker-dealer owes under a trade contract but has "failed to deliver." [77]

**\*1084** On the short side of the stock record, the broker-dealer keeps track of where securities it has received, shown on the long side, have gone. Since securities are fungible, the short side of the stock record does not in fact designate where particular securities have gone. The short side of the stock record indicates the totals of securities at each location. [78] Common examples of short-side securities record locations are securities depositories, such as the Depository Trust Company (DTC), [79] securities pledged to a bank as collateral for a loan, securities lent to another broker-dealer, and securities failed to receive. [80]

The securities record is used to generate the excess/deficit report, required under the Securities and Exchange Act (SEA) Release No. 9922, [81] which compares the amount of fully-paid and excess margin securities that the broker-dealer is required to maintain possession or control of to the amount it is holding in its possession or in a designated control

location. [82]  If, for example, because a customer has paid the remaining balance of a margin account and the securities serving as collateral for that account become fully-paid, the excess/deficit report would indicate how many securities the broker-dealer must obtain possession or control of to be in compliance with the rule.

## CONTROL LOCATIONS

"Control locations" are the places that the rule allows broker-dealers to keep fully-paid and excess margin securities of customers. [83]  The section of the rule that defines the term "control location" is frequently of interest to practicing lawyers, **\*1085**  because they are charged with devising the custodial legal documentation and agreements for the brokerage firm and the rule sets forth minimum requirements for those arrangements. Custodial agreements for foreign securities held in foreign countries pose a unique set of issues and challenges, and will be discussed in a separate section that immediately follows.

As stated above, paragraph (b) of the rule requires the broker-dealer to obtain and thereafter maintain the physical possession or control of all fully-paid and excess margin customer securities. [84]  "Physical possession" has been informally interpreted by the Division to mean "physical possession free of any lien" to address problems involving agreements to pledge of securities where no physical movement had occurred. The term "control" is defined in paragraph (c) in the rule. Generally, that paragraph defines securities to be under the control of the broker-dealer when they are in a "location" defined by the rule where the broker-dealer can obtain them promptly without the payment of money or value. [85]  Paragraph (c)(l) allows the broker-dealer to keep customer securities at securities depositories such as the DTC. [86]  Paragraph (c)(2) allows a broker-dealer that uses another broker-dealer to clear its transactions through an omnibus account established under Regulation T to keep customer securities at the broker-dealer with which its clears its transactions, provided the computing broker-dealer instructs the clearing broker-dealer which securities it should maintain in its physical possession or control, free of any lien. [87]  Paragraph (c)(3) treats bonafide items of transfer as under the control of the broker-dealer provided that within forty days new certificates conforming to the transfer instructions have been issued, or the transfer agent confirms that it has received the transfer instructions and the securities, or a revalidation of a window ticket from a transfer agent with respect to the certification received for transfer. [88]  Paragraph (c)(4), which applies to customer securities located in foreign countries, is covered in a separate section that follows. [89]

Paragraph (c)(5) allows the broker-dealer to keep customer securities

> in the *custody or control* of a bank as defined in section 3(a)(6) of the [Exchange] Act, the delivery of which ... does not require the payment of money or value and the bank having acknowledged in writing that the securities in its *custody or control* are not subject to any right, charge, security interest, lien or claim of any kind in favor of a bank or any person claiming through the bank; ... [90]

**\*1086**  It is important to note that, in this section of the paragraph, the Commission allows the broker-dealer to keep the customer securities in the "custody and control" of a bank. [91]  In the other sections of paragraph (c) the Commission requires the broker-dealer to maintain the customer securities in the "custody" of the approved custodial location, but does not allow the custodian to have the securities under its "control." [92]  The paragraph (c)(5) use of custody and control suggests that a bank need not have physical custody of the securities, but control, perhaps as defined by the rule in paragraph (c), is acceptable. [93]  This subject will be addressed again later in the "Foreign Control Location" section. [94]

Another point of significance regarding this paragraph involves the meaning of the word "bank." Paragraph (a)(7) of the rule defines bank to mean "a bank as defined in section 3(a)(6) of the [Exchange] Act *and* ... any building and loan, savings and loan or similar banking institution subject to supervision by a Federal banking authority." [95] Under the definition, the term also includes Canadian banks subject to supervision by an authority of the Dominion of Canada. [96] Paragraph (c)(5), by using the section (a)(6) of the Exchange Act, and not the paragraph (a)(7), defines the term "bank," by deliberately excluding savings and loans and Canadian banks as locations for customer securities. [97] It is likely that savings and loans were excluded because they are generally not in the securities custody business. Canadian banks are normally in the business of maintaining custody of Canadian, not U.S., securities. More than likely for this reason, the Commission may have found it more appropriate to treat them under the process established for foreign control locations.

Paragraph (c)(7) enables the Commission, or the Division through the use of its delegated authority, to designate other control locations that it deems adequate for the protection of customer securities that are not specifically addressed by paragraphs (c)(1) through (c)(6). [98] The Division has used this paragraph to, among other things, enable broker-dealers to maintain control of customers' certificate-less mutual funds, [99] limited partnership interests, [100] and commercial paper issued only in book-entry form. [101]

Paragraph (c)(7) is also used by the Division to facilitate the transfer of introduced customer accounts from one clearing broker-dealer to another. As a general **\*1087** rule the Commission does not allow broker-dealers to maintain custody of their customers' assets at other broker-dealers. This fact may seem unusual given that the Commission regulates broker-dealers. It is possible that the Commission does not see a business purpose for a broker-dealer to use another as a custodian, and could be attempting to avoid needlessly extending the length of the number of "links" in the chain of custody. The Commission is aware that the longer the chain, the greater the risk that one of the intermediaries in the middle fails. To accommodate firms that are engaging in bulk transfers of customer accounts, however, the Commission has allowed the broker-dealer receiving the accounts to temporarily establish a control location at the broker-dealer transferring them. The transfers are generally accomplished through the use of an omnibus account [102] temporarily established at both clearing firms. The omnibus accounts are used to control the amount of customers' funds and securities owed by the broker-dealer transferring the customer accounts to the other clearing broker-dealer. The Division has allowed the broker-dealer waiting receipt of the customer property to treat the omnibus account with the other broker-dealer as a satisfactory control location for thirty business days provided certain conditions are met. [103]

### FOREIGN CONTROL LOCATIONS

As mentioned earlier, because practicing lawyers are charged with drafting custodial agreements for the firm, the control location sections of the rule are of particular interest. Most firms use subtle variations of form agreements for their U.S. custody agreements, but must negotiate each agreement with each foreign custodian. [104] Laws differ in each country and those custodians do not immediately recognize the requirements of U.S. law or the needs of the U.S firm. To complicate things, (c)(4) of the rule is perhaps the most outdated. It dates from the rule's origin in 1972, when U.S. firms did not do substantial business overseas. Thus, the process established by the Commission requires each broker-dealer to separately approve each specific location. [105] While that process was appropriate at the time, now, with the proliferation of international securities business, it has become unwieldy. The Division receives many requests, including repeated requests, for the same custodian by different broker-dealers.

Also, at the time the rule was written, foreign securities were generally held in physical form. The rule acknowledges that and unfortunately has not changed to accommodate the expansion of international securities sales and book entry custody. **\*1088** The staff's hesitancy is likely due again to the their concern over unduly extending the "links in the

chain" of custody. That concern was apparently realized in the liquidation of some of the affiliates of Barings plc. In that liquidation, the Division had to contact foreign governments to protect the interests of U.S. customers that had foreign securities that were tied up in the "chain of custody" that included the parent bank. Although the staff understands that immediate physical custody is not possible, it also is, again, concerned about an indefinite custodial chain.

Paragraph (c)(4) is the paragraph that gives authority to the so-called "Foreign Control Location." [106] By its terms, paragraph (c)(4) allows the broker-dealer to keep customer securities "in the *custody* of a foreign depository, foreign clearing agency or foreign custodian bank which the Commission upon application from a broker or dealer, a registered national securities exchange or a registered national securities association, or upon its own motion shall designate as a satisfactory control location for securities." [107]

On October 12, 1973, the Commission issued SEA Release No. 10,429, entitled *Guidelines for Control Locations for Foreign Securities Under Subparagraphs (c)(4) and (c)(7) of Rule 15c3-3 Under the Exchange Act.* [108] The release established an approval process whereby the broker-dealer would request approval for each "Foreign Control Location" when it desired to maintain customer securities. [109] Because of the relatively low number of foreign transactions in that time period, no procedure was established to allow broker-dealers to rely on foreign control locations established previously by other broker-dealers. [110] The applications are considered accepted within ninety days after its receipt by the Commission and are deemed satisfactory while they are being considered. [111]

 **\*1089** More specifically, the release establishes two procedures depending on where the foreign securities are held. The first procedure involves customer securities in the custody of foreign depositories, clearing agencies, custodian banks, or broker-dealers. [112] For those entities, the release allows the broker-dealer to keep customer securities as long as they are not subject to any right, charge, security interest, lien, or claim of any kind in favor of the foreign entity except for their safe custody or administration and the securities are freely transferable without the payment of money or value other than for safe custody or administration. [113] In its application to the Secretary of the Commission, the broker-dealer must represent that above requirements have been met and must also identify the foreign regulatory authority that supervises or regulates the foreign entity where the securities are held. [114]

A slightly different procedure was established for customers' foreign securities held by another registered broker-dealer. SEA Release No. 10,429 requires the broker-dealer carrying the customers' foreign securities to carry them in an account, with no other securities transactions, designated as a "Special Custody Account for the Exclusive Benefit of Customers of (the name of the other broker or dealer)." [115] The broker-dealer whose customers own the foreign securities is required under the Release to instruct the carrying broker-dealer to maintain physical possession *or control* of such securities free of any charge, lien, or claim of any kind in favor of such carrying broker-dealer. [116] The carrying broker-dealer must then maintain the foreign securities belonging to the broker-dealer's customers in a foreign depository, clearing agency, custodian bank, or broker-dealer in a manner that satisfies the conditions specified above. [117]

## SECURITIES BORROWED

Practicing lawyers at securities firms and their law firms are usually responsible for drafting master agreements that document securities borrowed transactions. When the counter parties to those transactions are persons who would be considered to be customers under the rule, those agreements must include language required by the rule. [118] Customers, particularly institutions that have large portfolios of equity securities, can increase the return on their portfolios by lending  **\*1090** those securities to a broker-dealer for a fee. [119] When a broker-dealer borrows securities from a person who is included within the definition of a customer under the rule, that action, if not for the adoption of paragraph (b)

(3), could be considered a circumvention of the rule's possession or control provisions. As a general matter, the Division does not allow customers that are not insiders or affiliated with the broker-dealer to waive the protections afforded them under the rule. [120]

As the Commission noted in 1982,

> [f]or purposes of Rule 15c3-3, a "customer" is any person "from whom or on whose behalf a broker or dealer received or acquired or holds funds or securities for the account of such person" and may be construed to include any person or entity, such as an institution, that lends securities to a broker or dealer, whether or not it maintains an account with that broker or dealer. [121]

In that release the Commission acknowledged that "[t]he broad reading of 'customer transactions' for purposes of [Rule 15c3-] ... reflected, in part, the possibility that loans of fully-paid and excess margin securities by persons other than brokers or dealers might be protected under ... SIPA." [122]

Congress amended SIPA in 1978, however, among other things, to clarify that lenders of securities who receive collateral or compensation, generally, are not customers under SIPA. [123] The Commission recognized that although SIPA may not recognize institutional securities lenders as customers, the Commission nevertheless had an obligation to protect them, if not to insure that they were informed of their contractual or other legal rights. At the same time, the Commission recognized that "inclusion in the Reserve Formula of securities that are borrowed pursuant to a written agreement under which the broker or dealer has delivered to the lender full collateral in the form of cash or Government securities may impose an unnecessary financial burden on brokers and dealers." [124] For that reason, the Commission adopted paragraph (b)(3) to the Customer Protection Rule. When a broker-dealer borrows fully-paid or excess margin securities from a securities **\*1091** lender, and complies with the conditions specified in paragraph (b)(3), [125] the broker-dealer will be held to be in compliance with the rule's possession or control requirements and can treat the securities lender as a non-customer for purposes of the Reserve Formula. [126]

As adopted, paragraph (b)(3) requires the broker-dealer to enter into a loan agreement with the securities lender that specifies: [127] (i) the basis for compensation and the rights and liabilities of the parties; (ii) that the borrower will provide a schedule of the securities actually borrowed; (iii) that the borrower will provide collateral of cash, U.S. Treasury bills and notes, or an irrevocable letter of credit issued by a bank as defined under section 3(a)(6) of the Exchange Act on a daily basis equal to or exceeding the market value of the securities borrowed; and (iv) contains prominent notice that SIPA may not protect the lender, and its collateral may be the only source of satisfaction in the event of a liquidation of the broker-dealer. [128]

Paragraph (b)(3) in its adopted form was substantially similar to the rule as proposed by the Commission. [129] The Commission did, however, modify its proposal to take into account some of the comments it received. The comments generally fell into two categories. [130] The first group of comments concerns the written agreement and notice provisions of the rule. [131] The other set of comments relates to the type and delivery of loan collateral. [132]

**\*1092** Many of the comments relating to the written agreement requirement were remarks relating to practical, rather than substantive, considerations. [133] The commentators feared that the proposed rule would have required the broker-dealer to establish a separate securities lending agreement with every transaction, and include in that agreement the required disclosure regarding the absence of SIPA coverage and the reliance on the specified list of collateral. [134] The

Commission agreed with the commentators that one master securities lending agreement is sufficient with each counter party, but it emphasized that the master agreement "should be separate from other account agreements and should be executed at or before the first transaction." [135]

Since the adoption of paragraph (b)(3), the Division has been asked to expand the classes of collateral that can be delivered to the securities lender beyond cash, Treasury bills and notes, and irrevocable letters of credit. Broker-dealers that have large government securities portfolios and large securities lending businesses largely promote these requests. Those broker-dealers deliver their proprietary inventories as securities borrowed collateral as a means to finance their inventory. Securities borrowing transactions are an attractive source of financing for securities that are eligible as collateral because the broker-dealer generally receives 100% financing without interest. The proprietary securities are financed through the securities borrowing transactions because, for example, if a broker-dealer can deliver from its inventory a government security as securities borrowed collateral, it can redeliver the equity securities it borrowed and receive cash that will finance the government position. If the broker-dealer finances the position at a bank or other lender, it would not receive financing for the total amount of the position and would pay interest on the amount borrowed.

In March 1989, the Commission issued a release proposing the expansion of allowable collateral that can be delivered on a government securities borrowed transaction. [136] Concurrent with that release the Commission issued a no-action position that expanded the allowable collateral to the classes of securities it proposed for comment, which included all government securities as defined in sections 3(a)(42)(A) and 3(a)(42)(B) of the Act and securities issued or guaranteed by the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, the Student Loan Marketing Association, or the Financing Corporation. [137] Neither the proposal nor the no-action letter would allow stripped instruments to serve as collateral. [138]

## HOLD-IN-CUSTODY REPURCHASE TRANSACTIONS

In addition to securities borrowed agreements, practicing lawyers at securities firms and their law firms are also responsible for drafting master agreements that **1093** document repurchase transactions. The rule also requires specific language to be included in "hold-in-custody" repurchase agreements. [139] A repurchase transaction consists of a simultaneous purchase and sale of the same securities with different settlement dates. [140] The transaction operates as a financing of the securities position, in that the seller uses the proceeds of the sale to finance the original purchase of the securities position. [141] As part of the agreement, the seller pays interest to the purchaser on the amount of the contract. Consistent with the economics of the transaction, the margin rules and the other financial responsibility rules treat repurchase agreements as financing transactions. The SIPC also takes the position that, because the transaction is economically a financing, counter parties to repurchase agreements are not customers. [142]

When a counter party to a repurchase agreement with a broker-dealer leaves the securities it purchased, or its collateral, under the repurchase agreement with the firm, if the Customer Protection Rule was the only consideration, an argument could be made that if the counter party is an unsecured creditor and not a customer, the firm, already having use of the money lent by the counter party under the repurchase agreement, could also use the securities pledged to the customer (but not delivered to it) in its business. [143] Paragraph (b)(4) of Rule 15c3-3 is designed to address the Division's concern regarding that practice. [144]

As stated earlier, paragraph (b)(1) of the rule commands the firm to obtain and thereafter maintain possession or control of excess margin and fully paid customer securities. [145] During the 1980s, some government securities dealers were forced into liquidation proceedings, which caused substantial harm to third parties through fraudulent practices or inadequate accountability. [146] The Commission cited instances where government securities that were the subject of

"hold-in-custody" repurchase agreements were pledged a second time to someone other than the repurchase agreement counter party. [147] In some cases, government dealers entered into one hold-in-custody repurchase agreement with several counter parties where the collateral was "pooled," but when actually aggregated, may have **\*1094** been insufficient in liquidation to satisfy the amount of borrowings received by the dealer through the agreements. [148] In other cases, the collateral was never identified. [149] Despite the fact that the SIPC has taken the position that repurchase agreement counter parties are not treated as customers, at the time, in addition to being concerned about the abuses referred to above, the Commission was aware that the courts may take the opposite position and require SIPC protection of those persons. [150] For the above stated reasons, the Commission proposed new paragraph (b)(4) to Rule 15c3-3.

Under the new paragraph as originally proposed, broker-dealers that enter into hold-in-custody repurchase agreements with any counter party must, in a written agreement, disclose the rights and liabilities of the parties and the fact that the SIPC takes the position that repurchase agreement counter parties are not customers. [151] The proposed rule also required the broker-dealer to confirm the securities that are serving as collateral for the hold-in-custody repurchase agreement. [152] Finally, the proposed rule required broker-dealers to obtain possession or control of the collateral at the end of each business day. [153] The Commission recognized that many government dealers do not retain possession or control of the hold-in-custody repurchase agreement collateral during the trading day. As a matter of industry practice, the securities are segregated by the close of the business day, but are returned to the dealer's "free box" at the opening of business of the next business day. By the close of the next day, either the repurchase agreement is terminated and the counter party paid, or the new, substituted collateral is once again segregated. Through this practice, government dealers are able to achieve the maximum satisfaction of their government securities delivery requirements, greatly reducing their financing costs and making the clearance and settlement system for government securities more efficient.

