**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Ona T. Wang
Tracy L. Cole
Fernando A. Bohorquez
David M. McMillan
Michelle N. Tanney

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-05279 (SMB) |
| v. | |
| MAGNIFY INC.; PREMERO INVESTMENTS LTD.; STRAND INTERNATIONAL INVESTMENTS LTD.; THE YESHAYA HOROWITZ ASSOCIATION; YAIR GREEN; and EXPRESS ENTERPRISES INC. | **TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ............................................................1

II.     STATEMENT OF FACTS ................................................................3

        A.      Green Operated at the Center of the Web of Defendants' BLMIS Accounts..........3

        B.      The Lack of Real Securities Trading Was Patently Obvious to the
                Defendants. .......................................................................5

III.    PROCEDURAL HISTORY..................................................................8

IV.     STANDARD OF REVIEW ................................................................9

        A.      Green's 38-Page Affidavit and Hundreds of Pages of Attached Exhibits may
                not be Considered on this Motion to Dismiss and Must be Excluded. .................10

        B.      Converting the Motion to a Motion for Summary Judgment is not Requested
                by Either Party and is Inappropriate Here.............................................16

V.      THE SAC AMPLY ALLEGES DEFENDANTS' ACTUAL KNOWLEDGE OF
        BLMIS'S FRAUD ......................................................................17

        A.      Section 546(e) does not Apply to Strand and Premero, for Whose Accounts
                BLMIS did not Enter into any Securities Contracts or Identify any Securities
                Transactions. ......................................................................18

        B.      Magnify Knew that BLMIS Reported Fake Trades in Magnify's Accounts
                Beginning in 1990..................................................................20

        C.      Green Knew Magnify's, Strand's and Premero's Account Records did not
                Reflect Securities Trading...........................................................22

        D.      Green Benefitted Personally and Professionally from Siphoning Millions of
                Dollars from BLMIS, Without Risking a Dime of His Own Money....................27

VI.     PREMERO ALSO LACKED GOOD FAITH UNDER SECTION 548(C).....................30

VII.    THE TRUSTEE HAS SUFFICIENTLY PLEADED THAT MAGNIFY AND
        STRAND ARE ALTER EGOS OF GREEN..................................................31

        A.      Section 309 of the Restatement Applies to Officers' and Directors' Liability;
                Under Cases Applying Section 309, This Court Should Use New York Law
                For Its Veil Piercing Analysis.......................................................33

        B.      Defendants Incorrectly Rely on Cases Concerning Shareholder Liability. ...........34

i

C.      Even if Foreign Law Applies, Defendants have Failed to Meet Their Burden
of Proving it and the Law of the Forum State Applies. ........................................36

D.      Under New York Law, the Trustee has Sufficiently Pleaded that Magnify and
Strand are the Alter Egos of Green. .....................................................................40

E.      The Trustee Sufficiently Pleads Alter Ego and Veil Piercing Even Under The
Purported Law of Panama And The BVI..............................................................42

VIII.   THE SAC SUFFICIENTLY PLEADS A CLAIM FOR EQUITABLE
SUBORDINATION..........................................................................................................46

IX.     CONCLUSION.................................................................................................................49

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) ...................................................................47

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................9

*Barberan v. Nationpoint*,
    706 F. Supp. 2d 408 (S.D.N.Y. 2011) .................................................................16

*Batruk v. Mitsubishi Motors Corp.*,
    No. 94 Civ. 7593 (KMW), 1998 WL 307383 (S.D.N.Y. June 10, 1998), *as
    amended* (June 19, 1998) ....................................................................................38

*Benjamin v. Diamond* (*In re Mobile Steel Co.*),
    563 F.2d 692 (5th Cir. 1977) ..............................................................................47

*In re Bernard L. Madoff Inv. Sec. LLC*,
    08-01789 (Bankr. S.D.N.Y.) ...............................................................................46

*In re Bernard L. Madoff Inv. Sec. LLC*,
    773 F.3d 411 (2d Cir. 2014) ..........................................................................18, 19

*Bigio v. Coca-Cola Co.*,
    No. 97 Civ. 2858 (BSJ), 2010 WL 3377503 (S.D.N.Y. Aug. 23, 2010), *aff'd*,
    675 F.3d 163 (2d Cir. 2012) ..........................................................................36, 37

*Broader v. Cablevision Systems Corp.*,
    418 F.3d 187 (2d Cir. 2005) ................................................................................14

*Brown v. Marriott Int'l, Inc.*,
    No. 14CV5960SLTMDG, 2017 WL 4484194 (E.D.N.Y. Sept. 29, 2017) ............12

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M.
    Fabrikant & Sons, Inc.)*,
    480 B.R. 480 (S.D.N.Y. 2012) ...........................................................................28

*Cargo Partner AG v. Albatrans, Inc.*,
    352 F.3d 41 (2d Cir. 2003) ...................................................................................9

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) .............................................................11, 14, 16, 17

*Cortec Industries v. Sum Holdings*,
   949 F.2d 42 (2d. Cir. 1991)...................................................................................15

*In re Crown Vantage, Inc.*,
   No. 02-3836 (MMC), 2004 WL 1635543 (S.D. Cal. July 12, 2004).......................................21

*Dar El-Bina Eng'g & Contracting Co. v. Republic of Iraq*,
   79 F. Supp. 2d 374 (S.D.N.Y. 2000).......................................................36

*Dastranj v. Dehghan*,
   No. CV PX 15-2436, 2016 WL 7012299 (D. Md. Dec. 1, 2016)...........................................38

*DeLuca v. AccessIT Grp., Inc.*,
   695 F. Supp. 2d 54 (S.D.N.Y. 2010)..............................................................13, 16

*Dual Groupe, LLC v. Gans–Mex LLC*,
   932 F. Supp. 2d 569 (S.D.N.Y.2013)...........................................................14

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
   651 F.3d 329 (2d Cir. 2011)....................................................................18, 19

*Faulkner v. Beer*,
   463 F.3d 130 (2d Cir. 2006)...........................................................10, 11, 14, 16

*Fireman's Fund Ins. Cos. v. Meenan Oil Co.*,
   755 F.Supp. 547 (E.D.N.Y. 1991) ..............................................................21

*Fletcher v. Atex, Inc.*,
   68 F.3d 1451 (2d Cir. 1995)......................................................................35

*Friedl v. City of New York*,
   210 F.3d 79 (2d Cir. 2000).........................................................................12

*GeBBS Healthcare Sols., Inc. v. Orion Healthcorp, Inc.*,
   No. 1:16-CV-2206-GHW, 2017 WL 1251143 (S.D.N.Y. Apr. 4, 2017) ................................11

*Ginx, Inc. v. Soho All.*,
   720 F. Supp. 2d 342 (S.D.N.Y. 2010).............................................................9, 15

*Global Network Commc'ns, Inc. v. New York*,
   458 F.3d 150 (2d Cir. 2006).....................................................................11, 13, 14

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   131 S. Ct. 2060 (2011)..............................................................................31

*Goel v. Bunge*,
   820 F.3d 554 (2d Cir. 2016).......................................................................10, 13, 16

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985)..........................................................................13

*Golub v. Kidder, Peabody & Co.*,
   No. 89 CIV 5903 CSH, 2000 WL 1024688 (S.D.N.Y. July 25, 2000)....................21

*In re Bernard L. Madoff Inv. Sec. LLC* ...................................................................19

*Jonas v. Estate of Leven*,
   116 F. Supp. 3d 314 (S.D.N.Y. 2015)........................................................... *passim*

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
   8 F.3d 130 (2d Cir. 1993) ............................................................................35

*KiSKA Const. Corp.US v. G & G Steel, Inc.*,
   No. 04CIV9252CSH, 2005 WL 1225944 (S.D.N.Y. May 20, 2005)....................12

*Kopec v. Coughlin*,
   922 F.2d 152 (2d Cir. 1991)..........................................................................12

*Lyman Commerce Solutions, Inc. v. Lung*,
   No. 12-CV-4398, 2013 WL 4734898 (S.D.N.Y. Aug. 30, 2013)..........................33

*In re Lyondell Chem. Co.*,
   491 B.R. 41 (Bankr. S.D.N.Y. 2013), *aff'd*, 505 B.R. 409 (S.D.N.Y. 2014) ........15

*In re Madison Bentley Assocs. LLC*,
   No. 09-15479 (SHL), 2015 WL 6125893 (Bankr. S.D.N.Y. Oct. 16, 2015)..........40

*Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co.*,
   14 Civ. 1495 (ER), 2016 WL 4382709 (S.D.N.Y. Aug. 16, 2016) ........................16

*Milestone Shipping, S.A. v. Estech Trading LLC*,
   764 F. Supp. 2d 632 (S.D.N.Y. 2011)..............................................................32

*Murawski v. Pataki*,
   514 F.Supp.2d 577 (S.D.N.Y. 2007)................................................................14

*Network Enterprises, Inc. v. APBA Offshore Prods., Inc.*,
   No. 01-11765(CSH), 2003 WL 124521 (S.D.N.Y. Jan. 15, 2003)........................32

*Nisselson v. Drew Indus. Inc. (In re White Metal Rolling and Stamping Corp.)*,
   222 B.R. 417 (Bankr. S.D.N.Y. 1998)..............................................................10

*Norlin Corp. v. Rooney, Pace Inc.*,
   744 F.2d 255 (2d Cir. 1984)..........................................................................34

v

*Official Comm. of Unsecured Creditors Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.),*
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) ...................................................................47

*Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.),*
    343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...................................................................47

*Olmeca, S.A. v. Manufacturers Hanover Tr. Co.,*
    No. 84 Civ. 1984 (RWS), 1986 WL 3517 (S.D.N.Y. Mar. 18, 1986) ....................................37

*Panam Mgmt. Group, Inc. v. Pena,*
    No. 08–CV–2258 (JFB) (ARL), 2011 WL 3423338 (E.D.N.Y. Aug. 4, 2011) ............. *passim*

*Pension Comm. Of the Univ. Of Montreal Pension Plan v. Banc of America Sec. LLC,*
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) ...................................................................33

*Picard v. Avellino (In re BLMIS),*
    557 B.R. 89,116 (Bankr. S.D.N.Y. 2016) ............................................20, 23, 24, 33

*Picard v. Ceretti, et al. (In re Bernard L. Madoff Inv. Sec. LLC),*
    No. 08-99000 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015)................ *passim*

*Picard v. Chais (In re BLMIS),*
    445 B.R. 206 (Bankr. S.D.N.Y. 2011) ...................................................................31

*Picard v. The Estate of Steven Mendelow (In re Bernard L. Madoff Inv. Sec. LLC),*
    560 B.R. 208 (Bankr. S.D.N.Y. 2016) ..........................................................20, 23, 24

*Picard v. Katz,*
    462 B.R. 447 (S.D.N.Y. 2011) ...........................................................................47

*Picard v. Legacy Capital et al. (In re Bernard L. Madoff Inv. Sec. LLC),*
    548 B.R. 13 (Bankr. S.D.N.Y. 2016) ...................................................................28

*Picard v. Merkin,*
    440 B.R. 243 (Bankr. S.D.N.Y. 2010) ...................................................................10

*Picard v. Merkin, et al. (In re Bernard L. Madoff Inv. Sec. LLC),*
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ......................................................28, 30, 31, 47

*Picard v. Shapiro (In re BLMIS),*
    542 B.R. 100,113 (Bankr. S.D.N.Y. 2015) ........................................20, 23, 24, 30

*Remington Rand Corp.-Delaware v. Bus. Sys. Inc.,*
    830 F.2d 1260 (3d Cir. 1987) ...........................................................................37

*Republic of Turkey v. OKS Partners*,
146 F.R.D. 24 (D. Mass. 1993)............................................................................37

*Resolution Tr. Corp. v. Gregor*,
872 F. Supp. 1140 (E.D.N.Y. 1994) ....................................................................34

*Sea Trade Co. v. FleetBoston Fin. Corp.*,
No. 03 CIV. 10254 (JFK), 2008 WL 4129620 (S.D.N.Y. Sept. 4, 2008) .............37

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
476 B.R. 715 (S.D.N.Y. 2012).......................................................................18, 19

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*,
234 B.R. 293 (Bankr. S.D.N.Y. 1999)............................................................10, 32

*Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re Bernard L. Madoff Inv. Secs. LLC)*,
No. 12 Misc. 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013).............17, 19

*Soviet Pan Am Travel Effort v. Travel Comm., Inc.*,
756 F. Supp. 126 (S.D.N.Y. 1991)......................................................................35

*Tyco Int'l, Ltd. v. Kozlowski*,
756 F. Supp. 2d 553 (S.D.N.Y. 2010)..................................................................33

*In re Tyson*,
433 B.R. 68 (S.D.N.Y. 2010).............................................................38, 39, 44, 45

*Vaher v. Orangetown*,
916 F.Supp.2d 404 (S.D.N.Y. 2013)....................................................................14

*Warth Line, Ltd. v. Merinda Marine Co.*,
778 F. Supp. 158 (S.D.N.Y. 1991).......................................................................37

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*,
933 F.2d 131 (2d Cir. 1991)................................................................................40

*Yukos Capital S.A.R.L. v. Feldman*,
No. 15-CV-4964-(LAK), 2016 WL 183360 (S.D.N.Y. Jan. 11, 2016) .................36

**Statutes**

11 U.S.C. § 510(c) ........................................................................................................46

11 U.S.C. § 548(a)(1)(A) ........................................................................................17, 30

11 U.S.C. § 548(c) ....................................................................................................30, 31

Panama Commercial Code.......................................................................................39, 43

Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* .......................................................1

**Rules**

Fed. R. Civ. P. 8 .................................................................................................................14

Fed. R. Civ. P. 9(b) ...........................................................................................................10

Fed. R. Civ. P. 12(b)(6).............................................................................................. *passim*

Fed. R. Civ. P. 12(d) .................................................................................................11, 17

Fed. R. Civ. P. 44.1 ............................................................................................36, 38, 39

Fed. R. Civ. P. 56 ......................................................................................................11, 17

**Other Authorities**

Restatement (Second) of Contracts § 3 (1979), § 3 cmt. a .............................................18

Restatement (Second) of Conflict of Laws § 307 (1971) .......................................34, 35

Restatement (Second) of Conflict of Laws § 309 (1971) ..................................33, 34, 35

Restatement (Third) Agency § 5.03 (2006) ...................................................................30

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq.*, by and through his undersigned counsel, respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss [ECF 152] ("Motion" or "Mot.") filed by Defendants Magnify, Strand, Premero, Express, Green, and YHA.[1]

## I.    PRELIMINARY STATEMENT

The fraud in these Defendants' BLMIS accounts is staggering in its scope and brazenness.  By 2008, the two Magnify Accounts alone had purportedly generated close to $1 billion in fictitious value from a single $3 million deposit.  More incredibly, most of that was done without showing or purporting to effect a single securities trade.

