

Baker & McKenzie LLP

815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
United States

Tel: +1 202 452 7000
Fax: +1 202 452 7074
www.bakermckenzie.com

December 20, 2017

The Hon. Stuart M. Bernstein
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

***Picard v. South Ferry Bldg. Co, et al.*, Adv. Pro. 10-4387, 10-4488, 10-4350, 10-5110**

Dear Judge Bernstein:

The SF Customers and the Lowrey Customers submit this supplemental letter brief in response to the Court's questions:

1. Whether and to what extent a broker-dealer, pre-SIPA and pre-liquidation, can or cannot use customer property to pay debts of a brokerage?

The rules governing broker-dealers do not preclude the use of customer funds to pay a general obligation of the brokerage. While the SEC Financial Responsibility Rules do require a broker-dealer to keep customer funds separate, they do not directly prohibit it from satisfying a valid debt of the brokerage with customer funds. Instead, the Customer Protection Rule operates indirectly by requiring the broker-dealer to promptly replenish the fund of customer property within a prescribed period of time or—if it is unable to do so—to report the failure to the SEC. In short, the broker-dealer's failure to replenish or properly report is illegal, but its discharge of valid general obligations is not. Where, as here, the broker-dealer uses customer funds to pay an innocent customer's valid securities entitlement, the answer is clear: a payment in satisfaction of a valid debt to a customer does not violate any relevant rules governing the conduct of a broker-dealer.

2. Whether, aside from fraudulent transfer statutes, a broker has the right to recover payments that the broker made from customer funds to satisfy general obligations of the brokerage in a non-bankruptcy or pre-SIPA situation?

Whether or not the broker-dealer's payments came from an improper source or otherwise amounted to an improper payment has no effect on the rights of innocent parties who took in good faith. That is, violations of the financial responsibility rules are actionable against the broker-dealer and its agents, but not against innocent recipients of amounts due to them.

Baker & McKenzie LLP is a member of Baker & McKenzie International, a Swiss Verein.

1. **Madoff Securities was allowed to pay valid claims of an innocent party with customer funds.**

   a. **Rules governing broker-dealers do not preclude use of customer property to pay valid debts, but only require the broker-dealer to replenish and report these payments.**

The SEC's Customer Protection Rule, Rule 15c3-3, 17 C.F.R. § 240.15c3-3, is a regulatory compliance rule created "to give more specific protection to customer funds and securities, in effect forbidding brokers and dealers from using customer assets to finance any part of their businesses unrelated to servicing securities customers." *Financial Responsibility Rules for Broker-Dealers*, Exch. Act Release No. 34-70072 (Oct. 21, 2013) (quoting *Net Capital Requirements for Brokers and Dealers*, Exch. Act Release No. 21651 (Jan. 11, 1985), 50 FR 2690 (Jan. 18, 1985)). Rule 15c3-3 safeguards customer funds by "prevent[ing] broker-dealers from using funds held on behalf of customers to finance proprietary and other non-customer transactions." *Upton v. SEC*, 75 F.3d 92, 93 (2d Cir. 1996) (discussing Rule 15c3-3(e)).

However, because it is difficult to compute what is a general obligation and a customer obligation, the rule does not directly prohibit any individual payments using customer funds. Rather, the rule accomplishes this end indirectly through a two-fold requirement: If the broker pays general obligations out of customer property, it must replenish the customer fund—and if it is unable to do so, it must report this failure to the SEC. *Id.* (requiring the broker to submit a weekly calculation of customer funds); *see also* Rule 15c3-3(e) (requiring brokers to promptly replenish bank accounts that hold customer funds).

Specifically, every broker-dealer is required to maintain at least one bank account that is a Special Reserve Bank Account for the Exclusive Benefit of Customers ("Reserve Bank Account"), which must be kept separate from any other account. Rule 15c3-3(e)(1). In this Reserve Bank Account, the broker-dealer must maintain an amount that is computed according to the formula established in Rule 15c3-3a. If a Reserve Bank Account balance falls short, and the broker timely replenishes the reserve account out of its net capital, there is no adverse consequence.

If the broker has insufficient net capital, it violates the Net Capital Rule (Rule 15c3-1, 17 C.F.R. §240.15c3-1) and cannot operate. The broker must immediately self-report to the SEC. *See* Rule 15c3-3(i) (requiring brokers to notify the SEC if Reserve Bank Accounts fall below the required amounts); *see also* Rule 15c3-1(a)(6)(iv)(B) (requiring the broker to notify the SEC if he "fails to deposit any required equity within the time prescribed"). When the broker cannot operate—because the broker failed to maintain the funds required by the Net Capital Rule—there are consequences for the rules violations, but the consequences impose liabilities on the broker-dealer and its agents, they do not affect the validity of prior payments.

