UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SECURITIES INVESTOR PROTECTION          :
CORPORATION,                            :          Adv. Proc. No. 08-01789 (SMB)
                                        :
            Plaintiff,                  :          SIPA LIQUIDATION
                                        :
            -against-                   :          (Substantively Consolidated)
                                        :
BERNARD L. MADOFF INVESTMENT            :
SECURITIES LLC,                         :
                                        :
            Defendant.                  :
-------------------------------------------------------X
                                        :
In re:                                  :
                                        :
BERNARD L. MADOFF,                      :
                                        :
            Debtor.                     :
-------------------------------------------------------X
                                        :
IRVING H. PICARD, trustee for the liquidation :
of Bernard L. Madoff Investment Securities    :          Adv. Proc. No. 09-01182 (SMB)
LLC                                     :
                                        :
            Plaintiff,                  :
                                        :
            -against-                   :
                                        :
J. EZRA MERKIN, *et al.*,               :
                                        :
            Defendants.                 :
-------------------------------------------------------X

## MEMORANDUM DECISION REGARDING MOTIONS *IN LIMINE*

**A P P E A R A N C E S:**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
            David J. Sheehan, Esq.
            Lan Hoang, Esq.
            Brian W. Song, Esq.
                  Of Counsel

*Attorneys for Irving H. Picard, Trustee
  for the Liquidation of Bernard L. Madoff
  Investment Securities LLC*

DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036

> Andrew J. Levander, Esq.
> Neil A. Steiner, Esq.
> Mariel R. Bronen, Esq.
> Daphne T. Ha, Esq.
> > Of Counsel

*Attorneys for J. Ezra Merkin and Gabriel Capital
  Corporation*

NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019

> Judith A. Archer, Esq.
> Sarah O'Connell, Esq.
> David B. Schwartz, Esq.
> > Of Counsel

*Attorneys for Ralph C. Dawson, as Receiver for
  Ascot Partners, L.P., and Ascot Fund Ltd.*

Plaintiff Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA") on the one hand, and defendants J. Ezra Merkin

("Merkin"), Gabriel Capital Corporation ("GCC"), Ascot Partners, L.P. ("Ascot

Partners"), and Ascot Fund Ltd. ("Ascot Fund," and collectively with Merkin, GCC, and

Ascot Partners, the "Defendants") on the other, filed numerous motions *in limine*

seeking to exclude several expert witnesses and their expert reports.  Three are

addressed by this memorandum decision: the Trustee's motion to exclude the reports

and testimony of Jeffery M. Weingarten, (*Trustee's Motion In Limine Number 3 and

Memorandum of Law to Exclude the Opinions and Testimony of Jeffery M.*

*Weingarten*, dated Apr. 7, 2017 ("*Weingarten Motion*") (ECF Doc. # 334)[1]), the

Defendants' motion to exclude the reports and testimony of Dr. Steve Pomerantz

(*Defendants' Memorandum of Law in Support of Their Motion In Limine to Exclude*

*the Testimony, Reports, and Declaration of Steve Pomerantz*, dated Apr. 7, 2017

("*Pomerantz Motion*") (ECF Doc. # 356)), and the Defendants' motion to exclude the

reports and testimony of Lisa M. Collura.  (*Memorandum of Law In Support of*

*Defendants' Motion In Limine to Exclude the Expert Testimony of Lisa M. Collura*,

dated May 17, 2017 ("*Collura Motion*") (ECF Doc. # 379).)  For the reasons that follow,

the *Weingarten Motion* is granted, the *Pomerantz Motion* is granted in part and denied

in part, and the *Collura Motion* is granted in part and denied in part.

## INTRODUCTION

The facts surrounding this adversary proceeding are discussed in *Picard v.*

*Merkin* (*In re BLMIS*), 563 B.R. 737 (Bankr. S.D.N.Y. 2017) ("*Summary Judgment*

*Decision*"), familiarity with which is assumed.  Briefly, the Trustee seeks to avoid and

recover $280 million in withdrawals made between December 11, 2006 and December

11, 2008 (the "Two-Year Period") as intentional fraudulent transfers under sections

548(a)(1)(A) & 550(a) of the Bankruptcy Code from (1) Ascot Partners, as the initial

transferee,[2] and (2) Ascot Fund, GCC, and Merkin, as subsequent transferees.  The

Trustee has met his *prima facie* burden under section 548(a)(1)(A), (*see Order*

*Granting Defendants' Motion In Limine to Exclude the Testimony and Report of Bruce*

*G. Dubinsky*, signed Sept. 18, 2017 ("*Dubinsky Order*"), at ¶ 3 (ECF Doc. # 417)), and

---

[1]    "ECF Doc. # ___" refers to documents filed on the electronic docket of this adversary proceeding.

