Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-01789-smb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    SECURITIES INVESTOR PROTECTION CORPORATION,

6                    Plaintiff,

7              v.

8    BERNARD L. MADOFF INVESTMENT SECURITIES, LLC, et al.,

9                    Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY  10004

15

16                    December 20, 2017

17                    10:04 AM

18

19

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  FRANCES FERGUSON

Page 2

1   HEARING re Application for Interim Professional Compensation

2   Twenty-Fifth Application Of Trustee And Baker & Hostetler

3   LLP For Allowance Of Interim Compensation For Services

4   Rendered And Reimbursement Of Actual And Necessary Expenses

5   Incurred From April 1,2017 Through July 31, 2017 for Baker &

6   Hostetler, L.L.P., Trustee's Attorney, period: 4/1/2017 to

7   7/31/2017, fee: $33,782,780.11, expenses: $412,517.60.

8

9   HEARING re Application for Interim Professional Compensation

10   Application Of Browne Jacobson, LLP As Special Counsel to

11   The Trustee For Allowance Of Interim Compensation For

12   Services Rendered And Reimbursement Of Actual And Necessary

13   Expenses Incurred From April 1, 2017 Through July 31, 2017

14   for Browne Jacobson, LLP, Special Counsel, period: 4/1/2017

15   to 7/31/2017, fee: $750,288.54, expenses: $19,712.12.

16

17   HEARING re Application for Interim Professional Compensation

18   Application Of Cochran Allan As Special Counsel To The

19   Trustee For Allowance Of Interim Compensation For Services

20   Rendered From April 1, 2017 Through July 31, 2017 for

21   Cochran Allan, Special Counsel, period: 4/1/2017 to

22   7/31/2017, fee: $1,232.55, expenses: $0.

23

24

25

1    HEARING re Application for Interim Professional Compensation

2    Application Of Eugene F. Collins As Special Counsel To The

3    Trustee For Allowance Of Interim Compensation For Services

4    Rendered And Reimbursement Of Expenses Incurred From April

5    1, 2017 Through July 31, 2017 for Eugene F. Collins, Special

6    Counsel, period: 4/1/2017 to 7/31/2017, fee: $9,108.41,

7    expenses: $19.87.

8

9    HEARING re Application for Interim Professional Compensation

10   Application Of Graf & Pitkowitz Rechtsanwalte GmbH As

11   Special Counsel To The Trustee For Allowance Of Interim

12   Compensation For Services Rendered And Reimbursement Of

13   Expenses Incurred From April 1, 2017 Through July 31,2017

14   for Graf Pitkowitz Rechtsanwalte GmbH, Special Counsel,

15   period: 4/1/2017 to 7/31/2017, fee: $2,759.84, expenses:

16   $230.61.

17

18   HEARING re Application for Interim Professional Compensation

19   Application Of Higgs & Johnson (Formerly Higgs Johnson

20   Truman Bodden & Co.) As Special Counsel To The Trustee For

21   Allowance Of Interim Compensation For Services Rendered And

22   Reimbursement Of Expenses Incurred From April 1, 2016

23   Through July 31, 2017 for Higgs & Johnson, Special Counsel,

24   period: 4/1/2016 to 7/31/2017, fee: $41,097.29, expenses:

25   $142.64.

1   HEARING re Application for Interim Professional Compensation

2   Final Application Of Osborne & Osborne, P.A. As Special

3   Counsel To The Trustee For Reimbursement Of Fees Previously

4   Held Back By SIPC for Osborne & Osborne, P.A., Special

5   Counsel, period: 4/1/2017 to 7/31/2017, fee: $120.17,

6   expenses: $0.

7

8   HEARING re Application for Interim Professional Compensation

9   Application Of SCA Creque As Special Counsel To The Trustee

10  For Allowance Of Interim Compensation For Services Rendered

11  And Reimbursement Of Expenses Incurred From April 1,2017

12  Through July 31,2017 for SCA Creque, Special Counsel,

13  period: 4/1/2017 to 7/31/2017, fee: $19437.01, expenses: $0.

14

15  HEARING re Application for Interim Professional Compensation

16  Application Of Schiltz & Schiltz As Special Counsel To The

17  Trustee For Allowance Of Interim Compensation For Services

18  Rendered And Reimbursement Of Expenses Incurred From April

19  1, 2017 Through July 31,2017 for Schiltz & Schiltz, Special

20  Counsel, period: 4/1/2017 to 7/31/2017, fee: $32,096.72,

21  expenses: $2,086.29.

22

23

24

25

Page 5

1    HEARING re Application for Interim Professional Compensation

2    Application Of Soroker Agmon Nordman As Special Counsel To

3    The Trustee For Allowance Of Interim Compensation For

4    Services Rendered And Reimbursement Of Expenses Incurred

5    From April 1, 2017 Through July 31, 2017 for Soroker Agmon

6    Nordman, Special Counsel, period: 4/1/2017 to 7/31/2017,

7    fee: $539,293.00, expenses: $9,804.44.

8

9    HEARING re Application for Interim Professional Compensation

10   Application Of Triay Stagnetto Neish As Special Counsel To

11   The Trustee For Allowance Of Interim Compensation For

12   Services Rendered From December 1, 2016 Through July 31,

13   2017 for Triay Stagnetto Neish, Special Counsel, period:

14   12/1/2016 to 7/31/2017, fee: $449.83, expenses: $33.50.

15

16   HEARING re Application for Interim Professional Compensation

17   Application Of UGGC & Associés As Special Counsel To The

18   Trustee For Allowance Of Interim Compensation For Services

19   Rendered From April 1, 2017 Through July 31, 2017 for UGGC &

20   Associés Special Counsel, period: 4/1/2017 to

21   7/31/2017, fee: $112756.77, expenses: $0.

22

23

24

25

Page 6

1    HEARING re Application for Interim Professional Compensation

2    Application Of Werder Vigano As Special Counsel To The

3    Trustee For Allowance Of Interim Compensation For Services

4    Rendered From April 1, 2017 Through July 31, 2017 for Werder

5    Vigano, Special Counsel, period: 4/1/2017 to 7/31/2017, fee:

6    $501.53, expenses: $0.

7

8    HEARING re Application for Interim Professional Compensation

9    / Twenty-Fourth Application of Windels Marx Lane &

10   Mittendorf, LLP for Allowance of Interim Compensation for

11   Services Rendered and Reimbursement of Actual and Necessary

12   Expenses Incurred from April 1,2017 Through July 31, 2017

13   for Windels Marx Lane & Mittendorf, LLP, Special Counsel,

14   period: 4/1/2017 to 7/31/2017, fee: $1,931,328.50, expenses:

15   $73,421.18.

16

17   HEARING re Application for Interim Professional Compensation

18   Application Of Williams, Barristers & Attorneys As Special

19   Counsel To The Trustee For Allowance Of Interim Compensation

20   For Services Rendered From April 1,2017 Through July 31,

21   2017 for Williams, Barristers & Attorneys, Special Counsel,

22   period: 4/1/2017 to 7/31/2017, fee: $284781.53, expenses:

23   $0.

24

25

Page 7

1   HEARING re Application for Interim Professional Compensation

2   Application Of Young Conaway Stargatt & Taylor, LLP As

3   Special Counsel To The Trustee For Allowance Of Interim

4   Compensation For Services Rendered And Reimbursement Of

5   Expenses Incurred From April 1, 2017 Through July

6   31, 2017 for Young Conaway Stargatt & Taylor, LLP, Special

7   Counsel, period: 4/1/2017 to 7/31/2017, fee: $38,068.56,

8   expenses: $631.60.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   BAKER HOSTETLER

 4        Attorneys for the Trustee BLMIS

 5        45 Rockefeller Plaza

 6        New York, NY 10111

 7

 8   BY:  DAVID J. SHEEHAN

 9

10   SECURITIES INVESTOR PROTECTION CORPORATION

11        1667 K. Street, N.W., Suite 1000

12        Washington, D.C. 20006

13

14   BY:  KEVIN H. BELL

15

16   ALSO PRESENT TELEPHONICALLY:

17

18   PATRICK MOHAN

19

20

21

22

23

24

25
```

```
 1                   P R O C E E D I N G S

 2              MR. SHEEHAN:  Good morning, Your Honor.  How are

 3     you today?

 4              THE COURT:  Very well, thank you.

 5              MR. SHEEHAN:  Good.  This is the return date of

 6     the 25th application for interim compensation by the

 7     Trustee, his counsel, and an assortment of other firms who

 8     have supported the Trustee throughout these efforts.

 9              In the past, I've talked about some of the efforts

10     that are ongoing, but what I want to highlight this morning

11     is something that did take place this week was a filing,

12     which I'm sure Your Honor is aware of.  We will be

13     distributing close to $600 million as a result of the recent

14     settlements in Thema International, Thema Wise, and -- what

15     was the other one?

16              MAN 1:  Lagoon.

17              MR. SHEEHAN:  Lagoon.  I never remember Lagoon

18     anyway.  But what brings us up to -- with the reserves, it

19     gets us up to 62-1/2 cents -- 63-1/2 cents.  If you take the

20     reserves out against the 17.5, the original 17.5, we're at

21     73 cents.  So, but you can't ignore the reserves, so we

22     operate with the 63-cent number.

23              I think this late in the game to be seeing that

24     kind of an outcome still taking place nine years into the

25     litigation, I think is a testament to the work of all the
```

Page 10

1    people that I'm representing here today in connection with

2    this fee application.

3              It is, you know, Oren Warshovsky and his team did

4    the work on those three cases that settled.  But they were

5    not alone in terms of all the work that went into getting us

6    to where we are.

7              Your Honor, during one of our recent hearings

8    saying I feel like I'm getting things a piece at a time, and

9    I think that's absolutely true.  And I'd go back to the

10   office and think to myself, how can we present to the Court

11   without being ridiculous all the things that stand behind

12   what we do every day, which are obviously very apparent to

13   our adversaries, at least to some, who are represented, you

14   know, by major law firms as I've pointed out in the past.

15             And the settlements that we've arrived at are

16   arrived at after a very, very thorough analysis of all the

17   facts, all the evidence, and resulting in the settlements

18   that we're still getting.  And I think it is a tribute to

19   the relentlessness, if you will.

20             Some argue, you know, that the fees here are

21   enormous, but -- and the fees on the other side

22   collectively, I think, would add up to a lot more than what

23   we're spending.  I think we have to counter a lot of

24   activity.  For example, the three biggest numbers that you

25   have today in the foreign applications, two of those are

Page 11

1    associated with what's going on in Kingate.  Because Kingate

2    now, you know, that which is left of Kingate, the funds

3    themselves, are being and continue to be heavily litigated

4    and in discovery.

5            So the number for the fellows in England, Barron

6    Jacobson and the fellows at Williams Barristers in Bermuda

7    are fairly significant because a lot of that activity is

8    taking place in Bermuda, where we are still continuing to

9    fight the battle to get documents, which under the English

10   system, aren't as readily available as in our cross.

11           So that's the trenches, and we're in there and we

12   don't back off.  And the same thing's true, obviously with

13   Israel and what's going on there.  There's a tremendous

14   battle between the parties there, a lot of litigation,

15   various motions.  A recent motion to amend that was

16   partially granted, and there will be an interlocutory appeal

17   from the balance of it where we want to add certain counts.

18           So I think the point being this, is that the wide

19   range of activities that take place across all the firms

20   that we have, together with the work done by Baker on a

21   daily basis, is the -- is representative of what brings

22   about the results that we've seen most recently.

23           Now overall, we've obviously collected a great

24   deal of money, far beyond what anyone ever thought we would

25   get, and certainly far beyond anything I thought we would

Page 12

1    get.  But I think it is a result of two things: one is that

2    there is a, I must say, among the team members almost a

3    crusade that we are looking to always get the money back to

4    give it to the individuals, people that you almost never

5    hear from, and that is the people who get paid.  You know,

6    they don't come here.

7            As a matter of fact, at the very beginning, they

8    would be castigated by the winners who are actually

9    supporting the Trustee, so they've gone quiet.  It's kind of

10   an interesting phenomenon.

11           But the thing that's occurring now is that I think

12   we're seeking in the next year or so the end.  You know, we

13   are at the beginning of the end, as it were.  And I think

14   the active litigation that's still going on, as well as

15   obviously the appeal that we have in the Circuit, is going

16   to be very telling in terms of whether the case lasts

17   another two years or another four years, depending on the

18   appeal itself.

19           THE COURT:  Do you have an argument date for the

20   extra (indiscernible) of it?

21           MR. SHEEHAN:  No.  Our brief is due January 10th;

22   theirs is due, I think it's 60 days thereafter.  I don't

23   think we're going to have an argument not until probably the

24   early fall, given my experience in the past with Circuit and

25   how fast it moves on things.  On that equity, we even had

Page 13

1   expedited order, and it still took 13 months to get an

2   argument date, so it just doesn't move that quickly.

3            In any event, but, obviously, I always speak

4   highly of our co-counsel, and I think of them as our co-

5   counsel at Windels Marx, because we worked with them closely

6   and they assist us in a lot of endeavors, not just in

7   conflict stuff, but, for example, in the appeal.  The extra

8   territoriality appeal is a very, very difficult appeal.  We

9   brought them in to assist us analyzing these issues, trying

10  to bring clarity to our understanding of all the different

11  cases that are out there, as Your Honor well knows, having

12  written the opinion.  So they do an amazing job for us, and

13  we rely upon them a great deal.

14           But the same can be said of virtually all the

15  other firms, and that's another factor here.  I think when

16  everyone saw that we were in all the jurisdictions that were

17  necessary and SIPC supported that, so we could go into

18  Austria and get the documents or go into France and get the

19  documents and do things that we did in Switzerland, which

20  (indiscernible).  We took actually a deposition in

21  Switzerland, which is, like, extraordinary.  Nobody gets to

22  do that in Switzerland.

23           But we've done that, and we know that we're not

24  going to back off.  And the relentlessness of it, I think,

25  has paid dividends, even through -- as you saw recently, the

 1    recent settlements.

 2            So in light of those activities, many of which

 3    occurred during the reporting period, of course, I would

 4    submit that our applications for approval by the Court

 5    today.

 6            THE COURT:  Thank you.

 7            MR. BELL:   Good morning, Your Honor.

 8            THE COURT:  Good morning.

 9            MR. BELL:   Two weeks ago, you asked me a

10    question.  I do have the answer.  It's 17,158 days.

11            THE COURT:  How many hours?

12            MR. BELL:   Mr. Nisselson asked you that, and I

13    figured --

14            THE COURT:  All used to work together.

15            MR. BELL:   I may go, I realized that and I said,

16    I didn't have the honor of being an Assistant U.S. Attorney.

17    But if you do multiply 1440 times those number of days, we

18    can get the answer.  I turned my machine off because I

19    didn't want it ringing.

20            THE COURT:  It's not necessary, Mr. Bell.  Go

21    ahead.

22            MR. BELL:   So when Mr. Nisselson said hours, I

23    said, oh my God, the judge is going to ask me the same

24    thing.  I'll get back to you.

25            THE COURT:  Okay.

Page 15

1           MR. BELL:   This has been a long journey.  Today

2      is the 3,296th day.  And on January 31, you will hear a

3      motion that Mr. Sheehan talked about and you will see in the

4      papers that we will be able to get 47 more individuals to a

5      full 100 percent satisfaction with this motion, leaving 879

6      souls who still don't have 100 percent satisfaction.

7           If you have a claim, cash in/cash out for

8      $1,375,000, you have been fully paid.  3,296 days ago, when

9      the commission called us, I told the president and general

10     counsel of SIPC that we would get 100 percent back.  I do

11     believe we will get to that number.

12          There are a number of pieces of litigation you

13     will be getting later today, a five-page letter which will

14     walk you through from 17,158 days ago.  The mandate from

15     Congress within our statute of amending the 15(b) of the

16     1934 Act, Securities & Exchange Act of 1934 and requiring

17     the Commission to promulgate as they did in June of 1972,

18     Rule 15c3-3, and commented with that the SEC tightened up

19     their other rule, then that capital rule 15c3-1.  But I'll

20     let you read what we have written, and we will include an

21     affidavit from me where you'll have six documents which will

22     be foundational to everything we say.

23          THE COURT:   What does this relate to?

24          MR. BELL:   Hmm?

25          THE COURT:   What does all this relate to?

Page 16

```
 1              MR. BELL:   What you asked for, your question of

 2     two weeks.  You had two questions --

 3              THE COURT:  Oh, oh, yes, yes.

 4              MR. BELL:   -- two weeks ago.  And so, we have --

 5     we are giving you a very thorough analysis, which is even

 6     with the guidance of the people in Division of Trading and

 7     Markets.  I go back, and they make me stand up and they say,

 8     you forgot everything we told you, and I learn again.

 9              THE COURT:  It's a sign of age.

10              MR. BELL:   Yeah, well, when you get the whole

11     experts at the Commission telling you how important it is.

12     The conversation started on December 11, 2008 when they

13     called up, and my question was, wasn't the money locked up,

14     $20 million or $20 billion should have been locked up under

15     the 15c3-3 rules, whether here in the United States or if

16     you allow foreign safe harbors for customer property that

17     the Commission allows.

18              Well, I'm here about fee applications.

19              THE COURT:  You just told me there's going to be

20     100 percent, so doesn't have to -- the estate itself telling

21     you.

22              MR. BELL:   I know, Your Honor.

23              THE COURT:  Don't (indiscernible).

24              MR. BELL:   (indiscernible) overly optimistic.

25              THE COURT:  You just told me about
```

Page 17

1     (indiscernible).

2              MR. BELL:   Your Honor, there are major law firms

3     on the other side that have not seen the light.

4              THE COURT:  Mr. Bell, you just told me that you

5     believe that the net losers will recover 100 percent.

6              MR. BELL:   But --

7              THE COURT:  Let me just finish.

8              MR. BELL:   -- I --

9              THE COURT:  Let me just finish.  That makes the

10    estate solvent.  And how does that affect the recommendation

11    regarding the fees?

12             MR. BELL:   Maybe six years from now.

13             THE COURT:  Well, but still.

14             MR. BELL:   I am overly optimistic of us getting

15    there.  I said 100 percent from day one.  There have been

16    people on "60 Minutes" who are in this room who said 10 to

17    15 percent when asked in '09, you know.  They're starting to

18    see what I saw, that if you litigate hard and you're

19    correct, you will get there.  But currently, we are not

20    there.

21             And, therefore, the statute requires me to say to

22    you that we have thoroughly vetted the Trustee's application

23    and the application of all the others.  And as you will see

24    in Paragraph 3 of SIPC's recommendation on Baker, there has

25    been a reduction of about 14.53 percent of the fees they

Page 18

1    would charge a normal client to the amount that's

2    recommended to be paid in -- that's Paragraph 5 of the Baker

3    application.  In Paragraph 3 of the Windels application,

4    it's a reduction of 16.43 percent from their normal billing

5    rates.

6              Because under the statute, Section 78eee(b)(5)(A),

7    at this moment in time, there is not a likelihood, other

8    than winning at the Second Circuit.

9              THE COURT:  You just told me there was a

10   likelihood.

11             MR. BELL:   Well, if you could guarantee me, Your

12   Honor.

13             THE COURT:  What does the statute say though about

14   the force of your recommendation in light of the financial

15   condition of the Debtor?

16             MR. BELL:   I brought the statute.

17             THE COURT:  Okay, good.

18             MR. BELL:   It indicates in which it was allowed

19   to be paid by SIPC without a reasonable expectation -- and

20   everybody tells me I'm totally unreasonable all the time --

21   of recoupment, there are as provided in this chapter and

22   there is no difference between the amount requested and the

23   amounts recommended, the Court shall award the amounts

24   recommended by SIPC.

25             THE COURT:  If you've told me there's not only a

Page 19

1    reasonable expectation, there's a likelihood that the estate

2    is solvent.  Maybe I'll ask Mr. Sheehan how to respond.

3              MR. BELL:   I think the odds in Las Vegas on us

4    winning in the Second Circuit after Your Honor's opinion,

5    which affirmed or utilized Judge Rakoff's opinion, would not

6    be high on the likelihood of us winning.  It'd be like the

7    Giants winning the Super Bowl this year.

8              THE COURT:  Still possible.

9              MR. BELL:   Reasonable expectation, and that's the

10   guidance that we can discuss, Your Honor, if you wish.

11             THE COURT:  Yes, sir.

12             MR. SHEEHAN:  I think in the context of the

13   statute and looking at what's in front of us, as opposed to

14   what's going on in Las Vegas, is that, you know, there's a

15   tremendous amount of money, as Your Honor noted, riding on

16   the ET decision.  Given, you know, I would never in a

17   hundred years try to predict what the Second Circuit's going

18   to do there.  And with the loss of that, there'll be

19   absolutely no chance to getting to 100 percent.

20             So, you know, I don't think it's reasonable at

21   this point to assume that we're going to get there under any

22   circumstances.  And even if we lose or even if we win, you

23   still have to win those cases.  Your Honor's been around

24   this case long enough to know that even though we've had a

25   very nice track record and got some real results, there's

Page 20

1    been other cases where it hasn't quite worked out the way we

2    would hope.

3              And some of that emanates from the fact that the

4    money isn't there, so it wouldn't necessarily even be a

5    question of liability.  So that I think those variables

6    which are the very real variables that we deal with every

7    day would preclude a finding that's reasonable to expect

8    that the general estate would come to fruition.

9              MR. BELL:   I adopt his --

10             THE COURT:  Oh, I was going to ask you if you

11   disagreed with him.

12             MR. BELL:   Most times, I do, but this time, I

13   will take Mr. Sheehan's saving words.  Your Honor, and so,

14   therefore, SIPC would ask you to enter an order approving

15   these fees.

16             THE COURT:  Thank you.

17             MR. BELL:   Thank you, Your Honor.

18             THE COURT:  Based upon SIPC's recommendation and

19   notwithstanding Mr. Bell's optimism, I don't think it's

20   reasonably likely, given the fact that nine years have now

21   passed, the money is probably getting harder to get.  And at

22   best, you're three-quarters of the way there that you're

23   going to get that other quarter in the next however many

24   years.  So I don't think it's reasonably likely that the

25   estate will be solvent, unless something happens, which

Page 21

1    itself is not reasonably likely.

2              So under the circumstances, I'll grant the fee

3    applications in accordance with the statute, and you can

4    submit the order.

5              MR. SHEEHAN:  Thank you very much, Your Honor.

6              MR. BELL:   Thank you, Your Honor.

7              (Whereupon these proceedings were concluded at

8    10:20 AM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3                              RULINGS

4                                                  Page        Line

5

6    Fee Applications Granted                       21           2

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 23

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing

transcript is a true and accurate record of the proceedings.

Sonya
Ledanski Hyde

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2017.12.21 15:53:43 -05'00'

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  December 21, 2017