**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for the BNP Paribas Defendants*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| -against- | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 12-01576 (SMB) |
| v. | |
| BNP PARIBAS S.A., BNP Paribas Arbitrage SNC, BNP Paribas Bank & Trust (Cayman) Limited, BNP Paribas Securities Services S.A. | |
| Defendants. | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF THE BNP PARIBAS DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

PRELIMINARY STATEMENT .............................................................1

   I.   The Amended Complaint Should Be Dismissed As Improperly Filed ............................3

  II.   Section 546(e) Bars All Claims Other Than Those Under Section 548(a)(1)(A)..............4

 III.   Section 550(b) Bars The Trustee's Claims Under Section 548(a)(1)(A) ..........................5

     A.     The BNPP Defendants Did Not Subjectively Believe Madoff
           Was Likely A Fraud ..............................................................................5

        *1.*    *The BNPP Defendants Stated The Correct Willful Blindness Standard*..................6

        *2.*    *The Oreades-Related Allegations Are Insufficient* ..................................7

        *3.*    *The Laundry List Of Red Flags Is Insufficient* .....................................10

        *4.*    *The Allegations Regarding Unrelated Third Parties Are Insufficient*..................11

        *5.*    *The Allegations Regarding BNPP Affiliates Are Insufficient*................................12

        *6.*    *The Trustee's Core Theory Is Implausible* ............................................12

     B.     The BNPP Defendants' Diligence Is Wholly Inconsistent With The
           Allegation That They Took Steps To Avoid Learning Of Madoff's Fraud...............14

     C.     The BNPP Defendants Gave Value For The Transfers .............................................15

  IV.   The Court Cannot Exercise Jurisdiction Over The BNPP Defendants ...........................16

     A.     No General Jurisdiction Exists Over Any Of The BNPP Defendants.......................16

     B.     The Court Has No Specific Jurisdiction Over BNPP Cayman Or Any
           Other BNPP Defendants .........................................................................17

     C.     The Trustee's Request For Jurisdictional Discovery Should Be Denied ..................19

   V.   The New Claims Are Time-Barred .................................................................20

CONCLUSION....................................................................................20

## TABLE OF AUTHORITIES

### Cases

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
624 F. Supp. 2d 292 (S.D.N.Y. 2009) .............................................................................. 20

*Al Rushaid v. Pictet & Cie*,
28 N.Y.3d 316 (2016) ..................................................................... 18

*Anwar v. Fairfield Greenwich Ltd.*,
728 F. Supp. 2d 372 (S.D.N.Y. 2010).............................................................................. 8

*Boyer v. Crown Stock Distrib. (In re Crown Unlimited Machine Inc.)*,
No. 04-1085, 2006 WL 6401548 (Bankr. N.D. Ind. Oct. 13, 2006)................................. 16

*Correspondent Servs. Corp. v. J.V.W. Invs. Ltd.*,
120 F. Supp. 2d 401 (S.D.N.Y. 2000).............................................................................. 19

*Center v. Hampton Affiliates, Inc.*,
66 N.Y.2d 78 (1985) ...................................................................... 12

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014) ..................................................................... 16–17

*DC Comics, Inc. v. Powers*,
465 F. Supp. 843 (S.D.N.Y. 1978)................................................................................... 9–10

*Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund*,
No. 08 CIV. 11117, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013)................................. 15

*GCG Int'l, Inc. v. Eberhardt*,
No. 05 CIV. 2422 (DC), 2005 WL 2647942 (S.D.N.Y. Oct. 17, 2005) ........................... 18

*Hau Yin To v. HSBC Holdings, PLC*,
700 F. App'x 66 (2d Cir. 2017) ..................................................................... 18

*Hayes v. Palm Seedlings Partners-A*,
916 F.2d 528 (9th Cir. 1990) ...................................................................... 16

*Hill v. HSBC Bank plc*,
207 F. Supp. 3d 333 (S.D.N.Y. 2016).............................................................................. 17, 18

*Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Luxembourg) II SCA)*,
524 B.R. 488 (Bankr. S.D.N.Y. 2015) ............................................................... 17

*In re Agape Litig.*,
773 F. Supp. 2d 298 (E.D.N.Y. 2011) ................................................................ 6–7

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
No. 11 MDL 2262 (NRB), 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ......................... 17

*In re Parmalat Sec. Litig.*,
501 F. Supp. 2d 560 (S.D.N.Y. 2007) ................................................................ 10

*In re Terrorist Attacks on Sept. 11, 2001*,
689 F. Supp. 2d 552 (S.D.N.Y. 2010) ................................................................ 19

*Licci v. Lebanese Canadian Bank*,
20 N.Y.3d 327 (2012) ................................................................................. 18

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) .......................................................................... 10

*Majad ex rel. Nokia Ret. Sav. & Inv. Plan v. Nokia, Inc.*,
528 F. App'x 52 (2d Cir. 2013) ....................................................................... 9

*Mallis v. Bankers Tr. Co.*,
717 F.2d 683 (2d Cir. 1983) .......................................................................... 12

*Picard v. Avellino*,
557 B.R. 89 (Bankr. S.D.N.Y. 2016) .................................................................. 6

*Picard v. Bureau of Labor Ins.*,
480 B.R. 501 (Bankr. S.D.N.Y. 2012) ................................................................ 19

*Picard v. Ceretti* ("*Kingate*"),
No. 09-1161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) .................... *passim*

*Picard v. Chais*,
440 B.R. 274 (Bankr. S.D.N.Y. 2010) ................................................................ 18–19

*Picard v. Katz*,
462 B.R. 447 (S.D.N.Y. 2011) ........................................................................ 6

*Picard v. Legacy Capital Ltd.*,
548 B.R. 13 (Bankr. S.D.N.Y. 2016) .................................................................. *passim*

*Picard v. Merkin*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014) ............................................................. *passim*

*Picard v. Merkin*,
563 B.R. 737 (Bankr. S.D.N.Y. 2017) ..................................................... 6, 11, 15–16

*Picard v. Peter Madoff*,
468 B.R. 620 (Bankr. S.D.N.Y. 2012) ............................................................. 20

*Picard v. Shapiro*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015) ............................................................. 6

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* ("*Good Faith Decision*"),
516 B.R. 18 (S.D.N.Y. 2014) ..................................................................... 5, 11–12

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* ("*Extraterritoriality Decision*"),
No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) ................... 3–4

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* ("*Cohmad*"),
No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ............................. 4, 5

*Sid Bernstein Presents, LLC v. Apple Corps Ltd.*,
No. 16 CIV. 7084 (GBD), 2017 WL 4640149 (S.D.N.Y. July 26, 2017)......................... 9

*Stephenson v. Citco Grp. Ltd.*,
700 F. Supp. 2d 599 (S.D.N.Y. 2010)............................................................. 13

*Sullivan v. Barclays PLC*,
No. 13-cv-2811-PKC, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ............................... 14, 19

*Valle v. Bendett & McHugh, P.C.*,
No. 14-cv-1796 (SRU), 2015 WL 5797023 (D. Conn. Sept. 30, 2015) ........................... 14

*Waldman v. Palestine Liberation Org.*,
835 F.3d 317 (2d Cir. 2016) ..................................................................... 19

The BNPP Defendants, by their undersigned attorneys, submit this Reply Memorandum of Law in response to the Trustee's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint (the "Opposition" or "Opp.") and in further support of their Motion to Dismiss the Amended Complaint (the "Motion to Dismiss" or "Def. Br.").[1]

## PRELIMINARY STATEMENT

Recognizing his procedural misstep, the Trustee belatedly seeks this Court's leave to amend his Complaint, Opp. 37, submitted four months after he improperly filed the Amended Complaint and two months after having reviewed the arguments in the Motion to Dismiss. His eleventh hour request should be denied as procedurally barred and substantively futile.

The Trustee has confirmed (as he must) that he cannot plead that the BNPP Defendants had "actual knowledge" of the Madoff fraud. Opp. 6. Moreover, his efforts to show willful blindness, Opp. 7–25, fall far short of the plausibility line. Although the Trustee attempts to distract from his pleading deficiencies by arguing that the Motion to Dismiss relies upon an incorrect legal standard, Opp. 6–7, the Motion to Dismiss correctly recites the very standard for willful blindness applied by this Court many times before: the Trustee can only prevail on Section 548(a)(1)(A) if he demonstrates that a defendant "willfully blinded itself to the fact that BLMIS was not engaged in *the actual trading of securities*." *Picard v. Legacy Capital Ltd.*, 548 B.R. 13, 29 (Bankr. S.D.N.Y. 2016) (emphasis added). Furthermore, as the Trustee concedes, the willful-blindness analysis necessarily focuses on the subjective beliefs and awareness of the *BNPP Defendants*. Opp. 7. Fatally for the Trustee, the question of the BNPP Defendants' subjective beliefs is precisely where the Amended Complaint falls short.

---

[1]    Unless otherwise indicated, capitalized terms have the meaning ascribed to them in the Memorandum of Law in Support of the BNP Paribas Defendants' Motion to Dismiss, *Picard v. BNP Paribas S.A.*, Adv. Pro. No. 12-01576 (Bankr. S.D.N.Y. Oct. 25, 2017), ECF No. 107.

The crux of the Trustee's willful-blindness allegations relate to a single chain of emails involving BNPP SS employee Lionel Trouvain from 2003, which the Trustee previously viewed as so deficient that he dismissed BNPP SS from the action in which he was seeking to claw back related transfers. Critically, nowhere in that correspondence does Trouvain express any doubt as to whether Madoff was trading securities, and any questions that Trouvain may have had regarding the indexing of securities trades to the correct client were allayed when he received confirmation from Frank DiPascali of BLMIS and Friehling & Horowitz. Oreades Compl. ¶¶ 57–59. Moreover, the Trustee's newly-minted hypothesis that Trouvain believed Madoff's IA business was not audited, Opp. 12, is contradicted by the plain language of the correspondence the Trustee references and is in any event not properly before the Court. Accordingly, there is no basis to infer that Trouvain subjectively believed there was a high probability that Madoff was a fraud, nor to impute any such belief to any BNPP Defendant other than BNPP SS.

The Trustee spills much of his remaining ink on a recitation of a laundry list of "indicia of fraud" already presented (with little success) in dozens of other adversary proceedings. Am. Compl. ¶¶ 267–339; Opp. 13–16. He fails, however, to include particularized allegations giving rise to the plausible inference that the BNPP Defendants were *contemporaneously* aware of such supposed indicia of fraud. This failure stands in stark contrast to the Trustee's cited cases, such as *Legacy*, where the defendants had contemporaneously received a report documenting various trading impossibilities, 548 B.R. at 18–19, or *Merkin*, where the defendant contemporaneously possessed a dossier documenting the infeasibility of Madoff's returns, *Picard v. Merkin*, 515 B.R. 117, 129–30 (Bankr. S.D.N.Y. 2014). Thus, the Trustee's pleadings and arguments regarding supposed indicia of fraud boil down to an impermissible attempt to plead "fraud by hindsight." *See Legacy*, 548 B.R. at 33. The same can be said for the Trustee's reliance on

allegations relating to what unrelated third parties (like SocGen or Dresdner) and two individuals with some alleged affiliation with BNP Paribas affiliates (Paolo Gianferrara and Patrick Fauchier) thought about Madoff.  Opp. 16–19.  These misplaced allegations and arguments do not shed light on the subjective beliefs of the BNPP Defendants.

Additionally, the Opposition, Opp. 20–25, fails to address the BNPP Defendants' numerous Madoff-related due-diligence steps.  Def. Br. 28–31.  This due diligence is sufficient to preclude a finding that the BNPP Defendants took deliberate steps to turn away from any suspicions related to Madoff.  Similarly, the purported modifications of the BNPP Defendants' ordinary due-diligence procedures, Opp. 21—such as grouping all Madoff transactions together regardless of feeder fund—do not support an inference that the BNPP Defendants were seeking to avoid confirmation that Madoff did not, in fact, trade securities.

Nor does the Opposition provide any persuasive basis to upset prior binding precedent making clear that the BNPP Defendants, in surrendering their feeder fund shares, gave sufficient value both with respect to principal and any fictitious profits.  Opp. 27.

Separately, the Trustee has not shown that this Court can exercise personal jurisdiction over BNPP Cayman, and the other BNPP Defendants, or that his New Claims are timely.  Thus, for the reasons above and the additional ones set forth in the Motion to Dismiss and below, the Action must be dismissed in its entirety.[2]

## I.    The Amended Complaint Should Be Dismissed As Improperly Filed

Contrary to the Trustee's half-hearted argument that the Court granted leave to amend, Opp. 36, the *Extraterritoriality Decision* makes clear that any such leave was limited to the incorporation of extraterritoriality-related allegations which the Trustee had recently proffered.

---

[2]    The BNPP Defendants respectfully withdraw their service defense.

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (SMB), 2016 WL

6900689, at *9 (Bankr. S.D.N.Y. Nov. 22, 2016) ("*Extraterritoriality Decision*") (granting

"leave to amend many of the complaints to avoid dismissal under [Judge Rakoff's] ET

Decision"). Therefore, the Trustee's filing of the Amended Complaint is procedurally barred.

 In seeming recognition of the procedural impropriety of the Amended Complaint's filing,

the Trustee now belatedly requests this Court's permission to amend in his Opposition. Opp. 37.

For the reasons set forth below, that request should be denied as futile.

## II. Section 546(e) Bars All Claims Other Than Those Under Section 548(a)(1)(A)

 The Trustee can escape the application of Section 546(e) to his recovery claims here *only*

by sufficiently pleading both that the initial transferees and the BNPP Defendants had "actual

knowledge" of the Madoff fraud, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No.

12 MC 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"), which he

concedes he does not even attempt to do. Opp. 6. The Trustee argues instead that subsequent

transferees cannot raise Section 546(e) as a defense to Section 550(a) recovery claims, Opp. 26,

but that argument has already been conclusively rejected by the District Court, including in

circumstances where (as here) the initial transferee settled or prevailed on the 546(e)

defense. *Cohmad*, 2013 WL 1609154, at *7, *10 (where "*the [initial] transferee settled with the

Trustee*" or Section 546(e) barred the avoidance of the initial transfers "the subsequent transferee

is . . . entitled to raise a Section 546(e) defense *against recovery of those funds*" (emphasis

added)). Here, the Trustee incorporates by reference in the Amended Complaint the allegations

against the Tremont funds as initial transferees, which plainly fall short of alleging the "actual

knowledge" necessary for the safe harbor not to apply. Am. Compl. ¶ 343; Amended Complaint,

*Picard v. Tremont Grp. Holdings, Inc.*, Adv. Pro. No 10-5310, (Bankr. S.D.N.Y. Feb. 28, 2011),

ECF No. 4 (alleging red flag theory of actual knowledge). In addition, this Court has already

found that the allegations against initial transferee Ascot also do not plead "actual knowledge." *Merkin*, 515 B.R. 117. Those failures alone are sufficient to defeat the Trustee's non-Section 548(a)(1)(A) claims. Moreover, even if that were not the case, since Section 546(e) is intended to provide an objective safe harbor to the entire chain of securities customers, *see Cohmad*, 2013 WL 1609154, at *4, the failure of the Trustee to allege the BNPP Defendants' actual knowledge of Madoff's fraud further dooms their claims. Therefore, all claims other than those under Section 548(a)(1)(A) must be dismissed.

## III.    Section 550(b) Bars The Trustee's Claims Under Section 548(a)(1)(A)

The Trustee's allegations—even as improperly supplemented in his Opposition—fail to demonstrate either that the BNPP Defendants were willfully blind to the Madoff fraud or that they did not give value for the alleged transfers without knowledge of their voidability. Thus, his claims under Section 548(a)(1)(A) must be dismissed pursuant to Section 550(b).

### A.    The BNPP Defendants Did Not Subjectively Believe Madoff Was Likely A Fraud

The Trustee's failure to plead that the BNPP Defendants were willfully blind to the Madoff fraud is underscored by the arguments (and improper additional factual averments) in his Opposition. Indeed, the Trustee's repeated attempts to liken the BNPP Defendants to the *Kingate*[3] and *Merkin* defendants, who were personally close with Madoff, invested *directly* with Madoff instead of through feeder funds, openly discussed their knowledge of many red flags with others, and aggressively protected Madoff from inquisitive investors, lays bare what is missing from his Amended Complaint: plausible, "particularized"[4] allegations that *each* of the BNPP Defendants was subjectively and contemporaneously aware of a high probability of the

---

[3]    *Picard v. Ceretti*, No. 09-1161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*").

[4]    *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. 18, 24 n.4 (S.D.N.Y. 2014) ("*Good Faith Decision*") (allegations of willful blindness for subsequent transferees must be pleaded with "particularity").

Madoff fraud.  *See Kingate*, 2015 WL 4734749, at \*3, \*14–15; *Merkin*, 515 B.R. at 129, 141–42.

### 1. The BNPP Defendants Stated The Correct Willful Blindness Standard

In an apparent attempt to distract from the deficiency of his allegations, the Trustee

repeatedly claims that the BNPP Defendants cite the wrong standard for willful blindness.  That

claim is meritless.  Instead, it is the Trustee's proposed standard—which requires only

"suspicions of 'fraud,'" Opp. 7, to ground a finding of willful blindness—that is unmoored from

precedent.

As this Court has noted, "willful blindness" requires that "(1) the defendant must

subjectively believe that there is a *high probability* that a fact exists and (2) the defendant must

take deliberate actions to avoid learning of that fact."  *Merkin*, 515 B.R. at 139 (emphasis in

original) (citations omitted).  Here, the "fact" at issue is plainly that Madoff was not engaging in

the trading in which he purported to engage.  *See Legacy*, 548 B.R. at 29 (Trustee can only

recover under Section 548(a)(1)(A) if he demonstrates that a defendant "willfully blinded itself

to the fact that BLMIS was not engaged in *the actual trading of securities*") (emphasis added).[5]

Accordingly, to plead willful blindness, the Trustee must show an appreciation of facts

indicating a high probability that BLMIS was not engaged in the trading of securities, rather than

generalized suspicions about *any* type of improper or fraudulent activity—such as whether client

accounts were appropriately indexed or money laundering.[6]  *See Legacy*, 548 B.R. at 31–32

(predicating finding of willful blindness on suspicion that Madoff's purported option trading did

---

[5]     *See also Picard v. Merkin*, 563 B.R. 737, 743 (Bankr. S.D.N.Y. 2017) (same); *Picard v. Avellino*, 557 B.R. 89, 113 (Bankr. S.D.N.Y. 2016) (same); *Picard v. Shapiro*, 542 B.R. 100, 112 (Bankr. S.D.N.Y. 2015) (same).

[6]     The District Court's decision in *Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011) (cited at Opp. 7) is not to the contrary.  *Katz* involved allegations that defendants were aware of facts that strongly suggested BLMIS was a Ponzi scheme, not merely that they suspected "some kind of fraud."  *See, e.g.*, Am. Compl. ¶¶ 1025–39, *Picard v. Katz*, Adv. Pro. No. 10-05287 (Bankr. S.D.N.Y. Mar. 18, 2011), ECF No. 34 (hereinafter, "Katz Compl.") (alleging that Sterling Partners identified a list of Ponzi scheme red flags that largely applied to BLMIS, based on a previous investment in a Ponzi scheme).

not, in fact, occur); *In re Agape Litig.*, 773 F. Supp. 2d 298, 320 (E.D.N.Y. 2011) (willful

blindness shown only through actions "to avoid knowledge of [a Ponzi scheme] specifically, as

opposed to account fraud generally"). The Trustee has not done so in the Amended Complaint.[7]

### 2. The Oreades-Related Allegations Are Insufficient

The crux of the Trustee's allegations of willful blindness is a single chain of emails

involving BNPP SS employee Lionel Trouvain from 2003, which supposedly led to the closure

of the Oreades fund. Am. Compl. ¶¶ 113–26; Opp. 9–13. Despite the Trustee's attempts to

manufacture suspicions of fraud with selective quotations, these emails do not support the

inference that Trouvain strongly suspected Madoff was a fraud.[8]

*First*, the cited correspondence in no way suggests that Trouvain doubted Madoff was

actually engaged in the trading of securities. As the correspondence shows, Trouvain was

inquiring about the risk that Madoff might not properly index trades to the right client accounts,

Oreades Compl. ¶¶ 56–59, not whether the trades were real or "valid," as the Trustee

misleadingly argues, Opp. 9. Furthermore, after making these inquiries, Trouvain wrote to

BLMIS requesting "independent verification" as to "[Oreades's] assets and its two underlying

[BLMIS] accounts," which was then provided by DiPascali of BLMIS and, separately, Friehling

& Horowitz, who confirmed that they were "independent" auditors with respect to BLMIS

"under [the] requirements of [the American Institute of CPAs]." Oreades Compl. ¶¶ 57–59

(cited at Def. Br. 31). Having received such confirmation, there is no basis to infer that Trouvain

harbored strong suspicions that there were client indexing issues, let alone suspicions that

---

[7]    Even assuming *arguendo* that the Trustee is correct in his formulation of the willful blindness standard, his allegations at most suggest that BNPP SS was aware of certain potential control deficiencies within BLMIS, not that BLMIS may have been operating a Ponzi scheme. *See infra* pp. 7–10.

[8]    Rather than asking the Court to weigh evidence at this stage, Opp. 11, the BNPP Defendants are instead merely requesting for the Court to assess whether a quoted document supports a plausible inference of willful blindness, which this Court has done before. *See, e.g.*, *Legacy*, 548 B.R. at 31–32.

Madoff was a fraud.  By contrast, the defendants in *Merkin*, *Kingate* and *Legacy* all

contemporaneously suspected that Madoff could not have been engaging in the trading he

claimed to be carrying out.  *Kingate*, 2015 WL 4734749, at \*3, \*14–15; *Merkin*, 515 B.R. at 129,

141–42; *Legacy*, 548 B.R. at 19–24.

     *Second*, the Trustee's new interpretation of the Trouvain correspondence—that because

BNPP SS recognized that Madoff's broker-dealer business was audited, it *necessarily* presumed

that Madoff's investment advisory business was not, Opp. 12—is wholly unsupported by the text

of the correspondence and is in any event not properly before the Court because it does not

appear in the Amended Complaint.  Neither the cited correspondence nor the Amended

Complaint suggests that Trouvain was aware of a distinction between BLMIS's broker-dealer

and IA businesses, much less that he understood the former was audited but the latter was not.

Indeed, the allegations support only the inference that Trouvain believed BLMIS was audited by

independent and responsive auditors.  Oreades Compl. ¶¶ 57–59 (cited at Def. Br. 31).

     *Third*, the Trustee's attempt to liken the Oreades closure to the allegations in *Anwar v.*

*Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 408 (S.D.N.Y. 2010) (cited at Opp. 8–9), that the

defendants actively assisted Madoff in stymying an SEC investigation, is likewise misplaced.

The *Anwar* defendants allegedly spoke with Madoff himself, who warned them that "this

conversation never happened" and offered "what could charitably be called helpful hints in what

to say to the SEC."  *Id*.  No such "notorious signs of fraud," *id*. at 411, are alleged here, since

BNPP SS allegedly closed down Oreades to *comply* with—rather than to *avoid*—obligations

under Luxembourg law, when no other suitable solution could be found.  Am. Compl. ¶ 111.

     *Fourth*, even were the Trustee not precluded from raising his Oreades-related allegations,

Opp. 25, this Court should interpret the Trustee's prior, with-prejudice dismissal of BNPP SS

from the Oreades Action as a tacit concession that the Trouvain-related allegations do not pass

muster.  *Sid Bernstein Presents, LLC v. Apple Corps Ltd.*, No. 16 CIV. 7084 (GBD), 2017 WL

4640149, at *7 (S.D.N.Y. July 26, 2017) (interpreting a strategic decision about argumentation to

be a "tacit concession" regarding the weakness of the allegations).

 *Fifth*, even assuming that the purported concerns of a BNPP SS employee rose to the

requisite level of subjective belief—which they do not—the Trustee provides no basis for

imputing those beliefs to any BNPP Defendant other than BNPP SS.  Although the *Opposition*

conveniently conflates Trouvain's purported questions with those that were supposedly included

in a "Report" about Oreades written by BNPP SA, the *Amended Complaint* only mentions the

Report once and fails to outline what information was included in the Report.  *Compare* Am.

Compl. ¶¶ 113–16 (describing Trouvain's emails), *with* Opp. 9–10 (arguing that Trouvain's

emails parroted the Report).  Accordingly, the Amended Complaint provides no basis to infer

that BNPP SA was aware of the questions or doubts that Trouvain supposedly had.[9]

 *Finally*, even assuming *arguendo* that Trouvain's alleged concerns are imputable to

BNPP SA, the Trustee's argument for further imputation from BNPP SA to any other BNPP

Defendant must fail.  It is axiomatic that a "bald contention," such as that advanced by the

Trustee, "that it is plausible to impute notice of [parent company's] internal workings to those

with operational roles at [subsidiaries] . . . is insufficient to withstand a motion to dismiss."

*Majad ex rel. Nokia Ret. Sav. & Inv. Plan v. Nokia, Inc.*, 528 F. App'x 52, 56 (2d Cir. 2013)

(internal quotation marks omitted).  Here, the Trustee has not alleged any plausible basis for

inferring that BNPP SA would have shared any beliefs that it allegedly had with its subsidiaries.

---

[9] Although the Trustee now claims that BNPP SA "drafted" the Report, Opp. 12, the Oreades Complaint alleged that Trouvain's emails were prompted by a report issued by *Access*, an entirely separate entity unrelated to the BNPP Group.  Oreades Compl. ¶ 53.

*See DC Comics, Inc. v. Powers*, 465 F. Supp. 843, 849 n.8 (S.D.N.Y. 1978) ("[A] parent's

knowledge will [only] be imputed to its subsidiary" if the parent employees with knowledge had

a duty to "report that information to the subsidiary."); Def. Br. 24 n.18.[10] Notably, the

Opposition does not expressly link any defendant other than BNPP SS and BNPP SA to the

Trouvain-related allegations. *See* Opp. 8–13.

### 3. The Laundry List Of Red Flags Is Insufficient

Much of the Trustee's remaining ink is dedicated to reciting the same laundry list of "red

flags" that has repeatedly been found insufficient to ground a finding of willful blindness. Am.

Compl. ¶¶ 241–339; Opp. 13–16. As the Trustee concedes, these supposed "red flags" are *only*

relevant if the Trustee plausibly pleads that the BNPP Defendants were contemporaneously

aware of them. Opp. 16 (citing *Merkin* for proposition that "red flags" are sufficient if "they

allege real-time awareness of facts, as opposed to fraud by hindsight"). Here, fatally for the

Trustee, he fails to make the showing required by the cases he cites.

In *Merkin*, the Trustee alleged with particularity that Merkin was contemporaneously

aware of the impossibility of Madoff's trading volume and activities and had a report showing

the discrepancies between Madoff's returns and the S&P 500's. 515 B.R. at 141–42. Similarly,

the *Legacy* defendants were contemporaneously aware of the Renaissance Report's findings that

"the market could not support the options volume Madoff purported to trade" and "a very high

percentage of BLMIS' purported equity trades" were outside the daily range. 548 B.R. at 18.

Finally, in *Kingate*, consistent with their alleged disclosures to investors, the defendants had a

---

[10]     The Trustee's purported authority is distinguishable, as it speaks only to imputing *individual* managing directors' knowledge to the companies they manage. *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (discussing imputation of a natural person's knowledge); *see also In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 588–89 (S.D.N.Y. 2007) (allegations about corporate relationships, including overlap of officers and directors, insufficient to allege agency relationship for purposes of imputation).

duty to, and actually did, "actively review[] the impossible transactions reported by Madoff."
2015 WL 4734749, at *14–15.

The Trustee's conclusory claim that the BNPP Defendants were also contemporaneously
aware of such impossibilities is supported *only* by the allegation that they were "sophisticated"
actors who allegedly received feeder-fund account statements and trade confirmations. Opp. 14–
15. This at most establishes possession of documents that *could have* led to the discovery of
certain "red flags." *See Legacy*, 548 B.R. at 33 (explaining that "many red flags are no more
than pale pink" even if one were to "connect[] the dots in real time"). Therefore, the Trustee's
"red flag" theory, *see* Opp. 13–15; Am. Compl. ¶¶ 241–339, is insufficient to ground a finding of
willful blindness. *Legacy*, 548 B.R. at 33–35.

### 4. The Allegations Regarding Unrelated Third Parties Are Insufficient

In a variation on his "red flag" allegations, the Trustee continues to attempt to predicate
the BNPP Defendants' willful blindness on the awareness that unrelated third parties (such as
SocGen, Dresdner and Renaissance) supposedly had regarding certain indicia of fraud. Opp. 17–
19; Am. Compl. ¶¶ 152–64, 200–11, 218. These allegations are plainly insufficient because they
fail to shed light on the *BNPP Defendants*' subjective beliefs.

The Trustee concedes that the purported concerns of Dresdner and Renaissance were
never shared with any BNPP Defendant, Opp. 18–19, making such concerns entirely irrelevant to
the willful blindness inquiry. Moreover, the Trustee's conclusory claim that SocGen's concerns
were communicated to "BNP Paribas executives," Am. Compl. ¶ 162, lacks the necessary
particularities about what, when, and to whom such information was shared in order to speak to
the *BNPP Defendants*' beliefs. *Merkin*, 563 B.R. at 745–48; Def. Br. 26–28. Thus, the Trustee's
argument reduces to the bald claim that the BNPP Defendants *should have known* that certain
"red flags" existed, Opp. 17–19, an inquiry notice standard that has been squarely rejected by the

District Court as "unfair and unworkable." *Good Faith Decision*, 516 B.R. at 22.

### 5. The Allegations Regarding BNPP Affiliates Are Insufficient

As part of his kitchen-sink approach, the Trustee continues to rely upon allegations relating to supposed concerns that an employee (Gianferrara) and a joint-venture partner (Fauchier) of non-defendant BNP Paribas affiliates may have harbored with respect to Madoff. Am. Compl. ¶¶ 128–37; Opp. 16–17. These allegations are insufficient.

*First*, they fail to show that these individuals subjectively believed that Madoff was running a Ponzi scheme and not actually trading securities. The only Gianferrara-related allegations—that he "hate[d]" and "always had a problem with Madoff," and thus did not invest with him, Am. Compl. ¶¶ 128–29—do not suggest that Gianferrara's alleged dislike of Madoff related in any way to "suspicions of fraud." Opp. 17. Likewise, Fauchier's alleged suspicion from *June 2008*—well after the alleged Madoff investments and the lion's share of the alleged transfers took place—that "Madoff was not paid for managing investments," Am. Compl. ¶ 134, or that "Madoff was managing many more than 23 accounts," *id.* ¶ 135, do not show that he was aware of circumstances strongly suggesting that Madoff was not engaged in securities trading.

*Second*, there is no basis to impute any such beliefs held by Gianferrara and Fauchier to the BNPP Defendants. In particular, the Trustee has not alleged that the beliefs were "acquired by an agent acting within the scope of his agency," as he neither describes the scope of Gianferrara's or Fauchier's relationships with BNPP SA (including whether those relationships related in any way to Madoff) nor alleges that they came to hold these purported beliefs while acting within the scope of those relationships. *See Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 78, 78 (1985); *Mallis v. Bankers Tr. Co.*, 717 F.2d 683, 689 (2d Cir. 1983) (cited at Opp. 16).

### 6. The Trustee's Core Theory Is Implausible

The Trustee fails to grapple with the basic implausibility of his core theory of willful

blindness, resting instead on the non sequitur that "net losers" are not categorically precluded

from being deemed willfully blind.  Opp. 25.  According to the Amended Complaint, the BNPP

Defendants allegedly *chose* to structure credit facilities so that the *only* potential financial upside

they received were interest and fee payments untethered to the appreciation of Madoff shares,[11]

whereas the downside amounted to the entirety of the collateral, which became worthless upon

the discovery of the fraud.  Am. Compl. ¶¶ 138–40; Def. Br. 18.  Yet, the Trustee advances no

plausible reason that the BNPP Defendants would have structured their credit facilities in this

way if they truly harbored strong suspicions that Madoff was a fraud and the collateral was

worthless.  This Court has made clear that even permitting that "greed may cloud judgment,"

certain allegations of defendants' doubling down on the Madoff fraud can be facially implausible

given their *specific* incentives or duties.  *Legacy*, 548 B.R. at 32.  That reasoning applies here.

The Trustee's counterarguments fail to render his theory plausible.  *First*, the BNPP

Defendants' argument is not reliant on the actual knowledge standard, as it is implausible that an

economically rational actor would choose to take as collateral assets it strongly suspects may be

worthless in exchange for the upside of relatively small interest payments and fees.  Def. Br. 4.

Regardless of the amorphous "aura of profitability" which the Trustee cites for the first time in

the Opposition, Opp. 23, courts have found in similar circumstances that "it is economically

irrational to risk your professional reputation" and massive losses, in the manner alleged here,

without any substantial, concomitant upside.  *See Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d

599, 621 (S.D.N.Y. 2010) (cited at Def. Br. 19).[12]

---

[11]    Indeed, the Trustee nowhere disputes that the most well-pleaded measure of financial benefit was for
interest payments of 170 basis points above LIBOR for the Santa Barbara credit facility.  Def. Br. 9–10.

[12]    Although the Trustee quibbles with the BNPP Defendants' reliance on the *New York Times* article that he
cited in his Amended Complaint, Am. Compl. ¶ 137, he made the article fair game by incorporating it into his
Amended Complaint.  *See, e.g.*, *Legacy*, 548 B.R. at 26–27.  The article confirms the basic implausibility of the
Trustee's narrative, revealing that the BNP Paribas Group lost $500 million when the Madoff fraud was disclosed, a

*Second*, the Trustee's argument that the BNPP Group employed a "risky business strategy" in the context of U.S. sanctions against Cuba, Opp. 23 & n.9, is entirely irrelevant to the facts at hand, was offered to disparage the BNPP Defendants, and clearly smacks of desperation.  These new allegations are not properly before the Court, because they do not relate to the alleged misconduct and specified employees at issue in this action.[13]  And, in any event, the allegations fail to shed any light on the plausibility of the Trustee's narrative in relation to the entirely separate context of the *Madoff* fraud.

### B. The BNPP Defendants' Diligence Is Wholly Inconsistent With The Allegation That They Took Steps To Avoid Learning Of Madoff's Fraud

Because the Trustee has failed to allege that the BNPP Defendants subjectively suspected that Madoff was running a Ponzi scheme, *supra* pp. 5–13, he necessarily fails to demonstrate that they took "*deliberate* actions" to avoid confirming such non-existent suspicions.  *Merkin*, 515 B.R. at 139 (emphasis added).  Moreover, even *if* the BNPP Defendants harbored the requisite suspicions, the Trustee's allegations fail to dispel the conclusion that the BNPP Defendants did ample due diligence and, thus, did not "turn a blind eye" to such suspicions.  Fatally, the Trustee has conceded that the BNPP Defendants (1) engaged in significant follow-up with BLMIS as a response to the concerns raised by Trouvain, Oreades Compl. ¶¶ 57–59; (2) did diligence on the ZCM portfolio, Am. Compl. ¶ 143; (3) conducted a due diligence visit to Madoff's offices, *id.* ¶ 175; (4) called to request BLMIS's account statements after Madoff did not send them, *id.* ¶ 216; (5) reviewed such account statements, *id.* ¶ 229; (6) conducted due diligence on the Tremont credit facility, Proffer ¶ 145; (7) tracked BNP Paribas's exposure to Madoff on a "Heat Map,"

---

loss that would have been entirely foreseeable to anyone who strongly suspected Madoff was a fraud.

[13]      *Compare, e.g.*, *Valle v. Bendett & McHugh, P.C.*, No. 14-cv-1796 (SRU), 2015 WL 5797023, at *14 (D. Conn. Sept. 30, 2015) (no judicial notice of conviction where plaintiffs' far-fetched theory called into question conviction's relevance), *with Sullivan v. Barclays PLC*, No. 13-cv-2811-PKC, 2017 WL 685570, at *20–21 (S.D.N.Y. Feb. 21, 2017) (judicial notice where same alleged misconduct and employees were involved).

Am. Compl. ¶¶ 171–73; and (8) engaged in other ongoing due diligence on Madoff, Proffer ¶ 13.

Affirmative steps such as these cannot be reconciled with allegations of willful blindness.

*Elendow Fund, LLC v. Rye Select Broad Mkt. XL Fund*, No. 08 CIV. 11117, 2013 WL 5179064,

at *5 (S.D.N.Y. Sept. 16, 2013) (highlighting the peculiarity of continuing to find ways to learn

about Madoff's operation if one "even strongly suspected that Madoff was perpetrating a fraud").

Given these due diligence steps, the Trustee errs in trying to draw parallels to the *Kingate*

and *Merkin* defendants, Opp. 20–21, who allegedly decided not to engage in *any* diligence

because their close, personal relationships with Madoff made them aware of the futility of

diligence.  *Kingate*, 2015 WL 4734749, at *13–15; *Merkin*, 515 B.R. at 141.

Moreover, the alleged due diligence modifications[14] do not give rise to an inference that

the BNPP Defendants sought to avoid confirmation that Madoff may have been running a Ponzi

scheme.  Instead, they are at most the result of a business judgment—which the Trustee only

now questions in hindsight—to apply a specific due diligence regime to BLMIS.  *See Elendow

Fund*, 2013 WL 5179064, at *6 (defendants did not turn away from Madoff fraud merely

because their due diligence did not result in its discovery).  Additionally, certain of his particular

allegations belie his general averments that the BNPP Defendants modified their due diligence

approach, which thus need not be credited.  *Compare, e.g.*, Am. Compl. ¶ 174 (alleging

prohibition on on-site visits to BLMIS), *with id.* ¶ 175 (identifying on-site visit in March 2008).

### C.  The BNPP Defendants Gave Value For The Transfers

It is well-settled that by surrendering their feeder fund shares (and the claims and rights

that attached to them), the BNPP Defendants gave "value" for the transfers[15] they allegedly

---

[14]    These include, for example, the purported decisions to group all Madoff transactions together regardless of feeder fund, or to vest authority for approving Madoff transactions in senior management, rather than in the due diligence group.  Am. Compl. ¶¶ 167, 168, 172

[15]    The Trustee never disputes that Section 550(b), if applicable, would bar both the return of principal and of

received.  *See Legacy*, 548 B.R. at 37–38; *Merkin*, 563 B.R. at 749; Def. Br. 34 (citing Am. Compl. ¶¶ 233, 395, 407).  Neither of the Trustee's rejoinders alters this conclusion.

*First*, the Trustee's reliance on *Merkin* to argue that the value requirement involves a "fact-intensive inquiry," Opp. 27, is misplaced because, unlike the *Merkin* defendants, the BNPP Defendants do not draw upon facts outside the Amended Complaint to support their value defense.  *See Merkin*, 515 B.R. at 151.  *Second*, his stray observation about "payments on account of equity interests," Opp. 27, is wholly irrelevant here, where payments were allegedly made in exchange for shares, and not solely based on shareholder status.[16]

Because the Trustee has failed to adequately allege that the BNPP Defendants did not receive the alleged transfers in good faith and because they took the transfers for value and without knowledge of the voidability of the transfers,[17] Def. Br. 33–34, all of the Trustee's claims are barred by Section 550(b).

## IV.    The Court Cannot Exercise Jurisdiction Over The BNPP Defendants

The Trustee's claim that this Court has personal jurisdiction over the BNPP Defendants cannot survive the Supreme Court's decision in *Daimler* and the *To* and *Hill* decisions.

### A.  No General Jurisdiction Exists Over Any Of The BNPP Defendants

The Trustee's general jurisdiction argument, Opp. 33–34, ignores the Supreme Court's holding in *Daimler AG v. Bauman* that, absent exceptional circumstances, such jurisdiction exists only in the "formal place of incorporation or principal place of business."  134 S. Ct. 746,

---

any fictitious profits because the value that a subsequent transferee must provide is merely the consideration required to uphold a contract.  *Legacy*, 548 B.R. at 37; Def. Br. 33–34.

[16]    *See Boyer v. Crown Stock Distrib. (In re Crown Unlimited Machine Inc.)*, No. 04-1085, 2006 WL 6401548, at *15 (Bankr. N.D. Ind. Oct. 13, 2006) (payments received strictly based on shareholder status insufficient for finding of value); *Hayes v. Palm Seedlings Partners-A*, 916 F.2d 528, 540 (9th Cir. 1990) (same).

[17]    The Trustee has not "offered a distinction between lack of good faith and knowledge of the avoidability of the initial transfer under Bankruptcy Code § 550(b)(1)," an omission which this Court has deemed sufficient to find that the latter has been satisfied.  *Legacy*, 548 B.R. at 39.

761 n.19 (2014); Def. Br. 36.  Although the Trustee cites a single instance, six years before

*Daimler* was decided, in which BNPP elected not to dispute the general personal jurisdiction of a

California court, Opp. 33–34, no authority supports the proposition that that case means BNPP is

somehow subject to general jurisdiction in this Court now.  Moreover, the Trustee's reliance on

*Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Luxembourg) II SCA)*, 524 B.R.

488, 504, 506 (Bankr. S.D.N.Y. 2015) (cited at Opp. 34) is misplaced, given that the *Hellas*

court's conclusion was superseded by *Daimler*.  *In re LIBOR-Based Fin. Instruments Antitrust*

*Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 6243526, at *27 n.43 (S.D.N.Y. Oct. 20, 2015).

General jurisdiction thus cannot lie here.[18]

## B.  The Court Has No Specific Jurisdiction Over BNPP Cayman Or Any Other BNPP Defendants

As to specific jurisdiction, the Trustee concedes that the analysis hinges on a narrow set

of allegations, Opp. 28–29, that courts in this district have already deemed insufficient to

establish jurisdiction in Madoff-related cases.  Def. Br. 36.  *Hill* and *To* preclude a finding that

BNPP Cayman, as well as the other BNPP Defendants, had the requisite contacts with the New

York forum to permit the exercise of specific jurisdiction.

The *Hill* court was confronted with precisely the same threshold jurisdictional question as

the one here: whether the foreign defendant's Madoff-related investment activities constituted

"purposeful[] avail[ment] of the privilege of conducting activities within" the forum state

sufficient to ground a finding of jurisdiction.  *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 338

(S.D.N.Y. 2016).  Rather than being "merely passive," Opp. 30 n.16, the alleged forum-centric

activities that failed to pass jurisdictional muster in *Hill* included that HSBC marketed and

---

[18]    The Trustee's claim that a Fairfield Sentry subscription document lists BNPP Cayman's principal place of business as New York, Opp. 30, cannot be credited, as it is outside the four corners of the complaint, Opp. 23 n.8; *see supra* note 20.

encouraged investment in Madoff feeder funds; served as custodians, managers, and administrators of feeder funds; "transmitted information and funds to and from BLMIS located in New York;" and "entered into formal contracts with BLMIS in New York." *Hill*, 207 F. Supp. 3d at 337–39. Here, BNPP Cayman is alleged only to have communicated information and sent monies to New York (including through agents or affiliates) and to have owned mostly foreign feeder fund shares. Opp. 29; Am. Compl. ¶¶ 60, 71. Thus, this Court should follow *Hill* in finding that it lacks personal jurisdiction over BNPP Cayman.

Furthermore, the Trustee's focus on the BNPP Defendants' alleged use of New York correspondent bank accounts cannot withstand the Second Circuit's ruling in *Hau Yin To v. HSBC Holdings, PLC* that the "communication and transmission of information to and from" BLMIS and the "maintenance of correspondent bank accounts at an affiliate bank in New York" are insufficient to establish personal jurisdiction. 700 F. App'x 66, 67 (2d Cir. 2017).[19]

Realizing his allegations cannot survive *Hill* and *To*, the Trustee now argues, for the first time in his Opposition, that BNPP Cayman appointed BNPP Sec. Corp. as an agent in connection with certain activities. Opp. 31. These procedurally improper allegations should not be considered and in any event cannot salvage the Trustee's attempt to plead personal jurisdiction over BNPP Cayman.[20] Unlike in *Picard v. Chais*, 440 B.R. 274 (Bankr. S.D.N.Y. 2010) (cited at

---

[19]    The *To* court also found *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 319, 326–27 (2016)—upon which the Trustee heavily relies—unpersuasive, since *Al Rushaid* involved "*intentional* and *repeated* use of correspondent accounts" as part of a money laundering scheme, in contrast to the use of such accounts as a mere means of processing transfers from an entity that happens to use U.S. dollars. *To*, 700 F. App'x at 67–68 (emphasis added). *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327 (2012) likewise relates to the repeated use of a correspondent bank account to facilitate money laundering, and is therefore inapposite.

[20]    *See GCG Int'l, Inc. v. Eberhardt*, No. 05 CIV. 2422 (DC), 2005 WL 2647942, at *4 (S.D.N.Y. Oct. 17, 2005) (refusing to consider jurisdictional assertions appearing for the first time in plaintiff's opposition to a 12(b)(2) motion and dismissing defendant for lack of personal jurisdiction). Similar claims about BNPP Cayman's use of New York affiliates, Opp. 30, are procedurally improper, as they introduce new allegations, and do not in any event move the needle under *Hill* and *To*.

Opp. 31), where the "agent's contacts in his agency capacity [were] sufficient to establish specific personal jurisdiction," *id.* at 279, BNPP Sec. Corp.'s contacts have not been shown to relate to the transfers at issue[21] and, thus, those contacts cannot establish specific jurisdiction.

The additional forum contacts alleged against the other BNPP Defendants similarly miss the mark. The Trustee never ties his claims to the activities of the other BNPP Defendants' supposed New York offices. Def. Br. 38. Nor, contrary to his assertion, Opp. 33, has he shown that any of these contacts were *necessary* to his claims, which arise out of *particular* transfers by foreign feeder funds to the foreign BNPP Defendants, whose business activities principally took place abroad, much less that New York is the "focal point" or "nucleus" of his claims. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 340 (2d Cir. 2016); *see Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *43–45 (S.D.N.Y. Feb. 21, 2017) (no jurisdiction absent links between elements of claim and defendant's forum contacts).[22]

### C. The Trustee's Request For Jurisdictional Discovery Should Be Denied

Finally, the Trustee's request for jurisdictional discovery should be denied because: (1) for the reasons discussed above, *supra* pp. 17–19, he has not made "a prima facie showing of jurisdiction over the defendant," *In re Terrorist Attacks on Sept. 11, 2001*, 689 F. Supp. 2d 552, 566 (S.D.N.Y. 2010); and (2) he has not met his "burden of showing necessity," given his extensive prior investigation into the Madoff fraud.[23]

---

[21]    The Trustee's second exhibit demonstrates at most that BNPP Sec. Corp. was appointed in the limited capacity of servicing agent for a transfer from *Fairfield Sentry*, a fund no longer at issue in the Action. Exhibit 2 to Declaration of Torello H. Calvani in Support of the Trustee's Opposition to Defendants' Motion to Dismiss Amended Complaint, *Picard v. BNP Paribas S.A.*, No. 12-01576 (Bankr. S.D.N.Y. Dec. 20, 2017), ECF. No. 111-2.

[22]    The Trustee's cited cases are inapposite since they involve forum contacts that formed the basis of the asserted claims. *See, e.g.*, *Correspondent Servs. Corp. v. J.V.W. Invs. Ltd.*, 120 F. Supp. 2d 401, 405 (S.D.N.Y. 2000) (cited at Opp. 32) (claim based on defendant's stock purchase in New York securities account). Likewise, his reliance on *Picard v. Bureau of Labor Ins.*, 480 B.R. 501 (Bankr. S.D.N.Y. 2012) is misplaced because its broad jurisdiction holding, *id.* at 517–18, has been implicitly overturned by *Hill* and *To*.

[23]    That investigation included obtaining "tens of millions" of documents in Rule 2004 discovery, including many thousands from the BNPP Defendants. Trustee's Motion ¶ 20, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff*

## V.    The New Claims Are Time-Barred

The Trustee concedes that his New Claims are timely *only* if they relate back to the claims in the Original Complaint.  Opp. 37.  They do not.  Although the Trustee asserts that the New Claims relate back because they involve transfers related to the Madoff fraud, Opp. 37–39, that argument proves too much.  Claims for the recovery of fraudulent transfers "relate back" only if they merely enlarge transfers that were previously at issue or intimately relate to the specific transactions at issue.  *See, e.g.*, *Picard v. Peter Madoff*, 468 B.R. 620, 624 (Bankr. S.D.N.Y. 2012) (permitting Trustee to enlarge only transfers already at issue);  *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 334 (S.D.N.Y. 2009) (finding that new transfers related back only because "all the fraudulent transfers were related to the Co-Borrowing Facilities" that were specifically identified in the prior complaint).

Here, the New Claims do not merely enlarge the damages amounts with respect to transfers previously pled, Def. Br. 34 n.23, but instead raise new transfers from (1) Insurance Portfolio—a feeder fund *never* referenced in the Original Complaint—to certain BNPP Defendants, and (2) Portfolio Limited to BNPP SS and BNPP Cayman, Def. Br. 34.  *Id.* Moreover, because the Original Complaint never alleged any transactions giving rise to the transfers, the New Claims necessarily cannot relate back to such transactions.  Thus, the New Claims do not relate back and should be dismissed as time-barred.

## CONCLUSION

For the reasons set forth above, this Court should deny the Trustee's request for leave to amend and otherwise dismiss his claims with prejudice.

---

*Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Aug. 5, 2011), ECF No. 4290.

Dated: New York, New York
      January 19, 2018

                         Respectfully submitted,

                         **CLEARY GOTTLIEB STEEN &**
                         **HAMILTON LLP**

                         By:    */s/ Breon S. Peace*

                         Breon S. Peace
                         Ari D. MacKinnon
                         One Liberty Plaza
                         New York, New York 10006
                         Telephone: 212-225-2000
                         Facsimile: 212-225-3999
                         *Attorneys for the BNP Paribas Defendants*