**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Fernando A. Bohorquez
Jonathan B. New
Benjamin D. Pergament
Andrew W. Reich
Kendall E. Wangsgard
Joshua B. Rog

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05394 (SMB) |
| Plaintiff, | |
| v. | |
| RICHARD M. GLANTZ, individually, as trustee of | |

the Glantz-Ostrin Trust II, as personal
representative of the Estate of Edward R. Glantz,
and as administrator of the Estate of Thelma
Glantz;

EJS ASSOCIATES, L.P.;

JELRIS & ASSOCIATES, L.P.;

GRACE & COMPANY;

THE GLANTZ FAMILY FOUNDATION, INC.;

THE ESTATE OF EDWARD R. GLANTZ;

LAKEVIEW INVESTMENT, LP;

VISTA MANAGEMENT CO.;

LAW & MEDIATION OFFICES OF RICHARD
M. GLANTZ, A PROFESSIONAL
CORPORATION;

ELAINE OSTRIN;

THE ESTATE OF THELMA GLANTZ;

THE GLANTZ-OSTRIN TRUST II; and

AUSTIN BOSARGE,

                              Defendants.

## SECOND AMENDED COMPLAINT

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"),[1] and the substantively consolidated estate

of Bernard L. Madoff ("Madoff," and with BLMIS, the "Debtors"), by the Trustee's undersigned

counsel, for his second amended complaint (the "Second Amended Complaint"), states as

follows:

## **NATURE OF PROCEEDING**

1.       This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Madoff.  Over the course of the scheme, there were more than 8,000 client accounts at BLMIS.

In early December 2008, BLMIS generated client account statements for its approximately 4,900

open client accounts.   When added together, these statements purport to show that clients of

BLMIS had approximately $65 billion invested with BLMIS.  In reality, BLMIS had assets on

hand worth a small fraction of that amount.   On March 12, 2009, Madoff admitted to the

fraudulent scheme and pleaded guilty to 11 felony counts.  On June 29, 2009, he was sentenced

to 150 years in prison.

2.       Defendants were beneficiaries of Madoff's Ponzi scheme.  Since December 11,

2006, BLMIS made transfers to Richard M. Glantz ("Richard Glantz"), EJS Associates, L.P.

("EJS"), Jelris & Associates, L.P. ("Jelris"), Grace & Company ("Grace"), The Glantz Family

Foundation, Inc. ("GFF"), Edward R. Glantz ("Edward Glantz"), who is deceased, and Thelma

Glantz, who is deceased, totaling $33,100,000.   The Trustee's investigation has revealed that

$30,427,989 of this amount (the "Initial Transfers") represented fictitious profits from the Ponzi

scheme.  The Initial Transfers constitute avoidable transfers and are recoverable by the Trustee.

Richard Glantz, EJS, Jelris, Grace, GFF, the Estate of Edward R. Glantz ("ERG Estate"), and the

Estate of Thelma Glantz ("TG Estate") are, collectively, "Initial Transferee Defendants."

3.       Since December 11, 2006, Richard Glantz, EJS, Jelris, Grace, Edward Glantz,

Thelma Glantz, Lakeview Investment, LP ("Lakeview"), Vista Management Co. ("Vista"), the

Law & Mediation Offices of Richard M. Glantz, a Professional Corporation ("Richard Glantz

---

[1] Hereinafter, applicable sections of SIPA shall be cited as SIPA § ____, and omit reference to title 15, United States Code.

Law Office"), Elaine Ostrin ("Ostrin"), the Glantz-Ostrin Trust II ("G-O Trust II"), and Austin Bosarge ("Bosarge") received subsequent transfers of the Initial Transfers (the "Subsequent Transfers"). Richard Glantz, EJS, Jelris, Grace, ERG Estate, TG Estate, Lakeview, Vista, Richard Glantz Law Office, Ostrin, G-O Trust II, and Bosarge are, collectively, "Subsequent Transferee Defendants."

4.       This action is brought to avoid and recover the Initial Transfers and recover the Subsequent Transfers so that this customer property can be equitably distributed among the holders of allowed claims in this SIPA proceeding.

## JURISDICTION AND VENUE

5.       This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and (e)(1), and SIPA §§ 78eee(b)(2)(A) and (b)(4).

6.       This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

7.       Venue in this judicial district is proper under 28 U.S.C. § 1409.

8.      This adversary proceeding is brought pursuant to SIPA §§ 78fff(b) and 78fff-2(c)(3), §§ 105(a), 548(a), 550(a) and 551 of title 11 of the United States Code (the "Bankruptcy Code")[2], and other applicable law.

## DEFENDANTS

9.      Richard Glantz at all relevant times has been: a general partner of EJS, Jelris, and Grace; a trustee of G-O Trust II; an administrator of TG Estate; upon information and belief, a personal representative of ERG Estate; a director and president of GFF, a corporation; sole owner and president of Vista, a corporation and the general partner of Lakeview; and control person of Richard Glantz Law Office.   Richard Glantz owns and controls an Individual Retirement Account (the "Richard Glantz IRA").   Richard Glantz resides in Richmond, California.

10.     EJS is a limited partnership.  It was originally formed as a general partnership as of October 15, 1993.  EJS was reorganized as a limited partnership under the laws of the State of Delaware, effective January 1, 1998.  While EJS was a general partnership, Richard Glantz was one of its general partners.  While EJS has been a limited partnership, Richard Glantz has been EJS's sole general partner.   EJS maintains its principal place of business in San Rafael, California.

11.     Jelris is a limited partnership.  It was originally formed as a general partnership as of October 15, 1993.  Jelris was reorganized as a limited partnership under the laws of the State of Delaware, effective March 28, 1995.  While Jelris was a general partnership, Richard Glantz was one of its general partners.  While Jelris has been a limited partnership, Richard Glantz has

---

[2] Hereinafter, applicable sections of the Bankruptcy Code shall be cited as Bankruptcy Code § ____, and omit reference to title 11, United States Code.

been Jelris's sole general partner.  Jelris maintains its principal place of business in San Rafael, California.

12.    Grace is a general partnership.  Richard Glantz at all relevant times has been a general partner of Grace.  Grace maintains its principal place of business in San Rafael, California.

13.    GFF is a corporation that was incorporated in 1986 under the laws of the State of Florida.  Richard Glantz and Ostrin have been directors and officers of GFF at all relevant times.  Edward Glantz was president of GFF from at least 1993 until his death in February 2007, and Richard Glantz has been president at all times thereafter.  GFF maintains its principal place of business in San Rafael, California.

14.    Edward Glantz was Richard Glantz's father.  ERG Estate was created upon the death of Edward Glantz, which occurred on or about February 9, 2007.  Upon information and belief, Richard Glantz was a personal representative of ERG Estate.

15.    Prior to his death, Edward Glantz owned and controlled an Individual Retirement Account (the "Edward Glantz IRA").  At the time of Edward Glantz's death, his wife, Thelma Glantz, was designated as the 100% primary beneficiary of the Edward Glantz IRA.  Following Edward Glantz's death, Thelma Glantz owned and controlled the Edward Glantz IRA.

16.    Lakeview is a limited partnership formed in 2006 under the laws of the State of Delaware.  At all relevant times, Vista has been Lakeview's sole general partner.  Lakeview maintains its principal place of business in San Rafael, California.

17.    Vista is a corporation that was incorporated in 2004 under the laws of the State of California.  Throughout its existence, Richard Glantz has been the sole owner and president of Vista.  Vista maintains its principal place of business in San Rafael, California.

18.     Richard Glantz Law Office is a Subsequent Transferee Defendant.  Multiple checks issued by Initial Transferee Defendants EJS and Grace in the two years prior to the Filing Date were made payable to Richard Glantz Law Office and were deposited in a bank account held by Richard Glantz Law Office.  Records show that Richard Glantz used stationery with the letterhead "Law & Mediation Offices of Richard M. Glantz, a Professional Corporation."

19.     Ostrin is Richard Glantz's sister and the daughter of Edward and Thelma Glantz.  At all relevant times, she has been a general partner or a limited partner of EJS and Jelris, a trustee of ERG Trust, a co-administrator of TG Estate, and a director and officer of GFF.  Ostrin resides in San Francisco, California.

20.     Thelma Glantz was Richard Glantz's and Ostrin's mother, and the wife of Edward Glantz.  TG Estate is an estate that was created upon the death of Thelma Glantz, which occurred on or about July 23, 2010, in Santa Clara County, California.  By order of the Superior Court of California, Santa Clara County, entered August 8, 2012, Richard Glantz, Ostrin, and Jerald Ostrin (a son of Ostrin) were appointed co-administrators of TG Estate.  By order of the same court, entered August 25, 2014, the resignations of Ostrin and Jerald Ostrin as co-administrators of TG Estate were accepted, leaving Richard Glantz as the sole administrator of TG Estate.

21.     G-O Trust II is a trust formed under the laws of the State of California.  At all relevant times, Richard Glantz has been a trustee of G-O Trust II.  G-O Trust II maintains its principal place of business in San Rafael, California.

22.     Bosarge is a business associate of Richard Glantz.  Bosarge resides in Petaluma, California.

## BACKGROUND, THE TRUSTEE AND STANDING

23.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser

fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission (the "SEC") commenced the District Court Proceeding.

24.      On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

25.      Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    (a)      appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    (b)      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

    (c)      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

26.      By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

27.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

28.      At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

29.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali ("DiPascali"), a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

30.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel ("Kugel"), a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

31.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno ("Bongiorno"), Jo Ann Crupi ("Crupi"), George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

32.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

33.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, and 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

34.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including §§ 323(b) and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

### BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

*BLMIS*

35.     Madoff founded BLMIS in 1960 as a sole proprietorship.  In 2001, Madoff registered BLMIS as a New York limited liability company.  At all relevant times, Madoff controlled BLMIS, first as its sole member, and thereafter as its chairman and chief executive.

36.     In compliance with 15 U.S.C. § 78*o*(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority, Inc. reflect BLMIS's continuous registration with the SEC as a securities broker-dealer from January 19, 1960 through December 31, 2008.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer from January 19, 1960 through December 31, 2008.  On December 30, 1970, BLMIS became a member of SIPC and continued its membership without any change in status until the Filing Date.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

37.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and the IA Business.

38.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

39.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

40.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total assets under management of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in assets under management.  At all times, BLMIS's Form ADVs were publicly available.

*The Ponzi Scheme*

41.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including DiPascali, Irwin Lipkin, Kugel,

Bongiorno, Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

42.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

43.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

44.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

*Madoff's Investment Strategy*

45.     BLMIS purported to execute two primary investment strategies for IA Business customers:  the convertible arbitrage strategy and the split strike conversion strategy ("SSC strategy").    For a limited group of IA Business customers, primarily consisting of Madoff's

close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

46.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of IA Business accounts.

47.     From 1992 forward, Madoff began telling IA Business customers that he employed the SSC strategy for their accounts, even though in reality BLMIS never traded any securities for its IA Business customers. All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

48.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected substantial gains on the customers' principal investments.

49.     The SSC strategy purported to involve: (i) the purchase of a group or basket of equities (the "Basket") intended to highly correlate to the Standard & Poor's 100 Index (the "S&P 100 Index"), (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P Index call options.

50.     The put options were to control the downside risk of price changes in the Basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option would entail a loss for BLMIS.

51.     The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to outperform the market, because in a rising market, calls would be exercised by the counterparty.

52.     The simultaneous purchase of puts and calls to hedge a securities position is commonly referred to as a "collar."  The purpose of the collar is to limit exposure to volatility in the stock market and flatten out returns on investment.

53.     For the SSC strategy to be deployed as Madoff claimed, the total value of each of the puts and calls purchased for the Basket had to equal the notional value of the Basket.  For example, to properly implement a collar to hedge the $11.7 billion of assets under management that Madoff publicly reported in 2006 would have required the purchase of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

54.     Moreover, at all times that BLMIS reported its total assets under management, publicly available information about the volume of exchange-traded options showed that the volume of options contracts necessary to form the collar and implement the SSC strategy exceeded the available options.

55.     Sophisticated or professional investors knew that Madoff could not be using the SSC strategy because his returns drastically outperformed the market.  Not only did BLMIS regularly show gains when the S&P 100 Index was down (at times significantly), it would also

post gains that exceeded (at times, significantly) the S&P 100 Index's performance. Such results were impossible if BLMIS had actually been implementing the SSC strategy.

*BLMIS's Fee Structure*

56.     BLMIS charged commissions on purportedly executed trades rather than management and performance fees based on the value of assets under management. By using a commission-based structure, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

*BLMIS's Market Timing*

57.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he achieved market timing by intermittently taking customer funds out of the market. During those times, Madoff purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.

58.     BLMIS's market timing, as reported on its customer statements, showed an uncanny ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor could see it was statistically impossible. BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every quarter and year end.

59.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all

positions at fixed times, independent of market conditions, and win every time.  Yet this is precisely what BLMIS's customer statements reported.

60.     BLMIS's purported practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the SSC strategy, which relied on holding long positions rather than on short-term speculative trading.

61.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

62.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

*The Collapse of the Ponzi Scheme*

63.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

64.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

65.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## THE TRANSFERS

66.      According to BLMIS's records, Initial Transferee Defendants maintained investment advisory ("IA") accounts with BLMIS (Nos. 1T0026, 1ZA192, 1ZB010, 1ZB143, 1ZR010, and 1ZR176) (collectively, the "Accounts") in the name of, respectively, Grace, EJS, GFF, Jelris, the Richard Glantz IRA, and the Edward Glantz IRA, as set forth on Exhibit A.  For each of the Accounts, a "Customer Agreement," an "Option Agreement," and/or "Trading Authorization Limited to Purchases and Sales of Securities and Options" (collectively, the "Account Agreements") were executed and delivered to BLMIS at its headquarters at 885 Third Avenue, New York, New York.    Additionally, there were periodic customer statements, confirmations, and other communications made by BLMIS or Madoff and sent to Initial Transferee Defendants.

67.      The Account Agreements were to be performed in New York, New York, through securities trading activities that would take place in New York, New York.  The Accounts were held in New York, New York, and Initial Transferee Defendants sent funds to BLMIS and/or to BLMIS's bank account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York, for application to the Accounts and the purported conducting of trading activities.  Between the dates the Accounts were opened and the Filing Date, Initial Transferee Defendants made deposits to BLMIS through checks and/or wire transfers into the BLMIS Bank Account and/or received inter-account transfers from other BLMIS accounts.

68.      During the two years prior to the Filing Date, BLMIS made transfers to Initial Transferee Defendants of fictitious profits from the Ponzi scheme (as previously defined, the "Initial Transfers") totaling $30,427,989.

69.    The Initial Transfers constitute non-existent profits supposedly earned in the Accounts, but which, in reality, comprised other people's money.  The Initial Transfers are set forth in Column 9 on Exhibit B annexed hereto.

70.    In the two years prior to the Filing Date, BLMIS made Initial Transfers of fictitious profits to Grace in the total amount of $6,750,000 in connection with Grace's BLMIS IA account, No. 1T0026, as set forth in Column 9 of Exhibit B-1.

71.    In the two years prior to the Filing Date, BLMIS made Initial Transfers of fictitious profits to EJS in the total amount of $7,700,000 in connection with EJS's BLMIS IA account, No. 1ZA192, as set forth in Column 9 of Exhibit B-2.

72.    In the two years prior to the Filing Date, BLMIS made Initial Transfers of fictitious profits to GFF in the total amount of $385,000 in connection with GFF's BLMIS IA account, No. 1ZB010, as set forth in Column 9 of Exhibit B-3.

73.    In the two years prior to the Filing Date, BLMIS made Initial Transfers of fictitious profits to Jelris in the total amount of $11,500,000 in connection with Jelris's BLMIS IA account, No. 1ZB143, as set forth in Column 9 of Exhibit B-4.

74.    In the two years prior to the Filing Date, BLMIS made Initial Transfers of fictitious profits to Richard Glantz in the total amount of $3,327,989 in connection with the BLMIS IA account maintained in the name of the Richard Glantz IRA, No. 1ZR010, as set forth in Column 9 of Exhibit B-5.

75.    While he was alive, Edward Glantz controlled the BLMIS IA account maintained in the name of the Edward Glantz IRA, No. 1ZR176.  After Edward Glantz died, Thelma Glantz controlled this BLMIS IA account.  On December 28, 2006, BLMIS made an Initial Transfer of fictitious profits in the amount of $500,000 to Edward Glantz through Fiserv Investment Support

Services, in connection with the BLMIS IA account maintained in the name of the Edward

Glantz IRA, No. 1ZR176.  Following Edward Glantz's death, on January 3, 2008, BLMIS made

an Initial Transfer of fictitious profits in the amount of $265,000 to Thelma Glantz through

Fiserv Investment Support Services, in connection with the BLMIS IA account maintained in the

name of the Edward Glantz IRA, No. 1ZR176.  See Column 9 of Exhibit B-6.

76.     The Initial Transfers are avoidable and recoverable under Bankruptcy Code

§§ 548(a), 550(a)(1) and 551 and applicable provisions of SIPA, particularly SIPA § 78fff-

2(c)(3).

77.     Initial Transferee Defendants subsequently transferred some or all of the Initial

Transfers, directly or indirectly, to Subsequent Transferee Defendants.  The Subsequent

Transfers include, but are not limited to, the Subsequent Transfers detailed on Exhibit C.

78.     As shown on Exhibit C:

a.      Bosarge received a Subsequent Transfer from Jelris on the date and in the

amount set forth on Exhibit C-1.

b.      EJS received Subsequent Transfers from GFF and Grace on the dates and

in the amounts set forth on Exhibit C-2.

c.      Edward Glantz and Thelma Glantz received Subsequent Transfers from

Jelris on the dates and in the amounts set forth on Exhibit C-3.  Each of these Subsequent

Transfers was deposited into a joint bank account held jointly by Edward Glantz and Thelma

Glantz.  Accordingly, ERG Estate and TG Estate are jointly liable for these Subsequent

Transfers.

d.      Richard Glantz received Subsequent Transfers from EJS, Grace and Jelris

on the dates and in the amounts set forth on Exhibit C-4.

e.    Richard Glantz and Ostrin received Subsequent Transfers from EJS and Jelris on the dates and in the amounts set forth on Exhibit C-5.  Each of these Subsequent Transfers was deposited into a joint bank account held jointly by Richard Glantz and Ostrin. Accordingly, Richard Glantz and Ostrin are jointly liable for these Subsequent Transfers.

f.    Thelma Glantz received Subsequent Transfers from EJS on the dates and in the amounts set forth on Exhibit C-6.

g.    G-O Trust II received a Subsequent Transfer from Jelris on the date and in the amount set forth on Exhibit C-7.

h.    Grace received a Subsequent Transfer from EJS on the date and in the amount set forth on Exhibit C-8.

i.    Jelris received a Subsequent Transfer from EJS on the date and in the amount set forth on Exhibit C-9.

j.    Lakeview received Subsequent Transfers from EJS, Grace and Jelris on the dates and in the amounts set forth on Exhibit C-10.

k.    Richard Glantz Law Office received Subsequent Transfers from EJS, Grace and Jelris on the dates and in the amounts set forth on Exhibit C-11.

l.    Ostrin received a Subsequent Transfer from EJS on the date and in the amount set forth on Exhibit C-12.

m.    Vista received Subsequent Transfers from EJS and Jelris on the dates and in the amounts set forth on Exhibit C-13.

79.    The Subsequent Transfers are recoverable from Subsequent Transferee Defendants pursuant to Bankruptcy Code § 550(a).

80.    The Trustee's investigation is ongoing, and the Trustee reserves the right to (i) supplement the information regarding the Initial Transfers, the Subsequent Transfers, and any additional initial transfers or subsequent transfers and (ii) seek avoidance and recovery of such initial transfers or subsequent transfers.

81.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

## COUNT ONE
### FRAUDULENT TRANSFERS – 11 U.S.C. §§ 105(a), 548(a)(1)(A), 550(a) AND 551

82.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

83.    Each of the Initial Transfers was made on or within two years before the Filing Date.

84.    Each of the Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of Bankruptcy Code §§ 101(54) and 548(a) and SIPA § 78fff-2(c)(3).

85.    Each of the Initial Transfers was made or incurred by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing and/or future creditors.

86.    Each of the Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to Bankruptcy Code § 548(a)(1)(A) and recoverable from Initial Transferee Defendants pursuant to Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3).

87.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 105(a), 548(a)(1)(A), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Initial Transferee Defendants:  (a) avoiding and preserving the Initial Transfers; (b) directing that the

Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from Initial

Transferee Defendants for the benefit of the BLMIS estate; and (d) awarding any other relief the

Court deems just and appropriate.

## COUNT TWO
## RECOVERY OF SUBSEQUENT TRANSFERS –
## 11 U.S.C. §§ 105(a) and 550(a)

88.    To the extent applicable, the Trustee incorporates by reference the allegations

contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten

herein.

89.    Each of the Subsequent Transfers is recoverable from Subsequent Transferee

Defendants under Bankruptcy Code §§ 105(a) and § 550(a) and SIPA § 78fff-2(c)(3).

90.    Each of the Subsequent Transfers was made by Initial Transferee Defendants

directly or indirectly to Subsequent Transferee Defendants.

91.    Subsequent Transferee Defendants are immediate or mediate transferees of the

Subsequent Transfers from Initial Transferee Defendants.

92.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 105(a) and 550(a) and

SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Subsequent Transferee

Defendants:  (a) recovering the Subsequent Transfers, or the value thereof, from Subsequent

Transferee Defendants for the benefit of the BLMIS estate; and (b) awarding any other relief the

Court deems just and appropriate.

## COUNT THREE
## GENERAL PARTNER LIABILITY

93.    To the extent applicable, the Trustee incorporates by reference the allegations

contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten

herein.

94.    At all times relevant to the Initial Transfers and Subsequent Transfers, Richard Glantz was a general partner of EJS, Jelris and Grace.

95.    If EJS is unable to satisfy any judgment against it, Richard Glantz, as a general partner, is liable to satisfy any judgment against EJS.

96.    If Jelris is unable to satisfy any judgment against it, Richard Glantz, as a general partner, is liable to satisfy any judgment against Jelris.

97.    If Grace is unable to satisfy any judgment against it, Richard Glantz, as a general partner, is liable to satisfy any judgment against Grace.

98.    At all times relevant to the Subsequent Transfers to Lakeview, Vista was the general partner of Lakeview.

99.    In the event that Lakeview is unable to satisfy any judgment against it, Vista, as the general partner, is liable to satisfy any judgment against Lakeview.

100.    As a result of the foregoing, pursuant to applicable state law, Richard Glantz is jointly and severally liable for all debts and obligations of EJS, Jelris, and Grace, and the Trustee is entitled to a judgment against Richard Glantz recovering the Initial Transfers and Subsequent Transfers to EJS, Jelris, and Grace or their value from Richard Glantz for the benefit of the BLMIS estate.

101.    Additionally, pursuant to applicable state law, Vista is jointly and severally liable for all debts and obligations of Lakeview, and the Trustee is entitled to a judgment against Vista recovering the Subsequent Transfers to Lakeview or their value from Vista for the benefit of the BLMIS estate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Initial Transferee Defendants and Subsequent Transferee Defendants as follows:

i.     On the First Claim for Relief, pursuant to Bankruptcy Code §§ 105(a), 548(a)(1)(A), 550(a), and 551 and SIPA § 78fff-2(c)(3):  (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from Initial Transferee Defendants for the benefit of the BLMIS estate; and (d) awarding any other relief the Court deems just and appropriate;

ii.     On the Second Claim for Relief, pursuant to Bankruptcy Code §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3): (a) recovering the Subsequent Transfers, or the value thereof, from Subsequent Transferee Defendants for the benefit of the BLMIS estate; and (b) awarding any other relief the Court deems just and appropriate;

iii.     On the Third Claim for Relief, pursuant to applicable state law, judgment that Richard Glantz is jointly and severally liable for all debts and obligations of EJS, Jelris, and Grace, and recovering the Initial Transfers and Subsequent Transfers to EJS, Jelris, and Grace or their value from Richard Glantz for the benefit of the BLMIS estate.  Additionally, pursuant to applicable state law, judgment that Vista is jointly and severally liable for all debts and obligations of Lakeview, and recovering the Subsequent Transfers to Lakeview or their value from Vista for the benefit of the BLMIS estate;

iv.     On all Claims for Relief for which EJS, Jelris, and Grace are liable, judgment for that same relief against Richard Glantz as general partner of EJS, Jelris, and Grace;

v.     On all Claims for Relief for which Lakeview is liable, judgment for that same relief against Vista as the general partner of Lakeview;

vi.      On all Claims for Relief, as applicable, establishing a constructive trust over the

Initial Transfers and Subsequent Transfers and their proceeds, product and offspring in favor of the

Trustee for the benefit of the BLMIS estate;

vii.      On all Claims for Relief, awarding the Trustee prejudgment interest from the date

on which the Initial Transfers and/or Subsequent Transfers were received;

viii.      On all Claims for Relief, awarding the Trustee all applicable interest, costs, and

disbursements incurred in this proceeding; and

ix.      On all Claims for Relief, granting the Trustee such other, further, and different

relief as the Court deems just, proper and equitable.

Date:   January 19, 2018
        New York, New York

By: */s/ David J. Sheehan*
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Fernando A. Bohorquez
Email: fbohorquez@bakerlaw.com
Jonathan B. New
Email: jnew@bakerlaw.com
Benjamin D. Pergament
Email: bpergament@bakerlaw.com
Andrew W. Reich
Email: areich@bakerlaw.com
Kendall E. Wangsgard
Email: kwangsgard@bakerlaw.com
Joshua B. Rog
Email: jrog@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the Estate of Bernard L. Madoff*