**Davidoff Hutcher & Citron LLP**
605 Third Avenue, 34th Floor
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Michael Wexelbaum
E-mail: mw@dhclegal.com
Larry Hutcher
E-mail: lkh@dhclegal.com
Michael Katz
E-mail: mdk@dhclegal.com

*Attorneys for Defendants Magnify Inc., Premero Investments Ltd., Strand International Investments Ltd., The Yeshaya Horowitz Association, Yair Green, and Express Enterprises Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>MAGNIFY INC., PREMERO INVESTMENTS LTD., STRAND INTERNATIONAL INVESTMENTS LTD., THE YESHAYA HOROWITZ ASSOCIATION, YAIR GREEN, and EXPRESS ENTERPRISES INC.,<br><br>Defendants. | Adv. Pro. No. 10-05279 (SMB) |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

## TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT .......................................................................................................................... 3

I.    GREEN'S AFFIDAVIT AND THE EXHIBITS ATTACHED THERETO
      ARE PROPERLY CONSIDERED ON THIS MOTION TO DISMISS ............................ 3

      A.    Green's Affidavit .................................................................................................. 3

      B.    Documents Attached to Green's Affidavit ............................................................. 5

II.   THE SAC FAILS TO ALLEGE DEFENDANTS' ACTUAL KNOWLEDGE
      OF THE BLMIS PONZI SCHEME/FRAUD ..................................................................... 8

      A.    The Section 546(e) "Safe Harbor" Applies to Strand and Premero ....................... 8

      B.    The SAC Fails to Allege Defendants' Actual Knowledge of the BLMIS
            Fraud and the Documents Properly Considered on This Motion Refute It ........... 13

III.  THE TRUSTEE HAS FAILED TO PLEAD PREMERO'S "WILLFUL
      BLINDNESS" TO THE BLMIS PONZI SCHEME/FRAUD ........................................... 17

IV.   THE TRUSTEE'S ALTER EGO/PIERCING THE CORPORATE
      VEIL ALLEGATIONS FAIL AS A MATTER OF LAW ................................................. 19

      A.    The Court May Consider the Trustee's Alter Ego/Piercing the
            Corporate Veil Allegations at the Motion to Dismiss Stage .................................. 20

      B.    Under New York's Conflict-of-Law Analysis, the Law of the State
            of Incorporation Governs Alter Ego/Veil Piercing Allegations ............................ 21

      C.    Defendants Have Met Their Burden of Proving BVI and Panama Law ............... 26

      D.    The Trustee's Alter Ego/Piercing the Corporate Veil Allegations Fail
            Under BVI and Panama Law ................................................................................ 28

            1.    The Alter Ego/Piercing the Corporate Veil Allegations Against
                  Strand Fail Under BVI Law ........................................................................ 28

            2.    The Alter Ego/Piercing the Corporate Veil Allegations Against
                  Magnify Fail Under Panama Law ............................................................... 29

i

E.      Even if New York Law Applies to the Trustee's Alter Ego/Piercing the
        Corporate Veil Allegations, They Still Fail ........................................................31

        1.      The Trustee Has Failed to Plead Green's Complete Domination
                Over Magnify and Strand ........................................................................31

        2.      The Trustee Has Failed to Adequately Allege That Green
                Dominated Magnify and Strand to Commit a Fraud or Wrong ................34

V.      THE TRUSTEE'S EQUITABLE SUBORDINATION CLAIM FAILS ..........................35

CONCLUSION ................................................................................................................35

# TABLE OF AUTHORITIES

**Page No.**

**Cases**

*A Star Grp., Inc. v. Manitoba Hydro,*
    621 F. App'x 681 (2d Cir. 2015) ...............................................................................9, 14, 18

*Aekyung Co. v. Intra & Co.,*
    No. 99-cv-11773, 2008 WL 4974424 (S.D.N.Y. Nov. 19, 2008) ...........................................34

*Anglo Am. Ins. Grp., P.L.C. v. Calfed, Inc.,*
    899 F.Supp. 1070 (S.D.N.Y. 1995) ......................................................................................27

*Babitt v. Vebeliunas,*
    332 F.3d 85 (2d Cir. 2003) ..................................................................................................31

*Batruk v. Mitsubishi Motors,*
    Nos. 94-cv-7593, 94-cv-8677, 1998 WL 307383 (S.D.N.Y. June 10, 1998)..........................28

*Best v. Bank of Am., N.A.,*
    No. 14-cv-6546, 2015 WL 5124463 (E.D.N.Y. Sept. 1, 2015).................................................4

*Brown v. Marriott Int'l, Inc.,*
    No. 14-cv-5960, 2017 WL 4484194 (E.D.N.Y. Oct. 6, 2017) ..................................................4

*Carlone v. City of St. Paul,*
    No. 16-cv-4273, 2017 WL 4465284 (D. Minn. Sept. 14, 2017) ..............................................7

*Carotek, Inc. v. Kobayashi Ventures, LLC,*
    875 F.Supp.2d 313 (S.D.N.Y. 2012) ....................................................................................23

*Caterpillar Inc. v. M/V Karonga,*
    No. 06-cv-8236, 2008 WL 1849771 (S.D.N.Y. Apr. 23, 2008)..............................................27

*Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni,*
    No. 15-cv-9003, 2016 WL 5719793 (S.D.N.Y. Sept. 30, 2016) ...........................................27

*Cincotta v. Hempstead Union Free Sch. Dist.,*
    No. 15-cv-4821, 2016 WL 4536873 (E.D.N.Y. Aug. 30, 2016) ..............................................5

*Cortec Indus., Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2d Cir. 1991) ....................................................................................................6

*Daelim Trading Co. v. Glagni Enters., LLC,*
    No. 10-cv-2944, 2014 WL 6646233 (S.D.N.Y. Nov. 12, 2014) ............................................23

*Dastranj v. Dehghan,*
    No. 15-cv-2436, 2016 WL 7012299 (D. Md. Dec. 1, 2016) ..................................................28

*Deangelis v. Corzine (In re MF Global Holdings Ltd. Inv. Litig.),*
    998 F.Supp.2d 157 (S.D.N.Y. 2014) ....................................................................................25

*DiFolco v. MSNBC Cable L.L.C.,*
    622 F.3d 104 (2d Cir. 2010) ..................................................................................................5

601982v.6

*E. End Eruv Ass'n, Inc. v. Town of Southampton*,
No. 13-cv-4810, 2014 WL 4826226 (E.D.N.Y. Sept. 24, 2014)................................................4

*EED Holdings v. Palmer Johnson Acquisition Corp.*,
228 F.R.D. 508 (S.D.N.Y. 2005)............................................................................................34

*Eldesouky v. Aziz*,
No. 11-cv-6986, 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014)................................................23

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011) ..........................................................................................12, 13

*Faulkner v. Beer*,
463 F.3d 130 (2d Cir. 2006) .....................................................................................................6

*FDIC v. US Mortg. Corp.*,
132 F.Supp.3d 369 (E.D.N.Y. 2015) .........................................................................................8

*Fin. One, Inc. v. Timeless Apparel, Inc.*,
No. 09-cv-9397, 2011 WL 1345030 (S.D.N.Y. Mar. 29, 2011)..............................................23

*Fletcher v. Atex, Inc.*,
68 F.3d 1451 (2d Cir. 1995) ..............................................................................20, 21, 22, 23

*Friedl v. City of N.Y.*,
210 F.3d 79 (2d Cir. 2000) .......................................................................................................4

*Gerritsen v. Warner Bros. Entm't Inc.*,
112 F.Supp.3d 1011 (C.D. Cal. 2015) .......................................................................................4

*Ginx, Inc. v. Soho Alliance*,
720 F.Supp.2d 342 (S.D.N.Y. 2010) .........................................................................................7

*Global Network Commc'ns, Inc. v. N.Y.C.*,
458 F.3d 150 (2d Cir. 2006) .....................................................................................................6

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011)................................................................................................................19

*Goel v. Bunge, Ltd.*,
820 F.3d 554 (2d Cir. 2016) .....................................................................................................6

*Goldman v. Belden*,
754 F.2d 1059 (2d Cir. 1985) ...................................................................................................6

*Granata v. Berson*,
No. 11-cv-689, 2011 WL 6034366 (S.D.N.Y. Dec. 5, 2011).......................................9, 14, 18

*Growblox Scis., Inc. v. GCM Admin. Servs., LLC*,
No. 14-cv-2280, 2016 WL 1275050 (S.D.N.Y. Mar. 31, 2016)................................................5

*Hamlen v. Gateway Energy Servs. Corp.*,
No. 16-cv-3526, 2017 WL 6398729 (S.D.N.Y. Dec. 8, 2017)................................................34

*Hilton v. Bank of N.Y. Mellon*,
No. 15-cv-0667, 2016 WL 234851 (N.D.N.Y. Jan. 19, 2016) ..................................................8

*In re BLMIS*,
2016 WL 183492 (S.D.N.Y. Jan. 14, 2016) ........................................................................12

*In re Farraj*,
72 A.D.3d 1082, 900 N.Y.S.2d 340 (2d Dep't 2010).............................................................23

*In re Morris v. N.Y. State Dep't of Taxation & Fin.*,
82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993)....................................................34

*In re Rezulin Prods. Liab. Litig.*,
392 F.Supp.2d 597 (S.D.N.Y. 2005) .....................................................................................23

*In re Teligent, Inc.*,
No. 01-cv-12974, 2005 WL 267956 (Bankr. S.D.N.Y. Feb. 3, 2005) ......................................6

*In re Tyson*,
433 B.R. 68 (S.D.N.Y. 2010) .....................................................................................27, 29, 34

*Jackson v. Grondolsky*,
No. 09-cv-5617, 2011 WL 6756918 (D.N.J. Dec. 23, 2011) ....................................................4

*Jasper & Black, LLC v. Carolina Pad Co.*,
No. 10-cv-3562, 2012 WL 413869 (S.D.N.Y. Feb. 9, 2012) ....................................................4

*Jonas v. Estate of Leven*,
116 F.Supp.3d 314 (S.D.N.Y. 2015) ......................................................................................23

*Jonas v. Farmer Bros. Co. (In re Comark)*,
124 B.R. 806 (Bankr. C.D. Cal. 1991) ..................................................................................12

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
8 F.3d 130 (2d Cir. 1993) ........................................................................................21, 22, 23

*Kalin v. Xanboo, Inc.*,
526 F.Supp.2d 392 (S.D.N.Y. 2007) .....................................................................................20

*Kempf v. Mitsui Plastics, Inc.*,
No. 96-cv-1106, 1996 WL 673812 (S.D.N.Y. Nov. 20, 1996) ...............................................33

*Kiska Constr. Corp.-USA v. G & G Steel, Inc.*,
No. 04-cv-9252, 2005 WL 1225944 (S.D.N.Y. May 20, 2005)................................................4

*Kopec v. Coughlin*,
922 F.2d 152 (2d Cir. 1991) ...................................................................................................4

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1991) ...................................................................................................6

*Lyman Commerce Solutions, Inc. v. Lung*,
No. 12-cv-4398, 2013 WL 4734898 (S.D.N.Y. Aug. 30, 2013) .............................................25

*Malin v. XL Capital Ltd.*,
499 F.Supp.2d 117 (D. Conn. 2007).......................................................................................6

*Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice HMO, Inc.*,
No. 13-cv-6551, 2016 WL 2939164 (S.D.N.Y. May 19, 2016)................................................8

*Mcnerney v. Rescap Borrower Claims Trust,*
    563 B.R. 477 (S.D.N.Y. 2016) ................................................................................4

*Messer v. Bentley Manhattan Inc. (In re Madison Bentley Assocs., LLC),*
    No. 10-03487, 2015 WL 6125893 (Bankr. S.D.N.Y. Oct. 16, 2015) .....................33

*Milestone Shipping, S.A. v. Estech Trading LLC,*
    764 F.Supp.2d 632 (S.D.N.Y. 2011) .....................................................................21

*Naftali v. N.Y. Deferred Exch. Corp.,*
    No. 15-cv-7152, 2017 WL 4325725 (E.D.N.Y. Aug. 15, 2017) ............................20

*Nattel, LLC v. SAC Capital Advisors LLC,*
    370 F. App'x 132 (2d Cir. 2006) ...........................................................................22

*Network Enters., Inc. v. APBA Offshore Prods., Inc.,*
    No. 01-cv-11765, 2003 WL 124521 (S.D.N.Y. Jan. 15, 2003) .............................21

*Next Millennium Realty, L.L.C. v. Adchem Corp.,*
    No. 03-cv-5985, 2015 WL 11090419 (E.D.N.Y. Mar. 31, 2015) .....................32, 33

*Norlin Corp. v. Rooney, Pace Inc.,*
    744 F.2d 255 (2d Cir. 1984) .................................................................................26

*Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff,*
    2003 WL 22989669 (S.D.N.Y. Dec. 11, 2003) .....................................................23

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc.*
    *(In re Sunbeam Corp.),*
    284 B.R. 355 (Bankr. S.D.N.Y. 2002) ..................................................................20

*Panam Mgmt. Grp., Inc. v. Pena,*
    No. 08-cv-2258, 2011 WL 3423338 (E.D.N.Y. Aug. 4, 2011) .................23, 30, 31

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
    446 F.Supp.2d 163 (S.D.N.Y. 2006) .....................................................................25

*Picard v. Avellino (In re BLMIS),*
    557 B.R. 89 (Bankr. S.D.N.Y. 2016) ...............................................................16, 21

*Picard v. Ida Fishman Revocable Trust (In re BLMIS),*
    773 F.3d 411 (2d Cir. 2014) ..............................................................................9, 12

*Picard v. Katz,*
    462 B.R. 447 (S.D.N.Y. 2011) .........................................................................12, 13

*Picard v. Legacy Capital Ltd.,*
    548 B.R. 13 (Bankr. S.D.N.Y. 2016) .....................................................................16

*Picard v. Merkin (In re BLMIS),*
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ..............................................................17, 19

*Picard v. Shapiro (In re BLMIS),*
    542 B.R. 100 (Bankr. S.D.N.Y. 2015) ...................................................................5, 6

*Rakus, Inc. v. 3 Red G, LLC,*
    No. 16594/2009, 2010 WL 26252 (N.Y. Sup. Ct. Jan. 5, 2010) ...........................20

*Rays Trading (H.K.) Co. v. Judy-Philippine, Inc.*,
    No. 98-cv-0170, 1998 WL 355422 (S.D.N.Y. July 2, 1998)..................................35

*Resolution Trust Corp. v. Gregor*,
    872 F.Supp. 1140 (E.D.N.Y. 1994) ..................................................26

*Rincon v. Covidien*,
    No. 16-cv-10033, 2017 WL 2242969 (S.D.N.Y. May 22, 2017).................9, 14, 18

*Rodenbaugh v. Santiago*,
    No. 16-cv-2158, 2017 WL 194238 (E.D. Pa. Jan. 18, 2017) ...........................4

*Singh v. NYCTL 2009-A Trust*,
    No. 14-cv-2558, 2016 WL 3962009 (S.D.N.Y. July 20, 2016)..........................34

*SIPC v. BLMIS (In re Madoff Sec.)*,
    476 B.R. 715 (S.D.N.Y. 2012) .....................................................11

*SIPC v. BLMIS (In re Madoff Sec.)*,
    513 B.R. 437 (S.D.N.Y. 2014) .....................................................12

*SIPC v. Stratton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999)...............................................21

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004) .........................................................5

*Spagnola v. Chubb Corp.*,
    264 F.R.D. 76 (S.D.N.Y. 2010) .....................................................20

*Spizz v. Eluz (In re Ampal-Am. Isr. Corp.)*,
    544 B.R. 464 (Bankr. S.D.N.Y. Jan. 5, 2016) ........................................7

*Standex Int'l Corp. v. QCP, Inc.*,
    No. 16-cv-492, 2017 WL 481447 (S.D.N.Y. Feb. 6, 2017) ............................21

*Svensson v. Securian Life Ins. Co.*,
    706 F.Supp.2d 521 (S.D.N.Y. 2010) .................................................5

*Tianbo Huang v. iTV Media, Inc.*,
    13 F.Supp.3d 246 (E.D.N.Y. 2014) ..........................................21, 26, 27

*Tyco Int'l, Ltd. v. Kozlowski*,
    756 F.Supp.2d 553 (S.D.N.Y. 2010) ................................................25

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
    216 F.Supp.2d 198 (S.D.N.Y. 2002) ................................................23

*Viera v. Young*,
    No. 16-cv-04146, 2017 WL 3447608 (D.S.D. June 28, 2017)..........................4

*Willcox v. Lloyds TSB Bank, PLC*,
    No. 13-cv-00508, 2016 WL 8679353 (D. Haw. Jan. 8, 2016).........................27

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*,
    933 F.2d 131 (2d Cir. 1991) .......................................................33

*Wright v. Ernst & Young LLP*,
   152 F.3d 169 (2d Cir. 1998) ...........................................................................................9, 14, 18

*Xiotech Corp. v. Express Data Prods. Corp., ESI, LLC*,
   11 F.Supp.3d 225 (N.D.N.Y. 2014)........................................................................................33

**Statutes**

11 U.S.C. § 546(e) ............................................................................................... passim

11 U.S.C. § 548(a)(1)(A)................................................................................................17

11 U.S.C. § 548(c) .................................................................................................2, 17, 18

11 U.S.C. § 741(7)(A)(vii) ..........................................................................................11, 12

**Rules**

Fed. R. Civ. P. 12(b)(6) ..........................................................................................1, 4, 6

Fed. R. Civ. P. 44.1......................................................................................................26

**Other Authorities**

Restatement (Second) of Conflict of Laws § 302 cmt. e.........................................................22, 23

Restatement (Second) of Conflict of Laws § 307......................................................................23

Restatement (Second) of Conflict of Laws § 309................................................22, 23, 24, 25, 26

Restatement (Second) of Conflict of Laws § 309 cmt. c..................................................23, 24, 25

Defendants[1] respectfully submit this reply memorandum of law in further support of their motion to dismiss the SAC pursuant to *Rule 12(b)(6)* of the *Federal Rules of Civil Procedure* made applicable to this matter by *Rule 7012* of the *Federal Rules of Bankruptcy Procedure*.

## PRELIMINARY STATEMENT

After over seven years of litigation and almost six years of fact discovery, the Trustee knows full well that Defendants did not have "actual knowledge" of nor were they "willfully blind" to the BLMIS Ponzi scheme. Recognizing that such facts don't exist, the Trustee created them by relying on one-sided references to, selective quotes from, and torturous interpretations of documents that are in his possession and/or that he knew of prior to drafting the SAC. Worse yet, knowing full well that when these documents are considered in their entirety they completely refute his conclusory and unfounded allegations, the Trustee hides them from the Court, disingenuously claiming that, even though many are referred to in the SAC and even though the allegations contained therein could not have come from elsewhere, he did not rely on them in drafting it. As the Second Circuit has made clear, such gamesmanship is not allowed and thus Green's affidavit and the exhibits attached thereto must be considered in their entirety. The Trustee's dishonest and deceitful tactics should not be countenanced by this Court and should not be allowed to forestall a decision against him.

The Trustee's arguments are all without merit. First, Green's affidavit and the documents attached thereto are properly considered on this motion. Courts routinely hold that affidavits may be considered on a *Rule 12(b)(6)* motion where they attach and discuss the contents of documents properly considered to be part of the complaint. Moreover, all of the documents attached to Green's affidavit are properly deemed part of the SAC as they are either incorporated

---

[1] Capitalized terms not defined herein have the same meanings ascribed to them in Defendants' moving papers.

by reference in, quoted to, "integral" to, or "give the lie" to specious factual allegations in the SAC, or are documents of which the Court may take judicial notice.

Second, the § 546(e) "safe harbor" clearly applies to Strand and Premero as the transfers they received from BLMIS constitute both (i) transfers made "in connection with a securities contract" and (ii) "settlement payments" as those terms are defined in the Bankruptcy Code.

Third, the Trustee has failed to plausibly allege Defendants' "actual knowledge" of the BLMIS Ponzi scheme. The Trustee's contention that Magnify, through Albert Igoin ("Igoin") (rather than through Green), had the requisite knowledge was not pled in the SAC and new theories or contentions raised for the first time in opposition to a motion to dismiss cannot serve to amend the pleading and thus cannot be considered. Moreover, nowhere in the SAC does it allege that Igoin had "actual knowledge" of the BLMIS Ponzi scheme or that such knowledge should be imputed to Defendants (nor could it be with respect to Premero, Strand, and Express). With respect to Green, the SAC and the documents properly considered a part thereof conclusively establish that he had nothing to do with managing Magnify or its BLMIS Accounts prior to Igoin's death in 1995 and thus his purported "actual knowledge" of the BLMIS fraud cannot be based on events occurring prior thereto. The Trustee's post-1995 allegations with respect to Green are purely conclusory, contradicted by the SAC, have no basis in fact, and/or are refuted by the documents properly considered on this motion.

Fourth, the Trustee has failed to allege that Premero did not "take for value and in good faith." There is no dispute that Premero has satisfied the "value" element of a § 548(c) defense. Moreover, as the Trustee has failed to plead Premero's "actual knowledge" of the BLMIS fraud and there are no allegations of "willful blindness" or "red flags" in the SAC, he has failed to show that Premero did not take in "good faith." The Trustee's alternative claim that his deficient

2

allegations of "actual knowledge" suffice to show Green's "willful blindness" appear nowhere in the SAC and thus cannot be considered. In any event, the non-conclusory allegations the Trustee does offer come nowhere close to alleging Green's "willful blindness" to the BLMIS fraud.

Fifth, the Trustee's alter ego/piercing the corporate veil allegations also fail. Contrary to the Trustee's contention, the Court may consider such allegations on a motion to dismiss. Moreover, under New York's choice-of-law analysis, it is the law of the state of incorporation that governs such allegations, not New York law as the Trustee claims. Additionally, Defendants have met their burden of proving the law of Panama and the British Virgin Islands, the respective states of incorporation of Magnify and Strand, and have shown that the Trustee's alter ego/piercing the corporate veil allegations fail thereunder. Alternatively, even if New York law applies, the Trustee's alter ego/piercing the corporate veil allegations fail under that law as well.

Finally, because the Trustee has failed to plead Defendants' "actual knowledge" of or "willful blindness" to the BLMIS Ponzi Scheme, his equitable subordination claim also fails.

## ARGUMENT

### I.    GREEN'S AFFIDAVIT AND THE EXHIBITS ATTACHED THERETO ARE PROPERLY CONSIDERED ON THIS MOTION TO DISMISS

#### A.    Green's Affidavit

The Trustee alleges that there is "no set of circumstances" under which Green's affidavit "could be considered on a motion to dismiss" because it is a "narrative comprising his testimony concerning factual allegations and arguments he would make at trial." Trustee's Memorandum of Law in Opposition ("Opp'n") at 12. The Trustee's characterization of Green's affidavit could not be farther from the truth. The Green affidavit was submitted (1) to provide this Court with (i) the documents that the Trustee incorporated by reference in the SAC, quoted to in the SAC, relied on in drafting the SAC, and intentionally seeks to conceal from this Court because they refute the

3

allegations of the SAC, and (ii) documents of which this Court may take judicial notice; and (2) to show that, when such documents are considered in connection with the allegations of the SAC, the Trustee has failed to plead Defendants' "actual knowledge" of or "willful blindness" to the BLMIS fraud. Such documents are considered part of the SAC, (*see* Defendants' Moving Memorandum of Law ("Mem. in Supp.") at 9-11), and as such, courts routinely hold that affidavits attaching them and discussing their contents are properly considered on a *Rule 12(b)(6)* motion. *See, e.g., Jasper & Black, LLC v. Carolina Pad Co.*, No. 10-cv-3562, 2012 WL 413869, at \*4 (S.D.N.Y. Feb. 9, 2012) (considering affirmation on a motion to dismiss where it "consists merely of a brief description of each document attached, as well as a list of the paragraphs of the Complaint that Defendants contend rely on the attached documents").[2] Thus, Green's affidavit is properly considered by this Court on Defendants' motion to dismiss.[3,4]

---

[2] *See also Best v. Bank of Am., N.A.*, No. 14-cv-6546, 2015 WL 5124463, at \*1 (E.D.N.Y. Sept. 1, 2015) (considering affidavit attaching documents that were specifically referenced in and integral to the complaint); *E. End Eruv Ass'n, Inc. v. Town of Southampton*, No. 13-cv-4810, 2014 WL 4826226, at \*9 (E.D.N.Y. Sept. 24, 2014) (declarations are properly used on a motion to dismiss to "describe the documents attached to them as exhibits for the Court's consideration"); *Viera v. Young*, No. 16-cv-04146, 2017 WL 3447608, at \*4 (D.S.D. June 28, 2017) (affidavit properly considered on motion to dismiss where it "specifically discusses and clarifies the documents . . . attached to [the] complaint"); *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F.Supp.3d 1011, 1020-21 (C.D. Cal. 2015) ("[d]eclarations can be used to bring materials that are properly considered [on a motion to dismiss] to the attention of the court"); *cf. Jackson v. Grondolsky*, No. 09-cv-5617, 2011 WL 6756918, at \*5 (D.N.J. Dec. 23, 2011) (refusing to consider documents on a motion to dismiss where defendant failed to attach them to a certification or declaration).

[3] The Trustee's cases are distinguishable in that the affidavits and declarations offered by the parties therein were not limited, as Green's affidavit here, to attaching and discussing documents properly considered to be part of the complaint, but rather were offered to provide facts extrinsic to the complaint. *See Brown v. Marriott Int'l, Inc.*, No. 14-cv-5960, 2017 WL 4484194, at \*13 (E.D.N.Y. Oct. 6, 2017); *Kopec v. Coughlin*, 922 F.2d 152, 154-55 (2d Cir. 1991); *Kiska Constr. Corp.-USA v. G & G Steel, Inc.*, No. 04-cv-9252, 2005 WL 1225944, at \*4 (S.D.N.Y. May 20, 2005); *Friedl v. City of N.Y.*, 210 F.3d 79, 83-84 (2d Cir. 2000).

[4] To the extent that Green's affidavit contains any statements that do not relate directly to the contents of the documents attached thereto, such statements are merely offered as helpful background information and are no reason to reject consideration of the affidavit. *See Rodenbaugh v. Santiago*, No. 16-cv-2158, 2017 WL 194238, at \*1 n.2 (E.D. Pa. Jan. 18, 2017) (considering affidavit and documents attached thereto merely to add context to the factual background of the case and not in ruling on the motions to dismiss); *Mcnerney v. Rescap Borrower Claims Trust*, 563 B.R. 477, 497 (S.D.N.Y. 2016) (finding no error in the bankruptcy court's consideration of a declaration on a motion to dismiss where the court merely relied on it for background information).

**B.    Documents Attached to Green's Affidavit**

Defendants explain below why all of the documents attached to Green's affidavit are properly considered on this motion to dismiss. For the Court's convenience, Defendants are also attaching hereto as Appendix A a chart summarizing Defendants' position with respect to each document in the same format as the chart that the Trustee submitted in opposition.

First, the Trustee concedes that Exhibits F, H, J (in part), V (in part), and EE are incorporated by reference in the SAC and thus properly considered on this motion. Opp'n at 12, Ex. 1. The Trustee also concedes that this Court may take judicial notice of Exhibit D. *Id.*

Second, under a torturous interpretation of the "incorporation by reference" standard, the Trustee disingenuously claims that most of the documents he refers to or quotes from in the SAC and clearly relied upon in drafting it are somehow not "incorporated by reference." *Id.* at 13 n.13. As the Trustee states, a document is incorporated by reference where the complaint makes a "'clear, definite and substantial reference'" to it. *Id.* (citations omitted). As the Second Circuit has explained, this simply means that the complaint must "explicitly refer[] to and rel[y] upon" the document. *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004). *See also Growblox Scis., Inc. v. GCM Admin. Servs., LLC*, No. 14-cv-2280, 2016 WL 1275050, at *6 (S.D.N.Y. Mar. 31, 2016) (documents incorporated by reference where they were cited to and relied upon in the counterclaims); *Svensson v. Securian Life Ins. Co.*, 706 F.Supp.2d 521, 524-25 (S.D.N.Y. 2010) (insurance policy incorporated by reference where it was explicitly referred to in the complaint and relied upon by the plaintiff).[5] Moreover, as this Court has made clear, where the complaint "cites or quotes from excerpts of a document, the court may consider other parts of the same

---

[5] *See also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (lower court properly considered emails to be incorporated by reference where the plaintiff referred to them in her complaint); *Cincotta v. Hempstead Union Free Sch. Dist.*, No. 15-cv-4821, 2016 WL 4536873, at *8 (E.D.N.Y. Aug. 30, 2016) (holding documents to be incorporated by reference where they were explicitly referred to in the complaint).

601982v.6

document submitted by the parties on a motion to dismiss." *Picard v. Shapiro (In re BLMIS)*, 542 B.R. 100, 111 (Bankr. S.D.N.Y. 2015).[6] As set forth in Green's affidavit and Appendix A hereto, the majority of the documents Defendants submit on this motion are either referred to or quoted in the SAC and clearly relied upon by the Trustee to support his claims. Thus, they are undoubtedly "incorporated by reference" and properly considered on this motion.[7]

Third, the Trustee claims that a document is not integral to the SAC simply because it is "[r]elevant to the Claims." Opp'n at 14. But that is a red herring as Defendants are claiming no such thing. Rather, courts may consider on a motion to dismiss documents "plaintiffs had either in [their] possession or had knowledge of and upon which they relied in bringing suit." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). *See also* Mem. in Supp. at 9-10. Or as the Trustee puts it, the documents must be "'deemed necessary to the plaintiff's statement of a claim under Rule 8.'" Opp'n at 14 (citation omitted). The real dispute between the parties is not over the definition of "integral," but rather over the Trustee's disingenuous claim that he did not rely on the documents Defendants claim are "integral" to the SAC. However, as set forth in

---

[6] *See also Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (noting it is "permissible to consider full text of documents partially quoted in complaint"); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure. Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements."); *Malin v. XL Capital Ltd.*, 499 F.Supp.2d 117, 131 (D. Conn. 2007) ("Courts have routinely held that when a complaint quotes documents only in part and omits critical portions of the documents, it is permissible for the court ruling on a motion to dismiss to consider the full texts of the quoted documents."); *In re Teligent, Inc.*, No. 01-cv-12974, 2005 WL 267956, at *3 (Bankr. S.D.N.Y. Feb. 3, 2005) (holding that by excerpting and quoting selected portions of the document, the plaintiff "put the entire document into issue").

[7] The Trustee cites to several cases for the proposition that merely mentioning a document in the complaint or offering limited quotation from it is insufficient for it to be considered "incorporated by reference." Opp'n at 13 n.4. However, the Trustee does not merely mention or offer limited quotation from the documents at issue, but rather explicitly refers to and relies upon them in the SAC. *See* Appendix A. Such reference and reliance are absent from the Trustee's cases, thus distinguishing them. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 560 (2d Cir. 2016) (complaint did not specifically mention the plaintiff's prior testimony from another action, but only to "sworn testimony" in general from that action); *Global Network Commc'ns, Inc. v. N.Y.C.*, 458 F.3d 150, 156 (2d Cir. 2006) (plaintiff's sole shareholder's and president's testimony from an unrelated criminal proceeding was neither mentioned in nor relied upon by appellant in drafting the complaint); *Goldman v. Belden*, 754 F.2d 1059, 1066-67 (2d Cir. 1985) (no indication the plaintiff relied on the documents or otherwise incorporated them into the complaint).

6

the chart contained in Appendix A, there can be no other conclusion. *See, e.g., Spizz v. Eluz (In re Ampal-Am. Isr. Corp.)*, 544 B.R. 464, 472 (Bankr. S.D.N.Y. Jan. 5, 2016) (finding plaintiff must have relied on the minutes of the committee meetings as the allegations of the complaint concerning what happened at those meetings could not have come from anywhere else); *Carlone v. City of St. Paul*, No. 16-cv-4273, 2017 WL 4465284, at *1 n.2 (D. Minn. Sept. 14, 2017) (considering documents on a motion to dismiss where they were "embraced by the . . . Complaint because the . . . Complaint refers to the actions described in the exhibits").[8]

Fourth, the Trustee again misstates Defendants' position by claiming that they are suggesting that "every document the defendant believes is favorable to his view of the facts can be considered on a motion to dismiss simply because the plaintiff was aware of it when drafting the complaint." Opp'n at 15. *See also id.* at 11. But that is not what Defendants are claiming. Rather, as the case law makes clear, a plaintiff cannot "create a false impression in the complaint as to the material facts by hiding from the court documents which 'give the lie' to the specious factual presentation." Mem. in Supp. at 10; *see also Ginx, Inc. v. Soho Alliance*, 720 F.Supp.2d 342, 345, 352 (S.D.N.Y. 2010). As discussed in the chart attached hereto as Appendix A, several of the documents attached to Green's affidavit fall into that category.

Fifth, even if some of the documents are "integral" to the complaint, the Trustee claims that this Court still cannot consider them because he "disputes their authenticity, accuracy and relevance." Opp'n at 16. It should be noted that the Trustee is only actually "disputing" the "authenticity, accuracy and relevance" of Exhibits W, Y, Z, AA, and FF. *See* Opp'n at Ex. 1.

---

[8] The Trustee claims that in most instances where a document is deemed integral to the complaint, it is a "contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls." Opp'n at 14. But that doesn't mean it is always the case and as the case the Trustee cites makes clear, the test for whether a document is "integral" is still whether the plaintiff "rel[ied] on the terms and effect of the document in drafting the complaint." *Global*, 458 F.3d at 156 (holding testimony from an unrelated criminal proceeding was not integral to the complaint where the appellant did not rely on it drafting the complaint). The Trustee also claims a document is integral only where it is "'at the heart of the dispute,'" (Opp'n at 14), but none of the cases he cites contain that purported quote.

7

Moreover, even if "implicit, conclusory, contradictory, or implausible objections" of "authenticity, accuracy and relevance" will suffice, (Opp'n at 16), the Trustee does not even offer that for these five documents. He merely claims that he objects to their "authenticity, accuracy and relevance" without giving even an "implicit, conclusory, contradictory, or implausible [such] objection." That is insufficient. *See Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice HMO, Inc.*, No. 13-cv-6551, 2016 WL 2939164, at *7 n.15 (S.D.N.Y. May 19, 2016) (assertion that the "documents may not be authentic is conclusory and an obvious attempt to manufacture a factual dispute" as they "do not directly challenge the authenticity of these documents, but only speculate that the Court should not trust" their authenticity).[9]

Based on the above and Appendix A, it is clear that Green's affidavit and its exhibits are properly considered on this motion. However, to the extent that this Court disagrees and finds that part of Green's affidavit and/or some of the exhibits constitute extrinsic materials not properly considered on this motion, this Court should simply disregard such materials and decide Defendants' motion to dismiss based on the SAC and any materials that the Court does find proper to consider. As discussed below, even if Green's affidavit and the exhibits attached thereto are excluded in their entirety, Defendants have still shown that the Trustee has failed to plead Defendants' "actual knowledge" of or "willful blindness" to the BLMIS fraud.

## II.    THE SAC FAILS TO ALLEGE DEFENDANTS' ACTUAL KNOWLEDGE OF THE BLMIS PONZI SCHEME/FRAUD

### A.    The Section 546(e) "Safe Harbor" Applies to Strand and Premero

The Trustee has the audacity to contend that the "safe harbor" afforded by § 546(e) of the

---

[9] *See also Hilton v. Bank of N.Y. Mellon*, No. 15-cv-0667, 2016 WL 234851, at *8 (N.D.N.Y. Jan. 19, 2016) (considering documents on motion to dismiss where the plaintiff did not "sufficiently dispute the authenticity or accuracy of" those documents); *FDIC v. US Mortg. Corp.*, 132 F.Supp.3d 369, 381 (E.D.N.Y. 2015) (merely stating that counsel "lacks personal knowledge of the documents" is "insufficient to call their authenticity into question").

601982v.6

Bankruptcy Code does not apply to Premero and Strand. That argument flies in the face of the allegations of the SAC and the Exhibits annexed thereto.

The Trustee argues that the § 546(e) "safe harbor" is inapplicable to Premero and Strand because it only shields (a) transfers made "'in connection with a securities contract,'" and thus requires an agreement manifesting the parties' assent to enter into a securities transaction, or (b) transfers constituting "'settlement payments'" or "'transfers of cash or securities made to complete a securities transaction.'" Opp'n at 18 (*quoting Picard v. Ida Fishman Revocable Trust (In re BLMIS)*, 773 F.3d 411, 421-22 (2d Cir. 2014)) (the "*546(e) Decision*").

The Trustee asserts in conclusory fashion that neither Premero nor Strand entered into securities contracts with BLMIS because neither executed account opening documents with it and that BLMIS did not purport to engage in securities transactions in their accounts. *See* Opp'n at 18. The Trustee makes those conclusory assertions despite the fact that the SAC, drafted long after the "safe harbor" was judicially established in the BLMIS proceeding, contains no such allegations. Such absence is fatal to the Trustee's argument. *See, e.g., Rincon v. Covidien*, No. 16-cv-10033, 2017 WL 2242969, at *2 (S.D.N.Y. May 22, 2017) ("well established" that a plaintiff may not amend his "complaint by asserting new facts or theories for the first time in opposition to a motion to dismiss.") (internal quotation marks and citation omitted).[10]

In addition, the Trustee ignores what the SAC does say on this issue, as follows:

- "BLMIS operated as one broker-dealer from 1960 through 2008 . . . . BLMIS was registered continually as a securities broker-dealer from January 1, 1960 through December 31, 2008 . . . ." ¶ 24.[11]

---

[10] *See also Granata v. Berson*, No. 11-cv-689, 2011 WL 6034366, at *4 (S.D.N.Y. Dec. 5, 2011) ("The law is clear . . . that a plaintiff cannot amend a complaint with information contained in an opposition to a motion to dismiss."); *A Star Grp., Inc. v. Manitoba Hydro*, 621 F. App'x 681, 683 (2d Cir. 2015) (a "party may not amend its pleadings through statements in its briefs"); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (same).

[11] Unless otherwise indicated herein, references to "¶ __" refer to paragraphs of the SAC.

9

- "The Defendants in this action are a group of individuals and entities that invested with or received transfers from BLMIS." ¶ 36.

- "Premero held two accounts at BLMIS . . . ." ¶ 41.

- "Strand held an account with BLMIS . . . ." ¶ 42.

- "Strand and Premero were customers of BLMIS and had accounts with BLMIS . . . ." ¶ 45a.

- "[F]or most of the 1990's, the Portfolio Evaluations [for, *inter alia*, Premero and Strand] itemized a list of various stocks similar to those supposedly traded in other customer accounts . . . . By 1999, the information contained in the Portfolio Evaluations was limited to identifying U.S. Treasury Bills or Fidelity money market mutual funds, rather than stocks or other equities . . . ." ¶ 99.

- "According to BLMIS's records . . . Premero [and] Strand . . . maintained . . . Accounts . . . as set forth on Exhibit A." ¶ 146.

- "Strand [and] Premero . . . and/or their representatives sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co. . . . . for application to the Accounts." ¶ 147.

In addition, Exhibit B to the SAC reflects (a) cash deposits totaling $1,699,968 ($999,985 + $200,000 + $499,983) in Premero's BLMIS Account No. 1FN073, (b) a cash deposit of $99,980 in Premero's BLMIS Account No. 1FN097, and (c) a cash deposit of $500,000 in Strand's BLMIS Account No. 1FR051. With respect to those cash deposits with BLMIS by both Premero and Strand, in the three Notices of Trustee's Determination of Claim with respect to the BLMIS Accounts of Premero and Strand, which are a part of Exhibit C to the SAC, the Trustee stated, in no uncertain terms, that (a) Premero's withdrawals from its Account No. 1FN073 were "greater than the amount that was deposited with BLMIS for the purchase of securities (total of $1,699,967.50)," (b) Premero's withdrawals from its Account No. 1FN097 were "greater than the amount that was deposited with BLMIS for the purchase of securities (total of $99,980.00)," and (c) Strand's withdrawals from its Account No. 1FR051 were "greater than the amount that was deposited with BLMIS for the purchase of securities (total of $609,981.23)."

10

Thus, the Trustee has admitted in the SAC that both Premero and Strand deposited cash with BLMIS "for the purchase of securities." It is thus ill-advised for the Trustee to now contend that there were no securities agreements between BLMIS and Premero and between BLMIS and Strand or that neither received "settlement payments," i.e., transfers of cash or securities to complete a securities transaction. Moreover, it is particularly egregious for the Trustee to have the audacity to assert that "Strand did not invest any principal such as cash or securities into its account," (Opp'n at 19), when the SAC and the Exhibits thereto are clearly to the contrary.

Equally without basis is the Trustee's contention that if Premero and Strand did not execute BLMIS's account opening documents (a factual contention that is not even pled in the SAC), they could not have "manifested their assent to enter into securities contracts." Opp'n at 18. The Trustee predicates that contention upon the grounds that there is no caselaw holding "that a customer manifests such assent when [it] neither executes account opening documents nor receives any documents purporting to confirm securities transactions" *Id. (citing SIPC v. BLMIS (In re Madoff Sec.)*, 476 B.R. 715, 718-20 (S.D.N.Y. 2012)). The Portfolio Evaluations issued to Premero and Strand by BLMIS clearly "purport[] to confirm securities transactions." Confronted by that self-evident fact, the Trustee then creates his own fiction by asserting, without any basis whatsoever, that "the decisions applying 546(e) have held that account opening documents were the sole basis on which *those* customers had established a relationship with BLMIS and that those agreements therefore comprised a 'securities contract.'" Opp'n at 18 (emphasis added; citations omitted). While the cases referenced by the Trustee dealt with "account opening documents," there is no caselaw holding that such documents were the "sole basis" of establishing a securities relationship with BLMIS.

The statutory text and caselaw is also against the Trustee on this issue. The definition of a

11

"securities contract" is not solely agreement-based, but also includes any "other agreement *or transaction* that is similar to an agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7)(A)(vii) (emphasis added). Moreover, oral agreements have been held to be sufficient to support a "settlement payment" within the meaning of § 546(e). *See Jonas v. Farmer Bros. Co. (In re Comark)*, 124 B.R. 806, 808, 817-18 (Bankr. C.D. Cal. 1991). "The [Second] Circuit held that the terms 'in connection with a securities contract' or 'settlement payment,' as used in the Bankruptcy Code, should be construed broadly, and therefore applied to withdrawals made by BLMIS customers, even though Madoff had never purchased securities on behalf of his customers, and even if the customer's withdrawal was in excess of his or her principal invested and thereby allowed the customer to profit from Madoff's fraud." *In re BLMIS*, 2016 WL 183492, at *13 (S.D.N.Y. Jan. 14, 2016) (*citing 546(e) Decision*, 773 F.3d at 414, 417-22. The *546(e) Decision* was consistent with that which had been said earlier by Judge Rakoff in *Picard v. Katz*, 462 B.R. 447, 451-52 (S.D.N.Y. 2011), *abrogated on other grounds*, *SIPC v. BLMIS (In re Madoff Sec.)*, 513 B.R. 437 (S.D.N.Y. 2014) (the "*Safe Harbor Decision*"):

> Section 741(7) [of the Bankruptcy Code] defines a "securities contract" as a "contract for the purchase, sale, or loan of a security," which is the kind of contract [BLMIS] had with its customers. Section 741(8) defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade"— an "extremely broad" definition, *see Enron*, at 334 . . . , *which clearly includes all payments made by [BLMIS] to its customers. Furthermore, any payment by [BLMIS] to its customers that somehow does not qualify as a "settlement payment" qualifies as a "transfer" made "in connection with a securities contract."* By its literal language, . . . the Bankruptcy Code precludes the Trustee from bringing any action to recover from any of Madoff's customers any of the monies paid by [BLMIS] to those customers except in the case of actual fraud.

(emphasis added).

In the *Enron* case cited above in the *Safe Harbor Decision*, the Second Circuit held,

12

consistent with the holdings of several sister circuits, "that courts should interpret the definition [of "settlement payment"] 'in the context of the securities industry,' as 'the transfer of cash or securities made to complete a securities transaction,'" an "'extremely broad'" definition. *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011) (citations omitted). Clearly, the transfers from BLMIS to Strand and Premero fit within this definition.

Nowhere in the *Safe Harbor Decision* did Judge Rakoff rely upon or refer to account opening documents entered into with BLMIS by its customers. Rather, he stated that "Madoff Securities was a registered securities brokerage firm, a fact that directly invokes certain 'safe harbor' provisions of the Bankruptcy Code . . . . Because Madoff Securities was a registered stockbrokerage firm, the liabilities of customers like the defendants here are subject to the 'safe harbor' set forth in section 546(e)." *Safe Harbor Decision*, 462 B.R. at 451.

By reason of all of the foregoing, both Premero and Strand are entitled to the "safe harbor" protection under both prongs of the alternative grounds thereof, to wit, (a) the "securities contract" standard, and (b) the "settlement payment" standard.

### B.    The SAC Fails to Allege Defendants' Actual Knowledge of the BLMIS Fraud and the Documents Properly Considered on This Motion Refute It

In the SAC, it is alleged that Defendants' "actual knowledge" of the BLMIS Ponzi scheme/fraud is predicated upon Green's personal knowledge, which the Trustee then seeks to impute to the other Defendants.[12] However, in opposition to the motion, the Trustee now shifts lanes and asserts in the alternative an entirely new contention – that it was Magnify, through Igoin rather than through Green, that had the requisite knowledge that BLMIS was not actually

---

[12] *See* ¶ 10 ("The history of these Accounts demonstrates Green's actual knowledge of—and participation in— BLMIS's fraud."); ¶ 127 ("Green knew that Madoff was engaged in a fraud and not trading actual securities, and knowingly participated in that fraud. This knowledge must be imputed to all Defendants."). *See also* ¶¶ 127-45 (devoted entirely to the imputation of Green's alleged knowledge to all of the other Defendants).

13

engaged in the trading of securities. *See* Opp'n at 20-22.[13] The Trustee's change in course is not only at odds with the allegations of the SAC, but demonstrates that the Trustee knows that he has not plausibly alleged that Green had "actual knowledge" of the BLMIS fraud.

As previously noted, new theories or assertions first raised in opposition to a motion to dismiss cannot serve to amend the pleading that is subject to dismissal. *See Granata*, 2011 WL 6034366, at *4; *Rincon*, 2017 WL 2242969, at *2; *A Star Grp.*, 621 F. App'x at 683; *Ernst & Young*, 152 F.3d at 178. In addition, nowhere in the SAC is it alleged that Igoin had actual knowledge of the BLMIS fraud or that any such actual knowledge should be imputed to Defendants. With respect to Premero, Strand, and Express, there can be no such imputation as there were no contacts between Igoin and those entities: Premero's BLMIS Accounts were not opened until 1995 and 1996, respectively, after Igoin had died in January 1995; Strand did not even exist until 1998, more than three years after Igoin passed away; and Strand's BLMIS Account was not opened until 1999, more than four years after Igoin's death. ¶¶ 41-44.

In his opposition papers, the Trustee argues that Magnify knew that BLMIS reported fake trades in its Accounts beginning in 1990. *See* Opp'n at 20-21. That entire argument is based upon the MCI Communications stock transaction referred to in the opening customer statement for Magnify's second account with BLMIS, Account No. 1FN025. As is set forth in the moving papers, there are unresolved questions regarding the legitimacy of the MCI Communications stock transactions, which are tied in with the still unresolved question of when the BLMIS Ponzi scheme began. *See* Green Aff. ¶¶ 10-11, 16, Ex. H; Mem. in Supp. at 29-30. For purposes of the

---

[13] It is not surprising that the Trustee propounds this entirely new theory despite continuing to assert that Green took over Magnify and its BLMIS Accounts in 1990 in reliance upon an eleven word snippet of the testimony of Brunner, (¶ 56; Opp'n at 3-4, 20-22), since the Trustee's reliance upon that brief excerpt from Brunner's testimony is taken completely out of context and is totally misplaced, having been incontrovertibly refuted by Brunner's more comprehensive testimony on that issue. *See* Green Aff. ¶ 13, Ex. E; Memo. in Supp. at 68 n. 20.

14

601982v.6

motion at bar, what is significant is that Green's purported "actual knowledge" of that alleged phony stock transaction is based upon nothing more than conclusory allegations and has been conclusively refuted by the documents properly considered on this motion establishing that Green had nothing to do with the BLMIS Accounts of Magnify until after Igoin's death in 1995, more than four years after the MCI Communications stock appeared in the opening customer statement for Magnify Account No. 1FN025. *See* Green Aff. ¶¶ 13, 16 & n.6, 17, 23, 34, 37, Exs. E, H, I, J, Q, CC, DD, EE, FF, GG, JJ; Mem. in Supp. at 30-33. In addition, Magnify Account No. 1FN025 was opened in 1990, years before Green met Madoff for the first time in 1993. *See* Green Aff. ¶¶ 13, 16, 17, Ex. E; Mem. in Supp. at 29-30.

With respect to the balance of the Trustee's argument on the issue of "actual knowledge," he says nothing that plausibly refutes the detailed analysis in Defendants' moving papers. *See* Mem. in Supp. at 11-43.[14] In a desperate attempt to sustain his deficient pleading, the Trustee regurgitates allegations that are purely conclusory, are contradicted by the SAC, are made up and have no basis in fact, and/or are refuted by the documents properly considered, as follows:

- the allegation that Green began meeting with Madoff two to three times a year commencing in 1993, (Opp'n at 22), when the facts are that Green first met Madoff in 1993 on one social occasion; met him again once socially in 1994; that their business meetings with respect to Magnify's Accounts did not begin until 1995, after Igoin had died; and that all such meetings were precipitated by letters sent by Green to Madoff requesting that they meet to review the BLMIS Accounts then in existence. There were no such letters prior to Igoin's death, further verifying that Green did not take over the management and supervision of Magnify's BLMIS Accounts until after Igoin had died. Green Aff. p. 12 n.6, ¶¶ 16, 37, Ex. JJ; Mem. in Supp. at 30-32.[15]

---

[14] The Trustee's attempt to contradict Green's allegation that he did not begin receiving Magnify's Portfolio Evaluations from BLMIS until after Igoin's death in 1995 because Green produced the Magnify Portfolio Evaluations dating back to 12/31/92 is to no avail, as Green has alleged that Igoin first showed him those Portfolio Evaluations in 1993. *See* Green Aff. ¶ 17.

[15] Despite producing approximately 400,000 pages of documents, the Trustee cannot point to a single such letter from Green to Madoff/BLMIS prior to Igoin's death in 1995.

601982v.6

- the allegation that Green participated in the wrongful manipulation of the Portfolio Evaluations of Magnify, Strand, and Premero, (Opp'n at 22-24), when the only Portfolio Evaluations that were prepared as "drafts" for Green's meetings with Madoff were those of Premero, which were subject to adjustment to reflect the proper allocation between the two Premero Accounts of deposits and withdrawals that was consistent with the real-time letters of instruction that had been submitted to Madoff/BLMIS by Green during the period prior to those meetings, and which is nothing remotely similar to the "Schupt" process that was at issue in *Avellino* and *Mendelow* and does not support the purely conclusory allegations that Green and Madoff negotiated and agreed upon promised rates of return on any of the BLMIS Accounts of Magnify, Premero, and Strand, which rates of return were neither consistent nor exorbitant. *See* Green Aff. ¶¶ 17-21, Exs. I, J, K, L, M, N, O; Mem. in Supp. at 33-34, 41-42.

- the allegation that Green's Fee Agreement, and his purported failure to properly perform the duties called for pursuant thereto, somehow establishes Green's "actual knowledge" of the BLMIS Ponzi scheme/fraud, (Opp'n at 26-27), when if true (which is vehemently denied), it establishes nothing more than a dereliction of duty to Magnify and does nothing to establish Green's "actual knowledge." *See* Green Aff. ¶¶ 34-35, Exs. EE, FF; Mem. in Supp. at 36.

- the allegation that Green's purported wrongful conduct in allegedly misappropriating monies from Magnify's and Strand's Accounts with BLMIS establishes "actual knowledge," (Opp'n at 27-30), despite the fact that the documentary evidence demonstrates the legitimacy of those transactions, (Green Aff. ¶¶ 36, 39, 41; Mem. in Supp. at 36-40 & n. 11), and despite the fact that even if all such allegations were true (which Green vehemently denies), as this Court has stated, "dishonesty" and "greed" do "not support the inference that [a defendant] knew that Madoff was not actually engaged in trades." *Picard v. Avellino (In re BLMIS)*, 557 B.R. 89, 115 (Bankr. S.D.N.Y. 2016). *See also Picard v. Legacy Capital Ltd.*, 548 B.R. 13, 32-33 (Bankr. S.D.N.Y. 2016).

- the Trustee's contention that it is not implausible for Green to have left his clients' funds invested with Magnify despite supposedly having "actual knowledge" of the BLMIS Ponzi scheme/fraud "because neither he – nor any 'clients' – invested any money (principal) into Magnify's or Strand's accounts," (Opp'n at 28), is false and ignores the investments of principal by Premero as well as Magnify and Strand as evidenced by the SAC.[16] In addition to the cash deposit of $3,136,150 into Magnify's Account No. 1FN024 reflected in Exhibit B to the SAC, that same Exhibit B reflects three cash deposits of $999,985, $200,000, and $499,983, for a total of $1,699,968, into Premero's Account No. 1FN073, a cash deposit of $99,980 into Premero's Account No. 1FN097, and a cash deposit of $500,000 into Strand's Account No. 1FR051.

---

[16] This false contention is also contradicted by the Trustee's own admission that there were "deposits of real money into Strand's and Premero's accounts." Opp'n at 27.

16

Defendants "actual knowledge" of the BLMIS fraud has not been plausibly alleged by the SAC's non-conclusory allegations and has been conclusively refuted by the documents properly considered by this Court on this motion.

## III.    THE TRUSTEE HAS FAILED TO PLEAD PREMERO'S "WILLFUL BLINDNESS" TO THE BLMIS PONZI SCHEME/FRAUD

With respect to Count One of the SAC asserting a two-year intentional fraudulent transfer claim against Premero under § 548(a)(1)(A) of the Bankruptcy Code, the issue is whether Premero has an absolute defense thereto under the "takes for value and in good faith" standard set forth in § 548(c) of the Bankruptcy Code. *See* Mem. in Supp. at 43.

In falsely alleging that Green created Premero "for the sole purpose of receiving funds from BLMIS through BLMIS accounts," (Opp'n at 4; *see also* ¶ 63), the Trustee ignores the fact that although Premero was created in 1992, its two BLMIS Accounts were not opened until 1995 and 1996, respectively. ¶ 44. Thus, it is self-evident that there is no merit to the contention that Premero's sole purpose was to receive funds from BLMIS. In addition, in making that unfounded conclusory allegation, the Trustee ignores that Exhibit B to the SAC explicitly reflects cash deposits by Premero into its BLMIS Accounts totaling $1,699,968 in Account No. 1FN073 and $99,980 in Account No. 1FN097, giving rise to the principal the Trustee now seeks to recover.

There is no dispute that the Trustee's claim against Premero under Count One involves only Premero's principal, and not fictitious profits, (¶ 148 n.7), thereby satisfying the "value" element of the § 548(c) defense. *See Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 138-39 (Bankr. S.D.N.Y. 2014). Thus, what remains to be determined is whether the Trustee has adequately alleged a lack of good faith on the part of Premero.

The SAC is completely devoid of any allegations of "willful blindness" or "red flags" that were purportedly known to and ignored by Premero or Green acting on behalf of Premero.

17

*See* Mem. in Supp. at 50. Thus, in the absence of the sufficient pleading of "actual knowledge" on the part of Premero, through Green or otherwise, the Trustee cannot prevail on his Count One two-year intentional fraudulent transfer claim against Premero. *See* Mem. in Supp. at 43-44.

In recognition that his conclusory, unfounded, and blatantly false allegations in the SAC are insufficient to establish "actual knowledge," the Trustee now asserts in the alternative that his deficient allegations of "actual knowledge" should "alternatively suffice to allege his [Green's] willful blindness." Opp'n at 31. The Trustee then recites several completely conclusory, unfounded, and unsupported allegations that purport to establish "willful blindness," since they clearly do not establish "actual knowledge." Those allegations do not suffice.[17,18] In addition, once again, the Trustee's new assertions of "willful blindness," which appear nowhere in the SAC, cannot serve to amend that pleading. *See, e.g.*, *Granata*, 2011 WL 6034366, at *4; *Rincon*, 2017 WL 2242969, at *2; *A Star Grp.*, 621 F. App'x at 683; *Ernst & Young*, 152 F.3d at 178.

The Trustee's allegations that Green (a) founded Premero (which he did as its attorney), (b) served as Premero's Managing Director, (c) met with Madoff at least twice a year to discuss Premero's portfolio, and (d) reviewed Premero's Portfolio Evaluations which were addressed to him, (Opp'n at 30), all do absolutely nothing to establish either "actual knowledge" or "willful

---

[17] In support of this specious and unpled argument, the Trustee asserts in his opposition papers that "Green (1) subjectively believed that there was a high probability that BLMIS was engaged in a fraud, and (2) took deliberate actions to avoid learning of that fact," "that Green knew of quantitatively impossible fictitious trading activity . . . and that the Portfolio Evaluations did not suggest actual securities trading," that "if Green did not have subjective knowledge of the fraud, his ability to turn a 'blind eye' to it would be superhuman," and that "[h]is failure to request . . . where the growth in the accounts was coming from . . . and accepting the single-page Portfolio Evaluations as an appropriate method of reporting . . . was a caricature of deliberate action to avoid confirming the fraud," and then concludes that "because Green lacked subjective good faith, Premero's defense under section 548(c) must fail." Opp'n at 31. These contentions are conclusory to an extreme.

[18] The "quantitatively impossible fictitious trading activity" referenced by the Trustee, (Opp'n at 31), relies on SAC paragraphs that refer to the MCI Communications stock transactions set forth in the opening customer statement dated 9/30/90 for Magnify's second BLMIS Account, Account No. 1FN025. The fact that Green was not involved with Magnify's BLMIS Accounts at that time and had absolutely no knowledge about that MCI Communications stock has been conclusively established by Defendants. *See* Green Aff. ¶¶ 13, 16, Ex. E; Mem. in Supp. at 29-30.

18

blindness." In addition, the allegation that the purpose of Green's meetings with Madoff was purportedly "to come to an agreement or understanding regarding Premero's rate of return," (¶ 133; Opp'n at 30), is completely conclusory and devoid of merit, and has been conclusively rebutted and shown to be false by the documents attached to Green's affidavit and properly considered on this motion. *See* Green Aff. ¶¶ 19-21, Exs. L, M, N, O; Mem. in Supp. at 41-42.

Finally, the three cases cited by the Trustee, *Merkin*, 515 B.R. at 139-40, *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011), and *Picard v. Ceretti (In re BLMIS)*, No. 09-01161, 2015 WL 4734749, at *13 (Bankr. S.D.N.Y. Aug. 11, 2015), are of no support for his position, as they require him to plead two elements to show "willful blindness": (a) that the defendant must subjectively believe there is a high probability that a fact exists, and (b) that the defendant must take deliberate actions to avoid learning of that fact. Those cases then establish that allegations of a pattern of "red flags" that suggest a high probability of fraud and that a defendant intentionally chooses to ignore may be tantamount to a lack of good faith. However, with the critical elements being both a "high probability" of fraud and "deliberate actions" to avoid the truth, the Supreme Court has cited with approval the statement: "A court can properly find willful blindness only where it can almost be said that the defendant actually knew." *Global-Tech*, 563 U.S. at 769-70. The SAC contains no non-conclusory allegations pleading such facts.

## IV.   THE TRUSTEE'S ALTER EGO/PIERCING THE CORPORATE VEIL ALLEGATIONS FAIL AS A MATTER OF LAW

Recognizing that his alter ego/piercing the corporate veil allegations against Strand and Magnify fail as a matter of law under British Virgin Islands ("BVI") law (for Strand) and Panama law (for Magnify), the Trustee pulls out all stops to avoid the application of such law, arguing instead that New York law should apply. The Trustee's argument is baseless and goes against over a century of New York jurisprudence that holds that the law of the state of

19

incorporation governs alter ego/piercing the corporate veil allegations. But even if New York law applies, the Trustee's allegations are still insufficient to withstand a motion to dismiss.

### A.    The Court May Consider the Trustee's Alter Ego/Piercing the Corporate Veil Allegations at the Motion to Dismiss Stage

As an initial matter, the Trustee argues that "[v]eil piercing determinations" are "questions of fact, inappropriate for resolution on a motion to dismiss or even summary judgment." Opp'n at 31-32. The Trustee's argument is completely at odds with the case law.

The standard for establishing alter ego/piercing the corporate veil liability is "very demanding such that piercing the corporate veil is warranted only in extraordinary circumstances, and conclusory allegations . . . will not suffice to defeat a motion to dismiss." *Naftali v. N.Y. Deferred Exch. Corp.*, No. 15-cv-7152, 2017 WL 4325725, at *9 (E.D.N.Y. Aug. 15, 2017) (internal quotation marks and citations omitted). "[C]ourts have granted motions to dismiss as well as motions for summary judgment . . . where there has been a lack of sufficient evidence [or allegations] to place the alter ego issue in dispute." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995). As one court put it in rejecting the same argument put forth by the Trustee, "courts routinely consider, and grant, motions to dismiss for failure [to] adequately . . . allege facts sufficient to support the imputation of liability on an alleged alter-ego." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 85-86 (S.D.N.Y. 2010). *See also Rakus, Inc. v. 3 Red G, LLC*, No. 16594/2009, 2010 WL 26252, at *5 (N.Y. Sup. Ct. Jan. 5, 2010); *Kalin v. Xanboo, Inc.*, 526 F.Supp.2d 392, 403-04 (S.D.N.Y. 2007). Thus, it is entirely appropriate for this Court to consider the Trustee's alter ego/piercing the corporate veil allegations at this stage.[19]

---

[19] The cases the Trustee cites do not stand for the proposition that alter ego/veil piercing determinations are inappropriate on a motion to dismiss. In fact, *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 365-66 (Bankr. S.D.N.Y. 2002) makes clear that courts "have granted motions to dismiss . . . where there has been a lack of sufficient evidence to place the alter ego issue

20

**B.    Under New York's Conflict-of-Law Analysis, the Law of the State of Incorporation Governs Alter Ego/Veil Piercing Allegations[20]**

As this court correctly held in *Avellino*, "[u]nder New York's choice of law rules, the state of incorporation determines whether the corporate veil can be pierced." *Avellino*, 557 B.R. at 122. *See also* Mem. in Supp. at 52. This holding was not made in a vacuum. In *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993), the Second Circuit held that the "law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *See also Fletcher*, 68 F.3d at 1456 (holding that "under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded") (internal quotation marks and citations omitted). The Second Circuit's holdings in *Fletcher* and *Kalb* are binding on this Court, (*see Standex Int'l Corp. v. QCP, Inc.*, No. 16-cv-492, 2017 WL 481447, at *4 (S.D.N.Y. Feb. 6, 2017) ("Even on issues of state law, the district court is bound by Second Circuit precedent")), and that is why this Court cited to *Fletcher* and found as it did in *Avellino*. *See Avellino*, 557 B.R. at 122.[21]

---

in dispute." In the Trustee's other cases, the courts merely found that, unlike here, the plaintiffs had adequately pled their alter ego/veil piercing allegations. *See Milestone Shipping, S.A. v. Estech Trading LLC*, 764 F.Supp.2d 632, 636 (S.D.N.Y. 2011); *Network Enters., Inc. v. APBA Offshore Prods., Inc.*, No. 01-cv-11765, 2003 WL 124521, at *2-3 (S.D.N.Y. Jan. 15, 2003); *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 321-26 (Bankr. S.D.N.Y. 1999).

[20] New York and BVI alter ego/veil piercing law differ in that BVI law requires that the defendant incur a liability before creating the corporation. This is known as the "temporal requirement." *Tianbo Huang v. iTV Media, Inc.*, 13 F.Supp.3d 246, 257 n.4 (E.D.N.Y. 2014). Moreover, while New York law requires that the plaintiff allege that the defendant dominated the corporation to commit a fraud or wrong, Panama law requires a showing that the defendant used the corporation for the *sole purpose of perpetrating a fraud or violating the law. See supra* pp. 29-35. Thus, as there is a conflict between the laws that the parties claim apply, this Court must conduct a conflict-of-law analysis.

[21] The Trustee's attempts to distinguish *Avellino* fall short. He alleges that in *Avellino*, the "parties did not request – nor did this Court engage in – a choice of law analysis, the defendants clearly articulated Florida law, and the Trustee asserted that the same result would have obtained under New York or Florida law." Opp'n at 33 n.9. First, this Court did engage in a conflict-of-law analysis, it just decided that under New York's conflict-of-law rules, the law of the state of incorporation applies. Second, nowhere in this Court's opinion did it rely on the fact that the Trustee asserted that the same result would apply under New York law in deciding to apply Florida law. Finally, while this Court did find that the parties generally relied on Florida law and thus impliedly consented to its application, this was merely an additional reason to apply such law, especially since it was not clear from the complaint where the trust defendants (as opposed to the corporate and partnership defendants) were formed. This

The Trustee, recognizing that *Kalb* and *Fletcher* and their progeny are in conflict with his request to apply New York law to his alter ego/piercing the corporate veil allegations, argues that they are inapplicable because they deal only with alter ego/piercing the corporate veil allegations that seek to hold shareholders, as opposed to officers or directors, liable. *See* Opp'n at 34-36. Relying on Restatement (Second) of Conflict of Laws (the "Restatement") § 309, the Trustee argues that where, like here, his alter ego/piercing the corporate veil allegations seek to hold Green liable as an officer or director of Magnify and Strand (as he wasn't a shareholder of either), the automatic application of the law of the state of incorporation does not apply. *See id.* at 33-36. Instead, he argues that New York law should apply to such allegations as New York has the most "significant relationship with the parties and the dispute at issue." *Id.* at 34.

First, the Trustee's attempt to limit the holdings of *Kalb* and *Fletcher* is devoid of merit. Although it is true that *Kalb* and *Fletcher* dealt with alter ego/veil piercing allegations seeking to hold shareholders liable, there is simply no indication from those cases or their progeny that a law other than the law of the state of incorporation would apply to alter ego/piercing the corporate veil allegations seeking to hold officers or directors liable. This is because applying the law of the state of incorporation "achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation." *Nattel, LLC v. SAC Capital Advisors LLC*, 370 F. App'x 132, 134 (2d Cir. 2006).

> Uniform treatment of directors, officers and shareholders is an important objective which can only be attained by having the rights and liabilities of those persons with respect to the corporation governed by a single law. To the extent that they think about the matter, these persons would usually expect that their rights and duties with respect to the corporation would be determined by the local law of the state of incorporation.

---

additional reason for applying Florida law did not change the initial reason for why the Court decided to do so: it was the state of incorporation for the corporate and partnership defendants (and likely the trust defendants too).

22

Restatement § 302 cmt. e. Thus, it is no surprise that following *Kalb* and *Fletcher*, New York courts routinely apply the law of the state of incorporation to alter ego/piercing the corporate veil allegations seeking to hold officers or directors liable. *See, e.g., Jonas v. Estate of Leven*, 116 F.Supp.3d 314, 329-32 (S.D.N.Y. 2015); *Panam Mgmt. Grp., Inc. v. Pena*, No. 08-cv-2258, 2011 WL 3423338, at *2-5 (E.D.N.Y. Aug. 4, 2011) ("Panam").[22] Notably, the Trustee *does not cite one New York case that does otherwise*.[23]

Second, even if this Court were to find that *Kalb* and *Fletcher* do not definitively answer which law to apply to the Trustee's alter ego/piercing the corporate veil allegations and deems it necessary to look to the Restatement for guidance on the issue,[24] the law of the state of incorporation still applies. It is true that, unlike § 307, which automatically applies the law of the state of incorporation to issues concerning shareholder liability, (*see* Restatement § 307), § 309 applies the law of the state of incorporation to issues concerning directors' and officers' liability *unless* some other state has a more significant relationship to the dispute, (*see* Restatement § 309). However, as the comments to § 309 make clear, acts done by directors and officers fall into two categories: (1) "acts . . . which closely affect the organic structure or internal administration of the corporation"; and (2) "acts, such as seizing a corporate opportunity or causing the making

---

[22] *See also Eldesouky v. Aziz*, No. 11-cv-6986, 2014 WL 7271219, at *18-20 & n.18 (S.D.N.Y. Dec. 19, 2014); *Daelim Trading Co. v. Glagni Enters., LLC*, No. 10-cv-2944, 2014 WL 6646233, at *4 (S.D.N.Y. Nov. 12, 2014); *Carotek, Inc. v. Kobayashi Ventures, LLC*, 875 F.Supp.2d 313, 350-52 (S.D.N.Y. 2012); *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff*, 2003 WL 22989669, at *15 (S.D.N.Y. Dec. 11, 2003); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F.Supp.2d 198, 214-15 (S.D.N.Y. 2002); *cf. Fin. One, Inc. v. Timeless Apparel, Inc.*, No. 09-cv-9397, 2011 WL 1345030, at *4 (S.D.N.Y. Mar. 29, 2011).

[23] The Trustee's claim that ownership is the reason to apply the law of the state of incorporation to alter ego/piercing the corporate veil allegations that seek to hold shareholders liable, but not to those that seek to hold officers or directors liable, falls apart when considering that in order for an officer or director to be held liable based on an alter ego/veil piercing theory under New York law, he or she must be held to be an "equitable owner" of the company.

[24] The Restatement is not "binding law" and New York courts merely cite to it as a guiding authority. *See In re Farraj*, 72 A.D.3d 1082, 1083-84, 900 N.Y.S.2d 340, 341 (2d Dep't 2010) (looking to Restatement as "guidance in determining which law should govern"); *In re Rezulin Prods. Liab. Litig.*, 392 F.Supp.2d 597, 618 n.117 (S.D.N.Y. 2005) (noting Court of Appeals relies on the Restatement as "persuasive authority" in its choice of law decisions).

of a contract or the commission of a tort." Restatement § 309 cmt. c. With regard to the first, the Restatement notes that the validity of such acts and any resulting liability on the part of the directors and officers "cannot practicably be determined differently in different states" and thus the law of the state of incorporation must apply to them. *Id.*[25] On the other hand, with regard to the second category of acts, the Restatement notes that issues relating to the liability of directors and officers for such acts "can practicably be decided differently in difference states." *Id.*[26]

Here, there is no question that allegations of alter ego/piercing the corporate veil fit into the first category of acts discussed above, i.e., those which "affect the ***organic structure . . . of the corporation***" and thus require that the law of the state of incorporation apply to them. *Id.* (emphasis added). That is why, in line with the Restatement, New York courts have routinely applied the law of the state of incorporation to alter ego/veil piercing allegations, even where they seek to hold directors or officers (as opposed to shareholders) liable. *See supra* p. 23.

The Trustee claims that where there "has been wrongful conduct of officers or directors occurring within New York, courts have applied New York law over the law of the state of incorporation, following the principles of Section 309 and weighing the competing interests" of the states. Opp'n at 33. Following this logic, he argues that this Court should apply New York law to his alter ego/piercing the corporate veil allegations. *See id.* at 33-34. But that is a non sequitur. Alter ego/piercing the corporate veil allegations do not seek to directly address wrongful conduct of officers or directors, but rather seek to disregard the corporate form. Again, such allegations "affect the organic structure . . . of the corporation" and thus require that the law

---

[25] For instance, it would be "impracticable, for example, for a share issue or declaration of dividends to be valid in one state and invalid in another." Restatement § 309 cmt. c.

[26] Even then, the Restatement notes that the law of the state of incorporation has usually still been applied to determine the liability of directors and officers for such acts. *See* Restatement § 309 cmt. c.

24

of the state of incorporation apply to them. Restatement § 309 cmt. c. On the other hand, in the Trustee's cases, where courts apply New York law over the law of the state of incorporation, none involve a party seeking to pierce the corporate veil, but rather involve breach of fiduciary duty, fraud, and other similar claims against officers and directors arising from conduct that took place in the state. *See Tyco Int'l, Ltd. v. Kozlowski*, 756 F.Supp.2d 553, 558-61 (S.D.N.Y. 2010) (constructive fraud and forfeiture of compensation claims); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F.Supp.2d 163 (S.D.N.Y. 2006) (breach of fiduciary duty and fraud claims); *Deangelis v. Corzine (In re MF Global Holdings Ltd. Inv. Litig.)*, 998 F.Supp.2d 157, 179-80 (S.D.N.Y. 2014) (breach of fiduciary duty claims); *Lyman Commerce Solutions, Inc. v. Lung*, No. 12-cv-4398, 2013 WL 4734898, at *3-4 (S.D.N.Y. Aug. 30, 2013) (fraudulent conveyance claims). As discussed in Restatement § 309, such tort claims fall within the second category of acts for which it would not be impracticable to apply a law other than the law of the state of incorporation and that is why New York courts will in limited situations apply such law to such claims. *See Kozlowski*, 756 F.Supp.2d at 558-61 (citing Restatement § 309 cmt. c in applying New York law to constructive fraud and forfeiture of compensation claims).

Even if this Court does not automatically apply the law of the state of incorporation, but weighs the competing interests of the states, BVI and Panama law should still apply. Arguing otherwise, the Trustee claims that New York law should apply because Magnify and Strand had no connection to BVI or Panama "beyond the fact of their incorporation," while Green allegedly met with Madoff two or three times per year in New York, made calls to Madoff and DiPascali in New York, and directed transfers from Magnify's and Strand's BLMIS accounts in New York. Opp'n at 34. First, the Trustee ignores his own allegations that "Magnify and Strand each have a registered agent in their respective jurisdiction" and each have an office address in the same. *See*

25

¶¶ 38-39, 42, 122. Moreover, as the Trustee's own authorities make clear, Magnify's and Strand's contacts with New York are not enough to rebut the presumption of applying the law of the state of incorporation, as he has failed to allege that they did "'all, or nearly all, of [their] business and ha[d] most of [their] shareholders'" in New York, (Opp'n at 34 & n.10 (*quoting* Restatement § 309)), nor could he as that is not the case.[27]

Again, despite spending six pages arguing that this Court should apply a law other than the law of the state of incorporation to his alter ego/piercing the corporate veil allegations, the Trustee has *failed to cite to one case where a court has done so.* That fact speaks volumes and requires the rejection of the Trustee's request to apply New York law.

### C.    Defendants Have Met Their Burden of Proving BVI and Panama Law

Recognizing that he is likely to lose his argument that New York law should apply to his alter/ego piercing the corporate veil allegations, the Trustee tries one last-ditch attempt to avoid the application of Panama and BVI law: he argues that Defendants have failed to meet their burden to prove such law as they merely cited to United States cases applying the same law. *See* Opp'n at 36-39. The Trustee's argument is once again baseless.

As Fed. R. Civ. P. 44.1 makes clear, a court may "consider *any relevant material or source*, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." As numerous courts have made clear, the "analysis of another American court applying [foreign] law is a particularly relevant source." *Tianbo*, 13 F.Supp.3d at 258. *See also In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 291 (S.D.N.Y. 2008) (holding that in

---

[27] The Trustee's two cases are distinguishable. *See Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 262-64 (2d Cir. 1984) (not an alter ego case and holding that because the state of incorporation would refrain from applying its law to the transaction at issue, it had in essence already determined that its interest in the dispute was insufficient to warrant the application of its law); *Resolution Trust Corp. v. Gregor*, 872 F.Supp. 1140, 1150 (E.D.N.Y. 1994) (simple negligence, not veil-piercing case, and federally-charted institution was originally a local, state-chartered institution subject to New York law, defendants had no expectation federal common law would govern their duties, and federal common law on the relevant subject was ambiguous and difficult to apply, all factors absent here).

26

determining foreign law courts may consider "determinations by other courts").[28] This makes sense because as one court put it, "[f]oreign law should be argued and briefed like . . . domestic law" and courts base their decisions on prior case law every day. *Anglo Am. Ins. Grp., P.L.C. v. Calfed, Inc.*, 899 F.Supp. 1070, 1076-77 (S.D.N.Y. 1995). In fact, in *Centauro Liquid Opportunities Master Fund, L.P. v. Bazzoni*, No. 15-cv-9003, 2016 WL 5719793, at *4 (S.D.N.Y. Sept. 30, 2016), the court exclusively relied on the "detailed summary of English law[29] governing piercing the corporate veil" set forth in *In re Tyson*, 433 B.R. 68 (S.D.N.Y. 2010) in determining such law, directly contrary to the Trustee's claim that a court cannot exclusively rely on prior United States cases in interpreting and applying foreign law.

The Trustee argues that in the main cases Defendants rely on to prove foreign law, the parties did not just exclusively rely on United States cases applying foreign law, but also considered "the testimony of experts, foreign statutes, and/or foreign case law." Opp'n at 38. However, again, the Trustee cites no authority for the proposition that any particular source must be considered, and ignores the holding in *Tyson*, 433 B.R. at 78-79, that reliance on expert testimony is not required. In any event, the fact that the courts in Defendants' cases considered the above sources and performed a detailed analysis of Panama and BVI/English law should give the Trustee and this Court comfort that such cases are a reliable source of such foreign law.[30]

---

[28] *See also Willcox v. Lloyds TSB Bank, PLC*, No. 13-cv-00508, 2016 WL 8679353, at *13 (D. Haw. Jan. 8, 2016); *Caterpillar Inc. v. M/V Karonga*, No. 06-cv-8236, 2008 WL 1849771, at *1 n.3 (S.D.N.Y. Apr. 23, 2008) ("Based on the record before us . . . , and the numerous decisions of prior federal courts that have acknowledged that Chile has adopted the Hamburg Rules, we find that Caterpillar has met its burden of proving" such fact).

[29] As set forth in Defendants' moving brief, BVI follows English law. *See* Mem. in Supp. at 54.

[30] The Trustee claims that Defendants relied only on "three New York decisions" to prove Panama and BVI law. Opp'n at 38. However, Defendants relied on many more cases than that. *See* Mem. in Supp. at 54-66; *infra* pp. 28-31. The Trustee also tries to claim that relying solely on United States case law is dangerous, citing to an alleged conflict between Defendants' cases applying Panama law. *See* Opp'n at 39. However, as discussed below, even assuming such a conflict, it is irrelevant here. *Infra* pp. 30-31. In any event, federal courts resolve conflicts between prior case law all the time and the existence of such a conflict is certainly not a reason to avoid applying foreign law.

27

Accordingly, this Court should apply Panama law to the alter ego/piercing the corporate veil allegations against Magnify and BVI law to the similar allegations against Strand.[31]

### D.    The Trustee's Alter Ego/Piercing the Corporate Veil Allegations Fail Under BVI and Panama Law

The Trustee focuses most of his energy in arguing against the application of BVI and Panama law to his alter ego/piecing the corporate veil allegations. And that is because, as discussed below, his allegations clearly fail under such law.

### 1.    The Alter Ego/Piercing the Corporate Veil Allegations Against Strand Fail Under BVI Law

As Defendants established, the Trustee's alter ego/veil piercing allegations with respect to Strand are without merit for two reasons. First, the Trustee has failed to plead that Green incurred a liability to BLMIS prior to creating Strand, thus failing English law's "temporal requirement." *See* Mem. in Supp. at 59-61. The Trustee contends otherwise, arguing that "all of the interaccount transfers from Magnify to Strand consisted of fictitious profits that existed – and thus created an obligation to third parties – before Strand's creation." Opp'n at 46. However, to the extent that Magnify's BLMIS accounts contained fictitious profits prior to Strand's creation, that fact would only have made *Magnify*, not Green, liable to BLMIS at the time. The Trustee tries to claim otherwise, apparently relying on his allegations that Magnify was the alter ego of Green at the time to argue that Green would have also been liable to BLMIS.[32] However, as

---

[31] The two cases that the Trustee cites for the proposition that it is improper to rely solely on United States cases to prove foreign law are distinguishable. *See Dastranj v. Dehghan*, No. 15-cv-2436, 2016 WL 7012299, at *2-4 (D. Md. Dec. 1, 2016) (third-party plaintiff's counsel previously admitted that he had not yet investigated Iranian law and although the third-party plaintiff claimed the case was governed by Iranian law, he solely relied on Maryland law in arguing the merits of his third-party complaint and in opposing third-party defendants' motion to dismiss); *Batruk v. Mitsubishi Motors*, Nos. 94-cv-7593, 94-cv-8677, 1998 WL 307383, at *3-4 (S.D.N.Y. June 10, 1998) (finding memorandum, which included "string of citations," inadequate to prove Haitian law because, unlike here, such cases did not support the defendant's conclusory statements about the law).

[32] In other words, the sufficiency of the Trustee's alter ego/piercing the corporate veil allegations against Strand depend on the sufficiency of his alter ego/piercing the corporate veil allegations against Magnify.

28

601982v.6

discussed below, the Trustee's alter-ego/piercing the corporate veil allegations against Magnify fail. *Infra* pp. 29-31. The Trustee also alleges that Green used Strand to perform certain acts— which Green vehemently denies—to shield himself from personal liability to "third parties such as BLMIS customers" for such acts. *See* Opp'n at 46. However, using a corporation to avoid potential *future* liability is perfectly appropriate under English law. *See Tyson*, 433 B.R. at 94-95.

Second, even if Green had incurred a liability to BLMIS prior to creating Strand based on there being fictitious profits in Magnify's BLMIS accounts, the Trustee has still failed to adequately plead that "special circumstances exist[ed] indicating that" Strand was a "mere façade concealing the true facts," which requires him to allege an impropriety or dishonesty "linked to the use of [Strand's] structure to avoid or conceal" such liability. *Tyson*, 433 B.R. at 87 (internal quotation marks and citations omitted). The Trustee claims that he has "sufficiently pleaded that Green misused Strand's corporate façade." Opp'n at 45. However, he only cites to allegations that Green founded Strand for "one fraudulent purpose: to receive funds from BLMIS" for his benefit and that he thereafter directed "monies from the Magnify accounts to flow into Strand for his benefit and the benefit of others." *Id.* Even if all this is true—which Green strenuously denies—the Trustee fails to link this conduct to any misuse of Strand's corporate structure by Green to avoid or conceal his liability to BLMIS. *See* Mem. in Supp. at 61-62. Thus, the Trustee's alter ego/piercing the corporate veil allegations against Strand must fail.

## 2. The Alter Ego/Piercing the Corporate Veil Allegations Against Magnify Fail Under Panama Law

The Trustee argues that Defendants have put forth a conflicting picture of Panama law on alter ego/veil piercing claims. *See* Opp'n at 39. However, he later concedes that the test Defendants put forth is clear: "veil piercing . . . is only appropriate if the Trustee has alleged that Magnify 'was used for the *sole purpose of perpetrating a fraud or violating the law.*'" *Id.* at 43

29

(citation omitted). While the Trustee calls this a "tortuous interpretation of 'Panamanian law,'" he ignores that Defendants quote this test verbatim from the case law. *See Panam*, 2011 WL 3423338, at \*5 (corporate veil may be pierced under Panama law where shareholder "controlled and used the corporation for the ***sole purpose of perpetrating fraud or 'violating the law,'*** thereby abusing the corporate form and hiding behind it to avoid liability") (emphasis added).[33]

The Trustee claims that even under Panama law, his alter ego/piercing the corporate veil allegations are sufficient to survive a motion to dismiss. *See* Opp'n at 43-44. He is wrong. While the Trustee claims that he alleges that "Magnify served no other purpose than to enable Green to profit from Madoff's fraud, in which Green was complicit and a willing participant," (*Id.* at 44), the SAC says no such thing. In fact, the Trustee admits that Magnify was not used for the sole purpose of dealing with BLMIS, let alone for the sole purpose of perpetrating a fraud or violating the law relating thereto, alleging that "Green actively directed and controlled [Magnify's and Strand's] daily activities for his benefit and advantage, ***including dealings with Madoff and BLMIS***." ¶ 113 (emphasis added). Moreover, despite the Trustee's claim to the contrary, the fact that Magnify was used as a vehicle to make charitable contributions in Israel directly shows that it was not used for the sole purpose of perpetrating a fraud or violating the law. The SAC's other allegations come nowhere close to adequately alleging that Green used Magnify for the sole purpose of perpetrating a fraud or violating the law. *See* Mem. in Supp. at 62-65.

The Trustee's alter ego/piercing the corporate veil allegations with regard to Magnify should also be dismissed because Green was never a shareholder of the company. *See id.* at 65. Even if the Court were to accept the Trustee's argument that under Panama law, the corporate veil may be pierced to reach directors, (Opp'n at 43 n.11), Green was not a director of Magnify

---

[33] In fact, the Trustee later quotes this test from *Panam*, but leaves out, assumingly through inadvertence, the critical "sole purpose" language. *See* Opp'n at 43.

30

during the relevant time period (Brunner was Magnify's sole Director and Chairman during this time). *See* Mem. in Supp. at 65; ¶¶ 38-39. Although Green was the Managing Director[34] of Magnify, contrary to the Trustee's claim, *Panam* only states that the corporate veil may be pierced to reach shareholders or directors, not officers. *See Panam*, 2011 WL 3423338, at *5. Thus, the Trustee's alter ego/piercing the corporate veil allegations against Magnify fail.

> **E.      Even if New York Law Applies to the Trustee's Alter Ego/Piercing the Corporate Veil Allegations, They Still Fail**

> **1.      The Trustee Has Failed to Plead Green's Complete Domination Over Magnify and Strand**

The Trustee correctly lists the elements of an alter ego/veil piercing claim under New York law and the factors a court will consider in determining whether a defendant has exercised complete domination over a corporation. Moreover, where the alter ego/piercing the corporate veil allegations seek to hold a non-owner (like Green) liable, a plaintiff must also allege that that person was an equitable owner of the company, i.e., that the individual "exercise[d] considerable authority over the corporation to the point of completely disregarding the corporate form and acting as though its assets are his alone to manage and distribute." *Babitt v. Vebeliunas*, 332 F.3d 85, 92 (2d Cir. 2003). While the Trustee claims that he has alleged all of the control/domination factors, that could not be farther from the truth. Even more egregious, to make it look like he did, in his chart "summarizing" the factors alleged, (*see* Opp'n at 41-42), the Trustee merely repeats the same allegations multiple times, even though they have nothing to do with the factor listed.

First, regarding "[a]bsence of corporate formalities," corporate formalities were in fact observed through Green's interactions with Brunner as the sole Director of both companies and the repeated use of corporate minutes and resolutions where appropriate. *See* Green Aff. Exs. Q,

---

[34] A managing director is the equivalent of a CEO and is an officer of a company, not a director thereof.

31

U, V, BB, HH. Therefore, on this point, the Trustee alleges that Magnify and Strand had "no employees, physical offices, or actual places of business" and that Magnify and Strand used Green's law office address in Israel as their own. Opp'n at 41. However, courts have held such allegations to be insufficient to support alter-ego/veil piercing allegations against companies like Magnify and Strand because "[w]ith respect to small, privately-held corporations, the trappings of sophisticated corporate life are rarely present, and courts must avoid an over-rigid preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history." *Next Millennium Realty, L.L.C. v. Adchem Corp.*, No. 03-cv-5985, 2015 WL 11090419, at *15 (E.D.N.Y. Mar. 31, 2015). The other allegation listed, i.e., that Green used Magnify's account at Bank Hapoalim as collateral for a personal debt, has nothing to do with any alleged "absence of corporate formalities" and thus is inappropriately listed under this factor.

Second, regarding "[i]nadequate capitalization," the Trustee alleges that Magnify and Strand are "currently insolvent" and were funded by "fictitious profits." Opp'n at 41. However, the fact that they are currently insolvent is irrelevant; what is relevant is their capitalization at the time of the transfers at issue. *See* Mem. in Supp. at 65 n.19. And the Trustee has failed to provide any authority for the claim that a company is inadequately capitalized merely because the money in its bank account or the securities in its brokerage account may constitute "fictitious profits" or its assets were not what it thought they were because it was the victim of a Ponzi scheme.

Third, regarding "[c]ommon office space and address[es]," the Trustee alleges that Magnify and Strand "used Green's law office address in Israel as its own address." Opp'n at 42. However, again, facts such as common office space and addresses are "neutral in the context of closely-held corporations and are not enough to pierce the corporate veil." *In re Stamou*, No. 08-09-78895, 2013 WL 209473, at *10-11 (Bankr. E.D.N.Y. Jan. 17, 2013).

32

Fourth, regarding the "amount of business discretion displayed by the dominated corporation," the Trustee merely repeats his allegations of Green using corporate funds for personal use. Opp'n at 42. Thus, this is another instance of the Trustee listing allegations under a factor that have no relationship to it to mislead this Court into thinking he has pled such factor.

Fifth, regarding "[p]ayment of debts of the dominated corporation by other corporations," the Trustee nonsensically lists his allegations that Green transferred money from Magnify to YHA to make donations in Israel. *Id.* Again, one has nothing to do with the other.

Thus, of the ten control/domination factors, the only one the Trustee arguably alleges is that Green used corporate funds for personal use. *See* Opp'n at 41. However, merely alleging one factor is simply insufficient to show that Green had complete domination and control over Magnify and Strand such that their corporate veils should be disregarded. *See Next Millennium*, 2015 WL 11090419, at *21 (finding that where only a few factors weighed in favor of a finding of domination, the plaintiffs' allegations were as a matter of law insufficient to establish the degree of domination necessary to pierce the corporate veil); *Xiotech Corp. v. Express Data Prods. Corp., ESI, LLC*, 11 F.Supp.3d 225, 236-37 (N.D.N.Y. 2014) (holding that plaintiff did not adequately allege domination where the only factor it pled was common ownership and senior management responsibility); *Kempf v. Mitsui Plastics, Inc.*, No. 96-cv-1106, 1996 WL 673812, at *3-4 (S.D.N.Y. Nov. 20, 1996) (dismissing alter ego allegations where the plaintiff only alleged one domination/control factor).[35]

---

[35] Plaintiff's cases are inapposite. *See Messer v. Bentley Manhattan Inc. (In re Madison Bentley Assocs., LLC)*, No. 10-03487, 2015 WL 6125893, at *7-8 (Bankr. S.D.N.Y. Oct. 16, 2015) (finding the plaintiff alleged numerous factors supporting the finding that the defendants exercised complete domination over the debtor); *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139-40 (2d Cir. 1991) (holding that jury could have found a level of control that was substantial and could be interpreted as sufficient domination to justify piercing the corporate veil where the plaintiffs put forth evidence of most of the control/domination factors).

33

2.      **The Trustee Has Failed to Adequately Allege That Green Dominated
Magnify and Strand to Commit a Fraud or Wrong**

The Trustee claims that the second prong of the "alter ego or veil piercing test under New York law . . . requires little discussion" because the SAC alleges that "Green knowingly participated in the BLMIS fraud" and "used Magnify and Strand as instrumentalities in that fraud." Opp'n at 42. But such allegations completely fail to satisfy this element. As the New York Court of Appeals has made clear, it is not enough to merely allege a fraud or wrong: rather, a plaintiff must allege that the "owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party." *In re Morris v. N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 142, 603 N.Y.S.2d 807, 811, 623 N.E.2d 1157, 1161 (1993). In other words, the Trustee must allege that the "domination of [the corporation] was the means by which [the] wrong was done to [the plaintiff]." *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 513 (S.D.N.Y. 2005).[36]

Here, the Trustee has utterly failed to allege that any misuse of Magnify's or Strand's corporate form by Green was the means by which he carried out his participation in the BLMIS fraud. Thus, the Trustee's alter ego/veil piercing allegations fail under New York law also. *See Hamlen v. Gateway Energy Servs. Corp.*, No. 16-cv-3526, 2017 WL 6398729, at *12 (S.D.N.Y. Dec. 8, 2017) (dismissing alter ego claim where plaintiff's "injuries did not result from misuse of the corporate form itself" and the "alleged wrong . . . did not necessarily depend on or directly relate to [the entity's] limited liability status or its failure to observe corporate formalities").[37]

_____

[36] This element is similar to English law's requirement to allege an impropriety or dishonesty "linked to the use of the company structure to avoid or conceal liability." *Tyson*, 433 B.R. at 87.

[37] *See also Singh v. NYCTL 2009-A Trust*, No. 14-cv-2558, 2016 WL 3962009, at *14 (S.D.N.Y. July 20, 2016) (dismissing veil-piercing claim due to "absence of any concrete allegation that [p]laintiff was harmed by a misuse of the corporate form"); *Aekyung Co. v. Intra & Co.*, No. 99-cv-11773, 2008 WL 4974424, at *3 (S.D.N.Y. Nov. 19, 2008) (holding that "dominance of a corporation plus fraud does not lead to piercing the corporate veil unless the

34

## V.     THE TRUSTEE'S EQUITABLE SUBORDINATION CLAIM FAILS

The Trustee claims that Defendants, in arguing that his equitable subordination claim must be dismissed, "misstate[] the applicable law." Opp'n at 46. However, the parties are actually in complete agreement regarding the law. As the Trustee himself alleges, his claim for equitable subordination can withstand a motion to dismiss if the "SAC sufficiently alleges that Magnify, YHA, Premero, and Strand had actual knowledge of BLMIS's fraud." *Id.* at 47; *see also* Mem. in Supp. at 69-70. As clearly established above, the Trustee has failed to plead such knowledge. *See supra* Part II. Therefore, his equitable subordination claim must be dismissed.[38]

## CONCLUSION

Defendants' motion to dismiss the SAC should be granted in its entirety.

Dated: New York, New York
       January 24, 2018

DAVIDOFF HUTCHER & CITRON LLP

By: _____

Michael Wexelbaum
605 Third Avenue, 34th Floor
New York, New York 10158
Telephone: (212) 557-7200
Facsimile: (212) 286-1884
Michael Wexelbaum
E-Mail: mw@dhclegal.com
Larry Hutcher
E-mail: lkh@dhclegal.com
Michael Katz
E-mail: mdk@dhclegal.com

*Attorneys for Defendants*

---

corporate form was itself used to effectuate the fraud"); *Rays Trading (H.K.) Co. v. Judy-Philippine, Inc.*, No. 98-cv-0170, 1998 WL 355422, at *4 (S.D.N.Y. July 2, 1998) (dismissing claims based on veil-piercing because plaintiff failed to allege "that the corporate form itself was used as the means to commit the wrongs allegedly performed").

[38] As noted in the Mem. in Supp., a showing of reckless disregard (i.e., willful blindness) of the BLMIS fraud is also grounds for sustaining an equitable subordination claim. *See* Mem. in Supp. at 69-70. However, the SAC does not allege willful blindness at all, (*see id.* at 43-51), and the Trustee acknowledges that omission by not even arguing that his equitable subordination claim should be sustained because he made such a showing. *See* Opp'n at 46-48.

35

APPENDIX A

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit A | Second Amended Complaint | N/A | N/A | N/A | N/A | N/A |
| Exhibit B | Plea allocution of Madoff in *U.S. v. Madoff*, No. 09- CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) | Incorporated by reference. *See* Green Aff. ¶ 10. | SAC ¶ 25 | "Not incorporated by reference. While the Court may take judicial notice of Madoff's plea, the court cannot take judicial notice of statements within proceeding. *See, e.g., Global Network Commc'ns, Inc. v. New York*, 458 F.3d 150, 157 (2d Cir. 2006)" | Madoff's plea allocution is clearly incorporated by reference as it is (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee in support of his allegation that the BLMIS Ponzi scheme/fraud began prior to 1992. | When Madoff's statements in his plea allocution regarding the start date of the BLMIS Ponzi scheme/fraud are considered in their entirety, they contradict the Trustee's allegation that Madoff testified that the BLMIS Ponzi scheme/fraud began prior to 1992; rather, they establish that Madoff testified under oath that the BLMIS Ponzi scheme/fraud did not begin until the "early 1990s." |
| Exhibit C | Plea allocution of Frank DiPascali, Jr. in *U.S. v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) | Incorporated by reference. *See* Green Aff. ¶ 11. | SAC ¶ 26 | "Not incorporated by reference. *See* Trustee Opp. at § IV.A.2." | DiPascali's plea allocution is clearly incorporated by reference as it is (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee in support of his allegation that the BLMIS Ponzi scheme/fraud began prior to 1992. | When DiPascali's statements in his plea allocution regarding the start date of the BLMIS Ponzi scheme/fraud are considered in their entirety, they contradict the Trustee's allegation that DiPascali testified that the BLMIS Ponzi scheme/fraud began prior to 1992; rather, they establish that DiPascali testified under oath that the BLMIS Ponzi scheme/fraud did not begin until the "early 1990s." |
| Exhibit D | Judgment rendered by a Justice of the High Court of Justice of England | Judicial notice. *See* Green Aff. ¶ 12. | N/A | "Court may take judicial notice of the decision, but not of any of the substance of the findings. *See, e.g., Global Network Commc'ns, Inc.*, 458 F.3d at 157." | The Court can take judicial notice of this document. While the Trustee concedes that the Court can take judicial notice of "the decision," he is wrong in stating that the Court cannot also take judicial notice of the "substance of the findings." As the case he cites makes clear, the Court can take judicial notice of those findings for the fact that they were made, but not to prove the truth of their contents. | Defendants offer this document merely to bring to the Court's attention another court's findings and conclusions regarding the public perception of Madoff prior to his fall from grace and the impact of that widespread perception of Madoff in evaluating the issue of whether Defendants had "actual knowledge" of the BLMIS Ponzi scheme/fraud prior to Madoff's arrest and the public disclosure of such Ponzi scheme/fraud. |

**APPENDIX A**

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit E | Relevant Portions of 11/7/12 Deposition Transcript of Kurt Brunner | Incorporated by reference. *See* Green Aff. ¶ 13. | Deposition testimony quoted in SAC ¶ 56 and then referred to and relied upon in ¶ 115. | "Not incorporated by reference. *See* Trustee Opp. at § IV.A.2." | Brunner's deposition transcript is clearly incorporated by reference as it is (i) admittedly referred to/quoted in the SAC; and (ii) relied upon by the Trustee in support of his false allegation that Green took over control of Magnify and its BLMIS Accounts in 1989. The Trustee's claim that Green had actual knowledge of the BLMIS Ponzi scheme/fraud is predicated almost entirely on this false allegation. Moreover, because the Trustee selectively quotes from Brunner's deposition transcript, the Court may consider other parts of the same document on that same issue. | When Brunner's testimony on the issue is considered in its entirety, it confirms that prior to Igoin's death in 1995, Igoin executed sole and exclusive control over Magnify and its BLMIS Accounts and that Green played no role in the management or supervision thereof until after Igoin died. Thus, the Trustee's attempt to plausibly allege Green's "actual knowledge" of the BLMIS Ponzi scheme/fraud by showing he was in control of Magnify and its BLMIS Accounts since 1989 fails. |
| Exhibit F | Customer Claim filed by YHA in the liquidation proceeding of BLMIS | Incorporated by reference. *See* Green Aff. ¶ 14. | SAC ¶¶ 45e, 147, 168, 169, 232; Ex. C | "Incorporated by reference." | The Trustee concedes that this document is incorporated by reference. | This document contradicts the Trustee's allegation in ¶ 89 of the SAC that Green lied to a reporter about YHA's losses in the BLMIS Ponzi scheme/fraud, which the Trustee alleges to attack Green's credibility and to impugn his integrity, so as to somehow support the fact that Green had "actual knowledge" of the BLMIS Ponzi scheme/fraud. |
| Exhibit G | Correspondence from YHA to Madoff and corresponding debit memos from BLMIS to YHA | Integral. *See* Green Aff. ¶ 15. | SAC ¶ 141 alleges that Green did not direct withdrawals from YHA's BLMIS Account. | "Not integral to the SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A." | The correspondence from YHA to Madoff and corresponding debit memos from BLMIS to YHA are clearly "integral" to the SAC as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; and (ii) the Trustee clearly relied on them in drafting the SAC, including alleging that "Green largely avoided providing personal direction to BLMIS regarding withdrawals from YHA's Account." SAC ¶ 141. | The correspondence from YHA to Madoff and corresponding debit memos from BLMIS to YHA show that Green had nothing to do with YHA's requests to withdraw or transfer funds from its BLMIS Account. |

**APPENDIX A**

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit H | September 1990 Magnify customer statement | Incorporated by reference. *See* Green Aff. ¶ 16. | SAC ¶¶ 7, 88 | "Incorporated by reference." | The Trustee concedes that this document is incorporated by reference. | This document is offered to show that it was not addressed to Green (it was addressed to Brunner at his office address in Switzerland) and that he never received it. Thus, contrary to the Trustee's argument, it cannot serve in any way to establish Green's "actual knowledge" of the BLMIS Ponzi scheme/fraud. |
| Exhibit I | BLMIS semi-annual Portfolio Evaluations for the Magnify I Account, Account No. 1FN024-30, from 12/31/92 - 6/30/08 | Incorporated by reference. *See* Green Aff. ¶ 17. | SAC ¶¶ 9, 10, 75, 90, 91, 92, 95, 96, 97, 99, 100, 101, 102, 103, 105, 106, 107, 110, 130 | "Not incorporated by reference. *See* Trustee Opp. at § IV.A.2." | The BLMIS semi-annual Portfolio Evaluations for the Magnify I Account, Account No. 1FN024-30, from 12/31/92 - 6/30/08 are clearly incorporated by reference as they are (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee to (a) "confirm that Green's arrangement with Madoff was for BLMIS to create an ever-increasing equity value that would be at Green's disposal"; (b) show that the gains reflected therein were "impossible on their face because the instruments themselves were incapable of generating the yields reflected"; and (c) show that "Green knew that the gains reflected in the Magnify, Strand, and Premero Accounts were not created by securities trading." SAC ¶¶ 99, 100, 105. | The BLMIS semi-annual Portfolio Evaluations for the Magnify I Account dated through 12/31/96 were addressed to Brunner in Switzerland, while those dated thereafter were addressed to Green in Israel, which is consistent with the fact (and contradicts the SAC's allegations otherwise) that Green did not take over the management and supervision of the Magnify BLMIS accounts until after Igoin's death in 1995. They also show that Green merely continued with the reporting practice that was already in place between BLMIS and Magnify and that the gains reflected therein since January 1995 (when Green took over) were neither consistent nor exorbitant. *See* Green Aff. ¶ 17 & n.7. |

**APPENDIX A**

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit J | BLMIS semi-annual Portfolio Evaluations for the Magnify II Account, Account No. 1FN025-30, from 12/31/92 - 6/30/08 | Incorporated by reference. *See* Green Aff. ¶ 17. | SAC ¶¶ 9, 10, 75, 90, 91, 92, 95, 96, 97, 99, 100, 101, 102, 103, 105, 106, 107, 110, 130 | "12/31/1999 Portfolio Evaluation for Magnify's 1FN025 account is incorporated by reference. Remaining Portfolio Evaluations are not incorporated by reference, *see* Trustee Opp. at § IV.A.2." | The BLMIS semi-annual Portfolio Evaluations for the Magnify II Account, Account No. 1FN025-30, from 12/31/92 - 6/30/08 are clearly incorporated by reference as they are (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee to (a) "confirm that Green's arrangement with Madoff was for BLMIS to create an ever-increasing equity value that would be at Green's disposal"; (b) show that the gains reflected therein were "impossible on their face because the instruments themselves were incapable of generating the yields reflected"; and (c) show that "Green knew that the gains reflected in the Magnify, Strand, and Premero Accounts were not created by securities trading." SAC ¶¶ 99, 100, 105. | The BLMIS semi-annual Portfolio Evaluations for the Magnify II Account dated through 12/31/96 were addressed to Brunner in Switzerland, while those dated thereafter were addressed to Green in Israel, which is consistent with the fact (and contradicts the SAC's allegations otherwise) that Green did not take over the management and supervision of the Magnify BLMIS accounts until after Igoin's death in 1995. They also show that Green merely continued with the reporting practice that was already in place between BLMIS and Magnify and that the gains reflected therein since January 1995 (when Green took over) were neither consistent nor exorbitant. *See* Green Aff. ¶ 17 & n.7. |
| Exhibit K | BLMIS semi-annual Portfolio Evaluations for the Strand Account, Account No. 1FR051-30, from 6/30/99 - 6/30/08 | Incorporated by reference. *See* Green Aff. ¶ 18. | SAC ¶¶ 9, 10, 63, 75, 90, 91, 92, 95, 96, 97, 99, 100, 101, 105, 106, 107, 110, 136 | "Not incorporated by reference. *See* Trustee Opp. at § IV.A.2." | The BLMIS semi-annual Portfolio Evaluations for the Strand Account, Account No. 1FR051-30, from 6/30/99 - 6/30/08 are clearly incorporated by reference as they are (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee to (a) "confirm that Green's arrangement with Madoff was for BLMIS to create an ever-increasing equity value that would be at Green's disposal"; (b) show that the gains reflected therein were "impossible on their face because the instruments themselves were incapable of generating the yields reflected"; and (c) show that "Green knew that the gains reflected in the Magnify, Strand, and Premero Accounts were not created by securities trading." SAC ¶¶ 99, 100, 105. | The BLMIS semi-annual Portfolio Evaluations for the Strand Account show that (i) Green merely agreed to the same method of reporting that was already in effect for Magnify's BLMIS Accounts; and (ii) in conjunction with the Trustee's Notice of Determination of Claim for the Strand Account attached to the SAC as part of Exhibit C, the annual rates of return on the Strand Account were neither exorbitant nor consistent, both showings that contradict the Trustee's allegation that such Portfolio Evaluations plausibly allege Green's "actual knowledge" that no securities trading was occurring. |

4

**APPENDIX A**

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit L | BLMIS semi-annual Portfolio Evaluations for the Premero I Account, Account No. 1FN073-30, from 12/31/95 - 6/30/08 | Incorporated by reference. *See* Green Aff. ¶¶ 19-21. | SAC ¶¶ 9, 10, 63, 75, 90, 91, 92, 95, 96, 97, 99, 100, 101, 105, 106, 107, 110, 133 | "Not incorporated by reference. *See* Trustee Opp. at § IV.A.2." | The BLMIS semi-annual Portfolio Evaluations for the Premero I Account are clearly incorporated by reference as they are (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee to (a) "confirm that Green's arrangement with Madoff was for BLMIS to create an ever-increasing equity value that would be at Green's disposal"; (b) show that the gains reflected therein were "impossible on their face because the instruments themselves were incapable of generating the yields reflected"; and (c) show that "Green knew that the gains reflected in the Magnify, Strand, and Premero Accounts were not created by securities trading." SAC ¶¶ 99, 100, 105. | The BLMIS semi-annual Portfolio Evaluations for the Premero I Account show that (i) Green merely agreed to the same method of reporting that was already in effect for Magnify's BLMIS Accounts; and (ii) in conjunction with the Trustee's Notice of Determination of Claim for the Premero I Account attached to the SAC as part of Exhibit C, the annual rates of return on the Premero I Account were neither exorbitant nor consistent, both showings that contradict the Trustee's allegation that such Portfolio Evaluations plausibly allege Green's "actual knowledge" that no securities trading was occurring. |
| Exhibit M | BLMIS semi-annual Portfolio Evaluations for the Premero II Account, Account No. 1FN097-30, from 6/30/96 - 6/30/08 | Incorporated by reference. *See* Green Aff. ¶¶ 19-21. | SAC ¶¶ 9, 10, 63, 75, 90, 91, 92, 95, 96, 97, 99, 100, 101, 105, 106, 107, 110, 133 | "Not incorporated by reference. *See* Trustee Opp. at § IV.A.2." | The BLMIS semi-annual Portfolio Evaluations for the Premero II Account are clearly incorporated by reference as they are (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee to (a) "confirm that Green's arrangement with Madoff was for BLMIS to create an ever-increasing equity value that would be at Green's disposal"; (b) show that the gains reflected therein were "impossible on their face because the instruments themselves were incapable of generating the yields reflected"; and (c) show that "Green knew that the gains reflected in the Magnify, Strand, and Premero Accounts were not created by securities trading." SAC ¶¶ 99, 100, 105. | The BLMIS semi-annual Portfolio Evaluations for the Premero II Account show that (i) Green merely agreed to the same method of reporting that was already in effect for Magnify's BLMIS Accounts; and (ii) in conjunction with the Trustee's Notice of Determination of Claim for the Premero II Account attached to the SAC as part of Exhibit C, the annual rates of return on the Premero II Account were neither exorbitant nor consistent, both showings that contradict the Trustee's allegation that such Portfolio Evaluations plausibly allege Green's "actual knowledge" that no securities trading was occurring. |

**APPENDIX A**

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit N | March 18, 1996 letter from Green to Madoff | Integral and "gives the lie" to specious factual allegations in the SAC. *See* Green Aff. ¶¶ 20-21. | The SAC refers to Green's correspondence with Madoff in SAC ¶¶ 45c, 74, 89, and 93. | "Not integral to the SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A." | The March 18, 1996 letter from Green to Madoff is "integral" to the SAC and "gives the lie" to specious factual allegations therein as (i) such document was in the Trustee's possession and the Trustee had knowledge of it prior to drafting the SAC; and (ii) the Trustee intentionally omitted it from the SAC because it, together with Exhibit O, show that his allegations that BLMIS made adjustments to the "draft" Portfolio Evaluations for Premero to achieve a promised or agreed upon rate of return to be demonstrably false. | The March 18, 1996 letter from Green to Madoff, together with the adjustments BLMIS made to the "draft" Portfolio Evaluations for Premero were made to conform with Green's prior, real-time letters of instruction regarding the two Premero BLMIS Accounts. Such documents contradict the Trustee's allegations that the adjustments were made to achieve a promised or agreed upon rate of return by after-the-fact manipulation. |
| Exhibit O | Letters from Green to Madoff regarding Premero's BLMIS Accounts | Integral and "give the lie" to specious factual allegations in the SAC. *See* Green Aff. ¶¶ 20-21. | The SAC refers to Green's correspondence with Madoff in SAC ¶¶ 45c, 74, 89, and 93. | "Not integral to the SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A." | The letters from Green to Madoff regarding Premero's BLMIS Accounts are "integral" to the SAC and "give the lie" to specious factual allegations therein as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; and (ii) the Trustee intentionally omitted them from the SAC because they, together with Exhibit N, show that his allegations that BLMIS made adjustments to the "draft" Portfolio Evaluations for Premero to achieve a promised or agreed upon rate of return to be demonstrably false. | The letters from Green to Madoff regarding Premero's BLMIS Accounts, together with Exhibit N, establish that the adjustments BLMIS made to the "draft" Portfolio Evaluations for Premero were made to conform with Green's prior, real-time letters of instruction regarding the two Premero BLMIS Accounts. Such documents contradict the Trustee's allegations that the adjustments were made to achieve a promised or agreed upon rate of return by after-the-fact manipulation. |

**APPENDIX A**

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit P | Agreement dated June 28, 1983, entered into between Brunner and Igoin with respect to the organization of Magnify (in French), the English translation thereof produced by the Trustee at Brunner's deposition, and Brunner's letter dated July 18, 1983, to Madoff providing him with a copy of that Agreement | Incorporated by reference. *See* Green Aff. ¶ 22. | SAC ¶¶ 38, 39, 49, 51 | "Not incorporated by reference. *See* Trustee Opp. at § IV.A.2." | The June 28, 1983 Agreement between Brunner and Igoin and Brunner's July 18, 1983 letter to Madoff providing a copy of that Agreement are clearly incorporated by reference as they are (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee to allege that Igoin retained Brunner to organize Magnify as a Panamanian corporation as stated in ¶¶ 38, 39, and 49 of the SAC and to allege that in or around "June 28, 1983, Igoin and Brunner executed an agreement that appointed Brunner Magnify's chairman and director. Under that agreement, Brunner promised to carry out his duties exclusively according to Igoin's instructions." | The June 28, 1983 Agreement between Brunner and Igoin and Brunner's July 18, 1983 letter to Madoff providing a copy of that Agreement further show that Green played no role in the management or supervision of Magnify or Magnify's BLMIS Accounts until after Igoin died in 1995, at which time Brunner appointed Green as Magnify's Managing Director (as alleged in ¶ 38 of the SAC) and Green assumed the duties Igoin asked him to assume upon Igoin's death. These documents contradict the Trustee's allegation that Green took over control of Magnify and Magnify's BLMIS Accounts in 1989, which false contention the Trustee predominantly relies upon to allege Green had "actual knowledge" of the BLMIS Ponzi scheme/fraud. |
| Exhibit Q | June 1995 corporate resolution of Magnify pursuant to which Brunner appointed Green as the Managing Director of Magnify | Incorporated by reference. *See* Green Aff. ¶ 23. | SAC ¶¶ 38, 116 | "Not incorporated by reference. *See* Trustee Opp. at § IV.A.2." | The June 1995 corporate resolution of Magnify is clearly incorporated by reference as it is (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee to allege that in 1995, Green had Brunner appoint him "Magnify's Managing Director and grant him a general power of attorney." SAC ¶ 38. | The June 1995 corporate resolution of Magnify further shows that Green played no role in the management or supervision of Magnify or Magnify's BLMIS Accounts until after Igoin died in 1995, at which time Brunner appointed Green as Magnify's Managing Director and Green assumed the duties Igoin asked him to assume upon Igoin's death. This document contradicts the Trustee's allegation that Green took over control of Magnify and Magnify's BLMIS Accounts in 1989, which false contention the Trustee predominantly relies upon to allege Green had "actual knowledge" of the BLMIS Ponzi scheme/fraud. |

APPENDIX A

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit R | Magnify corporate documents filed in Panama to change corporate officers and directors of Magnify | Integral. *See* Green Aff. ¶ 24. | Fact of change of corporate officers and directors noted in SAC ¶ 39. | "Not incorporated by reference. *See* Trustee Opp. at § IV.A.2." | Defendants are not claiming that the Magnify corporate documents are "incorporated by reference" (as they are not directly referred to in the SAC), but rather are "integral" to the SAC. That is, (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; and (ii) the Trustee clearly relied on them in drafting the SAC, including alleging that "[i]n or around April 2016, Magnify named Ayala Nahir ("Nahir"), Igoin's niece, its new Chairperson and Director, appointed Green as Director and Treasurer, and appointed Green's son, Amir Green, as Director and Secretary." | Defendants bring these documents to the Court's attention merely to show that there was nothing sinister about the changes to the officers and directors of Magnify in 2016 and nothing should be inferred from those changes having been made. |
| Exhibit S | YHA registration documents | Incorporated by reference. *See* Green Aff. ¶ 25. | SAC ¶¶ 53, 54 | "Not incorporated by reference. Nor integral to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A." | The YHA registration documents are clearly incorporated by reference as they are (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee to allege that Green established and was a "co-founder" of YHA. | The YHA registration documents completely contradict the Trustee's allegations that Green established and was a "co-founder" of YHA as such documents name seven co-founders, of which Green was not one. |
| Exhibit T | August 23, 1993 letter from Green to Brunner and three corporate resolutions of Premero | Integral. *See* Green Aff. ¶ 26. | Details regarding Premero's incorporation, corporate structure, and officers and directors referred to in SAC ¶ 41. | "Not integral to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A." | The August 23, 1993 letter from Green to Brunner and the three corporate resolutions attached thereto are clearly "integral" to the SAC as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; and (ii) the Trustee clearly relied on them in drafting the SAC and alleging that Green "founded" Premero, "supervised its BLMIS portfolio," and "created Premero as an investment vehicle for himself and/or one of his clients." SAC ¶ 41. | The August 23, 1993 letter from Green to Brunner and the three corporate resolutions attached thereto establish that Green was acting as an attorney on behalf of a client in creating Premero and that Premero was formed as an investment vehicle for its owner. These documents refute the Trustee's allegations that Green "founded" Premero, "supervised its BLMIS portfolio," and "created Premero as an investment vehicle for himself." SAC ¶ 41. |

8

APPENDIX A

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit U | Minutes of a July 21, 1998 Magnify Board meeting and two October 26, 1998 corporate resolutions of Strand | Integral. *See* Green Aff. ¶ 27. | Details regarding Strand's incorporation, corporate structure, and officers and directors referred to in SAC ¶ 42. | "Not integral to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A." | The minutes of a July 21, 1998 Magnify Board meeting and two October 26, 1998 corporate resolutions of Strand are clearly "integral" to the SAC as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; and (ii) the Trustee clearly relied on them in drafting the SAC and alleging that Strand was formed in 1998 under the laws of the British Virgin Islands, that Brunner was its Sole Director, that Green served as its Managing Director, and that it is a wholly owned subsidiary of Magnify. | By establishing that Strand was not even founded until 1998, these documents contradict the Trustee's allegation in SAC ¶ 31 that Strand's BLMIS Account "engaged in no consistent strategy throughout the 1980s." |
| Exhibit V | December 18, 1989 cover letter from Brunner to Green, two Board minutes of Magnify dated December 14, 1989, and an "Assignment of Transfer" dated December 14, 1989 | Incorporated by reference; integral. *See* Green Aff. ¶ 29. | SAC ¶ 56 | "Assignment of Transfer is arguably incorporated by reference. Remaining documents not incorporated by reference, *see* Trustee Opp. at § IV.A.2." | The Trustee states that the "Assignment of Transfer" is "arguably incorporated by reference." However, there is no doubt that it is as it is (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee to allege that YHA became the "owner" of Magnify. Moreover, the other documents are "integral" to the SAC as (i) they were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; (ii) they relate directly to the "Assignment of Transfer"; and (iii) the Trustee clearly relied on them in drafting the SAC and alleging that YHA became the "owner" of Magnify. | The "Assignment of Transfer" and other documents attached as Exhibit V don't directly contradict any allegations in the SAC, but when considered with Exhibits W, X, Y, Z, and AA, they establish that YHA was never the "owner" of Magnify, but rather that it was entrusted with Magnify's shares "in trust," and that YHA was an "income beneficiary" of that trust arrangement, but not the owner of the corpus thereof. These documents, taken together, contradict the Trustee's allegation that YHA was the "owner" of Magnify. |

**APPENDIX A**

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit W | April 12, 1990 letter from Green to lgoin and May 18, 1990 letter from YHA to Green | Integral and "give the lie" to specious factual allegations in the SAC. *See* Green Aff. ¶ 29. | N/A | "Not integral because not relied on by the Trustee, nor do the parties agree on the authenticity or accuracy of the proffered documents. *See* Trustee Opp. at § IV.A." | The April 12, 1990 letter from Green to lgoin and the May 18, 1990 letter from YHA to Green are "integral" to the SAC and "give the lie" to specious factual allegations therein as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; (ii) such documents relate directly to the Deed of Trust referred to in the SAC; and (iii) the Trustee intentionally omitted them from the SAC because they show his allegations that YHA was the "owner" of Magnify to be demonstrably false. Moreover, although the Trustee states that he disputes the authenticity or accuracy of the documents, he offers no actual objection. | The April 12, 1990 letter from Green to lgoin and the May 18, 1990 letter from YHA to Green establish that YHA was never the "owner" of Magnify, but rather that it was entrusted with Magnify's shares "in trust," and that YHA was an "income beneficiary" of that trust arrangement, but not the owner of the corpus thereof. These documents contradict the Trustee's allegation that YHA was the "owner" of Magnify. |
| Exhibit X | May 1990 Fiduciary Agreement between YHA and Brunner | Integral and "gives the lie" to specious factual allegations in the SAC. *See* Green Aff. ¶ 29. | N/A | "Not integral to SAC by virtue of being potentially relevant to facts alleged in it, see Trustee Opp. at § IV.A." | The May 1990 Fiduciary Agreement between YHA and Brunner is "integral" to the SAC and "gives the lie" to specious factual allegations therein as (i) such document was in the Trustee's possession and the Trustee had knowledge of it prior to drafting the SAC; (ii) such document relates directly to the Deed of Trust referred to in the SAC; and (iii) the Trustee intentionally omitted it from the SAC because it shows his allegations that YHA was the "owner" of Magnify to be demonstrably false. | The May 1990 Fiduciary Agreement between YHA and Brunner establishes that YHA was never the "owner" of Magnify, but rather that it was entrusted with Magnify's shares "in trust," and that YHA was an "income beneficiary" of that trust arrangement, but not the owner of the corpus thereof. This document contradicts the Trustee's allegation that YHA was the "owner" of Magnify. |

**APPENDIX A**

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit Y | English translation and Hebrew version of handwritten notes of Green dated September 13, 1990, of a meeting he had with Igoin on the same date | Integral and "give the lie" to specious factual allegations in the SAC. *See* Green Aff. ¶ 29. | N/A | "Not integral because not relied on by the Trustee, nor do the parties agree on the authenticity or accuracy of the proffered documents. *See* Trustee Opp. at § IV.A." | Green's handwritten notes of a meeting he had with Igoin on September 13, 1990, are "integral" to the SAC and "give the lie" to specious factual allegations therein as (i) such document was in the Trustee's possession and the Trustee had knowledge of it prior to drafting the SAC; (ii) such document relates directly to the Deed of Trust referred to in the SAC; and (iii) the Trustee intentionally omitted it from the SAC because it shows his allegations that YHA was the "owner" of Magnify to be demonstrably false. Moreover, although the Trustee states that he disputes the authenticity or accuracy of the document, he offers no actual objection. | Green's handwritten notes of a meeting he had with Igoin on September 13, 1990, confirm that YHA was never the "owner" of Magnify, but rather that, as was set forth in Exhibit X, it was entrusted with Magnify's shares "in trust," and that YHA was an "income beneficiary" of that trust arrangement, but not the owner of the corpus thereof. This document contradicts the Trustee's allegation that YHA was the "owner" of Magnify. |
| Exhibit Z | Typed (for ease of reference) and handwritten versions of three amendments to the Deed of Trust sent to Green by Igoin, dated September 14, 1990, October 24, 1991, and December 13, 1991, respectively | Integral and "give the lie" to specious factual allegations in the SAC. *See* Green Aff. ¶ 29. | N/A | "Not integral because not relied on by the Trustee, nor do the parties agree on the authenticity or accuracy of the proffered documents. *See* Trustee Opp. at § IV.A." | The three amendments to the Deed of Trust are "integral" to the SAC and "give the lie" to specious factual allegations therein as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; (ii) such documents relate directly to the Deed of Trust referred to in the SAC; and (iii) the Trustee intentionally omitted them from the SAC because they show his allegations that YHA was the "owner" of Magnify to be demonstrably false. Moreover, although the Trustee states that he disputes the authenticity or accuracy of the documents, he offers no actual objection. | The three amendments to the Deed of Trust establish that YHA was never the "owner" of Magnify, but rather that it was entrusted with Magnify's shares "in trust," and that YHA was an "income beneficiary" of that trust arrangement, but not the owner of the corpus thereof. These documents contradict the Trustee's allegation that YHA was the "owner" of Magnify. |

**APPENDIX A**

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit AA | February 4, 1992 letter from Green to Igoin | Integral and "gives the lie" to specious factual allegations in the SAC. *See* Green Aff. ¶ 29. | N/A | "Not integral because not relied on by the Trustee, nor do the parties agree on the authenticity or accuracy of the proffered documents. *See* Trustee Opp. at § IV.A." | The February 4, 1992 letter from Green to Igoin is "integral" to the SAC and "gives the lie" to specious factual allegations therein as (i) such document was in the Trustee's possession and the Trustee had knowledge of it prior to drafting the SAC; (ii) such document relates directly to the Deed of Trust referred to in the SAC; and (iii) the Trustee intentionally omitted it from the SAC because it shows his allegations that YHA was the "owner" of Magnify to be demonstrably false. Moreover, although the Trustee states that he disputes the authenticity or accuracy of the document, he offers no actual objection. | The February 4, 1992 letter from Green to Igoin establishes that YHA was never the "owner" of Magnify, but rather that it was entrusted with Magnify's shares "in trust," and that YHA was an "income beneficiary" of that trust arrangement, but not the owner of the corpus thereof. This document contradicts the Trustee's allegation that YHA was the "owner" of Magnify. |
| Exhibit BB | English translation and original Hebrew version of the Israeli police report on the burglary of Green's law offices, the English translation and original Hebrew version of the insurance adjuster's report regarding the same, an Affidavit dated June 5, 1997, that Green executed with respect to the burglary, and a corporate resolution of Magnify dated July 2, 1997, concerning the same | Background information | N/A | "N/A" | The Trustee does not object to these documents and Defendants merely offer them as background information and to confirm the theft of the "Deed of Trust" that is referred to in the SAC as the "trust agreement with Albert Igoin" under which "YHA was the trustee." SAC ¶ 125. | N/A |

APPENDIX A

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit CC | Documents directing/evidencing the transfers to Ayala Nahir and her family referred to in the SAC | Integral. *See* Green Aff. ¶ 32. | Fact of transfers noted in SAC ¶ 68. | "Not integral to SAC by virtue of being potentially relevant to facts alleged in it. *See* Trustee Opp. at § IV.A." | The documents directing/evidencing the transfers to Albert Igoin's niece Ayala Nahir and her family are clearly "integral" to the SAC as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; and (ii) the Trustee clearly relied on them in drafting the SAC, including alleging that Green unilaterally made/directed such transfers to his "friends" without authority to do so. | The documents directing/evidencing the transfers to Albert Igoin's niece Ayala Nahir and her family establish that there was nothing sinister, nefarious, or inappropriate about any of those transfers, all of which were authorized by Igoin during his lifetime and approved by Doris Igoin during her lifetime, and all of which were made from the Igoin family's one-half share of the revenues generated by the BLMIS Accounts of Magnify. These documents contradict the SAC's allegations to the contrary. |
| Exhibit DD | Copies of three letters Green sent to Madoff directing/evidencing transfers to Ruth Amir referred to in the SAC | Integral. *See* Green Aff. ¶ 33. | Fact of transfers noted in SAC ¶ 68. | "Not integral to SAC by virtue of being potentially relevant to facts alleged in it. *See* Trustee Opp. at § IV.A." | The three letters Green sent to Madoff directing/evidencing transfers to Ruth Amir are clearly "integral" to the SAC as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; and (ii) the Trustee clearly relied on them in drafting the SAC, including alleging that Green unilaterally made/directed such transfers without authority to do so. | The three letters Green sent to Madoff directing/evidencing transfers to Ruth Amir establish that there was nothing sinister, nefarious, or inappropriate about any of those transfers, all of which were authorized by Igoin during his lifetime and approved by Doris Igoin during her lifetime, and all of which were made from the Igoin family's one-half share of the revenues generated by the BLMIS Accounts of Magnify. These documents contradict the SAC's allegations to the contrary. |

**APPENDIX A**

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit EE | Green's Fee Agreement with Magnify | Incorporated by reference. *See* Green Aff. ¶ 34. | SAC ¶¶ 69-71, 102, 116, 119 | "Arguably incorporated by reference." | The Trustee states that Green's Fee Agreement with Magnify is "[a]rguably incorporated by reference." However, there is no doubt that it is as it is (i) admittedly referred to in the SAC; and (ii) relied upon by the Trustee to allege that (a) Green formalized his role as Magnify's investment manager in 1995, (b) Green received fees for management duties for Magnify that he failed to perform and structured the fee arrangement so that there would be no oversight of his dealings, and (c) the Portfolio Evaluations did not provide sufficient information for Green to carry out those responsibilities, further demonstrating his "actual knowledge" of the BLMIS Ponzi scheme/fraud. | The Fee Agreement and the documents relating thereto (Exs. FF and GG) refute the Trustee's contention that Green unilaterally created the terms and conditions of that Agreement to benefit himself rather than to compensate him for serving as the supervisor of Magnify's BLMIS Accounts. The Fee Agreement also further shows that Green played no role in the management or supervision of Magnify or Magnify's BLMIS Accounts until after Igoin died in 1995, which contradicts the Trustee's allegation that Green took over control of Magnify and Magnify's BLMIS Accounts in 1989. Again, the Trustee relies upon this false contention to allege Green had "actual knowledge" of the BLMIS Ponzi scheme/fraud. |
| Exhibit FF | Green's contemporaneous handwritten notes (in Hebrew) and the English translation thereof of a November 23, 1994 meeting he had with Igoin | Integral and "give the lie" to specious factual allegations in the SAC. *See* Green Aff. ¶ 34. | Green's Fee Agreement with Magnify is discussed in SAC ¶¶ 69-71, 102, 116, and 119. | "Not integral because not relied on by the Trustee, nor do the parties agree on the authenticity or accuracy of the proffered documents. *See* Trustee Opp. at § IV.A." | Green's contemporaneous handwritten notes of a November 23, 1994 meeting he had with Igoin are integral to the SAC and "give the lie" to specious factual allegations therein as (i) such document was in the Trustee's possession and the Trustee had knowledge of it prior to drafting the SAC; (ii) such document directly relates to the Fee Agreement referred to in the SAC; and (iii) the Trustee intentionally omitted it from the SAC because it shows his allegations that Green unilaterally created the terms and conditions of the Fee Agreement to be demonstrably false. Moreover, although the Trustee states that he disputes the authenticity or accuracy of the document, he offers no actual objection. | Green's contemporaneous handwritten notes of a November 23, 1994 meeting he had with Igoin contradict the Trustee's allegation that Green unilaterally created the terms and conditions of the Fee Agreement. |

**APPENDIX A**

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit GG | November 14, 2002 letter from Green to Madoff and two November 18, 2002 letters from Madoff to Green | Integral and "give the lie" to specious factual allegations in the SAC. *See* Green Aff. ¶ 34. | Green's Fee Agreement with Magnify is discussed in SAC ¶¶ 69-71, 102, 116, and 119. | "Not integral to SAC by virtue of being potentially relevant to facts alleged in it. *See* Trustee Opp. at § IV.A." | Green's November 14, 2002 letter to Madoff and Madoff's two November 18, 2002 letters to Green are integral to the SAC and "give the lie" to specious factual allegations therein as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; (ii) such documents directly relate to the Fee Agreement referred to in the SAC; and (iii) the Trustee intentionally omitted them from the SAC because, in conjunction with Exhibits EE and FF, they show his allegations that Green unilaterally created the terms and conditions of the Fee Agreement to be demonstrably false. | Green's November 14, 2002 letter to Madoff and Madoff's two November 18, 2002 letters to Green directly relate to Exhibits EE and FF, which contradict the Trustee's allegation that Green unilaterally created the terms and conditions of the Fee Agreement. |
| Exhibit HH | December 22, 2003 letter from Green to Madoff; November 16, 2009 letter from Green to Brunner and November 18, 2009 corporate resolution of Strand | Integral. *See* Green Aff. ¶ 36 | Fact of transfer to/investment in Special Situations Cayman Fund L.P. noted in SAC ¶¶ 72, 73, and 119. | "Not integral because not relied on by the Trustee. *See* Trustee Opp. at § IV.A." | The December 22, 2003 letter from Green to Madoff, November 16, 2009 letter from Green to Brunner, and November 18, 2009 corporate resolution of Strand are clearly "integral" to the SAC as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; and (ii) the Trustee clearly relied on them in drafting the SAC, including alleging that Strand made a $500,000 transfer to/investment in Special Situations Cayman Fund L.P. | The December 22, 2003 letter from Green to Madoff, November 16, 2009 letter from Green to Brunner, and November 18, 2009 corporate resolution of Strand establish that the $500,000 that was transferred to/invested in Special Situations Cayman Fund L.P. was invested for the benefit of Strand and contradicts the Trustee's allegations that the investment was made for the benefit of Green and/or his family. |

## APPENDIX A

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit II | July 21, 2008 letter from Green to Madoff | Integral. *See* Green Aff. ¶ 36. | Fact of transfer to/investment in R.H. Book LLC noted in SAC ¶¶ 72, 73, 119, and 148 n.7. | "Not integral to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A." | The July 21, 2008 letter from Green to Madoff is clearly "integral" to the SAC as (i) such document was in the Trustee's possession and the Trustee had knowledge of it prior to drafting the SAC, and (ii) the Trustee clearly relied on it in drafting the SAC, including alleging that Premero made a $2.5 million transfer to/investment in R.H. Book LLC. | The July 21, 2008 letter from Green to Madoff establishes that the $2.5 million that was transferred to/invested in R.H. Book LLC was invested for the benefit of Premero and contradicts the Trustee's allegations that the investment was made for the benefit of Green and/or his family. |
| Exhibit JJ | Letters from Green to Madoff scheduling meetings between them | Incorporated by reference; integral and "give the lie" to specious factual allegations in the SAC. *See* Green Aff. ¶ 37. | Letter quoted in SAC ¶ 93. Moreover, the SAC refers to Green's correspondence with Madoff in SAC ¶¶ 45c, 74, 89, and 93. | "Not integral to SAC by virtue of being potentially relevant to facts alleged in it, *see* Trustee Opp. at § IV.A." | The letters from Green to Madoff scheduling meetings are clearly incorporated by reference as they are (i) referred to/quoted in the SAC; and (ii) relied upon by the Trustee to allege that Green had a close relationship with Madoff and participated in the BLMIS fraud. Moreover, the letters are integral to the SAC and "give the lie" to specious factual allegations therein as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; and (ii) the Trustee intentionally omitted them from the SAC because they show his allegations that Green had a close relationship with Madoff and participated in the BLMIS fraud to be demonstrably false. | The letters from Green to Madoff scheduling meetings between them establish that Green (i) believed that BLMIS was a legitimate enterprise and engaged in real securities trading; and (ii) was concerned about the volatility of the stock market, which contradict the Trustee's allegations that Green had "actual knowledge" of and participated in the BLMIS fraud. |

## APPENDIX A

| Exhibit | Description | Basis For Consideration | Reference in SAC | Trustee's Position (per Trustee's chart) | Defendants' Response to the Trustee's Position | SAC Allegation(s) Contradicted By Document |
|---|---|---|---|---|---|---|
| Exhibit KK | March 29, 1994 letter from Green to Madoff in his capacity as the attorney for YHA | Integral and "gives the lie" to specious factual allegations in the SAC. See Green Aff. ¶ 38. | N/A | "Not integral to SAC by virtue of being potentially relevant to facts alleged in it, see Trustee Opp. at § IV.A." | The March 29, 1994 letter from Green to Madoff and the confirmations of the holdings in YHA's BLMIS Account issued by Friehling & Horowitz (Ex. LL) are integral to the SAC and "give the lie" to specious factual allegations therein as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; and (ii) the Trustee intentionally omitted them from the SAC because they show his allegations that BLMIS's liquidation of all investments at the end of each quarter was unique to Magnify, Strand, and Premero to be demonstrably false. | The March 29, 1994 letter from Green to Madoff and the confirmations of the holdings in YHA's BLMIS Account issued by Friehling & Horowitz (Ex. LL) establish that BLMIS also liquidated YHA's alleged investments at the end of each quarter. This fact contradicts the Trustee's allegation that such practice was unique to Magnify, Strand, and Premero. |
| Exhibit LL | Written confirmations of the holdings in YHA's BLMIS Account for the years ending 12/31/02, 12/31/03, 12/31/04, 12/31/05, 12/31/06, and 12/31/07 issued by Friehling & Horowitz to YHA | Integral and "give the lie" to specious factual allegations in the SAC. See Green Aff. ¶ 38 | N/A | "Not integral to SAC by virtue of being potentially relevant to facts alleged in it, see Trustee Opp. at § IV.A." | The March 29, 1994 letter from Green to Madoff (Ex. KK) and the confirmations of the holdings in YHA's BLMIS Account issued by Friehling & Horowitz are integral to the SAC and "give the lie" to specious factual allegations therein as (i) such documents were in the Trustee's possession and the Trustee had knowledge of them prior to drafting the SAC; and (ii) the Trustee intentionally omitted them from the SAC because they show his allegations that BLMIS's liquidation of all investments at the end of each quarter was unique to Magnify, Strand, and Premero to be demonstrably false. | The March 29, 1994 letter from Green to Madoff (Ex. KK) and the confirmations of the holdings in YHA's BLMIS Account issued by Friehling & Horowitz establish that BLMIS also liquidated YHA's alleged investments at the end of each quarter. This fact contradicts the Trustee's allegation that such practice was unique to Magnify, Strand, and Premero. |