# EXHIBIT A

1. Claimant
2. J H Chapman
3. 1st Witness statement
4. 26 July 2011

**IN THE HIGH COURT OF JUSTICE**  **2010 Folio 1478**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

B E T W E E N:

(1) IRVING H. PICARD
(Trustee for the substantively consolidated SIPA liquidation of
BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") and BERNARD L. MADOFF ("MADOFF"))

**Claimants**

- and -

(1) KINGATE MANAGEMENT LIMITED
(2) FIM LIMITED
(3) FIM ADVISERS LLP
(4) CARLO GROSSO
(5) FEDERICO CERETTI
(6) ASHBY HOLDING SERVICES LIMITED
(7) FIRST PENINSULA TRUSTEES LIMITED
(8) ASHBY INVESTMENT SERVICES LIMITED
(9) EL PRELA GROUP HOLDING SERVICES LIMITED
(10) PORT OF HERCULES TRUSTEES LIMITED
(11) ALPINE TRUSTEES LIMITED
(12) EL PRELA TRADING INVESTMENTS LIMITED

**Defendants**

---

**WITNESS STATEMENT OF JULIAN HENRY CHAPMAN**

---

I, **JULIAN HENRY CHAPMAN**, of 60 Old Hertford Road, Hatfield, Herts say as follows:

**Introduction**

1. I am a consultant to an investment advisory firm, Leopard Rock Capital Partners Limited. Previously, I was employed at FIM Limited from April 2003 to July 2005, then FIM Advisers LLP from July 2005 to September 2008, when I was made redundant. I refer to both FIM Limited and FIM Advisers LLP together as "FIM" in this statement. This is my first witness statement in these proceedings.

2. Save where otherwise stated, the matters to which I refer in this statement are within my personal knowledge and are true. Where they are not within my personal knowledge, they are true to the best of my knowledge and belief and I state the source of my knowledge and/or belief.

**My previous employment and my role at FIM**

3. Prior to joining FIM, I had worked as an investment manager at Merrill Lynch Asset Management and as a stockbroker at ABN Amro Hoare Govett, amongst others.

4. I joined FIM Limited in July 2003 and left FIM Advisers LLP in September 2008 (the FIM business restructured in July 2005 and employees of FIM Limited transferred over to FIM Advisers LLP). At FIM, I carried out investment research and analysis with the qualitative due diligence team, and made investment recommendations to Carlo Grosso and the investment committee, in relation to equity long-short funds. I reported to Mr Grosso initially and then subsequently to Brendan Robertson. After leaving FIM, I worked briefly at Winterflood Securities Limited, and am currently a consultant with Leopard Rock Capital Partners Limited.

**Due diligence processes at FIM**

5. When I joined FIM, in 2003, it had due diligence processes in place, but they were not well documented or structured. For example, when I joined FIM Limited, there was no one who solely handled legal due diligence, and over time, specialists were recruited to deal with each area of due diligence. In 2003, FIM undertook a process of seeking to improve its due diligence processes, in my view successfully. The quality of due diligence processes increased substantially, such that FIM's due diligence was regarded in the market as being of very high standard. In my experience, all FIM investments were subjected to due diligence procedures which were documented and which increased in rigour over time, although I never saw any documentation relating to due diligence on BLMIS or Madoff.

6. I carried out qualitative due diligence, which concerns the process of reviewing the fund in question, the investment strategy, the investment manager and senior staff, their backgrounds, the research process, the strengths and weaknesses of the organisation, and the suitability of the fund for inclusion in FIM portfolios. Qualitative due diligence looks at the investment strategy and decision-making process which generates returns, accordingly, if a fund operated a master-feeder structure (as with BLMIS - Kingate), the qualitative due diligence team would need to look at BLMIS and Madoff (the investment manager), not Kingate, for it to be effective because you need to look at the entity / person actually making investment decisions. It would also need to consider total assets under management, not just those allocated to the feeder fund in question, as there are frequently diseconomies of scale in certain asset classes which I would need to take into account when conducting qualitative due diligence. This is especially the case in certain equity-related strategies.

7. In addition to the qualitative due diligence that I performed, other analysts within FIM undertook the other main areas of due diligence, which were legal due diligence, quantitative due diligence, and operational due diligence. In addition to my role in undertaking qualitative due diligence, I was responsible for collating the reports produced by each due diligence team into a single master report prior to presentation before the investment committee.

8. Legal due diligence involves reviewing where a fund is domiciled, its legal structure, legal risks, etc. Quantitative due diligence involves analysis of a fund's historic returns, volatility, positive/negative months, drawdowns, and reward to risk. Operational due diligence looks at the fund's operations, its service providers, internal processes, business continuity and disaster planning, record-keeping, and systems and controls.

9. The 'improved' due diligence process involved each of the four 'limbs' of the due diligence process producing a report into their specific area, using FIM standard templates. Those reports would then be combined into one due diligence report, which was usually around 45-50 pages long, which would then be discussed by the investment committee (which comprised, initially, Mr Grosso and Paul Boulton, who was then replaced by Mr Robertson after Mr Boulton left FIM, and Scott Dragoo later joined the investment committee). The investment committee would make a decision as to whether to approve a fund for investment.

10. FIM would not invest in a fund without an investment case being completed, the fund being recommended before the investment committee, and full evidence of due diligence being completed and available to investors if necessary (where FIM was investment adviser to the investor in question). Each of the four 'limbs' of due diligence had, in effect, a power of veto, so if they had serious concerns about a fund, they could veto investment. In some circumstances, we would raise the issue with the fund manager. If the concern could be resolved, then FIM might reconsider approving investment in the fund.

11. There were also occasions when FIM had an existing investment in a fund that we became concerned about because, for example, investments that the fund was making raised the risk profile of the fund above the acceptable threshold. In such cases, the underlying fund would be discussed internally, monitored more closely and if the analysts were still not happy with the position, it would be discussed at the investment committee and FIM would usually redeem the investment from the fund.

12. The investment committee was chaired by Mr Grosso, who had the final say on whether a fund was approved or not. Mr Grosso was very thorough in his consideration of the due diligence process, and would frequently question analysts in detail about any aspect of the due diligence, or would request more detail or explanation if he was not happy with the information before him. Nevertheless, I never heard any substantive discussion of Kingate or BLMIS/Madoff at any investment committee meeting, or monthly strategy meetings,

where analysts would discuss the performance of their funds and the outlook for the investment strategy for which they were responsible. Every investment would typically have been discussed as part of FIM's ongoing review process at each monthly strategy meeting.

13. FIM's due diligence process produced scores, or ratings, for funds. Where FIM had already invested or approved a fund for investment, such funds were rated on a scale from A1 to A4. A1 was the most highly rated fund, moving down to A4 as the lowest rating (which meant that the fund was on a watch list because of concerns), but all A-rated funds were approved for investment. In addition, funds that were going through the due diligence process were subject to a scale of "B" grades and, once approved for investment, would move up to the "A" scale described above. The "B" scale was for funds which were under consideration for investment. The lowest "B" grade was B3, which meant that the fund was potentially attractive and was being monitored. B2 was used where the due diligence process had begun and an investment case was being prepared, and B1 was used when an investment case had been completed and was awaiting presentation to the investment committee.

**FIM's due diligence into Kingate or Madoff/BLMIS**

14. I was not aware that any due diligence of the standard described above was performed by FIM on Kingate or BLMIS/Madoff. Had such due diligence been performed, I would have expected to see records of such in the form of meeting notes or on FIM's asset management database, WebFolio.

15. It seemed to me that there was an unwritten rule that Kingate and BLMIS/Madoff were within Mr Grosso's and Mr Ceretti's remit, and no one else within FIM was to look into Kingate or BLMIS/Madoff. To question Mr Grosso in relation to due diligence on Madoff would be akin to questioning his judgment, which was simply not acceptable at FIM.

16. If I had been asked to conduct qualitative due diligence into Kingate or Madoff, I would have had to carry out due diligence into BLMIS and Madoff, the investment manager, for my research to be of any value. This is because several of the factors that qualitative due diligence considers require an understanding of total assets under management, so in a master-feeder fund structure, I would need to look at the master fund, not the feeder fund.

17. I recall that I was aware that BLMIS/Madoff was believed to have very substantial assets under management, as I was aware that Kingate was not the only feeder fund believed to have substantial assets in BLMIS/Madoff (I recall that I was also aware of Fairfield). This meant that Madoff would have had to have had assets under management of several billion dollars at the very least.

18. As far as I am aware, no real due diligence was ever done at FIM on BLMIS/Madoff or Kingate, and I am certain that no due diligence report which combined the four "limbs" of

due diligence, which would be a requirement before considering whether to invest in a fund, was ever produced. In addition, to my knowledge, no records of meetings with BLMIS/Madoff or Kingate were entered onto WebFolio, which was a key part of the ongoing due diligence process once FIM had invested in a fund.

### Suspicions about the Kingate Funds and Madoff

19. I, and numerous other employees at FIM, were aware of the Kingate funds and Madoff, and were curious as to how Madoff could achieve the returns that he did over such a long period of time. FIM subscribed to a service called PerTrac, which is a database of funds which provided information and analysis (including metrics on drawdowns, compound annual returns, Sharpe ratios (a reward-to-variability ratio) and volatility) of a wide range of funds, including Kingate. For example, I recall that FIM employees (including me) were aware of the fact that Kingate had an extraordinary Sharpe ratio, and were curious as to how this was achieved. However, I couldn't substantiate my curiosity into anything more concrete because none of the senior analysts were responsible for FIM's investment in Kingate, and to the best of my knowledge, no member of staff with the exception of Mr Ceretti and Mr Grosso had ever met with Madoff.

### FIM's document retention/destruction policy

20. In terms of FIM's document retention/destruction policy, all emails and electronic documents were archived offsite. Richard Hurford, who was the head of information technology at FIM, would have dealt with this.

21. FIM employees were encouraged to commit information to a database which included information on funds, meetings where funds were discussed, correspondence and meetings with the fund manager, financial statements, information on returns, due diligence reports, upgrading or downgrading a fund in accordance with FIM's internal classification, and communications with investors. This database was intended to be a repository of all information within FIM relating to a particular fund or investment, and was essential to the ongoing due diligence of invested funds. This database was based on WebFolio software, which is an industry standard asset management software package, but which had been tailored specifically for FIM.

I believe that the contents of this witness statement are true.

_[signature]_

**Julian Henry Chapman**

Dated this 26th day of July 2011

1. Claimant
2. J H Chapman
3. 1st Witness statement
4. 26 July 2011

**Folio 2010 1478**

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
B E T W E E N:

IRVING H. PICARD
(Trustee for the substantively consolidated SIPA liquidation of
BERNARD L. MADOFF INVESTMENT SECURITIES LLC and BERNARD L. MADOFF)
**Claimant**

- and –

(1) KINGATE MANAGEMENT LIMITED
(2) FIM LIMITED
(3) FIM ADVISERS LLP
(4) CARLO GROSSO
(5) FEDERICO CERETTI
(6) ASHBY HOLDING SERVICES LIMITED
(7) FIRST PENINSULA TRUSTEES LIMITED
(8) ASHBY INVESTMENT SERVICES LIMITED
(9) EL PRELA GROUP HOLDING SERVICES LIMITED
(10) PORT OF HERCULES TRUSTEES LIMITED
(11) ALPINE TRUSTEES LIMITED
(12) EL PRELA TRADING INVESTMENTS LIMITED
**Defendants**

---

WITNESS STATEMENT OF JULIAN HENRY CHAPMAN

---

Taylor Wessing LLP
5 New Street Square
London
EC4A 3TW (Ref: DDF/LML/MAD18.U1-6)
Tel: 020 7300 7000
Fax: 020 7300 7100
Solicitors for the Claimant