# EXHIBIT A

1. Claimant
2. A Rahall
3. 1st Witness statement
4. 5 September 2011

IN THE HIGH COURT OF JUSTICE　　　　　　　　　　　　　　　　　2010 Folio 1478
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

B E T W E E N:

IRVING H. PICARD
(Trustee for the substantively consolidated SIPA liquidation of BERNARD L. MADOFF
INVESTMENT SECURITIES LLC and the estate of BERNARD L. MADOFF)

**Claimant**

- and -

(1) KINGATE MANAGEMENT LIMITED
(2) FIM LIMITED
(3) FIM ADVISERS LLP
(4) CARLO GROSSO
(5) FEDERICO CERETTI
(6) ASHBY HOLDING SERVICES LIMITED
(7) FIRST PENINSULA TRUSTEES LIMITED
(8) ASHBY INVESTMENT SERVICES LIMITED
(9) EL PRELA GROUP HOLDING SERVICES LIMITED
(10) PORT OF HERCULES TRUSTEES LIMITED
(11) ALPINE TRUSTEES LIMITED
(12) EL PRELA TRADING INVESTMENTS LIMITED

**Defendants**

---

### WITNESS STATEMENT OF ABDALLAH RAHALL

---

I, **ABDALLAH RAHALL**, of 18 Rusholme Road, London, SW15 3JZ say as follows:

Introduction

1. I am a director in the investment product risk group at Citigroup. Previously, I was employed at FIM Limited from February 2005 to July 2005, then FIM Advisers LLP from July 2005 to February 2011. I refer to both FIM Limited and FIM Advisers LLP together as "FIM" in this statement. This is my first witness statement in these proceedings. I provide this statement pursuant to the Order of the High Court of Justice dated 22 July 2011.

2. Save where otherwise stated, the matters to which I refer in this statement are within my personal knowledge and are true. Where they are not within my personal knowledge, they are true to the best of my knowledge and belief and I state the source of my knowledge and/or belief.

**My previous employment**

3. Prior to joining FIM, I worked at Vizor Investment Management from April 2001 to September 2003, where I was Head of Equities and also had responsibility for risk management of the fund, where I set up a risk management policy fund. Prior to that, I worked as an equity derivatives trader at each of Chase Manhattan (which became JP Morgan Chase), HSBC and Baring Brothers (which became ING Barings).

**FIM**

4. FIM was a multi-manager, or a fund of hedge funds, and FIM primarily invested in hedge-funds. However, because of how the Kingate Funds (which were comprised of two funds, Kingate Euro Fund, Ltd. and Kingate Global Fund, Ltd.) were structured and how they were managed by Bernard L. Madoff Investment Securities LLC ("BLMIS"), this aspect of FIM's business fell into the category of a single manager hedge fund (i.e. the BLMIS/Kingate Funds structure pursued a single strategy).

**My role at FIM**

5. I joined FIM Limited in February 2005 and left FIM Advisers LLP in February 2010 after being made redundant (the FIM business restructured in July 2005 and employees of FIM Limited transferred over to FIM Advisers LLP). I joined FIM as a senior investment analyst in the investment team. My responsibilities in this role were essentially twofold: first was to monitor existing investments in different hedge funds, and secondly it was to bring new investment ideas into the portfolio.

**Development of the due diligence processes at FIM**

6. When I joined in 2005, FIM had recently completed a process of overhauling their due diligence procedures, making them more robust, in particular with respect to pre-investment due diligence. During my time at FIM I do not believe that FIM ever invested in a fund where the renewed due diligence process was not followed in some form or another. Typically, pre-investment due diligence involved the preparation of an operational due diligence report, a risk management report and a strategy report for every new fund. With regard to legacy funds (i.e. long-term invested funds that were already in place when the new pre-investment due diligence process was introduced), enhanced due diligence was undertaken as part of the ongoing due diligence process, although the process was not as comprehensive as the pre-investment due diligence screening. For example, at a minimum, a due diligence questionnaire would have been sent to the fund manager, and FIM's operational due diligence analyst would have contacted the legacy fund's manager and formed a view as to whether the fund satisfied FIM's due diligence standards. I was involved as an analyst for both new investments and for legacy investments.

**Transfer of the operational due diligence function to New York**

7.  When William Jenkins, who was FIM's London-based head of due diligence, left the company in 2007, FIM's operational due diligence function was transferred to New York. Eric Lazear was hired to take over the role of head of operational due diligence for the whole of FIM. Eric Lazear was based in FIM's New York office, and he managed FIM's operational due diligence team from New York. Jose Verde, who was part of the operational due diligence team, was based in London and reported to Eric Lazear in New York. I believe Eric Lazear also had two other junior analysts working for him on operational due diligence in New York.

**The FIM investment team structure**

8.  The FIM investment team, within which I worked, was broken into five separate sub-groups: operational and legal due diligence; risk and quantitative analysis; portfolio management; data services and research. I set out as follows a short description of the role of each of these sub-groups:

8.1 Operational and legal due diligence included monitoring the valuations of the fund and how the fund valued the portfolio, who would be responsible for making cash payments out of the fund, what their prime brokerage arrangements were, what share classes are available to invest in and what would be the risks of investing in different share classes. When I first joined FIM, this sub-group was managed by William Jenkins. When William Jenkins left FIM, Eric Lazear took over the role of manager of the sub-group.

8.2 Risk and quantitative analysis monitored the aggregate risks of the whole portfolio, as well as the individual funds. This sub-group was managed by Antony Clark, whose role was previously filled by William Gilmore and Lee McCulloch-James.

8.3 Portfolio management was managed by Lisa Randall, The portfolio management sub-group were responsible for managing and monitoring the financial information that was provided to FIM by the fund managers on a weekly basis. The information that was provided would be entered into the databases for each fund.

8.4 Data services updated the databases of all the funds that FIM invested in, as well as all of the funds that reported to FIM. As FIM was a reasonably-sized fund of hedge funds, it had a lot of funds reporting data to it. The data would arrive on a weekly basis and was a valuable resource as it allowed FIM to build benchmarks and predict in what direction the whole industry was heading in terms of performance. In addition, data services also captured and kept up to date a large amount of data regarding the leverage of the funds in FIM's database, which was used to solve the risk numbers that the fund reported.

8.5 The research sub-group was divided up into different areas. Stuart Wall was responsible for event driven special situation funds and distressed investment funds. I monitored convertible arbitrage, derivatives and what became known broadly as multi-strategy

managers. Michael Dziegielewski covered macro fixed income and credit, both long and short. Jonathan Krause was a generalist and was based in New York. The research sub-group was headed by Scott Dragoo, who was also a member of the Investment Committee (previously the head of research was Brendan Robertson). Scott Dragoo coordinated the various research analysts, including making sure that we were correctly applying FIM's intended strategy, developing the pipeline of new investment ideas and also that we followed up on specific problems with funds. I recall that Scott Dragoo also covered research regarding long/short equity managers. Brendan Robertson became Head of Investments in or around 2007, but was essentially the chief portfolio manager, which primarily involved managing inflows and outflows from the funds and making sure the portfolio composition reflected the views of the Investment Committee.

9. The separate sub-groups would all work together in unison in managing and monitoring the funds, forming a comprehensive due diligence team. For example, if I wanted to invest in a hedge fund, I would initially start discussions with the fund manager to consider the strategy of the fund. Following that, the fund would be flagged for the risk and quantitative risk analysis team, as well as the operational and legal due diligence team. We would go through various stages including face-to-face meetings and/or conference calls where we would discuss past performance under that manager's investment strategy and when our interest/comfort level grew, the risk and quantitative analysis team would analyse the reported numbers of the fund to identify any obvious risks, while the operational due diligence team would review the fund's offering memorandum and fund set up.

10. Once the FIM investment team had approved the investment in a fund, its role did not stop there. Another significant aspect of its function was to monitor existing investments.

**Monthly investment meetings and fund review meetings**

11. On a monthly basis there would be two types of meetings involving FIM's investment analysts. The first were investment meetings where various analysts would present their ideas on their strategies for the funds they managed and potential future funds that were in the pipeline. These meetings involved a discussion of purely macro issues, such as where we thought the US consumer was going, where we thought equity markets were going or where we saw major risks in the world and how that could impact our portfolio. Sometimes it would just be focused on one issue, like credit strategy. In almost every meeting, each analyst will have to talk about his strategy.

12. When I arrived at FIM all analysts would attend this meeting, which was chaired by the Investment Committee (made up of Carlo Grosso, Brendan Robertson and Scott Dragoo). The Investment Committee would question each analyst on the ongoing monitoring of their funds and any proposed funds that were in the pipeline. As the number of funds FIM had under management increased, it became impractical for all analysts to attend the fund review meetings at the same time and this was broken out into second series of meetings.

13. This second series of meetings consisted of a fund review of each individual investment analyst's funds. Because strategic decisions relating to funds would be made off the back of these meetings, Lisa Randall, who was Brendan Robertston's assistant, would attend both the monthly investment and individual analyst meetings and memorialise the latter.

14. I do not recall there was ever any discussion of the Kingate Funds during either the monthly investment or individual analyst meetings at which I was present.

15. Carlo Grosso was the investment analyst assigned to the Kingate Fund. To my knowledge, this is the only fund to which he was assigned as an analyst. I understood that this was because Mr. Grosso was an owner of the Kingate Funds, and had a relationship with the manager of the Fund in which Kingate was invested. In hindsight, I believe it was not in accord with FIM's usual due diligence policies to appoint an analyst with in ownership interest in a fund to undertake responsibility for analyzing that fund. During our monthly investment meetings I do not recall Carlo Grosso or anyone ever discussing the Kingate Funds.

### Database of information for each fund

16. FIM kept an investment database for each fund in which FIM was invested, which contained, at a minimum, the meeting notes referred to above and any separate notes that any investment analyst may have taken relating to material issues concerning a fund. After each meeting the analyst was supposed to reach a brief conclusion on the fund and this would also be held on the database.

17. The database would also contain, for each fund, a copy of the investment report, the operational due diligence report, the quantitative research report, any notes relevant to the fund and details of monthly returns. In general the databases for each fund were large and contained a significant amount of information. In that regard, given how long the Kingate Funds had been established, the database for the Kingate Funds should be fairly voluminous.

### Meetings with fund managers

18. At least once a quarter the investment analysts would attend meetings with the fund managers. In general the meetings would typically last about one hour. Normally the operational due diligence manager would also visit the fund managers (the quantitative risk managers would not attend these meetings). I know that William Jenkins, when he was head of operational due diligence, went to New York to visit our U.S. fund managers. In addition to the quarterly meetings, investment analysts at FIM would make monthly calls to the fund managers.

19. During the quarterly meetings, the sort of issues that might be covered would vary from manager to manager, but generally they would include a run through of the portfolio down

to the individual positions or if the strategy was particularly stressful, it might require a more qualitative approach to establish why certain events were happening, for example convertible arbitrage would have been looked into in greater detail when it was suffering from particularly stressful moments in 2005. Within reason, nothing was off limits during the meetings.

20. Generally, when I went to these meetings I would be joined by a junior analyst. In meetings in the U.S., I would take Rob Santry or Jonathan Krause. If it was in London, I would usually take Omar Hassan.

21. As a rule, if we were ever denied access to a fund manager or a manager would not agree to a meeting, that was considered a red flag. There were some legacy positions where it was extremely difficult to ever meet the manager directly and that was considered to be a significant red flag. After a few quarters where it had not been possible to contact the fund manager, FIM would have typically moved the position to "sell".

22. I understand that the process of ongoing fund monitoring through meeting with fund managers was relatively similar from fund to fund and that every investment analyst undertook more or less the same approach. Some analysts had more frequent points of contact with fund managers. It would generally depend on what was going on with the strategy of the particular fund, i.e. if the strategy was under stress, there would likely be more frequent points of contact. If it was fairly benign, then there would be less contact and consideration would be given to the manager's report that was received on a monthly basis. Every point of contact with a fund manager required a conclusion to be added to the fund's database. In general, anyone who attended a meeting from FIM was supposed to reach a conclusion and record it in the fund's database. These conclusions were then circulated to the investment team.

23. I do not recall ever seeing any notes or conclusions from any meetings that Carlo Grosso, or anyone else, had with Mr. Madoff, the Kingate Funds or BLMIS, nor do I recall any substantive discussion concerning Mr. Madoff, the Kingate Funds or BLMIS during any of the investment team meetings. With hindsight, I consider this to be unusual.

### Requirement to report any material changes

24. In addition to the quarterly in-person meetings described above, a written report was circulated amongst the whole management team summarising the previous week's activity together with the conclusions of the operational analyst risk manager. This weekly report would also highlight where there had been material changes to any of the funds, for example if there had been a significant increase in the leverage of a fund. Such an occurrence would need to be added to the weekly report to keep everyone informed of all key developments.

25. I do not recall any discussion or mention of the Kingate Funds, Mr. Madoff or BLMIS in any of those weekly reports.

**Due diligence questionnaires**

26. Due diligence questionnaires ("DDQs") were usually required at an early stage in the process of initiating new funds. The fund managers would always have their most recent DDQ on request. DDQs were also required for legacy funds that were in existence when the more robust due diligence process was introduced by FIM. Over time, FIM would request updated DDQs for existing investor funds, i.e. if there were changes to the partners in the management company.

**Assets Under Management ("AUM")**

27. Part of my role as an investment analyst was to monitor the AUM, specifically any growth or sudden decline in AUM. The purpose of this was to make sure that there were no capacity constraints or that the fund manager's assets were not growing too quickly, which could give rise to problems managing the intended strategy.

28. It was critical that we knew what AUM growth or decline there had been for all funds. If a fund manager refused to inform FIM of the AUM of a fund, this would be considered to be a red flag.

29. In addition, FIM had a rule that it would not allow more than an investment of 10% of AUM per fund.

**FIM's due diligence into Kingate or Madoff/BLMIS**

30. While an employee of FIM I was aware of the Kingate Funds, which I understood Carlo Grosso and Federico Ceretti to have set up and owned. I understand that the Kingate Funds were set up to invest in a split strike conversion strategy and this strategy was managed by Bernard Madoff.

31. Carlo Grosso was also the investment analyst for the Kingate Funds. As far as I am aware, these were the only funds for which Carlo Grosso was the investment analyst.

32. I understand that operational due diligence was undertaken regarding the Kingate Funds, but I do not recall in any detail the form that due diligence took.

33. In a master-feeder fund structure, due diligence would be performed on the master fund since that is where the investment strategy is conducted and the strategy of the feeder fund is more of a technicality. I am not aware of any operational due diligence report, or any due diligence of any kind, having been done for BLMIS or Mr. Madoff.

34. There was a general reluctance within FIM to raise any issues with Mr. Grosso relating to Mr. Madoff, the Kingate Funds or BLMIS. For example, on a number of occasions Lisa

Randall, the manager of the portfolio management sub-group, raised with me her concerns about problems with reconciling a weekly statement she had received from BLMIS. When I suggested that she raise her query with whoever sent the statement, she responded that Mr. Madoff did not like to be contacted with such queries.

I believe that the contents of this witness statement are true.

*[signature]*

**Abdallah Rahall**

Dated this 5th day of September 2011

1. Claimant
2. A Rahall
3. 1st Witness statement
4. 5 September 2011

**Folio 2010 1478**

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>QUEEN'S BENCH DIVISION</u>
<u>COMMERCIAL COURT</u>
B E T W E E N:

IRVING H. PICARD
(Trustee for the substantively consolidated SIPA liquidation of BERNARD L. MADOFF INVESTMENT SECURITIES LLC and the estate of BERNARD L. MADOFF)

<u>Claimant</u>

- and -

(1) KINGATE MANAGEMENT LIMITED
(2) FIM LIMITED
(3) FIM ADVISERS LLP
(4) CARLO GROSSO
(5) FEDERICO CERETTI
(6) ASHBY HOLDING SERVICES LIMITED
(7) FIRST PENINSULA TRUSTEES LIMITED
(8) ASHBY INVESTMENT SERVICES LIMITED
(9) EL PRELA GROUP HOLDING SERVICES LIMITED
(10) PORT OF HERCULES TRUSTEES LIMITED
(11) ALPINE TRUSTEES LIMITED
(12) EL PRELA TRADING INVESTMENTS LIMITED

<u>Defendants</u>

---

**WITNESS STATEMENT OF
ABDALLAH RAHALL**

---

Taylor Wessing LLP
5 New Street Square
London, EC4A 3TW
(Ref: DDF/LML/MAD18.U1-6)
Tel: 020 7300 7000
Fax: 020 7300 7100
<u>Solicitors for the Claimant</u>