Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    SECURITIES INVESTOR PROTECTION

7    CORPORATION,

8                   Plaintiff,

9          v.                    Case No. 08-01789-smb

10   BERNARD L. MADOFF INVESTMENT

11   SECURITIES LLC,

12                  Defendant.

13   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14

15                  U.S. Bankruptcy Court

16                  One Bowling Green

17                  New York, New York 10004-1408

18

19                  January 19, 2018

20                  10:01 AM

21

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

1    Hearing re:   Trial on Profit Withdrawal Issue

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Dawn South, Sherri Breach, Tracey Williams

25    and Jamie Gallagher

1    A P P E A R A N C E S :

2    BAKER HOSTETLER

3         Attorneys for the Trustee

4         45 Rockefeller Plaza

5         New York, NY 10111

6

7    BY:  SEANNA R. BROWN, ESQ.

8         CHATERINE E. WOLTERING, ESQ.

9         LAN HOANG, ESQ.

10        AMY E. VANDERWAL, ESQ.

11        STEPHANIE A. ACKERMAN, ESQ.

12

13   CHAITMAN LLP

14        465 Park Avenue

15        New York, NY 10022

16

17   BY:  HELEN DAVIS CHAITMAN, ESQ.

18        GREGORY M. DEXTER, ESQ.

19

20

21

22

23

24

25

Page 4

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Madoff?
 3              MS. BROWN:  Good morning, Your Honor.  Seanna
 4    Brown on behalf of the trustee, Irving Picard.  Today I have
 5    with me my colleagues Amy Vanderwal.  And we also have
 6    Shannon Bails who's here to assist us with our exhibits.
 7              Your Honor, we have a number of housekeeping
 8    matters to address, and we also have the motion to preclude
 9    Robert Blecker as a witness, and I would defer to the Court
10    as to what order you'd like to address those items.
11              THE COURT:  I'll deal with the motion in limine
12    first.
13              MS. BROWN:  Okay.  My colleague, Kat Woltering, is
14    actually going to argue the motion today.
15              THE COURT:  Okay.
16              MS. BROWN:  Thank you, Your Honor.
17         (Pause)
18              MS. WOLTERING:  Good morning, Your Honor.
19    Catherine Woltering on behalf of the trustee here to argue a
20    motion in limine seeking to exclude the testimony of Robert
21    Blecker.
22              As a preliminary matter I will be referring to
23    both Aaron Blecker and his son, Robert Blecker, so I'll call
24    Aaron Blecker Mr. Blecker and Robert Blecker by his full
25    name.
```

Page 5

```
 1                The grounds for granting the trustee's motion in

 2     limine are simple.  First, the burden to identify any

 3     witness falls onto the party offering the testimony, and

 4     Ms. Chaitman failed to identify Robert Blecker within the

 5     time frames provided by Rule 26 and Your Honor's scheduling

 6     orders.

 7                THE COURT:  But you've known for over a year that

 8     he might be a -- or almost a year that he might be a

 9     witness, right?

10                MS. WOLTERING:  No, sir.

11                THE COURT:  Or that he was going to be a witness.

12                MS. WOLTERING:  No, sir.  Your Honor, the trustee

13     first learned that Robert Blecker may have knowledge after

14     the close of discovery --

15                THE COURT:  Right.

16                MS. WOLTERING:  -- 11 months after the close of

17     discovery and 6 months after final pretrial disclosures were

18     due.

19                THE COURT:  But we had a discussion on the record

20     in April of 2017, and I think the substance of it was if he

21     was going to be a witness Ms. Chaitman would tell you and

22     then you could take his depositions if you wanted, right?

23                MS. WOLTERING:  Your Honor, at that point in time

24     Ms. Chaitman said on the record at the hearing that he might

25     have personal knowledge, but she'd have to check.
```

1           THE COURT:  But I thought she told you the next

2    month that he did have -- that he was probably going to be a

3    witness.

4           MS. WOLTERING:  No, she offered to just give us

5    his deposition in May --

6           THE COURT:  Right.

7           MS. WOLTERING:  -- and we responded and said, what

8    personal knowledge does he have and is Aaron unavailable?

9    Because he only came up at that hearing by virtue of her

10   representing that Aaron might be unavailable.

11          THE COURT:  Well wouldn't you have to take his

12   deposition to find out what personal knowledge he had?

13          MS. WOLTERING:  We're under no obligation to

14   depose a party who may have personal knowledge after --

15          THE COURT:  Well that's certainly true.

16          MS. WOLTERING:  -- the close of discovery, after

17   final prehearing disclosures that are due in violation of

18   Rule 26.

19          Furthermore, Rule 26 is clear that any disclosure

20   must be in writing, timely to the Court and opposing

21   counsel, and must sufficiently identify whether that witness

22   is being called as a witness during the affirmative case or

23   maybe called later on rebuttal.

24          THE COURT:  Well let me just stop you on that,

25   because -- and I know we've discussed this in the past,

Page 7

1    we're trying Mr. Blecker's claim also at the same time?

2              MS. CHAITMAN:  The only claim that we're trying is

3    Mr. Blecker.

4              THE COURT:  Okay.  All right.

5              MS. CHAITMAN:  That's what you had ordered.

6              MS. WOLTERING:  And, Your Honor, Mr. Blecker will

7    be testifying here today, he just is doing so through

8    deposition --

9              THE COURT:  Right.

10             MS. WOLTERING:  -- designations, which is what

11   Ms. Chaitman has sought all along --

12             THE COURT:  Okay.

13             MS. WOLTERING:  -- and the only reason that Robert

14   Blecker ever even became an issue was because the trustee

15   was trying to get Ms. Chaitman to confirm whether or not

16   Mr. Blecker would be available, and if not to get his trial

17   deposition.

18             In lieu of those not going forward we never -- she

19   never disclosed Robert Blecker during discovery, she

20   didn't --

21             THE COURT:  But she disclosed him in April and May

22   of 2017 though.  I don't understand your hypertechnical

23   argument.  It was disclosed and I said just give him an

24   opportunity -- give the trustee an opportunity to take his

25   deposition, right?

Page 8

1           MS. WOLTERING:  Your Honor, it's not the trustee's

2    burden to -- she -- we asked her several times in response

3    to that offer to provide us with some basis of what personal

4    knowledge he had.

5           THE COURT:  But where's that in a federal rules

6    that somebody has to do that before you take their

7    deposition or you have to take the deposition?

8           MS. WOLTERING:  Your Honor, I agree with you if he

9    was disclosed during the normal course of discovery.  If

10   what Ms. Chaitman says is true and she's known all along

11   that he had personal knowledge he should have been disclosed

12   during discovery.

13          THE COURT:  Because she -- look, I don't want to

14   go through this again.  She disclosed it in April of 2017

15   and confirmed it in May of 2017 didn't she?

16          MS. WOLTERING:  She did not confirm that he had

17   personal knowledge of anything relevant to this proceeding.

18          THE COURT:  But she said he might be a witness or

19   he was going to be a witness, right?

20          MS. WOLTERING:  No, she just simply offered his

21   deposition.  She did not indicate --

22          THE COURT:  No, no, this is Robert.

23          MS. WOLTERING:  Yes.  Robert Blecker, she

24   indicated that his -- we could take his deposition but not

25   that he would be a witness.  The email reads:

Page 9

1              "Amy, I have spoken to Robert Blecker and he has

2         information relevant to his father's account.  He will

3         be available for deposition in June.  Please give me

4         some dates that are convenient for you so that I can

5         check with him regarding his schedule."

6              THE COURT:  Right.

7              MS. WOLTERING:  At no point in time has

8    Ms. Chaitman ever told us until late November or after you

9    scheduled this hearing and we had a meet and confer that

10   Robert Blecker was going to be called as a witness.  Rather

11   she said he has -- in April he may have personal knowledge,

12   and in May --

13             THE COURT:  Why don't you move on to your other

14   arguments.

15             MS. WOLTERING:  Yes, Your Honor.

16             Pursuant to this Court's order Rule 26 applies in

17   this case.  Ms. Chaitman did not identify Robert Blecker in

18   her prehearing disclosures.

19             THE COURT:  We just discussed that.  What other

20   arguments do you have?  I understand your Federal Rule of

21   Civil Procedure argument about disclosure.

22             MS. WOLTERING:  Your Honor, as the Southern

23   District has held a party's mere knowledge of the existence

24   of a witness does not satisfy Rule 26 disclosure

25   obligations, that obligation is only fulfilled if the

Page 10

1   disclosing party informed opposing counsel that it might

2   call the witness as an actual witness at trial.  We did not

3   even know Aaron Blecker was unavailable until December 8th

4   when she finally produced a doctor's note.

5            THE COURT:  He's 106 years old.

6            MS. WOLTERING:  That doesn't mean that counsel

7   doesn't have to comply with the rules.  You asked her and

8   she represented twice on the record at that hearing that she

9   would produce a doctor's note.  We did not get --

10           THE COURT:  He may be unavailable or he may -- he

11  may or may not be unavailable, that's a separate question

12  from whether Robert Blecker can testify isn't it?  If he's

13  got personal knowledge of relevant information why shouldn't

14  he testify?

15           MS. WOLTERING:  Whatever information or knowledge

16  he has is duplicative or accumulative --

17           THE COURT:  How do we know what he has?  You

18  didn't take his deposition, don't -- why doesn't he just

19  testify, we will find out if there's a foundation for what

20  he's about to testify to?

21           MS. WOLTERING:  Because, Your Honor, trustee's

22  counsel has not been provided with the opportunity to

23  conduct discovery.

24           THE COURT:  You were offered the opportunity to

25  take his deposition and you declined.

Page 11

1           MS. WOLTERING:  Discovery was closed, the trustee

2    had no obligation to take --

3           THE COURT:  You're right, you don't have to take

4    anybody's deposition.

5           MS. WOLTERING:  But we should not now be

6    prejudiced because Ms. Chaitman decided to disclose a

7    witness 11 months after the end of discovery.  She could

8    have moved to reopen discovery.  She could have amended her

9    pretrial --

10          THE COURT:  Didn't I implicitly do that though at

11   the April hearing?

12          MS. WOLTERING:  Did she?

13          THE COURT:  Didn't I implicitly do that when I

14   said, you know, as long as you had the opportunity to take

15   his deposition he can testimony.

16          MS. WOLTERING:  But that came up only with respect

17   to Aaron Blecker's handwriting, and then the discussion --

18   so it came up twice during the deposition transcript -- or

19   the hearing transcript.  Once in connection with our offer

20   to withdraw our motion in limine if Aaron Blecker confirmed

21   it was his handwriting and she produced a doctor's note.

22   And then more generally she said he may have information.

23   Just because a party might have information relevant isn't

24   sufficient to notify opposing counsel.

25          So in Fleming v. Verizon New York plaintiff

Page 12

1    disclosed two witnesses names after deposition, but absent

2    the disclosure of the declarant's identities under Rule

3    26(a) it would be unreasonable to expect defendant to depose

4    them.

5          If he had personal knowledge then she should have

6    disclosed that during discovery.  The fact that we only

7    found out he had personal knowledge 11 months after the

8    close of discovery.  And Rule 26 is clear, it has to be in

9    writing that you plan to call him as a witness, you must

10   differentiate between affirmative witnesses and witnesses

11   you may need to call -- you may call if the need arises, and

12   it must be timely, prompt.

13         What Ms. Chaitman did, she wasn't prompt, it

14   wasn't in writing to both opposing counsel and the Court, it

15   didn't identify or differentiate whether he was going to be

16   an affirmative witness or he might be called if the need

17   arises.  She did not comply with a single element of Rule

18   26.  Absent that the Second Circuit has held that there's no

19   greater harm to a party here, the trustee, then to be

20   confronted with a witness who opposing counsel failed to

21   identify during discovery.  This is intended to eliminate

22   gamesmanship and surprise and is the entire purpose of Rule

23   26.

24         Even in her motion in opposition to our motion in

25   limine Ms. Chaitman does not identify whether Robert Blecker

Page 13

1    is being called as an affirmative witness or on rebuttal,

2    nor does she provide in that opposition or at any point in

3    time has she provided any information suggesting what

4    knowledge Robert Blecker has or why he is relevant to this

5    proceeding.  Aaron Blecker will be testifying today by

6    virtue of his deposition.

7            Under Rule 37 it's clear, if a party fails to

8    disclose a witness under Rule 26 that testimony should be

9    excluded unless it's substantially justified or harmless.

10   Here it is neither substantially justified or harmless.

11   She's provided no reason for why if she's saying that in

12   2009 we should have known, the trustee, that Robert Blecker

13   had personal knowledge then she should have disclosed that

14   to us during discovery.  And if she's saying we should have

15   known by virtue of the fact that he attended his father's

16   deposition that's a very thin argument.

17           It's unsurprising that somebody would attend their

18   father's deposition.  That alone is not sufficient to

19   disclose that he had personal knowledge.

20           If Ms. Chaitman knew that Aaron Blecker was

21   unavailable or that Robert Blecker had information it's her

22   job to identify witnesses she needs.

23           THE COURT:  I got it.  Let me hear from

24   Ms. Chaitman.  Thank you.  Go ahead.

25           MS. CHAITMAN:  Judge, I have to confess I've never

Page 14

1    in my experience heard such kind of absurd gamesmanship.

2            As you will recall, Your Honor, Mr. Blecker, at

3    the age of 104 appeared for his deposition, the trustee

4    questioned him on a very limited basis, the trustee then

5    wrote to me saying they'd like to continue his deposition,

6    and I said, of course, what date would you like to do it,

7    even though I could have argued that they had their

8    opportunity, we set a date and then Baker wrote to me and

9    said they decided not to depose him.  Now he's 106 years

10   old, he is not able to testify.

11           THE COURT:  Well also they -- then they did want

12   to depose him and I denied that application.

13           MS. CHAITMAN:  Yes, that's correct, you did deny

14   it.  And then --

15           THE COURT:  Well let's get to Robert though,

16   that's -- the motion is about Robert.

17           MS. CHAITMAN:  Right.  So as to Robert Mr. Blecker

18   filed three SIPA claims.  With respect to each of them there

19   was a question in the trustee's form which said, "Has anyone

20   assisted you in the preparation of this claim??  And in all

21   three claims Mr. Blecker wrote, "My son, Robert Blecker,

22   assisted me."

23           And when we had the April conference I disclosed

24   to you that Mr. Blecker was not in condition to testify, we

25   can't put him through that, I think I said I will not be

Page 15

1   responsible for risking his life.  We provided a letter from

2   the doctor.  I didn't provide it six months ago because I

3   wanted it to be relevant to his health at the time of the

4   year.  So I provided it to Baker recently, and Mr. Blecker

5   is here, you can hear his testimony.  If you feel that he

6   doesn't have personal knowledge or it's a waste of Your

7   Honor's time you'll say so.  But to exclude his testimony I

8   don't think there's any basis for it.

9           And for the trustee -- when we had the discussion

10  in April of 2017 about Robert Blecker testifying I promptly

11  offered the trustee the opportunity to take his deposition.

12  They thought out a pattern here, they don't want to know the

13  truth.

14          THE COURT:  All right.  Let's just leave it at you

15  offered the deposition and they -- look, I'm going to deny

16  the motion.

17          The question of Robert Blecker's possible

18  knowledge came up in April of 2017, had a conference, I

19  indicated that if he was going to be called the trustee

20  should have an opportunity to take the deposition.  In an

21  email dated May 8th Ms. Chaitman confirmed that he has

22  relevant information to the father's account and made him

23  available and the trustee declined.  So that takes care of

24  the procedural argument, whether or not he has personal

25  knowledge we'll find out when he testifies.

1          So I will deny that motion.  You can submit an

2     order on that one when you get a chance.

3          Next.  I've reviewed -- let me go through the

4     objections to the depositions, because I've gone through

5     those.

6          First with respect to Ms. Bongiorno deposition,

7     the trustee objected -- let me just find the order.

8     (Pause)

9          THE COURT:  The trustee initially objected to the

10    introduction of testimony at page 205, lines 2 to 12, page

11    205, line 15, and page 207 -- to 207, line 8.  Those

12    objections are sustained.

13         The question yet concerned to whether or not they

14    were actual trades that ceded the scope of the PW discovery,

15    it's more relevant to the other discovery relating when the

16    Ponzi scheme began and whether or not there were actual

17    trades during those periods.

18         I'm not saying it's admissible in that proceeding

19    because that deposition was not taken in that proceeding and

20    there were other parties in interest, but it's sustained.

21         Let me see.  It also deals with questions

22    regarding when the fraud began, which is again not relevant

23    to the PW proceeding -- or to the discovery that was

24    permitted.

25         There's also an objection to the deposition at

Page 17

1    page 254, line 22 to 256, 01.  These questions relate to

2    Sage and their loan positions, they don't appear to have

3    anything to do with PW, so that's sustained.

4           Turning to Mr. Madoff's deposition.  First

5    objection is to pages 43, line 7 to 44, line 14.

6           The first reference -- those pages relate to

7    actual trading again for the same reason they exceed the

8    scope of the PW discovery.  And that objection is sustained.

9           Next is page 45, line 5 to page 46, line 25.  That

10   concerns executing actual transactions.  That objection is

11   sustained.

12          And page 62, line 12 to page 64, line 15.  Again,

13   those are questions regarding actual trading.  Those

14   objections are sustained.

15          Now, you can call your first witness.  Or you said

16   there were other housekeeping that you had.

17          MS. BROWN:  Yeah, I just do have a couple other

18   items just to cover very quickly.

19          The first I wanted to cover is just to clarify

20   who's participating in this proceeding.  We filed a notice

21   of hearing on January 8th, that notice had two exhibits.

22   The first exhibit was the original list of participating

23   claimants.  The Exhibit B was the current list of

24   participating claimants.

25          THE COURT:  Oh, okay.

Page 18

```
 1              MS. BROWN:  And if I may just run through the

 2     changes.

 3              As Your Honor is aware the Brums have settled.

 4     The Sages have confirmed that they're not participating in

 5     this proceeding.

 6              THE COURT:  Let me just ask --

 7              MS. BROWN:  Sure.

 8              THE COURT:  -- since it's Ms. Chaitman's

 9     clients --

10              MS. BROWN:  Of course.

11              THE COURT:  -- as I understand, not only

12     Ms. Chaitman's clients.  Ms. Chaitman, you've looked at the

13     I guess what's Exhibit B to the trustee's notice of

14     evidentiary hearing?  The question is whether those are the

15     only people who are participating in this proceeding.

16              MS. CHAITMAN:  I just want to check the copy.  I

17     did discuss this with Ms. Brown.

18              THE COURT:  All right.

19         (Pause)

20              MS. CHAITMAN:  Yeah, the Shapiro -- right.  Okay.

21     Where it's indicated that it's any client, Your Honor, the

22     list is accurate.

23              THE COURT:  Okay.  And with respect to non-

24     Chaitman clients --

25              MS. BROWN:  Yes, Your Honor.
```

1          THE COURT:  -- are those -- those are people who

2     have settled?

3          MS. BROWN:  They've either settled, so that would

4     cover the Blums and Doris Pearlman.

5          THE COURT:  Right.

6          MS. BROWN:  There were two -- there were several

7     people that Ms. Chaitman indicated that she could not -- or

8     that she no longer represented.  The Shulmans, we did reach

9     out to counsel for the Shulmans, they did not get back to

10    us, just to inform them of the proceeding.  We also spoke

11    with counsel -- or --

12         THE COURT:  So why aren't they deemed to still be

13    participating even if Ms. Chaitman doesn't represent them?

14         MS. BROWN:  Your Honor, we've provided them with

15    -- I didn't want to exclude them because I didn't hear back

16    from them.  Ms. Chaitman opted in on their behalf, she says

17    she no longer represents them.

18         THE COURT:  Okay.  But so they're in until they're

19    out.

20         MS. BROWN:  I suppose.

21         THE COURT:  They don't lose their participatory

22    right.

23         MS. BROWN:  No, they're still participating --

24         THE COURT:  Okay.

25         MS. BROWN:  -- according to the exhibit, I'm just

Page 20

1   trying to clarify what conversations we've had.

2          For the Shapiro accounts I spoke with an attorney

3   named Brendan Scott.  He wanted me to make a statement on

4   the record that he is not counsel of record because there is

5   no probate proceeding for David Shapiro.

6          THE COURT:  Okay.

7          MS. BROWN:  But he said that he did speak with

8   Ms. Shapiro and that she, based on the preservation of

9   rights in the adversary proceedings, that she's not going to

10  pursue any arguments at this time here today, but she could

11  remain in the proceeding for what it's worth.

12         THE COURT:  Well I guess it really -- you know,

13  this is going to bind everybody, people have an opportunity

14  to opt in --

15         MS. BROWN:  It is.

16         THE COURT:  -- so --

17         MS. BROWN:  Okay.

18         THE COURT:  -- it doesn't matter I guess.

19         MS. BROWN:  Okay.  And I do want to note as well,

20  Your Honor, that in January 2016 Ms. Chaitman voluntarily

21  removed two of her clients, Ben Heller and Barbara Engel

22  because she said that they received proper withdrawal

23  transactions.

24         THE COURT:  Is that correct, Ms. Chaitman?

25         MS. CHAITMAN:  Yes, it is, correct, Your Honor.

Page 21

1          THE COURT:  Okay.

2          MS. BROWN:  Your Honor, the other housekeeping

3    matter I have is before we call our witnesses, if I may, I'd

4    like to make a proposal for dealing with the admissibility

5    of certain documents the trustee plans to introduce at

6    today's hearing.

7          We've made every effort to streamline this hearing

8    so that it could be completed by the end of the day.  We

9    anticipate that our direct examinations of our experts will

10   take about an hour to an hour and a half each.

11         And so what we would proposal is that Your Honor

12   hear all of the testimony today and at the end of the

13   hearing the trustee can move the particular pieces of

14   evidence and particular documents that he's discussed here

15   today into evidence, and at that time Your Honor can address

16   any objections and argument about that.

17         THE COURT:  Are you going to question the

18   witnesses about the contents of the documents?

19         MS. BROWN:  We are going to mark it for

20   identification and have them describe their work and their

21   analysis of those documents, but the reason why --

22         THE COURT:  So don't they have to be in evidence

23   to talk about them?  That's my question.

24         MS. BROWN:  Your Honor, no.  The Federal Law 1-703

25   says that the experts can reply upon inadmissible documents,

Page 22

1    they also can present their findings.  They don't have to

2    disclose the facts and data that they relied on up front,

3    they can talk about them in any order.  So I think that the

4    documents can be discussed here today regardless of whether

5    or not they're ultimately admitted into evidence.

6            And one of the reasons that I would like to

7    propose dealing with the evidentiary objections at the end

8    is most of our documents, the vast majority of them, fall

9    into very discrete categories, and the arguments about

10   admissibility really go to the category of documents rather

11   than any particular document.

12           So to the extent that there were additional

13   arguments that counsel wanted to raise Your Honor has the

14   extensive motion in limine briefings that raises all of

15   those evidentiary arguments.

16           So in order to keep the hearing moving that's our

17   proposal, and we defer to Your Honor as to how you'd like to

18   do it.

19           THE COURT:  Any objection to that proposal?

20           MS. CHAITMAN:  I don't, Your Honor.  As you

21   know --

22           THE COURT:  You do or you don't?

23           MS. CHAITMAN:  I'd like to say one thing.  We've

24   moved -- we believe that all of Madoff's internal records

25   are not business records and they're not admissible, and

Page 23

1    we've briefed that issue.

2            THE COURT:  But doesn't the trustee have to

3    determine at least for purposes of net equity, which is what

4    we're talking about here, the customer's net equity based on

5    the books and records?

6            MS. CHAITMAN:  Yes and no, Your Honor.  I mean the

7    trustee was the one whose expert, Mr. Dubinsky (ph), said

8    that the -- that Madoff's records are permeated with fraud,

9    and as you will hear from my cross-examination of the expert

10   witnesses you will hear that there are massive

11   inconsistencies in Madoff's records, and you'll hear that --

12           THE COURT:  So why wouldn't that go to the weight

13   as opposed to the admissibility?  In other words, I mean any

14   forensic accountant is really dealing with hearsay records.

15           MS. CHAITMAN:  If you're dealing with a business

16   which is a legitimate business then it's more reasonable for

17   an expert to rely upon it.

18           THE COURT:  Uh-huh.

19           MS. CHAITMAN:  But I think when you hear -- I

20   don't know that we have to take the time now because --

21           THE COURT:  All right.

22           MS. CHAITMAN:  -- this is part of my argument.  So

23   I won't -- as documents are being discussed I'm not going to

24   make a hearsay objection, but I want you to know that I'd

25   like to object to all of the Madoff records.

1          THE COURT:  Well an expert can rely on anything

2     that a reasonable expert could rely on, and if the record is

3     coming in for that purpose it doesn't mean that they

4     necessarily come in for the proof of the contents of the

5     records.

6          MS. CHAITMAN:  Right.

7          THE COURT:  So there's a distinction.

8          MS. CHAITMAN:  Well we've also moved to strike the

9     expert reports, and that's sub judice.  I mean you're

10    allowing the experts to testimony but you --

11         THE COURT:  Do you have a motion to strike the

12    experts' reports?

13         MS. CHAITMAN:  Yeah, the --

14         THE COURT:  Are you aware of that?

15         MS. CHAITMAN:  Because the --

16         THE COURT:  I'm not aware of that.

17         MS. CHAITMAN:  Yeah, because --

18         THE COURT:  Is there a pending motion?

19         MS. BROWN:  It was part of the motions in limine,

20    and I believe Your Honor resolved it at the hearing by

21    ruling that the experts may testify here today.

22         MS. CHAITMAN:  And then you would determine.

23         THE COURT:  The expert reports or expert

24    testimony?  Because the expert reports may be hearsay, but

25    the expert testimony, why can't I hear that?

1           MS. CHAITMAN:  It's the same argument, Your Honor,

2    and we can --

3           MS. BROWN:  Your Honor, we're not moving the

4    expert reports into evidence for today.

5           THE COURT:  Okay.  I got it.

6           MS. CHAITMAN:  Okay.  Thank you.

7           THE COURT:  Call your first witness.

8           MS. BROWN:  Okay.  Your Honor, the trustee will

9    call Lisa Collura to the stand.

10           MS. CHAITMAN:  Excuse me, we had -- Ms. Brown and

11    I had discussed this and we had agreed that Robert Blecker

12    would be called first.  In fact --

13           MS. BROWN:  I hadn't heard back from you as to

14    whether or not he would -- what the order was.

15           MS. CHAITMAN:  Oh, you know what, Mr. Blecker is

16    here and he's arranged his schedule to be here, and if you'd

17    be good enough to accommodate him.

18           THE COURT:  I'm not going to have the -- require

19    the trustee to call -- you know, present the case out of

20    order.  It doesn't sound like it's going to be that long and

21    we'll probably get to him today.

22           MS. CHAITMAN:  But we had specifically discussed

23    this.

24           THE COURT:  Well if she consents that's fine.

25           MS. BROWN:  Can I have a minute?

Page 26

1          THE COURT:  Sure.

2          MS. BROWN:  Your Honor, as accommodation to the

3    witness and to Ms. Chaitman we will allow --

4          THE COURT:  Okay.

5          MS. BROWN:  -- her to proceed with Robert

6    Blecker's examination.

7          THE COURT:  All right.  Mr. Blecker?  Would you

8    raise your right hand, please.

9               ROBERT BLECKER, WITNESS, SWORN

10         THE COURT:  Okay.  Please take a seat and speak

11   into the microphone.  You can move it closer.

12         THE WITNESS:  Yes, Your Honor.

13                    DIRECT EXAMINATION

14   BY MS. CHAITMAN:

15   Q    Good morning, Mr. Blecker.

16         THE COURT:  And I'll ask you to keep your voice

17   up, Ms. Chaitman.

18         THE WITNESS:  Good morning.

19         MS. CHAITMAN:  Okay.  Sure.

20         THE COURT:  You can use the podium I'll probably

21   hear you better.

22         MS. CHAITMAN:  Is it better from the --

23         THE COURT:  Yeah, I think so.

24         MS. CHAITMAN:  Okay.

25   BY MS. CHAITMAN:

Page 27

```
 1    Q    Can you tell the Court what you do for a living?

 2    A    Yes.  I'm a law professor.

 3    Q    Where?

 4    A    At New York Law School.

 5    Q    And what is the area in which you teach?

 6    A    I primarily teach criminal law and also constitutional

 7    history.  I also teach an Eighth Amendment course on

 8    punishment.  And have in the past taught legal ethics.

 9    Q    Okay.  Can you briefly give the Court your education

10    background?

11    A    I was an undergraduate at Tufts University, I went to

12    Harvard Law School, and after a year in the academy I

13    returned to Harvard as a post-graduate fellow in law and

14    humanities.

15    Q    Okay.  And what did you do professionally after that?

16    A    Upon graduation from law school I became a special

17    assistance attorney general of New York prosecuting corrupt

18    public officials in the New York City criminal justice

19    system.

20    Q    Okay.  And after that what did you do?

21    A    I became a law professor.

22    Q    Okay.  Have you published any articles or books?

23    A    Yes, I have.  There's a crime and punishment memoir

24    called The Death of Punishment that I wrote.  I've written

25    dozens, perhaps hundreds, of shorter -- no, not hundreds --
```

1   dozens of shorter essays and opinion pieces as recently as

2   yesterday.

3   Q    Okay.  Now, are you the son of Aaron or Arthur Blecker?

4   A    Oh, yes I am.

5   Q    Okay.  Would you consider yourself to be a

6   disinterested witness today?

7   A    No, I'm not at all a disinterested witness.  I'm just

8   the opposite, I'm a very interested witness.  I'm an

9   interested witness emotionally.  It's extremely important to

10  me that my father be vindicated.  This has become a central

11  point of concern and angst and anxiety in our family and

12  with him.

13       And then contingently I mean I hope he lives long

14  enough to spend the money that he deserves and hopefully

15  will get, but if he doesn't my sister and I are -- will

16  inherent the estate and we'll split it.  So I guess

17  contingently I have a financial stake in the success, but

18  even more primarily I have an emotional stake in the

19  success.

20       So no, I'm the antithesis of a disinterested witness.

21  Q    And do you fear -- the fact that you are not a

22  disinterested witness will impact the truthfulness of your

23  testimony?

24  A    No, not at all.  I just swore to tell the truth.  I

25  teach perjury in criminal law.  I've published three

1   articles on the nature of truth and the importance to go

2   beyond the limited United States Supreme Court standard in

3   Bronston (ph), which came out of a bankruptcy proceeding,

4   which held that you don't commit perjury as long as you tell

5   the literal truth no matter how deceptive and how misleading

6   it is.  And I'm in print saying that that's the wrong

7   standard, that the standard should be much broader.  That

8   any intentional deceptive statement should constitute

9   perjury.  And it's a little late in the game, I turn 70 this

10  month to start committing it myself.

11      So I take the oath very seriously, I teach it as part

12  of the fundamental course in criminal law that I teach, and

13  also constitutional history.

14      So I'm not at all concerned that though I am an

15  interested witness and I'm the antithesis of a disinterested

16  witness I am still not only capable but deeply committed to

17  telling the truth and not just the literal truth in order to

18  deceive, but truth that's true in context and puts the

19  listener in working touch with reality.

20  Q    Did there come a time when you became aware that your

21  father invested through Madoff?

22  A    Yeah, sure.

23  Q    Do you have a recollection of when that was?

24  A    I can't tell you the exact date.  It was decades and

25  decades ago.  It was within the first few years or couple of

Page 30

1    years that he did.  I don't know that I knew it at the

2    moment that he initially invested, but I knew it soon

3    thereafter within a few years.  But I can't tell you, you

4    know, as we get old and months become years or years become

5    decades.

6    Q    Okay.  When you learned that your father had invested

7    in Madoff what did he tell you about the investment?

8    A    That he had been privileged to be able to do this.

9    That it was a wonderful investment.  That its returns were

10   high and that its risk was very low.  And he was connected

11   with -- through friendship with remote members of family and

12   that they had said that this was a wonderful thing to do and

13   they had allowed him to come in, and if I remember

14   correctly, at a level -- financial level beneath which they

15   were generally accepting clients.  So he was very pleased

16   and he was very pleased at the returns.

17   Q    Do you know when he first invested with Madoff?

18             THE COURT:  I thought he said he knew generally

19   but he didn't know the specific date.

20             THE WITNESS:  Well I know now based on the

21   trustee's records that it's 1981, but I can't tell you of my

22   own direct recollection that it was 1981.  I do not -- I

23   don't know that it was 1981.  But the records say it was and

24   I have no reason -- it's consistent with the basic period of

25   time at which I became aware of it.

Page 31

```
 1    BY MS. CHAITMAN:

 2    Q    Okay.  So in 1981 how old were you?

 3    A    Thirty-three.

 4    Q    And how old was your father?

 5    A    Sixty-nine.

 6    Q    Okay.  And how close were you to your father at that

 7    point in your life?

 8    A    I was and am extremely close.  I love him and respect

 9    him enormously above all other men.

10    Q    And do you live in proximity to his house?

11    A    I do.  I live about 15 to 20 minutes away from him.

12    Q    Okay.

13    A    And visit him frequently.

14    Q    Okay.  Now, what was your father's profession?

15    A    A certified public accountant.

16    Q    Okay.  And is it fair to say that he was successful?

17    A    Yes, he grew up in poverty and without any connections

18    or help, just worked his way up and out of the slums and

19    became middle class, upper middle class practice -- with a

20    good practice, sole practitioner.  But yes, successful and

21    ethical, and that was part of his success and his sense of

22    his own success.

23    Q    Now, in 1981 he was 69 and that was the year you now

24    know that he opened his Madoff account.  Was he --

25    A    Wait a minute, I'm sorry.  That's right, because he was
```

Page 32

```
 1   born in 1911 so in 1981, he turned 70 in July of '81.

 2   Q    Okay.  So would you say that he -- at the age of 69

 3   that he was functioning mentally as well as he had been?

 4   A    Oh, yes.

 5   Q    Okay.  So there was no deterioration in his --

 6   A    Oh, absolutely not.

 7   Q    Okay.

 8   A    Sharp as a tack.

 9   Q    Okay.  And if I take that forward from 1981 when he was

10   69, 10 years to 1991 when he was 79, how would you describe

11   his mental capacity?

12   A    Still perfectly sharp.

13   Q    No deterioration?

14   A    No.

15   Q    Okay.  And if I take it forward another 10 years to

16   2001 what was his mental condition?

17   A    Extraordinarily sharp for that age.

18   Q    But there was some deterioration?

19   A    If he ever reads this transcript.  I don't even know if

20   there was.  I don't even know -- it's still remarkable given

21   his age, but he's not what he once was.  So I can't tell you

22   exactly the small and slight decline and when it happened.

23   Q    Okay.

24   A    Or has -- or is happening.

25   Q    Now, did you ever observe your father reviewing
```

Page 33

1    statements he received from Madoff?

2    A    Yes.

3    Q    And did he -- is it fair to say that he reviewed them

4    very carefully?

5    A    His care was extraordinary and in some ways

6    frustrating.

7    Q    I'm sorry, what was that?

8    A    In some ways it was frustrating because he expected me

9    -- I eventually and got my daughter into Madoff, that's

10   another reason I'm not a disinterested witness because I too

11   was a Madoff victim.  But he expected of me the same care

12   which I couldn't give, I wasn't capable of reviewing the

13   statements, and yes, he was extraordinarily detailed and is

14   extraordinarily detailed oriented, I'm not.

15   Q    Okay.  Now, when did he stop practicing as an

16   accountant?

17   A    That's difficult to answer.  When he turned 70 my

18   mother insisted that he take on no new accounts, and so from

19   that point on he took on no new accounts, kept his promise

20   and his practice dwindled.  So there's no clear demarcation

21   as to when he stopped practicing.

22   Q    Okay.  As your father got older did you assist him in

23   any way?

24   A    You don't mean physically, you mean --

25   Q    No, for example, if he -- did he drive a car?

Page 34

1    A    No, my father never had a driver's license.  He never

2    drove.

3              THE COURT:  Can I ask you a question?  When was

4    the last PW transaction in Mr. Blecker's account?

5              MS. CHAITMAN:  Aaron Blecker's account?

6              THE COURT:  Yeah.

7              MS. CHAITMAN:  1997.

8              THE COURT:  '97.

9              MS. CHAITMAN:  Yes.

10             THE COURT:  Okay.  So maybe we could confine

11   ourselves to the issues in the case.

12             MS. CHAITMAN:  Okay.

13   BY MS. CHAITMAN:

14   Q    Did you ever drive your father into town for errands?

15   A    Yes.

16   Q    Okay.  And did you ever take him to a bank?

17   A    Yes, I did.

18   Q    Okay.  And did you ever observe that your father was

19   depositing checks received from Madoff?

20   A    No, I didn't specifically observe that he ever

21   deposited checks.  I mean to be fair I wouldn't have

22   necessarily examined the checks to see what checks he was

23   depositing.

24   Q    Okay.

25   A    So no, I never saw checks he deposited from Madoff, but

Page 35

1    that really doesn't show much.

2    Q    Okay.  Because you didn't review the checks he may have

3    deposited?

4    A    No.  No, I would just drive him there, occasionally

5    accompany him to the bank as he got elderly, but not

6    supervise what checks he was depositing.  He handled his own

7    financial matters.

8    Q    Okay.  And you recall, do you not, that when the

9    trustee served discovery demands on me I was in touch with

10   you and asked you to assist me in gathering all of your

11   father's documents?

12   A    I remember that well, yes.

13   Q    Okay.

14   A    We spent hours doing it.

15   Q    I'm sorry?

16   A    I spent hours doing it in the garage going through

17   cartons, moldy cartons where there were Madoff papers.

18   Q    Okay.  And in the course of doing that did you find any

19   check vouchers -- you took out money from Madoff didn't you?

20   A    Yes, we did, that's why we're not Madoff claimants, we

21   did.

22   Q    Okay.

23   A    That was a point of contention with my father who said

24   don't take anything out, I never have and you shouldn't

25   either, and that was one of the very few fights he and I

1    ever had.  But yes, I didn't listen to him, we needed the

2    money, and I did not follow his advice and I took out money.

3    Q    Okay.

4    A    And my daughter's account also.

5    Q    Okay.  Do you remember that the checks for Madoff were

6    a piece of paper with a serrated edge, the bottom half was

7    the check and the top half was the kind of voucher for the

8    check?

9              MS. WOLTERING:  Objection, Your Honor.

10             THE COURT:  Sustained.  It's a leading question.

11   BY MS. CHAITMAN:

12   Q    In the course of your searching through your father's

13   records did you find any documents evidencing that your

14   father had received a check?

15   A    No.  Nor may I add in his search, because the search

16   took two parts.  He searched his file cabinet in the study

17   for all documents pertaining as I gathered them at your

18   request.  He searched his file cabinets and gave me all the

19   documents he had from Madoff.  I then went into the garage,

20   most of the older documents that you have I found in

21   cartons.  I guess all the older documents that you have I

22   found in cartons.  But on more than one occasion I asked

23   him, have you given me everything that you have, because you

24   told me that we had to turn over everything that we had, and

25   I assiduously searched the cartons and spent hours and hours

Page 37

1   and hours.

2        So I did not find any checks and he did not -- or any

3   evidence of any checks, and he never turned over anything to

4   me showing any evidence of any checks.  And of course

5   insisted that there wouldn't be any because that was the

6   point, he -- his standard statement was, I've never

7   withdrawn from Madoff, you shouldn't either.  That's what

8   occasioned that fight when we needed money for an apartment

9   I think for my daughter and we withdraw it.

10  Q    Do you recall that the trustee took the deposition of

11  your father?

12  A    Yes, I do.

13  Q    Okay.  And you attended that deposition didn't you?

14  A    I did.

15  Q    And what was the reason that you attend the deposition?

16  A    To make sure it went smoothly.  I wanted to make sure

17  my father didn't, as he occasionally does, misstate

18  something that's not -- he's a brilliant man, graduated

19  first in his class in the City -- but I wanted to make sure

20  that it came out the way he meant it and that he didn't get

21  agitated.  He was in his late 90's at this point as I

22  recall.

23  Q    Well it was 2004, so no, he was --

24  A    Oh, no he was --

25  Q    -- 104.

Page 38

1    A    He was 104, I'm sorry.

2    Q    He was a mere child.

3    A    A mere child, right.  So obviously I wanted to make --

4    I mean I was concerned, I wanted to make things -- make sure

5    that things went smoothly and that he could be understood.

6    Sometimes he garbles a little, I understand him better than

7    anyone else, and that things were okay.  I mean obviously I

8    love him and I'm concerned about his health.  So yes, I

9    attended it.

10   Q    And at his deposition did he testify that he never took

11   any withdrawals from Madoff?

12   A    Yes, that's --

13            MS. WOLTERING:  Objection, Your Honor.

14            THE COURT:  Sustained.

15   BY MS. CHAITMAN:

16   Q    Did you assist in preparing your father's SIPA claims?

17   A    Yes, I did.  We prepared them together.  I helped

18   supply some of the wording, I typed the document, and of

19   course I said on it that I had -- as I'm required to do --

20   that I had helped him prepare it.  But it was jointly

21   prepared.  It wasn't just I handed him to document and he

22   signed it.  We talked it through.  I mean I write a lot so I

23   phrased it jointly and he corrected things that he wanted to

24   be said, and then just over and over.  I never took anything

25   out of it and there it is.

Page 39

1    Q    Okay.  Would you be good enough, you have a binder on

2    your --

3    A    I do, yes.

4    Q    Yes.  Would you turn to Exhibit 15?

5             THE COURT:  Do I have one?

6             MS. CHAITMAN:  Your Honor --

7             THE WITNESS:  I'm sorry, 1-5?

8    BY MS. CHAITMAN:

9    Q    1-5.

10   A    Yes, I see it.  I'm there.

11   Q    Is this one of the customer claims that you assisted

12   your father in preparing?

13   A    Yes.

14   Q    Okay.  And if you'd look at page 2 where it says a name

15   of security it says, "See statement attached.  I never

16   withdraw any funds."  Was it your idea to -- whose

17   handwriting is that?

18   A    It's his handwriting, it was his idea.  I said daddy,

19   it doesn't belong there, and he said, I want to say it, and

20   he put it there, and then there's a statement we attached.

21   That was his idea, that's his handwriting.

22   Q    Now, if you go to page 4 of the claim and on the top of

23   the page there's a question 9, "Have you or any member of

24   your family ever filed a claim" -- excuse me -- it's

25   actually -- "under the Securities Investment Protection Act,

1    if so give name of that broker."  And then your father

2    wrote, "My son, Robert Blecker," and then your address.  Do

3    you see that?

4    A    Well that was in response to who's assisting you.  It

5    says, "Please list the full name and address of anyone

6    assisting you --

7    Q    Of anyone, yes --

8    A    -- in the preparation."

9    Q    -- I misstated that.  Yes, you're right.

10   A    And we wrote -- he wrote, "My son, Robert Blecker," and

11   gave our address, yes.

12   Q    Okay.  And then on the next page there's a

13   February 23rd, 2009 letter.

14   A    Yes.

15   Q    Who wrote this letter?

16   A    Me principally, but us jointly.

17   Q    Okay.

18   A    And I typed it, and he signed it.  But I primarily

19   phrased it, but we went over it and he would correct a word

20   or two.

21   Q    Okay.  Now, in the last paragraph there's a -- the

22   third sentence says, "I never withdrew a penny."

23   A    I'm sorry, would you -- in the last full paragraph?

24   Q    The last paragraph of the third sentence.  "I never

25   withdrew a penny."

Page 41

1    A    Yes.  Yeah.

2    Q    What is that -- why did he repeat that so much in the

3    process of filing these claims?

4    A    Because it was a source of chagrin and anger.  As I

5    said, when he -- when we got involved in the Madoff -- when

6    we ourselves invested and we invested our daughter's money

7    in it as well so it became three generations it was with the

8    understanding that of course you'll never take this out,

9    this will be for the child's education, when we have

10   grandchildren for the grandchildren's education.  Then when

11   there came time that we needed money and we didn't have it

12   liquid and this seems like we could draw it from there we

13   had one of our very unusual fights -- very unusual for us --

14   and he said, this is too good an investment, don't do it,

15   it's not so important to get the apartment, whatever it was

16   at the time, or the car, I don't remember exactly, and I did

17   it nevertheless.

18        So then when the fraud was revealed at the end of 2008

19   of course first of all it looked as if initially he would

20   lose everything, that everybody would lose everything.  And

21   at that point we had already withdrawn a ballot we had put

22   in, we weren't sure what he had put in, but we thought we

23   would -- and I was fearful that we might have withdrawn

24   slightly more than we had put in then we would be subject to

25   the claw backs.  But at that point of course he would've

1    said, well at least thank heavens I got out what I put in, I

2    wish I had withdrawn more, but it was nothing like that.

3    What he said was just the opposite, which was, I should've

4    taken it out.  You were right, I was wrong, I should've

5    taken it out.

6        So this has been a source of deep anxiety and

7    frustration for him that he believed in it.

8            THE COURT:  Stop, let me stop you.

9            THE WITNESS:  Madoff would never do it --

10           THE WITNESS:  Sorry, Your Honor?

11           MS. WOLTERING:  Objection, Your Honor.  How is

12   this relevant to the PW proceedings and whether or not

13   Mr. Blecker got PWs?  Furthermore, it's all hearsay.

14           THE COURT:  Well I thought you were going to

15   object when he said but he would have said, which is

16   speculation.

17           MS. WOLTERING:  Well that's calls for speculation.

18           THE COURT:  But there's a lot in that answer.  And

19   I got it that Mr. Aaron Blecker told Mr. Robert Blecker and

20   he said all over that he never withdrew a penny.  I've got

21   it.  Okay?  Let's move along.

22   BY MS. CHAITMAN:

23   Q    If you'd look at Exhibit 16.  This is the second SIPA

24   claim that you filed and prepared?

25   A    Yes.

Page 43

1    Q     Do you see that?

2    A     Yes.

3    Q     Okay.  And --

4    A     Well that we jointly prepared.

5    Q     Yeah.  And I think that it has all of the same

6    notations and points that we just discussed.

7    A     Except that he wrote, "I never withdrew any funds,"

8    instead of I never withdrew -- but again, that was his idea,

9    not mine.

10   Q     Right.  Right.  Now, if you'd look at Exhibit 17.  This

11   is the trustee's determination letter sent to your father

12   dated October 19th, 2009.

13   A     Yes.

14   Q     If you look on page 4 of this letter it indicates that

15   the first deposit was $50,000 on September 22nd, 1986.  Do

16   you see that?

17   A     Yes, I do.

18   Q     Now, in 2009 did you know when your father had first

19   invested through Madoff?

20            MS. WOLTERING:  Objection, Your Honor.  She's

21   already elicited this testimony that he doesn't know the

22   exact date, but that he assumed it was --

23            THE COURT:  Yeah.  What's the purpose of this

24   testimony, Ms. Chaitman?  This is a transferee account isn't

25   it?  It's the 22 account?

1              MS. CHAITMAN:  Yes, Your Honor.

2              THE COURT:  I mean it just --

3              MS. CHAITMAN:  Yeah, it turned into 156.

4         What the evidence will show, Your Honor, is that

5    neither Aaron Blecker nor Robert Blecker knew when

6    Mr. Blecker first invested.  And the trustee's determination

7    letter indicated that the first investment was in 1986.

8              THE COURT:  I've seen other letters that said

9    1981.  For this account it was 1986.

10             MS. CHAITMAN:  Right.  And I'd like to -- I'm

11   going to be introducing those 1981 statements.

12             THE COURT:  But he's not the witness to do that.

13   He doesn't know.  The letters show whatever they show.  I

14   don't doubt there's an objection to a determination letter

15   because it's part of the history of the claim, but asking

16   Mr. Blecker, the witness, to testify about this --

17             MS. CHAITMAN:  Okay.

18             THE COURT:  -- it just doesn't make any sense, and

19   he didn't even prepare these letters, you know, the --

20             MS. CHAITMAN:  Okay.

21             THE COURT:  -- customer claims are different.

22             MS. WOLTERING:  Your Honor, for the record, just

23   to clarify, Exhibit 17 that Ms. Chaitman is referring to,

24   the document -- the rear of that letter it's an improper

25   compilation.  This was not part -- it looks like a scratch

```
1    pad handwritten note.  That is not part of the trustee's --

2              THE COURT:  Oh, yeah.

3              MS. WOLTERING:  -- determination letter.  It was

4    improperly compiled into this exhibit.

5              THE COURT:  Well --

6              MS. WOLTERING:  So I just note it for the record.

7              THE COURT:  When, as, and if testimony exhibit is

8    offered --

9              MS. WOLTERING:  Yes.

10             THE COURT:  -- you can raise that issue.

11             MS. CHAITMAN:  I agree, Your Honor, that's

12   obviously a mistake.

13   BY MS. CHAITMAN:

14   Q    Mr. Blecker, would you be good enough to turn to

15   Exhibit 18?

16   A    Yes.

17   Q    Now, did you assist your father in writing this letter?

18   A    No.

19   Q    Okay.  So this was a letter dated November 7th, 2009

20   that was sent to the bankruptcy court to judge -- to the

21   attention of Judge Lifland?

22   A    Yes.  I probably wouldn't have let him sent it in that

23   form with the scratch outs on there, but he was indignant

24   and insistent.

25   Q    Okay.  Now, if you'd look at Exhibit 19, please.  This
```

Page 46

1   is an affidavit of your father.  Did you have any role with

2   respect to this document?

3   A    Yes.  Yes, I did.

4   Q    Okay.  And can you tell us what your role was?

5   A    Yes, we -- I helped him prepare it and we tried to make

6   the case as clearly as possible.  The -- we didn't know how

7   much -- that was the relevance of the '81 versus the '86, we

8   didn't know when he started or how much he had invested and

9   at this point we were relying on the trustee's records that

10  it was about 200,000.  But he gave me various figures and we

11  were trying to determine what he was owed and what it had

12  accreted to and what it started at.  So this was my best

13  attempt, I'm no expert in this stuff, and this was my best

14  attempt with him.

15  Q    Okay.  Now, if you'd like at Exhibit 21?

16  A    Yeah.

17  Q    This is with respect to the joint account that your

18  parents had; is that right?

19  A    I think so.

20  Q    It says, "Arthur Blecker, Sophie Blecker --

21  A    Oh, I'm sorry, yes, I don't need to go beyond that.

22  Q    Yeah.

23  A    Right.  Yes.

24  Q    Okay.

25  A    Clearly.

1    Q    Okay.  And then if you look at the chart, the trustee's

2    chart on page 4, it doesn't indicate the first date that

3    there was an investment in the joint account.  Isn't that

4    right?

5             MS. WOLTERING:  Objection, Your Honor.

6             THE COURT:  Sustained.  He didn't prepare the

7    document, don't ask him about the document.

8    BY MS. CHAITMAN:

9    Q    If you'd look at Exhibit 22, Mr. Blecker?

10   A    Yeah.

11   Q    Is this a document that you assisted your father in

12   preparing?

13   A    Well I must have because I typed -- I mean he never

14   typed it.  Yes.  Yes.

15   Q    Okay.  And on the second page there's wording that's in

16   bold, do you see that, it begins, "I never withdrew a

17   penny"?

18   A    Yes.

19   Q    Okay.  And he talks about the fact that he had over two

20   and a half million dollars in the account?

21   A    Yes, about 2.6 I think.

22   Q    Now, when you discussed with your father what the

23   appreciation in his accounts had been what was -- what did

24   he tell you as to what he understood his appreciation had

25   been?

Page 48

```
 1    A    That it had done very well, that some years it had held

 2    higher --

 3              THE COURT:  Hold on.

 4              MS. WOLTERING:  Objection, Your Honor, calls for

 5    hearsay.

 6              THE COURT:  Hearsay, sustained.

 7              Isn't all this information in the record already

 8    through his deposition?  He has repeatedly -- Mr. Aaron

 9    Blecker has repeatedly said that it was a good investment

10    and he didn't withdraw any money.  Didn't he?  Isn't that

11    what the record -- so you're asking this witness the same

12    question over and over again.

13    BY MS. CHAITMAN:

14    Q    If you'd be good enough to turn to Exhibit 24?  Did you

15    ever review the actual statements that your father received?

16    A    At the time he received them, no.

17    Q    Okay.

18              THE COURT:  Is this a statement that BLMIS was

19    sending out?

20              MS. CHAITMAN:  Yes.

21              THE COURT:  Because it doesn't look like the

22    statements I'm used to seeing.  Was there a change over and

23    what was it 1997?

24              MS. CHAITMAN:  Judge, I think what you're looking

25    at is a document produced by the trustee, which was on a
```

Page 49

1    computer system, it wasn't printed on letterhead.  I think

2    that may be the difference.

3              THE COURT:  Oh, I don't know.

4              MS. WOLTERING:  There's an overlay when we were

5    printed to go to the customers so the internal BLMIS books

6    and records is missing the overlay that was printed on the

7    paper that then they printed the statement onto.

8              THE COURT:  Thank you.  So this is a statement

9    dated September 30th, 1986, right?

10             THE WITNESS:  Yes.  Yes.

11   BY MS. CHAITMAN:

12   Q    Now, Mr. Blecker, if you'd be good enough to look at

13   Exhibit 34?

14             THE COURT:  Is there a question about 24?

15             MS. CHAITMAN:  I had asked him if he had ever

16   reviewed these at the time his father received them.

17             THE COURT:  Okay.

18             THE WITNESS:  I'm at 34.

19   BY MS. CHAITMAN:

20   Q    You're at 34?  Okay.  And what is the date of this

21   statement?

22   A    Actually mine starts with page 2 of 5.

23   Q    Yeah.  You know what, ignore that part of it.

24   A    Oh, okay.

25   Q    Just look at the date.

```
1              MS. WOLTERING:  Your Honor, I'd object to --

2              THE COURT:  Sustained.  You're just asking the

3    witness to read from documents, Ms. Chaitman.  Is this

4    document going to be in evidence?

5              MS. CHAITMAN:  Yes.  There's no dispute --

6              THE COURT:  Well if it's going to be --

7              MS. CHAITMAN:  -- from the trustee that these are

8    admissible.

9              THE COURT:  Okay.  If it's going to be in evidence

10   then we have it in evidence --

11             MS. CHAITMAN:  Right.

12             THE COURT:  -- and it says what it says.  I don't

13   need Mr. Blecker to read it.  If it's not going to be in

14   evidence for whatever reason then he shouldn't be reading

15   from it, so.

16             MS. CHAITMAN:  These are documents to which

17   there's been a stipulation.

18             THE COURT:  Okay.  But I'm just -- you don't have

19   to ask Mr. Blecker --

20             MS. CHAITMAN:  Okay.

21             THE COURT:  -- about what these documents say.

22             MS. CHAITMAN:  Okay.

23             MS. WOLTERING:  There's no stipulation as to the

24   admissibility of the --

25             MS. CHAITMAN:  Of these records produced by the
```

Page 51

1    trustee?

2                THE COURT:  Let us deal with that.  Let's --

3                MS. CHAITMAN:  Yeah.

4                THE COURT:  -- let Mr. Blecker finish his

5    testimony so he doesn't have to hang around here, unless he

6    wants to.

7                THE WITNESS:  Thank you, Your Honor.

8                THE COURT:  Go ahead.

9    BY MS. CHAITMAN:

10   Q    Mr. Blecker, if you'd be good enough to look at the

11   account number on the top line of Exhibit 34?

12               MS. WOLTERING:  Objection, Your Honor.

13               THE COURT:  Well let me hear what the question is.

14   BY MS. CHAITMAN:

15   Q    It's 1-00214-1-5.  Can you see that?

16   A    Yeah.  Yes.

17   Q    Prior to seeing this document were you aware that your

18   father had this account number?

19   A    I couldn't testify to that.  I didn't -- I wasn't aware

20   of the numbers of the accounts or what they were.  So the

21   answer I guess has to be no.

22   Q    Okay.

23   A    I'm still not a master of the numbers of the accounts.

24   Q    Would you be good enough to look at Exhibit 50?  This

25   is a collation of letters from a customer named Barbara

Page 52

1    Alpern (ph) Engel, and I'd like you to look at the second

2    document in this exhibit.

3    A    Yes.

4    Q    You see it says --

5               MS. WOLTERING:  Objection, Your Honor.

6               THE COURT:  Hold on.  What's the question?

7               MS. WOLTERING:  Counsel has -- these documents are

8    -- relate to other customers.

9               THE COURT:  Yeah, yeah.

10              MS. WOLTERING:  She's just asking the witness to

11   read the documents.  He has no knowledge.

12              THE COURT:  Yeah, what's -- what are you going to

13   ask him about these documents?

14              MS. CHAITMAN:  These documents -- because the

15   evidence shows, Your Honor, that Madoff required customers

16   to send letters if they wanted withdrawals, whether profit

17   withdrawals or other withdrawals.

18              THE COURT:  But these are unsworn letters.

19              MS. CHAITMAN:  I'm sorry?

20              THE COURT:  They're unsworn letters.

21              MS. CHAITMAN:  These are documents that were

22   produced by the trustee and Madoff testified that he

23   retained in his files letters from the customers.  He also

24   testified that he would never accept a request for a

25   withdrawal.

```
 1              THE COURT:  Are you going to ask Mr. Blecker to his

 2   knowledge did his father ever write a letter to Madoff

 3   requesting a withdrawal?  Is that where this is going?

 4   Where Ms. Engel ever requested a withdrawal just seems to me

 5   to --

 6              MS. CHAITMAN:  Right.

 7              THE COURT:  -- be irrelevant, at least to what this

 8   witness might know.

 9              MS. CHAITMAN:  Okay.

10   BY MS. CHAITMAN:

11   Q    Mr. Blecker, when you withdrew money from Madoff did

12   you do it with a telephone request?

13              MS. WOLTERING:  Objection, Your Honor.  What Mr.

14   Blecker did is irrelevant --

15              MS. CHAITMAN:  Your Honor --

16              MS. WOLTERING:  -- to what his father did or did

17   not do.

18              THE COURT:  Well, you know, you're going to have

19   testimony about the way the business worked.

20              MS. WOLTERING:  But --

21              THE COURT:  And I understand the extra --

22              MS. WOLTERING:  -- he never had a PW account.  His

23   accounts were different.  They were split strike accounts.

24              THE COURT:  I'm over -- I will overrule that

25   objection.  Go ahead.
```

Page 54

1    BY MS. CHAITMAN:

2    Q    When you -- you testified earlier that you withdrew

3    money from --

4    A    Yes, we did.

5    Q    And did you do it by making a phone call to Madoff?

6    A    No.  We had to put it in writing, a request in writing.

7    Q    How did --

8    A    We initial -- I think we initially called and then they

9    -- if I remember -- and I'm vague on this.  I think we

10   initially called and then they said we had to request it in

11   writing and we did.

12   Q    Okay.  If you would look at Exhibit 61 can you just

13   identify this as the third SiPC claim that you helped your

14   father prepare?

15           MS. WOLTERING:  I'm sorry.  What was the number?

16           THE COURT:  61.

17       (Pause)

18           THE WITNESS:  Yeah.  Yes.  This is very much like

19   the other two.

20   BY MS. CHAITMAN:

21   Q    When you were preparing the SiPC claims did your father

22   tell you how many accounts he had had with Madoff over the

23   years?

24   A    I don't -- I don't remember that we discussed the exact

25   number of the accounts.  The -- what he had told me was that

Page 55

1    he -- well, I knew that he had at least these three.  I knew

2    that as some point he had been forced to consolidate them;

3    that their amounts were great enough and that the demand had

4    been made upon him that they be consolidated.  I don't

5    recall distinctly discussions about the exact number of

6    accounts.  No.

7    Q    Okay.  And in the course of your assembling the

8    documents to produce to me were you able to determine the

9    total number of accounts that your parents had?

10   A    No.

11         (Pause)

12             MS. CHAITMAN:  I have no further questions.

13             THE COURT:  Any cross-examination?

14             MS. WOLTERING:  Yes.  One moment, Your Honor.

15         (Pause)

16                      CROSS-EXAMINATION

17   BY MS. WOLTERING:

18   Q    Good morning, Mr. Blecker.

19   A    Good morning.

20   Q    I promise I'll keep this short.

21   A    I'm sorry.  I didn't hear you.

22   Q    I said I promise I'll keep this short.

23   A    No.  It's okay.  I appreciate your -- the courtesy of

24   allowing me to testify first.  I really do.

25             MS. WOLTERING:  Shannon, if you could please pull

Page 56

1    up trustees' Exhibit 82.

2    BY MS. WOLTERING:

3    Q    I'm going to --

4    A    Is that in this -- that's not in this book.

5    Q    No.

6              THE COURT:  It's going to be on a screen.

7              MS. WOLTERING:  It will pop up on your --

8              THE COURT:  On your --

9              MS. WOLTERING:  Right there.

10             THE COURT:  -- on your screen right there.

11             THE WITNESS:  Oh.  Oh.

12             MS. WOLTERING:  Yes.

13             THE COURT:  We're very high tech here.

14        (Laughter)

15   BY MS. WOLTERING:

16   Q    Mr. Blecker, you testified that the -- that you found

17   documents in your father's garage, correct?

18   A    Yes.

19   Q    And --

20   A    Yes.

21   Q    -- I will represent to you this is one of the documents

22   your father produced.  Does this look familiar?

23   A    It looks consistent with the kinds of documents I

24   found.

25             THE COURT:  What exhibit is this?

Page 57

```
 1              MS. WOLTERING:   82.  You should be able to tell in
 2      the top left corner, Your Honor.
 3              Shannon, if you could highlight the right two
 4      corners for -- the right two columns, please, and expanding
 5      out the right two columns of Exhibit 82.
 6      BY MS. WOLTERING:
 7      Q     Is this your father's handwriting?
 8      A     Yes.
 9      Q     And when you say he methodically reviewed the customer
10      statements, is this what you were talking about?
11      A     That and when he made up his tax returns he went
12      through -- Madoff would issue monthly large slips and then
13      smaller slips reflecting each trade.  I couldn't deal with
14      the smaller slips for my own account.  He reviewed all the
15      small slips and he reviewed the large slips.
16      Q     So this is his handwriting and his notations?
17      A     Yes, it is.
18      Q     Thank you.
19              MS. WOLTERING:  I have nothing further, Your Honor.
20              THE COURT:  Okay.  You can step down.  Thank you.
21              Do you have any redirect?
22              MS. CHAITMAN:  No, I don't.
23              THE COURT:  Thank you.
24              MS. BROWN:  Your Honor, at this time the trustee
25      would like to call Lisa Collura to the stand.
```

Page 58

1          THE COURT:  Sure.

2          MS. BROWN:  Thank you, Your Honor.

3          THE WITNESS:  Your Honor, do I --

4          THE COURT:  Just leave that there.  They may need

5     it for another witness.  Thank you.

6       (Pause)

7          THE COURT:  Would you raise your right hand,

8     please, Ms. Collura?

9                    LISA COLLURA, WITNESS, SWORN

10          THE COURT:  Okay.  Please take a seat and speak

11     into the microphone.

12          Go ahead.

13          MS. VANDERWAL:  Good morning, Your Honor.  Amy

14     Vanderwal for the trustee.

15                    DIRECT EXAMINATION

16     BY MS. VANDERWAL:

17     Q    Good morning, Ms. Collura.

18     A    Good morning.

19     Q    Please introduce yourself to the Court.

20     A    My name is Lisa Collura.  I am a senior managing

21     director at FTI Consulting in the forensic and motivation

22     consulting practice.

23          THE COURT:  Would you keep your voice up and --

24          THE WITNESS:  Yes.

25          THE COURT:  You can pull the microphone closer to

```
 1   you.  Thank you.

 2           Go ahead.

 3           THE WITNESS:  Is that better?

 4           THE COURT:  Yes.  Much better.

 5           THE WITNESS:  Okay.

 6           THE COURT:  Thank you.

 7   BY MS. VANDERWAL:

 8   Q    And how long have you worked at FTI?

 9   A    Almost 17 years.

10   Q    Can you describe the types of things you've done while

11   you've been there?

12   A    I manage and direct large scale financial fraud

13   investigations and those investigations involve forensic

14   accounting analysis, tracing flow of funds between and among

15   accounts and among entities.  Some of my assignments have

16   also involved technical accounting as well as auditing

17   issues.

18   Q    And why are you here with us today?

19   A    I'm here to talk about the analysis that my team has

20   conducted of the BLMIS books and records.  I'm specifically

21   here to offer my opinions on my reconciliation that I

22   conducted of all the cash transactions on the customer

23   statements, including the PW transactions.

24   Q    And can you briefly summarize those findings and

25   conclusions?
```

1   A   I was able to reconcile 99 percent of the cash

2   transactions that were reflected on the customer statements

3   in the two available BLMIS bank records for the time period

4   that those bank records were available.  Those -- that 99

5   percent included nearly a hundred percent of the PW

6   transactions for that same time period.

7           THE COURT:  What time period?

8           THE WITNESS:  The ten -- it's a ten-year time

9   period that we had available records, December -- available

10  bank records which was December 1998 to December 2008.

11          THE COURT:  Thank you.

12          THE WITNESS:  In addition to the ten-year period I

13  was also able to reconcile over 50 percent of the PW

14  transactions that spanned all time to other available

15  records.

16  BY MS. VANDERWAL:

17  Q   And let's discuss some of your background.  Where did

18  you attend college?

19  A   I went to John Carroll University and received a

20  bachelors of science in administration and a specific in

21  accounting degree.

22  Q   And do you hold any professional licenses or

23  certifications?

24  A   I do.  I am a certified public accountant, a CPA.  I am

25  a certified fraud examiner, CFE, and I'm also certified in

Page 61

1    financial forensics.

2    Q    Can you explain --

3            THE COURT:  What was the -- what was the last one?

4            THE WITNESS:  It's a CFF.  It's certified in

5    financial forensics.

6            MS. VANDERWAL:  Let's air that out.

7            THE COURT:  Thank you.

8    BY MS. VANDERWAL:

9    Q    What does that mean to be certified in financial

10   forensics?

11   A    So the certification is recognized by the AICPA, the

12   American Institute of Certified Public Accountants.  It --

13   in order to get the certification you need to meet -- pass a

14   test and meet certain professional experience requirements

15   as well as continuing education.

16   Q    And you also mentioned that you were a certified fraud

17   examiner.  What are the requirements for that?

18   A    It's very similar.  You need to pass an exam as well as

19   meet professional experience requirements in continuing

20   education every year.

21   Q    Are you also a member of any professional

22   organizations?

23   A    Yes.  I am a member of the AICPA, the American

24   Institute of Certified Public Accountants.  I'm a member of

25   the ACFE which is the Association of Certified Fraud

Page 62

1   Examiners, and I'm also a member of the New York Society of

2   CPAs.

3   Q    How long have you been working in forensic accounting

4   investigations?

5   A    For my whole time at FTI which is nearly 17 years.

6   Q    And can you briefly describe that field, the field of

7   forensic accounting?

8   A    Forensic accounting is a specialty area of accounting

9   where CPAs or accountants will gather and collect evidence

10  and they'll review and analyze that evidence.  The evidence

11  often includes financial records because this review in many

12  times is in connection with the fraud.  So the -- a forensic

13  accountant will generally review and analyze this evidence

14  and interpret the evidence and summarize it in -- to be

15  presented to a court or another trier of fact.

16  Q    Did you rely on your background and expertise in

17  forensic accounting for the work you performed for the

18  trustee?

19  A    I did.

20  Q    Have you been accepted as an expert in forensic

21  accounting previously?

22  A    I have.  I have testified as an expert in a matter

23  related to the Revco fraud a number of years ago.  I have

24  also testified in a matter for -- in --

25          THE COURT:  Sorry.  Go ahead.

Page 63

1            THE WITNESS:  I've also testified in a matter in

2      the UK courts related to Madoff International Securities

3      Limited or MISL, and I've also testified in a number of

4      other Madoff related matters.

5      BY MS. VANDERWAL:

6      Q    Did you submit any expert reports in connection with

7      your work in Revco?

8      A    I did.  I submitted two expert reports in the Revco

9      matter.

10     Q    And what did they -- that entail?

11     A    So the work that I did in Revco and my related expert

12     reports related to the fraud investigation that I conducted

13     related to the alleged fraud at Revco.  The specific

14     analysis involved tracing flow of funds through various

15     Revco entities.  My focus there was on year end and quarter

16     end transactions and what happened around those time periods

17     and also there was a very large related party receivable

18     that was kind of at the center of the fraud and I traced the

19     roots of that receivable and looked at how that receivable

20     grew over time.

21     Q    And you also mentioned MSIL.  What did you -- what work

22     did you do in connection with that proceeding in London?

23     A    So the proceeding in London I was asked to perform a

24     tracing analysis with respect to transfers between BLMIS in

25     the U.S. and MSIL in the UK.  I also looked at transfers to

1   and from bank and brokerage accounts held by Bernie Madoff

2   personally.

3       My specific -- one of the specific focuses in that

4   matter was looking at the source of those transfers and

5   where those funds were coming from.

6   Q    And you also mentioned other work with the trustee in

7   this liquidation.  Can you very -- sorry.  Can you very

8   briefly describe what that work entailed?

9   A    Yes.  So there's a number of adversary proceedings

10  brought on by the trustee and I have issued dozens of expert

11  reports in those proceedings.  They involve my

12  reconciliation and tracing analysis specific to the accounts

13  that are at issue in those proceedings, very similar to the

14  analysis that I conducted for the PW transactions.

15  Q    Are you being compensated for your time working for the

16  trustee?

17  A    I'm not personally, but FTI is.

18  Q    Do you know how much FTI is compensated for your time

19  in this proceeding?

20  A    At the time that I issued my reports in this proceeding

21  my hourly rate was $554 an hour.  My current hourly rate in

22  the Madoff matters generally is $654 an hour.

23  Q    Ms. Collura, do you have any financial interest in the

24  outcome of this proceeding?

25  A    I do not.

1    Q    Okay.

2         MS. VANDERWAL:  Your Honor, based on the foregoing

3    testimony I would proffer Lisa Collura as an expert in

4    forensic accounting.

5         THE COURT:  Any objection?

6         MS. CHAITMAN:  I do have an objection because I

7    don't think that the witness has testified that she has any

8    expertise other than if you look at her report as counting -

9    - she has no expertise in determining whether checks were

10   actually sent to customers.

11        THE COURT:  Well, she's a forensic accountant.  She

12   was just tracing the documents and I assume she will explain

13   the confirmations that she could or could not find that

14   coincided with the PW notations on the customer statements.

15        MS. CHAITMAN:  Right.  But she's already indicated

16   that the issue she was retained to determine was the

17   documentation with respect to profit withdrawals.  As Your

18   Honor has been told, profit withdrawals ended in 1997.

19        THE COURT:  For Mr. Blecker.

20        MS. CHAITMAN:  No, for everybody.

21        THE COURT:  That's --

22        MS. VANDERWAL:  That is not --

23        THE COURT:  There's no evidence of that.

24        MS. CHAITMAN:  Well, the -- I don't believe there

25   were any profit withdrawals for the period from December

Page 66

1    1998 through 2008 when she said she was able to confirm all

2    the transactions.  They -- she defined the transactions not

3    as profit withdrawals, but as cash transactions.

4            THE COURT:  No.  But let --

5            MS. CHAITMAN:  So --

6            THE COURT:  She's being offered as an expert in

7    forensic accounting and specifically with the PW

8    transactions confirming or not confirming that PW

9    transactions represented actual withdrawals by the customer.

10           Do you have any objection to her expertise to do

11   that and, if so, tell me what it is.  I understand the

12   argument about -- that there were no records prior to 1998

13   and as I said before I'm being asked to infer that if those

14   records existed they would also support profit withdrawal

15   actions.  Again -- but that's -- you know, that's a decision

16   I'll make after hearing all the evidence.  But the question

17   is whether she's qualified to testify as to the forensic

18   accounting of the PW transactions.

19           MS. CHAITMAN:  Your Honor, I don't and when --

20           THE COURT:  You don't what?

21           MS. CHAITMAN:  I don't think she's qualified as an

22   expert --

23           THE COURT:  Okay.  Just tell --

24           MS. CHAITMAN:  -- to testify.

25           THE COURT:  -- me why.

1          MS. CHAITMAN:  Because first of all she clouded her

2     conclusions by including non-profit withdrawal transactions.

3          THE COURT:  I don't know what her conclusions are.

4     I don't even know what her testimony is.

5          MS. CHAITMAN:  Okay.  Well, can we -- can I

6     preserve my objection and then you'll --

7          THE COURT:  Well, you can -- I guess you can always

8     object that it's beyond the scope of her expert report.

9          MS. CHAITMAN:  Well, in her expert report --

10          THE COURT:  If her conclusions are unclear, I mean,

11     maybe that will go to the weight, but not the admissibility

12     of her testimony.  That's what cross-examination is for.

13          MS. CHAITMAN:  Okay.

14          THE COURT:  All right.

15          MS. CHAITMAN:  Okay.

16          THE COURT:  I'm satisfied that the witness is an

17     expert in forensic accounting and that PW issue is a poster

18     child for forensic accounting.  So she's qualified to

19     testify.

20          MS. VANDERWAL:  Thank you, Your Honor.

21     BY MS. VANDERWAL:

22     Q    When did you start working on the Madoff case, Ms.

23     Collura?

24     A    I was part of the team at FTI that started in December

25     of 2008 and --

Page 68

```
 1              THE COURT:  Please.  It's -- it's very distracting.
 2              MS. CHAITMAN:  I'm sorry.
 3              THE COURT:  Go ahead.  I'm sorry.
 4              THE WITNESS:  FTI -- in December 2008 FTI was
 5    retained by counsel to the trustee to analyze and
 6    reconstruct the books and records of BLMIS.
 7    BY MS. VANDERWAL:
 8    Q    And what was your role in connection with that
 9    engagement?
10    A    I specifically was tasked with looking at the cash
11    transactions that were reflected on the customer statements
12    of BLMIS accounts and specifically looking at reconciling
13    those cash transactions to available BLMIS bank records.
14    Later I was also asked to conduct a tracing analysis to
15    identify where transfers went -- when transfers left BLMIS
16    if I could trace where those transfers went to.
17    Q    Could you please explain what you mean by reconcile?
18    A    Sure.  So reconcile means I matched or I agreed or I
19    determined consistency between two sources of information.
20    Particularly in this case it was again the cash transactions
21    reflected on the customer statements compared to one source
22    including the BLMIS bank records, but also other sources of
23    information.
24    Q    And is this process of reconciliation something that's
25    typically employed by a forensic accountant?
```

1    A    Yes.  I would say that forensic accounting assignments

2    generally involve reconciliation.

3    Q    And you also mentioned tracing.  Can you explain what

4    tracing means to you?

5    A    Tracing is following the flow of funds from one bank

6    account to another.  In this case it was looking at when the

7    funds left BLMIS bank accounts could I identify the bank

8    account that those funds went to.

9    Q    And is tracing an activity typically performed by

10   forensic accounting?

11            THE COURT:  I'm -- I can't hear your questions.

12            MS. VANDERWAL:  All right.

13   BY MS. VANDERWAL:

14   Q    Is tracing something that's typically performed by

15   forensic accountants?

16   A    It is.

17   Q    Turning now specifically to the profit withdrawal

18   matter how did you begin working on issues related to PWs?

19   A    In or about 2015 I was asked to conduct a

20   reconciliation analysis specific to the PW transactions and

21   looking at the PW transactions as reflected on the customer

22   statements reconciling those transactions to BLMIS bank

23   records that were available to me, correspondence in

24   customer files that were maintained at Madoff with the

25   Madoff records as well as any documents that were produced

1    or received by the trustee.

2    Q    Did you prepare any reports?

3    A    I did.  I prepared -- the first report that I prepared

4    was in July 2015 and then I issued a supplemental report in

5    December of 2015.

6    Q    Can you briefly describe those reports, please?

7    A    The July report essentially addressed four areas.  The

8    first area was what I refer to as my global reconciliation

9    and this is where I looked at all the cash transactions,

10   cash deposits and withdrawals that were reflected on the

11   customer statements during the ten-year period for which we

12   had available bank records.

13        Secondly, and more specifically to PW, I was asked to

14   reconcile PW transactions again to the BLMIS bank records,

15   also to correspondence or other documents containing

16   customer files and other records that were received by the

17   trustee.

18        Thirdly, I was asked to look at the -- with respect to

19   the PW transactions if they were withdrawals in the form of

20   a check to specifically look at the check payee of those

21   with -- related to those withdrawals and if it was in the

22   form of a wire transfer to specifically look at the wire

23   beneficiary and reconcile that information to the BLMIS

24   account holder.

25        And then lastly I was asked to trace PW transactions

Page 71

1    from BLMIS to bank accounts held by the account holder for

2    the time period for which I had available BLMIS bank

3    records.

4    Q    That was your June report, and what did you do in your

5    December report?

6    A    So my December report was much narrower than my July

7    report.  It was specific to the PW transactions in the

8    participating accounts at that time.  And I also had

9    reviewed additional documents that had been received by the

10   trustee since July 2015.

11   Q    To prepare those two reports what documentation did you

12   refer to or use?

13   A    I looked at BLMIS bank records.  I looked at the

14   customer statement data which contained the cash deposit and

15   withdrawal transactions.  I looked at the documentation

16   contained in customer files as well as documents produced to

17   the trustee.

18   Q    Let's start with the BLMIS bank records.  Can you

19   generally describe what you mean when you say BLMIS bank

20   records?

21   A    Yes.  So the -- there were a number of bank accounts

22   and lots of bank records that were analyzed and there were

23   over 90 bank accounts either in the name of BLMIS or Bernard

24   L. Madoff that we looked at in order to determine, well,

25   what bank accounts were used for purposes of cash deposit

1    and withdrawals.  And I then determined that based on my

2    analysis that there were three bank accounts used in the

3    ten-year period for customer deposits and customer

4    withdrawals.

5              MS. VANDERWAL:  Put up Demonstrative 1, please.

6    BY MS. VANDERWAL:

7    Q    Ms. Collura, did you prepare this demonstrative?

8    A    I did.

9    Q    Is it an accurate representation of your analysis?

10   A    Yes, it is.

11   Q    Could you please walk us through it?

12   A    So these are the three bank accounts that I just

13   referenced.  The first one listed there right in the middle

14   is the JPMorgan 703 account.  703 is just the last three

15   digits of the account number so for short we would call it

16   as the -- refer to it as the 703 account held at JPMorgan.

17   This was the primary account where cash deposits from BLMIS

18   customers were deposited into.  This account also

19   transferred money to BLMIS customers in the form of cash

20   withdrawals.

21       The JPMorgan 703 account funded the JPMorgan 509

22   account.  Again, the 509 just represents the last three

23   digits of the account number.  We refer to that as the 509

24   account.  The 509 account was a hundred percent funded by

25   the 70 -- transfers from the 703 account.  The 509 account

1    was referred to as a controlled disbursement account which

2    is an account used for checks to -- to write checks from.  I

3    -- you know, a controlled disbursement account is a typical

4    account used by companies that write a lot of checks.

5        And, essentially, what it means is that it only gets

6    funded from the 703 account or the main account, in this

7    case the 703 account to the extent that the funds are needed

8    to cover checks that are clearing on any particular day.  So

9    all of the checks -- all of the outflows or transfers out of

10   the 509 account were in the form of checks and the majority

11   of those checks went to BLMIS customers.

12       Lastly on this chart there is the -- a banker's trust

13   account and this was a third account that we identified as

14   being used for customer transaction -- cash transactions.

15   This account was also funded a hundred percent by the 703

16   account at least for the time period for which we have

17   available records for this account.  And this account had

18   wire transfers as well as checks that were written to BLMIS

19   customers.

20   Q    Okay.  And do you want to take us through the time

21   periods for records that you mentioned for each account?

22   What time periods we have records for each of those

23   accounts?

24   A    Sure.  So the -- for the 703 account and the 509

25   account we have records for the ten-year period that I

Page 74

1    referenced earlier which is December 1998 to December 2008.

2         For the banker's trust account we have records for

3    December -- starting again in December 1998, stopping in --

4    the majority of the activity stopped in May of 1999.  We did

5    find some statements after May of 1999, but based on my

6    review it was very limited activity and then eventually it

7    was closed out.

8         So at least for the time -- the six-month time period,

9    December 1998 to May 1999, there was activity in the

10   banker's trust account.

11   Q    And we're all done with that.  Thank you.

12        What types of documents when you say you reviewed bank

13   records what -- let's start with the 703 account, what types

14   of documents did you review?

15   A    The 703 account had monthly bank statements.  We looked

16   at deposited checks into the 703 account, related deposit

17   slips.  There were canceled checks that were written from

18   the 703 account as well as wire detail or wire information

19   regarding the wire transfers in and out of the account.

20   Q    And were those documents found at BLMIS?

21   A    Some were.  The ten-year period of -- for those records

22   were included in the documents found at BLMIS.  There were

23   also documents produced to the trustee directly from

24   JPMorgan and that -- those documents consisted of a seven-

25   year time period from December 2001 to December 2008.

1    Q    And did you review both the documents, the bank records

2    found at BLMIs and those provided by JPMorgan?

3    A    I did.

4    Q    And was there any difference in form between the two?

5    A    No.  They were substantially consistent in form and

6    content.

7    Q    For the 509 account what documents did you review?

8    A    So for the 509 account the -- I primarily reviewed the

9    canceled checks.  As I mentioned before it was a checking

10   account.  I also reviewed the monthly bank statements for

11   that account.

12   Q    And were those records found at BLMIS?

13   A    The same as for the 703, for a seven-year time period

14   we received records from JPMorgan as well as records for

15   that account within Madoff's records.  For the three years

16   preceding that, so December 1998 to November 2001 those

17   records were only from Madoff's records.

18   Q    And were -- again, was there any difference between the

19   documents found at BLMIS and those produced by JPMorgan?

20   A    No.  They were substantially the same in --

21   Q    Okay.  For the third bank account you mentioned

22   banker's trust, what documents did you review?

23   A    This bank account, again, monthly bank statements

24   because there were checks written from this account there

25   were canceled checks, also wire transfer detail.  There were

1    wire confirmations found in BLMIS records related to the

2    banker's trust account.

3    Q    Did you review all of the BLMIS bank records that were

4    available?

5    A    Either I did or somebody on my team under my direct

6    supervision.

7    Q    And are the bank records of the types we've been

8    discussing the type of evidence typically relied upon by

9    forensic accountants?

10   A    Yes.  They are.

11   Q    So you also mentioned that you reviewed the data from

12   customer statements; is that correct?

13   A    That's correct.

14   Q    And how did you use that data?

15   A    So the data from the customer statements, again,

16   specifically the customer cash transactions, the cash

17   deposits and withdrawals that were reflected on the customer

18   statements, was essentially the source of my reconciliation

19   so that was my starting point of what I was trying to

20   reconcile to other sources of information.

21   Q    When FTI was first engaged by the trustee were you

22   aware that BLMIS was alleged to be a Ponzi scheme?

23   A    Yes.  I was aware of that.

24   Q    How did that impact the reconciliation you were asked

25   to perform using the customer statement data?

Page 77

1    A    It didn't.  It -- my task was to look at the cash

2    transactions on the customer statements and to see if those

3    cash transactions appeared in the bank records, which they

4    did for the time period that I conducted my reconciliation.

5    So the fact that there was an alleged Ponzi scheme really

6    had no impact on what I was tasked to do.

7    Q    Have you had prior experience working on matters where

8    there's alleged fraudulent activity?

9    A    Yes.  Revco was an alleged fraud.

10   Q    And what is your role in that situation?

11   A    So I think in my -- in all my forensic accounting

12   assignments, including Revco and Madoff, part of what I do

13   is when I review documents I look at those documents to

14   identify what's reliable on these documents and what's not.

15   And that's where reconciliation comes into play where I can

16   reconcile to third party documents or other source --

17   sources.

18   Q    And did you find the customer data information here to

19   be reliable?

20   A    The customer cash transactions on the customer

21   statements, yes.

22   Q    The final first I believe you said you relied upon

23   what's BLMIS customer files.  Can you explain how you used

24   the --

25   A    So based on my review of the customer files there was

Page 78

1   often correspondence regarding the cash transactions in the

2   customer accounts.  And that helped me to reconcile those

3   cash transactions, whether it was a request for a withdrawal

4   or a communication regarding a cash deposit into a customer

5   account.

6        So I relied on those documents to reconcile to cash

7   transactions that appeared on the customer statements.

8   Q    In addition to the customer correspondence what else

9   did you observe in the customer files?

10  A    There were -- within the customer files there were

11  other documents including customer agreements or agreements

12  between the customer and BLMIS.  There were also other

13  agreements depending on what the -- what type of account or

14  who was the account holder.  So if -- in other words if the

15  account holder was a trust, the trust agreement would often

16  be included in the customer file.  There was a name and

17  address form which was just had general contact information

18  about the customer.  And sometimes I would see written notes

19  from BLMIS employees.

20  Q    How many customer files have you reviewed?

21  A    I've reviewed hundreds of customer files.

22  Q    And did you rely on the customer files in arriving at

23  your opinions?

24  A    I did.

25  Q    And is a customer file the type of evidence relied on

1    in the ordinary course of forensic accountants?

2    A    These type of customer files are specific to this -- to

3    the Madoff case.  However, I would put those in the

4    categories of company records that are relevant in

5    conducting an investigation of transactions occurring at a

6    company.

7    Q    And based on your review on your reconciliation did you

8    find the contents of the customer files to be reliable?

9    A    I did.  And that's based on the fact that I could

10   reconcile the correspondence in those files to cash

11   transactions on the customer statements.

12   Q    You also mentioned documents -- that you review

13   documents received by the trustee.  Can you explain what you

14   mean by that?

15   A    The trustee received documents from account holders,

16   sometimes in -- as part of an adversary proceeding maybe

17   there were documents attached to a customer claim that was

18   filed with the trustee.  These documents also sometimes came

19   from the -- an account holder's accountants that were

20   produced to the trustee, but they were related to the

21   activity in the customer accounts.

22   Q    And are these types of records records that are

23   typically used by forensic accountants?

24   A    Yes.  I mean, again, I think that these are specific to

25   this matter, but generally I would say that records received

1    from, you know, outside the company can represent documents

2    that were maintained either contemporaneously maintained or

3    just maintained in customer files.  So they -- they are very

4    relevant to an investigation.

5    Q    And did you find the correspondence in the customer

6    files to be reliable?

7    A    The correspondence in the customer files?

8    Q    Uh-huh.

9    A    Yes.

10   Q    And the other documents produced to the trustee?

11   A    Yes.  So the -- you know, I reviewed thousands of

12   documents produced to the trustee and those that were

13   related to the PW transactions were consistent with the

14   activity that I saw in the customer accounts.

15   Q    So we've talked about four categories of material that

16   you reviewed in connection with your reconciliation.  Is

17   there anything else that you reviewed with respect to your

18   PW reconciliation?

19   A    Yes.  I also reviewed deposition transcripts or

20   transcripts of depositions taken in this -- in the PW

21   proceeding of former BLMIS employees.

22   Q    Can you recall which employees?

23   A    I reviewed the transcript from Annette Bongiorno's

24   deposition, Bernie Madoff, Dorothy Kahn (ph), JoAnn Salla

25   (ph), Winifred Jackson (ph), and Alethia Long (ph) I believe

Page 81

1    is her last name.

2    Q    When did you review those reports?

3    A    The --

4    Q    Those transcripts?

5    A    The transcripts.  Just recently over the past month.

6    Q    Did your review of the employee testimony change any of

7    the conclusions that had been contained in your report?

8    A    No.  They did not.  And, if anything, they further

9    supported by conclusions.

10   Q    Let's turn now to the specifics of your global

11   reconciliation.  Can you explain generally how you completed

12   that reconciliation?

13   A    So again my global reconciliation was looking at all of

14   the cash transactions that were reflected on the customer

15   statements for the ten-year period for which we had

16   available bank records.  And during that time period there

17   were over 225,000 cash transactions, again, cash deposits

18   and withdrawals.  So that was one source of information and

19   that was, you know, my starting point for my reconciliation.

20        On the other hand I had the BLMIS bank records,

21   specifically for the three bank accounts that we referred to

22   before, the 703, the 509 and the banker's trust.  So I'm

23   starting with two, but I should mention that within those

24   three bank accounts there was over 150,000 transactions

25   included in those bank accounts.  So I had two very large

Page 82

1    data sets of information that I was tasked with reconciling.

2    And, you know, I -- we methodically approached the

3    reconciliation, but it did require a lot of manual review.

4         But at the end of the day my goal was to account for

5    every one of the 225,000 transactions on the customer

6    statements and the over 150,000 transactions on the bank

7    records.  And, you know, they either agreed or they didn't.

8    Q    And briefly what was the overall result of your

9    reconciliation?

10   A    Overall I reconciled 99 percent of those 225,000

11   transactions on the customer statements to the available

12   bank records.

13   Q    Let's look at an example of how you performed your

14   reconciliation.

15             THE COURT:  Can I just ask the 225,000, does that

16   include the PW transactions?

17             THE WITNESS:  Yes, it does.

18             THE COURT:  How many during that period?

19             THE WITNESS:  There was approximately 5,500 PW

20   transactions in that period.

21             THE COURT:  Thank you.

22   BY MS. VANDERWAL:

23   Q    Okay.  So let's have Exhibit 1, please.  Ms. Collura,

24   what is this document?

25   A    This is customer statement data for the account held by

Page 83

1   Alan Herwitz and Barbara Herwitz (ph) for the month of

2   October 2001.

3   Q    And is there -- what transaction would you like to talk

4   about on this exhibit?

5   A    The first transaction listed there that's dated October

6   1st with the description, check wire, a CW transaction

7   called for $574,241.32.

8   Q    Okay.  Take a look at Exhibit 2, please.  Can you tell

9   us what this document is?

10  A    This is a monthly bank statement for the 703 account

11  for the month of October 2001.

12  Q    Okay.  If you go to page 11, please.  And what

13  information did you use from this document?

14  A    The first transaction listed there is dated October 1st

15  and it's an outgoing wire for $574,241.32.  And it also

16  references in the description the account of Alan R. plus

17  Barbara J. Herwitz.

18  Q    Okay.  So if we look at Exhibit 1 and 2 together would

19  you please walk us through your reconciliation?

20  A    So the main data points that I reconciled was date and

21  in this case they were both dated -- both of these

22  transactions on the customer statement as well as the BLMIS

23  bank records were dated October 1st.  The amounts

24  reconciled.  They're both -- they match exactly in this

25  case.  And, again, in the description on the bank statement

1   it references the account holder, Alan and Barbara Herwitz.

2   So I would consider these transactions reconciled.

3   Q    Okay.  Thank you.

4        Did all of the cash transactions match up in this one

5   to one way?

6   A    No.  They did not.

7   Q    Can you explain that a little bit?

8   A    There were often times where there was multiple

9   transactions on the same day in the same amount that we

10  would need to look further into in order to reconcile the

11  specific transactions to one another.

12  Q    Okay.  So let's look at one of those examples.  We're

13  going to use Exhibits 3, 4, 5 and 6.  Can you start with

14  Exhibit 3, please?

15       Can you tell us what this document is?

16  A    This is a statement of -- a monthly bank statement for

17  the 703 account for the month of August 2007.

18  Q    Okay.  Can you take a look at page 43?  It's a little

19  hard to see, but is there an example here of the

20  transactions you were just discussing?

21  A    Yes.  The first three transactions listed there are all

22  dated August 29th of 2007, all -- these are all outgoing

23  wires for $500,000 each.

24  Q    Can we have the first page of Exhibit 4?  Tell us what

25  this document is.

1  A    This is information, customer statement data from the

2  BLMIS system for the account held by MJ 2005 Grats for the

3  month of August 2007.

4  Q    Okay.  If we could take a look at Exhibit 3 and Exhibit

5  4 together.  Could you explain your reconciliation using

6  these documents?

7  A    Sure.  So at the bottom is the -- again, the page from

8  the 703 account statement, monthly account statement.  In

9  the description of the first transactions there for $500,000

10  it references MJ 2005 Grats.  And this is an outgoing wire

11  for $500,000 which reconciles to the check wire dated August

12  29th of 2007 for an outgoing cash withdrawal of $500,000.

13  Q    Okay.  Can you take a look at Exhibit 5.  Tell us what

14  this document is.

15  A    This is the customer statement data for an account held

16  by Famad (ph), LLC for the month of August 2007.

17  Q    Okay.  And could we have Exhibit 3 and Exhibit 5

18  together.  Can you walk us through your reconciliation here?

19  A    So the second transaction at the bottom on -- that's on

20  the 703 statement is references in the transaction

21  description Famad, LLC and then I would have reconciled that

22  transaction to the first cash withdrawal transaction for the

23  account of Famad, LLC that's dated the same day for a

24  $500,000 cash withdrawal.

25  Q    Okay.  Thank you.

Page 86

1      And finally let's look at Exhibit 6.  Do you recognize

2  this document?

3  A    It's the customer statement data for the account held

4  by Sidney Laden (ph) for August 2007.

5  Q    Okay.  And if we put Exhibit 3 and Exhibit 6 up

6  together can you once again explain the reconciliation?

7  A    Very similar to what I just described.  At the very

8  last of the three transactions in the description it

9  references Sidney R. Laden, that would be reconciled to the

10  $500,000 withdrawal, cash withdrawal that appears on the

11  customer statement for Sidney Laden for the month of August

12  2007.

13  Q    Okay.  Thank you.

14      Did you ever have a single transaction in the bank

15  account that was made up of multiple customer deposits?

16  A    Yes.  Often there were -- this really was relevant for

17  the deposits that were in the form of checks.  So a number

18  of BLMIs customers may have deposited checks on the same day

19  and those checks would be accumulated into one deposit and

20  taken to the -- taken to the bank and deposited in the 703

21  account as one deposit.

22  Q    Let's look at an example of that.  Can we have Exhibit

23  7, please?  Can you tell us what this document is?

24  A    This is a monthly bank statement for the 703 account

25  for the month of June 2004.

Page 87

1   Q    And if we go to page 34 can you tell us what

2   transaction that you would like to talk about?

3   A    The first transaction listed there dated June 22nd is a

4   deposit into the J -- into the 703 account for $688,000 and

5   with the description deposit cash letter which was the kind

6   of generic description for a deposit into the account.

7   Q    Can we look at Exhibit 8, please?  Can you explain what

8   this is?

9   A    This is a deposit slip for a deposit into the 703

10  account for the one that we just looked at on the statement

11  for $688,000 dated June 22nd, 2004.  There are seven amounts

12  listed there that make up the total deposit of $688,000.

13  Q    Okay.  Let's take a look at Exhibit 51.  Can you tell

14  us what this is?

15  A    This is a copy of a deposited check into BLMIS, written

16  to BLMIS by an account held by Andrew Cohen.  The check is

17  dated June 17th, 2004 for $75,000 and there's also in the

18  memo line or the for line there's a reference to an account

19  1C1219-3-0.

20  Q    Let's take a look at Exhibit 9, please.  Do you

21  recognize this document?

22  A    This is the cash -- I'm sorry -- the customer statement

23  data for Andrew Cohen's account, Account Number 1C1219-30

24  for the month of June 2004.

25  Q    Can you go to page 4, please?  And what transaction

Page 88

1    would you like to discuss on this?

2    A    The -- about halfway down there's a transaction with

3    the Code CA for $75,000.  This is a cash deposit that was

4    dated June 22nd, for $75,000 into the Andrew Cohen account

5    at BLMIS.

6    Q    So how would you have reconciled the documents that

7    we've seen?

8    A    So this $75,000 was the first 75,000 -- I don't know if

9    you're able to pull up the deposit slip that lists the

10   various checks that were included in the --

11   Q    Is it --

12        (Pause)

13   A    So up at the upper left-hand corner of the screen

14   there's the deposit slip.  The first check listed there is

15   $75,000.  So that -- I would have concluded that this check

16   from Andrew Cohen was included in the deposited amount of

17   $688,000 that we saw on the JPMorgan statement.

18   Q    And did you reconcile the remaining entries on the

19   deposit slip?

20   A    I did and they were other customer cash deposits that

21   were made on that same day.

22   Q    And did you analyze all of the transactions in the 703

23   account for the time we had those records available?

24   A    Yes.  I reviewed and analyzed all the transactions.

25   Q    Moving on to the 509 account did you reconcile the 509

Page 89

1   account in the same manner that you reconciled the 703

2   account?

3   A     The task was the same, but it was a little bit

4   different just because the 509 account was a checking

5   account.  So in my reconciliation of transactions to the 509

6   account I primarily relied on the canceled checks from that

7   account.

8   Q     Okay.  I would like to look at one example.  Can we

9   have Exhibit 10, please?

10        Can you tell us what this is?

11  A     This is the customer statement data for an account held

12  by Max B. Cohen Family Foundation for the month of April

13  2007.  The account number is 1C1342.

14  Q     Okay.  And what transaction would you like to discuss?

15  A     The first transaction there which is a $400,000 cash

16  withdrawal in the form of a check as indicated by the

17  description there dated April 3rd, 2007.

18  Q     Okay.  If you could look at 11.  Do you recognize this

19  document?

20  A     I do.  This is a copy of a canceled check written --

21  for a check written from the 509 account and --

22  Q     Give me them both together.

23        (Pause)

24  Q     Can you explain how you used these together?

25  A     Yes.  So, again, using kind of the primary points of

1    information the date of the check is April 3rd, 2007 which

2    reconciles to the date of the transaction on the customer

3    statement.  The check payee is Max B. Cohen Family

4    Foundation which reconciles to the account holder.  The

5    check amount is $400,000 which reconciles to the amount of

6    the cash withdrawal transaction, and lastly in the memo line

7    of the check is the account number 1-C-1342 which reconciles

8    to the account number of Max B. Cohen Family Foundation.

9    Q    Did you complete a similar reconciliation for all the

10   checks from the 509 account that were available to you?

11   A    Yes, I did.

12   Q    And the third account you mentioned was banker's trust.

13   How did you perform your analysis for that account?

14   A    It was very similar with -- to the examples that we

15   just walked through.  The banker's trust account had

16   outgoing transfers to customers both in the form of a wire

17   transfer as well as checks.  So the examples that we just

18   walked through were -- it was the same process for the

19   banker's trust account.

20   Q    Could you take a look at Trustee Demonstrative 2?  Ms.

21   Collura, did you prepare this document?

22   A    I did.

23   Q    And could you tell us what it demonstrate -- what it

24   shows?

25   A    This shows that for the time period for which we had

Page 91

1    available bank records, again December 1998 to December 2008

2    there was approximately 225,000 transactions of -- cash

3    transactions on the BLMIS customer statements.  I reconciled

4    99 percent of those cash transactions to available BLMIS

5    bank records.  The one percent that I was unable to

6    reconcile was primarily related to canceled checks that I

7    didn't have available to me.

8    Q    Okay.  Let's move on from your global reconciliation

9    to your profit withdrawal reconciliation.

10              THE COURT:  Would this be a good time to take a

11   five-minute break?

12              MS. VANDERWAL:  Great.

13              THE COURT:  Okay.  Five minutes.  We're going to

14   try and keep it to five minutes.

15         (Recessed at 11:54 a.m.; reconvened at 12:04 p.m.)

16              THE COURT:  Go ahead.

17   BY MS. VANDERWAL:

18   Q    Ms. Collura, we were turning to your profit withdrawal

19   reconciliations.  Could you please briefly explain your

20   analysis with regard to PW transactions?

21   A    For PW transactions I was asked to reconcile those

22   transactions to the available BLMIS bank records for the

23   ten-year time period.  So those PW transactions were

24   included in my global reconciliation analysis that we just

25   walked through.

Page 92

1        In addition to that I was asked to reconcile PW

2    transactions for spanning all time to available records that

3    contained in BLMIS customer files as well as documents

4    received by the trustee.  And I was also asked to trace PW

5    transactions to bank accounts held by the account holders

6    for the time period for which I had available bank records.

7    Q    What is the population of profit withdrawal

8    transactions in total?

9    A    Approximately 91,000 PW transactions.

10   Q    And how many occurred within the ten-year period we've

11   been talking about?

12   A    Approximately 5,500.

13   Q    And how many of the PW transactions in the ten-year

14   period were you not able to reconcile?

15   A    There were only 20 PW transactions in the ten-year

16   period that I wasn't able to reconcile to BLMIS bank records

17   because I didn't have a copy of the canceled check.

18   However, 15 of those 20 I was able to reconcile to other

19   documentation including the documents in the customer file

20   or otherwise received from the trustee.

21        So therefore there were only five PW transactions in

22   the ten-year period that I was unable to reconcile.

23   Q    Let's look at an example of a PW reconciliation to the

24   bank records.  Could we have Exhibit 12, please?  Can you

25   tell us what this document is?

Page 93

1   A    This is a customer statement data for the account held

2   by Marjorie Klaskin (ph), account 1K0033 for the month of

3   November 1998.

4   Q    And what transaction would you like to discuss?

5   A    The PW transaction that's about halfway down the

6   statement dated November 25th.

7   Q    Okay.  Can we have Exhibit 13, please?  Can you tell us

8   what this is?

9   A    This is the front of the copy of the canceled check for

10  the check made payable to Marjorie Klaskin dated November

11  25th, 1998.

12  Q    Okay.  And so if we look at Exhibit 12 and 13 together

13  could you explain your reconciliation, please?

14  A    Sure.  So on the customer statement the PW transaction

15  dated November 25th with the description check, Cardinal

16  Health, for $448 reconciles to the check, the various points

17  of information on the check which is the check payee is

18  Marjorie Klaskin who is the account holder.  The date of the

19  check is November 25th, 1998 which agrees to the date of the

20  PW transaction on the customer statement.  $448 is the

21  amount of the check which reconciles to the amount of the PW

22  transaction.  And, lastly, in the memo field for the check

23  is the account number 1K0033 which reconciles to the account

24  number held by Marjorie Klaskin.

25  Q    Did you complete a similar analysis for each PW that --

Page 94

1    transaction that occurred in the ten-year period?

2    A    For all PW transactions that occurred through a check,

3    yes.  There were also PW transactions in the form of a wire

4    transfer.

5    Q    Okay.  How did the reconciliation differ for a wire

6    transaction?

7    A    So I would reconcile the same points of information,

8    but I would use -- I obviously wouldn't use a copy of the

9    canceled check for a wire transfer.  I would use information

10   that appeared on the face of the 703 bank statement and any

11   other wire detail that was available to me related to that

12   transaction.

13   Q    Okay.  Let's move on to customer files.  How did you

14   use customer files to perform your reconciliation?

15   A    So there were -- there was correspondence in customer

16   files that I reviewed related to PW transactions and often

17   the -- they were instructions from the account holder to

18   either start sending profit withdrawals or in some cases to

19   stop sending profit withdrawals and to start reinvesting

20   those profits.

21        So I would use those letters to reconcile to a series

22   of PW transactions either before or after that date that was

23   -- that was in accordance with the customer's instructions.

24   Q    Did you see letters in customer files requesting each

25   profit withdrawal transaction that would appear on the

1    customer statement?

2    A    There were a few instances that I -- there were a few

3    customer files that contained multiple letters that

4    referenced specific PW transactions or requested specific PW

5    transactions.  But for the most part the files that I

6    reviewed contained correspondence similar to the

7    instructions that I described earlier which was more of a --

8    I guess a general instruction to either start or to stop PW

9    transactions.

10   Q    How many transactions were you able to reconcile using

11   customer files?

12   A    Approximately 6,000.

13   Q    And for what time period was that correspondence

14   available?

15   A    The correspondence went all the way back into the

16   1980s.

17   Q    Let's take a look at an example.  Could we have Exhibit

18   19, please?

19        (Pause)

20             THE COURT:  Is there a technical problem?

21             MS. VANDERWAL:  We are experiencing technical

22   difficulties.  We apologize, Your Honor.

23             THE COURT:  Uh-huh.

24             MS. VANDERWAL:  We can use our binders if that will

25   work.

```
 1            THE COURT:  I have it.

 2            MS. VANDERWAL:  All right.  Excellent.

 3            THE COURT:  Something can be said for paper.

 4            MS. VANDERWAL:  We can go old school.

 5    BY MS. VANDERWAL:

 6    Q    Ms. Collura, do you have Tab 19?

 7    A    Yes.

 8    Q    Could you tell us what this document is, please?

 9    A    This is the name and address form that was included in

10    the customer file for Sylvia Brodsky's --

11            THE COURT:  Okay.  Hold on.

12            THE WITNESS:  -- account.

13            THE COURT:  Do -- Ms. Chaitman, do you need time to

14    find the document?

15            MS. CHAITMAN:  I'm sorry.

16            THE COURT:  Do you need time to find the document?

17            MS. CHAITMAN:  I'm sorry.  I did.

18            THE COURT:  Okay.  Just let me know when you're

19    ready.

20            MS. CHAITMAN:  Okay.

21         (Pause)

22            MS. CHAITMAN:  I'm ready.

23            THE COURT:  All right.  Thank you.  Go ahead.

24            MS. VANDERWAL:  Thank you.

25    BY MS. VANDERWAL:
```

1    Q     Please tell us what Exhibit 19 is.

2    A     Exhibit 19 is the name and address form that was

3    included in the customer file for Sylvia Brodsky's account,

4    1B0194.

5    Q     Okay.  Would you take a look at Exhibit 20?  Can you

6    tell us what that document is, please?

7    A     Exhibit 20 is the contents of additional documents that

8    were included in the customer file.

9    Q     Okay.  I think it's back on our --

10   A     Yeah.

11   Q     -- our monitor.  So if we could take a look at page 43

12   of that exhibit, please?  Thank you.

13         Could you tell us what is relevant about this document?

14   A     This document is a letter dated October 15th, 1994

15   related to Account 1B0066 which was the old account prior to

16   opening of 1B194 that -- that I just referenced that

17   appeared on Exhibit 19.  So this account was -- or, I'm

18   sorry, this letter on page 43 is signed by Benjamin Brodsky

19   and it looks to be Sylvia Brodsky related to Account 1B0066.

20         The -- and the second to the last paragraph that

21   starts, As I do not, I'll just read it: "As I do not wish to

22   have the profits reinvested you are notified to send a check

23   for the profits on any trades that are made subsequent to

24   the above date."

25   Q     And when you were describing the types of letters that

1    you saw in customer accounts earlier, was this one of what

2    you would be referring to?

3    A    Yes, it is.

4    Q    And after seeing a letter like this how would you use

5    it in your reconciliation process?

6    A    I would then look at the activity in the customer

7    statements for this account, 1B0066, particularly the PW

8    transactions and look to see the dates of when the PW

9    transactions started and stopped to see if it was consistent

10   with the instructions according to this letter.

11   Q    Can we have Exhibit 22, please?

12       Can you tell us what this document is?

13   A    This is a customer ledger for the account held by

14   Benjamin and Sylvia Brodsky, Account Number 1B0066 for the

15   month of November 1994.

16   Q    And how would you use this Exhibit 22, Exhibit 20 to

17   reconcile the transaction?

18   A    So again the letter that we just read was dated October

19   15th, 1994 asking or requesting to start -- start sending

20   profits on the account.  And this customer ledger in Exhibit

21   22 is dated November 1994, which is the next month and this

22   was the first PW transaction that appeared in this account

23   and was the -- if you see the very first transaction there

24   listed dated November 28th with the description, check CBS

25   transaction code PW for $9,917.  So I would have used this

1    letter to reconcile to this transaction as well as

2    subsequent PW transactions that took place in this account.

3    Q    Did you perform a similar analysis for all of the

4    relevant correspondence you found in the customer files?

5    A    I did.

6    Q    Okay.  You also mentioned that you used documents

7    received by the trustee in your analysis?

8    A    Correct.

9    Q    Can you explain how you did that?

10   A    So I reviewed thousands of documents that were received

11   by the trustee from account holders or, as I mentioned

12   before, some of those were from accountants of the account

13   holders.  And I would -- my review of those documents was to

14   look specifically for documents related to PW transactions

15   and these could have included bank records of the account

16   holders, accounting records, correspondence, some were the

17   same copies of correspondence that I saw in the customer

18   files.

19   Q    How many transactions were you able to reconcile using

20   these documents produced to the trustee?

21   A    Over 46,000 transactions.

22   Q    And for what time periods were these documents

23   available?

24   A    The documents went back to the 1980s.

25   Q    Who produced these documents to the trustee generally?

Page 100

1    A    They were account holders.  Many of the documents were

2    produced by one account holder in particular by the name of

3    Norman Levy.

4    Q    And what types of documents did Mr. Levy provide?

5    A    Mr. Levy provide -- generally produced bank records for

6    -- related to his bank account at JPMorgan.

7    Q    Let's review an example of these customer documents.

8    Can we have Trustee 31, please?

9         (Pause)

10   Q    Do you recognize this document?

11   A    I do.

12   Q    And what is it?

13   A    This is a document produced to the trustee by an

14   account holder under the name AHT Partners.  At the top you

15   can see AHT Partners - B Madoff Investment indicating that

16   this was a document related to the -- his Madoff investment.

17   The information that was relevant to me on this document was

18   the date column and the fourth column over which is titled,

19   checks received.  And I used those -- the information in

20   those two columns to reconcile to the PW transactions in the

21   AHT Partners' account.

22   Q    Okay.  I would like to take a look at Exhibit 32,

23   please.  Can you tell us what this is?

24   A    This is a customer ledger for the account held by AHT

25   Partners for the month of February 1998 -- I'm sorry --

Page 101

1    1993, February 1993.

2    Q    And if we can put Exhibit 31 and 32 up together, Ms.

3    Collura, could you walk us through how you completed your

4    reconciliation using these documents?

5    A    If we specifically look there are three transactions --

6    PW transactions that were reflected on the February 1993

7    customer statement for AHT Partners.  And the three PW

8    transactions, the first one is dated February 4th that's

9    about halfway down and with the description check Oakwood in

10   that amount, $3,630.27 appears under the checks received

11   column on the document.

12       The second one is dated February 10th for check

13   Motorola with -- in the -- as the -- excuse me -- as the

14   description in the amount $16,053.50 which again appears on

15   the schedule under the checks received.  And similar the

16   last PW transaction on this statement dated February 18th,

17   1993 the amounts match between the schedule and the customer

18   statement.

19   Q    Did all of the transactions identified on this schedule

20   match to the customer statement, the schedule in Exhibit 31?

21   A    Yes.  There were about 60 transactions.  Some of the

22   dates were off maybe one or two days.  There was one amount

23   that had an extra digit, but otherwise all of the

24   transactions reconciled to the PW transactions.

25   Q    Let's look at one more example.  Can we have Exhibit

Page 102

1      33, please?

2          (Pause)

3      Q    Do you recognize this document?

4      A    Yes.  This is a customer statement for the account held

5      by Irwin Kenneth Horowitz for the month of February 1993.

6      Q    And what transaction are we going to discuss on this?

7      A    There is a PW transaction about halfway down dated

8      February 18th for $1,681.76.

9      Q    Okay.  Let's look at Exhibit 35, please.  Can you tell

10     us what this is?

11     A    This is a bank statement that was produced to the

12     trustee for an account held at American Savings Bank for

13     Irwin Kenneth Horowitz for the period ending March 19th,

14     1993.

15     Q    Okay.  And if we could take a look at Exhibit 33 and 35

16     together, could you please explain how you used these

17     documents?

18     A    So on Exhibit 35 which is the customer statement there

19     was -- we saw the PW transaction dated February 18th for

20     $1,686.76.  I would expect to see the deposit into Irwin

21     Horowitz's personal bank account and, in fact, I did.  Under

22     the checking account transaction section there is a deposit

23     a few days later on February 23rd for the exact same amount

24     as the PW transaction.

25     Q    Did you complete a similar reconciliation analysis for

Page 103

1    the other documents (indiscernible) to the trustee?

2    A    I did.

3    Q    Can we have Demonstrative 3, please?  Did you prepare

4    this demonstrative?

5    A    I did.

6    Q    And could you please explain it?

7    A    This is the results of my reconciliation of the PW

8    transactions, talking about the three sources of

9    information, the BLMIS bank records.  I reconciled 5,507 PW

10   transactions to those available records.  I reconciled 6,008

11   PW transactions to BLMIS customer files, and the circle at

12   the top, the blue circle at the top indicates that I

13   reconciled 46,128 PW transactions to documents received by

14   the trustee.  The crossover of the circles is there to

15   indicate that there were often times where I reconciled to

16   multiple sources.  So in -- for an example, the BLMIS bank

17   records as well as correspondence in the customer files.

18        So overall I reconciled 51,769 PW transactions to one

19   or more of these three sources.

20   Q    After you completed your profit withdrawal analysis did

21   you become aware of any changes to the cash deposit and

22   withdrawal data that you used to complete your

23   reconciliation?

24   A    Yes, I did.

25   Q    And what was the nature of those changes?

Page 104

```
 1   A    They were what I considered to be minor changes to the
 2   PW transaction information, so date, the transactions
 3   description or -- and sometimes the amount of the PW
 4   transaction needed to change to match what was on the
 5   microfilm from BLMIS records.
 6   Q    Did you consider those changes in your analysis?
 7   A    I did.  I reviewed every single one of them.
 8   Q    And did any of those changes impact your overall
 9   conclusion?
10   A    No, they did not.
11   Q    Now you mentioned you also conducted a tracing analysis
12   for profit withdrawal transactions.  Could you please
13   explain that?
14   A    So for my tracing analysis, again, tracing is following
15   the flow of funds from one bank account to another.  In this
16   case BLMIS bank accounts to accounts held by the account
17   holders.  So for the PW transactions that took place in the
18   ten-year time period for which I had available BLMIS records
19   to conduct that tracing I looked -- if it was in the form of
20   a check transaction I would look at the information on the
21   copy of the canceled check.  If it was in the form of a wire
22   transfer, I would look at whatever wire detail I had
23   regarding that transaction to tell me where the funds went
24   when they left BLMIS.
25   Q    Okay.  Let's take a look at an example.  Can we have
```

Page 105

1   Exhibit 12 and 13 up again, please?

2        (Pause)

3   Q    Can you remind us what these two documents were -- are?

4   A    These are the -- the first one at the top is the

5   customer statement data for the account held by Marjorie

6   Klaskin for, I don't -- I don't see -- I think this was for

7   1998.  I don't see the date of the -- there it is.  November

8   1998.  And then the bottom is the front of the copy of the

9   canceled check related to this transaction.  What's -- what

10  I would need for my tracing analysis is actually the back of

11  that check, that canceled check.

12       (Pause)

13  Q    Okay.  Can you explain how you used the back of the

14  check?

15  A    So what appears in the lower right-hand corner of the

16  screen is information that was contained on the back of the

17  canceled check that related to the PW transaction for $448

18  dated November 25th.

19       The endorsement on the back of the canceled check was

20  important for my tracing analysis to indicate who was

21  signing the check, and in this case it was Marjorie Klaskin

22  that is Marjorie Klaskin, an endorsement of Marjorie Klaskin

23  which matches the check payee.

24       The redacted account number right under the endorsement

25  ending in 9342 represents the account that this check was

1   deposited into and the banking institution was Chase

2   Manhattan Bank which I know is a little bit hard to read on

3   the stamp there, but -- so I would conclude that this check

4   for $448,000 -- $448, I'm sorry, was deposited by Marjorie

5   Klaskin into an account held at Chase Manhattan Bank.

6   Q    Okay.  Did you perform a similar analysis for all the

7   bank records that you had available to you?

8   A    For the PW transactions in the ten-year period, yes.

9   Q    Can we see Demonstrative 4, please?

10       (Pause)

11  Q    Do you recognize this demonstrative?

12  A    I do.

13  Q    And did you prepare it?

14  A    Yes, I did.

15  Q    Can you explain what it shows?

16  A    This shows the results of my reconciliation -- of my --

17  sorry -- my tracing analysis of the ten-year period PW

18  transactions and reflects that I was able to trace for

19  99.997 percent of the time nearly a hundred percent of the

20  time traced the PW transaction to the BLMIS account holder.

21  There was .003 percent of the PW transactions where I didn't

22  have records sufficient for me to trace and that could

23  either be because I didn't have a copy of the canceled check

24  or I may have had a copy of the canceled check and the

25  information on the back of the canceled check was

Page 107

1    insufficient for me to trace that transaction.

2    Q    As a forensic accountant are you confident in the

3    conclusions we discussed today to a reasonable degree of

4    certainty?

5    A    I am.

6    Q    As part of your analysis did you review the customer

7    files of Mr. Aaron Blecker?

8    A    I did.

9    Q    Are you aware that Mr. Blecker's account statements

10   reference PW transactions?

11   A    Yes, they do.

12   Q    Do you know for which of his accounts?

13   A    1B0022 and 1B0023.

14   Q    Were you able to reconcile any of Mr. Blecker's profit

15   withdrawal transactions?

16   A    I was not.

17   Q    And why is that?

18   A    For the -- there was -- for the three sources of

19   information that I reconciled to there was no available

20   records related to Mr. Blecker's PW transactions.  For the

21   BLMIS bank records that were available to me in the ten-year

22   time period there was no PW transactions in Mr. Blecker's

23   account during that time period.  There was no

24   correspondence in Mr. Blecker's customer files that were

25   related to his PW transactions and the records that were

Page 108

1    produced to the trustee by Mr. Blecker or attached to his

2    claim were not related to his PW transactions.

3    Q    Okay.  Can we have Exhibits 36, 37 and 38, please?

4         (Pause)

5    Q    Can we have the full exhibit?  Can you tell us what

6    this document is, Ms. Collura?

7    A    This is the cover of the folder for the customer file

8    for 1B0156 held by Aaron Blecker.  And actually, I'm sorry,

9    the account number right above his name is the old account

10   1B0022.

11   Q    Okay.  And what is the 1B0156 if you know?

12   A    1B0156 is the new account after 1B0022 stopped having

13   any activity in that account and then it became 1B0156.

14   Q    Okay.  And do you see the number on top of the 1B0022?

15   A    Yeah.  Yes.  It is 10025410.

16   Q    Do you know what that number represents?

17   A    That was the all numeric account number that was the

18   number before it was assigned 1B0022.

19   Q    Can we have Exhibit 37, please?

20         THE COURT:  So all three numbers were the same

21   account essentially?

22         THE WITNESS:  Yes.  I would consider the first two

23   accounts the same account meaning, you know, they took it

24   down, but the two that are on like the file folder label --

25         THE COURT:  Can we see that number again?

Page 109

```
 1              THE WITNESS:  -- those two --

 2              THE COURT:  Which one?

 3              THE WITNESS:  -- the numeric and then the 1B0022 as

 4    the same account.  The 1B0156 was a new account after the

 5    activity in 1B0022 stopped.

 6              THE COURT:  Thank you.

 7    BY MS. VANDERWAL:

 8    Q    Okay.  Can we take a look at Exhibit 37, please?  Do

 9    you recognize this document?

10    A    This is the name and address form that was included in

11    many of the customer files for 1B0022 account held by Aaron

12    Blecker.

13    Q    And the number to the left or the 1B0022, is that the

14    same number that was on the cover?

15    A    Yes.

16    Q    Okay.  Could we have Exhibit 38, please?  Do you

17    recognize this document?

18    A    This is the back of the customer file folder for 1B0022

19    and the note is indicating that the new account is 1B0156.

20    Q    Can we have Exhibit 40, please?

21         (Pause)

22    Q    Can you tell us what this is?

23    A    This is the cover to the customer file for 1B0023 held

24    by Arthur and Sophie Blecker, and similarly the old account

25    number, the all numeric is listed right above the 1B0023
```

Page 110

1    which is 10021510 and then the handwritten account number of

2    1B0157 is the new account number after 1B0023 ended.

3    Q    Okay.  Can we have Exhibit 41, please?

4         (Pause)

5    Q    Can you tell us what this is?

6    A    This is the name and address form that was included in

7    the customer file for 1B0023 held by Arthur and Sophie

8    Blecker.

9    Q    Thank you.

10        Can we have Exhibit 42?

11        (Pause)

12   Q    Can you tell us what this is, please?

13   A    This is the back of the file folder for the customer

14   file of 1B0023 indicating that the new account number is

15   1B0157.

16   Q    Thank you.

17        Exhibit 43, could you please tell us what this is?

18   A    This is the front of the customer file for Aaron

19   Blecker's account, Number 1B0156.

20   Q    Exhibit 44, please.  What is this document.

21   A    This is similar to the name and address form.  It's

22   called the customer master file maintenance for 1B0156 which

23   also the old account number is indicated there, 1B0022 for

24   the account held by Aaron Blecker.

25   Q    Exhibit 45, please.

Page 111

1         (Pause)

2    Q    Can you tell us what this is?

3    A    This is the contents of the customer file for 1B0156.

4    Q    Can we take a look at page 25 of this exhibit?  Do you

5    recognize this document?

6    A    Yes.  This is the customer agreement that was included

7    in the customer file for 1B0156.  I often saw this -- a copy

8    of the customer agreement that looks like this in a number

9    of the customer files.

10   Q    Thank you.

11        Could we have Exhibit 46, please?

12            UNIDENTIFIED SPEAKER:  Could you repeat the number,

13   please?

14            MS. VANDERWAL:  46.  Sorry.

15            UNIDENTIFIED SPEAKER:  No problem.

16   BY MS. VANDERWAL:

17   Q    And can you tell us what this is?

18   A    This is the back of the customer file for 1B0156.

19   Q    Thank you.

20        Okay.  Exhibit 47, please.  Can you tell us what this

21   is?

22   A    This is the front of the customer file folder for

23   Arthur Blecker's account, Arthur and Sophie Blecker's

24   account with the number 1B0157.

25   Q    Exhibit 48.  Can you describe this, please?

Page 112

1    A    This is the customer master file maintenance or similar

2    to a name and address form for 1B0157.  And you can notice

3    at the top the 1 -- the old account number 1B0023 is crossed

4    out, but the name on this account is Arthur Blecker and

5    Sophie Blecker.

6    Q    And Exhibit 49, do you recognize this document?

7    A    This is the contents of the -- this customer file for

8    1B0157.

9    Q    And was there a customer agreement in this customer

10   file as well?

11   A    Yes.  On page 8 of the exhibit is the customer

12   agreement.

13   Q    Can we go to page 8, please?  That's the agreement to

14   which you were referring?

15   A    Yes.

16   Q    Thank you.

17        Do you have any observations about the contents of the

18   four files that we just looked at?

19   A    I did not identify any correspondence in these files

20   that reflected any disagreement from either Mr. Blecker or

21   his wife, Sophie Blecker, regarding any of the cash

22   transactions in any of these accounts.

23   Q    Thank you, Ms. Collura.

24        MS. VANDERWAL:  That's all I have for now.

25        MS. CHAITMAN:  Can we --

Page 113

1           THE COURT:  Do you want to take a lunch break now?

2    We'll reconvene at a quarter to two?

3           MS. CHAITMAN:  That would be great for me.  Thank

4    you, Your Honor.

5           THE COURT:  Okay.

6       (Recessed at 12:39 p.m.; reconvened at 1:47 p.m.)

7           THE COURT:  Ms. Chaitman.

8           MS. CHAITMAN:  Thank you, Your Honor.

9           Your Honor, can you hear me from here?  It's just

10   I'm going to be juggling two different --

11          THE COURT:  If you can move the microphone closer -

12   -

13          MS. CHAITMAN:  Closer.

14          THE COURT:  -- it would be easier.  Are you picking

15   her up?  Would you speak again?  We want to see if we can

16   pick you up on the recorded --

17          MS. CHAITMAN:  Oh.  Are you able to pick me up from

18   here?  Okay.  Great.

19          THE COURT:  Okay.

20          MS. CHAITMAN:  Is this okay for you, Judge?

21          THE COURT:  Yes.

22          MS. CHAITMAN:  Okay.  Great.  Thanks.

23                     CROSS-EXAMINATION

24   BY MS. CHAITMAN:

25   Q    Ms. Collura, I apologize.  I'm looking at you over the

Page 114

1    --

2    A    I know.

3    Q    -- the screen.  It's okay.  As long as you can see me.

4    That's fine.  Thank you.

5    A    Is that better?

6    Q    That's perfect.

7    A    Okay.

8    Q    Thanks.

9         You ended your testimony with the following statement:

10        "I did not identify any correspondence in these files

11        that reflected any disagreement from either Mr. Blecker

12        or his wife, Sophie Blecker, regarding any of the cash

13        transactions in any of these accounts."

14        Do you recall that?

15   A    Yes.

16   Q    Okay.  Did you identify any correspondence in these

17   files that reflected any agreement by either Mr. Blecker or

18   Ms. Blecker to any of the cash transactions in any of these

19   accounts?

20   A    No.  There was no correspondence regarding the PW

21   transactions.

22   Q    Okay.  And, in fact, if we look at --

23        THE COURT:  We can't pick that up.  That's the

24   problem.

25        MS. CHAITMAN:  Sorry.

Page 115

1   BY MS. CHAITMAN:

2   Q    Ms. Collura, I just brought you my exhibit binder and I

3   would like you to look at Exhibit 8 if you would.

4        (Pause)

5   Q    And if you turn to the end of this report of yours

6   which ends on page 8 and then you look at the next page

7   you'll see that there's a chart that you prepared.

8   A    On page 6?

9   Q    No.  It's --

10  A    Oh.

11  Q    -- actually after page 8.

12  A    Okay.

13  Q    Can you identify -- this is part of a much larger

14  chart, isn't it?

15  A    Yes.  There was a number of attachment D's.  This is

16  one of them.

17  Q    Okay.  But you prepared an analysis with respect to

18  each customer as to whether there was documentary evidence

19  indicating that that customer received profit withdrawals,

20  isn't that true?

21  A    Yes.  These charts represent the results of my

22  reconciliation to the various sources of information.

23  Q    Okay.

24  A    Yes.

25  Q    So if we go across another -- these pages deal with Mr.

Page 116

1    Blecker's account 1B0022.  Do you see that?

2    A    Yes.

3    Q    Okay.  And if we go across the top you list -- am I

4    correct that in the transaction date column you list every

5    date on which there appeared a PW on a statement issued to

6    Mr. Blecker; is that right?

7    A    Correct.

8    Q    Okay.  And then the next column going to the right you

9    list the amount next to the PW entry; is that right?

10   A    Yes.

11   Q    Okay.  And then the next column down is the type of

12   transaction and these are all PWs, right?

13   A    Correct.

14   Q    Okay.  And then the transaction description is the next

15   column and it's Check TRW, Check Holiday Corp., Check

16   Anheiser Busch.  Do you see those?

17   A    Yes.  Under --

18   Q    So you --

19   A    -- under the transaction description column.

20   Q    So you were summarizing in this document the notation

21   on every statement that Mr. Blecker received which had a PW

22   entry; is that right?

23   A    Yes.

24   Q    Okay.

25   A    That is correct.

Page 117

1    Q    And then you have a box which says reconciliation

2    results.  And if I'm reading across from left to right it

3    says reconciled to BLMIS bank records and the answer going

4    all the way down and actually through all of the pages of

5    Mr. Blecker's account you wrote N/A, right?

6    A    Correct.

7    Q    And what -- what did you intend to indicate by N/A?

8    A    That there -- the BLMIS bank records were not available

9    for the time period for which these transactions were dated.

10   Q    Okay.  And the next column says BLMIS customer files

11   and, again, going through every single page it says N/A.  Do

12   you see that?

13   A    Yes.

14   Q    And what does that mean?

15   A    There was -- there was no correspondence in Mr.

16   Blecker's customer files that reconciled to these PW

17   transactions.

18   Q    Okay.  And, in fact, with respect to the vast majority

19   of customers who had PW entries there were such letters in

20   their files, weren't there?

21   A    For 6,000 PW transactions there were.  I reconciled to

22   correspondence in the customer files.

23   Q    Right.  So that was one of your primary sources of

24   confirmation, was it not?

25   A    It was one of the three sources that I reconciled to.

Page 118

1    Q    Right.  But if we're talking about a period as you've

2    described it prior to 1998 you didn't have any bank records

3    that you could reconcile to, isn't that true?

4    A    Correct.  No BLMIS bank records.  Correct.

5    Q    Right.  So you were relying a hundred percent upon

6    other documentary evidence, isn't that true?

7    A    Prior to the ten-year period?

8    Q    Yes.

9    A    Yes.  The correspondence in the customer file and

10   documents received by the trustee.

11   Q    Okay.  And to the extent that you were able to verify

12   profit withdrawal receipts by customers, you relied upon the

13   letters in the customer files, didn't you?

14   A    That was one source that I relied upon.  Yes.

15   Q    Okay.  And those went back to the early 1980s, didn't

16   they?

17   A    Correct.

18   Q    And those letters were all located in the customer file

19   for each specific customer, isn't that true?

20   A    There were some letters that were related to a customer

21   account that may have been in the prior successor account

22   meaning that a new account if the account changed, but it

23   was in a related customer file account.

24        So in other words, if I was looking at a PW transaction

25   for account A001, just as an example, but that account

Page 119

1    changed to a new account number, the correspondence may have

2    been in the customer file for the new account number.

3    Q    Okay.  But it was in a file which somehow was labeled

4    for the customer, right?

5    A    Right.  Correct.

6    Q    Okay.  And then the last two columns -- oh, documents

7    received by trustee is the third column in the

8    reconciliation results.  And what were you referring to

9    there?

10   A    Those would have -- that's referring to any documents

11   received by the trustee from the account holder or in some

12   cases accountants or other parties --

13   Q    Or from --

14   A    -- related to the account --

15   Q    -- third parties?

16   A    -- from third parties.  Correct.

17   Q    And, again, with respect to this account you had no

18   such documentation; is that right?

19   A    Correct.

20   Q    Okay.  And then the last two columns on this Exhibit D,

21   Defendant's 8, can you tell me what those represent?

22   A    If there -- those two columns are there to include a

23   specific Bates number or a reference to the -- a document if

24   I did have a document that I was able to reconcile to.  So

25   if there was a document in the customer file I would have

Page 120

1    put the Bates reference there to that specific document.

2    Q    Okay.  So, again, just to be clear with respect to the

3    Blecker accounts you did not have a single document which

4    indicated that the Bleckers requested withdrawals or

5    received them, isn't that true?

6    A    For this account that we're looking at, that's right.

7    Q    Yes.  And did you look at any of the other Blecker

8    accounts?

9    A    I did.  I believe it was 1B0023 was another Blecker

10   account that had PW transactions.

11   Q    Okay.  Now just so that we're all clear about this.  If

12   you would look at Exhibit 12 of the trustees' exhibits --

13            MS. CHAITMAN:  Amy, I don't know if you want to

14   pull that up for the witness or if you want me to use the

15   binder.

16            MS. VANDERWAL:  We can pull it up.  Just give us

17   one moment.

18            UNIDENTIFIED SPEAKER:  One of ours?

19            MS. VANDERWAL:  Yeah.

20            THE COURT:  Which exhibit is this?  Which exhibit?

21            MS. CHAITMAN:  They're going to pull it up, Your

22   Honor, so you'll be able to see it on the screen.

23            THE COURT:  Okay.  Thank you.

24        (Pause)

25            MS. CHAITMAN:  It's on the screen.

```
 1              THE WITNESS:  Oh.

 2    BY MS. CHAITMAN:

 3    Q    I don't mean to confuse you, but you're looking at my

 4    binder and --

 5    A    Oh.  Right.  Yes.

 6    Q    -- this is --

 7    A    That's why I was confused.

 8    Q    Yeah.

 9    A    Thank you for clarifying that.

10    Q    So -- okay.  So we're looking on the screen at Exhibit

11    12 which was a statement about which you testified and it's

12    a Marjorie Claskin (ph) statement dated 11/30/98.  And

13    there's an entry which says, check Cardinal Health, and then

14    it says PW.  Do you see that?

15    A    Yes.

16    Q    Okay.  I just want to be clear.  That's what we're

17    talking about here, isn't that true?  We're talking about

18    entries that indicated check, name of corporation and then

19    PW?

20    A    There were some PW transactions that had the PW code

21    but may not have had a reference to something other than

22    check.  But if any transaction had the code PW that was part

23    of the population, the 91,000 transactions that I've been

24    referring to as PW transactions.

25    Q    Okay.  But if we go back to my Exhibit 8 which was that
```

Page 122

1   part of your report which had the table, with respect to Mr.

2   Blecker's account every entry was -- had that format, check

3   and then Enron, Snapple, American Brands.  Do you see that?

4   A    Yes.  That's correct.

5   Q    Okay.  Now when you looked at the trustees' exhibits at

6   Exhibit 39 --

7            MS. VANDERWAL:  What number was that?

8            MS. CHAITMAN:  39.  39.

9   BY MS. CHAITMAN:

10  Q    So this is a little bit hard to see, but if you look

11  sideways it says, Arthur and Sophie Blecker, reading from

12  the bottom and then 1 -- I don't know, it looks like 2510,

13  1B2510 and then on top of that -- oh, thank you so much.

14  That's so much better.  And then it says 10021310.  Do you

15  see that?

16  A    The top number is 100215.

17  Q    Do you see that?

18  A    And then the number in -- right under that is 1B0025.

19  Is that a 5?

20  Q    Right.

21            THE COURT:  Is it --

22            THE WITNESS:  Or is it a three?

23  BY MS. CHAITMAN:

24  Q    Okay.  So then it -- so it goes from 10021510 to

25  1B002510, right?

Page 123

```
 1              THE COURT:  2510 or 2310?

 2              THE WITNESS:  That's -- yeah.  That's a hard --

 3      it's hard to read.  I thought the number was 1B0023.

 4              THE COURT:  It does look like --

 5              MS. CHAITMAN:  23?

 6              THE COURT:  It looks like -- I don't know.

 7      BY MS. CHAITMAN:

 8      Q    Okay.  You may be right because if I look at Exhibit 41

 9      this indicates 1B00 -- could you pull up 41?

10              MS. VANDERWAL:  Can you refer to the trustees'

11      exhibits when you're referring to --

12              MS. CHAITMAN:  Okay.

13              MS. VANDERWAL:  -- exhibits?

14              MS. CHAITMAN:  If you would pull up Trustee Exhibit

15      41.  Thank you so much.

16          (Pause)

17      BY MS. CHAITMAN:

18      Q    So this is for 1B0023-10.  Do you see that?

19      A    Yes, at --

20      Q    Okay.

21      A    -- the top.

22      Q    Okay.  And then on the bottom of this page it has two

23      other account numbers.  Do you see that 100214 and then

24      100215?  Do you see that?

25      A    Yes.  I see those numbers.
```

Page 124

1   Q    Now do you understand those to be predecessor accounts?

2   A    I understand -- well, at least for the 100215 that also

3   appeared on the cover was the account number when BLMIS was

4   using all numeric account numbers before they changed to an

5   alpha-numeric system.  So I don't know if you would call it

6   a predecessor or that was just the account number for this

7   account prior to when it became 1B0023.

8   Q    Okay. But is it your understanding that once it became

9   1B0023 there were no more statements issued by Madoff under

10  100215?

11  A    That would be my understanding that I wouldn't expect

12  to see any statements for the all numeric account.

13  Q    If you would be good enough going to my binder to look

14  at Exhibit 38.  Do you see this is a statement dated 9/30/90

15  and it's for account number 215-9-0?

16  A    Yes.

17  Q    Okay.  Do you know why Mr. Madoff was still issuing

18  statements for that account as of 9/30/1990?

19  A    I -- when -- I don't recall the specific year when the

20  change was made from an all numeric account number to an

21  alpha-numeric.

22  Q    Well, if I can ask you -- let me come back to that

23  because I have to find the document which has a date on it.

24       (Pause)

25  Q    Now looking at the Trustees' Exhibit 36 this lists

Page 125

1   accounts 1B0156 and then the predecessor accounts appear to

2   be 1002510.  Do you see that?

3   A    It's 100254, 4510, 254 --

4   Q    410.  Okay.  And do you understand that to be a

5   predecessor account?

6   A    Again, I'm not sure if I would use the word

7   predecessor.  I think that that was the all numeric account

8   number associated with 1B0022 when it changed over from all

9   numeric to alpha-numeric.

10  Q    Okay.  And, again, would you expect Mr. Madoff to have

11  continued to send out statements on account 25410 after the

12  account was renamed 1B0156?

13  A    I wouldn't expect it.  No.

14  Q    Okay.  In the course of your research did you go back

15  and look at all of the account statements for the

16  predecessor accounts?

17  A    All available customer statement information was

18  captured as part of my starting point for my reconciliation.

19  So to answer your question, yes, we would have considered

20  all accounts at all times and the -- identified the cash

21  transactions in those accounts.

22  Q    If we go back to Exhibit 8, your chart on Mr. Blecker's

23  account, do you have that?

24  A    Yes.

25  Q    Okay.  So the date of the first transaction that you

Page 126

1    have listed is 11/24/86.

2              THE COURT:  Which page?

3              MS. CHAITMAN:  Page --

4              THE COURT:  Page 1 of the four page exhibit?

5              MS. CHAITMAN:  Yeah.  It's 11 of 19 on the very

6    top, but it's --

7              THE COURT:  Uh-huh.

8              MS. CHAITMAN:  -- it begins with list of PW

9    transactions 1B0022.  Exhibit 12 in my binder.  Excuse me.

10   Exhibit 8 in my binder.  It's the first page of the chart.

11   BY MS. CHAITMAN:

12   Q    Do you see that?

13   A    The date of the first transaction is November 24th,

14   1986.

15   Q    Okay.  And then if you go further on in the chart

16   there's -- there were four pages relating to Mr. Blecker's

17   account and then with respect to Sophie Blecker and Arthur

18   Blecker you began with 1982.  Do you see that?

19   A    So you're looking at page 1 of 5 --

20   Q    Of five.  Yes.

21   A    -- for the next chart which --

22   Q    Yes.

23   A    -- is Attachment D-18 --

24   Q    Yes.

25   A    -- for account 1B0023?

Page 127

1    Q    Yes.

2    A    The first -- the date of that first PW transaction in

3    that account is August 24th, 1982.

4         (Pause)

5    Q    Yeah.  Looking at my Exhibit 36 this is a statement

6    dated 7/31/81.  Do you see that?

7    A    Yes, I do.

8    Q    And can you tell me if you included that statement in

9    your summary which is part of Exhibit 8?

10   A    I did not because there's no PW transactions reflected

11   on this statement.

12   Q    Okay.  Are you confident, though, that you reviewed

13   these statements from the very beginning?

14           THE COURT:  Which -- what -- what do you mean by

15   these statements?

16           MS. CHAITMAN:  These statements --

17           THE COURT:  For this account?

18           MS. CHAITMAN:  -- referring to the Blecker

19   accounts.

20   BY MS. CHAITMAN:

21   Q    That you reviewed all of the Blecker accounts from the

22   very beginning of the accounts.

23   A    I feel confident that the data that I started with in

24   terms of the identification of cash transactions for all

25   customer accounts would have included any cash transaction

Page 128

```
 1    on customer statements going back as far as possible which

 2    would have included these statements dated as early as 1981.

 3    Q    Okay.  And you were only looking for profit withdrawal

 4    transactions; is that right?

 5    A    That's correct.  PW transactions that had -- either had

 6    the code PW or there were some transactions with the code CW

 7    that we included in the population of PW transactions

 8    because it had a description that was similar to a PW

 9    transaction.  So like check with a -- maybe a company name

10    after.

11    Q    Okay.  But in any event you wouldn't have had the

12    predecessor account and the subsequent number account

13    issuing simultaneously statements for the account, isn't

14    that true?

15    A    I'm sorry.  Can you repeat the question?

16    Q    Well, if we take the joint account and --

17         THE COURT:  What was the numeric number of the

18    joint account?

19         MS. CHAITMAN:  Well, it began with 254 and it

20    became 1B0156.

21    BY MS. CHAITMAN:

22    Q    Do you agree with me about that?

23         THE COURT:  Wasn't there one that ended in 23

24    somewhere along the line?

25         MS. CHAITMAN:  You know --
```

Page 129

```
 1              THE COURT:  If you look at that --

 2              MS. CHAITMAN:  -- there may have been --

 3              THE COURT:  -- Exhibit 8 --

 4              MS. CHAITMAN:  Exhibit 8 --

 5              THE COURT:  -- the two accounts in your -- in the

 6     chart or the 22 account and the 23 account, and I thought

 7     the evidence was that 22 account became 156 or 157 and the

 8     23 account became the other one.

 9              MS. CHAITMAN:  Right.  Right.  But -- and before --

10              THE COURT:  So what precede -- what preceded the 22

11     and 23 accounts?

12              MS. CHAITMAN:  Okay.

13     BY MS. CHAITMAN:

14     Q    Do you -- can you -- I mean, I have an answer of what I

15     believe, but are you able, Ms. Collura, to tell the judge

16     what number preceded the 22 and 23?

17     A    Yes.  So I'm looking at, if I'm able to look back at

18     exhibit -- Trustees' Exhibit 40 which I think most clearly

19     lays out the sequence of numbering.

20              THE COURT:  Put 40 up there.

21     BY MS. CHAITMAN:

22     Q    Okay.  So this is 2510 and then 2310 and then 157; is

23     that right?

24              THE COURT:  So the joint account started out as

25     21510 and then it went to 23 and then it became 1B0157?
```

Page 130

```
1              THE WITNESS:  Yes.  Correct.  Correct.

2              MS. CHAITMAN:  Okay.

3    BY MS. CHAITMAN:

4    Q    And can you do the same thing for us with respect to

5    Mr. Blecker's account?

6    A    I think you want to pull up exhibit -- Trustees'

7    Exhibit 36.

8         (Pause)

9    A    So this started at 100254.  It became 1B0022.  And then

10   when that account closed it was 1B0156.

11             THE COURT:  Okay.  Ma'am, would you take a look at

12   Blecker Exhibit 36?  Do you have that?

13             THE WITNESS:  Yes, I do.

14             THE COURT:  And the number on the top is 100214.

15   So what's that account?

16             THE WITNESS:  I don't know.  I don't know what it

17   is.  I --

18        (Pause)

19             THE WITNESS:  In one of the documents in the

20   customer file for 1B0023, I'm looking at Trustees' Exhibit

21   41, there -- it --

22             MS. CHAITMAN:  Excuse me.  Trustees' Exhibit what?

23             THE WITNESS:  I'm sorry.  41.

24             MS. CHAITMAN:  41.

25             THE WITNESS:  It's -- the 100214 number does appear
```

Page 131

1   at the bottom, but so does 100215.  So I can't tell you

2   sitting here what -- I would have expected that it went with

3   the number on the front of the file folder, which was the

4   100215.  I'm just not sure about the other one listed there.

5            MS. CHAITMAN:  Okay.

6   BY MS. CHAITMAN:

7   Q    And now if you would be good enough to look at my

8   Exhibit 30 which is in the binder.

9        (Pause)

10  Q    Now this is for account number 100254-9-0.  Do you see

11  that?

12  A    I do.

13  Q    And it's -- this is Aaron Blecker's account and this

14  statement is 10/31/90.  Do you see that?

15  A    I do.

16  Q    And that was long after the account was renumbered

17  1B0022, isn't that true?

18  A    I don't remember exactly what year those numbers went

19  from numeric -- all numeric to alphanumeric.  But if it was

20  prior to 1990 I -- I'm just -- I'm not sure when that

21  happened.

22  Q    Sure.

23  A    I don't remember.

24  Q    Let's take a look at Trustee Exhibit 37.  Thank you.

25        This has a handwritten notation on it which says --

Page 132

1    with initials which says 9/22/86.  Do you see that in the

2    second section?

3    A    I do.

4    Q    Okay.  So clearly the account was numbered 1B0022 as of

5    1986, right?

6    A    That --

7              THE COURT:  I'm sorry.  Which exhibit are you

8    referring to?

9              MS. CHAITMAN:  We're on Trustee Exhibit --

10             THE COURT:  Got it.  Okay.

11   BY MS. CHAITMAN:

12   Q    So this -- the handwritten notation in the second

13   section has initials and it says 9/22/86.  So as of 9/22/86

14   it appears that 1B0022-10 had been assigned, isn't that

15   true?

16   A    That's what it looks like based on this document.  Yes.

17   Q    And yet as of 10/31/90 Madoff was still issuing

18   statements to Mr. Blecker under 100254.  Do you see that?

19   A    I do.

20   Q    Do you have any explanation for that?

21   A    I do not have any explanation, but I can tell you on

22   this statement there's no cash transactions including PW

23   transactions so it wouldn't have impacted my analysis.

24   Q    All right.  But isn't it possible that if we had

25   available to us a complete set of the statements for this

Page 133

1   account that it might show deposits into this account of

2   these PW checks that Mr. Blecker claims he never received?

3          MS. VANDERWAL:  Objection.

4          THE COURT:  Yeah.  That's sustained.  Anything is

5   possible, but I guess the question is does it appear to you

6   that account statements with wholly numeric numbers were

7   being issued after the numeric numbers were changed over to

8   alpha numeric numbers?

9          THE WITNESS:  It looks like they were based on

10  this, although this was a microfilm.  So this isn't a

11  statement that -- it's not the customer statement that would

12  have been sent to Mr. Blecker.  I would be speculating as to

13  why this was part of the microfilm records of BLMIS.

14  BY MS. CHAITMAN:

15  Q    And if you look at Exhibit 31 in the binder this again

16  is an -- a statement on account 100254-9-0 and it's dated

17  8/31/93.  Do you see that?

18  A    Yes, I do.

19  Q    Now if we could bring up again the Trustees' Exhibit

20  38.  Thank you.

21         MS. CHAITMAN:  Okay.  I've asked you for the wrong

22  exhibit.  Let me just find the right one.

23      (Pause)

24         MS. CHAITMAN:  If you could bring up, please, the

25  Trustees' Exhibit 41.

Page 134

1    BY MS. CHAITMAN:

2    Q    Ms. Collura, this is for the joint account.  Do you see

3    that?

4    A    Yes.

5    Q    And the account number is 1B0023-10.  Do you see that?

6    A    That's right.

7    Q    And then on the bottom it lists those two accounts,

8    100215 and 100214.  Do you see that?

9    A    Yes, I do.

10   Q    Now there's no indication on here when this account was

11   started, right?

12   A    There's no date --

13   Q    Right.

14   A    -- indicated anywhere on here.  No.

15   Q    Right.  And in your -- going back to Exhibit 8 to your

16   chart, did you indicate on your chart in any way what the

17   account number was so that we could look at the joint

18   account and figure out when that was started?

19   A    There is a column on my attachments for BLMIS account

20   number.  It's the second column on the left-hand side.

21   Q    Right.

22   A    Yeah.

23   Q    But in -- are you saying that in 1985 the account

24   number was 1B0023?  I'm looking at page -- we're looking at

25   your Exhibit 8, the charts that you prepared with respect to

Page 135

1    the documentation on the Bleckers.  And your first entry is

2    1982 and you list the account number as 1B0023.  Do you see

3    that?

4    A    Yes.

5    Q    So does that indicate to you that this document which

6    we've put on the screen as Exhibit 41, Trustees' Exhibit 41,

7    must have been dated in 1982 or earlier?

8    A    It may be just that our -- for purposes of our analysis

9    if an -- we may have gone with the alphanumeric number

10   because as I explained before when it went from an all

11   numeric number to an alpha numeric number we didn't consider

12   that like a predecessor or a successor account relationship.

13   It really was an account number change.

14   Q    Okay.

15   A    So I think for purposes of us capturing the cash

16   transactions for any particular account we would have just

17   used the alphanumeric account number, in this case the

18   1B0023 regardless of when that number changed for purposes

19   of our analysis.

20   Q    okay.  And if I can ask you to go back to trustees'

21   Exhibit 37, please.  Thank you.

22        So this was the document which had 9/22/86 in the

23   second section of it.  Do you see that?

24   A    Yes.

25   Q    And this was a 1B0022, so this is the alphanumeric

Page 136

1   numbering system that Mr. Madoff used after he used the pure

2   numbers, right?

3   A    Correct.

4   Q    Okay.  So at least we know that as of 9/22/86 Mr.

5   Madoff was switching or had switched accounts to an

6   alphanumeric system; is that --

7          MS. VANDERWAL:  Objection, Your Honor.

8   BY MS. CHAITMAN:

9   Q    Is that correct?

10  A    Well, if you're just basing that on the date

11  handwritten on here I would say at least as of '86, but

12  there's no way to tell for sure when that alpha-numeric --

13  when the numeric number was crossed out.  I can't --

14          THE COURT:  I mean --

15          THE WITNESS:  -- tell from this document.

16          THE COURT:  -- there was an objection.  The problem

17  I'm having with this is we don't know if the date that's

18  written is the same date that the account number -- the

19  different account number or the alphanumeric account number

20  is written -- and, in fact, the handwritings don't even look

21  alike.

22          In other words, the redacted -- the section that

23  has redacted could have been added on September 22, 1986.

24          THE WITNESS:  So it --

25          THE COURT:  But it doesn't tell us when somebody

1    wrote 1B0022-10.

2    BY MS. CHAITMAN:

3    Q    So based on the massive review of Mr. Madoff's records

4    what is your best recollection of when Mr. Madoff switched

5    to the alphanumeric numbering system?

6    A    I honestly, and I apologize, I just don't remember.  I

7    don't remember when that happened.  I don't remember what

8    year it was.

9    Q    Well, was it -- do you have any recollection that it

10   occurred after 1990?

11   A    I don't remember the year and, honestly, it wasn't

12   relevant to my analysis so it wasn't a focus point for what

13   I -- you know, my reconciliation that was I conducting.  It

14   didn't -- it didn't matter for purposes of what I -- my

15   analysis.

16   Q    Okay.  Well, let me show you, if you would be good

17   enough to look at my binder, Exhibit 20 -- Exhibit 41.

18        (Pause)

19   Q    Do you see that?

20   A    Yes.

21   Q    So here we have a 12/31/91 statement issued by Madoff

22   to Arthur and Sophie Blecker and the account number is

23   100215-9-0.  Do you see that?

24   A    I do.

25   Q    Do you have any -- assuming that by 12/31/91 Mr. Madoff

Page 138

1    had switched to an alphanumeric system and we'll put in

2    documents that will show that, how can you explain the fact

3    that statements were being issued to the 215 account number

4    as of 12/31/91?

5    A    Same as before.  I'm sorry.  I would just be

6    speculating as to why this was issued.  What I see on this

7    statement or more importantly what I don't see are any PW

8    transactions so it wouldn't be relevant to my analysis.

9    Q    Okay.

10              THE COURT:  Let me ask this a different way.

11   Where is the trustees' determination letter for the account

12   that this became because that has the dates --

13              THE WITNESS:  Sure.

14              THE COURT:  -- of the trans -- okay -- of the

15   transactions.

16              THE WITNESS:  Sure.

17              THE COURT:  I think it was around 16 or --

18              Now the account -- the one you just showed the

19   witness, the 215 account.  I'm sorry.  I'm getting confused.

20   But this was account B0023, do you recall, according to my

21   notes?

22              MS. CHAITMAN:  The 215 account was also --

23              THE COURT:  Well, let's just start there.  It

24   became account --

25              MS. CHAITMAN:  23.

Page 139

1          THE COURT:  -- 23.  Is there a determination letter

2     for that account?

3          MS. CHAITMAN:  Right.  Yes.  In my binder, Your

4     Honor, it's Exhibit 21.

5          THE COURT:  Let me --

6       (Pause)

7          THE COURT:  And there's a table attached.  Okay.

8     This one only shows transactions starting in 2007.  Is there

9     a similar printout for the other account because the other

10    account goes back to 1986?

11         MS. CHAITMAN:  Okay.  So the first determination

12    letter that the trustees sent was September 29th, 2010.

13         THE COURT:  What exhibit is that?

14         MS. CHAITMAN:  It's Exhibit 21 in my binder.

15         THE COURT:  That I have.  That --

16         MS. CHAITMAN:  Okay.  And then he sent out a second

17    one which is Exhibit 23 in my binder.

18         THE COURT:  Okay.  And that's the 22 account and it

19    shows transactions in that account going back to 1981.

20         MS. CHAITMAN:  But I point out --

21         THE COURT:  I'm sorry.  This is mixed up because I

22    see the 23 account listed there.

23         MS. CHAITMAN:  It's very confusing, Your Honor,

24    because the numbers don't seem to correlate.

25         THE COURT:  I don't -- well, I know you put this

Page 140

1    book together.  But I'm looking at the tables that usually

2    accompany the termination letters.  The letter refers to

3    account 22, but the account information refers to 23.

4            MS. CHAITMAN:  I would point out also, Your Honor,

5    it refers --

6            THE COURT:  But -- and this here --

7            MS. CHAITMAN:  -- to --

8            THE COURT:  -- we -- you know --

9            MS. VANDERWAL:  Your Honor --

10           THE COURT:  -- whether it's your mistake or their

11   mistake.

12           MS. VANDERWAL:  -- just to try to provide some

13   clarity there was no claim filed for 1B23 so there is no

14   determination letter or related schedule for 1B23.  The --

15           THE COURT:  So --

16           MS. VANDERWAL:  -- claim was filed for 1B22.

17           THE COURT:  So where did the information --

18           MS. VANDERWAL:  So --

19           THE COURT:  -- that is attached to what is exhibit

20   -- Blecker Exhibit 23 --

21           MS. VANDERWAL:  So as we have been through 1B0023

22   became 1B0157 --

23           THE COURT:  Right.

24           MS. VANDERWAL:  -- for which a claim was filed.

25   And in an effort to explain sort of the permutations --

Page 141

1          THE COURT:  Okay.

2          MS. VANDERWAL:  -- of the accounts we provided the

3     information for 1B0023 to Mr. Blecker.

4          THE COURT:  The information provided doesn't seem

5     to go with the letter, though.  That's what --

6          MS. VANDERWAL:  Yeah.  Well --

7          THE COURT:  Unless you have a copy -- a different

8     copy of the letter and whatever went with it.  of course,

9     there was a -- my recollection was there was a request for a

10    determination to 1022 and that was the account where there

11    was $206,000, I think, left of the balance at the end of the

12    day in 1997.  So where's that letter?

13         MS. VANDERWAL:  So if you look at the first

14    paragraph of the second page of this letter you can see that

15    we also sort of were trying to explain to Mr. Blecker the

16    relationship between the accounts.

17         THE COURT:  Right.

18         MS. VANDERWAL:  And it's -- we seem to be missing

19    Exhibit A from this letter.

20         THE COURT:  Okay.  But --

21         MS. VANDERWAL:  So there would be an Exhibit A that

22    dealt with 1B22 which is not here.  And --

23         THE COURT:  Okay.  But then the question is looking

24    at this you're showing transactions dating back to 1981 in

25    the 23 account.

Page 142

1          MS. VANDERWAL:  That's correct.

2          THE COURT:  But then Ms. Chaitman has shown other

3    exhibits in her 30s and 40s range which see to show

4    documents with the predecessor through numeric numbers after

5    those dates.

6          MS. VANDERWAL:  So, again, for the purpose of

7    preparation of this exhibit I'm not -- or, sorry, of this

8    schedule they don't appear to have included the all numeric

9    code because it wasn't like one account transferred to

10   another.  It was the same account --

11         THE COURT:  Who --

12         MS. VANDERWAL:  -- that we --

13         THE COURT:  Who prepared these schedules?  It may

14   be the better thing to just have the person testify as to

15   how those were put together because we're all speculating.

16         MS. BROWN:  Your Honor, if I may for one second.

17   We -- the -- our next witness that we plan to put on is Mr.

18   Greenblatt who prepared the principal balance calculations

19   that list --

20         THE COURT:  Okay.

21         MS. BROWN:  -- all of the transactions and also

22   includes information about the predecessor accounts.  So I

23   think this line of questioning is going to be resolved

24   during that testimony because there are documents that

25   provide that information in a summary fashion as well as

Page 143

```
 1    have backup references.

 2           THE COURT:  All right.

 3        (Pause)

 4    BY MS. CHAITMAN:

 5    Q    Now, Ms. Collura, you've testified that you defined the

 6    body of transactions that you were going to analyze as going

 7    from, am I correct 1981 through 2008?

 8    A    For purposes of the PW transactions?

 9    Q    Yes.

10    A    I think we would have gone back as far as possible and

11    --

12           THE COURT:  I thought that the agreement was that

13    the trustee took the accounts, whatever they said, as of

14    1981 as if they were all cash.  In other words, that was the

15    balance and then went forward from there.  That's my

16    recollection.  Now whether this witness knows that --

17           THE WITNESS:  Okay.

18           THE COURT:  -- or not.

19           THE WITNESS:  Okay.

20           THE COURT:  So even if there were PW transactions

21    before '81 they weren't deducted from the account --

22           THE WITNESS:  Okay.

23           THE COURT:  -- balance.

24           THE WITNESS:  Okay.

25           THE COURT:  Is that -- I'll ask the trustee; is
```

Page 144

```
 1    that right?

 2             MS. VANDERWAL:  That's correct, Your Honor.

 3    BY MS. CHAITMAN:

 4    Q    What was the most recent PW transaction that you found

 5    in your work?

 6    A    2000 --

 7             THE COURT:  For Blecker or for anyone?

 8             MS. CHAITMAN:  Anyone.

 9             THE WITNESS:  2008.

10    BY MS. CHAITMAN:

11    Q    There were PW transactions in 2008?

12    A    Yes.

13         (Pause)

14    Q    And did you understand that the only issue here was PW

15    transactions?

16    A    The issue in this proceeding?

17    Q    Yes.

18    A    I'm not sure what you mean by issue.  I -- my focus was

19    the PW transactions.  My analysis focused on the PW

20    transactions.

21    Q    Right.  So then why did you include within your

22    analysis the cash withdrawal transactions and the JRNL

23    transactions?

24    A    I don't believe that there were any JRNL in the

25    population of PW transactions as the defined term PW.  As I
```

Page 145

1    described before there were some CW transactions or

2    transactions with the CW code that had a similar description

3    to some of the other PW transactions that we've seen like

4    the check with the company name or check with something not

5    just check, something else in the description and we would

6    have included those as well as part of the defined term, PW

7    transactions.

8    Q    Okay.  But you would agree with me that it's much

9    easier to reconcile transactions when you have the bank

10   records, isn't that true?

11   A    Easier how.  Easier than what?  I'm sorry.

12   Q    Well, is -- isn't it easier to confirm whether there

13   were transactions if you had the bank records?

14   A    The bank records were obviously one source that I used,

15   but I wouldn't say that those were easier than

16   correspondence with the other documents that I've testified

17   about.

18   Q    Well, would you agree with me that if we had -- you

19   understand that Mr. Blecker claims that he never took out

20   any money from his Madoff accounts, either he or his wife?

21   You understand that that's his contention?

22   A    Yes.  That's my understanding.

23   Q    And if we had even one check purportedly written to Mr.

24   or Ms. Blecker and we could look at the back of it we could

25   figure this out, isn't that true?

Page 146

1    A    Figure -- figure out for Mr. Blecker specifically?

2    Q    Yes, whether the check was deposited into his account,

3    into Mr. Madoff's account, into Frank DePasquale's account,

4    or thrown in the garbage, right?

5              MS. VANDERWAL:  Objection, Your Honor.

6              THE COURT:  Sustained. I don't know where

7    DePasquale or Madoff come from.

8              MS. CHAITMAN:  I'm just suggesting to the witness

9    that without having the check you don't know where it was

10   deposited.

11   BY MS. CHAITMAN:

12   Q    I mean, you testified this morning that you looked at,

13   was it Marjorie -- Margaret Klatsker (ph) or whatever, you

14   looked to see -- you verified her signature on the back

15   where it said, for deposit only?

16   A    But my analysis wasn't just on the Blecker account.  I

17   was looking at all --

18   Q    No.

19   A    -- PW transactions.

20   Q    But as a general principle the reason you looked for

21   the endorsements was you wanted to make sure that the named

22   payee received the check, isn't that true?

23   A    That was relevant for my tracing analysis.

24   Q    Yeah.

25              (Pause)

Page 147

1    Q     Now I believe your testimony was that with respect to

2    the pre-1998 PW transactions  you could only confirm 50

3    percent of them; is that correct?

4    A     The over 50 percent was across all time periods, not

5    just limited to the pre-'98 time period.

6    Q     Well, let me be clear.  I thought your testimony was

7    that once you had the bank records for the period from 1998

8    through 2008 you were able to confirm very close to a

9    hundred percent, isn't that true?

10   A     That's correct.

11   Q     Okay.  And did you ever calculate what percentage of

12   the transactions that predated 1998 you were able to

13   confirm?

14   A     I think that was over 50 percent.

15   Q     Okay.  And of the pre-1998 transactions isn't it true

16   that over 62 percent constituted transactions with Norman

17   Levy?

18   A     I don't know where you're getting the 62 percent.

19   Q     What percent do you recall?

20   A     That -- let me make sure I understand.  So you're

21   asking what percent of the pre-1998 PW transactions were

22   Normal Levy?

23   Q     Yes.

24   A     I think they -- it was around 50 percent.

25   Q     Okay.  And Norman Levy, you understood, was a very

Page 148

1    close friend of Mr. Madoff.  Did you understand that?

2    A    His relationship had no impact on my analysis.

3    Q    I didn't ask that.  I asked whether you understood that

4    Norman Levy had a very close relationship with Mr. Madoff?

5    A    Yes.  That was my understanding.

6    Q    Okay.  So when you say that you could verify 50 percent

7    of the pre-1998 PW transactions, over 50 percent of those

8    were Norman Levy transactions?

9            THE COURT:  Of the verifiable ones?

10           MS. CHAITMAN:  Yes.

11           THE WITNESS:  Yeah.  I'm getting a little confused

12   with the percentages.

13           THE COURT:  Let me do it this time.  Pre-December

14   1998 there were something like 46,000 PW transactions

15   because there were another 5.5 --

16           THE WITNESS:  So -- of the total PW transactions --

17           THE COURT:  Yeah.

18           THE WITNESS:  -- pre-'98 there was about 85,000.

19           THE COURT:  Okay.  So it's 85,000.  And what Ms.

20   Chaitman is asking is of those 85,000 approximately 50

21   percent (indiscernible) on Levy?

22           THE WITNESS:  That's right.

23   BY MS. CHAITMAN:

24   Q    Okay.  And, in fact, if you -- you said in your report

25   that approximately 47,000 relate to one BLMIS customer

Page 149

1    account under the name of Norman Levy, right?

2    A    That's right.

3    Q    Okay.  And do you recall that Mr. Levy actually had

4    other PW accounts in the period from the 80s to 1997 which

5    had profit withdrawal transactions?

6    A    There were other accounts that had the name Levy.  I

7    don't know if there was any specifically just in the name

8    Norman Levy, but I understand that they were maybe family

9    members of Norman Levy.

10   Q    Right.  And did you ever calculate of the total number

11   of PW transactions that pre-date 1998 how many of those

12   accounts that you were able to confirm were relatives of

13   Norman Levy?

14   A    I don't remember the exact number.  It may have added -

15   - I would be guessing.  You know, maybe two or 3,000.

16              THE COURT:  Where -- weren't all the pre-'98

17   accounts that you reconciled Norman Levy accounts?

18              THE WITNESS:  No.  That's not right.

19              THE COURT:  Because -- what were the numbers that

20   were just --

21              MS. CHAITMAN:  Well, I'm quoting from Ms. Collura's

22   report.  She says --

23              THE COURT:  But the total reconciliation was about

24   51,000?

25              THE WITNESS:  Yes.

Page 150

```
 1              THE COURT:  Okay.  So -- and 5,500 of those were

 2    post-December '98, right?

 3              THE WITNESS:  Correct.

 4              THE COURT:  That leaves about 46,000.

 5              THE WITNESS:  I think if I -- if I may, if -- I

 6    think what you're asking is how many pre-1998 transactions

 7    that weren't 1L0027 Norman Levy's account, was I able to

 8    reconcile.

 9              THE COURT:  Let's start with that one.

10              THE WITNESS:  That was about 7,000 PW transactions.

11    BY MS. CHAITMAN:

12    Q    And of those 7,000 how many were Norman Levy's

13    relatives?

14    A    I can't tell you sitting here today.  I could -- if I

15    had my file I could calculate it.  I didn't calculate it for

16    preparation for today.

17    Q    Well, you testified on direct that Mr. Levy delivered

18    or someone on his behalf, I think he had died, but Mr. --

19    somebody delivered to the trustee all of Mr. Levy's bank

20    records, right?

21    A    His bank records were produced to the trustee.  Yes.

22    Q    Right.  So you had a way of verifying that the account

23    holder received the money by looking at the account holder's

24    bank records, isn't that true?

25    A    Yes, for Mr. Levy.  Correct.
```

Page 151

1    Q     And also for his relatives?

2    A     I don't remember if there were -- if those bank records

3    included ones for his relatives or if it was his account at

4    JPMorgan.

5    Q     Now I would like you to take a look at Exhibit 48 in my

6    binder.

7          (Pause)

8    Q     Do you have it open?

9    A     Yes.

10   Q     Okay.  Did you ever see -- this is not a color copy,

11   but did you ever see the checks that Mr. Madoff sent to

12   customers still attached to the voucher that he sent to the

13   customers?

14         THE COURT:  Is the voucher the top part?

15         MS. CHAITMAN:  The voucher is the top part, Your

16   Honor.

17         THE WITNESS:  Not very often.  I've definitely seen

18   some, but not very often.

19   BY MS. CHAITMAN:

20   Q     Okay.  But you remember that he had that format.  It

21   was a -- it was a piece of paper the size of this Xerox and

22   it was -- it had a serrated edge above Bernard L. Madoff and

23   the customer could tear off the bottom and deposit the check

24   and then the customer could keep the top part?

25   A     I've only ever seen copies so I -- I'm -- I'm assuming

1    that that line is a serrated edge.

2    Q    Okay.  Okay.  But you've seen copies of this, right?

3    A    Yes.

4    Q    Okay.  And in the course of your research did you come

5    across the -- any checks like this which -- where there was

6    no record that the customer had deposited the check?

7            THE COURT:  You mean there was a voucher on the

8    records, but --

9            MS. CHAITMAN:  There was -- that Madoff had --

10           THE COURT:  What --

11           MS. CHAITMAN:  -- a record -- Madoff --

12           THE COURT:  I don't understand because I thought

13   the customer would have the voucher.

14           MS. CHAITMAN:  Right.  But there was a duplicate of

15   it that was kept in Madoff's files.

16           THE COURT:  Well, do you know that?

17           THE WITNESS:  I'm not sure I understand the

18   question.

19           THE COURT:  Was there a duplicate of the voucher

20   portion of the check maintained in the BLMIS files?

21           THE WITNESS:  The voucher portion, the top portion

22   are you referring to?

23           THE COURT:  Yes.

24           THE WITNESS:  Yes.  I believe those were maintained

25   in his files.

```
1              MS. CHAITMAN:  Okay.

2     BY MS. CHAITMAN:

3     Q     And in the course of all of your work did you ever find

4     that, in fact, a check was charged against the customer's

5     account, but had not been cashed by the customer?

6     A     Well, I did not have copies of canceled checks for all

7     of the PW transactions or cash transactions for that matter.

8     If I had a copy of the canceled check that showed me that

9     the check was deposited somewhere.

10    Q     Somewhere.

11    A     Sometime -- most of the time I had the information to

12    trace where it went.  Sometimes I didn't.

13    Q     Okay.  And if the customer -- if you would be good

14    enough to look at -- this check is dated December 17th, 1991

15    and it is for $4,226.  Do you see that?

16    A     I do.

17    Q     And 20 cents.  And then if you look at Exhibit 49 do

18    you see that on 12/17 there's a charge for a check mark for

19    PW 4,226.20.  Do you see that?

20    A     I do.

21    Q     And do you see that that was charged against the

22    customer's account?

23    A     Yes.  It was a -- in the debit column.  Correct.

24    Q     Okay.  And did you have any way of determining whether,

25    in fact, the customer received and deposited that check?
```

Page 154

1    A    I wouldn't have had the BLMIS bank records for this

2    time period for 1991.  So, no.

3    Q    Right.  So if a customer -- if a check was made out to

4    Mr. Blecker and it was sent to somebody else, unless you had

5    the actual bank record you had -- you would have no way of

6    knowing who cashed that check, isn't that true?

7    A    If I didn't have a copy of the canceled check?

8    Q    Yes.  Without having a copy of the -- without seeing

9    the back of the canceled check, how would you know where the

10   check was deposited?

11   A    I wouldn't, unless I had the accountholders personal

12   bank records.

13   Q    Okay.

14        (Pause)

15   Q    Now, you've testified that you reviewed all the

16   depositions of the Madoff employees?

17   A    In this PW proceeding, yes.

18   Q    And did you agree with the -- I believe you testified

19   on direct that you generally agreed with their testimony, is

20   that --

21   A    Yes, correct.

22   Q    Okay.  And do you generally agree with the proposition

23   that --

24        MS. VANDERWAL:  Objection, Your Honor.  Ms.

25   Chaitman is mischaracterizing the testimony of Ms. Collura.

```
 1              THE COURT:  No, she said she read -- she ticked

 2      off the people whose depositions she read, the recent

 3      depositions -- and let me just see, because I wrote it down.

 4          (Pause)

 5              THE COURT:  I can't find it offhand, but --

 6              MS. VANDERWAL:  My point was --

 7              THE COURT:  -- she -- I think she generally said

 8      that she -- there is nothing that she read that caused her

 9      to change her opinion.

10              MS. VANDERWAL:  That changed her conclusions --

11              THE COURT:  Yeah, all right.

12              MS. VANDERWAL:  -- correct.

13              THE COURT:  Why don't you rephrase the question

14      that way?

15      BY MS. CHAITMAN:

16      Q    You testified this morning as to which of the Madoff

17      employees' depositions you had read and your test -- well,

18      do you remember exactly what you said?  I don't have a note

19      of exactly what you said.  I thought you said that generally

20      agreed with what --

21      A    I think I said that there was -- the -- there was

22      nothing that I read in those transcripts that caused me to

23      change my conclusions --

24              THE COURT:  My notes --

25              THE WITNESS:  -- or opinions.
```

Page 156

```
 1              THE COURT:  -- my notes indicate that she

 2      testified that their testimony supported --

 3              THE WITNESS:  Yeah, that's --

 4              THE COURT:  -- her conclusions.

 5              THE WITNESS:  -- if anything, it supported my

 6      conclusions.

 7      BY MS. CHAITMAN:

 8      Q    Okay.  Are you able to tell us, focusing on the non-

 9      Norman Levy, pre-1998 PW transactions, right?

10      A    Okay.

11      Q    So we're talking about, I think you said, 5,000?

12      A    I said that there were 7,000, around 7,000 that I was

13      able to reconcile.

14      Q    Seven thousand that you were able to reconcile?  And

15      how many were you not able to reconcile?

16      A    So I would have to kind of back into that number.  So

17      if there's 91,000 total, less -- let's -- for ease of math,

18      let's say 5,000 in the ten-year time period.  So, 91 less is

19      86,000, approximately 86,000 prior to the ten-year time

20      period.  For Norman Levy specifically, there were 47,000 of

21      the 91.

22      Q    Right.

23      A    About 4,000 of those were in the ten-year period.  So

24      that leaves approximately 43,000 Levy -- Norman Levy

25      transactions prior to the ten-year period.  So there's a
```

Page 157

1    total -- just to summarize --

2              THE COURT:  Exactly half?

3              THE WITNESS:  It's exactly half.  I didn't mean

4    for that to happen, but it's half.  So just to summarize it,

5    prior to the ten-year period, there was approximately 85 --

6    86,000, and 43,000 of those were in Norman Levy's account,

7    1L0027.

8    BY MS. CHAITMAN:

9    Q    Okay.  So the other 43,000 were non-Norman Levy, pre-

10   1998 accounts?

11   A    Yes.

12   Q    Okay.  And we will put aside the issue of Norman Levy's

13   relatives, okay?  It's in your charts, because you have a

14   lot of Levy accounts listed that there are not Norman Levy,

15   but let's put that aside.  Of the 43,000, how many were you

16   able to reconcile to any documentary evidence?

17   A    Approximately 7,000.

18   Q    So that means that there were 36,000 that you were not

19   able to reconcile?

20   A    43,000 less 7,000 is --

21   Q    Okay.

22   A    -- 36,000.

23   Q    Okay.

24   A    I'm not very good with math in my head, even though I'm

25   an accountant.

Page 158

1    Q    Okay.  But is it fair to say that with respect to the

2    ones you did reconcile that there were in many instances

3    letters in the account -- in the files from the customers

4    asking for the profit withdrawals?

5    A    It could have been letters asking for the profit

6    withdrawals, it could have been letters requesting that the

7    profit withdrawals stop, it could have been accounting

8    schedules, it could have been bank records that were

9    produced by the accountholders.

10   Q    Okay.  If you'd be good enough to look at my Exhibit

11   60?

12        (Pause)

13   Q    Do you see this?  It's a letter from Alan Gordon and

14   it's to Erin Reardon, who worked for Madoff.  And it says,

15   "As per our conversation today, please establish my above-

16   referenced account so that all earnings are distributed to

17   me on a quarterly basis," do you see that?

18   A    I do.

19   Q    Okay.  And was it your understanding that Mr. Madoff

20   required customers to make requests in writing when they

21   wanted withdrawals?

22   A    I believe that that was part of his testimony.

23   Q    Yes.

24   A    I also remember reading that he clarified that to say

25   that not every single withdrawal, if it was establishing a

1    consistent profit withdrawal or quarterly withdrawal that he

2    didn't require every single one --

3    Q    Right.  So, in other words --

4    A    -- to be in writing.

5    Q    -- is it fair to say -- and I don't want to put words

6    in your mouth, but is it fair to say that if someone was

7    writing in, saying I'd like to get my profit withdrawals

8    every month, he wouldn't have to write every month, right?

9    He would just write that letter and then, until he notified

10   Madoff otherwise, that was pattern?

11   A    That was my understanding of Mr. Madoff's clarification

12   in his deposition, yes.

13   Q    Okay.  Now, you explained when you were questioned this

14   morning what your hourly rate was, but can you tell the

15   Court approximately how much money your firm, FTI, has been

16   paid in connection with the profit withdrawal work?

17   A    I don't know the number of just the fees associated

18   with the PW work.

19   Q    Well, do you have -- is it $20,000, is it $2 million?

20   Are you able to enlighten us at all about that?

21   A    I couldn't even guess.

22   Q    Well, how many people, to your knowledge, worked with

23   you on this?

24   A    My team consisted of five to six staff or professionals

25   working under my supervision for the PW-specific analysis.

Page 160

1   Q    And how much time would you estimate that you put into

2   the PW transactions?

3   A    I don't think I could even guess, I couldn't even -- if

4   I said an answer, it would be purely guessing.

5   Q    Well, what percentage of your time over the last five

6   years have you spent on it, approximately?

7   A    On PW?

8   Q    Yes.

9   A    So I started in 2015 -- it's so hard to say, because

10  the -- what else is included in my PW reports is my global

11  reconciliation and that would have spanned?

12  Q    Your -- I'm sorry, your what?

13  A    My global reconciliation, and that would have spanned

14  all the way back to the start of the investigation.  So it's

15  very -- it's nearly -- it's impossible to pull out time just

16  specific to the PW proceeding.

17  Q    And what about the people who work for you on this, on

18  the PW analysis?

19  A    Well, are you asking how much time they spent?

20  Q    Yes.

21  A    I would have the same answer, I think it's impossible

22  to pull out or segregate because, you know, part -- what was

23  part of my PW analysis was part of that initial, what I

24  refer to as the global reconciliation.

25  Q    And what was the global reconciliation?

Page 161

1   A    That's where I looked at all cash transactions for all

2   customer accounts in both cash deposits and withdrawals and

3   reconciled 99 percent of those 225,000 cash transactions to

4   available bank records.

5   Q    Okay.

6           MS. CHAITMAN:  I have no further questions.  Thank

7   you very much.

8           THE COURT:  Before you stand up, are there any

9   other participating claimants here not represented by Ms.

10  Chaitman who want to question the witness?

11          The record should reflect there's no response.

12          Redirect?

13          MS. VANDERWAL:  Thank you.

14                        REDIRECT EXAMINATION

15  BY MS. VANDERWAL:

16  Q    Ms. Collura, Ms. Chaitman asked you some questions

17  about the accounts held by Mr. Levy, do you remember that?

18  A    Yes.

19  Q    Did the profit withdrawal transactions in the Levy

20  account appear to differ from those you saw in any other

21  account?

22  A    No.

23  Q    So, as a forensic accountant, would you have a reason

24  to treat those transactions differently?

25  A    No.

Page 162

1    Q    You testified today that you reviewed bank records,

2    customer statement data, customer files, and documents

3    produced to the trustee; is that correct?

4    A    That's correct.

5    Q    Approximately how many documents would that be?

6    A    Tens of thousands of documents.

7    Q    And in all those documents, did you see a single

8    document suggesting that profit withdrawals are anything

9    other than a withdrawal from a customer account?

10   A    No.  The documents that I reviewed and saw were

11   consistent with treating profit withdrawals as withdrawals

12   from the customer account.

13   Q    Thank you.

14        MS. VANDERWAL:  That's all I have, Your Honor.

15        THE COURT:  One question.  Do you recall whether

16   in connection with your global reconciliation, and aside

17   from the PW transactions and the cash deposits, you saw any

18   cash transactions relating to the Blecker accounts at any

19   time, including after 1998?

20        THE WITNESS:  I don't remember if he had any cash

21   transactions after 1998, I don't -- I know there weren't any

22   PW transactions.  I want to say there were no transactions

23   after 1998; if there were, I don't remember that Blecker was

24   one of the ones that I was not able to reconcile.  But I

25   don't -- I know there weren't any PW, I just -- I can't

Page 163

1    recall when if he had other withdrawals reflected on his

2    customer statements after 1998.

3              THE COURT:  Okay, thank you.  You can step down.

4              MS. CHAITMAN:  Your Honor, I can represent to Your

5    Honor that there were no withdrawals after, and that's

6    evidenced by the determination letters.  You could look at

7    the determination letters, which list all the withdrawals,

8    and you'll see that in his accounts there were no

9    withdrawals after the alleged PW withdrawals.

10             THE COURT:  Thank you.  Call your next witness,

11   please.

12             MS. COLLURA:  Do you want me to leave this binder

13   up here?

14             THE COURT:  Why don't you just leave it there?

15             MS. CHAITMAN:  If you would.  Thank you so much.

16             MS. BROWN:  Your Honor, the Trustee would like to

17   call Matthew Greenblatt.

18             THE COURT:  Okay.  Raise your right hand, please.

19               MATTHEW GREENBLATT, WITNESS, SWORN

20             THE COURT:  Please take a seat and speak into the

21   microphone.

22                     DIRECT EXAMINATION

23   BY MS. BROWN:

24   Q    Good afternoon, Mr. Greenblatt.

25   A    Good afternoon.

Page 164

1    Q    Could you please introduce yourself to the Court?

2    A    My name is Matthew Greenblatt, I'm a senior managing

3    director with FTI Consulting in the forensic and litigation

4    consulting group.

5    Q    And why are you here today?

6    A    I'm here today to talk about FTI's work in the

7    reconstruction of the debtor's books and records and the

8    accumulation of all of the cash and principal transactions

9    from the debtor's books and records.

10   Q    Can you describe your educational background?

11   A    I graduated from Lehigh University in 1994 with a

12   Bachelor of Science degree in accounting.

13   Q    And where have you worked since you graduated?

14   A    I began my career in auditing at Price Waterhouse, I

15   was there for four years, and then joined a litigation

16   consulting firm called Kahn Consulting, which was acquired

17   by FTI in September of 1998, and I've been with FTI since

18   September of 1998.

19   Q    Are you a member of any professional associations?

20   A    I am.  I'm a member of the American Institute of CPAs,

21   the New York State Society of CPAs, and the Association of

22   Certified Fraud Examiners.

23   Q    And what are your professional certifications?

24   A    I'm a certified public accountant, I'm certified in

25   financial forensics, and I'm a certified fraud examiner.

1    Q    And how many years have you worked on forensic

2    accounting investigations?

3    A    Since I began at FTI in 1998.

4    Q    You also teach in the area of accounting, forensic

5    accounting, is that right?

6    A    I do, yes.

7    Q    And can you tell us about your teaching experience?

8    A    So I've been teaching since about 2006.  I am a

9    recurring member on a variety of panels at the Practicing

10   Law Institute, covering all areas of accounting for

11   practicing attorneys, and I have been adjunct professor at

12   NYU in their School of Continuing Studies in their forensic

13   accounting certificate program.

14   Q    What types of records do you normally look at in your

15   forensic accounting investigations?

16   A    It obviously varies from project to project and company

17   to company, but generally speaking it's all of the financial

18   and accounting books and records, as well as bank records

19   and other electronic documents.

20   Q    How many expert reports have you submitted as a

21   forensic accountant?

22   A    Over the years, I have submitted about 150 in the

23   Madoff matter and then, I would say, 20 or 25 non-Madoff-

24   related matters over my career as an expert.

25   Q    Have you been deposed as an expert witness before?

1   A    I have, yes.

2   Q    How many times have you been deposed as an expert?

3   A    Over the last seven years, I've been deposed four

4   times, and prior to seven years there were three others.

5   Q    Have you testified as an expert in forensic accounting?

6   A    I have, yes.

7   Q    And what was that matter about?

8   A    So I testified in federal court in Connecticut in

9   connection with the matter SEC v. Francisco Illarramendi and

10  the Michael Kenwood Group, and that was a Ponzi scheme and I

11  was asked to testify about the flow of funds in the Ponzi

12  scheme.

13  Q    Are you being compensated for your time, Mr.

14  Greenblatt?

15  A    FTI bills at an hourly rate for my time.

16  Q    And what is that hourly rate?

17  A    Currently, the hourly rate is $637 an hour.

18  Q    Do you have a financial interest in the outcome of this

19  litigation?

20  A    No, I have no -- no compensation is tied to the outcome

21  of this case, no personal compensation.

22  Q    When did you become involved in this matter?

23  A    I was --

24  Q    I'm sorry, in the Madoff matter overall.

25  A    I began working when FTI was first hired in December of

Page 167

1  2008.

2  Q    And what did the Trustee ask FTI to do?

3  A    So, overall, the Trustee asked FTI to assist with the

4  reconstruction of the debtor's books and records and the

5  analysis of the cash-in-and-cash-out activity within

6  customer accounts.  I was specifically asked to lead the

7  team that did the principal balance calculations, which was

8  the accumulation of all of the cash transactions recorded on

9  customer statements, and other debtor's books and records.

10 Q    Did you rely on your background in forensic accounting

11 to perform the work you just described?

12 A    Yes, I did.

13 Q    Did you work with a team to conduct your analysis?

14 A    Yes, I worked with a small group of people over the

15 years, yes.

16 Q    Have you reached any conclusions with respect to the

17 profit withdrawal -- I'm sorry, with respect to the

18 principal balance calculations?

19 A    Yes.  Overall, my conclusion is that the cash activity

20 recorded on the customer statements was consistently

21 recorded by the debtor, and that those cash entries recorded

22 on BLMIS customer statements accurately reflected the debits

23 and credits charged to customer accounts and are properly

24 applied in the principal balance calculation to determine

25 every customer's principal balance.

Page 168

1   Q    Have you reached any conclusions with respect to the

2   profit withdrawal transactions?

3   A    Yes.  The profit withdrawal transactions from the

4   outset of the work done to reconstruct the books and records

5   were a subset of the overall withdrawal transactions, and

6   the profit withdrawal transactions were consistently

7   recorded as debits in the debtor's books and records as

8   reductions to the equity reported in customer accounts and

9   are properly reflected as debits or reductions to the

10  principal in the principal balance calculation.

11  Q    Thank you.

12          MS. BROWN:  Your Honor, at this time I'd like to

13  proffer Matthew Greenblatt as an expert in forensic

14  accounting.

15          THE COURT:  Any objection?

16          MS. CHAITMAN:  No --

17          THE COURT:  Okay, he's quali --

18          MS. CHAITMAN:  -- just my general -- my general

19  objection based on the motion, et cetera.

20          THE COURT:  He's qualified.  Go ahead.

21          MS. BROWN:  Thank you, Your Honor.

22  BY MS. BROWN:

23  Q    Mr. Greenblatt, you've mentioned a principal balance

24  calculation, could you describe what that is?

25  A    Yes, the -- one of the original tasks that I was given

Page 169

1   was to analyze the cash-in and cash-out records from BLMIS

2   books and records and the principal balance calculation is

3   the accumulation of all of the cash and principal

4   transactions recorded on the debtor's books and records.  We

5   have prepared chronological listings of all of those cash

6   and principal transactions to quantify each account at

7   BLMIS, the principal balance in those accounts based on cash

8   in, cash out at all relevant points in time.

9   Q    And how are the principal balance calculations used in

10  this liquidation?

11  A    The principal balance calculations are used by the

12  Trustee and his professionals and his counsel to identify

13  how much principal accounts had in -- customers had in their

14  account as of December 11th, 2008 in order to make claims

15  determinations under CIPA (ph) for net equity.

16  Q    Did the Trustee provide you with any assumptions when

17  you were calculating the principal balances of the BLMIS

18  accounts?

19  A    Yes, I was told to calculate all of the -- to calculate

20  principal balance based on cash in and cash out and to

21  exclude any purported trading that was included on the

22  debtor's books and records, including any fictitious gains

23  or -- gains or losses on those statements.  Also, I was told

24  to assume a starting point for the calculation as of April

25  1, 1981.

Page 170

1   Q    And how did that starting point work with your

2   principal balance calculation?

3   A    So the -- for accounts that were opened prior to April

4   of 1981, we granted an initial principal credit as if that

5   was the amount -- the amount reported on a customer

6   statement as of March 31, 1981 was used as the starting

7   point for those accounts that were opened prior to that

8   date, and so for those customers that was the starting point

9   for the calculation.

10  Q    Do you know about how many accounts were opened prior

11  to 1981?

12  A    I believe it was -- 388 is my recollection of the

13  number of accounts that received a principal credit.

14  Q    And for all the other accounts that were opened after

15  that date, what did you use as the starting point in those

16  principal balance calculations?

17  A    The starting point for all of the other accounts were

18  their initial deposit into their account, which was usually

19  either in the form of a cash deposit or a transfer in from

20  another preexisting BLMIS account.

21  Q    Can you describe the inflows of the principal balance

22  calculation?

23  A    Yes.  So typically the inflows in the principal balance

24  calculation fell into two primary categories, which were the

25  customer deposits and the inter-account transfers of valid

Page 171

1    principal from preexisting BLMIS accounts.

2    Q    And what are the outflows of the principal balance

3    calculation?

4    A    There were primarily three outflows:  one was customer

5    withdrawals, a second was inter-account transfers of

6    principal out to other BLMIS accounts, and then the third

7    was there were certain foreign accountholders who had

8    amounts withheld from their account and paid to the IRS for

9    reported or supposed tax obligations.

10   Q    You've mentioned several times inter-account transfers.

11   How did inter-account transfers work with your principal

12   balance calculation?

13   A    There were many instances of inter-account transfers

14   within BLMIS and in order to identify how much principal was

15   the proper amount to move from one account to the other, we

16   needed to review and essentially reconstruct the books and

17   records of all accounts back to the very beginning, so that

18   we can determine how much principal was in the transferor's

19   account as of the time of the inter-account transfer.  And

20   so, depending on how much principal was in the account, that

21   would be whether or not the principal would move from

22   account A to account B.

23       So, essentially, an inter-account transfer could be one

24   of three things:  it could be all principal, if there was

25   enough principal in the account to cover the amount

Page 172

1    reported; it could be all fictitious profits and, if the

2    account had no principal at the time, no money would move

3    over in the principal balance calculation from account A to

4    account B; or it could be a combination of principal and

5    fictitious profits if there was some principal in the

6    account, but not enough to cover the amount of the reported

7    transfer.  So it was one of those three things.

8    Q    What BLMIS records did you primarily rely upon for your

9    principal balance calculations?

10   A    The debtor's books and records that I primarily used

11   was the BLMIS customer statements for each customer.

12   Q    And why did you use those as your primary source?

13   A    The customer statements represented the most extensive

14   document that was available.  It also was the document that

15   was -- that contained the most information regarding

16   transaction dates, transaction amounts, transaction

17   descriptions, transaction codes.  It also was the document

18   that was printed and mailed to customers, so it was a

19   document that was verifiable to some degree by the

20   customers, because customers would be able to identify

21   whether or not they had made a deposit or they had made a

22   withdrawal.  And so, for those reasons, I felt it was the

23   most reliable, specifically with respect to the cash and

24   principal transactions only.

25   Q    How many years of customer statement data is available

Page 173

```
 1    to you?

 2    A    We have the customer statements for that time period

 3    from 1981 through November of 2008.  And the customer

 4    statements were available in two different forms within

 5    BLMIS.  We had electronic customer statement data, some of

 6    which we've seen in the exhibits today.  From the period

 7    December 1995 through November of 2008, we had the

 8    electronic customer statements maintained on the BLMIS

 9    servers, and for the periods prior to December of 1995, the

10    customer statement data was available on microfilm.  And

11    then, additionally, there was a third group of customer

12    statements that was the statements produced back to the

13    trustee by claimants or accounts in litigation.

14    Q    Okay.  And can you tell us the specific items on the

15    customer statements that you used to calculate principal

16    balance?

17    A    Yes.  So the exercise that my team and I did was to

18    identify the cash and principal transactions from those

19    customer statements.  As I mentioned, the customer

20    statements contained relevant data that was used to identify

21    the cash and principal transaction.  And so we essentially

22    obtained from the customer statements the transaction date,

23    a transaction description, the transaction code that was

24    applied by BLMIS, and the amount.

25    Q    You just mentioned transaction codes.  Is it common for
```

Page 174

1    you as a forensic accountant to find that companies use

2    codes and descriptions to report their financial

3    transactions?

4    A    Yes.  It obviously varies from one company to another,

5    but all companies use a chart of accounts or a coding system

6    for their recordkeeping.  So, not only is it common, it's

7    expected.

8    Q    And were there any BLMIS documents that defined the

9    different transaction codes used by BLMIS?

10   A    Yes, there was an instruction manual called the House

11   17 Manual that outlined each of the codes used for the

12   recordkeeping.

13            MS. BROWN:  Could we put up Trustee's Exhibit 80?

14   BY MS. BROWN:

15   Q    Mr. Greenblatt, can you identify this document?

16   A    Yes, this is the House 17 Manual that I was just

17   referring to.

18            MS. BROWN:  If we could turn to page 10, Shannon?

19   Thank you.

20   BY MS. BROWN:

21   Q    Mr. Greenblatt, what is this page?

22   A    As you can see from the title of the document, this is

23   the transaction codes that were used within BLMIS's

24   recordkeeping on customer statement activity.

25   Q    Okay.  And which codes do you see on this document that

Page 175

1    you used in your principal balance calculation?

2    A    The top five rows, which have just been highlighted,

3    are typically the codes that would be used for the cash and

4    principal transactions --

5    Q    Okay.

6    A    -- in some way.

7    Q    Let's take them one at a time, starting with CA; can

8    you tell us what that code refers to?

9    A    Yes, so the third one listed there is the code CA,

10   which as you can see is shorthand for capital additions.

11   These were -- and from the second column you can see the

12   journal entry type is CR, which stands for credit.  So these

13   were typically recorded as credits in the customer accounts

14   or increases to their reported equity and they were used for

15   cash deposits.

16   Q    And how did you treat CA transactions in your principal

17   balance calculation?

18   A    So when the CA code was used on a customer statement,

19   that was one of the line items that we accumulated in the

20   chronological listings of all cash and principal

21   transactions.  And as these were credits, recorded as

22   credits within BLMIS's books and records, they were used as

23   credits or inflows and additions to principal in the

24   principal balance calculation.

25   Q    Can you tell us what CW stands for?

1   A     Yes.  You can see that CW is shorthand for capital

2   withdrawals and those were -- in this situation, DR stands

3   for debit, and so these are debited to customer accounts for

4   these withdrawals.

5   Q     And can you tell us what the code PW stands for?

6   A     Yes, in this case it refers to profit checks, but on

7   other documents PW stands for profit withdrawal.

8   Q     And what does the term withdrawal mean?

9   A     Generally speaking, withdrawal just means taking money

10  out of an account.

11  Q     How did you treat CW and PW transactions in your

12  principal balance calculation?

13  A     They were both treated as withdrawals and they were

14  both, as you can see here, they were recorded by BLMIS as

15  debits to the account, as reductions to an account's

16  reported equity, and they were treated as outflows and

17  debits and reductions to the principal balance.

18  Q     Can you tell us what the code JRNL stands for?

19  A     Yes, that is shorthand for journal or journal entry.

20  And you can see that those are both used as debits and

21  credits.  These are quite common in a company's bookkeeping

22  when the first description there under entry type says

23  adjustments.  These are very common in situations where

24  adjustments, manual adjustments need to be made for

25  bookkeeping.  So the JRNL credit was used mostly for

Page 177

1    adjustments if there were voided transactions that needed to

2    be reissued, but it was typically used for capital additions

3    or the first deposit in customers' accounts were usually

4    coded with a JRNL.

5    Q    And how did you treat JRNL transactions in your

6    principal balance calculation?

7    A    Because they were not uniformly cash transactions, each

8    JRNL transaction was analyzed independently to determine

9    whether or not it was adjusting a particular cash

10   transaction or a purported trading transaction.  So each

11   JRNL was reviewed to determine whether or not it was a cash

12   or principal transaction.  The JRNLs that were used to open

13   new accounts were all treated as the initial deposit and

14   were given a credit in the principal balance calculation,

15   but every other JRNL was then analyzed and used as

16   appropriate.

17            MS. BROWN:  If we could turn to page 32 of this

18   document?

19   BY MS. BROWN:

20   Q    Mr. Greenblatt, can you tell us what this record tells

21   you about how BLMIS treated checks?

22   A    Yes.  So this page is an overall instruction to the

23   employees doing data entry input, and so you could see at

24   the very top it's reflecting the checks coming in and checks

25   going out and then under the check codes column it gives a

Page 178

1    little more description of what each of the codes represent.

2    So it says PW is a profit withdrawal, the CW is a capital

3    withdrawal, and the CA is a capital addition.

4    Q    Okay.

5    A    And then at the bottom of the screen there you see the

6    relevant portion for the bookkeeping and the accounting

7    entries are that the PWs -- and that's the debit transfers

8    -- and the CWs, the capital withdrawals, are punched as

9    debits and the CAs are punched as credits, which means that

10   the profit withdrawal and capital withdrawal transactions

11   were both treated the same as debits to a customer's

12   account, meaning reductions to their reported equity, and

13   the CAs were recorded as credits to the account, meaning

14   increases.

15            MS. BROWN:   If we could turn to page 33 of this

16   document?

17   BY MS. BROWN:

18   Q    Was there any information on this page about the

19   transaction codes used by BLMIS?

20   A    It was consistent with what I have just described,

21   which is the check in is -- are those checks coming into

22   BLMIS.   Those are capital additions, new money coming in

23   from customers, and so checks being received were treated as

24   capital additions and increases to equity, and checks going

25   out were using those codes of profit withdrawal and capital

Page 179

```
1    withdrawal.  And on the bottom you can see that the capital

2    additions are -- where it says "therefore, you will usually

3    have three sets of checks daily," the first group are the

4    capital additions, which are the checks coming in from

5    customers on a given day, then the profit withdrawal

6    transactions is separated into those checks from the Levy

7    account, which we spoke about -- or which there was

8    testimony about, and then the third line item there is the

9    accumulation of all of the withdrawal transactions, capital

10   withdrawals and profit withdrawals indicating checks going

11   out for the next working day.

12   Q    And was the information we've discussed from Trustee's

13   Exhibit 80, the House 17 Manual, was that consistent with

14   how PW, CW and CA transactions appeared on the customer's

15   statement?

16   A    Yes, all of the CAs were recorded as credits and all of

17   the CWs and PWs were debits or reductions to reported

18   equity.

19   Q    Did you find that BLMIS reported its cash and principal

20   transactions in a similar manner on the statements during

21   the time period for which we have the customer statements?

22   A    Yes, throughout the entire time period; yes.

23   Q    I'd like to turn to the profit withdrawal transactions

24   specifically.  When did you first become aware of profit

25   withdrawal transactions?
```

Page 180

1   A    So from the beginning of the reconstruction of the

2   books and records they were included within all of the cash

3   and principal transactions.  So I was aware of the profit

4   withdrawal transactions and the capital withdrawal

5   transactions and all of them from the very beginning.

6   Q    Were you asked to supplement your earlier analyses to

7   focus on PW transactions specifically?

8   A    Yes, as a result of some of the issues raised in this

9   hearing, I was asked by counsel to perform further analyses

10  on the profit withdrawal transactions and I've issued three

11  reports as a result.

12  Q    And in the course of preparing your three reports did

13  you become aware of anything that changed your opinions

14  about PW transactions?

15  A    No.  In fact, the more analysis I did on PW

16  transactions specifically, the more it just corroborated and

17  confirmed my opinions that the profit withdrawal

18  transactions are properly reflected as debits.

19  Q    When you began looking at profit withdrawal

20  transactions for this proceeding, where did you start your

21  analysis?

22  A    With the customer statement data that was used to

23  prepare the chronological listings for each individual

24  account.

25  Q    And on that customer statement data was there any type

Page 181

1    of transactions that you focused on to analyze the profit

2    withdrawal transactions?

3    A    Yes.  So with each profit withdrawal transaction, the

4    first analysis that I did was to identify what the -- if it

5    was a profit withdrawal, what trading might have been

6    reported to generate such a profit that would be then

7    withdrawn by the account.

8    Q    And what -- excuse me -- did PW transactions tie to the

9    reported trading?

10   A    Yes, they did.

11   Q    I'd like to show you what's been marked as Trustee

12   Exhibit 81.  Mr. Greenblatt, can you identify this document?

13   A    Yes, this is the March 1995 customer statement for the

14   Aaron Blecker account numbered 1B0022.  This is one of the

15   customer statements that was produced back to the trustee by

16   the accountholder.

17   Q    And looking at Mr. Blecker's statement, can you

18   identify a PW transaction?

19   A    Yes, there is -- on March 14th, there is a profit

20   withdrawal transaction under the -- with the description

21   "check aluminum," and in the -- you can see it's got the PW

22   code and in the amount debited to your account column you

23   can see that the account is debited $2,784.

24   Q    And were you able to tie that transaction to any

25   purported trading in aluminum?

Page 182

1    A    Yes.  So the exercise was to see, you know, why there

2    was a profit withdrawal transaction for 2,784 and see if

3    there was any trading that I could tie to that number with

4    respect to the security name or the company name listed in

5    the description.  So I looked back over the February and

6    March time frame and identified the trading reported on

7    these statements associated with aluminum and was able to

8    identify the trading that generated that profit as reported.

9    Q    Let's turn to Trustee Exhibit 82.  Mr. Greenblatt, can

10   you identify the transactions that you analyzed on this

11   statement?

12   A    Yes.  So as I mentioned, this is the customer statement

13   for the month ended February 1995 for the 1B0022 account,

14   and you can see from the reported trading -- or from the

15   activity on this customer statement there was a trade

16   reported on February 13th in the security titled Aluminum

17   Company of America, it was the purported purchase of 2,484

18   shares for a cost, an amount debited to the account of

19   202,446.  And then you can see that at the end of that month

20   those 2,484 securities were listed as held, allegedly held

21   in the account under the securities positions column, the

22   2,484 shares are then in the account as reported as of the

23   end of February.

24   Q    Let's turn back to Trustee Exhibit 81.  Can you

25   identify the purported trading transactions that you

Page 183

1   analyzed in connection with the prior transactions?

2   A    Yes.  So on March 6th, following a two-for-one stock

3   split in Aluminum Company of America, on March 6th there was

4   the then reported sale of those shares of Aluminum Company

5   of America in two different price amounts as reported and,

6   therefore, the account was credited with two different

7   amounts, 99,300 and 105,930.  So the sum of those two or

8   205,230 represents the reported proceeds from the reported

9   sale of Aluminum Company of America.

10          MS. BROWN:  Mr. Rails (ph), could you put up all

11   four transactions together, please?

12   BY MS. BROWN:

13   Q    Mr. Greenblatt, can you walk us through how these

14   transactions work together?

15   A    Right, so the exercise that we did was to identify the

16   purported trading in the company that was listed in the PW

17   transaction.  So, as I mentioned, you can see that in

18   February the statements report a purchase with a cost basis

19   of 202,446.  Less than a month later, on March 6th, after a

20   two-for-one stock split, the shares are purportedly sold for

21   a profit.  The 205,230 proceeds less the $202,446 of cost

22   basis gives a reported gain, based on that reported trading,

23   of $2,784.  And then eight days later that same $2,784 is

24   withdrawn in a debit transaction, the PW transaction that

25   was listed there.

Page 184

1           MS. BROWN:  Shannon, if you could put up Trustee

2    Exhibit 81?

3    BY MS. BROWN:

4    Q    Could you once again just identify the profit

5    withdrawal transaction?

6    A    Right, it's that March 14th transaction for that 2,784,

7    which is the amount debited to the account.  And so the

8    trading resulted in a gain and that same gain was then

9    debited in a profit withdrawal transaction.

10   Q    Did you conduct a similar analysis for the other

11   accounts to match the purported trading at BLMIS to the

12   amount of the PW transactions?

13   A    Yes, we did the same analysis for all PW transactions

14   for all of the participating accounts.

15   Q    And what did your analysis show?

16   A    For the -- it showed that the trading was -- that there

17   was -- for every PW transaction, it corresponded to the

18   purported trading and the amounts virtually -- in virtually

19   all cases tied.

20           MS. BROWN:  We can clear the callout from Trustee

21   Exhibit 81, but please leave it up.

22   BY MS. BROWN:

23   Q    Did the customer statements identify PW transactions as

24   debits?

25   A    Yes, they did.

Page 185

```
 1    Q    And can you point us to where that is on the customer

 2    statement?

 3    A    Yes.  So as I was walking through it, if you -- again,

 4    if you look at the March 14th transaction under the

 5    transaction description "check aluminum," you'll see that

 6    the 2,784 is clearly listed in the amount debited to your

 7    account column.

 8    Q    Mr. Greenblatt, are you aware that Mr. Blecker has

 9    argued in this case that PW transactions are checks sent to

10    companies to purchase securities on his behalf?

11    A    Yes, I'm aware of that argument.

12    Q    And did you undertake any analyses to test this

13    assertion?

14    A    Yes, I did.

15    Q    Can you describe those analyses?

16    A    So for every PW transaction where I just described that

17    we looked at the related and reported trading to identify

18    the reported profit that generated that amount, I also

19    looked to see if there was any way to test the assertion

20    that that 2,700 -- as one example, but for all of them --

21    that that $2,784 line item was for the purchase of new

22    securities.  So I looked at -- for every PW transaction with

23    a stock name listed, I looked at the activity following the

24    PW transaction, so through the end of that current month as

25    well as the subsequent month, and in zero instances did I
```

Page 186

1    ever find where new securities came into the account to

2    support the assertion that that was used to purchase new

3    securities.  So you could see where, as we saw earlier, that

4    the shares were reported as held at the end of February, you

5    can see that there are no shares at the end of March

6    reported in Aluminum Company of America, and if you continue

7    on to page 2, you'll see it's not listed there either.

8         So the PW transaction does not appear to have been done

9    to purchase new securities in this account.

10   Q    I'm going to show you what's been marked as Trustee

11   Exhibit 83.  Can you explain this document and how you used

12   it?

13   A    Yes, so this is the subsequent month, this is the April

14   1995 customer statement for the Aaron Blecker account,

15   1B0022, and you can see that there was no new activity in

16   this account in April of 1995 and the security positions

17   allegedly held at the end of that month or reported as held

18   at the end of that month were the same as March and don't

19   include any shares for Aluminum Company of America.  I

20   looked at the subsequent month, just to make sure that there

21   weren't timing delays or anything else associated with that

22   allegation.

23   Q    Sticking with Mr. Blecker, I'd like to discuss your

24   analysis of his accounts and his principal balance.  Let's

25   start with account number 1B0022.  How did you calculate the

Page 187

1     principal balance for account 1B0022?

2     A     So for each account -- and this is not just Mr.

3     Blecker, but this is the process that was done for everyone

4     -- for each account and its predecessor account numbers, if

5     there were such account numbers, we tracked the cash and

6     principal transactions for all of the activity from the

7     opening of the accounts, if it was opened after April of

8     1981, or from April of '81 forward, and created these

9     chronological listings that were used to perform the

10    principal balance calculation and they were done for all

11    BLMIS accounts.

12    Q     I'd like to show you what's been marked as Trustee

13    Exhibit 86.  Mr. Greenblatt, can you identify this document?

14    A     Yes, I can.  This is the principal balance calculation

15    for Mr. Aaron Blecker's account 1B0022, as you can see,

16    which was formerly account 100254.

17    Q     And did you create this document?

18    A     I did, yes.

19    Q     So sticking with the account number that's on the top,

20    the two account numbers that we see on the top, can you tell

21    us why this document says 1B0022, formerly 100254?

22    A     Yes.  At BLMIS, they went through two different account

23    numbering system changes over the years.  There was

24    originally an eight-digit, all-numeric account numbering

25    system, and that was in place until 1983 and I want to say

Page 188

1    April of 1983 -- no, I'm sorry, July of 1983.  And so until

2    July of 1983, every account number had an eight-digit, all-

3    numeric account number, and then beginning in -- I'm not

4    sure if it was beginning in July or beginning in August of

5    1983, they changed the account numbering system to a now

6    six-digit account numbering system with two extra digits for

7    subaccounts.  And so that was done in 1983 and that was one

8    continuous exercise where it wasn't an inter-account

9    transfer to open up a new account, it was just an account

10   numbering change and the customer statements just kind of

11   continued seamlessly.

12        Then in 1992, there was an account numbering change

13   again to go from the all-numeric customer account numbering

14   system to the alphanumeric.  So this account became 1B0022

15   in 1992.

16   Q    So what date was this account opened?

17   A    This particular account was opened with the account

18   number 100254 in September of 1986.

19   Q    And what account number did it have after 1992?

20   A    It had the account number 1B0022.

21   Q    I'd like to talk about the various columns of this

22   document that appear on Trustee Exhibit 86.  Can you walk us

23   through what these columns are?

24   A    Yes.  So the -- and if you could put the column numbers

25   in there, it would make it easier as I walk through them

Page 189

1   all.  Perfect.

2          MS. BROWN:  And, Shannon, maybe include the first

3   couple --

4          THE WITNESS:  Right.

5          MS. BROWN:  -- thank you.

6          THE WITNESS:  Perfect.  So the first column is

7   simply an ID number that was used by FTI, so that at all

8   points in time each individual cash and principal

9   transaction had its own ID number.  So that was not included

10  on the customer statement itself.  But columns 2, 3 and 4

11  were the exact information that was included on the customer

12  statements themselves.  So that included the transaction

13  date, the transaction description and code, and the dollar

14  amount.  And so for those three columns, those four pieces

15  of information were exactly as they were recorded on the

16  BLMIS customer statement data.

17         And then columns 5, 6, 7, and 8 are essentially

18  the nuts and bolts of the principal balance calculation

19  where every deposit made by a customer, as we talked before,

20  inflows and outflows.  Columns 5 and 7 represent the

21  inflows, those are the customer deposits and the inter-

22  account transfers of principal in from preexisting BLMIS

23  accounts, and columns 6 and 8 are the outflows representing

24  the withdrawals, profit withdrawals and capital withdrawals

25  are both included in that column, as well as column 8, which

Page 190

```
 1    is the inter-account transfers of principal out.  And column

 2    9 provides us with the running balance of the principal in

 3    each account, so that at any point in time and every point

 4    in time we can tell you what amount of principal each

 5    customer had.

 6              Columns 10 and 11 provide the BLMIS source

 7    document where we obtained the cash and principal

 8    transactions.  So those are the customer statements and

 9    debtor's books and records where we obtained the data.

10    BY MS. BROWN:

11    Q    Okay.  And sticking with the customer statements in the

12    time period from 1986 to 1992 for the account 1B0022, did

13    you review all of those customer statements?

14    A    Yes, I did.

15    Q    Okay.  And based on your review, what account number

16    would have appeared on those statements in the time period

17    1986 to 1992?

18    A    Those would have been with the account number 100254

19    from 1986 through the middle of 1992.

20              MS. BROWN:  And if we could just show Chaitman

21    Exhibit 31?

22              THE WITNESS:  Is that one that will be on the

23    monitor --

24              MS. BROWN:  Chaitman Exhibit --

25              THE WITNESS:  -- or in the binder?
```

Page 191

1          MS. BROWN:  -- 31 -- oh, sorry, I apologize.  It

2    would be in the binder.

3          THE COURT:  31.

4          MS. BROWN:  31.

5    BY MS. BROWN:

6    Q    Mr. Greenblatt, can you identify this document?

7    A    Yes, this is one of the microfilm ledgers for the --

8    what eventually becomes 1B0022 for the month of August 1990

9    in the Aaron Blecker account.

10   Q    And what account number is used on this statement?

11   A    This is the 100254 account.

12   Q    And what account does 100254 become?

13   A    That becomes 1B0022.

14   Q    And based on your understanding of the BLMIS books and

15   records, would you expect to see BLMIS issuing a statement

16   for Aaron Blecker's account during this time period in the

17   number of 100254?

18   A    Up through and including the middle of 1992, yes.

19   Q    Thank you.

20          MS. BROWN:  If we could go back to Trustee's

21   Exhibit 86?

22   BY MS. BROWN:

23   Q    I would just like to walk through the principal balance

24   calculation.  What was the starting point for the principal

25   balance calculation in 1B0022?

Page 192

1   A    So the first two line items you see in September of

2   1986, based on the review of the debtor's books and records,

3   we identified the JRNL line item and the CA line item on the

4   customer statements.  And based on the recordkeeping within

5   BLMIS and the codes, we identified those as cash inflow

6   transactions in Mr. Blecker's account.

7   Q    Okay.  And after you identified those first

8   transactions, how did you analyze his principal balance

9   overall?

10  A    So the principal balance was a calculation of inflows

11  less outflows.  And so every new inflow added to that

12  balance and every outflow subtracted from that balance.  And

13  as we mentioned earlier, that was important at any point in

14  time there were inter-account transfers, we had to know the

15  transferor's principal balance as of every day.

16  Q    Okay.

17          MS. BROWN:  And if we could go to page 4 of

18  Trustee Exhibit 90.

19      (Pause)

20          MS. BROWN:  I'm sorry, page 4 of Trustee Exhibit

21  86.  I misspoke.

22      (Pause)

23          THE COURT:  Are you sure it's not page 3?

24          MS. BROWN:  Page 3.

25          THE WITNESS:  Page 3.

Page 193

1    BY MS. BROWN:

2    Q    What was the ending principal balance for account

3    1B0022?

4    A    It was a negative principal balance of $59,634.

5    Q    And why did this account have a negative principal

6    balance in your calculation?

7    A    Because throughout the time period of activity in this

8    account it had more withdrawals then it did deposits.

9            MS. BROWN:  If we could go back to page 1 of

10   Trustee's Exhibit 86?  And I'd like to focus on the year

11   1992, so if we could look at the bottom of page 1 and the

12   top of page 2 that would be great.  Okay.

13   BY MS. BROWN:

14   Q    So, Mr. Greenblatt, what transactions occurred in 1992

15   that affected your principal balance calculation?

16   A    As you can see from the bottom of page 1, there were

17   profit withdrawal transactions beginning on March 5th of

18   1992 and continuing through November of 1992, and then there

19   was a capital addition transaction on December 16th of 1992.

20           MS. BROWN:  If we could just highlight the bottom

21   rows --

22           THE WITNESS:  Right.  So --

23           MS. BROWN:  -- and then the top row, two rows of

24   page 2.

25           THE WITNESS:  Correct.

Page 194

1    BY MS. BROWN:

2    Q    Mr. Greenblatt, were those seven transactions reflected

3    on BLMIS customer statements for this account?

4    A    Yes.  So all -- the six PWs and the CA and the customer

5    statements that they were obtained from are included in the

6    Bates references in the far right two columns.

7    Q    And did those transactions appear on any other BLMIS

8    documents?

9    A    They did, yes.

10   Q    I'd like to show you what's been marked as Trustee's

11   Exhibit 87.  Mr. Greenblatt, can you identify this document?

12   A    Yes, this is one page or an excerpt of the portfolio

13   management transaction detail report, which was one of the

14   documents within the BLMIS books and records.

15   Q    Okay.  And can you tell us how you used this document

16   in your analysis?

17   A    This document was used to corroborate and confirm the

18   cash and principal transactions that were obtained from the

19   customer statement data.  And you can see from the activity

20   in 1B0022 that the -- it includes the same six PW

21   transactions and the one capital addition transaction right

22   there.

23   Q    And how did you use PMRs generally in your analysis?

24   A    Well, so this was a PMT --

25   Q    I'm sorry.

Page 195

1    A    -- which is the portfolio management transaction

2    report.  So we used this as confirmation and corroboration

3    that the exercise of accumulating all of the cash and

4    principal transactions was complete.

5    Q    I'd like to show you what's been marked as Trustee

6    Exhibit 88.  Mr. Greenblatt, can you identify this document?

7    A    Yes, this is a portfolio management report -- or one

8    page of a portfolio management report for the year ended

9    December 31, 1992, maintained within the BLMIS books and

10   records.

11   Q    And can you identify any accounts relating to Mr.

12   Blecker on this page?

13   A    Well, there's the top two.  We've been talking about

14   account 1B0022 and then the second one of 1B0023 are both

15   included on this page.

16   Q    And based on your analysis, is the account reference

17   with 1B0022, is that account number consistent with the time

18   period of this document?

19   A    Yes.

20   Q    How did you use this PMR in your principal balance

21   calculation?

22   A    So the activity reported related to cash and principal

23   activity is summarized.  Whereas a PMT report, the one we

24   just looked at, was line-item-by-line-item detail for a

25   given transaction, the portfolio management report was more

Page 196

1     summary-level information, it was year -- it was done on a

2     monthly basis and it included year-to-date information.  So,

3     for example, the one for the three months ended March would

4     contain three months of data, the year-end ones contained

5     the full calendar year data.  So this provides 12 months of

6     activity for the account and we used the information related

7     to the cash and principal transactions.

8          So you can see the capital additions line item under

9     1B0022 shows a $100,000 credit and that ties to the one

10    $100,000 CA transaction that we saw in the customer

11    statements and that we saw on the portfolio management

12    transaction detail report.  Additionally, the profits

13    withdrawn line item of $16,858.40 is the aggregate of the

14    six PW transactions that existed in 1992.

15    Q    For what time period did you find the PMRs and PMTs in

16    BLMIS's books and records?

17    A    The summary level PMRs that we're looking at right now

18    were available from the early 1980s through November of 2008

19    and during the microfilm time period prior to December of

20    1995 there were some -- some gaps in available PMRs.  The

21    detailed portfolio management transaction reports were

22    available from the mid-1980s until the mid-1990s with some

23    gaps in the availability of those records.

24    Q    I'd like to show you what's been marked as Trustee

25    Exhibit 89.  Mr. Greenblatt, can you identify this document?

1    A    Yes, this is one of the spiral-bound notebooks that was

2    maintained by BLMIS, this one was for customer deposits and

3    it was called the "check in book."

4    Q    And what is the date of this document?

5    A    It is dated February 1986.

6    Q    For what time period did you find spiral notebooks in

7    BLMIS's books and records?

8    A    There were spiral notebooks from -- covering various

9    points in time from the mid-1980s until the mid-1990s, but

10    as with the PMT transact -- or PMT reports there were gaps

11    and not all of the time periods were available.

12    Q    How did you use this document in your principal balance

13    calculation?

14    A    These documents were also used as corroboration and

15    confirmation of the cash and principal transactions that

16    were obtained from the customer statements and included on

17    the chronological listings.

18            MS. BROWN:  If we could turn to pages -- page 44

19    of this Trustee Exhibit 89?

20    BY MS. BROWN:

21    Q    Mr. Greenblatt, are you able to identify any

22    transactions relating to Aaron Blecker on this page?

23    A    Yes, there was the September -- the very last line

24    item, there was a September 22nd entry, and here you can see

25    the account number is the all-numeric number that was in

Page 198

1    existence in 1986 for 100254-10, and it was the amount

2    $50,000, which was that JRNL entry that we saw that opened

3    the account.

4              MS. BROWN:  And if we could turn to page 45 of

5    Exhibit 89?

6    BY MS. BROWN:

7    Q    Were you able to identify any other transactions

8    relating to Aaron Blecker on this page?

9    A    Yeah, right in the middle of the page, dated September

10   24th, there is a second deposit, also in 100254-10, and that

11   was also for 50,000.  If you remember, there was one JRNL

12   and one CA, this was the CA transaction.

13   Q    And did both of these transactions appear on the

14   customer statements?

15   A    Yes, they did.

16   Q    And did they both appear on your principal calculation?

17   A    Yes, they did.

18             MS. BROWN:  If we could turn to Trustee Exhibit

19   90?  And specifically page 180.

20   BY MS. BROWN:

21   Q    Mr. Greenblatt, can you identify this document?

22   A    Yes, this is again a spiral-bound notebook.  I can't

23   tell the year from this page, but this is the spiral-bound

24   notebook that was maintained at BLMIS related to checks

25   going out.

Page 199

```
 1   Q    And how did you use the spiral notebooks in your

 2   analysis?

 3   A    The same way we used the checks coming in, we used them

 4   as confirmation and corroboration of the cash and principal

 5   transactions that were reported on the customer statements.

 6   Q    And can you identify any transactions relating to Aaron

 7   Blecker on this page?

 8   A    Yes, the second Blecker line item there is for the

 9   100254 account that eventually became the 1B0022 account.

10   It indicates a profit withdrawal transaction for $3,230.02.

11   Q    And did you find that transaction on the customer

12   statement?

13   A    Yes, that was on the customer statement for the 1 --

14   what was eventually the 1B0022 account.

15   Q    You've mentioned that you reviewed customer statements,

16   PMRs, PMTs, and spiral notebooks; are these the type of

17   documents that -- are these documents the type of evidence

18   relied upon by professionals in your field?

19   A    Yes, they are.

20   Q    And you've mentioned that BLMIS did not have complete

21   sets of each of these categories of documents.  In your

22   experience, is it customary to have gaps in records?

23   A    Certainly, as a forensic accountant, when you're

24   brought into troubled-company situations or companies that

25   might be in litigation or in -- dealing with allegations of
```

Page 200

```
 1    fraud, very often we come into situations with incomplete or

 2    books and records that are not available at all or are not

 3    available in part.  So it is very common for books and

 4    records to have gaps in them.  I would say in this

 5    particular situation, for a scheme that lasted as long as it

 6    did, we are extremely fortunate, I would consider this

 7    particular matter to be one that had an extensive amount of

 8    available information for the time period it covered, in my

 9    experience.

10            MS. BROWN:  I'd like to go back to Trustee Exhibit

11    86.  And if you would go to page 3?

12    BY MS. BROWN:

13    Q    Mr. Greenblatt, this document shows your principal

14    balance calculation for 1B0022, correct?

15    A    Yes.

16    Q    And during the course of this proceeding did you make

17    any changes to this particular principal balance

18    calculation?

19    A    Yes, there was -- during the course of this proceeding,

20    there was one transaction that was obtained from a microfilm

21    ledger that was very difficult to read and upon further

22    review of that one individual statement, there was one

23    particular line item here in December of 1989 where the

24    amount was adjusted.

25    Q    If I could pause you for one second.
```

Page 201

1      MS. BROWN:  If we could just go to December 1989?

2  I think it might be page 1.

3      (Pause)

4      THE WITNESS:  Right, December 13th, 1989.

5  BY MS. BROWN:

6  Q    Thank you.  Please continue.

7  A    So that particular transaction, both the transaction

8  code and the amount were difficult to read.  The transaction

9  code was not possible to be read and the amount was unclear.

10  As we've seen from some of the documents earlier today, some

11  of these microfilm ledgers can be very difficult to read.

12  The data entry that was done to put the microfilm ledgers

13  into databases to do all of these calculations, it was

14  originally input as $5,187, but as I looked more closely at

15  that particular document, I did additional procedures and

16  essentially tested the statement by doing the math around

17  it.  And to get from the new balance to the ending balance

18  with all of the other activity on there, I was able to

19  determine that the number actually had to be 3,187.  So once

20  I identified that, that correction, I made the correction in

21  the principal balance calculation.

22  Q    Do you generally perform quality control on your

23  principal balance calculations?

24  A    Yes.  So there was an extensive quality control

25  exercise the first time all of this data was identified and

Page 202

1    input from microfilm, but then even more quality control is

2    done as these accounts move toward either a litigation or a

3    claims process, or are highlighted in some other way.  So

4    once we were able to identify a more finite group of

5    participating accounts, I went through all of the -- my team

6    and I went through all of those microfilm to make sure that

7    we were comfortable with the numbers and, if they were

8    difficult to read, we added additional procedures to

9    identify other difficult -- other adjustments like this one

10   from a 5 to a 3.

11   Q    Did you calculate the principal balances of all of Mr.

12   Blecker's accounts?

13   A    Yes, I did.

14            MS. BROWN:  Let's look at Trustee's Exhibit 91.

15   BY MS. BROWN:

16   Q    Mr. Greenblatt, can you identify this document?

17   A    Yes, this is the principal balance calculation for

18   account 1B0023.  And you can see it says formerly 100215.

19   This is one of the account numbers that actually had three

20   different account numbers, because it predated 1983 when

21   that first change happened.  So this is the principal

22   balance calculation for the account that eventually become

23   1B0023.

24   Q    Can you walk us through the history of the account

25   numbers for the account that ended up being 1B0023?

1              THE COURT:  What was the third account number?

2              THE WITNESS:  The first account number --

3              THE COURT:  Oh, the first.

4              THE WITNESS:  -- was -- it was the eight-digit

5     account number, that was 100214-18.  Then in 1983 that

6     account number changed 100215, with various subaccounts, and

7     then in 1992 it became 1B0023.  And so even though all of

8     these are listed under 1B0023, if you go back to the source

9     document in columns 10 and 11, those will come from the

10    customer statements that have the account number that was

11    applicable at the time.

12    BY MS. BROWN:

13    Q    And the original account number for this account,

14    100214 -- 18?

15    A    I believe so, yes.

16    Q    Okay.  That doesn't appear on this document, does it?

17    A    It doesn't, but if you went back to the pre-1983 source

18    documents, the customer statement that those -- the customer

19    statement data that that was pulled from was from that

20    account number, and then it was 100215 and then it was

21    1B0023.

22    Q    And can you describe the work you did to ensure that it

23    was one consistent account and these were just account

24    number changes?

25    A    Yes.  So a full analysis was done by my team and I to

Page 204

```
 1   ensure that the ending balance of one account, that it truly

 2   was not an inter-account transfer and a new account, but

 3   rather just an account numbering system change.  So an

 4   entire analysis was done from the first eight-digit account

 5   number to the second six-digit account number to make sure

 6   that the ending balance of one became the beginning balance

 7   of the other.  And that analysis was done all the way

 8   through not just the joint Blecker account, but for all

 9   BLMIS accounts that existed as of those conversions.

10            MS. BROWN:  If we could turn to page 4 of this

11   document, Trustee Exhibit 91?

12   BY MS. BROWN:

13   Q    Mr. Greenblatt, what was the ending principal balance

14   or 1B0023?

15   A    This account ended with a negative principal balance of

16   $466,527.

17   Q    Why did it end with a negative balance?

18   A    It ended with a negative balance because the total

19   amount of withdrawals summarized in column 6 were greater

20   than the amount of inflows of deposits and inter-account

21   transfers of principal in from columns 5 and 7.

22            MS. BROWN:  If we could look at Trustee Exhibit

23   92?

24   BY MS. BROWN:

25   Q    Mr. Greenblatt, can you identify this document?
```

```
 1    A     Yes, this is the principal balance calculation for

 2    account 1B0156, which was the Aaron Blecker revocable trust

 3    account.

 4    Q     And did this account have any PW transactions?

 5    A     It did not.

 6    Q     Did this account have any deposits of principal?

 7    A     It did not.

 8    Q     Okay.  Can you describe the nature of the transactions

 9    that occurred in this account?

10    A     Yes.  So as you can see from this activity, this

11    account had three inter-account transfers with other BLMIS

12    accounts.  As you can see from the top line item, the

13    initial transaction that opened this account was in April of

14    1997 when the 1B0022 account closed and the value of that

15    account as reported on that statement was transferred into

16    this account 1B0156.  And then in two transactions in 2007

17    -- and at that time the -- this account gets no principal in

18    the principal balance calculation, because the 1B0022 had

19    negative principal at the time of that inter-account

20    transfer.

21          And then in June and September of 2007, this account

22    had two more inter-account transfers from a preexisting

23    BLMIS account, in this case the 1B0157 account.  And based

24    on the analysis of the 157 account, that account also did

25    not have any principal at the time of these transfers;
```

Page 206

1    therefore, no principal was credited to this account.

2         So for all of these principal balance calculations,

3    they can't be performed unless you know how much principal

4    is available in the transferor's account.

5              MS. BROWN:  If we could look at Trustee's Exhibit

6    93?

7    BY MS. BROWN:

8    Q    Can you identify this document?

9    A    Yes, so this is the principal balance calculation for

10   account 1B0157.  And similar to what we just looked at from

11   156, you can see that on the same day, April 24th of 1997,

12   the 1B0023 account closed and the value recorded in that

13   account for $389,847 was transferred via inter-account

14   transfer to open this account, 1B0157, but we just -- you

15   just walked through that -- or you put the document up and I

16   walked you through it -- at the time, that principal balance

17   in 1B0023 was negative; therefore, this account opened with

18   an inter-account transfer that was all fictitious profits

19   and no principal came in.  So, therefore, the other side of

20   those two inter-account transfers with 156 that we looked

21   at, in June and September of 2007, this account transferred

22   -- had an inter-account transfer with 1B0156 at a point in

23   which it had no principal in it.

24   Q    Okay, I'd like to turn to a different analysis you

25   performed.  Are you aware that Mr. Blecker has alleged that

Page 207

```
 1   he didn't take any withdrawals from his BLMIS accounts?

 2   A    I am aware that he has made that argument, yes.

 3   Q    And did you do any specific analyses to test this

 4   assertion?

 5   A    I did, yes.

 6   Q    Can you describe what that analysis was?

 7   A    So what I did was I looked at his account over time to

 8   determine whether or not the activity in the account

 9   reflected withdrawals or reinvestments or any type of

10   activity that would test that assertion.

11   Q    And what did you find with respect to his balances?

12   A    I found that the ending balance in his -- so if we

13   start with the 1B0022 account, the ending balance in his

14   1B0022 account each and every month was roughly equal to his

15   cash deposits.  So the documentation in the account activity

16   indicates that he had made an initial deposit and every

17   profit, like the Aluminum Company of America that we walked

18   through, every reported profit that was shown in the account

19   was offset by a withdrawal transaction and the balance

20   remained flat.  So there were never any withdrawals of the

21   original deposits, but every individual profit was withdrawn

22   in a PW transaction.

23            MS. BROWN:  Let's look at Trustee Demonstrative 5.

24   BY MS. BROWN:

25   Q    Mr. Greenblatt, can you identify this document?
```

Page 208

```
 1    A    Yes, so that's what I just tried to describe without a
 2    picture, so this is the picture of what I was just
 3    describing.  So you can see here that the blue line
 4    represents what the reported value of the 1B0022 account was
 5    month after month after month from September 1986 through
 6    that transfer to the 1B00 -- to the 1B0156 account in 1997.
 7    Q    You described what the blue line represents; what does
 8    the red line represent?
 9    A    So the red line represents the cumulative total or the
10    aggregate of all of the profit withdrawal transactions.  So
11    each time a new withdrawal was being taken out, that shows
12    the growing balance of withdrawals.
13    Q    And what does the green line represent?
14    A    The green line represents what one would expect the
15    equity in his account to have looked like if the argument he
16    has made that he never took any withdrawals and that instead
17    the profits were reinvested, the green line represents what
18    one would have expected that account to do based on the
19    reported trading in that account.
20    Q    How much money did Mr. Blecker put into this account,
21    1B0022?
22    A    You can see by the two callout boxes there that in
23    total there was a -- there were $200,000 of deposits into
24    this account during this 11-year period.
25    Q    I'd like to show you what's been marked as Trustee
```

Page 209

1    Exhibit 97.  And can you identify this document, Mr.

2    Greenblatt?

3    A    Yes, so this is the customer statement data from the

4    1B0022 account for the month ended March 30th, 1997.

5    Q    And according to this account statement, what was the

6    reported value of the account at the time of the inter-

7    account transfer in this account?

8    A    So if you look at the transaction dated April 24th,

9    there was a transfer of 1B -- there was a transfer to

10   account 1B0156, which we saw from that principal balance

11   calculation was the transaction that opened that account,

12   and this was the second-to-last entry in 1B0022, so this was

13   the entry to move all of the remaining reported equity in

14   this account to the new account.  So the total value of this

15   account as of that time was $206,529.

16   Q    How many years was account 1B0022 open?

17   A    It was open for an 11-year period.

18   Q    And according to the statements, how much of the

19   account's balance appreciated over those 11 years?

20   A    Sixty five hundred dollars.

21           MS. BROWN:  If we could turn back to Trustee's

22   Demonstrative 5?

23   BY MS. BROWN:

24   Q    Can you tell us why this account's balance appreciated

25   by $6500 over 11 years?

Page 210

1    A    Yeah, simply put, because the -- each individual profit

2    that was reported as earned was taken out in a profit

3    withdrawal transaction.

4    Q    And if the profit transactions had not been debited but

5    were instead reinvested, what should have happened to this

6    account's balance?

7    A    Based on the reported trading that was done month after

8    month for that 11-year period, it would have represented

9    this green line and it would have been over $800,000 as of

10   April 1997.

11              MS. BROWN:  If we could turn to Trustee's

12   Demonstrative 6?

13   BY MS. BROWN:

14   Q    Mr. Greenblatt, can you identify this document?

15   A    Yes, this is the -- essentially the same type of

16   analysis, the same analysis that I had done, but this one

17   was done for 1B0023.  So I looked at the actual customer

18   statement reported activity and did the same analysis.

19   Q    And if you could just walk us through some of the

20   callout boxes, starting with principal credit of $42,000 --

21   42,350, can you explain that?

22   A    Yes.  So this is one of the accounts that was opened

23   prior to April 1st of 1981.  So, based on the assumption

24   provided to me, I started the principal balance calculation

25   with the value reported in the March 31, 1981 customer

Page 211

1   statement.  So it began with a principal credit of $42,350,

2   which was treated as the initial investment in the account,

3   and then there were those four subsequent months where there

4   were additional inflows into the account.

5   Q    And what did your analysis show with respect to the

6   reported equity in account 1B0023?

7   A    It showed the same essential result of 1B0022, which is

8   that the blue line represents the reported equity in the

9   account on a month-to-month basis and that remained flat and

10  limited to the balances of the cash deposits, and each

11  individual trade that was reported on the statements, all

12  generating gains, never any losses, but all of those gains

13  were then reduced immediately thereafter by a debit

14  transaction for the profit withdrawal.  And so the balance

15  never grew because each individual trade was followed by a

16  profit withdrawal transaction.

17           MS. BROWN:  I'd like to turn to Trustee's

18  Demonstrative 7.

19  BY MS. BROWN:

20  Q    Mr. Greenblatt, can you identify this document?

21  A    Yes, this was again the same exercise.  This was the

22  third analysis that I had done for account 1B0034 that at

23  one time was a participating account.

24  Q    And what can you tell us about your analysis with

25  respect to the 1B0034 account?

1  A    So this account was similar to Mr. Blecker's accounts

2  in many ways, but had a one-year period where it was

3  different than Mr. Blecker's account, because for all but

4  one year this account had its profits sent to it -- sent to

5  him following each transaction.  So each gain reported on

6  the statement was followed by a profit withdrawal

7  transaction with the exception of the one-year period from

8  June 1987 until May of 1988.  At that time, this particular

9  account asked for its profits to be reinvested.  And so it's

10  hard to see based on the scale of this graph, which is why

11  we've done the callout box with a different scale, but you

12  can see that starting in June of 1987 this account asked for

13  profits to be reinvested.  And so for that period you can

14  see the equity in the account is growing, as one would

15  expect an account with profits being reinvested to do.

16      Then after ten months, the customer requested a

17  redemption of the profits earned over the prior ten months

18  and asked for their profits to be sent to them moving

19  forward.  And so what you see following that transaction --

20  or following that correspondence is an immediate drop of

21  $21,340, which was the aggregate sum of those reinvested

22  profits.  That transaction was listed on the customer

23  statement as a capital withdrawal or a CW and then every

24  transaction following that for the withdrawals were listed

25  as PWs.  So this spike up of purported equity on the

Page 213

1    statements is what one would expect if the profits were

2    reinvested and then it shows how the PW transactions were

3    being used by BLMIS in its recordkeeping.

4    Q    So I'd like to wrap up.  So based on all of the works

5    you've done now with BLMIS's books and records, have you

6    reached conclusions about the cash and principal

7    transactions on those records?

8    A    Yes.  So the -- based on all of the work that I and the

9    FTI team have done, it's my conclusion that the cash and

10   principal transactions that have been reported on the BLMIS

11   customer statements accurately reflect cash transactions and

12   are appropriately used in the principal balance calculation

13   as debits and credits or inflows and outflows.

14   Q    And how many principal balance calculations have you

15   completed?

16   A    I've prepared over 8,000 of them.

17   Q    And have you -- did you follow the same process that

18   you've described here today with respect to Mr. Blecker's

19   account?

20   A    For all 8,000 of them, yes.

21   Q    And did you reach any conclusions about the profit

22   withdrawal transactions of BLMIS?

23   A    Yes.  Based on all of the analysis that I've done

24   around the profit withdrawal transactions, it is my

25   conclusion that the profit withdrawal transactions for five

Page 214

1   main reasons are properly reflected.  One, they're

2   withdrawal transactions, by definition they use the word

3   "withdrawal," to each time they debit the account and,

4   therefore, reduce the purported equity in the account, for

5   the period we have bank records, they've tied to bank

6   records and I've seen nothing that contradicts the treatment

7   of these as debits.

8   Q    Mr. Greenblatt, did you get an opportunity to review

9   the deposition testimony of the BLMIS employees?

10  A    I did, yes.

11  Q    And does any of that testimony change your opinions

12  that you've stated here today?

13  A    No, and in fact the testimony that I read from the

14  employees further support the opinions that I have about the

15  PW, the treatment of PW transactions.

16  Q    And are you confident in the results of your analyses

17  to a reasonable degree of accounting certainty?

18  A    I am, yes.

19          MS. BROWN:  I have nothing further, Your Honor.

20          THE COURT:  Cross-examination.

21          MS. CHAITMAN:  I'm sorry?

22          THE COURT:  Cross-examination.

23                  CROSS-EXAMINATION

24  BY MS. CHAITMAN:

25  Q    Mr. Greenblatt, did I understand you to say that with

Page 215

```
 1   respect to this --
 2          MS. CHAITMAN:  -- would you be good enough to pull
 3   up the last demonstrative that you just had?
 4          MS. BROWN:  Sure.  It's Trustee Demonstrative 7.
 5   BY MS. CHAITMAN:
 6   Q   With respect to this account 1B0034, did I understand
 7   you to say that you saw a letter from the customer
 8   instructing as to how the profit withdrawals should be
 9   handled?
10   A   I saw a notation -- I don't remember if it was a letter
11   or if it was a notation in the customer file requesting --
12   or acknowledging, I think it was initials in an employee's
13   handwriting that this was a period of reinvestment.
14   Q   So you -- are you -- do you know which employee
15   initialed the notation you're referring to?
16   A   I don't know which one.
17   Q   Okay.  So it wasn't a letter from Mr. Blecker?
18   A   Oh, definitely not Mr. Blecker.  This isn't Mr.
19   Blecker's account.
20   Q   Okay.  So 1B0034 is not Mr. Blecker's account?
21   A   No, this is the account of Norman Blum.
22   Q   Oh.
23          THE COURT:  Why are we -- why are you showing us
24   this account?
25          MS. BROWN:  I was showing that account, Your
```

Page 216

1    Honor, to show what the balances would have done if the

2    profits had been reinvested to contrast it with Mr.

3    Blecker's account, where the account balances stayed flat

4    for the entire time.

5             THE COURT:  But you showed that with the two

6    Blecker demonstratives.

7             MS. BROWN:  I showed it following the two Blecker

8    demonstratives and I asked him to identify the account that

9    it was about.

10            THE COURT:  I guess I don't understand why we're

11   even talking about this account, this 34 account.

12            MS. BROWN:  Okay, I apologize I didn't make it

13   clear.  The purpose was to show the distinction between Mr.

14   Blecker's account where he didn't have any periods of

15   reinvestment, he always had -- his account balances stayed

16   flat for the entire period, whereas this account had a brief

17   period where the profits were reinvested and you see the

18   spike up in the equity balance.

19            THE COURT:  It just seems irrelevant to me.

20            MS. BROWN:  Okay.

21            THE COURT:  Go ahead.

22   BY MS. CHAITMAN:

23   Q    In the course of your work, did you find any document

24   evidencing that Mr. Blecker or his wife, Sophie Blecker, had

25   ever communicated to anyone at Madoff that they wanted to

1    have profit withdrawals sent to them?

2    A    It was -- there are documents that include the account

3    opening forms -- based on what I understand from the

4    employee depositions, at the time accounts are opened, they

5    are identified as whether or not the profit should be sent

6    to them or reinvested.  So I think the account opening form

7    provided that documentation but I have not seen anything

8    since the account opening form either way.

9    Q    Okay.  And you haven't seen anything signed by either

10   of the Bleckers, isn't that true?

11   A    Well, I don't recall if they signed the account opening

12   form or not.

13   Q    Well, let's look at the account opening form.  Look for

14   example at Trustee Exhibit-41, if you'd be good enough to

15   pull that up.  Do you see any place on this document where

16   either of the Bleckers signed it?

17          THE COURT:  Didn't they sign the customer

18   statements, though?

19          MS. CHAITMAN:  I'm sorry?

20          THE COURT:  The -- I mean, the account statement

21   with the openings -- the opening account documents, wouldn't

22   they have signed that?

23          MS. CHAITMAN:  These -- this is the opening account

24   document that we have for the Blecker account.  We don't

25   have any other --

1          THE COURT:  They signed the discretionary trading

2     authorization and option trading authorization?

3          MS. BROWN:  Your Honor, my understand of this form

4     is this is an internal BLMIS document.  I think they signed

5     the customer agreement.

6          THE COURT:  That's what I mean.

7          THE WITNESS:  Right.

8          MS. CHAITMAN:  Yeah, I don't -- I haven't looked at

9     it recently, but I don't believe that says anything about

10    withdrawals.

11    BY MS. CHAITMAN:

12    Q    And the test -- would you agree with me, Mr.

13    Greenblatt, that the testimony of both the Madoff employees

14    and the records that you sought indicate that if someone

15    wanted withdrawals sent to them, they had to send a request

16    in writing?

17    A    Well, my recollection of the testimony from the

18    employees was that if they were routine or consistent

19    withdrawals, they didn't need to send it --

20    Q    Each time.

21    A    -- each time, but that for accounts that were opened

22    around this timeframe, from the very beginning, they were

23    identified as either a send or a reinvest account.  And

24    that's indicated here on this file maintenance page.

25    Q    Well, who wrote the S?

Page 219

```
 1    A     I don't know.

 2              THE COURT:  Where is the S?  LRC Properties, okay.

 3              THE WITNESS:  Right.  So when we looked at profit

 4    withdrawal transactions, there were sometimes where it said

 5    check and a stock name, sometimes it said check and

 6    dividends, sometimes it said check and interest.  And so

 7    that's what the S indicates.  I don't know who wrote it, but

 8    that's what the S indicates.

 9    BY MS. CHAITMAN:

10    Q    Right.  And when was it written?

11    A     I don't know.  I mean, I would assume at the time the

12    account was open, but there's no date and I don't know.

13    Q    You mean in 1981?

14    A     That would be my guess but I -- it's not dated and I

15    can't testify to when it was written.

16    Q    Okay.  In all of the work that you've done, have you

17    signed -- have you found a single check that was written to

18    the Bleckers?

19    A     I have not, no.

20    Q    Okay.  Now, what was the rate of return that Mr. Madoff

21    was paying to his customers during, say, 1981?  Do you know

22    that?

23    A     It was in the -- I -- it was in the low 20's.  I don't

24    know an exact number but it was in the low 20 percent range.

25    Q    Okay.  And how long did it stay in the low 20 percent
```

Page 220

1  range?

2  A    For most of the '80s and '90s, the reported trading for

3  the majority of accounts, I can't necessarily say that I can

4  testify that it was this way for all accounts, but for the

5  majority of the accounts he was reporting to manage, it was

6  in the low 20's for a consistent period throughout the '80s

7  and into the early '90s, at which point it might have

8  dropped below a 20 percent rate.  But for the most part, it

9  was in the low 20's.

10  Q    Okay.  And did you determine based on all of the work

11  you've done how it was determined that some people would get

12  higher returns than others?

13  A    No, that was beyond the scope of what I was doing for

14  principal balance.  I didn't look at one account versus

15  another from a rate of return perspective.

16  Q    Okay.  And with respect to the Blecker accounts, did

17  you determine that they had a higher or a lower return than

18  the 20 percent that you've been talking about?

19  A    They were in that same range.

20  Q    They were in the same range?

21  A    Yes.

22  Q    And even in the early 1990's?

23  A    I think my analysis continued through 1997.  So yes, it

24  was in the same range.

25  Q    Okay.  Would you be good enough to pull up Trustee's

Page 221

```
 1    Exhibit-88?  So this has in the middle of the page, the

 2    earnings in 1B0023, which was Mr. Blecker's account for the

 3    year 1992, right?

 4    A     Yes.

 5    Q     And this shows that the total profits were $64,000, is

 6    that right?

 7    A     You're looking at the joint account for B0023?

 8    Q     Yes.  Excuse me, no.  Let's start with Aaron Blecker,

 9    the 22 accounts.

10    A     Okay.

11    Q     Okay.  So this shows an expected rate of return of 22

12    percent, right?

13    A     That's what it says, yes.

14    Q     Okay.  And the profits -- all of the profits were

15    withdrawn from the account, is that right?

16    A     That is correct.  All of the reported profits, yes.

17    Q     Okay.  Well, were there unreported profits?

18    A     Well, I -- whether or not the profits were actually

19    earned or just reported, I'm drawing that distinction.

20    Q     Okay.  So if the account balance was $207,000, then it

21    was -- and it was paying 20 percent, you would expect that

22    he would have withdrawn 40,000 that year, right?

23    A     For that one year and that one year only, well, it's --

24    so that was the year that -- it's a little harder to answer

25    because the $100,000 second deposit came in on December 16th
```

Page 222

1      of that year, so there wouldn't have been any time to get a

2      return on that.  But there was $200,000 of cash deposits in

3      that account by the end of 1992.

4              THE COURT:  This is the other account, though.

5      This isn't the account with the $100,000 that went in on --

6      in December --

7              THE WITNESS:  Well, we moved to the top of this

8      page, so we're looking at the 1B0022 account for Aaron

9      Blecker.

10             THE COURT:  I apologize.

11             THE WITNESS:  So there was $200,000 of cash

12     deposits in that account by the end of December 1992.

13     BY MS. CHAITMAN:

14     Q    And the second hundred was deposited when?

15     A    December 16th of 1992, so at the very end.

16     Q    Okay.

17     A    And so the $200,000 was now showing a reported equity

18     value of 207,000.

19     Q    Okay.  So even if the -- if you just say that there was

20     100,000 -- 107 because you're saying all of the profits were

21     drawn out, so if there was 107,000 in the account for 11

22     months of 2002, right?  Because you're saying 100 was

23     deposited in November of 2002, right?

24     A    Well, the 100 was deposited on December 16th.

25     Q    Okay.  So let's just assume that we're only dealing

Page 223

1   with 107,000.  At 20 percent, that should be over $40,000,

2   right?

3   A      Well, that would be 20,000.

4   Q      $20,000, excuse me.  So do you know why this account

5   paid less in profits than the -- what you anticipated it

6   would?

7   A      Well, there is -- each individual trade -- reported

8   trade on these statements is -- there's some timing

9   differences here.  So there is -- likely, the part of the

10  spike from 200 to 204 back to 200, up to -- is because some

11  of these profits get withdrawn in January.  So it is highly

12  likely that there is a reported profit included in the year

13  end number that's then going to get withdrawn in January.

14  So there's slight timing differences, but each individual

15  transaction generated either 4 percent, 5 percent, but over

16  a 2 month period instead of a 12 month period.  So each

17  individual trade would have reported a smaller percentage

18  gain.  But if he did -- if he reported five trades that year

19  and they were all for 4 percent, the account generated

20  roughly 20 percent of the --

21          THE COURT:  Can I ask a question?  All of these

22  transactions are fictitious.  The profits or whatever are

23  made up, decide what the profits should be.  Isn't that

24  what's going on here?  He's making up transactions.

25          MS. CHAITMAN:  You've got the expert here.  I'm

Page 224

```
 1    not --

 2            THE COURT:  I think he's -- I heard his

 3    explanation, but the answer is if it's below 22 percent,

 4    it's because that's what Madoff decided it would be.  Isn't

 5    that the answer, though?

 6            MS. CHAITMAN:  Well, but the point is that if he

 7    was earning less than the 20 percent, then the differential

 8    between what the trustee contends he should have been

 9    earning if he had not taken the profits out would be very

10    different.

11            THE COURT:  I don't know if these expected -- where

12    these expected rate of returns come from.  The internal --

13    it looks like an internal document.

14            MS. CHAITMAN:  Right.

15            THE COURT:  Is Blecker going to sue Madoff for

16    breach of a fraudulent promise?

17    BY MS. CHAITMAN:

18    Q    Now, with respect to the Blecker accounts, can you tell

19    the Court what the gaps were in the records that you were

20    able to review?

21    A    So when I was referring to the gaps earlier, there are

22    portfolio management reports during the microfilm timeframe

23    like we're looking at here, where we may not have had a

24    particular month or a particular year end portfolio

25    management report because the microfilm is either lost,
```

Page 225

```
 1    damaged, or illegible.  For PMT reports and spiral bound

 2    notebooks, they are limited to the document -- the data

 3    available in the debtor's books and records as of 2008.  So

 4    there are handwritten spiral notebooks that we have and

 5    there are a lot more spiral notebooks that just were not

 6    maintained and did not exist in 2008.  And so when I refer

 7    to gaps, I'm referring to what we don't have that were most

 8    likely maintained during the ordinary course of business.

 9    Q    But with respect to the various accounts that Mr.

10    Blecker had from 1981 on, what percentage of the monthly

11    statements were you able to review?

12    A    All of them.

13    Q    You reviewed all of the monthly statements for all of

14    the accounts?

15    A    For all of the Blecker accounts?  Yes.

16    Q    Yes.  Now, you testified, I believe, that with respect

17    to 1B022 the negative principal balance was 59,634.  Do you

18    recall that testimony?

19    A    Yes.

20    Q    Okay.  And for what period of time was the negative

21    principal balance 59,634?

22    A    That was the ending principal balance.  So that was as

23    of the closing of the account and as -- essentially as of

24    December 11th, 2008.  That was the ending balance.

25    Q    Okay.  Well, so what you're saying is that Mr. Blecker
```

Page 226

1    -- you know he started that account in 1986?

2    A    Yes.

3    Q    Okay.  So from 1986 to 2008, you're saying he had a

4    negative principal balance of 59,634?

5    A    Correct.

6    Q    Now, you observed from the records, did you not, that

7    Mr. Blecker and his wife did not withdraw a single penny

8    according to Madoff's statements after 1997?

9    A    Correct.

10   Q    So how is it possible that in the period from 1997 to

11   2008, assuming as you testified, that Mr. Blecker put in

12   200,000, right?

13   A    Right.

14   Q    And he maintained his $200,000 investment, right?

15   A    No.  I mean, no -- I think that's where we might differ

16   in the language we're using.  When you say he maintained his

17   investment of 200,000, I would agree with you that he

18   maintained his investment as far as he understood within the

19   Madoff fraud.  But my calculation is based on cash in and

20   cash out.  So if he's generating a false profit for $4,000

21   and he then withdraws that $4,000, as far as he knows, he

22   hasn't taken his 200,000, right?  He just took the profit.

23   But if the profit was never earned, he's now taken 4,000 of

24   his 200.  Does that make sense?

25   Q    Okay.

Page 227

1    A     So I think we're using different terminology.

2    Q     Okay.  And what was your calculation with respect to

3    the joint account, which was started in 1981?

4    A     So the same concept is that over time, he had made the

5    -- we granted the initial principal credit of 42,300 and

6    change.  Then he had additional deposits along the way.  And

7    those cash deposits from his perception or from -- I don't

8    want to say his perception -- from the reporting of the

9    equity, and the trading, and all of the things on the

10   customer statements as part of the fraud, all of that

11   activity the balance that the investor was considering, he

12   was only using that as a foundation, that every profit would

13   go up and he was withdrawing that profit, leaving the

14   foundation the same.

15        However, for purposes of calculating principal balance

16   to determine the net equity, each one of those profits

17   didn't exist.  Therefore, when that profit -- supposed

18   profit was withdrawn, it actually was withdrawing from his

19   actual deposits.  So that's the difference between the

20   principal balance calculation and the amounts reported on

21   the customer statements.

22   Q     In the course of your work, did you interview any

23   Madoff employees?

24   A     When I first got to BLMIS in December of 2008, it was

25   already considered a crime scene and the FBI were there.  So

Page 228

1   my opportunity to interview or speak with any employees was

2   extremely limited.  I had a couple of initial discussions

3   with employees logistically, just to say where are the files

4   maintained, where can I find customer statements.  So my

5   conversations with employees was limited to a couple of

6   procedural type questions in December of 2008 and January of

7   2009.  Other than that, I wasn't able to speak with

8   employees as forensic accountants would normally do.

9   Q    Did you in the course of your work discover that there

10  were instances where employees stole money from customers by

11  taking checks?

12  A    I'm not aware of that.

13  Q    Well, you never were able to examine the backs of the

14  checks that were issued prior to 1998, isn't that true?

15  A    I have not reviewed the backs of checks.  I believe

16  there are some cancelled checks prior to 1998, but the

17  majority -- the vast majority of the bank records available

18  are from 1998 forward.

19  Q    Right.  And without looking at the back of a check, you

20  wouldn't really know where it was deposited, would you?

21  A    No.

22  Q    And even with respect to checks after 1998, have you

23  actually done a review to make sure that the checks were

24  endorsed by the payees and deposited into their accounts?

25  A    I haven't done that work, but the work's been done by

1    FTI.

2    Q    And did they discover that there were instances where

3    the checks were not deposited by the payees?

4    A    Not that I --

5            MS. BROWN:  Your Honor, I'm going to object.  Ms.

6    Callura was on the stand testifying about the cancelled

7    checks and her work.  She could have asked this question to

8    Ms. Callura.

9            THE COURT:  Well, yes.  He can say he doesn't know

10   because --

11           MS. BROWN:  Okay.

12           THE COURT:  -- it is a question that should have

13   been put to Ms. Collura.  She did the tracing analysis.  You

14   can answer the question, do you remember -- do you want to

15   re-ask the question, Ms. Chaitman?  We might have lost the

16   thread.

17   BY MS. CHAITMAN:

18   Q    Right.  Do you have any knowledge as to whether checks

19   after 1998 where you have possession of them show that the

20   checks were not deposited into the payees' accounts?

21   A    I'm not aware of any.

22   Q    Now, I'm reading from your July 14th, 2015 report at 4,

23   paragraph 6.  You said --

24           THE COURT:  What exhibit is that, Ms. Chaitman?  In

25   your book?

Page 230

1           MS. CHAITMAN:  You know what, let me --

2           THE COURT:  I'm looking at the table of contents.

3           MS. CHAITMAN:  I didn't mark that as an exhibit.

4    So let me --

5           THE COURT:  Okay.  It's not in your book?  Go ahead

6    and ask the question.  I just thought it would be easier.

7           MS. CHAITMAN:  Okay.

8    BY MS. CHAITMAN:

9    Q    The subset -- I'm quoting from you, "The subset of

10   withdrawal transactions, collectively referred to herein as

11   PW transactions, is comprised of: one, transactions referred

12   to as profit withdrawals for which the transaction code

13   according to the customer statement is PW; and two,

14   transactions reflected on the customer statements with a

15   transaction code other than PW (CW or JRNL)."  Do you recall

16   that that's what you wrote in your report?

17   A    Yes, I do.

18   Q    Okay.  Now, what was the period that the PW appeared on

19   the statements?

20   A    There were PW transactions from the early 1980's

21   through 2008.

22   Q    Now, even during the period following 1998 when you had

23   the bank records, were there instances where you found that

24   checks were not deposited by the customers?

25   A    I did not do that testing.

Page 231

1    Q    You did an analysis of the profit withdrawal

2    transactions, didn't you?

3    A    Yes.

4    Q    And you did a supplemental analysis of the profit

5    withdrawal transactions, didn't you?

6    A    Yes.

7    Q    Okay.  And in that supplemental withdrawal in paragraph

8    16, note 5, didn't you determine that 800 PW notations

9    represented checks to customers that were not cashed?

10   A    I know you're taking a section of my report.  I think I

11   might know what you're referring to, but it would be --

12           THE COURT:  Do you want to see the --

13           THE WITNESS:  That would be helpful.

14           THE COURT:  -- supplement report.  Anybody have it

15   to show him?

16           MS. BROWN:  Where are you on?  Which page?

17           MS. CHAITMAN:  It's the supplemental report.  It's

18   paragraph 16, note 5.

19           THE COURT:  Is there an extra copy?

20           MS. BROWN:  I have copies for everyone.

21   (Indiscernible).

22           THE COURT:  Yes, thank you.

23           MS. BROWN:  You're welcome.

24   BY MS. CHAITMAN:

25   Q    Paragraph 16, note 5.  Would you read that for the

1    Court?

2    A    The note?

3    Q    Paragraph 15, note 5.

4    A    Read the footnote?  Okay.  "These transactions exclude

5    approximately 800 line items corresponding to certain

6    initially reported transactions that were coded as PW

7    transactions that were subsequently cancelled on the

8    customer statements."

9    Q    And would you read note 4?

10   A    "The six individual transactions that were included in

11   the population of PW transactions as set forth in Exhibit 2

12   to the PW report, have since been eliminated because: A)

13   four transactions (related to BLMIS accounts 1N008 and

14   1FN016) were related to purported tax obligations and were

15   withheld by BLMIS and paid to the IRS on the customer's

16   behalf; and B) two transactions (one in BLMIS account 1H0022

17   and one in BLMIS account 1W0064) were cancelled in the

18   months following the transactions as reflected on the

19   customer statements.  In addition, there were updates to the

20   transaction date, amount, type, and description for 96 PW

21   transactions.  See Exhibit 3 for the listing of all PW

22   transaction and the specific updates to these PW

23   transactions."

24          MS. CHAITMAN:  Okay.  I have no further questions.

25          THE COURT:  Any redirect?

Page 233

1          MS. BROWN:  No, Your Honor.

2          THE COURT:  All right.  Let me just make sure.  Are

3    there any other participating claimants here not represented

4    by Ms. Chaitman that want to question the witness?  Hearing

5    no response, you can step down.

6          Do you have any further live witnesses?

7          MS. BROWN:  No, Your Honor, that -- we have no more

8    witnesses.

9          THE COURT:  Okay.  And, Ms. Chaitman, do you have

10   any live witnesses?

11         MS. CHAITMAN:  No, not here.

12         THE COURT:  All right.  I haven't reviewed all of

13   the deposition designations and there's no point -- and it's

14   also quarter to 5:00.  There's no point in having an

15   argument based on those designations.  What I suggest we do

16   is the trustee can submit proposed findings of fact and

17   conclusions of law, by paragraph with citations to the

18   record supporting each requested finding.

19         I'm not sure that there's many legal issues in this

20   particular matter, but you can submit a memorandum to the

21   extent necessary for issues of law.  How long can -- how

22   long will it be before you can submit that?

23         MS. BROWN:  Your Honor, could we have two weeks?

24         THE COURT:  Two weeks.  Okay.  And then what I'll

25   ask you to do, Ms. Chaitman, is then you'll have two weeks

Page 234

1    to submit any counter-proposed -- to take issue with their

2    findings of fact and conclusions of law so you can show me

3    other parts of the record that support or undercut their

4    proposed findings and additional findings that you want me

5    to make, again with specific citations to the record that

6    support those findings.

7              MS. CHAITMAN:  Okay.  Your Honor, I'm going on a

8    three week vacation starting February 18th and can I -- I

9    don't mind giving the trustee more time, but I'd just like

10   to be able to do this when I come back from vacation.

11             MS. BROWN:  Your Honor, we'll take more time if

12   that's okay.

13             THE COURT:  The case has been going on for nine

14   years now -- ten years --

15             MS. BROWN:  Why stop now?  We're having so much

16   fun.

17             THE COURT:  All right.  So when are you going to be

18   back?

19             MS. CHAITMAN:  I'm going to be back on March 8th.

20             THE COURT:  All right.  So I mean, I guess they can

21   have until March 7th to put in --

22             MS. CHAITMAN:  Yeah.  I mean, that's --

23             THE COURT:  -- whatever it is you're going to put

24   in.

25             MS. BROWN:  That would work for us, Your Honor.

Page 235

1            THE COURT:  And then you'll have two weeks.  Please

2    don't come back and say they had a month, now you want a

3    month.  This is being done --

4            MS. CHAITMAN:  No, no, no.

5            THE COURT:  -- to accommodate you.  All right, so

6    the trustee's -- this -- we'll call it the Blecker

7    claimant's response since it's really a dual --

8            MS. CHAITMAN:  It's really the Blecker response.

9    Yeah.

10           THE COURT:  Well, so that's March 22.  If I need

11   oral argument or I think I need it, then I'll schedule oral

12   argument.  Otherwise, the matter will just be submitted at

13   that point.  Okay?

14           MS. BROWN:  Thank you, Your Honor.

15           THE COURT:  Okay.  Let me give you back some of

16   this stuff you gave me.  Thank you very much.  This was a

17   very well tried case, both sides.

18           MS. CHAITMAN:  You have my binder.

19           THE COURT:  Yeah, this I'll hold -- you know what,

20   if you could give me -- what exhibits are coming in?  We

21   never really talked about that.

22           MS. BROWN:  I was just thinking of that.

23           THE COURT:  Yeah.

24           MS. BROWN:  Do you want us to outline the exhibits

25   that we'd like to move in in our proposed findings of fact

Page 236

```
1     and conclusions of law with --

2              THE COURT:  Then I have to have another argument

3     about -- why didn't we deal with that before?

4              MS. BROWN:  I'm sorry?

5              THE COURT:  What exhibits -- have you -- the two of

6     you discussed the proposed exhibits and whether there are

7     objections to the exhibits?  I guess I can deal with that

8     before February 18th, right?

9              MS. CHAITMAN:  You know what, there were thousands

10    of exhibits that actually didn't go in.  So what I would --

11             THE COURT:  I don't know what they want to put in.

12             MS. CHAITMAN:  Right, so --

13             THE COURT:  Nothing has gone in yet.

14             MS. CHAITMAN:  Yeah, what I would suggest if you

15    don't mind, Your Honor, is that Seanna just give me a list

16    of what she proposes to put in.  I'll give her a list.  And

17    then  -- I mean, that's --

18             THE COURT:  Okay.  But let's deal with that before

19    the proposed findings and conclusions.  It seems to be that

20    that -- that can get done quickly and this way you're not

21    basing any proposed findings on evidence that's not going to

22    come in.

23             MS. BROWN:  Do you want me to -- if you give us 10

24    minutes, I can tell you which evidence we'd like to put in

25    now.
```

Page 237

1          THE COURT:  Well, we can try it that way.

2          MS. CHAITMAN:  Can we -- if you don't mind, can we

3    do it by next Wednesday or so.  If you just -- I'd just like

4    to review everything.

5          MS. BROWN:  I guess I'm just confused, Your Honor,

6    if there's objections are we coming back or --

7          THE COURT:  Well, what we can do is you can each

8    exchange your proposed exhibits and today's Friday.  We can

9    do it by one day next week.

10         MS. CHAITMAN:  Yes.

11         THE COURT:  Then you can submit, you know, which

12   we'd normally do in a pretrial order, you can submit a list

13   of objections and the basis of the objections and then, you

14   know, I can deal with them.

15         MS. CHAITMAN:  I'd just like to be able to review

16   the transcript and get a complete list.

17         THE COURT:  Why don't you exchange the lists of

18   those exhibits that you want to offer into evidence, okay?

19         MS. BROWN:  Okay.

20         THE COURT:  And let's say you do that -- can you do

21   it by next Wednesday?

22         MS. BROWN:  Yes.

23         THE COURT:  Ms. Chaitman?

24         MS. CHAITMAN:  Sure.

25         THE COURT:  Simultaneous exchange by the close of

Page 238

1    business Wednesday.  So that's the 24th.  And how long do

2    you need for objections?

3              MS. BROWN:  A week.

4              THE COURT:  Okay.  And then you can submit your

5    objections but I want to know the basis of the objection.

6    You can do it in a box.  So you can have the exhibit number.

7    I have all of your exhibits on disc -- proposed exhibits on

8    disc.  And I have you on looseleaf.  Objections by January

9    31st.  Then we'll schedule a hearing before you go away and

10   we'll deal with the --

11             MS. CHAITMAN:  Okay.

12             THE COURT:  -- objections.  Actually, that plays

13   better into the timing anyway.

14             MS. BROWN:  Okay.

15             THE COURT:  All right?

16             MS. BROWN:  Thank you, Your Honor.

17             MS. CHAITMAN:  Thank you, Judge.

18             THE COURT:  Thank you.  Okay.  Thanks very much.

19        (Chorus of thank you)

20        (Whereupon, these proceedings were concluded at 4:50

21   p.m.)

22

23

24

25

Page 239

1                        I N D E X

2                    T E S T I M O N Y

3

4    WITNESS              EXAM BY                    PAGE

5    Robert Blecker       Ms. Chaitman                26

6                         Ms. Woltering               55

7

8    Lisa Collura         Ms. Vanderwal               58

9                         Ms. Chaitman               113

10                        Ms. Vanderwal              161

11

12   Matthew Greenblatt   Ms. Brown                  163

13                        Ms. Chaitman               214

14

15

16

17

18

19

20

21

22

23

24

25

Page 240

1                                RULINGS

2                                                              PAGE

3     Motion in Limine                                         15

4     Objections to Various Depositions                        16

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 241

1                      C E R T I F I C A T I O N

2

3     We, Dawn South, Sherri Breach, Tracey Williams & Jamie

4     Gallagher, certify that the foregoing transcript is a true

5     and accurate record of the proceedings.

6     

7     _____

8     Dawn South

9     Certified Electronic Transcriber

10

11    _____

12    Sherri L. Breach

13    AAERT Certified Electronic Reporter & Transcriber CERT*D-397

14

15    _____

16    Tracey Williams

17    AAERT Certified Electronic Transcriber CET-914

18

19    _____

20    Jamie Gallagher

21    Date:  January 23, 2018

22    Veritext Legal Solutions

23    330 Old Country Road

24    Suite 300

25    Mineola, NY 11501