Page 1



1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 08-99000-smb

4  Adv. Proc. No. 08-01789-smb

5  Adv. Proc. No. 10-05279-smb

6  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

7  In the Matter of:

8  BERNARD L. MADOFF INVESTMENT SECURITIES, LLC., et al,

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11  SECURITIES INVESTOR PROTECTION CORPORATION,

12              Plaintiffs,

13          v.

14  BERNARD L. MADOFF INVESTMENT SECURITIES, LLC., et al,

15              Defendants.

16  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

17  IRVING H. PICARD, ESQ., TRUSTEE FOR THE SUBSTANTIV,

18              Plaintiffs,

19          v.

20  MAGNIFY INC., et al,

21              Defendants.

22  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

23

24

25

1                    U.S. Bankruptcy Court

2                    One Bowling Green

3                    New York, New York 10004-1408

4

5                    January 31, 2018

6                    10:06 AM

7

8

9    B E F O R E :

10   HON STUART M. BERNSTEIN

11   U.S. BANKRUPTCY JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    HEARING RE:   Motion to Dismiss Case.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Nicole Yawn, Jamie Gallagher, Penny Skaw

Page 4

```
 1   A P P E A R A N C E S :

 2   BAKER & HOSTETLER

 3        Attorneys for Irving Picard, Madoff Trustee

 4        45 Rockefeller Plaza

 5        New York, NY 10111-0100

 6

 7   BY:  TRACY COLE, ESQ.

 8        ONA T. WANG, ESQ.

 9        DAVID M. MCMILLAN, ESQ.

10        MICHELLE TANNEY, ESQ.

11

12   DAVIDOFF HUTCHER & CITRON, LLP

13        Attorneys for defendants, Magnify

14        605 Third Avenue

15        New York, NY 10158

16

17   BY:  MICHAEL WEXELBAUM, ESQ.

18        MICHAEL D. KATZ, ESQ.

19

20

21

22

23

24

25
```

Page 5

```
1                    P R O C E E D I N G S
2              THE COURT:  Please be seated.
3              Good morning.
4              Picard v. Magnify?
5              MS. COLE:  Good morning, Your Honor.  Tracy Cole,
6    for the Trustee, from Baker Hostetler.
7              MS. TANNEY:  Michelle Tanney, for the Trustee,
8    from Baker & Hostetler.
9              THE COURT:  Very good.
10             MR. WEXELBAUM:  Michael Wexelbaum, from Davidoff
11   Hutcher & Citron, for the defendants, Your Honor.
12             THE COURT:  Oh.
13             MR. WEXELBAUM:  I'm accompanied by Michael Katz.
14             THE COURT:  How do you do?  I'll hear your motion.
15             MR. WEXELBAUM:  Thank you, Judge.  Your Honor, let
16   me start by telling you what I plan to address during this
17   oral argument.  And, of course, I'll be guided by the Court
18   as I go along.  I intend to tell the Court very briefly the
19   nature of the motion and the relief we seek.  I'm going to
20   touch on the standard of review, which I know Your Honor is
21   more than familiar with.  I'll then get into what I'll refer
22   to as the elephant in the room, which is the Green affidavit
23   and its numerous exhibits.  I'll then touch briefly on the
24   Trustee's new arguments and the Trustee's partnership claim,
25   which we deem to have been abandoned.  And then I'll spend a
```

Page 6

1    little bit more time on the Section 546(e) safe harbor

2    defense, as it applies to Premero and Strand, the actual

3    knowledge issue, which is probably the main issue before

4    Your Honor, and the willful blindness issue and then finish

5    up with the alter ego issue.

6              THE COURT:  Well, that's a lot.

7              MR. WEXELBAUM:  I understand.

8              THE COURT:  It just struck me, in reading the

9    papers, that the principal issue is what did Green know and

10   when did he know it and whether the complaint alleges it.

11             MR. WEXELBAUM:  I agree with that, Your Honor.

12             THE COURT:  Right.

13             MR. WEXELBAUM:  Let me respond to that right off

14   the bat.

15             THE COURT:  Okay.

16             MR. WEXELBAUM:  I think the entire argument that

17   Green knew about this fraud going back as far as 1989 is

18   based on an 11-word snippet from the testimony of Kurt

19   Brunner, the Swiss attorney who founded Magnify in 1983 at

20   the request of the Frenchman named Albert Igoin, who was the

21   founder of Magnify and one of the founders of the Yeshaya

22   Horowitz Association, which we'll refer to as YHA, which was

23   the entity that made $126 million of charitable

24   contributions and donations throughout Israel to

25   universities, hospitals, et cetera.

Page 7

1              I don't think there can be any legitimate dispute

2        over the admissibility or the right for this Court to

3        consider the testimony of Kurt Brunner on the issue at hand

4        in its entirety.  And that testimony is set forth on pages 7

5        through 11 of Mr. Brunner's -- I'm sorry -- of Mr. Green's

6        affidavit.  The 11-word snippet that they quote in their

7        papers, Your Honor, in their brief, in their second amended

8        complaint is that Mr. Igoin introduced Mr. Green to

9        Mr. Brunner as, and I quote, "the person that then would

10       deal with the fate of Magnify."  That's what they rely on to

11       say that Mr. Green took over that company in 1989.

12              I'm going to just read not four pages of this

13       testimony, but I'll read the highlights.  So before he made

14       that statement, Mr. Brunner said, "Mr. Igoin was sort of

15       quite advanced in age.  And in '83 in Zurich, he already

16       reflected on what would happen -- what should happen with

17       his money in case he died."

18              And then on 14 December, 1989, Mr. Igoin mentioned

19       it in more concrete terms.  "And I understood the visit of

20       Mr. Igoin, that he wanted to introduce me -- introduce me to

21       -- introduce to me the person that would then deal with the

22       fate of Magnify."

23              THE COURT:  Well, the question is what "then"

24       means, whether it means immediately or after Mr. Igoin dies.

25              MR. WEXELBAUM:  Absolutely, Your Honor.

Page 8

1                THE COURT:  So it's ambiguous.

2                MR. WEXELBAUM:  It's not ambiguous when you read

3      the rest of the testimony.

4                THE COURT:  Right.

5                MR. WEXELBAUM:  I'm going to move over to page 9,

6      where he says, "This document has been drafted by Mr. Green,

7      and it was given to me on 26 July, 1996 for me to sign.  The

8      contents of this says that Magnify, Inc. transfers to

9      Mr. Green all authorizations, decisions regarding the monies

10     of Magnify to Madoff in New York."  Then down below, he says

11     further to discuss -- this is a question.  "Further to

12     discussions concerning management and supervision of the

13     monies of Magnify, which duties you undertook as of January

14     1995."  That's Ms. Wang reading from the document.

15                And then she says in this letter -- "In the letter

16     you approved Mr. Green's appointment as supervisor of the

17     company's investment portfolio.  Was there ever a supervisor

18     of the company's investment portfolio before this letter was

19     drafted?"  Answer, "Before there was Mr. Igoin, who

20     monitored everything.  I do now assume that he transferred

21     the shares to Horowitz and that he then continued some

22     duties as regards administration or the portfolio

23     investment."

24                When you say he -- this is a question.

25                THE COURT:  He said, "But I assume this.  I don't

Page 9

1    know."  So he's -- Brunner's really speculating.

2           Did Brunner testify at all?  Did he have any

3    knowledge about the mechanics of when money was transferred

4    from Magnify to YHA?  In other words, I've seen the

5    requests, and they're signed by different people.  But that

6    doesn't necessarily tell me much.

7           MR. WEXELBAUM:  Brunner played no part in that,

8    Your Honor.

9           THE COURT:  All right, so he didn't know?

10          MR. WEXELBAUM:  But he says, "When you say he

11   continued certain duties, do you mean Mr. Igoin, or do you

12   mean Mr. Green?  I mean Mr. Igoin."  Then a question.  "Was

13   it your understanding that before this letter was issued,

14   that it was anybody's responsibility?  It was Mr. Igoin's

15   responsibility?  Well, it was Mr. Igoin's assets, and so, it

16   was his responsibility.  That was my understanding."

17          THE COURT:  Where is that?

18          MR. WEXELBAUM:  Question -- "Okay.  Before July

19   1996, Mr. Igoin never told you that he was -- that he was

20   setting investment policies with regard to Magnify's

21   portfolio in Madoff, did he?  He did not, because he wanted

22   his money -- they wanted his money and not my money."

23          Question -- "I'm not understanding the because he

24   wanted his money and not my money."  Answer -- "Mr. Igoin --

25   he managed his own money.  It was his own money, so it was

Page 10

1    not my money.  So he didn't have to discuss it with me."

2            Question -- "Okay, so I understand.  So before

3    July of 1996 then, if Magnify's investments with BLMIS are

4    being managed or supervised, they were the responsibility of

5    Mr. Igoin and then, after this letter, Brunner, Exhibit 20,

6    they had become the responsibility of Mr. Green; is that

7    right?"  Answer -- "As far as I am concerned, this is

8    right."

9            THE COURT:  But I don't know what kind of

10   agreements Mr. Green and Mr. Igoin had.  And when I -- I

11   read this before, and, you know, he's testifying honestly,

12   but he just doesn't know whether the way -- the way that

13   they transacted is necessarily accurately reflected by the

14   documents we're talking about.

15           MR. WEXELBAUM:  Well, Your Honor, I would say that

16   that testimony or our position regarding that testimony was

17   bolstered by the following.  The fee agreement that is in

18   question only starts compensating Mr. Green starting in

19   1995, after Albert Igoin passed away.

20           THE COURT:  Right.

21           MR. WEXELBAUM:  Green was not named managing

22   director of Magnify until after Mr. Igoin passed away in

23   1995.

24           THE COURT:  Well, maybe he thought he couldn't get

25   away with that before Mr. Igoin died.

Page 11

1           MR. WEXELBAUM:  Get away with what, Your Honor?

2     He --

3           THE COURT:  Collecting a fee dating back to 1995,

4     although the agreement was signed in 1997 and formally

5     taking over the management of Magnify.

6           MR. WEXELBAUM:  He took over the management of

7     Magnify --

8           THE COURT:  You know, you know, what I'm trying to

9     point out is you're arguing about inferences to be drawn

10    from the evidence bolstered by the affidavits.  I understand

11    your argument that I can consider this, and I agree with

12    you.  I can consider the entire transcript, because the

13    Trustee referred to part of it.  But on the motion to

14    dismiss, where I draw all inferences in favor of the non-

15    moving party, the statements are equivocal.  That's all.

16          MR. WEXELBAUM:  I think the -- you know, the --

17          THE COURT:  I'm not going to resolve it on the

18    motion to dismiss, not based on this testimony.

19          MR. WEXELBAUM:  Well, there are also the letters

20    of instruction from Green to Madoff regarding the Magnify

21    BLMIS accounts did not begin until after Igoin died in 1995.

22    All of this additional evidence -- certainly, the --

23          THE COURT:  But that's -- see, that's the point.

24    It's evidence.  You're giving me evidence in a motion to

25    dismiss.  I'm not going to treat this as a motion for

Page 12

1    summary judgment.  So let's look at the allegations in the

2    complaint to start, because you don't even have to look at

3    this if the allegations in the complaint are insufficient,

4    right?

5            MR. WEXELBAUM:  Correct.

6            THE COURT:  Or are you saying that the allegations

7    are sufficient, but when you match them against the

8    documents you provided and Mr. Green's affidavit, that

9    they're not sufficient or they contradict it?  Which is it?

10           MR. WEXELBAUM:  Our position is if you disregarded

11   all of the other exhibits, the complaint is still

12   insufficient.

13           THE COURT:  Okay, so let's go to the complaint.

14   The complaint alleges, starting in paragraph 53, that Green

15   filed the registration papers for YHA and opened the account

16   for YHA in 1998.  It also says he held himself out as the

17   co-founder of YHA, who, "guided the organization's

18   activities and contributed significant sums for scientific,

19   medical research to Israel."  Where did that come from?

20           Ms. Cole, where did that quote come from?

21           MS. COLE:  It is a (indiscernible).

22           MR. MCMILLAN:  Your Honor, I can't remember off

23   the top of my head, but I know that there are some publicly-

24   filed documents, and the Israeli Registrar has files.  It

25   may have been both -- there may have been documents

1    exchanged during discovery, but that's it.

2            THE COURT:  So you're saying Green said that, as

3    opposed to him saying it about YHA or Magnify?

4            MR. MCMILLAN:  I think the allegation is that he

5    held himself out publicly as the guiding force.

6            THE COURT:  That's somewhat conclusory.  I'm just

7    -- because you have a quote, I'm asking you where the quote

8    came from and whether the quote pertains to something Green

9    was saying about himself or he was saying about YHA or

10   Magnify.  Because certainly, Green didn't contribute

11   significant sums.

12           MR. WEXELBAUM:  Your Honor, if I may interject?

13   And the founding documents of YHA clearly name seven

14   founders, of which Mr. Green is not one of them.

15           THE COURT:  No, no, I know that.

16           MS. COLE:  Your Honor, these are in documents that

17   were in the file to the Israeli Registrar, and they are

18   statements by YHA.  It's what YHA said about Green.

19           THE COURT:  So it's not what Green said?

20           MS. COLE:  It's -- my understanding is it's what

21   YHA said about Green.

22           THE COURT:  All right.  So we disregard that

23   allegation.

24           MR. WEXELBAUM:  And I don't agree with that.  I

25   don't think there's anything that says YHA or Green ever

Page 14

1    made any statement like that.  He was their attorney,

2    nothing more.

3            THE COURT:  Well, now they're saying Green didn't

4    make that statement.  It was YHA.  So what difference does

5    it make?

6            MR. WEXELBAUM:  Okay.

7        (Pause)

8            THE COURT:  Okay.  Then paragraph 56 refers to

9    this meeting, on December 14th, 1989, where Igoin introduces

10   Green to Brunner as, quote, "the person that then would deal

11   with the fate of Magnify."  And I understand when you're

12   talking about "then", whether it refers to immediately or to

13   after Igoin passes away.  I've seen, you know, the portions

14   of the transcript you read.  And I just think that it could

15   be any -- you know, they're ambiguous.

16           MR. WEXELBAUM:  I respectfully disagree with that.

17           THE COURT:  Okay.

18           MR. WEXELBAUM:  But I understand, Your Honor.

19           THE COURT:  All right.  There's this thing about

20   transferring ownership of Magnify to YHA.  I looked at the

21   documents, and that does not appear to be what occurred.

22   They were transferred in trust for the benefit of Mr. --

23   primarily, for the benefit of Mr. Igoin's wife and niece

24   and, I guess, his daughter and granddaughter.

25           MS. COLE:  The actual document of assignment of

1   transfer is simply an assignment of transfer with all the

2   rights thereto.  It's an actual assignment with no

3   limitations.

4            THE COURT:  I didn't see that.

5            Was that one of your exhibits, Mr. Wexelbaum?

6            MR. WEXELBAUM:  Yes.

7            THE COURT:  Which exhibit was that?

8            MS. COLE:  It is --

9            THE COURT:  Since there are references to it being

10   held in -- other certain documents.

11            MR. WEXELBAUM:  There was a group of documents,

12   and they clearly said in trust.

13            THE COURT:  It was the assignment, though.

14            MS. COLE:  Well, --

15            THE COURT:  And that's all they're referring to is

16   the assignment.

17            MS. COLE:  There is an actual assignment that is

18   without any limitations.  There is a document that -- I'm

19   looking at the actual exhibit.  I'm looking for the --

20            THE COURT:  Mr. Wexelbaum, is it attached to your

21   papers?

22            MS. COLE:  Right.

23            MR. WEXELBAUM:  What document did Ms. Cole

24   mention?  I'm sorry.

25            MS. COLE:  The actual -- the actual assignment.

1    Here, let me look at my list of exhibits.

2              THE COURT:  Which exhibit?

3              MR. WEXELBAUM:  Exhibit V, Your Honor, V, as in

4    Victor.

5              THE COURT:  V?

6              MR. WEXELBAUM:  V, as in Victor.

7              MS. COLE:  V, as in Victor.

8              THE COURT:  Let me see what V is.

9              MS. COLE:  Okay, so there were board minutes and a

10   cover letter.

11             THE COURT:  That's the board minutes.

12             MS. COLE:  Right, and I believe the board minutes

13   -- there is a reference to the words in trust that appear in

14   the board minutes.  They do not appear in the assignment.

15             THE COURT:  The letter from Brunner just says that

16   these shares are being transferred.  I'm going to hand it

17   over.  Are transferred to YHA.

18             MS. COLE:  Okay.

19             THE COURT:  It doesn't say in trust.

20             MS. COLE:  It doesn't say in trust.  The transfer

21   itself doesn't say in trust.

22             THE COURT:  Is the transfer in this exhibit?

23             MS. COLE:  Yes.

24             THE COURT:  Where is the transfer?  What's the

25   document number at the bottom of it, if you have it?  You

Page 17

1     have to take it out.

2          (Pause)

3               THE COURT:  Found it.  It says, you know, -- it

4     does say -- I'm looking at the document with the numbers

5     Brunner 0058 at the bottom.  And I don't know if this is the

6     transfer or not, but it does say that the transferring --

7     Magnify is transferring two certificates with all rights

8     represented by these two certificates to YHA.

9               MS. COLE:  Correct.  And if Your Honor is inclined

10    to consider the Brunner deposition, we're happy to provide

11    it as he was asked about those documents and an

12    understanding about those documents.

13              THE COURT:  Well, you know, do you disagree --

14    you've quoted a portion of the Brunner deposition without

15    attribution, by the way.

16              MS. COLE:  Oh, we -- right, we --

17              THE COURT:  So the question is do you disagree

18    that I can consider the whole document.

19              MS. COLE:  Your Honor, it's not about whether you

20    can or cannot consider the document.  The threshold question

21    is what is the purpose for which the document is being

22    offered.  And our belief is that the document is being

23    offered to challenge our inferences, as Your Honor

24    indicated.  In the testimony he says other things.

25              And so, he -- defendant is saying you shouldn't

Page 18

1     infer what the Trustee is saying you should infer.

2              THE COURT:  Well, suppose you --

3              MS. COLE:  You should infer what I say.  And

4     you're absolutely right, Your Honor.  I don't mean to

5     interrupt you.  If -- go on.

6              THE COURT:  I was going to say suppose he said in

7     another part of the deposition when I said "then", I meant

8     when Igoin dies and not now?

9              MS. COLE:  Exactly right.  And that's if it did

10    say that, of course, Your Honor would be entitled to review

11    it.

12             THE COURT:  Look.

13             MS. COLE:  So I'm happy to provide the deposition.

14    I should say that the -- when he said the entirety of the

15    issue, it's a two-day deposition.  And we go back to the

16    issue a few times.  So there's a lot of written testimony

17    about it.

18             THE COURT:  Well, --

19             MS. COLE:  It is not contradicted that if you -- I

20    believe if you read what he quoted, --

21             THE COURT:  Yeah, I agree that you seem to pick

22    the best parts out, Mr. Wexelbaum.  And I read it, and, you

23    know, it's really -- it just raises disputed issues of fact.

24    I'm not even sure that I would grant a motion for summary

25    judgment, based on this testimony, let alone a motion to

Page 19

```
 1    dismiss.

 2            MS. COLE:  And --

 3            THE COURT:  Just I'm talking about the Brunner

 4    deposition now.  The parts you've given me -- they're just

 5    -- they're equivocal, for the reasons I've said.

 6            MR. WEXELBAUM:  As I said, I respectfully

 7    disagree.

 8            THE COURT:  But let me go along with the --

 9            MR. WEXELBAUM:  Your Honor, I just want to point

10    out Exhibits W, X, and --

11            THE COURT:  X?  WX?

12            MR. WEXELBAUM:  After Exhibit V, there's Exhibit

13    W, and there's Exhibit X.

14            THE COURT:  Right.

15            MR. WEXELBAUM:  And they clearly refer to this

16    being the trust.

17            THE COURT:  I saw that.  I have no question about

18    it.  I saw that, but that's -- they didn't rely on that.

19    And there is a question of fact, apparently, as to whether

20    or not the transfer was outright or was in trust, pursuant

21    to what -- and I don't have the deed of trust here.

22            MR. WEXELBAUM:  As I assume you know, the deed of

23    trust was stolen, and we --

24            THE COURT:  I didn't know that, no.

25            MR. WEXELBAUM:  Oh, well, one of the documents
```

Page 20

1    that we produced and we admitted it was not something that

2    should be attributable to the second amended complaint.  But

3    we gave it by way of background to confirm the theft of the

4    office safe in Mr. Green's office in --

5            THE COURT:  Oh, I saw that.  I didn't understand

6    why that was in there.  But --

7            MR. WEXELBAUM:  Because the deed of trust was in

8    there.

9            THE COURT:  Okay.

10           MR. WEXELBAUM:  We did produce the three

11   amendments to the deed of trust, clearly indicating it was a

12   trust arrangement.

13           THE COURT:  I saw that.  It's inconsistent with

14   the -- what has been represented to me to be the assignment.

15   So to the extent it's relevant, it's just a question of

16   fact.  They say it was an outright assignment, and, you

17   know, the assignment seems to support that.

18           MR. WEXELBAUM:  Well, even if you find that, Your

19   Honor, how does that impute actual knowledge to Mr. Green?

20   It doesn't.

21           THE COURT:  Okay, fair enough.  I'm going to ask

22   them what are the specific allegations that attribute actual

23   knowledge.  Do you contest that, after 1995, when he took

24   over the management of these accounts, he had actual

25   knowledge of the transactions?

Page 21

1          MR. WEXELBAUM:  Of the transactions?  He had no

2    actual knowledge that there was a Ponzi scheme being

3    conducted.

4          THE COURT:  Well, they're going to argue that he

5    knew, based on the fact, you know, in terms of what was

6    deposited and what was taken out, that no rational person --

7    I don't want to make this sound like an objective test.  But

8    that no rational person could think that this was a

9    legitimate scheme.

10          MR. WEXELBAUM:  I disagree with that, Your Honor.

11    When Mr. Green took over in 1995, from then until 2008, when

12    the fraud came to light, on the Magnify account, which is

13    the big account, the gains in that account never, ever

14    exceeded 10 percent per annum.  And there were even years

15    where it lost money.  So there were no exorbitant rates of

16    return.  There were no consistent rates of return.

17          THE COURT:  But how can you tell they're losing

18    money when they're not getting customer statements and

19    they're drawing all of this money out?  How did you keep

20    track?

21          MR. WEXELBAUM:  He keeps track by the amount on

22    the portfolio evaluations, semi-annually, and then taking

23    into account what was withdrawn from the account and given

24    to Yeshaya.  Because the monies came out of Magnify and went

25    to Yeshaya for the charitable contributions.

Page 22

1          THE COURT:  Okay, well, let me say this.  I'm

2     looking at your Exhibit J, which is the Magnify 2 account.

3     It looks like Green starts to get these portfolio

4     evaluations dated as of June 30th, 1997.  Do you see that?

5          MR. WEXELBAUM:  That was the first ones that were

6     addressed to him.

7          THE COURT:  Addressed to him?  So --

8          MR. WEXELBAUM:  Yes.

9          THE COURT:  -- giving him the benefit of the

10    doubt, that's when he started to get them.  And it shows

11    total equity of $482 million, right?

12         MR. WEXELBAUM:  It does.

13         THE COURT:  If you go to the -- what I assume is

14    the last -- the last one of June 30th, '08, which is the

15    last document in that exhibit, it shows total equity of $768

16    million.  And in addition, if you go back and look at the

17    Trustee's chart of withdrawals during that same period, he

18    withdrew $74 million.  So if you add that back in, the

19    account is worth $840 million.  So it goes from 480 to 840

20    million in 11 years?

21         MR. WEXELBAUM:  Your Honor?

22         THE COURT:  That's pretty good.

23         MR. WEXELBAUM:  On page 17 in footnote 7 of

24    Mr. Green's affidavit, we deal with this issue.  And we did

25    it -- we did it from January 1995, which is when Mr. Igoin

Page 23

1    died.  And we point out that, in January 1995, based on the

2    123194 statement, the equity in that account was $428

3    million and change -- in the two accounts.  I'm sorry.

4              THE COURT:  Right.

5              MR. WEXELBAUM:  31 million in this first account

6    and 397 in the second.  We then point out that, at the end

7    of the period, the Magnify 2 account had $768 million.

8              THE COURT:  What's the end of the period?

9              MR. WEXELBAUM:  I'm sorry.  Right before the June

10   of '95 -- of '98, I believe.

11             THE COURT:  Correct.

12             MR. WEXELBAUM:  $31 million in the Magnify account

13   had grown to -- in the first account, there was $1,145,000

14   in the Magnify 1 account and $768 million in the Magnify 2

15   account.  We then, in footnote 7, added in $119 million in

16   withdrawals or transfers that came from the Trustee's

17   notices of determination of claim on the two Magnify

18   accounts.  That means that, over that period -- and that is

19   from June -- I'm sorry -- December '94 to June of 2008.

20   It's almost a 14-year period.

21             The growth went from $428 million to approximately

22   $888 million.  That is not an outlandish appreciation over a

23   14-year period.  It averages less than 10 percent a year,

24   Your Honor.

25             THE COURT:  Well, he can make that argument.

Page 24

1    That's a question of fact, though, isn't it, really?

2              MR. WEXELBAUM:  But it doesn't impute that he has

3    actual knowledge that there's a fraud going on.  The account

4    was going up at 10 percent or less a year.  How does that

5    give him knowledge of fraud?

6              THE COURT:  But you're arguing -- you're arguing

7    the merits.  Couldn't I draw a reasonable inference that he

8    knew, based upon the fact that it always went up, never went

9    down and appeared to be an ATM on steroids that he didn't

10   know that, you know, there was no reality to the trading?  I

11   mean, it's not just that.

12             He wasn't getting statements in the account.  He

13   was getting targeted returns.  One of the documents -- a

14   couple of documents you included show that.

15             MR. WEXELBAUM:  I'm not sure what you mean by

16   targeted returns.

17             THE COURT:  Okay.  Talk about the Premero account,

18   where he splits it.  Let me go back to that letter.  He

19   writes a letter.  This is your Exhibit N.

20             MR. WEXELBAUM:  Nancy?

21             THE COURT:  Yeah, Nancy.  First of all, one of the

22   Trustee's allegations is he was getting drafts of these

23   portfolio evaluations, meeting with Madoff and DiPascali,

24   doing whatever they were doing to ensure that the returns

25   hit a target.  And then he was getting a final version,

Page 25

1    right?

2              So this March 18th, 1996 letter, which Green is

3    writing to Madoff, says, "Thank you for giving me a

4    portfolio evaluation at our February 26th, 1996 meeting."

5    Where is that portfolio evaluation?  All of the portfolio

6    evaluations that you've given me are dated as of June 30th

7    or as of December 31st.

8              So at any rate, --

9              MR. WEXELBAUM:  The meeting was on February 26th,

10   Your Honor.

11             THE COURT:  And he was given a portfolio

12   evaluation at that meeting, right?

13             MR. WEXELBAUM:  No, it would have been for the --

14             THE COURT:  That's what it said.  Well, --

15             MR. WEXELBAUM:  -- end of the prior year.

16             THE COURT:  -- that's what you say.  I don't know

17   that, but let me go on.  He says, "I want you to split the

18   accounts."  He wants the accounts to generate the same rate,

19   which is very prescient, which he hopes will be 20 percent.

20   And then he says at the end of March, on March 28th, "Please

21   transfer any sum over $500,000 to the Premero 2 account."

22             Not from the Premero 2 account, to a bank account,

23   right?  So as of --

24             MR. WEXELBAUM:  Correct.

25             THE COURT:  -- the end of March, you would think

Page 26

1    the Premero 2 account has $500,000, because he's transferred

2    the excess out, right?

3              MR. WEXELBAUM:  Correct.

4              THE COURT:  Okay.  So then you go to the Premero 2

5    account, the statement as of June, 3 months later.  And the

6    Premero 2 account has $525,000, which increased in value at

7    the rate of 5 percent or at an annual rate of 20 percent,

8    which is exactly what they're talking about in the letter.

9    Doesn't that make the Trustee's case?

10             MR. WEXELBAUM:  No, Your Honor.  I hope that the

11   proceeds will exceed 20 percent per annum is a hope and a

12   prayer.  It's wishful thinking.  It's not an agreement.

13             THE COURT:  But it's exactly 20 percent, almost to

14   the penny.

15             MR. WEXELBAUM:  That may be on that one statement.

16   I'd have to look at that.  But the others are not.

17             THE COURT:  Okay, but on that one statement, --

18   where are those -- doesn't that make the Trustee's case is

19   my point.

20             MR. WEXELBAUM:  Can I just take a look at the

21   statement you're referring to?  What exhibit --

22             THE COURT:  It's Exhibit M, the first statement --

23   Exhibit M, which is the first statement of the Premero 2

24   account.

25        (Pause)

1           MR. WEXELBAUM:  And what was the date of the

2      letter?

3           (Pause)

4           MR. WEXELBAUM:  For that one statement, Your

5      Honor, I don't disagree with you.

6           THE COURT:  All right.  You know, but I tied it

7      together with the letter, and it does support the inference

8      that, one, he expected to get the same returns in both

9      accounts.  I don't know how he could do that.  And, two,

10     that the return he hoped was exactly the return he got,

11     almost to the penny.

12          MR. WEXELBAUM:  For that one period, but not for

13     the others, if you compared the statements.  It was not a

14     regular rate of return, and it rarely came up anywhere close

15     to 20 percent.

16          THE COURT:  And did the estate -- did they ever

17     lose money from month-to-month?

18          MR. WEXELBAUM:  I know in the Magnify -- I can't

19     say month-to-month.  He got semi-annual portfolio

20     evaluations.  That was a procedure that was in effect

21     through Mr. Igoin, and he continued it.  Mr. Green continued

22     it.  So he didn't get monthly statements, Judge.

23          THE COURT:  I didn't see any statements, any of

24     these portfolio evaluations, prior to Mr. Igoin's death.

25     Were there others?

1          MR. WEXELBAUM:  From Magnify, he had -- well,

2    first of all, the accounts weren't created 'til after

3    Mr. Igoin died, for Premero.

4          THE COURT:  Well, but Magnify was getting

5    statements at some point, wasn't it?

6          MR. WEXELBAUM:  It was.

7          THE COURT:  When did it stop getting statements?

8          MR. WEXELBAUM:  It never -- I don't know, because

9    we never -- Mr. Green never saw those.  We were not privy to

10   those.

11         THE COURT:  But you also represent Magnify, right?

12         MR. WEXELBAUM:  Correct.

13         THE COURT:  Right.

14         MR. WEXELBAUM:  But the first statements we

15   produced were in '92.  Because in 1993, Mr. Igoin, for the

16   first time, showed Mr. Green what was in the Magnify

17   accounts.  So he did have the '92 statements.

18         THE COURT:  Okay, but there were statements --

19   it's --

20         MR. WEXELBAUM:  The portfolio evaluations, not the

21   statements.

22         THE COURT:  I saw a statement -- a screen shot of

23   one of the statements, the first statement, I guess, for --

24         MR. WEXELBAUM:  That's in 1990, I believe.  That's

25   --

1                THE COURT:  Yeah, by the way, I'll ask you.  I

2        don't understand how to read this statement, but okay.  But

3        there were clearly monthly statements.  When did they stop?

4        When did they stop?

5                MR. WEXELBAUM:  According to the Trustee, they

6        stopped some time in the early 1990s, before Mr. Green was

7        involved.

8                THE COURT:  Well, they said he was involved since

9        1989.

10                MR. WEXELBAUM:  I understand that, Your Honor, but

11        the credible interpretation of Mr. Brunner's testimony and

12        the documentary evidence clearly indicates that was not the

13        case.

14                THE COURT:  I would not consider Green's testimony

15        on a motion to dismiss.  I may consider documents which are

16        attached to his declaration, but -- or his affidavit.  But I

17        wouldn't --

18                MR. WEXELBAUM:  Well, I referred to the documents

19        already that we say support that.

20                THE COURT:  And I would only consider the

21        documents either that the Trustee relied on or that -- well,

22        that the Trustee relied on or incorporated by reference or

23        referred to as --

24                MR. WEXELBAUM:  All right.

25                THE COURT:  There may be documents that the

Page 30

1    Trustee has, but the Trustee doesn't rely on them in

2    drafting the complaint.  I don't think I consider those.

3              MR. WEXELBAUM:  Well, if they completely

4    contradict the Trustee's theory of the case and they give

5    the lie to what the Trustee is saying and the case law says

6    that that is also something that you would consider on a

7    motion to dismiss.

8              THE COURT:  Yeah, I haven't seen any blatant

9    contradictions in the documents.  And again, this is not the

10   trial.  This is --

11             MR. WEXELBAUM:  I understand that.

12             THE COURT:  This is a motion to dismiss a

13   complaint.  Oh, I was going back to the allegations in the

14   complaint.  Paragraph 59 alleges Green represented himself

15   at all times, both privately and publicly, as controlling

16   YHA's donations, which is described further below.  All

17   originate from transfers from Magnify's accounts to YHA's

18   account.  So why doesn't that allegation --

19             MR. WEXELBAUM:  It's a completely conclusory

20   allegation.  There's no basis to that.  He was not one of

21   the directors or Trustees or managers of YHA.  He was its

22   attorney.

23             THE COURT:  It's not always easy to distinguish

24   between a specific allegation of fact and a conclusory

25   allegation.  And maybe it depends on the degree of

1   specificity.

2            MR. WEXELBAUM:  But there should be some

3   evidentiary support for it.  It can't just be a conclusion.

4   And that's just a conclusion.

5            THE COURT:  Well, I agree with you that conclusory

6   allegations aren't entitled to be credited.  But at some --

7   the Trustee alleges he held himself out as the person who

8   controls the donations from YHA.

9            MR. WEXELBAUM:  Based on what, Your Honor?

10  There's not a --

11           THE COURT:  Well, why do they have to plead that?

12           MR. WEXELBAUM:  Because it's a conclusory

13  allegation.  You can't make a complaint up out of whole

14  cloth.  You can't just make up a story.  There has to be --

15           THE COURT:  Suppose he's --

16           MR. WEXELBAUM:  -- some evidentiary basis for it.

17  They have all of the records of BLMIS.

18           THE COURT:  To prove it, yes, there has to be an

19  evidentiary basis.  But for purposes of pleadings, suppose

20  the complaint said that Green told his brother that he

21  controls the donations.  Would that be specifically

22  specific?

23           MR. WEXELBAUM:  If they refer to specific

24  conversations between Green and his brother, yes.  If they

25  just make it as a naked statement, no.

Page 32

1           THE COURT:  All right.  I'm not saying it's an

2     easy line to draw, but, you know, on a -- at the stage of a

3     motion to dismiss, I don't know if you're right.

4           Then it says -- paragraph 62, "Beginning in the

5     early 1990s, Green began meeting with Madoff personally two

6     or three times per year to discuss Magnify's and Premero's

7     and Strand's accounts."  Why would he be meeting with Madoff

8     to discuss the Magnify accounts --

9           MR. WEXELBAUM:  He never did --

10           THE COURT:  -- if he wasn't controlling them?

11           MR. WEXELBAUM:  Because he never did, until after

12     Mr. Igoin passed away.

13           THE COURT:  But that's not what this says.

14           MR. WEXELBAUM:  That's a false allegation.  And

15     Mr. Green was not even in the United States from 1986 to

16     1993.  He met Mr. Madoff once in 1993 on a brief social

17     occasion.  Met him once in 1994 at a brief social occasion.

18     No business was discussed.

19           When Mr. Igoin died, he instituted the procedure

20     of sending a letter to Mr. Madoff requesting a meeting.

21     Those letters start after Mr. Igoin passed away, and they --

22           THE COURT:  But you're arguing --

23           MR. WEXELBAUM:  -- already know that.

24           THE COURT:  You're arguing the merits of the case.

25     And by the way, I happen to know, from other cases, not that

1   this is relevant, that Madoff met with Igoin's daughter in

2   France to set up her account.  So, you know, there were

3   meetings outside the United States.

4            MR. WEXELBAUM:  Mr. --

5            THE COURT:  All I'm saying is you're just --

6   you're arguing about what the evidence will show.

7            MR. WEXELBAUM:  They can't just conclusorily say

8   that he met with Madoff prior to Igoin's death and discussed

9   the Magnify accounts when there's no basis in fact for that.

10           THE COURT:  You know, it sounds like you're

11  arguing a motion for sanctions, not a motion to dismiss.

12  You're saying that, when the Trustee drafted this complaint,

13  the Trustee had no reasonable basis, after investigation, to

14  make these allegations.

15           MR. WEXELBAUM:  I happen to do believe that, Your

16  Honor.

17           THE COURT:  Okay.  But I'm not deciding that.

18           MR. WEXELBAUM:  I understand.

19           THE COURT:  I am deciding a motion to dismiss, and

20  I'm looking at the allegations in the complaint.  And I'm

21  not going to consider whether or not there's contrary

22  evidence which should have led him to make another

23  allegation.

24           MR. WEXELBAUM:  But they can't just make

25  conclusory statements and they become facts for purposes of

1    Your Honor's consideration.  In the cases where you found

2    there to be actual knowledge, Shapiro, Avellino, Mendelow,

3    Kingate (ph), there was absolutely something that went on

4    that was documented.  The Schupt process, in two of the

5    cases, --

6              THE COURT:  Schupt.

7              MR. WEXELBAUM:  Schupt?  Sorry.  Schupt process in

8    two of the cases --

9              THE COURT:  I think that's what they meant.  But

10   it was -- they called it a Schupt.  They called it the

11   Schupt's process.

12             MR. WEXELBAUM:  Yeah.  In the Shapiro case, the

13   recreating phony trades --

14             THE COURT:  Well, certainly, in those cases, well,

15   --

16             MR. WEXELBAUM:  I mean, that doesn't exist in this

17   case, Your Honor.  And then in the two cases where you found

18   there to be no actual knowledge that we cited, which was --

19   excuse me -- Merkin (ph) and Legacy -- these people knew

20   that there were impossible trade information, that there

21   were one questionable or wrongful or suspicious activity

22   after another.  And yet, Your Honor concluded there was

23   nothing there that said they had actual knowledge.  It's a

24   very, very, very high standard.

25             THE COURT:  I agree with you.  This is not --

Page 35

1    first of all, every case is different.

2              MR. WEXELBAUM:  Of course.

3              THE COURT:  And I agree with you that where a

4    defendant actually participated with BLMIS in the creation

5    of fictitious trading records, that that's a stronger case.

6    But it doesn't necessarily mean that I couldn't infer that,

7    when -- assuming everybody knows that when $5 million is

8    invested in an account, $150 million is pulled out over

9    whatever the period of time is and another $820 million is

10   still supposed to be in all of these accounts, that somebody

11   doesn't know that there is just something not right with

12   this.

13             MR. WEXELBAUM:  Your Honor, when he took over,

14   there was 450 million in the accounts.  At the end, it was

15   888 million in the accounts.  And that is a 10 percent or

16   less return annually.  There's nothing wrong or suspicious

17   about that.  How does that give you actual knowledge that

18   this maniac, Mr. Madoff, is not actually trading securities?

19             THE COURT:  One of the allegations in the

20   complaint is that, by September 1990, Green was the active

21   person in the Magnify accounts.  And they produced -- or

22   they alleged, by reference to a September 1990 opening

23   statement for Magnify 2, that 2 trades in 1986 were

24   attributed to that account and that subsequent trades for

25   about 120 million of that same stock, again, before the

1    account opened, were attributed to that account.

2              MR. WEXELBAUM:  That's right, Your Honor.

3              THE COURT:  And if --

4              MR. WEXELBAUM:  I'm sorry.

5              THE COURT:  If I accept the allegations for the

6    purposes of the pleading that Green knew all this, wouldn't

7    that indicate to him that there was no legitimate trading?

8              MR. WEXELBAUM:  Your Honor, that's the point.

9    This is the one thing that they're trying to impute to

10   Mr. Green that they have no basis to do.  That statement

11   that you're looking at -- they redacted the name and address

12   on it, but I don't think --

13             THE COURT:  No, it's here.  It's Magnify, Kurt

14   Brunner, attorney at law.  I'm sorry.

15             MR. WEXELBAUM:  The one I have had --

16             THE COURT:  I'm looking at paragraph 82 in the

17   pleading.

18             MR. WEXELBAUM:  Oh, okay.  The document itself had

19   the address redacted.  It was not addressed to Mr. Green.

20   Mr. Green never saw that document until it was produced in

21   this litigation.

22             He had nothing to do with the MCI stock

23   transaction.  The MCI stock transaction is something that

24   will have to be hashed out at trial, because it impacts the

25   very first claim in so far as Magnify's net equity is

Page 37

1   concerned.  But it's entirely conceivable, possible, maybe

2   even probable that Mr. Igoin, a very wealthy investor -- and

3   you're obviously aware of the monies he had invested in his

4   family's name.  I think he also had banks that were invested

5   with Mr. Madoff.

6           But he had a holding that he bought in 1986 of MCI

7   stock at $6.00 and change a share, that he gave that stock

8   to Mr. Madoff in 1990 and said, "Open a new Magnify account

9   with this money."

10          THE COURT:  But none of this is pleaded.

11          MR. WEXELBAUM:  But the point is, Your Honor,

12  their theory of the case is that Madoff gave Igoin and/or

13  Magnify $120 million gift.  Maybe that's the case, but I

14  find that to be a very implausible --

15          THE COURT:  Why?  They were giving gifts to YHA

16  throughout the years.

17          MR. WEXELBAUM:  No, no, no, Magnify was giving

18  charitable contributions money to YHA.  But Mr. Madoff,

19  according to this theory of the case, just created the

20  second Magnify account out of thin air with $120 million.

21  That means he gave Magnify $120 million.  I don't find that

22  plausible.

23          THE COURT:  So where did the $120 million come

24  from?

25          MR. WEXELBAUM:  Say that again.

Page 38

1           THE COURT:  Where did the $120 million come from

2    to seed the account?

3           MR. WEXELBAUM:  I don't know.  My conjecture is

4    that Mr. Igoin had MCI stock that he bought in 1986, gave it

5    to Madoff in 1990 when it had gone up 7-fold and said, "Open

6    this account with this stock."  It's just like a cash

7    deposit.  It's a security deposit to open an account.

8           I don't know that.  That's my conjecture, Your

9    Honor.  But Mr. Green had absolutely nothing to do with that

10   and had no knowledge of that.  And they can't just say he

11   did.  They have to show he did with some evidence.

12          THE COURT:  Right, they have to allege facts --

13          MR. WEXELBAUM:  Plausibly allege.

14          THE COURT:  They have to allege facts --

15          MR. WEXELBAUM:  Correct.

16          THE COURT:  -- that imply that he knew this.

17          MR. WEXELBAUM:  Non-conclusory facts, Judge.

18          THE COURT:  Conclusions when there's facts.

19          All right.  Let me hear from the Trustee.

20          I don't mean to cut you off, but, you know, I've

21   read all the papers and got it.

22          So tell me where you plead, at least prior to

23   1995, Green's knowledge of the various transactions which

24   are supposed to imply that he had actual knowledge or at

25   least that he was highly suspicious or that he knew there

Page 39

1    was a high probability that there was no actual trading in

2    these -- in these accounts.

3              MS. COLE:  Sure, Your Honor.  Let me start with

4    his control of Magnify, right, the allegations that he was

5    the person who was in charge of Magnify at the time.

6              THE COURT:  Right, he was that (ph).

7              MS. COLE:  Right.  So if you look at paragraph 56,

8    --

9              THE COURT:  Right.

10             MS. COLE:  -- of the complaint, Brunner prepared

11   board minutes, an assignment of transfer transferring

12   ownership of Magnify to YHA by delivering Magnify bearer

13   shares to Green.  That same day, Green used his authority to

14   open an account for Magnify at Bank Hapoalim in Jerusalem.

15   After that meeting, Brunner received no further contact from

16   Igoin on any matter and dealt only with Green concerning

17   Magnify.  That's all in paragraph 56.

18             So 1989 forward, the only person to direct Brunner

19   was Green.  Green authored all corporate resolutions entered

20   by Brunner from the time Brunner assumed control --

21             THE COURT:  Where are you reading from?

22             MS. COLE:  And that's paragraph 56 and 121.

23             THE COURT:  121?

24             MS. COLE:  121.

25        (Pause)

Page 40

1                    THE COURT:  Okay.

2                    MS. COLE:  Okay?  And to the extent it's helpful

3      to Your Honor, in the testimony that -- the snippet of the

4      Brunner testimony that the defendants submitted on page 93,

5      Brunner goes on to say, at the bottom of 93, --

6                    THE COURT:  Are you reading from something there?

7                    MS. COLE:  I'm sorry.  This is Exhibit E, with an

8      E.

9                    THE COURT:  Exhibit B?

10                   MS. COLE:  E, as in elephant.  And this is the

11     Brunner deposition testimony that was submitted by the

12     defendants.

13                   THE COURT:  Got it.  What page?

14                   MS. COLE:  Page 93, line 24.

15                   THE COURT:  Just give me a minute.

16                   MS. COLE:  No, you're -- you're doing better than

17     I can with so much paper.

18                   THE COURT:  Page 93.  Okay.  Line 24.

19                   MS. COLE:  And for me, it was clear that it was

20     Mr. Igoin's visit that got him the last contact, because he

21     also said farewell to this business.  By transferring the

22     shares from Magnify to Horowitz, he acted contrary to the

23     intention or will beforehand terms that his wife and

24     daughter could replace him, also with regard to the mandate

25     agreement.

1           And again, we are not asking Your Honor to go

2     beyond the four corners of the pleadings.  We just wanted to

3     point that out since it is before you.

4           THE COURT:  Okay.

5           MS. COLE:  What I'd like to do is take a step back

6     and go through the chronology of this entire case because I

7     think it would be helpful to ground our discussion.

8           THE COURT:  Go ahead.

9           MS. COLE:  I also wanted to point out one of the

10    things we've been talking about is what was submitted here

11    was really a summary judgment motion when we're talking

12    about what inferences should we be drawing based on the

13    fact.  And the question is why?  Why are they arguing with

14    summary judgment motion here?

15          And I think the reason is clear when you compare

16    this case to the other cases that Your Honor has heard,

17    because in the other cases, the face of the complaint

18    alleged that these Defendants received specific information

19    from BLMIS purporting to trade securities.   They got

20    monthly statements that purported to show I bought this many

21    securities.  I sold this many or this much.  And the

22    question from the Court has been given that background,

23    where do you, Trustee, allege that they were able to look

24    past that and ascertain the truth.  That it was all a lie.

25    That no securities were ever being traded.

1              In this case, the only monthly statements, the

2      only specific listings of securities being traded were in

3      the YHA accounts, which are talked about in the complaint

4      and were funded entirely by transfers from Magnify and in

5      the pre-'95 Magnify accounts, which were so blatantly

6      fraudulent that Mr. Wexelbaum has been, you know, trying to

7      convince the Court vociferously that he never saw them

8      before.

9              So all that the Defendants are getting is a piece

10     of paper that says a month or two ago, you had this many in

11     your account and, again, putting aside the circumstances of

12     the portfolio evaluations' creation.  So the question is in

13     order to determine that these defendants even thought

14     securities transactions were happening, you'd have to make

15     an inference because they're just getting the holdings.

16             THE COURT:  Well, that's a fair inference, though,

17     isn't it?

18             MS. COLE:  Huh?

19             THE COURT:  They have accounts.

20             MS. COLE:  Right.  And it may be a fair inference

21     but we're in a motion to dismiss stage.  And so if there's a

22     fair inference that maybe they thought they were trading

23     securities and maybe they didn't think they were trading

24     securities --

25             THE COURT:  That only goes to the safe harbor

1    issue.

2              MS. COLE:  Sure.  It goes to actual knowledge.

3              THE COURT:  Right.

4              MS. COLE:  I mean, all I'm saying is that's why

5    you're being presented with a motion to dismiss at this

6    point because if this case comes down to which inference are

7    you going to draw based on the evidence, which is what this

8    case is going to come down to, it can't be decided on motion

9    to dismiss.  It's not the same --

10             THE COURT:  Well, I certainly agree with you that

11   the discussion I was having with Mr. Wexelbaum is what

12   documents I can consider --

13             MS. COLE:  Right.

14             THE COURT:  And it seems like some of the

15   documents can be considered.  Whether they are relevant to

16   the disposition of the motion, I don't know, but you know so

17   when you say there's an assignment, you can consider it the

18   assignment.  He obviously relied on that to make that

19   allegation.  You know, the quoted without attribution from

20   some of the Brunner's testimony, I can (indiscernible)

21   testimony.

22             MS. COLE:  Of course, my only response to that is,

23   again, why are you being asked to consider it?  Because if

24   there's things you can consider, but the threshold question

25   is why.  So, you know, if there's correspondence -- the PE's

1     for example, I believe that the defendant submitted all of

2     the portfolio evaluations themselves.  You know, is the

3     Court entitled to consider them?  I guess the question is

4     what is the purpose?

5             THE COURT:  Well, I feel like you said I wasn't

6     entitled to consider them, but you referred to the --

7             MS. COLE:  We --

8             THE COURT:  -- giving of these portfolio --

9             MS. COLE:  Right.

10            THE COURT:  -- as part of your case that he isn't

11    getting monthly statements.

12            MS. COLE:  Right, we -- our position is that we're

13    not entitled to beyond the four corners of the complaint on

14    this motion.  I'm going towards -- my argument is about the

15    reasoning behind why we're saying you're not entitled to

16    consider that.  But let me go back to just the

17    (indiscernible) --

18            THE COURT:  Well, it may be meaningless on a

19    motion.  It may not contribute to the disposition of the

20    motion, but it seems to me I can look at it.  It

21    contradicted something you said, so attached to the

22    portfolio evaluation was six months' worth of trading

23    records, I think I could consider that.

24            MS. COLE:  I guess if you're going to rely on it

25    in the disposition.  I guess that's the issue and --

Page 45

1            THE COURT:  Well, it doesn't help you in the

2    disposition.

3            MS. COLE:  But let me just walk you through the

4    chronology, if that's okay.  So this is what the complaint

5    alleges.  In 1983, Igoin opened the Magnify 024 account and

6    he deposited about $3 million.  In 1989, Green and Igoin

7    opened the YHA account and the $3 million was transferred

8    from the 024 account into YHA.  From that point forward, YHA

9    got monthly customer statements and all of its money came

10   from inter-account transfers from the Magnify accounts.

11           In 1989, Magnify is transferred to YHA and bearer

12   shares are handed to Green, who is then the only person to

13   deal with the account.  In 1990, the Magnify 025 account

14   opens and $100 million appears out of nowhere.  By 1993,

15   Green has begun regularly meeting with Madoff.  And his

16   response is I met, you know, once a year instead of twice a

17   year, but he's meeting with Madoff.  By the early 1990's,

18   BLMIS had started issuing portfolio evaluations.

19           By mid-1995, BLMIS had stopped issuing customer

20   statements for both Magnify accounts and exclusively

21   produces the portfolio evaluations, meaning they stop

22   generating any of the other stuff that you would get from

23   the AS400.  In 1990 --

24           THE COURT:  Just when Green becomes the financial

25   advisor for the account?

1          MS. COLE:  That happened in 1995, '96.  Green

2    opens Premero accounts in 1996.  Green negotiates the fee

3    agreement, becomes the financial advisor for the Magnify

4    account, formally.  And then in 1998, Green opens Strand as

5    a subsidiary of Magnify.  And all of Strand's withdrawals

6    will go to the benefit of Green and his compatriots.

7    Premero and Strand never submit account opening documents.

8    They never received anything other than portfolio

9    evaluations.

10          And by 1999, BLMIS had stopped reporting

11   securities altogether.  Even the monthly portfolio

12   evaluations simply list treasury bills and --

13          THE COURT:  Well, that was supposed to be his way

14   of doing business, yeah.

15          MS. COLE:  Strategy.  But they would have had to

16   go, you know, into the market, go back out of the market and

17   come back with treasury bills.  And in -- by 2000, they

18   start clearing any reference to securities holdings in the

19   Magnify accounts out of the AS400.  Meaning that the AS400

20   system is simply reflecting negative cash balance going

21   further down as the years continue from 2000 to 2008.

22          So that's the chronology in a nutshell.  So we can

23   start with the -- do you want to start with the isolated

24   1990 transaction or do you want to start with the portfolio

25   evaluations in terms of evidence of actual knowledge?

Page 47

1                THE COURT:  Well, the earliest point because --

2                MS. COLE:  Sure.

3                THE COURT:  You know, the allegations are more

4      compelling, I'll say, after 1995 or 1996 after Igoin dies

5      and there's a dispute about whether the complaint

6      sufficiently alleges that Green was the guy who took over

7      effective after that meeting in 1989.  So you've told me

8      about those allegations.  What happens -- what are the

9      allegations in the ensuing years after that meeting?

10               MS. COLE:  After 1989?

11               THE COURT:  Yeah.

12               MS. COLE:  So the 1990 -- what happens -- the

13     complaint alleges that the 024 account continues from 1989

14     forward.  It continues -- it generates about $3 million in

15     the '80s.  And then it generates about $17 million right at

16     the end of the '80s.  And then it -- and then an 025 account

17     opens out of nowhere in September of 1990.  And do you walk

18     through --

19               THE COURT:  Yeah, I wanted to ask you about that.

20               MS. COLE:  -- the statement, yeah.

21               THE COURT:  So I understood it.  Let me find it.

22     It's 83.

23               MS. COLE:  Sure.  It's paragraph --

24               THE COURT:  Yeah.

25               MS. COLE:  -- it's been 82 and 83 on page 25.

Page 48

1                    THE COURT:  Yeah.  And my confusion is --

2                    MS. COLE:  Sure.

3                    THE COURT:  -- it says a net balance of 12

4    million --

5                    MS. COLE:  Yes.

6                    THE COURT:  -- 12.3 million.  And what does that

7    mean?

8                    MS. COLE:  So here's --

9                    MR. WEXELBAUM:  I'm sorry, what are we referring

10   to?

11                   MS. COLE:  My --

12                   THE COURT:  We're referring to paragraph -- the

13   statement -- the screenshot of paragraph 82.

14                   MS. COLE:  The screenshot between 82 and 83 in the

15   complaint, in the SAC.

16                   MR. WEXELBAUM:  Thank you.

17                   THE COURT:  What is the net balance referred to?

18                   MS. COLE:  So here's what this statement is

19   showing you.  The no balance forward is the indication that

20   this is the first account statement.  The first entry --

21   sorry, go down all the way to the bottom.  The bottom entry

22   on here is -- it says the trade date 10/21, settle date

23   10/28.

24                   THE COURT:  That I understand.

25                   MS. COLE:  Okay.

1           THE COURT:  What I don't understand is you show a

2    net balance of $12 million, but then you show positions of

3    $84 million and seem contradictory.  I assume that the $84

4    million reflects the value of all of the securities listed

5    as of the end of the statement.  But what is the new balance

6    $12 million referred to?

7           MS. COLE:  It's the cash -- it's the cash balance.

8           THE COURT:  It's cash?

9           MS. COLE:  Correct.

10          THE COURT:  So is the value of the account the $84

11   million plus the $12 million, is that what that's supposed

12   to mean?

13          MS. COLE:  Right.  It's about $100 million.

14          THE COURT:  Okay.  Thanks.  Did Brunner testify

15   what he did with these statements?  These Magnify statements

16   that he was receiving in the early '90s?

17          MS. COLE:  I believe Brunner testified that he

18   held on to them for a while and then -- I'm going to -- I'm

19   looking at my colleague, Ms. Wang, who deposed Mr. Brunner.

20          THE COURT:  Okay.

21          MS. WANG:  Yeah.  I took the deposition.  He

22   testified that he retained them and then he didn't -- he

23   kept them until sometime in the '90s and --

24          THE COURT:  So he didn't send them to Igoin or

25   Green?

Page 50

1          MS. WANG:  That's my understanding.  That's what

2     he said.  And that he didn't retain them -- you know, he

3     thought that he had copies for Magnify.

4          MR. WEXELBAUM:  I don't disagree with what

5     Ms. Wang said.  I think he said after so many years, he

6     would clean out his records and throw away stuff.  All that

7     he retained -- that he still had when we were deposing him

8     was what was on his desk that he had never thrown out.

9          THE COURT:  But he could -- there's no testimony

10    that he ever sent them on?

11         MR. WEXELBAUM:  That's what (indiscernible).

12         THE COURT:  Even though he was not really

13    participating in the business aspects that (indiscernible)?

14         MR. WEXELBAUM:  Correct.

15         THE COURT:  Okay.

16         MS. COLE:  Right, so and again the allegation

17    here --

18         THE COURT:  So the question I have is if he's not

19    sending these on, how does Igoin or Green for that matter

20    know what money is in the account and what they can pull

21    out?

22         MR. WEXELBAUM:  Green did not know.

23         THE COURT:  All right.  How did Igoin know?

24         MR. WEXELBAUM:  He should not have known because

25    he wasn't involved with it.

Page 51

1                THE COURT:  How did Igoin know?

2                MR. WEXELBAUM:  Perhaps Mr. Madoff was sending

3       other copies to Mr. Green -- to Mr. Igoin privately.

4                THE COURT:  Is there any evidence of that?

5                MR. WEXELBAUM:  Pardon me?

6                THE COURT:  Is there any evidence of that?

7                MR. WEXELBAUM:  We've seen none.  They have the

8       records, we don't.  They have the BLMIS records.

9                THE COURT:  Okay.

10               MS. COLE:  So our allegation is that based on the

11      fact that the customer statement that was created, that it

12      did, in fact, know it has the new 025 account, it started

13      spending money out of the 025 account.  So the inference is

14      that it was aware that the $100 million appeared.  And

15      because we alleged that the person in charge of Magnify as

16      of 1990 was Green that the person who was aware of that was

17      Green.

18               THE COURT:  Did Brunner testify that Green spoke

19      to him at all prior to Igoin's death about the accounts or

20      what was in the accounts?  I'm asking if there was any

21      testimony.

22               MR. WEXELBAUM:  No.

23               MS. COLE:  I --

24               MR. WEXELBAUM:  (Indiscernible).  No.

25               MS. COLE:  I don't remember, actually.  I don't

Page 52

1   remember.

2          THE COURT:  Okay.

3          MS. COLE:  I don't remember.

4          MR. WEXELBAUM:  I believe, Your Honor, the only

5   contacts, and Ms. Wang can correct me if she thinks I'm

6   wrong, between Mr. Brunner and Mr. Green before 1995 after

7   Mr. Igoin died, were when Mr. Green formed Premero in 1992,

8   three and four years before the Premero BLMIS accounts were

9   ever opened.  And he sent the minutes and the resolutions to

10  Mr. Brunner and asked him to become the director of this new

11  client, Premero.  So they did communicate regarding Premero,

12  but not with respect to Magnify.

13         THE COURT:  Did he testify about -- did Brunner

14  testify about what he was doing with the portfolio

15  evaluations that he was getting until about 1997?

16         MS. COLE:  I believe Brunner disclaimed -- did he

17  disclaim the (indiscernible) portfolio evaluations?  Because

18  were they only related to --

19         THE COURT:  Because his name is on the portfolio

20  evaluations I think before 1996 or 1997, whatever the date

21  is.

22         MR. MCMILLAN:  Yeah, Your Honor, to the best of my

23  recollection, he testified that he had never even seen the

24  portfolio evaluations.

25         THE COURT:  Because they're addressed -- some of

1      them are addressed to him, right?

2                    MR. MCMILLAN:  Correct.

3                    THE COURT:  Right.  So while Brunner is getting

4      the monthly customer statements from Magnify and not sending

5      them on, how much money is pulled out of Magnify?

6                    MS. COLE:  The first $8 million --

7                    THE COURT:  Is this in the B --

8                    MS. COLE:  It's in Exhibit B, uh-huh.

9                    THE COURT:  Okay.  Because you know the amounts

10     are very small in the '80s.

11                   MS. COLE:  They are.

12                   THE COURT:  Until you get to that one big

13     withdrawal which basically zeroes out the account.

14                   MS. COLE:  Right.  The real activity starts after

15     1989.  Right, it starts in the '90s which is when, of

16     course, the shares were transferred to YHA.

17                   THE COURT:  Well, in March of '89, the account is

18     zeroed out.  There's a $3 million transfer to YHA and --

19                   MS. COLE:  Right, the 024 account --

20                   THE COURT:  Okay.

21                   MS. COLE:  -- is zeroed out.

22                   THE COURT:  Right.  Is the trust, I realize I'm

23     getting beyond the motion to dismiss --

24                   MS. COLE:  Yes.

25                   THE COURT:  -- but I'm just curious about the

Page 54

1    case.  Was there any evidence, and I saw the withdrawal

2    request, but was there any evidence about who was initiating

3    these transfers to YHA and subsequent transfers, I guess, to

4    charities?  In other words, why was this happening when it

5    was happening?  Any evidence of any --

6              MS. COLE:  I'm sorry.  I'm trying to --

7              THE COURT:  Yeah.  No, I'm just curious about who

8    was deciding when to transfer money and why.  I've seen the

9    authorization request and I understand your theory that it's

10   really -- presumably it's Green who's telling him to do it.

11   But is there any evidence that Green requested that they

12   transfer money from Magnify to YHA or --

13             MS. COLE:  The -- yes.

14             THE COURT:  Is that alleged or --

15             MS. COLE:  Yes, the transfers --

16             THE COURT:  -- I should start with the complaint.

17             MS. COLE:  -- from Magnify to YHA's inter-account

18   transfer, those are directed by Green.

19             THE COURT:  Where is that alleged?

20             MS. COLE:  That is alleged --

21             THE COURT:  Starting when, I'm sorry.

22             MS. COLE:  Thank you.  Paragraph 66 says after

23   Igoin's death, Green dramatically escalated the --

24             THE COURT:  Well, that's 1995.

25             MS. COLE:  Right, right.

Page 55

 1              THE COURT:  Because the big -- the first big

 2     transfer is in 1989.

 3              MS. COLE:  From the 024 account.  And then there's

 4     a --

 5              THE COURT:  Right.

 6              MS. COLE:  -- $8 million transfer from the 025

 7     account.

 8              THE COURT:  No, I understand that, but --

 9              MR. WEXELBAUM:  Every transfer, Your Honor, that

10     Green asked them to make from Magnify to YHA was documented

11     by a letter that Green sent to Madoff or BLMIS.  None of

12     them took place prior to Igoin's death.

13              THE COURT:  I thought I saw a lot of documents or

14     transfer requests from -- to Nahir and somebody else.

15              MR. WEXELBAUM:  You're talking about Mrs. Amir

16     (ph), I think.

17              THE COURT:  Yeah.

18              MR. WEXELBAUM:  Who got $300,000.  Yes, Albert

19     Igoin and Doris Igoin.  Albert Igoin was raised by his

20     sister.

21              THE COURT:  No, no, no.  I'm asking something

22     else.

23              MS. COLE:  Right.  Those are transferred from YHA.

24     Those were transfers out of YHA -- out of BLMIS, not inter-

25     account transfers from Magnify to --

1              THE COURT:  Okay.

2              MR. WEXELBAUM:  No, one minute.  The transfers to

3    Mrs. Nahir and to Mrs. Amir were from the Magnify account,

4    not YHA.

5              THE COURT:  I was asking something different.  I

6    remember seeing a lot of requests, I guess to come take

7    money out of the YHA account signed by Igoin's niece.

8              MR. WEXELBAUM:  Igoin's niece was one of them.

9              THE COURT:  And somebody else who --

10             MR. WEXELBAUM:  Officers of the foundation.

11             THE COURT:  Who was a director.  And the question

12   I had asked Ms. Cole and it may not be part of the complaint

13   is who's telling them to do it.

14             MS. COLE:  And the complaints -- on paragraph 53,

15   the complaint says Green opened an account at Hapoalim for

16   YHA, which was funded by an inter-account transfer of $3

17   million from the Magnify account.

18             THE COURT:  You know, he was also the lawyer for

19   YHA though, wasn't he?  So the fact that he opened an

20   account doesn't necessarily mean anything, does it?

21             MS. COLE:  Which -- it's a good time to talk about

22   his control of YHA.

23             THE COURT:  Okay.

24             MS. COLE:  And we -- but we corrected -- I

25   apologize for our -- we misspoke when you asked us the

Page 57

1    question for the source of Green holds himself out.

2              THE COURT:  Yes.

3              MS. COLE:  I'm sorry, I --

4              THE COURT:  It's paragraph 55.

5              MS. COLE:  I'm sorry.  I can't find

6    (indiscernible).  Sorry.  Here it is.  The source is the bio

7    -- the Green bio for the Milken Institute Global Conference.

8              THE COURT:  It's the Green bio?

9              MS. COLE:  Green's bio.

10             MR. WEXELBAUM:  That is something that we have

11   never seen, but a third party document cannot establish that

12   Green was holding himself out as anything.

13             THE COURT:  Well, it's not proof, but you know --

14             MS. COLE:  Like I said --

15             THE COURT:  Did he -- he presumably adopted it.

16   But in any event, it provides a basis for the statement in

17   the pleading.  It may not be admissible but I don't know

18   that a pleading -- the facts pleaded in the complaint have

19   to be based on admissible evidence.

20             MS. COLE:  So --

21             MR. WEXELBAUM:  He was the --

22             THE COURT:  So this is --

23             MR. WEXELBAUM:  -- (indiscernible).

24             THE COURT:  -- Green's -- what -- do you have a

25   copy?

1          MS. COLE:  That was his bio, but there's -- right.

2     There are additional, I think, allegations that would be

3     helpful.  But that particular one, paragraph -- is it 55?

4          THE COURT:  Yeah.  It's a Green bio from what?

5          MS. COLE:  It's a Green bio from a conference.

6          THE COURT:  I know that when I'm asked to submit

7     bios, I write them myself and send them on.  What was the

8     conference?

9          MS. COLE:  Milken Institute Global Conference.

10    And I don't have the date here.

11         THE COURT:  Okay.

12         MS. COLE:  Thank you.  But so let's look at the --

13    there are some allegations in the complaint, I think, that

14    could be helpful.  You -- we already looked at the -- sort

15    of the allegation in paragraph 144 that Your Honor pointed

16    out.

17         THE COURT:  144?

18         MS. COLE:  Which was the held himself out publicly

19    and privately.

20         THE COURT:  Well, yes.

21         MS. COLE:  Right.  So if you look at paragraph

22    143, the complaint alleges -- let's start with 142.  The

23    universities and corporations that received donations from

24    YHA acknowledged that Green played a significant role in

25    YHA's decisions to give grants to particular organizations

1    and often presented project proposals to YHA's boards.

2    Organizations would also go directly to Green to request

3    funding.

4              After proposal was agreed to by the board, Green

5    and only Green was responsible for negotiating and drafting

6    the agreements, governing any funds YHA chose to give.

7    Doing so enabled him to have ultimate control over the terms

8    and conditions.

9              143, Green also signed many of these grant

10   agreements himself, not in his capacity as YHA's attorney.

11   Instead, many grant agreements were framed as an agreement

12   between the recipient and Green as the Trustee for an

13   anonymous donor who had discretion over the terms and

14   amounts of the grant on the donor's behalf.  This

15   effectively removed YHA from the terms of the agreement,

16   solidified Green's controlled the money.

17             Paragraph 144, starting in the middle of the

18   paragraph.  Green was also -- Green also was largely

19   responsible for selecting and appointing the members of

20   YHA's board who joined after YHA's initial formation.

21             THE COURT:  Where are the allegations relating to

22   the various awards that he received?

23             MS. COLE:  I'm looking, Your Honor.  Where is it?

24             THE COURT:  Paragraph 8.

25             MS. COLE:  There you go, I'm sorry.  In the middle

Page 60

1    of the paragraph, for example.  YHA gave Bar Ilan University

2    and Ben Gurion University grants totalling more than 28

3    million.  Afterward, Green received honorary doctorates from

4    both institutions and was appointed to Ben Gurion

5    University's investment in management (indiscernible).

6    Green was also elected to the Board of Trustees of the

7    Weizmann Institute in Israel, which received more than $13.5

8    million from YHA.

9            Hebrew University, which employed two YHA board

10   members received more than $36 million from YHA.

11           THE COURT:  So I guess the question I have, Mr.

12   Wexelbaum, is why is he receiving all of these accolades if

13   he's just an attorney for YHA?

14           MR. WEXELBAUM:  Not having been on any of the

15   committees that appointed him, I don't know.  I know that

16   Mr. Green has his own charitable foundation, a private one.

17   But none of this -- none of this alleges or infers actual

18   knowledge that BLMIS was not trading securities.  None of

19   it.

20           The fact that Green was -- at paragraph 142,

21   everything alleged in there is what an attorney would do.

22   There's nothing sinister or nefarious --

23           THE COURT:  Well, it said, though, he was signing

24   grants --

25           MR. WEXELBAUM:  -- about that.

1              THE COURT:  -- not as an attorney but as a Trustee

2       for an anonymous donor.

3              MR. WEXELBAUM:  That was the -- that was paragraph

4       143, not 142.

5              THE COURT:  Right.

6              MR. WEXELBAUM:  And again, that has nothing to do

7       with -- no actual knowledge.  There is no dispute that

8       Mr. Igoin was a very private individual and did not want his

9       name to be used after the initial founding of YHA, he wanted

10      his name to be kept confidential.  And that's the way it was

11      handled.  But that doesn't --

12             THE COURT:  Is there a dispute as to that?  That

13      Igoin preferred to be anonymous, in his charitable giving

14      anyway?

15             MS. COLE:  I don't know that the complaint in this

16      action goes into this other than to say that the initial

17      registration filing does name Igoin and then later says that

18      Igoin wished to remain anonymous.  There is an active

19      dispute in the Israeli action about --

20             THE COURT:  The registration filing for Magnify?

21             MS. COLE:  The actual -- YHA's registration.

22             THE COURT:  Okay.

23             MS. COLE:  Identifies Igoin as donor.

24             MR. WEXELBAUM:  Your Honor --

25             MS. COLE:  The initial one.

1           MR. WEXELBAUM:  (Indiscernible), but I believe

2    there's an allegation in the second amended complaint that

3    YHA and Green took steps to conceal Igoin's identity as the

4    person involved with YHA.  I believe that is in this

5    section.  (Indiscernible).  Am I correct?

6           MS. COLE:  It may be --

7           MR. MCMILLAN:  I think the allegation there, and I

8    can point to the specific one, is that the registrar in

9    Israel made repeated requests that YHA and Green

10   specifically reveal the name of the donor and YHA refused to

11   do so.

12          THE COURT:  Thank you.

13          MR. MCMILLAN:  Paragraph 54, Your Honor.

14          MS. COLE:  Okay.  So let's turn to the portfolio

15   evaluation, because whether or not, right, we've got the

16   creation of value out of nowhere of $100 million.  And

17   whether or not Green had been in the picture before or after

18   that happened, he is certainly in the picture by the mid-

19   1990's.

20          So here is the only documentation that is ever

21   created by BLMIS for the accounts are the portfolio

22   valuation.  And this is how -- I'll talk first a little bit

23   of how that's created and then sort of what's in them.

24   Paragraph 90, the Green tab.

25          These portfolio evaluations were manually

Page 63

1    generated on a BLMIS desktop computer.  As discussed before,

2    they contained no historical evaluation information or any

3    transaction details for any security allegedly bought or

4    sold for the relevant account, such as trade dates,

5    settlement dates, or trade (indiscernible).

6              92, by 1993, if not earlier, Green began meeting

7    with Madoff personally 2 to 3 times per year to discuss

8    Magnify, and later, Premero and Strand account.  These

9    meetings usually occurred roughly one to two months after

10   the dates listed on the portfolio evaluations generated for

11   those accounts, which were dated as of June 30th or December

12   31st of each year.

13             94, Green was treated with special care by Madoff

14   and BLMIS' employees on Exhibit --

15             THE COURT:  Well, actually, 92 --

16             MS. COLE:  Okay.

17             THE COURT:  -- supports something that

18   Mr. Wexelbaum said or speculated about, that

19   February 26th letter in which Green was given a portfolio

20   evaluation, was probably for the two months preceding,

21   right?  December 31, 1996, I guess, or 1995.

22             MS. COLE:  We're only aware of portfolio

23   evaluations for the two months preceding, the June and the

24   December.

25             THE COURT:  All right.  Okay.

Page 64

1          MS. COLE:  Ninety-Four:  Green was treated with

2    special care by Madoff and BLMIS his employees.  Green

3    special treatment particularly access to Madoff himself

4    perplexed BLMIS' employees.

5          Ninety-Five:  By the mid-1990s, during his regular

6    meetings with Madoff, Green participated in the preparation

7    and revision of the portfolio evaluation.

8          THE COURT:  That's a very general statement, in

9    some of the other cases I've had -- there were very specific

10   allegations about what the Defendant did, you know, with

11   creating losses, creating value.

12         And you're just saying that he participated in the

13   preparation.  Do you allege what he did?

14         MS. COLE:  Well, we allege that in 97, and I'll

15   explain a little bit more in a minute, we allege that upon

16   Green's arrival, Green would meet behind closed doors with

17   Madoff and DiPascali and, then, DiPascali would emerge from

18   the meetings with changes (indiscernible) portfolio

19   evaluation that we believe were directed by Green.

20         And the difference that you have to remember

21   between this case and the other cases is that there was no

22   paperwork being generated.  So, in order to hit a specified

23   return, Madoff and BLMIS didn't need to rewrite

24   (indiscernible) statements or back in to anything that would

25   be visible to anyone.  They could simply talk about it,

Page 65

1    directly.  They were having meetings with DiPascali and

2    Madoff and Green and no one else.

3            THE COURT:  But the point I was making was that in

4    some of these other cases the allegations were very specific

5    about the changes that were made or the additions that were

6    made.

7            MS. COLE:  Right.

8            THE COURT:  Here you're alleging that he would

9    meet and then changes would be made in the portfolio

10   evaluation following the meetings.

11              But, you know, I don't know what that means.

12   For all I know, it could be the address.

13           MS. COLE:  It --

14           THE COURT:  Go ahead.

15           MS. COLE:  Sure.  Can I get some water?

16           THE COURT:  Sure.

17      (Pause)

18           MS. COLE:  There are two sets of allegations

19   relating to what was discussed at those meetings.

20           The first is the specific allegation, the changes

21   that were made, at the meeting, which were the final -- the

22   finalization of the Premero account statements.

23           So, the Premero accounts, and we can talk about

24   that first, the Premero account, before Green's meeting,

25   would be in one statement.  Accounts one and two would be on

Page 66

1    one statement that was stamped draft.  Okay?  These are the

2    holdings of both Premero accounts.

3              They'd go into the meeting.  When they

4    emerged from the meeting, there were -- DiPascali would hand

5    off the statements to an employee and say, here's how you

6    divide this up and divide up the holding into the two

7    different accounts for a date as of two -- one to two months

8    ago.

9              THE COURT:  So, what?

10             MS. COLE:  So, if it were -- it would be one thing

11   if you said divide up the holdings that I have today, right?

12   I want to divide up my holdings today this way.

13             He's saying, I want to say that as of December

14   31st, there were 75 shares of AT&T in Premero I and there

15   were 150 in Premero II as of two months ago.

16             THE COURT:  But that's a lot different from, you

17   know, saying please generate these specific trades so that

18   it could have been my account and that'll be my compensation

19   for some service that I'm performing.

20             MS. COLE:  I disagree --

21             THE COURT:  Is it a backdating?  Yeah.  But it

22   doesn't necessarily indicate that -- knowledge that there's

23   no actual securities that are being traded in those -- in

24   that account.

25             MS. COLE:  Well, but if -- if it were real

1    securities, how would you be able to say, I want the account

2    to hold a different number of securities than it held.  I

3    want -- I'm deciding today what my account should have held

4    two months ago.  If this were real.

5              THE COURT:  Well, does it -- there's a difference

6    between backdating and creating -- backdating real trades

7    into two accounts and creating trades out of whole cloth.

8    That's all I'm saying.

9              MS. COLE:  Right.  And, then, let's get to your

10   point about creating trades out of whole cloth because, of

11   course, no trades were ever created.

12             And that's really the bottom line here that

13   distinguishes this case from every other case that you've

14   heard.

15             THE COURT:  This is a little different.  I agree

16   with you.

17             MS. COLE:  There were no trades.  There were no

18   trades.

19             THE COURT:  Is this --

20             MS. COLE:  There were --

21             THE COURT:  Is this the only case where you have

22   no trading information?

23             MS. COLE:  This is the only case where we have no

24   trading information.  This is the only case were BLMIS did

25   not bother to generate any documentation whatsoever that he

Page 68

1    could have shown the customer in real time.

2              THE COURT:  You know, I have a question.

3              MS. COLE:  Uh-huh.

4              THE COURT:  It's not -- it may not be pertinent to

5    your complaint but it's one that I've wondered about.

6              Why was Madoff letting someone like Igoin or

7    whatever pull all this money?  It's not like they were

8    investing money with him.

9              MS. COLE:  At -- and there are a few Defendants in

10   this case, Your Honor, that Madoff let pull out --

11             THE COURT:  Well, let take out a full $7 billion.

12             MS. COLE:  Exactly, $7 billion.

13             THE COURT:  Well --

14             MS. COLE:  Igoin pulled out --

15             THE COURT:  Yep.  Picower (ph) --

16             MS. COLE:  -- $300 million.

17             THE COURT:  -- at least one of his customers.

18   Igoin never -- you know, never put more than $3 million into

19   the account.  Why is Madoff letting him pull all this money

20   out or Green or whoever.

21             MS. COLE:  That is a good question, Your Honor.

22             THE COURT:  And it's one you can only speculate

23   on, right?

24             MS. COLE:  But the point is because this is

25   Madoff, to Mr. Wexelbaum's point, it is what happened.  It's

Page 69

1     not completely implausible or impossible or --

2              THE COURT:  Yeah.  I was just -- I'm just curious

3     about why he -- I mean, I might understand the motivation of

4     people who invested in it.

5              MS. COLE:  Uh-huh.

6              THE COURT:  I was just wondering at the other end,

7     why Madoff was doing this.  But -- I thought you might have

8     some insight into that.

9              MS. COLE:  Right.  My -- and, again, because this

10    is not directly relative to this complaint, but my team is

11    reminding me that the Igoin family put -- did put some money

12    in --

13             THE COURT:  Oh, okay.

14             MS. COLE:  -- as well.  But they were still --

15             THE COURT:  A billion dollars.

16             MS. COLE:  Exactly.  And they were still large net

17    winners.

18             So, it does make -- it doesn't, I think, answer

19    Your Honor's question.

20             Let me talk about -- a little bit about the face

21    of the PEs because it is important in terms of the question

22    -- because the ultimate question here is have we alleged

23    facts that suggest a plausible inference that he knew that

24    no securities trade were taking place.

25             And, again, this is the only case where he wasn't

Page 70

1    purporting to trade securities.

2             THE COURT:  Isn't it fair to infer, from the

3    portfolio evaluations, that they summarized positions based

4    on securities trades?

5             MS. COLE:  Well -- and that's the question.  Is

6    that a fair inference?

7             We allege, based on all of the evidence that is

8    alleged in the complaint, it's really not even a fair

9    inference.  But, at the motion to dismiss stage, the

10   question is; is it a plausible inference that they did not

11   believe it was summarizing securities trades when there is

12   no evidence that there were securities trades happening.

13            So --

14            THE COURT:  Did you attach one of these portfolio

15   evaluations?

16            MS. COLE:  We did it through -- we did a screen

17   shot of one of them.

18            THE COURT:  Where?

19            MS. COLE:  It is at paragraph -- right?  Page 33.

20       (Pause)

21            MS. COLE:  Right.  So, if you see on the specific

22   list of purported holdings that -- with a net market value

23   of $600 million dated as of 12/31/1999.

24            And from this period forward, he would only be

25   lists of treasury bills dated as of every six months which

Page 71

1    means that -- the question is why would he believe that

2    these were summarizing securities trades when all you're

3    seeing is treasury bills that are increasingly setting

4    value, which is what the complaint alleges, with no

5    explanation of how that happened.

6            THE COURT:  But aren't they different treasury

7    bills that were --

8            MS. COLE:  They are.  And what's interesting is

9    that doesn't -- they don't match up.  They're different

10   treasury bills.

11           So, these treasury bills, the rate of return would

12   get you to X on these treasury bills.  Next -- the next

13   statement's treasury bills do not add up to what that rate

14   of return would have been.

15           And that's in the complaint.

16           THE COURT:  Well, these are just unrealized gains.

17   They're not --

18           MS. COLE:  But you can actually measure, right,

19   how much -- how much these would be worth six months from

20   now if they were the same and they don't link back.

21           So, you know, this is never -- it's an increasing

22   amount of money that, as Your Honor pointed out, even from

23   '95 to 2008, went from half -- you know, 400 million to 800

24   million and --

25           THE COURT:  Just based on treasury bills?

Page 72

1           MS. COLE:  From '99, it was just based on treasury

2    bills, correct.

3           And the question is, if -- you know, I think that

4    the case file is clear that a customer may not have an

5    obligation to look behind a summary.

6           They might have -- they might not be obliged to

7    look at the background data and see what's supporting this.

8    But a customer may ask, over a period of decades, hey,

9    what's going on with my account.

10          (A) Hey, I need a cost basis for this share.  When

11   did we buy it?  Any information whatsoever about their

12   account.   Hey, how much cash is in my account so that I can

13   --

14          THE COURT:  I want to ask you; did Madoff send

15   1099s for any of these accounts to any of these account

16   holders?

17          MS. COLE:  He -- we allege about tax withholding

18   on paragraph --

19          THE COURT:  But he -- but presumably the owners of

20   the accounts -- the accountants for the owners of the

21   accounts would have to know --

22          MS. COLE:  Exactly.

23          THE COURT:  -- what was withheld and what needs to

24   be paid with a 1099.

25          MS. COLE:  And he -- and Madoff did for some

Page 73

1  customers.  I just don't know if he did for these customers.

2  I believe he -- I'm sorry.

3           UNIDENTIFIED SPEAKER:  1099s?

4           MS. COLE:  Not 1099s.  I'm sorry, with 1099(a).

5  (ph).  I'm sorry.  With 1099 informations.

6           THE COURT:  Is -- how is that reflected though?

7  Doesn't the broker send a 1099?

8           For instance -- Ms. Cole.

9           MS. COLE:  I'm sorry.

10          THE COURT:  You used an example where a stock in

11  the account, an equity in the account, that's traded and a

12  gain is realized.  I know I get a 1099 which tells me what

13  the gain is.

14          Was he sending those types -- that type of

15  information out to account holders?

16          MS. COLE:  In these accounts, no.  I don't believe

17  he was sending them to -- was he not to any account holders?

18          THE COURT:  All right.

19          MS. COLE:  Do we know?

20          UNIDENTIFIED SPEAKER:  On these, no.

21          MS. COLE:  Of these accounts, no.

22          UNIDENTIFIED SPEAKER:  No.

23          MS. COLE:  I don't know if he's asking case-wide.

24          UNIDENTIFIED SPEAKER:  Case-wide, yes.

25          MS. COLE:  Case-wide, yes.

Page 74

1           THE COURT:  Pardon.

2           MS. COLE:  Case-wide, he was, I am told.

3           UNIDENTIFIED SPEAKER:  (Indiscernible).

4           MR. WEXELBAUM:  What did you say, Tracy?  I'm

5    sorry.

6           MS. COLE:  For 1099 -- you get a 1099 when gain is

7    realized in your account.  Was Madoff ever sending them out?

8           For these accounts, he was not.  The question was

9    whether he was case-wide.

10          I'm sorry.

11       (Pause)

12          THE COURT:  Can I turn to a different subject?

13          MS. COLE:  Uh-huh.

14          THE COURT:  This goes with the -- goes to this

15   issue of piercing the corporate veil.

16          MS. COLE:  Sure.

17          THE COURT:  One of the points you make is that

18   there are no declarations, citations to learned treatises,

19   the things that a court would normally consider in deciding

20   foreign law.

21          On the other hand, the Defendants have provided me

22   with some Southern District cases where, you know, in one of

23   the Judge Cote goes through the English law in terms of the

24   piercing or alter ego liability.

25          Do I need declarations when I have an analysis by

Page 75

1    a district court judge about at least the English law?  The

2    Panamanian was a little weaker but --

3             MS. COLE:  Right.  And, certainly for Panamanian,

4    it is -- if all of that is being proffered is a case that

5    says in this case, the court held this way, that's

6    insufficient for the Court to make a determination of what

7    the law -- of what the law is.

8             It -- if this is the holding in a particular case

9    the court's reasoning applied to that case.  So, you

10   wouldn't try to make a determination of, you know, New York

11   law based on a single case.

12            That case, the English law case itself, was one

13   where the court went through and did significant research

14   and made an entire summary of the law.

15            So, that -- for that specific issue, in that case,

16   that was supported.

17            THE COURT:  I understand --

18            MS. COLE:  Right.

19            THE COURT:  -- what you're -- what you're saying

20   is that I don't have an expert who says, some facts of this

21   case, this would be the result under English law --

22            MS. COLE: Right.

23            THE COURT:  -- or Panamanian law.  Okay.

24            Let me ask from -- let me hear from Mr. Wexelbaum

25   on that.

Page 76

```
 1              MR. WEXELBAUM:  On piercing?  I have a few points

 2     on (indiscernible) --

 3              THE COURT:  Well, the question I --

 4              MR. WEXELBAUM:  -- on piercing the corporate veil

 5     --

 6              THE COURT:  (Indiscernible) --

 7              MR. WEXELBAUM:  I'm sorry.

 8              THE COURT:  The question I raised is do I have

 9     sufficient record to make that determination or should I

10     simply deny without prejudice that aspect --

11              MR. WEXELBAUM:  I think you should --

12              THE COURT:  -- of the (indiscernible)?

13              MR. WEXELBAUM:  -- clearly decide the issue and

14     decide it in our favor, Your Honor.

15              THE COURT:  So, what's --

16              MR. WEXELBAUM:  Judge Cote said, in her decision,

17     that you've referred to, that expert reports, while could be

18     used, are absolutely not necessary.

19              It's the function of a judge to interpret the law.

20     Your Honor is a very competent judge and you can interpret

21     the law if we provided nothing to you but we did provide you

22     with good case law.

23              THE COURT:  (Indiscernible) -- well, normally when

24     somebody says that to me, I say, okay.  Give me law.

25              So, for example, I have in my files the BVI
```

Page 77

1    Insolvency Law, the Cayman Island Insolvency Law.

2            And, yeah, I can -- you know, I can go and look at

3    the law and read it.  I don't have the law in Panama or --

4    well, it's -- I don't have the BVI Company's Act, I don't --

5            MR. WEXELBAUM:  But we provided you with case law.

6    The Panam case, which is a U.S. case, deals with the fact

7    that under Panama law (indiscernible) a company can only be

8    pierced if it was used for the sole purpose of perpetrating

9    fraud or violating law.

10           THE COURT:  So, why can't I say conclude that

11   Green was using these various companies, assuming I accept

12   the allegations as sufficient that by 1989, he had taken

13   over this and knew what was going on, that he was using

14   these companies to perpetrate a fraud on the other customers

15   of BLMIS?

16           MR. WEXELBAUM:  The fraud that we're talking about

17   is the fraud perpetrated by BLMIS.  It wasn't Magnify's

18   fraud or Premero's fraud or Strand's fraud.

19           And the facade, there was no corporate facade

20   created to avoid personal liability here.  That's not what

21   happened.  It's just not a proper case for veil piercing or

22   alter ego.

23           And it's discussed, at length, by Judge Cote, in

24   her decision, I know that was on English law, but we have

25   the Panam case and the other case that we cite.  What was

Page 78

1     the name of the other case (indiscernible)?

2               UNIDENTIFIED SPEAKER:  Jonas.

3               MR. WEXELBAUM:  The Jonas case under Panama law.

4               THE COURT:  Jonas.

5               MR. WEXELBAUM:  And I think under those cases, you

6     clearly -- Jonas and Panam indicate you can only reach

7     shareholders and maybe directors, not officers.  Green was

8     neither a shareholder nor a director.

9               THE COURT:  I thought he was a managing director.

10              MR. WEXELBAUM:  That's an office, Your Honor.

11              THE COURT:  Well (indiscernible) --

12              MR. WEXELBAUM:  The sole director was Mr. Brunner.

13    That's the board of directors.  Managing director is a term

14    used to connote an officer, not a director.

15              THE COURT:  I don't know that.  But, in any event,

16    if he's the guy that's running the company and the

17    management of the company is vested in the directors; isn't

18    he a de facto director?

19              MR. WEXELBAUM:  He's --

20              THE COURT:  I know that, under English law, they

21    have shadow directors and, you know, those kinds of things.

22              MR. WEXELBAUM:  But I think under the case law

23    that we cited at some length, it's clearly a question that

24    should be decided under the laws of the states of

25    incorporation and that, under their laws, there should be no

Page 79

```
1     veil piercing in this case, Your Honor.
2              Can I respond to a few other things Ms. Cole
3     mentioned?
4              THE COURT:  Sure.  Sure.
5              MR. WEXELBAUM:  She made an issue about the fact
6     that in 1999 the portfolio evaluations started showing,
7     instead of a list of actual securities, a list of the
8     treasury bills and the Fidelity money market holdings.
9              THE COURT:  Right.
10             MR. WEXELBAUM:  That was universal in the BLMIS
11    fraud.  You -- Your Honor referred to it in --
12             THE COURT:  No.  In every -- in every -- oh, oh,
13    you mean the -- I know what you mean.
14             MR. WEXELBAUM:  At the end of the reporting period
15    --
16             THE COURT:  (Indiscernible) --
17             MR. WEXELBAUM:  -- he went out of the -- you
18    mentioned in Kingate.  So, they alleged it in Kingate.
19             THE COURT:  Well, I know.  But how -- how did --
20             MR. WEXELBAUM:  And --
21             THE COURT:  -- how does --
22             MR. WEXELBAUM:  -- the reason the account would be
23    different, and the treasury bills would be different six
24    months later, is because he purportedly went back into the
25    market.
```

Page 80

1           THE COURT:  But Green is the manager of the

2    accounts.  He's the financial advisor for Magnify, as I

3    recall.  He's getting paid for that.  And he doesn't even

4    know what stocks are being -- or what equities are being

5    traded.

6           Wouldn't you think that if he -- if he really

7    thought that they were being traded, he'd ask?

8           MR. WEXELBAUM:  Your Honor, Mr. Igoin came to him

9    and said this is the way Madoff reports to me on these

10   accounts.

11          Mr. Madoff was the wizard of Wall Street.  People

12   were ecstatic if Madoff would let them -- if Madoff would

13   let them give him his -- their money.

14          And he just continued the process that he was

15   handed by Mr. Igoin and he didn't go beyond that.  That

16   doesn't mean he had actual knowledge.  There was nothing

17   that came remotely close to the Merkin allegations or the

18   Legacy allegations where these people knew stuff was not

19   right, simply not right.  Yet, you found no actual

20   knowledge.

21          Mr. -- maybe Mr. Igoin -- Ms. Cole cited the law.

22   There's no obligation to investigate your stockbroker by an

23   investor.

24          THE COURT:  I agree.

25          MR. WEXELBAUM:  He accepted what was given to him

Page 81

1    as gospel and I'll refer to the English Court decision that

2    we asked you to take judicial notice of.

3            That judge commented upon Mr. Madoff's reputation,

4    throughout the world, throughout the financial industry and

5    the world at large, and there was no basis for these people

6    to disbelieve that he was just a stockbroker, investment

7    advisor, financial advisor genius.

8            THE COURT:  But there were people who blew

9    whistles from the beginning.  They may not have been

10   believed but there were people.

11           MR. WEXELBAUM:  They may have.  But we didn't have

12   any knowledge of that.

13           THE COURT:  All right.

14           MR. WEXELBAUM:  And I -- Ms. Cole also mentioned

15   the cleaning out of all of the trade information.

16           Well, first of all, that does indicate there was

17   trade information in the internal records of BLMIS.

18   However, the --

19           THE COURT:  I didn't understand that.  The trade

20   information for these accounts?

21           MR. WEXELBAUM:  For these accounts.  And, then,

22   they cleaned it out.  I think they even allege that in their

23   second -- there came a point in time --

24           THE COURT:  I don't (indiscernible) --

25           MR. WEXELBAUM:  -- (indiscernible) --

Page 82

1          THE COURT:  -- that the allegation was there was

2    no trading information other than these portfolio

3    evaluations to the extent they were flat out trading.

4          MR. WEXELBAUM:  My recollection is that there

5    were, Your Honor, and that there came a point in time when

6    they said the internal records were then cleared out and

7    then no longer maintained.

8          So, for a period of time, there were these

9    records.  But my point is --

10         THE COURT:  My recollection of this case, not

11   necessarily this adversary proceeding, is that from 1998 on,

12   they had basically all the records, bank records, trading

13   records, everything.

14         MR. WEXELBAUM:  But, in this case, I think they

15   said he kept records up to a certain point.  Then stopped

16   keeping them.

17         THE COURT:  I think for Magnify they said he was

18   getting monthly statements.  YHA was always getting monthly

19   statements because I saw a last statement for YHA.

20         Magnify was getting statements and then they

21   stopped at some point.  I don't remember.

22         MR. WEXELBAUM:  Correct.  But then I believe, and

23   Mr. Katz will look for it while I'm speaking, that there was

24   an allegation; that there came a point in time, where they

25   erased their back office records.

Page 83

1          THE COURT:  In this case?

2          MR. WEXELBAUM:  Yes.  That's my recollection.

3          THE COURT:  Was there an allegation --

4          MR. WEXELBAUM:  That is my recollection.

5          THE COURT:  -- (indiscernible), Ms. Cole.

6          MR. WEXELBAUM:  Am I right, Ms. Cole?

7          MS. COLE:  The allegation is --

8          MR. WEXELBAUM:  Am (indiscernible) --

9          MS. COLE:  Okay.  Page 37, paragraph 111.

10          THE COURT:  Let me just get there.

11      (Pause)

12          MR. WEXELBAUM:  (Indiscernible) --

13          MS. COLE:  And the allegation is that beginning in

14   the 2000s, BLMIS cleared the accounts of any reported

15   holding lingering in its computer system from the mid-1990s

16   when BLMIS ceased reporting fake trading.

17          So, there were still remnants from when they had

18   created them and they simply cleared them out of the --

19          MR. WEXELBAUM:  My point is that the internal

20   machinations of BLMIS cannot be imputed to Mr. Green.  He

21   was not given their internal records.  They even allege that

22   he was not given the internal records.

23          THE COURT:  No, but this is saying -- this is

24   saying that they cleared out earlier records, as I read it,

25   and, then, starting in the mid-1990s, they didn't even

Page 84

1    bother to generate any records.  They were just giving the

2    portfolio evaluations.  That's what is says.

3             MR. WEXELBAUM:  I agree.  Yeah.  But the

4    allegation is that in the early 2000s, they cleared out the

5    records from the mid-1990s on.  It doesn't say only from the

6    mid-1990s.

7             I would assume it went up until when they started

8    clearing the account.

9             But the point is, we weren't privy to any of that.

10   They didn't give us their internal records.

11            In fact, the second amended complaint alleges that

12   they did not give --

13            THE COURT:  You know, actually this just came up

14   today but I find that mind boggling that Brunner was getting

15   these statements and not sending them on to anybody but

16   money keeps getting drawn out of these accounts.  I don't

17   understand how that --

18            MR. WEXELBAUM:  Well, they certainly never gave

19   them to Mr. Green who wasn't involved until 1995.

20            THE COURT:  Well, it seems to -- well, at least

21   his testimony was that he didn't give them to anybody,

22   right?

23            MR. WEXELBAUM:  Well, that's my recollection and I

24   think Ms. Wang agrees with it.

25            THE COURT:  So, if Green -- nobody's getting these

Page 85

1    statements; how is it that Green is able to transfer or --

2    if I accept the allegation that he ran YHA; how is it he was

3    able to transfer $3 million out of the account in 19 -- in

4    March of 1989 without getting any statements knowing what

5    was in the account?

6              MR. WEXELBAUM:  You're asking how Green could do

7    that?  Green didn't do it.

8              THE COURT:  Well, but the allegation is --

9              MR. WEXELBAUM:  But Mr. Igoin knew in 1983.  He

10   wrote a check for $3 million and gave it to Mr. Madoff.

11             THE COURT:  But for six years, he's pulling money,

12   not a lot of money.  But he's pulling money out --

13             MR. WEXELBAUM:  (Indiscernible) -- but the account

14   still had more than $3 million in it when he made that

15   transfer of I think $2.1 (indiscernible) --

16             THE COURT:  Well, it had 2.1 -- in real dollars,

17   he had $2.1 million and he pulls $3 million out.  But how

18   does he know what he's got in the account; is my question.

19             MR. WEXELBAUM:  Your Honor, I can't read

20   Mr. Igoin's mind.

21             THE COURT:  Unless it doesn't matter, right?

22             MR. WEXELBAUM:  It doesn't matter and I certainly

23   don't know what Mr. Igoin knew or didn't know.

24             MS. COLE:  And, Your Honor, you can draw the

25   inference that other people other than Mr. Brunner were

Page 86

1    getting account statements as well.  That's another thought.

2              THE COURT:  I don't know how I could draw that

3    inference.  The only account statements I've seen have

4    Brunner's address on them.

5              MR. WEXELBAUM:  With respect to the Premero draft

6    portfolio being divided into two --

7              THE COURT:  Yes.

8              MR. WEXELBAUM:  -- another point is those

9    adjustments were based on Mr. Green's real time letters for

10   the preceding period.

11             THE COURT:  The argument that's being made is that

12   the back dating and creation of a Premero 2 account or

13   holdings is somehow the equivalent of knowing that no actual

14   trades took place.

15             And, so, I don't think it's on the same level as

16   knowing that fictitious trades are being created to give

17   value to somebody.

18             MR. WEXELBAUM:  And especially if you look at the

19   real time letters saying, take this money and put it into

20   this Premero account.

21             THE COURT:  (Indiscernible) --

22             MR. WEXELBAUM:  And somebody put it into this one.

23   Take the money out of this one.  Take the money out of this

24   one.  These were real time letters --

25             THE COURT:  So, how did he know what was in the

Page 87

1   account though between those portfolio evaluations?

2           MR. WEXELBAUM:  He went from the portfolio

3   evaluation to portfolio evaluation.

4           THE COURT:  How did he know, though, whether --

5   when he had a reported gain or a loss, how he was going to

6   do that?

7           MR. WEXELBAUM:  That was not reported to him.  If

8   he was asking to withdraw money that was more than he had, I

9   would assume --

10          THE COURT:  But, I mean, presumably, if Madoff

11  trading stocks or BLMIS is trading stocks, every trade is

12  going to generate a gain or a loss.  I know that happens

13  with me.  And you get a -- that's why I asked the question

14  about a 1099.  So, if he doesn't know what trades are

15  occurring and he's, you know -- how does know --

16          MR. WEXELBAUM:  My recollection --

17          THE COURT:  -- (indiscernible) gains or losses for

18  tax purpose?

19          MR. WEXELBAUM:  My recollection is they did issue

20  statements to Magnify, I think, for withholding taxes and

21  that sort of stuff when there were dividend payments, et

22  cetera.

23          But, again, a lot of that was just not given.

24          THE COURT:  You've seen dividend payments --

25          MS. COLE:  And if --

Page 88

1            THE COURT:  It may have been a -- supposed

2    reinvestment dividends but --

3            MS. COLE:  The -- we've been talking a little bit

4    about the fee agreement.  I just want to cite, Your Honor,

5    that's in paragraph 102.

6            THE COURT:  1-0-2?

7            MS. COLE:  Uh-huh on page 34 that Green agreed to

8    and paid himself to set investment policy for management of

9    portfolio and safeguarding of Magnify's funds invested in

10   it, a follow up of actual implementation of investment

11   policy, examination of Magnify's earnings and supervision of

12   Magnify -- of movement in funds of Magnify's portfolio.

13           THE COURT:  That sounds like just something that

14   was put in an agreement so he could siphon off some

15   management fees.

16           That may have been a breach of fiduciary duty to

17   Magnify but --

18           MS. COLE:  But even -- the relevance of this is

19   not that he didn't do it.  It's that he took -- now, this is

20   his subjective understanding of the kinds of things that an

21   investment manager ought to be able to do.

22           So, the question is -- the question is; can you

23   plausibly infer that, based on being handed a piece of paper

24   that says you have $500 million out of two accounts, and

25   never receiving another scrap of information; would he have

Page 89

1    believed, just like Your Honor said; hey, I usually get the

2    (indiscernible) with every trade; would he have believed

3    that this was a legitimate securities trading.

4         So, the relevance of his drafting this agreement

5    is his own statement of here's what an investment advisor

6    ought to be able to do and he couldn't have done any of it.

7         The tax issue is discussed in paragraph 1-0-4.

8    And what we say is, although BLMIS purported to make

9    deductions for payment of foreign withholding tax on certain

10   dividends for other customers, BLMIS stopped reporting to

11   Green any dividend or withholding transactions providing no

12   basis for him to know whether such transactions were even

13   occurring; stopped paying payments to the IRS on Magnify's

14   behalf and gave Green no record to assess Magnify's

15   potential tax liability.

16        And, although we haven't talked about it, one more

17   thing that the complaint alleges is in his capacity as the

18   person in control of Yeshaya, of the -- of YHA, Green was

19   aware that they received monthly customer statements.

20        We're not alleging that he was aware of a

21   particular trade --

22        THE COURT:  Right.

23        MS. COLE:  -- but merely that he saw they get

24   monthly statements.

25        THE COURT:  Okay.

1          MR. WEXELBAUM:  And Mr. Green denies that.  He was

2   not privy to those statements.

3          But with respect to the fee agreement --

4          THE COURT:  That's when we get back to Green's

5   denials of some of the allegations that's appropriate for

6   trial.

7          MR. WEXELBAUM:  With respect to the fee agreement

8   and the alleged breach of fiduciary duty and all of the

9   other allegations of wrongdoing by Mr. Green, Your Honor has

10  repeatedly held that greed, dishonesty, misappropriation of

11  monies does not infer actual knowledge that BLMIS was not

12  actually trading securities.

13         THE COURT:  Well, that's (indiscernible) Madoff to

14  look the other way.  That's not --

15         MR. WEXELBAUM:  It doesn't provide actual

16  knowledge, Your Honor.

17         THE COURT:  Well -- okay.  Thank you.  I'll

18  reserve decision.

19         MS. COLE:  Thank you, Your Honor.

20      (Whereupon, these proceedings were concluded at 11:50

21  A.M.)

22

23

24

25

Page 91

1                 C E R T I F I C A T I O N

2

3    We, Nicole Yawn, Jamie Gallagher, and Penny Skaw, certify

4    that the foregoing transcript is a true and accurate record

5    of the proceedings.

6

7    **Nicole**
     **Yawn**
     Digitally signed by Nicole Yawn
     DN: cn=Nicole Yawn, o, ou,
     email=digital1@veritext.com,
     c=US
     Date: 2018.02.08 16:26:23
     -05'00'

8    _____

9    Nicole R. Yawn

10

11   **Jamie**
     **Gallagher**
     Digitally signed by Jamie
     Gallagher
     DN: cn=Jamie Gallagher, o, ou,
     email=digital1@veritext.com,
     c=US
     Date: 2018.02.08 16:26:52 -05'00'

12   _____

13   Jamie Gallagher

14

15   **Penny**
     **Skaw**
     Digitally signed by Penny Skaw
     DN: cn=Penny Skaw, o, ou,
     email=digital1@veritext.com,
     c=US
     Date: 2018.02.08 16:29:03 -05'00'

16

17   _____

18   Penny Skaw

19

20   Date:  February 8, 2018

21

22   Veritext Legal Solutions

23   330 Old Country Road

24   Suite 300

25   Mineola, NY 11501