# Exhibit A

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO. FSD0021/2010-AHJ

(Originally Cause No. 46 of 2009)

IN THE MATTER OF THE COMPANIES LAW

AND IN THE MATTER OF RYE SELECT BROAD MARKET XL PORTFOLIO LIMITED (IN LIQUIDATION)

## ORDER FOR TRANSFER TO FINANCIAL SERVICES DIVISION

**UPON** reading the written application of the Official Liquidators appointed over Rye Select Broad Market XL Portfolio Ltd, dated 12 January 2010.

**AND UPON** being satisfied that the cause or matter is a financial services proceeding.

**IT IS ORDERED** by the Registrar that –

(1)     the proceedings are hereby transferred to the Financial Services Division under Cause No. FSD0021/2010-AHJ

(2)     the proceedings are assigned to Mr Justice Henderson

(3)     transfer fees of CI$4,800 be paid by the Official Liquidators out the assets of Rye Select Broad Market XL Portfolio Ltd.

(4)     no further step may be taken in the proceedings unless and until the transfer has been paid in full.

Dated the 12th day of January 2010

Filed the 12th day of January 2010

CLERK OF COURTS
Registrar of the Financial Services Division

THIS ORDER was filed by the Registrar of the Financial Services Division of the Grand Court, the Law Courts, George Town, Grand Cayman.

IN THE GRAND COURT OF THE CAYMAN ISLANDS

CAUSE NO: 46    2009

IN THE MATTER OF SECTION 94 OF THE COMPANIES LAW (2007 REVISION)

AND IN THE MATTER OF RYE SELECT BROAD MARKET XL PORTFOLIO LIMITED

---

## PETITION

---

To:    The Grand Court of the Cayman Islands

The petition of Argus International Life Bermuda Limited of The Argus Building, 12 Wesley Street, Hamilton HM EX, Bermuda, ("the Petitioner") shows that:

**Background**

1.    Rye Select Broad Market XL Portfolio Limited ("the Company") was incorporated as an exempted company under the laws of the Cayman Islands on 10 February 2006.

2.    The registered office of the Company is situated at Walkers SPV Limited, Walker House, Mary Street, George Town, Grand Cayman KY1-9002, Cayman Islands.

3.    The share capital of the Company is US$100,000 consisting of 10,000,000 unclassified shares of US$0.01 par value each.

4.    The principal object for which the Company was established is to carry on the business of an investment company and for that purpose to acquire and hold, either in the name of the Company or in the name of any nominee various assets

including shares, stocks, debentures, debenture stock, bonds, notes, obligations and securities issued or guaranteed by any company wherever incorporated or carrying on business.

5.    The Company's management is undertaken by a subsidiary of, and individuals connected with, Tremont Group Holdings, Inc. Full details are set out below.

6.    According to the financial statements for the Company dated 31 December 2006 the Company had net assets of US$131,311,680.

**The Petitioner**

7.    On or around 28 December 2006, Bermuda Life Insurance Company Limited purchased the entire issued share capital of the Petitioner (then called Tremont International Insurance Limited) from Tremont Life Holdings Limited. As a consequence, Bermuda Life Insurance Company Limited became the holding company of the Petitioner.

8.    The Petitioner is an investor and shareholder in the Company and such investments were made on the instructions of the Petitioner's policy holders.

9.    By reason of the above, the Petitioner owns shares in the Company namely 6,600.1969 units in Class A valued as at 31 October 2008 at US$8,399,208.63.

**The Company**

10.    According to the Company's Information Memorandum dated 1 February 2008, ("the Information Memorandum") at that date, the directors were Darren Johnston, James V. Mitchell and Andrew Edgington.

10.1.    Mr Johnston is also a director of the Rye Investment Management Division of Tremont Group Holdings Inc. Prior to this, he served as Vice

President and Chief Operating Officer of Tremont Group Holding Inc's Canadian subsidiary, Tremont Capital Management Corp.

10.2.    It is understood that Mr Mitchell currently also serves as Senior Vice President and Managing Director overseeing Tremont Group Holdings Inc's European operations from London. Prior to this, he was a member of Tremont Group Holdings Inc's Investment Committee and also a Portfolio Manager for many European-based clients. Prior to this, he worked with the Tremont Group Holdings Inc's Relationship Management Team in New York.

11.    The Investment Manager of the Company appointed pursuant to an investment management agreement ("the Investment Management Agreement") is Tremont Partners Inc, a Connecticut corporation ("Tremont") which is a subsidiary of Tremont Group Holdings Inc. The principal decision makers of the Investment Manager are Robert Schulman, Stuart Pologe and Patrick Kelly.

11.1.    Robert Schulman was previously the Chief Executive Officer of Tremont Group Holdings Inc. At all material times he served as President and Chief Executive Officer of Rye Investment Management, Tremont Group Holdings Inc's single manager division. He also served as Chairman of the Board of Tremont Group Holdings Inc and was a member of the Tremont Capital Management Investment Advisory Board.

11.2.    Stuart Pologe is the Senior Vice President and the Director of Product Management at Tremont Group Holdings Inc. He also serves as Chairman of the New Product Committee and is a member of the Executive Committee of Tremont Group Holdings Inc.

11.3.    Patrick Kelly is the Senior Vice President of Tremont Group Holdings Inc and Tremont. Previously he has held various senior positions at Tremont Group Holdings Inc, including Director of Risk Management, Director of Manager Research and Director of Investment Technology.

12.     The Administrator of the Company is the Bank of New York Mellon Corporation.

13.     The Company is required by its Articles of Association to redeem participating shares at the redemption price. The redemption price is calculated as the net asset value per share of the relevant class of shares calculated at the relevant redemption date (which is the last Business Day of each calendar quarter) on receipt of 45 days prior written notice to the Administrator. The directors had power to suspend redemptions.

14.     The Petitioner's investment in the Company is governed by, *inter alia*, the Information Memorandum which states that the Company's objective is:-

14.1.   "*to provide investors with long-term capital growth through exposure, on an approximate three times levered basis, to the economic performance of the Rye Select Broad Market Portfolio Limited, a Cayman Islands exempted company (the "Reference Entity"). The [Company] intends to achieve this return by entering into one or more total return or price return swaps and/or options (or transactions similar to any of the foregoing) with one or more designated counterparties (each a "Counterparty") on a leveraged basis (each, a "Swap" and collectively, the "Swaps"). Furthermore, if, at any time, it becomes advantageous to achieve the foregoing investment objective by utilizing another type of investment transaction (e.g., note, option, etc.), the [Company] may, in its sole discretion, discontinue its use or enter into a new or different or additional Swap, in whole or in part. At present, the Investment Manager (as defined herein) serves as sub-adviser to the Reference Entity. The Investment Manager may, from time to time in its sole discretion, invest the [Company]'s assets directly in the Reference Entity (and other investment vehicles of which the Investment Manager may or may not serve as investment manager) or in any other manner that the Investment Manager, in its sole discretion, believes is consistent with the investment objective of the [Company]*"
(pages 1 to 2).

15.     Further, the Swaps aforementioned are described as follows:

4

15.1.    *"the [Company] will enter into one or more Swaps with one or more Counterparties, whereby each Counterparty will contract to pay the [Company], on a leveraged basis, a payment equal to the increase in the net asset value of the Reference Entity subject to the Swap; in exchange, the [Company], will pay floating or fixed rate payments on any leverage embedded in the Swap. Each Counterparty or affiliate thereof, is expected, but is not obligated, to invest directly in the Reference Entity in order to lodge the Counterparty's obligations to the [Company]. All payment calculations are to be determined by the relevant Counterparty (or affiliate thereof) to each Swap in accordance with the relevant Swap Documents..."* (page 2).

15.2.    *"It is expected that the Swaps will provide an enhanced return (or loss, as the case may be) for the [Company] by providing for a return (or loss, as the case may be), subject to the terms of the relevant Swap. It is intended that each Swap will provide the [Company] with a return equal to approximately three times (3x) the economic performance of the Reference Entity on a notional amount equal to the [Company]'s investment in the Swap, less associated costs and fees (including, without limitation, the above-referenced floating or fixed rate payments). Further details of floating or fixed rate payments to the Counterparty will be available to Shareholders on request. The Swaps do not and will not directly or indirectly grant any rights of ownership in the Reference Entity or any other rights in the Reference Entity to the [Company] or the Shareholders"* (page 2).

15.3.    The Reference Entity

Through each Swap, the [Company] will indirectly receive the returns of the "Rye Select Broad Market Portfolio Limited" (the "Reference Entity"). The [Company]'s Investment Manager also serves as sub-adviser to the Reference Entity. The Reference Entity's objective is to seek to (i) achieve long term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or direction, while focusing on preservation of capital. The Reference Entity attempts to accomplish its investment objective by presently investing the majority of the assets with one investment manager ("the Manager") who employs a "split

5

*strike conversion" strategy. However, the Reference Entity's investment manager reserves the right to allocate the Reference Entity's assets to other managers other than the Manager at any time in its sole discretion..."* (page 3).

16.   On the true construction of the Information Memorandum, the main object for which the Company was established is to seek long-term capital growth through exposure on an approximate three times levered basis to the economic performance of the Reference Entity by entering into a total return swap transaction with one or more designated counterparties. The Reference Entity sought to (i) achieve long term capital appreciation and (ii) consistently generate positive returns whilst preserving capital. The Reference Entity sought to achieve this objective by investing the assets of the Reference Entity with one Manager.

17.   By virtue of the arrangements set out in the Information Memorandum, the Investment Manager of the Company also serves a Sub-Advisor to the Reference Entity. The Investment Manager is permitted, from time to time, invest the Company's assets directly in the Reference Entity (and other investment vehicles of which the Investment Manager may or may not serve as Investment Manager) or any other manner that the Investment Manager in its sole discretion, believes is consistent with the investment objective of the Company.

18.   Although not stated in the Information Memorandum, subsequent events have revealed that all, or substantially all, of the assets of the Reference Entity were invested in Bernard L. Madoff Investment Securities LLC ("BMIS") which, at all material times, was owned and controlled by Bernard L. Madoff ("Mr Madoff").

**The Fraud**

19.   By letter dated 12 December 2008, Tremont has admitted to the Petitioner and others in the course of correspondence that:-

19.1.   Mr Madoff was arrested on 11 December 2008 by US Federal Law Enforcement and charged with a single count of securities fraud.

19.2.   The Securities and Exchange Commission ("SEC") has also charged Mr Madoff with securities fraud.

20.   By letter dated 19 December 2008, Tremont has admitted to the Petitioner and others that all, or substantially all, of the Company's investment portfolio had exposure to BMIS which is owned and controlled by Mr Madoff.

21.   That letter also made reference to the Complaint issued by the SEC. That Compliant states that:-

> "14.   From an indeterminate period through the present, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS.
>
> 15.   Madoff conducts certain investment advisory business for clients that is separate from the BMIS' proprietary trading and market making activities.
>
> 16.   Madoff ran his investment adviser business from a separate floor in the New York offices of BMIS.
>
> 17.   Madoff kept the financial statements for the firm under lock and key, and was "cryptic" about the firm's investment advisory business when discussing the business with other employees of BMIS.
>
> 18.   In or about the first week of December 2008, Madoff told a senior employee that there had been requests from clients for approximately $7 billion in redemptions, that he was struggling to obtain the liquidity necessary to meet those obligations, but that he thought that he would be able to do so. Accordingly to this senior employee, he had previously understood that the investment advisory business had assets under management on the order of between approximately $8-15 billion.
>
> 19.   On or about December 9, 2008, Madoff informed another senior employee that he wanted to pay 2008 bonuses to employees of the firm in December, which was earlier than employee bonuses are usually paid…

7

...

"21.    On or about December 10, 2008, the two senior employees referenced above visited Madoff at the offices of BMIS to discuss the situation further, particularly because Madoff had appeared to these two senior employees to have been under great stress in the prior weeks.

22.    At that time, Madoff informed the senior employees that he had recently made profits through business operations, and that now was a good time to distribute it.  When the senior employee challenged his explanation, Madoff said that he did not want to talk to them at the office, and arranged a meeting at Madoff's apartment in Manhattan.  At that meeting Madoff stated, in substance, that he "wasn't sure he would be able to hold it together" if they continued to discuss the issue at the office.

23.    At Madoff's Manhattan apartment, Madoff informed the two senior employees, in substance, that his investment advisory business was a fraud.  Madoff stated that he was "finished", that he had "absolutely nothing", that "it's all just one big lie", and that it was "basically, a giant Ponzi scheme."  In substance, Madoff communicated to the senior employees that he had for years been paying returns to certain investors out of the principal received from other, different, investors.  Madoff stated that the business was insolvent, and that it had been for years.  Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion.  One of the senior employees has a person account at BMIS in which several million had been invested under the management of Madoff.

24.    At Madoff's Manhattan apartment, Madoff further informed the two senior employees referenced above that, in approximately one week, he planned to surrender to authorities, but before he did that, he had approximately $200-300 million left, and he planned to use that money to make payments to certain selected employees, family, and friends".

22.     In light of the above, and the Company's exposure to BMIS, the Company notified the Petitioner and others that it had suspended redemptions in the letter of 19 December 2008 aforementioned.

23.     The Reference Entity has lost substantially all of its funds and is insolvent. As a result, it is likely that the Swap entered into by the Company has either been terminated or is susceptible to termination, and is in any event worthless.

24.     As a result, the main investment objective of the Company has failed there is no realistic hope that the Company will ever be profitable without further capital contributions which it is unlikely that any of its members including the Petitioner will contribute.

25.     Further, neither the Petitioner nor the other investors have any prospect of being repaid all of their funds or any portion of those funds within the ordinary timescale envisaged by them and the Company at the time they subscribed.

26.     In fact, the opportunity to provide investors with long-term capital growth by virtue of the Swap involving the Reference Entity's investment in BMIS was in fact never genuinely available to the Company and/or never materialised and/or has proved worthless and/or cannot be pursued.

27.     Further, or alternatively, the Company does not hold the investments it was authorised by its objects clause to acquire and hold in that the Swap was always worthless given that the Reference Entity's investments in BMIS have never had any value whatsoever.

28.     For the reasons set out above, the Company can no longer carry out the business for which it was formed and the substratum of the Company has failed.

29.     The members of the Company have a legitimate interest in the affairs of the Company, the conduct of its directors and the responsibility for the Company's involvement in the Swap involving the Reference Entity's investment in the

fraudulent scheme to be investigated by an independent liquidator. It is likely that there are claims to be pursued against the Company's directors, Investment Manager and other related entities within Tremont Group Holdings Inc for the benefit of the Company's members including the Petitioner.

30.    In all the premises, it is just and equitable to wind the Company up.

**YOUR PETITIONER THEREFORE HUMBLY PRAYS THAT:**

1.    The Company, Rye Select Broad Market XL Portfolio Limited, be wound up by the Court under the provisions of the Companies Law (2007 Revision); or

2.    Should the Court make an Order winding up the Company, that James Cleaver and Richard Fogerty of Kroll Cayman Limited, Box 1102 Bermuda House, 4th Floor Cayman Financial Centre, Dr Roy's Drive, Grand Cayman KY1-1102 be appointed liquidators of the Company;

3.    The liquidators are authorised to exercise any of the powers listed in section 109 of the Companies Law (2007 Revision) without the further sanction or intervention of the Court;

4.    The liquidators be authorised to do any act or things considered by them to be necessary or desirable in connection with the liquidation of the Company and the winding up of its affairs;

5.    The liquidators do file with the Clerk of the Court a report in writing of the position of and progress made with the winding up of the Company with the realisation of the assets thereof and to any other matters connected to the winding up of the Company, as the Court may direct;

6.    The liquidators be at liberty to appoint counsel, attorneys, professional advisors, whether in the Cayman Islands or elsewhere as they may consider necessary to

advise and assist them in the performance of their duties and on such terms as they may think fit and to remunerate them out of the assets of the Company;

7.    The liquidators and their staff be remunerated out of the assets of the Company at the usual customary rate;

8.    The liquidators be at liberty to apply generally;

9.    The costs of the Petition and the Petitioner be paid out of the assets of the Company;

10.   The liquidators cause a copy of this Petition to be delivered to the Registrar of Companies;

11.   Such further or other relief be granted as the Court deems appropriate.

Dated the 30th day of January 2009

Filed the 30th day of January 2009

Appleby

**Appleby**

Attorneys-at-Law for the Petitioner

**NOTE:**

It is intended to serve this Petition upon:

1.    The Registrar of Companies

2.    The Company at its last known registered office.

## INDORSEMENT

This Petition having been presented to the Court on 30 January 2009 would be heard at the Grand Court of the Cayman Islands on:

Date:                    2009

Time:      am

(Or as soon thereafter as the Petition may be heard).

THIS PETITION WAS FILED by Appleby of Clifton House, 75 Fort Street, PO Box 190, Grand Cayman KY1-1104, Cayman Islands (Ref. CJE/MH/18118.001), Attorneys-at Law for the Petitioner.