# Exhibit C

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO. FSD0022/2010-AHJ

(Originally Cause No. 47 of 2009)

IN THE MATTER OF THE COMPANIES LAW

AND IN THE MATTER OF RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC (IN LIQUIDATION)

## ORDER FOR TRANSFER TO FINANCIAL SERVICES DIVISION

**UPON** reading the written application of the Official Liquidators appointed over Rye Select Broad Market Insurance Portfolio LDC, dated 12 January 2010.

**AND UPON** being satisfied that the cause or matter is a financial services proceeding.

**IT IS ORDERED** by the Registrar that –

(1) the proceedings are hereby transferred to the Financial Services Division under Cause No. FSD0022/2010-AHJ

(2) the proceedings are assigned to Mr Justice Henderson

(3) transfer fees of CI$4,800 be paid by the Official Liquidators out the assets Rye Select Broad Market Insurance Portfolio LDC.

(4) no further step may be taken in the proceedings unless and until the transfer has been paid in full.

Dated the 12th day of January 2010

Filed the 12th day of January 2010

_____

CLERK OF COURTS

Registrar of the Financial Services Division

IS ORDER was filed by the Registrar of the Financial Services Division of the Grand Court, the Law Courts, George Town, Grand Cayman.

IN THE GRAND COURT OF THE CAYMAN ISLANDS

CAUSE NO: 47   2009

IN THE MATTER OF SECTION 94 OF THE COMPANIES LAW (2007 REVISION)

AND IN THE MATTER OF RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC

---
PETITION
---

To:   The Grand Court of the Cayman Islands

The petition of Bermuda Life Insurance Company Limited of The Argus Building, 12 Wesley Street, Hamilton HM EX, Bermuda ("the First Petitioner"), Argus International Life Bermuda Limited of The Argus Building, 12 Wesley Street, Hamilton HM EX, Bermuda, ("the Second Petitioner"), Scottish Annuity Company (Cayman) Limited of Northstar Financial Services Ltd, 3rd Floor, Caledonian House, 69 Dr Roy's Drive, Grand Cayman, Cayman Islands, KY1-1004, ("the Third Petitioner") and Scottish Annuity and Life Insurance Company (Bermuda) Limited of Northstar Financial Services Ltd, 3rd Floor, Caledonian House, 69 Dr Roy's Drive, Grand Cayman, Cayman Islands, KY1-1004, ("the Fourth Petitioner") (collectively referred to as "the Petitioners") shows that:

**Background**

1.  Rye Select Broad Market Insurance Portfolio LDC ("the Company") is an open ended investment company incorporated as an exempted limited duration company under the laws of the Cayman Islands on 30 January 1997.

2.  The registered office of the Company is situated at Walkers SPV Limited, Walker House, Mary Street, George Town, Grand Cayman KY1-9002, Cayman Islands.

3.  The share capital of the Company is US$1,000,000 consisting of 100,000,000 interests of a nominal or par value of US$0.01 each divided as follows:

    3.1. 50,000,000 Class A Interests of a nominal or par value of US$0.01 each;

    3.2. 20,000,000 Class B Interests of a nominal or par value of US$0.01 each; and

    3.3. 30,000,000 Unclassified Interests of a nominal or par value of US$0.01 each.

4.  The principal object for which the Company was established is to carry on the business of an investment company and for that purpose to acquire and hold, either in the name of the Company or in the name of any nominee various assets including shares, stocks, debentures, debenture stock, bonds, notes, obligations and securities issued or guaranteed by any company wherever incorporated or carrying on business.

5.  The Company, its Investment Manager and its Sub-Advisor are described in the Company's Information Memorandum dated 15 July 2008 (full details of which are included below) ("the Information Memorandum") as members of Tremont Group Holdings, Inc. The Company's management and administration is undertaken by subsidiaries of, and individuals connected with, Tremont Group Holdings, Inc. Accordingly, the Company, and its management and administration arms are closely connected. Full details are set out below.

6.  According to the Information Memorandum as of 31 March 2008, the Net Asset Value of the Company was US$162,441,852.

**The Petitioners**

7.  On or around 28 December 2006, the First Petitioner purchased the entire issued share capital of the Second Petitioner (then called Tremont International Insurance

2

Limited) from Tremont Life Holdings Limited. As a consequence, the First Petitioner became the holding company of the Second Petitioner.

8. The Petitioners are investors and shareholders in the Company and such investments were made on the instructions of the Petitioners' policy holders.

9. By reason of the above, the Petitioners own the following shares in the Company:-

   9.1. Bermuda Life Insurance Company Limited – 284,371.8274 units in Class A valued as at 31 October 2008 at US$10,492,535.85.

   9.2. Argus International Life Bermuda Limited – 3,685,893.6153 units in Class A valued as at 31 October 2008 at US$135,999,305.02.

   9.3. Scottish Annuity Company (Cayman) Limited – 152,001.1676 units in Class A valued as at 31 October 2008 at US$ 5,608,424.

   9.4. Scottish Annuity and Life Insurance Company (Bermuda) Limited – 5,826.9939 units in Class A valued as at 1 November 2008 at US$ 215,000.

**The Company**

10. According to the Information Memorandum, at 15 July 2008, the directors were Peter Anderson, Darren Johnston and James V. Mitchell.

    10.1. Mr Johnston is also a director of the Rye Investment Management Division of Tremont Group Holdings Inc. Prior to this, he served as Vice President and Chief Operating Officer of Tremont Group Holding Inc's Canadian subsidiary.

    10.2. Mr Mitchell currently also serves as Senior Vice President and Managing Director overseeing Tremont Group Holdings Inc's European operations

3

from London. Prior to this, he was a member of Tremont Group Holdings Inc's Investment Committee and also a Portfolio Manager for many European-based clients. Prior to this, he worked with the Tremont Group Holdings Inc's Relationship Management Team in New York.

10.3. Also, according to the Information Memorandum, the directors are not involved in the day-to-day operations and administration of the Company and are not responsible for the making or approving any investment decisions but they are obliged to meet at least annually with the Investment Manager to review the investment and administrative affairs of the Company.

11. The Investment Manager of the Company appointed pursuant to an investment management agreement dated 3 January 2003 ("the Investment Management Agreement") is Tremont (Bermuda) Limited, a Bermudan corporation ("Tremont") which is a subsidiary of Tremont Group Holdings Inc. The Investment Management Agreement authorised Tremont to delegate its responsibilities to others, subject to retaining certain responsibilities for evaluating and co-ordinating the services offered by others.

12. The Sub-Advisor of the Company appointed pursuant to an agreement dated 1 January 2002 ("the Sub-Advisory Agreement") is Tremont Partners Inc which is an affiliate of Tremont, the Investment Manager. By virtue of the Sub-Advisory Agreement, Tremont has delegated substantially all of its responsibilities to the Sub-Advisor, Tremont Partners Inc.

13. The Information Memorandum (at page 19) describes the Investment Manager and Sub-Advisor as wholly owned subsidiaries of Tremont Group Holdings Inc.

14. The Administrator of the Company is also Tremont Partners Inc.

4

15. Pursuant to an agreement dated 1 July 2007, the Company has retained The Bank of New York Mellon Corporation ("BNY") to serve as a sub-administrator. The Administrator has delegated certain duties to BNY.

16. The Company is required by its Articles of Association to redeem participating shares at the redemption price. The redemption price is calculated as the net asset value per share of the relevant class of shares calculated at the relevant redemption date (which is the last business day of each calendar month) on receipt of 30 days notice. The directors had power to suspend redemptions.

17. The Petitioners' investments in the Company are governed by, *inter alia*, the Information Memorandum") which states that the Company's objective is:--

   17.1. *"to provide investors with long term capital growth through investments in one or more securities accounts (each, an "Account" and collectively, the "Accounts") managed by one or more selected investment advisors or managers (each, a "Manager" and collectively, the "Managers") and/or identified general or limited partnerships, funds, corporations, trusts or other investment vehicles ("Portfolio Funds") based in the United States or elsewhere, that invest or trade in a wide range of securities"*; and that

   17.2. *"From its inception and as of the date of [the] Memorandum, the [Company] allocates its investment portfolio to one Account which is managed by one Manager (the "Designated Manager") selected by the Sub-Advisor.... The Designated Manager, who specialises in hedged transactions using equities, option trading and short selling, allocates the Account's balance among various Underlying investments"*; and that

   17.3. *"The [Company], in the sole discretion of the Investment Manager..., may leverage its investment activities through loans provided by one or more financial institutions... the [Company] has entered into a revolving credit facility with one or more banks, financial institutions or other entities."*

5

18. Further, the investment process of the Company is described as follows:

   18.1. *"The Investment Manager has delegated substantially all of its duties in respect of [the Company] to the Sub-Advisor who implements the investment strategy…and has the authority to select Underlying Managers in which the [Company] invests its assets".*

   18.2. *"Because the success of the [Company's] activities are now and will likely continue to be dependent upon the success of the Designated Manager, the overall success of the [Company] depends upon the ability of the Designated Manager to be successful in his own strategy".*

19. Accordingly, on the true construction of the Information Memorandum, the main object for which the Company was established is to pursue investments in Account(s) based in the United States or elsewhere, which would then invest or trade in a wide range of securities.

20. It was envisaged in the Information Memorandum that the Account(s) would be managed by Managers/Portfolios Funds (which were also termed "Underlying Managers" in the Information Memorandum) to be selected by the Sub-Advisor but in any event there would be one Designated Manager selected by the Sub-Advisor in the first instance.

21. By virtue of the arrangements set out in the Information Memorandum, as aforementioned, since the Company's board has bestowed the power to make investment decisions in the Investment Manager, who has in turn has delegated all of its duties to the Sub-Advisor, it is the Sub-Advisor who has selected the Designated Manager to manage the Account(s) containing the Company's investment portfolio.

22. It has become apparent that the Sub-Advisor allocated the Company's entire investment portfolio to one Account which was managed by the Designated Manager.

6

23. Although not stated in the Information Memorandum, subsequent events have revealed that the Designated Manager was Bernard L Madoff ("Mr Madoff") and the Account to which the Company's investment portfolio was allocated was Bernard L. Madoff Investment Securities LLC ("BMIS").

**The Fraud**

24. By letter dated 12 December 2008, Tremont has admitted to the Petitioners and others in the course of correspondence that:-

    24.1. Mr Madoff was arrested on 11 December 2008 by US Federal Law Enforcement and charged with a single count of securities fraud.

    24.2. The Securities and Exchange Commission ("SEC") has also charged Mr Madoff with securities fraud.

25. By letter dated 19 December 2008, Tremont has admitted to the Petitioners and others that all, or substantially all, of the Company's investment portfolio had exposure to BMIS which is owned and controlled by Mr Madoff.

26. That letter also made reference to the Complaint issued by the SEC. That Compliant states that:-

    *"14. From an indeterminate period through the present, Madoff and BMIS have been conducting a Ponzi-scheme through the investment adviser services of BMIS.*

    *15. Madoff conducts certain investment advisory business for clients that is separate from the BMIS' proprietary trading and market making activities.*

    *16. Madoff ran his investment adviser business from a separate floor in the New York offices of BMIS.*

7

*17.    Madoff kept the financial statements for the firm under lock and key, and was "cryptic" about the firm's investment advisory business when discussing the business with other employees of BMIS.*

*18.    In or about the first week of December 2008, Madoff told a senior employee that there had been requests from clients for approximately $7 billion in redemptions, that he was struggling to obtain the liquidity necessary to meet those obligations, but that he thought that he would be able to do so. Accordingly to this senior employee, he had previously understood that the investment advisory business had assets under management on the order of between approximately $8-15 billion.*

*19.    On or about December 9, 2008, Madoff informed another senior employee that he wanted to pay 2008 bonuses to employees of the firm in December, which was earlier than employee bonuses are usually paid"...*

*"21.    On or about December 10, 2008, the two senior employees referenced above visited Madoff at the offices of BMIS to discuss the situation further, particularly because Madoff had appeared to these two senior employees to have been under great stress in the prior weeks.*

*22.    At that time, Madoff informed the senior employees that he had recently made profits through business operations, and that now was a good time to distribute it. When the senior employee challenged his explanation, Madoff said that he did not want to talk to them at the office, and arranged a meeting at Madoff's apartment in Manhattan. At that meeting Madoff stated, in substance, that he "wasn't sure he would be able to hold it together" if they continued to discuss the issue at the office.*

*23.    At Madoff's Manhattan apartment, Madoff informed the two senior employees, in substance, that his investment advisory business was a fraud. Madoff stated that he was "finished", that he had "absolutely nothing", that "it's all just one big lie", and that it was "basically, a giant Ponzi scheme." In substance, Madoff communicated to the senior employees that he had for years been paying*

8

*returns to certain investors out of the principal received from other, different, investors. Madoff stated that the business was insolvent, and that it had been for years. Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion. One of the senior employees has a person account at BMIS in which several million had been invested under the management of Madoff.*

*24.    At Madoff's Manhattan apartment, Madoff further informed the two senior employees referenced above that, in approximately one week, he planned to surrender to authorities, but before he did that, he had approximately $200-300 million left, and he planned to use that money to make payments to certain selected employees, family, and friends".*

27.    In light of the above, and the Company's exposure to BMIS, the Company notified the Petitioners and others that it had suspended redemptions in the letter of 19 December 2008 aforementioned.

28.    It is apparent that the Company has lost substantially all of its funds and neither the Petitioners nor the other investors have any prospect of being repaid all of their funds or any portion of those funds within the ordinary timescale envisaged by them and the Company at the time they subscribed.

29.    There is no realistic hope that the Company will ever be profitable without further capital contributions which it is unlikely that any of its members including the Petitioners will contribute.

30.    The Company has never held and/or does not hold valid or real investments. The investments made in BMIS are wholly worthless.

31.    Further, or alternatively, the Company does not hold the investments it was authorised by its objects clause to acquire and hold in that none of the investments made in BMIS had any value.

9

32. The opportunity to acquire valuable investment by virtue of investment in BMIS was in fact never genuinely available to the Company and/or never materialised and/or has proved worthless and/or cannot be pursued.

33. For the reasons set out above, the Company can no longer carry out the business for which it was formed and the substratum of the Company has failed.

34. The members of the Company have a legitimate interest in the affairs of the Company, the conduct of its directors and the responsibility for the Company's investment in the fraudulent scheme to be investigated by an independent liquidator. It is likely that there are claims to be pursued against the Company's directors, Investment Manager, Sub-Advisor and other related entities within Tremont Group Holdings Inc for the benefit of the Company's members including the Petitioners.

35. In all the premises, it is just and equitable to wind the Company up.

YOUR PETITIONERS THEREFORE HUMBLY PRAY THAT:

1. The Company, Rye Select Broad Market Insurance Portfolio LDC, be wound up by the Court under the provisions of the Companies Law (2007 Revision); or

2. Should the Court make an Order winding up the Company, that James Cleaver and Richard Fogerty of Kroll Cayman Limited, Box 1102 Bermuda House, 4th Floor Cayman Financial Centre, Dr Roy's Drive, Grand Cayman KY1-1102 be appointed liquidators of the Company;

3. The liquidators are authorised to exercise any of the powers listed in section 109 of the Companies Law (2007 Revision) without the further sanction or intervention of the Court;

4. The liquidators be authorised to do any act or things considered by them to be necessary or desirable in connection with the liquidation of the Company and the winding up of its affairs;

5. The liquidators do file with the Clerk of the Court a report in writing of the position of and progress made with the winding up of the Company with the realisation of the assets thereof and to any other matters connected to the winding up of the Company, as the Court may direct;

6. The liquidators be at liberty to appoint counsel, attorneys, professional advisors, whether in the Cayman Islands or elsewhere as they may consider necessary to advise and assist them in the performance of their duties and on such terms as they may think fit and to remunerate them out of the assets of the Company;

7. The liquidators and their staff be remunerated out of the assets of the Company at the usual customary rate;

8. The liquidators be at liberty to apply generally;

9. The costs of the Petition and the Petitioners be paid out of the assets of the Company;

10. The liquidators cause a copy of this Petition to be delivered to the Registrar of Companies;

11. Such further or other relief be granted as the Court deems appropriate.

Dated the 30th day of January 2009

Filed the 30th day of January 2009

*Appleby*

**Appleby**

Attorneys-at-Law for the Petitioners

NOTE:

It is intended to serve this Petition upon:

1.  The Registrar of Companies

2.  The Company at its last known registered office.

12

INDORSEMENT

This Petition having been presented to the Court on 30 January 2009 would be heard at the Grand Court of the Cayman Islands on:

Date:                      2009

Time:     am

(Or as soon thereafter as the Petition may be heard).

THIS PETITION WAS FILED by Appleby of Clifton House, 75 Fort Street, PO Box 190, Grand Cayman KY1-1104, Cayman Islands (Ref. CJE/MH/18118.001), Attorneys-at Law for the Petitioners.

13