# EXHIBIT 1



Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-99000-smb

4   Adv. Case No. 09-01182-smb

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

9

10          Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF

13  BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

14               Plaintiff,

15          v.

16  MERKIN ET AL.,

17               Defendants.

18  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20

21

22

23

24

25

Page 2

```
 1              U.S. Bankruptcy Court

 2              One Bowling Green

 3              New York, NY  10004

 4

 5              August 9, 2017

 6              10:01 AM

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JULIO PESEYRA
```

Page 3

1    Hearing re:  Trustee's Motion to Exclude the Opinions and

2    Testimony of Jeffrey M. Weingarten

3

4    Hearing re:  Defendants' Motion to Exclude the Testimony and

5    Report of Bruce G. Dubinsky

6

7    Hearing re:  Defendants* Motion to Exclude the Testimony,

8    Reports, and Declaration of Steve Pomerantz

9

10   Hearing re:  Defendants' Motion to Exclude the Expert

11   Testimony of Amy B. Hirsch

12

13   Hearing re:  Defendants' Motion to Exclude the Expert

14   Testimony of Lisa M. Col

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   BAKER & HOSTETLER LLP

 4        Attorneys for Trustee, Irving H. Picard Esq.

 5        45 Rockefeller Plaza

 6        New York, NY 10111

 7

 8   BY:  LAN HOANG

 9        DAVID J. SHEEHAN

10        BRIAN W. SONG

11

12   NORTON ROSE FULBRIGHT US LLP

13        Attorneys for Defendants Ascot Fund, Receiver of Ascot

14        Partners

15        1301 Avenue of the Americas

16        New York, NY 10109

17

18   BY:  JUDITH A. ARCHER

19

20

21

22

23

24

25
```

1  DECHERT LLP

2        Attorneys for Merkin Defendants

3        1095 Avenue of the Americas

4        New York, NY 10036

5

6  BY:  ANDREW J. LEVANDER

7        NEIL A. STEINER

8

9  APPEARING TELEPHONICALLY

10  KEVIN H. BELL

11  SEANNA R. BROWN

12  NATHANIEL S. KELLEY

13

14

15

16

17

18

19

20

21

22

23

24

25

1    performing or not performing due -- adequate due diligence

2    or what adequate due diligence is.  And I just don't see

3    that as an issue in the case.

4              MR. LEVANDER:  So, Your Honor --

5              THE COURT:  And let me explain why.  I mean, Mr.

6    Merkin -- the issue in the case is not whether Mr. Merkin

7    adequately performed due diligence or was negligent in

8    performing due diligence or breached a fiduciary duty to

9    someone else in performing due diligence.  It's what he

10   knew.  If he did nothing, like the good faith purchasers in

11   these cases -- if he did nothing and didn't find out

12   anything, it just seems to me that's the end of the case.

13             MR. LEVANDER:  Your Honor, I don't disagree.

14             THE COURT:  Well, you put in a due diligence

15   report also.

16             MR. LEVANDER:  I did.  And I'll explain to you why

17   one could draw a distinction between the two.  I could also

18   understand Your Honor saying that under Rule 702 you're not

19   going to find what I'm about to say as assisting the Court

20   in making the decision.  But the fundamental, basic truth is

21   that Mr. Pomerantz's report is relevant to nothing.  Willful

22   blindness is the standard and Your Honor articulated the

23   issue.

24             THE COURT:  So, what's Mr. Weingarten's revelvant

25   --

1          MR. LEVANDER:  So, I do think -- so, unlike Mr.

2     Pomerantz who kind of dreamt up, you know, after the fact,

3     the tests that he had performed prior to Madoff's fall, Mr.

4     Weingarten does focus on -- based on 40 years of experience

5     including running Goldman Sachs Asset Management and his own

6     hedge fund, and having done due diligence a gazillion times

7     and having due diligence done on him a gazillion times, that

8     what -- he ties his analysis to what actually Mr. Merkin

9     did.  And to the extent he says that is consistent with his

10    40 years of experience and what people did prior to the

11    emergence of the Madoff fraud, that does bear, arguably, on

12    the good faith of Mr. Merkin, which, you know, ties into the

13    willful blindness standard.

14          And so, therefore I could draw that distinction.

15    There's no relevance to the Pomerantz report.  I'm going to

16    live with, you know, the goose and the gander here, though I

17    do think there is a difference between the goose and the

18    gander.

19          THE COURT:  All right.  I'll deal with Pomerantz's

20    motion first.

21          MR. LEVANDER:  Okay.  I'm not sure how much more I

22    need to say, but I'll quickly try to -- you know, we had

23    moved to exclude the report and testimony of --

24          THE COURT:  All right.  Going back to Weingarten -

25    -

1          MR. LEVANDER:  Yeah.

2          THE COURT:  -- why do I need Weingarten to tell me

3    what Merkin did?  Merkin can testify to what he did, right?

4          MR. LEVANDER:  Absolutely.  And --

5          THE COURT:  So, what do I -- what does Weingarten

6    do for it?

7          MR. LEVANDER:  So, arguably Mr. --

8          THE COURT:  Other than tell me what Merkin knew or

9    didn't know, which I wouldn't let him testify to anyway.

10         MR. LEVANDER:  -- no, but what he would testify to

11   and his report identified is, "Here's the methodology that

12   in pre-Madoff days, people need to focus on the five P's.

13   This is the methodology that people did due diligence.  And

14   based on my 40 years of experience and having done this a

15   lot, I've looked at what Mr. Merkin said he did.  I've

16   looked at what was in Mr. Merkin's due diligence file, and I

17   find that satisfies what would have been normal due

18   diligence standards in that period of time."

19         THE COURT:  Yeah.  But his report goes well beyond

20   that.  He talks about what Merkin knew or didn't know.

21         MR. LEVANDER:  Well, he's tying -- what he's

22   trying to do is to tie the five P analysis to what Merkin

23   has testified to.  His testimony relies on the accuracy of

24   Mr. Merkin's testimony and if the Court were to do this

25   probably then obviously the opinion becomes less useful.

Page 10

1  But to the extent that the Court accepts Mr. Merkin's

2  testimony, accepts the inferences to be drawn from the due

3  diligence file, what Mr. Weingarten does is he adds the

4  gloss that this obviously is the kind of thing that one did

5  in those days on due diligence and therefore it shows that

6  Mr. Merkin was acting in good faith.

7          THE COURT:  I think you got more out of his report

8  than I did.

9          MR. LEVANDER:  I'm sure I --

10         THE COURT:  I guess we're discussing Mr.

11 Weingarten's report at this point, but --

12         MR. LEVANDER:  -- okay.  I'm happy to discuss

13 either, Your Honor.

14         THE COURT:  All right.  Well, you made the motion

15 for Pomerantz so I'll hear Pomerantz.

16         MR. LEVANDER:  Thank you, Your Honor.  As much fun

17 as it would be to cross-examine Mr. Pomerantz and his

18 notions, I just think it's a waste of the Court's time and

19 it will be days of Court's time by the time we're finished

20 with all the motions you're going to hear today.  The only

21 issue here is the issue of willful blindness.  As you have

22 held, as Judge Rakoff has repeatedly held in the Madoff case

23 including your summary judgment decision, willful blindness

24 requires proof that Merkin subjectively believed there was a

25 high probability that Madoff was engaged in a Ponzi scheme

Page 27

1            Your initial instincts are correct.  It's

2    irrelevant.  And that's what Judge Rakoff held in the Katz

3    case.

4            THE COURT:  Okay.  Thank you.  I'll reserve

5    decision on Pomerantz.  Who's next?

6            MR. LEVANDER:  You want to hear from Weingarten --

7    on Weingarten as well?

8            THE COURT:  Sure.  What do we do on Weingarten?  I

9    have many of the same comments.  And frankly, I didn't find

10   your six-page report particularly probative.  Go ahead.  Did

11   I just make your argument?

12           MS. HOANG:  Okay.  Again, for the court reporter,

13   Lan Hoang, Your Honor.  (Indiscernible) requires that each

14   expert that's proffered by a party -- the expert's opinions

15   be grounded in reliable principles and methodology analyses.

16   The Trustee submits that Mr. Weingarten should be excluded

17   because he hasn't done any -- he hasn't espoused any

18   principles, any methodologies, or any analyses in his six-

19   page report or even the -- what's repeated in his five-page

20   rebuttal report.  It's the same concepts.  And there's the

21   statement by Mr. Levander that yes, Mr. Weingarten has this

22   40 years of experience and he did all these things.  Well,

23   yes, an expert could be qualified based on their experience.

24   But there still needs to be a bridge between that experience

25   and the bare conclusions that are contained in Mr.

Page 28

1    Weingarten's expert opinions.  And that bridge is whether

2    he's utilized reliable methodologies and analysis.  And I

3    submit he has not.

4          And so, what the defendants have argued is to say,

5    "Oh, yes, he has a methodology.  It's called the five P's."

6    Well, the five P's is not a methodology.  The five P's is a

7    framework for doing due diligence.  And what it is, is the

8    how of how you organize what you do.  The methodology is the

9    actual collection of the data, what you do with that data

10   and what analysis you perform on the data and what that data

11   reveals, the how do I look at it part of due diligence.

12         So, just if you'll indulge me for a second, I

13   don't want to be over-simplistic with a real-world analogy,

14   but I think it's helpful in understanding the difference

15   between the five P's framework and the methodology.  When

16   you buy a house, you have a home inspection because you

17   simply just don't rely on what the seller tells you is good

18   and bad about the house.  The home inspector comes in and he

19   has a checklist of things he has to look at, the electrical,

20   the plumbing, the roof, the basement.  That's the framework.

21   That's what he -- that's what do I look at.

22         So, from there, then he goes, for example, takes

23   the electrical.  He goes and looks at the electric box and

24   he wants to determine is that electrical box a fire hazard.

25   Are there enough breakers in there for the entire house?

1   And he goes through the whole house and does analysis.  What

2   appliances are in the kitchen.  What is in the living room.

3   What's in each of the bedrooms?  What's being utilized?  And

4   then he does an analysis of whether there's enough breakers

5   in that box, and he comes to a conclusion.

6           That's the methodology.  That's the analysis.  The

7   same goes for the basement.  And he'll do the same thing.

8   He looks at the basement because that's in the framework,

9   but he does independent analysis.  Does the basement flood?

10  Do I need sump pumps?  Do I have enough sump pumps for the

11  amount of water I see in there?  And each of those analyses,

12  that's what we're talking about methodology and reliable

13  analysis.

14          So, again, I bring you back to Mr. Weingarten's --

15  the opinions set forth in his report and even in his

16  rebuttal report.  They're conclusions.  The report consists

17  of a summary of conclusions and a conclusion.  There's no

18  analysis.

19          So, what are his opinions?  He said, "It is clear

20  that the made-up philosophy would be to forego potential

21  higher profits in order to avoid a risk of loss."  This is

22  at page 3.  My apologies, Your Honor.  "For example, being

23  out of the market around highly volatile periods during

24  which the options would have -- the options expired would be

25  part of that philosophy."

Page 30

1          So, let's ask.  It's not in there.  How did he

2     determine that being out of the market around highly

3     volatile periods during which options expire?  At his

4     deposition, Mr. Weingarten admitted that he looked at two,

5     maybe three trades and that they were some time in 2004,

6     maybe 2006, and that he doesn't recall exactly.  He may have

7     written it down but he doesn't have the notes.

8          So, he looks at two or three trades over the 18-

9     year investment history of the Merkin funds with BLMIS.

10     There were 60,000 trades over that period of time.  And so,

11     without identification of those two or three trades, we

12     can't, and the Court can't, assess how reliable his

13     methodology is, how reliable his analysis is, in order to

14     say to accept or reject his conclusion.

15          The same can be said for page 3 and 4 and he's

16     talking about the investment philosophy, the -- that Madoff

17     was utilizing the split-strike conversion strategy but with

18     added benefits.  Mr. Merkin understood that Mr. Madoff had,

19     by virtue of his long experience and knowledge and ability

20     to take advantage of both market timing and stock selection

21     to improve returns over that which would have been generated

22     by formulae putting on of the trades.

23          What Mr. Merkin understood is something for Mr.

24     Merkin to testify to.  But how did Mr. Merkin determine the

25     rest about market timing and stock selection?  We don't

1    know.  He -- there's no methodology.  He just says so.  So,

2    there's no bridge between what his experience is, because he

3    says, "I've seen it," to what his conclusion is that Madoff

4    was utilizing market timing and stock selection.  So, you

5    have to take his word for it.

6            That's ipse dixits.  That's not admissible as

7    expert -- as a basis for expert testimony under 702.

8    Another example, page 4 when he's talking about the

9    performance of the typical split-strike strategy.  And when

10   the market was down, the fund outperformed the overall

11   market.  When the market was up sharply, the fund

12   underperformed.

13           Well, what analysis did he do on BLMIS vis-à-vis

14   the market?  What periods of time did he review.  What were

15   the returns of BLMIS during those periods?  What was the

16   market doing during those periods?  Can he tell from the two

17   or three trades that he looked at, sometime in 2004,

18   sometime -- maybe 2006, over the 18-year history of the

19   investment?

20           There's other conclusions that he puts forth

21   within his report.  Page 5, over the course of my career.

22   He talks about the Sharpe ratio, that the oft-referred to

23   Sharpe ratio was relatively high for Madoff, but I counted

24   many funds with very high Sharpe ratios.  Madoff's results

25   were above IRTS but they were certainly achievable.  Well,

1    what did you look at?  What other funds?  What were their

2    Sharpe ratios?  What --

3              THE COURT:  Well, you took his deposition.  Did

4    you ask him any of these questions?

5              MS. HOANG:  That -- I need to know based on what's

6    in his expert opinions.  It's not our obligation to expand

7    on it because he didn't put it in there.  The same applies

8    for -- let me backtrack and just add there that Mr. Merkin -

9    - there's no evidence that Mr. Merkin performed an analysis

10   of the Sharpe ratio.  So, if you're trying to draw this back

11   to what Mr. Merkin did or didn't do and what he did was

12   proper, he didn't do it.

13             So, then we talk about the plausibility rule.  And

14   it says, "Well, this was plausible.  The returns were

15   plausible.  It's the smell test."  That's what he -- that's

16   what it is.  Well, where -- if it's the smell test, how do

17   you know that his returns were plausible?  Did you do

18   performance attribution?  Did he look at it and determine

19   whether the performance of the BLMIS returns were consistent

20   with the split-strike strategy, were consistent with the

21   split-strike strategy with market timing, with stock

22   selection?  He didn't do it.  There's -- it's not in his

23   opinions.  It's not -- he looked at two or three trades.

24   That's it.

25             So, we're not challenging Mr. Weingarten's

Page 33

1   conclusions because he has his -- he has on this motion to

2   exclude his testimony.  We're saying, yeah, those are his

3   conclusions.  We're challenging him and moving to exclude

4   him because he hasn't performed -- he hasn't set forth, and

5   I submit he hasn't performed any methodology or any analysis

6   to the Merkin Fund's BLMIS returns, trade conference or

7   statements, whatever information that was available

8   contemporaneously to Mr. Merkin and the defendants

9   throughout their 18-year investment.

10          Had he done that analysis standing here, we

11  wouldn't have made this motion, because then, as Your Honor

12  has said, we would have been left to cross-examine him on

13  the issues of his credibility.  But he hasn't met the

14  threshold for the submission of expert testimony.  What's --

15  so what's left of his opinion if you take out everything

16  that he opines to on the market and what happens in the

17  Merkin and the Madoff investment, take those out.  What's he

18  left -- he's left with statements regarding what Mr. Merkin

19  believed and what he felt.  And we set that forth in the

20  papers.  That's state of mind.  That's not for him to

21  expound on.

22          The rest is a factual narrative.  He's just

23  providing fact.  He's not saying -- providing anything other

24  than -- he's not providing first-hand testimony.  He's not

25  anxious to be a witness.  And to the extent that he refers

Page 34

1    to the OIG, the particular individual from the SEC or what

2    other saw or what other saw or what other funds did in the

3    industry, that's not relevant as to what Mr. Merkin saw.

4    This is subjective.  Your Honor said the first prong is

5    subjective.

6            And I think with the experts, there -- and

7    particularly on the bench trial, the Court seems to be

8    inclined based on the motions in limine we argued last time

9    to just let it in.  And I, as the fact-finder, can make

10   those determinations.  And we don't dispute.  We agree with

11   you that you could.  But the parties here have had seven

12   years of discovery.  They -- and expert discovery.  We've --

13   we're on the 15th, 16th, or 17th case management plan.  It's

14   been extended so the parties can complete expert discovery.

15   There have been no complaints that either party could not

16   get -- could not or did not have a fair and ample

17   opportunity to prepare their expert reports or to work with

18   their expert.

19           So, now it's for the Court to determine in advance

20   of trial whether Mr. Weingarten and each of the experts has

21   met the requirements of Rule 702 and Daubert, whether there

22   is a reliable, verifiable methodology and analysis.  And

23   regardless of the fact that his is a bench trial, this Court

24   is empowered to act as a gatekeeper.

25           I trust -- if you'd give me just one more minute,

Page 35

1   Your Honor, in -- recently in State of New York v. United

2   Parcel Service, Judge Katherine Forrest in a bench trial --

3   it's at 2016 Westlaw 4735368.  It's a September 2016

4   opinion.  Judge Forrest in a bench trial considered the

5   parties' respective motions to strike all the experts.  The

6   plaintiff's experts were excluded, not only because he

7   lacked qualification but also because he failed to identify

8   a reliable methodology, failed to clarify a time period

9   during -- relevant to his analysis, and failed to identify

10  the data that he analyzed to come to his conclusion.

11          In her opinion in excluding that expert testimony

12  and preventing the other to go forward, the -- Judge Forrest

13  said, "The Court's experience as a gatekeeper in this regard

14  does not, however, mean that the fact a matter may be

15  charged to the bench signals a free-for-all use of the

16  expert witnesses.  There's an obvious efficiency gains --

17  there are obvious efficiency gains in precluding testimony

18  from an individual unqualified to take the stand or one who

19  is providing testimony that is plainly irrelevant or is

20  based -- or, if relevant, is based on unreliable methods.

21  Such testimony is a waste of everyone's time.  But the

22  efficiency is not the sole reason for the Court to make a

23  pre-trial decision on Daubert motions.

24          "Pre-trial rulings can enhance fairness as well as

25  efficiency in forming sensible trial adjustments.  Pre-trial

Page 36

1    (indiscernible) are to assess the risk-reward profile of the

2    case on a real-time basis.  If a Court will preclude an

3    expert, it is generally better to sooner than later, simply

4    putting fair warning on the value."

5              And I would submit that, in opposite to Dr.

6    Pomerantz, Mr. Weingarten has not met the requirements of

7    Rule 702 and he should be exclude from trial.

8              THE COURT:  Thank you.

9              MR. LEVANDER:  What Mr. Weingarten has testified

10   to is that in this period of time, methodology of doing due

11   diligence was the (indiscernible) piece.  A --

12             THE COURT:  Well, that's what the goals or the

13   (indiscernible) that you looked into.  But the argument is

14   he didn't say what he did in order to look into it.

15             MR. LEVANDER:  No.  So, what he did then was --

16   and Mr. Pomerantz doesn't disagree that that's the

17   appropriate standard, the five P's, and that he, Mr.

18   Pomerantz, did it that way himself.  And what he said, based

19   on his 40 years of experience and hundreds of due diligence

20   examinations, either as the subject of it or doing it, that

21   the things that Mr. Merkin did satisfied the standards that

22   then existed with -- or exceeded those standards with regard

23   to each of the five P's.

24             THE COURT:  Is that everything that Merkin did in

25   Mr. Weingarten's report?

1           MR. LEVANDER:  I don't know the answer to that

2      question, Your Honor.  I think that Mr. Weingarten

3      definitely knew things that may not be in that report.  But

4      he --

5           THE COURT:  But that's the issue that's being

6      raised.

7           MR. LEVANDER:  Let me --

8           THE COURT:  That -- you know, that he shouldn't be

9      able to supplement his report by coming to trial and

10     expanding it.

11          MR. LEVANDER:  -- no.  What -- you know, what she

12     complained about, for example, was he said there were lots

13     of managers who did better than Madoff and that the returns

14     were plausible, and therefore when Mr. Merkin believed that,

15     that's consistent with his 40 years and his knowledge.  She

16     deposed him on it.  Give me some managers.  And he gave

17     names of those managers.

18          That's what they're supposed to do.  If they

19     didn't like the report, they shouldn't have taken his

20     deposition and waited a year and then said, "Oh, gee, we

21     don't know."  And if the standard is the one they've just

22     laid out for you, Mr. Pomerantz testified that he looked at

23     less than 10 of the confirmations out of the thousands of

24     confirmations and he can't remember which ones.  So, that's

25     our problem.  And then Mr. Pomerantz goes, too.  What's good

1    for the goose is good for the gander.

2           But the point here is that what Mr. -- his

3    expertise is, is that it didn't -- you didn't have all these

4    mathematical tests.  You actually asked questions consistent

5    with the questionnaire, a document that Mr. Pomerantz relied

6    on that Mr. Weingarten was familiar with, that that has

7    questions.  And those questions are tied into the six -- the

8    five P's.  And Mr. Merkin assiduously tried to get answers

9    to those five P's.  And he did his homework in the way that

10   it was done in those times.

11          Now, you know, the fact that there isn't a -- you

12   know, a mathematical calculation about that but it was, you

13   know, interfaced, but, you know, Mr. Merkin, the testimony

14   will show, brought in lots of sophisticated investors to

15   meet with Madoff and they asked the same kind of questions.

16   They had the same kind of due diligence.  And they were

17   sophisticated people, too, people from, you know, the best

18   firms on Wall Street, banks, and you'll hear all about that.

19          It seems to me that Mr. Weingarten's testimony

20   clearly satisfies Rule 26, clearly satisfies 702, and Your

21   Honor has to make a decision as to whether or not you want

22   to hear about all kinds of mathematical charts and the

23   cross-examination on those charts that's not relevant.

24   That's the Pomerantz issue.

25          THE COURT:  All right.  Thank you.

```
 1              MS. HOANG:  Your Honor, if I can just have a few

 2     minutes, very quickly.  A lot of what Mr. Levander said is -

 3     - are disputed facts.  Those facts will be before Your Honor

 4     whether through Mr. Merkin or through other witnesses in

 5     this case, and that's for Your Honor to decide.  As to what

 6     his -- what he said about the deposition, I could -- I did

 7     ask him about the managers and he named off a few, but it's

 8     not my duty -- job to further expand on what is in his

 9     report or what is not in his report, and Your Honor, I

10     direct your attention to those reports and the documents.

11     Consider there is no managers listed.  There's nothing in

12     there.  It's not my job to do what he -- they should have

13     done consistent with Rule 702.

14              And then, just to address one last point, they

15     keep ask -- saying that, you know, Mr. -- or that the

16     standards at the time didn't require you to do the

17     quantitative analysis that's set forth, the different types

18     of tools that are set forth in Dr. Pomerantz's report.

19     Well, they did.  As -- they did because they were available.

20     You see that from the (indiscernible) document in 1995.

21              In 1996, '97, there were AIMA standards.  And the

22     questions in the AIMA standards don't -- excuse me -- don't

23     specifically lay out all of those tools.  But as Dr.

24     Pomerantz responded to during his deposition on a pointed

25     question regarding, "well, where is it in the AIMA," he
```

1   responded that, "Well, it's not identified specifically, but

2   to get to each of those answers to the topics that are

3   raised in there, you have to perform quantitative analysis."

4           It talks about draw-down.  You have to perform

5   quantitative analysis based on what you know the returns are

6   on the fund to figure out if -- how much money that the fund

7   was down during particular months.  He said -- I mean -- if

8   you -- I'm sorry -- that he goes through the AIMA

9   questionnaire and says, "Yeah, for each of these you have to

10  perform quantitative analysis."

11          So, I don't think it's correct to keep repeating

12  that, well, the AIMA standards -- in 1997 they didn't

13  require you to do quantitative analysis.  You see it in the

14  (indiscernible) document in 1995 that was available and that

15  people were doing it, that Mr. Merkin had it in his

16  possession.

17          THE COURT:  I reserve decision on this one.  I

18  have a serious question about the relevance of virtually all

19  of this due diligence testimony for the reasons I've stated,

20  but I'll consider it in connection with both experts.

21          MR. LEVANDER:  Can I have a one-sentence --

22          THE COURT:  One sentence.

23          MR. LEVANDER:  -- one sentence.  How is it

24  possible that he can be qualified as an expert when he says

25  that it's not in the AIMA report and he didn't do it at that

Page 81

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 11, 2016