**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | **Trustee's Proposed Findings of Fact and Conclusions of Law Regarding Profit Withdrawal Transactions** |
| BERNARD L. MADOFF, | |
| Debtor. | |

Irving H. Picard (the "Trustee"), the trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act 15 U.S.C. § 78aaa *et seq*. ("SIPA"),[1] and the chapter 7 estate of Bernard L. Madoff ("Madoff"), submits these proposed findings of fact and conclusions of law following the evidentiary hearing on profit withdrawal transactions held on January 19, 2018.

I.    **FINDINGS OF FACT**

A.    **The SIPA Liquidation of BLMIS**

1.    The instant litigation ("PW litigation") is part of the main SIPA liquidation captioned *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, Adv. No. 08-01789 (SMB) (Bankr. S.D.N.Y.) ("*SIPC v. BLMIS*").

---

[1] Subsequent references to sections of SIPA shall be denoted as "SIPA § __."

This liquidation proceeding arises from a Ponzi scheme perpetrated by Madoff through the investment advisory business of BLMIS.

2.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violating numerous criminal securities statutes.  On the same day, the United States Securities and Exchange Commission (the "SEC") filed a complaint in the United States District Court for the Southern District of New York against BLMIS and Madoff.  On December 15, 2008, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").

3.      The District Court granted the SIPC application and entered an order which, in relevant part: (i) appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3); (ii) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and (iii) removed the combined action to this Court pursuant to SIPA § 78eee(b)(4).  Order, ECF No. 1 (Dec. 11, 2008).[2]

4.      Under SIPA, the Trustee is charged with assessing claims, recovering, and distributing customer property to BLMIS's customers with allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  A SIPA trustee has the general powers of a bankruptcy trustee, in addition to the powers granted by SIPA.  SIPA § 78fff-1(a).

5.      A SIPA liquidation has a unique claims process that differs from traditional bankruptcies, as reflected in specific provisions of SIPA and the claims procedures order entered by the Bankruptcy Court at the inception of the liquidation.  Order on Appl. for

---

[2] Unless otherwise noted, all ECF references are to the docket of the main liquidation proceeding at *SIPC v. BLMIS*, Adv. No. 08–01789 (SMB) (Bankr. S.D.N.Y.).

2

Entry of an Order Approving Form and Manner of Publication and Mailing of Notices,

Specifying Procedures for Filing, Determination, and Adjudication of Claims; and Providing

other Relief ("Claims Procedures Order"), ECF No. 12 (Dec. 23, 2008).

    6.    A SIPA liquidation gives priority to payment of customer net equity

claims from the customer property estate, as distinguished from claims of general creditors,

which are paid from the general estate.  *See In re Weiss Sec., Inc.*, No. 73-Civil-2332, 1976 WL

820, at *6 (S.D.N.Y. Aug. 2, 1976); *In re BLMIS*, 654 F.3d 229, 234 (2d Cir. 2011) ("*Net Equity*

*Decision*").  Customers share in customer property up to the amount of their "net equity," which

is the amount the debtor-broker would have owed to each customer if the broker liquidated the

customer's securities positions, plus any cash deposited by the customer to purchase securities.

SIPA § 78*lll*(11).  The Trustee's statutory obligation is to discharge net equity claims of

customers of the debtor "insofar as such obligations are ascertainable from the books and records

of the debtor or are otherwise established to the satisfaction of the Trustee."  SIPA § 78fff-2(b).

    7.    Although Madoff claimed to execute various investment strategies for his

customers, in reality, he neither bought nor sold any securities on their behalf.  He merely

deposited customer money into BLMIS's bank accounts, which he used to pay customer

withdrawals.  *Net Equity Decision*, 654 F.3d at 232–33, 240.  The securities reported on

customer statements were fictitious, but the actual cash deposits and withdrawals were accurate.

*See id.* at 232 ("[T]he only accurate entries reflected the customers' cash deposits and

withdrawals.").

    8.    On these facts, the Trustee determined that a cash in/cash out methodology

(the "Net Investment Method") was the only way to calculate net equity consistent with SIPA,

the Bankruptcy Code, and Ponzi scheme case law.  Under the Net Investment Method, the

Trustee determined each customer's net equity, without regard to fictitious "profits" reflected on

customer account statements. Each customer's net equity is the amount of cash or principal

deposited by the customer less cash or principal withdrawn. On August 16, 2011, the United

States Court of Appeals for the Second Circuit approved the Trustee's method for calculating net

equity because it was superior to the method put forth by the opposition. *Net Equity Decision*,

654 F.3d at 238, 242.

9.    In total, over 16,000 claims were filed against the BLMIS estate. The

Trustee issued claim determination letters to claimants. For those with accounts at BLMIS, the

Trustee provided his determination of the net equity of their customer accounts and a schedule

listing the transactions that resulted in the final net equity amount. *See, e.g.*, PCX-17, PCX-20,

PCX-21. Claimants that disagreed with the Trustee's claim determinations were required to file

objections with the Bankruptcy Court setting forth the bases for their objections. Claims

Procedures Order 6–7.

10.    The PW litigation is a claims objection proceeding wherein the certain

claimants[3] dispute the Trustee's treatment of certain transactions—those denoted as "PW" or

profit withdrawal transactions ("PW Transactions")—as debits from BLMIS accounts under the

Net Investment Method. Each of the Participating Claimants, including Aaron Blecker,

submitted a customer claim for a BLMIS account that contained one or more PW Transactions

(*i.e.*, a "direct account"), or for a BLMIS account that received an inter-account transfer from a

BLMIS account that contained one or more PW Transactions (*i.e.*, an "indirect account"). As set

---

[3] The customer claimants who are participating in this proceeding ("Participating Claimants") have changed over
time and are identified in Exhibits A and B to the Notice of Hearing on Profit Withdrawal Transactions, ECF No.
17102 (Jan. 8, 2018).

forth in the Claims Procedures Order, the Trustee determined their claims. The Participating

Claimants, including Aaron Blecker, filed timely objections to the Trustee's determinations of

their customer claims.

11.    On May 20, 2014, Aaron Blecker, along with certain other BLMIS

customers, objected to the inter-account transfer motion on the ground that their net equity

should not have been reduced by the amount of the PW Transactions on their customer

statements. *See* Decl. in Opp'n. to the Trustee's Mot. to Affirm Appl. of the Net Investment

Method to the Determination of Customer Transfers Between BLMIS Accounts ¶¶ 8–10, ECF

No. 6719; *see also* Customers' Mem. of Law in Opp'n. to the Trustee's Method for Valuing

Inter-Account Transfers 4–6, ECF No. 6708.

12.    On June 25, 2015, this Court established a separate omnibus proceeding to

resolve the issues related to the Trustee's treatment of PW Transactions. Order Establishing

Schedule for Limited Disc. and Briefing on Profit Withdrawal Issue, ECF No. 10266.

Thereafter, the parties engaged in discovery, including the Court-authorized depositions of

Madoff and BLMIS employees Annette Bongiorno, Winifier Jackson, Dorothy Khan, Alethea

Leung, and Joann Sala.

13.    On November 9, 2017, the Court scheduled an omnibus evidentiary

hearing on the Trustee's treatment of PW Transactions. The parties agreed to have Mr.

Blecker's claims objections that related to PW Transactions heard together with the omnibus

issue. *See generally* Tr. of Hr'g on Omnibus Profit Withdrawal Proceeding 16–30, ECF No.

16918.

14.    On January 19, 2018, the Court conducted an evidentiary hearing on the

Trustee's omnibus treatment of PW Transactions and on Mr. Blecker's PW-related claims

5

objections.  At the evidentiary hearing, the Court heard the live testimony of Mr. Blecker's son,

Robert Blecker, and the Trustee's professionals, Ms. Lisa Collura and Mr. Matthew Greenblatt.

The Court also received testimony through deposition designations submitted on stipulation of

the parties.  *See generally* Tr. of Hr'g on Profit Withdrawal Issue ("PW Hr'g Tr."), ECF No.

17206.

> **B.**   **Trustee's Professionals**

15.    In order to assist him in the SIPA liquidation of BLMIS, the Trustee

retained the professional services of FTI Consulting, including Ms. Lisa Collura and Mr.

Matthew Greenblatt.

16.    Ms. Collura is a forensic accountant with more than 20 years of

experience in financial fraud investigations and cases.  Ms. Collura was qualified as an expert in

the area of forensic accounting and testified as to her reconciliation of transactions that appeared

on customer statements with available bank records, customer correspondence, and documents

produced by third-parties, as well as her tracing analysis with respect to PW Transactions paid to

customers.  PW Hr'g Tr. 58:20–65:4, 67:16–19.

17.    Mr. Greenblatt is a forensic accountant with more than 20 years of

experience in financial fraud investigations and cases.  Mr. Greenblatt was qualified as an expert

in the area of forensic accounting and testified as to his analysis and reconstruction of the books

and records of BLMIS, his application of the Net Investment Method to calculate the ending

principal balance for each BLMIS account (the "Principal Balance Calculation"), and his

treatment of PW Transactions as debits for the purpose of the Principal Balance Calculation.  PW

Hr'g Tr. 164:1–168:14, 168:20.

6

C.      **Principal Balance Calculation**

18.      In order to apply the Net Investment Method to determine the Principal

Balance Calculation for each customer account, the Trustee's professionals reviewed and

reconstructed BLMIS's books and records.  The books and records include BLMIS customer

statements, bank records, cash receipt records or "check-in books," cash disbursement records or

"check-out books" (together with the check-in books, the "Spiral Notebooks"), the House 17

Manual, and customer account-related documents including BLMIS customer files, Portfolio

Management Reports ("PMRs"), Portfolio Management Transaction Reports ("PMTs"), and

customer correspondence.  PW Hr'g Tr. 71:11–17, 99:3–18, 174:8–179:18, 194:10–197:17,

198:18–200:9.

19.      As the first step in reconstructing the books and records and determining

the principal balance of each customer account, Mr. Greenblatt compiled a chronological listing

of all cash and principal transactions for every BLMIS customer account.  The chronological

listing is a line-by-line listing of the transaction details for all cash and principal transactions in

every BLMIS customer account and is made up of all "inflows" and "outflows" of cash and

principal into and out of the BLMIS customer accounts.  PW Hr'g Tr. 168:23–169:8.

20.      The chronological listing of all cash and principal transactions was derived

from the information contained on the BLMIS customer statements, which were generated from

BLMIS computer systems.  Mr. Greenblatt relied primarily on the customer statements for

several reasons: (i) the customer statements represent the most complete BLMIS records for the

longest time period, spanning from April 1981 to November 30, 2008; (ii) customer statements

contain the most comprehensive details for each transaction for every account, including the

transaction dates, amounts, descriptions and transaction codes; and (iii) because the customer

7

statements were received by BLMIS customers monthly, customers could confirm the deposits into and withdrawals from their accounts.  PW Hr'g Tr. 172:8–173:13.

21.    The Principal Balance Calculation is a calculation of the inflows into the BLMIS account less the amount of the outflows from the BLMIS account.  Inflows, or credits, under the Net Investment Method, include: (i) account balances reported on customer statements as of April 1, 1981; (ii) cash deposits; (iii) non-cash deposits consisting of actual securities and/or bonds deposited with BLMIS; and (iv) inter-account transfers of principal into the account.  Outflows, or reductions under the Net Investment Method, include: (i) cash withdrawals; (ii) inter-account transfers of principal out of the account; and (iii) payments made by BLMIS on behalf of customers.  PW Hr'g Tr. 170:21–171:9, 192:10–15.

22.    In order to confirm the accuracy and reliability of the customer statements, Mr. Greenblatt compared the cash and principal transactions from the BLMIS customer statements to other available BLMIS books and records.  Specifically, he reconciled the customer statement transactions to the year-to-date summary level cash and principal transactions identified on the PMRs, to the transaction-level detail on the PMTs, and to the Spiral Notebooks where applicable.  PW Hr'g Tr. 194:10–199:19; TX087; TX088; TX089; TX090.

23.    Mr. Greenblatt disclosed that there were some changes to the data in the chronological listing of cash and principal transactions that were discovered during quality control reviews of the Participating Claimants' accounts.  While these changes resulted, to the extent necessary, in adjustments to the Principal Balance Calculation for certain accounts, Mr. Greenblatt testified that he reviewed the changes and confirmed that they did not affect the conclusion he reached—that PW Transactions were debits to an account's balance.  No

8

testimony or evidence was presented to suggest that the change in the data would have yielded a

conclusion different from that offered by Mr. Greenblatt.  PW Hr'g Tr. 200:16–202:10.

24.     Ms. Collura reconciled the cash and principal transactions reported on the

BLMIS customer statements to available third-party bank records to confirm the accuracy and

reliability of those cash and principal transactions.  BLMIS used three primary bank accounts for

customer deposits and withdrawals—two accounts at JPMorgan (the "703 account" and the "509

account"), and one account maintained at Bankers Trust.  Third-party bank records from these

institutions were available for the ten-year period preceding the Filing Date, December 1998

through December 2008 (the "Ten-Year Period").  These bank records include hundreds of

thousands of pages of BLMIS bank statements, wire transfer data, cancelled checks, and deposit

slips.  PW Hr'g Tr. 71:18–76:2.

25.     Specifically, Ms. Collura confirmed that the deposit and withdrawal

transactions identified on the BLMIS customer statements corresponded to transactions on the

available third-party bank records in the same amount, on or around the same date, and to or for

the benefit of the same customer.  PW Hr'g Tr. 81:10–82:12.

26.     For example, the October 31, 2001 BLMIS customer statement for BLMIS

account 1H0094 reflects a transaction dated October 1, 2001, in the amount of $574,241.32, with

a transaction code of "CW" and a transaction description of "Check Wire."  Ms. Collura then

reviewed the October 31, 2001 third-party bank statements for BLMIS's bank accounts.  She

identified an outgoing wire transfer from the 703 account dated October 1, 2001 in the amount of

$574,241.32, referencing the accountholders for 1H0094—Alan Hurwitz and Barbara Hurwitz.

In Ms. Collura's opinion, this transaction reconciled because the date and amount were a one-to-

9

one match, and the description referenced the BLMIS accountholders.  PW Hr'g Tr. 82:13–84:2;

TX001; TX002.

27.     In other instances, there were multiple transactions on the same day in the

same amount that required further analysis in order to reconcile.  For example, the August 31,

2007 bank statement for the 703 account contains three transactions in the amount of $500,000

all dated August 29, 2007.  Using the date, amount, and description for each outgoing wire

transfer from the 703 account, Ms. Collura was able to reconcile these three transactions to three

separate BLMIS accounts.  The description on the 703 account statement included a reference to

"MJ 2005 GRATS, LLC" for the first transaction, "FAMMAD, LLC" for the second, and

"Sidney R. Ladin" for the third.  Ms. Collura reconciled these three outgoing wire transfers to

three withdrawals dated August 29, 2007 and in the amount of $500,000 from three BLMIS

accounts: 1M0230 held in the name of "M J 2005 Grats LLC"; 1F0201 held in the name of

"FAMMAD LLC"; and, 1L0063 held in the name of "Sidney Ladin & Sharlene Ladin TSTEES

Sidney Ladin Rev. TST DTD 12/30/96."  PW Hr'g Tr. 84:4–86:12; TX003; TX004; TX005;

TX006.

28.     Similarly, in other instances Ms. Collura reconciled a single transaction on

the third party bank records to transactions across more than one BLMIS account.  For example,

the June 30, 2004 bank statement for the 703 account reflects a deposit in the amount of

$688,000 on June 22, 2004 with only a generic description of "cash letter."  By reviewing the

corresponding deposit slip for this transaction, Ms. Collura determined that this deposit in the

amount of $688,000 was actually a bulk deposit of seven separate checks made payable to

BLMIS.  She then reconciled each of seven deposits listed on the deposit slip to a BLMIS

account based on the date and amount.  Ms. Collura was able to reconcile the first entry on the

deposit slip, for $75,000, to a deposit into BLMIS account 1C1219 in the same amount, dated

June 17, 2004, using the BLMIS customer statement and the third party bank records, including a

cancelled check with a reference to 1C1219 in the memo line.  PW Hr'g Tr. 86:14–88:21;

TX007; TX008; TX009; TX051.

29.    Ms. Collura also reconciled the transactions in the 509 account to the

BLMIS customer statement data.  For example, the April 30, 2007 BLMIS customer statement

for BLMIS account 1C1342, held in the name of the Max B. Cohen Family Foundation, reflects

a withdrawal for $400,000 on April 3, 2007.  Ms. Collura reconciled that transaction to a

cancelled check dated April 3, 2007 in the amount of $400,000, made payable to the "Max B.

Cohen Family Foundation" with a notation of 1C1342 in the memo line of the check.  She

reconciled the amount and date of the check to the customer statement and confirmed that the

payee of the check was the accountholder.  PW Hr'g Tr. 88:25–90:11; TX010; TX011.

30.    As with the 703 and 509 accounts, Ms. Collura completed a reconciliation

for the transactions in the Bankers Trust account.  PW Hr'g Tr. 90:12–90:19.

31.    Approximately 225,000 cash deposit and withdrawal transactions were

reflected on the BLMIS customer statements during the Ten-Year Period.  Ms. Collura was able

to reconcile 99% of these 225,000 transactions between 1998 and 2008 to the available BLMIS

bank records.  PW Hr'g Tr. 81:10–82:12, 90:20–91:7.

32.    The collective work of Mr. Greenblatt and Ms. Collura established the

accuracy and reliability of the BLMIS records for purposes of conducting the Principal Balance

Calculation.  Mr. Greenblatt compiled the chronological listings of cash and principal

transactions from the customer statements, the accuracy of which were confirmed by

corroborating the transactions on those documents to other available BLMIS books and records.

Ms. Collura reconciled the transactions on the chronological listings to available third party

records, including bank records.  Together, their analyses support the Trustee's use of the cash

and principal transactions from the BLMIS books and records to determine BLMIS customer

claims.

**D.    BLMIS Books and Records Confirmed Treatment of PW Transactions as Debits to the BLMIS Customer Accounts**

33.    PW Transactions are a subset of the outflows in the Net Investment

Method used to determine the Principal Balance Calculation.  BLMIS books and records confirm

that the PW Transactions reflected on customer statements were treated as debits to the account

and as reductions to principal.  Therefore, PW Transactions were properly treated as outflows in

determining the Principal Balance Calculation of each customer account.

34.    In conducting the Principal Balance Calculation, Mr. Greenblatt identified

the relevant data related to cash and principal transactions on the customer statement—the

transaction date, a transaction description, the transaction code that was applied by BLMIS, and

the amount of the transaction.  PW Hr'g Tr. 172:12–24.

35.    BLMIS customer statements were available for the time period from

March 1981 through November 2008 in different forms.  Electronic customer statements were

available for the time period of December 1995 through November 2008.  For the periods prior

to December 1995, customer statement data was available on microfilm.  For other periods,

customer statements were produced by customers back to the Trustee.  PW Hr'g Tr. 172:25–

173:13.

36.    Customer deposits into and withdrawals from their BLMIS accounts were

reported on the customer statements and designated with a "transaction code."  While the type of

12

transaction codes vary from company to company, Mr. Greenblatt explained that all companies commonly use a chart of accounts or a coding system for their recordkeeping. BLMIS's "House 17 Manual" identified the codes used for recordkeeping by BLMIS. On the page entitled "Cash/Securities Transaction Codes," the House 17 Manual identified, *inter alia*, two-letter codes, the journal entry type (*i.e.*, whether it was a credit or a debit), and a description. PW Hr'g Tr. 174:25–175:6; TX080; TX217. The codes that were relevant to the Principal Balance Calculation were CA, CW, PW, and JRNL. PW Hr'g Tr. 174:21–175-6.

37.    As detailed in the House 17 Manual, the transaction code "CA" reflected in the BLMIS books and records was shorthand for "Capital Addition." The CA transaction code identified cash deposits into a customer's BLMIS account. BLMIS recorded CA transactions as credits or increases to the customer's reported equity. As such, Mr. Greenblatt treated CA transactions identified on customer statements as inflows, or credits in the Principal Balance Calculation, thus increasing the account's net equity. PW Hr'g Tr. 175:7–24.

38.    As described in the House 17 Manual, the transaction code "CW" reflected in the BLMIS books and records is shorthand for "Capital Withdrawal" and the transaction code "PW" is shorthand for "Profit Withdrawal." BLMIS recorded both CW transactions and PW transactions as debits to the BLMIS account and reductions to the customer's reported equity. As such, Mr. Greenblatt treated CW and PW transactions identified on customer statements as outflows, or debits in the Principal Balance Calculation, thus decreasing an account's net equity. PW Hr'g Tr. 175:25 –176:17; TX080; TX217.

39.    As described in the House 17 Manual and as explained by Mr. Greenblatt, the transaction code "JRNL" relates to journal entries. This transaction type was used both for credits and debits, depending on the transaction. Mr. Greenblatt testified that the JRNL code was

13

used mostly for manual adjustments and that it was typically used for the first deposit into a

customer account.  PW Hr'g Tr. 176:18–177:16.

40.    The CA, CW, and PW transaction codes used by BLMIS to record the

cash and principal transactions appear throughout the BLMIS books and records—not only on

customer statements, but also in the House 17 Manual, PMRs, PMTs, and the Spiral Notebooks.

On each of these records, CAs were consistently recorded as credits or increases to the reported

equity and CWs and PWs were consistently recorded as debits or reductions to the reported

equity.  PW Hr'g Tr. 179:12–22; TX080.

41.    The House 17 Manual listed PW and CW transactions as "debits" and CA

transactions as "credits."  PW Hr'g Tr. 178:18–179:22; TX080.

42.    Mr. Greenblatt identified and analyzed the transaction codes on PMRs.

PMRs set forth a summary of the reported cash and principal activity of an account—capital

additions, capital withdrawals, and profit withdrawals—on a monthly basis and included year-to-

date information, which was used by Mr. Greenblatt to verify that the accounting exercise of

accumulating all of the cash and principal transactions was complete.  With some gaps, the

PMRs were available from the early 1980s through November of 2008; for the period prior to

December 1995, PMRs were available on microfilm.  On PMRs, CAs were consistently recorded

as credits or increases to the reported equity and CWs and PWs were consistently recorded as

debits or reductions to the reported equity.  PMRs corroborated the cash and principal

transactions that were reported on the customer statements, and therefore, the chronological

listings upon which the Principal Balance Calculations were based.  PW Hr'g Tr. 195:5–196:23;

Sala Tr. 117:23–120:18; Bongiorno Tr. 110:25–113:17; TX088; TX203; TX207.

14

43.    Mr. Greenblatt also identified and analyzed the transaction codes on

PMTs.  PMTs included information on the capital additions, capital withdrawals, and profit

withdrawals on a per-transaction basis.  PMTs were available from the mid-1980s until the mid-

1990s with some gaps.  On PMTs, CAs were consistently recorded as credits or increases to the

reported equity and CWs and PWs were consistently recorded as debits or reductions to the

reported equity.  PMTs corroborated the cash and principal transactions that were reported on the

customer statements and therefore, the chronological listings upon which the Principal Balance

Calculations were based.  PW Hr'g Tr. 194:10–195:4, 196:15–23; Leung Tr. 118:21–120:13;

Bongiorno Tr. 115:10–21; TX087; TX202; TX208.

44.    The Spiral Notebooks found at BLMIS contained lists of checks received

by BLMIS from customers (the check-in book) and checks sent out by BLMIS to customers (the

check-out book).  The check-in book identified by customer name and account number, checks

received from customers on a particular date.  The check-out book contained handwritten

notations identifying the checks, including PW checks, to be sent out on a particular date.  In

addition to the date, the check-out book identified the customer recipient, the amount of the

check and, in the case of PW Transactions, the related security from which the purported profit

resulted.  The check-out books in many instances utilized the transaction code PW for PW

Transactions.  In other instances, the PW checks were simply identified as "profits."  Bongiorno

Tr. 43:20–22, 130:24–136:18; Sala Tr. 163:13–164:9; TX080; TX089; TX090; TX190.

45.    The information in the Spiral Notebooks corroborated the cash and

principal transactions that were reported on the customer statements—the BLMIS accountholder,

the BLMIS account number, security name, check amounts, and transaction dates.  These

notebooks were available with gaps for various periods of time from the mid-1980s until the

mid-1990s.  PW Hr'g Tr. 196:24–197:17; Bongiorno Tr. 43:9–22, 130:24–136:18; Sala Tr.

151:23–155:8, 161:14–164:9, 181:13–183:19; Jackson Tr. 51:21–53:2; TX089; TX190; TX216;

TX229.

   46. Debit memoranda ("Debit Memos") found at BLMIS also confirmed and

corroborated the PW Transactions identified on customer statements.  Debit Memos, generated

by BLMIS's computer systems, included the words "PW CHECK + [security name]" (which

matched the entry on the customer statement), the accountholder name and address, account

number, and the amount, date, and security of the PW Transaction.  Attached to the Debit Memo

was either a copy of the check for BLMIS's files or the check corresponding to that transaction

for the customer.  Bongiorno Tr. 45:17–46:22, 76:16–78:5, 80:6-81:20, 86:3-17; Sala Tr.

196:21–199:1; Jackson Tr. 69:24–72:3; TX230.

   47. Mr. Greenblatt analyzed the various BLMIS books and records to ensure

that BLMIS treated cash and principal transactions consistently and to reconcile the transactions

from the customer statements.  For example, Mr. Greenblatt reconciled six PW transactions

listed on BLMIS customer statements for BLMIS account 1B0022 between March and

December 1992 to the relevant PMR and PMT.  He reconciled these six transactions to the

December 1992 PMT, which lists the same six transactions as "PW" transactions for the same

dates and amounts—March 5, 1992 for $3,969.02, April 28, 1992 for $2,606.03, June 16, 1992

for $2,627.74, August 21, 1992 for $3,929.33, October 6, 1992 for $2,629.25 and November 12,

1992 for $1,097.03.  In addition, the December 1992 PMR confirms that the total amount of

"Profits Withdrawn" from 1B0022 in 1992 is $16,858.40, which is the aggregate amount of the

six PW transactions listed on the customer statements and PMT.

48.    Mr. Greenblatt also reviewed the BLMIS Spiral Notebooks to confirm and

corroborate the PW transactions where possible.  For example, the PW transaction dated July 17,

1991, in the amount of $3,230.02, which was reflected on the 1B0022 customer statement, PMT

and PMR, was also recorded in the BLMIS Spiral Notebook for July 1991 in the same

amount.  PW Hr'g Tr. 198:18–199:14; TX086; TX090; TX209; *see also* TX190.

49.    Thus, the Court finds that the references to the transaction codes in the

BLMIS books and records were consistent with Mr. Greenblatt's determination that CA

transaction codes represent inflows, or credits, and that CW and PW transaction codes represent

outflows, or debits, to the BLMIS accounts.  PW Hr'g Tr. 174:13–176:17, 194:10–197:17; Sala

Tr. 196:21–199:1; Bongiorno Tr. 45:17–46:22; Jackson Dep. Tr. 69:24–72:3; TX080; TX087;

TX088; TX089; TX090; TX097; TX192; TX230.

50.    Mr. Greenblatt conducted an additional analysis on PW Transactions using

information from the BLMIS customer statements.  Mr. Greenblatt confirmed that the amount of

each PW Transaction reflected purported profits generated by securities transactions reported on

the customer statements.  First, Mr. Greenblatt identified the security listed in the description of

the PW Transaction.  Second, he reviewed the relevant customer statements to identify purported

purchases and sales in that security.  Third, he calculated the difference between the purchase

and sale amounts.  In virtually all instances, the amount of that difference corresponded to the

amount of the PW Transaction, which amount was listed in the debit column of the customer

statement and debited from the account's balance.  PW Hr'g Tr. 180:19–184:19, 194:10–197:17;

TX087; TX088; TX089.

51.    For example, Mr. Blecker's March 1995 customer statement for account

1B0022 identified a PW Transaction for $2,784 on March 14, 1995 with the description "Check

17

Aluminum." Mr. Greenblatt reviewed the February 1995 statement, which showed a purchase of

2,484 shares of "Aluminum Company of America" for $202,446 and listed the 2,484 shares in

the holdings section of the statement. Turning back to the March 1995 statement, following a

two-for-one stock split for that security, the shares are purportedly sold for $205,203, resulting in

a profit of $2,784. Eight days later, the amount of the purported profit, $2,784, was withdrawn

in a PW Transaction listed on the March 1995 customer statement in the column "Amount

Debited to Your Account." The securities for Aluminum Company of America no longer

appeared in the holdings section on the month-end March 1995 statement, and did not appear on

the April 1995 statement. PW Hr'g Tr. 182:9–186:22; TX081; TX082; TX083.

52.     Mr. Greenblatt's analysis showed the relationship between the profits

purportedly generated from the reported securities trading and confirmed that the PW

Transactions were debited from the accounts.

53.     Taken collectively, the BLMIS books and records confirm the Trustee's

treatment of the cash and principal transactions that were reported on the customer statements

and specifically that BLMIS treated PW Transactions as debits, or reductions to an account's

equity. PW Hr'g Tr. 176:11–17, 179:23–180:5.

**E.     Third Party Records Confirmed Treatment of PW Transactions as Debits to the BLMIS Customer Accounts**

54.     In addition to the reconciliation of BLMIS records described above, third

party records also confirmed that PW Transactions were properly treated as outflows, or

reductions to an account's net equity, under the Net Investment Method and Principal Balance

Calculation.

18

55.     There were approximately 91,000 PW Transactions between April 1981 and December 2008.  For that entire period, Ms. Collura was able to reconcile 51,769 PW Transactions to one or more third-party sources.  She reconciled 46,128 PW Transactions to documents produced by customers or third parties to the Trustee, including the account holders' accounting records, bank records.  She reconciled 6,008 to correspondence related to their BLMIS account.  She reconciled 5,507 PW Transactions to BLMIS bank records.  PW Hr'g Tr. 92:7–9, 99:6–101:24, 103:3–19; TX031; TX032.

56.     For example, Ms. Collura testified as to her analysis of accounting records produced to the Trustee by AHT Partners, the account holder for BLMIS account lA0001, which was entitled "AHT Partners-B Madoff Investment."  These records detailed the date and amount of sixty PW checks received by AHT Partners from BLMIS between 1992 and 1994.  Using the AHT Partners' account records, Ms. Collura reconciled three PW Transactions listed on the February 1993 BLMIS customer statement dated February 4, 1993 for $3,630.27, February 10, 1993 for $16,053.50, and February 18, 1993 for $7,594.23 to the information contained in the "Effective Date" and "Checks Received" columns on the accounting record.  Ms. Collura reconciled the date and amount of each of the sixty PW checks on the AHT Partners account record to the data from the BLMIS customer statements using this same methodology.  PW Hr'g Tr. 92:7–9, 99:6–101:24, 103:3–19; TX031; TX032.

57.     Ms. Collura was also able to reconcile PW Transactions to a customer's bank records as produced to the Trustee.  For example, the February 28, 1993 BLMIS customer statement for account 1H0063 held by Irwin Kenneth Horowitz reflects a PW Transaction dated February 18, 1993 for $1,686.76.  By analyzing the March 19, 1993 bank statement for Mr. Horowitz's personal account, Ms. Collura reconciled the February 18, 1993 PW Transaction to a

19

deposit into Mr. Horowitz's account on February 23, 1993 in the amount of $1,686.76.  PW Hr'g

Tr. 101:25–102:24; TX033; TX035.

58.    Ms. Collura further reconciled 6,008 PW Transactions to correspondence

located within the BLMIS customer files.  The correspondence generally consisted of

instructions from the accountholder to BLMIS asking to change the send/reinvest status of the

PW Transactions in their account.  Ms. Collura used those letters to reconcile to a series of PW

Transactions either before or after the date of the instructions from the BLMIS customer.  For

example, the customer file for account 1B0066, held in the name of Sylvia Brodsky, contains a

letter dated October 15, 1994, signed by Sylvia Brodsky and Benjamin Brodsky, in which the

accountholder requests that BLMIS "send a check for the profits on any trade . . . made

subsequent to the above date" rather than reinvest those profits.  Ms. Collura then reviewed the

customer statement data for 1B0066 to reconcile the date of the letter with the PW Transaction

activity in the account.  Ms. Collura reconciled the October 15, 1994 request from the

accountholder to the November 1994 customer statement showing the first PW Transaction in

the account, dated November 28, 1994, and to customer statements thereafter showing PW

Transactions.  PW Hr'g Tr. 94:13–99:5, 103:3–19; TX019; TX020; TX022.

59.    Finally, Ms. Collura also reconciled 5,507, or 99.6%, of the 5,527 total

PW Transactions in the Ten-Year Period to available BLMIS bank records, including monthly

bank statements and copies of cancelled checks.  Ms. Collura confirmed that for the profits

earned by the reported securities transactions within each account, a check made payable to the

customer, was sent by BLMIS to the customer for the amount of those earnings.  PW Hr'g Tr.

91:28–92:22, 103:3–19.

60.     For example, the November 30, 1998 BLMIS customer statement for

BLMIS account 1K0033, held in the name of Marjorie Klaskin, includes a November 25, 1998

PW Transaction in the amount of $448.00.  Ms. Collura was able to reconcile that PW

Transaction to a cancelled BLMIS check dated November 25, 2018, for $448.00 and made

payable to Marjorie Klaskin, with a notation of 1K0033 in the memo field of the check.  Ms.

Collura reconciled each of the 5,507 PW Transactions in the Ten-Year Period to a check or wire

transfer in this manner.  PW Hr'g Tr. 92:23–94:12; TX012; TX013.

61.     Ms. Collura then conducted a tracing analysis of the PW Transactions in

the Ten-Year Period in order to determine whether PW Transactions were received by the

BLMIS customers.  By analyzing the information on either the copy of the canceled check or, for

wire transfer transactions, the information available from the third-party bank, Ms. Collura was

able to determine, for 99% of the transactions where documents were available, the funds that

left BLMIS were received by the respective customer.  For example, by analyzing the back of the

cancelled BLMIS check drawn from the 703 account and made payable to Marjorie Klaskin, Ms.

Collura was able to confirm that the check was endorsed by Ms. Klaskin and deposited by her

into her Chase Manhattan Bank account.  PW Hr'g Tr. 104:11–105:8; TX012; TX013.

62.     Ms. Collura disclosed that there were some changes to the data in the

chronological listing of cash and principal transactions that were discovered during quality

control reviews of the Participating Claimants's accounts resulting in certain changes to her

reconciliation of the PW Transactions but that none of the changes impacted her overall

conclusions.  Ms. Collura testified that she reviewed the changes and confirmed that they did not

affect the conclusion she reached—that PW Transactions were debits to an account's balance.

No testimony or evidence was presented to suggest otherwise.  PW Hr'g Tr. 103:30–104:10.

21

63.     Ms. Collura's reconciliation of the PW Transactions to third party records confirms the accuracy and reliability of the BLMIS customer statements and the chronological listings upon which they were based.  This reconciliation confirms that PW Transactions were property treated as outflows, or reductions to an account's net equity, under the Net Investment Method and Principal Balance Calculation.

64.     Accordingly, the Court finds that the Trustee properly treated PW Transactions as outflows, or reductions to an account's net equity, under the Net Investment Method and Principal Balance Calculation.

## F.    **BLMIS Employees Confirmed that the Trustee's Treatment of PW Transactions Was Correct**

65.     In addition to the fact that the PW Transactions were corroborated and reconciled to available BLMIS records and third party records, the BLMIS employee testimony likewise confirmed that PW Transactions were treated as debits or reductions to principal by BLMIS.  BLMIS employees testified that the PW Transactions reflected checks sent to customers consisting of profits generated by purported trading in BLMIS accounts.  The BLMIS employees confirmed that the Trustee and his professionals had correctly interpreted the BLMIS books and records and that his treatment of PW Transactions was therefore correct.

66.     Ms. Bongiorno began working at BLMIS beginning in 1968 and continued working there until operations ceased; Ms. Jackson worked at BLMIS from 1986 until operations ceased; Ms. Khan worked at BLMIS from the early 1990s until operations ceased; Ms. Leung worked at BLMIS from 1995 until operations ceased; and Ms. Sala worked at BLMIS from 1984 until her retirement in 1998.  Bongiorno Tr. 10:21–22, 12:24–25; Jackson Tr. 9:18–21, 20:14–18; Khan Tr. 10:11–20, 17:21–24; Leung Tr. 9:21–10:3, 18:9–18; Sala Tr. 11:21–23, 12:9–15.

67.     BLMIS employees explained that BLMIS set up various "deals" to run over a period of time, usually between four and eight weeks.  Sala Tr. 27:9–28:10, 60:9–20; *see also* Bongiorno Tr. 74:2–10.

68.     At the beginning of the "deal" period, the customer would be set up in a particular stock (the "deal" stock), which would be listed on the accountholder's customer statement as a stock purchase with purchase amount appearing in the debit column.  Sala Tr. 183:1–14, 203:13–204:10; Bongiorno Tr. 72:13–24; *see also* TX197.

69.     At the end of the deal period, the customer statement would reflect a sale of the deal stock with the sale price appearing in the credit column.  Bongiorno Tr. 73:6–21, 99:1–6; Sala Tr. 80:8–81:17; 204:11–205:18; *see, e.g.*, TX195; TX197; TX235.

70.     The difference between the "buy" and the "sell" prices for the deal stock would result in a "profit" for the BLMIS account.  Bongiorno Tr. 73:4–74:10, 74:13–76:11; Sala Tr. 80:16–82:5, 204:11–206:11; *see, e.g.*, TX193; TX194; TX195; TX196; TX197.

71.     If an account was set up to receive its profits, a check would be automatically sent to the customer for the amount of the profit at the conclusion of each deal. This transaction was known to BLMIS employees as a PW Transaction and the amount of the check was listed in the "Amount Debited to Your Account" column on the customer statement. Sala Tr. 83:12–84:3, 105:13–107:13, 130:14–131:18, 196:21–199:6; Bongiorno Tr. 99:1–100:23; TX081; TX082; TX191; TX194; TX195; TX196; TX197; TX198; TX204; TX210; TX214; TX235.

72.     For example, the customer statement for account 1B0022 showed a transaction in "PEP BOYS" securities in April and June 1992.  Ms. Sala and Ms. Bongiorno identified the purported "buy" and "sell" transactions in PEP BOYS and confirmed that the entry

23

"PW CHECK PEP BOYS" dated June 16, 1992 was the purported profit due to Mr. Blecker resulting from this transaction.  Ms. Sala and Ms. Bongiorno further confirmed that the entry "PW CHECK PEP BOYS" on Mr. Blecker's statement represented the profit check sent to Mr. Blecker in April 1992.  Sala Tr. 110:25–117:21; Bongiorno Tr. 110:24–116:14, 116:20–118:4; TX205; TX206; *see also* Bongiorno Tr. 108:23–110:2; TX238.

73.     BLMIS employees identified the PEP BOYS profit transaction on the 1992 PMT for account 1B0022, confirmed that it matched the transaction on the customer statement, and confirmed that the transactions on both documents reflected a PW check to Mr. Blecker on June 16, 1992 for $2,627.74.  Bongiorno Tr. 117:12–118:4; Jackson Tr. 92:16–94:12; TX206; TX207; TX208; *see also* Khan Tr. 81:14–18, 83:22–15; Sala Tr. 218:15–219:16; TX226; TX233.

74.     Additionally, BLMIS employees confirmed that the December 1992 PMR for account 1B0022 reported $16,858.40 as the amount of PW Transactions received by Mr. Blecker from January to December 1992.  Sala Tr. 117:22–120:18; Bongiorno Tr. 110:24–112:20; TX207.

75.     The BLMIS employees confirmed that the Spiral Notebooks were used for tracking incoming and outgoing checks to customers, including checks relating to PW Transactions.  They confirmed that entries in the Spiral Notebooks corresponded to the PW Transactions on the customer statements, matching the BLMIS accountholder, account number, security name, check amounts, and dates.  They unequivocally stated that an entry in the check out Spiral Notebook reflects a check sent to a customer.  Bongiorno Tr. 53:24–56:5; Sala Tr. 124:24–126:11, 179:7–181:9; Khan Tr. 52:25–53:12.

24

76.     Ms. Bongiorno explained that because the process for printing checks was automated relatively early on, the Spiral Notebooks were mostly used for checks that had to be issued manually. This usually occurred when customers called BLMIS because they had not received PW checks that they had been expecting. In these instances, the employees would verify whether the check in question had been cashed, and if not, arrange to have a new check sent to the customer. The newly-issued check would be listed in the Spiral Notebooks. Bongiorno Tr. 93:8–21; Sala Tr. 271:16–272:11(TX239).

77.     With respect to Mr. Blecker's account, Ms. Bongiorno confirmed that PW Transactions reflected on Mr. Blecker's customer statements were corroborated by corresponding entries in the Spiral Notebooks. The Spiral Notebooks evidence that checks went to Mr. Blecker for the recorded amounts. For example, on July 17, 1991, Mr. Blecker's customer statement reported that a PW check was sent to Mr. Blecker on July 11, 1991 from account 1B00022 in the amount of $3,230.02 related to profits in a deal on Health South securities. As reflected on the customer statement, this transaction was canceled on July 17, 1991. Ms. Bongiorno testified that this series of transactions meant that Mr. Blecker must have called to say he did not receive the PW check. The customer statement then reflects that the check was re-issued to Mr. Blecker in the same amount on July 17, 1991. The re-issued check is reported in the Spiral Notebooks with corresponding information as to the date, accountholder, amount, and security deal. Bongiorno Tr. 90:22-95:5; TX210; TX229.

78.     BLMIS employees further confirmed that PW checks sent to accountholders were reported in "procedure logs" maintained by certain BLMIS employees, including those responsible for entering check information into the AS/400. The procedure logs, maintained yearly, recorded the date of a task, the procedure (e.g., "checks"), and the individual

25

performing the task throughout the day.  BLMIS employees confirmed that the procedure logs were used to track the processes for inputting and printing checks related to PW Transactions into the BLMIS computer systems.  For example, a $3,838.25 PW Transaction dated September 5, 1996, shown on the September 30, 1996 customer statement for account 1B0022, correlated to a description in the BLMIS procedure log of the printing of a PW check on September 5, 1996.  Similarly, the September 30, 1996 customer statement for the account 1B0023 showing a PW Transaction dated September 5, 1996 for $7,231.50, also correlated to the entry on the BLMIS procedure log indicating work on a PW check for September 5, 1996.  Khan Tr. 49:3-50:25; Leung Tr. 113:19–115:23, 117:9–118:19; TX222; TX223; TX224; TX227; TX228.

79.     The testimony of the BLMIS employees confirmed that PW Transactions resulted in checks sent to customers and are therefore properly treated as debits to customer account balances.

### G.     Participating Claimant Aaron Blecker's BLMIS Accounts

80.     Mr. Aaron Blecker, individually and with his wife, Sophie Blecker, held one or more accounts at BLMIS from at least 1978 through December 11, 2008.  Mr. Aaron Blecker is also known as Arthur Blecker.  Sala Tr. 128:12–130:13, 142:8–16; TX210; TX213; *see also* TX209; TX212; PCX-19, Attachment A.

81.     BLMIS account 100214 was opened as early as 1978 and held in the name of Arthur Blecker & Sophie Blecker J/T WROS.  In 1983, BLMIS converted many of its account numbers, including 100214, which became 100215.  In 1992, BLMIS again changed its account numbering scheme, this time from numeric account numbers to alphanumeric account numbers, changing account 100215 to 1B0023.  Both account number changes were noted on the BLMIS Name/Address File Maintenance form included in the customer file for 1B0023.  PW Hr'g Tr.

26

110:3–110:8, 202:14–204:9; Sala Tr. 129:1–17, 131:22–132:13; *see* Bongiorno Tr. 88:23–89:3,

89:19–90:10, 90:22–95:7, 95:14–97:1, 97:13–98:3; TX041; TX091; TX210; TX211; PCX-34.

82.     BLMIS account 100254 was opened in 1986 and held in the name of

Aaron Blecker.  In 1992, when BLMIS changed to alphanumeric account numbers, 100254 was

changed to 1B0022.  The notations on the folder for the customer file and on the Name/Address

File Maintenance form for account 1B0022 confirm that account 100254 was the predecessor

account to 1B0022.  PW Hr'g Tr. 187:12–188:20; 190:20–191:18; Bongiorno Tr. 88:23–90:10,

266:1-16; Sala Tr. 104:8–106:14; TX036; TX037; TX038; TX086; TX204; PCX-24; PCX-31.

83.     As reflected on the BLMIS customer file, account 1B0156 was held in the

name of Aaron Blecker REV TRUST U/A/D 3/15/07.  Account 1B0156 was opened in April

1997 with a reported inter–account transfer of $206,529 from account 1B0022.  The notations on

the Name/Address File Maintenance form for 1B0156 confirm that 1B0156 was the successor

account to 1B0022.  In addition, the back of the customer file folder for account 1B0022 reflects

a notation that the new account number is 1B0156.  Bongiorno Tr. 118:9-119:18; PW Hr'g Tr.

110:17-111:18, 204:25-206:4; TX036; TX038; TX043; TX044; TX045; TX046; TX212.

84.     As reflected on the BLMIS customer file, account 1B0157 was held in the

name of "Arthur Blecker & Sofie Blecker J/T WROS."  Account 1B0157 was opened in April

1997 with a reported inter-account transfer of $389,847 from account 1B0023.  The notations on

the folder for the customer file and on the Name/Address File Maintenance form for account

1B0023 confirm that 1B0157 was the successor account to 1B0023.  Specifically, the label for

the customer folder lists both account numbers 1B0023 and 1B0157 and the Name/Address File

Maintenance form shows 1B0023 being crossed out and 1B0157 being added.  Bongiorno Tr.

27

118:9-120:9, 120:24-121:12; PW Hr'g Tr. 109:20-110:15, 111:20-112:15; 206:5-23; TX040;

TX041; TX042; TX047; TX048; TX049; TX093; TX212; TX213.

85.    Aaron Blecker timely filed three customer claims with the Trustee: claim

number 3907 for BLMIS account 1B0022; claim number 3900 for BLMIS account 1B0156; and

claim number 3906 for BLMIS account 1B0157.  He did not file a claim for BLMIS account

1B0023.  PCX-16; PCX-15; PCX-61.

86.    The Trustee denied Mr. Blecker's customer claims as he did not have net

equity in his accounts under the Net Investment Method.  PCX-15; PCX-16; PCX-17; PCX-20;

PCX-21; PCX-61.

87.    On November 18, 2009, June 8, 2010, and October 22, 2010, Aaron

Blecker filed objections to the Trustee's determination of his customer, claiming that he never

took any withdrawals from his accounts, including those identified with the PW transaction code

and indicated as debits on the customer statements for his accounts.  *See* PCX-19; Resp. to

Trustee's Determination of Claim, ECF Nos. 2383, 3072.

88.    At the Hearing, Mr. Greenblatt testified about the Principal Balance

Calculations for Mr. Blecker's accounts that were used by the Trustee to determine that Mr.

Blecker's accounts had no net equity under SIPA, resulting in the denial of his claims.

89.    As with all BLMIS accounts, Mr. Greenblatt calculated the principal

balance for Mr. Blecker's BLMIS accounts by applying the Net Investment Method.  This

required crediting the total amount of all inflows into the account, and debiting the total amount

of outflows from the account from either April 1, 1981 or the inception of the account.  PW Hr'g

Tr. 186:23–187:11; *see also* PW Hr'g Tr. 170:14–172:7.

90.    Under the Net Investment Method, Mr. Blecker's BLMIS account 1B0022 had a negative balance of $59,634 because it had more withdrawals than deposits. Specifically, the books and records of BLMIS reflected total deposits in the amount of $200,000, and total withdrawals in the amount of $259,634.  The withdrawals reflected on the customer statements were comprised of PW Transactions denoted with a transaction code of "PW," one capital withdrawal identified with a transaction code of "CW," and one inter-account transfer also identified with a "CW" transaction code.  PW Hr'g Tr. 193:2–8; *see* Bongiorno Tr. 100:24–103:24; TX086; TX236.

91.    The PW, CW, and CA transactions included in the Principal Balance Calculation for account 1B0022 were reflected on the customer statements, as well as the relevant PMTs and PMRs for this time period.  Certain deposits into and withdrawals from the account 1B0022 were further reflected in the Spiral Notebooks maintained by BLMIS.  PW Hr'g Tr. 187:12–198:17; TX086, TX087, TX088, TX089, TX090.

92.    Under the Net Investment Method, Mr. Blecker's BLMIS account 1B0023 (for which no claim was filed) had a negative balance of $466,527 because it had more withdrawals than deposits.  PW Hr'g Tr. 202:14–204:21; TX091.

93.    Under the Net Investment Method, Mr. Blecker's BLMIS account 1B0156 had a balance of $0 because it did not receive any deposits of principal during the history of the account.  Account 1B0156 purportedly received an inter-account transfer comprised of the remaining balance of account 1B0022.  However, at the time of that inter-account transfer, 1B0022 had a balance of negative $59,634 and therefore could not transfer any principal. Account 1B0156 also received additional inter-account transfers from account 1B0157, but account 1B0157 also had a negative principal balance at the time of the attempted transfer.

29

1B0156 did not have any PW Transactions in the account history.  PW Hr'g Tr. 204:22–206:4;

TX092.

94.    Under the Net Investment Method, Mr. Blecker's BLMIS account 1B0157

was $0 because it did not receive any deposits of principal during the history of the account.

Account 1B0157 purportedly received an inter-account transfer of $389,847 from account

1B0023, but that account had a balance of negative $466,527 at the time of the inter-account

transfer.  Therefore, 1B0023 could not transfer any principal to 1B0157.  1B0157 did not have

any PW Transactions in the account history.  PW Hr'g Tr. 206:5–23; TX093.

95.    The principal balance calculation for each of Mr. Blecker's BLMIS

accounts is consistent with the Net Investment Method and the unambiguous testimony from Ms.

Collura, Mr. Greenblatt, and the BLMIS employees that PW Transactions were withdrawals

from customer accounts and were correctly treated as reductions when calculating net equity.

## II.    BLECKER OBJECTIONS TO CLAIMS DETERMINATIONS

96.    Mr. Blecker has posited multiple objections to the Trustee's determination

of his customer claims relevant to the PW Transactions.  The Court finds that none of Mr.

Blecker's objections are supported by the evidence and are accordingly overruled.

### A.    Objection: PW Checks Were Not Sent to Customers

97.    Mr. Blecker has asserted that BLMIS did not send PW checks to

accountholders.  PCX-19, November 7, 2009 Notarized Handwritten Letter to Honorable Burton

R. Lifland from Arthur Aaron Blecker.  This contention is contradicted by the evidence

presented at the hearing.

98.    BLMIS and third-party bank records analyzed by Ms. Collura show PW

that checks were sent to and cashed by BLMIS customers during the Ten-Year Period.  Ms.

30

Collura was able to trace 99% of the PW Transactions for which documentation was available in the Ten-Year Period to bank accounts held by BLMIS accountholders.  PW Hr'g Tr. 104:11–24.

99.    Participating Claimants produced a check dated December 17, 1991 from BLMIS made payable to Participating Claimants "Gunther Unflat & Margaret Unflat" bearing the notation "PW CHECK MARK IV."  This evidence demonstrates that PW checks were issued, sent to, and received by accountholders, even outside of the Ten-Year Period for which the Trustee has cancelled checks.  PCX-48.

100.    The admissions by counsel for the Participating Claimants at the hearing further demonstrate the futility of this argument. Two Participating Claimants, Ben Heller and Barbara Engel, were withdrawn from the PW litigation proceeding because they admitted that they received the profit withdrawals checks identified on their BLMIS customer statements.  PW Hr'g Tr. 20:19–25.

101.    Employee testimony also confirms that PW checks were sent to customers.  Indeed, BLMIS employee Jo Ann Sala testified that if an account was marked "send," the check would be made payable to, and sent to, the customer whose name was on the account.  Sala Tr. 2:9–13:8, 31:18–21, 39:6–45:18, 53:11–56:3, 82:6–84:3; Jackson Tr. 44:18–45:9; TX190; TX195.

102.    In particular, the employees' testimony about the check-out notebooks confirm that PW Transactions were checks sent to customers.  This notebook identified PW checks to be sent to customers including the amount of the check and the trading from which it resulted.  Bongiorno Tr. 43:9–44:23, 51:24– 52:8; Sala Tr. 194:24–195:25; TX229.

103.    BLMIS employees testified that each day the check-out notebook would be given to the data entry operators who would punch and print the checks and mailing labels.

31

By no later than 1998, profit withdrawal checks were generated by computer, and for the most

part, were no longer noted in the check-out notebook.  Sala Tr. 163:13-164:9.

104.    Once the check generation process was computerized, BLMIS employees

explained that customer names were auto-populated from same database that table that populated

the customer statements.  The data operators confirmed, by identifying screen shots of menus

they utilized in the computer system, how PW checks were generated and printed.  Therefore,

checks relating to customer accounts could not be printed with a name other than the customer

name in the payee line.  Bongiorno Tr. 139:5-140:11; Sala Tr. 154:15-155:8; Jackson Tr. 83:20–

84:20, 130:24-131:13; Leung Tr. 68:23–69:1, 69:4–71:6, 72:22–73:18; Khan Tr. 45:13-48:18,

54:10–55:4; TX220, TX221.

105.    Once checks were printed, they would be handed to Ms. Bongiorno or

others, for signature by Madoff.  The signed checks then would be taken to the mailroom where

they would be sorted, folded, placed in envelopes, and mailed.  Bongiorno Tr. 44:15–45:25;

Jackson Tr. 110:10–18.

106.    At the end of each month, Ms. Jackson testified that she would reconcile

copies of checks issued against the check log and bank statements.  The reconciliation was

performed a second time by Mr. Madoff's spouse or another BLMIS employee.  Jackson Tr.

63:5–64:19, 117:5–118:21.

107.    The check processes described by the BLMIS employees were consistent

with the House 17 Manual.  On pages 32 and 33 of TX080, the House 17 Manual has a section

entitled "Checks."  It refers to "check codes," and lists the PW, CW and CA transaction codes.  It

states that PW and CW checks are punched as debits, and CA checks are punched as credits.  It

refers to checks with these transaction codes as "checks coming in" and "checks going out."  The

House 17 Manual refers to PW Transactions as checks going out to customers.  PW Hr'g Tr. 178:18–179:22; TX080.

108.    Even Mr. Madoff, on whose testimony Mr. Blecker relies, confirmed that checks relating to PW Transactions would have been sent to the Bleckers.  Madoff Tr. 34:1–14.

109.    Testimony by the BLMIS employees and Ms. Collura, the admissions of and evidence offered by counsel for the Participating Claimants, and the BLMIS books and records all support the finding that PW checks were issued to accountholders, including Mr. Blecker.

### B.    Objection: No Withdrawal Request in Writing

110.    Mr. Blecker contends that BLMIS required withdrawal requests to be in writing.  On that basis, he further argues that BLMIS did not send him any checks because there was no written request for PW checks or other withdrawals in his BLMIS customer file. Participating Claimants' Mem. of Law in Opp'n. to Trustee's Mot. Seeking Affirmance of His Treatment of Profit Withdrawals 6, ECF No. 14161 (Sept. 23, 2016).  This assertion is not supported by the evidence.

111.    BLMIS employees explained that at the time an account was opened, it was set up to either automatically send the customer the profits at the conclusion of each deal or automatically reinvest those profits.  This decision was made verbally between the customer and Mr. Madoff when the account was opened; there was no form for the customer to fill out or any writing from the customer required.  The decision was then memorialized in the customer's account file.  The notation of "R" on the customer's Name/Address File Maintenance form meant "reinvest" while "S" stood for "send."  If an account was marked "S," PW checks would be sent automatically and it would be unnecessary for the customer to write to request the profits.

33

Only if the customer wished to change his election from "send" to "reinvest" would written

confirmation by the customer be required by BLMIS.  In that event, upon receipt of the

confirmation letter, BLMIS employees would update the Name/Address File Maintenance form

and enter the information into the BLMIS computer system—the "S" was then changed to "R"—

or vice versa.  The customer, however, would have to request a capital withdrawal (*i.e.*, a CW

transaction) in writing.  Bongiorno Tr. 33:16–40:04, 63:3–65:17; 193:2–7; Sala Tr. 143:19–

149:4, 149:7–151:17, 212:9–213:21, 214:22–216:5; TX191; TX214; TX215; TX231; TX232.

112.    BLMIS employees confirmed that the BLMIS books and records showed

Mr. Blecker's accounts 1B0022 and 1B0023 were designated as "Send" accounts, denoted by the

handwritten "S" on the Name/Address File Maintenance form in his customer files.  Bongiorno

Tr. 86:22–88:22; Sala Tr. 129:7–131:18; TX204; TX210; *see* Jackson Tr. 77:6–79:20; TX199.

113.    Because his accounts were "Send" accounts, BLMIS employees verified

that PW checks were automatically issued to Mr. Blecker, the accountholder, without the need

for him to make individual, written requests to receive those checks.  Bongiorno Tr. 86:22–

88:17, 107:9–108:21; TX237; *see also* Jackson Tr. 82:21–83:14; TX219.

C.    **Objection: Purchase of New Securities**

114.    Mr. Blecker has argued that the PW Transactions listed on his customer

statements were in fact checks sent by BLMIS and made payable to various corporations for

purchase of stock in the security listed in the transaction description.  PCX-19.

115.    This argument cannot be reconciled with BLMIS employee testimony

regarding how PW checks were generated by BLMIS—specifically, that the name on a check

was auto-populated by the computer system at BLMIS and matched the accountholder name on

file.  Sala Tr. 53:21–54:8, 58:9–14, 82:6–83:5, 95:19-97:24, 156:20–158:18, 162:4–163:7,

34

182:18–185:5, 189:3–190:16; Bongiorno Tr. 42:4-43:22, 70:23-71:11, 128:6-140:22; Leung Tr.

46:22-47:9, 49:4-51:22, 68:1-22, 72:22-73:18, 77:18-79:15, 84:5-18, 87:4-89:8, 94:18-97:17;

Khan Tr. 18:13-19:23, 45:13-48:13, 48:19-53:12, 54:10-55:4, 65:22-66:9, 72:1-75:17; TX191;

TX192; TX200-TX201; TX212; TX213; TX217; TX221-TX225.

116.    BLMIS employees further confirmed that the checks were sent to the

accountholder and that BLMIS did not send checks directly to companies for the purchase of

new securities.  Ms. Sala testified:

> Q.    Would-to your knowledge would a check relating to a
> profit withdrawal transaction, like we see for G. Alpern, ever be
> sent to Home Depot?
> A.    No.
>
> ***
>
> Q.    To your knowledge did each of these customer accounts
> that are listed receive profits relating to Home Depot?
> A.    Yes.
> Q.    And to your knowledge did each of these customers receive
> checks in the amounts that are listed next to their name, that related
> to purported securities trading in Home Depot?
> A.    Yes.

Sala Tr. 41:24–43.8.

117.    Finally, in order to determine whether PW Transactions were used to

purchase stock holdings directly from corporations, Mr. Greenblatt analyzed the purported

holdings listed on the BLMIS customer statements.  For each PW Transaction with a stock name

listed, Mr. Greenblatt analyzed securities held in the BLMIS account for the month in which the

PW Transaction occurred as well as the subsequent month.  Mr. Greenblatt's analysis confirmed

that in no instance did new securities with the same stock name come into the BLMIS account

after PW Transactions.  *See supra* ¶¶ 50-52; PW Hr'g Tr. 185:8–186:22; *see, e.g.*, TX081; TX082; TX083.

118.    The testimony of the BLMIS employees and Mr. Greenblatt support the finding that the PW Transactions reflected checks sent to BLMIS customers.  There is no evidence in the record to support any finding that BLMIS sent checks to companies for the purchase of new securities.

### D.    Objection: No Withdrawals From BLMIS Accounts

119.    Mr. Blecker contends that he never took any withdrawals from his account.  PCX-19.  Mr. Blecker, however, has provided no evidence other than these uncorroborated self-serving statements to support this contention.

120.    In response to the Trustee's claims determinations, Mr. Blecker submitted an affidavit acknowledging that he did find customer statements from 1995 for one account, which "did note entries for the checks in question" but repeatedly states that he never took a withdrawal from the accounts at BLMIS during the lifetime of his investment.  Other than these statements, there is no independent documentation—bank records, tax returns, or financial statements—that corroborates Mr. Blecker's contention that he did not receive withdrawals from BLMIS.  PCX-19 ¶¶ 1, 3, 4, 4A, 4B.

121.    Mr. Blecker's deposition testimony likewise mirrors his affidavit.  He states that he reviewed his BLMIS customer statements and repeats that he did not receive withdrawals from BLMIS.  Again, Mr. Blecker offers no independent documentation—bank records, tax returns, or financial statements—to corroborate this contention.  Blecker Tr. 10:12–18; 13:9–17; 14:4–12.

122.     To supplement his testimony, Mr. Blecker offered the testimony of his

son, Robert Blecker.  However, Robert Blecker's testimony supports the Trustee's treatment of

PW Transactions as debits to Mr. Blecker's accounts and demonstrates that Mr. Blecker

contemporaneously acknowledged the debits to his account for profit withdrawals. PW Hr'g Tr.

26:9–57:17.

123.     Robert Blecker testified that his father carefully reviewed his BLMIS

customer statements.  PW Hr'g Tr. 32:25–33:14, 48:14–16.

124.     Between 1981 and 1997, Mr. Blecker received customer statements

reflecting profit withdrawals from his account.  Robert Blecker stated that his father's mental

functions during this period were "still perfectly sharp" and he was "sharp as a tack."  PW Hr'g

Tr. 31:23–32:17, 34:3–7.

125.     Mr. Blecker produced BLMIS customer statements and trade

confirmations in this proceeding.  Robert Blecker confirmed that the February 1995 customer

statement for BLMIS account 1B0022 produced by his father reflected notations in his father's

handwriting, indicating his father's methodical review of the transactions.  The February 1995

customer statement had handwritten notations acknowledging the transactions, including the PW

Transaction in the "AMOUNT DEBITED TO YOUR ACCOUNT" column, and calculation of

the account balance.  PW Hr'g Tr. 56:16–57:17; TX082.

126.     The Court finds that Mr. Blecker's testimony that he never took any

withdrawals from his BLMIS accounts is not credible because it is directly contradicted by

customer statements produced by him with his handwriting and checkmarks acknowledging the

PW Transactions.

127.    The Trustee also put forth convincing evidence contradicting Mr. Blecker's assertion that he never took any withdrawals from his BLMIS accounts.  Mr. Blecker testified at his deposition that "[Madoff] kept increasing [his] investment, showed a profit return on [his] investment and that's why it kept accumulating."  Blecker Dep. Tr. 6:20–21.  However, using BLMIS records to create a line graph, Mr. Greenblatt examined the activity in accounts 1B0022 and 1B0023 and demonstrated that Mr. Blecker's balances did not accumulate over time.  TXDEM005; TXDEM006.

128.    BLMIS account 1B0022 had an initial balance in 1986 of $200,000.  In 1997, Mr. Blecker closed this account and transferred $206,528.75 to 1B0156.  This means that over an eleven-year period, BLMIS account 1B0022 had approximately $6,500 in gains.  Mr. Greenblatt explained that the reason the account balance did not grow more in that eleven-year period is because the purported gains were being withdrawn from this account in the form of PW Transactions.  PW Hr'g Tr. 206:24–210:10; TXDEM005.

129.    Mr. Greenblatt performed a similar analysis for BLMIS account 1B0023.  This account was given an initial principal credit of $42,350, had an inter-account transfer of $35,000, and had three $100,000 deposits, bringing the total inflows into the account to $377,350.  In 1997, Mr. Blecker closed this account and transferred $389,847 to 1B0157.  This means that over a sixteen-year period, BLMIS account 1B0023 had approximately $12,000 in gains.  Mr. Greenblatt explained that the reason the account balance did not grow more in that sixteen-year period is because the purported gains were being withdrawn from this account in the form of PW Transactions.  PW Hr'g Tr. 210:11–211:16; TXDEM006.  PW Hr'g 206:5–23; TX091; TX093; TXDEM006.

38

130.    The testimony of Mr. Greenblatt and the BLMIS books and records support the finding that the PW Transactions were withdrawals that debited Mr. Blecker's BLMIS accounts as reported on Mr. Blecker's customer statements.

## III.   EVIDENTIARY RULINGS

### A.    Stipulations of the Parties

131.    Before and after the Hearing, the parties reached various stipulations on evidence that are described herein.

132.    Under the Stipulations Regarding Designated Deposition Testimony and Admissibility of Certain Documents, as so ordered by this Court on January 17, 2018, the designated portions of the transcripts of Mr. Blecker, Ms. Jackson, Ms. Khan, Ms. Leung, and Ms. Sala were admitted into evidence without objection.  Stipulations Regarding Designated Dep. Testimony and Admissibility of Certain Docs. ("Deposition Designation Order") ¶ 1, ECF No. 17136.

133.    Pursuant to the Court's ruling during the Hearing, the Trustee's objections to the designated portions of the deposition transcript of Mr. Madoff at 43:07–44:14, 45:05–46:25, and 62:12–64:15 were sustained and those portions were not admitted into evidence.  The remainder of the designated portions of the deposition transcript of Mr. Madoff identified in the Deposition Designation Order were admitted into evidence without objection.  PW Hr'g Tr. 17:04–17:14; Deposition Designation Order ¶¶ 3, 5.

134.    Pursuant to the Court's ruling during the Hearing, the Trustee's objections to the designated portions of the deposition transcript of Ms. Bongiorno at 205:2–12 and 205:15–207:8 were sustained and those portions were not admitted into evidence.  The remainder of the designated portions of the deposition transcript of Ms. Bongiorno identified in the Deposition

Designation Order were admitted into evidence without objection.  PW Hr'g Tr. 16:6–17:3;
Deposition Designation Order ¶¶ 3, 5.

135.    As directed by the Court at the Hearing, on January 31, 2018, the parties
submitted the Stipulation Regarding Designated Deposition Testimony and Admissibility of
Certain Documents ("Stipulation on Admissibility"), ECF No. 17207.  This stipulation identified
the Court's rulings on deposition testimony as described in the preceding paragraphs and
identified the exhibits that each party proposed moving into evidence.

136.    The parties stipulated to the admission of exhibits PCX-15; PCX-16;
PCX-17; PCX-20; PCX-21; and PCX-61.  Accordingly, these exhibits are admitted into
evidence.

137.    The Trustee's exhibits to which Participating Claimants did not stipulate
on admissibility are set forth in Attachment A to the Stipulation on Admissibility.  *See*
Stipulation on Admissibility, Attachment A, ECF No. 17207.  The exhibits fall into the following
categories: (a) bank records for BLMIS bank accounts and BLMIS customers' bank accounts;
(b) BLMIS books and records, specifically customer statements, customer files, BLMIS
customer statements, PMTs, PMRs, and Debit Memos, House 17 Manual, BLMIS procedure
logs, BLMIS computer system screenshots, and BLMIS Spiral Notebooks; (c) customer-
produced records; (d) Mr. Blecker's customer claims and Trustee's determination letters for Mr.
Blecker's BLMIS accounts; (e) the principal balance calculations prepared by Mr. Greenblatt for
Mr. Blecker's accounts; and (f) charts prepared by Mr. Greenblatt relevant to Mr. Blecker's
accounts.

138.     Participating Claimants object to the admissibility of these documents on various grounds set forth in the objection column to Attachment A to the Stipulation on Admissibility and in various motions *in limine* filed before trial.

139.     The Court has reviewed the objections of Participating Claimants and overrules them as set forth below.  The Trustee's exhibits as listed on Attachment A to the Stipulation on Admissibility, ECF No. 17207, are hereby admitted into evidence.

**B.     Bank Records**

140.     The Trustee submitted bank records for BLMIS bank accounts with JPMorgan and certain BLMIS customers' bank accounts as exhibits: TX002, TX003, TX007, TX008, TX011, TX013, TX035, TX051, TX192, TX196, and TX219.  Participating Claimants do not stipulate to the admissibility of these exhibits into evidence but offer no objection.

141.     Ms. Collura testified that she reviewed the bank records for the BLMIS accounts produced by JPMorgan as well as those JPMorgan bank records found at BLMIS, found that the documents were substantially similar in form and substance, and that she typically relies on such documents in her work as a forensic accounting.  PW Hr'g Tr. 72:7–76:10.

142.     As to bank records from BLMIS customers' bank accounts, Ms. Collura testified that these were documents produced to the Trustee by the BLMIS customers and considered by her in conducting her analysis.  PW Hr'g Tr. 70:2–71:17, 79:12–80:14.

143.     Bank records, including checks, deposit slips, and account statements are self-authenticating as commercial paper under Federal Rule of Evidence 902(9).  Bank records can also be authenticated by their distinctive characteristics, including appearance, contents, substance, and internal patterns.  Accordingly, based on the foregoing testimony, a review of the

bank records, and lack of objection, exhibits identified at TX002, TX003, TX007, TX008,

TX011, TX013, TX035, TX051, TX192, TX196, and TX219 are admitted into evidence.

C.    **BLMIS Books and Records: Customer Statements, Customer Files, PMRs, PMTs, Debit Memos, House 17 Manual, Procedure Log, and Computer Screenshots**

1.    **Identification of Exhibits and Related Objections**

144.    The Trustee moved to admit into evidence BLMIS customer statements at

exhibits: TX001, TX004, TX005, TX006, TX009, TX010, TX012, TX022, TX032, TX033,

TX081, TX082, TX083, TX097, TX193, TX194, TX195, TX197, TX200, TX201, TX205,

TX206, TX209, TX211, TX215, TX216, TX220, TX226, TX227, TX228, TX233, TX235,

TX236, TX237, TX238, PCX-24, PCX-31, and PCX-34.  Participating Claimants object to

admission of these exhibits (including the latter three exhibits marked by them) into evidence on

the grounds of authenticity, lack of foundation, and hearsay.  The Participating Claimants assert

the additional objection of lack of relevance as to statements of customers other than the

Bleckers.

145.    The Trustee moved to admit into evidence BLMIS customer files at

exhibits:  TX019, TX020, TX036, TX037, TX038, TX040, TX041, TX042, TX043, TX044,

TX045, TX046, TX047, TX048, TX049, TX191, TX198, TX199, TX204, TX210, TX212,

TX213, TX214, TX225, TX231, and TX232.  Participating Claimants object to admission of

these exhibits into evidence on the grounds of authenticity, lack of foundation, relevance, and

hearsay.

146.    The Trustee moved to admit into evidence BLMIS PMRs and PMTs at

exhibits:  TX087, TX088, TX202, TX203, TX207, TX208, TX230, and TX234.  Participating

Claimants object to admission of these exhibits into evidence on the grounds of authenticity, lack of foundation, relevance, and hearsay.

147.    The Trustee moved to admit into evidence BLMIS Debit Memos with supporting documentation at exhibits: TX230 (containing a one-page Debit Memo and fifteen pages of trade confirmations) and TX234 (containing a one-page Debit Memo and fifteen pages of trade confirmations).  As to the first page of TX230 and TX234, Participating Claimants do not stipulate to admissibility but offer no objection.  As to pages 2-16 of TX230 and TX234, the Participating Claimants object on the grounds of authenticity, lack of foundation, relevance, and hearsay.  The Trustee withdrew pages 2–16 of TX230 and TX234 and moved to admit only the Debit Memos, which are reflected on page 1 of TX230 and TX234, to which Participating Claimants offer no objection.

148.    The Trustee moved to admit into evidence the BLMIS House 17 Manual at exhibits: TX080, TX217, and TX218. Participating Claimants object to admission of these exhibits into evidence on the grounds of lack of authentication, lack of foundation, and hearsay. The Trustee withdraws TX218.

149.    The Trustee moved to admit into evidence BLMIS Spiral Notebooks, procedure logs, and computer screenshots at exhibits: TX089, TX090, TX221, TX222, TX223, and TX224.  Participating Claimants object to admission of these exhibits into evidence on the grounds of lack of authentication, lack of foundation, and hearsay.  With respect to TX090, Participating Claimants assert the additional objection that the exhibit was not introduced at trial or any deposition.  As to TX221, Participating Claimants assert the additional objection that the exhibit is not relevant.

2.    **Evidentiary Rulings on the BLMIS Books and Records**

150.    The testimony of the BLMIS employees and the Trustee's professionals establish that the BLMIS books and records are authentic, relevant, and not subject to any exclusionary rules such as hearsay.  Accordingly, the Trustee's exhibits consisting of BLMIS books and records are admitted into evidence.

**(a)    Authentication**

151.    In a liquidation, a trustee inherits the books and records of the debtor and thus needs to establish only a *prima facie* case that the documents are what he claims them to be. He can meet this burden by offering circumstantial evidence of authenticity of the underlying documents through the testimony of a witness with knowledge of the documents.  *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1267 (11th Cir. 2015) (noting that where trustee established where records were found and that records substantially matched third-party records, the bankruptcy court could reasonably conclude that the business records were authentic) (citing Fed. R. Evid. 901(a)); *see United States v. Caldwell*, 776 F.2d 989, 1002–03 (11th Cir. 1985).

152.    Under the Deposition Designation Order, ECF No. 17136, Participating Claimants stipulated that the exhibits, where applicable, were the books and records of the Debtor, rendering their objection as to authenticity moot.  *See* Deposition Designation Order at ¶ 11, ECF No. 17136.  In any event, the Court finds that the BLMIS books and records offered into evidence are authentic and overrules Participating Claimants' objection.

153.    BLMIS employees authenticated the BLMIS books and records and testified that the BLMIS books and records were contemporaneously created and maintained as part of BLMIS's regular business activities, as set forth below.

44

154.    BLMIS employees explained that customer statements were issued by
BLMIS and communicated cash transaction and other information to customers.  They explained
that the customer statements were generated in the ordinary course of BLMIS's business, and
detailed how they were generated and mailed to customers each month.  They also confirmed
that the customer statements reflected accurate cash and principal transactions between BLMIS
and its customers.  Bongiorno Tr. 142:11-144:4; Jackson Tr. 47:23-49:24; Khan Tr. 15:16–22;
Leung Tr. 58:24–59:12, 93:15–94:2.

155.    BLMIS employees identified the BLMIS customer files and explained that
those files were maintained in the ordinary course of BLMIS's business operations, detailed how
those files were maintained, and how the information in the files, including notations on the
folder covers, was used in managing the business of BLMIS.  Specifically, the customer files,
comprised of the folder and the documents contained therein, tracked the account number,
customer name and address information, customer preferences as to receiving or reinvesting
profits, how the customer wished to receive funds from BLMIS, and maintained the BLMIS
account agreements signed by the account holder.  Bongiorno Tr. 61:1–71:1; Jackson Tr. 66:8–
69:1; Sala Tr. 36:9–37:8, 61:4–63:5.

156.    BLMIS employees identified PMTs and PMRs and explained that PMTs
and PMRs were maintained as part of the BLMIS books and records in the regular course of
business at BLMIS.  BLMIS employees further explained that these documents are reports
generated by the AS/400 and confirmed that the information on these reports correlated to the
customer statements.  PMTs provide monthly transaction-level detail for each customer account
including the date and amount for CA, CW, and PW Transactions, while PMRs provide
summary-level information on a monthly basis for CA, CW, and PW Transactions.  The PMTs

45

and PMRs corroborate and confirm the cash and principal transactions obtained from the

customer statement data used by the Trustee's experts in performing the Principal Balance

Calculation for each accountholder, including Mr. Blecker.  Leung Tr. 118:21–120:13;

Bongiorno Tr. 110:24–116:14, 116:20–118:4; Sala Tr. 117:22–120:18; Jackson Tr. 86:19–87:5;

PW Hr'g Tr. 194:10–196:23; TX087; TX088; TX202; TX203; TX207; TX208.

157.    BLMIS employees identified the Spiral Notebooks found at BLMIS

referred to as the "check-in" and "check-out" notebooks as those that were used in the ordinary

course of BLMIS's business to track transaction information related almost exclusively to checks

received and checks disbursed, *i.e.*, customer deposits to and withdrawals from BLMIS.  The

check-out Spiral Notebooks detail checks sent to customers and the check-in Spiral Notebooks

detail checks received from customers.  The employees also confirmed that entries in the Spiral

Notebooks correspond to the PW Transactions on the customer statements, matching BLMIS

account holder, BLMIS account number, security name, check amounts, and dates.  Contrary to

Participating Claimants' objection, Mr. Greenblatt did in fact testify at the Hearing to his use of

the Spiral Notebooks, particularly TX090, for corroboration of the customer statement data used

to compile the chronological listings upon which the Principal Balance Calculation was based.

Bongiorno Tr. 43:9–22, 47:11–48:13; 53:24–56:5; 130:24–136:18; Sala Tr. 121:24–126:11,

161:13–164:9, 179:7–12, 179:24–181:9, 181:13–183:19; Jackson Tr. 51:21–53:2; PW Hr'g Tr.

196:24–200:9; TX089; TX090; TX190; TX229.

158.    BLMIS employees testified that the BLMIS House 17 Manual detailed the

processes and protocols followed by former BLMIS employees for completing certain tasks,

including generating customer checks and updating customer information in the BLMIS AS/400

computer system.  Bongiorno Tr. 128:6–130:19; Khan Tr. 26:19–27:22; TX080; TX217.

46

159.    BLMIS employees reviewed computer screen printouts from the BLMIS

computer system and confirmed that the screenshots accurately represented the computer screens

they used on a daily basis to generate checks to customers, to update customer account

information, and to create new accounts. They identified the BLMIS procedure logs and testified

that the procedure logs were maintained in the ordinary course of BLMIS's business operations.

They explained how the tasks detailed on the procedure logs, including the generation of BLMIS

checks and updates to customer information, were performed on the BLMIS computer system.

Leung Tr. 43:14–46:3, 51:25–56:4, Khan Tr. 45:13–48:18, 49:3–52:2.

160.    A review of each category of BLMIS books and records further

demonstrates that they are exactly what they purport to be—the documents maintained by

BLMIS in the ordinary course of its business to track, *inter alia*, the cash transactions within

customer accounts at BLMIS.  The admissibility of BLMIS books and records does not require

the testimony of the document's author to demonstrate its authenticity.  *U.S. Bank Nat'l Ass'n v.

PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 144 (S.D.N.Y. 2015) ("As for authorship, it is

irrelevant for purposes of Rule 803(6) that the face of the [document] does not identify the

document's author.") (citations omitted) (internal quotation marks omitted)).  Rather,

authentication can be established based upon testimony from a competent witness as to the

knowledge of the document's authenticity or the "[a]ppearance, contents, substance, internal patterns,

or other distinctive characteristics, taken in conjunction with circumstances." *Arista Records LLC v.

Lime Grp. LLC*, 715 F. Supp. 2d 481, 503 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 901(b)(4)); *see

also Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003).

161.    Based on the foregoing, the requirements of authentication and foundation

as to BLMIS books and records have been met.  *See U.S. Info. Sys., Inc.*, No. 00 Civ. 4763 RMB

JCF, 2006 WL 2136249, at *5 (S.D.N.Y. Aug. 1, 2006) ("If in the court's judgment it seems

reasonably probable that the evidence is what it purports to be, the command of Rule 901(a) is

satisfied . . . ." (quoting *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001))); *Phoenix*

*Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995) (finding evidentiary foundation met where

testifying witness was familiar with the documents, and proffered testimony that the record was

kept in the course of business activity and it was regular practice to maintain that record).

### (b)    Relevance

162.    The "standard of relevance established by the Federal Rules of Evidence is

not high." *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985) (citation

omitted); *see also United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008) (calling the

relevance threshold "very low").  Under Rule 401, "[e]vidence is relevant when 'it has any

tendency to make a [material] fact more or less probable than it would be without the evidence.'"

*United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012), as amended (Sept. 28, 2012) (footnote

omitted) (quoting Fed. R. Evid. 401). "A material fact is one that would affect the outcome of the

suit under the governing law." *Arlio v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007) (quoting *Beth Isr.*

*Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 579 (2d Cir. 2006)).

163.    The purpose of a SIPA proceeding is to determine the net equity

obligations that are ascertainable from the debtor's books and records.  *Net Equity Decision*, 654

F.3d at 237 (quoting SIPA § 78fff-2(b)(2)).  As stipulated to by Participating Claimants, and as

established by the testimony, the BLMIS documents offered by the Trustee are the debtor's

books and records.  Plainly, these documents are relevant to this proceeding.

164.    More specifically, BLMIS books and records are relevant to and

probative of the Trustee's determination and treatment of PW transactions as debits to customer

accounts.  The books and records were used by the Trustee's experts to reach their conclusions

as to the reliability of the records themselves and to calculate the principal balance of each

BLMIS account, including Mr. Blecker's accounts.  These books and records were also used by

BLMIS employees in their daily record-keeping to track cash transactions.  These are the records

that the Trustee is required by SIPA to review, analyze, and use to fulfill his statutory

obligations.  Accordingly, the Court finds that these records are relevant.

### (c)    Hearsay

165.    Participating Claimants lodged hearsay objections to the admission of the

BLMIS records by the Trustee, including BLMIS customer statements and customer files.  The

Court notes, however, that Participating Claimants themselves sought to admit certain of these

same types of documents into evidence.  *See* Stipulation on Admissibility, Attachment B

(seeking to move in PX-49 (customer statement) and PX-50 (excerpts from customer files)).  The

Court further notes that the BLMIS customer statements are the only support Mr. Blecker has to

establish his deposits with BLMIS.  These facts diminish the validity of these hearsay objections.

166.    In any event, the Trustee has amply met his burden to show that the

BLMIS books and records fall within at least one or more hearsay exceptions.  In addition to

establishing authenticity and relevance, the foregoing employee testimony establishes that the

BLMIS books and records are business records of the debtor under Fed. R. Evid. 803(6); meet

the level of trustworthiness required by the residual exception under Fed. R. Evid. 807(a); and

are ancient documents under Fed. R. Evid. 901(b)(8) and 803(16); or any combination of the

above.

167.    Records made and kept in the ordinary course of a business are admissible

as business records pursuant to Fed. R. Evid. 803(6) if: "(1) the statements were recorded at or

near the time of the purported transaction; (2) the record was made by or from information communicated by an individual with personal knowledge; and (3) the record was made in the regular practice of business activity." *United States v. Manshul Constr. Corp.*, No. 93-cv-0308, 1996 WL 267945, at \*5 (S.D.N.Y. May 20, 1996). Business records can include internal company memoranda, corporate documents such as demands for withdrawal liabilities, and handwritten notes. *In re Blech Secs. Litig.*, 94-cv-7696, 2003 WL 1610775, at \*5 (S.D.N.Y. Mar. 26, 2003); *The Ret. Plan of the Unite Here Nat'l Ret. Fund v. Kombassan Holding, A.S.*, 629 F.3d 282, 289-90 (2d Cir. 2010); *United States v. Kaiser*, 609 F.3d 556, 574-76 (2d Cir. 2010). The requirements of Rule 803(6) "ensure that documents were not created for 'personal purpose[s] . . . or in anticipation of any litigation' so that the creator of the document 'had no motive to falsify the record in question.'" *Kaiser*, 609 F.3d at 574 (citing *United States v. Freidin*, 849 F.2d 716, 719 (2d Cir. 1988)).

168.    To be admissible as business records, it is not necessary to identify exactly when each document was created or who the author of the records was. *United States v. Ford*, 435 F.3d 204, 215 (2d Cir. 2006); *JPMorgan Chase Bank, N.A. v. Yuen*, No. 11-cv-9192, 2013 WL 2473013, at \*6 (S.D.N.Y. June 3, 2013) (citing *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000)). Instead, documents are admissible under the business records exception if they are "'integrated' into the testifying entity's records 'and relied upon in its day to day operations.'" *JPMorgan Chase Bank, N.A. v. Yuen*, 2013 WL 2473013, at \*6 (citing *United States v. Jakobetz*, 955 F.2d 786, 801 (2d Cir. 1992)). That is, the documents are admissible so long as a custodian or other qualified witness testifies that the document was kept in the course of a regularly conducted business activity and it was the regular practice of that business activity to make the record. *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003).

50

169.    Here, the testimony of the BLMIS employees established that the BLMIS

books and records were created in the ordinary course of BLMIS's business operations, detailed

how those files were maintained, and explained how the information in the documents was used

in managing the business of BLMIS.  *See supra* Section I(F), Section II, and ¶¶ 153–159.

Accordingly, the BLMIS books and records are business records under Fed. R. Evid. 803(6).

170.    In addition, many of the records the Trustee relies on were created more

than 20 years ago and therefore fall within the exception to the rule against hearsay as ancient

documents under Fed. R. Evid. 901(b)(8) and 803(16).  A document is admissible as an ancient

documents where it:  "(A) is in a condition that creates no suspicion about its authenticity; (B)

was in a place where, if authentic, it would likely be; and (C) is at least 20 years old when

offered." Fed. R. Evid. 901(b)(8); *see also United States v. Portrait of Wally*, 663 F. Supp. 2d

232, 254 (S.D.N.Y. 2009).  Ancient documents authenticated under Fed. R. Evid. 901(b)(8) are

presumptively excluded from the rule against hearsay pursuant to Fed. R. Evid. 803(16).  *See*

*e.g.*, *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary*

*Dance, Inc.*, 380 F.3d 624, 643 (2d Cir. 2004); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir.

1990).

171.    The BLMIS employee testimony and the documents themselves establish

that the virtually all of the BLMIS books and records offered as exhibits by the Trustee are older

than twenty years as of the date of the Hearing.  For the reasons discussed above, there is no

suspicion regarding the authenticity of the BLMIS records.  And the employees have testified

that the records were maintained at BLMIS, the place where one would expect to find such

records.  Accordingly, the documents are also admissible as ancient documents under Fed. R.

Evid. 901(b)(8) and 803(16).

172.    Finally, the BLMIS books and records are also admissible under the

residual exception.  Fed. R.  Evid. 807(a).  A hearsay statement not specifically otherwise

covered by an exception is nevertheless admissible if:

(1)    the statement has equivalent circumstantial guarantees of trustworthiness;

(2)    it is offered as evidence of a material fact;

(3)    it is more probative on the point for which it is offered than any other
evidence that the proponent can obtain through reasonable efforts; and

(4)    admitting it will best serve the purposes of these rules and the interests of
justice.

Fed. R. Evid. 807(a). The party offering the statement must also give notice of its intent to offer

the statement. Fed. R. Evid. 807(b); *see Schering Corp v. Pfizer, Inc.*, 189 F.3d 218, 231 (2d Cir.

1999) ("To be admissible under this exception, the evidence must, in other words, fulfill five

requirements: trustworthiness, materiality, probative importance, the interests of justice and

notice") (internal quotations omitted).

173.    The residual exception is used as a basis to admit hearsay more often in a

bench trial than in a jury trial.  *Ark-Mo Farms, Inc. v. United States*, 530 F.2d 1384, 1386-87 (Ct.

Cl. 1976) (studies admitted "pursuant to the residual exception at the discretion of a trial court in

a non-jury case to admit into evidence hearsay found to be the best evidence reasonably available

and to have assurances of accuracy and reliability.")

174.    The totality of the testimony presented at the Hearing established the

trustworthiness of the BLMIS documents offered by the Trustee. The BLMIS employees

testified to the creation of the documents and their maintenance in the ordinary course of

BLMIS's business.  *See supra* Section I(F), Section II, and ¶¶ 153–159.  The Trustee's experts

testified that the cash and principal transactions reflected on the BLMIS documents were

52

corroborated by both internal and external records, including bank records, which established

their reliability.  Importantly, the Participating Claimants have introduced no evidence to suggest

that the BLMIS books and records are not what they purport to be.  Accordingly, the BLMIS

books and records meet the level of trustworthiness to come in under the residual exception of

Fed. R. Evid. 807(a).

175.    The remainder of the requirements for the application of the residual

exception are also present here.  The books and records are material to the Hearing and more

probative than any other evidence because these records reflect the accounts of the Participating

Claimants and their deposits, withdrawals, transfers and direction for the management of the

accounts.  The interests of justice are served by admitting the books and records because they

speak to the key issue in these proceedings—the meaning of a PW Transaction—and they

constitute the very evidence that the Trustee is directed by SIPA to examine.  Finally, the Trustee

provided sufficient notice of his intent to rely on this evidence, having produced copies of the

BLMIS books and records to the Participating Claimants as part of these proceedings.

176.    As to the additional argument that the handwriting in the customer files

and on the folders is a second level of hearsay, that objection is overruled.  The testimony of

former BLMIS employees provide the context and meaning for the notations.  Those statements

are not being admitted for the truth of the matter but rather are simply submitted for the fact that

they appear on certain documents.  As they are not asserted for the truth of the matter, no hearsay

exception need apply.  *See* Fed. R. Evid. 801(c).

177.    Moreover, as identified and explained by the BLMIS employees, the

handwritten notations on records were made and kept in the ordinary course of business.

Specifically, the BLMIS employee testimony establishes that when a customer opened a new

account with BLMIS, they were asked whether to "send" or "reinvest" the profits.  *See*

Bongiorno Tr. 70:23–71:11; Leung Tr. 94:18–95:5, 95:9–96:24; Khan Tr. 73:2–75:17.  This

information was input into the AS/400 system.  *Id.*  If the account was labeled with an "S," the

system would routinely generate PW checks.  Bongiorno Tr. 70:12–71:11; Jackson Tr. 43:19–

44:7.  And, when customers requested account modifications—whether by mail or telephone—

BLMIS employees routinely and contemporaneously noted that on the customer's file.  Sala Tr.

36:22–37:5; Bongiorno Tr. 131:1–132:13.  Once updated, the customer files were then passed to

the BLMIS keypunch operators who updated the information in the AS/400 computer system.

Khan Tr. 71:6–17, 71:22–72:5; Leung Tr. 104:23–108:3.  Therefore, these statements are

admissible as business records pursuant to FRE 803(6).  *United States v. Manshul Constr. Corp.*,

No. Civ. 0308(JGK)(THK), 1996 WL 267945, at *5 (S.D.N.Y. May 20, 1996) (citation omitted).

178.    Participating Claimants' objections as to hearsay are overruled because the

statements are not hearsay or the documents fall within one or more hearsay exceptions.

179.    Accordingly, for the foregoing reasons, the Court finds that the exhibits

identified by the Trustee as the books and records of BLMIS are authentic, relevant, and not

subject to exclusion under the hearsay rules.  The Trustee's exhibits of the debtor's books and

records are admitted into evidence and the objections of the Participating Claimants are

overruled.

### D.    BLMIS Customer-Produced Records

180.    The Trustee submitted for admission into evidence a customer produced

record for account 1A0001, held in the name of AHT Partners.  The particular record is an

accounting schedule identified at TX031.  Ms. Collura testified that the accounting schedule was

produced by the accountholder to the Trustee, described the accounting schedule as one

containing information regarding checks received by AHT Partners, and how she used the

information in the accounting schedule to reconcile the PW Transactions in AHT Partners'

BLMIS account.  Ms. Collura's testimony satisfies any evidentiary concerns regarding

authentication, relevance, or foundation.  *See* Fed. R. Evid. 401, 402, 601, 602, and 901(a).  As

the Participating Claimants do not object, the exhibit is admitted into evidence.

### E.      Mr. Blecker's Customer Claims and Trustee's Claim Determination

181.    The Trustee submits Mr. Blecker's customer claims and the Trustee's

claim determinations for Mr. Blecker's BLMIS accounts, identified at PCX-15, PCX-16, PCX-

17, PCX-20, PCX-21, and PCX-61.  The documents accurately reflect the respective parties'

position with respect to the customer claim of Mr. Blecker and his BLMIS accounts and the

parties have stipulated to the admission of the documents into evidence.  Stipulation on

Admissibility ¶ 6.  Pursuant to Fed. R. Evid. 201(a) and (b), judicial notice can be taken of the

exhibits and they are admitted into evidence.

### F.      Principal Balance Calculations for Mr. Blecker's accounts

182.    The Trustee submitted Principal Balance Calculations prepared by Mr.

Greenblatt, identified at exhibits TX086, TX091, TX092, and TX093.  These calculations are

summary exhibits and pertain to the BLMIS account 1B0022, 1B0023, 1B0156, and 1B0157,

respectively, which were held by Mr. Blecker individually, or with his wife.  Participating

Claimants challenge the admissibility of the exhibits based on lack of authentication, lack of

foundation, and the inadmissibility of the summary exhibits based on hearsay challenges to the

underlying information.

183.    Under Fed. R. Evid. 1006, summary exhibits are appropriate and

admissible "to prove the content of voluminous writings" so long as the proponent makes the

underlying writings available for examination, which they were here.  Mr. Greenblatt testified

that he and his team prepared the summaries by reviewing thousands of documents and

summarizing the hundreds of transactions that were reported on the customer statements for Mr.

Blecker's BLMIS accounts.  PW Hr'g Tr. 187:12–194:9, 202:14–206:23.

184.    Mr. Greenblatt's testimony satisfies the evidentiary requirements for

summary evidence.  He prepared the summaries and testified that the exhibits summarized

voluminous records that were made available to Participating Claimants.  The BLMIS books and

records, the source of the information summarized in the exhibits and produced to defendants,

are admitted for the reasons set forth above and thus any authentication or hearsay objection is

overruled.  Accordingly, the Principal Balance Calculations are appropriate summary exhibits

under Fed. R. Evid. 1006 and admitted into evidence.

### G.    Equity Charts Relevant to Mr. Blecker's Accounts

185.    The Trustee submitted charts prepared by Mr. Greenblatt and identified at

exhibits TXDEM005 and TXDEM006.  The charts graphically plot the deposit and withdrawal

activity in Mr. Blecker's accounts 1B0022 and 1B0023 and then compare that against his

account balances had the PW Transactions been reinvested.  Participating Claimants object to the

admission of these charts because they are demonstratives and not evidence, lack authentication,

lack foundation, and are based on hearsay and speculation.

186.    "Demonstrative evidence—the use of charts, graphs, models to clarify

other evidence used in a trial—has been a part of the American trial process for over a century."

*Blue Cross and Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 138 F.Supp.2d 357, 363

(E.D.N.Y. 2001); *see Millers' Nat. Ins. Co. v. Wichita Flour Mills Co.*, 257 F.2d 93, 99 (10th

Cir. 1958) (demonstrative evidence is a means to "enable or assist the [expert] witness to make

an understandable communication of admissible matter with reasonable accuracy and

expedition"). Demonstrative evidence, similar to substantive evidence, is admissible if it is

relevant, has probative value, and is not unfairly prejudicial, confusing, or misleading. Fed. R.

Evid. 401, 402, 403; *Nat'l Ass'n. for Advancement of Colored People v. A.A. Arms, Inc.*, 2003

WL 2003800, *2 (E.D.N.Y. April 14, 2003). The admissibility of demonstrative evidence rests

within the discretion of the Court. Fed. R. Evid. 611; *Ahsan v. Staples, Inc.*, 2017 WL 1082404,

*10 (E.D.N.Y. March 21, 2017).

187.    The charts were prepared by Mr. Greenblatt and are directly relevant to

Mr. Blecker's claim that he never received PW checks because he reinvested his profits in his

BLMIS accounts. Mr. Greenblatt, explaining the deposits and withdrawals reflected in the

charts, testified that the reported equity in Mr. Blecker's accounts did not support the claim of

reinvestment because his balance stayed flat over time. PW Hr'g Tr. 206:24–211:16; TX097.

188.    Mr. Greenblatt's testimony addresses each of the Participating Claimants'

objections—relevance to Mr. Blecker's claim objection, authentication of charts he created, and

the information and source of information he relied on to create the charts. Thus, the evidentiary

requirements of relevance, authentication, and foundation have been satisfied, and the objections

on each of these grounds is overruled. Fed. R. Evid. 401, 402, 403, 601, 602, 901. As to the

objection that the source of the information in the equity charts—BLMIS books and records—is

hearsay, thus making the charts inadmissible, the Court has already ruled that the BLMIS books

and records are not subject to exclusion under the hearsay rules. Therefore, the charts are

admitted into evidence.

189.    The charts are also admissible under Fed. R. Evid. 702 and 703 because

they constitute scientific, technical, or other specialized knowledge that, for pedagogical reasons,

will help the factfinder understand the evidence and to determine facts at issue. *See Nat'l Ass'n. for Advancement of Colored People*, 2003 WL 2003800, *2 (finding that a chart of marketing tactics and information admissible as summary evidence under Fed. R. Evid. 1006, admissible as specialized expert knowledge under Fed. R. Evid. 702 and 703, and were relative, probative, and not prejudicial under Fed. R. Evid. 401, 402, and 403).

### H.   Declaration of Aaron Blecker

190.   Mr. Blecker submitted a declaration dated November 18, 2016 and identified as PCX-68 for admission into evidence. The Trustee objects to the admission of PCX-68 based on lack of authentication. Participating Claimants assert that PCX-68 is the same declaration that was used at Mr. Blecker's deposition as Exhibit 1. However, PCX-68 bears no exhibit markings to demonstrate that it was in fact the declaration used at his deposition. The deposition testimony is also insufficient to confirm that PCX-68 is in fact the same declaration referred therein. Blecker Tr. 5:5–6:4.

191.   The deposition transcript indicates that the original declaration marked as Deposition Exhibit 1 was retained by counsel for Participating Claimants. Blecker Tr. 18:8–12. However, counsel was unable to produce the declaration with the deposition exhibit markings or confirm that PCX-68 was in fact the declaration identified and marked as Deposition Exhibit 1. Accordingly, based on lack of authentication, PCX-68 is not admitted into evidence.

## IV.   CONCLUSIONS OF LAW

### A.   The Trustee's Omnibus Treatment of PW Transactions is Upheld

#### 1.   The Trustee's Net Investment Methodology Has Been Repeatedly Upheld

192.   A SIPA trustee's duty is to make payments to customers based on net equity "insofar as the amount owed to the customer is 'ascertainable from the books and records

58

of the debtor or [is] otherwise established to the satisfaction of the trustee.'" *Net Equity Decision*, 654 F.3d at 237 (quoting SIPA § 78fff-2(b)(2)).

193.    In prior decisions upholding Trustee's net investment method, courts have found the Trustee's methodology to be correct as a matter of law because it is based on the deposits and withdrawals that were ascertainable from the books and records of the debtor.

194.    In its net equity decision, the Second Circuit determined that the Trustee's selection of the Net Investment Method was superior to the last statement method as a matter of law because it relied upon "unmanipulated withdrawals and deposits."  *Net Equity Decision*, 654 F.3d at 238 (citing *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 140 (Bankr. S.D.N.Y. 2010) (*"Bankr. Net Equity Decision"*); *see also Bankr. Net Equity Decision*, 424 B.R. at 135 ("[T]he only verifiable amounts that are manifest from the books and records are the cash deposits and withdrawals.")

195.    In its decision on time-based damages, the Second Circuit likewise determined that the Trustee was correct as a matter of law to disallow an inflation adjustment to net equity claims because BLMIS books and records "reflected only funds deposited and withdrawn, without any time-based adjustment."  *Sec. Inv'r Prot. Corp. v. 2427 Parent Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 779 F.3d 74, 80 (2d Cir. 2015).

196.    In the inter-account transfer decision, the District Court found that the Trustee's inter-account transfer methodology, which applied the Net Investment Method to inter-account transfers, was the "superior method as a matter of law" because it accorded with "SIPA"s statutory definition of net equity and its requirement that net equity be determined to the extent it is ascertainable from the books and records of the debtor or [is] otherwise established to the satisfaction of the trustee. *Diana Melton Trust v. Picard (In re Bernard L.*

*Madoff Inv. Sec., LLC)*, No. 15 Civ. 1151 (PAE), 2016 WL 183492, at *9, *10 (S.D.N.Y. Jan.

14, 2016) (internal quotation marks omitted) (quoting *Net Equity Decision*, 654 F.3d at 237

(quoting SIPA § 78fff-2(b))), *aff'd sub nom. Sagor v. Picard (In re Bernard L. Madoff Inv. Sec.,*

*LLC)*, 697 F. App'x 708 (2d Cir. 2017).

197.     Accordingly, it would be legal error for the Trustee to include any

amounts other than cash or principal deposits or withdrawals in the net equity calculation, as

reflected in the BLMIS books and records.

## 2.     The Trustee's Application of the Net Investment Method to the PW Transactions is Correct as a Matter of Law

198.     Unlike the previous disputes relating to net equity, the PW litigation does

not raise a challenge to the fundamental "cash in minus cash out" methodology to determine net

equity.  Instead, the issue is whether the Trustee's determination that PW Transactions belong in

the "cash out" column is a proper exercise of his obligation under SIPA to ascertain net equity

based on the books and records of the debtor.

199.     Based on all of the evidence submitted to the Court, the Court concludes

that the Trustee's determination that the BLMIS books and records reflect accurate deposits and

withdrawals is correct.  The Court notes that Participating Claimants rely on the same records to

support their claims and therefore their objection that the records are unreliable is unsustainable.

200.     The Court further concludes that PW Transactions are properly treated as

withdrawals or debits in the Net Investment Method.  The PW Transactions are reflected as

debits in the BLMIS books and records.  The BLMIS books and records were reconciled

internally and externally by the Trustee's experts.  The BLMIS employees confirmed that

BLMIS treated PW Transactions as debits when they were recorded in the BLMIS books and

records and that PW Transactions reflected checks sent to customers of purported profits from
their accounts.

201.    Because the PW Transactions, like the other deposits and withdrawals
listed on the customer statements, are plainly ascertainable from BLMIS books and records, the
Court finds that the Trustee's treatment of PW Transactions as debits and reductions to a
customer's net equity under SIPA is correct as a matter of law.

### 3.    The Trustee's Determination is Entitled to Deference

202.    The Trustee's decisions to treat PW Transactions as debits is also entitled
to deference because it is not "clearly inferior" to other methods. *See Net Equity Decision*, 654
F.3d at 238 n.7; *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
Madoff)*, 522 B.R. 41, 50, 53 (Bankr. S.D.N.Y. 2014) (holding Trustee's methodology, which
was based on the cash deposits and withdrawals, was "not 'clearly inferior,' and indeed, is
superior to the alternative . . . . For these reasons, his chosen method is entitled to deference").

203.    Here, the Trustee reviewed the books and records of the debtor and
confirmed to a reasonable certainty that the deposit and withdrawal records were accurate,
including the PW Transactions.  And then he determined net equity based upon those records, in
accordance with his duties under SIPA.  Every piece of credible evidence adduced in this
proceeding supports the Trustee's determination to treat PW Transactions as debits or reductions
in the Net Investment Method.

204.    Participating Claimants do not offer a competing methodology.  Instead,
they suggest that unsupported allegations of a customer can trump the debtor's books and records
and that the Trustee can only determine net equity from third-party bank records.  Neither
premise finds any support under SIPA.  If the debtor's books and records show that a claimant

received certain amounts, the customer cannot receive a larger share of customer property than

that to which he is entitled just by making an assertion to the contrary.  And a rule whereby the

Trustee is only allowed to rely on those portions of the books and records derived from third

party bank records to determine claims—nowhere found in the text of SIPA—would result in

negative net equity for Mr. Blecker regardless of how the Court rules on the PW Transactions.

Mr. Blecker's deposits occurred before 1998—the earliest year for which the Trustee has bank

records—and Mr. Blecker has come forward with no other records to support his deposits.

205.    In essence, Participating Claimants' "methodology" represents an attempt

to cherry-pick the component parts of the net equity calculation that increase their claims against

the estate or reduce the amounts owed to the estate.  If everyone were permitted to do that, the

"net losers" in this case would not have received any return of their lost principal in this

proceeding.  Such a methodology would be clearly inferior to the Trustee's methodology, which

based on the books and records of the debtor and treats all customers equally.

206.    The Trustee must conduct his duties to benefit the entire estate, not just a

particular set of customers.  *See In re Adler Coleman Clearing Corp*., 211 B.R. 486, 496 (Bankr.

S.D.N.Y. 1997) (affirming trustee's discretion in protecting all customers in lieu of favoring

specific customers).  Other than testimony by Mr. Blecker, there has been no evidence presented

to suggest that the Trustee's determination to treat PW Transactions as debits in the Net

Investment Methodology is wrong or an abuse of his discretion.  Rather, the books and records

show that BLMIS treated PW Transactions consistently across accounts, and likewise, the

Trustee does as well.  Under these circumstances, the Court finds that the Trustee's

determination to treat PW Transactions as debits in the net equity calculation is reasonable and

entitled to deference.  *See Sec. & Exch. Comm'n v. Baron & Co. Inc.*, No. 1728-71 (D. N.J. May

1, 1975) ("If . . . the trustee is unable to satisfy himself that the claimant qualifies for the relief he

seeks then, unless such contention is unreasonable the claim is to be denied.").

**B.      The Trustee's Determination of Mr. Blecker's Claim is Affirmed**

**1.      Mr. Blecker Ratified the PW Transactions by Not Objecting to Them**

207.    Mr. Blecker claims—in some instances, twenty or thirty years after the

fact—that he did not receive or cash checks corresponding to the PW Transactions listed on his

customer statements.  To the extent that his argument is that BLMIS erred in reflecting PW

Transactions in his accounts, it is untimely by decades.

208.    Mr. Blecker has not produced any documentary evidence indicating that

he objected contemporaneously to any of the allegedly unauthorized transactions in his accounts,

even though he concedes, and his son Robert Blecker confirmed, that he regularly received and

reviewed his account statements.  Blecker Tr. 14:4–21; PW Hr'g Tr. 32:25–33:14; 48:14–16.

His failure to object within ten days of the contested transaction precludes him from raising such

arguments now.

209.    An investor ratifies an unauthorized transaction by acquiescing to it.

*Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*, 936 F.2d 640, 646 (2d Cir. 1991).  Courts

regularly enforce broker-customer agreements requiring written notice of objection to

transactions within a limited amount of time after a customer receives confirmation of the

transaction.  *Id.*

210.    In SIPA proceedings, where customers do not promptly object to certain

transactions in their account, courts hold them to have ratified such transactions.  *In re MF Glob.*

*Inc.*, No. 11-2790 (MG) SIPA, 2016 WL 270180, at *8–9 (Bankr. S.D.N.Y. Jan. 15, 2016) (SIPA

trustee's objection to a claim alleging an unauthorized transfer was sustained where a customer

63

ratified the transfer by not seeking to alter the method used when offered the opportunity to do so); *Pitheckoff v. Sec. Inv'r Prot. Corp. (In re Great E. Sec., Inc.)*, No. 10 Civ. 8647(CM), 2011 WL 1345152, at *6 (S.D.N.Y. Apr. 5, 2011) (affirming bankruptcy court finding that customer ratified transactions by failing to repudiate them); *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 419–20 (Bankr. S.D.N.Y. 2003) (denying investors' claim of unauthorized trading as ground for customer claim under SIPA based on investors' failure to timely complain of trading); *In re John Dawson & Assocs., Inc*., 289 B.R. 654, 665 (Bankr. N.D. Ill. 2003) (holding trustee adequately established that claimant ratified the transactions in claimant's account); *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 770 (2d Cir. 2010) (noting absence of objection to a securities trade in BLMIS account confirmed that funds were voluntarily transferred to debtor); *c.f. Sec. Inv'r Prot. Corp. v. Glob. Arena Capital Corp.*, No. 16 Civ. 620 (RWS), 2016 WL 590470, at *4 (S.D.N.Y. Feb. 11, 2016) (finding accountholders did not ratify transactions where they made complaints to broker).

211.    BLMIS customer agreements provided that customers had ten days to provide written objection to an unauthorized transaction noted in a transaction confirmation or customer account statement.  Otherwise, the transactions included therein became binding upon the customer.  *See, e.g.,* TX045; TX049.  The customer statements at issue here indicate on their face that PW Transactions occurred and resulted in deductions to the account balances. TX081; TX082.  Thus, if Mr. Blecker did not in fact receive the PW checks, the binding language in his customer agreements made it incumbent upon him to object upon receipt of their customer statements.  Mr. Blecker did not do so.  The Trustee's claims determination can be affirmed on this basis alone.

2.      **Mr. Blecker Failed to Carry his Burden to Establish his Claim**

212.    Under SIPA, a party seeking priority status as a "customer" bears the burden of establishing entitlement to its share of the customer property fund.  SIPA requires that a claimant establish (i) she is entitled to status as a customer and (ii) the amount owed to her by the debtor.  *See SIPC v. I.E.S. Mgmt. Grp.*, 612 F. Supp. 1172, 1177 (D.N.J. 1985), *aff'd without opinion*, 791 F.2d 921 (3d Cir. 1986); *In re A.R. Baron Co., Inc.*, 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998) ("Provisions of SIPA make clear a claimant's burden by requiring that a debtor's obligations to its customers be 'ascertainable from the books and records of the debtor," or "'otherwise established to the satisfaction of the trustee.'" (quoting SIPA § 78fff-2(b))).

213.    Unlike claims allowance procedures under the Bankruptcy Code, a SIPA proceeding provides for preferred "customer" status, giving customers priority over other creditors in the distribution of customer property. For these reasons, bankruptcy rules regarding claims allowance and the relative burdens of proof are not applicable to BLMIS customer claims but only to creditors claiming against the general estate.  *See, e.g.*, *In re MF Glob. Holdings Ltd.*, No. 11-15059 (MG), 2012 WL 5499847, at *3 (Bankr. S.D.N.Y. Nov. 13, 2012).

214.    In challenging the PW Transactions reported in his account, Mr. Blecker is asserting a larger claim against the fund of customer property.  Distributions from the fund of customer property are at the heart of the "priority" accorded to customers under SIPA and thus Mr. Blecker has the burden of showing that he is entitled to that priority with respect to each transaction.  *See e.g.*, *In re Adler Coleman Clearing Corp.*, 204 B.R. 111, 115 (Bankr. S.D.N.Y. Jan. 7, 1997) (claimants must show they are "customers" and amounts in their accounts are "customer property"); *Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*, 229 B.R. 273, 277 (Bankr. S.D.N.Y. Jan. 13, 1999) ("[A]n investor can be a customer vis-à-vis certain transactions

65

but not others"); *Sec. Inv'r Prot. Corp. v. Wise (In re Stalvey & Assocs., Inc.)*, 750 F.2d 464, 471

(5th Cir. 1985) ("Customer status 'in the air' is insufficient to confer the SIPA's protection on a

given transaction.").

215.    Mr. Blecker's self-serving testimony that he did not withdraw any funds

from his account is not sufficient to satisfy his burden.  *See, e.g.,* Blecker Tr. 6:13–19.  Although

Mr. Blecker claims that he did not receive PW checks, he has produced no bank records, no tax

returns, or any other documents to support this claim.  Self-serving testimony that has not been

corroborated cannot substantiate a SIPA claim.  *Sec. Inv'r Prot. Corp. v. Cont'l Capital Inv.*

*Servs., Inc. (In re Cont'l Capital Inv. Servs., Inc.)*, No. 03-3370, 2008 WL 4533665, at *4

(Bankr. N.D. Ohio Oct. 1, 2008) (no issue of fact existed on customer status where claimant

contended that debtor made representations that account was maintained in claimant's name but

failed to provide any corroborating evidence); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv.*

*Sec. LLC (In re Bernard L. Madoff)*, 496 B.R. 713, 721 (Bankr. S.D.N.Y. 2013), *aff'd sub nom.*

*Surabian v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 13 Civ. 4332(ALC), 2014 WL

1302660 (S.D.N.Y. Mar. 31, 2014) (rejecting "self-serving" affidavits and noting claimants

failed to produce tax returns, dividend statements, or any other documents evidencing their

investment).  There is reason to doubt the candor a self-interested witness could provide because

"self-interest creates such a powerful incentive to shade the truth that it is unusual for an

interested witness to be totally candid." *Magnoni v. Smith & Laquercia, LLP*, 701 F. Supp. 2d

497, 499 (S.D.N.Y. 2010) (internal quotation marks omitted).

216.    Moreover, Mr. Blecker's testimony conflicts with all of the other evidence

collected in this matter, including contemporaneous documentary records and testimony from

former BLMIS employees.  Where a party's own self-serving oral testimony conflicts with

ample documentary evidence, it should be afforded even less weight.  *Estate of Sheppard ex rel. Sheppard v. Sec'y of Dep't of Health & Human Servs.*, No. 04-112V, 2007 WL 5160383, at *10 (Ct. Cl. Aug. 7, 2007); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948) ("Where such testimony is in conflict with contemporaneous documents we can give it little weight . . . ."); *see also BanxCorp v. Costco Wholesale Corp.*, 978 F. Supp. 2d 280, 299 (S.D.N.Y. 2013) ("[W]here the uncontroverted record clearly supports a [particular] finding, then plaintiff's own self-serving declaration to the contrary is insufficient, under the circumstances, to raise a triable issue of fact" (internal quotation marks omitted) (quoting *Dzanoucakis v. Chase Manhattan Bank, USA*, No. 06-CV-5673(JFB)(ARL), 2009 WL 910691, at *8 (E.D.N.Y. Mar. 31, 2009))); *see also Ackerman v. Ventimiglia (In re Ventimiglia)*, 362 B.R. 71, 82 (Bankr. E.D.N.Y. 2007) ("Where purported loans are not supported [by] valid writings to confirm the existence of such debt, and the record as a whole does not support the existence of such debt, oral testimony alone can be insufficient to support a finding that such loans were made.") (citations omitted)).

217.    Mr. Blecker's testimony was also internally inconsistent.  Mr. Blecker stated, and his son corroborated, that he carefully reviewed his statements each month.  Blecker Tr. 14:4–21; PW Hr'g Tr. 32:25–33:14; 48:14–16.  However, Mr. Blecker testified that he saw his BLMIS account balances going up over time.  Blecker Tr. 7:3–21, 13:15–14:12.  As Mr. Greenblatt's testimony described, these two assertions cannot be reconciled as Mr. Blecker's account balances remained essentially flat during the relevant time period.  PW Hr'g Tr. 206:24–210:10, 210:11–211:16, 206:5–23; TXDEM005; TXDEM006; TX091; TX093.

218.    In fact, evidence was adduced during the Hearing that Mr. Blecker was contemporaneously aware of the PW Transactions that were debiting his account.  Robert

Blecker confirmed that, on a February 1995 statement produced by Mr. Blecker, his father made

certain notations that acknowledged the transactions on the statement, including the PW

Transactions. This indicates that Mr. Blecker was aware of the debits to his account at the time

they were made.  PW Hr'g Tr. 56:16–57:17; TX082.

219.    Given the self–serving nature of Mr. Blecker's testimony, the lack of

corroboration from a single other piece of evidence, and the inconsistency of the testimony itself,

this Court finds that Mr. Blecker has not satisfied his burden to establish his customer claim.

The Trustee's determinations of Mr. Blecker's customer claims are affirmed and Mr. Blecker's

objections thereto are overruled.

## V.    <u>CONCLUSION</u>

220.    The record now before the Court establishes that the Trustee properly

treated PW Transactions as debits in the net equity calculation, including in Mr. Blecker's

accounts.  The Trustee's treatment of PW Transactions as debits in the net equity calculation is

upheld and the objections of Mr. Blecker and the other Participating Claimants on the basis of

PW Transactions are overruled.  The Court affirms the Trustee's determinations of Mr. Blecker's

claims.

Dated:  March 7, 2018
         New York, New York

Respectfully submitted,

/s/ Seanna R. Brown
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Tel: (212) 589–4200
Fax: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Seanna R. Brown
Email:  sbrown@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Estate of Bernard L.*
*Madoff*

69