**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES INVESTOR PROTECTION

CORPORATION,

Plaintiff-Applicant,

v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

Defendant.

In re:

BERNARD L. MADOFF,

Debtor.

Adv. Pro. No. 08-1789 (SMB)

SIPA LIQUIDATION

(Substantively Consolidated)

## AARON BLECKER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**CHAITMAN LLP**
465 Park Avenue
New York, New York 10022
Phone and Fax: (888) 759-1114
Helen Davis Chaitman
Gregory M. Dexter
hchaitman@chaitmanllp.com
gdexter@chaitmanllp.com

*Attorneys for Aaron Blecker*

{00035572 2 }

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

PROPOSED COUNTER-STATEMENT OF FACTS ........................................................... 3

  I.  The undisputed deposits in the Blecker Accounts ............................................. 3

  II.  The Trustee utterly failed to account for the activity in the Bleckers' accounts ............................................................................................................. 4

  III.  Aaron Blecker has continuously and unequivocally maintained that he never withdrew a penny from his accounts ........................................................ 6

  IV.  There is no evidence whatsoever to establish that Blecker ever withdrew a penny ...................................................................................................................... 7

  V.  The Trustee's own expert, Lisa Collura, could not reconcile Blecker's accounts ................................................................................................................. 9

  VI.  Greenblatt's testimony ......................................................................................... 11

  VII.  The testimony of BLMIS employees proves that Blecker did not receive withdrawals ............................................................................................................ 12

EVIDENTIARY RULINGS ................................................................................................. 18

  I.  An expert's testimony is inadmissible as to whether documents exist ............ 18

  II.  The Court has already ruled that the Trustee's experts cannot speculate about the contents of non-existent documents or invade the province of the trier of fact with opinions not based on specialized expertise ......................... 19

  III.  THE BLMIS Records ........................................................................................... 19

    A.  Authenticity ................................................................................................. 19

    B.  Relevancy .................................................................................................... 20

    C.  Hearsay ........................................................................................................ 22

    1.  The Business Records Exception (Fed. R. Evid. 803(6)) does not apply ................... 24

      i.  The hearsay statements were made by unknown authors at unspecified times, and never by those with firsthand knowledge ....................... 26

    ii.    BLMIS did not maintain regular practices............................................................. 31

    iii.   The Madoff records lack the hallmarks of trustworthiness .................................. 33

  2.  The ancient documents exception (Fed. R. Evid. 803(16)) does not apply.................................................................................................................... 35

  3.  The residual exception (Fed. R. Evid. 807) does not apply ....................................... 39

  D.  The Trustee's Summary Exhibits rely on inadmissible material and are prohibited by Federal Rule of Evidence 1006 ............................................................ 42

  E.  The Trustee's demonstratives are inadmissible ........................................................ 43

  F.  The Declaration of Aaron Blecker............................................................................ 45

PROPOSED COUNTER-CONCLUSIONS OF LAW................................................................ 46

  I.  The Trustee's omnibus treatment of PW Transactions is upheld only as to those customers who did not object ....................................................................... 46

    A.  This proceeding does not challenge the Trustee's selection of the Net Investment Method for calculating net equity ........................................................ 46

    B.  The Trustee's application of the Net Investment Method to the PW Transactions is not correct as a matter of law.............................................................. 47

    C.  The Trustee's determination is not entitled to deference........................................... 47

  II.  It is for the Court to determine, by a preponderance of the evidence, whether Blecker received cash withdrawals corresponding to entries recorded as PW Transactions on the admittedly fraudulent BLMIS records ................... 49

  III.  Blecker has produced unrebutted direct evidence that he never received a Profit Withdrawal........................................................................................................ 51

  IV.  The Trustee has not established that Blecker received Profit Withdrawals...................... 53

  V.  Blecker did not ratify the Profit Withdrawal entries......................................................... 54

  VI.  Because the Trustee cannot show that Blecker received cash corresponding to the PW notations, the Trustee erred in calculating his claim, and his claim should be calculated without regard to the PW notations ...................................................................................................................... 57

CONCLUSION.................................................................................................................... 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aniero Concrete Co. v. NYC Constr. Auth.*,
  2003 WL 210882 (S.D.N.Y. May 5, 2003) ...........................................................52

*Arista Records LLC v. Lime Grp. LLC*,
  715 F. Supp. 2d 481 (S.D.N.Y 2011)...................................................................20

*Batoh v. McNeil-PPC*,
  167 F. Supp. 3d 296 (D. Conn. 2016)..................................................................39

*Beach Mar, Inc. v. L&L Wings, Inc.*,
  2016 U.S. Dist. LEXIS 9566 (E.D.N.C. Jan. 27, 2016) ......................................35

*Boykin v. W. Express, Inc.*,
  2016 WL 8710481 (S.D.N.Y. Feb. 5, 2016).........................................................43

*Buffalo Forge Co. v. Ogden Corp.*,
  717 F.2d 758 (2d Cir. 1983).................................................................................56

*Campbell v. Bd. of Ed.*,
  310 F. Supp. 94 (E.D.N.Y. 1970) ........................................................................22

*Cappuccio v. Prime Capital Funding LLC*,
  649 F.3d 180 (3d Cir. 2011)...........................................................................50, 51

*Carrasco v. N.M. Dep't of Workforce Sol.*,
  2013 WL 12092509 (D.N.M. 2013) ................................................................19, 25

*In re Cirrus Logic Secs. Litig.*,
  946 F. Supp. 1446 (N.D. Cal. 1996) ....................................................................25

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
  508 U.S. 602 (1993)..............................................................................................50

*Consorti v. Armstrong World Indus., Inc.*,
  72 F.3d 1003 (2d Cir. 1995).................................................................................42

*Curtis v. Perkins*,
  781 F.3d 1262 (11th Cir. 2015) ...........................................................................53

*Davis v. Caroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013)..................................................................18

*In re Edwards*,
    50 B.R. 933 (Bankr. S.D.N.Y. 1985) ........................................................50

*Ege v. Yukins*,
    380 F. Supp.2d 852 (E.D. Mich. 2005), *aff'd in part, rev'd in part*, 485 F. 3d
    364 (6th Cir. 2007)..................................................................................21

*Giles v. Rhodes*,
    2000 WL 1425046 (S.D.N.Y. Sept. 26, 2000) .........................................25

*In re Great E. Sec., Inc.*,
    2011 WL 1345152 (S.D.N.Y. Apr. 5, 2011)............................................54

*Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech Grp., Inc.)*,
    916 F.2d 528 (9th Cir. 1990) ..................................................................33

*Headley v. Tilghman*,
    53 F.3d 472 (2d Cir. 1995).......................................................................24

*Hicks v. Charles Pfizer & Co.*,
    466 F. Supp. 2d 799 (E.D. Tex. 2005) .....................................................37

*Hoffman v. Palmer*,
    129 F.2d 976 (2d Cir. 1942), *aff'd Palmer v. Hoffman*, 318 U.S. 109 (1943)........................34

*Hollander v. American Cyanamid Co.*,
    172 F.3d 192 (2d Cir. 1999)....................................................................21

*ITC Ltd. v. Punchgini Inc.*,
    482 F.3d 135 (2d Cir. 2007).....................................................................51

*Jacobson v. Deutsche Bank, A.g.*,
    206 F. Supp. 2d 590 (S.D.N.Y. 2002).................................................39, 40

*Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*,
    84 F.3d 1330 (10th Cir. 1996) ................................................................33

*Jordan v. Binns*,
    712 F.3d 1123 (7th Cir. 2013) ................................................................25

*JPMorgan Chase Bank, N.A. v. Yuen*,
    2013 WL 2473013 (S.D.N.Y. June 3, 2013) ..............................26, 27, 28

*Karlen v. Ray E. Friedman & Co. Commodities*,
    688 F.2d 1193 (8th Cir.1982) .................................................................55

*Keene Corp. v. United States*,
    508 U.S. 200 (1993)................................................................................50

*Kirk v. Raymark Indus., Inc.*,
    61 F.3d 147 (3d Cir. 1995)..................................................................................41

*Langbord v. U.S. Dep't of Treasury*,
    832 F.3d 170 (3d Cir. 2016), *cert. denied Langbord v. Dep't of Treasury*, 137
    S. Ct. 1578 (2017)..........................................................................................38

*In re Lavigne*,
    114 F.3d 379 (2d Cir. 1997)..........................................................................57

*Liebert v. Nisselson (In re Levine)*,
    2008 WL 4186322 (Bankr. S.D.N.Y. Sept. 5, 2008)...................................50

*LinkCo, Inc. v. Fujitsu, Ltd.*,
    2002 WL 1585551 (S.D.N.Y. July 16, 2002) ...............................................18

*LNC Invs. Inc. v. First Fid. Bank N.A.*,
    2000 WL 1072460 (S.D.N.Y. Aug. 3, 2000)................................................21

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)..........................................................45

*Maldonado v. Scully*,
    86 F.3d 32 (2d Cir. 1996) ..............................................................................52

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013)..........................................................................45

*Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*,
    936 F.2d 640 (2d Cir. 1991).....................................................................55, 56

*In re MV Secs., Inc.*,
    48 B.R. 156 (Bankr. S.D.N.Y. 1985)............................................................50

*Nadeau v. Equity Residential Properties Mgmt. Corp.*,
    251 F. Supp. 3d 637, 641 (S.D.N.Y. 2017)..................................................57

*Nat'l Ass'n. for Advancement of Colored People v. A.A. Arms, Inc.*,
    2003 WL 2003800 (E.D.N.Y. Apr. 14, 2003) .............................................44

*Paddack v. Dave Christensen, Inc.*,
    745 F.2d 1254 (9th Cir. 1984) .......................................................................42

*Palmer v. Hoffman*,
    318 U.S. 109 (1943).......................................................................................34

*Parker v. Reda*,
    327 F.3d 211 (2d Cir. 2003)..........................................................................26

*People v. Collins*,
438 P.2d 33 (Cal. 1968) ...................................................................................21

*People v. Risley*,
214 N.Y. 75 (1915) .........................................................................................21

*Picard v. HSBC Bank plc*,
454 B.R. 25 (S.D.N.Y. 2011)...........................................................................56

*Picard v. JPMorgan Chase & Co.*,
721 F.3d 54 (2d Cir. 2013)...............................................................................56

*Presser v. Key Food Stores Co-op, Inc.*,
2006 WL 2086346 (E.D.N.Y. July 25, 2006), *aff'd* 316 Fed. Appx. 9 (2d Cir.
2009) .................................................................................................................22

*Romano v. Howarth*,
998 F.2d 101 (2d Cir. 1993)..............................................................................28

*Russello v. United States*,
464 U.S. 16 (1983)............................................................................................50

*Sanders v. New York*,
2001 WL 1568422 (S.D.N.Y. Dec. 5, 2001) ....................................................21

*SEC v. F.O. Baroff Co.*,
497 F.2d 280 (2d Cir. 1974)..............................................................................49

*SIPC v. BLMIS (In re Bernard L. Madoff Inv. Sec. LLC)*,
654 F.3d 229 (2d Cir. 2011)........................................................................48, 49

*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*,
112 F. Supp. 3d 122 (S.D.N.Y. 2015)..........................................................21, 27

*United States v. Bishop*,
264 F.3d 535 (5th Cir. 2001) ............................................................................42

*United States v. Castillo*,
924 F.2d 1227 (2d Cir. 1991)............................................................................18

*United States v. Citron*,
783 F.2d 307 (2d Cir. 1986)..............................................................................42

*United States v. Dreer*
740 F.2d 18 (11th Cir. 1894) ............................................................................34

*United States v. Ford*,
435 F.3d 204 (2d Cir. 2006)..............................................................................27

*United States v. Groysman*,
    766 F.3d 147 (2d Cir. 2014)...........................................................................43

*United States v. N.Y. Foreign Trade Zone Operators*,
    304 F.2d 792 (2d Cir. 1962)...........................................................................34

*United States v. Oates*,
    560 F.2d 45 (2d Cir. 1977)......................................................................22, 24

*United States v. Portrait of Wally*,
    663 F. Supp. 2d 232 (S.D.N.Y. 2009)............................................................35

*United States v. Rowinsky*,
    2013 WL 5607064 (S.D. Fla. 2013) ...............................................................24

*United States v. Ruffin*,
    575 F.2d 346 (2d Cir. 1978)..............................................................22, 24, 41

*United States v. Samaniego*,
    187 F.3d 1222 (10th Cir. 1999) .....................................................................42

*United States v. Shonubi*,
    103 F.3d 1085 (2d Cir. 1997).........................................................................21

*United States v. Strother*,
    49 F.3d 869 (2d Cir.1995)........................................................................24, 26

*United States v. Tin Yat Chin*,
    371 F.3d 31 (2d Cir. 2004).............................................................................18

*Wantanabe Realty Corp. v. New York*,
    2004 WL 188088 (S.D.N.Y. Feb. 2, 2004)....................................................33

*Wiand v. Lee*,
    753 F.3d 1194 (11th Cir. 2014) .....................................................................33

**Statutes**

15 U.S.C. § 78eee(b)(6)(B).....................................................................................50

15 U.S.C. § 78fff-1(a)(4) ........................................................................................50

15 U.S.C. § 78fff-2(b)..............................................................................................49

15 U.S.C. § 78fff-2(c)(1)(B).....................................................................................49

15 U.S.C. §§ 78fff-4(a) *and* (f)................................................................................50

15 U.S.C. §§ 78fff(a)(4) and 78jjj(b)......................................................................36

15 U.S.C. § 78*lll*(2)(B)(i) .................................................................................................49

15 U.S.C. §78lll(11) ...........................................................................................................36

15 USC § 78fff-2 ................................................................................................................49

15U.S.C. § 78fff-2(a)(4) .....................................................................................................51

**Other Authorities**

4-611 Weinstein's Federal Evidence § 611.02 ....................................................................44

5-900 Weinstein's Federal Evidence § 900.07 ....................................................................44

6-1006 Weinstein's Federal Evidence § 1006.07 (2015).....................................................42

Bankruptcy Code Section 501 *et seq.* ................................................................................51

Fed. R. Bankr. Proc. 3001(f) ..............................................................................................50

Fed. R. Evid. 18 ..................................................................................................................37

Fed. R. Evid. 102 ................................................................................................................41

Fed. R. Evid. 301 ..........................................................................................................50, 51

Fed. R. Evid. 402 ................................................................................................................21

Fed. R. Evid. 702 ................................................................................................................44

Fed. R. Evid. 702(a) ............................................................................................................18

Fed. R. Evid. 703 ................................................................................................................44

Fed. R. Evid. 801 ................................................................................................................22

Fed. R. Evid. 801(a) ............................................................................................................22

Fed. R. Evid. 801(c) ............................................................................................................22

Fed. R. Evid. 801(d)(1)(B) ..................................................................................................52

Fed. R. Evid. 802(d)(2) .......................................................................................................48

Fed. R. Evid. 803 ...................................................................................................... *passim*

Fed. R. Evid. 803(6)................................................................................................... *passim*

Fed. R. Evid. 803(16)................................................................................................. *passim*

Fed. R. Evid. 804 ....................................................................................................................38

Fed. R. Evid. 805 ....................................................................................................................38

Fed. R. Evid. 807 ...........................................................................................................33, 39, 40

Fed. R. Evid. 807(a) ................................................................................................................24

Fed. R. Evid. 807(a)(3) ...........................................................................................................40

Fed. R. Evid. 807(a)(4) ...........................................................................................................41

Fed. R. Evid. 807(b) ................................................................................................................41

Fed. R. Evid. 901(b)(8) ...........................................................................................24, 35, 38, 39

Fed. R. Evid. 902(11) ..............................................................................................................25

Fed. R. Evid. 1002 ..................................................................................................................19

Fed. R. Evid. 1006 .............................................................................................................42, 43

*Picard v. Avellino*,
    Adv. Pro. No. 10-05421 (S.D.N.Y. Bankr. Jul. 21, 2016), *available at*
    http://www.nysb.uscourts.gov/sites/default/files/opinions/
    174497_13756_opinion.pdf. ..............................................................................................4

Robert D. Brain & Daniel J. Broderick, *The Derivative Relevance of
    Demonstrative Evidence: Charting Its Proper Evidentiary Status*, 25 U.C.
    Davis L. Rev. 957 (1992) ..................................................................................................44

SIPA Section 8(a)(4) ...............................................................................................................50

Based upon the evidence adduced at the trial on January 19, 2018, Aaron (a/k/a Arthur)

Blecker ("Blecker") submits these proposed counter-findings of fact and conclusions of law.

## PRELIMINARY STATEMENT

The Trustee has conceded, through the expert testimony of Lisa Collura, that the only way

to verify profit withdrawal ("PW") transactions that appear on Madoff account records is through

third party, reliable documents such as Madoff's bank records showing the checks to the customers

clearing Madoff's account; customer bank records showing the deposit of those checks in the

customers' account; and customer letters requesting profit withdrawals or asking that they be

terminated.  To the extent that the Trustee used that methodology in determining profit withdrawals

of specific customers, Blecker has no objection to the Trustee's methodology.   However, as

Collura conceded, in the case of Blecker, there is a total absence of reliable third-party documents

evidencing that Blecker ever asked for, or received, profit withdrawals.   Thus, there is no

evidentiary basis on which the Trustee could possibly conclude that Blecker received profit

withdrawal checks from Madoff.  The Trustee is relying solely upon the testimony of Matthew

Greenblatt that he reviewed Blecker's monthly account statements (not the <u>Bleckers'</u> account

statements) and there were no "gaps."  Obviously, and as set forth hereafter, Greenblatt is not

competent to testify as to whether the Trustee has a complete set of the Bleckers' account

statements from 1981 on and his testimony on this point is absolutely inadmissible.  Moreover, as

set forth in the accompanying Declaration of Helen Davis Chaitman ("Chaitman Decl."), there are

"gaps" in the Bleckers' statements.

The testimony of both Blecker and his son, Robert Blecker ("Robert"), was categorical that

Blecker and his wife never withdrew funds from their Madoff accounts and that, over the entire

time of their investments, from at least as early as 1981 through 2008, Blecker's investment

appreciated nearly 500%.  As the Trustee concedes, Blecker and his wife invested a total of

$577,350.33. That is the amount of the SIPC claim to which Blecker is entitled and we ask the Court to enter judgment, in Blecker's favor, for $577,350.33 plus prejudgment interest.

While there is an utter lack of evidence supporting the Trustee's contention that Blecker received profit withdrawals, both Blecker and Robert testified that Blecker considered Madoff to be an excellent investment. Obviously, then, his accounts appreciated from 1981-1997 after which time even the Trustee does not contend that the Bleckers withdrew any funds. So what happened with the appreciation in the Bleckers' accounts during the period from 1981 - 1997? It is impossible to answer this question because the Trustee has never produced complete records of the Blecker accounts. *See generally* Chaitman Decl. Indeed, after two years of litigation and after the Trustee produced (purportedly) all of the Blecker account statements, the Trustee filed his trial brief, on August 12, 2016, and represented to this Court that the Bleckers had only four accounts with BLMIS. [ECF No. 13876 at 36 (Trustee's Aug. 12, 2016 Br.)].

In fact, the Trustee has been forced to admit that the Bleckers had at least nine accounts and that they opened their first account at least as early as 1981. In addition, Blecker had invested in Madoff through Avellino & Alpern ("A&A"), since at least the early 1980s. *See* Chaitman Decl. ¶ 15; *id.*, Ex. L. The Trustee has not produced complete records for this account so we have no idea how long the Bleckers had funds in the A&A account or how much they invested through this account. *Id.*

While Greenblatt tried to finesse this obvious problem for the Trustee, he acknowledged a $35,000 transfer from "A&A" listed on one of Blecker's statements as an "inter-account transfer." *See* TX091 at 1. Yet the Trustee has not produced the back-up documentation for the A&A account; nor has he disclosed how much of the funds into and out of that account belonged to the Bleckers, and for what period of time that account contained the Bleckers' funds.

Of course, it is not surprising that no one can reconstruct financial transactions that occurred almost 40 years ago. That is why we have statutes of limitation. But the fact that Blecker did not retain account records going back to the 1970s does not mean that the Trustee should be permitted to enrich SIPC at Blecker's expense.

On the contrary, the Trustee's determination that Blecker received the profit withdrawals is utterly unsupported based on the methodology that his own expert testified was appropriate. Blecker has come forward with substantial, credible evidence that he never took a penny out of his Madoff accounts. Having come forward with evidence to support his claim, the Trustee's determinations are not entitled to any deference.

It is the Trustee's burden to put in evidence to rebut Blecker's claim, but the Trustee failed to do so. He has not even sought to put into evidence a complete set of the records with respect to the Bleckers' accounts. The fact is that the Trustee has no evidentiary basis to disallow Blecker's claim and he should be ordered to give Blecker a check for $577,350.33 plus prejudgment interest.

## PROPOSED COUNTER-STATEMENT OF FACTS

### I.    The undisputed deposits in the Blecker Accounts

1.    The Trustee has admitted that Blecker and his deceased wife, Sofie Blecker, made the following deposits into their accounts beginning in 1981 totaling $577,350.33:

| Date | Deposit | Proof |
|------|---------|-------|
| 3/31/81 | $42,350.33 | PCX023 at 3. |
| 2/18/83 | $35,000.00 | PCX023 at 3. |
| 9/16/83 | $70,000.00 | PCX023 at 3. |
| 9/16/83 | $30,000.00 | PCX023 at 3. |
| 10/12/84 | $100,000.00 | PCX023 at 3. |
| 10/9/90 | $100,000.00 | PCX023 at 3. |
| 9/22/86 | $50,000.00 | PCX017 at 4. |
| 9/24/86 | $50,000.00 | PCX017 at 4. |
| 12/16/92 | $100,000.00 | PCX017 at 4. |
| **Total** | **$577,350.33** | |

2.      While it is impossible to know if this is a complete list of the Bleckers' deposits, Blecker has no records which prove any other deposits and, therefore, he accepts this number.

3.      Thus, if the Bleckers took no withdrawals from their accounts, they would be entitled to a net equity claim in the amount of $577,350.33.  Of this amount, of course, SIPC would have to pay $500,000 and the Trustee would have to pay a mere $77,350.33.

4.      The February 18, 1983 "deposit" of $35,000, listed above, is described by Greenblatt as an inter-account transfer from "A&A."  *See* TX091.  "A&A" was a feeder fund managed by Sam Alpern, Ruth Madoff's father, and by Frank Avellino.[1]  Blecker testified that he confirmed information on his statements by speaking with Avellino.  Blecker Tr. at 14:22-15:5.

5.      Aside from not producing a complete history of the Bleckers' accounts, the Trustee has not produced to Blecker's counsel the Blecker account statements for the Bleckers' A&A accounts and they have no way of obtaining those records, assuming they exist.  *See* Chaitman Decl., ¶ 15.

## II.     The Trustee utterly failed to account for the activity in the Bleckers' accounts

6.      Six years after denying Blecker's claim and after two years of discovery, the Trustee claimed in his trial brief that the Bleckers had only four accounts with Madoff.  [ECF No. 13876 at 36 (Trustee's Aug. 12, 2016 Br.)].

7.      At trial, Blecker adduced evidence that the Bleckers had accounts with Madoff, from at least 1981 on, including the following accounts:

| | |
|---|---|
| 1-00254-1-0 | 1/19/18 Trial Transcript ("Tr.") at 108:5-18, 124:22-125:9. |
| 1-00254-9-0 | Tr. at 131:7-21. |
| 1-00214-1-8 | Tr. at 203:4-21. |
| 1-00215-1-0 | Tr. at 122:10-123:25. |

---

[1] *See, e.g.*, Memorandum Decision, *Picard v. Avellino*, Adv. Pro. No. 10-05421 (S.D.N.Y. Bankr. Jul. 21, 2016) (Bernstein, J.), *available at* http://www.nysb.uscourts.gov/sites/default/files/opinions/174497_13756_opinion.pdf.

| 1-00215-9-0 | Tr. at 124:13-16, 137:21-24. |
|---|---|
| 1-B0156-30 | PCX022 at 1 |
| 1-B0157-30 | PCX022 at 1; PCX020 at 4. |
| 1-B0022 | PCX022 at 1; PCX020 at 4; PCX017 at 1. |
| 1-B0023 | PCX021 at 4. |

8.     After two years of discovery, the Trustee had misrepresented the history of the Bleckers' account activities from 1981-1986 and had produced only partial records for the Bleckers' accounts.  *See generally* Chaitman Decl.  The Trustee produced no records showing the investors into the A&A account.  *Id.*, ¶ 15.

9.     Thus, the Trustee had no credible evidence of all of the Bleckers' account activity from 1981 on and there is no factual record on which the Court can find that the Bleckers withdrew funds from Madoff.

10.     The only testimony offered by the Trustee was that of Greenblatt who testified, incredibly, that there were no "gaps" in the Trustee's records of Mr. Blecker's monthly customer statements.  It is not admissible for an expert to testify about a pure fact, such as whether the Trustee had a complete set of the Bleckers' account statements.  If the Trustee had a complete set of the statements, he should have offered them into evidence.  His failure to do so speaks volumes.

11.     It is also possible that the Bleckers had funds in other accounts with Avellino and that any profits were transferred by Madoff to one of those accounts.  Absent a complete history of all of the Bleckers' records, there is no way to reconstruct events that occurred 20-40 years ago.

12.     Surely, if the Trustee had all of the account statements for all of the Blecker accounts, he would have produced them to Blecker's counsel and introduced them into evidence.  His failure to do so is indisputable evidence that the Trustee does not have a complete set of the Bleckers' statements and that Greenblatt did not review all of the Blecker statements for all of the Blecker accounts.

13.     Blecker did not have a complete set of his and Sofie's account statements.  Tr. 55:7-10.

14.     Even putting aside the possibility that the Bleckers' profits were deposited into the A&A account, the profits could have been deposited into some other account that the Bleckers had.  For example, there are entries of two deposits totaling $100,000 on September 16, 1983 which bear the notation "CHECK PFD SER D CONV $7.75."  PCX023 at 3.  The Trustee provided no explanation as to what this notation means.

15.     There is no indication on the customer statements that "PW" meant a check was sent to the customer.  On the contrary, the entry was simply "CHECK ALUMINUM" or "CHECK PACIFIC" in the Description Column and then "PW" in the column designated "PRICE OR SYMBOL."  *See* TX081; TX082.  There is no place on the statements where "PW" is defined.  Blecker believed that the entry indicated that Madoff had sent a check to the corporation named for the purchase of securities.  PCX018 at 1 ("If these checks were for purchases of stocks, what happened to the stocks?").

## III.    **Aaron Blecker has continuously and unequivocally maintained that he never withdrew a penny from his accounts**

16.     Blecker consistently stated in writing that he and his wife had never withdrawn a penny from any of their accounts.  PCX015 at 5; PXC016 at 5; PCX018 at 1; PCX019 at 1; PCX022 at 1; PCX068; *see also* Tr. 38:16-25, 39:14-21, 40:21-41:1, 43:5-9, 47:11-18.  This testimony is unimpeached.

17.     Blecker repeatedly testified in his deposition that he never withdrew any funds from his and his wife's accounts with Madoff.  Blecker Tr. at 6:9-7:21, 8:24-9:8, 11:3-16.  Blecker testified that he never received a withdrawal check and he never asked for a withdrawal.  *Id.* at 6:9-7:21, 8:24-9:8, 11:3-16, 12:16-25.

18.    Blecker testified that he did not desire withdrawals because his Madoff accounts were for his retirement and he had anticipated that they would be available for his grandchildren's college education.  *Id.* at 6:9-7:21, 8:24-9:8, 11:3-16, 12:16-25.  Blecker confirmed that he was certain that Sofie never withdrew any funds from their Madoff accounts and that she did not handle the accounts and would not know who to call to make a withdrawal.  *Id*. at 9:18-10:4.  Blecker testified that he would not have requested to receive checks in uneven amounts such as those that that Trustee asserts constitute Profit Withdrawals.  *Id*. at 11:17-12:7.

19.    Over a period of 27 years, Blecker consistently told Robert that he never took a single withdrawal from any of his Madoff accounts.  Tr. at 29:20-30:16, 35:18-25,  36:12-37:9, 41:2-17.

20.    In fact, Blecker and Robert, who rarely argued with each other, had one of their only arguments over the fact that Robert wanted to withdraw funds from his own Madoff account. Blecker told Robert that he had never withdrawn funds from any of his Madoff accounts and Robert should not do so either.  Tr. at 35:18-36:4, 36:12-37:9, 41:2-17.

21.    After Madoff confessed, Blecker told Robert that Robert was right: Blecker should have withdrawn funds from his accounts over the years.  Tr. at 41:2-42:7; *see id.* at 42:4-5 ("What he said was . . . I should've taken it out.  You were right, I was wrong, I should've taken it out.").

IV.    **There is no evidence whatsoever to establish that Blecker ever withdrew a penny**

22.    The Trustee deposed Blecker on July 1, 2014 and had the opportunity to depose him again in August 2014 and declined that opportunity.  Tr. at 14:2-10.

23.    Blecker is 106 years old and his doctor felt it would be life-threatening for him to testify at trial.  Tr. at 14:12-15:4.

24.    Robert assisted his father in producing all of his Madoff records to the Trustee. Robert testified that he searched his father's records "assiduously" and was instructed by Blecker's

counsel that Blecker had to turn over all records.  Tr. at 36:12-37:1.  In reviewing his father's records, Robert did not find a single check voucher indicating that his father had received a check from Madoff.  Tr. at 35:8-17, 36:12-37:9; *see also* PCX048 (check voucher to BLMIS customer other than Blecker).  Robert found no evidence whatsoever in his father's records that his father ever received a check from Madoff.  *See* Tr. at 36:12-37:9.

25.    Robert testified that, if his father had received any checks from Madoff, his father would have retained the voucher.  Tr. at 35:8-17, 36:12-37:9.

26.    Madoff testified that he required written requests from customers if they wanted withdrawals.  Madoff Tr. at 9:12-10:5, 10:8-20, 11:3-11:9, 13:16-23,34:15-20, 35:9-15, 108:16-20.  The Trustee has no such written request in his records from Blecker, although he has hundreds of such requests from other customers.  *See, e.g.*, PCX050; PCX060 (letters from customers requesting profits).

27.    Robert testified that he was told by someone in Madoff's office that, if Robert wanted to withdraw funds from his own Madoff account, he had to put the request in writing.  Tr. at 54:2-11.

28.    Robert did not find in his father's records a single writing to Madoff requesting that he be sent profits.  Tr. at 36:12-37:9.

29.    The Bleckers' customer file does not contain a single written request for profit withdrawals or any other withdrawals in the entire period from 1981-2008.

30.    According to the records Robert found, over the life of the investment, the Bleckers had invested $577,350, beginning in 1981.  At the time Madoff confessed, Sofie Blecker had died and Blecker had consolidated the accounts so that he had only one account, which had a balance of $2,625,435.95.  PCX015 at 2.

## V.    **The Trustee's own expert, Lisa Collura, could not reconcile Blecker's accounts**

31.    The Trustee's expert, Lisa Collura, explained that, in order to confirm profit withdrawals, as a forensic accountant she had to look at third-party records such as: (a) customer bank records showing the deposit of Madoff checks into customers' accounts or Madoff bank records showing the debiting of those checks from Madoff's account; (b) letters from customers requesting withdrawals and other third party documentation contained in BLMIS customer files; and (c) records obtained by the Trustee, which include third-party records and records produced by customers.  PCX08 at 5, ¶ 11; Tr. at 68:8-23, 69:17-70:1, 71:11-17, 76:14-20, 91:18-92:6.

32.    Collura's entire methodology was premised on the fact that, if third-party records do not exist or do not corroborate the PW entries on BLMIS statements, then those PW transactions cannot be "reconciled," *i.e.*, they cannot be confirmed.  *See generally* PCX08.

33.    Collura testified that she found the correspondence from the customers requesting profit withdrawals to be reliable.  Tr. at 80:5-9.

34.    Collura explained that she was able to reconcile 51,769 of the 91,132 total profit withdrawal transactions from such records, using the endorsements on the backs of checks to confirm that they were deposited into the payee's accounts; bank records from Madoff's banks showing the payment of the profit withdrawal amounts; and letters from the customers asking that the profit withdrawals be paid to them.  Tr. at 103:6-19; PCX08, ¶ 11.

35.    However, Collura was unable to confirm any of the alleged profit withdrawal transactions involving the Bleckers.  Tr. at 107:14-16.  She admitted that there was not a single piece of documentary evidence supporting the Trustee's contention that the Bleckers took out profit withdrawals from 1981-1997.  PCX08 at 9, Attachments D17 and D18; Tr. 107:14-16 (admitting that she was unable to reconcile any of the Bleckers' profit withdrawal transactions).

36.     Collura admitted that (a) she never found any correspondence regarding profit withdrawals in the Bleckers' files, (b) she was unable to reconcile any of the Bleckers' alleged profit withdrawals with any bank record, and (c) she was unable to reconcile any of the Bleckers' alleged profit withdrawals with any record obtained by the Trustee from third parties or from Blecker.  Tr. at 107:14-108:2, 114:16-21, 117:14-17, 117:1-9, 119:6-19; 120:2-6.

37.     Collura admitted that, without seeing the back of a cancelled check (or having a customer's personal bank records), she would have no way of knowing whether a PW check was deposited.  Tr. at 105:3-11, 153:24-154:12.

38.     In the absence of any of the third-party evidence on which she testified she would have to rely, Collura could not reach a conclusion with respect to whether the Bleckers ever received a profit withdrawal check.   All she could say was that she had not seen any correspondence in any of his files that "reflected any disagreement from Mr. Blecker or his wife, Sophie Blecker, regarding any of the cash transactions in any of these accounts."  Tr. at 112:16-22.

39.     And, of course, the opposite is also true: Collura had never seen any reliable document suggesting that the Bleckers had ever received a single profit withdrawal.  *Id.* at 114:16-21.  Moreover, the designation of profit withdrawals with "CHECK AT&T" could not possibly be understood by anyone who had not read Madoff's office manual as a check to the customer.

40.     Thus, although Collura was able to offer testimony about her efforts to reconcile the accounts of customers *other than Blecker*, during time periods *other than* those periods in which the Bleckers were alleged to have received profit withdrawals (and during which Madoff employed a *different* trading strategy), those results are irrelevant because, in all of those instances, she had reliable non-Madoff-generated evidence that the customers received the checks from Madoff.

VI.    **Greenblatt's testimony**

41.    Although Collura testified that only third party documents have the reliability required by a forensic accountant, Greenblatt nevertheless opined that the Bleckers received all of their profit withdrawals.  While he glibly claimed he reviewed all of the Bleckers' monthly account statements from inception of their accounts and that there were no gaps in those records, the Trustee conveniently did not introduce all of the Bleckers' statements into evidence so that Bleckers' counsel could confront Greenblatt with the gaps in the production.  *See* Chaitman Decl. ¶¶ 11-13.  Since Blecker was the only customer whose claim was being determined at the hearing, it would not have been burdensome on the Court or the parties for the Trustee to introduce these records.  Indeed, given the importance of the evidence to the Trustee's case, it is shocking that the Trustee did not put in all of the Bleckers' statements.  There is only one explanation for why the Trustee did not do so:  The Trustee does not have a complete history of Blecker's accounts and many of the records produced are not legible.  Chaitman Dec. ¶¶ 11-14, 16; *see also id*., Exs. M-P.

42.    Greenblatt admitted that he never saw a letter from Blecker requesting profit withdrawals for any period of time.  Tr. at 216:13-217:12.

43.    Greenblatt admitted that he never found a single check written to the Bleckers.  Tr. at 219:16-19.

44.    Greenblatt admitted that the Bleckers did not withdraw a penny after 1997.  Tr. at 226:6-9.

45.    Greenblatt admitted that, with respect to the Bleckers' accounts, he never examined the backs of any checks for any time period.  Tr. at 228:9-18.  And he admitted that, without looking at the backs of checks, he would have no way of knowing where the check was deposited.  Tr. at 228:19-21.

46.    Greenblatt testified that he understood, based on his reading the deposition testimony of BLMIS employees, that if an account opening form for Blecker's account had an "S," this meant that it was a "send" account.  Tr. at 218:12-24.  Of course, Greenblatt had no knowledge as to who put the "S" in, under what circumstances, or on what date.  Tr. at 218:25-219:15.  This testimony is inadmissible because it relies upon inadmissible and unreliable hearsay records.

47.    Greenblatt admitted that gaps existed in Madoff records.  Specifically, Greenblatt relied on Portfolio Management Reports, Portfolio Management Transaction Reports, and Spiral-bound notebooks, and he admitted that he did not have complete records for any of these documents.  Tr. at 196:15-197:11.

48.    Yet, in the case of the Bleckers, remarkably, Greenblatt claimed – without introduction of the Blecker statements – that the Trustee had a complete set of Blecker's monthly statements.

## VII.    The testimony of BLMIS employees proves that Blecker did not receive withdrawals

49.    Annette Bongiorno testified that Madoff's checks contained a bottom section, separated from the check by a serrated edge, which half was kept in the customers' files, along with a copy of each check ever sent to a customer.  Bongiorno Tr. at 42:4-20, 76:24-79:3, 214:20-217:6.  Yet, the Trustee does not have a single check stub indicating that a check was ever made payable to the Bleckers.

50.    The Trustee relies upon Joann Sala's testimony that she entered into the Spiral Notebooks each check that had to be written to each customer representing a profit withdrawal.  *See, e.g.*, Sala Tr. at 272:5-11.  Yet, of the 180 profit withdrawal checks that the Trustee claims the Bleckers received, only four are listed in the Spiral Notebooks upon which the Trustee relies.  *See* TX190; TX229.

51.     Former Madoff employees testified that customers had to make written requests for profit withdrawal checks and that such written requests were kept in the customers' files. Bongiorno Tr. at 256:9-257:15 (customers had to send a written request to change a "reinvest" to a "send" account); *see also id*. at 40:1-4 (indicating that requests for capital withdrawals "absolutely" had to be in writing); Jackson Tr. at 112:24-114:1 (unequivocally testifying that all requests for profit withdrawals had to be in writing);  Sala Tr. at 235:23-236:10, 237:20-238:1. Yet the Trustee has not produced a single such written request from the Bleckers.

52.     Bongiorno testified that, in 1997, when Madoff switched from the arbitrage trading to the split strike conversion trading, customers who had requested profit withdrawals were automatically switched to quarterly profit distributions.  Bongiorno Tr. at 227:21-229:4.

53.     Yet, the Bleckers never received a quarterly profit distribution and there is nothing in the Bleckers' files to even remotely suggest that the Bleckers ever wrote to Madoff stating that they did not want to receive quarterly profit distributions.   Indeed, Bongiorno testified that Blecker's account 1B022 became an options account in April 1996, but it was never changed from a "Send" to "Reinvest Account."  Bongiorno Tr. at 89:19-90:10.  Yet, even the Trustee does not contend that Blecker received checks after 1997.

54.     The Trustee has supplied no explanation whatsoever as to why the Bleckers would have received profit withdrawals until 1997, but not quarterly distributions thereafter.

55.     Bongiorno admitted that Madoff, alone, interviewed new customers and gave instructions to Bongiorno to set up the accounts; and Madoff testified that he required written requests from customers at inception of the account if they wanted profit withdrawals.  Bongiorno Tr. at 195:14-18; Madoff Tr.  at 9:12-10:5, 10:8-20,  11:3-11:9, 13:16-23,34:15-20, 35:9-15, 108:16-20.

56.     Yet, the Bleckers' customer file contains not a single written request for profit withdrawals or any other withdrawals in the entire period from 1981-2008.  While the Trustee has written requests from other customers, at inception of their accounts requesting profit withdrawals, *see, e.g.*, PCX050, PCX060, he has none from the Bleckers.

57.     Each of the former Madoff employees admitted she had no personal knowledge as to whether Blecker ever received a profit withdrawal check:

58.     Sala testified that, even though she was familiar with the name Aaron Blecker, she had no basis for believing that Blecker would have received profit withdrawals other than the fact that some unidentified person had inserted "S" on a form in Blecker's file, indicating that at least one of his accounts was marked a "Send" account at some undesignated time.  Sala Tr. at 249:19-21 ("I just assume that because it was a send account" but Sala had no idea who put the "S" on that form and, in fact, she did not even recognize the initials of the person, written next to the "S."); *id*. at 250:22-251:24.

59.     Sala admitted that she never confirmed with customers whether they received a profit withdrawal check and that she really had no idea at all whether customers ever received profit withdrawal checks.  *Id*. at 239:16-24-243:4, 261:4-12.

60.     Sala testified that customers were required to request withdrawals in writing.  *Id*. at 235:23-236:10; 237:20-238:1.

61.     Winnifer Jackson had no idea whether any customer ever received a profit withdrawal check.  Jackson Tr. at 109:25-112:23, 114:2-14, 117:5-8, 119:8-14.

62.     In her settlement with the Trustee, Bongiorno was allowed to retain over $4 million of assets and she was released, by the Trustee, of a $23 million clawback claim.  Bongiorno Tr. at 182:19-192:7.

63.     Bongiorno admitted that neither she, nor anyone she knew, ever confirmed with customers if they received their profit withdrawal checks. *Id.* at 197:12-201:3.

64.     Bongiorno testified that a letter requesting profit withdrawals was required except at the time of the account opening.  However, she testified that all account openings were handled solely by Madoff, who spoke personally to each new customer. *Id.* at 193:2-7.  She admitted that only Madoff could open an account and she was not privy to Madoff's communications with new account holders. *Id.* at 195:14-18.

65.     Bongiorno testified that a customer would have to send a written request to change a "reinvest" account to a "send" account. *Id.* at 40:1-4, 256:9-257:15.

66.     Madoff testified that he required written requests from customers at inception of the account if they wanted profit withdrawals.  Madoff Tr. at 9:12-10:5, 10:8-20, 11:3-11:9, 13:16-23, 34:15-20, 35:9-15, 108:16-20.  Madoff's unambiguous testimony is the only testimony which is based on personal knowledge on the issue of what was required at the time of an account opening.

67.     Jackson testified that the only reliable information in Madoff's files were letters from customers, and this would be the only way to determine whether a customer received a profit withdrawal.  Jackson Tr. at 107:21-7, 109:9-13, 112:24-114:1.

68.     Jackson testified unequivocally that all requests for profit withdrawals had to be in writing. *Id.* at 112:24-114:1.

69.     Alethea Leung had no knowledge as to whether a customer ever received a profit withdrawal check.  Leung Tr. at 134:13-16, 136:16-137:2, 143:5-15, 151:18-152:17.

70.     Dorothy Kahn testified:  "There's no way for me to know anything.  Nobody ever explained to me what we do.  All we know, we got work and we did the work.  I don't know the

detail of the work." Kahn Tr. at 98:25-99:4. Kahn testified: "I didn't understand anything. All I know, I just entered and printed. I don't know the details of anything." *Id*. at 100:1-5.

71.     Leung testified that she did not even know what a "profit withdrawal" was or whether an "S" meant an account was a "Send" account. Leung Tr. at 135:2-8, 142:18-143:4.

72.     The Madoff employees who were deposed overwhelmingly testified that they had no idea whether Madoff's books and records could be trusted at all. For example, Sala testified as follows:

> Q. But at this point, isn't it true that the only documents that are reliable are the ones that were sent from customers?
>
>  MS. BROWN: Objection.
>
> A.      I don't know. It seems that way now. I don't know. I don't know when it started. I have no idea.
>
> Q: And these documents that were created by Madoff Securities were all created by an entity that turned out to be engaged in fraud.
>
> A.      Yes.
>
> Q. So at this point, isn't it true that the only reliable documents are the customers -- are the letters from customers?
>
> MS. BROWN: Objection.
>
> A.      It seems like that, but I don't know when this started, so I'm not sure -- I'm not sure if these were real or not real.
>
> Q. Do you have any way of knowing which documents were real and which were not real?
>
> MS. BROWN: Objection.
>
> A.      No.
>
> Q. For the record –
>
> A. No.

Sala Tr. at 252:22-254:6.

Q: . . . all of these could be made up as well, right?

MS. BROWN: Objection.

A. Yes .

Q. So it's hard to say really what you do know is accurate and what isn't accurate, correct?

MS. BROWN: Objection.

A.      Well, according to the job that I had and what I was told, this was all accurate to me at the time.

Q. But now do you still think that these documents are accurate?

A. I don't know. I don't know.

*Id*. at 243: 20-244:16.

73.    Winnifer Jackson's testimony was similar:

Q. So again, I come back to the same question, isn't it true that the only reliable evidence of what the customers wanted would be a letter in the file, whether it was mailed or faxed, it would be a letter in the file from the customer, right?

A. Yes.

Q. Saying, I want my profit withdrawals or now I don't want them, right?

A. Yes.

Q. And, in fact, even Mr. Madoff would tell you that any request had to be in writing from a customer seeking a check; isn't that true?

A. Yes.

Jackson Tr. at 112:24-113:8.

74.    Leung also had no confidence in the accuracy of any of Madoff's records:  "They gave me information I guess that's false.  I don't know, you know, what they did with it.  But I guess now that I know it was a whole Ponzi scheme, everything was false, yeah."  Leung Tr. at 132:19-24.

## EVIDENTIARY RULINGS

**I.    An expert's testimony is inadmissible as to whether documents exist**

75.    The Trustee relies upon the flat, unsupported statement of Greenblatt that he reviewed all of Blecker's monthly statements and there were no gaps in those monthly statements. *See* Tr. at 225:9-12.  Aside from the fact that this testimony does not deal with the joint accounts that the Bleckers had and the fact that the testimony is inaccurate (since the Trustee has never produced a complete set of the Bleckers' statements), it is inadmissible to establish whether there were gaps in the monthly statements.  Expert testimony is only admissible if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Expert testimony will help the trier of fact only if "the subject matter of the testimony is beyond the ken of the average juror." *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991).  The Trustee cannot overcome his lack of evidence by having Greenblatt offer inaccurate statements that do not require or rely on specialized knowledge.

76.    Moreover, the proponent of expert testimony must do more than establish that the witness possesses expertise in the general subject matter.  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  He must show that the expertise is *specifically* relevant to the testimony offered.  *Davis v. Caroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013) (court's "admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case"); *LinkCo, Inc. v. Fujitsu, Ltd.*, 2002 WL 1585551, at * 2 (S.D.N.Y. July 16, 2002) (Scheindlin, J.) (expert report must be excluded where it does "no more than counsel . . . will do in argument, i.e., propound a particular interpretation" based on a review of documents over which the expert has only secondhand knowledge) (citation omitted).

77.     Greenblatt has no relevant expertise that could support his assertion that no gaps existed in monthly statements.  This is a fact which can only be established by the introduction of the statements – a simple step which the Trustee chose not to take.

## II.     The Court has already ruled that the Trustee's experts cannot speculate about the contents of non-existent documents or invade the province of the trier of fact with opinions not based on specialized expertise

78.     The Court has already ruled that the Trustee's experts cannot testify as to the contents of missing or non-existent documents.  April 18, 2017 Tr. at 28:15-16; *id.* at 42:4-12.  The Court has similarly determined that the Trustee's experts cannot testify that it would be reasonable to infer that all PW entries represent withdrawals.  April 18, 2017 Tr. at 28:15-16;  *id.* at 42:4-12.

79.     Thus, in the face of all of the evidence that the Bleckers never withdrew funds from Madoff, the Trustee has put in no evidence that the Bleckers took any withdrawals.  An original writing is required in order to prove its contents.  Fed. R. Evid. 1002.  There are no checks to the Bleckers in evidence.  There are no check vouchers in the Bleckers' file, as there are in other Madoff customers' files.  There are no letters from the Bleckers to Madoff requesting checks, as there are in other Madoff customers' files.  There are no third-party records indicating that the Bleckers received checks.

## III.     THE BLMIS Records

### A.     Authenticity

80.     The Trustee attempts to introduce a mass of BLMIS records that are plainly hearsay and which were created – as the Trustee contends – to perpetuate a fraud.  The Trustee attempts to use the notations on these documents to prove that they are debits to Blecker's accounts.  As a threshold matter, the Trustee cannot hope to authenticate these notations, as the authors are largely unknown.  *See, e.g.*, *Carrasco v. N.M. Dep't of Workforce Sol.*,  2013 WL 12092509, at *15 (D.N.M. 2013) (granting motion to strike "on the ground that the author of the documents is not

identified, and thus the documents have not been authenticated"); *Arista Records LLC v. Lime Grp. LLC*, 715 F. Supp. 2d 481, 503 (S.D.N.Y 2011) (authentication requires the proponent to provide competent testimony from a witness with knowledge of document's authenticity or circumstantial evidence establishing a "reasonable likelihood" that it is authentic). To the extent the Trustee attempts to authenticate these documents through exceptions to the rule against hearsay, those exceptions are inapplicable. *See infra.*

B.  Relevancy

81.    The Trustee attempts to overcome his inability to prove that Blecker ever received a profit withdrawal check by pointing to the accounts of *other* customers who do not dispute that they received Profit Withdrawals.  The Trustee offers no serious explanation for how the books and records of customers other than Blecker are relevant for this purpose. [*See* ECF No. 17308, ¶ 162-164].

82.    The Court recognized that the records of customers other than the Bleckers were irrelevant at trial. *Cf.* Tr. at 216:5-21 (questioning relevancy of account activity of the Blums, who were not parties to the trial).  The Trustee does not need a court order approving his general treatment of PW notations as cash withdrawals; he employed that methodology and honored claims up to that amount.  For those claimants who failed to object to his treatment of PW notations in their accounts, the issue is settled.

83.    The Trustee has no documentary evidence that the Bleckers ever received a profit withdrawal check.  And Blecker testified consistently that neither he nor Sofie ever took a withdrawal from Madoff.  Moreover, Collura admitted that there is not a single third-party record which suggests or indicates that Blecker ever received a profit withdrawal check.  In this unique situation, the Trustee must come forward with specific admissible evidence that the Bleckers received checks from Madoff.  Absent such evidence – which the Trustee obviously does not have

– the Court should order the Trustee to pay Blecker the sum of $577,350.33 with prejudgment interest.

84.     Blecker's situation is unique in this case, among the entire customer body.  The account activities with respect to other customers are irrelevant to prove that Blecker received profit withdrawals.  *See*, *e.g.*, *Sanders v. New York*, 2001 WL 1568422, at *2 (S.D.N.Y. Dec. 5, 2001) (granting motion *in limine* under Rule 402, as "[p]roposed evidence bearing no relation to facts that are of consequence to the action is inadmissible"); *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 140 (S.D.N.Y. 2015) ("It is of no assistance to a jury to know that Fortress chooses to invest in other distressed assets . . . . This evidence is therefore excluded …"); *LNC Invs. Inc. v. First Fid. Bank N.A.*, 2000 WL 1072460, at *6-7 (S.D.N.Y. Aug. 3, 2000) (excluding evidence as irrelevant because what may have occurred on one occasion is not relevant to what could have occurred under different circumstances).

85.     The fact that Blecker may be one of the only customers who did not receive profit withdrawals, even though they were indicated on his account, does not mean that the Trustee is entitled to ignore the evidence with respect to Blecker and treat him as if he did receive the withdrawals.  The issue is not a statistical one.  *See People v. Risley*, 214 N.Y. 75, 84-87 (1915) (probability cannot be used to establish a fact, even if probability is 1 in 4 billion); *Hollander v. American Cyanamid Co.*, 172 F.3d 192 (2d Cir. 1999), *abrogated on other grounds by Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000); *People v. Collins*, 438 P.2d 33, 41 (Cal. 1968) (improper to convict defendant by reliance on evidence that there was 1 in 12 million chance that defendants were innocent because the courts are distorted where there is a "trial by mathematics"); *Ege v. Yukins*, 380 F. Supp.2d 852, 876-77 (E.D. Mich. 2005) (listing cases and granting writ of habeas corpus where conviction was based upon statistical evidence), *aff'd in part, rev'd in part*, 485 F. 3d 364 (6th Cir. 2007); *United States v. Shonubi,* 103 F.3d 1085 (2d Cir. 1997) (statistical evidence

cannot be used to estimate quantities); *Presser v. Key Food Stores Co-op, Inc.*, 24 IER Cases 1596, 2006 WL 2086346, at *19 (E.D.N.Y. July 25, 2006) (use of statistical evidence to prove age discrimination was "demonstrably unsound"), *aff'd* 316 Fed. Appx. 9 (2d Cir. 2009); *Campbell v. Bd. of Ed.*, 310 F. Supp. 94, 105 (E.D.N.Y. 1970) ("computations offered at the trial were . . . not based upon any model demonstrably reflective of a real situation").

86.     Thus, BLMIS records relating to customers other than Blecker are irrelevant to establishing whether the Bleckers ever received profit withdrawals.  The evidence relating to other customers is relevant only to illustrate the Trustee's lack of evidence with respect to Blecker.

C.     <u>Hearsay</u>

87.     Blecker objects to the admission of records generated by BLMIS, other than the records Blecker produced and, as to them, they are not admissible for any purpose other than to show that Blecker received them.  The BLMIS records, particularly the "PW" notations on customer statements and the "S" or "R" on File Maintenance Forms are classic hearsay.  There is no evidence as to who prepared them, when they were prepared, or how the records were maintained.  Moreover, most of the handwriting on the individual customers' files is unidentified as to author, date, and circumstances of entry.  These documents are classic unreliable hearsay.

88.     Federal Rule of Evidence 801 defines hearsay as a "statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).  "Statement" includes any written assertion.  Fed. R. Evid. 801(a).

89.     A statement is offered for the truth of the matter asserted when it is offered to prove the assertion contain therein.  *See United States v. Ruffin*, 575 F.2d 346, 355-56 (2d Cir. 1978) (IRS computer printout with coded notation was "unquestionably hearsay"); *United States v.*

*Oates*, 560 F.2d 45, 65 (2d Cir. 1977) ("eminently clear" that lab report and worksheet identifying

tested substance as heroin were "written assertions" offered for their truth, and thus hearsay).

90.    It is truly remarkable that the Trustee would argue that Madoff's records are

admissible hearsay when he paid over $30 million to Bruce Dubinsky to opine that [f]raud

permeated BLMIS."[2]  The Trustee posits that a "PW" notation proves that a customer received a

check for the specified amount.  As support, the Trustee seeks to admit handwritten notations,

particularly the "S" and "R" notes made at unknown times by unverified authors on internal

customer File Maintenance forms, arguing that an S notation indicates that a customer requested

that profits be "Sent" to the customer rather than "Reinvested."

91.    Obviously, the fact that some unknown clerk wrote "S" on an unspecified date is

not evidence that a customer received a specified check on a specified date.

92.    Confronting the fact that the "S" and "R" marginalia are classic hearsay, the Trustee

now concedes for the first time that the "S" and "R" notes cannot be admitted for their truth and,

instead tries to avoid the hearsay bar by arguing that "[t]hose statements are not being admitted for

the truth of the matter but rather are simply submitted for the fact that they appear on certain

documents." [ECF No. 17308, ¶ 176].  This is nonsense.  The Trustee flatly admits that he is

attempting to use the fact that a document contains a handwritten "S" to prove the truth of the

matter asserted.   [*See* ECF No. 17308, ¶ 111] ("The notation of 'R' on the customer's

Name/Address File Maintenance form meant 'reinvest' while 'S' stood for 'send.'   If an account

was marked 'S,' PW checks would be sent automatically . . . ."); [*id.*, ¶ 155] ("Specifically, the

customer files, comprised of the folder and the documents contained therein, tracked the account

---

[2]  Declaration of Bruce G. Dubinsky, November 24, 2015, Ex. 1 at 13. [ECF No. 12137-1] (Expert Report
of Bruce G. Dubinsky).

number, customer name and address information, customer preferences as to receiving or reinvesting profits, how the customer wished to receive funds from BLMIS . . . .").

93.    The PW notations, the "S" and "R" marginalia, and other similar notations in the BLMIS records are classic hearsay and are inadmissible.  *See Ruffin*, 575 F.2d at 355-56 (coded notation suggesting that taxpayer had at some indefinite time contacted the IRS and stated to some unidentified IRS official that he was not required to file return was "unquestionably hearsay," but finding that objection was waived and admission was harmless error); *Oates*, 560 F.2d at 65 (lab report and chemist worksheet were "written assertions" that tested substance was heroin and were offered for their truth, and thus inadmissible hearsay) (reversing and remanding for new trial); *Headley v. Tilghman,* 53 F.3d 472, 477 (2d Cir. 1995) (referring to classic hearsay "risks of insincerity, distorted perception, imperfect memory, and ambiguity of utterance").  *United States v. Rowinsky*, 2013 WL 5607064, at *7-8  (S.D. Fla. 2013).

94.    The Trustee attempts to introduce BLMIS records on the basis of three hearsay exceptions:  (a) the business-records exception, Fed. R. Evid. 803(6); (b) the residual exception, Fed. R. Evid. 807(a); and (c) the exception for ancient documents under Fed. R. Evid. 901(b)(8) and 803(16).  None of these exceptions applies.

95.    These hearsay exceptions can only apply if there are significant guarantees of trustworthiness.  *See, e.g.*, *United States v. Strother*, 49 F.3d 869, 874 (2d Cir.1995).  Notations of unknown authorship contained in documents that were specifically created to deceive customers do not demonstrate any guarantee of trustworthiness, and there is not a single case in which a court has admitted similar documents for their truth.

    1.  <u>The Business Records Exception (Fed. R. Evid. 803(6)) does not apply</u>

97.    "Rule 803(6) assumes that in certain instances the need to produce and maintain accurate business records will provide sufficient guarantees of reliability so as to allow admission

of those records for the truth of their contents.  *See Giles v. Rhodes*, 2000 WL 1425046, at *8

(S.D.N.Y. Sept. 26, 2000) ("The touchstone of admissibility under Rule 803(6) is reliability.").

The exception does not encompass documents produced under circumstances that suggest a lack

of reliability, truthfulness, or accuracy.  *See, e.g., Carrasco*, 2013 WL 12092509, at *15

(granting motion to strike "on the ground that the author of the documents is not identified, and

thus the documents have not been authenticated"); *Jordan v. Binns*, 712 F.3d 1123, 1135 (7th Cir.

2013) ("[D]ocuments prepared with an eye toward litigation raise serious trustworthiness concerns

because there is a strong incentive to deceive."); *In re Cirrus Logic Secs. Litig.*, 946 F. Supp. 1446,

1469 (N.D. Cal. 1996) ("It is plainly unfair to hold defendants liable for the reporting of their

statements by third parties without independent corroboration of the accuracy of the reported

statements.").  The Trustee cannot show that the PW notations in customer statements, or the "S"

or "R" notations meet any of these standards.

98.    Federal Rule of Evidence 803(6) provides that business records reflecting an act or

event may be admitted, despite containing hearsay, only if they satisfy the following requirements:

> (A) the record was made at or near the time by–or from information
> transmitted by–someone with knowledge; (B) the record was kept in the
> course of a regularly conducted activity of a business, organization,
> occupation, or calling, whether or not for profit; (C) making the record
> was a regular practice of that activity; (D) all these conditions are shown by the
> testimony of the custodian or another qualified witness, or by a certification
> that complies with Rule 902(11) or (12) or with a statute permitting
> certification; and (E) the opponent does not show that the source of
> information or the method or circumstances of preparation indicate a lack
> of trustworthiness.

Fed. R. Evid. 803(6); *see also* Fed. R. Evid. 803, advisory committee's note ("The element of

unusual reliability of business records is said variously to be supplied by systematic checking, by

regularity and continuity which produce habits of precision, by actual experience of business in

relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.").

99.     The proffered records do not meet the criteria of Rule 803(6) because: (a) the Trustee cannot establish when or by whom the records were made; (b) the Trustee cannot show that BLMIS' practices were sufficiently regular to qualify for the exception; and (c) the testimony of the BLMIS employees proves that the source of the information, as well as the methods and circumstances of the preparation of the records, demonstrate a lack of trustworthiness.

i.   The hearsay statements were made by unknown authors at unspecified times, and never by those with firsthand knowledge

100.    Here, the Trustee cannot identify the author of any particular PW notation, "S" or "R" notation, or the date upon which the notation was made; therefore, he cannot demonstrate that the authors themselves made the notations at or near the relevant time.  The Trustee cannot establish that the authors had firsthand knowledge of the information they were entering.  The Trustee ignores these requirements, arguing that he does not need to know who authored the notations because the records in which they are found were "integrated" into BLMIS' records. [*See* ECF No. 17308, ¶ 168].  In other words, garbage plus more garbage, in the Trustee's view, equals admissible evidence.

101.    Courts applying Rule 803(6) have consistently stressed that the "trustworthiness" of the information is the "principal precondition to admissibility." *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) (internal quotation marks omitted); *JPMorgan Chase Bank, N.A. v. Yuen*, 2013 WL 2473013, at *6 (S.D.N.Y. June 3, 2013).  While various courts have found that particular documents satisfy this trustworthiness requirement even though the proponent could not identify the author or date of the entry, they have always required other indicia of reliability and trustworthiness for admission.  *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003) (citing Fed. R. Evid. 803(6) advisory committee's note) (explaining that the purpose of Rule 803

is to "'relax[] the requirement of producing as witnesses, or accounting for the nonproduction of, all participants' in the gathering and 'recording of ordinary business records'" because "business records are made reliable by 'systematic checking, by regularity and continuity which produce habits of precision' . . .") (internal citation omitted)).

102.    In every case relied on by the Trustee, the admitted documents had substantial independent indicators of trustworthiness upon which the court could rely; no such indicia are present here.  For example, in *United States v. Ford*, 435 F.3d 204, 215 (2d Cir. 2006), the *author* of undated annotations testified that it was his business practice "to keep a calendar in which he documented events of which he had personal knowledge at or near the time they occurred." Contrary to the Trustee's suggestion, the case does not stand for the broad proposition that notations of *unknown authorship* fall within the business records exception merely because they are found in a company's records.  [*See* ECF No. 17308, ¶ 168].  The Trustee's citation to *United States Bank N.A. v. PHL Variable Life Insurance Co.*, 112 F. Supp. 3d 122, 144 (S.D.N.Y. 2015), is equally unpersuasive.  [*See* ECF No. 17308, ¶ 160].  In that case, the court found that authorship was irrelevant *because* the opponent "pointed to nothing in any of the[] emails or actuarial memoranda indicating lack of reliability." *U.S. Bank Nat'l Ass'n*, 112 F. Supp. 3d at 144.

103.    The Trustee suggests that BLMIS' records are like those at issue in *JPMorgan Chase Bank, N.A. v. Yuen*, 2013 WL 2473013, at *6 (S.D.N.Y. 2013), in which the court allowed admission of a document where the records custodian was unable to specifically identify the author.  [*See* ECF No. 17308, ¶ 168].  In *Yuen*, the plaintiff challenged the admission of a spreadsheet that Chase used to identify a decedent's beneficiary on the grounds that the document had been originally created by J.P. Morgan before the companies merged.  *Yuen*, 2013WL

2473013, at *6. The court found that the document could be admitted even though Chase could

not identify the specific author:

> As the Estate itself concedes, J.P. Morgan and Chase had **absolutely no incentive to falsify or alter the decedent's beneficiary elections.** . . . The entities did not generate the Spreadsheet for "personal purposes" or "in anticipation of any litigation." To the contrary, they created and kept the document for the sole purpose of distributing the decedent's Accounts, a process in which they were entirely disinterested.

*Id.* at *7 (emphasis added) (internal citations omitted).

104.    Unlike Chase, BLMIS' records are "permeated" with fraud because, according to

the Trustee, the records were prepared in order to carry out a massive fraud that Madoff was

perpetrating on his customers.

105.    Moreover, the fact that Madoff himself was frequently the underlying source of the

instruction to enter "S" or "PW" and that such instructions were supplied third hand to the author

eviscerates the notion that the entries were made from firsthand knowledge in the ordinary course

of business. To satisfy the "essential link" between the informant and the author, the Trustee

must also show that the sources of the information (Madoff and his co-conspirators) were

complying with a business obligation to convey true and accurate statements. *See*, *e.g.*, *Romano*

*v. Howarth*, 998 F.2d 101, 108 (2d Cir. 1993).

106.    Where the Trustee claims that the recorded trades that ostensibly produced the

"profits" were entirely fictitious and intended to perpetuate a fraud, he is not entitled to the

conflicting presumption that Madoff and his co-conspirators supplied accurate information

concerning those trading profits to those who entered the notations in order to discharge a

legitimate business duty. Fed. R. Evid. 803, advisory committee's note ("If . . . the supplier of the

information does not act in the regular course, an essential link is broken; the assurance of accuracy

does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail.").

107.    Thus, under Rule 803(6), the Trustee has a duty to demonstrate that the information supplied was given by an informant with knowledge acting in the course of a regularly conducted business activity.  Because employees at BLMIS made the PW-related notations based on third-hand information they received from Madoff or others directly involved with the fraud, the notations do not fit within the business records exception.

108.    For instance, Jackson stated she handled only internal paper work generated by other BLMIS employees. Jackson Tr. at 12:14-12:25. She did not deal directly with customers; rather, she relied on the information supplied by Crupi and Bongiorno (both of whom are in prison). Jackson Tr. at 11:21-11:24. She admitted that "once [she] did the paperwork, [she didn't] know what was bought or sold." Jackson Tr. at 17:12-17:16. Dorothy Khan's job was purely data entry. Khan Tr. at 12:1-12:25. Alethea Leung wrote out checks based on information supplied to her by others. Leung Tr. at 20:22-21:8 (Q: What information were you given in order to print the checks? A: I guess the check - - I don't remember what it was. It was either the check, a check-out book or a list of checks that - - I don't know if its on the C&S. . . I know the process but I don't remember exactly what was given to me to enter them into as checks.").

109.    Here, the people providing information to BLMIS employees were not acting in the regular course of business; rather, as the Trustee admits, Madoff, Crupi, and Bongiorno were acting to perpetuate a fraudulent scheme.  Even if the employees responsible for entering the PW notations in Madoff's records were acting in the course of a regularly conducted activity, the information they received came from criminals perpetrating a fraud, and thus the annotations do not fall within the business records exception.

110.    With regard to the specific handwritten "S" notations on Blecker's account records, the Trustee has been unable to identify the author(s) of this marginalia – much less when and under what circumstances they were made.  Sala, for example – the only BLMIS employee who was deposed other than Bongiorno who worked at BLMIS in the period in which Blecker is alleged to have received Profit Withdrawals – had almost no knowledge regarding the initial account formation, when the majority of these "S" notations were purportedly made.  Sala Tr. at 36:3-36:8 ("Q: Do you know who did fill out forms when an account was opened? A: No. Q: Are you aware that forms were filled out when an account was opened. A: No.").  What little testimony the Trustee obtained from the BLMIS employees merely confirms that the account notations – to the extent they can be authenticated at all – were not made by anyone with firsthand knowledge of customer requests.

111.    Even the Trustee's witness who was convicted for her role in the conspiracy lacked such first-hand knowledge.  Bongiorno testified that the "Send" or "Reinvest" discussion took place between Madoff and the customer; Madoff would later relay the results of this conversation to her orally. Bongiorno Tr. at 31:7-32:20. Madoff himself said otherwise. Madoff Tr. at 10:8-10:20 ("[W]e did not accept verbal instructions from customers.  If they wanted withdrawals, they had to specifically request them in writing, and we retained copies of all such requests in our customer files.").  During his deposition, Madoff confirmed that that customers only received checks if they made a specific request for them in writing.  *Id*. ("If there are no such requests in our files, that indicates that the customer did not request any withdrawals and would not have received any checks.").  Like the PW notations, this marginalia is hearsay that does not fall within the business record exception.

ii.    BLMIS did not maintain regular practices

112.    The business records exception is also inapplicable because BLMIS did not strictly observe the same practices with respect to each purported PW transaction or S notation.   On the contrary, the evidence reveals that BLMIS changed its accounting policies and did not follow internal guidelines for reporting.

113.    Indeed, the Trustee's professionals confirmed as much, finding hundreds of errors in their review.  For example, the  Trustee  asserts  that  the House 17 Manual, which Blecker claims is inadmissible, is  evidence  that  the  PW notations followed a specific process and, therefore, each such notation indicates a check mailed to a customer.  [ECF No. 17308, ¶¶ 18, 107, 158].  With respect to the PW notations, the House 17 Manual directs the employee to write PW "[o]n description type 'check & stock name'" with a notation at the bottom of that page indicating to punch PW and  CW  checks  as  debits.  TX080 at MADTSS00336545.  However, BLMIS employees regularly failed to follow these instructions, and the Trustee's experts included non-conforming transactions as profit withdrawal transactions.  *See, e.g.*, Tr. at 121:3-24; 128:3-10; 144:21-145:7; 219:3-8.

114.    The BLMIS records are, as one would expect of a fraud, riddled with inaccuracies. The Trustee's professionals found conclusive evidence that 800 PW notations represented checks to customers that were not cashed.  Tr. at 231:7-232:8.  The Trustee's professionals continue to uncover errors.  In a supplemental report, Greenblatt decided to exclude six additional notations on the grounds that they were erroneously entered as PW notations and added 96 notations which he had previously determined were not PW notations.  *See* Tr. at 232:3-23 (noting that 6 notations were erroneously included as PW notations and that 96 PW notations had to be updated).

115.    PCX049 is a customer statement for Gunther Unflat, which was obtained from Gunther Unflat.  Blecker's counsel questioned Collura about it at trial for the non-hearsay purpose

of illustrating the unreliability of the BLMIS records. PCX049 shows that Unflat received a check for $4,226.20, which was deducted from his account. But as indicated by PCX048, Unflat never cashed that check. When asked about the check, Collura admitted that she would have no way to verify whether it was ever cashed by Unflat without seeing a cancelled check or Unflat's personal account records, and she had neither for this transaction. Tr. at 153:24-154:12.[3]

116.   Bongiorno testified that BLMIS had a "different story" every five to ten years. Bongiorno Tr. at 15:7-20. For instance, during one unidentified period Madoff decided to make all new accounts "Send" accounts. Bongiorno Tr. at 35:1-9. Winnifer Jackson testified that employees gave Madoff profit withdrawal checks directly on occasion, trusting Madoff to give the checks to the client personally. Jackson Tr. at 110:19-110:25. There is simply no basis to conclude that Madoff maintained a regular or reliable procedure with respect to Profit Withdrawals and thus the business records exception is inapplicable.

117.   Further, in 1998, BLMIS underwent considerable changes related to the PW notations, most notably the switch from an arbitrage system to an options system. Sala Tr. at 29:6-23; Bongiorno Tr. at 60:6-61:10. Whereas arbitrage checks would theoretically be sent every time a profit was realized, options checks went out far less frequently.

118.   JoAnn Sala, the BLMIS employee responsible for the arbitrage accounts from 1984 on, Sala Tr. at 12:20-13:12, 20:16-21, retired in 1998. Sala Tr. at 29:6-23; Bongiorno Tr. at 60:6-61:10. From 1984-1998, Sala tracked the purported arbitrage trades that created the non-existent profits. Sala Tr. at 188:6-188:9. She testified that she did not know whether any of her practices were carried forward as the accounts were moved from the arbitrage to the options model after

---

[3]   The Trustee makes the absurd argument that Blecker himself sought to introduce certain BLMIS documents such as PCX049, and therefore, Blecker cannot object on the basis of hearsay. [ECF No. 17308, ¶ 165]. But this statement was put in for the limited, non-hearsay purpose of demonstrating its falsity. And, of course, the writings from customers are not documents generated by BLMIS; they were written to BLMIS by customers.

her retirement.  Sala Tr. at 224:7-224:15 (Q: To your knowledge, did customers still have profit

withdrawal transactions after arbitrage was phased out?  A: I don't know if they did.  Q: When you

transferred accounts over to the dash 3 accounts, did any of the dash 3 accounts receive profit

withdrawal transactions? A: I don't know.").

   iii.   <u>The Madoff records lack the hallmarks of trustworthiness</u>

   119.   Finally, the business records exception is inapplicable because any hearsay

statement admitted under the rules must bear the hallmark of trustworthiness.  *See Wantanabe

Realty Corp. v. New York*, 2004 WL 188088, at *2 (S.D.N.Y. Feb. 2, 2004) (finding Rule 807

unavailable where there was "nothing particularly trustworthy" about a record upon which an

expert sought to rely); Fed. R. Evid. 803, advisory committee's note  ("Conventional doctrine

has excluded from the  hearsay  exception, as not within its guarantee of truthfulness, statements

to a physician consulted only for the purpose of enabling him to testify.").   Documents prepared

in order to deceive are inherently unreliable, and the Trustee alleges[4] that the same BLMIS

records on which he relies were meant to deceive customers and were made with actual intent

to hinder, delay, or defraud creditors.  *See Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014);

*Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir. 1996), *rev'd on

other grounds*, *Jubber v. SMC Elec. Prods. (In re C.W. Mining Co.,)*, 798 F.3d 983, 986 (10th Cir.

2015)); *Hayes v. Palm Seedlings Partners-A (In  re Agric. Research & Tech Grp., Inc.)*, 916

F.2d 528,  535  (9th Cir. 1990).  This alone takes them outside the purview of Rule 803.

---

[4]  [*See, e.g.* ECF No. 13876 at 5 (Trustee's Supp. Br., Aug. 12, 2016)] (discussing fraudulent and "fictitious"
notations in the customer statements);  [ *id*. at 5] (warning against giving "undue credence to fictitious
amounts engineered by Madoff"); [*id*. at 6] ("the securities transactions reflected on BLMIS books and
records were fictitious"); [*id*. at 63] (discussing "the fraudulent nature of BLMIS's business . . ."); [*id*. at
65] (discussing "the length of Madoff's fraud").  *See also* Declaration of Bruce G. Dubinsky, November
24, 2015, Ex. 1 at 157 [ECF No. 12137-1] (Expert Report of Bruce G. Dubinsky). ("[F]raud permeated
BLMIS to the extent that the company's books and records could not be relied upon by a hypothetical
buyer."); [*id*. at 12, 32, 155] ("Fraud permeated BLMIS.").

120.    When considering whether a document was prepared by an untrustworthy source, courts examine whether the party providing the information had an incentive to misrepresent. *Palmer v. Hoffman*, 318 U.S. 109, 113-14 (1943) (excluding accident report on the grounds that it was prepared in anticipation of litigation).    Like all hearsay exceptions, the business records exception rests on a fundamental premise that the information contained therein is reliable. Where, however, the records were created with an incentive to misrepresent, that fundamental premise is violated, and courts will not admit the evidence.

121.    To this end, courts discuss the lack of any incentive to misrepresent in the business records as a condition of admissibility.    *See e.g.*, *United States v. N.Y. Foreign Trade Zone Operators*, 304 F.2d 792, 796 (2d Cir. 1962) (admitting record on the grounds that it was prepared pursuant to a statutory duty); *Hoffman v. Palmer*, 129 F.2d 976, 991 (2d Cir. 1942), *aff'd Palmer v. Hoffman*, 318 U.S. 109, 113-14 (1943) (excluding evidence where author's statement was "dripping with motivations to misrepresent").    In *United States v. Dreer*, the Eleventh Circuit rejected a set of business records on the grounds that other records in the business were falsified.    740 F.2d 18 (11th Cir. 1984).    The court held that "[a]lthough the proponent of the records did not admit that the records were falsified, there was an extremely strong inference arising from evidence of numerous other forged financial documents that the proffered evidence was not genuine."    *Id*. at 20.

122.    Here, unlike legitimate businesses that rely on accurate records to maintain profitability and avoid regulatory issues, the *inaccuracy* of BLMIS' records was pivotal to its survival.    As the Trustee contends, Madoff relied on misleading innocent customers to hide the fact that no trades were occurring and the customer was not actually making any return.    This incentive to misrepresent disqualifies the BLMIS records from admission under Rule 803(6).

2. <u>The ancient documents exception (Fed. R. Evid. 803(16)) does not apply</u>

123.     In a bizarre twist worthy of a law review article, the Trustee argues that many of the records the Trustee relies on were created more than 20 years ago and therefore fall within the exception to the rule against hearsay as ancient documents under Fed. R. Evid. 901(b)(8) and 803(16).  [ECF No. 17308, ¶ 170].  Apparently, the Trustee believes the Second Circuit would accept the proposition that judges and juries should exercise their judicial and fact finding duties in reliance upon the documents of a fraudster once the documents have aged to at least 20 years. However, this hearsay exception is notoriously unreliable, and the Federal Rules of Evidence were amended in 2017 to narrow this exception to the point where it will soon cease to exist.

124.     We have found no case which has suggested that Rule 803(16) could be used to cleanse the documentary evidence of a notorious fraudster.  Examples of the types of ancient documents that are admitted under Rule 803(16) include benign letters or other correspondence, old maps, or miscellaneous news articles.  *See*, *e.g.*, *United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 253-56 (S.D.N.Y. 2009) (personal letter); *Beach Mar, Inc. v. L&L Wings, Inc.*, 2016 U.S. Dist. LEXIS 9566 (E.D.N.C. Jan. 27, 2016); Rule 803(16), advisory committee's note (listing "letters, records, contracts, maps, and certificate, in addition to title documents" as the intended types of ancient documents that may be admitted).  In other words, Rule 803(16) allows for the admission of mundane documents where there is no reason to doubt their reliability and the declarant is unavailable.

125.     Since he is writing new law, the Trustee has been very generous to himself.  The 20-year period does not begin to run, he says, until the Trustee decides to use a specific document in court.  Thus, as he prolongs his trusteeship, an ever-expanding body of fraudulent documents becomes, he hopes, admissible.  So far, this would have allowed him to single-handedly enlarge the body of admissible BLMIS records from records predating 1988 (twenty years before the filing

date) to records predating 1996 (twenty years before his brief in response to Participating

Claimants' *motions in limine*),[5] simply by delaying the litigation of this issue.

126. The ancient documents exception applies to materials created 20 years prior to the

development of "*the controversy*," not the ultimate hearing. See Fed. R. Evid. 803(16), advisory

committee note to 1972 proposed rules (emphasis added). SIPA itself fixes the date for claim

determination as of the filing date, in this case December 2008. 15 U.S.C. §78lll(11). Further,

on the granting of a petition for a protective decree, the business of the broker is required to be

liquidated, and it is unlawful for the trustee (except as authorized by United States Securities

Exchange Commission) to operate the business. *See* 15 U.S.C. §§ 78fff(a)(4) and 78jjj(b). These

provisions necessarily fix the date from which the debtor's obligations to the customer are

evaluated, and the date from which the 20-year rule should be calculated if it had any

applicability. Thus, if the hearsay exception for ancient documents applies at all to this

proceeding, it can only apply to records that were created prior to 1988. Since the Trustee lacks

any records prior to 1981, the potential scope of this hearsay exception is limited – at best – to

BLMIS records between 1981-1988.

127. However, admission of BLMIS records pursuant to this exception would clearly run

afoul of Rule 803(16). As the Advisory Committee makes clear, the exceptions to the hearsay

rule "proceed[] upon the theory that under appropriate circumstances a hearsay statement may

possess circumstantial guarantees of trustworthiness sufficient to justify nonproduction of the

declarant in person at the trial even though he may be available." The very premise for admitting

"ancient records" was the Advisory Committee's presumption that the "age affords *assurance*

*that the writing antedates the present controversy*." Fed. R. Evid. 803(16), advisory

---

[5] [*See, e.g.* ECF No. 14485 at 56 (Trustee's Br., Nov. 18, 2016) ] (announcing relevant date as November 18, 2016 – the date of the Trustee's response brief).

committee's note (emphasis added). That is, age can establish the reliability of a hearsay document because the document likely would have "been written ***before*** the current motive to fabricate arose." *Hicks v. Charles Pfizer & Co.*, 466 F. Supp. 2d 799, 805-07 (E.D. Tex. 2005) (citations omitted) (emphasis added).

128.    As an initial matter, the Advisory Committee has since recognized that the assumption behind the ancient documents exception was mistaken. *Preliminary Draft of Proposed Amendments to the Federal Rules of Bankruptcy Procedure and the Federal Rules of Evidence 18*, Committee On Rules of Practice and Procedure of the Judicial Conference of the United States, U.S. COURTS (Aug. 2015) ("[A] document does not become reliable just because it is old; and a document does not magically become reliable enough to escape the rule against hearsay on the day it turns 20."). Thus, where the circumstances are such that the already-faulty assumption behind the exception is inapplicable – as it is here – it should not be applied.

129.    The Trustee himself contends that Madoff's records from the 1980s are permeated with fraud. Obviously, then, BLMIS' records from the 1980s do not predate the present controversy and were written when there was a motive to fabricate. The lapse of time has not rendered BLMIS' account statements more likely to be truthful. Admitting the BLMIS books and records on the ground that the fraud was so difficult to detect that it lasted for decades would produce an absurd result.

130.    Indeed, recent amendments to the Federal Rules of Evidence make clear that the ancient documents exception will soon be abrogated entirely, and this Court should not now take this rare exception to unprecedented proportions. In 2017, the ancient documents exception was narrowed to limit its application only to "[a] statement in a document that was prepared before January 1, 1998, and whose authenticity is established." Fed. R. Evid. 803(16). This drafting revision narrows the application of the exception, and is the result of the Committee's

determination "that the ancient documents exception should be limited due to the risk that it will be used as a vehicle to admit vast amounts of unreliable electronically stored information (ESI)." Fed. R. Evid. 803(16), advisory committee notes to 2017 amendments. The effect of this amendment is to ultimately phase out the exception as future litigations will be increasingly less likely to rely on documents created prior to a fixed point in time.

131. Moreover, even if the ancient documents exception is applicable, such that the records themselves might be admissible, this does not resolve the fact that the contents of the records are inadmissible hearsay. *See* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."). "Ancient documents are subject to Rule 805 because 'hearsay statements contained within an ancient document lack the same indicia of trustworthiness and reliability that provide the rationale for admitting statements when the declarant is the author of the ancient document.'" *Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 190 (3d Cir. 2016), *cert. denied Langbord v. Dep't of Treasury*, 137 S. Ct. 1578 (2017) (citation omitted) (explaining trend to limit the ancient document exception because it relies on the faulty assumption that a document is accurate just because it is old). Similarly, the ancient documents exception is inapplicable because no hearsay can be admitted, other than statements of a party-opponent, absent personal knowledge. *See* Fed. R. Evid. 803, committee notes. ("In a hearsay situation, the declarant is, of course, a witness, and neither this rule nor Rule 804 dispenses with the requirement of firsthand knowledge.").

132. Here, it is not even known who the declarant is, when the statement was made, or whether the declarant had firsthand knowledge.

133. Moreover, the Trustee cannot authenticate the BLMIS documents under the authentication rules for the ancient documents exception. Such documents must be authenticated under Federal Rule of Evidence 901(b)(8), which requires the proponent to show that the record

is in a condition that creates *no suspicion about its authenticity*.  The proponent must also show that the document was in a place where, if authentic, it would likely be.  *Id.*  Certainly, the Trustee cannot establish that the records of a notorious fraudster are without suspicion as to their authenticity.  Thus, the ancient records exception cannot apply to admit the BLMIS records for their truth.

### 3. The residual exception (Fed. R. Evid. 807) does not apply

134.    The Trustee also seeks to admit BLMIS records based on the residual exception of Rule 807.  It is difficult to see how the Trustee can make this argument.

135.    A party seeking to admit a statement under Rule 807 bears the burden of establishing that the statement is especially trustworthy.  *See, e.g.*, *Jacobson v. Deutsche Bank, A.g.*, 206 F. Supp. 2d 590, 595 (S.D.N.Y. 2002).  At a minimum, "the hearsay evidence [must] have 'circumstantial guarantees of trustworthiness' that are 'equivalent' to those reflected in the other hearsay exceptions."  *Batoh v. McNeil-PPC*, 167 F. Supp. 3d 296, 311 (D. Conn. 2016) (citation omitted); Fed. R. Evid. 803, advisory committee's note ("The committee believes that there are certain ***exceptional circumstances*** where evidence which is found by a court to have guarantees of trustworthiness equivalent to or exceeding the guarantees reflected by the presently listed exceptions, and to have a high degree of pro[b]ativeness and necessity could properly be admissible.") (emphasis added).

136.    As detailed *supra*, Rule 803 does not allow for admission of BLMIS records because they bear no indicia of reliability:  the handwritten notations were made at unspecified times by unidentified personnel.  The customer statements were generated to perpetrate a fraud. The Trustee misses the point in arguing that Blecker has not shown that the "BLMIS books and records are not what they purport to be."  [ECF No. 17308, ¶ 174].  They purport to be BLMIS' books and records, but they have no indicia of reliability.  BLMIS was permeated by fraud; the

preparers of the books and records are in jail now; and there is no basis on which a rational person could rely upon the records. Rule 807 does not solve the Trustee's problem: it is not enough that a document is what it purports to be if what it purports to be is an unauthored book entry that was prepared at the behest of a convicted fraudster *in order to* deceive a customer and perpetuate the fraud.

137.    The Trustee cannot have it both ways. These are not "exceptional circumstances" in which this Court could find the documents have "guarantees of trustworthiness equivalent to or exceeding the guarantees" of all other hearsay exceptions. Accordingly, the Court should end its Rule 807 analysis and rule that the BLMIS account statements are inadmissible except to the extent they were produced by a customer and thus are evidence that they were received by the customer. The records are inadmissible for any other purpose.

138.    With a note of desperation, the Trustee argues that the BLMIS records are the "most probative" evidence he has. While that may be the case, it does not mean the evidence is admissible. The residual exception can only be invoked when it would be used to introduce evidence that "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(3). But "necessity alone will not render hearsay admissible under the residual exception" because "[s]uch a rule would eviscerate the hearsay rule." *Jacobson v. Deutsche Bank, A.g.*, 206 F. Supp. 2d 590, 596 (S.D.N.Y. 2002) (emphasis added). It is hard to imagine a worse case to invoke the Rule 807 exception; here, the Trustee has no objective evidence to verify the accuracy of otherwise fraudulent records but seeks to introduce the documents for their truth to rebut Blecker's firsthand testimony that he did not request or receive the alleged profit withdrawal checks. The Trustee wants the Court to eviscerate the hearsay rule so that he can deny SIPC insurance to Blecker in the face of direct and unimpeached evidence that Blecker never received profit withdrawal checks.

139.    The residual exception can only be applied when it would serve the interests of justice. Fed. R. Evid. 807(a)(4).  Admitting known fraudulent, misleading documents for the *truth* of the matter they assert perverts the goal of "ascertaining the truth and securing a just determination."   *See* Fed. R. Evid. 102.  The interests of justice are not served by relying on classic hearsay to deny SIPC insurance to a 106-year-old Madoff victim who obviously has a valid claim to $577,350.33.

140.    There is, additionally, a procedural defect which prevents the Trustee from obtaining the extraordinary relief he seeks.  The residual exception can be invoked "only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement *and its particulars, including the declarant's name and address*, so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b) (emphasis added).  The Trustee did not provide any notice of his intent to offer evidence under this exception, nor can he even identify the declarants.  The Trustee does not even attempt to make the necessary showing of having given notice, instead he cursorily suggests that he could provide sufficient notice simply by "having produced copies of the BLMIS books and records to the Participating Claimants as part of these proceedings."  [ECF No. 17308, ¶ 175].  This is not sufficient notice, and the Trustee has not satisfied this exception.  *See Ruffin*, 575 F.2d 346, 358 (2d Cir. 1978) ("'Requirement of advance notice to be rigidly enforced.'") (citation omitted); *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 167 (3d Cir. 1995) (trial court erred in admitting evidence under residual exception where proponent did not provide advance notice and holding that "the proponent must give notice of the hearsay statement itself as well as the proponent's intention specifically to rely on the rule as a grounds for admissibility of the hearsay statement").

D.      The Trustee's Summary Exhibits rely on inadmissible material and are prohibited by
        Federal Rule of Evidence 1006

141.    The Trustee seeks to introduce Principal Balance Calculations prepared by Greenblatt, identified at exhibits TX086, TX091, TX092, and TX093.    These exhibits purport to summarize the PW notations and other inadmissible hearsay within the BLMIS records.

142.    These exhibits are inadmissible because the underlying documents on which they are based are themselves inadmissible. *See, e.g.*, 6-1006 Weinstein's Federal Evidence § 1006.07 (2015) ("Summary evidence is inadmissible if the original materials on which it is based contains hearsay that does not qualify as admissible evidence under one of the exceptions to the hearsay rule."); *United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) (summary evidence cannot be admitted if the underlying materials are inadmissible).  Summary evidence is ***entirely inadmissible*** if it consists at all of ***any*** evidence that is inadmissible.  *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1260 (9th Cir. 1984) (emphasis added) ("And it is clear that a summary of both inadmissible and admissible hearsay should not be admitted under Rule 1006.").

143.    The Trustee argues that his summary exhibits are admissible under Rule 1006 because the underlying documents were made available to Participating Claimants.  [ECF No. 17308, ¶ 184].  First of all, this is untrue.  *See* Chaitman Decl., ¶¶ 11-4, 16; *see also id.*, Exs. M-P.  But it is irrelevant because the documents themselves are hearsay and are thus inadmissible.

144.    Greenblatt cannot pick-and-choose from an incomplete universe of records to create summaries which are totally misleading.  *See United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986) (reversible error for trial court to admit summary evidence that did not fairly represent and summarize the evidence upon which it was based); *United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001) (a summary cannot include only evidence favoring one party if the witness "represent[s] to the jury that he is summarizing all the evidence in the case"); *Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003, 1017 (2d Cir. 1995), *as amended* (Dec. 22, 1995),

*cert. granted, judgment vacated sub nom. Consorti v. Owens-Corning Fiberglas Corp.*, 518 U.S. 1031 (1996) (summaries excluded "because the records may not have comprised the universe of . . . documents"); *United States v. Groysman*, 766 F.3d 147 (2d Cir. 2014) (vacating conviction where government's primary evidence was summary evidence consisting of inadmissible hearsay for which the foundation had been provided by a witness without personal knowledge of the matter conveyed).

145.    Moreover, many of the "BLMIS Source Documents" cited in the summaries are illegible.  *See* Chaitman Decl., ¶ 15; *id.*, Exs. M-P.  Rule 1006's requirement that the originals or duplicates be made available for examination would have no meaning if it could be satisfied by producing illegible documents.  Thus, the summary exhibits are inadmissible.

E.    <u>The Trustee's demonstratives are inadmissible</u>

146.    Demonstrative evidence cannot be admitted for its truth.  *See, e.g.*, *Boykin v. W. Express, Inc.*, 2016 WL 8710481, at *5 (S.D.N.Y. Feb. 5, 2016) (admitting demonstrative for "limited purpose of illustrating . . . testimony to the jury" and holding that "to the extent it is offered for its truth, the diagram is inadmissible hearsay and cannot be submitted as substantive evidence").  Thus, the Trustee's demonstratives cannot be admitted as substantive evidence.

147.    The Trustee seeks to admit two demonstrative exhibits as substantive evidence, TXDEM005 and TXDEM006.  These demonstratives purport to summarize Blecker's Principal Balance Calculations, which themselves consist of inadmissible hearsay, and are also derived from portions of Greenblatt's expert reports.  *See* TXDEM005 (listing sources as TX086 and Second Supplemental Analysis of the Profit Withdrawal Transaction, Expert Report of Matthew B. Greenblatt, dated June 3, 2016, Ex. 11A); TXDEM006 (listing sources as TX091 and Second Supplemental Analysis of the Profit Withdrawal Transactions, Expert Report of Matthew B. Greenblatt, dated June 3, 2016, Ex. 14A).

148.     This evidence is inadmissible because the underlying evidence does not support the facts set forth in the demonstratives.

149.     The term demonstrative is used "to refer to an object or document that could be displayed to the jurors to help them understand the substantive evidence (testimony or other objects or documents) by interpreting, summarizing, or explaining it, but that would not be available during deliberations as substantive evidence." 4-611 Weinstein's Federal Evidence § 611.02. Demonstrative evidence "has no independent probative value.  Demonstrative evidence only illustrates or clarifies other substantive evidence."  Robert D. Brain & Daniel J. Broderick, *The Derivative Relevance of Demonstrative Evidence: Charting Its Proper Evidentiary Status*, 25 U.C. Davis L. Rev. 957, 973 (1992).  Thus, demonstrative evidence cannot be admitted as substantive evidence and it cannot be admitted in the absence of introduction of the substantive evidence. Here, clearly, the Trustee is using demonstratives, introduced through Greenblatt, where he lacks the underlying evidence to support the demonstratives.

150.     Exhibits 11A and 14A to Greenblatt's Second Supplemental Expert Report, which are the basis for the demonstratives, are not evidence in the case.   Thus, the Trustee's demonstratives simply summarize evidence that the Trustee has not proven.  This is untenable. *See Nat'l Ass'n. for Advancement of Colored People v. A.A. Arms, Inc.*, 2003 WL 2003800, at *2 (E.D.N.Y. Apr. 14, 2003) (admitting demonstrative evidence when it consisted of evidence that was already admitted and was otherwise admissible under some rule of evidence); 4-611 Weinstein's Federal Evidence § 611.02; 5-900 Weinstein's Federal Evidence § 900.07 (demonstrative evidence clarifies evidence that is in the case).

151.     The Trustee alternatively seeks to introduce the demonstratives under Rules 702 and 703 because "they constitute scientific, technical, or other specialized knowledge that, for pedagogical reasons, will help the factfinder understand the evidence and to determine facts at

issue." [ECF No. 17308, ¶ 189]. But the demonstratives do not seek to establish evidence requiring "scientific, technical, or other specialized knowledge." On the contrary, the demonstratives are based entirely on inadmissible hearsay. "Although the Rules permit experts some leeway with respect to hearsay evidence, a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (citing *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007)).

152.    Moreover, the Court has already determined that the Trustee's experts cannot testify as to the contents of missing or non-existent documents. April 18, 2017 Tr. at 28:15-16; *id.* at 42:4-12. The demonstratives impermissibly attempt to offer an opinion that missing or non-existent documents constituted checks to Blecker in amounts as to which Greenblatt offers only his speculation. The demonstratives are inadmissible.

F.    The Declaration of Aaron Blecker

153.    The Trustee challenges the admissibility of PCX068, which is Blecker's declaration that was an exhibit to Blecker's deposition, on the basis that PCX068 does not contain an exhibit tab. This declaration was filed with the Court on May 16, 2014 in opposition to the Trustee's motion to affirm his treatment of the Net Investment Method to the Determination of Customer Transfers between BLMIS Accounts. [*See* ECF No. 6719].[6] The filing of this declaration led to the Court's suggestion that the Trustee and Blecker's counsel take his deposition to preserve his testimony. *See* July 6, 2016 Tr. at 9:19-10:18 ("[H]e submitted a declaration which squarely put into issue the question of his profit withdrawals, and whether he had ever received anything. . . . More than two months later, you take his deposition, or you defend his deposition."). A copy of

---

[6] This same declaration was later filed on November 18, 2016 as Exhibit K to the November 18, 2016 Declaration of Helen Davis Chaitman on behalf of Blecker in opposition to the Trustee's Motions in Limine Numbers 3 and 4 in this Profit Withdrawal Proceeding. [*See* ECF No. 14480-11 (Ex. K)].

this declaration was supplied to the Trustee at Blecker's deposition, during which time Blecker

confirmed that the declaration was one that his counsel had drafted and had been filed with the

bankruptcy court.  *See* Blecker Tr. at 5:5-6:4.  The Court denied the Trustee's request to depose

Blecker a second time because this declaration was an exhibit at Blecker's Deposition.  July 6,

2017 Tr. at 9:9-20.  There is no reason to doubt that PCX068 is the same declaration that was

authenticated at Blecker's deposition, and has been filed with this Court numerous times, although

it may not contain an exhibit tab.

## PROPOSED COUNTER-CONCLUSIONS OF LAW

**I.    The Trustee's omnibus treatment of PW Transactions is upheld only as to those customers who did not object**

A. This proceeding does not challenge the Trustee's selection of the Net Investment Method for calculating net equity

154.    The Court rejects the Trustee's suggestion that his determination that PW entries

represent withdrawals is supported by his selection of the Net Investment Method for calculating

net equity.  [ECF No. 17308, ¶¶ 192-201].  Participating Claimants do not challenge the Net

Investment Method for calculating net equity, and this proceeding was not intended to determine

the appropriateness of the Net Investment Method.  As the Trustee tacitly acknowledges, this

proceeding is about the appropriateness of Collura's methodology of confirming PW transactions

through reliable third-party documents and about the validity of Blecker's claim for $577,350.33

– the amount the Trustee concedes that Blecker and his wife deposited with Madoff.  [*See* ECF

No. 17308, ¶ 198] ("[T]he issue is whether the Trustee's determination that PW Transactions

belong in the 'cash out' column is a proper exercise of his obligation under SIPA to ascertain net

equity based on the books and records of the debtor.").  The Trustee did not make this factual

showing for Participating Claimants in general or for Blecker in particular.

B.      The Trustee's application of the Net Investment Method to the PW Transactions is not
correct as a matter of law

155.    The Trustee asks the Court to conclude that the "BLMIS books and records reflect
accurate deposits and withdrawals" apparently without any exception.  [ECF No. 17308, ¶ 199].
However, it is simply impossible, based on the evidence and the Trustee's own admissions, to
conclude that BLMIS' books and records are *uniformly* accurate with respect to deposits and
withdrawals, particularly where the Trustee's own experts admit that BLMIS' books and records
are riddled with inaccuracies.

156.    Based on the erroneous premise that BLMIS' books and records are uniformly
arcuate with respect to deposits and withdrawals, the Trustee also asks the Court to conclude that
all PW transactions are withdrawals or debits.  [ECF No. 17038, ¶ 200].  The Court cannot
conclude that PW notations *uniformly* represent "cash out" withdrawals from client accounts.
Where a PW notation in the BLMIS books corresponds with a check actually received by a
customer, Participating Claimants do not dispute that the amount of the check should be included
as a withdrawal in the net equity calculation for that claimant.   On the other hand, as the Trustee
admits, whether a customer actually received such PW funds is a question of fact.  Thus, where
there is a dispute over whether such a check was sent or received, it is for the Court to determine,
by a preponderance of the evidence, whether a PW notation may be treated as a customer
withdrawal.

C.      The Trustee's determination is not entitled to deference

157.    The Trustee argues that "the Trustee's decision to treat PW Transactions as debits
is also entitled to deference because it is not 'clearly inferior' to other methods."  [ECF No. 17308,
¶ 202].  The Trustee argues that Participating Claimants do not offer a "competing methodology."
[*Id*., ¶ 204].  However, Blecker is not challenging the Trustee's *methodology*, and Blecker is thus
not required to offer an alternative methodology.  Blecker challenges the *fact* that the Trustee

assumes that Participating Claimants received Profit Withdrawal checks. The Court is not required to give any deference to the Trustee's determinations of this fact, particularly where it is not based on any admissible evidence.

158.   This matter does not concern any area for which a trustee is afforded deference. SIPC concedes this point. [*See* ECF No. 13872 at 29 (SIPC Supp. Br., Aug. 12, 2016)] ("Clearly, Congress has not committed the determination of claims to the sole discretion of the trustee."). With respect to claim determinations, the Trustee has some discretion to determine the best method to calculate net equity. *SIPC v. BLMIS (In re Bernard L. Madoff Inv. Sec. LLC)*, 654 F.3d 229, 238 n.7 (2d Cir. 2011). The Net Equity Methodology is not in dispute here – rather, it is the Trustee's unsupported factual assertion that Blecker received profit withdrawals that is at issue. The evidence sufficiently refutes the Trustee's determination as to Blecker's claim, such that the Court should determine the validity and amount of the claim *de novo*.

159.   Similarly, the Trustee argues that Blecker and other Participating Claimants attempt to "cherry-pick the component parts of the net equity calculation that increase their claims against the estate or reduce the amounts owed to the Estate." [ECF No. 17308, ¶ 205]. The Trustee argues that Blecker relies on customer statements to support his deposits and, therefore, he is bound by those statements with respect to his withdrawals. [ECF No. 17308, ¶¶ 199, 204-205]. However, this argument is without merit for at least two reasons.

160.   First, the Trustee has already admitted Blecker's deposits, *see* PCX017, PCX023, and therefore Blecker need not rely on the customer statements. *See* Fed. R. Evid. 802(d)(2) (admissions by party-opponents are non-hearsay). Second, if Blecker were bound by the customer statements, then the Trustee would be bound to honor Blecker's claim up to the total account balance on his last statement. By not honoring Blecker's claim up to the total amount on his last

statement, and by now seeking to further reduce Blecker's claim based on PW Transactions, it is the Trustee who is cherry-picking.

## II.    It is for the Court to determine, by a preponderance of the evidence, whether Blecker received cash withdrawals corresponding to entries recorded as PW Transactions on the admittedly fraudulent BLMIS records

161.    SIPA establishes procedures for liquidating failed broker-dealers, which grant priority to claims of the broker's customers for their account balances, computed as the customer's "net equity." SIPA establishes a fund of customer property separate from the general estate of the failed broker-dealer, for distribution exclusively to the broker-dealer's customers. Each customer shares ratably in this special fund to the extent of the net equity in each account. 15 U.S.C. § 78fff-2(c)(1)(B). The SIPA trustee is charged with determining the net equity claims of customers who make claims against the separate pool of customer property. 15 U.S.C. § 78fff-2(b).

162.    A claimant bears the initial burden of establishing that he is a customer and has a claim against the customer property pool. *See SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282 (2d Cir. 1974). Customer status is established simply by showing that the claimant deposited cash with a broker for the purpose of purchasing securities. *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 236 (2d Cir. 2011) (the "*Net Equity Decision*") (citing 15 U.S.C. § 78*lll*(2)(B)(i)). The Trustee is incorrect to argue that Blecker must establish customer status by proving, not only that he was a customers under SIPA as that status is defined by SIPA itself and cases in this liquidation, but also that he did not receive each and every PW debit that the Trustee alleges he did. [*See* ECF No. 17308, ¶¶ 212-214]. There is no authority for this argument whatsoever.

163.    A SIPA trustee's primary duty is to promptly discharge the debtor's obligations to customers by paying these claims where *either* the obligations "are ascertainable from the books and records of the debtor *or* are otherwise established to the satisfaction of the trustee." 15 USC

§ 78fff-2 (emphasis added).  Recognizing that books and records may not always be available, Congress gave a SIPA trustee the authority to pay claims in the absence of complete debtor records.  As SIPC points out, SIPA was created when "severe back office problems in the securities industry result[ed] in substantial inaccuracies in account records . . . ."  *See In re MV Secs., Inc.*, 48 B.R. 156, 159 n.5 (Bankr. S.D.N.Y. 1985).  In the absence of records, Congress allowed the trustee charged with the duty of investigating the estate the discretion to satisfy obligations that are established to his satisfaction.  *See* 15 U.S.C. § 78fff-1(a)(4).[7]

164.    However, much like the Bankruptcy Code's procedure, whereby a formal proof of claim constitutes *prima facie* evidence of the claim's validity and amount, the Trustee's determination stands only until it is sufficiently challenged.  Once a customer objects with evidence to rebut[8] the Trustee's determination, the customer is entitled to the Court's *de novo* review without deference to the Trustee to determine the validity and amount of the claim.  *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 619 (1993) (noting that a trustee "is not a judge.  He performs no judicial or quasi-judicial functions.  He hears no witnesses and rules on no disputed factual or legal questions.").  *See Fed. R. Bankr. Proc.* 3001(f).  SIPA Section 8(a)(4) specifically refers to the formal proof of claim

---

[7]   On the other hand, where the obligations are ascertainable from the books and records, Congress deliberately refrained from adding any deferential language.  Thus, even if a trustee has some discretion to honor a debtor obligation in the absence of records, where debtor obligations are ascertainable from the documents, they should be discharged.  *Compare* 15 U.S.C. §§ 78fff-4(a) *and* (f) (providing for SIPC discretion)*, with* 15 U.S.C. § 78eee(b)(6)(B) (explicitly giving trustee discretion); *see also Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")).

[8]   *See Cappuccio v. Prime Capital Funding LLC*, 649 F.3d 180, 190 (3d Cir. 2011) (discussing rebuttable presumption applicable under Federal Rule of Evidence 301 in civil cases); *Liebert v. Nisselson (In re Levine)*, 2008 WL 4186322, at *14 (Bankr. S.D.N.Y. Sept. 5, 2008) (applying Rule 301 to find rebuttable presumption of insolvency under bankruptcy code); *In re Edwards*, 50 B.R. 933, 942 (Bankr. S.D.N.Y. 1985) (citing Rule 301 in finding rebuttable presumption in bankruptcy proceedings).

language from Section 501 *et seq.* of the Bankruptcy Code, noting that SIPA does not limit this

process. *See* 15U.S.C. § 78fff-2(a)(4).

### III.    Blecker has produced unrebutted direct evidence that he never received a Profit Withdrawal

165.    Federal Rule of Evidence 301 provides the default rule for rebutting a presumption

of fact arising from applicable law. *See ITC Ltd. v. Punchgini Inc.*, 482 F.3d 135, 148 (2d Cir.

2007).  Where sufficient evidence is introduced to rebut a presumption, the presumption "ceases

to operate" and the issue is treated as an ordinary question of fact. *See id*.  Here, Blecker has

met his burden to rebut any presumption in favor of the Trustee's claim determination through the

evidence in this case.  Specifically, Blecker's testimony, made under oath and submitted into

evidence before this Court, shows that he did not receive checks corresponding to the PW

notations at issue. *See Cappuccio*, 649 F.3d at 190 (holding that testimony alone is sufficient to

overcome a presumption of receipt).  The majority position when applying Federal Rule of

Evidence 301 is that "the quantum of evidence needed to 'burst' the presumption's 'bubble' . . .

[is] minimal, given that the presumption's only effect is to require the party [contesting it] to

produce enough evidence substantiating [the presumed fact's absence] to withstand a motion for

summary judgment or judgment as a matter of law on the issue." *Id*. at 189 (internal quotation

marks omitted); *see also ITC*, 482 F.3d at 148 (demonstrating that the Second Circuit adopts the

majority view in interpreting Rule 301).

166.    As a result, to be entitled to a favorable ruling from the Court, the Trustee must

produce sufficient contrary evidence supporting his specific claim determinations.  In this

proceeding, the Trustee has offered no evidence that the PW notations at issue accurately record

withdrawals.  Because there is no evidence that Blecker received checks corresponding to any of

the PW transactions at issue and he has sworn to the contrary, the Trustee's inference runs counter

to the available evidence and should not be permitted to stand.

167.    The only direct evidence in this case relating to the Bleckers' accounts is the unimpeached sworn testimony of Blecker and his son.  This testimony establishes, *inter alia*, that: (a) Blecker never requested profit withdrawals, (b) Blecker never received profit withdrawals, (c) Blecker consistently maintained for decades that he never took profit withdrawals; (d) Blecker would not have taken profit withdrawals because it would have conflicted with his intent to use his Madoff accounts as a savings vehicle; and (e) one of the few arguments between Blecker and his son was when his son told his father he wanted to withdraw profits from his own Madoff account.

168.    Even during trial, when the Trustee literally had a courtroom full of attorneys, the Trustee could not impeach Robert's testimony on cross-examination.

169.    The Court finds this evidence to be credible.  *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("Credibility determinations and assessments regarding the weight of the evidence are made by the trier of fact . . . ."); *Aniero Concrete Co. v. NYC Constr. Auth.*, 2003 WL 210882, at *3-4 (S.D.N.Y. May 5, 2003)) (credibility determination is for trier of fact; concluding that oral testimony based on personal knowledge is sufficient to meet party's burden even absent documentary support).

170.    To hold otherwise would require this Court to find that Blecker consistently lied to his son – for no apparent reason – about whether he received withdrawals from his Madoff accounts, and he maintained that lie for decades.  It would be fanciful for this Court to conclude that Blecker would have concocted such lies decades in advance of this proceeding, when he would have no motivation to do so.  *Cf.*  Fed. R. Evid. 801(d)(1)(B) (consistent statements made prior to a motive to lie are reliable and thus non-hearsay).

**IV.      The Trustee has not established that Blecker received Profit Withdrawals**

171.    The Trustee has not established that Blecker received profit withdrawals.  The Trustee's only evidence in this case established that customers who did not participate in this proceeding, and whose calculation of net equity is not in dispute, may have received profit withdrawals.

172.    The Trustee's evidence with respect to other customers does nothing more than illustrate the Trustee's lack of evidence with respect to Blecker.  For example, the Trustee cannot explain why there is not a single writing in Blecker's customer file requesting profit withdrawals.  The Trustee cannot explain why Blecker's account allegedly received profits withdrawals through 1997, but not after.  The Trustee cannot explain why he does not have a single check representing profits paid to Blecker.  Even the Trustee's own expert, Lisa Collura, admitted that she could not reconcile Blecker's accounts.

173.    The Trustee, inexplicably, failed to introduce into evidence a complete set of the Bleckers' statements.   The Trustee put in no evidence that the Bleckers received profit withdrawals.  The Court will not now deny the claim of a 106 year-old, whose credibility there is no reason to dispute, based on the Trustee's evidence, which consists of nothing more than inferences and speculation.

174.    The Trustee's reliance on admittedly fraudulent documents over the sworn testimony of innocent customers with firsthand knowledge of the events appears to stem from his unfounded view that documentary evidence is inherently more reliable than oral testimony.  This Court is unaware of any authority to support the position that the fraudulent and uncorroborated records of a fraudster are more reliable than unrebutted sworn testimony.  *Cf. See Curtis v. Perkins*, 781 F.3d 1262 (11th Cir. 2015) (courts may admit documents sent to other

financial institutions prepared by broker in a fraudulent scheme *only* where trustee has reconciled

the information in those documents to reliable third party records).

## V.   Blecker did not ratify the Profit Withdrawal entries

175.    The Trustee argues that Blecker cannot contest the PW notations because he did

not object to the purported PW debits shown on various account statements within the ten-day

period provided in the BLMIS customer agreement.  The Court rejects this argument.

176.    As an initial matter, the two customer agreements relied on by the Trustee in

support of this argument were purportedly executed in November 1992, which was over a decade

after the Trustee alleges Blecker received any purported profit withdrawals.  [ECF No. 17308, ¶

211] (citing TX045, TX049).  These customer agreements obviously cannot retroactively ratify

alleged profit withdrawals that pre-date the agreements.  *See* TX045 at 28; TX049 at 11.

177.    But ratification does not apply at all in this case.  In the context of securities trading,

the doctrine of ratification is ordinarily only raised as a defense to claims by a customer against a

broker for unauthorized trading.  "An investor may 'ratify' an unauthorized trade by his conduct."

*In re Great E. Sec., Inc.*, 2011 WL 1345152, at *6 (S.D.N.Y. Apr. 5, 2011).

178.    However, this standard is not easily met.  "An investor ratifies an unauthorized

trade by acquiescing in it, and will be found to have acquiesced in a trade ***if the investor knew the***

***pertinent facts surrounding the transaction and*** ***manifested a clear intent to approve it***."  *Id*. at

*6 (emphasis added).  Here, Blecker did not know the pertinent facts surrounding the transaction,

*i.e.*, he did not know that Madoff was a fraud, and he denies ever receiving PW checks.  Thus,

Blecker did not manifest a clear intent to approve Madoff's sending him PW checks, which he

denies ever receiving.  The Court is unaware of any case that would support the Trustee's position

that a customer could ratify conduct that he denies ever happened.

179.    It is particularly appropriate to reject the Trustee's ratification argument in this case because the BLMIS statements were specifically designed to mislead customers.  The ratification doctrine can only apply where the customer is aware of all pertinent facts surrounding the transaction.  Clearly, where the BLMIS statements are virtually indecipherable, ratification cannot apply.  *See Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*, 936 F.2d 640, 646 (2d Cir. 1991) ("There will be instances where a disparity in sophistication between a brokerage firm and its customer will warrant a flexible application of such written notice clauses."); *Karlen v. Ray E. Friedman & Co. Commodities,* 688 F.2d 1193, 1200 (8th Cir.1982) ("When a customer lacks the skill or experience to interpret confirmation slips, monthly statements or other such documents, courts have generally refused to find that they relieve a broker of liability for its misconduct.");

180.    The Trustee makes much of the fact that Blecker's handwriting is found on two indecipherable BLMIS statements.   [ECF No. 17308, ¶¶ 125, 211] (citing TX081, TX082).  However, it is impossible for anyone to understand what those statements (or notes) might mean.  *See* TX081; TX082.  Cryptic brokerage statements intentionally designed to mislead cannot form the basis of ratification.  *See Karlen*, 688 F.2d at 1200 ("It has been recognized that confirmation slips and monthly statements do not enable a customer to determine his or her overall position or the total amount of real profit or loss occurring, unless the customer is sufficiently skilled to elaborate upon them to make that determination.").

181.    The Trustee argues that Blecker should have understood the statements, but Blecker already testified that he had "no way to prove whether . . . [his BLMIS statements] w[ere] correct or not," and he "assumed what they put on my statement must have been *in* my account."  Blecker Tr. at 14:14-20 (emphasis added).  Blecker also testified that he did not believe he had to check the BLMIS statements carefully because "Avellino & Bienes confirmed it," and he felt "that it was probably taken care of and there wouldn't be any worry about it and . . . there was no concern

about Madoff." Blecker Tr. at 14:22-15:5. Blecker further testified that he never felt he needed to carefully scrutinize his Madoff statements because he was introduced to Madoff through Madoff's father in law, who was a friend of his, and he understand that his investments were among those of Madoff's family. Blecker Tr. at 15:20-16:13.

182.    "The purpose of the ten-day written complaint clause in the customer agreement is to require the customer to memorialize his or her complaint soon after receipt of the account statement rather than waiting to see if the trade is profitable." *Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*, 936 F.2d 640, 645-46 (2d Cir. 1991). This purpose is not furthered by application of the doctrine to this case. This is not a case where Blecker was aware of an unauthorized trade, waited to see if it would be profitable, and then later sought to rescind it only after learning that it had moved against him. If the Trustee wants to rely on ratification, he should be required to pay Blecker his last-statement balance of $2.63 million. *See* PCX015 at 2.

183.    Further, the Trustee steps into Madoff's shoes, and he is barred under the doctrine of *in pari delicto* from enforcing the 10-day objection clause of the BLMIS contract against those customers whom he has defrauded. *See Modern Settings, Inc.*, 936 F.2d at 646 ("[A] broker may be estopped from raising a defense based on the written notice clause if the broker's own assurances or deceptive acts forestall the customer's filing of the required written complaint."); *Picard v. JPMorgan Chase & Co.*, 721 F.3d 54, 63 (2d Cir. 2013) ("The debtor's misconduct is imputed to the trustee because, innocent as he may be, he acts as the debtor's representative.") (dismissing common law claims); *Picard v. HSBC Bank plc*, 454 B.R. 25, 37 (S.D.N.Y. 2011) (applying "the common law doctrine of *in pari delicto*, which 'bars a trustee from suing to recover for a wrong that the debtor whose the estate he represents essentially took part in'") (citation omitted); *Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 758, 759 (2d Cir. 1983) (providing

that fraudulently induced contractual provisions are enforceable unless challenged by an unwilling innocent party seeking rescission).

184.    Madoff materially breached Blecker's customer agreements by converting Blecker's money and jeopardizing Blecker's life savings to concoct a massive fraud. A breach is material when it "substantially defeats the purpose of that contract." *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997). Thus, it is hornbook law that the Trustee, who steps in Madoff's shoes, may not, as a party in material breach of the customer agreement, enforce the 10-day-ratification provision against Blecker. *See, e.g.*, *Nadeau v. Equity Residential Properties Mgmt. Corp.*, 251 F. Supp. 3d 637, 641 (S.D.N.Y. 2017) ("Under New York law, when a party to a contract materially breaches that contract, it cannot then enforce that contract against a non-breaching party."). The Trustee may not invoke the securities contract waiver provision against Blecker.

## VI.    Because the Trustee cannot show that Blecker received cash corresponding to the PW notations, the Trustee erred in calculating his claim, and his claim should be calculated without regard to the PW notations

185.    Blecker accepts the cash-in cash-out methodology used by the Trustee to calculate net equity. With regard to the specific PW notations at issue, the Trustee has no corroborating evidence to support his assertion that these notations accurately reflect cash withdrawals. Blecker denies that they are accurate, a denial that comports with the bulk of the evidence regarding PW errors, the lack of any evidence of such checks, and the testimony concerning the PW process at BLMIS. There is insufficient basis to treat the PW notations as withdrawals from his accounts. The Trustee is required to pay Blecker's claim in an amount equal to the undisputed deposits into Blecker's accounts.

## CONCLUSION

Aaron Blecker's claim should be paid by the Trustee in the amount of $557,350.33 with prejudgment interest in view of the Trustee's unconscionable mistreatment of Blecker.

March 22, 2018                                **CHAITMAN LLP**

                                    By:      */s/ Helen Davis Chaitman*
                                             Helen Davis Chaitman
                                             Gregory M. Dexter
                                             465 Park Avenue
                                             New York, New York 10022
                                             Phone and Fax: (888) 759-1114
                                             hchaitman@chaitmanllp.com
                                             gdexter@chaitmanllp.com

                                             *Attorneys for Aaron Blecker*

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2018, I caused a true and correct copy of the foregoing document to be served upon the parties in this action who receive electronic service through CM/ECF and by electronic mail upon:

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
David J. Sheehan, Esq.
Email: dsheehan@bakerlaw.com
Seanna R. Brown, Esq.
Email: sbrown@bakerlaw.com
Amy E. Vanderwal, Esq.
Email: avanderwal@bakerlaw.com

**SECURITIES INVESTOR PROTECTION CORPORATION**
1667 K Street NW, Suite 1000
Washington, D.C. 20006
Telephone: 202.371.8300
Facsimile: 202.223.1679
Kevin H. Bell, Esq.
Email: kbell@sipc.org

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC and the Estate of Bernard L. Madoff*

**CHAITMAN LLP**
By: /s/ Helen Davis Chaitman
465 Park Avenue
New York, NY 10022
Phone & Fax: 888-759-1114
hchaitman@chaitmanllp.com

*Attorneys for Participating Claimants*