**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Dean D. Hunt
Email: dhunt@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff, | Adv. Pro. No. 10-05048 (SMB) |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT** |
| ESTATE of ARMAND L. GREENHALL, | |

PENG YAN, individually and as Executor of the
Estate of Armand L. Greenhall, and

DEIDRE SWEENEY, as Executor of the Estate of
Armand L. Greenhall,

                    Defendants.

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection

Act, 15 U.S.C. §§ 78aaa, et seq. ("SIPA"),[1] and the substantively consolidated chapter 7 estate of

Bernard L. Madoff ("Madoff," and with BLMIS, "Debtors"), by and through his undersigned

counsel, for his second amended complaint (the "Complaint") against the Estate of Armand L.

Greenhall (the "Greenhall Estate"), Peng Yan, individually and in his capacity as Executor of the

Greenhall Estate ("Yan"), and Deidre Sweeny, in her capacity as Executor of the Greenhall Estate

("Sweeney") (collectively, "Defendants"), states as follows:

## NATURE OF PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Madoff.  Over the course of the scheme, there were more than 8,000 client accounts at BLMIS.

In early December 2008, BLMIS generated client account statements for its approximately 4,900

open client accounts.  When added together, these statements purport to show that clients of

BLMIS had approximately $65 billion invested with BLMIS.  In reality, BLMIS had assets on

hand worth a small fraction of that amount.  On March 12, 2009, Madoff admitted to the fraudulent

scheme and pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in

prison.

---

[1] Hereinafter, applicable sections of SIPA shall be cited as SIPA § ____, and omit reference to title 15, United States
Code.

2.      Defendants the Greenhall Estate and Yan, individually, were beneficiaries of this Ponzi scheme.  After December 11, 2006, Armand L. Greenhall ("Greenhall") and the Greenhall Estate received $5,393,925 from BLMIS.  Of this amount, $5,217,527 represented fictitious profits from the Ponzi scheme.  Yan, in his individual capacity, received subsequent transfers of these fictitious profits in the amount of at least $4,208,133.  The Trustee seeks to avoid and recover BLMIS's fraudulent transfers of fictitious profits made to Greenhall, the Greenhall Estate, and, subsequently, to Yan, so that this customer property can be equitably distributed to the allowed customer claims against BLMIS.

3.      This adversary proceeding is brought pursuant to sections 78fff(b), 78fff-1(a) and 78fff-2(c)(3) of SIPA, sections 105(a), 548(a), 550(a), and 551 of title 11 of the United States Code (the "Bankruptcy Code").

## JURISDICTION AND VENUE

4.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

5.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H) and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

6.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

## DEFENDANTS

7.      Greenhall was an individual who died on or about April 14, 2008, in New York, New York.  The Last Will and Testament of Armand L. Greenhall dated August 17, 2006 ("Will") was submitted for probate on May 8, 2008 in the Surrogate Court for New York County, New York, File No. 2008-1750.  Defendant Greenhall Estate is successor-in-interest to Greenhall.

8.      Upon information and belief, Defendant Yan is a resident of Knoxville, Tennessee. Defendant Yan was appointed executor of the Greenhall Estate by preliminary letters testamentary issued in May 2008 and letters testamentary issued in November 2008 by the Surrogate Court for the County of New York.  Defendant Yan is also the residuary beneficiary of the Greenhall Estate and, in that capacity, received subsequent transfers of BLMIS funds as part of his residuary distribution between at least July of 2008 and July of 2014.

9.      Upon information and belief, Defendant Sweeney is a resident of New York, New York.  Defendant Sweeney was appointed executor of the Greenhall Estate by preliminary letters testamentary issued in May 2008 and letters testamentary issued in November 2008 by the Surrogate Court for the County of New York (Sweeney and Yan are referred to collectively as the "Co-Executors").

## BACKGROUND, THE TRUSTEE AND STANDING

10.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

11.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court

alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

12.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

(c)     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

13.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

14.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

15.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

16.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

17.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

18.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

19.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

20.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

21.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b),

544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

**I.     BLMIS**

22.     Madoff founded BLMIS in 1960 as a sole proprietorship.  In 2001, Madoff registered BLMIS as a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

23.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer from January 19, 1960 through December 31, 2008.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database ("MMS") also reflects BLMIS's registration with the Securities and Exchange Commission ("SEC") as a securities broker-dealer from January 19, 1960 through December 31, 2008.  On December 30, 1970, BLMIS became a member of SIPC and continued its membership without any change in status until the Filing Date.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

24.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

25.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely. BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

26.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

27.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total assets under management of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in assets under management.  At all times, BLMIS's Form ADVs were publicly available.

## II.    THE PONZI SCHEME

28.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, Joanne Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

29.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

30.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one employee was an administrative assistant, and one was a semi-retired accountant living in Florida.

31.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

*Madoff's Investment Strategy*

32.     BLMIS purported to execute two primary investment strategies for IA Business customers:   the convertible arbitrage strategy and the split strike conversion strategy ("SSC strategy").   For a limited group of IA Business customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

33.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for

the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of IA Business accounts.

34.     From 1992 forward, Madoff began telling IA Business customers that he employed the SSC strategy for their accounts, even though in reality BLMIS never traded any securities for its IA Business customers.  All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

35.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected substantial gains on the customers' principal investments.

36.     The SSC strategy purported to involve: (i) the purchase of a group or basket of equities (the "Basket") intended to highly correlate to the Standard & Poor's 100 Index (the "S&P 100 Index"), (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P Index call options.

37.     The put options were to control the downside risk of price changes in the Basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option would entail a loss for BLMIS.

38.     The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to outperform the market, because in a rising market, calls would be exercised by the counterparty.

39.    The simultaneous purchase of puts and calls to hedge a securities position is commonly referred to as a "collar."  The purpose of the collar is to limit exposure to volatility in the stock market and flatten out returns on investment.

40.    For the SSC strategy to be deployed as Madoff claimed, the total value of each of the puts and calls purchased for the Basket had to equal the notional value of the Basket.  For example, to properly implement a collar to hedge the $11.7 billion of assets under management that Madoff publicly reported in 2006 would have required the purchase of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

41.    Moreover, at all times that BLMIS reported its total assets under management, publicly available information about the volume of exchange-traded options showed that the volume of options contracts necessary to form the collar and implement the SSC strategy exceeded the available options.

BLMIS's Fee Structure

42.    BLMIS charged commissions on purportedly executed trades rather than management and performance fees based on the value of assets under management, but by using a commission-based structure, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

*BLMIS's Market Timing*

43.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he achieved market timing by intermittently taking customer funds out of the market.  During those times, Madoff purported to

invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.

44.    BLMIS's market timing, as reported on its customer statements, showed an uncanny ability to buy low and sell high, an ability so uncanny, that any sophisticated or professional investor, including the Defendant[s], could see it was statistically impossible. BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every quarter and year end.

45.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win every time. Yet this is precisely what BLMIS's customer statements reported.

46.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the SSC strategy, which relied on holding long positions rather than on short-term speculative trading.

47.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

48.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

*The Collapse of the Ponzi Scheme*

49.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

50.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

51.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## **THE TRANSFERS**

52.     Greenhall maintained three accounts (Nos. 1G0109, 1G0071, and 1G0234, collectively the "Accounts") with BLMIS.  For each Account, Greenhall executed a Customer Agreement and a Trading Authorization Limited to Purchases and Sales of Securities and Options ("Trading Authorization").  In addition to the Customer Agreement and Trading Authorization, for Account Nos. 1G0109 and 1G0234, Greenhall also executed an Option Agreement (the Option Agreement, together with the Customer Agreement and Trading Authorization, are collectively referred to as the "Account Agreements").  The Account Agreements were delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.  At all times relevant hereto, NTC & Co. ("NTC") was custodian of Account No. 1G0109.

53.    The Account Agreements were performed in New York, New York through securities trading activities that took place in New York, New York.  The Accounts were held in New York, New York, and Greenhall sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Accounts and the purported conducting of trading activities.

*Transfer History as Relating to Account 1G0109 (NTC & Co. FBO Armand L. Greenhall)*

54.    **Account No. 1G0109 (NTC & Co. FBO Armand L. Greenhall):**  In September 1995, Greenhall directed NTC to open an Individual Retirement Account ("IRA") on his behalf, and to invest the IRA with BLMIS.  As reflected in Exhibit B, over the life of Account No. 1G0109, $265,398 was deposited into, and $1,348,032 was withdrawn from, Account No. 1G0109.  Also as reflected in Exhibit B, in September 2003, $30,000 was transferred from Account No. 1G0109 to Account No. 1G0234.  In May 2008, Sweeney notified NTC that Greenhall had died, and that the Co-Executors had been appointed co-executors of the Greenhall Estate.  Thereafter, Sweeney instructed NTC to liquidate Account No. 1G0109.  On or about July 9, 2008, consistent with instructions from NTC, BLMIS wired $1,212,932 to a bank account held by the Greenhall Estate.  Of that amount, $1,112,634 consisted of fictitious profits received by the Greenhall Estate.

*Transfer History as Relating to Account 1G0234 (Armand L. Greenhall) and Transferor Accounts*

55.    **Silvia May Account No. 101309:**  In June 1983, Greenhall's mother, Silvia L. May, opened an account with BLMIS, labeled account no. 101309 (the "Silvia May Account").  Between June 1983 and June 1989, $280,000 was deposited into, and $323,918 was withdrawn from, the Silvia May Account.  In August 1989, when the Silvia May Account contained no principal, BLMIS purportedly transferred $280,000 from the Silvia May Account to Account No. 1G0071.

56.     **Account 1G0071 (Armand L. Greenhall):**     Greenhall opened Account No. 1G0071 in August 1989 with the purported $280,000 inter-account transfer from the Silvia May Account, consisting entirely of fictitious profits.   Thereafter, between August 1989 and March 1997, $720,000 was deposited into, and $877,723 was withdrawn from, Account No. 1G0071.   In April 1997, when Account No. 1G0071 contained no principal, BLMIS purportedly transferred $1,040,050 from Account No. 1G0071 to Account No. 1G0234.

57.     **Account 1G0234 (Armand L. Greenhall):**     Greenhall opened Account No. 1G0234 in April 1997 with the purported $1,040,050 inter-account transfer from Account No. 1G0071, consisting entirely of fictitious profits.   As reflected in Exhibit B, over the life of Account No. 1G0234, (i) no cash deposits were made into Account No. 1G0234; (ii) $30,000 was transferred into Account No. 1G0234 from Account No. 1G0109; and (iii) $4,239,893 was withdrawn from Account No. 1G0234.   The total lifetime amount withdrawn in excess of principal was $4,209,893.   During the two years prior to the Filing Date, as reflected in Exhibit B, $4,104,893 was withdrawn in excess of principal and received by Greenhall or the Greenhall Estate, as follows:

a.      Between January 2007 and April 2008, Greenhall withdrew $110,000 from Account No. 1G0234.  Greenhall deposited checks totaling this amount into a JPMorgan Chase Bank account held in his name.

b.      In May 2008, after Greenhall's death, the Co-Executors withdrew $3,985,470 from Account No. 1G0234, and wired that sum into a Wachovia Securities bank account held by the Greenhall Estate (the "Greenhall Estate Wachovia Securities Account").

c.      In June 2008, the Co-Executors withdrew $9,423 from Account No. 1G0234, and deposited a check in that sum into the Greenhall Estate Wachovia Securities Account.

*Summary of Two-Year Transfers to Greenhall and the Greenhall Estate*

58.     During the two years prior to the Filing Date, BLMIS made transfers of fictitious profits from the Ponzi scheme to (i) Greenhall, from Account No. 1G0234, totaling $110,000; and (ii) the Greenhall Estate, from Account Nos. 1G0109 and 1G0234, totaling $5,107,527.  In total, during the two years prior to the Filing Date, BLMIS made transfers (collectively, the "Transfers") to Greenhall and the Greenhall Estate from Account Nos. 1G0109 and 1G0234 totaling $5,217,527 in fictitious profits.

59.     The Transfers received by Greenhall and the Greenhall Estate constitute non-existent profits supposedly earned in Account Nos. 1G0109 and 1G0234, but, in reality, they were other people's money.  The Transfers were made to Greenhall and the Greenhall Estate and are set forth in Column 10 on Exhibit B annexed hereto.

60.     The Transfers are avoidable and recoverable under sections 548(a), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).

## SUBSEQUENT TRANSFERS TO DEFENDANT YAN

*Chronology of Subsequent Transfers to Yan*

61.    Defendants each produced to the Trustee a Greenhall Estate accounting covering the period from Greenhall's death on April 14, 2008 to June 30, 2010 (the "Greenhall Estate Accounting").  A copy of the Greenhall Estate Accounting accompanied by a draft "Agreement Settling Account of Executors Receipt and Release" (the "Co-Executors' Agreement"), produced by the Greenhall Estate and Sweeney, is attached hereto as Exhibit D.  Greenhall's Will and the Co-Executors' Agreement each identify Yan as the residuary beneficiary of the Greenhall Estate.

62.    In her capacity as co-executor of the Greenhall Estate, Sweeney subsequently transferred at least $4,208,133 of the Transfers to Defendant Yan (the "Subsequent Transfers"). A chart setting forth the presently known Subsequent Transfers received by Yan is attached as Exhibit C.  As reflected in Exhibit C, the presently known Subsequent Transfers were made to Yan between July 2008 and September 2014.  Of the $4,208,133 in Subsequent Transfers, $1,388,990 was transferred within the time period covered by the Greenhall Estate Accounting, April 14, 2008 through June 30, 2010.

63.    **Subsequent Transfers Between July 2008 and April 2010**:  The schedule of distributions attached to the Greenhall Estate Accounting confirms that the amount of the Subsequent Transfers to Yan during the time period it covers was $1,388,990.  *See* Exhibit D at 10-05048_DEF 0000033—10-05048_DEF 0000034.  The Greenhall Estate Accounting also reflects that a subsequent distribution of the residuary of the Greenhall Estate, of over $2.5 million, had yet to be made as of the end of the period covered by the Greenhall Estate Accounting, June 30, 2010.  *See id.* at 10-05048_DEF 0000038.

64.    **The September 14, 2010 Subsequent Transfer**:  Following the time period covered by the Greenhall Estate Accounting, on or about September 13, 2010, Sweeney sent a

letter to Wells Fargo Advisors by facsimile requesting a transfer of $300,000 from the Greenhall
Estate to Yan.  On or about September 14, 2010, consistent with Sweeney's instructions, $300,000
was wired from the Greenhall Estate's bank account at Wells Fargo Advisors (the "Greenhall
Estate Wells Fargo Account") to a bank account held by Yan at Bank of America.

65.    **The January 4, 2011 Subsequent Transfer**:  On or about December 29, 2010,
Sweeney sent another letter to Wells Fargo Advisors by facsimile, requesting all but approximately
$200,000 of the funds in the Greenhall Estate Wells Fargo Account to be transferred to Yan.  A
copy of the letter is attached as Exhibit E.  On or about January 4, 2011, consistent with Sweeney's
instructions, $2,503,043 was wired from the Greenhall Estate Wells Fargo Account to a bank
account held by Yan at Wells Fargo Advisors.  *See* Greenhall Estate Wells Fargo Account
statement with bank account numbers redacted, attached as Exhibit F, at 10-
05048_DS_0001264—10-05048_DS_0001265.   Approximately $200,000 was to be held in the
Greenhall Estate Wells Fargo Account to cover the remainder of Sweeney's executor's
commission and unforeseen expenses.  *See* Exhibit E at 10-05048_DS_0001098.

66.    **The September 17, 2014 Subsequent Transfer**:  On or about September 17, 2014,
Yan wrote an email to Sweeney, requesting a check for $16,100 to cover taxes he owed to the
United States and New York State taxing authorities, based on distributions received by Yan from
the Greenhall Estate between April 14, 2008 and March 31, 2009.  A copy of the email is attached
as Exhibit G, at 10-05048_DS_0001107.  On September 19, 2014, in accordance with Yan's
request, Sweeney sent a letter to Yan enclosing a check from the Greenhall Estate in the amount
of $16,100, payable to Yan.  A copy of the letter and enclosed check voucher are attached
collectively as Exhibit G, at 10-05048_DS_0001105—10-05048_DS_0001106.

*Recoverability of Subsequent Transfers to Yan*

67.    The Subsequent Transfers are recoverable from Defendant Yan under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

68.    Yan did not receive an executor's commission.  The Subsequent Transfers to Yan constituted a gift or bequest of the Greenhall Estate residuary.

69.    The Co-Executors were aware as early as December 11, 2008 that i) a large portion of Greenhall's assets were invested with BLMIS, ii) BLMIS's operations were fraudulent, and iii) the Transfers were avoidable by the Trustee.  Yan subsequently took the Subsequent Transfers from the Greenhall Estate knowing these facts, after being put on notice by Sweeney.

70.    Specifically, on December 17, 2008, Sweeney wrote to several Greenhall Estate beneficiaries, including Yan, "[o]n behalf of [her]self and Peng Yan as Executors," advising them that payment of legacies from the Greenhall Estate would be "delayed," as "[a] large portion of Mr. Greenhall's assets were invested with [BLMIS]," and "Mr. Madoff was arrested last week in what is alleged to be an elaborate Ponzi scheme."  A copy of these letters is attached collectively as Exhibit I.  Sweeney stated that, "considering the uncertainty surrounding this situation, the Executors feel that it would be imprudent to pay your legacy at this time."  *See* Exhibit I.

71.    On August 13, 2009, Sweeney wrote to another of the Greenhall Estate legatees, with copy to Yan, stating that "at this time, the Executors [which included Yan] are [still] not in not in a position to pay the legacies under the Will because we do not know whether we will be

required to repay any or all of the funds withdrawn from Mr. Greenhall's accounts at [BLMIS] to the bankruptcy trustee." A copy of this letter is attached as Exhibit J.

72.    On July 9, 2009, the Co-Executors both signed a United States Estate Tax Return for tax year 2008, on behalf of the Greenhall Estate, in which they reported "[u]nder penalties of perjury" "a possibility that one or more claims could be filed" against the Greenhall Estate in connection with withdrawals of funds from the Accounts.    *See* Exhibit H at 10-05048_DS_0000449, 10-05048_DS_0000461.

73.    On December 14, 2009, Sweeney submitted "protective claims" for refund of taxes paid by the Greenhall Estate to United States and New York State taxing authorities. A copy of the claims and related correspondence, with social security numbers, employer identification numbers and the Greenhall Estate's bank account number redacted, are attached collectively as Exhibit K. Sweeney wrote to the United States Department of the Treasury and the New York State Estate Tax Processing Center, copying Yan, "[o]n behalf of [her]self and Peng Yan," stating that the protective claims were "based on a currently unliquidated possible liability to Irving H. Picard, the Bankruptcy Trustee appointed in connection with the Bernard Madoff Ponzi scheme." *See* Exhibit K at YAN PRODUCTION 000002, YAN PRODUCTION 000006. Sweeney sent a copy of these protective claims to Yan on December 14, 2009. *See id.* at YAN PRODUCTION 000001.

74.    As early as December 11, 2008, and no later than December 17, 2008, the Co-Executors were aware of BLMIS's fraud, and of the Greenhall Estate's possible liability to the Trustee for return of the Transfers.

75.    Despite being aware that the Transfers held in the Greenhall Estate could be subject to avoidance by the Trustee, Yan chose to accept millions of dollars in distributions from the Greenhall Estate.

## COUNT ONE

### FRAUDULENT TRANSFERS
### 11 U.S.C. §§ 105(a), 548(a)(1)(A), 550(a) AND 551

76.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

77.    Each of the Transfers was made on or within two years before the Filing Date.

78.    Each of the Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

79.    Each of the Transfers was made by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing and/or future creditors.

80.    Each of the Transfers was made to Greenhall or the Greenhall Estate.

81.    Each of the Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Defendants pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

82.    As a result of the foregoing, pursuant to sections 105(a), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers, which total $5,217,527; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from the Greenhall Estate for the benefit of the BLMIS estate; and (d) awarding any other relief the Court deems just and appropriate.

**COUNT TWO**

**RECOVERY OF SUBSEQUENT TRANSFERS**
**11 U.S.C. §§ 105(a) AND 550(a)**

83.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

84.    Each of the Subsequent Transfers, which total at least $4,208,133, is recoverable from Defendant Yan under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

85.    Defendant Yan is an immediate or mediate transferee of the Subsequent Transfers from the Greenhall Estate.

86.    None of the Subsequent Transfers was taken by Defendant Yan in exchange for value.

87.    Each of the Subsequent Transfers after December 2008 was received by Defendant Yan at a time when he had actual knowledge or was willfully blind to facts suggesting a high probability of fraud at BLMIS, and with knowledge of the voidability of the Transfers and possible liability to the Trustee.

88.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant Yan: (a) recovering the Subsequent Transfers, which total at least $4,208,133, or the value thereof, from Defendant Yan for the benefit of the BLMIS estate; and (b) awarding any other relief as the Court deems appropriate.

89.    The Trustee's discovery and investigation is ongoing and the Trustee reserves the right to: (i) supplement the information on the initial and subsequent transfers discussed above, and any additional transfers; and (ii) seek recovery of such transfers.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor

of the Trustee and against Defendants as follows:

i.      On the First Claim for Relief, pursuant to sections 105(a), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, judgment: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from the Greenhall Estate for the benefit of the BLMIS estate; and (d) awarding any other relief the Court deems just and appropriate;

ii.     On the Second Claim for Relief, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, judgment: (a) recovering the Subsequent Transfers, or the value thereof, from Defendant Yan for the benefit of the BLMIS estate; and (b) awarding any other relief the Court deems just and appropriate;

iii.    On all Claims for Relief, impressing the Defendants' property, or the proceeds, product and offspring of such property, with an equitable lien and/or a constructive trust in favor of the Trustee for the benefit of the estate, to the extent that the Transfers or Subsequent Transfers were used, in whole or in part, to purchase, improve and/or maintain such property;

iv.     On all Claims for Relief, establishing a constructive trust over all Transfers and Subsequent Transfers and their proceeds, product and offspring in favor of the Trustee for the benefit of the estate;

v.      On all Claims for Relief, pursuant to federal common law and/or N.Y. CPLR 5001 and 5004, as applicable, awarding the Trustee prejudgment interest from the date on which the Transfers or Subsequent Transfers were received;

vi.     On all Claims for Relief, awarding the Trustee all applicable interest, costs and disbursements incurred in this proceeding; and

vii.    Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Date:  April 2, 2018
          New York, New York

Of Counsel:                                    By: /s/ Nicholas J. Cremona

**BAKER & HOSTETLER LLP**              **BAKER & HOSTETLER LLP**
811 Main Street, Suite 1100            45 Rockefeller Plaza
Houston, TX 77002-6111                 New York, New York 10111
Telephone: (713) 751-1600              Telephone: (212) 589-4200
Facsimile: (713) 751-1717              Facsimile: (212) 589-4201
Dean D. Hunt                           David J. Sheehan
Email: dhunt@bakerlaw.com              Email:  dsheehan@bakerlaw.com
Farrell A. Hochmuth                    Nicholas J. Cremona
Email: fhochmuth@bakerlaw.com          Email:  ncremona@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the estate of Bernard L. Madoff*