**MCDERMOTT WILL & EMERY LLP**
Andrew B. Kratenstein
Michael R. Huttenlocher
Darren Azman
340 Madison Avenue
New York, New York 10173
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

*Attorneys for Defendants Sage Associates, Sage Realty, Malcolm H. Sage, Martin A. Sage, and Ann M. Passer*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | ) ) ) | Adv. Pro. No. 08-1789 (SMB) |
| Plaintiff-Applicant, | ) ) | SIPA LIQUIDATION |
| v. | ) ) | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC | ) ) ) | Substantively Consolidated |
| Defendant. | ) ) | |
| ------------------------------------------------------- | ) | |
| In re: | ) ) | |
| BERNARD L. MADOFF, | ) ) | |
| Debtor. | ) ) | |
| ------------------------------------------------------- | ) | |
| IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | ) ) ) ) | Adv. Pro. No. 10-4362 (SMB) |
| Plaintiff. | ) ) | |
| v. | ) ) | |
| SAGE ASSOCIATES; LILLIAN M. SAGE, in her Capacity as Partner or Joint Venturer of Sage Associates and Individually as Beneficiary of Sage Associates; MALCOLM H. SAGE, in his Capacity as Partner or Joint Venturer of Sage Associates and Individually | ) ) ) ) ) ) ) | |

| | |
|---|---|
| as Beneficiary of Sage Associates; MARTIN A. SAGE, in his Capacity as Partner or Joint Venturer of Sage Associates and Individually as Beneficiary of Sage Associates; ANN M. SAGE PASSER, in her Capacity as Partner or Joint Venturer of Sage Associates and Individually as Beneficiary of Sage Associates, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |
| | ) |

| | | |
|---|---|---|
| IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | ) ) ) | Adv. Pro. No. 10-4400 (SMB) |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SAGE REALTY; LILLIAN M. SAGE, in her Capacity as Partner or Joint Venturer of Sage Realty and Individually as Beneficiary of Sage Realty; MALCOLM H. SAGE, in his Capacity as Partner or Joint Venturer of Sage Realty and Individually as Beneficiary of Sage Realty; MARTIN A. SAGE, in his Capacity as Partner or Joint Venturer of Sage Realty and Individually as Beneficiary of Sage Realty; ANN M. SAGE PASSER, in her Capacity as Partner or Joint Venturer of Sage Realty and Individually as Beneficiary of Sage Realty, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) ) | |
| Defendants. | ) | |
| | ) | |

## THE SAGE DEFENDANTS' OPPOSITION TO MOTION FOR AN ORDER ESTABLISHING OMNIBUS PROCEEDING FOR THE PURPOSE OF DETERMINING THE EXISTENCE, DURATION, AND SCOPE OF THE ALLEGED PONZI SCHEME AT BLMIS

TO:   THE HONORABLE STUART M. BERNSTEIN
      UNITED STATES BANKRUPTCY JUDGE

## INTRODUCTION

1.      Defendants Sage Associates, Sage Realty, Malcolm H. Sage, Martin A. Sage, and

Ann M. Passer (collectively, the "Sages") join in the arguments made in the Good Faith

Defendants' Consolidated Opposition ("Consolidated Opposition", Dkt. No. 17469 in the

consolidated proceeding) to the Trustee's motion to consolidate the Remaining Good Faith

Actions (the "Motion", Dkt. No. 17284 in the consolidated proceeding)[1] for the purpose of

determining the duration, existence, and scope of the fraud perpetrated by Bernard L. Madoff

and BLMIS.  The Sages make this separate submission to raise certain issues that are unique to

the Sages and demonstrate the particularly unfair prejudice that would result to the Sages from

consolidation.

## LEGAL STANDARD FOR CONSOLIDATION

2.      Rule 42 of the Federal Rules of Civil Procedure permits district courts to "join for

hearing or trial any or all matters at issue in the actions" or "consolidate the actions" where

"actions before the court involve a common question of law or fact."  Fed. R. Civ. P. 42(a)(1)-

(2); *see also Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir.1990) ("Rule 42(a) of the

Federal Rules of Civil Procedure empowers a trial judge to consolidate actions for trial when

there are common questions of law or fact to avoid unnecessary costs or delay.").

3.      "The trial court has broad discretion to determine whether consolidation is

appropriate," but that "discretion . . . is not unfettered." *Johnson*, 899 F.2d at 1284-85.  Under

Second Circuit law, "[a] party moving for consolidation must bear the burden of showing the

commonality of factual and legal issues in different actions, and a district court must examine

---

[1] Unless otherwise indicated, all capitalized terms herein have the same meaning as in the Motion.

'the special underlying facts' with 'close attention' before ordering a consolidation." *In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373 (2d Cir. 1993) (citation omitted) (quoting *Katz v. Realty Equities Corp.*, 521 F.2d 1354, 1361 (2d Cir. 1975)).

4.       "In assessing whether consolidation is appropriate in given circumstances, a district court should consider both equity and judicial economy." *Devlin v. Transp. Communication Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999).  The Second Circuit has specifically cautioned that "efficiency cannot be permitted to prevail at the expense of justice," and therefore consolidation should be considered only when "savings of expense and gains of efficiency can be accomplished *without sacrifice of justice*." *Id.* (internal quotations and citation omitted); *accord In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 853 (2d Cir. 1992) ("The systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiff's – and defendant's – cause not be lost in the shadow of a towering mass litigation."); *Johnson*, 899 F.2d at 1285 ("Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial."); *Cole v. Schenley Indus., Inc.*, 563 F.2d 35, 38 (2d Cir. 1977) ("Consolidation under Rule 42(a) . . . is a procedural device designed to promote judicial economy, and consolidation cannot effect a merger of the actions or the defenses of the separate parties.") (citation omitted)); *Garber v. Randell*, 477 F.2d 711, 714 (2d Cir.1973) (explaining that "where the claims against, or defenses of, some parties are substantially different from those of others, some may be prejudiced by consolidation, particularly if one general or lead counsel exercises his supervisory power in a way that tends to deprive them of full discovery and preparation of their individual cases"); *see also* 8 James Wm. Moore et al., *Moore's Federal Practice* ¶ 42.10[5][d][i] (3d ed. 2011) ("Consolidation is inappropriate when it will adversely affect the rights of the parties.").

5. Finally, and importantly, there is a material difference between a consolidation order that "merely requires the parties, in the interest of avoiding needless duplicative expenditure of time and money, to join in common pretrial discovery and preparation," and an order that "goes beyond these permissible objectives to deny a party his due process right to prosecute his own separate and distinct claims or defenses without having them so merged into the claims or defenses of others that irreparable injury will result." *Garber*, 477 F.2d at 716; *Liberty Media Corp. v. Vivendi Universal, S.A.*, 842 F. Supp. 2d 587, 592 (S.D.N.Y. 2012) (same).

## ARGUMENT

6. The Sages have no objection to coordinating the Remaining Good Faith Actions for discovery purposes. The Sages and their counsel have been coordinating with other defense counsel in the Remaining Good Faith Actions for some time, including in connection with obtaining document discovery (such as the Trustee's microfilm productions) and deposing Mr. Madoff. Most recently, in November 2017, the Sages' counsel participated in "Day 2" of Mr. Madoff's deposition pursuant to the protocol established by this Court, which generally worked well.

7. That said, because of certain unique arguments that the Sages have, the Sages would be unfairly prejudiced by and object to (a) having to act through Liaison Counsel for all Defendants in the Remaining Good Faith Actions (the "Good Faith Defendants") for all purposes and (b) having consolidated dispositive motion practice or a consolidated trial on the duration, existence, and scope of Mr. Madoff's and BLMIS's fraud (the "Fraud Issue").

8. *First*, as discussed in greater detail in the Consolidated Opposition and in the opposition filed by Chaitman LLP, all defendants have a right to a jury trial in the District Court. Indeed, certain Good Faith Defendants represented by Chaitman LLP have already sought to

- 3 -

remove the reference in three adversary proceedings in which discovery has already concluded

on the grounds that Good Faith Defendants have a constitutional right to a jury trial, including

concerning the Fraud Issue. Those motions remain *sub judice* in the District Court. It would be

inefficient and unfairly prejudicial to require other Good Faith Defendants such as the Sages to

be forced to opt into a consolidated proceeding (including a trial) on the Fraud Issue *before* the

District Court determines whether this Court has jurisdiction to adjudicate the Fraud Issue.

9.       *Second*, the Trustee proposes that the Participating Defendants select a Liaison

Counsel to "act on behalf of all Participating Defendants in all matters related to the Omnibus

Ponzi Proceeding, including, but not limited to:  (i) service and distribution of consolidated

discovery requests, discovery responses, and expert reports (affirmative and rebuttal);

(ii) submission of all motions, and arguments related thereto; and (iii) examination of witnesses

and introduction of evidence at depositions, hearings, and trial." (Proposed Order ¶ C.2.) There

would also be consolidated dispositive motion practice, hearings, and trial on the Fraud Issue.

(*Id.* ¶¶ G.1-H.1.)

10.      Such rules would be profoundly inefficient and unfair to the Sages because, as

this Court has already recognized, the Sages have unique responses to the Trustee's claims.

Most notably, the Second Circuit's Net Equity Opinion is premised entirely on Madoff's split-

strike fraud and ***explicitly excluded*** all non-split strike accounts. *In re Bernard L. Madoff Inv.

Secs. LLC*, 654 F.3d 229, 242 n.1 (2d Cir. 2011) ("The non-split strike customers are not parties

to this appeal.") The Second Circuit then determined that "[t]he Trustee properly declined to

calculate 'net equity' by reference to ***impossible transactions***" in split-strike. *Id.* at 241

(emphasis added).

11.      By contrast, the Second Circuit held that "the Last Statement Method may be

especially appropriate where – unlike with the BLMIS accounts at issue in this appeal –

***customers authorize or direct purchases of specific stocks***." *Id.* at 238 (emphasis added) (citing

*Miller v. DeQuine (In re Stratton Oakmont, Inc.),* No. 01-CV-2812 RCC, 01-CV-2313 RCC,

2003 WL 22698876 (S.D.N.Y. Nov. 14, 2003)).

12.    Here, the incontrovertible evidence adduced during discovery to date has

demonstrated that, unlike all of the other Good Faith Defendants, the Sages ***directed*** Mr. Madoff

and his firm as to how to trade in the Sage Associates account and in other Sage accounts.

Specifically, as Malcolm Sage testified at his deposition, beginning no later than 1982 and until

shortly before BLIMS's bankruptcy, the Sages actively managed several of their accounts and

specifically directed Mr. Madoff as to what stocks to buy, sell, and hold in those accounts.

(Ex. A at 26:14-42:21, 218:1-229:11, 233:19-237:8, 316:18-339:15.)

13.    For example, Mr. Sage specifically recalled when he directed Mr. Madoff to

purchase Disney stock in 1985:

> In fact, I'm recalling when we were purchasing stock back in 1985 and
> both my sister and my brother by that time had children.  My brother was
> living in California near Disneyland.  My sister thought that the world
> revolved around taking your kids to Disney World.  They were enamored
> of that company.  It went a lot into why we decided to invest in Disney.
> And we, in fact, invested in Disney not only in Sage Associates but in
> Sage Associates II as well.
>
> We wanted a -- our goal was always to have a diversified portfolio.  It fit
> the need.  So that's an example of how we might have interacted.  But I'm
> sure it happened other times over the years.  That's one recollection that I
> -- that I specifically remember.

(Ex. A at 236:3-23.)

14.    The Sages pursued a buy and hold strategy, holding the Disney stock and other

blue chip stocks for over two decades.  The Sages finally instructed Mr. Madoff to sell those

positions in 2006 and 2007, when they believed they had accomplished their goal of growing a

"nest egg" for their retirement and other financial needs.  (*Id.* at 223:10-224:24, 337:14-339:15.)

15.     After these positions were sold, the Sages instructed Mr. Madoff to purchase

Treasuries.  (*Id.* at 219:3-19.)  From December 31, 2007 until August 14, 2008, the Sage

Associates account held solely Treasury bills.  The Sages directed Mr. Madoff to move Sage

Associates into split-strike in August 2008, which was well *after* the withdrawals at issue were

made.

16.     Although most of the Sages' trading instructions prior to August 2008 were given

verbally during regular meetings and phone calls with Mr. Madoff, several of their directions

were memorialized in letters that Mr. Sage sent to Mr. Madoff and/or his assistant, Annette

Bongiorno, as well as in Ms. Bongiorno's notes of conversations with Mr. Sage.  (Kratenstein

Decl. Exs. B-F.)  For example, in three such letters, Mr. Sage specifically instructed Mr. Madoff

to execute the "following plan" concerning the Sage Associates and Sage Associates II accounts

and then directed Mr. Madoff to execute specific transactions.  (*Id.* Exs. B-D.)  The transactions

that Mr. Sage directed appeared as executed on his account statements and in confirms/trade

slips that he received in the mail.[2]  (Ex. A at 236:34-237:8.)

17.     In addition, Mr. Sage also instructed Mr. Madoff *not* to make certain trades.  For

example, Ms. Bongiorno's notes of a conversation with Mr. Sage in 2003 state:  "Could have

gone SAB in EBAY but cust did not want it."  (Ex. E.)  Both Mr. Sage and Mr. Madoff

confirmed that Mr. Madoff had suggested that the Sages might want go short against the box

("SAB") in Ebay stock, but Mr. Sage decided against it and Mr. Madoff followed that

instruction.  (Ex. A at 333:7-334:12; Ex. G at 471:25-473:24.)

18.     At his deposition, Mr. Madoff confirmed that the Sages were "unusual" and

"atypical" of his other customers because the Sages "would give instructions to me what they

wanted to buy and what they wanted – and when they wanted to sell it and so on."  (Ex. G

---

[2] These statements and confirms/trade slips are voluminous and are not attached hereto, but were marked as exhibits
at Mr. Sage's and Mr. Madoff's depositions and, as discussed below, were also identified to the Trustee's counsel in
correspondence.

at 400:1-401:14.) Mr. Madoff also repeatedly confirmed that he always followed the Sages'

instructions and that the Sages' trades were actually executed (i.e., they were real, non-fictitious

trades). (*Id.* at 398:18-399:15, 436:10-486:25.) And Mr. Madoff re-confirmed his prior

testimony that his fraud was limited to split-strike trading beginning in or around 1992 and that

all other trading, including convertible bond arbitrage trading (in which the Sages' other account

at issue, Sage Realty, engaged) was real. (*Id.* at 398:15-399:15.)

19.     As this Court observed during the hearing regarding the Trustee's microfilm

production on July 26, 2017, the Sages are "in a different position" than the split-strike

customers because the Sages "can identify specific instructions." (Ex. H at 50:1-9.) After that

hearing, the Trustee's counsel finally acknowledged in correspondence that the Sages delivered

"potentially real securities" to Mr. Madoff. (Ex. I.)

20.     The record demonstrates that these securities were, in fact, "real". For example, a

ledger produced by the Trustee lists a portfolio of various stock positions – in Asarco, Alcan,

Reynolds Metals, AT&T, Kaiser, Dr. Pepper, Skyline, and Central Penn National Corporation,

and RCA – that the Sages inherited from their father, Maurice Sage, after he died in 1976.

(Ex. J.) As Malcolm Sage testified and Mr. Madoff confirmed, in 1979, the Sages delivered this

stock to Mr. Madoff and instructed him to sell the stock, which he did. (Ex. A at 21:17-22:17,

87:7-25, Ex. G at 403:13-405:21, 408:21-412:19; Ex. J.) The Sages also inherited and physically

delivered to Mr. Madoff an RCA bond certificate, which Mr. Madoff kept at National Bank of

North America until he sold the bond at the Sages' direction in 1986. (Ex. G at 412:20-414:4,

419:17-421:15; Exs. K-L.)

21.     At the conclusion of the July 26 hearing, the Court directed that the Sages identify

to the Trustee the account statements and trade confirms corresponding to the written trading

instructions that had been located. (Ex. H at 54:18-55:2.) The Sages did so. (Ex. M.)

- 7 -

22.     Notwithstanding the Court's recognition that the Sages are "in a different position" than the split-strike customers, the Trustee now seeks to lump the Sages together with everyone else and require someone else's lawyer to make the Sages' case.  In this way, the Trustee hopes that he can avoid or blunt the Sages' unique arguments.  This Court should not countenance such gamesmanship.

**CONCLUSION**

23.     The Sages have no objection to coordinating discovery on the Fraud Issue, as they have done to date.  But given that the Sages are "in a different position" than the split-strike customers, the Sages should not have to rely on Liaison Counsel to seek discovery, examine witnesses (either at deposition or trial), or make arguments – particularly arguments that are unique to the Sages.  Nor should the Sages be forced to participate in consolidated dispositive motion practice, hearings, or trial on the merits of the Fraud Issue or else waive their ability to challenge the Trustee's false assertions about the nature, scope, and extent of Mr. Madoff's and his firm's fraud.  Compelling the Sages to do so would severely prejudice them and violate their due process rights.  The Motion should be denied.

Dated: April 11, 2018
    New York, New York          McDermott Will & Emery LLP

                      /s/Andrew B. Kratenstein
                      Andrew B. Kratenstein
                      Michael R. Huttenlocher
                      Darren Azman
                      340 Madison Avenue
                      New York, New York 10173-1922
                      Telephone: (212) 547-5400
                      Facsimile: (212) 547-5444

                      *Attorneys for Defendants Sage Associates, Sage Realty, Malcolm H. Sage, Martin A. Sage, and Ann M. Passer*