# EXHIBIT A

08-01789-cgm   Doc 17470-1   Filed 04/11/18   Entered 04/11/18 15:50:53   Exhibit A
Pg 2 of 19
Picard v Sage Associates-Realty          Malcolm Sage 11/15/2017

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiff-Applicant,   Adv.Pro.No.
                                   08-01789(SMB)
   v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,
        Defendant.
------------------------------------x
In Re:
BERNARD L. MADOFF,
        Debtor.
------------------------------------x

IRVING H. PICARD, Trustee for
the Substantively Consolidated
SIPA Liquidation of Bernard L.        Adv.Pro.No.
Madoff Investment Securities          10-04362(SMB)
LLC and Bernard L. Madoff,

        Plaintiff,

   v.

SAGE ASSOCIATES;

LILLIAN M. SAGE, IN HER CAPACITY
AS PARTNER OR JOINT VENTURER OF
SAGE ASSOCIATES AND INDIVIDUALLY
AS BENEFICIARY OF SAGE ASSOCIATES;

        Deposition of:

        MALCOLM SAGE

        November 15, 2017

Page 26

```
 1   decision, but my mother was an investor, and I
 2   can't recall if she made suggestions, but she
 3   probably came to meetings with Mr. Madoff.
 4        Q.   And when you say it was an equal
 5   decision between you, your brother and your
 6   sister, did either one of them, to your
 7   recollection, express any preference for any
 8   other broker?
 9            MR. KRATENSTEIN: He said a joint
10   decision but go ahead, answer the question.
11        A.   Well, we did invest some monies
12   with Ms. Evans -- Ms. Lattimer at Evans &
13   Company.
14        Q.   How did you communicate with
15   Mr. Madoff once you had invested?
16            MR. KRATENSTEIN: We're now after
17   investment?
18            MS. KERANEN: Yes.
19        A.   We would meet with him, and we
20   would call him on the telephone.
21        Q.   How often would you meet with him?
22        A.   At what period of the year are you
23   asking?
24        Q.   Let's say -- you started investing
25   in 1979. Let's say from 1979 to 1981, how often
```

Page 27

```
 1   would you meet with him?
 2        A.   Probably a couple times a year.
 3        Q.   Where would you meet?
 4        A.   Always at his office.
 5        Q.   How long would those meetings
 6   last?
 7        A.   Wow, that's hard to say. They
 8   weren't short.
 9        Q.   When you say they weren't short,
10   can you ballpark that for me?
11        A.   They were -- we had discussions.
12   There was give and take. I really can't say.
13   If I said -- if I said they lasted an hour, it
14   really would be based on what makes sense to me
15   now and not -- you know, not necessarily --
16        Q.   Not a reflection of --
17        A.   -- being accurate --
18        Q.   -- at that time?
19        A.   No. You want to say one thing,
20   but you're not sure.
21        Q.   So from 1981, did you continue to
22   meet with him through the '80s?
23        A.   We met with him regularly.
24        Q.   And did the frequency of your
25   meetings change in the '80s at any point?
```

Page 28

```
 1        A.   I would say not.
 2        Q.   So, just to restate it, so you're
 3   saying from 1979 to let's say 1990 you would
 4   meet with him a couple of times a year at his
 5   offices?
 6        A.   Correct.
 7        Q.   Who besides you would attend those
 8   meetings?
 9        A.   In general it would be my brother,
10   my sister and myself. Sometimes my mother.
11        Q.   Was there any particular reason
12   that your mother would attend some meetings and
13   not others?
14        A.   She was an investor as well. Oh,
15   why might she not come at times?
16        Q.   Right.
17        A.   My mother did things her way. I
18   can't speak for my mother.
19        Q.   You also mentioned that you had
20   calls with Mr. Madoff. Do you recall, let's say
21   in the same time period, 1979 to 1981, how many
22   times you would call him?
23            MR. KRATENSTEIN: I'm sorry, I
24   just want to be clear because you swapped time
25   periods. You're now '79 to '81?
```

Page 29

```
 1            MS. KERANEN: Um-hum.
 2            MR. KRATENSTEIN: Okay. And
 3   you're assuming that Mr. -- hang on. You're
 4   assuming Mr. Sage made the call? Are you really
 5   asking about calls initiated by either party?
 6            MS. KERANEN: I'm asking, first of
 7   all, calls he participated in with Mr. Madoff
 8   that he initiated.
 9            MR. KRATENSTEIN: That Mr. Sage
10   initiated?
11            MS. KERANEN: And then I was going
12   to ask about any calls that BLMIS made to the
13   Sages.
14            MR. KRATENSTEIN: Well -- and Just
15   one -- as you know, BLMIS did not come into
16   existence until I think 2001. So if we're in
17   the 1979 to 1981 time frame, I think you're
18   really talking about calls that Mr. Madoff
19   initiated. I think that would be more precise.
20   But why don't you ask your question and he'll
21   answer.
22            MS. KERANEN: Sure.
23   BY MS. KERANEN:
24        Q.   So you testified that you both met
25   with Mr. Madoff and that you had calls with him.
```

Page 30

1  From the 1979 to 1981 period, about how many
2  times would you call Mr. Madoff per year?
3       A.   As much as I'd like to answer that
4  question, I really can't recall that. I can't
5  recall how many times I called anybody, you
6  know. Maybe I can't recall when I called him
7  last year, but I certainly recall -- I can't
8  recall what I did 30 years ago in terms of phone
9  calls made. Easier to recall meetings.
10      Q.   So would you say you didn't have a
11 regular pattern of calling him?
12      A.   I would say that that's correct.
13      Q.   Did he ever initiate calls to you?
14      A.   To my recollection, yes.
15      Q.   And do you recall what the
16 circumstances were of those calls?
17           MR. KRATENSTEIN: Let me just
18 interject. Sorry, I just need a clarification.
19 Now this is at any time; not limited to '79 --
20           MS. KERANEN: No, we're still in
21 the '79 to '81 time period.
22           MR. KRATENSTEIN: Okay.
23      A.   Oh, we're limited to that period?
24 It's pretty much a haze to me, to be honest.
25      Q.   When the calls that you originated

Page 31

1  to Mr. Madoff occurred in 1979 to 1981, was
2  there anyone else participating in those calls?
3       A.   No.
4       Q.   To your knowledge in the 1979 to
5  1991 call -- time period when Mr. Madoff would
6  call you, was there anyone else participating in
7  those calls?
8       A.   No. The problem I'm having with
9  your questions is that when you restrict it to a
10 certain period of time, it's just hard for me to
11 remember one short time frame 30 years ago or 40
12 years ago to a short time frame 38 years -- it's
13 just complicated.
14      Q.   That's fair. What I'd like to do
15 would be to talk to you about individual time
16 periods and then your general recollection so we
17 can try and be as specific as possible in the
18 transcript.
19      A.   I probably did not talk to him as
20 much during the '79 to '81 or '82 period as I
21 did thereafter. I was in law school, I was
22 taking a Bar exam. I was starting my career.
23 We were invested in convertible arbitrage. I
24 probably had less interaction with him, now
25 that, you know, I think about it, at that --

Page 32

1  during that '79 to '81 period.
2       Q.   And during that period, did you
3  actively monitor your investments with
4  Mr. Madoff?
5       A.   I did.
6       Q.   And what did that monitoring
7  consist of?
8       A.   Reviewing the statements and the
9  confirms.
10      Q.   And when you say confirms, what
11 kind of confirms were those?
12      A.   Confirms on the convertible
13 arbitrage trades.
14      Q.   And were those confirmations
15 coming from BLMIS or Mr. Madoff or were they
16 coming from a third party?
17           MR. KRATENSTEIN: I'll just object
18 to the use of BLMIS in this time period. You
19 can answer the question.
20           I think we all know BLMIS didn't
21 exist in this time period, so I think -- I think
22 the question is geared towards Mr. Madoff, and
23 you can correct me if I'm wrong, or Madoff's
24 firm at that time.
25      A.   They came from Madoff.

Page 33

1       Q.   So -- and let's just tie this up
2  in the '79 to '81 time period. Do you know if
3  your siblings spoke with Mr. Madoff on the
4  phone?
5       A.   I wouldn't know that. I wouldn't
6  think they did.
7            MR. KRATENSTEIN: Don't speculate.
8            THE WITNESS: Yeah.
9            MR. KRATENSTEIN: If you don't
10 know, you don't know.
11      A.   I don't know.
12      Q.   Let's turn to the 1980s. Can you
13 tell me about your phone calls with Mr. Madoff
14 during that period?
15      A.   A lot changed in 1982. I had a
16 greater involvement with Madoff after '82, so as
17 it comes back to me now when you talked about
18 the '79 to '81 period when we were involved in
19 convertible arbitrage, the contact was probably
20 less. It probably increased after that.
21      Q.   And why is that?
22      A.   As -- after we sold my father's
23 business and could focus more on our portfolio
24 of stocks, my sister had children, my brother is
25 getting married, I met my wife. Our lives were

Page 34

1  changing. There were things that needed to be
2  addressed, a future that needed to be thought
3  of.
4         We were involved in the
5  convertible arbitrage trading with Madoff. At
6  Evans & Company we owned a portfolio of stocks.
7  We saw the market as being strong. We spoke to
8  Madoff about the market.
9         It was our idea, given our ages,
10 given where we were at the point in our lives
11 and careers that we wanted to build a nest egg,
12 develop a portfolio that would address our
13 future needs, whether it be in terms of
14 retirement, whether it be in terms of medical
15 needs, whether it be in terms of education for
16 our children. We decided that we thought it was
17 in our interest at that point, in that stage of
18 our lives, to build a portfolio of stocks to
19 move away from the convertible arbitrage.
20        We met with -- we met with Madoff,
21 and we instructed him to do that, and he
22 followed our directions.
23    Q.   So just to make sure I understand,
24 your testimony is that in 1982, you and your
25 siblings met with Mr. Madoff and instructed him

Page 35

1  to move away from the convertible arbitrage
2  strategy and towards building a portfolio of
3  stocks?
4     A.   That is mostly correct.
5     Q.   What did I get wrong?
6     A.   What you got wrong is that I
7  didn't fill in a blank for you. We had separate
8  accounts with Madoff. We had a Sage Associates
9  account at that time.
10    Q.   This is in 1982?
11    A.   In 1982. And we had a Maurice
12 Sage Trust account. We decided that in the
13 trust account we would maintain half of our
14 assets in convertible arbitrage, and the other
15 half of our assets we would purchase
16 securities -- if I recall they were Dupont and
17 General Motors -- and write covered calls
18 against them. That is what we did in the
19 Maurice Sage Trust account.
20        In the Sage Associates account,
21 we, I believe it was in mid-1982, we purchased
22 simply a portfolio of stock. At some later
23 point, shortly later, we decided to move away
24 from the covered calls writing and entirely away
25 from convertible arbitrage and establish a

Page 36

1  portfolio of stocks in the Sage -- in the
2  Maurice Sage Trust account, as well as the Sage
3  Associates account.
4         Does that clarify it for you?
5     Q.   Yes, thank you.
6         So in 1982 your testimony is that
7  you had two accounts, the Maurice Sage Trust and
8  the Sage Associates account. The Maurice Sage
9  Trust account, when was that opened?
10    A.   It was a testamentary trust that
11 was established pursuant to my dad's will. It
12 was probably opened sometime in the late '70s.
13    Q.   And when was the Sage Associates
14 account opened, if you recall?
15    A.   Probably right at around the same
16 time.
17    Q.   So starting in 1982 your testimony
18 is that you became more involved with actively
19 managing your portfolios with Mr. Madoff; is
20 that correct?
21    A.   That's correct.
22    Q.   So tell me about the frequency of
23 your meetings with him from 1982 through 1990.
24    A.   I don't think that the frequency
25 of our meetings changed significantly during

Page 37

1  that time period. I'm not sure that the
2  frequency for our meetings ever really changed
3  significantly.
4     Q.   So just so I understand, you're
5  saying from the time once you opened investments
6  with Mr. Madoff in the late '70s, around 1979,
7  through the dissolution of BLMIS, you continued
8  to meet with Mr. Madoff several times a year?
9     A.   Correct.
10        MR. KRATENSTEIN: I think he said
11 a couple times a year.
12    Q.   Couple times a year. So would
13 that be two or less or more than two?
14    A.   Probably two, two probably.
15    Q.   Twice a year?
16    A.   It's a good ballpark figure.
17    Q.   Was there a pattern? Like did you
18 meet every spring and fall?
19    A.   There may have been, but I
20 wouldn't recall that. I don't believe it, but
21 it's possible.
22    Q.   Do you remember when your last
23 meeting at -- with Mr. Madoff was?
24    A.   Physical meeting at his office?
25    Q.   Yes.

Page 38

1   A.   I would --
2       MR. KRATENSTEIN: Don't guess.
3   A.   Yeah.
4       MR. KRATENSTEIN: Give your best
5   recollection, but don't guess. If you can give
6   a recollection, give a recollection. But if you
7   have to guess, that's speculating.
8   A.   My best recollection is that it
9   was in 2008.
10  Q.   And do you remember what time of
11  year it was?
12  A.   It would not have been later in
13  the year.
14  Q.   Why is that?
15  A.   That's just my recollection
16  because of -- given what happened in December of
17  that year, my recollection is I hadn't met with
18  him in the immediate prior months. It was
19  probably earlier in the year.
20  Q.   So you would say sometime before
21  June 2008?
22  A.   I think that's fair to say, but
23  I'm not certain.
24  Q.   Do you happen to recall what you
25  discussed at that meeting?

Page 39

1   A.   No, I don't.
2   Q.   Do you happen to recall how long
3   the meeting was?
4   A.   My recollection is that in 2008 we
5   met with him -- actually, I think it was only I
6   met with him, and that the meeting was about
7   what we would do going forward with our
8   accounts. We had made a significant change in
9   early 2007, and we were indecisive in 2008 about
10  what we wanted to do. So I met with him and I
11  don't think we made any decisions.
12  Q.   When you say you made a
13  significant change in your accounts in early
14  2007, can you tell me about them?
15  A.   In January of 2007 -- and it's
16  possible that it happened in December of 2006 --
17  we instructed Madoff to sell our entire
18  portfolio of stocks that we held. That was a
19  big decision for us.
20  Q.   Why did you make that decision?
21  A.   I think we had reached our
22  objectives in terms of goals we had set back in
23  the early '80s. We were looking -- we had
24  looked to establish a portfolio that would be
25  long term, that would produce a solid nest egg.

Page 40

1   I think we made it there.
2       In addition, the market was high.
3   Our stocks were predominantly long term. We
4   thought it was a good time to sell. So we made
5   that decision.
6       We also were starting to struggle
7   between ourselves in the sense that -- we had
8   this tenancy in common, and as part of that
9   tenancy in common, we had to maintain equal
10  shares because -- in a stock portfolio, because
11  if we had unequal shares, how could one state
12  what one owned of one stock versus another?
13  Q.   Let me stop you right there for
14  just a second. When you say you had to maintain
15  equal shares, are you talking about equal shares
16  amongst the three of you, like you each had to
17  hold a third or --
18  A.   That is correct.
19  Q.   Okay. But you didn't have to
20  maintain equal shares of the actual stocks you
21  were buying?
22  A.   Correct, we did not have to
23  maintain equal shares of that. That had nothing
24  to do with it.
25  Q.   All right. Please continue.

Page 41

1   A.   So, we were in a situation where
2   we had now reached different stages in our
3   lives, and we couldn't all -- it wasn't easy.
4   If my brother wanted to withdraw money or my
5   sister wanted to withdraw money or if I wanted
6   to withdraw money, we all had to withdraw the
7   same amount of money. And if we wanted to add
8   money, we would all have to add the same amount
9   of money. It was unwieldy.
10      It was -- it was foreseeable that
11  it would become harder to reach a consensus, and
12  it made sense, in that sense, to no longer own a
13  shared portfolio of stocks in a tenancy in
14  common.
15  Q.   So in December of 2006 or early
16  2007, you instructed Mr. Madoff to sell all the
17  stocks in your portfolio?
18  A.   That is correct.
19  Q.   What did you do with the money?
20  A.   The monies remained at Madoff.
21  Q.   And that is across all of your
22  accounts that you had stocks in; you instructed
23  him to sell all of them?
24  A.   Are you asking me if we withdrew
25  money after we instructed --

Page 42

1   Q. Not yet. We'll get there.
2   A. Okay.
3   Q. I'm just saying, when you told
4   him, Mr. Madoff, please sell all the stocks, was
5   that instruction across all of your open
6   accounts --
7   A. No.
8   Q. -- or was that limited -- okay.
9   Which accounts did you instruct him to sell all
10  your stocks in?
11  A. We instructed him to sell the
12  stocks in the three accounts where we had --
13  which I referred to as stock accounts.
14      MR. KRATENSTEIN: Do you want him
15  to name those accounts?
16      MS. KERANEN: Yes, please.
17  A. That would be Sage Associates,
18  Sage Associates II, which was the successor
19  entity to the Maurice Sage Trust which I
20  mentioned earlier, and the Maurice S. Sage
21  Foundation, Inc.
22  Q. To your knowledge, at this time
23  period in late 2006 or early 2007, did you have
24  stock in any other of your accounts at Madoff?
25  A. A portfolio of stocks, as opposed

Page 43

1   to being involved in other type -- forms of
2   investments.
3   Q. Right, a portfolio of stocks?
4   A. Those were the only accounts where
5   we had a portfolio of stocks. Yes, those were
6   the only accounts.
7   Q. Let's take a step back and go back
8   to your meetings with Mr. Madoff in the 1990 to
9   2000 period.
10  A. Okay.
11  Q. Did the frequency or length of
12  those -- did the frequency of those meetings
13  change at all from your meetings in the '80s?
14  A. It would be impossible to state --
15  the frequency didn't change, I would say. Did
16  you ask about the length too?
17  Q. That was going to be my next
18  question.
19  A. I thought you had already said
20  that.
21  Q. I was going to say it. You're
22  anticipating me.
23      Did the length of those meetings
24  change at all?
25  A. That's something I couldn't -- I

Page 44

1   couldn't state with any certainty.
2   Q. Did the subject of those meetings
3   change? For instance, did you make any
4   different investment choices that you discussed
5   with Mr. Madoff?
6       MR. KRATENSTEIN: As compared to
7   the earlier meetings in the prior decade?
8       MS. KERANEN: Right.
9   A. Now we're talking between 1990 and
10  2000?
11  Q. Right. For example, you testified
12  that you made a major shift in your investment
13  strategy in 1982. Were there any other sorts of
14  investment shifts like that in the 1990s?
15  A. In 1995 to protect our long-term
16  positions, we instructed Madoff to sell our
17  shares short against the box, based on a
18  recommendation he made to protect those --
19  protect those gains.
20  Q. And you followed Mr. Madoff's
21  instruction?
22      MR. KRATENSTEIN: Objection.
23  A. No, he didn't make any --
24      MR. KRATENSTEIN: Hang on, hang
25  on.

Page 45

1       MS. KERANEN: I'm sorry.
2       MR. KRATENSTEIN: Slow. Object to
3   form.
4   Q. And you followed Mr. Madoff's
5   recommendation to sell short against the box?
6   A. We thought about it. We
7   understood why he was making the suggestion. We
8   thought it was a good idea, and we instructed
9   him to do that.
10  Q. How long did that strategy stay in
11  place?
12  A. It wasn't so much a strategy as a
13  form, one way of dealing with our investments.
14  Periodically over the next decade, we were short
15  against the box, or brought back into the shorts
16  against the box.
17  Q. So you said next decade. So are
18  you capping that at 2005?
19  A. I would cap that at when we sold
20  the stock. 2007.
21  Q. So late 2006, early 2007?
22  A. Correct.
23  Q. And let's talk about your calls
24  with Mr. Madoff during the 1990s to 2000 period.
25  Did you have phone calls that you originated to

**Page 218**

1  Q.  Do you understand what no balance
2  forward means in this context?
3  A.  My understanding is that this was
4  a new account, a new Sage Associates account
5  that was created.
6  Q.  And do you know why this account
7  was created in April 2008?
8  A.  We made a decision in 2006 to
9  early 2007, at some point we informed Madoff and
10 directed him that we wanted to sell our entire
11 portfolio of stock.
12      At that point we were discussing
13 transitioning the account to the basket
14 arbitrage.
15 Q.  Let me stop you there just to make
16 sure I understand correctly. At this point in
17 late 2006, early 2007, you had decided to sell
18 out your stock portfolio and switch to
19 Mr. Madoff's split-strike strategy?
20 A.  We hadn't made -- we had made the
21 decision to sell out our stock positions but we
22 had not yet made the decision to transition to
23 basket arbitrage, split-strike as you call it.
24 Q.  What were you doing with the funds
25 in the meantime?

**Page 219**

1  A.  The funds in the account?
2  Q.  Correct.
3  A.  Well, while we were -- in 2007 we
4  ultimately decided to try to establish a new
5  portfolio and to go forward again with a
6  portfolio of stocks and not go into the basket
7  arbitrage. It was a decision that we were
8  uncertain about, and by 2008 we had made a
9  decision to move out of the stock account,
10 traded stock accounts.
11     And so I believe I see a
12 withdrawal here for $10 million. I believe we
13 withdrew the money in early April to pay our
14 federal taxes, which were significant, and the
15 money was, while we were deciding exactly what
16 to do, we decided to put the money into Treasury
17 bills. That's what we directed Madoff to do,
18 was to buy Treasury bills while we awaited a
19 final decision as to what we were going to do.
20 Q.  Okay. Let me make sure I
21 understand your testimony correctly.
22     You decided in conjunction with
23 your sister and your brother in late 2006 or
24 2007 to close out of your stock portfolios in
25 the Sage Associates accounts?

**Page 220**

1  A.  That is correct.
2  Q.  And you directed Mr. Madoff to
3  sell your positions --
4  A.  That is correct.
5  Q.  -- or otherwise close out your
6  positions and stock --
7  A.  That is correct.
8  Q.  And then later in 2007 you
9  contemplated reopening your stock positions?
10 A.  No. In 2007 after we sold our
11 positions, we had made a decision to continue
12 with stock accounts and not -- not make the
13 transition.
14     The thinking for months had been
15 that we would make the transition to basket
16 arbitrage, and ultimately we decided in 2007 not
17 to do that.
18 Q.  Okay. So in 2007 after you had
19 directed Mr. Madoff to close out your stock
20 positions, what did you do with the money? Did
21 you buy back into any stocks?
22 A.  We did.
23 Q.  Do you recall which stocks you
24 selected?
25 A.  One stock I recall is Priceline.

**Page 221**

1  Another stock I recall was Medco. But what we
2  did -- as opposed to what we did back in '85, we
3  didn't at that point buy an entirely new
4  portfolio of stocks.
5  Q.  Do you remember how many stocks
6  you did purchase?
7  A.  Those are the two that I recall.
8  If you showed me the statement, it might refresh
9  my memory.
10 Q.  And do -- do you recall when you
11 had closed out of the positions?
12     MR. KRATENSTEIN: Which positions?
13 Q.  The -- when you made a decision
14 and directed Mr. Madoff to close out all of your
15 stock portfolios, do you know when that was
16 completed?
17 A.  That would have been completed in
18 January of 2007.
19 Q.  And do you know when you directed
20 Mr. Madoff to buy stocks again for you?
21 A.  It would have been shortly
22 thereafter or right around that time.
23 Q.  So shortly thereafter would have
24 been what time period of the year?
25 A.  I'd have to look at the statements

**Page 222**

1  to refresh my memory, but my recollection is
2  early in 2007, shortly after we sold out our
3  entire portfolio.
4       Q.   So you would expect your
5  statements from 2007 to reflect the closing out
6  of all your positions and then the next month
7  later all new stock purchases?
8       A.   I know that they would have
9  reflected the termination of all our positions
10 and shortly thereafter the establishment of some
11 new positions, yes.
12          MR. KRATENSTEIN: Is there
13 anything he can move away?
14          MS. KERANEN: You can move both of
15 those away for now.
16          I'm handing the court reporter a
17 document to be marked as Exhibit 16.
18          (Exhibit Trustee-16 marked for
19 identification.)
20          MS. KERANEN: I'll read the Bates
21 number into the record. MDPTPP05047503 through
22 05.
23      Q.   Mr. Sage, do you recognize this
24 document?
25      A.   I do.

**Page 223**

1       Q.   And what is this document?
2       A.   This document is Sage Associates
3  January 31st, 2007 statement.
4           MR. KRATENSTEIN: You have the
5  same caveat, I take it, as the prior statements
6  about the -- this is not in the form in which
7  you've received it.
8           THE WITNESS: It is not in the
9  form I received it.
10      Q.   Can you look at the second page of
11 this document, please.
12      A.   Yes, I'm looking at the second
13 page of the document.
14      Q.   Do you see where it says, "Market
15 value of securities" --
16      A.   I do.
17      Q.   -- "long and short"?
18      A.   I do.
19      Q.   What's the number under "long"?
20      A.   $24,106,000.
21      Q.   And I think it's 24,106,498?
22      A.   That is correct.
23      Q.   And the third page, do you see
24 where it says dividends?
25      A.   I do see that.

**Page 224**

1       Q.   What's that number there?
2       A.   Those would be the dividends paid
3  on the Walt Disney Company.
4       Q.   And that's in the amount of a
5  $131,502?
6       A.   That is correct.
7       Q.   So this statement is from January
8  2007 and reflects that your account, Sage
9  Associates, is still holding Walt Disney Company
10 stock, correct?
11      A.   At what point? What are you
12 suggesting?
13      Q.   At the date, January 31st, 2007
14 this shows that your account is long $24 million
15 worth of stock?
16      A.   It does show that.
17      Q.   Okay. And it shows that you
18 received a dividend --
19      A.   I'm going to correct a slight
20 error.
21      Q.   Sure.
22      A.   I instructed Madoff to sell all
23 our long-term positions at the end of 2006 and
24 the early 2007.
25      Q.   And what are your --

**Page 225**

1       A.   That would have included Disney
2  and eBay.
3       Q.   Okay. So your testimony is that
4  Walt Disney and eBay were your long-term
5  positions and you instructed Mr. Madoff to sell
6  both of those?
7       A.   That is correct.
8       Q.   Did you instruct Mr. Madoff to
9  sell any of your other stocks?
10      A.   No, we did not.
11      Q.   So in -- at the end of January
12 2007, it still shows that you are long
13 positions; is that correct?
14      A.   That is correct.
15      Q.   And that you received dividends
16 from the Walt Disney Company?
17      A.   That is correct. If you look at
18 the statement, I guess the ex-dividend date was
19 12/15/2006, so even though we sold out the
20 position in 2007, we still had earned a dividend
21 and it was payable on 1/12 of 2007.
22      Q.   And can you look at Fidelity
23 Spartan?
24      A.   I can.
25      Q.   What was that entity?

Page 226

1  A. My understanding was that that was
2  a money market account.
3  Q. Okay. Then you see security
4  positions below that?
5  A. Yes, I do.
6  Q. Apple, Inc., CarMax, Inc. and
7  General Motors Corp.?
8  A. I do see that.
9  Q. What was your position with these
10 three stocks?
11 A. We were long Apple 65,000 shares,
12 long CarMax 50,000 shares, long General Motors
13 125,000 shares, and we had $15,458 in a money
14 market fund. And we had a Treasury bill with a
15 face value of $11,725,000 due 5/24/2007.
16 Q. And you were not intending to sell
17 those stocks?
18 A. No, we were not intending to sell
19 those stocks. I erred earlier in saying that we
20 instructed Madoff to sell our entire portfolio.
21 What I meant to say was that I instructed Madoff
22 to sell the long-term stocks. I would have
23 called him on the telephone, and I would have
24 sent him a letter to that effect.
25 Q. And these are the only two

Page 227

1  long-term stocks?
2  A. In this account.
3  MR. KRATENSTEIN: By these two,
4  you mean Walt Disney and eBay?
5  MS. KERANEN: Walt Disney and
6  eBay.
7  MR. KRATENSTEIN: Correct,
8  Mr. Sage?
9  THE WITNESS: That is correct.
10 Q. Do you see towards the top where
11 the account number is listed as 1-S0004-3-0?
12 A. I do.
13 Q. Do you recognize that as being one
14 of the sub-accounts of Sage Associates?
15 A. I do.
16 Q. How many sub-accounts for Sage
17 Associates were there?
18 A. There was a sub 3 account, a sub 7
19 account and at various times a sub 8 account.
20 Q. What was the purpose of the sub 3
21 account?
22 A. I assume those were the inter --
23 what was the purpose? The 3 account showed the
24 long -- the long positions.
25 Q. And what was the purpose of the 7

Page 228

1  account?
2  A. The 7 account showed the short
3  against the box positions.
4  Q. And what was the purpose of the 8
5  account?
6  A. The 8 account showed naked short
7  positions.
8  Q. You said at various times there
9  was an 8 account. Why at various times?
10 A. Madoff -- at all times the buck
11 stopped with me. I directed Madoff in terms of
12 trading. Madoff operated in -- within limited
13 discretion. There were guardrails that he
14 understood in terms of our strategy.
15 There came a time where Madoff
16 engaged in trading naked shorts. I was
17 uncomfortable with it. I thought about it. He
18 did it a second time. I instructed him not to
19 do it again, and he did not do it again. So
20 there were only -- I believe that only happened
21 on two occasions.
22 Q. Okay, I'm not sure I quite
23 followed you. Are you saying the 8 account was
24 opened on two occasions or that --
25 A. I don't know that you would --

Page 229

1  that's how you would articulate it in terms of
2  open. How the accounts were set up in terms of
3  numerical sequencing was, you know, was an
4  internal Madoff decision. We didn't have
5  anything to do with determining how his accounts
6  were divided.
7  Q. So you're saying more that when
8  the transactions in the 08 accounts, or the 8
9  accounts, were engaged in, to your knowledge
10 they were only engaged in twice?
11 A. That is my recollection.
12 Q. Let's take a step back and just
13 run through some housekeeping on Sage
14 Associates.
15 A. Sure.
16 MR. KRATENSTEIN: Are you done
17 with this document?
18 MS. KERANEN: Yes.
19 I'm handing the court reporter a
20 document to be marked as Exhibit 17.
21 (Exhibit Trustee-17 marked for
22 identification.)
23 Q. Mr. Sage, do you recognize this
24 document?
25 A. I do recognize this document.

**Page 230**

1  Q. What is this document?
2  A. This is a response by Sage
3  Associates to the Trustee's first set of
4  interrogatories.
5  Q. Do you know who drafted this
6  document?
7  A. This document would have been
8  drafted by my attorney.
9  Q. And can you turn to the last two
10 pages of the document.
11 A. I can.
12 Q. Do you see the verification on the
13 very last page?
14 A. I do.
15 Q. Is that your signature?
16 A. That is my signature.
17 Q. Did you review the responses to
18 the Trustee's first set of interrogatories
19 before they were submitted?
20 A. I did.
21 Q. And what did you do to ensure they
22 were true and correct?
23 A. I would have reviewed the answer
24 to each question after preparing them. I would
25 have checked with whatever relevant

**Page 231**

1  documentation needed to be checked with, and I
2  would have then signed the document.
3  Q. What did you check, what relevant
4  information did you check in order to
5  substantiate your responses?
6  A. I would have checked the Madoff
7  statements. I would have checked the tax
8  returns, and I would have checked I believe the
9  bank statements, yes. And the bank statements.
10 Q. And did you speak with anybody
11 about the submission before it was submitted?
12     MR. KRATENSTEIN: Other than
13 counsel?
14     MS. KERANEN: Other than counsel.
15 A. No.
16 Q. You can set that aside for now.
17     MS. KERANEN: I'm handing the
18 court reporter a document to be marked as
19 Exhibit 18.
20     (Exhibit Trustee-18 marked for
21 identification.)
22 Q. Do you recognize this document?
23 A. I do recognize this document.
24 Q. And what is this document?
25 A. This document is a response to the

**Page 232**

1  Trustee's first set of interrogatories to myself
2  in the Sage Associates account, in the lawsuit
3  against Sage Associates.
4  Q. Can you turn to the last page, the
5  verification.
6  A. I can.
7  Q. Is that your signature?
8  A. That is my signature.
9  Q. Did you review the responses
10 before they were submitted?
11 A. I did.
12 Q. And what did you do to review them
13 to make sure the information was true and
14 correct?
15 A. I would have reviewed the
16 pertinent Madoff statements; I would have
17 reviewed the pertinent tax returns; and I would
18 have reviewed the pertinent bank statements.
19 Q. And did you speak with anybody,
20 aside from counsel about the information
21 contained herein?
22 A. No, I did not.
23 Q. So I believe we previously
24 discussed that Sage Associates was formed in
25 1980. Did you file any paperwork to form Sage

**Page 233**

1  Associates?
2  A. The only thing we would have done
3  was request a taxpayer ID number.
4  Q. Did your mother have any role with
5  Sage Associates?
6  A. No.
7  Q. And was Sage Associates ever
8  dissolved?
9  A. Formally?
10 Q. Formally.
11 A. No.
12 Q. Did you ever discuss with
13 Mr. Madoff the creation of Sage Associates?
14 A. No.
15 Q. Did you ever discuss with anyone
16 at Mr. Madoff's firm the creation of Sage
17 Associates?
18 A. No.
19 Q. How did you decide to create Sage
20 Associates?
21 A. When -- subsequent to my father's
22 death, subsequent to the probate of the will,
23 subsequent to the establishment of the trust
24 under the will, my brother, my sister and myself
25 had assets outside of the portfolio of stock,

**Page 234**

and we decided to form a second tenancy in common, which we called Sage Associates, to invest with Madoff in convertible bond arbitrage, a convertible arbitrage. I sometimes use the word bond. I think the more accurate phrase, in my mind, is convertible arbitrage.

Q. And do you remember why you decided to form a tenancy in common?

A. We wanted to invest with Madoff, and we felt that the best form to invest with Madoff was to do so jointly, as we were doing in the trust, so we decided that a tenancy in common made the most sense, that we'd each contribute equal assets and we would be equal pro rata tenants in common.

Q. Was there a particular reason that you wanted to invest jointly instead of each having singular accounts?

A. When your father dies when you're in college and he dies unexpectedly and you have a different family than you had and that you expected, it brings you all closer together. We were close to our mom, we were close to each other. We had a -- we shared a lot of the same visions. We were all embarking on what was then

**Page 235**

a new life, and I think that togetherness was a comforting feeling.

Q. So there wasn't a legal or financial reason for doing a joint tenancy -- or a tenancy in common instead of individual accounts?

A. No.

Q. Over the life of Sage Associates, how did you keep your brother and your sister updated on what was going on in the accounts?

A. We were together a lot, as a family. So either when we were together or through phone calls. I was always available. It was my responsibility to keep them up to date at all times. I did so always. It was something I feel good about. I did a good job at it.

Q. Did they ever inquire with you about the performance of Sage Associates?

A. We talked about it. I think -- we're all different people. I think they felt comfortable with me. I think they trusted me. I think I earned their trust. I think at all times I was available to them. So we talked about it on occasion, but I think the bottom

**Page 236**

line was that it was my responsibility to take care of.

Q. Did they ever come to you with any investment ideas for the Sage Associates account?

A. We talked as siblings or friends would talk, bat around ideas. In fact, I'm recalling when we were purchasing stock back in 1985 and both my sister and my brother by that time had children. My brother was living in California near Disneyland. My sister thought that the world revolved around taking your kids to Disney World. They were enamored of that company. It went a lot into why we decided to invest in Disney. And we, in fact, invested in Disney not only in Sage Associates but in Sage Associates II as well.

We wanted a -- our goal was always to have a diversified portfolio. It fit the need. So that's an example of how we might have interacted. But I'm sure it happened other times over the years. That's one recollection that I -- that I specifically remember.

Q. How did you verify that Mr. Madoff's firm was carrying out your

**Page 237**

directions?

A. The statements came in regularly. The confirms and trade slips, whatever you want to call them, came in regularly. It was no different than the account we had at Evans & Company in terms of the documentation we received. It was as straightforward as anything could be.

Q. Did you ever notice any irregularities in your account statements?

A. I did not recognize any irregularities in the account statements.

Q. Did you ever receive any actual stock certificates?

A. We never received stock certificates.

Q. Did you ever receive any DTCC confirmations?

A. I don't know what a DTCC --

Q. It's a Depository Trust --
(Reporter clarification.)
MR. KRATENSTEIN: Let him finish his answer. I think he was -- Mr. Sage, finish your answer, and then counsel will ask her question. You don't know what what is?

### Page 314

1      Q.  If Mr. Madoff testified that the
2  specialties of his trading were convertible
3  securities trading and split-strike conversion.
4      A.  Would it surprise me if he said
5  that his specialties were split-strike and --
6  did he say that?
7      Q.  And split-strike conversion.
8      A.  Or is this a hypothetical
9  question?
10      MR. KRATENSTEIN:  I'm going to
11  object to the form of the question.
12      A.  I'm not sure what I'm supposed to
13  answer.
14      Q.  Okay.  So, Mr. Madoff testified
15  last week that you and your family did not have
16  a particular strategy that was one of his
17  specialties, convertible securities --
18      A.  Again, you're using that word
19  specialty -- you're using that -- I'm sorry.
20  I'm sorry.  Why don't we do this again.
21      Q.  Sure.
22      Last week Mr. Madoff testified
23  that you and your family did not have a
24  particular strategy that was one of Madoff's
25  specialties, i.e., convertible securities

### Page 315

1  trading or split-strike conversion.
2      A.  Could I ask you to read what he
3  testified to as opposed to you paraphrasing what
4  he testified to?
5      Q.  Sure.
6      "QUESTION:  And so could you just
7  expand on that and explain how the Sages were
8  different than your discretionary customers.
9      "ANSWER:  Well, they basically
10  didn't have a particular strategy that was one
11  of our specialties, which would have been
12  convertible securities trading or split-strike
13  conversion, which happened in the later years."
14      A.  Okay.  So he did use the word
15  "specialties."  I thought you said he didn't and
16  that you were paraphrasing.
17      Q.  Oh, I misunderstood what you meant
18  by quotation marks then.
19      A.  Sorry.  Okay, now that we've
20  cleared that up.
21      MR. KRATENSTEIN:  What's the
22  question?
23      Q.  Now that -- were you previously
24  aware of that testimony?
25      A.  I read Madoff's deposition

### Page 316

1  testimony.
2      Q.  From last week?
3      A.  From last week.
4      Q.  Why were you invested with a
5  securities firm that did not follow your
6  particular strategy for investing?
7      MR. KRATENSTEIN:  Object to the
8  form --
9      A.  I have --
10      MR. KRATENSTEIN:  Hang on.  Object
11  to the form of the question.
12      A.  I have no idea.  Madoff was a
13  broker.  We were a customer.  We had -- we
14  invested the way we wanted to invest.  Madoff
15  never said to us, I can't do what you want us to
16  do.
17      Q.  Did you ever consider moving your
18  accounts to a different broker?
19      A.  No.
20      MR. KRATENSTEIN:  I assume you
21  mean before he was arrested?
22      MS. KERANEN:  Before he was
23  arrested.
24      THE WITNESS:  At least there's a
25  little bit of humor here.

### Page 317

1      MS. KERANEN:  I think if we can
2  take just five minutes and I'll formulate my
3  last questions.
4      MR. KRATENSTEIN:  Sure.
5      THE VIDEOGRAPHER:  The time is
6  6:52 p.m.  Off the record.
7      (Recess taken.)
8      THE VIDEOGRAPHER:  The time is
9  6:58 p.m.  Back on the record.
10      MS. KERANEN:  Thank you, Mr. Sage,
11  I have no more questions.
12      THE WITNESS:  Oh, thank you.
13      MR. KRATENSTEIN:  I think I have a
14  few questions, so we're going to stick around.
15      THE WITNESS:  Surprise, surprise.
16      - - -
17  EXAMINATION BY MR. KRATENSTEIN:
18      Q.  Before I get into some of these
19  letters that we've seen, I just wanted to
20  clarify some prior testimony you gave about
21  checking prices.
22      A.  Okay.
23      Q.  Do you just want to explain
24  clearly just so there's no confusion about what
25  your practice was with respect to checking the

Page 318

1   prices of stocks in your portfolio.
2       A.   I saw my job as the manager of the
3   tenancies in common to track the stocks, to
4   understand what our positions were, to at all
5   times feel that if I was asked a question that I
6   could respond appropriately and clearly. I had
7   a responsibility to my brother and sister to
8   manage that account properly, and that entailed
9   my tracking the stocks frequently.
10          If I recall, Madoff did not list
11  stock prices on the statements for many of the
12  earlier years. I believe that changed at some
13  point in time, where at the bottom of the
14  statement he listed the monthly price. I could
15  be wrong on this, but that's my recollection.
16          So if that is correct, then I
17  would have checked during those periods the
18  monthly end price of the stock. But it never
19  would have dawned on me that Madoff might not
20  accurately reflect the correct price of the
21  stock. I truly never saw any variances in all
22  of the years that I tracked the stocks.
23      Q.   So when you received statements or
24  confirms that reflected prices of stocks for
25  transactions, stock transactions in your

Page 319

1   account, would you go run off and check the
2   newspaper to see if the statement or confirm was
3   right?
4       A.   No.
5       Q.   Is it fair to say that you would
6   generally check stock prices to see how the
7   portfolio was doing in the market?
8       A.   That is correct.
9       Q.   I'm going to put back in front of
10  you what was marked today as Trustee Exhibit 19.
11      A.   Thank you.
12      Q.   And do you see that in this
13  document you are directing Mr. Madoff to execute
14  six transactions in the Sage Associates account
15  and two transactions in the Sage Associates II
16  account?
17      A.   I do see that.
18      Q.   And then you asked to make a
19  withdrawal?
20      A.   I do see that, too.
21      Q.   And did -- to your knowledge, did
22  these transactions get executed as you directed?
23      A.   To my knowledge, they did.
24      Q.   What's that based on?
25      A.   That is based on the statements

Page 320

1   and the confirmations received for all of these
2   transactions.
3       Q.   Would those be statements and
4   confirmations that you produced in this
5   litigation?
6       A.   They would be.
7       Q.   I'm not going to go through them
8   all with you now; they speak for themselves, but
9   they're all verifiable.
10          MS. KERANEN: Objection.
11          MR. KRATENSTEIN: Well, I'll say
12  that what's on the statements and confirms, what
13  they say is verifiable --
14          MS. KERANEN: Objection.
15          MR. KRATENSTEIN: -- that they
16  speak for themselves.
17      Q.   Let's now look at what was marked
18  earlier today as Exhibit 1.
19      A.   Okay.
20      Q.   Do you recall being shown that
21  document earlier today?
22      A.   I do recall that.
23      Q.   And do you see in this document
24  you are directing Mr. Madoff to execute two
25  transactions in the Sage Associates account with

Page 321

1   respect to Emulex, E-m-u-l-e-x, and Broadcom; do
2   you see that?
3       A.   Yes.
4       Q.   And you also make a direction with
5   respect to a withdrawal from the Maurice S. Sage
6   Foundation; do you see that?
7       A.   I see those.
8       Q.   And did you believe at the time
9   that these trades were actually executed?
10      A.   I did.
11      Q.   And that your instructions were
12  followed?
13      A.   They were.
14      Q.   On what do you base that?
15      A.   I base that on receiving the
16  confirmations and the statements and with regard
17  to the check, receiving the check.
18      Q.   The 25,000-dollar check.
19      A.   That's correct.
20      Q.   You can put that aside.
21          Putting back in front of you what
22  was previously marked as Exhibit 26. Do you
23  recall seeing that document earlier in this
24  deposition?
25      A.   Yes, I do.

Page 322

1    Q.   And you talked about constructive
2  sales and grandfathering. Do you recall those
3  questions and answers?
4    A.   I do recall them.
5    Q.   Do you see that you ask in this
6  letter Mr. Madoff to buy back into Broadcom in
7  the Sage Associates account and RJR in the Sage
8  Associates and Sage Associates II account prior
9  to January 30th? Do you see that?
10   A.   I do see that.
11   Q.   And I believe you testified,
12 correct me if I'm wrong, that seeing the
13 statements and confirms may help you pinpoint
14 when this letter was written. Do you recall
15 that?
16   A.   I do.
17   Q.   So let me just help you with that.
18 First of all, to your knowledge, by the way, did
19 Mr. Madoff buy back into Broadcom and RJR as you
20 instructed in this letter prior to January 30th?
21   A.   That is my recollection.
22   Q.   I'm going to show you what was
23 previously marked at Mr. Madoff's deposition as
24 Exhibit 30. It's two-sided.
25   A.   Okay.

Page 323

1         MS. KERANEN: Thank you.
2         MR. KRATENSTEIN: You're welcome.
3         MS. KERANEN: This was marked as
4  Exhibit 30?
5         MR. KRATENSTEIN: Yes, at
6  Mr. Madoff's deposition.
7         MS. KERANEN: Because it looks
8  like 70.
9         MR. KRATENSTEIN: Oh, I apologize.
10 Let me check. It was Exhibit 70. Thank you for
11 correcting me. It happens to be near tab 30 in
12 my binder. It was Exhibit 70, correct. Thank
13 you.
14   Q.   While you're looking at that, let
15 me also show you what was marked as Exhibit 71
16 at Mr. Madoff's deposition.
17        MS. KERANEN: Thank you.
18        MR. KRATENSTEIN: You're welcome.
19 And I'm going to ask the court reporter to just
20 mark a few documents that were not marked in
21 Mr. Madoff's deposition.
22        Counsel, how do you want to handle
23 this because the prior exhibits were marked
24 Trustee 1 through whatever. Because I'm marking
25 this, how do you want to change it?

Page 324

1         MS. KERANEN: You can mark it as
2  defense exhibits.
3         MR. KRATENSTEIN: Okay, 1?
4         MS. KERANEN: Yeah. I mean, you
5  haven't marked any previous defense exhibits,
6  have you?
7         MR. KRATENSTEIN: Not -- no.
8  These are not -- at the Madoff deposition they
9  were not called defense exhibits. So we can
10 call it Defense Exhibit 1.
11        (Exhibit D-1 marked for
12 identification.)
13        MR. KRATENSTEIN: Mark this as
14 D-2.
15        (Exhibit D-2 marked for
16 identification.)
17        MR. KRATENSTEIN: Mark this as
18 D-3, please.
19        (Exhibit D-3 marked for
20 identification.)
21        MR. KRATENSTEIN: Just for the
22 record, since these are new exhibits, D-1 bears
23 Bates No. SAGE004503; D-2 bears Bates No.
24 SAGE0006859 through 64; D-3 bears Bates No.
25 SAGE0008381 through 8382.

Page 325

1  BY MR. KRATENSTEIN:
2    Q.   Mr. Sage, do you recognize the
3  documents I've put in front of you?
4    A.   I recognize the documents.
5    Q.   Can you just tell us what they
6  are.
7    A.   There is a January --
8    Q.   Tell us by exhibit number.
9    A.   Exhibit No. D-2 is a January 31st,
10 2003 Sage Associates II statement with Madoff.
11        Exhibit D-1 is a confirmation
12 trade date 1/8/03 on Reynolds.
13   Q.   RJR?
14   A.   Yes, RJR, R.J. Reynolds, showing
15 that Madoff followed our instructions according
16 to the letter that I sent, which I can now
17 identify as having been sent in December of
18 2002. That would be the Trustee's Exhibit
19 No. 26.
20        Let me just also add that Exhibit
21 D-1 is the confirm on Sage Associates R.J.
22 Reynolds; and the Exhibit D-3 is the confirm on
23 Sage Associates II R.J. Reynolds.
24        All of these documents combined,
25 the confirms and the statement show that my

Page 326

1  instructions were followed in the letter that
2  I've now identified as having been sent in
3  December of 2002 with regard to the stocks that
4  were grandfathered and needed to be opened up
5  prior to January 31st of 2003.
6      Q.   And those stocks were Broadcom and
7  RJR?
8      A.   That is correct.
9      Q.   Thank you. You can put those
10 documents aside.
11          I don't think that you were shown
12 this letter earlier in this deposition, but it
13 was marked at Mr. Madoff's deposition as
14 Exhibit 73.
15     A.   Okay.
16     Q.   Do you recognize this document?
17     A.   I do recognize that document.
18     Q.   What is it?
19     A.   It is a document, letter that I
20 sent on behalf of the two stock account
21 tenancies in common, Sage Associates and Sage
22 Associates II, and the Maurice S. Sage
23 Foundation to Madoff with the attention to
24 Annette Bongiorno.
25     Q.   And you write to Ms. Bongiorno --

Page 327

1  well, strike that. Step back.
2          The fax line, which says 1/29/92,
3  is that date correct?
4      A.   That date would not be correct.
5      Q.   And that's for the reasons you've
6  previously stated about why the fax lines on
7  your letters were not correct?
8      A.   I never set my fax machines.
9      Q.   You never set the date?
10     A.   I never set the date on my fax
11 machine.
12     Q.   You state in your letter, quote,
13 "After discussions with Paul, we have come up
14 with the following plan with regards to the Sage
15 Associates, Sage Associates II and Maurice S.
16 Sage Foundation Inc. accounts." Do you see
17 that?
18     A.   I do.
19     Q.   And then you give instructions as
20 to Sage Associates with respect to Amgen,
21 Symantec, Reynolds and National Semiconductor.
22 Do you see that?
23     A.   I do see that.
24     Q.   For Sage Associates II you give a
25 direction with respect to the Symantec position

Page 328

1  in that account. Do you see that?
2      A.   I see that.
3      Q.   And with respect to the Maurice S.
4  Sage Foundation, you asked to withdraw a sum of
5  $16,000. Do you see that?
6      A.   I see that.
7      Q.   And you say, "This will not
8  require the sale of any stock because this sum
9  is available in money market funds." Do you see
10 that?
11     A.   I see that line.
12     Q.   Do you believe that these trades
13 were executed?
14     A.   I do believe the trades were
15 executed.
16     Q.   Why?
17     A.   They appeared in the statements,
18 and we received confirmation of the same in
19 trade slips, confirmations from Madoff's firm.
20     Q.   Do you see the notes in the
21 left-hand margin, the handwritten notes?
22     A.   I do.
23     Q.   Are those your notes?
24     A.   They are my notes -- no, they are
25 not my notes.

Page 329

1      Q.   Okay. Do you -- can you read them
2  out loud, please, if you can understand them,
3  the writing.
4      A.   "Plus additional 3 million-dollar
5  gain if possible, no long-term gain" -- "no long
6  term."
7      Q.   Do you know, first of all, what
8  those notes mean? Do you have an understanding
9  of what they mean?
10     A.   That I wanted to take $3 million
11 in gains on the -- in the account but not
12 long-term gains.
13     Q.   Did you give that instruction to
14 Ms. Bongiorno, the addressee of this letter?
15     A.   I did.
16     Q.   Why did you want to -- why did you
17 give her that instruction?
18     A.   It was always my goal to lower the
19 margin debt. The Amgen, Symantec, Reynolds and
20 National Semiconductor positions were held short
21 against the box. They were short-term
22 positions. They were shorted before the stocks
23 were held for a year. I believe that it made
24 sense to reduce the margin debt in that way.
25          We also had incurred significant

08-01789-cgm   Doc 17470-1   Filed 04/11/18   Entered 04/11/18 15:50:53   Exhibit A
Pg 17 of 19
Picard v Sage Associates-Realty                    Malcolm Sage 11/15/2017

84 (Pages 330 to 333)

Page 330

1  margin interest. I wanted to be able to write
2  off the margin interest, although margin
3  interest could be carried forward to a
4  subsequent year. Given that I could reduce the
5  debt and write off the margin interest, it
6  seemed to me like a logical move to make at that
7  time.
8       I believe that there were
9  significant losses in this year that we
10 incurred. I did not -- they were, to the best
11 of my recollection, not -- they were losses that
12 I did not want to offset with long-term gains.
13 It would have negated the value of my long-term
14 gains to offset the short-term losses with those
15 long-term gains.
16      So, I instructed to take these
17 gains but not to take long-term gains.
18      Q.   To your knowledge were your
19 instructions followed?
20      A.   To my knowledge these positions
21 that I outlined were followed and no long-term
22 gains were recognized.
23      Q.   Do you know when you wrote this
24 letter?
25      A.   It would appear to me to be in

Page 331

1  December prior to Christmas, and the year I
2  would be able to identify better if I could see
3  the statements and the confirms.
4       Q.   All right. Well I'll show you the
5  statements. I don't know if we'll need to go to
6  the confirms. But showing you what was
7  previously marked at Mr. Madoff's deposition as
8  Exhibit 74 and Exhibit 75.
9       A.   So this letter would have been
10 sent in 2002.
11      Q.   Are you sure? Look at the date.
12      A.   I'm sorry. The letter would have
13 been sent in 2003. These are the statements
14 that show that -- I see that Amgen and Symantec
15 and Reynolds and National Semiconductor were all
16 traded as I instructed.
17      Q.   Let's look at -- that's in the
18 Sage Associates account?
19      A.   That is in Sage Associates.
20      Q.   Now I'll show you the Sage
21 Associates II statement. Showing you what was
22 previously marked as Exhibit 80 at Mr. Madoff's
23 deposition and Exhibit 81.
24      A.   So Exhibit 81 is the December
25 statement on the 7 account, the short against

Page 332

1  the box account.
2       Q.   In Sage Associates?
3       A.   In Sage Associates II. The
4  Exhibit No. 80 is the 3 account, the long
5  positions in Sage Associates II. I see the --
6  that we delivered the short position in the 7
7  account against the long position in the 3
8  account as I instructed.
9       Q.   What are the date of those
10 statements?
11      A.   The date of those statements are
12 December of 2003.
13      Q.   And the last instruction in the
14 letter that we put in front of you, which was
15 marked at Mr. Madoff's deposition as Exhibit 73
16 talks about at the end a withdrawal of $16,000
17 from the Maurice S. Sage Foundation account. Do
18 you see that?
19      A.   I do see that.
20      Q.   And putting in front of you what
21 was marked at Mr. Madoff's deposition as
22 Exhibit 83, and I'll ask if you recognize that
23 document?
24      A.   I do recognize that document.
25      Q.   What is it?

Page 333

1       A.   It is a memorandum for a check
2  received on the Maurice S. Sage Foundation dated
3  12/24/2003, in the amount of $16,000 as I
4  instructed in my letter.
5       Q.   Thank you. You can put those
6  documents aside.
7       I show you what was previously
8  marked as Exhibit 84 at Mr. Madoff's deposition.
9       A.   Okay.
10      Q.   You see that the Bates number of
11 this document is not a Sage Bates number? Do
12 you see that?
13      A.   I do see that.
14      Q.   And do you see that these are --
15 the handwriting starts "year end notes." Do you
16 see that?
17      A.   I see that.
18      Q.   Do you see a reference in the
19 notes to Sage group?
20      A.   I see that.
21      Q.   And then do you see the note that
22 says, "Could have gone SAB on eBay but cust did
23 not want it"? Do you see that?
24      A.   I do see that.
25      Q.   Do you have any idea what that

Page 334

1  refers to?
2      A.   I believe in the previous letter
3  when I was suggesting that we would like not to
4  take any long-term gains, we had a long-term
5  gain in eBay at the time, so when I was asked if
6  we should go short against the box on eBay, I
7  didn't want that. We could have gone short
8  against the box in eBay and not opened it up
9  prior to January 31st of the subsequent year and
10 recognized the gain, as a constructive sale.
11 But that would have defeated the purpose of what
12 I wanted to do.
13     Q.   And you were shown Exhibit 24
14 before, and we had talked about the fact that
15 there were some notes missing on that. So let
16 me just get for you what was marked as
17 Exhibit 88 at Mr. Madoff's deposition, which is
18 a -- we double-sided it --
19     A.   Okay.
20     Q.   -- but I'll put that in front of
21 you as well.
22          So, Mr. Sage, do you see that this
23 version of the document has the additional notes
24 that we were referring to earlier that were
25 missing from Exhibit 24? Do you see that?

Page 335

1      A.   I see that.
2      Q.   And can you read out loud the
3  notes that are on the second page of the
4  document.
5      A.   "I called Malcolm Sage and of
6  June."
7      Q.   Is it and or end?
8      A.   "End of June to say the accounts
9  were as close to ever and should" -- "even and
10 should we do the transfers. He said he would
11 talk to Paul, call back. Called again end of
12 July. He said he didn't get a chance to get
13 talk" -- "to yet talk Paul and he will call me
14 back. Called again 8/23/06. He said the" --
15 premises?
16     Q.   Promises.
17     A.   -- "promises to call me" -- oh.
18 "And he said he promises to call me back by
19 Tuesday 8/29."
20     Q.   Does reading these notes refresh
21 your recollection of conversations you had with
22 Ms. Bongiorno in or around June through August
23 of 2006?
24     A.   It does.
25     Q.   What was this about?

Page 336

1      A.   This was that period I was trying
2  to explain before in 2006 where we -- we just
3  were indecisive -- I was indecisive about what I
4  wanted to do with our stock portfolio. And I
5  guess I sent Madoff two letters and -- I had
6  sent Madoff two letters about that, and
7  obviously we had spoken about this as earlier as
8  2005. And because I had sent those letters,
9  Bongiorno must have called me back to say, what
10 do you want to do, because I had clearly
11 indicated that we were going to sell off the
12 portfolio.
13          But as the months went by, as I
14 said earlier, I decided I really wanted to
15 realize the gains in 2007. So I just waited as
16 long as I could. I don't know that I ever
17 called back by Tuesday 8/29. Probably by that
18 time I had made a decision to see if we could
19 get to January 1st of 2007.
20          In fact, that is what we wound up
21 doing. And, you know, I guess all of this
22 letter writing was me thinking I wanted to sell
23 the stocks. As I mentioned, we were paying the
24 estimated taxes, but at the end of the day, I
25 didn't pull that trigger.

Page 337

1      Q.   That was your trigger to pull?
2      A.   That was my trigger to pull.
3      Q.   Did you understand -- you
4  mentioned that you understand these notes to be
5  Ms. Bongiorno awaiting your instructions; is
6  that correct?
7      A.   It would appear that way. I don't
8  know her handwriting but --
9      Q.   Was that consistent with your
10 recollection?
11     A.   It's consistent with my
12 recollection.
13     Q.   Thank you. A few more questions.
14          You testified earlier about the
15 decision to buy Disney. Do you remember that?
16     A.   I do recall that.
17     Q.   And just to refresh us, when was
18 Disney purchased?
19     A.   My recollection that it was -- is
20 that it was purchased in the spring of 1985.
21     Q.   Were other stocks purchased at
22 that time?
23     A.   At the time we purchased Disney,
24 Disney was bought both in Sage Associates and
25 in -- and in the Maurice Sage Trust because we

Page 338

1  didn't transfer the trust assets to Sage
2  Associates II until 1986, approximately in June.
3       So we bought Disney in those two
4  accounts at the same time that we bought Disney
5  in Sage Associates. My recollection is that in
6  Sage Associates we bought Merrill and Upjohn and
7  that in Sage Associates II we bought Disney,
8  Anheuser, Boise, American Express, and I believe
9  we bought Merrill in that account as well.
10      Q.   So those stocks you instructed
11 Mr. Madoff to purchase in 1985?
12      A.   That's my recollection.
13      Q.   How long were those stocks held,
14 to your recollection?
15      A.   With the exception of Upjohn,
16 which merged with Pharmacia, and became at first
17 Pharmacia Upjohn, then became Pharmacia and then
18 merged with Pfizer, and we sold that stock, my
19 recollection is in 2005, I believe or 2006, but
20 all of the other stocks were held till 2007 in
21 January when I instructed Madoff to sell off all
22 of those positions.
23      Q.   So you held those -- that stock
24 portfolio in those two accounts with the one
25 exception you mentioned all the way from 1985

Page 339

1  until 2007?
2       A.   That is correct.
3       Q.   Why did you do that?
4       A.   It was -- no one ever knows when
5  one starts on a road as to where that road will
6  lead. Certainly not in the market. But that
7  was our -- our objective was to grow a portfolio
8  of stocks and to hold them for as long as
9  possible and grow a nest egg that we could make
10 certain that we provided for ourselves and our
11 families as time went by.
12      Q.   And by January 2007 did you
13 believe you had accomplished that goal?
14      A.   I do believe that we had
15 accomplished that goal.
16      MR. KRATENSTEIN: I have no
17 further questions.
18      MS. KERANEN: I have one question
19 for you, Mr. Sage.
20          - - -
21 CONTINUED EXAMINATION BY MS. KERANEN:
22      Q.   As you sit here today, do you have
23 any evidence that was not generated by Madoff
24 that the trades that you directed actually
25 occurred?

Page 340

1       A.   Do I have evidence that the trades
2  that he executed and listed on our statements
3  and the confirms, that they did not happen? Do
4  I have evidence of that?
5       Q.   No, no, that's not what I asked.
6       A.   Oh, no --
7       Q.   Can you read back my question,
8  please.
9       (Last question read.)
10      A.   Maybe I'm getting tired. How did
11 that differ from what I said? Can you ask the
12 question again?
13      Q.   Sure. So you have testified that
14 you know that your directions were followed
15 because of the account statements and the trade
16 confirmations sent to you by Madoff.
17      A.   That's correct.
18      Q.   Do you have any evidence that was
19 not sent to you by Madoff that those trades
20 actually occurred?
21      A.   Evidence that was not sent to me
22 by Madoff? No.
23      MS. KERANEN: I have no further
24 questions.
25          - - -

Page 341

1  CONTINUED EXAMINATION BY MR. KRATENSTEIN:
2       Q.   Do you believe that your trades
3  were executed?
4       A.   I do believe my trades were
5  executed.
6       Q.   And that's based on what?
7       A.   Based on the confirms and the
8  statements.
9       MR. KRATENSTEIN: Thank you.
10      THE VIDEOGRAPHER: The time is
11 7:33 p.m. This concludes the deposition. Off
12 the record.
13      (Deposition concluded.)
14          -o0o-