EXHIBIT G

Page 386

1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
2
3

        In re:                          )
4                                       )
        SECURITIES INVESTOR             )
5       PROTECTION CORPORATION,         )
                                        )
6            Plaintiff-Applicant,       )
                                        )
7       vs.                             )    08-01789 (SMB)
                                        )
8       BERNARD L. MADOFF               )
        INVESTMENT SECURITIES, LLC,     )
9                                       )
             Defendant.                 )
10                                      )
                                        )
11      In re:                          )
                                        )
12      BERNARD L. MADOFF,              )
                                        )
13           Debtor.                    )
                                        )
14
15                         CONFIDENTIAL
16              Videotaped Deposition of BERNARD L.
17      MADOFF, VOLUME III, taken on behalf of the
18      Customers, before K. Denise Neal, Registered
19      Professional Reporter and Notary Public, at the
20      Federal Correctional Institution, 3000 Old Highway
21      75, Butner, North Carolina, on the 8th day of
22      November, 2017, commencing at 9:00 a.m.
23
24
25                         * * * * *

CONFIDENTIAL

Page 387

1 APPEARANCES OF COUNSEL:
2
3   On Behalf of the Customers:
4     HELEN DAVIS CHAITMAN, Esq.
5     Chaitman, LLP
6     465 Park Avenue
7     New York, New York  10022
8     (908) 303-4568
9     hchaitman@chaitmanllp.com
10
11  On Behalf of Sage Associates, Sage Realty,
12  Malcolm Sage, Martin Sage and Ann Passer Sage
13    ANDREW B. KRATENSTEIN, Esq.
14    McDermott Will & Emery, LLP
15    340 Madison Avenue
16    New York, New York  10173-1922
17    (212) 547-5695
18    akratenstein@mwe.com
19
20
21
22
23
24
25

Page 389

1         CONTENTS
2 THE WITNESS:  BERNARD L. MADOFF     EXAMINATION
3   BY MR. KRATENSTEIN       395
4
5         * * * * *
6
7       INDEX OF EXHIBITS
8 FOR THE CUSTOMERS:            PAGE
9 Exhibit Number 32, Client activity     403
10  document
11 Exhibit Number 33, House 17 cash and    405
12  securities for settlement - 12-13-79
13 Exhibit Number 34, Maurice Sage Trust    412
14  account statement - 3-31-80
15 Exhibit Number 35, House 5 cash and    408
16  securities for settlement - 5-16-96
17 Exhibit Number 36, Maurice Sage Trust    414
18  account statement - 6-30-81
19 Exhibit Number 37, Maurice Sage Trust    416
20  account statement - 12-31-81
21 Exhibit Number 38, Month-end statement    417
22  - 1-31-83
23 Exhibit Number 39, Ledger - 1-31-83    419
24 Exhibit Number 40, Maurice Sage Trust    420
25  statement - 6-30-86

Page 388

1 APPEARANCES OF COUNSEL:
2
3   On Behalf of the Trustee:
4     AMANDA E. FEIN, Esq.
5     STACY DASARO, Esq.
6     Baker Hostetler
7     45 Rockefeller Plaza
8     New York, New York  10111-0100
9     (212) 589-4621
10    afein@bakerlaw.com
11
12  On Behalf of the Deponent:
13    PETER A. GOLDMAN, Esq.
14    12 Fairlawn Parkway
15    Rye Brook, New York  10573
16    (914) 935-6857
17    pagoldman@gmail.com
18
19  Videographer:
20    Bob Collier, CLVS
21
22        * * * * *
23
24
25

Page 390

1    INDEX OF EXHIBITS (Continued)
2 FOR THE CUSTOMERS:            PAGE
3 Exhibit Number 41, Sage Realty statement    422
4  - 5-31-94
5 Exhibit Number 42, Sage Realty statement    423
6  - 12-31-96
7 Exhibit Number 43, Sage Realty statement    424
8  - 1-31-97
9 Exhibit Number 44, Sage Realty statement    428
10  - 7-31-94
11 Exhibit Number 45, House 17 stock    429
12  record summary
13 Exhibit Number 46, National Westminster    433
14   Bank activity report - 5-31-85
15 Exhibit Number 47, Letter from Maurice    436
16  Sage
17 Exhibit Number 48, Sage Associates    440
18  statement - 11-30-01
19 Exhibit Number 49, Sage Associates    441
20  statement - 11-30-01
21 Exhibit Number 50, Sage Associates    442
22  statement
23 Exhibit Number 51, Confirmation of    442
24  transaction
25

2 (Pages 387 - 390)

CONFIDENTIAL

Page 391

1        INDEX OF EXHIBITS (Continued)
2  FOR THE CUSTOMERS:                    PAGE
3  Exhibit Number 52, Confirmation of       442
4    transaction
5  Exhibit Number 53, Memorandum of         442
6    transaction and confirmation
7  Exhibit Number 53A, Credit memorandum    487
8  Exhibit Number 54, Memorandum of         444
9    transaction and confirmation
10 Exhibit Number 55, Memorandum of         447
11   transaction and confirmation
12 Exhibit Number 56, Memorandum of         448
13   transaction and confirmation
14 Exhibit Number 57, Sage Associates II    449
15   statement
16 Exhibit Number 58, Sage Associates II    450
17   statement
18 Exhibit Number 59, Sage Associates II    451
19   memorandum of transaction and confirms
20 Exhibit Number 60, Sage Associates II    451
21   memorandum of transaction and confirms
22 Exhibit Number 61, Letter          452
23 Exhibit Number 62, Sage Associates    456
24   statement
25

Page 393

1        INDEX OF EXHIBITS (Continued)
2  FOR THE CUSTOMERS:                    PAGE
3  Exhibit Number 75, Sage Associates      468
4    statement - 12-31-03
5  Exhibit Number 76, Confirmations        469
6  Exhibit Number 77, Confirmations        469
7  Exhibit Number 78, Confirmations        469
8  Exhibit Number 79, Confirmations        469
9  Exhibit Number 80, Sage Associates II   469
10   Statement - 12-31-03
11 Exhibit Number 81, Sage Associates II   469
12   Statement - 12-31-03
13 Exhibit Number 82, Confirmation         470
14 Exhibit Number 83, Memorandum of check  471
15 Exhibit Number 84, Handwritten note     471
16 Exhibit Number 85, Letter from Malcolm  474
17   Sage
18 Exhibit Number 86, Sage Associates      475
19   Statement - 4-30-06
20 Exhibit Number 87, Confirmations        475
21 Exhibit Number 88, Letter from Malcolm  476
22   Sage
23
24
25

Page 392

1        INDEX OF EXHIBITS (Continued)
2  FOR THE CUSTOMERS:                    PAGE
3  Exhibit Number 63, Sage Associates      458
4    statement
5  Exhibit Number 64, Exhibit inadvertently  ---
6    skipped
7  Exhibit Number 65, Maurice S. Sage      458
8    Foundation statement
9  Exhibit Number 66, Memorandum of        459
10   transaction and confirmation
11 Exhibit Number 67, Memorandum of        459
12   transaction and confirmation
13 Exhibit Number 68, Memorandum of        459
14   transaction and confirmation
15 Exhibit Number 69, Letter from Malcolm  459
16   Sage
17 Exhibit Number 70, Sage Associates      462
18   statement - 1-31-03
19 Exhibit Number 71, Confirmations        463
20 Exhibit Number 72, Confirmations        463
21 Exhibit Number 73, Letter from Malcolm  464
22   Sage
23 Exhibit Number 74, Sage Associates      467
24   statement - 12-31-03
25

Page 394

1        THE VIDEOGRAPHER:  We are now on the
2  record.  Please note that the microphones are
3  sensitive and may pick up whispering and private
4  conversations.  Please turn off all cell phones or
5  place them away from the microphones as they can
6  interfere with the deposition audio.  Recording will
7  continue until all parties agree to go off the
8  record.  My name is Bob Collier representing
9  Veritext Legal Solutions.
10       Today's date is November 8th, 2017 and the
11 time is approximately 9:00 a.m.  This video
12 deposition is being held at Butner Federal
13 Correction Facility located at 3000 Old 75 Highway,
14 Butner, North Carolina and is being taken by counsel
15 for the Plaintiff-Applicant.  The caption of this
16 case is Securities Investor Protection Corporation,
17 Plaintiff-Applicant v. Bernard L. Madoff Investment
18 Securities, LLC, Defendant.
19       This case is being held in the United
20 States Bankruptcy Court, Southern District of New
21 York, Case Number 08-01789 (SMB).  The name of the
22 witness is Bernard L. Madoff.  At this time the
23 attorneys present in the room and everyone attending
24 remotely will identify themselves and the parties
25 they represent.  Our court reporter is Denise Neal

CONFIDENTIAL

CONFIDENTIAL

**Page 395**

1 representing Veritext Legal Solutions.

2    MR. KRATENSTEIN: Good morning. Andrew

3 Kratenstein from McDermott Will & Emery, LLP

4 representing Malcolm Sage individually as well as

5 the representative of his mother Lillian's estate,

6 Martin Sage, Ann Passer Sage, Sage Associates and

7 Sage Realty.

8    MS. CHAITMAN: Helen Davis Chaitman on

9 behalf of a number of different Defendants.

10    MR. GOLDMAN: Peter Goldman on behalf of

11 Bernard L. Madoff.

12    MS. DASARO: Stacy Dasaro on behalf of the

13 Trustee.

14    MS. FEIN: Amanda Fein, Baker Hostetler,

15 on behalf of the Trustee.

16    THE VIDEOGRAPHER: Will the court

17 reporter, Denise Neal, please swear in the witness

18 and we can proceed.

19    BERNARD L. MADOFF,

20 having been first duly sworn, was examined and

21 testified as follows:

22    EXAMINATION

23 BY MR. KRATENSTEIN:

24    Q. Good morning, Mr. Madoff.

25    A. Morning.

**Page 396**

1    Q. Are you on any medication or is there any

2 other reason that you cannot give truthful testimony

3 today?

4    A. I'm on medication, but it won't interfere

5 with my testimony.

6    Q. You believe you can give full and complete

7 truthful testimony?

8    A. I do.

9    Q. Thank you. As I mentioned at the outset, I

10 represent the Sages, Martin Sage, Malcolm Sage, Ann

11 Passer Sage, as well as two entities with which

12 they're affiliated, Sage Associates and Sage Realty.

13 Do you recall the Sage family?

14    A. Yes.

15    Q. The Sage family were customers of yours?

16    A. Yes.

17    Q. How did they come to be your customers?

18    A. You know, through my father-in-law.

19    Q. Do you recall somebody named Maurice Sage?

20    A. Excuse me?

21    Q. Maurice Sage, do you remember him?

22    A. Yes, uh-huh.

23    Q. Who was he?

24    A. He was the father of the three children.

25    Q. Martin, Malcolm and Ann?

**Page 397**

1    A. Right.

2    Q. And was Mr. Maurice Sage a customer of

3 yours?

4    A. Yes.

5    Q. How did he come to be your customer?

6    A. The same way, through my father-in-law.

7    Q. Could you describe how that happened?

8    A. I had a lot of my father-in-law's clients.

9 He was their accountant.

10    Q. And just for the record, your

11 father-in-law's name was?

12    A. Paul Alpern.

13    Q. When did as best you can recall Maurice

14 Sage become a customer of yours?

15    A. Probably in the '60s.

16    Q. And do you recall Maurice Sage passing

17 away?

18    A. Yes.

19    Q. What do you recall of that?

20    A. I think he had a heart attack while giving

21 a speech at a charitable dinner.

22    Q. Do you recall when that was approximately?

23    A. No.

24    Q. And would 1976 sound about right?

25    A. Yes.

**Page 398**

1    Q. And is it correct that after he died his

2 wife, Lillian, and his children, Malcolm, Martin and

3 Ann, were customers of yours through various

4 accounts that they held with your firm?

5    A. Yes.

6    Q. Do you recall that one of those accounts

7 was called Sage Associates?

8    A. Correct.

9    Q. Another account was called Sage Realty?

10    A. Correct.

11    Q. Do you recall that they had various other

12 accounts such as Maurice Sage Trust, Sage Associates

13 II, MMRN and the Maurice Sage Foundation?

14    A. Yes.

15    Q. You've previously testified that your fraud

16 started in 1992; correct?

17    A. Correct.

18    Q. The Sages became your customers well before

19 your fraud started; correct?

20    A. Correct.

21    Q. Any trading you would have done in their

22 accounts before at least 1992 would have been real

23 trades that were actually executed?

24    A. Correct.

25    MS. FEIN: Objection to form.

4 (Pages 395 - 398)

CONFIDENTIAL

**Page 399**

1    Q. (By Mr. Kratenstein) You've also testified
2 previously that all of your convertible bond
3 arbitrage trading was real; is that correct?
4    A. Correct.
5    Q. So any convertible bond arbitrage trading
6 you did in any of the Sages' accounts at any time
7 including the Sage Realty account would have been
8 real trades that were actually executed by your
9 firm?
10    A. Correct.
11        MS. FEIN: Objection to form.
12    Q. (By Mr. Kratenstein) Is it correct that
13 your fraud was limited to what is known as the split
14 strike trading?
15    A. Correct.
16    Q. Do you recall having meetings with the
17 Sages at your offices?
18    A. Yes.
19    Q. What do you recall of your meetings with
20 the Sages?
21    A. I don't recall the dates, but it was in the
22 latter years, probably in 2000, something like that.
23    Q. Was this when you were in the Lipstick
24 Building?
25    A. Yes.

**Page 400**

1    Q. Do you recall any of the substance of those
2 meetings?
3    A. They wanted to change their style of
4 trading where they were going to direct the trades.
5    Q. What do you mean by direct the trades?
6    A. In other words, they would give
7 instructions to me what they wanted to buy and what
8 they wanted -- and when they wanted to sell it and
9 so on.
10    Q. Was that atypical?
11    A. Yes.
12    Q. How so?
13    A. That was the general rule was we handled
14 all of the decision making for the clients, limited,
15 limited decision making. Basically, there's a
16 definition of discretionary accounts in the
17 securities industry where discretion is limited --
18 discretion is limited to time and price of a
19 security.
20        That's not considered discretion. It's
21 only when you give them -- when you make the
22 decision to what security to buy and sell then it
23 becomes a full discretionary account. That's an SEC
24 regulation.
25    Q. And so could you just expand on that and

**Page 401**

1 explain how the Sages were different than your
2 discretionary customers?
3    A. Well, they basically didn't have a
4 particular strategy that was one of our specialties,
5 which would have been convertible securities trading
6 or split strike conversion, which happened in the
7 later years.
8    Q. And so they directed you on to whether to
9 buy or sell specific securities?
10    A. Yes.
11    Q. That was unusual?
12    A. Yes.
13    Q. Most of your customers were by that time in
14 split strike?
15    A. Yes.
16    Q. Did the -- do you recall anything else of
17 your meetings with them?
18    A. What was the question?
19    Q. Do you recall anything else of your
20 meetings with the Sages?
21    A. Not particularly, no.
22    Q. Would you meet with all three Sages, in
23 other words, Malcolm, Martin and Ann?
24    A. Yes.
25    Q. And would one of them do talking more than

**Page 402**

1 the other two?
2    A. Basically, Malcolm Sage.
3    Q. Okay. Did the Sages deal with anybody else
4 at your firm such as Annette Bongiorno?
5    A. Probably, yes.
6    Q. Why do you say probably yes?
7    A. Because she was on a different floor, so
8 I'm not aware of when the conversation took place;
9 but she was the head bookkeeper, so normally she
10 would follow the instructions of what the client
11 gave her on certain -- in certain instances.
12    Q. Would you recognize Ms. Bongiorno's
13 handwriting?
14    A. Not really.
15    Q. Well, we may see it later and we'll see if
16 you can recognize her handwriting. I take it you'd
17 have occasion to see her handwriting at work
18 sometimes; is that correct?
19    A. Yes.
20    Q. What was Ms. Bongiorno's exact role with
21 respect to the Sage accounts?
22    A. She primarily handled all of the retail
23 clients' accounts.
24    Q. And that would include the Sages?
25    A. Yes.

5 (Pages 399 - 402)

CONFIDENTIAL

Page 403

1    Q. And how do you define the retail clients?
2    A. Not an institution.
3    Q. Not an institution?
4    A. Right.
5    Q. Okay. To your knowledge did she maintain a
6 file for each customer's account?
7    A. Yes.
8    Q. To your knowledge would she maintain client
9 correspondence in those files?
10    A. Yes.
11    (Exhibit Number 32 was marked for
12 identification.)
13    Q. (By Mr. Kratenstein) We talked about one
14 of the accounts earlier, one that's called the
15 Maurice Sage Trust. I'm going to show you a
16 document that we've marked as Exhibit 32. Put that
17 in front of you. Mr. Madoff, do you recognize this
18 document?
19    A. Yes.
20    Q. What is it?
21    A. It's clients account document listing the
22 activity in the account.
23    Q. Do you see at the top it's dated
24 December 31, 1979?
25    A. Uh-huh, yes.

Page 404

1    Q. You see it's for the Maurice Sage Trust
2 account?
3    A. Yes.
4    Q. Were documents like these be generated on
5 or around the date indicated in the top left corner?
6    A. Yes.
7    Q. And was it ordinary practice of your
8 business to generate accounts like -- I'm sorry --
9 statements like this?
10    A. Correct.
11    Q. Do you know where statements like this
12 would be stored after they were generated?
13    A. Usually, you know, in the bookkeeping
14 department.
15    Q. And so documents of this type would be
16 maintained under your firm's custody and control?
17    A. Yes.
18    Q. Looking now at the specific activity in the
19 account, do you see in the middle of the page that
20 there are several securities that are marked as
21 having been received, Dr. Pepper, Asarco, Alcan,
22 American Telephone & Telegraph, Skyline, Kaiser?
23    A. Yes.
24    Q. RCA, Central Penn, Reynolds and more
25 Skyline? Do you see that?

Page 405

1    A. Uh-huh.
2    Q. So when it says RECD, what does that mean?
3    A. Means the security was received into the
4 account.
5    Q. Does that mean that the client would have
6 physically delivered a security to you?
7    A. Usually, unless it was received from a bank
8 or another brokerage firm.
9    Q. And then do you see above those entries
10 there are various credits also for those various
11 securities?
12    A. Those are sales transactions.
13    Q. And then the proceeds of the sales are
14 shown on the account?
15    A. Correct.
16    Q. Would these have been real receipts of the
17 securities, receipts of real securities?
18    A. Yes.
19    Q. Would the sales have been real sales of
20 those securities?
21    A. Yes.
22    MS. FEIN: Objection.
23    (Exhibit Number 33 was marked for
24 identification.)
25    Q. (By Mr. Kratenstein) Let's go to -- you

Page 406

1 can put that document aside. I'm going to show you
2 another document which we've marked as Exhibit
3 Number 33.
4    MS. FEIN: Thanks. We can take just one.
5    Q. (By Mr. Kratenstein) Okay. Mr. Madoff, do
6 you recognize what we've marked as Exhibit 33?
7    A. Yes.
8    Q. What is it?
9    A. It shows movement of monies into an
10 account.
11    Q. You see on the top it's called house number
12 17 cash and securities for settlement?
13    A. Uh-huh.
14    Q. Dated December 13th, 1979?
15    A. Yes.
16    Q. Do you see that?
17    A. Uh-huh.
18    Q. What is a cash and securities for
19 settlement statement?
20    A. It just shows the movement of securities.
21    Q. From where to where?
22    A. From other brokerage firms, from the client
23 themself, come from a number of sources.
24    Q. And would reports like this have been
25 generated in the ordinary course of your firm's

6 (Pages 403 - 406)

CONFIDENTIAL

Page 407

1 business?
2    A.  Correct.
3    Q.  And would a report like this have been
4 printed out on or around the date indicated at the
5 top, in this case, December 13th, 1979?
6    A.  Correct.
7    Q.  And was it a regular part of your firm's
8 business to keep and maintain records of this type?
9    A.  Yes.
10   Q.  Do you know where records like this would
11 have been maintained?
12   A.  Where they would have been?
13   Q.  Yeah, yes.
14   A.  The same place.  They were on the firm's
15 premises.
16   Q.  Thank you.  Do you know how often reports
17 such as this, these cash and securities for
18 settlement reports, would be run by your firm?
19   A.  Probably either the end of the week, the
20 end of the month or end of the quarter.  I'm not
21 sure.
22   Q.  Okay.  This one is a house 17 cash and
23 securities for settlement report.  Do you see that?
24   A.  Yes.
25   Q.  Were similar reports run for house five, in

Page 408

1 other words, are there house five cash and
2 securities for settlement reports?
3    A.  That would represent typically market
4 making or proprietary trading, not for clients,
5 which are the firm's principal account.
6    Q.  So is the answer to my question yes, that
7 there would be cash and securities for settlement
8 statements for house five?
9    A.  Yes.
10   Q.  I'm going to mark --
11   A.  I'm assuming.
12   Q.  Well, I'll show you one.  Here's Exhibit --
13 that's 33.  Wait a minute.  34.  You know what?
14 This will be 35.  I'm going to come back to 34.
15   MS. FEIN:  Okay.
16   MR. KRATENSTEIN:  Sorry.
17      (Exhibit Number 35 was marked for
18 identification.)
19   MS. FEIN:  Thank you.
20   MS. CHAITMAN:  Thank you.
21   Q.  (By Mr. Kratenstein)  Do you see that what
22 we've marked as Exhibit 35 is a house five cash and
23 securities for settlement statement dated in this
24 case May 16th, 1996?  Do you see that?
25   A.  Yes.

Page 409

1    Q.  And so is this the equivalent, I appreciate
2 it's for a different date, but it's the equivalent
3 of the type of report we see in Exhibit 33 for house
4 17, cash and securities for settlement?
5    A.  I'm assuming so.
6    Q.  Okay.  And do you know how often these
7 house five cash and securities for settlement
8 statements would be run?
9    A.  No.  I'm not.
10   Q.  They would be run periodically, though?
11   A.  Yes.
12   Q.  This is a house five statement.  So would
13 the transactions on the house five statement be real
14 transactions?
15   A.  Yes.
16   Q.  And for house 17 at a time like Exhibit 33,
17 which is December 13th, 1979, would those all be
18 real transactions?
19   MS. FEIN:  Objection to form.
20   THE WITNESS:  Yes.
21   Q.  (By Mr. Kratenstein)  Sorry.  Your answer
22 was?
23   A.  Yes.
24   Q.  Thank you.  To your knowledge did your firm
25 ever stop running cash and securities for settlement

Page 410

1 reports for either house 5 or house 17 during the
2 course of your business?
3    A.  I assume not.
4    Q.  Turning back to Exhibit Number 33, if you
5 turn -- there are Bates numbers in that corner.  If
6 you turn to the one that ends in 9381, look at that
7 corner.  Would you like me to do it for you?  Here,
8 turn it for you.
9    MS. CHAITMAN:  What page was that?
10   MR. KRATENSTEIN:  9381.
11   MS. CHAITMAN:  Okay.
12   Q.  (By Mr. Kratenstein)  If you look at the
13 bottom of page 9381, do you see the transactions
14 that we saw in Exhibit Number -- in the prior
15 exhibit, Exhibit Number 32 and 33, which were the
16 delivery of the various securities into the Maurice
17 Sage Trust account and then the sales of those
18 securities?
19   A.  Yes.
20   Q.  And those were at the bottom of the page
21 there?
22   A.  Uh-huh.
23   Q.  Sorry.  That's a yes?
24   A.  Yes.
25   Q.  And they show up on the cash and securities

7 (Pages 407 - 410)

CONFIDENTIAL

Page 411

1 for settlement statements dated December 13th, 1979;
2 correct?
3    A. Yes.
4    Q. And these are all real positions?
5    A. Yes.
6    Q. And the sales were real?
7    A. Yes.
8    Q. If you turn in a few more pages and I'll
9 just take it and turn to the page, to page 00709388,
10 looking at that page, Mr. Madoff, do you see there's
11 an entry there for National Bank of America, 160
12 Broadway at the bottom of the page?
13    MS. FEIN: Objection to form.
14    Q. (By Mr. Kratenstein) Under National Bank
15 of America?
16    A. Yes.
17    Q. And do you see under National Bank of
18 America it indicates sales of the securities we were
19 just talking about starting with Asarco? Do you see
20 that?
21    A. Yes.
22    MS. FEIN: Objection to form.
23    Q. (By Mr. Kratenstein) Do you understand
24 what these entries mean?
25    A. It means these are just sale transactions.

Page 412

1 Whose account is this for? Oh, this is a cash to
2 securities account. It would be transactions that
3 were made through National Bank of North America.
4    Q. Does that mean that these securities were
5 sold to National Bank of North America?
6    A. Probably correct, either sold through them
7 as an agent for other brokerage. I'm not sure.
8    Q. Okay. Would these have been real sales?
9    A. Yes.
10    MS. FEIN: Objection to form.
11    MR. KRATENSTEIN: I'm going to take these
12 documents and put them aside.
13    MS. FEIN: Andrew, just the name here, I
14 think you were using National Bank of America.
15    THE WITNESS: It's National Bank of North
16 America.
17    MR. KRATENSTEIN: I thought I said
18 National Bank of North America, but if I didn't, I
19 stand corrected. Thank you.
20    (Exhibit Number 34 was marked for
21 identification.)
22    MS. CHAITMAN: Is this 34?
23    MR. KRATENSTEIN: Yeah. This is 34. I
24 apologize. We're going out of order. This is
25 Exhibit Number 34.

Page 413

1    Q. (By Mr. Kratenstein) Mr. Madoff, do you
2 recognize this document?
3    A. Yes.
4    Q. What is it?
5    A. It's the Maurice Sage Trust account.
6    Q. And this is dated March 31, 1980; correct?
7    A. Uh-huh.
8    Q. Sorry. That's a yes?
9    A. Yes.
10    Q. And, again, like the other Maurice Sage
11 Trust document that we saw, account document, this
12 would have been generated in the ordinary course of
13 your firm's business?
14    A. Correct.
15    Q. And do you see that it shows in the middle
16 of the page the receipt of an RCA Corp convertible
17 bond and then two American Telephone & Telegraph?
18    A. Right.
19    Q. Two American Telephone & Telegraph
20 securities?
21    A. Correct.
22    Q. And would those have been receipts -- is
23 that what received means, received the securities?
24    A. Right, yes.
25    Q. Would these have been real transactions?

Page 414

1    A. Yes.
2    MR. KRATENSTEIN: You can put that
3 document aside.
4    (Exhibit Number 36 was marked for
5 identification.)
6    Q. (By Mr. Kratenstein) I'm showing you
7 what's been marked as Exhibit Number 36. Let me see
8 this for a second. That's the first page. Just a
9 second. Do you have two pages?
10    MS. FEIN: We have one.
11    MR. KRATENSTEIN: There's the next one.
12    MS. FEIN: Thank you.
13    Q. (By Mr. Kratenstein) I'm showing you
14 what's been marked as Exhibit Number 36.
15    MS. CHAITMAN: Thank you.
16    Q. (By Mr. Kratenstein) And do you see that,
17 Mr. Madoff, this is another Maurice Sage Trust
18 statement, this one from June 30th, 1981?
19    A. Correct.
20    Q. And like the other Maurice Sage Trust
21 account documents, this would have been generated in
22 the ordinary course of your firm's business?
23    A. Yes.
24    Q. You see it shows the sale of in the middle
25 of the page American Telephone & Telegraph?

8 (Pages 411 - 414)

CONFIDENTIAL

Page 415

1    A.  Yes.
2    Q.  Would that have been a real transaction?
3    A.  Yes.
4       MS. FEIN:  Objection to form.
5    Q.  (By Mr. Kratenstein)  Sorry.  I'll ask it
6  again.  Would that have been a real transaction?
7       MS. FEIN:  Objection to form.
8       THE WITNESS:  Yes.
9       MS. FEIN:  I'm just objecting to your use
10  of the term real.
11      MR. KRATENSTEIN:  Real.
12      MS. FEIN:  We didn't define real, but
13  you've been using it frequently.
14      Q.  (By Mr. Kratenstein)  When I say -- when I
15  say a real transaction, what do you understand me to
16  be meaning?
17      A.  Let's assume a legitimate transaction where
18  we actually buy or sell the securities.
19      MR. GOLDMAN:  That actually took place?
20      THE WITNESS:  Hmm?
21      MR. GOLDMAN:  That actually took place?
22      THE WITNESS:  Yes.
23      Q.  (By Mr. Kratenstein)  So when we say real,
24  and you understand for all the prior questions I
25  asked you about real transactions --

Page 416

1    A.  Correct.
2    Q.  -- we were talking about an actual purchase
3  or sale of a security or delivery of a security that
4  actually took place?
5    A.  Can't you just make the assumption if I
6  state that all the transactions prior to 1992 were
7  real transactions or are we going to go through this
8  whole charade of back and forth?
9       (Exhibit Number 37 was marked for
10  identification.)
11      Q.  (By Mr. Kratenstein)  Well, I do want to
12  get into -- and I don't mean to go through a
13  charade.  I just want to get through the documents
14  quickly, which I will quickly.  I'm almost done with
15  these --
16      A.  Okay.
17      Q.  -- and then we'll be done.  There are just
18  some specific ones I need to make sure of.  I'm
19  marking Exhibit 37.  Actually, there's a two-page
20  document.  This is part of this exhibit.  Didn't get
21  stapled for some reason.  Here's this one.  Just a
22  couple more of these and then we'll be done.  You
23  see this is a December 31, 1981 Maurice Sage Trust
24  statement?
25      A.  Yes.

Page 417

1    Q.  And this would have been generated in the
2  ordinary course of your firm's business?
3    A.  Yes.
4    Q.  And do you see that in the middle of the
5  page there's another sale of an American Telephone &
6  Telegraph security?
7    A.  Yes.
8    Q.  And that would have been a real transaction
9  that actually occurred?
10      A.  Yes.
11      (Exhibit Number 38 was marked for
12  identification.)
13      MR. KRATENSTEIN:  Thank you.  You can put
14  that document aside.  There's Exhibit 38.
15      MS. FEIN:  Thanks.
16      Q.  (By Mr. Kratenstein)  Mr. Madoff, this
17  document is a little bit different than the ones I
18  was just showing you.  Do you see at the top it's
19  dated January 31, 1983, National Bank of North
20  America?
21      A.  Correct.
22      Q.  What is this document, if you know?
23      A.  It's a month-end statement for activity
24  that happened during the month and at the end of the
25  month shows what the account was, long or short.

Page 418

1    Q.  Would these -- it says at the top National
2  Bank of North America.  Does that mean that these
3  were securities held at the National Bank of North
4  America by your firm?
5    A.  Probably, yes.  Could have been held in a
6  depository.
7    Q.  Why does it say National Bank of North
8  America?
9    A.  That's who had the -- that's whose account
10  it was.
11      Q.  And you would hold securities at National
12  Bank of North America; is that correct?
13      A.  Sometimes, yes.
14      Q.  I'm going to turn you to a specific page,
15  0964437.  Do you see towards the bottom of that page
16  -- 964437 everybody.  Tell me when you're there.
17      MS. DASARO:  Got it.  Thank you.
18      Q.  (By Mr. Kratenstein)  If you look at the
19  bottom of the page four entries up there's that RCA
20  convertible bond we talked about earlier.  Do you
21  see that?
22      A.  Yes.
23      Q.  And it's listed as being at the National
24  Bank of North America.  Do you see that?
25      A.  Yes.

9 (Pages 415 - 418)

CONFIDENTIAL

Page 419

1    Q.  So does that mean that that bond was held
2  at the National Bank of North America?
3        MS. FEIN:  Objection to form.
4        THE WITNESS:  It depends upon -- yes, but
5  depending upon what role they were acting as.  They
6  could have -- they could have cleared their
7  transactions through somewhere else, through another
8  depository.  I have no way of knowing that.
9        Q.  (By Mr. Kratenstein)  Okay.  But you are I
10  take it based on your prior testimony confident that
11  this is a real bond that was held somewhere?
12      A.  Correct.
13      MR. KRATENSTEIN:  Thank you.  You can put
14  that document aside.
15      (Exhibit Number 39 was marked for
16  identification.)
17      Q.  (By Mr. Kratenstein)  This is Exhibit 39.
18  You see, Mr. Madoff, this is another National Bank
19  of North America ledger?
20      A.  Correct.
21      Q.  This one dated January 31, 1983?
22      A.  Correct.
23      Q.  Okay.  And this one shows -- this is a
24  document that also would have been generated in the
25  ordinary course of your firm's business?

Page 420

1      A.  Correct.
2      Q.  It shows various instruments on this
3  document.  Do you see that?
4      A.  Yes.
5      Q.  Including various bonds, et cetera.  Do you
6  see that?
7      A.  Correct.
8      Q.  And would these have all, again, been
9  actual real positions?
10      A.  Correct.
11      Q.  You held securities at other banks as well;
12  is that right?
13      A.  Correct.
14      Q.  They included Chase Manhattan, Continental,
15  Commercial Bank of North America, Meadowbrook,
16  Marine Midland, Barclays, Bear Stearns, National
17  Westminster Bank and Bankers Trust; is that correct?
18      MS. FEIN:  Objection to form.
19      THE WITNESS:  Correct, plus other
20  brokerage firms.
21      MR. KRATENSTEIN:  Thank you.  You can put
22  that document aside.
23      (Exhibit Number 40 was marked for
24  identification.)
25      Q.  (By Mr. Kratenstein)  There's Exhibit 40.

Page 421

1  Mr. Madoff, do you see that this is a June 30, 1986
2  account statement for the Maurice Sage Trust?
3      A.  Yes.
4      Q.  Another statement that would have been
5  generated in the ordinary course of your firm's
6  business?
7      A.  Yes.
8      Q.  Do you see that it shows that RCA bond we
9  talked about earlier being sold on or around
10  June 19th, 1986, top entry?
11      A.  Yes.
12      Q.  And, again, that was a real sale?
13      A.  Yes.
14      Q.  Actual transaction; correct?
15      A.  Yes.
16      Q.  Thank you.  You can put that document
17  aside.  I'm going to switch topics.  In addition to
18  convertible bond arbitrage trading, did your firm do
19  trading or other types of arbitrage trading?
20      A.  Yes.
21      Q.  Did that include -- have you heard of the
22  term corporate events arbitrage?
23      A.  Yes.
24      Q.  What is that?
25      A.  It's when -- it could be a stock split, it

Page 422

1  could be a special dividend payment, could be any
2  number of events that happened in a particular
3  company.
4      Q.  You described when you talked about the
5  convertible bond arbitrage trading you did something
6  called legging in?
7      A.  Correct.
8      Q.  Which I believe you described as
9  accumulating a position over time and then averaging
10  a price; is that right?
11      MS. FEIN:  Objection to form.
12      THE WITNESS:  That's correct.
13      Q.  (By Mr. Kratenstein)  That's correct;
14  right?
15      A.  Yes.
16      Q.  When you did these other corporate events
17  arbitrage, would you also leg in?
18      A.  Yes.
19      (Exhibit Number 41 was marked for
20  identification.)
21      Q.  (By Mr. Kratenstein)  I'm showing you
22  Exhibit 41.  Mr. Madoff, do you see that this is a
23  statement from Sage Realty dated May 31, 1994?
24      A.  Yes.
25      Q.  And do you see in the middle of the

10 (Pages 419 - 422)

CONFIDENTIAL

Page 423

1 statement there are transactions involving General
2 Electric Company including a stock split?
3   A. Correct, yes.
4   Q. Could you describe what that transaction
5 is?
6   A. It's the company splits their stock two for
7 one or any number of variables.
8   Q. And in this case it appears that you are
9 buying General Electric stock, 2,099 shares, on or
10 around May 6th, 1994; is that correct?
11   A. Correct.
12   Q. And that's before a two-to-one stock split?
13   A. Correct.
14   Q. And then there's a sale of 4,198 shares in
15 two pieces on or around May 23rd; is that correct?
16   A. Correct.
17   Q. And is this an example of the stock split
18 arbitrage that you were discussing earlier?
19   A. Correct.
20   Q. Would this have been an actual transaction?
21   A. Yes.
22     MR. KRATENSTEIN: You can put that
23 document aside.
24     (Exhibit Number 42 was marked for
25 identification.)

Page 424

1   Q. (By Mr. Kratenstein) I'm showing you
2 Exhibit 42. If you turn to the second page of the
3 document there, let me see that. Do you see on the
4 first page of this document, which is a Sage Realty
5 statement from December 31, 1996, do you see that?
6   A. Yes.
7   Q. And do you see that there's a purchase on
8 or around December 24th, 1996 of 47,814 shares of
9 AT&T?
10   A. Correct.
11     (Exhibit Number 43 was marked for
12 identification.)
13   Q. (By Mr. Kratenstein) Do you see that?
14 Now, let me show you another document. Just keep
15 that in mind. This is Exhibit 43. And do you see
16 that this is a Sage -- yep? Okay. I apologize.
17     MS. CHAITMAN: Thank you.
18   Q. (By Mr. Kratenstein) Do you see that this
19 is a Sage Realty statement dated January 31, 1997?
20     MS. FEIN: Objection.
21     THE WITNESS: Correct, '94.
22     MR. KRATENSTEIN: Sorry. We're right. We
23 may have the wrong -- hang on a second. Let me just
24 check this.
25     MS. FEIN: Yeah. Mine has '96.

Page 425

1     MR. KRATENSTEIN: Let me see.
2     MS. FEIN: Sorry. This one? Yeah, sorry.
3 '94, yeah.
4     MR. KRATENSTEIN: This is right, so you
5 have the right one. I apologize. That's the right
6 one.
7     MS. FEIN: Okay.
8     MS. CHAITMAN: Which is the right one?
9     MR. KRATENSTEIN: Which is the right one?
10 Hang on a second. You know what? Let me -- is that
11 not the NCR? Let me get the right one.
12     THE WITNESS: Do I have the right to ask a
13 question about these records?
14     MR. GOLDMAN: Why don't we -- you want to
15 do it now because we'll just take a short recess and
16 I'll talk to you for two minutes.
17     MR. KRATENSTEIN: Well, let me actually
18 remark this document. I just made a -- I have the
19 document there, so I'm going to give you the right
20 exhibit. I'm remarking 43. You can give me that
21 one back.
22     (Exhibit Number 43 was remarked for
23 identification.)
24     MS. FEIN: Why don't we do the Bates for
25 this one?

Page 426

1     MR. KRATENSTEIN: This one is -- yeah,
2 sure. This one is Sage 0009352 through 53.
3     MS. FEIN: Okay. Thank you.
4   Q. (By Mr. Kratenstein) And do you see --
5     MS. CHAITMAN: Now I need one, too.
6 Sorry.
7     MR. KRATENSTEIN: That's fine.
8     MS. CHAITMAN: Thank you.
9   Q. (By Mr. Kratenstein) Sorry about that.
10 And do you see here this is now a January 31, 1997
11 Sage Realty statement? Do you see that?
12   A. Yes.
13   Q. And you see now this is the year -- so in
14 the first document we saw, Exhibit 42, that was at
15 the end of the year 1996 and this is in the new
16 year, 1997. Do you see that?
17   A. Yes.
18   Q. And at the top there's a transaction. It
19 says NCR Corp spin-off from AT&T Corp. And then
20 there are various AT&T and NCR transactions. Do you
21 see that?
22   A. Yes.
23   Q. Can you describe what this transaction is?
24   A. It looks like a distribution of -- AT&T
25 went through a whole series of divestitures of their

11 (Pages 423 - 426)

CONFIDENTIAL

Page 427

1 other companies, which was referred to as baby
2 bells. I'm not sure what period that they took
3 place, but we were a major market maker in AT&T
4 forever over the 50 years that I was in business.
5 So there were lots of events regarding AT&T and I'm
6 assuming this is one of them.
7      Q.  Okay. And this trade if we look at
8 Exhibits 42 and 43, this trade involves if I'm not
9 mistaken buying AT&T before the spin-off and then
10 after the spin-off selling AT&T as well as newly
11 received NCR shares?
12     A.  Correct.
13     Q.  Because AT&T had spun off NCR?
14     A.  Correct.
15     Q.  And what's the idea behind that? That the
16 spin-off creates greater value?
17     A.  Yes.
18     Q.  Was this an actual transaction, a real
19 transaction?
20     A.  Yes.
21     Q.  You can put that document aside. By this,
22 I mean, the transactions we see on 42 and 43, real
23 transactions?
24     A.  Yes.
25         MR. KRATENSTEIN:  Thank you. One more,

Page 428

1 please. And this is the one I just showed you a
2 minute ago. That's going to be 44 now.
3         MS. CHAITMAN:  I have that one.
4         MR. KRATENSTEIN:  You have that one?
5         MS. CHAITMAN:  Yeah. You gave it to me
6 before.
7         MR. KRATENSTEIN:  Thanks, yes.
8         (Exhibit Number 44 was marked for
9 identification.)
10     Q.  (By Mr. Kratenstein) Mr. Madoff, do you
11 see that this is a Sage Realty statement dated
12 July 31, 1994?
13     A.  Yes.
14     Q.  And do you see that there are various
15 transactions on this statement involving UAL?
16     A.  Yes.
17     Q.  Can you tell from looking at this what this
18 transaction entails?
19     A.  Similar to the other transaction, looks
20 like a spin-off of some sort.
21     Q.  Is it fair to say that this is a trade to
22 buy UAL before the -- a recapitalization and then
23 selling the stock after receiving a cash
24 distribution?
25         MS. FEIN:  Objection.

Page 429

1         THE WITNESS:  Possibly.
2     Q.  (By Mr. Kratenstein) Your answer was?
3     A.  Possibly.
4     Q.  Thank you. Would this transaction have
5 been an actual real transaction as reflected on this
6 statement?
7     A.  Correct.
8     Q.  In terms of your corporate event arbitrage
9 trading, would you sometimes take market risk over a
10 period of time of weeks?
11     A.  Correct.
12     Q.  You can put that aside. Do you want to
13 take a break now? We're changing topics.
14         MR. GOLDMAN:  Yeah. You wanted to ask me
15 a question, so let's go in the other room. You can
16 ask me what you want to ask me and then we'll see.
17         THE VIDEOGRAPHER:  Going off the record.
18 The time is 9:40.
19         (A recess was taken.)
20         THE VIDEOGRAPHER:  Back on the record.
21 The time is 9:51.
22         (Exhibit Number 45 was marked for
23 identification.)
24     Q.  (By Mr. Kratenstein) Mr. Madoff, we talked
25 about the fact that the Sages had an account called

Page 430

1 Sage Associates, so I'm going to ask a few questions
2 about that account now. I'm going to start with
3 another document we're going to mark as Exhibit
4 Number 45. I'm going to focus my questions on the
5 first page and then the page that is Bates labeled
6 MF 0091185. So I'm just going to -- I'll hand out
7 copies to everyone else.
8     A.  Your records.
9         MR. KRATENSTEIN:  Yeah. There you go.
10        MS. CHAITMAN:  I'm sorry. Take note of
11 that Bates number. Was that 185?
12     Q.  (By Mr. Kratenstein) 941185. I'm going to
13 start on the first page and then I'll flip it for
14 you. So if you don't mind, I'll just keep my finger
15 there so we can get to the page, which will help us
16 move through this relatively quickly. Mr. Madoff,
17 you see that this is a document called house 17
18 stock record summary through 5-31-85?
19     A.  Yes.
20     Q.  Do you recognize this type of document?
21     A.  Yes.
22     Q.  What is it?
23     A.  It's usually a month-end report that lists
24 the securities in each account.
25     Q.  And these reports would be generated in the

12 (Pages 427 - 430)

CONFIDENTIAL

Page 431

1 ordinary course of your firm business?
2   A.  Correct.
3   Q.  And would they be generated on or around
4 the date indicated at the top, May 31, 1985 in this
5 case?
6   A.  Correct.
7   Q.  And were these reports like this kept on
8 your firm's premises?
9   A.  Yes.
10   Q.  And created in the ordinary course of
11 business?
12   A.  Yes.
13   Q.  Okay.  Now I'm going to turn to the page I
14 indicated, which is again MF 00941185.  And are you
15 there, counsel?
16   MS. CHAITMAN:  Yeah.
17   Q.  (By Mr. Kratenstein)  Okay.  I'm going to
18 draw your attention to -- it's actually this page
19 right here.  See the bottom of the page, towards the
20 bottom there's a Walt Disney Productions entry.  Do
21 you see that?
22   MS. FEIN:  Is this the page ending in 184,
23 Andrew?
24   MR. KRATENSTEIN:  85.
25   MS. FEIN:  It's 85?

Page 432

1   MR. KRATENSTEIN:  Yes.
2   MS. FEIN:  Okay.
3   Q.  (By Mr. Kratenstein)  Do you see Walt
4 Disney Productions right here?
5   A.  Yes.
6   Q.  Okay.  So do you see under Walt Disney
7 Productions there are various customer accounts
8 listed including Sage Associates and Maurice Sage
9 Trust?
10   A.  Yes, yes.
11   Q.  And do you see according to this report
12 there are 9,000 shares of Walt Disney in Sage
13 Associates and 5,000 in Maurice Sage Trust?
14   A.  Correct.
15   Q.  And according to this report, when you add
16 up all of the customer's holdings, so in addition to
17 Sage Associates and Maurice Sage Trust, there are
18 entries for Appleby and then other customers.  Do
19 you see that?
20   A.  Yes.
21   Q.  And they add up to 34,780 shares.  Do you
22 see that?
23   A.  Correct.
24   Q.  That's of Disney stock; correct?
25   A.  Yes.

Page 433

1   Q.  And then there's an entry at the bottom
2 next to that 34,780 shares for the National
3 Westminster Bank USA.  Do you see that?
4   A.  Correct.
5   Q.  What does that mean, that all the stock is
6 listed next to that bank?
7   A.  That the securities are held at that bank
8 or one of their clearing agents.
9   Q.  And this is a 1985 report.  So I take it
10 from your prior testimony that these are actual
11 securities that were actually held at the National
12 Westminster Bank?
13   A.  Correct.
14   MR. KRATENSTEIN:  I'm going to move this
15 document and mark as Exhibit 46 another document.
16   (Exhibit Number 46 was marked for
17 identification.)
18   Q.  (By Mr. Kratenstein)  Mr. Madoff, do you
19 see that what we've marked as Exhibit Number 46 is a
20 report that at the top says 5-31-85, so May 31,
21 1985, National Westminster Bank USA?  Do you see
22 that?
23   A.  Yes.
24   Q.  And do you recognize this type of document?
25   A.  Yes.

Page 434

1   Q.  What is it?
2   A.  It's activity in the account of National
3 Westminster Bank.
4   Q.  And, again, is this a document that would
5 have been created in the ordinary course of your
6 firm's business?
7   A.  Yes.
8   Q.  And would have been kept at your firm's
9 premises?
10   A.  Yes.
11   Q.  That would have been generated on or around
12 May 31, 1985?
13   A.  Correct.
14   Q.  And would have been maintained in the
15 ordinary course of your firm's business; is that
16 correct?
17   A.  Correct.
18   Q.  And if you turn -- and I'll do this -- to
19 page 965279, if you look in the middle of the page
20 -- is everybody with me?
21   MS. DASARO:  Yeah.
22   Q.  (By Mr. Kratenstein)  At 965279 do you see
23 that there are 34,780 shares of Walt Disney stock
24 listed as being held at the National Westminster
25 Bank?

13 (Pages 431 - 434)

CONFIDENTIAL

Page 435

1    A. Correct.
2    Q. And that matches up with the previous
3 record that we just saw?
4    A. Correct.
5    Q. And these are actual securities held at the
6 National Westminster Bank?
7    A. Correct.
8    MR. KRATENSTEIN: Thank you.
9    MS. CHAITMAN: Oh, I see. Right here?
10    MR. KRATENSTEIN: Yes. Top entry in the
11 middle.
12    MS. CHAITMAN: Thank you.
13    MR. KRATENSTEIN: Okay. I want to make a
14 suggestion. I want to take a short break and just
15 sticker a whole bunch of exhibits instead of doing
16 it on the record and then that way it will be a lot
17 faster when we're on the record.
18    MS. CHAITMAN: Why don't you let me do it
19 for you?
20    MR. KRATENSTEIN: I think because I know
21 where I want to go.
22    MS. CHAITMAN: Oh, okay.
23    MR. KRATENSTEIN: It will take five
24 minutes. Let's just do that.
25    MS. DASARO: Okay.

Page 436

1    MR. KRATENSTEIN: Let's take a quick
2 break. I don't want to waste your time on the
3 record. You can get up and stretch.
4    THE VIDEOGRAPHER: Going off the record.
5 The time is 9:57.
6    (A recess was taken and Exhibit Number 47
7 was marked for identification.)
8    THE VIDEOGRAPHER: Back on the record.
9 The time is 10:13.
10    Q. (By Mr. Kratenstein) Welcome back, Mr.
11 Madoff. You had talked earlier about the Sages
12 directing you to do trades in their accounts. I
13 want to show you a few documents on that topic. I'm
14 showing you Exhibit Number 47. Mr. Madoff, do you
15 see that this is a letter from Malcolm Sage to you?
16    A. Yes.
17    Q. It's on the letterhead of Sage Associates
18 and Sage Associates II?
19    A. Yes.
20    Q. Those were each Sage accounts?
21    A. Yes.
22    Q. And do you have any reason to believe that
23 you did not receive this letter?
24    A. No.
25    Q. This letter would have been kept by your

Page 437

1 firm?
2    A. Correct.
3    Q. Probably by Annette Bongiorno?
4    A. Correct.
5    Q. By the way, was Ms. Bongiorno, do you
6 recall if she was left handed?
7    A. I believe so.
8    Q. So when she made a check mark, it would be
9 a left-handed check mark?
10    A. Yes.
11    Q. Do you see that the letter begins Dear
12 Bernie, after discussions with Paul we have come up
13 with the following plan with regards to the Sage
14 Associates IS-004 and Sage Associates II IS-005
15 accounts. Do you see that?
16    A. Yes.
17    Q. First of all, do you know who Mr. Sage is
18 referring to when he says Paul?
19    A. I would assume it's his accountant.
20    Q. And who is he?
21    A. I believe it's Paul Koenigsberg.
22    Q. And he says we have come up with the
23 following plan. Do you know what -- have an
24 understanding of what he means when he says the
25 following plan?

Page 438

1    A. I assume his tax plan.
2    Q. And do you see the backwards lefty checks
3 on this letter?
4    A. Correct.
5    Q. Do you believe those to be Ms. Bongiorno's?
6    A. Correct.
7    Q. And do you see in the letter Mr. Sage is
8 directing you to take various actions with respect
9 to securities in the Sage Associates and Sage
10 Associates II accounts?
11    A. Correct.
12    Q. For example, in the first entry with
13 respect to Abercrombie & Fitch he says please
14 deliver the short position in the seven account to
15 the three account to close out this position. Do
16 you see that?
17    A. Correct.
18    Q. And do you recall that Mr. Sage or the
19 Sages rather had subaccounts within Sage Associates
20 for long positions, short against the box positions
21 and naked short positions?
22    A. Correct.
23    Q. Does it make sense to you that three would
24 have been the long position account?
25    A. Correct.

14 (Pages 435 - 438)

CONFIDENTIAL

Page 439

1      Q.  And seven the short against the box
2  position account?
3      A.  Correct.
4      Q.  Eight, the naked short position account?
5      A.  Yes.
6      Q.  What is a short against the box?
7      A.  Short against the box is when you're
8  selling -- you're selling stock that you are also
9  long in another account.  You're long and short the
10 same security.
11     Q.  Does it mean you're actually holding the
12 security when you go short or no?
13     A.  Yes.
14     Q.  And what's --
15     A.  Well, I have to correct that.  If it's the
16 short against the box account, you would be long
17 security as well.  You could -- if it was what's
18 called a naked short, you're not long in the
19 corresponding security.
20     Q.  And do you see that there are obviously
21 various transactions here for -- instructions for
22 Abercrombie, Dow, International Paper, Oracle and
23 Qualcomm?  Do you see that?
24     A.  Correct.
25     Q.  And then he asks you at the end in .1(f) to

Page 440

1  please realize the approximately $600,000 of gain in
2  the eight account; correct?
3      A.  Correct.
4      Q.  Which would be the naked short account?
5      A.  Yes.
6      Q.  And then there are instructions for Gateway
7  and Coca-Cola in Sage Associates II.  Do you see
8  that?
9      A.  Yes.
10     Q.  And at the end he says after these steps
11 have been taken, we would like to withdraw the sum
12 of $6 million from Sage Associates.  Do you see
13 that?
14     A.  Correct.
15     Q.  And then he asks you if you have any
16 questions, to call him or Paul; right?
17     A.  Correct.
18     Q.  Would you have followed these instructions?
19     A.  Yes.
20     Q.  How do you know that?
21     A.  Just clients telling us to.  We have no
22 choice.
23         (Exhibit Number 48 was marked for
24 identification.)
25     Q.  (By Mr. Kratenstein)  I'm going to show you

Page 441

1  what we've marked as Exhibit Number 48, and you can
2  compare that with this.  If you look at this
3  document, you see that this is the Sage Associates
4  statement from November 30th, 2001?
5      A.  Yes.
6      Q.  And can you see on this statement the
7  transactions that Mr. Sage directed you to do in his
8  letter that we marked as Exhibit 47?
9      A.  Correct.
10     Q.  And you would have performed those
11 transactions?
12     A.  Yes.
13     Q.  Would they have been real transactions?
14     A.  Yes.
15     Q.  You can put that document aside.  And by
16 the way, just note before actually putting it aside
17 that this is the Sage Associates subaccount numbered
18 seven.  Do you see that?
19     A.  Correct.
20         (Exhibit Number 49 was marked for
21 identification.)
22     Q.  (By Mr. Kratenstein)  Okay.  And then now
23 I'm going to give you Exhibit Number 49, which is
24 Sage Associates subaccount three from the same date.
25 Do you see that?

Page 442

1      A.  Yes.
2      Q.  And, again, because there were -- he was
3  asking you to transfer between the seven and three
4  accounts.  Do you see the flip side on this?
5      A.  Yes.
6      Q.  Thank you.  And then you recall at the end
7  of the letter he asked you to realize -- he asked
8  you to recognize a $600,000 gain.  Do you recall
9  that?
10     A.  Correct.
11         (Exhibit Number 50 was marked for
12 identification.)
13         MR. KRATENSTEIN:  Here's Exhibit 50.
14 There's an extra copy.
15         MS. FEIN:  Okay.
16     Q.  (By Mr. Kratenstein)  And do you see the
17 $600,000 being recognized --
18     A.  Yes.
19     Q.  -- in Exhibit 50?
20     A.  Yes.
21         (Exhibit Numbers 51, 52 and 53 were marked
22 for identification.)
23     Q.  (By Mr. Kratenstein)  Thank you.  I'm going
24 to hand you a group of documents, which I'll
25 represent to you are the confirms reflecting all

15 (Pages 439 - 442)

CONFIDENTIAL

Page 443

1 these transactions. And I'm just going to ask you
2 when you have these in front of you are these
3 documents the confirms that reflect the transactions
4 that we just saw in the statements.
5         Okay. So I'm just going to put them in
6 front of you and I'm going to ask you to confirm
7 that that's what they at least appear to you to be.
8 So here's Exhibit -- and just wait until I give you
9 them all. Here's Exhibit 51. This is Exhibit 52.
10        MR. GOLDMAN: Are those exhibits multiple
11 pages, just so the record is clear?
12        MS. CHAITMAN: We didn't get 50.
13        MR. KRATENSTEIN: 50 was a one page.
14        MS. CHAITMAN: Yeah, but I don't have 51.
15 Did you get two copies of 51?
16        MS. FEIN: No.
17        THE WITNESS: Helen, move your soda
18 because he's about to knock it over.
19        MS. CHAITMAN: Oh, thank you.
20        THE WITNESS: I don't want to have to go
21 through this again.
22        Q. (By Mr. Kratenstein) Here's 53. Just take
23 a look at it while I'm handing them out and see if
24 you can flip through and just make sure you agree
25 whether these are the confirms showing the trades

Page 444

1 that we saw in the last document?
2        MS. CHAITMAN: Can you --
3        Q. (By Mr. Kratenstein) Do you
4 understand what -- what is Exhibit -- what is that,
5 Mr. Madoff? Exhibit 53, what is that?
6        A. This is just a memo of transferring monies.
7        Q. Is it a -- what is known as a trade
8 confirm?
9        A. No.
10        Q. Okay. It's a memo. So what does that
11 mean?
12        A. It's a memo. It's a making note of a
13 particular money transaction or receiving the
14 movement of securities. Confirmation is what
15 appears behind it.
16        Q. You see what's behind -- I see. So --
17        A. Confirmation is an actual purchase and sale
18 of a transaction.
19        Q. Okay. I see. And so when you see -- these
20 are memos you're saying, Exhibit 53, for example?
21        A. Yes.
22        (Exhibit Number 54 was marked for
23 identification.)
24        Q. (By Mr. Kratenstein) Okay. And here's
25 Exhibit 54.

Page 445

1        MR. GOLDMAN: Are you looking at
2 Exhibit 53?
3        THE WITNESS: Fifty-three and four.
4        MR. GOLDMAN: Okay. Under 53, the top
5 page is the memorandum, I think, you suggested for
6 the transfer of money. Is there anything else
7 attached to that? Fifty-three, look at 53.
8        THE WITNESS: Yeah. I have 53.
9        MR. GOLDMAN: Okay. What's underneath it?
10        THE WITNESS: Yeah, the confirmation.
11        Q. (By Mr. Kratenstein) Is that the confirm?
12        A. Confirmation.
13        Q. So that's the confirm, the second page of
14 53?
15        A. Right.
16        MR. KRATENSTEIN: Thank you.
17        MS. FEIN: Sorry. Just to clarify, that
18 second page isn't the same as the first page. The
19 transaction isn't the same. My understanding that
20 the memo -- or the difference between the memo and
21 the confirm I understand, but the transaction is a
22 different dollar amount.
23        MR. KRATENSTEIN: Well, there are actually
24 several. If you look, there are multiple
25 transactions.

Page 446

1        MS. FEIN: Okay. So --
2        MR. KRATENSTEIN: So they add up, I
3 believe, but you can see. You can look. There are
4 multiple. It's multiple transactions. You want a
5 minute?
6        MS. FEIN: I can't see the math. It looks
7 like the last page, the last page ending in 4294
8 corresponds to the memo page that's the page ending
9 in 290, but the two pages in between appear to be
10 different.
11        MR. KRATENSTEIN: Let's see. Which number
12 is that? What's the first page number?
13        THE WITNESS: 4290.
14        MR. KRATENSTEIN: Okay. And then there's
15 another, 4291, and then there are 4292, 93, 94.
16        MS. FEIN: Yeah. And, actually, my copy
17 doesn't have 4291. It just goes from 4290 to 4292,
18 but 4292 and 4293 appear to be different
19 transactions.
20        MR. KRATENSTEIN: Let me take a look at
21 it. Fifty-three this is? Here. Well, here's 4-2.
22 This is Exhibit 16. We'll get it worked out at a
23 break. Let me do it at a break. I don't want to
24 take up the time now, but thank you.
25        MS. FEIN: I understand.

16 (Pages 443 - 446)

CONFIDENTIAL

Page 447

1     MR. GOLDMAN: I only did that so the
2 record was clear. As I said, there are multiple
3 pages in each exhibit.
4     MR. KRATENSTEIN: Right.
5     MR. GOLDMAN: Once you go through it --
6     MS. CHAITMAN: What is the exhibit number
7 that you're talking about?
8     MR. KRATENSTEIN: Fifty-three.
9     MS. FEIN: Fifty-three. My concern was
10 the same. It was just about getting the record
11 clear. So if we clear it up on a break, we can do
12 it that way.
13     Q. (By Mr. Kratenstein) Yeah, sure. And then
14 Exhibit 54 you have in front of you?
15     A. Yes.
16     Q. Does that show in addition to a memo
17 confirms behind?
18     A. Yes.
19     (Exhibit Number 55 was marked for
20 identification.)
21     Q. (By Mr. Kratenstein) Okay. That's this
22 one. And now I'm going to give you 55, which again
23 is a memo followed by the confirms?
24     A. Yes.
25     MS. FEIN: Thank you.

Page 448

1     THE WITNESS: No. Wait a minute. I don't
2 see a confirmation. I see just memos.
3     Q. (By Mr. Kratenstein) Just memos for 55?
4     A. Right.
5     MR. KRATENSTEIN: Okay.
6     MS. CHAITMAN: How about the last page?
7 Is that a confirm?
8     MR. GOLDMAN: Yeah.
9     THE WITNESS: No. These are just --
10     MR. GOLDMAN: Go to the last page.
11     MR. KRATENSTEIN: The last page, 224.
12     THE WITNESS: Yes.
13     Q. (By Mr. Kratenstein) That's a confirm?
14     A. Yes.
15     (Exhibit Number 56 was marked for
16 identification.)
17     Q. (By Mr. Kratenstein) 224 is a confirm.
18 Thank you. Okay. And then the last one for this
19 set is number 56, which is the $600,000 we saw
20 earlier.
21     MR. GOLDMAN: You okay? You look like you
22 had a --
23     MS. FEIN: Well, Exhibit 55 on my copy is
24 missing a page but it may be the one that's missing
25 a page, so --

Page 449

1     MR. KRATENSTEIN: Let me look. Which page
2 is missing?
3     MS. FEIN: For me it's missing what would
4 be 4223. It goes from 4222 to 4224.
5     MR. KRATENSTEIN: This has -- it does. So
6 mine is marked the same way. It's marked the same
7 way.
8     MS. FEIN: Understood.
9     Q. (By Mr. Kratenstein) Okay. All right. So
10 is it fair to say that the documents that we have
11 now marked as Exhibits 51 to 55 reflect the
12 transactions that we saw in the letter that we
13 marked as Exhibit 47?
14     MS. FEIN: Objection to form.
15     THE WITNESS: Correct.
16     (Exhibit Number 57 was marked for
17 identification.)
18     Q. (By Mr. Kratenstein) Thank you. Now I'm
19 going to mark Sage Associates two statements
20 quickly. That was for Sage Associates. Those were
21 the Sage Associates trades. Now, two Sage
22 Associates II transactions that were shown in the
23 letter which is Exhibit 47, I'm just going to show
24 you the statements now. That's Exhibit 57. Put
25 these here. Keep this letter here. Exhibit 57.

Page 450

1     MS. FEIN: Thank you.
2     Q. (By Mr. Kratenstein) And if you see at the
3 end of the letter, he talks about the Gateway
4 delivery of short positions and closing out
5 Coca-Cola. And if you look at Exhibit Number 20, do
6 you see the Gateway and Coca-Cola transactions
7 reflected on this statement?
8     A. Yes.
9     (Exhibit Number 58 was marked for
10 identification.)
11     Q. (By Mr. Kratenstein) And then looking at
12 Exhibit Number 58 --
13     MS. CHAITMAN: Did you mean to say
14 Exhibit 20?
15     MS. FEIN: Did you mean Exhibit 57?
16     MR. KRATENSTEIN: I said 57. What did I
17 say?
18     MS. CHAITMAN: 20.
19     MS. FEIN: 20.
20     Q. (By Mr. Kratenstein) So do you see on
21 Exhibit 57, sorry, the Sage Associates II, the Sage
22 Associates II transactions for Gateway and Coca-Cola
23 reflected on Exhibit 47?
24     A. Yes.
25     Q. And now Exhibit 58.

17 (Pages 447 - 450)

CONFIDENTIAL

Page 451

1      MS. CHAITMAN:  What you're saying is
2  Exhibit 57 shows the transactions that Malcolm
3  instructed?
4      MR. KRATENSTEIN:  Correct.
5      MS. CHAITMAN:  Okay.
6      Q.  (By Mr. Kratenstein)  Do you agree with
7  that, Mr. Madoff?
8      A.  Yes.
9      Q.  Thank you.  And Exhibit 58, which is the
10 other side of the Sage Associates II transaction, do
11 you see again the Gateway transfer to that account
12 as directed by Mr. Sage --
13     A.  Yes.
14     Q.  -- in his letter?
15     A.  Uh-huh.
16     Q.  Correct?
17     A.  Yes.
18     MS. FEIN:  Objection to form.
19     (Exhibit Numbers 59 and 60 were marked for
20 identification.)
21     Q.  (By Mr. Kratenstein)  Thank you.  And here
22 are memos and confirms, Exhibit 59.  This is going
23 to be the same set of questions, whether the
24 confirms also reflect this time Sage Associates II
25 activity we see in the letter that was marked as

Page 452

1  Exhibit 47?
2      MS. FEIN:  Objection to form.
3      THE WITNESS:  Yes.
4      MR. KRATENSTEIN:  Thank you.  Do you have
5  this one, Amanda?
6      MS. FEIN:  I do.  Thank you.
7      MS. CHAITMAN:  What number is this?
8      MS. FEIN:  60.  Andrew, was your question
9  with respect to Exhibits 59 and 60?
10     Q.  (By Mr. Kratenstein)  Yeah.  I'm asking
11 whether on 59 and 60 they reflect the -- so it will
12 be 59 you see, Mr. Madoff, reflects the Gateway
13 transaction that is shown in Exhibit 47 at the
14 bottom under Sage Associates II; correct?
15     A.  Yes, correct.
16     Q.  And Exhibit 60 shows the Coca-Cola
17 transaction --
18     A.  Correct.
19     Q.  -- and to be in Exhibit 47; correct?
20     A.  Correct.
21     (Exhibit Number 61 was marked for
22 identification.)
23     Q.  (By Mr. Kratenstein)  Thank you.  I'm going
24 to show you another letter.  This is Exhibit
25 Number 61.  Mr. Madoff, do you see that this is a

Page 453

1  letter from Mr. Sage to you on the letterhead of
2  Sage Associates and the Maurice S. Sage Foundation?
3      A.  Yes.
4      Q.  Do you have any reason to believe that you
5  did not receive this letter?
6      A.  No.
7      Q.  Do you believe the handwriting on this
8  letter to be Annette Bongiorno's?
9      A.  Yes.
10     Q.  Do you see that in this letter Mr. Sage
11 writes, although it's addressed to you, he writes
12 Dear Annette.  Do you see that?
13     A.  Correct.
14     Q.  And that's Ms. Bongiorno?
15     A.  Yes.
16     Q.  He writes after discussions with Paul we
17 have come up with the following plan with regard to
18 the Sage Associates IS-0004 and Maurice S. Sage
19 Foundation, Inc. IS-0197 accounts.  Do you see that?
20     A.  Yes.
21     Q.  And, again, do you have any understanding
22 of what plan Mr. Sage was talking about?
23     A.  It's a tax plan.
24     Q.  And do you have any understanding of what
25 he was trying to accomplish tax-wise?

Page 454

1      A.  Yes.
2      Q.  What was that?
3      A.  To realize certain gains, gains and losses
4  based upon making a sale of security.
5      Q.  Okay.  And do you see that he for Sage
6  Associates directs you with respect to Emulex stock
7  to please deliver the short position --
8      A.  Right.
9      Q.  -- in the seven account to the three
10 account to close out this position; correct?
11     MS. FEIN:  Objection to form.
12     THE WITNESS:  Correct.
13     MR. KRATENSTEIN:  Sorry.  What's the basis
14 for the objection?
15     MS. FEIN:  You said he directs you, but
16 the letter is not only addressed to him.  It also
17 has attention Annette Bongiorno right under the
18 addressee line.
19     Q.  (By Mr. Kratenstein)  Okay.  Do you see Mr.
20 Sage directing Ms. Bongiorno, who worked for you;
21 correct?
22     A.  Correct.
23     Q.  To please deliver the short position in the
24 seven account to the three account to close out this
25 position in Emulex.  Do you see that?

18 (Pages 451 - 454)

CONFIDENTIAL

Page 455

1    A. Yes.
2    Q. The amount to be delivered is the entire
3 amount held, 220,000 shares; correct?
4    A. Correct.
5    Q. With respect to Broadcom, Mr. Sage writes
6 please deliver 15,000 shares in the seven account to
7 the three account. This will leave the remaining
8 40,000 shares in the three and seven accounts. Do
9 you see that?
10    A. Correct.
11    Q. And then with respect to the Maurice S.
12 Sage Foundation, Inc. account he says we would like
13 to withdraw the sum of $25,000. This will not
14 require the sale of any stock because this sum is
15 available in money market funds. Do you see that?
16    A. Yes.
17    Q. And do you see that in the handwriting for
18 Ms. Bongiorno the date is 12-24-02? Do you see
19 that?
20    A. Yes.
21    Q. And then he asks at the end, Mr. Sage asks
22 if you have any questions, please call him. Do you
23 see that?
24    A. Yes.
25    Q. Would you have followed these instructions?

Page 456

1    A. Yes.
2    Q. And that's the same reason as before,
3 because you have to follow the instructions of your
4 customers; correct?
5    A. Correct.
6    MS. FEIN: Objection to form.
7    (Exhibit Number 62 was marked for
8 identification.)
9    Q. (By Mr. Kratenstein) All right. Just
10 going to show you a few documents concerning whether
11 you did follow those instructions. We'll start with
12 Exhibit 62.
13    MS. FEIN: Andrew, can you just clarify
14 when you're saying you followed the instructions in
15 your questioning?
16    Q. (By Mr. Kratenstein) What did you
17 understand what I meant you follow the instructions?
18    A. What does it mean?
19    Q. Yeah.
20    A. It means I did what the client asked me to
21 do.
22    Q. And would you sometimes if a client asked
23 you to do something, would you -- who would you have
24 do it?
25    A. Usually, you know, Annette.

Page 457

1    Q. In this case it would be Annette because
2 she was working with you?
3    A. Right.
4    Q. Do you know if she would have come to you
5 -- do you know if you would have seen this letter
6 that we marked as Exhibit 61?
7    A. I either would have seen it or been told
8 about it.
9    Q. By Annette?
10    A. By Annette.
11    Q. Would that be true of all written
12 instructions from clients?
13    A. I assume so.
14    MS. FEIN: Objection to form.
15    Q. (By Mr. Kratenstein) And why do you assume
16 so?
17    A. Depends upon the -- could have been one of
18 her assistants, you know, calling me if she was not
19 available.
20    Q. But is your point that if a client gave you
21 instructions, you'd want to know about it?
22    MS. FEIN: Objection to form.
23    THE WITNESS: Correct.
24    Q. (By Mr. Kratenstein) So we've marked
25 Exhibit 62. And if you look at Exhibit 62, we

Page 458

1 talked about Emulex and Broadcom in the letter. And
2 do you see movements of Emulex and Broadcom as
3 directed in the letter reflected in this statement
4 that we marked as Exhibit 62?
5    A. Yes.
6    (Exhibit Number 63 was marked for
7 identification.)
8    Q. (By Mr. Kratenstein) Same for Exhibit 63?
9    A. Yes.
10    Q. Same question. Do you see the movements in
11 the Sage Associates account being directed by Mr.
12 Sage in his letter that we've marked as Exhibit 61
13 actually on the statements being executed?
14    A. Yes.
15    (Exhibit Number 65 was marked for
16 identification.)
17    Q. (By Mr. Kratenstein) And then with respect
18 there was a direction on the Maurice Sage
19 Foundation, so I'm going to show you Exhibit 65.
20    MS. CHAITMAN: Did we have Exhibit 64?
21    MS. DASARO: I think, yeah.
22    MS. FEIN: I think this should be 64.
23    MR. KRATENSTEIN: It should be. We might
24 have a miss. So if we have a miss, I apologize.
25 I'm not sure what happened there. Let's just call

19 (Pages 455 - 458)

CONFIDENTIAL

Page 459

1 this Exhibit 65 and we'll come back and if we missed
2 64, we'll just have this gap.
3    Q. (By Mr. Kratenstein) Do you see that there
4 in the Sage -- in Exhibit 61 he's asking to withdraw
5 $25,000 and do you see that in Exhibit Number 65,
6 the $25,000 withdrawal?
7    A. Yes.
8       (Exhibit Numbers 66, 67 and 68 were marked
9 for identification.)
10    Q. (By Mr. Kratenstein) Finally, the memos
11 and/or confirms. I'm showing you Exhibit 66,
12 Exhibit 67 and Exhibit 68. And, again, Mr. Madoff,
13 do Exhibits 66 through 68 reflect the execution of
14 the instructions that were contained in the letter
15 that we marked as Exhibit 61?
16    A. Yes.
17       (Exhibit Number 69 was marked for
18 identification.)
19    Q. (By Mr. Kratenstein) Thank you. I'm
20 showing you Exhibit Number 69. Mr. Madoff, do you
21 see that this is a letter from Maurice Sage to
22 Annette Bongiorno and you on the letterhead of Sage
23 Associates and Sage Associates II?
24    MS. FEIN: Objection to form.
25    THE WITNESS: Yeah. From Malcolm Sage.

Page 460

1    Q. (By Mr. Kratenstein) From Malcolm Sage,
2 yes.
3    A. Right, yes.
4    Q. Do you have any reason to believe that you
5 did not receive this letter?
6    A. No.
7    Q. Would it have been maintained by your firm
8 after it was received?
9    A. Yes.
10    Q. Mr. Sage writes Dear Annette, just wanted
11 to touch base with you regarding certain stocks in
12 Sage Associates IS-004 and Sage Associates II
13 IS-005. To the best of my understanding the only
14 stocks which were held short against the box and not
15 grandfathered, and the word grandfathered is in
16 quotes, with respect to the constructive sales rules
17 are Broadcom, and then he puts in parentheses Sage
18 Associates, and RJR, and then he puts in parentheses
19 Sage Associates and Sage Associates II.
20       Let me just stop there for a second. We
21 talked about what a short against the box is. Do
22 you have an understanding of what Mr. Sage meant
23 when he referred to grandfathered?
24    A. Not really.
25    Q. Okay. Therefore -- then he goes on in his

Page 461

1 sentence and says, therefore, I assume that these
2 positions will be bought into prior to January 30 so
3 as to avoid a constructive sale. Do you see that?
4    A. Yes.
5    Q. Do you understand him to be instructing you
6 to buy into Broadcom and RJR?
7    MS. FEIN: Objection to form.
8    THE WITNESS: Yes.
9    MR. KRATENSTEIN: What's the basis for the
10 objection?
11    MS. FEIN: This letter is addressed to
12 Annette, the letterhead is Annette and it's also
13 Dear Annette and you're saying instructing you,
14 directing you. I just -- I have an objection to
15 that in the past and in the future.
16    MR. KRATENSTEIN: I will fix. Thank you.
17    Q. (By Mr. Kratenstein) Do you see that the
18 letter is addressed both to you and Ms. Bongiorno,
19 Mr. Madoff?
20    MS. FEIN: Objection. I don't -- the firm
21 name is listed here underneath Annette's name. I
22 don't see that this letter is addressed to both Mr.
23 Madoff and Annette.
24    Q. (By Mr. Kratenstein) I see. Okay. So Mr.
25 Madoff, going back to prior testimony, is this the

Page 462

1 type of letter that you would have expected Ms.
2 Bongiorno to show you?
3    A. Yes.
4    Q. And do you have any reason to believe that
5 she did not show it to you?
6    A. Either showed me or told me on the phone.
7    Q. Okay. And when this letter says I assume,
8 Mr. Sage writes I assume that these positions will
9 be bought into prior to January 30 so as to avoid a
10 constructive sale, do you understand Mr. Sage to be
11 directing your firm to follow those instructions?
12    A. Correct.
13       (Discussion off the record.)
14    Q. (By Mr. Kratenstein) And do you have any
15 recollection of the tax law being changed with
16 respect to short against the box transactions and
17 certain of those transactions being grandfathered?
18    A. Yes, yes.
19    Q. What do you recall of that?
20    A. I recall that it happened. I can't tell
21 you the details.
22       (Exhibit Number 70 was marked for
23 identification.)
24    Q. (By Mr. Kratenstein) Okay. And now we're
25 just going to go through the same drill and I'm

20 (Pages 459 - 462)

CONFIDENTIAL

Page 463

1 going to ask you through statements whether any of
2 these transactions being directed in Exhibit 70 show
3 -- 69 rather show up on the Sage Associates
4 statements as Exhibit 70?
5     MS. FEIN: Objection to form. Thank you.
6     Q. (By Mr. Kratenstein) And do you see that
7 this is a January 31, 2003 Sage Associates
8 statement?
9     A. Yes.
10    Q. And do you see in the middle it shows
11 buying into RJR and Broadcom?
12    A. Yes.
13    Q. And is that as instructed in Exhibit 69?
14    A. Yes.
15    MR. KRATENSTEIN: You can put that
16 document aside and now we'll just do the memos or
17 confirms quickly, Exhibit 71. Make sure this is
18 right. Thanks.
19    (Exhibit Numbers 71 and 72 were marked for
20 identification.)
21    Q. (By Mr. Kratenstein) Exhibit 71, and here
22 is Exhibit 72. And if you look at Exhibit 71 and
23 72, what are they?
24    A. Confirmations.
25    Q. Of what?

Page 464

1     A. Sage Associates, R. J. Reynolds and
2 Broadcom.
3     Q. And those are the transactions reflected in
4 Exhibit 69 --
5     A. Correct.
6     Q. -- being executed by your firm?
7     A. Yes.
8     (Exhibit Number 73 was marked for
9 identification.)
10    Q. (By Mr. Kratenstein) One more to go.
11 Here's Exhibit 73. Are you okay, Mr. Madoff? You
12 need a break?
13    A. No. I'm fine.
14    Q. Okay. We're almost there. I'm showing you
15 Exhibit 73, Mr. Madoff, which do you see that it's a
16 letter to Bernard L. Madoff Investment Securities,
17 attention, Annette Bongiorno, from Malcolm Sage?
18    A. Yes.
19    Q. It's on the letterhead of Sage
20 Associates --
21    A. Uh-huh.
22    Q. -- and Sage Associates II and the Maurice
23 S. Sage Foundation?
24    A. Yes.
25    Q. Do you have any reason to believe you would

Page 465

1 not have been made aware of this letter by Ms.
2 Bongiorno?
3     A. No.
4     Q. In other words, she would have made you
5 aware of it; correct?
6     A. Yes.
7     Q. And do you have any reason to believe that
8 Ms. Bongiorno did not receive this letter?
9     A. No.
10    Q. Do you see the handwriting on the letter?
11    A. Yes.
12    Q. Is that Ms. Bongiorno's?
13    A. Definitely.
14    Q. How do you recognize it?
15    A. I recognize the handwriting now that I'm
16 looking at it.
17    Q. Okay. The letter says -- and I'm sorry.
18 You recognize it from having worked with her;
19 correct?
20    A. Yes.
21    Q. And Mr. Sage writes after discussions with
22 Paul, we have come up with the following plan with
23 regards to Sage -- the Sage Associates IS-004, Sage
24 Associates II IS-005 and Maurice S. Sage Foundation,
25 Inc. IS-197 accounts. Do you see that?

Page 466

1     A. Yes.
2     Q. And, again, do you have any understanding
3 of what this plan was?
4     A. It's just a tax plan realizing gains when
5 you have a short against the box transaction.
6     Q. Do you understand what Ms. Bongiorno's
7 notes mean on this left-hand margin?
8     A. By looking at -- by her saying $3 million
9 gain, it's realizing only part of the transaction.
10    Q. What do you mean by that?
11    A. In other words, she must have more shares
12 than she wants to sell.
13    Q. Okay. And then it says in a box no
14 long-term. Do you see that?
15    A. Yes.
16    Q. Do you have an understanding --
17    A. She doesn't want --
18    Q. Let me finish. Do you have an
19 understanding of what that means?
20    A. Not to receive -- doesn't -- do not take a
21 long-term gain.
22    Q. That would be for a tax reason?
23    A. Yes.
24    Q. Under Sage Associates there are four
25 transactions being directed. Do you see that?

21 (Pages 463 - 466)

CONFIDENTIAL

Page 467

1    A. Yes.
2    Q. And under Sage Associates II there's one
3 transaction?
4    A. Yes.
5    Q. Under Maurice S. Sage Foundation there's
6 one transaction; correct?
7    A. Yes.
8    Q. Would these transactions have been
9 executed?
10    A. Yes.
11    Q. And that's because your firm would follow
12 your client's instructions; correct?
13    A. Correct.
14    (Exhibit Number 74 was marked for
15 identification.)
16    Q. (By Mr. Kratenstein) Let's just again go
17 through the quick drill of confirming whether these
18 show up on the statements and in the memos and
19 confirms, so I'm going to put this letter here. I'm
20 going to show you Exhibit 74, which is the
21 December 31, 2013 Sage Associates statement --
22 sorry -- 2003 Sage Associates statement. Do you see
23 that?
24    A. Yes.
25    Q. And do you see the transfer of the Amgen

Page 468

1 and Symantec as directed --
2    A. Yes.
3    Q. -- in Exhibit 73?
4    A. Yes.
5    (Exhibit Number 75 was marked for
6 identification.)
7    Q. (By Mr. Kratenstein) And I'm going to show
8 you Exhibit 75. And in Exhibit 75, do you see that
9 that is a December 31, 2003 Sage Associates
10 statement?
11    A. Yes.
12    Q. And do you see there the transactions that
13 had been directed by Mr. Sage with respect to
14 National Semiconductor, RJR, Amgen and Symantec?
15    A. Yes.
16    MS. FEIN: We didn't receive that.
17    MR. KRATENSTEIN: Oh, you didn't get that
18 one? I'll just make sure I have the right one.
19 Yes.
20    MS. FEIN: Thank you. Yes.
21    MS. CHAITMAN: That's Exhibit 74?
22    MS. FEIN: This is Exhibit 75; right?
23    MR. KRATENSTEIN: It's Exhibit 75.
24    MS. CHAITMAN: I'll ask do you have
25 another one?

Page 469

1    MR. KRATENSTEIN: Yes.
2    MS. CHAITMAN: Thanks.
3    (Exhibit Numbers 76, 77, 78 and 79 were
4 marked for identification.)
5    Q. (By Mr. Kratenstein) And now let's just do
6 the memos and confirms quickly and we're almost
7 done. Here's Exhibit 76, Exhibit 77 --
8    MS. FEIN: Thank you.
9    Q. (By Mr. Kratenstein) -- and 78 and 79.
10 Mr. Madoff, have you had an opportunity to look at
11 what we've marked as Exhibits 70 -- what is it? 76,
12 77, 78 and 79?
13    A. Yes.
14    Q. And can you tell me what those documents
15 are?
16    A. Confirmations.
17    Q. Do they reflect the instructions with
18 respect to the -- the execution of the instructions
19 with respect to the Sage Associates account that are
20 contained in the letter that we marked as Exhibit
21 Number 73?
22    A. Yes.
23    (Exhibit Numbers 80 and 81 were marked for
24 identification.)
25    Q. (By Mr. Kratenstein) Thank you. And there

Page 470

1 were in that letter instructions for Sage Associates
2 II, so let's just look at those statements quickly.
3 This is Exhibit Number 80 and Exhibit 81.
4    And just to refresh your recollection, with
5 respect to Sage Associates II in the letter
6 Exhibit 73, there's an instruction with respect to
7 Symantec for Sage Associates II. And I'm going to
8 ask if you see on Exhibits 80 and 81 the execution
9 of that instruction?
10    A. Yes.
11    Q. And Exhibit -- just so the record is clear,
12 Exhibit 80 is a Sage Associates II statement from
13 December 31, 2003. That's for the sub three
14 account. And the next exhibit, 81, is a Sage
15 Associates II statement, also December 31, 2003, for
16 the seven subaccount of Sage Associates II; correct?
17    A. Yes.
18    (Exhibit Number 82 was marked for
19 identification.)
20    Q. (By Mr. Kratenstein) Thank you. Finally,
21 the confirm. This is Exhibit 82. Is that a -- what
22 is Exhibit 82?
23    A. It's a memo.
24    Q. It's a memo? Does it --
25    A. Showing movement of monies.

22 (Pages 467 - 470)

CONFIDENTIAL

Page 471

1    Q. Does the second page show the Symantec
2 move?
3    A. Yes.
4    Q. Thank you. And, finally, at the end of the
5 letter, Exhibit 73, you'll see that there's a
6 request to withdraw the sum of $16,000. Do you see
7 that?
8    A. Yes.
9        (Exhibit Number 83 was marked for
10 identification.)
11    Q. (By Mr. Kratenstein) I'm just showing you
12 Exhibit Number 83. Do you recognize Exhibit 83?
13    A. Yes.
14    Q. What is it?
15    A. A check, memo for a check.
16    Q. For how much?
17    A. Sixteen thousand dollars.
18    Q. To the Maurice S. Sage Foundation?
19    A. Yes.
20    Q. That shows the execution of the instruction
21 at the end of Exhibit 73, the letter?
22    A. Correct.
23        (Exhibit Number 84 was marked for
24 identification.)
25    Q. Thank you. We'll put that aside. I'm

Page 472

1 showing you Exhibit 84. Do you recognize
2 Exhibit 84, Mr. Madoff?
3    A. Yes.
4    Q. What is it?
5    A. It's a note from Annette.
6    Q. And you recognize her handwriting?
7    A. Yes.
8    Q. Would this document have been prepared --
9 well, strike that. Are you familiar with year-end
10 note documents prepared by Ms. Bongiorno?
11    A. Yes.
12    Q. How are you familiar with them?
13    A. I've seen it before.
14    Q. She prepared them in the ordinary course of
15 her business?
16    A. Yes.
17    Q. And it was a regular part of her
18 responsibilities to create notes like this?
19    A. Yes.
20    Q. And these documents would have been kept, a
21 document like this one would have been kept under
22 your firm's custody or control?
23    A. Yes.
24    Q. Do you see that there are notes here for
25 the Sage group?

Page 473

1    A. Yes.
2    Q. And do you understand that to be referring
3 to the Sage family accounts we've been talking
4 about?
5    A. Yes.
6    Q. And do you have an understanding of what
7 the notes on the first page if you look at them
8 mean?
9    A. I can't even read it.
10    Q. Okay. Well, do you see the second sentence
11 says -- tell me if you disagree with this -- could
12 have gone SAB in eBay but cust did not want it?
13    A. Correct.
14        MS. FEIN: Objection to form.
15    Q. (By Mr. Kratenstein) Correct?
16    A. Could have brought short against the box on
17 eBay, but customer did not want it.
18    Q. Do you understand that a member of the Sage
19 family was instructing your firm not to go short
20 against the box on eBay?
21    A. Yes.
22    Q. Would your firm have followed that
23 instruction?
24    A. Yes.
25        (Exhibit Number 85 was marked for

Page 474

1 identification.)
2    Q. (By Mr. Kratenstein) You can put that
3 document aside. Exhibit 85. Mr. Madoff, do you see
4 that this is a letter from Malcolm Sage to you?
5    A. Yes.
6    Q. Any reason to believe that you did not
7 receive this letter?
8    A. No.
9    Q. He writes Dear Bernie, it was nice to see
10 you at Ruth -- it was nice to see you and Ruth at
11 Paul's party. Do you see that?
12    A. Yes.
13    Q. And I'll skip some of the rest and I'll go
14 to the second paragraph. In the second sentence he
15 says, quote, when we spoke last year we decided that
16 it would be best to transition away from the managed
17 portfolio accounts.
18        And then he goes on to say a sentence later
19 or two sentences later since then our main holding,
20 eBay, has dropped significantly. As that holding is
21 a long-term one, I was hoping that you had shorted
22 it against the box a while back. If you have a
23 chance, can you confirm that? Do you see that?
24    A. Yes.
25    Q. And do you have any recollection as to

23 (Pages 471 - 474)

CONFIDENTIAL

Page 475

1 whether you had, in fact, shorted against the box as
2 Mr. Sage had hoped?
3    A. When was this letter written? I don't
4 know.
5    (Exhibit Number 86 was marked for
6 identification.)
7    Q. (By Mr. Kratenstein) Well, let me see if I
8 can refresh your recollection. He didn't date his
9 letters for whatever reason, so we have to match
10 them up against statements and/or confirms and
11 memos. So I'm going to show you Exhibit 86. And do
12 you see that this is a Sage Associates account
13 statement for April 30, 2006?
14    A. Yes.
15    Q. And do you see that there are various short
16 against the box positions for eBay?
17    A. I see sales transactions on eBay, right.
18    (Exhibit Number 87 was marked for
19 identification.)
20    Q. (By Mr. Kratenstein) Sorry. Sales
21 transactions, correct. And then if we look at
22 Exhibit 48 -- I'm sorry -- Exhibit 87. I apologize.
23 These are memos from this time period. If you look,
24 April 2006, memos and/or confirms. If you'll just
25 take a look at those and tell me what you see in

Page 476

1 Exhibit 87? What are those?
2    A. I'm looking now. These are all
3 confirmations.
4    Q. And do you see that they say short against
5 the box?
6    A. Yes.
7    Q. So those would have been short against the
8 box transactions?
9    A. Correct.
10    Q. Presumably as requested in the letter that
11 we marked as Exhibit 85?
12    A. Yes.
13    (Exhibit Number 88 was marked for
14 identification.)
15    Q. (By Mr. Kratenstein) Thank you. Last
16 letter, last one. This is Exhibit 88. Mr. Madoff,
17 do you see that Exhibit 88 is a letter from Malcolm
18 Sage to you?
19    A. Yes.
20    Q. And it's got handwriting on it?
21    A. Yes.
22    Q. Whose handwriting?
23    A. Annette's.
24    Q. And, again, you recognize that from your
25 time working with her?

Page 477

1    A. Yes.
2    Q. Do you have any reason to believe that you
3 did not receive this letter?
4    A. No.
5    Q. Do you see that Mr. Sage is writing to you,
6 Mr. Madoff, about sale of certain Sage Associates'
7 positions?
8    A. Yes.
9    Q. And he says Martin and I recently met with
10 Paul. Let me stop there. Do you understand Martin
11 to be Malcolm's brother, Martin Sage?
12    A. Yes.
13    Q. Martin and I recently met with Paul in
14 regard to selling our positions in the Sage
15 Associates accounts and to transfer the proceeds
16 into index option accounts. Do you see that?
17    A. Right, yes.
18    Q. And do you have an understanding of what he
19 meant by index option accounts?
20    A. That's a split strike transaction.
21    Q. So prior to this date in Sage Associates it
22 was directed trading and he's now talking about
23 moving to split strike?
24    MS. FEIN: Objection.
25    THE WITNESS: Right.

Page 478

1    Q. (By Mr. Kratenstein) Your answer was?
2    A. Correct.
3    Q. Thank you. And if you look on the second
4 page, you can see at the bottom that Ms. Bongiorno's
5 notes have dates in them, one being 8-23-06. Do you
6 see that at the bottom?
7    A. Yes.
8    Q. So do you believe that these notes were
9 created on or around August 23rd, 2006?
10    A. Yes.
11    Q. And Mr. Sage talks about -- he says, quote,
12 he referring presumably to Paul; correct?
13    A. Right.
14    Q. Had some ideas from a tax standpoint and
15 suggested that he with us meet with you at your
16 availability to finalize the transfer and the timing
17 thereof. Do you see that?
18    A. Yes.
19    Q. Do you recall whether you, in fact, met?
20    A. No.
21    Q. You may have, you just don't recall?
22    A. Correct.
23    Q. Then Mr. Sage writes the only concern he
24 had of any immediacy was that we not buy back into
25 the eBay short position because that would trigger a

24 (Pages 475 - 478)

CONFIDENTIAL

Page 479

1  short-term recognition as opposed to, quote,
2  delivering, unquote, the stock. Do you see that?
3      A. Yes.
4      Q. Do you have an understanding of what Mr.
5  Sage was talking about there?
6      A. Yes. He wanted us to deliver the
7  securities as opposed to -- I'm not sure whether he
8  was talking about delivering the securities from one
9  account to the other account, you know, to trigger a
10  particular gain or whether he was talking about
11  delivering the securities out, period, out of the
12  firm.
13      Q. Okay. But he is telling you that he
14  doesn't want you to buy back into the eBay short;
15  correct?
16      A. Right.
17      Q. And that's an instruction from him?
18      A. Yes.
19      Q. You would have followed that instruction?
20      A. Yes.
21      MS. FEIN: Objection.
22      Q. (By Mr. Kratenstein) Would you have
23  followed that instruction?
24      A. Yes.
25      Q. In the notes at the bottom Ms. Bongiorno --

Page 480

1  well, first, notes at the top Ms. Bongiorno writes
2  ask Bernie about this. Do you see that?
3      A. Yes.
4      Q. Do you recall being asked about this?
5      A. Do I recall? No. I can't --
6      Q. Right.
7      A. I can't say that I do.
8      Q. Right. It's too long ago?
9      A. Yes.
10      Q. Okay. You may have been asked about it,
11  but you just can't remember?
12      A. That's correct.
13      Q. At the bottom she writes don't do anything.
14  We cannot -- the next word may be trim or tran. Do
15  you have any idea?
16      A. Must be transfer.
17      Q. Transfer everything and leave open short
18  eBay. Do you see that?
19      A. Yes.
20      Q. Do you have an understanding of what she's
21  saying there?
22      A. She's telling us to leave the positions as
23  they appear, as they are.
24      Q. Okay. And then on the next page she writes
25  about several calls she had with Malcolm Sage. Do

Page 481

1  you see that?
2      A. Yes.
3      Q. So she writes first I called Malcolm Sage
4  end of June to say the accounts were as close to
5  even and should we do the transfers, exclamation
6  point. Do you see that?
7      A. Yes.
8      Q. He said he would talk to Paul, call back.
9  Do you see that?
10      A. Yes.
11      Q. So is it fair to say that Ms. Bongiorno was
12  seeking instruction from Mr. Sage?
13      A. Yes.
14      Q. Next note, called again end of July. He
15  said he didn't get a chance to get to talk to Paul
16  and he will call me back. Do you see that?
17      A. Yes.
18      Q. And, again, do you understand Ms. Bongiorno
19  to be seeking instructions from Mr. Sage?
20      A. Yes.
21      Q. Last note, called again 8-23-06. He said
22  the or he, it's hard to tell, promises to call me
23  back by Tuesday, August 29, 8-29, exclamation point.
24  Do you see that?
25      A. Yes.

Page 482

1      Q. And, again, fair to say that Ms. Bongiorno
2  was looking for direction from Mr. Sage?
3      A. Correct.
4      Q. Okay. We have talked about the Sage
5  Associates account and the fact that it was not a
6  split strike account; correct?
7      A. Correct.
8      Q. And we can pull out the year-end account
9  statements if you like, but we've marked a couple of
10  them. We marked the December 31, '02 and we marked
11  other year-end statements for Sage Associates during
12  the course of this deposition, but at the end of the
13  year in a split strike account what would -- what
14  types of securities would be in the account?
15      A. Typically, a basket of S&P 100 securities
16  and index options hedging that account.
17      Q. But at the end of the year didn't you go to
18  treasuries and cash in most accounts?
19      A. At the end of the year?
20      Q. Yes.
21      A. What period are you talking about?
22      Q. Well, was there ever a period when in split
23  strike accounts you would at the end of the year at
24  least on the statements show that you had liquidated
25  the portfolio of securities in that account and

25 (Pages 479 - 482)

CONFIDENTIAL

Page 483

1 moved it into treasuries and cash?
2    A.  What period are you talking about because
3 we weren't -- I didn't actually do the split strike
4 trade --
5    Q.  Correct.
6    A.  -- at a certain period of time post-1992.
7    Q.  I'm talking about post-1992.
8    A.  Well, then we wouldn't have gone into the
9 -- we never would have done the transaction.
10    Q.  Right.
11    A.  So the monies could have been in
12 treasuries, you know, but it wouldn't be fair to say
13 that we were actually executing the split strike
14 trade post-1992.
15    Q.  Right.  But on a customer statement
16 post-1992 at the end of the year what would you
17 show?
18    A.  It would appear.  It would appear in
19 treasuries.
20    Q.  And in the Sage Associates year-end
21 statements would you show treasuries or would you
22 show actual positions?
23    MS. FEIN:  Objection.
24    THE WITNESS:  If it was in a split strike
25 strategy, we would not show the positions typically.

Page 484

1 We would just show treasuries, which is a position.
2    Q.  (By Mr. Kratenstein)  Right.  And if it was
3 not in split strike, what would you show?  The
4 actual securities that were there?
5    A.  Yes.
6    Q.  And so, for example -- let me pull out the
7 document.  Hang on.
8    MS. CHAITMAN:  Is that Exhibit 80?
9    Q.  (By Mr. Kratenstein)  Here's Exhibit 63,
10 which we've already marked.  So here's Exhibit 63.
11 See, it's a Sage Associates account statement for
12 12-31-02?
13    A.  Correct.
14    Q.  And this is for the sub three account?
15    A.  Yes.
16    Q.  And you're showing actual securities in the
17 account at the end of the year, not treasuries and
18 cash?
19    A.  Correct.
20    Q.  And that shows it's not split strike;
21 right?
22    A.  Correct.
23    Q.  Your split strike accounts, they would
24 generate on paper steady returns; correct?
25    A.  Depends upon what period you're talking

Page 485

1 about.
2    Q.  Post-1992?
3    A.  Yes.
4    Q.  Of 10 to 20 percent; correct?
5    A.  No.
6    Q.  What was the general --
7    A.  Talking about an annualized return?
8    Q.  Annualized?
9    A.  Yes.
10    Q.  So 10 to 20 percent annually?
11    A.  Correct.
12    Q.  For an account like the Sage Associates
13 account which was not split strike and which was
14 showing actual securities, what kind of returns
15 would that type of account show?
16    A.  I have no idea.  It depends.
17    Q.  It would depend on the type of securities
18 in the account; right?
19    A.  That's right.
20    Q.  It wouldn't be a steady return?
21    A.  No.  Could be, but depends upon there were
22 never really steady returns.  That's been mentioned
23 before.  There was some -- there was some -- you
24 know, depends upon the strategy and depends upon the
25 period of time.  It could have been -- if you're

Page 486

1 talking about at the end of the month or the end of
2 the quarter, the returns could be all over the
3 place.
4    Q.  So in Sage Associates in 2002, for
5 example --
6    A.  Yes.
7    Q.  -- if Malcolm Sage was directing you to buy
8 and sell securities in Sage Associates; correct?
9    A.  Yes.
10    Q.  And you were holding those securities;
11 correct?
12    A.  Yes.
13    Q.  The Sage Associates accounts certainly in
14 2002 and any other year in which that type of
15 trading was being done would reflect the return of
16 the transactions that were executed in the account;
17 correct?
18    A.  Correct.
19    Q.  And that may not be a steady return?  It
20 would follow the market for those securities;
21 correct?
22    MS. FEIN:  Objection.
23    THE WITNESS:  Correct.
24    Q.  (By Mr. Kratenstein)  Correct?
25    A.  Yes.

26 (Pages 483 - 486)

CONFIDENTIAL

Page 487

1    MR. KRATENSTEIN:  Thank you very much, Mr.
2  Madoff.  I have no further questions at this time.
3  Why don't we take a break?
4    MR. GOLDMAN:  Your food from the wherever
5  they make it is here.
6    THE VIDEOGRAPHER:  Going off the record.
7  The time is 11:09.
8    (A recess was taken and Exhibit 53A was
9  marked for identification.)
10    THE VIDEOGRAPHER:  Back on the record.
11  The time is 11:58.
12    Q. (By Mr. Kratenstein)  Mr. Madoff, it was
13  pointed out during your examination that we had an
14  error in one of our exhibits, so I just want to
15  correct the error.
16    I put in front of you, back in front of you
17  Exhibit 47, which was the -- a letter from Malcolm
18  Sage to Bernard L. Madoff Investment Securities.
19  And it says Dear Bernie -- we marked it as
20  Exhibit 47.  One of the transactions in that letter
21  under 1(c) involved movement of International Paper
22  moving the short position from the Sage Associates
23  seven account to the three account.  Do you see
24  that?
25    A. Yes.

Page 488

1    Q. And I had showed you as Exhibit 53 memos
2  and/or confirms relating to that and it was pointed
3  out that we had some mispagination.  So I'm showing
4  you Exhibit 53A, which bears production numbers Sage
5  0004290 to 91.  Do you see that?
6    A. Uh-huh.
7    Q. And can you tell me what that is?
8    A. It's a credit memo.
9    Q. And that shows the transfer of the
10  international paper short position from the seven
11  account to the three account --
12    A. Right.
13    Q. -- as reflected --
14    A. Right.
15    Q. -- as instructed rather in Exhibit 47?
16    A. Correct.
17    Q. And you would have these memos instead of
18  confirms because it's an internal transfer?
19    A. That's correct.
20    Q. If you were doing a -- you'd have a confirm
21  when you were actually buying or selling?
22    A. Right.
23    MR. KRATENSTEIN:  Thank you very much.
24  That concludes my direct examination.  Thank you.
25    MS. FEIN:  I understand from you, Helen,

Page 489

1  that you're not planning to do an examination today.
2  We are waiting until the direct examination of Mr.
3  Madoff is finished to start our cross-examination.
4  That's what was contemplated by the order that was
5  entered by this Court September 11th, 2017 regarding
6  Mr. Madoff's second day deposition.
7    To the extent for whatever reason that we
8  don't have time to finish our cross-examination
9  tomorrow, we will object to the use of the testimony
10  and move to strike the direct testimony.  Thanks.
11    MR. KRATENSTEIN:  Before you go off, I
12  want to make sure I understand that.  If you don't
13  have time to finish your cross tomorrow, you reserve
14  the right to strike everything we did today?
15    MS. FEIN:  What I should say is to the
16  extent we're not permitted equal time to finish
17  tomorrow, so if for some reason Mr. Madoff is
18  unavailable tomorrow or there's some reason where we
19  don't have sufficient time in one day; not that we
20  would need -- be seeking future days after that, but
21  as long as we are provided what the order
22  contemplated, which is one day of direct testimony
23  and we shouldn't need more than that and that's what
24  we've agreed to, then that's all that we would need.
25    MR. KRATENSTEIN:  Okay.  Well, I think I

Page 490

1  understand your position, but we reserve all
2  rights --
3    MS. FEIN:  Certainly.
4    MR. KRATENSTEIN:  -- and cross these
5  bridges if and when we get to them.
6    MS. FEIN:  Certainly.  Thank you.
7    MR. KRATENSTEIN:  Thanks.
8    THE VIDEOGRAPHER:  We're off the record in
9  the November 8th, 2017 deposition of Bernard L.
10  Madoff, Volume III.  The number of discs used was
11  one.  The time is 12:02.
12    (Reading and signing of the deposition by
13  the witness was reserved and the deposition was
14  adjourned at 12:02 p.m.)
15
16    * * * * *
17
18
19
20
21
22
23
24
25

27 (Pages 487 - 490)

CONFIDENTIAL

Page 491

```
 1        C E R T I F I C A T E
 2  NORTH CAROLINA:
 3  GUILFORD COUNTY:
 4        I hereby certify that the foregoing
 5  deposition was reported, as stated in the caption,
 6  and the questions and answers thereto were reduced
 7  to the written page under my direction; that the
 8  foregoing pages 386 through 493 represent a true and
 9  correct transcript of the evidence given.  I further
10  certify that I am not in any way financially
11  interested in the result of said case.
12        I have no written contract to provide
13  reporting services with any party to the case, any
14  counsel in the case, or any reporter or reporting
15  agency from whom a referral might have been made to
16  cover this deposition.  I will charge my usual and
17  customary rates to all parties in the case.
18        This, the 21st day of November, 2017.
19
20
21        K. Denise Neal
22        K. Denise Neal, RPR
          Registered Professional Reporter
23        Notary Public No. 200517500101
24
25
```

Page 492

```
 1        E R R A T A   S H E E T
 2
 3     Pursuant to Rule 30(7)(e) of the Federal Rules
 4  of Civil Procedure, any changes in form or substance
 5  which you desire to make to your deposition
 6  testimony shall be entered upon the deposition with
 7  a statement of the reasons given for making them.
 8
 9     To assist you in making any such corrections,
10  please use the form below.  If supplemental or
11  additional pages are necessary, please furnish same
12  and attach them to this errata sheet.
13            * * * * *
14     I, the undersigned, BERNARD L. MADOFF, do hereby
15  certify that I have read the foregoing deposition
16  and that to the best of my knowledge said deposition
17  is true and accurate (with the exception of the
18  following corrections listed below).
19
20
21
22
23
24
25
```

Page 493

```
 1  Page    Line    should read:
 2  Reason for change:
 3
 4  Page    Line    should read:
 5  Reason for change:
 6
 7  Page    Line    should read:
 8  Reason for change:
 9
10  Page    Line    should read:
11  Reason for change:
12
13  Page    Line    should read:
14  Reason for change:
15
16  Page    Line    should read:
17  Reason for change:
18
19  Page    Line    should read:
20  Reason for change:
21  Signature:
22  Sworn to and Subscribed before me
23                  , Notary Public.
24  This    day of         , 2017.
25  My Commission Expires:
```

28 (Pages 491 - 493)