# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>          Plaintiff-Applicant,<br><br>      v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>          Defendant. | Adv. Pro. No. 08-1789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>          Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>          Plaintiff,<br><br>      v.<br><br>DEFENDANTS LISTED ON EXHIBIT A TO NOTICE OF MOTION [ECF 13603-1],<br><br>          Defendants. | |

<u>**DEFENDANTS' MEMORANDUM IN FURTHER SUPPORT OF THEIR REQUEST TO DEPOSE BERNARD L. MADOFF ON DAY TWO DEPOSITION TOPICS**</u>

**CHAITMAN LLP**
465 Park Avenue
New York, New York 10022
Phone and Fax: (888) 759-1114
Helen Davis Chaitman
hchaitman@chaitmanllp.com

*Attorneys for Defendants Listed on Exhibit A*
*to Notice of Motion [ECF 13603-1]*

{00031269 2 }

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS AND PROCEDURAL POSTURE ...................................................... 3

    The context in which the Trustee has misrepresented Madoff's
    trading activity ..................................................................................................................... 3

    Madoff's testimony about when the fraud began ................................................................. 4

    The Trustee's position that Madoff had not purchased any
    securities for his investment advisory customers prior to the split
    strike conversion strategy ................................................................................................... 6

    The Trustee's continuous representation that he has produced all
    trading records ................................................................................................................... 10

    The falsity of the Trustee's representations ...................................................................... 15

    The newly-produced documents prove the falsity of the Trustee's
    representations to the Second Circuit that Madoff never purchased
    securities for his investment advisory customers ............................................................. 17

    The Trustee's misrepresentations about Madoff's purchase of
    securities with investment advisory customers' money .................................................... 18

CONCLUSION ......................................................................................................................... 20

    The defendants should be given a full opportunity to develop a
    factual record ..................................................................................................................... 20

The Defendants listed on Exhibit A to the Notice of Motion ("Defendants") [ECF No. 13603-1] respectfully submit this memorandum in further support of their request to depose Bernard L. Madoff on Day two deposition topics.

## PRELIMINARY STATEMENT

This memorandum is submitted on behalf of numerous clawback defendants in response to the Trustee's memorandum on Day two deposition topics; to explain to the Court the significance of Mr. Madoff's deposition testimony to date; and to explain why it is essential that the defendants be given a full opportunity to question Mr. Madoff concerning his trading activities as a sole proprietorship and then, after January 2001, as Bernard L. Madoff Investment Securities LLC.

It was always contemplated that Defendants would have the opportunity to take Mr. Madoff's deposition with respect to "Day Two" topics. The "Day One" topics cover areas applicable to all defendants. The contemplation was that the "Day Two" topics would hone in on specific customer issues. That is still an important component of the "Day Two" topics. However, on January 4, 2017, Magistrate Judge Maas ordered the Trustee to produce any trading records he had not previously produced. *See In re: Bernard L. Madoff,* Adv. Pro. No. 08-01789 (SMB) ECF No. 14807 at 3 ("To the extent there are any additional relevant records of securities trading that have not been made available . . . through Data Room 1, they must promptly be produced."). Since January 4, 2017, the Trustee has produced 4,569,420 pages of trading records that he had withheld from disclosure since 2009. In fact, the Trustee, through his counsel, had flatly denied that these documents existed.

Defendants' efforts to obtain the Madoff trading records began with their service of discovery demands on the Trustee on March 8, 2016.[1]  The Trustee then sought a protective order from this Court, which was argued on May 17, 2016 at which time the Court ordered the Trustee to produce any trading records that had not already been produced.  The Trustee produced nothing in compliance with this Court's order.  Then, Defendants filed a motion to compel on August 29, 2016.  *See Picard v. Wilenitz,* Adv. Pro. No. 10-04995 (SMB) ECF 68, attached hereto as Chaitman Exh. B.  The parties agreed to have Magistrate Judge Maas decide the motion to compel and, on January 4, 2017, he ordered the Trustee to produce all trading records not previously produced.  *See In re: Bernard L. Madoff,* Adv. Pro. No. 08-01789 (SMB) ECF No. 14807 at 3.  Since January 4, 2017, the Trustee has produced more than 4 1/2 million pages of documents that had never been produced and that had been actively concealed from the defendants.

Defendants are in the process of culling through these documents but the production is massive.  Defendants have certainly have not had the opportunity to question Mr. Madoff about these documents and it is essential that they be given that opportunity.  Moreover, defendants have no idea whether the Trustee has now produced all of Madoff's trading records.  Defendants have written to the Trustee's counsel requesting clarification as to why the Trustee produced records responsive only to search terms that defendants had not approved, instead of producing all of the records as required by Magistrate Judge Maas.  Defendants have also questioned why the Trustee has only produced 201 reels of microfilm when one document the Trustee produced indicates that there were 319 reels of microfilm as of March 2, 1988.  Chaitman Exhs. C and D.

---

[1] *See* June 26, 2017 Declaration of Helen Davis Chaitman ("Chaitman") Exh. A.

On Sunday, June 25, 2017, defendants were informed by the Trustee's counsel, for the first time, that the "Trustee is in possession of nearly 5,300 reels of microfilm." See Chaitman Exh. AA. This is shocking information.

Defendants ask the Court to take all steps necessary to ensure that the Trustee produces all 5,300 reels of microfilm before defendants begin the "Day Two" depositions. The Court, the customers, and the public are entitled to a full explanation (under oath) of what records the Trustee is holding, why the Trustee represented for eight years that he had no such records; what efforts have been made to ensure that everything the Trustee has is being produced, and when the production will be completed.

## STATEMENT OF FACTS AND PROCEDURAL POSTURE

### The context in which the Trustee has misrepresented Madoff's trading activity

When Madoff confessed, there were 5,312 account holders who presented the Securities Investor Protection Corporation ("SIPC") with the possibility of its having to pay out SIPC insurance of $2.65 billion pursuant to the express provisions of the Securities Investor Protection Act.[2] This amount greatly exceeded the total amount in the SIPC insurance fund because, from 1996 on, the members of SIPC had fixed the annual contribution to the SIPC fund (to insure every customer's account up to $500,000 based on the customer's last statement) at $150 per year per firm. Thus, from 1996 through March 2009, every SEC-regulated broker-dealer was able to assure its customers that their accounts were insured against the dishonesty of their broker up to $500,000 based on their last statement for a cost, per firm, of $150 per year.

Since SIPC could not cover the Madoff customer losses, it had two choices: (a) to assess its member firms to cover the statutory liability; or (b) to vastly diminish the customer pool entitled

---

[2] *See* http://www.madofftrustee.com/claims-03.html (last accessed June 25, 2017).

to SIPC insurance.  The Trustee and SIPC embraced the second course of action and, as this Court

is well aware, the Trustee obtained the approval of the Second Circuit for his unique definition of

"net equity" as the net investment of the customer, over generations.  As a result, many customer

claims were disallowed entirely because the customers were cruelly deemed to be "net winners."

And even as to the "net losers," their entitlement to SIPC insurance was reduced by the netting out

process.  The Trustee pulled off this remarkable coup by representing to every court before whom

he appeared – and to the customer body and the general public – that Madoff never purchased any

securities for his investment advisory customers.

Of course, the Trustee has been able to reimburse SIPC for its insurance payments, out of

recoveries he has made.  However, at the time the "net equity" scheme was hatched by SIPC and

the Trustee, they had no way of knowing if there would be money recovered to reimburse SIPC

for its insurance payments.

### Madoff's testimony about when the fraud began

When Madoff confessed, and when he pled guilty, he explained that, beginning in 1992

with respect to his "split strike conversion strategy," he did not purchase the securities for each

customer as reflected on the customer's statements.[3]  Similarly, Frank DiPascali, who was

Madoff's right-hand man and the Government's principal witness in the criminal trial against other

Madoff employees, swore in his plea allocution:

> From at least the early 1990s through December of 2008, there was
> one simple fact that Bernie Madoff knew, that I knew, and that other
> people knew but that we never told the clients nor did we tell the
> regulators like the SEC.  No purchases of sales of securities were
> actually taking place in their accounts.  It was all fake.  It was all
> fictitious.  It was wrong and I knew it was wrong at the time . . .[4]

---

[3] Chaitman Exh. E, Plea Allocution of Bernard L. Madoff, *United States v. Madoff,* No. 09-CR-213 (S.D.N.Y. March 12, 2009) at 26:16-18.
[4] Chaitman Exh. F, Plea Allocution of Frank DiPascali, Jr., *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) at 46:9-15.

There has never been a factual dispute that Madoff did not purchase the Fortune 100 company securities for each customer as shown on the customer statements from some time in 1992/1993. Madoff testified in his deposition that, for some customers, he did buy the securities shown on the split strike statements for a period of time but, by 1993/1994, he stopped buying securities for any of the split strike customers. His testimony was as follows:

> Q. Okay. You testified the last time you were deposed by me that the fraud did not begin until you began doing the split strike conversion strategy in 1992?
>
> A. Correct.
>
> Q. Now, was it, as Judge Bernstein used the expression, a light switch? When you started doing split strike, did you stop buying any securities for the split strike customers?
>
> A. No. I had started -- I had started buying -- doing the strategy for probably through 1993; but as more money came in, that's when my problem began because I couldn't put it all to work in the strategy. And I had committed that I would keep all the money working.
>
> **Q. Okay. I just want to say one thing. I have seen statements as early as July 1991 which seem to be in split strike. Are you saying that it wasn't -- I'd like you to give me your best recollection of when you stopped buying securities for the split strike customers.**
>
> **A. Sometime post-'92. As I started, you know, I was still buying it in '92 and also through most of '93. After that, that's when I stopped buying securities for split strike.**
>
> **Q. Okay. Now, you continued to have some customers who were in convertible arbitrage?**
>
> **A. Correct.**
>
> **Q. Did you continue so long as people were in convertible arbitrage, did you actually buy those securities?**
>
> **A. Yes.**
>
> **Q. Okay. So it was only in the split strike that you stopped buying the securities?**
>
> **A. Correct.**

Q.  Okay.  Do you derive any kind of benefit from your testimony
as to when the fraud started?

A.  No.

Q.  Does it benefit anyone in your family?

A.  No.

Q.  If the Trustee claims you're lying as to when the fraud started, is
there any conceivable benefit that you enjoy by virtue of that
testimony?

A.  No.

Q.  Does this testimony benefit any of your family members?

A.  No.

Chaitman Exh. G, Madoff Dep. Tr. 4/26/17 at 11:5-13:1 (emphasis added).

### The Trustee's position that Madoff had not purchased any securities for his investment advisory customers prior to the split strike conversion strategy

In order to give SIPC the financial relief it wanted, the Trustee took the position that

Madoff never purchased securities for his investment advisory customers.  The Trustee had no

Madoff statements prior to 1980/81 so he started with the 1980/81 customer balances but he

disallowed all appreciation from 1980/81 on.  And, again, he persuaded the Second Circuit to

approve his unprecedented "net equity" definition by representing that Madoff never purchased

securities for his investment advisory customers.  In discovery, the Trustee has stated that he relies

solely on his expert, Bruce Dubinsky, to support his contention that Madoff never purchased

securities in the 1980s.

The Trustee and SIPC paid Mr. Dubinsky over $30 million to produce his expert report.[5]

Based on Mr. Madoff's testimony, the Dubinsky report is worthless.  As Mr. Madoff explained,

half of the Dubinsky report documents what Madoff admitted in December 2008:  that he did not

---

[5] Chaitman Exh. H, *United States v. Bonventre et al.,* (10-cr-228), 10/30/13 Tr. at 1580:25-1581:2.

purchase the Fortune 100 company securities for each customer as shown on the customer statements for the split strike conversion strategy.  Mr. Madoff testified as follows:

> Q. Okay.  Before we go into detail with respect to the report can you tell me some of the mistakes that you found with Mr. Dubinsky's approach?
>
> A. Well, first of all, the majority of the report had to deal with the split-strike conversion trades, which I was sort of at a loss for -- and this report, from what I understand from -- cost a lot of money to -- to produce.  And I had from day one acknowledged that there was no split-strike trades being done and that there was a fraud.  So I couldn't understand why so much money was -- Look, let me just say that from the time that I plead guilty for this -- for this fraud, I've had to live with the guilt of -- of knowing what I did.  All right.  And my decision basically to -- to plead guilty and to not go to trial was to be able to recover as much money as possible to my -- for my clients.

Chaitman Exh. I, Madoff Dep. Tr. 12/20/16 at 83:22-84:16.

The other half of the Dubinsky report deals with two issues:  (a) that Madoff never purchased securities for his investment advisory customers in the 1980s and (b) that Madoff was insolvent from the early 1980s on.

Madoff totally destroyed Dubinsky's credibility by pointing out the following flagrant defects in Dubinsky's conclusion that no securities were purchased for the investment advisory customers in the 1980s.  *See* Chaitman Exh. I, Madoff Dep. 12/20/16 Tr. at 91:24 *et seq.*  As Madoff explained:

a.     Dubinsky concluded that Madoff did not execute the convertible bond arbitrage trading reflected on customer statements from 1980-1997 because, when he added up the number of bonds purchased by all of the investment advisory customers on a particular day, it exceeded the daily volume for that bond according to the New York Stock Exchange ("NYSE") records.  However, as Madoff explained, only 1% of convertible bond trades were done on the NYSE; the vast majority of such trading was done over the counter, including all of Madoff's trades.  Madoff

read from a bond trading treatise he found in the prison library which stated this. There was no documentary record of the over-the-counter trades, many of which were done on the telephone, except for the custodial bank's "continuous net settlement" sheets. *Id.* at 103:4-108:25.

b.    Dubinsky admitted that he never reviewed any trading records from the 1980s.[6] Nevertheless, he concluded that Madoff did not execute the convertible bond trades because there were no confirmations of the purchases and sales. Madoff explained that the industry did not use written confirmations in the 1970s and 1980s because everything was done through continuous net settlement sheets. *Id.* at 128:2-134:5.

c.    Dubinsky concluded that Madoff did not execute the convertible bond trades because neither Bank of NY nor JPMorgan Chase documents proved the securities were cleared through them. Of course, Picard never gave Dubinsky any of the trading records from the 1980s so he had absolutely no basis to reach this conclusion. Madoff testified that he used numerous different banks in the 1970s and 1980s to clear his trades including: Loeb Rhoades, Meadowbrook Savings Bank, Continental, Barclays, Bank of Tokyo, Commercial Bank of North America, Irving Trust Company, Marine Midland, Manufacturers Hanover, Chase, and Bear Stearns. *Id.* at 122:4-20.

d.    Dubinsky concluded that Madoff's trades in the 1970s and 1980s were fraudulent because the prices of the bonds were not the same prices listed on the NYSE. Madoff explained that all transactions with investment advisory customers were transactions with Madoff's firm as clearly stated on the back of each trade confirmation. Thus, he sold securities to his customers; and he purchased securities from his customers. His customers never bought from or sold into the market. Moreover, he would buy convertible bonds over, for example, a five-day period and he

_____

[6] Chaitman Exh. J, Appendix B to Dubinsky Report.

would average the price and charge his customers the average price with a mark-up.  Thus, the

price would not reflect any specific day's market price.  *Id.* at 42:1-15; 100:3-22; 109:6-112:4;

128:2-12; 187:18-188-11.

        e.      Dubinsky concluded that Madoff's trades in the 1970s and 1980s were fraudulent

because there was no proof that the bonds were converted.  Madoff testified that he very rarely

converted the bonds; the goal was to trade them, not to take them out of circulation.  *Id*. at 115:23-

116:3; 120:20-121:2.

        f.      Dubinsky assumed that a market maker cannot sell naked shorts.  Madoff explained

that the SEC adopted the "Madoff exemption" which allowed market makers to sell naked shorts,

at Madoff's suggestion that it was necessary to assure liquidity in the markets.[7]  Thus, Madoff

explained, there was nothing improper about his listing on a customer statement the purchase of

securities that Madoff did not own.  Madoff simply had an obligation to tender the securities to the

customer if the customer asked for them.  What Madoff said was illegal was his failure – after

1992 – to show on his financial statement that he owed the debt to his customers for selling them

securities that he did not own.  *Id*. at 143:9-150:18.

        Dubinsky's credibility was further eviscerated by the expert report of William Feingold

which confirmed the flagrant defects in the Dubinsky report to which Madoff testified.  Unlike

Dubinsky, who knew nothing about trading convertible bonds and apparently did not spend $500

of the $30 million he was paid by the Trustee to consult with someone who actually did convertible

bond trading, Feingold is a convertible bond trader.  *See* Chaitman Exh. K, the Expert Report of

William Feingold dated May 11, 2017.

---

[7]  *See,e.g.,*  http://www.reuters.com/article/us-madoff-sec-remarks-idUSTRE4BG6US20081217
(last accessed June 25, 2017).

Dubinsky's credibility was further eviscerated by the May 11, 2017 Declaration of Steven

Maslow, a former Managing Director of Bear Stearns & Company, Inc., who worked at Bear

Stearns from 1985-1999 and attested that Madoff did a huge volume of business with Bear Stearns

involving convertible securities arbitrage. *See* Chaitman Exh. L.

### **The Trustee's continuous representation that he has produced all trading records**

As the Court will undoubtedly recall, the Trustee's counsel have waxed eloquently

throughout these proceedings over the steps they have taken to populate the Trustee's "E-Data

Room" with every single piece of paper that any defendant or customer could possibly want to

see. For example, Edward Jacobs made the following representation to the Court on May 17,

2016, in seeking a protective order, *inter alia,* with respect to defendants' request that the Trustee

produce trading records:

> What the Trustee has done in discovery in this case is quite
> remarkable, and I believe unprecedented, and we're very proud of it.
> Without even receiving a discovery request, we provide every single
> defendant with what we refer to as their core account documents,
> which are their customer statements, the cash activity of their
> accounts, their correspondence files with all of their correspondence
> to and from BLMIS over the life of their account; the account
> opening and closing documents; and in addition to that all of the
> applicable financial statements from BLMIS's financial institutions
> showing the bank transfer records from those independent third
> parties with respect to the cash activity in each and every single
> account. Where we don't have a complete set of customer
> statements, we produce portfolio management reports, which
> contain exactly the same information of the cash activity over the
> life of the account. Where we don't have those, we produce spiral
> notebooks where various employees over time at BLMIS kept
> meticulous notes of that cash transaction activity. And we provide
> that to every defendant. Wilenitz is no exception. We produced, I
> believe, approximately, 19,000 records that we've indexed to make
> it easy for the defendant to navigate exactly what's in that --
>
> THE COURT: 19,000 records for Wilenitz?
>
> MR. JACOBS: For the Wilenitz accounts, correct, over the life of
> their accounts. And that includes all of the items that I just
> discussed.

Chaitman Exh. M, 5/17/16 Tr. at 7:2-8:4.

With respect to the Dubinsky report, Mr. Edwards stated as follows:

> As Ms. Chaitman knows, we have an expert named Mr. Dubinsky, who offers a very comprehensive report on that subject, and all of the data that he considered and utilized in connection with his opinions have been made available to every defendant through an electronic data room that contains, approximately, 4 million records.

*Id*. at 10:19-24.

Mr. Jacobs represented to this Court that the Trustee had put into the E-Data room every

possible document a defendant could want to see relating to his defenses:

> MR. JACOBS:  Absolutely.  Every single document -- what we've endeavored to do, Your Honor, is that what we refer to as Electronic Data Room 1 contains all of the underlying documents considered by Mr. Dubinsky and we're also building upon that in including documents that our other experts who we may offer to prove transactions and who do other functions, all of those documents as well.  So, that's approximately 4 million records.  Not pages, but records.
>
> And it's an enormous amount of data that I believe is unprecedented, at least in my career, and for that reason we've structured the data room in a very organized fashion with issue trees.  So if you're a participant who's accessing the data room, you'll see something that you might be familiar with already in terms of like, an Outlook email folder tree that has topics, broken down documents, financials, third party records; and then each of those trees can be broken down further to drill down to J.P. Morgan statements.  You know, Chicago Options Trading information, Depository Trust Clearing Corporation documents; all of those types of things.  It's also searchable.
>
> **So, absolutely the Defendant has the ability to conduct whatever investigation they believe is relevant to the claims of their defenses, the same that our expert did, and they have access to all the same information that our expert did.  And we did that to be transparent and to provide any data that any litigant believes that they should have access to.**

*Id*. at 11:11-12:14 (emphasis added).

> So, that's the starting point of where we are in discovery.  And then because Section 4C of the procedures order allows us to provide a summary report, we do that.  And Mr. Dubinsky painstakingly analyzes the Ponzi scheme and the IA business specifically, but also the other aspects of BLMIS's businesses as well.  And issues of insolvency are also part of his analysis to the extent they may bear on the Ponzi scheme or on other proofs we may have, or have had at some point in our cases.
>
> But all of the financials are considered, the Ponzi scheme is considered, the stock-trading activity or activity or lack thereof in the IA business is considered, in addition to the activities of House Five proprietary trading function of BLMIS and the market-making function of BLMIS.

*Id.* at 12:15-13:3.

Mr. Edwards was emphatic that the defendants were given access to all of the documents

that would be necessary for them to defend the complaints:

> THE COURT: Yeah.  So, all I'm saying is although the claim only reaches back two years, you still have to compute whether you call it net equity or fictitious profits, that still has to be demonstrated so that you know the scope of the liability.
>
> MR. JACOBS:  That's correct, Your Honor.  And as you may recall from the (indiscernible) trial, we submit experts whose specific function is to do that.
>
> THE COURT:  Okay, but the Defendants are entitled to see the data --
>
> MR. JACOBS:  That's absolutely right.  And we have already produced in this litigation, without even having received a document request, 100 percent of that data.  So the Defendants have all of those records that we intend to rely upon in order to prove both the net equity and to trace the transfers.

*Id.* at 15:11-16:1.

With respect to defendants' demand that the Trustee produce all trading records, Mr.

Edwards represented to this Court that the Trustee had no such records:

> MR. JACOBS:  The same is true within that group of requests -- there are several requests that ask for stock trading records for the market-making side of the business, and the proprietary trading side

of the business, and the IA side of the business.  However, our contention is there were no stocks ever traded for any IA investment advisory customer.  And that request asks for that documentation going back to, I believe, 1982.

*Id.* at 19:15-22.

When challenged on his representation that the Trustee had produced all of Madoff's

trading records, Mr. Jacobs responded as follows:

> MR. JACOBS:  We have turned over everything that we have.  We scoured the ends of the earth, we have been in discussion with DTC to try to find out if there are more documents.  Ms. Chaitman subpoenaed DTC.  She obviously has subpoena power.  She can go out into the world and conduct third-party discovery.
>
> THE COURT:  Okay, but she's entitled also to ask you what documents you have.
>
> MR. JACOBS:  Your Honor, we didn't make 4 million records available because we're trying to hide anything.  We have made everything we have available within the parameters of what is readily accessible and reasonable under the federal rules of civil procedure.  Well beyond that.  But we have made everything on this issue that we have available.
>
> *          *
>
> THE COURT:  Right, but she's still entitled to the records.
>
> MR. JACOBS:  She has all of the records.
>
> THE COURT:  All right, then if she has them, she has them.
>
> MS. CHAITMAN:  Well, why can't he -- if he claims that there are monthly reports for the legitimate trading units, why can't he just give me the Bates Numbers?  Why do I have to go on a fishing expedition through 4 million pages of documents and then come back and say, they're not here?

*Id.* at 59:15-60:3; 60:10-19.

> THE COURT:  If you have those things and somebody can look at them and see the subject matter of what they want to look at, figure out what to look at, fine.
>
> MR. JACOBS:  There is a subfolder in Data Room 1 that is called DTC that has all of those records.
>
> MS. CHAITMAN:  I'm not asking for -- I have the DTC records.

> **THE COURT:  She wants other non-DTC records.**
>
> **MR. JACOBS:  To the extent we have them in addition to publicly available information that we obtain, it's all in the data room clearly labeled.**

*Id.* at 61:7-17 (emphasis added).

I explained to this Court that Madoff did actually purchase securities and that, in some instances, those securities matched up to the defendants' statements.  The following colloquy with the Court took place in which, again, Mr. Jacobs represented as an officer of the Court that all of Madoff's trading records had been produced:

> THE COURT:  Who's to say he didn't actually own that stock?
>
> MR. JACOBS:  I would love to be able to --
>
> THE COURT:  Which I guess would be relevant to his net equity claim or his claim in the SIPA case.
>
> MR. JACOBS:  I wish I could give you a satisfactory answer but in the time that we have today, I can't replicate the report of our expert, which, in painstaking detail goes through all of the reasons why we believe there was never a security traded in connection with the fraudulent Ponzi scheme being operated and the IA business.
>
> **THE COURT:  So, how does she test that conclusion?**
>
> **MR. JACOBS:  She tests that conclusion the same way our expert does, by examining the underlying records.  All of those records again have been made available to Ms. Chaitman. They're in the data room.  Those other records are expert reports.**
>
> THE COURT:  Maybe that's the answer.  If there are records -- because they do have the DTC records, at least from the period when Wilenitz was investing.  If the records show that BLMIS actually owned something, and the same stock shows up in Wilenitz's account statement, you can make the argument that he actually owned that stock.  But you can do that (indiscernible) and the information has been made available to you.

*Id.* at 68:4-69:5 (emphasis added).

The Court then made clear, lest there be any doubt, that if the Trustee has trading records that he has not put in the E-Data Room, he has an obligation to do so:

>    **THE COURT:  . . . Well, if the Trustee has additional documents, he's got to supplement the disclosure or the production, which he does by adding them to the data room, and maybe you have a continuing duty to check the data room.**

*Id.* at 69:19-22 (emphasis added).

Mr. Jacobs responded to the Court with the following statement:

>    MR. JACOBS:  What we're saying is that we shouldn't have to do more than what we've already done because we have invested enormous amounts of resources and time in finding a way to make all of those information available to all litigants in order for them to conduct their own investigations and have access to the same information that we do.

*Id.* at 70:17-22.

### The falsity of the Trustee's representations

Despite Mr. Jacobs' continuous representations that the Trustee had produced all of Madoff's trading records, those representations were false.  On May 17, 2016, this Court **directed** the Trustee to produce such records.  *See id.* at 68:12-18, 69:19-22; *see also* Chaitman Exh. N, Trustee's Response to Defendants' First Request for Production at Nos. 16, 18.  The Trustee ignored that order.

On August 29, 2016, defendants filed a motion in this Court to compel the Trustee to produce the trading records.  *See In re: Bernard L. Madoff,* Adv. Pro. No. 08-01789 (SMB) ECF No. 13962.  The parties agreed to have this motion heard by Magistrate Judge Maas.  On January 5, 2017, Judge Maas ordered the Trustee to produce all the trading records.  *See In re: Bernard L. Madoff,* Adv. Pro. No. 08-01789 (SMB) ECF No. 14807 at 3 ("To the extent there are any additional relevant records of securities trading that have not been made available . . . through Data Room 1, they must promptly be produced.").

Mr. Jacobs' recent explanation to this Court for his failure to produce such material

evidence was riddled with false statements:

> MR. JACOBS:  . . .I would like to correct the record.  There was never a motion to compel the trustee to produce any documents pending in this Court, that's a fiction.
>
> THE COURT:    But I thought I directed you to produce the documents.
>
> MR. JACOBS:  We said that when the Court allowed the deposition of Mr. Madoff for the specific, narrow purpose of examining as a preliminary matter, as a precursor to an omnibus fraud trial, the start date of the fraud and the Court opened the door to that evidence, we undertook a voluntary effort to search for and identify any material that we may have in BLMIS' possession that would evidence trading –
>
> THE COURT:  Did Ms. Chaitman –
>
> MR. JACOBS:  -- from that period.
>
> **THE COURT: -- did Ms. Chaitman ever ask for trading records in any of her discovery requests?**
>
> **MR. JACOBS:  She did.  She's been asking for trading records for a very long time, for a couple of years now, starting with the subpoena she served on the Depository Trust Clearing Company**.  That subpoena was limited in time for 2002 to 2008. We had already served our own subpoena on that entity and produced all of that material.  She later expanded the scope of that inquiry to periods prior to 2002.  We undertook a diligent and reasonable search for those records, there weren't any, so we didn't produce any.  Then the Court allowed Mr. Madoff's deposition on the narrow issue of the start date of the fraud.  **We voluntarily represented in both this Court and before Judge Maas, the discovery arbitrator, that we would voluntarily undertake an effort to look again for any third party verifiable trading records that would evidence real securities being bought or sold on behalf of IA customers and there weren't any.**  We have produced recently, in the past six months since we took all of these issues to the discovery arbitrator, a lot of additional documents, but **those are various iterations of BLMIS reports, very much like the customer statements, very much like the reports that are in the data room, very much like the tens of thousands, if not hundreds of thousands of documents we've already produced and made available in this litigation that we restored from microfilm at the cost of about half a million dollars in another**

> **attempt to try to find earlier trading records and they don't exist
> because there was no trading for those customers.**

Chaitman Exh. O, 5/31/17 Tr. at 17:4-18:25.

Despite his constant representations to this Court that the Trustee had produced all of the
trading records he had, Mr. Jacobs has now produced to the defendants over 4 1/2 million pages
of documents but the production does not appear to be complete. The last production made by the
Trustee was on April 26, 2017.  Defendants do not have any way of knowing if the Trustee has
now produced all trading records he had previously withheld from production.

### The newly-produced documents prove the falsity of the Trustee's representations to the Second Circuit that Madoff never purchased securities for his investment advisory customers

As set forth above, Mr. Edwards represented to this Court on May 31, 2017 that the newly-
produced documents are "various iterations of BLMIS reports, very much like the customer
statements, very much like the reports that are in the data room, very much like the tens of
thousands, if not hundreds of thousands of documents we've already produced and made available
in this litigation that we restored from microfilm at the cost of about half a million dollars in
another attempt to try to find earlier trading records and they don't exist because there was no
trading for those customers." *Id.* at 18:17-25.

Nothing could be further from the truth.  To take just a few examples, the Trustee has now
produced the January 31, 1983 statement of securities held in custody by National Bank of North
America.  *See* Chaitman Exh. P.  This document shows securities positions that Madoff had in
Lear Siegler and MCI.  Aaron Blecker's customer statements from the period from 8/31/82-
2/28/83 show transactions in these very securities.  *See* Chaitman Exh. Q.

Similarly, the Blecker customer statements from 2/28/85-5/31/85 show transactions
involving AMR, Atlantic Richfield, Interco, and Associated Dry Goods.  *See* Chaitman Exh. R.

The National Westminster Bank inventory of securities held in custody dated April 30, 1985 shows that Madoff held positions in every one of these companies.  *See* Chaitman Exh. Z.

To take just one further example – and the Court should understand that Defendants have only just begun an analysis of the millions of pages of documents the Trustee has produced in the past few months – the Trustee has always insisted that Madoff never purchased any securities for the clients of Avellino & Bienes.  Yet, a statement of securities held by National Bank of North America shows securities held in custody as of 12/14/82 for Avellino & Bienes.  *See* Chaitman Exh. S at MF00843942.

If, as Defendants  now believe, Madoff is telling the truth that he did purchase securities for all of his customers who were in convertible arbitrage trading – even through 1997 – the Trustee will have to revalue the claims of all customers whose accounts were in convertible arbitrage to give them credit for all profits earned in their accounts.  To not do so would be to allow SIPC and the Trustee to benefit from a deliberate concealment of material evidence spanning a period of more than eight years.

### The Trustee's misrepresentations about Madoff's purchase of securities with investment advisory customers' money

The Trustee has represented to this Court and to the District Court and the Second Circuit that Madoff never purchased any securities with the money invested by the investment advisory customers.  Even for the period of the split strike conversion strategy, this representation now appears to be false.  Although Madoff admitted, both in his plea and in his deposition, that he did not buy the basket of Fortune 100 company securities shown on the split strike statements, Madoff testified that he used the investment advisory customers' money to maintain a portfolio of up to $6 billion of United States Treasury securities.  It happens that United States Treasury securities appeared consistently on the statements of the investment advisory customers who were in the split

strike conversion strategy.  Moreover, it is impossible that the Trustee was not aware of this fact, because it is evidenced by the following documents:

a.    As the Trustee has always explained, Madoff maintained the account for the investment advisory customers at JPMorgan Chase ("JPMC").

b.    Madoff testified that, from the time he started the split strike conversion strategy, he maintained a portfolio of Treasury securities, purchased with investment advisory customers' money.  He testified that Frank DiPascali, Eric Lipkin and Robert Romer were authorized to purchase Treasury securities and that these securities were held by five institutions:  Morgan Stanley, Lehman Brothers, Bear Stearns, Fidelity, and JPMC.  Chaitman Exh. G, Madoff Dep. Tr. 4/26/17 at 27:16-28:13; 29:6-22.

c.    While defendants have not yet been able to locate the Lehman Brothers statements, the documentary evidence of Madoff's ownership of these Treasury securities includes monthly statements from Morgan Stanley, Bear Stearns, Fidelity and JPMC.  *See, e.g*., Chaitman Exh. T (Morgan Stanley); Chaitman Exh. U (Bear Stearns); Chaitman Exh. V (Fidelity); and Chaitman Exh. W (JPMC).

d.    While the Trustee has refused to produce unredacted statements of the 703 account, it is clear that Madoff used investment advisory customers' money to make investments and it is also clear that the Trustee redacted information on the JPMC statements to conceal this fact.  To take just one example, *see* Chaitman Exh. X, the December 2003 statement for the JPMC account ending in "703,"  pages showing the purchase of hundreds of millions of dollars of securities are evidenced on JPMSAB0000799, 803, 806, 807, 808, 811, 814, 815, 817, 820, 823, 825, 827, 829, 830, 832, 833, 835, 839, 843, 846, 850, 854, 859.

e.      Defendants have uncovered in the Trustee's recent production massive lists of securities held by Madoff which appear to have been generated by the National Securities Clearing Corp. (the "NSCC").   The lists are titled "National Securities Clearing Corp. Buyer Trade Reporting Blotter."   The NSCC, originally created in 1976, is a registered clearing corporation regulated by the SEC, which provided continuous net settlement services to the securities industry. The NSCC has been merged into the DTC.   *See, e.g.,* Chaitman Exh. Y.

## **CONCLUSION**

### **The defendants should be given a full opportunity to develop a factual record**

For the last eight-and-one-half years, the Trustee has engaged in a shocking concealment of material evidence from the courts, the defendants, and the customer body.   Aside from other sanctions that may be appropriate in individual cases, at a minimum all of the clawback defendants are entitled at this point to the following relief:

1.   A clear and unambiguous order that the Trustee must produce, and put into the E-Data Room, all Madoff documents for any time period from 1980 through 2008.

2.   An order permitting the defendants to depose the Trustee and all members of his staff who were involved in the concealment of evidence;

3.   An extension of the fact discovery period sufficient to allow the Trustee to produce all trading records and for the defendants to take discovery of former Madoff traders and of Mr. Madoff and possibly others, based on these records.

Dated: New York, New York
        June 26, 2017

**CHAITMAN LLP**

By:   /s/ *Helen Davis Chaitman*
      Helen Davis Chaitman
      465 Park Avenue
      New York, New York 10022
      Phone & Fax: (888)-759-1114
      hchaitman@chaitmanllp.com

      *Attorneys for Defendants listed on Exhibit A
      to Notice of Motion [ECF 13603-1]*

**CHAITMAN LLP**
Helen Davis Chaitman
465 Park Avenue
New York, New York 10022
Phone & Fax: 888-759-1114
hchaitman@chaitmanllp.com

*Attorneys for Defendants on Exhibit A to Notice of
Motion [ECF 13603-1]*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-1789 (SMB) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| v. | |
| DEFENDANTS LISTED ON EXHIBIT A TO NOTICE OF MOTION [ECF 13603-1], | |
| Defendants. | |

## <u>DECLARATION OF HELEN DAVIS CHAITMAN</u>

I, Helen Davis Chaitman, hereby declare, under penalty of perjury pursuant to 28 U.S.C.

§1746, as follows:

1.      I am a partner with Chaitman LLP, counsel to numerous clawback defendants ("Defendants").  I am a member of the bars of New York and New Jersey, and of this Court.

2.      I submit this declaration in further support of Defendants' request to depose Bernard L. Madoff on Day 2 deposition topics.

3.      Attached hereto as **Exhibit A** is a true and accurate copy of *Picard v. Wilenitz* Adv. Pro. No. 10-04995 (SMB) Defendants' First Set of Document Demands and Interrogatories to the Trustee dated March 8, 2016.

4.      Attached hereto as **Exhibit B** is a true and accurate copy of *Picard v. Wilenitz* Adv. Pro. No. 10-04995 SMB) ECF 68 Defendants' Notice of Motion dated August 29, 2016

5.      Attached hereto as **Exhibit C** is a true and accurate copy of TRI Microfilm Records Certification dated march 2, 1988.

6.      Attached hereto as **Exhibit D** is a true and accurate copy of Baker & Hostetler LLP letters dated March 6, 2017 and December 15, 2016.

7.      Attached hereto as **Exhibit E** is a true and accurate copy of Plea Allocution of Bernard L. Madoff, *United States v. Madoff,* No. 09-CR-213 (S.D.N.Y. March 12, 2009).

8.      Attached hereto as **Exhibit F** is a true and accurate copy of Plea Allocution of Frank DiPascali, Jr., *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009).

9.      Attached hereto as **Exhibit G** is a true and accurate copy of Deposition Transcript of Bernard L. Madoff dated April 26, 2017.

10.     Attached hereto as **Exhibit H** is a true and accurate copy of *United States v. Bonventre et al.,* (10-cr-228), trial transcript dated October 20, 2013.

11.     Attached hereto as **Exhibit I** is a true and accurate copy of redacted Deposition Transcript of Bernard L. Madoff dated December 20, 2016.

12.     Attached hereto as **Exhibit J** is a true and accurate copy of Expert Report Appendix "B" Listing of Documents Considered by Bruce G. Dubinsky.

13.     Attached hereto as **Exhibit K** is a true and accurate copy of Expert Rebuttal Report of William Feingold dated May 11, 2017.

14.     Attached hereto as **Exhibit L** is a true and accurate copy of Declaration of Steve Maslow dated May 11, 2017.

15.     Attached hereto as **Exhibit M** is a true and accurate copy of *In re Madoff* 08-01789 (SMB) Hearing Transcript dated May 17, 2016.

16.     Attached hereto as **Exhibit N** is a true and accurate copy of *Picard v. Wilenitz* 10-04995 (SMB) Trustee Irving H. Picard's Responses and Objections to Defendants' Document Demand and Interrogatories dated April 8, 2016.

17.     Attached hereto as **Exhibit O** is a true and accurate copy of *In re Madoff* 08-01789 (SMB) Hearing Transcript dated May 31, 2017.

18.     Attached hereto as **Exhibit P** is a true and accurate copy of National Bank of North America Statement Dated January 31, 1983.

19.     Attached hereto as **Exhibit Q** is a true and accurate copy of Arthur & Sofie Blecker customer statements from the period from August 31, 1982 – February 28, 1983.

20.     Attached hereto as **Exhibit R** is a true and accurate copy of Arthur & Sofie Blecker customer statements from February 28, 1985 – May 31, 1985.

21.     Attached hereto as **Exhibit S** is a true and accurate copy of statement of securities held by National Bank of North America shows securities held in custody as of December 14, 1982 for Avellino & Bienes (MF00843942).

{00031144 1 }

22.     Attached hereto as **Exhibit T** is a true and accurate copy of Morgan Stanley Statement dated November 30, 2000.

23.     Attached hereto as **Exhibit U** is a true and accurate copy of Bear Stearns Statement dated November 30, 2001.

24.     Attached hereto as **Exhibit V** is a true and accurate copy of Fidelity Statement dated February 29, 2000.

25.     Attached hereto as **Exhibit W** is a true and accurate copy of Chase Manhattan Bank Statement dated December 31, 2001.

26.     Attached hereto as **Exhibit X** is a true and accurate copy of JPMorgan Chase Statement dated December 31, 2003.

27.     Attached hereto as **Exhibit Y** is a true and accurate copy of National Securities Clearing Corp. Buyer Trade Reporting Blotter from December 12 1986 – March 19, 1987.

28.     Attached hereto as **Exhibit Z** is a true and accurate copy of National Westminster Bank inventory of securities held in custody dated April 30, 1985.

29.     Attached hereto as **Exhibit AA** is a true and accurate copy of Michael A. Sabella email dated June 25, 2017 11:33 AM.

I declare under penalty of perjury that the foregoing is true and correct.


June 26, 2017                                          /s/ Helen Davis Chaitman