UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

In re:                                          :
                                                :
BERNARD L. MADOFF INVESTMENT                    :          Adv. Proc. No. 08-01789 (SMB)
SECURITIES LLC,                                 :          SIPA LIQUIDATION
                                                :
                        Debtor.                 :
------------------------------------------------------X
IRVING H. PICARD, Trustee for the               :
Liquidation of Bernard L. Madoff Investment     :
Securities LLC,                                 :
                                                :
                        Plaintiff,              :
                                                :
            -against-                           :
                                                :          Adv. Proc. No. 10-05279 (SMB)
MAGNIFY INC.; PREMERO INVESTMENTS              :
LTD.; STRAND INTERNATIONAL                      :
INVESTMENTS LTD.; THE YESHAYA                   :
HOROWITZ ASSOCIATION; YAIR GREEN;               :
and EXPRESS ENTERPRISES INC.,                   :
                                                :
                        Defendants.             :
------------------------------------------------------X

## MEMORANDUM DECISION DENYING MOTION TO DISMISS

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
*Attorneys for Plaintiff, Irving H. Picard,*
  *Trustee for the Liquidation of*
  *Bernard L. Madoff Investment Securities LLC*
45 Rockefeller Plaza
New York, NY 10111

        David J. Sheehan, Esq.
        Tracy L. Cole, Esq.
        Fernando A. Bohorquez, Esq.
        David M. McMillan, Esq.
        Michelle N. Tanney, Esq.
        Joshua B. Rog, Esq.

                Of Counsel

DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for Defendants*
605 Third Avenue, 34th Floor
New York, NY 10158

> Michael Wexelbaum, Esq.
> Larry Hutcher, Esq.
> Michael Katz, Esq.
>
> Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

As great oaks from little acorns grow so too did the Defendants' accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS") — or so it seemed. During a twenty-five year period, the Defendants deposited roughly $5.4 million in their BLMIS accounts, withdrew nearly $154 million (the "Transfers"), and in 2009, filed net equity customer claims of approximately $839 million for the balance supposedly undrawn. Plaintiff Irving H. Picard, as trustee (the "Trustee") for the liquidation of BLMIS under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA") sued the Defendants to avoid and recover the value of the Transfers and disallow and equitably subordinate their net equity customer claims. (*See Second Amended Complaint*, dated Sept. 29, 2017 ("SAC") (ECF Doc. # 143).)[1]

The Defendants have moved to dismiss the SAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, for failure to state a claim upon which relief can be granted. For the reasons that follow, the motion is denied.

---

[1]   "ECF Doc. #" refers to the electronic docket in this adversary proceeding.

## BACKGROUND

Bernard Madoff, operating BLMIS first as a sole proprietorship and then as a limited liability company, ran a Ponzi scheme by which he induced investors to entrust their money with BLMIS for investment in the financial markets with the promise or expectation of significant returns regardless of the direction the markets took.  (¶ 25.)[2] In fact, while the Ponzi scheme operated, Madoff did not invest any funds entrusted with him, and instead, used customer deposits to pay redemption requests made by other BLMIS investors.  (¶¶ 29, 32.)  He was arrested in December 2008, (¶ 15), pled guilty in March 2009 and was sentenced to 150 years in prison.  (¶ 25.)  Other employees of BLMIS were also arrested and either pled guilty or were convicted after trial relating to their criminal activities perpetrated through BLMIS.  (¶¶ 26, 27, 28.)

### A.    Magnify and Yair Green

The origin of the Trustee's claims in this case begins with the Defendant Magnify Inc. ("Magnify").  Magnify, a Panamanian corporation, opened Account No. 1FN024 (the "Magnify I Account")[3] with BLMIS in 1983, depositing $3,136,150.  (¶ 2; SAC, Ex. B, at 1 of 51.)[4]  Magnify was formed by Kurt Brunner, a Swiss attorney, who until April 2016, was listed as Magnify's Chairman and Managing Director, but Brunner did not exercise any actual control or decision-making authority over Magnify.  (¶¶ 39, 49-51.) Instead, Magnify's creator, Albert Igoin, a French banker who was one of Madoff's

---

[2]      The parenthetical "(¶ ___)" refers to paragraphs in the SAC.

[3]      At some point, BLMIS switched from a numeric to an alphanumeric numbering system pertaining to the BLMIS accounts.  The Magnify I Account was initially numbered 1-05105-3-0.  (¶ 38 n. 3.)

[4]      The citation "1 of 51" and similar citations refer to the numbers imprinted at the top of a page by the Court's CM/ECF system.

oldest and largest customers as well as a social acquaintance, controlled Magnify, at least until December 1989.  (¶¶ 2, 48.)

Between the time of its creation and March 1989, the withdrawals from the Magnify I Account were not particularly significant compared to what came later. During these first six years, approximately $320,000 was withdrawn, leaving $2,816,661 of the original deposit still in the account.  (SAC, Ex. B, at 5 of 51.)  In the late 1980s, Igoin asked the Defendant Yair Green, an Israeli lawyer, to create and register an Israeli association to handle Igoin's planned charitable contributions in Israel.  (¶ 53.)  Green filed registration papers with the Israeli Registrar of Associations for the Defendant Yeshaya Horowitz Association ("YHA") on or around May 4, 1988.  (¶ 53.)  On March 17, 1989, Green opened Account No. 1FN037 (the "YHA Account") for YHA at BLMIS which was funded by an inter-account transfer[5] of $3 million from the Magnify I Account.  (¶ 53.)  As noted, the account contained only $2,816,661, and the balance of the transfer consisted of fictitious profits.  (See SAC, Ex. B, at 5 of 51.)  As a result of the transfer, no actual cash remained in the Magnify I Account, and despite the significant withdrawals described below, no additional funds were ever deposited.

According to the SAC, Green assumed control of Magnify and YHA following a December 14, 1989 meeting with Igoin and Brunner.  At the meeting, Igoin introduced Green to Brunner as "the person that then would deal with the fate of Magnify." (¶ 56.)[6]

---

[5]    The use of the term "transfer" in connection with inter-account transfers is for convenience only, and does not imply that a "transfer" took place within the meaning of 11 U.S.C. § 101(54).  In fact, no transfer of funds took place and the "transferee" received no credit to the extent an inter-account transfer consisted of fictitious profits.  See Sagor v. Picard (In re BLMIS), 697 F. App'x 708, 711-12 (2d Cir. 2017).

[6]    The quote comes from a deposition of Brunner taken in this adversary proceeding.  (See Affidavit of Yair Green in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, sworn to Oct. 26, 2017 ("Green Affidavit"), Ex. E (ECF Doc. # 150).)  The Defendants submitted extracts of the

At Igoin's direction, Brunner prepared board minutes and an "Assignment of Transfer,"

transferring ownership of Magnify to YHA by delivering Magnify's bearer shares to

Green.  (¶ 56.)  After that meeting, Brunner had no further contact with Igoin on any

matter, and dealt only with Green concerning Magnify.  (¶¶ 56, 115, 121.)  Green

authored all corporate resolutions for Magnify, and Magnify's other nominal officers

and directors prior to BLMIS's collapse had no function other than to sign corporate

documentation when necessary, and they had no involvement with the Magnify

Accounts (defined below).  (¶ 121.)

In addition to incorporating YHA, Green served as its "legal representative" or

legal counsel from its inception.  (¶ 55.)  Green also held himself out as a co-founder of

YHA, who "guided the organization's activities and . . . contributed significant sums for

scientific and medical research throughout Israel."[7]  (¶ 55.)  Organizations would

request funding from Green, and after YHA's board (Green was not a member)

approved a request, Green negotiated and drafted the funding agreements over which he

exercised total control.  (¶ 142.)  Green also signed many of the grant agreements, not in

---

Brunner deposition to support their contention that Igoin intended to transfer control to Green only after
his death, which occurred in January 1995.  (*See* ¶ 48.)  While Igoin had earlier expressed concerns to
Brunner about a succession plan after his death, (*see Green Affidavit*, Ex. E, at 91:11-16), the referenced
quote and another statement by Brunner support the Trustee's theory that Igoin surrendered control of
Magnify and YHA to Green at that meeting.  (*See id.*, Ex. E, at 93:24-94:2 ("And for me it was clear that
with Mr. Igoin's visit, that that was the last contact, because he also said farewell to this business.").)
Assuming it is even proper to consider the Brunner transcript, it does not support the Defendants'
argument for the dismissal of the SAC.

[7]      The SAC did not attribute this quote to a specific source.  The Court questioned the Trustee's
counsel about the source at oral argument, and was informed that the quote was taken from Green's bio
included in the materials relating to a Milken Institute global conference.

his capacity as YHA's attorney, but as the "trustee" for an anonymous donor, who had discretion over the terms and amount of the grant on the donor's behalf. (¶ 143.)

Between the time of YHA's formation and the collapse of BLMIS, Magnify transferred over $120 million in fictitious profits to YHA[8] which YHA used to fund the beneficiaries of YHA's generosity including prominent hospitals, universities, and research institutions in Israel. (¶¶ 5, 8.) For example, YHA gave Bar Ilan University and Ben Gurion University grants totaling more than $28 million. (¶ 8.) Green personally benefitted from YHA's largesse. In return, he received honorary doctorates from both institutions, and was appointed to Ben Gurion University's investment and management committees. (¶ 8.) In addition, Hebrew University, which employed two YHA board members, received $36 million from YHA. (¶ 8.)

Green created several other entities that either held BLMIS accounts or benefitted from them. Over the years, he formed Defendants Premero Investments Ltd. ("Premero") and Strand International Investments Ltd. ("Strand"), and ultimately opened two BLMIS accounts for Premero (the "Premero I Account" and the "Premero II Account," and together, the "Premero Accounts") and one for Strand (the "Strand Account"). (¶ 63.) Although Brunner was at all relevant times Strand's "Sole Director," Green managed the Strand Account and dealt directly with BLMIS on all account activity. (¶ 117.) Green also opened bank accounts for Strand in Switzerland and Israel through which he diverted fictitious profits from BLMIS for his personal use. (¶ 117.) And in 1992, Green directed Brunner to create Defendant Express Enterprises Inc.

---

[8] No actual cash was ever deposited into the YHA Account after the initial transfer from the Magnify I Account. (*See* SAC, Ex. B, at 11-48 of 51.)

("Express"), and Express received $1 million directly from BLMIS in the form of redemptions from the Strand and Magnify Accounts.  (¶ 64.)

One additional account was created.  In September 1990, a second Magnify account (the "Magnify II Account," and together with the Magnify I Account, the "Magnify Accounts") was created without any initial deposit or account opening documents such as a Customer Agreement, Options Agreement and a Trading Authorization Limited to Purchases and Sales of Securities and Options that other BLMIS customers typically executed.  (¶ 80 & n. 5.)  Instead, BLMIS "funded" the Magnify II Account with a backdated trade of approximately $120 million, evidenced by fake trade confirmations.  (¶¶ 82-87.)  The September 1990 monthly statement, which started with a zero balance, was funded with a sale of roughly $120 million of MCI stock in *May.*  The monthly statement listed a host of other *May* purchases and two purchases of MCI stock in *October.*  The trade confirmations indicate that Magnify purchased the stock (which it supposedly sold to fund the account) in October *1986*, or four years before the Magnify II Account was opened, and listed an address for BLMIS that it did not move to until 1987.  (¶ 85.)

## B.    Green Obtains Personal Benefits

As noted, Green garnered accolades and honoraria as a result of YHA's philanthropy.  But he also benefitted in more concrete ways.  After Igoin's death in January 1995, Green drafted an agreement (the "Fee Agreement") between himself and Magnify appointing himself the manager and supervisor of Magnify's investment portfolio, which consisted solely of the Magnify Accounts, in exchange for a percentage of Magnify's purported profits.  At Green's request, Brunner signed the Fee Agreement

7

on Magnify's behalf.  (¶ 69.)  Although the Fee Agreement was dated July 26, 1996,

Green represented in the Fee Agreement that he undertook his duties "as of January

1995," making the fees retroactive to that date.  (¶ 69.)  Green admitted to receiving a

BLMIS transfer of $3.15 million in 2002 pursuant to the Fee Agreement.  (¶ 71.)

     Green also withdrew approximately $15 million from the Magnify and Strand

Accounts, and redirected the withdrawals to entities and individuals that benefitted

himself, his family, and others having no relationship to YHA.  These included nearly

$1.5 million transferred from the Strand Account to his children, other individuals

affiliated with Green in Israel, and an investment fund in the Cayman Islands.  (¶¶ 72,

119.)  Green transferred almost all of the remainder of the $15 million to bank accounts

in Magnify's and Strand's names in Israel and Switzerland, and Green made personal

use of these funds, including the transfer of approximately $3 million to offshore

investment funds, and hundreds of thousands of dollars to Green's children, his

secretary (who was also the co-founder of Green's charitable foundation) and other

affiliates.  (¶¶ 73, 119.)  In addition, Green used Magnify's account at Bank Hapoalim as

collateral for a personal debt, (¶¶ 61, 120), and represented to HSBC that he was

Strand's beneficial owner in order to obtain a mortgage to buy his daughter a home in

Maryland.  (¶¶ 63, 120.)  He also used a withdrawal from the Strand Account to buy an

apartment in Israel for one of his business associates.  (¶ 120.)  Finally, between

February of 1996 and May of 2000, Green periodically wrote to BLMIS requesting

withdrawals totaling at least $1,070,000 from the Magnify Accounts to finance

Magnify's "ongoing activities," but Magnify, a shell investment vehicle with minimal

operating expenses, did not need such funds to finance any ongoing activities.  (¶ 74.)

### C.    The Accounts Reporting

BLMIS generated monthly customer account statements for the Magnify I
Account when it was first opened, and generated a monthly statement for the Magnify II
Account, at least for September 1990.  Green also knew that other BLMIS customers,
including YHA, received monthly customer statements detailing supposed trading
information for that month.  (¶¶ 76, 106.)

By the early-1990s, BLMIS dispensed with monthly customer account statements
for the Defendants' Accounts (other than YHA)[9], and instead, began providing Green
with "Portfolio Evaluations."  (¶¶ 90, 133, 136.)  Unlike the monthly customer
statements, the Portfolio Evaluations were produced two times each year, dated "as of"
June 30 or December 31 of each year.  (¶ 92.)  They contained no historical information
or any transaction details for any security allegedly bought or sold during the relevant
six-month period, such as trade dates, settlement dates or trade prices.  (¶ 90.)  During
most of the 1990s, the Portfolio Evaluations itemized a list of various stocks similar to
those supposedly traded in other customer accounts, but after 1999, the Portfolio
Evaluations listed only holdings of U.S. Treasury Bills or Fidelity money market mutual
funds and no stocks or other equities.  (¶ 99.)  BLMIS never provided the missing details
or purported trading activity to Magnify, Premero or Strand, and the gains could not be

---

[9]    YHA continued to receive monthly customer statements and trade confirmations.  It was
registered as an association with the Israeli Registrar of Associations, was required to provide and file
annual financial reports, and its account records were subject to review or audit by the Israeli government
and others unaffiliated with YHA or BLMIS.  (¶ 106.)

explained by holding Treasury bills to maturity or investing in Fidelity mutual funds. (¶¶ 100-01.)

The Portfolio Evaluations were also a collaborative work.  By 1993, if not earlier, Green began meeting with Madoff personally two to three times each year to discuss Magnify's (and later Premero's and Strand's) Accounts and prepare and revise the draft Portfolio Evaluations that had been prepared prior to the meetings. (¶¶ 92, 95, 116; *see* ¶ 133.)  Upon Green's arrival, he would meet with Madoff and Frank DiPascali behind closed doors to agree on the rate of return, and DiPascali would emerge with revised Portfolio Evaluations which, the SAC alleges upon information and belief, were directed by Green.  (¶¶ 97, 98.)  After the meeting,  Madoff often directed Green to Madoff's secretary to dictate letters requesting withdrawals or  transfers from the Magnify, Strand, and Premero Accounts.  (¶ 98.)   At Green's request, Madoff's secretary prepared letters of instruction to BLMIS and printed these documents on Green's law firm's own letterhead.  (¶ 98.)  The SAC alleges, on information and belief, that on at least one occasion, Green and Madoff agreed to backdate a letter typed by Madoff's secretary so that the letter would appear to pre-date their meeting.  (¶ 98.)  Madoff's secretary was then instructed to delete and leave no electronic record of these letters after they were generated.  (¶ 98.)

The Portfolio Evaluations were the only records of the activity in and the value of these accounts after 1992, and although the Fee Agreement required Green to set investment policies and ensure their implementation, manage and safeguard Magnify's portfolio, and supervise the movement of funds, Green never examined—nor had the "opportunity" to examine—individual trades in the non-YHA Accounts.  (¶¶ 101-02.)

10

Once the Portfolio Evaluations became the sole account records provided for the
Magnify Accounts, Green never requested—and BLMIS did not provide—confirmation
of any of the transfers or any other cash activity in these accounts.  (¶ 103.)  Finally,
although BLMIS purported to make deductions for the payment of foreign withholding
taxes on certain dividends for other customers, BLMIS eventually stopped reporting any
dividend or withholding tax transactions to Green, stopped purporting to make
payments to the IRS on Magnify's behalf for foreign withholding tax, and gave Green no
records to assess Magnify's potential tax liability.  (¶ 104.)

## D.    The Initial Transfers from BLMIS

The following table summarizes the Transfers that form the basis of the Trustee's
claims:

| Account No. | Account | 90 day Transfers | Two Year Transfers | Six Year Transfers | Total Transfers |
|---|---|---|---|---|---|
| 1FN024 | Magnify I | 0 | 700,000 | 2,450,000 | 7,603,549 |
| 1FN025 | Magnify II | 0 | 0 | 150,000 | 4,745,822 |
| 1FN037 | YHA | 1,900,000 | 24,000,000 | 77,580,000 | 126,489,846 |
| 1FN073 | Premero I | 0 | 2,500,000[10] | 2,500,000 | 2,731,065 |
| 1FN097 | Premero II | 0 | 0 | 0 | 421,770 |
| 1FR051 | Strand | 0 | 2,600,000 | 4,800,000 | 11,730,019 |
| | | 1,900,000 | 29,800,000 | 87,480,000 | 153,722,071 |

---

[10]    The Trustee settled with Premero and two other parties.  Pursuant to the settlement, the Trustee
acknowledges that, under Section 550(a) of the Bankruptcy Code, he is deemed to have recovered
$1,031,098.00 in fictitious profits with respect to the 1FN073 account for the benefit of the consolidated
BLMIS estate.  The Trustee is not seeking to recover this amount from the Defendants.  (¶ 148 n. 7.)

(SAC, Ex. A.)  In addition, in or around 1992, Express received $1 million directly from BLMIS as redemptions from the Strand and Magnify Accounts.  (¶¶ 64, 153(b), (c).)

Against the $153,722,071 withdrawn, cash deposits totaled just $5,436,098.  In addition to the initial, 1983 deposit that funded the Magnify I Account, $1,799,948 was deposited into the Premero Accounts between April 1995 and June 1998, (SAC, Ex. B, at 49-50 of 51), and $500,000 was deposited into the Strand Account on January 28, 2002.  (SAC, Ex. B, at 51 of 51.)

### E.    The Defendants' Net Equity Claims

Green filed customer net equity claims with the Trustee on behalf of the Magnify I and II Accounts, the Premero I and II Accounts and the Strand Account, and Ayala Nahir, YHA's Treasurer (as well as Chairperson and Director of Magnify) filed a customer claim with the Trustee on behalf of YHA.  The following table summarizes the claims:[11]

| Account | Net Equity Claim |
|---|---|
| Magnify I | 1,145,805.83 |
| Magnify II | 768,127,744.66 |
| YHA | 51,543,614.10 |
| Premero I | 1,600,185.00 |
| Premero II | 6,309,214.00 |
| Strand | 10,335,528.26 |
| **Total** | **839,062,091.85** |

---

[11]    The SAC refers to the submission of the net equity claims and seeks to disallow them under 11 U.S.C. § 502(d), but did not attach the claims to the SAC.  The Defendants submitted the YHA customer claim with their opposition, (*Green Affidavit*, Ex. F), and at the Court's request, the Trustee filed all of the customer claims on the docket.  (*See* ECF Doc. # 163.)

Each customer claim was denied by the Trustee, and each defendant objected to the Trustee's determination.  (¶¶ 165-68; SAC, Ex. C.)

**F.      The Trustee's Claims for Relief and the Motion to Dismiss**

The SAC asserts claims to avoid and recover the Transfers to Magnify, YHA, Premero, Strand and Express as actual fraudulent and constructive fraudulent transfers under the Bankruptcy Code and New York Debtor and Creditor Law and to disallow the customer claims pursuant to 11 U.S.C. § 502(d) (Counts One through Seven).  The Trustee also seeks to hold Green liable as the alter ego of Magnify and Strand for their debts.  In addition to the fraudulent transfer claims, the SAC seeks to avoid and recover a preference from YHA (Count Eight) and to equitably subordinate the customer claims (Count Nine).

The Defendants have moved to dismiss the SAC for failure to state a claim upon which relief can be granted.  They mainly argue that the SAC fails to adequately allege that they had actual knowledge that BLMIS was not engaged in trading securities or that they received the Transfers in bad faith.  (*Defendants' Memorandum of Law in Support of Motion to Dismiss Plaintiff's Second Amended Complaint*, dated Oct. 30, 2017 ("*Defendants Memo*"), at 11-43 (ECF Doc. # 152).)  In addition, Premero argues that the intentional fraudulent transfer claim in Count One directed at the Premero I Account must be dismissed because the claim seeks to recover transfers of principal rather than fictitious profits.  Because the SAC does not allege Premero's lack of good faith, it has a complete defense under 11 U.S.C. § 548(c).  (*Id.* at 43-51.)  Next, Green contends that the SAC fails to adequately plead alter ego liability for the transfers to Magnify and

Strand. (*Id.* at 51-65.)  The Defendants also argue that the SAC fails to allege facts showing a partnership between Green and Igoin, (*id.* at 66-68), an argument aimed at a statement in a single sentence in paragraph 2 of the SAC that is irrelevant to the claims asserted by the Trustee and will not be considered further.  In addition, the Defendants maintain that claims based on transfers made prior to January 1, 2001, the date BLMIS converted from Madoff's sole proprietorship to a limited liability company, should be dismissed, (*id.* at 68-69), but the parties have agreed to stay the litigation of this issue pending the Court's decision relating to the balance of the motion.  (*See Stipulation and Order Modifying Scheduling Order*, dated Dec. 13, 2017, at ¶¶ 4, 5 (ECF Doc. # 155).)  Finally, the Defendants argue that the SAC fails to allege a legally sufficient equitable subordination claim.  (*Defendants Memo* at 69-70.)

## DISCUSSION

### A.    Standard Governing Motion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 556.  The court should assume the veracity of all "well-pleaded factual allegations," and determine whether, together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S. at 679.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is deemed to include any written instrument attached to it as an exhibit, documents incorporated in it by reference, and other documents "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (citations omitted); *accord Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992). A document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous information and relied on it in framing the complaint. *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153). However, "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *accord Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008).

The Defendants submitted the thirty-eight page *Green Affidavit* in support of their motion to dismiss to rebut the allegations in the SAC. The Court has not treated the Defendants' motion to dismiss under Rule 12(b)(6) as a motion for summary judgment, *see* FED. R. CIV. P. 12(d), and will not consider the *Green Affidavit*.

The *Green Affidavit* also attached thirty-two documents. The Court will consider the documents to the extent they are "integral" to the SAC. These include the Portfolio

15

Evaluations.  Whether the Brunner deposition transcript is integral to the SAC based on the Trustee's quotation of a single line is an open question, but as noted in a prior footnote, the relevant parts of the Brunner deposition transcript cited by the Defendants do not support dismissal, and even if they raised a factual issue, the Court does not resolve factual disputes on a motion to dismiss under Rule 12(b)(6).  Except as noted, the Court will not otherwise consider Green's documents for the same reason it will not consider his affidavit.

**B.      Counts One through Eight**

Count One of the SAC asserts intentional fraudulent transfer claims under 11 U.S.C. § 548(a)(1)(A).  Counts Two through Seven assert constructive fraudulent transfer claims under Bankruptcy Code § 548(a)(1)(B) and intentional and constructive fraudulent transfer claims under the New York Debtor and Creditor Law, §§ 270, *et. seq.* Count Eight asserts a preference claim against YHA.  In light of the safe harbor granted under 11 U.S.C. § 546(e),[12] the Trustee may only avoid and recover intentional fraudulent transfers asserted in Count One, *Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773 F.3d 411, 423 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015); *Picard v. Katz*, 462 B.R. 447, 452 (S.D.N.Y. 2011) ("*Katz*"), *abrogated on other grounds by SIPC v. BLMIS* (*In re BLMIS*), 513 B.R. 437 (S.D.N.Y. 2014), unless the transferee had

---

[12]      Bankruptcy Code § 546(e) states in relevant part:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . .  settlement payment, . . . or that is a transfer made by or to (or for the benefit of) a . . . stockbroker . . .  in connection with a securities contract . . . except under section 548(a)(1)(A) of this title.

The parties submitted their memoranda before the Supreme Court decided *Merit Mgmt. Grp. v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018), which limited the reach of section 546(e), but neither side has suggested that *Merit* changes the analysis.

actual knowledge of Madoff's Ponzi scheme, or more generally, "actual knowledge that there were no actual securities transactions being conducted." *SIPC v. BLMIS* (*In re BLMIS*), No. 12 MC 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013). In that event, the Trustee can avoid and recover preferences and actual and constructive fraudulent transfers to the full extent permitted under state and federal law. *See id.*, at *6.

The transferee's knowledge is also relevant under 11 U.S.C. § 548(c). Section 548(c) provides a defense to a fraudulent transfer claim brought under Bankruptcy Code § 548(a) to the extent the transferee "takes for value and in good faith." 11 U.S.C. § 548(c). A transferee takes for value to the extent he withdraws his principal deposits from BLMIS. *Katz*, 462 B.R. at 453. To recover the transfer of principal deposits, the Trustee must plead the transferee's lack of subjective good faith which, in this SIPA case, means the transferee turned a blind eye to facts that suggested a high probability of fraud. *SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18, 21 (S.D.N.Y. 2014); *Katz*, 462 B.R. at 454-56; *Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117, 138-39 (Bankr. S.D.N.Y. 2014); *Picard v. Ceretti* (*In re BLMIS*), Adv. P. No. 09-01161 (SMB), 2015 WL 4734749, at *12 (Bankr. S.D.N.Y. Aug. 11, 2015), *leave to appeal denied*, 15 Civ. 7086 (JPO) (S.D.N.Y. Dec. 4, 2015). *A fortiori*, the transferee lacks good faith if he did not merely suspect fraud but actually knew of the fraud.

Although the Defendants strenuously argue that Green lacked actual knowledge about Madoff's Ponzi scheme, they do not seriously dispute that his knowledge is imputed to the Defendants. (*See Defendants Memo* at 12 ("In this case, the Trustee rests his entire case of actual knowledge upon what he claims to be the actual knowledge

17

of Green, which he then seeks to impute to all of the other Defendants. Thus, if the SAC fails to adequately allege that Green had the requisite actual knowledge, the Trustee's entire case on that issue falls apart like the house of cards it really is.").) Premero does argue that Green's knowledge cannot be imputed to it because Green acted as Premero's attorney, did not own Premero and took instructions from his client. (*Defendants Memo* at 50-51.) But Premero's refutation of Green's role or status is derived from the *Green Affidavit* which the Court will not consider.

Moreover, Premero's argument against imputation makes no sense. An attorney is the client's agent, *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994); *United States v. Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 986 F.2d 15, 20 (2d Cir. 1993), and in general, the information the attorney acquires material to the representation is imputed to the client. *Veal v. Geraci*, 23 F.3d at 725; *see Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010) ("Of particular importance is a fundamental principle that has informed the law of agency and corporations for centuries; namely, the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals."). Premero has not invoked any exception to this rule, such as the "adverse interest" exception, *see Kirschner*, 938 N.E.2d at 952-53, and in fact, Green did not act adversely to Premero by perpetuating a fraud from which Premero profited. *See id.* at 952 ("Where the agent is perpetrating a fraud that will benefit his principal, this rationale [which presumes that the agent will not communicate all material information to the principal] does not make sense.").

18

The SAC adequately alleges that Green controlled the Defendants and their
BLMIS Accounts, and used their assets for his personal financial benefit or his
reputation as a source of considerable charitable largesse and the accolades and
honoraria that accompanied YHA's generosity.  He controlled the Magnify Accounts
after December 1989 when Igoin introduced him to Brunner, he arranged the transfers
from the Magnify Accounts to the YHA Account, and managed the $120 million in
charitable contributions made by YHA.  He also formed Premero, Strand and Express,
for no apparent purpose except to provide cash when he needed it, and served as
Express' "Managing Director and/or authorized representative."  (¶¶ 43, 138 (quotation
marks in original).)  Finally, he alone met with Madoff and DiPascali regarding the
accounts and participated in the revision of the Portfolio Evaluations to insure that they
hit their mark.

In addition, the facts alleged in the SAC plausibly suggest that Green knew, at
least by late 1989 or 1990, that the money in the Accounts could not have resulted from
trading securities.  After December 1989, Green managed the Magnify I Account, the
only Account at the time.  Although no additional cash deposits were made into the
Magnify I Account, Green transferred tens of millions of dollars out of the account
beginning in January 1990, including $47,650,000 to the YHA Account (No. 1FN037).
(*See* SAC, Ex. B, at 6-8 of 51.)

In fact, the sheer growth of the Magnify Accounts and the other accounts was
mind-boggling.  Over a twenty-five year period, the Defendants' Accounts grew from
$5.4 million in deposits to nearly $1 billion based on the amounts withdrawn and the
amounts supposedly still in the accounts according to the customer claims.  This

19

translates to a return of about 23%, compounded annually, for each of the twenty-five years.[13]

If Green wondered where all the money was coming from, the circumstances surrounding the opening of the Magnify II Account (originally Account no. 1-05123-3) in September 1990 answered that question. Starting with a zero balance on September 1 (the statement says "No Balance Forward"), it grew to more than $100 million by the end of the month without a single deposit or inter-account transfer. Instead, the account was supposedly funded with a $120 million sale of MCI stock that occurred in May 1990, four months earlier. Moreover, according to the statement, the MCI securities sold in May 1990 were acquired in October, and the trade confirmations placed the acquisition in October 1986, four years before the Magnify II Account was opened. The statement also listed several other purchases that occurred in May 1990 before the account was opened. These were clearly fictitious transactions. The September 1990 statement coupled with the trade confirmations were bright red flags indicating fictitious trading activity, and it is not plausible that Green, the manager of the Magnify Accounts, missed them.

Allegations relating to the Portfolio Evaluations and Green's semi-annual meetings with Madoff and DiPascali lend further support to the conclusion that Green knew that BLMIS was not engaged in the actual trading of securities. By 1992, BLMIS had dispensed with sending the usual monthly customer statements regarding the

---

[13]    In fact, the returns were higher. The 23% return assumed that all $5.4 million was deposited on day one, and nothing was withdrawn during the twenty-five years. As noted, however, roughly $2.3 million was deposited during and after year twelve, and over $150 million was withdrawn from the accounts.

Magnify Accounts, and never sent any customer statements relating to the Premero or the Strand Accounts. Instead, BLMIS provided Green with semi-annual "Portfolio Evaluations" depicting the Defendants' Accounts' holdings (other than YHA) as of June 30 and December 31. Armed with draft Portfolio Evaluations, Green, Madoff and DiPascali met in private to discuss and revise the Portfolio Evaluations to reflect agreed upon returns. They would then arrange for fictitious letters of instruction on Green's letterhead requesting withdrawals and transfers from the accounts.

The information provided by BLMIS made it impossible for Green to do his job, but he did not seem to care. Green was responsible under the Fee Agreement, effective January 1995, to set Magnify's investment policies, manage and safeguard the funds it invested, follow-up to ensure the actual implementation of those policies, examine Magnify's earnings and supervise the movement of funds in its portfolio. The Portfolio Evaluations did not reflect any trading activity or deposits or withdrawals, and Green never received monthly statements or evidence of the transactions that BLMIS was supposedly executing on behalf of Magnify. He was content with the Portfolio Evaluations he received twice a year that purported to show Magnify's positions without showing the trading that led to them. In short, it was impossible for Green to perform his duties under the Fee Agreement, for which he received over $3 million, in light of the information BLMIS was providing. A fair inference is that both he and Madoff knew that there was no trading activity to oversee, and disregarded even the semblance of any actual trading.

In addition, BLMIS did not provide Green with the information necessary to prepare and pay the taxes on all of the profitable trades and dividend income that

supposedly fueled the growth in the Accounts.  Until 1995, BLMIS' records for the

Magnify accounts reflected reductions for the payment of withholding taxes on

dividends, identifying the stock and the amount of taxes withheld.  (*See* SAC, Ex. B, at 1-

7, 9 of 51.)  No further deductions appear in the Accounts after 1995, (*see* SAC, Ex. B, 7-

8, 9-10 of 51), and BLMIS never withheld taxes from the Premero or Strand Accounts.

(*See* SAC, Ex. B, at 49-51 of 51.)  In contrast, BLMIS continued to deduct withholding

taxes from the YHA Account which also continued to receive monthly customer

statements until the very end, (*see* SAC, Ex. B, at 11-47 of 51), presumably to satisfy the

reporting and oversight mandated by Israeli law.  As a result, Green had no records to

assess Magnify's potential tax liability.  (¶ 104.)  Once again, the plausible inference is

Green didn't care about the details because he knew there were no details.

The Defendants' opposition primarily focuses on the disposition of motions to

dismiss in other BLMIS-related avoidance actions brought by the Trustee, and argues

that this case is more like those in which the Court concluded that the Trustee had failed

to allege actual knowledge than those in which the Court concluded that he did.  (*See*

*Defendants Memo* at 13-28.)  Obviously, legal sufficiency must be judged on a case-by-

case basis.  As noted, the sheer magnitude of the withdrawals and untapped balances

compared to the deposits, the creation of accounts with $120 million in overnight value

generated by backdated trades and the lack of any information relating to trading

activity or tax liability support the finding of actual knowledge.

Furthermore, this is not a typical "red flag" case like others considered by the

Court where the knowledge was supposedly acquired through a multi-year comparison

of account statements with outside pricing and volume data or other information

22

relating to Madoff's unusual operations, including his fee structure, insufficient support staff, strip mall accountants, self-clearing of trades and absence of real-time information.  *E.g., Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548 B.R. 13 (Bankr. S.D.N.Y. 2016); *Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117 (Bankr. S.D.N.Y. 2014). Here, Green and BLMIS dispensed with the fiction of monthly account statements or trading information which, considering Green's duties as Magnify's investment manager and Magnify's potential tax obligations, was itself a red flag.

Moreover, the SAC alleges circumstances relating to the funding of the Magnify II Account and the creation of the Portfolio Evaluations that suggest that Green and Madoff were manufacturing financial information to achieve predetermined results. Similar allegations of trading manipulation by Madoff and the defendant to reach predetermined results have led to the conclusion that the complaints in those cases adequately pled actual knowledge.  *Picard v. Estate of Mendelow* (*In re BLMIS*), 560 B.R. 208 (Bankr. S.D.N.Y. 2016); *Picard v. Avellino* (*In re BLMIS*), 557 B.R. 89 (Bankr. S.D.N.Y. 2016); *Picard v. Shapiro* (*In re BLMIS*), 542 B.R. 100 (Bankr. S.D.N.Y. 2015).

Accordingly, the Court concludes that the Complaint adequately alleges that Defendants Magnify, YHA, Premero, Strand and Express had actual knowledge, through Green, that BLMIS was not trading securities.  For this reason, the safe harbor, 11 U.S.C. § 546(e), does not apply, and the Trustee has adequately pleaded that these Defendants lacked good faith for purposes of 11 U.S.C. § 548(c).  Consequently, the motion to dismiss Counts One through Eight is denied as to Magnify, YHA, Premero, Strand and Express.

C.    **Green's Alter Ego Liability**

The SAC asserts that Green is liable for the claims asserted against Magnify and

Strand on a theory of alter ego liability, or piercing the corporate veil.  "The doctrine of

piercing the corporate veil is typically employed by a third party seeking to go behind

the corporate existence in order to circumvent the limited liability of the owners and to

hold them liable for some underlying corporate obligation."  *Morris v. N.Y. State Dep't

of Taxation & Fin.*, 623 N.E.2d 1157, 1160 (N.Y. 1993).

Initially, the parties dispute which substantive law governs the question of

Green's alter ego liability.  Magnify was formed in Panama and Strand was incorporated

in the British Virgin Islands ("BVI").  Green contends that his alter ego liability must be

determined in accordance with the "internal affairs" doctrine under the laws of Panama

and the BVI, respectively, and neither jurisdiction recognizes alter ego liability under the

facts alleged in the SAC.  The Trustee contends that New York substantive law governs

the issue, and the SAC asserts a legally sufficient claim against Green.[14]   Both sides

contend that New York's choice of law rules relating to alter ego liability determine

which substantive law applies.  (*See Defendants Memo* at 52; *Trustee's Memorandum of

Law in Opposition to Defendants' Motion to Dismiss*, dated Dec. 20, 2017, at 33 (ECF

Doc. # 156).)

---

[14]    In the reply, Green argues that the SAC also fails to state an alter ego claim under New York law.
(*Defendants' Reply Memorandum of Law in Further Support of Motion to Dismiss Plaintiff's Second
Amended Complaint*, dated Jan. 24, 2018, at 31-34 (ECF Doc. # 160).)

### 1.  New York Alter Ego Law Governs

Under New York's choice of law rules, the law of the state of incorporation generally determines when the corporate form will be disregarded and liability will be imposed on the shareholders. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995); *Kalb, Voorhis & Co. v. Am. Fin. Corp.,* 8 F.3d 130, 132 (2d Cir. 1993); *Panam Mgmt. Grp., Inc. v. Pena,* No. 08–CV–2258 (JFB) (ARL), 2011 WL 3423338, at *3 (E.D.N.Y. Aug. 4, 2011); *Picard v. Avellino*, 557 B.R. at 122; RESTATEMENT (SECOND) OF CONFLICT OF LAWS ("RESTATEMENT") § 307 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts."). This is known as the "internal affairs" doctrine:

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders— because otherwise a corporation could be faced with conflicting demands.

*Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) (citing RESTATEMENT § 302, cmt. *b*, pp. 307–308)).

This rule, however, is not absolute.  Rather, New York law creates a presumption that the law of the state of incorporation will govern the question of alter ego liability but a party can rebut the presumption by showing that the transaction at issue has a more significant relationship with another jurisdiction.  *Greenspun v. Lindley*, 330 N.E.2d 79, 80-81 (N.Y. 1975); *see Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 263 (2d Cir. 1984) (stating that the *Greenspun* Court "expressly left open the question of what law would be applied in a case in which some or all of these factors dictated the

application of New York law"); *Aboushanab v. Janay*, No. 06 Civ. 13472 (AKH), 2007
WL 2789511, at *4 n. 2 (S.D.N.Y. Sept. 26, 2007) ("New York recognizes the doctrine
and usually, but not automatically, applies the law of the incorporating state to matters
concerning the internal affairs of the corporation."); *Deutsche Bank, AG v. Vik,* 40
N.Y.S.3d 23, 24 (N.Y. App. Div. 2016) (applying New York law rather than the law of the
state of incorporation (Turks and Caicos Islands) to the question of alter ego liability
where defendant had "scant contacts" with Turks and Caicos and the allegedly wrongful
acts occurred in New York); *Serio v. Ardra Ins. Co., Ltd.*, 761 N.Y.S.2d 1, 1-2 (N.Y. App.
Div. 2003) ("Although incorporated in Bermuda, Ardra's contacts with that jurisdiction
were minimal.  It was not authorized to sell insurance in Bermuda or to do business with
Bermuda residents.  It was controlled by defendant Richard DiLoreto from New York
and all the transactions complained of occurred in New York."); *see also Deangelis v.
Corzine* (*In re MF Global Holdings Ltd, Inv. Litig.*), 998 F. Supp. 2d 157, 179 (S.D.N.Y.
2014) ("*MF Global*") ("[T]he internal affairs doctrine creates a presumption in favor of
applying the law of the state of incorporation [but] the presumption is not irrebuttable;
if there is a state with a more significant relationship with the parties and the dispute at
issue, the court should apply that state's law.") (internal quotation marks and citations
omitted), *aff'd*, 611 F. App'x 34 (2d Cir.), *cert. denied*, 136 S. Ct. 497 (2015); *Tyco Int'l,
Ltd. v. Kozlowski,* 756 F. Supp. 2d 553, 560 (S.D.N.Y. 2010) ("In New York, the internal
affairs doctrine is applied only as one factor in an analysis where 'the law of the state
with the greatest interest in the issue governs.'") (*quoting BBS Norwalk One, Inc. v.
Raccolta, Inc.,* 60 F. Supp. 2d 123, 129 (S.D.N.Y.1999)), *leave to appeal denied*, No. 02
Civ. 7317 (TPG), 2011 WL 2038763 (S.D.N.Y. May 24, 2011).

Here, the allegations in the SAC support the conclusion that New York substantive law governs the question of Green's alter ego liability. *MF Global*, 998 F. Supp. 2d 157, which dealt with analogous common law claims rather than alter ego liability, is illustrative. There, MF Global Inc. ("MFGI"), a Delaware corporation, operated as a futures commission agent for its customers, taking their money to facilitate trades in futures contracts through commodities exchanges. *Id.* at 169. The regulations governing the segregation and use of the customer cash were similar to those that applied to the customer cash held by BLMIS pursuant to the Customer Protection Rule in 17 C.F.R. § 240.15c3-3(e). *See Picard v. Lowery* (*In re BLMIS*), Adv. Pro. No. 10-04387 (SMB), 2018 WL 1442312, at *10-12 (Bankr. S.D.N.Y. Mar. 22, 2018) (report and recommendation) (discussing the Customer Protection Rule). The rules varied depending on whether the funds were used for trading in domestic or foreign markets, but in essence, the customer funds remained the customers' property, MFGI had to segregate the customer funds from its own funds and calculate on a daily basis the amounts that had to be segregated and could not use the customer funds except for the customer for which they were held. *MF Global*, 998 F. Supp. 2d at 169-70.

The claims at issue arose when MFGI allegedly transferred $1.6 billion in customer funds to solve its liquidity problems created by investments in European sovereign debt. *Id.* at 170. A class of commodities customers of MFGI who had deposited cash brought an action on behalf of similarly situated customers and as assignee of the claims of MFGI's SIPA trustee against, *inter alia*, the former officers and directors of MFGI. The complaint asserted statutory and common law claims including breach of fiduciary duty. The parties disputed which law applied to the latter claim. The

defendants argued that under New York's conflicts rules, specifically the internal affairs

doctrine, Delaware law applied.  The plaintiffs argued that the laws of New York and

Illinois, which had the most significant relationship to the breach of fiduciary duty

claim, governed.  *Id.* at 179.

Quoting RESTATEMENT § 309,[15] the District Court explained that the internal

affairs doctrine created a presumption that the law of the state of incorporation

governed, but the presumption could be rebutted by showing that another state had a

more significant relationship with the parties and the dispute at issue.  *Id.* at 179; *accord*

*Resolution Trust Corp. v. Gregor,* 872 F. Supp. 1140, 1150 (E.D.N.Y. 1994).  The Court

then concluded that New York and Illinois law, rather than Delaware law, governed the

breach of fiduciary duty claim.  First, New York and Illinois had the greatest contact and

interest in the action because the alleged breaches of duty were masterminded in those

jurisdictions.  Second, aside from its role as the state of incorporation, "Delaware has no

meaningful relationship to the events giving rise to this action."  *Id.* at 180.  Third, the

customers brought the action, and the case did not concern a director's or officer's

liability to the corporation, its creditors or its shareholders.  *Id.*; *see First Nat'l City*

*Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621-22 (1983) ("As a

general matter, the law of the state of incorporation normally determines issues relating

to the *internal* affairs of a corporation. . . .  Different conflicts principles apply, however,

---

[15]    Restatement § 309 states:

The local law of the state of incorporation will be applied to determine the existence and
extent of a director's or officer's liability to the corporation, its creditors and
shareholders, except where, with respect to the particular issue, some other state has a
more significant relationship under the principles stated in § 6 to the parties and the
transaction, in which event the local law of the other state will be applied.

where the rights of third parties *external* to the corporation are at issue. . . .  To give

conclusive effect to the law of the chartering state in determining whether the separate

juridical status of its instrumentality should be respected would permit the state to

violate with impunity the rights of third parties under international law while effectively

insulating itself from liability in foreign courts.  We decline to permit such a result.")

(emphasis in original).

The same considerations compel the application of New York substantive law to

the question of Green's alter ego liability.  The dispute centers on the withdrawal of

more than $150 million of customer funds from BLMIS accounts located in New York.

(¶¶ 45 46.)  Moreover, Green came to New York at least twice a year to meet with Madoff

and DiPascali and evaluate the portfolios of the accounts other than the YHA account.

Conversely, Panama and the BVI have no meaningful relationship to the fraudulent

withdrawals.  Their connection is limited to the fact that they are the jurisdictions where

Magnify and Strand were incorporated.  Finally, the Trustee brings this lawsuit standing

in the shoes of the BLMIS customers, and the case does not concern Green's liability to

the Defendant corporations or their creditors or shareholders.

### 2.    The Allegations of Alter Ego Liability Are Sufficient Under New York Law

Under New York law, an alter ego claim is not a separate cause of action

independent of the claim against the corporation; "it is an assertion of facts and

circumstances which will persuade the court to impose the corporate obligation on its

owners," *Morris*, 623 N.E.2d at 1160, or in this case, the *de facto* officer and director.

The defendant need not have a legal interest in the corporation; "an individual who

exercises sufficient control over the corporation may be deemed an 'equitable owner,' notwithstanding the fact that the individual is not a shareholder of the corporation." *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1051 (2d Cir. 1997); *accord Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 270 F. Supp. 3d 716, 733-34 (S.D.N.Y. 2017).

The party seeking to pierce the corporate veil must show that at the time of the transaction in question, the defendant (1) exercised such control that the corporation had become a mere instrumentality of the defendant, who is the real actor; (2) the defendant used his control to commit fraud or other wrong; and (3) the fraud or wrong resulted in an unjust loss or injury to plaintiff. *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014); *Babitt v. Vebeliunas* (*In re Vebeliunas*), 332 F.3d 85, 91-92 (2d Cir. 2003); *Freeman*, 119 F.3d at 1052; *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991); *accord Morris*, 623 N.E.2d at 1161. As to the first prong, courts will consider the following factors:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Passalacqua Builders*, 933 F.2d at 139; *accord N.Y. State Elec. & Gas Corp.*, 766 F.3d at 224.

The SAC plausibly alleges that Green controlled Magnify after 1989 and always controlled Strand.  Initially, there was no semblance of a corporate existence apart from Green.  Although Magnify and Strand each had a registered agent in their respective jurisdictions, neither had employees, physical offices or actual places of business.  (¶ 122.)  Further, while Brunner was a titular managing or sole director of these entities, he was not involved in any decision making, and after Igoin withdrew from the business of Magnify in December 1989, Green was the only decision maker and ran the Defendants for his personal benefit.  In addition, Green held himself out to HSBC as Strand's beneficial owner in order to obtain a mortgage to buy his daughter a home in Maryland, and pledged Magnify's bank account as collateral for a personal debt.

The capitalization of these entities was also inadequate.  The only cash deposit made in either Magnify Account was $3,136,150 in 1983.  A review of the Trustee's reconstruction of Magnify's deposits and withdrawals shows that Green "transferred" nearly $48 million in fictitious profits from the Magnify I Account to the YHA Account after the December 1989 meeting, (SAC, Ex. B, 6-8 of 51), and over $75 million in fictitious profits from the Magnify II Account to the YHA Account.  (SAC, Ex. B, 9-10 of 51.)  In addition, Magnify withdrew $12,349,371 in fictitious profits from the two Magnify Accounts.  (SAC, Ex. B, at 8, 10 of 51.)  Strand was funded with a single $500,000 cash deposit on January 28, 2002, (*see* SAC, Ex. B, at 51 of 51), but managed to transfer $11,730,019 in fictitious profits over the next six years.  In fact, Strand withdrew $370,000 from its BLMIS account months before it was initially "funded"

with a $5 million transfer of fictitious profits.  (*Id.*)  The amount of capital invested in

Magnify and Strand was plainly insufficient to sustain these withdrawals and inter-

account transfers.

The SAC also alleges that the funds were used for personal rather than corporate

purposes; in fact, Magnify and Strand had no corporate purpose except, in the end, to

fund Green's needs.  After Igoin's death, Green entered into a Fee Agreement with

Magnify which he had drafted, and collected $3.15 million for services he did not

perform.  He withdrew a total of approximately $15 million from the Magnify and

Strand Accounts for his personal benefit including a $1.5 million transfer from Strand to

his children, $3 million to offshore investment funds and hundreds of thousands of

dollars to Green's children and his secretary and withdrew money from Strand's BLMIS

Account to buy an apartment in Israel for one of his business associates.  In addition,

Green used the Strand Account as collateral for a mortgage to buy a home in Maryland

for his daughter, and used Magnify's bank account at Bank Hapoalim as collateral for a

personal debt.  Finally, Green used the funds "transferred" from the Magnify Accounts

to YHA to orchestrate YHA's $120 million in charitable contributions, enhancing his

philanthropic profile in Israel and the honors that went with it.

The SAC also alleges facts that satisfy the second and third elements of the alter

ego test.  As noted, the SAC sufficiently alleges that Green acted with actual knowledge

that BLMIS was not engaged in trading securities.  He nevertheless continued to

withdraw the funds as part of his fraudulent scheme depleting the customer property

estate by over $150 million.

32

Accordingly, the allegations in the SAC are sufficient to pierce Magnify's corporate veil (at least as of the time of the December 1989 meeting and thereafter) and Strand's corporate veil, and impose alter ego liability on Green for their fraudulent withdrawals of customer funds.

## D.    Count Nine

Count Nine asserts a claim to equitably subordinate the approximate $839 million in customer claims filed by Magnify, YHA, Premero and Strand.  The SAC alleges that their conduct "enabled Madoff to prolong the Ponzi scheme that resulted in injury to the customers and creditors of the estate and . . . conferred an unfair advantage on Magnify, Premero, Strand, and YHA," (¶ 233), misled the customers into investing in BLMIS based on a false impression of its financial condition, (¶ 234), and withdrew approximately $153,722,070 from BLMIS which would otherwise have been customer property available for distribution.  (¶ 235.)  The Defendants contend that the SAC fails "to adequately allege 'actual knowledge,' 'bad faith,' or 'willful blindness' (*i.e.*, reckless disregard) of the BLMIS Ponzi scheme," and the equitable subordination claim must, therefore, be dismissed.  (*Defendants Memo* at 70.)

A Bankruptcy Court may equitably subordinate a claim under 11 U.S.C. § 510(c)[16] where: (1) "[t]he claimant engaged in some type of inequitable conduct"; (2) "[t]he misconduct caused injury to the creditors or conferred an unfair advantage on the claimant"; and (3) "[e]quitable subordination of the claim is consistent with bankruptcy

---

[16]    Section 510(c)(1) provides in relevant part that a court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim."

law." *Lehman Bros. Holdings, Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros. Holdings, Inc.*), 541 B.R. 551, 582 (S.D.N.Y. 2015) (quoting *80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*), 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994)); *accord Benjamin v. Diamond* (*In re Mobile Steel Co.*)*,* 563 F.2d 692, 700 (5th Cir. 1977).  Where the defendant is not an insider of the debtor, the proponent must plead and prove that the non-insider engaged in "gross and egregious" conduct "tantamount to fraud, misrepresentation, overreaching or spoliation." *80 Nassau Assocs.*, 169 B.R. at 838-39 (internal quotation marks and citations omitted); *accord Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc.* (*In re Sunbeam Corp.*), 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002), *appeal dismissed*, 287 B.R. 861 (S.D.N.Y. 2003); *see Vargas Realty Enters., Inc. v. CFA W. 111 St., L.L.C.* (*In re Vargas Realty Enters., Inc.*), 440 B.R. 224, 240-41 (S.D.N.Y. 2010).

For the reasons stated, the SAC adequately alleges that the Defendants received the transfers from BLMIS with actual knowledge that BLMIS was not trading securities and in bad faith.  It also adequately alleges that these withdrawals injured the net losers because the withdrawals stripped $154 million in fictitious profits from the customer property estate that would otherwise be available to satisfy the customers' net equity claims.  These allegations allege a legally sufficient equitable subordination claim.  *See Katz*, 462 B.R. at 456.

34

## CONCLUSION

The motion to dismiss is denied.  The Court has considered the remaining

arguments (other than the avoidability of pre-2001 transfers which issue was stayed by

Court-ordered stipulation) and concludes that they lack merit or have been rendered

moot by the disposition of the motion for the reasons stated in this decision.  The parties

are directed to submit a proposed consensual order or, absent consent, to settle a

proposed order, consistent with this decision.

**Dated:  New York, New York**
**        April 13, 2018**

                                        /s/ *Stuart M. Bernstein*
                                        **HON.  STUART M. BERNSTEIN**
                                        **United States Bankruptcy Court**