Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    SECURITIES INVESTOR PROTECTION

7    CORPORATION,

8                        Plaintiff,

9            v.                    Case No. 08-01789-smb

10   BERNARD L. MADOFF INVESTMENT

11   SECURITIES LLC,

12                       Defendant.

13   - - - - - - - - - - - - - - - - - - - - - - - - - - x

14

15                    U.S. Bankruptcy Court

16                    One Bowling Green

17                    New York, New York 10004-1408

18

19                    April 25, 2018

20                    10:05 AM

21

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    Hearing re: Submission of Dean Loren, Executor of the Evelyn

2    Goldberg Estate, dated Jan 24, 2018 (ECF Doc #17160)

3

4    Application for interim professional compensation Twenty-

5    Sixth Application of Trustee and Baker & Hostetler, LLP for

6    allowance of interim compensation for services rendered and

7    reimbursement of actual and necessary expenses incurred from

8    August 1, 2017 through November 30, 2017 for Baker &

9    Hostetler, LLP, Trustee's Attorney, period: 08/01/2017 to

10   11/30/2017, fee $34,131,524.04, expenses $290,520.17

11

12   Application for interim professional compensation

13   application of Schiltz & Schiltz as special counsel to the

14   trustee for allowance of interim compensation for services

15   rendered and reimbursement of expenses incurred from August

16   1, 2017 through November 30, 2017 for Schiltz & Schiltz,

17   special counsel, period: 08/01/2017 to 11/30/2017, fee

18   $47,892.27, expenses: $3,113.00

19

20

21

22

23

24

25

1   Application for interim professional compensation

2   application of Higgs & Johnson (Formerly Higgs Johnson

3   Truman Bodden & Co) as special counsel to the trustee for

4   allowance of interim compensation for services rendered and

5   reimbursement of expenses incurred from August 1, 2017

6   through November 30, 2017 for Higgs & Johnson, special

7   counsel, period: 08/01/2017 to 11/30/2017, fee $41,093.36,

8   expenses: $3,906.44

9

10  Application for interim professional compensation

11  application of Soroker Agmon Nordman as special counsel to

12  the trustee for allowance of interim compensation for

13  services rendered and reimbursement of expenses incurred

14  from August 1, 2017 through November 30, 2017 for Soroker

15  Agmon Nordman, special counsel, period: 08/01/2017 to

16  11/30/2017, fee $485,357.61, expenses: $10,967.12

17

18  Application for interim professional compensation

19  application of Graf & Pitkowitz Rechtsanwalte Gmbh as

20  special counsel to the trustee for allowance of interim

21  compensation for services rendered and reimbursement of

22  expenses incurred from August 1, 2017 through November 30,

23  2017 for Graf & Pitkowitz Rechtsanwalte Gmbh, special

24  counsel, period: 08/01/2017 to 11/30/2017, fee $10,997.11,

25  expenses: $46.98

Page 4

1    Application for interim professional compensation/Twenty-

2    Fifth application of Windels Marx Lane & Mittendorf, LLP for

3    allowance of interim compensation for services rendered and

4    reimbursement of actual and necessary expenses incurred from

5    August 1, 2017 through November 30, 2017 for Windels Marx

6    Lane & Mittendorf, LLP, special counsel period: 08/01/2017

7    to 11/30/2017, fee $2,100,296.00, expenses: $16,306.87

8

9    Application for interim professional compensation

10   application of SCA Creque as special counsel to the trustee

11   for allowance of interim compensation for services rendered

12   from August 2, 107 through November 30, 2017 for SCA Creque,

13   special counsel, period: 08/01/2017 to 11/30/2017, fee

14   $11,589.71, expenses: $0.00

15

16   Application for interim professional compensation

17   application of Young Conaway Stargatt & Taylor, LLP, as

18   special counsel to the trustee for allowance of interim

19   compensation for services rendered and reimbursement of

20   expenses incurred from August 1, 2017 through November 30,

21   2017 for Young, Conaway, Stargatt & Taylor, special counsel,

22   period: 08/01/2017 to 11/30/2017, fee $141,485.22, expenses:

23   $5,414.05

24

25

1    Application for interim professional compensation

2    application of Williams Barristers & Attorneys as special

3    counsel to the trustee for allowance of interim compensation

4    for services rendered from August 1, 2017 through November

5    30, 2017 for Williams Barristers & Attorneys, special

6    counsel, period: 08/01/2017 to 11/30/2017, fee $302,928.61

7    expenses: $0.00

8

9    Application for interim professional compensation

10   application of UGGC & Associes as special counsel to the

11   trustee for allowance of interim compensation for services

12   rendered from August 1, 2017 through November 30, 2017 for

13   UGGC & Associes, special counsel, period: 08/01/2017 to

14   11/30/2017, fee $71,205.95, expenses: $1,816.17

15

16   Application for interim professional compensation

17   application of Browne Jacobson, LLP as special counsel to

18   the trustee for allowance of interim compensation for

19   services rendered and reimbursement of actual and necessary

20   expenses incurred from August 1, 2017 through November 30,

21   2017 for Browne Jacobson, LLP, special counsel, period:

22   08/01/2017 to 11/30/2017, fee $986,539.78, expenses:

23   $17,040.11

24

25

1    Application for interim professional compensation

2    application of Eugene F. Collins as special counsel to the

3    trustee for allowance of interim compensation for services

4    rendered from August 1, 2017 through November 30, 2017 for

5    Eugene F. Collins, special counsel, period: 08/01/2017 to

6    11/30/2017, fee $9,279.67, expenses: $0.00

7

8    Application for interim professional compensation

9    application of Cochran Allan as special counsel to the

10    trustee for allowance of interim compensation for services

11    rendered from August 1, 2017 through November 30, 2017 for

12    Cochran Allan, special counsel, period: 08/01/2017 to

13    11/30/2017, fee $504.90, expenses: $0

14

15    Application for interim professional compensation

16    application of The Scaletta Law Firm, Pllc as special

17    counsel to the trustee for allowance of interim compensation

18    for services rendered from August 1, 2017 through November

19    30, 2017 for The Scaletta Law Firm, PLCC, special counsel,

20    period: 08/01/2017 to 11/30/2017, fee $21,721.05, expenses:

21    $280.16

22

23

24

25

1    Application for interim professional compensation

2    application of Robbins, Russell, Englert, Orseck, Untereiner

3    & Sauber, LLP as special counsel to the trustee for

4    allowance of interim compensation for services rendered from

5    September 22, 2017 through November 30, 2017 for Robbins,

6    Russell, Englert, Orseck, Untereiner & Sauber, LLP, special

7    counsel, period: 09/22/2017 to 11/30/2017, fee $62,172.00,

8    expenses: $493.37

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach

```
 1    A P P E A R A N C E S :

 2    BAKER HOSTETLER

 3         Attorneys for the Trustee

 4         45 Rockefeller Plaza

 5         New York, NY 10111

 6

 7    BY:  AMY E. VANDERWAL, ESQ.

 8         DAVID J. SHEEHAN, ESQ.

 9         JASON BLANCHARD, ESQ.

10

11    WINDELS, MARX, LANE & MITTENDORF, LLP

12         Attorneys for Unspecified

13         156 West 56th Street

14         New York, New York 10019

15

16    BY:  ALAN NISSELSON, ESQ.

17

18    LAW OFFICES OF LALIT K. JAIN, ESQ.

19         Attorneys for Dean Loren

20         6122 Booth Street

21         Rego Park, New York 11374

22

23    BY:  LALIT K. JAIN, ESQ.

24

25
```

1   SiPC

2        Attorneys for SiPC

3        1667 K Street, N.W., Suite 1000

4        Washington, D.C. 20006

5

6   BY:   KEVIN H. BELL, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     P R O C E E D I N G S

 2              THE COURT:  Please be seated.

 3              Madoff.  I'll hear the matter brought on by Mr.

 4    Loren first.

 5         (Pause)

 6              THE COURT:  Would you give your appearances,

 7    please?

 8              MR. BLANCHARD:  Jason Blanchard of Baker Hostetler

 9    for the trustee.

10              MR. JAIN:  Lalit J. Jain on behalf of Dean Loren.

11              THE COURT:  Okay.  Thank you.

12              Go ahead, Mr. Jain.

13              MR. JAIN:  What we have filed, Your Honor, is an

14    information that in the course of Dean Loren as the executor

15    marshaling the assets of Evelyn Goldberg estate, she is the

16    widow of Simon Goldberg.

17              THE COURT:  She's also deceased, isn't she?

18              MR. JAIN:  Yes.  In the course of that Mr. John

19    Fischer (ph), he is now with the Anne Berger (ph) law firm.

20    He was with Hopper (ph) way back.  He submitted quite a few

21    of accounting information to us from (indiscernible)

22    accounting information, and they have a list of both U.S.

23    and Canada treasury bonds and other assets.

24              When Dean Loren became aware of the Madoff

25    situation with U.S. treasury bond investments, we thought
```

1    that that information that we had, if shared with the

2    trustee, might be helpful to them and that was the reason

3    for the petition being made by Dean.  And I am acting as of

4    counsel now.

5              THE COURT:  So what relief are you seeking from

6    the court today?

7              MR. JAIN:  What I'm seeking is either a court

8    order, but we had a discussion yesterday for us to talk with

9    each other and if they are interested in the information we

10   will submit that information to them.  So we don't need a

11   court order since they agreed yesterday they would -- they

12   are willing to talk to us.

13             THE COURT:  But I thought Mr. Loren had filed a

14   claim on behalf of the estate under SIPA?

15             MR. JAIN:  Correct.

16             THE COURT:  Is it your contention that Evelyn

17   Goldberg or her estate had an account with Madoff

18   Securities?

19             MR. JAIN:  No.  I don't think that would be our

20   contention because there is none.  What our contention is

21   that she being a beneficiary of the Simon Goldberg estate --

22             THE COURT:  I'm sorry.  Who's she?

23             MR. JAIN:  Evelyn.

24             THE COURT:  Oh, okay.

25             MR. JAIN:  Sorry.  Evelyn Goldberg being a

1    beneficiary of the Simon Goldberg estate and that Simon

2    Goldberg estate has been open for like 30 years now,

3    (indiscernible) and that's where executor learned that most

4    of the investments were handled through John Fischer and

5    there is an account of, what was the name?

6            MR. LOREN:  Wolf Popper as --

7            MR. LOREN:  Wolf Popper as one of the account

8    holders in the list.  So since everything is in the dark for

9    us, we were interested in sharing the information that we

10   have to the trustee.  And if they can marshal the assets of

11   the trust of Madoff based on the information that we have

12   and we are willing to share, we all will benefit from that

13   from the Simon estate down to the Evelyn Goldberg estate.

14           THE COURT:  All right.  So you don't -- you don't

15   want any specific relief from the Court.  You just want to

16   give them information?

17           MR. JAIN:  Correct.  Hold on one second.

18       (Pause)

19           MR. JAIN:  Yes, Your Honor, because if the

20   information does not disclose anything more, then there's no

21   relief for us.

22           THE COURT:  Okay.  All right.  Anything from the

23   trustee?

24           MR. BLANCHARD:  Thank you, Your Honor.  Jason

25   Blanchard for the trustee.

1                    THE COURT:  Would you keep your voice up, please.

2                    MR. BLANCHARD:  Yes, Your Honor.

3                    To the extent that Mr. Loren seeks the opportunity

4    to file a late claim we would reject that --

5                    THE COURT:  Well, he's saying -- as I understand

6    it he's saying they didn't have a BLMIS account, right?

7                    MR. JAIN:  That's correct, Your Honor.

8                    THE COURT:  And the only claim we're talking about

9    is a SIPA claim that was filed, right?

10                   MR. JAIN:  Yes.

11                   THE COURT:  Okay.  So that claim has to be

12   disallowed.

13                   MR. JAIN:  Okay.

14                   THE COURT:  Whether you have some other sort of

15   claim against the general estate, I don't know.  But, you

16   know, you can give the trustee your information.

17                   MR. JAIN:  No.  Excuse me, Your Honor.

18                   THE COURT:  Oh, sure.

19        (Pause)

20                   MR. JAIN:  Okay, Your Honor.  Our claim is through

21   Wolf Popper.  As I mentioned, Wolf Popper does have an

22   account --

23                   THE COURT:  Okay.

24                   MR. JAIN:  -- that is listed.  So we have to go

25   via Wolf Popper.

1              THE COURT:  So you have a claim against Wolf

2      Popper that has an account with BLMIS, Bernard --

3              MR. JAIN:  That is correct --

4              THE COURT:  -- Madoff Securities.

5              MR. JAIN:  -- because --

6              THE COURT:  I see.

7              MR. JAIN:  -- that's on the list.

8              THE COURT:  Okay.  And that's the basis of your --

9      are you asserting a claim against the Madoff estate is

10     really my question --

11             MR. JAIN:  Bottom line, yes, if the information

12     turns out that the investments of Simon Goldberg estate,

13     whose beneficiary is Evelyn Goldberg estate, does have

14     assets coming from the Madoff trust.

15             THE COURT:  Okay.  Yes, sir.

16             MR. BLANCHARD:  Our understanding is that Wolf

17     Popper does not have an account with BLMIS.

18             THE COURT:  They've never had a BLMIS account?

19             MR. BLANCHARD:  Not to my understanding because

20     they --

21             THE COURT:  Okay.

22             MR. BLANCHARD:  -- represented certain parties

23     that had accounts with BLMIS, but --

24             THE COURT:  Right.

25             MR. BLANCHARD:  -- not the Goldbergs nor Mr.

```
1    Loren.

2              THE COURT:  What -- what's the basis of your

3    belief or understanding that Wolf Popper had a Madoff

4    Securities' account?

5              MR. JAIN:  Excuse me, Your Honor.

6         (Pause)

7              MR. JAIN:  Wolf Popper as an account holder is

8    mentioned in the list of 162 pages that we got.

9              THE COURT:  In the --

10        (Pause)

11             THE COURT:  I don't have a list of 162 pages.

12             MR. JAIN:  It's like a lot of fine prints that we

13   go through with a microscope, unless they deny that Wolf

14   Popper is not listed in those -- in that list.

15             MR. LOREN:  It's the last page, sir.  Page 162 of

16   Exhibit A of the first document that's listed on the docket

17   sheet.  I believe it's Mr. John Franks.  Let me just look at

18   my --

19             THE COURT:  I don't have 162 page exhibit.

20             MR. BLANCHARD:  Your Honor, at Docket Item Number

21   76-1 on the 163rd page there is a --

22             THE COURT:  I -- yeah.

23             MR. BLANCHARD:  -- Wolf Popper, attention Marion

24   Popper account.  But our understanding is that -- sorry.

25   There's Wolfe Popper, LLP is identified here, attention
```

1    Marion Popper, but our understanding is that Wolfe Popper

2    itself did not have a BLMIS account.

3              THE COURT:  Who owned -- who owned that account,

4    do you know?

5              MR. BLANCHARD:  I do not, Your Honor.

6              THE COURT:  So what makes you think that Wolf

7    Popper didn't have an account?

8              MR. BLANCHARD:  It's based on Mr. Segal's

9    declaration and my overview of the customer --

10             THE COURT:  Did Mr. Segal say that Wolf Popper

11   didn't have an account?  I thought he looked to see if Ms.

12   Goldberg had an account.

13             MR. LOREN:  If it please the Court, the affidavit

14   of the employee of Irving Picard's trustee did attest to

15   that there were receipts and accountings alleging that Wolf

16   Popper, LLP was a client.

17             THE COURT:  Was a client of -- you mean a customer

18   of BLMIS?

19             MR. LOREN:  Yes, sir.  And it was his sworn

20   affidavit which is the first document on your exhibit list

21   within this case.  It is Docket -- Document Number 1 --

22             THE COURT:  Well --

23             MR. LOREN:  -- affidavit of service.

24             THE COURT:  So the basis of your understanding

25   that Wolf Popper had an account with BLMIS is that Wolf

Page 17

1   Popper received notice of the claims procedures?  Okay.  And

2   I'm being told they may have received notice, but they

3   didn't have an account.

4           MR. LOREN:  Bernie also did not reveal the

5   Canadian and U.S. treasury accounts, either.

6           THE COURT:  Which treasury accounts?

7           MR. LOREN:  From the 703 accounts that just came

8   out in the April 26th, 2017 deposition in which he listed

9   the -- how the transactions were done to which our expressly

10  laid out in our 1992 to 1993 accounting.

11          THE COURT:  What is the connection between those

12  treasuries and the treasuries you're talking about which I

13  guess were held by Ms. Goldberg or the estate of Ms.

14  Goldberg?

15          MR. LOREN:  Those treasuries were, in fact, part

16  of or the bounty out of the 703 comingled accounts that Mr.

17  Madoff traded at BLMIS on the 17th floor by Mr. Pasquale.

18          THE COURT:  But what's the basis of your

19  understanding that the treasuries that were either in Mr.

20  Goldberg's estate or Ms. Goldberg's estate were the same

21  treasuries that were in the 703 account?

22          MR. LOREN:  That they were under complete and

23  total control of Wolf Popper and that they have actually no

24  reference to who their broker was.  They have undeclared

25  amounts.  They do not know where they are receiving them

1    from.

2            And, in fact, that is why we are here with the

3    claim because when Irving Picard produces those claim

4    receipts that he has already sworn to, we will be able to

5    track those accounts and match them with the 80 pages.  And

6    this is just '93 to '95.  There is at least 300 more pages

7    of treasuries that will match and that will prove that there

8    is a link for the comingled accounts in the 703 at the BLMIS

9    to Wolf Popper, to Simon Goldberg's estate, to the Evelyn

10   Goldberg estate so that we can distribute them to the

11   Vatican.

12           THE COURT:  Okay.  So let me see if I understand

13   what your theory is.  Either of the Goldberg estates or

14   Goldberg's or their estates own treasuries.

15           MR. LOREN:  Yes, sir.

16           THE COURT:  And your contention is that Wolf

17   Popper had an account and Wolf Popper deposited those

18   treasuries into their account which Madoff then placed in

19   his 703 account or whatever account he was maintaining?

20           MR. LOREN:  No, sir.

21           THE COURT:  Okay.  Explain to me --

22           MR. LOREN:  Wolf Popper --

23           THE COURT:  I'm just trying to get the connection

24   between your claim and this estate.

25           MR. LOREN:  Yes, sir.  It is convoluted because

1    Wolf Popper had total control of the Simon Goldberg estate

2    --

3            THE COURT:  Okay.

4            MR. LOREN:  -- through fraud.  That has been

5    proven.

6            THE COURT:  Uh-huh.

7            MR. LOREN:  They took the assets from the Simon

8    Goldberg estate and handed them to a comingled account at

9    Wolf Popper.  Wolf Popper then placed those monies for

10   investments at BLMIS.  Those investments out of the 703

11   pursuant to the deposition of April 26th, 2017 were then

12   used to purchase treasuries.  Those treasury receipts were

13   then used to create the filings in Simon Goldberg estate.

14           So they actually used our cash to purchase U.S.

15   and Canadian treasuries which Mr. Madoff has admitted and

16   that were done on the Bloomberg terminals.  And, therefore,

17   there is a direct trail that we can now follow through

18   Bloomberg terminals to JPMorgan and we can ascertain under

19   which account of the big four clients Wolf Popper through

20   the Simon Goldberg monies in order to purchase the U.S.

21   treasuries and Canadian treasuries.

22           And, sir, if this transcript had not been made

23   confidential, have this information been made earlier, I

24   have been asking since 2012 with Mr. Picard, I would have

25   been able to confront Mr. Fischer of Wolf Popper before

Page 20

1    Surrogate Maya (ph) and said, excuse me, I want an

2    accounting that tells me where these securities come from.

3    You have no broker listed.  You have nothing listed except

4    for accounts that say undeclared income we have no knowledge

5    about.  We have U.S. and Canadian treasuries that are

6    trading almost every day, no broker.  It matches word for

7    word Mr. Madoff's direct testimony from April 26th, 2017 to

8    the next day, April 27th.

9             And by your order they were made confidential

10   which means I did not have knowledge of them until 2018 and

11   I had already started to settle with Wolf Popper.

12            THE COURT:  If Wolf Popper diverted the treasuries

13   as you say, why do you think it was put into a Madoff

14   account as opposed to somewhere else?

15            MR. LOREN:  Because Madoff had direct -- I mean --

16   oh.  The monies that were taken from Simon Goldberg estate

17   were comingled into a Wolf Popper --

18            THE COURT:  That I understand.

19            MR. LOREN:  Okay.  Wait.  And the person

20   responsible for the total control and investment was Emily

21   Madoff, Bernie's cousin.

22            THE COURT:  This is -- is -- what makes you think

23   it's -- she's Bernie's cousin?

24            MR. LOREN:  She is directly related through

25   Bernie's, Ralph Madoff --

1          THE COURT:  Who is Ralph Madoff?

2          MR. LOREN:  -- is Bernie's father.  Ralph is the

3    son of Abraham.  There were five children and it's Rae

4    Madoff who will go to Boston and marry into the Boston

5    Madoffs in Brookline, Massachusetts, to which Morton Madoff

6    will be produced.  That is the father of Emily and Emily and

7    her sister, Rae (ph), will become trust and estate

8    attorneys.  Rae Madoff works for Boston University which is

9    one of the victims.  Morton Madoff, her father, is a doctor,

10   is with another university that is another victim.  Emily

11   Madoff came to New York, worked with Wolf Popper and we have

12   absolute evidence that they were using trust and estates out

13   of the Manhattan Surrogate Court to plunder monies and put

14   them into a comingled account at Wolf Popper or under the

15   big four and used to invest on the 17th floor by Mr.

16   Pasquale by BLMIS.

17          THE COURT:  I'm just trying to understand.  What

18   is the connection or the relationship between Emily Madoff

19   and Bernard Madoff, slowly?

20          MR. LOREN:  Emily Madoff, the cousin of Bernard

21   Madoff.

22          THE COURT:  She's a first cousin?

23          MR. LOREN:  I believe that would be a first

24   cousin.

25          THE COURT:  What's the common -- who is the common

Page 22

1    ancestor?

2              MR. LOREN:  Rae Madoff.

3              THE COURT:  That's a man or a woman?

4              MR. LOREN:  A woman.

5              THE COURT:  Okay.  So Rae Madoff and what is her

6    relationship to Bernie Madoff?

7              MR. LOREN:  Rae?  Oh, that would be his aunt.

8              THE COURT:  But who is the common ancestor?

9              MR. LOREN:  Abraham.

10             THE COURT:  Okay.

11             MR. LOREN:  Abraham Madoff.  He comes to America

12   in 1898, settles in Pennsylvania and then moves to the

13   Bronx.

14             THE COURT:  Okay.  So Abraham Madoff, now trace

15   his lineage down to Bernard.

16             MR. LOREN:  Abraham Madoff then has five children.

17             THE COURT:  Uh-huh.  And is one of those children

18   Bernard's father?

19             MR. LOREN:  Ralph.  Yes, sir.

20             THE COURT:  Okay.  So one of the children is

21   Ralph.  And Ralph Madoff is Bernard's father?

22             MR. LOREN:  Yes, sir.

23             THE COURT:  Okay.  Now as for Emily, what's her

24   connection to Abraham?

25             MR. LOREN:  Her father is Morton.

```
1              THE COURT:  Well --

2              MR. LOREN:  And Morton is descended from Rae.

3              THE COURT:  You told me Abraham Madoff --

4              MR. LOREN:  Yes.

5              THE COURT:  -- was one of Rae's children, was

6    Rae's child, right?

7              MR. LOREN:  Abraham gave birth to Rae.  Yes.

8              THE COURT:  Okay.  So Rae is a child of Abraham?

9              MR. LOREN:  Yes.

10             THE COURT:  One of the five children you told me

11   about?

12             MR. LOREN:  I believe so.

13             THE COURT:  So she would be a sibling of Ralph's?

14             MR. LOREN:  Yes.

15             THE COURT:  And her relationship to Emily?

16             MR. LOREN:  She is -- Emily would be most likely

17   -- well, because she's -- okay.  Morton is descended from

18   Rae Madoff, the sibling of Ralph.

19             THE COURT:  Oh, boy.

20             MR. LOREN:  You have to understand in the Hasidic

21   community it is not a direct line and --

22             THE COURT:  Well, I'm just trying to understand

23   the --

24             MR. LOREN:  Yes.

25             THE COURT:  You told me the common ancestor is
```

Page 24

1    Abraham.

2            MR. LOREN:  Yes.

3            THE COURT:  Abraham had five children.

4            MR. LOREN:  Yes.

5            THE COURT:  Which of those children figures into

6    the lineage we're talking about?

7            MR. LOREN:  Both Ralph and Rae.

8            THE COURT:  Okay.  And you've told me Ralph is the

9    father of Bernard.

10           MR. LOREN:  Yes, sir.

11           THE COURT:  And Rae is the mother of who?

12           MR. LOREN:  Morton, or connected to Morton Madoff.

13           THE COURT:  How is she connected if she's not the

14   mother?

15           MR. LOREN:  She could be -- you know, at this

16   point the Hasidic records are absent.  They disappear right

17   at this moment in Boston.  But we do know it is in

18   Brookline, Massachusetts.  We could bring Emily Madoff here

19   and have her trace her lineage and her sister, Rae, and her

20   sister, Judy, who married Jeff Boxer and Jeff Boxer's father

21   is Steven Boxer who married Barbara Levy to become Senator

22   Barbara Boxer, another Madoff recipient.

23           THE COURT:  Okay.  Now you told me that the

24   Hasidic records in Boston disappeared.  What happened to

25   them?

1          MR. LOREN:  I have no idea.  At this point there's

2     probably a marriage.  And so the Madoffs, because it's a

3     Madoff to a Madoff, it's probably not being registered.

4     These are European -- and European I'm using the old sense

5     of the words.  These are Russian Europeans coming over.

6     There is a mix -- not -- there is not very good record

7     keeping.  The only reason why we have Abraham is because he

8     came in and he was directly through Ellis Island and we have

9     those -- and he settles in the Bronx.  Massachusetts, not so

10    well.

11          THE COURT:  Uh-huh.

12          MR. LOREN:  There -- and that is why we are

13    missing -- there's also another child and her name is like

14    Zita (ph).  It's another Russian female name.  She

15    disappears.

16          THE COURT:  What do you mean she disappears?

17          MR. LOREN:  The records disappear.  They move to

18    Massachusetts and disappear.  In Brookline and I think it's

19    --

20          THE COURT:  You think somebody removed them to

21    hide something?

22          MR. LOREN:  No.  I think they just intermarried.

23    There was no need to file because this was a Hasidic

24    approved marriage and, you know, an orthodox approved

25    marriage and they don't necessarily record everything.

Page 26

1    These are first cousins marrying each other.  They're

2    directly related.  It may be a scandal, but at this point

3    it's policy within the orthodox Jewish community to

4    intermarry.  So I don't throw shade on that, sir.

5              THE COURT:  Okay.  So I asked Mr. Jain this.  I'll

6    ask you.  What is the relief that you're seeking from the

7    Court today?

8              MR. LOREN:  We want our money that was invested in

9    BLMIS.

10             THE COURT:  Through Wolf Popper.

11             MR. LOREN:  Yes, sir, or through the accounts

12   represented by Wolf Popper to which they directed our monies

13   into.  They comingled our monies.

14             THE COURT:  I got it.  All right.

15             MR. JAIN:  Thank you.

16             THE COURT:  Thank you.

17             Any -- anything else?

18             MR. LOREN:  And I apologize for the convolution,

19   sir.  It took me three years to figure it out and then when

20   I saw the transcript, bingo, all the trades matched.

21             THE COURT:  Uh-huh.

22             MR. LOREN:  And I want to thank you for ordering

23   that deposition in Georgia.

24             THE COURT:  Okay.  Anything from the trustee?

25             MR. BLANCHARD:  It's set forth in our papers --

1              THE COURT:  All right.  I'll reserve decision.

2              MR. BLANCHARD:  Thank you, Your Honor.

3              THE COURT:  Thank you very much.

4              MR. JAIN:  Thank you, Your Honor.

5              MR. LOREN:  Thank you, sir.

6              Would we be able to submit any papers?

7              THE COURT:  What would you like to submit?

8              MR. LOREN:  Well, we have the -- the reason being

9     -- sir, would you like to step back?

10             Evelyn Goldberg exposed the Madoffs in 1993.  And,

11    in fact, she did it on April 16th.  There was a memo written

12    by Wolf Popper that explained to Emily Madoff that she was

13    to stand in front of Renie Roth (ph) and keep her mouth shut

14    because Renie Roth, the surrogate, already knew and was

15    going to deny everything.

16             There -- at this point the entire Madoff scheme is

17    collapsing.  She now brings this -- Evelyn finds this memo

18    on April 15th for an accounting hearing at John -- at Wolf

19    Popper's offices.  She starts to contact the district

20    attorney, the federal people, the IRS and then Wolf Popper

21    slaps a fraudulent GAL on Evelyn so that everybody will

22    disbelieve her.  And we have telephone records that prove

23    that Wolf Popper created the false GAL on June 8th and then

24    had the order created on June 30th when Eve Preminger (ph)

25    wouldn't sign it and forced Judge Roth to sign it on June

1    30th.

2            At the same time the New York Post is exposing Eve

3    Preminger on June 1st, 1993 for patronage with these people.

4    And secretly Wolf Popper is doing a Canadian ancillary

5    probate action that we know nothing about because Simon

6    Goldberg was a Canadian citizen.  And it is Wolf Popper who

7    helped keep the false death certificate that he was a U.S.

8    citizen.  That's how they got control of the estate.

9            So at this point Evelyn Goldberg is saying, hey,

10   Wolf Popper has forged all these -- this guardian ad litem.

11   There was no hearing.  I'm here to remove Fischer as Wolf

12   Popper's attorney and Mandelbaum (ph) for forgery on checks

13   that have been proved.  He has been a CPA without a license

14   misrepresenting them.  And Ms. Goldberg then gets slapped

15   with a GAL.

16           There is a conspiracy hearing in 1995 when Roth is

17   about to be re-elected.  At the conspiracy hearing Wolf

18   Popper openly admits on the transcript in trying to get the

19   special referee to drop the GAL questions because at all

20   times Wolf Popper is directly handing the information to the

21   GAL and Evelyn Goldberg is not receiving it.

22           And, sir, for your information I brought you what

23   is the docket in 2010 of 20, 20 documents that don't even

24   have the petition on it in the Surrogate's Court.  And after

25   I complained to the IRS through a congressman that I work

1   with we have 190 documents placed on the docket in 2015.

2   This is three years after I've gone to Mr. Picard.  Twenty-

3   five documents that have no relation or no mention of fraud

4   to a hundred -- no -- well, we add this to the 190, so now

5   we have 210 documents expressly addressing the fraud.

6            Sir --

7            THE COURT:  Have you raised this in State Court?

8            MR. LOREN:  They are freaking out, sir, that we --

9   they -- Judge Maya took the file and personally ordered

10  these to be put on when the IRS contacted her.  She is

11  beside herself because Judge Roth got caught living the GAL

12  with Harvey Korn (ph).  That was to silence the Madoff --

13           THE COURT:  Who is Harvey Korn?

14           MR. LOREN:  Harvey Korn was the guardianship clerk

15  for the Manhattan Surrogate Court and he was also the

16  attorney responsible for -- there was a wealthy socialite

17  who was, Asther (ph).  He was the attorney that did all the

18  papers for Asther for the guardian ad litem that was

19  responsible for her being held prisoner on the couch and

20  that eventually killed her.  That's what they did not want

21  to come out.

22           And, in fact, today --

23           THE COURT:  They didn't want the Asther case to

24  come out?

25           MR. LOREN:  Yes.  That it was also under the

Page 30

1    control of this Harvey Korn guardianship.  This was common

2    at the time, sir, in 1993.  Jack Newfield (ph) was breaking

3    the story.  And then today I see that the Rockefeller heir

4    is also before Judge Maya contesting the same issue.  And,

5    in fact, all her funds were directed through JPMorgan and

6    Merril Lynch the same way.

7              And on top of that when I contacted Irving

8    Picard's law firm and I personally spoke with Irving Picard

9    within 48 hours I received a call from the New York City Law

10   Department saying that I was being charged with stealing

11   $72,000 --

12             THE COURT:  What is that about?

13             MR. LOREN:  It was from a Bank of America account

14   and I said, I don't know.  I don't have $72,000.  I said,

15   please send me the Bank of America account.  I went to Bank

16   of America.  They said, this $72,000 is in a branch in Las

17   Vegas.  That branch in Las Vegas had $72,000 that was moved

18   out of Merril Lynch accounts and were being double counted

19   on the Bank of America books which were under investigation

20   at that time.

21             I called Merril Lynch.  They personally called the

22   New York City Law Department and in five minutes they called

23   me back and said, there is no longer any investigation.  One

24   month later, Bank of America settled with the Department of

25   Justice for the fraud.  I was never informed.

Page 31

1          Then I receive non-stop calls from a debt

2    collector at the same time from Illinois.  I look on the web

3    where this debt collector is.  All of a sudden it's a four-

4    way intersection in Cornfields.  So I call Lisa Mattigan

5    (ph), the attorney general.  I say, excuse me.  I'm involved

6    in the Madoff case and all of a sudden -- well, this Madoff

7    fraud and I have this debtor calling me, debt collection.

8    They say, oh, she's not here.  Let's go to the capital.

9          I call.  They send me to the capital and I get the

10   executive secretary of Mattigan.  I explain to her that I'm

11   being harassed by this imaginary firm.  They ask me to fax

12   the information to them and I ask the spelling of the first

13   name, just to make sure that -- Lisa, sometimes, you know,

14   there is a misspelling of Lisa.  It comes in different

15   manners.  They say, it's Michael.  It's Michael Mattigan's

16   office that I'm speaking with and he is the speaker of the

17   Illinois government, the senate.  He turns around and within

18   five days I receive a letter that says we will never bother

19   you again.

20          THE COURT:  You had asked -- this had started,

21   though, you had asked whether you could submit additional

22   papers.  You can submit additional papers within seven days.

23          MR. LOREN:  Yes.  And also we would like the Court

24   to have Irving Picard submit the Wolf Popper documents that

25   finger them as a client because we believe that there has to

Page 32

1    be a mutual -- we have proof beyond a doubt, summary

2    judgment, cannot be thrown out.  We have shown without a --

3    beyond a preponderance so now the burden shifts to Irving

4    Picard to also show us the Michael -- the Wolf Popper papers

5    and we are due those, sir.

6                THE COURT:  Okay.  Thank you.

7                MR. JAIN:  Thank you, Your Honor.

8                MR. LOREN:  And we would like that to be requested

9    today, that they produce those to us and we will produce all

10   our documents to them so that you can have a final decision

11   based on facts, truth and accuracy, sir.  Would that be okay

12   for you to explain to Irving Picard to produce those to us?

13               THE COURT:  I'll reserve decision.

14               MR. JAIN:  Thank you, Your Honor.

15               MR. LOREN:  Is there a reason, sir?

16               THE COURT:  You raise very difficult issues.  I

17   would like to think about it.

18               MR. LOREN:  They're only truth, sir.  These

19   documents exist.  They are there.  They prove our case.

20               THE COURT:  Okay.  Thank you.

21               MR. LOREN:  And I appreciate your time and

22   patience.  It's a very difficult process.  And I will be

23   sending my papers also to the Congress.

24               THE COURT:  Thank you very much.

25               MR. JAIN:  Thank you, Your Honor.

Page 33

1              THE COURT:  Thank you, Mr. Jain.

2              MR. BLANCHARD:  Thank you, Your Honor.

3              THE COURT:  Thank you.

4         (Pause)

5              THE COURT:  The next matter on the calendar are

6    the fee applications.

7              MR. SHEEHAN:  Good morning, Your Honor.  David

8    Sheehan with Baker Hostetler on behalf of the trustee and

9    the firm of Baker Hostetler.

10             Today is the return date of the 26th interim fee

11   application.  On behalf of the trustee's counsel and all of

12   the related counsel including conflicts counsel who have

13   worked in the case during the period from August 1, 2017 to

14   November 30, 2017.

15             THE COURT:  I'm waiting for Mr. Bell to give me

16   the day count.  Don't steal his --

17             MR. SHEEHAN:  He has --

18             THE COURT:  -- thunder.

19             MR. SHEEHAN:  He tells me has it to the second.

20             THE COURT:  Okay.

21             MR. SHEEHAN:  Yeah.  So I'm holding him to it.

22             THE COURT:  Unfortunately, we're getting close to

23   the tenth anniversary, so that will be a special day, I

24   guess.

25         (Laughter)

Page 34

1           MR. SHEEHAN:  In any event, so as I normally do,

2     Your Honor, I thought I would just report on --

3           THE COURT:  Yeah.

4           MR. SHEEHAN:  -- a few of the major things that

5     are occurring.  And especially with regard to the related

6     counts.

7           Your Honor has a, I would say at this point given

8     our -- the number of appearances here close to an intimate

9     knowledge of what the trustee and his counsel are engaged in

10    from the various matters from ET to Merkin (ph) to whatever

11    the case may be, Magnify, et cetera.

12          So I won't dwell on that.  The only thing I would

13    say to Your Honor is, is that we have spending a, not an

14    insignificant amount on the extraterritoriality appeal.  And

15    as I'm sure Your Honor has noticed (indiscernible) is that

16    there have been just multiple extraterritoriality opinions

17    by both the Supreme Court and the Second Circuit.  We're

18    just trying to keep track of those and it's -- it's going to

19    be a very, very interesting appeal.

20          The -- with regard to the foreign, Your Honor, is,

21    again, familiar with the Magnify matter.  You just issued an

22    opinion on the motion to dismiss.

23          THE COURT:  Is there --

24          MR. SHEEHAN:  So --

25          THE COURT:  Is there litigation in Israel relating

Page 35

1  to that?

2          MR. SHEEHAN:  Yes.  As a matter of fact, one of

3  the things that we're going to try and resolve is where it's

4  going to end up as a matter of fact because we did not file,

5  and I don't know if we ever informed Your Honor of this, but

6  we didn't file the Israeli action until the last minute and

7  there is a six-year statute there.  So it's only been filed

8  a little over three years ago.  We wanted to proceed here,

9  but it -- you know, a lot of things intervened.  Your

10  Honor's familiar with those as well.

11          And so as a result that case started to move much

12  more quickly and we ended up, there were two cases --

13          THE COURT:  Who were the defendants in those

14  cases?

15          MR. SHEEHAN:  Pardon, Your Honor.

16          THE COURT:  Who were the defendants?

17          MR. SHEEHAN:  The -- well, the majority -- well,

18  Mr. Green (ph) is a defendant there as well as sort of any

19  other defendants that are before Your Honor.  But in

20  addition a large amount of the defendants are indeed

21  recipients, subsequent transferees we would call them of the

22  (indiscernible) if you will of Ishie Horowitz (ph) and we've

23  sued everyone from the Hebrew University to the Bangorian

24  University to -- it's an array of prominent people who have

25  received these funds.

1           And there, unlike here, it's basically an unjust

2      enrichment cause of action because we're not barred from

3      that.  One thing about this case is I've learned more about

4      laws in 27 jurisdictions than I ever thought I would.  But

5      as a result we're proceeding with that there.  But it's

6      (indiscernible) not unlike litigation I think everywhere.

7           So right now our preference as always is to try

8      the case here before Your Honor, to do it in the Southern

9      District.  That's what we're trying to proceed with there --

10     here.  But in the meantime we wanted to protect the, you

11     know, the trustee's cause of action.  And so as a result we

12     filed the news reel.

13          And that's why you see Soroker Agmon which is

14     honorable counsel there, one of the top three people in the

15     interim fee applications in terms of hours and dollars

16     because of all the work that they're doing there on a daily

17     basis, including a modified form of discovery.  They have

18     more or less an English system which if Your Honor is I

19     think probably familiar with, but in the sense that there's

20     no discovery.  I'm beginning to -- after what we've been

21     going through here I'm starting to think that maybe we

22     should adopt it which is hey --

23          THE COURT:  It's cheaper.

24          MR. SHEEHAN:  Yeah.  Well, you just take

25     everything you have and you give it to the other side and

1    that's it.  And it's up to them to figure it all out.  And

2    they try to the case basically on affidavits and cross-

3    examination.  So it's a much reduced system.

4          So in any event, it would get rid of at least a

5    lot of discovery applications that we have.  So that's

6    what's going on over there and a lot of translation and that

7    kind of work.  It's quite frankly quite tedious, but it

8    requires a lot of attention to get it done right.

9          Then, of course, we have our -- the people at

10   Williams Barristers & Attorneys down in Bermuda.  While Your

11   Honor doesn't see a lot of it here in the courtroom, you're

12   familiar with the fact that the King -- the liquidators in

13   Kingate -- you may not be familiar with this.  But they --

14   they've reached a settlement and it's one of the things that

15   I find fast eddy about working with foreign jurisdictions.

16   I always think that this should be.

17          But there -- it's -- it's private.  We can't get

18   access to it.  We were actually barred from the courtroom.

19          THE COURT:  Who did Kingate --

20          MR. BELL:  Well --

21          THE COURT:  -- get upset with?

22          MR. BELL:  -- what it is is it's not the

23   liquidators.  It's actually -- well, it is the liquidators,

24   but it's Kingate Management, the management company for

25   Kingate.  It -- and they together with Thin (sic) and

Page 38

1    together with, there's another company in between, oh, and

2    the funds themselves, Global and Euro, they all sued, you

3    know, and they tried to bring a suit against, not Seretti &

4    Grasso (ph), but other third banks and other intermediaries

5    on the basis that the NAV had been paid out on a mistake of

6    fact.

7           That action was rejected by the English courts and

8    suggested that what they really needed to do was bring a

9    fraud cause of action at which time that action would have

10   essentially paralleled to ours in terms of what was being

11   said.  So as a result they've settled.

12          And just again everything is related in this case.

13   They're not trying to introduce the settlement into the

14   Second Circuit record on extraterritoriality.  So we have a

15   whole skirmish going on about that.

16          THE COURT:  What does the settlement have to do

17   with it?

18          MR. SHEEHAN:  Pardon

19          THE COURT:  What does the settlement have to do

20   with the extraterritoriality question?

21          MR. SHEEHAN:  Well, I'm not sure I could tell you

22   that yet because I haven't seen their papers.  All I'm

23   seeing is, is the application.  But they're -- they're

24   obviously thinking it has something to do with the fact that

25   we shouldn't be continued to go around as it were to

Page 39

```
 1    liquidation when they've actually already settled it.  But
 2    there's lots of moving parts there.
 3               So in any event --
 4               THE COURT:  But Seretti & Grasso didn't settle,
 5    did they?
 6               MR. SHEEHAN:  Pardon?  No.   They -- Seretti &
 7    Grasso?
 8               THE COURT:  Yeah.
 9               MR. SHEEHAN:  Well, the entities that it also sued
10    were, you know, the Laperla (ph) trust and the other trusts
11    in there which is eluding me.  But in any event, those two
12    trusts were also sued.  And I'm getting into the balance of
13    this, but there was $300 million that we found in BVI early.
14    We went in and were able to have the BVI court to freeze
15    that.
16               Then the other party showed up and we all came to
17    an agreement that until there was a court decision we're --
18    wherever that might be, BVI, Bermuda or here, that that
19    money would remain there.  And the -- they -- Seretti &
20    Grasso claimed, of course, it was the trust's money and that
21    they should get it.
22               That money, and we don't have any idea of how
23    much, you know, in real detail, is actually being used to
24    fund this settlement.  And we're objecting and we'll see
25    where that all goes.
```

1          But that's where -- all that activity orbits

2     around Bermuda where most of the activity takes place

3     because that's where Kingate Management was and that's where

4     Euro and the liquidators are.  So we have a busy schedule

5     down there.

6          And last but not least, and they're directly

7     involved in this, too, is Brown Jacobson which has the

8     largest amount that they're seeking of foreign counsel.  And

9     the foreign counsel in that case are assisting us with

10    regard to, for example, we were just on the phone with them

11    yesterday, not that that's in the reporting period, but it's

12    a good example of what happens, is that we are looking to --

13    the process and procedures that transpire in Bermuda with

14    regard to the settlement and looking to get a foreign law

15    affidavit prepared in anticipation of the motion practice

16    that will occur in the Second Circuit.

17         So they arranged for that.  There are solicitors

18    there.  They can then provide expert opinion and submit that

19    to the Court.

20         And that's an example of what we do all the time.

21    We do have a protective action there, too.  Again, we want

22    to try the Kingate case here.  So we have not moved that

23    case along, but they stay on top of it and make sure that,

24    you know, it's still preserved.  They also assist us in

25    discovery throughout the EEU.  There is still going on, and

Page 41

1   I think Your Honor sees the serve at the end of the game

2   when you saw last year that we were able to settle Athema

3   (ph) International and some of those large settlements we

4   had.  They came about as a result of the enormous activity

5   that was taking place in Europe with regard to documents and

6   statements being taken through our Austria counsel, English

7   counsel, and Lichtenstein counsel.

8          So -- and it's that kind of discovery that's

9   really still going to be going on and -- I'm losing -- I got

10  too many ABAs and Anabros and everything running around in

11  my head here.  But that case, Mr. Bell can comment -- no,

12  you can't?  Okay.

13         In any event, we have this case going on.  You

14  know, as Your Honor knows, we just had a partial settlement

15  in it, but the rest of the case is continuing.  We have an

16  issue there about again equitable subordination that Your

17  Honor knows is something --

18         UNIDENTIFIED SPEAKER:  Alpha Prime.

19         MR. SHEEHAN:  -- that we're -- pardon?

20         UNIDENTIFIED SPEAKER:  Alpha Prime.

21         MR. SHEEHAN:  Alpha Prime.  That's it.

22         So in that case we're -- we allowed ourselves I

23  think 15 months for discovery in the order that Your Honor

24  entered and the reason being is most of that discovery would

25  probably be taking place in Europe and that's where most of

1   the statements and documents will come from.

2          So a lot of -- as much as Your Honor sees an

3   enormous amount of activity here, there's a lot of activity

4   that takes place in foreign courts on a regular basis and

5   that's where those foreign counsel come in.

6          And I never like to end my application before Your

7   Honor without mentioning the folks who had -- with Mr.

8   Nisselson and his fine firm and the work that they've done

9   for us throughout, not only on cases that -- of which we

10  have conflicts, but we've called upon them to assist us, for

11  example, on the appeal of extraterritoriality.  There's a

12  lot of additional work there, et cetera.

13         So -- and, of course, Young Conaway has done a

14  very fine job as well.

15         So, Your Honor, I would ask that you enter the

16  order that we've requested and allow all the applications

17  for fees.

18         Thank you.

19         THE COURT:  Thank you.

20         MR. BELL:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22         MR. BELL:  Kevin Bell for SiPC.

23         When Mr. Sheehan was talking about Mr. Seretti &

24  Mr. Grasso and mentioned Laperla trust I would have to say

25  the Panama papers came to my mind because those trusts are

Page 43

1    Panamanian.  So -- and that's going to be taking a long

2    while.

3           Your Honor, SiPC has reviewed all of the

4    applications, has reviewed all the invoices, has reviewed

5    every entry in all those invoices and made comments and

6    suggestions to Baker and Windels regarding their

7    applications and all the applications that are before the

8    Court as we have done for all the days of this liquidation

9    proceeding.

10          And I will note in our recommendation, in SiPC's

11   recommendation on Baker at paragraph 5 we show how that has

12   resulted in a reduction from the normal rates charged by

13   Baker Hostetler and in paragraph 3 of Windels has -- how

14   that has resulted in a reduction from the normal rates

15   charged.

16          And I will go through as I have, and this is the

17   26th occasion to appear before the Court on fee

18   applications, SiPC Section 78 eee(b)(5)(A) and (b)(5)(C)

19   talk about the standard at this point in time with the last

20   allocation motion this Court approved and the distribution

21   that occurred in February.  Victims of this case that shall

22   have allowed claims have received 63.904 cents on every

23   dollar of their claim.  And we persist going forward.

24          As Mr. Sheehan has so wonderfully articulated to

25   the Court the worldwide effort that we seek, and I agree

Page 44

1    with Mr. Sheehan as recently as Monday, the Supreme Court

2    came down with more guidance on extraterritorial application

3    of United States laws in the Jesper (ph) case.  A wonderful

4    read, bedtime reading.

5            The -- there is no reasonable expectation at this

6    moment in time and our last discussion, Your Honor, on fees.

7    I may have been too overly enthusiastic about --

8            THE COURT:  Let's say optimistic.

9            MR. BELL:  Optimistic, Your Honor, I will adopt

10   your word, in where we will end up.  In the -- all the days

11   of this case I have been exuberant and optimistic in the

12   results that we will achieve because that's the statutory

13   purpose is to get back money that has been entrusted to

14   broker dealers that is governed by the SEC rules that were

15   promulgated as a result of the enactment of the Securities

16   Investor Protection Act that brokers are supposed to protect

17   customer assets from the moment they're entrusted.  And that

18   should occur and if it doesn't then the SiPC liquidation

19   mandate is to try and fulfill customers' expectations.  And

20   the results so far have exceeded some people's expectations.

21           I would recommend on this, and I know you're

22   expecting me to say this on this 3,415th day which has been

23   81,960 hours or thereabouts since you asked me that last

24   time and I was stunned --

25           THE COURT:  But they've billed for even more time

1    than that.  How can it be?

2        (Laughter)

3            MR. BELL:  Your Honor, I read all those fee

4    applications and fee invoices and it's -- it's a 24/7 or

5    36/12 effort depending on --

6            THE COURT:  They keep going west.  That's how they

7    do it, I guess.

8            MR. BELL:  Yeah.  Well, they still go on as we go

9    through all the litigation that Mr. Sheehan has talked about

10   and the various special counsel including Windels Marx which

11   I know are intimately involved in a lot of the high level

12   litigation that's going on at the circuit with regard to

13   this.

14           And I will not take Mr. Sheehan's bait and mention

15   the number of seconds that have been, but that's at

16   fingertip knowledge.

17           But I would ask the Court to approve the fee

18   applications based on our recommendation and review as the

19   statute contemplates and in the Court's discretion as

20   allowed by the -- in this unique liquidation proceeding

21   under federal law.

22           THE COURT:  Thank you.

23           MR. BELL:  Thank you.

24           THE COURT:  Does anyone else want to be heard?

25           All right.  Based on SiPC's recommendation and the

Page 46

1    fact that it is unlikely that we'll get through the SiPC

2    customer estate claims and to the general claims I'll

3    approve the fees.  You can submit an order.

4           MR. SHEEHAN:  Thank you very much, Your Honor.

5           MR. BELL:  Thank you.

6           THE COURT:  Thank you.

7       (Whereupon, these proceedings were concluded at 10:56

8    a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2                             RULINGS

3                                                          PAGE

4      Hearing re: Submission of Dean Loren, Executor of

5      the Evelyn Goldberg Estate, dated Jan 24, 2018

6      (ECF Doc #17160)                                     --

7

8      Application for interim professional compensation

9      Twenty-Sixth Application of Trustee and Baker &

10     Hostetler, LLP for allowance of interim compensation

11     for services rendered and reimbursement of actual and

12     necessary expenses incurred from August 1, 2017

13     through November 30, 2017 for Baker & Hostetler,

14     LLP, Trustee's Attorney, period: 08/01/2017 to

15     11/30/2017, fee $34,131,524.04, expenses

16     $290,520.17                                          46

17

18     Application for interim professional compensation

19     application of Schiltz & Schiltz as special counsel

20     to the trustee for allowance of interim compensation

21     for services rendered and reimbursement of expenses

22     incurred from August 1, 2017 through November 30, 2017

23     for Schiltz & Schiltz, special counsel, period:

24     08/01/2017 to 11/30/2017, fee $47,892.27, expenses:

25     $3,113.00                                            46

1                           I N D E X

2                            RULINGS

3                                                        PAGE

4    Application for interim professional compensation

5    application of Higgs & Johnson (Formerly Higgs Johnson

6    Truman Bodden & Co) as special counsel to the trustee

7    for allowance of interim compensation for services

8    rendered and reimbursement of expenses incurred from

9    August 1, 2017 through November 30, 2017 for Higgs &

10   Johnson, special counsel, period: 08/01/2017 to

11   11/30/2017, fee $41,093.36, expenses: $3,906.44        46

12

13   Application for interim professional compensation

14   application of Soroker Agmon Nordman as special

15   counsel to the trustee for allowance of interim

16   compensation for services rendered and reimbursement

17   of expenses incurred from August 1, 2017 through

18   November 30, 2017 for Soroker Agmon Nordman, special

19   counsel, period: 08/01/2017 to 11/30/2017, fee

20   $485,357.61, expenses: $10,967.12                      46

21

22

23

24

25

1                          I N D E X

2                           RULINGS

3                                                        PAGE

4     Application for interim professional compensation

5     application of Graf & Pitkowitz Rechtsanwalte Gmbh as

6     special counsel to the trustee for allowance of interim

7     compensation for services rendered and reimbursement of

8     expenses incurred from August 1, 2017 through November

9     30, 2017 for Graf & Pitkowitz Rechtsanwalte Gmbh,

10    special counsel, period: 08/01/2017 to 11/30/2017,

11    fee $10,997.11, expenses: $46.98                    46

12

13    Application for interim professional compensation/

14    Twenty-Fifth application of Windels Marx Lane &

15    Mittendorf, LLP for allowance of interim compensation

16    for services rendered and reimbursement of actual and

17    necessary expenses incurred from August 1, 2017 through

18    November 30, 2017 for Windels Marx Lane & Mittendorf,

19    LLP, special counsel period: 08/01/2017 to 11/30/2017,

20    fee $2,100,296.00, expenses: $16,306.87              46

21

22

23

24

25

1                          I N D E X

2                            RULINGS

3                                                          PAGE

4     Application for interim professional compensation

5     application of SCA Creque as special counsel to the

6     trustee for allowance of interim compensation for

7     services rendered from August 2, 107 through November

8     30, 2017 for SCA Creque, special counsel, period:

9     08/01/2017 to 11/30/2017, fee $11,589.71, expenses:

10    $0.00                                                  46

11

12    Application for interim professional compensation

13    application of Young Conaway Stargatt & Taylor, LLP,

14    as special counsel to the trustee for allowance of

15    interim compensation for services rendered and

16    reimbursement of expenses incurred from August 1,

17    2017 through November 30, 2017 for Young, Conaway,

18    Stargatt & Taylor, special counsel, period: 08/01/2017

19    to 11/30/2017, fee $141,485.22, expenses: $5,414.05      46

20

21

22

23

24

25

1                          I N D E X

2                            RULINGS

3                                                       PAGE

4    Application for interim professional compensation

5    application of Williams Barristers & Attorneys as

6    special counsel to the trustee for allowance of interim

7    compensation for services rendered from August 1, 2017

8    through November 30, 2017 for Williams Barristers &

9    Attorneys, special counsel, period: 08/01/2017 to

10   11/30/2017, fee $302,928.61 expenses: $0.00           46

11

12   Application for interim professional compensation

13   application of UGGC & Associes as special counsel to

14   the trustee for allowance of interim compensation for

15   services rendered from August 1, 2017 through November

16   30, 2017 for UGGC & Associes, special counsel, period:

17   08/01/2017 to 11/30/2017, fee $71,205.95, expenses:

18   $1,816.17                                             46

19

20

21

22

23

24

25

Page 52

1                              I N D E X

2                                RULINGS

3                                                           PAGE

4    Application for interim professional compensation

5    application of Browne Jacobson, LLP as special counsel

6    to the trustee for allowance of interim compensation

7    for services rendered and reimbursement of actual and

8    necessary expenses incurred from August 1, 2017

9    through November 30, 2017 for Browne Jacobson, LLP,

10   special counsel, period: 08/01/2017 to 11/30/2017,

11   fee $986,539.78, expenses: $17,040.11                  46

12

13   Application for interim professional compensation

14   application of Eugene F. Collins as special counsel to

15   the trustee for allowance of interim compensation for

16   services rendered from August 1, 2017 through November

17   30, 2017 for Eugene F. Collins, special counsel, period:

18   08/01/2017 to 11/30/2017, fee $9,279.67, expenses:

19   $0.00                                                  46

20

21

22

23

24

25

Page 53

1                          I N D E X

2                           RULINGS

3                                                        PAGE

4     Application for interim professional compensation

5     application of Cochran Allan as special counsel to the

6     trustee for allowance of interim compensation for

7     services rendered from August 1, 2017 through November

8     30, 2017 for Cochran Allan, special counsel, period:

9     08/01/2017 to 11/30/2017, fee $504.90, expenses: $0      46

10

11    Application for interim professional compensation

12    application of The Scaletta Law Firm, Pllc as special

13    counsel to the trustee for allowance of interim

14    compensation for services rendered from August 1,

15    2017 through November 30, 2017 for The Scaletta Law

16    Firm, PLCC, special counsel, period: 08/01/2017 to

17    11/30/2017, fee $21,721.05, expenses: $280.16          46

18

19

20

21

22

23

24

25

1                              I N D E X

2                              RULINGS

3                                                              PAGE

4    Application for interim professional compensation

5    application of Robbins, Russell, Englert, Orseck,

6    Untereiner & Sauber, LLP as special counsel to the

7    trustee for allowance of interim compensation for

8    services rendered from September 22, 2017 through

9    November 30, 2017 for Robbins, Russell, Englert,

10   Orseck, Untereiner & Sauber, LLP, special counsel,

11   period: 09/22/2017 to 11/30/2017, fee $62,172.00,

12   expenses: $493.37                                          46

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

1              C E R T I F I C A T I O N

2

3      I, Sherri Breach, certify that the foregoing transcript

4  is a true and accurate record of the proceedings.

5

6  **Sherri L**   Digitally signed by Sherri L Breach
                   DN: cn=Sherri L Breach, o, ou,
   **Breach**      email=digital1@veritext.com,
                   c=US
7  _____  Date: 2018.04.26 14:45:00 -04'00'_____

8  Sherri L. Breach

9  AAERT Certified Electronic Reporter & Transcriber CERT*D-397

10

11

12  Date:  April 26, 2018

13

14

15

16

17

18

19

20

21

22  Veritext Legal Solutions

23  330 Old Country Road

24  Suite 300

25  Mineola, NY 11501