# EXHIBIT 2

*This* *to assure timely delivery*

**CUSTOMER CLAIM**

Bernard L. Madoff Investment Securities LLC
Case No 08-01789-BRL

U.S. Bankruptcy Court for the Southern District of New York

Claim Number: **004713**

Date Received _____

# BERNARD L. MADOFF INVESTMENT SECURITIES LL**RECEIVED**

In Liquidation

MAR 0 2 2009

## DECEMBER 11, 2008

Irving H. Picard, Esq.
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

Provide your office and home telephone no.

OFFICE: _Retired_
Redacted

HOME:_

Taxpayer I.D. Number (Social Security No.)
____ Redacted    _____

Account Number: Redacted
NTC & CO.
FBO PETER MOSKOWITZ DDS Redacted
P O BOX 173859
DENVER, CO 80217

Peter Moskowitz
Redacted

(If incorrect, please change)

**NOTE:**    BEFORE COMPLETING THIS CLAIM FORM, BE SURE TO READ CAREFULLY
THE ACCOMPANYING INSTRUCTION SHEET. A SEPARATE CLAIM FORM
SHOULD BE FILED FOR EACH ACCOUNT AND, TO RECEIVE THE FULL
PROTECTION AFFORDED UNDER SIPA, ALL CUSTOMER CLAIMS MUST BE
RECEIVED BY THE TRUSTEE ON OR BEFORE March 4, 2009. CLAIMS
RECEIVED AFTER THAT DATE, BUT ON OR BEFORE July 2, 2009, WILL BE
SUBJECT TO DELAYED PROCESSING AND TO BEING SATISFIED ON TERMS
LESS FAVORABLE TO THE CLAIMANT. PLEASE SEND YOUR CLAIM FORM BY
CERTIFIED MAIL - RETURN RECEIPT REQUESTED.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1.    Claim for money balances as of **December 11, 2008** :
      a.    The Broker owes me a Credit (Cr.) Balance of        $ _O_
      b.    I owe the Broker a Debit (Dr.) Balance of        $ _O_

502180406

    c.    If you wish to repay the Debit Balance,

            please insert the amount you wish to repay and

            attach a check payable to "Irving H. Picard, Esq.,

            Trustee for Bernard L. Madoff Investment Securities LLC."

            If you wish to make a payment, **it must be enclosed**

            with this claim form.          $_____

    d.    If balance is zero, insert "None."      *NONE*

2.        Claim for securities as of **December 11, 2008**:

## PLEASE DO NOT CLAIM ANY SECURITIES YOU HAVE IN YOUR POSSESSION.

|  | YES | NO |
|---|---|---|
| a.  The Broker owes me securities | *Yes* | |
| b.  I owe the Broker securities | | *NO* |

    c.    If yes to either, please list below:

| Date of Transaction (trade date) | Name of Security | The Broker Owes Me (Long) | I Owe the Broker (Short) |
|---|---|---|---|
| | *See Statement Enclosed Dated 11-30-08* | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Number of Shares or Face Amount of Bonds*

**Proper documentation can speed the review, allowance and satisfaction of your claim and shorten the time required to deliver your securities and cash to you. Please enclose, if possible, copies of your last account statement and purchase or sale confirmations and checks which relate to the securities or cash you claim, and any other documentation, such as correspondence, which you believe will be of assistance in processing your claim. In particular, you should provide all documentation (such as cancelled checks, receipts from the Debtor, proof of wire transfers, etc.) of your deposits of cash or securities with the Debtor from as far back as you have documentation. You should also provide all documentation or**

9.  Have you or any member of your family
    ever filed a claim under the Securities
    Investor Protection Act of 1970? if
    so, give name of that broker.                    _____  ✓____

    Please list the full name and address of anyone assisting you in the
    preparation of this claim form:_____
    _____.

If you cannot compute the amount of your claim, you may file an estimated claim. In that
case, please indicate your claim is an estimated claim.

*SEE The enclosed B.M.L.I.S. statement Dated 11-30-08*
*Estimated value of equities is $1,150,000 – as of filing date,*

IT IS A VIOLATION OF FEDERAL LAW TO FILE A FRAUDULENT CLAIM.
CONVICTION CAN RESULT IN A FINE OF NOT MORE THAN $50,000 OR
IMPRISONMENT FOR NOT MORE THAN FIVE YEARS OR BOTH.


THE FOREGOING CLAIM IS TRUE AND ACCURATE TO THE BEST OF MY
INFORMATION AND BELIEF.

Date _February 19, 2009_   Signature _Peter Moskowitz_

Date _____   Signature _____
*In order to assure timely delivery*
*This Is a Duplicate of The original*  _Peter Moskowitz_ 2-23-09

(If ownership of the account is shared, all must sign above. Give each owner's name,
address, phone number, and extent of ownership on a signed separate sheet. If other
than a personal account, *e.g.*, corporate, trustee, custodian, etc., also state your capacity
and authority. Please supply the trust agreement or other proof of authority.)


**This customer claim form must be completed and mailed promptly,
together with supporting documentation, etc. to:**

Irving H. Picard, Esq.,
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800
Dallas, TX 75201

502180406

information regarding any withdrawals you have ever made or payments received from the Debtor.

Please explain any differences between the securities or cash claimed and the cash balance and securities positions on your last account statement. If, at any time, you complained in writing about the handling of your account to any person or entity or regulatory authority, and the complaint relates to the cash and/or securities that you are now seeking, please be sure to provide with your claim copies of the complaint and all related correspondence, as well as copies of any replies that you received.

**PLEASE CHECK THE APPROPRIATE ANSWER FOR ITEMS 3 THROUGH 9.**

NOTE:    IF "YES" IS MARKED ON ANY ITEM, PROVIDE A DETAILED EXPLANATION ON A SIGNED ATTACHMENT.    IF SUFFICIENT DETAILS ARE NOT PROVIDED, THIS CLAIM FORM WILL BE RETURNED FOR YOUR COMPLETION.

|   |   | YES | NO |
|---|---|-----|-----|
| 3. | Has there been any change in your account since December 11, 2008? If so, please explain. | | ✓ |
| 4. | Are you or were you a director, officer, partner, shareholder, lender to or capital contributor of the broker? | | ✓ |
| 5. | Are or were you a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the broker? | | ✓ |
| 6. | Are you related to, or do you have any business venture with, any of the persons specified in "4" above, or any employee or other person associated in any way with the broker? If so, give name(s) | | ✓ |
| 7. | Is this claim being filed by or on behalf of a broker or dealer or a bank? If so, provide documentation with respect to each public customer on whose behalf you are claiming. | | ✓ |
| 8. | Have you ever given any discretionary authority to any person to execute securities transactions with or through the broker on your behalf? Give names, addresses and phone numbers. | | ✓ |

Peter Moskowitz
Redacted

February 25, 2009

Irving H. Picard
Trustee for Bernard L. Madoff Investment Securities LLC
Claims Processing Center
2100 McKinney Ave., Suite 800

Dear Sir:

Enclosed please find a customer claim form, the last BLMIS statement (11-30-2008), and supporting documents. This is a claim for securities.  Please send any proceeds directly to ameriprise Trust Company(see enclosed documents). I expect to send a supplemental letter in support of this claim.

Sincerely,

Peter Moskowitz DDS

# CIVIL COVER SHEET

JS 44 (Rev. 12/07)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

John J. Barrett, III, as Trustee for the Dynasty Construction, Inc. 401K Plan, et al.

## DEFENDANTS

Fiserv, Inc., et al.

**(b)** County of Residence of First Listed Plaintiff  Sarasota
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  doing business in FL
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
James F. Lowy, Esquire, Lowy Law Firm, LLC, 3907 Henderson Blvd., Suite 200, Tampa, Florida  33629  (813) 288-9525

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ⊗ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 465 Other Immigration Actions | | |

**PERSONAL INJURY** (Torts, middle column additional):
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY:**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**PRISONER PETITIONS:**
- ☐ 510 Motions to Vacate Sentence
- **Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 USC 1332(a)

Brief description of cause: BREACH OF CONTRACT RELATED TO LOUIS PEARLMAN PONZI SCHEME

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ OVER 85 MILLION

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE  LAZZARRA    DOCKET NUMBER  07-CV-0399

DATE  10/24/08

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| JOHN J. BARRETT, III, as Trustee for the DYNASTY CONSTRUCTION, INC. 401K PLAN, et al. <br><br> Plaintiffs, <br><br><br><br> FISERV, INC., FIRST TRUST CORPORATION, RETIREMENT ACCOUNTS, INC., FISERV TRUST COMPANY, FISERV, INC., TD AMERITRADE TRUST COMPANY and DOES 1-100 inclusive, <br><br><br><br> Defendants. | 08-cv-_____ <br><br> 1) BREACH OF FIDUCIARY DUTY; <br> 2) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; <br> 3) AIDING AND ABETTING COMMON LAW FRAUD; <br> 4) NEGLIGENCE; <br> 5) BREACH OF CONTRACT; <br> 6) VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT; <br> 7) AIDING AND ABETTING VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT. |

## DEMAND FOR A JURY TRIAL

Plaintiffs (collectively "Plaintiffs") for their Complaint as against Defendants, allege as follows:

### INTRODUCTION

1.    This case involves the actions of defendants First Trust Corporation d/b/a Retirement Accounts, Inc., and a subsidiary of Fiserv, Inc., Fiserv Trust Company, a former subsidiary of Fiserv, Inc. which was recently merged into TD Ameritrade Trust Company and Fiserv, Inc., a holding company (all defendants collectively hereinafter being referred to as "Fiserv"; NASDAQ: FISV), a large financial services conglomerate with annual revenues approaching Four Billion Dollars and a market capitalization of over Five Billion Dollars, which describes itself as "[T]he world's largest service provider to banks, credit unions, lending institutions, and investment advisors" with over 18,000 clients worldwide.

2.    At all relevant times, Fiserv knew it was being used by, and yet turned a blind eye to, a long-term *Ponzi* scheme perpetrated by one Louis J. Pearlman ("Pearlman") that robbed

hundreds if not thousands of elderly and unsophisticated investors, many who were in their 70's and 80's, out of in excess of $300 million of the investors' life savings by facilitating the purchase by these investors of certain illusory investments (hereinafter described and referred to as the "Transcon Investments") which were to be maintained in individual retirement accounts ("IRAs") established by joint agreement between Fiserv and Pearlman and maintained for each investor by Fiserv. Hereinafter, the *Ponzi* scheme perpetrated by Pearlman and his co-conspirators is referred to as the "Pearlman Fraud."

3.     Purportedly acting as IRA custodian and trustee on behalf of its customers, Fiserv purchased the Transcon Investments from unregistered broker-dealers for "deposit" into the investors' accounts and continued to do so over the course of many years despite numerous, detailed customer complaints alerting Fiserv to serious problems with the investments and despite the fact that the Transcon Investments: a) were purely illusory; b) failed to qualify as the type of investments which are eligible to be deposited into qualified retirement accounts according to IRS regulations; and c) failed to meet Fiserv's own standards as to permissible IRA investments for Fiserv IRA custodial accounts.

4.     Many of the investors lost their entire life savings which they amassed by sacrificing and cautiously saving throughout the course of their working lives. The losses at issue are not the simple result of the failure of legitimate investments to perform as expected; rather, this was a massive and pervasive fraud which could not have been perpetrated had Fiserv (and its employees) not breached fiduciary, statutory and contractual duties owed to its customers. The actions and inaction of Fiserv provided substantial assistance to the fraudulent scheme perpetrated by Pearlman, which devastated the Plaintiffs and their families.

5.     The named Plaintiffs and their counsel have thus far reviewed the investment files of only a fraction of the Pearlman Fraud victims. The shocking evidence of Fiserv's actions and omissions contained therein strongly suggests that the details set forth below represent the tip of the iceberg and are indicative of a widespread pattern of malfeasance.

## THE NATURE OF THE PEARLMAN FRAUD

6.     The term "*Ponzi* Scheme" derives from the notorious Charles Ponzi, who stole millions of dollars from Boston investors in 1920 and describes a financial fraud which is perpetrated by utilizing monies obtained under false pretenses from subsequent investors to pay

"interest" or "dividends" and return of principal to earlier investors who have no reason to suspect that no legitimate enterprise is actually generating revenues to make these payments. A *Ponzi* scheme will only last as long as there are new investors who part with their investment funds anticipating unusually high returns. Eventually, the house of cards will have to collapse, usually leaving the later-in-time investors holding the bag and the con-artist promoters in jail. The *Ponzi* scheme perpetrated by Pearlman did not unravel until the State of Florida Office of Financial Regulation ("OFR") finally brought injunctive proceedings against Pearlman in December 2006, after years and years of on-again, off-again investigations, effectively shutting down his operations.   Only after that did Fiserv finally stop protecting the financial fraud at the heart of this case.

7.     From the early 1980's until December 2006, Pearlman and related entities wholly owned by Pearlman such as Transcontinental Airlines, Inc., Trans Continental Travel Services Inc., Clean Systems Technology, Inc., and other related companies and entities (collectively, "Transcon"), offered and sold, and received proceeds from, unregistered securities identified either as the "Employee Investment Savings Accounts ( "E.I.S.A."), or as common or preferred stock in one or more of the Transcon companies.

8.     The E.I.S.A. savings program was marketed by Pearlman and his cohorts as providing CD and/or savings accounts to friends and family of Transcon, with pass-through Federal Deposit Insurance Corporation ("FDIC") insurance and reinsurance through Lloyd of London and AIG.  The preferred stock sold in Trans Continental Travel Services Inc. was slated to pay 10% annual dividends.  Stock in other entities was sold as well, including Airship International, Inc., another of the Transcon companies.

9.     Unbeknownst to the Plaintiffs and other bilked investors, the Transcon companies were little more than shell companies designed to defraud investors.  There was no charter airline with 50 airplanes as presented by Transcon on its balance sheets.  Pearlman, the entertainment impresario who obtained fame by promoting the "boy bands" NSync and the Backstreet Boys, was expert at moving assets out of one company and into another, and therefore out of reach of creditors.  He and his co-conspirators created an elaborate fake accounting scheme, with false data from a fictional accounting firm, creating entirely fabricated financial statements which were summarily republished in Dun & Bradstreet reports for a decade or more.

-3-

10. By the time the scheme unraveled in late 2006, Transcon had few if any profitable entities or divisions. No actual segregated E.I.S.A savings accounts were ever established for investors and companies issuing preferred stock had little or no income or assets other than deposits from the E.I.S.A. program. As is typical in *Ponzi* schemes of this nature, Pearlman and his co-conspirators used incoming funds from newer investors to pay principal and interest or dividends to already existing investors.

11. Transcon's E.I.S.A. "savings program" was initially sold by Pearlman and his co-conspirators directly to investors. As the program expanded, the Transcon Investments were sold through a loose network of sales agents, who were either licensed securities brokers or insurance salespeople and who all reported to Pearlman's chief salesman, Michael Crudele.

12. Transcon eventually recruited and utilized defendant Retirement Accounts, Inc. ("RAI") and, later, Fiserv Trust Company, to act as custodian for Transcon investors' retirement plans.

13. Funds paid by Plaintiffs to invest in the Transcon Investments were deposited by Pearlman and his co-conspirators into various Transcon accounts with Florida based banks.

14. Plaintiffs were to be passive and were not expected or obligated to perform any entrepreneurial effort in conjunction with their Transcon Investments to produce the income or profit, which would result in the payment of the interest.

15. According to an OFR analysis, between January 2003 and December 2006 alone, approximately $118 million in proceeds from the sale of the E.I.S.A. program were received and deposited in the Transcon bank accounts.

16. Investors in the Transcon Investments were never advised that their funds would be paid out to earlier investors for account redemption or as interest payments.

17. Investors in the Transcon Investments were never advised that their funds would be paid to third parties in any manner.

18. Investors in the Transcon Investments were informed:

    a.    that the E.I.S.A. program investor funds were held in U.S. bank accounts;

    b.    that the FDIC insured each E.I.S.A. account up to $100,000;

    c.    that a Lloyd's of London insurance policy and Subsequently an AIG insurance policy covered each E.I.S.A. account;

    d.     that a Florida C.P.A. firm, Cohen & Siegel, issued an opinion concerning the E.I.S.A. program on May 3, 1995.

19.    Investors in the Transcon Investments, or some of them, were provided a document to demonstrate that Lloyd's of London insured E.I.S.A. accounts in U.S. financial institutions under Lloyd's Policy # 823/AM9 100780 with the "Assured" being Trans Continental Airlines, Inc. Orlando, Florida, 32819 U.S.A.

20.    F.S. § 517.021, entitled Definitions, provides at subsection (20) the following definition of a security:

    (20) "Security" includes any of the following:

        (a) ...

        (f) An evidence of indebtedness.

        (q) An investment contract.

21.    The Transcon Investments were "securities" as defined by F.S. §§ 517.021 (20)(f) and (q).

22.    The Transcon Investments were not "federal covered securities" as defined by F.S. § 517.021(10).

23.    Upon information and belief, in connection with the sale of the Transcon Investments, no persons were ever registered as an "issuer," "dealer" or "associated person" pursuant to the registration provisions of Chapter 517, Florida Statutes.

24.    At all times material to this action, the Transcon Investments offered to Plaintiffs were never registered as "securities" pursuant to the registration provisions of Chapter 517, Florida Statutes.

25.    F.S. § 517.301 provides a cause of action for, among other things, misrepresentations and omissions in connection with the rendering of investment advice.

26.    Recommending the investment in the Transcon Investments constitutes the rendering of investment advice.

27.    Pearlman and his co-conspirators obtained money from the Transcon Investors by means of a scheme to defraud, and misrepresentations and omissions of material facts in connection with the rendering of investment advice in violation of F.S. § 517.301 of the Florida Securities Investor Protection Act, falsely misrepresented to the Plaintiffs material facts as set

forth herein above.

28.    In connection with the transactions described above, Pearlman and his co-conspirators also omitted to disclose material facts to the Transcon Investors in violation of F.S. § 517.301, Florida Securities and Investor Protection Act, as set forth herein above.

29.    In connection with the transactions described above, Pearlman and his co-conspirators employed a scheme to defraud and engaged in business which operated as a fraud, as previously set forth herein. Said conduct is in violation of F.S. § 517.301.

30.    F.S. § 517.301, Florida Statutes, entitled Fraudulent transactions; falsification or concealment of facts, provides at section (l)(a)1, 2, and 3, the following:

(1) It is unlawful and a violation of the provisions of this chapter for a person:

(a)  In connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security, including any security exempted under the provisions of s. 517.051 and including any security sold in a transaction exempted under the provisions of s. 517.061, directly or indirectly:

1. To employ any device, scheme, or artifice to defraud;

2. To obtain money or property by means of any untrue statement of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

3. To engage in any transaction, practice, or course of business, which operates or would operate as a fraud or deceit upon a person.

31.    Pearlman and his co-conspirators violated the registration and anti-fraud provisions of the Florida Securities and Investor Protection Act in selling unregistered securities and engaging in fraudulent misrepresentations and omissions in connection with the sale of the Transcon Investments.

32.    In late 2006, Pearlman's *Ponzi* scheme began to unravel.  Transcon was unable to pay investors interest on their investments or cash people out of their Transcon Investments.

### THE STATE OF FLORIDA TAKES ACTION

33.    Finally, in December 27, 2006, OFR filed suit after years of investigating Pearlman.  In February 2007, the Florida regulators announced that Pearlman had indeed engaged

in a massive fraud and a receiver was appointed by the Court to take possession of all of the Transcon companies and assets. Later, Pearlman himself and all the Transcon companies filed for bankruptcy, which bankruptcy proceeding is still pending and being jointly administered by a single Trustee, Soneet Kapila.

34.    OFR sued Transcon to enjoin the continuing violation of the Florida Securities and Investor Protection Act, Chapter 517, Florida Statutes, and the Florida Financial Institution Code, Chapter 655, Florida Statutes.

35.    On May 21, 2008, Pearlman was sentenced to 25 years in federal prison, after pleading guilty to charges of conspiracy, money laundering, and making false statements during a bankruptcy proceeding. U.S. District Judge G. Kendall Sharp gave Pearlman the chance to cut his prison time, by offering to reduce the sentence by one month for every million dollars he helps bankruptcy Trustee Kapila recover. Pearlman is currently in Federal prison serving his sentence.

## JURISDICTIONAL ALLEGATIONS

36.    Jurisdiction is proper under 28 U.S.C. § 1332 (d). The matter in controversy exceeds $5,000,000 and at least one of the Plaintiffs is a citizen of a State different from that of a defendant.

37.    Pursuant to 28 U.S.C. § 1391(b), venue in this Court is appropriate. All defendants are subject to personal jurisdiction in the Middle District of Florida, and a substantial portion of the acts underlying the claims contained in this Complaint occurred in this District.

38.    Certain Plaintiffs listed in Appendix "A" are individual citizens of the state of Florida. Other Plaintiffs are citizens of other states. All Plaintiffs invested IRA monies earned through employment in the Pearlman Fraud through Fiserv and have lost approximately $6,546,468.28 as a result of Fiserv's conduct.

39.    Defendant Retirement Accounts, Inc. is the trade name for First Trust Corporation, a Colorado corporation with a principal place of business in Denver, Colorado.

40.    Defendant Fiserv Trust Company is a chartered trust company, which, until recently, had its principal place of business in Denver, Colorado, and was a citizen of the State of Colorado. It was merged with TD AMERITRADE Trust Company, the latter becoming the surviving corporation, on August 18, 2008. TD Ameritrade Trust Company is a Maine Corporation with a principal place of business in Columbia, MD.

–7–

41.     Fiserv, Inc. is a Wisconsin based public company which is a citizen of the State of Wisconsin.

42.     DOE DEFENDANTS 1 - 25 are individuals or corporations who engaged in the wrongful conduct herein and/or aided and abetted and assisted in the Pearlman Fraud.

43.     Certain individuals who were central to the Pearlman Fraud are not named in this complaint. As described above, they include Louis J. Pearlman, who is currently in prison, and Michael Crudele, who was recently sued by the bankruptcy Trustee and agreed to pay approximately $1,000,000 in settlement to the Trustee. It is believed that further collection efforts against Crudele would be fruitless. Any remaining Pearlman co-conspirators are not sued because they are either under criminal investigation or their assets are being pursued by the Trustee.

### FISERV'S ROLE AND COMPLICITY IN THE PEARLMAN FRAUD

44.     IRA accounts are governed by the Internal Revenue Code and accompanying Treasury Regulations. An important feature of an IRA is that legal title to the account is held by a custodial trustee rather than directly by the IRA owner. This is because the financial planning goal of an IRA is to defer the possession and use of income so that taxes are paid on the money during retirement, when the owner is in a lower tax bracket than when employed.

45.     In exchange for administrative review fees, annual account fees, transaction fees and lockbox fees paid by investors, and possibly other financial consideration not yet unearthed by Plaintiffs' investigation to date, paid to either Fiserv alone and/or its employees, Fiserv undertook the responsibility of acting as a custodial trustee, holding legal title to IRA accounts on a substantial number of the bilked victims of the Pearlman Fraud.

46.     Fiserv apparently operated under the incorrect assumption that if it attempted to contractually disclaim any liability for the loss of an investment's value, it could, with impunity, collect various fees and charges from investors while willfully ignoring the clear signs of the Pearlman Fraud. Fiserv – which holds itself out as one of the nation's premiere custodial trustees – thereby allowed Pearlman to use it as an essential element of the fraud, to the extreme detriment of Fiserv's customers.

47.     Fiserv, in its previous iteration as First Trust Corporation d/b/a Retirement Accounts, Inc., first began to act as IRA custodian for the Transcon Investments as early as 2002

–8–

if not before. Prior to that time, one of Pearlman's own companies served as IRA custodian. Adding legitimacy to what was in actually a colossal fraud, Pearlman enlisted RAI to serve as his "IRA custodian of choice", thereby allowing unsuspecting retirement account owners to be further duped. Later, when Fiserv placed First Trust, RAI and two other affiliate companies under one umbrella, Fiserv Trust Company became Pearlman's "custodian of choice." Potential investors where informed by their individual sales representatives that, in order to invest retirement funds in the Transcon Investments, they would have to open an account with RAI/Fiserv.

48.    Upon information and belief, Fiserv accepted millions of dollars from investors who sent retirement monies to Fiserv to purchase Transcon Investments, which monies Fiserv remitted to Pearlman and his co-conspirators. Yet Fiserv already knew that it had facilitated similar massive frauds in the past through defendant First Trust Corporation, initially through a financial fraud perpetrated by an IRA custodian called Qualified Pensions, Inc. ("QPI"). When QPI failed and a receiver took control of its custodial accounts, First Trust purchased many of those accounts from the receiver and became the new, substitute custodian for those accounts. At the time it became trustee for the QPI accounts, Fiserv was well-aware that QPI had been notorious for its lax oversight of the investments it purchased for its IRA customers and had thus become a magnet for unscrupulous investment sponsors selling illusory investments. According to the Motion for Approval of Final Receiver's Report filed in that case (styled, SEC v. Qualified Pensions, Inc., United States District Court for the District of Columbia, 95-1746-LFO): "QPI had attracted business by accepting virtually any customer-directed investment. QPI's unusual degree of tolerance for holding unconventional investments was apparently known to a number of promoters of investments. As a result, many of QPI's customers had fallen prey to promoters of investment that ranged in quality from normal to dubious to fraudulent."

49.    Following that fiasco, First Trust permitted the same atrocious behavior to occur by acting as the IRA custodian of choice for another *Ponzi* perpetrator, this time by the notorious Daniel Heath, another con-artist from California who, together with his co-conspirators, perpetrated a fraudulent scheme that was the subject of an enforcement proceeding brought by the Securities Exchange Commission, which scheme raised more than $187 million from over 1,800 victims, mostly senior citizens and the elderly. Heath was sentenced on September 26,

–9–

2008 to 127 years and four months in state prison and he, together with his co-conspirators, was ordered to pay a total of $117 million in restitution to the defrauded investors. Again, First Trust was the custodian for the IRA accounts established for the purpose of permitting Heath to encourage investors to place their hard-earned retirement funds in Heath investments. The Heath investments occurred during the period 1995 to 2004, as detailed in a certain amended class action complaint filed against First Trust Corporation in the United States District Court, Central District of California in 2005 bearing case number 2:05-cv-03124-ABC-CT.

50.    The QPI and Heath frauds demonstrate Fiserv's "unusual degree of tolerance for holding unconventional investments" which was furthered with the Transcon Investments. Indeed, continuing into 2005 and 2006, Fiserv was already aware of the history of the QPI fraud and its own defalcations and complicity in the Heath disaster, but failed to rectify its own internal practices and observe the warning signs with respect to the Pearlman Fraud which would have resulted in the savings of millions of dollars of losses incurred by Fiserv IRA account holders who were in no position to know that they were being victimized. Past history would naturally suggest that Fiserv would have subjected Pearlman and the Transcon Investments to heightened scrutiny in light of Fiserv's experience with QPI and Heath, had it not been for Fiserv's fixation on profits.

51.    Simply put, Fiserv had ample opportunity to learned from its prior mistakes yet appears to have "looked the other way" for profit, despite the completely mystifying nature of the Transcon Investments as witnessed by Fiserv's own inability to uniformly characterize the Transcon Investments on its own customers' statements. Apparently Fiserv believed that, as long as its contracts contained exculpatory language purportedly insulating Fiserv from liability, it could act with impunity.

52.    With Fiserv's assistance, the Pearlman Fraud persisted until December 2006, when the OFR filed its action in State Court Pearlman and his co-conspirators. Had Fiserv acted responsibly and within its legal obligations, none of the Plaintiffs' funds could possibly have been invested in the Transcon Investments in light of the IRS requirements that IRA accounts be placed in custodial accounts.

53.    It is now abundantly clear to Plaintiffs that the simple goal of the Pearlman Fraud was to take investors' money, steal it or otherwise squander it, and use new investors' money to

make principal and interest payments to the existing investors lucky enough to redeem their investments and/or to take interim payments in cash. While the scheme was ongoing, however, Fiserv was in a unique position to notice all of the many "red flags" that were raised – and to stop the Pearlman Fraud. Instead, as set forth herein, Fiserv viewed Pearlman as its valued customer and their real customers as mere nuisances.

54.     In light of these and other numerous irregularities and breaches of the terms and conditions of the various investments, Fiserv had knowledge of the Pearlman Fraud and ample basis to put it to an end. Indeed, faced with numerous detailed customer complaints, Fiserv had an obligation to stop the Pearlman Fraud before other senior citizens were victimized. However, Fiserv did exactly the opposite; Fiserv actively assisted Pearlman's fraudulent scheme. Fiserv failed to conduct even the most basic administrative review before purchasing the Transcon Investments with customer funds, failed to enforce the rights of its customers, and failed to respond to customer complaints.

55.     Examples of Fiserv' complicity with or knowledge or reason to suspect the Pearlman Fraud include:

- Failure to conduct a sufficient administrative review of the Transcon Investments to ascertain problems inherent on their face:
- Continuing to report Transcon Investments at values provided by Pearlman when the investments were completely valueless;
- Failing to require Pearlman to provide documentation as to the nature of the Trancon Investments so that Fiserv could verify the nature of the investments themselves;
- Treating Pearlman as its customer – rather than the investors for whom Fiserv served as trustee handling hard-earned monies saved in IRAs, and who paid Fiserv's various fees;
- Rather than serving the interests of its elderly clientele, as demonstrated above, Fiserv was more concerned with perpetuating the Pearlman Fraud;
- Customers who contacted Fiserv requesting documentation regarding their investments went unanswered.
- Customer requests for distributions from their Transcon Investments resulted in

-11-

significant delays without explanation by Fiserv.

- Representatives of Fiserv, designated as "Team H" and identified as the appropriate personnel assigned to address customer requests concerning the Transcon Investments, voiced frustration about continuing difficulties with Pearlman and Transcon regarding customer requests for distributions and the proper crediting and calculation of "interest" which the customers understood they had earned on their investments

- Problems with normal systematic distributions expected by Fiserv customers occurred with such regularity that Fiserv customers became familiar with the names of the Fiserv employees with whom they regularly communicated, including Barb Star, Melanie Cash, Maggie Martinez and Deb Yarborough.

- Fiserv account statements listing the Transcon Investments alternatively, *within the same account*, as mutual funds, assets, shares, non standard assets and brokerage accounts.

56.     From the very outset of Fiserv's initial dealings with Pearlman, and continuing throughout the relationship, Fiserv regularly failed to require Pearlman to provide appropriate documentation of the various Transcon Investments or even to inquire as to whether there were any offering documents which would be required in the event the Transcon Investments were claimed to be exempt from registration.  In fact, Fiserv substantially assisted Pearlman, and repeatedly breached the duties it owed to its own customers, by failing to review any Transcon Investment materials, by failing to administer and enforce the terms of the Transcon Investments and by failing to follow its own internal procedures regarding the determination as to whether the Transon Investments were eligible to be placed in IRA custodial accounts.

57.     Fiserv required its customers (or their Financial Representatives) to sign a number of documents, each of which set forth Fiserv's policy that it would review offering materials for unregistered or private investments such as those offered by Pearlman. While there were slight variations in the language from document to document and over the years, Fiserv maintained a policy to have the offering materials, private placement memorandum or prospectus for each investment on file and to review this documentation to determine its "administrative feasibility."

58.     For example, forms used by RAI, as early as January 2002 and possibly before

that time, stated: "Private offerings must meet certain administrative requirements before they can be held in an RAI retirement plan. Any such requirement or information must be provided by the investment sponsor (presumably Pearlman). RAI does not conduct due diligence and does not review or retain investment related information. Any required subscription or enrollment documents must be provided by the Account Owner along with an "Investment Authorization" form signed by the Account Owner or the Account Owner's designated agent."

59.     The same form stated that "Debt instruments require an independent third party servicing agent (not RAI)."

60.     The same form stated that "The following investments *may not be permitted within RAI's IRA plans . . . Private debt instrument without a Trust Indenture or Servicing Agreement."* (Emphasis supplied)

61.     IRA forms used by RAI during this period described RAI's "Operationally Compatible Investment Policy as follows: " Basic guidelines for this policy are set by the IRS; other investment restrictions are set by RAI for administrative purposes. We reserve the right not to honor an Account Owner's investment authorization if adequate information has not been provided or is RAI cannot meet special administrative requirements of the investment." (Emphasis in original)

62.     Fiserv represented to its customers that it would comply with IRS regulations, and that further restrictions on the acceptance of certain investments could be imposed as a part of Fiserv's own additional policies.

63.     With respect to the various investments involved in the Pearlman Fraud, Fiserv breached its contractual obligation to determine if the Transcon Investments complied with its own internal administrative requirements and IRS regulations. Upon information and belief, Fiserv either failed to determine the nature of the Transcon Invesments, or, alternatively, knew that the Transcon Investments were fraudulent and illusory and failed, for reasons only known to Fiserv, to alert its customers and the authorities.

64.     By investing its customers' IRA funds in Transcon Investments without conducting a review of the investments offering materials and without otherwise conducting an investigation of the investment as the duty is described in the Subscription Agreement – which Fiserv signed on behalf of its customers – Fiserv breached the contractual and fiduciary duties it

–13–

owed to its customers and substantially assisted the Pearlman Fraud.

65.     As the trustee of Plaintiffs' IRAs, purchasing investments on behalf of its customers, Fiserv was the legal owner of the Transcon Investments and was contractually and legally obligated to take custody of the promissory notes, bonds, or other form of physical documentation representing the Transcon Investments. The IRA Plan and Trust Agreements and the Roth IRA Plan and Trust Agreements used during Fiserv's course of dealing with Pearlman stated that among its other powers or duties, Fiserv "shall have the power or duty: To hold any securities or other property in the Trust in the name of the Trustee or its nominee, or in another form as it may deem best, with or without disclosing the trustee relationship."

66.     Fiserv's crucial failure to investigate the existence of any offering materials and any other documentation representing the Transcon Investments prevented Fiserv from ascertaining the nature or structure of the Transcon Investments and precluded any possibility of Fiserv fulfilling its duties as trustee to enforce the terms of the investments on behalf of its customers.

67.     Fiserv substantially assisted the Pearlman Fraud by allowing Pearlman to characterize the investments in whatever manner was most convenient or beneficial for Pearlman, rather than taking custody of the offering materials, promissory notes, or other investment documents to ensure that the Transcon Investments were structured and serviced properly.  Fiserv's assistance to Pearlman in this regard extended the life of the *Ponzi* scheme causing detriment to Plaintiffs.

68.     As trustee, purchasing the Transcon Investments for the benefit of its customers, Fiserv had the duty to observe the terms of the Transcon Investments. Pearlman's repeated breaches of the terms of the Transcon Investments, in the form of delayed interest payments and failure to pay distributions as requested and required by the terms of the Transcon Investments further suggest Fiserv's knowledge of Pearlman Fraud.  Fiserv also substantially assisted the Pearlman Fraud by concealing Pearlman's breaches of the terms of the Transcon Investments, however, when Fiserv:

·       allowed Pearlman to make late interest payments;

·       failed to enforce default provisions by failing to call the Transcon Investments when interest was not paid when due or within the time period to cure;

–14–

- failed to seek instructions or approval from the beneficial owners – the Pearlman
  Fraud investors – to waive the terms any Pearlman default
- Fiserv essentially treated Pearlman as its customer, by failing to call investors'
  attention to Pearlman's inability to make required payments, which extended the
  length of, and substantially assisted the Pearlman Fraud to the severe detriment of
  Plaintiffs.
- Fiserv also failed to observe maturity dates on many investments, thereby
  extending the life of and substantially assisting the Pearlman Fraud.
- Fiserv also substantially assisted the Pearlman Fraud by continuing to report the
  values of the investments at par – or whatever value Pearlman provided – at times
  when the Transcon Investments were in default because Pearlman was failing to
  make interest payments. Again, Fiserv had knowledge of and substantially
  assisted the Pearlman Fraud by preventing Pearlman Fraud investors from
  learning of the fraud, thus extending the life of the Pearlman Fraud, and causing
  harm to Plaintiffs.
- Fiserv knew that Pearlman was mismanaging investors' money because Fiserv
  received repeated detailed complaints in the form of phone calls and letters from
  its customers regarding their Transcon Investments. Fiserv, however, was utterly
  unresponsive in the face of persistent attempts by its own customers who were
  invested in the Pearlman Fraud even to obtain information regarding their
  investments.
- Fiserv also ignored and/or cynically dismissed the alarming concerns repeatedly
  raised by those customers invested in the Pearlman Fraud, including concerns
  over Pearlman's defensive aversion to providing any information regarding the
  investments and the recurring inability of Pearlman Fraud investors to recover
  their principal upon demand. Plaintiffs believe that Fiserv's refusal to cooperate
  with or respond to its customers' repeated requests and concerns regarding their
  Transcon Investments substantially assisted the Pearlman Fraud by masking
  deeply-rooted problems with the investments and delaying the revelation of the
  fraud to the great number of investors, thus causing severe detriment to Plaintiffs.

- Fiserv was put on notice of Pearlman's dubious activities at least as early as 2002. Customers began to inform Fiserv of Pearlman's failure to pay principal upon demand, yet Fiserv continued to invest its customers' IRAs in the Pearlman Fraud without pause to inquire into the legitimacy of the Transcon Investments. Fiserv also substantially assisted the Pearlman Fraud by continuing to issue account statements with valuations as reported by Pearlman – thus providing investors with a false sense of assurance in the performance of their investments – even with the knowledge that the investments were not only illiquid private investments, but as alleged more fully herein, Fiserv knew or had more than ample reason to believe that the Transcon Investments were essentially valueless.

- Fiserv also received – and dismissed – numerous phone complaints from other Pearlman Fraud investors with concerns about their Transcon Investments and errors in account statements. Fiserv often directed its customers that they had to contact Pearlman directly regarding such information. However, when customers complained to Pearlman about errors in Fiserv's account statements, they were directed to telephone Fiserv.

- Fiserv's knowledge of Pearlman's fraudulent activities due to the number and significance of customer complaints regarding their Transcon Investments, and Pearlman's failure or refusal to pay principal on demand. Fiserv breached its duties to its customers and substantially assisted the Pearlman Fraud by ignoring substantial customer complaints, and by continuing to purchase and value the Transcon Investments at par when Fiserv knew that the investments were not only illiquid, but essentially valueless as Pearlman refused to pay back investors' principal.

- Fiserv knowledge of the problems associated with Pearlman and the Transcon Investments is exemplified by customers' attempts to liquidate, completely or partially their investments or obtain current dividends/interest:

- Fiserv's unwillingness to provide investors with information regarding their Transcon Investments can only be explained in terms of Fiserv breaching its fiduciary and contractual duties to its customers and its role in assisting the

Pearlman Fraud. As the nation's "largest trustee of self-directed individual and business plans" and "a wholly-owned subsidiary of Fiserv, Inc., one of the largest suppliers of information technology services to banks worldwide," Fiserv boasts of having a sophisticated system for filing and tracking of information and documentation as basic as the notes, subscription agreements, and offering materials such as PPMs or prospectuses for the Transcon Investments that Fiserv purchased on behalf of its customers. Either Fiserv did not have the documents they were required to keep as custodian and trustee of these IRAs because they never required Pearlman to provide such documents, or Fiserv lied to its customers about not having the requested documentation because Fiserv simply did not want to produce the documents, as doing so would have risked the revelation and unraveling of the Pearlman Fraud. Regardless of Fiserv's reason for not providing its customers with information regarding their Transcon Investments, the failure to provide such information substantially assisted the Pearlman Fraud by concealing the innate problems with the investments and delaying the revelation of the fraud.

69.     The IRS requires that IRA owners withdraw at least a minimum amount, known as a Required Minimum Distribution ("RMD"), from their retirement accounts annually, starting the year an investor turns age 70½. Thus, the RMD requirement demands that retirement assets have a certain degree of liquidity. While RMDs may vary based on the ages of the investor and beneficiary, as well as the rate of return earned on the investment, RMD amounts on most retirement accounts are usually less than 1/20 of the principal in the retirement account. Fiserv knew that the Transcon Investments were completely illiquid and that Pearlman was breaching his duties to investors and mismanaging their investments because the Pearlman Fraud investment accounts frequently failed to maintain enough cash to pay even the investors' relatively small RMDs when such distributions came due. Additionally, while the RMDs were not objectively large, because investors' account values were inflated, so were the RMD amounts – subjecting customers to greater penalties upon a failure to take the distribution.

70.     By allowing Pearlman to continually fail to make timely interest payments on the Transcon Investments, such that Pearlman Fraud investors were repeatedly unable to satisfy

RMDs, Fiserv breached its fiduciary and contractual duties to its customers and subjected its customers to severe IRS penalties – 50% of the amount that tax records indicate should have been distributed but was not distributed – and aided and abetted the Pearlman Fraud:

- By continuing to issue account statements with par values as reported by Pearlman – at times when Fiserv knew that the investments were essentially valueless because of the repeated problems with illiquidity, Pearlman's repeated failure to pay principal on demand, and the insufficiency of the accounts to make customers' RMDs – Fiserv delayed revelation of the Pearlman Fraud and breached its fiduciary and contractual duties to its customers by subjecting them to even more severe IRS penalties. If Fiserv had adjusted the values it reported for the Transcon Investments as it became aware that the values were, indeed, less than that reported by Pearlman, the RMDs for Pearlman Fraud investors would have been lower, lessening the likelihood of the customers' violation of RMD rules.

- By continuing to invest 100% of many of its customers' IRAs into the Pearlman Fraud at a time when Fiserv knew the investments were illiquid and essentially valueless, Fiserv breached its duties as trustee of these accounts and substantially assisted the Pearlman Fraud by ensuring the continued influx of money necessary to sustain the *Ponzi* scheme.

- Indeed, whereas one of Fiserv's primary responsibilities to IRA account holders was with respect to compliance with the IRC and IRS rules, the repeated number of times Fiserv was forced to issue notices that its Pearlman Fraud customers had insufficient liquid funds to take RMDs must have raised a "red flag" that there were problems with the Pearlman investments.

- Despite years of repeated customer complaints and the consistent inability of Pearlman Fraud investment accounts to be able to make investors' RMDs, Fiserv admittedly did absolutely nothing in response to the serious concerns and problems plaguing the Transcon Investments.

- Fiserv aided and abetted the Pearlman Fraud by failing to make a full and fair disclosure of the information that it in fact knew regarding the Transcon

Investments – including that Fiserv knew that Pearlman was selling securities in violation of Florida law, that Fiserv knew that the values of the investments were significantly less than Fiserv reported on account statements, that Fiserv knew that the Transcon Investments were unregistered securities being sold by unlicensed salesmen and that Fiserv knew that the liquidity problems with the Transcon Investments had persisted for years.

- Fiserv's February 22, 2007 letter to Pearlman Fraud investors reported that Fiserv had learned of the OFR complaint and the appointment by the Court of a Receiver of the Transcon assets. The letter further stated that "Due to the situation, we are unable to determine if the last reported value for your investment is accurate," suggesting that, in the past, Fiserv believed that its prior reports of valuations *were* accurate.

- Fiserv also explained to the investors that "For clients needing to take a Required Minimum Distribution from their IRA based on their 2008 year-end account values, we will work to ensure that the updated account value is provided to the IRS on Form 5498."

- Fiserv set up a toll-free telephone number for Pearlman Fraud investors to speak to a Client Relations Department, Team A.

- Fiserv failed to properly report the interest or dividends on the quarterly statement when payments were due indicating that Fiserv apparently did not receive any interest payments or dividend reinvestment documentation from Pearlman during those periods. Fiserv's failure to alert its customers to Pearlman's defaults, and then to correctly reflect on a future quarter's statement that the amounts already had been reinvested, is not only a breach of both Fiserv's fiduciary and contractual duties to its customers, it substantially assisted and perpetuated the Pearlman Fraud by covering for Pearlman's breaches and late payments.

- Fiserv substantially assisted the Pearlman Fraud by failing to require timely interest payments and/or dividend reinvestments, allowing such dividend reinvestments to be done without requiring additional investment paperwork, failing to notify its customers of Pearlman's breaches of duty, and then further

–19–

covering for Pearlman's breaches by reporting the transactions on its customers' account statements improperly. Thus, Fiserv not only failed to require Pearlman to comply with the terms of the Transcon Investments, but also disguised Pearlman's breaches of duty to the investors, helping to extend the life of the Pearlman Fraud to the severe detriment of Plaintiffs.

- During the time that Fiserv acted as the exclusive custodial trustee for the Transcon Investments, there were abundant signs that Fiserv was aware of the Pearlman Fraud. Fiserv knew that the Transcon Investments were worth substantially less than their reported value (or even valueless) much earlier than December 2006 when OFR filed its action in Florida State Court.

- In addition to the numerous Fiserv customers who contacted Fiserv regarding difficulties with the Pearlman Fraud beyond mere record-keeping, including the refusal of Pearlman to provide investment documents, the refusal of Pearlman to allow the redemption of investments for cash, and the fact that customers' accounts who were invested in the Pearlman Fraud often contained insufficient funds to allow the investor to take the RMD required by the IRS, numerous other red flags existed. These signs included that: the "Designated Representatives" selected by Fiserv's customers were not NASD- licensed financial representatives or affiliated with registered broker-dealers and the Transcon Investments were not registered offerings; that there were no investment documents such as private placement offering memoranda which would be required for any Regulation D exempt private placement, and that the investment advisors and the investment issuer created a conflict which disqualified the Transcon Investments from favorable tax treatment under IRS Code §4975, regarding prohibited transactions through related parties.

- Although the fact should have been easily detected had Fiserv done an appropriate administrative review of the Transcon Investments, Fiserv failed to discern whether Pearlman, or any of the Pearlman co-conspirators involved with selling the Transcon Investments, including the "Designated Representatives" selected by the Plaintiffs, was a registered broker-dealer or affiliated with a registered broker-

dealer as required by state and federal securities laws.

Fiserv also failed to inquire into whether Pearlman or any of the Pearlman co-conspirators involved with selling the Transcon Investments, including the "Designated Representatives" selected by the Plaintiffs, was a NASD-licensed financial representative or investment sponsor. Furthermore, Fiserv should have made the inquiry as soon as it became clear that Pearlman was, in fact, acting as a broker-dealer conducting a public securities offering to investors other than family and friends – and that the Transcon Investments could not possibly fall within the narrow private issuer exemption.

Had Fiserv, as the custodial trustee executing these transactions for the benefit of the individual investors, inquired into Pearlman's status as a unregistered broker-dealer, as required by Fiserv's role as a fiduciary and by industry practice, Fiserv would have discovered that Pearlman was not registered and that the Transcon Investments were not eligible for a private placement exemption under federal or state law.

As trustee of its customers' IRAs, Fiserv had a duty to refrain from participating in any prohibited transactions under Internal Revenue Code Section 4975. The IRA Plan and Trust Agreement required that "[N]either the Trustee nor any other party may engage, either directly or indirectly, in a prohibited transaction with respect to the Participant's IRA, as defined in IRS Code Section 4975."

For example, while interest payments generally should be made on the same day of the week each month, the timing of interest payments and/or dividend re-investments paid to investors in the same Pearlman Fraud investment were inconsistent and sometimes never even made at all for periods of months; while the interest rate received by owners of the same investment generally should be the same, the interest rate provided by most of the Transcon Investments varied widely – such that the amount of interest paid to investors within the same investment was often inconsistent. Also during many quarters, investors received payments in random amounts not calculated according to a given interest rate, or did not receive any interest payments or dividend reinvestment at all;the Pearlman

–21–

Fraud investors often received a "dividend reinvestment" rather than cash interest payments – a classic sign of a *Ponzi* scheme is to avoid paying out any cash – and the form of payment, whether dividend reinvestment or cash interest changed frequently and often differed among investors who owned the same Pearlman investment at the same time; while the maturity date of all investments purchased by investors in the same offering should usually be the same, the Pearlman Fraud had many different maturity dates for different owners who owned the same investment; while industry convention is to pay interest on debt instruments every six or twelve months, the Transcon Investments provided for monthly interest payments at relatively high rates of return;

Fiserv's own contracts indicate that, as the custodian or trustee of plaintiffs' Individual Retirement Accounts (IRAs), Fiserv is subject to the mandates of Internal Revenue Code § 408, and the corresponding Treasury Regulations. Those regulations require Fiserv to "act within accepted rules of fiduciary conduct" and "assure the uninterrupted performance of its fiduciary duties."

When selling the Transcon Investments to investors with retirement accounts, Pearlman's co-conspirators used contract forms provided to them by Fiserv. Furthermore, the overwhelming majority of victims who used IRA money to invest in the Pearlman Fraud used Fiserv as their custodial trustee. Fiserv was aware of this virtually exclusive relationship, and Fiserv employees, maintained close relations with Pearlman and some of the other Pearlman co-conspirators in order to maintain that relationship, and often treated Pearlman as its customer rather than the elderly investors for whom Fiserv served as the IRA trustee. Fiserv helped to further the Pearlman Fraud by lending credibility to Pearlman's scheme. While touting its "independence" to investors, Fiserv used its services to enable Pearlman's *Ponzi* scheme, and at the same time collecting large amounts of fees.

Fiserv is subject to the regulations promulgated by the FDIC, which requires institutions that manage accounts in trust to maintain record keeping systems that "provide a detailed picture of all funds and other assets under the control of the

fiduciary from the account's inception to its closing. Procedures must be
developed to process work in a uniform and orderly manner and a practical system
of checks and balances must be developed to ensure the integrity of the work
performed."

       .   As a custodial trustee of self-directed retirement accounts, Fiserv is also governed
by the FDIC's Interagency Statement on Retail Sales of Nondeposit Investment
Products, which, among other duties, requires institutions such as Fiserv to:
conduct an appropriate review of any third party with whom the institution
engages in a transaction when that third party is involved in recommending certain
non-deposit investment products – such as the Transcon Investments at the heart
of this case; disclose the existence of any material relationship between the
institution and an investment company whose shares are sold by the institution; to
train personnel who are involved in the selling of non-deposit investment products
to "impart a thorough knowledge of the products involved, of applicable legal
restrictions, and of customer protection requirements..."; to have in place
compliance policies and procedures to "ensure that non-deposit investment
product sales activities are in compliance with applicable laws and regulations...
Compliance procedures should identify any potential conflicts of interest... [and]
should also provide for a system to monitor customer complaints and their
resolution."

## COUNT I

## BREACH OF FIDUCIARY DUTY

71.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint as
though fully set forth herein.

72.     Fiserv's contracts indicate that as the custodian or trustee of the Plaintiffs' IRA's,
Fiserv is subject to the mandates of Internal Revenue Code §408, and the corresponding Treasury
Regulations. Those rules require Fiserv to "act within accepted rules of fiduciary conduct" and
"assure the uninterrupted performance of its fiduciary duties."

73.     As Trustee of Plaintiffs' IRA custodial accounts, Fiserv owed Plaintiffs and the

Plaintiffs a fiduciary duty.

74.    Also as described above, Fiserv substantially assisted the Pearlman Fraud and thus breached its fiduciary duties owed to the Plaintiffs.

75.    Plaintiffs have suffered substantial financial injury as a result of Fiserv's conduct, as alleged herein.

76.    Fiserv engaged in the above-described acts while Fiserv had a fiduciary relationship with Plaintiffs. Whereas Fiserv was a custodian and/or trustee of Plaintiffs' accounts, Fiserv owed a duty of loyalty, a duty to exercise reasonable care and skill, and a duty to deal with them fairly and impartially. Fiserv's conduct constitutes a breach of Fiserv's fiduciary duties. The result of these breaches was, inter alia, to convince the Plaintiffs that their money was safe, that the periodic statements of value issued by Fiserv accurately reflected the actual values of their accounts, and the Transcon Investments were legitimate. Such reliance was reasonable and resulted in massive damage to the Plaintiff.

WHEREFORE, Plaintiffs demand judgment for damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.


## COUNT II

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

77.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

78.    Pearlman and his co-conspirators, having rendered investment advice to the Plaintiffs, were themselves fiduciaries owing a fiduciary duty of care to the Plaintiffs.

79.    Fiserv had knowledge of the Pearlman Fraud, or at least some of the elements of the Pearlman Fraud and rendered substantial assistance to Pearlman and his co-conspirators in their fraudulent conduct.

80.    As a result of Fiservs' aiding and abetting the Pearlman Fraud and Pearlman's breaches of fiduciary duties, the Pearlman Fraud was allowed to grow and flourish, causing Plaintiffs to suffer damages, with interest thereon, in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment for damages, interest, prejudgment interest,

attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

## COUNT III

### AIDING AND ABETTING COMMON LAW FRAUD

81.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

82.    Fiserv had knowledge of the Pearlman Fraud, or at least some of the elements of the Pearlman Fraud and rendered substantial assistance to Pearlman and his co-conspirators in their fraudulent conduct.

83.    As a result of Fiserv's aiding and abetting Pearlman and his co-conspirators, the Pearlman Fraud was allowed to flourish, and Plaintiffs suffered damages, with interest thereon, in an amount to be determined at trial.

84.    Plaintiffs have suffered substantial financial injury as a result of Fiserv's conduct, as alleged herein.

WHEREFORE, Plaintiffs demand judgment for damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

## COUNT IV

### NEGLIGENCE

85.    Plaintiffs incorporate by reference the preceding paragraphs, as if fully set forth herein.

86.    Fiserv had during the relevant period a duty to use due care and protect plaintiffs from injury, which included, among other things, a duty to verify, ensure, and adequately investigate the truthfulness and accuracy of the statements they made, as well as to refrain from disseminating false and misleading statements.

87.    Fiserv violated FDIC regulations by failing to maintain record keeping systems that "provide a detailed picture of all funds and other assets under the control of the fiduciary from the account's inception to its closing" and by failing to establish procedures "to process

–25–

work in a uniform and orderly manner and a practical system of checks and balances must be developed to ensure the integrity of the work performed."

88.    Fiserv further violated FDIC-imposed obligations by failing to conduct an appropriate review of Pearlman, as the third party; by failing to disclose the existence , if any, of a relationship between Pearlman and Fiserv, by failing to train personnel who are involved in transactions concerning Pearlman investment products to "impart a thorough knowledge of the products involved, of applicable legal restrictions, and of customer protection requirements..."; by failing to have in place compliance policies and procedures to "ensure that non-deposit investment product sales activities are in compliance with applicable laws and regulations;" and by failing to establish compliance procedures to identify "potential conflicts of interest... [and] to monitor customer complaints and their resolution."

89.    Fiserv breached the duty of care owed to its customers, the Plaintiffs, as described above.

90.    Fiserv's breaches of duty were the proximate cause plaintiffs' injuries, in that each of Fiserv's breaches were a substantial factor in bringing about the injuries suffered by the Plaintiffs. As a result of Fiserv's negligent conduct, the Plaintiffs were damaged. The Plaintiffs reasonably and foreseeably relied on what turned out to be false information concerning the investments they made in the Pearlman Fraud and have been damaged as a result, and are entitled to recover all actionable damages, including general, consequential, incidental and special damages, lost profits, lost opportunities and other damages.

91.    Fiserv's actions were malicious, fraudulent, oppressive, and intended to injure the Plaintiffs, rendering Fiserv liable for punitive damages.

WHEREFORE, Plaintiffs demand judgment for damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.


## COUNT V
## BREACH OF CONTRACT

92.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

93.     As set forth above, Fiserv, as custodial trustee, obligated itself to certain contractual duties, inter alia: to timely and accurately report customers' holdings and the accurate value thereof to both customers and the IRS; to ensure that only qualified investments meeting IRS and IRC standards be placed into Plaintiffs' Fiserv IRA accounts; to enforce the rights and remedies available to holders of Transcon Investments; and not to commingle funds from multiple accounts held by customers.  As alleged above,

94.     Fiserv breached one or more of these duties in its dealings with respect to Transcon Investments.  Plaintiffs have suffered substantial financial injury as a direct, foreseeable and proximate result of Fiserv's contractual breaches, as alleged herein. In addition to the general damages flowing directly from these breaches, the Plaintiffs are entitled to recover consequential, incidental and special damages, lost profits, lost opportunities and other economic damages.

WHEREFORE, Plaintiffs demand judgment for damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

## COUNT VI

### VIOLATION OF THE FLORIDA SECURITIES
### AND INVESTOR PROTECTION ACT

95.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

96.     The Transcon Investments involved a commitment of money.

97.     The Transcon Investments involved a common enterprise.

98.     The Transcon Investments involved an expectation of profit solely through the efforts of another.

99.     The Transcon Investments constituted investment contracts.

100.     The Transcon Investments involved the offer, sale or purchase of a security.

101.     The Transcon Investments were sold to the Plaintiffs in violation of F.S. §§ 517.12(1); 517.301(1 )(a) 1 and 517.07(1).

102.     In connection with the establishment of the IRA custodial account between Fiserv

and the Plaintiffs, Fiserv acted as agent for Pearlman within the meaning of F.S. §§ 527.211(1) and (2), which provides the following remedy in the event of a violation of the anti-fraud or registration requirements of the Florida Securities and Investor Protection Act:

> Each person making the sale and every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security.

103.    Fiserv acted as agent for Pearlman and his co-conspirators by providing access to IRA custodial services to victims of the Pearlman Fraud, upon information and belief, by receiving financial compensation or consideration for agreeing to act as the "IRA custodian of choice" for victims of the Pearlman Fraud, by treating Pearlman and his co-conspirators as its customers, as opposed to the account holders victimized by the Pearlman Fraud, by allowing the Pearlman Fraud to be perpetuated despite numerous and all-too-obvious red flags that had all the earmarks of a classic *Ponzi* scheme.

104.    To victims of the Pearlman Fraud who established Fiserv IRA custodial accounts, Fiserv was an agent of Pearlman and his co-conspirators since they were told that, if they wanted to invest their retirement funds in the Transcon Investments, they had no choice but to open Fiserv accounts, representations on which they relied in their decisions to open Fiserv accounts and invest in the Transcon Investments.

105.    By reason of the foregoing, Fiserv violated F.S. §§ 517.12(1); 517.301(1)(a) 1 and 517.07(1), and each Plaintiff is entitled to damages and/or rescission from Fiserv.

WHEREFORE, Plaintiffs demand judgment for rescission, damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

## COUNT VII

### AIDING AND ABETTING VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT

86.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as

though fully set forth herein.

106.    Fiserv aided and abetted Pearlman and his co-conspirators, acting in concert with various sales agents at their control, and in connection with the offer and sale of an investment or security as represented by the Transcon Investments by providing substantial assistance to Pearlman and his co-conspirators who employed various devices, schemes, or artifices to defraud Plaintiffs in connection with their purchase of the Transcon Investments through custodial accounts maintained with Fiserv.

107.    Fiserv aided and abetted Pearlman and his co-conspirators, acting in concert with various sales agents at their control, in connection with the offer and sale of an investment or security as represented by the Transcon Investments by providing substantial assistance to Pearlman and is co-conspirators who directly or indirectly obtained money or property, often monies directed through Plaintiffs' Fiserv custodial accounts, by means of an untrue statement of a material fact or by an, omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

108.    Fiserv aided and abetted Pearlman and his co-conspirators, acting in concert with various sales agents at their control, in connection with the offer and sale of the Transcon Investments by providing substantial assistance to Pearlman and his co-conspirators who obtained money or property through the offer and sale of unregistered securities within the state of Florida.

109.    Fiserv aided and abetted Pearlman and his co-conspirators, acting in concert with various sales agents at their control, in connection with the offer and sale of the Transcon Investments by providing substantial assistance to Pearlman and his co-conspirators who obtained money or property through the offer and sale of unregistered securities within the state of Florida although none of the parties were registered as securities salesmen with the State of Florida.

110.    Pursuant to F.S. § 517.211(2), remedies available in cases of unlawful sale, Plaintiffs are entitled to damages and/or rescission from Fiserv.

WHEREFORE, Plaintiffs demand judgment for rescission, damages, interest, prejudgment interest, attorneys' fees and costs, and for such other and further relief that this Court deems appropriate.

Dated: December 24 2008

Respectfully Submitted:

Robert J. Pearl
FBN: 0255297
Pearl Malarney Smith, PC
649 5th Ave. South
Naples, FL 34102
Tel. 239-659-1005
Fax 239-659-1007
robert@investorattorneys.com

James F. Lowy, Esq.
FBN: 0081434
Lowy Law Firm, LLC
3907 Henderson Blvd., Suite 200
Tampa, FL 33629-5761
Tel: 813-288-9525
Fax: 813-282-0384
Email: jameslowy@LowyLawFirm.com

-30-

## Appendix A

| NAME | TOTAL |
|---|---|
| Alkow, Beverly (IRA) | $612,154.45 |
| Andrews, Fred (IRA) | $123,877.79 |
| Arkin, Deborah (EPP) | $19,515.94 |
| Arkin, Steven (IRA) | $119,432.93 |
| Barrett, Joanne (Rollover) | $63,614.39 |
| Bernstein, Joan (IRA) | $185,725.37 |
| Bernstein, Maurice (IRA) | $105,087.99 |
| Boenig, Jeffrey (IRA) | $34,309.65 |
| Chitester, Lester (IRA) | $51,375.07 |
| Chitester, Mary (IRA) | $143,207.93 |
| DeWalt, David Allen (Rollover IRA) | $169,047.47 |
| DeWalt, David Allen (Pension Plan) | $19,945.30 |
| Dexter, Lynn (IRA) | $24,916.89 |
| Dynasty Construction 401K (FISERV statement shows: $854,573.23; Indivdual accts total: $913,044.97 | $913,044.97 |
| Barrett, John, (Dynasty) As Trustee | |
| Hirschmann, France (Emp. Pension Plan) | $3,500.00 |
| Hirschmann, France (IRA) | $12,933.46 |
| Hirschmann, Kenneth (IRA) | $339,356.49 |
| Jonas, Barry ( IRA) | $284,966.89 |
| Kesinger, Margie (IRA) | $74,298.06 |
| Kesinger, Margie (Rollover) | $4,726.43 |
| Miller, Wayne A. (Rollover) | $34,039.33 |
| Monks, Rosalie (IRA) | $78,852.76 |
| Nevler, Leda (IRA) | $36,178.60 |
| Paaso, Theodora (Rollover) | $27,882.91 |
| Parr, Stephen (Simple) | $107,191.01 |
| Pashayan, Maria Dr. (Keogh) | $328,327.31 |
| Pashayan, Maria Dr. (IRA) | $50,850.85 |
| Pashayan, Richard Dr. (Keogh) | $1,308,595.90 |
| Pashayan, Richard Dr. (IRA) | $50,487.37 |
| Provenzano, Linda (IRA) | $86,394.56 |
| Reed, Beverly (IRA) | $100,927.54 |
| Richardson, Elizabeth (IRA) | $131,272.59 |
| Rosen, Paula (IRA) | $13,103.56 |
| Rosen, Paula (IRA) | $77,648.90 |
| Rothschild, Jerome (IRA) | $45,000.00 |
| Sarin, Sheryl (IRA) | $12,848.84 |
| Scheller, Frederick (Rollover) | $19,816.01 |
| Scheller, Libia (Rollover) | $9,316.60 |
| Swette, Dominique (IRA) | $116,734.08 |
| Williams, James (IRA) | $85,141.34 |
| Wright, Betsy (IRA) | $322,639.95 |
| Wright, Gregory (IRA) | $198,180.80 |
| TOTAL | $6,546,468.28 |



**RETIREMENT ACCOUNTS, INC.**

*Retirement Accounts, Inc.*
717 17th Street, Suite 1700
Denver, Colorado 80202-3323
1-800-325-4352

*Please Direct mail to:*
P.O. Box 173785
Denver, CO 80217-3785

# Roth IRA Transfer/ Rollover/Conversion Form

This form must be completed in addition to (or in conjunction with) a Retirement Accounts, Inc. (RAI) Roth Individual Retirement Account Application (since you need a Roth IRA at our firm to transfer, rollover or convert Roth IRA assets.)

**Section 1 - Current (Resigning) Trustee Information** Complete for Roth IRA Transfers and Conversions from another institution. *(Please type or print in black ink.)*

| | |
|---|---|
| Current Trustee | *Retirement Accounts, Inc.* |
| Mailing Address | *P.O. Box 173785* |
| | *Denver, Co 80217-3785* |
| City / State / Zip | |

Current Trustee Account Number: Redacted

Telephone *(include area code)*
*(800) 325 - 4352*

**Section 2 - Roth IRA Account Owner Information**
*(Please type or print in black ink.)*

| | |
|---|---|
| Your Name | *Peter Moskowitz* |
| Mailing Address | Redacted |
| City / State / Zip | |

Retirement Accounts, Inc. Roth IRA Account #

Social Security #  Redacted
Date of Birth  Redacted
Telephone *(home)*  Redacted
*(business)*  *D, N. A.*

## Section 3 - Transfer/Rollover/Conversion Option

**Transfer:** Describes the movement of Roth IRA assets directly <u>between Roth IRA trustees</u> without distribution to the individual. As such, no tax forms are generated by either Roth trustee. (This process involves the transfer of an <u>existing</u> Roth IRA account; non-Roth IRA plan types may <u>not</u> be transferred to a Roth IRA.)

**Rollover:** Describes a cash and/or asset contribution to a Roth IRA <u>by an individual</u> within sixty (60) days of receipt of the eligible Roth IRA rollover distribution. To make this rollover, the individual must have received an eligible distribution (full or partial) from another Roth IRA outright. The individual may not roll over all or any part of a distribution from a business retirement plan, 401(a) or (b) annuity or any other non-Roth IRA. (Non-Roth IRA rollovers or direct rollovers from a business retirement plan may be made into a "Traditional" (non-Roth) IRA, and require the use of a different form.)

**Conversion:** Describes a cash and/or asset contribution to a Roth IRA from a Traditional IRA by taxpayers with Adjusted Gross Income under $100,000 (and not married and filing separately). By checking the Conversion box, the Account Owner certifies that the conversion meets the requirements under law for a qualifying conversion contribution as defined in the Plan documents, and that he or she understands the tax consequences of the transaction.

**Note:** If the current trustee of a Traditional IRA does not "convert" cash and/or assets directly to RAI, but instead sends them directly to you as Account Owner, it is your responsibility to initiate the qualifying conversion contribution to your RAI Roth IRA. (You must ensure that the contribution is clearly indicated as a "Conversion." Please contact an RAI Customer Service Representative for further instructions.)

This will be a *(choose one)*  ☐ Transfer  ☐ Rollover  ☐ Conversion

**Section 4 - Asset List and Instructions** The option described in Section 3 will be *(choose one)* ☐ Partial *OR* ☒ Complete *(Please provide a copy of your most recent account statement for complete transfers or conversions. If Partial, please specify exact assets or dollar value below.)*

| Liquidate/Sell | Reregister* | Description of Asset/Cash | Dollar Value | Number of Shares | Acct # / Cert # / Maturity Date |
|---|---|---|---|---|---|
| | ✓ | *ALL* | $ *ALL* | *ALL* | |
| | | | $ | | |
| | | | $ | | |
| | | | $ | | |

**\*Assets should be reregistered to:**
Retirement Accounts & Co.
FBO *PETER MOSKOWITZ* Roth IRA
P.O. Box 173785
Denver, CO 80217-3785

Make checks payable to Retirement Accounts, Inc.

Tax ID number: 84-1314088.

*For overnight delivery only*
Retirement Accounts, Inc.
717 17th St., Suite 1700
Denver, CO 80202-3323

**THIS FORM MUST BE SIGNED ON PAGE 2.**

*(Continued on the reverse side.)*

© Retirement Accounts, Inc., 1998

1 of 2

ROTH-2004 (RAI)  (1/98)

## RAI Roth IRA Transfer/Rollover/Conversion Form *(continued)*

**Section 5 - Broker-Dealer Information** *(To be completed by the Account Owner's Designated Representative if he or she has been authorized as an agent for the account.)*

Dealer Name

Dealer Number

Branch Number

Branch Address

Designated Representative's Name

Designated Representative Number

Designated Representative's Phone Number

Designated Representative's Signature **X**

Date

**Acceptance by Retirement Accounts, Inc.**
*(To be completed by Retirement Accounts, Inc.)*

Retirement Accounts, Inc. hereby accepts the appointment as Roth IRA Trustee of the assets listed. This acceptance is not to be construed as validation of any rollover or conversion contribution, if any.

By

Title

Date

## Section 6 - Signatures

I certify that I have read the description for the transaction I have chosen and understand and agree to all the terms thereunder. I represent that any rollover or conversion contribution I have authorized on this form represents a valid rollover or conversion contribution as defined by law and described in the Roth IRA Plan documents. I understand it is solely my responsibility to determine the validity of any Roth IRA rollover or conversion contribution. In the case of a Roth IRA rollover, I understand it is solely my responsibility to initiate and make such rollover. In the case of a Roth IRA transfer or conversion, the current Trustee is authorized to send cash and/or assets to RAI as specified. I hereby agree to indemnify and hold harmless RAI for any and all costs, obligations, losses, claims, damages and expenses (including reasonable attorneys' fees) related to or associated with its agreement to accept the assets reflected on this form.

Roth IRA Account Owner's
Signature **X** *Peter Mahowy DDS*

Date  *2 - 17 - 98*

*Please ask your current trustee if a signature guaranatee is required.*
Signature Guaranteed by

Name of Firm or Bank

Signature of Officer and Title **X**



## RETIREMENT ACCOUNTS, INC.

Retirement Accounts, Inc.
717 17th Street, Suite 1700
Denver, Colorado 80202-3923
1-800-325-4352

Please direct mail to:
P.O. Box 173785
Denver, CO 80217-3785

# IRA Distribution Request Form

## I. IRA Account Owner Information *(please type or print)*

Retirement Accounts, Inc. Account #   Redacted

Name  PETER MOSKOWITZ

Residence Address *(not a P.O. Box)*
Redacted

City/State/Zip   Redacted

Check here if this is a change of address. ☐

Daytime Phone   Redacted

Date of Birth   Redacted

Social Security #   Redacted

Retirement Accounts, Inc. (RAI) as Trustee of my Individual Retirement Account, is requested to make payment(s) to me as follows:

## 2. Reason for Distribution (check one) ROTH IRA CONVERSION

☐ A. I am under age 59½. I understand the IRS 10% premature distribution penalty tax may be imposed on this payment.

☐ B. This distribution is intended to qualify as a "substantially equal" payment under Section 72(t) of the Internal Revenue Code.

☐ C. I have become disabled as defined in Section 72(m) of the Internal Revenue Code. I have completed and attached RAI's Acknowledgment of Disability Form.

☐ D. I am over age 59½.

☐ E. I am over age 70½ and this distribution is intended to satisfy my Required Minimum Distribution. *(Please also complete Section 5.)*

☐ F. I wish to have a recent contribution removed or corrected. *(Please also complete Section 6.)*

☐ G. I intend to use this distribution to pay for medical expenses that are in excess of 7.5% of my adjusted gross income.

☐ H. I intend to use this distribution to pay for health insurance premiums as permitted to unemployed individuals under IRS Code section 72(t)(2)(D).

☐ I. I intend to use this distribution to pay for "qualified higher education expenses" as permitted and defined under IRS Code Section 72(t)(2)(E).

☐ J. I wish to take a "qualified first-time homebuyer distribution" as permitted and defined under IRS Code Section 72(t)(2)(F).

*Do not use this form for a Trustee-to-Trustee Transfer.*

## 3. Payment Amount(s) (check one and complete applicable blanks)

☐ A. Single Payment:

I wish to withdraw _____

from my IRA. *(Fill in dollar amount or write in "total amount," or "200 shares of XYZ stock," etc.)*

© Retirement Accounts, Inc., 1997

☐ B. Installment Payments:

If you are age 70½ or older, please read and complete the "Information Concerning Minimum Distributions" in Section 5. Then complete following items 2, 3 and 4. Otherwise, complete all information following.

1. Installment payments are a specified dollar amount or are based on a given payment period. I choose:

☐ a. an amount of $_____ for each payment period. *(Specify exact amount or enter "all available cash.")*

☐ b. a fixed period of _____ years.

2. The first payment should be deducted in the month of _____ , 19_____ .

3. Please deduct and send my payments *(choose one)*:

☐ near the middle of the applicable month.

☐ at the end of the applicable month.

4. Subsequent payments are to be paid *(choose one)*:

☐ annually    ☐ semiannually

☐ quarterly    ☐ monthly    ☐ bimonthly

(Note: You, the IRA Account Owner, must ensure that enough cash is available to make each payment when due. Payments will continue until you notify RAI to the contrary.)

## 4. Asset Instructions

☐ A. Payment to be made in cash *(choose all that apply)*:

☐ 1. I authorize RAI to liquidate or reregister the asset(s) listed below.

☐ 2. I have contacted my Designated Representative to liquidate any broker-held assets (such as stocks and bonds) or any limited partnerships or other illiquid assets I choose to have sold. My Designated Representative will be responsible for forwarding funds to RAI.

☐ 3. My Peak Money Market balance is sufficient to make the distribution.

☐ 4. I authorize RAI to request funds from my brokerage account # _____ at _____ brokerage firm.

☑ B. Distribute (reregister) shares of the following assets into my personal name to make up the requested amount.

*Please list assets here:*

| # Shares | $ Amt | Name of Asset | Liqui-date / Sell | Re-regis-ter |
|----------|-------|---------------|-------------------|--------------|
| ALL | ALL | ALL ASSETS | ☐ | ☑ |
|  |  |  | ☐ | ☐ |
|  |  |  | ☐ | ☐ |
|  |  |  | ☐ | ☐ |

*(Continued on the reverse side.)*

1 of 3

RAI-1715  (rev. 11/97)



# RETIREMENT ACCOUNTS, INC.

Retirement Acounts, Inc.
717 17th Street, Suite 1700
Denver, Colorado 80202-3323
1-800-325-4352

**Please Direct mail to:**
P.O. Box 173785
Denver, CO 80217-3785

## Self-Directed
## Roth Individual Retirement Account
## Application
Adoption Agreement

### Establishment and Appointment

I, the undersigned Participant ("Account Owner"), hereby establish a Roth Individual Retirement Account ("Roth IRA") under the Roth Individual Retirement Plan and Trust Agreement which is incorporated within this Adoption Agreement by this reference. I designate Retirement Accounts, Inc. (RAI) as Trustee of this Roth IRA and make the following declarations.

### Account Owner Information *(please type or print)*

Full Name    PETER   MOSKOWITZ

Mailing Address    Redacted

City/State/Zip

Telephone - Day ( Redacted

Telephone - Evening ( Redacted

Social Security Number    Redacted

Birth Date    Redacted

**Primary Beneficiary Designation** My Three Children
*(See Article VI of the Roth IRA Plan and Trust Agreement.)*

Name    Jesse  Brit  Moskowitz

Address    Redacted

City/State/Zip    Redacted

Date of Birth    Redacted

Social Security #    Redacted

Relationship    Son

### Contingent Beneficiary Designation
*(In case of death of Primary Beneficiary)*

Name

Date of Birth

Social Security #

SEE Attachment for additional Primary
*(Attach another sheet of paper to designate additional beneficiaries.)*
Beneficiaries — Joelle + Samuel

### Spousal Consent
*(To be executed if Primary Beneficiary is other than spouse and Roth IRA Account Owner is subject to laws of community property state.)* I consent to the Beneficiary Designation on this Application.

Spouse's Signature X

Date

### Trade Authorization by Phone (TAP)

I direct Retirement Accounts, Inc. to accept telephone trading requests on behalf of my account through its Trade Authorization by Phone (TAP) service:

☐Yes    ☐No

*(If left blank, telephone trading requests will be accepted for mutual funds and/or other investments for which RAI will accept telephone authorizations.)*

### Designated Representative Information
*(The Designated Representative is an agent of the Account Owner, and not of RAI. RAI shall be relieved of any responsibility for acting on instructions from the Account Owner's Designated Representative. See Article VII of the Roth IRA Plan and Trust Agreement.)*

Representative's Name

Firm Name

Firm Address

City/State/Zip

Representative's Phone Number (        )

Broker/Dealer

Broker/Dealer's Address

City/State/Zip

### Cash Investment
The IRA Account Owner directs that any cash received by the Trustee be deposited automatically into the Peak Money Market Account, pending further investment direction.

(To be completed by Trustee)
TAP    ☑ Yes    ☐ No

*(Continue to the next page.)*

© Retirement Accounts, Inc., 1998

5 of 6

ROTH-1999 (RAI)  (1/98)

9995 650000

# Self-Directed Roth Individual Retirement Account
## Application (continued)

**Roth IRA Plan Type** (choose only one):

☐ **Roth IRA (Contributory)** is intended for contributions (up to a maximum of $2,000 annually) which are not tax deductible, but which may be withdrawn tax-free if part of a "qualified distribution." This plan type includes Spousal Roth IRAs, in which a separate Roth IRA must be established (with a separate Application) for each spouse.

☑ **Roth Conversion IRA** is intended for conversion contributions from a "Traditional" IRA into this Plan (during a single tax year) by taxpayers with Adjusted Gross Income under $100,000 and not married filing separately. Designating this plan type certifies that the conversion meets the requirements under law for qualifying rollover contributions defined in the Plan documents.

☐ **Roth Combined IRA** is intended for accounts containing both annual Roth IRA contributions and conversion contributions or conversion contributions for different tax years. Designating this plan type certifies that the conversion(s) meet the requirements under law for qualifying rollover contributions defined in the Plan documents, and the account owner understands that the five-year exclusion period for receiving tax-free "qualified distributions" may be extended by making an additional conversion contribution into the same Roth IRA. This plan type allows the account owner to pool regular Roth IRA contributions and conversion contributions for investment purposes.

## Roth IRA Program Fee Schedule Selection

☑ Simple Roth IRA          ☐ Flexible Roth IRA

### Check Enclosure Summary

| | |
|---|---|
| Roth IRA Contribution for 19____ ($2,000 maximum) | $ |
| Roth IRA Contribution for 19____ ($2,000 maximum) | $ |
| Cash Roth Rollover Contribution | $ |
| Cash Conversion Contribution | $ |
| Establishment Fee* ($25 Simple, $50 Flexible) | $ 25 |
| Annual Administration Fee (Simple*: $58; Flexible: .4% of asset value billed biannually) | $ 58 |
| Total Enclosed (Make checks payable to "Retirement Accounts, Inc.") | $ 83 |

*These fees must be paid at time of application.

## Your Acknowledgment and Signature

Having read all pages of this application, the Plan and Trust Agreement and the Disclosure Statement, I understand and agree:

● To manage the investment of this Roth IRA pursuant to the provisions of the Roth IRA Plan and Trust Agreement.
● To the Arbitration Agreement (stated herein).
● That, unless I answered **NO** to telephone authorization (the TAP service), I have authorized Retirement Accounts, Inc. to honor telephone transaction requests for my account. I understand and agree that Retirement Accounts, Inc. is not responsible for determining whether or not a caller is authorized other than verifying that such caller is using the proper identifying number for my account. I understand and agree that neither Retirement Accounts, Inc. nor its agents will be responsible for unauthorized trades in my account.
● That Retirement Accounts, Inc. has installed automatic telephone recording equipment on telephone lines used by Customer Service Representatives who handle trading processing and client inquiries

and I give Retirement Accounts, Inc. consent to record and play back such calls.

● That I have received and accept the Trustee's fee schedule.

In witness whereof, I evidence adoption of the Plan by execution of this Adoption Agreement on the date below.

Account Owner's
Signature          X  *Peter Madoff*

Date:  *Feb 2, 1998*

Retirement Accounts, Inc. hereby accepts appointment as Trustee of this Roth IRA.

Retirement Accounts, Inc.
By:  *[signature]*

Account Number (RAI will complete)  *094151*

## Valuation Reporting Policy

Each Account statement you receive shows the value of your assets, all transactions that have taken place and all fees that have been charged. RAI reports the value of account securities as accurately as possible using the resources available to us. The prices listed on your RAI account statement may differ slightly from the values listed on your brokerage account or other investment sponsor statements. RAI cannot guarantee the accuracy of prices obtained from quotation services, nor the length of availability of such prices. Assets marked N/A indicate that a current price was not available at the time of valuation, or that the security had no value. Illiquid assets (such as limited partnerships and private stock) are generally reflected at original offering cost to investors unless we receive written notification verifying a new "fair market value" from an officer representing the investment.

**Note:** Retirement Accounts, Inc. does not conduct appraisals of investments, and it does not seek to verify any values reported to it by officers representing the investments. You should refer to reports received from the general partner, corporate issuer or sponsor (or contact these sources directly) with regard to the current operation and status of your chosen asset(s). The account statement (and reported values therein) should not be used as a basis for making, retaining or disposing of an investment. Please contact your Designated Representative with additional questions.

## Arbitration Statement

The Account Owner hereby agrees that all claims and disputes of every type and matter which may arise between the Account Owner and Retirement Accounts, Inc. shall be submitted to binding arbitration pursuant to the rules of the American Arbitration Association, that such arbitration proceedings and hearings shall take place only in Denver, Colorado; and that, to the extent not preempted by federal law, Colorado statutory law (including without limitation the statutes governing the award of damages in arbitration) and Colorado common law shall control during arbitration. The Account Owner expressly waives any right he/she may have to institute or conduct litigation or arbitration in any other forum or location, or before any other body. Arbitration is final and binding on the parties. An award rendered by the arbitrator(s) may be entered in any court having jurisdiction over the parties. Under the rules of the American Arbitration Association, there may be no right to prearbitration discovery, including depositions or written questions and document production. The arbitrator's award is not required to include factual findings or legal reasoning, and any party's right to appeal or seek modification of rulings by the arbitrator(s) is strictly limited.

© Retirement Accounts, Inc., 1998

ROTH-1999 (RAI)  (1/98)


**RETIREMENT ACCOUNTS, INC.**

**A ROTH IRA account has been established**

PETER MOSKOWITZ
Redacted

Redacted -0001

ACCOUNT NUMBER: Redacted -0001

Thank you for opening an Individual Retirement Account. Please take a
moment to verify that we have recorded your name, address and account
information correctly. If you need to change any of the information
below, please send the corrected information to the return address
referenced above or call us at the phone number provided on this form.

Account Disclosures for the PEAK MONEY MARKET ACCOUNT Account
A. Rate Information
The interest rate on your account is 2.18 % with an annual
percentage yield of 2.20 %. This is a variable rate account.
Your interest rate and yield may change. At our discretion, we may
change the interest rate on your account at any time.
B. Compounding and Crediting
Interest will be compounded on a daily basis. Interest will be
credited to your account on a daily basis.
C. Balance Information
There are no minimum balance requirements for this account. We use
the daily balance method to calculate interest on your account.
This method applies a daily periodic rate to the principal in the
account each day.

| Account Information: | | Corrected Information: |
|---|---|---|
| Plan Owner Name: | PETER MOSKOWITZ | |
| Mailing Address: | Redacted | |
| | | |
| Plan Owner Telephone: | Redacted | |
| Social Security #: | Redacted | |
| Date of Birth: | Redacted | |
| Plan Type: | IRA - ROLLOVER | |

Billing Schedule: SIMPLE


**RETIREMENT**
**ACCOUNTS, INC.**

February 26, 1998

Bernard Madoff
Investment Security
Attn: Frank Di Pascali
885 Third Ave.
New York, NY 10022-4834

RE:    Retirement Accounts, Inc. **FBO**
        Peter Moskowitz A/C# Redacted
        Your A/C#Redacted

Dear Mr. Di Pascali:

Please use this letter as your authorization to **REREGISTER ALL SHARES** of the above named
brokerage account as follows:

        Retirement Accounts, Inc.
        **FBO Peter Moskowitz**
        A/C# Redacted
        PO Box 173785
        Denver, CO 80217-3785

Enclosed is our corporate resolution to facilitate this request. **Please notify RAI once this
transaction has been completed**. If you have any questions, please contact a Customer Service
Representative at 1-800-325-4352. Thank you for your assistance in this matter.

Sincerely,

Retirement Accounts, Inc.

Authorized Signor



**RETIREMENT ACCOUNTS, INC.**

March 3, 1998

BERNARD MADOFF INV. SEC.
885 THIRD AVENUE
NEW YORK, NY 10022-4834

Re:   Client:  PETER MOSKOWITZ
      RAI Account #: Redacted
      Fund Name:  Brokerage Account
      Fund Account #:  Redacted
      Current Registration: Retirement Accounts, Inc. TTEE FBO PETER MOSKOWITZ

Enclosed is a stock power executed by Retirement Accounts, Inc. which authorizes you to REREGISTER in the title of and to TRANSFER all shares presently held in the above account to:

> RETIREMENT ACCOUNTS INC.
> TTEE FBO PETER MOSKOWITZ
> P.O. BOX 173785
> DENVER, CO 80217-3785
> New Account # Redacted
> Tax ID:  Redacted

Please note that this investment is part of a tax sheltered retirement plan which is exempt from Federal income taxes and back-up withholding.

Sincerely,

_____

Retirement Accounts, Inc.

TO:  Retirement Accounts, Inc.
The above reregistration and transfer was made on_____, as requested.
                                          (Date)

      By:      _____
      Title:   _____
      Date:    _____

RAI/TRANSFER.REG

3514

*DELIVERING HIGH PERFORMANCE SERVICE TO SELF-DIRECTED INDIVIDUAL RETIREMENT ACCOUNTS SINCE 1976*
P.O. Box 173785 ■ Denver, CO ■ 80217-3785
303-294-5959 ■ 800-325-4352 ■ Fax 303-294-5899



# RETIREMENT ACCOUNTS, INC.

## IRREVOCABLE STOCK OR BOND POWER

For value received, the undersigned does (do) hereby sell, assign and transfer to

RETIREMENT ACCOUNTS INC.
TTEE FBO PETER MOSKOWITZ
P.O. BOX 173785
DENVER, CO 80127-3785

(Social Security or Taxpayer Identifying Number) Redacted

| IF STOCK ) | ALL shares of the capital stock HELD IN THE BROKERAGE ACCOUNT fund represented by |
| COMPLETE) | Certificate(s) No(s) _____ inclusive standing in the name of the undersigned |
| THIS ) | on the books of said Company. |
| PORTION ) | |

IF BONDS )   _____ bonds of _____ in the principal amount of $_____ COMPLETE)
     No(s) _____ inclusive standing in the name of the undersigned
THIS   )   on the books of said Company.
PORTION )

The undersigned does (do) hereby irrevocably constitute and appoint _____ attorney to transfer the said stock or bond(s), as the case may be, on the books of said Company, with full power of substitution in the premises.

Dated _____          _____

**IMPORTANT**                    Persons Executing This Power Sign Here

The signature(s) to this power must correspond with the name(s) as written upon the face of the certificate(s) or bond(s) in every particular without alteration.

Retirement Accounts, Inc.
TTEE FBO          PETER MOSKOWITZ
Account #         Redacted

Dated: March 3, 1998

_____

Signature Guaranteed
Retirement Accounts, Inc.

RA/TRANSFER.REO                              3514

*DELIVERING HIGH PERFORMANCE SERVICE TO SELF-DIRECTED INDIVIDUAL RETIREMENT ACCOUNTS SINCE 1976*
P.O. Box 173785 ▪ Denver, CO ▪ 80217-3785
303-294-5959 ▪ 800-325-4352 ▪ Fax 303-294-5899

For assistance call 800-325-4352.          PRINTED  01/23/1999 R 9995                 For assistance call 800-325-4352.          PRINTED  01/23/1999 R 9995

RECIPIENT COPIES — LR4

---

**Form 1099-R**    CORRECTED (if checked)    OMB No. 1545-0119    **1998**

1 Gross distribution    397,003.21
2a Taxable amount    397,003.21

Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.

2b Taxable amount not determined  X
Total distribution  X

PAYER'S name, street address, city, state, and ZIP code
The Affinity Group, Inc. Payer
Retirement Accounts, Inc
717 17th Street, Suite 2600
Denver, CO 80202-3326

PAYER'S Federal identification number  Redacted    RECIPIENT'S identification number  Redacted

3 Capital gain (included in box 2a)
4 Federal income tax withheld
5 Employee contributions or insurance premiums

6 Net unrealized appreciation in employer's securities
7 Distribution code  2  IRA/SEP/SIMPLE X
8 Other    %

9a Your percentage of total distribution
9b Total employee contributions

RECIPIENT'S name and street address (incl. apt. no.), city, state and ZIP code
PETER MOSKOWITZ DDS
Redacted

Account number (optional)  924334 0001
10 State tax withheld
11 State/Payer's state no.
12 State distribution
13 Local tax withheld
14 Name of locality
15 Local distribution

File this copy with your state, city, or local income tax return, when required.
Department of the Treasury Internal Revenue Service

---

**Form 1099-R**    CORRECTED (if checked)    OMB No. 1545-0119    **1998**

1 Gross distribution    397,003.21
2a Taxable amount    397,003.21

Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.

2b Taxable amount not determined  X
Total distribution  X

PAYER'S name, street address, city, state, and ZIP code
The Affinity Group, Inc. Payer
Retirement Accounts, Inc
717 17th Street, Suite 2600
Denver, CO 80202-3326

PAYER'S Federal identification number  Redacted    RECIPIENT'S identification number  Redacted

3 Capital gain (included in box 2a)
4 Federal income tax withheld
5 Employee contributions or insurance premiums

6 Net unrealized appreciation in employer's securities
7 Distribution code  2  IRA/SEP/SIMPLE X
8 Other    %

9a Your percentage of total distribution
9b Total employee contributions

RECIPIENT'S name and street address (incl. apt. no.), city, state and ZIP code
PETER MOSKOWITZ DDS
Redacted

Account number (optional)  924334 0001
10 State tax withheld
11 State/Payer's state no.
12 State distribution
13 Local tax withheld
14 Name of locality
15 Local distribution

File this copy with your state, city, or local income tax return, when required.
Department of the Treasury Internal Revenue Service

---

**Form 1099-R**    CORRECTED (if checked)    OMB No. 1545-0119    **1998**

1 Gross distribution    397,003.21
2a Taxable amount    397,003.21

Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.

2b Taxable amount not determined  X
Total distribution  X

PAYER'S name, street address, city, state, and ZIP code
The Affinity Group, Inc. Payer
Retirement Accounts, Inc
717 17th Street, Suite 2600
Denver, CO 80202-3326

PAYER'S Federal identification number  Redacted    RECIPIENT'S identification number  Redacted

3 Capital gain (included in box 2a)
4 Federal income tax withheld
5 Employee contributions or insurance premiums

6 Net unrealized appreciation in employer's securities
7 Distribution code  2  IRA/SEP/SIMPLE X
8 Other    %

9a Your percentage of total distribution
9b Total employee contributions

RECIPIENT'S name and street address (incl. apt. no.), city, state and ZIP code
PETER MOSKOWITZ DDS
Redacted

Account number (optional)  924334 0001
10 State tax withheld
11 State/Payer's state no.
12 State distribution
13 Local tax withheld
14 Name of locality
15 Local distribution

**Copy C For Recipient's Records**
Department of the Treasury Internal Revenue Service

For assistance call 800-325-4352.          PRINTED  01/23/1999 R 9995

---

**Form 1099-R**    CORRECTED (if checked)    OMB No. 1545-0119    **1998**

1 Gross distribution    397,003.21
2a Taxable amount    397,003.21

Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.

2b Taxable amount not determined  X
Total distribution  X

PAYER'S name, street address, city, state, and ZIP code
The Affinity Group, Inc. Payer
Retirement Accounts, Inc
717 17th Street, Suite 2600
Denver, CO 80202-3326

PAYER'S Federal identification number  Redacted    RECIPIENT'S identification number  Redacted

3 Capital gain (included in box 2a)
4 Federal income tax withheld
5 Employee contributions or insurance premiums

6 Net unrealized appreciation in employer's securities
7 Distribution code  2  IRA/SEP/SIMPLE X
8 Other    %

9a Your percentage of total distribution
9b Total employee contributions

RECIPIENT'S name and street address (incl. apt. no.), city, state and ZIP code
PETER MOSKOWITZ DDS
Redacted

Account number (optional)  924334 0001
10 State tax withheld
11 State/Payer's state no.
12 State distribution
13 Local tax withheld
14 Name of locality
15 Local distribution

**Copy B** If this form shows Federal income tax withheld in Box 4, attach this copy to your Federal tax return.
Department of the Treasury Internal Revenue Service

For assistance call 800-325-4352.          PRINTED  01/23/1999 R 9995

Peter  Moskowitz
Redacted

January 13, 2009

Fiserv. Investment  Support Services
717 17th Street  Ste.1700
Denver, Co 80202-3331

Dear Sirs:

On January 10, 2009 I received SIPC claim forms and notice of liquidation by the SIPC of
Bernard Madoff Investment Securities LLC from the SIPC appointed trustee, Irving  H. Picard, Esq.  I have
a Roth IRA  account being handled by your company. The account number isRedacted          The
securities  in that account were valued at $1,154,098.96 according to my understanding of the last
brokerage statement.  The securities from that account were located in a segregated or individual
brokerage account managed  by the Madoff firm. I believe the account is in your name with me as the
beneficiary. I believe that this  account is covered by the Securities Investor Protection Act.  I ask  that
you file the appropriate claim form  with the SIPC trustee so as to maximize the recovery of assets to my
account. Time is of the essence. There are  less than fifty days  left to file a timely SIPC  claim in this
matter.  If  you can not comply with my request, please notify me immediately with a full and complete
explanation.  Please send me a copy of any claim form that you do file for my records.

Sincerely,

*Peter Moskowitz DDS*

January 7, 2009

**RE:    PROOF OF CLAIM FORM**

Dear Sir/Madam:

Fiserv Investment Support Services (Fiserv ISS) recently received the enclosed Proof of Claim form.

Because all Fiserv ISS retirement plans are self-directed, we cannot comment on this matter. Please contact your financial representative with any questions you may have regarding this claim. If you should choose to participate in the claim, please return your completed claim form to the claims administrator at the address indicated in the security litigation materials. We have authorized the claims administrator to accept the signature of the beneficial owners (our clients) on these forms. It is *not* necessary for you to obtain a signature from Fiserv ISS on this form.

If you still hold this as an asset in your Fiserv ISS retirement account, the Claimant Section should be completed in the name of the IRA FBO (Your Name and Account Number).

**If the asset is still held in your Fiserv ISS IRA, and you do not complete the Claimant Section correctly, the proceeds from this claim (if received by you personally) will be deemed a distribution. You may be required to pay income taxes and any applicable penalties. If you have any questions regarding the completion of the Claimant Section of the proof of claim form, please contact one of our Client Relationship Representatives at 800-525-2124.**

Thank you for your attention to this matter.


Fiserv Investment Support Services



Enclosure

Peter Moskowitz
Redacted

January 26, 2009

Fiserv Investment Support Services
717 17th Street  Ste. 1700
Denver, CO 800202-3331

Dear sirs:

I have received your proof of claim form letter dated January 7, 2009. I also received a telephone call on
January 21  from Brian Martishinske in response to the letter I sent you dated January 13. He informed
me, in no uncertain terms, that your company will not file the SIPC claim related to my Roth IRA account
with you and the missing securities in the account you established with Bernard Madoff Investment
Securities LLC  as I requested in my letter. He explained that your company has made an arrangement
with the claims administrator to accept my signature on the form. Please send me a copy of any written
agreement or the names of the parties to that agreement if it isn't in writing. Your letter mentions the term
"beneficial owner". Please explain this term. I was under the impression that you owned the account as
custodian for my IRA. I don't know that I have the proper standing to sign the form unless it is in a
capacity as your agent. I never had such authority before, why now? Even then I don't   know if  IRS or
other regulations permit me to do so for my own IRA. I may be able to do so if you have abandoned your
responsibilities to me. In any case you are the primary custodian of the documents necessary to file the
claim. I believe the only document necessary to file the claim is the last monthly brokerage statement at
the filing date. At least send me your copy of that statement. If you do not have that statement please
explain how you could value my account or expect the SIPC administrator to process the claim. The
information you sent was inadequate. Furthermore if   I am signing in your stead then I believe I need to
understand the complete relationship between the Madoff firm and yours in order to answer questions
4,5,6,7, and 8 so as to complete the form properly.   Please send me the information I require so that I
may more adequately protect my interests. Please respond promptly as deadlines in this matter are
approaching.

Thank you for your attention to this matter

Peter Moskowitz



February 6, 2009

PETER MOSKOWITZ
Redacted

RE:    PETER MOSKOWITZ, Roth IRA  #(Redacted

Dear PETER MOSKOWITZ:

Fiserv Investment Support Services ("Fiserv ISS") recently sent a notification to its self-directed Individual Retirement Account ("IRA") owners who had chosen to invest their Fiserv ISS IRAs with Bernard Madoff and his brokerage firm, Bernard L. Madoff Investment Securities, LLC ("BMIS"). Because additional information has come out since that notice we are providing the following update.

## SIPC Trustee Claims Process

In January 2009 Fiserv ISS placed in overnight mail all claim forms that it received from the Securities Investor Protection Corporation ("SIPC") Trustee, Irving H. Picard. As stated in those forms, the deadline for filing with the Trustee is March 4, 2009. Fiserv ISS will not be filing claims on behalf of account owners – it is the responsibility of each account owner to decide whether or not they wish to file a claim, and to complete and submit the proper forms to the Trustee.

Some account owners have requested that we provide them with account documents to support their claims with the Trustee, and we have been working diligently to complete those requests. Please note that your Fiserv ISS statements reflect only the total market value (as reported to Fiserv ISS) of your account at BMIS, and not the purported holdings of your BMIS account. Detailed holdings should have been included on statements provided to you by BMIS.

Because requests for all documents that relate to an account take longer than requests for only certain documents (such as account statements), in order to expedite document requests we ask that you refer to the forms provided by the Trustee for instructions as to what specific documents are required.

## Trustee's Release of Account Owner Information

On February 4, 2009, the SIPC Trustee filed with the court a document that it had prepared for it entitled "Customers." The document included names and other information relating to customers of BMIS, including some partial (and in a handful of cases, complete) account numbers. The court then made that information available to the public. Please be assured that this information alone is not sufficient to access accounts. In addition, all these accounts are currently restricted with respect to transactions. In any case, more identifying information, including but not limited to full account numbers, is required to access accounts.

## Form 1099 Reporting

A few account owners have asked for clarification regarding the tax reporting on amounts recovered through the SIPC Trustee. As directed custodian for self-directed IRAs, Fiserv ISS is required by the Internal Revenue Code to report on Form 1099 any amounts removed from an IRA account. This requirement applies to amounts that may be recovered from the Trustee in relation to investments that were originally made through a Fiserv ISS IRA.

With respect to any recovery related to your investments with BMIS, your options include, but may not be limited to, having the recovery directed to your Fiserv IRA (in which case no 1099 would be required), or directing the

SIPC Trustee to pay it to you or to a successor IRA custodian. Because Fiserv ISS does not give tax advice, you should consult with a qualified tax advisor as to which method is best for your particular situation.

If you have questions specifically regarding Bernard L. Madoff or BMIS, please contact the SIPC Trustee, Mr. Irving H. Picard at (888) 727-8695.

Sincerely,

Fiserv Investment Support Services

*Fiserv*
*Investment*
*Support*
*Services*

Toll Free: 800-962-4238

February 6, 2009

PETER MOSKOWITZ
Redacted

RE:    PETER MOSKOWITZ, Roth IRA  #Redacted

Dear PETER MOSKOWITZ:

Fiserv Investment Support Services ("Fiserv ISS") recently sent a notification to its self-directed Individual Retirement Account ("IRA") owners who had chosen to invest their Fiserv ISS IRAs with Bernard Madoff and his brokerage firm, Bernard L. Madoff Investment Securities, LLC ("BMIS"). Because additional information has come out since that notice we are providing the following update.

### SIPC Trustee Claims Process

In January 2009 Fiserv ISS placed in overnight mail all claim forms that it received from the Securities Investor Protection Corporation ("SIPC") Trustee, Irving H. Picard. As stated in those forms, the deadline for filing with the Trustee is March 4, 2009. Fiserv ISS will not be filing claims on behalf of account owners – it is the responsibility of each account owner to decide whether or not they wish to file a claim, and to complete and submit the proper forms to the Trustee.

Some account owners have requested that we provide them with account documents to support their claims with the Trustee, and we have been working diligently to complete those requests. Please note that your Fiserv ISS statements reflect only the total market value (as reported to Fiserv ISS) of your account at BMIS, and not the purported holdings of your BMIS account. Detailed holdings should have been included on statements provided to you by BMIS.

Because requests for all documents that relate to an account take longer than requests for only certain documents (such as account statements), in order to expedite document requests we ask that you refer to the forms provided by the Trustee for instructions as to what specific documents are required.

### Trustee's Release of Account Owner Information

On February 4, 2009, the SIPC Trustee filed with the court a document that it had prepared for it entitled "Customers." The document included names and other information relating to customers of BMIS, including some partial (and in a handful of cases, complete) account numbers. The court then made that information available to the public. Please be assured that this information alone is not sufficient to access accounts. In addition, all these accounts are currently restricted with respect to transactions. In any case, more identifying information, including but not limited to full account numbers, is required to access accounts.

### Form 1099 Reporting

A few account owners have asked for clarification regarding the tax reporting on amounts recovered through the SIPC Trustee. As directed custodian for self-directed IRAs, Fiserv ISS is required by the Internal Revenue Code to report on Form 1099 any amounts removed from an IRA account. This requirement applies to amounts that may be recovered from the Trustee in relation to investments that were originally made through a Fiserv ISS IRA.

With respect to any recovery related to your investments with BMIS, your options include, but may not be limited to, having the recovery directed to your Fiserv IRA (in which case no 1099 would be required), or directing the

StreetInsider.com - SIPC's Role In Madoff-Of-All-Scams Could Save ...   http://www.streetinsider.com/Insiders+Blog/SIPCs+Role+In+Madoff...

StreetInsider.com
*if you're not inside...you're outside*

**InvestmentFraudLawsuits**
Call now if you've lost money
866-552-3101
www.alexhernandezlaw.com

**Stock Trading Brokerage**
"Best Online Broker" 4 years in a row!
Barron's 2003-2006.
optionsXpress.com

**Is Your Bank In Trouble?**
Free list Of Banks Doomed To Fail. The
Banks and Brokers X List. Free!
www.MoneyAndMarkets.com

Ads by Google

Join Free   SI Premium   RSS Feeds   E-mail Alerts   Portfolio   Login

Font Size:   Increase   Decrease

Send to a Friend

Sponsored by: Set-Up 'Insiders Blog' E-Mail Alerts!

**Special Reports**

After-Hours Movers 2/19: CAB, MXWL, RRGB, ACTG, LOPE Higher; VLCM, NDSN, CQB, CENX, UNTD Lower

Trading Radar for 2/20: JCPenny (JCP), Lowe's (LOW), Barrick Gold (ABX) Report; CPI Due

Unusual 11 Mid-Day Movers 2/19: WFMI, GRT, S, APOG Higher; ABR, BMRN, FITB, LDK Lower

**Market Snapshot**

Nasdaq   S&P 500   NYSE



Nasdaq   1442.82
-25.15   (-1.71%)
S&P 500   778.94
-9.48   (-1.20%)
NYSE   4881.16
-43.38   (-0.88%)
Quotes delayed at least 20 mins.

Advertisement
Ads by Google

**Stanford Fraud Victim?**
Board Certified Texas
Trial Lawyer Free
consultation
www.stanfordfinancialfraud.info

**Madoff - Recoup Taxes**
"Contingency Fee" - Yes
IRS and States
www.MortnerLaw.com

**High Annual Yield Notes**
8.71%-1 Yr Term,
9.96%-2 Yr Term
10.46%-3 Yr Term. Not
FDIC Insured
www.CPSNotes.com

**Registered Reps**
Profit sharing and full
service Join a B/D that
works for you
equitasusa.com

## Insiders' Blog

# SIPC's Role In Madoff-Of-All-Scams Could Save The Stock Market

December 16, 2008 2:14 PM EST
Could the Bernard Madoff fraud actually help the stock market?

The SIPC came out with a statement last night indicating that they will be involved in the Madoff situation. The SIPC maintains a special reserve fund authorized by Congress to help investors at failed brokerage firms. The SIPC reserves are available to satisfy the remaining claims of each customer up to a maximum of $500,000, including a maximum of $100,000 for cash.

It seems likely that most, if not all, of the statements Bernard Madoff delivered to clients were entirely bogus. Based on the SIPC mandate, it could be in the realm of possibility that the *SIPC has to buy securities* to replace those that were faked on statements delivered to Madoff clients.

Based on a conversations with the SIPC general counsel Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing that they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

Imagine $50 billion in net buying to the stock market, on behalf of the SIPC, to replace client's stocks that were never bought? While this likely won't happen to this extent, it is in the realm of possibility.

Ms. Wang indicated to us that the SIPC has a budget of just $1.6 billion and a few credit lines worth $2 billion total. While SIPC is a non-profit organization, they have indicated to us that they will try to make as many people as whole as possible. They claim to be free from any conflicts of interest, even if the amount needed would eclipse their budget. When asked if the Madoff claims came in at $5 billion what would be done, Ms. Wang indicated to us that they could look to Congress for the money.

The SIPC said their involvement with the Madoff case strictly involves the broker-dealer. So, one of the main issues the SIPC trustee appointed to the Madoff case will have to address is how Madoff hedge fund clients and other investment management clients will be dealt with. Will they be protected? Also, if a hedge fund that invested in Madoff has 100 clients, will the SIPC pay out $500K just to the hedge fund or $500K to each of the 100 clients?

There are many questions that are still unanswered on the massive Bernie Madoff ponzi scheme, but it would be ironic if the biggest scam in history, that has hurt so many people, turned out to be a slight positive to the market. Our prayers are with all of those who have lost money having faith in Madoff and the system that has failed us.

## Stocks Mentioned

## Related Entities

- Hedge Funds
- Bernard Madoff

**TODAY'S TOP STORY**

**Buffett Buys $500 Million of This Stock**

A few weeks ago, Warren Buffett loaded up on this promising retailer, purchasing a stake valued at nearly $500 million. This little-known retail stock has already gained +2.469%, but we expect its market share to grow ten-fold in the coming years, leading to market-crushing gains.

**Click here** to continue this article and learn the name and ticker symbol of Warren Buffett's most recent stock purchase.

www.TopStockAnalysts.com   Ads by Goooooogle

## More News related to Insiders' Blog

- TheStreet.com (TSCM) Highlights From Q4 Conference Call; Things Are Tough "But We Have Cash"
- General Electric (GE) Taps New Low, After Briefly Falling Into Single-Digits
- ITT Educational (ESI) Sinks After Disclosing Possibly Higher Default Rates
- Nelson Peltz Loads Up On Doughnuts and Burgers (KKD, CKR)
- Rick Santelli - The Rant Heard 'Round the World'

**More News related to Insiders' Blog**

Partner Center


learn more


learn more

   


Skip to content

Skip to search - Accesskey = s

# mehtafiscal

## The End of a Sure Thing: Madoff's Long Bet

Posted in Madoff by ninamehta212 on December 22nd, 2008



The Madoff affair has been unfolding for just over a week, yet the legacy of what is now being learned is likely to resonate long into the future for the Securities and Exchange Commission, the U.S. regulatory infrastructure, legions of individual investors, hedge funds, charities and industry groups. The scope of Bernie Madoff's Ponzi scheme is breathtaking, and the losses—reputedly $50 billion, according to the SEC—dwarf most previous frauds and scandals.

But while the end of the fraud occurred on Dec. 10, when Madoff confessed to his two sons that the cupboards were bare and he had scammed friends and investors for years, what's not known is how early the fraud started. Based on several interviews with Madoff clients, it's clear that Madoff has been managing money both directly and indirectly for investors since the early 1970s, if not before. Those early investors, whose return rates were guaranteed, garnered even more stratospheric rates of return than the high rates the most recent investors received.

Some of those early clients remained customers until Dec. 11, when the FBI arrested Madoff on a single count of securities fraud and the façade of Bernard L. Madoff Investment Securities disintegrated, setting off shock waves of anger and confusion. Madoff's company was known primarily as a third-market firm, a market-maker that got its start in 1960 trading over-the-counter stocks and then NYSE-listed stocks away from the Big Board. Bernie Madoff was instrumental in helping form the Nasdaq Stock Market in 1971 and was chairman of that

market in 1990, 1991 and 1993. He helped shape the regulatory structure for the equities market that affected the way stocks now trade. But during all those years as a macher in the securities industry, Madoff also operated an investment advisory business that colleagues and regulators knew little about. That closely held secret at the heart of Madoff's company is now gradually coming unglued.

Based on conversations with three individual Madoff investors, including two who invested with Madoff in the 1970s and a third who began investing with him in the late 1980s or early 1990s, a different picture emerges than the one dominating the headlines. That picture fleshes out the early years of what was a four-decade-long saga of exceptionally high returns. It is not known how early the fraud may have begun, but the pattern of returns never changed significantly over the decades. The three investors interviewed are identified as Investor A, Investor B and Investor C. None wanted to reveal his or her name publicly.

"What should have raised a red flag was that in 1987, when the market dropped, we still got our 20 percent return," said Investor A, a man who began investing with Madoff around 1971. The investor currently lives in Manhattan and works in the real-estate business. He invested directly with Madoff in the 1970s, and received a guaranteed return of 20 percent annually, regardless of the market's gyrations. The return never wavered, and the investor received 20 percent per year until 1992.

Madoff's eventual father-in-law, Saul Alpern, was Investor A's family accountant in the 1950s and 1960s. The Manhattan accounting firm in the West 40s, called Alpern & Heller, was run by Alpern and his colleague Sherman Heller. Heller was a friend of Investor A's father. Two junior accountants at the firm were named Frank Avellino and Michael Bienes. These men would wind up playing a key role in Madoff's brush with a Securities and Exchange Commission investigation in 1992. Heller died in the mid-1960s at the age of 46, according to Investor A, and in the 1970s Avellino and Bienes took over the accounting firm.

In the late 1970s or early 1980s, Investor A recalled, Madoff decided he didn't want to handle small individual investor accounts. So Avellino and Bienes packaged together the accounts of people who had been invested directly with Madoff. "Madoff traded them as a single entity instead of maintaining them as single accounts with separate statements," this investor said. "He didn't want the bookkeeping of all the separate accounts." This investor met Madoff a number of times over the years, but was not friends with him.

Investor A brought several friends into Madoff's ambit as investors, via Avellino & Bienes. While he continued to get 20 percent annual returns, paid out on a quarterly basis, A&B gave these friends 19 percent. "As the years went on, as people went in, they offered lower and lower percentages," he said. "At the end, they were giving [investors] 13 percent." He added that the investments were considered loans. "My 20 percent was considered interest income on a loan," he said. "The tax returns treated it as interest income. That's how Avellino and Bienes set it up."

Investor B, who is related to Investor A through her husband, a physician in Manhattan, said the couple began investing indirectly in Madoff's accounts in the 1970s. In the mid-1960s, Avellino & Bienes had become the couple's accountants. Sometime in the 1970s, when the couple had saved up some money, the accountants recommended an investment to them that they had offered to other clients.

"Other members of our family had been involved in this," the woman said. "We put some money in with them. We were guaranteed a very nice interest rate on that money. No matter what happened, we got that money." The couple never knew the money was managed by Madoff.

Like Investor A, the couple received quarterly checks from Avellino & Bienes, for close to 20 percent. "They sent us a check every quarter for what our money had earned," the woman said. She does not recall receiving monthly or quarterly statements about the investment.

Investor C, a medical researcher who knows the husband of Investor B, began investing with Madoff through Avellino & Bienes in the late 1980s or early 1990s. He never met Madoff, he said, but instead relied on the faith that several prominent people in the financial arena, whom he knew, had in Madoff. "There were no

statements," he said. "We had put $25,000 or $50,000 in there in the 1980s and got 16 to 20 percent interest because, we were told, it was an arbitrage. We always got a quarterly check and the principal stayed the same."

The guaranteed profits lasted until 1992. On Nov. 17 of that year, Avellino and Bienes were charged by the Securities and Exchange Commission with having run an unregistered investment company since 1984. The civil complaint, filed in New York federal court, also alleged that from 1962 until 1992 the two accountants had sold unregistered securities to the public in the form of notes. According to the SEC summary, Avellino and Bienes had "accepted funds from customers and guaranteed those customers interest rates ranging between 13.5% and 20%. The money the defendants collected from investors was then invested in securities with one broker-dealer." The complaint noted that more than 3,200 investors had purchased these notes and that the accountants had raised over $441 million from investors.

The broker-dealer that invested the money was Madoff's firm. Madoff had been the chairman of Nasdaq's board in 1990 and 1991, according to a Bloomberg report, and would again be chairman in 1993. Bloomberg did not explain he gap year in Madoff's leadership of Nasdaq's board.

On Nov. 25, 1992, another firm, Telfran Associates, was charged by the SEC with having run an unregistered investment company and with selling unregistered securities, from 1989 to 1992. The two partners at Telfran sold notes that paid about 15 percent to investors and used those funds to purchase notes from A&B. The SEC said that more than $88 million had been raised from 800 investors who bought the Telfran notes.

The following year, in November 1993, A&B agreed to pay a civil penalty of $250,000, and Avellino and Bienes each agreed to pay civil penalties of $50,000. The same penalties were applied to Telfran and its two partners, Steven Mendelow and Edward Glantz. Ira Lee Sorkin, one of Madoff's current attorneys, represented Avellino, Bienes, Mendelow and Glantz in 1993.

According to an article in the Wall Street Journal on Dec. 16, 1992, Madoff told the WSJ reporter that he hadn't known A&B had raised the money illegally. The article also quoted Richard Walker, the SEC's New York regional administrator, saying SEC officials had initially feared a scam. "We went into this thinking it could be a major catastrophe," Walker had said. But Lee Richards, the court-appointed receiver, found all the money in Madoff's investment accounts. Richards last week was named the court-appointed receiver for Madoff's Ponzi scheme. The 1992 WSJ article also raised a number of questions about how Madoff's investments had achieved consistently high returns.

In 1992, Richard Breeden was chairman of the SEC. One of the other three commissioners was Mary Schapiro, who is President-Elect Obama's choice to be the next SEC chairperson (the fifth commissioner had resigned earlier that year). Schapiro is currently CEO of the Financial Industry Regulatory Authority, which oversees about 5,000 broker-dealer member firms.

None of the investors who had bought the A&B notes lost their money. "Avellino and Bienes weren't registered securities dealers, and someone complained to the SEC," said Investor A. "Every account was closed with Avellino & Bienes, but everyone got every penny back. Madoff then agreed to take on everyone [who had invested through A&B], and everyone who wanted to opened accounts with him."

Investor B concurred. "Everyone got their money back, every cent," she said. "[Avellino and Bienes] were taking funds and investing them with Madoff. That was the first I heard of Madoff, when the two were put out of business." After that, she said, Madoff gave the accountants' former clients the option of investing directly through him. "He didn't call it a fund," she said. "He didn't guarantee a certain [return] percentage, compared to what the original people did. But compared to what was around in those economic times, we always got a nice return." She signed a letter of agreement with Madoff in December 1992.

According to Investor B's husband, the SEC had caught wind of A&B's scheme when the stock-broker boyfriend of the daughter of a big investor, who was hard-pressed to believe what his girlfriend had said about her father's investments, contacted the SEC. That led to the November 1992 charges. Investor B's husband said

Bienes contacted him at the time and told him investors would get their money back. Investors, he recalls, were "urged" to return the money to Madoff. This investor said Madoff had worked at Alpern & Heller in the late 1950s, with Avellino and Bienes, and was friendly with them [this last statement could not be independently verified].

Once investors were investing directly with Madoff, the documentation associated with those investments began to flow. "Once we were back with Madoff, we got transaction slips and a statement every month," Investor A said. "We got a list of stocks we owned, the number of shares, and what we paid for them. On another page were the dividends. We could set up the account in two ways—we could roll the profits over or have a check issued every quarter." This person added that the quarterly statements showed the initial investment, how much had been made to date, the balance and the percentage return for the quarter or year to date. He did not remember what information had been included in the statements he had received directly from Madoff in the 1970s, or whether those earlier statements were similar to those he later received.

The level of Madoff's investment returns were in the same ballpark each year after 1992, but on a quarterly basis the returns varied, according to Investor A. His annual returns through Madoff were in the range of 10 percent to 11 percent. Asked if his Madoff account ever had a negative quarter, he replied: "No, never." The lowest quarter, he said, "was maybe 1 percent," or 4 percent on an annualized basis. "But [the lower return] was made up the next quarter."

Investor B's post-1992 experience was similar. "We got transaction slips every month," she said. "It was forests and forests of trees—two inches worth a month, plus a big spreadsheet statement reflecting all of the [trading] activity." She and her husband also received quarterly statements that said how much they had earned so far that year.

Investor B said she noticed, in flipping through recent records, that the annualized return in one quarter had been about 3 percent. "That was unusual," she said. She added that she didn't remember ever seeing a negative quarter. This year, her quarterly statements showed annualized returns of 3.30 percent, 11.96 percent and 10.01 percent. In 2007, they were 8.95 percent, 10.33 percent, 11.02 percent and, finally, 10.86 percent.

Some investors took their quarterly returns out of their Madoff account, while others left the returns in their account since statements showed they were consistently outperforming the market. Investor A said he took money out at various times. "If I ever wanted a check, I'd drop a letter off at their office, and within a week I'd have a check," he said.

Investor B and her husband never took any money out. "We know of people who did, and they always could get it within a few days," the woman said. "I'm assuming that because of bad economic times now, people wanted their money back. [Madoff] just must have never had so many people anxious about needing the money. I don't think they suspected him, they just must have needed the money."

The woman estimated that the couple had given Madoff about $100,000 to invest over the years since 1992. "We added money, but with no regularity," she said. "We never took it out. We let it sit there as a cushion." Her portfolio management reports came from Bernard L. Madoff Investment Securities LLC, New York and London. According to the statement, the firm was affiliated with Madoff Securities International Ltd., Mayfair and London.

So what did these investors know about Madoff's strategy? Precious little. "Zero, zero," said Investor A. "It was all based on confidence in [Madoff]. I've been in there for 37 years. I had no reason to question it." Investor B said she knew the investment strategy had to do with "arbitrage," but didn't know what that was. She said that was the strategy in the 1980s with A&B as well.

Investor C, who also transferred his money to Madoff after A&B were charged in 1992, is angry that the deception and fraud may have gone undetected for years. "Everyone had a high opinion of Madoff, he was the chairman of Nasdaq," Investor C said. "He was helping the SEC set up regulations. It's like finding out that a

http://mentafiscal.wordpress.com/2008/12/

Justice of the Supreme Court is a gangster."

Investor C is focused on trying to regain as much of the money he gave Madoff to manage as possible. He wants to know who should have uncovered Madoff's vast fraud. "If the SEC is part of the federal government and we as investors pay taxes to the federal government for regulation, policies and procedures, why isn't the federal government responsible?" he said. "Their SEC went in 10 years ago, and just admitted that in September 2006 they gave Madoff a clean bill of health. Who is responsible for what happened, other than Bernard L. Madoff?"

Harry Markopolos, who a decade ago was chief investment officer at Rampart Investment Management Co. in Boston, first contacted the SEC's Boston office in May 1999 with doubts about the veracity of Madoff's investment returns. He pursued his suspicions and in November 2005 sent the SEC a 19-page report detailing evidence he had accumulated indicating that Madoff was either front-running customer order flow in the broker-dealer arm of his business or running the "world's largest Ponzi scheme." Markopolos's prescient memo said the latter was "highly likely" and estimated that Madoff was managing between $20 billion and $50 billion. He also provided a detailed list of 29 "red flags" suggesting that Madoff's investment business was generating fraudulent returns. Last week the Wall Street Journal published the November 2005 document.

The SEC's Division of Enforcement opened a case file in January 2006 to determine whether Markopolos's allegations were true and whether Madoff was running a Ponzi scheme. It closed the file in November 2007, after finding that Madoff had misled the SEC examination staff about his investment strategy and had withheld information about customer accounts. It also found that Madoff had acted as an investment adviser to several hedge funds without registering as an adviser. However, the first line of the report's conclusion noted: "The staff found no evidence of fraud." Prior to the case closing, Madoff registered as an investment adviser.

During this time and subsequently, individual investors had no cause to doubt Madoff. Their confidence remained a high as it had ever been. Investor C gave Madoff $1 million this year after taking money out of other accounts because those investments had fared poorly. "I am sick about it," he said. Investor C kept his quarterly profits in the Madoff account. "There was one time when I took out $100,000, but I quickly replaced it," he said. He got a cousin of his into Madoff's investment business as a client earlier this year.

Investors B and C both said that friends and relatives who tried to open accounts with Madoff over the years were rejected. Some of those individuals had a net worth of millions of dollars.

Investor C said he never questioned his Madoff investment. "There was a never a negative quarter," he said. "We had years with Madoff where we got 6 or 7 percent. But other accounts we had were getting that amount, so it didn't throw us off. And it was taxable." He added that an overall taxable income of 8 or 9 percent wasn't that far "off the wall." In his view, the A&B investment returns had been more unusual, but he believed those returns were as high as they were because the investment was risky. Of course, the investment turned out not to be risky.

Investor C said his November statement from Madoff showed that his account was up 1 or 2 percent for the month. Reading that November statement, he said, was the first time he thought, "Wow, how could this be, when the markets are down so much?" The statement showed a portfolio of T-bills, a Fidelity Spartan fund investment, a range of blue-chip stocks, and a lot of puts, indicating short positions.

When Investor C heard last week that Madoff had been arrested by the FBI in connection with his investment business, he was shocked. "I couldn't eat dinner, I was ill," he said. "When I first heard, I said 'Oh,' but I never thought my account was in jeopardy." He said two-thirds of his life savings were invested with Madoff.

Investor B was equally stunned. "When you think it's been working and working for many years, you just don't question it," the woman said. "There were a lot of well-known companies on the list. He tells you in each of these statements how much you own, the price and symbol, and how much you sold it for or bought it for." She said her last statement indicated long positions in Wells Fargo, Walmart, Johnson & Johnson, Intel, McDonald's, Oracle, Apple, Amgen, Bank of America, Pfizer, UPS, Cisco, Verizon, General Electric, United Technologies,


**Ameriprise** *Financial*

Ameriprise Brokerage
70400 Ameriprise Financial Center
Minneapolis, MN 55474

02/05/09

RE:    Client Name                    Peter Moskowitz
       Social Security number: Redacted
       Our Account number:      Redacted-4-021
       Your Account number     Redacted

To Whom It May Concern:

Enclosed is a request for a Direct Rollover to the above listed Roth IRA. This request instructs you to transfer assets from the client's current plan held with you, directly to a Roth IRA held with Ameriprise Trust Company.

We are writing to inform you that Ameriprise Trust Company is qualified under applicable Treasury Regulations to act as a custodian for IRA assets. We accept the transfer of the assets described in the form and will deposit the assets we receive into an Individual Retirement Account for the benefit of the above named individual. We will accept the In-Kind transfer of stock shares via physical certificate and/or DTC.

*All assets should be sent with the following instructions:*

> **DTC & SDFS ELIGIBLE SECURITIES**
> **Participant #0216**
> **FBO: Acct# (see our above mentioned account number)**

> **PHYSICAL CERTIFICATES & CHECKS**
> **Ameriprise Financial Services, Inc.**
> **70400 Ameriprise Financial Center**
> **Minneapolis MN 55474**
> **FBO: Acct# (see our above mentioned account number)**

If you have any questions, please contact me at the number below.

Sincerely,

Robert Lineburg
Ameriprise Financial Services, Inc.
Brokerage Transfers
70400 Ameriprise Financial Center
Minneapolis, MN 55474
Phone (800) 297-7378

SIGNATURE GUARANTEEI
MEDALLION GUARANTEEI
ERICAN ENTERPRISE INVESTMI
SERVICES, INC.

AUTHORIZED SIGNATURE
A9007098
( 59 )
SECURITIES TRANSFER AGENTS MEDALLION PROGRAM

Ameriprise Brokerage is provided by Ameriprise Financial Services, Inc. Member FINRA and SIPC.

Ameriprise Financial, Inc.
1098 Ameriprise Financial Center
Minneapolis, MN 55474



Ameriprise
*Financial*

## CERTIFICATE OF RESOLUTION

The undersigned, Kasey L. Ross, Assistant Secretary of Ameriprise Trust Company, a corporation duly organized and existing under the laws of the State of Minnesota, (the "Company") hereby certifies that:

1. She is a duly elected and qualified Assistant Secretary of the Company.

2. The following resolution was duly adopted at a meeting of the Board of Directors of the Company on April 30, 1996, and is still in full force and effect on the date hereof:

> WHEREAS, American Express Trust Company is appointed custodian of TSCAs and IRAs and Keoghs transferred to products and services offered by its affiliates ("Accounts");
>
> WHEREAS, American Express Trust Company wishes to delegate to the Secretary of this Corporation the authority to appoint individuals (including employees of this Corporation's affiliates) as Assistant Secretaries solely for the purpose of accepting the Corporation's appointment as custodian of these Accounts; now, therefore be it
>
> RESOLVED, American Express Trust Company hereby delegates the authority to appoint individuals as Assistant Secretary or Assistant Treasurer of this Corporation to the President of this Corporation.

3. The following resolution was duly adopted at a meeting of the Board of Directors of the Company on January 25, 2005, and is still in full force and effect on the date hereof:

> RESOLVED, that American Express Trust Company hereby delegates the authority to appoint individuals as Assistant Secretary of Assistant Treasurer of this Corporation to the Secretary of the Company.

4. American Express Trust Company changed its name to Ameriprise Trust Company, effective August 1, 2005.

*#232750 v07*

5. On October 17, 2008, Thomas R. Moore, Secretary of the Company, appointed each of the following individuals as Assistant Secretary of this Company solely for the purpose of accepting the Company's appointment as custodian with respect to TSCA, IRA and Keogh transfers and rollovers to products and services offered by the Company's affiliates:

| | | |
|---|---|---|
| Todd M. Abrahamian | Lydia F. Guise | Jennifer L Nelson |
| Kristin A. Amoth | Jeff D. Halter | Jennifer M. Nielsen |
| Lisa J. Andres | Joel A. Heger | Robert L. Norstrem |
| Amy R Austin | Tyna M. Hetrick | Kevin P. O'Connor |
| Jessica L. Barbey | Paula C. Hodges | Quincy Oliver |
| Susan L. Bauer Dominik | Adam E. Holly | Linda K. Olson |
| Christopher K. Bediako | Brian J. Houwman | Soule Paraschou |
| Tara J. Bilcik | Aksana Hrynevich | Dionne L Perteet |
| Ricardo S. Box | Sue J. Johnk | Darin W. Plummer |
| Douglas P. Bruska | Brenda M. Johnson | Jeanne M. Raffesberger |
| Allan B. Campbell | Georgette Johnson | Tracey A. Ramsden |
| Phyllis J. Carroll | Marlys M. Kirk | Namgyal Rapten |
| Chriscinda Carter | Penny L. Kuykendall | Debra L. Risk |
| Pamela Carter | Dan J. LaMotte | Charles A. Roman |
| Kalsang Chodon | Brian S. Lewis | Krista M. Schave |
| Elizabeth A. Cianchette | Robert C. Lineburg | Cindy J. Scherer |
| David A Cockerham | Jeffrey M. Little | Jeff P. Schuhwerck |
| Carol L. Crowell | Saul L. Margulas | Becky L. Schwen |
| Karen M. DeWolf | Michael G. Martin | Rebecca L. Strand |
| Linda M. Doran | Joann McDonald | Jessica L. Sullivan |
| Tommica A. Edwards | Steven M. Miller | Dawn C. Vereide |
| David Elroy Ford | James A. Molex | John P. Walker |
| Alicia N. Fredrikson | Aneesa K. Nathim | Carrie R. Washington |
| Joy A. Gorton | Dan E. Negrete | David S. Webb |
| Chrisanne M. Greenwood | | |

IN WITNESS WHEREOF, the undersigned has executed this certificate and caused the seal of the Corporation to be hereunto affixed this 17th day of October, 2008.

Kasey L. Ross, Assistant Secretary

#232750 v07

**BERNARD L. MADOFF**
**INVESTMENT SECURITIES LLC**
New York □ London

MADF

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

**DUPLICATE** FOR ACCOUNT NTC & CO.
PETER MOSKOWITZ DDS

Redacted

| PERIOD ENDING | PAGE |
|---|---|
| 11/30/08 | 1 |

| YOUR ACCOUNT NUMBER | YOUR TAX PAYER IDENTIFICATION NUMBER |
|---|---|
| 1-ZR135-3-0 | ******6253 |

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| | | | | BALANCE FORWARD | | 72,989.66 | |
| 11/12 | 1,008 | | 1762 | WELLS FARGO & CO NEW | 29.800 | 30,078.40 | |
| 11/12 | 720 | | 2264 | HEWLETT PACKARD CO | 34.900 | 25,156.00 | |
| 11/12 | 624 | | 6088 | WAL-MART STORES INC | 55.830 | 34,861.92 | |
| 11/12 | 408 | | 6590 | INTERNATIONAL BUSINESS MACHS | 87.270 | 35,622.16 | |
| 11/12 | 1,512 | | 10414 | EXXON MOBIL CORP | 72.880 | 110,254.56 | |
| 11/12 | 1,656 | | 10916 | INTEL CORP | 14.510 | 24,094.56 | |
| 11/12 | 792 | | 15242 | JOHNSON & JOHNSON | 59.580 | 47,218.36 | |
| 11/12 | 1,080 | | 19567 | J.P. MORGAN CHASE & CO | 38.530 | 41,655.40 | |
| 11/12 | 576 | | 23893 | COCA COLA CO | 44.660 | 25,747.16 | |
| 11/12 | 336 | | 28219 | MCDONALDS CORP | 55.370 | 18,617.32 | |
| 11/12 | 624 | | 32545 | MERCK & CO | 28.550 | 17,839.20 | |
| 11/12 | 2,280 | | 36871 | MICROSOFT CORP | 21.810 | 49,817.80 | |
| 11/12 | 1,152 | | 41197 | ORACLE CORPORATION | 17.300 | 19,975.60 | |
| 11/12 | 456 | | 54175 | PEPSICO INC | 56.410 | 25,740.96 | |
| 11/12 | 264 | | 54677 | APPLE INC | 100.780 | 26,615.92 | |
| 11/12 | 1,944 | | 58501 | PFIZER INC | 16.940 | 33,008.36 | |
| 11/12 | 456 | | 59003 | ABBOTT LABORATORIES | 54.610 | 24,920.16 | |
| 11/12 | 864 | | 62827 | PROCTER & GAMBLE CO | 64.080 | 55,399.12 | |
| 11/12 | 312 | | 63329 | AMGEN INC | 59.160 | 18,469.92 | |
| 11/12 | 600 | | 67153 | PHILLIP MORRIS INTERNATIONAL | 43.600 | 26,184.00 | |
| 11/12 | 1,440 | | 67655 | BANK OF AMERICA | 21.590 | 31,146.60 | |
| 11/12 | 480 | | 71479 | QUALCOMM INC | 33.770 | 16,228.60 | |
| 11/12 | 1,560 | | 71981 | CITI GROUP INC | 12.510 | 19,577.60 | |
| | | | | CONTINUED ON PAGE    2 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES.

PLEASE REPORT PROMPTLY ANY INACCURACY OR DISCREPANCY IN YOUR ACCOUNT STATEMENT TO THE ACCOUNTING DEPARTMENT AT BERNARD L. MADOFF INVESTMENT SECURITIES LLC (212.230.2470). ANY ORAL COMMUNICATIONS SHOULD BE RE-CONFIRMED TO THAT DEPARTMENT IN WRITING.

PLEASE CONTACT US IF THERE HAVE BEEN ANY CHANGES IN THE ACCOUNT HOLDER'S FINANCIAL CONDITION OR INVESTMENT OBJECTIVES, OR IF THE HOLDER WISHES TO IMPOSE OR MODIFY ANY RESTRICTIONS ON THE MANAGEMENT OF THIS ACCOUNT.

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York ☐ London

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

**DUPLICATE** FOR ACCOUNT  NTC & CO.
PETER MOSKOWITZ DDS

Redacted

| PERIOD ENDING | PAGE |
|---|---|
| 11/30/08 | 2 |

| YOUR ACCOUNT NUMBER | YOUR TAX PAYER IDENTIFICATION NUMBER |
|---|---|
| 1-ZR135-3-0 | ******6253 |

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| 11/12 | 360 | | 75805 | SCHLUMBERGER LTD | 49.430 | 17,826.80 | |
| 11/12 | 864 | | 76307 | COMCAST CORP CL A | 16.510 | 14,298.64 | |
| 11/12 | 1,704 | | 80131 | AT&T INC | 27 | 46,076.00 | |
| 11/12 | 432 | | 80633 | CONOCOPHILIPS | 52.510 | 22,701.32 | |
| 11/12 | 288 | | 84457 | UNITED PARCEL SVC INC CLASS B | 52.040 | 14,998.52 | |
| 11/12 | 1,752 | | 84959 | CISCO SYSTEMS INC | 16.730 | 29,380.96 | |
| 11/12 | 504 | | 88783 | U S BANCORP | 29.530 | 14,903.12 | |
| 11/12 | 600 | | 89285 | CHEVRON CORP | 73.430 | 44,082.00 | |
| 11/12 | 288 | | 93109 | UNITED TECHNOLOGIES CORP | 53.160 | 15,321.08 | |
| 11/12 | 3,048 | | 93611 | GENERAL ELECTRIC CO | 19.630 | 59,953.24 | |
| 11/12 | 816 | | 97435 | VERIZON COMMUNICATIONS | 30.410 | 24,846.56 | |
| 11/12 | 72 | | 97937 | GOOGLE | 337.400 | 24,294.80 | |
| 11/12 | | 1,125,000 | 24368 | U S TREASURY BILL DUE 2/12/2009 2/12/2009 | 99.936 | | 1,124,280.00 |
| 11/12 | | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET DIV 11/12/08 | DIV | | 3.48 |
| 11/12 | | 8,543 | 19472 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | 8,543.00 |
| 11/12 | 41,066 | | 28840 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 41,066.00 | |
| 11/19 | | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET DIV 11/19/08 | DIV | | 5.04 |

CONTINUED ON PAGE   3

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES.

PLEASE REPORT PROMPTLY ANY INACCURACY OR DISCREPANCY IN YOUR ACCOUNT STATEMENT
TO THE ACCOUNTING DEPARTMENT AT BERNARD L. MADOFF INVESTMENT SECURITIES LLC
(212.230.2470). ANY ORAL COMMUNICATIONS SHOULD BE RE-CONFIRMED TO THAT DEPARTMENT
IN WRITING.

PLEASE CONTACT US IF THERE HAVE BEEN ANY CHANGES IN THE ACCOUNT HOLDER'S
FINANCIAL CONDITION OR INVESTMENT OBJECTIVES, OR IF THE HOLDER WISHES TO IMPOSE
OR MODIFY ANY RESTRICTIONS ON THE MANAGEMENT OF THIS ACCOUNT.

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

**DUPLICATE** FOR ACCOUNT  NTC & CO.
PETER MOSKOWITZ DDS

Redacted

| PERIOD ENDING | PAGE |
|---|---|
| 11/30/08 | 3 |

YOUR ACCOUNT NUMBER: 1-ZR135-3-0

YOUR TAX PAYER IDENTIFICATION NUMBER: ******6253

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| 11/19 | | 41,066 | 54387 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | 41,066.00 |
| 11/19 | 100,000 | | 58794 | U S TREASURY BILL DUE 03/26/2009            3/26/2009 | 99.926 | 99,926.00 | |
| 11/19 | 13,049 | | 63423 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | 13,049.00 | |
| | | | | NEW BALANCE | | 140,045.86 | |
| | | | | SECURITY POSITIONS | MKT PRICE | | |
| | 1,704 | | | AT&T INC | 28.560 | | |
| | 456 | | | ABBOTT LABORATORIES | 52.390 | | |
| | 312 | | | AMGEN INC | 55.540 | | |
| | 264 | | | APPLE INC | 92.670 | | |
| | 1,440 | | | BANK OF AMERICA | 16.250 | | |
| | 600 | | | CHEVRON CORP | 79.010 | | |
| | 1,752 | | | CISCO SYSTEMS INC | 16.540 | | |
| | 1,560 | | | CITI GROUP INC | 8.290 | | |
| | 576 | | | COCA COLA CO | 46.870 | | |
| | 864 | | | COMCAST CORP CL A | 17.340 | | |
| | 432 | | | CONOCOPHILIPS | 52.520 | | |
| | 1,512 | | | EXXON MOBIL CORP | 80.150 | | |
| | 3,048 | | | GENERAL ELECTRIC CO | 17.170 | | |
| | | | | CONTINUED ON PAGE    4 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES.

PLEASE REPORT PROMPTLY ANY INACCURACY OR DISCREPANCY IN YOUR ACCOUNT STATEMENT
TO THE ACCOUNTING DEPARTMENT AT BERNARD L. MADOFF INVESTMENT SECURITIES LLC
(212.230.2470). ANY ORAL COMMUNICATIONS SHOULD BE RE-CONFIRMED TO THAT DEPARTMENT
IN WRITING.

PLEASE CONTACT US IF THERE HAVE BEEN ANY CHANGES IN THE ACCOUNT HOLDER'S
FINANCIAL CONDITION OR INVESTMENT OBJECTIVES, OR IF THE HOLDER WISHES TO IMPOSE
OR MODIFY ANY RESTRICTIONS ON THE MANAGEMENT OF THIS ACCOUNT.

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York □ London

MADF

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

**\*\*DUPLICATE\*\*  FOR ACCOUNT  NTC & CO.**
PETER MOSKOWITZ DDS

Redacted

| PERIOD ENDING |
|---|
| 11/30/08 |

| PAGE |
|---|
| 4 |

| YOUR ACCOUNT NUMBER |
|---|
| 1-ZR135-3-0 |

| YOUR TAX PAYER IDENTIFICATION NUMBER |
|---|
| \*\*\*\*\*\*6253 |

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| | 72 | | | GOOGLE | 292.960 | | |
| | 720 | | | HEWLETT PACKARD CO | 35.280 | | |
| | 1,656 | | | INTEL CORP | 13.800 | | |
| | 408 | | | INTERNATIONAL BUSINESS MACHS | 81.600 | | |
| | 1,080 | | | J.P. MORGAN CHASE & CO | 31.660 | | |
| | 792 | | | JOHNSON & JOHNSON | 58.580 | | |
| | 336 | | | MCDONALDS CORP | 58.750 | | |
| | 624 | | | MERCK & CO | 26.720 | | |
| | 2,280 | | | MICROSOFT CORP | 20.220 | | |
| | 1,152 | | | ORACLE CORPORATION | 16.090 | | |
| | 456 | | | PEPSICO INC | 56.700 | | |
| | 1,944 | | | PFIZER INC | 16.430 | | |
| | 600 | | | PHILLIP MORRIS INTERNATIONAL | 42.160 | | |
| | 864 | | | PROCTER & GAMBLE CO | 64.350 | | |
| | 480 | | | QUALCOMM INC | 33.570 | | |
| | 360 | | | SCHLUMBERGER LTD | 50.740 | | |
| | 13,049 | | | FIDELITY SPARTAN U S TREASURY MONEY MARKET | 1 | | |
| | 504 | | | U S BANCORP | 26.980 | | |
| | 288 | | | UNITED PARCEL SVC INC CLASS B | 57.600 | | |
| | 100,000 | | | U S TREASURY BILL DUE 03/26/2009          3/26/2009 | 99.971 | | |
| | 288 | | | UNITED TECHNOLOGIES CORP | 48.530 | | |
| | | | | CONTINUED ON PAGE    5 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES.

PLEASE REPORT PROMPTLY ANY INACCURACY OR DISCREPANCY IN YOUR ACCOUNT STATEMENT
TO THE ACCOUNTING DEPARTMENT AT BERNARD L. MADOFF INVESTMENT SECURITIES LLC
(212.230.2470). ANY ORAL COMMUNICATIONS SHOULD BE RE-CONFIRMED TO THAT DEPARTMENT
IN WRITING.

PLEASE CONTACT US IF THERE HAVE BEEN ANY CHANGES IN THE ACCOUNT HOLDER'S
FINANCIAL CONDITION OR INVESTMENT OBJECTIVES, OR IF THE HOLDER WISHES TO IMPOSE
OR MODIFY ANY RESTRICTIONS ON THE MANAGEMENT OF THIS ACCOUNT.

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

**BERNARD L. MADOFF**
**INVESTMENT SECURITIES LLC**
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

**DUPLICATE** FOR ACCOUNT  NTC & CO.
PETER MOSKOWITZ DDS

Redacted

| PERIOD ENDING | PAGE |
|---|---|
| 11/30/08 | 5 |

| YOUR ACCOUNT NUMBER | YOUR TAX PAYER IDENTIFICATION NUMBER |
|---|---|
| 1-ZR135-3-0 | ******6253 |

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| | 816 | | | VERIZON COMMUNICATIONS | 32.650 | | |
| | 624 | | | WAL-MART STORES INC | 55.880 | | |
| | 1,008 | | | WELLS FARGO & CO NEW | 28.890 | | |
| | | | | MARKET VALUE OF SECURITIES | | | |
| | | | | LONG            SHORT | | | |
| | | | | 1,170,418.96 | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES.

PLEASE REPORT PROMPTLY ANY INACCURACY OR DISCREPANCY IN YOUR ACCOUNT STATEMENT
TO THE ACCOUNTING DEPARTMENT AT BERNARD L. MADOFF INVESTMENT SECURITIES LLC
(212.230.2470). ANY ORAL COMMUNICATIONS SHOULD BE RE-CONFIRMED TO THAT DEPARTMENT
IN WRITING.

PLEASE CONTACT US IF THERE HAVE BEEN ANY CHANGES IN THE ACCOUNT HOLDER'S
FINANCIAL CONDITION OR INVESTMENT OBJECTIVES, OR IF THE HOLDER WISHES TO IMPOSE
OR MODIFY ANY RESTRICTIONS ON THE MANAGEMENT OF THIS ACCOUNT.

**BERNARD L. MADOFF**
INVESTMENT SECURITIES LLC
New York ☐ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

**DUPLICATE** FOR ACCOUNT NTC & CO.
PETER MOSKOWITZ DDS

Redacted

| PERIOD ENDING | PAGE |
|---|---|
| 11/30/08 | 6 |

| YOUR ACCOUNT NUMBER | YOUR TAX PAYER IDENTIFICATION NUMBER |
|---|---|
| 1-ZR135-3-0 | ******6253 |

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| | | | | YEAR-TO-DATE SUMMARY | | | |
| | | | | DIVIDENDS | | | 8,619.14 |
| | | | | GROSS PROCEEDS FROM SALES | | | 7,052,742.97 |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES.

PLEASE REPORT PROMPTLY ANY INACCURACY OR DISCREPANCY IN YOUR ACCOUNT STATEMENT
TO THE ACCOUNTING DEPARTMENT AT BERNARD L. MADOFF INVESTMENT SECURITIES LLC
(212.230.2470). ANY ORAL COMMUNICATIONS SHOULD BE RE-CONFIRMED TO THAT DEPARTMENT
IN WRITING.

PLEASE CONTACT US IF THERE HAVE BEEN ANY CHANGES IN THE ACCOUNT HOLDER'S
FINANCIAL CONDITION OR INVESTMENT OBJECTIVES, OR IF THE HOLDER WISHES TO IMPOSE
OR MODIFY ANY RESTRICTIONS ON THE MANAGEMENT OF THIS ACCOUNT.

**BERNARD L. MADOFF**
**INVESTMENT SECURITIES LLC**
New York □ London

885 Third Avenue
New York, NY 10022
(212) 230-2424
800 334-1343
Fax (212) 838-4061

Affiliated with
Madoff Securities International Limited
12 Berkeley Street
Mayfair, London W1J 8DT
Tel 020 7493 6222

**DUPLICATE** FOR ACCOUNT  NTC & CO.
PETER MOSKOWITZ DDS

Redacted

| PERIOD ENDING |
|---|
| 11/30/08 |

| PAGE |
|---|
| 1 |

| YOUR ACCOUNT NUMBER |
|---|
| 1-ZR135-4-0 |

| YOUR TAX PAYER IDENTIFICATION NUMBER |
|---|
| ******6253 |

| DATE | BOUGHT RECEIVED OR LONG | SOLD DELIVERED OR SHORT | TRN | DESCRIPTION | PRICE OR SYMBOL | AMOUNT DEBITED TO YOUR ACCOUNT | AMOUNT CREDITED TO YOUR ACCOUNT |
|---|---|---|---|---|---|---|---|
| | | | | BALANCE FORWARD | | | 72,990.00 |
| 11/12 | | 24 | 45523 | S & P 100 INDEX NOVEMBER 460 CALL | 15.800 | | 37,896.00 |
| 11/12 | 24 | | 49849 | S & P 100 INDEX NOVEMBER 450 PUT | 17.800 | 42,744.00 | |
| 11/19 | | 24 | 35953 | S & P 100 INDEX DECEMBER 430 CALL | 26 | | 62,376.00 |
| 11/19 | 24 | | 40278 | S & P 100 INDEX DECEMBER 420 PUT | 30 | 72,024.00 | |
| 11/19 | 24 | | 44603 | S & P 100 INDEX NOVEMBER 460 CALL | 3 | 7,224.00 | |
| 11/19 | | 24 | 48928 | S & P 100 INDEX NOVEMBER 450 PUT | 37 | | 88,776.00 |
| | | | | NEW BALANCE | | | 140,046.00 |
| | | | | SECURITY POSITIONS | MKT PRICE | | |
| | | 24 | | S & P 100 INDEX DECEMBER 430 CALL | 23.300 | | |
| | 24 | | | S & P 100 INDEX DECEMBER 420 PUT | 16.500 | | |
| | | | | MARKET VALUE OF SECURITIES LONG    SHORT 39,600.00    55,920.00- | | | |

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES

PLEASE RETAIN THIS STATEMENT FOR INCOME TAX PURPOSES.

PLEASE REPORT PROMPTLY ANY INACCURACY OR DISCREPANCY IN YOUR ACCOUNT STATEMENT TO THE ACCOUNTING DEPARTMENT AT BERNARD L. MADOFF INVESTMENT SECURITIES LLC (212.230.2470). ANY ORAL COMMUNICATIONS SHOULD BE RE-CONFIRMED TO THAT DEPARTMENT IN WRITING.

PLEASE CONTACT US IF THERE HAVE BEEN ANY CHANGES IN THE ACCOUNT HOLDER'S FINANCIAL CONDITION OR INVESTMENT OBJECTIVES, OR IF THE HOLDER WISHES TO IMPOSE OR MODIFY ANY RESTRICTIONS ON THE MANAGEMENT OF THIS ACCOUNT.



**PRIORITY MAIL®**

UNITED STATES POSTAL SERVICE

Flat Rate
Mailing Envelope

*For Domestic and International Use*

*Visit us at usps.com*





$5.60
0003065S-04

UNITED STATES POSTAL SERVICE    0000    75201

Any amount of mailable material may be enclosed, as long as the envelope is not modified, and the contents are entirely confined within the envelope with the adhesive provided as the means of closure.

**INTERNATIONAL RESTRICTIONS APPLY:**

**4-POUND WEIGHT LIMIT ON INTERNATIONAL APPLIES**

Customs forms are required.
*International Mail Manual (IM*
or ask a retail associate for c

From/Expéditeur:

PRIORITY MAIL
UNITED STATES POSTAL SERVICE
Label 228, February 2006    www.usps.com

From    Peter Moskowitz, DDS
        945 La Salle Cir
        Corona CA 92879-7727

TO  IRVING H PICARD, Esq.
TRUSTEE for Bernard L MADOff Investment Sec.
CLAIMS PROCESSING CENTER
2100 McKinney Ave., Suite 800
DALLAS, TX 75201

Country of Destination:/Pays de destination:



**United States Postal Service®**
**DELIVERY CONFIRMATION™**
0EDO 1400 0000 0710 2023



USPS packaging products hav
to Cradle Certification™ for the
design. For more information g
Cradle to Cradle Certified™ is a certificat

*Please recycle.*

Recycled Paper



This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; Oct. 2008; All rights reserved.

082708_PM_EP14F  OCT 2008

EP14F