# EXHIBIT 1

**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Geraldine E. Ponto
Gonzalo S. Zeballos

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated  SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC and*
*the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | **LETTER OF REQUEST** |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff, | Adv. Pro. No. 09-01161 (SMB) |
| Plaintiff, | |
| v. | |
| FEDERICO CERETTI, *et al.* | |
| Defendants. | |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE TO THE APPROPRIATE JUDICIAL AUTHORITY IN BERMUDA

Presenting his compliments to the appropriate judicial authority of Bermuda, this Request is made by The Honorable Stuart M. Bernstein, of the United States Bankruptcy Court for the Southern District of New York, which is located at One Bowling Green, New York, New York 10004-1408, United States of America, to the Registrar of the Supreme Court, Second Floor, Government Administration Building, 30 Parliament Street, Hamilton HM12, Bermuda.

A copy of the documents obtained through the examination together with a copy of the transcript of the examination and the certification of the Bermuda Registrar should be returned to The Honorable Stuart M. Bernstein, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, 10004-1408.

In light of the international law and comity that exists between the United States and Bermuda, the undersigned applicant respectfully submits this Request:

## **INTRODUCTION**

This Request seeks evidence for use in the above-named proceeding pending before this Court, which alleges claims arising under the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa-*lll* ("SIPA"), and applicable provisions of the United States Bankruptcy Code, and the New York Debtor and Creditor Law. This Court has not yet made a determination on the merits of the claims and allegations asserted by the Plaintiff in this action, which are summarized below.

The Plaintiff's Fourth Amended Complaint filed on March 17, 2014 (ECF No. 100 (hereinafter, "FAC")) seeks, *inter alia*, to avoid and recover $926,351,905 in fraudulent transfers made to Kingate Global Fund, Ltd., In Liquidation ("Kingate Global") and Kingate Euro Fund, Ltd., In Liquidation ("Kingate Euro" and together with Kingate Global, the "Kingate Funds")

under the Bankruptcy Code, the New York Debtor Creditor Law, and SIPA § 78fff-2(c)(3).

The FAC makes clear that the Plaintiff's allegations against the Kingate Funds, and in particular, of their actual knowledge of fraud and willful blindness are largely based on the imputation of the knowledge and bad faith of their service providers, their officers and agents, and the individuals that dominated and controlled them, including Mr. Federico Ceretti, and Mr. Carlo Grosso, who founded the Kingate Funds.

Ceretti and Grosso structured the Kingate Funds with management companies that they directly or beneficially owned and controlled. In 1994, Ceretti and Grosso established the nominal management company, Kingate Management Limited ("KML"), which assigned its management responsibilities to FIM Limited and later its affiliate, FIM Advisers LLP ("FIM Advisers" and with FIM Limited, "FIM"). Together, KML and FIM (collectively, the "Kingate Managers") purported to "advise," "consult," and "manage" the Kingate Funds.

On Mr. Ceretti's and Mr. Grosso's direction, the Kingate Funds engaged other service providers for the Kingate Funds, including Citi Hedge Fund Services Limited ("Citi Hedge"), based in Bermuda, as administrator, HSBC Bank Bermuda ("HSBC"), as custodian, and PricewaterhouseCoopers ("PwC") through its Bermuda division PwC Bermuda, as auditor.

Mr. Ceretti and Mr. Grosso have first-hand knowledge of the flow of the Kingate Funds' assets to and from HSBC, and gave direction as to the movement of those funds to and from BLMIS, or to the Kingate Funds' other service providers. Mr. Ceretti and Mr. Grosso also have first-hand knowledge of the roles performed by Citi Hedge, HSBC, PwC, and PwC Bermuda on behalf of the Kingate Funds, and the concerns raised by these service providers about BLMIS in the course of performing their roles.

On August 11, 2015, in its denial of the Kingate Funds' Motion to Dismiss, this Court found, in relevant part:

to recover from the [Kingate] Funds under the Avoidance Claims, the FAC must also plead facts that permit the imputation of the Non-Fund Defendants' knowledge to the Kingate Funds. . . . The Non-Fund Defendants [which include Citi Hedge Fund Services Limited ("Citi Hedge") and KML] were agents of the Kingate Funds, and their dealings with BLMIS and Madoff on the Funds' behalf fell within the scope of their duties. Ceretti and Grosso created the Funds to invest exclusively with BLMIS and created the Management Defendants to manage the Kingate Funds. In addition, Citi Hedge provided administrative services for the Kingate Funds. . . . The allegations in the FAC are . . . sufficient to support the inference that the Funds benefitted from the actions of their agents even if the agents were conflicted and also acted for their own benefit. . . . Accordingly, the Court concludes that the FAC pleads sufficient facts to permit imputation of the Non-Fund Defendants' knowledge to the Funds.

*Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec.)*, Adv. No. 09-01161 (SMB), 2015 WL 4734749, at *15-16 (S.D.N.Y. Aug. 11, 2015).

Mr. Watson-Brown was the relationship partner at PwC, the Kingate Funds' auditors. The purpose of this Request is to obtain documentary and testimonial evidence from Mr. Watson-Brown, a non-party in this proceeding and a resident of Bermuda, for use as evidence in a trial in this proceeding in this Court and in support of the facts pleaded in the FAC.

### THE PARTIES AND THEIR REPRESENTATIVES

The parties to this action and their representatives are as follows:

(a)     The Plaintiff is Irving H. Picard, as trustee ("Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under SIPA substantively consolidated with the estate of Bernard L. Madoff. The Trustee is represented in this action by Baker & Hostetler LLP, 45 Rockefeller Plaza, New York, New York 10111, United States of America.

(b)     The Defendants in this action are the Kingate Funds. The Kingate Funds are in liquidation proceedings and act through their joint liquidators, who are represented in this action by Quinn Emanuel Urquhart & Sullivan LLP, 51 Madison Avenue, New York, New York 10010, United States of America.

## NATURE AND PURPOSE OF THE PROCEEDING AS ALLEGED BY THE TRUSTEE IN HIS FOURTH AMENDED COMPLAINT

**The Proceeding**

This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) is pending.

By way of background, Bernard L. Madoff ("Madoff"), through the investment advisory business of BLMIS, conducted a decades-long Ponzi scheme of breathtaking scale. His fraud was sustained by infusions of money from around the globe. In particular, domestic and foreign investment vehicles, sometimes colloquially known as "feeder funds," injected several billions of dollars into his scheme.

Included among these feeder funds were the Kingate Funds. Mr. Ceretti and Mr. Grosso formed an important part of Madoff's *de facto* global sales force, marketing BLMIS to European investors. Since their inception, the Kingate Funds deposited a combined total of approximately $1.7 billion with BLMIS, and over time withdrew nearly a billion dollars from BLMIS. The Trustee alleges that these withdrawn funds comprise customer property and constitute avoidable transfers under the United States Bankruptcy Code and other applicable law that the Trustee seeks to recover for equitable distribution.

**Watson-Brown's Connection to This Proceeding**

This Request seeks to obtain testimony and documents from Mr. Watson-Brown. The Trustee's investigation under his statutory authority, including the transcripts of the Kingate Funds' interviews of Mr. Ceretti and Mr. Grosso, testimony provided by Mr. Ceretti and Mr. Grosso to third parties, the review of documents produced to the Trustee, and depositions taken by the Trustee in this proceeding establish that Mr. Watson-Brown has knowledge that is highly relevant to the Trustee's claims in the FAC. Specifically, the Trustee anticipates that Mr.

Watson-Brown will be able to provide further information in relation to the issues and allegations contained in paragraphs 107-09, 110, 115, 118, 135, 136, 142,-43 145, 200-04, 218, 234-37, 239-41, 242-46, and 254-58 of the FAC a copy of which is attached to this Request as Exhibit A.

PwC Bermuda acted as auditor for the Kingate Funds from approximately 1999-2009. Mr. Watson-Brown is currently a partner with PwC Bermuda.  As part of PwC Bermuda's role as auditor of the Kingate Funds, Mr. Watson-Brown visited the offices of BLMIS in 2002 and 2004. Mr. Watson-Brown also had numerous conversations with Messrs. Ceretti and Grosso, as well as Mr. Christopher Wetherhill, regarding the audits of the Kingate Funds.

The Trustee is continuing to collect evidence for use at trial to support his claims in this proceeding.  Mr. Watson-Brown has knowledge that is highly relevant to the claims in this proceeding and the Trustee has a need for the documents in Mr. Watson-Brown's possession identified below, to be produced to the Trustee.

### <u>REQUEST FOR JUDICIAL ASSISTANCE</u>

This Request includes a request for the examination under oath of Mr. Watson-Brown.  As stated above, upon information, the Trustee believes Mr. Watson-Brown resides and is located in Bermuda.

**Request for Documentary Evidence from Mr. Watson-Brown**

It is hereby requested that Mr. Watson-Brown be ordered to make available for inspection and copying by the Trustee's legal representatives the following:

1. All working papers and files, other materials, reports and work created, developed or performed by PwC during the course of the audit of the Kingate Funds for the year ending December 31, 1999 as referenced in the February 2, 2000 engagement letter, a copy of which is attached hereto as Exhibit 1.

2. All working papers and files, other materials, reports and work created, developed or

performed by PwC during the course of the audit of the Kingate Funds for the year ending December 31, 2000 as referenced in the December 14, 2000 engagement letter, a copy of which is attached hereto as Exhibit 2.

3. All working papers and files, other materials, reports and work created, developed or performed by PwC during the course of the audit of the Kingate Funds for the year ending December 31, 2001 as referenced in the December 11, 2001 engagement letter, a copy of which is attached hereto as Exhibit 3.

4. All working papers and files, other materials, reports and work created, developed or performed by PwC during the course of the audit of the Kingate Funds for the year ending December 31, 2002 as referenced in the November 7, 2002 engagement letter, a copy of which is attached hereto as Exhibit 4.

5. All working papers and files, other materials, reports and work created, developed or performed by PwC during the course of the audit of the Kingate Funds for the year ending December 31, 2003 as referenced in the October 23, 2003 engagement letter, a copy of which is attached hereto as Exhibit 5.

6. All working papers and files, other materials, reports and work created, developed or performed by PwC during the course of the audit of the Kingate Funds for the year ending December 31, 2004 as referenced in the November 3, 2004 engagement letter, a copy of which is attached hereto as Exhibit 6.

7. All working papers and files, other materials, reports and work created, developed or performed by PwC during the course of the audit of the Kingate Funds for the year ending December 31, 2005 as referenced in the September 29, 2005 engagement letter, a copy of which is attached hereto as Exhibit 7.

8. All working papers and files, other materials, reports and work created, developed or

performed by PwC during the course of the audit of the Kingate Funds for the year ending December 31, 2006 as referenced in the November 30, 2006 engagement letter, a copy of which is attached hereto as Exhibit 8.

9. All working papers and files, other materials, reports and work created, developed or performed by PwC during the course of the audit of the Kingate Funds for the year ending December 31, 2007 as referenced in the November 6, 2007 engagement letter, a copy of which is attached hereto as Exhibit 9.

10. All working papers and files, other materials, reports and work created, developed or performed by PwC during the course of the audit of the Kingate Funds for the year ending December 31, 2008 as referenced in the October 30, 2008 engagement letter, a copy of which is attached hereto as Exhibit 10.

11. The attachments referenced in the email exchanges between PwC Bermuda and PwC US bearing bates number KING_000067810, a copy of which is attached hereto as Exhibit 11.

12. The entire contents of the paper file referenced in the working paper bearing bates number KING_000069330, a copy of which is attached hereto as Exhibit 12.

13. All attachments and documents referenced in the document bearing bates number KING_000069837, a copy of which is attached hereto as Exhibit 13.

14.  All attachments and documents referenced in the document bearing bates number KING_000069455, a copy of which is attached hereto as Exhibit 14.

15. All attachments and documents referenced in the document bearing bates number KING_000069818, a copy of which is attached hereto as Exhibit 15.

16. All attachments and documents referenced in the document bearing bates number KING_000069832, a copy of which is attached hereto as Exhibit 16.

17. All attachments and documents referenced in the document bearing bates number

KING_000070445, including but not limited to all documents related to a meeting held between PwC and Mr. Wetherill in November 2003, and a meeting held between PwC and Mr. Wetherill on February 16, 2004, a copy of which is attached hereto as Exhibit 17.

18.  Documents responding to the request by PwC for further explanation of "calculations [received] from Hemisphere [requesting] . . . as they are inconsistent with [PwC's] numbers," as referred to in a letter from Andrew Brook to Mr. Wetherill dated February 15, 2002, a copy of which is attached hereto as Exhibit 18.

19. Documents relating to or discussing a review of BLMIS undertaken by PwC as referred to in a letter from same to Mr. Wetherill dated November 7, 2002, a copy of which is attached hereto as Exhibit 19.

20. Documents, including but not limited to any notes or communications, relating to a meeting held between representatives of PwC and Mr. Wetherill, as set forth in a PwC memo dated February 18, 2003, a copy of which is attached hereto as Exhibit 20.

21. All "Audit Strategy Memos" relating to the audits for the years ending 1999, 2000, 2001. 2002, 2003, 2004, 2005, 2007 and 2008 or any similar documentation to the "Audit Strategy Memo" for the year ended December 31, 2006, a copy of which is attached hereto as Exhibit 21.

**Request for Testimonial Evidence and Question List for Mr. Watson-Brown**

The Trustee seeks testimonial evidence from Mr. Watson-Brown regarding the following topics:

1.  PwC's audit procedures undertaken for the Kingate Funds.

2.  Two visits Mr. Watson-Brown made in 2002 and 2004 to the BLMIS offices in New York, New York to conduct audit procedures for the Kingate Funds.

3.  Communications between Mr. Watson-Brown and Mr. Ceretti or Mr. Grosso regarding their role in relation to the Kingate Funds.

4.  Communications between Mr. Watson-Brown and Mr. Ceretti or Mr. Grosso regarding

the annual audits of the Kingate Funds.

5.  Communications between Mr. Watson-Brown and Mr. Christopher Wetherhill concerning the annual audits of the Kingate Funds.

6.  The substance of a meeting that occurred in November 2008, at which Mr. Watson-Brown and Ms. Shazieh Salahuddin were present concerning the Kingate Funds.

7.  The processes undertaken to evaluate KML as the manager of the Kingate Funds.

8.  The processes undertaken to evaluate FIM as consultant to the Kingate Funds.

9.  The processes undertaken to evaluate BLMIS as the broker-dealer, investment manager for, and custodian of the assets of, the Kingate Funds.

10. Mr. Watson-Brown's knowledge of Tremont Bermuda Limited as co-manager of the Kingate Funds and the process undertaken to evaluate Tremont Bermuda Limited as co-manager.

11. Mr. Watson-Brown's participation in correspondence within PwC and/or PwC Bermuda regarding the Kingate Funds and BLMIS.

## COSTS

All fees and costs incurred in the execution of this Request shall be borne by Plaintiff.

## CONCLUSION

This Court expresses its appreciation for this assistance and states that the courts of the United States are authorized by statute, section 1782 of Title 28 of the United States Code, to extend similar assistance to the tribunals of Bermuda, and shall be ready and willing to provide reciprocal assistance in a similar case when required.

The Court extends to the judicial authorities of Bermuda the assurances of the highest consideration.

Dated: New York, New York

_____

_____
The Honorable Stuart M. Bernstein
United States Bankruptcy Judge

# EXHIBIT 1

# PRICEWATERHOUSE COOPERS 🏢

**PricewaterhouseCoopers**
Chartered Accountants
Dorchester House
7 Church Street
Hamilton
Bermuda HM 11
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242

Hemisphere Management Limited
Hemisphere House
9 Church Street
Hamilton

Attention: Mr. Damian Resnik

February 2, 2000

Reference: DQJ/RWW/swb 45109ENGAGE LTR-150-1

Dear Sir,

**Subject: Kingate Global Fund Ltd (the "Fund")**

Thank you for re-appointing PricewaterhouseCoopers as your auditors for the year ended December 31, 1999. The purpose of this letter is to confirm our mutual understanding of the terms of our engagement.

**Our Responsibilities**

Our responsibility as auditors of the Fund is to report to the shareholders whether the Fund's annual financial statements present fairly, in all material respects, the Fund's financial position, results of operations and changes in financial position in accordance with accounting principles generally accepted in United States of America.

We will be responsible for performing the audit in accordance with auditing standards generally accepted in United States of America. These standards require that we plan and perform the audit to attain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

KING_000067985

KING_000067985

# PRICEWATERHOUSECOOPERS 🅾

**Hemisphere Management Limited**
**February 2, 2000**
Reference: DQJ/RWW/swb 45109ENGAGE LTR-150-1

If an annual report is to be provided to shareholders, we will also read the other information included in the annual report to shareholders and consider whether such information, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements.

## Engagement Team Leaders

The engagement will be led by:

- Darren Johnston, engagement leader, who will be responsible for assuring the overall quality, value, and timeliness of our services to you;

- George Holmes, will serve as the concurring partner and will be available in the absence of the engagement partner; and

- Richard Whitefield, team manager, who will be responsible for managing the delivery of our services to you.

## Terms and Conditions Supporting Fee

Any fees estimated by PricewaterhouseCoopers will take into account the level of preparation and assistance from Hemisphere Management Limited ("Hemisphere") as already mutually agreed, and from client personnel. PricewaterhouseCoopers undertakes to advise Hemisphere and the Fund's management on a timely basis should this preparation and assistance not be provided or should any other circumstances arise which cause actual time to exceed that estimate.

In providing our services, we will consult with Hemisphere about matters of accounting, financial reporting or other significant accounting business issues. Accordingly, our fee reflects the time necessary for a reasonable amount of such consultation. However, should a matter require research, consultation or audit work beyond that amount, PricewaterhouseCoopers and the Fund will agree on an appropriate revision in services and fee.

(2)

# PRICEWATERHOUSECOOPERS 🏢

Hemisphere Management Limited
February 2, 2000
Reference: DQJ/RWW/swb 45109ENGAGE LTR-150-1

Our fees will be limited to those set out below, subject to any changes in fees, which may result from the circumstances described above.

Our estimate of fees for the services described above will be $30,000, subject to terms and conditions above, excluding out-of-pocket expenses.

PricewaterhouseCoopers will bill for all reasonable expenses including telephone, facsimile transmission, photocopying, delivery, postage, clerical assistance and computer usage.

Our fees and out-of-pocket expenses will be billed as follows:

| (i) Date | (ii) Amount |
|---|---|
| Upon commencement of fieldwork | 50% of estimated fees |
| Upon issuance of final financial statements * | Remaining fees and expenses |

(Note: * Payment should not be delayed for events beyond the control of PricewaterhouseCoopers)

Invoices are due and payable upon receipt. Interest may be charged on the balance of any accounts remaining unpaid for more than 30 days at a monthly rate of 1-1/2% (or as set out on the invoice).

**Internal Control and Limitations of the Auditing Process**

We will consider the Fund's internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to render an opinion on the effectiveness of internal control over financial reporting. However, we will inform the appropriate level of management of any significant weaknesses in internal control that come to our attention.

(3)

KING_000067987

KING_000067985

# PRICEWATERHOUSECOOPERS 🏢

Hemisphere Management Limited
February 2, 2000
Reference: DQJ/RWW/swb 45109ENGAGE LTR-150-1

We will design our audit to provide reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as illegal acts having a direct and material effect on the financial statements.

It is important to recognise that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements and are, therefore, subject to the limitation that material misstatements arising from the consequences of errors or fraud, or illegal acts, if any exist, may not be detected. Because of the nature of fraud, including attempts at concealment through collusion and forgery, an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we can not guarantee that errors, fraud or illegal acts, if present, will be detected. However, we will inform the appropriate level of management of any material errors that come to our attention and any fraud or illegal acts that come to our attention, unless they are clearly inconsequential.

## Management's Responsibilities

The financial statements referred to above are the responsibility of management. In this regard, management is responsible for ensuring that transactions are properly recorded in the accounting records and maintaining internal control sufficient to permit the preparation of financial statements in conformity with generally accepted accounting principles. Management is responsible for adjusting the financial statements to correct material misstatements, if any, and for affirming to us in the representation letter that the effects of any uncorrected misstatements brought to its attention by us are immaterial, both individually and in the aggregate, to the financial statements taken as a whole. Management is also responsible for identifying and ensuring that the Fund complies with the laws and regulations applicable to its activities.

An audit of financial statements conducted in accordance with generally accepted auditing standards is not designed to detect whether the Fund's systems are Year 2000 compliant. Further, we have no responsibility with regard to the Fund's efforts to make its systems, or any other systems, such as those of the Fund's vendors, service providers, or any other third

(4)

KING_000067988

KING_000067985

# PRICEWATERHOUSECOOPERS ⓡ

Hemisphere Management Limited
February 2, 2000
Reference: DQJ/RWW/swb 45109ENGAGE LTR-150-1

parties, Year 2000 compliant or provide assurance on whether the Fund has addressed or will be able to address all of the affected systems on a timely basis. These are responsibilities of the Fund's management.

Management is also responsible for making available to us, upon request, all of the original accounting records and related information, and personnel to whom we may direct inquiries. As required by generally accepted auditing standards, we will make specific inquiries of management and others about the representations embodied in the financial statements and the effectiveness of internal control over financial reporting. Generally accepted auditing standards also require that we obtain representation letters covering the financial statements from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements.

## Representation from Management

As noted above, at the conclusion of the engagement, the Fund's management will provide to us a representation letter that, among other things, will confirm:

- management's responsibility for the preparation of the financial statements in accordance with generally accepted accounting principles;

- the completeness and accuracy of financial records and related data;

- the completeness and availability of all minutes of the Board and committee meetings; and

- to the best of their knowledge and belief, the absence of illegal acts, fraud and other irregularities involving management or those employees who have significant roles in the control structure.

- The Fund's compliance with its investment restrictions as stated in its most recent offering memorandum.

- The Fund's reported net assets throughout the year have been properly computed in accordance with its bye-laws.

(5)

KING_000067989

KING_000067985



Hemisphere Management Limited
February 2, 2000
Reference: DQJ/RWW/swb 45109ENGAGE LTR-150-1

## Representation from Investment Advisor

At the conclusion of the engagement, the Fund's management will provide to us a
representation letter, that among other things, will confirm:

- To the best of their knowledge and belief, the absence of illegal acts, fraud and other
  irregularities involving management or those employees who have significant roles in the
  control structure.

- The portfolio securities as shown in the financial statements are stated at value as
  determined in accordance with the valuation method set forth in the most recent offering
  memorandum.

- The Fund's compliance with its investment objectives, policies and investment restrictions
  as stated in its most recent offering memorandum.

## Publication/Reproduction of Financial Statements

If management intends to publish or reproduce, in printed form or electronically (e.g., on an
Internet Web Site), the financial statements together with our report (or otherwise make
reference to our firm) in a document that contains other information, management agrees to (a)
provide us with a draft of such document to read, and (b) obtain our approval for inclusion of
our report, before the document is finalised and distributed. Where our audit report is
reproduced in any medium, the complete financial statements, including notes, must also be
presented.

## Communications

At the end of the engagement, we will provide management with our recommendations
designed to help make improvements in its internal control structure and operation. This
communication will include any other significant matters that may come to our attention (see
Internal Control and Limitations of the Auditing Process above).

(6)



Hemisphere Management Limited
**February 2, 2000**
Reference: DQJ/RWW/swb 45109ENGAGE LTR-150-1

### Indemnification for Management Misrepresentations

The Fund hereby indemnifies PricewaterhouseCoopers and its partners and employees, and holds them harmless from all claims, liabilities, losses, and costs arising in circumstances where there has been a knowing misrepresentation by a member of the Fund's management, regardless of whether such person was acting in the Fund's interest. This indemnification will survive termination of this engagement letter.

### Limitation of Liability

In any action, claim, loss or damage arising out of the engagement, the client agrees that PricewaterhouseCoopers' liability will be several and not joint and several; and the client may only claim payment from PricewaterhouseCoopers of PricewaterhouseCoopers' proportionate share of the total liability based on degree of fault.

### Working Papers

All working papers and files, other materials, reports and work created, developed or performed by PricewaterhouseCoopers during the course of the audit are the property of PricewaterhouseCoopers.

### Governing Law

This agreement shall be governed by and construed in accordance with the laws of Bermuda.

### Timely Performance

PricewaterhouseCoopers will use all reasonable efforts to complete within any agreed upon time frame the performance of the services described in the engagement. However, PricewaterhouseCoopers shall not be liable for failures or delays in performance that arise from causes beyond its control, including the untimely performance by the client of its obligations as set out above under the headings Terms and Conditions Supporting Fee and Management's Responsibilities.

(7)

KING_000067991

KING_000067985



Hemisphere Management Limited
February 2, 2000
Reference: DQJ/RWW/swb 45109ENGAGE LTR-150-1

## Other Matters

Any additional services that you may request and we agree to provide will be the subject of separate written arrangements.

The agreement of the Fund and PricewaterhouseCoopers outlined in this engagement letter shall survive the completion and termination of this engagement.

We are proud to serve as your auditors and we appreciate your confidence in our work. If the services outlined herein are in accordance with your requirements and if the above terms are acceptable to you, please have one copy of this letter signed in the space provided below and return it to us.

Yours very truly,

*PricewaterhouseCoopers*

Darren Q Johnston
Partner, Assurance and Business Advisory Service

(8)

KING_000067992

KING_000067985



**P**RICE**W**ATERHOUSE**C**OOPERS

Hemisphere Management Limited
February 2, 2000
Reference: DQJ/RWW/swb 45109ENGAGE LTR-150-1

The services and terms as set forth in this letter are agreed to.

Signed on behalf of the Board of Directors

By: _____          MARCH. 1 ST, 2000.
     Director's Signature                Date

     CWE MERHIU.
     Director's Name (please print)

                                                                    **(9)**

KING_000067993

KING_000067985

# EXHIBIT 2

# PRICEWATERHOUSECOOPERS 🅟

---

**PricewaterhouseCoopers**
Chartered Accountants
Dorchester House
7 Church Street
Hamilton
Bermuda HM 11
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242

Mr. Christopher Wetherhill
c/o Hemisphere Management Limited
Hemisphere House
9 Church Street
Hamilton



December 14, 2000

Reference: DQJ/SWB/cdh ENGAGE LTR-150-1

**Subject: Kingate Global Fund, Ltd. – USD Shares
Kingate Euro Fund, Ltd. (together the "Funds")**

Dear Mr Wetherhill,

The purpose of this letter is to confirm our understanding of the terms of our engagement as auditors of Kingate Global Fund, Ltd. – USD Shares and Kingate Euro Fund, Ltd. (hereinafter referred to as the "Funds").

**Services and related report**

We will audit the Funds' financial statements of net assets at December 31, 2000, and the related statements of operations and changes in net assets (hereinafter collectively referred to as the "financial statements") for the year then ending. Upon completion of our audit, we will provide you with our audit report on the financial statements referred to above. If, for any reasons caused by you or relating to the affairs of the Funds, we are unable to complete the audit, we may decline to issue reports as a result of these engagements.

---

MAILING ADDRESS: PO BOX HM 1171, Hamilton, Bermuda HM EX.

A list of partners can be obtained from the above address

KING_000009497

KING_000009497



**Kingate Global Fund, Ltd. – USD Shares**
**Kingate Euro Fund, Ltd.**
**December 14, 2000**
**Reference: DQJ/SWB/cdh ENGAGE LTR-150-1**

## Our responsibilities and limitations

The objective of an audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with auditing standards generally accepted in the United States of America. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation in accordance with accounting standards generally accepted in the United States of America.

We will consider the Funds' internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies relating to internal control over financial reporting identified during our audit will be communicated to you.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion and falsified documentation (including forgery), an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For

(2)

KING_000009498

KING_000009497



**P**RICE**WATERHOUSE**C**OOPERS** ⬚

Kingate Global Fund, Ltd. – USD Shares
Kingate Euro Fund, Ltd.
December 14, 2000
Reference: DQJ/SWB/cdh ENGAGE LTR-150-1

these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be
detected. However, we will communicate to you, as appropriate, any illegal act, material
errors, or evidence that fraud may exist identified during our audit.

Our audit is intended for the benefit of the Funds. The audit will not be planned or conducted
in contemplation of reliance by any third party or with respect to any specific transaction.
Therefore, items of a possible interest to a third party will not be specifically addressed and
matters may exist that would be assessed differently by a third party, possibly in connection
with a specific transaction.

**Management's responsibilities**

The financial statements referred to above are the responsibility of the management of the
Funds. In this regard, management is responsible for properly recording transactions in the
accounting records and for establishing and maintaining internal control sufficient to permit
the preparation of financial statements in conformity with generally accepted accounting
principles. Management is responsible for adjusting the financial statements to correct
material misstatements and for affirming to us in the representation letter that the effects of
any uncorrected misstatements aggregated by us during the current engagement and pertaining
to the year ending December 31, 2000 are immaterial, both individually and in the aggregate,
to the financial statements taken as a whole. Management also is responsible for identifying
and ensuring that the Funds comply with the laws and regulations applicable to their activities.

Management is responsible for making available to us, on a timely basis, all of the Funds'
original accounting records and related information and Fund personnel to whom we may
direct inquiries. As required by generally accepted auditing standards, we will make specific
inquiries of management and others about the representations embodied in the financial
statements and the effectiveness of internal control over financial reporting. Generally
accepted auditing standards also require that we obtain written representations covering
audited financial statements from certain members of management. The results of our audit
tests, the responses to our inquiries and the written representations comprise the evidential
matter we intend to rely upon in forming our opinions on the financial statements.

(3)

KING_000009499

KING_000009497



# PRICEWATERHOUSE COOPERS

Kingate Global Fund, Ltd. – USD Shares
Kingate Euro Fund, Ltd.
December 14, 2000
Reference: DQJ/SWB/cdh ENGAGE LTR-150-1

## Representation from Management

As noted above, at the conclusion of the engagement, the Funds' management will provide to us representation letters that, among other things, will confirm:

- management's responsibility for the preparation of the financial statements in accordance with generally accepted accounting principles;

- the completeness and accuracy of financial records and related data;

- the completeness and availability of all minutes of the Board and committee meetings;

- to the best of their knowledge and belief, the absence of illegal acts, fraud and other irregularities involving management or those employees who have significant roles in the control structure;

- that the effects of any uncorrected misstatements brought to its attention by us are immaterial, both individually and in the aggregate, to the financial statements taken as a whole;

- the Funds' compliance with their investment restrictions as stated in their most recent offering memorandums; and

- the Funds' reported net assets throughout the year have been properly computed in accordance with their bye-laws.

## Representation from Investment Advisor

At the conclusion of the engagements, the Funds' management will provide to us representation letters, that among other things, will confirm:

- To the best of their knowledge and belief, the absence of illegal acts, fraud and other irregularities involving management or those employees who have significant roles in the control structure.

(4)

KING_000009500

KING_000009497

# PRICEWATERHOUSECOOPERS 🄸

Kingate Global Fund, Ltd. – USD Shares
Kingate Euro Fund, Ltd.
December 14, 2000
Reference: DQJ/SWB/cdh ENGAGE LTR-150-1

- The portfolio securities as shown in the financial statements are stated at value as determined in accordance with the valuation method set forth in the most recent offering memorandum.

- The Funds' compliance with their investment objectives, policies and investment restrictions as stated in their most recent offering memorandums.

## Other documents

Generally accepted auditing standards require that we read any annual report that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

If management intends to publish or reproduce, in printed form or electronically (e.g., on an Internet Web Site), the financial statements together with our reports (or otherwise make reference to our firm) in a document that contains other information, management agrees to (a) provide us with a draft of such document to read, and (b) obtain our approval for inclusion of our reports, before the documents are finalized and distributed. Where our audit report is reproduced in any medium, the complete financial statements, including notes, must also be presented.

The Funds may wish to include our reports on these financial statements in a registration statement for a securities offering. You agree that the aforementioned audit report, or reference to our Firm, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

(5)



## Release and indemnification

Because of the importance of oral and written representations to an effective audit, the Funds release PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses attributable to any knowing misrepresentation by management.

Further, the Funds agree to indemnify and hold harmless PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses relating to PricewaterhouseCoopers' services under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

In no event shall PricewaterhouseCoopers be liable to the Funds, whether a claim be in tort, contract or otherwise:

(a) for any amount in excess of the total professional fees paid by the Funds under this engagement letter; or

(b) for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers' services provided under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

## Limitation of Liability

In any action, claim, loss or damage arising out of the engagement, the client agrees that PricewaterhouseCoopers' liability will be several and not joint and several; and the client may only claim payment from PricewaterhouseCoopers of PricewaterhouseCoopers' proportionate share of the total liability based on degree of fault.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Funds and PricewaterhouseCoopers agree not to demand a trial by jury in any

(6)

KING_000009502

KING_000009497

# PRICEWATERHOUSECOOPERS 🔳

**Kingate Global Fund, Ltd. – USD Shares**
**Kingate Euro Fund, Ltd.**
**December 14, 2000**
**Reference: DQJ/SWB/cdh ENGAGE LTR-150-1**

action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

## Working Papers

All working papers and files, other materials, reports and work created, developed or performed by PricewaterhouseCoopers during the course of the audit are the property of PricewaterhouseCoopers.

## Governing Law

This agreement shall be governed by and construed in accordance with the laws of Bermuda.

## Engagement Team Leaders

The engagement will be led by:

- Darren Johnston , Antony d'Ombrain, engagement leaders, who will be responsible for assuring the overall quality, value and timeliness of our services to you; and

- Scott Watson-Brown, team manager, who will be responsible for managing the delivery of our services to you.

## Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from Hemisphere Management Limited ("Hemisphere"), including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason Hemisphere or the Funds are unable to provide such schedules, information and assistance, PricewaterhouseCoopers and the Funds will mutually revise the fee to reflect additional services, if any, required of us to complete the audit.

(7)

KING_000009503

KING_000009497

# PRICEWATERHOUSECOOPERS 🅰

**Kingate Global Fund, Ltd. – USD Shares**
**Kingate Euro Fund, Ltd.**
**December 14, 2000**
**Reference: DQJ/SWB/cdh ENGAGE LTR-150-1**

In providing our services, we will consult with Hemisphere about matters of accounting, financial reporting or other significant business issues. Accordingly, our fee reflects the time necessary for a reasonable amount of such consultation. However, should a matter require research, consultation or audit work beyond that amount, PricewaterhouseCoopers and the Funds will agree to an appropriate revision in services and fee.

Our fee estimates are based on the time required by the individuals assigned to the engagement. Individual hourly rates vary according to the degree of responsibility involved and experience and skill required. We estimate our fees for this audit engagement will be $75,000, exclusive of out-of-pocket expenses. In addition, in the event that our relationship is terminated prior to the issuing of our accounts, time incurred will be billed at full rates for the work undertaken to such date. This estimate takes into account the agreed-upon level of preparation and assistance from Hemisphere; we will advise Hemisphere and the Funds' management should this not be provided or should any other circumstances arise which may cause actual time to exceed that estimate. Out-of-pocket expenses will include meals, telephone, facsimile transmission, photocopying, delivery, postage, clerical assistance and computer usage.

Invoices rendered are due and payable upon receipt. Interest may be charged on the balance of any accounts remaining unpaid for more than 30 days at a monthly rate of 1-1/2% (or as set out on the invoice).

**Other matters**

Any additional services that you may request and we agree to provide will be the subject of separate written agreements.

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for you, you will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

(8)

KING_000009504

KING_000009497



**Kingate Global Fund, Ltd. – USD Shares**
**Kingate Euro Fund, Ltd.**
**December 14, 2000**
**Reference: DQJ/SWB/cdh ENGAGE LTR-150-1**

The Funds agree that they will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers arising out of this engagement to anyone.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements of the Funds and PricewaterhouseCoopers contained in this engagement letter shall survive the completion or termination of this engagement.

*   *   *   *   *

If the services outlined herein are in accordance with your requirements and if the above terms are acceptable to you, please have one copy of this letter signed in the space provided below and return it to us.

Yours very truly,

*PricewaterhouseCoopers*

Darren Johnston
Partner, Assurance and Business Advisory Service

(9)

KING_000009505

KING_000009497



Kingate Global Fund, Ltd. – USD Shares
Kingate Euro Fund, Ltd.
December 14, 2000
Reference: DQJ/SWB/cdh ENGAGE LTR-150-1


\*   \*   \*   \*   \*


The services and terms as set forth in this letter are agreed to.

Signed on behalf of the Board of Directors.

Kingate Global Fund, Ltd. – USD Shares
Kingate Euro Fund, Ltd.


By: _____
     Director's Signature

     _CWEATHERHILL_____
     Director's Name (please print)

_____19 / 12 / 2000_____
(Date)


cc.    Jamie Jared
      Hemisphere Management Limited


(10)

KING_000009506

KING_000009497

# EXHIBIT 3


# PRICEWATERHOUSECOOPERS

**PricewaterhouseCoopers**
Chartered Accountants
Dorchester House
7 Church Street
Hamilton
Bermuda HM 11
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242

Mr. Christopher Wetherhill
Hemisphere Management Limited
Hemisphere House
9 Church Street
Hamilton

December 11, 2001

Reference: AJB/SWB/mdc/pat/45109 ENGAGE LTR - 150-1

**Subject: Kingate Global Fund, Ltd.**
            **Kingate Euro Fund, Ltd. (the "Funds")**

Dear Mr. Wetherhill,

The purpose of this letter is to confirm our understanding of the terms of our engagement as auditors of Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (hereinafter referred to as the "Funds").

**Services and related report**

We will audit the Funds' financial statements of assets and liabilities at December 31, 2001, and the related statements of operations and changes in net assets and financial highlights (hereinafter collectively referred to as the "financial statements") for the year then ending. Upon completion of our audit, we will provide you with our audit report on the financial statements referred to above. If, for any reasons caused by you or relating to the affairs of the Funds, we are unable to complete the audit, we may decline to issue reports as a result of these engagements.

MAILING ADDRESS: PO BOX HM 1171, Hamilton, Bermuda HM EX.

A list of partners can be obtained from the above address

KING_000069289

KING_000069289



Mr. Christopher Wetherhill
Reference: AJB/SWB/mdc/pat/45109 E L
December 11, 2001

## Our responsibilities and limitations

The objective of an audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with auditing standards generally accepted in the United States of America. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation in accordance with accounting standards generally accepted in the United States of America.

We will consider the Funds' internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies relating to internal control over financial reporting identified during our audit will be communicated to you.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion and falsified documentation (including forgery), an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For

(2)

KING_000069290

KING_000069289


# PRICEWATERHOUSE COOPERS

Mr. Christopher Wetherhill
Reference: AJB/SWB/mdc/pat/45109 E L
December 11, 2001

these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to you, as appropriate, any illegal act, material errors, or evidence that fraud may exist identified during our audit.

Our audit is intended for the benefit of the Funds. The audit will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of a possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

## Management's responsibilities

The financial statements referred to above are the responsibility of the management of the Funds. In this regard, management is responsible for properly recording transactions in the accounting records and for establishing and maintaining internal control sufficient to permit the preparation of financial statements in conformity with generally accepted accounting principles. Management is responsible for adjusting the financial statements to correct material misstatements and for affirming to us in the representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year ending December 31, 2001 are immaterial, both individually and in the aggregate, to the financial statements taken as a whole. Management also is responsible for identifying and ensuring that the Funds comply with the laws and regulations applicable to their activities.

Management is responsible for making available to us, on a timely basis, all of the Funds' original accounting records and related information and Fund personnel to whom we may direct inquiries. As required by generally accepted auditing standards, we will make specific inquiries of management and others about the representations embodied in the financial statements and the effectiveness of internal control over financial reporting. Generally accepted auditing standards also require that we obtain written representations covering audited financial statements from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinions on the financial statements.

(3)

KING_000069291

KING_000069289



# PRICEWATERHOUSE COOPERS

Mr. Christopher Wetherhill
Reference: AJB/SWB/mdc/pat/45109 E L
December 11, 2001

## Representation from Management

As noted above, at the conclusion of the engagement, the Funds' management will provide to us representation letters that, among other things, will confirm:

- management's responsibility for the preparation of the financial statements in accordance with generally accepted accounting principles;

- the completeness and accuracy of financial records and related data;

- the completeness and availability of all minutes of the Board and committee meetings;

- to the best of their knowledge and belief, the absence of illegal acts, fraud and other irregularities involving management or those employees who have significant roles in the control structure;

- that the effects of any uncorrected misstatements brought to its attention by us are immaterial, both individually and in the aggregate, to the financial statements taken as a whole;

- the Funds' compliance with their investment restrictions as stated in their most recent offering memorandums; and

- the Funds' reported net assets throughout the year have been properly computed in accordance with their bye-laws.

## Representation from Investment Advisor

At the conclusion of the engagements, the Funds' management will provide to us representation letters, that among other things, will confirm:

- To the best of their knowledge and belief, the absence of illegal acts, fraud and other irregularities involving management or those employees who have significant roles in the control structure.

(4)

KING_000069292

KING_000069289

# PRICEWATERHOUSE COOPERS 🄫

Mr. Christopher Wetherhill
Reference: AJB/SWB/mdc/pat/45109 E L
December 11, 2001

- The portfolio securities as shown in the financial statements are stated at value as determined in accordance with the valuation method set forth in the most recent offering memorandum.

- The Funds' compliance with their investment objectives, policies and investment restrictions as stated in their most recent offering memorandums.

**Other documents**

Generally accepted auditing standards require that we read any annual report that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

If management intends to publish or reproduce, in printed form or electronically (e.g., on an Internet Web Site), the financial statements together with our reports (or otherwise make reference to our firm) in a document that contains other information, management agrees to (a) provide us with a draft of such document to read, and (b) obtain our approval for inclusion of our reports, before the documents are finalized and distributed. Where our audit report is reproduced in any medium, the complete financial statements, including notes, must also be presented.

The Funds may wish to include our reports on these financial statements in a registration statement for a securities offering. You agree that the aforementioned audit report, or reference to our Firm, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

(5)

KING_000069293

KING_000069289



**PRICEWATERHOUSECOOPERS** 🌐

Mr. Christopher Wetherhill
Reference: AJB/SWB/mdc/pat/45109 E L
December 11, 2001

## Release and indemnification

Because of the importance of oral and written representations to an effective audit, the Funds release PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses attributable to any knowing misrepresentation by management.

Further, the Funds agree to indemnify and hold harmless PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses relating to PricewaterhouseCoopers' services under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

In no event shall PricewaterhouseCoopers be liable to the Funds, whether a claim be in tort, contract or otherwise:

    (a)    for any amount in excess of the total professional fees paid by the Funds under this engagement letter; or

    (b)    for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers' services provided under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

## Limitation of Liability

In any action, claim, loss or damage arising out of the engagement, the client agrees that PricewaterhouseCoopers' liability will be several and not joint and several; and the client may only claim payment from PricewaterhouseCoopers of PricewaterhouseCoopers' proportionate share of the total liability based on degree of fault.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Funds and PricewaterhouseCoopers agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

(6)

KING_000069294

KING_000069289



PRICEWATERHOUSECOOPERS 

Mr. Christopher Wetherhill
Reference: AJB/SWB/mdc/pat/45109 E L
December 11, 2001

## Working Papers

All working papers and files, other materials, reports and work created, developed or
performed by PricewaterhouseCoopers during the course of the audit are the property of
PricewaterhouseCoopers.

## Governing Law

This agreement shall be governed by and construed in accordance with the laws of Bermuda.

## Engagement Team Leaders

The engagement will be led by:

- Andrew Brook, engagement leader, who will be responsible for assuring the overall
  quality, value and timeliness of our services to you;

- Antony d'Ombrain, will serve as the concurring partner and will be available in the
  absence of the engagement partner; and

- Scott Watson-Brown, manager, who will be responsible for managing the delivery of our
  services to you.

## Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from
Hemisphere Management Limited ("Hemisphere"), including timely preparation of necessary
schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant
accounting and financial reporting matters. When and if for any reason Hemisphere or the
Funds are unable to provide such schedules, information and assistance,
PricewaterhouseCoopers and the Funds will mutually revise the fee to reflect additional
services, if any, required of us to complete the audit.

(7)

KING_000069295

KING_000069289



**P**RICEWATERHOUSE**C**OOPERS

Mr. Christopher Wetherhill
Reference: AJB/SWB/mdc/pat/45109 E L
December 11, 2001

In providing our services, we will consult with Hemisphere about matters of accounting, financial reporting or other significant business issues. Accordingly, our fee reflects the time necessary for a reasonable amount of such consultation. However, should a matter require research, consultation or audit work beyond that amount, PricewaterhouseCoopers and the Funds will agree to an appropriate revision in services and fee.

Our fee estimates are based on the time required by the individuals assigned to the engagement. Individual hourly rates vary according to the degree of responsibility involved and experience and skill required. We estimate our fees for this audit engagement will be $72,400, exclusive of out-of-pocket expenses. In addition, in the event that our relationship is terminated prior to the issuing of our accounts, time incurred will be billed at full rates for the work undertaken to such date. This estimate takes into account the agreed-upon level of preparation and assistance from Hemisphere; we will advise Hemisphere and the Funds' management should this not be provided or should any other circumstances arise which may cause actual time to exceed that estimate. Out-of-pocket expenses will include meals, telephone, facsimile transmission, photocopying, delivery, postage, clerical assistance and computer usage. Our fees and out-of-pocket expenses will be billed to you in advance of the expected settlement dates:

| Date | Amount |
|---|---|
| January 14, 2002 | $54,300 |
| Upon issuance of draft financial statements | Remaining fees and expenses |

**Other matters**

Any additional services that you may request and we agree to provide will be the subject of separate written agreements.

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for you, you will, so long as we are not a party to the

(8)

KING_000069296

KING_000069289

# PRICEWATERHOUSECOOPERS 🅟

Mr. Christopher Wetherhill
Reference: AJB/SWB/mdc/pat/45109 E L

December 11, 2001

proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Funds agree that they will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers arising out of this engagement to anyone.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements of the Funds and PricewaterhouseCoopers contained in this engagement letter shall survive the completion or termination of this engagement.

*   *   *   *   *

If the services outlined herein are in accordance with your requirements and if the above terms are acceptable to you, please have one copy of this letter signed in the space provided below and return it to us.

Yours very truly,

*PricewaterhouseCoopers*

Andrew J. Brook
Partner

*   *   *   *   *

(9)

KING_000069297

KING_000069289

# EXHIBIT 4



# PRICEWATERHOUSE COOPERS 🅑

PricewaterhouseCoopers
Chartered Accountants
Dorchester House
7 Church Street
Hamilton
Bermuda HM 11
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242

Mr. Christopher Wetherhill
Director
Kingate Management Limited
99 Front Street
Hamilton HM 11

November 7, 2002

Reference: AJB/SWB/smh/45109 ENGAGE LTR – 100-1

**Subject:  Kingate Global Funds, Ltd.**
**Kingate Euro Funds, Ltd. (the "Funds")**

Dear Mr. Wetherhill,

The purpose of this letter is to confirm our understanding of the terms of our engagement as auditors of Kingate Global Funds, Ltd. and Kingate Euro Funds, Ltd. (hereinafter referred to as the "Funds").

**Services and related report**

We will audit the Funds' financial statements at December 31, 2002, and for the year then ending. Upon completion of our audit, we will provide you with our audit report on the financial statements referred to above.

If, for any reasons caused by you or relating to the affairs of the Company, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

MAILING ADDRESS: PO BOX HM 1171, Hamilton, Bermuda HM EX.

A list of partners can be obtained from the above address

CONFIDENTIAL                                          PWCB000164

KING_000074973

KING_000074973

# PRICEWATERHOUSE COOPERS 🏢

**Our responsibilities and limitations**

The objective of an audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with auditing standards generally accepted in the United States of America. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation in accordance with accounting standards generally accepted in the United States of America.

We will consider the Funds internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies relating to internal control over financial reporting identified during our audit will be communicated to you.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion and falsified documentation (including forgery), an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For

(2)

CONFIDENTIAL

# PRICEWATERHOUSE COOPERS 🅡

these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to you, as appropriate, any illegal act, material errors, or evidence that fraud may exist identified during our audit.

The audit will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of a possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

## Management's responsibilities

The financial statements referred to above are the responsibility of the management of the Funds. In this regard, management (which includes for purposes of this letter the Funds Administrator, The Transfer Agent, or other Service Agents) is responsible for properly recording transactions in the accounting records and for establishing and maintaining internal control sufficient to permit the preparation of financial statements in conformity with general accepted accounting principles. Management is responsible for adjusting the financial statements to correct material misstatements, if any, and for affirming to us in the representation letter that the effects of any uncorrected misstatements brought to its attention by us are immaterial, both individually and in the aggregate, to the financial statements taken as a whole. Management also is responsible for identifying and ensuring that the Funds complies with the laws and regulations applicable to its activities.

Management is responsible for making available to us, on a timely basis, all of the Funds' original accounting records and related information and personnel to whom we may direct inquiries. As required by generally accepted auditing standards, we will make specific inquiries of management and others about the representations embodied in the financial statements and the effectiveness of internal control over financial reporting. Generally accepted auditing standards also require that we obtain written representations covering audited financial statements from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements.

Management agrees to comply with the Funds' offering memorandum and all other agreements.

(3)

CONFIDENTIAL

PWCB000166

KING_000074975

KING_000074973

# PriceWaterhouseCoopers 🅿

## Representation from management

As noted above, at the conclusion of the engagement, the Funds' management will provide to us a representation letter that, among other things, will confirm:

- management's responsibility for the preparation of the financial statements in accordance with generally accepted accounting principles;

- the completeness and accuracy of financial records and related data;

- the completeness and availability of all minutes of the Board and committee meetings;

- to the best of their knowledge and belief, the absence of illegal acts, fraud and other irregularities involving management or those employees who have significant roles in the control structure; and

- that the effects of any uncorrected misstatements brought to its attention by us are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

## Other documents

Generally accepted auditing standards require that we read any annual report that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

If management intends to publish or reproduce, in printed form or electronically (e.g., on an Internet Web Site), the financial statements together with our report (or otherwise make reference to our firm) in a document that contains other information, management agrees to (a) provide us with a draft of such document to read, and (b) obtain our approval for inclusion of

(4)

CONFIDENTIAL

PWCB000167

KING_000074976

KING_000074973

# PRICEWATERHOUSE COOPERS 🅿

our report, before the document is finalized and distributed. Where our audit report is reproduced in any medium, the complete financial statements, including notes, must also be presented.

The Funds may wish to include our report on these financial statements in a registration statement for a securities offering. You agree that the aforementioned audit report, or reference to our Firm, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

**Release and indemnification**

Because of the importance of oral and written representations to an effective audit, the Funds releases and indemnifies PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses (including attorneys fees and costs) attributable to any misrepresentation by management. Further, in no event shall PricewaterhouseCoopers be liable to the Funds, whether a claim be in tort, contract or otherwise:

(a) for any amount in excess of the total professional fees paid by the Funds under this engagement letter; or

(b) for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers services provided under this engagement letter,

except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

In addition, the Funds agrees to indemnify and hold harmless PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses (including attorney fees and costs) relating to PricewaterhouseCoopers' services under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

(5)

CONFIDENTIAL

PWCB000168

# PRICEWATERHOUSECOOPERS

## Limitation of liability

In any action, claim, loss or damage arising out of the engagement, the client agrees that PricewaterhouseCoopers' liability will be several and not joint and several; and the client may only claim payment from PricewaterhouseCoopers of PricewaterhouseCoopers' proportionate share of the total liability based on degree of fault.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Funds and PricewaterhouseCoopers agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

## Working papers

All working papers and files, other materials, reports and work created, developed or performed by PricewaterhouseCoopers during the course of the audit are the property of PricewaterhouseCoopers.

## Governing law

This agreement shall be governed by and construed in accordance with the laws of Bermuda.

## Engagement team leaders

The engagement will be led by:

- Andrew Brook, engagement leader, who will be responsible for assuring the overall quality, value and timeliness of our services to you;

- Antony d'Ombrain, will serve as the concurring partner and will be available in the absence of the engagement partner; and

(6)

CONFIDENTIAL                              PWCB000169

KING_000074978

KING_000074973

# PRICEWATERHOUSECOOPERS 🅡

- Scott Watson-Brown, team manager, who will be responsible for managing the delivery of our services to you.

## Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Funds' personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Funds is unable to provide such schedules, information and assistance, PricewaterhouseCoopers and the Funds will mutually revise the fee to reflect additional services, if any, required of us to complete the audit.

In providing our services, we will consult with the Company's personnel about matters of accounting, financial reporting or other significant business issues. Accordingly, our fee reflects the time necessary for a reasonable amount of such consultation. However, should a matter require research, consultation or audit work beyond that amount, PricewaterhouseCoopers and the Company will agree to an appropriate revision in services and fee.

Our fee estimates are based on the time required by the individuals assigned to the engagement. Individual hourly rates vary according to the degree of responsibility involved and experience and skill required. We estimate our fees for this audit engagement will be $74,100, exclusive planned visit to the investment advisor (see separate letter) and of out-of-pocket expenses. This estimate takes into account the agreed-upon level of preparation and assistance from company personnel; we will advise management should this not be provided or should any other circumstances arise which may cause actual time to exceed that estimate.

We also will bill you for reasonable out-of-pocket expenses and our internal charges for certain support activities. Our internal charges include certain flat-rate amounts that reflect an allocation of estimated costs, including those associated with airline ticketing and general office services, such as computer usage, telephone charges, facsimile transmissions, postage and photocopying. We leverage our size to achieve cost savings for our clients in all areas of expense, including those covered by these internal charges and use this system of allocation to minimize total costs.

(7)

CONFIDENTIAL                                    PWCB000170

KING_000074979

KING_000074973

# PRICEWATERHOUSECOOPERS 🅿️

Our fees and out-of-pocket expenses will be to you in advance of the following expected settlement dates:

| Date | Amount |
|---|---|
| December 8, 2002 | $35,000 |
| January 31, 2003 | $20,000 |
| Upon issuance of draft financial statements | Remaining fees and expenses |

Invoices rendered are due and payable upon receipt. Interest may be charged on overdue accounts at a monthly rate of 1-1/2%. This rate may be adjusted depending upon major changes in the prime-lending rate. If the rate is changed, you will be notified in advance.

## Other matters

Any additional services that you may request and we agree to provide will be the subject of separate written agreements.

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for you, you will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Funds agrees that it will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers arising out of this engagement to anyone.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements of the Funds and PricewaterhouseCoopers contained in this engagement letter shall survive the completion or termination of this engagement.

(8)

CONFIDENTIAL                                          PWCB000171

KING_000074980

KING_000074973

# PRICEWATERHOUSECOOPERS ⓡ

\*   \*   \*   \*   \*

If the services outlined herein are in accordance with your requirements and if the above terms are acceptable to you, please have one copy of this letter signed in the space provided below and return it to us.

Very truly yours,

*PricewaterhouseCoopers*

Andrew J. Brook
Partner

\*   \*   \*   \*   \*

The services and terms as set forth in this letter are agreed to.

**Kingate Global Fund, Ltd.**
**Kingate Euro Fund, Ltd.**

By: _____
        Christopher Wetherill

_____
Director

November 11 2002.
Date

(9)

CONFIDENTIAL                          PWCB000172

KING_000074981

KING_000074973

# EXHIBIT 5

08-01789-cgm   Doc 17819-1   Filed 07/24/18   Entered 07/24/18 17:11:42   Exhibit 1
Pg 54 of 232

# KINGATE MANAGEMENT LIMITED

### 99 FRONT STREET
### HAMILTON HM 11, BERMUDA

TELEPHONE: (441) 296 2888
FAX:            (441) 296 6775

## *FACSIMILE*

**FROM:**        Dawné Ottley

**TO:**            Micheal O'Conghaile

**COMPANY:**   BISYS

**FAX NO:**     296-8227

**PAGES:**      1 + 11

**DATE:**       November 19, 2003

Dear Micheal,

Please find enclosed the engagement letter for Kingate Global Fund, Ltd. – USD Shares and Kingate Euro Fund, Ltd. for your files.

Kind regards,

Dawné Ottley

KING_000263767

KING_000263767

# KINGATE MANAGEMENT LIMITED

### 99 FRONT STREET
### HAMILTON HM 11, BERMUDA

TELEPHONE: (441) 296 2888
FAX: (441) 296 6775

19th November 2003

Mr Andrew J. Brook
PricewaterhouseCoopers
Dorchester House
7 Church Street
Hamilton HM11
Bermuda

Dear Andrew,

Please find enclosed the engagement letter signed by Mr Christopher Wetherhill on behalf of Kingate Global Fund, Ltd. – USD Shares and Kingate Euro Fund, Ltd.

In addition, please note that in the enclosed letter each fund is referred to in plural (i.e. Kingate Global Funds, Ltd. and Kingate Euro Funds, Ltd.), which is incorrect. Please note that the correct name of the Funds are:

**Kingate Global Fund, Ltd. – USD Shares**
**Kingate Euro Fund, Ltd.**

Please amend your records accordingly.

Yours sincerely,

Shazieh Salahuddin
General Manager

KING_000263768

KING_000263767



# PRICEWATERHOUSECOOPERS

**PricewaterhouseCoopers**
Chartered Accountants
Dorchester House
7 Church Street
Hamilton
Bermuda HM 11
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242

Mr. Christopher Wetherhill
Director
Kingate Management Limited
99 Front Street
Hamilton HM 11

October 23, 2003

Reference: AJB/SWB/rvl/pat/45109 ENGAGE LTR – 100-1

> RECEIVED
> NOV 1 0 2003

Subject: **Kingate Global Fund, Ltd.**
**Kingate Euro Fund, Ltd. (the "Funds")**

Dear Mr. Wetherhill.

The purpose of this letter is to confirm our understanding of the terms of our engagement as auditors of Kingate Global Funds, Ltd. and Kingate Euro Funds, Ltd. (hereinafter referred to collectively as the "Funds").

**Services and related report**

We will audit the Funds' financial statements as at December 31, 2003 and for the year then ending. Upon completion of our audits, we will provide the Funds with our audit reports on the financial statements referred to above.

If, for any reasons caused by the Funds or relating to the affairs or management of the Funds, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

MAILING ADDRESS: PO BOX HM 1171, Hamilton, Bermuda HM EX

A list of partners can be obtained from the above address

KING_000263769

KING_000263767



Mr. Christopher Wetherhill
Reference: AJB/SWB/rvl/pat/45109 EL
October 24, 2003

## Our responsibilities and limitations

The objective of an audit is the expression of an opinion on the financial statements. We will be responsible for performing the audits in accordance with auditing standards generally accepted in the United States of America. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audits will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation in accordance with accounting standards generally accepted in the United States of America.

We will consider the Funds' internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies relating to internal control over financial reporting identified during our audit will be communicated to the management of the Funds.

We will design our audits to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audits will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with generally accepted auditing standards may not

(2)

KING_000263770

KING_000263767



Mr. Christopher Wetherhill
Reference: AJB/SWB/rvl/pat/45109 EL
October 24, 2003

detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to the management of the Funds, as appropriate, any illegal act, material errors or evidence that fraud may exist identified during our audit.

The audits will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

**Management's responsibilities**

The Funds' management is responsible for the financial statements and information referred to above. In this regard, management (which includes for purposes of this letter the Funds Administrator. The Transfer Agent, or other Service Agents) is responsible for properly recording transactions in the accounting records and for establishing and maintaining internal control sufficient to permit the preparation of financial statements in conformity with generally accepted accounting principles. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the entity involving (a) management, (b) employees who have significant roles in internal control, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for adjusting the financial statements to correct material misstatements and for affirming to us in the representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year ending December 31, 2003 are immaterial, both individually and in the aggregate, to the financial statements taken as a whole. Management also is responsible for identifying and ensuring that the Funds comply with the laws and regulations applicable to its activities.

(3)

KING_000263771

KING_000263767



Mr. Christopher Wetherhill
Reference: AJB/SWB/rvl/pal/45109 EL
October 24, 2003

Management is responsible for making available to us, on a timely basis, all of the Funds'
original accounting records and related information and personnel to whom we may direct
inquiries. As required by generally accepted auditing standards, we will make specific
inquiries of management and others about the representations embodied in the financial
statements and the effectiveness of internal control over financial reporting. Generally
accepted auditing standards also require that we obtain written representations covering
audited financial statements from certain members of management. The results of our audit
tests, the responses to our inquiries and the written representations comprise the evidential
matter we intend to rely upon in forming our opinion on the financial statements.

Management agrees to comply with the Funds' offering memorandum and all other
agreements.

### Representation from management

As noted above, at the conclusion of the engagement, the Funds' management will provide to
us a representation letter that, among other things, will confirm:

- management's responsibility for the preparation of the financial statements in accordance
  with generally accepted accounting principles and for the implementation and operation
  of internal controls that are designed to prevent and detect fraud and error;

- the completeness and accuracy of financial records and related data;

- the completeness and availability of all minutes of the Board and committee meetings;

- that the effects of any uncorrected misstatements brought to its attention by us during our
  audit are immaterial, both individually and in the aggregate, to the financial statements
  taken as a whole;

- the results of management's assessment of the risk that the financial statements may be
  materially misstated as a result of fraud; and

(4)

KING_000263772

KING_000263767



Mr. Christopher Wetherhill
Reference: AJB/SWB/rvl/pat/45109 EL
October 24, 2003

- all significant facts relating to any frauds or suspected frauds known to management that may have affected the Funds.

**Other documents**

Generally accepted auditing standards require that we read any annual report that contains our audit reports. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audits.

If management intends to publish or reproduce, in printed form or electronically (e.g., on an Internet Web Site), the financial statements together with our report (or otherwise make reference to PricewaterhouseCoopers) in a document that contains other information, management agrees to (a) provide us with a draft of such document to read, and (b) obtain our approval for inclusion of our report, before the document is finalized and distributed. Where our audit report is reproduced in any medium, the complete financial statements, including notes, must also be presented.

The Funds may wish to include our reports on these financial statements in a registration statement for a securities offering. The Funds agree that the aforementioned audit reports, or reference to PricewaterhouseCoopers, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

**Release and indemnification**

Because of the importance of oral and written representations to an effective audit, the Funds release and indemnify PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses (including attorneys fees and costs) attributable to any misrepresentation by management. Further, in no event shall PricewaterhouseCoopers be liable to the Funds, whether a claim be in tort, contract or otherwise:

(5)

KING_000263773

KING_000263767



Mr. Christopher Wetherhill
Reference: AJB/SWB/rvl/pml/45109 EL
October 24, 2003

(a) for any amount in excess of the total professional fees paid by the Funds under this engagement letter; or

(b) for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers services provided under this engagement letter,

except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

In addition, the Funds agrees to indemnify and hold harmless PricewaterhouseCoopers and its personnel from any and all third party claims, liabilities, costs and expenses (including attorney fees and costs) relating to PricewaterhouseCoopers' services under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

**Limitation of liability**

In any action, claim, loss or damage arising out of the engagement, the Funds agree that PricewaterhouseCoopers' liability will be several and not joint and several; and the Funds may only claim payment from PricewaterhouseCoopers of PricewaterhouseCoopers' proportionate share of the total liability based on degree of fault.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Funds and PricewaterhouseCoopers agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

**Working papers**

All working papers and files, other materials, reports and work created, developed or performed by PricewaterhouseCoopers during the course of the audit are the property of PricewaterhouseCoopers.

(6)

KING_000263774

KING_000263767



Mr. Christopher Wetherhill
Reference: AJB/SWB/rvl/pat/45109 EL
October 24, 2003

## Governing law

This agreement shall be governed by and construed in accordance with the laws of Bermuda.

## Engagement team leaders

The engagement will be led by:

- Andrew Brook, engagement leader, who will be responsible for assuring the overall quality, value and timeliness of our services to the Funds;

- Ian Davidson, will serve as the concurring partner and will be available in the absence of the engagement partner; and

- Scott Watson-Brown, team manager, who will be responsible for managing the delivery of our services to the Funds.

## Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Funds' personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Funds are unable to provide such schedules, information and assistance, PricewaterhouseCoopers and the Funds will mutually revise the fee to reflect additional services, if any, required of us to complete the audit.

In providing our services, we will consult with the Funds' personnel about matters of accounting, financial reporting or other significant business issues. Accordingly, our fee reflects the time necessary for a reasonable amount of such consultation. However, should a matter require research, consultation or audit work beyond that amount, PricewaterhouseCoopers and the Funds will agree to an appropriate revision in services and fee.

(7)

KING_000263775

KING_000263767



**PRICEWATERHOUSE COOPERS** 🅟

Mr. Christopher Wetherhill
Reference: AJB/SWB/rvl/pal/45109 EL
October 24, 2003

Our fee estimates are based on the time required by the individuals assigned to the engagement. Individual hourly rates vary according to the degree of responsibility involved and experience and skill required. We estimate our fees for these audit engagements will be $80,000, exclusive of out-of-pocket expenses. This estimate takes into account the agreed-upon level of preparation and assistance from Funds personnel; we will advise management should this not be provided or should any other circumstances arise which may cause actual time to exceed that estimate.

We also will bill the Funds for reasonable out-of-pocket expenses and our internal charges for certain support activities. Our internal charges include certain flat-rate amounts that reflect an allocation of estimated costs, including those associated with airline ticketing and general office services, such as computer usage, telephone charges, facsimile transmissions, postage and photocopying. We leverage our size to achieve cost savings for our clients in all areas of expense, including those covered by these internal charges and use this system of allocation to minimize total costs.

Our fees and out-of-pocket expenses will be billed to the Funds in advance of the following expected settlement dates:

| Date | Amount |
|---|---|
| November 15, 2003 | 32,000 |
| January 30, 2004 | 32,000 |
| February 27, 2004 | Balance plus disbursements |

**Other matters**

Any additional services that the Funds may request and we agree to provide will be the subject of separate written agreements.

In the event we are requested or authorized by the Funds or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Funds, the Funds will, so long as we are not

(8)

KING_000263776

KING_000263767

# PRICEWATERHOUSE COOPERS

Mr. Christopher Wetherhill
Reference: AJB/SWB/rvl/pat/45109 EL
October 24, 2003

a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Funds agree they it will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers arising out of this engagement to anyone.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

If the services outlined herein are in accordance with the Funds' requirements and if the above terms are acceptable to the Funds, please have one copy of this letter signed in the space provided below and return it to us.

Very truly yours,

*PricewaterhouseCoopers*

Andrew J. Brook
Partner

\*   \*   \*   \*   \*

(9)

KING_000263767

KING_000263767

# PRICEWATERHOUSECOOPERS

Mr. Christopher Wetherhill
Reference: AJB/SWB/rvl/pat/45109 EL
October 24, 2003

The services and terms, as set forth in this letter, are agreed to.

**Kingate Global Funds, Ltd.**
**Kingate Euro Funds, Ltd.**

By: _____

Christopher Wetherhill
Director

12/11/03
Date

(10)

KING_000263778

KING_000263767

# EXHIBIT 6

# PRICEWATERHOUSECOOPERS ⓘ

PricewaterhouseCoopers
Chartered Accountants
Dorchester House
7 Church Street
Hamilton
Bermuda HM 11
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242

Mr. Christopher Wetherhill
Director
Kingate Management Limited
99 Front Street
Hamilton HM 11

November 03, 2004

Reference: AJB/MDC/pat/45109 ENGAGE LTR – 150-1

Subject:  **Kingate Global Fund, Ltd.**
          **Kingate Euro Fund, Ltd.**

Dear Sir,

The purpose of this letter is to confirm our understanding of the terms of our engagement as
auditors of Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (hereinafter referred to
collectively as the "Funds").

**Services and related report**

We will audit the financial statements of the Funds' at December 31, 2004 and for the year
then ending. Upon completion of our audits, we will provide the Funds with our audit reports
on the financial statements referred to above.

If, for any reasons caused by the Funds or relating to the affairs or management of the Funds,
we are unable to complete the audits, we may decline to issue our reports as a result of this
engagement.

MAILING ADDRESS: PO BOX HM 1171, Hamilton, Bermuda HM EX.

A list of partners can be obtained from the above address

KING_000023090

KING_000023090



# PRICEWATERHOUSE COOPERS 🅘

Mr. Christopher Wetherhill
Reference: AJB/MDC/pat/45109 EL
November 03, 2004

## Our responsibilities and limitations

The objective of an audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with auditing standards generally accepted in The United States of America. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation in accordance with accounting standards generally accepted in The United States of America.

We will consider the Funds' internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies relating to internal control over financial reporting identified during our audits will be communicated the management of the Funds.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audits will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested, and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud.

(2)

KING_000023091

KING_000023090

# PRICEWATERHOUSE(COOPERS 🅡

Mr. Christopher Wetherhill
Reference: AJB/MDC/pat/45109 EL
November 03, 2004

Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to the management of the Funds, as appropriate, any illegal act, material errors or evidence that fraud may exist identified during our audit. We will also inform the Board of Directors of those uncorrected misstatements aggregated by us during the audits that were determined by management to be immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

The audit will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

**Management's responsibilities**

The Funds' management is responsible for the financial statements and information referred to above. In this regard, management (which includes for purposes of this letter the Funds' Administrator, The Transfer Agent, or other Service Agents) is responsible for properly recording transactions in the accounting records and for establishing and maintaining internal control sufficient to permit the preparation of financial statements in conformity with generally accepted accounting principles. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the fund involving (a) management, (b) employees who have significant roles in internal control, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the fund received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for adjusting the financial statements to correct material misstatements and for affirming to us in the representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year ending December 31, 2004 are immaterial, both individually and in the aggregate, to the financial statements taken as a whole. Management also is responsible for identifying and ensuring that the Funds comply with the laws and regulations applicable to its activities.

(3)

KING_000023092

KING_000023090

# PRICEWATERHOUSE COOPERS 🅚

Mr. Christopher Wetherhill
Reference: AJB/MDC/pat/45109 EL
November 03, 2004

Management is responsible for making available to us, on a timely basis, all of the Funds'
original accounting records and related information and personnel to whom we may direct
inquiries. As required by generally accepted auditing standards, we will make specific
inquiries of management and others about the representations embodied in the financial
statements and the effectiveness of internal control over financial reporting. Generally
accepted auditing standards also require that we obtain written representations covering
audited financial statements from certain members of management. The results of our audit
tests, the responses to our inquiries and the written representations comprise the evidential
matter we intend to rely upon in forming our opinion on the financial statements.

Management agrees to comply with the Funds' offering memorandum and all other
agreements.

## Representation from management

As noted above, at the conclusion of the engagement, the Funds' management will provide to
us a representation letter that, among other things, will confirm:

- management's responsibility for the preparation of the financial statements in accordance
  with generally accepted accounting principles and for the implementation and operation
  of internal controls that are designed to prevent and detect fraud and error;

- the completeness and accuracy of financial records and related data;

- the completeness and availability of all minutes of the Board and committee meetings;

- that the effects of any uncorrected misstatements brought to its attention by us during our
  audit are immaterial, both individually and in the aggregate, to the financial statements
  taken as a whole;

- the results of management's assessment of the risk that the financial statements may be
  materially misstated as a result of fraud; and

- all significant facts relating to any frauds or suspected frauds known to management that
  may have affected the Funds.

(4)

KING_000023093

KING_000023090



*PRICEWATERHOUSE COOPERS* 🅙

Mr. Christopher Wetherhill
Reference: AJB/MDC/pat/45109 EL
November 03, 2004

**Internet Communications**

During the engagement we may from time to time communicate with you electronically.
However, as you are aware, the electronic transmission of information cannot be guaranteed to
be secure or error free and such information could be intercepted, corrupted, lost, destroyed,
arrive late or incomplete or otherwise be adversely affected or unsafe to use. We shall not
have any liability to you arising from or in connection with the electronic communication of
information to you during or as a result of its electronic transmission outside of
PricewaterhouseCoopers' electronic environment. If the communication relates to a matter of
significance and there are concerns about possible effects of electronic transmission a hard
copy of such transmission should be requested from us.

**Other documents**

Generally accepted auditing standards require that we read any annual report that contains our
audit reports. The purpose of this procedure is to consider whether other information in the
annual report, including the manner of its presentation, is materially inconsistent with
information appearing in the financial statements. We assume no obligation to perform
procedures to corroborate such other information as part of our audits.

If management intends to publish or reproduce, in printed form or electronically (e.g., on an
Internet Web Site), the financial statements together with our report (or otherwise make
reference to PricewaterhouseCoopers) in a document that contains other information,
management agrees to (a) provide us with a draft of such document to read, and (b) obtain our
approval for inclusion of our report, before the document is finalized and distributed. Where
our audit report is reproduced in any medium, the complete financial statements, including
notes, must also be presented.

The Funds may wish to include our report on these financial statements in a registration
statement for a securities offering. The Funds agree that the aforementioned audit reports, or
reference to PricewaterhouseCoopers, will not be included in any such offering without our
prior permission or consent. Any agreement to perform work in connection with an offering,
including an agreement to provide permission or consent, will be a separate engagement.

(5)

KING_000023094

KING_000023090



Mr. Christopher Wetherhill
Reference: AJB/MDC/pat/45109 EL
November 03, 2004

**Release and indemnification**

Because of the importance of oral and written representations to an effective audit, the Funds releases and indemnify PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses (including attorneys fees and costs) attributable to any misrepresentation by management. Further, in no event shall PricewaterhouseCoopers be liable to the Funds, whether a claim be in tort, contract or otherwise:

(a) for any amount in excess of the total professional fees paid by the Funds under this engagement letter; or

(b) for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers services provided under this engagement letter,

except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

In addition, the Funds agrees to indemnify and hold harmless PricewaterhouseCoopers and its personnel from any and all third party claims, liabilities, costs and expenses (including attorney fees and costs) relating to PricewaterhouseCoopers' services under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

**Limitation of liability**

In any action, claim, loss or damage arising out of the engagement, the Funds agree that PricewaterhouseCoopers' liability will be several and not joint and several; and the Funds may only claim payment from PricewaterhouseCoopers of PricewaterhouseCoopers' proportionate share of the total liability based on degree of fault. In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Funds and PricewaterhouseCoopers agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

(6)

KING_000023095

KING_000023090


# PRICEWATERHOUSECOOPERS

Mr. Christopher Wetherhill
Reference: AJB/MDC/pat/45109 EL
November 03, 2004

**Working papers**

All working papers and files, other materials, reports and work created, developed or
performed by PricewaterhouseCoopers during the course of the audit are the property of
PricewaterhouseCoopers.

**Governing law**

This agreement shall be governed by and construed in accordance with the laws of Bermuda.

**Engagement team leaders**

The engagement will be led by:

- Andrew Brook, engagement leader, who will be responsible for assuring the overall
  quality, value and timeliness of our services to the Funds;

- Ian Davidson, will serve as the concurring partner and will be available in the absence of
  the engagement partner; and

- Scott Watson-Brown, team manager, who will be responsible for managing the delivery
  of our services to the Funds.

**Timing and fees**

Completion of our work is subject to, among other things, 1) appropriate cooperation from the
Fund's personnel, including timely preparation of necessary schedules, 2) timely responses to
our inquiries, and 3) timely communication of all significant accounting and financial
reporting matters. When and if for any reason the Funds is unable to provide such schedules,
information and assistance, PricewaterhouseCoopers and the Funds will mutually revise the
fee to reflect additional services, if any, required of us to complete the audit.

In providing our services, we will consult with the Funds' personnel about matters of
accounting, financial reporting or other significant business issues. Accordingly, our fee
reflects the time necessary for a reasonable amount of such consultation. However, should a

(7)

KING_000023096

KING_000023090

# PRICEWATERHOUSECOOPERS 🄫

Mr. Christopher Wetherhill
Reference: AJB/MDC/pat/45109 EL
November 03, 2004

matter require research, consultation or audit work beyond that amount,
PricewaterhouseCoopers and the Funds will agree to an appropriate revision in services and
fee.

We may use temporary contract staff to perform certain tasks on your engagement and will
bill for that time at the rate that corresponds to PwC staff providing a similar level of service.
Upon request, we will be happy to provide details on the training, supervision and billing
arrangements we use in connection with these professionals.

Our fee estimates are based on the time required by the individuals assigned to the
engagement. Individual hourly rates vary according to the degree of responsibility involved
and experience and skill required. We estimate our fees for this audit engagement will be
$84,800 exclusive of out-of-pocket expenses and fees associated with our visit to the
Investment Advisor to the Funds. This estimate takes into account the agreed-upon level of
preparation and assistance from Fund personnel; we will advise management should this not
be provided or should any other circumstances arise which may cause actual time to exceed
that estimate.

We also will bill the Funds for reasonable out-of-pocket expenses and our internal charges for
certain support activities. Our internal charges include certain flat-rate amounts that reflect an
allocation of estimated costs, including those associated with airline ticketing and general
office services, such as computer usage, telephone charges, facsimile transmissions, postage
and photocopying. We leverage our size to achieve cost savings for our clients in all areas of
expense, including those covered by these internal charges and use this system of allocation to
minimize total costs.

Our fees and out-of-pocket expenses will be billed to the Funds in advance of the following
expected settlement dates:

| Date | Amount |
|------|--------|
| November 15, 2004 | $60,000 |
| February 4, 2005 | Balance plus disbursements |

(8)

# PRICEWATERHOUSE COOPERS 🅡

Mr. Christopher Wetherhill
Reference: AJB/MDC/pat/45109 EL
November 03, 2004
**Other matters**

Any additional services that the Funds may request and we agree to provide will be the subject of separate written agreements.

In the event we are requested or authorized by the Funds or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Funds, the Funds will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Funds agree that they will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers arising out of this engagement to anyone.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.
If the services outlined herein are in accordance with the Funds' requirements and if the above terms are acceptable to the Funds, please have one copy of this letter signed in the space provided below and return it to us.

Very truly yours,

*PricewaterhouseCoopers*

_____
Andrew J. Brook
Partner

(9)

# PRICEWATERHOUSECOPERS 🅖

Mr. Christopher Wetherhill
Reference: AJB/MDC/pat/45109 EL
November 03, 2004

\*   \*   \*   \*   \*

The services and terms, as set forth in this letter, are agreed to.

**Kingate Global Fund, Ltd.**
**Kingate Euro Fund, Ltd.**

By: _____
Christopher Wetherhill
Director

_____23/11/04_____
Date

(10)

KING_000023099

KING_000023090

# EXHIBIT 7



**PRICEWATERHOUSE COOPERS** 🅿

PricewaterhouseCoopers
Dorchester House
7 Church Street
Hamilton
Bermuda HM 11
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242

Mr. Christopher Wetherhill
Director
Kingate Management Limited
99 Front Street
Hamilton HM 11

September 29, 2005

Reference:  AJB/SWB/pat/163931 ENGAGE LTR – 150-1

Dear Sir,

The purpose of this letter is to confirm our understanding of the terms of our engagement as auditors of Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (hereinafter referred to collectively as the "Funds").

**Services and related report**

We will audit the financial statements of the Funds at December 31, 2005 and for the year then ending.  Upon completion of our audits, we will provide the Funds with our audit report on the financial statements referred to above.

If, for any reasons caused by the Funds or relating to the affairs or management of the Funds, we are unable to complete the audits, we may decline to issue a report as a result of this engagement.

**Our responsibilities and limitations**

The objective of an audit is the expression of an opinion on the financial statements.  We will be responsible for performing the audit in accordance with auditing standards generally

MAILING ADDRESS: PO BOX HM 1171, Hamilton, Bermuda HM EX.

A list of partners can be obtained from the above address

# PRICEWATERHOUSECOOPERS 🅐

Mr. Christopher Wetherhill
Reference: AJB/SWB/pat/163931 EL
September 29, 2005

accepted in the United States of America. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audits will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation in accordance with accounting standards generally accepted in the United States of America.

We will consider the Funds' internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies and material weaknesses and other deficiencies (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude) relating to internal control over financial reporting identified during our audits will be communicated to the Funds.

We will design our audits to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audits will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested, and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. However, we will communicate to the Funds, as appropriate, any such matters identified during our audits.

Because of the characteristics of fraud, particularly those involving concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that

(2)

KING_000031625

KING_000031624

# PRICEWATERHOUSECOOPERS 🅘

Mr. Christopher Wetherhill
Reference: AJB/SWB/pat/163931 EL
September 29, 2005

possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if
present, will be detected.

The audits will not be planned or conducted in contemplation of reliance by any third party or
with respect to any specific transaction. Therefore, items of a possible interest to a third party
will not be specifically addressed and matters may exist that would be assessed differently by
a third party, possibly in connection with a specific transaction.

## Management's responsibilities

The Funds' management is responsible for the financial statements and information referred to
above. In this regard, management (which includes for purposes of this letter the Funds
Administrator, the Transfer Agent, or other Service Agents) is responsible for establishing
policies and procedures that pertain to the maintenance of accounting records, the
authorization of receipts and disbursements, the safeguarding of assets, properly recording
transactions in the accounting records and for establishing and maintaining internal control
sufficient to permit the preparation of financial statements in conformity with generally
accepted accounting principles. Management also is responsible for the design and
implementation of programs and controls to prevent and detect fraud, and for informing us (i)
about all known or suspected fraud affecting the Funds involving (a) management, (b)
employees who have significant roles in internal control over financial reporting, and (c)
others where the fraud could have a material effect on the financial statements; and (ii) of its
knowledge of any allegations of fraud or suspected fraud affecting the Funds received in
communications from employees, former employees, analysts, regulators, short sellers, or
others. Management is responsible for (i) adjusting the financial statements to correct material
misstatements and for affirming to us in the representation letter that the effects of any
uncorrected misstatements aggregated by us during the current engagement and pertaining to
the year ending December 31, 2005 are immaterial, both individually and in the aggregate, to
the financial statements taken as a whole; and (ii) notifying us of all material weaknesses,
including other significant deficiencies, in the design or operation of the Funds' internal
control over financial reporting that are reasonably likely to adversely affect the Funds' ability
to record, process, summarize and report external financial data reliably in accordance with
generally accepted accounting principles. Management also is responsible for identifying and
ensuring that the Funds comply with the laws and regulations applicable to their activities.

(3)

KING_000031626

KING_000031624

# PRICEWATERHOUSE COOPERS 🝙

Mr. Christopher Wetherhill
Reference: AJB/SWB/pat/163931 EL
September 29, 2005

As part of management's responsibility for the financial statements and the effectiveness of its systems of internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the Funds' original accounting records and related information and Fund personnel to whom we may direct inquiries. As required by generally accepted auditing standards, we will make specific inquiries of management and others about the representations embodied in the financial statements and the effectiveness of internal control over financial reporting. Generally accepted auditing standards also require that we obtain written representations covering audited financial statements from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements.

## Representation from management

As noted above, at the conclusion of the engagement, the Funds' management will provide to us a representation letter that, among other things, will confirm:

- management's responsibility for the preparation of the financial statements in accordance with generally accepted accounting principles and for the implementation and operation of internal controls that are designed to prevent and detect fraud and error;

- the completeness and accuracy of financial records and related data;

- the completeness and availability of all minutes of the Board and committee meetings;

- that the effects of any uncorrected misstatements brought to its attention by us during our audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole;

- that management have notified us of all material weaknesses, including other significant deficiencies, in the design or operation of the Funds' internal control over financial reporting that are reasonably likely to adversely affect the Funds' ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles;

(4)

KING_000031627

KING_000031624

# PRICEWATERHOUSECOOPERS 🅿

Mr. Christopher Wetherhill
Reference: AJB/SWB/pat/163931 EL
September 29, 2005

- that management have identified and ensured that the Funds have complied with the laws and regulations applicable to their activities;

- that management have made available to us all of the Funds' original accounting records and related information;

- the results of management's assessment of the risk that the financial statements may be materially misstated as a result of fraud; and

- all significant facts relating to any frauds or suspected frauds known to management that may have affected the Funds.

## Internet Communications

During the engagement we may from time to time communicate with you electronically. However, as you are aware, the electronic transmission of information cannot be guaranteed to be secure or error free and such information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use. We shall not have any liability to you arising from or in connection with the electronic communication of information to you during or as a result of its electronic transmission outside of PricewaterhouseCoopers' electronic environment. If the communication relates to a matter of significance and there are concerns about possible effects of electronic transmission a hard copy of such transmission should be requested from us.

## Other documents

Generally accepted auditing standards require that we read any annual report that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audits.

If management intends to publish or reproduce, in printed form or electronically (e.g., on an Internet Web Site), the financial statements together with our report (or otherwise make reference to PricewaterhouseCoopers) in a document that contains other information, management agrees to (a) provide us with a draft of such document to read, and (b) obtain our

(5)

KING_000031628

KING_000031624

# PRICEWATERHOUSE COOPERS [K]

Mr. Christopher Wetherhill
Reference: AJB/SWB/pat/163931 EL
September 29, 2005

approval for inclusion of our report, before the document is finalized and distributed. Where our audit report is reproduced in any medium, the complete financial statements, including notes, must also be presented.

The Funds may wish to include our report on these financial statements in a registration statement for a securities offering. The Funds agree that the aforementioned audit reports, or reference to PricewaterhouseCoopers, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

## Release and indemnification

Because of the importance of oral and written representations to an effective audit, the Funds release PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses (including attorneys fees and costs) attributable to any knowing misrepresentation by management. Further, in no event shall PricewaterhouseCoopers be liable to the Funds, whether a claim be in tort, contract or otherwise:

(a)    for any amount in excess of the total professional fees paid by the Funds under this engagement letter; or

(b)    for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers' services provided under this engagement letter,

except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

In addition, the Funds agree to indemnify and hold harmless PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses (including attorneys fees and costs) relating to PricewaterhouseCoopers' services under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

(6)

KING_000031629

KING_000031624

# PRICEWATERHOUSECOOPERS 🅿

Mr. Christopher Wetherhill
Reference: AJB/SWB/pat/163931 EL
September 29, 2005

## Limitation of liability

In any action, claim, loss or damage arising out of the engagement, the Funds agree that PricewaterhouseCoopers' liability will be several and not joint and several; and the Funds may only claim payment from PricewaterhouseCoopers of PricewaterhouseCoopers' proportionate share of the total liability based on degree of fault.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Funds and PricewaterhouseCoopers agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

## Working papers

All working papers and files, other materials, reports and work created, developed or performed by PricewaterhouseCoopers during the course of the audits are the property of PricewaterhouseCoopers.

## Governing law

This agreement shall be governed by and construed in accordance with the laws of Bermuda and shall be deemed in all respects to be a Bermuda contract. The parties hereby agree to the jurisdiction of the courts of Bermuda with respect to all matters arising under or by virtue of this agreement. If any of the provisions of this agreement are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and be binding on the parties to the fullest extent permitted by law.

## Engagement team leaders

The engagement will be led by:

- Andrew Brook, engagement leader, who will be responsible for assuring the overall quality, value and timeliness of our services to the Funds;

- Scott Watson-Brown, team manager, who will be responsible for managing the delivery of our services to the Funds.

(7)

KING_000031630

KING_000031624

# $P$RICEWATERHOUSE$C$OOPERS 🔳

Mr. Christopher Wetherhill
Reference: AJB/SWB/pat/163931 EL
September 29, 2005

## Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Funds' personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Funds are unable to provide such schedules, information and assistance, PricewaterhouseCoopers and the Funds will mutually revise the fee to reflect additional services, if any, required of us to complete the audits.

We may use temporary contract staff to perform certain tasks on your engagement and will bill for that time at the rate that corresponds to PricewaterhouseCoopers staff providing a similar level of service. Upon request, we will be happy to provide details on the training, supervision and billing arrangements we use in connection with these professionals.

Our fee estimates are based on the time required by the individuals assigned to the engagement. Individual hourly rates vary according to the degree of responsibility involved and experience and skill required. We estimate our fees for this audit engagement will be $88,000, exclusive of out-of-pocket expenses. This estimate takes into account the agreed-upon level of preparation and assistance from Fund personnel; we will advise management should this not be provided or should any other circumstances arise which may cause actual time to exceed that estimate.

We also will bill the Funds for reasonable out-of-pocket expenses and our internal charges for certain support activities. Our internal charges include certain flat-rate amounts that reflect an allocation of estimated costs, including those associated with general office services, such as computer usage, telephone charges, facsimile transmissions, postage and photocopying. We leverage our size to achieve cost savings for our clients in all areas of expense, including those covered by these internal charges and use this system of allocation to minimize total costs. Our fees and out-of-pocket expenses will be billed to the Funds in advance of the following expected settlement dates:

| Date | Amount |
|---|---|
| October 30, 2005 | 70% |
| February 28, 2006 | The Balance, plus disbursements |

(8)

KING_000031631

KING_000031624



# PRICEWATERHOUSECOOPERS

Mr. Christopher Wetherhill
Reference: AJB/SWB/pat/163931 EL
September 29, 2005

## Other matters

Any additional services that the Funds may request and we agree to provide will be the subject of separate written agreements.

In the event we are requested or authorized by the Funds or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Funds, the Funds will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Funds agree that they will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers arising out of this engagement to anyone.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

If the services outlined herein are in accordance with the Funds' requirements and if the above terms are acceptable to the Funds, please have one copy of this letter signed in the space provided below and return it to us.

Very truly yours,

*PricewaterhouseCoopers*

Andrew J. Brook
Partner

\*   \*   \*   \*

(9)

KING_000031632

KING_000031624

# PRICEWATERHOUSECOOPERS 🅚

Mr. Christopher Wetherhill
Reference: AJB/SWB/pat/163931 EL
September 29, 2005

The services and terms, as set forth in this letter are agreed to.

**Kingate Global Fund, Ltd.**
**Kingate Euro Fund, Ltd.**

By: _____
      Christopher Wetherhill
      Director

      _____
      Date

(10)

KING_000031633

KING_000031624

# PRICEWATERHOUSE COOPERS 🅚

Mr. Christopher Wetherhill
Reference: AJB/SWB/pat/163931 EL
September 29, 2005

The services and terms, as set forth in this letter are agreed to.

**Kingate Global Fund, Ltd.**
**Kingate Euro Fund, Ltd.**

By: _____

Christopher Wetherhill
Director

3/12/2005
Date

**(10)**

KING_000031634

KING_000031624

# EXHIBIT 8

# PRICEWATERHOUSECOOPERS 🅿

**PricewaterhouseCoopers**
Chartered Accountants
Dorchester House
7 Church Street
Hamilton HM 11
Bermuda
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242
www.pwc.com/bermuda

Mr. Christopher Wetherhill
Director
Kingate Management Limited
99 Front Street
Hamilton HM 11

November 30, 2006

Reference: : AJB/GRM/swt/163931 ENGAGE LTR – 100-1

**Subject:** **Kingate Global Fund, Ltd and Kingate Euro Fund, Ltd**

Dear Mr. Wetherhill,

The purpose of this letter is to confirm our understanding of the terms of our engagement as auditors of Kingate Global Fund, Ltd, and Kingate Euro Fund, Ltd. (hereinafter referred to as the "Funds").

## Services and related report

We will audit the financial statements of the Funds at December 31, 2006 and for the year then ending. Upon completion of our audit, we will provide the Funds with our audit report on the financial statements referred to above.

If, for any reasons caused by the Funds or relating to the affairs or management of the Funds, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

## Our responsibilities and limitations

The objective of an audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with auditing standards generally accepted in United States of America. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation in accordance with accounting standards generally accepted in United States of America.

We will consider the Funds' internal controls over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any reportable conditions and material weaknesses and other deficiencies (i.e., those deficiencies in internal control over

A list of partners can be obtained from the above address
PricewaterhouseCoopers refers to the members of the worldwide PricewaterhouseCoopers organisation

KING_000057857

KING_000057857

# PRICEWATERHOUSECOOPERS 🄿

Mr. Christopher Wetherhill
Reference:  AJB/GRM/swt/163931 ENGAGE LTR – 100-1
Date:  November 30, 2006

financial reporting that are of a lesser magnitude) relating to internal control over financial reporting identified during our audit will be communicated to the Fund.

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts.  Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements.  It is important to recognize that there are inherent limitations in the auditing process.  Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested, and the nature, timing, extent and results of the tests to be performed.  Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected.  However, we will communicate to the Fund, as appropriate, any such matters identified during our audit.

Because of the characteristics of fraud, particularly those involving concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud.  Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility.  For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected.

The audit will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of a possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

**Management's responsibilities**

The Funds' management are responsible for the financial statements and information referred to above.  In this regard, management (which includes for purposes of this letter the Fund Administrator, the Transfer Agent, or other Service Agents) is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, properly recording transactions in the accounting records and for establishing and maintaining internal control sufficient to permit the preparation of financial statements in conformity with generally accepted accounting principles.  Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the Funds involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the Funds received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us in the representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year ending December 31, 2006 are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all material weaknesses, including other significant deficiencies, in the design or operation of the Funds' internal

(2)

KING_000057858

KING_000057857

# PRICEWATERHOUSE COOPERS 

Mr. Christopher Wetherhill
Reference: AJB/GRM/swt/163931 ENGAGE LTR – 100-1
Date:  November 30, 2006

controls over financial reporting that are reasonably likely to adversely affect the Funds' ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles.  Management also is responsible for identifying and ensuring that the Funds comply with the laws and regulations applicable to their activities.

As part of management's responsibility for the financial statements and the effectiveness of its systems of internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the Funds' original accounting records and related information and Fund personnel to whom we may direct inquiries.  As required by generally accepted auditing standards, we will make specific inquiries of management and others about the representations embodied in the financial statements and the effectiveness of internal control over financial reporting.  Generally accepted auditing standards also require that we obtain written representations covering audited financial statements from certain members of management.  The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements.

**Representation from management**

As noted above, at the conclusion of the engagement, the Funds' management will provide to us a representation letter that, among other things, will confirm:

- management's responsibility for the preparation of the financial statements in accordance with generally accepted accounting principles and for the implementation and operation of internal controls that are designed to prevent and detect fraud and error;

- the completeness and accuracy of financial records and related data;

- the completeness and availability of all minutes of the Board and committee meetings;

- that the effects of any uncorrected misstatements brought to its attention by us during our audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole;

- that management have notified us of all reportable conditions and material weaknesses, in the design or operation of the Funds' internal controls over financial reporting that are reasonably likely to adversely affect the Funds' abilities to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles;

- that management have identified and ensured that the Funds have complied with the laws and regulations applicable to its activities;

- that management have made available to us all of the Funds' original accounting records and related information;

- the results of management's assessment of the risk that the financial statements may be materially misstated as a result of fraud; and

(3)

KING_000057859

KING_000057857



- all significant facts relating to any frauds or suspected frauds known to management that may have affected the Funds.

## Internet Communications

During the engagement we may from time to time communicate with you electronically. However, as you are aware, the electronic transmission of information cannot be guaranteed to be secure or error free and such information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use. We shall not have any liability to you arising from or in connection with the electronic communication of information to you during or as a result of its electronic transmission outside of PricewaterhouseCoopers' electronic environment. If the communication relates to a matter of significance and there are concerns about possible effects of electronic transmission a hard copy of such transmission should be requested from us.

## Other documents

Generally accepted auditing standards require that we read any annual report that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

If management intends to publish or reproduce, in printed form or electronically (e.g., on an Internet Web Site), the financial statements together with our report (or otherwise make reference to PricewaterhouseCoopers) in a document that contains other information, management agrees to (a) provide us with a draft of such document to read, and (b) obtain our approval for inclusion of our report, before the document is finalized and distributed. Where our audit report is reproduced in any medium, the complete financial statements, including notes, must also be presented.

The Funds may wish to include our report on these financial statements in a registration statement for a securities offering. The Funds agree that the aforementioned audit report, or reference to PricewaterhouseCoopers, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

## Release and indemnification

Because of the importance of oral and written representations to an effective audit, the Funds release PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses (including attorneys fees and costs) attributable to any knowing misrepresentation by management. Further, in no event shall PricewaterhouseCoopers be liable to the Funds, whether a claim be in tort, contract or otherwise:

- for any amount in excess of the total professional fees paid by the Funds under this engagement letter; or

(4)

KING_000057860

KING_000057857

# PRICEWATERHOUSECOOPERS 🅿

Mr. Christopher Wetherhill
Reference: AJB/GRM/swt/163931 ENGAGE LTR – 100-1
Date: November 30, 2006

- for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers' services provided under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behavior of PricewaterhouseCoopers relating to such services.

In addition, the Funds agree to indemnify and hold harmless PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses (including attorneys fees and costs) relating to PricewaterhouseCoopers' services under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behavior of PricewaterhouseCoopers relating to such services.

## Limitation of liability

In any action, claim, loss or damage arising out of the engagement, the Funds agree that PricewaterhouseCoopers' liability will be several and not joint and several; and the Fund may only claim payment from PricewaterhouseCoopers of PricewaterhouseCoopers' proportionate share of the total liability based on degree of fault.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Funds and PricewaterhouseCoopers agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

## Working papers

All working papers and files, other materials, reports and work created, developed or performed by PricewaterhouseCoopers during the course of the audit are the property of PricewaterhouseCoopers.

## Governing law

This agreement shall be governed by and construed in accordance with the laws of Bermuda and shall be deemed in all respects to be a Bermuda contract. The parties hereby agree to the jurisdiction of the courts of Bermuda with respect to all matters arising under or by virtue of this agreement. If any of the provisions of this agreement are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and be binding on the parties to the fullest extent permitted by law.

## Engagement team leaders

The engagement will be led by:

Andrew Brook, engagement leader, who will be responsible for assuring the overall quality, value and timeliness of our services to the Funds;

Ian Davidson, will serve as the concurring partner and will be available in the absence of the engagement leader; and

(5)

KING_000057861

KING_000057857

# PRICEWATERHOUSECOOPERS 🏢

Mr. Christopher Wetherhill
Reference: AJB/GRM/swt/163931 ENGAGE LTR – 100-1
Date: November 30, 2006

Graham MacDonald, team manager, who will be responsible for managing the delivery of our services to the Funds.

**Timing and fees**

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Funds' personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Funds are unable to provide such schedules, information and assistance, PricewaterhouseCoopers and the Funds will mutually revise the fee to reflect additional services, if any, required of us to complete the audit.

We may use temporary contract staff to perform certain tasks on your engagement and will bill for that time at the rate that corresponds to PricewaterhouseCoopers staff providing a similar level of service. Upon request, we will be happy to provide details on the training, supervision and billing arrangements we use in connection with these professionals.

Our fee estimates are based on the time required by the individuals assigned to the engagement. Individual hourly rates vary according to the degree of responsibility involved and experience and skill required. We estimate our fees for this audit engagement will be $94,200, exclusive of out-of-pocket expenses. This estimate takes into account the agreed-upon level of preparation and assistance from Fund personnel; we will advise management should this not be provided or should any other circumstances arise which may cause actual time to exceed that estimate.

We also will bill the Funds for reasonable out-of-pocket expenses and our internal charges for certain support activities. Our internal charges include certain flat-rate amounts that reflect an allocation of estimated costs, including those associated with general office services, such as computer usage, telephone charges, facsimile transmissions, postage and photocopying. We leverage our size to achieve cost savings for our clients in all areas of expense, including those covered by these internal charges and use this system of allocation to minimize total costs.

Our fees and out-of-pocket expenses will be billed to the Funds in advance of the following expected settlement dates:

| Date | Amount |
| --- | --- |
| | |
| November 22, 2006 | $65,490 |
| February 28, 2007 | The Balance, plus disbursements |

Interest may be charged on overdue accounts at a monthly rate of 1-1/2%. This rate may be adjusted depending upon major changes in the prime-lending rate. If the rate is changed, the Fund will be notified in advance.

(6)

KING_000057862

KING_000057857

# PRICEWATERHOUSECOOPERS ⓟ

Mr. Christopher Wetherhill
Reference: AJB/GRM/swt/163931 ENGAGE LTR – 100-1
Date: November 30, 2006

**Other matters**

Any additional services that the Funds may request and we agree to provide will be the subject of separate written agreements.

In the event we are requested or authorized by the Funds or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Funds, the Funds will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Funds agree that it will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers arising out of this engagement to anyone.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

If the services outlined herein are in accordance with the Funds' requirements and if the above terms are acceptable to the Funds, please have one copy of this letter signed in the space provided below and return it to us.

Very truly yours,

*Pricewaterhousecoopers*

Andrew J. Brook
Partner

\* \* \* \*

The services and terms, as set forth in this letter are agreed to.

**Kingate Global Fund, Ltd.**
**Kingate Euro Fund, Ltd.**

By: _____
       Christopher Wetherhill
       Director

Date signed  *14/12/06*

(7)

KING_000057863

KING_000057857

# EXHIBIT 9



# PRICEWATERHOUSECOOPERS ⬚

PricewaterhouseCoopers
Chartered Accountants
Dorchester House
7 Church Street
Hamilton HM 11
Bermuda
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242
www.pwc.com/bermuda

Mr. Christopher Wetherhill
Director
Kingate Management Ltd.
99 Front Street
Hamilton HM 11

November 6, 2007

Reference: AJB/SWB/spi/pat/163931 ENGAGE LTR – 150-1

Dear Mr. Wetherhill,

The purpose of this letter is to confirm our understanding of the terms of our engagement as auditors of Kingate Global Fund Ltd. and Kingate Euro Fund, Ltd. (hereinafter referred to as the "Funds").

## Services and related report

We will audit the financial statements of the Funds at December 31, 2007 and for the year then ending. Upon completion of our audit, we will provide the Funds with our audit report on the financial statements referred to above.

If, for any reasons caused by the Funds or relating to the affairs or management of the Funds, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

## Our responsibilities and limitations

The objective of an audit is the expression of an opinion on the financial statements. We will be responsible for performing the audit in accordance with auditing standards generally accepted in the United States of America. These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audit will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation in accordance with accounting standards generally accepted in the United States of America.

We will consider the Funds' internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any use significant deficiencies and material weaknesses and other deficiencies (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude) relating to internal control over financial reporting identified during our audit will be communicated to you.

A list of partners can be obtained from the above address.
PricewaterhouseCoopers refers to the members of the worldwide PricewaterhouseCoopers organisation

KING_000048612

KING_000048612

# PRICEWATERHOUSE COOPERS

Mr. Christopher Wetherhill
Reference: AJB/SWB/spi/pat/163931 EL
October 1  2007

We will design our audit to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested, and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to the Funds, as appropriate, any such matters identified during our audit.

The audit will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of a possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction. We are aware that, from time to time, you may request that representatives of PricewaterhouseCoopers communicate directly with a third party (such as an investor, or a firm acting on its behalf) (the "Third Party") who is making certain inquiries with respect to the Funds to confirm our engagement as the Funds' auditor. To facilitate our response to these request, any such requests should be made to us in writing and are subject to our standard policies for responding to such requests including obtaining written acknowledgements from the management an the Third Party with respect to such communications. We may decline to engage in such communications if such written acknowledgements are not obtained, or for any other reason at our discretion.

## Management's responsibilities

The Funds' management are responsible for the financial statements and information referred to above. In this regard, management (which includes for purposes of this letter the Fund Administrator, the Transfer Agent, or other Service Agents) is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records and for establishing and maintaining internal control sufficient to permit the preparation and reporting of financial statements in conformity with generally accepted accounting principles. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the Funds involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the Fund received in

(2)

KING_000048613

KING_000048612

# PRICEWATERHOUSE(COOPERS ⬚

Mr. Christopher Wetherhill
Reference: AJB/SWB/spl/pat/163931 EL
October 1, 2007

communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the year under audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all use significant deficiencies and material weaknesses, in the design or operation of the Funds' internal control over financial reporting that are reasonably likely to adversely affect the Funds' ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles. Management also is responsible for identifying and ensuring that the Funds compy with the laws and regulations applicable to their activities.

As part of management's responsibility for the financial statements and the effectiveness of its system of internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the Funds' original accounting records and related information and Fund personnel to whom we may direct inquiries. As required by generally accepted auditing standards, we will make specific inquiries of management and others about the representations embodied in the financial statements and the effectiveness of internal control over financial reporting. Generally accepted auditing standards also require that we obtain written representations covering audited financial statements from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements.

## Representation from management

As noted above, at the conclusion of the engagement, the Funds' management will provide to us a representation letter that, among other things, will confirm:

* management's responsibility for the preparation of the financial statements in accordance with generally accepted accounting principles and for the implementation and operation of internal controls that are designed to prevent and detect fraud and error;

* the completeness and accuracy of financial records and related data;

* the completeness and availability of all minutes of the Board and committee meetings;

* that the effects of any uncorrected misstatements brought to its attention by us during our audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole;

* that management have notified us of all deficiencies in the design or operation of the Funds' internal controls over financial reporting that are reasonably likely to adversely affect the Funds' abilities to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles;

(3)

KING_000048614

KING_000048612



# PRICEWATERHOUSE COOPERS

Mr. Christopher Wetherhill
Reference: AJB/SWB/spkpat/183931 EL
October 1, 2007

- that management have identified and ensured that the Funds have complied with the laws and regulations applicable to its activities;

- that management have made available to us all of the Funds' original accounting records and related information;

- the results of management's assessment of the risk that the financial statements may be materially misstated as a result of fraud; and

- all significant facts relating to any frauds or suspected frauds known to management that may have affected the Funds.

## Internet Communications

During the engagement we may from time to time communicate with you electronically. However, as you are aware, the electronic transmission of information cannot be guaranteed to be secure or error free and such information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use. We shall not have any liability to you arising from or in connection with the electronic communication of information to you during or as a result of its electronic transmission outside of PricewaterhouseCoopers' electronic environment. If the communication relates to a matter of significance and there are concerns about possible effects of electronic transmission a hard copy of such transmission should be requested from us.

## Other documents

Generally accepted auditing standards require that we read any annual report that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

If management intends to publish or reproduce, in printed form or electronically (e.g., on an Internet Web Site), the financial statements together with our report (or otherwise make reference to PricewaterhouseCoopers) in a document that contains other information, management agrees to (a) provide us with a draft of such document to read, and (b) obtain our approval for inclusion of our report, before the document is finalized and distributed. Where our audit report is reproduced in any medium, the complete financial statements, including notes, must also be presented.

The Funds may wish to include our report on these financial statements in a registration statement for a securities offering. The Funds agree that the aforementioned audit report, or reference to PricewaterhouseCoopers, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

(4)

KING_000048615

KING_000048612



Mr. Christopher Wetherhill
Reference  AJB/SWB/spl/pat/ 183931 EL
October 1, 2007

## Release and indemnification

Because of the importance of oral and written representations to an effective audit, the Funds release
PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses
(including attorneys fees and costs) attributable to any knowing misrepresentation by management.
In no event shall PricewaterhouseCoopers be liable to the Funds, whether a claim be in tort, contract
or otherwise:

- for any amount in excess of the total professional fees paid by the Funds under this engagement
  letter; or

- for any consequential, indirect, lost profit or similar damages relating to
  PricewaterhouseCoopers' services provided under this engagement letter, except to the extent
  finally determined to have resulted from the wilful misconduct or fraudulent behaviour of
  PricewaterhouseCoopers relating to such services.

In addition, the Funds agree to indemnify and hold harmless PricewaterhouseCoopers and its
personnel from any and all claims, liabilities, costs and expenses (including attorneys fees and costs)
relating to PricewaterhouseCoopers' services under this engagement letter, except to the extent finally
determined to have resulted from the wilful misconduct or fraudulent behaviour of
PricewaterhouseCoopers relating to such services.

## Limitation of liability

In any action, claim, loss or damage arising out of the engagement, the Funds agree that
PricewaterhouseCoopers' liability will be several and not joint and several; and the Funds may only
claim payment from PricewaterhouseCoopers of PricewaterhouseCoopers' proportionate share of the
total liability based on degree of fault.

In the unlikely event that differences concerning our services or fees should arise that are not resolved
by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the
Funds and PricewaterhouseCoopers agree not to demand a trial by jury in any action, proceeding or
counterclaim arising out of or relating to our services and fees for this engagement.

## Working papers

All working papers and files, other materials, reports and work created, developed or performed by
PricewaterhouseCoopers during the course of the audit are the property of PricewaterhouseCoopers.

## Governing law

This agreement shall be governed by and construed in accordance with the laws of Bermuda and shall
be deemed in all respects to be a Bermuda contract.  The parties hereby agree to the jurisdiction of the
courts of Bermuda with respect to all matters arising under or by virtue of this agreement.  If any of the

(5)

KING_000048616

KING_000048612

# PRICEWATERHOUSE COOPERS

Mr. Christopher Wetherhill
Reference  AJB/SWB/spi/pat/ 163931 EL
October 1, 2007

provisions of this agreement are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and be binding on the parties to the fullest extent permitted by law.

## Engagement team leaders

The engagement will be led by:

- Andrew J. Brook, engagement leader, who will be responsible for assuring the overall quality, value and timeliness of our services to the Funds;

- Graham MacDonald, team manager, who will be responsible for managing the delivery of our services to the Funds.

## Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Funds' personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Funds are unable to provide such schedules, information and assistance, PricewaterhouseCoopers and the Funds will mutually revise the fee to reflect additional services, if any, required of us to complete the audit.

We may use temporary contract staff to perform certain tasks on your engagement and will bill for that time at the rate that corresponds to PricewaterhouseCoopers staff providing a similar level of service. Upon request, we will be happy to provide details on the training, supervision and billing arrangements we use in connection with these professionals.

Our fee estimates are based on the time required by the individuals assigned to the engagement. Individual hourly rates vary according to the degree of responsibility involved and experience and skill required. We estimate our fees for this audit engagement will be $100,000, exclusive of out-of-pocket expenses. This estimate takes into account the agreed-upon level of preparation and assistance from Fund personnel; we will advise management should this not be provided or should any other circumstances arise which may cause actual time to exceed that estimate.

We also will bill the Funds for reasonable out-of-pocket expenses and our internal charges for certain support activities. Our internal charges include certain flat-rate amounts that reflect an allocation of estimated costs, including those associated with general office services, such as computer usage, telephone charges, facsimile transmissions, postage and photocopying. We leverage our size to achieve cost savings for our clients in all areas of expense, including those covered by these internal charges and use this system of allocation to minimize total costs.

Our fees and out-of-pocket expenses will be billed to the Funds in advance of the following expected settlement dates:

(6)

KING_000048617

KING_000048612

# PRICEWATERHOUSECOOPERS 🏛

Mr. Christopher Wetherhill
Reference: AJB/SWB/api/pat/163931 EL
October 1, 2007

| Date | Amount |
|------|--------|
| November 22, 2007 | $70,000 |
| February 28, 2008 | The balance, plus disbursements |

## Other matters

PricewaterhouseCoopers, a Bermuda partnership ("PricewaterhouseCoopers"), is the Bermuda firm of the global network of PricewaterhouseCoopers firms, a worldwide organization of individual partnerships and companies. This engagement letter is between the Funds and PricewaterhouseCoopers only. In the course of providing the services set out in this engagement letter, PricewaterhouseCoopers may, at its discretion, draw on the resources of another entity (whether or not incorporated) which carries on business under a name which includes all or part of the PricewaterhouseCoopers name or is otherwise within (or associated or connected with an entity within) or is a correspondent firm of the worldwide network of PricewaterhouseCoopers firms (together, "PwC Affiliates"). The Funds agree that we may provide any information we receive in connection with this engagement to other PwC Affiliates for the purpose of providing the services set forth in this engagement letter and/or for internal administrative and regulatory compliance purposes.

Unless a PwC Affiliate is contracted by you or a group entity to provide any of the services which are the subject of this letter, provision of the services remains the responsibility of PricewaterhouseCoopers alone and you will not bring any claim, whether in contract, tort (including negligence) or otherwise against any PwC Affiliate or any employee of PricewaterhouseCoopers or PwC Affiliate ("the Employees") in respect of this engagement letter or the services. In these circumstances any PwC Affiliate who deals with you in the course of providing the services, does so on behalf of PricewaterhouseCoopers alone. The provisions of this clause have been stipulated by PricewaterhouseCoopers expressly for the benefit of PwC Affiliates and the Employees. PwC Affiliates and the Employees will have the right to rely on this clause as if they were parties to the engagement letter and will have the right (subject to the discretion of the Court) to a stay in proceedings if you bring any claim against any PwC Affiliate or any of the Employees in breach of this clause.

Any additional services that the Funds may request and we agree to provide will be the subject of separate written agreements.

In the event we are requested or authorized by the Funds or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Funds, the Funds will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Funds agree that it will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers arising out of this engagement to anyone, except to an entity with which the Funds merge or an entity which acquires all or substantially all of the assets of the Funds, and where, in either case, the assignee entity agrees to be bound by this provision.

(7)

KING_000048618

KING_000048612

# PRICEWATERHOUSE COOPERS 🅿

Mr. Christopher Wetherhill
Reference: AJB/SWB/spi/pat/163931 EL
October 1, 2007

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

If the services outlined herein are in accordance with the Funds' requirements and if the above terms are acceptable to the Funds, please have one copy of this letter signed in the space provided below and return it to us.

Very truly yours,

*PricewaterhouseCoopers*

Andrew J. Brook
Partner

\*   \*   \*   \*

(8)

KING_000048619

KING_000048612

# PRICEWATERHOUSE COOPERS 🅿️

Mr. Christopher Wetherhill
Reference: AJB/SWB/spl/pat/163931 EL
October 1, 2007

The services and terms, as set forth in this letter are agreed to.

**Kingate Global Fund, Ltd.**
**Kingate Euro Fund, Ltd.**

By: _____
     Christopher Wetherhill
     Director

     17/11/07
     _____
     Date signed

(9)

KING_000048620

KING_000048612

# EXHIBIT 10

# PRICEWATERHOUSECOOPERS 🅟

**PricewaterhouseCoopers**
Chartered Accountants
Dorchester House
7 Church Street
Hamilton HM 11
Bermuda
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242
www.pwc.com/bermuda

The Board of Directors
Kingate Global Fund, Ltd. and
Kingate Euro Fund, Ltd.
99 Front Street
Hamilton HM 11

October 30, 2008

Reference:  SWB/GRM/spi/pat/163931 ENGAGE LTR – 150-1

Dear Sirs,

The purpose of this letter is to confirm our understanding of the terms of our engagement as auditors of Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (hereinafter referred to collectively as the "Funds").

## Services and related report

We will audit the financial statements of the Funds at December 31, 2008 and for the year then ending. Upon completion of our audits, we will provide the Funds with our audit report on the financial statements referred to above.

If, for any reasons caused by the Funds or relating to the affairs or management of the Funds, we are unable to complete the audits, we may decline to issue a report as a result of this engagement.

## Our responsibilities and limitations

The objective of an audit is the expression of an opinion on the financial statements. We will be responsible for performing the audits in accordance with auditing standards generally accepted in the United States of America. These standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The audits will include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation in accordance with accounting standards generally accepted in the United States of America.

We will consider the Funds' internal control over financial reporting solely for the purpose of determining the nature, timing and extent of auditing procedures necessary for expressing our opinion on the financial statements. This consideration will not be sufficient to enable us to provide assurance on the effectiveness of internal control over financial reporting. However, any significant deficiencies and material weaknesses and other deficiencies (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude) relating to internal control over financial reporting identified during our audits will be communicated to you.

A list of partners can be obtained from the above address.
"PricewaterhouseCoopers" refers to PricewaterhouseCoopers (a Bermuda partnership) or, as the context requires, the PricewaterhouseCoopers global network or other member Firms of the network, each of which is a separate and independent legal entity.

KING_000073894

KING_000073894

# PRICEWATERHOUSE COOPERS ⓔ

The Board of Directors
Reference: SWB/GRM/spi/pat/163931 EL
October 30, 2008

We will design our audits to obtain reasonable, but not absolute, assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts. Our audits will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements. It is important to recognize that there are inherent limitations in the auditing process. Audits are based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested, and the nature, timing, extent and results of the tests to be performed. Audits are, therefore, subject to the limitation that material errors or fraud or other illegal acts having a direct and material financial statement impact, if they exist, may not be detected. Because of the characteristics of fraud, particularly those involving concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with generally accepted auditing standards may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to the Funds, as appropriate, any such matters identified during our audits.

The audits will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction. Therefore, items of a possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction. We are aware that, from time to time, you may request that representatives of PricewaterhouseCoopers communicate directly with a third party (such as an investor, or a firm acting on its behalf) (the "Third Party") who is making certain inquiries with respect to the Funds to confirm our engagement as the Funds' auditor. To facilitate our response to these requests, any such requests should be made to us in writing and are subject to our standard policies for responding to such requests including obtaining written acknowledgements from the management and the Third Party with respect to such communications. We may decline to engage in such communications if such written acknowledgements are not obtained, or for any other reason at our discretion.

## Management's responsibilities

The Funds' management is responsible for the financial statements and information referred to above. In this regard, management (which includes for purposes of this letter the Fund Administrator, the Transfer Agent, or other Service Agents) is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records and for establishing and maintaining internal control sufficient to permit the preparation and reporting of financial statements in conformity with generally accepted accounting principles. Management also is responsible for the design and implementation of programs and controls to prevent and detect fraud, and for informing us (i) about all known or suspected fraud affecting the Funds involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the Funds received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us during the

KING_000073895

KING_000073894

# PRICEWATERHOUSECOOPERS ⓟ

The Board of Directors
Reference: SWB/GRM/spi/pat/163931 EL
October 30, 2008

current engagement and pertaining to the year under audit are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all significant deficiencies and material weaknesses, in the design or operation of the Funds' internal control over financial reporting that are reasonably likely to adversely affect the Funds' ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles. Management also is responsible for identifying and ensuring that the Funds comply with the laws and regulations applicable to their activities.

As part of management's responsibility for the financial statements and the effectiveness of its system of internal control over financial reporting, management is responsible for making available to us, on a timely basis, all of the Funds' original accounting records and related information and Fund personnel to whom we may direct inquiries. As required by generally accepted auditing standards, we will make specific inquiries of management and others about the representations embodied in the financial statements and the effectiveness of internal control over financial reporting. Generally accepted auditing standards also require that we obtain written representations covering audited financial statements from certain members of management. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements.

**Representation from management**

As noted above, at the conclusion of the engagement, the Funds' management will provide to us a representation letter that, among other things, will confirm:

- management's responsibility for the preparation of the financial statements in accordance with generally accepted accounting principles and for the implementation and operation of internal controls that are designed to prevent and detect fraud and error;

- the completeness and accuracy of financial records and related data;

- the completeness and availability of all minutes of the Board and committee meetings;

- that the effects of any uncorrected misstatements brought to its attention by us during our audits are immaterial, both individually and in the aggregate, to the financial statements taken as a whole;

- that management have notified us of all deficiencies in the design or operation of the Funds' internal control over financial reporting that are reasonably likely to adversely affect the Funds' ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles;

- that management have identified and ensured that the Funds have complied with the laws and regulations applicable to its activities;

- that management have made available to us all of the Funds' original accounting records and related information;

(3)

KING_000073896

KING_000073894

# PRICEWATERHOUSECOOPERS 🅟

The Board of Directors
Reference. SWB/GRM/spi/pat/163931 EL
October 30, 2008

- the results of management's assessment of the risk that the financial statements may be materially misstated as a result of fraud; and

- all significant facts relating to any frauds or suspected frauds known to management that may have affected the Funds.

**Internet Communications**

During the engagement we may from time to time communicate with you electronically. However, as you are aware, the electronic transmission of information cannot be guaranteed to be secure or error free and such information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use. We shall not have any liability to you arising from or in connection with the electronic communication of information to you during or as a result of its electronic transmission outside of PricewaterhouseCoopers' electronic environment. If the communication relates to a matter of significance and there are concerns about possible effects of electronic transmission a hard copy of such transmission should be requested from us.

**Other documents**

Generally accepted auditing standards require that we read any annual report that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audits.

If management intends to publish or reproduce, in printed form or electronically (e.g., on an Internet Web Site), the financial statements together with our report (or otherwise make reference to PricewaterhouseCoopers) in a document that contains other information, management agrees to (a) provide us with a draft of such document to read, and (b) obtain our approval for inclusion of our report, before the document is finalized and distributed. Where our audit report is reproduced in any medium, the complete financial statements, including notes, must also be presented.

The Funds may wish to include our report on these financial statements in a registration statement for a securities offering. The Funds agree that the aforementioned audit reports, or reference to PricewaterhouseCoopers, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

**Release and indemnification**

Because of the importance of oral and written representations to an effective audit, the Funds release PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses (including attorneys fees and costs) attributable to any knowing misrepresentation by management. In no event shall PricewaterhouseCoopers be liable to the Funds, whether a claim be in tort, contract or otherwise:

(4)

KING_000073897

KING_000073894

# PRICEWATERHOUSE**C**OOPERS 🄫

- for any amount in excess of the total professional fees paid by the Funds under this engagement letter; or

- for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers' services provided under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

In addition, the Funds agree to indemnify and hold harmless PricewaterhouseCoopers and its personnel from any and all claims, liabilities, costs and expenses (including attorneys fees and costs) relating to PricewaterhouseCoopers' services under this engagement letter, except to the extent finally determined to have resulted from the wilful misconduct or fraudulent behaviour of PricewaterhouseCoopers relating to such services.

## Limitation of liability

In any action, claim, loss or damage arising out of the engagement, the Funds agree that PricewaterhouseCoopers' liability will be several and not joint and several; and the Funds may only claim payment from PricewaterhouseCoopers of PricewaterhouseCoopers' proportionate share of the total liability based on degree of fault.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, the Funds and PricewaterhouseCoopers agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

## Working papers

All working papers and files, other materials, reports and work created, developed or performed by PricewaterhouseCoopers during the course of the audits are the property of PricewaterhouseCoopers.

## Governing law

This agreement shall be governed by and construed in accordance with the laws of Bermuda and shall be deemed in all respects to be a Bermuda contract. The parties hereby agree to the jurisdiction of the courts of Bermuda with respect to all matters arising under or by virtue of this agreement. If any of the provisions of this agreement are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

## Engagement team leaders

The engagement will be led by:

- Scott Watson-Brown, engagement leader, who will be responsible for assuring the overall quality, value and timeliness of our services to the Funds;

(5)

KING_000073898

KING_000073894

# PRICEWATERHOUSE COOPERS 🄿

- Graham MacDonald, team manager, who will be responsible for managing the delivery of our services to the Funds.

## Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the Funds' personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the Funds are unable to provide such schedules, information and assistance, PricewaterhouseCoopers and the Funds will mutually revise the fee to reflect additional services, if any, required of us to complete the audits.

We may use temporary contract staff to perform certain tasks on your engagement and will bill for that time at the rate that corresponds to PricewaterhouseCoopers staff providing a similar level of service. Upon request, we will be happy to provide details on the training, supervision and billing arrangements we use in connection with these professionals.

Our fee estimates are based on the time required by the individuals assigned to the engagement. Individual hourly rates vary according to the degree of responsibility involved and experience and skill required. We estimate our fees for this audit engagement will be $105,000, exclusive of out-of-pocket expenses. This estimate takes into account the agreed-upon level of preparation and assistance from Fund personnel; we will advise management should this not be provided or should any other circumstances arise which may cause actual time to exceed that estimate.

We also will bill the Funds for reasonable out-of-pocket expenses and our internal charges for certain support activities. Our internal charges include certain flat-rate amounts that reflect an allocation of estimated costs, including those associated with general office services, such as computer usage, telephone charges, facsimile transmissions, postage and photocopying. We leverage our size to achieve cost savings for our clients in all areas of expense, including those covered by these internal charges and use this system of allocation to minimize total costs.

Our fees and out-of-pocket expenses will be billed to the Funds in advance of the following expected settlement dates:

| Date | Amount |
| --- | --- |
| December 15, 2008 | 70% |
| Upon issuance of draft financial statements | The balance plus disbursements |

## Other matters

PricewaterhouseCoopers, a Bermuda partnership ("PricewaterhouseCoopers"), is the Bermuda firm of the global network of PricewaterhouseCoopers firms, a worldwide organization of individual partnerships and companies. This engagement letter is between the Funds and PricewaterhouseCoopers only. In the course of providing the services set out in this engagement letter, PricewaterhouseCoopers may, at its discretion, draw on the resources of another entity (whether or not incorporated) which carries on business under a name which includes all or part of the PricewaterhouseCoopers name or is otherwise within (or associated or connected with an entity within)

(6)

# PRICEWATERHOUSE COOPERS 🅿️

The Board of Directors
Reference: SWB/GRM/spi/pat/163931 EL
October 30, 2008

or is a correspondent firm of the worldwide network of PricewaterhouseCoopers firms (together, including such entities' partners, members and employees, "PwC Affiliates"). The Funds agree that we may provide any information we receive in connection with this engagement to other PwC Affiliates for the purpose of providing the services set forth in this engagement letter and/or for internal administrative and regulatory compliance purposes.

Unless a PwC Affiliate is contracted by you or a group entity to provide any of the services which are the subject of this letter, provision of the services remains the responsibility of PricewaterhouseCoopers alone and you will not bring any claim, whether in contract, tort (including negligence) or otherwise against any PwC Affiliate or any employee of PricewaterhouseCoopers or PwC Affiliate ("the Employees") in respect of this engagement letter or the services. In these circumstances any PwC Affiliate who deals with you in the course of providing the services, does so on behalf of PricewaterhouseCoopers alone. The provisions of this clause have been stipulated by PricewaterhouseCoopers expressly for the benefit of PwC Affiliates and the Employees. PwC Affiliates and the Employees will have the right to rely on this clause as if they were parties to the engagement letter and will have the right (subject to the discretion of the Court) to a stay in proceedings if you bring any claim against any PwC Affiliate or any of the Employees in breach of this clause.

Any additional services that the Funds may request and we agree to provide will be the subject of separate written agreements.

In the event we are requested or authorized by the Funds or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the Funds, the Funds will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The Funds agree that they will not, directly or indirectly, agree to assign or transfer any claim against PricewaterhouseCoopers arising out of this engagement to anyone, except to an entity with which the Funds merge or an entity which acquires all or substantially all of the assets of the Funds, and where, in either case, the assignee entity agrees to be bound by this provision.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

(7)

KING_000073900

KING_000073894

# PRICEWATERHOUSECOOPERS 🅿

The Board of Directors
Reference SWB/GRM/bpvpab/-63931 EL
October 30, 2008

If the services outlined herein are in accordance with the Funds' requirements and if the above terms
are acceptable to the Funds, please have one copy of this letter signed in the space provided below
and return it to us.

Very truly yours,

*PriceWaterhouseCoopers*

Scott Watson-Brown
Partner

*    *    *    *

The services and terms, as set forth in this letter are agreed to

**Kingate Global Fund, Ltd.**
**Kingate Euro Fund, Ltd.**

By: _____
Name of Funds' official

_____
Title    DIRECTOR

NOV 3 2008
Date signed

(6)

KING_000073901


KING_000073894

# EXHIBIT 11

| Client Name: | 45109A Kingate Global Fund, Ltd. | **Working Paper** |
|---|---|---|
| Period End: | 12/31/99 | |

Title:        Internal correspondence wrt client background checks
Reference:   📄9100 - 5
Type:        Imported

Area:         9100 -Internal
File Section:  Correspondence

Details:

---------------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:52 PM ----------------------

✎  Richard Whitefield
    02/12/2000 11:37 AM

To:       Scott Watson-Brown/ABS/Price Waterhouse@Americas-BM
cc:
Subject:  Re: Bermuda request (5 names) - Rush

Could you check the internet for the SEC website ie Edgar to see what you can find on Madoffs

Thanks

---------------------- Forwarded by Richard Whitefield/Hamilton/C&L/BM on 02/12/2000 11:37 AM ----------------------

📨 Darren Johnston                            🗓 02/11/2000 09:24

To:       Antony J d'Ombrain/ABS/Price Waterhouse@Americas-BM
cc:       Richard Whitefield/Hamilton/C&L/BM@Americas-BM
Subject:  Re: Bermuda request (5 names) - Rush 📄

I spoke to Don Brooks head of capital markets in the NY firm and he was comfortable with Madoff.  I also spoke to a broker dealer partner re the situation and he pointed me to some public info available on Edgar.  He was not put out by the thought of being involved  with such an entity but could not offer any thoughts on the  cash strategy.

Darren

---------------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:52 PM ----------------------

KING_000067810

CONFIDENTIAL
PWCB028254

KING_000067810

 Richard Whitefield
02/16/2000 01:26 PM

To:       Jean Scanlan/ABS/Price Waterhouse@AMERICAS-US@INTL
cc:       Scott Watson-Brown/ABS/Price Waterhouse@Americas-BM
Subject:  Re: EDGAR

Thanks for the update, unfortunately we haven't been hooked up to KnowledgeCurve yet although I believe we will be this year

Can you help me further?

Regards

Richard
From: Jean Scanlan@AMERICAS-US on 02/16/2000 10:13 AM EST

From:     Jean Scanlan@AMERICAS-US on 02/16/2000 10:13 AM EST
To:       Richard Whitefield@Americas-BM
cc:
Subject:  EDGAR

Can you get into KnowledgeCurve? If so, change the Geography to US. Go to Research Centre, choose Company & Industry, then EDGARSCAN SEC documents. If you cannot access KCurve in this fashion let me know.


To:       Paula E. Smith/ABS/Price Waterhouse
cc:
Subject:  Help!

Paula

I am trying to obtain financial and any other filing information of Bernard L.Madoff Investment Securities a US Broker/Dealer and understand that the SEC have a web site called EDGAR

I have asked one of our staff to obtain current information about the above but have been told that to access the site, you need to be a subscriber. Does your office have access to the site and if so, could you please ask someone to take a look around for me and print and fax me what is found.

My fax number is 441 295 1242

Thanks for your help

KING_000067811

CONFIDENTIAL
PWCB028255

KING_000067810

Best regards

Richard

---------------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:52 PM ----------------------

> Richard Whitefield
> 02/22/2000 11:41 AM

To:     Scott Watson-Brown/ABS/Price Waterhouse@Americas-BM
cc:
Subject:  Re: Your comments would be appreciated

---------------------- Forwarded by Richard Whitefield/Hamilton/C&L/BM on 02/22/2000 10:41 AM ----------------------

> Linda Ianieri@AMERICAS-US
> 02/08/2000 06:41 PM

To:     Eddy Zuaiter/ABS/Price Waterhouse@Americas-US
cc:     Richard Whitefield/Hamilton/C&L/BM@AMERICAS-BM@INTL, Mark J. Casella/BAS/New York NY/C&L/US@Americas-US, Michael S. Greenstein/BAS/New York NY/C&L/US@Americas-US
Subject:  Re: Your comments would be appreciated

Richard:

As many hedge funds maintain their own books and records without the benefit of an outside administrator, it is not necessarily a problem if the administrator has only limited responsibilities.  If it is a JBO- it would also be the case that there is a clearing firm that is associated with the fund that would also be processing trading activities.  I think the first thing to do is find out why they are a broker, how do they clear their securities transactions, what is their trading objective and strategy ( why do they go to cash at the end of each month).  It is possible that they are involved with a large firm as JBO and are providing the firm with some sort of tax management strategy, which allows the large firm to reduce tax exposures or liabilities for which they get a return at the fund level. I am sure this is only one of many strategies that they could be using.

Assuming that they are trading and that the other JBO firm is also processing records, you should be able to adequately test the records.  If it is not a JBO, you will need to test the controls and systems at the fund

I hope this is of some use to you.

CONFIDENTIAL
PWCB028256

KING_000067812

KING_000067810

Linda

| | |
|---|---|
| To: | Richard Whitefield/Hamilton/C&L/BM@AMERICAS-BM@INTL |
| cc: | Mark J. Casella/BAS/New York NY/C&L/US@Americas-US, Linda Ianieri/BAS/New York NY/C&L/US@Americas-US, Michael S. Greenstein/BAS/New York NY/C&L/US@Americas-US |
| From: | Eddy Zuaiter/ABS/Price Waterhouse |
| Date: | 02/08/2000 12:22:33 PM |
| Subject: | Re: Your comments would be appreciated |

Richard,

My quick answer, in response to your urgency, is a follows:

1. You need to share more information/facts. I am not sure what your questions really is (how do you audit this? what are the inherent risks? Is this a problem? or just general info).
2. Given what you wrote below, I can only say that the fact pattern appears similar to a hedge fund that operates a JBO (Joint Back Office) with a broker dealer that is an affiliate to the advisor. This is not uncommon in the industry, although I personally do not have any fund set up in this nature - at this time.
3. I would recommend that you converse with one of our capital markets partners that may have similar (If I understand the facts correctly) situations.

Sorry I could not be of more help.

Z

Richard Whitefield@AMERICAS-BM



      Richard Whitefield@AMERICAS-BM
      02/07/2000 04:02 PM

| | |
|---|---|
| To: | Eddy Zuaiter/ABS/Price Waterhouse |
| cc: | |
| Subject: | Your comments would be appreciated |

Eddy

Here in Bermuda, a situation has arisen for which I would urgently like to receive your views.

The client in question, a Cayman offshore fund, has been very successful. We have ascertained that the broker used also acts in the capacity of investment advisor. The portfolio is actively traded for one month and then all positions are realised and T bills are purchased at the month end. In the following month, he realises the TBills held and trades actively again throughout the month, realising the portfolio at the month end as before. This process continues each month. The same broker also provides records of the portfolio trades to the administrator in the form of a month end statement. The administrator does not separately record the portfolio trading, relying on the broker statements as the prime record.

KING_000067813

CONFIDENTIAL
PWCB028257

KING_000067810

Clearly, and subject to obtaining further information to clarify, there appears to be a segregation of duties issue which causes us a potential risk management concern

My question is :

Have you come across such a set up on any fund ie where the broker acts in a number of other capacities

if so, how did you address the matter

This matter is very urgent and we would greatly appreciate your help and comments

Thanks in advance

Best regards,

Richard

--------------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:53 PM -------------------------

Richard Whitefield
02/22/2000 11:44 AM

To:        Scott Watson-Brown/ABS/Price Waterhouse@Americas-BM
cc:
Subject:   Re: Bermuda request (5 names) - Rush

for file--------------------- Forwarded by Richard Whitefield/Hamilton/C&L/BM on 02/22/2000 10:44 AM -------------------------

Antony J d'Ombrain
02/11/2000 07:53 AM

To:        Richard Whitefield/Hamilton/C&L/BM@Americas-BM
cc:        Darren Johnston/Hamilton/C&L/BM@Americas-BM
Subject:   Re: Bermuda request (5 names) - Rush

Please handle and advise Felecia

KING_000067814

CONFIDENTIAL
PWCB028258

KING_000067810

-------------------- Forwarded by Antony J d'Ombrain/ABS/Price Waterhouse on 02/11/2000 07:53 AM --------------------

Harvey A. Creem@AMERICAS-US
02/10/2000 03:33 PM

To:      Antony J d'Ombrain/ABS/Price Waterhouse@AMERICAS-BM@INTL
cc:      Cathleen Finneran/ABS/Price Waterhouse@AMERICAS-US@INTL, Felecia Braun/ABS/Price Waterhouse@Americas-US@INTL
Subject:  Re: Bermuda request (5 names) - Rush

We will attempt to put your request near the top of the pile.  As Cathleen informed you, our sources may not be the right ones for finding information which you seek.  If you have not already done so, I would check with Kelley Brennan and/or Marty Jennings, both in NY City.  They are involved with this industry and may have ways to check out or otherwise know of the two NY entities.  If this method provides you with sufficient information, pls advise Cathleen so she can call off the adverse data search.

Good hunting.

To:      Cathleen Finneran/ABS/Price Waterhouse@AMERICAS-US@INTL
cc:      Felecia Braun/ABS/Price Waterhouse@Americas-US@INTL, Harvey A. Creem/FAS/BAS/Boston MA/C&L/US@Americas-US@INTL
From:    Antony J d'Ombrain/ABS/Price Waterhouse @ AMERICAS-BM@INTL
Date:    02/10/2000 11:04:25 AM AST
Subject:  Re: Bermuda request (5 names) - Rush

Please put this one on a rush basis. After the recent debacle with the Fraud in the Manhattan Fund it is very important that we check out this Fund , which is showing some strange trading patterns, is reliant on one US broker for accounting , brokerage and custodian services and has assets of some $1 Billion. Thanks for your cooperation and I do understand your position.
To: Antony J d'Ombrain/ABS/Price Waterhouse@Americas-BM @ INTL

To:      Antony J d'Ombrain/ABS/Price Waterhouse@Americas-BM @ INTL
cc:      Felecia Braun/ABS/Price Waterhouse@Americas-US, Harvey A. Creem/FAS/BAS/Boston MA/C&L/US@Americas-US
Subject:  Bermuda request (5 names) - Rush

Please advise if you believe that we should "RUSH" this request.

The ABAS Risk Management Research Group (the folks who do adverse data searches) is currently working through a three week (about 180) backlog of search requests.  We are committed to providing searches on a first come, first serve basis as it is the only way that we can be fair to all investigating teams. We have been understaffed for some time and due to the firms ban on hiring internal firm services personnel, have only recently been given approval to hire additional researchers who are not yet on board.

That being said, we have instituted a process that would allow a request to be put on the top of the pile if the Regional Risk Management Partner authorizes the RUSH.  Every time we do a RUSH, someone, who submitted their request and is waiting in line for their turn, gets put further down the list.  RUSHES are

KING_000067815

CONFIDENTIAL
PWCB028259

KING_000067810

not to be approved because an investigating team submitted their request to the group in an untimely fashion.

We will elevate this request to a RUSH if you so approve, but please understand that our group's primary responsibility is to serve the US ABAS practice and that we can't routinely elevate nonUS requests to RUSHES.

Finally, as Felecia has communicated to Richard Whitefield, our ability to search nonUS entities/people is limited due to the nature of the search tools we employ so that using the Group may not be your best source of information for these requests.

--------------------- Forwarded by Cathleen Finneran/ABS/Price Waterhouse on 02/10/2000 08:18 AM ---------------------------



Felecia Braun@AMERICAS-US
02/09/2000 03:50 PM

To:      Cathleen Finneran/ABS/Price Waterhouse@Price Waterhouse-US
cc:
Subject:  Bermuda request (5 names) - Rush

**1 file attached**

Cathleen, this is a RUSH request from our Bermuda office regarding a continuance of their client.  When I told him it could take us 3 weeks to get back to him, this was his response:

This is becoming a risk management issue and we are looking at a number of other matters in addition to detailed back ground checks which we have asked you to carry out. Is there anything you can do to reduce the 3 week turnaround? - our risk management partner is sure to ask.

Should we rush this one along?

--------------------- Forwarded by Felecia Braun/ABS/Price Waterhouse on 02/09/2000 03:44 PM ---------------------------



Felecia Braun
02/09/2000 03:46 PM

To:      Richard Whitefield/Hamilton/C&L/BM@AMERICAS-BM@INTL
cc:
Subject:  Re: FOLLOWING OUR DISCUSSION TODAY - Further information please 

**1 file attached**

Regarding a contact in the UK, we do not have one.  In the past, we suggest conducting one of the Risk Management Partners in that country for assistance. I referred to the Global Risk Management database and found two RMPs you may wish to contact:

CONFIDENTIAL
PWCB028260

KING_000067810

KING_000067816

Cluster ABAS Leader for EMEA Theatre - Tim Pope Cluster ABAS Leader: UK & Ireland (including Pakistan, Gibraltar & Malta) located in London.  His phone number is +44 171 213 5508; notes name is Tim P Pope/Audit/London/C&L/GB@C&L GB @ C&L INT

ABAS EMEA Theatre RM Leader - Paul Hainsworth in London.  His phone number is +44 171 804 2029; notes name is Paul Hainsworth @ Price Waterhouse-Europe.

Meanwhile, we will include Carlo Grosso and Federico Ceretti in our search.

As for the rush, I will pass on your request to our Director.

Richard Whitefield@AMERICAS-BM



Richard Whitefield@AMERICAS-BM
02/09/2000 02:18 PM

To:      Felecia Braun/ABS/Price Waterhouse@AMERICAS-US@INTL
cc:
Subject:  Re: FOLLOWING OUR DISCUSSION TODAY - Further information please

1 file attached

pls see below

regards

Richard

Felecia Braun@AMERICAS-US

Felecia Braun@AMERICAS-US
02/09/2000 02:39 PM

To:      Richard Whitefield/Hamilton/C&L/BM@AMERICAS-BM@INTL
cc:
Subject:  Re: FOLLOWING OUR DISCUSSION TODAY - Further information please

Richard, I can't recall, does this relate to a new client acceptance or a continuance of a Bermuda client?  Either way, please let me know the name of the prospective/present client to which this request relates? This is a continuing client, Kingate Global Fund Ltd.

Reviewing your list of names to search, please note that our sources for companies and individuals outside the US is limited to news articles only.  So for the searches on the Carlo Grosso and Federico Ceretti, since they are in the UK, our search will be limited to US and international news only.  You may want to contact someone in the UK to do a search for you there. Do you have a counterpart in the UK firm to whom you can refer me?

KING_000067817

CONFIDENTIAL
PWCB028261

KING_000067810

As for Bernard L. Madoff, Bernard L. Madoff Investment Services and the CPA firm, we will be able to do our full search on them since they are in the US.

Our current turnaround time on requests is about 3 weeks. We'll do our best to get back to you as soon as possible. This is becoming a risk management issue and we are looking at a number of other matters in addition to detailed back ground checks which we have asked you to carry out. Is there anything you can do to reduce the 3 week turnaround? - our risk management partner is sure to ask.

Please let me know. Thanks.

Richard Whitefield@AMERICAS-BM



Richard Whitefield@AMERICAS-BM
02/04/2000 02:29 PM

To:      Felecia Braun/ABS/Price Waterhouse@Americas-US@INTL
cc:
Subject:  FOLLOWING OUR DISCUSSION TODAY

**1 file attached**

Hi Felecia

Following my call to you this afternoon, please find attached the completed search request form, filled is as agreed - see page 6. We are looking for background checks in three areas,

     1.     a consultant, FIM Ltd,
     2.     a broker, Bernard LMadoff, and
     3.     a Firm of Accountants, Freihling and Horowitz CPA

Please let me know the soonest that you can let me have your findings

Thanks and regards

Richard Whitefield
Senior Manager - ABAS

Location of investigating office:  BERMUDA
Name of investigating partner:  DARREN Q. JOHNSTON

TYPE OF SERVICE TO BE RENDERED - Audit

PROSPECTIVE CLIENT - Name not provided

KING_000067818

CONFIDENTIAL
PWCB028262

KING_000067810

NON-OFFICER FINANCIAL ADVISOR :

CARLO GROSSO
with FIM LTD
25-28 OLD BURLINGTON STREET
LONDON WIX ILB, UK


FIM LTD ACT AS CONSULTANTS

FEDERICO M. CERETTI
with FIM LTD
25-28 OLD BURLINGTON STREET
LONDON WIX ILB, UK

BERNARD L. MADOFF INVESTMENT SECURITIES
885 THIRD AVENUE
NEW YORK, NY  10022
212 230 2400
800 334 1343

FRIEHLING AND HOROWITZ C.P.A.
ACCOUNTANTS in NEW YORK



adverse data check.do

KING_000067819

CONFIDENTIAL
PWCB028263

KING_000067810

----------------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:53 PM -----------------------



Richard Whitefield
02/22/2000 11:44 AM

To:     Scott Watson-Brown/ABS/Price Waterhouse@Americas-BM
cc:
Subject:  Re: Bermuda request (5 names) - Rush

----------------------- Forwarded by Richard Whitefield/Hamilton/C&L/BM on 02/22/2000 10:45 AM -----------------------

Darren Johnston               02/11/2000 09:24

To:     Antony J d'Ombrain/ABS/Price Waterhouse@Americas-BM
cc:     Richard Whitefield/Hamilton/C&L/BM@Americas-BM
Subject:  Re: Bermuda request (5 names) - Rush

I spoke to Don Brooks head of capital markets in the NY firm and he was comfortable with Madoff.  I also spoke to a broker dealer partner re the situation and he pointed me to some public info available on Edgar.  He was not put out by the thought of being involved  with such an entity but could not offer any thoughts on the  cash strategy.

Darren

----------------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:53 PM -----------------------

Richard Whitefield
02/22/2000 11:45 AM

To:     Scott Watson-Brown/ABS/Price Waterhouse@Americas-BM
cc:
Subject:  Kingate Global Fund

----------------------- Forwarded by Richard Whitefield/Hamilton/C&L/BM on 02/22/2000 10:45 AM -----------------------

Eileen Blair@AMERICAS-US

KING_000067820

CONFIDENTIAL
PWCB028264

KING_000067810

Eileen Blair@AMERICAS-US
02/11/2000 04:43 PM

To:       Richard Whitefield/Hamilton/C&L/BM@AMERICAS-BM@INTL
cc:       Felecia Braun/ABS/Price Waterhouse@Americas-US
Subject:  Kingate Global Fund


The ABAS Risk Management Research Group has searched on the entities and individuals listed below.  Our research includes adverse news articles and securities litigation/violations on the entities and individuals.  The results are summarized and the full-texts of our findings are included in the attachment.

<u>Entities and Individuals Researched</u>:

<u>Full search</u>

Non officer financial advisor:

Carlo Grosso
with FIM Ltd
25-28 Old Burlington Street
London WIX ILB, UK


**FIM Ltd.** - act as consultants  (Also searched as Fleming Investment Management)
25-28 Old Burlington Street
London WIX ILB, UK


Federico M. Ceretti
with FIM Ltd
25-28 Old Burlington Street
London WIX ILB, UK


**Bernard L. Madoff** (in US)

**Bernard L. Madoff Investment Securities**
885 Third Avenue
New York, NY  10022
212 230 2400
800 334 1343
(We noted:  Founded in 1960, Bernard L. Madoff Investment Securities started by sifting through the convertible bond business for opportunities left over by more-established brokerage houses, such as Goldman, Sachs & Co. Increasingly mainstream - at least in the OTC marketplace -- Madoff's firm was one of

KING_000067821

CONFIDENTIAL
PWCB028265

KING_000067810

the original five that formed the National Association of Securities Dealers Automated Quotation system in the early 1970s. As chairman of the NASD national market design committee in the late '70s, Madoff was in on the ground-floor discussions that led to the creation of the Intermarket Trading System. In the '80s Madoff pioneered the controversial "payment for order flow" practice, offering cash to other brokerage firms for the right to execute their OTC trades; he made a tidy profit by capturing a portion of the spread between the stocks' bid and asked prices. Once he perfected that volume-driven business, he began paying for order flow in shares listed on the New York Stock Exchange, trading them off the exchange floor in the so-called third market. Madoff's firm firm says it accounts for some 10 percent of the trades in NYSE-listed stocks)

**Friehling and Horowitz,** C.P.A.
(accountants in New City NY)

We were advised by the engagement team that there were no other officers, directors, significant shareholders, related entities, or underwriter to be included in this search.

Securities Litigation/Violations:


We located a sanction on **Bernard L. Madoff** dated 5/25/1988 alleging a failure to report NASDQ SECS. volume not subject to last sale reporting under the provisions of the schedule D to the associations by-laws. **Sanction: DISMISSED THE ALLEGATIONS** CONTAINED IN THE COMPLAINT WITH NO FURTHER ACTION OTHER THAN TO ORDER RESPT. TO COMPLY W/ UNDERTAKING.   Jurisdiction: NASD    Source : SEC PLAD DATABASE(SEC LAPB: VOL 54, NO. 3, P. 346)

Please note, the Securities and Exchange Commission (SEC) does not confirm or deny any on-going investigations. So, if any of the referenced entities or individuals are currently under investigation, we would not have been informed.

Adverse Publicity (Adverse News Articles):

Bernard L. Madoff

A February 1993 Wall Street Journal article reported **Bernard Madoff** , a highly successful New York trader and broker, found himself inadvertently in possession of nearly a half-billion dollars in illegally raised funds.   The Securities and Exchange Commission (SEC) cracked down on two Florida accountants for selling unregistered securities - notes in which they promised annual returns of 13.5 to 20 percent. The accountants raised $460 million, which was invested in nine Madoff-managed accounts. The SEC complaint indicates that the pair was pocketing the difference between Madoff's returns and their own promised returns. Madoff has said he didn't know the money had been raised illegally. . Richard Walker, the SEC's New York regional administrator, stated that the agency's action involved only the money raised by the two Florida accountants, which was placed in the hands of a trustee who has since returned the money to investors.

FIM   (Fleming Investment Management)

A September 1996 Private Banker International article reported UK regulators imposed fines on three companies in the Robert Fleming group for malpractice.  London-based **Fleming Investment Management ( FIM )**, Fleming Investment Trust Management (FITM); and Save & Prosper Securities (S&PS) were fined #100,000 ($150,000)  for breaches of Securities and Investment Board (SIB) and Investment Management Regulatory Authority (IMRO) rules.  **Fleming Investment Management ( FIM )**, Fleming Investment Trust Management (FITM) and Save & Prosper Securities (S&P)  failed to make Jardine Fleming Asset Management (JFAM), to which they had subcontracted fund management responsibilities, conform with the regulatory regime.  Lax

KING_000067822

CONFIDENTIAL
PWCB028266

KING_000067810

internal controls and procedures at Hong Kong-based JFAM enabled Colin Armstrong - one of its `star' fund managers - to engage profitably in `rat trading'. Rat trading is the practice of using client accounts to generate personal gain.

JFAM has received censure from two sets of authorities. The UK's Investment Management Regulatory Organisation (IMRO) imposed a fine of #400,000 and revoked its London authorisation, along with that of Robert Thomas, JFAM's former chief executive. And Hong Kong's Securities & Futures Commission (SFC) has issued a public reprimand to JFAM's parent, Jardine Fleming Investment Management (JFIM) and revoked the authorisations of both Armstrong and Thomas.

<u>Aside from the information detailed above, we located no adverse material on the remaining affiliated individuals and entities.</u>  Please be advised that we located no reference in the media to Carlo Grosso and Friehling and Horowitz.

Please note that our search included international and US news and US securities sanctions.  We do not have access to international regulatory actions.

Attachment:



FIM2.rtf

The results of adverse data search need to be kept in the proper perspective - i.e., they provide negative assurance only and the absence of information does not confirm the integrity of the entity(ies) or individual(s).

--------------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:53 PM ---------------------

Richard Whitefield
02/22/2000 11:45 AM

To:      Scott Watson-Brown/ABS/Price Waterhouse@Americas-BM
cc:
Subject:  Kingate Global Fund - Additional Information

--------------------- Forwarded by Richard Whitefield/Hamilton/C&L/BM on 02/22/2000 10:46 AM ---------------------

Felecia Braun@AMERICAS-US
02/11/2000 06:45 PM

To:      Richard Whitefield/Hamilton/C&L/BM@AMERICAS-BM@INTL
cc:      Eileen Blair/INFR/Price Waterhouse@Americas-US
Subject:  Kingate Global Fund - Additional Information

We just wanted to add that we contacted the AICPA (American Institute of Certified Public Accountants) and confirmed that the accounting firm of **Friehling**

KING_000067823

CONFIDENTIAL
PWCB028267

KING_000067810

**and Horowitz** located in New City, NY, does exist.  One of its managing partners is named David Gary Friehling.  As Eileen noted in her report, no adverse information was found on the firm.

-------------------- Forwarded by Felecia Braun/ABS/Price Waterhouse on 02/11/2000 05:36 PM --------------------------

Eileen Blair
02/11/2000 03:43 PM

To:        Richard Whitefield/Hamilton/C&L/BM@AMERICAS-BM@INTL
cc:        Felecia Braun/ABS/Price Waterhouse@Americas-US
Subject:   Kingate Global Fund

**1 file attached**

The ABAS Risk Management Research Group has searched on the entities and individuals listed below.  Our research includes adverse news articles and securities litigation/violations on the entities and individuals.  The results are summarized and the full-texts of our findings are included in the attachment.

<u>Entities and Individuals Researched</u>:

<u>Full search</u>

Non officer financial advisor:

Carlo Grosso
with FIM Ltd
25-28 Old Burlington Street
London WIX ILB, UK

**FIM Ltd.** - act as consultants  (Also searched as Fleming Investment Management)
25-28 Old Burlington Street
London WIX ILB, UK

Federico M. Ceretti
with FIM Ltd
25-28 Old Burlington Street
London WIX ILB, UK

Bernard L. Madoff (in US)

Bernard L. Madoff Investment Securities

KING_000067824

CONFIDENTIAL
PWCB028268

KING_000067810

885 Third Avenue
New York, NY  10022
212 230 2400
800 334 1343

(We noted:  Founded in 1960, Bernard L. Madoff Investment Securities started by sifting through the convertible bond business for opportunities left over by more-established brokerage houses, such as Goldman, Sachs & Co. Increasingly mainstream - at least in the OTC marketplace — Madoff's firm was one of the original five that formed the National Association of Securities Dealers Automated Quotation system in the early 1970s. As chairman of the NASD national market design committee in the late '70s, Madoff was in on the ground-floor discussions that led to the creation of the Intermarket Trading System. In the '80s Madoff pioneered the controversial "payment for order flow" practice, offering cash to other brokerage firms for the right to execute their OTC trades; he made a tidy profit by capturing a portion of the spread between the stocks' bid and asked prices. Once he perfected that volume-driven business, he began paying for order flow in shares listed on the New York Stock Exchange, trading them off the exchange floor in the so-called third market. Madoff's firm firm says it accounts for some 10 percent of the trades in NYSE-listed stocks)

**Friehling and Horowitz,** C.P.A.
(accountants in New City NY)

We were advised by the engagement team that there were no other officers, directors, significant shareholders, related entities,  or underwriter to be included in this search.

Securities Litigation/Violations:

We located a sanction on **Bernard L. Madoff** dated 5/25/1988 alleging a failure to report NASDQ SECS. volume not subject to last sale reporting under the provisions of the schedule D to the associations by-laws.  **Sanction:  DISMISSED THE ALLEGATIONS** CONTAINED IN THE COMPLAINT WITH NO FURTHER ACTION OTHER THAN TO ORDER RESPT. TO COMPLY W/ UNDERTAKING.   Jurisdiction: NASD    Source : SEC PLAD DATABASE(SEC LAPB: VOL 54, NO. 3, P. 346)

Please note, the Securities and Exchange Commission (SEC) does not confirm or deny any on-going investigations.  So, if any of the referenced entities or individuals are currently under investigation, we would not have been informed.

Adverse Publicity (Adverse News Articles):

Bernard L. Madoff

A February 1993 Wall Street Journal article reported **Bernard Madoff** , a highly successful New York trader and broker, found himself inadvertently in possession of nearly a half-billion dollars in illegally raised funds.   The Securities and Exchange Commission (SEC) cracked down on two Florida accountants for selling unregistered securities - notes in which they promised annual returns of 13.5 to 20 percent. The accountants raised $460 million, which was invested in nine Madoff-managed accounts. The SEC complaint indicates that the pair was pocketing the difference between Madoff's returns and their own promised returns. Madoff has said he didn't know the money had been raised illegally. . Richard Walker, the SEC's New York regional administrator, stated that the agency's action involved only the money raised by the two Florida accountants, which was placed in the hands of a trustee who has since returned the money to investors.

FIM  (Fleming Investment Management)

KING_000067825

CONFIDENTIAL
PWCB028269

KING_000067810

A September 1996 Private Banker International article reported UK regulators imposed fines on three companies in the Robert Fleming group for malpractice. London-based **Fleming Investment Management ( FIM )**, Fleming Investment Trust Management (FITM); and Save & Prosper Securities (S&PS) were fined #100,000 ($150,000) for breaches of Securities and Investment Board (SIB) and Investment Management Regulatory Authority (IMRO) rules. **Fleming Investment Management ( FIM )**, Fleming Investment Trust Management (FITM) and Save & Prosper Securities (S&P) failed to make Jardine Fleming Asset Management (JFAM), to which they had subcontracted fund management responsibilities, conform with the regulatory regime. Lax internal controls and procedures at Hong Kong-based JFAM enabled Colin Armstrong - one of its `star' fund managers - to engage profitably in `rat trading'. Rat trading is the practice of using client accounts to generate personal gain.

JFAM has received censure from two sets of authorities. The UK's Investment Management Regulatory Organisation (IMRO) imposed a fine of #400,000 and revoked its London authorisation, along with that of Robert Thomas, JFAM's former chief executive. And Hong Kong's Securities & Futures Commission (SFC) has issued a public reprimand to JFAM's parent, Jardine Fleming Investment Management (JFIM) and revoked the authorisations of both Armstrong and Thomas.

Aside from the information detailed above, we located no adverse material on the remaining affiliated individuals and entities. Please be advised that we located no reference in the media to Carlo Grosso and Friehling and Horowitz.

Please note that our search included international and US news and US securities sanctions. We do not have access to international regulatory actions.

Attachment:


FIM2.rtf

The results of adverse data search need to be kept in the proper perspective - i.e., they provide negative assurance only and the absence of information does not confirm the integrity of the entity(ies) or individual(s).

-------------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:53 PM --------------------

Richard Whitefield
02/22/2000 11:46 AM

To:     Scott Watson-Brown/ABS/Price Waterhouse@Americas-BM
cc:
Subject:   40pg FAX To: RWW from L Hendersonre FIM Ltd

pls print out and see how it looks and discuss with me
-------------------- Forwarded by Richard Whitefield/Hamilton/C&L/BM on 02/22/2000 10:47 AM --------------------



KING_000067826

CONFIDENTIAL
PWCB028270

KING_000067810

| Sally Trott | 02/16/2000 05:46 PM |
|---|---|

To:     Richard Whitefield/Hamilton/C&L/BM@Americas-BM
cc:
Subject:    40pg FAX To: RWW from L Hendersonre FIM Ltd

----------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:53 PM -----------------

     Richard Whitefield
     02/22/2000 11:47 AM

To:     Scott Watson-Brown/ABS/Price Waterhouse@Americas-BM
cc:
Subject:    Re: EDGAR

----------------- Forwarded by Richard Whitefield/Hamilton/C&L/BM on 02/22/2000 10:47 AM -----------------

From:     Jean Scanlan@AMERICAS-US on 02/17/2000 10:19 AM EST

To:     Richard Whitefield/Hamilton/C&L/BM@AMERICAS-BM@INTL
cc:      Paula E. Smith/ABS/Price Waterhouse@Americas-US
Subject:    Re: EDGAR

Primark will fax a 12 page X17A5 document on Bernard Madoff filed 10/99.  Should be there this morning.  Let me know if there are problems.

Paula, Primark also has broker/dealer filings which the rep says are 1-2 page updates of an original filing and that the one he is faxing is the most complete. Should I ask for the other filings?

----------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:53 PM -----------------

     Richard Whitefield
     02/22/2000 11:48 AM

To:     Scott Watson-Brown/ABS/Price Waterhouse@Americas-BM
cc:
Subject:    11pg FAX To: RWW from S Baughman re Oath of Affirmation

KING_000067827

CONFIDENTIAL
PWCB028271

KING_000067810

lets review

-------------- Forwarded by Richard Whitefield/Hamilton/C&L/BM on 02/22/2000 10:48 AM --------------


Bermuda DFS@BERMUDA DFS
10/16/99 12:34 PM

To:        IncomingFaxes@Price Waterhouse-Bermuda
cc:
Subject:   11pg FAX To: RWW from S Baughman re Oath of Affirmation

**Lotus** 🚚 **Domino Fax Server**

# Fax Delivery

You can view your fax by clicking on the icon(s) below.

9578.tif

--------------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:53 PM ---------------------

Scott Watson-Brown
03/14/2000 03:28 PM

To:        Richard Whitefield/BM/ABAS/PwC@Americas-BM
cc:        Darren Johnston/BM/ABAS/PwC@Americas-BM (bcc: Scott Watson-Brown/BM/ABAS/PwC)
Subject:   Kingate - discussion with Madoff auditors

Richard,

Darren has asked that we draft a list of queries we intend to pose to Madoff's auditors, and meet with Darren tomorrow (am) to fine tune before sending off to Frank DiPascali (at Madoffs) , with cc to Tom Healy.  (212-838-4061)

Scott

--------------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:53 PM ---------------------

Scott Watson-Brown

KING_000067828

CONFIDENTIAL
PWCB028272

KING_000067810

03/15/2000 09:25 AM

To:        Darren Johnston/BM/ABAS/PwC@Americas-BM
cc:        (bcc: Scott Watson-Brown/BM/ABAS/PwC)
Subject:   Kingate - fax re Madoff auditors

Darren,

As requested, I have drafted a fax per Tom Healy's request yesterday.  A hard copy is on your desk, and a doc link to the word document below, should you
wish to send this this morning.

I am at Hemisphere (295-9166 - Alberto) today should you need to contact me, else leave a voicemail message (7411).


doc link --> 

Scott

--------------------- Forwarded by Scott Watson-Brown/BM/ABAS/PwC on 03/19/2000 03:53 PM ---------------------


Darren Johnston                                    03/15/2000 02:08

To:        Scott Watson-Brown/ABS/Price Waterhouse@Americas-BM
cc:        Richard Whitefield/Hamilton/C&L/BM@Americas-BM
Subject:   pls reattach to file

Fax to Madoff auditors.do


| Document Status: | Reviewed |
|---|---|

| Completed By: |
|---|
| Scott Watson-Brown |

| Reviewed By: |
|---|
| |

| Review Categorization: |
|---|
| |


Maintenance

| Created By: |
|---|
| |

CONFIDENTIAL
PWCB028273

KING_000067810

KING_000067829

| Scott Watson-Brown |
| --- |
| **Last Modified By:**<br>Scott Watson-Brown |
| **Editors:**<br>Scott Watson-Brown |

CONFIDENTIAL
PWCB028274

KING_000067810

KING_000067830

# ADVERSE DATA SEARCH REQUEST (12/99)

The Adverse Data Search Request Form is used to facilitate requests for searches of prospective and continuing clients. The Form must be used to communicate all search requests. For prospective clients, this request will also initiate the Independence Process (public entities and entities with affiliates with publicly traded securities) and the Conflicts Check. While all of the information requested on the Form is not required, the more information you provide will expedite the search process and ensure greater accuracy of information developed and reported back to you. Required fields are indicated by a ✔ .

In accordance with PwC Audit Section 3.1.2.1, please provide the names of the officers; board members and their corporate affiliations, if known; significant shareholders; non-employee financial advisors; underwriters; or related entities which should be included in this search request. If there are none, please confirm this on the form. By submitting this form, you are confirming that you have provided all required information.

Please check as appropriate:

Completed Attest Requests:

**For acceptance of new clients**:
☐ Attach the completed request form to FRISK Acceptance at "Electronically Attached Documents" following Question I01 and to a LN addressed to the ABAS Risk Management Research Group requesting them to perform the search. The Adverse Data Search results will be attached to the FRISK Acceptance.

**For continuing clients**:
Send the completed request form via LN, to the ABAS Risk Management Research Group.

☐ For continuance assessments in process, the results will be attached to the FRISK Continuance at the end of the **Recent Audit Results Section**.

☐ For event driven reassessments, occurring subsequent to completion of a FRISK assessment. The results will be sent by LN to the requestor for consideration in a memo addressing the event. **YES**

Completed Non-Attest Requests:

☐ For both acceptance of new clients and assessment of continuing clients, send the completed request via LN to ABAS Risk Management Research. The results will be sent by LN to the requestor.

CONFIDENTIAL
PWCB028275


KING_000067831


KING_000067810

## INVESTIGATING TEAM INFORMATION

| ✔ Location of investigating office: | BERMUDA |
|---|---|

| ✔ Name of investigating partner: | DARREN Q. JOHNSTON |
|---|---|

## TYPE OF SERVICE TO BE RENDERED (please check all that apply) ✔ :

| Audit | [ YES ] | PFI | [ ] | TS | [ ] |
|---|---|---|---|---|---|
| SAS 70 | [ ] | Other Attest | [ ] | Other (specify): | |
| SSARS | [ ] | GRMS | [ ] | | |

## PROSPECTIVE CLIENT

| ✔ Name and Address of Company: | | | |
|---|---|---|---|
| ✔ Is the Company: | Public [ ] | Private [ ] | IPO Candidate [ ] |
| ✔ If the company is public, CUSIP number*: | | | |
| ✔ Name of ultimate parent company, if applicable: | | | |
| ✔ If ultimate parent company is public, CUSIP number*: | | | |

*First six characters (entity identifier) only

### Affiliates with Publicly Traded Securities

| ✔ Name(s) of affiliate: | ✔ CUSIP number*: |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

*First six characters (entity identifier) only

2

CONFIDENTIAL
PWCB028276

KING_000067832

KING_000067810

## Other Affiliates

❧ Name(s) of affiliate:

| | | | |
|---|---|---|---|
| | | | |
| | | | |

## OFFICERS OR KEY MANAGEMENT PERSONNEL
## (Chairman, President, CEO, COO, CFO, etc.)

❧ Full Name(including middle initial):                    ❧ Title:

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

If any of the names are common, please indicate the name below and provide social security number and previous corporate affiliation(s) and location(s). If not available, please provide date of birth or age and current or previous home/office address (including street, city, and state).

| Name: | Other Information: |
|---|---|
| | |
| | |
| | |
| | |
| | |

3

# MEMBERS OF THE BOARD OF DIRECTORS

A limited search (media only) will be conducted regarding members of the Board of Directors. The search will entail media research concentrating on negative, or potentially negative, news articles. If you feel a full adverse data search on any Board member is required, e.g., securities sanctions, lawsuits, please indicate so by marking the appropriate box.

Directors - For small companies, mostly all.
For large companies, be selective; concentrate on audit and finance committee members

| ✔ Full Name: | ✔ Corporate Affiliation (city/state): | Full Adverse Data Search: |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

If any of the names are common, please indicate the name below and provide social security number and previous corporate affiliation(s) and location(s). If not available, please provide date of birth or age and current or previous home/office address (including street, city, and state).

| Name: | Other Information: |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

4

CONFIDENTIAL
PWCB028278

KING_000067834

# SIGNIFICANT SHAREHOLDERS (> 20%, INDIVIDUALS OR COMPANIES)

**Check if n/a** ☐

| ✔ Full Name (including middle initial): | ✔ Corporate Affiliation (city/state): |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

If any of the names are common, please indicate the name below and provide social security number and previous corporate affiliation(s) and location(s). If not available, please provide date of birth or age and current or previous home/office address (including street, city, and state).

| Name: | Other Information: |
|---|---|
| | |
| | |
| | |
| | |
| | |

5

CONFIDENTIAL
PWCB028279

# NON-OFFICER FINANCIAL ADVISOR  (INDIVIDUALS OR COMPANIES)

**Check if n/a** ☐

| ✔ Full Name (including middle initial): | ✔ Corporate Affiliation (city/state): |
|---|---|
| | FIM LTD<br>25-28 OLD BURLINGTON STREET<br>LONDON WIX ILB<br>UK |
| CARLO GROSSO | FIM LTD ACT AS CONSULTANTS |
| FEDERICO M.CERETTI | AS ABOVE |
| | |
| BERNARD L.MADOFF<br>INVESTMENT SECURITIES | 885 THIRD AVENUE<br>NEW YORK<br>NY 10022<br>212 230 2400<br>800 334 1343 |
| | |
| FRIEHLING AND HOROWITZ C.P.A. | ACCOUNTANTS<br>NEW YORK |
| | |

| If any of the names are common, please indicate the name below and provide social security number and previous corporate affiliation(s) and location(s).  If not available, please provide date of birth or age and current or previous home/office address (including street, city, and state). | |
|---|---|
| Name: | Other Information: |
| | |
| | |
| | ☐ |
| | |
| | |

## UNDERWRITER

**Check if n/a** ☐

If the prospective client is an IPO candidate, a search is not necessary if a tier one or two player.

| ✔ Company Name and Address: | |
|---|---|

6

CONFIDENTIAL
PWCB028280

KING_000067836

KING_000067810

**Illegal Sales
Of Securities
Are on the Rise**
By Randall Smith

02/10/1993
The Wall Street Journal
PAGE C1
(Copyright (c) 1993, Dow Jones & Co., Inc.)

NEW YORK -- With interest rates on bank accounts and certificates of deposit near 20-year lows, more and more small investors are falling for sales pitches promoting "safe" double-digit returns on unregistered securities that are being sold illegally.

When anyone sells stocks or bonds to small, unsophisticated investors, the issuer must register the securities offering with the Securities and Exchange Commission. SEC clearance is then needed for an offering document fairly describing how the money will be put to work and all risks involved.

But within the past three months, the SEC has filed civil lawsuits in two cases involving unregistered-note sales totaling $656 million. In the latest case, the agency moved Monday against Towers Financial Corp. a company controlled by Steven Hoffenberg, for allegedly selling $215 million in unregistered notes paying interest of as much as 16%.

"Over the past year, an increasing amount of our enforcement activity has involved sales of unregistered securities," says Richard Walker, the SEC's regional administrator in New York. "Lower bank interest rates are increasing the temptation for people to consider less conventional investments."

But Mr. Walker warns: "If it's too good to be true, it probably isn't true."

What's wrong with unregistered securities? Investors who don't have an SEC-approved offering statement may lack vital information about the issuer's business history, financial results and even past run-ins with regulators by the company or its officers.

By contrast, big institutional investors and wealthy individuals are allowed to buy unregistered securities through so-called private placements; regulators assume those investors can decide for themselves how much information they need.

For small investors, Mr. Walker and other officials offer these tips. Warning bells should go off if an investor is offered a sky-high interest rate to invest in the securities of a company he has never heard of, whose business is hard to understand, by a broker he doesn't know.

"In these days of low CD rates, the higher the interest rate being offered, the greater the investor's chance of losing some or all of his money," says Lewis W. Brothers, director of the securities division for the Virginia State Corporation Commission.

And the risks go up astronomically if the investor doesn't get at least a preliminary offering statement describing the company and how it plans to use the money.

Last year, Eugene F. Karczewski and Eugene R. Karczewski agreed to pay $51.6 million in reimbursments, interest and penalties to settle SEC civil charges that they sold $34 million in unregistered notes offering 14% interest on behalf of a New York mortgage brokerage business. The two men also received prison sentences in a related criminal case.

In July, Deepak Gulati, former host of the cable-television show "You and Your Money," agreed to pay $9.1 million in profits, interest and penalties to settle SEC civil charges that he sold at least $3.7 million in unregistered notes paying 12%. He also received a three-year prison sentence on fraud charges in a related criminal case.

Both the Karczewskis and Mr. Gulati were accused by the SEC of operating a "Ponzi" scheme -- using funds from later investors to pay artificially high returns to early investors in order to attract more funds. In both cases, investors lost most of their money, the SEC's Mr. Walker says.

In November, the SEC charged two Florida accountants with selling $441 million in unregistered notes paying interest rates of 13 1/2% to 20%. The money was invested with New York securities broker **Bernard L. Madoff**, who was generating the sizzling returns in the stock market. The SEC didn't suggest that Mr.

CONFIDENTIAL
PWCB028281


KING_000067837


KING_000067810

Madoff knew that the money had been raised **illegally** , but ordered the money returned to the investors. The two accountants settled the SEC's civil case without admitting or denying wrongdoing.

In the Madoff case, investors recovered their money in full. But it isn't clear they will fare as well with Mr. Hoffenberg, whose Towers Financial was also accused by the SEC of overstating its profits. Mr. Hoffenberg has declined to comment, but his attorney says Towers Financial has never defaulted on any notes.

Investors who are concerned that they may be buying an illegal securities offering can check out the salesperson with a few phone calls.

The National Association of Securities Dealers maintains a toll-free hotline (1-800-289-9999) offering access to disciplinary actions and certain criminal convictions involving NASD-registered brokers. And the North American Securities Administrators Association (202-737-0900), a group of state securities regulators, keeps brokers' disciplinary history on a state-by-state basis.

There's no quick-and-easy method to determine whether an official-looking document is actually a prospectus containing all the required information about a company's business, finances and how it plans to use the investment proceeds. But investors can call the public reference branch of the SEC in Washington (202-272-7450) to learn whether a company has filed an offering statement with the agency.

A spokesman for the state regulators' group points out that many operators of investment scams are happy to send investors an auditor's statement, news clippings and glossy brochures, all of which appear to suggest credibility without actually providing legally required information.

In a civil suit filed in New York federal court Monday, the SEC alleges that in the Hoffenberg case, brokers selling Towers Financial notes attempted to get around registration requirements by having customers seem to qualify as sophisticated investors having a net worth of at least $1 million and an income over $200,000. The agency says Towers Financial paid more than $6 million in commissions to at least 60 broker-dealers in at least 16 states who sold the notes.

The SEC alleges that 26 customers of Gary Bohling, a broker with Andover Securities Inc. in Clinton, N.Y., declared on the questionnaires that they had assets over $1 million even though they didn't have that much. In each case, the SEC said, the investors used an improper estimate supplied by Mr. Bohling of the present value of their future Social Security and pension benefits.

Mr. Bohling didn't respond to messages left on his answering machine.


**Tony Carideo**
**Proposed acquisition caps off a stellar year for Life USA Holding**
Tony Carideo; Staff Writer

12/24/1992
Star-Tribune Newspaper of the Twin Cities Mpls.-St. Paul
METRO
Page 02D
(Copyright 1992)


Madoff and Minnesota

Readers of the Wall Street Journal may have noticed a piece last week about **Bernard Madoff** , a highly successful New York trader and broker who found himself inadvertently in possession of nearly a half-billion dollars in **illegally** raised funds. Madoff, I hear, is a pretty popular guy in this area.

The Securities and Exchange Commission (SEC) cracked down on two Florida accountants for selling unregistered securities - notes in which they promised annual returns of 13.5 to 20 percent. The accountants raised $460 million, which was invested in nine Madoff-managed accounts. The SEC complaint indicates that the pair was pocketing the difference between Madoff's returns and their own promised returns. Madoff has said he didn't know the money had been raised illegally.

CONFIDENTIAL
PWCB028282


KING_000067838


KING_000067810

The scuttlebutt is that Madoff's other portfolios are made up of anywhere from $40 million to $70 million of Minnesota money, including investments from a healthy sprinkling of Oak Ridge Country Club members in Hopkins. The word is that some of those individuals have put $2 million to $4 million into Madoff's hands. He couldn't be reached for comment.

Madoff has generated his high returns through a strategy of investing in a combination of stocks, stock market futures and options. Richard Walker, the SEC's New York regional administrator, told me that the agency's action involved only the money raised by the two Florida accountants, which was placed in the hands of a trustee who has since returned the money to investors.

**Generation gap**
Jack Willoughby

02/01/1999
Institutional Investor
Page 48
Copyright UMI Company 1999. All Rights Reserved. Copyright Institutional Investor Systems, Inc. Feb 1999

**BERNARD MADOFF** HAS MADE A career of breaking down the walls of the stock market establishment, helping to revolutionize the way shares are traded over the counter. Today he's trying to bar the gates against a new wave of insurrectionists.

Founded in 1960, Bernard L. Madoff Investment Securities started by sifting through the convertible bond business for opportunities left over by more-established brokerage houses, such as Goldman, Sachs & Co. Increasingly mainstream - at least in the OTC marketplace -- Madoff's firm was one of the original five that formed the National Association of Securities Dealers Automated Quotation system in the early 1970s. As chairman of the NASD national market design committee in the late '70s, Madoff was in on the ground-floor discussions that led to the creation of the Intermarket Trading System.

In the '80s Madoff pioneered the controversial "payment for order flow" practice, offering cash to other brokerage firms for the right to execute their OTC trades; he made a tidy profit by capturing a portion of the spread between the stocks' bid and asked prices. Once he perfected that volume-driven business, he began paying for order flow in shares listed on the New York Stock Exchange, trading them off the exchange floor in the so-called third market. His success spawned imitators, causing grave distress among NYSE executives, who protested what they called an unfair gaming of the system, as Madoff and his competitors lured trades away from the exchange. In the first quarter of last year, third-market trades represented about 16 percent of the trade reports in NYSE and American Stock Exchange stocks, according to the NASD, or 6 percent of total dollar volume.

Madoff, whose firm says it accounts for some 10 percent of the trades in NYSE-listed stocks, finds himself in an odd position: Today the 60-year-old is part of the establishment, and he's railing against the newfangled electronic communications networks and their legions of day traders. "I'm more aware than most of how easy it is to trade and how narrower spreads and lower costs have brought more to the table," says Madoff. "That being said, easy access has its dangers."

So convinced is Madoff of an impending disaster that he has stopped making markets in a handful of leading Internet stocks, including Amazon.com, Infoseek and Yahoo!, because he thinks the trading is out of control. "I wanted to send a message," he says. "The pain in some of these stocks is going to be severe." - J.W.

CONFIDENTIAL
PWCB028283

* * * THIS DATA IS FOR INFORMATION PURPOSES ONLY * * *

* * * COLLECTED AND COMPILED BY MORTGAGE ASSET RESEARCH INSTITUTE, INC. * * *

**PARTY: MADOFF, BERNARD L**

* * * * * * * * INCIDENT INFORMATION * * * * * * * * *

CASE NUMBER: MS-604

JURISDICTION: NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

SOURCE: SEC PLAD DATABASE(SEC LAPB: VOL 54, NO. 3, P. 346)

DATE: 05/25/1988

Alleged Offense(s): FAILED TO REPORT NASDAQ SECS. VOLUME NOT SUBJECT TO LAST SALE
REPORTING UNDER THE PROVISIONS OF THE SCHEDULE D TO THE ASSOCIATIONS
BY-LAWS.

Other Incident Info: ACTION TYPE: NASD
COMPLAINT DATE: 02/09/88
VIOLATION(S): ACTION DISMISSED
PLAD FILE NO. SV354301ND

MADOFF, BERNARD L
NEW YORK, NY

Sanctions: DISMISSED

DISMISSED THE ALLEGATIONS CONTAINED IN THE COMPLAINT WITH NO FURTHER
ACTION OTHER THAN TO ORDER RESPT. TO COMPLY W/ UNDERTAKING.

CONFIDENTIAL
PWCB028284


KING_000067840


KING_000067810

**UK regulators clamp down hard on fund malpractices**

09/01/1996
Private Banker International
**Lafferty Publications Limited**
Page 1
(Copyright 1996)
THE ZEAL with which UK regulators are clamping down on malpractices in the fund management sector is clearly illustrated by the decision to impose heavy fines on three companies in the Robert Fleming group (Flemings).

London-based **Fleming Investment Management ( FIM )**, Fleming Investment Trust Management (FITM); and Save & Prosper Securities (S&PS) have each been fined #100,000 for breaches of Securities and Investment Board (SIB) and Investment Management Regulatory Authority (IMRO) rules.

The fines relate to the apparent inability of the three companies to ensure that a subcontractor was properly supervised and had in place proper compliance procedures; for failing to take action once regulatory misdemeanours came to light; and for failing to disclose fully all commissions paid to brokers.

Hong Kong-based Jardine Fleming Asset Management (JFAM), the company with which the fund management business was placed, was also heavily punished by IMRO. In addition to a fine of #400,000 ($615,384) it has had its London authorisation revoked as has Robert Thomas, its former chief executive. IMRO felt that the nature of JFAM's failings was so serious that Thomas - who headed the subsidiary when the misdemeanours were being committed - had to go. JFAM and its parent, Jardine **Fleming Investment Management** (JFIM) also invoked the wrath of the Hong Kong regulator. The Securities & Futures Commission (SFC) has issued a public reprimand to JFIM for breaches of the SFC Code of Conduct.

In addition, it too has revoked the registrations of Jones - who was also the chief executive of JFIM - as well as that of Colin Armstrong, a senior fund manager. To top it all, JFIM has agreed to pay out HK$148.96 million in compensation to clients.

If the regulators' actions have caused considerable embarrassment at Flemings, the impact on Jardine Fleming has been traumatic. Jardine Fleming, which was established as a joint venture in 1970 by Robert Fleming and Jardine Mathieson, is the premier investment banking group in Hong Kong. It has assets under management of around $22 million and a small private banking operation.

"This has been a painful experience for our group," said Henry Strutt, managing director of Jardine Fleming Holdings. "We very much regret the regulatory breaches."

"Robert Fleming accepts that the procedural problems within Jardine Fleming meant that there was potential for customer disadvantage," said John Manser, group chief executive of Flemings. "These procedural issues should have been identified and dealt with sooner and Robert Fleming should have been more active in monitoring its delegate to ensure detailed compliance with IMRO rules."

JFAM's failings mirror those levelled at the three Fleming companies. According to the regulatory authority, JFAM and JFIM:

* "Did not have in place adequate procedures for compliance monitoring of dealings. Where procedures were in place, they were not always followed, and this was not adequately addressed by JFIM's management."

* "When JFAM learnt of weaknesses in, and non-compliance with, dealing procedures at JFIM, it did not take adequate steps to remedy the failings and to remove the potential for customer disadvantage . . . the steps it took over a two-year period were inadequate to rectify them in a timely manner."

* "Although total commissions charged were disclosed to JFAM customers, JFAM did not disclose that some of those commissions were retained by an associated broker. This associate dealt with third party brokers on behalf of JFAM's customers and, in some cases, was remunerated for this action. In one instance, the retention of these commissions was prohibited by JFAM'S customer agreement."

CONFIDENTIAL
PWCB028285

KING_000067841

KING_000067810

Irrespective of the precise nature of JFIM and JFAM misdemeanours - and the fact that it was institutional and not private clients who were at risk - the IMRO ruling is of importance to private bankers in one major respect.

With outsourcing increasing in the private banking sector, especially in fund management, the UK regulators are making it quite clear that they expect any company which undertakes business for a UK principal to adhere to the regulatory code wherever its geographical location. Furthermore, they are putting the onus on outsourcing companies to ensure that this is the case.

"IMRO's investigation has amply illustrated the danger of firms paying insufficient attention to the responsibilities that arise when they delegate business to another entity, whether in the UK, or overseas," said Phillip Thorpe, its chief executive. "Other firms would be well advised to review thoroughly their own arrangements relating to delegated functions."

The incident is also notable for the extent to which two regulatory authorities operating in different jurisdictions were prepared to co-operate. The investigation which uncovered the extent of the misdemeanours at JFIM was conducted jointly by IMRO in the UK and the SFC in Hong Kong. It is likely that this precedent will become increasingly commonplace.

"IMRO and the SFC have co-operative arrangements with various overseas counterparts, through joint inspections, exchanges of information and assistance in investigations, and continue to develop the effectiveness of investor protection through these arrangements", said Thorpe and Gerard McMahon, executive director, enforcement and member of the Commission of the SFC, in a joint statement.

The underlying misdemeanours that provoked the wrath of regulators also illustrate the scope that fund managers have for making money in their own account, sometimes - as in this instance - at their clients' expense.

The practice of "front running", where a manager buys or sells a security on his own account prior to immediately executing a similar trade for a client, is a well-recognised feature of the sector. Two years ago, for example, the activities of Boston-based fund managers at Fidelity Investments attracted particular media attention in this respect.

It is usually relatively unregulated markets which provide the best opportunities for front running and other scams. Until the creation of the SFC in 1989, the Hong Kong market provided considerable opportunities for fund managers in this respect.

As JFIM, or rather trader Colin Armstrong, conclusively proved, however, there was still scope for "rat trading", in the more regulated environment which has typified the 1990s. "Rat trading" is the practice of using client trades to specifically benefit personal accounts. Between September 1993 and September 1995 Armstrong used this ploy to successfully trade Nikkei options on his own account.

By delaying the allocation of trades between his own personal dealing account and the funds which he managed on behalf of JFIM and other clients by up to a day, Armstrong could effectively follow a "heads I win, tails you lose" strategy.

Nikkei options are very volatile. Within the space of a day their price can exhibit large changes, so opening up the prospect of quick profits - or losses. If prices moved favourably between execution and allocation, the deals were booked to Armstrong's own account and JFIM's Ninja Fund, a hedge fund which he also managed, and in which some Jardine Fleming employees held stakes. When price movements were unfavourable, however, Armstrong would allocate the deals to other funds he managed. The SFC claims that two funds were particularly disadvantaged in this respect, JF Pacific Securities Trust, and FFF-Fleming Pacific Fund, a sub-fund of Fleming Flagship Fund (FFF), a fund established and authorised in Luxembourg. It is these funds - and their unit holders - which will receive the bulk of the compensation.

Of course, this state of affairs should not have been allowed to happen. JFIM's own dealing rules prohibited such activities. Compliance was so lax, however, that Armstrong was able to proceed unhindered.

In its investigation the SFC found that JFIM:

* "Failed to adopt dealing procedures whereby the fund managers' intended allocation for a particular trade was recorded prior to or at the time of placing the trade."

CONFIDENTIAL
PWCB028286

KING_000067842

KING_000067810

* "Failed to ensure compliance at all times within the JF Dealing Rules requiring fund managers to record in writing their intention to trade through their personal accounts prior to or at the time of placing the trade."
* "Lacked an effective audit trail to monitor compliance, and where misconduct is suspected to have taken place, to facilitate investigation.
* "Failed to ensure that adequate resources, training and managerial support were devoted to compliance monitoring."
* "When it became aware of the failings in dealing procedures, failed to take sufficient action to remedy the situation."

The regulators' investigation found that Jardine Fleming's compliance department were aware of the problems relating to Armstrong's trades as early as December 1993. But no action was taken. Indeed, it was not until March 1996 - two months after the investigation had started that Armstrong resigned.

During the course of the year much has changed at JFIM. Mark White, the former chief investment officer at Save & Prosper - Flemings' retail fund management arm - has been appointed chief operating officer.

JFIM also has a new group head of compliance, also recruited from within the Fleming Group. The company's compliance team has been expanded from six people to ten. Total manpower in the compliance and internal audit units will be expanded to 22 people compared to 14 in January 1994.

An enhanced compliance training and assessment programme and assessment programme for fund management has been put into operation and centralised dealing structures have been created and recruitment is underway for the personnel to head these units. Coopers & Lybrand have been contracted to assist in the creation of a new, comprehensive, procedures manual.

Linklaters & Paines, a law firm, have undertaken an independent review of compliance procedures and an action plan has been drawn up and implemented. A follow-up review which will examine the effectiveness of compliance procedures will be made in October.

So far the scandal, which has been known in the investment community since the beginning of the year, appears to have had little impact on Jardine Fleming's business. "We have written to inform all our institutional clients about what has happened," said a company spokesman."Our retail fund management business has been barely affected."

Yet the feeling persists that there could be further ramifications, not least as far as Jardine Fleming's relationship with its London-based parent is concerned.

Much has already been made of the repatriation of the management contract of Fleming Far Eastern Investment Trust earlier in the year, for example, although Flemings claims that this occurred for internal reasons. Indeed, with the influx of its personnel at Jardines it would appears that Flemings is intent on increasing control.

Despite the reforms - and the bill of clean health - there is also a suspicion that the full extent of employee participation in the scam has yet to be revealed.

CONFIDENTIAL
PWCB028287

KING_000067843

KING_000067810

**UK, HK regulators discipline Jardine Fleming units**

08/30/1996
Business Times (Singapore)
Copyright, STP (1975) Limited
By Quak Hiang Whai in Hongkong
They were fined or made to compensate those hurt by their irregularities
SECURITIES regulators in Britain and Hongkong yesterday jointly announced tough disciplinary actions
against key units of the Jardine Fleming group and its former senior executives for irregularities in their
fund management practices between 1993 and 1995.
The Jardine Fleming units were either fined or made to compensate those who were adversely affected by
the irregularities.
The units involved are Jardine Fleming Asset Management Ltd (JFAM), **Fleming Investment
Management** Ltd ( **FIM** ), Fleming Investment Trust Management Ltd (FITM), Save and Prosper
Securities (S&PS) and Jardine **Fleming Investment Management** Ltd (JFIM).
The UK-based regulator, Investment Management Regulatory Organisation (Imro), and Hongkong's
Securities and Futures Commission (SFC) said they took disciplinary actions against them for breaches of
Imro rules and SFC's code of conduct.
JFIM has agreed to make voluntary payments worth HK$148.96 million (S$27.1 million) as
compensation to three accounts it managed.
Imro fined JFAM [pound]400,000 (S$877,000) and **FIM** , FITM and S&PS [pound]100,000 each.
The actions followed five months of joint investigations centring on a breakdown of internal controls and
irregularities in the group's trading and compliance procedures, as a result of which certain customers had
been put at a disadvantage by the allocations of deals.
The two regulators also disciplined Robert Thomas, former chief executive of JFAM and JFIM, for
supervisory failings. The SFC disciplined Colin Armstrong, the former senior fund manager and director
of JFIM, for misconduct.
**FIM** , FITM and S&PS are part of the Robert Fleming Group. JFAM and JFIM are part of the Jardine
Fleming group which is jointly owned by Jardine Matheson and Robert Fleming groups.
JFAM, **FIM** , FITM and S&PS, which come under the regulation of Imro, delegated to JFIM the fund
management of 19 customers, whose funds were invested in Asian markets. JFIM, which is regulated by
SFC, managed about [pound]2 billion on behalf of the Imro-regulated firms.
The investigations found that Mr Armstrong had engaged in late allocation of deals -after changes in the
prices of the instruments he traded had occurred. His actions had disadvantaged the three accounts, two of
which are publicly-held funds set up in Hongkong and Luxembourg. The third is a client account.
SFC said JFIM agreed, without admitting liability, to make the voluntary payments.
John Manser, chief executive of Robert Fleming, conceded yesterday that there were "structural
weaknesses and failings of reporting mechanisms" and that "procedural problems ... meant there was a
potential for customer disadvantage".

CONFIDENTIAL
PWCB028288


KING_000067844


KING_000067810

**Illegal Sales**
**Of Securities**
**Are on the Rise**
By Randall Smith

02/10/1993
The Wall Street Journal
PAGE C1
(Copyright (c) 1993, Dow Jones & Co., Inc.)
NEW YORK -- With interest rates on bank accounts and certificates of deposit near 20-year lows, more and more small investors are falling for sales pitches promoting "safe" double-digit returns on unregistered securities that are being sold illegally.

When anyone sells stocks or bonds to small, unsophisticated investors, the issuer must register the securities offering with the Securities and Exchange Commission. SEC clearance is then needed for an offering document fairly describing how the money will be put to work and all risks involved.

But within the past three months, the SEC has filed civil lawsuits in two cases involving unregistered-note sales totaling $656 million. In the latest case, the agency moved Monday against Towers Financial Corp. a company controlled by Steven Hoffenberg, for allegedly selling $215 million in unregistered notes paying interest of as much as 16%.

"Over the past year, an increasing amount of our enforcement activity has involved sales of unregistered securities," says Richard Walker, the SEC's regional administrator in New York. "Lower bank interest rates are increasing the temptation for people to consider less conventional investments."

But Mr. Walker warns: "If it's too good to be true, it probably isn't true."

What's wrong with unregistered securities? Investors who don't have an SEC-approved offering statement may lack vital information about the issuer's business history, financial results and even past run-ins with regulators by the company or its officers.

By contrast, big institutional investors and wealthy individuals are allowed to buy unregistered securities through so-called private placements; regulators assume those investors can decide for themselves how much information they need.

For small investors, Mr. Walker and other officials offer these tips. Warning bells should go off if an investor is offered a sky-high interest rate to invest in the securities of a company he has never heard of, whose business is hard to understand, by a broker he doesn't know.

"In these days of low CD rates, the higher the interest rate being offered, the greater the investor's chance of losing some or all of his money," says Lewis W. Brothers, director of the securities division for the Virginia State Corporation Commission.

And the risks go up astronomically if the investor doesn't get at least a preliminary offering statement describing the company and how it plans to use the money.

Last year, Eugene F. Karczewski and Eugene R. Karczewski agreed to pay $51.6 million in reimbursments, interest and penalties to settle SEC civil charges that they sold $34 million in unregistered notes offering 14% interest on behalf of a New York mortgage brokerage business. The two men also received prison sentences in a related criminal case.

In July, Deepak Gulati, former host of the cable-television show "You and Your Money," agreed to pay $9.1 million in profits, interest and penalties to settle SEC civil charges that he sold at least $3.7 million in unregistered notes paying 12%. He also received a three-year prison sentence on fraud charges in a related criminal case.

Both the Karczewskis and Mr. Gulati were accused by the SEC of operating a "Ponzi" scheme -- using funds from later investors to pay artificially high returns to early investors in order to attract more funds. In both cases, investors lost most of their money, the SEC's Mr. Walker says.

In November, the SEC charged two Florida accountants with selling $441 million in unregistered notes paying interest rates of 13 1/2% to 20%. The money was invested with New York securities broker **Bernard L. Madoff** , who was generating the sizzling returns in the stock market. The SEC didn't suggest that Mr.

CONFIDENTIAL
PWCB028289

KING_000067845

KING_000067810

Madoff knew that the money had been raised **illegally** , but ordered the money returned to the investors. The two accountants settled the SEC's civil case without admitting or denying wrongdoing.

In the Madoff case, investors recovered their money in full. But it isn't clear they will fare as well with Mr. Hoffenberg, whose Towers Financial was also accused by the SEC of overstating its profits. Mr. Hoffenberg has declined to comment, but his attorney says Towers Financial has never defaulted on any notes.

Investors who are concerned that they may be buying an illegal securities offering can check out the salesperson with a few phone calls.

The National Association of Securities Dealers maintains a toll-free hotline (1-800-289-9999) offering access to disciplinary actions and certain criminal convictions involving NASD-registered brokers. And the North American Securities Administrators Association (202-737-0900), a group of state securities regulators, keeps brokers' disciplinary history on a state-by-state basis.

There's no quick-and-easy method to determine whether an official-looking document is actually a prospectus containing all the required information about a company's business, finances and how it plans to use the investment proceeds. But investors can call the public reference branch of the SEC in Washington (202-272-7450) to learn whether a company has filed an offering statement with the agency.

A spokesman for the state regulators' group points out that many operators of investment scams are happy to send investors an auditor's statement, news clippings and glossy brochures, all of which appear to suggest credibility without actually providing legally required information.

In a civil suit filed in New York federal court Monday, the SEC alleges that in the Hoffenberg case, brokers selling Towers Financial notes attempted to get around registration requirements by having customers seem to qualify as sophisticated investors having a net worth of at least $1 million and an income over $200,000. The agency says Towers Financial paid more than $6 million in commissions to at least 60 broker-dealers in at least 16 states who sold the notes.

The SEC alleges that 26 customers of Gary Bohling, a broker with Andover Securities Inc. in Clinton, N.Y., declared on the questionnaires that they had assets over $1 million even though they didn't have that much. In each case, the SEC said, the investors used an improper estimate supplied by Mr. Bohling of the present value of their future Social Security and pension benefits.

Mr. Bohling didn't respond to messages left on his answering machine.


**Tony Carideo**
**Proposed acquisition caps off a stellar year for Life USA Holding**
Tony Carideo; Staff Writer

12/24/1992
Star-Tribune Newspaper of the Twin Cities Mpls.-St. Paul
METRO
Page 02D
(Copyright 1992)


Madoff and Minnesota
Readers of the Wall Street Journal may have noticed a piece last week about **Bernard Madoff** , a highly successful New York trader and broker who found himself inadvertently in possession of nearly a half-billion dollars in **illegally** raised funds. Madoff, I hear, is a pretty popular guy in this area.

The Securities and Exchange Commission (SEC) cracked down on two Florida accountants for selling unregistered securities - notes in which they promised annual returns of 13.5 to 20 percent. The accountants raised $460 million, which was invested in nine Madoff-managed accounts. The SEC complaint indicates that the pair was pocketing the difference between Madoff's returns and their own promised returns. Madoff has said he didn't know the money had been raised illegally.


CONFIDENTIAL
PWCB028290

The scuttlebutt is that Madoff's other portfolios are made up of anywhere from $40 million to $70 million of Minnesota money, including investments from a healthy sprinkling of Oak Ridge Country Club members in Hopkins. The word is that some of those individuals have put $2 million to $4 million into Madoff's hands. He couldn't be reached for comment.

Madoff has generated his high returns through a strategy of investing in a combination of stocks, stock market futures and options. Richard Walker, the SEC's New York regional administrator, told me that the agency's action involved only the money raised by the two Florida accountants, which was placed in the hands of a trustee who has since returned the money to investors.

**Generation gap**
Jack Willoughby

02/01/1999
Institutional Investor
Page 48
Copyright UMI Company 1999. All Rights Reserved. Copyright Institutional Investor Systems, Inc. Feb 1999

**BERNARD MADOFF** HAS MADE A career of breaking down the walls of the stock market establishment, helping to revolutionize the way shares are traded over the counter. Today he's trying to bar the gates against a new wave of insurrectionists.

Founded in 1960, Bernard L. Madoff Investment Securities started by sifting through the convertible bond business for opportunities left over by more-established brokerage houses, such as Goldman, Sachs & Co. Increasingly mainstream - at least in the OTC marketplace -- Madoff's firm was one of the original five that formed the National Association of Securities Dealers Automated Quotation system in the early 1970s. As chairman of the NASD national market design committee in the late '70s, Madoff was in on the ground-floor discussions that led to the creation of the Intermarket Trading System.

In the '80s Madoff pioneered the controversial "payment for order flow" practice, offering cash to other brokerage firms for the right to execute their OTC trades; he made a tidy profit by capturing a portion of the spread between the stocks' bid and asked prices. Once he perfected that volume-driven business, he began paying for order flow in shares listed on the New York Stock Exchange, trading them off the exchange floor in the so-called third market. His success spawned imitators, causing grave distress among NYSE executives, who protested what they called an unfair gaming of the system, as Madoff and his competitors lured trades away from the exchange. In the first quarter of last year, third-market trades represented about 16 percent of the trade reports in NYSE and American Stock Exchange stocks, according to the NASD, or 6 percent of total dollar volume.

Madoff, whose firm says it accounts for some 10 percent of the trades in NYSE-listed stocks, finds himself in an odd position: Today the 60-year-old is part of the establishment, and he's railing against the newfangled electronic communications networks and their legions of day traders. "I'm more aware than most of how easy it is to trade and how narrower spreads and lower costs have brought more to the table," says Madoff. "That being said, easy access has its dangers."

So convinced is Madoff of an impending disaster that he has stopped making markets in a handful of leading Internet stocks, including Amazon.com, Infoseek and Yahoo!, because he thinks the trading is out of control. "I wanted to send a message," he says. "The pain in some of these stocks is going to be severe." - J.W.

CONFIDENTIAL
PWCB028291

KING_000067847

KING_000067810

* * * THIS DATA IS FOR INFORMATION PURPOSES ONLY * * *

* * * COLLECTED AND COMPILED BY MORTGAGE ASSET RESEARCH INSTITUTE, INC. * * *

**PARTY: MADOFF, BERNARD L**

* * * * * * * * * INCIDENT INFORMATION * * * * * * * * *

CASE NUMBER: MS-604

JURISDICTION: NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

SOURCE: SEC PLAD DATABASE(SEC LAPB: VOL 54, NO. 3, P. 346)

DATE: 05/25/1988

Alleged Offense(s): FAILED TO REPORT NASDAQ SECS. VOLUME NOT SUBJECT TO LAST SALE REPORTING UNDER THE PROVISIONS OF THE SCHEDULE D TO THE ASSOCIATIONS BY-LAWS.

 Other Incident Info: ACTION TYPE: NASD
 COMPLAINT DATE: 02/09/88
 VIOLATION(S): ACTION DISMISSED
 PLAD FILE NO. SV354301ND

MADOFF, BERNARD L
 NEW YORK, NY

 Sanctions: DISMISSED

 DISMISSED THE ALLEGATIONS CONTAINED IN THE COMPLAINT WITH NO FURTHER ACTION OTHER THAN TO ORDER RESPT. TO COMPLY W/ UNDERTAKING.

CONFIDENTIAL
PWCB028292

KING_000067848

KING_000067810

# UK regulators clamp down hard on fund malpractices

09/01/1996

Private Banker International

**Lafferty Publications Limited**

Page 1

(Copyright 1996)

THE ZEAL with which UK regulators are clamping down on malpractices in the fund management sector is clearly illustrated by the decision to impose heavy fines on three companies in the Robert Fleming group (Flemings).

London-based **Fleming Investment Management ( FIM )**, Fleming Investment Trust Management (FITM), and Save & Prosper Securities (S&PS) have each been fined #£100,000 for breaches of Securities and Investment Board (SIB) and Investment Management Regulatory Authority (IMRO) rules.

The fines relate to the apparent inability of the three companies to ensure that a subcontractor was properly supervised and had in place proper compliance procedures; for failing to take action once regulatory misdemeanours came to light; and for failing to disclose fully all commissions paid to brokers. Hong Kong-based Jardine Fleming Asset Management (JFAM), the company with which the fund management business was placed, was also heavily punished by IMRO. In addition to a fine of #£400,000 ($615,384) it has had its London authorisation revoked as has Robert Thomas, its former chief executive. IMRO felt that the nature of JFAM's failings was so serious that Thomas - who headed the subsidiary when the misdemeanours were being committed - had to go. JFAM and its parent, Jardine **Fleming Investment Management** (JFIM) also invoked the wrath of the Hong Kong regulator. The Securities & Futures Commission (SFC) has issued a public reprimand to JFIM for breaches of the SFC Code of Conduct.

In addition, it too has revoked the registrations of Jones - who was also the chief executive of JFIM - as well as that of Colin Armstrong, a senior fund manager. To top it all, JFIM has agreed to pay out HK$148.96 million in compensation to clients.

If the regulators' actions have caused considerable embarrassment at Flemings, the impact on Jardine Fleming has been traumatic. Jardine Fleming, which was established as a joint venture in 1970 by Robert Fleming and Jardine Mathieson, is the premier investment banking group in Hong Kong. It has assets under management of around $22 million and a small private banking operation.

"This has been a painful experience for our group," said Henry Strutt, managing director of Jardine Fleming Holdings. "We very much regret the regulatory breaches."

"Robert Fleming accepts that the procedural problems within Jardine Fleming meant that there was potential for customer disadvantage," said John Manser, group chief executive of Flemings. "These procedural issues should have been identified and dealt with sooner and Robert Fleming should have been more active in monitoring its delegate to ensure detailed compliance with IMRO rules."

JFAM's failings mirror those levelled at the three Fleming companies. According to the regulatory authority, JFAM and JFIM:

* "Did not have in place adequate procedures for compliance monitoring of dealings. Where procedures were in place, they were not always followed, and this was not adequately addressed by JFIM's management."

* "When JFAM learnt of weaknesses in, and non-compliance with, dealing procedures at JFIM, it did not take adequate steps to remedy the failings and to remove the potential for customer disadvantage . . . the steps it took over a two-year period were inadequate to rectify them in a timely manner."

* "Although total commissions charged were disclosed to JFAM customers, JFAM did not disclose that some of those commissions were retained by an associated broker. This associate dealt with third party brokers on behalf of JFAM's customers and, in some cases, was remunerated for this action. In one instance, the retention of these commissions was prohibited by JFAM's customer agreement."

CONFIDENTIAL
PWCB028293

KING_000067849

KING_000067810

Irrespective of the precise nature of JFIM and JFAM misdemeanours - and the fact that it was institutional and not private clients who were at risk - the IMRO ruling is of importance to private bankers in one major respect.

With outsourcing increasing in the private banking sector, especially in fund management, the UK regulators are making it quite clear that they expect any company which undertakes business for a UK principal to adhere to the regulatory code wherever its geographical location. Furthermore, they are putting the onus on outsourcing companies to ensure that this is the case.

"IMRO's investigation has amply illustrated the danger of firms paying insufficient attention to the responsibilities that arise when they delegate business to another entity, whether in the UK, or overseas," said Phillip Thorpe, its chief executive. "Other firms would be well advised to review thoroughly their own arrangements relating to delegated functions."

The incident is also notable for the extent to which two regulatory authorities operating in different jurisdictions were prepared to co-operate. The investigation which uncovered the extent of the misdemeanours at JFIM was conducted jointly by IMRO in the UK and the SFC in Hong Kong. It is likely that this precedent will become increasingly commonplace.

"IMRO and the SFC have co-operative arrangements with various overseas counterparts, through joint inspections, exchanges of information and assistance in investigations, and continue to develop the effectiveness of investor protection through these arrangements", said Thorpe and Gerard McMahon, executive director, enforcement and member of the Commission of the SFC, in a joint statement.

The underlying misdemeanours that provoked the wrath of regulators also illustrate the scope that fund managers have for making money in their own account, sometimes - as in this instance - at their clients' expense.

The practice of "front running", where a manager buys or sells a security on his own account prior to immediately executing a similar trade for a client, is a well-recognised feature of the sector. Two years ago, for example, the activities of Boston-based fund managers at Fidelity Investments attracted particular media attention in this respect.

It is usually relatively unregulated markets which provide the best opportunities for front running and other scams. Until the creation of the SFC in 1989, the Hong Kong market provided considerable opportunities for fund managers in this respect.

As JFIM, or rather trader Colin Armstrong, conclusively proved, however, there was still scope for "rat trading", in the more regulated environment which has typified the 1990s. "Rat trading" is the practice of using client trades to specifically benefit personal accounts. Between September 1993 and September 1995 Armstrong used this ploy to successfully trade Nikkei options on his own account.

By delaying the allocation of trades between his own personal dealing account and the funds which he managed on behalf of JFIM and other clients by up to a day, Armstrong could effectively follow a "heads I win, tails you lose" strategy.

Nikkei options are very volatile. Within the space of a day their price can exhibit large changes, so opening up the prospect of quick profits - or losses. If prices moved favourably between execution and allocation, the deals were booked to Armstrong's own account and JFIM's Ninja Fund, a hedge fund which he also managed, and in which some Jardine Fleming employees held stakes. When price movements were unfavourable, however, Armstrong would allocate the deals to other funds he managed. The SFC claims that two funds were particularly disadvantaged in this respect, JF Pacific Securities Trust, and FFF-Fleming Pacific Fund, a sub-fund of Fleming Flagship Fund (FFF), a fund established and authorised in Luxembourg. It is these funds - and their unit holders - which will receive the bulk of the compensation.

Of course, this state of affairs should not have been allowed to happen. JFIM's own dealing rules prohibited such activities. Compliance was so lax, however, that Armstrong was able to proceed unhindered.

In its investigation the SFC found that JFIM:

* "Failed to adopt dealing procedures whereby the fund managers' intended allocation for a particular trade was recorded prior to or at the time of placing the trade."

CONFIDENTIAL
PWCB028294

* "Failed to ensure compliance at all times within the JF Dealing Rules requiring fund managers to record in writing their intention to trade through their personal accounts prior to or at the time of placing the trade."

* "Lacked an effective audit trail to monitor compliance, and where misconduct is suspected to have taken place, to facilitate investigation.

* "Failed to ensure that adequate resources, training and managerial support were devoted to compliance monitoring."

* "When it became aware of the failings in dealing procedures, failed to take sufficient action to remedy the situation."

The regulators' investigation found that Jardine Fleming's compliance department were aware of the problems relating to Armstrong's trades as early as December 1993. But no action was taken. Indeed, it was not until March 1996 - two months after the investigation had started that Armstrong resigned. During the course of the year much has changed at JIFM, Mark White, the former chief investment officer at Save & Prosper - Flemings' retail fund management arm - has been appointed chief operating officer.

JIFM also has a new group head of compliance, also recruited from within the Fleming Group. The company's compliance team has been expanded from six people to ten. Total manpower in the compliance and internal audit units will be expanded to 22 people compared to 14 in January 1994. An enhanced compliance training and assessment programme and assessment programme for fund management has been put into operation and centralised dealing structures have been created and recruitment is underway for the personnel to head these units. Coopers & Lybrand have been contracted to assist in the creation of a new, comprehensive, procedures manual.

Linklaters & Paines, a law firm, have undertaken an independent review of compliance procedures and an action plan has been drawn up and implemented. A follow-up review which will examine the effectiveness of compliance procedures will be made in October.

So far the scandal, which has been known in the investment community since the beginning of the year, appears to have had little impact on Jardine Fleming's business. "We have written to inform all our institutional clients about what has happened," said a company spokesman. "Our retail fund management business has been barely affected."

Yet the feeling persists that there could be further ramifications, not least as far as Jardine Fleming's relationship with its London-based parent is concerned.

Much has already been made of the repatriation of the management contract of Fleming Far Eastern Investment Trust earlier in the year, for example, although Flemings claims that this occurred for internal reasons. Indeed, with the influx of its personnel at Jardines it would appears that Flemings is intent on increasing control.

Despite the reforms - and the bill of clean health - there is also a suspicion that the full extent of employee participation in the scam has yet to be revealed.

CONFIDENTIAL
PWCB028295

KING_000067851

**UK, HK regulators discipline Jardine Fleming units**

08/30/1996
Business Times (Singapore)
Copyright, STP (1975) Limited
By Quak Hiang Whai in Hongkong
They were fined or made to compensate those hurt by their irregularities
SECURITIES regulators in Britain and Hongkong yesterday jointly announced tough disciplinary actions against key units of the Jardine Fleming group and its former senior executives for irregularities in their fund management practices between 1993 and 1995.

The Jardine Fleming units were either fined or made to compensate those who were adversely affected by the irregularities.

The units involved are Jardine Fleming Asset Management Ltd (JFAM), **Fleming Investment Management** Ltd ( **FIM** ), Fleming Investment Trust Management Ltd (FITM), Save and Prosper Securities (S&PS) and Jardine **Fleming Investment Management** Ltd (JFIM).

The UK-based regulator, Investment Management Regulatory Organisation (Imro), and Hongkong's Securities and Futures Commission (SFC) said they took disciplinary actions against them for breaches of Imro rules and SFC's code of conduct.

JFIM has agreed to make voluntary payments worth HK$148.96 million (S$27.1 million) as compensation to three accounts it managed.

Imro fined JFAM [pound]400,000 (S$877,000) and **FIM** , FITM and S&PS [pound]100,000 each.

The actions followed five months of joint investigations centring on a breakdown of internal controls and irregularities in the group's trading and compliance procedures, as a result of which certain customers had been put at a disadvantage by the allocations of deals.

The two regulators also disciplined Robert Thomas, former chief executive of JFAM and JFIM, for supervisory failings. The SFC disciplined Colin Armstrong, the former senior fund manager and director of JFIM, for misconduct.

**FIM** , FITM and S&PS are part of the Robert Fleming Group. JFAM and JFIM are part of the Jardine Fleming group which is jointly owned by Jardine Matheson and Robert Fleming groups.

JFAM, **FIM** , FITM and S&PS, which come under the regulation of Imro, delegated to JFIM the fund management of 19 customers, whose funds were invested in Asian markets. JFIM, which is regulated by SFC, managed about [pound]2 billion on behalf of the Imro-regulated firms.

The investigations found that Mr Armstrong had engaged in late allocation of deals -after changes in the prices of the instruments he traded had occurred. His actions had disadvantaged the three accounts, two of which are publicly-held funds set up in Hongkong and Luxembourg. The third is a client account.

SFC said JFIM agreed, without admitting liability, to make the voluntary payments.

John Manser, chief executive of Robert Fleming, conceded yesterday that there were "structural weaknesses and failings of reporting mechanisms" and that "procedural problems ... meant there was a potential for customer disadvantage".

CONFIDENTIAL
PWCB028296


KING_000067852


KING_000067810

KING_0000067853



**PRIMARK**

Primark Financial Information Division

5161 River Road
Bethesda, MD 20816

Tel: 800-638-8241
Fax: 800-579-2598

www.primark.com

TO: *Richard Whitefield*          DATE: 2/17/00

COMPANY: *Price Waterhouse Coopers*

FAX#: 441 2951242          PHONE#: 439 1412

PAGE *1* OF *11*

**FROM:**

**LADDIE HUNTER      PAUL BRUNING      OSCAR BLACKIE**

**TOSIN ADEGBITE      CARLOS DAVILA      SCOTT BAUGHMAN**

**JOHN HAWK      ROGER MIRELES      JAMI SPANGLER**

**JEFF MONTGOMERY BRIAN WILLIAMS   PAT WILLIAMSON**

**NOTES:**

CONFIDENTIAL
PWCB028297

KING_000067810

00-01789-sgm Doc 17818-1 Filed 072418 Entered 072418 17:11:42 Exhibit 1
Pg 161 of 232

|||||||| |||| ||||| |||
99 09 5587 **STATES**
**...HANGE COMMISSION**
Washington, D.C. 20549

**ANNUAL AUDITED REPORT**
**FORM X-17A-5**
**PART III**

DEC 1 6 1999

**OMB APPROVAL**

| OMB Number | 3235-0123 |
| Expires September 30, 1998 |
| Estimated average burden |
| hours per response 12.00 |

**SEC FILE NUMBER**
8- 8132

**FACING PAGE**
Information Required of Brokers and Dealers Pursuant to Section 17 of the
Securities Exchange Act of 1934 and Rule 17a-5 Thereunder

REPORT FOR THE PERIOD BEGINNING ___11/01/98___ AND ENDING ___10/31/99___
                                      MM/DD/YY                        MM/DD/YY

## A. REGISTRANT IDENTIFICATION

NAME OF BROKER-DEALER. BERNARD L. *Lawrence* MADOFF

| OFFICIAL USE ONLY |
| FIRM ID NO |

ADDRESS OF PRINCIPAL PLACE OF BUSINESS. (Do not use P.O. Box No )

___885 Third Avenue___
(No. and Street)

___New York___          ___New York___          ___10022___
(City)                    (State)                  (Zip Code)

NAME AND TELEPHONE NUMBER OF PERSON TO CONTACT IN REGARD TO THIS REPORT

___Enrica Cotellessa-Pitz___          ___212-230-2424 Ext. 2429___
                                        (Area Code — Telephone No )

## B. ACCOUNTANT IDENTIFICATION

INDEPENDENT PUBLIC ACCOUNTANT whose opinion is contained in this Report*

___Friehling & Horowitz, CPA's, PC___
(Name — if individual state last, first, middle name)

___Four High Tor Road___          ___New City___          ___New York___
(Address)                           (City)                  (State)         (Zip Code)

CHECK ONE.
- ☒ Certified Public Accountant
- ☐ Public Accountant
- ☐ Accountant not resident in United States or any of its possessions

**PROCESSED BY**
DEC 2 9 1999
PRIMARK CORPORATION

| FOR OFFICIAL USE ONLY |

*Claims for exemption from the requirement that the annual report be covered by the opinion of an independent public accountant
must be supported by a statement of facts and circumstances relied on as the basis for the exemption See section 240 17a-5(e)(2).*

SEC 1410 (3-91)      *Potential persons who are to respond to the collection of information
contained in this form are not required to respond unless the form displays
a currently valid OMB control number*

CONFIDENTIAL
PWCB028298

# OATH OR AFFIRMATION

I, __Bernard L. Madoff__ , swear (or affirm) that, to the best of my knowledge and belief the accompanying financial statement and supporting schedules pertaining to the firm of

__Bernard L. Madoff__ , as of

__October 31__ , 19 __99__ , are true and correct. I further swear (or affirm) that neither the company nor any partner, proprietor, principal officer or director has any proprietary interest in any account classified solely as that of a customer, except as follows:

_(signature)_

Notary Public

_(signature)_ Sole Proprietor

Title

SHANA SKOLLER
Notary Public, State of New York
No. 02SK6013161
Qualified in New York County
Commission Expires Sept. 8, 2000

This report** contains (check all applicable boxes)
- ☒ (a) Facing page
- ☒ (b) Statement of Financial Condition
- ☒ (c) Statement of Income (Loss)
- ☒ (d) Statement of Changes in Financial Condition Cash Flows.
- ☒ (e) Statement of Changes in Stockholders' Equity or Partners' or Sole Proprietor's Capital
- ☒ (f) Statement of Changes in Liabilities Subordinated to Claims of Creditors
- ☒ (g) Computation of Net Capital
- ☒ (h) Computation for Determination of Reserve Requirements Pursuant to Rule 15c3-3
- ☐ (i) Information Relating to the Possession or control Requirements Under Rule 15c3-3
- ☐ (j) A Reconciliation, including appropriate explanation, of the Computation of Net Capital Under Rule 15c3-1 and the Computation for Determination of the Reserve Requirements Under Exhibit A of Rule 15c3-3
- ☐ (k) A Reconciliation between the audited and unaudited Statements of Financial Condition with respect to methods of consolidation
- ☐ (l) An Oath or Affirmation
- ☐ (m) A copy of the SIPC Supplemental Report
- ☐ (n) A report describing any material inadequacies found to exist or found to have existed since the date of the previous audit
- ☒ (o) Accountants' Supplementary Report on Internal Accounting Control

**For conditions of confidential treatment of certain portions of this filing, see section 240.17a-5(e)(3)

\* See Note 4 Supplementary Information
\*\* See Note 1 Supplementary Information
\*\*\* See Note 2 Supplementary Information

CONFIDENTIAL
PWCB028299

KING_000067855

KING_000067810

FRIEHLING & HOROWITZ, CPA's, P.C.

FOUR HIGH TOR ROAD
NEW CITY, NEW YORK 10956

914-634-1254
FAX 914-634-2310

Bernard L. Madoff
885 Third Avenue
New York, New York 10022

## INDEPENDENT AUDITORS' REPORT

Dear Sir:

We have audited the accompanying statement of financial condition of Bernard L.
Madoff as of October 31, 1999 and the related statement of operations, changes in
ownership equity and cash flows for the year then ended that you are filing pursuant to
Rule 17a-5 under the Securities Exchange Act of 1934. These financial statements are
the responsibility of the Firm. Our responsibility is to express an opinion on these
financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards.
Those standards require that we plan and perform the audit to obtain reasonable
assurance about whether the financial statements are free of material misstatement. An
audit includes examining, on a test basis, evidence supporting the amounts and
disclosures in the financial statements. An audit also includes assessing the accounting
principles used and significant estimates made by the firm, as well as evaluating the
overall financial statement presentation. We believe that our audit provides a reasonable
basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material
respects, the financial position of Bernard L. Madoff as of October 31, 1999, and the
results of its operations and cash flows for the year then ended in conformity with
generally accepted accounting principles.

Our audit was conducted for the purpose of forming an opinion on the basic financial
statements taken as a whole. The information referred to in the alternate net capital
requirement is presented for the purpose of additional analysis and is not a required part
of the basic financial statements, but is supplementary information required by Rule 17a-5
under the Securities Exchange Act of 1934. Such information has been subjected to the
auditing procedures applied in the audit of the basic financial statements and, in our
opinion, is fairly stated in all material respects in relation to the basic financial statements
taken as a whole.

New City, New York
December 13, 1999

KING_000067856

CONFIDENTIAL
PWCB028300

KING_000067810

# BERNARD L. MADOFF
## STATEMENT OF FINANCIAL CONDITION
## AS OF OCTOBER 31, 1999

### ASSETS

| | | Allowable | Non-Allowable | Total |
|---|---|---|---|---|
| 1 | Cash | $ 8,642,683 | $ | $ 8,642,683 |
| 2 | Cash segregated in compliance with federal and other regulations | | | |
| 3 | Receivable from brokers or dealers and clearing organizations | 70,000 | | 70,000 |
| | A Failed to deliver | | | |
| | 2 Other | | | |
| | B Securities Borrowed | 958,940 | | 958,940 |
| | 2 Other | | | |
| | D Clearing organizations: | 169,839,960 | | 169,839,960 |
| | 2 Other | | | |
| 7 | Securities and spot commodities owned, at market value | 429,208 | | 429,208 |
| | B U.S. and Canadian government obligations | | | |
| | C State and municipal government obligations | 124,229,500 | | |
| | E Stocks and warrants | 7,062,700 | | |
| | F Options | 162,555,806 | | |
| | | 125,428,116 | | |
| 12 | Memberships in exchanges | | | |
| | B Owned at cost | | 419,276,122 | 419,276,122 |
| 14 | Property, furniture, equipment & leasehold improvements At cost (net of accumulated depreciation) | | 61,400 | 61,400 |
| 15 | Other Assets | | 4,375,776 | 4,375,776 |
| | A Dividends and interest receivable | 1,818,083 | 41,754 | 1,859,847 |
| 16 | TOTAL ASSETS | $601,035,006 | $ 4,478,930 | $605,513,936 |

FRIEHLING & HOROWITZ
CERTIFIED PUBLIC ACCOUNTANTS

KING_000067857

CONFIDENTIAL
PWCB028301

KING_000067810

# BERNARD L. MADOFF
## STATEMENT OF FINANCIAL CONDITION
### AS OF OCTOBER 31, 1999

## LIABILITIES AND OWNERSHIP EQUITY

|  |  | Total |
|---|---|---|
| 19 | **Liabilities** |  |
|  | Payable to brokers or dealers and clearing organizations |  |
|  | A   Failed to receive |  |
|  | 2   Other |  |
|  | D   Clearing Organizations |  |
|  | 2   Other | $ 2,508,385 |
| 22 | Securities sold not yet purchased at market value | 284,955 |
| 23 | Accounts payable and accrued liabilities and expenses | 320,433,489 |
|  | E   Accrued expenses and other liabilities | 6,768,748 |
|  | F   Other | 538,379 |
| 26 | **TOTAL LIABILITIES** | $330,513,936 |
| 27 | **Ownership Equity** |  |
|  | Sole proprietorship | 275,000,000 |
| 31 | **TOTAL LIABILITIES AND OWNERSHIP EQUITY** | $605,513,936 |

FRIEHLING & HOROWITZ
CERTIFIED PUBLIC ACCOUNTANTS

KING_000067858

CONFIDENTIAL
PWCB028302

KING_000067810

# BERNARD L. MADOFF

## STATEMENT OF FINANCIAL CONDITION

### OCTOBER 31, 1999

**FRIEHLING & HOROWITZ**
CERTIFIED PUBLIC ACCOUNTANTS

CONFIDENTIAL
PWCB028303

KING_000067859

KING_000067810

CONFIDENTIAL
PWCB028304

**FRIEHLING & HOROWITZ, CPA'S, PC**
FOUR HIGH TOR ROAD
NEW CITY, NEW YORK 10956

914-634-1254
FAX 914-634-2310

Bernard L Madoff
885 Third Avenue
New York, New York 10022

## INDEPENDENT AUDITORS' REPORT

Dear Sir

We have audited the accompanying statement of financial condition of Bernard L Madoff as of October 31, 1999  The financial statement is the responsibility of the Firm.  Our responsibility is to express an opinion on the financial statement based on our audit

We conducted our audit in accordance with generally accepted auditing standards  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statement is free of material misstatement  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement  An audit also includes assessing the accounting principles used and significant estimates made by the firm, as well as evaluating the overall financial statement presentation  We believe that our audit provides a reasonable basis for our opinion

In our opinion, the financial statement referred to above presents fairly, in all material respects, the financial position of Bernard L Madoff as of October 31, 1999 in conformity with generally accepted accounting principles

New City, New York
December 13, 1999

*Friehling & Horowitz, CPA's*

KING_000067860

KING_000067810

# BERNARD L. MADOFF
## STATEMENT OF FINANCIAL CONDITION
### AS OF OCTOBER 31, 1999

## ASSETS

| | |
|---|---:|
| Cash | $ 8,643,000 |
| Cash segregated in compliance with federal and other regulations | 70,000 |
| Receivable from brokers, dealers and others | 173,088,000 |
| U.S. gov't, state and municipal bonds owned, at market value | 131,292,000 |
| Other securities owned, at market value | 287,984,000 |
| Furniture, fixtures, equipment and leasehold improvements (net of accumulated depreciation) | 4,376,000 |
| Membership in exchange | 61,000 |
| **TOTAL ASSETS** | **$605,514,000** |

SEE ACCOMPANYING NOTES TO FINANCIAL STATEMENT

**FRIEHLING & HOROWITZ**
CERTIFIED PUBLIC ACCOUNTANTS

CONFIDENTIAL
PWCB028305

KING_000067810

KING_000067861

## BERNARD L. MADOFF
## STATEMENT OF FINANCIAL CONDITION
## AS OF OCTOBER 31, 1999

### LIABILITIES AND NET WORTH

| | |
|---|---:|
| Payable to brokers, dealers and others | $ 2,773,000 |
| Securities sold but not yet purchased at market value | 320,434,000 |
| Accounts payable, accrued expenses, taxes and other liabilities | 7,307,000 |
| TOTAL LIABILITIES | $330,514,000 |
| NET WORTH | 275,000,000 |
| TOTAL LIABILITIES AND NET WORTH | $605,514,000 |

SEE ACCOMPANYING NOTES TO FINANCIAL STATEMENT

**FRIEHLING & HOROWITZ**
CERTIFIED PUBLIC ACCOUNTANTS

CONFIDENTIAL
PWCB028306

KING_000067862

KING_000067810

# BERNARD L. MADOFF
## NOTES TO STATEMENT OF FINANCIAL CONDITION
### OCTOBER 31, 1999

Our audited Statement of Financial Condition filed pursuant to S E C Rule 17a-5, dated October 31, 1999, is available for examination and copying at our office and at the Securities and Exchange Commission in New York, New York

## NOTE 1 – NATURE OF BUSINESS AND ORGANIZATION

Bernard L Madoff is a registered broker/dealer with the U S Securities and Exchange Commission and a member of the National Association of Securities Dealers, Inc The Firm has been executing securities transactions since 1960

## NOTE 2 – SIGNIFICANT ACCOUNTING PRINCIPLES

The Firm records commission income and related expenses as well as principal securities transactions on a settlement date basis Securities owned or sold but not yet purchased are stated at quoted market values, with resulting unrealized gains and losses included in results of operations

Furniture and equipment are stated at cost, less accumulated depreciation. Depreciation is provided on the MACRS method over the estimated useful life of the asset, generally five or seven years

## NOTE 3 – REGULATORY REQUIREMENTS

The Firm is subject to the Securities and Exchange Commission Uniform Net Capital Rule 15c3-1 The Firm has elected to compute its Net Capital requirement under the Alternative Method At October 31, 1999, under this method, the Firm's Net Capital was $219,647,000 The required Net Capital was $1,000,000 thereby leaving capital in excess of all requirements of $218,647,000

## NOTE 4 – COMMITMENTS AND CONTINGENT LIABILITIES

The Firm leases certain office space under non-cancelable operating leases which expire in 2007 The aggregate lease and rental commitment payable for the entire term of the lease is $16,356,000

The Firm has no pending lawsuits against it

**FRIEHLING & HOROWITZ**
CERTIFIED PUBLIC ACCOUNTANTS

KING_000067863

CONFIDENTIAL
PWCB028307

KING_000067810

# EXHIBIT 12

| Client Name: | 45109 Kingate Funds | Working Paper |
|---|---|---|
| Period End: | 12/31/2001 | |

Title:           Letter from Madoff confirming confirms originate from Investment Advisory dept
Reference:      975 - 8
Type:           External to System

Area:           975 -Confirmation Control
File Section:     Planning and engagement management

Details:

See paper file

Document Status:          Reviewed

| Completed By: |
|---|
| Matthew Clarke |
| **Reviewed By:** |
| Scott Watson-Brown |
| **Review Categorization:** |
| |

Maintenance

| Created By: |
|---|
| Matthew Clarke |
| **Last Modified By:** |
| Scott Watson-Brown |
| **Editors:** |
| Matthew Clarke; Scott Watson-Brown |

KING_000069330

CONFIDENTIAL                                  PWCB003631

# EXHIBIT 13

## Step

| | |
|---|---|
| **Entity Name:** | Kingate Global Fund Ltd. |
| **Engagement Name:** | Kingate Global Funds |
| **Period End:** | 12/31/2002 |

**Completed By:** Stacy Hammett/BM/ABAS/PwC
**Reviewed By:** Scott Watson-Brown/BM/ABAS/PwC

**Status: Reviewed**

**Title:** Assess key risks and prepare risk and approach schedule

### Categorisation

**Section:** Audit comfort cycle scoping
**Area:** 900 - Client Service Plan, including audit strategy
**Risk:**
**Industry Name:** TPA General 1.1  - Required
**Review Categorisation:**
**Assignee:**

### Classification

**Audit Objectives:**
**Strategy Option:**
**Reference:**                                              **Control Step?**     No
**Document Sort No:**    100052000                **Paper File?**       No

### Details

**Guidance:**

**Tailored Procedures:**

Document a summary of key audit risks, and the audit response to these risks in the table below:

| Key Risks (Explanation of key risks, include those from acceptance and continuance) | Mitigating controls (including management's response) | Approach (include overview of our audit approach to the identified risks) | Link |
|---|---|---|---|
| | | | |

**CONFIDENTIAL**                                                                                  PWCB004677

KING_00069837

| | | | |
|---|---|---|---|
| Investments may be incorrectly valued | Custodian & administrator independently value investments at month end and. HML uses two seperate pricing sources, Bloomberg and IDC, these values are compared to those reported by the custodian each month to ensure market values are reasonable. | Controls over monthly reconciliations will be tested during the year<br><br>100% of year-end portfolio will be re-priced and any bond amortization calculation tested | 🖹<br><br>🖹 |
| Investments may not exist | HML prepares portfolio based on Madoff Statements and reconciles HiPort to Madoff each month. Reconciliations are also prepared on the bank account.<br><br>The Accounting department at Madoff reconciles daily activity on the rolling balance report (showing opening balance, trades for the day and ending balances) to the advisory system. These processes are performed systematically and there are rarely, if ever, any breaks in the system. The operations department reconcilies the dpositories , for the most part daily, for the firm as a whole using the stock record and trade date data. | 100% confirmation of investments with Custodian - Madoff, including derivaties confirmation sent to BoB for forward foreign exchange contracts and confirmation of portfolio with Investment Manager<br><br>SWB will by visiting Madoff with a partner from the PwC NY Capital Markets Division to confirm controls in place at Madoff.<br><br>PwC will obtain the SEC Rule 17(a) 5(g) internal control report issued by the auditors of Bernard Madoff for the year ended October 31 | 🖹<br>🖹<br>🖹<br><br>🖹<br><br>🖹 |
| Laws and regulations governing the Fund have not been complied with throughout the year | HML has a compliance department which ensures that funds comply with laws in Bermuda and the country that the Fund is domiciled in<br>Tremont Limited and Kingate Management Limited are responsible for managing subscriptions and redemptions and perform reviews of money laundering and suspected terrorists -> note that the Funds are closed to new investors so subscriptions are only from existing investors | Show me meeting was held with Alison Morrison in HML's compliance department<br><br>Testing is performed on a sample of subscriptions and redemptions in the year, as part of this review it is ensured that approval has been obtained from the manager of the Fund.<br><br>Compliance reviews performed by PwC - see compliance cyle:<br>Impact of US legislation on the fund -> 🖹<br>Review Fund's compliance with local laws and regulations -> 🖹<br>Review compliance with regulations in the country the Fund is domiciled -> 🖹<br>Review tax structure and ensure | 🖹<br><br>🖹 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| | | compliance with tax laws -> <br>Test compliance with laws on withholding tax deductions -> | |
| That an NAV error has occurred and subscriptions or redemptions have been processed at an incorrect NAV | The monthly NAV's have three levels of review before the NAV/share is released to the shareholders. These include detailed review by the account manager at HML, overall review by group manager at HML and final approval is obtained from the manager of the Fund before final NAVs are released to the shareholders | Testing of a sample of subscriptions and redemptions in the year, ensuring coverage obtained throughout the year and focusing on months where there has been high level of activities as part of preliminary analytics performed. | |
| | | Matrix of exceptions in the year was obtained as part of 'show me' meeting held with Alison Morrison, VP Risk Management | |
| | | Controls over the preparation of monthly NAVs has been tested | |
| Management and performance fees may be misstated | Calculation of fees is reviewed by the account manager at the administrator and by the investment manager as part of the NAV review process | Controls over monthly reconciliations will be tested during the year | |
| | | Due to high risk nature of fees, they will be recalculated by PwC at year end. | |
| Trades executed by the investment manager are not reasonable prices, i.e. price paid is greater than market or price received is less than market | There are not controls in place at the administrator to detect pricing errors. This has been identified as a critical matter per , and will included in the management letter. | Detailed testing on been performed on investment purchases and sales during the year, including ensuring that price paid/received is reasonable compared to Bloomberg high/low, volumn comparison and agreement to trade blotters. | |
| Investment strategy is not being executed by the Investment Advisor in accordance with the Prospectus and Advisory agreement. | Madoff's system is programmed with the account stategy and limitations to ensure that trading levels are maintained within those prescribed in the brokerage agreement (i.e. the controls to ensure that cash accounts are not margined)<br><br>FIM, the Fund's Consultant, reviews the transactions that are entered into each month by Madoff to ensure they are in compliance with the Fund's Investment | SWB will by visiting Madoff with a partner from the PwC NY Capital Markets Division to confirm controls in place at Madoff.<br><br>Investment strategy has been documented throughout the year to determine when the Fund is invested in equities and options vs treasury bills. This review was used to determine the months to test the investment strategy - July has been identified as a high risk month and has | <br><br> |

CONFIDENTIAL

PWCB004679

KING_000069837    KING_000069839

| | Restrictions and that overall the transactions appear reasonable. | been reviewed in detail to determine reasonableness of returns acheived in that month. This review included discussions with Frank DiPascali at Madoff to discuss the performance of the Fund and how Madoff acheives this performance.

PwC will obtain the SEC Rule 17(a) 5(g) internal control report issued by the auditors of Bernard Madoff for the year ended October 31 | |
|---|---|---|---|

Once the Risk & Approach schedule is complete in A&C copy & paste the Explanation of the Key Risks, Management response, and Approach columns in this schedule into the Risk and Approach summary table above (before A&C becomes available bring the Key Risks from FRISK).

a.  Assess the inherent risk of material misstatement at the financial statement level as well as for material account balances/transactions for which each management unit/business process has responsibility.

b.  Taking into account the results of the continuance and acceptance assessment and other information gathered to date, make a preliminary assessment of the risk that the client may not be able to continue as a going concern.

Note:  Detailed steps for obtaining audit comfort on the client's ability to continue as a going concern can be found in Area 8050 - Going concern.

c.  Obtain a general understanding of the legal and regulatory framework applicable to the entity and the industry and how the entity is complying with that framework:

d.  Identify related parties and assess the risk of material related party transactions by performing the following procedures as appropriate:
   1.  Evaluate the client's procedures for identifying, authorising and properly accounting for related party transactions.  Perform to the extent necessary the following:
      i.  review the formal policies;
      ii.  assess the internal control structure;
      iii.  verify the dissemination of the policies as applicable to officers, employees, vendors and customers;
      iv.  assess the methodology for monitoring adherence with policies; and
      v.  review the policy statements regarding corporate ethics and conflicts of interests and if available inspect statements of compliance with business ethics and conflicts of interest policies received from officers, directors and key employees.

   2.  Provide all PwC personnel on the engagement (from all offices) and any other auditing firms involved in the audit with an up-to-date list of related parties and the nature of transactions with them.

Note:  Detailed steps for obtaining audit comfort on material related party transactions can be found in Area 8500 - Related Parties

CONFIDENTIAL

PWCB004680

KING_000069837        KING_000069840

Results:

a.  Inherent risk of the include the risk of a significant market wide in stock prices and a significant redemption of capital by the shareholders. Risk assessment by management of the Company is consistent with the Management of an Investment Fund.
b.  No going concern issues identified;
c.  The administrator, Hemisphere, has experience with the legal and regulatory requirements surrounding a Fund in Bermuda.  See documentation of show me meeting held with Alison Morrison, HML Compliance Dept -> 🗎 and Marty Brant, HML in-house legal counsel -> 🗎
d.  Related party transactions are fully disclosed in the financial statements and transactions have been audited in the expense cycle.  Note that in the case of management fees, reliance obtained from Investments and NAV calculation cycle are key factors as these are performance based fees.

Attachments:

| Status | | |
|---|---|---|
| Status: | Reviewed | |
| Completed By: | Stacy Hammett/BM/ABAS/PwC | |

| Maintenance | | |
|---|---|---|
| Created By: | Stacy Hammett | Date: |
| Last Modified By: | Scott Watson-Brown/BM/ABAS/PwC | Date: |
| Editors: | Stacy Hammett | |
| | Stacy Hammett/BM/ABAS/PwC | |
| | Scott Watson-Brown/BM/ABAS/PwC | |

KING_000069837    KING_000069841

CONFIDENTIAL

PWCB004681

# EXHIBIT 14

| Client Name: | 45109 Kingate Funds | Working Paper |
|---|---|---|
| Period End: | 12/31/2001 | |

**Title:** Phone call with Madoff - January 10, 2002
**Reference:** 300 - 13
**Type:** Created in Notes

**Area:** 300 -Client's business, industry, business objectives and related risks
**File Section:** Planning and engagement management

Details:

On January 10, 2002 Matt Clarke telephoned Frank DiPascali at Madoff, 1 212 230 2424. The following points were discussed:-

- That there had been no changes in the internal controls within Madoff including the segregation of the advisory/front office from the broker, accounting and custodial departments; that the process of events was the same ie the trade initiation and authorisation process and the security over the trading terminals. As confirmed by Frank, there were no changes; see 🗎
- A copy of the latest 17a-5(g)(1) SEC report on practices and procedures on internal control was requested. This was to be sent on January 10 - see 🗎
- It was explained to Frank the necessity to test a walk through of the system from the initiation of the trade to Hemisphere's ultimate recording of it. It was agreed to provide Frank with a sample of dates and securities purchased and he would provide documentation which would effectively be trade blotters - see transaction testing per 🗎

| Document Status: | Reviewed |
|---|---|

| Completed By: |
|---|
| Matthew Clarke |
| Reviewed By: |
| Scott Watson-Brown |
| Review Categorization: |
| Expected practice |

Maintenance

| Created By: |
|---|
| Matthew Clarke |

CONFIDENTIAL

PWCB003330

KING_000069455

| Last Modified By: |
| Scott Watson-Brown |
| Editors: |
| Matthew Clarke; Scott Watson-Brown |

CONFIDENTIAL

PWCB003331

# EXHIBIT 15

## Step

| Entity Name: | Kingate Global Fund Ltd. | |
|---|---|---|
| Engagement Name: | Kingate Global Funds | Completed By: Stacy Hammett/BM/ABAS/PwC |
| Period End: | 12/31/2002 | Reviewed By: Scott Watson-Brown/BM/ABAS/PwC |

**Status: Reviewed**

Title:                      Evaluation of Adviser and Investment Manager

### Categorisation

| Section: | Audit comfort cycle scoping |
|---|---|
| Area: | 300 - Client's buiness, industry, business objectives and related risks |
| Risk: | Addional procedures |
| Industry Name: | User Defined |
| Review Categorisation: | |
| Assignee: | |

### Classification

| Audit Objectives: | | | |
|---|---|---|---|
| Strategy Option: | | | |
| Reference: | | Control Step? | No |
| Document Sort No: | 400001000 | Paper File? | No |

### Details

Guidance:

Tailored Procedures:

Obtain an understanding of the Adviser/Manager relationship with the Fund by documenting the following:

1. Document relationships between Directors of the Fund and owners/directors/management of the Adviser/Manager.

CONFIDENTIAL                                                                PWCB004198

KING_000069818

2. Document an understanding of how many Funds the Adviser and Manager have as clients including how many are audited by PwC.

3. Discuss with client management any operational and management problems they are having with the Adviser/Manager. Document our discussions in the workpapers.

## Kingate Mangement Limited

Kingate Management Limited are the management company of Euro and co-manager of Global.

They receive the management fees, paid by the funds - caluated by Hemisphere and pay KML out of the funds' accounts. KML then remit a portion of the management fees to Tremont (Bermuda) Limtied as co-managers of Global and FIM Ltd as consultants (serviced by separate agreement).

Kingate Management Limited is a Bermuda incorporated company. It was originally based at Hemisphere but as of April 2000, they acquied their own office. There are 2 members of staff based on the premises - Miss Shazieh Salahuddin and Ms Patra Lee Robinson. Shazieh is the main client contact.

telephone 296-2888
fax - 296-6775
99 Front Street, Hamilton HM 11, Bermuda

Chris Wetherhill is the director of the company and also a director of the Kingate funds.

KML roles:

- Are responsible for arranging review of the NAV. The weekly NAV is not review but the monthly NAV is reviewed and approved by Chris Wetherhill (fund Director). Shazieh is not an accountant.
- Approve subscriptions and redemptions. See 🖺 for details of HML's initial procedures. Subscribers usually first contact FIM, Tremont or KML. FIM or Tremont forward the subscribers to KML and HML. Since January 2000, Madoff has not wanted the Fund to get any larger and so not many new shareholders have joined the Fund. Therefore approval procedures for new investors are not applicable. Sub and red movements have generally been for the same shareholders. Shazieh confirmed that there were not many private investors even in the nominee accounts, where there are often in respect of reputable organisations. Because the size of the Fund is not to grow, Shazieh has rejected several investors including those from South America.
- Receiving advice from FIM Limited on forward currency contract and executing trades with the Bank of Bermuda as counterparty.

Matt Clarke spoke to Shazieh of KML on January 29, 2002 who confirmed that she compares the report detailing a list of terrorists to her shareholder register (Updated by Scott Watson-Brown January 24, 2003 in meeting at 99 Front Street).

CONFIDENTIAL

## Tremont Limited

Tremont act as co-manager of the Global fund and are remunerated by this fund under a co-manager agreement.

Tremont Limited is a global alternative investments company occupying locations in New York, Toronto, London and Bermuda. It is an "investment solution provider" per its internet site and it provides advisory services, information and investment services.

Sue Hammond at Tremont is responsible for Kingate Global and works out of the New York office
- contact # (914) 925 1187

Internet site: http://www.tremontadvisers.com/index.html

Matt Clarke had a telephone conversation with Sue Hammond of Tremont discussing their role with the Funds. Sue confirmed that Tremont or responsible for managing susbcriptions and redempions for the Funds. Sue also confirmed that the Funds are not taking any new subs or reds and that subscriptions come from existing shareholders when existing shareholders redeem. Sue mentioned that she is always receiving calls from new investors but has to turn them down.

The issue of money laundering arose and Sue confirmed that Tremont take this matter very seriously. She forwarded the following attachment which she has to sign as part of role as identifying inappropriate investors:-

 - Tremont Memo re OFAC Efforts.doc

Further to this she also forwarded the instructions that she receives on dealing with suspected terrorists, as copied below:-

 - Control List Instructions.txt

Sue also forwarded the list of suspected terrorists that she must consider against those investors in Kingate:-

 - Control List - Supplement # 1_#79266.XLS

Finally, Sue also attached another attachment that she has received which upon clicking on the "Bulletin" button takes you to further suspected terrorists.

KING_000069820

**CONFIDENTIAL**

PWCB004200

 - terror.pdf

Sue said that whilst she reviews all these lists, there is still the problem when investors have nominee accounts at Banks and therefore there is no guarantee of who the ultimate investors are.

## FIM Limited

FIM Limited are consultants to the Fund and provide investment advisory services to the Fund. FIM Ltd are based and incorporated in London. Andrew Brook and Scott Watson-Brown had a conference call with FIM Ltd on March 4, 2002 discussing aspects of the Companies including the investors, minutes of the meeting are documented in the attached word document.



Kingate Funds meeting notes March 4 Carlo Gros

## Madoff Investment Securities

Madoff is both the investment advisor and the broker/custodian. Madoff has a website per http://www.madoff.com/dis/display.asp?id=203&mode=1&home=1.

Per the website, the following information was obtained about Madoff:-

- Inception was 1960
- It has grown since its inception and now has $400m in capital
- Ranks as one of the top 1% of US Securities firms
- Customers include US invesment firms and banks globally
- It is a leading market maker in all of the S&P 500 stocks and over 200 NASDAQ issues
- Over 250 employees
- It has become a leader in the US 3rd market, enabling it to trade listed equities away from the exchange floor
- It is a registered US broker-dealer and is regulated by the SEC and the National Association of Securities Dealers
- Bernard L Madoff Securities LLC is the actual name and it was conducted as a sole proprietorship prior to January 2001. There is also Madoff Securities International Ltd which is regulated by the FSA and is a member of the London Stock Exchange and NASDAQ Europe.

- see results of meeting held with Bernard Madoff December 17, 2002

CONFIDENTIAL

PWCB004201

KING_000069821

KING_000069818



PwC NY Madoff visit Dec 17 2002.c

---

**Results:**

1-3) done see above

**Attachments:**

## Status

| | |
|---|---|
| Status: | Reviewed |
| Completed By: | Stacy Hammett/BM/ABAS/PwC |

## Maintenance

| | | |
|---|---|---|
| Created By: | Stacy Hammett | Date: |
| Last Modified By: | Scott Watson-Brown/BM/ABAS/PwC | Date: |
| Editors: | Stacy Hammett | |
| | Stacy Hammett/BM/ABAS/PwC | |
| | Scott Watson-Brown/BM/ABAS/PwC | |

CONFIDENTIAL

PWCB004202

KING_000069822

KING_000069818

# EXHIBIT 16

## Step

| Entity Name: | Kingate Global Fund Ltd. | |
|---|---|---|
| Engagement Name: | Kingate Global Funds | Completed By:Stacy Hammett/BM/ABAS/PwC |
| Period End: | 12/31/2002 | Reviewed By: Scott Watson-Brown/BM/ABAS/PwC |

**Status: Reviewed**

Title:          Obtain an understanding of the financial measures used to manage the company

### Categorisation

Section:                Audit comfort cycle scoping
Area:                   300 - Client's buiness, industry, business objectives and related risks
Risk:
Industry Name:          TPA General  1.1   - Required
Review Categorisation:
Assignee:

### Classification

Audit Objectives:
Strategy Option:
Reference:                                          Control Step?        No
Document Sort No:       100051500                   Paper File?          No

### Details

Guidance:

Tailored Procedures:

Obtain an understanding of the financial measures and information used to manage the business.  Particular attention should be paid to the management of and the interaction of risk, return and growth, measuring the company's economic performance, financial position, risk management and segmental performance.

In managing a company, traditional financial accounting measures are usually further developed to gain a better understanding of business

CONFIDENTIAL                                        PWCB004573

segment performance through a focus on the capital base invested and the expected returns required by management in the light of the risk and growth in profits of the business.

Consider the following:

## Economic Performance

It is essential management understand how their key financial objectives support the company's strategic objectives and the creation of value.  In particular, attention should be paid to the cost of capital for the group as a whole and for each business unit.  In addition, to an increasing degree, companies are using both an external shareholder value measure, Total Shareholder Return (TSR) and an internal shareholder value measure, such as economic profit or Economic Value Added (referred to as EVA) to assess their ability to create value.  Shareholder value is increased only if the appropriately discounted present value of future cash flows generated by a business unit is greater than the cost of capital.  Merely generating the rate of return demanded or expected by the investment community creates no value.

Questions to build into the agenda of the "show me" meetings with top management:
    How does the company assess its ability to create value, eg does it utilise an external and/or internal shareholder value measure?
    How does the company incorporate differing risk levels in determining target returns and in assessing overall performance?
    What is the process for setting the company's and business unit's cost of capital and how often is it reassessed?  Is it consistent with market expectations?
    Does the company compare their own performance against peer companies?

Potential business risks which may impact on the audit:
    A focus on accounting profits in isolation may mask business units or activities that are actually destroying value
    Insufficient focus on cash flow management particularly in a growth phase or during a downturn in economic activity
    Incorrect investment decisions being made as a result of applying the wrong hurdle rate

Example information and measures that management may be using to assess their economic performance:
    Cost of capital, eg hurdle rates, weighted average cost of capital (WACC)
    Return on equity
    Free cash flows, eg maintainable cash flows
    Economic profit eg free cash flow less the cost of capital
    Total Shareholder Return (TSR) eg growth in share price appreciation plus cash dividends received

## Financial Condition

Two decades ago, physical assets accounted for most, if not all, of the market capitalisation of the average firm.  Today, for many companies they account for less than 15 percent.  As a consequence, the balance sheet has become less relevant for many businesses and less meaningful to investors as a means of communicating current and future value.  However the balance sheet still provides important information on key financial ratios around liquidity and gearing which should not be ignored.

Questions to build into the agenda of the "show me" meetings with top management:
    How does the company determine its funding strategy?
    How often are cash flow forecasts prepared and for what period?

CONFIDENTIAL

PWCB004574

How does the company assess if it has the correct funding arrangements?
Does the company compare its financial condition measures to peer companies?
How does the company assess the "value" of its tangible assets (value/state, age and quality of tangible assets versus historical accounting net book value)?
How are investment decisions made and what are the key elements of the approval process?

Potential business risks which may impact on the audit:
Inappropriate company funding structure for current stage of life cycle
Inability to service high levels of debt (eg high gearing, low interest cover)
Complex funding arrangements with many different forms of finance and funding institutions
Cash resources/borrowing facilities insufficient to provide the working capital growth to support forecast turnover
Funding of long term capital projects with short term facilities
Reliance on timing of large/one off receipts to meet cash outflows

Example information and measures that management may be using to assess their financial condition:
Interest cover
Debt service ability
Nature of facilities - amounts, duration of covenants
State of tangible assets - age and quality of tangible assets, remaining useful life etc
Capital expenditures (maintenance expenditure vs incremental)
Working capital measures and trends
Earnings Per Share and other income measurements

## Risk Management

Management must be able to answer the questions "are we delivering the returns commensurate with the risks being taken?"  To properly answer this question, they need to understand fully both the company's risk profile and its risk strategy - "its chosen appetite for risk".  This includes the relative risk profiles of the individual businesses within the company, the nature of its business, its location and other risks such as environmental risk and the increasingly important security and reputation risks associated with e-business.  All these risk factors need to be considered in establishing the cost of capital and required returns.

Questions to build into the agenda of the "show me" meetings with top management;
What industry specific risks have been identified for each business unit?
What is the company's risk strategy and appetite for risk?
How are the identified risks managed?
How does the company determine acceptable levels of risk?
How is risk incorporated into investment decisions?
How are non financial risks, eg environmental, security risks identified and managed?
Does the company have a disaster recover plan, has it been tested etc?

Potential business risks which may impact on the audit:
Inability to trade

CONFIDENTIAL

PWCB004575

Financial loss
Loss of reputation
Inadequate insurance cover

Example information and measures that management may be using to assess the effectiveness of their risk management procedures:
Board governance procedures
Risk assessments/SWOT analyses as part of planning, budgeting process
Financial and non financial exception reports
Foreign exchange risk reports
Credit risk reports
Environmental risk reports
Security risk reports

## Segmental Performance

It is critical to understand each of the business segment's performance in order to assess the underlying performance of the entire organisation. These segments must align with how the overall business is managed, whether by geography, business unit, or product area.

Questions to build into the agenda of the "show me" meetings with top management:
How has management segmented the business and is there a matrix management structure in place?
How much autonomy does each business unit have and how does the group exercise influence and control?
How does the company determine if each of the individual businesses or operational units are creating or destroying value?
Is a different cost of capital allocated to each of the units to reflect each units risk profile?
Are performance measures consistent across segments or business units?
Does each business or operating unit compare its own performance against other units and/or external peer companies?
How does the company monitor contribution from individual products/services?

Potential business risks which may impact on the audit:
Individual businesses, products/service offerings may be destroying value in economic terms even if they are showing accounting profits

Example information and measures that management may be using to assess their segmental performance:
Cost of capital by segment
Free cash flow by segment (historic and prospective)
Return on investment by segment
Future revenue growth potential
Contribution by segment, eg by product or service

See guidance below

Results:

KING_000069835

CONFIDENTIAL

PWCB004576

KING_000069832

The Fund is measured against the S&P100 on a monthly basis, this review is performed by the Investment Manager and we have reviewed as part of our preliminary analytics documented per 📄.

HML also prepares weekly NAV estimates and the change in NAV's for the Global and Euro funds are charted against each other to ensure that the movements are consistent between funds.

Although HML does not review of NAVs to S&P100, significant fluctions from month to month are investigated to ensure that there is not an error in the NAV calculation and the investment advisor is contacted to discuss the movement if change can not be explained or verified by other procedures performed by HML.

Risk management is addressed at the board level of the Fund is also monitored through the risk managment procedures in place at HML to ensure that Fund is in compliance with appicable laws and regulations.  See 📄 for discussion on management's risk management processes and 📄 for notes from show me meeting held with Alison Morrison, VP Risk Management at HML.

Attachments:

| Status | |
|---|---|
| **Status:** | Reviewed |
| **Completed By:** | Stacy Hammett/BM/ABAS/PwC |

| Maintenance | |
|---|---|
| **Created By:** | Stacy Hammett |
| **Last Modified By:** | Scott Watson-Brown/BM/ABAS/PwC |
| **Editors:** | Stacy Hammett |
| | Stacy Hammett/BM/ABAS/PwC |
| | Scott Watson-Brown/BM/ABAS/PwC |

**Date:**
**Date:**

CONFIDENTIAL

PWCB004577

KING_000069832    KING_000069836

# EXHIBIT 17

## Step

| | |
|---|---|
| Entity Name: | Kingate Global Fund Ltd. |
| Engagement Name: | Kingate Global Fund Ltd 2003 |
| Period End: | 12/31/2003 |

Completed By:Richard van Lienden/BM/ABAS/PwC
Reviewed By: Scott Watson-Brown/BM/ABAS/PwC

Status: Reviewed

Title:                Conduct show me meeting with the Board and record results

### Categorisation

Section:            2500 - Audit comfort cycle - scoping
Area:               400 - Initial "Show me" Meetings with Senior Executives
Risk:
Industry Name:      US General  July, 2003
Review Categorisation:
Assignee:

### Classification

Audit Objectives:
Reference:
Document Sort No:        200                 Control Step?        No
                                             Paper File?         No

### Details

Guidance:

a)  Conduct the "show me" meeting with the client to understand, evaluate and validate business understanding and controls by:

  i)   rigorous, in-depth enquiry of the client;

  ii)  examination of evidence, e.g., the reports used by the client; and

  iii) identifying where further "show me" meetings or other follow-up procedures are required in order to corroborate explanations obtained and/or to obtain comfort that information used by the client is reliable.

CONFIDENTIAL

KING_000070445

PWCB006159

b) Perform follow-up procedures to corroborate explanations.

c) Perform analytical review procedures to help validate management controls by directing our audit effort, asking better questions and better establishing how we can audit management's comfort by relating our findings to the "show me" evidence we obtain.

d) Document the following:

　　i)　description of the meeting, e.g., who was met and when;

　　ii)　understanding of the business, to the extent necessary;

　　iii)　description of the controls which management use to gain comfort;

　　iv)　validation of those controls (e.g., reports examined); and

　　v)　results of analytical procedures performed to help validate management controls.

e) Consider whether any knowledge gained during the "show me" meeting is appropriate for sharing with your industry group within PwC. If so, discuss with the rest of the team during the next "taking stock" meeting.

f) Consider sharing identified board controls and results of "show me" meetings with supporting engagement teams.

g) If you are a supporting engagement team and do not have access to the Board of Directors, consider requesting the Head Office engagement team to provide details of any audit comfort they have obtained from their "show me" meetings with the Board of Directors.

See Reference field below.

| Reference |
| --- |

Refer to PwC Audit 4030 for further guidance on applying the "show me" process.

a) A "Show me" meeting practice aid is available in MyClient Template Manager ⬛. A "Show me" meeting note taking practice aid is also available ⬛.

b) Information that will be relevant to the subsequent period's audit, such as narrative and/or flowcharts recording our understanding of significant business processes that this management unit is responsible for controlling (and the linkage to the financial statements), should be recorded in the tailored procedures field, as the content of that field will be retained when the file is rolled forward.

c) The controls that management will use will vary from high level controls over information (including business performance reviews) to lower level control activities within business processes. (Management may describe their controls differently - we should focus on how they operate and on evaluating their effectiveness using our knowledge of the business and our cumulative audit knowledge, which can take into account our knowledge of typical controls and their effectiveness) These controls may be manual or automated, and where they are automated, the

KING_000070446

effectiveness of those controls will be dependent on the general computer controls relating to the relevant computer environment. When preparing for "show me" meetings and in seeking to understand and evaluate whether management are controlling the right things and the controls they use, it may be helpful to refer to steps on internal control in the control activities section in either the US PwC Audit supplement master data or a specific industry master data, if available, which provide points of focus to consider.

**Tailored Procedures:**

a)  Conduct the "show me" meeting with the client to understand, evaluate and validate business understanding and controls by:

   i)   rigorous, in-depth enquiry of the client;

   ii)  examination of evidence, e.g., the reports used by the client; and

   iii) identifying where further "show me" meetings or other follow-up procedures are required in order to corroborate explanations obtained and/or to obtain comfort that information used by the client is reliable.

b)  Perform follow-up procedures to corroborate explanations.

c)  Perform analytical review procedures to help validate management controls by directing our audit effort, asking better questions and better establishing how we can audit management's comfort by relating our findings to the "show me" evidence we obtain.

d)  Document the following:

   i)   description of the meeting, e.g., who was met and when;

   ii)  understanding of the business, to the extent necessary;

   iii) description of the controls which management use to gain comfort;

   iv)  validation of those controls (e.g., reports examined); and

   v)   results of analytical procedures performed to help validate management controls.

e)  Consider whether any knowledge gained during the "show me" meeting is appropriate for sharing with your industry group within PwC. If so, discuss with the rest of the team during the next "taking stock" meeting.

f)  Consider sharing identified board controls and results of "show me" meetings with supporting engagement teams.

g)  If you are a supporting engagement team and do not have access to the Board of Directors, consider requesting the Head Office engagement team to provide details of any audit comfort they have obtained from their "show me" meetings with the Board of Directors.

CONFIDENTIAL

PWCB006161

KING_000070447

Results:

a,b,d) A meeting was held on the 6 November 2003 between Chris Wetherhill (Director - Kingate Management Limited), Andrew Brook (PwC) and Scott Watson Brown (PwC). Refer to the attachment below for the minutes of the meeting. An update meeting was held on the 16 February 2004. Refer to attached minutes below.

c) For analytical review procedures performed, refer ----->📄 .

e,f,g) Not applicable.

Attachments:

    

Audit Meeting - 16 Feb 2004.doc   Kingate Agenda - C Wetherhill Nov 2003.doc

## Status

| | |
|---|---|
| Status: | Reviewed |
| Completed By: | Richard van Lienden/BM/ABAS/PwC |
| Reviewed By: | Scott Watson-Brown/BM/ABAS/PwC |

## Maintenance

| | |
|---|---|
| Created By: | Richard van Lienden/BM/ABAS/PwC |
| Last Modified By: | Scott Watson-Brown/BM/ABAS/PwC |
| Editors: | Richard van Lienden/BM/ABAS/PwC |
| | Scott Watson-Brown/BM/ABAS/PwC |

KING_000070448

CONFIDENTIAL

PWCB006162

CONFIDENTIAL

PᴿɪᴄᴇⱮᴛᴇʀʜᴏᴜsₑCₒₒₚₑₚₛ ▮

*Kingate Global fund, Ltd.*
*Kingate Euro Fund, Ltd.*
*Audit Meeting, February 16, 2004*

<u>Outstanding Matters</u>

- Matters as per e-mail (dated 14 February 2004) were discussed

<u>Fraud Discussions</u>

- Confirmed with Chris Watermill (director) that none were noted in his capacity as director of the Kin gate Funds or as director of KML.
- Chris raised his concerns over the role of the Board of Directors – he feels they need to be more active. PWC is to follow this up by providing industry examples of the Boards role.

<u>SAS 61 letter</u>

- Letter has been issued in draft to Chris Watermill and awaiting his response.

<u>Industry developments (Patriot Act)</u>

- This will be covered by the change in the role the Board is to play. (Refer above)

PWCB006163

KING_000070449

PRICEWATERHOUSE(COPERS ▪

*Kingate Global fund, Ltd.*
*Kingate Euro Fund, Ltd.*
*Audit Meeting, November, 2003*

<u>Attendees:</u>
Chris Wetherhill
Andrew Brook
Scott Watson-Brown

**Audit process:**

1.  General fund update:
    - performance
    - levels of subscriptions, redemptions (still closed to new subscribers?)
    - any significant changes in the controls or process of the Fund over prior year?

2.  Telephonic conversation with Bernard Madoff:
    - proposed agenda
    - timing
    - cost reduction opportunities

3.  Current industry issues

4.  Role of Kingate Management Limited
    - reviews that are performed on a weekly, monthly basis?
    - NAV reviews and other controls over the fund performance
    - approval of NAV by Chris Wetherhill (weekly estimate, monthly)
    - any specific review procedures performed on the NAV (e.g. May and July results)
    - Subscriptions, redemptions processes
    - money laundering procedures, Patriot Act impact

5.  Role of Tremont for Kingate Global Fund, Ltd.

6.  Planned call to FIM Limited (update call)
7.  Fraud Discussion

CONFIDENTIAL

PWCB006164

KING_000070450

CONFIDENTIAL

_P_RICE_W_ATERHOUSE_C_OOPERS ■

Audit timing and our audit approach:
- planning and interim                  October 20 to October 31, 2003
- final field work                      January 19, 2004
- draft financial statements*           January 30, 2004
- final financial statements*           February 06, 2004
* dates subject to timely provision of audit information

**Prior year matters for consideration:**

1.  Amortization of Treasury bills

2.  Representation letter formats (with Hemisphere)

**Client needs and expectations:**

1.  Financial statement presentation - US GAAP reporting on comparative figures

2.  Communication of issues and delays on a timely basis

3.  Review process of draft financial statements

4.  Finalization process and closing meeting

5.  Audit fee proposal

(2)

PWCB006165

KING_000070451

# EXHIBIT 18

# PRICEWATERHOUSECOOPERS 🅿

**PricewaterhouseCoopers**
Chartered Accountants
Dorchester House
7 Church Street
Hamilton
Bermuda HM 11
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242

Mr. Christopher Wetherhill
Kingate Management Limited
99 Front Street
Hamilton HM 11

February 15, 2002

Reference: AJB/SWB/mc/pat/45109 DRAFT FS - 9000-5

**Subject: Kingate Global Fund, Ltd.**
**Kingate Euro Fund, Ltd. - Working Drafts**

Dear Mr. Wetherhill,

Please find enclosed working draft financial statements (the "Statements") for Kingate Global Fund, Ltd. and Kingate Euro Fund, Ltd. (the "Companies") for your attention. We should be grateful if you could review the Statements and we look forward to responding to any comments or queries you might have.

We draw your attention to significant changes and updates to the Statements from the prior year.

1.  You will note that we have included a line on the Kingate Euro Fund, Ltd. Statement of Assets and Liabilities described as "Cash held as collateral on forward currency contracts". As required by FAS 140, this amount should now be disclosed on the face of the statement instead of the notes. The confirmation in currently outstanding and therefore, we are awaiting the figure to disclose. The amount is presently included in cash and cash equivalents.

MAILING ADDRESS: PO BOX HM 1171, Hamilton, Bermuda HM EX.

A list of partners can be obtained from the above address

KING_000216642



PRICEWATERHOUSECOOPERS 🅟

Mr. Christopher Wetherhill
Reference: AJB/SWB/mc/pat/45109

February 15, 2002

2. We have amended Note 5 in both sets of Statements to incorporate a more detailed
description of Madoff's roles for the Companies.

3. As now required under US GAAP, the Statements include a note on financial highlights.
Amounts have been calculated by PricewaterhouseCoopers but as we are sure you
appreciate, this is a new and complex area. In this light, we have received calculations
from Hemisphere but have requested further explanation, as they are inconsistent with our
numbers.

We are continuing to work with Hemisphere to clear "standard" outstanding audit matters.

Please feel free to contact our office should you have any queries. We look forward to
meeting you in the near future.

Kindest regards,

Andrew J Brook
Partner

cc: Mr. Eric Bertrand – Hemisphere Management Limited

(2)

KING_000216643

# EXHIBIT 19

# PRICEWATERHOUSE COOPERS 🅛

PricewaterhouseCoopers
Chartered Accountants
Dorchester House
7 Church Street
Hamilton
Bermuda HM 11
Telephone +1 (441) 295 2000
Facsimile +1 (441) 295 1242

Mr. Christopher Wetherhill
Director
Kingate Management Limited
99 Front Street
Hamilton HM 11

November 7, 2002

Reference: AJB/SWB LTR-9000-1

**Subject: Kingate Global Fund, Ltd.**
　　　　**Kingate Euro Fund, Ltd. (together the "Funds")**
　　　　**Control environment review at the Funds advisor and broker/dealer**

Dear Mr Wetherhill,

As we have discussed, we update our knowledge of the Funds' control environment during each audit. Specifically, this year we have planned to perform procedures in the New York office of Bernard L. Madoff Investment Securities LLC ("Madoff") as the investment advisor, broker/dealer and custodian for the fund, in the following areas:

1. Observe and understand the nature of Madoff's business, including the role as principal to the Funds' transactions;
2. Gain an understanding of the structure of the organisation, to determine the extent of high level general controls in operation (e.g. governance, internal audit, etc.);
3. Understand and document Madoff's procedures for compliance with regulatory requirements;
4. Obtain an understanding of the segregation of the Investment Advisor, Brokerage and Custody functions within the organisation;
5. Gain an understanding of client recordkeeping and reporting procedures (i.e. report of holdings and related transactions to clients).

MAILING ADDRESS: PO BOX HM 1171, Hamilton, Bermuda HM EX.

A list of partners can be obtained from the above address

KING_000069775

# PRICEWATERHOUSECOOPERS 🅟

Kingate Global Fund, Ltd.
Kingate Euro Fund, Ltd.
November 7, 2002
Reference: AJB/SWB/ LTR-9000-1

The above procedures will be based primarily on observation and enquiry with limited examination of documentary evidence. Accordingly, we anticipate that we will only need to be in Madoff's offices for four to seven hours, and that all of the procedures will be performed within a three to four day period.

Further to discussions with our New York office, we are anticipating that a team consisting of a partner from our US Capital Market Division (Linda McGowan) who has previously visited the Madoff office, and Scott Watson-Brown, the engagement manager from the Bermuda office, will attend the offices of Madoff in early December 2002.

Please confirm that this timing is acceptable to you and Madoff.

Yours very truly,

Andrew J. Brook
Partner

(2)

KING_000069776

# EXHIBIT 20



## Memo

| | |
|---|---|
| To: / Location: | TA File 12/31/2001/ Bermuda |
| From: / Location: | Andrew Brook/ Bermuda<br>Scott Watson-Brown/ Bermuda |
| Date: | February 18, 2003 |
| Subject: | Kingate Global Fund, Ltd.<br>Kingate Euro Fund, Ltd. |

Meeting held with Chris Wetherhill (director of the funds and the management company) at offices of PwC Bermuda, prior to release of draft statements on February 25, 2003.

Discussion topics:
1. financial statement presentation – client would like to present comparative figures. Statements updated to reflect this;
2. financial statement note disclosures – client suggested additional wording in notes relating to the impact of the audit guide for investment companies, in particular the accretion of discounts on fixed income products; disscussion held over the presentation of financial highlights and PwC walked through the different lines items of required disclosure;
3. client expectations – client was pleased with the timing of the planned release of draft accounts, in particular the small number of outstanding items; representation letters were discussed, as were specific paragraphs as they related to service providers surrounding the fund and those parties' ability to represent on matters they were not privy to – certain wording tailored in the rep letters for the roles of the consultants to the fund (FIM Ltd) and the portfolio investment advisor (Madoff);
4. audit process – discussed that while no significant issues were noted during the audit process, we discussed the work we had planned to perform when we planned the audit and noted to CW that this level of work was performed and given the level of accounting performed at HML we would not see any change in our level of audit work. Discussed our enquiries with Madoff during the audit process and the fact that we would be looking to visit Madoff's offices as part of the 2002 year end audit process.

CONFIDENTIAL

# PRICEWATERHOUSECOOPERS 🅰

5. fund developments, performance post year end, and any other matters (regulatory issues, matters affecting our audit and subsequent events process) – no changes occurring or planned for the funds in so much as their structure, related parties and service providers and strategy; HML is to begin booking trades from the Madoff statements; performance in line with past performance (performance relatively flat); subscriptions/redemptions occurring at levels expected for January, February; other matters occurring surrounding or within the funds that CW is aware of; no instances of fraud or illegal acts noted.

# EXHIBIT 21

**Audit Strategy Memo**
**Guidance**

The **Audit Strategy Memo** and the companion Summary Plan & Results summarize the results of the audit planning and risk assessment procedures in a single document.

**Guidance on Completing the Audit Strategy Memo**

- Refer to the guidance on the Summary Plan & Results [**PwC Audit 3762**].

- All items in the table of contents are required to be addressed in the memo in order to document compliance with GAAS.

- To the extent the Audit Strategy Memo is being used to meet the applicable documentation standards, care should be taken that all aspects of those standards are met.

- All Key Risks and strategies should be clearly identified in the Audit Strategy Memo and included and addressed in the Summary Plan & Results.

- Generally, the manager is responsible for overseeing the development of the memo and its content and related documentation supporting the completed Audit Strategy Memo; various sections may involve preparation and participation by other team members.

- The engagement leader and manager provide the engagement team with sufficient direction regarding how to complete the various Audit Strategy Memo sections such as:

  - Perspectives on risks and materiality,

  - Understanding of the business and industry, and

  - Expectations for preliminary analytics.

- The engagement leader and manager ensure that the Key Risks discussed in the Audit Strategy Memo are:

CONFIDENTIAL

KING_000072626

PWCB014162

- Inclusive of risks presented to the Audit Committee/management,

- Inclusive of items noted in the Acceptance and Continuance Risk and Approach Schedule, and

- Adequately addressed by the testing plan documented in the Summary Plan & Results.

- The Comments/References field includes sufficient information to meet the documentation requirements.

- The Audit Strategy Memo and its companion, the Summary Plan & Results, should be shared with the entire engagement team, including SPA, Tax and other specialists.

- The engagement leader, quality review partner (if applicable) and manager approve, sign and date (either manually or electronically in MyClient) the Audit Strategy Memo prior to the commencement of substantive fieldwork.

The Audit Strategy Memo should be completed prior to the commencement of substantive fieldwork.

The Audit Strategy Memo is only being rolled out in the US.  Accordingly, while it is anticipated that the Audit Strategy Memo would include the identification of non-US PwC firms which are expected to participate in the audit; it is not anticipated that non-US PwC firms will prepare an Audit Strategy Memo at this time.  Sharing of the Audit Strategy Memo and the Summary Plan & Results with the non-US PwC firms is encouraged.

KING_000072627

# Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.
## Audit Strategy Memo

Year Ended December 31, 2006

FOR INTERNAL DISTRIBUTION ONLY



CONFIDENTIAL

PWCB014164

KING_000072628

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| Table of Contents | Primary References | | | |
|---|---|---|---|---|
| Section | PwC Audit | AS | AU | ISA |
| **I.**   **Engagement Objectives, Deliverables and Key Dates** | 3300,7130 | 2.4-.6 | 310.05-.07, 311.03(h) | 210.5-.9 |
| **II.**   **Understanding the Business** | | | | |
| Market overview | 4322 | 2.39 | 311.07 | 315.22-29 |
| Strategy and value creating activities | 4323,4324 | 2.39 | 311.07 | 315.30-34 |
| Related parties | 5640 | -- | 311.03(g), 334 | 315.27, 550 |
| Industry and regulatory developments | 5660 | 2.39 | 311.07, 317.04-.06 | 315.22-.24, 250.15 |
| Financial performance | 4325 | 2.39 | 311.07 | 315.35-.40 |
| Preliminary analytics | 3930,3940 | -- | 329.06-.08 | 520.8-.9 |
| Disaggregated revenue analytics | 3931.01 | -- | 316.29,.30 | 240.53,.54 |
| Preliminary assessment of going concern | 5630 | -- | 341.02-.03(a) | 315.4, 330.9, 570.2, .11 |
| **III.**   **Internal Control Environment** | | | | |
| Understanding the Company's Internal Control (including Company Level Controls) | 4300,4170 | 2.52-.54 | 150.02, 311.09,319 | 315.41, .67 |
| Understanding the IT environment | 4410,4141 | 2.75 | 311.09,319.16-.20,.43-.52,.77-.79 | 315.57-.63,315.80-.88,.93-.95 |
| Considerations required only for integrated audits: Understanding and evaluating: | | | | |
| Management's assessment process | 4330,4120 | 2.40-.46 | 319.37-.40 | 315.33,.43,.76-.79 |
| Significant accounts | 4330,4340 | 2.60-.70 | | |
| Significant locations or business units | 4330,4340 | 2.39-.40,B1-17 | | |
| Significant processes | 4330,4340,4360 | 2.71-.78,B18-29 | 319.47-52, 324.06-.10 | 315.80-88, 402.4-.10 |
| Plan to test and evaluate management's assessments | 4330 | 2.41-.46 | 319.39 | |

CONFIDENTIAL
For Internal Information only

## Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.
### Audit Strategy Memo
### Year Ended December 31, 2006

| Table of Contents | PwC Audit | AS | AU | ISA |
|---|---|---|---|---|
| **Section** | | Primary References | | |
| **IV.  Audit Scope Considerations** | | | | |
| Consideration of, and changes to, prior year audit approach.................... | 3737,3735 | -- | 311.04(a),.8, 319.96-.99 | 315.12, 330.39-.44 |
| Preliminary assessment of materiality (overall, planning, specific & de minimis).. | 1310 | 2.22-.23 | 312.12-.33 | 320 |
| Potential for material misstatements and other risks | | | | |
| Significant new and complex accounting matters.............................. | 5650,3741 | 2.40 | 311.04(f),.06(e), 330.08,.25 | 315.28,505.11 |
| Risk of material misstatement due to fraud (including heightened risk)............ | 4210 | 2.24-.26 | 316 | 315.2, 240 |
| Key risks or significant matters identified from review of: | 3000,3100, 5620, 5720 | 2.32-.35 | QC20.14-.16,150.02,220,311 .06, 330.25 | 220.12-.18, ISQC1,315.9,.11, .23 |
| Acceptance and Continuance, Independence, board & key committee minutes, significant contracts, internal audit reports and other..................................................................... | | | | |
| Understanding of, and reliance on, internal audit or relevant compliance functions.................................... | 4350 | 2 – var. | 311.04(h),319.55, 322 | 315.98, 610 |
| **V.  Communication and Coordination** | | | | |
| Matters discussed with the audit committee/management...................... | 7000, 3165 | 2.207-.214 | 311.04(e), 316.22, 380 | 300.7, 260 |
| Use of specialists and experts........................................... | 3720,2080,2090 | 2.108-.126,3.6 | 311.04(h),311.10, 319.31-.33,328.20-.22,336.06-.07 | 300.4,620.6-.7 |
| Multi-location audit plan (if applicable)................................... | 8000 | 2.39,B1-17,3.18-.19 | 312.18 | ED600 |
| Review schedule........................................................ | 2540,2570 | 3.3, 6,.18-.19 | 311.11-.14 | 300.18-.21 |
| TeamFind key dates | 6920 | | | |
| **VI.  Summary Plan & Results** ......................................... | 3762 | 2 - var | 107, 108, 109 - var | 300, 315, 330 - var |
| **VII.  Audit Strategy Memo Approvals** ................................... | 2031, 2033 | -- | | |

CONFIDENTIAL
For internal evaluation only

PricewaterhouseCoopers PWC-BD1 4166

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| I.   Engagement Objectives, Deliverables and Key Dates | Comments/References |
|---|---|
| 1.  The financial statements are available to the directors of the Funds. <br> 2.  We will render an opinion on the financial statements for the 12 months ended December 31, 2006 in accordance with accounting principles generally accepted in the USA. More specifically, the Fund reports under the AICPA Guide: Investment Companies. <br> 3.  Our deliverables to the Funds in relation to our audit engagement include communication to the Fund, in writing, of any significant deficiencies and material weaknesses and other deficiencies (i.e., those deficiencies in internal control over financial reporting of a lesser magnitude) relating to internal control over financial reporting. <br> 4.  The following is a schedule of client deliverable items and target dates agreed with the client: <br>    ▪ Audit commencement date <br>    ▪ Draft financial statements provided to client <br>    ▪ Final sign-off. | See engagement letter. |

| II.   Understanding the Business | Comments/References |
|---|---|
| **Market overview** <br> **Competitive Environment** <br><br> The Primary business risks facing the Fund are as follows: <br> - A significant Market Wide (S&P 100) decline in stock prices and low volatility in stock prices. <br> - A significant redemption of Capital by the Shareholders <br><br> Risk assessment by management of the Company is consistent with the Management of an Investment Fund <br><br> **Macroeconomic environment** <br><br> The S&P 100 Index has shown a steady increase for most of the year. We therefore expect Kingate to successfully utilize their investment strategy to make a profit. <br><br> **Regulatory environment** <br><br> Based on PwC's relationship with client and representations of lawyers in prior years audits, and consistent with a review of the minutes, no unusual items or developments were noted in prior years.  Management (KML and BISYS) is aware of applicable Bermuda law and monitors compliance. | |

KING_000072631

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| II.    Understanding the Business | Comments/References |
|---|---|
| The fund utilizes lawyers in both the USA and BVI (where it is actively trading and registered, respectively).<br><br>In addition to procedures performed by BISYS, additional money laundering procedures are performed by Kingate Management  - details of their responsibilities and their relationships to the Funds have been documented in the Myclient File per step 300. Based on review of share activity and discussion between Shazieh Salahuddin (KML) and Scott Watson-Brown (PwC) - the Fund routinely rejects subscriptions into the Fund's where sufficient level of comfort cannot be obtained on the source of the Funds. | |
| **Strategy and value creating activities**<br><br>**Goals & Objectives**<br><br>The investment strategy uses the following:<br><br> o Long equity positions of US listed stocks within the S&P 100 (selection of a basket of stocks numbering 40 to 50, that have the greatest correlation with the market).<br> o writing Call options on the S&P100 Index<br> o buying Put options on the S&P100 Index<br> o purchase of US Treasury bills<br><br>The parameters of the strategy are set up such that the equity positions selected must have a correlation with the index of 90% or above.  During 2002 the selection of stocks was increased from a basket of 25 to 35 stocks to a basket of 40 to 50 stocks.  At this level the basket of stocks has a correlation with the index of around 95%.<br><br>**Organisational design & governance structure**<br><br>**Kingate Global Fund:**<br><br>Directors of the company: Chris Wetherhill (Independent Director - Bermuda)<br>           Sandra Manzke (Independent Director - Unites States of America)<br>           John Epps (Independent Director – Bermuda -> replaces Charles Sebah (Independent Director<br>- France) during 2006 | |

KING_000072632

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
Audit Strategy Memo
Year Ended December 31, 2006

| II.    Understanding the Business | Comments/References |
|---|---|
| Graham Cook (Independent Director - British Virgin Islands)<br><br>Co-Managers:  Kingate Management Limited and Tremont Bermuda Limited<br>Administrator:  BISYS Hedge Fund Services Limited<br>Bank:  Bank of Bermuda (Bermuda)<br>Consultant:  FIM Limited<br>Investment Mgr/Custodian  Madoff Securities, LLC<br>Legal advisers:  O'Neal Webster, O'Neal Myers (BVI)<br>Tannenbaum, Helpern (NY)<br><br>**Kingate Euro Fund:**<br>Directors of the company:  Chris Wetherhill, (Independent Director - Bermuda)<br>John Epps (Independent Director – Bermuda -> replaces Charles Sebah (Independent<br>Director - France) during 2006<br>Graham Cook (Independent Director - British Virgin Islands)<br>Manager:  Kingate Management Limited<br>Administrator:  BISYS Hedge Fund Services Limited<br>Bank:  Bank of Bermuda (Bermuda)<br>Consultant:  FIM Limited<br>Investment Mgr/Custodian  Madoff Securities, LLC<br>Legal advisers:  O'Neal Webster, O'Neal Myers (BVI)<br>Tannenbaum, Helpern (NY)<br><br>**Corporate governance**<br><br>**Board of Directors**<br><br>Kingate Euro Fund Ltd. has three Independent Directors not associated with the Investment Advisor"<br>    - John Epps who replaces Charles D. Sebah: Managing Partner of SV International.<br>    - Christopher Wetherhill: Founder of BISYS and former director of MRM Financial Services Ltd. (directorship<br>    ceased when MRM sold BISYS)<br>    - Graham Cook | |

KING_000072633

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| II.    Understanding the Business | Comments/References |
|---|---|
| Kingate Global Fund Ltd. has four Independent Directors not associated with the Investment Advisor:<br>    - Sandra Manzke: President of Tremont Advisors<br>    - Charles D. Sebah: Managing Partner of SV International.<br>    - Christopher Wetherhill: Director of KML<br>    - Graham Cook<br><br>The Board of Directors meet periodically to review the performance and administrative affairs of the Fund.<br><br>The Board of Directors continues to increase its rols as non-executive Directors<br><br>**Value Creating Activities**<br><br>**Key Management:**<br><br>The administrator has a staffing structure that allows the fund to be appropriately serviced, with the use of suitably qualified staff and staffing levels representative of the size of the fund's operations. The Investment Manager (Madoff) is responsible for the day to day trading activity of the funds and the funds have a history of solid performance. The structure of the fund and service entities is appropriate for this fund. See risk assessment and audit strategy per the audit comfort matrix.<br><br>BISYS personnel are as follows:<br>    Brendan Sheehan - Senior Fund Accountant, responsible for the preparation of the weekly NAV estimates and monthly NAVs<br>    Daniel O'Donavan - Account Manager, responsible for the detailed review of the weekly NAV estimates and monthly NAVs<br>    Ciara Harnett - Group Manager, responsible for overall review of monthly NAVs before sent to KML for final approval for release to shareholders<br><br>Investment managers:<br>    KML and Tremont are co-managers of Kingate Global and KML is the manager of Kingate Euro. Tremont is not actively involved in the Fund's operations or decision making (Tremont originally came on board when the fund was introduced to Madoff). KML - Chris Weatherhil, director of KML is responsible for reviewing and approving the monthly NAVs, once approval is given, BISYS will forward final NAVs to shareholders. | |

KING_000072634

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| II.    Understanding the Business | Comments/References |
|---|---|
| **Related parties**<br><br>The following related parties have been identified:<br>   o   Kingate Management Limited (Investment Manager )<br>   o   FIM Limited (Consultant)<br>   o   Tremont  (Co-Manager for Kingate Global)<br>   o   BISYS Hedge Fund Services Limited  (Administrator)<br>   o   Bernard Madoff Securities (Investment advisor, US regulated broker dealer and custodian)<br>   o   HSBC (Banker)<br>   o   Member of the Board of Directors | |
| **Industry and regulatory developments**<br><br>There are no significant developments that are having an impact on the business. The Fund obviously plans to react to changes to markets through appropriate investment decisions. | |
| **Financial performance**<br><br>**Financial Condition**<br><br>**Estimates**<br><br>BISYS produce an estimated weekly NAV for both funds. Management does not use estimates in the preparation of financial statements and monthly NAV's. For the weekly estimates that are performed, these are not used as part of the subscription/redemption process.<br><br>Weekly portfolio results are forwarded by Madoff.  No price testing is performed at this stage by BISYS.  The "estimated" NAV is prepared by the fund accountant and reviewed by the account manager.  No review of this estimate is performed by the BISYS group manager or KML prior to it being sent to all shareholders and KML.<br><br>**Overall Financial Reporting**<br><br>BISYS prepares a monthly NAV which is subject to two levels of review, first by the account manager and then by the group | |

KING_000072635

## Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.
### Audit Strategy Memo
### Year Ended December 31, 2006

| II.   Understanding the Business | Comments/References |
|---|---|
| manager.  Once the NAV has been approved by the group manager at BISYS the NAV calculation is sent to KML who perform a review and approve the NAV for release to shareholders. Hemisphere is a reliable fund administrator in Bermuda and employs professional staff, there is no reason to question the ability of BISYS staff to prepare and review accurate reports for KML's review.<br><br>There are significant levels of review by both BISYS and KML management to identify control breakdowns or possible misstatements.  In addition to the preparation of monthly NAVs, BISYS also prepares weekly estimates, which assists in the month end preparation as a method of ensuring the reasonableness of results.<br><br>Where results for the month are not as expected, additional procedures performed by BISYS include additional pricing tests to verify significant fluctuations in NAV and/or discussions of results with the Investment Manager to obtain explanations for performance variances.<br><br>**Budgetary Controls**<br><br>Management does not utilize budgets but monitors performance of the underlying investments and fluctuations in NAV.<br>The investment advisor monitors the portfolio holdings and their performance on an ongoing basis in order to assist with the investment management decisions.<br>The Administrator prepares monthly (and weekly estimates) of the NAV from the source documents provided by the IA (Madoff). The manager of the fund (KML) actively reviews the NAV at each calculation date. | |
| **Preliminary analytics**<br><br>See MyClient Database for detailed work performed. | |
| **Disaggregated revenue analytics**<br><br>Analysis of revenue is covered in review of performance as per preliminary analytics in the file. | |

KING_000072636

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| II.    Understanding the Business | Comments/References |
|---|---|
| **Preliminary assessment of going concern**<br><br>Done, risk of going concern is assessed as low per the following:<br><br>    o   The FRISK has resulted in no issues of heightened risk of fraud,<br>    o   Performance in the Fund has been consistently positive and moving in trends that track the movements of their underlying securities as documented by the preliminary analytics,<br>    o   The Investment Advisor constantly working to improve the investment strategy to ensure that it correlates with changing market conditions as documented in the testing of the investment stratgegy,<br>    o   There are several investors who are interested in investing in the Fund, however, subscriptions are routinely declined by the Fund Manager - thus there is not any problems anticipating with the Fund maintaining its current capital or risk of significant capital being redeemed as result of the consistent positive performance achieved by the Funds.<br>    o   As per meeting held with Madoff, the client does not believe there are any going concern problems,<br>    o   Identified risks have been taken into consideration in the preparation of and conduct of the controls testing performed and documented. No control issues were noted. | |

KING_000072637

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| III.   Internal Control Environment | Comments/References |
|---|---|
| **Understanding the Company's Internal Control (including Company Level Controls)**<br><br>Key reviews by upper management of the reconciliation procedures in place on the funds are key to monitoring the appropriateness of the NAV and financial statement reporting process. Periodic reviews of the fund performance and results are undertaken by FIM Limited in its role as marketer of the Fund. KML oversees the NAV process performed by BISYS, with directors of KML approving the NAV on a monthly basis.<br><br>Specifically at the administrator, group manager reviews are performed of share transaction cycle activity, NAV production cycle, financial statements and audit packs.  In addition the administrator maintains a risk management function (see details below), which includes an internal function, and holds regular meetings across all groups at the administrator to ascertain and compile results of recent events.<br><br>While a moderate level of assurance can be taken on the controls that upper management has in place (justified by the results of our controls testing in each cycle, where such checks and monitoring was identified and reviewed), certain amounts of additional testing on a substantive level (substantive analytics and tests of detail) will be performed, as indicated in the results of each cycle.<br><br>The entities controls include the following:<br>    - independent accounting for and reconciling of positions (BISYS as independent administrators);<br>    - valuation and pricing verified independently by BISYS;<br>    - cash controls for receiving of subscriptions, remitting redemptions, payment of expenses.<br>The controls surrounding the fund seem appropriate for the type and level of trading and investments maintained.<br><br>While certain controls may mitigate risks, our audit procedures are designed around 100% valuation and existence process, in addition to testing of cash reconciliations.<br><br>There appears to be strong organizational control of the funds and the surrounding service providers.  That is, there is a visible segregation of duties between significant functions (investment adviser - trading and operations, custodian, fund accountant, and transfer agent).  There is also levels of segregation within some of these functions - note that Madoff is the Investment Advisor and the Custodian, as such additional procedures were undertaken to satisfy ourselves that these functions operate independently of each other. The fund accountant and transfer agent are both performed by BISYS, however, Kingate Management and Tremont are also actively involved in reviewing subscriptions/redemptions to the Fund as such additional reviews seems to be appropriate to mitigate the fact that both functions are performed by the administrator. | |

KING_000072638

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| III.   Internal Control Environment | Comments/References |
|---|---|
| The PwC team discussion was lead by Andrew Brooks and Scott Watson-Brown, drawing on the existence and valuation processes and ensuring the correct information is flowed into the statements and also amongst team members. Concerns were raised with respect to Madoff acting as the investment advisory and also being the market maker for the transactions entered into and whether transactions occurring during the year were occurring at fair values. Additional procedures were undertaken as part of the audit process to address these concerns. | Issues regarding Madoff acting as Investment Mgr, Custodian, and Broker/Dealer have been addressed in the Critical Matter in the MyClient file. |
| **Understanding the IT environment**<br><br>SPA review of BISYS was conducted and documented by Matthew Clarke (PwC, Manager) in September 2005. See results and flowcharts in e-mail attachment in MyClient file. | |
| **Considerations required only for integrated audits:  (Mark this section N/A if not subject to 404)** | |
| **Understanding and evaluating:**<br>     **Management's assessment process**<br>N/A | |
|      **Significant accounts**<br>N/A | |
|      **Significant locations or business units**<br>     N/A | |
|      **Significant processes**<br>N/A | |
| **Plan to test and evaluate management's assessments**<br><br>Key audit risks have been identified in the audit comfort matrix, these include:<br>          (i)  a significant market wide decline in stock prices; and<br>          (ii) a significant redemption of capital by shareholders | |

KING_000072639

PricewaterhouseCoopers
PWCB014175

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| III.    Internal Control Environment | Comments/References |
|---|---|
| There is obviously very little that an investment manager can do about the risk of redemptions, however, assuming the fund performs well then investors should not redeem.  A significant part of the risk of a downturn in investments is the hedging options that the funds utilize. | |

KING_000072640

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| IV.   Audit Scope Considerations | Comments/References |
|---|---|
| **Consideration of, and changes to, prior year audit approach**<br><br>In applying the risk-based approach to determining the nature, timing and extent of our testing for the financial statement audit, we considered the following factors:<br>1.   Results of prior year audit<br>2.   Prior history of misstatements due to error or fraud or control deficiencies<br>3.   Significant changes in internal control environment<br>4.   Significant changes in the business<br>From the above considerations, there were no new items that could have an impact on our planned procedures for the audit. | |
| **Preliminary assessment of materiality (overall, planning, specific & de minimis)**<br>As recommended in PwC Audit 1311 for investment funds, **overall** materiality will be set at 0.5% of net assets. This is compounded by the following factors:<br><br>1.   There have been no adjustments to net assets in prior years;<br>2.   This is an industry standard materiality threshold for investment funds investing in priceable securities; and<br>3.   From the review of the operations of the entity in the reporting period, there have been no fundamental changes,<br><br>Due to the following facts:<br><br>1.   There have been no significant changes in the operations;<br>2.   This is not the first year audit;<br>3.   There are no going concern issues,<br><br>PwC have deemed a "**haircut**" of 25% of **overall** materiality to be suitable for **planning** materiality.<br><br>A **de minimis** threshold will be set at 10% (as judgement) of **overall** materiality. | See materiality spreadsheet attached to the MyClient Database. |
| **Potential for material misstatements and other risks**<br>   **Significant new and complex accounting matters**<br><br>Both Kingate Funds use derivative instruments in their investment strategy. Only Kingate Euro is expected to have derivative instruments at year-end - forward currency contracts. Refer to detailed testing performed and documented in MyClient file | |

KING_000072641

PricewaterhouseCoopers
PWCB014177

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| IV.  Audit Scope Considerations | Comments/References |
|---|---|
| **Risk of material misstatement due to fraud (including heightened risk)**<br><br>Done, the following 3 general conditions were considered:<br>    (i) Incentives:<br>    Independent calculations are performed on amounts payable for performance based fees including management and administration fees - these calculations are reviewed as part of our interim and final field work<br><br>    (ii) Misappropriation:<br>    Independent monthly NAV calculations are performed, and approved by Kingate Management.  There is the appropriate level of segregation to detect an error or fraud<br><br>    (iii) Attitude:<br>    Chris Wetherhill is generally concerned about the operations and performance of the funds and they take the issues of money laundering very seriously.  Madoff sets a strong "tone at the top" on the IA side and the other service providers for the funds appear to have appropriate consideration for ethical behaviour, etc.<br><br>Heightened fraud risk assessment:<br>Heightened fraud risk exists if any of the following questions are answered yes:<br><br>1.  With regards to the current FRISK v3:<br>a)  The frisk score equal to or greater than 42, **and  No, actual score of 26**<br>b) Any of the following risk conditions triggered:<br>  - incentive for intentional misstatement in financial reporting, **No**<br>  - integrity and etics, **or  No**<br>  - management inclination for intentional misstatement in financial reporting  **No**<br><br>2.  Is this client a significant client in the United States or a material subsidiary of a significant client in any other territory? **No**<br><br>3.  Is this client a public company (eg SEC registrant) or is it a material subsidiary of a public company in any territory? **No**<br><br>4.  Is this a first or second year audit? **No**<br><br>Accordingly, the Fund does not have a heightened risk of fraud. | |

KING_000072642

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| IV.   Audit Scope Considerations | Comments/References |
|---|---|
| PwC has documented discussions held on fraud and the effect on the audit programme as follows:<br>  o   minutes of call with Frank De'Pascali<br>  o   minutes of the meeting held with Chris Wetherhill (Kingate Management Limited) per<br>  o   It was confirmed via discussion with the Fund accountant (Brendan Sheehan) that he was not aware of any fraud/material misstatement.<br><br>Overall assessment<br><br>In developing our 2006 approach, we considered risk factors relative to the Fund's industry, functions and processes as well as considering the potential for material misstatements due to error or fraud. Evidence gathered to assist us in making this assessment included:<br>  1.   Prior year working papers<br>  2.   Results of preliminary analytics<br>  3.   Client continuance procedures<br>  4.   New accounting pronouncements (none noted)<br>  5.   Results of inquiries of management (service providers) – see steps 1750-10 and 1750-20<br><br>*See the attachment in the audit file summarizing fraud risk assessment.* | |
| **Key risks or significant matters identified from review of:  Acceptance and Continuance, Independence, board & key committee minutes, significant contracts, internal audit reports and other**<br><br>The Funds were not determined to be high risk. The items in the Risk and Approach Schedule from A&C have been brought forward into the Summaries of Comfort. | |
| **Understanding of, and reliance on, internal audit or relevant compliance functions**<br><br>The Funds ithemselves do not have an internal audit function although BISYS, the administrator does have its own internal audit function. Based on discussions of the scope of the work performed by BISYS internal auditor, it is not anticipated that we will be able to rely on any of their work. | |

KING_000072643

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
Audit Strategy Memo
Year Ended December 31, 2006

| V.   Communication and Coordination | Comments/References |
|---|---|
| **Matters discussed with the audit committee/management**<br><br>See the Client Service Plan presented to BISYS in the MyClient Database on 1750-30 | |
| **Use of specialists and experts**<br>Not considered necessary. PwC Bermuda Investments Group is anticipated to have suitable knowledge and experience based on planning knowledge of Fund's operations. | |
| **Multi-location audit plan (if applicable)**<br>N/A | |
| **Review schedule**<br><br>Graham MacDonald, Team Manager, will review the entire file. | |
| **TeamFind key dates**<br><br>Period Begin Date – January 1, 2006<br>Period End Date – December 31, 2006<br>Report Signing Date – March 31, 2007<br>Report Release Date - April 18, 2007 | |

KING_000072644

**Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.**
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| VI.   Summary Plan & Results | Comments/References |
|---|---|
| See ACM with extended SOCs in the "Summary Plan & Results" step. | |

For internal distribution only
**CONFIDENTIAL**

PricewaterhouseCoopers
PWCB014181

KING_000072645

## Kingate Global Fund, Ltd. & Kingate Euro Fund, Ltd.
**Audit Strategy Memo**
**Year Ended December 31, 2006**

| VII.  Audit Strategy Memo Approvals | Comments/References |
|---|---|

I have read the above Audit Strategy Memo and related attachments and understand the broad approach to the areas on which we need to obtain audit evidence so that the audit is performed in an effective manner and have shared it with key engagement team members as deemed appropriate.

All key risks identified have been appropriately carried forward to the "Summary Plan & Results".

**Name**                                    **Date**

Team Manager

Engagement Leader

Quality Review Partner

KING_000072646

For internal distribution only
**CONFIDENTIAL**

PricewaterhouseCoopers
PWCB014182