# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In re:                                          :
                                                :
SECURITIES INVESTOR PROTECTION  :      SIPA Liquidation
CORPORATION,                           :      Substantively Consolidated
                                                :
                   Plaintiff-Applicant, :      Adv. Pro. No. 08-01789 (SMB)
                                                :
                        v.                      :
                                                :
BERNARD L. MADOFF INVESTMENT  :
SECURITIES LLC,                       :
                                                :
                        Defendant.     :
-------------------------------------------------------X

In re:                                          :      Chapter 7
                                                :      Case No. 09-11893
BERNARD L. MADOFF,                 :
                                                :
                        Debtor.          :
-------------------------------------------------------X

**MEMORANDUM DECISION AND ORDER REGARDING
TREATMENT OF PROFIT WITHDRAWAL TRANSACTIONS**

**A P P E A R A N C E S:**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111

 David J. Sheehan, Esq.
 Seanna R. Brown, Esq.
 Amy E. Vanderwal, Esq.
  Of Counsel

*Attorneys for Irving H. Picard, Trustee for SIPA Liquidation of
 Bernard L. Madoff Investment Securities LLC*

CHAITMAN LLP
465 Park Avenue
New York, New York 10022

 Helen Davis Chaitman, Esq.
  Of Counsel

*Attorneys for Participating Claimants*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

This omnibus proceeding is related to the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA").  BLMIS was the corporate vehicle that Bernard L. Madoff used to perpetrate a Ponzi scheme through its investment advisory business.  BLMIS' books and records, including many of the monthly statements sent to customers, included the notation "PW" generally followed by the name of a publicly-traded corporation and an amount deducted from the customer's monthly balance (a "PW Transaction").  The Trustee contends that the PW notation refers to distributions sent by check to the customer, and in computing customers' net equity claims, the Trustee treated PW checks the same as cash withdrawals.  The Participating Claimants (defined below) contend that in the absence of corroborating evidence as to any particular customer, the PW notation should be disregarded, and the customer's net equity claim should be credited (increased) accordingly.

The Court conducted an evidentiary hearing on January 19, 2018, at which it heard the testimony of three witnesses and received into evidence numerous documents and portions of the deposition transcripts of several former employees of BLMIS, including Madoff, and Aaron Blecker, one of the Participating Claimants.  For the reasons set forth in Part I of this opinion, the Court concludes that a PW notation appearing in a monthly statement supports the finding, in the absence of credible contrary evidence offered by a claimant in that claimant's case, that the customer received a cash distribution in the amount indicated.

2

In addition, the Court tried the objection to the Trustee's determination of the net
equity claims submitted by Aaron Blecker ("Blecker Claims").  Mr. Blecker, individually
and as joint tenant with his late wife, had four different BLMIS accounts (collectively,
the "Blecker Accounts") over a span of approximately thirty years.  Mr. Blecker contends
that the Blecker Claims should be valued in the aggregate amount of $577,350.33, but
the Trustee valued the claims at zero based on his treatment of the PW Transactions in
the Blecker Accounts as cash withdrawals.  For the reasons set forth in Part II of this
opinion, the Court concludes that Mr. Blecker has waived any objection to the treatment
of PW Transactions in the Blecker Accounts as cash withdrawals, and additionally, has
failed to sustain his burden of proving the amount of his Blecker Claims.  Accordingly,
the Court sustains the Trustee's determination of the Blecker Claims at zero.

## BACKGROUND

### Part I

**A.    The BLMIS SIPA Liquidation and the Trustee's Duties[1]**

On December 11, 2008, Madoff was arrested by federal agents for violating
numerous criminal securities statutes.  On the same day, the United States Securities
and Exchange Commission (the "SEC") filed a complaint in the United States District
Court for the Southern District of New York against BLMIS and Madoff.  On December
15, 2008, the SEC consented to a combination of its own action with an application of

---

[1]    In this decision, "TX" refers to the Trustee's trial exhibits, "PCX" refers to the Participating
Claimants' trial exhibits, and "Tr." refers to the trial transcript of the January 19, 2018 hearing (ECF Doc.
# 17206).  Unless otherwise noted, "ECF Doc. #" refers to the docket of the main liquidation proceeding,
*SIPC v. BLMIS*, Adv. No. 08–01789 (SMB) (Bankr. S.D.N.Y.).

the Securities Investor Protection Corporation ("SIPC"). The District Court granted the

SIPC application and entered an order which, in relevant part: (i) appointed the Trustee

for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3); (ii)

appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA §

78eee(b)(3); and (iii) removed the combined action to this Court pursuant to SIPA §

78eee(b)(4). *Order*, dated Dec. 15, 2008, at ¶¶ II, IX (ECF Doc. # 1).

Among his other duties, a SIPA Trustee must determine each customer's share in

customer property up to the amount of their "net equity," which is the amount the

debtor-broker would have owed to the customer if the broker had liquidated the

customer's securities positions, plus any cash deposited by the customer to purchase

securities, less any sums owed by the customer to the broker. SIPA § 78*lll*(11). The

Trustee's statutory obligation is to discharge net equity claims of customers of the

debtor "insofar as such obligations are ascertainable from the books and records of the

debtor or are otherwise established to the satisfaction of the Trustee." SIPA § 78fff-2(b).

The BLMIS books and records presented the Trustee with a challenge. Although

Madoff claimed to execute various investment strategies for his customers, in reality, he

neither bought nor sold any securities on their behalf. Instead, he deposited customer

money into BLMIS' bank accounts, and used customer deposits to pay customer

withdrawals. *In re BLMIS*, 654 F.3d 229, 232–33, 240 (2d Cir. 2011) ("*Net Equity

Decision*"), *cert. denied*, 567 U.S. 934 (2012). The securities transactions and holdings

reported on customer statements were fictitious, but the actual cash deposits and

withdrawals were accurate. *See id.* at 232 ("[T]he only accurate entries reflected the

4

customers' cash deposits and withdrawals.").  Accordingly, the Trustee determined to

calculate each customer's net equity based on a cash in/cash out methodology (the "Net

Investment Method").  Under the Net Investment Method, each customer's net equity is

equal to the amount of cash or principal deposited by the customer less the amount of

cash or principal withdrawn.[2]  Customers that deposited more in their BLMIS accounts

than they withdrew were net losers with positive net equity claims, while those that

withdrew more than they deposited were net winners with no net equity claims.

Over 16,000 claims were filed against the BLMIS estate, and the Trustee issued

claim determination letters to each claimant.[3]  As noted, the issue raised by the

Participating Claimants[4] concerns the Trustee's treatment of the PW Transactions as

debits, *i.e.,* cash withdrawals from their BLMIS accounts.  Each of the Participating

Claimants, including Mr. Blecker, submitted a customer claim for a BLMIS account that

contained one or more PW Transactions (*i.e.*, a "direct account"), or for a BLMIS

account that received an inter-account transfer from a BLMIS account that contained

---

[2]     Customers challenged the Trustee's methodology arguing that their net equity should be
determined based on the last (fictitious) monthly statements they received covering November 2008, but
the Second Circuit rejected the so-called Last Statement Method and approved the Net Investment
Method for calculating net equity because it was superior to the method put forth by the opposition.  *Net
Equity Decision*, 654 F.3d at 238, 242.

[3]     Unlike the typical bankruptcy in which the trustee must formally object to a claim, the Trustee
issued a determination letter to the claimant regarding the allowed amount of his net equity claim.  If the
claimant disagreed with the Trustee's determination, he had to object within thirty days.  If the claimant
failed to submit a timely objection, the Trustee's determination became final and binding.  *See Order on
Application for an Entry of an Order Approving Form and Manner of Publication and Mailing of
Notices, Specifying Procedures for Filing, Determination, and Adjudication of Claims; and Providing
Other Relief*, dated Dec. 23, 2008, at 6-7 (ECF Doc. # 12).

[4]     The customer claimants who are participating in this proceeding ("Participating Claimants") have
changed over time.  The Participating Claimants are identified in Exhibits A and B to the *Notice of
Hearing on Profit Withdrawal Transactions*, dated Jan. 8, 2018 (ECF Doc. # 17102).

one or more PW Transactions (*i.e.*, an "indirect account"). The Trustee determined their claims by treating each PW Transaction as a withdrawal, and the Participating Claimants, including Mr. Blecker, filed timely objections to the Trustee's determinations.

Given the number of Participating Claimants raising the identical issue, the Court established a separate omnibus proceeding to resolve the issues related to the Trustee's treatment of PW Transactions. *Order Establishing Schedule for Limited Discovery and Briefing on Profit Withdrawal Issue*, signed June 24, 2015 (ECF Doc. # 10266). Thereafter, the parties engaged in discovery, including the taking of the depositions of Madoff and BLMIS employees Annette Bongiorno, Winifier Jackson, Dorothy Khan, Alethea Leung, and Joann Sala. In addition, Mr. Blecker, who is elderly, was deposed to preserve his testimony. The parties agreed to try Mr. Blecker's objections to the Trustee's determination of the Blecker Claims together with the omnibus issue regarding the appropriate treatment of PW Transactions under the Net Investment Method.

## B.    The Trustee's Experts

### 1.    Lisa Collura

In order to assist him in the SIPA liquidation of BLMIS, the Trustee retained the professional services of FTI Consulting, including Ms. Lisa Collura and Mr. Matthew Greenblatt. Ms. Collura is a forensic accountant with more than twenty years of experience in financial fraud investigations and cases. She is a CPA, a certified fraud examiner and certified in financial forensics. Tr. 60:22-61:1. Forensic accounting is a

6

specialty area of accounting in which CPAs or accountants gather, collect, review,

analyze and interpret financial records and other evidence in connection with a fraud.

Tr. 62:6-15.  Based on her training and experience, Ms. Collura was qualified as an

expert in the area of forensic accounting.  Tr. 67:16-19.

Ms. Collura sought to reconcile cash transactions reflected on the statements of

the BLMIS customer accounts with available BLMIS bank records and other sources and

trace the flow of those funds — tasks typically performed by forensic accountants.  Tr.

68:8-69:16; 76:11-20.  The purpose of the reconciliation was to determine the reliability

of the BLMIS records.  Tr. 77:10-17.  In addition to bank records, she reviewed

documents in customer files and documents supplied by former BLMIS customers, the

types of documents that a forensic accountant typically reviews in connection with a

reconciliation.  Tr. 77:22-80:14.

Ms. Collura produced an expert report dated July 14, 2015, spanning 705 pages

("*Collura Report*").[5]  Although neither side offered it into evidence, the Participating

Claimants offered Ms. Collura's supplemental report, dated Dec. 17, 2015 (PCX 8),

which was received without objection from the Trustee.  PCX 8 incorporates by

reference the opinions and information contained in the *Collura Report*, amplifies that

earlier report, and must be read in conjunction with the *Collura Report*.  Accordingly,

the Court deems the *Collura Report* to be part of the record.

---

[5]        A copy of the *Collura Report* is available at ECF Doc. # 10664.

### 2.    Matthew Greenblatt

Mr. Greenblatt is also a forensic accountant with more than twenty years of experience in financial fraud investigations and cases.  Like Ms. Collura, Mr. Greenblatt is a CPA, a certified fraud examiner and certified in financial forensics, and experienced in forensic accounting investigations.  Tr. 164:19-165:2.  He also teaches forensic accounting and has served as an adjunct professor at NYU's School of Continuing Studies in the forensic accounting certificate program.  Tr. 165:4-13.  Based on his training and experience, Mr. Greenblatt was qualified as an expert in the area of forensic accounting.  Tr. 168:12-20.

Mr. Greenblatt oversaw the task of reconstructing BLMIS' books and records, and calculating the principal balance for each BLMIS account on a cash in/cash out basis (the "Principal Balance Calculation").  Tr. 168:23-169:8; *see also Collura Report* at ¶ 4 ("As part of our engagement, FTI was tasked with the exercise of reconstructing the books and records of BLMIS, including all records of the 'cash in/cash out' transactions related to the BLMIS customer accounts as far back as the records allow.").  Inflows, or credits included: (i) account balances reported on customer statements as of April 1, 1981 (*i.e.*, the Trustee assumed the validity of all transactions up to that date); (ii) cash deposits; (iii) non-cash deposits; and (iv) inter-account transfers of principal into the account.  Outflows, or reductions, included: (i) cash withdrawals; (ii) inter-account transfers of principal out of the account; and (iii) payments made by BLMIS on behalf of customers.  Tr. 170:1–171:22, 192:7–15.  According to Mr. Greenblatt, the primary and most reliable source for his analysis was the customer statements because they contained the most transaction information and were sent to customers who could

8

identify any inaccuracies.  The customer statements were available from 1981 through November 2008 in electronic format on BLMIS' servers, on microfilm and/or through copies produced by account holders.  Tr. 172:8-173:13.

Customer deposits into and withdrawals from their BLMIS accounts were reported on the customer statements and designated with a "transaction code."  BLMIS' "House 17 Manual," TX 80, identified the codes used for recordkeeping by BLMIS.  The codes relevant to the Principal Balance Calculation were CA, CW, PW, and JRNL.  Tr. 174:21–175:6.  "CA" meant "Capital Addition," such as a cash deposit, which increased the customer's reported equity, "CW" referred to a "Capital Withdrawal" and "PW" referred to "Profit Withdrawal," both of which reduced the customer's reported equity.  Finally, "JRNL" referred to a journal entry used for both credits and debits, depending on the transaction.  The JRNL code was used mostly for manual adjustments and, typically, the first deposit into a customer account.  Tr. 175:7–177:16; 179:12-18.

Mr. Greenblatt reconciled the transactions listed in the customer statements with other internal BLMIS records, including cash receipt records or "check-in books," cash disbursement records or "check-out books" (together with the check-in books, the "Spiral Notebooks"), Portfolio Management Reports ("PMRs"), Portfolio Management Transaction Reports ("PMTs"), and customer correspondence.  These records are the type of evidence relied on by forensic accountants in performing their work.  Tr. 199:15-19.  The PMRs listed the customer's year-to-date summary level cash and principal transactions.  *See* TX 88; Tr. 195:20-196:2.  With some gaps, the PMRs were available from the early 1980s through November of 2008; for the period prior to December

9

1995, PMRs were available on microfilm.  Tr. 196:17-20.  PMRs reported CAs as credits

or increases to the reported equity and CWs and PWs as debits or reductions to the

reported equity.  Tr. 196:8-14; Deposition of Annette Bongiorno, held July 8, 2016

("Bongiorno Tr.") 110:25–113:17.  PMRs corroborated the cash and principal

transactions reported on the customer statements.

PMTs included information on the capital additions, capital withdrawals and

profit withdrawals on a per-transaction basis.  Tr. 195:23-25.  They recorded CAs as

credits or increases to the reported equity and CWs and PWs as debits or reductions to

the reported equity.  *See* TX 87, TX 202, TX 208.  PMTs were available from the mid-

1980s until the mid-1990s with some gaps.  Tr. 196:20-23; TX 87, TX 202, TX 208.  The

transaction entries and codes on the PMTs corresponded to the transactions and codes

reported on the customer monthly statements, *see* Tr. 194:10-22, and were used to

corroborate the cash and principal transactions reported on the customer statements.

For example, the April 1992 customer statement for Mr. Blecker's account 1B0022 (at

that time, numbered 1-00254-1-0), TX 205, showed a purchase of shares in "Pep Boys"

for $99,466.66 and sale of shares in "Pep Boys" for $102,094.40, generating a profit of

$2,627.74.  Deposition of Jo Ann Sala, held May 19 and June 13, 2016 ("Sala Tr.")

110:25–114:8.  The June 1992 customer statement for that same account, TX 206, listed

a June 16 PW Transaction "Check Pep Boys" in the amount of $2,627.74 which

corresponded to a check sent to Mr. Blecker in that amount.  Sala Tr. 115:4-117:21;

Bongiorno Tr. 117:21-118:4.  The same PW Transaction appeared on the PMT, TX 208.

In addition, the PMT reflected a PW Transaction in the account in the amount of

$2,606.03 on April 28, 1992.  The April 1992 customer statement, TX 205, listed a PW Transaction, "Check Fleet Norstar," in the sum of $2,606.03.

Mr. Greenblatt also reviewed the BLMIS Spiral Notebooks to confirm and corroborate the PW Transactions.  Tr. 197:12-17.  The Spiral Notebooks contained lists of checks received by BLMIS from customers (the check-in book), TX 89, and checks sent out by BLMIS to customers (the check-out book), TX 90.  The check-out book, TX 90, contained handwritten notations identifying the checks, including PW checks, sent out on a particular date.  Bongiorno Tr. 44:9-14.  In addition to the date, the check-out book identified the customer recipient, the amount of the check and, in the case of PW Transactions, the related security that supposedly generated the purported profit.  Tr. 199:6-14.  These notebooks were available with gaps for various periods of time from the mid-1980s until the mid-1990s.  Tr. 197:6-11.

Mr. Greenblatt disclosed that there were some changes to the data in the chronological listing of cash and principal transactions that were discovered during quality control reviews of the Participating Claimants' accounts.  While these changes resulted, to the extent necessary, in adjustments to the Principal Balance Calculation for certain accounts, Mr. Greenblatt testified that he reviewed the changes and confirmed that they did not affect the conclusion he reached that PW Transactions were debits to an account's balance.  Tr. 200:16–202:10.

## C.    The PW Transactions

As noted, the PW Transactions were treated as cash outflows and reductions to principal in determining the Principal Balance Calculation.  BLMIS employees explained

how PW Transactions were used to create fictitious transactions and pay fictitious profits.[6]    BLMIS set up "deals" for customers to run over a period of time, usually between four and eight weeks.  Sala Tr. 19:21-20:6, 60:9–20; *see also* Bongiorno Tr. 74:2–10.  At the beginning of the "deal" period, the customer would be set up in a particular stock (the "deal" stock), which would be listed on the accountholder's customer statement as a stock purchase with the purchase amount appearing in the debit column.  Sala Tr. 42:4-19; Bongiorno Tr. 72:13–24; *see also* TX 197.  At the end of the deal period, the customer statement would reflect a sale of the deal stock with the sale price appearing in the credit column.  Bongiorno Tr. 73:6–21, 99:1–6; Sala Tr. 42:20-25; *see, e.g.*, TX 195; TX 197; TX 235.  The difference between the "buy" and the "sell" prices for the deal stock would result in a "profit" for the BLMIS account.  Sala Tr. 43:1-4; *see, e.g.*, TX 193; TX 194; TX 195; TX 196; TX 197.

If an account was set up to receive its profits, a check would be automatically sent to the customer for the amount of the profit at the conclusion of each deal.  At the time an account was opened, the customer and Madoff orally agreed to send the customer the profits at the conclusion of each deal, or instead, reinvest those profits.  Madoff would then instruct Ms. Bongiorno of the decision and direct her to memorialize it in the customer's account file with an appropriate notation.  At times, Ms. Bongiorno

---

[6]    Ms. Bongiorno worked at BLMIS from 1968 until operations ceased.  Bongiorno Tr. 10:21–22, 12:24–25.  Ms. Jackson worked at BLMIS from 1986 until operations ceased.  Deposition of Winifier Jackson, held May 23, 2016 ("Jackson Tr.") 9:18-21, 20:14-18.  Ms. Khan worked at BLMIS from the early 1990s until operations ceased.  Deposition of Dorothy Khan, held May 25, 2016 ("Khan Tr.") 10:11–20, 17:21–24.  Ms. Leung worked at BLMIS from 1995 until operations ceased.  Deposition of Alethea Leung, held June 2, 2016 ("Leung Tr.") 9:21–10:3, 18:9–18.  Ms. Sala worked at BLMIS from 1983 until her retirement in 1998.  Sala Tr. 11:21–23, 12:9–15.

confirmed the customer's instruction directly with the customer.  Bongiorno Tr. 30:12-
35:17, 38:19-22.  The notation "R" on the customer's Name/Address File Maintenance
form meant "reinvest" while "S" meant "send."  Bongiorno Tr. 35:18-36:13.  If an
account was marked "S," PW checks were sent automatically and it was unnecessary for
the customer to send a written request for the profits.  Bongiorno Tr. 36:14-37:4; Sala
Tr. 130:6-131:17.  If the account was a "Send" account, a check would be made out in the
name of the customer even though the transaction to which the check related would be
listed in BLMIS' records with the notation "PW [security name]."  Sala Tr. 82:6-83:5.
The PW checks were never sent to the corporation identified in the PW Transaction
notation.  Sala Tr. 41:24-42:3.

Customers sometimes wanted to switch from "S" to "R," or *vice versa*.  Prior to
the computerization of BLMIS' records, the customer would speak to Madoff, but once
the records were computerized, the customer had to send a written confirmation.
Bongiorno Tr. 37:23-38:13.  Upon receipt of the written confirmation, BLMIS employees
would update the customer's file and enter the new information into the BLMIS
computer system.  Bongiorno Tr. 38:8-18; TX 191; TX 214; TX 215; TX 231; TX 232.
Where a check was sent, the amount of the check would be listed in the "Amount
Debited To Your Account" on the customer's statement as a reduction to the balance.
Bongiorno Tr. 71:13–75:9; TX 81; TX 82; TX 191; TX 194; TX 195; TX 196; TX 197; TX
198; TX 204; TX 210; TX 214; TX 235.

The Spiral Notebooks were used for tracking incoming and outgoing checks to
customers, including checks relating to PW Transactions.  The Spiral Notebooks

corresponded to many of the PW Transactions on the customer statements, matching

the BLMIS accountholder, account number, security name, check amounts, and dates.

The employees who were deposed confirmed that an entry in the check-out Spiral

Notebook reflected a check sent to a customer. Bongiorno Tr. 53:24–56:5; Sala Tr.

123:25–126:11. The process for printing checks was automated relatively early on, and

the Spiral Notebooks were mostly used for checks that had to be issued manually, such

as when customers called BLMIS because they had not received PW checks that they

were expecting. After verifying that the PW check had not been cashed, BLMIS sent a

replacement check to the customer. The newly-issued check would be listed in the

Spiral Notebooks. *See* Bongiorno Tr. 90:24–93:7.

Debit memoranda ("Debit Memos") found at BLMIS also corroborated the PW

Transactions identified on customer statements. Debit Memos generated by BLMIS'

computer systems included the words "PW CHECK + [security name]" (which matched

the entry on the customer statement), the accountholder's name and address, account

number, and the amount, date, and security of the PW Transaction. Attached to the

Debit Memo was either a copy of the check for BLMIS' files or the check corresponding

to that transaction for the customer (TX 230). Bongiorno Tr. 45:17–46:22, 80:6-81:20,

86:3-17.

### D.    Third-Party Records Confirmed Treatment of PW Transactions as Debits to the BLMIS Customer Accounts

In addition to the reconciliation of BLMIS' internal records as described above,

third-party records also confirmed that PW Transactions were properly treated as

outflows, or reductions to an account's net equity in the Principal Balance Calculations.

There were approximately 91,000 PW Transactions between April 1981 and December 2008.[7] For that entire period, Ms. Collura was able to reconcile 51,769 PW Transactions to one or more third-party sources. Importantly, Ms. Collura reconciled 5,507, or 99.6%, of the 5,527 total PW Transactions, and 99% of all 225,000 cash transactions that occurred during the ten-year period from December 1998 to December 2008 ("Ten-Year Period"), to available BLMIS bank records, including monthly bank statements and copies of cancelled checks. *Collura Report* at ¶¶ 6, 7, 17, 35, 42. Ms. Collura also conducted a tracing analysis of the PW Transactions in the Ten-Year Period, and was able to confirm for 99% of the transactions where documents were available that the funds that left BLMIS were received by the respective customer. Tr. 104:11–105:8; TX 12; TX 13.

Prior to the Ten-Year Period, bank records generally were not available. Lacking bank records, Ms. Collura was able to corroborate approximately 54% of the PW Transactions as cash payments to the customer. Nevertheless, her conclusions regarding the Ten-Year Period support the inference that all of the PW Transactions reflect cash withdrawals. The testimony by the BLMIS employees confirmed that BLMIS created records and operated in the same manner before and during the Ten-Year Period as it pertains to PW Transactions. The inability to confirm a higher percentage prior to the Ten-Year Period was due to the lack of confirming evidence rather than the existence of contradictory evidence. Accordingly, the Court concludes

---

[7]      The actual number is 91,138.

that a PW Transaction listed in an account statement created prior to the Ten-Year

Period supports the finding, absent credible contrary evidence in any individual case,

that the PW Transaction reflected a withdrawal of cash from that customer's account.

## E.     The Participating Creditors' Evidentiary Objections

The Trustee's experts' conclusions are based on their analysis of BLMIS' records,

and where available, bank and other third-party records.  Many of the underlying

records have been offered into evidence by the Trustee.  The Participating Claimants,

including Mr. Blecker, have objected to many of the exhibits offered into evidence,

generally on one or more grounds including lack of foundation, failure to authenticate,

hearsay and relevance.[8]

In ruling on the objections, it is necessary to bear in mind that a SIPA trustee

must make payments to customers based on their net equity "insofar as the amount

owed to the customer is 'ascertainable from the books and records of the debtor or [is]

otherwise established to the satisfaction of the trustee.'"  *Net Equity Decision*, 654 F.3d

at 237 (quoting SIPA § 78fff-2(b)(2)).  The Second Circuit has ruled that this

determination should be based on a cash in/cash out analysis under the Net Investment

Method.  *Net Equity Decision*, 654 F.3d at 238.  Furthermore, the District Court,

affirming this Court, has ruled that the Trustee's inter-account transfer methodology,

---

[8]     The Trustee's exhibits and the Participating Claimants' objections are summarized in Attachment
A to the *Joint Post-Hearing Submission on Admission of Deposition Designations and Exhibits into
Evidence*, dated Jan. 31, 2018 ("*Post Hearing Submission*") (ECF Doc. # 17207).  In many cases, the
Participating Claimants did not stipulate to the admissibility of an exhibit but did not object to its
admission.

which applies the Net Investment Method to inter-account transfers ("Inter-Account Method"), is the "superior method as a matter of law" because it accords with "SIPA's statutory definition of net equity and its requirement that net equity be determined to the extent it is 'ascertainable from the books and records of the debtor or [is] otherwise established to the *satisfaction of the trustee*.'" *Diana Melton Trust v. Picard* (*In re BLMIS*), No. 15 Civ. 1151 (PAE), 2016 WL 183492, at *9, *10 (S.D.N.Y. Jan. 14, 2016) (emphasis in original) (quoting *Net Equity Decision*, 654 F.3d at 237 (quoting SIPA § 78fff-2(b)), *aff'd sub nom. Sagor v. Picard* (*In re BLMIS*), 697 F. App'x 708 (2d Cir. 2017).

### 1.    Authentication

The Trustee's computation of a customer's net equity in this case was based primarily on his experts' analysis of customer statements which treated PW Transactions as cash withdrawals, and the latter treatment was based on the experts' analysis of other BLMIS records and third-party records, including bank records. The Participating Claimants challenge the authenticity of the BLMIS records.

The proponent of evidence may satisfy the authentication requirement by producing evidence "sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). The authentication burden is a "light one." *Curtis v. Perkins* (*In re Int'l Mgmt. Assocs., LLC*), 781 F.3d 1262, 1267 (11th Cir. 2015). The Court is not required to hear the testimony of the document's author to demonstrate its authenticity. *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 144 (S.D.N.Y. 2015), *reconsideration denied*, Nos. 12 Civ. 6811, 13 Civ. 1580 (CM), 2015

WL 4610894 (S.D.N.Y. July 30, 2015). Authentication can be established based upon testimony from a competent witness as to the knowledge of the document's authenticity or the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 419 (S.D.N.Y. 2011) (quoting FED. R. EVID. 901(b)(4)); *see also Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003). A trial court has broad discretion in determining whether an exhibit has been properly authenticated. *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir.), *cert. denied*, 534 U.S. 897 (2001). Ultimately, the question of authenticity is intertwined with the concept of trustworthiness, and many courts consider trustworthiness of a document in analyzing its authenticity. 5 JACK B. WEINSTEIN ET AL., WEINSTEIN'S FEDERAL EVIDENCE § 901.02[2] (2d ed. 2018) ("WEINSTEIN").

Initially, the parties have stipulated to the authenticity of most of the internal BLMIS records. In the *Stipulations* [and Order] *Regarding Designated Deposition Testimony and Admissibility of Certain Documents*, signed Jan. 17, 2018 (ECF Doc. # 17136), the parties agreed that "[w]ith regard to the deposition exhibits referred to in any portions of the designated testimony, the parties stipulate that those exhibits are, where applicable, the books and records of the Debtor, but maintain their evidentiary objections to the admissibility of those documents under the Federal Rules of Evidence." Except for certain portions of depositions of Mr. Madoff and Ms. Bongiorno, all of the portions of the deposition transcripts designated by the parties were admitted into evidence. *Post Hearing Submission* at ¶¶ 1-4.

18

The *Post Hearing Submission*, Ex. A, identifies those exhibits that were designated and shown to the witnesses at the depositions.  They include TX 190-238.[9]  The Court has reviewed the depositions and confirmed that every one of these exhibits was identified and discussed during the designated portions of the depositions.  Accordingly, the Participating Claimants have conceded their authenticity as BLMIS business records.  In addition, many of the other exhibits offered by the Trustee are duplicates of all or part of the authenticated deposition exhibits.  They include TX 36-38 (TX 204),[10] TX 40-42 (TX 210), TX 43-46 (TX 212), TX 47-49 (TX 213), TX 80 (TX 217), TX 87 (TX 208), TX 88 (TX 207) and TX 90 (TX 190, 229).  In addition, Mr. Blecker's son authenticated TX 82, a document his father produced,[11] and identified Mr. Blecker's handwritten notations on the document.  Tr. 56:16-57:8.[12]  The remaining BLMIS records include three of Mr. Blecker's customer statements, (TX 81, 83, 97), other records relating to other customer accounts, (TX 1, TX 4, TX 5, TX 6, TX 9, TX 10, TX 12, TX 19, TX 20, TX 22, TX 32, TX 33), and one general record.  (TX 89 (Check-In Spiral Notebook)).

---

[9]    The Trustee has since withdrawn TX 218.

[10]    The parenthetical refers to the trial exhibit designation of the deposition exhibit that includes all or part of the referenced trial exhibit(s).  Thus TX 204 includes TX 36, 37 and 38.

[11]    TX 82 is identified by Bates nos. BKLR000003-4.  TX 81 and TX 83, also Blecker Accounts statements, bear consecutive Bates nos. beginning with BLKR000005.  This suggests that all three exhibits were produced by Mr. Blecker who got them from BLMIS.

[12]    The submission also lists exhibits, primarily bank records, as to which there is no stipulation to admissibility but no specific objection to admissibility.  These included TX 2, TX 3, TX 7, TX 8, TX 11, TX 13, TX 31, TX 35, TX 51, TX 192, TX 196 and TX 219.  These exhibits are admitted.

The Court is satisfied that all of the BLMIS records offered by the Trustee, including the remaining exhibits whose authenticity is contested, were part of the BLMIS records.  *Int'l Mgmt.* supports this conclusion.  In *Int'l Mgmt.,* the chapter 11 trustee contended that the debtor ran a Ponzi scheme, and sued numerous transferees to recover fictitious profits.  The bankruptcy court conducted a consolidated hearing to determine if the debtor was operated as a Ponzi scheme.  *Int'l Mgmt.,* 781 F.3d at 1264.

The trustee, himself a certified fraud examiner, testified how he had seized the debtor's files and reconstructed them to verify their accuracy.  He satisfied himself as to their reliability by hiring an international accounting firm, subpoenaing records of the debtor's accounts from national banking institutions and cross-checking the debtor's records with records provided by investors and the banks, and interviewing the debtor's principals and employees, including the debtor's office manager, from whom he learned the procedures for creating the debtor's documents.  *Id.* at 1265.

On appeal, the Eleventh Circuit agreed with the lower courts that the trustee had authenticated the debtor's books and records:

> The trustee testified that all of the underlying documents were found at IMA's offices and that the information in those documents *substantially matched the records kept by the financial institutions and clients with which IMA had transacted.*  If the bankruptcy court believed that testimony, it could have reasonably concluded that the underlying documents were a true and authentic record of IMA's business.  That is all Rule 901 required.

*Id.* at 1267 (emphasis added).

Here, the Trustee did not testify regarding his seizure of the BLMIS records or the chain of custody, but the testimony of his experts convince the Court that BLMIS

business records are what they purport to be. Mr. Greenblatt testified and the *Collura*

*Report* confirmed that their employer, FTI Consulting, was tasked with reconstructing

BLMIS' books and records, and hence, bore the responsibility for assembling, analyzing

and reconciling them. Thus, the experts were the ones who took possession of the

BLMIS books and records for the purpose of their work, and I accept the implication of

their testimony that the BLMIS records which they used to reconcile and analyze the

customer accounts were what they purported to be.

    In addition, the Trustee confirmed their accuracy through the same methods

employed by the trustee in *Int'l Mgmt.* He obtained BLMIS' bank records, cross-

checked them against BLMIS' cash transaction records and records provided by other

customers, and matched over 99% of the PW Transactions that occurred during the

Ten-Year Period. Furthermore, the former BLMIS employees who were deposed

explained the office procedures and how the BLMIS documents were created, and these

documents, including the PMTs, PMRs and Spiral Notebooks, where available,

corroborated the entries on the customer statements. Finally, the older records were

generally created in the same manner, are the same type and form as the documents

shown to the BLMIS witnesses during their depositions and the Ten-Year Period

documents that are unquestionably trustworthy. Accordingly, the objection to the

authenticity of the BLMIS records is overruled.

### 2.    Relevance

    Mr. Blecker challenges many BLMIS records, primarily records pertaining to

other customer accounts, (TX 1, TX 4, TX 5, TX 6, TX 9, TX 10, TX 12, TX 19, TX 20, TX

22, TX 32, TX 33, TX 191, TX 193, TX 194, TX 195, TX 197, TX 198, TX 199, TX 200, TX

201, TX 214, TX 215, TX 216, TX 220, TX 221, TX 225, TX 226, TX 230, TX 231, TX 232,

TX 233, TX 234), on relevancy grounds.  Under Rule 401, "[e]vidence is relevant when

'it has any tendency to make a [material] fact more or less probable than it would be

without the evidence.'" *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012)

(quoting FED. R. EVID. 401).  "A material fact is one that would affect the outcome of the

suit under the governing law." *Arlio v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007) (quoting

*Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 579

(2d Cir. 2006)).  Relevance is closely related to authentication and trustworthiness

because evidence cannot have any probative value unless it is actually what it purports

to be.  5 WEINSTEIN § 901.02[2]; FED. R. EVID. 901 advisory committee's note (1972)

("Authentication and identification represent a special aspect of relevancy.").

       As stated, the purpose of this SIPA proceeding is to determine the net equity

obligations to the extent ascertainable from BLMIS books and records or otherwise to

the satisfaction of the Trustee, *Net Equity Decision*, 654 F.3d at 237 (quoting SIPA §

78fff-2(b)(2)), and the Second Circuit has already concluded that BLMIS' records of

cash deposits and withdrawals are "accurate."  *Id.* at 232.  The BLMIS records offered by

the Trustee, including the records relating to other customer accounts, were relied on by

the Trustee's experts to analyze the PW Transactions and reach their conclusions.

Moreover, this is an omnibus proceeding involving many Participating Claimants, and

the "other customer" records relied on by the experts tends to make it more probable

that PW Transactions represented cash withdrawals in any individual customer case.

Accordingly, the Participating Claimants' relevancy objections are overruled.

### 3.    Hearsay

The Participating Claimants argue that the BLMIS records offered by the Trustee, including BLMIS customer statements (TX 1, TX 4, TX 5, TX 6, TX 9, TX 10, TX 12, TX 22, TX 32, TX 33, TX 81, TX 82, TX 83, TX 97, TX 193, TX 194, TX 195, TX 197, TX 200, TX 201, TX 205, TX 206, TX 209, TX 211, TX 215, TX 216, TX 220, TX 226, TX 227, TX 228, TX 233, TX 235, TX 236, TX 237, TX 238), customer files (TX 19, TX 20, TX 36, TX 37, TX 38, TX 40, TX 41, TX 42, TX 43, TX 44, TX 45, TX 46, TX 47, TX 48, TX 49, TX 191, TX 198, TX 199, TX 204, TX 210, TX 212, TX 213, TX 214, TX 225, TX 231, and TX 232), and all or some portion of other documents (TX 80, TX 89, TX 90, TX 221, TX 222, TX 223, TX 224, TX 217, TX 230 and TX 234), are hearsay and should not be received in evidence.

> Under the business records exception, the hearsay rule does not exclude
>
> A record of an act, event, condition, opinion or diagnosis if:
>
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6).  "The business records exception has been construed generously in favor of admissibility, due to the general trustworthiness of regularly kept records and the need for this type of evidence in many cases." *Arista Records*, 784 F. Supp. 2d at 421; *accord Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 391 (Fed. Cir. 1996); *accord*

23

*Health Alliance Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 129 (S.D.N.Y. 2007)

("Rule 803(6) favors the admission of evidence rather than its exclusion if it has any

probative value at all."), *aff'd*, 294 F. App'x 680 (2d Cir. 2008). The principal

precondition to the admission of a document under the business records exception is

that the records "have a sufficient indicia of trustworthiness to be considered reliable . . .

[and] [t]he determination of whether, in all the circumstances, the records are

sufficiently reliable to warrant their admission in evidence is left to the sound discretion

of the trial court." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632-

33 (2d Cir. 1994) (internal quotation marks and citation omitted); *accord Elsevier B.V.*

*v. UnitedHealth Grp., Inc.*, 784 F. Supp. 2d 286, 292 (S.D.N.Y. 2011). "The custodian

need not have personal knowledge of the actual creation of the document to lay a proper

foundation." *United States v. Komasa,* 767 F.3d 151, 156 (2d Cir. 2014) (citation and

alteration omitted), *cert. denied*, 135 S. Ct. 1579 (2015); *accord Int'l Mgmt.,* 781 F.3d at

1268 ("As long as the trustee presented enough circumstantial evidence to establish the

trustworthiness of the underlying documents, he did not need to present testimony from

the person who actually prepared them; his own testimony would suffice."); *Saks Int'l,*

*Inc. v. M/V "Export Champion",* 817 F.2d 1011, 1013 (2d Cir. 1987) ("[T]here is no

requirement that the person whose first-hand knowledge was the basis of the entry be

identified, so long as it was the business entity's regular practice to get information from

such a person."); *see generally* 5 WEINSTEIN § 803.08[04].

The BLMIS records offered by the Trustee, particularly the customer statements,

are excepted from hearsay under the business records exception for the reasons

explained by the Eleventh Circuit in *Int'l Mgmt.* In *Int'l Mgmt.*, the Court rejected the

24

defendants' contention that the debtor's records underlying the charts the trustee used to prove his case were hearsay. As custodian of the documents, the trustee testified about his investigation into the provenance of the documents, their reliability, and his interviews with the former employees during which he learned how the documents were created. Furthermore, he reconciled the documents with third-party documents including those obtained from financial institutions. *Int'l Mgmt.*, 781 F.3d at 1267.

Here, the Trustee's experts were qualified to identify the records as BLMIS' records for the reasons stated in connection with their authentication. They were tasked with reconstructing and analyzing them, and the Court has already found BLMIS' records to be trustworthy for the purpose of computing net equity under the Net Investment Method. Furthermore, Ms. Bongiorno and Ms. Sala, the two longest serving BLMIS employees, as well as the other former BLMIS employees who were deposed, had personal knowledge of BLMIS' regular record keeping practices. They explained how BLMIS created the books and records in the ordinary course of its business, including the customer statements and the "S" and "R" notations in the customers' files, and in particular, how the entries relating to the cash transactions, including the PW Transactions, were recorded at or about the time they were executed. Finally, Ms. Collura testified regarding the reconciliation process through which she matched the BLMIS records to the transactions depicted in third-party records, including BLMIS' banking records, and confirmed the cash outflow through a tracing analysis.

Accordingly, the Participating Claimants' hearsay objections and other objections to the admission of the BLMIS books and records are overruled, and they are received in evidence except to the extent a proffered exhibit was withdrawn by the Trustee.

## Part II - The Blecker Claims

### A.    Introduction

Having determined that in the absence of contrary evidence in an individual case the PW notation supports a finding that it reflects a cash withdrawal, the Court turns to Mr. Blecker's objection to the Trustee's determination valuing the Blecker Claims at zero. Mr. Aaron Blecker, aka Arthur Blecker, both individually and with his wife, Sophie Blecker, as joint tenant, held four different accounts at BLMIS from at least 1978 through December 11, 2008. Over the course of the years, BLMIS changed the numbering systems used to designate the accounts. BLMIS account 100214, a joint account, was opened as early as 1978. In 1983, BLMIS converted many of its account numbers, including 100214, which became 100215. In 1992, BLMIS changed to an alphanumeric numbering system, and account 100215 became account 1B0023[13] (the "023 Account"), Tr. 202:14-204:9, TX 91. As discussed below, the 023 Account was closed out in April 1997 through an inter-account transfer to BLMIS account 1B0157 (the "157 Account"). Similarly, BLMIS account 100254 was opened in 1986 and held in the name of Aaron Blecker. In 1992, BLMIS changed account 100254 to account

---

[13]    Mr. Blecker suggested that these were three different accounts and the Trustee had failed to account for the activity in all of the accounts. *Aaron Blecker's Proposed Findings of Fact and Conclusions of Law,* dated Mar. 22, 2018 ("*Blecker PFFCL*"), at p. 2 & ¶¶ 6-8 (ECF Doc. # 17398). In fact, 100214, 100215 and the 023 Account were the same account.

1B0022 (the "022 Account").  Tr. 187:12-188:22.[14]  As discussed below, the 022 Account

was also closed in April 1997 through an inter-account transfer to BLMIS account

1B0156 (the "156 Account").

Mr. Blecker filed the Blecker Claims with the Trustee, respectively, for the 156

Account, PCX 15, the 022 Account, PCX 16, and the 157 Account.  PCX 61.  He did not

file a claim for the 023 Account.  The claims relating to the 156, 022 and 157 Accounts

were in the amounts of $2,625,435.95, $753,107.40 and $1,480,131.54, respectively.

The Trustee denied the claims on the ground that the withdrawals exceeded the

deposits.  PCX 17 (022 Account); PCX 20 (156 Account); PCX 21 (157 Account).

It is undisputed that Mr. Blecker deposited the aggregate amount of $577,350.33

into the 022 and 023 Accounts.  The basis of the Trustee's objection to the Blecker

Claims relates to the numerous PW Transactions that appeared in the customer

statements for those accounts and exceeded the total deposits.  The 156 and 157

Accounts were funded exclusively through inter-account transfers originating with the

022 and 023 Accounts, which, the Trustee argues, were "dry" by the time of the inter-

account transfers.  As no fresh funds were ever deposited into the 156 and 157 Accounts,

their balances for net equity purposes are also zero under the Inter-Account Method.

Mr. Blecker contends that he never withdrew any funds from his accounts, and

therefore, he is entitled to an aggregate net equity claim in the sum of $577,350.33.

---

[14]     Again, Mr. Blecker implied that these were two different accounts, but they were the same
account.

27

**B.    The Activity in the Blecker Accounts**

**1.    The 022 Account**

Mr. Greenblatt testified at great length regarding his analysis of the 022 Account and summarized the transactions in a Principal Balance Calculation, TX 86, based on BLMIS' books and records, including the monthly account statements.  Tr. 186:23-194:9; *see also* PCX 17.  The 022 Account was opened in September 1986 with two deposits aggregating $100,000, and increased in December 1992 with an additional $100,000 deposit.  The customer statements between November 1986 and April 1997 listed seventy-five PW Transactions,[15] PCX 8, at ECF pp. 11-14 of 19.[16]  Under the Net Investment Method, Mr. Blecker's 022 Account had a negative balance of $59,634 by late April 1997, the amount by which the withdrawals exceeded the deposits.  TX 86, at 3.  On April 24, 1997, BLMIS purported to transfer $206,529 from the 022 Account to the 156 Account.  TX 86, at 3; *accord* Tr. 208:25-209:15; TX 97.  Following the debiting of the account in the sum of $2,323 on April 29, 1997 based on a PW Transaction, the balance in the 022 Account was zero, and there were no subsequent deposits.  The Trustee denied the Blecker Claim for the 022 Account because the withdrawals exceeded the deposits, PCX 17, but there is no dispute that in light of the purported inter-account transfer, the net equity is zero even under Mr. Blecker's theory of the case.  Accordingly, the Trustee's determination of net equity is confirmed on this basis alone.

---

[15]    The 022 Account also listed a check on December 13, 1989 in the sum of $3,187 denoted by a CW code.  TX 86, at 1.

[16]    "ECF pp." refers to the numbers imprinted at the top of the page by the Court's CM/ECF system.

### 2.    The 023 Account

Mr. Greenblatt engaged in a similar analysis for the 023 Account and summarized his analysis in the Principal Balance Calculation for that account in TX 91. Tr. 202:14-204:21.  This account was funded with several deposits and one inter-account transfer aggregating $377,350.  TX 91, at 1, 2; PCX 23, at Bates No. MWPTAP00000349.  The customer statements reflect that the Bleckers received nine checks between April 16, 1981 and June 18, 1982 in the total amount of $13,295.  TX 91, at 1.  These were not PW Transactions.  In addition, the account statements listed 105 PW Transactions between August 1982 and April 1997.[17]  PCX 8, at ECF pp. 15-19 of 19. A total of $843,877 was withdrawn from the account, leaving a negative balance of $466,527 as of late April 1997.  TX 91, at 4; PCX 23, at Bates No. MWPTAP00000352. On April 24, 1997, BLMIS purported to transfer $389,847 from the 023 Account to the 157 Account, and after a PW Transaction debit in the sum of $4,381 on April 29, 1997, the balance in the 023 Account was zero.  TX 91, at 4.  As noted, Mr. Blecker did not submit a net equity claim for this account.

### 3.    The 157 Account

Mr. Greenblatt also testified regarding his analysis of the 157 Account, and his Principal Balance Calculation is set forth in TX 93.  Tr. 206:5-23; *accord* PCX 21, at Bates No. MWPTAP00995997.  According to the customer statements, the account was funded with a single inter-account transfer from the 023 Account in the sum of

---

[17]    Many of the PW Transactions in the 023 Account were listed simply as "Check" without the usual reference to the corporation to which the check supposedly related.  Ms. Collura treated these "Checks" as PW Transactions based on their "PW" coding.

$389,847, but by then, the 023 Account was substantially overdrawn and the principal

amount transferred was zero under the Inter-Account Method.  Moreover, BLMIS

purported to transfer the entire equity to the 156 Account in June and September 1997,

reported as approximately $1.46 million, TX 93, so nothing was left in that account even

under Mr. Blecker's theory of the case.  Hence, the net equity claim was zero as reflected

in the Trustee's determination letter on this basis alone.  *See* PCX 21.

### 4. The 156 Account

Lastly, Mr. Greenblatt analyzed the 156 Account in the same manner as the other

accounts, and TX 92 reflects his Principal Balance Calculation.  Tr. 204:22-206:4.

According to the customer statements, the 156 Account was initially funded with an

inter-account transfer from the 022 Account in the sum of $206,529, but there was no

net equity in the 022 Account at the time so the actual transfer was zero under the Inter-

Account Method.  The aggregate amount of approximately $1.46 million was thereafter

transferred from the 157 Account, but the amount of that transfer under the Inter-

Account Method was also zero.  *See* TX 92.  As there were no other deposits into the

account, the Trustee denied the claim.  PCX 20.

### C. Mr. Blecker Ratified the PW Transactions as Debits to the Blecker Accounts

Mr. Blecker admitted that he reviewed his monthly customer statements and saw

the PW Transactions, and thought they represented checks *sent* to the companies

identified after the PW notation for the purchase of securities.  Deposition of Aaron

Blecker, held July 1, 2014 ("Blecker Tr.") at 10:19-11:16; PCX 68 at ¶ 10.[18]  Robert

Blecker, his son, confirmed that on a February 1995 statement produced by Mr. Blecker,

TX 82, his father had made certain notations that acknowledged the transactions on the

statement, including the PW Transactions.  Tr. 56:16–57:17.  The PW Transactions on

Mr. Blecker's statements reflected reductions in the principal balance.  *E.g.*, TX 81

("Check Aluminum" in the sum of $2,784.00); TX 82 ("Check Pacific" in the sum of

$2,517.75); TX 97 ("Check Philip Morris" in the sum of $2,323.00); TX 205 ("Check

Fleet Norstar" in the sum of $2,606.03); TX 206 ("Check Pep Boys" in the sum of

$2,627.74); TX 209 ("Check Health South" in the sum of $3,230.02, "Check Liberty

Natl" in the sum of $360.82); TX 211 ("Check Health South" in the sum of $12,364.06,

"Check Liberty Natl" in the sum of $1,375.28).

     The Customer Agreements signed by Mr. Blecker set a ten-day deadline for

objecting to the transactions listed in the customer statements:

> Confirmations of transactions and statements for the Customer Account(s)
> shall be binding upon the Customer if the Customer does not object, in
> writing, within ten days after the receipt by the Customer. . . .

TX 45, at ¶ 16, Bates No. AMF00154152; TX 49, at ¶ 16, Bates No. AMF00154167.  As the

Second Circuit has explained:

> The purpose of the ten-day written complaint clause in the customer
> agreement is to require the customer to memorialize his or her complaint
> soon after receipt of the account statement rather than waiting to see if the
> trade is profitable.  The writing requirement of the clause insures that
> unauthorized trading disputes are not relegated to "swearing contests"

---

[18]    The Trustee objected to PCX 68, Mr. Blecker's *Declaration Opposing Trustee's Method to Determine Inter-Account Transfers*, signed Apr. 29, 2014, on the ground that it was not authenticated.  *Post-Hearing Submission*, Ex. B, at 3.  Blecker identified and authenticated the exhibit at his deposition, *see* Blecker Tr. at 4:21-5:20, and the objection is overruled.

> between broker and customer.  For these reasons, broker-customer
> agreements requiring written notice of objection within a limited amount
> of time after the customer receives confirmation of the transaction
> generally have been enforced by courts.

*Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*, 936 F.2d 640, 645-46 (2d Cir.

1991); *accord DBL Liquidating Tr. v. Clarkson Constr. Co.* (*In re Drexel Burnham*

*Lambert Grp., Inc.*), 157 B.R. 539, 543-44 (S.D.N.Y. 1993) (Pollack, J.).

Mr. Blecker was a successful CPA, Tr. 31:14-22, and understood the difference

between a debit and a credit.  Whether the PW Transactions reflected payments to the

Bleckers as the Trustee's proof implies, or checks sent to the seller or issuer of the

identified security as Blecker believed, they still reduced the balances in the accounts,

and aggregated far more than the deposits.  There is no evidence that the Bleckers ever

protested the transactions depicted in the monthly statements, and specifically, the

reductions in the balances resulting from the PW Transactions.  Having failed to object

to the customer statements, Mr. Blecker is now barred from contesting that the PW

Transactions reduced the balances in his accounts.  *Pitheckoff v. SIPC* (*In re Great E.*

*Sec., Inc.*), No. 10 Civ. 8647(CM), 2011 WL 1345152, at *6 (S.D.N.Y. Apr. 5, 2011)

("Where the agreement with the broker-dealer requires the customer to object in

writing, within a specified period of time, failure to do so may suffice to ratify an

unauthorized trade."); *In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 419–20 (Bankr.

S.D.N.Y. 2003) (denying investors' claim of unauthorized trading as ground for

customer claim under SIPA based on investors' failure to timely complain of trading as

required by the customer agreement).

### D.    Mr. Blecker Failed to Sustain His Burden of Proof

Even if Mr. Blecker had not ratified the PW Transactions, he failed to sustain his burden of proving the amount of the Blecker Claims. "SIPA places the burden of proof to establish customer status on the claimant by requiring that a debtor's obligations to its customers be 'ascertainable from the books and records of the debtor' or 'otherwise established to the satisfaction of the trustee.'" *Pitheckoff*, 2011 WL 1345152, at *4 (quoting 15 U.S.C. § 78fff−2(b)); *accord In re A.R. Baron Co., Inc.*, 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998) ("Provisions of SIPA make clear a claimant's burden by requiring that a debtor's obligations to its customers be 'ascertainable from the books and records of the debtor,' or 'otherwise established to the satisfaction of the trustee.'") (quoting SIPA § 78fff-2(b)). It is not disputed that he individually, and together with his wife as joint tenants, were customers of BLMIS; the dispute relates to the amount of Blecker Claims. He has failed to prove that any of the accounts had positive net equity.

Mr. Blecker did not offer any evidence of his own to establish the amount of the Blecker Claims. With the help of the Trustee's experts, he was able to show that the deposits into the Blecker Accounts totaled $577,350. However, the reconciliations in the Trustee's determination letters on which he relied, *see Blecker PFFCL* ¶ 1 (citing PCX 17 and 23) also showed that the PW Transactions alone greatly exceeded the deposits and resulted in zero net equity. Mr. Blecker testified that he thought that the PW Transactions represented checks sent to the identified corporation to purchase the security and denied that he received the PW checks, but he never challenged the appropriateness of treating the PW Transactions as debits to the Blecker Accounts. Furthermore, his testimony that he never received the PW checks was incredible for the

reasons discussed later in the decision.  Accordingly, Mr. Blecker did not make a *prima facie* showing that the amount of the Blecker Claims was greater than zero.

But even if he shifted the burden of going forward to the Trustee, the Trustee rebutted Mr. Blecker's *prima facie* case and shifted the ultimate burden of persuasion back to Mr. Blecker which he then failed to carry.  Although the Trustee could not corroborate any of the PW Transactions in the Blecker Accounts as payments to the Bleckers as he could in nearly 100% of the PW Transactions during the Ten-Year Period, *see* PCX 8, at ECF pp. 11-19 of 19, the lack of corroboration was due to the absence of older bank records and not because of evidence contradicting the opinions of the Trustee's experts.  These opinions still support the inference that absent contradictory evidence, a PW Transaction represented a cash withdrawal.  Furthermore, Mr. Greenblatt's reconstruction of the Blecker Accounts based on the monthly statements summarized in the Principal Balance Calculations demonstrated that there was no net equity in the Blecker Accounts by the end of April 1997.  In simplest terms, the Bleckers overdrew the 022 Account by $59,634, the 023 Account by $466,527, and following the inter-account transfers, never deposited any principal into the 156 and 157 Accounts. Mr. Blecker was aware of the PW Transactions debited to the Blecker Accounts, but thought they represented checks sent to the identified corporation.  But whether they were checks sent to the corporation or checks sent to Blecker, they were still debits or cash outflows.  By the end of April 1997, those debits in the Blecker Accounts exceeded the credits by a substantial amount.

### 1.    Objections to the Principal Balance Calculations

Mr. Blecker objects to the admission under Fed. R. Evid. 1006[19] of the Principal

Balance Calculations on the ground that the summary is comprised of hearsay and other

inadmissible evidence, the offer lacks a foundation and the Trustee has failed to

authenticate the Principal Balance Calculations.  Initially, Mr. Greenblatt testified

extensively, and without objection, regarding the preparation of the Principal Balance

Calculations for the Blecker Accounts.  Tr. 187:12-206:23.  Thus, he authenticated the

Principal Balance Calculations.

He also supplied the necessary foundation testimony.  "A summary must of

course be based on foundation testimony connecting it with the underlying evidence

summarized."  *Fagiola v. Nat'l Gypsum & Co.*, 906 F.2d 53, 57 (2d Cir. 1990).  Mr.

Greenblatt testified on cross-examination that he "reviewed all of the monthly

statements . . . [f]or all of the Blecker accounts," Tr. 225:9-15[20], and explained during his

---

[19]    Rule 1006 provides:

The proponent may use a summary, chart, or calculation to prove the content of
voluminous writings, recordings, or photographs that cannot be conveniently examined
in court.  The proponent must make the originals or duplicates available for examination
or copying, or both, by other parties at a reasonable time and place.  And the court may
order the proponent to produce them in court.

[20]    In a separate, post-trial declaration, Mr. Blecker's counsel argued that this meant that he did not
review all of the monthly statements for the joint account that Mr. Blecker held with his late wife, Sophie
Blecker.  *See Declaration of Helen Davis Chaitman*, dated Mar. 22, 2018 ("*Chaitman Declaration*"), at ¶
6 (ECF Doc. # 17398-1).  During questioning, the experts referred to all of the accounts as the "Blecker
accounts," and specifically referred to the 023 Account, a joint account, as one of the Blecker accounts.
Tr. 120:2-10.  Even Mr. Blecker's attorney referred to all of the accounts, including the joint accounts, as
the "Blecker accounts."  *E.g.,* Tr. 120:2-10, 127:21-128:2, 217:13-25, 220:16-19, 224:18-225:15.  That is
how I understood Mr. Greenblatt's testimony and that is how I interpret it.

testimony that the Principal Balance Calculations summarized those statements.
Hence, he laid the proper foundation.

The balance of Mr. Blecker's objection to the receipt of the admission of the
Principal Balance Calculations lacks merit.  A summary may be admitted as a
convenient means to prove the contents of voluminous documents provided the original
or duplicates of the underlying evidence are available for inspection and copying and are
admissible in evidence, 6 WEINSTEIN § 1006.06[1], [3], but the documents underlying
the summary do not have to be introduced into evidence.[21]  *See United States v.
Milkiewicz*, 470 F.3d 390, 396 (1st Cir. 2006); *United States v. Janati*, 374 F.3d 263,
272-73 (4th Cir. 2004).

The relevant customer statements were voluminous.  They spanned twenty-six
years (1982-2008) and involved 180 separate PW Transactions.  Furthermore, the
underlying monthly statements are admissible under the business records exception for
the reasons discussed above, and it was unnecessary to introduce them into evidence
although some have been received.

Finally, the data underlying the Principal Balance Calculations — the customer
statements — were available for inspection and copying in the Trustee's data room.  The
Principal Balance Calculations showed that there were no gaps in the statements and
included the Bates numbers for every customer statement that Mr. Greenblatt reviewed.

---

[21]       Mr. Blecker's argument that the Trustee should have offered all of the customer statements into
evidence, *Blecker PFFCL* ¶¶ 10, 12, therefore lacks merit.

In addition, Ms. Collura tracked 180 PW Transactions in the Blecker's accounts, and

identified them by date, amount and description.  PCX 8, at ECF pp. 11-19 or 19.

According to her footnotes, this information came directly from the Bleckers' monthly

customer statements.  Obviously, Mr. Greenblatt and Ms. Collura reviewed all of the

Bleckers' monthly statements to identify the universe of PW Transactions and to

prepare the Principal Balance Calculations and PCX 8.[22]

In a post-trial submission, Mr. Blecker's counsel contends that the Trustee did

not make all of the monthly statements available, and purports to offer proof.  She sent

paralegals into the Trustee's data room *after the trial*, and, she claims, they could not

find all of the monthly statements.  *Chaitman Declaration* ¶¶ 9-16.  Aside from the fact

that the *Chaitman Declaration* attesting to missing account statements is rank hearsay

submitted *after* the trial record was closed, the statements are not credible.  The

production of the customer statements has been a long-running dispute during which

the Trustee has produced the customer statements for all of Ms. Chaitman's clients on

multiple occasions.  *Letter from Seanna R. Brown, Esq. to the Court*, dated Apr. 10,

2018 ("*Brown Letter*") (ECF Doc. No. 17462) (responding to the *Chaitman

Declaration*).  Ms. Chaitman has never moved to compel the production of the

---

[22]    The evidence also supports the inference that Mr. Blecker received all of his monthly statements
over the years.  He testified that he reviewed his statements which he would have had to have done to
conclude as he did that BLMIS was a great investment.  In addition, a statement culled from his own files
and produced by his son, Robert, showed that he made handwritten calculations relating to the
information.  *See* TX 82.  Thus, Mr. Blecker reviewed the statements carefully.  There is no evidence that
he ever complained that he had not received a monthly statement.

supposedly missing customer statements, implying that they were not missing from the productions.

In addition, it strains credulity that the Trustee's data room contained some but not all of Mr. Blecker's customer statements when the Principal Balance Calculations identified them all by Bates number. Assuming that the paralegals really couldn't find the statements, it doesn't mean they weren't there. The more plausible explanation is that they didn't look hard enough or needed help. The paralegals could have located all the statements by using the Bates numbers or by asking the Trustee for help.

Mr. Blecker also complains that the Principal Balance Calculation regarding the 023 Account included a $35,000 inter-account transfer on February 18, 1983 from an "A & A" account, and "as far as" his counsel knows, the Trustee never produced the data for that account. *Chaitman Declaration* ¶ 15.[23] The Trustee again disagrees, *Brown Letter*, but the dispute is a red herring.[24] The Principal Balance Calculations summarized the Bleckers' account statements, not the A & A account statements, and the only question is whether the $35,000 inter-account transfer appeared as a credit in the February 1983 statement.

---

[23] In support, counsel attached an exhibit from Mr. Greenblatt's supplemental declaration which she pre-marked as PCX 9 but never offered into evidence.

[24] Mr. Blecker was not a customer with respect to the A & A account. *See Kruse v. SIPC (In re BLMIS)*, 708 F.3d 422, 426 (2d Cir. 2013) (Judicial interpretations of "customer" status "support a narrow interpretation of the SIPA's provisions," and the "critical aspect" of such status is the "entrustment of cash or securities to the broker-dealer for the purposes of trading securities.") (citations omitted).

Based on Mr. Greenblatt's testimony and his Principal Balance Calculations, I find that it does.[25] Moreover, Mr. Blecker confirmed the information on the statement with Frank Avellino, one of the managers of the A & A account,[26] *see* Blecker Tr. 14:22-15:5, and Mr. Blecker got full credit for that inter-account transfer; Mr. Greenblatt did not reduce the transfer under the Inter-Account Method. Mr. Blecker also implied that the "A & A" account was another Blecker account, *Blecker PFFCL* ¶ 5, but there is no evidence to support that finding. To the contrary, Blecker has stated that the only accounts that he established were his personal account and the joint account with his wife. PCX 19, at ¶ 1.

Finally, the same calculations were summarized in exhibits offered by Mr. Blecker which were received without objection. Each determination letter included a chart that reconstructed the particular account and contained the same information as the Principal Balance Calculations. *See* PCX 17 (022 Account), PCX 20 (156 Account), PCX 21 (157 Account). *See also* PCX 23 (023 Account). The information contained in Mr. Blecker's own exhibits duplicated the Principal Balance Calculations. Accordingly, the objection to the admission of the Principal Balance Calculations is overruled, and they are received.

---

[25]    Ms. Collura's supplemental report also listed a PW Transaction on February 15, 1983 in the 023 Account, *see* PCX 8, at ECF pp. 15 of 19, so the February 1983 statement plainly exists.

[26]    Mr. Blecker also speculated that he had funds in other accounts with Avellino, and Madoff may have transferred profits to those accounts. *Blecker PFFCL* ¶¶ 11, 14. Blecker never testified that he had other accounts, and took the position that the PW Transaction checks were sent to the issuing corporation, not to another account. Further, his counsel failed to adduce any evidence that he had other accounts.

### 2.    Other Evidence Supports the Trustee's Determinations

Other BLMIS records and former employee testimony support the Trustee's conclusion that the PW Transactions in the Blecker Accounts represented checks paid to the Bleckers.  BLMIS' internal records listed Mr. Blecker's accounts as "S" accounts signifying that the PW Transaction checks would be sent to Mr. Blecker automatically, and there was no need for Mr. Blecker to request written withdrawals.  During her deposition, Ms. Bongiorno was shown the Name/ADDR File Maintenance form relating to the 023 Account.  The exhibit, Bates No. MADTBB01988421-24, was marked as Exhibit 42 at her deposition and as TX 210 at trial.  The columns headed "Profits," "Dividends" and "Interest" each bore the notation "S," meaning that profits, interest and dividends generated in the account would be sent automatically to Mr. Blecker without further request.  Ms. Bongiorno identified the handwriting of the "S" notations as her own, and explained that in the ordinary course of BLMIS' business, the "S" treatment would have been agreed to verbally between Mr. Blecker and Madoff, no letter would have been required and the profits would be sent automatically.  Bongiorno Tr. 104:3-107:2.

Similarly, Ms. Bongiorno was shown the Name/ADDR File Maintenance pertaining to the 022 Account.  This exhibit, Bates No. MADTBB01988418-20, was marked as Exhibit 36 at her deposition and as TX 204 at trial.  This exhibit contained a single, handwritten "S" notation to the right of the "Profits," "Dividend" and "Interest" columns, which Ms. Bongiorno testified was written by Jodi Crupi, another BLMIS employee.  Bongiorno Tr. 86:22-87:10, 221:17-21.  She further testified that it would have been set up in the same way as the 023 Account, and profits would have been sent

40

automatically to the Bleckers.  Bongiorno Tr. 87:11-88:17; *accord* Deposition of Bernard

L. Madoff, held June 15, 2016 ("Madoff Tr.") 102:15-23.[27]

Furthermore, Ms. Bongiorno confirmed that certain PW Transactions reflected

on the Blecker Accounts' monthly statements matched several corresponding entries in

the "cash out" Spiral Notebooks.  For example, Mr. Blecker's July 1991 customer

statement for the 022 Account, TX 209, reported a PW Transaction on July 11, 1991 in

the amount of $3,230.02 related to profits on a deal involving Health South securities,

but this transaction was canceled on July 17, 1991.  That same day, a check, coded "PW,"

was re-issued to Mr. Blecker in the same amount.  The re-issued check was reported in

the Spiral Notebooks with corresponding information as to the date, accountholder,

amount, and related security.  TX 229, at Bates No. HWN0001651; Bongiorno Tr.

90:22-95:7.  The Spiral Notebooks also listed a PW check to Mr. Blecker in the sum of

$360.82 relating to Liberty National Bancorp.  TX 229, at Bates No. HWN0001655.  A

corresponding entry, "Check Liberty Natl," dated June 22, 1991, appeared as a PW

Transaction (and debit) on the June 1991 customer statement.  In fact, Madoff testified

that a PW Transaction appearing in Mr. Blecker's customer statement corresponded to a

check that would have been sent to Mr. Blecker.  Madoff Tr. 34:1-14.

Finally, the Spiral Notebooks reported PW checks sent to Mr. Blecker in the

amount of $12,364.06 on June 17, 1991, relating to Health South, TX 229, at Bates No.

---

[27]    The PW Transactions in the Blecker Accounts stopped once the 156 and 157 Accounts were
opened at the end of April 1997.  The trial record does not reflect a written request by the Bleckers to
switch from "Send" to "Reinvest" for those accounts.

HWN0001651, and another PW check in the amount of $1,375.28 relating to Liberty National Bancorp.  *Id.*, at Bates No. HWN0001655.  The parties did not offer the June 1991 customer statement for the 023 Account into evidence, but Ms. Collura's supplemental report confirmed that both checks appeared as PW Transactions in that customer statement.  PCX 8, at ECF pp. 17 of 19 & nn. 1 & 2.

### 3.    Mr. Blecker's Denial of Withdrawals Lacked Credibility

Mr. Blecker testified that he never withdrew any funds from the Blecker Accounts because they were such a "good investment."  Blecker Tr. 6:5-7:11.[28]  His son Robert also testified, without objection, that Mr. Blecker told him that the BLMIS investment was a "wonderful investment," "its returns were high" and "he was very pleased at the returns," Tr. 30:6-16, and "I've never withdrawn from Madoff, you shouldn't either."  Tr. 37:2-7.  I do not credit Mr. Blecker's assertions that he never withdrew any money from the Blecker Accounts.

All of the PW Transactions occurred in the 022 and 023 Accounts, both of which were closed in April 1997 through inter-account transfers to the 156 Account and the 157 Account, respectively.[29]  Mr. Blecker deposited $200,000 into the 022 Account, $100,000 in 1986 and another $100,000 in 1992.  According to the last 022 Account statement, BLMIS transferred $206,528.75, the principal plus remaining profits, to the 156 Account on April 24, 1997.  TX 86; *accord* PCX 17, at Bates No. MWPTAP00995732.

---

[28]    The objection to a question at Blecker Tr. 6:12 is overruled.

[29]    As noted earlier, there was a final PW Transaction in both the 022 and the 023 Accounts on April 29, 1997, after which the balances were zero.

If he never withdrew any funds as he says, his $200,000 in deposits earned only $6,528.75 in profits over an eleven year period.  Using the intermediate date of April 1989, the approximate midpoint of the two deposits, the 022 Account earned a profit of $816.09 for each of the eight years, or approximately four tenths of one percent per annum.[30]

Similarly, Mr. Blecker deposited $377,350 into the 023 Account between March 1981 and October 1990, all but $100,000 of which was deposited prior to 1985.  PCX 23, at Bates No. MWPTAP00000349.  According to the April 1997 monthly statement, BLMIS transferred $389,846.73, the principal and remaining profits, to Account 157 on April 24, 1997.  *See* PCX 23, at Bates No. MWPTAP00000352; TX 91.  Again, if Mr. Blecker never withdrew any money as he claims, the 023 Account earned only $12,496.40 in profits over its sixteen-year life.  Using April 1984 as the intermediate date to keep the math simple, the 023 Account earned a profit of $1,041.37 for each of twelve years, or approximately three tenths of one percent per annum.[31]

---

[30]    The Trustee appears to be seeking the admission of Demonstrative 5, a graphic depiction shown to Mr. Greenblatt during his testimony that charted the return on Mr. Blecker's 022 Account and compared it to the hypothetical returns it would have earned if BLMIS had reinvested the PW Transactions.  The hypothetical investment line on the graph was based on Mr. Greenblatt's understanding that Mr. Blecker was contending that he reinvested all of his profits.  Tr. 208:13-19.  However, Mr. Blecker testified that he thought the PW Transaction checks were being sent to the corporation identified in the customer statements for the purchase of its securities, not reinvested.  Moreover, the graphic depiction is not helpful.  Finally, the projection of hypothetical profitability does not appear to lie within Mr. Greenblatt's expert qualifications as a forensic accountant.  Accordingly, the Court sustains Mr. Blecker's objection to the receipt of this exhibit.

[31]    The Trustee seeks the admission of Demonstrative 6, which was also shown to Mr. Greenblatt and contained the same type of information and projections regarding the 023 Account as Demonstrative 5.  Tr. 210:11-211:16.  Mr. Blecker's objection to the admission of this exhibit is sustained for the same reasons.

If Mr. Becker didn't receive the PW Transaction checks, it is difficult to understand why he viewed these meager returns as a "good investment" and a "wonderful investment" earning high returns that pleased him so. The only way this makes sense is if he received the high returns in the form of the PW checks.

In addition, his testimony and statements that he thought the PW Transactions were checks issued to the identified corporation for the purchase of its securities is belied by the monthly statements which did not show that he held the stock he was supposedly purchasing with the PW checks. Mr. Greenblatt provided an example. Mr. Blecker's February 1995 statement, TX 82, showed a purchase of 2,484 shares of "Aluminum Company of America" for $202,446 and listed the 2,484 shares in the holdings section of the statement. The March 1995 statement, TX 81, showed that following a two-for-one stock split, the shares are purportedly sold for $205,203, resulting in a profit of $2,784. Eight days later, the amount of the purported profit, $2,784, was listed as a PW Transaction on the March 1995 customer statement in the column "Amount Debited to Your Account." The securities for Aluminum Company of America no longer appeared in the holdings section on the month-end March 1995 statement, and did not appear on the April 1995 statement, TX 83. Tr. 182:9–186:22. Other account statements also show that the Blecker Accounts did not own the corresponding security after a PW Transaction relating to that security. *See, e.g.,* TX 82 (showing PW "Check Pacific" debited on February 7, 1995 but no corresponding "Pacific" security held in the account); TX 97 (showing sale of Philip Morris stock on April 16, 1997 and PW "Check Philip Morris" debited on April 29, 1997); TX 205 (showing PW "Check Fleet Norstar" on April 28, 1992 but no corresponding holding at

44

the end of the month); TX 206 (showing a PW "Check Pep Boys" debited on June 16,

1992 but no corresponding purchase or holding of Pep Boys securities after the debit);

TX 209 (showing PW "Check Health South" debit on July 17, 1991 and no corresponding

purchase or holding); TX 211 (same).

## CONCLUSION

The Court finds that the PW Transactions listed in a customer's monthly

statement supports the finding, absent credible contrary evidence, that a check in that

amount was sent to the customer and constitutes a cash withdrawal under the Net

Investment Method.  As concerns the Blecker Accounts, the Court finds that Mr. Blecker

ratified the treatment of PW Transactions as debits to the Blecker Accounts, and in

addition, the PW Transactions represent cash withdrawals from the Blecker Accounts in

the form of direct payments to the Bleckers.  The Court has considered the remaining

arguments made by the Participating Claimants and Mr. Blecker, and concludes that

they lack merit.  The foregoing constitutes the Court's findings of fact and conclusions of

law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure made applicable by

Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure and shall apply to

the Participating Claimants' objections to the Trustee's determinations of their net

equity claims.  The Trustee is directed to submit an order overruling Mr. Blecker's

objection to his determination of the Blecker Claims, and fixing the amount of the

Blecker Claims at zero.

     So ordered.

Dated:  New York, New York
        July 27, 2018

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge