# EXHIBIT D

Helen Davis Chaitman (4266)
PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
Attorneys for Carol Nelson and Stanley Nelson

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------
SECURITIES INVESTOR PROTECTION
CORPORATION,

        Plaintiffs

vs.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

        Defendant.
---------------------------------------------------------

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

**OBJECTION TO TRUSTEE'S DETERMINATION OF CLAIM**

        Carol Nelson and Stanley Nelson hereby object to the Notice of Trustee's Determination of Claim dated October 19, 2009 sent by Irving H. Picard and state as follows:

**Background facts**

        1.    On December 8, 1992, the Nelsons opened an account with Bernard L. Madoff Investment Securities LLC ("Madoff"): Account No. 1ZA284 (the "Account") in the name of Carol Nelson and Stanley Nelson JTWROS. Each of the Nelsons had deposited money into the Account for the purpose of purchasing securities and each of them had the power to direct the investments in the Account. Each of the Nelsons communicated with Madoff concerning the Account.

        2.    During the period from December 8, 1992 through December 11, 2008, according to the Trustee, the Nelsons deposited a total of $5,550,000 into the Account and withdrew a total

1096129.1

of $11,955,000 from the Account. See Exh. A at 4 - 6. The Nelsons dispute the Trustee's calculations.

3. Throughout the period that the Nelsons had the Account, they paid taxes annually on the appreciation in the Account.

4. The November 30, 2008 market value of securities in the Account was $7,855,126.01.

5. On January 9, 2009, the Nelsons sent a SIPC claim to Picard for the Account asserting a claim for securities in the amount of $7,855,126.01 based upon the November 30, 2008 Madoff statement.

6. On October 19, 2009, Picard sent the Nelsons a determination letter (the "Determination Letter") with respect to the Account, rejecting the claim for securities based upon the November 30, 2008 balance on the theory that they withdrew $6,405,000 more than they invested, ignoring all appreciation in the Account and ignoring the fact that each of them is a "customer" under the Securities Investor Protection Act ("SIPA"), entitled to up to $500,000 in SIPC insurance. See Exh. A at 1-2.

**Grounds for objection**

**A. Picard has failed to comply with the Court's December 23, 2008 Order**

7. The Determination Letter fails to comply with the Court order dated December 23, 2008 which directs Picard to satisfy customer claims and deliver securities in accordance with "the Debtor's books and records." December 23, 2008 Order at 5 (Docket No. 12). The November 30, 2008 account statement generated by Madoff is reflective of "the Debtor's books and records" by which Picard is bound, absent proof that the Nelsons did not have a "legitimate expectation" that the balance on the Account statements represented their property. In fact, in

2

1096129.1

each year that they had the Accounts, the Nelsons paid ordinary income taxes on the appreciation in the Account, which were duly accepted by the taxing authorities. The Nelsons would not have paid those sums if they did not believe that the assets in the Account belonged to them.

8. Picard has failed to state a basis in the Determination Letter for the position he has taken. Thus, he has not complied with the requirement that an "objection to a claim should . . . meet the [pleading] standards of an answer. It should make clear which facts are disputed; it should allege facts necessary to affirmative defenses; and it should describe the theoretical bases of those defenses." Collier on Bankruptcy ¶ 3007.01(3)(15th ed.); *In re Enron Corp.,* No. 01-16034, 2003 Bankr. LEXIS 2261, at *25 (B.S.D.N.Y. Jan. 13, 2003).

**B. Picard has violated the requirement that he honor a customer's "legitimate expectations"**

9. The legislative history of the SSIPA makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.
>
> \* \* \*
>
> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

3

10. SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

11. Thus, SIPC is statutorily bound to honor a customer's "legitimate expectations." This was acknowledged by SIPC in a brief it submitted to the Second Circuit in 2006, wherein SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities. SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

12. Picard's position in the Madoff case is contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each. So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

4

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html.

13. As indicated *infra,* in the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements. In fact, SIPC's president, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

> HARBECK: . . . if you file within sixty days, you'll get the securities, without question. Whether – if they triple in value, you'll get the securities . . . Even if they're not there.
>
> COURT: Even if they're not there.
>
> HARBECK: Correct.
>
> COURT: In other words, if the money was diverted, converted –
>
> HARBECK: And the securities were never purchased.
>
> COURT: Okay.
>
> HARBECK: **And if those positions triple we will gladly give the people their securities positions.**

Tr. at 37-39, *In re New Times Securities Services, Inc.,* No 00-8178 (B.E.D.N.Y. 7/28/00) (emphasis added).

**C. Without legal authority, Picard has invented his own definition of "net equity"**

14. SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

> The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –

5

1096129.1

(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus

(B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11).

15. SIPA specifically prohibits SIPC from changing the definition of "net equity." 15 U.S.C. § 78ccc(b)(4)(A).

16. The Second Circuit has recognized that:

Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also, In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

17. In derogation of his obligations to carry out the provisions of SIPA, Picard has created his own definition of "net equity." Picard has asserted that he has a right to recognize investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts. By this procedure, Picard would avoid paying SIPC insurance to the thousands of elderly, long-term Madoff investors who, like the Nelsons, have depended upon their Madoff investments for their daily living expenses. He also would be able to reduce all claims to the net investment, thus enhancing SIPC's subrogation claim for reimbursement of the insurance it does pay to customers.

18. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

6

1096129.1

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

19.    Harbeck's statement is a rationalization of what appears to be SIPC's goal, *i.e.,* to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

20.    After ten months of his tenure, Picard has identified only two Madoff investors who **might not** have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. For example, Picard has sued two Madoff customers, Stanley Chais and Jeffry Picower who, Picard has alleged, took out of Madoff $7 billion more than they invested. Picard has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

21.    However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's depriving the more than 8,000 remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

22.    The Nelsons, like thousands of other investors, received monthly statements from Madoff over the past 16 years indicating returns on their Madoff investment in the range of 9.58% to 20.05% per year. The Nelsons had entered into a standard brokerage agreement with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which the Account had specific numbers; they received on a monthly basis trade confirmations for every securities transaction in the Account which accurately set forth the names and prices of securities indicating the purchase

7

1096129.1

and sale of Fortune 100 company stocks and the purchase of US Treasury securities. There is no basis to claim that the Nelsons did not have a "legitimate expectation" that the assets reflected on the Account statements sent to them by Madoff belonged to them. Thus, the Nelsons are entitled to a claim for securities in the amount of $7,855,126.01, as reflected on the November 30, 2008 Madoff statement.

**D. The Nelsons are each a "customer" under SIPA and are entitled to $500,000 in SIPC insurance each.**

23. Each of the Nelsons is a "customer" under the plain definition of "customer" in SIPA. Thus, each is entitled to receive up to $500,000 in SIPC insurance. 15 U.S.C. § 78lll(2)("The term "customer" includes . . . any person who has deposited cash with the debtor for the purpose of purchasing securities.").

24. Clearly, if Congress had intended to limit customers to account holders the definition of customer could have been six words: "A "customer" is an account holder." Instead, Congress' definition of customer is 20 lines long and is further clarified in 15 U.S.C. § 78fff-3(a) to make clear that customers of a bank or broker or dealer that invests in Madoff are all customers under SIPA ("no advance shall be made by SIPC to the trustee to pay or otherwise satisfy any net equity claim of any customer who is a broker or dealer or bank, other than to the extent that it shall be established . . . that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank . . . , **in which event each such customer of such broker or dealer or bank shall be deemed a separate customer** of the debtor").

8

1096129.1

25.     Any ambiguity in the definition of "customer," and there is none here, should be construed in favor of the Nelsons because "SIPA is remedial legislation. As such, it should be construed liberally to effect its purpose." *Tcherepin v. Knight,* 389 U.S. 332 (1967).

26.     The Trustee erroneously relies upon SIPC Rule 105. SIPA does not permit SIPC, by the promulgation of Rules, to change the definition of "customer" under the statute. Hence, Rule 105 is invalid. 15 U.S.C. § 78ccc(b)(4)(A).

**E. The Nelsons are entitled to prejudgment interest on their investment and profits.**

27.     Under New York law, which is applicable here, funds deposited with Madoff are entitled to interest. *See, e.g.,* N.Y.C.P.L.R. § 5004; N.Y. Gen. Oblig. § 5-501, *et seq.* Moreover, since Madoff converted the Nelsons' funds, that fact also entitles them to prejudgment interest. *See, e.g., Steinberg v. Sherman,* No. 07-1001, 2008 *U*.S. Dist. LEXIS 35786, at *14-15 (S.D.N.Y. May 2, 2008)("Causes of action such as . . . conversion and unjust enrichment qualify for the recovery of prejudgment interest."); *Eighteen Holding Corp. v. Drizin,* 701 N.Y.S. 2d 427, 428 (1st Dept. 2000)(awarding prejudgment interest on claims for unjust enrichment and conversion).

28.     Although it is not legally relevant, Picard cannot prove that Madoff earned no money on the Nelsons' investment. To the extent the funds were deposited into a bank, they earned interest while on deposit. Madoff disbursed customer funds to favored customers, to family members, and for other purposes. Those funds may have yielded substantial profits to which the Nelsons and other customers are entitled once the ultimate recipients of Madoff's thievery are known.

29.     In a Ponzi scheme, out of pocket damages are an improper and inadequate remedy. *See, e.g.*, *Donell v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008). Where a Ponzi scheme

9

is operated by an SEC-regulated broker-dealer, investors are not limited to "out-of-pocket damages." *See Visconsi v. Lehman Bros., Inc.*, No. 06-3304, 2007 WL 2258827, at *5 (6th Cir. Aug. 8, 2007). In *Visconsi*, Lehman Brothers made the same argument that the Trustee makes here, that the plaintiffs were not entitled to any recovery because they already had withdrawn more than they had invested. The Sixth Circuit rejected that argument because, as the court explained, the plaintiffs gave $21 million to Lehman, not to hide under a rock or lock in a safe, but for the express purpose of investment, with a reasonable expectation that it would grow. Thus, the out-of-pocket theory, which seeks to restore to plaintiffs only the $21 million they originally invested less their subsequent withdrawals, is a wholly inadequate measure of damages. *Id.* Instead, the Sixth Circuit upheld an arbitration award to the plaintiffs of "an expectancy measure of damages, which seeks to put Plaintiffs in the position they would have held had [the brokers] not breached their 'bargain' to invest Plaintiffs' money." *Id. Cf., S.E.C. v. Byers,* 2009 W.L. 2185491 (S.D.N.Y.)(district court sitting in equity in non-SIPA liquidation approved distribution to investors in Ponzi scheme whereby investors' claims were allowed in the amount of their net investment plus their re-invested earnings).

**F. Picard has no power to claw back withdrawals beyond the statute of limitations period and solely for SIPC's benefit**

30. In derogation of his fiduciary duty to the Nelsons, Picard has applied his net investment calculation to determine the amount of their claim. However, he has no right to reduce their claim in this manner and to deduct withdrawals from their Account balances. Without any legal authority, Picard is, in effect, imposing upon the Nelsons a fraudulent conveyance judgment for sums the Nelsons withdrew from the Accounts beyond the statute of limitations period applicable to fraudulent conveyances. Thus, even if Picard were entitled to

utilize the fraudulent conveyance provisions of the Bankruptcy Code against customers, he could not possibly do so beyond the applicable statute of limitations. Yet, he has done so here and deprived the Nelsons of the claim to which they are absolutely entitled.

**G. Picard has violated SIPA by delaying the payment of SIPC insurance**

31. Picard has breached his statutory obligation to "promptly" replace a customer's securities. 15 U.S.C. § 78fff-2(b). Picard is obligated to replace the Nelsons's securities up to a value of $500,000 as of November 30, 2008.

**Conclusion**

The Nelsons are entitled to an order compelling Picard and SIPC to immediately replace the securities in their Account to the extent of a valuation of $500,000 for each of the Nelsons as of November 30, 2008.

The Nelsons are entitled to have their claim recognized in the amount of $7,855,126.01, consistent with the November 30, 2008 statements.

The Nelsons are entitled to judgment against Picard and Baker & Hostetler LLP for the damages they have suffered as a result of the breach of fiduciary duty of Picard and his counsel.

November 6, 2009

                PHILLIPS NIZER LLP

                By <u>s/s Helen Davis Chaitman</u>

                666 Fifth Avenue
                New York, NY 10103-0084
                (212) 841-1320
                Attorneys for
                Carol Nelson and Stanley Nelson

# EXHIBIT A

# BERNARD L. MADOFF INVESTMENT SECURITIES LLC

In Liquidation

## DECEMBER 11, 2008[1]

### NOTICE OF TRUSTEE'S DETERMINATION OF CLAIM

October 19, 2009

Carol Nelson and Stanley Nelson J/T WROS
136 Woodbury Rd.
Washington, CT 06793

Dear Carol Nelson and Stanley Nelson J/T WROS:

**PLEASE READ THIS NOTICE CAREFULLY.**

The liquidation of the business of BERNARD L. MADOFF INVESTMENT SECURITIES LLC ("BLMIS") is being conducted by Irving H. Picard, Trustee under the Securities Investor Protection Act, 15 U.S.C. § 78aaa et seq. ("SIPA"), pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

The Trustee has made the following determination regarding your claims on BLMIS Account No. 1ZA284 designated as Claim Number 480 and Claim Number 1868 (the latter of which is duplicative of Claim Number 480) and are combined ("Combined Claim") for purposes of this determination. This letter shall serve as the Trustee's determination with respect to the Combined Claim:

Your Combined Claim for a credit balance of $7,855,126.01 and for securities is **DENIED**. No securities were ever purchased for your account.

Further, based on the Trustee's analysis, the amount of money you withdrew from your account at BLMIS (total of $11,955,000.00), as more fully set forth in Table 1 annexed hereto and made a part hereof, is greater than the amount that was deposited with BLMIS for the purchase of securities

---

[1] Section 78lll(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." Section 78lll(7)(B). Thus, even though the Application for a protective decree was filed on December 15, 2008, the Filing Date in this action is on December 11, 2008.

(total of $5,550,000.00). As noted, no securities were ever purchased by BLMIS for your account. Any and all profits reported to you by BLMIS on account statements were fictitious.

Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of the deposits in your account ($6,405,000.00) was taken from other customers and given to you. Accordingly, because you have withdrawn more than was deposited into your account, you do not have a positive "net equity" in your account and you are not entitled to an allowed claim in the BLMIS liquidation proceeding. Therefore, your Combined Claim is **DENIED** in its entirety.

Should a final and unappealable court order determine that the Trustee is incorrect in his interpretation of "net equity" and its corresponding application to the determination of customer claims, the Trustee will be bound by that order and will apply it retroactively to all previously determined customer claims in accordance with the Court's order. Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by you in having your customer claim re-determined in accordance with any such Court order.

Nothing in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any rights or claims held by the Trustee against you.

**PLEASE TAKE NOTICE:** If you disagree with this determination and desire a hearing before Bankruptcy Judge Burton R. Lifland, you **MUST** file your written opposition, setting forth the grounds for your disagreement, referencing Bankruptcy Case No. 08-1789 (BRL) and attaching copies of any documents in support of your position, with the United States Bankruptcy Court **and** the Trustee within **THIRTY DAYS** after October 19, 2009, the date on which the Trustee mailed this notice.

**PLEASE TAKE FURTHER NOTICE:** If you do not properly and timely file a written opposition, the Trustee's determination with respect to your claim will be deemed confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** If you properly and timely file a written opposition, a hearing date for this controversy will be obtained by the Trustee and you will be notified of that hearing date. Your failure to appear personally or through counsel at such hearing will result in the Trustee's determination with respect to your claim being confirmed by the Court and binding on you.

**PLEASE TAKE FURTHER NOTICE:** You must mail your opposition, if any, in accordance with the above procedure, to each of the following addresses:

> Clerk of the United States Bankruptcy Court for
> the Southern District of New York
> One Bowling Green
> New York, New York 10004
>
> and
>
> Irving H. Picard, Trustee
> c/o Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, New York 10111

_____
Irving H. Picard

Trustee for the Liquidation of the Business of
Bernard L. Madoff Investment Securities

cc:   Richard Oppenheim, Esq.
      38 Stoney Brook Rd.
      Holmdel, NJ 07732

## Table 1

### DEPOSITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| 12/8/1992 | CHECK | $1,500,000.00 |
| 1/5/1993 | CHECK | $500,000.00 |
| 1/12/1996 | CHECK | $700,000.00 |
| 7/9/1996 | CHECK | $300,000.00 |
| 10/23/1996 | CHECK | $850,000.00 |
| 9/16/1997 | CHECK | $400,000.00 |
| 1/16/1998 | CHECK | $400,000.00 |
| 1/5/2000 | CHECK | $100,000.00 |
| 3/15/2002 | CHECK | $300,000.00 |
| 1/17/2008 | CHECK | $500,000.00 |
| **Total Deposits:** | | $5,550,000.00 |

### WITHDRAWALS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| 4/5/1994 | CHECK | ($250,000.00) |
| 7/20/1994 | CHECK | ($50,000.00) |
| 4/5/1995 | CHECK | ($230,000.00) |
| 9/20/1995 | CHECK | ($60,000.00) |
| 4/15/1996 | CHECK | ($225,000.00) |
| 4/10/1997 | CHECK | ($230,000.00) |
| 3/29/1999 | CHECK | ($325,000.00) |
| 4/9/1999 | CHECK | ($200,000.00) |
| 5/27/1999 | CHECK | ($60,000.00) |
| 7/29/1999 | CHECK | ($60,000.00) |
| 8/19/1999 | CHECK | ($60,000.00) |
| 11/22/1999 | CHECK | ($120,000.00) |
| 4/12/2000 | CHECK | ($600,000.00) |
| 5/1/2000 | CHECK | ($100,000.00) |
| 6/1/2000 | CHECK | ($70,000.00) |
| 6/26/2000 | CHECK | ($65,000.00) |
| 10/27/2000 | CHECK | ($200,000.00) |
| 1/12/2001 | CHECK | ($70,000.00) |
| 3/7/2001 | CHECK | ($50,000.00) |
| 4/17/2001 | CHECK | ($300,000.00) |
| 5/2/2001 | CHECK | ($50,000.00) |
| 6/22/2001 | CHECK | ($50,000.00) |
| 8/1/2001 | CHECK | ($100,000.00) |
| 9/26/2001 | CHECK | ($120,000.00) |
| 12/11/2001 | CHECK | ($100,000.00) |
| 1/10/2002 | CHECK | ($100,000.00) |

08-01789-smb    Doc 647-1    Filed 11/06/09    Entered 11/06/09 14:27:08    Exhibit
Exhibit A    Pg 6 of 7

| Date | Type | Amount |
|---|---|---|
| 4/12/2002 | CHECK | ($300,000.00) |
| 5/15/2002 | CHECK | ($100,000.00) |
| 5/30/2002 | CHECK | ($200,000.00) |
| 6/26/2002 | CHECK | ($100,000.00) |
| 8/19/2002 | CHECK | ($100,000.00) |
| 9/24/2002 | CHECK | ($100,000.00) |
| 12/3/2002 | CHECK | ($100,000.00) |
| 12/31/2002 | CHECK | ($100,000.00) |
| 2/14/2003 | CHECK | ($100,000.00) |
| 4/8/2003 | CHECK | ($300,000.00) |
| 4/15/2003 | CHECK | ($200,000.00) |
| 5/30/2003 | CHECK | ($100,000.00) |
| 7/11/2003 | CHECK | ($100,000.00) |
| 9/3/2003 | CHECK | ($100,000.00) |
| 11/5/2003 | CHECK | ($100,000.00) |
| 12/30/2003 | CHECK | ($100,000.00) |
| 12/31/2003 | STOP PAYMENT | $100,000.00 |
| 1/2/2004 | CHECK | ($100,000.00) |
| 3/2/2004 | CHECK | ($100,000.00) |
| 4/14/2004 | CHECK | ($275,000.00) |
| 6/2/2004 | CHECK | ($100,000.00) |
| 7/28/2004 | CHECK | ($100,000.00) |
| 9/22/2004 | CHECK | ($100,000.00) |
| 10/13/2004 | CHECK | ($100,000.00) |
| 10/26/2004 | CHECK | ($100,000.00) |
| 12/9/2004 | CHECK | ($100,000.00) |
| 12/22/2004 | CHECK | ($100,000.00) |
| 1/25/2005 | CHECK | ($100,000.00) |
| 3/22/2005 | CHECK | ($100,000.00) |
| 4/11/2005 | CHECK | ($350,000.00) |
| 5/10/2005 | CHECK | ($100,000.00) |
| 6/10/2005 | CHECK | ($100,000.00) |
| 7/20/2005 | CHECK | ($100,000.00) |
| 11/10/2005 | CHECK | ($100,000.00) |
| 12/15/2005 | CHECK | ($100,000.00) |
| 1/5/2006 | CHECK | ($100,000.00) |
| 2/23/2006 | CHECK | ($100,000.00) |
| 4/12/2006 | CHECK | ($375,000.00) |
| 5/11/2006 | CHECK | ($100,000.00) |
| 6/6/2006 | CHECK | ($100,000.00) |
| 7/11/2006 | CHECK | ($100,000.00) |
| 9/8/2006 | CHECK | ($100,000.00) |
| 11/3/2006 | CHECK | ($100,000.00) |
| 12/5/2006 | CHECK | ($100,000.00) |
| 1/3/2007 | CHECK | ($100,000.00) |
| 1/31/2007 | CHECK | ($100,000.00) |
| 3/20/2007 | CHECK | ($100,000.00) |
| 4/10/2007 | CHECK | ($325,000.00) |

300035031.1    5

| | | | |
|---|---|---|---|
| 5/3/2007 | CHECK | | ($60,000.00) |
| 6/4/2007 | CHECK | | ($100,000.00) |
| 7/31/2007 | CHECK | | ($100,000.00) |
| 9/21/2007 | CHECK | | ($100,000.00) |
| 11/6/2007 | CHECK | | ($100,000.00) |
| 12/26/2007 | CHECK | | ($100,000.00) |
| 3/26/2008 | CHECK | | ($200,000.00) |
| 4/10/2008 | CHECK | | ($350,000.00) |
| 6/10/2008 | CHECK | | ($100,000.00) |
| 7/9/2008 | CHECK | | ($100,000.00) |
| 9/5/2008 | CHECK | | ($100,000.00) |
| 10/1/2008 | CHECK | | ($100,000.00) |
| 10/30/2008 | CHECK | | ($375,000.00) |
| 11/24/2008 | CHECK | | ($100,000.00) |
| **Total Withdrawals:** | | | ($11,955,000.00) |
| | | | |
| **Total deposits less withdrawals:** | | | ($6,405,000.00) |

Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Carol Nelson and Stanley Nelson*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                              Plaintiff,<br><br>         v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>                              Defendant. | Adv. Pro. No. 09-01789 (BRL)<br><br>SIPA Liquidation<br><br><br>**CERTIFICATE OF SERVICE** |

I, Lourdes Blanco, hereby certify that on November 6, 2009 I caused a true and correct copy of the **Objection to Trustee's Determination of Claim** on behalf of Carol Nelson and Stanley Nelson to be filed electronically with the Court and served upon the parties in this action who receive electronic service through CM/ECF, and served by hand upon:

> David J. Sheehan, Esq.
> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, NY 10111

November 6, 2009

                                        _____/s/ Lourdes Blanco_____

1096241.1