# EXHIBIT 4

*** CONFIDENTIAL ***

Page 1

```
 1      UNITED STATES BANKRUPTCY COURT
        SOUTHERN DISTRICT OF NEW YORK
 2
     ------------------------------------X
 3                                       :
     In re:                              :
 4                                       :
     SECURITIES INVESTOR PROTECTION      :
 5   CORPORATION,                        :
                                         :
 6            Plaintiff-Applicant,       :
                                         :
 7         -vs-                          :   08-01789 (SMB)
                                         :
 8   BERNARD L. MADOFF INVESTMENT        :
     SECURITIES, LLC,                    :
 9                                       :
              Defendant.                 :
10                                       :
     ------------------------------------X
11                                       :
     In re:                              :
12                                       :
     BERNARD L. MADOFF,                  :
13                                       :
              Debtor.                    :
14                                       :
     ------------------------------------X
15
16             *** CONFIDENTIAL ***
17            VIDEOTAPED DEPOSITION
18                    OF
19            BERNARD L. MADOFF
20          (Taken by the Customers)
21          Butner, North Carolina
22            December 20, 2016
23
24   Reported by:  Lisa A. DeGroat, RPR
                   Notary Public
25
```

*** CONFIDENTIAL ***

Page 2

1    **A P P E A R A N C E S**
2
     For the Customers:
3
     **HELEN DAVIS CHAITMAN, Esq.**
4    **Chaitman, L.L.P.**
     **465 Park Avenue**
5    **New York, New York  10022**
     **(908) 303-4568**
6    **hchaitman@chaitmanllp.com**
7
     For the Trustee:
8
     **DAVID J. SHEEHAN, Esq.**
9    **AMANDA E. FEIN, Esq.**
     **Baker & Hostetler, L.L.P.**
10   **45 Rockefeller Plaza**
     **New York, New York  10111**
11   **(212) 589-4616**
     **dsheehan@bakerlaw.com**
12
13   For the Witness:
14   **PETER A. GOLDMAN, Esq.**
     **Attorney at Law**
15   **12 Fairlawn Parkway**
     **Rye Brook, New York  10573**
16   **(914) 937-6857**
     **pagoldman45@gmail.com**
17
18   The Videographer:
19   Robert Collier
20        CONFIDENTIAL VIDEOTAPED DEPOSITION OF BERNARD L.
21   MADOFF, taken by the Customers, at the Federal
22   Correctional Institution, Butner Medium I, Old NC
23   Highway 75, Butner, North Carolina, on the 20th day of
24   December, 2016, at 8:52 a.m., before Lisa A. DeGroat,
25   Registered Professional Reporter and Notary Public.

Page 28

1  and trade confirmations of investment advisory clients
2  gave the appearance of profitable trading, when, in
3  fact, no trading had actually occurred."
4        "I helped Bongiorno, Crupi and others create
5  these fake backdated trades based on historical stock
6  prices and were executed only on paper."
7        Now, during the 1970s and '80s who within
8  the firm was responsible to deal with the clients that
9  you've described were involved in transactions that
10 you felt were violations of either the tax laws or the
11 securities laws?
12    A.    Well, first of all, I was the only one that
13 dealt with the clients, period, as far as doing the
14 trading.
15    Q.    Okay.
16    A.    So none of this makes sense to me, because I
17 think David Kugel started in the '70s working for me.
18    Q.    But let me -- let's just go back to my
19 question.  You mentioned before that there were
20 certain investors for whom you did certain
21 transactions --
22    A.    Uh-huh.
23    Q.    -- that you knew were illegal, but they --
24 they directed you to do them?
25    A.    Not in the '70s.

Page 29

```
 1     Q.    Okay.  Was that in the '80s?
 2     A.    That was -- that started after the crash in
 3  the '80s.
 4     Q.    Okay.  And who were those -- who were those
 5  customers?
 6     A.    Basically Carl Shapiro, the family of
 7  Shapiro, Norman Levy, Stanley Chais and Jeffry
 8  Picower.
 9     Q.    Okay.
10     A.    And there were some others, but primarily
11  those.
12     Q.    Okay.  And --
13     A.    Those are my four big clients.
14     Q.    And did each of the four big clients have
15  multiple accounts?
16     A.    Yes.
17     Q.    So they might have had accounts for their
18  children or their --
19     A.    Yes.  They all did.
20     Q.    Okay.  So can I refer to them as the four
21  families?
22     A.    Yes.
23     Q.    Okay.  When did you begin doing business
24  with the four families?  Was it at different times?
25     A.    Varied times.  Yeah.  It started from the
```

*** CONFIDENTIAL ***

Page 30

1 early '60s, you know, through 2008.
2     Q.    Okay.  Let me just take them one by one.
3 Carl Shapiro?
4     A.    Yes.  He was probably the first one.
5     Q.    And would that date back to the 1960s?
6     A.    Yes.
7     Q.    Norman Levy?
8     A.    Probably started in the '70s.
9     Q.    Okay.  Stanley Chais?
10    A.    In -- in the '60s and '70s.
11    Q.    And Jeffry Picower?
12    A.    Probably in the '70s.
13    Q.    Okay.  Now, you've testified, and I just
14 want to summarize it, but I want you to tell me if I'm
15 summarizing it incorrectly.
16          You've testified that for the four families
17 you did transactions at their direction, which, if I
18 can just summarize it, that -- that you understood
19 were illegal; is it fair to say that?
20              MR. SHEEHAN:  Object to the form.
21              THE WITNESS:  Well, no.  I wasn't --
22      the timing is important as to when you're saying
23      that, you know --
24 BY MS. CHAITMAN:
25    Q.    Okay.

Page 31

1      A.     -- I started doing these illegal trades.
2      Q.     Okay.  But when you say that they're
3  illegal, what you testified to was -- and, again, I
4  don't want to put words in your mouth, but I think you
5  said that they might have violated tax laws?
6      A.     That's correct.  That all started, you know,
7  in the late '80s.
8      Q.     Okay.  And they might have violated --
9      A.     You know, they were backdating trades to --
10 to accomplish certain losses and gains.  They had
11 hedge -- they had hedge transactions set up, you know,
12 as part of their strategy, which meant they were
13 long -- they had long equity positions, and they had
14 short equity positions.  Different positions.
15            All right.  Some of those -- you know,
16 that's -- that strategy involves you having, you know,
17 long-term gains -- or short-term and long-term
18 unrealized gains, as well as short-term losses on the
19 short side of the transaction, which is a hedge.
20            So that, you know, as the market would move
21 up, you would have, let's say, gains on one side,
22 shorts on another -- losses on another side from the
23 short position.
24            Depending upon when you closed out the
25 transaction, you're going to establish gains and

08-01789-cgm   Doc 18016-5   Filed 09/21/18   Entered 09/21/18 18:02:30   Exhibit 4 - Madoff Dep Excerpts (12/20/2016)   Pg 8 of 11
*** CONFIDENTIAL ***

Page 32

1  losses.  And they were at that time starting to -- to
2  show losses that they wanted to show, they or their
3  accountants wanted to show, to -- to offset other
4  trading that they were doing at other brokerage firms.
5           And they instructed my -- my clients -- my
6  employees with written instructions for the most part,
7  as well as over the telephone, what they -- what they
8  wanted in the way of losses.
9           So it wasn't a matter of just creating new
10 losses.  It was just realizing a loss by actually
11 putting the trade through.  And some of the times they
12 wanted to backdate the trades to get a maximum gain or
13 loss.
14      Q.   Okay.  And who among your employees dealt
15 with the four families?
16      A.   Well, I dealt with the families as -- you
17 know, initially with them, but when it came to doing
18 bookkeeping work, backdating their trades or changing
19 statements, which I looked at as an SEC violation,
20 that they were -- they were dealing directly with
21 primarily Annette Bongiorno, who was the bookkeeper at
22 that time.
23           Jodi Crupi came on -- I'm not sure.  It was
24 a little bit later, but she was not really involved in
25 the -- handling the four clients, certainly with their

Page 33

1    account statements and so on.  That was primarily
2    Annette -- Annette Bongiorno's responsibility.
3        Q.   Okay.  So, just to be clear, Annette
4    Bongiorno would have direct contact with the four
5    families?
6        A.   With -- yes.
7        Q.   And when we say, "the four families," are
8    you saying that Norman Levy himself would call Annette
9    directly or would he have someone in his office?
10       A.   Norman Levy or his accountant, which at that
11   time was Adam Woltz, who is no longer alive.
12       Q.   Okay.  And with respect to Picower, would it
13   be Picower directly or --
14       A.   Primarily it was Picower directly and his
15   assistant, which was -- who was April Freilich.
16       Q.   Okay.  And with respect to Stanley Chais?
17       A.   It was primarily Stanley Chais himself.
18       Q.   And with respect to Carl Shapiro?
19       A.   It was Carl Shapiro or it was his
20   accountant, who was with Coopers & Lybrand.
21       Q.   Okay.  And, just to be very clear about
22   this, because Mr. Kugel is suggesting something quite
23   different, I just want to be very clear, is it your
24   testimony that these transactions for the four
25   families were done specifically at their direction?

Page 162

1  Q.    And do you remember in 1992 what the
2  interest rate was -- was on the treasury bills?
3  A.    Probably like two percent, something like
4  that, on -- you know, one and a half, two percent.
5  Q.    Okay. And is it fair to say that for the
6  whole period up until 2008 that the money that wasn't
7  used to redeem customer accounts was in treasury
8  bills?
9  A.    Probably, yeah.
10 Q.    And that would have been interest-earning
11 treasury bills?
12 A.    Yeah.
13 Q.    Whatever the current interest rate was; is
14 that right?
15 A.    Uh-huh, uh-huh.
16 Q.    Were these longer-term treasury bills --
17 A.    No.
18 Q.    -- or shorter term?
19 A.    No. They were short term. They were
20 T-bills, you know. You know, the short term. One to
21 two years.
22 Q.    Okay. So the customers' money was earning
23 some percentage?
24 A.    Yeah.
25 Q.    Whatever the treasury bill rate was?

*** CONFIDENTIAL ***

Page 163

1     A.   Yeah, but there wasn't enough treasury bills
2  to cover all of the liabilities.
3           MS. CHAITMAN:  Okay.  Does everybody --
4  do you want to take a break, and then we'll go
5  through until --
6           MR. SHEEHAN:  Sure.  As a --
7           MS. CHAITMAN:  Because I'm about to --
8  to go through the Dubinsky report, which is going
9  to be tedious.  Why don't we take --
10          MR. SHEEHAN:  Whatever.
11          MS. CHAITMAN:  -- five minutes.
12          MR. SHEEHAN:  Five minutes?
13          MS. CHAITMAN:  Yeah.
14          MR. SHEEHAN:  That's good.
15          THE VIDEOGRAPHER:  Going off the
16  record.  The time is 13:01.
17           (RECESS FROM 1:01 P.M. TO 1:18 P.M.)
18           (MADOFF EXHIBIT 14 WAS MARKED FOR
19  IDENTIFICATION.)
20          THE VIDEOGRAPHER:  Back on the record.
21  This begins media number three in the deposition
22  of Bernard L. Madoff.  The time is 13:18.
23  BY MS. CHAITMAN:
24     Q.   Mr. Madoff, I've just given you what had
25  previously been marked in your -- in a -- your