# EXHIBIT 8

CONFIDENTIAL

**Page 494**

1  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
2
3
4   In re:                            )
                                      )
5   SECURITIES INVESTOR               )
    PROTECTION CORPORATION,           )
                                      )
6       Plaintiff-Applicant,          )
                                      )
7   vs.                               )   08-01789 (SMB)
                                      )
8   BERNARD L. MADOFF                 )
    INVESTMENT SECURITIES, LLC,       )
9                                     )
        Defendant.                    )
10                                    )
                                      )
11  In re:                            )
                                      )
12  BERNARD L. MADOFF,                )
                                      )
13      Debtor.                       )
                                      )
14
15                  CONFIDENTIAL
16       Videotaped Deposition of BERNARD L.
17  MADOFF, VOLUME IV, taken on behalf of the Customers,
18  before K. Denise Neal, Registered Professional
19  Reporter and Notary Public, at the Federal
20  Correctional Institution, 3000 Old Highway 75,
21  Butner, North Carolina, on the 9th day of November,
22  2017, commencing at 8:43 a.m.
23
24
25                      * * * * *

08-01789-cgm    Doc 18016-9    Filed 09/21/18    Entered 09/21/18 18:02:30    Exhibit 8 -
Madoff Dep Excerpts (11/9/2017)    Pg 3 of 16
CONFIDENTIAL

Page 495

1  APPEARANCES OF COUNSEL:

2

3     On Behalf of the Customers:

4         HELEN DAVIS CHAITMAN, Esq.

5         Chaitman, LLP

6         465 Park Avenue

7         New York, New York  10022

8         (908) 303-4568

9         hchaitman@chaitmanllp.com

10

11    On Behalf of Sage Associates, Sage Realty,

12    Malcolm Sage, Martin Sage and Ann Passer Sage

13        ANDREW B. KRATENSTEIN, Esq.

14        McDermott Will & Emery, LLP

15        340 Madison Avenue

16        New York, New York  10173-1922

17        (212) 547-5695

18        akratenstein@mwe.com

19

20

21

22

23

24

25

CONFIDENTIAL

Page 496

1  APPEARANCES OF COUNSEL:
2
3      On Behalf of the Trustee:
4          AMANDA E. FEIN, Esq.
5          STACY DASARO, Esq.
6          Baker Hostetler
7          45 Rockefeller Plaza
8          New York, New York  10111-0100
9          (212) 589-4621
10         afein@bakerlaw.com
11
12     On Behalf of the Deponent:
13         PETER A. GOLDMAN, Esq.
14         12 Fairlawn Parkway
15         Rye Brook, New York  10573
16         (914) 935-6857
17         pagoldman@gmail.com
18
19     Videographer:
20         Bob Collier, CLVS
21
22                 * * * *
23
24
25

Page 504

1  say in General Motors for any of the thousands of
2  brokers that exist that buys and sells, if you sold,
3  for example, 2 million -- if you brought 2 million
4  shares from assorted brokers and then you sold
5  1,500,000 shares, they would send you what they call
6  a balance order at the end of the day that said you
7  bought or sold 500 shares, which is the net amount.
8           And they would give you the dollar amount
9  of the net practice.  And -- and the person
10 guaranteeing the trade became the clearing
11 corporation.
12      Q.   (By Ms. Chaitman)  Was there a system in
13 place at your firm to verify the information you
14 received on a daily basis from the clearing
15 corporation?
16      A.   Yes, you know, there was.  I can't tell you
17 exactly what it was because I'm not part of the back
18 office operation.
19      Q.   Okay.  But there was such a system in
20 place?
21      A.   Yes.
22           (Exhibit Number 90 was marked for
23 identification.)
24      Q.   (By Ms. Chaitman)  I'm going to show you
25 what I've marked as Exhibit 90, and I apologize.  I

CONFIDENTIAL

Page 508

1  trading activities of your firm or were there
2  other --
3      A.  No.
4      Q.  Okay.  So what other categories of
5  activities were there that are not reflected on a
6  report like this?
7      A.  If we were trading with a client, you know,
8  out of our own inventory principal, it would not be
9  reflected on this -- on this report.
10     Q.  Anything else?
11     A.  I don't believe so.
12     Q.  If you were doing convertible bond trading,
13 would that show up on this report --
14         MS. FEIN:  Objection.
15     Q.  (By Ms. Chaitman)  -- or would that be on a
16 different report?
17     A.  I do not believe it would be on this
18 report.
19     Q.  Do you recall that your firm generated
20 reports which -- in the 1980s which showed all of
21 the convertible bond purchases and sale on a daily
22 basis?
23     A.  It would reflect, be reflected in a
24 customer's account if -- and it would be reflected
25 in the firm's account, in the firm's trading --

08-01789-cgm Doc 18016-9 Filed 09/21/18 Entered 09/21/18 18:02:30 Exhibit 8 - Madoff Dep Excerpts (11/9/2017) Pg 7 of 16
CONFIDENTIAL

Page 509

1  you'd have to look at the trading ledger for the
2  firm. It depends upon also whether we did it as
3  principal or whether we did it as agent. Most of
4  our trades were done as principal. We're selling
5  out of our own inventory account to the customer.
6           I don't know exactly where that would
7  appear, but it would not appear -- these are what's
8  called street side transactions, as I said, mostly
9  from a market making proprietary trading side of the
10 firm, broker-to-broker trades.
11      Q.  Okay. You had testified previously that
12 with respect to the convertible bond trading,
13 99 percent of it in the 1980s was done in the
14 over-the-counter market?
15          MS. FEIN:  Objection.
16      Q.  (By Ms. Chaitman)  Do you recall that?
17      A.  Depends upon the bond. The bonds,
18 convertible bonds traded -- most convertible bonds
19 traded in the over-the-counter market. Some of them
20 were traded on an exchange, but the great majority
21 of them would trade over the counter.
22      Q.  Okay. Now, if I wanted to find a record on
23 any specific date in the 1980s of the volume and
24 specific transactions that you did in the
25 over-the-counter market, what document would I look

Page 559

1  Q. So would this document have been prepared
2  in late 2007 or early 2008?
3  A. Yes. I assume, right.
4  Q. Okay. This report is another stock record,
5  correct, and it shows some of the same columns that
6  we were looking at on the last stock record. Do you
7  see at the top of the page?
8  A. Yes.
9  Q. Do you recognize from this page there are
10 some IA customer names on here?
11 A. Uh-huh, yes.
12 Q. And do you recognize that there are
13 customer accounts listed on the right-hand side of
14 the page?
15 A. Yes.
16 Q. This report would have been generated by
17 your house 17 staff most likely; right?
18 A. Correct.
19 Q. And the computer system you were using on
20 the house 17 side was an AS/400?
21 A. Correct.
22 Q. Would this report have been generated by
23 the AS/400 system?
24 A. I believe so.
25 Q. That's the same system that generated the

Page 560

1  customer statements and trade confirmations; right?
2       A.   I don't know.  I don't know what generated
3  the -- what system generated the trade, market
4  making.
5       Q.   I'm sorry.  I was referring to IA customer
6  trade confirmations and customer statements.
7       A.   Yeah.  That would be -- that would be the
8  AS/400.
9       Q.   Okay.  Do you know who would be reviewing a
10 report like this?
11      A.   No.  I assume someone in Annette's
12 department.
13      Q.   Do you see underneath the security listed
14 there are customer names and then an entry below
15 that that says clearing banks?
16      A.   Correct.
17      Q.   Do you agree that number for account number
18 29000030 is not a customer account number; right?
19 The customer numbers typically have letters?
20      A.   No.  That looks like -- that looks like the
21 number they use for the clearing banks.
22      Q.   Okay.  The amount next to the clearing bank
23 number looks like 199066; right?
24      A.   Correct.
25      Q.   And I can represent to you that the four

Page 563

1  bank here is used where you would typically have a
2  counterparty listed for where the securities were
3  held; right?
4          MR. KRATENSTEIN:  Object to form.
5          THE WITNESS:  It's the balancing number,
6  yes.
7          Q.  (By Ms. Fein)  Okay.  And what do you mean
8  by the balancing number?
9          A.  In other words, it typically would balance.
10 In other words, you would always have the -- if it
11 didn't balance, it would be -- it would be a broken
12 trade.  Typically your long -- your long side would
13 always equal, always be represented on the short
14 position, should be the same.
15         Q.  Okay.
16         A.  When they use the term clearing banks,
17 that's not one single bank.  It's just, you know,
18 any number of clearing banks that the transactions
19 were custodied at.  And these -- I don't know why
20 you're looking -- I mean, I've already stated that
21 before that during this period in, you know, 2000s
22 or certainly post-'90s in general, that there were
23 times that I wasn't purchasing the securities.
24         Q.  Okay.  So when clearing banks is used here,
25 it's not --

Page 564

1    A.  It doesn't --
2    Q.  -- it doesn't mean the same thing as it
3    would if it showed DTC?
4    A.  No.  It wouldn't -- that would -- that was
5    a fraud period, in other words.  So there's nothing
6    -- I can -- I'm perfectly willing, I've already
7    stated that anything post-'92 period is not going to
8    be accurate in my records.
9    Q.  Okay.  So the term clearing banks here is
10   used as a place holder for the other side of the
11   transaction; right?
12   A.  Correct.
13   Q.  Okay.  I don't know.  We've been going a
14   while.  Would you like to take a break or do you
15   want to keep going?
16   A.  I'm fine.
17        MS. FEIN:  Okay.
18        MR. KRATENSTEIN:  Are you done with this
19   one?
20        MS. FEIN:  I think -- oh, you know what?
21   I have one more.  I have one more thing I want to
22   look at.  Thank you.  Sorry.  Can you turn -- I can
23   help you turn to the page, but the page is 498.  Let
24   me help you figure it out.  There you go.
25   Q.  (By Ms. Fein)  Do you see the transaction

Page 565

1  for the Treasury bill listed on this page due
2  1-3-2008?
3       A.  Uh-huh.
4       Q.  And at the bottom of that entry there's the
5  term clearing banks again?
6       A.  Correct.
7       Q.  And in this context it's being used as a
8  place holder or filler --
9       A.  Right.
10      Q.  -- counterparty for the trade; right?
11      A.  Uh-huh.
12      Q.  Okay.  So this trade is not -- is one that
13 didn't happen in the market; right?
14      A.  Correct.
15      Q.  And would that be true for the entries that
16 show this clearing banks on this report in 2007,
17 would that be true for those trades?
18      A.  Correct.
19          MS. FEIN:  We'll try to go quickly.  There
20 are a couple more reports of this size.  So we're
21 going to mark one more, but we're done with this
22 one.
23          MR. KRATENSTEIN:  I know all about trying
24 to go quickly through reports.
25          MS. FEIN:  I'm not going to match your

Page 619

1    A.  Correct.
2    Q.  Can you read the next two sentences after
3  that?
4    A.  I can't find them.
5    Q.  Oh, so the next one would be since then our
6  main holding, eBay, has dropped significantly.
7    A.  Right, okay.  I see it.
8    Q.  And then the next, as that holding is a
9  long-term one, I was hoping you had shorted it
10 against the box a while back.  Do you see that?
11   A.  Yes, uh-huh.
12   Q.  That statement is in the past tense; right?
13   A.  I was hoping you had shorted it against the
14 box, okay.
15   Q.  It's referring to something that would have
16 happened before you got this letter; right?
17      MR. KRATENSTEIN:  Objection to the form of
18 the question.
19      THE WITNESS:  Yes.  I think what they're
20 referring to is sometimes even if I had felt that
21 they should have been sold regardless of what they
22 had -- they were doing tax planning, obviously,
23 shorting against the box to adjust whether they were
24 going to get long-term gain, short-term gains and so
25 on and depending upon when you closed out the

Page 620

1  transaction, in other words, covered the short, that
2  would trigger a tax event.  So if, in fact -- again,
3  I'm assuming because this -- you know, if, in fact,
4  they originally wanted to keep the trade open but
5  then there was a market event that happened, you
6  know, then I felt that it wasn't -- it didn't make
7  any sense to worry about the tax treatment because
8  if they -- if I didn't go short against the box, the
9  stock was going to go down, I would pay no attention
10 to it.
11       Q.  Right.
12       A.  Technically a client could call me up and
13 say to me, which did happen at the time, well, you
14 shouldn't have -- you should have followed my
15 instructions even though you would have lost money
16 for me to do that.  That's not an unusual situation.
17 So I don't remember what happened here, but that's
18 probably what happened.
19       Q.  Okay.  All right.  So we can look at
20 Exhibit 69.
21       A.  Uh-huh.
22       Q.  This is another of the letters we reviewed
23 yesterday; right?
24       A.  Right.
25       Q.  Do you see -- it's a long sentence, but the

Page 674

1    MS. FEIN: That was -- it was testifying.
2    It was your testimony, not Mr. Madoff's.
3    Q. (By Ms. Chaitman) Mr. Madoff, would you be
4    good enough to cure Amanda's objection and could you
5    say that in your own words? I don't want to put
6    words in your mouth.
7    A. My plan was that if I needed money to
8    settle a customer's account, I would typically
9    either take the money out of the 703 bank account,
10   which is typically where we kept all clients'
11   monies, or if there wasn't immediate cash available,
12   which there was most of the time, I would then
13   liquidate T-bills.
14   Q. Okay. And, again, those T-bills were
15   purchased with money --
16   A. It was always purchased with money from the
17   703 account.
18   Q. Okay. And that was the investment advisory
19   customers' money?
20   A. Correct.
21   Q. Now, you were talking about the ledgers.
22   Amanda was showing you some ledgers and I believe
23   you testified that there was subsidiary ledgers for
24   each institution that you did business with?
25   A. There were -- there were either ledgers or

Page 675

1  documents. You know, there were statements. So
2  that's what -- I'm not -- I don't recall what -- and
3  it changed all the time, you know, how -- what the
4  practice was of firms sending out statements
5  because, again, it depended upon what stage the
6  clearing cycles were in, in other words, whether --
7  how the DTC worked, how NSCC worked and whether we
8  had automated interfaces with firms.
9           We had 500 interfaces with -- not 500. We
10 had over 100 interfaces with 500 different brokerage
11 firms. Everything was done, you know, on computer.
12 So there was no -- there was no exchanging of
13 confirmations. There was no cash in settlement,
14 things of that sort.
15          And the firm themselves, the operations
16 department had their own policies of how they --
17 what records they have, which I, quite frankly, am
18 not even familiar with. I have no idea with some of
19 these C&S, cash and securities settlements. I don't
20 know what they relate to.
21     Q. Okay. But with the 10 or 11 banks that
22 you've named that you had custodial relationships
23 with, is it fair to say that you would have had
24 records showing what securities were held at each
25 institution?