UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

| | | |
|---|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | : | |
| | : | Adv. Proc. No. 08-01789 (SMB) |
| Plaintiff, | : | |
| | : | SIPA LIQUIDATION |
| v. | : | |
| | : | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------X

| | |
|---|---|
| In re: | : |
| | : |
| BERNARD L. MADOFF, | : |
| | : |
| Debtor. | : |

-------------------------------------------------------X

| | | |
|---|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | : | |
| | : | |
| Plaintiff, | : | Adv. Proc. No. 12-01576 (SMB) |
| | : | |
| v. | : | |
| | : | |
| BNP PARIBAS S.A., *et al.* | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------X

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART TRUSTEE'S MOTION FOR LEAVE TO SERVE AMENDED COMPLAINT

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
*Attorneys for Irving H. Picard, Trustee*
45 Rockefeller Plaza
New York, NY 10111

David J. Sheehan, Esq.
Mark A. Kornfeld, Esq.
Torello H. Calvani, Esq.
Joanna F. Wasick, Esq.
Marco Molina, Esq.
Jonathan A. Forman, Esq.
    Of Counsel

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
*Attorneys for the Defendants*
One Liberty Plaza
New York, NY 10006

Breon S. Peace, Esq.
Ari D. MacKinnon, Esq.
    Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge**

Plaintiff Irving H. Picard (the "Trustee"), the trustee for the liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), filed his proposed *Amended*

*Complaint* on August 30, 2017 ("PAC")[1] (ECF Doc. # 100)[2] seeking to recover avoidable

transfers totaling approximately $156 million from subsequent transferees BNP Paribas

S.A. ("BNP Bank"), BNP Paribas Arbitrage SNC ("BNP Arbitrage"), BNP Paribas

Securities Services S.A. ("BNP Securities Services"), and BNP Paribas Bank & Trust

(Cayman) Limited ("BNP Cayman," and collectively, the "Defendants"). The Defendants

have moved to dismiss the PAC arguing that (i) it was improperly filed without leave of

Court, (ii) the Court lacks personal jurisdiction over the Defendants, (iii) the PAC fails to

---

[1]     References to paragraphs in the PAC will be denoted as "(¶ _ )."

[2]     "ECF Doc. # _" refers to documents filed on the docket of this adversary proceeding. References
to other dockets will include the case number.

state claims upon which relief can be granted, and (iv) certain claims are time-barred.

For reasons outlined below, the motion to dismiss for lack of personal jurisdiction is

denied, the filing of the PAC will be treated as a motion by the Trustee for leave to

amend his existing complaint, and that motion is granted in part and denied in part.

## BACKGROUND

Unless otherwise indicated, the background information is taken from the well-

pleaded factual allegations of the PAC and other information the Court may consider in

determining whether the pleading is legally sufficient.

### A.    The Ponzi Scheme[3]

At all relevant times, Bernard Madoff operated the investment advisory arm of

BLMIS as a Ponzi scheme.  (¶ 36.)  Beginning in 1992, Madoff told investors that he

employed the "split-strike conversion" strategy ("SSC Strategy"), under which BLMIS

purported to purchase a basket of stocks intended to track the S&P 100 Index, and

hedged the investment by purchasing put options and selling call options on the S&P

100 Index.  (¶¶ 42-45.)  In reality, BLMIS never purchased any securities on behalf of its

investors and sent monthly statements to investors containing falsified trades typically

showing fictitious gains.  (¶¶ 40, 41.)  All investor deposits were commingled in a

JPMorgan Chase Bank account held by BLMIS, and the funds were used to satisfy

withdrawals by other investors, benefit Madoff and his family personally, and prop up

BLMIS' proprietary trading department.  (¶ 40.)

---

[3]    Certain of the headings are derived from the PAC.  They are descriptive only and do not
necessarily imply the Court's views of the allegations.

The BLMIS Ponzi scheme collapsed when redemption requests overwhelmed the flow of new investments, (¶ 49), and Madoff was arrested by federal agents for criminal violations of federal securities laws on December 11, 2008 (the "Filing Date").  (¶ 18.) The Securities and Exchange Commission ("SEC") contemporaneously commenced an action in the United States District Court for the Southern District of New York, and that action was consolidated with an application by the Securities Investor Protection Corporation ("SIPC") asserting that BLMIS' customers needed the protections afforded by SIPA.  (¶¶ 18, 19.)  On December 15, 2008, the District Court granted SIPC's application, appointed the Trustee and his counsel, and removed the SIPA liquidation to this Court.  (¶ 20.)

At a plea hearing on March 12, 2009, Madoff pleaded guilty to an eleven count criminal information and admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  (¶¶ 23, 50.)

## B.    Defendants

BNP Bank is a corporation organized under the laws of France.  (¶ 52.)  It provides banking services in seventy-five countries and has maintained a presence in the United States since the late 1800s.  (¶ 58.)  Currently, BNP Bank has over 10,000 employees and more than 700 retail branches in the United States.  (¶ 58.)

BNP Arbitrage and BNP Securities Services, both French entities, are wholly-owned subsidiaries of BNP Bank, (¶¶ 53, 55), and maintain offices in Paris, France and New York, New York.  (¶¶ 53, 55, 59.)  BNP Cayman is also a wholly owned subsidiary of BNP Bank that is located in and organized under the laws of the Cayman Islands.  (¶ 54.)

## C.    BNP Bank's Introduction to Madoff and the Creation of a Feeder Fund

### 1.    BNP Bank Made Loans to Madoff

BNP Bank's relationship with Madoff began around November 1988 when it provided a $15 million personal line of credit to Madoff, which increased to $40 million by May 1995, and to $75 million by October 1996.  As collateral for the loan, Madoff pledged securities it held on behalf of BLMIS customers.  (¶ 84.)  BNP Bank conducted due diligence in connection with the extension of credit, which included reviewing BLMIS' Financial Operating and Combined Uniform Single ("FOCUS") Reports and audited financials and meeting with Madoff at BLMIS' office.  (¶ 85.)  Madoff used the loan proceeds to finance and grow the BLMIS Ponzi scheme.  (¶ 88.)

### 2.    BNP Bank Created and Serviced Oreades

In 1997, BNP Bank partnered with Access International Advisors ("Access") to create Oreades SICAV ("Oreades"), a Luxembourg-incorporated "feeder fund" that invested exclusively with BLMIS.  (¶ 89.)  BNP Bank, through its subsidiaries purported to provide services to Oreades while Access recruited investors.  (¶ 90.)

In January and March 1998, a BNP Bank subsidiary opened two investment accounts at BLMIS for Oreades.  (¶ 91.)  Two BNP Bank subsidiaries served as administrators of Oreades: BNP Paribas Fund Administration S.A. from 1997 to 2002 and BNP Securities Services from 2002 to 2004.  (¶ 92.)  The administrators were responsible for processing subscriptions into and redemptions from Oreades and frequently corresponded with BLMIS employees to direct transfers in and out of Oreades' BLMIS accounts.  (¶ 94.)  The administrators received all of the BLMIS

account statements and trade confirmations for Oreades, and were responsible for calculating the fund's monthly net asset value based on those numbers. (¶ 95.)

By 2003, BNP Bank's standard practice was to receive account statements and trade confirmations electronically. In May 2003, BNP Securities Services asked BLMIS to adhere to this policy, but BLMIS refused, and continued to send paper statements and confirmations through the mail. BNP Bank exempted BLMIS from this requirement to maintain the business relationship. (¶ 96.)

From the time of Oreades' formation, BNP Bank and Access hid the fact that BLMIS was serving as Oreades' custodian and investment advisor. (¶ 97.) Oreades represented that a BNP Bank subsidiary served as its official custodian (BGL BNP Paribas from 1997 to 2002 and BNP Securities Services from 2002 to 2004), but in reality, the BNP Bank subsidiary delegated all custodial authority to BLMIS through an undisclosed sub-custodian agreement. (¶¶ 98, 99.) Madoff demanded this arrangement as a precondition to investment, (¶ 99), but did not charge a fee for the custodial services performed by BLMIS. (¶ 100.) This allowed the BNP Bank subsidiaries to charge custodial fees to Oreades investors without performing corresponding services. (¶ 100.)

Similarly, Oreades represented to investors and to Luxembourg's financial regulator, the Commission de Surveillance du Secteur Financier ("CSSF"), that a BNP Bank affiliate, Inter Conseil, served as its investment advisor. (¶ 101.) However, Inter Conseil delegated its investment advisory duties to BLMIS in an undisclosed Sub-Advisory and Management Agreement. (¶ 102.) Madoff required the delegation and

performed the services free of charge, (¶¶ 102, 105), and Inter Conseil received fees from

Oreades investors despite the delegation of duties. (¶ 105.) In addition, BNP Bank's

own compliance rules required a "strict separation" between a fund's investment adviser

and custodian. (¶ 106; *see also* ¶¶ 99, 102.) The delegation of custodial and investment

advisory duties to BLMIS violated this rule. (¶ 107.)

BNP Bank knew that the delegation to BLMIS of custodial and investment

advisory duties violated Luxembourg law. First, only a Luxembourg-regulated entity

could act as Oreades' custodian, but BLMIS was not regulated by the CSSF. (¶ 108.)

Second, Luxembourg law required that Oreades' investment advisor and custodian be

disclosed, but BNP Bank and its affiliates deliberately omitted mention of BLMIS in

offering materials. (¶ 109; *see also* ¶¶ 261-62.) Third, Luxembourg law required the

BNP Bank subsidiary purportedly acting as custodian to verify the actions of BLMIS as

investment advisor, but the subsidiary lacked the ability to verify BLMIS trades. (¶ 110.)

Because BLMIS' relationship with Oreades violated Luxembourg law, BNP Bank

required that Inter Conseil's management arrangement with BLMIS "must remain

'private' that is, the CSSF . . . must remain unaware of it." (¶ 111; *see also* ¶¶ 261-62.)[4]

### 3.   BNP Bank Recognized BLMIS' Fraud Risk and Closed Oreades

On July 10, 2003, a senior executive at BNP Securities Services, Lionel Trouvain,

reviewed a BNP Bank internal audit and compliance report on Oreades and became

---

[4]      The Trustee also alleges that BNP Bank and BNP Securities Services knew BLMIS was not
registered as an investment advisor with the SEC in violation of U.S. securities laws. (¶ 112.)

concerned "that the risk [to] BNP Paribas is very extensive." (¶ 113.) Trouvain noted

that BLMIS' practice of sending account documents via mail was problematic:

> [N]o reference is ever made to the method of sending the [trading] deals
> carried out by 'BLMIS'. As you undoubtedly know, the trades are sent by
> mail after 7 or 8 days and are then posted after the fact by our settlement
> department. Market practices are really different today and it would seem
> that B. Madoff does not ever want to improve its order transmission
> methods.
>
> In practice [today], orders are sent by fax or via SWIFT by the managers
> on the day of the deal (along with the broker confirmation if the orders are
> not pre-matched). They are then coded by the depository bank and the
> operation is then carried out on the Settlement date (D+1;2;3) according
> to the markets. It would be appropriate to put this type of order
> transmission in place between us and B. Madoff because in current
> practice, *we have no opportunity to consider the true validity of the
> orders. . . . This is a point that our risk and ethics departments found
> during their internal audit* and I have to contribute a source of
> improvement.

(¶ 114 (emphasis and ellipsis in PAC); *see also* ¶¶ 246-49, 253.)

Trouvain also stated that BNP Bank would ultimately be held liable for

misrepresenting and omitting the role of BLMIS as Oreades' custodian and investment

advisor:

> In my opinion, if there is a management problem with [BLMIS], the entire
> responsibility for management would lie . . . in the last resort, with the
> promoter, namely BNP Paribas . . . In the eyes of the CSSF, B. Madoff does
> not exist.

(¶ 116.) He also inquired about where BLMIS was holding U.S. Treasury Bills on

Oreades' behalf. (¶ 117.)

In August 2003, Trouvain and other BNP Bank employees met with Access'

management to determine whether it was possible to bring their relationship with

BLMIS into compliance with BNP Bank's internal rules. According to the meeting

minutes, BLMIS' hidden role as Oreades' custodian and investment advisor was an "unconscionable" violation of BNP Bank's rules and Luxembourg law. BNP Bank wanted "to be released from liability it ha[d] incurred as a 'sponsor' (initiator of the creation) manager, and custodian of the fund." (¶ 118; *see also* ¶¶ 241-45.)

Communicating through Access, BNP Bank asked Madoff to permit it to disclose BLMIS to the CSSF, but Madoff refused. Access told BNP Bank that Madoff's refusal was based in part on wanting to avoid U.S. regulatory scrutiny for BLMIS' failure to register as an investment advisor. (¶ 119.) One BNP Bank employee warned that "if the CSSF asks me about the precise role of Inter Conseil and of BNP in Oreades, I will have to tell the truth." (¶ 120.) Madoff similarly refused BNP Bank's request to permit BNP Securities Services or Access to track BLMIS trading activity in real time. (¶¶ 121, 252.)

By November 2003, BNP Bank was measuring its potential liability as Oreades' sponsor, administrator and custodian "in the event of a default on the part of Madoff." (¶ 122.) Ultimately, BNP Bank decided to shut down Oreades: BNP Securities Services closed the BLMIS accounts in March 2004, and Inter Conseil placed Oreades into liquidation in Luxembourg in May 2004. (¶¶ 123-25.)

## D.    Others at BNP Bank were Suspicious of Madoff

Paulo Gianferrara, who from 2000 to 2006 served as the Head of Hedge Funds for BNP Paribas Private Wealth in Paris and Geneva, refused to approve transactions involving BLMIS feeder funds for private banking clients. (¶ 128.) According to employees of Fairfield Greenwich Group – an entity that managed certain BLMIS feeder

- 9 -

funds – Gianferrara "always had a problem with Madoff" and would "not even consider[]" investments in Fairfield's Madoff-related products. (¶ 129.)

Patrick Fauchier of Fauchier Partners – an entity that was involved in a joint venture with a BNP Bank affiliate – told Access in June 2008 that he was concerned that the SEC would not allow BLMIS to continue as a business and found it suspicious that Madoff did not charge customary investment management fees. (¶¶ 131, 133, 134; *see also* ¶¶ 258-60.) Fauchier also flagged BLMIS' FOCUS Reports in which BLMIS disclosed that it managed only twenty-three investment accounts; Fauchier knew that BLMIS was underreporting that figure. (¶ 135.) The Trustee alleges, upon information and belief, that Fauchier shared his concerns about Madoff to senior officers at BNP Bank. (¶ 136.)

## E.    BNP Bank Became a Global Leverage Provider to BLMIS Feeder Funds

Despite the circumstances surrounding the closing of Oreades, BNP Bank embarked on a strategy to become a global leverage provider to BLMIS feeder funds and their investors. (¶ 138.) In addition to generating fees for BNP Bank and its subsidiaries, pursuing this business would build BNP Bank's reputation as a leverage provider and allow it to compete with rival bank Société Générale ("SocGen"). It also presented opportunities to cross-sell BNP Bank services to institutional clients. (¶ 139.) Becoming a leverage provider allowed BNP Bank to profit from BLMIS' performance without the risk associated with serving in a fiduciary capacity (as it did with Oreades). (¶¶ 140, 148.)

### 1.    Acquisition of ZCM

- 10 -

In the early 2000s, BNP Bank lacked the infrastructure and personnel necessary to offer credit facilities and structured products at the level of rival banks.  (¶ 141.)  In 2003, Zurich Financial offered to sell its leverage business unit, Zurich Capital Markets, Inc. ("ZCM"), consisting of sixty employees in New York and a portfolio linked to investment funds.  (¶ 142.)  In connection with a potential acquisition, BNP Bank conducted due diligence on ZCM's portfolio, including a multi-million dollar credit facility with Santa Barbara Holdings Ltd. ("Santa Barbara") – a fund that was invested solely in BLMIS feeder fund Harley International (Cayman) Limited ("Harley").  (¶ 143.)  BNP Bank had a strict policy against transacting with single-manager funds, and Harley was a single-manager fund managed by BLMIS.  (¶ 144.)  BNP Bank nonetheless approved the acquisition of ZCM in July 2003.  (¶ 145.)

The ZCM acquisition provided BNP Bank with the infrastructure and personnel necessary to create and market credit facilities and structured products to clients, including BLMIS feeder funds.  (¶¶ 146-47.)  These transactions were highly lucrative and, according to the Trustee, incentivized BNP Bank to turn a blind eye to Madoff's fraud.  (¶ 150.)

SocGen had also considered acquiring ZCM but its diligence revealed obvious risks of fraud associated with Harley, including "impossibl[y]" consistent returns, BLMIS' failure to charge customary management or performance fees, and BLMIS acting as its own custodian.  (¶¶ 153-59.)  SocGen offered to purchase ZCM's assets excluding the Santa Barbara credit facility, but Zurich Financial refused.  Thereafter, SocGen blacklisted BLMIS-related investments.  (¶ 161.)  According to the Trustee, BNP

Bank chose to acquire ZCM despite knowing about SocGen's misgivings concerning Madoff. (¶ 162.)

### 2.    The Defendants Deviated from Standard Diligence Practices to Avoid Confirming Madoff's Fraud

Following the ZCM acquisition, customer demand for leverage and credit on BLMIS-related transactions was high and BNP Bank management was eager to profit from the demand. (¶ 168.) This line of business was handled by the "Fund Derivatives Group" – consisting of employees of BNP Bank, BNP Arbitrage, and non-party BNP Paribas Securities Corp. ("BNP Securities Corp."), (¶ 66), – that created, marketed, and serviced credit facilities and derivative financial instruments such as swaps, notes, and other structured products. Such products offered customers "leverage," thereby creating an opportunity to earn multiples of the returns generated by the underlying referenced asset without large up-front outlays of capital. (¶ 64.) BNP Bank provided billions of dollars in capital to fund the credit facilities and structured products. (¶¶ 4, 67.) BNP Arbitrage created and managed the facilities and products, and BNP Securities Corp. marketed and monitored the facilities and products. (¶ 67.) In addition, BNP Securities Corp. served as the calculation agent, which included calculating the amount that BNP Bank should invest or redeem from a BLMIS feeder fund. (¶ 68.)

Typically, the Fund Derivatives Group's due diligence in connection with an ongoing or potential transaction entailed reviewing all relevant public documents including financial documents, offering memoranda, subscription agreements, account statements, trade confirmations and documents relating to the fund manager's

investment strategy. (¶ 169.) When a transaction would result in significant exposure to BNP Bank, it was standard procedure for the due diligence team to conduct on-site visits and memorialize findings in a memorandum. (¶ 170.)

Notwithstanding the diligence procedures, the Fund Derivatives Group's due diligence team lacked authority to reject Madoff-related transactions, (¶¶ 165, 167), and such transactions were pre-approved by senior management at BNP Bank. (¶ 168.) Likewise, senior management instructed the due diligence team not to contact Madoff or anyone from BLMIS to arrange on-site diligence visits. (¶ 174.) The due diligence team did make one on-site visit to BLMIS in March 2008, but did not draft a memorandum to memorialize the visit. (¶ 175.)

The due diligence team also ranked fund managers in a periodic report called the "Heat Map" based on a risk score assigned by the team. For purposes of this report, Madoff-related transactions were grouped into a single "Madoff" category regardless of the BLMIS feeder fund involved, and Madoff was always listed at the top of the Heat Map. (¶¶ 171-73.)

Moreover, by taking on billions of Madoff-related deals, the Fund Derivatives Group disregarded BNP Bank's policy against taking on exposure from single-manager trades. (¶ 178.) According to the Trustee, BNP Bank deviated from its standard operating procedures because the Fund Derivatives Group would not have been profitable absent the Madoff-related transactions. (¶¶ 166, 179.)

### 3.   BNP Bank Provides Leverage to BLMIS Feeder Funds

#### a.   Santa Barbara

In February 2004, BNP Bank, through its Fund Derivatives Group, entered into another credit facility with Santa Barbara.  (¶ 180.)  Trouvain (who had previously raised concerns regarding Oreades) worked on this transaction.  (¶ 182.)  The credit facility called for BNP Bank to make senior secured loans to Santa Barbara for levered investments with Harley; Harley's BLMIS account served as collateral for the credit facility.  In exchange, Santa Barbara paid BNP Bank above-market fees and interest, which, as of 2004, was 170 basis points above LIBOR.  (¶ 183.)  BNP Arbitrage served as calculation agent, (¶ 185), and BNP Securities Corp. served as collateral agent, (¶ 184), for the credit facility.  Under the terms of the credit facility, BNP Bank, BNP Arbitrage and BNP Securities Corp. took control over Harley's BLMIS account so that Harley could not make redemptions absent BNP Bank's consent.  (¶ 187.)  These BNP entities communicated directly with BLMIS and received and reviewed Harley's BLMIS account statements and trade confirmations.  (¶ 186.)

In 2007, BNP Bank entered into an option agreement with HSBC Bank USA, N.A. ("HSBC"), with Harley as the underlying reference fund.  The option required HSBC to pay BNP Bank for losses sustained by Harley above a certain fixed percentage of the fund's net asset value.  The notional amount of the trade was $70 million, and increased to $90 million in 2008.  The Trustee alleges that BNP Bank entered into this transaction to protect itself in the event of BLMIS' failure.  (¶ 190.)  During negotiations over the option, the head of trading at the Fund Derivatives Group told an HSBC employee that

he was unable to reconcile the trading statements BNP Bank had received from BLMIS.
(¶ 191.)

Between 2003 and 2008, BNP Bank's relationship with Santa Barbara, Harley
and Fix Asset Management (the investment manager of Santa Barbara and Harley) grew
substantially, as did the size of the credit facility.  By the Filing Date, BNP Arbitrage had
received transfers of approximately $975 million of customer property from Harley's
BLMIS account.  (¶ 192.)

### b.    Legacy

In July 2004, BNP Bank entered into a $100 million credit facility with Legacy
Capital Ltd. ("Legacy"), an investment company that invested exclusively with BLMIS.
(¶ 193.)  Under the facility, BNP Arbitrage and BNP Securities Corp. served as
calculation agent and collateral agent, respectively, and both were authorized to act on
BNP Bank's behalf.  (¶ 195.)  Legacy pledged all of its capital stock to BNP Securities
Corp. and granted a security interest in Legacy's BLMIS account.  (¶ 196.)  In connection
with the Legacy credit facility, BNP Bank, BNP Arbitrage, and/or BNP Securities Corp.
communicated directly with BLMIS and received and reviewed Legacy's BLMIS account
statements and trade confirmations.  (¶ 197.)  In September 2006, the credit facility was
increased to a maximum of $120 million.  (¶ 198.)  BNP Bank, BNP Arbitrage and BNP
Securities Corp. maintained the Legacy credit facility through the Filing Date and
directed the withdrawal of approximately $175 million of customer property from
BLMIS.  (¶ 199.)

The PAC also described the circumstances leading to BNP Bank's extension of the Legacy credit facility.  In June 1999, Meritage – a sub-fund of Renaissance Technologies Corp. ("Renaissance"), entered into a total return swap through which it received returns equal to those paid on an equivalent amount of the counterparty's own investment with BLMIS via Legacy's BLMIS account.  (¶ 201.)  In 2003, Renaissance identified red flags at BLMIS analogous to that identified by SocGen in connection with the ZCM acquisition (*e.g.,* returns not correlated to the S&P 100 Index, nearly impossible market timing, impossible options trading volume, failure to charge customary management fees, failure to use a well-known auditor).  (¶¶ 200, 203-05.)  As a result, Renaissance directed Meritage to begin unwinding its BLMIS investment, and Legacy began looking for an investor to replace Meritage.  (¶ 206.)  In 2004, Legacy approached BNP Bank about providing it with a line of credit to replace the Meritage investments.  (¶ 207.)  BNP Bank performed due diligence on Legacy's BLMIS account receiving information similar to that reviewed by Renaissance and thereafter decided to extend the $100 million credit facility to Legacy in July 2004.  (¶¶ 208-09.)

### c.    Tremont

In August 2005, BNP Bank entered into a $100 million credit facility with Rye Select Broad Market Insurance Portfolio LDC ("Insurance Portfolio Fund"), a BLMIS feeder fund managed by Tremont Group Holdings, Inc. ("Tremont").  (¶ 212.)  As collateral for the credit facility, Insurance Portfolio Fund pledged the assets held in its BLMIS account.  (¶ 214.)  BNP Bank authorized and directed BNP Securities Corp. to act as the collateral agent and calculation agent for the credit facility, and BNP Bank

received and reviewed Insurance Portfolio Fund's BLMIS account statements and trade confirmations.  (¶¶ 215-16.)

Prior to entering into a credit facility with BNP Bank, Tremont explored a similar facility with the investment bank Dresdner Kleinwort ("Dresdner").  Dresdner raised a variety of concerns about Madoff with Tremont including whether BLMIS segregated its investment accounts, whether an independent third party verified the assets held by BLMIS, how BLMIS was compensated for its role with respect to Tremont's investment, and Madoff's secrecy regarding BLMIS operations.  In light of Dresdner's concerns, Tremont decided to pursue a credit facility with BNP Bank instead.  (¶ 218.)

### d.    Option and Swap Agreements with BLMIS Feeder Funds

In December 2005, BNP Bank entered into an option agreement to provide leverage to Equity Trading Fund, Ltd., a fund that invested exclusively in BLMIS feeder fund Equity Trading Portfolio Limited ("Equity Trading").  (¶¶ 219-20.)  The agreement contemplated another transaction (the "Equity Trading Option") wherein BNP Bank sold Equity Trading Fund, Ltd. a structured option to leverage Equity Trading's investments with BLMIS.  (¶ 221.)  As collateral for the Equity Trading Option, BNP Arbitrage and BNP Cayman acquired a direct ownership interest in Equity Trading.  (¶ 222.)  Pursuant to the Equity Trading Option, BNP Bank, BNP Arbitrage and BNP Cayman received and reviewed Equity Trading's BLMIS account statements and trade confirmations.  (¶ 223.)

In October 2006, BNP Paribas Securities[5] entered into an option agreement to provide leverage to Tremont (Bermuda) Ltd., a fund of funds managed by Tremont that invested with BLMIS. (¶ 224.)  Under the agreement, BNP Bank sold Tremont (Bermuda) Ltd. a structured option (the "Tremont Option") to leverage Rye Select Broad Market Portfolio Limited ("Portfolio Limited Fund"), a Tremont-managed BLMIS feeder fund. (¶ 225.)  In practical terms, the Tremont Option meant that BNP Bank would provide Tremont (Bermuda) Ltd. with increased returns on its BLMIS investments. (¶ 226.)  In January 2007, BNP Bank entered into a swap agreement (the "Tremont Swap") to provide leverage to Tremont Enhanced Market Neutral Fund L.P., a Tremont-controlled fund that invested with BLMIS. (¶ 227.)  The Tremont Swap called for a total return swap transaction linked to various Tremont-controlled reference funds, including Rye Select Broad Market Prime Fund L.P. ("Prime Fund"), Rye Select Broad Market Fund, L.P. ("Broad Market Fund"), and Rye Select Broad Market, L.P. ("XL LP") – all funds that invested directly or indirectly with BLMIS. (¶ 228.)  Pursuant to the Tremont Option and Tremont Swap, BNP Bank and BNP Securities Corp. received and reviewed Tremont's BLMIS account statements and trade confirmations. (¶ 229.)

For some deals, BNP Bank affiliates helped to shield the involvement of Madoff/BLMIS in the transactions.  In December 2007, BNP Bank was negotiating an option agreement administered by HSBC, which referenced a BLMIS feeder fund. HSBC told BNP Securities Corp. to delete any reference to Madoff or BLMIS in the option agreement and BNP Securities Corp. complied. (¶ 263.)  Similarly, in September

---

[5]    The PAC does not specify which BNP entity it is referring to in ¶ 224.

2008, an Access employee asked a BNP Bank subsidiary – FundQuest – to remove BLMIS references in marketing materials for products invested in BLMIS feeder fund Luxalpha SICAV; FundQuest complied with Access' request.  (¶¶ 264-65.)

### 4.    BNP Bank Created Structured Products for Clients Referencing BLMIS Feeder Funds

In addition to providing leverage to BLMIS feeder funds, BNP Bank sold BLMIS-related financial products to its customers touting its "extensive experience" with Madoff.  (¶ 232.)  In 2006, BNP Bank began providing leverage to clients who invested in BLMIS feeder fund Ascot Partners, L.P. ("Ascot") in exchange for fees and interest payments.  Through these leveraged transactions, BNP Cayman redeemed shares and ultimately received transfers of customer property from Ascot.  (¶ 233.)

BNP Bank also marketed and sold structured products to clients that referenced other large BLMIS feeder funds.  For example, BNP Bank sold three-year term notes that paid note purchasers a return based on the performance of Fairfield Sentry Limited ("Fairfield Sentry") – the largest BLMIS feeder fund.  However, BNP Bank structured the notes so that it did not have to pay investors in the event Fairfield Sentry lost more than 30% of its value.  (¶¶ 234-39.)

Last, BNP Bank sold shares in BLMIS feeder funds directly to its clients earning fees from both the clients and the funds.  (¶ 240.)

### F.    Red Flags

The PAC also includes allegations that the Defendants were aware of various performance impossibilities at BLMIS learned while servicing Oreades and providing

leverage to clients.  (¶¶ 267-68.)  These include that BLMIS achieved returns

inconsistent with a fund employing the SSC Strategy (¶¶ 269-84), some of BLMIS'

trades were made at prices outside the daily price range for the security (¶¶ 285-88),

there were not enough options in the entire market to implement the SSC Strategy for

the amount that BLMIS purported to have under management (¶¶ 289-95), BLMIS was

misreporting the number of accounts and amount under management (¶¶ 296-303),

BLMIS consistently purchased shares below the daily average price and sold shares

above the daily average price (¶¶ 304-10), BLMIS reported options trading volumes

beyond the entire options volume reported on the Chicago Board Options Exchange for

certain days (¶¶ 311-16), BLMIS was secretive about identities of counterparties to its

purported over-the-counter options trades, and the volume of such options was

implausible (¶¶ 317-21), BLMIS sometimes made profitable trades that were purely

speculative and not consistent with the SSC Strategy (¶¶ 322-27), BLMIS settled options

trades as much as three days after execution instead of the one-day period customary in

the industry (¶¶ 331-35), and certain BLMIS customer statements showed multiple

dividends paid from a Fidelity money market fund within a given month even though

the fund paid dividends only once per month.  (¶¶ 336-39.)

## G.    The Transfers

The Trustee seeks to recover avoidable transfers from the Defendants as

subsequent transferees under section 550(a)(2) of the Bankruptcy Code in the amount

of approximately $156 million.  (*See* ¶¶ 423-46.)  The subsequent transfers came from

two sources: (i) the BLMIS accounts held by four Tremont-managed funds: Prime Fund,

Broad Market Fund, Insurance Portfolio Fund, and Portfolio Limited Fund (collectively, the "Tremont Funds") and (ii) the BLMIS account held by Ascot. (*See* PAC, Ex. B.)

### 1.    Initial Transfers to the Tremont Funds

In a separate adversary proceeding styled *Picard v. Tremont Group Holdings, Inc.*, Adv. Proc. No. 10-05310 (SMB), the Trustee sought to avoid and recover approximately $2,140,297,364 in initial transfers ("Tremont Initial Transfers") from numerous parties including the Tremont Funds.[6] (¶ 343.) On September 22, 2011, the Court approved a settlement under Federal Bankruptcy Rule 9019 that "ensure[d] judgments" against the defendants and "enable[d] the estate to immediately recover $1.025 billion . . . ." (*Bench Memorandum and Order Granting Trustee's Motion for Entry of Order Approving Agreement*, dated Sept. 22, 2011 ("Tremont Settlement Order"), at 2 (ECF Adv. Proc. No. 10-05310 Doc. # 38).)

### 2.    Transfers from Ascot

The PAC sought to recover subsequent transfers totaling $57,190,550 from Ascot to the Defendants ("Ascot Subsequent Transfer Claims"), but these claims are now moot. The Trustee had commenced a separate adversary proceeding styled *Picard v. Merkin*, Adv. Proc. No. 09-01182 (SMB), seeking, *inter alia*, to avoid and recover $461 million transferred from BLMIS to Ascot within six years of the Filing Date. By order, dated December 10, 2014 (ECF Adv. Proc. No. 09-01182 Doc. # 251), the Court dismissed the Trustee's avoidance claims against Ascot other than the intentional

---

[6]    According to the PAC (¶¶ 346, 351, 361, 371 and Ex. C), the Tremont Initial Transfers were made to Prime Fund ($945 million), Broad Market Fund ($252 million), Insurance Portfolio Fund ($90.65 million) and Portfolio Limited Fund ($609 million).

fraudulent transfer claims made within two years of the Filing Date pursuant to 11 U.S.C. § 548(a)(1)(A). The surviving claims totaled $280 million. *See Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117 (Bankr. S.D.N.Y. 2014).

After the Court took the instant matter under advisement, the remaining parties to the *Picard v. Merkin* adversary proceeding entered into a settlement pursuant to which Ascot and Gabriel Capital Corporation agreed to pay the Trustee $280 million in satisfaction of all claims. (*See Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code and Rules 2002 and 9019 of the Federal Rules of Bankruptcy Procedure Approving Settlement Agreement Between the Trustee and Ascot Partners, L.P., Through Its Receiver, Ralph C. Dawson, Ascot Fund Limited, J. Ezra Merkin, and Gabriel Capital Corporation*, dated June 13, 2018 (ECF Adv. Proc. No. 09-01182 Doc. # 450).) The settlement was approved by order dated July 3, 2018 (*see* ECF Adv. Proc. No. 09-01182 Doc. # 454).

In light of the settlement for the full amount of the Trustee's remaining initial transfer claims against Ascot, the Court issued an *Order to Show Cause*, dated Aug. 29, 2018 (ECF Doc. # 140) in this adversary proceeding requiring the Trustee to explain why his claims to recover subsequent transfers that were sent from Ascot to BNP Cayman should not be dismissed under the "single satisfaction" rule, 11 U.S.C. § 550(d).[7] Thereafter, the Trustee and BNP Cayman stipulated to the dismissal of the Ascot Subsequent Transfer Claims, (*see Stipulated Order to Dismiss Claims to Recover the*

---

[7] Section 550(d) of the Bankruptcy Code provides that "[t]he trustee is entitled to only a single satisfaction under subsection (a) of this section."

*Ascot Transfers from the Amended Complaint*, signed Sept. 12, 2018 (ECF Doc. # 145)), and the Court need not address those claims any further.

## H.    The Defendants Motion

The Defendants have moved to dismiss the PAC.  (*See Memorandum of Law in Support of the BNP Paribas Defendants' Motion to Dismiss*, dated Oct. 25, 2017 ("*BNP Brief*") (ECF Doc. # 107).)  They argue that the Trustee improperly filed the PAC without their consent or leave of court, (*BNP Brief* at 12-13), the safe harbor codified in 11 U.S.C. § 546(e) barred the claims, (*id*. at 14-16), the Defendants took the subsequent transfers for value, in good faith and without knowledge of the voidability of the initial transfer as set forth in 11 U.S.C. § 550(b)(1), (*id*. at 16-34), certain of the claims are time-barred under 11 U.S.C. § 550(f), (*id*. at 34-35), and the Court lacks personal jurisdiction over the Defendants.  (*Id*. at 35-38.)[8]

The Trustee filed his *Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint* on December 20, 2017 ("*Trustee Brief*") (ECF Doc. # 110) disagreeing with each point made in the *BNP Brief*.  The Defendants filed their *Reply Memorandum of Law in Support of the BNP Paribas Defendants' Motion to Dismiss* on January 19, 2018 ("*Defendants Reply*") (ECF Doc. # 116).

---

[8]    The Defendants also argued that they were not properly served, (*see BNP Brief* at 38-40), but withdrew that contention in advance of the hearing.  (*See Transcript of March 9, 2018 Hearing* ("*Tr.*") at 60:14-17 (ECF Doc. # 137).)

## DISCUSSION

### A.    Personal Jurisdiction

As discussed later, the Court is treating the matter before it as a motion by the Trustee for leave to amend his existing complaint. Before addressing that motion, the Court will initially consider the Defendants' contention that the Court lacks personal jurisdiction over them. Although teed up as a motion to dismiss a proposed complaint which has not technically been filed, the Defendants' motion is directed at the allegations in the PAC, and the Court may consider the allegations in the proposed pleading in deciding whether the Court would lack personal jurisdiction over the Defendants should it grant leave to file the PAC. *See, e.g., Meeker v. Ellis*, No. 4:08CV04219 (JLH), 2010 WL 749552, at * 2 (E.D. Ark. Mar. 2, 2010) (considering jurisdictional allegations in a proposed amended complaint in denying a motion to dismiss under Rule 12(b)(2)).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the Trustee "must make a prima facie showing that jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*), 609 F.3d 30, 34-35 (2d Cir. 2010)). A trial court has considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2). It may "determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). Where a court chooses not to conduct an evidentiary

hearing on personal jurisdiction, the plaintiff's *prima facie* "showing may be made through the plaintiff's 'own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'" *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d. Cir. 2001)); *accord In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 751 (S.D.N.Y. 2017) (*prima facie* showing to defeat pre-discovery challenge to jurisdiction may be made through plaintiff's affidavits and other materials); *Wego Chem. & Mineral Corp. v. Magnablend, Inc.*, 945 F. Supp. 2d 377, 381 (E.D.N.Y. 2013) (plaintiff may defeat a pre-discovery challenge to jurisdiction "by way of the complaint's allegations, affidavits, and other supporting evidence"). The pleadings and affidavits are to be construed "in the light most favorable to the plaintiffs, resolving all doubts in their favor." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)); *accord Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).

In order to exercise personal jurisdiction over a defendant, "due process requires a plaintiff to allege (1) that a defendant has certain minimum contacts with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *SPV Osus*, 882 F.3d at 343 (quoting *O'Neill v. Asat Trust Reg.* (*In re Terrorist Attacks on Sept. 11, 2001*), 714 F.3d 659, 673 (2d Cir. 2013)). In determining reasonableness, a court considers (1) the burden that the exercise of personal jurisdiction will place on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial

system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several States in furthering substantive social policies. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 113 (1987); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). The minimum contacts and the reasonableness requirements are related, and "a court must weigh the relative strengths and weaknesses of each requirement – that is, depending upon the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir.), *cert. denied*, 519 U.S. 1007 (1996); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) (the "reasonableness" considerations sometimes serve to establish jurisdiction "upon a lesser showing of minimum contact than would otherwise be required"). Nevertheless, it would be a "rare" case where the defendant's minimum contacts with the forum support the exercise of personal jurisdiction but it is unreasonable to force the defendant to defend the action in that forum. *See Licci*, 732 F.3d at 170 (discussing personal jurisdiction under New York's long-arm statute).

Here, the Trustee asserts that the Court has general jurisdiction over BNP Bank, BNP Arbitrage, and BNP Securities Services (*Trustee Brief* at 33-34), has specific jurisdiction over all the Defendants (*id.* at 28-33), and the exercise of personal jurisdiction is reasonable. (*Id.* at 34-35.)

### 1.    General Jurisdiction

In *Daimler AG v. Bauman*, the Supreme Court described the "limited set of affiliations" that will subject a defendant to general jurisdiction in a forum:

> For an individual, the paradigm forum for the exercise of general
> jurisdiction is the individual's domicile; for a corporation, it is an
> equivalent place, one in which the corporation is fairly regarded as at
> home.  With respect to a corporation, the place of incorporation and
> principal place of business are paradigm bases for general jurisdiction.
> Those affiliations have the virtue of being unique—that is, each ordinarily
> indicates only one place—as well as easily ascertainable.  These bases
> afford plaintiffs recourse to at least one clear and certain forum in which a
> corporate defendant may be sued on any and all claims.

571 U.S. 117, 137 (2014) (quotation marks, citations, and alternations omitted); *accord id.* at 138-39 (the inquiry is "whether [the] corporation's affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State") (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Except in an "exceptional" case, a corporate defendant may only be subject to general jurisdiction in its place of incorporation or principal place of business.  *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016); *accord Daimler*, 571 U.S. at 139 n. 19.  It is not enough that a foreign corporation conducts a portion of its business through a branch office located in the forum State.  *SPV Osus*, 882 F.3d at 343; *Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 135 (2d Cir. 2014).

Although BNP Arbitrage and BNP Securities Services maintain offices in New York, (¶ 59), and BNP Bank has over 10,000 employees and more than 700 retail branches in the United States, (¶ 58), they were incorporated in France, (¶¶ 52, 53, 55), and presumably conduct business principally in France.  The Trustee does not allege a principal place of business in the United States nor does he argue that this is an "exceptional" case in which the Court should exercise general jurisdiction over a foreign defendant.  *See Lockheed Martin*, 814 F.3d at 628-30 (recognizing that *Daimler* had made stricter the general jurisdiction standard and ruling that Lockheed Martin was not

subject to general jurisdiction in Connecticut despite having had a physical presence for over thirty years, employing between thirty and seventy workers, making $160 million in revenues, and paying Connecticut taxes).  Therefore, the Court concludes that the Trustee has not made a *prima facie* showing that the Court can exercise general jurisdiction over these Defendants.[9]

## 2.    Specific Jurisdiction

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation."  *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (quotation marks and citations omitted).[10]  In *Walden*, the Supreme Court set forth two related principles for specific jurisdiction.  "First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State."  *Id.* at 284 (quoting *Burger King*, 471 U.S. at 475) (emphasis in original).  "Second, our 'minimum contacts' analysis looks to

---

[9]     As discussed in the succeeding text, the Trustee has provided evidence that New York is BNP Cayman's principal place of business.  This might support the conclusion that BNP Cayman is subject to the Court's general jurisdiction, but the Trustee has not made this argument.

[10]    Determining personal jurisdiction over a foreign defendant in a federal question case requires that the Court first look to the jurisdictional law of the forum state, *Licci*, 732 F.3d at 168; *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007), and the PAC alleges personal jurisdiction under New York's Civil Practice Law & Rules ("CPLR").  (¶ 56.)  However, in bankruptcy cases, a court must consider the defendant's minimum contacts with the United States rather than the forum state.  *Owens-Illinois, Inc. v. Rapid Am. Corp.* (*In re Celotex Corp.*), 124 F.3d 619, 630 (4th Cir. 1997) ("[W]hen an action is in federal court on 'related to' jurisdiction … we need only ask whether [defendant] has minimum contacts with the United States such that subjecting it to personal jurisdiction does not offend the Due Process Clause of the Fifth Amendment to the United States Constitution.  Given that [defendant] is a Delaware corporation with its principal place of business in New York, we have no doubt that this is the case." (citations omitted)); *Hosking v. TPG Capital Mgmt., L.P.* (*In re Hellas Telecomm. (Lux.) II SCA*), 547 B.R. 80, 96-97 (Bankr. S.D.N.Y. 2016) (collecting cases).  In this regard, the parties have not addressed personal jurisdiction under the CPLR in their briefs, and instead, have focused on the principles of general and specific jurisdiction discussed in the text.

the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 285; *see also id.* ("although physical presence in the forum is not a prerequisite to jurisdiction . . . physical entry into the State – either by the defendant in person or through an agent, goods, mail, or some other means – is certainly a relevant contact"). The defendant's "suit-related conduct must create a substantial connection with the forum state," *id.* at 284, and "general connections" will not suffice. *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017).

The Second Circuit has established a sliding scale to determine whether a defendant's in-forum activities are sufficient for the exercise of specific jurisdiction:

> Where the defendant has had only limited contacts with the state it may be appropriate to say that he will be subject to suit in that state only if the plaintiff's injury was proximately caused by those contacts. Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.

*SPV Osus*, 882 F.3d at 344 (quoting *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998)).

Here, the Trustee's claims are based on 11 U.S.C. § 550(a)(2), which allows him to recover avoidable transfers from subsequent transferees. Therefore, the jurisdictional analysis focuses on the Defendants' U.S. contacts related to the receipt of the fifty-nine subsequent transfers at issue. Each transfer is a separate claim, *cf. Metzeler v. Bouchard Transp. Co., Inc.* (*In re Metzeler*), 66 B.R. 977, 984 (Bankr. S.D.N.Y. 1986) ("Courts have consistently treated preferential transactions as separate and distinct under Rule 15(c). . . . The same should be true of separate fraudulent transfers.") (citations omitted)), and the Trustee "must establish the court's jurisdiction with respect

- 29 -

to each claim asserted." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)); *accord Daniel v. Tootsie Roll Indus., LLC*, 17 Civ. 7541 (NRB), 2018 WL 3650015, at *8 (S.D.N.Y. Aug. 1, 2018).

Initially, the subsequent transfers fall into at least two groups. First, the PAC alleges that the leverage and structured products businesses generated by the Fund Derivatives Group accounted for virtually all of the subsequent transfers that are the subject of the Trustee's claims. (¶ 65 ("The fraudulent transfers of customer property received by Defendants were derived from products and investments made possible in large part by the Fund Derivatives Group in New York"), ¶ 408 ("As discussed above, the transfers from the Tremont Funds arise out of levered transactions—credit facilities, swaps, and option agreements with the Tremont Funds—that were created, marketed, operated, and supervised by members of BNP Paribas's Fund Derivatives Group in New York."); *see also The Trustee's Proffered Allegations Pertaining to the Extraterritoriality Issue as to the BNP Paribas Defendants*, dated June 26, 2015 ("*Trustee's Proffer*"), at ¶ 83 (ECF Doc. # 64).) Second, the PAC alleges that each of the Defendants were investors that maintained their own accounts with one or more of the Tremont Funds. (*See* ¶ 393.)

The Trustee has made a *prima facie* showing of personal jurisdiction with respect to the subsequent transfers at issue. Employees from BNP Bank and BNP Arbitrage comprised the Fund Derivatives Group, (¶ 66), which operated out of New York, (¶¶ 4, 8, 65, 408; *Trustee's Proffer* ¶¶ 12, 66), and those subsequent transfers arose, for the most part, from the Fund Derivatives Group's New York contacts. Although BNP

Securities Services and BNP Cayman were not part of the Fund Derivatives Group, they provided services to that group through their participation in the Securities Services Group. (¶¶ 69-71.) Moreover, the PAC alleges that BNP Securities Services maintained an office in New York, and while the PAC does not allege that BNP Cayman had a New York office, it does allege that the "Defendants and [BNP Securities Corp.] also shared the same offices, employees, contact information, and bank accounts relating to BNP Paribas's Madoff business." (¶ 63.) BNP Securities Corp. is a Delaware corporation and a broker-dealer registered with the SEC, and maintains an office located at 787 Seventh Avenue, New York, New York. (*Trustee's Proffer* ¶ 10.) Furthermore, Bank Cayman represented in a subscription agreement signed in August 2005 with Fairfield Sentry, another BLMIS feeder fund, that its principal place of business was New York. (*Declaration of Torello H. Calvani in Support of the Trustee's Opposition to Defendants' Motion to Dismiss Amended Complaint*, dated Dec. 20, 2017 ("*Calvani Declaration*"), Ex. 1, Bates No. BNPSAD0000039 (ECF Doc. # 111).)[11] Based on these allegations and additional information provided by the Trustee in opposition to this branch of the motion to dismiss, the Trustee has made a *prima facie* showing that the Defendants had sufficient minimum contacts with the United States, specifically New York, regarding the services rendered in connection with the Fund Derivatives Group, and any related transfers arose out of those contacts and were the proximate cause of the injuries the Trustee seeks to redress through the PAC.

---

[11]    BNP Cayman also represented in a subscription agreement with Ascot that it was organized under Delaware law, (*Calvani Declaration*, Ex. 3 at Bates Nos. NYGSAA0020973, NYGSAA0020989), and that it was not a foreign corporation or partnership for tax purposes. (*Id.* at Bates No. NYGSAA0020974.)

The Trustee has also made a *prima facie* showing that the Court has personal
jurisdiction over any fraudulent transfer claims resulting from redemptions by the
Defendants from their accounts with the Tremont Funds.  The Tremont Funds were
managed from offices in New York, (¶¶ 386-92, 397-99, 405-06), and in their capacity
as investors, the Defendants sent subscription agreements to New York, wired funds in
U.S. dollars to New York, sent redemption requests to New York and received
redemption payments from a Bank of New York account in New York.  (¶¶ 393-95, 407;
*Trustee's Proffer* ¶¶ 72-73, 80).)  The redemption and any other payments the
Defendants received as direct investors in the Tremont Funds arose from the
aforementioned New York contacts and were the proximate cause of the injuries that the
Trustee seeks to redress.

The Defendants' principal contrary authority, *Hill v. HSBC Bank plc*, 207 F.
Supp. 3d 333 (S.D.N.Y. 2016), is distinguishable.  In *Hill*, former BLMIS customers sued
multiple HSBC entities that served as custodians and administrators for BLMIS feeder
funds alleging that the HSBC entities aided and abetted the BLMIS Ponzi scheme by
facilitating investments into BLMIS feeder funds while ignoring red flags and suspicious
conduct indicating fraud at BLMIS.  *Id*. at 336-37.  Most of the HSBC entities were
foreign, and the plaintiffs alleged that these foreign defendants were subject to specific
jurisdiction through their contacts with New York, including the transmission of
instructions to BLMIS in New York, the receipt of BLMIS accounts statements and trade
confirmations sent from New York, contracting with BLMIS to act as sub-administrator
or sub-custodian, the facilitation of the transfer of funds from feeder funds to BLMIS in

New York and the transmission of false information to customers around the world.  *Id.* at 337-38.

The foreign defendants asserted that the District Court lacked personal jurisdiction over them under New York's long-arm statute, and the District Court agreed.  It observed that "[n]one of the business activities allegedly conducted by the Foreign Defendants occurred in New York."  *Id.* at 339.  The plaintiffs did not allege that the contracts between the foreign defendants and Madoff were executed in New York. Instead, the complaint alleged that they "communicated with and transmitted information and funds to and from BLMIS in New York," activities which were "incidental" to fulfilling a foreign contract.  *Id.* at 339-40.  Furthermore, although the complaint alleged that HSBC Bank plc created and structured financial products and hired KPMG to conduct due diligence on BLMIS, these activities, even if directed at New York residents, were insufficient to establish a transaction of business under N.Y.C.P.L.R. § 302(a)(1) unless supplemented by business transactions occurring in New York.  *Id.* at 340.

In contrast, the PAC alleges that the Fund Derivatives Group operated from New York, and the subsequent transfers were largely the result of those New York activities. (¶ 65.)[12]  In addition, BNP Securities Services maintained an office in New York, BNP Cayman operated out of the New York office with the same employees as BNP Securities Corp., and BNP Cayman represented that New York was its principal place of business.

---

[12]    For the same reasons, the Defendants' reliance on *To v. HSBC Holdings, PLC*, No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y.), *aff'd*, 700 F. App'x 66 (2d Cir. 2017) – a case addressing substantially similar claims against foreign HSBC defendants – is also distinguishable.

Both entities provided securities services to the Fund Derivatives Group, and although the PAC does not identify those services in granular detail, the PAC fairly implies that they were rendered in connection with the business of the Fund Derivatives Group, and the subsequent transfers they received in connection with those services arose from their New York contacts.  Furthermore, *Hill* has no bearing on the issue of personal jurisdiction arising from the Defendants' redemptions as investors in the Tremont Funds which arose from their New York contacts with the Tremont Funds.

### 3.    Reasonableness

To avoid jurisdiction on the basis that it would fail to comport with traditional notions of fair play and substantial justice, the defendant must present a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477; *accord Metro Life Ins.*, 84 F.3d at 575 ("dismissals resulting from the application of the reasonableness test should be few and far between").  The Defendants do not suggest that the exercise of personal jurisdiction would be unreasonable, and they are represented by capable New York counsel in this Court.

Accordingly, the Defendants' motion to dismiss for lack of personal jurisdiction is denied.

### B.    Failure to Seek Leave to Amend

The Defendants argue that the PAC was improperly filed without leave of Court or consent as required under Rule 15(a)(2) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7015 of the Federal Rules of Bankruptcy

Procedure.  (*Defendants Brief* at 12-13.)  The Trustee responds that the Court explicitly

granted him leave in *SIPC v. BLMIS* (*In re BLMIS*), No. 08-01789 (SMB), 2016 WL

6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) ("*Bankr. Ct. ET Decision*"), *consolidated*

*appeal docketed*, No. 17-2992 (2d Cir. Sept. 27, 2017).  (*Trustee Brief* at 36-37.)

        Some additional background is necessary to understand the Trustee's contention

and the disposition of this issue.  The District Court previously withdrew the reference

pursuant to 28 U.S.C. § 157(d)[13] on several occasions to consider common issues arising

out of the over 1,000 avoidance actions commenced by the Trustee.  Two decisions

issued by District Judge Rakoff are relevant to the question presented.  In *SIPC v.*

*BLMIS* (*In re BLMIS*), 513 B.R. 222 (S.D.N.Y. 2014) ("*Dist. Ct. ET Decision*"), the

District Court ruled that 11 U.S.C. § 550(a)(2) does not apply extraterritorially, and bars

the Trustee's claims "to the extent that they seek to recover purely foreign transfers."  *Id.*

at 232; *see also id.* at 232 n. 4.  In *SIPC v. BLMIS* (*In re BLMIS*), 516 B.R. 18 (S.D.N.Y.

2014) ("*Good Faith Decision*"), the District Court, addressing the question of the

transferee's "good faith" under 11 U.S.C. §§ 548(c) and 550(b), ruled that good faith

should be determined under a subjective standard, *id.* at 21-23, and placed the burden

of pleading a lack of good faith on the Trustee.  *Id.* at 23-24.  Lack of good faith, in the

context of these cases, refers to knowledge of Madoff's Ponzi scheme, *i.e.*, knowledge

---

[13]    Section 157(d) of Title 28 states

        The district court may withdraw, in whole or in part, any case or proceeding referred
        under this section, on its own motion or on timely motion of any party, for cause shown.
        The district court shall, on timely motion of a party, so withdraw a proceeding if the court
        determines that resolution of the proceeding requires consideration of both title 11 and
        other laws of the United States regulating organizations or activities affecting interstate
        commerce.

that BLMIS was not actually trading securities.  *See SIPC v. BLMIS* (*In re BLMIS*), No.
12 MC 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013).  Both District Court
decisions, however, stopped short of dismissing the Trustee's claims and returned the
actions to the Bankruptcy Court for further proceedings consistent with the decisions.
*Good Faith Decision*, 516 B.R. at 24; *Dist. Ct. ET Decision*, 513 B.R. at 232.

Upon return to this Court, and because of the adverse District Court rulings, the
Trustee filed a *Motion for Leave to Replead Pursuant to Fed. R. Civ. P. 15(a) and Court
Order Authorizing Limited Discovery Pursuant to Fed. R. Civ. P. 26(d)(1)*[14] on August
28, 2014 (ECF Adv. Proc. No. 08-01789 Doc. # 7827) to amend his allegations in various
avoidance actions, including this adversary proceeding, to show that (i) the subsequent
transfers were domestic and not purely foreign (the "Extraterritoriality Issue"), and (ii)
the defendants received the transfers under circumstances sufficient to establish
subjective bad faith (the "Good Faith Issue").  After a conference with the parties on
September 17, 2014, the Court entered an *Order Concerning Further Proceedings on
Extraterritoriality Motion and Trustee's Omnibus Motion for Leave to Replead and
For Limited Discovery* on December 10, 2014 ("*Scheduling Order*") (ECF Adv. Proc. No.
08-01789 Doc. # 8800) under which the Court would first resolve the Extraterritoriality
Issue before addressing the Good Faith Issue.  (*See id.*, ¶ 14 ("Further proceedings on
the Trustee's Motion insofar as it seeks . . . leave to amend the complaints . . . to add

---

[14]     The branch of the Trustee's motion seeking limited, expedited discovery under Rule 26(d)(1) was
denied.  *See SIPC v. BLMIS* (*In re BLMIS*), No. 08-01789 (SMB), 2018 WL 2734825 (Bankr. S.D.N.Y.
June 5, 2018).

allegations relevant to the good faith issue . . . shall be scheduled by the Court following the decision on the Extraterritoriality Motion.").)

This Court resolved the Extraterritoriality Issue in *Bankr. Ct. ET Decision*. As relevant to this adversary proceeding, the Court granted the Trustee's motion to amend his complaint based on proffered allegations that certain Tremont-managed feeder funds operated out of New York, used U.S. bank accounts to send redemptions, and the redeemers (*i.e.* the subsequent transferee defendants) received the transfers into U.S. bank accounts. *Bankr. Ct. ET Decision*, 2016 WL 6900689, at *29-30. The Trustee now relies on the Court's ruling in the *Bankr. Ct. ET Decision* to argue that he was also granted leave to amend his allegations as to the Defendants' lack of good faith. However, the portion of the Trustee's motion seeking to amend based on the Good Faith Issue was expressly deferred pursuant to the *Scheduling Order*. The parties did not address and the Court did not decide the issue in connection with the *Bankr. Ct. ET Decision*. Consequently, the Defendants are correct that the Trustee filed his PAC without leave of Court or consent in violation of Federal Civil Rule 15(a)(2).

Although the PAC is a nullity because it was filed without leave, *Shanghai Weiyi Int'l Trade Co. Ltd. v. FOCUS 2000 Corp.*, No. 15-CV-3533 (CM) (BCM), 2016 WL 5817009, at *3 (S.D.N.Y. Oct. 4, 2016)(report and recommendation); *Higgins v. Monsanto Co.*, 862 F. Supp. 751, 754 (N.D.N.Y. 1994), the Court will treat the pending motion, though made by the Defendants, as one for leave to file the PAC. As discussed immediately below, the same standard governs a motion for leave to amend and a motion to dismiss for failure to state a claim. Furthermore, no party will be prejudiced

because they have extensively briefed and argued the common legal principle that governs both motions.

## C.    Leave to Amend

### 1.    Standards Governing the Motion

Rule 15(a) of the Federal Rules of Civil Procedure governs motions for leave to amend pleadings.  Generally, leave should be freely granted, but the court may deny the motion in instances of undue delay, bad faith, dilatory motive, undue prejudice to the opposing party or futility.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The Defendants do not charge the Trustee with bad faith or an improper motive, assert that they were unduly prejudiced or that the Trustee unduly delayed.  Instead, they argue that the PAC is futile.  (*See BNP Brief* at 13-40.)  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."  *Lucente v. Int'l Bus. Machines Corp.,* 310 F.3d 243, 258 (2d Cir. 2002).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678; *accord Twombly*, 550 U.S. at 556.  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  The court should assume the

veracity of all "well-pleaded factual allegations," and determine whether, together, they plausibly give rise to an entitlement of relief.  *Id.*

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Moreover, a court may consider prior iterations of pleadings containing statements inconsistent with the latest version.  *See Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112, 129 (S.D.N.Y. 2017) ("A party cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version.") (quoting *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984)) (alterations omitted), *appeal docketed*, 17-2783 (2d Cir. Sept. 7, 2017).

The PAC incorporates by reference the *Complaint* in *Picard v. Tremont Group Holdings, Inc.*, dated Dec. 7, 2010 ("*Tremont Complaint*") (ECF Adv. Proc. No. 10-05310 Doc. # 1), in which the Trustee sought to avoid the Tremont Initial Transfers, and the proffered *Second Amended Complaint* in *Picard v. HSBC Bank PLC*, dated June 26, 2015 (ECF Adv. Proc. No. 09-01364 Doc. # 399).  (*See* ¶ 343.)  The Defendants relied on the Trustee's *Complaint*, dated December 2, 2010 in *Picard v. Oreades SICAV*, Adv. Proc. No. 10-05120 (SMB) (the "*Oreades Complaint*") (ECF Adv. Proc. No. 10-05120 Doc. # 1) and the *Trustee's Proffer* in support of their dismissal motion, and the Trustee agreed that the Court may consider both pleadings.  (*See Tr.* at 32:13-33:23.)

## 2.    Claims to Recover Subsequent Transfers

Section 550(a)(2) of the Bankruptcy Code allows the Trustee to recover an avoidable transfer from "any immediate or mediate transferee of" the initial transferee. To plead a subsequent transfer claim, the Trustee must plead that the *initial* transfer is avoidable, and the defendant is a subsequent transferee of that initial transferee, that is, "that the funds at issue originated with the debtor." *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548 B.R. 13, 36 (Bankr. S.D.N.Y. 2016); *accord Silverman v. K.E.R.U. Realty Corp.* (*In re Allou Distribs., Inc.*), 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007). The plaintiff must allege the "necessary vital statistics—the who, when, and how much–" of the purported transfers to establish an entity as a subsequent transferee of the funds. *Allou Distribs.*, 379 B.R. at 32; *accord Gowan v. Amaranth LLC* (*In re Dreier LLP*), 452 B.R. 451, 464 (Bankr. S.D.N.Y. 2011). However, the plaintiff's burden at the pleading stage "does not require dollar-for-dollar accounting" of the exact funds at issue. *IBT Int'l, Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 708 (11th Cir. 2005) (citations omitted); *accord Legacy Capital*, 548 B.R. at 36. Federal Civil Rule 9(b) governs the portion of a claim to avoid an initial intentional fraudulent transfer, *Sharp Int'l Corp. v. State St. Bank & Trust Co.*, (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005), and Rule 8(a) governs the portion of a claim to recover the subsequent transfer. *Legacy Capital*, 548 B.R. at 36 (citing cases).

The fraudulent transfer provisions provide an affirmative defense to a good faith purchaser for value. Thus, an initial transferee may defend against or limit his liability to the extent he "takes for value and in good faith." *See* 11 U.S.C. § 548(c). In a slight variation, Bankruptcy Code § 550(b)(1) limits the Trustee's recovery from a subsequent

transferee to the extent the subsequent transferee "[took] for value, . . . in good faith, and without knowledge of the voidability" of the initial transfer.  Once a subsequent transferee meets the three elements of § 550(b)(1), a later subsequent transferee that acted in good faith (and regardless of value or knowledge of avoidability) is fully protected.  *See* 11 U.S.C. § 550(b)(2); *Coleman v. Home Sav. Assoc.* (*In re Coleman*), 21 B.R. 832, 836 (Bankr. S.D. Tex. 1982); *accord* 5 RICHARD LEVIN & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 550.03[1] and [4] (16th ed. 2018).

Ordinarily, the transferee must raise the affirmative defense under both sections 548(c) and 550(b).  *See Good Faith Decision*, 516 B.R. at 24.  In addition, an objective, reasonable person test usually applies to determine a transferee's good faith.  *See Marshall v. Picard* (*In re BLMIS*)*,* 740 F.3d 81, 90 n. 11 (2d Cir. 2014) ("The presence of 'good faith' depends upon, *inter alia,* 'whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose.'") (quoting *Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC* (*In re Bayou Grp., LLC*)*,* 439 B.R. 284, 310 (S.D.N.Y. 2010)).  As discussed earlier, however, the District Court has placed the burden of pleading a lack of good faith on the Trustee.  *Good Faith Decision*, 516 B.R. at 24 n. 4; *see also BLMIS*, 2018 WL 2734825, at *3 (discussing District Court BLMIS rulings).  In addition, the District Court has ruled that a subjective test governs the good faith inquiry under sections 548(c) and 550(b), *Good Faith Decision*, 516 B.R. at 23; *see also Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012) (Lack of objective good faith is not enough "because the securities laws do not ordinarily impose any duty on investors to investigate their brokers, [and] those laws foreclose any interpretation of 'good faith'

- 41 -

that creates liability for a negligent failure to so inquire."), and in *Legacy Capital*, this Court concluded that, given the District Court's treatment of the defenses set forth in sections 548(c) and 550(b)(1) of the Bankruptcy Code, the Trustee must also plead that the subsequent transferee lacked knowledge of the voidability of the initial transfer. *Legacy Capital*, 548 B.R. at 36.

In summary, the Trustee must plead that (1) the initial transfer is avoidable, and either (2) the subsequent transferee lacked good faith or (3) received the subsequent transfer with knowledge that the initial transfer was avoidable. But even if the subsequent transferee received the transfer in good faith and without knowledge of the avoidability of the initial transfer (and assuming a prior transferee did not take for value), the subsequent transferee must still take for value to prevail on its defense. The District Court has not placed the burden of pleading lack of value on the Trustee, and the transferee is in the better position to identify the value he gave for the subsequent transfer. *See Legacy Capital*, 548 B.R. at 37. Accordingly, the value component remains the transferee's burden to plead and prove.

### a. Avoidability

The PAC did not allege specific facts in support of the avoidability of the Tremont Initial Transfers, but instead, incorporated the *Tremont Complaint*. The Defendants did not challenge the legal sufficiency of the *Tremont Complaint* in their initial moving papers. Rather, they asserted that their subsequent transfers were also protected by the

safe harbor, 11 U.S.C. § 546(e). [15]  (*See BNP Brief* at 15 ("The *only* way the Trustee can

escape the application of Section 546(e) here is by pleading with particularity and

plausibility that the [Defendants] actually knew of the Madoff Ponzi scheme.")

(emphasis in original).)

Their invocation of the safe harbor is only partially correct.  By its terms, the safe

harbor is a defense to the avoidance of the *initial* transfer.  *See* 11 U.S.C. § 546(e)

("Notwithstanding [enumerated avoidance powers], the trustee *may not avoid a*

*transfer* . . . .) (emphasis added).  Hence, a subsequent transferee is protected indirectly

to the extent that the initial transfer is not avoidable because of the safe harbor.  *See*

*SIPC v. BLMIS* (*In re BLMIS*), 2013 WL 1609154, at *7 (a subsequent transferee may

raise the § 546(e) defense even where the initial transferee fails to raise the defense or

settles with the trustee).  The Trustee does not, however, "avoid" the subsequent

transfer; he recovers the value of the avoided initial transfer from the subsequent

transferee under 11 U.S.C. § 550(a), and the safe harbor does not refer to the recovery

claims under section 550.  Moreover, even if the subsequent transferee was unaware of

Madoff's Ponzi scheme, it must still prove that it gave value in order to prevail on its

defense.

---

[15]    Section 546(e) of the Bankruptcy Code provides in pertinent part:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee
may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741
of this title, made by . . . a . . . stockbroker . . . , or that is a transfer made by . . . a . . .
stockbroker . . . in connection with a securities contract, as defined in section 741(7) . . . ,
that is made before the commencement of the case, except under section 548(a)(1)(A) of
this title.

The Defendants did not challenge the legal sufficiency of the *Tremont Complaint* until their reply, and then only in a half-hearted and conclusory manner.  (*BNP Reply* 4 ("Here, the Trustee incorporates by reference in the Amended Complaint the allegations against the Tremont funds as initial transferees, which plainly fall short of alleging the 'actual knowledge' necessary for the safe harbor not to apply).)  This belated argument suffers from two problems.  First, a court will not ordinarily consider arguments raised for the first time in the reply brief.  *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009).  Second, the Defendants failed to explain why the *Tremont Complaint* was legally insufficient.  The *Tremont Complaint* spans 135 pages and consists of 467 separately numbered paragraphs.  The Defendants did not identify any defects beyond their conclusory statement, and the Court declines their implicit invitation to hunt for them.

Accordingly, the Trustee has adequately pled the avoidability of the Tremont Initial Transfers.

### b.    Knowledge and Good Faith

As stated, the Trustee must also plead that the Defendants took the subsequent transfers in good faith and without knowledge of the avoidability of the initial transfer. The two concepts represent separate elements under section 550(b), but they are related.  To satisfy his burden of pleading a lack of good faith, the Trustee must allege that each Defendant willfully blinded itself to facts suggesting a high probability of fraud at BLMIS.  *Good Faith Decision*, 516 B.R. at 22-23; *Picard v. Merkin* (*In re BLMIS*), 563 B.R. 737, 752 (Bankr. S.D.N.Y. 2017).  Willful blindness consists of two elements: "(1) the defendant must subjectively believe that there is a high probability that a fact exists

and (2) the defendant must take deliberate actions to avoid learning of that fact."
*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). If a person who is
not under an independent duty to investigate "nonetheless, intentionally chooses to
blind himself to the 'red flags' that suggest a high probability of fraud, his 'willful
blindness' to the truth is tantamount to a lack of good faith." *Picard v. Katz*, 462 B.R.
447, 455 (S.D.N.Y. 2011), *abrogated on other grounds by SIPC v. BLMIS*, (*In re
BLMIS*), 513 B.R. 437 (S.D.N.Y. 2014). "Thus, willful blindness connotes strong
suspicion but *some* level of doubt or uncertainty of the existence of a fact and the
deliberate failure to acquire actual knowledge of its existence." *Merkin*, 515 B.R. at 140
(emphasis in original).

To plead that a Defendant knew that it was receiving the proceeds of an avoidable
transfer, the Trustee must plausibly allege that the Defendant "possess[ed] knowledge of
facts that suggest a transfer may be fraudulent." *Banner v. Kassow*, 104 F.3d 352, 1996
WL 680760, at *3 (2d Cir. Nov. 22, 1996) (summary order) (quoting *Brown v. Third
Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1355 (8th Cir. 1995)). Section 550(b)(1) does
not impose a duty to investigate or monitor the chain of transfers that preceded the
subsequent transfer, but "[s]ome facts strongly suggest the presence of others; a
recipient that closes its eyes to the remaining facts may not deny knowledge." *Bonded
Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 898 (7th Cir. 1988)
(Easterbrook, J.). This standard "essentially defines willful blindness which, the District
Court has held, is synonymous with lack of good faith." *Legacy Capital*, 548 B.R. at 38;
*see also id.* at 38-39 (noting that some courts and commentators have suggested that the
good faith and knowledge elements of 11 U.S.C. § 550(b)(1) are one and the same).

- 45 -

Here, too, the parties have not identified a distinction between the two elements of § 550(b)(1). Therefore, the Court will examine whether the Trustee adequately alleged that the Defendants willfully blinded themselves to Madoff's Ponzi scheme, *i.e.,* that BLMIS was not actually trading securities.

### i.    First Element: High Probability of Fraud

The Trustee contends that the Defendants were aware of the high probability that BLMIS was not actually trading securities based on so-called red flags, the closing of the Oreades fund because of concerns about Madoff, and information they learned and warnings they received from others. The Court addresses these "triggers" below, but in the end, they do not imply and the Trustee fails to plausibly plead that the Defendants subjectively believed there was a high probability that BLMIS was a Ponzi scheme.

#### *Red Flags*

The Trustee alleges that the Defendants became aware of the numerous red flags summarized earlier. (*See generally* ¶¶ 267-339.) The Court has previously rejected the Trustee's attempt to plead, in hindsight, a defendant's subjective knowledge by showing trading impossibilities in BLMIS account statements. *See Legacy Capital*, 548 B.R. at 33-34 ("Hindsight is infallible, but connecting the dots in real time may require clairvoyance. In many cases, it requires a regular comparison of information in BLMIS generated trade confirmations and monthly account reports with market information. Even if the comparison is made, many red flags are no more than pale pink especially when they crop up infrequently over a long period."). The Court also observed that the "red flag" theory of *scienter* has been rejected in Madoff-related securities fraud litigation by numerous courts in the Second Circuit. *Id.* (listing cases). Instead, the

- 46 -

existence of the red flags supports the more compelling inference that Madoff fooled the

Defendants as he did individual investors, financial institutions and the regulators. *In

re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 402 (S.D.N.Y. 2010) ("The SEC and

FINRA failed to catch Madoff's fraud."); *SEC v. Cohmad Sec. Corp.*, No. 09 Civ.

5680(LLS), 2010 WL 363844, at *2 (S.D.N.Y. Feb. 2, 2010) ("[T]he complaint supports

the reasonable inference that Madoff fooled the defendants as he did individual

investors, financial institutions, and regulators.").  The Trustee pleads the same red flags

in the PAC, (*see, e.g.*, ¶ 284 (returns of BLMIS feeder funds were too consistent), ¶ 286

(Defendants received trade confirmations for BLMIS feeder funds with prices above the

daily high or below the daily low), ¶ 305 (BLMIS timed trades too consistently), ¶ 314

(BLMIS option volumes were too high), ¶ 322 (BLMIS made trades that were

inconsistent with the SSC Strategy)), and for the same reasons, the Trustee's "red flag"

allegations do not support an inference that the Defendants subjectively believed there

was a high probability that BLMIS was not actually trading securities.

### Servicing and Shutting Down Oreades

The Trustee alleges that the way certain Defendants serviced and ultimately

closed Oreades supports an inference that they knew that there was a high probability of

fraud at BLMIS.  Some of the Defendants' practices with respect to Oreades were

undoubtedly questionable.  They include representing that BNP Securities Services was

Oreades' custodian and receiving fees while delegating those duties to BLMIS, (¶¶ 97-

100), allowing BLMIS to act as Oreades' custodian and investment adviser in violation

of BNP Bank's "strict separation" rule, (¶ 106), and Luxembourg law, and failing to

disclose that BLMIS served as Oreades' investment advisor.  (¶¶ 108-111.)  Although

these allegations raise questions about the propriety of certain of Defendants' actions in

servicing Oreades, and imply that they were willing to overlook legal and regulatory

violations to make more money, they do not support the inference that those

Defendants believed there was a high probability that BLMIS was not actually trading

securities on behalf of Oreades and its investors.

The Trustee's allegations relating to Oreades center on the aforementioned email

authored by Trouvain, a senior officer at BNP Securities Services, who expressed

concern about the antiquated methods of communication used by BLMIS for sending

trade documentation.  Truncating that email, the PAC attempts to imply that Trouvain

thought BLMIS was not actually making the trades it was reporting:

> It would be appropriate to put this type of order transmission in place
> between us and B. Madoff because in current practice, *we have no
> opportunity to consider the true validity of the orders. . . . This is a point
> that our risk and ethics departments found during their internal audit*
> and I have to contribute a source of improvement.

(¶ 114 (emphasis in original).)  The Trustee argues that the emphasized portion of the

email shows that Trouvain questioned whether BLMIS was actually engaged in trading

securities.  (*Trustee Brief* at 9.)

The omitted portion of the email indicated by the ellipsis appeared in the

Trustee's 2010 *Oreades Complaint* and is supplied in italics below.  It clearly shows that

Trouvain did not question whether BLMIS was actually trading securities — he was

satisfied that it was — and instead, pointed out that the lack of real-time trading

information made it difficult for auditors to determine how to allocate the BLMIS trades

among BLMIS' clients, which included Oreades:

> It would be appropriate to put this type of order transmission in place
> between us and B. Madoff because in current practice, we have no
> opportunity to consider the true validity of the orders. *As Broker/Dealer,*
> *B. Madoff was audited and it seems that everything is correctly posted*
> *but since there is no B. Madoff management company, it is surely very*
> *difficult for the auditors to verify that all the deals carried out on behalf*
> *of the clients of B. Madoff are correctly indexed to these same clients.*
> This is a point that our risk and ethics departments found during their
> internal audit and I have to contribute a source of improvement.

(*Oreades Complaint* ¶ 56 (emphasis added and omitted from a separate portion).)

The Trustee also asks the Court to infer that BNP Bank and BNP Securities Services subjectively believed that BLMIS was not trading securities based on the circumstances surrounding the closing of Oreades. According to the Trustee's counsel, "[y]ou don't [shut down a successful feeder fund] because you have concerns that . . . the bookkeeping isn't being adequately done." (*Tr.* at 39:1-3.) However, Trouvain's July 2003 email confirmed that Madoff "was audited and it seems that everything was correctly posted." In addition, BLMIS and its auditors confirmed to Trouvain one month later that all securities positions had been segregated. (¶ 59.)

The Defendants closed the Oreades fund nine months later in May 2004, and the PAC does not allege any information that came to the Defendants' attention during that period that turned them from believers to non-believers. The more plausible inference is that the Defendants shut down the Oreades fund because of the risks associated with using the unregistered BLMIS as a sub-custodian and investment advisor in violation of Luxembourg law, (¶¶ 116, 118, 122, 123), questions regarding the location of the U.S. Treasury securities held by BLMIS, (¶ 117), and Madoff's refusal to allow BNP Bank to confirm the trades in real time or disclose his role to the CSSF because BLMIS was not

registered as an investment adviser in the United States and wanted to avoid regulatory scrutiny. (¶¶ 119, 121.)

### *Concerns of Third Parties Regarding BLMIS*

The PAC alleges or implies that various third parties expressed concern to one or more of the Defendants about BLMIS or refused to do business with BLMIS or any fund that invested with BLMIS.

First, rival bank SocGen (like BNP Bank) considered purchasing ZCM but was unwilling to take on the credit facility to BLMIS feeder fund Santa Barbara because BLMIS' returns were impossibly consistent, BLMIS failed to charge customary investment management fees and BLMIS acted as its own custodian. (¶¶ 153-61.) The Trustee alleges that a former ZCM employee told BNP Bank executives about SocGen's concerns, (¶ 162), but these concerns involved three of the red flags that were generally known. In addition, a Tremont employee confirmed SocGen's reluctance to do Madoff-related financing to a member of BNP Bank's Fund Derivatives Group, (¶ 162), but the PAC does not indicate what he said or the reason for its reluctance.

Second, Mr. Fauchier, who was involved in a joint venture with a BNP Bank affiliate, became suspicious about Madoff because BLMIS did not charge investment management fees and underreported the number of managed accounts in its FOCUS Reports. Fauchier refused to invest with BLMIS or BLMIS feeder funds and questioned whether the SEC would allow BLMIS to continue as a business. (¶¶ 131-35.) The PAC then alleges "[u]pon information and belief, as a member of BNP Paribas's Asset Management Group, Fauchier Partners shared its knowledge that Madoff was

illegitimate, as well as its prohibitions against investing with Madoff, with other senior officials at BNP Paribas." (¶ 136.) The PAC does not allege the basis for the Trustee's belief.[16]

Third, the PAC alleges that BNP Bank extended a $100 million credit facility to Legacy because Renaissance, upon identifying multiple red flags associated with BLMIS, decided to terminate its Legacy investment. (¶¶ 200, 203-05.) The PAC does not allege that the Defendants were privy to the diligence performed by Renaissance or the red flags it identified. In fact, the Trustee represented in connection with the motion to dismiss the *Legacy* complaint that the Renaissance Report was never shared with BNP Securities Corp., the only BNP defendant in that case. (*Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended Complaint*, dated Aug. 27, 2015, at 32 ("Neither the Renaissance Proposal nor the Meritage Oversight Committee's subsequent findings were disclosed to BNP when Legacy sought to secure its funding.") (ECF Adv. Pro. No. 10-05286 Doc. # 122).)

Fourth, the PAC describes how Dresdner raised a variety of concerns about Madoff with Tremont, (¶ 218), but the Trustee does not allege that these concerns were communicated to the Defendants.

Fifth, the PAC alleges that the head of hedge funds at BNP Paribas Private Wealth, Mr. Gianferrara, would not approve Madoff-related investments for his private

---

[16]    The joint venture in which Fauchier participated involved a BNP Bank affiliate that is not a party. The PAC does not allege facts supporting the inference that the knowledge gathered by the employees and agents of this BNP affiliate was communicated to the Defendants or should be imputed to any of the Defendants.

banking clients, (¶ 128), "always had a problem with Madoff," and "would 'not even consider[]' investments in FGG's Madoff-related funds." (¶ 129.) The PAC does not, however, identify the problems or imply that Mr. Gianferrara believed that BLMIS was not trading securities.

Sixth, the Trustee alleges that in December 2007, HSBC told non-party BNP Securities Corp. to delete any reference to Madoff and BLMIS in an option agreement, and BNP Securities Corp. complied, (¶ 263), and in September 2008, an Access representative told BNP Bank subsidiary FundQuest to remove any references to Madoff, and FundQuest "deleted all references to Madoff and deliberately destroyed FundQuest's old marketing materials." (¶ 264.) Access stressed that Madoff's role in Luxalpha, another foreign feeder fund, was "very sensitive," and wanted assurances, which FundQuest gave, that no one would be able to find any traces of Madoff in the files or on the internet. (¶ 265.) As in many of the prior instances just discussed, the PAC does not identify the concerns with disclosing Madoff's connection with the fund or option agreement at issue, whether the non-debtor affiliates communicated these concerns to the Defendants or, for that matter, whether the Defendants had any connection to the two transactions.

Third-party concerns that are actually communicated to a defendant may be relevant to the defendant's knowledge. *See Merkin*, 563 B.R. at 749. However, the "warnings" identified by the Trustee amount, in most cases, to pleading by innuendo.[17]

---

[17] In another example of this type of pleading, the PAC alleges that the head of trading for the Fund Derivatives Group told a former BNP Bank employee then working at HSBC that he was unable to reconcile the trading statements received from BLMIS. (¶ 191.) The PAC does not identify what the

Typically, they refer to a third-party "concern," sometimes unidentified, with Madoff
that may or may not have been conveyed to the Defendants and as to which the Trustee
asks the Court to infer that the Defendants were aware of the concern.  But even if these
concerns raised a suspicion that Madoff might be engaged in fraudulent activities, they
did not imply a subjective belief in the high probability that Madoff was operating a
Ponzi scheme, or was not actually trading securities, or that the trades reported in the
monthly customer statements were fictitious.

This brings me to the ultimate question — does the PAC allege a plausible claim,
*i.e.,* does it make sense, that the Defendants would have done what the PAC says they
did if they subjectively believed that there was a high probability that BLMIS was not
trading securities, and the trades it was reporting to its customers, including the
Defendants' transaction counterparties, were fictitious.  For the reasons that follow, it
does not.

### *The Implausibility of the Trustee's Theory of the Case*

The crux of the Trustee's argument is that the Defendants engaged in the leverage
business while entertaining a belief that there was a high probability that BLMIS was
not actually trading securities, the reported BLMIS trades were fictitious and their
collateral was therefore fictitious, and their obligors' sole assets, at least in the case of
feeder funds fully invested with BLMIS, were non-existent.  The reason: the Defendants
wanted to earn fees, "to establish their reputation as a leverage provider in a highly-

_____

reconciliation problem was or its relevance to the Defendants' subjective belief in the high probability that
BLMIS was not engaged in the actual trading of securities.

- 53 -

competitive market, to grow the brand of BNP Paribas's Fund Derivatives Group, to compete with its biggest rival, SocGen, and to cross-sell services to BNP Paribas's institutional clients." (¶ 139.) In other words, BNP Bank made billions of dollars of risky and possibly uncollectible loans to those investing with BLMIS or BLMIS feeder funds in order to make tens of millions of dollars in fees and build its profile.

In *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 480 B.R. 480 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 55 (2d Cir. 2013), District Judge Sullivan characterized a near identical argument as "nonsensical" and "bordering on the absurd." *Id.* at 489. There, the defendant banks (the "Banks") made prepetition secured loans to two entities that operated a jewelry business (the "Debtors"). *Id.* at 483-84. The Debtors then allegedly transferred the loan proceeds to entities unaffiliated with the Debtors but affiliated with and owned and controlled by the Debtors' owners, the Fortgangs (the "Affiliates"). *Id.* at 484. Thus, at the end of the day, the Debtors were left with encumbered assets but no loan proceeds.

After the Debtors filed chapter 11 petitions, the unsecured creditors committee commenced an action to avoid the Banks' liens as fraudulent transfers. *Id.* at 485. The committee sought to collapse the first leg of the transaction (the Banks' loans to the Debtors) with the second leg (the Debtors' transfer of the loan proceeds to the Affiliates) under the collapsing principles discussed in *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995), contending that the Banks knew or should have known that the loans were part of a fraudulent scheme by which the Debtors would transfer the loan proceeds

to the Affiliates.[18]  According to the plaintiff, the Banks were aware of the Debtors' poor

financial condition, the transfers to the Affiliates, the Affiliates' lack of any relationship

to the Debtors and the poor loan documentation.  *Id.* at 488-89.  They nevertheless

made loans to insolvent Debtors, knowing that the Debtors would thereafter transfer the

loan proceeds to unaffiliated entities, to raise their profiles and earn commissions.

The District Court rejected the plaintiff's theory observing that it "requires an

inference that is highly implausible, bordering on the absurd."  *Id.* at 489.

> In essence, [the plaintiff] alleges that the Banks took the massive risk of
> continuing their lending relationships with the [Debtors and Affiliates] on
> the speculative hope that there may be sufficient liquidity in the 'Fabrikant
> Empire' . . . as a whole to enable the Banks to obtain repayment through
> personal guarantees and other pressure.  Such an assertion would be
> nonsensical if the Banks were in fact aware that Debtors and the Affiliates
> had to use the same dollars to repay separate obligations.  *Put simply,*
> *drawing all inferences in favor of the [plaintiff], it is difficult to see what*
> *benefit the Banks could hope to obtain by lending ever-larger amounts of*
> *money to failing companies.  The [complaint's] wholly conclusory*
> *allegations that the Banks were clouded in judgment due to lavish*
> *commissions is equally implausible, since the loss of principal would have*
> *far outweighed the commissions earned on the loans[.]*

*Id.* (record citations and corresponding quotation marks omitted) (emphasis added).

The scheme on which the PAC is based is equally implausible.  According to the

PAC, BNP Bank provided Madoff with a personal line of credit of $75 million, secured

by Madoff's pledge of the securities held on behalf of BLMIS customers.  (¶ 84.)  It

extended credit to Santa Barbara in an undisclosed amount to invest in Harley, another

BLMIS feeder fund, and collateralized the loan with Harley's BLMIS account.  (¶ 183.)

It loaned $120 million to Legacy, an entity that invested exclusively with BLMIS, and

---

[18]    Following the confirmation of the chapter 11 plan, the GUC Trustee substituted for the committee
as the plaintiff.

collateralized that loan with a pledge of Legacy's BLMIS account.  (¶¶ 193-98.)  It even made a direct loan to Tremont's Insurance Portfolio Fund in the sum of $100 million, and collateralized that loan with a pledge of the assets held in its BLMIS account.  (¶¶ 212, 214.)  The PAC refers with less detail to many similar transactions by which BNP Bank loaned money to a counterparty for the purpose of investing with BLMIS or a BLMIS feeder fund, and took a pledge of its borrower's account with BLMIS or the BLMIS feeder fund as collateral to secure repayment.

The Defendants' ability to collect on whatever leverage BNP Bank extended to direct investors in BLMIS or investors in BLMIS feeder funds ultimately depended on the value of the BLMIS investments.  If BLMIS was a Ponzi scheme, the securities listed in the BLMIS customer statements were non-existent and BNP Bank's collateral was as worthless as its borrowers' investments in BLMIS or a BLMIS feeder fund.  According to the PAC, BNP Bank nonetheless engaged in billions of dollars of risky transactions, including loans and extensions of credit that ultimately depended on the value of BLMIS accounts, to earn "tens of millions of dollars in fees and interest payments," (¶ 64), and raise BNP Bank's position as a world leader in the fast-moving derivatives market.  (¶ 151.)  This theory is as preposterous as the scheme alleged by the plaintiff in *Fabrikant*, and it is implausible to suggest that the Defendants would make loans or engage in the transactions described in the PAC if they subjectively believed that there was a high probability that BLMIS was not actually trading securities.[19]

---

[19]    The PAC cites two instances in which BNP Bank hedged its positions against potential losses of BLMIS feeder funds.  (¶¶ 190, 239.)  However, the hedges represented a small fraction of the total exposure the Defendants faced with respect to BLMIS.  If the Defendants were aware of a high probability that BLMIS was a Ponzi scheme and its collapse meant the collapse of the feeder funds, it would not have

Accordingly, the PAC fails to plausibly allege that the Defendants subjectively believed there was a high probability that BLMIS was not actually trading securities and was, in fact, a Ponzi scheme.

### ii.     Second Element: Turning a Blind Eye

Since the Court has concluded that the Trustee failed to plead that the Defendants were highly suspicious of BLMIS fraud, it need not address whether the Defendants took deliberate actions to avoid confirming that fraud.  But assuming that the Trustee adequately pleaded the knowledge prong of the willful blindness test, he failed to plead that the Defendants turned a blind eye.

The Trustee's pleadings are replete with allegations that the Defendants performed due diligence when dealing with Madoff, BLMIS, BLMIS feeder funds or BLMIS-related securities.  BNP Bank performed due diligence on Madoff and BLMIS as early as 1988 and into the mid-1990s when it extended a personal line of credit to Madoff and accepted BLMIS customer securities as collateral.  (¶¶ 84-85.)  BNP Bank also conducted due diligence of ZCM's portfolio, including the sizeable credit facility with BLMIS feeder fund Santa Barbara, in connection with the acquisition of ZCM in 2003.  (¶¶ 143, 163.)  After the acquisition, the Defendants continued to perform due diligence when transactions involved BLMIS, (¶ 83 (the Fund Derivatives Group and BNP Bank's "Group Risk Management" department conducted due diligence on transactions involving BLMIS feeder funds); ¶ 208 (BNP Bank conducted due diligence

---

limited itself to two hedges.  Furthermore, it is not uncommon to purchase hedges, such as credit default swaps, to guard against the default of one's obligor.

on Legacy's BLMIS account when entering into $100 million credit facility with Legacy);
¶ 230 (the head of the Fund Derivatives Group represented to BNP Bank's risk
management department that it would conduct due diligence on BLMIS and BLMIS
feeder funds)), and made an on-site diligence visit to BLMIS in March 2008.  (¶ 175.).

The *Trustee's Proffer* also includes several allegations relating to the Defendants'
due diligence of BLMIS and Madoff.  It alleges that the Defendants "conducted initial
and ongoing due diligence on BLMIS and BLMIS feeder funds," (*Trustee's Proffer* ¶ 13),
"[a]s the collateral agent, BNP Securities Corp. conducted due diligence, monitored the
[Santa Barbara] facility, and provided operational support to BNP, and as the
calculation agent BNP Securities Corp. calculated the facility's interest rates, fees, and
loan-to-value ratio," (*id.* ¶ 61), BNP Securities Corp. "served as the calculation agent for
the Tremont credit facility and . . .  as the collateral agent for the Tremont credit facility .
. . was responsible for conducting due diligence, monitoring the facility, and providing
operational support to BNP," (*id.* ¶ 86), and requested that the Kingate Funds, large
BLMIS feeder funds, email all due diligence materials to BNP.  (*Id.* ¶ 145.)

In addition, the *Oreades Complaint* detailed how Trouvain followed-up with
BLMIS after he expressed concerns in July 2003.  On August 7, 2003, Trouvain sent a
fax attaching a letter written by his colleague to BLMIS requesting periodic verification
of the assets in Oreades' BLMIS accounts:

> The current operational flow provides a monthly statement of trading
> activity and positions sent via fax and post.  This process has been
> reviewed by the Bank's internal and external auditors and is not
> considered to be compliant with our requirements under Luxembourg
> Law, as it does not constitute an independent verification.

> *We are therefore seeking from yourselves a method whereby a periodic
> independent verification of the Fund's assets* and its two underlying
> accounts can be conducted and confirmed to Luxembourg in order to
> allow [BNP Securities Services] to discharge its fiduciary function.  Were
> this verification to be proved by your auditors, Friehling and Horowitz, the
> information can be relied upon by both the Fund's auditors KPMG and our
> internal auditors.

(*Oreades Complaint* ¶ 57 (emphasis in original and emphasis omitted from other

portions).)

Frank DiPascali of BLMIS responded to Trouvain on August 12, 2003.  He

assured Trouvain that as of June 2002 (when BNP Securities Services became Oreades'

administrator and custodian), "all security positions . . . have been segregated for the

exclusive benefit of [BNP Securities Services]."  (*Id.* ¶ 58.)  BLMIS' auditor, Friehling &

Horowitz ("F&H"), also wrote back to Trouvain on August 21, 2003 providing an

independent verification of the assets in Oreades' BLMIS accounts:

> As Independent Auditors for [BLMIS], we have verified and hereby
> confirm to you that on May 31, 2003 the security positions stated on
> Appendix 1 and Appendix 2 (please see attached) were held in segregated
> accounts for the exclusive benefit of [BNP Securities Services].
> . . .
> We further confirm that we are independent with respect to [BLMIS],
> [BNP Securities Services] and their affiliates under requirements of
> A.I.C.P.A.

(*Id.* ¶ 59.) [20]

---

[20]   The PAC states that the Defendants knew that F&H was "unqualified and incapable" of auditing a
firm the size of BLMIS, (¶ 257), based on its communications with F&H, (¶ 254), and because F&H did not
appear on the American Institute of Certified Public Accountants' ("AICPA") peer review program list.  (¶
256.)  However, the Trustee does not allege that any Defendant reviewed the AICPA list let alone noticed
that F&H was absent from such list.  Moreover, the Trustee does not provide any details about the
communications between any Defendant and F&H that led the Defendants to question F&H's
qualifications.  To the contrary, Trouvain's August 7, 2003 correspondence with BLMIS specifically
seeking verification from F&H supports the opposite inference.

Rather than turn a blind eye, the above correspondence and other allegations show that the Defendants engaged in ongoing due diligence and received repeated confirmations that the transactions were real. Furthermore, while the Trustee alleges that the Fund Derivatives Group made exceptions to its typical due diligence practices for BLMIS-related transactions, (¶¶ 165, 167, 168, 171-74, 178), these allegations do not undercut the affirmative allegations of due diligence. In short, and not surprisingly, the Defendants did not ignore their BLMIS exposure; the likelihood of repayment of the Defendants' loans and credit facilities depended on the value of their counterparties' BLMIS assets.

### c.      Value

Although the Trustee has failed to plead the Defendants' lack of good faith or knowledge that the initial transfers were avoidable, the Defendants must still demonstrate that they gave value for the subsequent transfers to prevail on their defense under section 550(b)(1).[21] The "value" that a subsequent transferee must provide is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." *Legacy Capital*, 548 B.R. at 37 (citation omitted); *accord Enron Corp. v. Ave. Special Situations Fund II, LP* (*In re Enron Corp.*), 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005). In addition, the "value" element under section 550(b)(1) looks to what the transferee

---

[21]      In many cases, the Defendants were the first subsequent transferees. In other instances, they received the transfers following previous subsequent transfers from one Tremont Fund to another Tremont Fund. The PAC does not indicate whether in the latter situations, the Tremont Fund subsequent transferee gave value to the Tremont Fund subsequent transferor. I assume for the purposes of judging futility that no value was exchanged, and accordingly, the Defendants must demonstrate that they gave value.

gave up rather than what the transferor received. *Bonded Fin. Servs.*, 838 F.2d at 897;
*Genova v. Gottlieb* (*In re Orange Cty. Sanitation, Inc.*), 221 B.R. 323, 328 (Bankr.
S.D.N.Y. 1997).

Even where the pleading burden rests with the defendant, the Court may dismiss
for failure to state a claim when the defense is apparent on the face of the complaint.
*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
322 F.3d 147, 158 (2d Cir. 2003); *accord Pani v. Empire Blue Cross Blue Shield*, 152
F.3d 67, 74 (2d Cir. 1998), *cert. denied*, 525 U.S. 1103 (1999). The Defendants assert,
(*BNP Brief* at 33-34; *BNP Reply* at 15-16), that they provided value because they
received subsequent transfers in exchange for the redemption of BLMIS feeder fund
shares. *See Redmond v. Brooke Holdings, Inc.* (*In re Brooke Corp.*), 515 B.R. 632, 642
(Bankr. D. Kan. 2014) (redemption of stock could provide value); *CLC Creditors'*
*Grantor Trust v. Howard Sav. Bank* (*In re Commercial Loan Corp.*), 396 B.R. 730, 744
(Bankr. N.D. Ill. 2008) ("stock was 'value' because it constituted consideration sufficient
to support a simple contract"). The Trustee counters, (*Trustee Brief* at 27), that
subsequent transfers were not for value because they were distributions made to the
Defendants as holders of equity in the BLMIS feeder funds. *See Boyer v. Crown Stock*
*Distrib., Inc.*, 587 F.3d 787, 796 (7th Cir. 2009) (agreeing with the bankruptcy court
below that equity distributions to shareholders were not for value); *Hayes v. Palm*
*Seedlings Partners-A* (*In re Agric. Research & Tech. Grp., Inc.*), 916 F.2d 528, 540 (9th
Cir. 1990) (distributions to limited partners on account of equity interests were not for
value).

- 61 -

The PAC identifies fifty-nine subsequent transfers to the Defendants.  (PAC, Ex. E, F, H, I.)  For the most part, the PAC alleges that the subsequent transfers related to leverage transactions in which the Defendants made loans, extended credit or provided structured products, or rendered support services in connection with the leverage business.  However, the PAC also alleges that the Defendants were investors in the Tremont Funds in their own right, and the Trustee provided evidence in connection with the Defendants' jurisdictional objection that BNP Cayman requested redemptions from its own BLMIS account.  Each subsequent transfer must be judged separately to determine whether the Defendant gave value, and that determination cannot be made from the four corners of the PAC or the other pleadings that the Court has previously considered.

### 3.    Statute of Limitations

Claims to recover subsequent transfers must be commenced no later than the earlier of one year after the initial transfer is avoided or the date that the case is closed or dismissed.  11 U.S.C. § 550(f).  A settlement of an avoidance claim represents finality and triggers the one-year period set forth in § 550(f).  *SIPC v. BLMIS* (*In re BLMIS*), 501 B.R. 26, 32 (S.D.N.Y. 2013), *denying motion to amend*, No. 12 MC 115 (JSR), 2014 WL 465360 (S.D.N.Y. Jan. 14, 2014); *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 522 (Bankr. S.D.N.Y. 2012).  The Court approved the Trustee's settlement with the Tremont Funds on September 22, 2011, and the limitations period set forth in section 550(f) expired on September 22, 2012.  An amendment filed after the applicable statute of limitations has run asserting additional claims that do not relate back to the

date of an earlier timely pleading is futile.  *See Rodriguez v. City of N. Y.,* 10–CIV–1849, 2011 WL 4344057, at *6 (S.D.N.Y. Sept. 7, 2011).

While the Trustee timely commenced this adversary proceeding to recover, *inter alia*, the value of certain Tremont Initial Transfers from the Defendants, the PAC was filed almost five years after the expiration of the statute of limitations.  It added claims under § 550(a)(2) to recover the following forty-one additional subsequent transfers (collectively, the "New Subsequent Transfer Claims") that were not included in the original *Complaint*, dated May 4, 2012 ("*Original Complaint*") (ECF Doc. # 1):

| Transferor | Transferee | Date of Transfer | Amount ($) | PAC Ex. |
|---|---|---|---|---|
| Insurance Portfolio Fund | BNP Arbitrage | 12/19/08 | 32,865 | F |
| Insurance Portfolio Fund | BNP Bank | 11/17/05 | 15,591 | F |
| Insurance Portfolio Fund | BNP Bank | 11/30/05 | 1,075,822 | F |
| Insurance Portfolio Fund | BNP Bank | 1/18/06 | 12,500 | F |
| Insurance Portfolio Fund | BNP Bank | 3/1/06 | 1,178,000 | F |
| Insurance Portfolio Fund | BNP Bank | 5/19/06 | 12,500 | F |
| Insurance Portfolio Fund | BNP Bank | 5/31/06 | 1,282,480 | F |
| Insurance Portfolio Fund | BNP Bank | 7/18/06 | 10,417 | F |
| Insurance Portfolio Fund | BNP Bank | 3/1/07 | 1,705,000 | F |
| Insurance Portfolio Fund | BNP Bank | 3/21/07 | 258 | F |
| Insurance Portfolio Fund | BNP Bank | 6/1/07 | 1,740,333 | F |
| Insurance Portfolio Fund | BNP Bank | 7/2/07 | 583,833 | F |
| Insurance Portfolio Fund | BNP Bank | 8/1/07 | 564,167 | F |
| Insurance Portfolio Fund | BNP Bank | 9/4/07 | 640,333 | F |
| Insurance Portfolio Fund | BNP Bank | 12/3/07 | 1,760,000 | F |
| Insurance Portfolio Fund | BNP Bank | 3/3/08 | 1,661,698 | F |
| Insurance Portfolio Fund | BNP Bank | 6/3/08 | 1,156,550 | F |
| Insurance Portfolio Fund | BNP Bank | 7/31/08 | 25,000,000 | F |

| Transferor | Transferee | Date of Transfer | Amount ($) | PAC Ex. |
|---|---|---|---|---|
| Insurance Portfolio Fund | BNP Bank | 7/31/08 | 654,111 | F |
| Insurance Portfolio Fund | BNP Bank | 10/1/08 | 574,792 | F |
| Portfolio Limited Fund | BNP Cayman | 8/4/05 | 400,000 | H |
| Portfolio Limited Fund | BNP Cayman | 11/1/05 | 400,000 | H |
| Portfolio Limited Fund | BNP Cayman | 12/1/05 | 1,250,000 | H |
| Portfolio Limited Fund | BNP Cayman | 4/3/06 | 750,000 | H |
| Portfolio Limited Fund | BNP Cayman | 12/28/06 | 2,300,000 | H |
| Portfolio Limited Fund | BNP Cayman | 12/28/06 | 1,000,000 | H |
| Portfolio Limited Fund | BNP Cayman | 6/13/07 | 108,420 | H |
| Portfolio Limited Fund | BNP Securities Services | 10/20/04 | 2,041,858 | H |
| Portfolio Limited Fund | BNP Securities Services | 12/22/04 | 2,118,243 | H |
| Portfolio Limited Fund | BNP Securities Services | 1/21/05 | 1,510,684 | H |
| Portfolio Limited Fund | BNP Securities Services | 7/21/05 | 2,528,454 | H |
| Portfolio Limited Fund | BNP Securities Services | 1/5/06 | 5,300,000 | H |
| Portfolio Limited Fund | BNP Securities Services | 1/5/06 | 900,000 | H |
| Portfolio Limited Fund | BNP Securities Services | 1/5/06 | 6,040,000 | H |
| Portfolio Limited Fund | BNP Securities Services | 1/24/06 | 17,137 | H |
| Portfolio Limited Fund | BNP Securities Services | 1/24/06 | 32,727 | H |
| Portfolio Limited Fund | BNP Securities Services | 1/24/06 | 42,346 | H |
| Portfolio Limited Fund | BNP Securities Services | 1/25/06 | 10,000 | H |
| Portfolio Limited Fund | BNP Securities Services | 5/2/06 | 1,520,000 | H |

| Transferor | Transferee | Date of Transfer | Amount ($) | PAC Ex. |
|---|---|---|---|---|
| Portfolio Limited Fund | BNP Securities Services | 5/26/06 | 172,359 | H |
| Portfolio Limited Fund | BNP Securities Services | 12/1/06 | 7,385,000 | H |
| **Total** | | | **75,488,478** | |

The Defendants assert that the New Subsequent Transfer Claims are time-barred. (*BNP Brief* at 34-35.)  The Trustee responds, (*Trustee Brief* at 37-39), that the New Subsequent Transfer Claims relate back to the filing of the *Original Complaint* pursuant to Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure, which provides for relation back when "the amendment asserts a claim . . . that arose out of the conduct, transaction or occurrence set out – or attempted to be set out – in the original pleading."

To relate back, the new claim must arise out of "a common 'core of operative facts' uniting the original and newly asserted claims." *Mayle v. Felix*, 545 U.S. 644, 659 (2005).  The "central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006); *accord Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999).  "This test does not require that the prior complaint put the defendants on notice of new or additional legal theories . . . but it must inform the defendants of the facts that support those new claims." *Official Comm. of Unsecured Creditors v. Pirelli Commc'ns Cables & Sys. USA LLC* (*In re 360networks (USA) Inc.*), 367 B.R. 428, 434 (Bankr. S.D.N.Y. 2007) (citation omitted).

In the context of avoidance actions, "each preferential and fraudulent transaction is treated separately and distinctly," *Fabrikant*, 480 B.R. at 492; *accord Metzeler*, 66 B.R. at 984, because the "[p]roof offered for one transaction does not govern as to another and, as such, relation back cannot be ordered between different transactions merely for being similar or arising from the same conduct." *Fabrikant*, 480 B.R. at 492; *accord 360networks*, 367 B.R. at 434 ("a preference action based on one transfer does not put defendant on notice of claims with respect to any other unidentified transfers"). Furthermore, the "mere allegation" that the previously identified transfers and the newly added transfers are "all . . . fraudulent transfers does not make them part of the same conduct." *Metzeler*, 66 B.R. at 983; *see also id.* at 984 ("there is no indication that, merely because different transactions bear the same label, relation back is to be ordered on the ground that they arise from similar conduct").

The Trustee contends that the New Subsequent Transfer Claims relate back "because the Trustee's initial pleading (plus years of active litigation in this and related adversary proceedings) provided Defendants with notice that the Trustee intended to recover all fraudulent transfers of BLMIS customer property that Defendants received from BLMIS Feeder Funds." (*Trustee Brief* 39.)  This argument proves too much; it ignores the Rule's requirement that the new claims must "ar[ise] out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." FED. R. CIV. P. 15(c)(1)(B).  The New Subsequent Transfer Claims arise from different facts and circumstances and depend on different proof.  For example, the PAC seeks to recover twenty-one subsequent transfers totaling $39,661,250 made by the Insurance Portfolio Fund, (PAC, Ex. F), but the *Original Complaint* did not allege any

- 66 -

transfers from the Insurance Portfolio Fund.  Furthermore, each subsequent transfer, old or new, arose from either separate and distinct loans, credit facilities or derivative transactions with various counterparties while others appear to relate to either redemptions or equity distributions to the Defendants as direct investors in the Tremont Funds.  The assertion that all the original subsequent transfer claims and the New Subsequent Transfer Claims arose from a "common core of operative facts" lacks merit.

The Trustees' authorities, *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292 (S.D.N.Y. 2009) ("*Adelphia*"), *reconsideration granted in part*, No. 05 Civ. 9050 (LMM), 2009 WL 16760677 (S.D.N.Y. June 16, 2009) and *Picard v. Peter Madoff* (*In re BLMIS*), 468 B.R. 620 (Bankr. S.D.N.Y. 2012) ("*Peter Madoff*"), are distinguishable.  *Adelphia* involved the prosecution of numerous claims arising from the Rigas family's borrowing billions of dollars prepetition for personal use using the debtor's assets as collateral (the "Co-Borrowing Facilities").  624 F. Supp. 2d at 297.  The Adelphia Recovery Trust, established under the chapter 11 plan, brought intentional fraudulent transfer claims against Salomon Smith Barney ("SSB") for prepetition payments made on account of the Rigas family's margin loan debt.  The Trust's amended complaint added $95 million in additional fraudulent transfers, and SSB moved to dismiss the new claims as time-barred.  *Id.* at 333.

The Trust argued that the new transfers related back, and the Court agreed:

The newly alleged fraudulent transfers relate back to the Creditors Complaint and are not time barred.  The new margin loan payments in the Amended Complaint arise out of the same Co-Borrowing Facility transactions as those pled in the Creditors Complaint.  The newly alleged margin loan payments occurred during the same time period as those alleged in the Creditors Complaint. . . .  SSB was placed on notice in the original complaint because the Creditors Complaint listed roughly 84

- 67 -

> million dollars in loan payments to SSB.  The Creditors Complaint also
> pled that [the Adelphia Recovery Trust] was seeking repayment of monies
> related to the margin loans broadly.

*Id.* at 333-34.  The *Adelphia* Court distinguished *Metzeler* as a case "involv[ing]

fraudulent transfers which arose out of different transactions."  *Adelphia*, 624 F.

Supp. 2d at 334.

Similarly, in *Peter Madoff*, the Trustee sought leave to amend his complaint

against Bernard Madoff's family members, *inter alia*, to add new initial fraudulent

transfer claims against Bernard Madoff's brother Peter Madoff, and Bernard Madoff's

sons or their estates (the "Family Defendants").  468 B.R. at 623-24.  Although the

Family Defendants did not object to the assertion of the new claims, *id.* at 634, the Court

nevertheless analyzed whether they related back, and concluded that they did.  The

original complaint alleged that BLMIS was operated as a "piggy bank" that allowed the

Family Defendants to take huge sums of money for their personal use.  *Id.*  The

proposed new claims relied on the same legal theories as the initial complaint which

named the Family Defendants, and gave reasonable notice that the Trustee was still

uncovering additional transfers that he would seek to recover.  *Id.* at 633.  The Court did

not discuss *Metzeler*.

The subsequent transfers to the Defendants listed in the PAC, old and new, were

not part of the common fraudulent scheme or pattern present in *Adelphia* and *Peter

Madoff*.  Each arose out of a separate leverage transaction or redemption, and the facts

and circumstances surrounding the value given in exchange for the transfer will differ.

Moreover, the Court has concluded that the PAC fails to plead the Defendants' bad faith.

Thus, unlike the claims relating to transactions involving the Rigas or Peter Madoff's

family, the Defendants were not at the center of a common scheme to strip assets from BLMIS, but instead, were looking to payments from third parties. Accordingly, the New Subsequent Transfer Claims are time barred, and it is futile to permit the Trustee to amend the *Complaint* to assert them.

## CONCLUSION

For the reasons stated, the Defendants' motion to dismiss for lack of personal jurisdiction is denied. The Trustee's motion for leave to amend his pleading is denied to the extent of the assertion of the New Subsequent Transfer Claims and is otherwise granted except that the only issue regarding each surviving transfer is whether the Defendant subsequent transferee (or a predecessor subsequent transferee) gave value for the transfer. The Court has considered the parties' other arguments and concludes that they are without merit or rendered moot by the disposition of the motion. Settle Order.

Dated: New York, New York
       October 3, 2018

                            /s/ *Stuart M. Bernstein*
                            STUART M. BERNSTEIN
                            United States Bankruptcy Court