**McDermott Will & Emery LLP**
Andrew B. Kratenstein
Michael R. Huttenlocher
Darren Azman
340 Madison Avenue
New York, New York 10173
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

*Attorneys for Defendants Sage Associates, Sage Realty, Malcolm H. Sage, Martin A. Sage, and Ann M. Sage Passer*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC | Substantively Consolidated |
| | **Re: Docket No. 18015** |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | Adv. Pro. No. 10-4362 (SMB) |
| Plaintiff. | **Re: Docket No. 87** |
| v. | |
| SAGE ASSOCIATES; LILLIAN M. SAGE, in her Capacity as Partner or Joint Venturer of Sage Associates and Individually as Beneficiary of Sage Associates; MALCOLM | |

H. SAGE, in his Capacity as Partner or Joint )
Venturer of Sage Associates and Individually )
as Beneficiary of Sage Associates; MARTIN )
A. SAGE, in his Capacity as Partner or Joint )
Venturer of Sage Associates and Individually )
as Beneficiary of Sage Associates; ANN M. )
SAGE PASSER, in her Capacity as Partner or )
Joint Venturer of Sage Associates and )
Individually as Beneficiary of Sage )
Associates, )
)
Defendants. )
)
_____ )
)
IRVING H. PICARD, TRUSTEE FOR THE )        Adv. Pro. No. 10-4400 (SMB)
LIQUIDATION OF BERNARD L. MADOFF )
INVESTMENT SECURITIES LLC, )
)
Plaintiff. )        **Re: Docket No. 87**
)
v. )
)
SAGE REALTY; LILLIAN M. SAGE, in her )        **Hearing Date:  October 31, 2018 at 10:00 a.m.**
Capacity as Partner or Joint Venturer of Sage )   **Objection Deadline:  October 17, 2018 at 5:00 p.m.**
Realty and Individually as Beneficiary of )
Sage Realty; MALCOLM H. SAGE, in his )
Capacity as Partner or Joint Venturer of Sage )
Realty and Individually as Beneficiary of )
Sage Realty; MARTIN A. SAGE, in his )
Capacity as Partner or Joint Venturer of Sage )
Realty and Individually as Beneficiary of )
Sage Realty; ANN M. SAGE PASSER, in her )
Capacity as Partner or Joint Venturer of Sage )
Realty and Individually as Beneficiary of )
Sage Realty, )
)
Defendants. )
)
_____ )

## THE SAGE DEFENDANTS' OBJECTION TO THE TRUSTEE'S MOTION FOR LIMITED ADDITIONAL DISCOVERY BASED ON PRIOR ORDERS AUTHORIZING DEPOSITION OF BERNARD L. MADOFF

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ............................................................................................2

      A.     2008-2009: Madoff's Arrest and Plea..........................................................2

      B.     2010: The Trustee Commences the Sage Adversary Proceedings.........................2

      C.     August 2013: The Dubinsky Report ........................................................2

      D.     September 2015: The Sage Answers ........................................................3

      E.     October 2015: Sage Fact Discovery Commences......................................4

      F.     July-August 2016: The Madoff Deposition Order...................................5

      G.     November-December 2016: The Bongiorno Profit Withdrawal
           Deposition Dispute...........................................................................5

      H.     December 2016: Madoff Deposition Day 1 Begins..............................6

      I.     February 2017: The Feingold Report.......................................................7

      J.     June-August 2017: The Sages Identify Directed Trading Records .......................7

      K.     November 8-9, 2017: Madoff Day 2 Deposition ....................................8

      L.     November 15-21, 2017: The Sage Depositions ....................................10

      M.     February 2018: The Trustee Moves for Omnibus Proceeding.............................11

      N.     July 2018: Sage Fact Discovery Closes and Court Denies
           Trustee's Motion for Omnibus Proceeding............................................12

      O.     September 21, 2018: The Trustee Finally Files The Instant Motion ...................13

ARGUMENT..................................................................................................................13

      I.     THE TRUSTEE MUST DEMONSTRATE THAT THE
           DISCOVERY HE SEEKS COULD NOT HAVE BEEN
           ANTICIPATED HAD HE BEEN DILIGENT ......................................13

      II.     THE TRUSTEE HAS NOT BEEN DILIGENT...............................................14

III.    OTHER GOOD CAUSE FACTORS MILITATE AGAINST
       REOPENING DISCOVERY ..................................................................................18

CONCLUSION.....................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bernard L. Madoff Inv. Secs. LLC*,
    654 F.3d 229 (2d Cir. 2011).................................................................................3

*Callari v. Blackman Plumbing Supply, Inc.*,
    No. CV 11-3655 (ADS) (AKT), 2016 WL 1273237 (E.D.N.Y. Mar. 31, 2016).....................17

*Gray v. Town of Darien*,
    927 F.2d 69 (2d Cir, 1991)................................................................................17

*Grochowski v. Phoenix Constr.*,
    318 F.3d 80 (2d Cir. 2003)...........................................................................14, 16

*Gucci Am., Inc. v. Guess?, Inc.*,
    790 F. Supp. 2d 136 (S.D.N.Y. 2011)....................................................................17

*In re Application of Barnet*,
    No. 13 Misc. 214(RMB), 2014 WL 7409524 (S.D.N.Y. Dec. 30, 2014)...................17, 18, 19

*Jeannite v. City of New York Dep't of Buildings*,
    No 09 Civ. 3464(DAB) (KNF), 2010 WL 2542050 (S.D.N.Y. June 21, 2010)...............17, 19

*Kassner v. 2nd Ave. Delicatessen Inc.*,
    496 F.3d 229 (2d Cir. 2007)...............................................................................14

*Krawec v. Kiewet Constructors, Inc.*,
    No. 11-cv-0123 (LAP), 2013 WL 1104414 (S.D.N.Y. Mar. 1, 2013)....................................17

*Lopez v. Ramos*,
    11-cv-07790 (NSR), 2013 WL 6912692 (S.D.N.Y. Dec. 30, 2013) ..........................14, 17, 18

*Miller v. DeQuine (In re Stratton Oakmont, Inc.)*, No. 01-CV-2812 RCC, 01-CV-
    2313 RCC, 2003 WL 22698876 (S.D.N.Y. Nov. 14, 2003)................................................3, 4

## PRELIMINARY STATEMENT

After litigating for over eight years and racking up over $1 billion in legal fees, the Trustee says he needs more discovery. He blames his delay in seeking that discovery on the defendants in the good faith proceedings (the "Good Faith Defendants"). According to the Trustee, he could not have foreseen that the Good Faith Defendants would have the audacity to put the Trustee to his proof. The record of this long-running litigation tells a very different story.

When Bernard L. Madoff ("Madoff") pleaded guilty in 2009, he stated that his fraud was limited to his so-called "split-strike investment conversion" strategy. In August 2013, the Trustee released an expert report authored by Bruce Dubinsky ("Dubinsky"). Dubinsky asserted that the entire investment advisory business at Bernard L. Madoff Investment Securities, LLC ("BLMIS") was a fraud. Dubinsky relied in part on statements made by and proceedings concerning the former BLMIS employees whom the Trustee now belatedly seeks to depose.

In 2010, the Trustee filed the above-captioned adversary proceedings (the "Sage Adversary Proceedings") against defendants Malcolm Sage, Martin Sage, Ann Sage Passer, Sage Associates, and Sage Realty (collectively, the "Sages"). In September 2015, the Sages answered the Trustee's Complaints. In their Answers, the Sages stated that, unlike other Good Faith Defendants, they directed Madoff and his firm as to how to trade in the Sages' accounts.

During the nearly three years of fact discovery that ensued, the Sages sought and obtained discovery from the Trustee proving that they directed Madoff's trading, including written trading directions. The Sages identified these documents to the Trustee. Madoff then confirmed at his deposition that the Sages were "atypical" and "unusual" customers because they regularly gave him trading directions, which he followed.

The Trustee had almost three years in which to take the depositions of former BLMIS employees or anyone else whom the Trustee believed had relevant information. He chose

1

instead to sit on his hands, taking only the Sages' depositions (who confirmed that they had directed Madoff's trading).

As the Court rightly observed at the hearing on July 25, 2018, it is the Trustee who pleads for more discovery while the Good Faith Defendants have said enough is enough. The Trustee has a burden to meet. He knew or should have known what evidence he needed to meet that burden and to counter any defenses raised by the Good Faith Defendants. His failure to take that discovery during the fact discovery period cannot be blamed on anyone but himself. The fault here is with the Trustee. It should not be excused.

## STATEMENT OF FACTS

The time line of relevant events is as follows:

### A.    2008-2009: Madoff's Arrest and Plea

Madoff was arrested on December 11, 2008, approximately a decade ago. At his plea allocution on June 29, 2009, Madoff stated that his fraud "began in the 1990s" and concerned his so-called "split-strike investment conversion strategy". (Kratenstein Decl. Ex. 1 at 25:25-30:17.) As the Court noted at the hearing on July 25, 2018, Madoff has "never deviated" from his allocution. (Kratenstein Decl. Ex. 2 at 12:4-5.)

### B.    2010: The Trustee Commences the Sage Adversary Proceedings

Approximately eight years ago, on November 30, 2010, the Trustee filed the Sage Adversary Proceedings. The Trustee seeks to claw-back alleged "fictitious profits" that the Sages received from BLMIS. The Trustee does not allege that Sages were aware of Madoff's fraud.

### C.    August 2013: The Dubinsky Report

Over five years ago, the Trustee released Dubinsky's "global expert report, dated August 20, 2013, on the fraud and insolvency at BLMIS." (Trustee Mem. at 4.) Dubinsky

2

opined that Madoff's entire investment advisory business was a fraud. (Kratenstein Decl. Ex. 3

¶ 28.) He asserted that, contrary to Madoff's plea allocution and subsequent testimony, Madoff's

fraud was not limited to the split-strike strategy, but also included convertible arbitrage trading

and other non-split-strike trading. (*Id.* ¶¶ 82-126, 154-55.) In his report, Dubinsky relies on

documents concerning the criminal proceedings against numerous former BLMIS employees,

including five of the six former BLMIS employees whom the Trustee now seeks to depose

(Annette Bongiorno, Daniel Bonventre, Enrica Cotelessa-Pitz, Joann ("Jodi") Crupi, and David

Kugel). (*Id.* ¶¶ 56-57, 60-65, 70-71)

### D.    September 2015:  The Sage Answers

On September 18, 2015 – over three years ago – the Sages filed their Answers to the

Trustee's Complaints. In their Answers, the Sages asserted that trading in the accounts at issue

was outside of the so-called "split strike conversion" strategy that Madoff confessed was a fraud.

Specifically, the Sages pleaded:

> Many of the trades in the [Sage Associates and Sage Realty] account[s] were
> entirely independent of the "split strike conversion" strategy. Madoff did not
> control these sales. On the contrary, the activity in the [Sage Associates and Sage
> Realty] account[s] included the retention and sale of actual securities, controlled by
> [Sage Associates and Sage Realty], which generated both short term and long term
> capital gains for which [Sage Associates and Sage Realty] [are] absolutely entitled
> to credit.

(Kratenstein Decl. Exs. 4-5 ¶ 54.) Thus, the Sages put the Trustee on notice in their responsive

pleading that they were contending that their trading activities were outside the scope of

Madoff's fraud and thus the Trustee cannot claw back their trading profits.[1]

---

[1] The Second Circuit's Net Equity Opinion, issued in 2011, is premised entirely on Madoff's split-strike fraud and
explicitly excluded all non-split strike accounts. *In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 242 n.1 (2d
Cir. 2011) ("The non-split strike customers are not parties to this appeal."). The Second Circuit then determined that
"[t]he Trustee properly declined to calculate 'net equity' by reference to ***impossible transactions***" in split-strike. *Id.*
at 241 (emphasis added). By contrast, the Second Circuit held that "the Last Statement Method may be especially
appropriate where – unlike with the BLMIS accounts at issue in this appeal – ***customers authorize or direct
purchases of specific stocks.***" *Id.* at 238 (emphasis added) (citing *Miller v. DeQuine (In re Stratton Oakmont, Inc.),*

3

E.    **October 2015: Sage Fact Discovery Commences**

The Sages also took extensive discovery on these issues. The First Case Management

Notices in the Sages Adversary Proceedings were entered on October 21, 2015, and set fact

discovery deadlines of December 20, 2016, and January 5, 2017, respectively. (Kratenstein

Decl. Ex 6.)

The parties served their initial disclosures in December 2015. In his initial disclosures,

the Trustee identified Annette Bongiorno ("Bongiorno") and Jodi Crupi ("Crupi") – two of the

individuals he now seeks to depose – as individuals who may have relevant information.

(Kratenstein Decl. Ex. 7.)

In their document requests and interrogatories, served on July 1, 2016, the Sages sought

documents related to Madoff's trading activities and the scope of his fraud, including whether

BLMIS executed the Sages' "directed trades" or any other trades. (E.g., Kratenstein Decl. Ex. 8

at Interrog. No. 2, Doc. Req. No. 11.) Conversely, in their responses to the Trustee's

interrogatories, served on August 11, 2016, the Sages described their interactions with Madoff,

including their directions to buy, sell, or hold securities:

> In addition to regular telephone conversations regarding the status of the
> Accounts, Malcolm H. Sage, Martin A. Sage, and Ann M. Passer met with
> Bernard L. Madoff at least once every year. In telephone conversations and in-
> person meetings, they: (i) discussed the status of the Accounts, including stock
> market trends and opportunities; (ii) reviewed the performance of [Sage
> Associates and Sage Realty], raised concerns, and discussed strategies and
> alternatives; (iii) *directed Bernard L. Madoff to use certain investment strategies*
> *and to buy, sell, or hold certain stocks*; (iv) explored various investment vehicles,
> discussed specific stocks held, and new companies and types of industries that
> may have been worth pursuing for investment purposes; and (v) communicated
> near-term and long-term financial plans and goals.

---

No. 01-CV-2812 RCC, 01-CV-2313 RCC, 2003 WL 22698876 (S.D.N.Y. Nov. 14, 2003)). Here, as discussed
below, the incontrovertible evidence adduced during discovery demonstrates that, unlike all of the other so-called
Good Faith Defendants, the Sages directed Madoff and his firm as to how to trade in the Sage Associates account
and in other Sage accounts. And, although Madoff had discretion over the convertible arbitrage transactions in the
Sage Realty account, these transactions were not "impossible" like the split-strike transactions purportedly were.

4

(Kratenstein Decl. Ex. 9 at Response to Interrog. No. 13) (emphasis added).

### F.    July-August 2016:  The Madoff Deposition Order

In July 2016, Helen Chaitman of Chaitman LLP sought to depose Madoff concerning, among other things, the nature, extent, and scope of Madoff's alleged fraud.  Several other defendants (including the Sages) joined in that request.  The Madoff Day 1 Deposition Order listed the topics for the deposition, which included "[t]he nature, extent and scope of Madoff's legitimate and illegitimate activities at various time periods . . . ."  (Sheehan Decl. Ex. 1 ¶ 4.) Again, it was absolutely clear that multiple defendants, including the Sages, were challenging the Trustee's claim that Madoff's entire investment advisory business was a fraud and a fraud from practically inception.

At a hearing to authorize the Madoff deposition held on August 24, 2016, the Sages' counsel noted that "[o]ne of the questions about scope" is whether the fraud "extended beyond the so-called split strike strategy or went to the so-called directed trading and [convertible] bond arbitrage that Mr. Madoff did with a number of accounts, including my clients' accounts." (Kratenstein Decl. Ex. 10 at 18:16-20.)  At the same hearing, the Trustee's counsel stated that Madoff's deposition "shouldn't be used to hit restart on all of the discovery for the defendants now that it's coming towards the end or near the end of their fact discovery deadline.  I think the Court understood that point and said it agreed."  (*Id.* at 21:19-22.)

### G.    November-December 2016:  The Bongiorno Profit Withdrawal Deposition Dispute

On November 14, 2016, counsel for the Sages wrote to the Court requesting permission to use in the Sage Adversary Proceedings the transcript of Bongiorno's deposition taken in the profit withdrawal proceeding.  (Kratenstein Decl. Ex. 11.)  Bongiorno had testified that the Sages' accounts "in fact held real securities".  (*Id.* at 2.)

5

By letter dated November 18, 2016, the Trustee's counsel objected to the Sages' request. (Kratenstein Decl. Ex. 12.) The Trustee's counsel also "reserve[d] all rights to request a[n] . . . . omnibus deposition of additional former BLMIS employees, including Bongiorno, at which both the Trustee's counsel and defense counsel may examine the deponents on subjects properly within the scope of the deposition." (*Id.* at 2.)

At a hearing held on December 6, 2016, counsel for the Sages stated to the Court that, if the Trustee wanted to take an omnibus deposition of Bongiorno or anyone else, then "the Trustee should tell us that now . . . because the clock is running." (Kratenstein Decl. Ex. 13 at 9:16-17.) The Court ruled in the Trustee's favor and precluded the Sages from using Bongiorno's profit withdrawal deposition transcript. (*Id.* at 15:5-21.)

On November 17, 2016, the Sages and the Trustee agreed to extend their fact discovery period until June 23, 2017. (Kratenstein Decl. Ex. 14) During that approximately seven-month period, the Trustee's counsel did not seek to take an omnibus deposition of Bongiorno or anyone else and instead continued to wait while the discovery clock ticked.

## H.    December 2016:  Madoff Deposition Day 1 Begins

"Day 1" of Madoff's deposition was held over three days on December 20, 2016, and April 26-27, 2017. On December 20, 2016, Madoff testified at length – consistent with his plea allocution and prior testimony in the profit withdrawal proceeding – that his fraud was limited to the split-strike conversion strategy, did not encompass convertible bond arbitrage trading or directed trading, David Kugel's testimony concerning convertible bond trading was inaccurate, and Dubinsky's report was riddled with errors. (E.g., Kratenstein Decl. Ex. 15 at 15:10-13, 18:9-21, 19:8-17, 35:1-57:4, 83:22-157:19.)

6

I.    **February 2017:  The Feingold Report**

On February 13, 2017 – in between the first and second sessions of Madoff Day 1 – one

of the other Good Faith Defendants served the report of Bill Feingold ("Feingold").  (Kratenstein

Decl. Ex. 16.)  In his report, Feingold rebutted Dubinsky's conclusions concerning whether

Madoff's firm engaged in convertible arbitrage trading.

When Day 1 of Madoff's deposition continued on April 26, 2017, Madoff was questioned

about Feingold's report.  (Kratenstein Decl. Ex. 17 at 109:15-125:21.)  Madoff agreed with

Feingold's critique of Dubinsky's report, which Madoff described as "an embarrassment".  (*Id.*

at 115:1.)

On June 22, 2017, the Sages and the Trustee agreed to extend their fact discovery period

to September 29, 2017.  (Kratenstein Decl. Ex.18.)  During that extended period, the Trustee did

not notice any of the depositions that he seeks now even though the scope of Madoff's fraud was

in the midst of being hotly contested.

J.    **June-August 2017:  The Sages Identify Directed Trading Records**

On July 26, 2017, the Court held a hearing on certain defendants' (including the Sages')

request that the Trustee produce certain microfilm records.  At that hearing, the Sages' counsel

noted that, in response to the Sages' timely discovery requests, the Trustee had produced

documents demonstrating that the Sages had, in fact, directed Madoff's trading in their accounts.

(Kratenstein Decl. Ex. 19 at 41:17-47:15.)

After reviewing one of the direction letters from the bench, the Court stated that the

Sages are "in a different position" than the split-strike customers because the Sages "can identify

specific instructions" that they gave to Madoff.  (*Id.* at 47:13-15, 50:1-9.)  The Court also

directed the Sages to identify to the Trustee the account statements and trade confirms

7

corresponding to the written trading instructions. (*Id.* at 54:18-55:2.) The Sages did so by letter dated August 30, 2017. (Kratenstein Decl. Ex. 20.)

Among the documents identified by the Sages were direction letters that Malcolm Sage sent to Madoff and Bongiorno as well as Bongiorno's notes reflecting directions. (Kratenstein Decl. Exs. 21-26.) In three such letters, Malcolm Sage instructed Madoff to execute the "following plan" concerning the Sage Associates and Sage Associates II accounts and then directed Madoff to execute specific transactions. (*Id.* Exs. 21-23.) The transactions that Malcolm Sage directed appeared as executed on his account statements and in confirms/trade slips that he received in the mail. (Kratenstein Decl. Ex. 20.)

The documents also demonstrated that the Sages instructed Madoff *not* to make certain trades. For example, Bongiorno's notes of a conversation with Malcolm Sage in 2003 state: "Could have gone SAB in EBAY but cust did not want it." (Kratenstein Decl. Ex. 25.) As Madoff later testified, these notes confirm that Madoff had suggested that the Sages go short against the box ("SAB") in Ebay stock, but the Sages decided against it and Madoff followed their instruction. (Kratenstein Decl. Ex. 27 at 471:25-473:24.)

### K.    November 8-9, 2017: Madoff Day 2 Deposition

On September 28, 2017, the Trustee and the Sages agreed to extend their fact discovery period to January 31, 2018. (Kratenstein Decl. Exs. 28.) "Day 2" of Madoff's deposition – which mainly concerned issues specific to the Sages' accounts – was held on November 8-9, 2017.

During Day 2, Madoff confirmed that the Sages were "unusual" and "atypical" of his other customers because the Sages "would give instructions to me what they wanted to buy and

8

what they wanted – and when they wanted to sell it and so on."[2]  (Kratenstein Decl. Ex. 27 at 400:1-401:14.)  Madoff also repeatedly confirmed that he always followed the Sages' instructions and that the Sages' trades in the Sage Associates account were real, non-fictitious trades.  (*Id.* at 398:18-399:15, 436:10-486:25.)  In addition, Madoff testified about Bongiorno's notes and her role in assisting him in following the Sages' trading directions.  (*Id.* at 436:10-441:14, 452:10-457:23, 459:19-467:13, 471:13-473:24, 476:15-482:3.)  Finally, Madoff re-confirmed his prior testimony that his fraud was limited to split-strike trading beginning in or around 1992 and that all other trading, including convertible bond arbitrage trading (in which the Sage Realty account engaged until 1997) was not fictitious.  (*Id.* at 398:15-399:15.)  The Trustee's counsel had a full opportunity to cross-examine Madoff on these issues and did so.  (E.g., Sheehan Decl. Ex. 8.)

At the conclusion of Madoff's deposition, Ms. Chaitman held it open solely so that he could be questioned about "additional documents that we now know the Trustee has" that Ms. Chaitman had timely requested be produced.  (Kratenstein Decl. Ex. 29 at 681:9-11.)  The Trustee's counsel "reserve[d] the right to cross-examine on any documents that Ms. Chaitman asks about."  (*Id.* at 681:12-15.)

---

[2] Contrary to the Trustee's assertion, Madoff did not provide "contradictory testimony" about whether he or his firm engaged in directed trading for customers.  (Trustee Mem. at 12-13.)  It is clear from the testimony cited by the Trustee that Madoff was not saying that he or his firm never engaged in directed trading on behalf of customers.  Rather, Madoff testified that customers "***usually*** did not give us instructions" and "we ***basically*** did not do that kind of business."  (Sheehan Decl. Ex. 5 at 26:25-27:15) (emphasis added).  That testimony is true.  Madoff and BLMIS did not usually engage in directed trading.  They did so only rarely and, as Madoff testified, the Sages were "unusual" and "atypical" customers because they gave him directions.  (Kratenstein Decl. Ex. 27 at 400:1-401:14.)  In fact, Dubinsky states in his report, "A small, limited group of IA Business customer accounts did not follow either the purported convertible arbitrage strategy or the [split-strike conversion] strategy.  Instead, securities (typically equities) were purportedly purchased, held for a certain duration, and then purportedly sold for a profit."  (Kratenstein Decl. Ex. 3 ¶ 24, *see also* ¶ 153.)

L.    **November 15-21, 2017: The Sage Depositions**

The Sages were deposed on November 15-21, 2017. The Sages' testimony was

consistent with their Answers, their discovery responses, and Madoff's testimony that the Sages

directed Madoff on how to trade. The Sages testified that, beginning no later than 1982 and until

shortly before BLIMS's bankruptcy in 2008, they actively managed several of their accounts and

specifically directed Madoff as to what stocks to buy, sell, or hold in those accounts. (*E.g.*,

Kratenstein Decl. Ex. 30 at 26:14-42:21, 218:1-229:11, 233:19-237:8, 316:18-339:15.) For

example, Malcolm Sage specifically recalled when he directed Madoff to purchase Disney stock

in 1985:

> In fact, I'm recalling when we were purchasing stock back in 1985 and
> both my sister and my brother by that time had children. My brother was
> living in California near Disneyland. My sister thought that the world
> revolved around taking your kids to Disney World. They were enamored
> of that company. It went a lot into why we decided to invest in Disney.
> And we, in fact, invested in Disney not only in Sage Associates but in
> Sage Associates II as well.
>
> We wanted a -- our goal was always to have a diversified portfolio. It fit
> the need. So that's an example of how we might have interacted. But I'm
> sure it happened other times over the years. That's one recollection that I
> -- that I specifically remember.

(*Id.* at 236:3-23.)

Malcolm's brother, Martin Sage, likewise testified that, during discussions with Madoff,

the Sages "wanted to direct him in terms of buying the stocks that we indicated, and he said he

was happy to do so . . . ." (Kratenstein Decl. Ex. 31 at 37:23-38:4.) Martin Sage too specifically

recalled the Sages directing the purchase of Disney stock, noting that Martin "had worked for

Disney for a time, and in fact, promoting Disney helped pay my salary at Disney." (Kratenstein

Decl. Ex. 31 at 133:24-134:8.) Martin also recalled promoting the purchase of Anheuser-Busch

stock. (*Id.* at 135:4-5.)

Malcolm and Martin's sister, Ann Sage Passer, likewise recalled the Sages' meetings with Madoff. She testified that, at those meetings, "Malcolm would discuss what he wanted to do with the accounts" and "make the decisions whether to buy or sell stocks." (Kratenstein Decl. Ex. 32 at 21:14-22:9.)

The Sages pursued a buy and hold strategy, holding the blue chip stocks they had directed Madoff to purchase for over two decades. The Sages finally instructed Madoff to sell those positions in 2006 and 2007, when they believed they had accomplished their goal of growing a "nest egg" for their retirement and other financial needs. (Kratenstein Decl. Ex. 30 at 223:10-224:24, 337:14-339:15.)

After these positions were sold, the Sages instructed Madoff to purchase Treasuries. (*Id.* at 219:3-19.) From December 31, 2007 until August 14, 2008, the Sage Associates account held solely Treasury bills. The Sages directed Madoff to move Sage Associates into split-strike in August 2008, which was well *after* the withdrawals that the Trustee seeks to claw back.

## M.    February 2018: The Trustee Moves for Omnibus Proceeding

As discussed above, even though the Trustee had been on notice since at least September 2015 that the Sages contended that their trading was outside the scope of Madoff's split-strike fraud, the Trustee elected not notice a single deposition of anyone other than of the Sages during the following *two-and-a-half years*. Instead, on February 23, 2018, the Trustee (without first meeting and conferring with the Good Faith Defendants) filed his long overdue motion for an order establishing an omnibus proceeding on the existence, duration, and scope of Madoff's alleged fraud.

11

### N.    July 2018:  Sage Fact Discovery Closes and Court Denies Trustee's Motion for Omnibus Proceeding

Meanwhile, the fact discovery period in the Sage Adversary Proceedings – which by now had been extended *five* times[3] – ticked away.  The fact discovery period finally closed on July 5, 2018, when the Sages' counsel denied the Trustee's counsel request to extend yet again.

On July 25, 2018, the Court held a hearing on the Trustee's motion to establish an omnibus proceeding.  At that hearing, the Trustee's counsel informed the Court that, of all of the good faith cases still being litigated, fact discovery was still open in only seven.[4]  (Kratenstein Decl. Ex. 2 at 9:5.)  The Court then pressed the Trustee's counsel on what additional discovery it needed, noting that the Trustee had been "preparing these cases for ten years or eight years" and also observed that the Dubinsky Report came out in 2013, "so the issue was certainly up there then."  (*Id.* at 10:21-23, 39:23-40:2.)  The Court further stated that the Trustee was not entitled to a "complete do-over" on discovery and that he was "perplexed that the Trustee wants to take discovery on something the Trustee should know and the Defendants are fighting it."  (*Id.* at 18:10, 52:17-19.)  Other Good Faith Defendants pointed out that the Trustee previously had denied their requests to extend discovery periods.  (*E.g., id.* at 53:14-54:15.)

At the conclusion of the hearing, the Court denied the Trustee's motion to commence an omnibus proceeding.  The Court instead instructed the Trustee's counsel to make a motion for further discovery under the Madoff Deposition Order.  The Court warned that "[i]f you are going to make that motion, you have to show specifically what is it that Madoff said that is new, that you couldn't have anticipated with due diligence of taking that discovery."  (*Id.* at 70:17-20.)

---

[3] On January 23, 2018, the parties extended the fact discovery period to April 6, 2018.  (Kratenstein Decl. Ex. 33.) On March 19, 2018, the parties extended the fact discovery period until July 5, 2018.  (Kratenstein Decl. Ex. 34.)

[4] The Trustee now asserts that there are 33 cases in which fact discovery is open and 59 cases in which fact discovery is closed, including the Sages Adversary Proceedings.  (Trustee Mem. at 17-18.)

12

The Court also directed the Trustee's counsel to file its motion "expeditiously". (*Id.* at 80:14.) When one of the Trustee's army of lawyers stated that she was on vacation for two weeks in August, the Court replied: "You're the only lawyer working on this case, right? . . . I've seen your firm's fee applications. . . . You must have a high billing rate." (*Id.* at 82:5-19.)

### O.    September 21, 2018: The Trustee Finally Files The Instant Motion

Notwithstanding the Court's admonition to move expeditiously, the Trustee did not file this motion until approximately two months later, on September 21, 2018. The Trustee claims that he wants to take only "limited additional discovery", including taking eight depositions. (Trustee Mem. at 2.) That is double the number of depositions taken in the Sage Adversary Proceedings during fact discovery.

The Trustee also seeks to produce more documents considered by his experts. (*Id.* at 3.) The full volume of those documents is undisclosed. The Trustee says only that FBI recently returned "over 200 boxes of documents to the Trustee following the close of the Criminal Trial." (*Id.* at 30.) There is presumably more.

### ARGUMENT

### I.    THE TRUSTEE MUST DEMONSTRATE THAT THE DISCOVERY HE SEEKS COULD NOT HAVE BEEN ANTICIPATED HAD HE BEEN DILIGENT

At the conclusion of the hearing held on July 25, 2018, the Court advised the Trustee of the high standard that he must meet to obtain additional discovery: "If you are going to make that motion, you have to show specifically what is it that Madoff said that is new, ***that you couldn't have anticipated with due diligence of taking that discovery***." (Kratenstein Decl. Ex. 2 at 70: 17-20) (emphasis added). The standard enunciated by the Court is supported by the case law cited by the Trustee. As those cases hold, the Trustee must demonstrate "good cause" to reopen discovery and "[a] finding of good cause depends on the diligence of the moving party."

*Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003). As another case cited by the
Trustee holds, "[t]he moving party must show that even if it had exercised diligence, it could not
have met the deadline set by the court." *Lopez v. Ramos*, 11-cv-07790 (NSR), 2013 WL
6912692, at *3 (S.D.N.Y. Dec. 30, 2013).

The Trustee's diligence is thus the "primary consideration" that this Court must consider.
*Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007). As the Trustee notes,
other factors that courts consider are: "(1) the imminence of trial; (2) whether the request is
opposed; (3) prejudice to the non-moving party; (4) whether the moving party foresaw the need
for additional discovery, in light of the discovery deadline set by the court; and (5) whether
further discovery is likely to lead to relevant evidence." (Trustee Mem. at 25) (quoting *Lopez*,
2013 WL 6912692, at *3).

## II.    THE TRUSTEE HAS NOT BEEN DILIGENT

The Trustee asserts that he "did not know whether additional discovery would be
necessary until Madoff was fully deposed" and thus his motion was not "ripe" until now.
(Trustee Mem. at 26.) But the history of this prolonged litigation leaves no doubt that the
Trustee easily could have, should have and, in fact, did anticipate his need for the discovery that
he now belatedly seeks to take. As discussed above:

- In August 2013, the Trustee submitted the Dubinsky Report, which relied on
  statements from and proceedings concerning many of the same witnesses whom
  the Trustee now seeks to depose to assert that Madoff's entire investment
  advisory business was a fraud. (Kratenstein Decl. Ex. 3.)

14

- The Sages stated in their Answers filed in September 2015 that their trading was outside of the "split strike conversion" strategy that Madoff had confessed was a fraud. (Kratenstein Decl. Exs. 4-5 ¶ 54.)

- The Trustee stated in his initial disclosures served in December 2015 that Bongiorno and Crupi may have relevant information. (Kratenstein Decl. Ex. 7.)

- In their discovery requests and responses served in the summer of 2016, the Sages specifically sought documents related to Madoff's trading activities and the scope of his fraud and also reiterated that they directed Madoff's trading. (Kratenstein Decl. Exs. 8-9.)

- Among the reasons stated in July 2016 for taking Madoff's deposition was to obtain testimony about the "nature, extent, and scope" of his fraud. (Sheehan Decl. Ex. 1 ¶ 4; Kratenstein Decl. Ex. 10 at 18:16-20.)

- In November 2016, the Trustee's counsel stated that the Trustee might seek to take an "omnibus deposition" of Bongiorno and other former BLMIS employees concerning the scope of the fraud. (Kratenstein Decl. Ex. 12 at 2.)

- Despite the Sage's counsel's admonition at a hearing on December 6, 2016 that "the Trustee should tell us that now . . . because the clock is running" (Kratenstein Decl. Ex. 13 at 9:16-17), the Trustee inexplicably waited until February 2018 to make a motion to create such an omnibus proceeding, which the Court rightly denied.

- Madoff testified at length on December 20, 2016 that his non-split strike trading for good faith customers was not fraudulent. (Kratenstein Decl. Ex. 15 at 15:10-13, 18:9-21, 19:8-17, 35:1-57:4, 83:22-157:19.)

15

- In February 2017, Feingold rebutted Dubinsky's opinion that Madoff's convertible bond arbitrage trading was fake. (Kratenstein Decl. Ex. 16.)

- In April 2017, Madoff corroborated Feingold's conclusions. (Kratenstein Decl. Ex. 17 at 109:15-125:21.)

- During the summer of 2017, the Sages identified documentary evidence of their directed trading to the Court and the Trustee. (Kratenstein Decl. Exs. 20-26.)

- In early November 2017, Madoff testified that, unlike his other customers, the Sages directed him to trade and he executed those trades. (Kratenstein Decl. Ex. 27 at 398:18-401:14, 436:10-486:25.)

- Later in November 2017, the Sages likewise testified that they directed Madoff to trade over almost the entirety of the approximately 25-year period during which they held their Madoff accounts. (*E.g.*, Kratenstein Decl. Ex. 30 at 26:14-42:21, 218:1-229:11, 233:19-237:8, 316:18-339:15; Ex. 31 at 133:24-134:8; Ex. 32 at 21:14-22:9.)

Despite this extensive battle over the nature, extent, and scope of Madoff's fraud, the Trustee did not seek to depose a single former BLMIS employee or FBI agent. Instead, the Trustee allowed the discovery clock to tick away. After objecting to any defendant getting to "hit restart" on discovery (Kratenstein Decl. Ex. 10 at 21:19-22), the Trustee himself now wants a "do-over" (Kratenstein Decl. Ex. 2 at 18:10, 52:17-19).

The cases on which the Trustee relies demonstrate he deserves no mulligan. In *five* of those cases, the court denied the motion to reopen discovery because the party seeking to reopen discovery, like the Trustee, was not diligent. *See Grochowski*, 318 F.3d at 86 (affirming the denial of the plaintiff's motion for leave to amend their complaint and to take more discovery

after the plaintiff "delayed more than one year" before seeking such relief); *Gray v. Town of Darien*, 927 F.2d 69, 74 (2d Cir., 1991) ("In light of plaintiff's failure to seek any discovery in the six months provided by the district court's scheduling order and failure to show good cause for reopening or extension of that order, we cannot say the district court abused its discretion in cutting off discovery and in later denying plaintiff's motion to reopen it."); *Gucci Am., Inc. v. Guess?, Inc.*, 790 F. Supp. 2d 136, 140 (S.D.N.Y. 2011) (denying motion to reopen after "several extensions" where the court found it "hard to believe that Gucci needed more than one year of discovery to piece together the nature of Defendants' foreign sales activity."); *Lopez v. Ramos*, 11-cv-07790 (NSR), 2013 WL 6912692, at *3 (S.D.N.Y. Dec. 30, 2013) (denying motion to reopen discovery where the plaintiff "knew or should have known" while discovery was open of the discovery he sought to take after discovery had closed); *Jeannite v. City of New York Dep't of Buildings*, No 09 Civ. 3464(DAB) (KNF), 2010 WL 2542050 (S.D.N.Y. June 21, 2010) ("The plaintiff has not pursued his claims diligently.").[5]

The Trustee's two-month delay in bringing this motion after the Court admonished the Trustee to do so "expeditiously" (Kratenstein Decl. Ex. 2 at 80:14) confirms his lack of diligence. In *In re Application of Barnet*, Judge Berman denied a motion to reopen discovery because the movants had been "dilatory" in conducting discovery. No. 13 Misc. 214(RMB), 2014 WL 7409524, at *3 (S.D.N.Y. Dec. 30, 2014). Judge Berman added that the movants'

---

[5] By contrast, in the two cases cited by the Trustee in which discovery was extended, the party seeking discovery had been diligent and could not be faulted for failing to take the requested discovery sooner. *See Krawec v. Kiewet Constructors, Inc.*, No. 11-cv-0123 (LAP), 2013 WL 1104414, at *8 (S.D.N.Y. Mar. 1, 2013) (observing that plaintiff did not oppose the defendant's request to reopen discovery because the plaintiff had not supplemented its initial disclosures and thus was "partially responsible" for the defendant's failure to depose witnesses) *Callari v. Blackman Plumbing Supply, Inc.*, No. CV 11-3655 (ADS) (AKT), 2016 WL 1273237, at *4 (E.D.N.Y. Mar. 31, 2016) (noting that defendants seeking discovery regarding opt-in plaintiffs could not have sought that discovery sooner because the defendants had not yet been apprised of the identities of the potential opt-in plaintiffs).

"lack of diligence is also evidenced by their delay . . . in filing the instant motion" after the Court

issued orders "that clearly stated that discovery had already ended. . . ." *Id.* at *4.

Here, on July 25, 2018, the Court directed the Trustee's counsel to file its motion

"expeditiously". (Kratenstein Decl. Ex. 2 at 80:14.) When the Trustee's counsel protested due

to her vacation schedule, the Court sardonically noted the Trustee's vast resources. (*Id.* at 82:5-

19.) Despite the massive resources at his disposal, the Trustee did not file this motion for

another two months.

As Judge Román stated in *Lopez*, "[n]ot only must counsel be diligent, the litigant must

be diligent as well. Plaintiffs as initiators of lawsuits must be held accountable for their actions

just as litigants can be held to the actions of their counsel." 2013 WL 6912692, at *3. Here, the

Trustee and their counsel should be held accountable for their inexcusable delay in seeking the

discovery that they now belatedly seek.

## III.    OTHER GOOD CAUSE FACTORS MILITATE AGAINST REOPENING DISCOVERY

The Trustee's lack of diligence is reason alone to deny his motion. Of the other five

factors that courts consider in assessing whether good cause exists to reopen discovery, at least

three clearly favor the Sages.

*First*, the Sages oppose the motion, which itself weighs against the motion. *See, e.g.*,

*Lopez*, 2013 WL 6912692, at *5 ("[T]he motion to reopen is vehemently opposed by Defendant

in this case, also weighing against reopening discovery."); *Barnet*, 2014 WL 7409524, at *5

("[T]he Liquidators' request is opposed by the Discovery Entities").

*Second*, there will be substantial prejudice to the Sages and other Good Faith Defendants

if discovery is reopened. In considering prejudice, the Court should consider "the additional

18

costs associated with further discovery, including depositions." *Barnet*, 2014 WL 7409524, at *5. Here, the cost of the Trustee's proposed "limited" additional discovery will be substantial.

The Trustee proposes to take eight potentially multi-day depositions (including of three individuals incarcerated out of state, thus requiring travel) and to dump who knows how many more documents on the defendants. Taking those depositions and reviewing those documents will costs the Sages alone tens, if not hundreds, of thousands of dollars in legal fees and costs.

The Trustee blithely asserts that "Defendants cannot complain that they will face undue burden or expense from this limited additional discovery." (Trustee Mem. at 24.) Easy for the Trustee to say. He has a blank check to litigate these cases, which he has already cashed to the tune of over $1 billion. By contrast, the Sages are a family, not a government-backed Trustee with limitless resources to throw at never-ending litigation.

*Third*, courts also consider "whether the moving party foresaw the need for additional discovery, in light of the discovery deadline set by the court". *Jeannite*, 2010 WL 2542050, at *2. Here, as discussed above at length, the Trustee clearly foresaw the need for this discovery. In fact, he admits in his brief that he foresaw it. (Trustee Mem. at 22) ("Before the Madoff deposition took place, the Trustee raised the issue that some discovery would likely be necessary to rebut Madoff's testimony.").

It is no excuse for the Trustee to claim he could not have sought this discovery until now. The issues about which the Trustee seeks discovery have been in the case at least since the Sages filed their Answers in September 2015. At no time since then have the Sages even intimated that they would stipulate that Madoff's fraud infected the two Sage accounts at issue.

To the contrary, the Sages have consistently contested that point and produced evidence supporting their position. The Sages' counsel also warned the Trustee's counsel ***approximately***

19

*two years ago* that, if the Trustee wanted to take an omnibus deposition of Bongiorno or anyone else, then "the Trustee should tell us that now . . . because the clock is running." (Kratenstein Decl. Ex. 13 at 9:16-17.) The Trustee ignored that warning at his own peril.

## CONCLUSION

The Trustee filed the Sage Adversary Proceedings almost eight years ago. He knew or should have known then what discovery he needed. If he did not know then, he certainly knew or should have known for at least the last three years while the Sages and other Good Faith Defendants were actively contesting the Trustee's case. Despite the massive resources at his disposal, the Trustee allowed a very generous discovery clock to expire without taking the discovery he now claims that he needs to defeat the Sages' arguments. He is not entitled to a do-over.

Dated: October 17, 2018
     New York, New York          **MCDERMOTT WILL & EMERY LLP**

                              */s/Andrew B. Kratenstein*
                              Andrew B. Kratenstein
                              Michael R. Huttenlocher
                              Darren Azman
                              340 Madison Avenue
                              New York, New York 10173-1922
                              Telephone: (212) 547-5400
                              Facsimile: (212) 547-5444

                              *Attorneys for Defendants Sage Associates, Sage*
DM_US 155818147-1.100255.0011  *Realty, Malcolm H. Sage, Martin A. Sage, and*
                              *Ann M. Sage Passer*