# EXHIBIT 3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

## EXPERT REPORT OF BRUCE G. DUBINSKY
## MST, CPA, CFE, CVA, CFF, MAFF

19.  There was no trading using the so-called "convertible arbitrage trading strategy" purportedly implemented by BLMIS in the 1970s. In many instances, purported trades exceeded the entire reported market volume for particular securities on the days they were purportedly traded. On numerous trading days, trades were recorded at prices that were outside the range of market reported trading prices on a given day.

20.  Convertible securities were reported by the IA Business as being traded on days after the actual date of conversion reported by the issuing corporation, thereby evidencing the fictitious nature of the purported trades. Further, dividend payments and/or accrued interest were not reported by the IA Business on many customer statements even though the real convertible securities paid such dividends and/or interest. Lastly, there was no evidence that the purported convertible securities were ever actually converted, again supporting the fictitious nature of the purported trading activity.

21.  Similarly, no trading occurred under the so-called "split-strike conversion" ("SSC") strategy, purportedly put into place by BLMIS in the 1990s. Many purported trades exceeded the entire reported market volume for particular securities on numerous trading days and were recorded at prices that were outside the range of reported trading prices on the days at issue.

22.  The prices at which the IA Business supposedly bought and sold shares also evidenced the fictitious nature of the trades. The IA Business purportedly executed 83% of the buy transactions by share volume below the Volume Weighted Average Price ("VWAP") and executed 72% of the sell transactions by share volume above the VWAP.

23.  Further evidence that trading did not occur is that certain purported trades were recorded as being settled on weekends or holidays when the U.S. stock and option exchanges were closed. Many trades were also supposedly settled after the industry mandated time period of T+1 (for options) or T+3 (for equities).[13] In addition, billions of dollars of purported dividends that were reported on IA Business customer statements were fictitious and were never received by BLMIS, again showing the fictitious nature of the trades.

24.  A small, limited group of IA Business customer accounts did not follow either the purported convertible arbitrage strategy or the SSC strategy. Instead, securities (typically equities) were

---

[13] As described *infra*, the industry requirement for the settlement of options is one day after the trade date, or T+1, and the industry requirement for the settlement of equity transactions is three days after the trade date, or T+3.

purportedly purchased, held for a certain duration, and then purportedly sold for a profit. Trading anomalies reflected in these customer accounts also show how these purported trades could not have been executed and were therefore fictitious.

25.    Other evidence of fraud in the IA Business was the creation of fake reports from the DTC trading clearinghouse. IA Business customer statements contained fictitious trades that were backdated using special software modified in-house to reprint customer statements after the fact. Extensive in-house computer programs were created and used to generate the fictitious investment transactions.

26.    The IA Business was propping up, or "schtupping,"[14] certain IA Business customers' purported investment returns by providing those customers with extra fictitious trades that were intended to generate additional fictitious gains. This was done in order to reach predetermined rate of return thresholds. The process involved a careful monitoring of certain accounts to attain levels of reported investment returns throughout the year. Those accounts that were falling short were given additional fictitious trades, typically in December of that year, in order to bump the purported yearly returns to levels that Madoff had targeted for those customers.

27.    Additionally, various regulatory reports reflected false financial and other information.

### B.  The IA Business was a Ponzi Scheme

28.    The IA Business was a Ponzi scheme, utilizing new customer monies to fund BLMIS's operations, as well as to fund the withdrawal of fictitious profits and principal for its older customers. The Ponzi scheme had been operating for many years, as evidenced by the fact that the IA Business was not generating any legitimate profits since no trading activity was taking place. Additionally, the IA Business was not receiving legitimate financial support from the Proprietary Trading Business in amounts sufficient to satisfy the cash requirement needs of the IA Business customer withdrawals. Nor was the IA Business receiving any legitimate outside financial support vis-à-vis loans or otherwise.

---

[14] *See infra* (discussing the context surrounding the "schtupping" of certain IA Business customer returns).

roles.[47]  DiPascali managed the IA Business and was critical to its day-to-day activities, interfacing with customers and overseeing IA Business employees.[48]

54.    In 2009, DiPascali was charged with a ten count criminal information, and he subsequently entered into a plea agreement.  In his plea allocution, DiPascali admitted to learning of the fraud in the late 1980s or early 1990s, and he stated that no purchases or sales of securities actually took place in the customers' accounts.[49]  Instead, DiPascali created fraudulent account statements using information gleaned from historical stock data to create the returns that Madoff had promised his customers.[50]

55.    On August 11, 2009, DiPascali pled guilty to federal securities fraud and related offenses. DiPascali is facing 125 years in prison, but is awaiting sentencing.

### 7. David Kugel

56.    David Kugel ("Kugel") worked for BLMIS for nearly 40 years, originally starting in 1970.[51] Prior to working for BLMIS, Kugel worked as a trader specializing in convertible securities.[52] For BLMIS, Kugel purportedly traded in convertible securities and applied an arbitrage strategy to these stocks, buying both the convertible security and then shorting the underlying stock.[53]  This arbitrage strategy is similar to the purported strategy that BLMIS claimed to employ in IA Business accounts from at least the 1970s to the 1990s.[54]

57.    On November 21, 2011, Kugel pled guilty to federal securities fraud and related offenses, admitting that the investment fraud in the IA Business started in the 1970s.[55]  He is awaiting sentencing.[56]

---

[47] *Id.* at 47.
[48] *Id.*
[49] *Id.* at 46.
[50] *Id.* at 47.
[51] David Kugel Plea Allocution, *United States v. David Kugel*, 10-CR-228 (LTS), at 35-36 (S.D.N.Y. Nov. 21, 2011).
[52] *See generally id.*
[53] *See generally id.*
[54] *See infra* (discussing the convertible arbitrage strategy).
[55] Kugel stated the following:

As to Counts One, Three, Four, and Five, I provided historical trade information to other BLMIS employees, which was used to create false, profitable trades in the Investment Advisory clients' accounts at BLMIS.  Specifically, beginning in the early '70s, until the collapse of BLMIS in December 2008, I helped

### 8. Craig Kugel

58.    Craig Kugel began his affiliation with BLMIS in 2001 as an employee of Primex Trading, N.A. ("Primex"), which was an electronic trading auctions system company nominally owned in part by members of Madoff's family.[57]  At Primex, Craig Kugel completed tasks consistent with the role of Controller and was ultimately offered a job at BLMIS in 2003.[58]  While at BLMIS, he was responsible for the Proprietary Trading Business's budget forecasting, BLMIS's healthcare plan, and certain employee-related forms and records.[59]

59.    On June 5, 2012, Craig Kugel pled guilty to one count of conspiracy and multiple counts of falsifying documents.[60]  He is awaiting sentencing.[61]

### 9. Annette Bongiorno

60.    Bongiorno worked at BLMIS from July 1968 until December 11, 2008.[62]  She managed hundreds of IA Business accounts and supervised IA Business employees including the key punch operators responsible for entering the purported trades.[63]  Many of the accounts that Bongiorno managed were close friends and family of Madoff and BLMIS employees, and included some of the oldest Madoff clients.[64]

---

create fake, backdated trades.  I provided historical trade information – sorry – first to Annette Bongiorno, and later to Joanne (*sic*) Crupi, and others which enabled them to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred.  I helped Bongiorno, Crupi and others create these fake, backdated trades based on historical stock prices and were executed only on paper.

David Kugel Plea Allocution at 32.

[56] *See generally* David Kugel Information, *United States v. David Kugel*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011).

[57] Craig Kugel Information, *United States v. Craig Kugel*, No. 10-CR-228 (LTS), at 2 (S.D.N.Y. June 6, 2012); *see also* Complaint, *Picard v. Madoff Technologies LLC*, No. 08-01789 (BRL) (S.D.N.Y. Jul. 29, 2010).

[58] Craig Kugel Information at 2.

[59] *Id.* at 2-3.

[60] Craig Kugel Cooperation Agreement, *United States v. Craig Kugel*, No. 10-CR-228 (LTS), at 2 (S.D.N.Y June 5, 2012).

[61] *Id.*

[62] Superseding Indictment, *United States v. Bonventre*, No. 10-CR-228, at 4 (S.D.N.Y. Oct. 1, 2012).

[63] *Id.* at 4.

[64] *See generally id.*

61.    Bongiorno was charged with federal securities fraud and related offenses on November 17, 2010.[65]  She is awaiting trial.


### 10. Daniel Bonventre

62.    As BLMIS's Director of Operations, Daniel Bonventre ("Bonventre") ran the back office at BLMIS and oversaw the firm's accounting and securities clearing functions for at least 30 years.[66]  He was responsible for overseeing the accounting functions for both the IA Business and the Proprietary Trading Business, including maintenance of the BLMIS general ledger.[67] Bonventre provided information that was used in the creation of the FOCUS reports and the BLMIS financial statements.[68]

63.    Bonventre was charged with federal securities fraud and related offenses.[69]  He is awaiting trial.


### 11. Enrica Cotellessa-Pitz

64.    Enrica Cotellessa-Pitz ("Cotellessa-Pitz") began working for BLMIS in June 1978, eventually becoming Controller in 1998.  She worked directly for Bonventre, helping to maintain the books and records of BLMIS, including the general ledger and the stock record, as well as the FOCUS reports and financial statements submitted to regulators.[70]

65.    In December 2011, Cotellessa-Pitz entered into a plea agreement, pleading guilty to charges that she conspired to falsify records of a broker-dealer, falsify records of an investment adviser, make false filings with the SEC, and obstruct and impede the lawful government function of the IRS, among other charges.[71]  She is awaiting sentencing.

---

[65] *Id.* at 94-152.
[66] *Id.* at 2-3.
[67] *Id.* at 2-3.
[68] *Id.* at 99-100.
[69] *Id.* at 94-152.
[70] Enrica Cotellessa-Pitz Cooperation Agreement, *United States v. Enrica Cotellessa-Pitz*, S5 10-CR-228 (LTS) (S.D.N.Y. Dec. 15, 2011).
[71] "I caused inaccurate ledgers and other books and records to be kept by BLMIS, including inaccurate general ledgers and stock records.  I then transferred the same inaccurate record entries into FOCUS reports and annual

### 14. Joann "Jodi" Crupi

70.    Joann "Jodi" Crupi ("Crupi"), who worked for BLMIS for approximately 25 years,[78] performed many tasks for BLMIS.  Crupi tracked the daily activity in the primary checking account for the IA Business operations to ensure there was enough money for pending redemptions, and she authorized wire transfers into and out of the account.  Crupi created a Daily Report, delivered to Madoff every day, which reflected the bank account balance, customer deposits, and all pending customer redemptions.[79]  Similar to Bongiorno, Crupi was also responsible for managing several IA Business customer accounts,[80] for which she manufactured statements in order to produce certain promised rates of return.[81]

71.    Crupi was charged with federal securities fraud and related offenses on November 17, 2010.[82] She is awaiting trial.

### 15. Jerry O'Hara and George Perez

72.    Jerry O'Hara ("O'Hara") was hired in 1990 as a computer programmer in the IA Business to create and maintain the systems and functions that falsified customer account statements. George Perez ("Perez") was hired in 1991 to assist O'Hara.  Perez and O'Hara's programs and systems created fake trade blotters and reports.[83]  Additionally, they maintained the systems that falsified the trading data using historical stock prices to manufacture the customer statements and other reports sent to customers.[84]

73.    O'Hara and Perez were both charged with federal securities fraud and related offenses.[85] They are awaiting trial.

---

[78] Superseding Indictment at 5.
[79] *Id.* at 5, 56-58.
[80] *Id.* at 16-17, 21-23, 29-30.
[81] *Id.* at 16-17, 21-23, 29-30, 38-39, 42-43.
[82] *Id.* at 94-152.
[83] *Id.* at 6, 11, 14, 31-51.
[84] *See, e.g.*, MDPTTT00000001-MDPTTT00002748.
[85] *See generally* Superseding Indictment.

## VI.    OPINION NO. 1: FRAUD PERMEATED BLMIS

### A. THE IA BUSINESS WAS A FRAUD

**1. Fictitious Trading in the IA Business - There is no evidence that the purported investment transactions for IA Business customers ever occurred at least as far back as the 1970s. In fact, the evidence shows the trading did not occur.[90]**

**a. The Purported Convertible Arbitrage Strategy – the 1970s to the 1990s:  There is no evidence that the purported convertible arbitrage strategy for IA Business customers actually occurred.  In fact, the evidence proves that the purported trades did not occur.**

82.    Convertible securities are generally fixed income and preferred equity instruments that allow the purchaser to convert that security to shares of stock under pre-specified conditions set forth by the issuer.  Although there can be myriad covenants for convertible securities, the most common conditions include a predetermined strike price (*i.e.*, the price at which the securities can be converted) and a predetermined timeframe necessary in order to convert the security into shares of common stock.[91]

83.    Corporate convertible securities include the following:

- Convertible Bonds:  Corporate bonds that can be converted to company equity at some predetermined ratio during a certain period of time.

- Warrants:  Similar to call options in that they provide an investor with the right (but not the obligation) to purchase a security at a predetermined price during a certain period of time, but issued by the company usually as a benefit to bondholders.

- Convertible Preferred Stock:  Preferred stock that can be converted to common equity at some predetermined ratio during a specified period of time.

---

[90] All discussion and opinions related to trading activities or positions held in the IA Business are assumed herein to be purported, including, but not limited to, all references to "trades," "securities held" or "trading."  The opinion herein encompasses the convertible arbitrage and split-strike conversion trading strategies for the IA Business, which were the trading strategies purportedly utilized for nearly all of its customers.  A few self-directed trades for a single IA Business customer were identified as being purportedly executed through the Proprietary Trading Business.  The *de minimis* number of these transactions does not impact my opinions herein.

[91] Frank J. Fabozzi, *The Handbook of Fixed Income Securities* 1372 (7th ed. 2005).

84.  A convertible arbitrage trading strategy aims to generate profits by taking advantage of the pricing mismatches that can occur between the equity and convertible instruments.  This strategy is implemented when the convertible instrument is incorrectly valuing the option component of the security relative to the underlying common stock price.  The investor is looking then to benefit from a change in the expectations for the stock or convertible security over a period of time.

85.  Normally, this arbitrage is initiated by simultaneously purchasing convertible securities and selling short enough shares of the underlying common stock to create a delta neutral hedge.[92]

86.  With this trading strategy, if the underlying stock loses value, the potential arbitrageur will benefit from the short sale of the stock, while still receiving constant interest payments to the extent the underlying instrument was a bond.  Conversely, if the stock price improves in value, the loss on the short sale will be mitigated by the increase in the option value of the underlying security.

### (i)    Convertible arbitrage strategy - IA Business Customers

87.  During the 1970s through the early 1990s, Madoff purportedly utilized a convertible arbitrage investment strategy.  IA Business customer statements and ledgers suggest that this purported trading strategy occurred by showing long convertible positions, corresponding short positions, and positions converted and unwound (*i.e.*, the short positions were purchased back and/or the convertible security was sold).[93]

88.  In order to investigate the IA Business's purported convertible arbitrage strategy, customer transactions and ledgers were analyzed both in the aggregate (*i.e.*, across all convertible arbitrage customer accounts) and on an individual customer account basis.[94]  All BLMIS customer accounts utilizing the purported convertible arbitrage strategy were analyzed for the following months (the "Monthly Time Period"):

---

[92] "Delta neutral" implies that the investor is protected from price movement of the common stock.  B. Arshanapalli, *New Evidence on the Market Impact of Convertible Bond Issues in the U.S.* 17-18 (2004).

[93] Similar to customer statements, the customer ledgers contained the monthly transactional details for the IA Business accounts.  In certain instances, customer ledgers reflected the purported purchase and sale of warrants. These transactions were included in the analyses as described *infra*.

[94] *See* **Exhibit 1** and **Exhibit 2** for examples of a customer statement and a customer ledger, respectively.

- October 1979, November 1979;[95]

- every March and December from 1981-1992;[96] and

- randomly selected months, other than March and December, between 1983 and 1992.[97]

89.   In addition to the accounts selected and analyzed for the Monthly Time Period, eight Avellino & Bienes ("A&B")[98] accounts were analyzed from November 1978 through July 1992 (the "A&B Time Period").[99]

90.   For the Monthly Time Period and the A&B Time Period, IA Business customer ledgers purportedly employing the convertible arbitrage strategy were tested against historical, independent market trading records for the applicable securities.[100]   The daily price range, total daily volume, and corporate actions (*e.g.*, dividends) of each security in question were analyzed in comparison to those identified on the customer ledgers.

91.   An example of how the purported transactions in the IA Business were constructed can be seen in Table 2 below.  Customer ledgers from the IA Business depicted that the customers were long in convertible securities and short in the underlying common stock.  In this instance, the ledgers purport to show that the customer was long Macmillan Inc. convertible debentures and short the underlying common stock.  However, as described in the following paragraphs, there are a number of reasons this trade, and the majority of the IA Business convertible arbitrage transactions, could not have occurred.

---

[95] The customer ledger data for these months were fully coded into a database by the Trustee's consultants.

[96] This was the time period prior to the dissolution of Avellino & Bienes, when, thereafter, there was a movement away from purported IA Business investments pursuant to the convertible arbitrage strategy and towards the SSC strategy.  March was chosen because it was a quarter-end statement; December was chosen because it was a year-end statement.

[97] A random number generator selected one additional month for each year to be analyzed in the 10-year period.

[98] A detailed overview of A&B is discussed later in this report.

[99] These accounts include: 1A0045 through 1A0050, as well as 1A0051 and 1B0018, which belonged to Frank Avellino and Diane Bienes, respectively.  These eight accounts were utilized as the customer data associated with these accounts were fully coded by the Trustee's consultants into a database.  As noted *supra* in this report, the underlying data used in these analyses were validated and tested.  This is the time period for which convertible arbitrage information was available for these accounts.

[100] Market data sources include: New York Stock Exchange Daily Stock Price Record, Over-the-Counter Exchange Daily Stock Price Record, American Stock Exchange Daily Stock Price Record, Wall Street Journal New York Exchange Bonds, Moody's Industrial Manual, Moody's Bank and Financial Manual, Frankfurter Allgemeine Zeitung and The Times (London).

**Table 2**
**A&B 1A0045 Account – Macmillan Inc. Sub Deb Conv 8.75 – Due 2/15/2008**

| | Bates | Statement Date | Transaction Date | Long | Short | Security | Price | Debit | Credit |
|---|---|---|---|---|---|---|---|---|---|
| A | MF00370649 | 1/31/1985 | 9-Jan | 706,000 | | MACMILLAN INC SUB DEB CONV 8.750 2/15/2008 | 138 | $ 1,000,191.12 | |
| B | MF00370649 | 1/31/1985 | 9-Jan | 705,000 | | MACMILLAN INC SUB DEB CONV 8.750 2/15/2008 | 138 | 998,774.42 | |
| C | MF00370649 | 1/31/1985 | 10-Jan | | 41,300 | MACMILLAN INC | 44 7/8 | | $ 1,853,337.50 |
| D | MF00370649 | 1/31/1985 | 10-Jan | | 5,152 | MACMILLAN INC | 44 3/4 | | 230,552.00 |
| E | MF00370649 | 1/31/1985 | 17-Jan | | | MACMILLAN INC FRACTIONAL SHARES | JRNL | | 30.20 |
| F | MF00371844 | 3/31/1985 | 14-Mar | | 705,000 | MACMILLAN INC SUB DEB CONV 8.750 2/15/2008 | DELV | | |
| G | MF00371844 | 3/31/1985 | 14-Mar | 41,300 | | MACMILLAN INC | RECD | | |
| H | MF00371844 | 3/31/1985 | 14-Mar | | 706,000 | MACMILLAN INC SUB DEB CONV 8.750 2/15/2008 | DELV | | |
| I | MF00371844 | 3/31/1985 | 14-Mar | 5,152 | | MACMILLAN INC | RECD | | |
| | | | | | | | Total | $ 1,998,965.54 | $ 2,083,919.70 |

(ii)    **Purported convertible security trades exceeded the entire reported market volume for certain days**

92.    To test if the purported trades could have been legitimate, the daily volume from the long convertible positions as indicated on the customer ledgers was compared to the historical market volume for those securities on the specific days the trades purportedly occurred. Customer ledgers from the Monthly Time Period were aggregated to analyze the relevant transactions.

93.    During the Monthly Time Period, the historical daily trading volume of 432 unique convertible security transactions reflected in BLMIS's records was analyzed.[101]  The purported trading in 407 of the 432 unique convertible securities transactions (94%) exceeded the daily market volume traded by an average of over 200 times the entire reported daily volume for all market trades in those securities.  (*See* Figure 1 and **Exhibit 3** – "Convertible Arbitrage IA Business Volume Analysis, Monthly Time Period".)[102]  In fact one security, Westinghouse Electric Corp. Sub Debenture Convertible 9% due 8/15/2009, purportedly traded on November 28, 1989 nearly 5,051 times the actual daily volume, a fact that shows

---

[101] There were 165 additional instances where publicly available market data could not be identified.

[102] A volume analysis was also performed for all the common equity that was shorted for the transactions executed during the Monthly Time Period.  Data was collected from the Daily Stock Price Record-New York Stock Exchange and the Daily Stock Price Record-American Stock Exchange, which provided the end-of-month short positions.  The purported IA Business month-end short positions for the Monthly Time Period were then compared to the publicly available data.  The investigation concluded that of the 494 short positions for which data was publicly available, 38% of the IA Business purported short common shares positions exceeded the end-of-month historical volume for the common shares.  (*See* **Exhibit 4** – "Convertible Arbitrage IA Business Securities Short Interest Analysis, Monthly Time Period".)  In fact, one position, purportedly traded in February 1991, exceeded the volume by approximately 382 times the actual reported total market short position.

the purported trades were fictitious.[103]  Forty-one percent of the trades occurred where there was no reported volume at all in that particular security for that particular day.

**Figure 1**
**Breakdown of Purported Securities Exceeding Daily Volume**
**for the Monthly Time Period**



94.   To further test the volume analysis, eight A&B accounts were similarly tested to determine whether the transactions exceeded the actual daily market volume for the chosen convertible securities during the A&B Time Period.  The daily historical volume for these convertible securities was compared to the volume the IA Business purportedly traded per the customer account records, and results were similar to that of the Monthly Time Period analysis described above.  Of the 1,081 convertible securities in these eight accounts, over ninety percent of the total exceeded the daily volume on the transaction day by an average of nearly 30 times the actual daily volume.  (*See* Figure 2 and **Exhibit 5** – "Convertible Arbitrage IA Business Volume Analysis, A&B Time Period".)  Forty-four percent of the trades occurred

---

[103] Two of the largest European exchanges (London Stock Exchange and the Frankfurt Stock Exchange) were analyzed to assess whether or not these securities were traded in those markets.  For the Monthly Time Period, the investigation showed that none of the convertible securities was traded on those exchanges and therefore could not have accounted for the potential excess volume that was not traded on the U.S. exchanges.

where there was no reported volume at all in that particular security for that particular day. In one instance, the volume in a particular security reported by the IA Business was over 500 times the total volume reported in the entire market for that security.

**Figure 2**
**Breakdown of Purported Securities Exceeding Daily Volume**
**for 8 A&B Accounts for the A&B Time Period**



95.    Accordingly, the purported securities trades underlying the convertible arbitrage strategy for IA Business customers could not have been legitimate trades as they exceeded the reported volume of the entire market on the securities the IA Business purportedly executed. These volume discrepancies are further illustrated by an individual transaction on a single customer ledger. Referring to Table 2, on January 9, 1985, the A&B customer ledger for account 1A0045 reported that $1,411,000 par value of Macmillan Inc. subordinated debt was traded (together Row A and Row B). However, on that day, this security did not change hands in the open market. (*See* Figure 3 below for listing of traded securities for January 9, 1985.)[104]

---

[104] *New York Exchange Bonds Daily Record*, Wall St. J., Jan. 10, 1985.

Accordingly, the IA Business simply could not have traded Macmillan Inc. subordinated debt on that day.[105]

**Figure 3**



(iii) **Purported purchase prices of convertible securities on customer ledgers did not represent market prices**

96.     The purchase prices for the convertible securities as stated on the IA Business customer ledgers were tested against the historical market prices to determine if the purported IA Business trades fell within the actual daily market trading range. As the IA Business often purportedly executed the same convertible security several times per day for the accounts,

---

[105] The Macmillan Inc. subordinated debt could not have traded on the OTC market either. While the New York Exchange Bonds listing does not reflect OTC trading, the S&P Bond Guide captures the month-end high and low traded prices for the exchanges and the OTC market. A review of the February 1985 S&P Bond Guide as of month-end January 1985 for the exchanges and the OTC market indicates that the high traded price for the Macmillan Inc. subordinated debt in January 1985 was $154 and the low was $141.5. Given that the IA Business customer ledgers indicate a traded price of $138 as of January 9, 1985, this price is outside the possible traded range in both the exchanges and OTC market and could not have been traded in either market. S&P Bond Guide, Feb. 1985, at 10. Nor did I find any evidence of OTC contracts (such as International Swaps and Derivatives Association ("ISDA") agreements with counterparties) documenting any such OTC trades at BLMIS.

each unique trade price was tested against the historical trading range for that day.[106]  For the Monthly Time Period, 582 unique trade prices were tested.[107]  Of the 582 unique trade prices, 444 (76%), were outside the actual daily market trading price range showing that the prices listed on the customer ledgers were fictitious.  (*See* **Exhibit 7** – "Convertible Arbitrage IA Business Price Analysis, Monthly Time Period".)[108]

97.    The pricing discrepancies were further tested during the A&B Time Period for the eight A&B accounts to determine if the same anomalies described above occurred.  Of the 1,118 securities with unique prices that were tested, 848 (76%) were outside the actual reported daily market price range.  (*See* **Exhibit 8** – "Convertible Arbitrage IA Business Price Analysis, A&B Time Period".)

98.    This pricing discrepancy is further illustrated earlier in Table 2 with the Macmillan Inc. subordinated debt long position.  The ledger for account 1A0045 shows that $1,411,000 par value of the Macmillan Inc. convertible bond was traded on January 9, 1985 at a price of $138 (Row A and Row B).  However, given that there was no trading of the bond on this date, the IA Business could not have purchased the Macmillan Inc. subordinated debt for $138.[109]

---

[106] A price analysis was also performed for all the common equities that were purportedly shorted for the transactions executed during the Monthly Time Period.  Data was collected from Center for Research in Security Prices, the Daily Stock Price Record-New York Stock Exchange, the Daily Stock Price Record-American Stock Exchange and the OTC Exchange Daily Stock Record.  The investigation concluded that of the 2,244 short transactions for which data was publicly available, 10% of the IA Business purported short common shares transactions were outside the daily price range for the common shares.  (*See* **Exhibit 6** – "Convertible Arbitrage IA Business Securities Short Sale Price Analysis, Monthly Time Period".)

[107] In some instances, historical data was unavailable.  In the cases of the OTC transactions and certain convertible bond transactions, the only publicly available information was the bid-ask and close prices.  Therefore, no conclusive range could be determined.  In instances where publicly available daily high price and low price data were not available, the purported trades were excluded from the analysis.  For example, beginning in 1988, the *Wall Street Journal* no longer provided the daily high price and low price for bonds.

[108] In those cases where the purported IA Business trades were higher or lower than the actual recorded daily market traded prices, the IA Business prices themselves would have been the daily high or low.  In the event that the out of range prices on the IA Business customer statements were the result of an inadvertent typing error (sometimes referred to as "fat fingering"), the IA Business would have had to issue corrected trade confirmations and customer statements with actual market prices.  There is no evidence of any corrections or reissuances to account for these "corrections."

[109] *New York Exchange Bonds Daily Records*, Wall St. J., Jan. 10, 1985.

(iv)     **Convertible securities were purportedly traded by the IA Business even after they were called for conversion**

99.     Many convertible securities have the option for the company to call the security at a predetermined date or at the company's discretion. That is, the company has the right to convert the convertible securities into common shares. In instances where the bond or preferred equity is called, the shares are converted on the record date at a determined amount. Once the security is converted by the company it can no longer be held by an investor. However, there are multiple instances where customer ledgers show that a convertible arbitrage security was purportedly still being held by an IA Business customer despite the fact that the security had already been called.

100.    For example, in the case of Macmillan Inc., the IA Business purportedly closed out its position on March 14, 1985 (Table 2, Row H); however, the subordinated debentures were converted into 1,645,071 shares of common stock in January 1985.[110] This transaction simply could not have been legitimately completed, as reflected on the customer ledger, given that the debentures were retired by Macmillan Inc. well before the March 14, 1985 date when the IA Business purported to have converted the convertible security and to have bought back the common shares.

(v)     **The IA Business did not account for dividend payments or accrued interest on the convertible securities thereby evidencing the fictitious nature of the underlying transactions**

101.    One major component of a convertible arbitrage transaction is that the underlying convertible security pays a regular coupon or dividend. This coupon or dividend is considered in the valuation of the underlying security, which is used to determine whether an arbitrage situation exists. In many instances, however, the IA Business did not account for the coupon or dividend payment during the purported convertible arbitrage transactions.

102.    In the Monthly Time Period, an analysis was performed to identify actual dividend or coupon payments for those convertible securities in which the IA Business customers were purportedly invested as of the ex-dividend date. The dates and amounts were then reconciled

---

[110] *Macmillan Inc.*, Moody's Industrial Manual 1985 at 4083.

to the customer ledgers to confirm whether the IA Business accurately recorded these payments. In most instances, the coupon or dividend payments were not recorded as being paid to the customer.

103.    For example, Textron Inc. Preferred Convertible security paid a quarterly dividend of $0.52/share to record holders as of June 15, 1982. (*See* Figure 4.)[111]  A&B account 1A0045, for example, was an account holder as of this record date and should have received a dividend payment worth $6,592.56 (12,678 shares times quarterly dividend of $0.52/share). However, this payment does not appear on the A&B account 1A0045 ledger.

**Figure 4**



104.    Based upon the foregoing discussion regarding dividend discrepancies, this investigation and analysis further support the conclusion that trading in the IA Business did not occur.

    (vi)    **There is no evidence that the IA Business converted the convertible securities into common shares**

105.    Companies that have publicly traded securities typically use third-party institutions known as transfer agents to keep track of the individuals and entities that own their stocks and bonds. Most transfer agents are banks or trust companies. Although a company sometimes acts as its

---

[111] *Textron Inc.*, Moody's Industrial Manual 1982 at 4493.

own transfer agent, companies that issue preferred convertible stock and convertible subordinated debt must do so through these transfer or conversion agents.[112]

106.    The transfer agent maintains records of pertinent shareholder information, such as names, addresses and number of shares owned.  The transfer agent also administers dividend payments for companies, including dividends to be paid to each shareholder and makes dividend distributions by mailing out dividend checks or through other means.[113]

107.    Given that these agents stand directly between the issuing company and the security holder, operations with these agents would have been essential to carrying out the IA Business's purported convertible arbitrage strategy.  The Securities and Exchange Act of 1934 requires that transfer agents be registered with the SEC, or if the transfer agent is a bank, with a bank regulatory agency.[114]  As a result, the SEC has strict rules and regulations in place for all registered transfer agents that include minimum performance standards regarding the issuance of new certificates and related recordkeeping.

108.    In order to convert shares of preferred convertible stock or convertible subordinated debt into common stock, shareholders must contact the company's transfer agent and:

- Complete and sign a conversion notice provided by a transfer agent, and deliver such notice to the transfer agent;

- Deliver a certificate or certificates representing the shares of convertible preferred stock/subordinated debt to be converted by the transfer agent; and

- If required, furnish appropriate endorsements and transfer documents.[115]

109.    In order to have converted preferred convertible stock and convertible debt into common stock, the IA Business would have needed documentation regarding the conversion of the

---

[112] *See Transfer Agents*, U.S. Securities and Exchange Commission, http://www.sec.gov/answers/transferagent.htm (last visited Nov. 20, 2011).
[113] *Id.*
[114] The Securities Exchange Act § 17A(c), 15 U.S.C. §78 (2010).
[115] Such documentation usually contains most, if not all, of the following information: conversion date, conversion factor (shares or price), total principal amount, total number of shares, name(s) and address(es) of person(s) in whose name(s) the shares required to be delivered on conversion of the shares are to be registered.

securities.  To test whether proper documentation existed, ten purportedly converted securities
were tested as shown in Table 3.[116]

**Table 3**
**Transfer Agents as of Conversion Date**

| Security | Date of Purported Conversion | Transfer Agents for Date of Purported Transaction |
|---|---|---|
| AETNA LIFE & CAS CO PDF CONV $2 | 8/22/1980 | Hartford National Bank & Trust Morgan Guaranty Trust |
| RELIANCE GROUP INC PFD SER B CONV $2.20 | 7/25/1979 | First Jersey National Bank Jersey City |
| EATON CORP PFD SER B CONV $10 | 3/13/1984 | AmeriTrust Co., Cleveland |
| GATX CORP PFD CONV $2.50 | 6/3/1980 | Manufacturers Hanover Trust |
| LEAR SIEGLER INC PFD CONV $2.25 | 1/10/1979 | Irving Trust Co. United California Bank |
| LIBERTY NATL CORP PFD CONV $2.125 | 7/13/1981 | Liberty National Bank & Trust |
| TENNECO CORP PFD $1.60 | 10/24/1979 | Chemical Bank |
| TEXAS GAS TRANSMISSION CORP PREF CONV $1.50 | 12/12/1979 | Chemical Bank |
| TRANE CO SUB DEB CONV 4.000 9/15/1992 | 9/23/1982 | Morgan Guaranty Trust |
| TRW INC PREF SER 1 CONV $4.40 | 12/11/1981 | Morgan Guaranty Trust |

110.    No supporting documentation related to transfer agents or the conversion of these underlying
        convertible securities was identified.  Absent this documentation and/or evidence of
        communication with the transfer agents (which also was not identified), the IA Business

---

[116] Data obtained from Moody's Industrial Manual for each of the respective years indicated in Table 3. The transfer agent for each company is listed by year; data was reviewed for the year in which conversion occurred. *Aetna Life*, Moody's Bank & Finance Manual 1980 at 4303; *Reliance Group Inc.*, Moody's Bank & Finance Manual 1980 at 2478; *Eaton Corp.*, Moody's Industrial Manual 1984 at 296; *GATX Corp.*, Moody's Industrial Manual 1980 at 1156; *Lear Siegler*, Moody's Industrial Manual 1979 at 3898; *Liberty National Corp.*, Moody's Bank & Finance Manual 1981 at 1493; *TenneCo Corp.*, Moody's Industrial Manual 1979 at 3143; *Texas Gas Transmission Corp.*, Moody's Public Utility Manual 1979 at 1942; *Trane Co.*, Moody's Industrial Manual 1982 at 6053; *TRW Inc.*, Moody's Industrial Manual 1982 at 4518.

could not have converted the underlying shares into common stock for any of the thousands of transactions in its convertible arbitrage strategy.

111.   Further, the IA Business consistently did not report on the customer ledgers that it had converted the convertible securities into the required number of common shares based on the correct conversion factor. For example, Cooper Industries, Inc. Preferred Security B was purportedly purchased by the IA Business on May 19, 1980. The adjusted conversion factor at that time was 7.2 common shares per convertible security; the adjustment was effective as of April 1980 due to a 2-for-1 stock split (*i.e.*, prior to April 1980, the conversion factor was 3.6). (*See* Figure 5.) The IA Business, however, did not account for the stock split and continued to use the unadjusted conversion factor of 3.6 shares. As a result, the IA Business customers who purportedly owned Cooper Industries, Inc. Preferred Security B as of May 19, 1980, received half the common shares when the convertible security was converted to common shares in July 1980. As shown in Figure 6, IA Business customer account 1A0045 (formerly 1-00121) received 12,938 common shares when it should have received 25,876 shares based on the adjusted conversion factor.

**Figure 5**[117]



---

[117] *Cooper Industries Inc.*, Moody's Industrial Manual 1980 at 126.

**Figure 6**



MF00084918

112.    Additionally, when the convertible security is converted into common stock, a fractional
        share often remains, as the number of shares-to-par value is not cleanly divisible by the
        conversion factor/price.  For example, if the conversion factor on 100 convertible securities is
        0.3 common shares, upon conversion the owner would receive 33 1/3 common shares.  When
        this occurs, the company will pay out the fractional share in cash on the date of the
        conversion.  The payment value is the fraction of a share multiplied by the trading price for
        the common stock on the date converted.

113.    In instances where fractional shares appeared on the IA Business customer ledgers, they were
        not paid out at the price on the conversion date as required.  For example, the IA Business
        recorded a journal entry of $18.90 on May 7, 1982 for fractional shares of Textron Inc. (*See*
        Table 4, Row D.)  First, the fractional share should not have been reported on the customer
        ledger until the actual conversion date of June 30, 1982.  Second, the price of $18.90 equates
        to a common share price of $23.63 multiplied by the fraction of a share left after converting
        12,678 shares of Textron Preferred at the conversion factor of 1.1 shares of common per share
        of preferred.  As of the conversion date, $23.63 was not the price of the common stock.  The
        value of the fractional share would not be known until the conversion date, which in this case

was June 30, 1982 (Row E in Table 4).  On June 30, 1982, the common share price for Textron was $18.88, which, after converting at the conversion factor of 1.1 shares, would result in a fractional share payment of $15.10, not the $18.90 that the IA Business recorded on May 7, 1982 (*i.e.*, a difference of 25%).

### Table 4
### A&B 1A0045 Account – Textron Inc. Pfd Conv $2.08

|   | Bates | Statement Date | Transaction Date | Long | Short | Security | Price | Debit | Credit |
|---|-------|----------------|------------------|------|-------|----------|-------|-------|--------|
| A | MF00147263 | 5/28/1982 | 29-Apr |  | 7,065 | TEXTRON INC | 23 3/4 |  | $ 167,793.75 |
| B | MF00147263 | 5/28/1982 | 29-Apr |  | 6,880 | TEXTRON INC | 23 7/8 |  | 164,260.00 |
| C | MF00147263 | 5/28/1982 | 30-Apr | 12,678 |  | TEXTRON INC PFD CONV $2.08 | 25 1/8 | $ 318,334.79 |  |
| D | MF00147263 | 5/28/1982 | 7-May |  |  | TEXTRON INC FRACTIONAL SHARES | JRNL |  | 18.90 |
| E | MF00147806 | 6/30/1982 | 30-Jun |  | 12,678 | TEXTRON INC PFD CONV $2.08 | DELV |  |  |
| F | MF00147806 | 6/30/1982 | 30-Jun | 13,945 |  | TEXTRON INC | RECD |  |  |
|   |  |  |  |  |  |  | Total | $ 318,334.79 | $ 332,072.65 |

114.    Based upon the foregoing discussion regarding the IA Business's incorrect conversion processes, this investigation and analysis show that trading in the IA Business did not occur.

### (vii)    Fictitious Convertible Arbitrage Trade Confirmations

115.    Trade confirmations fabricated by the IA Business to support the convertible arbitrage trades were actually prepared backwards as though BLMIS was trading as a principal rather than an agent as represented in the customer account opening agreements.[118]  A good exemplar of this is a purported convertible trade executed for the account referenced in the customer statement depicted in Figure 7.

116.    The purported convertible trade was as follows:

- A purchase of 761 shares of Aetna Life & Casualty $2 Pfd ("Aetna Pfd") on 6/23/80, settlement on 6/30/80 at $83 7/8 per share.  The shares had a conversion factor of 2.25.[119]

---

[118] The customer account opening agreements state that BLMIS was acting as an agency broker in the purported transactions for its customer and not as principal, unless otherwise notified.  Accordingly, the trade confirmations should follow the form and substance of those agreements.  *See, e.g.*, AMF00000624.

[119] The customer statements showed only the settlement dates and not the trade dates; June 30, 1980 was the settlement date for the purported June 23, 1980 trade for Aetna Pfd.  The trade confirmations included the trade dates (*see* Figure 8, Figure 9 and Figure 10).

- Two sales of Aetna Life & Casualty common stock: one for 1052 shares at $39 1/8 and one for 660 shares at $39 1/4, both sold on 6/25/80 and settled on 7/2/80.

- The purported trade was to be an eight week trade that was pre-calculated to generate $3,191 in total profits with a close out date of 9/1/80.[120]

---

[120] *See generally* **Exhibit 9** for examples of Adding Machine Tapes calculating projected profit on the purported trade see MADTSS00401002; for handwritten notes detailing the purported trades see MADTSS00400966 at MADTSS00400966; MADTSS00401003; MADTSS00400994; MADTSS00400966 at MADTSS00400986; MADTSS00400988; MADTSS00400990; MADTSS00400992; MADTSS00400993; MADTSS00401023; MADWAA00497515.

Figure 7[121]



117. This customer statement shows the purported purchase of the Aetna Pfd and short sale of the
Aetna Life & Casualty common stock. However, the purported trade confirmations
fabricated by the IA Business show the opposite. The trade confirmations in Figure 8, Figure
9, and Figure 10, show that the Aetna Pfd was <u>sold</u> rather than bought on 6/23/80, and that the

---

[121] Personal Identifying Information has been redacted throughout this Report and its accompanying Exhibits in
compliance with Fed. R. Bankr. P. 9037 and applicable federal and state law.

Aetna Life & Casualty common stock was bought on 6/25/80 -- the direct opposite of what the customer statement showed for the purported trades.[122]

**Figure 8**

MADF Bernard L. Madoff
INVESTMENT SECURITIES
Established 1960
110 Wall Street, New York, NY 10005

TELEPHONE (212) 825-3910
P & S DEPT. (212) 825-3916
TELETYPE (710) 581-3082
TELEX 235130
WATS (800) 221-2242

| ORIGINATOR NO. | DELIVERED VIA | ACCOUNT NUMBER | O/R | TRANS. NO. | CODES TR | CAP | SETT | TRADE DATE | SETTLEMENT DATE |
|---|---|---|---|---|---|---|---|---|---|
| 0646 | | | | | | | | 6/23/80 | 6/30/80 |

| IDENTIFICATION NO. | CONTRA PARTY | C.H. NUMBER | SPECIAL DELIVERY INSTRUCTIONS |
|---|---|---|---|
| | | | |

[redacted]

"SLD" 761"

| WE | QUANTITY | CUSIP NUMBER | SECURITY DESCRIPTION | NET AMOUNT |
|---|---|---|---|---|
| SLD | 761 | | AETNA LIFE & CASUALTY 2.00 CONV PFD | 63823.82 |

| PRICE | PRINCIPAL | COMMISSION | STATE TAX | INTEREST | SEC. FEE | MISC. |
|---|---|---|---|---|---|---|
| 83 7/8 | 63823.88 | | | | | |

MEMBERS
NASD NSCC SIAC DTC SIPC
MADTSS00400995
COMPARISON DUPLICATE

**Figure 9**

MADF Bernard L. Madoff
INVESTMENT SECURITIES
Established 1960
110 Wall Street, New York, NY 10005

TELEPHONE (212) 825-3910
P & S DEPT. (212) 825-3916
TELETYPE (710) 581-3082
TELEX 235130
WATS (800) 221-2242

| ORIGINATOR NO. | DELIVERED VIA | ACCOUNT NUMBER | O/R | TRANS. NO. | CODES TR | CAP | SETT | TRADE DATE | SETTLEMENT DATE |
|---|---|---|---|---|---|---|---|---|---|
| 0646 | | | | | | | | 6/25/80 | 7/2/80 |

| IDENTIFICATION NO. | CONTRA PARTY | C.H. NUMBER | SPECIAL DELIVERY INSTRUCTIONS |
|---|---|---|---|
| | | | |

[redacted]

"BOT" 1052"

| WE | QUANTITY | CUSIP NUMBER | SECURITY DESCRIPTION | NET AMOUNT |
|---|---|---|---|---|
| BOT | 1052 | | AETNA LIFE & CASUALTY | 42126.62 |

| PRICE | PRINCIPAL | COMMISSION | STATE TAX | INTEREST | SEC. FEE | MISC. |
|---|---|---|---|---|---|---|
| 39 1/8 | 42139.50 | | 00.00 | | | |

MEMBERS
NASD NSCC SIAC DTC SIPC
MADTSS00400997
COMPARISON DUPLICATE

---

[122] *See also* **Exhibit 10** for an example of a trade confirmation.

## Figure 10



118.  As shown on the customer statement (*see* Figure 7), Madoff purportedly purchased 761 shares
      of Aetna Pfd for $83.875.  However, as shown below in Figure 11, the Daily Stock Price
      Record reflects that this security did not change hands in the open market that day.
      Therefore, it would not have been possible for the IA Business to legitimately trade Aetna Pfd
      on that day.

## Figure 11



Daily Stock Price Record, NYSE, Q2 1980

### b. Following the 1992 SEC investigation of A&B, BLMIS transitioned from convertible arbitrage to the split-strike conversion strategy

119.   A&B was an accounting firm at its origin, but developed exclusively into a "private investing" firm in the mid-1980s.[123]  Given that the investing business had increased in relative importance, it became "financially wise" to end the accounting practice.[124]  A&B, however, was never registered as a broker-dealer, an investment company, or an investment adviser.[125]  As of 1992, A&B had three partners: Frank Avellino ("Avellino") was a 50% partner, and Michael Bienes ("Bienes") and Dianne Bienes were each a 25% partner.[126]

120.   A&B first began investing with the IA Business in the 1960s through its predecessor firm, Alpern & Avellino.[127]  Saul Alpern was Madoff's father-in-law and founder of that firm. A&B attracted investor funds by promising guaranteed rates of return (typically 13%-18%) on money collected from individuals and entities[128] and labeling the transactions with

---

[123] Avellino and Bienes Dep. Ex. 02901-02902, July 7, 1992.

[124] *Id.*

[125] *See* Avellino and Bienes Dep. July 7, 1992 (MADOFF_EXHIBITS-03014).

[126] Avellino & Bienes Agreement of General Partnership, executed Aug. 12, 1988 (MBISAA0003076; MBISAA0003079).

[127] Complaint, *SEC v. Avellino & Bienes,* No. 92-CV-08314 (JES) (S.D.N.Y. Nov. 25, 1992).

[128] A&B Loans Detail by Investor (SECSDK0000325-SECSDK0000834); *see also* Avellino & Bienes SEC Complaint.

investors as "loans."[129]  A&B issued letters to investors that specified the rate of return on these loans.[130]  A&B in turn invested customer funds with BLMIS and retained the difference between the "returns" BLMIS paid to A&B and the returns A&B promised to its underlying investors.[131]  At the time of the SEC's investigation in 1992, A&B was one of the IA Business's largest sources of investor monies, funneling hundreds of millions of dollars into the IA Business.[132]

121.    On November 25, 1992, after its investigation, the SEC filed a complaint against A&B and Avellino and Bienes individually, seeking, among other things, a permanent injunction for having unlawfully operated as an unregistered investment company.[133]  To settle the claims against them, Avellino and Bienes entered into a consent decree in which they agreed not to sell securities without a registration statement or to act as an investment company.  In addition, they agreed to pay fines to the SEC totaling $350,000.[134]

122.    Prior to approximately June 23, 1992, A&B maintained IA accounts with the following account numbers: 1A0045, 1A0046,[135] 1A0047, 1A0048, 1A0049 and 1A0050 (the "Existing A&B IA Accounts").[136]  During that time, A&B used these IA Business accounts to invest money pooled from investors.[137]

123.    Documents provided in connection with the SEC investigation of A&B indicated that as of June 18, 1992, A&B owed its investors almost $399,819,455 despite the fact that the purported aggregate equity balance of the Existing A&B IA Accounts only totaled

---

[129] *See, e.g.*, Avellino and Bienes Dep. Exs. 02913; 02925-02934, July 7, 1992.

[130] *See generally* Avellino & Bienes SEC Complaint.

[131] *Interview: Michael Bienes*, Frontline (May 12, 2009), http://www.pbs.org/wgbh/pages/frontline/madoff/interviews/bienes.html; Avellino & Bienes SEC Complaint (MADOFF_EXHIBITS-03058).

[132] BLMIS customer statements for A&B accounts through June 1992.

[133] *See generally* Avellino & Bienes SEC Complaint.

[134] Final Judgment of Permanent Injunction and Other Equitable Relief and Consent Against Avellino & Bienes, Frank J. Avellino and Michael S. Bienes, *SEC v. Avellino & Bienes*, No. 92-CV-08314 (JES) (S.D.N.Y. Nov. 25, 1992).

[135] Account number 1A0046 was in the name of the A&B Pension Plan & Trust.  Account Maintenance File for 1A0046 (AMF00309438-9450).

[136] *See* Arbitrage Portfolio Transaction Reports (MF00545002-MF00545003); Portfolio Management Reports as of June 30, 1992 (MF00011542-MF00011551); *see also* Avellino and Bienes Dep. Ex. 03223, Nov. 20, 1992.

[137] BLMIS customer statements for A&B accounts through June 1992.  *See* Avellino and Bienes Dep., Nov. 20, 1992.

approximately $364 million.[138]  On July 7, 1992, Avellino and Bienes testified to the SEC

that A&B utilized Chemical Bank account(s) to handle investor funds and that the account

balance was typically $2 million to $3 million but never higher than $6 million.[139]  Assuming

that the Chemical Bank account(s) held all $6 million, this meant that A&B had a funding

shortfall of at least approximately $29.8 million ($399.8 million owed to investors less $364.0

million purported aggregate equity balance of the Existing A&B IA Accounts, and less a

maximum of $6 million that could be purportedly held at Chemical Bank at any time) in its

IA Business accounts.[140]

124.    The shortfall explained above demonstrates that a cushion did not exist in June 1992.  In or

about June 1992, the IA Business created an additional account for A&B (the "1A0053

Account") and manufactured fictitious trading in order to account for the shortfall.[141]

Backdated transactions manufactured in the 1A0053 Account were designed to show realized

and unrealized gains from securities and options transactions totaling approximately $65.9

million, which satisfied the shortfall and provided some of the purported cushion.[142]  The

creation of the 1A0053 Account in June 1992 allowed Avellino and Bienes to state, in sworn

testimony provided to the SEC in July 1992, that A&B had a significant "cushion" between

what it owed on "loans" from investors and what it held in capital in its accounts at BLMIS,

which would protect customers from potential losses.[143]  However, there is no evidence that

[138] See A&B Loans Detail by Investor (SECSDK0000325); Arbitrage Portfolio Transaction Reports (MF00545002-
MF00545003); Portfolio Management Reports as of June 30, 1992 (MF00011542-MF00011551); see generally
Avellino & Bienes Dep., July 7, 1992.

[139] Avellino and Bienes Dep. Ex. 02917-02918, July 7, 1992.

[140] See A&B Loans Detail by Investor (SECSDK0000325); Arbitrage Portfolio Transaction Reports (MF00545002-
MF00545003); Portfolio Management Reports as of June 30, 1992 (MF00011542-MF00011551); Avellino and
Bienes Dep. Ex. 02917-02918, July 7, 1992.

[141] 1A0053 Account June 30, 1992 statements (MADTBB02391076-MADTBB02391078; MADTBB02391007-
MADTBB02391017).

[142] 1A0053 Account Nov. 1989 to Dec. 1992 statements (MADTBB02397292; MADTBB02397300;
MADTBB02397304; MADTBB02391086; MADTBB02390998-2391007; MADTBB02391009;
MADTBB02391011; MADTBB02391013; MADTBB02391015; MADTBB02391017; MADTBB02391076;
MADTBB02391078; MADTBB003346469; SECSDK0010189; MADTBB03347804; MADTBB03346114;
MADTBB03345819-5823; MADTBB02391071; MADTBB03345824; MADTBB03345825-5830;
MADTBB03345817-5818; SECSDK0000035; MADTBB03345466-5467; SECSDK0000141, 143-149;
MADTBB03345474-5475; MADTBB03345492; MADTBB03345476-5484; MADTBB03347613-7614;
MADTBB03345495-5496; MADTBB03345485-5487; MADTBB03345497-5503; MADTBB03347604-7605;
MADTBB03345504; MADTBB03114024; MADTBB03114026).

[143] Avellino and Bienes Dep. Ex. 02944-02951, July 7, 1992.

this balance was the result of deposits and investments of funds received by either A&B or by A&B clients.[144]  Instead, the IA Business created fictitious backdated transactions to make it appear that the account had equity sufficient to make up the shortfall.[145]

125.    In addition, generally the IA Business created new account numbers sequentially, based on the date on which they were opened (*e.g.*, 1A0045, 1A0046, 1A0047, etc.).  For example, account 1A0052 (opened for a different BLMIS customer), was created in May 1992 and the first transaction posted to the account was the purported purchase of S&P 100 options on May 1, 1992.[146]  Account 1A0054 (opened for a different BLMIS customer) was created in September 1992, with the first transaction posted on September 22, 1992 for the purported purchase of McKesson Corp. convertible subordinated debt.[147]  Chronologically, the 1A0053 Account would have been created after 1A0052 (May 1992) and before 1A0054 (September 1992), and the 1A0053 Account therefore should not have reflected any transactions as occurring in 1989, 1990, 1991 or at any time prior to its creation in June 1992.  However, the account statements generated for the 1A0053 Account reflected backdated transactions as early as November 1989.[148]  The out of order sequencing of the account creation dates, as well as the backdated trades on the June 1992 customer statement, support the conclusion that the 1A0053 Account was fabricated by the IA Business specifically in response to the SEC investigation.  (*See* Figure 12.)

---

[144] 1A0053 Account June 30, 1992 statements (MADTBB02391076-MADTBB02391078; MADTBB02391007-MADTBB02391017).
[145] *Id.*
[146] 1A0052 Account May 31, 1992 statement (MF00462572).
[147] 1A0054 Account September 30, 1992 statement (MF00454666).
[148] 1A0053 Account November 30, 1989 statement (MADTBB03346469).

**Figure 12**[149]



126.    After the liquidation of A&B many of its former investors reinvested their returned funds
directly with BLMIS, leading to a great influx of new BLMIS accounts.[150]  (*See* Figure 13
below which highlights the dramatic increase in the IA Business customer accounts after the
liquidation of A&B in 1992.)  With the advent of these new accounts, the IA Business
purportedly implemented a new investment strategy.

---

[149] The Transaction IDs ("TRN" column) for the various transactions on this customer statement are out of sequence
with the reported dates of the transactions.

[150] *See* Portfolio Netcap Totals by Group-A&B dated March 31, 1993 (MADTBB03079814-MADTBB03079910).

to the fact that, unlike the market indices, the IA Business accounts <u>do not show a negative annual rate of return in any year during the period</u>.  Because the IA Business SSC strategy was supposedly engineered around the S&P 100, the returns the strategy would have necessarily generated should have been highly, positively correlated to the relevant indices discussed above.  This clearly was not the case.

153.    The lack of volatility in the annual rates of return for the purported IA Business investments, and the fact that the rates of returns never exhibited a negative period, lend further support that the trades in the IA Business did not occur.

### d. Non-convertible arbitrage strategy and non-SSC strategy customer accounts - evidence shows that these transactions were fictitious

154.    As described above, a small number of IA Business customer accounts did not follow either the purported convertible arbitrage strategy or the SSC strategy.  Instead, securities (typically equities) were purportedly purchased, held for a certain duration, and then purportedly sold for a profit.

155.    These accounts also reflected similar trading discrepancies that were identified for those accounts following the purported convertible arbitrage and SSC strategies.  That is, these accounts also showed trading volumes of securities that exceeded the daily market trading volume, purported purchases and sales of securities at prices that were beyond the daily market highs or lows, backdated trades, trade settlement anomalies, and trades on weekends and holidays.  Such trading discrepancies are further evidence that these purported transactions also could not have occurred.

### e. There are no records from the DTC evidencing any legitimate trades occurring from the IA Business

156.    Transfers of securities between licensed brokers are conducted by the DTC through automated book-entry changes to the broker's accounts.[167]  Instead of trading paper stock

---

[167] The Depository Trust & Clearing Corporation ("DTCC") was formed in 1999 by combining the DTC and the NSCC.  The DTCC, through its subsidiaries, provides clearance and settlement for almost all equity, bond,