# EXHIBIT 11

# McDermott
# Will & Emery

Boston  Brussels  Chicago  Dallas  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Rome  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Andrew B. Kratenstein
Attorney at Law
akratenstein@mwe.com
+1 212 547 5695

November 14, 2016

BY ECF, FEDERAL EXPRESS AND EMAIL TO
BERNSTEIN.CHAMBERS@NYSB.USCOURTS.GOV

The Honorable Stuart M. Bernstein
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

Re:   *Secs. Inv. Protection Corp. v. Bernard L. Madoff Inv. Secs. LLC*, No. 08-1789 (SMB);

   *Picard v. Sage Associates, et al.*, Adv. Pro. No. 10-04362 (SMB);

   *Picard v. Sage Realty, et al.*, Adv. Pro. No. 10-04400 (SMB)

Dear Judge Bernstein:

This law firm represents Defendants Sage Associates, Sage Realty, Malcolm H. Sage, Martin A. Sage, and Ann M. Sage Passer, and the Estate of Lilian M. Sage (collectively, the "Sages") in the above-referenced adversary proceedings (the "Sage Adversary Proceedings"). I write pursuant to Local Civil Rule 7007-1 and your Honor's Chambers Rules to request a discovery conference because the Trustee refuses to stipulate that the Sages may use certain deposition testimony from the profit withdrawal litigation in their defense against the Trustee's claims.

During the profit withdrawal litigation, both Bernard L. Madoff and Annette Bongiorno gave deposition testimony that is highly relevant to the Sage Adversary Proceedings. For example, in his plea allocution, Mr. Madoff stated that the fraud in which he engaged began "in the early 1990s" and concerned his "split strike conversion strategy."[1] (Ex. A, Madoff Plea Allocution at 2-3.) In his profit withdrawal deposition, Mr. Madoff further specified that the fraud began in 1992, "which was when I started doing the business in the split-strike, you know, or not doing business in the split-strike." (Ex. B, Madoff Profit Withdrawal Dep. at 63:4-64:15.)

---

[1] According to Mr. Madoff, this strategy consisted of buying a subset ("basket") of common stocks in the Standard & Poor's 100 Index ("S&P 100") before an expected run-up in the S&P 100 and selling the basket after the index had risen. The downside risks of this effort to time the market were purportedly hedged – and the consistent returns achieved – by purchasing put options on the S&P 100 funded by sales of call options on that index. Mr. Madoff admitted that he never made these investments. (Ex. A, Madoff Plea Allocution at 2-3.)

U.S. practice conducted through McDermott Will & Emery LLP.
340 Madison Avenue  New York, New York 10173-1922  Telephone: +1 212 547 5400  Facsimile: +1 212 547 5444  www.mwe.com

The Honorable Stuart M. Bernstein
November 14, 2016
Page 2

This testimony is highly relevant to the Sages because one of the two accounts at issue in the Sage Adversary Proceedings, known as Sage Associates, was not a "split-strike" account until *after* all of the withdrawals at issue ($13,510,000 according to the Trustee) were made. Rather, the Sage Associates account was operated as a regular brokerage account, and was used by the Sages to buy and hold securities long term at the Sages' direction from 1982 until mid-2008. In mid-2008, at the Sages' instruction, the securities were liquidated, the proceeds were distributed to Sage Associates (distributions the Trustee is now seeking to claw back), and only then was the account converted to a split-strike account.

In her profit withdrawal deposition testimony, Ms. Bongiorno confirmed that the Sages' account in fact held real securities. She testified:

> *Q. You mentioned there were customers that had long positions, where you actually held the stock?*
>
> *A. Right.*
>
> *Q. Was one of those customers Sage, S-A-G-E?*
>
> *A. Yes.*
>
> Q. And you --
>
> A. He had that account for awhile and then he became options also.
>
> Q. Right. But he had a long position, where you held those stocks for a long period of time?
>
> . . .
>
> Q. He is. Isn't that -- isn't that correct that those were held --
>
> MS. BROWN: Objection.
>
> BY MS. CHAITMAN:
>
> Q. You can answer the question.
>
> A. Okay. Mr. Sage had an arbitrage account. He had a long position account. And he had an option account, just like Stan Chais. At one point, though, his option account went to -- sorry -- his arbitrage went to option and his long positions went to option. Then he was just doing options there for a while.
>
> Q. When you say his long position went to options --

The Honorable Stuart M. Bernstein
November 14, 2016
Page 3

A. They sold off whatever was in his account, my best recollection --

Q. Right. Right.

A. -- and took that investment and put it into the option account.

*Q. But prior to that those securities were held; isn't that correct?*

MS. BROWN: Objection.

*A. Prior to that? To the best of my knowledge, yes, it was a long position account.*

(Ex. C., Bongiorno Profit Withdrawal Dep. at 254:14-255:25) (emphasis added).

This testimony is obviously important because it confirms that the Sage Associates account was not part of the fraud, and thus the Trustee cannot claw back the profits that were distributed to Sage Associates.

Mr. Madoff also confirmed in his profit withdrawal deposition testimony that the other Sage account at issue, called Sage Realty, engaged in real transactions too. The Sage Realty account was established in 1985 and transacted in convertible bond arbitrage trades. In his profit withdrawal litigation deposition, Mr. Madoff testified that, unlike split-strike transactions, convertible bond arbitrage transactions were actually executed at least prior to 1992. (Ex. B, Madoff Profit Withdrawal Dep. at 37:12-64:15.) The Trustee nonetheless claims that all of these trades were fake.

During a recent meet and confer, in order to minimize the burden and expense of discovery in the Sage Adversary Proceedings, I asked the Trustee's counsel to stipulate that the Sages could use the Madoff and Bongiorno profit withdrawal deposition transcripts in the Sage Adversary Proceedings. I explained that I wanted to avoid having to re-depose Ms. Bongiorno or have counsel re-ask questions of Mr. Madoff at his upcoming deposition (which I understand is being scheduled for December 20, 2016) that Mr. Madoff already answered at his profit withdrawal deposition.[2]

The Trustee's counsel refused. He cited this Court's orders restricting the use of those transcripts to the profit withdrawal proceedings. (Ex. D, Nov. 8, 2016 e-mail from Sabella to Kratenstein; Ex. E, Order Authorizing the Deposition of Bernard L. Madoff With Certain Limitations (Doc. No. 13060) ¶ 6; Ex. F, Order Authorizing the Deposition of Federal Prisoner Annette Bongiorno With Certain Limitations (Doc. No. 13240) ¶ 7.)

---

[2] The Court authorized Mr. Madoff to be deposed in the Sage Adversary Proceedings and others as to certain permitted topics. Chaitman LLP will serve as lead counsel on the first day of the deposition and then other "Participating Customers" (which include the Sages) may seek to depose Mr. Madoff on a second day. (Ex. G, Order Authorizing the Deposition of Bernard L. Madoff (Doc. No. 14213).)

The Honorable Stuart M. Bernstein
November 14, 2016
Page 4

When this Court heard argument on the motion to authorize Mr. Madoff's deposition in the Sage Adversary Proceedings and others, the Trustee made a similar argument. He contended that Mr. Madoff's upcoming deposition testimony should not be used in any adversary proceeding in which the discovery cutoff had passed. The Court rejected that argument, stating, "[B]ut if we're litigating in those particular cases and Mr. Madoff has said, you know, the scheme began on January 1st, 1992, how do I not use that information? . . . Or anybody else for that matter." (Ex. H, Aug. 24, 2016 Hearing Tr. at 23:7-24:18.) Indeed, Federal Rule of Civil Procedure 32(a) provides that a deposition transcript may be used against a party if that party was present at the taking of the deposition and certain other requirements are met. The Trustee's counsel was present at both Mr. Madoff's and Ms. Bongiorno's profit withdrawal depositions.

It would also be inefficient and wasteful to require the Sages to incur the burden and expense of re-deposing Ms. Bongiorno in federal prison in Florida simply to have her confirm her prior deposition testimony. And it would also be inefficient and wasteful to require defense counsel to re-ask questions of Mr. Madoff at his upcoming deposition that he has already answered in the profit withdrawal litigation.

Accordingly, the Sages respectfully request that a discovery conference be scheduled so that this issue can be resolved.

Respectfully,

/s/ Andrew B. Kratenstein

Andrew B. Kratenstein

Enclosures
cc:    (*by ECF and email*)

    David Sheehan, Esq. (dsheehan@bakerlaw.com)
    Nicholas Cremona, Esq. (ncremona@bakerlaw.com)
    Heather J. McDonald, Esq. (hmcdonald@bakerlaw.com)
    Molly Tranbaugh, Esq. (mtranbaugh@bakerlaw.com)
    Michael Sabella, Esq. (msabella@bakerlaw.com)
    Michael Huttenlocher, Esq. (mhuttenlocher@mwe.com)
    Darren Azman, Esq. (dazman@mwe.com)

DM_US 77526651-1.100255.0011