# EXHIBIT 15

Page 1

1        UNITED STATES BANKRUPTCY COURT
          SOUTHERN DISTRICT OF NEW YORK
2
        ------------------------------------X
3                                           :
      In re:                                :
4                                           :
      SECURITIES INVESTOR PROTECTION        :
5      CORPORATION,                         :
                                            :
6                Plaintiff-Applicant,       :
                                            :
7            -vs-                           :   08-01789 (SMB)
                                            :
8      BERNARD L. MADOFF INVESTMENT         :
       SECURITIES, LLC,                     :
9                                           :
                Defendant.                  :
10     ------------------------------------X
                                            :
11                                          :
      In re:                                :
12                                          :
      BERNARD L. MADOFF,                    :
13                                          :
                Debtor.                     :
14     ------------------------------------X
15
16
17                VIDEOTAPED DEPOSITION
18                         OF
19                 BERNARD L. MADOFF
20            (Taken by the Customers)
21            Butner, North Carolina
22             December 20, 2016
23
24   Reported by:  Lisa A. DeGroat, RPR
                   Notary Public
25

Page 14

1 achieved the results I believed they expected."
2     Is that statement 100 percent true?
3   A.  Yes.  However, there's -- if I understand
4 this statement, it said that -- that -- "to falsely
5 give the appearance," implies that I had achieved the
6 results.  When I took the money and I started the
7 strategy, the strategy -- there was nothing in the
8 strategy to give a false impression.
9     In other words, I was the -- you know, I
10 intended to invest the money.  The fact that I
11 invested -- that I couldn't invest it because of
12 market conditions, but then shorted the strategy to
13 the clients, then it was -- it -- it gave the false
14 impression, but that -- it was not my intention when I
15 first developed the strategy or made the commitments
16 to the clients to -- to not invest the money at that
17 time.
18   Q.  Okay.  So, if I understand you correctly,
19 when you developed the split-strike conversion
20 strategy, your intention was to carry it out --
21   A.  Correct.
22   Q.  -- honestly?
23   A.  Correct.
24   Q.  But you didn't have the money to do that,
25 and so you --

Page 15

1   A.  I didn't have the market conditions to do
2 that.
3   Q.  Okay.  So you started sending statements to
4 clients which were not accurate, because they
5 reflected purchases of securities that did not occur?
6   A.  Yes.  That's correct.
7   Q.  Okay.  Now, you understood that this was a
8 fraud on your customers; right?
9   A.  Yes.
10   Q.  And is it your testimony that you never
11 perpetrated a fraud on your customers prior to the
12 initiation of the split-strike conversion strategy?
13   A.  That's correct.
14     MR. SHEEHAN:  Object -- object to the
15 form.
16     THE WITNESS:  I'm sorry.  I didn't hear
17 what you just --
18     MR. SHEEHAN:  I said I objected to the
19 form.
20     THE WITNESS:  Oh.
21     MR. SHEEHAN:  We have an understanding
22 that all objections are preserved, as subject to
23 objections as to form.
24     MS. CHAITMAN:  Right, but what is your
25 objection to that form?  I just want to --

Page 16

1     MR. SHEEHAN:  You're testifying.
2     MS. CHAITMAN:  Okay.  Okay.
3     MR. SHEEHAN:  All right.
4 BY MS. CHAITMAN:
5   Q.  Mr. Madoff, can you tell us in your own
6 words whether you had ever -- prior to the
7 split-strike conversion strategy ever misrepresented a
8 purchase or a sale on a customer's statement so that
9 the customer was misled?
10   A.  Yes.
11   Q.  When?
12   A.  Well, basically after the market crashed in
13 1987, certain customers that were not doing the
14 split-strike conversion strategy, but were involved in
15 a -- in a normal market-hedging strategy, where there
16 were commitments on both my side and the client's side
17 to keep the strategy open, and -- because of the
18 market crash they were forcing me to liquidate part of
19 their -- their strategy in violation of a commitment
20 that -- that they had made to me and to others.
21     That was done, and that triggered in the
22 years after that, which I guess started primarily --
23 that went really from the early '90s on through, you
24 know, 2008, where those clients gave instructions to
25 do some backdating of transactions, and, you know,

Page 17

1 liquidating of securities or -- so on to generate
2 certain losses that they deemed desirable for tax
3 purposes.
4     So I was aware of the fact that those --
5 and, you know -- and told the clients that they were,
6 you know, basically, you know, running into a tax
7 violation problem.  So that had nothing to do with the
8 split-strike conversion, and that was --
9     I don't know if I've answered your question.
10   Q.  Okay.  Well, we've gone into a different
11 subject, but let me, if I may, just come back to my
12 question, and perhaps I misstated it.
13     What I was really asking you -- I'm not
14 asking you whether a client directed you to do
15 something illegal.
16   A.  Right.
17   Q.  Because that would not be a fraud on that
18 client; right?
19   A.  No.
20   Q.  Yeah.
21   A.  That's correct.
22   Q.  Okay.  So I want you to limit --
23   A.  It was a violation for probably the SEC
24 regulations on my part, but it was not a fraud.  It
25 was -- it was the clients that, you know, instructed

5 (Pages 14 - 17)

Page 18

1  what should be done to employees in my firm.
2      Q.   Okay.
3      A.   My employees in my firm.
4      Q.   Okay.  We'll come back to that, but I want
5  you to focus now solely on the situation where you are
6  making a misrepresentation to a client and the client
7  doesn't know the truth.
8      A.   Okay.
9      Q.   Prior to the split-strike conversion
10  strategy did you ever orally or in writing make a
11  misrepresentation to the client where the client
12  didn't know the truth?
13      A.   No.
14      Q.   Are you absolutely sure about that?
15      A.   Yes.
16      Q.   Now, to the best of your recollection do you
17  remember when in 1992 you started to do the
18  split-strike conversion strategy?
19          MR. SHEEHAN:  Object to the form.
20          THE WITNESS:  No.  I would just say it
21  was the early part of '92.
22  BY MS. CHAITMAN:
23      Q.   Okay.  But we can look at statements, and we
24  would be --
25      A.   Yeah.

Page 19

1      Q.   -- able to recognize that --
2      A.   Yes.
3      Q.   -- that -- a statement would show that
4  trading strategy; isn't that true?
5      A.   Correct.
6      Q.   Okay.
7      A.   It should.
8      Q.   Okay.  So is it your testimony that if we
9  found the first split-strike conversion statement,
10  that you would say that that's when the fraud began?
11      A.   When I failed -- well, it's -- I had
12  developed a strategy before '92, the split-strike
13  strategy before '92.  And I might have actually done
14  some transactions, but I was -- it wasn't until
15  sometime after '92, when the market conditions
16  changed, that I was not able to continue doing the
17  split-strike, and that's when the fraud began.
18      Q.   So how would we determine -- what market
19  conditions should we look for in order to determine
20  when you actually stopped buying the positions that
21  were reflected on the statements?
22      A.   Well, you could look for the -- you can look
23  for the transactions and -- well, you would -- you
24  could look at the market conditions that occurred, you
25  know, in '92.

Page 20

1          It was actually -- this started during the
2  Gulf War situation.  I don't remember the exact dates
3  of when I -- when I started or stopped it, but
4  there -- '92 is a ballpark number.
5      Q.   What were the specific market conditions
6  that led to your not actually purchasing the
7  securities that were reflected on the statements?
8      A.   There wasn't enough volatility or really
9  volume to do what I wanted to do for the strategy.
10      Q.   Explain to me what you mean by that.  You
11  mean there weren't enough shares of the securities
12  that you were --
13      A.   It was a combination of not -- the strategy
14  was basically a strategy that required sort of an
15  upmarket, a market that would appreciate.  So at that
16  time the markets were in a very fragile state, because
17  of the -- the Gulf War, and there was -- the recession
18  had already started.
19          So in order for the strategy to work
20  successfully you basically had to have an upward bias
21  in the market for the -- for the basket of securities
22  that were involved in the strategy to move towards the
23  upward strike price of the call options that you sold
24  for the strategy.
25          MS. CHAITMAN:  Okay.  Okay.  Now I'd

Page 21

1  like to mark as Exhibit 3 the transcript of the
2  plea of Mr. DiPascali.
3          (MADOFF EXHIBIT 3 WAS MARKED FOR
4      IDENTIFICATION.)
5  BY MS. CHAITMAN:
6      Q.   Now, Mr. Madoff, I'd like you to -- if you'd
7  look at the transcript, the first page, you can see
8  this is an August 11th, 2009 transcript before Judge
9  Sullivan in the United States of America versus Frank
10  DiPascali.  Do you remember when he plead guilty?
11      A.   Yes.
12      Q.   Okay.  If you'd be good enough to turn to
13  page 44.
14      A.   Uh-huh.
15      Q.   The -- the court is asking Mr. DiPascali
16  to -- to read his plea, and the court says, and I
17  quote, "Let me ask you to read slowly, so that the
18  court reporter can get it down."
19          And then the defendant says, Mr. DiPascali
20  says, and I quote, "I am standing here today to say
21  that from the early 1990s until December of 2008" --
22          MR. SHEEHAN:  Where are you?
23          THE WITNESS:  Excuse me.
24          MS. CHAITMAN:  Page 44.
25          THE WITNESS:  Page 44.

6 (Pages 18 - 21)

Page 34

1    A.   Yes.  David Kugel had nothing to do with
2  these clients.  I don't think he's ever spoke to them
3  at this stage.  What did he say?
4    Q.   Okay.  Okay.
5    A.   David Kugel's work for me was strictly
6  involving arbitrage securities, convertible bond
7  arbitrage securities.  It had nothing to do with --
8  with the trades, the hedged trades that they were
9  doing to get long-term gains.
10     In other words, there's -- David Kugel was
11 hired as an arbitrageur in convertible securities, and
12 that's all he ever was involved in.  He was not
13 involved in -- and he would have no reason to give
14 Annette Bongiorno or anybody else in my firm any
15 instructions to create any trades, because they were
16 not -- because he didn't -- he only dealt in
17 convertible securities.
18     And these people were -- were primarily
19 dealing with, you know, just long positions.  They did
20 have convertible arbitrage accounts, like everybody
21 else did in the very early stages, but most of their
22 money was involved in these long position accounts, as
23 we called them, which was handled by -- by me and by
24 Annette Bongiorno.  And David Kugel, to my knowledge,
25 never touched anything with those trades.

Page 35

1    Q.   Now, with respect to the convertible
2  arbitrage trading that you did for the investment
3  advisory customers from -- from the 1980s, was that
4  all actual trading that was conducted?
5    A.   Correct.
6    MR. SHEEHAN:  Object to the form.
7  Sorry.
8  BY MS. CHAITMAN:
9    Q.   Sitting here today, Mr. Madoff, are you
10 absolutely certain that the convertible arbitrage
11 trading, which was done for your investment advisory
12 customers, was executed trading which was actually
13 performed by your office?
14   A.   Correct.
15   Q.   Okay.  Is there any doubt in your mind about
16 that?
17   A.   No.
18   Q.   Now, did David Kugel report to you with
19 respect to his trading?
20   A.   Yes.
21   Q.   And was his compensation determined based
22 upon his trading performance?
23   A.   Correct.  All my traders were compensated
24 that way.
25   Q.   So tell me how that worked.  Did he have to

Page 36

1  on a periodic basis supply to you reports of his
2  trades?
3    A.   He -- well, he -- you know, he doesn't -- he
4  doesn't have -- the way the -- the way the firm was
5  always operated, which was typical of all firms like
6  ours, market-making or dealer firms, each
7  market-maker, which David Kugel was one of them, that
8  made market in convertible securities, which was
9  really basically all he did.
10     They -- their compensation is based upon a
11 percentage of their net trading profits.  So I,
12 particularly at that time, when the firm was much
13 smaller, was very familiar with what the firm's
14 trading profits were with each trader.
15     And David Kugel was one of a number of
16 convertible bond traders in my firm.  You know, I
17 always monitored what their -- what their long and
18 shorts were, what their profits were and all.
19     And, of course, it was then -- each trader
20 had his -- had his own account that was kept by the
21 bookkeepers in the firm, and that -- and that was
22 Annette Bongiorno -- not Annette Bongiorno.  She had
23 nothing to do with that.
24     That was, you know, handled by the
25 operations people in the firm.  And they got a report.

Page 37

1  We had a report at the end of each month, which was
2  monitored on a, you know, daily basis as to what their
3  profits were.
4    Q.   So let me just understand this.  Was there a
5  system in place where you had the ability to monitor
6  on a daily basis what David Kugel --
7    A.   Yes.
8    Q.   What trades he did?
9    A.   Yeah.
10   Q.   And how often would you monitor that?
11   A.   Pretty much daily.
12   Q.   So you would come into the office and
13 monitor on a daily basis what each of the traders had
14 done the day before?
15   A.   At the time he's talking about, yes.
16   Q.   Okay.  And when you say, "at the time he's
17 talking about," you mean the '70s and the '80s?
18   A.   Well, in -- certainly in the '70s.  You
19 know, in the '80s my sons came into the firm, and
20 the -- the SEC has very specific regulations when it
21 comes to market-making firms.
22     And it's -- the regulation requires there to
23 be a Chinese wall established with the firm, where
24 each trader is only privy to his own trading profits
25 or losses and his positions or risks.

Page 38

1     And there has to be a -- we had two
2 different types of operations. We had proprietary
3 trading, which is trading for the firm's own account,
4 and market-making, which is also for the firm's own
5 account, but involve making a two-sided market in --
6 in securities, particularly convertible securities,
7 which was our specialty at that time.
8     So the -- the trader -- each trader only
9 knows what he is buying and selling. He has no idea
10 what the firm is buying and selling. He has no idea
11 what the firm's -- what those positions are. They're
12 walled off.
13     You even have to have a separate supervisor
14 for each one of those departments. So, for example,
15 in the later years my son -- one son ran the
16 market-making department, supervised that. One
17 firm -- one son managed the proprietary trading side
18 of the firm.
19     And then the -- the only one that was
20 familiar with the overall positions of the firm and
21 the firm's investment account was myself, because I
22 was the only one that handled that.
23     So David Kugel would only be privy, like --
24 like any other trader, to what he was buying and
25 selling, what his profit and loss was, not -- not the

Page 39

1 rest of the firm.
2   Q.   Okay. And if he did trades that were
3 fictitious, is -- was there some -- if he -- if he
4 gave you a false report as to what he had traded,
5 would you have been able to pick that up?
6   A.   Sure.
7   Q.   How?
8   A.   Well, because I was -- it's between those --
9 in the '70s is what he's talking about. You know,
10 I -- I -- the firm was not that large that I wouldn't
11 know -- I knew what was going on everywhere in the
12 firm.
13     So I knew -- I would know whether or not he
14 had -- what he was buying and selling. You know, I
15 could see that the firm had -- you know, had the
16 ability, you know -- we had to supervise -- I had to
17 supervise what the firm's risk was, what their
18 positions were, what their inventory was.
19     So if he was creating trades, as he -- as
20 this states, certainly I would know that the trades
21 didn't -- you know, were fictitious.
22   Q.   How could you tell -- if he gave you a
23 report, which said, I earned X dollars last month,
24 because I did all of these trades, if he put down
25 fictitious trades, how could you check to make sure

Page 40

1 they were real?
2   A.   Because there were trades -- well, any
3 number of ways. Number one, if he created -- if a
4 trader creates a ticket that is wrong, that says he
5 bought stock and sold stock and didn't, then when the
6 delivery -- when the securities were not delivered or
7 not came in, they wouldn't settle.
8     So there would be -- it would be a vacuum
9 between -- you know, because the way the stock market
10 works, when you do a trade, eventually the trades get
11 settled and the delivery is made of the securities and
12 people pay for it.
13     To say nothing of the fact that we monitor
14 what is being bought and sold for the firm on an
15 ongoing basis. So -- so we would know what the
16 exposure of the firm was, what the profitability of
17 the firm was.
18     So a trader -- a trader can't, you know,
19 create a -- now -- nowadays, you know, with large
20 volumes and so on if you have a lot of traders, a
21 trader can put through what they call a wooden ticket
22 or a rogue trade. That's what you hear about.
23     You can do that if the firm is very large.
24 You know, unless the firm has the proper automation,
25 which we certainly had in the later days, you know,

Page 41

1 you would -- you would be able to detect that.
2   Q.   Okay.
3     MR. GOLDMAN:  Bernie, if you get tired
4 or you want to stand up and stretch at anytime,
5 just tell us. Okay?
6     THE WITNESS:  I'm okay.
7     Can -- can I interject something that I
8 think that maybe will -- will clear up this thing
9 with David Kugel?
10     MS. CHAITMAN:  Sure.
11     THE WITNESS:  And this -- because
12 this -- this -- this issue of him creating
13 fictitious trades surfaced originally when you
14 were down here last time, seven years ago or six
15 years ago or whatever it was.
16 BY MS. CHAITMAN:
17   Q.   Okay. When you -- when you said, "you,"
18 you -- you looked at Mr. Sheehan?
19   A.   David Sheehan.
20   Q.   Okay.
21   A.   Yes. Where a -- a scrap of paper was handed
22 to me and to my attorney, Ike Sorkin, at that time
23 that had a handwritten scribbling of a formula with a
24 convertible bond on it that said, for example, X
25 convertible bonds equals X number of shares of stock.

11 (Pages 38 - 41)

Page 42

1       It was a -- it was a -- it was when we were
2  setting up a -- the way we traded convertible bonds,
3  which is typical of any -- any firm like ours, for a
4  client. You know, you buy stock into a trading
5  account, because we deal always as principal.
6       So the stock -- we go out, and we buy --
7  we -- as a market-maker we maintain positions in -- in
8  convertible bonds and also in, you know, the related
9  security for that.
10      And then those securities, if they're
11 allocated to clients after the -- the positions are
12 accumulated, you then break up -- you break up the
13 trade. That may be 100 bonds, and you're going to
14 give each client, for example, ten bonds or 15 bonds
15 and so on.
16      So an instruction sheet is issued to --
17 basically to the operations side of the firm as to,
18 you know, how you allocate a buy and a sell.
19      All right. So Kugel, as one of my
20 convertible bond traders. All right. If the firm was
21 selling -- if -- whether it be from my investment
22 account or from another trader's account, if we were
23 going to -- if I wanted to sell a convertible bond to
24 a client from my firm's trading account or investment
25 account, then, you know, the instructions had to be

Page 43

1  issued to the back office as to how many shares or
2  bonds to -- to transact for a client.
3       So this scrap of paper was an instruction
4  sheet that David Kugel, if he was one of the
5  market-makers in a particular security, would be told
6  okay by me, all right. I want to give this bond to
7  this client and so on.
8       He would write an instruction sheet out to
9  the back office, to Annette Bongiorno or Jodi Crupi,
10 if she was there at the time, that this -- this is how
11 you convert this bond.
12      In other words, this bond -- because the
13 back office are not familiar, not being traders, with
14 what the -- what the formulas are. So at the -- that
15 is probably one of maybe 100 different scraps of paper
16 that -- that would be issued or written by David Kugel
17 or another trader, if there was another trader
18 involved, you know, of what the allocation formula is.
19      Now, at that time, you know, when -- the
20 first meeting that I had with the attorneys down here
21 and my attorney, they showed me this piece of paper.
22 And they asked me, what is this?
23      And I looked at it. And at first I wasn't
24 really sure what it was, because the handwriting was
25 hard for me, you know, to understand. Then I said

Page 44

1  to -- it looks like to me like a formula, and it looks
2  like David Kugel's handwriting.
3       So I -- I explained, just as I explained to
4  you now, what this was. And I said, you'd probably
5  find a lot of them. So they said, well, you know, so
6  he's the one that is -- that is writing this? And I
7  said, yes. It's an instruction sheet.
8       This is not uncommon for -- you know, this
9  is the way the business is done. That -- now, this
10 was not a fictitious trade. It was -- it was just
11 instructing the -- the operations side of the firm
12 what the allocation.
13      It would be no different than if I said, I'm
14 selling to Carl Shapiro, you know, 1,000 shares of IBM
15 that we had bought, you know, as a -- you know, as
16 part of our business. I would -- I would put through
17 an -- an instruction sheet, sell 1,000 shares of IBM
18 to Carl Shapiro.
19      In David Kugel's side, if he was a trader in
20 that particular security, he would issue the same
21 instruction for that. These are not -- there's
22 nothing fictitious about it.
23      So that -- none of that makes any sense to
24 me. And I think that -- that, you know, one of the
25 problems that I had when I, you know, met with both

Page 45

1  the proffer agreement and so on, when I gave my -- and
2  told how the firm operated, there seemed to be sort of
3  a blank stare in the room when I said certain things.
4       And for an example -- now, in fairness to
5  the people that were there, whether it be the trustee,
6  whether it be the U.S. attorney or all the other
7  people and the attorneys and all, the market-making
8  business, the dealer business is -- is a specialized
9  type of business.
10      It is not Merrill Lynch. You know, if you
11 ask the average person how the stock markets work and
12 how Merrill Lynch works, they have no clue. You know,
13 they actually think that every time you buy, for
14 example, a share of stock, the money goes to the
15 company, and the company, you know, invests it.
16      When the average person buys a share of
17 stock, the company gets nothing. It's just all he's
18 doing is buying and selling, you know, from other
19 clients that have the stocks, but people never
20 understood that.
21      The market-making and dealers are a very
22 specialized type of business, and they really don't
23 have a clue. And the best example that I can use is
24 that the U.S. -- the -- the prosecutor at the time
25 asked me, can you please explain the history of the

12 (Pages 42 - 45)

Page 46

1 firm and how you operated?
2　　　And I said, well, when? He says, from the
3 beginning. So I started in 1960, which is when I
4 started the firm, and I went into -- then after I got
5 to a certain period, I said, like in the '70s I became
6 a market-maker, and I, you know, bought stock, and I
7 sold stock for clients, as well as the firm.
8　　　Sometimes I was long stock. Sometimes I
9 shorted stock. And I said the word short, and it was
10 like there was a magic, you know, word that I said.
11 He said, short? And what does short mean?
12　　　And I'm sitting there in a room that has at
13 least three or four SEC people sitting there. So I
14 said, you don't know what short is? And everybody --
15 nobody said anything.
16　　　So I had to explain the shorts. He said, so
17 you're selling stock, and you don't own it? You
18 shorted it? I said, yes. As a market-maker I'm
19 required at times to sell a stock short.
20　　　It's part of my -- my job. I have to -- I
21 am required to make a two-sided market. Meaning I
22 have to make a bid and make an offer as a registered
23 market-maker.
24　　　So, yes, I do short stock for customers. I
25 sell them stock they don't own. Hopefully I'm going

Page 47

1 to buy it back, you know, at a profit, not a loss, but
2 that is the typical way of doing business.
3　　　So, to get back to the -- this issue of
4 David Kugel, when you talk about, you know, him
5 putting instructions to the operations side of the
6 firm, how to allocate a position or a formula, there's
7 nothing unusual about that.
8　　　It's an everyday occurrence in a
9 market-making firm. How or why he would say that he
10 was creating a fictitious trade, I'm sort of
11 dumbfounded. You know, I just -- it doesn't make any
12 sense to me. And the timing is -- is -- doesn't make
13 any sense to me, you know.
14　　Q. Okay. Now, you've just said that you
15 started your business in 1960. Can you tell us the
16 various distinctions that you achieved in the
17 securities industry?
18　　A. What do you mean distinctions?
19　　Q. Well, you were president of the NASDAQ.
20　　A. Oh, you mean the -- my --
21　　Q. Achievements.
22　　A. All right.
23　　Q. You're reading from notes.
24　　A. I'm reading from -- because, you know, my
25 brain is a little bit --

Page 48

1　　　MR. SHEEHAN: Could -- could we mark
2 that note?
3　　　THE WITNESS: -- is fried.
4　　　MR. SHEEHAN: It should be part of the
5 record, if he's going to read from it.
6　　　MS. CHAITMAN: Yeah, yeah.
7　　　MR. SHEEHAN: But you read from it
8 first. We'll mark it afterwards.
9　　　THE WITNESS: Okay. Well, okay. I was
10 chairman of --
11 BY MS. CHAITMAN:
12　　Q. Are these handwritten notes that you've --
13　　A. Yes.
14　　Q. -- prepared?
15　　　Okay. Okay.
16　　A. The reason why I did this, by the way, is
17 I -- I understand that I have to establish my
18 credibility, you know, at this deposition, because I
19 was --
20　　　MR. GOLDMAN: Just read.
21　　　THE WITNESS: I was told that I had no
22 credibility, but apparently, from what I've read
23 in the, you know, cases that I've been reviewing,
24 people that are like David Kugel or Frank
25 DiPascali or other people in my firm, Annette

Page 49

1 Bongiorno, who have been accused and admitted
2 guilt, they seem to be the witnesses that all of
3 a sudden have credibility.
4　　　So -- but I have no credibility, and I
5 don't understand how -- I mean, I admitted that I
6 created a fraud, and for that I can understand
7 why there's some question about whether I have
8 credibility, but since everybody else is
9 establishing their credibility, I feel I have to
10 establish my credibility as well.
11 BY MS. CHAITMAN:
12　　Q. Well, let me ask you something, Mr. Madoff.
13 You've been in prison about seven years?
14　　A. Seven and a half years.
15　　Q. Seven and a half years. And you've had a
16 lot of time to think, haven't you?
17　　A. Unfortunately.
18　　Q. Yeah. And you've been provided with the
19 services of a prison psychiatrist?
20　　A. Yes.
21　　Q. And is it fair to say that you allowed a
22 number of different people who are writers and
23 scholars to interview you?
24　　A. Yes.
25　　Q. Is it fair to say that you at this point

13 (Pages 46 - 49)

Page 50

1  have had a very long time to think about what you did?
2      A.  Uh-huh.
3      Q.  You have to say yes or no.
4      A.  Yes.
5      Q.  Okay.  And do you have any motivation at
6  this point to lie about what you did?
7      A.  No.
8      Q.  Okay.  Tell us what accomplishments you had
9  achieved.
10     A.  All right.  I served as chairman of NASDAQ
11  and the NASD board of directors, chairman of the --
12     Q.  Okay.  And can you just explain for the
13  record what NASDAQ is?
14     A.  NASDAQ is the automated marketplace for the
15  trading of non-listed securities and now listed
16  securities as well.  It's an automated part of the
17  market, like the New York Stock Exchange.
18     Q.  Okay.
19     A.  So I --
20     Q.  And when was NASDAQ formed?
21     A.  NASDAQ was formed in the late '60s, early
22  '70s.  I was one of the founders of NASDAQ.  And then
23  became its chairman and served on the -- the board of
24  directors of NASDAQ for nine years.
25         I also served as chairman on the board of

Page 51

1  the National Association of Securities Dealers, also
2  for nine years, starting in the early '80s through
3  that.
4          I was also founder and chairman of the
5  National Securities Clearing Corporation and
6  Depository Trust.  I was chairman of the International
7  Securities Clearing Corporation.
8          I was chairman of the NASD trading
9  committee.  Chairman of the NASD National Market
10  Design Committee.  Chairman of the National
11  Association for Securities Business -- National
12  Business Conduct Committee, which is a regulatory arm
13  of the -- of the industry.
14         I served as chairman of an SEC Large Trader
15  Reporting Committee.  I chaired -- was -- served as
16  chairman of the NASD Small Order Execution Committee.
17  Chairman of the NASD Surveillance Committee and
18  chairman of an SEC NASD Payment for Order Flow
19  Committee.
20         I was also a member of the Securities
21  Industry Association board of directors, the
22  Securities Industry Association Trading Committee,
23  Securities Industry Association Federal Regulation
24  Committee, Security -- chairman -- a member of the SEC
25  SIAV/SIA Capital Markets Committee.

Page 52

1          I was chairman and member of the SEC
2  Intermarket Trading System Committee, which is the
3  committee that links all of the exchanges, the
4  New York Stock Exchange, NASDAQ and the five regional
5  exchanges.  And I was head of the SEC NASD arbitration
6  committee.  Those were the committees that I served on
7  over the history of my firm.
8      Q.  Did you advise any foreign governments with
9  respect to the establishment of a stock exchange?
10     A.  Yes.  I was -- I served as the liaison and
11  consultant to the London Stock Exchange, the London
12  Futures Exchange, the Singapore Stock Exchange, the
13  Tokyo Stock Exchange, the Frankfort Stock Exchange,
14  the Paris boards and the Moscow Stock Exchange.
15         MS. CHAITMAN:  We have to wait a
16  second.
17         THE VIDEOGRAPHER:  Going off the
18  record.  The time is 9:56.
19         (RECESS FROM 9:56 A.M. TO 10:16 A.M.)
20         (MADOFF EXHIBIT 5 WAS MARKED FOR
21  IDENTIFICATION.)
22         THE VIDEOGRAPHER:  Back on the record.
23  The time is 10:16.
24  BY MS. CHAITMAN:
25     Q.  Mr. Madoff, we've taken a break, and do you

Page 53

1  remember where we were when we were interrupted?
2      A.  Yes.  We were -- I had listed the number of
3  exchanges that I was advising on building new trading
4  platforms, and I listed, you know, basically London,
5  Singapore, Tokyo, Frankfort, Paris and Moscow.
6          This was basically partly at the request of
7  the SEC, who was asked by these various exchanges if,
8  in fact, they could have me willing to -- to travel
9  over there to consult with them on building a platform
10  that was similar to the NASDAQ platform that I was one
11  of the ones that designed that platform for -- for
12  NASDAQ.
13         And the SEC had a policy basically where
14  they would send up, you know, teams of employees to
15  come up -- basically compliance people, come up to
16  watch us into our trading room to witness us trading
17  on a daily basis and looking at the operations side of
18  the firm and the automation side of the firm.
19         So they would -- we did that for a number of
20  years, where they came and watched us trade, and we
21  consulted with them.  So --
22     Q.  Now, when you say, "they," you mean people
23  who were employed by the SEC --
24     A.  Yeah.  We had --
25     Q.  -- would come to your offices?

14 (Pages 50 - 53)

Page 54

1    A.   The past four chairmen of the SEC have all
2  been up in my office, watching us trade and meeting
3  with us, as well as all of these foreign exchanges.
4        As a matter of fact, the -- the NASD used
5  our -- during the 9/11 crisis the SEC and the NASD
6  asked us, would we allow the NASD to -- to operate
7  their backer facility out of our backer facility that
8  we had in Queens, because that's the -- everybody was
9  having problems because of the -- you know, the -- the
10  bombing out of the -- the plane crashing into the
11  buildings.
12       So the NASD for a period of, I guess it was,
13  three months used our facilities to back up their
14  trades, and also their compliance people sat in my
15  office for a period of months, operating, you know,
16  because they didn't have -- their offices were
17  destroyed.
18    Q.   Now, Mr. Madoff, I think you know that the
19  trustee has taken the position in court he has not
20  conceded that you ever did any legitimate trading.
21  Can you explain to us -- starting in 1960 and then
22  ending on December 11th, 2008 can you explain to us
23  the volume of trading that you did in various periods
24  of time and the number of employees whose job was to
25  conduct real trades?

Page 55

1    A.   Well, when I started my firm in 1960, it was
2  basically myself.  And I operated at that time out of
3  my father-in-law's accounting office, because I was in
4  law school at the time.  So in those days it was very
5  common for small brokerage firms to operate.
6        As a matter of fact, I started with $500 of
7  capital.  And that was a small amount even by the
8  SEC's standard during that time.  So I was required to
9  meet with the New York office of the SEC to explain
10  how I basically had the nerve to present a handwritten
11  balance sheet with $500 cash assets and no
12  liabilities.
13       And, you know, so they wanted to make sure
14  that I was real.  And I started with the $500 of -- of
15  capital, which in those days didn't require much,
16  because I was -- my plan was just to do a small retail
17  business basically with my family as clients.
18       That, you know, eventually grew from a
19  one-man operation to, I guess, you know, 200 some odd
20  people here and in -- in London in 2008.
21       I started this small retail firm.
22  Relatively unsuccessful the first couple of years,
23  because I ran into the Cuban missile crisis, and the
24  marketplace collapsed in 2000 -- in 1962.
25       Required me to borrow $30,000 from my

Page 56

1  father-in-law in the form of -- of municipal bonds to
2  recapitalize my firm, which I paid back, you know, a
3  year or so later.
4        And then gradually just -- and then became a
5  market-making firm in the '70s, early '70, and became
6  a market-making firm for the rest of the balance of my
7  50 years in the business.
8        At one -- we -- at the -- by the time we
9  were finished in 2008 the firm was operating -- was
10  executing a few 100,000 trades, up to 600,000 trades a
11  day at the high, but we were averaging about 300,000
12  transactions a day, and we represented ten percent of
13  the United States' volume in -- in transactions.
14    Q.   Now, we're talking about legitimate
15  transactions?
16    A.   All market-making were legitimate
17  transactions.  The -- and the firm was operating
18  basically as -- primarily most of the time as a
19  market-making and proprietary trading firm.
20       It was -- the investment advisory firm
21  really came into -- you know, into being on a gradual
22  basis, and then was my undoing basically in the early
23  '90s, because of a problem that occurred originally in
24  '80 -- as I say, the crash in '87, but perpetuated a
25  fraud that started, as I said, in the '90s, which was,

Page 57

1  you know, a disaster.
2    Q.   And when -- the fraud in the '90s you're
3  referring to is the split-strike conversion?
4    A.   Correct.
5    Q.   Okay.  Now, can you just briefly explain
6  what the difference is between market-making and
7  proprietary trading?
8    A.   Well, market-making is -- in order to be a
9  market-maker, according to SEC and NASD regulations,
10  you have to maintain an inventory -- trading inventory
11  and making a two-sided market.  In other words, you --
12  you post bids and offers to the -- to the market in
13  general.
14       Originally that was done in the
15  over-the-counter market through what was called pink
16  sheets, where they were daily published bids and
17  offers of the brokerage firms in the United States,
18  listing what you were willing to buy and sell
19  securities.
20       And you had to be ready to buy and sell
21  securities, whether either long or short, for -- for
22  the market in general or for your clients.
23       Then with the development of NASDAQ, which
24  was an -- which was the first automated system,
25  basically we automated the pink sheets.

Page 82

1　IDENTIFICATION.)
2　　　MS. CHAITMAN: Oh, you know what? I'll
3　give this to the witness, and I'll give this to
4　you.
5　　　THE WITNESS: I already have a copy.
6　　　MS. CHAITMAN: I'm sorry?
7　　　THE WITNESS: I have a copy of this
8　one.
9　　　MS. CHAITMAN: You can just give it to
10　the reporter.
11　　　MR. GOLDMAN: David, here is one you
12　can look at.
13　　　MR. SHEEHAN: I'm fine. I brought my
14　own.
15　　　MR. GOLDMAN: Oh.
16　　　THE WITNESS: Are you still awake?
17　　　MR. SHEEHAN: Always.
18　　　THE WITNESS: The last time we were
19　together, I had a meeting with you, you fell
20　asleep during my testimony.
21　　　MR. SHEEHAN: Yeah, you warned me about
22　that. I remember that exchange.
23　　　THE WITNESS: That's okay. I --
24　　　MR. SHEEHAN: You told me the SEC fell
25　asleep in that meeting too. I remember that.

Page 83

1　　　THE WITNESS: I -- I can -- I can put
2　people to sleep. The chairman of the London
3　Stock Exchange fell asleep during one of my
4　meetings with him, but he said it was jet lag.
5　You don't have jet lag. So --
6　　　MR. SHEEHAN: I have no jet lag.
7　BY MS. CHAITMAN:
8　　Q.　Mr. Madoff, I had sent you in advance of the
9　deposition a copy of Mr. Dubinsky's report. Have you
10　had a chance to review it?
11　　A.　Yes, I have.
12　　Q.　Okay. And did you agree with his
13　conclusions?
14　　A.　Some of them.
15　　Q.　Okay. Did you agree with all of them?
16　　A.　No.
17　　Q.　Okay. Did you find that overall there were
18　some mistakes that Mr. Dubinsky made?
19　　　MR. SHEEHAN: Objection as to the form.
20　　　THE WITNESS: Yes.
21　BY MS. CHAITMAN:
22　　Q.　Okay. Before we go into detail with respect
23　to the report can you tell me some of the mistakes
24　that you found with Mr. Dubinsky's approach?
25　　A.　Well, first of all, the majority of the

Page 84

1　report had to deal with the split-strike conversion
2　trades, which I was sort of at a loss for -- and this
3　report, from what I understand from -- cost a lot of
4　money to -- to produce.
5　　　And I had from day one acknowledged that
6　there was no split-strike trades being done and that
7　there was a fraud. So I couldn't understand why so
8　much money was --
9　　　Look, let me just say that from the time
10　that I plead guilty for this -- for this fraud, I've
11　had to live with the guilt of -- of knowing what I
12　did.
13　　　All right. And my decision basically to --
14　to plead guilty and to not go to trial was to be able
15　to recover as much money as possible to my -- for my
16　clients.
17　　　And the -- you know, rather than go to -- to
18　trial, which I knew that I was guilty of, and put my
19　family through a -- the horror of, you know, what
20　would -- what would occur with the trial, I -- I
21　decided that the best thing that I could do would be
22　to plead guilty, take my sentence and do everything
23　that I could to recover the money for the clients, who
24　I defrauded.
25　　Q.　Let me just interrupt you there.

Page 85

1　　　When you saw in -- in 2008 that the economy
2　was collapsing, and you had -- you had out-of-ordinary
3　redemptions in 2008; isn't that true?
4　　A.　Yes.
5　　Q.　Okay. Would you say that the redemption
6　demand was extraordinary or --
7　　　MR. SHEEHAN: Object to form.
8　　　THE WITNESS: Well, yes. I mean, look,
9　unfortunately or fortunately, however you want to
10　look at it, my commitment to the people that I
11　took the money from for the split-strike was that
12　they could have their money back at anytime.
13　　　In other words, most hedge funds do
14　not -- do not allow people to withdraw their
15　money. They have what they call lockup periods.
16　They -- they say that you have to give them 90
17　days notice, sometimes six months notice before
18　you can get your money back.
19　　　Because of the way the split-strike
20　strategy was designed there was no reason to have
21　a lockup period if, in fact, I was doing it the
22　way I intended to do it originally.
23　　　So that people that gave me money,
24　whether it be an individual or whether it be a
25　hedge fund, to invest, had the ability to call me

22 (Pages 82 - 85)

Page 86

1  up and say, you know, that they wanted their
2  money back within the settlement period of three
3  days or four days.
4       So when this -- when this bank run
5  occurred with the crisis in 2008, when everybody
6  thought the world was coming to an end, the
7  market was -- was crashing, because of the
8  Lehman -- you know, first Bear Stearns and then
9  the Lehman collapse, everybody needed money.
10      So I was one of the few places that
11  they could -- that a hedge fund could go to -- to
12  demand their money back and not have to wait with
13  a lockup period. So everybody was calling me up,
14  saying, we want -- we need the money, you know,
15  to meet margin calls elsewhere on Wall Street.
16      They needed money back to meet their
17  margin calls on Wall Street. So send me my money
18  back and liquidate the position, and I'll send it
19  back to you to reinvest as soon as things calm
20  down.
21      So I was the -- the one place that they
22  could go to get the money. So I started getting
23  everybody calling me up, you know, send me 500
24  million, send me a billion dollars back. And I
25  did. I started sending the money back.

Page 87

1       But, obviously, you know, I couldn't
2  keep doing that, because, you know, of the -- the
3  nature of -- of the Ponzi scheme. So I knew
4  that -- that the game was over.
5       As it turns out, I was --
6  BY MS. CHAITMAN:
7       Q.  If I could just interrupt you. Do you
8  recall approximately how much money you did send back
9  to customers in 2008?
10      A.  Close to six billion dollars.
11      Q.  Six billion. Okay.
12      A.  But I knew that -- that it was over for me,
13  and --
14      Q.  At that --
15      A.  As it -- as it turns out, I was mentally --
16  I was in a mental state that I was -- I could no
17  longer continue with -- anyhow. So it was almost like
18  a relief to say, this is it.
19      I just can't continue this charade any
20  longer. And that's what -- that's what caused me to
21  acknowledge to my family that I had been committing
22  this fraud.
23      Q.  Okay.
24      A.  So, to continue, I decided to plead guilty
25  to this. And when -- before the sentencing my

Page 88

1  attorneys pleaded with me to cooperate with the
2  government.
3       The government wanted -- the prosecutor
4  wanted me to -- to plea bargain with them to, you
5  know, make some sort of a deal by providing
6  information as to who else was involved in this fraud.
7       I mean, the belief was that I couldn't be
8  doing this all myself, that there had to be other
9  people involved in this fraud. So -- because, look,
10  nobody could understand -- you know, it seems that for
11  the past eight years nobody can figure out why did
12  Bernie Madoff do this?
13      There have been books written about this.
14  Every reporter that's called me, every academic, you
15  know, that's called me from every business school
16  literally in the world, everybody says, why would
17  Bernie Madoff commit the largest fraud in history?
18      Why -- he had a very successful business
19  that was the envy of everybody on Wall Street. He was
20  on all of these committees. He was supposedly boy
21  wonder, of course, you know, of Wall Street at that
22  time.
23      Why would he do this? The SEC was
24  dumbfounded. You can speak to any of the past
25  chairmen over the past eight years and ask them, would

Page 89

1  Bernie Madoff do this? You know, they would all look
2  at you as though there was something wrong with you.
3       And that's what everybody wanted to know.
4  It didn't make any sense. There had to be something
5  else that created this problem. Was he blackmailed?
6  Was he, you know, involved with -- you know, with the
7  Russian mob? Was he involved with drug dealers?
8       Something happened, you know. You don't --
9  you don't -- you know, and when I said -- you know,
10  when I gave explanations for it, nobody really
11  understood it, you know, but I knew, you know, what
12  happened.
13      I knew, yes, there were people involved that
14  put me in this situation. That being said, it was my
15  fault. I can't blame anybody for -- for what
16  occurred. I mean, I did this knowingly.
17      I was not blackmailed by any -- was not
18  involved with any mob thing. I made a tragic error of
19  judgment that was precipitated by a number of clients
20  that, you know, put me in this situation.
21      That being said, there was not a gun to my
22  head. You know, I could have refused to accommodate,
23  you know, some people that I tried to accommodate.
24  And -- you know, so, therefore, I have the
25  responsibility.

23 (Pages 86 - 89)

Page 90

1    So my decision at that time was not to make
2 a plea bargain. I was convinced that I could get the
3 money back that was involved that people lost. I
4 couldn't get the profits back, for sure, but I
5 certainly felt I could recover the principal, you
6 know, back.
7    So -- and I knew that my clients had
8 withdrawn -- many of them over the earlier years
9 before the fraud started that they had -- they had
10 made and -- and withdrew legitimate profits over the
11 years.
12    So I felt that while people were not going
13 to make an average annual return of 12 percent, as
14 they thought that they made, they certainly would --
15 would do all right, and I certainly would be able to
16 recover everyone's principal.
17    So when I told my attorneys that, Ike
18 Sorkin, I said, look, I'm going to recover everybody's
19 money, you know, you know, but I -- I have to do this
20 my way. I can't -- I can't establish a plea. I don't
21 want to make any deal.
22    I said, I'm the only one that really has the
23 knowledge of what happened and what people did to put
24 me in this situation and the wrongdoing that certain
25 people were involved in, I said.

Page 91

1    And if I go to these people and -- which
2 I've already done to a certain extent anyhow -- and
3 threaten them with -- you know, with their complicity,
4 I said, I'll get the money back. Now, nobody believed
5 that I could possibly do this.
6    MS. CHAITMAN: We're just running out
7 of the tape. So we have to --
8    THE WITNESS: Okay.
9    MS. CHAITMAN: -- take a break.
10    THE VIDEOGRAPHER: Okay. This ends
11 media number one in the deposition of Bernie
12 L. -- Bernard L. Madoff. Going off the record.
13 The time is 11:12.
14    (RECESS FROM 11:12 A.M. TO 11:27 P.M.)
15    THE VIDEOGRAPHER: Back on the record.
16 This begins media number two in the deposition of
17 Bernard L. Madoff. The time is 11:27.
18 BY MS. CHAITMAN:
19    Q.    Mr. Madoff, we've been --
20    A.    Okay. I --
21    Q.    -- discussing a few other things, but I want
22 to come back, if I may, to the Dubinsky report.
23    A.    Right.
24    Q.    And my question is: Are there some
25 fundamental errors that you feel Mr. Dubinsky?

Page 92

1    A.    Yes.
2    Q.    Okay. Let's -- let's go through them one at
3 a time.
4    A.    Okay. All right. Basically what -- well,
5 I'd like to say is that I would -- I'm not going to
6 get involved in his -- the majority of the report that
7 deals with the split-strike conversion trades or
8 whether or not the trades were executed or not,
9 because the -- I have no objection to -- I can't find
10 fault with what he -- what his determination was,
11 because I was not executing the trades.
12    So there's no point in me, you know,
13 evaluating what he says was right or wrong. There may
14 be errors in there, but it doesn't matter. The fact
15 was the errors that I found were -- had to deal with
16 the beginning of the report dealing with the
17 convertible -- the trading that took place before
18 1992, which basically involved the convertible bond
19 arbitrage transactions.
20    So, first of all, let me start by saying
21 that it was quite -- I understand that his -- from his
22 CV that he has a very good CV. All right. In other
23 words, he seems to be -- have his references of fraud
24 reporting or -- I don't find any fault with that. He
25 seems to have a lot of experience.

Page 93

1    That being said, it became very obvious to
2 me that his knowledge of the market-making and the
3 dealer markets and the over-the-counter trading,
4 whether it be convertibles or so on, there -- he had
5 very little experience in that.
6    And that's not a great surprise to me,
7 because it's sort of a specialized marketplace. And
8 unless, you know, you -- you have firsthand experience
9 of how market-makers operate, how the dealer market
10 works and how the trading of convertible bonds takes
11 place, you know, that's a specialized kind of
12 marketplace.
13    And he had things that were really wrong.
14 For example, he makes the statement that Madoff sent a
15 confirmation to a client, where he -- you know, the
16 client -- he says that the client bought stock or sold
17 stock, which was opposite of what happened.
18    In other words, typically when a retail
19 client gets a confirmation from Merrill Lynch, for
20 example, it states the client bought IBM at a price or
21 sold IBM at a price.
22    When a dealer sends a confirmation to a
23 client, it says, we bought, we sold. Meaning the
24 dealer bought or sold to the client. So, for example,
25 there's a confirmation, and I have a -- a copy of one

24 (Pages 90 - 93)

Page 94

1  of our confirmations.
2      Well, I don't need that.  In other words,
3  our confirmation says we bought.  That means Madoff
4  bought for the customer or from the customer or sold
5  to the customer.
6  Q.   Okay.  You know what?  I don't know if this
7  is going to help you, but --
8  A.   Here is --
9  Q.   Okay.
10 A.   Here is a confirmation.  There's a
11 confirmation --
12     MR. SHEEHAN:  Let her mark that.
13     MS. CHAITMAN:  I will.
14     THE WITNESS:  It says in the box, "We
15 sold."  All right.  Or it would say, we bought.
16 "We," referring to the firm.  Madoff.
17     Now, if we had said you bought or you
18 sold, that would be the customer bought.  You
19 know -- you know what I'm saying?
20     MR. SHEEHAN:  Uh-huh.
21     THE WITNESS:  All right.  This is a
22 standard dealer confirmation.  It also has on
23 here codes, the transaction code and a capacity
24 code.  Meaning that it has a number.
25     Meaning what is -- what -- what

Page 95

1  capacity are we operating?  Where -- on the back
2  of the confirmation it says the capacity -- the
3  transaction is transacted over the counter in
4  New York and so on.  It also has a capacity code,
5  which is trading as principal or agent and so on.
6      Dubinsky -- okay -- is used to seeing a
7  retail confirmation, which would have the
8  opposite of that.  So he makes a big point in his
9  report of saying that Madoff reflected this wrong
10 for the customer.
11     All right.  He says that, you know --
12 now, that's -- there's -- nobody that was
13 familiar with the dealer markets would make that
14 kind of a statement.  It's -- it's -- quite
15 frankly, it's an embarrassment, you know, to --
16 to put that in the report.
17     All right.  He then says that it --
18 this was in violation of his agreement with the
19 customer to act as agent.  If you look at the
20 agreements that we have with our clients, and
21 there's a whole series of when a customer opens
22 an account agreement, where there's a trading
23 authorization and so on, it says that Madoff,
24 meaning Bernard L. Madoff, the client is giving
25 Madoff -- is appointing Madoff his agent to

Page 96

1  transact business for the customer.
2      So it says Madoff is the agent for the
3  customer.  It doesn't say that -- you know, so
4  that means that Bernard Madoff, myself, when --
5  he's authorizing me as the only person that is
6  authorized to transact the business with the
7  firm.
8      So the firm is transacting business as
9  principal for their own account, which it clearly
10 states that on the information.  He -- this
11 totally confused him for some reason.
12 BY MS. CHAITMAN:
13 Q.   Mr. Madoff, can I just stop you for a
14 second.
15     I'm going to show you a statement, but if --
16 if a -- if a customer's statement says bought 100
17 shares of IBM --
18 A.   That means the customer bought it on the
19 statement.  The statement is showing it as the
20 customer bought.  Okay.  The statement is assuming the
21 customer -- that he's bought it from Madoff.
22     He knows it, because Madoff is sending the
23 confirmation -- is sending the statement to the
24 customer, saying, you -- he's reflecting the
25 customer -- what the customer bought and sold.  It's

Page 97

1  not reflecting who he --
2  Q.   Okay.
3  A.   -- bought and sold it from --
4  Q.   Okay.  So you're --
5  A.   -- because we already know that.
6  Q.   You're distinguishing between the
7  confirmation and the statements?
8  A.   The statement -- yes.  The statement is --
9  was -- the statement only shows a transaction on the
10 settlement date.  All statements are operated that way
11 with every brokerage firm.  The confirmation shows
12 both the trade date and the settlement date.
13     MS. CHAITMAN:  Okay.  Let me mark as
14 Exhibit 8 the document to which you've been
15 referring.
16     (MADOFF EXHIBIT 8 WAS MARKED FOR
17 IDENTIFICATION.)
18 BY MS. CHAITMAN:
19 Q.   And if I can just summarize this, this is
20 dated -- the trade date is October 14th, 2005.  The
21 settlement date is October 19th, 2005.  And it says --
22 you've crossed out the account number, but it says,
23 "Sold" -- "we sold 42 shares" --
24 A.   To the customer.
25 Q.   -- "of Wells Fargo"?

25 (Pages 94 - 97)

Page 98

1    A.  To the customer.  Right.
2    Q.  Okay.  So, "we," is Bernard L. Madoff?
3    A.  Right.
4    Q.  So -- so let me just understand something.
5  So if the customer was buying 42 shares of Wells
6  Fargo, you wouldn't go into the marketplace and -- and
7  buy it for the customer?
8    A.  Well, we -- we could, but we buy it -- we'd
9  go into the marketplace and buy it for our own account
10 and then resell it to the customer.
11    Q.  Okay.
12    A.  That's how principal trades work.
13    Q.  Okay.  As a general statement with respect
14 to the investment advisory customers --
15    A.  Uh-huh.
16    Q.  Now, obviously from whenever in 1992 you
17 stopped executing split-strike trades, there weren't
18 any purchases and sales?
19    A.  That's correct.
20    Q.  So --
21        MR. SHEEHAN:  Object to the form.
22 Sorry.  What I'm going to do in the future is
23 just say form or object.
24        MS. CHAITMAN:  That's fine.  It doesn't
25 matter.

Page 99

1        MR. SHEEHAN:  I don't want to interrupt
2  the flow.
3        MS. CHAITMAN:  Yeah, that's all right.
4  BY MS. CHAITMAN:
5    Q.  I want to exclude the period after you
6  stopped executing trades that were reflected on the
7  statement.  So whenever that was.  Okay.  Whether --
8  you know, whatever month of --
9    A.  Okay.
10    Q.  -- 1992 it was.  Let me take the time before
11 that.
12    A.  Yeah.  Well, he's -- the Dubinsky report
13 that was making the statement of a trade that was a
14 convertible bond trade that was actually made.  So the
15 example he's using -- he's not talking about a
16 split-strike.
17        He's talking -- he's saying that -- on the
18 convertible bond trade didn't really exist, because
19 Madoff's confirmation is incorrect.
20    Q.  Okay.
21    A.  So --
22    Q.  So let me -- so let me just try to
23 understand something.  I want to take the period -- I
24 want to limit my questions and your answers to the
25 period when you -- before the split-strike fraud

Page 100

1  began.
2    A.  Correct.
3    Q.  Okay.  So we're going to go earlier than
4  whatever date that was in 1992, when the split-strike
5  trades were not executed.
6    A.  And the Dubinsky report that's making this
7  statement is referring to a convertible bond trade
8  that was in the period that you're talking about.
9    Q.  Okay.  So as to the convertible bond trades,
10 is it generally true that the customers were buying
11 from Madoff and selling to Madoff?
12    A.  Correct.  From Madoff's inventory that he
13 already had or that he just bought or sold.
14    Q.  Is -- is that true for everyone in the --
15 if -- if I take the convertible --
16    A.  Operating as a dealer.  Yes.
17    Q.  So with your investment advisory customers,
18 who were doing convertible arbitrage --
19    A.  Uh-huh.
20    Q.  -- their transactions always were with
21 Madoff?
22    A.  Correct.
23    Q.  So --
24    A.  All of our customers -- we always traded
25 for --

Page 101

1    Q.  From your own inventory?
2    A.  Other than theoretically in options, we
3  traded from our own inventory.
4        Now, again, a dealer operates -- you -- a
5  customer may tell the -- we may decide to sell stock
6  to a customer or buy stock from a customer.
7        Now, we may already have that stock in our
8  inventory, and we're selling it to the customer from
9  inventory or the customer may -- we may not have the
10 stock in inventory.
11        So we have to go out and buy it into -- from
12 Wall Street, from the marketplace, into our inventory
13 and then resell it to the customer.  So that might
14 happen over a period of the same day or it might
15 happen over a period of a week and so on.
16        Which brings me to the next point.  Okay?
17 That --
18    Q.  Can you -- can you remember that?  Because I
19 have a question about this.
20    A.  Okay.  Go ahead.  Then give me that then.
21    Q.  Give me a word, so I can remind you about
22 your next point.
23    A.  I'll remember.
24    Q.  You promise?
25    A.  Yes.

26 (Pages 98 - 101)

Page 102

1  Q.  Okay.  So -- so let's say that in the
2  convertible arbitrage strategy you had a need for
3  5,000 shares of IBM, because you were going to sell
4  them to the convertible arbitrage customers.
5  A.  Right.
6  Q.  Okay.  Mr. Dubinsky was looking for the
7  purchase of 5,000 shares of IBM on a specific date in
8  the market; right?
9  MR. SHEEHAN:  Objection.
10  THE WITNESS:  Uh-huh.
11  BY MS. CHAITMAN:
12  Q.  Is that what he should have been doing?
13  A.  I'm not sure I understand your question.
14  Q.  Okay.  Well, let me start it over again.
15  Dubinsky made the point in several instances
16  that with the convertible arbitrage strategy the
17  statements all together showed more purchases of a
18  particular security than he could find records for --
19  A.  Okay.
20  Q.  -- on the New York Stock Exchange.
21  A.  Okay.  All right.  So that's a -- that's a
22  different subject, but -- all right.  He -- if
23  we're -- he -- what Dubinsky was -- was trying to
24  establish or -- was that the -- the number of bonds
25  that we -- let's say convertible bonds, because we're

Page 103

1  talking about convertibles, because we're referring to
2  bonds rather than stock.
3  Q.  Okay.
4  A.  Okay?  So Dubinsky is claiming that if we
5  show on a confirmation or in a customer account that
6  we sold stock -- we sold stock to a customer or
7  bonds to -- to a customer, that he looks to try and
8  establish that there weren't enough bonds that
9  actually traded in the marketplace at the time that we
10  claim that we bought the bonds for the customer.
11  All right.  So the way he researches that is
12  he looks on the New York Stock Exchange, you know,
13  number of bonds that traded on the New York Stock
14  Exchange, and shows that that was, let's say, 100
15  bonds, and Madoff bought 200 bonds for a customer.
16  So, therefore, he couldn't have possibly
17  bought 200 bonds for a customer, because only 100
18  bonds traded on the -- on the New York Stock Exchange.
19  All right.  Now, the -- the fallacy of that
20  is that, number one, convertible bonds, which is what
21  he's researching here, do not trade on the New York
22  Stock Exchange.  They trade over the counter.
23  And to demonstrate that I happen to -- I
24  brought this.  This is a very expensive book, I was
25  told.  I happened to find it in the library here, for

Page 104

1  some strange reason.  It's the -- it's the Bible of --
2  of the bond markets.  All right.
3  MR. GOLDMAN:  Tell us the title, so we
4  have it.
5  THE WITNESS:  It's the, "Bond and Money
6  Markets:  Strategy, Trading, Analysis."
7  BY MS. CHAITMAN:
8  Q.  And who is the author?
9  A.  Moorad Choudhry or something of that sort.
10  MR. SHEEHAN:  Could we have the
11  spelling of that since we won't be able to take
12  the book with us?
13  THE WITNESS:  Moorad --
14  MS. CHAITMAN:  Okay.  So the -- the
15  book is written by, M-o-o-r-a-d, and then his
16  last name is, C-h-o-u-d-h-r-y.  And it's
17  published by Butterworth-Heinemann Finance, and
18  it's called the, "Bond and Money Markets."
19  MR. SHEEHAN:  What edition is it?
20  Sorry.  So I don't want to have the wrong book.
21  MS. CHAITMAN:  You know what?  I'll let
22  you look at it.  It -- it's -- it's first
23  edition.
24  MR. SHEEHAN:  Okay.  Fine.
25  MS. CHAITMAN:  First edition.

Page 105

1  THE WITNESS:  All right.  You know, I
2  happened to have made a copy of this.  It's
3  discussing the secondary market, which is
4  what's -- you know, when you -- when you buy and
5  sell stock for clients, you're buying in the
6  secondary market, as opposed to the primary
7  market.
8  The primary market is when a company
9  goes public, they sell stock in the primary
10  market.  All right.  Then after the company sells
11  that stock to the public, it then trades -- the
12  stock trades for the rest of the -- its life in
13  the secondary market.  All right.
14  MR. GOLDMAN:  Bernie, you keep saying,
15  "stock."  You mean bond too; right?
16  THE WITNESS:  Same thing.
17  MR. GOLDMAN:  Okay.
18  THE WITNESS:  You know.  So, you know,
19  it basically is talking about -- you know, this
20  section was -- was talking about convertible
21  bonds.
22  It says here -- it says, "Corporate
23  bonds virtually everywhere are traded on an
24  over-the-counter, OTC, basis.  That is directly
25  between counterparties over the telephone."

27 (Pages 102 - 105)

Page 106

1  Meaning people like Madoff.
2      "Bonds are usually listed on the
3  exchange." I'll read what it says. "On the New
4  York Stock Exchange a low volume of trading in
5  bonds takes place on the exchange itself, but
6  this is dwarfed by the volume of trading in the
7  bonds in the over-the-counter market."
8      In other words, what they're stating is
9  that, although, this is a bond that is listed on
10  the New York Stock Exchange, you know, most of
11  the trading takes place in that bond in the
12  over-the-counter market.
13      It's a listed bond. So you can buy it
14  on the New York Stock Exchange, but no one does
15  that. It's traded over the counter. So
16  Dubinsky, you know, looks -- when he looks -- for
17  example, it would be the same thing if he looked
18  on the equity side of the market.
19      Let's say in -- in a split-strike
20  trade. If he looked in -- because IBM trades on
21  the New York Stock Exchange, if you just looked
22  at the volume on the New York Stock Exchange to
23  try and account for that -- for the customer
24  trading, if the customer traded in the
25  over-the-counter market, which is where we trade,

Page 107

1  and where everybody else trades today, where it
2  used to be 99 percent of the market, as I said
3  earlier, traded on the floor of the exchange, now
4  ten percent trades on the floor of the exchange,
5  and the rest of it trades everywhere else.
6      And the convertible bonds have always
7  been that way. In other words, so that Dubinsky
8  looks at the -- in order to say, well, Madoff
9  says he bought 200 bonds for a client.
10      Now, I'm looking on -- you know, in his
11  report. He -- he looks on the New York Stock
12  Exchange, and clearly he sees that that doesn't
13  match.
14      He's ignoring the over-the-counter
15  market. Even though in one of his examples it
16  says the bond trading on the New York, and then
17  it also says OTC market.
18      But bonds -- that was the price range
19  he was trying to establish in that. There is --
20  if you spoke to anybody that knew anything -- you
21  know, and I'm not trying to be -- I'm not trying
22  to, you know, be sarcastic with him, but if you
23  spoke to any other person, you know, that -- that
24  understood how the markets work, and you said,
25  I -- I just looked at the New York Stock

Page 108

1  Exchange, and he said, well, wait a minute.
2  Nobody trades bonds on the New York Stock
3  Exchange. They trade them in the
4  over-the-counter market.
5      So, you know, that was to me sort of
6  surprising, that anybody would do that. It -- it
7  demonstrated, you know, a total lack of
8  understanding.
9      Again, this is not -- I don't want to
10  be unfair to the man. I've had 50 years of
11  experience dealing in things like this, where
12  people who, you know, understand -- I wouldn't
13  understand how lawyers operate.
14      Okay. So if you asked me how I'm
15  supposed to give a deposition or anything else, I
16  would not know. Of course, now I'm becoming an
17  expert on that also, but it would not be -- I
18  wouldn't -- you know, it wouldn't mean that --
19      I'm not saying Dubinsky is not a smart
20  guy. He may be a very smart guy. He -- his CV
21  is very good, but I've -- I've dealt with tons of
22  people that are smart people and are experienced
23  people, but, you know, it's like a brain surgeon
24  going to a dentist for -- to have a brain surgery
25  done.

Page 109

1      All right. So, to get back to your
2  statement, his -- his lack of understanding how a
3  confirmation in a dealer market works, which is
4  clearly a mistake, or where the volume were
5  traded is another mistake.
6      He -- he goes on to make another
7  mistake when he talks about the price range.
8  Now, that's a little bit more complicated. Now,
9  all of our transactions are -- are what's called
10  average price transactions.
11      If you look on the back of my
12  confirmation -- I'm going to take this for a
13  second again -- it states, "Customer equity
14  transactions" -- because this is an equity, being
15  it says -- so it doesn't matter. It would be the
16  same thing with bonds.
17      It says, "As per your authorization and
18  instructions, we have executed this transaction
19  for your account."
20      All right. It says, "Unless stated
21  otherwise on the front of this confirmation, the
22  trade price of your transaction is an average
23  price and includes a commission equivalent of
24  four cents per share markup. Full details of
25  this transaction on request."

28 (Pages 106 - 109)

Page 110

1    In other words, an average price
2  transaction is when we buy stock for a customer
3  or, you know, we buy stock. We -- we may start
4  buying the stock on a Monday, and we may buy that
5  Monday, Tuesday, Wednesday, Thursday, Friday. So
6  we may buy a -- 1,000 shares over a period of
7  three days, four days or five days.
8    We start on a Monday. We may finish on
9  a Friday. That's typically because we're buying
10  a large amount of bonds or stock for a client.
11  And we may start buying the -- let's say, the
12  bond at 98, and then we may wind up paying 100 by
13  the time Friday is, because as the market moves.
14    So we're accumulating stock, a number
15  of shares or bonds, over an average number of
16  days at an average price.
17    So if we start buying a bond, let's
18  say, at 98, and we wind up finishing buying it at
19  100, as the market moves up, we bought stock --
20  the bonds at 98, 99, 99 and a quarter and so on
21  and so forth.
22    When we report the trade for the
23  customer on Friday, which is when we're finished,
24  we may have paid 90 -- 99 and three-quarters on
25  the bond. All right. What Dubinsky -- you know,

Page 111

1  that was the average that we accumulated for the
2  customer.
3    Now, the 99 and three-quarters was
4  bought over a period of three days. If -- if you
5  look at -- if he looks at the price, the range of
6  the stock, the price on the day that appears on
7  the confirmation, it may show 100, which was
8  where this -- the closing price was on that day.
9    All right. But, you know, we may -- we
10  may sell it to the customer at 99 and
11  three-quarters, which was the average price of
12  that stock. He -- he thinks that that's a
13  mistake.
14    How could we have bought the stock for
15  the customer at 99 and three-quarters, when it
16  shows that -- it shows that the cheapest price
17  the stock traded was 100.
18    So he's saying that Madoff is -- is
19  buying stock cheaper than he could have bought it
20  in the marketplace. He's not accounting for the
21  fact that we started buying it, you know, three
22  days.
23    In other words, it wasn't -- he thinks
24  it was all bought at one price on that day.
25  Okay. If he -- if he bothered to read the back

Page 112

1  of the confirmation, which he probably never did,
2  you know, it clearly states that these are
3  average price transactions. They're not one
4  price.
5    Okay? We're --
6    MR. SHEEHAN: I just have a little
7  housekeeping.
8    MS. CHAITMAN: Yeah.
9    MR. SHEEHAN: I'd like -- he read from
10  that. I'd like to get that marked. That.
11    MS. CHAITMAN: This -- this marked.
12    MR. GOLDMAN: The photocopy.
13    MR. SHEEHAN: And his notes too. He's
14  reading from notes.
15    THE WITNESS: This is just --
16    MS. CHAITMAN: That page. Okay. Good.
17  Okay. So I'm going to mark as Exhibit 9, this is
18  a page from the volume that we've just described.
19  It's page 323.
20    MR. SHEEHAN: Great. And I think he
21  had his notes that he was reading from too.
22  So --
23    MS. CHAITMAN: Did you have notes that
24  you were reading from?
25    MR. SHEEHAN: Yeah.

Page 113

1    MR. GOLDMAN: Yeah, there was.
2    THE WITNESS: Where did I put them?
3    MS. CHAITMAN: Were there -- I did mark
4  notes before. Are there new notes? I didn't
5  notice.
6    MR. SHEEHAN: Yeah, there were notes
7  that were part of the --
8    THE WITNESS: Here they are.
9    MS. CHAITMAN: Okay.
10    MR. GOLDMAN: There they are.
11    MS. CHAITMAN: Can I mark that?
12    THE WITNESS: You can have it, but it's
13  my only copy. Okay. I am not finished with it
14  yet. So don't -- don't take it.
15    MS. CHAITMAN: No. I'm not taking it.
16    (MADOFF EXHIBIT 9 WAS MARKED FOR
17  IDENTIFICATION.)
18    MS. CHAITMAN: I'm going to mark as
19  Exhibit 10 some handwritten notes that Mr. Madoff
20  has been referring to, and I'm going to give it
21  back to Mr. Madoff.
22    (MADOFF EXHIBIT 10 WAS MARKED FOR
23  IDENTIFICATION.)
24    MR. SHEEHAN: For the record, there's
25  notes on the back of that page too.

29 (Pages 110 - 113)

Page 114

1    MS. CHAITMAN:  Yeah, yeah.
2    MR. SHEEHAN:  That'll be fine.
3    MS. CHAITMAN:  But it's all one
4  exhibit.
5    MR. SHEEHAN:  Yes.  It is one exhibit.
6    MS. CHAITMAN:  Yeah.
7    THE WITNESS:  Okay.  So --
8  BY MS. CHAITMAN:
9    Q.  So let -- just to catch up.  One mistake he
10  made was not understanding that on the trade
11  confirmations it -- Madoff -- the firm is buying -- if
12  it says, "bought," it means Madoff, the firm, bought?
13    A.  It means that -- it means -- yes.  The,
14  "we," refers to the firm, Madoff, bought from the
15  customer or sold to the customer.
16    Q.  To the customer.  Okay.  And -- and sold
17  from the firm's own inventory?
18    A.  That's correct.
19    Q.  Okay.  And then you've made the point that
20  Dubinsky looked for confirmation of the volume on the
21  New York Stock Exchange or the London Stock Exchange,
22  and, in fact, the convertible bonds were not sold on
23  the -- you didn't buy them on the --
24    A.  We traded in the over-the-counter market.
25    Q.  Right.

Page 115

1    A.  And there was not even volume reported -- in
2  the days -- the period of time he's looking for there
3  was no volume -- actually, the majority of the volume
4  was never reported in the over-the-counter market,
5  because there was no volume requirements to report
6  volume in bonds in the over-the-counter market until a
7  later date.
8    Q.  Okay.  Do you --
9    A.  It was very -- it was a very -- I don't --
10  it was very hazy, the -- the volume reporting
11  requirements on -- on bond -- in the bond market was
12  never really -- it was that way -- to this day it's
13  sort of a gray area.
14    Q.  Okay.  All right.  Now -- now you want to
15  go -- do you have another area that you want to cover?
16    A.  We've covered the confirmations and the
17  statements, and we've covered the volume, and we've
18  covered the price.  So basically what I'm saying is
19  his -- his criticism of the price of the volume and of
20  the confirmations and statements are inaccurate.
21    Q.  Now, Mr. Dubinsky says that there's no proof
22  that the bonds were converted.
23    A.  Okay.  A -- the -- the typical strategy on
24  convertible bonds is not to convert.  In other words,
25  nobody in their right mind should ever -- if a

Page 116

1  convertible bond exists, you would never buy the
2  stock, as opposed to buying the bond, if you could buy
3  the bond at a discount.
4    In other words, a convertible bond trade --
5  a convertible bond -- let's say a bond is convertible
6  into 100 shares of stock at $10 a share.  All right.
7  The -- the convertible bond always should trade at a
8  premium above what it's convertible into the price of
9  the stock at, because it has a coupon attached.  It
10  pays interest.
11    So convertible bonds typically trade at a
12  premium.  In other words, the bond theoretically would
13  be worth 100 based upon the price of the stock at ten.
14  The bond should always trade above 100.
15    It should trade at 101, 100 and a half and
16  so on, because of the fact that the convertible bond
17  is always -- is always going to be worth more than the
18  stock, you know, because of the coupon that it has to
19  it.
20    So convertible bonds sometimes trade at a
21  discount, but rarely.  Usually they trade at a
22  premium.  All right.  When you combine a bond at -- a
23  convertible bond at a -- at a discount, you could
24  theoretically buy the bond, let's say, at 98, when it
25  really should be selling at 100.

Page 117

1    All right.  Because you could buy the bond
2  at 98.  Sell the stock at ten.  Would be -- you'd make
3  a two point profit by converting it.  So ideally you
4  would say, okay.  If you -- because then you'd have no
5  risk.
6    You'd immediately buy the bond at a
7  discount, sell the common stock simultaneously at a
8  profit, and then convert one into the other.  You
9  exchange the bond by selling -- sending it to the
10  conversion agent and say, here is your bond back.  You
11  know, I want stock back.  And then you'd deliver the
12  stock out, and you'd make a profit.
13    But most bonds trade at premiums, which is
14  what they shouldn't be doing.  All right.  So the
15  typical strategy of a convertible bond trader would be
16  to -- to buy the bond either at a discount, which
17  allows you to convert it immediately and make a
18  profit, or hold the bond open and wait for the bond to
19  go to a premium, where it historically should trade
20  at, and then you sell out the bond, cover the stock
21  and un -- what's called unwinding the transaction.
22    Which Dubinsky in his report does state that
23  that is one of the -- he has that right.  That is
24  the -- you do that kind of trading, you know, either
25  buying it and converting it or unwinding the

30 (Pages 114 - 117)

Page 118

1  transaction. He acknowledges -- he has that -- that
2  part right.
3      He doesn't go into the fact that most bonds
4  should not be converted, but anybody that is familiar
5  with convertible bond trading would know that.
6      All right. The -- so what Dubinsky then
7  does is he says that Madoff, you know, who -- who did
8  buy bonds at a discount and sell the stock, you know,
9  accordingly, it had a locked-in profit, he never
10  physically converted -- he never sent the bonds in to
11  be converted, you know, and take the profit that way,
12  which he should have -- he should have done, you know.
13      But he said, there's no evidence that he
14  ever put the bonds into conversion, because typically
15  he would have found in our records, he assumes, some
16  sort of instructions to the conversion agent to
17  convert the bonds into stock.
18      All right. And if, in fact, we did that, he
19  would -- he would find those instructions, but our
20  strategy, as he acknowledges, as most people's
21  strategy would be, to -- to not convert. He doesn't,
22  you know, really go into the details of that.
23      So our strategy is basically buy the bond,
24  sell the stock. And even though we have a profit and
25  could convert it and lock in the profit, is we don't

Page 119

1  convert it. We hold it open, and then we undo the
2  whole transaction when the premium goes back to where
3  it should be.
4      As a matter of fact, when David Kugel was
5  first hired by me his job was to track all of the
6  convertible bonds that traded in the marketplace. And
7  we had a -- a whole spreadsheet that -- that we
8  developed for him that tracked what every bond that
9  was trading in the marketplace historically traded at.
10      So it would look and see that -- let's say
11  IBM bonds traded over this past two years always went
12  to a two point premium. It always traded at a two
13  point premium.
14      You know, every now and then it -- it would
15  go to a -- a discount or a one point premium, and
16  then, you know, it would go back to that premium. So
17  we would track them historically.
18      And we would always look to see when the
19  bond was -- you know, was changing its relationship.
20  And then we would go into the marketplace and buy
21  those bonds. And that's what all convertible bonds
22  traded, but that was our specialty, was trading this
23  way.
24      All right. But anybody that was a good
25  convertible bond trader did the same thing. It was

Page 120

1  not unique to us. We happened to do more of it than
2  most people.
3      All right. So our goal was to not convert.
4  It was -- it was basically to unwind the transaction.
5  All right. So because he -- he could never see that
6  we were actually converting, and -- and he did find
7  some that we converted, but not -- you know, but there
8  were instances -- he made the assumption that we would
9  always convert, and that -- that's totally untrue.
10      All right. Because what we would do would
11  be when -- when the premium went to where we expected
12  it to go to, we would, what's known as, unwind it or
13  swap the transaction, which another dealer that had
14  the transaction.
15      The problem -- the customer would make -- he
16  could make more money theoretically, you know, within
17  what we -- than what he made had we actually converted
18  it. He could make a greater profit or he could make
19  the same profit. It didn't matter.
20      But as a dealer our goal was to keep bonds
21  out of conversion, because the more you kept the bonds
22  out of conversion, you kept them open in the
23  marketplace to trade at a -- at a future time.
24      So -- because once you convert a bond it's
25  out of existence any longer. So the goal of all

Page 121

1  traders is to keep these bonds in circulation. So you
2  could --
3      It would be like if a customer -- if
4  everybody took the stock that they bought, and they --
5  and they -- the company bought back more of their
6  stock, when a company, like IBM, buys back their stock
7  in the marketplace, they're taking it out of existence
8  anymore. Nobody can trade that stock. So everybody
9  wants to keep these bonds in circulation.
10      All right. Now, another mistake that he
11  makes is if, in fact, we did convert -- you know, he
12  makes the assumption that we would physically put the
13  bonds ourselves into conversion, which, you know, I
14  can understand him thinking that we would do that.
15      All right. But he makes the assumption that
16  because he didn't see any instructions from Madoff to
17  the conversion agent, that we didn't convert.
18      What he seems to not understand, which I can
19  understand him not understanding, is we had -- he
20  thinks our only bank was J.P. Morgan and Bank of
21  New York, which -- in the 2000's those were our main
22  banks.
23      J.P. Morgan was our primary bank when we
24  were dealing with customers in split-strike, and our
25  operating bank when we were dealing with our

31 (Pages 118 - 121)

Page 122

1  market-making and dealer in -- in general, doing
2  hundreds of thousands of trades, were handled through
3  Bank of New York, which was our operating bank.
4      All right.  In the period that he's looking
5  at the convertible bonds in the '70s and the '80s, we
6  had -- our banks were Chase Manhattan Bank,
7  Continental Bank, Commercial Bank of North America,
8  Meadowbrook National Bank, Marine Midland Bank.
9      You know, we also had clearing arrangements
10  with -- with Barclays, with Carlo LaBorde (PHONETIC) &
11  Company, Edwards & Hanley (PHONETIC) and others.  In
12  other words --
13  Q.  Bear Stearns?
14  A.  Huh?
15  Q.  Bear Stearns?
16  A.  Bear Stearns.  So he like -- he doesn't see
17  any of that, because he wouldn't.  He's looking at --
18  you know, in the -- in the more recent period those
19  banks have already been merged out or don't exist any
20  longer.
21      You know, when we -- when we did convert
22  bonds -- and we did convert bonds, you know.  We
23  didn't -- you know, the -- the majority of what we
24  unwound, but we looked -- when we did convert a bond,
25  we would convert the bond through one of those agents,

Page 123

1  like Commercial Bank of North America, because if the
2  bank's conversion agent was in Chicago, and we wanted
3  to convert it, we would have -- we would have had
4  to either send somebody out to Chicago or a messenger
5  to convert the bond or mail it and hope that the
6  mail -- the bonds actually got there.
7      You would never do that.  You would -- you
8  would give it to a bank, you know, and the bank would
9  convert it for you.  So we would give it to the
10  Commercial Bank of North America.
11      They had -- they were a large clearing bank,
12  and they would physically convert it with arrangements
13  through whoever the conversion agent was doing that.
14      All right.  He doesn't -- he has no way of
15  knowing that, because those banks weren't -- he
16  doesn't even know those banks existed when they were
17  there.  So the banks themselves, which we would
18  convert, would -- would draft out.
19      It was the same thing like when we would
20  deliver -- before we formed the clearing corporation
21  on equities, if you sold stock to a brokerage firm in
22  Chicago, in order to get paid for that you would have
23  to mail that stock to Chicago and hope that they sent
24  you a check while the bank -- you know, when they
25  finally got it.

Page 124

1      All right.  As opposed to when we developed
2  a clearing corporation, meaning the National
3  Securities Clearing -- Clearing Corporation, NTTC, you
4  know, we would -- they would clear the whole
5  transaction.
6      So it would -- you know, of course, the
7  industry -- another thing I got blamed for was
8  founding the clearing corporation, because Wall Street
9  cleared all of their transactions through basically a
10  couple of major banks, like Citicorp, Chase and so on.
11      Nobody -- they handled -- they -- brokerage
12  firms themselves didn't all have the facilities --
13  back office facility.  So a bank used to clear those
14  trades for them.  The banks -- that was a great
15  business for banks.
16      So the industry, because of the paperwork
17  crisis, decided they had to have a -- they had to have
18  a clearing corporation developed to clear the trades
19  for the industry.
20      The major banks in the United States went
21  crazy with that concept, because they wanted to keep
22  all of the business themselves.  They wanted brokerage
23  firms to be required to -- to use the banks to clear
24  the transactions rather than have a clearing
25  corporation.

Page 125

1      But finally we -- you know, the SEC put
2  enough pressure on people to develop a clearing
3  corporation.  So we formed the National Securities
4  Clearing Corporation, which I became the chairman of.
5      And then we merged also Depository Trust
6  into that.  So that brokerage firms would send their
7  deliveries of stocks rather than through the mail,
8  where you have to use the bank to do that, to use a
9  clearing corporation, which settled all of the trades
10  for the whole industry.
11      So what -- what happens today -- I'm telling
12  you more than you probably are interested or wanting
13  to know, but if I -- I may buy stock -- you know, sell
14  10,000 shares to Merrill Lynch and 10,000 shares to
15  someone else and so on and so forth.
16      And buy and sell all day long with -- you
17  know, like we did hundreds of thousands of
18  transactions as -- as the report points out.  The
19  clearing corporation nets all of these transactions,
20  you know, among the Wall Street brokerage firms.
21      And at the end of the day they net out -- I
22  may have bought and sold a million shares during the
23  day, but the net comes out to 500 shares between all
24  my buys and sells.
25      They send me a bill at the end of the day

32 (Pages 122 - 125)

Page 126

1  that I either have to pay on the 500 shares or get a
2  check for the 500 shares of stock. And all of the
3  banks went out of the clearing business, and now it's
4  all handled by the National Securities Clearing
5  Corporation Depository Trust.
6      Q.  Okay. I want to go back, because that's one
7  of the things that Dubinsky talks about, that he can't
8  find trade confirmations. Now, we're dealing with --
9      A.  So --
10     Q.  -- the convertible arbitrage strategy --
11  strategy in the 1980s.
12         THE COURT REPORTER: Can I ask for a
13  break?
14         MS. CHAITMAN: Of course. Of course.
15         THE VIDEOGRAPHER: Going off the
16  record. The time is 12:09.
17         (RECESS FROM 12:09 P.M. TO 12:16 P.M.)
18         THE VIDEOGRAPHER: Back on the record.
19  The time is 12:16.
20         THE WITNESS: Okay. So I think we were
21  at the -- the clearing of -- oh, so that his
22  inability to find instructions to convert bonds,
23  you know, all the time was that he was not aware
24  of the fact that if we did convert bonds we had
25  the ability and did convert bonds through other

Page 127

1  clearing -- other clearing banks.
2  BY MS. CHAITMAN:
3      Q.  So that you wouldn't have the records for
4  that?
5      A.  Wouldn't -- they would not exist, because
6  there would be no way that we would put the bonds
7  physically for the most part -- we did some -- some of
8  them, depending upon what the year it was and what he
9  was looking for, but, as I say, the idea was not to --
10  to actually convert, but --
11     Q.  Right.
12     A.  -- to arrange a swap arrangement --
13     Q.  Right.
14     A.  -- or a clearing arrangement.
15     Q.  Okay. Now, he also makes the point that he
16  couldn't find trade confirmations.
17     A.  Okay. That -- when -- one of the times
18  that -- when you first came down, if you still
19  remember --
20     Q.  And when you say, "you," are you --
21     A.  Meaning David Sheehan --
22     Q.  Sheehan.
23     A.  -- and his staff of attorneys came down
24  here. I think it was at that time that they mentioned
25  to me that they could not find confirmations --

Page 128

1  counterparty confirmations on transactions.
2      So -- and we were buying and selling stock
3  through other brokerage firms for clients. They
4  expected us to -- they saw that we had confirmations
5  selling and buying stocks from the customer, but they
6  did not find any confirmations to the broker.
7      All right. Now, number one, if we were
8  dealing as principal, which clearly our confirmations
9  stated, and we always did it as principal, we would --
10  there wouldn't be a counterparty on the other side of
11  the trade, because we were the counterparty on the
12  other side of the trade.
13     But when we did go out into the street to
14  buy the stock, you know, there would be a
15  counterparty, you know, on the other side of the
16  trade. He couldn't find the confirmation. So he saw
17  thousands of confirmations with clients, but he never
18  saw any broker confirmations, period.
19     So he said to the -- you weren't buying and
20  selling stock from anywhere. You know, there were no
21  confirmations. And I looked at him, and I said, well,
22  no. You know, I was sort of -- didn't understand the
23  question, because I didn't understand why he expected
24  there to find confirmations.
25     Q.  When you say, "him," to whom are you

Page 129

1  referring?
2      A.  The trustee.
3      Q.  Okay.
4      A.  And -- so it was that -- you know, I then
5  realized that, you know, he expected to find -- you
6  know, just as he found a broker confirmation, he
7  assumed that every time we went and sold or bought
8  stock from a customer we bought it from another
9  broker, which sometimes we did.
10     Sometimes we bought it out of inventory. If
11  it was bought out of inventory, there wouldn't be --
12  there would be a customer confirmation at an earlier
13  date that -- that we put it into our inventory, but --
14     All right. But, I said, there -- there are
15  no confirmations. And that sort of went on deaf ears.
16  Now, number one, I said, first of all, you're looking
17  at -- we don't -- we don't keep any records of
18  customer confirmations from the past six years.
19     I said, the record retention period for the
20  industry is six years. So after six years everybody
21  gets rid of all of their records. You can imagine, we
22  do hundreds of thousands of trades everyday.
23     If we -- if we kept paperwork for all of
24  those transactions, you know, it would be impossible.
25  I said, so we keep customer confirmations for, you

33 (Pages 126 - 129)

Page 130

1  know, a longer period of time, because customers need
2  that for tax purposes, audits and so on and so forth.
3        But a general policy, we don't keep records
4  for more than six years, because that's what the
5  record retention period does.  Even though we did have
6  records, because -- and I used to always yell at my
7  people.
8        I used to say, after six years, get rid of
9  everything, because I'm paying for storage on this
10  stuff.  But I said, wait a minute.  I said, you
11  won't -- you won't find confirmations for any of my
12  trades.
13        I said, I do hundreds of thousands of
14  shares -- of trades everyday.  I said, you don't
15  find -- you can't find any of those confirmations.  I
16  said, so are you now assuming because you can't find a
17  confirmation when my market-makers or proprietary
18  traders bought hundreds of thousands of trades
19  everyday that those trades didn't take place either?
20        And there was no answer.  I said, first of
21  all, are you aware of the fact that brokers stopped
22  issuing confirmations years ago?
23  Q.    How --
24  A.    Because of the clearing corporation.
25  Q.    How many years ago?

Page 131

1  A.    Well, there's what's called a continuous net
2  settlement, which I started to say.  In other words,
3  when we buy and sell stock all day long, anybody buys
4  and sell stocks when they're long, they don't issue a
5  counterparty confirmation to Merrill Lynch, because
6  those trades are reported automatically through the
7  clearinghouse, and you get -- you don't get
8  confirmations.
9        Customers get -- confirmations get mailed
10  out back and forth, but the industry does not issue
11  confirmations to each other, you know, as a general
12  rule.  You can, if you want, but nobody would do that.
13        So I said, so making your supposition that
14  you can't find a confirmation from a brokerage firm on
15  the other side of a customer trade, and you can't
16  find -- you won't find a confirmation on the other
17  side of a - of a non-customer trade either, because
18  they don't -- I don't have any customer confirmations
19  in my records.
20        I said, how can you not understand that?
21  Now, maybe -- like my lawyers -- you can't expect him
22  to understand.  They're lawyers.  They're not
23  brokerage firms.
24        I said, all right, but you're asking me
25  questions -- you know, they're asking me questions

Page 132

1  that they have to get somebody that explains that.
2        Now, certainly Dubinsky would know that, but
3  he doesn't even mention -- in fairness to Dubinsky, he
4  doesn't -- he doesn't mention anything about this
5  confirmation issue, because he clearly knows that
6  much.
7        This was the trustee, Irving Picard, and his
8  attorneys, or, I guess, and David's partners or
9  whatever.  And maybe they had no reason to know that
10  either, because the average person would not know
11  that.
12  Q.    When did the continuous net settlement
13  system come into place?  Was it in place in the '80s?
14  A.    Yes.  Probably in the '80s.
15  Q.    Okay.
16  A.    So --
17  Q.    So how -- how does that work?  At the end of
18  the day you just get a computerized printout --
19  A.    Right.
20  Q.    -- with -- with the net amount that you have
21  to sell --
22  A.    Right.
23  Q.    -- or receive?
24  A.    Right.
25  Q.    Okay.  Okay.  And if you were doing

Page 133

1  over-the-counter purchases and sales of subordinated
2  bonds, convertible bonds --
3  A.    Yeah.
4  Q.    -- was that done on a continuous net
5  settlement basis also?
6  A.    No.
7  Q.    How was that done?
8  A.    It was just -- it was -- you wouldn't issue
9  a confirmation.  It was -- well, it depends -- you
10  want to know about a convertible bond for a -- for a
11  claim?
12  Q.    When you were doing the investment -- I'm
13  focusing on the 1980s.
14  A.    Right.
15  Q.    The convertible arbitrage transactions.
16  A.    Uh-huh.  We wouldn't have -- there wouldn't
17  be -- it -- we would issue, you know, a -- we would
18  issue a confirmation there, but we wouldn't have those
19  in our records in the '80s, because we don't hold the
20  confirmations after six years.
21  Q.    Right.  And the -- if you were -- you were
22  selling to the customer, you had a confirmation, but
23  when you were buying it --
24  A.    There wouldn't be a confirmation.
25  Q.    -- for inventory, there wouldn't be a

34 (Pages 130 - 133)

Page 134

1  confirmation?
2  A.  No.  Not -- not after six years.
3  Q.  Okay.  Okay.  So we're -- we're going -- we
4  started out listing the mistakes that you felt --
5  A.  Right.
6  Q.  -- Dubinsky made.  Did he make a mistake
7  with respect to using the trade date versus the
8  settlement date; is that what you covered already?
9  A.  The average price.  Yes.
10  Q.  Okay.
11  A.  On the ranges?
12  Q.  Yeah.
13  A.  Well, it's -- if you look at the range on --
14  you wouldn't have -- there wouldn't be a -- there
15  wouldn't be a record of the ranges.
16  Well, first of all, you can't even use the
17  ranges, because you'd have to -- well, he -- in order
18  to -- in order -- in other words, if the SEC was doing
19  an audit, which they did all of the time as to, you
20  know, best -- what's called best execution, they would
21  actually look and see, you know, what dates you bought
22  this stock.
23  Okay.  You know, if it was an average price
24  transaction, they would have to go back and look at
25  all of the days, you know, that you accumulated the

Page 135

1  stock, not just use the last day that you reported the
2  trade to the customer, because they understand what an
3  average price is.
4  Now, the only ones -- typically if you call
5  up a broker, and you tell him, buy me, you know, 50
6  shares of IBM or 200 shares of IBM, they would
7  actually -- they wouldn't do that over the course of a
8  day.
9  All right.  Because that -- you know, they
10  would just buy -- it's a small amount of a lot, but if
11  you're dealing with -- with discretionary accounts or
12  you're accumulating a larger -- with a -- a portfolio
13  of accounts, the way we always traded, you would
14  always do an average price transaction.
15  So they -- what they would have to do is go
16  back, which they would do, and see what was your real
17  average price.  They would verify what the average
18  price was, not just look at the last day, because they
19  would realize that you would never be able to find
20  a -- you would rarely be able to find a match, because
21  you'd --
22  Q.  Right.
23  A.  -- have done it, you know, at different
24  periods of time.
25  Q.  Right, right.  Are there other general

Page 136

1  mistakes that you can recall from --
2  A.  Well, we -- he mentions that David -- well,
3  he talks about David Kugel as -- you know, he mentions
4  in the report that David Kugel -- in other words, he
5  acknowledges that they don't have records going back
6  to the time that David -- he's talking about David
7  Kugel, because we don't -- there are no records.
8  So he's -- he points out as a footnote that
9  he's using David Kugel's information to plea bargain
10  that he created fictitious trades.  Now, as I stated
11  before, that makes no sense to me at all.
12  And I think that David Kugel -- I'm not
13  even -- I'm not saying that he's lying.  I'm saying
14  that he misinterpreted -- what he said when he created
15  a trade, he's misinterpreting what he's saying.
16  In other words, if -- if -- if I -- if I
17  give instructions to -- you know, if I wanted -- if I
18  decide I want to sell stock to a customer out of my
19  inventory, I -- I could say to someone like David
20  Kugel, you know, I want to sell stock to -- I want to
21  sell, you know, IBM to the client.
22  So we have 100 bonds in -- 100 convertible
23  bonds in the account.  I want to sell to Carl Shapiro,
24  you know, 20 bonds.  You know, I want to do a
25  convertible trade for him.

Page 137

1  Give instructions, you know, to Annette to
2  buy, you know, convertible bond, you know, for -- for
3  Carl Shapiro, and, you know, just tell her what --
4  tell them what the formula -- what the formula is, so
5  she knows how many bonds -- how to set the trade up.
6  He -- you know, he would have these
7  instruction sheet -- this -- this convertible bond,
8  you've got to -- if you're going to do 50 bonds, you
9  know, this is -- this is how many bonds, and this is
10  how much stock you sell.
11  And it gives her like -- she then looks at
12  my inventory record and sees, okay.  He -- he has X
13  number of bonds he can convert.  Takes it out of --
14  out of the investment account or the firm's trading
15  account into this customer account.
16  So David Kugel has no idea, nor has any
17  other trader, what the -- what the firm's net
18  inventory.  We could have -- we could have -- we have
19  five different traders trading IBM convert.  They're
20  all competing with each other.
21  They don't want to -- they never want David
22  to know what his position is, because he -- you know,
23  they're competing with him.  That's part of the
24  strategy of the firm, all market-making firms.
25  So he -- if -- if -- if someone says, well,

35 (Pages 134 - 137)

Page 138

1 give them instructions, he'll give -- he'll give
2 Annette or Jodi instructions of how many bonds to --
3 to buy and sell for this customer.
4        He has no idea after that where that --
5 where it's coming from.  He doesn't know whether it's
6 coming from the firm's inventory, from his inventory
7 or someone else's inventory.  He would not know that.
8        So if -- if he says to somebody, which is a
9 very -- I'm going back to like when I told in my
10 proffer agreement that I short stock to a customer.
11 And they said, you sold stock to a customer?  How can
12 you short stock a customer?  You're selling them stock
13 that you don't own.
14        And I say, yeah, market-makers do that all
15 day long.  That's part of our business.  We're
16 shorting stock to a customer.  And he -- and an alarm
17 bell goes off and says, well, how can you sell stock
18 to a customer you don't own?
19   Q.   Okay.  Well, that --
20   A.   You know --
21   Q.   Let me ask you that.
22   A.   Okay.
23   Q.   Was that illegal, for you to be selling
24 stock to a customer that you didn't own?
25   A.   No.  I'll -- I'll -- I'll explain that too,

Page 139

1 because that's -- that's another issue, but let me
2 just finish this thing.
3        So that if, in fact, David Kugel or anybody
4 is -- is giving instructions to the operations side of
5 the business, meaning Annette or Jodi, of -- of how to
6 do a trade, that doesn't mean that's a fictitious
7 trade.
8        He -- you know, he has no idea.  He's just
9 telling her how to do the allocation of the trade.
10 Not -- he doesn't know if -- you know, whether or not
11 the firm has it in inventory or doesn't have it in
12 inventory.
13        But even if I wanted to short it to the
14 customer, let's say I didn't have it in inventory,
15 there's nothing wrong with that.  I am allowed to
16 short stock to a customer.
17        Theoretically I could have shorted all of
18 these split-strike trades to the customer forever.  My
19 violation was not going short.  It was not recording
20 the short on my financial records as a liability,
21 which I guarantee you, nobody understands that.
22        To this day if I called up the prosecutor,
23 Litt, and I said to him, you know, I don't have --
24 there's nothing wrong with me shorting stock.  He
25 would look at me and say, that's not true.  You can't

Page 140

1 short to a customer.
2        And I can prove that to you, because I don't
3 know how many times, you know, I had to -- I had to
4 argue this case in front of the SEC and with the
5 issuing companies, like Apple computer and everything
6 at -- when we were at board meetings with the IBM.
7        Average company does not want you to ever
8 short stock.  In other words, every company that
9 trades on an exchange does not want a brokerage firm
10 to sell stock that he doesn't own.
11        They think that short selling is illegal, is
12 immoral and should never be done.  All right.  That's
13 what they want.  They don't want ever -- they don't
14 want anybody to be able to short stock.
15        Just like nobody wanted, you know, George
16 Soros to short Sterling and make a billion dollars
17 shorting -- you know, breaking the market on -- on
18 shorting.
19        But what they don't understand is that
20 shorting is a very -- you know, a very, you know,
21 legitimate market, you know, thing to do in the
22 marketplace, and it's required, because it keeps
23 stocks from going to artificially high prices.
24        All right.  And the -- it certainly happens
25 that as I was -- when I was looking for -- reading

Page 141

1 another book, one of the things I do here is I tutor
2 people on finance and the marketplace.
3        Of course, the Bureau of Prisons only big
4 concern is that I'm teaching them a fraud.  All right.
5 So originally I was told, no, you can't tutor or teach
6 anybody here, you know, but I said, listen, I said,
7 they -- you have outside people coming in here,
8 professors, to -- to lecture, you know, as part of,
9 you know, the justice department, and they're all
10 asking, can Bernie Madoff -- you have Bernie Madoff
11 sitting here.  Let him lecture people.
12        And the Bureau of Prisons says, the
13 newspapers are going to say that Bernie Madoff is --
14 is perpetuating a fraud.  Just like when they put me
15 in charge -- when I first got here, my first job was
16 in the engraving department.
17        I was engraving signs, you know, that they
18 hung on walls here.  So the -- the Wall Street Journal
19 said, Bernie's first job is engraving, you know.  So
20 they said, take him away from the engraving
21 department.
22        And they -- I had seven jobs in seven days,
23 because no matter what I was doing, including I was in
24 charge of cleaning the computers, you know, can't do
25 that, you know, because you're reprogramming the

36 (Pages 138 - 141)

Page 142

1 computer.
2     I couldn't reprogram my telephone number.
3 You know, that's not my -- not my strengths here. So
4 I'm now -- my job is now cleaning the laundry room.
5 That's my job here.
6     The -- I'll -- I'll -- there's a book that
7 was written by someone like Dubinsky. He has a very
8 big -- and he talks about --
9     MR. GOLDMAN: Tell us the name of the
10 book and the author, Bernie.
11     THE WITNESS: I don't even know what
12 it --
13     MS. CHAITMAN: May I mark that whole
14 thing as --
15     THE WITNESS: "Secret Weapon."
16     MS. CHAITMAN: -- the next exhibit?
17     MR. SHEEHAN: Could you just mark it as
18 an exhibit?
19     MS. CHAITMAN: Yeah. Let me just mark
20 it.
21     Can I mark this whole thing?
22     THE WITNESS: Yeah.
23     MS. CHAITMAN: Is it all connected?
24     THE WITNESS: Yeah.
25     MS. CHAITMAN: Is it all one --

Page 143

1     THE WITNESS: Yeah, yeah.
2     MS. CHAITMAN: Okay.
3     THE WITNESS: Anyhow --
4     MS. CHAITMAN: So I'm marking as
5 Exhibit 11 --
6     (MADOFF EXHIBIT 11 WAS MARKED FOR
7 IDENTIFICATION.)
8 BY MS. CHAITMAN:
9     Q.  -- a -- it says the author is Kevin Freeman,
10 and the title is, "Secret Weapon." And it's pages --
11 I don't know what the first page is, but the --
12     MR. SHEEHAN: It's the inside cover.
13     Q.  The inside cover is 78. 78 to 83, and then
14 123 and 124.
15     A.  He's talking about how the markets work. He
16 talks about bear runs, and he talks about naked short
17 selling, and he talks about the Madoff exemption.
18     Q.  Is that a term that's in the industry?
19     A.  Naked -- yeah, naked --
20     Q.  No, but the Madoff exemption?
21     A.  Yes. In other words, he goes on to state,
22 "Long before he was convicted of defrauding the
23 American public of some 50 billion through a Ponzi
24 scheme, Bernie Madoff was chairman of the National
25 Association of Securities Dealers, NASD. In that

Page 144

1 capacity he appeared regularly at the SEC and served
2 on agency panels."
3     And then he quotes them as saying, "When it
4 came to Bernie, people paid more attention, said
5 Georgetown University law school professor, Donald
6 Langevoort, who worked on an SEC panel with Madoff."
7     He quoted -- then goes on to quote, saying,
8 "This was a guy who really knew how markets worked.
9 He was the grownup in the room. If there was a
10 confession" -- "if there was confusion or a question
11 or two people on opposite sides going at each other,
12 Bernie would speak up and explain what the deal was.
13 I'm sure in some ways that may have thrown even the
14 commission off their guard."
15     "One of Madoff's key accomplishments at the
16 SEC was to get a rule approved, the so-called Madoff
17 exemption, that allowed market-makers to naked short
18 sell. Market-makers are broker-dealer firms that gain
19 fees by holding blocks of securities in order to help
20 grease the wheels of trading."
21     "If someone buys stock in a company, it is
22 the market-maker who sells the stock and then finds an
23 offsetting order. This keeps the markets flowing
24 smoothly."
25     "In the case of short selling if the

Page 145

1 market-maker has no inventory of the shares sold, the
2 firm is allowed to create an IOU for the shares. This
3 is a form of naked short selling legalized by the
4 Madoff market exemption."
5     Basically what he's stating, this is the --
6 he's quoting this law professor at Georgetown, who
7 served on a panel with me, that says that I could sell
8 stock short.
9     So selling stock short, not only is it
10 something that is to the benefit of the marketplace,
11 market-makers are required to sell stock short. So
12 theoretically I don't ever have to, you know, buy
13 stock for a customer.
14     I'm responsible for producing that stock if
15 the customer ever wants it. And any profit that the
16 customer makes in the trade I'm responsible for.
17     So in theory, which my attorney said to me,
18 Bernie, you know, you can -- you're not doing anything
19 wrong with being short these split-strike trades to
20 the client, you know. You know, I can short all day
21 long, and I do short stock at times. Every brokerage
22 firm short stocks to a customer.
23     My violation was not showing the IOU, the
24 liability, you know, on my balance sheet. That's what
25 the violation was. I would have also been out of

37 (Pages 142 - 145)

Page 146

1  ratio, you know, by not -- if I did show that. So --
2      Q.  So you mean that there was -- do you -- if
3  you sell short, do you have an obligation -- is it
4  your understanding that you have an obligation to the
5  customer?
6      A.  To produce that stock if the customer wants
7  it.
8      Q.  Right, but do you have an obligation -- and
9  we're talking about the investment advisory customer.
10     A.  Yes.
11     Q.  Did you have an obligation to tell the
12 customer, your statement shows 30 shares of IBM, but
13 I'm actually short that --
14     A.  No.
15     Q.  -- position?
16     A.  No.
17     Q.  So it was --
18     A.  No.  You don't -- you're not --
19     Q.  So if -- if a customer is -- if a securities
20 customer is dealing with a market-maker --
21     A.  Or anybody.
22     Q.  Well, only the market-makers have the
23 exemption.
24     A.  No, no.  That's -- that's wrong.  The
25 market -- the -- the -- anybody can sell stock short

Page 147

1  to a customer, you know.  The -- it's -- they always
2  can sell stock through shorting, but he --
3      You know, what he's talking about is -- you
4  know, is that, you know, I was the one that argued for
5  the short stock selling, because what he -- he
6  confuses the situation, because there are certain
7  requirements that a market -- if a market-maker is
8  shorting stock to a customer or to anybody, he has
9  to -- his records have to show that he shorted the
10 stock.
11         MR. SHEEHAN:  Who is, "he"?
12         THE WITNESS:  Meaning the brokerage
13     firm.
14         MR. SHEEHAN:  Okay.
15 BY MS. CHAITMAN:
16     Q.  Okay.  So the brokerage -- so let's just
17 take the split-strike.  Okay?
18         MR. GOLDMAN:  Wait.  Before -- before
19     you ask the question, I think he said -- and the
20     transcript will speak for itself, obviously, but
21     I think he said that the -- the market-maker was
22     required to sell short.  Did you mean permitted
23     to sell short?
24         THE WITNESS:  Well, you -- you're
25     required to make a two-sided market.  So if, in

Page 148

1  fact, you -- you're not required to sell stock to
2  the customer short.  You're allowed to sell stock
3  to a customer short.
4          MR. GOLDMAN:  That's --
5          THE WITNESS:  If -- in other words,
6      that's the difference.  You have to be -- you
7      have to sell it at a price that's related to the
8      marketplace, you know.
9          And you have to -- you -- you -- you
10     would put it on your records that you're selling
11     short on the original order ticket.  You have to
12     mark it, because it's what they call an uptake
13     rule and so on, which means you have to -- it's
14     not important.  It's confusing.
15 BY MS. CHAITMAN:
16     Q.  Okay.  So -- so basically if you take John
17 Smith.  He's a split-strike customer.  His statement
18 shows that he owns a portfolio of securities, and, in
19 fact, you don't at that time own them.
20     A.  No.
21     Q.  Are you saying that there's nothing
22 fraudulent about issuing a statement to an IA
23 customer --
24     A.  Uh-huh.
25     Q.  -- an investment advisory customer, showing

Page 149

1  securities as having been purchased for the customer,
2  when, in fact, they haven't been purchased?
3      A.  That's correct.
4          MR. SHEEHAN:  Object.
5          THE WITNESS:  You don't have to --
6      you're not required.  It's not the customer's
7      business whether or not you're selling the stock
8      from long or whether you're selling it short.
9  BY MS. CHAITMAN:
10     Q.  Okay.  So what you're saying is that the
11 fact that the split-strike conversion strategy was
12 carried out from sometime in 1992 until December of
13 2008 without your actually owning the securities that
14 showed up on the statements, that was not a fraud, but
15 the fraud was that you didn't disclose to the SEC on
16 your focus reports --
17     A.  That's correct.
18     Q.  -- that you had that debt?
19     A.  Right.
20         MR. SHEEHAN:  Objection.  Objection,
21     but go ahead.
22         THE WITNESS:  That's correct.
23 BY MS. CHAITMAN:
24     Q.  Okay.  Can you put this in your own words,
25 so we don't have any confusion about it?  I just want

38 (Pages 146 - 149)

Page 150

1  it to be very clear on the record.
2      A.   That there is nothing wrong with selling
3  stock to a customer out of a short position. In other
4  words, you do not have -- that is not a violation.
5  The violation -- and it is typical for a brokerage
6  firm to at times sell stock to a customer short. That
7  is not a violation itself.
8          And the customer doesn't care whether the
9  stock that you are selling him is stock that you
10 actually are long or short. You know, the customer
11 assumes, as -- and, rightfully so, that if he wants --
12 if wants delivery of those securities, or he wants the
13 profit made from the transaction, that you're still
14 obligated to do that.
15         So had I reported this transaction on my
16 financial records as a liability, that would be --
17 that would be all right, but because I didn't, that's
18 where the violation was.
19         Now, obviously, I couldn't do that, because
20 my -- my liabilities would have been too great. Which
21 brings me to another error, you know, that I find in
22 the Dubinsky report. See if I can remember where it
23 was. Related to that. The -- well --
24     Q.   Do you -- do you want -- do you want her to
25 read back your last comment? Maybe it'll prompt you

Page 151

1  to --
2      A.   No.
3      Q.   -- to recall.
4      A.   No. I'll think of it. First of all, here
5  is this. This is yours, and this is yours, I think.
6  I have too much paperwork here.
7      Q.   I just want to go back -- back to this.
8  Forgive me, but it intrigues me.
9          So the entire portfolio that was purportedly
10 owned by the investment advisory customers from 19 --
11 from whenever it was in 1992 that you stopped buying
12 the securities that showed up on the statements until
13 2008, you had always honored withdrawals?
14     A.   Right.
15     Q.   You never defaulted in any of your
16 obligations to the customers?
17     A.   Not until, you know, I went out of business.
18     Q.   Right. Okay. So the only violation of law
19 that you understand you committed was not disclosing
20 on your focus reports that you had sold short; is that
21 right?
22     A.   Not that I had sold short. That I didn't --
23 I did not reflect my liabilities. That was because of
24 the short position.
25     Q.   Right.

Page 152

1      A.   The short position would have reflected a
2  liability to the customer.
3      Q.   To purchase the shares?
4      A.   I did not show that.
5      Q.   Okay. Okay. And I just want to ask you one
6  other thing, which is not related, except it came into
7  my mind.
8      A.   Okay. Before you do that --
9      Q.   Oh, okay.
10     A.   -- I remembered what I was going to say.
11     Q.   Go ahead.
12     A.   Dubinsky states that -- well, he -- he -- he
13 acknowledges that he -- he doesn't have records to
14 prove this, but he infers in some language that
15 because I did not on my focus reports --
16         One of the -- one of the things that he --
17 points he makes to demonstrate that I was -- he was
18 trying to establish his theory, obviously, initiated
19 by the trustee, most likely, that my fraud went back almost to the
20 beginning of time.
21         All right. That I didn't do any business,
22 because I did not reflect any customer business on my
23 financials -- on my focus reports. Customers that
24 were -- you know, activity, long and shorts.
25         So -- because he says that, you know, I

Page 153

1  mean, he -- he's saying he could have been doing
2  business in -- for customers in the '80s or '70s or
3  '60s, the '70s even, because my focus reports, which
4  he doesn't have, by the way, because he doesn't -- he
5  can't get that, but he's assuming that there was no
6  customer, you know, business -- no customer positions
7  shown on my focus reports.
8          All right. But this is a common error made
9  in -- by customers in general. I used to get calls
10 from people that would say, listen, Merrill Lynch
11 doesn't show, you know, my assets on a position.
12         He's doing all of this business with -- with
13 me or with all of these customers, and it doesn't show
14 on Merrill Lynch's financial statements, you know, any
15 of this business.
16         I said, well, are you talking about his
17 balance sheet? He says, yeah. I said, brokerage
18 firms do not show customer assets fully paid for
19 securities on their balance sheets. Otherwise,
20 Merrill Lynch would have trillions and trillions of
21 dollars.
22         I said, you know, when a brokerage firm
23 files a focus report or any balance sheet, when they
24 send you, you know, they do not -- they do not show or
25 record customers' fully paid for securities.

39 (Pages 150 - 153)

Page 154

1    So if a customer had a margin account or
2    a -- you know, a liability, he would have to show a
3    payable or a receivable from a customer.
4    But if a customer buys IBM, pays for the
5    IBM, and the brokerage firm has that IBM in his -- you
6    know, in his box or at the clearing corporation, that
7    doesn't appear on his records anywhere. So, you know,
8    as long -- if I was -- if I had a -- a liability, and
9    not from a short sale, because, you know, the short
10   sale -- the short sale, if it's a liability, would
11   appear on it, but if he was long and short, the
12   same -- it's another thing.
13   When you're trading in convertible
14   securities, you're -- you're allowed to net the -- the
15   receivable and payable for the same customer against
16   each other. So that stuff does not appear on a focus
17   report.
18   Now, that's a basic accounting. Anybody
19   that's a -- anybody that's familiar with any brokerage
20   firm accounting would know that question. So why he
21   would think there would be a -- that would be on my --
22   on my balance sheet, it's not certain.
23   What would be on my balance sheet would be
24   if the customer owed me money, which is another thing.
25   There's a -- there's a major flaw. And this I have to

Page 155

1    address, even though you didn't ask me about it.
2    The trustee somehow or other when I read the
3    GAO report -- and I actually spoke to the treasury
4    secretary -- the inspector general of the treasury
5    department about this.
6    In the -- in the -- in the GAO report,
7    issued by the government, which is a report that he
8    issues from the general accounting -- accountability
9    office, based upon the trustee's report, there's a --
10   I have a -- this is something that -- David,
11   you might ask Irving Picard how he had managed to get
12   this thing slipped through.
13   Jeffry Picower --
14   MR. GOLDMAN: Tell us what you're
15   looking at, Bernie.
16   THE WITNESS: Oh, this is the GA -- a
17   copy -- part of the G -- the SIPC report, the GAO
18   report, which is -- took seven years to -- to
19   finally get, which my attorneys assured me was
20   going to be done immediately. It took seven
21   years to finally get them to do the results of --
22   of the trustee's report.
23   There's a 6.3 billion dollar liability
24   to the debit balance in Jeffrey Picower's
25   account, which was a -- major issue was one of

Page 156

1    the things that created my whole problem. This
2    relates to them -- them not honoring their
3    commitments with me when -- and --
4    Okay. This is on -- and I can't give
5    you -- this is my only copy, but you can find it.
6    It's on page 37 of the -- of the GAO report.
7    And I'm quoting now the General
8    Account -- Accounting Office. It says, "As part
9    of our review of the records provided by the
10   trustee, we noted some customer accounts having a
11   negative balance."
12   "For example, in the Picower case the
13   records showed a negative balance of 6.3 billion
14   dollars. In theory this reflected some kind of
15   margin account or debit balance."
16   "The trustee told us even though such
17   an account would not be in keeping with the
18   standard industry practice, such negative
19   balances raised the question of whether the
20   reported amounts represent a debt owed by the
21   customers to the Madoff firm."
22   Now, that clearly is a debt. All
23   right. Jeffry Picower owed me 6.3 billion
24   dollars. All right. The trustee -- I mean, the
25   GAO -- thank God. He questioned the trustee,

Page 157

1    what about the 6.3 billion dollars?
2    And for some reason the trustee
3    claimed, well, we can ignore that, you know.
4    That's not typical.
5    All right. Now, if you look at my
6    records or any brokerage firm's records or
7    account agreements with customers, it clearly
8    states that, you know, they're responsible for
9    any debit balances or margin accounts that they
10   have with the firm.
11   It says here on my trading
12   authorization, which clients sign, it says, "The
13   undersigned hereby agrees to indemnify and hold
14   you harmless from and to pay you promptly on
15   demand any and all losses arising thereof or
16   debit balance due hereon."
17   In other words, every customer that
18   opens a margin account or has any debt with a
19   brokerage firm owes them that money. All right.
20   MS. CHAITMAN: Okay. Can I just
21   mark -- okay. I'm going to mark as Exhibit 12 --
22   can I take that? Is that one document, the one
23   you just read from?
24   THE WITNESS: Yeah.
25   MS. CHAITMAN: Okay. So I'm marking as

40 (Pages 154 - 157)