# EXHIBIT 17

Page 1

CONFIDENTIAL
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                              )
                                    )
SECURITIES INVESTOR                 )
PROTECTION CORPORATION,             )
                                    )
     Plaintiff-Applicant,           )
                                    )
vs.                                 )   08-01789 (SMB)
                                    )
BERNARD L. MADOFF                   )
INVESTMENT SECURITIES, LLC,         )
                                    )
     Defendant.                     )
                                    )
In re:                              )
                                    )
BERNARD L. MADOFF,                  )
                                    )
     Debtor.                        )
                                    )

         Videotaped Deposition of BERNARD L.
MADOFF, VOLUME I, taken on behalf of the Customers,
before K. Denise Neal, Registered Professional
Reporter and Notary Public, at the Federal
Correctional Institution, 3000 Old Highway 75,
Butner, North Carolina, on the 26th day of April,
2017, commencing at 9:07 a.m.

                 * * * * *

CONFIDENTIAL

Page 106

1 other words, you couldn't as a customer, our firm
2 policy was to not handle a typical retail order for
3 a client. We either -- you either had to be a
4 broker-dealer or a bank to be a client of Madoff or
5 if you were a customer, you had to have -- when you
6 opened an account, you had to have a minimum of
7 500,000, which is at the very earliest $500,000 in
8 the account. Typically it was then 2 million. That
9 was if you were an individual client.
10     So but if you called us up and you said
11 you want to buy 20 shares of IBM or you want to buy
12 a thousand shares of IBM, we would not do that
13 order. If it wasn't -- the only customer business
14 that we did was where we managed the entire account
15 and we made the decisions.
16     Q. Okay. Now, if you'd look on page 23 at the
17 bottom of the page, the question was how many
18 accounts under consideration for avoidance action
19 were established with Madoff prior to the inception
20 of the Ponzi scheme?
21     In making the net investment method
22 determination net equity from these accounts, has
23 the Trustee used any of the pre-Ponzi disbursements?
24 If so, provide details, et cetera. And the response
25 says based on the Trustee's investigation and upon

Page 107

1 review of the earliest records available to him, the
2 Trustee has found no evidence indicating that the
3 BLMIS investment advisory business has been operated
4 as anything but a Ponzi scheme.
5     A. Right.
6     Q. Now, did anyone on behalf of the Trustee
7 ever talk to you about the trades that you did in
8 the 1980s?
9     A. No.
10     Q. Did the Trustee ever disclose to you that
11 he, in fact, had some trading records from the
12 1980s?
13     A. No.
14     Q. Now, when SIPC is using here the phrase
15 Ponzi scheme, if you accept for a moment that a
16 Ponzi scheme is a nonexistent business in which
17 people invest where the sole source of paying
18 returns on their investments is investments from new
19 investors --
20     A. Uh-huh.
21     Q. -- on that definition was the split strike
22 ever a Ponzi scheme? In other words, did you ever
23 need new cash from new customers in order to redeem
24 other customers?
25     A. No.

Page 108

1     Q. Did you ever need new cash from new
2 customers to pay the earnings that were reported on
3 the statements?
4     A. No. Let me make a statement that I have
5 never to my recollection ever had a conversation
6 with a Trustee, ever. The Trustee never met with
7 me, never spoke to me, never asked me anything from
8 the date of my arrest until currently. I've had
9 meetings with the attorneys when the attorneys came
10 down here after, you know, I don't know whether that
11 was 2010 or some year in that, but there was
12 nothing; but the Trustee, the only time I ever saw
13 the Trustee was at my proffer meeting with the SEC.
14     Q. In December 2008?
15     A. December of 2008. And as far as I recall,
16 he never asked me anything and I never said anything
17 to him.
18     Q. Okay. But did anyone from the Trustee's
19 law firm --
20     A. No. The law firm, yes. They came down at
21 one period of time. David Sheehan could -- was
22 present.
23     Q. Okay. But did they ever ask you whether
24 you actually executed the trades that were done in
25 the convertible arbitrage strategy?

Page 109

1     A. I don't think they ever asked me that. The
2 only conversation I had with them about trade at all
3 was the David Kugel scrap of paper that I mentioned
4 before.
5     Q. Okay, okay. Did they ever ask you exactly
6 when the -- when you stopped buying the securities
7 for the split strike?
8     A. No.
9     Q. Did they ever ask you whether you needed
10 the money from new investors in order to pay old
11 investors?
12     A. No.
13     (Customers Exhibit Number 31 was marked
14 for identification.)
15     MS. CHAITMAN: I'm up to Exhibit 31, and
16 this is the expert report of Bill Feingold. That's
17 okay.
18     MR. GOLDMAN: I'll take it easy.
19     Q. (By Ms. Chaitman) Okay. Have you seen
20 this document before?
21     A. Yes.
22     Q. Okay. Do you know Bill Feingold?
23     A. No.
24     Q. Did you ever hear about him?
25     A. No.

CONFIDENTIAL

Page 110

1  Q. I'd like to go through the substantive
2  portion of this report and I'd like you to give me
3  your insights on it; okay?
4  A. Uh-huh.
5  Q. So if you'd be good enough to turn to page
6  two?
7  A. Uh-huh.
8  Q. And if you could just read paragraph 12 and
9  then if you have any comments on that, I'd like you
10 to tell me what they are.
11 A. Yes.
12 Q. Okay. Can you tell me what they are?
13 A. What? What did you ask me?
14 Q. Did you have any comments on this? Do
15 you -- do you --
16 A. Yeah. I think, you know, he pointed out,
17 you know, the fallacy of what Dubinsky used, made
18 statements about volume and so on. He's
19 criticizing -- I think there were 41 points that he
20 made that Dubinsky was incorrect in his analysis,
21 which was basically very similar to all my comments
22 when I analyzed the Dubinsky report.
23 Q. Okay. In paragraph 13 he says that most
24 trading and bonds, unlike stocks, takes place in the
25 over-the-counter market and that's something you had

Page 111

1  testified to; right?
2  A. Right.
3  Q. And then he quotes the SIFMA website for
4  the statement, quote, the OTC market is much larger
5  than the exchange markets and the vast majority of
6  bond transactions, even those involving exchange
7  listed issues, take place in this market?
8  A. Correct. I think this is -- he's
9  reflecting very similar to the last time we had a
10 deposition and I produced a very large book that was
11 written. I gave -- you took as evidence --
12 Q. Yes.
13 A. -- that stated all of this.
14 Q. Right.
15 A. That was in complete contrast to Dubinsky's
16 report.
17 Q. Right. And if Dubinsky had spoken to
18 anyone who did trading and convertible bonds in the
19 1980s, would they have found this information out?
20 A. Yes.
21 Q. In paragraph 14 Feingold says in an OTC
22 market investors do not trade directly with each
23 other but with many individual dealers who
24 continuously make markets, paren, buy and sell. As
25 such, OTC markets are much less centralized and data

Page 112

1  are less readily available. Is that accurate?
2  A. That's correct.
3  Q. If you'd just take a look at paragraph 15
4  and if you'd just take a moment to read that and
5  then I'd like your comments on it.
6  A. Right. He's basically saying that, you
7  know, that -- that convertible bonds and bonds in
8  general do not trade for the most part on the floor
9  of an exchange. They trade over the counter between
10 dealers. Madoff is one of the largest convertible
11 bond dealers in the country. We made more markets
12 in convertible bonds than any other firm. He
13 doesn't state that, but that was common knowledge.
14     And he's saying that you couldn't get
15 accurate information, you know, until 2002 because
16 that was when TRACE came in. And even when TRACE
17 came in, there was question as to whether or not the
18 correct volume was reported even then. Bond dealers
19 in general do not like to report their transactions
20 or their volume because they consider it proprietary
21 information.
22     The SEC would like -- look, the SEC would
23 like everything to be transparent. That's been a --
24 in the 50 years I've been in this industry, that has
25 been a debate that went on and still has not been

Page 113

1  resolved. And to a certain extent, you know, they
2  blame me for a lot of -- a lot of this because of
3  the fact that we were the ones that pioneered the
4  form of electronic trading.
5      Right now all of these problems that you
6  have with this what they call that book that came
7  out, Flash Boys, all the trading is done in dark
8  pools and not -- when I came into this industry,
9  98 percent of the business in securities was traded
10 on the floor of an exchange and listed securities.
11     The SEC was unhappy with that and I was
12 given the responsibility for developing a more
13 competitive marketplace. And that's how we started
14 this electronic trading and that's how I developed
15 NASDAQ originally. The volume on the -- on New York
16 Stock Exchange's list of securities today is only
17 about 30 percent on the floor of the exchange and
18 70 percent if it is done over the counter.
19     So and that's a constant problem. The
20 whole marketplace has changed and will probably
21 never go back to the way it was. And nobody wants
22 to -- the goal of the industry is to have less
23 transparency because people always -- always want to
24 trade against somebody else. They're all competing
25 with each other.

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1  So the idea is to conceal what you're
2  doing, what you're buying, what you're selling. And
3  because of what the SEC would like to do, they'll
4  never change that. Business is done more in Europe
5  now than ever before and it's -- that's where the
6  industry is.
7      Q. In paragraph 19 Mr. Feingold says, thus,
8  when Mr. Dubinsky cites data from the New York Stock
9  Exchange to support his arguments about bond volume,
10 he is treating approximately one percent of the
11 activity as indicative of the entire market.
12     A. Really?
13     Q. Is that --
14     A. Yes.
15     Q. In fact, I think that the book that you
16 brought to the last deposition --
17     A. Right, right.
18     Q. -- said that one percent of the convertible
19 bond trading was done on the New York Stock
20 Exchange?
21     A. Right.
22     Q. And if Mr. Dubinsky or someone working for
23 him had spoken to anyone who did convertible bond
24 trading in the 1980s, would they have learned that?
25     A. Look, without trying to be cruel, the

Page 115

1  Dubinsky report is an embarrassment. I mean, I just
2  -- that's the only way to describe it. Quite
3  frankly, I don't understand it because if you look
4  at his background, you know, as an accountant and
5  his so-called fraud order, I don't understand how --
6  to me it's a mystery and would be for anybody a
7  mystery that would read that report would be
8  stunned, you know, at his -- at the report.
9      I don't understand it. I mean, Feingold's
10 background is certainly equal, if not better, than
11 Dubinsky's and it's certainly more current. So but,
12 quite frankly, you could find anybody that was
13 familiar with the marketplaces that would be able to
14 write the same kind of report that Feingold wrote
15 that was critical of Dubinsky's report.
16     He does state in the report if you read
17 through the Dubinsky report, he does make comments
18 that he doesn't have -- he doesn't have access to
19 certain information. He can't find it, but that
20 didn't prevent him from still coming -- drawing
21 conclusions.
22     So if you're going to -- if you're going
23 to say, well, I only looked at the New York Stock
24 Exchange volume, you know, and, therefore, I'm
25 determined that Madoff could not have bought

Page 116

1  securities because he -- you know, it didn't match
2  the volume of the New York Stock Exchange when
3  everybody knows that you don't -- you can't just
4  look at the New York Stock Exchange volume.
5      I mean, how could you write a report that
6  said that? What he should have said is I do not
7  have access to the information to make a
8  determination of whether these transactions took
9  place or not. That's what -- that's what -- you
10 know, that's what I would have done or anybody would
11 have done.
12     Q. In paragraph 27 Mr. Feingold writes in
13 paragraph 99 Mr. Dubinsky inaccurately describes the
14 process by which convertible securities become
15 common shares. He writes that, quote, many
16 convertible securities have the option for the
17 company to call the security at a predetermined date
18 or at the company's discretion, that is, the company
19 has the right to convert the convertible securities
20 into common shares.
21     In instances where the bond or preferred
22 equity is called, the shares are converted on the
23 record date at a determined amount, end quote. In
24 fact, except for a specific subcategory known as
25 quote, mandatory, end quote, convertible securities,

Page 117

1  the securities are convertible at the investor's
2  discretion, not the issuing company's. When a
3  company calls a security, the investor is then given
4  a period typically between 20 and 120 days in which
5  to decide whether to convert the security into
6  common shares or to accept the cash call price
7  stipulated in the company's call notice. Do you
8  agree with Mr. Feingold on that?
9      A. Yes.
10     Q. Now, in paragraph 30 Mr. Feingold writes
11 footnote one of two of Mr. Dubinsky's report
12 contends that a significant percentage of the short
13 positions reported by Madoff customers exceed the
14 amount of short interest in those stocks as reported
15 at month end by the stock exchange. I found this
16 very dubious.
17     Going through the list I noticed that
18 Pfizer, one of the world's largest drug companies,
19 had short interests according to Mr. Dubinsky's
20 table of 826,162 shares at the end of March 1992.
21 Pfizer's closing price that month was $69.50 per
22 share according to Yahoo Finance.
23     Average daily trading volume in Pfizer was
24 10.74 million shares. If Mr. Dubinsky's data are
25 correct, the short interest in Pfizer then

CONFIDENTIAL

Page 118

1  constituted less than eight percent of an average
2  day's volume.
3      A. I don't know what you -- I don't know what
4  you're asking me. I mean, as I say, I'm at a loss
5  to explain this whole Dubinsky report. I know, it's
6  -- if it wasn't such a -- if his accusations weren't
7  so serious, it would almost be comical.
8      Q. Well, is it difficult to find out what the
9  average daily volume in Pfizer was?
10     A. Yes, I mean, because volumes were reported.
11 The over the -- he's looking at volume that was
12 reported on the exchange when over-the-counter
13 dealers don't report the volume. I mean, you know,
14 so you can't -- it's like adding apples and oranges.
15 You can't -- you can't -- you can't find the
16 information.
17      Again, as I said before, the business of
18 an exchange is to try and let people know exactly
19 what has happened. That's what they advertise. You
20 know, an exchange wants to make everything public
21 because in theory, you know, the SEC would love, you
22 know, the public to understand everything that goes
23 on, how many shares trade, where they trade, at what
24 price they trade. Institutions who do the majority
25 of the business want to do just the opposite.

Page 119

1      They do not want to let, you know,
2  everybody know what they're doing because it's no
3  different than like insider trading. You know, the
4  idea is you're in an industry where everybody is
5  competing against each other, including -- including
6  the public customers. You have to understand that
7  the person who buys stock thinks he knows something
8  that the person who's selling it doesn't understand.
9      It's not a zero sum gain. Someone is
10 going to be a winner, someone is going to be a
11 loser. And it's the same. So information is the
12 key. People are trying to get less information out
13 as possible, you know, but that's the way the
14 industry is done now. The markets are not --
15 they're much less transparent today than they were
16 20 years ago, you know.
17      So you can't -- it's not an accident that
18 people can't -- that Dubinsky can't find this
19 information that he's trying to do because it's not
20 available. I mean, quite frankly, I think that what
21 happened was in fairness -- fairness to me, not the
22 Trustee -- the Trustee drew conclusions from day one
23 of what he thought he wanted to -- he wanted the
24 outcome to be. He wanted the outcome to be that I
25 was a fraud from the very beginning, that I never

Page 120

1  did any transactions. He made statements like
2  because he couldn't find confirmations, therefore,
3  from other broker-dealers. Therefore, the
4  transaction never took place.
5      All right. Him not understanding that the
6  industry stopped producing confirmations to
7  noncustomers. So when I bought stock from -- you
8  know, in the open market from Merrill Lynch, we
9  didn't send confirmations to each other. The
10 industry discontinued that.
11     Picard drew a conclusion because he
12 couldn't produce a confirmation. Therefore, the
13 trade never took place. He totally ignored the fact
14 that, number one, confirmations weren't even
15 generated any longer, which is something that is
16 very obvious to anybody in the industry. Also, he
17 totally eliminated the fact that nobody keeps
18 records past six years any longer.
19     They're destroyed, you know. So he -- you
20 know, but he had a conclusion that he drew from day
21 one very similar to what the U.S. Attorney did when
22 he asked me do I ever short stocks and I said yes,
23 of course, I short stocks. You know, he said did
24 you ever sell to a customer that didn't know? Of
25 course, I did.

Page 121

1      You know, and I had to explain to the U.S.
2  Attorney that that's what the business of market
3  makers are doing, you know; but so he wanted to
4  determine, well, since I always shorted stock back
5  in 1962, that I might have never bought stock. I
6  mean, you know, I don't -- I think that what
7  happened was Dubinsky was -- you know, the Trustee
8  must have told Dubinsky this is what my conclusion
9  was. This is what my theory is.
10     And Dubinsky, whether he did it in a
11 devious way or not, I don't think so. I just think
12 that he just did the best he could. He wanted to
13 get information, so he took whatever information was
14 available. The fact that the information didn't
15 exist didn't mean that, you know -- that, you know,
16 the conclusion they drew, it didn't make any sense.
17 I don't know what else to say.
18     Q. Okay. Now, Mr. Dubinsky opined that you
19 were insolvent as far back as 1983.
20     A. I saw that.
21     Q. Do you agree with him?
22     A. No. I can tell you he stated how he came
23 to that conclusion, you know. He just took whatever
24 the -- you know, whatever -- he made the conclusion
25 that I never did any transactions in '83. So,

31 (Pages 118 - 121)

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

CONFIDENTIAL

Page 122

1  therefore, he said since the customer showed that,
2  you know, balances in the account from transactions,
3  he figured, okay, that was a liability that Madoff
4  had. He totally eliminated the fact that I was
5  doing business, you know, back in 1983 and so on.
6  So, therefore, I had the assets to cover that.
7      So he said, well, he knew what the
8  liabilities were because it was a customer
9  statement. He had no way of knowing what the assets
10 that I had were because he didn't have any records
11 going back then. I mean, who would possibly make a
12 statement like that? I mean, the biggest mistake I
13 made was not going to trial.
14     Had I gone to trial rather than just
15 saying okay, I'm going to eliminate the government
16 spending millions of dollars and years in a trial
17 with me, I'm just going to admit that I was guilty
18 because I was from 1992 on, which was bad enough.
19 You know, they for some reason, the Trustee wanted
20 to determine that I was guilty from 1963.
21     All right. Had I gone to trial, I would
22 have called in any number of expert witnesses like
23 this Feingold or anything else and the judge would
24 have totally laughed the Trustee out of court. Why
25 he even bothered writing -- 90 percent of his report

Page 123

1  deals with after 1992. I already admitted that I
2  didn't do the transactions after '92. So why spend
3  all that time on that, you know? What he did prior
4  to that made absolutely no sense anyhow.
5      Q. Now, did Dubinsky acknowledge that you held
6  securities at Lehman, Bear Stearns, Morgan
7  Stanley --
8      A. No.
9      Q. -- Fidelity and JPMC?
10     A. No, no. That's not true. He did state
11 that I had an account at Morgan Stanley, yeah. He
12 stated that. He didn't give any details on it but,
13 I mean, it was he had a copy of the Morgan Stanley
14 report in his information here. So, therefore, he
15 had to know that I had securities over there. He
16 did state that I had securities at those -- at other
17 firms, yeah. He did state that.
18     Q. But did he acknowledge that you had
19 purchased those securities --
20     A. No.
21     Q. -- with 703 account money?
22     A. No.
23     Q. Now, Mr. Dubinsky also opined that your
24 firm was insolvent from 2002 on. Do you agree that
25 you were insolvent as of 2002?

Page 124

1      A. In 2002 I did not have -- if he's -- I
2  would say yes, I was insolvent because I did not
3  have enough assets to cover the liabilities that I
4  had with the customers in 2002.
5      Q. If you had -- if everyone had demanded
6  payment at one time?
7      A. Yes. You have to assume that if I show the
8  customers had a liability on that, whether they
9  asked me for it or not, I was insolvent. You have
10 to make the assumption that if you owe the money
11 out, whether you have the ability -- if you don't
12 have the ability to pay if called, you're insolvent.
13     Q. Okay. Now, as of 2002 if the four families
14 had paid you the money they owed you, would you
15 still have been insolvent?
16     A. In 2002? Yes, because the fund business
17 was -- I wouldn't have been able to cover all my
18 direct accounts, you know, other than the funds
19 because the customers only had a liability of $5
20 billion whereas the funds had $14 billion.
21     So, you know, I wouldn't have enough money
22 to cover, you know, $19 billion; but I certainly
23 wouldn't have had enough money to cover all my
24 individual clients but, quite frankly, it doesn't
25 make a difference. They're both the same.

Page 125

1      Q. Looking at paragraph 39 of Mr. Feingold's
2  report, he says an active trader would likely have
3  held many convertible arbitrage positions for
4  substantially less than the period until the next,
5  paren, usually, end paren, semi-annual coupon was
6  paid. Most likely, bonds were either converted or
7  sold into the open market.
8      Again, an investor who sells a corporate
9  bond receives accrued interest from the buyer
10 instead of collecting on the coupon date from the
11 issuer and the interest is built into the total cash
12 inflow.
13     A. Right.
14     Q. Do you agree with that?
15     A. Yes.
16     Q. Is that the -- is that the strategy that
17 you used?
18     A. Yeah. It's what anybody would use at
19 TRACE. It's not unique to Madoff. It's, you
20 know -- it's, you know, standard operating
21 procedure.
22     MS. CHAITMAN: Okay. All right. We have
23 to take a break because they have to change the
24 disc.
25     THE VIDEOGRAPHER: Going off the record.

32 (Pages 122 - 125)