# EXHIBIT 19

Page 1

```
 1   UNITED STATES BANKRUPTCY COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - - - - - - -x
 4   SECURITIES INVESTOR PROTECTION
 5   CORPORATION
 6   v.                              CASE NO. 08-01789-smb
 7   BERNARD L. MADOFF INVESTMENT
 8   SECURITIES, LLC, et al,
 9           Debtors.
10   - - - - - - - - - - - - - - - - - -x
11   IRVING H. PICARD, TRUSTEE,
12           Plaintiff,
13   v.                              CASE NO. 09-01161-smb
14   KINGATE GLOBAL FUND,
15   LTD., et al.,
16           Defendants.
17   - - - - - - - - - - - - - - - - - -x
18   IRVING H. PICARD, TRUSTEE,
19           Plaintiff,
20   v.                              CASE NO. 10-04946-smb
21   GOLDENBERG,
22           Defendants.
23   - - - - - - - - - - - - - - - - - -x
24
25
```

### Page 2

```
 1         U.S. Bankruptcy Court
 2         One Bowling Green
 3         New York, New York
 4
 5         July 26, 2017
 6         10:09 AM
 7
 8
 9  BEFORE:
10  HON. STUART M. BERNSTEIN
11  U.S. BANKRUPTCY JUDGE
12
13  ECRO:  Unidentified
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1  Conference re: Madoff Day 2 Deposition Topics
 2
 3  Discovery Conference Pursuant to Local Bankruptcy Rule
 4  7007-1
 5
 6  Conference regarding status of factual stipulation in
 7  advance of motions for summary judgment
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Transcribed by: Sherri L. Breach, CERT*D-397
```

### Page 4

```
 1  A P P E A R A N C E S :
 2  BAKER & HOSTETLER, LLP
 3      Attorneys for BLMIS, Trustee
 4      45 Rockefeller Plaza
 5      New York, NY  10111
 6
 7  BY: GERALDINE E. PONTO, ESQ.
 8      MARSHALL J. MATTERA, ESQ.
 9      DAVID J. SHEEHAN, ESQ.
10      STACEY A. BELL, ESQ.
11      AMANDA E. FEIN, ESQ.
12
13  CHAITMAN, LLP
14      Attorneys for large group of defendants
15      465 Park Avenue
16      New York, New York 10022
17
18  BY: HELEN DAVIS CHAITMAN, ESQ.
19
20  MCDERMOTT, WILL & EMERY, LLP
21      Attorneys for Sage defendants
22      340 Madison Avenue
23      New York, New York 10173
24
25  BY: ANDREW B. KRATENSTEIN, ESQ.
```

### Page 5

```
 1  SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
 2      Attorneys for Tremont
 3      Four Times Square
 4      New York, New York 10036
 5
 6  BY: SETH M. SCHWARTZ, ESQ.
 7
 8  SCHULTE ROTH & ZABEL, LLP
 9      Attorneys for Picower Parties
10      919 Third Avenue
11      New York, New York 10022
12
13  BY: MICHAEL KWON, ESQ.
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 38

1  for the market making and proprietary. He didn't have a
2  separate one for investment and advisory. That was a closed
3  system and no outside world had contact with it. So for him
4  to then negotiate and sell those stocks that were delivered
5  in for -- by that customer, they are going to show up. They
6  -- I don't disagree. They'll show up in DTCC and they'll
7  show up in the market making records. Why, because --
8       THE COURT: Have the --
9       MR. SHEEHAN: -- there's no other place to
10 negotiate them.
11      THE COURT: Have the DTCC records been produced
12 either by DTCC or the trustee?
13      MR. SHEEHAN: Yeah. We produced a number of
14 those. We -- certainly all the ones that we had going back
15 to 1998 included in the reference that we've given to Ms.
16 Chaitman. And I want to be very careful with this date
17 here. There's a predecessor at DTCC called National
18 Securities Career Incorporation, NCSS. We have found
19 records of those.
20      We believe what those are, just to be very clear
21 here today in court, is that Madoff had access to -- had a
22 printer in his office and he could print that out. So while
23 it is a -- I believe an NCSS record, it is actually printed
24 out in Madoff's office, not delivered by NCSS. I think
25 that's an important distinction.

Page 39

1       But in any event, we have produced those records
2  as well. So we believe that there's enough -- more than
3  enough information in the 600 that Ms. Chaitman has, all
4  right, that she should be able to come to Your Honor with a
5  lot more information than she's giving to you now, to
6  justify the expense of taking whether it's 1,281 or 4,500
7  more tapes and putting those together.
8       Now we're going to accommodate her. We -- Your
9  Honor suggested the last time we were here, well, just give
10 her the tapes. And I guess what we could do to make it easy
11 so she doesn't have to have somebody from Iron Mountain
12 watch her or any of that stuff, we could just copy the tapes
13 and give it to her.
14      But I don't know -- and to be candid, and I think
15 Ms. Chaitman would be right if we gave her that we're giving
16 her a pig in the poke because at that point how the heck
17 could she go through 4,500 tapes without them being, you
18 know, digitized and put in a format to -- that can be looked
19 at.
20      So I believe what's before Your Honor today and I
21 think that, you know, especially in light of the Judge Moss
22 history, it's not a failure on our part to comply with two
23 prior orders or with Judge Moss's order. We believe and I
24 believe Judge Moss believed that we have complied with what
25 he asked us to do. And that what he then suggested to Ms.

Page 40

1  Chaitman is, okay, fine, just where we are here today; that
2  what you can do is look at the 600 and if you come back to
3  me and you demonstrate to me that there's reason to be had
4  that the trustee should incur the further expense of putting
5  those other tapes together, that's fine.
6       What I would also suggest in adding to that is
7  that Ms. Chaitman has those 600. She says she wants to go
8  back and talk to Mr. Madoff. I agree. We should go. We
9  should go sooner rather than later. And she can utilize
10 that opportunity to also ask him and then there would be
11 perhaps even a further record. I submit, anticipate the
12 argument that Mr. Madoff will have no knowledge of this as
13 demonstrated by what he was telling us the last time we were
14 down there. His knowledge of the back office, the trades,
15 the records and everything is very minimum. And when asked
16 about it he disavows any real knowledge.
17      So I don't know what we're going to gain, but I'm
18 more than happy to go down. I'm more than happy to have her
19 answer. But to suggest today I think -- I think there's no
20 motion pending to be frank. I think Ms. Madoff -- I
21 apologize again. I've made that mistake before and I do
22 apologize. Is that Ms. Chaitman should put together a
23 motion utilizing those 600 and Mr. Kratenstein can add to
24 that. And they've heard what I've had to say today. And I
25 recognize that we've given them a lot of additional data.

Page 41

1       But I think we've given more than enough to put
2  the onus on them to come to Your Honor with a motion that
3  says, wait a minute, whatever the trustee did here is not
4  enough. I need the rest of those tapes. And I think at
5  that point we can respond again, all right, and I'm not
6  holding anything back here. It's not like I've got more
7  than I can tell Your Honor. We're very comfortable that
8  there's nothing on those 600 nor would there be anything on
9  the 4,500 that will contradict what we're representing and
10 have represented throughout the course of the case, that
11 there was no trading going on on the investment advisory
12 side of the house.
13      Thank you, Your Honor.
14      THE COURT: Okay.
15      MR. KRATENSTEIN: Your Honor, may I be heard?
16      THE COURT: Sure.
17      MR. KRATENSTEIN: Thank you, Your Honor.
18      Good morning, Your Honor. Andrew Kratenstein of
19 McDermott, Will & Emory for the Sage defendants.
20      I want to start by thanking Mr. Sheehan for
21 acknowledging that the Sages did, in fact, deliver stock.
22 That's actually the first time -- to Mr. Madoff. That's
23 actually the first time we've heard that admission. He also
24 just said several things just now that I've never heard
25 before and was very interested to hear. He said that, yes,

11 (Pages 38 - 41)

Page 42

1  they admit that the Sages delivered stock to Mr. Madoff, but
2  they can show that Mr. Madoff liquidated the stock and then
3  started his scheme.
4     I would love to see that evidence. I haven't seen
5  it yet. Maybe it will help, if you show it to me, resolve
6  this case, maybe it won't. I don't know. But I would love
7  to see it sooner rather than later. We certainly haven't
8  found it.
9     What we have seen, and I attached some of this to
10 my letter back from the last hearing, are documents that
11 appear to show from Mr. Madoff's records and we did try to
12 make the showing to show what we were finding in this
13 microfilm, that (a) stocks were delivered to Mr. Madoff back
14 in the late '70s by my clients. That's now apparently
15 admitted. And that stocks were held according to Mr.
16 Madoff's records at least for some period of time at
17 different banks including National Westminster Bank and
18 MBNA, stocks or other securities including an RCA bond.
19    And if the trustee has evidence showing that those
20 records of Mr. Madoff's are inaccurate and that, in fact,
21 those positions were liquidated before the Sages gave the
22 instructions to liquidate them later in time, I would love
23 to see it. Show it to us as soon as possible and maybe that
24 could help streamline this whole matter.
25    I will note that we do have a defense that

Page 43

1  regardless of whether the trades actually occurred, the mere
2  fact that the Sages directed the trading is a defense, but
3  put that aside it would also obviously be interesting for us
4  to know if the trades actually occurred or not.
5     And so we've been trying to figure that out
6  through all of the records that have been produced and it is
7  difficult to do. There are tons and tons of records that
8  have now been produced.
9     The other thing we can't -- and we just got these
10 pie charts and other charts which, again, I wish I had seen
11 before this morning so that we could study them. But, for
12 example, talking about those cash and securities records
13 that were on that list, we have done our review of those.
14 We think that they're very interesting records. We have
15 only found them at what has been produced for the house 17.
16 We have investment advisory accounts through 1985.
17    And we -- maybe they exist beyond that and maybe
18 they don't. We're curious as to why. That's one of the
19 reasons we think that the production is incomplete. It's
20 unclear to us why there are no post-1985 cash and securities
21 reports for the house 17 account. And we have questions
22 about that.
23    Turning to proportionality, you know, I will just
24 quickly take to the factors here. We have already addressed
25 resources. The importance of the issues at stake in this

Page 44

1  action, as Your Honor knows the importance is, is quite
2  large. There's also a public side of this, obviously, what
3  happened with Mr. Madoff, what was the scope of the fraud,
4  et cetera.
5     The amount of controversy from my clients at least
6  this case involves their life savings. So that's certainly
7  to them a very high amount of controversy.
8     In terms of the access to the data, the trustee
9  has all the access. We only have access to what we have
10 been given.
11    Resources, we've already discussed, and the
12 importance of the discovery to resolving the issues in this
13 case, we do think it's very important for the reasons that I
14 just said and also because as Ms. Chaitman eluded to, when
15 the trustee puts forward a $30 million expert and says,
16 there is no evidence and my case -- their case is based on
17 an absence of evidence of real trading, then it's really
18 incumbent on them to make available to the defendants all of
19 the evidence.
20    And for them to say, well, we have to define what
21 is a trading record and what isn't, as I believe my
22 colleague, Mr. Hutmaker (ph) said at the last hearing to
23 you, what is a trading record and what isn't, what counts
24 and what doesn't, that's for the fact finder. It's not for
25 the trustee to say, well, there's no third party

Page 45

1  verification so you should disregard it. That will be for
2  the fact finder to decide what credence to give to Madoff
3  records or other records. And if Mr. Sheehan and his
4  colleagues want to prove that these are fake accounts or
5  dummy accounts or what have you and that they can show us
6  through DTCC or other records that these stock trades never
7  occurred or the stock was liquidated, they'll have every
8  opportunity to do that. But we think we need to see the
9  documents so that we can test their assertions.
10    Thank you, Your Honor.
11    THE COURT: All of the documents, all 4,700 boxes?
12    MR. KRATENSTEIN: Well, now that we've seen this,
13 you know --
14    THE COURT: What's this?
15    MR. KRATENSTEIN: Well, I'm sorry. The records
16 that have been produced it is possible that we may be able
17 to narrow that. We hadn't seen this breakdown that we got
18 until this morning. I was going to come in here this
19 morning and say, yes, because we just got this chart here
20 and for my clients at least, my clients bought and held
21 securities so they were not switched right to begin. The --
22 and the Sages (indiscernible) account they bought and held
23 securities between 1982 approximately and 2007. Okay.
24    So that's a long period of time and we need the
25 records of that entire period of time to see what happened

12 (Pages 42 - 45)

### Page 46

1 to those securities, if anything. And, again, if they have
2 the documents that they say prove beyond a shadow of a doubt
3 or whatever evidentiary standard you want to apply that they
4 -- that it didn't occur, or preponderance of the evidence,
5 whatever. Here's the evidence showing that these trades
6 didn't occur, here's the evidence showing what Mr. Sheehan
7 just said that they were liquidated and assumes the stocks,
8 give it and then show it to us.
9     THE COURT: Your clients were giving trading
10 instructions to Madoff.
11     MR. KRATENSTEIN: Yes. In fact, I'll -- my letter
12 which was dated July 20 -- June 26th rather, if you look at
13 Exhibit C, that's an evidence of one of the instructions.
14 (Pause)
15     THE COURT: I'm sorry. What tab is that?
16     MR. KRATENSTEIN: I don't --
17     THE COURT: Oh.
18     MR. KRATENSTEIN: It's Exhibit C of my June 26th,
19 letter.
20 (Pause)
21     MR. KRATENSTEIN: I'll --
22     THE COURT: I'm looking for it.
23     MR. KRATENSTEIN: Yeah.
24     THE COURT: How frequently did your client give
25 trading instructions to Madoff?

### Page 47

1     MR. KRATENSTEIN: My client gave trading
2 instructions -- he met with Madoff at least once a year or
3 more. There are more letters like this. There are at least
4 a half dozen that we found. He regularly gave trading
5 instructions. It would depend on the time. So they bought
6 securities, as I said, in the early '80s on their
7 instructions and there was a buy and hold strategy mostly,
8 but certain positions were changed over time at the
9 direction of the Sages.
10     THE COURT: Did the trades that the Sages were
11 instructing show up on the customer statements?
12     MR. KRATENSTEIN: They did.
13     THE COURT: All right. Now you're in a different
14 position than the usual investment advisory customer who
15 gave him trading discretion. I understand.
16     MR. KRATENSTEIN: Yes, Your Honor.
17     THE COURT: All right.
18     MR. KRATENSTEIN: Thank you.
19     THE COURT: Yeah.
20     MS. CHAITMAN: Judge, I won't take the time to
21 refute everything that Mr. Sheehan said, but I -- we have
22 made extensive use of the e-data room. We had no knowledge
23 that the 400 reels of documents were -- that were put in the
24 data room came from the reels. We just looked at the e-data
25 room. It didn't say these are reels. But of course we

### Page 48

1 looked at the e-data room.
2     But if you recall last May, May 2016, we had
3 argument on my motion to compel because I made the point
4 that a lot of my clients would not have claw back exposure
5 if they were given credit for their profits prior to this
6 foot strike.
7     And so I've always been asking for these records.
8 And as you, I'm sure you remember Ted Jacobs represented to
9 the Court that everything had been produced and was the --
10 in the e-data room. And he was bragging about how proud he
11 was of how complete the e-data room was.
12     So now of course we realize the e-data room is not
13 complete and it -- it's not -- you know, to say at this
14 point when they've been hiding this evidence for eight
15 years, to say that they should just give me the microfilm
16 reels when we're talking about this enormous massive
17 documents and we don't really know everything that's on
18 them. That little label done by the vendor is not
19 satisfactory to assure us of everything that's on each reel.
20     If I get the microfilm reels, first of all, it's
21 not manageable for me. I mean, we're talking about probably
22 15 million pages of documents.
23     Number two, the trustee's going to have to put
24 them in a readable, searchable format for himself anyway
25 because he's going to have that expense anyway because how

### Page 49

1 do you -- they won't be Bate stamped. If I go to trial and
2 I have a document what am I going to do? I'm going to say,
3 it's from microfilm reel screen number 178, you know, from
4 reel -- it's not manageable.
5     In addition to which without it being searchable
6 when you're talking about 50 million pages of documents it's
7 as good as saying, you're not entitled to the evidence.
8     THE COURT: You know, I remember going on document
9 reviews when I was a young lawyer. We didn't have digitized
10 documents. We looked at the documents --
11     MS. CHAITMAN: Judge --
12     THE COURT: -- and made copies of what we wanted.
13     MS. CHAITMAN: -- I doubt very much that you had
14 50 million pages of documents.
15     THE COURT: Actually, I probably did in the --
16     MS. CHAITMAN: Okay.
17     THE COURT: -- first case I did.
18     MS. CHAITMAN: And was your adversary someone who
19 had been paid a billion dollars in a case that involves 64
20 billion and where your adversary made representations for
21 eight years that everything had been produced --
22     THE COURT: Okay.
23     MS. CHAITMAN: -- and now our hands are going to
24 be tied because we don't have the financial wherewithal to
25 prove how dishonest the trustee has been.

13 (Pages 46 - 49)

Page 50

1  THE COURT: All right. Look, I don't have a
2  motion before me. And I think that Sage is a slight -- is
3  in a different position than Ms. Chaitman's clients because
4  they can identify specific instructions and I think you
5  ought to deal with that issue about whether or not you can
6  produce the corresponding trading records for that day or
7  whatever it is, that it's supposedly shows up on his account
8  statements and then he can compare trading records with
9  account statements.
10     With respect to the 4,700 boxes, you're not going
11  to convince me to simply force the trustee to turn them
12  over. You're going to have to make a showing through a
13  motion or through negotiation.
14     What I would suggest since you're also appear to
15  be suspicious about the labeling or not suspicious, dubious
16  of its accuracy, is pick a small representative example, 20
17  reels, digitize them and then you can show me why these are
18  relevant or how these are relevant. If I look at the sample
19  and you don't show it to me, then you'll have to pay for
20  whatever it's going to cost. It's essentially a cost
21  shifting issue and a relevance issue, I suppose.
22     That's how I would suggest you deal with it in the
23  short term. but otherwise you can make a motion to compel
24  discovery. But he's going to come back and say, they're
25  irrelevant, but if you really want to look at them you pay

Page 51

1  for it. And it's going to be the same issue.
2     MS. CHAITMAN: Then I would suggest, Your Honor,
3  that you require the trustee to give me all the microfilm
4  and I will go through that process and try to do it myself
5  because I don't want to be in a position --
6     THE COURT: So you'll pay for it?
7     MS. CHAITMAN: No. He's just going to give me the
8  microfilm. He's not going to digitize it.
9     THE COURT: Well, he has to copy it --
10     MS. CHAITMAN: He doesn't have that.
11     THE COURT: He has to copy it.
12     MS. CHAITMAN: Well, he can certainly afford to
13  copy --
14     THE COURT: I think my suggestion is better. Look
15  through the list, pick a small representative sample, 20
16  reels, look through the reels. You can -- I assume you're
17  going to look at reels that correspond to dates in your
18  customers' statements if you're talking about treasury bills
19  or treasury trading to see if you can make a connection
20  because that's really what we're talking about.
21     MS. CHAITMAN: No, it isn't.
22     THE COURT: Well, that's what I understand it to
23  be --
24     MS. CHAITMAN: No.
25     THE COURT: -- because there's no --

Page 52

1     MS. CHAITMAN: Can I correct that?
2     THE COURT: Well, my understanding from what I've
3  heard is that the BLMIS other aspects of the business were
4  always engaged in actual transactions. They just weren't
5  allocated to customers. They were for BLMIS. And your
6  argument is that they were allocated because there are
7  corresponding entries in the customer statements where they
8  should have been allocated. Isn't that what you're arguing?
9     MS. CHAITMAN: There are different arguments.
10  With respect to the treasury, I can match up based on Mr.
11  Madoff's testimony as to where the treasuries were I can --
12  and he testified that all of those treasuries, I didn't
13  realize it was 16 billion as Mr. Sheehan said. Those were
14  purchased with 703 account money. Mr. Madoff testified --
15     THE COURT: Wasn't that just because he was
16  putting the cash into treasury bills to get more interest?
17     MS. CHAITMAN: No, because he had -- he had money
18  -- he held them to term. He held them to maturity. They
19  showed up on customer statements. And they were at Bearn
20  Sterns. They were at Fidelity. They were at Lehman
21  Brothers. They were at Morgan Stanley.
22     But that's an issue post-1992. I'm focusing on
23  the 1980s, and what we've already found from the 450 odd
24  reels that were produced is we can show that the convertible
25  bond trading of our customers was supported by the ownership

Page 53

1  of the securities that their statements showed they had.
2     THE COURT: All right. Well, you can --
3     MS. CHAITMAN: But we've only gotten a small
4  portion of those. I showed -- I included those in my
5  submission to Your Honor before the last -- I -- there were
6  NCSS statements which Mr. Sheehan has conceded are
7  legitimate and there were National Bank of North America and
8  National Westminster Bank statements. And I assume they
9  were generated the same way. Computers were linked up and
10  they could be printed out by Madoff of what was being held
11  in custody.
12     So, you know, we've already established that these
13  documents prove that there was real trading done for the
14  customers. Now obviously that's going to be determined by
15  the fact finder, but we've only gotten a sliver of the
16  documents. That's why --
17     THE COURT: Well, you can show that in a motion to
18  compel discovery. There are a lot of issues that are
19  involved with cross-shifting. If you can convince me that
20  there's gold or that there may be gold in these unproduced
21  documents, then, you know, fine.
22     MR. SHEEHAN: Your Honor, I know you don't want to
23  hear more from me, but I just wanted to add one thing.
24     THE COURT: Yeah. I'm just -- you know --
25     MR. SHEEHAN: No. I don't want to argue. I just

14 (Pages 50 - 53)

Page 54

1  want to -- a point of clarification. It's our position that
2  Ms. Chaitman has all of the 1992 tapes, '92 and prior.
3      THE COURT: Pre-'92?
4      MR. SHEEHAN: Yes. At least according to the
5  markings on them and the --
6      THE COURT: Well, you know --
7      MR. SHEEHAN: -- stuff we've found. So --
8      THE COURT: -- if she makes a motion for it, you
9  just give me an affidavit saying they've all been produced.
10     MR. SHEEHAN: All right. Fine, Your Honor.
11     THE COURT: You don't have --
12     MR. SHEEHAN: Fine. Okay. I just want --
13     THE COURT: Because there's no point --
14     MR. SHEEHAN: -- to be clear.
15     THE COURT: -- there's no point in arguing back
16 and forth about that.
17     MR. SHEEHAN: No. I understand.
18     THE COURT: Now with respect to Sage, you may be
19 able to work out something to get the --
20     MR. SHEEHAN: We'll actively try that, Your Honor.
21     THE COURT: -- records that correspond to the
22 trading directions that were being sent over the years.
23     MR. SHEEHAN: Yes, Your Honor.
24     THE COURT: It certainly sounds relevant and --
25     MR. SHEEHAN: No question, Your Honor. And we

Page 55

1  will do that.
2      THE COURT: All right.
3      MR. KRATENSTEIN: Thank you, Your Honor.
4      THE COURT: All right. And give me the order for
5  the second day. Let's complete that deposition and schedule
6  a trial.
7      MR. SHEEHAN: Thank you, Your Honor.
8      THE COURT: All right. Thank you.
9      (Proceedings concluded at 11:09 a.m.)

Page 56

INDEX

RULINGS

IDENTIFICATION                                PAGE
N/A

Page 57

CERTIFICATE

I, Sherri L. Breach, certify that the foregoing
transcript is a true and accurate record of the proceedings.


_____
Sherri L. Breach
AAERT Certified Electronic Reporter & Transcriber CERT*D-397


DATE: July 27, 2017










Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

15 (Pages 54 - 57)