# EXHIBIT A

Page 1

CONFIDENTIAL

1              UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF NEW YORK
2

3

  In re:                          )
4                                 )
  SECURITIES INVESTOR             )
5 PROTECTION CORPORATION,         )
                                  )
6      Plaintiff-Applicant,       )
                                  )
7 vs.                             )   08-01789 (SMB)
                                  )
8 BERNARD L. MADOFF               )
  INVESTMENT SECURITIES, LLC,     )
9                                 )
       Defendant.                 )
10                                )
                                  )
11 In re:                         )
                                  )
12 BERNARD L. MADOFF,             )
                                  )
13      Debtor.                   )
                                  )
14

15

16         Videotaped Deposition of BERNARD L.
17 MADOFF, VOLUME I, taken on behalf of the Customers,
18 before K. Denise Neal, Registered Professional
19 Reporter and Notary Public, at the Federal
20 Correctional Institution, 3000 Old Highway 75,
21 Butner, North Carolina, on the 26th day of April,
22 2017, commencing at 9:07 a.m.

23

24                  *  *  *  *  *

25

CONFIDENTIAL

1  APPEARANCES OF COUNSEL:
2   On Behalf of the Customers:
3       HELEN DAVIS CHAITMAN, Esq.
4       Chaitman, LLP
5       465 Park Avenue
6       New York, New York  10022
7       (908) 303-4568
8       hchaitman@chaitmanllp.com
9
10  On Behalf of the Trustee:
11      DAVID J. SHEEHAN, Esq.
12      AMANDA E. FEIN, Esq.
13      Baker Hostetler
14      45 Rockefeller Plaza
15      New York, New York  10111-0100
16      (212) 589-4621
17      afein@bakerlaw.com
18
19  On Behalf of the Deponent:
20      PETER A. GOLDMAN, Esq.
21      12 Fairlawn Parkway
22      Rye Brook, New York  10573
23      (914) 935-6857
24      pagoldman@gmail.com
25

1  APPEARANCES OF COUNSEL:
2   Videographer:
3       Ken Morrison, CLVS
4
5           * * * * *
6
7           CONTENTS
8  THE WITNESS:  BERNARD L. MADOFF        EXAMINATION
9   BY MS. CHAITMAN          6
10  BY MR. SHEEHAN          132
11
12          * * * * *
13
14          INDEX OF EXHIBITS
15 FOR THE CUSTOMERS:          PAGE
16 Exhibit Number 15, Copies of Bloomberg     38
17   trade tickets
18 Exhibit Number 16, JPMorgan Chase     52
19   statement - 2-2001
20 Exhibit Number 17, 703 account statement   58
21   - 6-2001
22 Exhibit Number 18, JPMorgan Chase     60
23   statement - 10-2002
24 Exhibit Number 19, JPMorgan Chase     61
25   statement - 12-2003

1          INDEX OF EXHIBITS (Continued)
2 FOR THE CUSTOMERS:          PAGE
3 Exhibit Number 20, JPMorgan Chase     61
4   statement - 12-2004
5 Exhibit Number 21, JPMorgan Chase     62
6   statement
7 Exhibit Number 22, Bear Stearns statement   64
8   - 8-1-05
9 Exhibit Number 23, Documents - composite   67
10 Exhibit Number 24, Morgan Stanley statement 70
11 Exhibit Number 25, JPMorgan Chase position  72
12   summary
13 Exhibit Number 26, Fidelity statement -   73
14   1-31-99
15 Exhibit Number 27, Clothmasters statement   74
16   - 8-31-91
17 Exhibit Number 28, Account Canada document  75
18 Exhibit Number 29, Appendix to Dubinsky   92
19   report
20 Exhibit Number 30, Copies of correspondence 94
21 Exhibit Number 31, Bill Feingold expert   109
22   report
23
24          * * * * *
25

1       THE VIDEOGRAPHER:  My name is Ken Morrison
2  representing Veritext Legal Solutions.  The date
3  today is April 26th, 2017 and the time is 9:07 a.m.
4  This is the deposition being held at Butner Federal
5  Correctional Facility located at 3000 Old 75
6  Highway, Butner, North Carolina 27509 and is taken
7  by counsel for the Plaintiffs in the case of
8  Securities Investor Protection Corporation,
9  Plaintiff-Applicant, versus Bernard L. Madoff
10  Investment Securities, LLC, Defendant.
11       This case is being held in the United
12  States Bankruptcy Court, Southern District of New
13  York, Case Number Adversary Proceeding 08-01789
14  (SMB).  The name of the witness is Bernard L.
15  Madoff.  At this time would the attorneys present in
16  the room identify themselves and the parties you
17  represent and then our court reporter, Denise Neal,
18  representing Veritext Legal Solutions, will swear in
19  the witness and we can proceed.
20       MS. CHAITMAN:  Helen Davis Chaitman on
21  behalf of a great number of claw-back Defendants.
22  And, in fact, I'm taking the deposition.  It's not
23  the Trustee who's taking it.
24       MR. SHEEHAN:  Right.
25       MR. GOLDMAN:  Peter A. Goldman.  I

CONFIDENTIAL

CONFIDENTIAL

Page 6

1  represent Bernard Madoff.
2      MR. SHEEHAN:  David J. Sheehan with Baker
3  Hostetler, counsel to the Trustee.
4      MS. FEIN:  Amanda Fein, Baker Hostetler,
5  for the Trustee.
6      (The witness was duly sworn by the court
7  reporter.)
8      MR. GOLDMAN:  Keep your voice up.
9      BERNARD L. MADOFF,
10  having been first duly sworn, was examined and
11  testified as follows:
12      EXAMINATION
13  BY MS. CHAITMAN:
14      Q.  Good morning, Mr. Madoff.
15      A.  Good morning.
16      Q.  Irving Picard has argued to Judge Bernstein
17  that you're not a credible witness and I want to ask
18  you a few questions about that.  At the time you
19  confessed on December 11th, 2008 had you been
20  indicted?
21      A.  No.
22      Q.  At the time you confessed was there a
23  criminal investigation against you?
24      A.  No.
25      Q.  At the time you confessed was there an SEC

Page 7

1  investigation against you?
2      A.  No.
3      Q.  At the time you confessed was there any
4  limitation on your ability to transfer funds?
5      A.  No.
6      Q.  At the time you confessed was there any
7  limitation on your ability to travel abroad?
8      A.  No.
9      Q.  So is it fair to say that you had the
10  option of taking a couple of hundred million dollars
11  and moving with your wife to Switzerland and living
12  out your life in Switzerland the way Mark Rich did?
13      A.  I'm --
14      MR. SHEEHAN:  Objection to form.  Let's
15  get this geared up because I don't want to
16  interrupt.  I apologize.  So I'm just going to say
17  objection.  When I say that, it means as to form.
18  That's it.
19      MS. CHAITMAN:  Okay.
20      MR. SHEEHAN:  But just to preserve.
21      MS. CHAITMAN:  Sure, sure.
22      MR. SHEEHAN:  Okay.  All right.  I'll shut
23  up.
24      MS. CHAITMAN:  I'm going to rephrase the
25  question because I was rudely interrupted.

Page 8

1      (Laughter on the record.)
2      MR. SHEEHAN:  I apologize for that.  I
3  apologize.  Go right ahead.  Go ahead.
4      MS. CHAITMAN:  I'm kidding.
5      Q.  (By Ms. Chaitman)  Okay.  At the time you
6  confessed you knew who Mark Rich was; didn't you?
7      A.  Yes.
8      Q.  And did you understand that Mark Rich had
9  escaped prosecution by moving to Switzerland?
10      A.  Yes.
11      Q.  And did you recognize that you could have
12  done the same thing, just moved to Switzerland with
13  Ruth with a couple of hundred million dollars and
14  lived out your life?
15      A.  Yes.
16      Q.  Now, at the time you confessed the global
17  economy had collapsed.  Do you recall that?
18      A.  Yes.
19      Q.  Bear Stearns had collapsed in March 2008;
20  isn't that true?
21      A.  Correct.
22      Q.  And Lehman filed in bankruptcy in
23  October 2008?
24      A.  Correct.
25      Q.  And the stock market lost half its value

Page 9

1  when Lehman filed in bankruptcy; isn't that true?
2      A.  Just about, yes.
3      Q.  And you had a lot of wealthy people who
4  owed you about $10 billion; isn't that true?
5      A.  Correct.
6      Q.  So instead of confessing to a crime which
7  would inevitably result in your spending the rest of
8  your life in prison, why didn't you move to
9  Switzerland or try to work out a negotiated
10  liquidation of your business?
11      A.  Well, first of all, I knew that I was
12  guilty.  I felt responsible.  Secondly, I had made a
13  decision that the best thing that I could do for the
14  -- you know, to make restitution to my clients was
15  to try and convince certain people that were
16  responsible for creating my problem to threaten them
17  with turning them in with their complicit behavior
18  if they did not return the money that they owed me.
19      Q.  Okay.  And I just want to caution you.
20  We're going to speak a little bit about the four
21  families, but I don't want you to mention the names
22  of any of the people.
23      A.  Okay.
24      Q.  Now, when you met with the U.S. Attorney's
25  Office in December 2008, did you tell them the

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

1  complete truth about what happened?
2      A. Yes.
3      Q. Since that time have you ever been
4  dishonest when you testified about what happened?
5      A. No.
6      Q. Now, as I just mentioned, you've testified
7  previously about the four families who had been your
8  clients from the 1960s on. And, again, I don't want
9  you to mention the names of any of those four
10 families, but I just want to ask you a question.
11 Was there a period prior to 1990 when Annette
12 Bongiorno backdated trades from members of the four
13 families?
14     A. Yes.
15     Q. Was that done without the knowledge of the
16 members of the four families?
17     A. No. They were aware of it. They had
18 instructed her to do it.
19     Q. They instructed her to backdate trades?
20     A. Yes.
21     MS. CHAITMAN: Okay.
22     MR. SHEEHAN: Excuse me. What time period
23 was that?
24     MS. CHAITMAN: Before the 1990s.
25     MR. SHEEHAN: Okay.

Page 11

1      Q. (By Ms. Chaitman) Now, to your knowledge
2  has the Trustee settled with each of these four
3  families?
4      A. I believe so.
5      Q. Okay. You testified the last time you were
6  deposed by me that the fraud did not begin until you
7  began doing the split strike conversion strategy in
8  1992?
9      A. Correct.
10     Q. Now, was it, as Judge Bernstein used the
11 expression, a light switch? When you started doing
12 a split strike, did you stop buying any securities
13 for the split strike customers?
14     A. No. I had started -- I had started buying
15 -- doing the strategy for probably through 1993; but
16 as more money came in, that's when my problem began
17 because I couldn't put it all to work in the
18 strategy. And I had committed that I would keep all
19 the money working.
20     Q. Okay. I just want to say one thing. I
21 have seen statements as early as July 1991 which
22 seem to be in split strike. Are you saying that it
23 wasn't -- I'd like you to give me your best
24 recollection of when you stopped buying securities
25 for the split strike customers.

Page 12

1      A. Sometime post-'92. As I started, you know,
2  I was still buying it in '92 and also through most
3  of '93. After that, that's when I stopped buying
4  securities for split strike.
5      Q. Okay. Now, you continued to have some
6  customers who were in convertible arbitrage?
7      A. Correct.
8      Q. Did you continue so long as people were in
9  convertible arbitrage, did you actually buy those
10 securities?
11     A. Yes.
12     Q. Okay. So it was only in the split strike
13 that you stopped buying the securities?
14     A. Correct.
15     Q. Okay. Do you derive any kind of benefit
16 from your testimony as to when the fraud started?
17     A. No.
18     Q. Does it benefit anyone in your family?
19     A. No.
20     Q. If the Trustee claims you're lying as to
21 when the fraud started, is there any conceivable
22 benefit that you enjoy by virtue of that testimony?
23     A. No.
24     Q. Does this testimony benefit any of your
25 family members?

Page 13

1      A. No.
2      Q. Now, you testified that at some point in
3  1992 you leased the 17th floor of the Lipstick
4  Building?
5      A. Yes.
6      Q. And you bought a separate computer system
7  for the people you moved to the 17th floor; is that
8  right?
9      A. Correct.
10     Q. And that was called the IBM AS/400?
11     A. Yes.
12     Q. Now, was the IBM AS/400 on the 17th floor
13 linked to outside sources, like other investment
14 firms or DTC?
15     A. No.
16     Q. Now, the computers that were used on the
17 18th and the 19th floors by the traders --
18     A. Right.
19     Q. -- were those Bloomberg terminals?
20     A. Well, we have Bloomberg terminals all over
21 the firm, yes.
22     Q. Okay. Were the Bloomberg terminals linked
23 to outside sources?
24     A. Yes.
25     Q. What outside sources were they linked to?

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1   A. I can't probably tell you all of them, but
2   they -- Bloomberg generally is linked to --
3   basically, Bloomberg terminal gets information from
4   other information providers. They're also -- I'm
5   not sure, but they're also linked to probably the
6   depositories as well. They're not linked to other
7   brokerage firms.
8   Q. Okay. Now, when you testified that Annette
9   Bongiorno prior to 1990 had backdated trades for the
10   four families, were those carried out on the AS/400?
11   A. Yes.
12   Q. Okay. But before -- before you bought the
13   AS/400 in 1992, what kind of computer was she using
14   that she would backdate trades?
15   A. We had other small like, you know,
16   computers, what you would call them, just like, you
17   know, what you would use at home, you know, word
18   processors and, you know, NASDAQ terminals and
19   things of that sort.
20   Q. They were not linked to outside sources?
21   A. No. They were not linked, right.
22   Q. Now, was it -- you testified last time, and
23   correct me if my recollection is incorrect, but I
24   think what you testified last time is that it was
25   not illegal for you to sell short?

Page 15

1   A. Correct.
2   Q. And that was because -- can you explain?
3   A. It's an obligation if you're -- if
4   you're -- first of all, any brokerage firm can sell
5   short, you know, just as any client can sell short.
6   That's a typical way of doing business, you know.
7   So you as a client could instruct your broker to --
8   to execute a short sale.
9       Brokerage firms more routinely go short
10   stock to complete their customer orders at times if
11   they don't have them in their inventory. If you're
12   a market making firm like I was, you're obligated to
13   honor your market, which requires you to go short,
14   you know, at times.
15       So going short is a regular, every day
16   business. A firm like ours, you know, regular
17   trading inventory typically would have hundreds of
18   millions of dollars, probably $500 million short all
19   the time.
20   Q. Okay. But a naked short is where you're
21   selling short but you don't own the security; right?
22   A. The definition of a short sale is naked.
23   It means that you're selling something that you
24   don't own at the current time.
25   Q. Okay. And as a market maker did you have

Page 16

1   an unlimited right to sell naked shorts?
2   A. Correct.
3   Q. So was it illegal for you to send a
4   statement say beginning in '94 or whenever you
5   stopped buying the securities shown on the split
6   strike, was it illegal for you to send a statement
7   to a split strike customer that indicated that the
8   customer owned certain Fortune 100 company stocks
9   when you hadn't purchased them?
10   A. No. It was not illegal.
11   Q. Okay. So if it was not illegal for you to
12   sell unlimited naked shorts, what was illegal about
13   the split strike activity?
14   A. Well, what was illegal and what we did was
15   not reflect our short positions to the clients on
16   our audited financials.
17   Q. Because you had a debt to each client to
18   whom you sold naked shorts --
19   A. Correct.
20   Q. -- in the amount -- the present value of
21   those securities; is that correct?
22   A. Correct.
23   Q. And that was a fraud on anyone to whom you
24   gave your financial statements; is that right?
25   A. Well, depends upon how you define fraud.

Page 17

1   It was a bookkeeping violation. I don't think
2   anybody initially would consider it a fraud. You
3   know, that's -- well, I just don't know. I would
4   say that it clearly was an SEC violation.
5   Q. And is it fair to say that the SEC reviewed
6   the financial information that you submitted in your
7   focus reports on a monthly basis?
8   A. Regularly, yes.
9   Q. And if you showed a massive debt to your
10   customers, your investment advisory customers, what
11   would they have done?
12   A. It would have been a violation. You
13   probably would have been suspended.
14   Q. You would have been suspended as a broker?
15   A. Correct.
16   Q. Okay. So in your view was the crime simply
17   that you didn't properly disclose the debt to your
18   customers on your financial statements?
19   A. Correct.
20   Q. Now, you've testified this morning that you
21   think either at the end of '93 or early '94 you
22   stopped buying securities for your customers, and I
23   just want to get a better understanding of why that
24   occurred at that time. You had -- I think you said
25   you made a commitment to your clients to put them in

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1  this strategy?
2      A. Correct.
3      Q. And what happened at the end of '93 or
4  early '94 that you could no longer do that?
5      A. The markets had gone into a -- into a slump
6  because of a number of things, you know, starting
7  with the Mideast Crisis at that time. So there was
8  a lack of liquidity. This particular strategy that
9  we used, the split strike strategy, requires certain
10  market conditions to be able to execute it properly.
11  And we didn't have those conditions.
12      So because I had committed when I took in
13  the money from the clients, primarily they were
14  hedge funds, I had made a commitment to keep the
15  money working constantly. Because I couldn't do
16  that, I started to short the securities, which was
17  as I said, not a violation at the time I was
18  shorting the stock. It only became a violation when
19  I filed my financial reports.
20      I thought that would just be a temporary
21  situation for the market to, you know, recover and
22  improve and then I would have started doing the
23  strategy. In the interim the money that the
24  customers came in, I basically kept it located in
25  Treasury bills.

Page 19

1      Q. Okay. So you took the money --
2      A. Which is part of the strategy as well.
3      Q. Right. So you basically took the money
4  that went into the 703 account?
5      A. Correct.
6      Q. Which was the investment advisory
7  customers' money?
8      A. Correct.
9      Q. And you purchased Treasury bills with that?
10      A. Correct.
11      Q. And in the early '90s the Treasury bills
12  were bearing an interest rate of about six percent;
13  isn't that true?
14      A. No. They probably were -- you know, they
15  were short-term T bills, so they were probably, you
16  know, closer to three to four percent.
17      Q. Okay. And that three to four percent was
18  money that was earned by the customers --
19      A. Correct.
20      Q. -- whose money you were using?
21      A. Correct.
22      Q. And, in fact, the statements reflected the
23  ownership of those Treasury securities?
24      A. Correct. And they -- well, they also, you
25  know, reflected the ownership of the securities that

Page 20

1  I wasn't buying.
2      Q. Right. Now, in late 1993 or early 1994 was
3  your business, you were operating at that point as a
4  sole proprietorship; is that right?
5      A. Yes.
6      Q. Was your business insolvent?
7      A. No.
8      Q. At what point in time did you become
9  insolvent? And when I say you, I mean your sole
10  proprietorship or the limited liability company.
11      A. I would say probably in the early 2000s,
12  maybe somewhere between let's say '98 and 2002.
13      Q. Okay. And what --
14      MR. SHEEHAN: Can I just -- before you get
15  an answer, two things. One is I don't know what
16  insolvency means.
17      MS. CHAITMAN: Oh, okay.
18      MR. SHEEHAN: I'm going to ask to define
19  that.
20      MS. CHAITMAN: Okay.
21      MR. SHEEHAN: And I'm not going to
22  interrupt you again because I'm just going to have a
23  continuing objection to leading questions, which is
24  you're testifying more than he is, but I don't care
25  about that. Just objecting. All right.

Page 21

1      Q. (By Ms. Chaitman) Okay, okay. When you
2  say that your business became insolvent at some
3  point between '98 and what did you say? 2000 --
4      A. 2002.
5      Q. Okay. What are the events that you're
6  thinking about that --
7      A. Well, because I was also returning -- there
8  were client -- part of the strategy was to return
9  profits that were earned to clients. So in order to
10  do that, I was returning money from the 703 account
11  to clients and, therefore, I wasn't able to buy
12  either the securities or the treasuries. So there
13  was a deficit.
14      So because that wasn't reflecting the
15  liabilities and I didn't have assets to back them up
16  at some point, I would say that would be -- the firm
17  would be insolvent.
18      Q. Okay. So would it be fair to say that the
19  insolvency arose from the differential between what
20  the investment advisory customers' money was earning
21  in Treasury bills versus the return you were paying
22  them?
23      A. Correct.
24      Q. Did your formation of the limited liability
25  company in -- it became effective January 2001, did

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1 that relate in any way to your feeling that your
2 firm had become insolvent?
3     A. I realize that that -- yeah, that there
4 were problems brewing, yes, I would say.
5     Q. Well, what motivated you to form a limited
6 liability company since you had been operating as a
7 sole proprietorship since 1960?
8     A. Well, I was always -- I had always been
9 advised to incorporate since I started my firm. I
10 never felt the need to do that because I was not
11 worried about, you know, ever being in a situation
12 that, you know, I would have any exposure. The firm
13 was always successful and, you know, it just never
14 really entered my mind.
15        So I just didn't do it, but then because
16 of what was going on with the stock market, the
17 market had -- had crashed in 2000 because of the --
18 there was the bubble of the technology stocks, so
19 everybody became very nervous about the market in
20 general.
21        So there was a rush to incorporate or go
22 into an LLC type of mode. And the regulators had
23 also sort of started recommending to the industry
24 that everybody should basically do that.
25     Q. Now, Mr. Madoff, according to Mr. Dubinsky

Page 23

1 the three areas of your firm functioned as totally
2 separate legal entities, that is, market making,
3 proprietary trading and investment advisory. Is
4 that correct that each of these groups functioned as
5 a separate legal entity?
6     A. No.
7     Q. Were the expenses for -- the operating
8 expenses for each group paid solely out of the
9 revenues generated by that group?
10     A. They were -- all the expenses were paid
11 through a -- through the firm, but the money came
12 out of an expense account that was held at Bank of
13 New York.
14     Q. So there was one Bank of New York account
15 which covered all of the say overhead expenses?
16     A. All the operations of the firm. There was
17 a JP Morgan account. We referred to it as a 703
18 account. And that was exclusively used for client
19 monies in and client monies out --
20     Q. Okay. And --
21     A. -- for the investment advisory side.
22     Q. Okay. So all of the rent, personnel
23 expenses, general overhead was paid out of the Bank
24 of New York account?
25     A. Everything. Salaries, everything.

Page 24

1     Q. For all of the employees at first the sole
2 proprietorship?
3     A. Right, right.
4     Q. And then all of the employees at the LLC?
5     A. Yes. It never changed, right.
6     Q. Okay. And is it fair to say that at times
7 money went from the 703 account to the Bank of New
8 York account?
9     A. Yes. There were some instances that --
10 that I used that, but the issue is because all of
11 these clients had margin accounts because they were
12 short securities, whether it be convertible
13 securities or whether it be the split strike trades,
14 their -- the assets of the client is fungible with
15 the firm because the long positions, whether it be
16 Treasury bonds or whatever, is the collateral for
17 the exposure on the short side of the firm.
18        So there were sometimes where relatively
19 small amounts of money, I think, in the late '90s
20 went from the 703 account into the Bank of New York
21 account to cover -- what was not, I don't think,
22 understood in the Dubinsky report among a lot of
23 other things was that customers have short
24 positions. They're mark to market from the clearing
25 corporation every day and short position being the

Page 25

1 difference in the market. As the stock market goes
2 up, the short position goes up. The customer gets a
3 call which is called a margin call.
4        So typically the money would come from the
5 customer account to meet those margin calls. So we
6 had -- we had margin calls that we had to make to
7 the clearing corporation, which all that which was
8 done through the Bank of New York account.
9        So by taking the money from the client
10 account, putting it into the Bank of New York
11 account, that allowed us to meet the margin calls of
12 the clearing corporation. That is typical of the
13 industry.
14     Q. Okay. Now, I want to ask you something
15 else since you've mentioned the margin. If you --
16 if someone had a margin loan and you bought stock
17 for them --
18     A. Right.
19     Q. -- would that stock be segregated in a
20 clearing or custody account for that customer?
21     A. No.
22     Q. Why is that?
23     A. Because margin, the whole concept of a
24 margin account is the firm is allowed to use those
25 securities to borrow money to cover, you know, what

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1  the customer is requesting to be able to purchase
2  securities. The brokerage firm also has to deliver
3  securities if the firm that he sold it to for the
4  customer who needs delivery.
5      So he has to go out and borrow securities.
6  And to borrow the securities to make the delivery,
7  he has to -- he has to borrow them from another
8  brokerage firm. He has to pay them for those
9  securities. So the only -- the only securities that
10  are segregated for a customer are what's called
11  fully paid for securities where there is no
12  liability or debt involved in the firm.
13      Q. Okay. Now, you've explained that the fraud
14  was in the split strike, but if you had an
15  investment advisory customer who instructed you to
16  buy a specific position for them and you gave them a
17  margin loan to do that, did you actually execute
18  those sales?
19      A. We always execute the sales. Whatever was
20  reflected on the customer statement, we executed.
21  We executed the sales to the customer. You know, we
22  wouldn't have executed them in the market unless we
23  were doing a strategy, unless we were also buying
24  securities.
25      Q. Okay. But where a customer made a specific

Page 27

1  instruction to you to buy a specific stock, are you
2  saying that you always executed those instructions?
3      A. The customer didn't usually give us
4  instructions. These accounts are handled basically
5  as sort of discretionary accounts. So once the
6  customer opened the account to go into this
7  particular strategy, the firm had the -- had the,
8  you know, allowance to be able to execute the
9  strategy whenever he saw fit.
10      Q. No, but I'm thinking of customers who were
11  not in split strike, investment advisory customers
12  who had you as their investment advisor but they
13  instructed you as to what stocks to buy and sell.
14      A. We didn't -- we basically did not do that
15  kind of business.
16      Q. Now, in the government's deferred
17  prosecution agreement with JPMorgan Chase, the
18  government and the bank stipulated that during the
19  period from 2003 to 2008 you maintained on deposit
20  at JPMorgan Chase three to six billion dollars. Is
21  that correct?
22      A. Yes.
23      Q. Did that amount -- was that only between
24  2003 or 2008 or had you done that earlier than 2003?
25      A. Well, there were certain -- we started

Page 28

1  buying treasuries when we start the split strike
2  conversions. So that would have been, you know, in
3  the '90s.
4      Q. Okay. And to the best of your recollection
5  at any given time how much investment advisory
6  customers' money was held in U.S. treasuries?
7      A. Well, I would say basically the maximum
8  that we had was between five firms we had about
9  two-and-a-half billion dollars between Morgan
10  Stanley, Lehman Brothers, Bear Stearns and Fidelity.
11  Was that five firms? Four firms. And JP Morgan.
12      Q. Okay.
13      A. So I would say probably the maximum was
14  probably about $6 billion held in treasuries.
15      Q. Okay, okay. Did it fluctuate or did you
16  instruct your staff to maintain that amount?
17      A. No. It pretty much fluctuated depending
18  upon the monies that came in and the monies that --
19  monies that came out.
20      Q. What percentage of the investment advisory
21  customers' money was put in Treasury securities, if
22  you can estimate that?
23      A. Well, I mean, the most we had -- I mean,
24  the customer statements depending, you know, at the
25  end was 60 some odd billion dollars.

Page 29

1      Q. Not what the statements showed, but what
2  you actually did.
3      A. What we actually did?
4      Q. Yeah. How --
5      A. I don't understand your question.
6      Q. Let me step back a minute. Were the people
7  on the 17th, were any of the people on the 17th
8  floor authorized to buy Treasury securities?
9      A. Yes.
10      Q. Who was authorized to buy Treasury
11  securities?
12      A. Frank DiPascali, Eric Lipkin and a fellow
13  by the name of Robert Romer.
14      Q. And they were -- what money were they
15  authorized to use to buy the Treasury securities?
16      A. Whatever -- they followed the instructions
17  of basically Frank DiPascali, who was the manager of
18  that department. And the money, the money to buy
19  the securities always came from customer money
20  except for a small amount of treasuries or financial
21  instruments that came from the operating operations
22  of the market making proprietary trading side.
23      Q. Okay. So the money came from the 703
24  account, is that what you're saying, except for
25  the --

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1    A.  For the most part, yes.
2    Q.  Except for the money that came from the BNY
3  account?
4    A.  Right.
5    Q.  Okay.  Now, did you ever have a lock-in
6  period like hedge funds would have which would
7  prevent a customer from immediately demanding a
8  redemption on their money?
9    A.  No.
10    Q.  Was there any period of time from the end
11  of 1993 to 2008 when you were unable to honor a
12  customer redemption?
13    A.  No.
14    Q.  Was there anytime between 1993 and 2008
15  when you felt that you couldn't redeem a customer's
16  account unless you brought in new investment
17  advisory customers?
18    A.  No.  Well, I would say during -- in 2008
19  probably that half the market was -- was collapsing.
20  There would have been -- had customers requested
21  money, I wouldn't have been able to do it, but no
22  one had ever requested it.
23    Q.  Okay.  So, well, you did have significant
24  redemptions in 2008?
25    A.  Yes, at the very end in December.

Page 31

1    Q.  Okay.  And prior to December 2008 --
2    A.  But there was always -- there was -- you
3  know, I never got an official request for redemption
4  that I didn't have money to cover it to my
5  recollection other than maybe the last week in
6  December.
7    Q.  Okay.
8    A.  The last, you know, week that I was in
9  business.
10    Q.  Okay.  So in the entire period when you
11  were not buying the split strike securities starting
12  say late 1993 or early 1994, had you ever received a
13  redemption request where you thought oh, my God,
14  I've got to bring in a new customer to have the
15  money to pay this?
16    A.  No.
17    Q.  Did you actively solicit new investment
18  advisory customers?
19    A.  No.
20    Q.  Why not?
21    A.  Because the firm was in a position that we
22  were always turning away investors.  We never --
23  never solicited, you know, new monies coming in.  As
24  a matter of fact, we tried to return monies at times
25  but met resistance with clients.

Page 32

1    Q.  We talked last time about the fact that you
2  maintained clearing accounts with various banks?
3    A.  Correct.
4    Q.  And can you just review the banks with
5  which you had clearing accounts?
6    A.  Well, first of all, the firm itself was a
7  self-clearing firm, which meant we had the ability
8  to clear transactions.  That was starting with the
9  firm in 1960 through the very end, but most firms
10  also had clearing arrangements with a number of
11  banks to be able to service different types of the
12  operations of the firm.
13       So the firm at one point had clearance
14  facilities with -- initially with Meadowbrook
15  National Bank, then, you know, also Commercial Bank
16  of North America.  There was then Irving Trust
17  Company, Bank of New York, Bankers Trust,
18  Manufacturers Hanover, Chase Manhattan Bank, Marine
19  Midland Bank, Chemical Bank, JP Morgan Bank,
20  Continental Illinois Bank.  I think that pretty much
21  covers it.
22    Q.  M&T?
23    A.  M&T, yes.  M&T Bank.
24    Q.  Now, what services did these banks provide
25  to you?

Page 33

1    A.  Both loans, brokered and unbrokered loans,
2  conversion, instructions to convert securities,
3  drafts for election, you know, checking accounts,
4  typical usually broker day loans, things -- you
5  know, whatever, complete clearance facilities.
6    Q.  Did they have custodial accounts where you
7  maintained securities for customers?
8    A.  Not that I'm aware of, no.
9    Q.  Did you have custodial accounts with anyone
10  where securities were maintained for customers?
11    A.  Well, the -- we had securities at
12  depositories, but they were not basically segregated
13  for customers.  That was the practice, quite
14  frankly, that most brokerage firms never did any
15  longer when securities -- as the industry progressed
16  and you didn't have full physical securities in your
17  own vaults.
18       We always had some securities in our vault
19  we had, but those are from many, many years ago.
20  They were a relatively small amount of securities
21  that we were holding or that we bought, you know;
22  but for the most part all the securities were
23  commingled, which was typical for a firm that
24  operated the way we did where you had customers that
25  were short securities.

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1    Whether or not we executed the transaction
2  or not, they had opened up, you know, accounts, what
3  would be deemed as a margin account, and that
4  automatically allows you to commingle the
5  securities.
6    Q.  Okay.  So you did have -- you did have
7  physical possession of the securities with the
8  margin accounts?
9    A.  When we were buying them, yes.
10    Q.  Okay.  Now, you referenced the change from
11  physical securities to electronic securities.  Can
12  you pinpoint when that occurred?
13    A.  I don't remember any longer.  I would say
14  sometime during the '90s.
15    Q.  Would it help if I told you that the
16  Securities Investor Protection Act was enacted in
17  1970?
18    A.  No.
19    Q.  Okay.  Now, when you were doing the
20  convertible arbitrage, did you ever use a strategy
21  called legging in?
22    A.  Always.
23    Q.  Okay.  And can you explain what legging in
24  means?
25    A.  Legging in means that when you're doing a

Page 35

1  strategy, whether it be for convertible securities
2  or for the split strike, you go in and you don't buy
3  everything typically in one day.
4    You start -- when the firm makes a decision
5  to effect a strategy, whether it be convertible
6  bonds or whether it be a basket strategy and a split
7  strike where you're buying, you know, a portfolio of
8  securities, the skill of the strategy is to being
9  able to judge the market.
10    So you -- if when you're going out and
11  buying securities, you would start buying it let's
12  say on a Monday, Tuesday, Wednesday, Thursday.
13  Typically you would buy it over a four-day period
14  was basically what our practice is.  And you would
15  have different prices during the four-day period.
16    And all of our strategies use what's
17  defined as an average price transaction, which means
18  we would then take the average price that we bought
19  stock during that four-day period and that would be
20  the -- you know, we'd figure what the average was
21  that we paid and then we would -- we would send the
22  customer a confirmation on the last day.
23    So let's say on a Thursday, we started on
24  Monday.  And if you start -- to make a simple
25  example, let's say you did it over four days and you

Page 36

1  paid -- you started buying stock at 50 and you wound
2  up buying it at, you know, up to 51 and you had an
3  average of 50-and-a-half, you would -- you would
4  place five-and-a-half.
5    Q.  Was that unique to you or was this
6  something --
7    A.  No.  That's typical for any firm that is
8  investing in a strategy and treating -- you know,
9  that's treatable to customers the same in a
10  particular strategy.
11    Q.  Now, you testified last time that Mr.
12  Dubinsky apparently lacked an understanding of that
13  strategy?
14    A.  Well, he -- he must have.  He must have not
15  understood the strategy because his report failed to
16  -- failed to state that.  So, for example, where
17  Dubinsky, when he was trying to analyze the prices
18  that a customer paid in relationship to the market,
19  he would look on whatever the trade date was on the
20  confirmation.
21    And the trade date on the confirmation, for
22  example, would be -- an example I use would be the
23  trade date would be Thursday's trade date.  If the
24  stock had traded at 51 and on that day if that was
25  the higher, the lower stock and the average was

Page 37

1  50-and-a-half for the customer, there would be a
2  difference.  So it wouldn't match up.  Now, the
3  customer, the customer confirmation always stated --
4  there was a legend on it that said that the
5  transactions effected for the customer was an
6  average price transaction.
7    So right away that would -- that would
8  illustrate that he wasn't accounting for the -- for
9  the fact that the transaction was an average price
10  transaction.
11    The same thing would happen when you -- the
12  same error he made when he accounted for volume
13  because he would just look at the volume that
14  occurred on the one day, on the date of the trade
15  date, as opposed to the volume that happened on the
16  four days.  So, obviously, he's looking at the
17  volume on one day when you should be looking at the
18  volume on four days.
19    Q.  Now, Mr. Madoff, Mr. Dubinsky testified at
20  the Bonventry trial that the Trustee paid him over
21  $30 million to do his report.  Did he at any time
22  ever seek to talk to you?
23    A.  No.
24    Q.  To your knowledge did he or anyone on his
25  behalf ever seek to meet with you to discuss how you

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1  operated the business?
2      A. No.
3      Q. Did anyone working with the Trustee ever
4  ask you any questions about how your convertible
5  arbitrage trades were done?
6      A. No.
7      Q. Did anyone working with the Trustee ever
8  question you about any activity of the firm that
9  predated 1992?
10     A. No.
11     Q. Now, you mentioned with respect to the
12  purchase of Treasury securities with the investment
13  advisory customers' money that the purchases were
14  done through Bear Stearns, Morgan Stanley, Fidelity,
15  Lehman Brothers and JPMorgan Chase?
16     A. Right.
17     Q. Were there also purchases done directly by
18  Frank DiPascali, Eric Lipkin and Robert Romer?
19     A. Correct.
20     MS. CHAITMAN: I'm going to mark as
21  Exhibit 15, which is the next number from our last
22  deposition, a compilation of trade tickets. I have
23  two if you each want one.
24     (Customers Exhibit 15 was marked for
25  identification.)

Page 39

1      MS. FEIN: Thank you.
2      MR. SHEEHAN: Thank you.
3      Q. (By Ms. Chaitman) Mr. Madoff, do you
4  recognize what these documents are?
5      A. Yes. They're -- they're a copy of the
6  Bloomberg terminal execution, meaning a trade that
7  was executed through a Bloomberg terminal.
8      Q. Okay. Now, could this be a phony document?
9      A. No.
10     Q. Why is that?
11     A. Because we've got the ability to -- to
12  create something like this.
13     Q. Is that because it's a Bloomberg terminal?
14     A. Yes.
15     Q. So if we look at the first one, this was
16  the trader was Eric Lipkin; right?
17     A. Uh-huh.
18     Q. The date was September 26, 2002; right?
19     A. Uh-huh.
20     Q. And the -- it was the purchase of a
21  Treasury bill with a cost of $998,461.94; is that
22  right?
23     A. Yes.
24     Q. And this would have been purchased with
25  money from the 703 account?

Page 40

1      A. Yes.
2      Q. And it would have been held for the benefit
3  of the investment advisory customers?
4      A. It would have been -- it would have been
5  held at the firm for the benefit of the firm. We
6  didn't segregate, you know, these securities.
7      Q. But if the money that was used to purchase
8  this --
9      A. Uh-huh.
10     Q. -- came from the 703 account, would this
11  show up, for example, on your focus reports?
12     A. This particular -- I don't know. I mean,
13  the only trades that -- if it went through the
14  Bloomberg terminal, typically that would show up --
15  I don't know if it would show up on the focus
16  report.
17     It depends upon whether the trade was
18  bought for -- there were some trades that were
19  bought -- well, not if it was bought by the people
20  that you mentioned. They only have the authority to
21  execute trades for client accounts, not for the
22  firm's account.
23     Q. Okay. So I'm confused.
24     A. These securities would be held either at --
25  typically it would be held at DTC or the Bank of New

Page 41

1  York.
2      Q. Okay.
3      A. I mean, I can't tell from that. It depends
4  upon where the trade would settle. Any of these
5  Bloomberg trades that went through the Bloomberg
6  terminal, it would actually be a money settlement
7  for the transaction. Otherwise, you couldn't -- you
8  couldn't do it.
9      Q. Okay. And that would be done through some
10  ins --
11     A. It would be done through some -- typically
12  through Bank of New York.
13     Q. Okay.
14     A. It could also have been done through JP
15  Morgan as well in delivery.
16     Q. Okay, okay. You didn't have the ability
17  yourself to clear Treasury security purchases?
18     A. Correct. We didn't have the authority to
19  execute and clear.
20     Q. Treasury security purchases?
21     A. Right.
22     MS. CHAITMAN: Okay.
23     MR. SHEEHAN: Helen, just for the record,
24  this seems to be -- you did call it a compilation,
25  but since there were different productions, one is

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1  AMF, another one is MAD Trustee, are you going to
2  for the record tell us how this was put together or
3  is that going to happen through your testimony?
4      MS. CHAITMAN:  It's not, but I don't think
5  that we have to take up his time to do that.
6      MR. SHEEHAN:  Okay.  We can do it later.
7      MS. CHAITMAN:  Yeah, sure.
8      MR. SHEEHAN:  All right.  Just take care
9  of it.
10     MS. CHAITMAN:  They were all produced by
11 the Trustee.
12     MR. SHEEHAN:  Okay.
13     Q.  (By Ms. Chaitman)  If you -- these are not
14 in continuous order.  They didn't come from one
15 place, but I'm showing you one that was done where
16 the trader is Erin Reardon.
17     A.  Ellen Reardon?
18     Q.  Erin Reardon.
19     A.  Erin, yes.
20     MR. SHEEHAN:  What's the Bates number on
21 that?
22     MS. CHAITMAN:  It's MAD TEE 00118284.
23     MR. SHEEHAN:  Okay.
24     Q.  (By Ms. Chaitman)  Did she work under Frank
25 DiPascali?

Page 43

1      A.  Yes.
2      Q.  And then two pages on there is one executed
3  by Robert Romer?
4      A.  Yes, same.
5      Q.  He worked for Frank DiPascali?
6      A.  Yes.
7      Q.  Now, I'm skipping to a page which is
8  Public-USAO 0960973.  Can you identify why that
9  format is different?  Is that a different kind of
10 transaction?
11     A.  I don't know what this is.  I mean, I'm not
12 that familiar with it.  It looks like a ticket for
13 -- for a treasury, trading of a treasury, but it's
14 actually from the Bloomberg terminals on here.  So
15 it must be --
16     Q.  Okay.  A different format?
17     A.  -- a different format, right.
18     Q.  Okay.  And then on the next page, which is
19 Public-USAO 0961013, it indicates that the trader is
20 Frank?
21     A.  Right.
22     Q.  Is that Frank DiPascali?
23     A.  Yes.
24     Q.  And was it Frank's responsibility to
25 maintain the portfolio Treasury securities for the

Page 44

1  703 account customers?
2      A.  Yes.
3      Q.  Is it fair to say that he would direct the
4  work of Eric Lipkin and Robert Romer?
5      A.  Yes.
6      Q.  And they reported to Frank?
7      A.  Yes.
8      Q.  Now, what was your purpose in instructing
9  Frank to maintain a portfolio of Treasury securities
10 up to $6 billion using the 703 account money?
11     A.  We had to put the money somewhere, so if we
12 were -- if it wasn't -- we would never keep the
13 money in cash.  So if we weren't buying the
14 securities, we would put it into -- we would put it
15 into treasuries.
16     Q.  Okay.  And did you have some thought that
17 the three to six billion -- that was at JPMorgan
18 Chase.  That the up to six billion in Treasury
19 securities was intended to protect any of your
20 customers?
21     A.  Well, if it was -- it was customer money,
22 you know, yes.
23     Q.  Okay.  And in your mind over the years did
24 you have customers, investment advisory customers
25 that you wanted to protect more than others?

Page 45

1      A.  No.
2      Q.  Were you concerned about protecting the
3  European investors?
4      A.  No.
5      Q.  Why is that?
6      A.  Well, because I was aware of the fact that,
7  first of all, they really weren't my customers.
8  They were customers of hedge funds.  I was aware of
9  the fact that the -- that most of the hedge funds,
10 if not all of them, had structured product
11 arrangements with banks that they were guaranteed,
12 their principal was guaranteed and they were sharing
13 in the profits of the transaction.
14     So it was as far as -- I mean, basically,
15 they were all my customers.  So I was obligated from
16 a legal standpoint whether -- you know, whether I
17 wanted to or not; but I would say that the -- I
18 looked at the individual clients which would -- who
19 had direct accounts with me differently than I did
20 with the hedge funds, particularly because the hedge
21 fund money that was pouring in was the thing that
22 caused me the problem.
23     Q.  What about the feeder funds?  Are you
24 putting them in the category of the hedge funds?
25     A.  The who?

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1    Q.  The feeder funds?
2    A.  Those are the hedge funds.
3    Q.  Those are the hedge funds.  Okay.  So were
4  you buying the Treasury securities then to protect
5  the private customers as opposed to the hedge funds?
6    A.  I didn't look at it, you know.  I didn't
7  isolate it one over the other because I knew I was
8  basically obligated for -- you know, for all of it.
9    Q.  Okay.  Now, you said that you purchased
10  Treasury securities with the 703 account money
11  through the five institutions that you named?
12    A.  Right.
13    Q.  Bear Stearns, Fidelity, Lehman Brothers,
14  JPMorgan Chase and Morgan Stanley --
15    A.  Right.
16    Q.  -- is that right?
17    A.  Yes.
18    Q.  Okay.  It was only those five firms?
19    A.  Yes.
20    Q.  Okay.  And did you maintain a consistent
21  portfolio of Treasury securities at each of those
22  institutions?
23    A.  They were rarely sold unless they matured
24  and then we repurchased, you know, different, you
25  know, Treasury bills.  Yes, I mean, for the most

Page 47

1  part the monies in those accounts built and became,
2  you know, more and more up to the maximum, which
3  was, I think, $500 million pretty much in each
4  account.
5    Q.  So you maintained 500 million of Treasury
6  securities at each of those five firms?
7    A.  Pretty much, yes.
8    Q.  Okay.  And then in addition you had the
9  portfolio that was purchased directly --
10    A.  Correct.
11    Q.  -- by the 17th floor people?
12    A.  Right.
13    Q.  Now, the market making and proprietary
14  trading people were buying and selling securities;
15  right?
16    A.  Yes.
17    Q.  And what kind of records were kept of the
18  securities that were held by the firm as of say
19  month end of each month?  Was there a record kept of
20  an inventory of securities that were owned by the
21  firm as of the end of each month?
22    A.  That the firm was long you're talking
23  about?
24    Q.  Yes.
25    A.  Yeah.  That was -- you know, you were

Page 48

1  required to -- you had trading ledgers that
2  reflected what was long by the market makers or the
3  proprietary traders in the firm's investment
4  account.  There were trading ledgers and then there
5  were -- there's what's called a securities record,
6  stock record.
7    Q.  Is it called a trade blotter?
8    A.  There's trade blotters, yes.
9    Q.  Is that the same thing?
10    A.  Same thing.
11    Q.  Okay.  So if I -- if I --
12    A.  Trade blotters basically reflect also
13  monies -- monies in and monies out for the payment
14  of the securities.  The trading ledgers just shows
15  the inventory long and short, and same for the stock
16  record.  Stock record would reflect where the
17  securities are held.
18    Q.  Okay.  So I just want to get the terms.
19  There are trade blotters?
20    A.  Trading ledgers.
21    Q.  And it's called a trading ledger?
22    A.  Correct.
23    Q.  Okay.
24    A.  You know, which would -- trading ledgers
25  would be for the market making, proprietary trading

Page 49

1  and the investment account, investment ledger.
2    Q.  Okay.
3    A.  And then there's what's known as a stock
4  record, which breaks down by each security.
5    Q.  So each of those reports was done as of
6  month end?
7    A.  Daily.
8    Q.  They were done daily?
9    A.  The reports were effected daily.
10    Q.  Okay.  And did you -- through
11  December 11th, 2008 did you maintain those records?
12    A.  Yes.
13    Q.  So they should have been there for the
14  Trustee when he took over?
15    A.  They would be, yeah.
16    Q.  Okay.  And were they all electronic records
17  or were they paper records?
18    A.  No.  They were -- well, they were all done
19  through computers.
20    Q.  Okay.  Who was responsible within the firm
21  for generating these reports?
22    A.  Well, depends upon, you know, where they
23  were executed.  Basically, Dan Bonventry was the
24  operations director, so he had the final
25  responsibility.  The records themselves were

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1 generated by the systems people. And depending upon
2 whether it was generated by the Stratus system,
3 which handled basically all the -- all the market
4 making, proprietary trading side of the firm, or
5 whether it was done by the investment advisory side,
6 that would have been through the AS/400.
7     Q. Okay. But the investment advisory side
8 would show -- would it show securities that actually
9 hadn't been purchased? In other words, the split
10 strike securities that weren't purchased, would
11 they -- would that be listed on that report?
12     A. That's correct.
13     Q. Okay. So that's the trading ledger?
14     A. Right.
15     Q. Okay. So --
16     A. It would be -- it would be the customer
17 ledger. There's a customer ledger.
18     Q. There's a customer ledger. So if I wanted
19 to get an accurate picture of what securities the
20 firm actually held as of any given day, what would
21 be the best document to look at?
22     A. You would have to look at the -- the
23 trading ledgers.
24     Q. The trading ledgers. Okay. Now, at
25 JPMorgan Chase did you have an account or accounts

Page 51

1 other than the 703 account?
2     A. Yeah. They had what they called a
3 controlled disbursements account, which most
4 brokerage firms maintain, so that the money was only
5 transferred -- it was part of the 703 account, but
6 it was so that they didn't take the money out of the
7 account until the checks would hit from the checks
8 that you issued it to. So it was like a flow of
9 funds account.
10     Q. Was there a 509 account? Do you remember
11 that?
12     A. I don't remember the number.
13     Q. You don't remember. Okay.
14     A. I mean, it was related to the 703 account.
15     MS. CHAITMAN: Okay.
16     MR. GOLDMAN: I'm going to direct this to
17 the reporter. Do you need a break? Okay.
18     MR. SHEEHAN: I could use a bio break in
19 about five minutes.
20     THE WITNESS: A what break?
21     MR. SHEEHAN: Bio break.
22     THE WITNESS: Bio break?
23     MR. SHEEHAN: Men's room.
24     THE WITNESS: Oh, okay.
25     MS. CHAITMAN: I'm going to mark as

Page 52

1 Exhibit 16 a JPMorgan Chase account statement for
2 the 703 account dated February 2001.
3     MR. GOLDMAN: I want to clear something up
4 just so we know where they are.
5     MS. CHAITMAN: Yeah.
6     MR. GOLDMAN: The trading ledgers or
7 customer accounts that we were talking about that
8 you were just being asked about --
9     THE WITNESS: I don't understand the
10 question.
11     MR. GOLDMAN: I just want to ask you some
12 questions about where you could look at the end of
13 the month to see what was held by the company.
14     THE WITNESS: Right.
15     MR. GOLDMAN: Okay. Were those
16 electronically maintained?
17     THE WITNESS: Yes.
18     MR. GOLDMAN: Okay.
19     MR. SHEEHAN: That's all right.
20     (Customers Exhibit Number 16 was marked
21 for identification.)
22     Q. (By Ms. Chaitman) Bernie, do you recognize
23 this as a 703 account statement?
24     A. Yes.
25     Q. And if you'd turn to page four of

Page 53

1 thirty-two?
2     A. Four of thirty-two?
3     MS. CHAITMAN: Yeah.
4     MS. FEIN: Is that the last Bates? It's
5 777; is that right?
6     MS. CHAITMAN: Yes.
7     THE WITNESS: Uh-huh.
8     Q. (By Ms. Chaitman) If you look at the entry
9 on the 1st of February for $55 million and it says
10 debit memorandum, reference purchase of ticket
11 number. Do you see that? It's down here, 55
12 million?
13     A. Yeah, okay. Uh-huh.
14     Q. Do you know what that is?
15     A. It's a debit, so I'm assuming it's -- I'm
16 assuming it's a check.
17     Q. Were you investing through JPMorgan Chase
18 funds that you had on account?
19     A. Purchase of -- I'm not sure what the
20 question is.
21     Q. Were you -- that $55 million, were you
22 instructing Chase to invest that money in some
23 interest earning security?
24     A. Oh, they -- we must have, but they -- I
25 don't know if that was a sweep account. It was 55

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1 million. What did they purchase? I can't tell from
2 here.
3 Q. Well, you would have to look at the ticket,
4 001478.
5 A. Well, basically they wouldn't purchase
6 anything unless we instructed them to do it, but
7 they had -- all banks have what they call a sweep
8 account, you know, where they swept the money that
9 was cash that was in an account, they put it into a
10 financial instrument so that it was an interest
11 bearing account.
12 Q. Okay. And would you tell them what to
13 invest in it?
14 A. No. They would do that themselves.
15 Q. Okay. If you'd just look up a little bit,
16 there's a $13 million entry on February 1st?
17 A. Right.
18 Q. And it says --
19 A. Nassau.
20 Q. -- Nassau deposit taken?
21 A. Right.
22 Q. Attention, Tony Tiletnick?
23 A. Right.
24 Q. And it says to establish your deposit for
25 purchase or sale of Chemical commercial paper?

Page 55

1 A. Commercial paper, right.
2 Q. Right. Do you see that?
3 A. Yes.
4 Q. Who was Tony Tiletnick?
5 A. He was the -- around the cashiering
6 department.
7 Q. Was he responsible for dealing with
8 JPMorgan Chase?
9 A. Yes, uh-huh.
10 Q. Was he responsible to make sure that the
11 money was invested so that it was earning money?
12 A. Yes.
13 Q. Okay. So was it your general practice to
14 make sure that the money in the 703 account was
15 always invested in securities so that it was earning
16 money?
17 A. Yes. We would never keep it just in cash.
18 That's what that -- that's why I'm referring to a
19 sweep account. They would sweep their money into an
20 interest bearing account.
21 Q. Okay. But if it's Chemical commercial
22 paper --
23 A. Right.
24 Q. -- was that -- would that have had to be a
25 specific instruction?

Page 56

1 A. No. They would have -- they would do that.
2 You know, well, I mean, Tony would tell them -- you
3 know, Tony knew that they were investing it, but
4 they were -- he, obviously, would have had a
5 conversation with someone at the bank because at one
6 point we told them not to use -- that we didn't want
7 money going into Nassau because it was a -- it
8 wasn't -- there was concern that, you know,
9 commercial paper that was not, you know, in the U.S.
10 was more at risk. Turned out never to be a problem,
11 but it was an issue at one point.
12 Q. So where -- if I look at page nine of
13 thirty-two, let me show you which one that is.
14 There's a hundred million dollar debit memorandum on
15 February 5th. Do you see that?
16 A. Uh-huh.
17 Q. It's Bates number 1458787.
18 A. Right, uh-huh.
19 MS. FEIN: Thanks.
20 MR. SHEEHAN: Yeah.
21 Q. (By Ms. Chaitman) So do you know what that
22 would have been purchasing?
23 A. It would have -- if it's not a -- it,
24 obviously, must have been a financial instrument.
25 Whether it would be a CD or whether it be a

Page 57

1 Treasury, I can't tell.
2 Q. Okay. Did Tony Tiletnick consult with you
3 on a daily basis --
4 A. No.
5 Q. -- or did he have authority to make these
6 decisions?
7 A. No. He had authority to do it himself.
8 Q. And in essence what were his instructions?
9 A. He was in charge of paying securities, you
10 know, and settling up with the clearing houses.
11 Q. But in terms of the investment of deposits
12 that were in the 703 account?
13 A. He would put whatever money that wasn't
14 being -- he typically wouldn't buy treasuries
15 himself. He was not someone that would normally buy
16 treasuries. He would basically be involved with
17 purchasing financial instruments like CDs or
18 treasuries for the sweep account. They weren't
19 typically large amounts. I mean by large amounts,
20 they weren't billions of dollars.
21 MS. CHAITMAN: Okay. All right. You want
22 to take a break?
23 MR. SHEEHAN: Sure.
24 THE VIDEOGRAPHER: Going off the record.
25 This ends disc number one. The time is 10:20 a.m.

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1    (A recess was taken and Customers Exhibit
2 Number 17 was marked for identification.)
3    THE VIDEOGRAPHER: Back on the record.
4 This begins disc number two. The time is 10:35 a.m.
5    Q. (By Ms. Chaitman) Okay. I've marked as
6 Exhibit 17 a June 2001 statement for the 703
7 account.
8    THE VIDEOGRAPHER: Ms. Chaitman, your
9 microphone.
10    MS. CHAITMAN: It's on.
11    THE VIDEOGRAPHER: Okay. Raise it up
12 higher. It's being covered.
13    Q. (By Ms. Chaitman) And I'm going to just
14 take a look at page seven of forty-four. Mr.
15 Madoff --
16    MR. SHEEHAN: What's the Bates number?
17    MS. CHAITMAN: The Bates number is -- it
18 ends --
19    MR. SHEEHAN: Oh, we have it, seven of
20 forty-four. I'm sorry.
21    MS. CHAITMAN: Sorry.
22    MR. SHEEHAN: Okay. Go ahead.
23    Q. (By Ms. Chaitman) If you look at --
24 there's on June 4th at the bottom of the page,
25 there's a $50 million debit?

Page 59

1    A. Uh-huh.
2    Q. And it says purchase of slash sale of
3 JPMorgan Chase. Is that commercial paper?
4    A. Yes.
5    Q. And then reference purchase of Chemical
6 commercial paper?
7    A. Uh-huh.
8    Q. Okay. And then above that there's a
9 $35 million debit memorandum for purchase of ticket
10 and then it's redacted?
11    A. Uh-huh.
12    Q. Okay. And then above that it's
13 12-and-a-half million and it says Nassau deposit
14 taken account?
15    A. Right.
16    Q. Can you describe what these are?
17    A. Those are just financial instruments that
18 are invested so that the money is not just sitting
19 there not earning any interest overnight.
20    Q. Okay, okay. And, again, was Tony Tiletnick
21 authorized to do this on a daily basis?
22    A. Yes.
23    Q. Okay. And is it fair to say that the goal
24 was to earn money on the investment advisory
25 customers' money?

Page 60

1    A. Yes.
2    (Customers Exhibit Number 18 was marked
3 for identification.)
4    Q. (By Ms. Chaitman) I'm marking as
5 Exhibit 18 a 703 account statement for October 2002.
6 And Mr. Madoff, I'm going to open this to Bates
7 number 576, which is page eight of fifty-five. Mr.
8 Madoff, we're looking at a statement for
9 October 2002.
10    And if we look at the entry on
11 October 1st, there's a $279 million entry for --
12 it's a debit for the purchase of slash sale of JP
13 Morgan commercial paper --
14    A. Right.
15    Q. -- is that right?
16    A. Uh-huh.
17    Q. And, again, was this done on -- by Tony
18 Tiletnick under your instructions?
19    A. Correct, yes, yes.
20    Q. Okay. Now, were there times of the year
21 when you tended to have more cash to invest than
22 others or was this a general?
23    A. No, no. It was just -- was just a normal
24 flow of funds.
25    (Customers Exhibit Number 19 was marked

Page 61

1 for identification.)
2    Q. (By Ms. Chaitman) Okay. We'll go through
3 a few more of these just because they cover
4 different periods. This is -- will be Exhibit 19
5 and this covers the period of November -- of
6 December 2003. And if you could look at page 41 of
7 65? Let me open it up for you.
8    A. Uh-huh.
9    Q. There are two entries for December 22nd
10 where $50 million --
11    A. Right.
12    Q. -- is being invested; is that right?
13    A. Yes.
14    MS. CHAITMAN: Okay. I'm going to mark as
15 Exhibit 20 the statement for December 2004.
16    (Customers Exhibit Number 20 was marked
17 for identification.)
18    MS. FEIN: Thanks.
19    Q. (By Ms. Chaitman) Some of them I have -- I
20 don't know why some of them I have four and some of
21 them I don't, but if you look at page 35 of 63,
22 which bears Bates stamp number 1486? Now, this is
23 -- this is December of 2004 and do you see that
24 there's a $30 million --
25    A. Right.

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1  Q. -- Nassau deposit ticket?
2  A. Uh-huh.
3  Q. And then there's a $90 million purchase?
4  A. Right.
5  Q. Is it fair to say that those are again --
6  A. Uh-huh.
7  Q. -- investments?
8  A. Yes.
9  Q. So that the investment advisory customers
10 were earning money on their money?
11 A. Uh-huh.
12 Q. And can you explain what the Nassau deposit
13 is?
14 A. It's a CD, commercial paper of the -- I
15 don't know how to describe it to you, but it's no
16 different than JP Morgan. It's their branch in
17 Nassau.
18 MS. CHAITMAN: Okay, okay. I've just got
19 two more of these. I'm marking as Exhibit 21 a
20 June 2007 statement from JPMorgan Chase.
21 (Customers Exhibit Number 21 was marked
22 for identification.)
23 MS. FEIN: Thank you.
24 Q. (By Ms. Chaitman) And if you look on page
25 16 of 66 which bears Bates numbers 3654, this has an

Page 63

1  entry for 50 million on June 6th, which is AIP
2  overnight investment?
3  A. Uh-huh.
4  Q. Purchase of JPMorgan Chase commercial
5  paper?
6  A. Right, uh-huh.
7  Q. And then the next one is 150 million and
8  that's -- can you explain what that is? It seems to
9  have an interest rate of 5.1407 percent; is that
10 right?
11 A. Yes.
12 Q. Can you tell what that is?
13 A. You know, I don't know. I mean, it must be
14 some sort of commercial paper of JP Morgan.
15 Q. Okay. And then the next entry on June 6th
16 is 600 million and that's invested in short-term
17 derivatives; is that right?
18 A. Where is that? Six hundred million?
19 Q. Six hundred million is -- it's June 6th.
20 A. It says JP Morgan short-term derivatives.
21 I don't know what that is. It must be a -- you
22 know, it must be some sort of commercial paper that
23 is a financial instrument.
24 Q. Okay. And, again, is it fair to say that
25 even in 2007 it was Tony Tiletnick who had handled

Page 64

1  these investments?
2  A. I don't -- he died at one point. It might
3  have been his brother, Walter Tiletnick, took over
4  his job at one point. I think in 2007 he was
5  already -- he had already died.
6  MS. CHAITMAN: Okay, okay.
7  MR. GOLDMAN: I didn't know whether you
8  could hear with the microphone.
9  THE WITNESS: Uh-huh.
10 MS. CHAITMAN: I'm going to mark as
11 Exhibit 22 a Bear Stearns statement dated April --
12 dated August 1, 2005.
13 MR. SHEEHAN: Twenty-three?
14 MS. FEIN: Twenty-two.
15 MR. SHEEHAN: Twenty-two. My fault.
16 (Customers Exhibit Number 22 was marked
17 for identification.)
18 Q. (By Ms. Chaitman) Twenty-two. Can you
19 identify this document, Mr. Madoff?
20 A. It's Bear Stearns' account statement.
21 Q. Did you -- what was the time period that
22 you transacted business with Bear Stearns?
23 A. I transacted business with Bear Stearns,
24 you know, from the time I started my firm over the
25 years. So it was probably the 1960s on, you know,

Page 65

1  through 2008.
2  Q. What kind of business did you do with Bear
3  Stearns?
4  A. My market makers and proprietary traders
5  traded with them, you know, on a regular basis. We
6  executed trades for their customers for -- you know,
7  we were a wholesaler, a market maker. So we did
8  business with, you know, hundreds of brokerage
9  firms, Bear Stearns being one of them.
10 Q. Is it fair to say that you did billions of
11 dollars a year in business with Bear Stearns?
12 A. With Bear Stearns, yes, certainly. I mean,
13 I think we probably traded a trillion dollars a year
14 in general with Wall Street.
15 Q. With everyone?
16 A. Yes.
17 Q. Now, did you have more than one account at
18 Bear Stearns?
19 A. No. We only had one -- well, I guess my
20 wife had an account at Bear Stearns, you know, just
21 a brokerage account for herself; but the firm, you
22 know, only had -- they had Treasury -- an account
23 where we bought Treasury bonds and then we had -- we
24 executed trades on the exchanges through Bear
25 Stearns because they were the clearing broker for

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1  Cohmad Securities, which is a firm that we owned.
2  We were the owners of that.
3      Q.  For Cohmad?
4      A.  For Cohmad.
5      Q.  Okay, okay.  So is this a statement for the
6  securities account because on the second page it
7  lists different securities?
8      A.  Yeah, yes.  It must have been -- yeah.
9  This is the securities.
10     Q.  Now, why would -- I mean, these seem to
11 indicate that the transactions were sold, bought,
12 received, delivered?
13     A.  Uh-huh.
14     Q.  Why would you have used Bear Stearns to buy
15 securities instead of buying them yourself?
16     A.  Because we're not a member of the New York
17 Stock Exchange.  Bear Stearns was.  So if we bought
18 an executed trade on the floor of the exchange and
19 we weren't a market maker in that security, we would
20 go through Bear Stearns.  It could have been
21 probably for like proprietary traders.
22     Q.  Now, you've testified that you had
23 two accounts at Bear Stearns.  One was to hold the
24 Treasury securities that were purchased and one was
25 trading?

Page 67

1      A.  It would have been for proprietary and
2  market making trading activity.
3      Q.  Okay, okay.  So if I wanted to get the
4  evidence of the Treasury securities that were
5  purchased with the 703 account money, I would have
6  to get the statements relating to the Treasury
7  securities?
8      A.  Correct.
9      Q.  Okay.  And did you maintain those records?
10     A.  Yeah.  They would have been at the firm,
11 yeah.
12         (Customers Exhibit Number 23 was marked
13 for identification.)
14     Q.  (By Ms. Chaitman)  Okay.  I'm going to mark
15 as Exhibit 23 a document which was produced by the
16 Trustee.  Now, this document consists of a number of
17 different pages.  And if you would, Mr. Madoff, I'd
18 like you to explain to me to the best of your
19 ability what each of these pages represents.
20     A.  Well, the first page is -- is an account
21 for Cohmad Securities, which is an account -- which
22 is a firm that we used to execute certain trades for
23 Bear Stearns.  If it was a -- if it was what's
24 called a dot trade, a trade that they had a dot
25 machine that went directly down the floor to Bear

Page 68

1  Stearns, that would be a firm that -- that would be
2  part of our market making or proprietary trading
3  business.
4      Q.  Okay.  And the second page?
5      A.  The same.
6      Q.  Okay.  So this is the -- the second page,
7  which is Bates numbered ending in 14, says buy SEG?
8      A.  Uh-huh.
9      Q.  That's a stock; right?
10     A.  Right.
11     Q.  Okay.  And then on the sell line it says
12 hold PR something, OUS.  Do you know what that is?
13     A.  No.
14     Q.  Okay.  So is this a document that would
15 have been generated by Bear Stearns or --
16     A.  Yes.  This is.
17     Q.  Okay, okay.  If you look at page 16, which
18 -- do you recognize the handwriting on this page?
19     A.  No.
20     Q.  This is dated November 11th, '94 and the
21 handwritten note says open account for Madoff.  Do
22 you see that?  Here.  Open account?
23     A.  Oh, handwritten, yeah.
24     Q.  Do you know what that is?
25     A.  No.  This looks like Miller, you know,

Page 69

1  Tabak and Hirsch.  It probably is probably an option
2  account.
3      Q.  Were they clients of yours?
4      A.  No.  They must have been -- this isn't Bear
5  Stearns.  This is the -- they're another
6  broker-dealer.
7      Q.  Okay.
8      A.  -- that we must have done.  It's an option
9  account --
10     Q.  Okay.
11     A.  -- that was part of our hedging, probably
12 our proprietary trading department.
13     Q.  If you look at the third to the last page
14 of this collection of documents --
15     A.  Uh-huh.
16     Q.  -- this is dated January 30th, 1985 and it
17 seems to -- it says please install a restricted
18 centrex line to existing Turret equipment at Bernard
19 Madoff.  Do you have any idea what that was about?
20     A.  No.  It's the communications department.
21 So it must be, you know, one of numerous, you know,
22 systems lines that we had to -- you know, we had
23 hundreds of these types of lines to different
24 brokerage firms so that we could route orders
25 directly through them for our market making and

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1  proprietary trading.
2      (Customers Exhibit Number 24 was marked
3  for identification.)
4      Q. (By Ms. Chaitman)  Okay.  I'm going to mark
5  as Exhibit 24 a statement of account, and I'm
6  wondering if you can identify that.  It bears a
7  Bates number MS 236.  Is this a Morgan Stanley
8  statement?  You can --
9      A. I'm trying.  Everything seems to be
10 redacted.  I don't know.
11     Q. Right.  I believe that the MS means it was
12 produced to the Trustee by Morgan Stanley.
13     A. Okay.  It probably is because it's Treasury
14 bills.
15     MR. GOLDMAN:  I think it is because if you
16 look on the last page, they have a note about
17 retirement accounts and review with your Morgan
18 Stanley financial advisor.  It's unlikely one bank
19 is soliciting for another bank, so I think you can
20 conclude it's a Morgan Stanley statement.
21     THE WITNESS:  Uh-huh.
22     Q. (By Ms. Chaitman)  So am I correct that
23 this is showing that you had one-and-a-half million
24 dollars in income from this account as of March 8th,
25 2003?  Am I reading that correctly?

Page 71

1      A. What page are you on?
2      Q. On the first page.
3      A. On the first page?
4      Q. It looks like -- it looks like Morgan
5  Stanley is holding Treasury bills; right?
6      A. Uh-huh, right.
7      Q. Okay.  And then it has a liquid asset fund
8  of about 9.7 billion.  Do you see that?
9      A. Nine point seven billion?  No.
10     Q. No, million.  Excuse me.
11     A. Nine million, right.
12     Q. Excuse me, excuse me.  Yes, of course.
13     A. Yeah.  Right.  A million five hundred
14 thousand dollars was the yearly income.
15     Q. Okay.  To the best of your recollection did
16 you have more than one account at Morgan Stanley?
17     A. Not for treasuries.  We would have had only
18 one account.
19     Q. One account for treasuries?
20     A. Right.
21     Q. But you would have had accounts for
22 something --
23     A. Well, we also executed trades for Morgan
24 Stanley.
25     (Customer Exhibit Number 25 was marked for

Page 72

1  identification.)
2      Q. (By Ms. Chaitman)  Okay.  I'm going to mark
3  as Exhibit 25 a document which is a JPMorgan Chase
4  position summary.  So Mr. Madoff, did you have a
5  separate account at JPMorgan Chase which held the
6  Treasury bills for the --
7      A. Yes.
8      Q. -- 703 account customers?
9      A. Uh-huh.
10     Q. Can you identify this document?  Is it in a
11 form that you've seen before?
12     A. I don't know what -- I mean, I typically
13 wouldn't look at these statements, so looks to me
14 just like a -- you know, a typical Treasury bond
15 account where we bought treasuries.  It lists all
16 the activity as of April 2008.
17     Q. Okay.  So if you look at JPMorgan Chase, you
18 had about 2.8 billion, right, in Treasury
19 securities?
20     A. Let me see.  Yes.
21     Q. And then you maintained about 500 million
22 at each of those other four institutions?
23     A. Right.
24     Q. So that would have been 2.8 and then it
25 would have been 4.8; right?

Page 73

1      A. Right.
2      Q. And then you had Treasury securities that
3  were purchased directly by --
4      A. Right.
5      Q. -- Frank DiPascali?
6      A. Right.  It would be at DTC.  Those would
7  have been -- no.  Those would have been by -- those
8  would have been bought by Frank.
9      (Customers Exhibit Number 26 was marked
10 for identification.)
11     Q. (By Ms. Chaitman)  Okay.  I'm going to mark
12 as Exhibit 26 what I believe is a Fidelity
13 statement.  Can you identify this?
14     A. Uh-huh.
15     Q. Is it a Fidelity statement?
16     A. Yes.
17     Q. So they use the trade name Premium
18 Services?
19     A. Uh-huh.
20     Q. And this statement is dated January 31,
21 1999.  So what does the statement show that Fidelity
22 was holding in U.S. Treasury securities?
23     A. Looks like 205 million.
24     Q. Okay.  And these were bearing interest of
25 5.25 percent and 5.375 percent?

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1    A. Right, uh-huh.
2    Q. And was this purchased with money from the
3 703 account?
4    A. Yes.
5    (Customers Exhibit Number 27 was marked
6 for identification.)
7    Q. (By Ms. Chaitman) I've marked as
8 Exhibit 27 an August 31, 1991 statement of
9 Clothmasters, Inc. Mr. Madoff, was Clothmasters an
10 investment advisory customer?
11    A. I would assume so, yes.
12    Q. Okay. And this statement is dated August
13 31, 1991. Can you tell what trading strategy this
14 statement reflects?
15    MR. GOLDMAN: I'm going to step out for a
16 second.
17    MS. CHAITMAN: Sure.
18    THE WITNESS: This looks like a -- it
19 looks like a split strike trade via equity. It
20 looks like a basket of securities that were part of
21 the split strike transaction.
22    Q. (By Ms. Chaitman) Okay. And as of
23 August 31, 1991 were you actually purchasing the
24 securities?
25    A. Yes.

Page 75

1    (Customers Exhibit Number 28 was marked
2 for identification.)
3    Q. (By Ms. Chaitman) I'm marking as
4 Exhibit 28 a document which is called Account
5 Canada. Can you tell me what this is?
6    A. Looks like it says Canadian dollars, so
7 this must have been part of our proprietary trading,
8 I think. I doubt whether this is -- I doubt whether
9 this is a customer.
10    Q. So this is a record of investments that the
11 firm made in Canadian dollars?
12    A. Right.
13    Q. Is this a report that was regularly
14 prepared by your firm?
15    A. I don't know what this is. I mean, you
16 know, I'm not familiar with this, so, you know --
17    Q. Okay. I don't want you to guess if --
18    A. No. I don't know.
19    MS. CHAITMAN: Okay.
20    MR. GOLDMAN: Do you need to eat?
21    THE WITNESS: Yeah. Whenever you're --
22    MR. GOLDMAN: They have your food outside.
23    THE WITNESS: Huh?
24    MR. GOLDMAN: I checked. They have your
25 food outside.

Page 76

1    THE WITNESS: All right. I'm okay for
2 now.
3    MS. CHAITMAN: Do you want to? Do you
4 want to?
5    THE WITNESS: No. It's all right.
6    MS. CHAITMAN: You sure?
7    MR. SHEEHAN: Whenever you're ready, just
8 tell us.
9    THE WITNESS: Okay.
10    MR. SHEEHAN: We're not going anywhere.
11    THE WITNESS: I don't know how long she's
12 going to be with this. What are you doing?
13    MS. CHAITMAN: Well, I --
14    MR. SHEEHAN: I think we're looking at all
15 day.
16    CHAITMAN: No, but if you want -- do you
17 want to take a break? Is this when you normally eat
18 lunch? Why don't we --
19    MR. SHEEHAN: Why don't we just do it?
20    MS. CHAITMAN: Yeah.
21    THE WITNESS: Okay.
22    THE VIDEOGRAPHER: Going off the record.
23 The time is 11:09 a.m.
24    (A luncheon recess was taken.)
25    THE VIDEOGRAPHER: Back on the record.

Page 77

1 The time is 11:29 a.m.
2    Q. (By Ms. Chaitman) Just to review, Mr.
3 Madoff, if I wanted to get a full picture of the
4 Treasury securities that were purchased with money
5 from the 703 account as of any point in time from
6 say 1994 on when you say that the split strike,
7 that's when you stopped writing securities for the
8 customers, I would have to get the statements from
9 Bear Stearns; right?
10    A. (Witness nods head.)
11    Q. The statements from Morgan Stanley?
12    A. Right.
13    Q. The statements from Fidelity?
14    A. Right.
15    Q. The statements from Lehman Brothers?
16    A. Right.
17    Q. And I would have to get the JPMorgan Chase
18 statements like the one we looked at, which was the
19 account that held the Treasury securities?
20    A. Correct.
21    Q. Okay. And if I wanted to get a complete
22 picture of the securities that your firm held that
23 were long positions that you actually held, I would
24 have to look at the DTC records?
25    A. Correct.

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1    Q. I'd have to look at -- were there other
2  places that you held securities? Would I have to
3  look at, say, your account at Bear Stearns?
4    A. You would have to look at the banks if
5  there were -- if there were bank loans.
6    Q. Because if you borrowed from a bank, you
7  would have pledged the securities to the bank?
8    A. Right. Typically they would be held at
9  DTC, but they would be in the bank's account at DTC.
10  They would be journaled over to the bank. So you'd
11  have to look at the DTC -- you'd have look at the --
12  you would have to get that from the bank themselves
13  because DTC would not give them to you.
14    Q. What banks did you borrow money from where
15  you pledged the securities to the banks?
16    A. It could be JP Morgan. It could be Bank of
17  New York, you know, depending on what period; but if
18  you were looking at 2008 or 2000s, it would be
19  typically Bank of New York, M&T, it could be JP
20  Morgan. I think that's -- those are the banks that
21  we used at that time.
22    Q. And if it's earlier?
23    A. You'd have to look at any one of the -- you
24  probably couldn't get them, you know, but it would
25  be the banks that I mentioned to you.

Page 79

1    Q. All the clearing accounts?
2    A. Right, right.
3    Q. So if I wanted -- let's say I'm talking
4  about 2003.
5    A. Right.
6    Q. I would have -- in order to determine what
7  securities were held by your firm, I would have to
8  look at the DTC records for each of the banks that
9  you listed before?
10    A. Right.
11    Q. Plus your own DTC --
12    A. Right.
13    Q. -- correct? And would that give me a
14  complete picture of all the securities you owned as
15  of a given point in time?
16    A. Uh-huh.
17    Q. Yes?
18    A. Yes.
19    Q. Now, again, I don't want you to mention any
20  individual names, but you testified previously that
21  the four families entered into hold harmless
22  agreements with you?
23    A. Right.
24    Q. Do you recall who was involved in drafting
25  those hold harmless agreements?

Page 80

1    A. One of the partners at Price Waterhouse.
2    Q. Do you remember who?
3    A. Ed Kostin, Edward Kostin.
4      MR. GOLDMAN: Could you spell the name?
5      THE WITNESS: K-o-s-t-i-n. He's deceased
6  now.
7    Q. (By Ms. Chaitman) And, again, I don't want
8  you to mention any names, but were the hold harmless
9  agreements signed by members of all the four
10  families?
11    A. Yes.
12    Q. And what was the total amount of the debt
13  that the hold harmless agreements obligated the four
14  families together to pay you?
15    A. Well, it varied depending upon the
16  fluctuation of the -- of the securities because the
17  hold harmless agreements basically stated that they
18  were holding me harmless for any loss involved in
19  the naked part of their securities because of the
20  short positions that had been maintained. So it
21  could have -- probably was a maximum of probably I
22  would say at one point probably $9 million --
23  $9 billion.
24    Q. Okay. As of December 11th, 2008 do you
25  have any sense of how much it was?

Page 81

1    A. As of when?
2    Q. December 11th, 2008.
3    A. I couldn't give you an exact figure. You
4  know, the --
5    Q. Don't mention any names.
6    A. Not counting the 6 billion, there was one
7  debit balance of 6.3 billion.
8    Q. Okay. So one person had a -- that a
9  margin loan?
10    A. Yes.
11    Q. So ones customer had a margin loan of six
12  billion?
13    A. Right, right.
14    Q. And then --
15    A. Then I would say the others were probably
16  -- there was probably an additional $5 billion in
17  exposure that they caused me.
18    Q. Okay. So it was approximately $11 billion
19  at the time you confessed?
20    A. Approximately, yes.
21    Q. Okay. Now, Mr. Madoff, you've testified
22  that the investment advisory fraud did not begin
23  until either late 1993 or early 1994. Are you aware
24  that David Kugel testified that the fraud began in
25  the 1970s?

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1    A. Yes.
2    Q. Mr. Kugel testified at the Bonventry trial
3  that in the 1970s he gave Annette Bongiorno
4  arbitrage trades for the accounts of Stanley, Chase
5  and for Avellino and Bienes. Were you defrauding
6  Chase and Avellino and Bienes in the 1970s?
7    A. No.
8    Q. Did you read Mr. Kugel's testimony?
9    A. Yes.
10    Q. Do you think it's accurate?
11    A. No.
12    Q. Can you explain why?
13    A. First of all, I think that --
14    THE VIDEOGRAPHER: Microphone, microphone,
15  microphone.
16    MS. CHAITMAN: You took care of the
17  microphone.
18    MR. GOLDMAN: Want me to remove the
19  microphone? Sorry.
20    MS. CHAITMAN: I'm sorry, Mr. Madoff.
21    THE WITNESS: I guess the best way to
22  describe -- from what I've been able to piece
23  together from the -- what I've read from the
24  testimony and what I've been told and what I've seen
25  is that this so-called smoking gun I would refer to

Page 83

1  it is that David Kugel, who is one of my convertible
2  bond traders, used to -- at our -- at my request
3  used to generate a convertible bond formula that he
4  would give to either Annette Bongiorno or Jodi, all
5  right, that would lay out what the proper conversion
6  ratio was on a particular convertible security.
7    In other words, it was a formula that he
8  would write on a scrap of paper that would say MCI
9  convertible bond would be bought 100 bonds, you
10  would short let's say a thousand shares of stock at
11  a certain price. And they would take that formula
12  and they would use that when they were going to now
13  generate a trade for a client.
14    All right. Now, that was so that they --
15  because they were not traders, they were not
16  familiar with what the proper conversion ratios
17  were. All right. So typically what would happen,
18  the step used to be if Annette would come to them
19  with a convertible bond and say okay, I have a
20  million dollars worth of convertible bonds, that
21  typically would be a million because we traded in
22  much larger numbers.
23    So she would say there's $10 million
24  available to be invested in convertible securities.
25  What securities would you recommend that would put

Page 84

1  for the customers in? All right. So he would pick
2  out a security that we were trading and he would
3  give him the correct formula. Once they got that
4  formula, that scrap of paper, the next step would be
5  to go and search our trading records, which would be
6  what the market maker or the firm's investment
7  account bought and sold over a period of let's say
8  for four days.
9    And then they would -- he would by running
10  a run of what we bought and sold, then Annette or
11  Jodi, not David, you know, Annette or Jodi would
12  look through the trading records and pick out a
13  certain number of shares in stock and they would
14  come up with an average price and the appropriate
15  number of shares.
16    All right. So this David Kugel had no
17  access to any of those records. He wouldn't be able
18  to do that. He was just giving them -- he was just
19  giving them what the correct formula would be.
20    So by -- for some reason the Trustee, all
21  right, because he had this piece of paper which they
22  showed me when they first came down here years ago
23  and asked me what it was, I told them it was a
24  formula, exactly what I just said. They determined
25  from that that David was generating the trade and

Page 85

1  that we weren't actually buying. He was just making
2  up the trade, which I laughed at at the time because
3  it didn't make any sense, you know, for him to do
4  that. He couldn't possibly generate the trade
5  because he had no access to the records to pick that
6  out. He was just looking at one trade.
7    That is why -- and that was why Dubinsky,
8  you know, you know, did not have the -- couldn't
9  match up the number of shares or the price properly.
10  So David's testimony -- and I don't know why he
11  would even say that. I don't think that he would --
12  if he believed that he was actually generating a
13  trade, I can't believe that he would even think that
14  he was generating a trade because he knows that.
15    I mean, it just didn't make any sense. So
16  either he was -- either the Trustee or whoever it
17  was that was determining that, you know, just didn't
18  understand it, which is probably the most likely
19  situation or they were just trying to create a
20  situation. Just doesn't make any sense.
21    And anybody that if you call anybody in
22  for the industry, another person that ran a trading
23  desk that was familiar with how you did these types
24  of transactions would tell you the same thing. I
25  mean, it made absolutely no sense.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1    Q. (By Ms. Chaitman)  Now, when you confessed
2  you weren't in the process of negotiating a plea
3  agreement; right?
4    A. No, no.
5    Q. When David Kugel gave his testimony --
6    A. Uh-huh.
7    Q. -- he had negotiated a plea agreement;
8  right?
9    A. From what I understand, yes.
10    Q. So he had to give the prosecutor something
11  that the prosecutor wanted; right?
12    A. I don't know.  It looks like it.  I mean, I
13  just -- you know, I don't think David Kugel was a --
14  you know, a devious type of person.  David Kugel was
15  not a good communicator.  I mean, he was known in
16  the firm as having a very hard time telling anybody
17  anything.  Nobody ever wanted to speak to David
18  Kugel.  He was a very nice guy and he was actually a
19  talented trader himself, but he could not
20  communicate with anybody.
21        I mean, and so that's the only thing I can
22  think of is he didn't understand the question, he
23  got nervous.  I just don't know, but it made
24  absolutely -- it made absolutely no sense, his
25  testimony.

Page 87

1        And another example of this was there was
2  a testimony by Irwin Lipkin, all right, about -- you
3  know, first of all, you have to understand that the
4  only one that ever saw a completed focus report in
5  our firm or that ever signed a completed focus
6  report was me.  Nobody -- nobody in our firm knew
7  what the actual P&L was.  The traders -- and this is
8  not by accident.
9        In other words, the securities industry
10  has very strict requirements so that there's no
11  conflict of interest between market makers, the
12  trading department and so on.  You're required to
13  keep your records separate.
14        The trade -- the market makers are not
15  allowed to see another market maker's, you know,
16  trading positions or P&L.  As a matter of fact, you
17  have to have supervisors that are different.  For
18  example, my brother -- my one son was in charge of
19  the market making department.  The other son was in
20  charge of the proprietary trading department.  They
21  had to be separate.
22        And you couldn't have a system -- the
23  traders are not allowed to see what this other
24  trader has a position of because of what they call
25  Chinese walls between your market making, your

Page 88

1  client business and your proprietary trading
2  department.  The -- now, when do our -- when a firm
3  like ours that is a market maker and is doing an
4  arbitrage business, whether it be split strike or
5  whether it be convertible bonds and is trading
6  baskets and options and all sorts of hedging
7  strategy, which is what our firm specialized in,
8  when you do -- when you prepare your financial
9  reports, your focus reports at the end of any month,
10  you are allowed to net all of your positions.
11        So, for example, if you have -- in our
12  firm we could have ten traders trading the same
13  security.  So some traders would have long positions
14  in IBM.  Some would be short positions in IBM.  Some
15  would have option positions on IBM.  What you
16  have to do at the end of every month is you net all
17  the positions, the option positions, to come up with
18  a net exposure or net position.
19        So you could have, for example, one trader
20  may be long a thousand shares.  Another trader is
21  long -- is short 500 shares of stock so that the net
22  would be 500 shares.  All right.  The person that
23  instructs -- there's one person that instructs, you
24  know, how you do all of this.  Now, Irwin Lipkin
25  even before he retired was very -- was not the most

Page 89

1  efficient person.  Irwin Lipkin started with me when
2  he first came out of the Army, but as the firm grew,
3  as the firm became more and more sophisticated and
4  was trading in the old strategies, it was beyond
5  Irwin Lipkin's grasp, which was fine because he was
6  a bookkeeper.
7        He only had to know specific things.  At
8  the end of each month when you had to net all these
9  different positions, Irwin Lipkin didn't do that.
10  So what would happen is if Irwin Lipkin and the
11  records that he was looking at showed a thousand
12  shares of stock but didn't -- he wouldn't know what
13  the rest of the firm's were.  So somebody had to net
14  all of this out.
15        And it was a very complicated procedure
16  and each firm depending upon the type of business
17  you had had certain what they called no action
18  letters from the SEC, which told you how you could
19  -- you know, how you could handle each security.
20        And as a matter of fact, because I was the
21  chairman of the trading committee for the industry,
22  I had to work with the SEC when we formulated all of
23  these different regulations and rules.  So I was
24  aware of the fact that the typical accountant or
25  lawyer, for example, would not be familiar with any

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1  of that. So I was not the least bit surprised that,
2  for example, Dubinsky's errors that he had because
3  he, obviously, was not that familiar with how -- you
4  know, how you did this. Now, it doesn't mean you
5  couldn't find out.
6      If you went -- if you got someone that
7  really was familiar with all of these things, they
8  would be able to understand that; but if you ask the
9  typical accountant because, look, I worked with
10  every major accounting firm in the country, you
11  know, over the years. So I was familiar with what
12  they did, what they understood and what they -- it's
13  not surprising. It's a typical problem in the
14  industry.
15      So David Kugel's testimony as far as I'm
16  concerned as with Annette and as with any of these
17  people in my firm, whether it be Enriqua Pitz or
18  anyone else because I read all of their depositions.
19  And, you know, none of that was really valid because
20  they were looking at only what their specific job
21  was. They didn't know what the rest -- they weren't
22  familiar with the whole picture of the firm.
23      The only ones that would know that would
24  be Dan Bonventry in my firm, who was the director of
25  all operations, or myself. It wouldn't have been

Page 91

1  David Kugel. It wouldn't have been Enriqua Pitz and
2  so on.
3      Q. Did you believe that the focus reports were
4  accurate prior to 1994 when you stopped buying the
5  split strike securities?
6      A. Yes. And you see, you're using the '94,
7  '93, '92, so I want to make sure there. I said that
8  the fraud began in '92 because that was when we
9  weren't completing all of the transactions in this
10  split strike. All right. There was some -- there
11  were some transactions in the split strike done, you
12  know, through 1993.
13      All right. But I'm not comfortable saying
14  that everything was done -- was done -- I'm
15  comfortable saying that everything was done
16  correctly, you know, prior to '92.
17      Other than the fact there was some back
18  trading of -- of customer transactions for the
19  accounts, for the four large accounts that started
20  like in 1990, that was -- because of what happened
21  was after the crash in 1987, the four big clients,
22  you know, forced me to liquidate some of their
23  positions. And that's when the hold harmless
24  agreements started.
25      Q. Okay. But --

Page 92

1      A. Focus reports were accurate because that
2  wouldn't have affected the focus reports anyhow.
3  The focus reports were accurate through 1992 for
4  sure.
5      Q. Through 1992?
6      A. Yes.
7      Q. Okay. So I know it's a long time ago and I
8  don't want you to say anything unless it's your best
9  recollection, but you testified earlier today that
10  you were doing the split strike trades until late
11  1993 or early 1994?
12      A. Right.
13      Q. But are you unsure of it? I mean, do
14  you --
15      A. No. I was -- I didn't do it for all of the
16  clients, you know. That's what I said. There were
17  some clients that I did do the trades through 1993
18  for.
19      Q. Is there any way that we could determine
20  now which clients you did the trades for and which
21  ones you didn't?
22      A. No. I couldn't remember that for sure.
23      (Customers Exhibit Number 29 was marked
24  for identification.)
25      Q. (By Ms. Chaitman) Okay. I'm up to

Page 93

1  Exhibit 29. I'm handing you what I've marked as
2  Exhibit 29, which is an appendix to Mr. Dubinsky's
3  report in which he lists the documents that he
4  considered. Have you seen this document before?
5      A. No.
6      Q. Now, you've testified that Mr. Dubinsky did
7  not interview you and no one on his behalf
8  interviewed you; is that right?
9      A. Yes.
10      Q. Okay. And if you look at page eight of
11  this document, it lists a number of people who have
12  been -- whose deposition transcripts Mr. Dubinsky
13  said that he read. Can you look through this list
14  and tell me if any of these people -- it begins on
15  the bottom of page eight --
16      A. Uh-huh.
17      Q. -- and then it goes on to page nine. Can
18  you look at these names and tell me if any of these
19  people would have known how you executed the
20  convertible arbitrage trades in the 1980s?
21      A. You're looking at the depositions you're
22  saying?
23      Q. Yeah. The names of the people. Do you
24  recognize any of these people as people who had
25  knowledge about convertible arbitrage trading from

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1  the 1980s?
2      A.  None.
3      (Customers Exhibit Number 30 was marked
4  for identification.)
5      Q.  (By Ms. Chaitman)  Okay.  Now, I'd like to
6  mark as Exhibit 30 an August 20th, 2010 letter that
7  was written by Scott Garrett to Stephen Harbeck and
8  then a September 7th, 2010 letter from Mr. Harbeck
9  to Scott Garrett, which is the response.  I'll just
10  have to find the one that I marked up.  Just give me
11  one second.  I should have one more of these.  Let
12  me just see.
13      MS. FEIN:  That's all right.  We'll share.
14      MR. SHEEHAN:  It's all right.  Go ahead.
15      MR. GOLDMAN:  This may be the marked up
16  one.
17      MS. CHAITMAN:  Oh, yeah.  Thank you.
18      Q.  (By Ms. Chaitman)  Have you seen this
19  document before?
20      A.  No.
21      Q.  If you'd be good enough to turn to page 18?
22  And the numbers are on the left-hand side
23  of the page.  The numbers are right up there.
24      A.  Uh-huh.
25      Q.  SIPC is telling Scott Garrett that you had

Page 95

1  all together -- you had the 703 account, you had two
2  custody accounts at JPMorgan Chase and you had an
3  additional 127 accounts.  Do you see that?
4      A.  Right.
5      Q.  Does that sound accurate to you?
6      A.  A hundred and twenty-seven accounts why?
7      Q.  Held by -- I'm reading from the top of the
8  page.  It says in addition to the Madoff 703 account
9  and the two BLMIS custody accounts held at JPMorgan
10  Chase as discussed in response to section two,
11  question 1(a) above, an additional 127 accounts held
12  by Madoff, BLMIS or other Madoff-related entities
13  have been identified to date as a result of the
14  investigation.
15      A.  Well, I'm not sure which accounts he's
16  referring to when he says 127 accounts.  What is
17  that?  Customer accounts or what is it?
18      Q.  Accounts in the name of your firm, either
19  you or in the name of either you or BLMI.
20      MR. SHEEHAN:  Helen, it might be a good
21  idea if Mr. Madoff read question to question that's
22  being answered here, the page before.
23      MS. CHAITMAN:  Sure.
24      MR. SHEEHAN:  It might be a little bit
25  helpful.

Page 96

1      MS. CHAITMAN:  Sure.
2      THE WITNESS:  I'm still confused as to
3  what the question is.  I don't know.  Maybe it's
4  just me right now, but I don't -- when he's talking
5  about how many accounts, he's talking about -- what
6  is he talking about?  Customer accounts or accounts
7  we had at other brokerage firms or what?
8      Q.  (By Ms. Chaitman)  Well, the question was,
9  and I'm reading from the bottom of page 17, if for
10  the same period, which is --
11      A.  Right.
12      Q.  -- December 1998 through December 2008,
13  Madoff, BLMIS or other Madoff controlled businesses
14  had other accounts at U.S. or foreign banks or other
15  financial institutions provide annual balance data
16  for these accounts?
17      A.  Okay.  Well, again, if he's talking about
18  accounts that we had, you know, if he's talking
19  about that we had -- for example, if the Union Bank
20  in Switzerland handled an account for a hedge fund,
21  they may have had ten hedge fund accounts because
22  they have been the custodian for those accounts.  As
23  far as we're concerned, we never had an account with
24  these entities.  So again, it depends on how you
25  define we have an account.

Page 97

1      We trade for -- we had -- we were hooked
2  into hundreds of other broker-dealers, whether it be
3  Charles Schwab or Merrill Lynch or Fidelity.  You
4  know, we didn't have a -- we don't consider that we
5  had an account there.  We did business with them, so
6  we had transactions that went through that.  We were
7  executing Charles Schwab's customers' accounts but,
8  you know, Charles Schwab was our customer, not a
9  customer of Charles Schwab.
10      Q.  Okay.
11      A.  So I don't know --
12      Q.  Is it fair to say that you don't believe
13  that you, Madoff or BLMIS maintained 127 different
14  accounts?
15      A.  No, no.  Again, it depends on how you
16  define an account.  I mean, we had hundreds, you
17  know, of accounts.  We had much more than 127
18  accounts depending upon what your definition of an
19  account is.  We did 10 percent of all the trading in
20  the United States.
21      So, you know, we had -- we transacted five
22  or six hundred thousand transactions every day, you
23  know; but as I say, if you were a customer of
24  Fidelity or Charles Schwab, you had an account
25  there.  All right.  You weren't my customer.

25 (Pages 94 - 97)

CONFIDENTIAL

| Page 98 | Page 100 |
|---|---|

**Page 98**

1 Fidelity or Schwab was my customer. Now, they did
2 business with us, Fidelity. We don't consider that
3 we had an account with them.
4     Q. Right.
5     A. Because when we executed transactions for
6 them, those transactions went through the clearing
7 corporation. They were settled every day. We
8 didn't keep money at Fidelity. They didn't keep
9 money at our account. Those all went through the
10 clearing accounts.
11     Now, they would say that they -- they could
12 say they have an account with us because they did
13 business with us. So they would have a -- they
14 would show that -- what business they did with
15 Madoff on a particular day the same way that if you
16 were a customer of ours, Sean Jones, it would say
17 you have an account with us; but that's not what a
18 firm --
19     Q. Right.
20     A. So I don't know exactly how they're
21 defining an account.
22     Q. Okay. If you look at the back of the
23 document and you go in one, two, three, four, five
24 -- let's see. From the back of the document six
25 pages, you see you get to this from the back of the

**Page 99**

1 document. You've got it.
2     MR. SHEEHAN: Okay.
3     Q. (By Ms. Chaitman) You're in the wrong
4 document.
5     A. Oh, I'm in the wrong --
6     Q. That will make it even harder.
7     A. No wonder why you people charge $700 an
8 hour.
9     Q. Okay. Sorry to confuse you.
10     A. Uh-huh, right.
11     Q. So these are -- this lists three Bank of
12 New York accounts; right?
13     A. Right.
14     Q. One was for you and Ruth and then one was
15 just for you and one was for BLMIS; right?
16     A. Right.
17     Q. And then there's a Bankers Trust account in
18 your name?
19     A. Uh-huh.
20     Q. Was that used for the firm?
21     A. Yes.
22     Q. Okay. And there was a Barclays account?
23     A. Right.
24     Q. There were two -- actually, three Barclays
25 accounts; right?

**Page 100**

1     A. Uh-huh.
2     Q. One Bear Stearns account?
3     A. Right.
4     Q. One Fidelity account?
5     A. Uh-huh.
6     Q. One M&T account?
7     A. Right.
8     Q. And one Morgan Stanley account?
9     A. Right.
10     Q. Okay. Now, this is captioned Madoff
11 related accounts, year-end balances and annual
12 earnings accounts with transfers to and from the
13 Madoff 703 account. Do you see that in the upper
14 left-hand corner?
15     A. Uh-huh.
16     Q. So these were -- is it fair to say that
17 these were all accounts which received transfers
18 from the 703 account?
19     A. If that's what it says, yeah.
20     Q. Well, do you recall -- I mean, you've
21 testified that Treasury securities were purchased
22 with 703 account money by Fidelity, Bear Stearns,
23 Morgan Stanley and Lehman; right?
24     A. Uh-huh.
25     Q. And Barclays is Lehman?

**Page 101**

1     A. No. Barclays is Barclays.
2     Q. Well, if you look at the entry for
3 Barclays, underneath it says Lehman?
4     MR. SHEEHAN: Could Lehman -- I'll stop.
5     THE WITNESS: Okay. I mean, Barclays we
6 use -- Madoff Securities in London cleared their
7 transactions through Barclays.
8     MS. CHAITMAN: Okay.
9     THE WITNESS: So but I don't know what
10 Lehman did with Barclays. They may have used
11 Barclays as well.
12     Q. (By Ms. Chaitman) Okay. When money was
13 transferred from the 703 account to MSIL in
14 London --
15     A. Uh-huh.
16     Q. -- was that money used to purchase
17 securities?
18     A. It was used to purchase usually treasuries.
19     Q. From -- by MSIL?
20     A. Right.
21     Q. Okay. And were those treasuries also held
22 for the benefit of the investment advisory
23 customers?
24     A. Probably.
25     Q. Do you remember approximately how much MSI

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1  held in Treasury securities?
2      A. No.
3      Q. And for us to determine that, we'd have to
4  get the Barclays Bank statements, is that -- for the
5  Treasury account?
6      A. Correct.
7      Q. If you look on the next page, which is page
8  19 -- let me help you. Under paragraph two, what
9  appears in bold is the question that was asked by --
10     A. Right.
11     Q. -- Congressman Garrett. It said during the
12  period 1992-2008 when Madoff was actively pursuing
13  his Ponzi fraud, he was engaged in market making and
14  proprietary trading. For each of these years
15  provide data on trading volumes and the annual gross
16  and net revenues from this trading activity.
17         And then the answer is a table, which SIPC
18  says the table below includes annual revenue, net
19  income and trading volumes as reported in the focus
20  reports filed by Madoff with regulatory authorities.
21  Madoff focus reports were available back to 1983.
22     A. Uh-huh.
23     Q. Was this information on the focus reports
24  accurate after 1992?
25     A. I assume so. The revenue, yeah.

Page 103

1      Q. So, for example, where it says average
2  monthly reported trade ticket executions, do those
3  numbers look accurate to you?
4      A. It would be under focus reports, yes.
5      Q. Okay. And would the focus reports
6  accurately reflect the monthly trade ticket
7  executions?
8      A. Uh-huh.
9      Q. And what -- if you can answer this, what
10  was the average volume of each trade ticket? I
11  mean, I assume you wouldn't do a trade for three
12  shares of IBM?
13     A. No. These would be -- this is not -- I'm
14  assuming these are not customer transactions. These
15  are -- on the focus reports these were just
16  reflecting the market making proprietary trading
17  business.
18     Q. What you were doing for your own account?
19     A. Right.
20     Q. Right.
21     A. Yeah. So --
22     Q. Do these numbers look accurate to you?
23     A. I would -- I would assume so. If we run
24  the focus reports, the focus reports were accurate
25  all the time.

Page 104

1      Q. So what would -- if there's a -- if you can
2  quantify this. If you can't, just say you can't,
3  but what would be the average number of shares that
4  you would do on one ticket?
5      A. On a ticket?
6      Q. Yeah.
7      A. It varies. I just -- no way to be able to
8  tell you that. I know how many trades they were
9  doing. They were doing, you know, anywhere from a
10  low of 250,000 transactions a day to 600,000
11  transactions a day. I mean, you know, how the
12  shares were, you know, I don't -- you know, I don't
13  know. I didn't pay attention to that.
14     Q. Okay.
15     A. Why is it relevant?
16     Q. I'm just trying to get a sense of the
17  volume. In other words, let's say if we take in
18  1983 you did a reported -- average monthly reported
19  trade tick at executions was 8,135.
20     A. Well, let me put it to you this way. The
21  industry kept records, transactions of how many
22  transactions we did because they were reported, you
23  know, to -- you know, to the NASD. I mean, it was
24  reported all over the industry basically. These
25  were not numbers that we generated. That went

Page 105

1  through the systems, the clearance and settlement
2  systems and the reporting, trade reporting systems
3  that we did anywhere from typically a low of five
4  to ten percent of the actual number of transactions
5  were executed in the United States. That's not
6  something that I made up.
7         That was something that's been reported
8  all over the -- all over the industry. It's been
9  reported by the NASD and the SEC. I mean, by
10  anybody's scope it was a huge amount of business.
11        As a matter of fact, when we -- when we
12  developed this Primex trading system and my partners
13  were Goldman Sachs, Merrill Lynch, Lehman Brothers
14  and Citicorp, the five -- all five firms that were
15  the partners in Primex handled 50 percent of all the
16  trading in the United States. Again, this is not
17  numbers that we generated. This is what the
18  industry reported.
19     Q. Okay. But if I had been your customer,
20  would you have taken an order from me to buy five
21  shares of IBM?
22     A. No.
23     Q. So what was the low --
24     A. We didn't -- if a customer called us up to
25  buy stock for them, we never took an order. In

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1  other words, you couldn't as a customer, our firm
2  policy was to not handle a typical retail order for
3  a client. We either -- you either had to be a
4  broker-dealer or a bank to be a client of Madoff or
5  if you were a customer, you had to have -- when you
6  opened an account, you had to have a minimum of
7  500,000, which is at the very earliest $500,000 in
8  the account. Typically it was then 2 million. That
9  was if you were an individual client.
10      So but if you called us up and you said
11  you want to buy 20 shares of IBM or you want to buy
12  a thousand shares of IBM, we would not do that
13  order. If it wasn't -- the only customer business
14  that we did was where we managed the entire account
15  and we made the decisions.
16      Q. Okay. Now, if you'd look on page 23 at the
17  bottom of the page, the question was how many
18  accounts under consideration for avoidance action
19  were established with Madoff prior to the inception
20  of the Ponzi scheme?
21      In making the net investment method
22  determination net equity from these accounts, has
23  the Trustee used any of the pre-Ponzi disbursements?
24  If so, provide details, et cetera. And the response
25  says based on the Trustee's investigation and upon

Page 107

1  review of the earliest records available to him, the
2  Trustee has found no evidence indicating that the
3  BLMIS investment advisory business has been operated
4  as anything but a Ponzi scheme.
5      A. Right.
6      Q. Now, did anyone on behalf of the Trustee
7  ever talk to you about the trades that you did in
8  the 1980s?
9      A. No.
10      Q. Did the Trustee ever disclose to you that
11  he, in fact, had some trading records from the
12  1980s?
13      A. No.
14      Q. Now, when SIPC is using here the phrase
15  Ponzi scheme, if you accept for a moment that a
16  Ponzi scheme is a nonexistent business in which
17  people invest where the sole source of paying
18  returns on their investments is investments from new
19  investors --
20      A. Uh-huh.
21      Q. -- on that definition was the split strike
22  ever a Ponzi scheme? In other words, did you ever
23  need new cash from new customers in order to redeem
24  other customers?
25      A. No.

Page 108

1      Q. Did you ever need new cash from new
2  customers to pay the earnings that were reported on
3  the statements?
4      A. No. Let me make a statement that I have
5  never to my recollection ever had a conversation
6  with a Trustee, ever. The Trustee never met with
7  me, never spoke to me, never asked me anything from
8  the date of my arrest until currently. I've had
9  meetings with the attorneys when the attorneys came
10  down here after, you know, I don't know whether that
11  was 2010 or some year in that, but there was
12  nothing; but the Trustee, the only time I ever saw
13  the Trustee was at my proffer meeting with the SEC.
14      Q. In December 2008?
15      A. December of 2008. And as far as I recall,
16  he never asked me anything and I never said anything
17  to him.
18      Q. Okay. But did anyone from the Trustee's
19  law firm --
20      A. No. The law firm, yes. They came down at
21  one period of time. David Sheehan could -- was
22  present.
23      Q. Okay. But did they ever ask you whether
24  you actually executed the trades that were done in
25  the convertible arbitrage strategy?

Page 109

1      A. I don't think they ever asked me that. The
2  only conversation I had with them about trade at all
3  was the David Kugel scrap of paper that I mentioned
4  before.
5      Q. Okay, okay. Did they ever ask you exactly
6  when the -- when you stopped buying the securities
7  for the split strike?
8      A. No.
9      Q. Did they ever ask you whether you needed
10  the money from new investors in order to pay old
11  investors?
12      A. No.
13      (Customers Exhibit Number 31 was marked
14  for identification.)
15      MS. CHAITMAN: I'm up to Exhibit 31, and
16  this is the expert report of Bill Feingold. That's
17  okay.
18      MR. GOLDMAN: I'll take it easy.
19      Q. (By Ms. Chaitman) Okay. Have you seen
20  this document before?
21      A. Yes.
22      Q. Okay. Do you know Bill Feingold?
23      A. No.
24      Q. Did you ever hear about him?
25      A. No.

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1  Q. I'd like to go through the substantive
2  portion of this report and I'd like you to give me
3  your insights on it; okay?
4  A. Uh-huh.
5  Q. So if you'd be good enough to turn to page
6  two?
7  A. Uh-huh.
8  Q. And if you could just read paragraph 12 and
9  then if you have any comments on that, I'd like you
10 to tell me what they are.
11 A. Yes.
12 Q. Okay. Can you tell me what they are?
13 A. What? What did you ask me?
14 Q. Did you have any comments on this? Do
15 you -- do you --
16 A. Yeah. I think, you know, he pointed out,
17 you know, the fallacy of what Dubinsky used, made
18 statements about volume and so on. He's
19 criticizing -- I think there were 41 points that he
20 made that Dubinsky was incorrect in his analysis,
21 which was basically very similar to all my comments
22 when I analyzed the Dubinsky report.
23 Q. Okay. In paragraph 13 he says that most
24 trading and bonds, unlike stocks, takes place in the
25 over-the-counter market and that's something you had

Page 111

1  testified to; right?
2  A. Right.
3  Q. And then he quotes the SIFMA website for
4  the statement, quote, the OTC market is much larger
5  than the exchange markets and the vast majority of
6  bond transactions, even those involving exchange
7  listed issues, take place in this market?
8  A. Correct. I think this is -- he's
9  reflecting very similar to the last time we had a
10 deposition and I produced a very large book that was
11 written. I gave -- you took as evidence --
12 Q. Yes.
13 A. -- that stated all of this.
14 Q. Right.
15 A. That was in complete contrast to Dubinsky's
16 report.
17 Q. Right. And if Dubinsky had spoken to
18 anyone who did trading and convertible bonds in the
19 1980s, would they have found this information out?
20 A. Yes.
21 Q. In paragraph 14 Feingold says in an OTC
22 market investors do not trade directly with each
23 other but with many individual dealers who
24 continuously make markets, paren, buy and sell. As
25 such, OTC markets are much less centralized and data

Page 112

1  are less readily available. Is that accurate?
2  A. That's correct.
3  Q. If you'd just take a look at paragraph 15
4  and if you'd just take a moment to read that and
5  then I'd like your comments on it.
6  A. Right. He's basically saying that, you
7  know, that -- that convertible bonds and bonds in
8  general do not trade for the most part on the floor
9  of an exchange. They trade over the counter between
10 dealers. Madoff is one of the largest convertible
11 bond dealers in the country. We made more markets
12 in convertible bonds than any other firm. He
13 doesn't state that, but that was common knowledge.
14 And he's saying that you couldn't get
15 accurate information, you know, until 2002 because
16 that was when TRACE came in. And even when TRACE
17 came in, there was question as to whether or not the
18 correct volume was reported even then. Bond dealers
19 in general do not like to report their transactions
20 or their volume because they consider it proprietary
21 information.
22 The SEC would like -- look, the SEC would
23 like everything to be transparent. That's been a --
24 in the 50 years I've been in this industry, that has
25 been a debate that went on and still has not been

Page 113

1  resolved. And to a certain extent, you know, they
2  blame me for a lot of -- a lot of this because of
3  the fact that we were the ones that pioneered the
4  form of electronic trading.
5  Right now all of these problems that you
6  have with this what they call that book that came
7  out, Flash Boys, all the trading is done in dark
8  pools and not -- when I came into this industry,
9  98 percent of the business in securities was traded
10 on the floor of an exchange and listed securities.
11 The SEC was unhappy with that and I was
12 given the responsibility for developing a more
13 competitive marketplace. And that's how we started
14 this electronic trading and that's how I developed
15 NASDAQ originally. The volume on the -- on New York
16 Stock Exchange's list of securities today is only
17 about 30 percent on the floor of the exchange and
18 70 percent if it is done over the counter.
19 So and that's a constant problem. The
20 whole marketplace has changed and will probably
21 never go back to the way it was. And nobody wants
22 to -- the goal of the industry is to have less
23 transparency because people always -- always want to
24 trade against somebody else. They're all competing
25 with each other.

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1    So the idea is to conceal what you're
2 doing, what you're buying, what you're selling. And
3 because of what the SEC would like to do, they'll
4 never change that. Business is done more in Europe
5 now than ever before and it's -- that's where the
6 industry is.
7    Q. In paragraph 19 Mr. Feingold says, thus,
8 when Mr. Dubinsky cites data from the New York Stock
9 Exchange to support his arguments about bond volume,
10 he is treating approximately one percent of the
11 activity as indicative of the entire market.
12    A. Really?
13    Q. Is that --
14    A. Yes.
15    Q. In fact, I think that the book that you
16 brought to the last deposition --
17    A. Right, right.
18    Q. -- said that one percent of the convertible
19 bond trading was done on the New York Stock
20 Exchange?
21    A. Right.
22    Q. And if Mr. Dubinsky or someone working for
23 him had spoken to anyone who did convertible bond
24 trading in the 1980s, would they have learned that?
25    A. Look, without trying to be cruel, the

Page 115

1 Dubinsky report is an embarrassment. I mean, I just
2 -- that's the only way to describe it. Quite
3 frankly, I don't understand it because if you look
4 at his background, you know, as an accountant and
5 his so-called fraud order, I don't understand how --
6 to me it's a mystery and would be for anybody a
7 mystery that would read that report would be
8 stunned, you know, at his -- at the report.
9    I don't understand it. I mean, Feingold's
10 background is certainly equal, if not better, than
11 Dubinsky's and it's certainly more current. So but,
12 quite frankly, you could find anybody that was
13 familiar with the marketplaces that would be able to
14 write the same kind of report that Feingold wrote
15 that was critical of Dubinsky's report.
16    He does state in the report if you read
17 through the Dubinsky report, he does make comments
18 that he doesn't have -- he doesn't have access to
19 certain information. He can't find it, but that
20 didn't prevent him from still coming -- drawing
21 conclusions.
22    So if you're going to -- if you're going
23 to say, well, I only looked at the New York Stock
24 Exchange volume, you know, and, therefore, I'm
25 determined that Madoff could not have bought

Page 116

1 securities because he -- you know, it didn't match
2 the volume of the New York Stock Exchange when
3 everybody knows that you don't -- you can't just
4 look at the New York Stock Exchange volume.
5    I mean, how could you write a report that
6 said that? What he should have said is I do not
7 have access to the information to make a
8 determination of whether these transactions took
9 place or not. That's what -- that's what -- you
10 know, that's what I would have done or anybody would
11 have done.
12    Q. In paragraph 27 Mr. Feingold writes in
13 paragraph 99 Mr. Dubinsky inaccurately describes the
14 process by which convertible securities become
15 common shares. He writes that, quote, many
16 convertible securities have the option for the
17 company to call the security at a predetermined date
18 or at the company's discretion, that is, the company
19 has the right to convert the convertible securities
20 into common shares.
21    In instances where the bond or preferred
22 equity is called, the shares are converted on the
23 record date at a determined amount, end quote. In
24 fact, except for a specific subcategory known as
25 quote, mandatory, end quote, convertible securities,

Page 117

1 the securities are convertible at the investor's
2 discretion, not the issuing company's. When a
3 company calls a security, the investor is then given
4 a period typically between 20 and 120 days in which
5 to decide whether to convert the security into
6 common shares or to accept the cash call price
7 stipulated in the company's call notice. Do you
8 agree with Mr. Feingold on that?
9    A. Yes.
10    Q. Now, in paragraph 30 Mr. Feingold writes
11 footnote one of two of Mr. Dubinsky's report
12 contends that a significant percentage of the short
13 positions reported by Madoff customers exceed the
14 amount of short interest in those stocks as reported
15 at month end by the stock exchange. I found this
16 very dubious.
17    Going through the list I noticed that
18 Pfizer, one of the world's largest drug companies,
19 had short interests according to Mr. Dubinsky's
20 table of 826,162 shares at the end of March 1992.
21 Pfizer's closing price that month was $69.50 per
22 share according to Yahoo Finance.
23    Average daily trading volume in Pfizer was
24 10.74 million shares. If Mr. Dubinsky's data are
25 correct, the short interest in Pfizer then

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1 constituted less than eight percent of an average
2 day's volume.
3     A. I don't know what you -- I don't know what
4 you're asking me. I mean, as I say, I'm at a loss
5 to explain this whole Dubinsky report. I know, it's
6 -- if it wasn't such a -- if his accusations weren't
7 so serious, it would almost be comical.
8     Q. Well, is it difficult to find out what the
9 average daily volume in Pfizer was?
10     A. Yes, I mean, because volumes were reported.
11 The over the -- he's looking at volume that was
12 reported on the exchange when over-the-counter
13 dealers don't report the volume. I mean, you know,
14 so you can't -- it's like adding apples and oranges.
15 You can't -- you can't -- you can't find the
16 information.
17     Again, as I said before, the business of
18 an exchange is to try and let people know exactly
19 what has happened. That's what they advertise. You
20 know, an exchange wants to make everything public
21 because in theory, you know, the SEC would love, you
22 know, the public to understand everything that goes
23 on, how many shares trade, where they trade, at what
24 price they trade. Institutions who do the majority
25 of the business want to do just the opposite.

Page 119

1     They do not want to let, you know,
2 everybody know what they're doing because it's no
3 different than like insider trading. You know, the
4 idea is you're in an industry where everybody is
5 competing against each other, including -- including
6 the public customers. You have to understand that
7 the person who buys stock thinks he knows something
8 that the person who's selling it doesn't understand.
9     It's not a zero sum gain. Someone is
10 going to be a winner, someone is going to be a
11 loser. And it's the same. So information is the
12 key. People are trying to get less information out
13 as possible, you know, but that's the way the
14 industry is done now. The markets are not --
15 they're much less transparent today than they were
16 20 years ago, you know.
17     So you can't -- it's not an accident that
18 people can't -- that Dubinsky can't find this
19 information that he's trying to do because it's not
20 available. I mean, quite frankly, I think that what
21 happened was in fairness -- fairness to me, not the
22 Trustee -- the Trustee drew conclusions from day one
23 of what he thought he wanted to -- he wanted the
24 outcome to be. He wanted the outcome to be that I
25 was a fraud from the very beginning, that I never

Page 120

1 did any transactions. He made statements like
2 because he couldn't find confirmations, therefore,
3 from other broker-dealers. Therefore, the
4 transaction never took place.
5     All right. Him not understanding that the
6 industry stopped producing confirmations to
7 noncustomers. So when I bought stock from -- you
8 know, in the open market from Merrill Lynch, we
9 didn't send confirmations to each other. The
10 industry discontinued that.
11     Picard drew a conclusion because he
12 couldn't produce a confirmation. Therefore, the
13 trade never took place. He totally ignored the fact
14 that, number one, confirmations weren't even
15 generated any longer, which is something that is
16 very obvious to anybody in the industry. Also, he
17 totally eliminated the fact that nobody keeps
18 records past six years any longer.
19     They're destroyed, you know. So he -- you
20 know, but he had a conclusion that he drew from day
21 one very similar to what the U.S. Attorney did when
22 he asked me do I ever short stocks and I said yes,
23 of course, I short stocks. You know, he said did
24 you ever sell to a customer that didn't know? Of
25 course, I did.

Page 121

1     You know, and I had to explain to the U.S.
2 Attorney that that's what the business of market
3 makers are doing, you know; but so he wanted to
4 determine, well, since I always shorted stock back
5 in 1962, that I might have never bought stock. I
6 mean, you know, I don't -- I think that what
7 happened was Dubinsky was -- you know, the Trustee
8 must have told Dubinsky this is what my conclusion
9 was. This is what my theory is.
10     And Dubinsky, whether he did it in a
11 devious way or not, I don't think so. I just think
12 that he just did the best he could. He wanted to
13 get information, so he took whatever information was
14 available. The fact that the information didn't
15 exist didn't mean that, you know -- that, you know,
16 the conclusion they drew, it didn't make any sense.
17 I don't know what else to say.
18     Q. Okay. Now, Mr. Dubinsky opined that you
19 were insolvent as far back as 1983.
20     A. I saw that.
21     Q. Do you agree with him?
22     A. No. I can tell you he stated how he came
23 to that conclusion, you know. He just took whatever
24 the -- you know, whatever -- he made the conclusion
25 that I never did any transactions in '83. So,

31 (Pages 118 - 121)

Page 122

1  therefore, he said since the customer showed that,
2  you know, balances in the account from transactions,
3  he figured, okay, that was a liability that Madoff
4  had. He totally eliminated the fact that I was
5  doing business, you know, back in 1983 and so on.
6  So, therefore, I had the assets to cover that.
7      So he said, well, he knew what the
8  liabilities were because it was a customer
9  statement. He had no way of knowing what the assets
10  that I had were because he didn't have any records
11  going back then. I mean, who would possibly make a
12  statement like that? I mean, the biggest mistake I
13  made was not going to trial.
14      Had I gone to trial rather than just
15  saying okay, I'm going to eliminate the government
16  spending millions of dollars and years in a trial
17  with me, I'm just going to admit that I was guilty
18  because I was from 1992 on, which was bad enough.
19  You know, they for some reason, the Trustee wanted
20  to determine that I was guilty from 1963.
21      All right. Had I gone to trial, I would
22  have called in any number of expert witnesses like
23  this Feingold or anything else and the judge would
24  have totally laughed the Trustee out of court. Why
25  he even bothered writing -- 90 percent of his report

Page 123

1  deals with after 1992. I already admitted that I
2  didn't do the transactions after '92. So why spend
3  all that time on that, you know? What he did prior
4  to that made absolutely no sense anyhow.
5      Q. Now, did Dubinsky acknowledge that you held
6  securities at Lehman, Bear Stearns, Morgan
7  Stanley --
8      A. No.
9      Q. -- Fidelity and JPMC?
10      A. No, no. That's not true. He did state
11  that I had an account at Morgan Stanley, yeah. He
12  stated that. He didn't give any details on it but,
13  I mean, it was he had a copy of the Morgan Stanley
14  report in his information here. So, therefore, he
15  had to know that I had securities over there. He
16  did state that I had securities at those -- at other
17  firms, yeah. He did state that.
18      Q. But did he acknowledge that you had
19  purchased those securities --
20      A. No.
21      Q. -- with 703 account money?
22      A. No.
23      Q. Now, Mr. Dubinsky also opined that your
24  firm was insolvent from 2002 on. Do you agree that
25  you were insolvent as of 2002?

Page 124

1      A. In 2002 I did not have -- if he's -- I
2  would say yes, I was insolvent because I did not
3  have enough assets to cover the liabilities that I
4  had with the customers in 2002.
5      Q. If you had -- if everyone had demanded
6  payment at one time?
7      A. Yes. You have to assume that if I show the
8  customers had a liability on that, whether they
9  asked me for it or not, I was insolvent. You have
10  to make the assumption that if you owe the money
11  out, whether you have the ability -- if you don't
12  have the ability to pay if called, you're insolvent.
13      Q. Okay. Now, as of 2002 if the four families
14  had paid you the money they owed you, would you
15  still have been insolvent?
16      A. In 2002? Yes, because the fund business
17  was -- I wouldn't have been able to cover all my
18  direct accounts, you know, other than the funds
19  because the customers only had a liability of $5
20  billion whereas the funds had $14 billion.
21      So, you know, I wouldn't have enough money
22  to cover, you know, $19 billion; but I certainly
23  wouldn't have had enough money to cover all my
24  individual clients but, quite frankly, it doesn't
25  make a difference. They're both the same.

Page 125

1      Q. Looking at paragraph 39 of Mr. Feingold's
2  report, he says an active trader would likely have
3  held many convertible arbitrage positions for
4  substantially less than the period until the next,
5  paren, usually, end paren, semi-annual coupon was
6  paid. Most likely, bonds were either converted or
7  sold into the open market.
8      Again, an investor who sells a corporate
9  bond receives accrued interest from the buyer
10  instead of collecting on the coupon date from the
11  issuer and the interest is built into the total cash
12  inflow.
13      A. Right.
14      Q. Do you agree with that?
15      A. Yes.
16      Q. Is that the -- is that the strategy that
17  you used?
18      A. Yeah. It's what anybody would use at
19  TRACE. It's not unique to Madoff. It's, you
20  know -- it's, you know, standard operating
21  procedure.
22      MS. CHAITMAN: Okay. All right. We have
23  to take a break because they have to change the
24  disc.
25      THE VIDEOGRAPHER: Going off the record.

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1  The time is 12:46 p.m.
2      (A recess was taken.)
3      THE VIDEOGRAPHER: Back on the record.
4  This begins disc number three. The time is
5  1:00 o'clock p.m.
6      Q. (By Ms. Chaitman) Mr. Madoff, I just have
7  one other area that I want to cover with you and
8  that is Mr. Dubinsky's conclusion that the
9  proprietary trading aspect of your business never
10  made money.
11     A. Yeah. I'm sort of at a loss for that
12  because when I read that in his report, his own
13  information was, and I don't -- do you have his
14  report?
15     Q. I do.
16     A. And as I say, I'm overly sensitive to
17  anybody criticizing the side of the firm that my
18  sons ran, which was the proprietary and market
19  making side. So where is the section --
20     MS. CHAITMAN: I think it's at the very
21  end.
22     MR. SHEEHAN: I think there is an index.
23     THE WITNESS: Don't try to be -- don't try
24  to be accurate. I'm not used to that.
25     MR. SHEEHAN: All right.

Page 127

1      THE WITNESS: Oh, here it is.
2      MR. GOLDMAN: Bernie, tell us what page
3  you're on. I'm sorry.
4      MS. CHAITMAN: Just tell us, yeah.
5      THE WITNESS: Page 116. He correctly
6  states that the firm from 2000 to 2008 showed
7  revenue of a billion three hundred thousand dollars
8  in proprietary trading, but of that -- during that
9  period it was 714, $715 million worth of income that
10  came in from the 703, from the customer account.
11     So if you eliminate that, the proprietary
12  trading only had legitimate profits of $573 million,
13  you know, after you eliminated the money that came
14  from the customer accounts into the proprietary
15  trading. So it still showed the firm made 572
16  million, $573 million of profit.
17     Stating that, how does he determine that
18  proprietary trading was not profitable? I don't
19  understand it. It's like saying one and one equals
20  three.
21     Q. (By Ms. Chaitman) Do you agree that 716 --
22  $714 million was transferred from the 703 account to
23  the proprietary trading?
24     A. I agree with that. That really, you know,
25  if you want to eliminate all the customer money that

Page 128

1  was -- that was funneled into the firm, you know,
2  was from customers, was not from proprietary
3  trading, I would say that would be correct; but that
4  in itself is not really correct because what he has
5  no way of knowing is he -- is that the big four
6  accounts that owed me all this money, for example,
7  with one account that had a six point some odd
8  billion dollar out, you know, debit balance, when
9  those accounts put me in a short -- what's called a
10  naked short position, which is what created my
11  problem why I had to start the fraud in '92, all
12  right, those short positions were mark to market,
13  got mark to market at the clearing house every day,
14  which typically happened.
15     So I was called for money to cover those,
16  that deficit all the time. That was money that I
17  was taking, so I did that by -- you know, part of it
18  by transferring the money from the customer 703
19  account to be able to meet those margin calls, which
20  was -- which I would have done normally had I been
21  showing all the figures correctly.
22     So, you know, realistically, what I did
23  was I penalized my proprietary traders' income, you
24  know, but my proprietary traders as far as they're
25  concerned, they made a million -- a billion two.

Page 129

1      And when I paid -- when I paid my -- the
2  percentage of their -- when I paid their bonuses
3  based upon their profits, I paid it on a billion
4  three because proprietary traders, I had no reason
5  to penalize my proprietary traders because of the
6  problem that I put myself in with those big four
7  clients. You understand what I'm saying?
8      Q. I just want to clarify something. Staying
9  on that page, the 714 --
10     A. Million dollars.
11     Q. -- million that Dubinsky found went from
12  the 703 account, now, the proprietary trading didn't
13  have their own bank account; right?
14     A. No.
15     Q. It went into the BNY account?
16     A. Right.
17     Q. Okay. So you agree that 714 million from
18  the 703 account went into the BNY account?
19     A. Right.
20     Q. And as I understand your testimony, what
21  you're saying is that some portion of that money was
22  used by you to meet the margin calls --
23     A. Right.
24     Q. -- on the portfolio that you assumed from
25  the four families?

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1    A. Correct.

2    Q. That was subject to the hold harmless?

3    A. Right. Which normally I would have done

4  had I shown that that was going on, but I didn't.

5  So Dubinsky is not -- Dubinsky is correct. That

6  money did come from the 703 account, but what he

7  doesn't have anything to do with, which he doesn't

8  know about, was the whole problem that I had

9  occurred -- you know, that created that problem.

10    Q. But if the money went from the 703 account

11  to the BNY account, then wasn't it commingled with

12  all the money in the BNY account?

13    A. Yeah.

14    Q. So what is the basis of saying that any of

15  it went to proprietary trading?

16    A. Because the problem, the margin calls that

17  I got was because of customer account. In other

18  words --

19    Q. But was that charged to the proprietary

20  trading business?

21    A. No. It was. It wasn't on the focus report

22  because it shouldn't have been. In other words, had

23  I shown all of this stuff properly, that's what the

24  SEC would have said yeah, of course, you can take

25  them. That money in the 703 account is actually

Page 131

1  part of that money is due me, was due Madoff. Not

2  all of it, but part of it was. In other words, the

3  monies that the four clients owed me, you know, from

4  the hold harmless agreements, that money, part of

5  that, the 703 account was their monies.

6        So I was not wrong. Under normal

7  circumstances I would have taken that money. The

8  reason why I paid my traders, my proprietary traders

9  on the billion three, because that's what they made.

10  The proprietary traders made a billion three. They

11  didn't only make 573 million. They made a billion

12  three.

13        And if my -- if I didn't pay my traders

14  properly, they would have said -- they get

15  25 percent of their trade. They would have said to

16  me, listen, because you made this ridiculous

17  agreement with your four big clients and they cost

18  you all that money, don't penalize us. That's your

19  problem, which would have been true.

20    MS. CHAITMAN: Okay. I have no further

21  questions. Thank you, Mr. Madoff.

22    MR. SHEEHAN: You're done?

23    MS. CHAITMAN: Yeah. I'm done. You want

24  to change seats or --

25    MR. SHEEHAN: No. I'm fine. I do need to

Page 132

1  get an outline out, but it will take just a second.

2    EXAMINATION

3  BY MR. SHEEHAN:

4    Q. Mr. Madoff, before we get started, I just

5  want to ask you a question that wasn't quite asked

6  the way I wanted it to be. That is, are you on any

7  medications that would impair your ability to

8  testify here today?

9    A. No, no.

10    Q. Okay. That's not particularized towards

11  you. It's asked at every deposition.

12    A. Yeah. No. I understand.

13    Q. Because people do take medications that

14  sometimes doesn't render --

15    A. No. I'm on lots of medication, but nothing

16  that would impair my --

17    Q. Okay. All right. Just so you and I agree

18  on that. Okay. Let me sort of go back over some of

19  the testimony --

20    A. Right.

21    Q. -- this afternoon before we get into some

22  other stuff I want to talk about. On November 30,

23  2008 your customer statements showed you to be owed

24  your customers $64.6 billion, thereabouts; right?

25    A. Right.

Page 133

1    Q. And when the Trustee looked at all of your

2  bank accounts and stock they had available at that

3  point, you had a little over 300 million left?

4    A. Right.

5    Q. So in the course of -- you're kind of

6  short, yeah, like 64.3 billion dollars; right?

7    A. Right.

8    Q. Are you saying that that disappeared over

9  -- that you actually could have covered everybody

10  prior to 2002?

11    A. No, no.

12    Q. Okay. So what you did do, though, is that

13  in 2008 according to our calculations you actually

14  paid redemptions of close to $12 billion?

15    A. Uh-huh.

16    Q. About 11.7, I think, is what it was?

17    A. Right.

18    Q. Does that sound accurate to you?

19    A. I guess so, yeah.

20    Q. So there was a lot of money going out

21  during 2008; right?

22    A. Right.

23    Q. But it wasn't anywhere near $64 billion --

24    A. No.

25    Q. -- that you said you were long?

34 (Pages 130 - 133)

CONFIDENTIAL

1    A. No.
2    Q. And is it your testimony that that $64
3  billion shortfall occurred from 1992 through 2008?
4    A. Yeah.
5    Q. All right.  Do you know what at the end of
6  1992 you showed on your books and records assuming
7  all trading is as you say it was, what was on your
8  books and records then as what you were -- you
9  yourself were long?
10    A. Well, first of all, you have to understand
11  that the -- there was -- the losses that I incurred
12  from the short positions of the big four accounts,
13  all right, that occurred from the 1987 through 1992
14  when the market had recovered from the crash in
15  1987.  That was -- that was substantial.  That could
16  have been, you know, as I said, I don't know how
17  many billions of dollars it was at the time; but you
18  have to take that into consideration, you know.
19    Q. Right.
20    A. So, you know, the $64 billion, don't
21  forget, is -- the reason that number got so large
22  was that I was generating falsely like 12 percent
23  return on all the -- on the principal money that was
24  invested.  Let's say the total of almost
25  $19 billion, you know, at 12 percent return from

1  nineteen ninety -- from 1992 through 2008.  That's
2  where the $64 billion came in.
3    Q. Okay.
4    A. It was the profits that were being
5  generated, the false profits that were being
6  generated.
7    Q. I understand that, but let's go back to the
8  beginning.
9    A. Uh-huh.
10    Q. I think sometimes chronologically it helps
11  when we talk about this stuff.
12    A. Right.
13    Q. So you started the business in 1960; right?
14    A. '60, right.
15    Q. That's when you first registered.  And did
16  you start out as a market maker --
17    A. Yes.
18    Q. -- or as a retail business?
19    A. Well, I started, I did a retail business
20  for the first three years until 1963.  Then I became
21  a market maker.  After the market I had the 1962 new
22  issue break, which was during the Cuban Missile
23  Crisis and so on.  When I had my first bad
24  experience where I lost about $30,000 for some
25  family accounts --

1    Q. Right.
2    A. -- then I had to borrow $30,000 worth of
3  bonds from my father-in-law to be able to make my
4  clients whole because I felt responsible for the
5  losses that they incurred.  That's why in like 1963
6  I decided I didn't really want to be in the retail
7  business.  I wanted to be a market maker.  So I
8  start making markets from 1963 on.
9    Q. When did -- did there come a time when you
10  went back into retail business?
11    A. No.
12    Q. When did you start what we call the
13  investment advisory business?
14    A. Probably '70s.
15    Q. And you would not characterize that as a
16  customer oriented business?
17    A. Not really.  I knew, yes, it would be.
18    Q. Right.
19    A. It would be, but it was never -- I never
20  had a business where a customer would call me up and
21  say I want to buy stock or what should I buy.  In
22  other words, when I started my business it was
23  always sort of like a discretionary-type business
24  where people would give me -- you know, basically it
25  was family and friends who would give me a certain

1  amount of money.  And I would invest, started doing
2  convertible bond arbitrage.  I never did retail
3  business, like if you called me up and said I want
4  to buy IBM.
5    Q. Right.
6    A. It was always a hedge type of trading that
7  I started doing.
8    Q. So in the early '70s you started into the
9  IA business?  Let's just call it that.
10    A. From starting with the big four accounts
11  plus some family and friends.
12    Q. Okay.  So the big four accounts started
13  with you in the early '70s?
14    A. Yes.
15    Q. Now, the strategy --
16    A. Some of them.
17    Q. Okay.  We'll get into that later if it's
18  important.
19    A. Right.
20    Q. But what were the strategies you initially
21  engaged in?  You mentioned convertible arbitrage.
22  Were you doing that right away?
23    A. Yes.  That was right.
24    Q. Okay.  Were you doing other investment
25  strategies at the same time?

CONFIDENTIAL

Page 138

1      A.  No.
2      Q.  Okay.  I'm going to ask you some
3  definitions just for --
4      A.  Uh-huh.
5      Q.  -- you know, the record.  What's a discount
6  arb?
7      A.  A discount arb is when -- well, a discount
8  convertible it would be.
9      Q.  Yeah.  A discount convertible.
10     A.  Yeah.  A discount convertible is a
11 convertible is selling at a discount to what it's
12 worth, the stock.  In other words, if a bond is
13 convertible into stock let's say at $10 a share and
14 you're able to buy there would be a hundred -- the
15 bond would be trading at a hundred and the stock
16 would be trading at let's say ten.  All right.
17 That's what they call on the money.
18     Q.  Right.
19     A.  If the convertible bond, if you could buy
20 the convertible bond below par, below 100, let's say
21 you bought it at 98 and sold the stock at 10, you're
22 doing a discount arbitrage because you can make --
23 you're making two points on it.  So you would buy
24 the bond, short the stock at 10 and you lock in a
25 bona fide profit of two points.

Page 139

1      Q.  In terms of convertible securities, there
2  are different kinds of those; are there not?
3      A.  Well, for the most part they're all the
4  same.
5      Q.  Well, they may have the same features, but
6  some are --
7      A.  Some are trade in premiums.
8      Q.  Yeah, but what I meant by that is this.
9  Some are bonds.  Some are warrants.  Some are
10 rights.  Some are preferred securities?
11     A.  Yeah.  Well, they're not bonds, though.
12 Arbitrage securities could be convertible bonds,
13 convertible preferreds, units, warrants, rights.
14     Q.  All right.
15     A.  That's all hedge type of trading.
16     Q.  Right.  And did you in your convertible
17 arbitrage strategy use all of those types?
18     A.  All of those, yes.
19     Q.  You used all of those?
20     A.  Right.
21     Q.  And do you know whether bonds were a
22 minority or a majority of the trades you engaged in?
23     A.  They were -- well, depending upon when it
24 was, particularly bonds would be the majority of it.
25     Q.  Okay.  What does that mean, when it was?

Page 140

1      A.  I mean, when I -- when I was doing it,
2  there was always more volume in convertible bonds
3  than there would be let's say in warrants, units or
4  rights; but depending upon when it was, depending
5  on, you know, for example, when AT&T split up and --
6  and, you know, and became all the baby Bells that
7  they traded, we made a market.
8         We were the primary market maker.  As a
9  matter of fact, I have a copy in my records here of
10 an ad that we ran in the Wall Street Journal that
11 said that we made markets, you know, to banks,
12 brokers and institutions in all of the convertible
13 securities.  We did a very big business --
14     Q.  Right.
15     A.  -- trading all the various AT&T break-up
16 issues.
17     Q.  In the normal course in the '70s, let's
18 give it a time frame, are discount arbitrage
19 opportunities plentiful?
20     A.  Yes.  There were convertible bonds traded
21 -- first of all, you have to understand that most
22 convertible arbitrage trading did not go through the
23 conversion process, which he even -- Dubinsky even
24 states that in his report.  In other words --
25     Q.  You mean you didn't go through the -- I'm

Page 141

1  sorry to interrupt you, but just to clarify, you
2  didn't go through the conversion process or the
3  industry?
4      A.  The industry.  In other words, typically
5  most convertible bonds should always trade at a
6  premium.  In other words, when a bond trades at a
7  discount, it's sort of a freak.
8      Q.  That was my question.  Thank you.
9      A.  Yeah, yes.
10     Q.  Okay.
11     A.  So that, you know, obviously, if you can
12 buy a convertible bond at a discount, you would
13 typically buy it and convert it because you have a
14 guaranteed profit and you lock it up.  All right.
15 But most convertible bonds create premiums because
16 nobody in their right mind should -- you know,
17 should ever, you know, buy a -- should buy common
18 stock if you could buy a convertible bond at a
19 discount.
20     Q.  Right.
21     A.  All right.  So typically, in other words,
22 look, to give you an example, when I hired David
23 Kugel when he -- David Kugel used to work for a firm
24 of mine, for a friend of mine whose name was Mike
25 Lieberbaum, all right, who had a firm called

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1 Lieberbaum & Company. When I first went into
2 business we were friends. We went to high school
3 together, college together, and his father had a
4 business, Lieberbaum & Company. And David Kugel
5 happened to work for him as a convertible bond
6 trader, you know.
7       So what happened was, but that firm went
8 out of business. They decided to liquidate the firm
9 and they all retired, you know. David Kugel was
10 working for that firm and looking for a job. Now, I
11 was trading convertible securities at that time, so
12 Lieberbaum said to me can you do me a favor and hire
13 David Kugel?
14    Q. Right.
15    A. And I said I don't really want to hire
16 David Kugel. I'm not looking for another trader.
17 And, quite frankly, David Kugel was sort of a pain
18 in the ass. You know, nice guy, but he was very
19 difficult to deal with because you couldn't have a
20 conversation with him that made any sort of sense;
21 but -- and we used to kid about that, you know.
22       This friend said look -- he was my good
23 friend, went to school. He said look, I'm trying to
24 find this guy a job. You know, I feel bad we're
25 closing the firm. Why don't you hire him? So I

Page 143

1 said I don't really want to hire him, Michael. So
2 he said -- you know, so I said look, he had a Friden
3 -- you probably are -- how old are you?
4    Q. Seventy-three.
5    A. All right. So you remember what Friden
6 calculators were?
7    Q. Sure.
8    A. The old with the hand crank? This is
9 before computers. Okay. Mike Lieberbaum's firm, he
10 had a Friden calculator, which was expensive. And I
11 was, you know, relatively young in the business. So
12 I said I want -- if you're liquidating the firm, I'd
13 like your Friden calculator because we used to use
14 it to figure out all the convertibles, you know, you
15 know.
16       So he said I'll tell you what. Take David
17 Kugel and I'll give you the Friden calculator. So
18 we always used to tease David Kugel and say the only
19 reason that we hired you is for the Friden
20 calculator. He used to be very sensitive to that,
21 but that was really a true story.
22       Now, I came up with a concept of -- I said
23 to David, I said this is your job. I said I want
24 you to track every convertible security that exists,
25 okay, and I want you to track and see what the

Page 144

1 historical prices of the convertibles. Most
2 convertibles, we trade at premiums. So we used to
3 have a -- and we used to have to do all this by
4 hand, you know, before computers with this Friden
5 calculator. We would track every convertible bond
6 and see when it was trading at a discount or when it
7 was trading at a premium.
8       So historically if you knew that a
9 particular convertible security traded let's say
10 typically at a three point premium but now all of a
11 sudden it went to a ten point premium, all right,
12 you would know that that premium is too high. It
13 should go back to historically to a three point
14 premium.
15       So we would go ahead and we would set up
16 the trade. We'd buy the convertible, short the
17 stock, all right, and then wait, hold them open,
18 which immediately had a loss. So you're setting up
19 a trade where you had a loss, but historically the
20 bond would close up and go back to a three point
21 premium.
22       You would then unwind the transaction, all
23 right, and you'd make a three point profit. It's
24 called Chinese arbitrage. Don't ask me why it was
25 called that. It was just ass backwards. So for

Page 145

1 some reason that was what the industry -- so most
2 convertible trading went on at premiums, you know,
3 where you set it up. You had a loss, but you knew
4 what your loss was.
5       It was no more than three points. And
6 David Kugel used to have a huge spreadsheet
7 literally like this long that had tracked all the
8 convertibles. And we would just -- and that's what
9 we would do. So we would do business with our
10 customers, you know, doing this kind of trading.
11       I was doing it for the big four clients
12 and, quite frankly, it was like bending down and
13 picking up money. All right. Now, most people on
14 Wall Street didn't want to trade convertibles like
15 that because your profit was limited, you know. You
16 know, your loss was limited, but your profit was
17 limited.
18    Q. How scalable was that kind of trading?
19    A. It was -- well, it was -- everything was
20 relative. You know, when I first started in the
21 business my -- you know, what I considered to be a
22 great profit was different than let's say Goldman
23 Sachs did. All right. So in that -- when I went
24 into business all the convertible securities were
25 handled by a handful of European arbitrageurs.

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1    The whole business was handled by Goldman
2 Sachs, Rouss & Company. There were maybe ten
3 foreign convertible firms. The joke in the industry
4 was that when you called up and asked a convertible
5 bond market maker what the price was, he would say
6 what do you want to do? You know, that was what --
7 they all had this heavy Jewish accent, but these
8 guys were all money arbitrageurs in Europe.
9    Q. Right.
10    A. You know, and when they came to this
11 industry, they started trading the convertible
12 securities. All right. So after I got my brains
13 beat in, which to me, $30,000 loss in 1963 was a
14 lot, I said listen, I can't possibly -- you know,
15 can't stay in this business like this because my
16 father-in-law is not going to keep on lending me
17 money to bail myself out.
18    So I said I can't do retail business. As a
19 matter of fact, the SEC said to me, Bernie, when
20 they examined my firm, the first examination and
21 they saw that I paid back the customers $30,000
22 because they lost money, they said, you know, you
23 really can't keep doing this because how many times
24 are you going to do this? He said if you're going
25 to be responsible for your clients, you know, that's

Page 147

1 not a business you want. So I said you know what?
2 I looked around for what I could do that had limited
3 risk. And convertible securities to me, I decided
4 that that was a business I wanted to be in.
5    So but the problem was it was controlled,
6 that business, by Goldman Sachs, by all these
7 handful of firms, by Bear Stearns and so on. So at
8 that time I went and I had -- I went to see Gus
9 Levy, who was the chairman of Goldman Sachs, you
10 know, and I went to Bear Stearns, Cy Lewis, who was
11 the chairman of that, and I said to them, you know,
12 I did things that probably people today would think
13 were stupid.
14    I had them -- I went up there and I said --
15 made an appointment with them and I said listen, I
16 would like to trade convertible securities. And
17 they said Bernie, you know, this is not a business
18 for you. This is our business. You can't go into
19 this business. And I told them the story and they
20 -- I know it's hard for you to appreciate this now,
21 but I was appealing to them in those days.
22    And I said look, give me a break. Let me
23 make something. I told them my tale of woe and they
24 said okay. Look, you know what? If you want to
25 trade, if you want to trade convertible bonds, he

Page 148

1 says I'll tell you what we'll do. We'll give you
2 the odd lot pieces. We don't want to trade -- we
3 don't want to buy ten convertible bonds and eight
4 convertible bonds. We only want to buy 100 bonds
5 and so on. So if you want the small ones, if you're
6 willing to do the small pieces, you trade them.
7 We'll send the customers to you.
8    And I said that's fine with me because
9 whatever I made was good business for me. So I
10 started doing that and I developed this relationship
11 with these European arbitrageurs and they started
12 sending me the odd lot business. And then, of
13 course, kept on doing -- you know, I grew the
14 business and that's how I got started in the
15 business.
16    Q. I'll give you a break in a minute here.
17 When you give an answer like that, and I'm not going
18 to interrupt you because -- but it takes the court
19 reporter a while to recover from that.
20    A. Oh, I didn't realize you were still doing
21 it.
22    Q. She's constantly --
23    A. I didn't realize. I didn't realize this
24 was on the record.
25    Q. Yeah. This is on the record.

Page 149

1    A. I thought it was just curiosity. I'm
2 sorry.
3    Q. No, no, no. Everything is on the record.
4 Okay. Let's go back, though, just to the -- so
5 we're back in 1970. You told us how this all got
6 started, and the majority of your business at that
7 point was premium arbitrage?
8    A. Both. Whenever I --
9    Q. Both. You were doing discounts, but you
10 called discounts freaks just a moment ago; right?
11    A. Right.
12    Q. So when you spotted a discount opportunity
13 by watching it as you did, did you not immediately,
14 simultaneously, isn't that, you know, buy the stock
15 or short the stock, I should say?
16    A. Well, you always sort of did what's called
17 legging. In other words, when you -- you would buy
18 even -- you would always buy the -- if you thought
19 the bond was -- the mark was going to go up and you
20 thought the bond was going to appreciate, the stock
21 was going to appreciate because you know how to do
22 it, you would buy the bond first and then you'd sell
23 the stock later. You'd sell the stock on the way
24 up. You know, depending upon which way you thought
25 the market was going to go, that's how you determine

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1 which piece to buy first.
2    Q. But --
3    A. You couldn't normally --
4    Q. I'm sorry.
5    A. You couldn't normally go in and buy the
6 bond and short the stock and lock in the profit
7 immediately. You had to take some degree of risk
8 while you're setting it up.
9    Q. Isn't the classic definition of a discount
10 arbitrage simultaneous buying and selling?
11    A. No.
12    Q. No?
13    A. I mean, no. That's not the way it
14 realistically works. There's always -- I mean, if
15 you could do it that way, that would be fine, but
16 you're totally limiting your --
17    Q. Profit.
18    A. You're not only limiting your profit.
19 You're limiting your ability to do it because you --
20 you have to be able to judge the market as well.
21 It's not just a simple of just going in and having a
22 guaranteed locked-in profit because the arbitrageurs
23 would close that up immediately. In other words,
24 you're competing against these guys. Obviously, if
25 you can do a trade and have a guaranteed immediate

Page 151

1 profit, that's the most -- that's the most ideal
2 situation; but so you can do that, but even if you
3 could do that, if you really want to be a good
4 trader, you would buy it at a discount, you know.
5    You start -- you buy the bond when it's a
6 discount, but if historically it would always go to
7 a premium, you wait, what's called lifting a leg, in
8 other words, so you have a risk involved and then
9 you'll unwind the transaction.
10    MR. SHEEHAN: I want to get to that later.
11 I agree with that.
12    MS. CHAITMAN: I'm sorry to hear that.
13    MR. SHEEHAN: No. I agree with what he
14 just said.
15    Q. (By Mr. Sheehan) If you hang onto it, that
16 can happen, but isn't -- well, I won't say isn't.
17 What's a fractional share?
18    A. A fractional share is less than 100 shares.
19    Q. When does that occur in an arbitrage
20 situation?
21    A. Not very often.
22    Q. When you convert the bond, preferred,
23 whatever you're converting, does it not always have
24 a fractional share?
25    A. Sometimes yes and sometimes no.

Page 152

1    Q. Do you credit a fractional share or what do
2 you do with it?
3    A. Yeah. I mean, if, in fact -- if, in fact,
4 a customer -- depends upon if you're talking about
5 doing it for a customer or doing it for the firm?
6    Q. I'm talking about a customer here. Okay.
7 You're now selling this arbitrage strategy to a
8 customer. You go in. You buy the arb. I'm calling
9 it an arb.
10    A. Right.
11    Q. And then you short the stock and you do it
12 simultaneously. And when you do that, you get a
13 fractional share?
14    A. Yeah. Typically if customers do a
15 fractional share, you would give them the fractional
16 share.
17    Q. Do you give them the stock or cash?
18    A. You could do either, both.
19    Q. There are actually fractional shares that
20 trade on the exchange?
21    A. You make a fractional share. Typically you
22 would give them a cash credit for the fractional
23 share.
24    Q. Typical, right?
25    A. Yeah.

Page 153

1    Q. But more likely cash a fractional share?
2    A. Yeah.
3    Q. Okay. When does that fractional share
4 occur?
5    A. I don't know when. I'm not sure.
6    Q. Let me rephrase it. Does the fractional
7 share not only occur when you sell the convertible
8 security?
9    MS. CHAITMAN: Objection to form.
10    THE WITNESS: Does the fractional share
11 ever occur?
12    Q. (By Mr. Sheehan) No. I said does the
13 fractional share only occur after you sell the
14 convertible security?
15    A. I'm not sure. I don't know the answer to
16 that.
17    Q. Well, if you don't sell the convertible
18 security, there can't be a fractional share; can
19 there?
20    A. If you don't sell the security?
21    Q. Yeah. So I'm not selling the convertible
22 security. Can there be a fractional share?
23    A. Probably not.
24    Q. Okay. That was my point. Let me see. So
25 let's go back to 1970. Again, you know, you were

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1  doing -- let me ask you, where were you doing the --
2  and what I mean by this is market making or IA.
3  Where were you initially doing the convertible
4  arbitrage strategy.
5      A.  Where?
6      Q.  Yeah.  Either market making -- where did it
7  start, market making or IA?
8      MS. CHAITMAN:  Objection to form.
9      THE WITNESS:  Objection to form?
10     MR. SHEEHAN:  Yeah.  She can do that, too.
11  She can do that.
12     THE WITNESS:  Oh.  It was one firm.  You
13  know, it was all done -- you know, at that time I
14  was the only one doing it.  It was I was the only
15  trader when I first started, so it was me.  It
16  wasn't -- I didn't have -- David Kugel came in.  You
17  know, I don't remember when he came in, in '70
18  something or other, but the whole firm was me.  I
19  was doing it.
20     Q.  (By Mr. Sheehan)  I know it's one firm, but
21  my point is you had the market making, which is you
22  as a wholesale market maker; right?
23     A.  Right.
24     Q.  Over here you've got your IA business,
25  which is your discretionary trading?

Page 155

1      A.  It was -- but it was all done by me as one
2  firm.  It was always one firm.  It may have been --
3  you know, it was only later on when we had like
4  different departments because the rules required you
5  to have sort of different departments with different
6  compliance procedures and so on and different
7  supervisors, but when I started it was me.
8      Q.  Okay.  Just trying to figure out how this
9  worked.  Okay.  So you used the market making
10  inventory.  I think this is your testimony.  Tell me
11  if I'm wrong.  You used a market making inventory
12  and used that inventory of stock in connection with
13  the convertible arbitrage strategy in the IA
14  business?
15     A.  Correct.
16     Q.  Okay.  So the initial purchase would take
17  place in the IA business -- I mean, the market
18  making business?
19     A.  Yeah, but if I was doing -- it was sort of
20  one and the same.  In other words, I was making a
21  market around the customer security that I had.
22     Q.  Right.
23     A.  It depends upon sometimes if I -- sometimes
24  I would just do the business for the market making
25  for the profit and sometimes I would get a customer

Page 156

1  order and I would do it for the customer.
2      Q.  Right.
3      A.  It depends upon -- you know, it was sort of
4  all mixed in together, but it depends upon what was
5  available.
6      Q.  Well, when you're buying the stock in the
7  market making business and, as you say, you're a
8  market maker.  You have to buy the stock.  I
9  understand how market making works.
10     A.  Well, the firm had a limited amount of
11  capital.
12     Q.  Right.
13     A.  So I could only -- you know, once I used up
14  the capital of the firm, all right, obviously, let's
15  say my capital could have been $20,000 in the firm's
16  capital.  So I could only -- I could only -- once I
17  finished buying -- I used that $20,000 up, you know,
18  if Carl -- let's say if one of my clients gave me
19  $100,000 to trade with, obviously, I would use that
20  hundred thousand dollars for the client to do
21  business.
22     I might do also 20,000 for the firm's
23  capital, but it was -- you know, I'm -- obviously, I
24  was limited to what I can do for the firm.
25     Q.  So Shapiro, just use him.  I know we're not

Page 157

1  supposed to name names --
2      A.  That's all right.
3      Q.  -- but that doesn't apply to me.  It only
4  applies to you.
5      MS. CHAITMAN:  Thank you.
6      Q.  (By Mr. Sheehan)  So anyway -- because I'm
7  not suing the Picowers, so there you go.
8      A.  Doesn't matter.
9      Q.  Can yell at me if she wants.  All right.  I
10  don't know how we're supposed to comply with this.
11  So Carl Shapiro comes to you, gives you a hundred
12  grand, invest it at your discretion --
13     A.  Right.
14     Q.  -- right?  How do you deal with that?  So
15  how would you take that hundred grand and put it
16  into a convertible arbitrage strategy?
17     MS. CHAITMAN:  Objection to form.
18     THE WITNESS:  I would buy whatever was
19  available, you know, for 50,000 or 100,000, whatever
20  was available.
21     Q.  (By Mr. Sheehan)  Of what?
22     A.  In whatever security that I was trading
23  when that was available.
24     Q.  Available in what sense?  As a preferred or
25  as a discounted arbitrage?

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

1     A.  It could be any one of them.  There was
2  no -- it was up to me.  It was usually -- sometimes
3  it would be at a discount since it would be at a
4  premium, sometimes doing a unit, a warrant or a
5  right.  It could be anything.
6     Q.  Would you take that hundred grand and buy
7  that security we just talked about from your market
8  making account?
9     A.  Well, it depends.  You know, if it was --
10  if it was the market making -- if it was trading
11  with the firm's capital, you know, it would be for
12  the market making account.
13    Q.  Right.
14    A.  If I was working a customer order, you
15  know, or with the customer's money, it would go into
16  his account.
17    Q.  Okay.  Were you clearing those trades prior
18  to DTCC yourself?
19    A.  Clearing them myself, yeah.
20    Q.  And how would you do that?
21    A.  Those days the bonds would come in over the
22  window.  It was a physical delivery.
23    Q.  Right.
24    A.  You would pay for it.  And then if it was
25  convertible, typically we would use -- we would have

Page 159

1  the bank convert the security.  We would never
2  convert the security ourselves physically because
3  the convertible -- the clearing agent, the
4  convertible agent may have been in Chicago.  So we
5  weren't going to get our trade until the Chicago.
6     Q.  Right.
7     A.  So we would use one of the banks.  We would
8  take the convertible security, send it over to the
9  bank, give them instructions to convert.
10    Q.  All right.  At the beginning then you have
11  a fairly active box?
12    A.  Everything is relative.  What do you
13  consider active?
14    Q.  Well, with no DTCC and you're
15  self-clearing --
16    A.  No.
17    Q.  -- so you had physical possession of all
18  your securities?
19    A.  That's correct, right.
20    Q.  Right.  So and you used the banks just to
21  -- you know, to exchange as you say when you were
22  buying and selling?
23    A.  Right.
24    Q.  All right.  You didn't use banks as
25  depositories?

Page 160

1     A.  No.  Well, if you were going to convert the
2  security and use the bank to do that, you would send
3  the security over to the bank and let them --
4     Q.  Convert?
5     A.  They would hold it.  They would actually
6  convert it.  What the bank did depends upon what the
7  bank's position was.  The bank may have -- the banks
8  may have been handling other customer accounts also,
9  so they could actually borrow the securities,
10  deliver you the securities.
11        There's all sorts of various, you know,
12  mechanisms of how they would handle it; but in the
13  pure sense the bank would then take the security and
14  deliver it, you know, to whatever method they use to
15  Chicago or whatever it is.
16    Q.  Yeah.
17    A.  You know, they would what they call draft a
18  collection.  And then they would do the conversion,
19  get the stock and they would deliver you the stock
20  and then you would deliver the stock out.
21    Q.  To cover your short?
22    A.  Well, it wouldn't be covering -- yeah.  It
23  would be your fail to deliver.
24    Q.  Right.
25    A.  Right.

Page 161

1     Q.  Okay.  So how many customers did you -- in
2  the IA, I'm calling it IA, in the IA business did
3  you have to start?
4     A.  Probably, you know, let's say 25.
5     Q.  Okay.  By 1980 how big was the IA and how
6  many customers did you have then?
7     A.  Well, I had, you know, the four big clients
8  for sure.  I had European clients in France.  I was
9  dealing business with the Rothchilds with, you know,
10  a number of French big clients.  And then I had my
11  father-in-law had sent up this account, Avellino &
12  Alpern, which was a limited partnership where they
13  had their clients.
14        And they could have had typically probably
15  50 or 60 of their clients in his limited partnership
16  that I traded for that limited partnership.
17    Q.  Avellino & Alpern.  Alpern is your
18  father-in-law?
19    A.  Yeah.
20    Q.  Whose first name is Sam?
21    A.  Saul.
22    Q.  Saul, okay.  And he had an account?
23    A.  Yes.
24    Q.  All right.  Avellino, did he have an
25  account?

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1    A. Well, they had -- he didn't have an
2 individual account himself. I don't recall that he
3 did. They had it -- they just had this limited
4 partnership account and he was part of it.
5    Q. What was the nature of the limited
6 partnership, if you know?
7    A. They had -- they had this -- they had a
8 bunch of their accounts. They were all sort of, you
9 know, somewhat wealthy individuals that they did the
10 accounting work for. So they -- they formed a
11 limited partnership. It was sort of like an
12 investment club where they -- let's say they had
13 $100 million. It's a round number.
14    Q. Right.
15    A. That might have had, you know, fifty
16 clients. They couldn't have more than 100 clients
17 because the regulations were that in order for you
18 to not be an investment company, you had to have
19 less than 100 clients, which they clearly had -- you
20 know, that was never a problem for them. So let's
21 say they had 50 or 60 different clients in there. I
22 would -- I opened up an account.
23    I had an Alpern and Avellino or Avellino
24 and Alpern, whatever it was. That was the account.
25 I would then treat that as one account, as a limited

Page 163

1 partnership account. I would buy, you know, various
2 convertible bonds for them. I would then, you know,
3 send them the confirmation on the transaction. They
4 would get the -- they would then split that up.
5    If they had 25 or 50 accounts, they would
6 based upon the amount of money that each client had,
7 that would be what percentage each client had of
8 that -- of the limited partnership. And they would
9 -- they would actually report the individual
10 transactions. And each client would file his own on
11 his tax return, which Avellino and Alpern would
12 handle for them, being their accountant.
13    Q. Right.
14    A. They would show short-term capital gains,
15 you know, on each -- on the transaction.
16    Q. So from the beginning were you aware that
17 there were all these people behind Avellino and --
18    A. Oh, yeah, yeah, yeah. I knew them all.
19    Q. Okay.
20    A. That was before Mike Bienes got involved
21 and my father-in-law retired. And then they went to
22 that. That's how their problem started. They
23 made -- he made a decision on his own without even
24 telling me, you know, that they were issuing notes.
25 They decided they would just pay them interest and

Page 164

1 they would, you know, take all the actual
2 transactions themselves.
3    Q. Let's talk about those notes. Would those
4 notes guarantee interest to your knowledge?
5    A. The first time I found out about that was
6 in 1992 when the SEC you, know, told me that they
7 had all of these, that they had a number of -- as
8 far as I knew, they had like I don't remember
9 whether it was three accounts or four accounts. All
10 different Avellino and Alpern accounts, but they had
11 like maybe three limited partnership accounts, but I
12 wasn't aware of the fact that they were actually
13 issuing notes --
14    Q. Right.
15    A. -- you know, to them because I had already
16 told them that you can only have 100 clients in a
17 limited partnership. Otherwise, you would have to
18 register as a -- as an investment company. They
19 claim that they thought that they were okay because
20 they were -- although they think they had like maybe
21 300 accounts as it turned out what the SEC said, but
22 they were a lot of family accounts.
23    So they said they were counting each family
24 as one account, even though there could be a
25 son-in-law, a son and so on and so forth. The SEC

Page 165

1 basically's position was that they said look, as a
2 matter of fact, when they called me up to tell me,
3 they said -- you know, they asked me, you know, I
4 got a phone call from the SEC to say, you know, you
5 have this account, you know, these accounts, these
6 accountants, you know, and they have too much money.
7 They have too much money, too many clients on there.
8 It's an investment company.
9    And I said -- and I told them how I was
10 handling it and they said yeah, okay, that's fine,
11 but these guys are paying notes. You know, it's
12 different. So I said, well -- you know, I was upset
13 with them. I said what the hell? They never told
14 me. So when I called them up I said listen, I'm
15 closing these accounts. I'm sending back the money.
16    The SEC said to me at the time, you know,
17 you don't have to do that. He said, you know, you
18 can just tell them to register, but I said no. I
19 don't want to do that. So, you know, I sent them
20 back all their money, closed their accounts. As a
21 matter of fact, the SEC when they -- as soon as this
22 happened the SEC came up for the whole examination.
23    They sent up the group chief from New York.
24 They looked at the accounts. They saw that all the
25 money was there. They saw that I was actually

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1  buying the securities because they were able to --
2  they looked at the -- at my stock record. They
3  looked at DTC. They saw that I had the securities
4  and so on. And, you know, I said I'm closing the
5  accounts, and I did. And I returned all the money.
6  And then I took in the accounts.
7      My father-in-law called me up and he said
8  look, you know, these people are all crazy. They're
9  sending -- they're hysterical. You know, they're
10 relying upon the money to live on, these clients.
11 And they said they didn't do anything wrong. This
12 was all Mike Bienes's stupid -- so I said okay,
13 fine. I'll open up individual accounts, you know,
14 but I only want like $500,000. I don't want an
15 account for 50,000 or 75,000.
16     So I said the account -- each account
17 could be 500,000 was the minimum. I said if they
18 want to take a five -- if they want to form a family
19 partnership, that's fine, but it can only be their
20 family. I don't want anybody -- I don't want to
21 have more limited partnerships. So they said fine
22 and that was what we did. And they opened up a
23 whole bunch of accounts, you know, like a few
24 hundred accounts.
25     Q. The three partnerships of Avellino and

Page 167

1  Bienes before the SEC, were you guaranteeing a
2  return to them?
3      A. No, no, no.
4      Q. Were you trying to predetermine the amount
5  that you would give them?
6      A. No. They had -- I told them what the
7  expected return was. In other words, look, when you
8  did arbitrage, anybody did arbitrage, there was a --
9  you had a what you would consider to be what would
10 be the reasonable rate of return for doing
11 arbitrage. It's no different than if you do a
12 covered option right, which was like the split
13 strike conversion was.
14     Q. Right.
15     A. You know, you're not going to do it for --
16 you know, typically you would do it for double the
17 long bond rate. So if long bonds and Treasury bonds
18 were playing let's say five percent, you would
19 expect to make like 10 percent return; but, you
20 know, it depends.
21     In 1980, for example, interest rates were
22 12 percent. So, you know, unless you could do it
23 for 25, 30 percent return, you wouldn't do the
24 trade.
25     Q. Weren't you asking David Kugel to actually

Page 168

1  look at convertible arb, arbitrage opportunities, to
2  guarantee an outcome?
3      A. Not -- there wasn't such a thing as a
4  guarantee of return. It's what you expected to
5  make, called an expect return.
6      Q. Didn't David Kugel actually look
7  historically backwards to take trades that had
8  already happened --
9      A. No, no.
10     Q. -- and manufacture those into guaranteed
11 results?
12     A. No.
13     Q. Why would he have testified to that?
14     A. I have no idea. I told you that.
15     Q. Why whatever the Trustee said or did
16 influence David Kugel's testimony?
17     A. I don't know what happened between the
18 Trustee and David Kugel. You know, as I said, it
19 was -- you know, I was -- my clients all knew, you
20 know, there was no secret as to what our strategy
21 was or what it was. It was a very common strategy.
22 It wasn't rocket scientists.
23     So people knew that if you're going to do
24 hedge type of trading, whether it be any one of the
25 different kinds of arbitrage or hedge trading, what

Page 169

1  your return would be. You wouldn't do it if you
2  didn't make at least double the bond rate. It
3  wouldn't pay to do it. So clearly David Kugel knew.
4  All my traders know we're not going to tie up the
5  firm's capital for ourselves or for a client unless
6  we can -- we have a good reason to believe at least
7  our goal was to make double the long bond rate.
8      So depending upon whether the bond rate
9  was -- let's say in 1980, for example, unless I
10 thought I could make, you know, 25 or 30 percent
11 return, you know, I wouldn't -- wouldn't do the
12 trade. If the interest rates were five percent,
13 then ten percent looked attractive to do it.
14     So if I -- David Kugel or any of my traders
15 knew, you know, don't tie up the firm's capital,
16 don't do a trade for making two or three percent,
17 might as well put your money in bonds.
18     Q. Right.
19     A. So, you know, David Kugel knew even if he's
20 trading for his own account, if David Kugel or any
21 of the traders came to me and said, well, okay, I'm
22 tieing up the firm's capital and I'm making five
23 percent return, I'd say what are you? Crazy? I
24 mean, you know, we didn't do that. As a matter of
25 fact, we used to send our client, we had what they

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1  call a portfolio evaluation report where we would --
2  a customer -- would send them when we were doing
3  arbitrage what the expected return was, what their
4  actual return or how much was their over and under.
5  You must have seen that these reports, they were
6  part of our records that were generated.
7       You saw that we said expected return, over
8  and under return and so on and so forth. And
9  depending upon the strategy and what you wanted to
10  do, that's what you made. So all of our -- when
11  people came to do arbitrage for us, it was always
12  from day one that the return was going to be -- that
13  the goal was to make double the long bond rate.
14      Q. How could you guarantee that?
15      A. We didn't guarantee it. It's what we
16  expected. We didn't guarantee anybody.
17      Q. Did you ever not do it?
18      A. Of course. What do you mean did we ever
19  not do it?
20      Q. Did you ever not do what you expected?
21      A. Sure, at times.
22      Q. So if we go through your records, you will
23  have losing periods of time?
24      A. Look, let me -- I see where you're going.
25  Let me -- let me tell you something. Let me give

Page 171

1  you an example; okay?
2       Q. Yeah.
3       A. When --
4       MR. SHEEHAN: Are you okay?
5       MS. CHAITMAN: Yeah.
6       MR. SHEEHAN: All right.
7       THE WITNESS: When we were doing --
8  because nothing I'm telling you is not something
9  that was widely known and was given to reporters, to
10  people that wrote the books and so on. Nothing in
11  Madoff is really a mystery. All right. When we did
12  -- the only mystery was that we weren't actually
13  doing the trades, but our strategy was always very
14  clear.
15      So I'm going to tell you an example, give
16  you an example of one. The chairman of UBS, Union
17  Bank of Switzerland, one of the world's great Nazis
18  if you ever met him --
19      MR. SHEEHAN: I did.
20      THE WITNESS: -- came up to my office.
21  All right. And because when we were doing the split
22  strike trades, all right, everyone said, well,
23  listen, you know, Madoff is making double -- he's
24  making -- you know, you know, he's making like a
25  12 percent return, which in those days, you know,

Page 172

1  was a very good return. And the guy never has -- he
2  very rarely has a losing quarter, okay, which was
3  true. He very rarely had a losing quarter.
4       And he would say, well, how the hell do
5  you always -- you know, how does that happen? I
6  said wait a minute. You understand that -- you
7  understand how the transaction works. And now
8  literally the Chairman of Union Bank of Switzerland
9  in my office and chairman of almost most of these
10  banks along with the guys that ran their trading
11  desk because when they were doing the due diligence,
12  everyone wanted it figured out. Madoff can't be
13  this smart, so what is the strategy, you know?
14  Explain it to me.
15      So I'd say okay, fine. And I would, you
16  know, show them what the strategy was, very vanilla
17  covered right with a quick wrapper. So that was
18  something that we sort of started, but everyone
19  understood what it was. They said -- I said and,
20  all right, so you understand that your loss is going
21  to be limited because the put is going to kick in.
22      So your loss is limited basically to one
23  or two percent on each trade and your profit is
24  typically, let's say, three percent. So you have a
25  two-to-one sort of ratio, all right, but you

Page 173

1  definitely from the day we start the trade, you
2  definitely can lose. If the market goes against us
3  and we're guessing wrong, we're going to lose one or
4  two percent. If we're right, we're going to make
5  three percent.
6       You're never going to make really more
7  than that because then you're going to be called
8  away. Then that was the strategy. So let's say one
9  percent loss, three percent, and everyone understood
10  that. We said okay. Now, typically the strategy is
11  like a three-month strategy because of the 90-day
12  options and so on and so forth.
13      We said so if you look at, you know, over
14  the course of a year, maybe we'll have three or four
15  losing quarters and the rest of it, you know, we
16  have gains, which everybody said, well, that's still
17  pretty good, you know. And we said you understand
18  the reason why you don't -- that the whole -- the
19  key to the strategy is that you're never forced to
20  liquidate the strategy even -- you're going to be
21  wrong.
22      We're going to set it up and we think the
23  market is going to go up. We may be wrong. You
24  know, two days after we set the strategy up, the
25  market may go against us and we may have a loss, but

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1 we don't have to sell it out because we have the
2 put. Until the put expires we can keep the trade
3 open, waiting for the market to reverse and go up.
4 If the market goes up, then we're fine and we're
5 going to make a profit.
6     If the market doesn't go up and continues
7 to go down, we're going to have a loss; but the big
8 key is you're not forced to sell prematurely unless
9 it happens within three months.
10    Q. Can I ask you a question?
11    A. Yeah.
12    Q. Didn't all your puts expire?
13    A. Huh?
14    Q. Didn't all your puts expire?
15    A. Eventually. Eventually they expired.
16    Q. Because you never lost?
17    A. No. What do you mean never? Wait a
18 minute, wait a minute. Let me finish.
19    Q. Then you never lose?
20    A. Yes, of course, we lost.
21    Q. But you -- all your puts expired. Saul
22 Katz said to me that he asked you one time why are
23 we buying puts, because we never lose. Do you
24 remember that?
25    A. Oh, a lot of my traders would say let's not

Page 175

1 buy the puts because why are we going to pay the
2 premium on the puts?
3    Q. Yeah.
4    A. And I would say because that the key to the
5 strategy is to be able to limit your loss.
6    Q. Right.
7    A. You know, you're not forced to sell.
8    Q. So we're on the split strike now, and I
9 want to go back to convertible arb, but just one
10 thing. Isn't split strike strategy, which is
11 common, it's not unknown, a conservative strategy?
12    A. Yes.
13    Q. Right. And you don't expect big returns
14 from that; do you?
15    A. No.
16    Q. Because you capture --
17    A. Right.
18    Q. Yeah, okay.
19    A. So let me finish --
20    Q. Sure.
21    A. -- the story; okay?
22    Q. Didn't mean to cut you off.
23    A. When they said -- you know, I said did you
24 ever look at the strategy, you know, on a day-to-day
25 basis and see what happened? So the guy said, well,

Page 176

1 no. I'm only looking at it, you know, over the
2 course of a year or the course of months. And I
3 noticed that over the course of a year we had three
4 losing quarters, we had one losing quarter or we had
5 one losing month.
6     MR. SHEEHAN: Bless you.
7     THE WITNESS: Really, we had very few
8 losing quarters, but we did have losing months I
9 said if we close the trade out. So I said let me
10 show you -- let me show you a chart that shows you
11 what the strategy did on a daily basis. And they
12 would look and they would see that they had the
13 strategy set up for 90 days, but it could be ten
14 days where we actually had a loss had we closed it
15 out.
16     So if I was forced to close it out because
17 the option was going to expire, the put was going to
18 expire or not, I said there are lots of -- I said if
19 you look at the trade, you would see that this --
20 you would see it looks like this. Okay. Now, we
21 would only close it out hopefully when we had it
22 here, but if we closed it out when we were not here,
23 we'd have a loss.
24    Q. Right.
25    A. So then he said ah. So there are loss --

Page 177

1 there would be loss trades. If they called me up
2 and said to me I want my money back, close out the
3 strategy, which no one -- very rarely did anyone do
4 that except in 2008 when people were getting margin
5 calls all over the place; but before that nobody
6 ever called up and said sell it out because I would
7 then say to them, listen, if you force me to sell it
8 out, I'll sell it out. I'm sending your money back.
9 Don't come back. Okay.
10    Q. I want to go back to the -- but I want
11 to --
12    A. And let me just tell you one other thing.
13    Q. Sure.
14    A. You've heard of Jim Simons; right?
15    Q. Of course.
16    A. Okay. Now, I handled Jim's private
17 account, his foundation account.
18    Q. Yeah.
19    A. Now, when Jim Simons, who's probably one of
20 the smartest traders on Wall Street today, all
21 right, you know, called me up and he said to me,
22 look, he said, Bernie, he said you know what? He
23 said I'd like you to handle all of Renaissance
24 business as a dealer. Your market -- I want your
25 market makers to trade because we're sending our

45 (Pages 174 - 177)

CONFIDENTIAL

1 business down on the floor of the exchange of the
2 two Bear Stearns and, you know, they're clipping us
3 left and right on commissions and so on. So Madoff
4 has the fastest execution in the industry. I'm
5 going to let you do our business.
6       So I said really, Jim, I don't want your
7 business because your traders are too good. So I
8 don't really want Renaissance business. So he said
9 come on, come on. We'll give you the good business.
10 I said don't tell me you'll give me the good
11 business. You aren't giving me all your business
12 and I don't want my traders competing against yours
13 because we're going to lose money.
14       So he convinced me. He said look, just
15 take it, you know, but also I also want you do my --
16 handle my foundation personal account. So he set up
17 an account, I don't remember, that was two million,
18 ten million. I don't remember it anymore. You
19 know, it wasn't a big account, but let's say I think
20 it was in the neighborhood of 10 or $20 million.
21       So he understood as every one of my
22 clients understood the transaction. They saw it
23 because they got the confirmations. They saw what
24 was buying and selling. They had the ability to see
25 whether or not the trades could be done or couldn't

1 be done, and they -- so they saw the trade and the
2 trade made sense. If you'll remember going back
3 when you came down to visit me, I said to you when
4 you told me we're going to sue all these funds and
5 this, I said do yourself a favor.
6       If you think -- if you're going to believe
7 Harry Markopolos, who's one of the big idiots in our
8 industry, the great whistleblower, and believe him
9 that this strategy did not make any sense and if
10 you're going to say the reason your funds should
11 close out, you know, should have noticed a red flag,
12 don't say the strategy didn't make sense because I'm
13 telling you we had virtually every important trader
14 on Wall Street and the chairman of every firm had a
15 client -- had accounts with Madoff.
16       They knew the transaction made sense to do
17 it. They knew what my advantage was of being a
18 market maker and doing all this volume.
19       Q. But they also knew you weren't doing split
20 strike; isn't that true?
21       A. No.
22       Q. Didn't they all know you weren't doing
23 split strike?
24       A. No, no.
25       Q. They knew you were telling them that?

1       A. No. And if you believe that anybody
2 thought that I would -- why would anybody give me
3 money thinking that I was committing a fraud?
4       Q. Why did Jim Simon take his money out?
5       A. Because I'll tell you why Jim Simons --
6 because Jim --
7       Q. You know, he's testified so I have sworn
8 testimony of why he did, so let's hear what you
9 think.
10       A. Yeah. I know why. I'll tell you why he's
11 closing money out. Because he had -- he got wind
12 that the SEC was investigating me because they were
13 investigating him. What happened was the SEC was
14 investigating all of the hedge funds, had nothing to
15 do with Madoff. All right.
16       And the -- and Jim Simons, you know, was
17 getting -- had an inquiry about his firm. All
18 right. And one of the things was Madoff, was doing
19 business with Madoff. So Jim Simons knew that the
20 SEC was questioning me and, therefore, he wanted to
21 close out the transactions.
22       He had no idea that I wasn't doing the
23 trades because -- and none of them did. I don't
24 care what anybody says now. Well, I always knew.
25 Believe me, none of these guys would have done --

1 they're not crazy. Why would they want to be giving
2 money to a firm that was committing a fraud? They
3 didn't know. Now, there were some firms that didn't
4 care whether I shorted the stock to them.
5       As a matter of fact, as I -- as I told
6 people, all right, I got a call from Switzerland
7 once. This was -- I don't remember what year it
8 was.
9       Q. I think we're drifting from Jim Simons, but
10 you're going to connect that up or --
11       A. No, no.
12       Q. Okay.
13       A. This was from -- I get a call from
14 Switzerland from one of the hedge fund managers in
15 Switzerland and he says hey, Bernie, you know what?
16 He said there's a rumor going around Switzerland
17 that the reason that you are -- you're able to do
18 these trades so successfully, which I never
19 considered being so successful, was that you're
20 front running -- you're front running all your --
21 your market making orders, which, by the way, that's
22 what Markopolos told the SEC.
23       You know, because, obviously, you know,
24 if, in fact, I was front running the orders, you
25 know, that would be a great thing. It would have

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1  been, unfortunately, illegal and very easy to check
2  whether anybody is front running. And believe me, I
3  know that because I know what the rules are in the
4  industry. And when Markopolos went to the SEC and
5  said you're front running, the SEC said Bernie
6  wouldn't be front running.
7        So when they -- when they looked at it and
8  they looked at all the information, they said no,
9  no, this guy is not front running. And the reason I
10  wasn't front running, because I wasn't doing the
11  orders. So, of course, I wasn't front running
12  because I wasn't actually doing the trades. So the
13  SEC looked at that. They didn't know who was doing
14  the trades, but they knew I wasn't front running.
15  Now, let me finish. Switzerland thought I was front
16  running.
17     Q.  I've been very good here.
18     A.  You know what they said, front running?
19  They said if you're front running, that's great
20  because front running isn't illegal in Switzerland.
21  We don't care if you're front running. If the SEC
22  closes you down for an SEC violation, so you'll give
23  us our money back. We're happy. That's not our
24  problem.
25     Q.  I'm aware of that.

Page 183

1     A.  And I said I'm not front running. I wasn't
2  front running because I wasn't doing the trades.
3     Q.  Right. And the reason you were always
4  successful is you were using yesterday's newspapers;
5  correct? You weren't actually trading, so you made
6  those trades based on yesterday's newspapers?
7     A.  When I wasn't doing the trades, yes.
8     Q.  Yes.
9     A.  Yeah. That's no secret. I said that.
10     Q.  So, therefore, no one, including Jamie
11  Simon, could replicate that; could he?
12     A.  He could have if he was a market maker,
13  yeah.
14     Q.  How could he do it without yesterday's
15  newspaper?
16     A.  Let me ask you, don't you think that
17  they -- that they knew that I -- don't you think
18  that they originally thought that I was doing the
19  trades? Do you really believe that anybody gave me
20  money and knew that I was committing a fraud?
21     Q.  People do it every day, Bernie.
22     A.  Not these guys.
23     Q.  All right. People do it every day.
24     A.  Not these guys. Don't believe that, David.
25     MS. CHAITMAN:  Is that what Simons

Page 184

1  testified to?
2     MR. SHEEHAN:  Simons testified he couldn't
3  replicate what you were doing and got out.
4     THE WITNESS:  Yeah.
5     MR. SHEEHAN:  That's what he said.
6     THE WITNESS:  Yeah, but do you know why he
7  couldn't? Because he wasn't a market making firm.
8  He wasn't doing the volumes that we were doing.
9  That's why he couldn't do it.
10     Q.  (By Mr. Sheehan) I mean, yours was all
11  fictitious?
12     A.  Wait a minute. It was fictitious because
13  -- all right. Let me --
14     Q.  It never happened.
15     A.  Since you want to know this.
16     Q.  No, no. Let's go back. We've got all day
17  tomorrow to talk about this.
18     A.  Okay.
19     Q.  I want to get back to the early '80s. All
20  right?
21     A.  But let me just finish. Let me explain
22  something to you.
23     Q.  All right. Go right ahead. I won't cut
24  you off.
25     A.  Okay.

Page 185

1     Q.  I won't cut you off.
2     A.  The people always wanted to know how much
3  volume I was doing. Okay. That was the big secret.
4  How much money is Bernie Madoff doing? Okay. And
5  typically they thought that I was doing $20 million,
6  $20 billion.
7     Q.  Billion, yeah.
8     A.  That was the -- that was the consensus. I
9  was doing 20 billion; okay?
10     Q.  Yeah.
11     A.  So it was about 20 billion because that --
12  because when I filed an ADV report, the most I
13  showed was 16 billion.
14     Q.  Right.
15     A.  All right. But so they thought that it was
16  20 billion, but let's say it was when they finally
17  got the ADV report in 2006, it showed 16 billion.
18  So everybody said, well, 16 billion, that's a lot of
19  money; but this is -- how does Bernie Madoff do the
20  trades?
21        Okay. Number one, typically he never had
22  more than 50 percent of the money invested.
23  Fifty percent was in T bills, 50 percent was in the
24  marketplace. Sometimes it was 100 percent, but it
25  most of the time was not 100 percent, but let's

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

1  assume it takes 16 billion. Let's assume I invested
2  16 billion at the most, which is what they thought.
3  Okay. The $16 billion was invested over a period of
4  four days, you know. So, you know, it's 4 billion a
5  day, all right, at most, was 4 billion or 2 billion
6  depending upon how you want to look at it.
7      Q. Without an ounce of volatility?
8      A. Huh?
9      Q. No volatility?
10     A. Four billion dollars, for me to invest $4
11 billion when you're doing 10 percent of the volume
12 of the business is nothing. So the people that --
13 believe me, everything that you're saying, when guys
14 first came in, everybody figured, well, this guy
15 must have -- must be doing something wrong because
16 how could he possibly be making this profit? All
17 right. So then I -- but I heard that all from day
18 one when I was doing the trades, you know.
19     Q. In the '80s?
20     A. No. I wasn't doing this in the '80s.
21     Q. You said you were doing the trades?
22     A. You're doing convertible bonds.
23     Q. Right.
24     A. I wasn't doing split strike.
25     Q. Right.

Page 187

1      A. I'm talking about when I was doing
2  convertible bond trades, I wasn't doing it for
3  funds. I was doing it for -- just for my clients,
4  and that was no big deal for me to do that. I mean,
5  you're not -- now, you can sit here and say that I
6  never did the convertible bond trades because
7  that -- I wasn't doing the convertible bonds trades
8  to be a problem at all.
9          I mean, I was the largest convertible bond
10 trader in Wall Street at that time. Nobody thinks
11 that I was -- I wasn't managing that much money in
12 convertible bond trades even with the four big
13 clients because I wasn't doing convertible bonds for
14 them in 1980.
15     Q. When did the big four start the margin
16 accounts?
17     A. What happened was I was doing the big four
18 accounts when I started doing business for them.
19 I've been doing -- it started in the '70s. Someone
20 like Levy came in in the '90s and so on, and so but
21 let's assume I started doing it let's say in the
22 '80s when I was doing it. All right. And everybody
23 was doing convertible bond trades. And in those
24 days they were making, you know, 25, 35 percent. It
25 was no big deal to do that.

Page 188

1      Q. All through the '80s, I just want to be
2  clear, the big four did convertible bond? They
3  didn't do different strategies besides that?
4      A. No. Because what happened was --
5      Q. Okay.
6      A. -- you know, you know, in 1980, before that
7  up to 1980 I was doing convertible bonds with them.
8  All right. The four big accounts were doing
9  convertible bonds. And what happened was in 1980
10 they came to me. They were doing straddles.
11 Everybody that was doing short-term trading in Wall
12 Street was hedging their trades using commodity
13 straddles.
14     Q. Right.
15     A. You remember, you know what commodity
16 straddles, silver straddles?
17     Q. Yeah, of course.
18     A. Okay. So they were doing silver straddles
19 through Bear Stearns and through E. F. Hutton and so
20 on.
21     Q. The big four?
22     A. Big four. All right. They were hedging
23 because the arbitrage was all short-term capital
24 gains. So they were making short-term capital gains
25 making, you know, nice returns; but they -- you

Page 189

1  know, tax rates, you know, were 80-some odd percent,
2  you know. So they -- they were using the silver
3  straddles to hedge themselves. And that was fine
4  until the IRS started challenging the silver
5  straddles saying that there was no risk. These were
6  sham transactions and so on.
7      Q. Right.
8      A. And they were doing them through -- we
9  didn't do that business, but I was doing it for
10 these clients. I had recommended them to Bear
11 Stearns and Carl Shapiro had a son-in-law at E. F.
12 Hutton, so they were doing the straddles.
13         So in 1980 they came to me and they said
14 look, you know, Bernie, isn't there anything we can
15 make long-term capital gains, you know, because the
16 short-term, the arbitrage, the profits are great,
17 but the tax rates are killing us. And now we can't
18 use the straddles because the IRS is challenging the
19 commodity straddles for us.
20         So what can you do to generate long-term
21 gains? So I said wait a minute. Look, forget about
22 the real estate shelters because that was being
23 charged -- that was being -- that was being
24 threatened. Picower was doing the leasing things.
25 He had his leasing companies, cockamamie thing that

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1  he was doing. You know, everybody had their -- you
2  know, was doing something. All right. So they came
3  to me. Can you do -- what can you do to generate
4  long-term gains? I said the only thing you can do
5  for long-term gains is actually to put on long-term
6  positions, not do the arbitrage.
7       You can just -- you've got to buy
8  portfolio of stocks, but in order for that to work,
9  the market has to go up. And I can't tell you
10 whether the market is going to go up, you know,
11 from, you know, 1980.
12     Q. Right.
13     A. I said so you want to -- you know, that's
14 the only thing that's available. I don't want to do
15 any real estate tax shelters. I don't want you to
16 do any silver straddles anymore. You know, this is
17 the only game in town if you want to do that; but,
18 you know, I don't know what if the market is going to go
19 up. I said I can put together a portfolio of
20 stocks, a diversified portfolio. I happened to like
21 the market, you know, in 1980, but there's no
22 guarantee.
23     And, you know, so I don't know what to
24 tell you. So they said, well, can't you hedge it?
25 You're supposed to be the great hedger. Can't you

Page 191

1  hedge it? I said yeah. You can hedge it. There
2  are certain ways you can do it. You can go short
3  against the box. You know, you can do, you know,
4  pairs trading; but, again, you have to hold them for
5  a one-year period. That was the holding period.
6       So I, you know, explained to them all this
7  stuff and I said and there's no guarantee. You want
8  to do it, but, you know, it's better than nothing if
9  you want to do it. So they said fine. Let's do
10 that, you know. So I said so all right. Now,
11 coincidentally at the same time they were doing
12 that, I was doing a hedging strategy for a group of
13 European investors.
14     Q. I remember you telling this already.
15     A. Yeah. So they as it turned out, it would
16 have been -- they would have been a great
17 counterparty for these other traders because they
18 were doing the hedging strategy. As I explained to
19 you, they had to be in -- they had to be in U.S.
20 securities in order to hedge the French franc and so
21 on and so forth. So, you know, I said to them okay,
22 look, this is the deal.
23     I can set up portfolios or strategies for
24 you guys for the big four. I said I have
25 counterparties that supply the liquidity to you on

Page 192

1  the other side, put you guys together. The only
2  problem is you have to all understand that you can't
3  unwind these strategies prematurely because these
4  guys, you know, you're going to screw them up. So
5  if you're going to unwind, you both have to be
6  agreed to unwind at the same time.
7       So Shapiro and the rest of these guys, you
8  know, Picower, said okay, fine. It's a risk, but
9  it's better than what we were doing anyhow. We have
10 no other choice, so let's do it. So I put the
11 portfolio on for the four big clients, which is not
12 difficult to do.
13     Q. When did you do that?
14     A. 1980 I started doing that with them.
15     Q. Okay.
16     A. I put the portfolio on for them. You know,
17 the portfolio and the French guys were doing it.
18 Their side was great. It was fine. And the market,
19 of course, started to march up from 1980 to 1987.
20 Everything was going along fine. And, of course, my
21 four big clients, being the greedy people that they
22 were, never wanted to close out the transaction.
23     They wanted to keep rolling it, which is
24 very typical because everybody -- nobody wanted to
25 close out the money. They just -- let's roll it,

Page 193

1  you know, just keep rolling it and because why
2  should I pay the tax? Why do I have to pay the tax
3  money? The rate was still, you know, even on those
4  long-term gains were better than short-term gains.
5       They didn't even want to pay that, so but
6  the market accommodated everybody. So from 1980 to
7  1987 everybody was making a lot of money doing this
8  strategy and everything was fine. Comes the crash
9  in 1987. The shit hit the fan or forget about
10 repeating that, you know, and these -- my four big
11 clients said holy cow. We've now, you know, had
12 seven years of long-term gains.
13     You know, we're going to get killed.
14 We're going to give all that up with the market
15 going down. I said relax. Don't worry about it.
16 The market eventually will turn, I said, and you
17 guys made a commitment to us. We have this
18 commitment to, you know, to the French people. And
19 I'm not going to unwind. I can't unwind them, you
20 know.
21     So these guys -- that's when they started
22 to hold on. They said close out the -- sell the
23 longs, don't worry about the shorts. The market is
24 going to go -- continue to go down. We're not
25 worried about it. We'll hold you harmless for any

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1  losses.
2       MR. SHEEHAN:  Okay.  You want to take two
3  minutes?  I thought you would.
4       THE COURT REPORTER:  Yes.
5       MR. SHEEHAN:  All right.  I know we have
6  to leave soon, but I --
7       MS. CHAITMAN:  Yeah.  No.  Whatever you
8  want, yeah.
9       MR. SHEEHAN:  I don't want this young lady
10 to have her hands fall off because when you get on a
11 roll, Bernie.
12      THE VIDEOGRAPHER:  Going off the record.
13 The time is 2:14 p.m.
14      (A recess was taken.)
15      THE VIDEOGRAPHER:  Back on the record.
16 This beginning disc number four.  The time is
17 2:25 p.m.
18  Q.  (By Mr. Sheehan) Do you recall when you
19 started using DTC?
20  A.  No.
21  Q.  Would it help if I called it NSCC instead?
22  A.  What year?  Certainly before DTC because,
23 you know, I don't remember the year.  It's in the
24 report somewhere.
25  Q.  Right.  Early '80s?  That work for you?

Page 195

1  A.  Yes, yeah.
2  Q.  Early '80s.  We'll work with that.
3  A.  Yeah, because I was -- I was chairman of
4  NSCC 1984 through 1987, so --
5  Q.  Right.  At that point you're still
6  obviously -- were your stocks then on deposit at
7  NSCC?
8  A.  No.  NSCC didn't hold.  They weren't a
9  depository.
10 Q.  Okay.  What function did they perform?
11 A.  Just the clearing and settlement, the
12 settlement, money settlement, the netting.  So
13 securities weren't delivered there.
14 Q.  Uh-huh, okay.  So were you still holding
15 your securities physically at that point?
16 A.  Yeah.  We were holding them physically or
17 down at the banks.
18 Q.  Uh-huh, okay.  Where were you located in
19 the early '80s?
20 A.  110 Wall Street probably.  We moved up in
21 sometime in the mid-'80s, I think, to 110 Wall -- I
22 mean, to 885 3rd.
23 Q.  Okay.  I wanted to clarify something else,
24 too.  You talked earlier about DTCC; right?  You had
25 a -- the account there was 646?

Page 196

1  A.  Yes.
2  Q.  Did you have any other account?
3  A.  No.
4  Q.  Okay.  You talked about all your stocks
5  would be there except for bank loans.  Do you
6  remember that?
7  A.  Right.
8  Q.  All right.  Would not the fact that there
9  was a bank loan with regard to certain stocks also
10 show in your account?
11 A.  There would be a what?
12 Q.  If you had a stock loan?
13 A.  Right.
14 Q.  All right.  To the bank and the bank,
15 therefore, had your stocks pledged --
16 A.  At DTC.
17 Q.  Yeah, DTC.  It would also show in your
18 account that you had so pledged those stocks; would
19 it not?
20 A.  Yes, probably.
21 Q.  Okay.  Could you pledge customer stocks?
22 A.  Could we?
23 Q.  Could you?
24 A.  Yeah.
25 Q.  You could use that for stock loan purposes?

Page 197

1  A.  Yes.
2  Q.  Okay.
3  A.  Either at -- it depends upon whether we did
4  it at DTC or we did it at our banks, at one of the
5  banks.
6  Q.  Okay.  So let's go back to the 1980s and
7  the long strategy that you started --
8  A.  Right.
9  Q.  -- for the big four.  The big four at the
10 same time, were they still doing convertible arb --
11 A.  No.
12 Q.  -- at that point?
13 A.  They were -- some of -- I think Stanley
14 Chase was doing it for some of his accounts.  He was
15 doing -- he was still doing convertible bonds.  Oh,
16 in 1980 you're talking about?
17 Q.  In the '80s when you started the long
18 strategy.
19 A.  In the '80s.  He may have been doing it.
20 They may have been doing it for some of their
21 accounts, some of their family accounts, you know,
22 the kids' accounts and so on.
23 Q.  Yeah.  Would you say the majority of your
24 convertible arbitrage strategy in the '80s was
25 premium trading?

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

1    A.  I don't know.  Probably, probably.
2    Q.  Okay.  And how many customers?  You know,
3  let's count Avellino and Bienes as one.
4    A.  Right.
5    Q.  And then you've got the big four.  That's
6  five.  How many more customers did you have up to
7  1987?  I know that's hard, but just your best
8  thought on that.
9    A.  My brain is a little fried to begin with --
10   Q.  Yeah.
11   A.  -- so but I don't know.  Probably I would
12  say no more than 50, I would say.  I'm guessing.
13   Q.  Okay.  So in 1987 there's a crash and
14  you've testified to this.  I'm not going to repeat
15  it.  You may, but I'm not going to; but seriously,
16  why did you feel compelled to cover those shorts?
17   A.  Which shorts?
18   Q.  Well, when you were saying you would cover
19  the short positions of the big four and they
20  indemnified you, they were big boys.  Why wouldn't
21  you just say to them hey, you're in the game?
22   A.  Do you know how many times I ask myself
23  that now?
24   Q.  Yeah.
25   A.  I mean, look, I'm not proud that I did what

Page 199

1  I did, you know.  I spent a lot of hours with a
2  psychologist here trying to analyze why I did what I
3  did or I -- I had a -- a very special relationship
4  with the big four clients, all right, particularly,
5  you know, with Carl Shapiro and Norman Levy and Stan
6  Chase.
7        Picower was a little bit different, but
8  look, one of my problems was I always wanted to
9  please everybody.  You know, that was my thing
10  forgetting about whether it was my -- you know,
11  whether, you know --
12   Q.  But this was a billion dollars, a billion
13  dollars that you were going to go at risk for?
14   A.  Well, I was -- I had very special
15  relationships with the people in France.  I had a
16  special relationship with Shapiro, and I had given
17  my word.  You know, something about the securities
18  business, you know, the -- we -- everybody did
19  business on trust.
20        I know it sounds strange coming from me,
21  all right, but when I went into business the first
22  thing I learned from both Cy Lewis and Gus Levy is
23  they said to me, Bernie, whatever you do, you know,
24  in this business, never break your word because
25  there was no such thing as written contracts in the

Page 200

1  securities industry.  When everybody called you up
2  and said I want to sell -- when Merrill Lynch called
3  you and said I'm selling you a thousand shares of
4  IBM or a thousand shares of Intel, there was no
5  contract.
6        You did the trade over the phone.  You
7  waited until you got your confirmation, which may
8  have been, you know, two days later or it may have
9  been five days later, and you waited and you assumed
10  that they were going to deliver on time.  And if
11  they didn't, you were screwed.  There was no written
12  contract.
13        And in 50 years that I was in business, I
14  never, ever had anyone not honor their contract.
15  You never thought about it.  It was something that,
16  you know, if you're in this industry, your word was
17  your bond literally and that was it.  You trusted
18  everybody.  And that's the way the industry operated
19  and for the most part still operates that way today
20  but not as much.
21        All right.  So when I started doing
22  business with all my clients, I was a little guy
23  with nothing.  No one had any reason -- and Carl
24  Shapiro always tells this story famously.  When he
25  gave me $100,000, people thought he was crazy.  Why

Page 201

1  would anybody give me?  I was this little kid from
2  Brooklyn, didn't go to Harvard or so on.  Why would
3  anybody trust me to give me business, you know, turn
4  their money over to me on a discretionary basis
5  basically and, you know, and go with it?
6        All right.  They did.  And because they
7  showed -- he showed faith in me and guys like Levy
8  and so on did, all right, I felt obligated to keep
9  my word.  And it was the same thing when I did
10  business in Europe, you know.  People showed a lot
11  of faith in me.  Now, I made them a lot of money.
12  They weren't doing it, you know, as a philanthropy,
13  but there was a special relationship I had with
14  them.
15        And all of these clients, I was like a son
16  to them and they were like surrogate fathers to me.
17  All right.  So when the crash came in '87 -- and
18  also I had went from nothing.  You know, I started
19  my business with literally $500, you know.  You
20  know, all of a sudden, you know, by '87 I was a rich
21  guy.
22        At least I thought I was very successful
23  and everybody in the industry thought I was like,
24  you know, this terrific, terrific success story,
25  which I was.  All right.  So when the crash came in

51 (Pages 198 - 201)

CONFIDENTIAL

Page 202

1 '87 and these guys panicked on me, which is not a
2 surprise in hindsight because the one thing every
3 one of them was, which is everybody in the industry
4 is, they're greedy. All right. So they all
5 panicked. They didn't want to give up their returns
6 and I made the mistake. What I should have said to
7 them was look, this is the agreements you have.
8       Now, could I have sued them? There was no
9 -- there was no written contract, all right, when we
10 made these agreements to, you know, to not unwind,
11 you know, prematurely. This was all, you know,
12 arm's length agreements. These were not -- there
13 were no contracts in that. So I didn't have the
14 right to litigate with Carl Shapiro and Jeff Picower
15 and say listen, you can't sell.
16       You know, if they wanted to sell
17 regardless of whether they were short, I could have
18 said no, you've got to sell. I could have said
19 cover your shorts, too, in other words, but I
20 didn't. All right.
21     Q. That was my question. Why didn't you tell
22 them cover your own shorts?
23     A. Because they said to me -- after we argued
24 and argued for days, everybody says don't panic.
25 Now, you have to understand also that everybody that

Page 203

1 was trading convertible bonds through me when the
2 crash came in '87, they had a windfall because every
3 convertible bond went to premiums. So the guys that
4 were doing convertible bonds, they thought I was a
5 goddamned codified genius because the market
6 crashed, but all convertible bonds, you know, which
7 you would expect them to do, went to premiums.
8       These guys weren't doing convertible bonds
9 except for some of their accounts, as I said, so
10 they didn't -- you know, everybody said -- I said
11 now, look, don't panic. The market will go up. We
12 knew Reliant went down because of the United
13 Airlines bust and the merger and so on. You know,
14 they didn't want to. They just said look, let's
15 sell and get out of it.
16       All right. I didn't -- I couldn't force
17 them to cover the shorts because I had the
18 Europeans, the French guys on the other side of the
19 trades. I couldn't close them out prematurely. So
20 that's why I didn't unwind.
21       So and then they said to me, look, as much
22 as I -- all I can use is moral-suasion. And they
23 didn't want to screw me either generally because,
24 number one, we had a close, family-type
25 relationship. And also I made them a lot of money.

Page 204

1 They didn't want to kill the goose that laid the
2 golden egg. And they were so sure that the market
3 was -- the shorts were not going to be a problem.
4 So they said fine. We'll hold you harmless. Close
5 out, sell the longs out so we get the advantage of
6 the long-term gains.
7       Let's not worry about the shorts. We'll
8 take responsibility of the shorts because I said all
9 right, the market eventually is recovered. You're
10 going to lose money on the shorts. They said we're
11 not worried about it. That's why. In hindsight now
12 it looks like a stupid thing to do and it was.
13     Q. You know, we've looked everywhere. Ellen
14 has actually asked us for the hold harmless
15 agreements. We can't find them. Would Price
16 Waterhouse Cooper as you mentioned have yours? The
17 likelihood, it's a long time ago so when it
18 happened.
19     A. No. I mean, you know, Ed Kostin,
20 unfortunately, has been dead a long time by now. He
21 did it. I don't know. You know, look, I mean, if
22 you looked for the trust agreements, you would see
23 that I was the -- I was the Trustee and the executor
24 of all of their trust agreements. Now, they've
25 probably changed it by now.

Page 205

1     Q. Right.
2     A. But they -- look, there was meetings with,
3 for example, I don't know whether -- Paul
4 Konigsberg, did he ever go to jail or did he not go
5 to jail?
6       MR. GOLDMAN: He's in jail.
7       THE WITNESS: He did not go to jail?
8       MR. GOLDMAN: Konigsberg went to jail.
9       MR. SHEEHAN: No. He walked.
10      MR. GOLDMAN: Not Konigsberg. I'm
11 thinking of someone else. Okay.
12      THE WITNESS: Okay.
13      MR. SHEEHAN: He should have gone to jail.
14      THE WITNESS: Huh? Look, well, I don't
15 think anybody should go to jail, but --
16      MR. SHEEHAN: But anyway --
17      THE WITNESS: -- look, these people, there
18 were meetings held, you know, where the family
19 because, look, when these guys made these agreements
20 with me, all right, I said look, these guys were
21 old. They were -- you know, Carl Shapiro thought he
22 was going to die. He's still alive as far as I
23 know.
24      MR. SHEEHAN: He is.
25      THE WITNESS: Carl, he must be 104, for

52 (Pages 202 - 205)

CONFIDENTIAL

Page 206

1  crying out loud, but when he was 60 some odd years
2  old he called me up hysterical when he had his first
3  Bell's palsy attack to Boston and said look, I'm
4  going to die and so on and so forth.
5        And that's when I made Paul Konigsberg his
6  accountant because, you know, at that time Coopers
7  and -- PaineWebber, who is Coopers and Lybrand
8  really, was his accounting firm; but he wanted, you
9  know, a closer relationship with Paul Konigsberg,
10  who became his accountant.
11    Q. (By Mr. Sheehan) Who's he? I'm sorry.
12    A. Carl Shapiro.
13    Q. Oh, I'm sorry.
14    A. All right. So all of these guys, most of
15  them except for Picower, but Picower was unhealthy
16  to begin with. He'd had three heart attacks and
17  he'd had, you know -- what does he have? I forgot
18  what the disease is, you shake all the time.
19    MR. GOLDMAN: Parkinson's.
20    THE WITNESS: Parkinson's, right. I said
21  look, you know, we have these agreements. I said I
22  want the family to make -- I want to make sure your
23  children know this. They weren't really children.
24  They weren't much younger than -- you know, younger
25  than me, so I said -- but everybody knew of these

Page 207

1  agreements, these arrangements that they were
2  responsible for any losses. And we had meetings and
3  everyone knew that. So I wasn't even worried about
4  having, you know, written agreements. We had them,
5  but when I said to them, look, you know what? When
6  you die, I said I want -- who's -- you know, you
7  tell me I'm still handling your investments.
8        So they -- Levy, for example, took JP
9  Morgan off -- it wasn't JP Morgan. It was Chemical
10  at the time. Took Chemical and its Trustee and
11  executor of his estate off and he made me that. I
12  was going to get to handle all and their kids had to
13  sign agreements that I was the one that was going to
14  handle, you know, all of their monies and I had no
15  responsibility. So this was -- you know, that's
16  what the agreements were. They all knew what was
17  going on.
18    Q. We're going to end with this today, all
19  right, and we'll start tomorrow morning.
20    A. Uh-huh.
21    Q. Early in December you had a meeting in your
22  office. The big four was there. Fred was there.
23  Other people were there. What was the purpose of
24  that meeting?
25    MS. CHAITMAN: Early December of what

Page 208

1  year?
2    MR. SHEEHAN: '08.
3    THE WITNESS: Oh, that was the foundation
4  -- that was for the charitable thing that we had. I
5  was -- we had -- I was raising the money for cancer
6  then, you know, and Andy had been diagnosed --
7    MR. SHEEHAN: Right.
8    THE WITNESS: -- with cancer. And I
9  forgot the name of our -- the Madoff foundation we
10  had. And I -- they were on the board. It was a
11  board meeting.
12    Q. (By Mr. Sheehan) Did you not discuss the
13  status of BLMIS that day?
14    A. No, no.
15    Q. You'd just paid out $11 billion. Two days
16  later you're going to get turned into the FBI, and
17  you didn't mention anything?
18    A. Paying out $11 billion?
19    Q. Pardon?
20    A. What do you mean paying out 11 billion?
21    Q. You had just paid out over the past year
22  $11 billion in redemptions?
23    A. Oh, yeah.
24    Q. Here's the big four, Fred and other people
25  as you're sitting here?

Page 209

1    A. No. The only one that was there was Fred.
2  Shapiro wasn't there. One of his -- Bob Jaffey was
3  there. I don't think Jeff Picower was there. I
4  don't know if his wife was there. I don't think
5  Picower was there. Either he may have been in
6  Florida. No. We didn't -- I mean, I knew that I
7  was in trouble, but no one else did, including my
8  wife.
9    MR. SHEEHAN: Okay.
10    MS. CHAITMAN: When you say Fred, are you
11  referring to Fred Wilpon?
12    THE WITNESS: Yeah. He was on the board.
13  He was on the board, my board.
14    MR. SHEEHAN: Okay. Let's end it there.
15    THE VIDEOGRAPHER: Okay. This concludes
16  the deposition. Going off the record at 2:42 p.m.
17    (The deposition was adjourned at 2:42
18  p.m.)
19        * * * * *
20
21
22
23
24
25

53 (Pages 206 - 209)

CONFIDENTIAL

Page 210

```
 1        C E R T I F I C A T E
 2   NORTH CAROLINA:
 3   GUILFORD COUNTY:
 4        I hereby certify that the foregoing
 5   deposition was reported, as stated in the caption,
 6   and the questions and answers thereto were reduced
 7   to the written page under my direction; that the
 8   foregoing pages 1 through 209 represent a true and
 9   correct transcript of the evidence given.  I further
10   certify that I am not in any way financially
11   interested in the result of said case.
12        I have no written contract to provide
13   reporting services with any party to the case, any
14   counsel in the case, or any reporter or reporting
15   agency from whom a referral might have been made to
16   cover this deposition.  I will charge my usual and
17   customary rates to all parties in the case.
18        This, the 10th day of May, 2017.
19
20
21        K. Denise Neal
22
23        K. Denise Neal, RPR
             Registered Professional Reporter
24           Notary Public No. 200517500101
25
```

54 (Page 210)