# EXHIBIT B

CONFIDENTIAL

Page 494

1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF NEW YORK
2

3

        In re:                          )
4                                        )
        SECURITIES INVESTOR             )
5       PROTECTION CORPORATION,          )
                                         )
6            Plaintiff-Applicant,        )
                                         )
7       vs.                              )   08-01789 (SMB)
                                         )
8       BERNARD L. MADOFF               )
        INVESTMENT SECURITIES, LLC,     )
9                                        )
            Defendant.                   )
10                                       )
                                         )
11      In re:                          )
                                         )
12      BERNARD L. MADOFF,              )
                                         )
13          Debtor.                      )
                                         )
14

15                      CONFIDENTIAL
16           Videotaped Deposition of BERNARD L.
17      MADOFF, VOLUME IV, taken on behalf of the Customers,
18      before K. Denise Neal, Registered Professional
19      Reporter and Notary Public, at the Federal
20      Correctional Institution, 3000 Old Highway 75,
21      Butner, North Carolina, on the 9th day of November,
22      2017, commencing at 8:43 a.m.
23

24

25                      * * * * *

CONFIDENTIAL

Page 495

1 APPEARANCES OF COUNSEL:
2
3    On Behalf of the Customers:
4        HELEN DAVIS CHAITMAN, Esq.
5        Chaitman, LLP
6        465 Park Avenue
7        New York, New York  10022
8        (908) 303-4568
9        hchaitman@chaitmanllp.com
10
11    On Behalf of Sage Associates, Sage Realty,
12    Malcolm Sage, Martin Sage and Ann Passer Sage
13        ANDREW B. KRATENSTEIN, Esq.
14        McDermott Will & Emery, LLP
15        340 Madison Avenue
16        New York, New York  10173-1922
17        (212) 547-5695
18        akratenstein@mwe.com
19
20
21
22
23
24
25

Page 497

1                   CONTENTS
2 THE WITNESS:  BERNARD L. MADOFF        EXAMINATION
3        BY MS. CHAITMAN        499
4        BY MS. FEIN            520
5        BY MR. GOLDMAN         579
6        BY MS. FEIN            582
7        BY MS. CHAITMAN        667
8        BY MR. KRATENSTEIN     678
9
10              * * * * *
11
12            INDEX OF EXHIBITS
13 FOR THE CUSTOMERS:              PAGE
14 Exhibit Number 89, Schwab blotters -     502
15    12-5-86
16 Exhibit Number 90, Securities transaction  504
17    report
18 Exhibit Number 91, NSCC trade reporting    505
19    blotter - 12-11-86
20
21 FOR THE TRUSTEE:
22 Exhibit Number 10, Customer statement -   524
23    12-31-07
24 Exhibit Number 11, House 5 daily stock    535
25    Record activity - 7-16-87

Page 496

1 APPEARANCES OF COUNSEL:
2
3    On Behalf of the Trustee:
4        AMANDA E. FEIN, Esq.
5        STACY DASARO, Esq.
6        Baker Hostetler
7        45 Rockefeller Plaza
8        New York, New York  10111-0100
9        (212) 589-4621
10       afein@bakerlaw.com
11
12    On Behalf of the Deponent:
13        PETER A. GOLDMAN, Esq.
14        12 Fairlawn Parkway
15        Rye Brook, New York  10573
16        (914) 935-6857
17        pagoldman@gmail.com
18
19    Videographer:
20        Bob Collier, CLVS
21
22              * * * * *
23
24
25

Page 498

1          INDEX OF EXHIBITS (Continued)
2 FOR THE TRUSTEE:                  PAGE
3 Exhibit Number 12, House 17 stock record    558
4    summary through 12-31-07
5 Exhibit Number 13, Stock record summary -   566
6    8-31-01
7 Exhibit Number 14, House 17 stock record    569
8    summary - 3-31-94
9 Exhibit Number 15, House 17 stock record    571
10    summary - 7-16-87
11 Exhibit Number 16, Confirmation - 11-11-83  600
12 Exhibit Number 17, House 17 stock record    603
13    summary - 11-10-83
14 Exhibit Number 18, Cash and securities      611
15    blotter
16 Exhibit Number 19, Cash and securities      611
17    blotter
18 Exhibit Number 20, Proffer meeting          626
19    document - 12-16-08
20 Exhibit Number 21, Report - 12-8-08         644
21
22
23
24
25

CONFIDENTIAL

CONFIDENTIAL

Page 499

1    THE VIDEOGRAPHER: We're now on the
2 record. Please note that the microphones are
3 sensitive and may pick up whispering and private
4 conversations. Recording will continue until all
5 the parties agree to go off the record. My name is
6 Bob Collier representing Veritext Legal Solutions.
7 Today's date is November 9th, 2017 and the time is
8 approximately 8:43.
9    This deposition is being held at Butner
10 Federal Correction Facility located at 3000 Old 75
11 Highway, Butner, North Carolina and is being taken
12 by counsel for the Plaintiff-Applicant. The caption
13 of this case is Securities Investor Protection
14 Corporation, Plaintiff-Applicant v. Bernard L.
15 Madoff Investment Securities, LLC, Defendant.
16    This case is being held in the United
17 States Bankruptcy Court, Southern District of New
18 York, Case Number 0801789 (SMB). The name of the
19 witness is Bernard L. Madoff. At this time the
20 attorneys present in the room will identify
21 themselves and the parties they represent.
22    MS. CHAITMAN: Helen Davis Chaitman on
23 behalf of numerous Defendants.
24    MR. KRATENSTEIN: Andrew Kratenstein of
25 McDermott Will & Emery, LLP on behalf of the Sage

Page 500

1 Defendants.
2    MS. DASARO: Stacy Dasaro, Baker
3 Hostetler, on behalf of the Trustee.
4    MS. FEIN: Amanda Fein, Baker Hostetler,
5 on behalf of the Trustee.
6    MR. GOLDMAN: Peter Goldman on behalf of
7 the witness, Mr. Madoff.
8    THE VIDEOGRAPHER: Our court reporter,
9 Denise Neal, representing Veritext Legal Solutions,
10 will swear in the witness and we can proceed.
11    BERNARD L. MADOFF,
12 having been first duly sworn, was examined and
13 testified as follows:
14    EXAMINATION
15 BY MS. CHAITMAN:
16    Q. Good morning, Mr. Madoff. Yesterday you
17 identified a document which was marked as
18 Exhibit 38, which appears to be a January 31, 1983
19 statement bearing the name National Westminster
20 Bank?
21    A. Uh-huh.
22    Q. And it shows --
23    MR. GOLDMAN: You've got to answer yes or
24 no, Bernie.
25    THE WITNESS: Says National Bank of North

Page 501

1 America.
2    Q. (By Ms. Chaitman) Excuse me. National
3 Bank of North America. Thank you. And was this
4 generated by your firm or was it generated by
5 National Bank of North America?
6    A. I believe it was generated by my firm.
7    Q. Did you receive on a monthly basis from
8 National Bank of North America statements showing
9 the securities transactions conducted in that month
10 for your firm?
11    A. I don't recall whether we received one. I
12 don't know. I mean, you know, you're talking about
13 1983. I don't know what the policy was. Typically
14 we would receive statements from the banks at the
15 end of a month.
16    Q. Okay, okay. And, for example, here is
17 Exhibit 46, which is another statement that was
18 generated by your firm as well; right?
19    A. Yes.
20    Q. And do you know how the information was
21 obtained that was incorporated into these
22 statements?
23    A. Well, these statements were generated by
24 us. They're showing the transactions according to
25 our records as they're done.

Page 502

1    Q. Okay, okay.
2    A. They're not the bank's records. So these
3 are just, you know, the transactions as they
4 appeared in this account.
5    Q. Okay. And you testified yesterday that
6 these all reflect accurate transactions that were
7 fulfilled --
8    A. That's correct.
9    Q. -- is that correct?
10    A. Yes.
11    Q. Okay. And I'm showing you again
12 Exhibit 39, which is a January 31, 1983 statement of
13 transactions with National Bank of North America.
14    A. Yes.
15    Q. And is that an accurate reflection of the
16 transactions that were done in that prior month for
17 National Bank of North America?
18    A. Correct.
19    Q. Okay. Now, let me show you what I'm going
20 to mark as Exhibit 89. These are it says Schwab
21 blotters for 12-5-86 and it says house five.
22    MS. FEIN: Thank you.
23    MR. KRATENSTEIN: Thank you.
24    Q. (By Ms. Chaitman) Can you tell me what
25 this document is?

3 (Pages 499 - 502)

CONFIDENTIAL

Page 503

1    A. It looks like the activity that took place
2 in the Charles Schwab & Company.
3    Q. Okay. And, again, would these be actual
4 transactions that were conducted by your firm?
5    A. They would be.
6    Q. Okay. And would you have received in the
7 ordinary course of business some documentation from
8 Schwab evidencing these same transactions?
9    MS. FEIN: Objection.
10    THE WITNESS: It depends upon what period
11 of time. I mean, people stopped using
12 confirmations. Broker-to-broker confirmations were
13 eliminated after a certain period of time. I don't
14 know when that was. Before that period we received
15 confirmations on every trade every day.
16    After that there were no confirmations
17 because the trades went to the clearing corporation
18 and those trades were all netted, which is a
19 practice so that the transaction that you did with
20 Schwab doesn't -- would not be what you would
21 receive from the clearing corporation because they
22 net all the -- from market makers like Madoff what
23 happens is they take all of the transactions, all
24 the transactions that you had in a particular
25 security, so if we had every trade that we did with

Page 504

1 say in General Motors for any of the thousands of
2 brokers that exist that buys and sells, if you sold,
3 for example, 2 million -- if you brought 2 million
4 shares from assorted brokers and then you sold
5 1,500,000 shares, they would send you what they call
6 a balance order at the end of the day that said you
7 bought or sold 500 shares, which is the net amount.
8    And they would give you the dollar amount
9 of the net practice. And -- and the person
10 guaranteeing the trade became the clearing
11 corporation.
12    Q. (By Ms. Chaitman) Was there a system in
13 place at your firm to verify the information you
14 received on a daily basis from the clearing
15 corporation?
16    A. Yes, you know, there was. I can't tell you
17 exactly what it was because I'm not part of the back
18 office operation.
19    Q. Okay. But there was such a system in
20 place?
21    A. Yes.
22    (Exhibit Number 90 was marked for
23 identification.)
24    Q. (By Ms. Chaitman) I'm going to show you
25 what I've marked as Exhibit 90, and I apologize. I

Page 505

1 only have one copy of this, but I'll show it to
2 everybody after you identify it. Can you tell me
3 what this is?
4    A. It reflects the securities we bought for
5 Vanguard and Wells Fargo.
6    Q. During this -- the period indicated?
7    A. During that period of time, right.
8    Q. Okay. And is this a report that was also
9 generated by your firm?
10    A. Correct.
11    Q. Okay. And were these transactions actual
12 transactions?
13    A. Yes. They were.
14    (Exhibit Number 91 was marked for
15 identification.)
16    Q. (By Ms. Chaitman) Okay. I'd like to show
17 you what I've marked as Exhibit 91. Can you tell me
18 what this document is?
19    A. It looks like a trade reporting blotter
20 under National Securities Clearing Corporation.
21    Q. Okay. Now, is the National Securities
22 Clearing Corporation generally referred to as NSCC?
23    A. Correct.
24    Q. And was NSCC the precursor to DTC, the
25 Depository Trust Company?

Page 506

1    A. Yes, then they merged.
2    Q. Okay. So what does this document reflect?
3 It reflects trade date December 11th, 1986. Can you
4 tell me what this document shows?
5    A. It would show the transactions that we did
6 with other brokerage firms in the street but not
7 reflect any customer transactions.
8    Q. Okay. And is there an indication on this
9 document as to which brokerage firms were on the
10 other side of these transactions?
11    A. I don't believe so.
12    Q. The member number ID of 0158, was that your
13 member number?
14    A. No. Oh, yes.
15    Q. The first column on the left?
16    A. No. That's -- ours was 646. This member
17 ID would be -- refer to another brokerage firm.
18    Q. So this document -- which I don't represent
19 is complete. I just printed out a portion of it.
20 The column on the left represents another brokerage
21 firm and this lists all the transactions done on
22 December 11th, 1986 by your firm with 0158?
23    A. Let me just look at this. Yes.
24    MS. FEIN: It looks like there -- on
25 future pages there might be others.

4 (Pages 503 - 506)

CONFIDENTIAL

Page 507

1    MS. CHAITMAN:  Right, right.  I just
2  wanted to clarify this.
3    MS. FEIN:  Understood.
4    MS. CHAITMAN:  Yeah.  I didn't print out
5  complete.
6    THE WITNESS:  These are the transactions
7  of the market making or proprietary trading side of
8  the firm.
9    Q.  (By Ms. Chaitman)  Okay.  As a matter of
10  fact, Mr. Kratenstein just pointed out to me if you
11  look on page two there are other numbers in the
12  left-hand column.  Do you see that?
13    A.  Yes.  You mean other ID numbers?
14    Q.  Yes.
15    A.  Yes.
16    Q.  So that means -- I didn't notice that, so
17  this lists transactions with all the other firms and
18  they're identified by their code number?
19    A.  That is correct.
20    Q.  And were these all legitimate transactions?
21    A.  Yes.
22    Q.  And they were all executed?
23    A.  Yes.
24    Q.  Now, would -- as of December 11th, 1986
25  would this kind of report reflect 100 percent of the

Page 508

1  trading activities of your firm or were there
2  other --
3    A.  No.
4    Q.  Okay.  So what other categories of
5  activities were there that are not reflected on a
6  report like this?
7    A.  If we were trading with a client, you know,
8  out of our own inventory principal, it would not be
9  reflected on this -- on this report.
10    Q.  Anything else?
11    A.  I don't believe so.
12    Q.  If you were doing convertible bond trading,
13  would that show up on this report --
14    MS. FEIN:  Objection.
15    Q.  (By Ms. Chaitman) -- or would that be on a
16  different report?
17    A.  I do not believe it would be on this
18  report.
19    Q.  Do you recall that your firm generated
20  reports which -- in the 1980s which showed all of
21  the convertible bond purchases and sale on a daily
22  basis?
23    A.  It would reflect, be reflected in a
24  customer's account if -- and it would be reflected
25  in the firm's account, in the firm's trading --

Page 509

1  you'd have to look at the trading ledger for the
2  firm.  It depends upon also whether we did it as
3  principal or whether we did it as agent.  Most of
4  our trades were done as principal.  We're selling
5  out of our own inventory account to the customer.
6    I don't know exactly where that would
7  appear, but it would not appear -- these are what's
8  called street side transactions, as I said, mostly
9  from a market making proprietary trading side of the
10  firm, broker-to-broker trades.
11    Q.  Okay.  You had testified previously that
12  with respect to the convertible bond trading,
13  99 percent of it in the 1980s was done in the
14  over-the-counter market?
15    MS. FEIN:  Objection.
16    Q.  (By Ms. Chaitman)  Do you recall that?
17    A.  Depends upon the bond.  The bonds,
18  convertible bonds traded -- most convertible bonds
19  traded in the over-the-counter market.  Some of them
20  were traded on an exchange, but the great majority
21  of them would trade over the counter.
22    Q.  Okay.  Now, if I wanted to find a record on
23  any specific date in the 1980s of the volume and
24  specific transactions that you did in the
25  over-the-counter market, what document would I look

Page 510

1  for?
2    A.  You'd have to look at the firm trading
3  account records and blotters, but I don't -- and if
4  you're talking about period in the '80s, I doubt
5  whether or not you would be able to find them
6  because the record retention period was six years in
7  the industry.  So there would be no reason the firm
8  would keep those.
9    Q.  Now, Mr. Madoff, I believe you're aware
10  that there were microfilm records that the Trustee
11  found?
12    A.  Yes.
13    Q.  Do you recall how it came about that some
14  of your records were microfilmed?
15    A.  It depends upon what the policy of the firm
16  was at that -- during that period of time.  I mean,
17  there was a -- there was a lot of confusion within
18  the industry as to whether you had to microfilm
19  records or whether you would put them -- send the
20  records to a place like Stone Mountain, which was an
21  off premises places.
22    Everybody had a different policy, so -- and
23  I'm not particularly aware of what our firm's policy
24  was.  It's not something I would be involved in.
25    Q.  Okay.  Was the decision to microfilm

5 (Pages 507 - 510)

CONFIDENTIAL

Page 511

1 records your decision or did someone else in your
2 firm make that decision?
3    A. It wasn't my decision, no.
4    Q. It was not?
5    A. No.
6    Q. Okay. So is it fair to say that you didn't
7 instruct your staff as to what should be microfilmed
8 and what should not be microfilmed?
9    A. No.
10    Q. Did you ever seek to verify that documents
11 were being microfilmed?
12    A. Probably not. It's not an area that I
13 would be involved in. That would be something that
14 somebody in the systems department would make those
15 decisions or someone in the operations department.
16    Q. Okay. Can you think of anyone in
17 particular who would have been responsible for that?
18    A. It varied, you know, over the years. No.
19    Q. Okay. There was a person named Asha,
20 A-s-h-a. Do you recall that name?
21    A. No.
22    Q. Okay. Do you know you've testified
23 previously that the -- all of the trading that you
24 did except for the split strike was actual trading?
25    MS. FEIN: Objection to form.

Page 512

1    MS. CHAITMAN: I'm just trying to lay the
2 background.
3    THE WITNESS: Yes.
4    Q. (By Ms. Chaitman) You testified to that
5 yesterday. Okay.
6    A. Up to a certain period of time. There were
7 actual trades done in split strike prior to 1990,
8 some period in the '90s.
9    Q. Okay, okay, okay. So just to clarify, when
10 you started the split strike for some period of time
11 you actually did the trades?
12    A. Correct.
13    Q. And at some point which you haven't been
14 able to specify you stopped doing the trades?
15    A. Correct.
16    Q. Okay. Now, I want to ask you something
17 about that, Mr. Madoff. Is it your understanding
18 from your experience in the securities business that
19 it was illegal for you to send a customer statement
20 to a customer which said in essence I've purchased
21 five shares of IBM for you when, in fact, you hadn't
22 actually made that purchase?
23    A. Was it what?
24    Q. Was there anything improper or illegal
25 about your in a sense selling a short, a naked short

Page 513

1 to a client?
2    MS. FEIN: Objection.
3    THE WITNESS: No.
4    Q. (By Ms. Chaitman) Can you explain to me
5 why that was not illegal?
6    A. Short selling is a very common practice and
7 a significant part of the stock market, whether it
8 be an over-the-counter transaction or whether it be
9 an exchange-traded transaction.
10    That is -- as a matter of fact, there are
11 -- you can look at any one of the financial records
12 that are produced, you know, by the media and get
13 what the open short positions are in every
14 particular security. So the concept of selling
15 short has been in existence since the securities
16 started trading in the market maker.
17    Q. And the fact that you did that, that you
18 may have done naked short selling --
19    A. Right.
20    Q. -- was that illegal or improper?
21    A. No.
22    Q. Okay. So is it fair to say that because
23 you were a market maker, you had not only the right
24 but also the obligation --
25    A. That is correct.

Page 514

1    MS. FEIN: Objection.
2    Q. (By Ms. Chaitman) -- to sell?
3    A. The rule was that if you were a registered
4 market maker, you were required to post on a regular
5 and continuous basis a two-sided market, meaning
6 what you're willing to buy and what you're willing
7 to sell. And in order to -- in order to continue to
8 be a registered market maker, you had to honor that
9 quote. Otherwise, it would be a violation of the
10 SEC.
11    Q. Okay. But you say it's not a violation of
12 any SEC rule to indicate on a customer statement
13 that the customer owns certain securities when you
14 hadn't actually purchased them?
15    A. Of course.
16    Q. It's not -- that's not improper?
17    A. No.
18    Q. Okay. So what was improper, if anything,
19 about the fact that with respect to the split
20 strike, at a certain point in time you stopped
21 buying the securities shown on the statements?
22    MS. FEIN: Objection.
23    THE WITNESS: What was improper was when
24 we reported our -- when we gave the SEC our
25 financial statements, you would have to show what

6 (Pages 511 - 514)

CONFIDENTIAL

Page 515

1  your -- you wouldn't -- you wouldn't show whether
2  you were long or short for any particular customer.
3  That policy was changed many, many years ago, but
4  you had to reflect the liability of what was
5  involved in your total short positions.
6      Q. (By Ms. Chaitman) So just to be
7  clear, if you sent customer A a statement which
8  showed that he had a portfolio worth a million
9  dollars in various Fortune 100 company stocks and
10  you did not own those stocks at that time, you would
11  have had to reflect on your FOCUS report to the SEC
12  that you owed that customer a million dollars worth
13  of stocks?
14      MS. FEIN: Objection. Helen, we covered
15  this on the first day of Mr. Madoff's testimony back
16  in April.
17      MS. CHAITMAN: Okay.
18      MS. FEIN: So I just want to put on the
19  record that this is day one testimony.
20      MS. CHAITMAN: Okay.
21      THE WITNESS: You would -- if the firm was
22  short to a customer, you would reflect on -- you
23  would reflect -- that would reflect what your open
24  position was that's a short position; but if you had
25  an arbitrage transaction in that particular

Page 516

1  security, you would net the long positions versus
2  the short position of the firm, both the market
3  making, proprietary and the customer transaction.
4  Plus, you would have to take options into
5  consideration. You'd have to -- there were certain
6  exemptions and instructions of how you treated your
7  capital.
8      Q. (By Ms. Chaitman) Okay. But, in fact, you
9  never disclosed to the SEC that you had naked short
10  positions. Is that fair to say?
11      A. During the period where we didn't sell the
12  stock, that is correct.
13      Q. Where you didn't buy the stock you mean?
14      A. Didn't buy the stock.
15      Q. Okay, okay. And in your mind is that what
16  was illegal about what you did?
17      A. Correct.
18      Q. Okay. Now, in all the years you were in
19  business prior to the global economic collapse in
20  2008, did you ever find yourself unable to satisfy a
21  customer demand for a withdrawal from a --
22      MS. FEIN: Objection. This is not only --
23  it's outside the scope of the day two deposition.
24  We didn't enter the order today, but this was all --
25  these were things that were covered on the day one

Page 517

1  deposition.
2      MS. CHAITMAN: Okay. You've made your
3  record.
4      THE WITNESS: No.
5      Q. (By Ms. Chaitman) So you're sure that
6  there was never a time from 1992 when you started
7  the split strike until 2008 when you were unable to
8  satisfy a customer demand for a redemption?
9      A. That's correct.
10      Q. Did you ever need to take in a new
11  customer's money in order to pay money to an
12  existing customer?
13      A. No.
14      Q. In the entire time you were in business?
15      A. Up until the collapse of the financial
16  market.
17      Q. Okay. Now, did you make margin loans to
18  some customers?
19      A. Yes.
20      Q. And were those margin loans in your view
21  debts from the customers to you?
22      A. Of course, yes.
23      Q. And why is that? Tell us what a margin
24  loan is.
25      A. Margin loan is regulations set by the

Page 518

1  Federal Reserve. If a customer wants to buy --
2  wants to buy securities, he is allowed to pledge,
3  you know, other securities in his account, you know,
4  to purchase it. So the margin rates varied. I
5  believe in the period of time that you're talking
6  about it would be 50 percent, but again, it depends
7  upon the securities, whether they were bond, whether
8  they were -- you know, the type of bond, whether or
9  not they had options involved with it.
10      It was a complicated practice, but
11  basically it was the customer's ability to borrow to
12  be able to purchase more securities without posting
13  cash for that particular transaction. So he was --
14  it's similar to when you have a house and you take a
15  mortgage loan out to buy the house or to expand the
16  house. Well, use it for whatever you want. Those
17  regulations are set by the Federal Reserve Board.
18      Q. Okay. And would you have made a margin
19  loan to someone who didn't own any securities?
20      A. No.
21      Q. So is it fair to say that almost by
22  definition if you made a margin loan to a customer,
23  that customer had real securities in his account?
24      MS. FEIN: Objection.
25      THE WITNESS: Yes.

7 (Pages 515 - 518)

CONFIDENTIAL

Page 519

1    Q. (By Ms. Chaitman) And do you recall that
2  you made substantial margin loans to the Sages?
3    A. That I can't recall.
4    Q. Okay. But it would be reflected on their
5  statements; wouldn't it?
6    A. You could figure it out from the statement,
7  yes. You'd see by whether it had a debit balance in
8  their account --
9    Q. Okay.
10   A. -- past the settlement date of the
11 transaction.
12   Q. Okay. And was it your practice to insist
13 that margin loans be repaid by customers?
14   A. Yes.
15     MS. CHAITMAN: I have nothing further.
16 Thank you very much, Mr. Madoff.
17     MS. FEIN: Okay. We can get started if
18 that's okay with you. Would you prefer that we take
19 a break now?
20     THE WITNESS: No, no. I'm fine.
21     MS. FEIN: Okay.
22     MR. GOLDMAN: You want something to drink?
23     THE WITNESS: Anything, water or Pepsi is
24 fine.
25     MR. GOLDMAN: You want water or Pepsi?

Page 520

1     THE WITNESS: Pepsi.
2     MS. CHAITMAN: Do you need a dollar?
3     MR. GOLDMAN: No.
4          EXAMINATION
5  BY MS. FEIN:
6    Q. Good morning, Mr. Madoff.
7    A. Good morning.
8    Q. When -- I want to define a couple of terms
9  up front so when we talk about them later, you know
10 what I'm referring to; but if I ask a question about
11 the IA business or house 17, would you agree that
12 that's referring to your investment advisory
13 business?
14   A. Yes.
15   Q. And if I ask a question about market making
16 or proprietary trading or house five, I might use
17 those terms somewhat interchangeably. I might use
18 house five to refer to the market marking and
19 proprietary trading business, but do you agree that
20 we can use those terms?
21   A. Yes.
22   Q. And yesterday I believe Mr. Kratenstein
23 asked for clarification about what -- at my request,
24 so thank you, about what a real trade was and you
25 had -- and we have that term defined. We can use

Page 521

1  that term today as well?
2    A. Yes.
3    Q. For the period of time where your
4  customers' statements showed trades that where the
5  underlying securities weren't purchased, what term
6  would you refer to those as?
7    A. Basically, short.
8    Q. Okay. Would you agree that can we say that
9  the statements at least were fake statements? They
10 showed transactions that didn't occur?
11   A. Well, depends upon -- I have to think
12 about, you know, how you would define that. In
13 other words, because selling short is -- is not
14 considered a legitimate trade or a trade that was
15 not real, in other words, let me just for the record
16 make sure that you understand that when a brokerage
17 firm sells short, all right, that is no different
18 than a broker selling stock long as to whether or
19 not it's legal.
20     In other words, that is -- it's a valid
21 transaction. I noticed in the GA -- in the expert
22 witness, I guess it would have been referred to as
23 the Dubinsky report and in the Trustee's reports
24 that I have seen, they consistently refer to short
25 sales as fake or illegitimate transactions.

Page 522

1     Anybody in the industry would not
2  understand using that terminology because if you
3  sell -- if you make a short sale through a brokerage
4  firm, the brokerage firm is under the same
5  obligation to deliver those securities to you if you
6  request them as long and you have -- and you have
7  the same obligation to pay for those securities.
8     There is no difference between whether the
9  transaction was actually purchased or not. If the
10 broker said that he sold you the stock, whether he's
11 long or short does not affect his obligation, does
12 not alter his obligation to honor that transaction
13 upon your request.
14     So you can't say -- otherwise, if you ever
15 had -- went into court with that and said this is a
16 fake transaction, this is a real transaction, they
17 would not know what you're talking about.
18   Q. I understand. We spoke yesterday a bit and
19 we're going to talk about it today as well that
20 there are amounts listed on customer statements
21 where you hadn't purchased the amounts that are
22 listed --
23   A. Correct.
24   Q. -- correct? So and that would be I believe
25 it's your testimony after 1992 that you would have

8 (Pages 519 - 522)

CONFIDENTIAL

Page 523

1  customer statements that showed transactions that
2  didn't have the underlying securities purchased by
3  your firm; correct?
4      A.  We would show short positions on a customer
5  statement at any time, you know, that it took place,
6  even if it was before 1992 because that's a --
7  there's no brokerage firm that does a market making
8  or proprietary trading.  Well, there's no -- let me
9  clarify that.
10         There is not a brokerage firm in existence
11  probably that sells stock short to a customer from
12  his principal account if he's, in fact, maintaining
13  a market making or proprietary trading account.  So
14  I know -- I'm not sure if I'm confusing you or not,
15  but it is a perfectly legal -- a short sale or a
16  naked short sale, which by definition is the same
17  thing, is a perfectly legal transaction.
18         So I could sell stock short.  As a matter
19  of fact, and I probably shouldn't go into all this.
20  I don't know, but during my proffer agreement, my
21  proffer session, the prosecutor in the presence of
22  the SEC and the Trustee asked me to explain my
23  market making business or my business in general.
24  And during that period of time he asked me whether
25  or not we ever sold stock to a customer short.

Page 524

1         And I said, of course, there was periods of
2  time where we sold stock short to a customer.  And
3  he didn't seem to understand that.  As a matter of
4  fact, I had turned to the SEC people that were there
5  and my own lawyer and said please explain to him,
6  you know, how the market making worked, that they
7  were sort of shocked.
8         I can understand the prosecutor not
9  understanding that, certainly not a prosecutor that
10  was handling a securities case.  So I don't know
11  whether he was going through some exercise or not,
12  but that's how -- they seemed to be focusing in on
13  whether or not we ever sold short.  I said if you're
14  a market maker, you had to sell short at times.  I
15  don't know if I've clarified that or not.
16         (Trustee's Exhibit Number 10 was marked
17  for identification.)
18      Q.  (By Ms. Fein) I'll try -- I'm going to try
19  a different way.  So I'm handing you what's been
20  marked as Trustee's Exhibit 10.  And --
21      MS. CHAITMAN:  Thank you.
22      Q.  (By Ms. Fein) -- this appears to be a
23  customer statement.  Would you agree?
24      A.  Yes.
25      Q.  And it appears to be dated December 31st,

Page 525

1  2007.  Do you see that?
2      A.  Yes.
3      Q.  This customer statement -- if you turn to
4  the third page of the document, the Bates number is
5  960.  Do you see that page?
6      A.  Yes.
7      Q.  This customer statement shows the purchase
8  of U.S. treasuries on December 31st.  Do you see
9  that transaction?
10      A.  Yes.
11      Q.  You previously testified that the
12  individual transactions shown on customer statements
13  like these weren't always -- I understand your
14  position with respect to shorts, but if we went to
15  where you held Treasury bills for this period or
16  went to where you held the securities for the period
17  shown on these statements, we wouldn't necessarily
18  be able to find those securities at the DTC.
19         We wouldn't necessarily be able to find
20  those treasuries held at a depository or a
21  third-party firm; correct?
22      MS. CHAITMAN:  Objection to form.
23      THE WITNESS:  If I said on treasuries, we
24  never went short treasuries.  So if, in fact, you
25  went to locate them, you would find them.

Page 526

1      Q.  (By Ms. Fein)  So for the treasuries shown
2  on your customer statements, you've told us in the
3  past that you did not have -- the amount of
4  treasuries you said you purchased was between
5  two-and-a-half and $6 billion.  Do you remember
6  that?
7      A.  Depends upon the period of time.
8      Q.  Right.  You said over any period of time,
9  two-and-a-half to $6 billion was the amount of
10  treasuries that you would have had on hand.  Do you
11  remember that?
12      MS. CHAITMAN:  I think you're misstating
13  his testimony, but it stands.  Bernie, you testify
14  as to what you believe --
15      MS. FEIN:  What you understood.
16      MS. CHAITMAN:  -- not what --
17      THE WITNESS:  During this period of time
18  if we said that we had -- if a Treasury transaction
19  was in a client's account, that transaction was --
20  that transaction was actually bought or it was held,
21  the equivalent amount, at a third-party depository,
22  which would be DTC or another brokerage firm like a
23  Morgan Stanley or a Fidelity and so on.
24      Q.  (By Ms. Fein)  So the same -- you're saying
25  that this same -- the same Treasury bill, the same

9 (Pages 523 - 526)

CONFIDENTIAL

Page 527

1  due date, the same CUSIP number, the same amount,
2  that that information would appear on a third-party
3  financial statement or a DTC record?
4      A. Right, correct.
5      Q. So for the period of time that this
6  Exhibit 10 refers to --
7      A. Uh-huh.
8      Q. -- December 2007, your customer statements
9  showed $56 billion in treasuries aggregated?
10     A. 56 billion dollars?
11     Q. Yes, your customer statements.
12     A. During what period of time?
13     Q. December 2007 when this statement --
14     A. Oh, this is 2007.
15     Q. Yes.
16     A. I thought you were looking at an '87 date.
17     Q. I see. Okay. So is your testimony
18  somewhat different since this is a 2007 statement?
19     A. Yes, yes, right.
20     Q. Okay. So in the 2007 time frame would you
21  say -- I mean, did you have $56 billion of
22  treasuries in 2007?
23     A. No.
24     Q. And the treasuries that would be shown on
25  your individual statements that aggregate to the 56

Page 528

1  billion, those amounts wouldn't be something that
2  your firm held; correct?
3      A. Not in 2007, no.
4      Q. Understood.
5      A. I've taught you -- we were on the last
6  date, which was '87.
7      Q. Got it. I'm glad you clarified so we're on
8  the same page.
9      A. All right.
10     Q. Let's see. I wanted to ask -- we've
11  discussed a bit about clearing firms in the past
12  couple of days. The BLMIS back office had the
13  capability to receive and deliver securities; right?
14     A. Yes.
15     Q. And is that -- and you refer to BLMIS as a
16  self-clearing firm for that reason?
17     A. Correct.
18     Q. If you were a firm that did not have that
19  back office capability, would you rely on a
20  third-party clearing firm to clear your
21  transactions?
22     MS. CHAITMAN: Objection to form.
23     THE WITNESS: Yes. Would I or would
24  someone in general?
25     MS. FEIN: Thank you. I'm going to

Page 529

1  rephrase the question.
2      THE WITNESS: Yes.
3      Q. (By Ms. Fein) Thank you. Would a firm
4  that had -- did not have the back office capability
5  to receive and deliver securities need to rely on a
6  third-party clearing firm like Merrill Lynch or Bear
7  Stearns?
8      A. Correct.
9      Q. For this firm that uses a third-party
10  clearing firm, there were brokerage firms that acted
11  this way; right?
12     A. Correct.
13     Q. And would that brokerage firm basically use
14  Bear Stearns or Merrill Lynch as a back office to
15  receive and deliver the securities?
16     A. Correct.
17     MS. CHAITMAN: Objection to form.
18     Q. (By Ms. Fein) If the trades were cleared
19  through a third-party clearing firm, would that firm
20  issue statements to -- to the statements of the
21  holders of those underlying securities?
22     MS. CHAITMAN: Objection to form. I don't
23  know what time period you're questioning him about.
24  He's testified that the practice has varied through
25  the decades. Can you just give him a time period?

Page 530

1      Q. (By Ms. Fein) Understood, yes. Did the
2  practice of back office operations of receiving and
3  delivering securities change over time?
4      A. Yes.
5      Q. Was one part of that change that DTC and
6  other depositories were available after a certain
7  period?
8      A. Correct.
9      Q. Would you say that would -- the time period
10  where depositories were available was sometime in
11  the '70s or '80s?
12     A. No.
13     Q. What time frame do you recall?
14     A. Well, I don't -- well, there was -- there
15  were always clearing firms like a Bear Stearns that
16  would -- that would operate during the period of
17  time you're talking about, but DTC came into
18  existence later. So did National Securities
19  Clearing Corporation come into existence later. It
20  would be sometime probably in the '80s.
21     Q. Okay. I believe we looked at a document
22  with Ms. Chaitman from 1986 that had National
23  Securities Clearing Corp on it. Is that date --
24     A. Then that would probably be, you know, when
25  National Securities Clearing Corporation existed was

10 (Pages 527 - 530)

CONFIDENTIAL

Page 531

1 in operations.
2      Q.  Do you recall was the DTC also in operation
3 around that time?
4      A.  It came in after.  I don't know exactly
5 what the date was, but National Securities Clearing
6 Corporation was not a depository.
7      Q.  Understood.
8      A.  It just cleared the transactions.
9      Q.  Okay.  So the difference between -- so DTC
10 would -- was a depository in that it held the
11 securities?
12     A.  Yes.
13     MS. CHAITMAN:  It helped them?
14     MS. FEIN:  Held.
15     THE WITNESS:  It depends upon the
16 security, whether it was a bond or not, and also it
17 depends upon you if you had a clearing arrangement
18 with a bank or another brokerage firm, even after
19 the clearing corporation or DTC came into existence
20 you might use any one of the other clearing firms.
21     Q.  (By Ms. Fein)  Understood.  But BLMIS
22 didn't need to use -- strike that.  Typically
23 because BLMIS was a self-clearing firm for every day
24 transactions, it wouldn't rely on a third-party
25 clearing firm; correct?

Page 532

1      MS. CHAITMAN:  Objection to form.
2      THE WITNESS:  No.  That's not correct.
3      Q.  (By Ms. Chaitman)  Okay.  Please tell me.
4      A.  In other words, it depends upon -- we had
5 arrangements as most brokerage firms would have
6 arrangements, particularly market making firms, with
7 all sorts of clearing firms, whether it be a Bear
8 Stearns, a Goldman Sachs or whether it be a bank,
9 any number of banks that clear or they would clear
10 themselves.
11     And depending upon the type of transaction
12 that they were doing, for example, if it was a
13 Treasury bill transaction, only certain brokerage
14 firms are registered to deal in treasuries.
15     So you would have to use like a Bank of New
16 York, for example, one or a Goldman Sachs and so on.
17 So there is no general rule as to -- and it also
18 depends upon how you were dealing with that other
19 firm and what you in general do business with that
20 other firm.  I don't know if I'm confusing a little,
21 but it varies.
22     Q.  If you -- you held securities at DTC;
23 correct?
24     A.  Some securities, yes.
25     Q.  If -- and what was the difference between

Page 533

1 why you would hold a security at DTC or elsewhere
2 other than the fact that DTC didn't clear a certain
3 security or couldn't hold a certain security for
4 you, like treasuries?
5      A.  It depends upon who the securities -- who
6 the contra-side of the securities we bought or sold,
7 depending upon what brokerage firm we were dealing
8 with.  It depends upon the type of security and that
9 we were dealing with it, what we planned to do with
10 the security, in other words, whether we would be a
11 long-term holder of the security, whether there was
12 a customer involved in the transaction.
13     There's any number of reasons why we would
14 do a -- the same reason -- there was different
15 reasons why we buy and sell through different
16 brokerage firms and, for example, also depends upon
17 where that firm is located.
18     So, for example, if we're dealing with a
19 firm in Chicago, we would use a different clearing
20 facility, whether it be a bank or a firm that's
21 located in Chicago because -- and then, again, it
22 depends upon the period of time whether people are
23 using physical securities or they were not using
24 physical securities.  In other words, there were --
25 you know, some customers wanted to take possession

Page 534

1 of securities.  The industry, you know, is trying to
2 eliminate the movement of securities back and forth.
3 And it depends upon how the security was being paid
4 and whether this contra-party had the ability to
5 pay.
6      Some, for example, customer transactions,
7 they would want you to deliver the securities to
8 them or to a clearing agent against payment.  Other
9 customers had the money in their account.  So
10 there's any number of -- look, I was the chairman of
11 a clearing corporation, you know, and was the
12 founder of a clearing corporation, so I'm maybe more
13 familiar with this than the average person is.
14     I hope I'm not confusing you, but there's
15 any number of reasons why a transaction gets cleared
16 in one form or another.
17     Q.  Okay.
18     A.  If it makes you feel any better, Dubinsky
19 has no clue either.
20     Q.  Thank you.  We're trying to figure it out.
21 I'm trying to figure it out.
22     A.  It's difficult.  I understand.  I'm not --
23     Q.  Thank you.  I want to look at some
24 documents with you that maybe will help.  I think we
25 want to make sure we're getting it right.  I do.

11 (Pages 531 - 534)

CONFIDENTIAL

Page 535

1    A. That's fine.
2    Q. So let me show you a document. You've said
3 in the past you kept stock records; correct?
4    A. Correct.
5    Q. And the stock records would show where the
6 securities were held; correct?
7    A. Correct.
8    Q. We're going to take a look at one now. The
9 stock records would also show your inventory for
10 your long and short positions; right?
11    A. Correct.
12    (Trustee's Exhibit Number 11 was marked
13 for identification.)
14    MR. KRATENSTEIN: This is 11?
15    Q. (By Ms. Fein) So what you're looking at is
16 Trustee 11. And I want to go through some of these
17 column headings with you.
18    A. Uh-huh.
19    Q. Are you familiar with this document?
20    A. Yes.
21    Q. Is this the type of document that you would
22 have prepared around the date listed, which is
23 July 16th, 1987?
24    A. Yes.
25    Q. Would this have been prepared in your

Page 536

1 ordinary course of business?
2    A. Would this what?
3    Q. Have been prepared in your ordinary course
4 of business?
5    A. Yes.
6    Q. The title reads house five daily stock
7 record activity --
8    A. Correct.
9    Q. -- for -- thank you -- July 16th, 1987?
10    A. Yes.
11    Q. If you look at the columns below --
12    MS. CHAITMAN: I'm sorry. Where does it
13 say that?
14    MS. FEIN: The first line on the top.
15    MS. CHAITMAN: Oh, I see. Okay.
16    Q. (By Ms. Fein) Do you see the first column
17 on the left, last act, is that last activity?
18    A. Yes.
19    Q. The column directly right next to that,
20 safekeeping?
21    A. Safekeeping, right.
22    Q. And what's under that, STRT? Do you know
23 what that refers to?
24    A. No.
25    Q. Okay. The next one, safekeeping owner?

Page 537

1    A. Correct.
2    Q. The next column, transfer STRT. Start
3 maybe, do you think?
4    A. I don't know whether that's start or
5 street. I don't know whether --
6    Q. Okay. And then looks like transfer owner
7 in the next line?
8    A. Correct.
9    Q. Okay. If you go over a couple of columns
10 do you see securities/account name --
11    A. Yes.
12    Q. -- in the middle of the page?
13    A. Uh-huh.
14    Q. Okay. And then next to that what I think
15 is previous balance?
16    A. Correct.
17    Q. Current long/short?
18    A. Correct.
19    Q. New balance and account number, do you see
20 that?
21    A. Yes.
22    Q. So looking at this first transaction, the
23 security name is AMR Corp?
24    A. Uh-huh.
25    Q. And the trader says Peter, dash, trading?

Page 538

1    A. Correct.
2    Q. In the previous balance column do you see
3 an amount, 2,307 L?
4    A. Okay.
5    Q. Do you think that would be 2,307 long?
6    A. Correct.
7    Q. And then if you keep going across it looks
8 like there was some activity on this date. Do you
9 agree?
10    A. Yes.
11    Q. In the long and short position?
12    A. Uh-huh.
13    Q. And the new balance --
14    A. Yes.
15    Q. -- is 3,157 long. Do you see that?
16    A. Yep.
17    Q. So looking at this trade, can we just go
18 underneath where it says AMR Corp and Peter trading?
19 The next line, Prudential Bach Sec, Inc.?
20    A. Correct.
21    Q. Do you know what that refers to?
22    A. Prudential Bache Securities. That's
23 another brokerage firm.
24    Q. Okay. And do you see below that SIAC?
25    A. Correct.

12 (Pages 535 - 538)

CONFIDENTIAL

1    Q.  What does that refer to on this report?
2    A.  Securities Industry Automation Corp.
3 That's -- they keep the clearing records.  It's an
4 automated system.
5    Q.  Okay.  So at this -- for this date,
6 July 1987, this automated records system was in
7 place based on this report; right?
8    A.  Correct.
9    Q.  And the line below that looks like DTC?
10    A.  Yes.
11    Q.  Do you see in the previous balance column
12 the 2,307 long, if you go down to DTC it has 2,307
13 S.  Would that be 2,307 short?  I can show you.
14    A.  Okay, yes.
15    Q.  Do you agree that's the -- that appears to
16 be the same holding in that 2,307 long is your
17 firm's balance and the DTC is holding that security.
18 That's what's reflected in 2,307 short?
19    A.  Yes.
20    Q.  Okay.  And then the new balance column, I
21 think you'll see the same thing somewhat.  It
22 appears there's a total of 3,357 long at the end of
23 the day?
24    A.  Uh-huh.
25    Q.  And DTC is holding 3,357 short.  Do you see

1 that?
2    A.  Yep.
3    Q.  So if on this date, July 16th, 1987, you
4 had -- does this show that your firm would have an
5 inventory of 3,357 shares of AMR Corp?
6    A.  I'm a little bit confused myself with this
7 because this is not a record that, you know, I would
8 work with typically.  I don't know whether this is a
9 complete record.  This is -- it seems to be
10 reflecting the market making department, their
11 trades.  So does this show -- this looks like the
12 market -- all the market making trades.
13    Q.  Okay.
14    A.  Because I did -- these people, Peter,
15 Martin Joel, Mark, those -- it's identifying trading
16 that took place in the market making.  I don't see
17 any customer transactions on here.
18    Q.  Okay.  The customer transactions, your
19 testimony is the customer transactions would come
20 out of your inventory; right?
21    A.  Yeah, but this is -- not out of the -- I
22 don't see the investment.  That would be the
23 investment account, not the market making account.
24 This house five account is the market making
25 account.  So we also have a -- you know, an

1 inventory here.  These are not inventory
2 transactions.  These are the market making, the
3 market makers' transactions.
4    Q.  Okay.  You told us the stock records would
5 show the inventory of long and short positions for a
6 certain time; right?
7    A.  Of market makers.
8    Q.  So let's go back then.  Because of the
9 inventory documents that you kept, why don't you
10 talk about the other documents that would show your
11 trading inventory?
12    A.  Well, you should be able to -- if you --
13 you should be able to find an account that showed
14 the inventory in the trading account, you know, in
15 the market making account, in -- not market -- the
16 investment account.  Do you have records that show
17 whether the investment account was long or short?
18    Q.  I'm not sure what you're referring to when
19 you say investment account.  Can you give me more
20 information about it?
21    A.  For example, that would be the firm itself.
22 There's not a market maker assigned to that account.
23    Q.  Okay.  So for --
24    A.  And there are other -- there are individual
25 trading accounts.  This is -- from looking at this

1 record here, it's showing particularly market
2 makers.  You see it's identified.  I don't see a
3 record that shows what the investment account is.
4 You'd also have to look at -- you'd also have to
5 have something that would reflect option trading and
6 convertible bond trading if, in fact, there was a
7 convertible bond transaction.
8    Q.  Do you see the entry for America West
9 Airlines about one, two, three, four, five down?
10    A.  Yes.  That's a bond, right.
11    Q.  Okay.  A convertible bond; right?
12    A.  Right.
13    Q.  And the traders listed here would be
14 trading in your house five business; right?
15    A.  Correct.
16    Q.  It doesn't -- this report doesn't show the
17 activity of a single trader.  It shows multiple
18 traders; right?
19    A.  If there was a -- if there were multiple
20 traders, it's in here.  And then this AMR shows --
21 where is it again?  Peter.
22    Q.  Okay.
23    A.  That would be my brother.
24    Q.  Okay.  And then if you look to the aluminum
25 company transaction, which is four down?

13 (Pages 539 - 542)

CONFIDENTIAL

Page 543

1    A. Martin Joel, right.
2    Q. That's another trader in your firm?
3    A. Yes, uh-huh.
4    Q. And the one below that, Mark, dash,
5 trading, would that be another trader in your firm?
6    A. Yes.
7    Q. And you see a few lines down closer to the
8 end of the page David, dash, trading?
9    A. Correct.
10    Q. And Margaret, dash, trading?
11    A. Correct. Those are all market makers.
12    Q. Okay. And did those traders also trade for
13 your proprietary account as well?
14    A. Sometimes. Sometimes I would trade for the
15 investment account.
16    Q. Okay. So this report shows your -- it
17 shows more than one trader trading on the same day
18 in a variety of securities; right?
19    A. Correct.
20    Q. And it shows that there's a previous
21 balance in the security and a new balance. So it is
22 showing that there are some held positions. It's
23 not just reflecting the daily activity. It's
24 reflecting the activity before that date as well and
25 then it has a previous balance column?

Page 544

1    A. In that, for that particular trader. It's
2 not showing the global position for the firm.
3    Q. Well, the trader that's listed as the last
4 activity trader, the trader on this day --
5    A. Correct.
6    Q. -- it doesn't mean -- you wouldn't say that
7 this report means that the trader listed as the only
8 trader in that security; right?
9        MS. CHAITMAN: Objection to form.
10       THE WITNESS: In other words, we had in
11 some securities there could be multiple traders, you
12 know, trading it. So and those, those names would
13 be there also. For example, you would see Martin
14 Joel and there could be Peter and so on.
15       Here, for example, you see if you go down
16 to American Express, you see Peter for trading and
17 then there's Prudential Bache. You know, that's
18 another -- another street side transaction. I don't
19 know -- I don't know how to explain.
20    Q. (By Ms. Chaitman) No, no. I think here's
21 where we're misunderstanding each other.
22    A. Right, okay.
23    Q. There's a previous balance column that's
24 here, which means that there's a held position
25 before this daily activity starts; right?

Page 545

1    A. In that particular trading trader's
2 account.
3    Q. But these -- these aren't listed by trader.
4 They're listed by security; right?
5    A. I know, but if I did -- for example, if I
6 traded in Allied for the firm's investment account
7 for not a market maker's account, you know, that
8 would not be reflected here. This is looking at --
9 at what the trades were before and after in a
10 particular trader's account.
11       If there is no -- so if you look at any one
12 of these transactions, you know, you would have to
13 also find a stock record that reflected the -- that
14 reflected these other traders' securities or the
15 firm's investment account.
16    Q. Okay. So my understanding was because if
17 you look next to Peter's name, there's a date?
18    A. Right.
19    Q. And the date is July 16th, 1987?
20    A. Right. That would be the last activity
21 that that trader traded the security.
22    Q. But why would it be any different? Why
23 couldn't it be that other traders had traded that
24 same security on a prior date? This is just showing
25 that that's the last trader that traded in it;

Page 546

1 right?
2    A. I'm not really sure. I don't know. I
3 don't know what you're trying to -- I don't know
4 what you're trying to identify.
5    Q. Okay. Well, I'm trying to identify where
6 your securities are held and this report shows --
7    A. That I understand, but --
8    Q. Okay.
9    A. -- I don't know, you know, if you -- I
10 don't know if these are all the records that reflect
11 what you're trying to do. In other words, you'd
12 have to -- do you have -- have you been able to find
13 records for the investment account, you know, and
14 other stock record?
15       This is not necessarily just all the --
16 just all the trading that took place in the firm
17 itself. I don't see where you would be able to
18 identify that.
19    Q. Okay. Well, that's why we're asking you.
20    A. I don't know.
21    Q. Because this is a stock record and you told
22 us that stock records showed where securities were
23 held, we thought that the stock records that we had
24 would show where those securities were held, but --
25    A. If you have all the stock records.

14 (Pages 543 - 546)

CONFIDENTIAL

Page 547

1    Q.  Okay.  But, I mean, you're referring to
2  something different, which is something for an
3  investment account.  I'm not sure I understand what
4  that document would look like.
5    A.  It would look -- it would be the same as
6  this.
7    Q.  So even though this shows your market
8  making activity, you're saying that there's another
9  document that would show something else?  Are you
10  saying that -- what would be on that document?
11  Would it have trader names?
12    A.  It would say investment account and it
13  might have my name on it or someone else's name on
14  it, probably -- I did most of the trading for the
15  investment account.
16    Q.  Okay.
17    A.  It could have my brother's name on it.
18    Q.  Okay.  But this has your brother's name on
19  it; right?
20    A.  In his capacity as a market maker.  He
21  traded as a market maker and he also traded for the
22  firm's investment account.
23    Q.  Is that the same as proprietary trading?
24    A.  Correct.
25    Q.  Okay.  So it's your position that you'd

Page 548

1  have a different house five report for market making
2  activity than you would for other legitimate
3  activity that was also going on at your firm on the
4  same day, same time?
5    A.  House five typically refers to the market
6  making activity.  I don't know what the -- I don't
7  really know the answer to that, how you would
8  identify that.
9    Q.  Well, when we spoke earlier today --
10    A.  Understand that I'm not from the back
11  office, so I don't -- I understand the global
12  concept of what we do; but as far as working records
13  or how our firm kept certain records, that's not
14  something -- I'm not a -- wasn't a clerk.
15    Q.  Okay.  So you agree that this report shows
16  that positions were held at DTC; right?
17    A.  It shows the position that -- it shows what
18  is held at -- if it says -- if it says that it was
19  held at DTC, then the security was held at DTC for
20  this particular transaction, this particular
21  account.  If we had a trading inventory in the same
22  -- if we had a position in the same security, it
23  might be held through another broker.  It might be
24  held at Morgan Stanley.  It might be held through
25  one of our clearing banks.

Page 549

1    In other words, I could -- I do a trade,
2  the firm could do a transaction in AMR and we could
3  have it in three different locations depending upon
4  who we bought the security, bought and sold the
5  security for and whether the trade was cleared
6  in-house or whether it was cleared through another
7  -- through another -- another brokerage firm.  And,
8  you know, you can't -- there's no general rule.
9    Q.  So you're saying there isn't a document
10  that would show --
11    A.  Yeah.  There are documents that would show
12  that but, you know, it wouldn't necessarily -- for
13  example, if we had it at another brokerage firm, you
14  know, there would be a document that would show
15  that, you know, it's at that particular firm.  You
16  have to -- you'd have to -- you'd have to present to
17  me -- and I can't tell you what all these records --
18  whether you have a complete set of records there.
19    Q.  So will you turn ahead to page ending in
20  950?  It's the same document.  It's about -- I'm
21  sorry.  Ending in 954, so it's four pages in.
22    MR. KRATENSTEIN:  I just realized
23  something.
24    MS. CHAITMAN:  It has 950 on every page.
25    MR. KRATENSTEIN:  All of our copies appear

Page 550

1  to have 950.
2    MS. FEIN:  You know, there are two numbers
3  listed.
4    MR. KRATENSTEIN:  Oh, you're looking at
5  the top number.
6    MS. FEIN:  So I'm referring to the number
7  that's changing, yes.
8    MR. KRATENSTEIN:  So what number are you
9  on?
10    MS. CHAITMAN:  954.
11    MS. FEIN:  954.
12    MR. KRATENSTEIN:  Thank you.  Sorry.
13    THE WITNESS:  What am I looking at now?
14    Q.  (By Ms. Fein)  So there's a transaction for
15  Continental Investment it looks like Corp Mass in
16  the middle of the page?
17    A.  What page am I on?
18    Q.  954.  I'll show you.  Do you see that?
19    A.  Yes.
20    Q.  This has it looks like 100 long is the
21  balance, the new balance, and on the other side of
22  the transaction it doesn't say DTC.  It says
23  Shearson Lehman Brothers, Inc.  Do you see that?
24    A.  Correct.
25    Q.  Would that be another place that you held

15 (Pages 547 - 550)

CONFIDENTIAL

Page 551

1 securities at this time?
2     A. Could be.
3     Q. Okay. So this report doesn't just show DTC
4 activity. It shows other places where securities
5 are held beyond DTC; right?
6     A. I can't tell from this.
7     Q. Well, is this transaction, this Lehman
8 Brothers transaction showing that Lehman Brothers is
9 holding the 100 shares for you?
10     A. I'm not sure whether this is -- whether
11 Lehman -- this looks like we bought the stock from
12 Lehman, the other side.
13     Q. So the counterparty?
14     A. Would be the counterparty, I believe.
15 That's what it looks like to me.
16     Q. Okay. So this report has some -- will show
17 some counterparties as well then?
18     A. Yes.
19     Q. Okay.
20     A. Is this '87 or '07?
21     Q. '87. This is '87.
22     A. Okay, okay.
23     Q. Would your answer change for '07?
24     A. No.
25     Q. Okay. Will you go ahead forward two more

Page 552

1 pages, actually, it's four more ending at 958?
2     A. Uh-huh.
3     Q. Do you see in the middle of the page MCI
4 Communications Corp? Is that a bond trade that you
5 see?
6     A. I'm looking at the wrong page.
7     Q. Oh.
8     A. Yes. A bond trade.
9     Q. Okay. So this report shows market making
10 -- actually, let me back up. Initially we defined
11 house five as encompassing the market making and
12 proprietary trading businesses of your firm; right?
13     A. I believe that's correct, yes.
14     Q. Okay. This report shows some transactions
15 in securities and some transactions in bonds. Do
16 you agree?
17     A. Yes. Well, I see here MCI sub convert,
18 yes, correct.
19     Q. And this trade actually has SIAC?
20     A. Yes.
21     Q. Does this appear to have SIAC on the other
22 side?
23     A. Uh-huh.
24     Q. Could you -- can you explain trading? Did
25 SIAC just keep track of the trades or were they a

Page 553

1 counterparty to trades as well?
2     A. No. They weren't a counterparty of the
3 trade. I can't -- I can't answer that question
4 because I'm not sure myself.
5     Q. Okay.
6     A. SIAC you understand doesn't hold
7 securities.
8     Q. Understood.
9     A. Okay.
10     Q. If you look down a few more lines to Medco
11 Research, Inc --
12     A. Right.
13     Q. -- WTSX 11-7-08, that would be a warrants
14 trade?
15     A. Yes.
16     Q. And so tell me about the type of trading
17 that you were doing at this time period.
18     A. In '07?
19     Q. In 1987.
20     A. '87?
21         MR. GOLDMAN: You mean money market or the
22 IA, I mean, in the market? Pardon me. Which?
23     Q. (By Ms. Fein) In the house five
24 business --
25         MR. GOLDMAN: Oh, all right.

Page 554

1     Q. (By Ms. Fein) -- what trading were you
2 doing in 1987?
3     A. Sort of beats me. I don't know. I did a
4 little bit of everything. I wasn't -- I really --
5 I'm not sure that I considered myself a market maker
6 at that time. I traded for the firm's investment
7 account.
8     Q. Okay.
9     A. And I also traded for customer accounts as
10 well.
11     Q. When you say you traded for customer
12 accounts, is that what you referred to when we were
13 talking about the inventory where you would move
14 trades from inventory into customer accounts or are
15 you talking about something different?
16     A. No. Well, it could be a journal. If we
17 had securities in an investment account and we had
18 any number of investment accounts depending upon
19 what the firm, whether we considered it a long-term
20 transaction or it was just, you know, part of a --
21 of trading for a client, there are various forms of
22 trading that we did for the investment account, you
23 know. So I don't know how to -- I'm not sure what
24 you're trying -- maybe if I knew what you were
25 trying to find out, I'd make it -- might be able to

16 (Pages 551 - 554)

CONFIDENTIAL

Page 555

1  help you with that --
2      Q.  Okay.
3      A.  -- but I don't know.
4      Q.  Well, when you -- so you're saying you
5  weren't doing much market making during this time
6  frame, but you were trading -- you were doing some
7  proprietary trading it sounds like?
8      A.  Correct.
9      Q.  Okay.  Will you turn to the next page?  It
10  ends in 959.  It's here.  Do you see the County of
11  Nassau on Series A transaction listed?
12      A.  Uh-huh.
13      Q.  And then under there it says Bernard, dash,
14  trading?
15      A.  Correct.
16      Q.  Would this be a trade -- this means that
17  there's a -- would that be your trade that's
18  showing?
19      A.  It might be, yes.  Well, if it says me, I
20  mean, it meant that I did that, that I did that
21  particular transaction.
22      Q.  So this report does show trades that you
23  were doing in addition to your other traders?
24      A.  Correct.
25      Q.  I guess I'm trying to understand why you

Page 556

1  would say that this wouldn't represent the trades in
2  your firm.  It has the trades that you were doing.
3  It has the trades your other traders were doing.  It
4  shows who the counterparties are.  It shows where
5  the securities are held.
6          I understand if you're saying it's not
7  100 percent comprehensive, but I'm trying to figure
8  out what this report shows and what it doesn't show.
9  Do you understand that?
10      MR. KRATENSTEIN:  Object to the form of
11  the question.
12      THE WITNESS:  I'm not sure I understand
13  it.  I'm saying that I don't know if you'll -- if
14  these are the only records that reflect that.  I
15  can't answer your question.
16      Q.  (By Ms. Fein)  Okay.  Got it.  But it does
17  reflect trades that you were doing --
18      A.  Some of the trades.
19      Q.  -- in July '87?
20      A.  Yes.
21      Q.  Okay.
22      A.  Are we back -- oh, yeah.  These are '87
23  you're talking about?
24      Q.  Yeah.
25      A.  Okay.

Page 557

1      Q.  And it shows a counterparty or would you
2  agree this report shows where the securities are
3  held that are listed here?
4      A.  Yes.
5      Q.  Okay.  Do you see any other counterparties
6  listed on this page other than the ones we've
7  reviewed so far?
8      A.  I see Smith Barney.
9      Q.  Okay.
10      A.  I also see SIAC.
11      Q.  Uh-huh.
12      A.  Now, I don't know whether SIAC is
13  representing -- represents other traders or whether
14  that's sort of a netting process.  I don't know.
15  That was done in '87.
16      Q.  Okay, yeah.  Do you see in the second entry
17  the Microsoft Corp?  It says Peter, trading, and
18  then Goldman Sachs underneath it?
19      A.  Correct.
20      Q.  Would that be another counterparty?
21      A.  Yes.
22      Q.  And do you see across from the names of the
23  counterparties they have different account numbers
24  as well?  So DTC appears to have the number 9993115?
25      A.  Uh-huh.

Page 558

1      Q.  Okay, okay.  We can put this document aside
2  for now.
3      A.  Thank you.
4      (Trustee's Exhibit Number 12 was marked
5  for identification.)
6      Q.  (By Ms. Fein)  We've spent enough time with
7  it; right?  So I'm going to show you what's being
8  marked as Trustee Exhibit 12.  Oh, yeah.  You have
9  to share a copy.  These are big.
10      MS. CHAITMAN:  Okay.
11      Q.  (By Ms. Fein)  Okay.  Mr. Madoff, do you
12  see the date at the top of the page?
13      A.  '07.
14      Q.  Uh-huh.
15      A.  Yes.
16      Q.  Yeah.  This is December 31st, 2007; is that
17  right?
18      A.  Right.
19      Q.  Is the title house 17 stock record summary
20  through 12-31-07?
21      A.  Yes.
22      Q.  And do you see the handwriting on the same
23  line run -- it looks like one and then illegible
24  '08?
25      A.  Right.

17 (Pages 555 - 558)

CONFIDENTIAL

Page 559

1    Q. So would this document have been prepared
2  in late 2007 or early 2008?
3    A. Yes. I assume, right.
4    Q. Okay. This report is another stock record,
5  correct, and it shows some of the same columns that
6  we were looking at on the last stock record. Do you
7  see at the top of the page?
8    A. Yes.
9    Q. Do you recognize from this page there are
10 some IA customer names on here?
11   A. Uh-huh, yes.
12   Q. And do you recognize that there are
13 customer accounts listed on the right-hand side of
14 the page?
15   A. Yes.
16   Q. This report would have been generated by
17 your house 17 staff most likely; right?
18   A. Correct.
19   Q. And the computer system you were using on
20 the house 17 side was an AS/400?
21   A. Correct.
22   Q. Would this report have been generated by
23 the AS/400 system?
24   A. I believe so.
25   Q. That's the same system that generated the

Page 560

1  customer statements and trade confirmations; right?
2    A. I don't know. I don't know what generated
3  the -- what system generated the trade, market
4  making.
5    Q. I'm sorry. I was referring to IA customer
6  trade confirmations and customer statements.
7    A. Yeah. That would be -- that would be the
8  AS/400.
9    Q. Okay. Do you know who would be reviewing a
10 report like this?
11   A. No. I assume someone in Annette's
12 department.
13   Q. Do you see underneath the security listed
14 there are customer names and then an entry below
15 that that says clearing banks?
16   A. Correct.
17   Q. Do you agree that number for account number
18 29000030 is not a customer account number; right?
19 The customer numbers typically have letters?
20   A. No. That looks like -- that looks like the
21 number they use for the clearing banks.
22   Q. Okay. The amount next to the clearing bank
23 number looks like 199066; right?
24   A. Correct.
25   Q. And I can represent to you that the four

Page 561

1  amounts in the long position equal the same as
2  what's shown here in the short position?
3    A. That's correct.
4    Q. We looked at a customer statement from
5  December 2007 and we talked about at this time in
6  December 2007 the customer statements showed
7  activity where the underlying securities hadn't been
8  purchased; right?
9    A. Correct.
10      MS. CHAITMAN: Objection. I do not
11 believe that the -- the split strike statements for
12 December ever showed securities.
13      MS. FEIN: Excuse me? So you mean because
14 I should have said treasuries instead of securities?
15      MS. CHAITMAN: Yeah, yeah.
16      MS. FEIN: So there were securities shown
17 as sold and then there were treasuries shown as
18 purchased on the December statement that we
19 reviewed.
20      MS. CHAITMAN: Okay, okay.
21   Q. Okay. And I can be clearer. So the
22 customer statements in December 2007 would have
23 shown -- would have shown treasuries that hadn't
24 been purchased; right?
25      MS. CHAITMAN: Objection to form. He's

Page 562

1  already testified that they have been.
2    MS. FEIN: No. That's not correct, not in
3  2007. He said in 1987 that was true and in 2007 it
4  was not true.
5    MS. CHAITMAN: No. He said that he had --
6    MS. FEIN: The record can speak for
7  itself. It's okay. The record can speak for
8  itself.
9    MS. CHAITMAN: Okay. You're
10 misrepresenting what he said.
11   MS. FEIN: Okay. I'm going to continue --
12   MS. CHAITMAN: He said he didn't buy 64
13 billion, but he didn't say he didn't maintain the
14 portfolio. It's very different.
15   MS. FEIN: We can have this conversation
16 offline.
17   MS. CHAITMAN: Okay, okay.
18   MS. FEIN: I'm talking about what is
19 represented on the customer statements and the
20 aggregate. We talked about the number that was
21 represented on the customer statements, not the fact
22 that there were treasuries purchased at that time.
23 Okay.
24   MS. CHAITMAN: Okay.
25   Q. (By Ms. Fein) Okay. The term clearing

18 (Pages 559 - 562)

CONFIDENTIAL

Page 563

1 bank here is used where you would typically have a
2 counterparty listed for where the securities were
3 held; right?
4        MR. KRATENSTEIN: Object to form.
5        THE WITNESS: It's the balancing number,
6 yes.
7        Q. (By Ms. Fein) Okay. And what do you mean
8 by the balancing number?
9        A. In other words, it typically would balance.
10 In other words, you would always have the -- if it
11 didn't balance, it would be -- it would be a broken
12 trade. Typically your long -- your long side would
13 always equal, always be represented on the short
14 position, should be the same.
15       Q. Okay.
16       A. When they use the term clearing banks,
17 that's not one single bank. It's just, you know,
18 any number of clearing banks that the transactions
19 were custodied at. And these -- I don't know why
20 you're looking -- I mean, I've already stated that
21 before that during this period in, you know, 2000s
22 or certainly post-'90s in general, that there were
23 times that I wasn't purchasing the securities.
24       Q. Okay. So when clearing banks is used here,
25 it's not --

Page 564

1        A. It doesn't --
2        Q. -- it doesn't mean the same thing as it
3 would if it showed DTC?
4        A. No. It wouldn't -- that would -- that was
5 a fraud period, in other words. So there's nothing
6 -- I can -- I'm perfectly willing, I've already
7 stated that anything post-'92 period is not going to
8 be accurate in my records.
9        Q. Okay. So the term clearing banks here is
10 used as a place holder for the other side of the
11 transaction; right?
12       A. Correct.
13       Q. Okay. I don't know. We've been going a
14 while. Would you like to take a break or do you
15 want to keep going?
16       A. I'm fine.
17       MS. FEIN: Okay.
18       MR. KRATENSTEIN: Are you done with this
19 one?
20       MS. FEIN: I think -- oh, you know what?
21 I have one more. I have one more thing I want to
22 look at. Thank you. Sorry. Can you turn -- I can
23 help you turn to the page, but the page is 498. Let
24 me help you figure it out. There you go.
25       Q. (By Ms. Fein) Do you see the transaction

Page 565

1 for the Treasury bill listed on this page due
2 1-3-2008?
3        A. Uh-huh.
4        Q. And at the bottom of that entry there's the
5 term clearing banks again?
6        A. Correct.
7        Q. And in this context it's being used as a
8 place holder or filler --
9        A. Right.
10       Q. -- counterparty for the trade; right?
11       A. Uh-huh.
12       Q. Okay. So this trade is not -- is one that
13 didn't happen in the market; right?
14       A. Correct.
15       Q. And would that be true for the entries that
16 show this clearing banks on this report in 2007,
17 would that be true for those trades?
18       A. Correct.
19       MS. FEIN: We'll try to go quickly. There
20 are a couple more reports of this size. So we're
21 going to mark one more, but we're done with this
22 one.
23       MR. KRATENSTEIN: I know all about trying
24 to go quickly through reports.
25       MS. FEIN: I'm not going to match your

Page 566

1 speed. I promise.
2        MS. DASARO: This is a full one.
3        MS. FEIN: Okay. So we have excerpts of
4 this one --
5        MR. KRATENSTEIN: Okay.
6        MS. FEIN: -- because it's very large.
7        MR. KRATENSTEIN: Thank you.
8        MS. CHAITMAN: So what number is this?
9        MS. FEIN: This is Number 13.
10       (Trustee's Exhibit Number 13 was marked
11 for identification.)
12       MR. GOLDMAN: Do you have the date because
13 this is sort of marked out. I just want to make
14 sure. It looks like 8-31-0 --
15       MS. FEIN: '01.
16       MR. GOLDMAN: '01?
17       MS. FEIN: Yes. It is, I know. It's
18 easier on some pages to read than others.
19       MS. CHAITMAN: I'd just like to make a
20 statement for the record. Amanda, you objected to
21 some of the areas of our questioning on the basis
22 that it was not a part of the day two subjects.
23 And, in fact, I had covered the T-bill issue in the
24 day one topics and you had an opportunity to fully
25 cross-examine Mr. Madoff on them, so --

19 (Pages 563 - 566)

CONFIDENTIAL

Page 567

1    MS. FEIN: Understood. These reports are
2 really part of the microfilm report
3 cross-examination because that's one of the day two
4 topics, but I understand your position.
5    MS. CHAITMAN: Right. And, in fact, if
6 you had produced these documents in a timely manner
7 to us, we could have questioned him about them, but
8 you certainly could have.
9    MS. FEIN: I should clarify. These
10 documents are in the data room. The reports that
11 we're going through are all in the data room.
12    MS. CHAITMAN: So then you had the
13 ability to question him about them during the day
14 one depositions.
15    MS. FEIN: And this is part of the day two
16 topics with respect to the microfilm reports that
17 I'm questioning him on. That's -- that's why
18 they're part of these topics.
19    MS. CHAITMAN: If this was in the data
20 room, wasn't it available to you when you were
21 questioning him?
22    MS. FEIN: This is in response to your
23 questioning. This is my cross-examination.
24    MS. CHAITMAN: Okay. And I think it's not
25 within the scope of the day two.

Page 568

1    MS. FEIN: Understood.
2    Q. (By Ms. Fein) Okay. So, Mr. Madoff, this
3 report is entitled abbreviated stock record summary
4 through 8-31-01. Do you see that at the top of the
5 page? I'm sorry. Let me get it ready for you.
6 This report that I'm holding, abbreviated stock
7 record summary through 8-31-01?
8    A. Uh-huh.
9    Q. And on the left it says distribution,
10 Annette. Do you believe that's referring to Annette
11 Bongiorno?
12    A. I assume so because I don't think we have
13 another person named Annette.
14    Q. And this is 2001. If you look at the first
15 transaction --
16    A. Right.
17    Q. -- do you see Daimler Chrysler AG listed as
18 the security?
19    A. Correct.
20    Q. And at the bottom do you see customer names
21 listed after that?
22    A. Yes.
23    Q. And customer account numbers listed to the
24 left -- I'm sorry -- to the right of that; right?
25    A. Yes.

Page 569

1    Q. At the bottom of this entry do you see
2 clearing banks listed on the other side?
3    A. Yes.
4    Q. And would that be used as a place holder
5 counterparty because there wasn't a counterparty to
6 this trade?
7    A. That's correct.
8    Q. Do you agree that this report shows IA
9 customer holdings?
10    A. Right.
11    MS. FEIN: Okay. We can be finished with
12 that document.
13    (Trustee's Exhibit Number 14 was marked
14 for identification.)
15    Q. (By Ms. Chaitman) Yes. We're all set with
16 that. This is Trustee Exhibit 14.
17    MR. KRATENSTEIN: Excuse me.
18    Q. (By Ms. Chaitman) Is the title of this
19 document house 17 stock record summary through
20 3-31-94?
21    A. Yes.
22    Q. Does it appear similar to the other stock
23 record summaries we reviewed previously?
24    A. Uh-huh.
25    Q. It has the same column headings; right?

Page 570

1    A. Right.
2    Q. The first security that's listed under
3 security account name, ATD, Ltd. Do you see that?
4    A. Yes.
5    Q. And then do you see customer names listed
6 underneath the security.
7    A. Yes.
8    Q. And customer account numbers that are
9 listed on the right-hand side; right?
10    A. Yes.
11    Q. So would this be referring to customer
12 positions in -- in 1994 when this report was put
13 together?
14    A. Correct.
15    Q. And do you see the clearing bank's entry at
16 the end of the -- at the end of the ADT security
17 list?
18    A. Uh-huh, yes.
19    Q. And the account number 29000030, do you see
20 that?
21    A. Yes.
22    Q. Would this also be a place holder
23 counterparty?
24    A. Yes.
25    MS. FEIN: So I think we're done with that

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

CONFIDENTIAL

Page 571

1 one.
2      (Discussion off the record.)
3      MS. FEIN: Okay. I'm going to mark this
4 Exhibit 15.
5      MS. CHAITMAN: Will you be sending us a
6 complete set of these exhibits?
7      MS. FEIN: That's no problem.
8      MS. CHAITMAN: Okay.
9      MS. FEIN: Sorry it's so large. It's just
10 -- whoops.
11      Q. (By Ms. Fein) Okay. Do you see in the
12 middle of the page the title of this report?
13      A. Yes.
14      Q. Is it house 17 stock record summary through
15 7-16-87?
16      A. Yes.
17      Q. Do you see the first trade listed under the
18 title AGS Computers, Inc. sub deb conv?
19      A. Correct.
20      Q. Is that a convertible arb trade?
21      A. Yes.
22      Q. And do you see IA customers listed
23 underneath that?
24      A. Uh-huh.
25      Q. Okay. Do you see at the end of that same

Page 572

1 set the term clearing banks used?
2      A. I don't see. Oh, yes.
3      Q. Okay. Would that be used as a filler
4 counterparty in this report?
5      A. Yes.
6      Q. And if you turn ahead to page ending -- I
7 think it's two pages ahead ending in 064. Sorry
8 about this. Do you see a transaction in -- oh, you
9 know what? The pages for this one so that it would
10 print out so we could read it, it's three pages per
11 on your copy. His copy has a page --
12      MR. KRATENSTEIN: Okay. Could you just
13 show us where to go?
14      MS. FEIN: No problem.
15      MR. KRATENSTEIN: Thank you.
16      MS. CHAITMAN: So what is the date of this
17 document?
18      MR. KRATENSTEIN: 7-16-87.
19      MS. CHAITMAN: 7-16-87.
20      MS. FEIN: This is the --
21      MR. KRATENSTEIN: Thank you very much.
22      Q. (By Ms. Fein) Do you see the AMR Corp
23 transaction listed at the bottom of the page?
24      A. Uh-huh.
25      Q. Okay. And do you see clearing banks listed

Page 573

1 at the end of that transaction or at the bottom of
2 the -- I'm sorry. Let me back up. Is there a list
3 of IA customers underneath the AMR Corp listing
4 security?
5      A. Yes.
6      Q. And do you see there on the right-hand
7 column there are IA account numbers listed?
8      A. Correct.
9      Q. Do you see the clearing banks entry at the
10 bottom of the AMR Corp transaction or the long
11 positions?
12      A. Correct.
13      Q. And do you see the account number 2900030?
14      A. Yes.
15      Q. Would this be a filler counterparty that
16 was used on your reports?
17      A. When you say filler counterparty, why --
18 what are you referring to?
19      Q. Well, what we were referring to on the
20 earlier reports is that those trades didn't occur,
21 but you needed to have another side to the
22 transaction; right?
23      A. If, in fact -- if, in fact, it was during a
24 period that we were not doing the transaction, the
25 actual transaction.

Page 574

1      Q. Okay.
2      A. You're talking about a period now in 1987
3 that we did the transactions.
4      Q. Okay.
5      A. So that would be -- when you say a filler,
6 I'm assuming you're assuming that the trade wasn't
7 done.
8      Q. Okay.
9      A. That doesn't mean that every time we used
10 clearing banks that there wasn't an actual trade
11 being done.
12      Q. Okay.
13      A. What I had said originally, I was
14 explaining to you, it would be a balancing number.
15 It should always -- it would always balance. If
16 didn't balance, there would be a break in the
17 transaction. That's -- so if that didn't balance,
18 it didn't match the number of shares bought, it
19 would alert the -- whoever was running the records
20 that there's an error, you know, that we're missing
21 something there.
22      Q. Okay.
23      A. You also have to understand that when
24 you're talking about treasuries, for example, there
25 were treasuries that were bought under the firm's

21 (Pages 571 - 574)

CONFIDENTIAL

Page 575

1 name, you know, at a place like Morgan Stanley or
2 Fidelity and so on that would not be reflected
3 necessarily on my books and records.
4   Q.  You mean in the 1987 time frame?
5   A.  Not in the 1987.  In the later period.
6   Q.  Okay.  What do you mean they wouldn't be
7 reflected on your books and records?
8   A.  In other words, I'm not sure how they
9 handled -- even in the '87 period, I'm not sure, you
10 know, how those treasuries were handled, you know,
11 whether they were bought.  Depends upon how they
12 were purchased.  You'd have to ask -- during '87
13 wouldn't be Frank DiPascali because he wasn't
14 handling that.  You'd have to speak to someone else
15 who would know that.  I don't know how they handled
16 that transaction.
17   Q.  Would Annette maybe know?
18   A.  Probably not, not during that period.
19   Q.  Okay.  So this is a trade in AMR Corp
20 that's listed?
21   A.  Uh-huh.
22   Q.  AMR Corp was -- the DTC held AMR Corp
23 securities in 1987 because we saw that on the
24 earlier report we reviewed; right?
25   A.  Correct.

Page 576

1       MR. KRATENSTEIN:  Object to the form.
2   Q.  (By Ms. Fein)  But it's your testimony that
3 these shares weren't -- is it your testimony that
4 these shares were not held at DTC even though DTC
5 could hold the securities?
6   A.  I don't see the DTC.
7   Q.  Right.
8   A.  No.  I don't see DTC.
9   Q.  It just says clearing banks; right?
10   A.  Clearing banks, right.
11   Q.  And it's --
12   A.  So that could be any number of five
13 different clearing banks we had and, you know,
14 probably eight different clearing banks that were
15 used to -- as a depository to clear the transaction.
16   Q.  Wouldn't you need to know who was on -- who
17 was holding the securities for your transactions?
18 Why would it show up as clearing banks?
19   A.  It would.  There would be a subsidiary
20 ledger that would show that.
21   Q.  Okay.
22   A.  The stock record only shows -- just like at
23 DTC, you know, it's just one entity.  There were
24 subsidiary ledgers that would show where the
25 securities were held.

Page 577

1   Q.  But these securities listed here wouldn't
2 be held at DTC or else you would show DTC on the
3 other side; right?  So it has to be held at another
4 clearing firm?
5   A.  That's correct.
6   Q.  Okay.  I'm just going to go back to show
7 you something on Exhibit 11.  All right.  So the
8 first transaction in AMR Corp, the balance held at
9 DTC as shown on this report for July 16th, 1987 is
10 3,357; correct?
11   A.  Uh-huh.
12   Q.  If you look at the short position shown on
13 the AMR Corp trade here for the same date,
14 July 16th, 1987, how many shares does it say are
15 held at the clearing banks?
16   A.  It looks like --
17       MS. CHAITMAN:  When you say here, what
18 document are you asking to look at?
19       MS. FEIN:  Sorry.  So now we're looking
20 at --
21       MS. CHAITMAN:  Exhibit 15?
22       MS. FEIN:  -- Exhibit 15, page ending in
23 064.
24       THE WITNESS:  Is that 290,000 or --
25       MS. FEIN:  I think it's -- let me just

Page 578

1 make sure.
2       MS. CHAITMAN:  So I can't read this.
3 Trustee Exhibit 11 is house five?  Is that what it
4 says at the top?
5       MR. KRATENSTEIN:  Yes.
6       MS. FEIN:  It does.
7       MS. CHAITMAN:  And Trustee Exhibit 15 is
8 house five also?
9       MS. FEIN:  House 17.
10       MS. CHAITMAN:  House 17, okay.
11   Q.  (By Ms. Fein)  So just to be clear, we're
12 looking at the AMC security at the bottom of that
13 transaction.  It says clearing banks.  The account
14 number listed is 29,000, three zero, and then
15 there's a short position listed.  What short are
16 they showing?
17   A.  332, right, 785.
18   Q.  Yes.  So for the same date that you had a
19 little over 3,000 shares held at DTC as shown on
20 your house five stock record summary --
21   A.  Correct.
22   Q.  -- this shows over 330,000 shares in the
23 same security; right?
24   A.  In the 17 -- in the 17 account.
25   Q.  Right.  On the house 17 side?

22 (Pages 575 - 578)

CONFIDENTIAL

Page 579

1    A. Right, right.
2        MS. FEIN: Okay. Now is a good time to
3    take a break if that's okay with everyone.
4            EXAMINATION
5    BY MR. GOLDMAN:
6        Q. I have two questions. They're quick
7    questions. I don't know if the answers are long,
8    but Ms. Chaitman asked you earlier on about
9    confirmations on transactions.
10       A. Yeah. What? Oh, I didn't know you were
11   talking to me.
12       Q. Ms. Chaitman asked you some questions about
13   confirmations, whether you got confirmations.
14   Sometimes you did get confirmations, sometimes you
15   didn't --
16       A. Yes.
17       Q. -- at the time you were looking through all
18   the transactions that occurred?
19       A. Correct.
20       Q. Was there a procedure or protocol in place
21   to authenticate that the transactions actually
22   occurred? This is prior to '92. Did you get
23   something back from whoever you contracted to have
24   the transaction performed?
25       A. If it was -- if it was a -- if the

Page 580

1    transaction was handled through NSCC, if it was part
2    of the C&S netting practice. I'm not sure that I
3    understand the question.
4        Q. Okay. How did -- how were you assured that
5    the order, whether it was a purchase or a sale,
6    actually occurred if you have it listed on your
7    account that's your own internal records? How were
8    you assured that the transaction actually occurred?
9        A. That was handled, would have been handled
10   by the what we call the P&S department, the purchase
11   and sales department. And they would typically
12   either get a confirmation or if it went through the
13   clearing house, you know, and, again, depending upon
14   if that was during the netting period or not, you
15   would get what they call a balance order from the
16   clearing corporation.
17       It also -- also depends upon whether or not
18   we had an automatic interface with the firm that was
19   on the other side of the transaction.
20       Q. But there was some procedure or protocol in
21   place?
22       A. Oh, yeah. Of course, yes.
23       Q. And the second question I have, did you
24   send your clients, customers, clients quarterly or
25   monthly financial statements?

Page 581

1    A. They had --
2        Q. Statements of transactions?
3        A. Some clients got them quarterly and some
4    clients got them monthly.
5        Q. Okay.
6        A. Depends upon whether they requested them,
7    when they requested them.
8        Q. And if there were short transactions that
9    occurred for that particular client or customer, was
10   it indicated on the statement that it was a short
11   transaction?
12       A. No.
13       Q. Nothing. Just --
14       A. No brokers indicated to the customer
15   because the customer didn't care whether it was a
16   short transaction or it was a long transaction.
17   They didn't care whether the broker was short or
18   whether he was long. They looked -- the ownership
19   rights were the same. In other words, you were
20   entitled to the dividend. You were entitled to a
21   stock split or any action, corporate action.
22       MR. GOLDMAN: Okay. Thanks.
23       MR. KRATENSTEIN: Take a break?
24       MS. DASARO: Yes, thanks.
25       THE VIDEOGRAPHER: Going off the record.

Page 582

1    The time is 10:32.
2        (A recess was taken.)
3        THE VIDEOGRAPHER: Back on the record.
4    This begins tape number two in the deposition of
5    Bernard L. Madoff in Butner, North Carolina on
6    November 9th, 2017. The time is 11:07.
7            FURTHER EXAMINATION
8    BY MS. FEIN:
9        Q. Mr. Madoff, do you remember yesterday Mr.
10   Kratenstein asked you about a list of banks where
11   you performed clearing functions?
12       A. Correct.
13       Q. You provided us a list when we met with you
14   in April and I can show it to you --
15       A. Uh-huh.
16       Q. -- if you want to see it, if it helps
17   refresh your recollection about what those firms
18   are.
19       A. Right.
20       Q. This just the testimony from April 26,
21   2017.
22       A. Uh-huh.
23       Q. Do you see around line ten there's a list
24   that includes Meadowbrook National Bank, Commercial
25   Bank of North America, Irving Trust Company, Bank of

23 (Pages 579 - 582)

CONFIDENTIAL

Page 583

1 New York, Bankers Trust, Manufacturers Hanover,
2 Chase Manhattan, Marine Midland, Chemical Bank,
3 JPMorgan Bank, Continental Illinois Bank and M&T
4 Bank?
5    A. Yeah.
6    Q. Do you recall any firms -- scratch that.
7 Do you see right below that in the testimony --
8 well, actually, here. You listed what services
9 those banks provided to you on the next page. And
10 then you were asked do they have custodial accounts
11 where you maintain securities for customers.
12    Did this list of banks we just went
13 through, did any of those have custodial accounts
14 where securities were maintained for customers?
15    A. Okay. What is the question?
16    Q. The list of banks that we just reviewed --
17    A. Right.
18    Q. -- did any of those banks have custodial
19 accounts where you maintained securities for
20 customers?
21    A. When you say did they have accounts they
22 maintained for customers, they would have -- no.
23 The answer would be that they would have usually one
24 account for the firm. They wouldn't -- they
25 wouldn't have -- they wouldn't identify them by

Page 584

1 customers. That was the same practice with DTC. In
2 other words, there was -- I don't know what the
3 terminology would be because my brain isn't working,
4 but they would have one account. They wouldn't
5 break it out by clients.
6    Q. This question was and my question to you,
7 did you have custodial accounts where you maintained
8 securities for customers?
9    A. Yes.
10    Q. Okay. When you were asked -- so this
11 deposition took place on April 26, 2017. You
12 remember you were under oath for that deposition;
13 right?
14    A. Correct.
15    Q. And the answer to the question you provided
16 then --
17    MR. GOLDMAN: Why don't you read it?
18    MS. FEIN: Sure.
19    MR. GOLDMAN: Thanks.
20    MS. FEIN: Yeah.
21    MR. KRATENSTEIN: Tell us where you are.
22 I have it here, so --
23    MS. FEIN: Okay, sure. I'm on page 33.
24    MR. KRATENSTEIN: Yes.
25    MS. FEIN: And the line is line six.

Page 585

1    MR. KRATENSTEIN: Thank you.
2    Q. (By Ms. Fein) This right here. You were
3 asked by Ms. Chaitman about this list of banks. Did
4 they have custodial accounts where you maintained
5 securities for customers. Your answer, not that I'm
6 aware of, no. So I guess I'm trying to understand
7 why your answer is different today?
8    A. I'm not sure that it's different. When you
9 say do I own -- when you're asking was I own --
10 maintain a custodial account for a customer, it
11 would be -- the answer would be yes. It depends
12 upon the period you're talking about. The stock
13 records would show -- the stock record would show
14 the customers that we had securities for. That's on
15 the stock record.
16    That's the only record that we would
17 maintain of that. And I would assume that the
18 question you were asking when you say did we have --
19 did the banks have custodial, the answer would be,
20 you know, they wouldn't know who our customers were.
21 They would just have -- they would just -- the firm
22 is the customer.
23    We don't tell the bank that these
24 securities -- that these securities that we're
25 clearing through you are for John Jones. No one

Page 586

1 does that. We don't identify that. And they don't
2 -- for example, they don't -- they don't have a
3 record of who the clients were. It's the same thing
4 with DTC.
5    Q. I understand that.
6    A. Oh, okay.
7    Q. I do understand that.
8    A. That's the question. I'm not sure what
9 your question was.
10    Q. Okay. Well, my question is you --
11    A. I don't think it's -- what I'm saying, I
12 don't know that my response to Helen Chaitman is
13 different than what I had made then. At least I
14 don't see the difference.
15    Q. Well, this refers to accounts you would
16 have, your firm would have --
17    A. Right.
18    Q. -- where you maintain securities for
19 customers.
20    A. Right.
21    Q. Not that they would be segregated
22 necessarily.
23    A. Oh.
24    Q. Just that you maintain the securities for
25 customers.

24 (Pages 583 - 586)

CONFIDENTIAL

Page 587

1    A. Right.
2    Q. And when you were asked in April the answer
3  to that question was no, but it sounds like today
4  your answer is different?
5        MR. KRATENSTEIN: I object to the form of
6  the question.
7        MS. CHAITMAN: Yeah. I think what he was
8  saying was I think the way the first -- the way my
9  question was worded, he thought does he maintain at
10 an institution account for Mrs. Jones and Mrs. Brown
11 and --
12       MS. FEIN: Okay. Your interpretation
13 notwithstanding --
14       MR. KRATENSTEIN: Just for the record,
15 you're interpreting his testimony, too, so --
16       MS. FEIN: I was just trying to read it
17 and then understand what it said.
18    Q. (By Ms. Fein) Okay. So is your testimony
19 today that the banks that we listed -- actually, let
20 me go back. That set of banks that we went over
21 didn't include NatWest; right?
22    A. What do you mean didn't include it?
23    Q. So you listed 11 banks during your
24 testimony that day. NatWest wasn't one of them;
25 right? And the list is here.

Page 588

1    A. Because it would have been NatWest took
2  over -- as I said, I believe I said in the other
3  testimony earlier, these banks merged with each
4  other. So, for example, Meadowbrook National Bank
5  became NatWest at one point in time, you know.
6    Q. Okay. So --
7    A. NatWest would have been one of them.
8  Again, this was -- I said pretty much covers it. I
9  was giving a list of the banks that I had remembered
10 that I was familiar with, but Meadowbrook National
11 was merged with NatWest the same way that Chase
12 Manhattan and Manufacturers became Chase Manhattan
13 and then Chase Manhattan became JP Morgan.
14    Q. Okay. I had thought National Bank of North
15 America had merged with NatWest. Does that ring a
16 bell for you?
17    A. No. Nat -- oh, I don't know. I don't
18 remember.
19    Q. Okay, okay. Understood.
20    A. I mean, my question was answered just that
21 I had other facilities, clearing facilities through
22 banks and brokerage firms. I didn't list them all.
23 It was just that -- just saying that besides being a
24 self-clearing firm, I also had arrangements and did,
25 in fact, clear certain transactions through other

Page 589

1  entities.
2    Q. So if you were clearing transactions
3  through those other entities, you wouldn't be
4  relying on your back office for the purposes of
5  delivery of the securities or --
6    A. Well, the back office would eventually --
7  they would start with us, you know. Like we bought
8  the stock, but we would give instructions to the
9  counterparty, deliver the securities to this broker
10 or this bank and so on and so on. It depends upon
11 the transaction.
12       I mean, we were the one that would actually
13 buy the securities, but then again there were times
14 that we would call them depending upon what it was.
15 Like if it was a Treasury instrument, we would
16 typically just call JPMorgan or Bank of New York and
17 they would actually buy the transaction.
18    Q. And did you say where would you be keeping
19 track of --
20    A. We would have an internal record of that
21 somewhere at the firm.
22    Q. Okay.
23    A. Whether -- and, again, it depends upon at
24 what stage it was and what our ordination was and
25 what the bank's -- we had direct interfaces with

Page 590

1  some of these banks and brokerage firms the same way
2  that we had -- that we had direct interfaces with
3  NCC and DTC and so on and so forth.
4    Q. Okay. So your -- for the period of time
5  let's say the 1980s --
6    A. Uh-huh.
7    Q. -- it's your testimony those transactions
8  were taking place in the market; right?
9    A. Yeah.
10    Q. They were taking place within your house
11 five business; is that right?
12    A. It depends upon who would -- who we were
13 acting for. If it was -- and whether it was just a
14 transaction coming out of the inventory account of
15 the firm, you know, out of the -- and we had any
16 number -- we had different trading accounts
17 depending upon the strategy and who was handling it.
18 So there was internal records somewhere in the firm.
19       I mean, obviously, you know, we had to have
20 some record, you know, and to be able to track it.
21 And then there was the stock record which showed
22 the -- usually the global picture but, again, you
23 can have any number of stock records.
24    Q. Okay. The trades shown on your convertible
25 arb customer statements in the '80s --

25 (Pages 587 - 590)

Page 591

1    A.  Right.
2    Q.  -- would have -- so tell me, you're saying
3  there's more than one place that those trades could
4  have originated?
5    A.  Correct.
6    Q.  Is there more than one place that those
7  trades would have been cleared through?
8    A.  Yes.  Again, depends upon whether the
9  entity or the bank was also a market maker in the
10  security depending upon where they were located and
11  so on.  So, in other words, the bank -- these banks
12  and other brokerage firms like a Bear Stearns or a
13  low roads, they're also, you know, competitors of
14  ours.  In other words, they're also doing the same
15  thing that we're doing.
16        And there are any number of ways that you
17  do a -- that you can buy or sell transactions.  You
18  can actually go out into the market -- into the
19  street to buy the security.
20        We might do a swap with a particular firm,
21  which is -- I don't want to bore you with all the
22  details, but the same way that when you're doing a
23  convertible transaction trade, you can rather than
24  put the bond into conversion to convert it into
25  stock, which would eventually have to go to -- if

Page 592

1  you did that, you would have to put it through
2  whoever the -- whoever was the conversion agent, you
3  know, for that particular security.  You could also
4  go to -- we would -- we could go to another broker,
5  another market maker and swap, in other words, swap
6  our bond for stock, you know, that it was
7  convertible into because then they may be doing the
8  opposite side of the transaction that we do.
9        These are things that in the Dubinsky
10  report he seemed to be totally unaware of.  Like he
11  made statements, well, I contacted the conversion
12  agent of the particular security that we -- the bond
13  and they didn't have any agreement in place with
14  Madoff as if that was the only way that you could
15  exchange.
16        The idea is when you're doing a convertible
17  trade if you do it depending upon, again, what the
18  strategy you're using, if it's strictly to buy the
19  bond for the client and then sell the common stock,
20  you know, short, you know, against that, and then
21  you're going to -- you either convert it physically
22  by sending it to the conversion agent or you can, in
23  fact, go ahead and exchange with another market
24  maker in that particular bond and say okay, look, I
25  want to -- I'll exchange my bond.

Page 593

1        He may want the bond and he's willing to
2  give me stock for it and then you do a stock swap.
3  And when I say short, you know, you're talking about
4  it's like a short exempt transaction.  In other
5  words, I'm selling stock, you know, that -- which is
6  short, which I don't have the stock at the time but
7  I have a bond at the time.
8    Q.  So are you saying that where your various
9  bonds and securities cleared would be dependent on
10  the type of bond or security in part, right, because
11  some places wouldn't clear certain --
12    A.  Right.
13    Q.  -- certain bonds or certain securities?
14    A.  Well, any bank would -- any bank would
15  clear any transaction that you do, but depending
16  upon what you want to do.  If I was looking to
17  convert the bond into common stock, which means I'm
18  going to exchange the bond position, then the bank
19  itself might have -- you know, if they're a market
20  maker they might be willing to say okay, look,
21  Madoff wants to convert -- he wants to exchange the
22  bond for stock.
23        You know, we'll give him the stock --
24  they'll give me the stock from their inventory to
25  satisfy what I'm asking him to do and take the bond

Page 594

1  into their inventory.  Did I lose you or not?
2        MS. FEIN:  Okay.  No.  So we looked at an
3  exhibit yesterday, maybe also today.  Maybe it's in
4  this other pile.
5        MR. KRATENSTEIN:  What number are you
6  looking for?
7        MS. FEIN:  I'm looking for 39.  It's in
8  that other pile.  I wanted to look at one document
9  that we looked at yesterday, but I don't see it.
10  Thank you.
11        MR. KRATENSTEIN:  You want 39?
12        MS. FEIN:  Yeah.  Didn't see it there.
13        (Discussion off the record.)
14    Q.  (By Ms. Fein)  So looking at this
15  Exhibit 39 that we reviewed yesterday, thank you, do
16  you see -- this looks like a customer statement,
17  right, for the most part other than the client?
18    A.  Right.
19    Q.  This format I should say.
20    A.  Uh-huh.
21    Q.  Do you see where it says balance forward,
22  $75,892,366.08?  There's a debit balance listed?
23    A.  Right.
24    Q.  Do you know why there would be a debit
25  balance on this report?

26 (Pages 591 - 594)

Page 595

1      MS. CHAITMAN: I'm sorry. Show me where
2  you are.
3      MS. FEIN: Just the first line of Exhibit
4  39, yeah.
5      MS. CHAITMAN: The debit, I see.
6      MS. FEIN: Yeah.
7      THE WITNESS: It might be, I'm assuming it
8  arose from activity that occurred in that account.
9      Q. (By Ms. Fein) Okay. That would mean that
10 the bank had owed you 75 million and change; right?
11     A. Based upon deliveries, what was taking
12 place in the account. See, this -- these securities
13 would have been -- these received and delivered
14 would have monies attached to it and all, which
15 doesn't show on the statement but it would be on
16 another, another statement depending on what was --
17 what was flowing through. Obviously, it represents,
18 you know, the debits and credits that were involved
19 in these transactions.
20     MS. FEIN: Okay.
21     MR. KRATENSTEIN: I mean, if you look at
22 later -- if I could, if you look at later pages
23 there are debit and credit numbers listed on some of
24 the pages.
25     MS. FEIN: I do see that, yes.

Page 596

1      MR. KRATENSTEIN: Okay.
2      MS. FEIN: Thank you.
3      Q. (By Ms. Fein) At the end of the report if
4  you look at the page ending in 69, do you see where
5  security positions is listed?
6      A. Uh-huh.
7      Q. And then there are a number of positions
8  that follow from that?
9      A. Correct.
10     Q. A couple of pages later, it's the last page
11 of the document, it says end of positions?
12     A. Right.
13     Q. And there's a long and a short and a
14 difference?
15     A. Uh-huh.
16     Q. Would this list of security positions be
17 the securities that were listed in this account at
18 the time?
19     MS. CHAITMAN: Objection to form.
20     THE WITNESS: I'm not sure I understand.
21     Q. (By Ms. Fein) Well, my question is --
22     A. Yeah. I see this.
23     Q. -- typically at the bottom of your customer
24 statements and similar statements you would have
25 security positions and then you would have the

Page 597

1  securities or other bonds that would be --
2      A. Right.
3      Q. -- listed in your account. Does that
4  appear to be true here as well?
5      A. I'm not sure whether this represents market
6  value of the securities or whether it represents a
7  customer statement. Our customer statements
8  reflected balances from the buying and the selling
9  and then there's a market value of the securities in
10 the account if you looked on the statement. I don't
11 know what -- I don't know what this represents.
12     Q. Okay. Because there's like -- there are
13 two different balances listed, so I was trying to
14 figure out why they were different. If you look at
15 new balance, which is at the end of this activity,
16 you see $78,544,284.62?
17     A. Uh-huh.
18     Q. And then --
19     MS. CHAITMAN: I'm sorry. Which page is
20 that?
21     MS. FEIN: Oh, on page 869.
22     MS. CHAITMAN: 869.
23     Q. (By Ms. Fein) Right before you get to the
24 security positions listed. And then at the end of
25 the report, the end of positions, those figures are

Page 598

1  different, right, on the last page for the security
2  positions?
3      A. It would -- it would seem to me that this
4  is -- one of them is representing, this typically
5  would be representing what the market, the current
6  market of these positions were.
7      Q. Okay. That's your understanding of why
8  they're different?
9      A. I'm assuming. Typically on a customer
10 statement you would have the opening balance, like
11 you would have the opening balance and closing
12 balance is for the actual money flows out of the
13 account. And then at the end of -- the end of the
14 statement it shows what the open and long and short
15 positions are and what the current market value of
16 those are on a mark-to-market basis.
17     Q. Okay.
18     A. I mean, you can figure it out by adding up
19 what -- by just doing the math and adding up if it
20 tells you, for example, if it's showing you --
21 whether or not it's showing you, you know, prices of
22 the securities.
23     Q. Uh-huh.
24     A. At least that's the way the customer
25 statement normally occurs.

27 (Pages 595 - 598)

CONFIDENTIAL

Page 599

1    Q.  Okay.
2    A.  I'm not familiar with what -- necessarily
3  how the clearing accounts are handled on our books
4  and records.
5    Q.  Okay.  But these security positions that
6  are listed here, you see there are some long
7  positions and some short positions listed starting
8  on page 869 and then through the next couple of
9  pages?
10    A.  Right.
11    Q.  Would that mean that National Bank of North
12  America owned those -- owned -- the long positions
13  would be securities owned by National Bank of North
14  America?
15    A.  No, not owned.  Being cleared through
16  there.
17    Q.  So this document --
18    A.  It's not National Bank of North America.
19  That's a client of ours.  You know, we're not buying
20  and selling the stock for National Bank of North
21  America.
22    Q.  Okay.
23    A.  We're buying it for customers, transactions
24  being cleared through that account.
25    Q.  Okay.  So this is -- you're saying this

Page 600

1  document shows the clearing that --
2    A.  It's showing the activity that flowed
3  through that account.
4    Q.  Okay.  So they were not an IA customer of
5  yours; right?
6    A.  No.
7    MS. FEIN:  Okay.
8    MR. KRATENSTEIN:  Thank you very much.
9    (Trustee's Exhibit Number 16 was marked
10  for identification.)
11    Q.  (By Ms. Fein)  I'm marking as Exhibit 16 a
12  document I'm about to hand to you that's being
13  marked as Exhibit 16.  Do you recognize what kind of
14  document this is?
15    A.  It's a customer confirmation.
16    Q.  Do you see, can you read the trade date
17  there?
18    A.  1983, 11-11-83.
19    Q.  And the settlement date looks like
20  11-18-83; is that right?
21    A.  Uh-huh, yes.
22    Q.  Under the security description would you
23  agree that it's showing a preferred -- preferred
24  convertible security?
25    A.  Right, yes.

Page 601

1    Q.  And for the capacity code, do you see the
2  number two?
3    A.  Yes.
4    Q.  And that -- those are trades where you're
5  acting as principal; right?
6    A.  Correct, yes.
7    MR. KRATENSTEIN:  In other words, that's
8  what the capacity code means, two equals principal?
9    MS. FEIN:  That's right.
10    THE WITNESS:  You have to look at the back
11  of the confirmation to see that.
12    Q.  (By Ms. Fein)  The customer listed is
13  George Scheer Special.  Do you see that information?
14    A.  Yes.
15    Q.  And where it says we sold, does it mean
16  that your --
17    A.  Sold is from our principal account.
18    Q.  Okay.  So where -- can you explain to me
19  kind of how this trade would end up in your
20  principal account before it got to the customer
21  statement?
22    A.  We are selling the stock.  Typically on an
23  agency transaction it would say -- it would refer to
24  what the customer bought and sold.  This would have
25  confused Dubinsky.

Page 602

1    Q.  I'm not confused about that point.  Let me
2  back up.
3    A.  Okay.
4    Q.  My only question is would this -- where
5  would this trade have originated on the market?
6    A.  Well, to begin --
7    Q.  Like who would have been the trader in your
8  business or elsewhere?
9    A.  I don't know who the trader could have
10  been.  Typically it depends upon the transaction.
11  The transaction could have been we a had bought the
12  stock first, you know.  We could have had it in
13  inventory, which would have appeared in one of the
14  firm's trading accounts or in our investment
15  account.  And then we would sell it from a trading
16  account or investment account to the client as
17  principal.
18    Q.  Okay.
19    A.  That's -- it could be any number of -- or
20  we can go out and buy it into this -- buy it from
21  the street, you know, and then it flows from Goldman
22  Sachs, who's a market maker, you know, selling it to
23  us.  And I could originate the trade, according if
24  Goldman Sachs's market making department, and buy
25  the stock.

28 (Pages 599 - 602)

CONFIDENTIAL

Page 603

1    So it goes from step one, from Goldman,
2 who's selling it as principal to Madoff, who's
3 buying it as principal, and Madoff in turn is
4 selling it from my principal account to the customer
5 account.
6        (Trustee's Exhibit Number 17 was marked
7 for identification.)
8    Q. (By Ms. Fein)  Okay.  I'm going to mark or
9 I'm going to show you what's been marked as
10 Trustee's 17.
11       MS. DASARO:  I just want to make sure.
12       MR. KRATENSTEIN:  Thank you.
13       MS. CHAITMAN:  Thank you.
14    Q. (By Ms. Fein)  Is this another one of the
15 stock record documents that your firm maintained?
16    A. Yes.
17    Q. And would this be for house 17, your IA
18 customers?
19    A. I can't read the --
20    Q. Look at the --
21       MS. CHAITMAN:  Page 63, 11-30-63?  Is that
22 the date?
23       MS. FEIN:  No.  If you look at the -- it's
24 '83, yes.
25       THE WITNESS:  This is house 17.  This is

Page 604

1 house 17, so --
2    Q. (By Ms. Fein)  Okay.  Here, just to be
3 clear, will you read the title of the document
4 starting with the house 17?
5    A. Stock record summary through 11-10-83.
6    Q. Okay.
7    A. Or 11-30-83.  I can't read it.
8    Q. Okay.  Yeah.  I think it's 11-30.
9    A. Yeah, 11-30-83.
10    Q. Okay.  For your IA customers were these
11 typically run at month end?
12    A. Yes.
13    Q. These type of reports?
14    A. I'm assuming if it says through 11-30-83,
15 that would be the month end.
16    Q. For this report; right?
17    A. For this report.
18    Q. I'm asking you if you know more generally
19 if for house 17 these reports were typically run at
20 the end of the month?
21    A. I assume so, but I can't be sure.
22    Q. Okay.  I'm going to show you a different
23 page, page 750.  And if you look toward the bottom
24 of the page --
25    A. Uh-huh.

Page 605

1    Q. -- do you see a transaction in -- I'm
2 sorry -- in the middle of the page in International
3 Harvester?
4    A. Yes.
5    Q. Okay.  I'd like you to look again on this
6 page.
7    A. Uh-huh.
8    Q. The International Harvester transaction.
9    A. Right.
10       MS. CHAITMAN:  Is this 750?
11       MS. FEIN:  This is 750, yes.
12       MS. CHAITMAN:  Okay.
13    Q. (By Ms. Fein)  Preferred series A
14 convertible, $3?
15    A. Uh-huh.
16    Q. Do you see that transaction?
17    A. Right.
18    Q. If you look about six lines up from the
19 bottom, there is the customer that we looked at,
20 George Scheer Special.  Do you see that?
21    A. Right.
22    Q. Actually, look down here.  I know it's
23 listed a couple of different places, but I'm
24 referring to the one right down at the bottom.
25    A. I see.  Okay.

Page 606

1    Q. Six lines up.  Okay.  Do you see the amount
2 for this looks like 13,388 --
3    A. Right.
4    Q. -- long?
5    A. Uh-huh.
6    Q. And the trade date is 11-18-83?
7    A. Uh-huh.
8    Q. If you look at what's been marked as
9 Exhibit 16, would you agree that this trade shown on
10 the first page of Exhibit 16 is also 13,388 shares
11 for George Scheer Special?
12    A. Right.
13    Q. The security description is the same;
14 right?
15    A. Uh-huh.
16    Q. Okay.  So do you think this is -- do you
17 think that the amount shown on Exhibit 17, the
18 transaction shown on Exhibit 17 for George Scheer is
19 the same as the one shown on Exhibit 16?
20    A. I want to make sure I can find it.
21    Q. Sure.
22    A. 13,388.  The shares seems to be the same.
23    Q. And this --
24    A. And the monies.
25    Q. -- date listed looks like November 18th,

29 (Pages 603 - 606)

CONFIDENTIAL

Page 607

1  1983 --
2     A. Right, okay.
3     Q. -- is the settlement date. So does this
4  transaction appear to match the -- the transaction
5  in Exhibit 16 appear to march the report in
6  Exhibit 17?
7     A. The shares match. I don't see monies.
8     Q. Right, no. I don't think that they put it
9  on this report.
10    A. Okay, right, right.
11    Q. Okay. If you go to the next page of
12 Exhibit 17, this is the end of that same
13 transaction. Do you see who's on -- who's listed at
14 the bottom of the page?
15    A. Correct.
16    Q. What entity is listed?
17    A. National Westminster Bank. Is that what
18 it's saying?
19    Q. Yes. What's your understanding of how
20 National Westminster Bank was related to this trade?
21    A. I'm assuming the trade must have cleared
22 through the bank.
23    Q. Okay. Do you see the account number?
24 There's two entries and two account numbers for
25 National Westminster Bank that are listed at the

Page 608

1  bottom of the transaction?
2     A. Right.
3     Q. The account number for the first reads
4  299000010 and the second, 6000020. Do you see that?
5     A. Uh-huh.
6     Q. Do you know why there would be two entries
7  here for National Westminster Bank?
8     A. I don't have a clue.
9     Q. Okay.
10    A. They must have two different types of trade
11 clearing accounts that can handle it.
12    Q. Okay. So we know how we had discussed
13 whether this would be a month-end report. The
14 transaction that we're looking at is dated
15 November 18th and this report is dated
16 November 30th.
17       And there are many other transactions
18 listed on here, but do you think that that would
19 mean it would encompass at least more than just the
20 day, November 30th? At least it has other days of
21 the month that are also listed here?
22    MS. CHAITMAN: Objection.
23    Q. (By Ms. Chaitman) Other transactions?
24    A. I'm not sure.
25    Q. Okay. That's fine. I don't know if you

Page 609

1  thought it was most certainly a month-end report
2  based on that, but the transactions listed on this
3  stock record summary, if you look at other
4  transactions on the page, they also have National
5  Westminster Bank USA --
6     A. Uh-huh.
7     Q. -- listed underneath each security.
8     A. Okay.
9     Q. Would it be typical that all the
10 transactions would have the same clearing bank for
11 all the transactions that would be listed on a
12 single for every customer account?
13    A. Could be. It depends upon -- you know, the
14 answer is I have no idea why we would choose one
15 bank or the other. Again, it depends upon, you
16 know, any number of things. I don't know. It's not
17 something that I would be familiar with.
18    Q. Right. We went over a number of banks
19 earlier, though, and this report only lists one. So
20 I was just trying to understand why it might be that
21 there's only one listed?
22    A. That could be -- I don't know. I mean, it
23 could be typically, you know, why they use one
24 particular bank or clearing agent or broker depends
25 upon the fee structure, depends upon whether they

Page 610

1  were a market maker also in that, depends upon -- I
2  don't know the answer to that question.
3     Q. Okay. That's fine. The transaction we
4  were looking at in Exhibit 16 was a transaction you
5  did as principal; right?
6     A. Mostly all of ours were principal, right.
7     Q. So if National Westminster was shown as the
8  clearing firm --
9     A. Right.
10    Q. -- would that mean National Westminster --
11 it wouldn't mean National Westminster was the
12 counterparty to the transaction; right?
13    A. No.
14    Q. Okay.
15    A. I mean, it theoretically could be, but I
16 don't know. Again, they may have been a market
17 maker. They may have been a -- I don't know the
18 answer to that.
19    Q. You were a self-clearing firm; right?
20    A. Correct.
21    Q. So I guess I'm trying to understand why all
22 the transactions that are shown on the report would
23 have not cleared through you or wouldn't have
24 gone --
25    A. Because they're not going to -- because

30 (Pages 607 - 610)

CONFIDENTIAL

Page 611

1 they're not going to -- we don't convert ourselves.
2 In other words, we don't handle the conversion of
3 the security. We don't handle the delivering the
4 bond to the clearing agent to actually exchange it
5 for stock. In other words, that -- we don't have an
6 arrangement with -- with the conversion agent to
7 actually do that.
8         MS. FEIN: Okay, okay. We can move on.
9 I'm going to show you two documents, Trustee's 18,
10 Trustee's 19.
11         (Trustee's Exhibit Numbers 18 and 19 were
12 marked for identification.)
13         MR. KRATENSTEIN: Just want to make sure I
14 get these right. So which is 18? Ends in 393?
15         MS. FEIN: That's correct, yes.
16         MR. KRATENSTEIN: Eighteen is 393?
17         MS. FEIN: That's right. Here, let me get
18 this out of your way.
19         Q. (By Ms. Fein) Do you recognize?
20         A. Not really. It says -- it says cash and
21 securities blotter. Is that what --
22         Q. Uh-huh.
23         A. Right.
24         Q. Are you looking at Exhibit 18 then?
25         A. Yes.

Page 612

1         Q. Okay. Both documents show roll number and
2 then contents and then documents at the top of the
3 page. Do you see that?
4         A. Uh-huh.
5         Q. Okay. If you look at Exhibit 19, do you
6 see -- can you turn the -- look at the second page
7 of it ending in 396. Can you read the note at the
8 bottom of the page, the handwritten note?
9         A. Do not microfilm trading blotters?
10         Q. Yeah. And the line right above it.
11         A. As per BLM.
12         Q. Okay. Do you -- does BLM refer to you?
13         A. I would assume so.
14         Q. Do you know whose handwriting this is?
15         A. No.
16         Q. If you go back to Exhibit 18, other page --
17         A. Uh-huh.
18         Q. -- do you see at the bottom of the page
19 where it says shred the Xs only --
20         A. Okay.
21         Q. -- the handwritten note? Do you know whose
22 handwriting that is?
23         A. No.
24         Q. Do you know why you would shred cash and
25 securities blotters during this time period?

Page 613

1         MR. KRATENSTEIN: Object to form.
2         THE WITNESS: No.
3         MS. FEIN: Okay.
4         THE WITNESS: I don't even know what they
5 were used for.
6         Q. (By Ms. Fein) Okay. I'm going to ask a
7 couple of questions about the Sage accounts. Paul
8 Koenigsberg was an accountant; right?
9         A. Yes.
10         Q. And he -- we looked at some letters where
11 it appeared that he did work for the Sages; right?
12         A. I'm assuming he did. I said I don't know
13 whether Paul --
14         Q. Right.
15         A. Was Paul Koenigsberg or could have been
16 Paul somebody else.
17         Q. Okay. Was Paul Koenigsberg an accountant
18 for other BLMIS customers?
19         A. Yes.
20         Q. Was he an accountant for Carl Shapiro?
21         A. Yes.
22         Q. Was he an accountant for Norman Levy?
23         A. At one -- he was an accountant for them,
24 for Norman Levy in the later years.
25         Q. Okay.

Page 614

1         A. And same thing with -- who's the other one
2 you asked?
3         Q. Carl Shapiro.
4         A. Carl Shapiro, Norman Levy, yes. Their
5 accountants had died, so they switched over. And
6 then in -- Shapiro moved from Price Waterhouse to --
7 because the partner that handled Price Waterhouse
8 moved to London. So he took Paul Koenigsberg on as
9 an accountant. And Levy's accountant died and he
10 moved over to Paul Koenigsberg.
11         Q. Did Carl Shapiro and Norman Levy have short
12 against the box accounts with you?
13         A. Yes.
14         Q. Did Annette handle some of the
15 correspondence and other activity related to those
16 accounts?
17         A. Yes.
18         Q. Were Carl Shapiro and Norman Levy two of
19 the customers you identified as having backdated
20 transactions in their accounts before 1992?
21         A. Well, let me make sure you understand
22 backdating accounts because backdating accounts
23 occur in a number of ways. One of them was -- well,
24 there's a -- backdating accounts can refer to an as
25 of transaction. As a market making firm, it's a

31 (Pages 611 - 614)

CONFIDENTIAL

Page 615

1 very common occurrence to have to adjust both a
2 price and a date on a confirmation based upon
3 typically an error that is being made by the market
4 making firm or the originating firm, meaning like
5 Schwab. Schwab gives us an order to buy and sell
6 stock from a particular customer.
7       And either Schwab makes an error or his
8 customer makes an error as to doing the trade on the
9 wrong day or the wrong time or the price. And then
10 there's usually a discussion that takes place
11 between both parties. And then a decision is made
12 to put the trade back to a certain date and that's
13 what it refers to as an as of transaction.
14      So you're adjusting it and the error might
15 be -- might be the market maker or it might be the
16 originating broker who gave us the order. That's
17 one. Then there is the backdating trade where there
18 is a dispute between the customer and myself.
19      And then, of course, there's the totally
20 illegal transaction of backdating a transaction,
21 which is what -- what the -- I don't know whether it
22 was Dubinsky or Picard that happened, but I had
23 explained backdating trades to -- in the past. And
24 I don't know. You'd have to -- it depends upon
25 which transaction.

Page 616

1       Q. Okay.
2       A. But a backdating trade in itself doesn't on
3 the face of it because you are backdating a trade by
4 adjusting a price or the date, but it doesn't
5 necessarily on the face mean it's an illegal trade.
6       Q. No, and I didn't ask that.
7       A. Okay.
8       Q. I was actually just asking about if Carl
9 Shapiro and Norman Levy were two of the customers
10 that had those transactions?
11      A. Yes, yes.
12      MS. FEIN: Okay. That was my question.
13      MR. KRATENSTEIN: I'm going to object to
14 the form of that question.
15      Q. (By Ms. Fein) Okay. You testified about a
16 meeting with members of the Sage family yesterday?
17      A. Yes.
18      Q. How many meetings do you remember with
19 them?
20      A. A number of meetings, you know. As to how
21 many, I don't know. It depends upon -- you know, I
22 remember, you know, the meeting where they wanted to
23 change the strategy, where they wanted to make the
24 decisions themselves. That happened. That was one
25 meeting I remember because it was a meeting that

Page 617

1 there was a lot of discussions whether it was the
2 right thing to do, but they wanted to do it --
3       Q. Okay.
4       A. -- because of tax break. And then there
5 were other meetings that they came up just because
6 they were in the area. And the family was -- I
7 mean, I was friendly with the mother and the family,
8 so they felt free to come up. And also they said
9 that they came up to visit with Annette depending
10 upon -- they were not necessarily unique. And then
11 they would come and visit me to say hello.
12      Q. Okay. And did you have a good sense of
13 when that meeting took place, the one you testified
14 about directed trading?
15      A. I was trying to think of that, you know,
16 myself. I don't remember. There was -- there were
17 meetings and I know as recently as the 2000s.
18      And then there certainly must have been
19 meetings prior to that depending upon -- you can see
20 yourself depending upon when it started,
21 transactions changed when it went from a convertible
22 bond arbitrage account to a split strike account and
23 then to an account where they were just doing tax
24 planning and changed the style of trade they wanted
25 to do.

Page 618

1       Q. Okay. But I guess you're saying then
2 before that meeting you wouldn't have taken trade
3 direction from the Sages; right?
4       MR. KRATENSTEIN: Object to form. Go
5 ahead.
6       THE WITNESS: Depends upon whether the
7 father was alive and he was running the account with
8 me or -- I mean, they were accountants, the family,
9 for a very long period of time.
10      Q. (By Ms. Chaitman) Okay. But it wasn't
11 your typical practice to take trade direction;
12 right?
13      A. That's correct.
14      Q. Okay. That was my -- what I was trying to
15 get at. Okay. I'd like you to take a look at a
16 document we reviewed yesterday, Exhibit 85.
17      MR. KRATENSTEIN: Hang on a minute.
18      MS. FEIN: Oh, sure.
19      MR. KRATENSTEIN: Okay. Go ahead.
20      Q. (By Ms. Fein) In the second paragraph we
21 went over some language yesterday and I'd like to
22 ask you about one sentence, but let's look a little
23 earlier. Do you see this sentence says as of the
24 last statements we received in March the accounts
25 were a little off of the usual benchmark?

32 (Pages 615 - 618)

CONFIDENTIAL

Page 619

1    A.  Correct.
2    Q.  Can you read the next two sentences after
3 that?
4    A.  I can't find them.
5    Q.  Oh, so the next one would be since then our
6 main holding, eBay, has dropped significantly.
7    A.  Right, okay.  I see it.
8    Q.  And then the next, as that holding is a
9 long-term one, I was hoping you had shorted it
10 against the box a while back.  Do you see that?
11    A.  Yes, uh-huh.
12    Q.  That statement is in the past tense; right?
13    A.  I was hoping you had shorted it against the
14 box, okay.
15    Q.  It's referring to something that would have
16 happened before you got this letter; right?
17    MR. KRATENSTEIN:  Objection to the form of
18 the question.
19    THE WITNESS:  Yes.  I think what they're
20 referring to is sometimes even if I had felt that
21 they should have been sold regardless of what they
22 had -- they were doing tax planning, obviously,
23 shorting against the box to adjust whether they were
24 going to get long-term gain, short-term gains and so
25 on and depending upon when you closed out the

Page 620

1 transaction, in other words, covered the short, that
2 would trigger a tax event.  So if, in fact -- again,
3 I'm assuming because this -- you know, if, in fact,
4 they originally wanted to keep the trade open but
5 then there was a market event that happened, you
6 know, then I felt that it wasn't -- it didn't make
7 any sense to worry about the tax treatment because
8 if they -- if I didn't go short against the box, the
9 stock was going to go down, I would pay no attention
10 to it.
11    Q.  Right.
12    A.  Technically a client could call me up and
13 say to me, which did happen at the time, well, you
14 shouldn't have -- you should have followed my
15 instructions even though you would have lost money
16 for me to do that.  That's not an unusual situation.
17 So I don't remember what happened here, but that's
18 probably what happened.
19    Q.  Okay.  All right.  So we can look at
20 Exhibit 69.
21    A.  Uh-huh.
22    Q.  This is another of the letters we reviewed
23 yesterday; right?
24    A.  Right.
25    Q.  Do you see -- it's a long sentence, but the

Page 621

1 last sentence of the first paragraph, with respect
2 to other positions in these accounts please note
3 that Pharmacia will become long-term this January.
4 Do you see that sentence?
5    A.  Yes.
6    Q.  And then do you see just under that unless
7 you deem that these stocks must be shorted prior to
8 these dates due to various considerations, it would
9 be to our tax benefit that these positions not be
10 shorted?
11    A.  Right.
12    Q.  That's not a direction to you about what to
13 do with the trade; right?
14    MR. KRATENSTEIN:  Object to form.
15    Q.  (By Ms. Fein)  In other words, this is left
16 in your discretion; correct?
17    MR. KRATENSTEIN:  Object to the form.
18    THE WITNESS:  I assume that's what they're
19 saying, right.
20    Q.  (By Ms. Fein)  Okay.  I just want to look
21 at two of the documents we went through.  These
22 exhibits, Exhibits 70 and 72, were looked at in
23 connection with this same letter.  And on Exhibit 70
24 do you see an R. J. Reynolds Tobacco HLDS?
25    A.  Right.

Page 622

1    Q.  Okay.  And what date is that transaction?
2    A.  January 13th.
3    Q.  And it's 9,000 shares purchased?
4    A.  Yes.
5    MR. KRATENSTEIN:  What year was that?
6    THE WITNESS:  '03.
7    Q.  (By Ms. Fein)  Okay.  And do you see the
8 account number listed, 1S004-7?
9    A.  Yes.
10    Q.  Okay.  And you were shown the trade
11 confirmation in Exhibit 72 in connection with this
12 customer statement?
13    A.  Right, uh-huh.
14    Q.  What's the date of the trade indicated on
15 this confirmation on the first page?
16    A.  12-12-03.
17    Q.  And what's the date indicated on the second
18 page of the confirmation?
19    A.  8-28-03.
20    Q.  Okay.  Can you see either of those trades
21 on the customer statement that we reviewed in
22 Exhibit 70, any of the -- either of those trade
23 dates?
24    A.  I see that Reynolds has a trade date of
25 January 13th.

33 (Pages 619 - 622)

CONFIDENTIAL

Page 623

1    Q. Okay. So no?
2    A. And what's the other one? Broadcom?
3    Q. Yeah. No. We're just looking at the RJR
4 Reynolds trade.
5    A. Okay.
6    Q. If you look on the trade confirmation,
7 Exhibit 72, do you see the account number is
8 1S0004-3?
9    A. On this, yes.
10    Q. So this is a different account?
11    A. Uh-huh.
12    Q. These confirmations pertain to a different
13 account and a different time frame; right?
14    A. Right.
15    Q. They're not the ones that are shown on the
16 statement in Exhibit 70; right? And take your time.
17    A. Okay.
18    Q. Do you agree?
19    A. The statement is -- it says -- I'm not --
20 you lost me.
21    Q. So the statement is for accounts ending in
22 dash seven; right?
23    A. Right.
24    Q. But the confirmations are for an account
25 ending in dash three; right?

Page 624

1    A. Correct.
2    Q. And the trade date shown on Exhibit 72 is
3 December 12th, 2003?
4    A. Uh-huh.
5    Q. And August 28th, 2003?
6    A. Uh-huh.
7    Q. But the customer statement that was shown
8 is for January 2003; right?
9    A. Right.
10    Q. Okay. So these transactions don't match
11 the statement in the confirm; right?
12    A. You know, to tell you the truth, you've
13 sort of lost me on this whole thing.
14    Q. Okay.
15    A. I'm assuming if you told me they don't
16 match, they don't match.
17    Q. Well, the dates are different and the trade
18 -- the number of the trade is different and the
19 accounts are different right?
20    A. Okay. All right.
21    Q. Okay. Well, I'm asking you.
22    A. Ask me what?
23    Q. I'm asking you do you agree that the trade
24 dates are different?
25    A. Yes, yes.

Page 625

1    Q. The amounts are different?
2    A. Yes.
3    Q. And the accounts are different?
4    A. Yes.
5    Q. Okay. You mentioned earlier today meeting,
6 a proffer meeting with the United States Attorney's
7 Office. Do you remember that reference?
8    A. Yes.
9    Q. Okay. Do you recall when that meeting took
10 place?
11    A. There were two meetings with the U.S.
12 Attorney. One was the proffer agreement, which was,
13 I think, I believe the first meeting. That took
14 place down at the U.S. Attorney's office, which was
15 made shortly after my arrest. Then there was a
16 second meeting that took place in my apartment where
17 the U.S. Attorney was not present.
18        He was on a speakerphone. And that
19 included a whole length of proffer agreement
20 meeting. There were all sorts of people there in my
21 apartment.
22    Q. Do you remember did the meeting take place
23 in a conference room in the United States Attorney's
24 office, the December meeting?
25    A. Yes, yes.

Page 626

1    Q. Do you remember how long it was?
2    A. A long time. Started in the morning and
3 went through lunch.
4    Q. Okay. I'm going to mark -- I'm going to
5 show you what's been marked as Exhibit --
6        MR. KRATENSTEIN: What number?
7        MS. FEIN: 20.
8        MS. CHAITMAN: Do you have a copy for
9 Peter?
10        MS. FEIN: Yeah.
11        (Trustee's Exhibit Number 20 was marked
12 for identification.)
13    Q. (By Ms. Chaitman) If you look at the
14 bottom of the first page there's a date listed,
15 investigation on 12-16-2008, the bottom of the first
16 page?
17    A. Yes.
18    Q. Does that sound about right when the
19 meeting took place that you remember?
20    A. Yes.
21    Q. Okay. So this would be the same week, a
22 few days after you confessed; right?
23    A. Correct.
24    Q. We're just going to take a look at a couple
25 of individual statements here.

34 (Pages 623 - 626)

CONFIDENTIAL

Page 627

1    MS. CHAITMAN: I just want to put on the
2  record that I object to any questioning about this
3  document because, number one, it's obviously
4  inadmissible for good reasons. Number two, it's
5  redacted more than it's not redacted and it's
6  impossible to know what -- obviously, we have no
7  idea what's said in the redacted sections.
8    And I think for you to ask Mr. Madoff
9  about something that hasn't been redacted, assuming
10 this is even a legitimate document -- for example,
11 I'm sure that you're going to ask him about what
12 hasn't been redacted on page three, but it may be
13 that in the blacked out part underneath it, it
14 contradicts what's said and what's there.
15    MS. FEIN: Understood. If we had the
16 full, unredacted document, that would be our
17 preference as well.
18    MS. CHAITMAN: Right, but I think any
19 questioning about this document is a waste of time
20 because it's --
21    MS. FEIN: I understand your objection.
22    MS. CHAITMAN: Okay.
23    Q. (By Ms. Fein) If you turn to page seven of
24 the document, the pages are marked at the top.
25    A. Okay.

Page 628

1    Q. Do you see the first sentence?
2    A. When Madoff began a retail business in 19
3  -- yes.
4    Q. Uh-huh. Do you agree with that statement?
5    A. Yes.
6    MS. FEIN: Okay.
7    MR. GOLDMAN: Read that question back?
8    Q. (By Ms. Fein) Sure. The first statement,
9  Madoff began a retail business in about 1960. He
10 had about a dozen clients, all of whom were family
11 and friends. Do you agree with the statement?
12    MR. GOLDMAN: Well, I'm going to object to
13 it. It says it morphed into a fraud.
14    MS. FEIN: I didn't -- I didn't ask about
15 that sentence.
16    MR. KRATENSTEIN: First sentence, just
17 first sentence.
18    MR. GOLDMAN: Oh, I'm sorry.
19    MS. FEIN: I only asked about the first
20 sentence. Sorry.
21    MR. KRATENSTEIN: Do you want to reask the
22 question if he agrees with that sentence, the first
23 sentence?
24    Q. (By Ms. Fein) Sure. Mr. Madoff, do you
25 agree to the first sentence on page seven, that that

Page 629

1  is an accurate reflection of your business?
2    A. Madoff began a retail business in about
3  1960.
4    Q. Yes.
5    A. He had about a dozen clients, all of whom
6  were family and friends, yes.
7    Q. Do you recall making that statement at your
8  proffer meeting?
9    A. Yes.
10    Q. The next sentence after that, can you read
11 that?
12    MR. GOLDMAN: That's what I'm going to
13 object to. You know, this is a memorialization of
14 what someone thinks they heard. We don't know who
15 wrote it; okay? There are certain characterizations
16 in here such as that which are his conclusions or
17 her conclusions, whoever wrote it. And I think it's
18 unfair to ask him.
19    If there's something in here that you want
20 to ask him whether he actually said something, I
21 don't have an objection to that. And if you could
22 point to where he said it in the report, that's
23 fine; but I'm going to object to these
24 characterizations and then asking him whether those
25 are correct or not.

Page 630

1    MS. FEIN: I understand.
2    MR. GOLDMAN: Okay.
3    MS. FEIN: I understand. I'm going to ask
4  about the statements that are here.
5    MR. GOLDMAN: Okay.
6    Q. (By Ms. Fein) And I just want to really
7  know if you recall making the statements at the
8  meeting?
9    MR. GOLDMAN: I want to make sure, though,
10 when you ask him did he make the statement and if
11 he -- I don't want -- what I object to is the
12 characterization that he's made the statement. I
13 haven't seen quotation marks anywhere in here that
14 Mr. Madoff said this.
15    MS. FEIN: Right.
16    MR. GOLDMAN: If you can point to that and
17 ask him, that's fine, but the other -- asking him
18 about someone else's conclusions I just think is
19 inappropriate.
20    MS. FEIN: Okay. Well, if I -- I don't
21 plan to ask --
22    MR. GOLDMAN: And he'll answer
23 accordingly. Okay.
24    MS. FEIN: -- much more about that. It's
25 about whether he recalls making the statements that

35 (Pages 627 - 630)

CONFIDENTIAL

Page 631

1 are here.
2        MR. GOLDMAN: Okay.
3        Q. (By Ms. Fein) So if you want to read the
4 text on page seven. You don't have to read it out
5 loud. You can read it to yourself, but I did want
6 to ask. So the statement the retail business
7 morphed into a fraud as time went by, do you recall
8 making that statement at the proffer meeting?
9        A. You're asking if I said in 1962 all the
10 clients lost virtually their entire investment?
11       Q. No. The sentence before that, the retail
12 business morphed into a fraud as time went by.
13       MR. GOLDMAN: Do you recall saying that?
14       THE WITNESS: I don't remember saying
15 that.
16       MR. FEIN: Okay.
17       MR. GOLDMAN: Okay. Let's go on.
18       Q. (By Ms. Fein) Do you -- if you look down a
19 bit on the page, so it refers to in 1962 Madoff's
20 retail business was wiped out in the new issue
21 collapse. And the following sentence, all his
22 clients lost virtually their entire investment,
23 which amounted to a total of $30,000. Madoff felt
24 he had to pay them back, so he borrowed $30,000 from
25 his father-in-law to do so. Do you recall making

Page 632

1 that statement?
2        A. Yes.
3        Q. His father-in-law was not pleased by this
4 development. Madoff was able to pay all these
5 clients back and start the market making business.
6 Do you recall making that statement?
7        A. Yes.
8        Q. At about this time he took in new retail
9 clients. These clients were also family and
10 friends. Do you recall making that statement?
11       A. Yes.
12       Q. He began to falsely report returns of
13 30 percent, 40 percent annual to these customers.
14 Do you recall making that statement?
15       A. Wait a minute. After this time he took in
16 new retail clients. He had to falsely -- no. I did
17 not say he had to falsely report returns of 30 to
18 40 percent. Definitely didn't ever say that.
19       Q. Okay. If you look at page four of the
20 document, go back a couple of pages, my next
21 questions are on page four.
22       A. Okay. I'm still looking at that last
23 question --
24       Q. Sure.
25       A. -- because I can't imagine having said

Page 633

1 that.
2        Q. Okay.
3        A. Where are we now?
4        Q. Page four.
5        A. So I have to go back?
6        Q. Yes.
7        A. Okay.
8        Q. I think it's one more back. It's on the
9 back, yep. There. The first sentence that is
10 unredacted, the fraud entailed Madoff taking in
11 funds from investors, holding those funds and paying
12 them out to investors seeking redemptions. Do you
13 recall making that statement?
14       MS. CHAITMAN: I would suggest that you
15 read through the whole unredacted portion, Bernie,
16 before you respond.
17       THE WITNESS: The fraud entailed Madoff
18 taking in funds from investors, holding those funds
19 and paying them out to investors seeking
20 redemptions, essentially a Ponzi scheme.
21       MR. GOLDMAN: See, the other part of the
22 problem with that is that we don't have any dates.
23       THE WITNESS: Yeah.
24       MR. GOLDMAN: I don't know when the dates
25 are.

Page 634

1        MS. FEIN: I'm just asking if he remembers
2 making the statements. I can't make any. I was not
3 involved in -- I was not -- yeah.
4        MR. GOLDMAN: So I just think it's unfair
5 ask him that question.
6        MS. FEIN: I'm asking if he recalls the
7 statements that are here and that's really it.
8        MR. GOLDMAN: Okay, all right.
9        THE WITNESS: Let's put it this way.
10 Depending upon what period of time they were talking
11 about, I could have made that statement because I'd
12 made that statement a number of times since then;
13 but I certainly was not talking about it, you know,
14 in the early periods of time because I was very
15 clear and forthright in everything I said at the
16 proffer agreement and at the other meeting.
17       And nothing has changed in my story. So I
18 -- just the same reason I would not have mentioned
19 anything about the 30 or 40 percent, I certainly
20 could have said that, for example, in 1980s my
21 clients were making 30 or 40 percent because that
22 was what was common at that time when interest rates
23 were 12 percent at that period of time.
24       So I can tell you that referring to this
25 proffer agreement, it was an absurdity. The

36 (Pages 631 - 634)

CONFIDENTIAL

Page 635

1 questions that were asked by me, by people who I
2 knew knew the answer, you know, and, you know, it
3 was obvious that that they were trying to paint a
4 picture that was not the case. And I'm still pissed
5 off by it, quite frankly.
6     Q. I'm going to ask you about a couple more
7 questions.
8        MR. GOLDMAN: Okay. Ask the question.
9     Q. (By Ms. Fein) So the next sentence, you
10 just read the first two sentences. The next
11 sentence, customers received both monthly account
12 statements and trade confirmations reflecting trades
13 that never took place. Do you recall making that
14 statement at the proffer meeting?
15    A. No.
16    Q. Madoff began engaging in fraud in earnest
17 in the 1970s. The 1980s saw a large expansion in
18 the retail, i.e., fraudulent portion of the
19 business. Do you recall making that statement at
20 the meeting?
21    A. Let me go back and read it. I certainly
22 never said that fraud took place in the '70s because
23 it did not. In the 1980s there was a large
24 expansion in the retail business and in the, i.e.,
25 parentheses, fraudulent. I assume that's not my

Page 636

1 statement. That's the interpretation statement
2 because why would they -- the fact that if I
3 understand English properly, when someone says with
4 parentheses, i.e., fraudulent, that's someone's
5 interpretation of what he claims I said was
6 fraudulent.
7     Q. Okay.
8     A. Which -- so I never said it was fraudulent.
9     Q. I'm just asking about your recollection.
10 Okay.
11    A. My recollection was I explained what was
12 happening in the business, but as far as the dates
13 are concerned, you know, I do not recall ever saying
14 that.
15    Q. Okay. The next sentence, as there was no
16 actual trading, nothing cleared through DTCC or any
17 clearing firm and the only records of the purported
18 trades are the paper confirmations. Do you recall
19 saying that at the proffer meeting?
20    A. No. I do not.
21    Q. If you turn back one page to page three,
22 the second paragraph on page three begins when
23 Madoff first began the retail business. Do you see
24 that sentence?
25    A. Uh-huh.

Page 637

1     Q. Okay. The statement when Madoff first
2 began the retail business he did initially engage in
3 some actual trades. Soon, however, he began to
4 engage in fraud as to the entire retail business.
5 Do you recall making that statement?
6     A. No. Again, I assume if I'm reading this
7 correctly, this is somebody interpreting what I
8 said.
9     Q. Understood. Do you recall saying this at
10 the proffer meeting, though? I'm not saying that
11 it's verbatim. I'm asking if you recall discussing
12 this?
13    A. I remember discussing the fact the business
14 was small and also that I started -- I started a
15 retail business, discussing trade position, yes.
16 Was paying ridiculously high returns, no. I never
17 said that because they were not --
18    Q. I'm only talking about the second
19 paragraph. I'm not asking about the first
20 paragraph.
21    A. Okay. When Madoff first began the retail
22 business, he initially engaged in some actual
23 trades. Again, that's someone interpreting what I
24 said. Began to engage in the fraud, no. Virtually
25 the entire life of the retail business was simply

Page 638

1 not trade. No, I don't recall saying this.
2     Q. Okay. And you were just reading the last
3 sentence on page three that's unredacted, for
4 virtually the entire life of the retail business?
5 Is that what you were referring to?
6     A. Not during -- not during an earlier period.
7 I was referring -- if I was saying that, I was
8 referring to post-'92 period.
9     Q. When you say if I was saying that, you mean
10 if you said --
11    A. What I'm saying is that I never would have
12 said, you know, anything other than what I always
13 had said, that the fraud began in, you know, in the
14 post-'90 period. So I don't know -- and I have a
15 pretty good memory, so I do not remember saying
16 anything like that.
17       MR. GOLDMAN: Amanda, this is a
18 memorialization of the proffer on the 16th? Is that
19 what it is?
20       MS. FEIN: Yes.
21       MR. GOLDMAN: Okay.
22    Q. (By Ms. Fein) You mentioned that it made
23 you angry to think about this meeting somewhat;
24 right?
25    A. Excuse me?

37 (Pages 635 - 638)

CONFIDENTIAL

Page 639

1    Q. You mentioned that it made you kind of
2  angry to think about this meeting; right?
3         MR. KRATENSTEIN:  Object to form.
4         THE WITNESS:  I'm angry because there were
5  interpretations here of what I said that were --
6  were not true.  I was very clear about what I said
7  and I was very forthright what I said.  I would have
8  no reason to change that after the fact.
9         And the -- the way this -- what happened
10  at this meeting was a lot of the -- a lot of this
11  was someone asking me questions like saying so this
12  is what happened?  And I had to go -- had to answer
13  back and say no, this is -- that is not what
14  happened.  And they were asking me questions which
15  to me sounded totally ridiculous.
16        And as a matter of fact, I do remember
17  specifically turning to the two SEC people were
18  there who were very well aware of me and my business
19  and I looked at them and said help me out here.  I
20  mean, do you really expect me to answer these
21  questions, explain what is a short sale, what does a
22  market maker do?
23        And it was like, you know, a smoking gun
24  type of thing.  And yeah, I was pissed off at it
25  because I knew, you know, that it made no sense.

Page 640

1  And they were embarrassed when I turned and asked
2  them.  I mean, for someone who was a senior person
3  at the SEC to sit there, you know, looking very
4  quiet and sheepish when Marc Litt, who knows nothing
5  at all, who is the prosecutor, about the securities
6  business or at least claimed not to know, you know,
7  asked me what is a short sale, what does a market
8  maker do?  You know, so you sold stock to a customer
9  that you didn't own?
10    Q. (By Ms. Fein)  So the SEC -- you're saying
11  and the SEC people in the room knew you.  They knew
12  of your reputation?
13    A. Of course.  There was no one in the
14  industry that didn't know me, you know, at that
15  time.  You know, so --
16    Q. Yeah.  Well, you had a very good reputation
17  in the industry; right?
18    A. Before I -- before this fiasco, yes, but it
19  was in every aspect of the industry.  So it was --
20  it just -- it infuriated me when David went through
21  this theater the other day.  So did the SEC lie?
22  Did the FBI lie he said?  I said I didn't say that
23  they lied.  I said they misinterpreted, you know,
24  what I said or maybe they just don't understand
25  anything.

Page 641

1    Q. Well, the statements, I won't represent
2  everything that we looked at, but you'll agree that
3  some of the statements we looked at didn't say
4  anything about market making certainly or short
5  sales; right?
6         MR. GOLDMAN:  We don't know that because
7  so much is redacted.
8         MS. FEIN:  I'm saying just the statements
9  that we looked at.
10        MS. CHAITMAN:  But it's a meaningless
11  question due to the fact that 90 percent of it is
12  redacted.
13        MS. FEIN:  If you want to object to the
14  question, you can object to the question.
15        MR. KRATENSTEIN:  Objection.
16        THE WITNESS:  Yes.  I mean, to me this
17  document is nothing.  You know, it's just -- look,
18  I've always felt that this -- you know, this whole
19  thing, the GAO report -- not the GAO report.  I had
20  no problem with the GAO report.  I had a problem
21  with Dubinsky's report and Picard.
22        Picard has made a whole series of
23  statements which the GAO report, his own report
24  proved totally, you know, false, like the firm used
25  it as a piggy bank, that I never made any money, the

Page 642

1  firm was never profitable, you know.  And he totally
2  ignored his own expert witness, you know, Lubbe and
3  Lozard.  You know, I read -- talk about getting
4  pissed off, that's how you get pissed off, making
5  statements, you know, that were totally untrue
6  that -- but look, I don't want to abuse you for
7  that, but this -- there are things here that make no
8  sense at all.
9         And I have no reason -- I have no -- you
10  know, I have no ax to grind.  It's not like, you
11  know, I'm not admitted of a fraud.  I admitted to a
12  fraud.  I said that.  So, you know, there's no
13  reason for me to say things that were not the case
14  because I've already been sentenced, totally
15  unfairly because they're trying to make me the
16  poster boy of Wall Street, which everyone is aware
17  of; but the -- you know, there are certain -- well,
18  it's not important.
19        So yes, I am pissed off because they did
20  enough -- I admitted to doing enough things that
21  were totally embarrassing and wrong that I regret,
22  obviously, but there gets to be a point where enough
23  is enough because it's an insult to my intelligence,
24  you know, for someone who's supposed to be an expert
25  witness, you know, to not -- you know, to make

38 (Pages 639 - 642)

CONFIDENTIAL

Page 643

1 statements that it looked -- on the face of it look
2 ridiculous. And there were other expert witnesses
3 of reports I've read who said that themselves that
4 the Dubinsky report is preposterous or that the --
5 Picard has made statements that are totally
6 ridiculous.
7      I can't believe that he has -- that he had
8 the nerve to even say these things and then hold
9 himself out as, you know, being a legitimate and
10 honest, you know, person. I mean, for this whole
11 idea with the short sale fiasco I've spoken to
12 numerous attorneys that -- you know, SEC attorneys
13 that have said what?
14      Is he saying that a short sale is a
15 fictitious transaction? It's not an honest
16 transaction? You know, I'm considering starting a
17 class action. And there are people that can turn
18 around and say look, you know what?
19      Anybody that lost money in a short sale in
20 the market, had nothing to do with me, if they lost
21 money in a short sale based upon his expert, you
22 know, witnesses and himself say, well, that's not a
23 legitimate transaction. So, therefore, I'll sue
24 Charles Schwab because, you know, it's so -- I've
25 had people tell me, well known attorneys much major

Page 644

1 and much bigger than your firm who've said now,
2 Bernie, nobody could say, he couldn't possibly say
3 that. He couldn't possibly be basing his case that
4 a fraud -- you know, that a short sale is a
5 fictitious transaction and a fraud.
6      He may get a bankruptcy judge who probably
7 knows less than him make that statement, you know,
8 or not do anything about it; but the people that say
9 they don't understand how anybody could do that
10 because it makes them look like a fool. And I know
11 he's not, so I don't understand why he would, you
12 know, try and ruin his reputation, which is what
13 he's doing, by submitting a report like that. Well,
14 anyway, I've said my peace.
15      MS. FEIN: Okay.
16      MR. GOLDMAN: Do you have another question
17 for him?
18      MS. FEIN: I do.
19      THE WITNESS: Peter, can you get me a
20 water or soda? I'm losing my voice here.
21      MR. GOLDMAN: Yeah, yeah. I'd get you a
22 scotch, but I don't think --
23      THE WITNESS: I don't drink, so we'll go
24 with -- I'm considering it.
25      (Trustee's Exhibit Number 21 was marked

Page 645

1 for identification.)
2      MR. KRATENSTEIN: 21?
3      Q. (By Ms. Fein) Yeah. This has been marked
4 as Exhibit 21. You can look through the document,
5 but I have a couple of questions on this first page
6 before -- this first page that you're looking at
7 now, so you just tell me when you're ready.
8      A. Okay.
9      Q. So this appears to be -- the first page
10 appears to be a form with handwritten notes and the
11 date appears to be 12-8-08. Do you see that?
12      A. Thank you. Yes.
13      Q. Do you recognize this form?
14      A. Yes.
15      Q. What was it called?
16      A. I don't know what it was -- I don't know
17 that it had any name.
18      Q. You didn't have something that you would
19 call it?
20      A. No.
21      Q. Okay. Who worked on it?
22      A. This looks like Jodi Crupi.
23      Q. And when you say -- are you referring to
24 the handwriting?
25      A. Yes. I know she kept this kind of report.

Page 646

1      Q. Okay. Was this report kept regularly by
2 Jodi?
3      A. Yes.
4      Q. Was it kept on a daily basis?
5      A. I believe so.
6      Q. Was it kept by your firm in the ordinary
7 course of business?
8      A. Not on the market making or proprietary
9 side, no.
10      Q. For the IA business was this kept, was
11 this --
12      A. Yes.
13      Q. -- report kept in the ordinary course of
14 your business?
15      A. Yes.
16      Q. What was the form used for?
17      A. Adjusted for, you know, what was -- what
18 was requested to be sent out in the way of checks
19 that were requested by clients and what checks had
20 come in. So she -- she or other people that worked
21 in this or that department could keep track of
22 monies in and monies out.
23      Q. Does the first -- underneath the date
24 there's a figure, 297,903, balance forward. Do you
25 see that?

39 (Pages 643 - 646)

CONFIDENTIAL

Page 647

1    A. Yes.
2    Q. Does that refer to a positive cash amount?
3    A. I assume it would refer to a cash balance
4 in the 703 account, bank account.
5    Q. Okay.
6    A. Which was a Morgan -- JPMorgan account.
7    Q. Okay. And next to wiring out at like the
8 bottom half of the page it appears that there's a
9 large amount of money that's being wired out on this
10 date?
11    A. By the way, I want to correct my statement
12 about starting a class action because I --
13    Q. You don't plan on doing that?
14    A. I would love to, but it's a little bit
15 preposterous. So let's say just so that I can get
16 out of here early, not this meeting, although I
17 wouldn't mind that either, but I don't want Picard
18 to get nervous, which I'm sure he wouldn't anyhow.
19    Q. Do you see that there are substantial sums
20 in the wiring out --
21    A. Correct.
22    Q. -- category? Okay. Would you have seen
23 this document at or around the time that it's dated,
24 12-8-08?
25    A. I typically saw this regularly.

Page 648

1    Q. Okay. And would this document give you
2 information about customer withdrawals and deposits?
3    A. Yes.
4    Q. And would it give you information about the
5 financial health of the firm with respect to the
6 customer side?
7    A. Would it give me --
8       MS. CHAITMAN: Objection to form.
9       THE WITNESS: It would give me a picture
10 of what was about to happen with monies in and out
11 of the firm, but it was never really a concern
12 because the firm -- this side of the firm always
13 had -- you know, it was liquid enough to handle
14 whatever withdrawals were coming out.
15    Q. (By Ms. Fein) But at this time, so
16 December 8th, 2008, that wouldn't be the case;
17 right?
18    A. No.
19    Q. Okay. So would this document be an
20 indication for you that you knew that perhaps you
21 wouldn't have a lot of funds left in the 703
22 account?
23    A. At this period of time there was no one on
24 Wall Street that didn't know what was going to
25 happen to Wall Street unless they weren't breathing.

Page 649

1 Probably Dubinsky had no clue.
2    Q. I'm talking with respect to your firm,
3 though, not with respect to Wall Street but just
4 with respect to your firm at that time?
5    A. Yes. It was very obvious to us there was a
6 crisis coming.
7    Q. Okay. So there are handwritten notes on
8 the pages that follow this first page of the
9 document. If you just look at that first -- the
10 page ending in 589, do you recognize that
11 handwriting?
12    A. No. This actually looks like my
13 handwriting.
14    Q. Okay.
15    A. That right there?
16    Q. Yeah, yeah.
17    A. Yeah.
18    Q. Okay. And then if you go forward another
19 page there's also handwriting. It appears the
20 handwriting on this document in general, so you can
21 look at it.
22    A. I want to look at these notes for a second.
23    Q. Sure.
24    A. Okay.
25    Q. Okay. On the page ending in 591, is that

Page 650

1 also your handwriting, 591?
2    A. Oh, yes.
3    Q. And if you flip ahead to page 593, it looks
4 like every other page is blank. So I'm only
5 referring to the ones that have handwriting on them.
6 Does that also look like your handwriting?
7    A. Yes.
8    Q. Okay. Would you agree your handwriting is
9 also on page 595?
10    A. Yes.
11    Q. Would you agree your handwriting is on 597?
12    A. Uh-huh, yes.
13    Q. And would you agree your handwriting is on
14 599?
15    A. Yes.
16    Q. Okay. And if you'd just look through the
17 remaining pages, if you can just confirm that's your
18 handwriting, too? If you see any that's not yours,
19 let me know.
20    A. You know, I have a question.
21    Q. Uh-huh.
22    A. Oh, these are not -- I don't understand how
23 -- it looks like there's two -- two pages made to
24 look just like one. For example, on the first
25 page --

40 (Pages 647 - 650)

CONFIDENTIAL

Page 651

1    Q. Oh, that's just the copying. That's just
2  the copying, yeah.
3    A. Okay. So in other words -- okay. It has
4  nothing to do with the --
5    Q. The original.
6    A. -- the original, the first page.
7    Q. That's right.
8    A. All right.
9    Q. Oh, this is a single document in terms of
10 this was found in one place, but I --
11   A. But this is -- this report --
12   Q. Right.
13   A. -- would normally not have this on the
14 other side.
15   Q. Understood, right. That's just an issue of
16 the copying. That's just an issue of --
17   A. Oh, okay. All right, okay.
18      MS. FEIN: Right, right. I can't speak to
19 that process.
20      MR. KRATENSTEIN: Just for the record, you
21 took a single-sided document and made it
22 double-sided? That's what happened? In other
23 words, the documents were found single-sided in a
24 row and then for the purposes of this deposition
25 you've double-sided them?

Page 652

1      MS. FEIN: That's my understanding. I
2  would say that the Bates are consecutive.
3      MR. KRATENSTEIN: Okay.
4      MS. FEIN: So when we printed it, it was
5  printed double-sided. I can't make representations
6  about what the original looked like because we're
7  looking at the copy from the files.
8      MR. KRATENSTEIN: Okay.
9      THE WITNESS: In other words, they're not
10 -- the dates are not related to each other
11 because --
12   Q. (By Ms. Fein) You don't believe that the
13 dates are related to one another?
14   A. This in itself was --
15      MR. GOLDMAN: Say page one of the
16 document.
17      THE WITNESS: This page of the copy,
18 Jodi's handwriting, had nothing to do with the
19 other. In other words, what Andrew is saying is
20 true. They probably took -- it would probably be
21 like taking this document and putting it, you know,
22 on the other side of this document and making it
23 appear as if they're the same document and they're
24 not.
25   Q. (By Ms. Fein) I know we certainly didn't

Page 653

1  doctor the document. This was -- my understanding
2  is this was found together. The fact that it's
3  double-sided as opposed to single-sided is, you
4  know, an oversight; but -- and I apologize that it's
5  double-sided, but I'm saying that this was found as
6  a single document.
7    A. Yeah, but they could have been ten days
8  apart or two weeks apart.
9    Q. Well, I wanted to ask you. That was my
10 question for you.
11   A. I'm assuming because Jodi would not -- none
12 of this has anything to do -- stuff that's in my
13 handwriting has nothing to do with Jodi with what
14 was on this page. She would keep this page. All
15 right. And there would be another one for another
16 day for that page. This here looks like you can
17 tell from the lines this was on a legal pad.
18      It was my notes for myself, all right, as
19 to any number of things, but it's not related to
20 this document. They may have found this document in
21 Jodi's office and this could have been in my
22 briefcase.
23   Q. This document was found together. I don't
24 want to quibble with you about that. I do -- you
25 should look at the last page of the document. On

Page 654

1  the last page of the document also is another --
2  it's a printout. It's not handwritten notes. So I
3  understand not all the pages are handwritten that
4  you're seeing here. I wanted to ask you about the
5  notes and if they were your handwriting?
6    A. I will acknowledge that the notes are in my
7  handwriting --
8    Q. Okay.
9    A. -- but there's nothing in my handwriting
10 has nothing to do with that original Jodi's document
11 because, in other words --
12   Q. You don't think they were close in time.
13 Is that what you're saying?
14   A. No. This would -- they were probably not
15 close in time. They may be a couple of dates in
16 time. Obviously, it would -- it would have nothing
17 to do with Jodi, you know.
18   Q. I understand that, I understand that.
19   A. Okay.
20   Q. The handwritten notes you're saying are not
21 -- you don't -- it wouldn't have involved Jodi's
22 process at all --
23   A. That's correct.
24   Q. -- because it's your notes. I understand
25 that, yes.

41 (Pages 651 - 654)

CONFIDENTIAL

Page 655

1    MR. KRATENSTEIN:  Just so we're all clear,
2  Jodi's notes on the first page and then on the pages
3  thereafter, it's Mr. Madoff's handwritten notes.
4    THE WITNESS:  Right.
5    Q.  (By Ms. Fein)  Do you have a recollection
6  of making any of the notes that are here?
7    A.  Yes.  It's my handwriting, so --
8    Q.  Do you recall -- do you recall making these
9  notes?  Do you recall going through the exercise of
10  making these notes in 2008?
11    A.  Yes, yes.
12    Q.  What do you recall about it?
13    A.  These are notes -- well, that at the end I
14  was considering sending out monies, paying bonuses
15  to people, sending out checks to -- I was planning
16  to send out checks because I knew the firm was -- we
17  were going out of business.  And I had written the
18  checks and, as a matter of fact, I put them in my
19  drawer.
20    It was actually, I think, I wrote these
21  notes, you know, prior to me making the decision
22  that the firm was -- well, it was in conjunction was
23  going out of business.  I wanted to sort of -- I
24  owed traders money for what was due to them, so on
25  and so forth.  So I wrote out checks, put them in my

Page 656

1  drawer and called my lawyer because I was planning
2  at that time to turn myself in.  And he said don't
3  send the checks out.  So I left them in the drawer
4  and then they never did go out.  That's what I
5  recall.
6    Q.  So do you think you could have looked at
7  the amounts listed on the first page of the document
8  in 588 so that you knew how much money you had for
9  writing the checks?
10    A.  Yes.  That's certainly possible.
11    Q.  So the handwritten notes were made around
12  the same time, you wouldn't say necessarily on the
13  same day, but around the same time as December 8th,
14  2008?
15    A.  Right, yes, uh-huh.  Or sometime
16  afterwards, you know.
17    Q.  After you would have seen the report --
18    A.  Yes.
19    Q.  -- from Jodi?
20    A.  Well, no.  It could have been made prior.
21  I just don't know.  I mean, my head was sort of up
22  my wherever at that time, but I don't -- obviously,
23  I can see from the notes here that it was what I had
24  planned to do was paying out traders and so on; but
25  then there were things on here, on notes that would

Page 657

1  have nothing to do that would have had to be done.
2  It was things to myself trying to figure out where I
3  stood afterwards.
4    Q.  Okay.
5    A.  If you look at -- see, it says I can't make
6  -- I wrote can't make traders 100 percent whole.  I
7  was referring to the fact that I didn't have enough
8  money to cover, you know, what I owed the traders in
9  their compensation.
10    Q.  Is that employees or traders?
11    A.  Employees, and employees also had accounts
12  with me.  So I was -- you know, I couldn't --
13  couldn't cover everything that was in their account.
14    Q.  And you're referring to page Bates ending
15  in 599; right?
16    A.  Yes, correct.
17    Q.  Okay.  On page ending 597, one page before
18  the one you're looking at, I think, can you find the
19  one ending in 597 for me?
20    A.  Which one?
21    Q.  597.  I think it's the other way.
22    A.  Yes.
23    Q.  The first line looks like 1960, dash,
24  present.  And then I can't -- I'm not sure.  Average
25  or --

Page 658

1    A.  Looks like average, 39 million.
2    Q.  Okay.  Do you know what that would be
3  referring to?
4    A.  I think it refers to what the profit of the
5  firm was over a certain period of time from 1960 to
6  present.
7    Q.  Okay.  And do you see down -- there are
8  calculations on the right side.  One says equal 39
9  mill per year and then to the left of that, 1909
10  divided by 49 years?
11    A.  Yeah.  I'm trying to figure out what
12  they're referring to.
13    Q.  But you agree that the calculation, it does
14  say 49 years; right?
15    A.  Doesn't it say 39 years?  It says 1960 to
16  present average equals 39 million.
17    Q.  Uh-huh.  And then look at underneath where
18  you have 691, 1218 over 1909.  Do you see that?
19    A.  Right.
20    Q.  Divided, and that looks like 49 equals 39
21  mill per year.  Do you see that?
22    A.  Right.
23    Q.  Okay.  And below that it looks like it says
24  without draw.  Do you see that, without draw?
25    A.  I think it refers to the profit of the

42 (Pages 655 - 658)

CONFIDENTIAL

Page 659

1 firm.
2     Q. Okay. But does draw refer to amounts taken
3 out by your employees?
4     A. Draw was money that -- no. It was either I
5 had a draw account, which is typical that I drew
6 money out. I didn't have a -- it was like a salary
7 that I would draw out of the firm. And I'm not real
8 sure what this is referring to, my draw or the
9 traders' draw or a combination thereof.
10     Q. Okay. Do you see where the line under
11 draw, it looks like it says draw five mill per -- do
12 you see that? It looks like the last line next to
13 the calculation ending in 2154?
14     A. Right.
15     Q. Was the 5 million draw something that you
16 received?
17     A. I don't know. It could be. It could have
18 been my draw. I know I didn't draw 5 million a
19 year, so it could have been my draw. It could have
20 been mine plus other people's draw. I'm not sure.
21     Q. Okay. 1962 to December 2008 is about -- is
22 49 years; right?
23     A. Uh-huh, right, yeah. The 1909 divided by
24 49 is -- it looks -- to me it would look like how
25 much the firm, you know, grew over a 49-year period,

Page 660

1 39-year period, something like that.
2     Q. Okay. Forty-nine years is about how long
3 your business was going on; right?
4     A. Correct.
5     Q. Okay. And there were references to your
6 firm starting in 1960 in the proffer agreement that
7 we looked at or the proffer statement?
8     A. Yeah. It looked to me like I was trying to
9 calculate how much the firm made or how much they
10 showed on their focus reports. I don't recall.
11     Q. Okay. But the calculations taking place
12 over 49 years; right?
13     A. Right, which was the life of the firm.
14     Q. Uh-huh. So these notes were written in
15 December 2008; right?
16     A. I can't -- I can't be sure. I can't say
17 for certain what period. There's so many different
18 notes and --
19     Q. Okay.
20     A. -- some of them are related, some of them
21 are not related to each other.
22     Q. Okay. But would this have been part of the
23 same exercise we were talking about, thinking about
24 writing out checks and what you were going to do
25 about the end of the firm?

Page 661

1     MS. CHAITMAN: Objection to form.
2     THE WITNESS: Well, I certainly know -- I
3 certainly know that there are notes here that refer
4 to how much employees would do from their trading
5 profits, their draws, things of that sort.
6     MS. FEIN: Uh-huh.
7     THE WITNESS: That -- you know, there were
8 certain things that I was trying to analyze how much
9 the firm had made, how much -- things of that sort.
10     Q. (By Ms. Fein) Okay. So you think the firm
11 -- so you think the firm on average made 39 million
12 a year for the 49 years it was in business?
13     A. Again, I don't know whether that was
14 including money that was taken out in compensation
15 by my -- you know, by me alone, by my family or by
16 the employees. I can't really -- I can't really
17 tell from looking at it just like this. It was --
18 I'm just analyzing various things.
19     And most of it deals with monies with the
20 checks that I was planning to send out, which I
21 would have determined by looking at how much money
22 people had in their accounts.
23     Q. Okay. And it looks like it refers to what
24 -- so these would have been notes -- let me ask.
25 Were these notes you made to yourself?

Page 662

1     A. Notes I was writing to myself, yeah.
2     Q. Yes, okay. Was anyone else present when
3 you were making them that you recall?
4     A. No.
5     Q. Okay. Do you recall where you were when
6 you made them?
7     A. No. It could have been in my office. It
8 could have been when I was home. I don't know.
9     Q. But did you share them with anyone else
10 after you made them?
11     A. No. I would have had to get the
12 information from Annette as to how much money people
13 had in their accounts because I had to get them from
14 because that's not something that I ever had off the
15 top of my head.
16     Q. Okay. Mr. Madoff, did you have any
17 meetings to prepare for this deposition?
18     A. Meetings?
19     Q. Uh-huh.
20     A. No. You mean --
21     Q. Did you meet with Mr. Goldman to prepare
22 for your deposition today?
23     A. No. Oh, today he came -- I met with him
24 the day before yesterday, but it wasn't necessarily
25 in relation to that. He came down here earlier.

43 (Pages 659 - 662)

CONFIDENTIAL

Page 663

1    Q. So you've not had any -- you're saying you
2  have not had meetings to prepare for your
3  deposition?
4    A. Peter Goldman came down. We discussed this
5  -- you know, my situation in general, I mean, from
6  how I was feeling.
7        MS. CHAITMAN: You don't have to talk
8  about anything confidential that you --
9        THE WITNESS: No, no.
10       MR. GOLDMAN: Yeah. We had a meeting.
11       THE WITNESS: Well, you can find out who
12 was here to visit me. That's all.
13   Q. (By Ms. Fein) Okay. Did you meet with Ms.
14 Chaitman or Mr. Kratenstein to prepare for your
15 deposition?
16   A. Mister who?
17   Q. Mr. Kratenstein.
18   A. They were down here yesterday. Not
19 yesterday, the day before yesterday. Is this the
20 second day or the third day? Yesterday.
21   Q. How long did you meet with them?
22   A. An hour or two.
23   Q. What did you guys discuss?
24       MR. KRATENSTEIN: I'm going to object.
25 Hang on. I'm going to object. What we discussed

Page 664

1  with Mr. Madoff is our work product because we're
2  allowed to talk to people. So I consider that our
3  work product. So my view is any discussions we had
4  with Mr. Madoff are work product that go to our
5  mental impressions. So I object to that question.
6  I'll leave it to Mr. Goldman as to whether he's
7  going to instruct not to answer.
8        I'll allow you to talk about the -- I
9  don't have an objection to subject matter or asking
10 him of any documents we used to refresh recollection
11 or anything like that, but I do have an objection to
12 discussions, substance of discussions.
13       MS. FEIN: So are you directing him not to
14 answer on the basis of your work product?
15       MR. KRATENSTEIN: It's our work product,
16 our mental impressions and our discussions with him
17 that reveal as mental impressions our work product.
18 And I would ask that an instruction be given that he
19 should not disclose that information.
20       MS. FEIN: Any information related to your
21 work product; right?
22       MR. KRATENSTEIN: Yes, yes.
23       MS. FEIN: Understood.
24       MR. GOLDMAN: Ask the question and then
25 we'll -- if I have an objection, then we'll -- I'll

Page 665

1  decide which direction I'll go.
2    Q. (By Ms. Fein) I think I asked how long you
3  met with Ms. Chaitman and Mr. Kratenstein, if you
4  recall.
5    A. I guess it would be probably a couple of
6  hours.
7    Q. Were you shown any documents during the
8  meeting?
9    A. I asked what the meeting was going to be
10 about.
11       MR. GOLDMAN: Bernie, just try and answer
12 the question. She asked you if you saw any
13 documents. So it's either --
14       THE WITNESS: I guess I saw documents,
15 yes.
16   Q. (By Ms. Fein) Do you -- were they any of
17 the documents that we reviewed today or yesterday?
18   A. To tell you the truth, I don't even know
19 what I saw. I saw documents. I don't know whether
20 they were the same as the ones that you had or not.
21 I don't know.
22       MS. FEIN: Okay. We would ask to see any
23 documents that you showed Mr. Madoff during the
24 course of your meeting with him.
25   Q. (By Ms. Fein) Did you have any -- any

Page 666

1  other preparation for your deposition with Ms.
2  Chaitman or Mr. Kratenstein before this week?
3    A. I'd never met Mr. Kratenstein until that
4  original meeting.
5    Q. Okay. Did you discuss the Sages at your
6  meeting?
7    A. Did I discuss the Sages? I discussed what
8  my relationship -- he asked what my relationship was
9  with the Sages and who I met with, so I told him.
10   Q. And were you shown any documents to refresh
11 your recollection about the Sages or any meetings
12 you had with them?
13   A. I was familiar with -- with the Sages.
14 They knew I was familiar with the Sages. I'm not
15 sure I understand what you're asking me.
16   Q. The question was have you looked at any
17 documents?
18   A. Yes. I looked at documents. I saw -- you
19 know, I saw confirmations, you know, and statements
20 of trades, not all, certainly not as much as I've
21 seen today.
22       MS. FEIN: Understood. All right. I
23 think we're all set. Thank you, Mr. Madoff.
24       THE WITNESS: Okay.
25       MS. CHAITMAN: I just have a few questions

44 (Pages 663 - 666)

CONFIDENTIAL

Page 667

1 and then --
2     MR. KRATENSTEIN: And I have a couple.
3     FURTHER EXAMINATION
4 BY MS. CHAITMAN:
5     Q. Okay. Mr. Madoff, how were the traders
6 compensated at your firm?
7     A. They got -- they basically got a percentage
8 of their market making profits, proprietary trading
9 profits.
10     Q. What was the percentage? Did it vary per
11 person?
12     A. Typically it was 20 percent of their net
13 trading profits. That was after commissions and
14 expenses related to their trading.
15     Q. The commissions would have been payable to
16 whom?
17     A. To their -- which --
18     Q. When you say after, typically 20 percent of
19 their net?
20     A. Oh, depends upon where the transaction was
21 executed. If it was -- if the transaction was
22 cleared, there would be -- that would be deducted.
23 If there was interest, it would be charged to their
24 account depending upon whether we had bank loans
25 out, things like that. They were -- if the -- if it

Page 668

1 was a transaction that was laid off on the floor of
2 an exchange, there would be commissions -- there
3 would be commissions paid on that so they would --
4 that would be deducted. Their 20 percent was a net
5 net.
6     Q. So it was 20 percent of the profits they
7 generated. Is that a fair --
8     A. That's correct.
9     Q. Okay. If you could just take a look? You
10 can look at my copy of Trustee's Exhibit 19. This
11 is -- just take a look at this. It's 19 and --
12     MS. FEIN: Marked copy.
13     Q. (By Ms. Chaitman) 19 and 18, yeah. Do you
14 recognize the handwriting on Exhibit 18 where it
15 says hold?
16     A. It looks like it's the same as -- like it's
17 Annette or it could be Jodi. You know, I can't
18 really tell from that.
19     Q. Okay.
20     A. Yeah. Looks like two different
21 handwriting. One is printed and one is like script.
22     Q. Right. And one is asking you -- one is
23 asking you about documents in 1979 to '81 and the
24 other is asking you about documents in 1982. Do you
25 see that?

Page 669

1     A. Yes.
2     Q. Okay. Do you remember what your desires
3 were with respect to what documents would be
4 shredded and what documents would be held?
5     A. Not really.
6     Q. Were you trying to conceal evidence of a
7 crime?
8     A. Well, let's put it this way. There was no
9 crime prior to '90 -- to the '90s. So that's easy
10 for me to answer.
11     Q. Okay. So what -- do you remember why you
12 would have said to hold certain documents and shred
13 others?
14     A. You know, we had no general policy with
15 retaining -- as I've said numerous times, the
16 retention period for documents on Wall Street is six
17 years. That's an industry requirement. So you're
18 not required to hold documents more than six years
19 and most firms shred immediately after that because
20 they just don't want to store the documents.
21     As far as the -- but as I've said numerous
22 times, we held customer-related documents relating
23 to cost basis for customers, tax basis for customers
24 because that -- we would constantly be asked to --
25 for information from the clients' accountants, you

Page 670

1 know, or a tax lawyer, which could happen at any
2 given time.
3     MS. CHAITMAN: Do you have to stop?
4     THE VIDEOGRAPHER: Yes. I do.
5     MS. CHAITMAN: Okay.
6     THE VIDEOGRAPHER: This marks the end of
7 disc number two in the deposition of Bernard L.
8 Madoff. Going off the record. The time is 13:08.
9     (A recess was taken.)
10     THE VIDEOGRAPHER: Back on the record.
11 This begins disc number three in the deposition of
12 Bernard L. Madoff in Butner, North Carolina on
13 November 9th, 2017. The time is 13:12.
14     Q. (By Ms. Chaitman) So Mr. Madoff, if you
15 look at Exhibit 19 --
16     A. Yes.
17     Q. Okay. You apparently gave instructions to
18 shred the C&S statements. Do you see that?
19     A. Number one, I don't know that I gave that
20 -- I don't believe that I gave anybody instructions
21 as to what to shred, what not to shred. I mean,
22 it's not -- I would have no interaction with these
23 people. So somebody in Annette's office like either
24 Annette or some other employee, some of the other
25 people would tell people what to shred, what not to

45 (Pages 667 - 670)

CONFIDENTIAL

Page 671

1  shred. My instructions were to shred anything that
2  we did not need to have in the future, so --
3      Q. Right. Okay. So consistent with that
4  where it says hold at the second half of the first
5  page of Trustee's Exhibit 19, there are several
6  items which are hold and they're all EOM customer
7  ledgers.
8      A. Yes.
9      Q. Is that consistent with the strategy you've
10 described?
11     A. It would -- holding a customer ledger would
12 be because a customer ledger would typically have
13 all the pricing information, the information we
14 would need to supply to their accountants.
15     Q. Okay.
16     A. So there was no reason to hold.
17     Q. Okay.
18     A. The other things here are -- involve
19 brokerage firms that we bought and sold stock to.
20 So there's no reason for that because once the trade
21 settles, there's no reason to have anything related
22 to the counterparties.
23     Q. Okay. Similarly, if you look at Trustee's
24 Exhibit 18, are the documents that you -- that have
25 the X next to them, which the handwriting which is

Page 672

1  unidentified says shred the Xs only, were those
2  specific to customers or were they general?
3      A. They would need -- we wouldn't have any
4  reason to have them because once the trade settles,
5  it settles. So there's no reason to hold anything.
6      Q. Okay, okay. Now --
7      MR. KRATENSTEIN: Go ahead.
8      Q. (By Ms. Chaitman) Now, Amanda asked you
9  several questions about the T-bills that you held?
10     A. Right.
11     Q. And you had previously testified that you
12 maintained a portfolio of about $6 billion of
13 T-bills?
14     A. Correct.
15     Q. And did you buy those with money invested
16 through the investment advisory business?
17     A. Correct.
18     Q. So it was -- those T-bills were purchased
19 with house 17 customer money?
20     A. Yes.
21     Q. Okay. And you've previously described how
22 those were maintained at --
23     A. Morgan Stanley, Fidelity.
24     Q. -- Bear Stearns, Morgan Stanley, Fidelity,
25 Lehman and JPMorgan Chase --

Page 673

1      A. Correct.
2      Q. -- right? Okay. And was it your intention
3  to keep that money for the benefit of the investment
4  advisory customers?
5      A. That was the only reason. It was money
6  that, you know, we would have needed to settle with
7  clients if they asked us for money from their
8  account.
9      Q. Okay. And, in fact, do you recall
10 testifying that you kept those T-bills to maturity?
11     A. I don't remember, you know. They were
12 basically short-term instruments, so we would
13 normally keep them until we needed the money to pay
14 out or whether they expired.
15     Q. Okay, okay. Now, so is it fair to say that
16 if an investment advisory customer wanted to close
17 out his or her account and you had to come up with
18 $5 million in cash, that if you didn't have
19 $5 million sitting in a bank account, you would have
20 liquidated one of the T-bills to pay it?
21     MS. FEIN: Objection.
22     Q. (By Ms. Chaitman) Pardon?
23     A. Yes.
24     MS. CHAITMAN: Okay. What's your
25 objection?

Page 674

1      MS. FEIN: That was -- it was testifying.
2  It was your testimony, not Mr. Madoff's.
3      Q. (By Ms. Chaitman) Mr. Madoff, would you be
4  good enough to cure Amanda's objection and could you
5  say that in your own words? I don't want to put
6  words in your mouth.
7      A. My plan was that if I needed money to
8  settle a customer's account, I would typically
9  either take the money out of the 703 bank account,
10 which is typically where we kept all clients'
11 monies, or if there wasn't immediate cash available,
12 which there was most of the time, I would then
13 liquidate T-bills.
14     Q. Okay. And, again, those T-bills were
15 purchased with money --
16     A. It was always purchased with money from the
17 703 account.
18     Q. Okay. And that was the investment advisory
19 customers' money?
20     A. Correct.
21     Q. Now, you were talking about the ledgers.
22 Amanda was showing you some ledgers and I believe
23 you testified that there were subsidiary ledgers for
24 each institution that you did business with?
25     A. There were -- there were either ledgers or

46 (Pages 671 - 674)

CONFIDENTIAL

Page 675

1  documents. You know, there were statements. So
2  that's what -- I'm not -- I don't recall what -- and
3  it changed all the time, you know, how -- what the
4  practice was of firms sending out statements
5  because, again, it depended upon what stage the
6  clearing cycles were in, in other words, whether --
7  how the DTC worked, how NSCC worked and whether we
8  had automated interfaces with firms.
9      We had 500 interfaces with -- not 500. We
10 had over 100 interfaces with 500 different brokerage
11 firms. Everything was done, you know, on computer.
12 So there was no -- there was no exchanging of
13 confirmations. There was no cash in settlement,
14 things of that sort.
15     And the firm themselves, the operations
16 department had their own policies of how they --
17 what records they have, which I, quite frankly, am
18 not even familiar with. I have no idea with some of
19 these C&S, cash and securities settlements. I don't
20 know what they relate to.
21     Q. Okay. But with the 10 or 11 banks that
22 you've named that you had custodial relationships
23 with, is it fair to say that you would have had
24 records showing what securities were held at each
25 institution?

Page 676

1      A. As a general rule, yes, but I don't know.
2  Again, it depends upon the time frame involved
3  because all of that changed over the years depending
4  upon what the various interfaces of automation was
5  available to firms.
6      Q. Right, right. So if you could do it
7  through the internet, you wouldn't need to have the
8  paper copies; is that right?
9      A. Correct.
10     Q. Okay. I understand that.
11     A. You know, I want to go on the record of
12 stating, by the way, relating to that, when this
13 thing -- when I first got arrested I requested, you
14 know, all the records that were available to the
15 firm. I requested it to my attorneys, who then
16 requested the Trustee send me all the documents that
17 they had.
18     And my purpose was that I was -- if I
19 wanted -- I would want to go to trial to demonstrate
20 when the crime started and what was involved and
21 what was -- how much was made and lost. And the
22 only thing that they -- and they never produced
23 anything. I shouldn't say never. All they produced
24 was a box exactly this size that was delivered up to
25 me while I was in -- you know, in jail. And I

Page 677

1  complained.
2      I said how am I going to -- how am I going
3  to piece everything together? How am I going to
4  demonstrate what really -- what really occurred
5  financially and so on? I said, well, that's all
6  that they were able to produce to me.
7      Q. Ike Sorkin?
8      A. Ike Sorkin. And they produced records that
9  went back no longer than 1998. And that was even --
10 you know, they said we don't have any bank records.
11 We don't have this and that. They complained. They
12 complained to the judge, I guess, prior to my
13 sentencing. It was one of my court appearances.
14 And Chin insisted, got agitated and insisted to the
15 prosecutor, said instruct -- you know, give them the
16 records.
17     And they said, well, we can't find any.
18 The records were very sloppy. You know, you would
19 have the impression that we didn't have any records
20 and that the records were scraps of paper. And this
21 -- you know, so when I was sentenced, you know, I
22 couldn't -- as a matter of fact, I was asked do you
23 want to appeal when I had this 150-year sentence.
24     I said how am I going to appeal? I said I
25 don't have any records. I said where in the hell

Page 678

1  are the records? And I said I've got warehouses
2  full of records. I said, you know, how can they not
3  produce the records? He said Bernie, what do you
4  want me to tell you? So you can imagine my anger
5  when I was notified by you that there were 32
6  million pages of goddamn documents. I'm looking at
7  these documents now and all of a sudden miraculously
8  these documents appear.
9      Now, you can't possibly tell me that you
10 didn't know, not you individually, that the Trustee,
11 you know, did not know that these documents existed
12 because I have -- I was paying rent on something
13 like eight warehouses to say nothing of the whole
14 basement of the Lipstick Building where I knew there
15 were records, you know.
16     And I'm not talking about necessarily, you
17 know, what I'm seeing here. So how does that
18 happen? I mean, you know, I don't understand it.
19     MS. CHAITMAN: You know what, Bernie? I
20 asked the same question. Okay. I have no further
21 questions and I'm going to turn to Andrew.
22     MR. KRATENSTEIN: I will be, I hope,
23 brief.
24     FURTHER EXAMINATION
25 BY MR. KRATENSTEIN:

47 (Pages 675 - 678)

CONFIDENTIAL

Page 679

1    Q. So Ms. Fein showed you a document, Mr.
2  Madoff, that she marked as Exhibit Number 11, which
3  was a house number five daily stock record activity
4  for July 16th, 1987. And she asked you some
5  questions about a County of Nassau, it's third from
6  the bottom, a County of Nassau bond. Is that a
7  municipal bond, the County of Nassau bond?
8    A. Yes.
9    Q. Okay. And did your firm do -- trade in
10 municipal bonds?
11   A. No.
12   Q. Did you have municipal bonds in your
13 custody, your firm's custody?
14   A. Yes.
15   Q. Okay. So what was your -- what did your
16 firm do with respect to municipal bonds? Can you
17 describe?
18   A. The clients used them as either margin or
19 with instructions to sell them to go into -- rather
20 than sending in cash to a strategy, they sent them
21 bonds to either be liquidated or to use as
22 collateral for a margin account.
23   Q. I'm going to show you Exhibit 38, which we
24 showed you yesterday. And just take a look at that
25 page. I've opened it to page MF 00964437, which you

Page 680

1  might recall yesterday towards the bottom of that
2  page I showed you the RCA Corp convertible
3  debenture. And there are a whole bunch of positions
4  around that. Do you see that?
5    A. Where am I looking? Here?
6    Q. So bottom, if you look -- we talked about
7  this yesterday, but there are -- fourth up from the
8  bottom do you see the RCA Corp bond?
9    A. Yes.
10   Q. And then all around that do you see
11 municipal bonds like for Puerto Rico, Pennsylvania,
12 Oregon?
13   A. Right, uh-huh.
14   Q. Do you see that?
15   A. Yes.
16   Q. And they all have different maturities,
17 different yield dates --
18   A. Right.
19   Q. -- right? So what are these?
20   A. They're municipal bonds.
21   Q. And are these the types of bonds you were
22 just describing?
23   A. Yes.
24   Q. And are these all real securities that were
25 held at the National Bank of North America for your

Page 681

1  firm?
2    A. Yes.
3       MR. KRATENSTEIN: Thank you very much.
4  That's all I have.
5       MS. CHAITMAN: Okay. I'd just like to put
6  on the record the discussion that I had with Amanda
7  that we will be continuing your deposition so long
8  as your health continues once we get further
9  documents from the Trustee. We're negotiating to
10 get additional documents that we now know the
11 Trustee has.
12      MS. FEIN: We just want to put on the
13 record that we would reserve a right to
14 cross-examine on any documents that Ms. Chaitman
15 asks about.
16      MS. CHAITMAN: Of course, of course.
17 Okay. Thank you so much. Andrew and I are going to
18 run.
19      THE VIDEOGRAPHER: We are off the record
20 in the November 9th, 2017 deposition of Bernard L.
21 Madoff, Volume IV. The number of discs used was
22 three. The time is 13:26.
23      (Reading and signing of the deposition by
24 the witness was reserved and the deposition was
25 concluded at 1:26 p.m.)

Page 682

1       C E R T I F I C A T E
2  NORTH CAROLINA:
3  GUILFORD COUNTY:
4       I hereby certify that the foregoing
5  deposition was reported, as stated in the caption,
6  and the questions and answers thereto were reduced
7  to the written page under my direction; that the
8  foregoing pages 493 through 682 represent a true and
9  correct transcript of the evidence given. I further
10 certify that I am not in any way financially
11 interested in the result of said case.
12      I have no written contract to provide
13 reporting services with any party to the case, any
14 counsel in the case, or any reporter or reporting
15 agency from whom a referral might have been made to
16 cover this deposition. I will charge my usual and
17 customary rates to all parties in the case.
18      This, the 21st day of November, 2017.
19
20
21      K. Denise Neal
22      K. Denise Neal, RPR
        Registered Professional Reporter
23      Notary Public No. 200517500101
24
25

48 (Pages 679 - 682)

CONFIDENTIAL

Page 683

1    E R R A T A   S H E E T

2

3    Pursuant to Rule 30(7)(e) of the Federal Rules
4  of Civil Procedure, any changes in form or substance
5  which you desire to make to your deposition
6  testimony shall be entered upon the deposition with
7  a statement of the reasons given for making them.

8

9    To assist you in making any such corrections,
10  please use the form below.  If supplemental or
11  additional pages are necessary, please furnish same
12  and attach them to this errata sheet.

13    * * * * *

14    I, the undersigned, BERNARD L. MADOFF, do hereby
15  certify that I have read the foregoing deposition
16  and that to the best of my knowledge said deposition
17  is true and accurate (with the exception of the
18  following corrections listed below).

19

20

21

22

23

24

25

Page 684

1  Page      Line      should read:
2  Reason for change:
3
4  Page      Line      should read:
5  Reason for change:
6
7  Page      Line      should read:
8  Reason for change:
9
10  Page      Line      should read:
11  Reason for change:
12
13  Page      Line      should read:
14  Reason for change:
15
16  Page      Line      should read:
17  Reason for change:
18
19  Page      Line      should read:
20  Reason for change:
21  Signature:
22  Sworn to and Subscribed before me
23            , Notary Public.
24  This      day of         , 2017.
25  My Commission Expires:

49 (Pages 683 - 684)