**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>          Plaintiff-Applicant,<br><br>          v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES, LLC,<br><br>          Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>          Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff,<br><br>          Plaintiff,<br><br>          v.<br><br>STANLEY SHAPIRO, *et al.*,<br><br>          Defendants. | Adv. Pro. No. 10-05383 (SMB) |

**TRUSTEE'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO QUASH**

## **TABLE OF CONTENTS**

Page(s)

I.   PRELIMINARY STATEMENT ................................................................................................1

II.  RELEVANT FACTS ...............................................................................................................2

   A.   Mr. Shapiro Colluded with BLMIS to Fabricate Securities Transactions in
        1995........................................................................................................................2

   B.   The Trustee's Subpoena and JPMC's Response....................................................5

III. ARGUMENT ..........................................................................................................................6

   A.   Applicable Legal Standards ..................................................................................6

   B.   Documents Bearing on Mr. Shapiro's Role in a Scheme to Create Millions
        of Dollars in False Account Value Are Highly Relevant ......................................7

   C.   The Relevance of the Subpoenaed Documents Far Outweighs any
        Minimal Privacy Interests Mr. Shapiro Might Have .............................................9

IV.  CONCLUSION.....................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Glatt v. Fox Searchlight Pictures, Inc.*,
   No. 11 Civ. 6784, 2012 WL 2108220 (S.D.N.Y. June 11, 2012)............................................10

*Hughes v. Twenty-First Century Fox, Inc.*,
   No. 1:17-CV-7093, 2018 WL 1936096 (S.D.N.Y. Apr. 24, 2018) ........................................6, 7

*In re Glitnir banki hf.*, No. 08-14757 (SMB)
   No. 08–14757, 2011 WL 3652764 (Bankr. S.D.N.Y. Aug. 19, 2011) .................................6, 7

*Langford v. Chrysler Motors Corp.*,
   513 F.2d 1121 (2d Cir. 1975)...................................................................................................6

*Manolis v. Brecher*,
   No. 11 Civ. 2750 (RMB) (HBP), 2013 WL 4044808 (S.D.N.Y. Aug. 9, 2013) ......................7

*In re Penthouse Exec. Club Compensation Litig.*,
   No. 10 CV 1145, 2012 WL 1511772 (Bankr. S.D.N.Y. Apr. 30, 2012) .................................10

*Picard v. Magnify Inc. (In re BLMIS)*,
   583 B.R. 829 (Bankr. S.D.N.Y. 2018)......................................................................................8

*Picard v. Roman (In re BLMIS)*,
   Adv. Pro. No. 10-04292 (SMB), 2017 WL 4685525 (Bankr. S.D.N.Y. Oct. 17,
   2017) ........................................................................................................................................7

*Sierra Rutile Ltd. v. Katz*,
   No. 90 Civ. 4913 (JFK), 1994 WL 185751 (S.D.N.Y. May 11, 1994) ................................6, 9

*SIPC v. BLMIS*,
   Adv. Pro. No. 08-01789 (SMB), 2017 WL 2602332 (Bankr. S.D.N.Y. June
   15, 2017) ..................................................................................................................................7

*United States Reg'l Econ. Dev. Auth., LLC v. Matthews*,
   No. 3:13-CV-01093 (CSH), 2018 WL 2172713 (D. Conn. May 10, 2018) .............................9

**Statutes**

11 U.S.C. §§ 701...............................................................................................................................1

15 U.S.C. §§ 78aaa ..........................................................................................................................1

**Rules**

Rule 26(b) .........................................................................................................................................7

Rule 45 ..............................................................................................................................................7

Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*, and the substantively consolidated estate of Bernard L. Madoff, under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 701 *et seq.*, by and through his undersigned counsel, hereby opposes the motion (the "Motion" (ECF No. 120)) of defendants Stanley Shapiro and the estate of Renee Shapiro for an order quashing the subpoena that the Trustee issued to JPMorgan Chase Bank, N.A. ("JPMC").

## I.  PRELIMINARY STATEMENT

In 1995, Stanley Shapiro (either alone or together with his late wife) obtained a line of credit or other type of loan from Chemical Bank (*nka* JPMC). In connection with that loan application, BLMIS's Annette Bongiorno sent a letter in July 1995 to Chemical Bank to "confirm" that a BLMIS account held by S&R Investment Co. ("S&R"), a partnership between Mr. Shapiro and his late wife, was valued "in excess of $8 million" as of June 30, 1995. This representation was false. Even at face value, S&R's account statements for June 1995 reflected an equity value of less than $6 million. Shortly after securing the loan, Mr. Shapiro calculated that the reported value of the account totaled less than $6 million, and noted that the value "should be" $9 million by year's end. To remedy this shortfall, Ms. Bongiorno fabricated out of whole cloth an entirely new account for Mr. Shapiro and his wife with trades backdated to June 1995, the very month Ms. Bongiorno referenced in her letter to the bank in support of the loan. This new account increased S&R's reported holdings at BLMIS by millions of dollars.

The foregoing sequence of events – beyond constituting bank fraud – demonstrates Mr. Shapiro knew that BLMIS would readily fabricate account statements (as well as entire accounts) with backdated, fictitious securities transactions. Mr. Shapiro also knew that BLMIS

1

was willing to engage in such fraud – and create millions in paper gains – at his behest. The events of 1995 further bolster the Trustee's allegations of knowledge against Mr. Shapiro and bring the backdating of trades in the Shapiros' BLMIS accounts that occurred between 2000 and 2003 into even sharper focus.

While Ms. Bongiorno's fraudulent representation to Chemical Bank kicked off a series of further fraudulent conduct by her and Mr. Shapiro, we do not know what representations Mr. Shapiro may have made directly to the bank, including representations regarding the value of S&R's holdings at BLMIS, or why he apparently did not pledge S&R's BLMIS account as collateral for the loan as initially contemplated. To that end, the Trustee issued a subpoena to JPMC, Chemical Bank's successor, seeking production of its 1995 loan file as well as its files from two related loans.

Mr. Shapiro moved to quash the subpoena. He does not want further evidence of his wrongdoing to come to light. But he lacks any basis for such relief. The likely relevance of the documents sought from JPMC is beyond question. By contrast, the privacy interest asserted by Mr. Shapiro is tenuous at best given the age of the loan documents at issue, coupled with the fact that the documents can be produced subject to the protective order in place in this proceeding. On balance, the relevance of the subpoenaed documents greatly outweighs any marginal privacy interest Mr. Shapiro may have, and the motion to quash the Trustee's subpoena should be denied.

## II.    RELEVANT FACTS

**A.    Mr. Shapiro Colluded with BLMIS to Fabricate Securities Transactions in 1995.**

Mr. Shapiro began investing with BLMIS in the 1960s. (Second Amended Complaint, ¶¶ 3, 39.) As of the early 1990s, he held just one account at BLMIS together with his late wife through S&R. (*Id*. at ¶¶ 39–40.) Annette Bongiorno managed the account which was assigned No. 1SH014. (*Id*. at ¶ 4.)

2

In the summer of 1995, Mr. Shapiro sought a line of credit or other type of loan from Chemical Bank, and asked Ms. Bongiorno to provide written confirmation to the bank regarding the value of Account 1SH014. Ms. Bongiorno did so by letter dated July 26, 1995, wherein she purported to "confirm that the net equity in the account of S&R Investment, as of 6/30/95[,] was in excess of eight million dollars." (Declaration of Torello H. Calvani ("Calvani Decl.", Ex. 1.) This representation was false on several levels. According to the face of the June 1995 account statement for 1SH014, the account's reported equity was under $6 million. (*Id.*, Ex. 2.)[1] Shortly thereafter, the Shapiros secured the line of credit or loan from Chemical Bank as evidenced by Chemical Bank's filing of a UCC Financing Statement. (*Id.*, Ex. 3 at p. 2.)[2]

Mr. Shapiro thereafter undoubtedly became aware (if he did not know earlier) that the representation that Ms. Bongiorno had made at his behest to Chemical Bank in late July was false. Mr. Shapiro calculated the reported equity of Account 1SH014 on a "MADF" notepad (which he previously produced to the Trustee) based on figures from his August 1995 account statement. (Calvani Decl., Ex 4.) A copy of the notepad is reproduced on the following page:

---

[1] Of course, this value as reflected in the statement was itself fiction because BLMIS never engaged in any trading activity for this account.

[2] Although Chemical Bank received Ms. Bongiorno's letter, the Shapiros ultimately used their interest in their cooperative apartment as collateral for the loan. (*Id.*) Shortly after the loan was secured, a prior line or loan with Chemical Bank apparently was satisfied and/or extinguished because Chemical Bank filed a further UCC Financing Statement to that effect in November 1995. (*Id.* at pp. 1 & 3.) Likewise, the August 1995 line or loan apparently was satisfied and/or extinguished in 1999 contemporaneously with the apparent securing of a new line or loan by the Shapiros from Chemical Bank. (*Id.* at pp. 4 & 5.) Because the three loans appear to be interrelated, the Trustee seeks documents relating to all three.

3



(*Id.*)  According to Mr. Shapiro's calculations (which are accurate), the reported equity of

Account 1SH014 as of the end of August 1995 was $5.78 million, well below the $8 million

represented by Ms. Bongiorno to Chemical Bank as of the end of June 1995.  Moreover, Mr.

Shapiro noted that the equity value of the account was "(3,220)" short and that it "should be 9.0

@ 12/30/95."[3]

Mr. Shapiro surely advised Ms. Bongiorno where he believed the value of Account

1SH014 "should be" because in early October 1995, she and BLMIS created an entirely new

---

[3] On the lower half of the notepad, Mr. Shapiro performed the same type of calculations for his children's trust accounts (Account Nos. 1SH024, 1SH08, and 1SH030), and noted that they too "should be" valued higher at "12/31/95."

4

account for S&R (numbered 1SH079) out of whole cloth with trades backdated to June 1995, the very month Ms. Bongiorno used when representing the purported "net equity in the account of S&R Investment" to Chemical Bank. (Calvani Decl., Ex. 1 & Ex. 6.) Starting with a zero balance as of the beginning of June 1995 (there is no amount indicated for the "Balance Forward"), BLMIS fabricated purchases of $3.375 million of Micron Technology stock as having occurred on June 7, 1995. (*Id*., Ex. 5 and Ex. 6.) The purchases were reportedly made completely on margin.[4] (*Id*.) The account thereafter reportedly grew in value as the price of Micron Technology climbed. (*Id*., at Ex. 5.) In November 1995, BLMIS reportedly locked in more than $2 million in gains on the fictitious Micron Technology holdings by purporting to sell off 30,000 shares and to sell another 45,000 shares short. (*Id.*) By year's end, the value of the S&R's holdings at BLMIS reportedly totaled nearly $9 million, just where Mr. Shapiro noted in early September that it "should be" at year's end. (*Id.*)

**B.    The Trustee's Subpoena and JPMC's Response.**

On September 11, 2018, the Trustee issued a subpoena to JPMC (as the successor to Chemical Bank) for its files relating to any loan issued to Mr. Shapiro for which he pledged the interest in his and his late wife's cooperative apartment (any "Loan"). The subpoena contained only the following two document requests:

1. Your entire file Concerning any Loan.

2. Any communications between You, on the one hand, and either Stanley Shapiro, Renee Shapiro, Bernard L. Madoff, and/or any employee of Bernard L. Madoff Investment Securities LLC ("BLMIS"), on the other hand, Concerning any Loan. For

---

[4] BLMIS thus did not report that the account was funded with a deposit or an inter-account transfer. BLMIS thereafter did reportedly charge interest on the margin balance. The interest charge was simply added to the margin balance, and thus Mr. Shapiro did not have to go out of pocket to pay it. And Mr. Shapiro could make effective use of it for tax purposes by reporting it as an expense to offset ordinary income. Thus beyond potential bank fraud, Mr. Shapiro may have committed tax fraud.

5

>    the sake of clarity, this Request seeks, among others, Communications Concerning the purported value or equity in any investment account held by Stanley Shapiro, Renee Shapiro, and/or S&R Investment Co. at BLMIS which may have been submitted in connection with any Loan.

JPMC's counsel subsequently advised the parties that it had located documents responsive to the subpoena, and Mr. Shapiro filed his motion to quash.

### III.    ARGUMENT

The relevance of the documents that the Trustee seeks in his subpoena to JPMC is beyond question. They likely will reveal, *inter alia*, what Mr. Shapiro may have represented to the bank regarding S&R's account at BLMIS and why he chose not to use the account as collateral for his loan. Thus it is highly likely that JPMC's production will further substantiate the Trustee's position regarding Mr. Shapiro's knowledge. By contrast, any privacy concern claimed by Mr. Shapiro is marginal given the age of the loan documentation together with the fact that JPMC can produce the documents subject to the protective order in place in this proceeding.

**A.    Applicable Legal Standards.**

Parties generally do not have standing to object to subpoenas issued to non-parties. *Langford v. Chrysler Motors Corp.*, 513 F.2d 1121, 1126 (2d Cir. 1975). "However, exceptions are made for parties who have a claim of some personal right or privilege with regard to the documents sought." *Hughes v. Twenty-First Century Fox, Inc.*, No. 1:17-CV-7093, 2018 WL 1936096, at * 1 (S.D.N.Y. Apr. 24, 2018) (internal marks omitted). For example, a party's privacy interest in financial records sufficiently confers standing to object to a subpoena. *See Sierra Rutile Ltd. v. Katz*, No. 90 Civ. 4913 (JFK), 1994 WL 185751, at *2 (S.D.N.Y. May 11, 1994). But such standing does not entitle a party to object on other grounds, such as undue

6

burden. *See, e.g., Manolis v. Brecher*, No. 11 Civ. 2750 (RMB) (HBP), 2013 WL 4044808, at *2 n.1 (S.D.N.Y. Aug. 9, 2013).[5]

A subpoena issued pursuant to Rule 45 nevertheless "is subject to Rule 26(b)(1)'s overriding relevancy requirement." *Hughes*, 2018 WL 1936096 at * 2 (internal marks omitted). Under Rule 26(b), "relevance is . . . to be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense." *Picard v. Roman (In re BLMIS)*, Adv. Pro. No. 10-04292 (SMB), 2017 WL 4685525, at *3 (Bankr. S.D.N.Y. Oct. 17, 2017) (internal marks omitted); *see also SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (SMB), 2017 WL 2602332, at *4 (Bankr. S.D.N.Y. June 15, 2017) ("the bar for relevancy . . . is very low") (internal marks omitted). Finally, as this Court has stated, "When a subpoena seeks the production of an individual's personal financial information, the court must balance the relevance of the information sought against the intrusion into the affected individual's privacy interests." *In re Glitnir banki hf.*, No. 08-14757 (SMB), 2011 WL 3652764, at *5 (Bankr. S.D.N.Y. Aug. 19, 2011).

**B.    Documents Bearing on Mr. Shapiro's Role in a Scheme to Create Millions of Dollars in False Account Value Are Highly Relevant.**

Even without the benefit of JPMC's production, the Trustee knows: (a) BLMIS falsely represented that the value of S&R's accounts was "in excess of 8 million dollars"; (b) Mr. Shapiro calculated the purported value of S&R's sole BLMIS account as of August of 1995 to be less than $6 million, and noted just how much the reported value was below where it "should be"; and (c) BLMIS subsequently fabricated not just new trading activity, but an entirely new

---

[5] As such, the attention that Mr. Shapiro devotes to arguing proportionality and burden is misplaced. *See* ECF No. 121, Br. at 7-8. JPMC has not objected to producing what it has collected.

7

account that increased S&R's purported holdings at BLMIS by more than $2 million. The documents that the Trustee now seeks from JPMC are highly likely to shed further light on Mr. Shapiro's knowledge of the lack of actual securities trading in his BLMIS accounts. They may reveal, for instance, what he represented to Chemical Bank regarding the value of S&R's account at BLMIS and/or why he ultimately did not pledge the account as collateral for his loan.

The facts here are akin to those in the *Magnify* proceeding which this Court found to be probative of a defendant's knowledge of the fraud. *See Picard v. Magnify Inc. (In re BLMIS)*, 583 B.R. 829 (Bankr. S.D.N.Y. 2018). In *Magnify*, as here, BLMIS created a new account out of whole cloth that, without any deposit or inter-account transfer, immediately contained millions of dollars of unexplained value. *Id*. at 844. And here, the documentary evidence indicates not just that Mr. Shapiro was aware of the windfall but that he engineered it. If the appearance of new, unexplained money in a new, unexplained account in *Magnify* shows knowledge of the fraud, Mr. Shapiro's participation in the creation of his new, unexplained wealth is equally if not more probative.

Although Mr. Shapiro may contend that the subpoenaed loan records are irrelevant to any backdating and his knowledge thereof (ECF No. 121, Br. at 5-6), the sequence of events and the documents described above dispense with that argument. Indeed, Ms. Bongiorno's letter of July 26, 1995 reflects that she was writing to Chemical Bank at Mr. Shapiro's request to "confirm" the value of S&R's account at BLMIS. This letter surely is in the loan file which likely will contain other incriminating documents which may reveal what Mr. Shapiro directly represented to the bank. The likely relevance of the subpoenaed records cannot be disputed.[6]

---

[6] Mr. Shapiro therefore may have joined the ranks of two other former BLMIS employees, David Kugel and Jodi Crupi, who pleaded guilty and were convicted for engaging in substantially similar bank fraud.

8

**C.    The Relevance of the Subpoenaed Documents Far Outweighs any Minimal Privacy Interests Mr. Shapiro Might Have.**

Although he offers nothing to substantiate his blanket assertion on the issue of relevance, Mr. Shapiro nevertheless argues that "the loan file sought by the Trustee is not remotely proportional to the invasion of Defendants' privacy interest." Br. at 8. But Mr. Shapiro's claimed privacy interest is tenuous at best and is significantly outweighed by the relevance of the records sought. *See, e.g., United States Reg'l Econ. Dev. Auth., LLC v. Matthews*, No. 3:13-CV-01093 (CSH), 2018 WL 2172713, at * 9 (D. Conn. May 10, 2018) (holding relevancy of bank records concerning alleged fraud outweighed defendant's claimed privacy interest).

As a threshold matter, Mr. Shapiro has not articulated a non-conclusory cognizable privacy interest in preventing the production of the JPMC loan documents to the Trustee. "Other than a conclusory allegation such an interest exists, Defendants fail to inform the Court how their privacy interests would be negatively impacted by the disclosure of the documents." *Matthews* at * 9. Mr. Shapiro likewise makes no effort to articulate any harm which could flow from JPMC's production, particularly given the age – "dat[ing] back at least 25 years" – of the documents at issue. (ECF No. 121, Br. at 8.)

Further, an extensive amount of the Shapiros' financial information already has been produced to the Trustee in this case. Most notably, their former accounting firm produced decades of their tax returns, to which Mr. Shapiro consented. That consent forecloses Mr. Shapiro's privacy argument here. *See Sierra Rutile Ltd.*, 1994 WL 185751, at *3 ("While some privacy interests are at stake, they appear to be relatively modest in light of the information which Mr. Steinberger has already produced in this litigation without objection. Mr. Steinberger has provided personal tax returns and personal financial statements. If any non-privileged financial information would be entitled to heightened protection, it is the tax returns.").

Finally, any privacy concern that Mr. Shapiro may have can be adequately addressed by the protective order that governs this case. The June 6, 2011 Litigation Protective Order ("LPO") prohibits the disclosure of confidential material to any person or entity other than the Court, the parties, their agents, and any relevant witnesses. *See* LPO, APN 08-01789, ECF 4137 at ¶ 10. Courts routinely have held that such protective orders provide the litigants with adequate privacy protection. *See, e.g.*, *In re Penthouse Exec. Club Compensation Litig.*, No. 10 CV 1145 (KMW), 2012 WL 1511772, *1 (Bankr. S.D.N.Y. Apr. 30, 2012); *Glatt v. Fox Searchlight Pictures, Inc.*, No. 11 Civ. 6784 (WHP), 2012 WL 2108220, at *3 (S.D.N.Y. June 11, 2012).

Given the foregoing, the relevance of the documents, which JPMC is ready and willing to produce, far outweighs Mr. Shapiro's claimed privacy interest.

## IV.    CONCLUSION

For the foregoing reasons, the Trustee respectfully submits that Mr. Shapiro's motion for an order to quash the subpoena issued to JPMC should be denied and that JMPC should produce, subject to the LPO, the contents of the subject loan files, as they will very likely shed further light on Mr. Shapiro's involvement in and knowledge of fraud at BLMIS.

<table>
<tr><td>

Dated: October 29, 2018
      New York, New York

**BAKER & HOSTETLER LLP**
PNC Center
1900 E. 9th Street, Suite 3200
Cleveland, Ohio 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
James H. Rollinson
Email: jrollinson@bakerlaw.com

</td><td>

**BAKER & HOSTETLER LLP**

By: */s/ David J. Sheehan*
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Torello H. Calvani
Email: tcalvani@bakerlaw.com
Nicholas M. Rose
Email: nrose@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff*

</td></tr>
</table>

11