After the Commission proposed its rule amendment for comment, Congress enacted the Government Securities Act of 1986, [154] which authorized the Department of Treasury ("Treasury") to adopt financial responsibility rules governing all **\*1095** government securities brokers and dealers, including those currently registered with the Commission. [155] In large part, the Commission and the Treasury worked together to adopt rules that were consistent. The Commission's reproposal reflected that effort. As part of that effort, the rule was amended to include mandated disclosure applicable to broker-dealers that use hold-in-custody repurchase agreement collateral for deliveries during the business day. [156] The Commission and the Treasury, however, issued separate proposals with respect to the manner of protection for counter parties to hold-in-custody repurchase agreements of $1 million or less. [157] The Treasury proposal would have allowed intra-day use of the collateral provided that the government securities dealer had prior consent, written or oral, of the counter party. [158] The Commission, on the other hand, harbored concerns about smaller investors and preferred its original proposal. In SEA Release No. 24,554, it reproposed its proposal and the Treasury alternative. [159]

In its adopting release, the Commission resolved the difference in approaches by way of interpretation. [160] In that release, the Commission stated that it was concerned about the ability of broker-dealers to convert free credit balances into hold-in-custody repurchase agreements, and thereby avoid the deposit requirement associated with those balances. [161] Under its interpretation, the Commission stated that if a broker-dealer enters into hold-in-custody repurchase agreements with customers that have pre-existing free credit balances, the repurchase agreement liability of the broker-dealer will be considered to be a free credit balance for purposes of the Reserve Formula, thereby protecting those customers in spite of their willingness to enter into repurchase transactions. [162] As many institutional customers transact their business with broker-dealers on a DVP basis, the Commission excepted those customers from this interpretation.

**PROTECTION OF CUSTOMER FUNDS**

Unlike customer securities, where the Commission and its staff generally insist that the broker-dealer maintain custody of the specific security owned by the broker-dealer, funds are completely fungible and are protected on a different basis. Customer funds are protected by requiring the broker-dealer to maintain a deposit in a separate account in a bank representing the net amount of funds that the **\*1096** broker-dealer owes customers and certain other items. [163] The deposit is adjusted weekly when the firm computes the Formula For Determination for Reserve Requirements For Brokers and Dealers ("Reserve Formula") set out in Exhibit A of the Customer Protection Rule. [164] Under the Reserve Formula, the broker-dealer compares "Credit Items" which include: (i) balances that represent money obligations to customers; (ii) situations where the broker-dealer has obtained funds through the use of customer property; and (iii) certain reserves for operational inefficiencies to the "Debit Items" which are receivables from customers or other persons involved with financing transactions on behalf of customers. [165]

Before getting into the details of this section of the rule some general observations are worth noting. First, note that, unlike in the case of securities, where compliance is measured daily, the Reserve Formula is computed weekly. [166] The weekly computation was adopted because not all firms had the operational capacity to make the computation more frequently. Secondly, note that the deposit under the Reserve Formula represents a net number. [167] Although, this aspect of the rule was the subject of reproposals discussed later, the rule, as adopted, allows the broker-dealer, for example, to finance one customer's margin balance with the free credit balance of another. In interpreting the rule, the staff is conscious that including a Debit Item without also including a Credit Item related to that transaction results in the use of the free credit balance of an unrelated customer. Many Reserve Formula items are in fact related and therefore have no or minimal effect on the deposit requirement. [168] Thus, the rule as interpreted and applied has a bias toward ensuring that free credit balances are reserved in the deposit and not used to finance debit items (with the exception of margin accounts debits) of other customers. A complicating factor is that, because money balances are fungible, determining which of those balances are related to customer activity is not always easy. To address this, the Commission has allowed the firms to make conservative determinations commonly known as the "Reserve Formula Allocation." [169]

Generally, the analytical path used for understanding what items belong in the Reserve Formula is:

(i) Is there a customer or operational penalty Credit Item?

(ii) If the Credit Item is an operational penalty, it goes in without an offsetting Debit Item;

**\*1097** (iii) If the Credit Item is a customer credit, is there a Debit Item related to that Credit Item?

(iv) If so, generally both sides go in the Reserve Formula;

(v) If it does not relate to a Debit Item, the Credit Item goes in the Reserve Formula; and

(vi) If there is no customer Credit Item and only a customer Debit Item, with the exception of margin account debits, it will be difficult to get the Division staff to agree that the Debit should go in. The Commission and its staff commit much more scrutiny to whether specific Debit Items should be allowed

in the Reserve Formula, as evidenced in the discussion in the section later in the article devoted to Note E to the Reserve Formula.

## THE RESERVE FORMULA—HISTORY

Prior to the adoption of the Customer Protection Rule, the Commission found that with the exception of a few jurisdictions, no restrictions existed on the use of monies received by the broker-dealer from its customers. [170] Although the Commission adopted Exchange Act Rule 15c3-2 in 1964 [171] to address this problem, that rule required only that the broker-dealer periodically disclose to the customer that his funds may be used in the operation of the business of the broker-dealer and that the funds are payable on demand. [172] The Customer Protection Rule, adopted in the aftermath of the Paperwork crisis, addressed this issue directly.

The Commission originally proposed what became the Customer Protection Rule in the form of two proposed rules, Rule 15c3-3 and 15c3-4. [173] The proposed Rule 15c3-3 would protect customer funds in the custody of the broker-dealer and would have required the broker-dealer to establish a "Special Account for the Exclusive Benefit of Customers" ("Special Account") and a "Cash Reserve Account." [174] Generally, the broker-dealer would have been required to effectuate all transactions relating to customers through the Special Account. [175] The proposed rule would have allowed disbursements from the account for only "limited specified purposes," which primarily included payment to customers and completion of customer transactions. [176]

Proposed Rule 15c3-3 would have further required the broker-dealer to make daily computations, which would have compared amounts that customers owed the firm or cash remitted by the firm to borrow securities used to complete customer transactions to: (i) funds carried for the account of all customers; (ii) monies **\*1098** borrowed by the firm using customer securities as collateral; (iii) cash deposits received by the firm for loans of customers' securities; and (iv) monies received by the firm for sales of securities under which customers' margin securities were delivered. [177] The net amount of customer funds received by the firm would have been required to be deposited in the Cash Reserve Account. [178]

Similar to Rule 15c3-3 in its present form, proposed Rule 15c3-4 would have required the broker-dealer to obtain and thereafter maintain possession or control of fully-paid or excess margin securities of customers. [179] Unlike the current rule, however, proposed Rule 15c3-4 would have required the broker-dealer to establish a "Securities Reserve Bank Account" and make deposits into that account in the amount of the market value of customer securities for which it was required, but failed, to obtain possession or control. [180] In connection with its quarterly securities count required under 17a-13, the proposed rule would have required the broker-dealer to "buy-in" [181] any fully-paid or excess margin customer securities not in its possession or control within thirty days of the required time of the securities count under which such possession or control deficiency was determined. [182]

A subsequent reproposal combined the two proposed Rules 15c3-3 and 15c3-4 into a form similar to the present Rule 15c3-3. [183] The reproposal altered the method for protecting customer funds by creating the Reserve Formula, which according to the Commission, "is computed from ... data which currently can be obtained without significant difficulty, as the major components of the formula are required to be reported by Rule 17a-5." [184] The Reserve Formula, the reproposing release stated, "offers the further advantage over the earlier proposal of being more readily subject to independent verification by the Commission [staff] and by self-regulatory bodies and outside auditors." [185]

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    15

Under the Reserve Formula as finally adopted, the securities firm is required to periodically compare its "credits" or the amount of funds it has obtained directly or by the use of customer assets, plus certain amounts to reserve for operational inefficiencies, to the funds it extended to finance activities of its customers, or "debits." [186] Under paragraph (e)(1) of the rule, when those computations indicate **\*1099** that the broker-dealer's credits exceed its debits, the broker-dealer is required to deposit cash or qualified securities ("Reserve Requirement") in a "Special Reserve Bank Account For the Exclusive Benefit of Customers" ("Reserve Account"). [187] The deposit must not be less than 105% of the excess of the total credits over total debits. [188]

Paragraph (e)(3) requires larger broker-dealers to compute the Reserve Formula as of the close of the last business day of the week. [189] Any deposits required to be made under the computation must be deposited no later than one hour after the opening of banking business on the second following business day. [190] Paragraph (g) allows the broker-dealer to make withdrawals from the Reserve Account when its Reserve Formula computation indicates that excess cash or qualified securities have been deposited in the Reserve Account. [191] The time frame under which the broker-dealer has to make withdrawals has been interpreted to be "one hour after the opening of banking business on the second business day following the [Reserve] recomputation." [192]

## THE RESERVE FORMULA—CREDIT ITEMS

Credit Items fall within four categories. Item 1 consists of "free" and other credit balances. [193] Generally, those items represent customer money balances held **\*1100** by the broker-dealer waiting for investment by the customer. [194] Note A to the Reserve Formula provides that, "Item 1 shall include all outstanding drafts payable to customers [who] have been applied against free ... or other credit balances" and all checks written "in excess of bank balances" of the broker-dealer. [195] Note A takes into account that, under most conventional broker-dealer accounting systems, the credit in the customer account is reduced at the time the check or draft is issued. [196]

Items 2 through 4 represent situations where the broker-dealer has obtained funds through the use of customer securities. In Item 2, the broker-dealer includes the amount of customer securities pledged to banks for loans. [197] Note B to the Reserve Formula requires the broker-dealer to include in Item 2 "the amount of [l]etters of [c]redit ... collateralized by customers' securities, to the extent" the letters of credit have been used to satisfy the broker-dealer's margin requirement related to options positions of customers at Options Clearing Corporation (OCC). [198]

In Item 3, the broker-dealer includes the greater of the amount of cash collateral the broker-dealer has received (and is required to return) for customer securities it has loaned and the market value of the customer securities loaned. [199]

In Item 4, the broker-dealer includes the amount of funds that it will be required to remit when other broker-dealers deliver customer securities outstanding **\*1101** past settlement date. For customer securities that the broker-dealer has failed to receive for longer than thirty days, Note D requires the broker-dealer to increase the credit by "the amount by which the market value of [the] securities failed to receive" exceeds the amount of funds owed by the broker-dealer. [200]

In Item 5, the broker-dealer includes "[c]redit balances in firm accounts which are attributable to principal sales to customers." [201] Those credit balances represent the current market value of securities sold short by the firm to customers. [202] This item is an exception to the possession or control requirements of the rule. [203] Generally, if the customer fully pays for securities, the broker-dealer must obtain possession or control of the customer securities. [204] If, however, the broker-dealer sells short to a customer as principal, the broker-dealer is not required to obtain possession

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.    16

or control of the securities, as by doing so the broker-dealer would be closing out its short position. [205] By including the market value of the securities in Item 5, the Commission has provided against a liquidation shortfall because the funds required to obtain the securities for the customer have been accounted for in the Reserve Formula.

Items 6 through 9 can be referred to as "penalty items." As discussed in the introductory section of the Article, the Customer Protection Rule was adopted following the "Paperwork Crisis," a period in which many participants in the securities industry lost control of securities processing and record keeping. The effect of the so-called penalty items is to require the broker-dealer to set aside cash or qualified securities in situations where the firm has not obtained securities promptly, or has aged shortages or record keeping differences. [206] Because the penalty items were designed, among other things, "[t]o motivate the securities industry to process its securities transactions in a more expeditious manner," [207] penalty items must be included in the Reserve Formula, whether or not the underlying transaction is related to customer activity. [208]

The first penalty item, Item 6, requires the broker-dealer to include in the Reserve Formula the "[m]arket value of stock dividends, stock splits and similar distributions receivable outstanding ... [for] over [thirty] calendar days." [209] The second penalty item requires the broker-dealer to include in Reserve Formula the "[m]arket value of short security count differences over [thirty] calendar days old." [210] After forty-five calendar days, the broker-dealer is required to buy-in those **1102** differences. [211] The third penalty item requires the broker-dealer to include the "[m]arket value of short securities and credits ... in all suspense accounts over [thirty] calendar days." [212] The final penalty item, Item 9, requires the broker-dealer to include as a credit the "[m]arket value of securities [that] are in transfer in excess of [forty] calendar days and have not been confirmed to be in transfer by the transfer agent or the issuer [within] the [forty] days." [213] Under this item, the broker-dealer has forty days to confirm that the transfer agent is in the process of transferring securities for which the broker-dealer is responsible. [214] If the forty days pass before the broker-dealer confirms that the transfer is in process, the **1103** broker-dealer must include the market value of the securities in Item 9 until the securities are confirmed to be in transfer. [215]

## THE RESERVE FORMULA—DEBIT ITEMS

Items 10 through 13 include the "debit items," which are those situations where the broker-dealer is financing, directly or indirectly, customer transactions. [216] Item 10 includes "[d]ebit balances in customers' cash and margin accounts excluding unsecured accounts and accounts doubtful of collection." [217] These amounts represent credit extended by broker-dealers directly to customers for the purchase of securities. Item 10 debit items are subject to reductions for, among other things, concentrated securities positions as specified in Note E to the Reserve Formula. [218] Those reductions are discussed in a later section of this Article.

Item 11 includes "[s]ecurities borrowed to effectuate short sales by customers and securities borrowed to make delivery on customers' securities failed to deliver." [219] When a broker-dealer sells short on behalf of a customer, the broker-dealer normally borrows the security sold short for delivery to the purchaser. When a broker-dealer borrows securities, the broker-dealer must remit collateral, often in the form of cash, to the securities lender. [220] The borrowing broker-dealer would record a receivable from the securities lender for the amount of the cash collateral. This receivable, when the securities are borrowed to complete a customer short sale is the Item 11 debit. The proceeds of the customer short sale could be used as the cash collateral for the securities borrowing, and would be included as an Item 1 credit.

An Item 11 debit would also be included when the customer, although not selling short, failed to give the broker-dealer securities that the broker-dealer could deliver to the purchaser. [221] If, for example, the customer securities were sent to

the transfer agent to effect change in record ownership, the broker-dealer may borrow securities to complete the delivery to the purchaser. Again, any cash given by the broker-dealer to the securities lender would result in a receivable qualifying as an Item 11 debit.

Item 12 includes "[f]ailed to deliver of customers' securities not older than 30 calendar days." [222] In this item, the broker-dealer includes the amount of securities **\*1104** that its customer has sold but not delivered, resulting in a failure to deliver to the broker-dealer purchasing the securities or acting on behalf of the purchaser. [223]

Under the final debit item, Item 13, the broker-dealer includes the "[m]argin required and on deposit with the [OCC] for all option[s] contracts written or purchased in customer accounts." [224] Note F limits the amount of the debit "to the extent [the] margin ... [on deposit] is represented by cash, proprietary qualified securities, and letters of credit collateralized by customers' securities." [225] This limitation in Note F prevents the broker-dealer from doing indirectly what it is prohibited from doing directly. As stated earlier, paragraph (e)(1) required the broker-dealer to deposit cash or qualified securities into the Reserve Account in amounts computed in accordance with the Reserve Formula. [226] Note F prevents the broker-dealer from lowering its Reserve Requirement by depositing as margin with OCC proprietary securities that it would not be allowed to deposit into its Reserve Account. [227]

## NOTE E

Note E includes six specific instances where Debit Items are required to be reduced. Generally, the reductions can be classified into two classes. Paragraphs (1), (2), and (3) of Note E take into account potential problems associated with collecting the debits in the event of a liquidation of the firm. [228] Other than any cash or qualified securities deposited in the Reserve Account, the Debit Items represent the source of funds remaining for the SIPC or the firm, in the case of SRO-supervised liquidation, to use to pay customer balances represented by the credit items. [229]

Note E(1) takes into account shortfalls that may arise in the debit items if the broker-dealer's margin accounts are secured by a concentrated amount of a particular security. [230] This paragraph anticipates collection problems that would arise if that security drops in value and a large deficit arises in the firm's margin accounts. More specifically, Note E (1) requires the broker-dealer to reduce its Debit Items

> by the amount by which a specific security (other than an exempted security) which is collateral for margin accounts exceeds in aggregate value [fifteen] percent of the aggregate value of all securities which collateralize all margin accounts receivable .... [The] security is deemed to be collateral for a margin **\*1105** account only to the extent it represents in value not more than 140[%] of the customer debit balance in a [particular] margin account. [231]

The reduction is further limited to the amount of each debit balance collateralized by the particular security. [232]

Note E (2) provides for an exception from the general rule that the debit items must be reduced by unsecured accounts. In the case of omnibus accounts maintained in compliance with section 220.4 (b) of Regulation T under the Exchange Act, [233] the broker-dealer is allowed to decrease the reduction for unsecured Debit Items "by any calls for margin, marks to the market, or other required deposits ... outstanding [five] ... days or less." [234]

To take into account unanticipated collection problems with the debits, Note E (3) requires the broker-dealer to reduce its margin account Debit Items in Item 10 by one percent. [235] If the broker-dealer computes its net capital requirements under the alternative standard, the amount of this reduction is increased to three percent. [236]

Paragraphs (3), (4), (5), and (6) relate to efforts by the Commission to further restrict the use of free and other credits by the broker-dealer adopted, in large part, as the result of apparently fraudulent schemes which occurred at two broker-dealers where insiders of the firm misappropriated or embezzled customer funds through margin accounts created in the names of themselves, friends, family members, or nominees. [237]

In the case of Bell & Beckwith, Edward P. Wolfram ("Wolfram"), formerly the managing partner of the firm, engaged in a fraudulent scheme that involved the misappropriation of over $32 million of customer assets. [238] This fraud was accomplished largely by funneling customer funds into margin accounts controlled by Wolfram. Although Item 10 of the Reserve Formula requires the debit to be fully secured before it can be used to offset credit items, [239] the accounts created by Wolfram were collateralized by securities which either did not exist or which were overvalued. [240]

 *1106   In the case of *United States v. Brimberry*, [241] a margin clerk inflated the collateral value of margin accounts in his name, the names of his friends and associates and of accounts in fictitious names. In a manner similar to the fraud at Bell and Beckwith, Thomas R. Brimberry, and his partners in the scheme, James Massa and Duane Skinner, embezzled over $16 million from the customers of Stix & Co. ("Stix"), through the creation of fictitious accounts and by overstating the collateral value in the margin accounts they controlled. [242]

As a result of the above cases, in 1985, the Commission amended Note E to exclude certain concentrated and affiliated debits from the Reserve Formula. [243] The amendments were adopted in large part as originally proposed, [244] with some modifications. Generally, the amendments, as adopted: (i) revised the Commission's published interpretation of how the rule should treat combined accounts that include both customers and persons that the rule excludes as customers; (ii) required the broker-dealer to exclude from the Debits Items debits which are large in relation to the broker-dealer's net capital before deductions for securities haircuts; [245] and (iii) required the broker-dealer to exclude from the Debits Items debits of "household members and other persons related to principals" and debits of "affiliated" persons of a broker-dealer. [246]

The first amendment, regarding combined accounts, alters an earlier Commission interpretation. Soon after the adoption of the Customer Protection Rule, the Commission issued a number of interpretations of the rule in  *1107 Exchange Act Release No. 9922. [247] One of those interpretations required the broker-dealer to treat as customer accounts those accounts that include both "customers" and persons that the rule excludes from the definition of customer. [248] In the form the amendments to Note E were originally proposed, the rule would have required broker-dealers to treat those accounts as customer accounts but exclude any debit balances from the Reserve Formula. [249] In response to complaints from commentators that the original proposal was overly broad, the Commission reproposed and adopted the following three part compromise: (i) if the percentage ownership of the non-customer is less than five percent, then the entire debit balance should be included in the Reserve Formula; (ii) if the percentage portion of any debit ownership interest of the non-customer is between five and fifty percent, the balance related to the non-customer in that account will be excluded from the Reserve Formula unless the broker-dealer can demonstrate that the debit is related to a credit in the Reserve Formula other than a free credit balance; and (iii) if the percentage portion of any debit ownership interest of the "non-customer" is over fifty percent, the rule, as amended, excludes the entire debit balance from the Reserve Formula. [250]

In the second set of amendments, the Commission sought to address the concern raised by the Bell & Beckwith liquidation. [251] In that case, free credits of the firm were misappropriated by the principals through margin accounts of family members and others controlled by the principals. The amendments address the case by requiring the broker-dealer to exclude from the Reserve Formula any debits of affiliated persons of a broker-dealer, household family members, and other persons related to principals of a broker-dealer. [252] The Commission found that "with respect to the debit balances of close relatives such as spouses and children, there is no basis for distinguishing those debit balances from the debit balances of principals of a broker-dealer." [253] The Commission defined the term "affiliated person" to include "any person who is directly or indirectly controlled by or under common control with the broker-dealer." [254] Ownership of ten percent or more of the common stock of the relevant entity has been deemed to be prima facie control. [255]

Finally, the amendments adopted in Exchange Act Release No. 22,499 address potential exposure to the broker-dealer arising from margin debt that is concentrated **1108** with a single customer. [256] As originally proposed, Note E would have reduced the amount includible in Item 10 of the Reserve Formula of a debit balance from a particular customer to the extent that the debit exceeded ten percent of all customer margin debit balances. [257]

Many of the commentators stated that they believed that the proposal would be unfair to small and medium sized firms, because it would be more likely for those firms to have a single debit balance comprising a large percentage of their total margin debit balances. [258] In particular, they believed that a firm should not be required to exclude a debit if the firm can demonstrate that the debit is directly related to a credit item, other than a free credit balance, in the Reserve Formula. [259] Other commentators noted that a concentration test based on tentative net capital would be a more appropriate means of measuring a firm's ability to manage credit risk associated with one account. [260] Other commentators believed that the Commission should, as an alternative to a concentration reduction, require the broker-dealer to report large margin debits on its "FOCUS" report. [261] Other commentators stated that any concentration test should take into account the quality, diversity, and marketability of the collateral securing the margin debit. [262] Finally, commentators asked about the applicability of the concentration test to debits in omnibus accounts. [263]

In response to the comments described above, Note E (5) was reproposed and adopted substantially in the form of the reproposal. [264] As adopted, Note E (5) requires the broker-dealer to exclude from Item 10 of the Reserve Formula the amount by which a debit balance in a margin account exceeds the greater of twenty-five percent of tentative net capital or $50,000. [265] This provision represents a change from the original proposal in that it addresses the commentators' belief that tentative net capital is a better measure than total margin debits upon which to base a concentration test. The Commission also addressed the commentators' concerns by excluding from the concentration test those debits that are directly related to credit items (other than free credit balances) included in the Reserve Formula. [266] For example, if the broker-dealer finances the large margin debit by pledging the securities that secure the margin account to a bank and borrowing **1109** the funds needed to lend to the margin customer, the broker-dealer would not be required to exclude the margin debit from the Reserve Formula even if it exceeded twenty-five percent of tentative net capital. [267] To address the commentators' concerns regarding the diversity and quality of collateral, the Commission added a provision that authorizes the broker-dealer's DEA to grant partial or plenary exception from the concentration test after taking into account the quality, diversity, and marketability of the collateral securing the debit balance. [268]

## THE RESERVE FORMULA ALLOCATION

The Reserve Formula Allocation presents a mystery for many lawyers. The Reserve Formula Allocation is an operationally practical way to address the fact that because money and securities are fungible, it is difficult to determine

which balances and transactions are customer-related and which are not. The Reserve Formula Allocation allows the broker-dealer to make assumptions on a conservative basis. The confusion is caused by the somewhat incomplete legal foundation for the way the Reserve Formula Allocation is performed in practice today. The origin of the Reserve Formula Allocation is in an interpretive release issued shortly after the rule was adopted. [269] That release, described immediately below, covers only the allocation of limited types of transactions. In practice, firms vary in both the way they allocate transactions, and in the types of transactions that they include in their allocation processes. Many firms allocate every open position on their securities record. Although these practices appear to have become industry convention, the absence of clear legal foundation may concern lawyers that counsel the firm. This matter is discussed further in the section devoted to "Issues Related to the Customer Protection Rule." [270]

A literal reading of Rule 15c3-3 would require the broker-dealer to specifically identify which customer money balances are related monies extended by the broker-dealer to finance those transactions. [271] Because of the extremely large volume of securities transactions processed by major broker-dealers, this identification would be an extremely difficult, if not impossible, task. Indeed, as explained earlier, the rule requires broker-dealers to determine its possession or control requirements on an aggregate basis for all customers in a particular security and does not require the broker-dealer to identify where specific customer securities are held. [272]

The Commission addressed this concern at least in part, immediately after the rule was adopted, but before it became effective. On January 2, 1973, (the rule became effective on January 15, 1973) the Commission published Exchange Act Release No. 9922, which stated

> **\*1110** [i]f it is impractical or unduly burdensome to determine which fail to receive contracts and fail to deliver contracts relate to proprietary accounts versus customer accounts and which securities loaned and securities borrowed are for proprietary accounts or customer accounts, an appropriate allocation may be made on a conservative basis to accomplish maximum protection for customers. If an allocation is used with regard to the foregoing items, the broker or dealer should be able to demonstrate that the results so obtained regarding designations of customer versus proprietary positions would be comparable to those which would be obtained if the respective positions had been developed without the use of an allocation. [273]

The Commission's concern was limited to securities borrowed and loaned and securities failed to receive and deliver apparently because it assumed that the other items in the Reserve Formula could be determined by reference to the broker-dealer's balance sheet, where they are stated in amounts that are solely attributable to customers.


Release No. 9922 appears on its face to limit the use of the allocation to securities borrowed and loaned and securities failed to receive and deliver. Indeed, the SIA Transcripts include examples of the allocation that are limited to allocating to securities borrowed and loaned and securities failed to receive and deliver. [274] Those examples would require the broker-dealer to allocate all proprietary long or short positions to securities borrowed and loaned and securities failed to receive and deliver, and assume that any remaining securities borrowed and loaned and securities failed to receive and deliver are allocable to customer positions and should be included in the Reserve Formula.

In Release No. 11,497 published in 1975, the Commission specifically addressed how securities borrowed and loaned and securities failed to receive and deliver should be allocated. [275] That release codified that fails to receive and fails to deliver are allocated first to proprietary and noncustomer positions and the remainder are assumed to be related to customer transactions and therefore included in the Reserve Formula. [276] Under Release No. 11,497, securities borrowed and loaned, however, are allocated first to long or short positions in customer accounts and the remainder is assumed to be related to proprietary positions and therefore excluded from the Reserve Formula. [277]

The allocation of securities borrowed and loaned and securities failed to receive and deliver was subsequently altered in Commission releases and interpretations. In Release No. 18,737, the Commission announced the amendment of the Division **\*1111** of Market Regulation's interpretation in Release No. 11,497. [278] The new "allocation procedure" is set forth below:

> (1) Fails to receive which are allocable to long positions in the proprietary or other accounts of the broker or dealer or to fails to deliver of the same quantity and issue may be excluded from the computation of the Reserve Formula;

> (2) Fails to deliver which are allocable to short positions in the proprietary or other accounts of the broker or dealer or to fails to receive of the same quantity and issue may be excluded from the computation of the Reserve Formula;

> (3) Securities borrowed which are allocable to fails to receive may be excluded from the computation of the Reserve Formula. [279]

Under a later interpretation, the presumption for allocating securities borrowed and loan transactions set forth in Release No. 11,497 was reversed and made more consistent with the way fail to receive and deliver are allocated. [280] Under that interpretation, securities borrowed and loaned are now allocated first to proprietary and noncustomer positions and the remainder is assumed to be related to customer positions and included in the Reserve Formula. [281]

## THE SPECIAL RESERVE BANK ACCOUNT FOR THE EXCLUSIVE BENEFIT OF CUSTOMERS ("RESERVE ACCOUNT")))))

Paragraph (e) of the rule requires the broker-dealer to establish the Reserve Account, which is an account at a U.S. bank into which the broker-dealer must deposit the amount by which its credit items in the Reserve Formula exceed its debit items. [282] Although establishing a bank account may seem like a simple matter, the rule requires that the legal documentation supporting the Reserve Account must contain certain representations by the bank acknowledging its understanding of the nature of the account and the fact that no liens apply to it. [283] **\*1112** Strangely enough, the account is frequently established by operational and accounting personnel at the securities firm, without the input of the legal or compliance department. Yet, the documentation supporting the Reserve Account is routinely reviewed by regulatory examiners and is often the subject of comment in examination findings. The documentation is important to the Commission and its staff because it will support the assertion by the SIPC that the funds in the account are customer property to be used to fund distributions to customers and are not generally available to other creditors including the bank.

With respect to what can be deposited into the account, paragraph (e) requires that the deposit be made in cash or qualified securities. [284] The term "qualified security" is defined in paragraph (a)(6) of the rule to mean "a security issued by the United States or a security in respect of which the principal and interest are guaranteed by the United States." [285] It includes mortgage-backed securities guaranteed by the Government National Mortgage Association, because they are backed by the Full Faith and Credit of the United States government. Collateralized mortgage obligations that are not issued or guaranteed by the United States, such as those issued by the Federal National Mortgage Association

and Federal Home Loan Mortgage Corporation are not qualified securities. Many firms hold their treasury function responsible for funding the Reserve Account. Treasurers generally view highly rated mortgage obligations with similar performance characteristics as fungible. For that reason, the deposit of inappropriate mortgaged backed securities into the Reserve Account is a frequent finding of regulatory examiners.

The qualified securities may be borrowed at a two percent reduction in value [286] or obtained under a repurchase agreement. [287] Stripped U.S. government securities may be deposited, provided the value of stripped securities exceeding one year to maturity is reduced by six percent in determining its value for purposes of complying with the Reserve Requirement. [288]

**\*1113**  The deposit may be made using certificates of deposit that are valued, less any early withdrawal penalties, less than $100,000, or if greater, ten percent of the bank's equity capital or fifty percent of the broker-dealer's excess net capital. [289]  Money market accounts as defined under Federal Reserve Board Regulation D, with a bank as defined under paragraph (a)(7), are allowed under the same percentage limitations as certificates of deposit. [290]

## RESERVE FORMULA SUBSTITUTIONS

"Reserve Formula Substitutions" refers generally to the practice of conducting transactions before and after a Reserve Formula computation that have the desired effect of reducing the deposit requirement while enabling the firm to use customer property in its business during the period between computations. This practice has been the subject of at least two Commission proceedings. [291]

Paragraph (e)(2) prohibits the broker-dealer from accepting or using "any of the amounts under items comprising Total Credits under the formula referred to in paragraph (e)(1) ... except for the specified purposes indicated under items comprising Total Debits under the formula, and, to the extent Total Credits exceed Total Debits, at least the net amount thereof shall be maintained in the Reserve Bank Account pursuant to paragraph (e)(1) ...." [292]  Literally, this paragraph would require the broker-dealer to compute its Reserve Requirement on a continuous basis, to know, at any point in time, whenever a particular Credit Item is being used for a Debit Item.

Despite the language of the rule, the Commission has never required continuous compliance, but has on occasion, used paragraph (e)(2) to deter schemes developed by broker-dealers to take advantage of the weekly computation of the Reserve Requirement in a manner that allows them to use Credit Items in their proprietary business activities. In at least two cases, the broker-dealer manipulated the Credit Items in the Reserve Formula such that the broker-dealer made use of monies obtained by pledging customer securities at a bank throughout the week. [293]  Near the close of business on every Friday, however, the firm would substitute the customer bank loan for a firm bank loan, which effectively removed the customer bank loan Credit Item from the Reserve Formula from the Friday computation. The bank loan secured by customer securities could be reestablished on the following Monday morning, thereby enabling the firm to use customer  **\*1114**  property in its business during the week. Although the Commission has used paragraph (e)(2) to void schemes that are deliberately designed to avoid the deposit requirement, the Commission has never used it to capture instances where the broker-dealer has not willingly used Credit Items in its business.

The Commission's position in the Reserve Formula Substitution cases may cause firms to ask themselves what their responsibility is for large changes in Credit or Debit Items between Reserve Formula computations. Although the Commission has accepted the weekly Reserve Formula computation as an accommodation to the operational limitations of the industry, its application of paragraph (e)(2) would suggest that the broker-dealer is nevertheless prohibited from using Credit Items received between computations in its business. The Commission could be making a distinction based on intent, as all of the proceedings brought by the Commission involve deliberate attempts to manipulate the Reserve

Formula and not changes in Reserve Formula amounts between computations that occur because of normal business operations.

### THE RESERVE ACCOUNT "SPIRAL"

The so-called "spiral" occurs with broker-dealers that do not have sufficient capital or access to proprietary funding to finance the volume of customer business that they are carrying. Although the rule generally allows the broker-dealer to use customer margin securities to finance lending to those customers, the broker-dealer must independently finance transactions that occur near a Reserve Formula computation date. [294] For example, we shall assume that a customer purchases securities, pays on Friday, and the transaction settles the following week. The customer funds become a Credit Item in the Reserve Formula that Friday, and are deposited in the Reserve Account the following Tuesday. Paragraph (g) of the rule prohibits the broker-dealer from withdrawing funds from the Reserve Account without making a Reserve Formula computation. [295] When the securities arrive on settlement date, the broker-dealer must use its own capital, or borrow without using customer securities as collateral, to pay for the securities, because it is prohibited from withdrawing funds from the Reserve Account. [296] If it recomputed the Reserve Formula on the settlement date, the funds held for the customer would still represent a Credit Item, because the customer purchase has not settled. [297] The paradox is that the broker-dealer needs the customer funds to settle the transaction, but cannot access them until the transaction has settled. Hence, it must use its own capital, or borrow without pledging customer assets, to avoid the spiral. [298]

The spiral occurs when those broker-dealers that do not have adequate capital or access to proprietary funding resort to using margin securities of customers to **\*1115** fund transactions similar to the one described above. Although the rule allows broker-dealers to do this by virtue of the fact the firm can borrow using up to 140% of each customer's debit balance, [299] the result of that borrowing is that additional Credit Items must be included in the following week's Reserve Formula, resulting in an even higher deposit requirement. To fund that deposit, the firm borrows an additional amount using customer securities as collateral, raising its deposit for the following week. For firms that are strapped for funding, this pattern usually continues, and the broker-dealer becomes faced with a large customer bank loan and an offsetting large Reserve Account Deposit. As borrowing to deposit cash makes no economic sense, and at some point the available customer margin securities will run out, the broker-dealer will ultimately resort to appealing to the Commission staff for relief. Generally, the Division will accommodate the firm, as long as assurances are granted that the firm will take measures to fund itself such that it will not have to request further relief. [300] In the end, the consequences of the spiral are that the rule limits broker-dealers with limited capital or limited available credit from carrying unlimited customer accounts.

### PROPRIETARY ACCOUNTS OF INTRODUCING BROKER-DEALERS (PAIB)

As discussed earlier in the section addressing the definition of customer, although Rule 15c3-3 does not grant broker-dealers that keep their investment property at another broker-dealer customer status, SIPA treats broker-dealers that have securities accounts at the defunct firm as customers. [301] Those broker-dealers obtain a pro rata share of customer property, but are not eligible for advances from the SIPC fund. Earlier, we also discussed how the Division looked to SIPA in analyzing how it should interpret the rule. [302] The recent cases of *Adler, Coleman Clearing Corp.* [303] and *W.S. Clearing Inc.*, [304] alerted the Division to the exposure to the SIPC and to customers of a failed broker-dealer stemming from the discrepancy between the definition of customer in the rule and SIPA.

**\*1116** To address this problem, the Division dealt with this issue by issuing a no-action letter granting relief from the Net Capital Rule, Exchange Act Rule 15c3-1. [305] Although at first glance that may seem inappropriate, the Division addressed two of its issues with one letter. In addition to its concern about an SIPC liquidation shortfall, it had also

been concerned about the regulatory capital treatment of assets of the introducing firm given to its clearing but not held in safekeeping.

To remedy its concerns regarding both the liquidity of the assets of one broker-dealer held by another, and the issues raised by the gap between under SIPA, the staff's no-action letter stated that the investment assets of the broker-dealer that holds its property at another broker-dealer would be allowable, (i.e. not incur a regulatory capital charge) if the carrying broker-dealer followed the procedures laid out in the staff's no-action letter. [306]

Generally, the letter states that assets held by a broker-dealer (the "clearing broker-dealer") for the account of another broker-dealer (the "introducing broker-dealer") need not be deducted from the net capital of the introducing broker-dealer if the clearing broker-dealer complies with a number of conditions. [307] Generally, those conditions include: (i) a written contract between the clearing broker-dealer and its broker-dealer client; (ii) the preparation of a separate Reserve Formula ("PAIB Formula") computation that generally follows the requirements for the computation applicable for customer funds under the rule; (iii) customer credits cannot be used to fund debits of broker-dealers in the PAIB Formula; and (iv) broker-dealer credits in the PAIB Formula may be used to fund customer debits in the Reserve Formula under the rule. [308]

Although the PAIB no-action letter effectively subjects broker-dealer property to the PAIB Formula computation, the possession or control requirements of the rule do not apply. [309] Nevertheless, the clearing broker-dealer should remember not to use the property of others, even those not covered by the rule, without obtaining their permission, or that firm may become liable for tortious conversion under common law or through Rule 10b-5. [310]

## ISSUES RELATED TO THE CUSTOMER PROTECTION RULE

The Customer Protection Rule, together with the Commission's other financial responsibility rules, has proved effective in achieving the purposes the Commission **\*1117** set forth in the adopting release in 1972. In particular, the financial responsibility rules are primarily responsible for the large predominance of orderly self-liquidations of financially troubled securities firms promoting self-liquidations, as opposed to SIPC liquidations, since the adoption of the rules. For example, following a period of extreme market distress, there were only eight SIPC liquidations in 1987 and 1988. [311] During that same period, however, there were eighteen self-liquidations in which the NASD oversaw the distribution of over $250 million of customer property. [312] Even in those cases where an SIPC liquidation was necessary, the customer protection, Net Capital, and other financial responsibility rules enabled the SIPC to make much of the distributions to customers out of the broker-dealer's estate and significantly reduced the reliance on SIPC funds to cover distributions of customer property and other liquidation expenses. In the period from SIPC's inception in 1971 until the end of 2000, 287 SIPC proceedings were instituted. [313] In the course of those proceedings, the SIPC distributed $3.8 billion to customers. [314] $3.5 billion of that amount came from the estates of the defunct broker-dealers being liquidated. [315] Although the causes for the demise of broker-dealers that have become the subject of SIPC liquidations is not generally publicly available, many of those firms failed as the result of embezzlement, misappropriation, or some other misconduct that circumvented the firm's compliance with the financial responsibility rules.

Despite the effectiveness of the Customer Protection Rule, some adjustments to the rule may be warranted to take into account not only gaps between the rule and SIPA that originate at the rule's inception, but also changes in the securities industry, business and product lines, and capabilities of operating systems. Some of the issues that confront the Commission are discussed below.

## STATUS OF FOREIGN BROKER-DEALERS

As mentioned above, broker-dealers are excluded from the definition of customer under paragraph (a)(1) of the rule. [316] As interpreted by the Division, the term "broker-dealer," as used in paragraph (a)(1) includes foreign banks (and broker-dealers) that would fall within the definitions of "broker" and "dealer" under paragraphs (3)(a)(4) and (5) under the SEA but not within the definition of "bank" under section 3 (a)(6) of the Exchange Act. [317] The problems with that interpretation are both administrative and substantive. The administrative difficulty is that most of the people at securities firms that apply Rule 15c3-3 are not lawyers and have no experience with the large body of interpretations that surround Exchange Act paragraphs (3)(a)(4),(5), and (6). Secondly, the interpretation **\*1118** requires the broker-dealer seeking to comply with Rule 15c3-3 to apply the test, to make the determination of whether foreign broker-dealers and banks fall within Exchange Act paragraphs (3)(a)(4), (5), and (6). People who work for the broker-dealer may not be familiar with the activities of those foreign entities, particularly if they are not affiliated. Thirdly, the legal staffs of the foreign broker-dealer probably never had to consider the issue. The final and substantive issue is that SIPA considers foreign broker-dealers, like registered broker-dealers as customers in the distribution of the pro-rata shares of customer property held by the defunct broker-dealer. [318]

Although the Division addressed the gap between the rule and SIPA in the PAIB no-action letter, it has yet to address the gap that still exists between foreign broker-dealers and foreign banks acting as broker-dealers. The Division was able to address the gap with registered broker-dealers through a no-action letter because, by requiring the introducing firm to incur a Rule 15c3-1 net capital deduction unless the clearing broker-dealer reserved its investment property in the PAIB Reserve Account, it was able to force the "introducing firm" to pressure its carrying firm to segregate the assets of the introducing broker-dealer. [319]

As foreign banks and broker-dealers are not subject to the Commission's Net Capital Rule, the Division cannot use the approach that it took in the PAIB letter, and more than likely will be required to consider amending the definition of customer in paragraph (a)(1) of the rule to conform with SIPA.

## STATUS OF REPURCHASE AGREEMENT COUNTER PARTIES

As stated earlier, the SIPC, and the Division in applying the Customer Protection Rule, both take the position that counter parties to repurchase agreements are not customers. [320] This position is in apparent conflict with the finding of at least one court. In connection with the liquidation of Bevill, Bresler & Schulman, Inc. ("BBS, Inc."), [321] a registered broker-dealer affiliated with Bevill, Bresler & Schulman Asset Management Corporation, an unregistered government securities dealer, in 1986 the U.S. District Court for the District of New Jersey examined the issue of the status of repurchase agreement counter parties (or "participants," as referred to by the court). [322] The question presented was whether repurchase agreements were purchases and sales of government securities or whether they should be characterized as secured loans. [323] In connection with that analysis, the court was asked to further decide the status of the participants (i.e. whether they **\*1119** were customers under SIPA), which was, to a large degree, dependent on the court's answer to the first question. If the court found that repo participants were secured lenders, then the court had to examine available remedies under the UCC to allow them to recover under the repo transactions with BBS, Inc. [324] If the court found them to be purchasers and sellers of securities, it could then make a finding that they were also "customers" under SIPA. [325] The court concluded that "repo and reverse repo participants in the BBS, Inc. test cases are 'customers' within the meaning of ..." the definition of the term "customer" in SIPA. [326]

The *BBS Inc.* cases create a difficult problem for the Commission. To treat repo counter parties as customers would require large investment banks that have government securities dealing activities to include receivables and payables that

exceed the many billions of dollars associated with their so-called "matched books" [327] in the Reserve Formula. Most repo counter parties are large institutions that conduct independent credit reviews of their counter parties and are in a much better position to protect themselves than the average retail investor. Although those counter parties might enjoy the assurance of the additional protection SIPA coverage offers, they are not as dependent on it. In addition, although the literal language of the repo agreement sets forth the transaction as a purchase and resale, the economics of the repo transaction are clearly those of a secured loan. As such the Division has been reluctant to recharacterize repo counter parties as customers under the rule.

The staff should address the disparity raised by the *BBS Inc.* case however, as it clearly has the potential to create future SIPC liquidation shortfalls. The staff could continue to interpret the rule to exclude repo counter parties from the definition of customers, but require the counter parties to consent in the repo agreement. As mentioned earlier, however, the SIPA does not include a provision that enables SIPA customers to waive SIPA protection. [328] Nevertheless, as the *BBS Inc.* court relied on the literal language of the repo contract in rendering its decision, [329] a potential court faced with an express waiver of SIPA coverage may do the same and exclude those counter parties based on the terms of the agreement. By encouraging a modification to the standard industry agreements that most broker-dealers now employ, the Division at least will cause future courts that will look to the *BBS Inc.* opinion to pause before concluding that repo counter parties are customers.

**FOREIGN CONTROL LOCATIONS**

As discussed above, a broker-dealer seeking to maintain custody of the foreign securities of its customers must comply with a procedure established in 1973, **\*1120** when the volume of foreign securities business conducted by U.S. broker-dealers was drastically below that which is conducted today. The procedure, which calls for Division approval of each location for every broker-dealer, was practical at the time, but is currently burdensome on both industry and Division. Each broker-dealer must seek approval of its own custodians, even though those same custodians have been accepted by the Division for other broker-dealers many times before. [330]

In addition to administrative burdens, the process should be reviewed for substantive reasons, as well. The process established in 1973 does not take into account the differing legal systems in the many countries that U.S. securities firms now conduct business. Under Release No. 10,429, the broker-dealer must obtain representations that its customers' securities are held free of lien. [331] Not all countries, particularly some emerging market countries, operate under developed legal systems that employ concepts familiar to western legal systems. For example, in some countries, the concept of beneficial ownership may not be recognized, making it difficult, if not impossible for book entry transfer and custody of securities to take place.

This section of the rule may seem antiquated, but the Division is appropriately cautious in updating this section of the rule. Although it is clear that the rule does not reflect current international custody practices, the variance in those practices raises questions as to what rights the broker-dealer, and for that matter, the customer has in enforcing a claim to retrieve securities held in a foreign jurisdiction. Some foreign jurisdictions have legal systems that are so unstable that corruption is an every day occurrence. In those countries, book entry ownership may be dependent on the whim and financial aspirations of the local employee that maintains the official stockholders' record. In addition to a vast collage of underdeveloped legal systems, the staff also faces issues related to the political risk, or risk that the domicile of the issuer may incur an unfavorable change in leadership due to revolution, war or other political instability.

Complicating the matter further, are the concerns raised earlier about unduly extending the chain of custody. Many broker-dealers use Euroclear plc or another foreign clearance mechanism as a means to settle and hold foreign securities. As discussed above, the rule and the process established in Release No. 10,429 does not clearly take into account the use of subcustodians in the custody of foreign securities. Paragraph (c)(4) of the rule provides that only customer securities "in

the *custody* of a foreign depository, foreign clearing agency or foreign custodian bank ...” [332] are within the control of the broker-dealer. In practice, however, foreign depositories such as Euroclear plc typically do not maintain physical custody of securities, but rather hold them at banks or depositories located in the domicile of the issuer. Literal compliance with the rule is improbable as most **\*1121** firms use Euroclear plc or foreign depositories that employ book entry custody systems.

Although the staff is aware that this aspect of the rule is ready for change, it is hesitant because of its concerns related to unduly extending the chain of custody. This concern was discussed earlier in the discussion of domestic control locations, but it presents an even more difficult issue internationally. The more links in the international chain of custody, the higher the chance that more foreign jurisdictions, with varied bankruptcy laws and custodial practices will be involved. The Division's concern involving an extended international chain of custody was realized in the failure of Barings plc. Barings plc had foreign affiliates that had been approved as a foreign control location for customers' securities of issuers of various countries. The staff was able to protect the customers of the U.S. broker-dealers, but only after extended discussions with foreign regulatory authorities. Although the customers of the U.S. securities firms did not suffer significant, if any, losses in the Barings liquidation, that liquidation did, however, cause the Division to be even more hesitant to update the foreign control location section of the rule.

The staff could address concerns related to political risk in the domicile of the issuer with disclosure. Certainly a U.S. investor that purchases a security of an eastern European company appreciates that his investment is exposed to a large degree of risk related to potential political events or turmoil. As acceptance of that risk is part of his investment decision, it should not be an issue to dissolve to him that part of that risk includes the risk that problems may occur with the eastern European financial institution that is maintaining custody of his securities. Although that institution may be unaffiliated with the company whose shares he purchased, he should understand that by making his investment, he is buying into an assortment of risks associated with the sovereign government of the nation in which the issuer is located.

The staff's concern related to the extension of the chain of custody poses a much more difficult problem that cannot be solved with disclosure. Although investors may accept political risk associated with the country that the issuer is domiciled in, an extended chain of custody may cause the investor to be exposed to risk related to a country unrelated to the purchase of securities. For example, assume that the customer has purchased shares in a Latin American company that are held through the broker-dealer's affiliated bank located in another, less stable Latin American country. If problems occurred in that country's banking system, the customer's securities may be exposed to loss even though the investment was made in a company domiciled in a country unaffected by problems in the country where that bank is located.

The Commission has entered into Memorandums of Understanding with many foreign securities and banking regulators and could explore whether those agreements could be used as a means to address potential custodial issues. [333] This **\*1122** approach, however, has limitations, as foreign regulators frequently cannot alter local bankruptcy laws, and those regulators may be rendered powerless in the event of political change.

## RESERVE FORMULA ALLOCATION

As stated earlier, the discussion of the use of an allocation to compute the Reserve Formula in the Commission Releases and the SIA Transcripts is limited to the allocation of securities borrowed and loaned and securities failed to receive and deliver. Since the publication of those Releases, the self-regulatory organizations have made available allocation charts that instruct the broker-dealer what the impact on the Reserve Formula will be for a given allocation. [334] Those allocation charts offer interpretative guidance not only on the securities borrowed and loaned and securities failed to receive and deliver transactions covered by the SIA Transcripts Commission Releases, but also other Reserve Formula balances as well. In practice, the allocation programs operated by most securities firms do not limit their allocation

matrices to the allocation of securities borrowed and loaned and securities failed to receive and deliver. These programs developed over the years since the adoption of the rule as a result of limitations of broker-dealer operating systems and the practical problems associated with identifying fungible securities positions to *any* location on the securities record, not merely securities borrowed and loaned and securities failed to receive and deliver. In fact, many firms include most, if not all short and long positions on the securities record in their allocation matrix. Although many firms make conservative assumptions in their allocation programs, those matrices, and for that matter, the allocation matrices in the self regulatory publications, do not appear to strictly conform to what the Commission originally intended when the rule was adopted.

Although the specific Reserve Formula allocation practices may vary substantially from firm to firm, the Commission and other self-regulatory examiners appear to have grown comfortable with industry practices as a whole. This comfort may be in part due to the interaction between the possession or control requirement and the Reserve Formula. The examiners are aware that whenever the firm does not obtain possession or control of a customer security, the firm is generally required to set aside funds in the Reserve Formula. In contrast, as mentioned earlier, the Division does not generally allow broker-dealers the option of accepting a higher Reserve Formula deposit requirement in lieu of maintaining possession or control of customer fully-paid and excess margin securities.

Although Exchange Act Release No. 9922 requires that the "allocation may be made on a conservative basis to accomplish maximum protection for customers" [335] there is little guidance as to what that means. The example allocations in the SIA Transcripts and the discussions in Release No. 11,497 are limited to allocations **\*1123** of fails to receive and deliver and securities borrowed and loaned as those transactions were the only transactions discussed when the allocation concept was originated in Release No. 9922. [336] Now that allocation of all of the long and short locations in the stock record has been indirectly sanctioned by the allocation charts in the New York Stock Exchange Interpretation Handbook, [337] the Division should consider rendering more specific guidance as to what the appropriate allocation priority sequence is that a broker-dealer should follow to make its allocation on a conservative basis as contemplated under Release No. 9922. That guidance would enable firms to know with certainty that their allocation sequence is in compliance and make the manner that funds are segregated more consistent among firms.

## OPTIONS TRANSACTIONS

Although the Reserve Formula implication of customer listed options transactions is discussed briefly above, options raise a number of issues under the rule. Options are securities, [338] and when a customer purchases a listed option, the broker-dealer is required to maintain possession or control of the option. [339] The broker-dealer generally accomplishes this by maintaining the option positions at the OCC and satisfying possession or control requirements of the rule under paragraph(c)(1).

The rule's treatment of short listed options is more problematic. In addition to obtaining the option premium, the broker-dealer is required to obtain margin from the customer in addition to the money amount. [340] The short credit created by the premium paid and the cash or securities posted as margin trigger Reserve Formula and possession or control requirements. In the same manner that the SRO rules require the payment of short option premium and margin, the OCC requires that the option premium and additional margin be posted. [341] The rule allows the broker-dealer to meet the OCC requirement by passing on margin received from the customer. [342] As that margin would otherwise be required to be segregated, the staff created a margin debit ("net debit balance") based on the amount of the option premium and the OCC margin requirement. [343]

When the interpretation was written in 1975, [344] the OCC margin rules were based on the transactions in each customer's account, similar to what the SRO margin rules require. Since then however, OCC bases its margin requirement on the exposure generated by all of the customer transactions of the broker-dealer **\*1124** member and uses a complex quantitative formula to measure that exposure. [345] In computing that formula, offsetting positions of different customers may be netted or considered as a risk reducing hedge position. [346] Because the OCC requirement can no longer be divided on a separate customer basis, broker-dealers now either continue to use the old OCC margin requirement originally programmed into their systems or the current SRO margin requirement to determine the net debit balance. The Commission and self-regulatory examiners have not yet objected to this practice, probably because they realize that the broker-dealer does not have an alternative. Using the old OCC or current SRO margin requirement however, allows broker-dealers to use more customer securities than they need, because the aggregate margin requirements of all the broker-dealer's customers' accounts under those rules will almost always significantly exceed the amount the broker-dealer will be required to post at OCC.

At some point, the Division will likely explore other methods to compute the net debit balance. As mentioned above, using the old OCC or current SRO margin requirement releases more securities from the possession or control requirement than are needed to fund the OCC margin requirement. The staff seeks to limit the ability of the broker-dealer to substitute cash for fully paid customer securities, even if those funds are included in the Reserve Formula. To limit the amount of customer securities that become available because of the net debit balance, it could explore requiring the broker-dealer to apply the OCC margin formula to each customer account. This formula is already used in a modified form by broker-dealers computing deductions under Rule 15c3-1 for proprietary options positions of broker-dealers. [347] Before this alternative is adopted however, the staff would have to have a dialog with the industry to determine if it is in fact operationally feasible and cost effective.

A more practical short term approach could be to use the old OCC or current SRO margin requirements to compute the net debit balance for each customer account, but to limit the aggregate net debit balance available to the broker-dealer as a whole to the amount of the current margin required at OCC. In that manner, the firm is limited to using only those customer securities needed to finance its OCC margin requirement.

When a customer purchases a long over-the-counter option, as in a long listed option, a possession or control requirement is triggered. It is unclear, however, over what security, if any, the broker-dealer is required to maintain possession or control. The over-the-counter option has been viewed by the SIPC to be a purchase of a private placement investment in the broker-dealer, which, of course, is likely to be without value because the broker-dealer is in liquidation. [348] To date, the Division has not appeared to have required action under the Customer Protection **\*1125** Rule with respect to the option premium or any security created by it. To make its position clear, the Division may consider publishing an interpretation consistent with the approach the SIPC successfully applied in the case cited above. [349] In the same way that disclosure is required with hold-in-custody repos and securities borrowed transactions, the interpretation could require the broker-dealer to inform purchasers of over-the-counter options that they are not protected under SIPA.

It is important to note that although the purchasers of over-the-counter options are not customers under the rule, persons that sell over-the-counter options to the broker-dealer and remit margin may be considered customers to the extent of the margin posted. When a customer sells an unlisted option, the broker-dealer may require the customer to remit margin, either because it is required under an SRO margin rule, [350] to avoid a charge under the net capital rule, [351] or due to its own credit concerns. Under Rule 15c3-3, whatever margin received by the broker-dealer is treated, if cash, as a credit balance, and if securities, as fully paid securities requiring maintenance of possession or control by the broker-dealer.

Footnotes

[1]    Generally, brokers or dealers conducting a general securities business are required to register with the Commission under section 15(b) of the Securities Exchange Act (SEA or "Exchange Act"). 15 U.S.C. § 78*o*(b) (2000). A "broker" is any person that is engaged in effecting securities transactions for the account of others. *See id.* § 78c(a)(4). A "dealer" is any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise. *See id.* § 78c(a)(5).

[2]    17 C.F.R. § 240.15c3-3 (2001). Brokers or dealers that conduct activities in government securities are also covered under section 15C of the Exchange Act. 15 U.S.C. § 78*o*-5. Those government securities broker-dealers are subject to rules adopted by the Department of Treasury. *Id.* Under section 403.4 adopted by the Treasury, those government securities brokers and dealers are required to comply with the Commission's Customer Protection Rule. 17 C.F.R. § 403.4.

[3]    For the Exchange Act rules (other than the Net Capital Rule) that are generally classified as financial responsibility rules, see Rule 15c3-1, Net Capital Requirements for Brokers or Dealers, 17 C.F.R. § 240.15c3-1, which requires broker-dealers to maintain minimum amounts of net liquid assets; Rule 17a-3, Records To Be Made by Certain Exchange Members, Brokers and Dealers, *id.* § 240.17a-3, and Rule 17a-4, Records To Be Preserved by Certain Exchange Members, Brokers and Dealers, *id.* § 240.17a-4, which specify records broker-dealers must maintain and the periods that they must be maintained; Rule 17a-5, Reports To Be Made by Certain Brokers and Dealers, *id.* § 240.17a-5, which requires broker-dealers to file financial statements and obtain an audit by an independent accountant; Rule 17a-11, Notification Provisions for Brokers and Dealers, *id.* § 240.17a-11, which requires "early warning" reports to be made by broker-dealers experiencing difficulties; Rule 17a-13, Quarterly Security Counts To Be Made by Certain Exchange Members, Brokers and Dealers, *id.* § 240.17a-13, which requires broker-dealers to verify their securities records; and Rules 8c-1 and 15c2-1, Hypothecation of Customer Securities, *id.* §§ 240.8c-1, 240.15c2-1 which place limits on the broker-dealer's ability to hypothecate customer securities.

[4]    *See infra* notes 16-17 and accompanying text. In part due to the effectiveness of the Customer Protection Rule, in many SIPC liquidations, customer property can be distributed promptly and expenses may be funded out of the defunct broker-dealer's estate. *See* SECS. INVESTOR PROTECTION CORP., ANNUAL REPORT 2000, at 4 (Apr. 30, 2001), *available at* http:// www.sipc.org/pdf/SIPC%2000%%%%%AnnualReport.pdf [hereinafter SIPC ANNUAL REPORT 2000]. In cases of fraud, unauthorized trading, or embezzlement where the SIPC trustee cannot rely on the books and records of the broker-dealer, the distribution of customer property may be more prolonged and more costly to administer.

[5]    Whenever possible, the SIPC generally attempts to transfer customer assets to another brokerage firm before the six-month statutory claim period has elapsed. In the recent liquidation of MJK Clearing Inc. approximately 175,000 customers had access to their accounts within eight days. *See generally* Secs. Investor Prot. Corp., *SIPC: Bankruptcy Court Clears Sale of Troubled Minnesota Brokerage Firm* (Oct. 2, 2001), *at* http:// www.sipc.org/release10*a*ct.html (discussing MJK Clearing case).

[6]    17 C.F.R. § 240.15c3-3(e).

[7]    *Id.* § 240.15c3-3(b).

[8]    The purposes specified in the adopting release are:
(i) To insure that customer's funds held by a broker-dealer (both free credit balances and deposits which may be restricted as to withdrawal) and the cash which is realized through the lending, hypothecation and other permissible uses of customers' securities are deployed in safe areas of the broker-dealer's business related to servicing his customers, or to the extent that the funds are not deployed in these limited areas, that they be deposited in a reserve bank account. In this regard, the Commission has taken a broad view of the Congressional mandate by requiring that the reserve account include all funds which have as their source customer assets.
(ii) To require a broker-dealer promptly to obtain possession or control of all fully-paid securities and excess margin securities carried by that broker-dealer for the account of customers and to require him to act within designated time frames where possession or control has not been established.
(iii) To accomplish a separation of the brokerage operation of the firm's business from that of its firm activities such as underwriting and trading.

(iv) To require a broker-dealer to maintain more current records. Thus, Rule 15c3-3 requires a daily determination of security locations and periodic computations of the reserve.

(v) To motivate the securities industry to process its securities transactions in a more expeditious manner. This is particularly important in the area of the Rule which penalizes a broker-dealer if a security is in a location which the Commission has determined to be unacceptable or has been out of the broker-dealer's possession for too long a period, as for example in transfer.

(vi) To inhibit the unwarranted expansion of a broker-dealer's business through the use of customers' funds by prohibiting the use of those funds except for designated purposes.

(vii) To augment the broad program of broker-dealer financial responsibility which the Commission has been developing as a result of the financial crisis experienced by the securities industry during the 1968-1970 period.

(viii) To facilitate the liquidations of insolvent broker-dealers and to protect customer assets in the event of an SIPC liquidation through a clear delineation in Rule 15c3-3 of specifically identifiable property of customers.

Adoption of Rule 15c3-3, Exchange Act Release No. 9856, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,083, at 82,342, 83,343-44 (Nov. 13, 1972); *see* Net Capital Rule, Exchange Act Release No. 31,511, 52 SEC Docket (CCH) 2694 (Nov. 24, 1992).

9       *See* Exchange Act Release No. 9856, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 82,342.

10      The Customer Protection Rule was adopted by the Commission in 1972 "to furnish the protection for the integrity of customer funds and securities as envisioned by Congress when it amended Section 15(c)(3) of the [Exchange] Act by adopting Section 7(d) of the Securities Investor Protection Act of 1970 ([SIPA])." *See id.* at 82,343. SIPA mandates that the Commission "provide safeguards with respect to the financial responsibility and related practices of brokers and dealers including, but not limited to, the acceptance of custody and use of customers' securities ...." 15 U.S.C. § 78*o*(c)(3)(A) (2000).

11      Generally, SIPC liquidations differ from other bankruptcy proceedings in that under SIPA, the broker-dealer's estate is divided into two separate estates. In determining what property belongs to customers, SIPA relies heavily on the Commission rules, most notably those adopted under Exchange Act section 15(c)(3), such as the Customer Protection Rule. The term "customer property" is defined in section 16(4) of SIPA to mean

cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and for the proceeds of any such property transferred by the debtor including property unlawfully converted. The term "customer property" includes—

(A) securities held as property of the debtor to the extent that the inability of the debtor to meet its obligations to customers for their net equity claims based on ... noncompliance with the requirements of section 78*o*(c)(3) of this title and the rules prescribed under such section;

(B) resources provided through the use or realization of customers' debit cash balances and other customer-related debit items as defined by the Commission by rule;

(C) any cash or securities apportioned to customer property pursuant to section 78fff(d) of this title; and

(D) any other property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers, unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property.

15 U.S.C. § 78*lll*(4). Customers of the failed firm first receive all "customer name securities." *Id.* § 78fff(a). The term "customer name securities" is defined at section 16(3) of SIPA, *id.* § 78*lll*(3), which are generally securities registered in the customers' names or in the process of being so registered. Customers then receive, on a pro-rata basis, all remaining customer property held by the firm. *See id.* § 78fff-2(c)(1)(B). In the event that the customer property held by the firm is inadequate to completely satisfy customers, the SIPC will advance its funds to satisfy the remaining claims for funds and securities of each customer up to a maximum of $500,000. *See id.* § 78fff-3(a)(1). Claims for cash are limited to $100,000 per customer. *See id.* Any individual customer whose claim is not completely satisfied by a combination of a pro-rata distribution of customer property and funds advanced by the SIPC will participate in the general estate, if any, as a general creditor. *See id.* § 78fff-2(c)(1). For further information regarding SIPC liquidations, see Stephen P. Harbeck, *Customer Protection In Stockbroker Bankruptcy Under the Securities Investor Protection Act*, SEC. NEWS, Spring 1994, at 3.

12      SIPA also created the SIPC. *See* 15 U.S.C. § 78ccc(a)(1). Generally, most registered broker-dealers, except those that deal exclusively in mutual funds or U.S. government securities, are required to be members of the SIPC. *See id.* § 78ccc(a)(2). Under that section, broker-dealers that are not required to become SIPC members are those that limit their business to government

securities and register with the Commission under Exchange Act section 15C; certain broker-dealers that limit their business to mutual fund, variable annuity, and insurance activities; broker-dealers that limit all of their business activities to one state; and other broker-dealers whose business, in the determination of the SIPC, taking into account business of affiliated entities, is conducted outside of the United States. *See id.*

13    *See id.* § 78eee(a)(3). Under SIPA, upon notice to the broker-dealer, the SIPC may file an application for a protective decree with a court of competent jurisdiction as specified under section 21(e) or 27 of the Exchange Act if the SIPC has determined that the broker-dealer has failed or is in danger of failing to meet its obligations to customers and that the broker-dealer:
(A) is insolvent within the meaning of section 101 of title 11, or is unable to meet its obligations as they mature;
(B) is the subject of a proceeding pending in any court or before any agency of the United States or any State in which a receiver, trustee, or liquidator for such debtor has been appointed;
(C) is not in compliance with applicable requirements under the 1934 Act or rules of the Commission or any self-regulatory organization with respect to financial responsibility or hypothecation of customers' securities; or
(D) is unable to make such computations as may be necessary to establish compliance with such financial responsibility or hypothecation rules.
*Id.* § 78eee(a)(3), (b)(1).

14    The SIPC assesses registered broker-dealers fees to establish a fund to reimburse customers for losses arising from certain unsatisfied claims resulting from the failure of a registered broker-dealer. *See id.* § 78 ddd(c). This fund replaced a $140 million New York Stock Exchange trust fund created by the industry during the crisis. *See* Notice of Proposal to Amend Rule 15c3-1, Exchange Act Release No. 9891, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,128, at 82,441, 82,442 (Dec. 5, 1972).

15    In the event the SIPC fund becomes diminished, SIPA empowers the SIPC to borrow through the Commission, from the United States Treasury. *See* 15 U.S.C. § 78ddd(f)-(h).

16    *See id.* § 78eee(b)(5)(B), (C). SIPA provides for self-liquidations supervised by self-regulatory organizations. *See id.* § 78 eee(a)(2). The Supreme Court has stated that "[t]he SIPC properly treats an application for the appointment of a receiver and liquidation of a brokerage firm as a last resort." Secs. Investor Prot. Corp. v. Barbour, 421 U.S. 412, 421 (1975).

17    The SIPC generally attempts to effect the prompt transfer of customer accounts to other solvent brokerage firms, even if it expects a shortfall in the liquidation. 15 U.S.C. § 78fff-2(f). If such a transfer is not possible because of poor books and records or for other reasons, to the extent their claims exceed the SIPA limitation on advances, customers of the failed firm may be unable to access their property for at least the six months that it takes for customer claims to be aggregated. *See* 15 U.S.C. § 78fff-2(a)(3).

18    *See* SEC, STUDY OF UNSAFE AND UNSOUND PRACTICES OF BROKERS AND DEALERS, H.R. DOC. NO. 92-231, at 13 (1971).

19    *Id.*

20    *Id.*

21    *Id.* at 11.

22    17 C.F.R. § 240.15c3-3(a)-(i).

23    In addition to the three exemptions discussed in the text, paragraph (k)(3) enables the Commission to grant an exemption from the rule "upon written application by a broker or dealer ... if the Commission finds that the broker or dealer has established safeguards for the protection of funds and securities of customers comparable to those provided for by this rule and that it is not necessary in the public interest or for the protection of investors to subject the particular broker or dealer to the provisions of this rule." While the Division frequently entertains and responds to requests for "no-action" positions by broker-dealers, the author knows of no instance where the Commission has ever granted an exemption under paragraph (k)(3). In a no-action position, the staff issues a letter to the broker-dealer that states that it will not recommend enforcement action to the Commission if the broker-dealer complies with the conditions set forth in the letter.

24    *Id.* § 240.15c3-3(k)(1)(iii). Although there is no definition in the Customer Protection Rule, under paragraph (c)(9) of Rule 15c3-1, a broker-dealer is deemed, for purposes of paragraphs (a)(2)(i) and (a)(2)(v) of that rule, to "promptly transmit" all funds and to "promptly deliver" all securities ... [when] such transmission or delivery is made no later than noon of the next business day after the receipt of such funds or securities; provided, however, that such prompt transmission or delivery shall not be required to be effected prior to the settlement date for such transaction. *Id.* § 240.15c3-1(c)(9).

25    *Id.* § 240.15c3-3(k)(1).

26    *Id.* § 240.15c3-3(k)(2)(i).

27    *Id.*

28    *Id.* § 240.15c3-3(k)(2)(ii).

29    *Id.*

30    *Id.* § 240.15c3-3(k)(1).

31    *Id.* § 240.15c3-3(k)(1)(i), (ii).

32    *Id.* § 240.15c3-3(k)(1)(iv).

33    *Id.* § 240.15c3-3(k)(2)(i).

34    *See* Adoption of Rule 15c3-3, Exchange Act Release No. 9856, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,083, at 82,342, 82,345 (Nov. 13, 1972).

35    17 C.F.R. § 240.15c3-3(k)(2)(i) (emphasis added). The Division staff has issued no-action positions that enable firms to settle transactions on an RVP/DVP basis outside the Special Reserve Account and still comply with the paragraph (k)(2)(A) exemption. *See* Midland Doherty Inc., SEC No-Action Letter, 1984 WL 45450 (June 18, 1984).

36    17 C.F.R. § 240.15c3-3(k)(2)(ii).

37    *Id.*

38    *See* Net Capital Rule, Exchange Act Release No. 31,511, 52 SEC Docket (CCH) 2694, 2702 n.16 (Nov. 24, 1992).

39    *Id.*

40    *Id.*

41    17 C.F.R. § 240.15c3-3(k)(2)(ii).

42    *See id.* § 240.15c3-3(a)(1).

43    *Id.*

44    Under SIPA, "customer" means
any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities, but does not include—
(A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member SIPC; or
(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor,

notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.
15 U.S.C. § 78*lll*(2) (2000).

45    *Id.*§ 78*lll*(2)(A). The SIPC has informally indicated that if the customer accounts of the foreign subsidiary were held by the SIPC member on a fully disclosed basis, the SIPC would treat them not as accounts of the foreign subsidiary, but as customers of the failed member. If the foreign subsidiary's customer accounts were held by the SIPC member on an omnibus basis, the SIPC would not treat them as customer accounts of the failed member, because the account is in the name of the foreign subsidiary and not the individual customers.

46    *See*15 U.S.C. § 78*lll*(2).

47    *See id.* § 78fff-3(a)(5). Note that proprietary bank accounts of banks are also not eligible for advances. An SIPC proceeding cannot be initiated if the only claims are those of customers who are not entitled to advances, such as broker-dealers and banks. *Id.*

48    *See infra* text accompanying notes 305-10.

49    *See id.*

50    *See*N.Y. STOCK EXCH., INC., NEW YORK STOCK EXCHANGE INTERPRETATION HANDBOOK at Rule 15c3-3 (a)(1)/01, at 475 (rev. 2001) [hereinafter NYSE HANDBOOK]; NAT'L ASS'N OF SECS. DEALERS, NASD GUIDE TO RULE INTERPRETATIONS, 1996 NET CAPITAL AND CUSTOMER PROTECTION RULES 63 (1996) [hereinafter NASD RULE INTERPRETATIONS]. In order to avoid liability for tortuous conversion under Rule 10b-5 and common law fraud, consent to use the securities in the account should be obtained in writing.

51    *Cf.*17 C.F.R. § 240.15c3-3(a)(1).

52    *See*NYSE HANDBOOK, *supra* note 50, Rule 15c3-3(a)(1)/021, at 480 (rev. 2002). The DEA is the self-regulatory organization designated by the Commission to examine the broker-dealer for compliance with the financial responsibility rules. *See*17 C.F.R. § 240.17d-1.

53    17 C.F.R. § 240.15c3-3(b)(4)(i)(C). At least one court has differed with the SIPC in this view. *See* Cohen v. Army Moral Support Fund (*In re*Bevill, Bresler & Schulman Asset Mgmt. Corp.), 67 B.R. 557, 602 (Bankr. D.N.J. 1986). For a discussion of the *Bevill, Bresler & Schulman, Inc.* case, see *infra* notes 321-29 and accompanying text.

54    *See infra* notes 143-62 and accompanying text.

55    *See*SEC v. F.O. Baroff Co., 497 F.2d 280, 284 (2d Cir. 1974); Secs. Investor Prot. Corp. v. Executive Sec. Corp., 556 F.2d 98, 99 (2d Cir. 1977).

56    *See infra* notes 118-38 and accompanying text.

57    Under paragraph (a)(3) of the rule, the term "fully-paid securities" includes:
all securities carried for the account of a customer in a special cash account as defined in Regulation T promulgated by the Board of Governors of the Federal Reserve System, as well as margin equity securities within the meaning of Regulation T which are carried for the account of a customer in a general account or any special account under Regulation T during any period when section 8 of Regulation T specifies that margin equity securities shall have no loan value in a general account or special convertible debt security account, and all such margin equity securities in such account if they are fully paid: *Provided, however,* That the term "fully paid securities" shall not apply to any securities which are purchased in transactions for which the customer has not made full payment.
17 C.F.R. § 240.15c3-3(a)(3) (citation omitted).
Regulation T, as issued by the Board of Governors of the Federal Reserve System ("Fed") pursuant to the Exchange Act, regulates the extensions of credit by and to brokers and dealers. *See*12 C.F.R. § 220.1(a) (2001). It imposes, among other obligations, initial margin requirements and payment rules on securities transactions. Regulation T provides that all financial relations between a customer and a broker-dealer shall be recorded in a margin account or one of four purpose accounts. *See id.*§ 220.1(b)(1). In a cash account generally, the broker-dealer may record customer purchases that the broker-dealer believes

that the customer will make prompt full payment and customer sales when the broker-dealer believes that the customer owns and will deliver the security sold. *See id.* § 220.8(a)(1), (2). All transactions not specifically authorized for inclusion in another account shall be recorded in a margin account. Generally, transactions in margin accounts are subject to minimum initial maintenance margin requirements as prescribed by the Fed under sections 220.4 and 220.12. *See id.* §§ 220.4, 220.12.

Regulation T was substantially revised in 1983. Although that revision included many amendments, the revision also reorganized the rule, renumbering many of the sections to which Rule 15c3-3 makes reference. *See* Simplification of Regulation T, 48 Fed. Reg. 23,161 (May 24, 1983) (codified in 12 C.F.R. pt. 220). A chart that cross-references the citations from the old version of Regulation T to the revision is included in Comparison Chart, 48 Fed. Reg. 32,978 (July 20, 1983). Unfortunately, several revisions have followed, for which there is no reference chart currently available.

Paragraph (a)(5) of the rule defines "excess margin securities" to mean:

those securities referred to in paragraph (a)(4) of this section carried for the account of a customer having a market value in excess of 140 percent of the total of the debit balances in the customer's account or accounts encompassed by paragraph (a)(4) of this section which the broker or dealer identifies as not constituting margin securities.

17 C.F.R. § 240.15c3-3(a)(5). The term "margin securities" is defined to mean "those securities carried for the account of a customer in a general account as defined in Regulation T, as well as securities carried in any special account (such general or special accounts hereinafter referred to as 'margin accounts') other than the securities referred to in paragraph (a)(3) of this section." *Id.* § 240.15c3-3(a)(4).

58    17 C.F.R. § 240.15c3-3(b). The term "securities carried for the account of any customer" is not defined in the rule. However, the term is defined in SEA Rules 8c-1 and 15c2-1 to mean:

(i) [s]ecurities received by or on behalf of such member, broker or dealer for the account of any customer; (ii) [s]ecurities sold and appropriated by such broker or dealer to a customer, except that if such securities were subject to a lien when appropriated to a customer they shall not be deemed to be "securities carried for the account of any customer" pending their release from such lien as promptly as practicable; (iii) [s]ecurities sold, but not appropriated, by such member, broker or dealer to a customer who has made any payment therefor, to the extent that such member, broker or dealer owns and has received delivery of securities of like kind, except that if such securities were subject to a lien when such payment was made they shall not be deemed to be "securities carried for the account of any customer" pending their release from such lien as promptly as practicable[.]

*Id.* §§ 240.8c-1(b)(2), 240.15c2-1(b)(2).

59    *Id.* § 240.15c3-3(a)(4).

60    *Id.* § 240.15c3-3(*l*).

61    *See, e.g.*, Ralph M. Nordstrom, 1975 SEC LEXIS 2543, at *13-*14 (Feb. 21, 1975) (admin. proc. initial decision).

62    *See, e.g.*, NYSE HANDBOOK, *supra* note 50, Rule 15c3-3 (a)(1)/01, at 475; NASD RULE INTERPRETATIONS, *supra* note 50, at 63 (allowing foreign banks to be treated as noncustomers and therefore excluded from the possession or control requirement); *see also* 17 C.F.R. § 240.15c3-3(b)(4)(iii)(B) (notifying persons that do hold-in-custody repurchase agreements that fully-paid securities which serve as the collateral to those agreements may be delivered out by the brokerage firm during the trading day to satisfy settlement obligations). For a discussion of hold-in-custody repurchase agreements, see *infra* notes 139-62 and accompanying text.

63    17 C.F.R. § 240.15c3-3(c).

64    *Id.* § 240.15c3-3(b).

65    *See* NASD RULE INTERPRETATIONS, *supra* note 50, at 104; *see also* Nat'l Ass'n of Sec. Dealers, Inc., SEC No-Action Letter, 1974 SEC No-Act. LEXIS 2725, at *5 (July 16, 1974).

66    Although some exceptions apply, generally section 220.10 of Regulation T prohibits the broker-dealer from borrowing (or lending) securities for a purpose other than making delivery of the securities in the case of short sales or failure to receive securities required to be delivered. 12 C.F.R. § 220.10 (2001).

67    17 C.F.R. § 240.15c3-3(d).

68    *Id.* § 240.15c3-3(d)(1)-(3).

69    *Id.* § 240.15c3-3(d)(1).

70    *Id.*

71    *Id.* § 240.15c3-3(d)(2).

72    *Id.*

73    *Id.* Buy-in procedures are industry-accepted practices for resolving securities contracts that have not been completed in accordance with their terms. Generally, when "buying-in" a security, the firm that is owed securities and has not received them at settlement date buys them from a third party and demands any excess amount paid over the contract amount from the broker-dealer that failed to deliver the securities. The self-regulatory organizations have rules that require their member firm broker-dealer to close out failed securities contracts that include procedures for executing the buy-in including provisions requiring the broker-dealer to give adequate notice the broker-dealer that failed to deliver the securities. *See* Rule 282, 2 N.Y.S.E. GUIDE (CCH) ¶ 2282, at 2923, 2923 (Apr. 18, 1968); *see also* NAT'L ASSOC. SECS. DEALERS, NASD MANUAL, UNIF. PRACTICE CODE IM-11810, at 7921 (1999).

74    *See* NYSE HANDBOOK, *supra* note 50, Rule 15c3-3(d)(2)/02, at 539 (rev. 1994); *see also* J.B. Hanauer & Co., SEC No-Action Letter, 1988 WL 234610 (Mar. 22, 1988).

75    17 C.F.R. § 240.15c3-3(d)(3).

76    The broker-dealer is required make and keep current a securities record. 17 C.F.R. § 240.17a-3(a)(5).

77    A "fail to deliver" arises when the selling broker-dealer fails to deliver the certificates in proper form at the agreed upon settlement date to the buying broker-dealer. A fail to deliver is an asset since it represents monies due to the firm for sales of securities. *See* Net Capital Rule Amendments, Exchange Act Release No. 18,737, [1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,220, at 85,105, 85,120 n.39 (May 13, 1982); *see also* REPORT OF SPECIAL STUDY OF THE SECURITIES MARKETS OF THE SECURITIES AND EXCHANGE COMMISSION, H.R. DOC. NO. 88-95, pt. 1, at 416 (1963) [hereinafter SEC SPECIAL STUDY].

78    When the long and short sides of the stock record in a particular issue of securities do not equal each other, a "securities difference" is created. When the broker-dealer has more securities recorded at locations on the short side of the stock record than it shows received on the long side, a "long securities difference" is created and deductions under Rule 15c3-1(c)(2)(v) are appropriate. 17 C.F.R. § 240.15c3-1(c)(2)(v)(B). When the broker-dealer indicates more securities have been received on the long side of the stock record than it shows in short locations, "a short securities difference" has been created. Short securities differences are covered under Item 7 of Exhibit A, "Formula for Determination Reserve Requirement of Brokers and Dealers under § 240.15c3-3." 17 C.F.R. § 240.15c3-3a; *see infra* notes 210-11 and accompanying text. Long and short securities differences are subject to deductions under the Net Capital Rule, 17 C.F.R. § 240.15c3-1(c)(2)(v).

79    Like Rule 15c3-3, the creation of DTC was also a reaction to the "Paperwork Crisis" of the late 1960s. DTC was created in 1973 to acquire the business of the NYSE's Central Certificate Service. The Securities Acts Amendments of 1975 added section 17A to the Exchange Act, which mandated establishment of a National System for Clearance and Settlement of Securities Transactions to address among other things, the difficulties encountered when a securities firm must deal with a dozen or more different clearing and depository systems in their daily securities operations. In 1975, DTC's ownership was expanded to include other self-regulatory organizations in addition to the NYSE. *See* COMM. ON BANKING, HOUS. & URBAN AFFAIRS, SECURITIES ACTS AMENDMENTS OF 1975, S. REP. NO. 94-75, at 53-59 (1975); *see also* DEPOSITORY TRUST & CLEARING CORP., ABOUT THE COMPANY, *at* http:// www.dtcc.com/about/aboutus.html (last visited 4/18/2002).

80    A "fail to receive" arises when a buying broker-dealer has not taken delivery from the selling broker-dealer as of settlement date. A fail to receive is a liability which the buying broker-dealer must satisfy when the securities are delivered. *See* Exchange Act Release No. 18,737, [1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 85,120 n.39; *see also* SEC SPECIAL STUDY, *supra* note 77, at 416.

81      Div. of Market Regulation's Interpretations of Rule 15c3-3, Exchange Act Release No. 9922, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,158, at 82,521 (Jan. 2, 1973).

82      *See id.* at 82,523.

83      17 C.F.R. § 240.15c3-3(c).

84      *Id.*§ 240.15c3-3(b).

85      17 C.F.R. § 240.15c3-3(c). In connection with this section of the rule, the term "control location" is frequently used. As stated earlier, the short side of the stock record represents the broker-dealer's record of where securities are located. Thus, control "locations" are those places, as represented by an entry on the stock record, which meet the provisions of paragraph (c) of the rule. *Id.*

86      *Id.*§ 240.15c3-3(c)(1).

87      *Id.*§ 240.15c3-3(c)(2); *see*12 C.F.R § 220.7(f). For a discussion of clearance on an "omnibus" basis, see *supra* note 39 and accompanying text.

88      17 C.F.R. § 240.15c3-3(c)(3).

89      *Id.*§ 240.15c3-3(c)(4); *see infra* notes 104-17 and accompanying text.

90      *Id.*§ 240.15c3-3(c)(5) (emphasis added).

91      *Id.*

92      *Id.*

93      *Id.*

94      *See infra* notes 104-17 and accompanying text.

95      *Id.*§ 240.15c3-3(a)(7) (emphasis added).

96      *Id.*

97      *Id.*§ 240.15c3-3(c)(5); *see*15 U.S.C. § 78c(6) (2000). Broker-dealers may maintain custody of customer securities at a Canadian bank by seeking approval under paragraph (c)(4). *Id.*§ 240.15c3-3(c)(4).

98      *Id.*§ 240.15c3-3(c)(7).

99      *See* N.Y. Stock Exch., Inc., SEC No-Action Letter, 1986 SEC No-Act. LEXIS 1877 (Mar. 3, 1986).

100     *See* Wayne Hummer & Co., SEC No-Action Letter, 1986 SEC No-Act. LEXIS 2002 (Mar. 6, 1986).

101     *See* N.Y. Stock Exch., Inc., SEC No-Action Letter, 1989 SEC No-Act. LEXIS 976 (Sept. 5, 1989).

102     A constant source of confusion for lawyers practicing in this area is the liberal use of terms by operational personnel that have a more precise legal meaning. In this context, the term "omnibus account" is not the same as the omnibus account referred to above in the text in the discussion of paragraph (c)(2) in that no credit is going to be extended in the account. *See*12 C.F.R. § 220.7(f); *cf.*17 C.F.R. § 240.15c3-3(c)(2). It is similar in that the securities of several customers are combined and that one firm is responsible for maintaining records as to which securities each customer owns.

103     *See* Herzog, Heine, Geduld, Inc., SEC No-Action Letter, 1989 SEC No-Act. LEXIS 288 (Feb. 7, 1989).

104     17 C.F.R. § 240.15c3-3(c)(4).

105     *Id.*

THE CUSTOMER PROTECTION RULE, 57 Bus. Law. 1069

106    17 C.F.R. § 240.15c3-3(c)(4).

107    *Id.* (emphasis added). Some evidence exists suggesting that the Joint Industry Committee on Reserves for Customer Balances and Segregation of Securities, which assisted the Commission in the design of the rule, contemplated that customers' foreign securities position may not be in the custody of the foreign control location, but nevertheless satisfy the requirements of the rule. In the transcripts to the meetings held at the time the rule was adopted, Fred Stock Jr., assistant vice president, New York Stock Exchange, Inc. stated:

The question quite often arises as to what about foreign broker/dealers? I trade in Japanese securities and I can't have those securities physically delivered here because of Japanese law and I run an account with Carl Marks or some other broker/dealer, is that a good control location for me? Again, those would require specific approval of the Commission. But it's contemplated that they would become good control locations.

SEC. INDUS. ASS'N, TRANSCRIPT RULE 15C3-3: FREE CREDIT AND SEGREGATION OF SECURITIES 63 (1973) [hereinafter SIA TRANSCRIPTS].

108    Guidelines for Control Locations for Foreign Securities, Exchange Act Release No. 10,429, [1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,531, at 83,455 (Oct. 12, 1973).

109    *Id.*

110    Purchases of foreign securities have grown substantially since the rule was adopted. For example, in 1978, U.S. purchases of foreign equity securities totaled $3.1 billion. In 1987, U.S. purchases of foreign equity securities totaled $10.7 billion. *See* DIV. MKT. REG., SEC, THE OCTOBER 1987 MARKET BREAK, Chart 11-1, at 11-23 (Feb. 1988).

111    Exchange Act Release No. 10,429, [1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 83,457. Although SEA Release No. 10,429 calls for Commission approval of foreign control locations, *id.* at 83,456, most, if not all, applications are not responded to by the Commissioners. The applicant generally will receive a routine notice from the Division indicating that the application is complete and accepted unless you are notified of its rejection within ninety days. Unlike many other similar Commission processes (e.g., paragraph (c)(7) applications), the staff does not have delegated authority from the Commission to deny applications under paragraph (c)(4). The rules delegating Commission functions to be performed by, or under the direction of, the Director of the Commission's Division of Market Regulation can be found in 17 C.F.R. § 200.30-3.

112    Exchange Act Release No. 10,429, [1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 83,456.

113    *Id.*

114    *Id.* at 83,457.

115    *Id.*

116    *Id.*

117    *Id.*

118    17 C.F.R. § 240.15c3-3(b)(3)(iv).

119    Under Regulation T, a broker-dealer may only borrow securities for the purpose of making delivery of the securities in the case of short sales, failure to receive securities required to be delivered, or other similar situations. *See* 12 C.F.R. § 220.10.

120    Insiders and affiliates may subordinate their accounts and thereby become excluded from the definition of customer, provided the broker-dealer enters into an agreement that meets certain requirements and notifies them of the absence of SIPC protection. *See* NYSE HANDBOOK, *supra* note 50, Rule 15c3-3(a)(1)/021, at 480; *see also supra* text accompanying note 52.

121    *See* Borrowing and Lending of Securities, Exchange Act Release No. 18,420, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,086, at 84,788, 84,788 (Jan. 13, 1982).

122    *Id.* at 84,789 n.10.

123    *See* SIPA, Pub. L. No. 95-283, §§ 9, 15 (renumbered § 16), 92 Stat. 260, 271 (current version at 15 U.S.C. § 78*lll*(2)); Exchange Act Release No. 18,420, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 84,789. Prior to the amendment of SIPA, some courts ruled that securities lenders were not SIPA customers. *See* SEC v. F.O. Baroff Co., 497 F.2d 280, 284 (2d Cir. 1974); *In re* Hanover Square Secs., Inc., 55 B.R. 235, 238 (Bankr. S.D.N.Y. 1985).

124    *See* Exchange Act Release No. 18,420, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 84,790.

125    17 C.F.R. § 240.15c3-3(b)(3). Paragraph (b)(3) states that "the broker or dealer shall not be deemed to be in violation of the provisions of paragraph (b)(1) of this section regarding physical possession or control of fully-paid or excess margin securities borrowed from any *person* ...." *Id.* (emphasis added). The use of the term "person" appears to imply that the rule applies to persons other than customers as defined in paragraph (a)(1), such as broker-dealers. *Cf. id.* § 240.15c3-3(a)(1).

126    *See* Exchange Act Release No. 18,420, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 84,790.

127    *See* Net Capital Requirements for Brokers and Dealers, Exchange Act Release No. 18,737, [1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,220, at 85,105, 85,105 (May 13, 1982).

128    17 C.F.R. § 240.15c3-3(b)(3). Paragraph (b)(3) requires actual delivery of securities borrowed collateral to the securities lender. *Id.* This interpretation may be based, at least in part, on the Commission's concern stated in the proposing release to paragraph (b)(3),
      If the lender, however, appointed as its agent to receive the collateral either the borrowing broker or an associated person of the borrowing broker, the lender may significantly increase the risk of loss associated with the transaction. In the event that the broker [or dealer] failed to return the securities loaned or became insolvent, the lender could risk the loss of the securities and the collateral, since the lender would not appear to have a perfected security interest.
      Exchange Act Release No. 18,420, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 84,791 n.14; *see also* U.C.C. §§ 9-304, -305 cmt. 2 (2001). The Commission continues by stating its concern that the lender might not be covered under SIPC, and asks for comment on whether the borrowing broker-dealer should be precluded from retaining the collateral. In the adopting release, the Commission concluded that the rule should "compel the firm to turn over the collateral physically to the lender ...." Exchange Act Release No. 18,737, [1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 85,120.

129    Exchange Act Release No. 18,737, [1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 85,118; 17 C.F.R. § 240.15c3-3(b)(3); *cf.* Exchange Act Release No. 18,420, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 84,788.

130    Exchange Act No. 18,737, [1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 85,119.

131    *Id.*

132    *Id.*

133    *See id.* at 85,119.

134    *Id.*

135    *Id.*

136    Customer Protection-Reserves and Custody of Securities, Exchange Act Release No. 26,608, 54 Fed. Reg. 10,680 (Mar. 15, 1989).

137    Pub. Secs. Ass'n, SEC No-Action Letter, 1989 WL 245944, at *5-*6 (Mar. 2, 1989).

138    *Id.* at *6.

139    *See* 17 C.F.R. § 240.15c3-3(b)(4); *see also* Securities; Net Capital, Customer Protection, Recordkeeping and Quarterly Securities Count Rules, Exchange Act Release No. 23,602, 51 Fed. Reg. 32,658, 32,659-60 (Sept. 15, 1986) (proposed rule).

140    Exchange Act Release No. 23,602, 51 Fed. Reg. at 32,659.

141    *Id.* at 32,661.

142    *Id.* at 32,660. A repurchase agreement is "the sale of [a] security at a specified price with a simultaneous agreement to repurchase the security at a specified price on a specified future date." *Id.* at 32,659. Generally, for purposes of the financial responsibility rules, repurchase agreements are treated as financing transactions in which the seller of the securities has borrowed funds that are collateralized by the securities sold.

143    It is important to note that despite the fact that Rule 15c3-3 does not treat such a person as a customer, and would thereby not prohibit the use of its property by the broker-dealer in its business, a non-consensual conversion of any person's property raises both common law tort and securities fraud issues. *See, e.g.*, Forma Secs., Inc., Exchange Act Release No. 11,181, 6 SEC Docket 78 (Jan. 15, 1975).

144    Exchange Act Release No. 23,602, 51 Fed. Reg. at 32,659.

145    17 C.F.R. § 240.15c3-3(b)(1).

146    Exchange Act Release No. 23,602, 51 Fed. Reg. at 32,659.

147    *Id.* "'[H]old in custody' repurchase agreement is a repurchase agreement where the broker-dealer retains custody of the [counterparty's] securities." *Id.* n.1.

148    *Id.*

149    *See* Customer Protection Rule, Exchange Act Release No. 24,778, 52 Fed. Reg. 30,331, 30,332 (Aug. 14, 1987) (codified at 17 C.F.R. § 240.15c3-3(b)(4)).

150    *See* Cohen v. Army Moral Support Fund (*In re* Bevill, Bresler & Schulman Asset Mgmt. Corp.), 67 B.R. 557, 599 (Bankr. D.N.J. 1986). For a discussion of the Bevill, Bresler & Schulman, Inc. case, see *infra* notes 321-29 and accompanying text.

151    Exchange Act Release No. 23,602, 51 Fed. Reg. at 32,663 (proposed 17 C.F.R. § 240.15c3-3(b)(4)(i)(B), (C)). Paragraph (b)(4) states that "a broker or dealer that retains custody of securities that are the subject of a repurchase agreement between the broker or dealer and a *counterparty* shall" comply with the possession or control and disclosure requirements of the paragraph. 17 C.F.R. § 240.15c3-3(b)(4)(i) (emphasis added). The use of the term *counterparty* takes into account the fact that repurchase agreement counter parties are not customers.

152    Exchange Act Release No. 23,602, 51 Fed. Reg. at 32,663 (proposed 17 C.F.R. § 240.15c3-3(b)(4)(ii)).

153    *Id.* (proposed 17 C.F.R. § 240.15c3-3(b)(4)(iii)). In its proposal, however, the Commission decided to exclude from the intra-day possession or control exception customers that enter into hold-in-custody repurchase agreements of $1 million or less. *Id.* For those persons, the proposed rule would have required continuous segregation.

154    Pub. L. No. 99-57, 100 Stat. 3208 (codified in scattered sections of 15 U.S.C.).

155    15 U.S.C. § 78*o*-5(b). Prior to the enactment of the GSA, broker-dealers that conducted a business solely in U.S. government securities were not required to register with the SEC or the Treasury.

156    Customer Protection Rule, Exchange Act Release No. 24,554, 52 Fed. Reg. 22,493, 22,494 (June 12, 1987) (proposed rule amendments).

157    *Id.*

158    *Id.*

159    *Id.* In that release, the Commission also asked for comment on whether substitution could be effected on a contemporaneous basis for hold-in-custody repurchase agreements under $1 million and the extent oral consent by repurchase agreement counterparties could be verified by regulatory examiners. *Id.* at 22,494-95.

160    *See* Customer Protection Rule, Exchange Act Release No. 24,778, 52 Fed. Reg. 30,331 (Aug. 14, 1987) (codified at 17 C.F.R. § 240.15c3-3(b)(4)).

161    *Id.* at 30,333.

162    *Id.*

163    17 C.F.R. § 240.15c3-3(e)(1).

164    *Id.* § 240.15c3-3a.

165    *Id.*

166    *Id.* § 240.15c3-3(e)(3).

167    *Id.*

168    For example, if the firm financed a customer's purchase of securities in a margin account by pledging those securities in a bank loan, it would include the amount borrowed from the bank as a Credit Item and the margin account balance as a Debit Item. Similarly, when a customer sells securities short, the broker-dealer would include the short sale proceeds in the account as a Credit Item and the cash used to collateralize the borrow of securities to settle the transaction as a Debit Item.

169    Div. of Market Regulation's Interpretation of Rule 15c3-3, Exchange Act Release No. 9922, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,158, at 82,521, 82,523-24 (Jan. 2, 1973).

170    *See* SEC SPECIAL STUDY, *supra* note 77, at 393, 397.

171    *See* Customers' Free Credit Balances, Exchange Act Release No. 7325, 29 Fed. Reg. 7239 (June 3, 1964) (codified at 17 C.F.R. pt. 240).

172    *Id.* at 7240.

173    *See* Proposal to Adopt Rules 15c3-3 and 15c3-4, Exchange Act Release No. 9388 (Nov. 8, 1971).

174    *Id.* at 2.

175    *Id.*

176    *Id.* at 3.

177    *Id.* at 10-11.

178    *Id.*

179    *Id.* at 3-4.

180    *Id.* at 4.

181    *Id.* at 5; *see supra* note 73.

182    Exchange Act Release No. 9388, at 5.

183    *See* Proposal to adopt Rule 15c3-3 under the Exchange Act, Exchange Act Release No. 9622, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 78,801, at 81,711, 81,717 (May 31, 1972).

184    *Id.* at 81,720.

185    *Id.* at 81,720-21.

186    17 C.F.R. § 240.15c3-3a. Under the May 1972 reproposal of the rule, the broker-dealer would have been required to compute the Reserve Formula on a daily basis. Exchange Act Release No. 9622, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 81,739. In a second reproposal, however, the Commission provided for a weekly computation of the Reserve Formula for

THE CUSTOMER PROTECTION RULE, 57 Bus. Law. 1069

most large firms conducting a general securities business, in response to commentators. The Commission summarized those comments by stating:

It was represented that, although cash and cash related items could be computed on a daily basis, the nature of broker-dealer accounting, clearance and settlement procedures is such that customer transactions could not be individually traced and segregated, so that the daily figures would necessarily reflect combined figures for the firm and the customer. Moreover, numerous smaller broker-dealers felt that the cost of computing such figures daily, including the manual reviewing of customer accounts, would be out of proportion with the additional protection intended for customers, and that the costs in some cases might even be prohibitive. It was pointed out that, as to those firms which use outside computer service facilities, they would find it virtually impossible to comply with the daily requirement, because such service facilities could not reasonably generate the required figures on a daily basis for the multitude of brokers which they serve.

Amendment of Rule 17a-5 Under the Securities Exchange Act Concerning Report of Securities Investor Protection Corporation Assessments by Adoption of Subparagraph (b)(4), Exchange Act Release No. 9766, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 78,988, at 82,121, 82,126 (Sept. 15, 1972).

187  17 C.F.R. § 240.15c3-3(e)(1). Under Rule 15c3-3(a)(6), the term "qualified security" means "a security issued by the United States or a security in respect of which the principal and interest are guaranteed by the United States." Id. § 240.15c3-3(a) (6). Paragraph (e)(1) requires the broker-dealer to maintain a Reserve Account with a bank. Id. § 240.15c3-3(e)(1). The term "bank" is defined in paragraph (a)(7) to mean "a bank as defined in section 3(a)(6) of the [Exchange] Act and ... also ... any building and loan, savings and loan" or similar banking institution subject to supervision by a Federal or Canadian banking authority. Id. § 240.15c3-3(a)(7).

188  Id. § 240.15c3-3(e)(3).

189  Id. Under paragraph (e)(3), a broker-dealer that has aggregate indebtedness less than 800% of its net capital (under Exchange Act Rule 15c3-1 or the capital rules of a national securities exchange of which it is a member, provided it is a specialist exempt from Rule 15c3-1) and carries aggregate customer funds as defined in paragraph (a)(10), of $1 million or less, may make the reserve computation monthly, but must deposit at least 105% of the amount computed under the Reserve Formula. Id.

190  Id.

191  Id. § 240.15c3-3(g).

192  Wall Street Clearing Co., SEC No-Action Letter, 1984 WL 45225, at *2 (May 11, 1984).

193  17 C.F.R. § 240.15c3-3a; see id. § 240.15c3-3(a)(8), (9).

194  Note "[c]ash balances are protected under the [SIPA] if the money was deposited or left in a securities account for the purpose of purchasing securities." Notice to Broker-Dealers Concerning Interest-Bearing Free Credit Balances, Exchange Act Release No. 18,262, 3 Fed. Sec. L. Rep. (CCH) ¶ 25,134B, at 18,327-3, 18,327-4 (Nov. 17, 1981). Free credit balances that remain idle for an extended period (e.g. five months) raise questions regarding the availability of SIPC protection. The payment of interest on deposits that are not used for securities investments also raises concerns under the banking laws. Id.

195  17 C.F.R. § 240.15c3-3a (Note A).

196  Id.

197  Id. (Note B). A pledge of customer securities toward a margin requirement related to proprietary options of the broker-dealer may result in a violation of the Commission's hypothecation rules. Hypothecation of Customers' Securities, 17 C.F.R. § 240.8c-1(a)(2); Hypothecation of Customers' Securities, id. § 240.15c2-1(a)(2). The hypothecation rules prohibit broker-dealers from commingling securities carried for the account of any customer with securities carried for the account of any person other than a customer of the broker-dealer under a lien for a loan made to the broker-dealer. Id. §§ 240.8c-1(a)(2), 240.15c2-1(a)(2). This provision causes broker-dealers to maintain separate customer and firm bank loans.

The hypothecation rules were adopted in 1940 to address some of the concerns that the Commission had when it adopted the Customer Protection Rule. See Hypothecation of Customers' Securities, Exchange Act Release No. 2690, 3 Fed. Sec. L. Rep. (CCH) ¶ 22,423, at 16,305-3 (Nov. 15, 1940). For example, paragraph (a)(3) of both hypothecation rules limits the aggregate amount of funds the broker-dealer can obtain under a pledge of customer securities to the amount that the firm has lent to

THE CUSTOMER PROTECTION RULE, 57 Bus. Law. 1069

customers. *See* 17 C.F.R. §§ 240.8c-1(a)(3), 240.15c2-1(a)(3). The application of the hypothecation rules, however, have been interpreted by the Commission to be limited to funds obtained by the firm by pledging securities as collateral under a loan. It does not cover funds obtained by the firm by lending customer securities, through repurchase agreements or other uses that do not involve loans. The original proposing release to Rule 15c3-3 included a proposal to amend the hypothecation rules to address this problem, at least in part, by treating securities loaned as if they were hypothecated. *See* Exchange Act Release No. 9388, at 6. The proposed amendments to the hypothecation rules were never adopted.

198    17 C.F.R. § 240.15c3-3a.

199    *Id.*

200    *Id.*

201    *Id.*

202    Nat'l Ass'n of Secs. Dealers, Inc., SEC No-Action Letter, 1974 WL 10790, at *3 (July 16, 1974).

203    *See* discussion *supra* notes 57-75 and accompanying text.

204    *Nat'l Ass'n of Secs. Dealers, Inc.*, 1974 WL 10790, at *1.

205    *See supra* notes 64-66 and accompanying text.

206    *See supra* notes 78-80 and accompanying text.

207    Adoption of Rule 15c3-3 under the Exchange Act, Exchange Act Release No. 9856, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,083, at 82,342, 82,343 (Nov. 13, 1972).

208    Baker, Watts & Co., SEC No-Action Letter, 1985 WL 54443, at *2-*3 (Oct. 12, 1985).

209    17 C.F.R. § 240.15c3-3a.

210    *Id.* (Item 7). A "short securities count difference" is a short securities difference discovered by a securities count or verification of the stock record. *See supra* note 78 and accompanying text. Broker-dealers that are not exempt from Exchange Act Rule 17a-13 (i.e., generally those that hold or have control or direction over securities) are required, at least once every calendar quarter-year, to physically count securities that they are holding, and to account for or verify securities positions that they are not physically holding but are subject to the firm's control or direction. *See* Quarterly Security Counts To Be Made by Certain Exchange Members, Brokers, and Dealers, 17 C.F.R. § 240.17a-13. Rule 17a-13(b)(5) requires the broker-dealer, no later than seven business days after each security count or verification, to record unresolved differences in a short security count difference account. *Id.* § 240.17a-13(b)(5). In addition to including credit items in the Rule 15c3-3 Reserve Formula, broker-dealers are required to incur deductions for aged short securities differences. *See id.* § 240.15c3-1(c)(2)(v).
If the broker-dealer computes its net capital requirement under SEA Rule 15c3-1 using the alternative standard, it must include the market value of short security count differences over seven, instead of thirty days in Item 7. *See* Net Capital Requirements for Brokers or Dealers, *id.* § 240.15c3-1(a)(1)(ii)(B). The Commission's Net Capital Rule establishes a capital adequacy standard for broker-dealers registered with the Commission under section 15(b) of the Exchange Act. *Id.* § 240.15c3-1(a). The Net Capital Rule prescribes a test that ensures that registered broker-dealers have adequate liquid assets to meet their obligations to customers and creditors. The rule requires the broker-dealer to maintain net capital in excess of certain prescribed ratio standards. *Id.* Generally, net capital is net worth plus certain subordinated liabilities less illiquid assets and specified percentages of its proprietary securities and commodities positions. Broker-dealers with more than $250,000 of net capital may elect between two standards of computing the applicable minimum ratio requirement. Under the aggregate indebtedness standard, the broker-dealer may not "permit its aggregate indebtedness to ... exceed 1500[%] of its net capital." *Id.* § 240.15c3-1(a)(1)(i). Under the alternative standard, the broker-dealer may "not permit its net capital to be less than ... [two] percent of [its] ... debit items [under the Reserve Formula]." *Id.* § 240.15c3-1(a)(1)(ii). For a more comprehensive discussion on the Net Capital Rule, see Michael P. Jamroz, *The Net Capital Rule*, 47 BUS. LAW. 863 (1992).

211    17 C.F.R. § 220.15c3-3(h); *see supra* note 73 and accompanying text.

212   17 C.F.R. § 220.15c3-3a. Although the term "short securities and credits (not to be offset by longs or by debits) in all suspense accounts" is not defined in Rule 15c3-3, the general instruction to Part II of the FOCUS Report required to be filed under Securities Exchange Act Rule 17a-5 defines "security suspense accounts" to include "all transactions in any accounts containing a long or short security position with a related ledger balance pending determination of their ultimate disposition because of doubtful ownership, collectability, or deliverability, except for transactions promptly resolved." Form X-17A-5, Part II (FOCUS Report), 5 Fed. Sec. L. Rep. (CCH) ¶ 33,929, at 22,739, 22,753 (1987). In the SIA Transcripts, a suspense account is generally described as

unidentified items at the end of the day that have to be placed somewhere to create a balance. These may be placed in a temporary account. You have customer transactions and you cannot attribute them to a particular account. Usually in the accounting jargon they're called plug accounts. They could be stock record breaks, any number of a variety of items that you would need to get in balance at the end of the day.

*See* SIA TRANSCRIPTS, *supra* note 107, at 21. The term "'credits in all suspense accounts' includes all suspense credits regardless of whether they" are related to customer activity. Checkers, Simon & Rosner, SEC No-Action Letter, 1988 WL 235383, at *2 (Nov. 8, 1988).

213   17 C.F.R. § 240.15c3-3a (Item 9).

214   *Id.*

215   Broker-dealers that are not exempt from SEA Rule 17a-13 (i.e. generally those that hold or have control or direction over securities) are required, at least once every calendar quarter-year, to physically count securities that they are holding, and to account for or verify securities positions that they are not physically holding but are subject to the firm's control or direction. 17 C.F.R. § 240.17a-13(b)(1)-(3). More specifically, paragraphs (b)(2) and (3) require the broker-dealer, as part of its quarterly securities count, to account for and verify all securities in transfer. *Id.*

216   17 C.F.R. § 240.15c3-3a (Item 10-13).

217   *Id.* (Item 10); *see supra* note 119 (discussing Regulation T).

218   17 C.F.R. § 240.15c3-3a (Item 10, Note E).

219   *Id.* (Item 11).

220   *See* 12 C.F.R. § 220.10; 17 C.F.R. § 240.15c3-3(b)(3).

221   *See* 17 C.F.R. § 240.15c3-3a.

222   *Id.*

223   *See id.*

224   *Id.*

225   *Id.*

226   *Id.* § 240.15c3-3(e).

227   *Id.* § 240.15c3-3a.

228   *Id.*

229   *Id.*

230   *Id.*

231   *Id.* Generally, section 3(a)(12) of the Exchange Act defines "exempted security" to include, among other things, government and municipal securities. 15 U.S.C. § 78c(a)(12)(A)(i-ii) (2000). The term "government securities" is defined at section 3(a)

(42) of the Exchange Act. *Id.* § 78c(a)(42). The term "municipal securities" is defined at section 3(a)(29) of the Exchange Act. *Id.* § 78c(a)(29).

232    The New York Stock Exchange Interpretation Handbook includes an example of this computation at Rule 15c3-3, Exhibit A—Item 10/04. *See*NYSE HANDBOOK, *supra* note 50, Rule 15c3-3(Exhibit A—Item 10)/04, at 658 (rev. 2002).

233    *See supra* note 39 and accompanying text (discussing clearance through omnibus accounts). *See* Broker-dealer credit account, 12 C.F.R. § 220.7(f).

234    17 C.F.R. § 240.15c3-3a.

235    *Id.*

236    *Id.*§ 240.15c3-1(a)(1)(ii)(A).

237    *See infra* notes 238-42 and accompanying text.

238    *See* United States v. Wolfram, Litig. Release No. 9952, 27 SEC Docket 1065 (N.D. Ohio Apr. 5, 1983).

239    17 C.F.R. § 240.15c3-3a. Regulation T and the margin rules of the self-regulatory organizations require the broker-dealer to collateralize customer debit balances by obtaining and maintaining specified minimum amounts of margin consisting of liquid "marginable" securities. 12 C.F.R. § 220.16.

240    *Wolfram*, 27 SEC Docket at 1065. The indictment alleged that of the $20 million misappropriated by Wolfram, approximately $14,332,000 were used in connection with the purchase and operation of the Landmark Hotel and Casino in Las Vegas, Nevada; approximately $3,181,000 were used in connection with the purchase and operation of a horse farm located in Ocala, Florida; approximately $1,721,000 were used in connection with the operation of an oil well located in Baton Rouge, Louisiana; and approximately $955,000 were used with the operation of cattle ranches located in Flippin and Mountain Home, Arkansas. *Id.* at 1066. The remainder of the monies appropriated by Wolfram was used, in part for the purchase of an airplane, the purchase and renovation of antique cars, donations, loans, gifts, and other personal expenses. In 1983 Wolfram was sentenced to twenty-five years in prison for is theft of customer assets. He was paroled in 1993 and currently lives in Las Vegas, Nevada.

241    779 F.2d 1339 (8th Cir. 1985).

242    From about 1978 to 1981, the participants of this scheme began to exhibit a lavish lifestyle. Brimberry, Massa, Skinner, and another took frequent trips to Las Vegas together, sometimes as often as twice a month. They also traveled on more than one occasion to Hawaii, Disney World, the Bahamas, and Monte Carlo. Brimberry was building a very expensive home in Granite City, IL. Indeed, it was Brimberry's extravagant lifestyle that caught the attention of the Internal Revenue Service, who notified the Commission after Brimberry entered into a plea agreement. Another $1.3 million of money from Stix customer went to fund corporations fronted by Brimberry and Skinner. Brimberry and Massa were sentenced to twenty years in prison. *See also*United States v. Massa, 854 F.2d. 315 (8th Cir. 1988).

243    The amendments were reproposed in the Customer Protection Rule, Exchange Act Release No. 21,865, 50 Fed. Reg. 11,896, 11,898 (Nov. 26, 1985).

244    Customer Protection Rule, Exchange Act Release No. 20,655, 29 Fed. Reg. 7245 (Feb. 28, 1984).

245    Generally, net capital is net worth plus certain subordinated liabilities less illiquid assets and specified percentages of its proprietary securities and commodities positions. "Net capital before the application of securities haircuts," or "tentative net capital" is the net worth of the broker-dealer less unsecured receivables and assets that cannot be readily converted into cash. *See*17 C.F.R. § 240.15c3-1(c)(2)(iv) (2001); *see also* Michael P. Jamroz, *The Net Capital Rule, 47 BUS. LAW. 863, 867 (1992).*

246    Exchange Act Release No. 21,865, 50 Fed. Reg. at 11,897.

247    Div. of Market Regulation's Interpretations of Rule 15c3-3, Exchange Act Release No. 9922, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,158, at 82,521 (Jan. 2, 1973).

248    Customer Protection Rule, Exchange Act Release No. 22,499, 50 Fed. Reg. 41,337, 41,339 (Oct. 10, 1985).

249    *Id.* at 41,338.

250    *Id.* at 41,339.

251    *See* United States v. Wolfram, Litig. Release No. 9952, 27 SEC Docket 1065, 1067 (N.D. Ohio Apr. 5, 1983).

252    Exchange Act Release No. 22,499, 50 Fed. Reg. at 41,338. The term "household members and other persons related to principals" is defined at 17 C.F.R. § 240.15c3-3(a)(12).

253    *See* Exchange Act Release No. 22,499, 50 Fed. Reg. at 41,338.

254    *See id.* at 41,339 (codified at 17 C.F.R. § 240.15c3-3(a)(13)).

255    *Id.*

256    *Id.* (codified at 17 C.F.R. § 240.15c3-3a (Note E)).

257    Customer Protection Rule, Exchange Act Release No. 20,655, 29 Fed. Reg. 7245, 7247 (Feb. 28, 1984).

258    Customer Protection Rule, Exchange Act Release No. 21,865, 50 Fed. Reg. 11,896, 11,899 (Nov. 26, 1985).

259    *See id.*

260    *Id.*

261    *Id.* The "Financial and Operational Combined Uniform Single Report" or FOCUS Report is a regulatory report containing certain financial and operational information required to be filed under 17 C.F.R. § 240.17a-5.

262    Exchange Act Release No. 21,865, 50 Fed. Reg. at 11,899.

263    *Id.* For a discussion of omnibus accounts, see *supra* notes 102-03 and accompanying text.

264    *See* Exchange Act Release No. 21,865, 50 Fed. Reg. at 11,899 (reproposing amendment); Customer Protection Rule, Exchange Act Release No. 22,499, 50 Fed. Reg. 41,337, 41,340 (Oct. 10, 1985) (adopting and amending 17 C.F.R. § 240.15c3-3a(5)).

265    Exchange Act Release No. 22,499, 50 Fed. Reg. at 41,340.

266    *Id.*

267    *Id.*

268    *Id.* As of this writing, the author knows of no DEA that has given relief under this provision.

269    Div. of Mkt. Regulation's Interpretations of Rule 15c3-3, Exchange Act Release No. 9922, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,158, at 82,521 (Jan. 2, 1973).

270    *See infra* notes 311-15 and accompanying text.

271    17 C.F.R. § 240.15c3-3(b)(3), (4).

272    *Id.*

273    Exchange Act Release No. 9922, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 82,524.

274    *See* SIA TRANSCRIPTS, *supra* note 107, at 122-23.

275    Adoption of Amendments to Rule 15c3-3, Exchange Act Release No. 11,497, [1975-1976 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 80,212, at 85,437, 85,443 (June 26, 1975).

276    *Id.*

277    *Id.* at 85,440, 85,443.

278    Net Capital Requirements for Brokers and Dealers, Exchange Act Release No. 18,737, [1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,220, at 85,105 (May 13, 1982).

279    *Id.* at 85,122. To the extent broker-dealers exclude matched fails and securities borrowed transactions from the Reserve Formula under this interpretation, they are required to incur a net capital deduction under Rule 15c3-1 of one percent of the contract amount. *Id.*

280    *See* NYSE HANDBOOK, *supra* note 50, Rule 15c3-3(Exhibit A Item 11)/ 03, at 663 (rev. 1996); *see also id.* Rule 15c3-3(Exhibit A Item 4)/06, at 644 (rev. 1992) (discussing allocation of fails to deliver and receive).

281    *Id.*

282    17 C.F.R. § 240.15c3-3(e)(1), (2). The term "bank" is defined at section 3(a)(6) of the Exchange Act. 15 U.S.C. § 78c(a)(6) (2000).

283    Paragraph (f) of the rule states:
       A broker or dealer required to maintain the reserve bank account prescribed by this section or who maintains a special account referred to in paragraph (k) of this section shall obtain and preserve in accordance with § 240.17a-4 written notification from each bank in which he has his reserve bank account or special account that the bank was informed that all cash and/or qualified securities deposited therein are being held by the bank for the exclusive benefit of customers of the broker or dealer in accordance with the regulations of the Commission, and are being kept separate from any other accounts maintained by the broker or dealer with the bank, and the broker or dealer shall have a written contract with the bank which provides that the cash and/or qualified securities shall at no time be used directly or indirectly as security for a loan to the broker or dealer by the bank and, shall be subject to no right, charge, security interest, lien, or claim of any kind in favor of the bank or any person claiming through the bank.
       17 C.F.R. § 240.15c3-3(f).

284    *Id.* § 240.15c3-3(e)(1).

285    *Id.* § 240.15c3-3(a)(6).

286    Broker-dealers may margin all debt securities, including government securities, on a good faith basis. *See* 12 C.F.R. §§ 220.6, 220.12(b). The section 220.10(a) purpose test for borrowing securities does not apply to securities that are entitled to good faith loan value. *See id.* § 220.10(a); Securities Credit Transactions: Borrowing by Brokers and Dealers, 63 Fed. Reg. 2806, 2810 (Jan. 16, 1998). With respect to the two percent reduction, see NYSE HANDBOOK, *supra* note 50, Rule 15c3-3(e)(1)/04, at 544.

287    For purposes of determining the reserve deposit, the broker dealer is required to value qualified securities obtained under repurchase agreements at the lower of contract value under the agreement or the market value of the securities. 17 C.F.R. § 240.15c3-3a (Note C). In lieu of determining this amount, the broker-dealer may include an amount equal to two percent less than the market value of the qualified securities. *See* NYSE HANDBOOK, *supra* note 50, Rule 15c3-3(e)(1)/051, at 545.

288    NYSE HANDBOOK, *supra* note 50, Rule 15c3-3(a)(6)/013, at 486.

289    *Id.* Rule 15c3-3(a)(6)/012. at 486.

290    *Id.* Rule 15c3-3(e)(1)/01, at 543.

291    *See* Underwood, Neuhaus & Co., Inc., Exchange Act Release No. 25,531, 40 SEC Docket (CCH) 785, 786 (Mar. 30, 1988) (admin. proceeding); *see also* Kevin Upton, Initial Decision Release No. 34, 34 SEC Docket 317, 318-21 (May 18, 1993) (admin. proceeding); John Dolcemaschio, Exchange Act Release No. 30,634, 51 SEC Docket 543, 543 (Apr. 27, 1992).

292    17 C.F.R. § 240.15c3-3(e)(2).

293    See *Underwood, Neuhaus & Co. Inc.*, Exchange Act Release No. 25,531, 40 SEC Docket (CCH) at 786; Kevin Upton, Exchange Act Release No. 35,292, 52 S.E.C. 145 (Jan. 30, 1995). The Commission's order in the *Upton* case was vacated on grounds unrelated to the substance of the interpretation in *Upton v. Securities & Exchange Commission*. Upton v. SEC, 75 F.3d 92 (2d Cir. 1996). The court found that Mr. Upton did not have actual notice of the Division's interpretation. *Id.* at 98.

294    17 C.F.R. § 240.15c-3(b), (e), (g).

295    *Id.* § 240.15c3-3(g).

296    *See* N.Y. Stock Exch., Inc., SEC No-Action Letter, 1990 WL 357286 (Apr. 25, 1990).

297    *Id.* at *1.

298    *Id.* at *2.

299    *See* 17 C.F.R. § 240.15c3-3(a)(5).

300    In those instances where the Division has provided relief to firms, it has so done so informally on a case-by-case basis. The relief generally involves allowing the broker-dealer to withdraw funds from the Reserve Account to pay down the bank loan and then requiring it to immediately recompute the Reserve Formula. Although the staff has provided this relief under limited circumstances and conditions to allow firms to get out of the spiral, it is the far greater preference of the staff that the broker-dealer have adequate access to borrowing and capital to be able to fund timing differences that may give rise to a spiral, as well as other aspects of the firm's business. As it is generally the practice of broker-dealers to rely on published no-action letters issued to others in matters involving the customer protection and other financial responsibility rules, it is likely that the Division has not published a no-action letter in this area to require those firms that seek to escape a spiral to contact them directly.

301    *See supra* notes 44-46 and accompanying text.

302    *See supra* notes 13-14 and accompanying text.

303    Jackson v. Mishkin (*In re* Adler, Coleman Clearing Corp.), 263 B.R. 406 (Bankr. S.D.N.Y. 2001).

304    Hanifen, Imhoff Clearing Corp., SEC No-Action Letter, 1997 WL 245187 (May 7, 1997).

305    *See* N.Y. Stock Exch., Inc., SEC No-Action Letter, [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 77,486, at 78,493, 78,494 (Nov. 10, 1998); 17 C.F.R. § 240.15c3-1. For more information regarding the Net Capital Rule, see also Michael P. Jamroz, *The Net Capital Rule*, 47 BUS. LAW. 863 (1992).

306    N.Y. Stock Exch., Inc., SEC No-Action Letter, [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) at 78,496.

307    *Id.* at 78,493-94. It is important to note that the term "introducing firm" is not meant to be used literally by the Division in this letter. Although the term generally applies to broker-dealers that "introduce" their customer's accounts to other broker-dealers, in the context of the no-action letter, it refers to any broker-dealer that entrusts its property with another. *Id.* at 78,493.

308    *See id.* at 78,494-95.

309    Note that if the clearing broker-dealer raises funds using the property of introducing broker-dealers, it must include the amount of those funds in the PAIB Formula.

310    17 C.F.R. § 240.10b-5.

311    Net Capital Rule, Exchange Act Release No. 27,249, 54 Fed. Reg. 40,395, 40,397 (Oct. 2, 1989).

312    *Id.*

313    *See* SIPC ANNUAL REPORT 2000, *supra* note 4, at 6.

314    *Id.*

315    *Id.*

316    17 C.F.R. § 240.15c3-3(a)(1).

317    *See infra* notes 330-33 and accompanying text.

318    *See supra* note 44.

319    *See* N.Y. Stock Exch., Inc., SEC No-Action Letter, [1998 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 77,486 at 78,495 (Nov. 10, 1998).

320    *See supra* note 151 and accompanying text.

321    *See* Cohen v. Army Moral Support Fund (*In re* Bevill, Bresler & Schulman Asset Mgmt. Corp.), 67 B.R. 557, 562 (Bankr. D.N.J. 1986).

322    *See id.* at 557. Registration of broker-dealers that limited their activities to government securities was not required until 1986 as a result of the Government Securities Act of 1986, which was enacted, in large part, in reaction to the failure of Bevill, Bresler & Schulman Asset Mgmt. Corp. and its related entities.

323    *Id.* at 582.

324    *Id.*

325    *Id.*

326    *Id.* at 602.

327    Large dealers in government securities often enter into offsetting repurchase and reverse repurchase agreements with different counter parties with different terms. A "matched book" is an industry term for a large portfolio of offsetting repurchase and reverse repurchase agreements.

328    *See supra* note 120 and accompanying text.

329    *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 67 B.R. at 597.

330    17 C.F.R. § 240.15c3-3(c)(4),(7).

331    Guidelines for Control Locations for Foreign Securities, Exchange Act Release No. 10,429, 38 Fed. Reg. 29,217, 29,217 (Oct. 23, 1973).

332    17 C.F.R. § 240.15c3-3(c)(4) (emphasis added).

333    Registration Requirements for Foreign Broker-Dealers, Exchange Act Release No. 25,801, 41 SEC Docket 165, 175 n.65 (June 14, 1988).

334    *See* NYSE HANDBOOK, *supra* note 50, Rule 15c3-3a(Exhibit A)/08, at 613; NASD RULE INTERPRETATIONS, *supra* note 50, at 96.

335    Div. of Market Regulation's Interpretations of Rule 15c3-3, Exchange Act Release No. 9922, [1972-1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,158, at 82,521, 82,524 (Jan. 2, 1973).

336    *See* SIA TRANSCRIPTS, *supra* note 107, 122-23; Exchange Act Release No. 11,497, [1975-1976 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 80,212, at 85,437, 85, 443 (June 26, 1975).

337    *See* NYSE HANDBOOK, *supra* note 50, Rule 15c3-3a(Exhibit A)/08, at 613-18.

338    15 U.S.C. § 78c(a)(10) (2000).

339    17 C.F.R. § 240.15c3-3(c)(1).

340  *See, e.g.*, Rule 431(f)(2)(D)(iii), N.Y.S.E. Guide (CCH) ¶ 2431, at 3751, 3760 (Sept. 1, 1968).

341  *See* Option Clearing Corp., SEC No-Action Letter, 1975 WL 11464, at *3-*4 (Feb. 19, 1975).

342  *Id.* at *4.

343  *See id.* at *5.

344  *Id.* at *1.

345  The Options Clearing Corp., OCC Rules, Rule 602(c) (amended Mar. 29, 1999), *at* http://www.theocc.com/publications/rules/chapter06/602.jsp.

346  *Id.*

347  *See* 17 C.F.R. § 240.15c3-1a(b) (2001).

348  *See* Secs. Investor Prot. Corp. v. Assoc. Underwriters, Inc., 423 F. Supp. 168, 173 (D. Utah 1975).

349  *Id.* at 179.

350  *See, e.g.*, Rule 431, N.Y.S.E. Guide (CCH) ¶ 2431 at 3751, 3760 (Sept. 1, 1968).

351  The deductions under the Net Capital Rule for unlisted options and other "derivative" instruments are described in Net Capital Rule, Exchange Act Release No. 32,256, 58 Fed. Reg. 27,486, 27,489 (May 10, 1993).

57 BUSLAW 1069

---

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.