In 1990, just months after Yair Green took control of Magnify, Magnify opened its second BLMIS account.  Magnify did not invest any money in this account nor did it receive a transfer of assets from any other BLMIS account.  Yet on its opening September 1990 customer ledger, a new history was created.  Magnify was credited with securities "purchased" in 1986 (four years before the account opened), the "sale" of those securities in May of 1990 (four months before the account opened), and new purchases from the "proceeds" of that sale also in May 1990.  From nothing, Magnify's new BLMIS account was now worth about $100 million. Based on that fraudulent beginning, it is no surprise that Madoff and the Defendants did away with even the pretense that BLMIS was trading securities in both Magnify Accounts, and never bothered even to create fake securities trading when Green established Strand and Premero and opened BLMIS accounts for them.  With the artifice of legitimacy dispensed, BLMIS's

---

[1] All capitalized terms herein carry the meanings ascribed to them in the Trustee's Second Amended Complaint ("SAC") [ECF 143].

employees, working at Madoff's direction, ceased creating and sending account statements. Instead, Green, on behalf of Magnify, Strand and Premero, regularly met with Madoff to agree upon the accounts' growth.  Once they reached an agreement, Madoff would generate a final, single page "Portfolio Evaluation," which purported to show Magnify's, Strand's and Premero's assets under management.

To combat the irresistible inference that Green knew Madoff was not trading securities but simply making up numbers to give Defendants money, Defendants submit a mountain of alternative facts: Green's 38-page affidavit attaching nearly 1,000 pages of exhibits.  Almost everything submitted by Green goes well beyond the pleadings, and in many cases suffers from problems concerning authenticity, accuracy and relevance.

Even if the Court were to accept Green's invitation to improperly review this evidence, it still does not help Defendants.  This is because the crux of their submission is that Green had nothing to do with any of these accounts until 1995.  If that were true, all it would mean is that someone else was involved in the initial fraudulent creation of $100 million, and that Green simply succeeded to that role and commenced both directing the amount of the returns and doing away with the façade of securities trading.  But the well-pleaded allegations in the SAC, which must be presumed true here, demonstrate specifically that Magnify's creator (Albert Igoin) ceded control to Green *in 1989*.  And the SAC further alleges that through his control of Magnify, Green paid millions of dollars to himself and his family, and used the stolen money to fuel philanthropy for a slate of personal rewards, including honorary doctorates and board positions.

Because the SAC plausibly alleges facts demonstrating Defendants' actual knowledge of the fraud, the Motion should be denied. [2]

---

[2] By stipulation so ordered by this Court on December 13, 2017 [ECF 155], the parties agreed that the Trustee's time to respond to the argument raised in "Point V" of the Motion shall be stayed until the Court reaches a determination

## II.    STATEMENT OF FACTS

Defendants claim that "the operative facts pertaining to this matter are set forth in the

Green Aff[idavit] and the Exhibits annexed thereto." Mot. at 6. Yet on a Rule 12(b)(6) motion

the operative facts are those alleged in the SAC, which are summarized here.

### A.    Green Operated at the Center of the Web of Defendants' BLMIS Accounts.

Magnify was created in 1983 when Igoin, a longtime Madoff associate, sought to open a

BLMIS account because, as he explained to his skeptical banker, Madoff guaranteed a 25% -

30% return.  SAC ¶¶ 48-49.  The banker asked Brunner, a Swiss attorney, to organize Magnify,

and, shortly thereafter, Igoin instructed Brunner to transfer about $3 million to fund the Magnify

I Account.  SAC ¶¶ 39, 49, 51.  Contrary to BLMIS's usual practice, it opened that account

without any account opening documents.  SAC ¶¶ 52, 80 n.5.  For the next six years, BLMIS

generated and issued regular monthly statements, reporting little to no trading activity.  SAC ¶ 76.

### 1.    Green Controlled Magnify and YHA.

Green met Igoin in the late 1980s, and together they created YHA.  SAC ¶ 53.  At Igoin's

request, Green created and registered YHA with the Israeli Registrar of Associations as a

"research association" to promote and support applied science research in Israel.  SAC ¶¶ 53, 54.

In 1989, Green opened YHA's BLMIS account, which, like every other penny YHA would ever

receive, was funded by a transfer from a Magnify Account.  SAC ¶¶ 53, 65.  In December 1989,

Igoin transferred control of Magnify to YHA and Green.  SAC ¶¶ 56, 58. After introducing

Green to Brunner as "the person that then would deal with the fate of Magnify" (SAC ¶ 56),

Igoin directed Brunner to transfer the Magnify corporate entity to YHA.  Brunner complied and

transferred Magnify's bearer shares to YHA by physically delivering them to Green.  *Id.*

---

on the remainder of the Motion, at which point the parties will file a stipulation setting forth a briefing schedule as to
that argument.

Thereafter, Brunner received no further contact from Igoin, and took direction exclusively from Green. SAC ¶¶ 56, 129. After receiving the bearer shares in 1989, Green opened a bank account for Magnify at Bank Hapoalim. SAC ¶ 57.

Despite the clear transfer of title of the Magnify entity to YHA, YHA and Green have denied their control over Magnify. YHA originally informed the Israeli Registrar of Associations that Igoin was its source of funds, and later claimed that it was funded by a donor who sought anonymity. SAC ¶¶ 54, 141. Presumably to preserve the fiction that the source of YHA's funds was an "anonymous donor" and not Magnify, Green generally avoided directing withdrawals from YHA's BLMIS account. SAC ¶ 141. For similar reasons, YHA never received fictitious Portfolio Evaluations like those delivered to Green in connection with Magnify, Strand and Premero as early as 1992; instead, BLMIS generated monthly customer statements of the kind it did for all other customers. SAC ¶¶ 44, 106. As those statements reveal, however, the only source of funds YHA ever received were transfers directed by Green out of the Magnify Accounts. SAC ¶¶ 58-59, 61, 65.

After Igoin's death in 1995, Green solidified his control over Magnify and dramatically increased Magnify's funding of YHA. SAC ¶¶ 66, 69, 144. Green presented himself, both publicly and privately, as having control over YHA's grant process. SAC ¶¶ 59-60, 142-143. For the next 13 years, until BLMIS collapsed in 2008, YHA distributed more than $120 million to prominent Israeli institutions, all of it fictitious profits transferred from the Magnify Accounts, garnering Green public accolades and honorary positions for his philanthropy. SAC ¶¶ 5, 8.

**2.    Green Created and Controlled Strand and Premero, and Used Magnify and its Related Entitles for his own Purposes.**

Green created the other accountholder Defendants – Premero in 1992 and Strand in 1998 – for the sole purpose of receiving funds from BLMIS through BLMIS accounts. SAC ¶¶ 63,

117.  For these accounts, BLMIS never generated any documentation other than the fictitious

Portfolio Evaluations, discussed below.  SAC ¶¶ 44, 52, 63, 103, 108-09.  No one but Green

communicated with anyone at BLMIS concerning these accounts.  SAC ¶¶ 41-42, 45(c), 63, 117.

Premero was created by Green in 1992 as an investment vehicle for himself or on behalf

of a client and held two BLMIS accounts.  SAC ¶ 41.  Green created Strand as a "wholly owned"

subsidiary of Magnify.  SAC ¶ 42.  Green directed approximately $1.5 million from Strand to

various offshore destinations, including $500,000 to a Cayman investment fund, $300,000 to his

children's U.S. bank accounts, and $130,000 to his secretary.  SAC ¶ 119.  Strand is credited

with a single principal deposit of $500,000.  SAC, Ex. B.  Green's control over Magnify and

Strand was such that he used them both as collateral to secure personal obligations.  SAC ¶¶ 61,

63.

The $1.5 million in withdrawals from Strand was only part of the $12 million that Green

directed be transferred from BLMIS to Magnify's and Strand's bank accounts at Credit Suisse in

Switzerland.  SAC ¶¶ 72-73, 119.  In addition, Green paid himself over $3 million to "manage"

the Magnify Accounts and withdrew more than $1 million from the Magnify Accounts to finance

Magnify's "ongoing activities," even though Magnify was a shell investment vehicle with

minimal costs.  SAC ¶¶ 69-71, 74, 102-03, 119.  All told, Green withdrew approximately $15

million from Magnify and Strand for his own purposes. SAC ¶ 72.

### B.   The Lack of Real Securities Trading was Patently Obvious to the Defendants.

### 1.   The 1990 MCI Transaction in the Magnify II Account Created Approximately $100 Million out of Thin Air.

In the months after Green took control of Magnify's BLMIS account, the Magnify I

Account spawned several subaccounts, which purported to engage in short sales entered with the

benefit of hindsight to create maximal value (approximately $17 million) from the holdings

purportedly in the account.  SAC ¶ 79.  After purportedly executing these trades, the new

subaccounts closed.  *Id.*

The creation of $17 million was apparently insufficient, because BLMIS then

implemented a more dramatic method of creating fictitious value for Magnify.  With no opening

documents, or initial deposit, the Magnify II Account was created.  SAC ¶ 80.  On its first

customer ledger, dated September 1990, the Magnify II Account shows that the account opened

with a zero balance.  SAC ¶¶ 82-83.

BLMIS created fake trades purporting to show "purchases" of MCI stock dated October

21, 1986 – four years earlier and four years before the account opened.  SAC ¶ 85. The customer

ledger shows a corresponding "sale" of much of this MCI stock on May 18, 1990, four months

before this account opened.  SAC ¶ 86.  This "sale" grossed nearly $120 million. The $120

million was then used to "purchase" various securities between May 21-23, 1990 (again, months

before the account purportedly opened) so that the September 1990 customer ledger reflected

securities holdings worth approximately $97 million and a "new [cash] balance" of over $12

million.  SAC ¶¶ 82, 84, 86-87.  The end result was the creation of more than $100 million from

literally nothing.  SAC ¶ 84.

**2.    BLMIS and the Defendants Abandoned the Pretense of Securities
Trading with the Portfolio Evaluations.**

By at least 1993, Green personally met with Madoff two or three times a year at BLMIS

to discuss the Magnify Accounts, and eventually Strand's and Premero's accounts as well. SAC

¶ 92.  Green regularly called Madoff directly (SAC ¶ 94), and often wrote to Madoff, stating it

was "imperative" to meet on a more frequent basis regarding Magnify's portfolio and their

"mutual interests."  SAC ¶ 93.  At those meetings, Madoff, Green and DiPascali came to an

understanding regarding Magnify's, Strand's and Premero's rates of return.  SAC ¶ 130.  It was

6

also at those meetings when they finalized the only documentation generated by BLMIS for the

accounts: single page Portfolio Evaluations, purporting to represent the account "holdings" for

Magnify's, Strand's and Premero's accounts as of a date a month or two prior, an example of

which is below:



*See* SAC ¶¶ 9, 90-92, 95-97, 99.

These lists of holdings were devoid of any historical information or transaction-level detail for any security allegedly bought or sold for the accounts, such as trade dates, settlement dates or trade prices. SAC ¶ 90. Green did not receive any records reflecting the execution of his requests for withdrawals or inter-account transfers, or even reflect the few deposits made in Premero's accounts. SAC ¶¶ 44, 90-91, 99-103, 107-10. Instead, roughly every four to six months, Green would meet with Madoff and DiPascali again to receive another set of Portfolio Evaluations that reflected an ever-increasing value at the promised rate of return. SAC ¶¶ 95-97. Green actively participated in the creation of these Portfolio Evaluations, as discussed below, by retroactively distributing the purported "holdings" between Premero's two accounts to reach a desired value. SAC ¶¶ 95-97, 133.

### 3. The Facially Fraudulent Nature of the Portfolio Evaluations Was Particularly Obvious to Green, Who Paid Himself to Monitor the Accounts.

In 1996, Green executed a Fee Agreement between himself and Magnify, under which he became the titled manager and supervisor of Magnify's "investment portfolio" (which comprised only the Magnify Accounts) and received a percentage of Magnify's purported profits. SAC ¶ 69. This Fee Agreement, which Green made retroactive to January 1995, assured there would be no oversight of Green's dealings with BLMIS. SAC ¶ 69-70. Under the Fee Agreement, Green was required to manage and supervise the funds and investment strategy in the Magnify Accounts. Although Green could not possibly discharge those duties with the documents he was given, Green concededly paid himself more than $3 million to do so. SAC ¶¶ 102-03, 71.

## III.   PROCEDURAL HISTORY

The initial complaint was filed on December 6, 2010, and a First Amended Complaint was filed on September 21, 2011. Former Defendants Kurt Brunner ("Brunner") and Osnat

8

Dodelson ("Dodelson") moved to dismiss for lack of personal jurisdiction and *forum non conveniens* on or around August 30, 2011, and on June 15, 2012, the Court issued a Memorandum Decision and Order Denying Defendants' Motion to Dismiss and granting the Trustee the authority to conduct jurisdictional discovery into Brunner's contacts with the United States. [ECF 97].  Under the limited jurisdictional discovery, the Trustee deposed Brunner in November 2012.[3]

Defendants filed their answer on January 18, 2012 [ECF 63], and the parties have engaged in fact discovery since March 2012.  [ECF 76].  The parties have exchanged written discovery requests and produced documents, but have not taken any depositions.  [ECF 141].  Most recently, the parties held a meet and confer on December 6, 2017, to discuss outstanding document discovery issues and the scheduling and order of depositions.

## IV.    STANDARD OF REVIEW

"In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff."  *Ginx, Inc. v. Soho All.*, 720 F. Supp. 2d 342, 351 (S.D.N.Y. 2010), *as corrected* (Aug. 19, 2010) (*citing Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003)).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court outlined a two-step approach to deciding a motion to dismiss.  First, the court should identify "pleadings that, because they are no more than [legal] conclusions, are not entitled to the assumption of truth."  556 U.S. at 679. Second, the court should assume the veracity of all "well-pleaded factual allegations," and determine whether, together, they plausibly give rise to an entitlement of relief.

---

[3] Brunner and Dodelson have since been dismissed from this action.

*Id.* Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Complaints alleging fraud must also meet the heightened pleading standard of Rule 9(b), which nonetheless permits "[m]alice, intent, knowledge, and other conditions of a person's mind" to be pleaded generally. *Picard v. Merkin*, 440 B.R. 243, 254 (Bankr. S.D.N.Y. 2010) (*quoting* FED. R. CIV. P. 9(b)). Moreover, "this Court is mindful of the vastness and complexity of the Trustee's investigation of the Madoff Ponzi scheme, and the disadvantage the Trustee faces in pleading fraud against multiple defendants." *Id.* at 254. The Trustee is accorded "greater liberality in the pleading of fraud" because he is a third party outsider to the fraudulent transactions who must plead the fraud on secondhand knowledge. *Id.* (*quoting Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999)); *Nisselson v. Drew Indus. Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998) (a bankruptcy trustee may plead scienter based upon information and belief because he rarely has personal knowledge of the events preceding his appointment).

## A.    Green's 38-Page Affidavit and Hundreds of Pages of Attached Exhibits may not be Considered on this Motion to Dismiss and Must be Excluded.

The purpose of a 12(b)(6) motion is to test the "legal feasibility" of the SAC's allegations, not their veracity: to "challenge the complaint as presented by the plaintiff, taking no account of its basis in evidence." *Goel v. Bunge*, 820 F.3d 554, 559 (2d Cir. 2016). "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

A court may look beyond the four corners of the complaint only to consider a "narrow universe" of documents, specifically: (1) documents attached to the complaint; (2) documents incorporated into the complaint by reference; (3) documents that are "integral" to the complaint;

and (4) documents of which the court may take judicial notice, provided certain criteria are met.

*Faulkner*, 463 F.3d at 134; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153-54 (2d Cir. 2002).

Contrary to Defendants' apparent position, a court may not consider every document of which a

plaintiff was aware at the time he drafted the complaint. *Chambers*, 282 F.3d at 153 ("[W]e

reiterate here that a plaintiff's *reliance* on the terms and effects of a document in drafting the

complaint is a necessary prerequisite to the court's consideration of the document on a dismissal

motion; mere notice or possession is not enough.") (emphasis in original).  When presented with

other material "outside the pleadings," a court must either exclude the material or convert the

motion to one for summary judgment, giving all parties a "reasonable opportunity to present all

the material that is pertinent to the [Rule 56] motion." FED. R. CIV. P. 12(d); *Global Network

Commc'ns, Inc. v. New York*, 458 F.3d 150, 156 (2d Cir. 2006).

> ### 1.    Green's Affidavit Falls Under no Conceivable Category of Documents that may be Considered on a Motion to Dismiss.

"[A] motion to dismiss is not the proper vehicle for [the movant] to tell its side of th[e]

story." *GeBBS Healthcare Sols., Inc. v. Orion Healthcorp, Inc.*, No. 1:16-CV-2206-GHW, 2017

WL 1251143, at *4 (S.D.N.Y. Apr. 4, 2017).  In this case, Green has provided a 38-page

narrative comprising his testimony concerning factual allegations and arguments he would make

at trial in response to the Trustee's allegations. ("Green Aff.").  He avers, for example, that:

- "I had absolutely nothing to do with the BLMIS Accounts of Magnify until …" Green Aff. ¶ 13;

-  "I never saw [YHA's BLMIS] customer statements until after the collapse of BLMIS." Green Aff. ¶ 15;

- "I never saw the September 1990 Magnify customer statement until after it was produced by the Trustee in this litigation." Green Aff. ¶ 16;

- "At the time when Igoin first showed me the Magnify Portfolio Evaluations dated as of 12/31/92, he explained to me that such was the manner in which Madoff/BLMIS reported to him on those two Accounts." Green Aff. ¶ 17;

11

- "After I caused Strand to be created, as a wholly-owned subsidiary of Magnify, I opened the Strand Account with BLMIS, and Madoff suggested and I agreed to implement the same method of reporting the holdings in the Strand Account as was already in effect for Magnify, to wit, the semi-annual Portfolio Evaluations." Green Aff. ¶ 18;

- "My semi-annual meetings with Madoff covered all of the portfolios of Magnify, Premero, and Strand that were then in existence at the time of each such meeting, and those meetings lasted no more than 1-1.5 hours each." Green Aff. ¶ 37, fn. 12.

There is no set of circumstances under which such testamentary material could be considered on a motion to dismiss. *See, e.g.*, *Brown v. Marriott Int'l, Inc.*, No. 14CV5960SLTMDG, 2017 WL 4484194, at *13 (E.D.N.Y. Sept. 29, 2017) ("[A] district court errs when it considers affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda.") (*citing Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991)); *KiSKA Const. Corp.US v. G & G Steel, Inc.*, No. 04CIV9252CSH, 2005 WL 1225944, at *4 (S.D.N.Y. May 20, 2005); *Friedl v. City of New York*, 210 F.3d 79, 84 (2d Cir. 2000) (District Court committed reversible error by considering defendants' factual contention, contained in a declaration).

### 2.    The Vast Majority of the Exhibits may not be Considered on a Motion to Dismiss, and None of Them "Gives The Lie" to the SAC.

Attached to Green's affidavit are 38 exhibits ("Green Exhibits"), totaling more than 800 pages, that he claims support his narrative. For the Court's convenience, attached as "Exhibit 1" is a chart summarizing the Trustee's position concerning the consideration of each exhibit as well as: (1) a description of each exhibit; (2) Defendants' argued basis for consideration; (3) the reference (if any) to the exhibit in the SAC; and (4) the SAC allegation (if any) the exhibit is purported to contradict. As the chart shows, the Green Exhibits fall into three general categories.

First, four of the Green Exhibits are properly incorporated by reference, such as the customer account ledger showing the spontaneous generation of more than $100 million in the

Magnify II account (which is pictured in the SAC).[4]  *See* Exhibit 1.  These are the only
documents appropriate for consideration on this Motion, and none of them is inconsistent with
any allegation in the SAC.

Second is a larger group of Green Exhibits that are relevant to factual allegations in the
SAC but may not be considered on this Motion because they are neither incorporated by
reference into, nor are they integral to, the SAC.  *See* Exhibit 1 (last column).  For example,
Green attaches as Exhibit G 72 pages of correspondence between YHA and BLMIS to show that
he did not sign it (the SAC does not allege that he did) and decades' worth of Portfolio
Evaluations to show that they were not always addressed to him (the SAC does not allege they
were).  Green Aff. ¶ 15.  As discussed below, this extrinsic evidence may not be considered on a
motion to dismiss. In any event, none of it contradicts the allegations in the SAC.

Third is a group of Green Exhibits that Green produced to the Trustee and plans to rely
on for his defense.  As discussed below and as set forth in Exhibit 1, these documents also may
not be considered because the Trustee did not rely on them in drafting the SAC.  Nor does the
Trustee accept their accuracy, authenticity or relevance, which in itself precludes their
consideration on this Motion.  While this group contains the only documents that are argued to
contradict specific allegations in the SAC, none of the Green Exhibits "gives the lie" to the SAC
as that term has been used in connection with dismissing a complaint—*i.e.*, indisputable
evidence that goes to the heart of the action and was misleadingly omitted.  Even if every
document submitted in the Green Exhibits were accurate, authentic and stood for the proposition

---

[4] Most of the documents that Green claims are "incorporated by reference" are not. For a document to be
incorporated by reference, the complaint must make "a clear, definite and substantial reference to the documents[,]"
*DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010); "merely mentioning a document" in the
SAC or offering "limited quotation" is insufficient. *Goel*, 820 F.3d at 559 (*citing Global Network Commc'ns*, 458
F.3d at 156); *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985) ("The documents here were to some extent
quoted, but limited quotation does not constitute incorporation by reference.").

Defendants suggest, at most Defendants would have created an issue of fact to be determined at trial.

### a.    The Green Exhibits are not "Integral" to the SAC Simply Because they may be Relevant to the Claims.

Facts may not be litigated on a motion to dismiss . *Dual Groupe, LLC v. Gans–Mex LLC*, 932 F. Supp. 2d 569, 572 (S.D.N.Y.2013) ("Defendants dispute many of the complaint's factual allegations, which the court cannot adjudicate at the motion to dismiss stage."). If a document is not attached to or incorporated into a complaint, it cannot be considered on a motion to dismiss unless it is "integral" to the plaintiff's claim: the plaintiff must have "reli[ed] on the terms and effect of [the] document in drafting the complaint." *Chambers*, 282 F.3d at 153. Courts deem documents integral to a complaint when they are "at the heart of the dispute." *Vaher v. Orangetown*, 916 F.Supp.2d 404, 423 n. 16 (S.D.N.Y. 2013)("In order for the contents of a document to be deemed integral to the complaint, they must be deemed necessary to the plaintiff's statement of a claim under Rule 8.").

Thus, for example, on a motion to dismiss courts have gone beyond the pleadings to include: (i) the contract at issue in a breach of contract action, *Broader v. Cablevision Systems Corp.*, 418 F.3d 187, 197 (2d Cir. 2005); *Chambers*, 282 F.3d at 153 n.4; (ii) allegedly defamatory material in a defamation action, *Murawski v. Pataki*, 514 F.Supp.2d 577, 589 (S.D.N.Y. 2007); and (iii) allegedly fraudulent material relied upon in a fraud action. *See Faulkner*, 463 F.3d at 134-135. As the Second Circuit noted in *Global Network Communications*, "[i]n most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls." 458 F.3d at 157 (rejecting extrinsic evidence that "would stretch beyond reason the meaning of integral in this context").

14

**b.**     **Courts may not Consider Documents Outside the Pleadings on a Motion to Dismiss, Particularly Where – as here – There is a Dispute as to their Authenticity, Accuracy and Relevance.**

Defendants appear to suggest that *any* document about which the Trustee was aware may be considered here because a plaintiff cannot "hide" documents from the court in order to "create a false impression." *See* Mot. at 10-11. For this proposition, Defendants rely on a line of cases in which plaintiffs deliberately avoided referring to documents that were integral to their complaint, such as: (i) the stock purchase agreement, offering memorandum, and warrant underlying the transaction into which plaintiffs claimed they had been fraudulently induced, *see Cortec Industries v. Sum Holdings*, 949 F.2d 42 (2d. Cir. 1991); (ii) the text of a state liquor authority's court-ordered "Reasons for Decision," an Article 78 petition and the decision on that petition, which collectively formed the factual underpinning for the key issues in dispute, *see Ginx v. Soho Alliance*, 720 F. Supp. 2d 342 (2000); and (iii) documents relating to the contract on which plaintiff's tortious inference claim was based and which the plaintiff had referenced and filed with the court in an earlier lawsuit involving the same parties. *See In re Lyondell Chem. Co.*, 491 B.R. 41, 51 (Bankr. S.D.N.Y. 2013), *aff'd*, 505 B.R. 409 (S.D.N.Y. 2014). None of these cases stand for the proposition that every document the defendant believes is favorable to his view of the facts can be considered on a motion to dismiss simply because the plaintiff was aware of it when drafting the complaint.

Here, Green asks the Court to consider – on a motion to dismiss – handwritten notes purportedly written by Igoin that refer to Magnify and a "trust," as well as documents referring to a "deed of trust" (but no document purporting to be an actual deed of trust), as contradicting the Trustee's allegations concerning Magnify's ownership. Green Aff. Ex. Z. He also asks the Court to consider notes that he claims are his contemporaneous notes of meetings with Igoin, to

15

contradict the Trustee's allegations regarding control over Defendants' accounts. None of this is appropriate on a motion to dismiss.

The Second Circuit has directed that a court "may not consider [an integral document] on a motion to dismiss if there is a dispute regarding the authenticity or accuracy of the document or the relevance of the document to the dispute," even if it otherwise satisfies the requirements for consideration. *Faulkner*, 463 F.3d at 134; *DeLuca*, 695 F. Supp. 2d at 60 (internal quotations omitted); *see also Barberan v. Nationpoint*, 706 F. Supp. 2d 408, 416 (S.D.N.Y. 2011) ("[T]he requirement that there be 'no dispute' about the authenticity of documents 'integral' to the complaint 'has been interpreted strictly: even implicit, conclusory, contradictory, or implausible objections to the authenticity or accuracy of a document render consideration impermissible.'"); *Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co*., 14 Civ. 1495 (ER), 2016 WL 4382709, at *7 (S.D.N.Y. Aug. 16, 2016) (citations omitted). As to certain documents submitted by Green, such as the notes referred to above, the Trustee disputes their authenticity, accuracy and relevance.

### B.  Converting the Motion to a Motion for Summary Judgment is not Requested by Either Party and is Inappropriate Here.

Where, as here, defendants seek to raise a factual dispute about the well-pleaded allegations in the complaint by submitting affidavits and extraneous material, it is inappropriate for the court to consider the extraneous material in ruling on the motion. *See Goel*, 820 F.3d 554 (considering extraneous materials on a motion to dismiss would improperly transform "the Rule 12(b)(6) inquiry into a summary judgment proceeding—one featuring a bespoke factual record, tailor-made to suit the needs of defendants"); *see also Chambers*, 282 F.3d at 155. If the Court does consider the extrinsic material, it must convert the Defendants' motion to one for summary judgment and "give the parties an opportunity to conduct appropriate discovery and submit the

additional supporting material contemplated by Rule 56." *Chambers*, 282 F.3d at 154; Fed. R. Civ. P. 12(d).

Notably, despite submitting hundreds of pages of documents falling far outside the "four corners" of the complaint, Defendants have not requested their motion be converted to one for summary judgment. This is because the case is not ripe for summary judgment: the parties are in the midst of discovery, have held numerous meet-and-confer conferences to resolve discovery issues (though several disputes remain outstanding), continue to exchange written discovery, and have yet to take a single fact deposition (although they have agreed that the majority of witnesses will likely have to be deposed abroad).[5] Because the parties have neither completed written discovery nor taken depositions, summary judgment is inappropriate here. This court should deny the motion to dismiss and allow the parties' discovery to continue.

## V.    THE SAC AMPLY ALLEGES DEFENDANTS' ACTUAL KNOWLEDGE OF BLMIS'S FRAUD

Defendants seek to dismiss Counts II – VII of the SAC claiming that the section 546(e) "safe harbor" insulates them from liability.[6] Mot. at 5-6. Their Motion should be denied because the Trustee has amply pleaded that Defendants "had actual knowledge that there were no actual securities transactions being conducted [at BLMIS]." *Picard v. Ceretti, et al.* (*In re Bernard L. Madoff Inv. Sec. LLC*), No. 08-99000 (SMB), 2015 WL 4734749, at *12 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*") (citing *Cohmad*, 2013 WL 1609154, at *4). Indeed, as to Strand and Premero, there is no basis to argue that section 546(e) even applies, as there were no

---

[5] The two jurisdictional depositions taken in this and a related case against Igoin's heirs were of Brunner, a Swiss citizen, and Laurence Apfelbaum, a French citizen, in London and Paris, respectively. Green and several other individuals involved with YHA are Israeli citizens and will be deposed in Israel.

[6] Defendants do not seek dismissal of Count I – fraudulent transfer pursuant to section 548(a)(1)(A) of the Code – as against Magnify, Strand and YHA. The SAC adequately pleads that those Defendants received transfers of fictitious profits that are avoidable under section 548(a)(1)(A) and are therefore unprotected by the 546(e) safe harbor.

documents purporting to be "securities contracts" nor any identified securities transactions for which "settlement payments" could have occurred.

A. **Section 546(e) does not Apply to Strand and Premero, for Whose Accounts BLMIS did not Enter into any Securities Contracts or Identify any Securities Transactions.**

The 546(e) safe harbor is facially inapplicable to both Strand and Premero. Section 546(e) shields transfers made "in connection with a securities *contract*," that is, an *agreement* in which two parties manifest their assent to enter into a securities transaction. *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 421 (2d Cir. 2014) (citing Restatement (Second) of Contracts § 3 (1979), § 3 cmt. a) (emphasis added). It also shields transfers constituting "settlement payments," which are "transfer[s] of cash or securities made *to complete [a] securities transaction.*" *Id.*, 773 F.3d at 422 (emphasis added). Strand and Premero entered into no securities contracts and BLMIS purported to engage in no securities transactions in their accounts.

In *Greiff*, the District Court held customers who executed BLMIS's trio of account opening documents, the Customer Agreement, Trading Authorization and Options Agreement had manifested their assent to enter into securities contracts. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 718-20 (S.D.N.Y. 2012) ("*Greiff*") (*citing Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011)). Neither *Greiff* nor any other decision has held that a customer manifests such assent when he or she neither executes account opening documents nor receives any documents purporting to confirm securities transactions. To the contrary, the decisions applying section 546(e) have held that account opening documents were the sole basis on which those customers had established a relationship with BLMIS and that those agreements therefore comprised a "securities contract." *See In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 418–19 (2d Cir. 2014) ("[T]he

18

Account Documents are agreements by which BLMIS will "acquire or dispose of securities" on

behalf of its customers."); *Grieff*, 476 B.R. at 720, *supplemented* (May 15, 2012), *aff'd sub*

*nom. In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014) (complaints

"acknowledge[d]" that defendants invested with Madoff Securities in the "expectation that

Madoff Securities would perform under the account agreements").  Here, not only did Strand and

Premero fail to enter into account opening agreements, they failed to take any action or receive

any document that can be characterized as a contract with BLMIS at all, let alone one involving

the purchase or sale of securities.

For similar reasons, the transfers from Strand's and Premero's accounts were not

"settlement payments" under section 546(e). *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d at

422 ("settlement payments" are "transfer[s] of cash or securities made to complete [a] securities

transaction") (*citing Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334

(2d Cir. 2011).  Regardless of BLMIS's failure to perform real securities trading, the Portfolio

Evaluations received by Strand and Premero did not purport to depict "transactions" – such as

purchases or sales – that could have been settled; they only contained lists of purported securities

positions as of a certain prior date.  Moreover, as to Strand, because Strand did not invest any

principal such as cash or securities into its account, there was no "transaction" between BLMIS

and the customer that could have been "settled" by the payment of fictitious profits.  The 546(e)

defense protects only "the reasonable expectations of investors who believed they were signing a

securities contract…for the purpose of trading securities in his account," and Strand and Premero

had no such expectation.  *Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC (In re*

*Bernard L. Madoff Inv. Secs. LLC)*, No. 12 Misc. 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y.

Apr. 15, 2013) ("*Cohmad*"); *Grieff*, 476 B.R. at 720 ("the defendants here, having every reason

to believe that Madoff Securities was actually engaged in the business of effecting securities

transactions, have every right to avail themselves of . . . § 546(e)").

>   **B.      Magnify Knew that BLMIS Reported Fake Trades in Magnify's Accounts
>   Beginning in 1990.**

The allegations that more than $100 million dollars was manufactured in the Magnify

Accounts through obviously backdated trades (SAC ¶¶ 80-88), in themselves, sufficiently allege

Magnify's subjective knowledge that BLMIS was not engaged in actual securities trading.  *See

Picard v. Avellino (In re BLMIS)*, 557 B.R. 89,116 (Bankr. S.D.N.Y. 2016) ("*Avellino*"); *Picard

v. Shapiro (In re BLMIS)*, 542 B.R. 100,113 (Bankr. S.D.N.Y. 2015) ("*Shapiro*").  In *Avellino*,

the Trustee sufficiently pleaded Mr. Avellino's actual knowledge by detailing the "Schupt"

process, in which – similar to this case – BLMIS manufactured value out of thin air and

delivered that value to the defendants through fake trades. 557 B.R. at 102, 116; *see also Picard

v. The Estate of Steven Mendelow* (*In re Bernard L. Madoff Inv. Sec. LLC*), 560 B.R. 208, 226

(Bankr. S.D.N.Y. 2016) ("*Mendelow*").  Similarly, in *Shapiro*, the Trustee adequately pleaded

actual knowledge through, among other things, allegations the defendant collaborated with

BLMIS to fabricate backdated trades to increase the value of accounts.  *Shapiro*, 542 B.R. at

113; *see also Kingate*, 2015 WL 4734749, at *14 (actual knowledge adequately pleaded through

allegations that defendants' review of feeder funds' performance disclosed impossible trades).

Because even Defendants cannot pretend the opening transaction in the Magnify II

Account was real, the crux of Defendants' defense is that Green "never received any of those

documents and had no involvement with the Magnify Accounts" until after Igoin died in 1995.

Mot. at 30, 33 (citing Green Aff. ¶¶ 13, 16, 17, 23; Exs. E, H).  This is contradicted by the

specific, well-pleaded allegations that, among other things: (1) Green controlled the Magnify

Accounts as of December 1989, when Igoin told Brunner that Green would be in charge of

20

Magnify,[7] Brunner transferred Magnify's shares to YHA and physically delivered them to Green, and Green opened a bank account for Magnify; (2) just months after this change in control Madoff began aggressively generating fake value in the Magnify Accounts; and (3) by 1993, Green was regularly meeting with Madoff and finalizing the Portfolio Evaluations.[8] SAC ¶¶ 56-58, 79-89, 92. Accordingly, the SAC's well-pleaded allegations, taken as true, establish Green's control over Magnify from 1989 forward and well before 1995 as Green attests.

In any event, the actual knowledge claim against Magnify does not depend on whether Green controlled the entity in 1990. Regardless of who controlled Magnify, the entity had actual knowledge that the creation of a hundred million dollars of "value" in the Magnify Accounts in 1990 and their underlying transactions – for which there was no principal – were fake. Magnify's knowledge would not be erased by virtue of Green's professed assumption of control in 1995. *See Fireman's Fund Ins. Cos. v. Meenan Oil Co.*, 755 F.Supp. 547, at *553 (E.D.N.Y. 1991) ("The process of acquisition simply does not sanitize the acquired corporation, notwithstanding either the fact that it has gained new owners and fresh management"); *In re Crown Vantage, Inc.*, No. 02-3836 (MMC), 2004 WL 1635543 at *5 (S.D. Cal. July 12, 2004) (noting that courts applying both New Jersey and New York common law "have found that a corporation retains its imputed knowledge even after a change of ownership."). Rather, any existing liabilities remained with, and were retained by, the entity. *Id.; see also Golub v. Kidder, Peabody & Co.*,

---

[7] Green's attack on the SAC based on the deposition testimony of Kurt Brunner is a perfect illustration of why extrinsic evidence is inadmissible on a 12(b)(6) motion. Green admits that Brunner made the statement he is alleged to have made, but highlights in his affidavit snippets of Brunner testimony that he argues contradicts this testimony. Green Aff. ¶ 13. Over the course of a two day deposition, Brunner made additional statements confirming the statement quoted in the SAC, which the Trustee reserves the right to present at the appropriate time. In any event, the proper interpretation of Brunner's testimony is a classic example of a factual dispute not appropriately resolved on a motion to dismiss or, for that matter, on summary judgment.

[8] Green's factual contention that he did not begin receiving Portfolio Evaluations until 1995 (Green Aff. ¶ 17), aside from being outside the pleadings and improper on this Rule 12(b)(6) motion, is belied by the very exhibits Green improperly seeks to submit, which include Portfolio Evaluations dating back to 1992 that were produced by Green in this action. Green Aff. Exs. I, J.

No. 89 CIV 5903 CSH, 2000 WL 1024688, at *4 (S.D.N.Y. July 25, 2000) ("Where a corporation is acquired by the purchase of all of its outstanding stock, the corporate entity remains intact and retains its liabilities, despite the change of ownership.").

Likewise, the actual knowledge claim against Green does not depend on when he took control over Magnify. The allegations in the SAC describe, among other things, Green's active participation in finalizing purported lists of "holdings" for Magnify's, Strand's and Premero's accounts that went up in value every six months or so with no explanation.

### C.    Green Knew Magnify's, Strand's and Premero's Account Records did not Reflect Securities Trading.

By 1993, Green began meeting with Madoff privately two to three times per year to discuss the Magnify Accounts (and later Strand's and Premero's accounts), and called Madoff on a regular basis. SAC ¶ 91, 94. Often, while in New York, Green met with Madoff socially, sometimes including their wives. SAC ¶ 94. Green's position in Madoff's inner circle allowed him access to and opportunity with Madoff that the vast majority of investors did not enjoy. *See Kingate*, 2015 WL 4734749, at *3 (noting Trustee's allegations that defendants were part of "Madoff's inner circle" because they met with Madoff "at least twice a year," engaged in "various telephone discussions," and had social outings with Madoff and their wives). Indeed, it was this connection that allowed Green the opportunity to participate in and prepare fraudulent Portfolio Evaluations alongside Madoff to generate fictitious value in Magnify's, Strand's and Premero's accounts.

### 1.    Green Participated in the Creation of Fraudulent Portfolio Evaluations Used to Create Value in Magnify's, Strand's and Premero's Accounts.

The inference of Green's actual knowledge is supported by well-pleaded allegations that during regular meetings with Madoff and DiPiscali, Green directly and actively participated in

22

manipulating the Portfolio Evaluations.  SAC ¶¶ 95-99; *see Avellino*, 557 B.R. at 116;

*Mendelow*, 560 B.R. at 226; *Shapiro*, 542 B.R. at 113 (actual knowledge inferred from

allegations defendant collaborated with and directed BLMIS personnel to manipulate trading

records to create specific gains and losses).  These documents reflected an allocation of shares as

of a date one to two months prior to Green's meetings with Madoff – often dated "as of" June 30

or December 31 of each year – and did not reflect actual securities trading.  SAC ¶ 91-92, 97.

The fictitious statements were created by a BLMIS employee who, in the days leading up to

Green's visit, reviewed copies of previous Portfolio Evaluations and computed a projected

account value based on an expected rate of return.  SAC ¶ 96.  From the projected or expected

account value, the employee would then back into a fictitious portfolio of holdings to reach the

promised amount.  *Id.*

Once Green arrived at BLMIS, he would meet with Madoff and DiPascali to direct

changes to the Portfolio Evaluations that were tailor-made for his review.  SAC ¶ 97, 99.  Indeed,

Portfolio Evaluations for Premero were stamped "draft" until after Green had an opportunity to

review them. SAC ¶ 95.  Green and Madoff would also discuss the rate of return in the Magnify,

Strand and Premero accounts, and reached or reconfirmed an agreement regarding that rate of

return. SAC ¶ 98.  Green then instructed DiPascali to split the "holdings" on Premero's single

Portfolio Evaluation into two separate Portfolio Evaluations, some one to two months *after* the

securities depicted in the single Portfolio Evaluation had already purportedly settled. SAC ¶¶ 92,

97, 133.  Once Green directed the requisite changes to the Portfolio Evaluations, the BLMIS

employee would enter the changes and provide the resulting Portfolio Evaluation to Green.  SAC

¶ 97.  Green knew that the manipulation of these documents could not possibly reflect actual

securities trading, but nevertheless participated in crafting these documents to ensure an ever-increasing equity value for his use and benefit.  SAC ¶ 97, 99.

Green's direct participation in on-the-spot manipulation of account records is analogous to the "Schupt" process at issue in *Avellino* and *Mendelow*, where the defendants collaborated with Madoff to revise account statements so that they would exhibit a promised rate of return. *See Avellino*, 557 B.R. at 116 (defendant involved in directing BLMIS employees regarding the execution of the Schupt process, which was designed to deliver a promised rate of return); *Mendelow*, 560 B.R. at 226 (defendant actively participated in calculating the Schupt payments necessary to hit a guaranteed rate of return); *see also Shapiro*, 542 B.R. at 113 (defendant helped BLMIS manipulate account records to create specific gains and losses).  Green, like Mr. Avellino, is alleged to have garnered a promised rate of return from Madoff, tracked Magnify's, Strand's and Premero's returns, and communicated with BLMIS employees regarding how to allocate fictitious securities positions among accounts.  SAC ¶¶ 95, 97, 98; *Avellino*, 557 B.R. at 116.  Because he was assisting in the creation of the returns, Green knew that the securities holdings depicted on the Portfolio Evaluations "could not be real."  *See Shapiro*, 542 B.R. at 113 (finding actual knowledge where Trustee alleged that after Madoff meeting, BLMIS "issued 'revised' monthly statements reflecting fictitious trades through pure financial alchemy, wiped out the lost value.'").  These allegations, taken as true, plausibly show that Green – like Mr. Avellino – had actual knowledge that BLMIS was not engaged in securities trading. *Avellino*, 557 B.R. at 116; *Mendelow*, 560 B.R. at 226.

> **2.    Green Knew That the Portfolio Evaluations Did Not Reflect Securities Trading.**

This is not a case in which customers had suspicions, doubts or concerns as to whether the securities trading reflected on their account records was real. This is a case—the only case—

in which Madoff failed to provide the Defendants with any indication that any actual securities were being traded at all, for more than a decade. SAC ¶¶ 10, 90. *Cf. Kingate*, 2015 WL 4734749, at *13 (Trustee alleged actual knowledge by alleging, among other things monthly statements received by defendants depicted "trades on margin even though the Kingate Funds did not maintain margin accounts, settlement dates that were inconsistent with industry practice, option trades that did not identify counterparties, and over-the-counter option trades that included CUSIP numbers."). The Portfolio Evaluations were devoid of any information about how the accounts were supposedly growing, much less how the account values implacably grew no matter how much money Defendants withdrew. SAC ¶ 99. Moreover, after 1999, the Portfolio Evaluations listed only U.S. Treasury Bills or Fidelity money market mutual funds, rather than stocks, and the instruments reflected on the statements were incapable of generating the yields reflected. SAC ¶¶ 99, 100.

In an attempt to normalize the Portfolio Evaluations, Defendants deny that Green ever saw YHA's customer statements until after BLMIS's collapse. *See* Mot. at 31 (*citing* Green Aff. ¶¶ 15, 38). The SAC alleges specifically that Green was aware of and reviewed the standard form monthly customer statements and trade confirmations YHA received for its account. *See* SAC ¶¶ 106, 91 (alleging Green knew YHA, which was subject to regulatory reporting requirements, received regular monthly statements, and was fully aware of what those statements looked like); SAC ¶ 40 (alleging Green's "control over YHA and … the flow of funds into its [BLMIS] Account"); SAC ¶ 53 (alleging Green's direct involvement in the opening of YHA's BLMIS account and its initial funding in 1989); SAC ¶ 80 fn. 5 (alleging Green's execution of customer agreements on YHA's behalf). Even if Green had not been aware that the Portfolio Evaluations were contrary to BLMIS's standard practice, he knew they were contrary to any

25

legitimate investment advisor's practice. *See Kingate*, 2015 WL 4734749, at *14 (actual

knowledge inferred from allegations defendants reviewed trading activity that was contrary to

industry practice).  The Portfolio Evaluation depicted in the complaint depicts "holdings" in the

Magnify II Account of almost $600 million in US Treasury bills, an amount that had grown

steadily every few months no matter how much money was withdrawn.  SAC ¶ 99.  It is not

plausible that Defendants subjectively believed, based on no other information, that BLMIS was

trading securities in those accounts.

### 3.    Green's Fee Agreement Further Supports His Actual Knowledge of Fraud.

Even if Green had never seen a "normal" fake BLMIS customer statement, the face of a

Portfolio Evaluation lacks any of the information an accountholder would expect to see, such as

what "trades" were effectuated, when and at what quantity and price, whether any dividends

were paid, whether deposits, withdrawals or inter-account transfers had been carried out, or any

other explanation for how the account value grew between every single bi-annual meeting.  SAC

¶¶ 90-91, 99-110.  But Green was not just an accountholder; he was Magnify's investment

manager.  SAC ¶ 58.

The significance of the Fee Agreement is not simply that Green failed to perform his

management obligations: it is that by drafting it, signing it, and paying himself under it, Green

(an attorney) expressly undertook diligence obligations and acknowledged that he understood

them—obligations he could not possibly have performed based on the information he received.

Under the Fee Agreement, Green was responsible for setting and implementing Magnify's

investment policies, safeguarding its funds, examining Magnify's earnings, and supervising the

"movement of funds" in Magnify's portfolio.  SAC ¶ 102.  It was flatly impossible to perform

these duties based on the scant information found in the Portfolio Evaluations. SAC ¶ 103. For

example, since the Portfolio Evaluations did not reflect the supposed cash in the accounts, Green

would have had no way of knowing whether Magnify's, Strand's or Premero's accounts had

sufficient cash available to support the transfers he directed to YHA and elsewhere if they had

actually been trading in securities.  SAC ¶ 103.  Even the few deposits of real money into

Strand's and Premero's accounts were not confirmed by BLMIS, and indeed some of these

deposits were erroneously credited to the wrong Premero account and never corrected.  SAC ¶

110.  None of that mattered, because Green knew that BLMIS was simply providing money to

him on demand – not undertaking any legitimate business, let alone making money by trading

real securities.

> **D.** **Green Benefitted Personally and Professionally from Siphoning Millions of Dollars from BLMIS, Without Risking a Dime of His Own Money.**

Defendants claim that they could not have known that BLMIS was a fraud because it

would be "absurd to think that Green would *leave approximately $770 million on deposit in*

*Magnify's BLMIS accounts* if he knew that BLMIS was running a Ponzi scheme." Mot. at 19

(emphasis added). To the contrary, the SAC alleges that Green well knew that this $770 million

was imaginary: *it is impossible for $3 million to grow to more than $750 million over and above*

*the more than $150 million in withdrawals*.  SAC ¶ 89.  Green enjoyed exclusive control over a

portfolio whose on-paper value grew from just $3 million to over $800 million in 25 years,

orchestrating over $150 million in transfers consisting almost exclusively of fictitious profits to

himself, his family members, YHA and other personal ends.  SAC ¶¶ 4-5, 8, 66-68, 71-74. Green

did so without investing a single dime of his or anyone else's own money.

This case is therefore not comparable to the BLMIS "fund manager" scenario relied on

by Defendants in their Motion. Those cases typically deal with a defendant collecting money

from investors and placing that money into investment vehicles linked to BLMIS. *See, e.g.,*

*Picard v. Legacy Capital et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, 548 B.R. 13, 18 (Bankr.

S.D.N.Y. 2016) (defendant was a corporation that functioned as a "single purpose vehicle to

invest in BLMIS") ("*Legacy*"); *Picard v. Merkin, et al. (In re Bernard L. Madoff Inv. Sec. LLC)*,

515 B.R. 117, 125 (Bankr. S.D.N.Y. 2014) (defendant was an "investment manager" who

"managed several funds," including funds linked to BLMIS) ("*Merkin*"). In those cases, the

defendants undertook substantial risk by investing their clients' principal with BLMIS—risk that,

this Court has found, defendants would not plausibly have assumed had they actually known

BLMIS was not trading securities. *See Legacy*, 548 B.R. at 33 ("While greed may cloud

judgment, it is not plausible that the average financial professional owing fiduciary duties to its

own clients and investors would knowingly invest their money in a Ponzi scheme that is doomed

to collapse.") (*citing Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M.

Fabrikant & Sons, Inc.)*, 480 B.R. 480, 489 (S.D.N.Y. 2012). Here, by contrast, Green had

nothing to lose by remaining invested with BLMIS because neither he – nor any "clients" –

invested any money (principal) into Magnify's or Strand's accounts. SAC ¶¶ 4, 89, 123. And

the only person who did invest principal – Igoin – passed away in 1995. SAC ¶¶ 48, 51.

While he had nothing to lose, Green had much to gain from the fraud—not only in

transfers to himself and his family but also in the form of power, prestige and honors earned for

orchestrating over $125 million in donations to prominent institutions throughout Israel. SAC ¶¶

5, 8, 58-59, 66-67. From 1989 onward Green exercised *de facto* control over YHA, Magnify,

and the flow of funds between the two entities' BLMIS accounts. SAC ¶¶ 40, 53, 58. Green, as

YHA's legal representative (SAC ¶ 55), held himself out as YHA's "co-founder," who "guided

the organization's activities." *Id.* Using that control, Green exploited his unique access to

Madoff to siphon increasingly exorbitant sums for YHA's benefit (SAC ¶¶ 66, 67), garnering

28

public recognition from prominent institutions in the process.  SAC ¶ 8.  For example, Green

earned honorary doctorates from Bar Ilan University and Ben Gurion University after those

institutions collectively received over $28 million from YHA.  SAC ¶ 8.  Green also was elected

to the board of trustees of the Weizmann Institute, which received more than $13.5 million from

YHA.  SAC ¶ 8.  Based on these well-pleaded allegations, it is certainly plausible that Green

received these accolades in part because of YHA's donations, providing Green with a motive to

continue dealing with BLMIS despite his actual knowledge of fraud.

When Igoin died in 1995 (SAC ¶ 66), Green drastically increased the magnitude and

frequency of transfers from the Magnify Accounts to YHA's BLMIS account (SAC ¶ 66),

allowing YHA to increase its "donations" in near lock-step.  SAC ¶ 67.  While Defendants invite

the Court to infer that these increases were due to Green's assumption of control in 1995 rather

than 1989 (Mot. at 42-43), it is more plausible that Green simply felt at liberty to amplify YHA's

donations after Igoin died because the modest framework Igoin originally intended (as evidenced

by the relatively low number of transfers from Magnify to YHA between 1989-1995 (SAC ¶ 66))

was no longer an obstacle standing in the way of Green's goals.  This inference is directly

supported both by Green's drafting, *after* Igoin's death, the Fee Agreement that bestowed

significant management fees (SAC ¶¶ 69, 102-03), and also by Green's *de facto* self-appointment

as Magnify's Managing Director in 1995.  SAC ¶¶ 38-39, 116.

The SAC further alleges that the Israeli Registrar of Associations made multiple requests

that YHA disclose the source of its funding.  SAC ¶¶ 53-54.  Yet YHA (which was controlled by

Green) refused to divulge Igoin's (and Madoff's) names. SAC ¶ 54.  These allegations plausibly

support an inference that Green sought to conceal YHA's source of funding for fear of further

inquiry. *See, e.g.*, *Kingate*, 2015 WL 4734749, at *14 (Trustee plausibly alleged defendants had

actual knowledge in part because they "took steps to deflect inquiries directed at Madoff implying that they feared what might be discovered"). It is more than plausible that Green had a motive to ensure that the Registrar did not discover YHA's "donations" originated from a Panamanian company whose founder was deceased, with assets being managed by BLMIS and controlled exclusively by Green (who also served in an official capacity as YHA's legal counsel).

## VI.    PREMERO ALSO LACKED GOOD FAITH UNDER SECTION 548(C)

Defendants also move to dismiss the Trustee's claim to avoid and recover, under section 548(a)(1)(A) of the Bankruptcy Code, $1,468,902 in transfers of principal made to Premero on the ground that the Trustee has failed to alleged Premero's lack of good faith. Mot. at 4, 43-51 (citing 11 U.S.C 548(c)). But a transferee who takes with "actual knowledge" cannot sustain a good faith defense. *See Kingate*, 2015 WL 473479, at *16 ( "[i]f the Funds had actual knowledge that Madoff was not trading securities … they did not receive the initial transfers in good faith within the meaning of 11 U.S.C. § 548(c)"); *Shapiro*, 542 B.R. at 116 ("Because [certain defendants] had actual knowledge, they did not receive the transfers in good faith.").

The Trustee has specifically alleged that Green founded Premero, served as the company's managing director and "sole representative," and supervised its portfolio. SAC ¶ 41. The SAC also alleges that Green met with Madoff at least twice per year to discuss Premero's portfolio – including to come to an agreement or understanding regarding Premero's rate of return – and that Green reviewed Premero's Portfolio Evaluations which were addressed to him. SAC ¶ 133. Green's subjective knowledge of the fraud, as alleged in the SAC, is imputed to Premero on agency principles. *See* Restatement (Third) Agency § 5.03 (2006); *see id.* § 5.03 cmt. b; *Merkin*, 515 B.R. at 146-47 (finding under "well-established principles of agency law," the Trustee had adequately established Merkin was an agent of other defendants sufficient to

30

impute willful blindness); *Picard v. Chais (In re BLMIS)*, 445 B.R. 206, 223 (Bankr. S.D.N.Y.

2011).

If these allegations did not demonstrate Green's subjective knowledge of the fraud, they

would alternatively suffice to allege his willful blindness; specifically, that Green (1)

subjectively believed that there was a high probability that BLMS was engaged in a fraud, and

(2) took deliberate actions to avoid learning of that fact. *Merkin*, 515 B.R. at 139 (*citing Global-

Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011)). On the first prong, the SAC

alleges that Green knew of quantitatively impossible fictitious trading activity, (*see, e.g.*, SAC

¶¶ 86, 88, fn. 6), and that the Portfolio Evaluations did not suggest actual securities trading. As

to the second prong, if Green did not have subjective knowledge of the fraud, his ability to turn a

"blind eye" to it would be superhuman. His failure to request even the most basic questions as to

where the growth in the accounts was coming from, despite paying himself to manage the

accounts, and accepting the single-page Portfolio Evaluations as an appropriate method of

reporting for a portfolio that supposedly grew to the astronomical size of approximately $800

million (SAC ¶¶ 89-90, 99, 31, 69-7, 102-03) was a caricature of deliberate action to avoid

confirming the fraud. *See Merkin*, 515 B.R. at 139-140; *Kingate*, 2015 WL 4734749, at *13.

Accordingly, because Green lacked subjective good faith, Premero's defense under section

548(c) must fail.

## VII.   THE TRUSTEE HAS SUFFICIENTLY PLEADED THAT MAGNIFY AND STRAND ARE ALTER EGOS OF GREEN

The Trustee's well-pleaded allegations establish that Green should be held personally

liable for the fraudulent transfers received by Magnify and Strand because those entities existed

as Green's alter egos. As a preliminary matter, the determination and extent of a corporation's

domination is a question of fact. *See, e.g.*, *Off. Comm. of Unsecured Creditors of Sunbeam Corp.*

31

*(In re Sunbeam Corp.)*, 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002) ("determination of the nature

and extent of domination is a question of fact"); *Network Enterprises, Inc. v. APBA Offshore

Prods., Inc.*, No. 01-11765(CSH), 2003 WL 124521, at *2-3 (S.D.N.Y. Jan. 15, 2003) (denying

motion to dismiss for lack of personal jurisdiction based on alter ego theory, noting that

defendant may revisit the issue on summary judgment).

Veil piercing determinations are also questions of fact, inappropriate for resolution on a

motion to dismiss or even summary judgment. *See, e.g.*, *Miller v. Porush, et al. (Sec. Inv'r Prot.

Corp. v. Stratton Oakmont, Inc.)*, 234 B.R. 293, 322 (Bankr. S.D.N.Y. 1999) (decisions to pierce

corporate veil should be made according to circumstances of particular case); *Milestone

Shipping, S.A. v. Estech Trading LLC*, 764 F. Supp. 2d 632, 636 (S.D.N.Y. 2011) ("without a

fuller record aided by proper discovery," defendant could not "extinguish all questions of fact

nor defeat [plaintiff's] claim against it as a matter of law," and thus claims were sufficiently

pleaded).

Here, Defendants seek to dismiss Counts III – VII of the SAC to the extent they are

predicated on alter ego/piercing the corporate veil allegations.  Mot. at 65-66.  As discussed more

fully below, the Court should not dismiss the alter ego allegations regardless of which law

applies. The choice of law analysis is more complex than Defendants argue, and they have not

carried their burden in proving the foreign law they seek to have the Court apply. Moreover, they

have not addressed the balancing of interests between New York on the one hand – with its

significant relationship with the parties and dispute at issue – and Panama and BVI on the other,

where the only apparent connection to Magnify and Strand, respectively, is their state of

incorporation. And finally, even if Panamanian and BVI law, as described by Defendants, were

to be applied to the non-conclusory factual allegations in the SAC, the Trustee has pleaded

sufficient facts to defeat the Motion on this ground, particularly at this early stage before

discovery.

> ### A.  Section 309 of the Restatement Applies to Officers' and Directors' Liability; Under Cases Applying Section 309, This Court Should Use New York Law For Its Veil Piercing Analysis.

The Restatement (Second) Conflict of Laws provides:

> The local law of the state of incorporation will be applied to determine the existence and extent of *a director's or officer's* liability to the corporation, its creditors and shareholders, *except* where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.

Restatement (Second) of Conflict of Laws § 309 (1971) (emphases added).

Where there has been wrongful conduct of officers or directors occurring within New

York, courts have applied New York law over the law of the state of incorporation, following the

principles of Section 309 and weighing the competing interests of the state of incorporation and

the forum state.[9]  *See, e.g.*, *Tyco Int'l, Ltd. v. Kozlowski*, 756 F. Supp. 2d 553, 561 (S.D.N.Y.

2010) (rejecting law of state of incorporation in favor of New York law because defendants'

wrongdoing occurred in New York); *Pension Comm. Of the Univ. Of Montreal Pension Plan v.

Banc of America Sec. LLC*, 446 F. Supp. 2d 163, 194-95 (S.D.N.Y. 2006) (rejecting application

of Bermuda law in favor of New York where state of incorporation had limited connection to

conduct at issue, and where breach of fiduciary duty and related conduct occurred in New York);

*Deangelis v. Corzine, et al. (In re MF Glob. Holdings)*, 998.F. Supp. 2d 157, 180 (determining

that New York and Illinois to have more significant relationship to dispute than state of

incorporation); *Lyman Commerce Solutions, Inc. v. Lung*, No. 12-CV-4398, 2013 WL 4734898,

---

[9] Contrary to Defendants' Motion, *Avellino* is inapposite to this case. This Court's application of Florida's veil piercing law in *Avellino* does not compel the application of foreign law here; in *Avellino*, the parties did not request – nor did this Court engage in – a choice of law analysis, the defendants had clearly articulated Florida law, and the Trustee asserted that the same result would have obtained under New York or Florida law.

at *5 (S.D.N.Y. Aug. 30, 2013) (New York's interest in seeing its law applied outweighed the

interest of the LLC in having its relationships governed by the law under which it was organized,

given that wrongdoing occurred in New York, and defendants used New York bank accounts as

vehicles to make fraudulent conveyances).

The Court should apply New York law to the Trustee's alter ego and veil piercing

allegations because New York "has a more significant relationship with the parties and the

dispute at issue."[10] *Resolution Tr. Corp. v. Gregor*, 872 F. Supp. 1140, 1150 (E.D.N.Y. 1994).

Panama and BVI had no connection to Magnify and Strand beyond the fact of their incorporation

as neither company had any directors, employees, offices or actual places of business in either of

those jurisdictions.  SAC ¶ 122.  When weighed against Green's repeated visits to New York to

meet with Madoff and others at BLMIS (SAC ¶¶ 10, 97, 130), Green's calls to Madoff and

DiPascali in New York (SAC ¶¶ 45, 94), and Green's direction of transfers from Magnify's and

Strand's BLMIS accounts in New York (SAC ¶¶ 8, 61, 68, 72-73, 119), the Trustee has rebutted

any presumption that Panamanian and BVI law should govern the alter ego and veil piercing

analysis as to the claims against Magnify and Strand.

## B.    Defendants Incorrectly Rely on Cases Concerning Shareholder Liability.

Defendants argue that foreign law should apply automatically to the Trustee's alter ego

and veil piercing allegations, but Defendants' entire proposition relies on precedent grounded in

shareholder liability under the separate Restatement Section 307.  This precedent is inapplicable

in the instant case because Green was not a shareholder of either Magnify or Strand. Rather, he

---

[10] Indeed, the Second Circuit has held that "principles compelling a forum state to apply foreign law come into play *only when* a legitimate and substantial interest of another state would thereby be served." *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 263 (2d Cir. 1984) (emphasis added). "[W]here the corporation does all, or nearly all, of its business and has most of its shareholders in this other state and has little contact, apart from the fact of its incorporation, with the state of incorporation," the law of the other state will be applied. Restatement (2d.) of Conflict of Laws § 309.

was each entity's Managing Director. SAC ¶¶ 38, 42.

The key cases cited by Defendants are the progeny of *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130 (2d Cir. 1993) and *Fletcher v. Atex, Inc.*, 68 F.3d 1451 (2d Cir. 1995), and are inapposite, because they both deal with shareholder liability. *Kalb* examined whether to pierce the corporate veil to reach a former shareholder of a company that had issued debentures to the plaintiff. In conducting its choice-of-law analysis, the court noted that the issue in that matter revolved around "the limited liability of shareholders of a corporation". 8 F.3d at 132. Therefore, it found that the law of the state of incorporation, and not New York or Arizona, applied to appellant's alter ego claim "[b]ecause a corporation is a creature of state law whose primary purpose is to insulate *shareholders* from legal liability". *Id.* (emphasis added). Accordingly, "the state of incorporation has the greater interest in determining when and if that insulation is stripped away." *Id.* (quoting *Soviet Pan Am Travel Effort v. Travel Comm., Inc.,* 756 F. Supp. 126, 131 (S.D.N.Y. 1991)). In so holding, the court explicitly relied on Section 307 of the Restatement, which provides, "[t]he local law of the state of incorporation will be applied to determine the existence and extent of a *shareholder's liability* to the corporation for assessments or contributions and to its creditors for corporate debts." Restatement (Second) of Conflict of Laws § 307 (emphasis added).

Defendants seek to apply the principles articulated in *Kalb*, *Fletcher* and their progeny blindly, ignoring that Green was not a shareholder of either Magnify or Strand, but rather an officer or director. The choice of law principles articulated in the Restatement section 309 (officers and directors) and section 307 (shareholders) reflect different roles in a company: shareholders own the company and have extremely limited roles in directing the corporation, while directors manage the corporation's affairs. The lower court cases relied on by Defendants

did not consider this distinction and should not be relied upon by this Court for this point. *See Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015) (citing only to shareholder cases; declining veil piercing to officers and directors on other grounds) and *Panam Mgmt. Group, Inc. v. Pena,* No. 08–CV–2258 (JFB) (ARL), 2011 WL 3423338, at *4-5 (E.D.N.Y. Aug. 4, 2011) (with expert testimony, recognizing liability of officers and directors as well as shareholders under Panamanian law).

### C.      Even if Foreign Law Applies, Defendants have Failed to Meet Their Burden of Proving it and the Law of the Forum State Applies.

Federal Rule of Civil Procedure 44.1 controls determinations of foreign law in federal court. It states, in relevant part, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED. R. CIV. P. 44.1.

Although Rule 44.1 provides courts with broad authority to conduct their own independent research to determine foreign law, the Rule "imposes no duty upon them to do so." *Bigio v. Coca-Cola Co.*, No. 97 Civ. 2858 (BSJ), 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010), *aff'd*, 675 F.3d 163 (2d Cir. 2012).  Accordingly, "the party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action *and the burden of proving foreign law* to enable the district court to apply it in a particular case." *Jonas* 116 F. Supp. at 330 (quoting *Bigio*, 2010 WL 3377503, at *4) (emphasis added).  Where the party fails to satisfy either burden, the district court "should apply the forum state's law." *Yukos Capital S.A.R.L. v. Feldman*, No. 15-CV-4964-(LAK), 2016 WL 183360, at *2 (S.D.N.Y. Jan. 11, 2016) (citations omitted); *see also Dar El-Bina Eng'g & Contracting Co. v. Republic of Iraq*, 79 F. Supp. 2d 374, 383–84 (S.D.N.Y. 2000) (applying New York law due to parties' failure to provide information as to content of applicable foreign law).

36

In carrying that burden, the party or parties may present materials they believe germane to proving foreign law such as "[s]tatutes, administrative material, and judicial decisions [ ] established most easily by introducing *an official or authenticated copy* of the applicable provisions or court reports *supported by expert testimony as to their meaning*." *Republic of Turkey v. OKS Partners*, 146 F.R.D. 24, 27 (D. Mass. 1993) (emphases added). Expert witness testimony "remains the basic mode of proving foreign law," *Bigio*, 2010 WL 3377503, at *4, as evidenced by the cases upon which Defendants rely. *See Jonas,* 2015 WL 4522763, at *13 ("expert testimony should help the court understand the content of the governing law"); *Panam. Mgmt. Grp.*, 2011 WL 3423338, at *4 ("Either oral or written testimony from expert witnesses . . . is the basic mode of proving foreign law") (internal citations omitted).

Courts have also referenced foreign law case decisions introduced by counsel, treatises and learned articles. *See, e.g., Remington Rand Corp.-Delaware v. Bus. Sys. Inc.*, 830 F.2d 1260, 1264 (3d Cir. 1987) (relying on expert testimony and Netherlands Civil Code to determine Dutch law); *Sea Trade Co. v. FleetBoston Fin. Corp.*, No. 03 CIV. 10254 (JFK), 2008 WL 4129620, at *10 (S.D.N.Y. Sept. 4, 2008) ("The Bank has submitted ample authority, in the form of Argentinian treatises and case law. . . ."); *Warth Line, Ltd. v. Merinda Marine Co.*, 778 F. Supp. 158, 159, n.1 (S.D.N.Y. 1991) (court relied on declaration of Belgian attorney in consideration of issues raised under Belgian law); *Olmeca, S.A. v. Manufacturers Hanover Tr. Co.*, No. 84 Civ. 1984 (RWS), 1986 WL 3517, at *2 (S.D.N.Y. Mar. 18, 1986) (relying on Panamanian Civil and Commercial Codes introduced by defendant to determine Panamanian banking practices).

Here, Defendants have provided no expert testimony, no administrative material, no regulations, no learned articles, no treatises, no foreign statutes or case law from either Panama or the BVI to enable this Court to understand the content of the purported applicable foreign law.

Instead, Defendants rely primarily on three New York decisions referring to or interpreting Panamanian and BVI law to "prove" what that law is. Defendants' submission is insufficient to satisfy their burden under Rule 44.1. *See, e.g, Dastranj v. Dehghan*, No. CV PX 15-2436, 2016 WL 7012299, at *3 (D. Md. Dec. 1, 2016) (finding that reference to single U.S. case applying foreign law was not enough for defendant to sustain burden under Fed. R. Civ. P. 44.1); *Batruk v. Mitsubishi Motors Corp.*, No. 94 Civ. 7593 (KMW), 1998 WL 307383, at *3 (S.D.N.Y. June 10, 1998), *as amended* (June 19, 1998) (defendant's submission of memorandum, which included "a string of citations," failed to provide the court with adequate discussion of Haitian law).

In *Dastranj v. Dehghan*, the court found that the defendant, Dehghan, failed to satisfy his burden under Rule 44.1 because while he suggested Iranian law may be applicable in his reply in support of his motion, he provided the court with one case from the Fourth Circuit to "prove" Iranian law. 2016 WL 7012299, at *3. Finding that reference to that case was "not enough for Dehghan to sustain his burden under Rule 44.1, the court noted that in the case Dehghan submitted to "prove" Iranian law, the defendant had submitted "substantive memoranda concerning Iranian law, and retained Iranian law experts who analyzed the issues pending before the court." *Id.* The same is true here: in the three cases which Defendants cite to "prove" foreign law – *In re Tyson*, 433 B.R. 68 (S.D.N.Y. 2010) (for BVI law) and *Jonas* and *Panam* (for Panamanian law) – the parties and courts did not rely merely on fellow U.S. courts' interpretation of foreign law in different cases. Instead, they considered the testimony of experts, foreign statutes, and/or foreign case law. Defendants' very citation to these cases demonstrates that merely citing to U.S. cases applying Panamanian or BVI law to facts in their cases does not provide enough information for *this* Court to ascertain how a foreign court would apply its own

law in this case. *See, e.g.*, *Tyson*, 433 B.R. at 79 (relying on and analyzing English cases to "prove" English veil piercing doctrine).

Moreover, the two cases relied on by Defendants to "prove" Panamanian law illustrate the danger of relying solely on U.S. cases to prove foreign law: the cases appear to conflict on a point material to this case.  In *Jonas,* the noted that the corporate directors in that case might not be subject to jurisdiction "to the extent that defendant's expert avers that Panamanian courts will only pierce the corporate veil to reach shareholders—but not directors." 116 F. Supp. 3d at 332 (stating that directors can be liable only in "certain [unidentified] limited circumstances," and citing *Panam* to suggest broader director liability).  Conversely, in *Panam*, the court concluded that the Panamanian veil piercing doctrine *does* apply to directors, and cited the *Panam* defendant's expert and Section 444 of Panama's Commercial Code.  2011 WL 3423338, at * 4 (directors shall be held personally liable to the corporation and third parties for *inter alia* the "good or bad performance of their mandate and any violation of any law").

Here, Defendants cherry pick from dicta in *Jonas* and *Panam* to create a Frankenstein that they would have this Court apply as "Panamanian" law: that under *Jonas*, veil piercing only reaches shareholders but not directors, and only for "illicit acts in Panama," while under *Panam*, the corporation must have been controlled by its "shareholders … **for the sole purpose of perpetrating fraud or violating the law**."  Mot. at 59 (internal quotations omitted; emphasis in original). Reliance on two cases which appear to propound different rules, and cherry-picking from those rules, simply cannot be enough to prove foreign law under Rule 44.1. Accordingly, this Court should apply New York law.

D.   **Under New York Law, the Trustee has Sufficiently Pleaded that Magnify and Strand are the Alter Egos of Green.**

Under New York law, piercing the corporate veil is required when the corporation (1) was so dominated, and (2) such domination was used to commit fraud or wrong against a plaintiff, resulting in the plaintiff's injury. *In re Madison Bentley Assocs. LLC*, No. 09-15479 (SHL), 2015 WL 6125893, at *7 (Bankr. S.D.N.Y. Oct. 16, 2015). To determine whether the corporation was so dominated it acted as an alter ego, courts consider a variety of factors:

> 1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991) (applying New York law); *see also Madison Bentley Assocs., LLC*, 2015 WL 6125893, at *8 (at summary judgment, court applied *Passalacqua* factors to find that individual defendants exercised domination over Chapter 7 debtor to use debtor's corporate assets for the benefit of the defendant entities).

The facts pleaded in the SAC satisfy virtually all of the *Passalacqua* factors for both Magnify and Strand:

40

| Alter Ego Factor | Facts Applicable to Magnify | Facts Applicable to Strand |
|---|---|---|
| Absence of corporate formalities | • Magnify had no employees, physical offices, or actual places of business. SAC ¶ 122.<br><br>• Magnify used Green's law office address in Israel as its own address. SAC ¶ 122.<br><br>• Green used Magnify's account at Bank Hapoalim as collateral for a personal debt. SAC ¶ 120. | • Strand had no employees, physical offices, or actual places of business. SAC ¶ 122.<br><br>• Strand used Green's law office address in Israel as its own address. SAC ¶ 122.<br><br>• Green directed millions of dollars in transfers from Strand's accounts for his and his family's benefit. SAC ¶ 120.<br><br>• Green held himself out as Strand's beneficial owner to obtain a mortgage to buy his daughter a home. SAC ¶¶ 63, 120. |
| Inadequate capitalization | • Magnify is currently insolvent, having been funded by fictitious profits from Madoff's Ponzi scheme. SAC ¶ 123. | • Strand is currently insolvent, having been funded by fictitious profits from Madoff's Ponzi scheme. SAC ¶ 123.<br><br>• Strand was funded through two transfers of fictitious profits from Magnify's account. SAC ¶ 124. |
| Corporate funds used for personal rather than corporate purposes | • Green directed millions more in withdrawals from Magnify's accounts to family members, and other Defendant entities, including Strand and Express. SAC ¶ 119. | • Green directed millions of dollars in transfers from Strand's accounts for his and his family's benefit. SAC ¶¶ 72, 117, 119.<br><br>• Green used a withdrawal from Strand's account to buy an apartment in Israel for one of his business associates. SAC ¶ 120. |

41

| Common office space and address | • Magnify used Green's law office address in Israel as its own address. SAC ¶ 122. | • Strand used Green's law office address in Israel as its own address. SAC ¶ 122. |
|---|---|---|
| The amount of business discretion displayed by the dominated corporation | • Green directed millions more in withdrawals from Magnify's accounts to family members, and other Defendant entities, including Strand and Express. SAC ¶ 119. | • Green directed millions of dollars in transfers from Strand's accounts for his and his family's benefit. SAC ¶¶ 72, 117, 119. |
| Payment of debts of the dominated corporation by other corporations | • Green transferred money from Magnify to YHA to effectuate donations throughout Israel to increase his stature in philanthropic society. SAC ¶ 115. | |

The second prong of the alter ego or veil piercing test under New York law – that Green dominated Magnify and Strand to commit fraud and wrong – requires little discussion. The SAC alleges that Green knowingly participated in the BLMIS fraud (SAC ¶¶ 9-10, 90-98, 105, 127) and used Magnify and Strand as instrumentalities in that fraud to siphon out more than $125 million of customer money. SAC ¶¶ 5, 38, 61, 114.

    **E.**    **The Trustee Sufficiently Pleads Alter Ego and Veil Piercing Even Under The Purported Law of Panama And The BVI.**

Even if this Court finds that Defendants have met their burden in proving Panama and BVI law, the Trustee's alter ego and veil piercing allegations are sufficiently pleaded to satisfy the veil piercing doctrine of Panama and the BVI.

### 1.    The Trustee's Alter Ego and Veil Piercing Allegations as to Magnify Would Still Meet the Standard Under "Panamanian Law."

Defendants heavily rely on two cases—*Jonas*[11] and *Panam*—for the proposition that veil piercing under Panamanian law is only appropriate if the Trustee has alleged that Magnify "was used for the *sole purpose of perpetuating a fraud or violating the law.*" Mot. at 62 (emphasis in original). However, even assuming Defendants' interpretation of Panamanian law discussed in these cases is correct, the Trustee's allegations meet that standard.

Defendants, citing *Jonas*, argue that the corporate veil should be pierced when (and only when) "corporations have been used with the sole intention of defrauding third parties or violating the law, thus resulting in a case of abuse of the legal capacity." *Id.* In *Panam,* the Eastern District of New York found that Section 444 of the Commercial Code of the Republic of Panama was also instructive as to veil piercing.  2011 WL 3423338, at *4. Specifically, Section 444 states that "Directors shall not assume any personal liability for the corporation's obligations, but shall be liable personally . . . to the corporation and to third parties . . . in general for the good or bad performance of their mandate and any violation of *any* law." *Id.* (emphasis added). From its reading of Section 444 of the Commercial Code of the Republic of Panama, the court concluded that "the corporate veil may be pierced under Panamanian law where it is demonstrated that directors or shareholders controlled and used the corporation for perpetrating fraud or violating the law, thereby abusing the corporate form." *Id.* at *5.  In dismissing the veil piercing claims against the individuals, the *Panam* court noted that the complaint focused on the

---

[11] As discussed in Section VII.C., *supra*, Defendants also cite *Jonas* for the proposition that only shareholders, and not directors like Green, can be liable under Panamanian law. However, even *Jonas* noted that directors can be liable under Panamanian law, *Jonas*, 116 F. Supp. 3d at 331, and further notes that the *Panam* court had also received evidence that directors could be liable under Panamanian law, *Id.*; and *Panam* clearly recognizes that the corporate veil may be pierced to reach officers and directors under Panamanian law.  *Panam*, 2011 WL 3423338, at *5. At a minimum, Defendants have not carried their burden to show that Panamanian veil piercing law applies only to shareholders and not directors.

corporation's misrepresentations but did not explain how the individual defendants were

involved in the alleged misrepresentations. *Id.*

Here, the Trustee has made specific allegations regarding Green's control of Magnify,

and his use of Magnify to profit from and actively participate in Madoff's fraud. SAC ¶¶ 114-

26. Under Green's control, Magnify <u>served no other purpose</u> than to enable Green to profit from

Madoff's fraud, in which Green was complicit and a willing participant. *Id.* Defendants argue

that the Trustee's allegations regarding Green's relationship with Madoff and BLMIS were "only

part of" Magnify's activities, and that somehow the fact that fictitious profits transferred from

Magnify's accounts were used to fund charitable donations by YHA mean that Magnify was not

created for the "sole" purpose of perpetuating fraud. Mot. at 64. This argument ignores the

close relationship – pleaded in the SAC – between Green, YHA and Magnify (SAC ¶ 115), and

Green's actual knowledge of fraud and participation therein. SAC ¶¶ 7, 9-10, 75-112, 127, 151.

The fact that Green chose to direct most of the stolen money to legitimate institutions does not

obviate the allegations that Green's control and "management" of Magnify, active participation

in the fraud at BLMIS, direction of transfers to YHA and to himself and others, all served to

benefit Green financially and reputationally. Those allegations suffice, even under Defendants'

tortuous interpretation of "Panamanian law," as allegations that Green used the corporations to

perpetuate fraud and that he benefited in many ways from his control of Magnify. SAC ¶ 144.

**2.    Similarly, The Trustee's Alter Ego and Veil Piercing Allegations
        Against Strand Would Meet the Standard Under BVI Law.**

Defendants rely on the *Tyson* case to articulate BVI law. The *Tyson* court did not

conduct a choice of law analysis because the parties agreed that English law controlled their veil

piercing allegations. *See In re Tyson*, 433 B.R. at 79. The *Tyson* court went on to note that

unlike American law, English law "does not provide an enumerated set of factors that a court can

44

evaluate in deciding whether to lift the corporate veil." *Id*. at 81 (internal citations omitted). However, the court reasoned that the corporate veil could be pierced under English law if the company "is a mere façade concealing the true facts," evidenced by a "defendant's subjective intent to defraud." *Id.* at 87. Nevertheless, the evidence of impropriety is not enough to justify veil piercing because, for example, the fact that a shell company has breached a contract is "not, in itself dispositive of the veil piercing inquiry." *Id.*

The *Tyson* court also raised the idea that timing of misuse of the corporation is important to consider because for veil piercing to make sense, the corporate structure must be "interposed for the purpose of shielding a defendant from liability to the plaintiff or other third parties." 433 B.R. at 88. In other words, veil piercing "turns on whether the defendant had already incurred some liability to the plaintiff at the time he interposed the corporate structure." *Id.*

Even applying the general principles of veil piercing described in *Tyson*, the Trustee sufficiently pleaded that Green misused Strand's corporate façade. The SAC alleges that Strand, which represented that it was a wholly owned subsidiary of Magnify, was founded by Green in 1998 with only one fraudulent purpose: to receive funds from BLMIS for the benefit of Green. SAC ¶¶ 42, 63, 117. At Green's direction, Strand was funded with fictitious profits from the Magnify I Account, which Green also controlled, but which he did not fund. SAC ¶¶ 51, 58, 63, 65, 109, 123. Unlike the defendants in *Tyson*, Green was no stranger to the entity. Rather, he was the puppet master who controlled the relationship between Magnify, Strand, and himself, directing monies from the Magnify accounts to flow into Strand for his benefit and the benefit of others. For example, Green used money transferred to Strand from the Magnify I Account to buy an apartment in Israel for a business associate, and, in holding himself out at Strand's "beneficial owner," Green obtained a mortgage for his daughter in Maryland. SAC ¶¶ 63, 120.

45

The Trustee also sufficiently pleaded that Green created Strand to avoid a liability he already incurred.  The SAC satisfies this requirement because all of the interaccount transfers from Magnify to Strand consisted of fictitious profits that existed – and thus created an obligation to third parties – before Strand's creation.  SAC ¶¶ 63, 123.  Thus, Green had already incurred liability when he created the fictitious value in the Magnify Accounts that was later transferred to Strand.  Indeed, by using Strand's funds to buy an apartment for a business associate and by using his alleged position as Strand's owner, he further attempted to shield himself from liability to third parties such as BLMIS customers.

## VIII.    THE SAC SUFFICIENTLY PLEADS A CLAIM FOR EQUITABLE SUBORDINATION

Defendants incorrectly argue that Count IX of the SAC fails to state a claim for equitable subordination of the claims filed by Magnify, YHA, Premero, and Strand because the Trustee has failed to sufficiently allege actual knowledge or willful blindness of the BLMIS Ponzi scheme or bad faith. Defendants' position lacks merit and misstates the applicable law.[12]

Section 510(c) of the Bankruptcy Code provides that the court may equitably "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest. . . ." 11 U.S.C. § 510(c).  This Court has stated that to successfully plead a claim for equitable subordination, the Trustee must allege that the claimant engaged in some type of inequitable conduct and the misconduct resulted in injury to creditors or conferred an unfair advantage on

---

[12] Following the Trustee's evaluation of BLMIS's books and records, the Trustee provided notice to Magnify, YHA, Premero, and Strand of his determination that their customer claims have been denied.  *See* SAC, Ex. C. Magnify, YHA, Premero, and Strand each filed an objection to the Trustee's claim determination.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 08-01789 (Bankr. S.D.N.Y.) [ECF Nos. 772, 985, 986, 2494, 3791, 3792, 3793]. The Trustee intends to seek a final adjudication of the Defendants' customer claims and their objections through a separate hearing following the resolution of this adversary proceeding, as contemplated by the Claims Procedures Order.  *See* SAC ¶ 169.

the claimant. *See Merkin*, 515 B.R. at 158 (*citing Benjamin v. Diamond* (*In re Mobile Steel Co.*),

563 F.2d 692, 700 (5th Cir. 1977)).[13]

Inequitable conduct is alleged if the claimant's conduct is egregious and severely unfair

to other creditors such that it is "tantamount to fraud, misrepresentation, overreaching or

spoliation. . . or . . . involve[s] oral turpitude." *80 Nassau Assocs. v. Crossland Fed. Sav. Bank*

*(In re 80 Nassau Assocs.)*, 169 B.R. 832, 838–39 (Bankr. S.D.N.Y. 1994) (internal citations

omitted). With respect to injury to creditors, "[i]f misconduct results in harm to the entire

creditor body" the Trustee "need not identify the injured creditors or quantify their injury, but

need only show that the creditors were harmed in some general, concrete manner." *80 Nassau*

*Assoc.*, 169 B.R. at 840. Moreover, in *Katz*, Judge Rakoff determined that if a complaint:

> adequately alleges that the defendants did not receive fraudulent transfers in good
> faith, it also adequately alleges that they engaged in inequitable conduct.
> Moreover, this alleged misconduct would have injured any investors who invested
> in Madoff Securities based on the impressive returns others appeared to receive.
> Thus, [the Trustee] can potentially subordinate [the defendants' claims] by
> proving that the defendants invested with Madoff Securities with knowledge, or in
> reckless disregard, of its fraud.

*Picard v. Katz*, 462 B.R. 447, 456 (S.D.N.Y. 2011). Accordingly, the Trustee's claim for

equitable subordination may not be dismissed if the SAC sufficiently alleges that Magnify,

YHA, Premero, and Strand had actual knowledge of BLMIS's fraud.

As discussed above, the SAC alleges with particularity that Green through Magnify,

YHA, Premero, and Strand, had actual knowledge of the fraud, thereby engaging in inequitable

---

[13] In *Mobile Steel*, the Fifth Circuit stated that the proponent of an equitable subordination claim must plead and
prove that the remedy would not be inconsistent with the provisions of the Bankruptcy Act. *See Mobile Steel Co.*,
563 F.2d at 700. This Court and others have noted that this requirement is likely to be moot, given the Bankruptcy
Code's express authority for equitable subordination in Section 510. *See Official Comm. of Unsecured Creditors
Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 360 (Bankr. S.D.N.Y. 2010) ("a complaint that
satisfies the first two prongs of the Mobile Steel test would survive a motion to dismiss."); *Official Comm. of
Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 461 (Bankr.
S.D.N.Y. 2006); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 841
(Bankr. S.D.N.Y. 1994).

conduct that harmed the BLMIS customer estate as a whole. The SAC specifically alleges that Green, as the person in control of Magnify's, YHA's, Premero's and Strand's accounts: (1) knew from the spontaneous generation of nearly $120 million in purported value in the Magnify II Account in 1990 through backdated trades that BLMIS was not trading securities (SAC ¶¶ 7, 31, 77-89); (2) perpetuated the BLMIS fraud by directing more than $126 million in inter-account transfers from the Magnify Accounts to YHA's account, which Green used to finance YHA's "donations" to prominent hospitals, universities, and research institutions in Israel in exchange for accolades and honors for his perceived generosity (SAC ¶¶ 8, 65-67); (3) pocketed millions from Magnify's and Strand's accounts to enrich himself in the form of purported investment management fees, and used those accounts to transfer millions of dollars to family members, certain individuals associated with the defendants, other entities he controlled, and foreign investments (SAC ¶¶ 5, 8, 63, 68-74, 119-20); and (4) met personally with Madoff two or three times a year to discuss Magnify's, Strand's and Premero's accounts, and assisted BLMIS employees in the fabrication of fictitious Portfolio Evaluations, which did not reflect any trading activity, withdrawals, deposits, or other information concerning the accounts' value (SAC ¶¶ 9-10, 90-107 ). This conduct harmed the other customers and creditors of BLMIS.

## IX.    <u>CONCLUSION</u>

Regardless of when Green took over Magnify, the allegations in the SAC show that he

controlled the Defendants, and that all of the Defendants knew that no securities were being

traded in their BLMIS accounts.  Because the Defendants offer no basis to dismiss the SAC, the

Trustee respectfully requests that, with the exception of the argument raised in Point V of the

Motion, the Motion be denied in its entirety.[14]

Date:    December 20, 2017
         New York, New York

                                        By: /s/  Tracy Cole
                                        **BAKER & HOSTETLER LLP**
                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone: (212) 589-4200
                                        Facsimile: (212) 589-4201
                                        David J. Sheehan
                                        Ona T. Wang
                                        Tracy L. Cole
                                        Fernando A. Bohorquez
                                        David M. McMillan
                                        Michelle N. Tanney

                                        *Attorneys for Irving H. Picard, Trustee for the*
                                        *Substantively Consolidated SIPA Liquidation*
                                        *of Bernard L. Madoff Investment Securities*
                                        *LLC and the Estate of Bernard L. Madoff*

---

[14] As stated in note 2 above, the Court has approved the Trustee's and the Defendants' agreement to defer briefing
on Point V of the Motion until after a decision is rendered on the Defendants' other arguments.

**EXHIBIT 1**

| Exhibit | Description | Apparent Argued basis for consideration | Reference in SAC (if any) | SAC allegation purportedly contradicted (if any) | Trustee's position |
|---|---|---|---|---|---|
| **Exhibit A** | Second Amended Complaint | N/A | | | N/A |
| **Exhibit B** | Plea allocution of Madoff in *U.S. v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) | **Incorporated by reference + Judicial notice** (Asks court to "take judicial notice" of Madoff's position on start date). Green Aff. ¶ 10 | SAC ¶ 25 | **None.** | **Not incorporated by reference.** While the Court may take judicial notice of Madoff's plea, **the court cannot take judicial notice of statements within proceeding.** *See, e.g., Global Network Commc'ns, Inc. v. New York*, 458 F.3d 150, 157 (2d Cir. 2006) |
| **Exhibit C** | Plea allocution of Frank DiPascali, Jr. in *US. v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) | **Incorporated by reference.** Green Aff. ¶ 11 | SAC ¶ 26 | **None:** asks court to infer statement was mistaken. | **Not incorporated by reference.** *See* Trustee Opp. at § IV.A.2. |
| **Exhibit D** | Judgment rendered by a Justice of the High Court of Justice of England | **Judicial notice.** Green Aff. ¶ 12 | **None.** | **None.** | **Court may take judicial notice of the decision, but not of any of the substance of the findings.** *See, e.g., Global Network Commc'ns, Inc.*, 458 F.3d at 157 |

| Exhibit E | 11/7/12 Deposition of Kurt Brunner: snippets of testimony selected by Defendants | **Incorporated by reference.** Green Aff. ¶ 13 | Statement from testimony quoted at SAC ¶ 56 | **None:** claims testimony referred to in SAC was misleadingly taken out of context | **Not incorporated by reference.** *See* Trustee Opp. at § IV.A.2. |
|---|---|---|---|---|---|
| Exhibit F | Customer Claim filed by YHA in the liquidation proceeding of BLMIS | **Incorporated by reference + integral.** Green Aff. ¶ 14 | Ex. C | **None.** | **Incorporated by reference.** |
| Exhibit G | 72 pages of correspondence between YHA and Madoff | **Integral.** Green Aff. ¶ 15 | **None.** | **None.** | **Not integral to the SAC** by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A. |
| Exhibit H | September 1990 Magnify customer ledger | **Incorporated by reference + integral.** Green Aff. ¶ 16. | SAC ¶¶ 82, 88 | **None.** | **Incorporated by reference.** |
| Exhibit I | BLMIS Portfolio Evaluations for Account No. 1FN024-30, from 12/31/92 - 6/30/08 | **Incorporated by reference.** Green Aff. ¶ 17 | SAC ¶¶ 9, 10, 90, 91, 92, 95, 96, 97 | **None.** | **Not incorporated by reference.** *See* Trustee Opp. at § IV.A.2. |
| Exhibit J | BLMIS Portfolio Evaluations for Account No. 1FN025-30, from 12/31/92 - 6/30/08 | **Incorporated by reference.** Green Aff. ¶ 17 | SAC ¶¶ 9, 10, 90, 91, 92, 95, 96, 97 | **None.** | **12/31/1999 Portfolio Evaluation for Magnify's 1FN025 account is incorporated by reference.** Remaining Portfolio Evaluations are not incorporated by reference, |

| | | | | | *see* Trustee Opp. at § IV.A.2. |
|---|---|---|---|---|---|
| **Exhibit K** | BLMIS Portfolio Evaluations for Strand Account No. 1FR051-30, from 6/30/99 - 6/30/08 | **Incorporated by reference**. Green Aff. ¶ 18 | SAC ¶¶ 9, 10, 90, 91, 92, 95, 96, 97 | **None.** | **Not incorporated by reference.** *See* Trustee Opp. at § IV.A.2. |
| **Exhibit L** | BLMIS Portfolio Evaluations for the Premero I Account No. 1FN073-30, 12/31/95 - 6/30/08 | **Incorporated by reference.** Green Aff. ¶ 20 | SAC ¶ 95 | **None.** | **Not incorporated by reference**. *See* Trustee Opp. at § IV.A.2. |
| **Exhibit M** | BLMIS Portfolio Evaluations for the Premero II Account No. 1FN097-30, from 6/30/96 - 6/30/08 | **Incorporated by reference.** Green Aff. ¶ 20 | SAC ¶ 95 | **None.** | **Not incorporated by reference**. *See* Trustee Opp. at § IV.A.2. |
| **Exhibit N** | March 18, 1996 letter from Green to Madoff | **Integral.** Green Aff. ¶ 21 | **None.** | **None:** claims letter supports a different interpretation of his meetings with Madoff | **Not integral to the SAC** by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A. |
| **Exhibit O** | Correspondence between Green and Madoff regarding Premero's Account | **Integral.** Green Aff. ¶ 21 | **None.** | **None**: claims letter supports a different interpretation of his meetings with Madoff | **Not integral to the SAC** by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A. |
| **Exhibit P** | Agreement dated June 28, 1983 between Brunner and Igoin and transmittal letter to Madoff | **Incorporated by reference.** Green Aff. ¶ 22 | Fact of agreement referred to in SAC ¶ 51 | **None.** | **Not incorporated by reference.** *See* Trustee Opp. at § IV.A.2. |

| Exhibit Q | 1995 resolution appointing Green Managing Director of Magnify | **Incorporated by reference.** Green Aff. ¶ 23 | SAC ¶ 38 | **None.** | **Not incorporated by reference**. *See* Trustee Opp. at § IV.A.2. |
|---|---|---|---|---|---|
| **Exhibit R** | Magnify corporate documents changing corporate directors in 2016 | **Incorporated by reference.** Green Aff. ¶ 24 | Fact of change in directors noted in SAC ¶ 39 | **None.** | **Not incorporated by reference**. *See* Trustee Opp. at § IV.A.2. |
| **Exhibit S** | YHA registration document | **Incorporated by reference + integral.** Green Aff. ¶ 25 | SAC ¶ 53, 54 | Claimed to contradict SAC ¶ 40 (alleging Green incorporated YHA and "held himself out as a co-founder of YHA who 'guided the organization's activities and…contributed significant sums for scientific and medical research throughout Israel…') by showing Green was not identified as a founder of YHA in its registration. | **Not incorporated by reference**. Nor integral to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A. |
| **Exhibit T** | Corporate resolutions relating to Premero and cover letter dated August 23, 1993 | **Integral**. Green Aff. ¶ 26 | Corporate structure of Premero noted in SAC ¶ 41 | Claimed to contradict SAC ¶ 41 (alleging Green "founded Premero, served as [its] managing director and supervised its BLMIS portfolio. On information and belief Green created Premero as an investment vehicle for himself and/or one of his clients.") because letter references "my | **Not integral** to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A. |

| | | | | client" | |
|---|---|---|---|---|---|
| **Exhibit U** | Corporate documents relating to formation of Strand in 1998 | **Integral.** Green Aff. ¶ 27 | Strand's corporate structure referred to in SAC ¶ 42 | **None.** | **Not integral** to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A. |
| **Exhibit V** | "Assignment of Transfer" of Magnify shares to YHA dated December 14, 1989, board minutes and cover letter | **Incorporated by reference.** Green Aff. ¶ 29 | SAC ¶¶ 56, 58, 61, 115 | **None.** | **Assignment of Transfer is arguably incorporated by reference.** Remaining documents not incorporated by reference, *see* Trustee Opp. at § IV.A.2. |
| **Exhibit W** | Purported correspondence between Green and Igoin and between YHA and Green dated April 12, 1990 and May 18, 1990 | **Integral.** Green Aff. ¶ 29 | Green's position that Green or YHA was a trustee of Magnify is noted in SAC ¶ 125 | Claimed to contradict allegation in SAC ¶ 61 and elsewhere that YHA owned Magnify. | **Not integral** because not relied on by the Trustee, nor do the parties agree on the authenticity or accuracy of the proffered documents.[1] *See* Trustee Opp. at § IV.A. |
| **Exhibit X** | Fiduciary Agreement between YHA and | **Integral.** Green Aff. ¶ 29 | Green's position that Green or | Claimed to contradict allegation in SAC ¶ 61 and elsewhere that | **Not integral** to SAC by virtue of being potentially relevant to facts alleged in |

---

[1] There are certain exhibits that on their face present questions of authenticity and accuracy and therefore the Trustee cannot agree to their authenticity or accuracy at this time. The Trustee has identified those exhibits for the Court's convenience in this chart. The Trustee does not waive any evidentiary challenges—authenticity, accuracy or otherwise—to any of the other exhibits proffered by the Defendants on this motion to dismiss. Rather, as the parties remain in active discovery and the Trustee has not had an opportunity to take any depositions, the Trustee reserves all rights to raise any evidentiary challenges to any exhibit proffered in support of Defendants' motion to dismiss at the appropriate time in this litigation.

|  | Brunner dated May 1990 |  | YHA was a trustee of Magnify is noted in SAC ¶ 125 | YHA owned Magnify. | it, *see* Trustee Opp. at § IV.A. |
|---|---|---|---|---|---|
| **Exhibit Y** | Purported handwritten notes by Green | **Integral.** Green Aff. ¶ 29 | **None.** | **None.** | **Not integral** because not relied on by the Trustee, nor do the parties agree on the authenticity or accuracy of the proffered documents. *See* Trustee Opp. at § IV.A. |
| **Exhibit Z** | Purported handwritten notes purported to be "amendments of trust" written by Igoin | **Integral.** Green Aff. ¶ 29 | Green's position that Green or YHA was a trustee of Magnify is noted in SAC ¶ 125 | Claimed to contradict allegation in SAC ¶ 61 and elsewhere that YHA owned Magnify. | **Not integral** because not relied on by the Trustee, nor do the parties agree on the authenticity or accuracy of the proffered documents. *See* Trustee Opp. at § IV.A. |
| **Exhibit AA** | Purported letter from Green to Igoin dated February 1992 | **Integral.** Green Aff. ¶ 29 | **None.** | **None.** | **Not integral** because not relied on by the Trustee, nor do the parties agree on the authenticity or accuracy of the proffered documents. *See* Trustee Opp. at § IV.A. |
| **Exhibit BB** | Documents relating to purported burglary of Green's offices | **No stated basis for incorporation.** | **None.** | **None.** | N/A |

| | | | | | |
|---|---|---|---|---|---|
| **Exhibit CC** | Documents relating to transfers to Ayala Nahir and her family | **Integral**. Green Aff. ¶ 32 | Fact of transfers noted in SAC ¶ 68 | **None.** | **Not integral** to SAC by virtue of being potentially relevant to facts alleged in it. *See* Trustee Opp. at § IV.A. |
| **Exhibit DD** | Copies of correspondence purportedly from Green to Madoff directing payments to Ruth Amir | **Integral**. Green Aff. ¶ 33 | Fact of transfer noted in SAC ¶ 68 | **None.** | **Not integral** to SAC by virtue of being potentially relevant to facts alleged in it. *See* Trustee Opp. at § IV.A. |
| **Exhibit EE** | "Fee Agreement" as defined in SAC | **Incorporated by reference.** Green Aff. ¶ 34 | SAC ¶ 69-71 | **None.** | **Arguably incorporated by reference.** |
| **Exhibit FF** | Purported handwritten notes by Green | **Integral**. Green Aff. ¶ 34 | **None.** | **None.** | **Not integral** because not relied on by the Trustee, nor do the parties agree on the authenticity or accuracy of the proffered documents. *See* Trustee Opp. at § IV.A. |
| **Exhibit GG** | Purported correspondence between Green and Madoff dated November 2002 | **Integral**. Green Aff. ¶ 34 | **None.** | **None.** | **Not integral** to SAC by virtue of being potentially relevant to facts alleged in it. *See* Trustee Opp. at § IV.A. |
| **Exhibit HH** | December 2003 letter from Green to Madoff requesting transfer from Strand; correspondence between Brunner and Green dated November 2009 enclosing resolution | **Integral**. Green Aff. ¶ 36 | **None.** | **None.** | **Not integral** because not relied on by the Trustee. *See* Trustee Opp. at § IV.A. |

| | | | | | |
|---|---|---|---|---|---|
| **Exhibit II** | Letter dated July 21, 2008, from Green to Madoff requesting transfer | **Integral**. Green Aff. ¶ 36 | Fact of transfer noted in SAC ¶ 148 n.7 | **None.** | **Not integral** to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A. |
| **Exhibit JJ** | Letters from Yair Green to Madoff scheduling meetings | **Integral**.  Green Aff. ¶ 37 | Fact that Green corresponded and met with Madoff referenced in SAC ¶¶ 45(c), 92-93 | **None.** | **Not integral** to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A. |
| **Exhibit KK** | Letter dated March 29, 1994 from Yair Green to Madoff | **Integral**.  Green Aff. ¶ 38 | **None.** | **None.** | **Not integral** to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A. |
| **Exhibit LL** | Letters to YHA from Friehling & Horowitz dated between January 2003 – July 2007 | **Integral**. Green Aff. ¶ 38 | **None.** | Claimed to contradict allegation in ¶ 106 (alleging Green knew other BLMIS customers received monthly customer statements detailing securities information) | **Not integral** to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A. |