In short, no statute, regulation, or other law prevented Madoff Securities from paying customers—such as the defendants here—out of customer funds pre-SIPA. The rule does not prohibit the broker-dealer from paying general debts out of customer funds; it merely requires the broker-dealer to replenish the funds.

    **b. The Trustee has stipulated to facts that establish that Madoff Securities was allowed to and required to pay these customer-defendants in satisfaction of their securities entitlements (or any other valid debt) that Madoff Securities owed them.**

The Trustee has stipulated that the *South Ferry* and *Lowrey* defendants were—at all times—innocent customers of Madoff Securities. South Ferry SUMF ¶¶ 27, 32; South Ferry #2 SUMF ¶¶ 27, 32; Mesora SUMF ¶¶ 29, 34; Lowrey SUMF ¶¶ 42–43, 48. The defendants therefore are squarely under the protection of Rule 15c3-3. If Madoff Securities made a miscalculation in its segregation of customer funds, that does not change the defendants' rights to be paid valid customer claims out of the Reserve Bank Account. Even if Madoff Securities deliberately violated Rule 15c3-3, that does not change the defendants' rights to be paid funds to which they were legally entitled at the times of the payments. In short, Madoff Securities could use the Reserve Bank Account to pay amounts owed to customers, but if that account was empty, it does not change its obligation to pay funds due to the customer promptly on demand.

A customer has an established state law right to demand the full amount of the securities positions shown on his trade confirmations and brokerage account statements. *Section 546(e) Decision*, 773 F.3d 411, 421-21 (2d Cir. 2014) (citing N.Y.U.C.C. § 8-501(b)(1) & cmt. 2) (broker's written crediting of securities to a customer's account creates an enforceable securities entitlement).[1] Federal law preserves this state law remedy. *See* SF Mem. I.D. Under Rule 15c3-3, the broker-dealer is required to "maintain the physical possession or control of all fully-paid securities and excess margin securities and free credit balances carried by a broker or dealer for the account of customers." Rule 15c3-3(b)(1). With this requirement, Rule 15c3-3 also protects "the *absolute right* of a customer" to receive—on demand—physical delivery of certificates for fully paid securities or (upon full payment by the customer) margin securities and free credit balances. Rule 15c3-3(j), (l) (emphasis added). The rule therefore underscores that—at any moment—these customer-defendants could demand prompt payment regardless of whether Madoff Securities had properly computed its Reserve Bank Account.

    **2. Under non-bankruptcy law, no one has the right to recover payments that a broker made out of customer funds, even wrongfully, to an innocent party in satisfaction of valid obligations.**

The SF Customers and the Lowrey Customers have sought summary judgment on the Trustee's avoidance claims under the Bankruptcy Code because of defenses available to them. No principle of non-bankruptcy law would permit a different result in an action against a good-faith creditor, let alone an innocent customer, to recover payments made in satisfaction of a valid state law claim at the time. Even if the defendants were not customers, but were general creditors of the broker-dealer, and Madoff Securities violated the Financial Responsibility Rules in paying them, no person has the right to recover those payments because they were made to an innocent party on account of a claim against the broker-dealer that was valid and legally enforceable at the time of payment. Assuming that Madoff Securities failed to segregate customer funds and report

---

[1] Each time a customer requested a withdrawal from Madoff Securities, he or she intended that Madoff Securities dispose of securities and remit payment to the customer: "[I]f I instruct my broker to sell my shares of ABC Corporation and remit the cash, that payment is a 'settlement' even if the broker may have failed to execute the trade and sent me cash stolen from another client." *546(e) Decision*, 773 F.3d.at 422–23.

3

their status to the regulators, such failures would give rise to law enforcement claims *against Madoff Securities* and/or its principals and accountants, but those are claims that are limited to the government.

### a. As a matter of law, an innocent customer's rights to retain value are not diminished by the improper actions of a broker-dealer.

The Customer Protection Rule was promulgated *to protect customers*. The text specifically states that it was "designed to protect broker-dealer customers in the event the brokerage firm becomes insolvent." *See*, *e.g.*, *SEC v. Goble*, 682 F.3d 934, 940–41 (11th Cir. 2012). To that end, Rule 15c3-3(*l*) provides clear guidance that "nothing stated in this section shall be construed as affecting the absolute right of a customer of a broker or dealer. . . to receive . . . following demand made on the broker or dealer . . . [f]ully-paid securities to which he is entitled." *See*, *e.g.*, *Harris v. TD Ameritrade, Inc.*, 805 F.3d 664, 666–67 (6th Cir. 2015). In the context of the relationship between Madoff Securities and its customers, a demand for cash was, in effect, a demand for fully-paid securities, since it was necessary to convert securities positions reported on the customer's statement to cash in order to satisfy the demand. *See* note 2, *supra*.

Assuming Madoff Securities violated Rule 15c3-3, it follows that nothing in that rule could support an action against—or other otherwise diminish the rights of—a customer who received payment on account of a valid claim in good faith due to them at the time of payment.

### b. Based on the undisputed facts of this case no one—not Madoff Securities, its Trustee, customers, the SEC, or any private party—can recover payments made to innocent parties under non-bankruptcy law.

Neither Madoff Securities nor the Trustee as its successor can recover under principles of non-bankruptcy law payments made to innocent parties because they lack standing to bring such claims under principles of *in pari delicto*. *JPMorgan*, 721 F.3d 54, 57–58 (2d Cir. 2013). Instead, the Trustee's powers are limited to those under avoidance law, constrained by the value defense and other statutory defenses.[2]

Nor would any individual creditor have the ability pre-petition to recover such payment of a valid debt based on state fraudulent transfer law. This is because the state law equivalent of the value defense gives the payee the right to retain any amounts received in satisfaction of a claim against the broker-dealer that was valid and legally enforceable at the time of payment. In adopting now-Justice Breyer's *Boston Trading v. Burnazos* decision, the Second Circuit recognized that the rights of a good faith transferee to retain value are the same whether the funds originated from a legitimate source or were stolen. *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54–55 (2d Cir. 2005); *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1508 (1st Cir. 1987).

---

[2] The bankruptcy preference provisions may provide recourse against the general creditor who receives a valid payment since such creditors are not protected by Section 546(e), which protects customers who receive payments in connection with securities contracts. But that claim would arise only if the broker-dealer also violated the net capital rules by operating with too little capital or otherwise operating while insolvent and was promptly liquidated thereafter.

4

Further, even if the *SEC* had discovered Madoff Securities' fraud, it would have had no recourse against innocent recipients. The SEC could bring regulatory claims against Madoff Securities. *See*, *e.g.*, *Goble*, 682 F.3d at 940–41. But even the SEC could not bring the disgorgement claim that the Trustee now seeks. *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (2d Cir. 2002) (citing *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)). *See* SF Mem. I.A.

Finally, private parties would lack standing to bring a claim against any payment recipient (or even Madoff Securities) for Madoff's failure to segregate property. It is well established that SEC Rule 15c3-3 does not give rise to a private right of action that would allow for any recovery. *Kidder Peabody & Co. v. Unigestion Int'l, Ltd.*, 903 F. Supp. 479, 493 (S.D.N.Y. 1995) (Section 15c3 does not provides a private right of action).

To the extent the Trustee would urge the court to "imply a private right of action under [its] equitable powers," such arguments must fail. *See Harris*, 805 F.3d at 666–67 (rejecting this precise argument in the context of Rule 15c3-3). Such a result would "exceed[] [a court's] authority" because "legal remedies to enforce federal statutes must stem from the legislatively enacted statute, not from court-created equitable enforcement doctrines." *Id.* at 667 (citations omitted). Where, as here, "a statute fails to provide a private remedy [ . . .] the federal courts may not create what Congress did not." *Id.* (citations omitted). Congress provided no such remedy, so there can be no private right of action. *See Kidder*, 903 F. Supp. at 494 ("The primary aim expressed in these words is that of protecting the integrity of the securities markets through regulatory compliance. The protection that § 15(c)(3) affords to private parties is a positive but incidental by-product of the primary goal.").

The scope of Madoff Securities' fraud does not allow this Court to depart from these foundational legal principles. As the Supreme Court instructs, equitable remedies cannot be used to circumvent existing legal rights or obligations. *See Grupo Mexicano De Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 322 (1999); *accord Law v. Siegel*, 134 S. Ct. 1188 (2014). In *Grupo Mexicano*, the Court held that, while "there are indeed new conditions that might call for a wrenching departure from past practice, Congress is in a much better position than [the courts] both to perceive them and to design the appropriate remedy." 527 U.S. at 322. "The law of fraudulent conveyances and bankruptcy was developed to [address] such conduct; an equitable power" was not. *Id*.

**Conclusion**

For the reasons stated, the supplemental questions posed by the Court pose no obstacle to summary judgment. For all the reasons stated in the briefs and at the hearing, the Court should grant the SF Customers' and the Lowrey Customers' motions for summary judgment.

Respectfully submitted,

/s/ Richard A. Kirby
Richard A. Kirby

5