[2]    The Trustee also seeks to recover the initial transfers from Merkin as a general partner of Ascot
Partners.

the issues remaining for trial concern the defenses set forth in sections 548(c) and 550(b) of the Bankruptcy Code.[3]

Under section 548(c), an initial transferee may defend to the extent it received the transfers "for value and in good faith." Since Ascot Partners is a net loser that withdrew its own deposits, it gave value for the purposes of section 548(c). *Katz*, 462 B.R. at 453 ("It is clear that the principal invested by any of Madoff's customers 'gave value to the debtor,' and therefore may not be recovered by the Trustee absent bad faith."); *Summary Judgment Decision*, 563 B.R. at 749 (same). Thus, the section 548(c) defense comes down to the question of whether Ascot Partners received the initial transfers in good faith.[4]

Ascot Partners does not contest the imputation of Merkin's knowledge to it. *Summary Judgment Decision*, 563 B.R. at 749 n. 33. Hence, Merkin's good faith is the principal issue to be tried.[5] In the context of this case, the good faith inquiry asks whether Merkin willfully blinded himself to the fact that Madoff was not actually trading securities. *Id.* at 749. "Willful blindness consists of two elements or prongs: '(1) the

---

[3]    The Trustee alternatively seeks to equitably subordinate the Defendants' claims against the BLMIS estate under section 510(c) of the Bankruptcy Code. (*See Third Amended Complaint*, dated Aug. 30, 2013, at ¶¶ 402-08 (ECF Doc. # 151).) Although the parties have focused on the Trustee's intentional fraudulent transfer claims in their briefs, factual matters related to the Defendants' good faith are also relevant to the equitable subordination claims. *See Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117, 158 (Bankr. S.D.N.Y. 2014) (the Trustee may be able to equitably subordinate claims "by proving that the defendants invested with Madoff Securities with knowledge, or in reckless disregard, of its fraud") (quoting *Picard v. Katz*, 462 B.R. 447, 456 (S.D.N.Y. 2011), *abrogated on other grounds*, *SIPC v. BLMIS* (*In re BLMIS*), 513 B.R. 437 (S.D.N.Y. 2014)).

[4]    The subsequent transferee's good faith is also an element of the defense under Bankruptcy Code § 550(b)(2), but the subsequent transferee's liability depends on the avoidance of the initial transfer, and section 548(c) is a defense to the initial transfer claim.

[5]    Merkin's knowledge will also be imputed to GCC. *Summary Judgment Decision*, 563 B.R. at 742 (Merkin "occasionally conducted business through his wholly-owned corporation, GCC"). Whether his knowledge will be imputed to Ascot Fund remains a disputed issue of fact. *Id.* at 753 ("[T]here are disputed issues of material fact pertaining to the imputation of Merkin's knowledge to Ascot Fund.").

defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact.'" *Id.* at 743 (quoting *Global–Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).

## A.    The Due Diligence Experts

In connection with the "willful blindness" inquiry, the Trustee and the Defendants have each retained experts to opine as to whether Merkin performed adequate due diligence of BLMIS in connection with investments he managed on behalf of Ascot Partners and other investment funds.  As stated in the *Summary Judgment Decision*, during the relevant period, Ascot Fund invested substantially all of its assets with Ascot Partners, and Ascot Partners invested substantially all of its assets with BLMIS.  563 B.R. at 743.

### 1.    Dr. Steve Pomerantz

The Trustee retained Dr. Steve Pomerantz ("Pomerantz") to opine on Merkin's due diligence with respect to BLMIS and submitted his *Initial Expert Report of Dr. Steve Pomerantz* on March 20, 2015 ("*Pomerantz Report*").[6]  Pomerantz initially described his assignment, his qualifications, and his personal experience with BLMIS. (*Pomerantz Report* at ¶¶ 1-30.)  He explained that appropriate due diligence entailed consideration of the five Ps – process, portfolio, people, performance and price, (*id.* at ¶¶ 49-63) – and broke his analysis down into initial due diligence and post-investment - ongoing/monitoring due diligence.  (*Id.* at ¶¶ 64-71.)  The latter involves proactive and

---

[6]    A copy of the *Pomerantz Report* without exhibits is annexed as Exhibit A to the *Declaration of Daphne T. Ha In Support of Motion n Limine by Defendants to Exclude Testimony, Reports, and Declaration of Steve Pomerantz*, dated Apr. 7, 2017 ("*Ha Declaration*") (ECF Doc. # 357).

reactive due diligence.  Reactive due diligence refers to due diligence triggered by

concerns regarding the investment raised by information obtained from third parties or

uncovered independently, and this information is referred to as a "due diligence

trigger." (*Id.* at ¶¶ 70-71.)

   The vast majority of the *Pomerantz Report* dealt with initial and ongoing,

proactive due diligence.  Pomerantz described appropriate due diligence consistent with

industry customs and norms, and opined that had Merkin performed appropriate due

diligence, he "would have" discovered numerous red flags indicating that BLMIS was a

fraud.  (*Id.* at ¶¶ 2, 35, 98, 99, 101, 122, 128, 142, 146, 163, 171, 205, 206, 227, 247, 295,

298, 295, 302, 309, 316, 337.)  These included consistently positive returns that

outperformed the S&P 100 Index, (*id.* at ¶¶ 120-21, 205-13, 310-16), impossibly high

volumes of option transactions, (*id.* at ¶¶ 122-27), securities trades outside the daily

price ranges, (*id.* at ¶¶ 128-34), unexplained investments in cash at the end of each year,

(*id.* at ¶¶ 143-47), speculative options transactions inconsistent with the hedging

functions typically employed under Madoff's split-strike conversion strategy, (*id.* at ¶¶

160-63), serving as its own broker-dealer, custodian, and administrator, (*id.* at ¶¶ 164-

69), lack of a well-known auditor, (*id.* at ¶¶ 170-72), use of paper account statements

even after most comparable firms had switched to electronic correspondence, (*id.* at ¶¶

173-82), lack of transparency, (*id.* at ¶¶ 228-33), gains during periods of market stress,

(*id.* at ¶¶ 300-09), and an abnormally low fee structure.  (*Id.* at ¶¶ 339-53.)

   The last part of the *Pomerantz Report,* beginning at paragraph 354, discussed

due diligence triggers and reactive due diligence.  Pomerantz opined that it is customary

in the investment industry for fund managers such as Merkin to perform follow-up due

diligence when "due diligence triggers arise that cast doubt on a particular investment." (*Id.* at ¶ 354.) He described three specific triggers relevant to the willful blindness inquiry. First, Merkin was warned about BLMIS by his colleagues and investors. For example, around 1992/1993, Victor Teicher—a portfolio manager for two Merkin-managed funds—told Merkin that the returns Madoff was achieving were "just not possible," and advised Merkin to divest his BLMIS investment. (*Id.* at ¶ 358.) Teicher disclosed additional concerns to Merkin, including that BLMIS self-cleared its own trades and delayed issuing trade confirmations. (*Id.*) In 1995, Joel Ehrenkranz—an Ascot Partners investor and himself a fund manager—redeemed his Ascot investment because "the stability of [Madoff's] returns began to belie any understanding of how it was possible to achieve." (*Id.* at ¶ 361.) He also expressed concern about the lack of "independent verification" at BLMIS. (*Id.*)

Second, Merkin read two 2001 articles—(i) "Madoff tops charts; skeptics ask how" published in *MAR/Hedge*, and (ii) "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum" published in *Barron's*—each of which questioned how Madoff could achieve consistently positive returns. (*Id.* at ¶¶ 363-65 & 363 n. 384.)

Third, in 2005, the collapse of the Bayou Fund, another Ponzi scheme, received extensive press coverage. (*Id.* at ¶ 368.) In connection with Bayou, Merkin reviewed a report by an investment management firm addressing red flags, articles addressing the need for due diligence referencing Bayou, and communications from other investment managers who were invested with Bayou. (*Id.*) Merkin also sent an email within days of the Bayou news listing "[i]ssues we should be asking each of our money managers." (*Id.*

at ¶ 369.)  His list included (i) "Clearing firm;" (ii) "Unusual, unconventional, or self-owned broker-dealer relationship;" (iii) "Auditing firm;" (iv) "Law Firm;" (v) "Use of leverage;" and (vi) "Pricing of fund."  (*Id.*)

According to Pomerantz, it is investment industry custom to perform follow-up due diligence upon the occurrence of triggering events such as the ones described above. Had Merkin done so, he "would have" discovered numerous red flags related to his funds' investment in BLMIS.  (*Id.* at ¶¶ 359, 362, 366, 371, 372.)

### 2.    Jeffery M. Weingarten

The Defendants retained Jeffery M. Weingarten as their expert on Merkin's due diligence, and he submitted the *Expert Report of Jeffery M. Weingarten* on March 19, 2015 ("*Weingarten Report*").[7]  The *Weingarten Report* contained a single analytical section spanning less than four pages.  (*See Weingarten Report* at 2-5.)  After stating that adequate due diligence entails understanding an investment's philosophy, process, procedures, people and performance, (*id.* at 3), Weingarten concluded:

> In my opinion, the Merkin Defendants performed more than adequate due diligence on Mr. Madoff and his organization.  They adequately understood the investment Philosophy; they understood and carefully examined the Process; had transparent knowledge of the Procedures; and knew Mr. Madoff both personally and by reputation.  The Performance, both in terms of the results and in terms of realizing the cash from those results were entirely consistent. Moreover, this due diligence was not a one off event but was continued through the life of the Funds' investments.

(*Id.* at 5.)

---

[7]    A copy of the *Weingarten Report* is attached as Exhibit 5 to the *Declaration of Lan Hoang In Support of Trustee's Motions In Limine Numbers 1 Through 4*, dated Apr. 7, 2017 (ECF Doc. # 337).

### 3.    Rebuttal Reports

Pomerantz submitted his *Rebuttal Expert Report of Dr. Steve Pomerantz* on May 15, 2015 ("*Pomerantz Rebuttal*") in response to the *Weingarten Report*.[8]  Pomerantz challenged Weingarten's conclusion about the adequacy of Merkin's due diligence and added, "Weingarten provides no analysis or references to specific documents to support this conclusion." (*Pomerantz Rebuttal* at ¶ 3.)  Weingarten likewise submitted his *Rebuttal Expert Report of Jeffery M. Weingarten* on May 14, 2015 ("*Weingarten Rebuttal*") in response to the *Pomerantz Report*[9] asserting that "[a]lmost none" of the "after-the-fact forensics" conducted by Pomerantz to identify red flags was standard prior to the revelation of Madoff's fraud.  (*Weingarten Rebuttal* at 2.)  As a result, Pomerantz applied the wrong due diligence standard to Merkin.  (*Id.* at 3, 5.)

### 4.    The Motions *In Limine*

Each side has moved to exclude the other side's expert and his report.  In the main, the Defendants assert that Pomerantz's opinions are not relevant to the "willful blindness" inquiry.  (*Pomerantz Motion* at 3.)  Instead of discussing matters that bear on Merkin's subjective beliefs, the *Pomerantz Report* is filled with purported red flags.  (*Id.* at 3-4.)  In addition, (i) Pomerantz's opinions were excluded by District Judge Rakoff in another action commenced by the Trustee—*Picard v. Mets Ltd. P'ship*, No. 11 Civ. 3605 (S.D.N.Y.), (ii) Pomerantz never told his former clients who invested in BLMIS feeder funds that he thought BLMIS was a Ponzi scheme, (iii) his description of

---

[8]        A copy of the *Pomerantz Rebuttal* is attached as Exhibit C to the *Declaration of Mariel R. Bronen in Opposition to Trustee's Motion In Limine Number 3 to Exclude the Opinions and Testimony of Jeffrey M. Weingarten*, dated May 10, 2017 ("*Bronen Declaration*") (ECF Doc. # 363).

[9]        A copy of the *Weingarten Rebuttal* is attached as Exhibit D to the *Bronen Declaration*.

customary due diligence practices was conclusory, (iv) his actual due diligence practices contradicted those set forth in his expert reports, (v) and the *Pomerantz Report* inaccurately disclosed the documents Pomerantz considered by including the many more documents reviewed by other members of his team. (*Id.* at 4-9.) Finally, the Defendants seek to exclude a declaration submitted by Pomerantz, (*see Declaration of Dr. Steve Pomerantz*, dated Nov. 24, 2015 ("*Pomerantz Declaration*"[10])), in opposition to a prior motion of the Defendants for summary judgment. They argue that the *Pomerantz Declaration* improperly introduces new opinions not found in the *Pomerantz Report*. (*Pomerantz Motion* at 9-11.)

The Trustee opposes the Defendants' motion. (*See Trustee's Memorandum of Law In Opposition to Defendants' Motion In Limine to Exclude the Testimony, Reports, and Declaration of Steve Pomerantz*, dated May 10, 2017 (ECF Doc. # 375).) He argues that Pomerantz's opinions about industry due diligence standards will assist the fact finder to determine whether Merkin willfully blinded himself to the fraud, (*id.* at 5-6), Pomerantz's opinions are reliable, and the Defendants' arguments go to the weight of the evidence, not its admissibility. (*Id.* at 7-11.) The Trustee further contends that Pomerantz's team approach to the preparation of an expert report was entirely proper, (*id.* at 11-13), and the opinions he expressed in the *Pomerantz Declaration* fell within the scope of the *Pomerantz Report*. (*Id.* at 13-17.)[11]

---

[10]    A copy of the *Pomerantz Declaration* is attached as Exhibit C to the *Ha Declaration*.

[11]    The Defendants filed a reply in further support of the *Pomerantz Motion* reiterating arguments made in the motion. (*See Reply Memorandum of Law in Further Support of Defendants' Motion In Limine to Exclude the Testimony, Reports, and Declaration of Steve Pomerantz*, dated June 13, 2017 (ECF Doc. # 406).)

The Trustee, in turn, seeks to exclude Weingarten and the *Weingarten Report*. (*See Weingarten Motion*.)  According to the Trustee, Weingarten's opinion relating to the adequacy of Merkin's due diligence is *ipse dixit*, and is devoid of analysis.  (*Id.* at 6-16.)  Further, Weingarten's expert opinion is filled with conclusions regarding Merkin's state of mind, (*id.* at 17-20), and factual narratives, (*id.* at 20-22), both of which are improper in an expert report.  The Defendants respond that Weingarten properly analyzed Merkin's due diligence using the five P's methodology, a variation of which was used by the Trustee's own expert Pomerantz.  (*Defendants' Memorandum of Law In Opposition to Trustee's Motion In Limine Number 3 to Exclude the Opinions and Testimony of Jeffrey M. Weingarten*, dated May 10, 2017, at 3, 5-6 (ECF Doc. # 362).)[12]

## DISCUSSION

"The purpose of an in limine motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'"  *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quoting *Banque Hypothecaire du Canton de Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987)).  The Court may defer ruling on an *in limine* motion until trial, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996), or alter a prior *in limine* ruling at trial.  *Luce v. United States*, 469 U.S. 38, 41-42 (1984).

---

[12]    The Trustee filed a reply in further support of the *Weingarten Motion*.  (*See Trustee's Reply Memorandum of Law in Further Support of Motion In Limine Number 3 to Exclude the Opinions and Testimony of Jeffrey M. Weingarten*, dated June 13, 2017 (ECF Doc. # 385).)

As the present motions seek to exclude expert witnesses, the analysis begins with

Rule 702 of the Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  The party offering the expert testimony bears the burden of

establishing the admissibility requirements set forth in the rule, *Teachers' Ret. Sys. of*

*La. v. Pfizer, Inc.* (*In re Pfizer Inc. Sec. Litig.*), 819 F.3d 642, 658 (2d Cir. 2016), and the

court serves as the "gatekeeper" to ensure "that an expert's testimony both rests on a

reliable foundation and is relevant to the task at hand."  *United States v. Williams*, 506

F.3d 151, 160 (2d Cir. 2007) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

579, 597 (1993)), *cert. denied*, 552 U.S. 1224 (2008); *accord Kumho Tire Co., Ltd. v.*

*Carmichael*, 526 U.S. 137, 152 (1999).  The trial court enjoys "broad discretion" in

carrying out this gatekeeping function, *Pfizer*, 819 F.3d at 658, and the court's "inquiry

into the reliability of expert testimony under Rule 702 is a 'flexible one.'"  *Williams*, 506

F.2d at 160 (quoting *Daubert*, 509 U.S. at 594).

The "focus" of the court's inquiry "must be solely on principles and methodology,

not on the conclusions that they generate."  *Daubert*, 509 U.S. at 595.  "Questions about

the weight or the sufficiency of the evidence upon which the expert relied, or the

conclusions generated therefrom, are for cross-examination."  *CIT Grp./Bus. Credit,*

*Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 676 (S.D.N.Y. 2011). However, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)). Therefore, expert testimony should be excluded if it is "speculative or conjectural" or is "conclusory." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (quotation omitted). Likewise, speculation about a person's state of mind is improper expert testimony. *Bd. of Trs. of the Aftra Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09 Civ. 686 (SAS), 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011) ("There is no dispute that opinions concerning state of mind are an inappropriate topic for expert opinion.") (footnote omitted); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony [because] "it describes lay matters which a jury is capable of understanding and deciding without the expert's help.") (quoting *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) and *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004)). Finally, an expert may not testify in the form of a factual narrative based on evidence about which he lacks personal knowledge. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016).

A.      **Due Diligence Experts**

     1.      *Pomerantz Report*

     The majority of the *Pomerantz Report* devotes itself to an exhaustive discussion of what constitutes appropriate initial and proactive, ongoing due diligence and what red flags Merkin "would have" discovered had he performed appropriate due diligence on BLMIS consistent with industry standards.  These issues are immaterial.  This is not a negligence case.  Whether Merkin failed to conduct appropriate due diligence (or whether he breached a fiduciary duty to his own investors by not conducting adequate due diligence) is irrelevant with an exception discussed shortly.  For this reason, what Merkin "would have" discovered but failed to discover because of shoddy due diligence is not before the Court.

     Instead, the case turns, in the first instance, on whether Merkin entertained the *subjective* belief that there was a high probability that BLMIS was not actually trading securities.  Thus, "the question is what did [Merkin] learn about BLMIS as the years passed, and what did he do with that information."  *Summary Judgment Decision,* 563 B.R. at 749.  If Merkin did not learn a fact because he conducted an inadequate investigation or no investigation, he still didn't learn that fact.  The most that can be said about due diligence is that the failure to conduct initial or ongoing, proactive due diligence might support the inference that Merkin already knew the answer:  Madoff was running a Ponzi scheme.  However, the Trustee has not made this argument, and the inference is weak and does not justify a time consuming trial within a trial to consider the general principles of due diligence that form the main part of Pomerantz's 167-page report.

On the other hand, the portion of the *Pomerantz Report* discussing due diligence triggers and reactive due diligence is germane to the second prong of the willful blindness inquiry. Pomerantz opined that it was industry "custom and practice" for fund managers such as Merkin to follow-up when due diligence triggers arose, (*Pomerantz Report* at ¶ 354), including when colleagues or investors warn the fund manager about a particular investment, (*id.* at ¶¶ 356-62), when articles are published that raise questions about an investment, (*id.* at ¶¶ 363-66), or when another fund, exhibiting similar characteristics to an invested fund, is exposed as a fraud. (*Id.* at ¶¶ 367-72.) The *Pomerantz Report* referred to specific instances when others warned Merkin about Madoff or Merkin acquired information indicating that further investigation of Madoff might be warranted.[13] It is important to know what someone like Merkin should have done, because if he did not respond appropriately to specific indications that Madoff was a fraud, it may support an inference that Merkin consciously turned away from those facts and any further investigation.

Some of the Defendants' remaining objections are mooted by the decision to exclude Pomerantz's report and testimony relating to general due diligence standards and what Merkin "would have" discovered if he had followed those standards. However, the Defendants also argue that the *Pomerantz Report* violated Federal Civil Rule 26(a)(2)(B)(ii) by including not only documents reviewed by Pomerantz himself, but also documents reviewed by his assistants. (*Pomerantz Motion* at 7-9.) An expert

---

[13]    Although the vast majority of Pomerantz's opinion regarding what Merkin actually learned appears in the "Due Diligence Triggers" section of *Pomerantz Report*, Pomerantz may also testify about the appropriate response to red flags raised by the information that Merkin discovered on his own. For example, the *Pomerantz Report* referred to documents produced by Merkin that showed that the returns of a different BLMIS feeder fund did not correlate to the S&P 500 Index. (*E.g.*, *Pomerantz Report* at ¶ 201.)

witness can rely on assistants to formulate an expert opinion, *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 266 (W.D.N.Y. 2013) (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002)), and Pomerantz disclosed the fact that he had hired an advisory firm to assist him. (*See Pomerantz Report* at 1 n. 1 ("I retained Duff & Phelps, LLC, a valuation and corporate finance advisory firm ("D&P") to assist me in the preparation of this report. Employees of D&P worked under my direction and supervision in the preparation of work supporting my opinions contained herein.").) Nevertheless, the Defendants are entitled to know what Pomerantz reviewed and separately, what his assistants reviewed and what they did with that information. *See Herman v. Marine Midland Bank*, 207 F.R.D. 26, 31 (W.D.N.Y. 2002) (where the expert report was a result of collaboration between an expert and his assistant, the adversary was "entitled to explore what [the assistant] did"); *Derrickson v. Circuit City Stores, Inc.*, No. DKC 95-3296, 1999 WL 1456538, at *7-8 (D. Md. Mar. 19, 1999) (assistant who manipulated and organized raw data into tables upon which the expert relied must disclose information regarding how he manipulated the data), *aff'd*, 203 F.3d 821 (4th Cir.), *cert. denied*, 530 U.S. 1276 (2000); *accord America's Collectibles Network, Inc. v. Sterling Commerce (Am.), Inc.*, No 3:09-cv-143-HBG, 2017 WL 2602980, at *2-3 (E.D. Tenn. Apr. 18, 2017) (expert need not disclose notes taken by his assistant that the expert never saw).

"[E]ven if a party fails to adhere strictly to the disclosure requirements of Rule 26, imposing the sanction of precluding expert testimony is not required." *Harkabi v. SanDisk Corp.*, No. 08 Civ. 8203(WHP), 2012 WL 2574717, at *4 (S.D.N.Y. June 20, 2012). Preclusion of expert testimony is a "drastic remedy," and imposing such sanction

for failing to comply strictly with Rule 26 could "frustrate the Federal Rules' overarching objective of doing substantial justice to litigants." *Id.* (quoting *Wechsler v. Hunt Health Sys. Ltd.*, 381 F. Supp. 2d 135, 155 (S.D.N.Y. 2003) and *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d 446, 458 (S.D.N.Y. 1999)).  Moreover, the extent of any prejudice may be minimal because the only portion of the *Pomerantz Report* that will be admissible relates to reactive due diligence and the due diligence triggers.  Therefore, the Court orders the Trustee to identify those documents Pomerantz actually considered in this part of the *Pomerantz Report*, and if he relied on his assistants, the documents they reviewed.  Thereafter, the parties should meet and confer regarding whether any supplemental discovery of Pomerantz is necessary to mitigate any prejudice the Defendants may have suffered because they did not know which specific documents he considered.

Last, the Defendants seek to exclude the *Pomerantz Declaration.*  (*Pomerantz Motion* at 9-11.)  The *Pomerantz Declaration* was submitted in opposition to the summary judgment motions previously made by the Defendants.  Rule 26(a)(2)(B)(i) of the Federal Rules of Civil Procedures requires that an expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them," FED. R. CIV. P. 26(a)(2)(B)(i), but an expert may submit an additional affidavit in conjunction with dispositive motions to the extent that such affidavit is within the scope of the initial expert report.  *Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 301 F.R.D. 31, 36 (S.D.N.Y. 2014).

The *Pomerantz Declaration* was submitted in connection with the summary judgment motions decided by the Court in the *Summary Judgment Decision*.  The

Defendants did not challenge the admissibility of the *Pomerantz Declaration* during

that proceeding.  Nevertheless, the seven page declaration deals with general due

diligence principles, and duplicates the parts of the *Pomerantz Report* that the Court

has excluded.[14]  Importantly, the *Pomerantz Declaration* does not discuss the due

diligence triggers and corresponding reactive due diligence that is germane to the willful

blindness inquiry.   Accordingly, it is inadmissible.

### 2.    *Weingarten Report*

The *Weingarten Report* also dealt with the general subject of appropriate due

diligence, and for the reasons stated in connection with the *Pomerantz Report,* is

inadmissible.  In addition, the *Weingarten Report* suffers from additional shortcomings

that render it inadmissible for other reasons.

First, the majority of the *Weingarten Report* impermissibly attested to Merkin's

state of mind.  For example, it states that "Merkin was aware" that various regulators

and others had looked into BLMIS, and had not uncovered any wrongdoing.

(*Weingarten Report* at 2-3.)  In addition, "Merkin had a clear understanding" of

Madoff's investment philosophy, (*id.* at 3), and his conversations with Madoff

"reinforced the notion" that Madoff's investment philosophy was sound.  (*Id.*)  It was

"clear," presumably to Merkin, that Madoff's philosophy would forego potential higher

profits and that the philosophy of preventing risk of loss was more important than

---

[14]    The *Pomerantz Declaration* attached a later version of the *Pomerantz Report* than the report
referenced in the *Pomerantz Motion.*  The latter is dated March 20, 2015.  The *Pomerantz Report*
attached as Exhibit A to the *Pomerantz Declaration* is a corrected version dated April 13, 2015.  (*See
Declaration of Dr. Steve Pomerantz*, Ex. A (ECF Doc. # 294-1).)  Neither side has identified any material
differences between the two versions.

risking greater gain.  (*Id.*)  It was also "understood," again presumably by Merkin, that the "with benefits" part of the process was how BLMIS generated the majority of the returns.  (*Id.*)  In addition, "Merkin understood" that Madoff could predict short term trends, and also "understood" that Madoff's knowledge and experience allowed him to take advantage of market timing and stock selection to improve returns.  (*Id.* at 4.) Furthermore, "Merkin had reason to believe" that Madoff's procedures were clear and transparent.  (*Id.*)  "Merkin knew" the people running BLMIS, "Merkin knew" Madoff's experience and reputation, and based on what he knew about Madoff, "Merkin had every reason to believe" that Madoff was a highly reputable, highly regarded professional who possessed the requisite experience to manage money in the manner he intended.  (*Id.*)  Merkin also had "no reason to doubt" that BLMIS' records were accurate, "Merkin knew" that Madoff had paid a $440 million redemption without hesitation following an SEC third-party investigation, the "Merkin Defendants at the time believed" that Madoff's results were plausible, and "Merkin knew"  that many other highly sophisticated and experienced investors were clients of Madoff.  (*Id.* at 5.) Finally, as the earlier quotation regarding Weingarten's conclusion attested, the Merkin Defendants "adequately understood" Madoff's investment philosophy, "understood and carefully examined" the process, "had transparent knowledge" of Madoff's procedures and "knew Mr. Madoff both personally and by reputation."  (*Id.*)

Second, Weingarten did not explain his methodology and his opinions are conclusory and devoid of analysis.  "If the witness is relying solely or primarily on experience, then [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is

reliably applied to the facts." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 636 (S.D.N.Y. 2016) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 n. 148 (S.D.N.Y. 2010)) (alternation in original).  While Weingarten referred to his experience a number of times in his report, he failed to link the experience to the conclusions he reached.  (*E.g.*, *Weingarten Report* at 5 ("in my experience, [BLMIS'] returns were not implausible").) Among other things, Weingarten states without analysis that BLMIS' non-volatile, better-than-expected returns were "consistent" with BLMIS' philosophy, process, and procedures, (*id.* at 4-5), that Madoff's returns "were not implausible" and were instead "achievable," (*id.* at 5), and that under BLMIS' investment philosophy, Madoff "would forgo potential high profit opportunities" and be out of the market "around highly volatile periods."  (*Id.* at 3.)

### 3.    The Rebuttal Reports

The *Pomerantz Rebuttal* rebutted the *Weingarten Report* which is being excluded.  Accordingly, the *Pomerantz Rebuttal* is unnecessary and will also be excluded.

The brief *Weingarten Rebuttal* responded to the *Pomerantz Report*, the majority of which will be excluded.  It included a statement, possibly in response to the *Pomerantz Report's* discussion of due diligence triggers, that the "concerns" about BLMIS' accounting firm, the manual confirmations and the issue of self-clearing were "publically known and discussed at the time," but did not dissuade some of the most sophisticated investors from investing with Madoff.  (*Weingarten Rebuttal* at 2.) However, Weingarten is not being offered as an expert in what was publically known,

- 20 -

and moreover, the question is what Merkin knew, not what the public knew.  Merkin

and others with first-hand knowledge are in the best position to testify regarding what

Merkin knew or suspected, and the *Weingarten Rebuttal* will be excluded.

In summary, the *Pomerantz Motion* is granted except to the extent that the Court

will receive that portion of the *Pomerantz Report* and Pomerantz's testimony relating to

reactive due diligence and due diligence triggers as outlined above.  The *Weingarten*

*Motion* is granted in its entirety.

## B.    The Accounting Expert

The Trustee also retained a forensic accountant, Lisa M. Collura ("Collura"), and

she submitted her *Expert Report of Lisa M. Collura CPA, CFE, CFF* on March 20, 2015

("*Collura Report*").[15]  Collura had two roles.  First, she verified that the cash

transactions in all BLMIS accounts[16] (*i.e.*, customer deposits and withdrawals) actually

occurred.  (*Collura Report* at ¶¶ 7, 20.)  Collura identified 89 deposit and withdrawal

transactions in the accounts held by Ascot Partners and former defendants Gabriel and

Ariel, and reconciled 84 of those transactions with bank records, documents contained

in their BLMIS customer files, and records produced by them.  (*Id.* at ¶¶ 36-56.)

---

[15]    A copy of the *Collura Report* is attached as Exhibit A to the *Declaration of Judith A. Archer In Support of Defendants' Motion In Limine to Exclude the Expert Testimony of Lisa M. Collura*, dated May 17, 2017 ("*Archer Declaration*") (ECF Doc. # 380).

[16]    The report included transfers into the bank accounts owned by former defendants Gabriel Capital, L.P. ("Gabriel") and Ariel Fund Ltd ("Ariel").  A short period of time after the issuance of the *Collura Report*, these defendants entered into settlements with the Trustee, the settlements were approved by the Court under Rule 9019 of the Federal Rules of Bankruptcy Procedure, (*see Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement Agreement Between the Trustee and Gabriel Capital, L.P., Ariel Fund Ltd., and Bart M. Schwartz as the appointed receiver of Gabriel Capital, L.P. and Ariel Fund Ltd.*, dated June 23, 2015 (ECF Doc. # 270)), and the defendants were dismissed from the case.  (*See Stipulation of Dismissal with Prejudice and Consent Order*, signed Sept. 8, 2015 (ECF Doc. # 282).)

Second, the Trustee directed Collura to calculate the immediate and mediate transfers between and among Ascot Partners and the other Defendants.[17]  Because the subsequent transfers originated from commingled accounts, it was necessary to determine what portion of the subsequent transfer stemmed from the initial transfer. She used five methodologies selected by the Trustee, and her conclusions are summarized in the following table:

| Method | Description of Method | Subsequent Transferees (Amount) |
|---|---|---|
| Last In, First Out (LIFO) | Last dollar in, first dollar out | Ascot Fund: ($21,081,296)<br>GCC:          ($11,405,779) |
| First In, First Out (FIFO) | First dollar in, first dollar out | Ascot Fund: ($33,365,000)<br>GCC:          ($12,051,196) |
| Lowest Intermediate Balance Rule (LIBR) | Trust funds are the last funds disbursed from the account. | Ascot Fund: ($29,064,189)<br>GCC:          ($9,356,021) |
| Restated Tracing Rules (Restated LIBR) | Claimant (*i.e.*, the Trustee) can claim that the entirety of the withdrawals are attributable to the claimant's funds (*i.e.*, the funds originating from BLMIS), and can trace for his benefit any withdrawal that does not exceed the lowest balance in a commingled account at various points. | Ascot Fund: ($33,365,000)<br>GCC:          ($17,756,812) |
| Proportionality | Proportion of the balance in a commingled bank account attributable to different sources applies in that proportion to the next disbursement. | Ascot Fund: ($25,984,614)<br>GCC:          ($11,546,306) |

---

[17]      Collura's tracing analysis included subsequent transfers to former defendants Gabriel and Ariel, but concluded that neither entity received any portion of the $280 million initially transferred to Ascot Partners in the Two-Year Period.

- 22 -

(*Collura Report* at ¶¶ 84-111.)

In addition, Collura calculated the amounts subsequently transferred from GCC to, or for the benefit of, Merkin. (*Id.* at ¶¶ 112-18.) Employing the same five methodologies, Collura concluded these mediate subsequent transfers ranged in amount from between $4,746,330 to $9,957,970. (*Id.* at ¶¶ 119-33.)

The Defendants have moved *in limine* to exclude the *Collura Report* and Collura's testimony. (*See Collura Motion.*) Her testimony confirming the initial transfers from BLMIS to Ascot Partners is unnecessary because the parties have stipulated to the amounts of the initial transfers, and the Defendants concede that the Trustee has satisfied his *prima facie* burden to show that the transfers from BLMIS to Ascot Partners were avoidable under section 548(a)(1)(A) of the Bankruptcy Code. (*Dubinsky Order* at ¶ 3.) As a result, the amounts of the initial transfers are undisputed. (*Collura Motion* at 2.)

The Defendants also maintain that Collura should be precluded from testifying about the five tracing methodologies used to calculate the subsequent transfers. The Trustee, not Collura, selected the five methods, and Collura will not opine as to whether one or any of the five is an appropriate methodology. (*Id.* at 5-8.) The Defendants, on the other hand, have retained their own expert who has accepted Collura's calculations and will opine that LIFO and Proportionality are the most appropriate tracing methodologies given how the Defendants operated. (*See Expert Rebuttal Report of Paul K. Meyer TM Financial Forensics, LLC*, dated May 15, 2015, at ¶ 24 (attached as Exhibit C to the *Archer Declaration*).)

The Trustee objects to the *Collura Motion*.  (*See Trustee's Memorandum of Law in Opposition to Defendants' Motion In Limine to Exclude the Expert Testimony of Lisa M. Collura*, dated June 13, 2017 ("*Trustee Objection to Collura Motion*") (ECF Doc. # 394).)  He argues that Collura's explanations about the five tracing methodologies will provide the Court with helpful context in deciding the correct one to apply.  (*Id.* at 6-7.)  Moreover, Collura's testimony about the payment of management fees to or for the benefit of Merkin is relevant to the "good faith" inquiry because it indicates that Merkin had a motive to continue dealing with BLMIS in the face of red flags.  (*Id.* at 7-8.)[18]

I agree that Collura's testimony about the initial transfers is unnecessary.  They have been conceded.  Collura's analysis regarding subsequent transfers represents a more difficult question.  As detailed above, Collura calculated the immediate and mediate transfers but did not select one methodology over another and has no opinion on the subject.  In addition, the Defendants do not contest her calculations under each method.  The Trustee nevertheless argues that Collura's explanation of the tracing methodologies will assist the Court in determining the correct one to apply.  (*Trustee Objection to Collura Motion* at 1.)

While it is true that Collura does not opine on the appropriate tracing methodology, a description of the methodologies may assist the Court in making its own determination as to the proper methodology.  The tracing methodologies reflect legal rules or fictions designed to assist a Court in dealing with an improper transfer from a

---

[18]    The Defendants filed a reply further supporting the *Collura Motion*.  (*See Reply Memorandum of Law in Further Support of Defendants' Motion In Limine to Exclude the Expert Testimony of Lisa M. Collura*, dated June 23, 2017 (ECF Doc. # 403).)

commingled fund. *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 59 & cmts. (2011); 2 DAN B. DOBBS, LAW OF REMEDIES § 6.1(4), at 17 (2d ed. 1993). Expert opinion regarding the appropriate methodology may prove helpful, but the Court's selection of an appropriate methodology is committed to the Court's discretion. *United States v. Henshaw*, 388 F.3d 738, 739 (10th Cir. 2004) ("Adherence to specific equitable principles, including rules concerning tracing analysis, is subject to the equitable discretion of the court.") (quoting *United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996)) (alterations omitted); *accord McHale v. Boulder Capital LLC* (*In re 1031 Tax Grp., LLC*), 439 B.R. 78, 81 (Bankr. S.D.N.Y. 2010) ("Courts have discretion when determining how to allocate commingled funds where a party has acted improperly in obtaining the funds."). Thus, the Court may select a different methodology than the one supported by the opinion of the Defendants' expert. Accordingly, the Court denies the branch of the *Collura Motion* seeking to exclude the portions of the *Collura Report* and Collura's testimony relating to the tracing methodologies and her calculation of the immediate and mediate transfers utilizing those methodologies. The *Collura Motion* is otherwise granted.

The parties are directed to settle an order on notice and arrange a conference for the purpose of scheduling the trial.

Dated:   New York, New York
         December 22, 2017

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge