# Exhibit D

CONFIDENTIAL

Page 494

```
 1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF NEW YORK
 2
 3
         In re:                      )
 4                                   )
         SECURITIES INVESTOR         )
 5       PROTECTION CORPORATION,     )
                                     )
 6            Plaintiff-Applicant,   )
                                     )
 7       vs.                         )  08-01789 (SMB)
                                     )
 8       BERNARD L. MADOFF           )
         INVESTMENT SECURITIES, LLC, )
 9                                   )
              Defendant.             )
10                                   )
                                     )
11       In re:                      )
                                     )
12       BERNARD L. MADOFF,          )
                                     )
13            Debtor.                )
                                     )
14
15                    CONFIDENTIAL
16            Videotaped Deposition of BERNARD L.
17       MADOFF, VOLUME IV, taken on behalf of the Customers,
18       before K. Denise Neal, Registered Professional
19       Reporter and Notary Public, at the Federal
20       Correctional Institution, 3000 Old Highway 75,
21       Butner, North Carolina, on the 9th day of November,
22       2017, commencing at 8:43 a.m.
23
24
25                      * * * * *
```

CONFIDENTIAL

**Page 495**

1   APPEARANCES OF COUNSEL:

2

3       On Behalf of the Customers:

4               HELEN DAVIS CHAITMAN, Esq.

5               Chaitman, LLP

6               465 Park Avenue

7               New York, New York   10022

8               (908) 303-4568

9               hchaitman@chaitmanllp.com

10

11      On Behalf of Sage Associates, Sage Realty,

12      Malcolm Sage, Martin Sage and Ann Passer Sage

13              ANDREW B. KRATENSTEIN, Esq.

14              McDermott Will & Emery, LLP

15              340 Madison Avenue

16              New York, New York   10173-1922

17              (212) 547-5695

18              akratenstein@mwe.com

19

20

21

22

23

24

25

CONFIDENTIAL

**Page 496**

1    APPEARANCES OF COUNSEL:

2

3         On Behalf of the Trustee:

4              AMANDA E. FEIN, Esq.

5              STACY DASARO, Esq.

6              Baker Hostetler

7              45 Rockefeller Plaza

8              New York, New York  10111-0100

9              (212) 589-4621

10             afein@bakerlaw.com

11

12        On Behalf of the Deponent:

13             PETER A. GOLDMAN, Esq.

14             12 Fairlawn Parkway

15             Rye Brook, New York  10573

16             (914) 935-6857

17             pagoldman@gmail.com

18

19        Videographer:

20             Bob Collier, CLVS

21

22                        *  *  *  *  *

23

24

25

CONFIDENTIAL

Page 497

1                           CONTENTS
2      THE WITNESS:  BERNARD L. MADOFF          EXAMINATION
3              BY MS. CHAITMAN                    499
4              BY MS. FEIN                        520
5              BY MR. GOLDMAN                     579
6              BY MS. FEIN                        582
7              BY MS. CHAITMAN                    667
8              BY MR. KRATENSTEIN                 678
9
10                      *  *  *  *  *
11
12                    INDEX OF EXHIBITS
13      FOR THE CUSTOMERS:                        PAGE
14      Exhibit Number 89, Schwab blotters -      502
15         12-5-86
16      Exhibit Number 90, Securities transaction  504
17         report
18      Exhibit Number 91, NSCC trade reporting   505
19         blotter - 12-11-86
20
21      FOR THE TRUSTEE:
22      Exhibit Number 10, Customer statement -   524
23         12-31-07
24      Exhibit Number 11, House 5 daily stock    535
25         Record activity - 7-16-87

CONFIDENTIAL

Page 498

1              INDEX OF EXHIBITS (Continued)

2    FOR THE TRUSTEE:                              PAGE

3    Exhibit Number 12, House 17 stock record      558

4       summary through 12-31-07

5    Exhibit Number 13, Stock record summary -     566

6       8-31-01

7    Exhibit Number 14, House 17 stock record      569

8       summary - 3-31-94

9    Exhibit Number 15, House 17 stock record      571

10      summary - 7-16-87

11   Exhibit Number 16, Confirmation - 11-11-83    600

12   Exhibit Number 17, House 17 stock record      603

13      summary - 11-10-83

14   Exhibit Number 18, Cash and securities        611

15      blotter

16   Exhibit Number 19, Cash and securities        611

17      blotter

18   Exhibit Number 20, Proffer meeting            626

19      document - 12-16-08

20   Exhibit Number 21, Report - 12-8-08           644

21

22

23

24

25

CONFIDENTIAL

Page 499

1          THE VIDEOGRAPHER:  We're now on the

2    record.  Please note that the microphones are

3    sensitive and may pick up whispering and private

4    conversations.  Recording will continue until all

5    the parties agree to go off the record.  My name is

6    Bob Collier representing Veritext Legal Solutions.

7    Today's date is November 9th, 2017 and the time is

8    approximately 8:43.

9          This deposition is being held at Butner

10   Federal Correction Facility located at 3000 Old 75

11   Highway, Butner, North Carolina and is being taken

12   by counsel for the Plaintiff-Applicant.  The caption

13   of this case is Securities Investor Protection

14   Corporation, Plaintiff-Applicant v. Bernard L.

15   Madoff Investment Securities, LLC, Defendant.

16         This case is being held in the United

17   States Bankruptcy Court, Southern District of New

18   York, Case Number 0801789 (SMB).  The name of the

19   witness is Bernard L. Madoff.  At this time the

20   attorneys present in the room will identify

21   themselves and the parties they represent.

22         MS. CHAITMAN:  Helen Davis Chaitman on

23   behalf of numerous Defendants.

24         MR. KRATENSTEIN:  Andrew Kratenstein of

25   McDermott Will & Emery, LLP on behalf of the Sage

CONFIDENTIAL

Page 500

1    Defendants.

2              MS. DASARO:  Stacy Dasaro, Baker

3    Hostetler, on behalf of the Trustee.

4              MS. FEIN:  Amanda Fein, Baker Hostetler,

5    on behalf of the Trustee.

6              MR. GOLDMAN:  Peter Goldman on behalf of

7    the witness, Mr. Madoff.

8              THE VIDEOGRAPHER:  Our court reporter,

9    Denise Neal, representing Veritext Legal Solutions,

10   will swear in the witness and we can proceed.

11                   BERNARD L. MADOFF,

12   having been first duly sworn, was examined and

13   testified as follows:

14                      EXAMINATION

15   BY MS. CHAITMAN:

16       Q.  Good morning, Mr. Madoff.  Yesterday you

17   identified a document which was marked as

18   Exhibit 38, which appears to be a January 31, 1983

19   statement bearing the name National Westminster

20   Bank?

21       A.  Uh-huh.

22       Q.  And it shows --

23              MR. GOLDMAN:  You've got to answer yes or

24   no, Bernie.

25              THE WITNESS:  Says National Bank of North

CONFIDENTIAL

Page 501

1    America.

2        Q.   (By Ms. Chaitman)  Excuse me.  National

3    Bank of North America.  Thank you.  And was this

4    generated by your firm or was it generated by

5    National Bank of North America?

6        A.   I believe it was generated by my firm.

7        Q.   Did you receive on a monthly basis from

8    National Bank of North America statements showing

9    the securities transactions conducted in that month

10   for your firm?

11       A.   I don't recall whether we received one.  I

12   don't know.  I mean, you know, you're talking about

13   1983.  I don't know what the policy was.  Typically

14   we would receive statements from the banks at the

15   end of a month.

16       Q.   Okay, okay.  And, for example, here is

17   Exhibit 46, which is another statement that was

18   generated by your firm as well; right?

19       A.   Yes.

20       Q.   And do you know how the information was

21   obtained that was incorporated into these

22   statements?

23       A.   Well, these statements were generated by

24   us.  They're showing the transactions according to

25   our records as they're done.

CONFIDENTIAL

Page 502

1        Q.   Okay, okay.

2        A.   They're not the bank's records.  So these

3    are just, you know, the transactions as they

4    appeared in this account.

5        Q.   Okay.  And you testified yesterday that

6    these all reflect accurate transactions that were

7    fulfilled --

8        A.   That's correct.

9        Q.   -- is that correct?

10       A.   Yes.

11       Q.   Okay.  And I'm showing you again

12   Exhibit 39, which is a January 31, 1983 statement of

13   transactions with National Bank of North America.

14       A.   Yes.

15       Q.   And is that an accurate reflection of the

16   transactions that were done in that prior month for

17   National Bank of North America?

18       A.   Correct.

19       Q.   Okay.  Now, let me show you what I'm going

20   to mark as Exhibit 89.  These are it says Schwab

21   blotters for 12-5-86 and it says house five.

22            MS. FEIN:  Thank you.

23            MR. KRATENSTEIN:  Thank you.

24       Q.   (By Ms. Chaitman)  Can you tell me what

25   this document is?

CONFIDENTIAL

Page 503

1        A.   It looks like the activity that took place

2     in the Charles Schwab & Company.

3        Q.   Okay.   And, again, would these be actual

4     transactions that were conducted by your firm?

5        A.   They would be.

6        Q.   Okay.   And would you have received in the

7     ordinary course of business some documentation from

8     Schwab evidencing these same transactions?

9            MS. FEIN:   Objection.

10           THE WITNESS:   It depends upon what period

11    of time.   I mean, people stopped using

12    confirmations.   Broker-to-broker confirmations were

13    eliminated after a certain period of time.   I don't

14    know when that was.   Before that period we received

15    confirmations on every trade every day.

16           After that there were no confirmations

17    because the trades went to the clearing corporation

18    and those trades were all netted, which is a

19    practice so that the transaction that you did with

20    Schwab doesn't -- would not be what you would

21    receive from the clearing corporation because they

22    net all the -- from market makers like Madoff what

23    happens is they take all of the transactions, all

24    the transactions that you had in a particular

25    security, so if we had every trade that we did with

CONFIDENTIAL

Page 504

1    say in General Motors for any of the thousands of

2    brokers that exist that buys and sells, if you sold,

3    for example, 2 million -- if you brought 2 million

4    shares from assorted brokers and then you sold

5    1,500,000 shares, they would send you what they call

6    a balance order at the end of the day that said you

7    bought or sold 500 shares, which is the net amount.

8              And they would give you the dollar amount

9    of the net practice.  And -- and the person

10   guaranteeing the trade became the clearing

11   corporation.

12        Q.  (By Ms. Chaitman)  Was there a system in

13   place at your firm to verify the information you

14   received on a daily basis from the clearing

15   corporation?

16        A.  Yes, you know, there was.  I can't tell you

17   exactly what it was because I'm not part of the back

18   office operation.

19        Q.  Okay.  But there was such a system in

20   place?

21        A.  Yes.

22              (Exhibit Number 90 was marked for

23   identification.)

24        Q.  (By Ms. Chaitman)  I'm going to show you

25   what I've marked as Exhibit 90, and I apologize.  I

CONFIDENTIAL

Page 505

1      only have one copy of this, but I'll show it to

2      everybody after you identify it.  Can you tell me

3      what this is?

4           A.   It reflects the securities we bought for

5      Vanguard and Wells Fargo.

6           Q.   During this -- the period indicated?

7           A.   During that period of time, right.

8           Q.   Okay.  And is this a report that was also

9      generated by your firm?

10          A.   Correct.

11          Q.   Okay.  And were these transactions actual

12     transactions?

13          A.   Yes.  They were.

14               (Exhibit Number 91 was marked for

15     identification.)

16          Q.   (By Ms. Chaitman)  Okay.  I'd like to show

17     you what I've marked as Exhibit 91.  Can you tell me

18     what this document is?

19          A.   It looks like a trade reporting blotter

20     under National Securities Clearing Corporation.

21          Q.   Okay.  Now, is the National Securities

22     Clearing Corporation generally referred to as NSCC?

23          A.   Correct.

24          Q.   And was NSCC the precursor to DTC, the

25     Depository Trust Company?

CONFIDENTIAL

Page 506

1          A.   Yes, then they merged.

2          Q.   Okay.  So what does this document reflect?

3     It reflects trade date December 11th, 1986.  Can you

4     tell me what this document shows?

5          A.   It would show the transactions that we did

6     with other brokerage firms in the street but not

7     reflect any customer transactions.

8          Q.   Okay.  And is there an indication on this

9     document as to which brokerage firms were on the

10    other side of these transactions?

11         A.   I don't believe so.

12         Q.   The member number ID of 0158, was that your

13    member number?

14         A.   No.  Oh, yes.

15         Q.   The first column on the left?

16         A.   No.  That's -- ours was 646.  This member

17    ID would be -- refer to another brokerage firm.

18         Q.   So this document -- which I don't represent

19    is complete.  I just printed out a portion of it.

20    The column on the left represents another brokerage

21    firm and this lists all the transactions done on

22    December 11th, 1986 by your firm with 0158?

23         A.   Let me just look at this.  Yes.

24              MS. FEIN:  It looks like there -- on

25    future pages there might be others.

CONFIDENTIAL

Page 507

1          MS. CHAITMAN:  Right, right.  I just

2    wanted to clarify this.

3          MS. FEIN:  Understood.

4          MS. CHAITMAN:  Yeah.  I didn't print out

5    complete.

6          THE WITNESS:  These are the transactions

7    of the market making or proprietary trading side of

8    the firm.

9          Q.  (By Ms. Chaitman)  Okay.  As a matter of

10   fact, Mr. Kratenstein just pointed out to me if you

11   look on page two there are other numbers in the

12   left-hand column.  Do you see that?

13         A.  Yes.  You mean other ID numbers?

14         Q.  Yes.

15         A.  Yes.

16         Q.  So that means -- I didn't notice that, so

17   this lists transactions with all the other firms and

18   they're identified by their code number?

19         A.  That is correct.

20         Q.  And were these all legitimate transactions?

21         A.  Yes.

22         Q.  And they were all executed?

23         A.  Yes.

24         Q.  Now, would -- as of December 11th, 1986

25   would this kind of report reflect 100 percent of the

CONFIDENTIAL

Page 508

1  trading activities of your firm or were there

2  other --

3       A.  No.

4       Q.  Okay.  So what other categories of

5  activities were there that are not reflected on a

6  report like this?

7       A.  If we were trading with a client, you know,

8  out of our own inventory principal, it would not be

9  reflected on this -- on this report.

10      Q.  Anything else?

11      A.  I don't believe so.

12      Q.  If you were doing convertible bond trading,

13  would that show up on this report --

14          MS. FEIN:  Objection.

15      Q.  (By Ms. Chaitman)  -- or would that be on a

16  different report?

17      A.  I do not believe it would be on this

18  report.

19      Q.  Do you recall that your firm generated

20  reports which -- in the 1980s which showed all of

21  the convertible bond purchases and sale on a daily

22  basis?

23      A.  It would reflect, be reflected in a

24  customer's account if -- and it would be reflected

25  in the firm's account, in the firm's trading --

CONFIDENTIAL

Page 509

1   you'd have to look at the trading ledger for the

2   firm.  It depends upon also whether we did it as

3   principal or whether we did it as agent.  Most of

4   our trades were done as principal.  We're selling

5   out of our own inventory account to the customer.

6           I don't know exactly where that would

7   appear, but it would not appear -- these are what's

8   called street side transactions, as I said, mostly

9   from a market making proprietary trading side of the

10  firm, broker-to-broker trades.

11      Q.  Okay.  You had testified previously that

12  with respect to the convertible bond trading,

13  99 percent of it in the 1980s was done in the

14  over-the-counter market?

15          MS. FEIN:  Objection.

16      Q.  (By Ms. Chaitman)  Do you recall that?

17      A.  Depends upon the bond.  The bonds,

18  convertible bonds traded -- most convertible bonds

19  traded in the over-the-counter market.  Some of them

20  were traded on an exchange, but the great majority

21  of them would trade over the counter.

22      Q.  Okay.  Now, if I wanted to find a record on

23  any specific date in the 1980s of the volume and

24  specific transactions that you did in the

25  over-the-counter market, what document would I look

CONFIDENTIAL

Page 510

1  for?

2      A.  You'd have to look at the firm trading

3  account records and blotters, but I don't -- and if

4  you're talking about period in the '80s, I doubt

5  whether or not you would be able to find them

6  because the record retention period was six years in

7  the industry.  So there would be no reason the firm

8  would keep those.

9      Q.  Now, Mr. Madoff, I believe you're aware

10 that there were microfilm records that the Trustee

11 found?

12     A.  Yes.

13     Q.  Do you recall how it came about that some

14 of your records were microfilmed?

15     A.  It depends upon what the policy of the firm

16 was at that -- during that period of time.  I mean,

17 there was a -- there was a lot of confusion within

18 the industry as to whether you had to microfilm

19 records or whether you would put them -- send the

20 records to a place like Stone Mountain, which was an

21 off premises places.

22         Everybody had a different policy, so -- and

23 I'm not particularly aware of what our firm's policy

24 was.  It's not something I would be involved in.

25     Q.  Okay.  Was the decision to microfilm

CONFIDENTIAL

Page 511

1    records your decision or did someone else in your

2    firm make that decision?

3        A.   It wasn't my decision, no.

4        Q.   It was not?

5        A.   No.

6        Q.   Okay.  So is it fair to say that you didn't

7    instruct your staff as to what should be microfilmed

8    and what should not be microfilmed?

9        A.   No.

10       Q.   Did you ever seek to verify that documents

11   were being microfilmed?

12       A.   Probably not.  It's not an area that I

13   would be involved in.  That would be something that

14   somebody in the systems department would make those

15   decisions or someone in the operations department.

16       Q.   Okay.  Can you think of anyone in

17   particular who would have been responsible for that?

18       A.   It varied, you know, over the years.  No.

19       Q.   Okay.  There was a person named Asha,

20   A-s-h-a.  Do you recall that name?

21       A.   No.

22       Q.   Okay.  Do you know you've testified

23   previously that the -- all of the trading that you

24   did except for the split strike was actual trading?

25            MS. FEIN:  Objection to form.

CONFIDENTIAL

Page 512

1           MS. CHAITMAN:  I'm just trying to lay the

2     background.

3           THE WITNESS:  Yes.

4           Q.  (By Ms. Chaitman)  You testified to that

5     yesterday.  Okay.

6           A.  Up to a certain period of time.  There were

7     actual trades done in split strike prior to 1990,

8     some period in the '90s.

9           Q.  Okay, okay, okay.  So just to clarify, when

10    you started the split strike for some period of time

11    you actually did the trades?

12          A.  Correct.

13          Q.  And at some point which you haven't been

14    able to specify you stopped doing the trades?

15          A.  Correct.

16          Q.  Okay.  Now, I want to ask you something

17    about that, Mr. Madoff.  Is it your understanding

18    from your experience in the securities business that

19    it was illegal for you to send a customer statement

20    to a customer which said in essence I've purchased

21    five shares of IBM for you when, in fact, you hadn't

22    actually made that purchase?

23          A.  Was it what?

24          Q.  Was there anything improper or illegal

25    about your in a sense selling a short, a naked short

CONFIDENTIAL

Page 513

1   to a client?

2           MS. FEIN:  Objection.

3           THE WITNESS:  No.

4       Q.  (By Ms. Chaitman)  Can you explain to me

5   why that was not illegal?

6       A.   Short selling is a very common practice and

7   a significant part of the stock market, whether it

8   be an over-the-counter transaction or whether it be

9   an exchange-traded transaction.

10          That is -- as a matter of fact, there are

11  -- you can look at any one of the financial records

12  that are produced, you know, by the media and get

13  what the open short positions are in every

14  particular security.  So the concept of selling

15  short has been in existence since the securities

16  started trading in the market maker.

17      Q.  And the fact that you did that, that you

18  may have done naked short selling --

19      A.   Right.

20      Q.  -- was that illegal or improper?

21      A.   No.

22      Q.  Okay.  So is it fair to say that because

23  you were a market maker, you had not only the right

24  but also the obligation --

25          A.   That is correct.

CONFIDENTIAL

Page 514

1              MS. FEIN:  Objection.

2         Q.  (By Ms. Chaitman)  -- to sell?

3         A.   The rule was that if you were a registered

4    market maker, you were required to post on a regular

5    and continuous basis a two-sided market, meaning

6    what you're willing to buy and what you're willing

7    to sell.  And in order to -- in order to continue to

8    be a registered market maker, you had to honor that

9    quote.  Otherwise, it would be a violation of the

10   SEC.

11        Q.   Okay.  But you say it's not a violation of

12   any SEC rule to indicate on a customer statement

13   that the customer owns certain securities when you

14   hadn't actually purchased them?

15        A.   Of course.

16        Q.   It's not -- that's not improper?

17        A.   No.

18        Q.   Okay.  So what was improper, if anything,

19   about the fact that with respect to the split

20   strike, at a certain point in time you stopped

21   buying the securities shown on the statements?

22             MS. FEIN:  Objection.

23             THE WITNESS:  What was improper was when

24   we reported our -- when we gave the SEC our

25   financial statements, you would have to show what

CONFIDENTIAL

Page 515

1    your -- you wouldn't -- you wouldn't show whether

2    you were long or short for any particular customer.

3    That policy was changed many, many years ago, but

4    you had to reflect the liability of what was

5    involved in your total short positions.

6         Q.   (By Ms. Chaitman)   Okay.   So just to be

7    clear, if you sent customer A a statement which

8    showed that he had a portfolio worth a million

9    dollars in various Fortune 100 company stocks and

10   you did not own those stocks at that time, you would

11   have had to reflect on your FOCUS report to the SEC

12   that you owed that customer a million dollars worth

13   of stocks?

14        MS. FEIN:   Objection.   Helen, we covered

15   this on the first day of Mr. Madoff's testimony back

16   in April.

17        MS. CHAITMAN:   Okay.

18        MS. FEIN:   So I just want to put on the

19   record that this is day one testimony.

20        MS. CHAITMAN:   Okay.

21        THE WITNESS:   You would -- if the firm was

22   short to a customer, you would reflect on -- you

23   would reflect -- that would reflect what your open

24   position was that's a short position; but if you had

25   an arbitrage transaction in that particular

CONFIDENTIAL

Page 516

1  security, you would net the long positions versus

2  the short position of the firm, both the market

3  making, proprietary and the customer transaction.

4  Plus, you would have to take options into

5  consideration.  You'd have to -- there were certain

6  exemptions and instructions of how you treated your

7  capital.

8       Q.  (By Ms. Chaitman)  Okay.  But, in fact, you

9  never disclosed to the SEC that you had naked short

10 positions.  Is that fair to say?

11      A.  During the period where we didn't sell the

12 stock, that is correct.

13      Q.  Where you didn't buy the stock you mean?

14      A.  Didn't buy the stock.

15      Q.  Okay, okay.  And in your mind is that what

16 was illegal about what you did?

17      A.  Correct.

18      Q.  Okay.  Now, in all the years you were in

19 business prior to the global economic collapse in

20 2008, did you ever find yourself unable to satisfy a

21 customer demand for a withdrawal from a --

22           MS. FEIN:  Objection.  This is not only --

23 it's outside the scope of the day two deposition.

24 We didn't enter the order today, but this was all --

25 these were things that were covered on the day one

CONFIDENTIAL

Page 517

1    deposition.

2             MS. CHAITMAN:   Okay.  You've made your

3    record.

4             THE WITNESS:   No.

5        Q.   (By Ms. Chaitman)  So you're sure that

6    there was never a time from 1992 when you started

7    the split strike until 2008 when you were unable to

8    satisfy a customer demand for a redemption?

9        A.   That's correct.

10       Q.   Did you ever need to take in a new

11   customer's money in order to pay money to an

12   existing customer?

13       A.   No.

14       Q.   In the entire time you were in business?

15       A.   Up until the collapse of the financial

16   market.

17       Q.   Okay.  Now, did you make margin loans to

18   some customers?

19       A.   Yes.

20       Q.   And were those margin loans in your view

21   debts from the customers to you?

22       A.   Of course, yes.

23       Q.   And why is that?  Tell us what a margin

24   loan is.

25       A.   Margin loan is regulations set by the

CONFIDENTIAL

Page 518

1   Federal Reserve.  If a customer wants to buy --

2   wants to buy securities, he is allowed to pledge,

3   you know, other securities in his account, you know,

4   to purchase it.  So the margin rates varied.  I

5   believe in the period of time that you're talking

6   about it would be 50 percent, but again, it depends

7   upon the securities, whether they were bond, whether

8   they were -- you know, the type of bond, whether or

9   not they had options involved with it.

10           It was a complicated practice, but

11  basically it was the customer's ability to borrow to

12  be able to purchase more securities without posting

13  cash for that particular transaction.  So he was --

14  it's similar to when you have a house and you take a

15  mortgage loan out to buy the house or to expand the

16  house.  Well, use it for whatever you want.  Those

17  regulations are set by the Federal Reserve Board.

18       Q.  Okay.  And would you have made a margin

19  loan to someone who didn't own any securities?

20       A.  No.

21       Q.  So is it fair to say that almost by

22  definition if you made a margin loan to a customer,

23  that customer had real securities in his account?

24           MS. FEIN:  Objection.

25           THE WITNESS:  Yes.

CONFIDENTIAL

Page 519

1          Q.   (By Ms. Chaitman)   And do you recall that

2     you made substantial margin loans to the Sages?

3          A.   That I can't recall.

4          Q.   Okay.   But it would be reflected on their

5     statements; wouldn't it?

6          A.   You could figure it out from the statement,

7     yes.   You'd see by whether it had a debit balance in

8     their account --

9          Q.   Okay.

10         A.   -- past the settlement date of the

11    transaction.

12         Q.   Okay.   And was it your practice to insist

13    that margin loans be repaid by customers?

14         A.   Yes.

15              MS. CHAITMAN:   I have nothing further.

16    Thank you very much, Mr. Madoff.

17              MS. FEIN:   Okay.   We can get started if

18    that's okay with you.   Would you prefer that we take

19    a break now?

20              THE WITNESS:   No, no.   I'm fine.

21              MS. FEIN:   Okay.

22              MR. GOLDMAN:   You want something to drink?

23              THE WITNESS:   Anything, water or Pepsi is

24    fine.

25              MR. GOLDMAN:   You want water or Pepsi?

CONFIDENTIAL

Page 520

1           THE WITNESS:  Pepsi.

2           MS. CHAITMAN:  Do you need a dollar?

3           MR. GOLDMAN:  No.

4                          EXAMINATION

5    BY MS. FEIN:

6           Q.  Good morning, Mr. Madoff.

7           A.  Good morning.

8           Q.  When -- I want to define a couple of terms

9    up front so when we talk about them later, you know

10   what I'm referring to; but if I ask a question about

11   the IA business or house 17, would you agree that

12   that's referring to your investment advisory

13   business?

14          A.  Yes.

15          Q.  And if I ask a question about market making

16   or proprietary trading or house five, I might use

17   those terms somewhat interchangeably.  I might use

18   house five to refer to the market marking and

19   proprietary trading business, but do you agree that

20   we can use those terms?

21          A.  Yes.

22          Q.  And yesterday I believe Mr. Kratenstein

23   asked for clarification about what -- at my request,

24   so thank you, about what a real trade was and you

25   had -- and we have that term defined.  We can use

CONFIDENTIAL

Page 521

1    that term today as well?

2         A.   Yes.

3         Q.   For the period of time where your

4    customers' statements showed trades that where the

5    underlying securities weren't purchased, what term

6    would you refer to those as?

7         A.   Basically, short.

8         Q.   Okay.  Would you agree that can we say that

9    the statements at least were fake statements?  They

10   showed transactions that didn't occur?

11        A.   Well, depends upon -- I have to think

12   about, you know, how you would define that.  In

13   other words, because selling short is -- is not

14   considered a legitimate trade or a trade that was

15   not real, in other words, let me just for the record

16   make sure that you understand that when a brokerage

17   firm sells short, all right, that is no different

18   than a broker selling stock long as to whether or

19   not it's legal.

20            In other words, that is -- it's a valid

21   transaction.  I noticed in the GA -- in the expert

22   witness, I guess it would have been referred to as

23   the Dubinsky report and in the Trustee's reports

24   that I have seen, they consistently refer to short

25   sales as fake or illegitimate transactions.

CONFIDENTIAL

Page 522

1        Anybody in the industry would not

2    understand using that terminology because if you

3    sell -- if you make a short sale through a brokerage

4    firm, the brokerage firm is under the same

5    obligation to deliver those securities to you if you

6    request them as long and you have -- and you have

7    the same obligation to pay for those securities.

8        There is no difference between whether the

9    transaction was actually purchased or not.  If the

10   broker said that he sold you the stock, whether he's

11   long or short does not affect his obligation, does

12   not alter his obligation to honor that transaction

13   upon your request.

14       So you can't say -- otherwise, if you ever

15   had -- went into court with that and said this is a

16   fake transaction, this is a real transaction, they

17   would not know what you're talking about.

18       Q.   I understand.  We spoke yesterday a bit and

19   we're going to talk about it today as well that

20   there are amounts listed on customer statements

21   where you hadn't purchased the amounts that are

22   listed --

23       A.   Correct.

24       Q.   -- correct?  So and that would be I believe

25   it's your testimony after 1992 that you would have

CONFIDENTIAL

Page 523

1    customer statements that showed transactions that

2    didn't have the underlying securities purchased by

3    your firm; correct?

4         A.   We would show short positions on a customer

5    statement at any time, you know, that it took place,

6    even if it was before 1992 because that's a --

7    there's no brokerage firm that does a market making

8    or proprietary trading.  Well, there's no -- let me

9    clarify that.

10             There is not a brokerage firm in existence

11   probably that sells stock short to a customer from

12   his principal account if he's, in fact, maintaining

13   a market making or proprietary trading account.  So

14   I know -- I'm not sure if I'm confusing you or not,

15   but it is a perfectly legal -- a short sale or a

16   naked short sale, which by definition is the same

17   thing, is a perfectly legal transaction.

18             So I could sell stock short.  As a matter

19   of fact, and I probably shouldn't go into all this.

20   I don't know, but during my proffer agreement, my

21   proffer session, the prosecutor in the presence of

22   the SEC and the Trustee asked me to explain my

23   market making business or my business in general.

24   And during that period of time he asked me whether

25   or not we ever sold stock to a customer short.

CONFIDENTIAL

Page 524

1         And I said, of course, there was periods of

2    time where we sold stock short to a customer.  And

3    he didn't seem to understand that.  As a matter of

4    fact, I had turned to the SEC people that were there

5    and my own lawyer and said please explain to him,

6    you know, how the market making worked, that they

7    were sort of shocked.

8         I can understand the prosecutor not

9    understanding that, certainly not a prosecutor that

10   was handling a securities case.  So I don't know

11   whether he was going through some exercise or not,

12   but that's how -- they seemed to be focusing in on

13   whether or not we ever sold short.  I said if you're

14   a market maker, you had to sell short at times.  I

15   don't know if I've clarified that or not.

16        (Trustee's Exhibit Number 10 was marked

17   for identification.)

18        Q.   (By Ms. Fein)  I'll try -- I'm going to try

19   a different way.  So I'm handing you what's been

20   marked as Trustee's Exhibit 10.  And --

21        MS. CHAITMAN:   Thank you.

22        Q.   (By Ms. Fein)  -- this appears to be a

23   customer statement.  Would you agree?

24        A.   Yes.

25        Q.   And it appears to be dated December 31st,

CONFIDENTIAL

Page 525

1    2007.  Do you see that?

2        A.   Yes.

3        Q.   This customer statement -- if you turn to

4    the third page of the document, the Bates number is

5    960.  Do you see that page?

6        A.   Yes.

7        Q.   This customer statement shows the purchase

8    of U.S. treasuries on December 31st.  Do you see

9    that transaction?

10       A.   Yes.

11       Q.   You previously testified that the

12   individual transactions shown on customer statements

13   like these weren't always -- I understand your

14   position with respect to shorts, but if we went to

15   where you held Treasury bills for this period or

16   went to where you held the securities for the period

17   shown on these statements, we wouldn't necessarily

18   be able to find those securities at the DTC.

19           We wouldn't necessarily be able to find

20   those treasuries held at a depository or a

21   third-party firm; correct?

22           MS. CHAITMAN:  Objection to form.

23           THE WITNESS:  If I said on treasuries, we

24   never went short treasuries.  So if, in fact, you

25   went to locate them, you would find them.

CONFIDENTIAL

Page 526

1      Q.   (By Ms. Fein)   So for the treasuries shown

2   on your customer statements, you've told us in the

3   past that you did not have -- the amount of

4   treasuries you said you purchased was between

5   two-and-a-half and $6 billion.  Do you remember

6   that?

7      A.   Depends upon the period of time.

8      Q.   Right.  You said over any period of time,

9   two-and-a-half to $6 billion was the amount of

10   treasuries that you would have had on hand.  Do you

11   remember that?

12         MS. CHAITMAN:  I think you're misstating

13   his testimony, but it stands.  Bernie, you testify

14   as to what you believe --

15         MS. FEIN:  What you understood.

16         MS. CHAITMAN:  -- not what --

17         THE WITNESS:  During this period of time

18   if we said that we had -- if a Treasury transaction

19   was in a client's account, that transaction was --

20   that transaction was actually bought or it was held,

21   the equivalent amount, at a third-party depository,

22   which would be DTC or another brokerage firm like a

23   Morgan Stanley or a Fidelity and so on.

24      Q.   (By Ms. Fein)   So the same -- you're saying

25   that this same -- the same Treasury bill, the same

CONFIDENTIAL

Page 527

1   due date, the same CUSIP number, the same amount,

2   that that information would appear on a third-party

3   financial statement or a DTC record?

4        A.   Right, correct.

5        Q.   So for the period of time that this

6   Exhibit 10 refers to --

7        A.   Uh-huh.

8        Q.   -- December 2007, your customer statements

9   showed $56 billion in treasuries aggregated?

10       A.   56 billion dollars?

11       Q.   Yes, your customer statements.

12       A.   During what period of time?

13       Q.   December 2007 when this statement --

14       A.   Oh, this is 2007.

15       Q.   Yes.

16       A.   I thought you were looking at an '87 date.

17       Q.   I see.  Okay.  So is your testimony

18   somewhat different since this is a 2007 statement?

19       A.   Yes, yes, right.

20       Q.   Okay.  So in the 2007 time frame would you

21   say -- I mean, did you have $56 billion of

22   treasuries in 2007?

23       A.   No.

24       Q.   And the treasuries that would be shown on

25   your individual statements that aggregate to the 56

CONFIDENTIAL

Page 528

1  billion, those amounts wouldn't be something that

2  your firm held; correct?

3       A.   Not in 2007, no.

4       Q.   Understood.

5       A.   I've taught you -- we were on the last

6  date, which was '87.

7       Q.   Got it.  I'm glad you clarified so we're on

8  the same page.

9       A.   All right.

10      Q.   Let's see.  I wanted to ask -- we've

11  discussed a bit about clearing firms in the past

12  couple of days.  The BLMIS back office had the

13  capability to receive and deliver securities; right?

14      A.   Yes.

15      Q.   And is that -- and you refer to BLMIS as a

16  self-clearing firm for that reason?

17      A.   Correct.

18      Q.   If you were a firm that did not have that

19  back office capability, would you rely on a

20  third-party clearing firm to clear your

21  transactions?

22           MS. CHAITMAN:  Objection to form.

23           THE WITNESS:  Yes.  Would I or would

24  someone in general?

25           MS. FEIN:  Thank you.  I'm going to

CONFIDENTIAL

Page 529

1    rephrase the question.

2            THE WITNESS:  Yes.

3            Q.   (By Ms. Fein)  Thank you.  Would a firm

4    that had -- did not have the back office capability

5    to receive and deliver securities need to rely on a

6    third-party clearing firm like Merrill Lynch or Bear

7    Stearns?

8            A.   Correct.

9            Q.   For this firm that uses a third-party

10   clearing firm, there were brokerage firms that acted

11   this way; right?

12           A.   Correct.

13           Q.   And would that brokerage firm basically use

14   Bear Stearns or Merrill Lynch as a back office to

15   receive and deliver the securities?

16           A.   Correct.

17           MS. CHAITMAN:  Objection to form.

18           Q.   (By Ms. Fein)  If the trades were cleared

19   through a third-party clearing firm, would that firm

20   issue statements to -- to the statements of the

21   holders of those underlying securities?

22           MS. CHAITMAN:  Objection to form.  I don't

23   know what time period you're questioning him about.

24   He's testified that the practice has varied through

25   the decades.  Can you just give him a time period?

CONFIDENTIAL

Page 530

1        Q.   (By Ms. Fein)  Understood, yes.  Did the

2   practice of back office operations of receiving and

3   delivering securities change over time?

4        A.   Yes.

5        Q.   Was one part of that change that DTC and

6   other depositories were available after a certain

7   period?

8        A.   Correct.

9        Q.   Would you say that would -- the time period

10   where depositories were available was sometime in

11   the '70s or '80s?

12        A.   No.

13        Q.   What time frame do you recall?

14        A.   Well, I don't -- well, there was -- there

15   were always clearing firms like a Bear Stearns that

16   would -- that would operate during the period of

17   time you're talking about, but DTC came into

18   existence later.  So did National Securities

19   Clearing Corporation come into existence later.  It

20   would be sometime probably in the '80s.

21        Q.   Okay.  I believe we looked at a document

22   with Ms. Chaitman from 1986 that had National

23   Securities Clearing Corp on it.  Is that date --

24        A.   Then that would probably be, you know, when

25   National Securities Clearing Corporation existed was

CONFIDENTIAL

Page 531

1   in operations.

2          Q.   Do you recall was the DTC also in operation

3   around that time?

4          A.   It came in after.  I don't know exactly

5   what the date was, but National Securities Clearing

6   Corporation was not a depository.

7          Q.   Understood.

8          A.   It just cleared the transactions.

9          Q.   Okay.  So the difference between -- so DTC

10  would -- was a depository in that it held the

11  securities?

12         A.   Yes.

13              MS. CHAITMAN:  It helped them?

14              MS. FEIN:  Held.

15              THE WITNESS:  It depends upon the

16  security, whether it was a bond or not, and also it

17  depends upon you if you had a clearing arrangement

18  with a bank or another brokerage firm, even after

19  the clearing corporation or DTC came into existence

20  you might use any one of the other clearing firms.

21         Q.   (By Ms. Fein)  Understood.  But BLMIS

22  didn't need to use -- strike that.  Typically

23  because BLMIS was a self-clearing firm for every day

24  transactions, it wouldn't rely on a third-party

25  clearing firm; correct?

CONFIDENTIAL

Page 532

1           MS. CHAITMAN:  Objection to form.

2           THE WITNESS:  No.  That's not correct.

3      Q.  (By Ms. Chaitman)  Okay.  Please tell me.

4      A.  In other words, it depends upon -- we had

5  arrangements as most brokerage firms would have

6  arrangements, particularly market making firms, with

7  all sorts of clearing firms, whether it be a Bear

8  Stearns, a Goldman Sachs or whether it be a bank,

9  any number of banks that clear or they would clear

10  themselves.

11           And depending upon the type of transaction

12  that they were doing, for example, if it was a

13  Treasury bill transaction, only certain brokerage

14  firms are registered to deal in treasuries.

15           So you would have to use like a Bank of New

16  York, for example, one or a Goldman Sachs and so on.

17  So there is no general rule as to -- and it also

18  depends upon how you were dealing with that other

19  firm and what you in general do business with that

20  other firm.  I don't know if I'm confusing a little,

21  but it varies.

22      Q.  If you -- you held securities at DTC;

23  correct?

24      A.  Some securities, yes.

25      Q.  If -- and what was the difference between

Page 533

1    why you would hold a security at DTC or elsewhere

2    other than the fact that DTC didn't clear a certain

3    security or couldn't hold a certain security for

4    you, like treasuries?

5             A.   It depends upon who the securities -- who

6    the contra-side of the securities we bought or sold,

7    depending upon what brokerage firm we were dealing

8    with.   It depends upon the type of security and that

9    we were dealing with it, what we planned to do with

10   the security, in other words, whether we would be a

11   long-term holder of the security, whether there was

12   a customer involved in the transaction.

13             There's any number of reasons why we would

14   do a -- the same reason -- there was different

15   reasons why we buy and sell through different

16   brokerage firms and, for example, also depends upon

17   where that firm is located.

18             So, for example, if we're dealing with a

19   firm in Chicago, we would use a different clearing

20   facility, whether it be a bank or a firm that's

21   located in Chicago because -- and then, again, it

22   depends upon the period of time whether people are

23   using physical securities or they were not using

24   physical securities.   In other words, there were --

25   you know, some customers wanted to take possession

CONFIDENTIAL

Page 534

1   of securities.  The industry, you know, is trying to

2   eliminate the movement of securities back and forth.

3   And it depends upon how the security was being paid

4   and whether this contra-party had the ability to

5   pay.

6           Some, for example, customer transactions,

7   they would want you to deliver the securities to

8   them or to a clearing agent against payment.  Other

9   customers had the money in their account.  So

10  there's any number of -- look, I was the chairman of

11  a clearing corporation, you know, and was the

12  founder of a clearing corporation, so I'm maybe more

13  familiar with this than the average person is.

14          I hope I'm not confusing you, but there's

15  any number of reasons why a transaction gets cleared

16  in one form or another.

17      Q.  Okay.

18      A.  If it makes you feel any better, Dubinsky

19  has no clue either.

20      Q.  Thank you.  We're trying to figure it out.

21  I'm trying to figure it out.

22      A.  It's difficult.  I understand.  I'm not --

23      Q.  Thank you.  I want to look at some

24  documents with you that maybe will help.  I think we

25  want to make sure we're getting it right.  I do.

CONFIDENTIAL

Page 535

1          A.   That's fine.

2          Q.   So let me show you a document.  You've said

3     in the past you kept stock records; correct?

4          A.   Correct.

5          Q.   And the stock records would show where the

6     securities were held; correct?

7          A.   Correct.

8          Q.   We're going to take a look at one now.  The

9     stock records would also show your inventory for

10    your long and short positions; right?

11         A.   Correct.

12              (Trustee's Exhibit Number 11 was marked

13     for identification.)

14              MR. KRATENSTEIN:  This is 11?

15         Q.   (By Ms. Fein)  So what you're looking at is

16    Trustee 11.  And I want to go through some of these

17    column headings with you.

18         A.   Uh-huh.

19         Q.   Are you familiar with this document?

20         A.   Yes.

21         Q.   Is this the type of document that you would

22    have prepared around the date listed, which is

23    July 16th, 1987?

24         A.   Yes.

25         Q.   Would this have been prepared in your

CONFIDENTIAL

Page 536

1    ordinary course of business?

2         A.   Would this what?

3         Q.   Have been prepared in your ordinary course

4    of business?

5         A.   Yes.

6         Q.   The title reads house five daily stock

7    record activity --

8         A.   Correct.

9         Q.   -- for -- thank you -- July 16th, 1987?

10        A.   Yes.

11        Q.   If you look at the columns below --

12             MS. CHAITMAN:  I'm sorry.  Where does it

13   say that?

14             MS. FEIN:  The first line on the top.

15             MS. CHAITMAN:  Oh, I see.  Okay.

16        Q.   (By Ms. Fein)  Do you see the first column

17   on the left, last act, is that last activity?

18        A.   Yes.

19        Q.   The column directly right next to that,

20   safekeeping?

21        A.   Safekeeping, right.

22        Q.   And what's under that, STRT?  Do you know

23   what that refers to?

24        A.   No.

25        Q.   Okay.  The next one, safekeeping owner?

CONFIDENTIAL

Page 537

1          A.   Correct.

2          Q.   The next column, transfer STRT.   Start

3     maybe, do you think?

4          A.   I don't know whether that's start or

5     street.   I don't know whether --

6          Q.   Okay.   And then looks like transfer owner

7     in the next line?

8          A.   Correct.

9          Q.   Okay.   If you go over a couple of columns

10    do you see securities/account name --

11         A.   Yes.

12         Q.   -- in the middle of the page?

13         A.   Uh-huh.

14         Q.   Okay.   And then next to that what I think

15    is previous balance?

16         A.   Correct.

17         Q.   Current long/short?

18         A.   Correct.

19         Q.   New balance and account number, do you see

20    that?

21         A.   Yes.

22         Q.   So looking at this first transaction, the

23    security name is AMR Corp?

24         A.   Uh-huh.

25         Q.   And the trader says Peter, dash, trading?

CONFIDENTIAL

Page 538

1          A.   Correct.

2          Q.   In the previous balance column do you see

3    an amount, 2,307 L?

4          A.   Okay.

5          Q.   Do you think that would be 2,307 long?

6          A.   Correct.

7          Q.   And then if you keep going across it looks

8    like there was some activity on this date.  Do you

9    agree?

10         A.   Yes.

11         Q.   In the long and short position?

12         A.   Uh-huh.

13         Q.   And the new balance --

14         A.   Yes.

15         Q.   -- is 3,157 long.  Do you see that?

16         A.   Yep.

17         Q.   So looking at this trade, can we just go

18   underneath where it says AMR Corp and Peter trading?

19   The next line, Prudential Bach Sec, Inc.?

20         A.   Correct.

21         Q.   Do you know what that refers to?

22         A.   Prudential Bache Securities.  That's

23   another brokerage firm.

24         Q.   Okay.  And do you see below that SIAC?

25         A.   Correct.

CONFIDENTIAL

Page 539

1          Q.   What does that refer to on this report?

2          A.   Securities Industry Automation Corp.

3     That's -- they keep the clearing records.  It's an

4     automated system.

5          Q.   Okay.  So at this -- for this date,

6     July 1987, this automated records system was in

7     place based on this report; right?

8          A.   Correct.

9          Q.   And the line below that looks like DTC?

10         A.   Yes.

11         Q.   Do you see in the previous balance column

12    the 2,307 long, if you go down to DTC it has 2,307

13    S.  Would that be 2,307 short?  I can show you.

14         A.   Okay, yes.

15         Q.   Do you agree that's the -- that appears to

16    be the same holding in that 2,307 long is your

17    firm's balance and the DTC is holding that security.

18    That's what's reflected in 2,307 short?

19         A.   Yes.

20         Q.   Okay.  And then the new balance column, I

21    think you'll see the same thing somewhat.  It

22    appears there's a total of 3,357 long at the end of

23    the day?

24         A.   Uh-huh.

25         Q.   And DTC is holding 3,357 short.  Do you see

CONFIDENTIAL

Page 540

1   that?

2        A.   Yep.

3        Q.   So if on this date, July 16th, 1987, you

4   had -- does this show that your firm would have an

5   inventory of 3,357 shares of AMR Corp?

6        A.   I'm a little bit confused myself with this

7   because this is not a record that, you know, I would

8   work with typically.  I don't know whether this is a

9   complete record.  This is -- it seems to be

10  reflecting the market making department, their

11  trades.  So does this show -- this looks like the

12  market -- all the market making trades.

13       Q.   Okay.

14       A.   Because I did -- these people, Peter,

15  Martin Joel, Mark, those -- it's identifying trading

16  that took place in the market making.  I don't see

17  any customer transactions on here.

18       Q.   Okay.  The customer transactions, your

19  testimony is the customer transactions would come

20  out of your inventory; right?

21       A.   Yeah, but this is -- not out of the -- I

22  don't see the investment.  That would be the

23  investment account, not the market making account.

24  This house five account is the market making

25  account.  So we also have a -- you know, an

CONFIDENTIAL

Page 541

1    inventory here.  These are not inventory

2    transactions.  These are the market making, the

3    market makers' transactions.

4         Q.  Okay.  You told us the stock records would

5    show the inventory of long and short positions for a

6    certain time; right?

7         A.  Of market makers.

8         Q.  So let's go back then.  Because of the

9    inventory documents that you kept, why don't you

10   talk about the other documents that would show your

11   trading inventory?

12        A.  Well, you should be able to -- if you --

13   you should be able to find an account that showed

14   the inventory in the trading account, you know, in

15   the market making account, in -- not market -- the

16   investment account.  Do you have records that show

17   whether the investment account was long or short?

18        Q.  I'm not sure what you're referring to when

19   you say investment account.  Can you give me more

20   information about it?

21        A.  For example, that would be the firm itself.

22   There's not a market maker assigned to that account.

23        Q.  Okay.  So for --

24        A.  And there are other -- there are individual

25   trading accounts.  This is -- from looking at this

CONFIDENTIAL

Page 542

1   record here, it's showing particularly market

2   makers.  You see it's identified.  I don't see a

3   record that shows what the investment account is.

4   You'd also have to look at -- you'd also have to

5   have something that would reflect option trading and

6   convertible bond trading if, in fact, there was a

7   convertible bond transaction.

8           Q.  Do you see the entry for America West

9   Airlines about one, two, three, four, five down?

10          A.  Yes.  That's a bond, right.

11          Q.  Okay.  A convertible bond; right?

12          A.  Right.

13          Q.  And the traders listed here would be

14  trading in your house five business; right?

15          A.  Correct.

16          Q.  It doesn't -- this report doesn't show the

17  activity of a single trader.  It shows multiple

18  traders; right?

19          A.  If there was a -- if there were multiple

20  traders, it's in here.  And then this AMR shows --

21  where is it again?  Peter.

22          Q.  Okay.

23          A.  That would be my brother.

24          Q.  Okay.  And then if you look to the aluminum

25  company transaction, which is four down?

CONFIDENTIAL

Page 543

1          A.   Martin Joel, right.

2          Q.   That's another trader in your firm?

3          A.   Yes, uh-huh.

4          Q.   And the one below that, Mark, dash,

5     trading, would that be another trader in your firm?

6          A.   Yes.

7          Q.   And you see a few lines down closer to the

8     end of the page David, dash, trading?

9          A.   Correct.

10         Q.   And Margaret, dash, trading?

11         A.   Correct.  Those are all market makers.

12         Q.   Okay.  And did those traders also trade for

13    your proprietary account as well?

14         A.   Sometimes.  Sometimes I would trade for the

15    investment account.

16         Q.   Okay.  So this report shows your -- it

17    shows more than one trader trading on the same day

18    in a variety of securities; right?

19         A.   Correct.

20         Q.   And it shows that there's a previous

21    balance in the security and a new balance.  So it is

22    showing that there are some held positions.  It's

23    not just reflecting the daily activity.  It's

24    reflecting the activity before that date as well and

25    then it has a previous balance column?

CONFIDENTIAL

Page 544

1          A.   In that, for that particular trader.   It's

2     not showing the global position for the firm.

3          Q.   Well, the trader that's listed as the last

4     activity trader, the trader on this day --

5          A.   Correct.

6          Q.   -- it doesn't mean -- you wouldn't say that

7     this report means that the trader listed as the only

8     trader in that security; right?

9               MS. CHAITMAN:   Objection to form.

10              THE WITNESS:   In other words, we had in

11    some securities there could be multiple traders, you

12    know, trading it.   So and those, those names would

13    be there also.   For example, you would see Martin

14    Joel and there could be Peter and so on.

15              Here, for example, you see if you go down

16    to American Express, you see Peter for trading and

17    then there's Prudential Bache.   You know, that's

18    another -- another street side transaction.   I don't

19    know -- I don't know how to explain.

20         Q.   (By Ms. Chaitman)   No, no.   I think here's

21    where we're misunderstanding each other.

22         A.   Right, okay.

23         Q.   There's a previous balance column that's

24    here, which means that there's a held position

25    before this daily activity starts; right?

CONFIDENTIAL

Page 545

1          A.   In that particular trading trader's
2     account.
3          Q.   But these -- these aren't listed by trader.
4     They're listed by security; right?
5          A.   I know, but if I did -- for example, if I
6     traded in Allied for the firm's investment account
7     for not a market maker's account, you know, that
8     would not be reflected here.  This is looking at --
9     at what the trades were before and after in a
10    particular trader's account.
11              If there is no -- so if you look at any one
12    of these transactions, you know, you would have to
13    also find a stock record that reflected the -- that
14    reflected these other traders' securities or the
15    firm's investment account.
16         Q.   Okay.  So my understanding was because if
17    you look next to Peter's name, there's a date?
18         A.   Right.
19         Q.   And the date is July 16th, 1987?
20         A.   Right.  That would be the last activity
21    that that trader traded the security.
22         Q.   But why would it be any different?  Why
23    couldn't it be that other traders had traded that
24    same security on a prior date?  This is just showing
25    that that's the last trader that traded in it;

CONFIDENTIAL

Page 546

1  right?

2       A.  I'm not really sure.  I don't know.  I

3  don't know what you're trying to -- I don't know

4  what you're trying to identify.

5       Q.  Okay.  Well, I'm trying to identify where

6  your securities are held and this report shows --

7       A.  That I understand, but --

8       Q.  Okay.

9       A.  -- I don't know, you know, if you -- I

10 don't know if these are all the records that reflect

11 what you're trying to do.  In other words, you'd

12 have to -- do you have -- have you been able to find

13 records for the investment account, you know, and

14 other stock record?

15          This is not necessarily just all the --

16 just all the trading that took place in the firm

17 itself.  I don't see where you would be able to

18 identify that.

19      Q.  Okay.  Well, that's why we're asking you.

20      A.  I don't know.

21      Q.  Because this is a stock record and you told

22 us that stock records showed where securities were

23 held, we thought that the stock records that we had

24 would show where those securities were held, but --

25      A.  If you have all the stock records.

CONFIDENTIAL

Page 547

1          Q.   Okay.  But, I mean, you're referring to

2     something different, which is something for an

3     investment account.  I'm not sure I understand what

4     that document would look like.

5          A.   It would look -- it would be the same as

6     this.

7          Q.   So even though this shows your market

8     making activity, you're saying that there's another

9     document that would show something else?  Are you

10    saying that -- what would be on that document?

11    Would it have trader names?

12         A.   It would say investment account and it

13    might have my name on it or someone else's name on

14    it, probably -- I did most of the trading for the

15    investment account.

16         Q.   Okay.

17         A.   It could have my brother's name on it.

18         Q.   Okay.  But this has your brother's name on

19    it; right?

20         A.   In his capacity as a market maker.  He

21    traded as a market maker and he also traded for the

22    firm's investment account.

23         Q.   Is that the same as proprietary trading?

24         A.   Correct.

25         Q.   Okay.  So it's your position that you'd

Page 548

1    have a different house five report for market making

2    activity than you would for other legitimate

3    activity that was also going on at your firm on the

4    same day, same time?

5         A.   House five typically refers to the market

6    making activity.  I don't know what the -- I don't

7    really know the answer to that, how you would

8    identify that.

9         Q.   Well, when we spoke earlier today --

10        A.   Understand that I'm not from the back

11   office, so I don't -- I understand the global

12   concept of what we do; but as far as working records

13   or how our firm kept certain records, that's not

14   something -- I'm not a -- wasn't a clerk.

15        Q.   Okay.  So you agree that this report shows

16   that positions were held at DTC; right?

17        A.   It shows the position that -- it shows what

18   is held at -- if it says -- if it says that it was

19   held at DTC, then the security was held at DTC for

20   this particular transaction, this particular

21   account.  If we had a trading inventory in the same

22   -- if we had a position in the same security, it

23   might be held through another broker.  It might be

24   held at Morgan Stanley.  It might be held through

25   one of our clearing banks.

CONFIDENTIAL

Page 549

1           In other words, I could -- I do a trade,

2    the firm could do a transaction in AMR and we could

3    have it in three different locations depending upon

4    who we bought the security, bought and sold the

5    security for and whether the trade was cleared

6    in-house or whether it was cleared through another

7    -- through another -- another brokerage firm.  And,

8    you know, you can't -- there's no general rule.

9         Q.  So you're saying there isn't a document

10   that would show --

11        A.  Yeah.  There are documents that would show

12   that but, you know, it wouldn't necessarily -- for

13   example, if we had it at another brokerage firm, you

14   know, there would be a document that would show

15   that, you know, it's at that particular firm.  You

16   have to -- you'd have to -- you'd have to present to

17   me -- and I can't tell you what all these records --

18   whether you have a complete set of records there.

19        Q.  So will you turn ahead to page ending in

20   950?  It's the same document.  It's about -- I'm

21   sorry.  Ending in 954, so it's four pages in.

22           MR. KRATENSTEIN:  I just realized

23   something.

24           MS. CHAITMAN:  It has 950 on every page.

25           MR. KRATENSTEIN:  All of our copies appear

CONFIDENTIAL

Page 550

1      to have 950.

2             MS. FEIN:  You know, there are two numbers

3      listed.

4             MR. KRATENSTEIN:  Oh, you're looking at

5      the top number.

6             MS. FEIN:  So I'm referring to the number

7      that's changing, yes.

8             MR. KRATENSTEIN:  So what number are you

9      on?

10            MS. CHAITMAN:  954.

11            MS. FEIN:  954.

12            MR. KRATENSTEIN:  Thank you.  Sorry.

13            THE WITNESS:  What am I looking at now?

14       Q.  (By Ms. Fein)  So there's a transaction for

15      Continental Investment it looks like Corp Mass in

16      the middle of the page?

17       A.  What page am I on?

18       Q.  954.  I'll show you.  Do you see that?

19       A.  Yes.

20       Q.  This has it looks like 100 long is the

21      balance, the new balance, and on the other side of

22      the transaction it doesn't say DTC.  It says

23      Shearson Lehman Brothers, Inc.  Do you see that?

24       A.  Correct.

25       Q.  Would that be another place that you held

Page 551

1    securities at this time?

2         A.  Could be.

3         Q.  Okay.  So this report doesn't just show DTC

4    activity.  It shows other places where securities

5    are held beyond DTC; right?

6         A.  I can't tell from this.

7         Q.  Well, is this transaction, this Lehman

8    Brothers transaction showing that Lehman Brothers is

9    holding the 100 shares for you?

10        A.  I'm not sure whether this is -- whether

11   Lehman -- this looks like we bought the stock from

12   Lehman, the other side.

13        Q.  So the counterparty?

14        A.  Would be the counterparty, I believe.

15   That's what it looks like to me.

16        Q.  Okay.  So this report has some -- will show

17   some counterparties as well then?

18        A.  Yes.

19        Q.  Okay.

20        A.  Is this '87 or '07?

21        Q.  '87.  This is '87.

22        A.  Okay, okay.

23        Q.  Would your answer change for '07?

24        A.  No.

25        Q.  Okay.  Will you go ahead forward two more

CONFIDENTIAL

Page 552

1    pages, actually, it's four more ending at 958?

2         A.   Uh-huh.

3         Q.   Do you see in the middle of the page MCI

4    Communications Corp?  Is that a bond trade that you

5    see?

6         A.   I'm looking at the wrong page.

7         Q.   Oh.

8         A.   Yes.  A bond trade.

9         Q.   Okay.  So this report shows market making

10   -- actually, let me back up.  Initially we defined

11   house five as encompassing the market making and

12   proprietary trading businesses of your firm; right?

13        A.   I believe that's correct, yes.

14        Q.   Okay.  This report shows some transactions

15   in securities and some transactions in bonds.  Do

16   you agree?

17        A.   Yes.  Well, I see here MCI sub convert,

18   yes, correct.

19        Q.   And this trade actually has SIAC?

20        A.   Yes.

21        Q.   Does this appear to have SIAC on the other

22   side?

23        A.   Uh-huh.

24        Q.   Could you -- can you explain trading?  Did

25   SIAC just keep track of the trades or were they a

CONFIDENTIAL

Page 553

```
 1   counterparty to trades as well?

 2        A.   No.   They weren't a counterparty of the

 3   trade.   I can't -- I can't answer that question

 4   because I'm not sure myself.

 5        Q.   Okay.

 6        A.   SIAC you understand doesn't hold

 7   securities.

 8        Q.   Understood.

 9        A.   Okay.

10        Q.   If you look down a few more lines to Medco

11   Research, Inc --

12        A.   Right.

13        Q.   -- WTSX 11-7-08, that would be a warrants

14   trade?

15        A.   Yes.

16        Q.   And so tell me about the type of trading

17   that you were doing at this time period.

18        A.   In '07?

19        Q.   In 1987.

20        A.   '87?

21             MR. GOLDMAN:   You mean money market or the

22   IA, I mean, in the market?   Pardon me.   Which?

23        Q.   (By Ms. Fein)   In the house five

24   business --

25             MR. GOLDMAN:   Oh, all right.
```

CONFIDENTIAL

Page 554

1      Q.   (By Ms. Fein)  -- what trading were you

2   doing in 1987?

3      A.   Sort of beats me.  I don't know.  I did a

4   little bit of everything.  I wasn't -- I really --

5   I'm not sure that I considered myself a market maker

6   at that time.  I traded for the firm's investment

7   account.

8      Q.   Okay.

9      A.   And I also traded for customer accounts as

10  well.

11     Q.   When you say you traded for customer

12  accounts, is that what you referred to when we were

13  talking about the inventory where you would move

14  trades from inventory into customer accounts or are

15  you talking about something different?

16     A.   No.  Well, it could be a journal.  If we

17  had securities in an investment account and we had

18  any number of investment accounts depending upon

19  what the firm, whether we considered it a long-term

20  transaction or it was just, you know, part of a --

21  of trading for a client, there are various forms of

22  trading that we did for the investment account, you

23  know.  So I don't know how to -- I'm not sure what

24  you're trying -- maybe if I knew what you were

25  trying to find out, I'd make it -- might be able to

Page 555

1    help you with that --

2         Q.   Okay.

3         A.   -- but I don't know.

4         Q.   Well, when you -- so you're saying you

5    weren't doing much market making during this time

6    frame, but you were trading -- you were doing some

7    proprietary trading it sounds like?

8         A.   Correct.

9         Q.   Okay.  Will you turn to the next page?  It

10   ends in 959.  It's here.  Do you see the County of

11   Nassau on Series A transaction listed?

12        A.   Uh-huh.

13        Q.   And then under there it says Bernard, dash,

14   trading?

15        A.   Correct.

16        Q.   Would this be a trade -- this means that

17   there's a -- would that be your trade that's

18   showing?

19        A.   It might be, yes.  Well, if it says me, I

20   mean, it meant that I did that, that I did that

21   particular transaction.

22        Q.   So this report does show trades that you

23   were doing in addition to your other traders?

24        A.   Correct.

25        Q.   I guess I'm trying to understand why you

Page 556

1    would say that this wouldn't represent the trades in

2    your firm.  It has the trades that you were doing.

3    It has the trades your other traders were doing.  It

4    shows who the counterparties are.  It shows where

5    the securities are held.

6            I understand if you're saying it's not

7    100 percent comprehensive, but I'm trying to figure

8    out what this report shows and what it doesn't show.

9    Do you understand that?

10           MR. KRATENSTEIN:  Object to the form of

11   the question.

12           THE WITNESS:  I'm not sure I understand

13   it.  I'm saying that I don't know if you'll -- if

14   these are the only records that reflect that.  I

15   can't answer your question.

16       Q.  (By Ms. Fein)  Okay.  Got it.  But it does

17   reflect trades that you were doing --

18       A.  Some of the trades.

19       Q.  -- in July '87?

20       A.  Yes.

21       Q.  Okay.

22       A.  Are we back -- oh, yeah.  These are '87

23   you're talking about?

24       Q.  Yeah.

25       A.  Okay.

CONFIDENTIAL

Page 557

1          Q.   And it shows a counterparty or would you

2     agree this report shows where the securities are

3     held that are listed here?

4          A.   Yes.

5          Q.   Okay.  Do you see any other counterparties

6     listed on this page other than the ones we've

7     reviewed so far?

8          A.   I see Smith Barney.

9          Q.   Okay.

10         A.   I also see SIAC.

11         Q.   Uh-huh.

12         A.   Now, I don't know whether SIAC is

13     representing -- represents other traders or whether

14     that's sort of a netting process.  I don't know.

15     That was done in '87.

16         Q.   Okay, yeah.  Do you see in the second entry

17     the Microsoft Corp?  It says Peter, trading, and

18     then Goldman Sachs underneath it?

19         A.   Correct.

20         Q.   Would that be another counterparty?

21         A.   Yes.

22         Q.   And do you see across from the names of the

23     counterparties they have different account numbers

24     as well?  So DTC appears to have the number 9993115?

25         A.   Uh-huh.

CONFIDENTIAL

Page 558

1         Q.   Okay, okay.  We can put this document aside

2    for now.

3         A.   Thank you.

4              (Trustee's Exhibit Number 12 was marked

5    for identification.)

6         Q.   (By Ms. Fein)  We've spent enough time with

7    it; right?  So I'm going to show you what's being

8    marked as Trustee Exhibit 12.  Oh, yeah.  You have

9    to share a copy.  These are big.

10             MS. CHAITMAN:   Okay.

11        Q.   (By Ms. Fein)  Okay.  Mr. Madoff, do you

12   see the date at the top of the page?

13        A.   '07.

14        Q.   Uh-huh.

15        A.   Yes.

16        Q.   Yeah.  This is December 31st, 2007; is that

17   right?

18        A.   Right.

19        Q.   Is the title house 17 stock record summary

20   through 12-31-07?

21        A.   Yes.

22        Q.   And do you see the handwriting on the same

23   line run -- it looks like one and then illegible

24   '08?

25        A.   Right.

CONFIDENTIAL

Page 559

1        Q.  So would this document have been prepared

2    in late 2007 or early 2008?

3        A.  Yes.  I assume, right.

4        Q.  Okay.  This report is another stock record,

5    correct, and it shows some of the same columns that

6    we were looking at on the last stock record.  Do you

7    see at the top of the page?

8        A.  Yes.

9        Q.  Do you recognize from this page there are

10   some IA customer names on here?

11       A.  Uh-huh, yes.

12       Q.  And do you recognize that there are

13   customer accounts listed on the right-hand side of

14   the page?

15       A.  Yes.

16       Q.  This report would have been generated by

17   your house 17 staff most likely; right?

18       A.  Correct.

19       Q.  And the computer system you were using on

20   the house 17 side was an AS/400?

21       A.  Correct.

22       Q.  Would this report have been generated by

23   the AS/400 system?

24       A.  I believe so.

25       Q.  That's the same system that generated the

CONFIDENTIAL

Page 560

1    customer statements and trade confirmations; right?

2         A.   I don't know.  I don't know what generated

3    the -- what system generated the trade, market

4    making.

5         Q.   I'm sorry.  I was referring to IA customer

6    trade confirmations and customer statements.

7         A.   Yeah.  That would be -- that would be the

8    AS/400.

9         Q.   Okay.  Do you know who would be reviewing a

10   report like this?

11        A.   No.  I assume someone in Annette's

12   department.

13        Q.   Do you see underneath the security listed

14   there are customer names and then an entry below

15   that that says clearing banks?

16        A.   Correct.

17        Q.   Do you agree that number for account number

18   29000030 is not a customer account number; right?

19   The customer numbers typically have letters?

20        A.   No.  That looks like -- that looks like the

21   number they use for the clearing banks.

22        Q.   Okay.  The amount next to the clearing bank

23   number looks like 199066; right?

24        A.   Correct.

25        Q.   And I can represent to you that the four

CONFIDENTIAL

Page 561

1   amounts in the long position equal the same as

2   what's shown here in the short position?

3        A.   That's correct.

4        Q.   We looked at a customer statement from

5   December 2007 and we talked about at this time in

6   December 2007 the customer statements showed

7   activity where the underlying securities hadn't been

8   purchased; right?

9        A.   Correct.

10            MS. CHAITMAN:   Objection.   I do not

11   believe that the -- the split strike statements for

12   December ever showed securities.

13            MS. FEIN:   Excuse me?   So you mean because

14   I should have said treasuries instead of securities?

15            MS. CHAITMAN:   Yeah, yeah.

16            MS. FEIN:   So there were securities shown

17   as sold and then there were treasuries shown as

18   purchased on the December statement that we

19   reviewed.

20            MS. CHAITMAN:   Okay, okay.

21        Q.   Okay.   And I can be clearer.   So the

22   customer statements in December 2007 would have

23   shown -- would have shown treasuries that hadn't

24   been purchased; right?

25            MS. CHAITMAN:   Objection to form.   He's

CONFIDENTIAL

Page 562

1   already testified that they have been.

2            MS. FEIN:  No.  That's not correct, not in

3   2007.  He said in 1987 that was true and in 2007 it

4   was not true.

5            MS. CHAITMAN:  No.  He said that he had --

6            MS. FEIN:  The record can speak for

7   itself.  It's okay.  The record can speak for

8   itself.

9            MS. CHAITMAN:  Okay.  You're

10  misrepresenting what he said.

11           MS. FEIN:  Okay.  I'm going to continue --

12           MS. CHAITMAN:  He said he didn't buy 64

13  billion, but he didn't say he didn't maintain the

14  portfolio.  It's very different.

15           MS. FEIN:  We can have this conversation

16  offline.

17           MS. CHAITMAN:  Okay, okay.

18           MS. FEIN:  I'm talking about what is

19  represented on the customer statements and the

20  aggregate.  We talked about the number that was

21  represented on the customer statements, not the fact

22  that there were treasuries purchased at that time.

23  Okay.

24           MS. CHAITMAN:  Okay.

25        Q.  (By Ms. Fein)  Okay.  The term clearing

CONFIDENTIAL

Page 563

1    bank here is used where you would typically have a

2    counterparty listed for where the securities were

3    held; right?

4            MR. KRATENSTEIN:  Object to form.

5            THE WITNESS:  It's the balancing number,

6    yes.

7        Q.  (By Ms. Fein)  Okay.  And what do you mean

8    by the balancing number?

9        A.  In other words, it typically would balance.

10   In other words, you would always have the -- if it

11   didn't balance, it would be -- it would be a broken

12   trade.  Typically your long -- your long side would

13   always equal, always be represented on the short

14   position, should be the same.

15       Q.  Okay.

16       A.  When they use the term clearing banks,

17   that's not one single bank.  It's just, you know,

18   any number of clearing banks that the transactions

19   were custodied at.  And these -- I don't know why

20   you're looking -- I mean, I've already stated that

21   before that during this period in, you know, 2000s

22   or certainly post-'90s in general, that there were

23   times that I wasn't purchasing the securities.

24       Q.  Okay.  So when clearing banks is used here,

25   it's not --

CONFIDENTIAL

Page 564

1        A.   It doesn't --

2        Q.   -- it doesn't mean the same thing as it

3    would if it showed DTC?

4        A.   No.   It wouldn't -- that would -- that was

5    a fraud period, in other words.   So there's nothing

6    -- I can -- I'm perfectly willing, I've already

7    stated that anything post-'92 period is not going to

8    be accurate in my records.

9        Q.   Okay.   So the term clearing banks here is

10   used as a place holder for the other side of the

11   transaction; right?

12       A.   Correct.

13       Q.   Okay.   I don't know.   We've been going a

14   while.   Would you like to take a break or do you

15   want to keep going?

16       A.   I'm fine.

17            MS. FEIN:   Okay.

18            MR. KRATENSTEIN:   Are you done with this

19   one?

20            MS. FEIN:   I think -- oh, you know what?

21   I have one more.   I have one more thing I want to

22   look at.   Thank you.   Sorry.   Can you turn -- I can

23   help you turn to the page, but the page is 498.   Let

24   me help you figure it out.   There you go.

25       Q.   (By Ms. Fein)   Do you see the transaction

CONFIDENTIAL

Page 565

1    for the Treasury bill listed on this page due

2    1-3-2008?

3        A.   Uh-huh.

4        Q.   And at the bottom of that entry there's the

5    term clearing banks again?

6        A.   Correct.

7        Q.   And in this context it's being used as a

8    place holder or filler --

9        A.   Right.

10       Q.   -- counterparty for the trade; right?

11       A.   Uh-huh.

12       Q.   Okay.  So this trade is not -- is one that

13   didn't happen in the market; right?

14       A.   Correct.

15       Q.   And would that be true for the entries that

16   show this clearing banks on this report in 2007,

17   would that be true for those trades?

18       A.   Correct.

19           MS. FEIN:  We'll try to go quickly.  There

20   are a couple more reports of this size.  So we're

21   going to mark one more, but we're done with this

22   one.

23           MR. KRATENSTEIN:  I know all about trying

24   to go quickly through reports.

25           MS. FEIN:  I'm not going to match your

CONFIDENTIAL

Page 566

1  speed.  I promise.

2            MS. DASARO:  This is a full one.

3            MS. FEIN:  Okay.  So we have excerpts of

4  this one --

5            MR. KRATENSTEIN:  Okay.

6            MS. FEIN:  -- because it's very large.

7            MR. KRATENSTEIN:  Thank you.

8            MS. CHAITMAN:  So what number is this?

9            MS. FEIN:  This is Number 13.

10            (Trustee's Exhibit Number 13 was marked

11  for identification.)

12            MR. GOLDMAN:  Do you have the date because

13  this is sort of marked out.  I just want to make

14  sure.  It looks like 8-31-0 --

15            MS. FEIN:  '01.

16            MR. GOLDMAN:  '01?

17            MS. FEIN:  Yes.  It is, I know.  It's

18  easier on some pages to read than others.

19            MS. CHAITMAN:  I'd just like to make a

20  statement for the record.  Amanda, you objected to

21  some of the areas of our questioning on the basis

22  that it was not a part of the day two subjects.

23  And, in fact, I had covered the T-bill issue in the

24  day one topics and you had an opportunity to fully

25  cross-examine Mr. Madoff on them, so --

CONFIDENTIAL

Page 567

1          MS. FEIN:  Understood.  These reports are

2     really part of the microfilm report

3     cross-examination because that's one of the day two

4     topics, but I understand your position.

5          MS. CHAITMAN:  Right.  And, in fact, if

6     you had produced these documents in a timely manner

7     to us, we could have questioned him about them, but

8     you certainly could have.

9          MS. FEIN:  I should clarify.  These

10    documents are in the data room.  The reports that

11    we're going through are all in the data room.

12         MS. CHAITMAN:  Right.  So then you had the

13    ability to question him about them during the day

14    one depositions.

15         MS. FEIN:  And this is part of the day two

16    topics with respect to the microfilm reports that

17    I'm questioning him on.  That's -- that's why

18    they're part of these topics.

19         MS. CHAITMAN:  If this was in the data

20    room, wasn't it available to you when you were

21    questioning him?

22         MS. FEIN:  This is in response to your

23    questioning.  This is my cross-examination.

24         MS. CHAITMAN:  Okay.  And I think it's not

25    within the scope of the day two.

CONFIDENTIAL

Page 568

1          MS. FEIN:  Understood.

2          Q.  (By Ms. Fein)  Okay.  So, Mr. Madoff, this

3    report is entitled abbreviated stock record summary

4    through 8-31-01.  Do you see that at the top of the

5    page?  I'm sorry.  Let me get it ready for you.

6    This report that I'm holding, abbreviated stock

7    record summary through 8-31-01?

8          A.  Uh-huh.

9          Q.  And on the left it says distribution,

10   Annette.  Do you believe that's referring to Annette

11   Bongiorno?

12         A.  I assume so because I don't think we have

13   another person named Annette.

14         Q.  And this is 2001.  If you look at the first

15   transaction --

16         A.  Right.

17         Q.  -- do you see Daimler Chrysler AG listed as

18   the security?

19         A.  Correct.

20         Q.  And at the bottom do you see customer names

21   listed after that?

22         A.  Yes.

23         Q.  And customer account numbers listed to the

24   left -- I'm sorry -- to the right of that; right?

25         A.  Yes.

CONFIDENTIAL

Page 569

1          Q.  At the bottom of this entry do you see

2     clearing banks listed on the other side?

3          A.  Yes.

4          Q.  And would that be used as a place holder

5     counterparty because there wasn't a counterparty to

6     this trade?

7          A.  That's correct.

8          Q.  Do you agree that this report shows IA

9     customer holdings?

10          A.  Right.

11          MS. FEIN:  Okay.  We can be finished with

12     that document.

13          (Trustee's Exhibit Number 14 was marked

14     for identification.)

15          Q.  (By Ms. Chaitman)  Yes.  We're all set with

16     that.  This is Trustee Exhibit 14.

17          MR. KRATENSTEIN:  Excuse me.

18          Q.  (By Ms. Chaitman)  Is the title of this

19     document house 17 stock record summary through

20     3-31-94?

21          A.  Yes.

22          Q.  Does it appear similar to the other stock

23     record summaries we reviewed previously?

24          A.  Uh-huh.

25          Q.  It has the same column headings; right?

CONFIDENTIAL

Page 570

1        A.  Right.

2        Q.  The first security that's listed under

3   security account name, ATD, Ltd.  Do you see that?

4        A.  Yes.

5        Q.  And then do you see customer names listed

6   underneath the security.

7        A.  Yes.

8        Q.  And customer account numbers that are

9   listed on the right-hand side; right?

10       A.  Yes.

11       Q.  So would this be referring to customer

12   positions in -- in 1994 when this report was put

13   together?

14       A.  Correct.

15       Q.  And do you see the clearing bank's entry at

16   the end of the -- at the end of the ADT security

17   list?

18       A.  Uh-huh, yes.

19       Q.  And the account number 29000030, do you see

20   that?

21       A.  Yes.

22       Q.  Would this also be a place holder

23   counterparty?

24       A.  Yes.

25            MS. FEIN:  So I think we're done with that

CONFIDENTIAL

Page 571

1    one.

2                (Discussion off the record.)

3                MS. FEIN:  Okay.  I'm going to mark this

4    Exhibit 15.

5                MS. CHAITMAN:  Will you be sending us a

6    complete set of these exhibits?

7                MS. FEIN:  That's no problem.

8                MS. CHAITMAN:  Okay.

9                MS. FEIN:  Sorry it's so large.  It's just

10   -- whoops.

11        Q.  (By Ms. Fein)  Okay.  Do you see in the

12   middle of the page the title of this report?

13        A.  Yes.

14        Q.  Is it house 17 stock record summary through

15   7-16-87?

16        A.  Yes.

17        Q.  Do you see the first trade listed under the

18   title AGS Computers, Inc. sub deb conv?

19        A.  Correct.

20        Q.  Is that a convertible arb trade?

21        A.  Yes.

22        Q.  And do you see IA customers listed

23   underneath that?

24        A.  Uh-huh.

25        Q.  Okay.  Do you see at the end of that same

CONFIDENTIAL

Page 572

1    set the term clearing banks used?

2         A.   I don't see.  Oh, yes.

3         Q.   Okay.  Would that be used as a filler

4    counterparty in this report?

5         A.   Yes.

6         Q.   And if you turn ahead to page ending -- I

7    think it's two pages ahead ending in 064.  Sorry

8    about this.  Do you see a transaction in -- oh, you

9    know what?  The pages for this one so that it would

10   print out so we could read it, it's three pages per

11   on your copy.  His copy has a page --

12             MR. KRATENSTEIN:  Okay.  Could you just

13   show us where to go?

14             MS. FEIN:  No problem.

15             MR. KRATENSTEIN:  Thank you.

16             MS. CHAITMAN:  So what is the date of this

17   document?

18             MR. KRATENSTEIN:  7-16-87.

19             MS. CHAITMAN:  7-16-87.

20             MS. FEIN:  This is the --

21             MR. KRATENSTEIN:  Thank you very much.

22        Q.   (By Ms. Fein)  Do you see the AMR Corp

23   transaction listed at the bottom of the page?

24        A.   Uh-huh.

25        Q.   Okay.  And do you see clearing banks listed

CONFIDENTIAL

Page 573

1   at the end of that transaction or at the bottom of

2   the -- I'm sorry.  Let me back up.  Is there a list

3   of IA customers underneath the AMR Corp listing

4   security?

5        A.  Yes.

6        Q.  And do you see there on the right-hand

7   column there are IA account numbers listed?

8        A.  Correct.

9        Q.  Do you see the clearing banks entry at the

10  bottom of the AMR Corp transaction or the long

11  positions?

12       A.  Correct.

13       Q.  And do you see the account number 2900030?

14       A.  Yes.

15       Q.  Would this be a filler counterparty that

16  was used on your reports?

17       A.  When you say filler counterparty, why --

18  what are you referring to?

19       Q.  Well, what we were referring to on the

20  earlier reports is that those trades didn't occur,

21  but you needed to have another side to the

22  transaction; right?

23       A.  If, in fact -- if, in fact, it was during a

24  period that we were not doing the transaction, the

25  actual transaction.

CONFIDENTIAL

Page 574

1        Q.   Okay.

2        A.   You're talking about a period now in 1987

3   that we did the transactions.

4        Q.   Okay.

5        A.   So that would be -- when you say a filler,

6   I'm assuming you're assuming that the trade wasn't

7   done.

8        Q.   Okay.

9        A.   That doesn't mean that every time we used

10  clearing banks that there wasn't an actual trade

11  being done.

12       Q.   Okay.

13       A.   What I had said originally, I was

14  explaining to you, it would be a balancing number.

15  It should always -- it would always balance.  If

16  didn't balance, there would be a break in the

17  transaction.  That's -- so if that didn't balance,

18  it didn't match the number of shares bought, it

19  would alert the -- whoever was running the records

20  that there's an error, you know, that we're missing

21  something there.

22       Q.   Okay.

23       A.   You also have to understand that when

24  you're talking about treasuries, for example, there

25  were treasuries that were bought under the firm's

CONFIDENTIAL

Page 575

1  name, you know, at a place like Morgan Stanley or

2  Fidelity and so on that would not be reflected

3  necessarily on my books and records.

4          Q.   You mean in the 1987 time frame?

5          A.   Not in the 1987.  In the later period.

6          Q.   Okay.  What do you mean they wouldn't be

7  reflected on your books and records?

8          A.   In other words, I'm not sure how they

9  handled -- even in the '87 period, I'm not sure, you

10  know, how those treasuries were handled, you know,

11  whether they were bought.  Depends upon how they

12  were purchased.  You'd have to ask -- during '87

13  wouldn't be Frank DiPascali because he wasn't

14  handling that.  You'd have to speak to someone else

15  who would know that.  I don't know how they handled

16  that transaction.

17          Q.   Would Annette maybe know?

18          A.   Probably not, not during that period.

19          Q.   Okay.  So this is a trade in AMR Corp

20  that's listed?

21          A.   Uh-huh.

22          Q.   AMR Corp was -- the DTC held AMR Corp

23  securities in 1987 because we saw that on the

24  earlier report we reviewed; right?

25          A.   Correct.

CONFIDENTIAL

Page 576

1           MR. KRATENSTEIN:  Object to the form.

2           Q.  (By Ms. Fein)  But it's your testimony that

3     these shares weren't -- is it your testimony that

4     these shares were not held at DTC even though DTC

5     could hold the securities?

6           A.  I don't see the DTC.

7           Q.  Right.

8           A.  No.  I don't see DTC.

9           Q.  It just says clearing banks; right?

10          A.  Clearing banks, right.

11          Q.  And it's --

12          A.  So that could be any number of five

13    different clearing banks we had and, you know,

14    probably eight different clearing banks that were

15    used to -- as a depository to clear the transaction.

16          Q.  Wouldn't you need to know who was on -- who

17    was holding the securities for your transactions?

18    Why would it show up as clearing banks?

19          A.  It would.  There would be a subsidiary

20    ledger that would show that.

21          Q.  Okay.

22          A.  The stock record only shows -- just like at

23    DTC, you know, it's just one entity.  There were

24    subsidiary ledgers that would show where the

25    securities were held.

CONFIDENTIAL

Page 577

1        Q.  But these securities listed here wouldn't

2    be held at DTC or else you would show DTC on the

3    other side; right?  So it has to be held at another

4    clearing firm?

5        A.  That's correct.

6        Q.  Okay.  I'm just going to go back to show

7    you something on Exhibit 11.  All right.  So the

8    first transaction in AMR Corp, the balance held at

9    DTC as shown on this report for July 16th, 1987 is

10   3,357; correct?

11       A.  Uh-huh.

12       Q.  If you look at the short position shown on

13   the AMR Corp trade here for the same date,

14   July 16th, 1987, how many shares does it say are

15   held at the clearing banks?

16       A.  It looks like --

17            MS. CHAITMAN:  When you say here, what

18   document are you asking to look at?

19            MS. FEIN:  Sorry.  So now we're looking

20   at --

21            MS. CHAITMAN:  Exhibit 15?

22            MS. FEIN:  -- Exhibit 15, page ending in

23   064.

24            THE WITNESS:  Is that 290,000 or --

25            MS. FEIN:  I think it's -- let me just

CONFIDENTIAL

Page 578

1    make sure.

2          MS. CHAITMAN:  So I can't read this.

3    Trustee Exhibit 11 is house five?  Is that what it

4    says at the top?

5          MR. KRATENSTEIN:  Yes.

6          MS. FEIN:  It does.

7          MS. CHAITMAN:  And Trustee Exhibit 15 is

8    house five also?

9          MS. FEIN:  House 17.

10         MS. CHAITMAN:  House 17, okay.

11         Q.  (By Ms. Fein)  So just to be clear, we're

12   looking at the AMC security at the bottom of that

13   transaction.  It says clearing banks.  The account

14   number listed is 29,000, three zero, and then

15   there's a short position listed.  What short are

16   they showing?

17         A.  332, right, 785.

18         Q.  Yes.  So for the same date that you had a

19   little over 3,000 shares held at DTC as shown on

20   your house five stock record summary --

21         A.  Correct.

22         Q.  -- this shows over 330,000 shares in the

23   same security; right?

24         A.  In the 17 -- in the 17 account.

25         Q.  Right.  On the house 17 side?

CONFIDENTIAL

Page 579

1        A.   Right, right.

2             MS. FEIN:   Okay.  Now is a good time to

3   take a break if that's okay with everyone.

4                        EXAMINATION

5   BY MR. GOLDMAN:

6        Q.   I have two questions.  They're quick

7   questions.   I don't know if the answers are long,

8   but Ms. Chaitman asked you earlier on about

9   confirmations on transactions.

10       A.   Yeah.  What?  Oh, I didn't know you were

11  talking to me.

12       Q.   Ms. Chaitman asked you some questions about

13  confirmations, whether you got confirmations.

14  Sometimes you did get confirmations, sometimes you

15  didn't --

16       A.   Yes.

17       Q.   -- at the time you were looking through all

18  the transactions that occurred?

19       A.   Correct.

20       Q.   Was there a procedure or protocol in place

21  to authenticate that the transactions actually

22  occurred?  This is prior to '92.  Did you get

23  something back from whoever you contracted to have

24  the transaction performed?

25       A.   If it was -- if it was a -- if the

CONFIDENTIAL

Page 580

1    transaction was handled through NSCC, if it was part

2    of the C&S netting practice.  I'm not sure that I

3    understand the question.

4        Q.   Okay.  How did -- how were you assured that

5    the order, whether it was a purchase or a sale,

6    actually occurred if you have it listed on your

7    account that's your own internal records?  How were

8    you assured that the transaction actually occurred?

9        A.   That was handled, would have been handled

10   by the what we call the P&S department, the purchase

11   and sales department.  And they would typically

12   either get a confirmation or if it went through the

13   clearing house, you know, and, again, depending upon

14   if that was during the netting period or not, you

15   would get what they call a balance order from the

16   clearing corporation.

17            It also -- also depends upon whether or not

18   we had an automatic interface with the firm that was

19   on the other side of the transaction.

20       Q.   But there was some procedure or protocol in

21   place?

22       A.   Oh, yeah.  Of course, yes.

23       Q.   And the second question I have, did you

24   send your clients, customers, clients quarterly or

25   monthly financial statements?

CONFIDENTIAL

Page 581

1        A.   They had --

2        Q.   Statements of transactions?

3        A.   Some clients got them quarterly and some

4   clients got them monthly.

5        Q.   Okay.

6        A.   Depends upon whether they requested them,

7   when they requested them.

8        Q.   And if there were short transactions that

9   occurred for that particular client or customer, was

10   it indicated on the statement that it was a short

11   transaction?

12        A.   No.

13        Q.   Nothing.   Just --

14        A.   No brokers indicated to the customer

15   because the customer didn't care whether it was a

16   short transaction or it was a long transaction.

17   They didn't care whether the broker was short or

18   whether he was long.   They looked -- the ownership

19   rights were the same.   In other words, you were

20   entitled to the dividend.   You were entitled to a

21   stock split or any action, corporate action.

22             MR. GOLDMAN:   Okay.   Thanks.

23             MR. KRATENSTEIN:   Take a break?

24             MS. DASARO:   Yes, thanks.

25             THE VIDEOGRAPHER:   Going off the record.

CONFIDENTIAL

Page 582

1    The time is 10:32.

2              (A recess was taken.)

3              THE VIDEOGRAPHER:  Back on the record.

4    This begins tape number two in the deposition of

5    Bernard L. Madoff in Butner, North Carolina on

6    November 9th, 2017.  The time is 11:07.

7                    FURTHER EXAMINATION

8    BY MS. FEIN:

9         Q.  Mr. Madoff, do you remember yesterday Mr.

10   Kratenstein asked you about a list of banks where

11   you performed clearing functions?

12        A.  Correct.

13        Q.  You provided us a list when we met with you

14   in April and I can show it to you --

15        A.  Uh-huh.

16        Q.  -- if you want to see it, if it helps

17   refresh your recollection about what those firms

18   are.

19        A.  Right.

20        Q.  This just the testimony from April 26,

21   2017.

22        A.  Uh-huh.

23        Q.  Do you see around line ten there's a list

24   that includes Meadowbrook National Bank, Commercial

25   Bank of North America, Irving Trust Company, Bank of

CONFIDENTIAL

Page 583

1   New York, Bankers Trust, Manufacturers Hanover,

2   Chase Manhattan, Marine Midland, Chemical Bank,

3   JPMorgan Bank, Continental Illinois Bank and M&T

4   Bank?

5        A.   Yeah.

6        Q.   Do you recall any firms -- scratch that.

7   Do you see right below that in the testimony --

8   well, actually, here.  You listed what services

9   those banks provided to you on the next page.  And

10  then you were asked do they have custodial accounts

11  where you maintain securities for customers.

12        Did this list of banks we just went

13  through, did any of those have custodial accounts

14  where securities were maintained for customers?

15       A.   Okay.  What is the question?

16       Q.   The list of banks that we just reviewed --

17       A.   Right.

18       Q.   -- did any of those banks have custodial

19  accounts where you maintained securities for

20  customers?

21       A.   When you say did they have accounts they

22  maintained for customers, they would have -- no.

23  The answer would be that they would have usually one

24  account for the firm.  They wouldn't -- they

25  wouldn't have -- they wouldn't identify them by

Page 584

1    customers.  That was the same practice with DTC.  In

2    other words, there was -- I don't know what the

3    terminology would be because my brain isn't working,

4    but they would have one account.  They wouldn't

5    break it out by clients.

6         Q.  This question was and my question to you,

7    did you have custodial accounts where you maintained

8    securities for customers?

9         A.  Yes.

10        Q.  Okay.  When you were asked -- so this

11   deposition took place on April 26, 2017.  You

12   remember you were under oath for that deposition;

13   right?

14        A.  Correct.

15        Q.  And the answer to the question you provided

16   then --

17             MR. GOLDMAN:  Why don't you read it?

18             MS. FEIN:  Sure.

19             MR. GOLDMAN:  Thanks.

20             MS. FEIN:  Yeah.

21             MR. KRATENSTEIN:  Tell us where you are.

22   I have it here, so --

23             MS. FEIN:  Okay, sure.  I'm on page 33.

24             MR. KRATENSTEIN:  Yes.

25             MS. FEIN:  And the line is line six.

Page 585

1              MR. KRATENSTEIN:  Thank you.

2         Q.  (By Ms. Fein)  This right here.  You were

3    asked by Ms. Chaitman about this list of banks.  Did

4    they have custodial accounts where you maintained

5    securities for customers.  Your answer, not that I'm

6    aware of, no.  So I guess I'm trying to understand

7    why your answer is different today?

8         A.  I'm not sure that it's different.  When you

9    say do I own -- when you're asking was I own --

10   maintain a custodial account for a customer, it

11   would be -- the answer would be yes.  It depends

12   upon the period you're talking about.  The stock

13   records would show -- the stock record would show

14   the customers that we had securities for.  That's on

15   the stock record.

16             That's the only record that we would

17   maintain of that.  And I would assume that the

18   question you were asking when you say did we have --

19   did the banks have custodial, the answer would be,

20   you know, they wouldn't know who our customers were.

21   They would just have -- they would just -- the firm

22   is the customer.

23             We don't tell the bank that these

24   securities -- that these securities that we're

25   clearing through you are for John Jones.  No one

CONFIDENTIAL

Page 586

1    does that.  We don't identify that.  And they don't

2    -- for example, they don't -- they don't have a

3    record of who the clients were.  It's the same thing

4    with DTC.

5         Q.  I understand that.

6         A.  Oh, okay.

7         Q.  I do understand that.

8         A.  That's the question.  I'm not sure what

9    your question was.

10        Q.  Okay.  Well, my question is you --

11        A.  I don't think it's -- what I'm saying, I

12   don't know that my response to Helen Chaitman is

13   different than what I had made then.  At least I

14   don't see the difference.

15        Q.  Well, this refers to accounts you would

16   have, your firm would have --

17        A.  Right.

18        Q.  -- where you maintain securities for

19   customers.

20        A.  Right.

21        Q.  Not that they would be segregated

22   necessarily.

23        A.  Oh.

24        Q.  Just that you maintain the securities for

25   customers.

CONFIDENTIAL

Page 587

1        A.   Right.

2        Q.   And when you were asked in April the answer

3    to that question was no, but it sounds like today

4    your answer is different?

5             MR. KRATENSTEIN:   I object to the form of

6    the question.

7             MS. CHAITMAN:   Yeah.   I think what he was

8    saying was I think the way the first -- the way my

9    question was worded, he thought does he maintain at

10   an institution account for Mrs. Jones and Mrs. Brown

11   and --

12            MS. FEIN:   Okay.   Your interpretation

13   notwithstanding --

14            MR. KRATENSTEIN:   Just for the record,

15   you're interpreting his testimony, too, so --

16            MS. FEIN:   I was just trying to read it

17   and then understand what it said.

18       Q.   (By Ms. Fein)   Okay.   So is your testimony

19   today that the banks that we listed -- actually, let

20   me go back.   That set of banks that we went over

21   didn't include NatWest; right?

22       A.   What do you mean didn't include it?

23       Q.   So you listed 11 banks during your

24   testimony that day.   NatWest wasn't one of them;

25   right?   And the list is here.

Page 588

1          A.   Because it would have been NatWest took

2     over -- as I said, I believe I said in the other

3     testimony earlier, these banks merged with each

4     other.  So, for example, Meadowbrook National Bank

5     became NatWest at one point in time, you know.

6          Q.   Okay.  So --

7          A.   NatWest would have been one of them.

8     Again, this was -- I said pretty much covers it.  I

9     was giving a list of the banks that I had remembered

10    that I was familiar with, but Meadowbrook National

11    was merged with NatWest the same way that Chase

12    Manhattan and Manufacturers became Chase Manhattan

13    and then Chase Manhattan became JP Morgan.

14         Q.   Okay.  I had thought National Bank of North

15    America had merged with NatWest.  Does that ring a

16    bell for you?

17         A.   No.  Nat -- oh, I don't know.  I don't

18    remember.

19         Q.   Okay, okay.  Understood.

20         A.   I mean, my question was answered just that

21    I had other facilities, clearing facilities through

22    banks and brokerage firms.  I didn't list them all.

23    It was just that -- just saying that besides being a

24    self-clearing firm, I also had arrangements and did,

25    in fact, clear certain transactions through other

CONFIDENTIAL

Page 589

1  entities.

2       Q.  So if you were clearing transactions

3  through those other entities, you wouldn't be

4  relying on your back office for the purposes of

5  delivery of the securities or --

6       A.  Well, the back office would eventually --

7  they would start with us, you know.  Like we bought

8  the stock, but we would give instructions to the

9  counterparty, deliver the securities to this broker

10 or this bank and so on and so on.  It depends upon

11 the transaction.

12          I mean, we were the one that would actually

13 buy the securities, but then again there were times

14 that we would call them depending upon what it was.

15 Like if it was a Treasury instrument, we would

16 typically just call JPMorgan or Bank of New York and

17 they would actually buy the transaction.

18      Q.  And did you say where would you be keeping

19 track of --

20      A.  We would have an internal record of that

21 somewhere at the firm.

22      Q.  Okay.

23      A.  Whether -- and, again, it depends upon at

24 what stage it was and what our ordination was and

25 what the bank's -- we had direct interfaces with

Page 590

1    some of these banks and brokerage firms the same way

2    that we had -- that we had direct interfaces with

3    NCC and DTC and so on and so forth.

4         Q.  Okay.  So your -- for the period of time

5    let's say the 1980s --

6         A.  Uh-huh.

7         Q.  -- it's your testimony those transactions

8    were taking place in the market; right?

9         A.  Yeah.

10        Q.  They were taking place within your house

11   five business; is that right?

12        A.  It depends upon who would -- who we were

13   acting for.  If it was -- and whether it was just a

14   transaction coming out of the inventory account of

15   the firm, you know, out of the -- and we had any

16   number -- we had different trading accounts

17   depending upon the strategy and who was handling it.

18   So there was internal records somewhere in the firm.

19            I mean, obviously, you know, we had to have

20   some record, you know, and to be able to track it.

21   And then there was the stock record which showed

22   the -- usually the global picture but, again, you

23   can have any number of stock records.

24        Q.  Okay.  The trades shown on your convertible

25   arb customer statements in the '80s --

CONFIDENTIAL

Page 591

1        A.   Right.

2        Q.   -- would have -- so tell me, you're saying

3    there's more than one place that those trades could

4    have originated?

5        A.   Correct.

6        Q.   Is there more than one place that those

7    trades would have been cleared through?

8        A.   Yes.  Again, depends upon whether the

9    entity or the bank was also a market maker in the

10   security depending upon where they were located and

11   so on.  So, in other words, the bank -- these banks

12   and other brokerage firms like a Bear Stearns or a

13   low roads, they're also, you know, competitors of

14   ours.  In other words, they're also doing the same

15   thing that we're doing.

16            And there are any number of ways that you

17   do a -- that you can buy or sell transactions.  You

18   can actually go out into the market -- into the

19   street to buy the security.

20            We might do a swap with a particular firm,

21   which is -- I don't want to bore you with all the

22   details, but the same way that when you're doing a

23   convertible transaction trade, you can rather than

24   put the bond into conversion to convert it into

25   stock, which would eventually have to go to -- if

CONFIDENTIAL

Page 592

1    you did that, you would have to put it through

2    whoever the -- whoever was the conversion agent, you

3    know, for that particular security.  You could also

4    go to -- we would -- we could go to another broker,

5    another market maker and swap, in other words, swap

6    our bond for stock, you know, that it was

7    convertible into because then they may be doing the

8    opposite side of the transaction that we do.

9            These are things that in the Dubinsky

10   report he seemed to be totally unaware of.  Like he

11   made statements, well, I contacted the conversion

12   agent of the particular security that we -- the bond

13   and they didn't have any agreement in place with

14   Madoff as if that was the only way that you could

15   exchange.

16           The idea is when you're doing a convertible

17   trade if you do it depending upon, again, what the

18   strategy you're using, if it's strictly to buy the

19   bond for the client and then sell the common stock,

20   you know, short, you know, against that, and then

21   you're going to -- you either convert it physically

22   by sending it to the conversion agent or you can, in

23   fact, go ahead and exchange with another market

24   maker in that particular bond and say okay, look, I

25   want to -- I'll exchange my bond.

CONFIDENTIAL

Page 593

1          He may want the bond and he's willing to

2    give me stock for it and then you do a stock swap.

3    And when I say short, you know, you're talking about

4    it's like a short exempt transaction.  In other

5    words, I'm selling stock, you know, that -- which is

6    short, which I don't have the stock at the time but

7    I have a bond at the time.

8          Q.  So are you saying that where your various

9    bonds and securities cleared would be dependent on

10   the type of bond or security in part, right, because

11   some places wouldn't clear certain --

12         A.  Right.

13         Q.  -- certain bonds or certain securities?

14         A.  Well, any bank would -- any bank would

15   clear any transaction that you do, but depending

16   upon what you want to do.  If I was looking to

17   convert the bond into common stock, which means I'm

18   going to exchange the bond position, then the bank

19   itself might have -- you know, if they're a market

20   maker they might be willing to say okay, look,

21   Madoff wants to convert -- he wants to exchange the

22   bond for stock.

23          You know, we'll give him the stock --

24   they'll give me the stock from their inventory to

25   satisfy what I'm asking him to do and take the bond

CONFIDENTIAL

Page 594

1    into their inventory.  Did I lose you or not?

2                MS. FEIN:  Okay.  No.  So we looked at an

3    exhibit yesterday, maybe also today.  Maybe it's in

4    this other pile.

5                MR. KRATENSTEIN:  What number are you

6    looking for?

7                MS. FEIN:  I'm looking for 39.  It's in

8    that other pile.  I wanted to look at one document

9    that we looked at yesterday, but I don't see it.

10   Thank you.

11               MR. KRATENSTEIN:  You want 39?

12               MS. FEIN:  Yeah.  Didn't see it there.

13               (Discussion off the record.)

14       Q.  (By Ms. Fein)  So looking at this

15   Exhibit 39 that we reviewed yesterday, thank you, do

16   you see -- this looks like a customer statement,

17   right, for the most part other than the client?

18       A.  Right.

19       Q.  This format I should say.

20       A.  Uh-huh.

21       Q.  Do you see where it says balance forward,

22   $75,892,366.08?  There's a debit balance listed?

23       A.  Right.

24       Q.  Do you know why there would be a debit

25   balance on this report?

CONFIDENTIAL

Page 595

1           MS. CHAITMAN:  I'm sorry.  Show me where

2      you are.

3           MS. FEIN:  Just the first line of Exhibit

4      39, yeah.

5           MS. CHAITMAN:  The debit, I see.

6           MS. FEIN:  Yeah.

7           THE WITNESS:  It might be, I'm assuming it

8      arose from activity that occurred in that account.

9           Q.  (By Ms. Fein)  Okay.  That would mean that

10     the bank had owed you 75 million and change; right?

11          A.  Based upon deliveries, what was taking

12     place in the account.  See, this -- these securities

13     would have been -- these received and delivered

14     would have monies attached to it and all, which

15     doesn't show on the statement but it would be on

16     another, another statement depending on what was --

17     what was flowing through.  Obviously, it represents,

18     you know, the debits and credits that were involved

19     in these transactions.

20          MS. FEIN:  Okay.

21          MR. KRATENSTEIN:  I mean, if you look at

22     later -- if I could, if you look at later pages

23     there are debit and credit numbers listed on some of

24     the pages.

25          MS. FEIN:  I do see that, yes.

CONFIDENTIAL

Page 596

1          MR. KRATENSTEIN:   Okay.

2          MS. FEIN:   Thank you.

3      Q.   (By Ms. Fein)   At the end of the report if

4  you look at the page ending in 69, do you see where

5  security positions is listed?

6      A.   Uh-huh.

7      Q.   And then there are a number of positions

8  that follow from that?

9      A.   Correct.

10     Q.   A couple of pages later, it's the last page

11  of the document, it says end of positions?

12     A.   Right.

13     Q.   And there's a long and a short and a

14  difference?

15     A.   Uh-huh.

16     Q.   Would this list of security positions be

17  the securities that were listed in this account at

18  the time?

19          MS. CHAIRMAN:   Objection to form.

20          THE WITNESS:   I'm not sure I understand.

21     Q.   (By Ms. Fein)   Well, my question is --

22     A.   Yeah.   I see this.

23     Q.   -- typically at the bottom of your customer

24  statements and similar statements you would have

25  security positions and then you would have the

CONFIDENTIAL

Page 597

1   securities or other bonds that would be --

2        A.  Right.

3        Q.  -- listed in your account.  Does that

4   appear to be true here as well?

5        A.  I'm not sure whether this represents market

6   value of the securities or whether it represents a

7   customer statement.  Our customer statements

8   reflected balances from the buying and the selling

9   and then there's a market value of the securities in

10  the account if you looked on the statement.  I don't

11  know what -- I don't know what this represents.

12       Q.  Okay.  Because there's like -- there are

13  two different balances listed, so I was trying to

14  figure out why they were different.  If you look at

15  new balance, which is at the end of this activity,

16  you see $78,544,284.62?

17       A.  Uh-huh.

18       Q.  And then --

19            MS. CHAITMAN:  I'm sorry.  Which page is

20  that?

21            MS. FEIN:  Oh, on page 869.

22            MS. CHAITMAN:  869.

23       Q.  (By Ms. Fein)  Right before you get to the

24  security positions listed.  And then at the end of

25  the report, the end of positions, those figures are

CONFIDENTIAL

Page 598

1    different, right, on the last page for the security

2    positions?

3         A.   It would -- it would seem to me that this

4    is -- one of them is representing, this typically

5    would be representing what the market, the current

6    market of these positions were.

7         Q.   Okay.  That's your understanding of why

8    they're different?

9         A.   I'm assuming.  Typically on a customer

10   statement you would have the opening balance, like

11   you would have the opening balance and closing

12   balance is for the actual money flows out of the

13   account.  And then at the end of -- the end of the

14   statement it shows what the open and long and short

15   positions are and what the current market value of

16   those are on a mark-to-market basis.

17        Q.   Okay.

18        A.   I mean, you can figure it out by adding up

19   what -- by just doing the math and adding up if it

20   tells you, for example, if it's showing you --

21   whether or not it's showing you, you know, prices of

22   the securities.

23        Q.   Uh-huh.

24        A.   At least that's the way the customer

25   statement normally occurs.

CONFIDENTIAL

Page 599

1          Q.   Okay.

2          A.   I'm not familiar with what -- necessarily

3    how the clearing accounts are handled on our books

4    and records.

5          Q.   Okay.  But these security positions that

6    are listed here, you see there are some long

7    positions and some short positions listed starting

8    on page 869 and then through the next couple of

9    pages?

10         A.   Right.

11         Q.   Would that mean that National Bank of North

12   America owned those -- owned -- the long positions

13   would be securities owned by National Bank of North

14   America?

15         A.   No, not owned.  Being cleared through

16   there.

17         Q.   So this document --

18         A.   It's not National Bank of North America.

19   That's a client of ours.  You know, we're not buying

20   and selling the stock for National Bank of North

21   America.

22         Q.   Okay.

23         A.   We're buying it for customers, transactions

24   being cleared through that account.

25         Q.   Okay.  So this is -- you're saying this

CONFIDENTIAL

Page 600

1    document shows the clearing that --

2        A.   It's showing the activity that flowed

3    through that account.

4        Q.   Okay.  So they were not an IA customer of

5    yours; right?

6        A.   No.

7            MS. FEIN:  Okay.

8            MR. KRATENSTEIN:  Thank you very much.

9            (Trustee's Exhibit Number 16 was marked

10   for identification.)

11       Q.   (By Ms. Fein)  I'm marking as Exhibit 16 a

12   document I'm about to hand to you that's being

13   marked as Exhibit 16.  Do you recognize what kind of

14   document this is?

15       A.   It's a customer confirmation.

16       Q.   Do you see, can you read the trade date

17   there?

18       A.   1983, 11-11-83.

19       Q.   And the settlement date looks like

20   11-18-83; is that right?

21       A.   Uh-huh, yes.

22       Q.   Under the security description would you

23   agree that it's showing a preferred -- preferred

24   convertible security?

25       A.   Right, yes.

CONFIDENTIAL

Page 601

1        Q.   And for the capacity code, do you see the

2   number two?

3        A.   Yes.

4        Q.   And that -- those are trades where you're

5   acting as principal; right?

6        A.   Correct, yes.

7             MR. KRATENSTEIN:  In other words, that's

8   what the capacity code means, two equals principal?

9             MS. FEIN:  That's right.

10            THE WITNESS:  You have to look at the back

11  of the confirmation to see that.

12       Q.   (By Ms. Fein)  The customer listed is

13  George Scheer Special.  Do you see that information?

14       A.   Yes.

15       Q.   And where it says we sold, does it mean

16  that your --

17       A.   Sold is from our principal account.

18       Q.   Okay.  So where -- can you explain to me

19  kind of how this trade would end up in your

20  principal account before it got to the customer

21  statement?

22       A.   We are selling the stock.  Typically on an

23  agency transaction it would say -- it would refer to

24  what the customer bought and sold.  This would have

25  confused Dubinsky.

CONFIDENTIAL

Page 602

1          Q.   I'm not confused about that point.  Let me
2     back up.
3          A.   Okay.
4          Q.   My only question is would this -- where
5     would this trade have originated on the market?
6          A.   Well, to begin --
7          Q.   Like who would have been the trader in your
8     business or elsewhere?
9          A.   I don't know who the trader could have
10    been.  Typically it depends upon the transaction.
11    The transaction could have been we a had bought the
12    stock first, you know.  We could have had it in
13    inventory, which would have appeared in one of the
14    firm's trading accounts or in our investment
15    account.  And then we would sell it from a trading
16    account or investment account to the client as
17    principal.
18         Q.   Okay.
19         A.   That's -- it could be any number of -- or
20    we can go out and buy it into this -- buy it from
21    the street, you know, and then it flows from Goldman
22    Sachs, who's a market maker, you know, selling it to
23    us.  And I could originate the trade, according if
24    Goldman Sachs's market making department, and buy
25    the stock.

CONFIDENTIAL

Page 603

1           So it goes from step one, from Goldman,

2      who's selling it as principal to Madoff, who's

3      buying it as principal, and Madoff in turn is

4      selling it from my principal account to the customer

5      account.

6           (Trustee's Exhibit Number 17 was marked

7      for identification.)

8           Q.  (By Ms. Fein)  Okay.  I'm going to mark or

9      I'm going to show you what's been marked as

10     Trustee's 17.

11           MS. DASARO:  I just want to make sure.

12           MR. KRATENSTEIN:  Thank you.

13           MS. CHAITMAN:  Thank you.

14           Q.  (By Ms. Fein)  Is this another one of the

15     stock record documents that your firm maintained?

16           A.  Yes.

17           Q.  And would this be for house 17, your IA

18     customers?

19           A.  I can't read the --

20           Q.  Look at the --

21           MS. CHAITMAN:  Page 63, 11-30-63?  Is that

22     the date?

23           MS. FEIN:  No.  If you look at the -- it's

24     '83, yes.

25           THE WITNESS:  This is house 17.  This is

CONFIDENTIAL

Page 604

1   house 17, so --

2          Q.   (By Ms. Fein)   Okay.   Here, just to be

3   clear, will you read the title of the document

4   starting with the house 17?

5          A.   Stock record summary through 11-10-83.

6          Q.   Okay.

7          A.   Or 11-30-83.   I can't read it.

8          Q.   Okay.   Yeah.   I think it's 11-30.

9          A.   Yeah, 11-30-83.

10          Q.   Okay.   For your IA customers were these

11   typically run at month end?

12          A.   Yes.

13          Q.   These type of reports?

14          A.   I'm assuming if it says through 11-30-83,

15   that would be the month end.

16          Q.   For this report; right?

17          A.   For this report.

18          Q.   I'm asking you if you know more generally

19   if for house 17 these reports were typically run at

20   the end of the month?

21          A.   I assume so, but I can't be sure.

22          Q.   Okay.   I'm going to show you a different

23   page, page 750.   And if you look toward the bottom

24   of the page --

25          A.   Uh-huh.

CONFIDENTIAL

Page 605

1        Q.  -- do you see a transaction in -- I'm

2    sorry -- in the middle of the page in International

3    Harvester?

4        A.  Yes.

5        Q.  Okay.  I'd like you to look again on this

6    page.

7        A.  Uh-huh.

8        Q.  The International Harvester transaction.

9        A.  Right.

10           MS. CHAITMAN:  Is this 750?

11           MS. FEIN:  This is 750, yes.

12           MS. CHAITMAN:  Okay.

13       Q.  (By Ms. Fein)  Preferred series A

14    convertible, $3?

15       A.  Uh-huh.

16       Q.  Do you see that transaction?

17       A.  Right.

18       Q.  If you look about six lines up from the

19    bottom, there is the customer that we looked at,

20    George Scheer Special.  Do you see that?

21       A.  Right.

22       Q.  Actually, look down here.  I know it's

23    listed a couple of different places, but I'm

24    referring to the one right down at the bottom.

25       A.  I see.  Okay.

CONFIDENTIAL

Page 606

1          Q.   Six lines up.   Okay.   Do you see the amount

2     for this looks like 13,388 --

3          A.   Right.

4          Q.   -- long?

5          A.   Uh-huh.

6          Q.   And the trade date is 11-18-83?

7          A.   Uh-huh.

8          Q.   If you look at what's been marked as

9     Exhibit 16, would you agree that this trade shown on

10    the first page of Exhibit 16 is also 13,388 shares

11    for George Scheer Special?

12         A.   Right.

13         Q.   The security description is the same;

14    right?

15         A.   Uh-huh.

16         Q.   Okay.   So do you think this is -- do you

17    think that the amount shown on Exhibit 17, the

18    transaction shown on Exhibit 17 for George Scheer is

19    the same as the one shown on Exhibit 16?

20         A.   I want to make sure I can find it.

21         Q.   Sure.

22         A.   13,388.   The shares seems to be the same.

23         Q.   And this --

24         A.   And the monies.

25         Q.   -- date listed looks like November 18th,

CONFIDENTIAL

Page 607

1    1983 --

2          A.   Right, okay.

3          Q.   -- is the settlement date.  So does this

4    transaction appear to match the -- the transaction

5    in Exhibit 16 appear to march the report in

6    Exhibit 17?

7          A.   The shares match.  I don't see monies.

8          Q.   Right, no.  I don't think that they put it

9    on this report.

10         A.   Okay, right, right.

11         Q.   Okay.  If you go to the next page of

12   Exhibit 17, this is the end of that same

13   transaction.  Do you see who's on -- who's listed at

14   the bottom of the page?

15         A.   Correct.

16         Q.   What entity is listed?

17         A.   National Westminster Bank.  Is that what

18   it's saying?

19         Q.   Yes.  What's your understanding of how

20   National Westminster Bank was related to this trade?

21         A.   I'm assuming the trade must have cleared

22   through the bank.

23         Q.   Okay.  Do you see the account number?

24   There's two entries and two account numbers for

25   National Westminster Bank that are listed at the

CONFIDENTIAL

Page 608

1    bottom of the transaction?

2          A.   Right.

3          Q.   The account number for the first reads

4    299000010 and the second, 6000020.  Do you see that?

5          A.   Uh-huh.

6          Q.   Do you know why there would be two entries

7    here for National Westminster Bank?

8          A.   I don't have a clue.

9          Q.   Okay.

10         A.   They must have two different types of trade

11   clearing accounts that can handle it.

12         Q.   Okay.  So we know how we had discussed

13   whether this would be a month-end report.  The

14   transaction that we're looking at is dated

15   November 18th and this report is dated

16   November 30th.

17              And there are many other transactions

18   listed on here, but do you think that that would

19   mean it would encompass at least more than just the

20   day, November 30th?  At least it has other days of

21   the month that are also listed here?

22              MS. CHAITMAN:   Objection.

23         Q.   (By Ms. Chaitman)  Other transactions?

24         A.   I'm not sure.

25         Q.   Okay.  That's fine.  I don't know if you

CONFIDENTIAL

Page 609

1   thought it was most certainly a month-end report

2   based on that, but the transactions listed on this

3   stock record summary, if you look at other

4   transactions on the page, they also have National

5   Westminster Bank USA --

6       A.   Uh-huh.

7       Q.   -- listed underneath each security.

8       A.   Okay.

9       Q.   Would it be typical that all the

10  transactions would have the same clearing bank for

11  all the transactions that would be listed on a

12  single for every customer account?

13      A.   Could be.  It depends upon -- you know, the

14  answer is I have no idea why we would choose one

15  bank or the other.  Again, it depends upon, you

16  know, any number of things.  I don't know.  It's not

17  something that I would be familiar with.

18      Q.   Right.  We went over a number of banks

19  earlier, though, and this report only lists one.  So

20  I was just trying to understand why it might be that

21  there's only one listed?

22      A.   That could be -- I don't know.  I mean, it

23  could be typically, you know, why they use one

24  particular bank or clearing agent or broker depends

25  upon the fee structure, depends upon whether they

CONFIDENTIAL

Page 610

1    were a market maker also in that, depends upon -- I

2    don't know the answer to that question.

3          Q.   Okay.   That's fine.   The transaction we

4    were looking at in Exhibit 16 was a transaction you

5    did as principal; right?

6          A.   Mostly all of ours were principal, right.

7          Q.   So if National Westminster was shown as the

8    clearing firm --

9          A.   Right.

10          Q.   -- would that mean National Westminster --

11    it wouldn't mean National Westminster was the

12    counterparty to the transaction; right?

13          A.   No.

14          Q.   Okay.

15          A.   I mean, it theoretically could be, but I

16    don't know.   Again, they may have been a market

17    maker.   They may have been a -- I don't know the

18    answer to that.

19          Q.   You were a self-clearing firm; right?

20          A.   Correct.

21          Q.   So I guess I'm trying to understand why all

22    the transactions that are shown on the report would

23    have not cleared through you or wouldn't have

24    gone --

25          A.   Because they're not going to -- because

CONFIDENTIAL

Page 611

1   they're not going to -- we don't convert ourselves.

2   In other words, we don't handle the conversion of

3   the security.  We don't handle the delivering the

4   bond to the clearing agent to actually exchange it

5   for stock.  In other words, that -- we don't have an

6   arrangement with -- with the conversion agent to

7   actually do that.

8            MS. FEIN:  Okay, okay.  We can move on.

9   I'm going to show you two documents, Trustee's 18,

10  Trustee's 19.

11           (Trustee's Exhibit Numbers 18 and 19 were

12  marked for identification.)

13           MR. KRATENSTEIN:  Just want to make sure I

14  get these right.  So which is 18?  Ends in 393?

15           MS. FEIN:  That's correct, yes.

16           MR. KRATENSTEIN:  Eighteen is 393?

17           MS. FEIN:  That's right.  Here, let me get

18  this out of your way.

19        Q.  (By Ms. Fein)  Do you recognize?

20        A.  Not really.  It says -- it says cash and

21  securities blotter.  Is that what --

22        Q.  Uh-huh.

23        A.  Right.

24        Q.  Are you looking at Exhibit 18 then?

25        A.  Yes.

CONFIDENTIAL

Page 612

1         Q.   Okay.   Both documents show roll number and

2    then contents and then documents at the top of the

3    page.   Do you see that?

4         A.   Uh-huh.

5         Q.   Okay.   If you look at Exhibit 19, do you

6    see -- can you turn the -- look at the second page

7    of it ending in 396.   Can you read the note at the

8    bottom of the page, the handwritten note?

9         A.   Do not microfilm trading blotters?

10        Q.   Yeah.   And the line right above it.

11        A.   As per BLM.

12        Q.   Okay.   Do you -- does BLM refer to you?

13        A.   I would assume so.

14        Q.   Do you know whose handwriting this is?

15        A.   No.

16        Q.   If you go back to Exhibit 18, other page --

17        A.   Uh-huh.

18        Q.   -- do you see at the bottom of the page

19   where it says shred the Xs only --

20        A.   Okay.

21        Q.   -- the handwritten note?   Do you know whose

22   handwriting that is?

23        A.   No.

24        Q.   Do you know why you would shred cash and

25   securities blotters during this time period?

CONFIDENTIAL

Page 613

```
 1              MR. KRATENSTEIN:  Object to form.

 2              THE WITNESS:  No.

 3              MS. FEIN:  Okay.

 4              THE WITNESS:  I don't even know what they

 5      were used for.

 6          Q.  (By Ms. Fein)  Okay.  I'm going to ask a

 7      couple of questions about the Sage accounts.  Paul

 8      Koenigsberg was an accountant; right?

 9          A.  Yes.

10          Q.  And he -- we looked at some letters where

11      it appeared that he did work for the Sages; right?

12          A.  I'm assuming he did.  I said I don't know

13      whether Paul --

14          Q.  Right.

15          A.  Was Paul Koenigsberg or could have been

16      Paul somebody else.

17          Q.  Okay.  Was Paul Koenigsberg an accountant

18      for other BLMIS customers?

19          A.  Yes.

20          Q.  Was he an accountant for Carl Shapiro?

21          A.  Yes.

22          Q.  Was he an accountant for Norman Levy?

23          A.  At one -- he was an accountant for them,

24      for Norman Levy in the later years.

25          Q.  Okay.
```

CONFIDENTIAL

Page 614

1        A.   And same thing with -- who's the other one

2   you asked?

3        Q.   Carl Shapiro.

4        A.   Carl Shapiro, Norman Levy, yes.  Their

5   accountants had died, so they switched over.  And

6   then in -- Shapiro moved from Price Waterhouse to --

7   because the partner that handled Price Waterhouse

8   moved to London.  So he took Paul Koenigsberg on as

9   an accountant.  And Levy's accountant died and he

10  moved over to Paul Koenigsberg.

11       Q.   Did Carl Shapiro and Norman Levy have short

12  against the box accounts with you?

13       A.   Yes.

14       Q.   Did Annette handle some of the

15  correspondence and other activity related to those

16  accounts?

17       A.   Yes.

18       Q.   Were Carl Shapiro and Norman Levy two of

19  the customers you identified as having backdated

20  transactions in their accounts before 1992?

21       A.   Well, let me make sure you understand

22  backdating accounts because backdating accounts

23  occur in a number of ways.  One of them was -- well,

24  there's a -- backdating accounts can refer to an as

25  of transaction.  As a market making firm, it's a

CONFIDENTIAL

Page 615

1   very common occurrence to have to adjust both a

2   price and a date on a confirmation based upon

3   typically an error that is being made by the market

4   making firm or the originating firm, meaning like

5   Schwab.  Schwab gives us an order to buy and sell

6   stock from a particular customer.

7              And either Schwab makes an error or his

8   customer makes an error as to doing the trade on the

9   wrong day or the wrong time or the price.  And then

10  there's usually a discussion that takes place

11  between both parties.  And then a decision is made

12  to put the trade back to a certain date and that's

13  what it refers to as an as of transaction.

14             So you're adjusting it and the error might

15  be -- might be the market maker or it might be the

16  originating broker who gave us the order.  That's

17  one.  Then there is the backdating trade where there

18  is a dispute between the customer and myself.

19             And then, of course, there's the totally

20  illegal transaction of backdating a transaction,

21  which is what -- what the -- I don't know whether it

22  was Dubinsky or Picard that happened, but I had

23  explained backdating trades to -- in the past.  And

24  I don't know.  You'd have to -- it depends upon

25  which transaction.

CONFIDENTIAL

Page 616

1          Q.   Okay.

2          A.   But a backdating trade in itself doesn't on

3    the face of it because you are backdating a trade by

4    adjusting a price or the date, but it doesn't

5    necessarily on the face mean it's an illegal trade.

6          Q.   No, and I didn't ask that.

7          A.   Okay.

8          Q.   I was actually just asking about if Carl

9    Shapiro and Norman Levy were two of the customers

10   that had those transactions?

11         A.   Yes, yes.

12              MS. FEIN:   Okay.   That was my question.

13              MR. KRATENSTEIN:   I'm going to object to

14   the form of that question.

15         Q.   (By Ms. Fein)   Okay.   You testified about a

16   meeting with members of the Sage family yesterday?

17         A.   Yes.

18         Q.   How many meetings do you remember with

19   them?

20         A.   A number of meetings, you know.   As to how

21   many, I don't know.   It depends upon -- you know, I

22   remember, you know, the meeting where they wanted to

23   change the strategy, where they wanted to make the

24   decisions themselves.   That happened.   That was one

25   meeting I remember because it was a meeting that

CONFIDENTIAL

Page 617

1    there was a lot of discussions whether it was the

2    right thing to do, but they wanted to do it --

3         Q.   Okay.

4         A.   -- because of tax break.  And then there

5    were other meetings that they came up just because

6    they were in the area.  And the family was -- I

7    mean, I was friendly with the mother and the family,

8    so they felt free to come up.  And also they said

9    that they came up to visit with Annette depending

10   upon -- they were not necessarily unique.  And then

11   they would come and visit me to say hello.

12        Q.   Okay.  And did you have a good sense of

13   when that meeting took place, the one you testified

14   about directed trading?

15        A.   I was trying to think of that, you know,

16   myself.  I don't remember.  There was -- there were

17   meetings and I know as recently as the 2000s.

18             And then there certainly must have been

19   meetings prior to that depending upon -- you can see

20   yourself depending upon when it started,

21   transactions changed when it went from a convertible

22   bond arbitrage account to a split strike account and

23   then to an account where they were just doing tax

24   planning and changed the style of trade they wanted

25   to do.

CONFIDENTIAL

Page 618

1      Q.  Okay.  But I guess you're saying then

2  before that meeting you wouldn't have taken trade

3  direction from the Sages; right?

4           MR. KRATENSTEIN:  Object to form.  Go

5  ahead.

6           THE WITNESS:  Depends upon whether the

7  father was alive and he was running the account with

8  me or -- I mean, they were accountants, the family,

9  for a very long period of time.

10      Q.  (By Ms. Chaitman)  Okay.  But it wasn't

11  your typical practice to take trade direction;

12  right?

13      A.  That's correct.

14      Q.  Okay.  That was my -- what I was trying to

15  get at.  Okay.  I'd like you to take a look at a

16  document we reviewed yesterday, Exhibit 85.

17           MR. KRATENSTEIN:  Hang on a minute.

18           MS. FEIN:  Oh, sure.

19           MR. KRATENSTEIN:  Okay.  Go ahead.

20      Q.  (By Ms. Fein)  In the second paragraph we

21  went over some language yesterday and I'd like to

22  ask you about one sentence, but let's look a little

23  earlier.  Do you see this sentence says as of the

24  last statements we received in March the accounts

25  were a little off of the usual benchmark?

CONFIDENTIAL

Page 619

1          A.   Correct.

2          Q.   Can you read the next two sentences after

3     that?

4          A.   I can't find them.

5          Q.   Oh, so the next one would be since then our

6     main holding, eBay, has dropped significantly.

7          A.   Right, okay.  I see it.

8          Q.   And then the next, as that holding is a

9     long-term one, I was hoping you had shorted it

10    against the box a while back.  Do you see that?

11         A.   Yes, uh-huh.

12         Q.   That statement is in the past tense; right?

13         A.   I was hoping you had shorted it against the

14    box, okay.

15         Q.   It's referring to something that would have

16    happened before you got this letter; right?

17              MR. KRATENSTEIN:  Objection to the form of

18    the question.

19              THE WITNESS:  Yes.  I think what they're

20    referring to is sometimes even if I had felt that

21    they should have been sold regardless of what they

22    had -- they were doing tax planning, obviously,

23    shorting against the box to adjust whether they were

24    going to get long-term gain, short-term gains and so

25    on and depending upon when you closed out the

CONFIDENTIAL

Page 620

1    transaction, in other words, covered the short, that

2    would trigger a tax event.  So if, in fact -- again,

3    I'm assuming because this -- you know, if, in fact,

4    they originally wanted to keep the trade open but

5    then there was a market event that happened, you

6    know, then I felt that it wasn't -- it didn't make

7    any sense to worry about the tax treatment because

8    if they -- if I didn't go short against the box, the

9    stock was going to go down, I would pay no attention

10   to it.

11        Q.  Right.

12        A.  Technically a client could call me up and

13   say to me, which did happen at the time, well, you

14   shouldn't have -- you should have followed my

15   instructions even though you would have lost money

16   for me to do that.  That's not an unusual situation.

17   So I don't remember what happened here, but that's

18   probably what happened.

19        Q.  Okay.  All right.  So we can look at

20   Exhibit 69.

21        A.  Uh-huh.

22        Q.  This is another of the letters we reviewed

23   yesterday; right?

24        A.  Right.

25        Q.  Do you see -- it's a long sentence, but the

CONFIDENTIAL

Page 621

1    last sentence of the first paragraph, with respect

2    to other positions in these accounts please note

3    that Pharmacia will become long-term this January.

4    Do you see that sentence?

5        A.  Yes.

6        Q.  And then do you see just under that unless

7    you deem that these stocks must be shorted prior to

8    these dates due to various considerations, it would

9    be to our tax benefit that these positions not be

10   shorted?

11       A.  Right.

12       Q.  That's not a direction to you about what to

13   do with the trade; right?

14            MR. KRATENSTEIN:  Object to form.

15       Q.  (By Ms. Fein)  In other words, this is left

16   in your discretion; correct?

17            MR. KRATENSTEIN:  Object to the form.

18            THE WITNESS:  I assume that's what they're

19   saying, right.

20       Q.  (By Ms. Fein)  Okay.  I just want to look

21   at two of the documents we went through.  These

22   exhibits, Exhibits 70 and 72, were looked at in

23   connection with this same letter.  And on Exhibit 70

24   do you see an R. J. Reynolds Tobacco HLDS?

25       A.  Right.

CONFIDENTIAL

Page 622

1        Q.   Okay.  And what date is that transaction?

2        A.   January 13th.

3        Q.   And it's 9,000 shares purchased?

4        A.   Yes.

5             MR. KRATENSTEIN:  What year was that?

6             THE WITNESS:  '03.

7        Q.   (By Ms. Fein)  Okay.  And do you see the

8    account number listed, 1S004-7?

9        A.   Yes.

10        Q.   Okay.  And you were shown the trade

11   confirmation in Exhibit 72 in connection with this

12   customer statement?

13        A.   Right, uh-huh.

14        Q.   What's the date of the trade indicated on

15   this confirmation on the first page?

16        A.   12-12-03.

17        Q.   And what's the date indicated on the second

18   page of the confirmation?

19        A.   8-28-03.

20        Q.   Okay.  Can you see either of those trades

21   on the customer statement that we reviewed in

22   Exhibit 70, any of the -- either of those trade

23   dates?

24        A.   I see that Reynolds has a trade date of

25   January 13th.

CONFIDENTIAL

Page 623

1          Q.   Okay.  So no?

2          A.   And what's the other one?  Broadcom?

3          Q.   Yeah.  No.  We're just looking at the RJR

4    Reynolds trade.

5          A.   Okay.

6          Q.   If you look on the trade confirmation,

7    Exhibit 72, do you see the account number is

8    1S0004-3?

9          A.   On this, yes.

10         Q.   So this is a different account?

11         A.   Uh-huh.

12         Q.   These confirmations pertain to a different

13   account and a different time frame; right?

14         A.   Right.

15         Q.   They're not the ones that are shown on the

16   statement in Exhibit 70; right?  And take your time.

17         A.   Okay.

18         Q.   Do you agree?

19         A.   The statement is -- it says -- I'm not --

20   you lost me.

21         Q.   So the statement is for accounts ending in

22   dash seven; right?

23         A.   Right.

24         Q.   But the confirmations are for an account

25   ending in dash three; right?

Page 624

1          A.  Correct.

2          Q.  And the trade date shown on Exhibit 72 is

3     December 12th, 2003?

4          A.  Uh-huh.

5          Q.  And August 28th, 2003?

6          A.  Uh-huh.

7          Q.  But the customer statement that was shown

8     is for January 2003; right?

9          A.  Right.

10         Q.  Okay.  So these transactions don't match

11    the statement in the confirm; right?

12         A.  You know, to tell you the truth, you've

13    sort of lost me on this whole thing.

14         Q.  Okay.

15         A.  I'm assuming if you told me they don't

16    match, they don't match.

17         Q.  Well, the dates are different and the trade

18    -- the number of the trade is different and the

19    accounts are different right?

20         A.  Okay.  All right.

21         Q.  Okay.  Well, I'm asking you.

22         A.  Ask me what?

23         Q.  I'm asking you do you agree that the trade

24    dates are different?

25         A.  Yes, yes.

CONFIDENTIAL

Page 625

1          Q.   The amounts are different?

2          A.   Yes.

3          Q.   And the accounts are different?

4          A.   Yes.

5          Q.   Okay.  You mentioned earlier today meeting,

6     a proffer meeting with the United States Attorney's

7     Office.  Do you remember that reference?

8          A.   Yes.

9          Q.   Okay.  Do you recall when that meeting took

10    place?

11         A.   There were two meetings with the U.S.

12    Attorney.  One was the proffer agreement, which was,

13    I think, I believe the first meeting.  That took

14    place down at the U.S. Attorney's office, which was

15    made shortly after my arrest.  Then there was a

16    second meeting that took place in my apartment where

17    the U.S. Attorney was not present.

18              He was on a speakerphone.  And that

19    included a whole length of proffer agreement

20    meeting.  There were all sorts of people there in my

21    apartment.

22         Q.   Do you remember did the meeting take place

23    in a conference room in the United States Attorney's

24    office, the December meeting?

25         A.   Yes, yes.

CONFIDENTIAL

Page 626

1          Q.  Do you remember how long it was?

2          A.  A long time.  Started in the morning and

3     went through lunch.

4          Q.  Okay.  I'm going to mark -- I'm going to

5     show you what's been marked as Exhibit --

6               MR. KRATENSTEIN:  What number?

7               MS. FEIN:  20.

8               MS. CHAITMAN:  Do you have a copy for

9     Peter?

10              MS. FEIN:  Yeah.

11              (Trustee's Exhibit Number 20 was marked

12    for identification.)

13         Q.  (By Ms. Chaitman)  If you look at the

14    bottom of the first page there's a date listed,

15    investigation on 12-16-2008, the bottom of the first

16    page?

17         A.  Yes.

18         Q.  Does that sound about right when the

19    meeting took place that you remember?

20         A.  Yes.

21         Q.  Okay.  So this would be the same week, a

22    few days after you confessed; right?

23         A.  Correct.

24         Q.  We're just going to take a look at a couple

25    of individual statements here.

CONFIDENTIAL

Page 627

1           MS. CHAITMAN:  I just want to put on the

2      record that I object to any questioning about this

3      document because, number one, it's obviously

4      inadmissible for good reasons.  Number two, it's

5      redacted more than it's not redacted and it's

6      impossible to know what -- obviously, we have no

7      idea what's said in the redacted sections.

8           And I think for you to ask Mr. Madoff

9      about something that hasn't been redacted, assuming

10     this is even a legitimate document -- for example,

11     I'm sure that you're going to ask him about what

12     hasn't been redacted on page three, but it may be

13     that in the blacked out part underneath it, it

14     contradicts what's said and what's there.

15          MS. FEIN:  Understood.  If we had the

16     full, unredacted document, that would be our

17     preference as well.

18          MS. CHAITMAN:  Right, but I think any

19     questioning about this document is a waste of time

20     because it's --

21          MS. FEIN:  I understand your objection.

22          MS. CHAITMAN:  Okay.

23       Q.   (By Ms. Fein)  If you turn to page seven of

24     the document, the pages are marked at the top.

25       A.   Okay.

CONFIDENTIAL

Page 628

1          Q.   Do you see the first sentence?

2          A.   When Madoff began a retail business in 19

3    -- yes.

4          Q.   Uh-huh.  Do you agree with that statement?

5          A.   Yes.

6               MS. FEIN:  Okay.

7               MR. GOLDMAN:  Read that question back?

8          Q.   (By Ms. Fein)  Sure.  The first statement,

9    Madoff began a retail business in about 1960.  He

10   had about a dozen clients, all of whom were family

11   and friends.  Do you agree with the statement?

12              MR. GOLDMAN:  Well, I'm going to object to

13   it.  It says it morphed into a fraud.

14              MS. FEIN:  I didn't -- I didn't ask about

15   that sentence.

16              MR. KRATENSTEIN:  First sentence, just

17   first sentence.

18              MR. GOLDMAN:  Oh, I'm sorry.

19              MS. FEIN:  I only asked about the first

20   sentence.  Sorry.

21              MR. KRATENSTEIN:  Do you want to reask the

22   question if he agrees with that sentence, the first

23   sentence?

24         Q.   (By Ms. Fein)  Sure.  Mr. Madoff, do you

25   agree to the first sentence on page seven, that that

CONFIDENTIAL

Page 629

1     is an accurate reflection of your business?

2          A.   Madoff began a retail business in about

3     1960.

4          Q.   Yes.

5          A.   He had about a dozen clients, all of whom

6     were family and friends, yes.

7          Q.   Do you recall making that statement at your

8     proffer meeting?

9          A.   Yes.

10         Q.   The next sentence after that, can you read

11    that?

12              MR. GOLDMAN:  That's what I'm going to

13    object to.  You know, this is a memorialization of

14    what someone thinks they heard.  We don't know who

15    wrote it; okay?  There are certain characterizations

16    in here such as that which are his conclusions or

17    her conclusions, whoever wrote it.  And I think it's

18    unfair to ask him.

19              If there's something in here that you want

20    to ask him whether he actually said something, I

21    don't have an objection to that.  And if you could

22    point to where he said it in the report, that's

23    fine; but I'm going to object to these

24    characterizations and then asking him whether those

25    are correct or not.

CONFIDENTIAL

Page 630

1            MS. FEIN:  I understand.

2            MR. GOLDMAN:  Okay.

3            MS. FEIN:  I understand.  I'm going to ask

4    about the statements that are here.

5            MR. GOLDMAN:  Okay.

6        Q.  (By Ms. Fein)  And I just want to really

7    know if you recall making the statements at the

8    meeting?

9            MR. GOLDMAN:  I want to make sure, though,

10   when you ask him did he make the statement and if

11   he -- I don't want -- what I object to is the

12   characterization that he's made the statement.  I

13   haven't seen quotation marks anywhere in here that

14   Mr. Madoff said this.

15           MS. FEIN:  Right.

16           MR. GOLDMAN:  If you can point to that and

17   ask him, that's fine, but the other -- asking him

18   about someone else's conclusions I just think is

19   inappropriate.

20           MS. FEIN:  Okay.  Well, if I -- I don't

21   plan to ask --

22           MR. GOLDMAN:  And he'll answer

23   accordingly.  Okay.

24           MS. FEIN:  -- much more about that.  It's

25   about whether he recalls making the statements that

CONFIDENTIAL

Page 631

1    are here.

2             MR. GOLDMAN:  Okay.

3        Q.  (By Ms. Fein)  So if you want to read the

4    text on page seven.  You don't have to read it out

5    loud.  You can read it to yourself, but I did want

6    to ask.  So the statement the retail business

7    morphed into a fraud as time went by, do you recall

8    making that statement at the proffer meeting?

9        A.  You're asking if I said in 1962 all the

10   clients lost virtually their entire investment?

11       Q.  No.  The sentence before that, the retail

12   business morphed into a fraud as time went by.

13            MR. GOLDMAN:  Do you recall saying that?

14            THE WITNESS:  I don't remember saying

15   that.

16            MR. FEIN:  Okay.

17            MR. GOLDMAN:  Okay.  Let's go on.

18       Q.  (By Ms. Fein)  Do you -- if you look down a

19   bit on the page, so it refers to in 1962 Madoff's

20   retail business was wiped out in the new issue

21   collapse.  And the following sentence, all his

22   clients lost virtually their entire investment,

23   which amounted to a total of $30,000.  Madoff felt

24   he had to pay them back, so he borrowed $30,000 from

25   his father-in-law to do so.  Do you recall making

CONFIDENTIAL

Page 632

1    that statement?

2         A.   Yes.

3         Q.   His father-in-law was not pleased by this

4    development.  Madoff was able to pay all these

5    clients back and start the market making business.

6    Do you recall making that statement?

7         A.   Yes.

8         Q.   At about this time he took in new retail

9    clients.  These clients were also family and

10   friends.  Do you recall making that statement?

11        A.   Yes.

12        Q.   He began to falsely report returns of

13   30 percent, 40 percent annual to these customers.

14   Do you recall making that statement?

15        A.   Wait a minute.  After this time he took in

16   new retail clients.  He had to falsely -- no.  I did

17   not say he had to falsely report returns of 30 to

18   40 percent.  Definitely didn't ever say that.

19        Q.   Okay.  If you look at page four of the

20   document, go back a couple of pages, my next

21   questions are on page four.

22        A.   Okay.  I'm still looking at that last

23   question --

24        Q.   Sure.

25        A.   -- because I can't imagine having said

CONFIDENTIAL

Page 633

1    that.

2         Q.   Okay.

3         A.   Where are we now?

4         Q.   Page four.

5         A.   So I have to go back?

6         Q.   Yes.

7         A.   Okay.

8         Q.   I think it's one more back.  It's on the

9    back, yep.  There.  The first sentence that is

10   unredacted, the fraud entailed Madoff taking in

11   funds from investors, holding those funds and paying

12   them out to investors seeking redemptions.  Do you

13   recall making that statement?

14            MS. CHAITMAN:  I would suggest that you

15   read through the whole unredacted portion, Bernie,

16   before you respond.

17            THE WITNESS:  The fraud entailed Madoff

18   taking in funds from investors, holding those funds

19   and paying them out to investors seeking

20   redemptions, essentially a Ponzi scheme.

21            MR. GOLDMAN:  See, the other part of the

22   problem with that is that we don't have any dates.

23            THE WITNESS:  Yeah.

24            MR. GOLDMAN:  I don't know when the dates

25   are.

CONFIDENTIAL

Page 634

1          MS. FEIN:  I'm just asking if he remembers

2    making the statements.  I can't make any.  I was not

3    involved in -- I was not -- yeah.

4          MR. GOLDMAN:  So I just think it's unfair

5    ask him that question.

6          MS. FEIN:  I'm asking if he recalls the

7    statements that are here and that's really it.

8          MR. GOLDMAN:  Okay, all right.

9          THE WITNESS:  Let's put it this way.

10   Depending upon what period of time they were talking

11   about, I could have made that statement because I'd

12   made that statement a number of times since then;

13   but I certainly was not talking about it, you know,

14   in the early periods of time because I was very

15   clear and forthright in everything I said at the

16   proffer agreement and at the other meeting.

17          And nothing has changed in my story.  So I

18   -- just the same reason I would not have mentioned

19   anything about the 30 or 40 percent, I certainly

20   could have said that, for example, in 1980s my

21   clients were making 30 or 40 percent because that

22   was what was common at that time when interest rates

23   were 12 percent at that period of time.

24          So I can tell you that referring to this

25   proffer agreement, it was an absurdity.  The

Page 635

1    questions that were asked by me, by people who I

2    knew knew the answer, you know, and, you know, it

3    was obvious that that they were trying to paint a

4    picture that was not the case.  And I'm still pissed

5    off by it, quite frankly.

6         Q.  I'm going to ask you about a couple more

7    questions.

8             MR. GOLDMAN:  Okay.  Ask the question.

9         Q.  (By Ms. Fein)  So the next sentence, you

10   just read the first two sentences.  The next

11   sentence, customers received both monthly account

12   statements and trade confirmations reflecting trades

13   that never took place.  Do you recall making that

14   statement at the proffer meeting?

15        A.  No.

16        Q.  Madoff began engaging in fraud in earnest

17   in the 1970s.  The 1980s saw a large expansion in

18   the retail, i.e., fraudulent portion of the

19   business.  Do you recall making that statement at

20   the meeting?

21        A.  Let me go back and read it.  I certainly

22   never said that fraud took place in the '70s because

23   it did not.  In the 1980s there was a large

24   expansion in the retail business and in the, i.e.,

25   parentheses, fraudulent.  I assume that's not my

CONFIDENTIAL

Page 636

1    statement.  That's the interpretation statement

2    because why would they -- the fact that if I

3    understand English properly, when someone says with

4    parentheses, i.e., fraudulent, that's someone's

5    interpretation of what he claims I said was

6    fraudulent.

7            Q.   Okay.

8            A.   Which -- so I never said it was fraudulent.

9            Q.   I'm just asking about your recollection.

10   Okay.

11           A.   My recollection was I explained what was

12   happening in the business, but as far as the dates

13   are concerned, you know, I do not recall ever saying

14   that.

15           Q.   Okay.  The next sentence, as there was no

16   actual trading, nothing cleared through DTCC or any

17   clearing firm and the only records of the purported

18   trades are the paper confirmations.  Do you recall

19   saying that at the proffer meeting?

20           A.   No.  I do not.

21           Q.   If you turn back one page to page three,

22   the second paragraph on page three begins when

23   Madoff first began the retail business.  Do you see

24   that sentence?

25           A.   Uh-huh.

CONFIDENTIAL

Page 637

1       Q.   Okay.   The statement when Madoff first

2   began the retail business he did initially engage in

3   some actual trades.   Soon, however, he began to

4   engage in fraud as to the entire retail business.

5   Do you recall making that statement?

6       A.   No.   Again, I assume if I'm reading this

7   correctly, this is somebody interpreting what I

8   said.

9       Q.   Understood.   Do you recall saying this at

10  the proffer meeting, though?   I'm not saying that

11  it's verbatim.   I'm asking if you recall discussing

12  this?

13      A.   I remember discussing the fact the business

14  was small and also that I started -- I started a

15  retail business, discussing trade position, yes.

16  Was paying ridiculously high returns, no.   I never

17  said that because they were not --

18      Q.   I'm only talking about the second

19  paragraph.   I'm not asking about the first

20  paragraph.

21      A.   Okay.   When Madoff first began the retail

22  business, he initially engaged in some actual

23  trades.   Again, that's someone interpreting what I

24  said.   Began to engage in the fraud, no.   Virtually

25  the entire life of the retail business was simply

CONFIDENTIAL

Page 638

1   not trade.  No, I don't recall saying this.

2        Q.  Okay.  And you were just reading the last

3   sentence on page three that's unredacted, for

4   virtually the entire life of the retail business?

5   Is that what you were referring to?

6        A.  Not during -- not during an earlier period.

7   I was referring -- if I was saying that, I was

8   referring to post-'92 period.

9        Q.  When you say if I was saying that, you mean

10   if you said --

11        A.  What I'm saying is that I never would have

12   said, you know, anything other than what I always

13   had said, that the fraud began in, you know, in the

14   post-'90 period.  So I don't know -- and I have a

15   pretty good memory, so I do not remember saying

16   anything like that.

17             MR. GOLDMAN:  Amanda, this is a

18   memorialization of the proffer on the 16th?  Is that

19   what it is?

20             MS. FEIN:  Yes.

21             MR. GOLDMAN:  Okay.

22        Q.  (By Ms. Fein)  You mentioned that it made

23   you angry to think about this meeting somewhat;

24   right?

25        A.  Excuse me?

Page 639

1      Q.  You mentioned that it made you kind of

2   angry to think about this meeting; right?

3           MR. KRATENSTEIN:  Object to form.

4           THE WITNESS:  I'm angry because there were

5   interpretations here of what I said that were --

6   were not true.  I was very clear about what I said

7   and I was very forthright what I said.  I would have

8   no reason to change that after the fact.

9           And the -- the way this -- what happened

10   at this meeting was a lot of the -- a lot of this

11   was someone asking me questions like saying so this

12   is what happened?  And I had to go -- had to answer

13   back and say no, this is -- that is not what

14   happened.  And they were asking me questions which

15   to me sounded totally ridiculous.

16           And as a matter of fact, I do remember

17   specifically turning to the two SEC people were

18   there who were very well aware of me and my business

19   and I looked at them and said help me out here.  I

20   mean, do you really expect me to answer these

21   questions, explain what is a short sale, what does a

22   market maker do?

23           And it was like, you know, a smoking gun

24   type of thing.  And yeah, I was pissed off at it

25   because I knew, you know, that it made no sense.

CONFIDENTIAL

Page 640

1    And they were embarrassed when I turned and asked

2    them.   I mean, for someone who was a senior person

3    at the SEC to sit there, you know, looking very

4    quiet and sheepish when Marc Litt, who knows nothing

5    at all, who is the prosecutor, about the securities

6    business or at least claimed not to know, you know,

7    asked me what is a short sale, what does a market

8    maker do?  You know, so you sold stock to a customer

9    that you didn't own?

10        Q.  (By Ms. Fein)  So the SEC -- you're saying

11    and the SEC people in the room knew you.  They knew

12    of your reputation?

13        A.  Of course.  There was no one in the

14    industry that didn't know me, you know, at that

15    time.  You know, so --

16        Q.  Yeah.  Well, you had a very good reputation

17    in the industry; right?

18        A.  Before I -- before this fiasco, yes, but it

19    was in every aspect of the industry.  So it was --

20    it just -- it infuriated me when David went through

21    this theater the other day.  So did the SEC lie?

22    Did the FBI lie he said?  I said I didn't say that

23    they lied.  I said they misinterpreted, you know,

24    what I said or maybe they just don't understand

25    anything.

CONFIDENTIAL

Page 641

1      Q.  Well, the statements, I won't represent

2  everything that we looked at, but you'll agree that

3  some of the statements we looked at didn't say

4  anything about market making certainly or short

5  sales; right?

6           MR. GOLDMAN:  We don't know that because

7  so much is redacted.

8           MS. FEIN:  I'm saying just the statements

9  that we looked at.

10           MS. CHAITMAN:  But it's a meaningless

11  question due to the fact that 90 percent of it is

12  redacted.

13           MS. FEIN:  If you want to object to the

14  question, you can object to the question.

15           MR. KRATENSTEIN:  Objection.

16           THE WITNESS:  Yes.  I mean, to me this

17  document is nothing.  You know, it's just -- look,

18  I've always felt that this -- you know, this whole

19  thing, the GAO report -- not the GAO report.  I had

20  no problem with the GAO report.  I had a problem

21  with Dubinsky's report and Picard.

22           Picard has made a whole series of

23  statements which the GAO report, his own report

24  proved totally, you know, false, like the firm used

25  it as a piggy bank, that I never made any money, the

CONFIDENTIAL

Page 642

1   firm was never profitable, you know.  And he totally

2   ignored his own expert witness, you know, Lubbe and

3   Lozard.  You know, I read -- talk about getting

4   pissed off, that's how you get pissed off, making

5   statements, you know, that were totally untrue

6   that -- but look, I don't want to abuse you for

7   that, but this -- there are things here that make no

8   sense at all.

9           And I have no reason -- I have no -- you

10  know, I have no ax to grind.  It's not like, you

11  know, I'm not admitted of a fraud.  I admitted to a

12  fraud.  I said that.  So, you know, there's no

13  reason for me to say things that were not the case

14  because I've already been sentenced, totally

15  unfairly because they're trying to make me the

16  poster boy of Wall Street, which everyone is aware

17  of; but the -- you know, there are certain -- well,

18  it's not important.

19          So yes, I am pissed off because they did

20  enough -- I admitted to doing enough things that

21  were totally embarrassing and wrong that I regret,

22  obviously, but there gets to be a point where enough

23  is enough because it's an insult to my intelligence,

24  you know, for someone who's supposed to be an expert

25  witness, you know, to not -- you know, to make

CONFIDENTIAL

Page 643

1    statements that it looked -- on the face of it look

2    ridiculous.  And there were other expert witnesses

3    of reports I've read who said that themselves that

4    the Dubinsky report is preposterous or that the --

5    Picard has made statements that are totally

6    ridiculous.

7              I can't believe that he has -- that he had

8    the nerve to even say these things and then hold

9    himself out as, you know, being a legitimate and

10   honest, you know, person.  I mean, for this whole

11   idea with the short sale fiasco I've spoken to

12   numerous attorneys that -- you know, SEC attorneys

13   that have said what?

14             Is he saying that a short sale is a

15   fictitious transaction?  It's not an honest

16   transaction?  You know, I'm considering starting a

17   class action.  And there are people that can turn

18   around and say look, you know what?

19             Anybody that lost money in a short sale in

20   the market, had nothing to do with me, if they lost

21   money in a short sale based upon his expert, you

22   know, witnesses and himself say, well, that's not a

23   legitimate transaction.  So, therefore, I'll sue

24   Charles Schwab because, you know, it's so -- I've

25   had people tell me, well known attorneys much major

CONFIDENTIAL

Page 644

1    and much bigger than your firm who've said now,

2    Bernie, nobody could say, he couldn't possibly say

3    that.  He couldn't possibly be basing his case that

4    a fraud -- you know, that a short sale is a

5    fictitious transaction and a fraud.

6             He may get a bankruptcy judge who probably

7    knows less than him make that statement, you know,

8    or not do anything about it; but the people that say

9    they don't understand how anybody could do that

10   because it makes them look like a fool.  And I know

11   he's not, so I don't understand why he would, you

12   know, try and ruin his reputation, which is what

13   he's doing, by submitting a report like that.  Well,

14   anyway, I've said my peace.

15             MS. FEIN:  Okay.

16             MR. GOLDMAN:  Do you have another question

17   for him?

18             MS. FEIN:  I do.

19             THE WITNESS:  Peter, can you get me a

20   water or soda?  I'm losing my voice here.

21             MR. GOLDMAN:  Yeah, yeah.  I'd get you a

22   scotch, but I don't think --

23             THE WITNESS:  I don't drink, so we'll go

24   with -- I'm considering it.

25             (Trustee's Exhibit Number 21 was marked

CONFIDENTIAL

Page 645

1  for identification.)

2          MR. KRATENSTEIN:  21?

3          Q.  (By Ms. Fein)  Yeah.  This has been marked

4  as Exhibit 21.  You can look through the document,

5  but I have a couple of questions on this first page

6  before -- this first page that you're looking at

7  now, so you just tell me when you're ready.

8          A.  Okay.

9          Q.  So this appears to be -- the first page

10  appears to be a form with handwritten notes and the

11  date appears to be 12-8-08.  Do you see that?

12          A.  Thank you.  Yes.

13          Q.  Do you recognize this form?

14          A.  Yes.

15          Q.  What was it called?

16          A.  I don't know what it was -- I don't know

17  that it had any name.

18          Q.  You didn't have something that you would

19  call it?

20          A.  No.

21          Q.  Okay.  Who worked on it?

22          A.  This looks like Jodi Crupi.

23          Q.  And when you say -- are you referring to

24  the handwriting?

25          A.  Yes.  I know she kept this kind of report.

Page 646

1          Q.  Okay.  Was this report kept regularly by

2     Jodi?

3          A.  Yes.

4          Q.  Was it kept on a daily basis?

5          A.  I believe so.

6          Q.  Was it kept by your firm in the ordinary

7     course of business?

8          A.  Not on the market making or proprietary

9     side, no.

10          Q.  For the IA business was this kept, was

11     this --

12          A.  Yes.

13          Q.  -- report kept in the ordinary course of

14     your business?

15          A.  Yes.

16          Q.  What was the form used for?

17          A.  Adjusted for, you know, what was -- what

18     was requested to be sent out in the way of checks

19     that were requested by clients and what checks had

20     come in.  So she -- she or other people that worked

21     in this or that department could keep track of

22     monies in and monies out.

23          Q.  Does the first -- underneath the date

24     there's a figure, 297,903, balance forward.  Do you

25     see that?

CONFIDENTIAL

Page 647

1        A.   Yes.

2        Q.   Does that refer to a positive cash amount?

3        A.   I assume it would refer to a cash balance

4   in the 703 account, bank account.

5        Q.   Okay.

6        A.   Which was a Morgan -- JPMorgan account.

7        Q.   Okay.  And next to wiring out at like the

8   bottom half of the page it appears that there's a

9   large amount of money that's being wired out on this

10  date?

11       A.   By the way, I want to correct my statement

12  about starting a class action because I --

13       Q.   You don't plan on doing that?

14       A.   I would love to, but it's a little bit

15  preposterous.  So let's say just so that I can get

16  out of here early, not this meeting, although I

17  wouldn't mind that either, but I don't want Picard

18  to get nervous, which I'm sure he wouldn't anyhow.

19       Q.   Do you see that there are substantial sums

20  in the wiring out --

21       A.   Correct.

22       Q.   -- category?  Okay.  Would you have seen

23  this document at or around the time that it's dated,

24  12-8-08?

25       A.   I typically saw this regularly.

CONFIDENTIAL

Page 648

1          Q.   Okay.  And would this document give you

2     information about customer withdrawals and deposits?

3          A.   Yes.

4          Q.   And would it give you information about the

5     financial health of the firm with respect to the

6     customer side?

7          A.   Would it give me --

8               MS. CHAITMAN:  Objection to form.

9               THE WITNESS:  It would give me a picture

10    of what was about to happen with monies in and out

11    of the firm, but it was never really a concern

12    because the firm -- this side of the firm always

13    had -- you know, it was liquid enough to handle

14    whatever withdrawals were coming out.

15         Q.   (By Ms. Fein)  But at this time, so

16    December 8th, 2008, that wouldn't be the case;

17    right?

18         A.   No.

19         Q.   Okay.  So would this document be an

20    indication for you that you knew that perhaps you

21    wouldn't have a lot of funds left in the 703

22    account?

23         A.   At this period of time there was no one on

24    Wall Street that didn't know what was going to

25    happen to Wall Street unless they weren't breathing.

CONFIDENTIAL

Page 649

1    Probably Dubinsky had no clue.

2         Q.  I'm talking with respect to your firm,

3    though, not with respect to Wall Street but just

4    with respect to your firm at that time?

5         A.  Yes.  It was very obvious to us there was a

6    crisis coming.

7         Q.  Okay.  So there are handwritten notes on

8    the pages that follow this first page of the

9    document.  If you just look at that first -- the

10   page ending in 589, do you recognize that

11   handwriting?

12        A.  No.  This actually looks like my

13   handwriting.

14        Q.  Okay.

15        A.  That right there?

16        Q.  Yeah, yeah.

17        A.  Yeah.

18        Q.  Okay.  And then if you go forward another

19   page there's also handwriting.  It appears the

20   handwriting on this document in general, so you can

21   look at it.

22        A.  I want to look at these notes for a second.

23        Q.  Sure.

24        A.  Okay.

25        Q.  Okay.  On the page ending in 591, is that

CONFIDENTIAL

Page 650

1    also your handwriting, 591?

2         A.   Oh, yes.

3         Q.   And if you flip ahead to page 593, it looks

4    like every other page is blank.  So I'm only

5    referring to the ones that have handwriting on them.

6    Does that also look like your handwriting?

7         A.   Yes.

8         Q.   Okay.  Would you agree your handwriting is

9    also on page 595?

10        A.   Yes.

11        Q.   Would you agree your handwriting is on 597?

12        A.   Uh-huh, yes.

13        Q.   And would you agree your handwriting is on

14   599?

15        A.   Yes.

16        Q.   Okay.  And if you'd just look through the

17   remaining pages, if you can just confirm that's your

18   handwriting, too?  If you see any that's not yours,

19   let me know.

20        A.   You know, I have a question.

21        Q.   Uh-huh.

22        A.   Oh, these are not -- I don't understand how

23   -- it looks like there's two -- two pages made to

24   look just like one.  For example, on the first

25   page --

CONFIDENTIAL

Page 651

1          Q.  Oh, that's just the copying.  That's just

2     the copying, yeah.

3          A.  Okay.  So in other words -- okay.  It has

4     nothing to do with the --

5          Q.  The original.

6          A.  -- the original, the first page.

7          Q.  That's right.

8          A.  All right.

9          Q.  Oh, this is a single document in terms of

10    this was found in one place, but I --

11         A.  But this is -- this report --

12         Q.  Right.

13         A.  -- would normally not have this on the

14    other side.

15         Q.  Understood, right.  That's just an issue of

16    the copying.  That's just an issue of --

17         A.  Oh, okay.  All right, okay.

18              MS. FEIN:  Right, right.  I can't speak to

19    that process.

20              MR. KRATENSTEIN:  Just for the record, you

21    took a single-sided document and made it

22    double-sided?  That's what happened?  In other

23    words, the documents were found single-sided in a

24    row and then for the purposes of this deposition

25    you've double-sided them?

Page 652

1          MS. FEIN:  That's my understanding.  I

2    would say that the Bates are consecutive.

3          MR. KRATENSTEIN:  Okay.

4          MS. FEIN:  So when we printed it, it was

5    printed double-sided.  I can't make representations

6    about what the original looked like because we're

7    looking at the copy from the files.

8          MR. KRATENSTEIN:  Okay.

9          THE WITNESS:  In other words, they're not

10   -- the dates are not related to each other

11   because --

12        Q.  (By Ms. Fein)  You don't believe that the

13   dates are related to one another?

14        A.  This in itself was --

15          MR. GOLDMAN:  Say page one of the

16   document.

17          THE WITNESS:  This page of the copy,

18   Jodi's handwriting, had nothing to do with the

19   other.  In other words, what Andrew is saying is

20   true.  They probably took -- it would probably be

21   like taking this document and putting it, you know,

22   on the other side of this document and making it

23   appear as if they're the same document and they're

24   not.

25        Q.  (By Ms. Fein)  I know we certainly didn't

CONFIDENTIAL

Page 653

1   doctor the document.  This was -- my understanding

2   is this was found together.  The fact that it's

3   double-sided as opposed to single-sided is, you

4   know, an oversight; but -- and I apologize that it's

5   double-sided, but I'm saying that this was found as

6   a single document.

7          A.  Yeah, but they could have been ten days

8   apart or two weeks apart.

9          Q.  Well, I wanted to ask you.  That was my

10  question for you.

11         A.  I'm assuming because Jodi would not -- none

12  of this has anything to do -- stuff that's in my

13  handwriting has nothing to do with Jodi with what

14  was on this page.  She would keep this page.  All

15  right.  And there would be another one for another

16  day for that page.  This here looks like you can

17  tell from the lines this was on a legal pad.

18             It was my notes for myself, all right, as

19  to any number of things, but it's not related to

20  this document.  They may have found this document in

21  Jodi's office and this could have been in my

22  briefcase.

23         Q.  This document was found together.  I don't

24  want to quibble with you about that.  I do -- you

25  should look at the last page of the document.  On

CONFIDENTIAL

Page 654

1   the last page of the document also is another --

2   it's a printout.  It's not handwritten notes.  So I

3   understand not all the pages are handwritten that

4   you're seeing here.  I wanted to ask you about the

5   notes and if they were your handwriting?

6          A.  I will acknowledge that the notes are in my

7   handwriting --

8          Q.  Okay.

9          A.  -- but there's nothing in my handwriting

10  has nothing to do with that original Jodi's document

11  because, in other words --

12         Q.  You don't think they were close in time.

13  Is that what you're saying?

14         A.  No.  This would -- they were probably not

15  close in time.  They may be a couple of dates in

16  time.  Obviously, it would -- it would have nothing

17  to do with Jodi, you know.

18         Q.  I understand that, I understand that.

19         A.  Okay.

20         Q.  The handwritten notes you're saying are not

21  -- you don't -- it wouldn't have involved Jodi's

22  process at all --

23         A.  That's correct.

24         Q.  -- because it's your notes.  I understand

25  that, yes.

Page 655

1          MR. KRATENSTEIN:  Just so we're all clear,

2     Jodi's notes on the first page and then on the pages

3     thereafter, it's Mr. Madoff's handwritten notes.

4          THE WITNESS:  Right.

5          Q.  (By Ms. Fein)  Do you have a recollection

6     of making any of the notes that are here?

7          A.  Yes.  It's my handwriting, so --

8          Q.  Do you recall -- do you recall making these

9     notes?  Do you recall going through the exercise of

10    making these notes in 2008?

11         A.  Yes, yes.

12         Q.  What do you recall about it?

13         A.  These are notes -- well, that at the end I

14    was considering sending out monies, paying bonuses

15    to people, sending out checks to -- I was planning

16    to send out checks because I knew the firm was -- we

17    were going out of business.  And I had written the

18    checks and, as a matter of fact, I put them in my

19    drawer.

20          It was actually, I think, I wrote these

21    notes, you know, prior to me making the decision

22    that the firm was -- well, it was in conjunction was

23    going out of business.  I wanted to sort of -- I

24    owed traders money for what was due to them, so on

25    and so forth.  So I wrote out checks, put them in my

CONFIDENTIAL

Page 656

1   drawer and called my lawyer because I was planning

2   at that time to turn myself in.  And he said don't

3   send the checks out.  So I left them in the drawer

4   and then they never did go out.  That's what I

5   recall.

6        Q.  So do you think you could have looked at

7   the amounts listed on the first page of the document

8   in 588 so that you knew how much money you had for

9   writing the checks?

10        A.  Yes.  That's certainly possible.

11        Q.  So the handwritten notes were made around

12   the same time, you wouldn't say necessarily on the

13   same day, but around the same time as December 8th,

14   2008?

15        A.  Right, yes, uh-huh.  Or sometime

16   afterwards, you know.

17        Q.  After you would have seen the report --

18        A.  Yes.

19        Q.  -- from Jodi?

20        A.  Well, no.  It could have been made prior.

21   I just don't know.  I mean, my head was sort of up

22   my wherever at that time, but I don't -- obviously,

23   I can see from the notes here that it was what I had

24   planned to do was paying out traders and so on; but

25   then there were things on here, on notes that would

Page 657

1    have nothing to do that would have had to be done.

2    It was things to myself trying to figure out where I

3    stood afterwards.

4           Q.  Okay.

5           A.  If you look at -- see, it says I can't make

6    -- I wrote can't make traders 100 percent whole.  I

7    was referring to the fact that I didn't have enough

8    money to cover, you know, what I owed the traders in

9    their compensation.

10          Q.  Is that employees or traders?

11          A.  Employees, and employees also had accounts

12   with me.  So I was -- you know, I couldn't --

13   couldn't cover everything that was in their account.

14          Q.  And you're referring to page Bates ending

15   in 599; right?

16          A.  Yes, correct.

17          Q.  Okay.  On page ending 597, one page before

18   the one you're looking at, I think, can you find the

19   one ending in 597 for me?

20          A.  Which one?

21          Q.  597.  I think it's the other way.

22          A.  Yes.

23          Q.  The first line looks like 1960, dash,

24   present.  And then I can't -- I'm not sure.  Average

25   or --

CONFIDENTIAL

Page 658

1          A.   Looks like average, 39 million.

2          Q.   Okay.  Do you know what that would be

3     referring to?

4          A.   I think it refers to what the profit of the

5     firm was over a certain period of time from 1960 to

6     present.

7          Q.   Okay.  And do you see down -- there are

8     calculations on the right side.  One says equal 39

9     mill per year and then to the left of that, 1909

10    divided by 49 years?

11         A.   Yeah.  I'm trying to figure out what

12    they're referring to.

13         Q.   But you agree that the calculation, it does

14    say 49 years; right?

15         A.   Doesn't it say 39 years?  It says 1960 to

16    present average equals 39 million.

17         Q.   Uh-huh.  And then look at underneath where

18    you have 691, 1218 over 1909.  Do you see that?

19         A.   Right.

20         Q.   Divided, and that looks like 49 equals 39

21    mill per year.  Do you see that?

22         A.   Right.

23         Q.   Okay.  And below that it looks like it says

24    without draw.  Do you see that, without draw?

25         A.   I think it refers to the profit of the

CONFIDENTIAL

Page 659

1   firm.

2        Q.   Okay.  But does draw refer to amounts taken

3   out by your employees?

4        A.   Draw was money that -- no.  It was either I

5   had a draw account, which is typical that I drew

6   money out.  I didn't have a -- it was like a salary

7   that I would draw out of the firm.  And I'm not real

8   sure what this is referring to, my draw or the

9   traders' draw or a combination thereof.

10       Q.   Okay.  Do you see where the line under

11   draw, it looks like it says draw five mill per -- do

12   you see that?  It looks like the last line next to

13   the calculation ending in 2154?

14       A.   Right.

15       Q.   Was the 5 million draw something that you

16   received?

17       A.   I don't know.  It could be.  It could have

18   been my draw.  I know I didn't draw 5 million a

19   year, so it could have been my draw.  It could have

20   been mine plus other people's draw.  I'm not sure.

21       Q.   Okay.  1962 to December 2008 is about -- is

22   49 years; right?

23       A.   Uh-huh, right, yeah.  The 1909 divided by

24   49 is -- it looks -- to me it would look like how

25   much the firm, you know, grew over a 49-year period,

CONFIDENTIAL

Page 660

1   39-year period, something like that.

2       Q.  Okay.  Forty-nine years is about how long

3   your business was going on; right?

4       A.  Correct.

5       Q.  Okay.  And there were references to your

6   firm starting in 1960 in the proffer agreement that

7   we looked at or the proffer statement?

8       A.  Yeah.  It looked to me like I was trying to

9   calculate how much the firm made or how much they

10  showed on their focus reports.  I don't recall.

11      Q.  Okay.  But the calculations taking place

12  over 49 years; right?

13      A.  Right, which was the life of the firm.

14      Q.  Uh-huh.  So these notes were written in

15  December 2008; right?

16      A.  I can't -- I can't be sure.  I can't say

17  for certain what period.  There's so many different

18  notes and --

19      Q.  Okay.

20      A.  -- some of them are related, some of them

21  are not related to each other.

22      Q.  Okay.  But would this have been part of the

23  same exercise we were talking about, thinking about

24  writing out checks and what you were going to do

25  about the end of the firm?

CONFIDENTIAL

Page 661

1          MS. CHAITMAN:  Objection to form.

2          THE WITNESS:  Well, I certainly know -- I

3   certainly know that there are notes here that refer

4   to how much employees would do from their trading

5   profits, their draws, things of that sort.

6          MS. FEIN:  Uh-huh.

7          THE WITNESS:  That -- you know, there were

8   certain things that I was trying to analyze how much

9   the firm had made, how much -- things of that sort.

10         Q.   (By Ms. Fein)  Okay.  So you think the firm

11  -- so you think the firm on average made 39 million

12  a year for the 49 years it was in business?

13         A.   Again, I don't know whether that was

14  including money that was taken out in compensation

15  by my -- you know, by me alone, by my family or by

16  the employees.  I can't really -- I can't really

17  tell from looking at it just like this.  It was --

18  I'm just analyzing various things.

19             And most of it deals with monies with the

20  checks that I was planning to send out, which I

21  would have determined by looking at how much money

22  people had in their accounts.

23         Q.   Okay.  And it looks like it refers to what

24  -- so these would have been notes -- let me ask.

25  Were these notes you made to yourself?

CONFIDENTIAL

Page 662

1          A.   Notes I was writing to myself, yeah.

2          Q.   Yes, okay.  Was anyone else present when

3    you were making them that you recall?

4          A.   No.

5          Q.   Okay.  Do you recall where you were when

6    you made them?

7          A.   No.  It could have been in my office.  It

8    could have been when I was home.  I don't know.

9          Q.   But did you share them with anyone else

10   after you made them?

11         A.   No.  I would have had to get the

12   information from Annette as to how much money people

13   had in their accounts because I had to get them from

14   because that's not something that I ever had off the

15   top of my head.

16         Q.   Okay.  Mr. Madoff, did you have any

17   meetings to prepare for this deposition?

18         A.   Meetings?

19         Q.   Uh-huh.

20         A.   No.  You mean --

21         Q.   Did you meet with Mr. Goldman to prepare

22   for your deposition today?

23         A.   No.  Oh, today he came -- I met with him

24   the day before yesterday, but it wasn't necessarily

25   in relation to that.  He came down here earlier.

CONFIDENTIAL

Page 663

1      Q.  So you've not had any -- you're saying you

2   have not had meetings to prepare for your

3   deposition?

4      A.  Peter Goldman came down.  We discussed this

5   -- you know, my situation in general, I mean, from

6   how I was feeling.

7         MS. CHAITMAN:  You don't have to talk

8   about anything confidential that you --

9         THE WITNESS:  No, no.

10        MR. GOLDMAN:  Yeah.  We had a meeting.

11        THE WITNESS:  Well, you can find out who

12  was here to visit me.  That's all.

13     Q.  (By Ms. Fein)  Okay.  Did you meet with Ms.

14  Chaitman or Mr. Kratenstein to prepare for your

15  deposition?

16     A.  Mister who?

17     Q.  Mr. Kratenstein.

18     A.  They were down here yesterday.  Not

19  yesterday, the day before yesterday.  Is this the

20  second day or the third day?  Yesterday.

21     Q.  How long did you meet with them?

22     A.  An hour or two.

23     Q.  What did you guys discuss?

24        MR. KRATENSTEIN:  I'm going to object.

25  Hang on.  I'm going to object.  What we discussed

CONFIDENTIAL

Page 664

1  with Mr. Madoff is our work product because we're

2  allowed to talk to people.  So I consider that our

3  work product.  So my view is any discussions we had

4  with Mr. Madoff are work product that go to our

5  mental impressions.  So I object to that question.

6  I'll leave it to Mr. Goldman as to whether he's

7  going to instruct not to answer.

8          I'll allow you to talk about the -- I

9  don't have an objection to subject matter or asking

10  him of any documents we used to refresh recollection

11  or anything like that, but I do have an objection to

12  discussions, substance of discussions.

13          MS. FEIN:  So are you directing him not to

14  answer on the basis of your work product?

15          MR. KRATENSTEIN:  It's our work product,

16  our mental impressions and our discussions with him

17  that reveal as mental impressions our work product.

18  And I would ask that an instruction be given that he

19  should not disclose that information.

20          MS. FEIN:  Any information related to your

21  work product; right?

22          MR. KRATENSTEIN:  Yes, yes.

23          MS. FEIN:  Understood.

24          MR. GOLDMAN:  Ask the question and then

25  we'll -- if I have an objection, then we'll -- I'll

CONFIDENTIAL

Page 665

1   decide which direction I'll go.

2          Q.   (By Ms. Fein)   I think I asked how long you

3   met with Ms. Chaitman and Mr. Kratenstein, if you

4   recall.

5          A.   I guess it would be probably a couple of

6   hours.

7          Q.   Were you shown any documents during the

8   meeting?

9          A.   I asked what the meeting was going to be

10  about.

11             MR. GOLDMAN:   Bernie, just try and answer

12  the question.   She asked you if you saw any

13  documents.   So it's either --

14             THE WITNESS:   I guess I saw documents,

15  yes.

16         Q.   (By Ms. Fein)   Do you -- were they any of

17  the documents that we reviewed today or yesterday?

18         A.   To tell you the truth, I don't even know

19  what I saw.   I saw documents.   I don't know whether

20  they were the same as the ones that you had or not.

21  I don't know.

22             MS. FEIN:   Okay.   We would ask to see any

23  documents that you showed Mr. Madoff during the

24  course of your meeting with him.

25         Q.   (By Ms. Fein)   Did you have any -- any

CONFIDENTIAL

Page 666

1   other preparation for your deposition with Ms.

2   Chaitman or Mr. Kratenstein before this week?

3        A.   I'd never met Mr. Kratenstein until that

4   original meeting.

5        Q.   Okay.  Did you discuss the Sages at your

6   meeting?

7        A.   Did I discuss the Sages?  I discussed what

8   my relationship -- he asked what my relationship was

9   with the Sages and who I met with, so I told him.

10       Q.   And were you shown any documents to refresh

11  your recollection about the Sages or any meetings

12  you had with them?

13       A.   I was familiar with -- with the Sages.

14  They knew I was familiar with the Sages.  I'm not

15  sure I understand what you're asking me.

16       Q.   The question was have you looked at any

17  documents?

18       A.   Yes.  I looked at documents.  I saw -- you

19  know, I saw confirmations, you know, and statements

20  of trades, not all, certainly not as much as I've

21  seen today.

22            MS. FEIN:  Understood.  All right.  I

23  think we're all set.  Thank you, Mr. Madoff.

24            THE WITNESS:  Okay.

25            MS. CHAITMAN:  I just have a few questions

CONFIDENTIAL

Page 667

1    and then --

2              MR. KRATENSTEIN:  And I have a couple.

3                     FURTHER EXAMINATION

4    BY MS. CHAITMAN:

5         Q.  Okay.  Mr. Madoff, how were the traders

6    compensated at your firm?

7         A.  They got -- they basically got a percentage

8    of their market making profits, proprietary trading

9    profits.

10        Q.  What was the percentage?  Did it vary per

11   person?

12        A.  Typically it was 20 percent of their net

13   trading profits.  That was after commissions and

14   expenses related to their trading.

15        Q.  The commissions would have been payable to

16   whom?

17        A.  To their -- which --

18        Q.  When you say after, typically 20 percent of

19   their net?

20        A.  Oh, depends upon where the transaction was

21   executed.  If it was -- if the transaction was

22   cleared, there would be -- that would be deducted.

23   If there was interest, it would be charged to their

24   account depending upon whether we had bank loans

25   out, things like that.  They were -- if the -- if it

CONFIDENTIAL

Page 668

1    was a transaction that was laid off on the floor of

2    an exchange, there would be commissions -- there

3    would be commissions paid on that so they would --

4    that would be deducted.  Their 20 percent was a net

5    net.

6          Q.  So it was 20 percent of the profits they

7    generated.  Is that a fair --

8          A.  That's correct.

9          Q.  Okay.  If you could just take a look?  You

10   can look at my copy of Trustee's Exhibit 19.  This

11   is -- just take a look at this.  It's 19 and --

12             MS. FEIN:  Marked copy.

13         Q.  (By Ms. Chaitman)  19 and 18, yeah.  Do you

14   recognize the handwriting on Exhibit 18 where it

15   says hold?

16         A.  It looks like it's the same as -- like it's

17   Annette or it could be Jodi.  You know, I can't

18   really tell from that.

19         Q.  Okay.

20         A.  Yeah.  Looks like two different

21   handwriting.  One is printed and one is like script.

22         Q.  Right.  And one is asking you -- one is

23   asking you about documents in 1979 to '81 and the

24   other is asking you about documents in 1982.  Do you

25   see that?

CONFIDENTIAL

Page 669

1          A.   Yes.

2          Q.   Okay.  Do you remember what your desires

3    were with respect to what documents would be

4    shredded and what documents would be held?

5          A.   Not really.

6          Q.   Were you trying to conceal evidence of a

7    crime?

8          A.   Well, let's put it this way.  There was no

9    crime prior to '90 -- to the '90s.  So that's easy

10   for me to answer.

11         Q.   Okay.  So what -- do you remember why you

12   would have said to hold certain documents and shred

13   others?

14         A.   You know, we had no general policy with

15   retaining -- as I've said numerous times, the

16   retention period for documents on Wall Street is six

17   years.  That's an industry requirement.  So you're

18   not required to hold documents more than six years

19   and most firms shred immediately after that because

20   they just don't want to store the documents.

21              As far as the -- but as I've said numerous

22   times, we held customer-related documents relating

23   to cost basis for customers, tax basis for customers

24   because that -- we would constantly be asked to --

25   for information from the clients' accountants, you

CONFIDENTIAL

Page 670

1   know, or a tax lawyer, which could happen at any

2   given time.

3            MS. CHAITMAN:  Do you have to stop?

4            THE VIDEOGRAPHER:  Yes.  I do.

5            MS. CHAITMAN:  Okay.

6            THE VIDEOGRAPHER:  This marks the end of

7   disc number two in the deposition of Bernard L.

8   Madoff.  Going off the record.  The time is 13:08.

9            (A recess was taken.)

10            THE VIDEOGRAPHER:  Back on the record.

11   This begins disc number three in the deposition of

12   Bernard L. Madoff in Butner, North Carolina on

13   November 9th, 2017.  The time is 13:12.

14       Q.  (By Ms. Chaitman)  So Mr. Madoff, if you

15   look at Exhibit 19 --

16       A.  Yes.

17       Q.  Okay.  You apparently gave instructions to

18   shred the C&S statements.  Do you see that?

19       A.  Number one, I don't know that I gave that

20   -- I don't believe that I gave anybody instructions

21   as to what to shred, what not to shred.  I mean,

22   it's not -- I would have no interaction with these

23   people.  So somebody in Annette's office like either

24   Annette or some other employee, some of the other

25   people would tell people what to shred, what not to

CONFIDENTIAL

Page 671

1   shred.  My instructions were to shred anything that

2   we did not need to have in the future, so --

3          Q.  Right.  Okay.  So consistent with that

4   where it says hold at the second half of the first

5   page of Trustee's Exhibit 19, there are several

6   items which are hold and they're all EOM customer

7   ledgers.

8          A.  Yes.

9          Q.  Is that consistent with the strategy you've

10  described?

11         A.  It would -- holding a customer ledger would

12  be because a customer ledger would typically have

13  all the pricing information, the information we

14  would need to supply to their accountants.

15         Q.  Okay.

16         A.  So there was no reason to hold.

17         Q.  Okay.

18         A.  The other things here are -- involve

19  brokerage firms that we bought and sold stock to.

20  So there's no reason for that because once the trade

21  settles, there's no reason to have anything related

22  to the counterparties.

23         Q.  Okay.  Similarly, if you look at Trustee's

24  Exhibit 18, are the documents that you -- that have

25  the X next to them, which the handwriting which is

CONFIDENTIAL

Page 672

1   unidentified says shred the Xs only, were those

2   specific to customers or were they general?

3        A.   They would need -- we wouldn't have any

4   reason to have them because once the trade settles,

5   it settles.  So there's no reason to hold anything.

6        Q.   Okay, okay.  Now --

7             MR. KRATENSTEIN:  Go ahead.

8        Q.   (By Ms. Chaitman)  Now, Amanda asked you

9   several questions about the T-bills that you held?

10       A.   Right.

11       Q.   And you had previously testified that you

12   maintained a portfolio of about $6 billion of

13   T-bills?

14       A.   Correct.

15       Q.   And did you buy those with money invested

16   through the investment advisory business?

17       A.   Correct.

18       Q.   So it was -- those T-bills were purchased

19   with house 17 customer money?

20       A.   Yes.

21       Q.   Okay.  And you've previously described how

22   those were maintained at --

23       A.   Morgan Stanley, Fidelity.

24       Q.   -- Bear Stearns, Morgan Stanley, Fidelity,

25   Lehman and JPMorgan Chase --

CONFIDENTIAL

Page 673

1        A.   Correct.

2        Q.   -- right?  Okay.  And was it your intention

3    to keep that money for the benefit of the investment

4    advisory customers?

5        A.   That was the only reason.  It was money

6    that, you know, we would have needed to settle with

7    clients if they asked us for money from their

8    account.

9        Q.   Okay.  And, in fact, do you recall

10   testifying that you kept those T-bills to maturity?

11       A.   I don't remember, you know.  They were

12   basically short-term instruments, so we would

13   normally keep them until we needed the money to pay

14   out or whether they expired.

15       Q.   Okay, okay.  Now, so is it fair to say that

16   if an investment advisory customer wanted to close

17   out his or her account and you had to come up with

18   $5 million in cash, that if you didn't have

19   $5 million sitting in a bank account, you would have

20   liquidated one of the T-bills to pay it?

21            MS. FEIN:  Objection.

22       Q.   (By Ms. Chaitman)  Pardon?

23       A.   Yes.

24            MS. CHAITMAN:  Okay.  What's your

25   objection?

CONFIDENTIAL

Page 674

1           MS. FEIN:  That was -- it was testifying.

2      It was your testimony, not Mr. Madoff's.

3           Q.  (By Ms. Chaitman)  Mr. Madoff, would you be

4      good enough to cure Amanda's objection and could you

5      say that in your own words?  I don't want to put

6      words in your mouth.

7           A.  My plan was that if I needed money to

8      settle a customer's account, I would typically

9      either take the money out of the 703 bank account,

10     which is typically where we kept all clients'

11     monies, or if there wasn't immediate cash available,

12     which there was most of the time, I would then

13     liquidate T-bills.

14          Q.  Okay.  And, again, those T-bills were

15     purchased with money --

16          A.  It was always purchased with money from the

17     703 account.

18          Q.  Okay.  And that was the investment advisory

19     customers' money?

20          A.  Correct.

21          Q.  Now, you were talking about the ledgers.

22     Amanda was showing you some ledgers and I believe

23     you testified that there was subsidiary ledgers for

24     each institution that you did business with?

25          A.  There were -- there were either ledgers or

CONFIDENTIAL

Page 675

1   documents.  You know, there were statements.  So

2   that's what -- I'm not -- I don't recall what -- and

3   it changed all the time, you know, how -- what the

4   practice was of firms sending out statements

5   because, again, it depended upon what stage the

6   clearing cycles were in, in other words, whether --

7   how the DTC worked, how NSCC worked and whether we

8   had automated interfaces with firms.

9            We had 500 interfaces with -- not 500.  We

10  had over 100 interfaces with 500 different brokerage

11  firms.  Everything was done, you know, on computer.

12  So there was no -- there was no exchanging of

13  confirmations.  There was no cash in settlement,

14  things of that sort.

15           And the firm themselves, the operations

16  department had their own policies of how they --

17  what records they have, which I, quite frankly, am

18  not even familiar with.  I have no idea with some of

19  these C&S, cash and securities settlements.  I don't

20  know what they relate to.

21       Q.  Okay.  But with the 10 or 11 banks that

22  you've named that you had custodial relationships

23  with, is it fair to say that you would have had

24  records showing what securities were held at each

25  institution?

CONFIDENTIAL

Page 676

1          A.   As a general rule, yes, but I don't know.

2     Again, it depends upon the time frame involved

3     because all of that changed over the years depending

4     upon what the various interfaces of automation was

5     available to firms.

6          Q.   Right, right.  So if you could do it

7     through the internet, you wouldn't need to have the

8     paper copies; is that right?

9          A.   Correct.

10         Q.   Okay.  I understand that.

11         A.   You know, I want to go on the record of

12    stating, by the way, relating to that, when this

13    thing -- when I first got arrested I requested, you

14    know, all the records that were available to the

15    firm.  I requested it to my attorneys, who then

16    requested the Trustee send me all the documents that

17    they had.

18              And my purpose was that I was -- if I

19    wanted -- I would need to go to trial to demonstrate

20    when the crime started and what was involved and

21    what was -- how much was made and lost.  And the

22    only thing that they -- and they never produced

23    anything.  I shouldn't say never.  All they produced

24    was a box exactly this size that was delivered up to

25    me while I was in -- you know, in jail.  And I

CONFIDENTIAL

Page 677

1  complained.

2          I said how am I going to -- how am I going

3  to piece everything together?  How am I going to

4  demonstrate what really -- what really occurred

5  financially and so on?  I said, well, that's all

6  that they were able to produce to me.

7      Q.   Ike Sorkin?

8      A.   Ike Sorkin.  And they produced records that

9  went back no longer than 1998.  And that was even --

10 you know, they said we don't have any bank records.

11 We don't have this and that.  They complained.  They

12 complained to the judge, I guess, prior to my

13 sentencing.  It was one of my court appearances.

14 And Chin insisted, got agitated and insisted to the

15 prosecutor, said instruct -- you know, give them the

16 records.

17          And they said, well, we can't find any.

18 The records were very sloppy.  You know, you would

19 have the impression that we didn't have any records

20 and that the records were scraps of paper.  And this

21 -- you know, so when I was sentenced, you know, I

22 couldn't -- as a matter of fact, I was asked do you

23 want to appeal when I had this 150-year sentence.

24          I said how am I going to appeal?  I said I

25 don't have any records.  I said where in the hell

CONFIDENTIAL

Page 678

1    are the records?  And I said I've got warehouses

2    full of records.  I said, you know, how can they not

3    produce the records?  He said Bernie, what do you

4    want me to tell you?  So you can imagine my anger

5    when I was notified by you that there were 32

6    million pages of goddamn documents.  I'm looking at

7    these documents now and all of a sudden miraculously

8    these documents appear.

9             Now, you can't possibly tell me that you

10   didn't know, not you individually, that the Trustee,

11   you know, did not know that these documents existed

12   because I have -- I was paying rent on something

13   like eight warehouses to say nothing of the whole

14   basement of the Lipstick Building where I knew there

15   were records, you know.

16            And I'm not talking about necessarily, you

17   know, what I'm seeing here.  So how does that

18   happen?  I mean, you know, I don't understand it.

19            MS. CHAITMAN:  You know what, Bernie?  I

20   asked the same question.  Okay.  I have no further

21   questions and I'm going to turn to Andrew.

22            MR. KRATENSTEIN:  I will be, I hope,

23   brief.

24                  FURTHER EXAMINATION

25   BY MR. KRATENSTEIN:

CONFIDENTIAL

Page 679

1        Q.   So Ms. Fein showed you a document, Mr.

2    Madoff, that she marked as Exhibit Number 11, which

3    was a house number five daily stock record activity

4    for July 16th, 1987.  And she asked you some

5    questions about a County of Nassau, it's third from

6    the bottom, a County of Nassau bond.  Is that a

7    municipal bond, the County of Nassau bond?

8        A.   Yes.

9        Q.   Okay.  And did your firm do -- trade in

10   municipal bonds?

11       A.   No.

12       Q.   Did you have municipal bonds in your

13   custody, your firm's custody?

14       A.   Yes.

15       Q.   Okay.  So what was your -- what did your

16   firm do with respect to municipal bonds?  Can you

17   describe?

18       A.   The clients used them as either margin or

19   with instructions to sell them to go into -- rather

20   than sending in cash to a strategy, they sent them

21   bonds to either be liquidated or to use as

22   collateral for a margin account.

23       Q.   I'm going to show you Exhibit 38, which we

24   showed you yesterday.  And just take a look at that

25   page.  I've opened it to page MF 00964437, which you

CONFIDENTIAL

Page 680

1    might recall yesterday towards the bottom of that

2    page I showed you the RCA Corp convertible

3    debenture.  And there are a whole bunch of positions

4    around that.  Do you see that?

5         A.   Where am I looking?  Here?

6         Q.   So bottom, if you look -- we talked about

7    this yesterday, but there are -- fourth up from the

8    bottom do you see the RCA Corp bond?

9         A.   Yes.

10         Q.   And then all around that do you see

11    municipal bonds like for Puerto Rico, Pennsylvania,

12    Oregon?

13         A.   Right, uh-huh.

14         Q.   Do you see that?

15         A.   Yes.

16         Q.   And they all have different maturities,

17    different yield dates --

18         A.   Right.

19         Q.   -- right?  So what are these?

20         A.   They're municipal bonds.

21         Q.   And are these the types of bonds you were

22    just describing?

23         A.   Yes.

24         Q.   And are these all real securities that were

25    held at the National Bank of North America for your

CONFIDENTIAL

Page 681

1    firm?

2        A.   Yes.

3            MR. KRATENSTEIN:  Thank you very much.

4    That's all I have.

5            MS. CHAITMAN:  Okay.  I'd just like to put

6    on the record the discussion that I had with Amanda

7    that we will be continuing your deposition so long

8    as your health continues once we get further

9    documents from the Trustee.  We're negotiating to

10   get additional documents that we now know the

11   Trustee has.

12           MS. FEIN:  We just want to put on the

13   record that we would reserve a right to

14   cross-examine on any documents that Ms. Chaitman

15   asks about.

16           MS. CHAITMAN:  Of course, of course.

17   Okay.  Thank you so much.  Andrew and I are going to

18   run.

19           THE VIDEOGRAPHER:  We are off the record

20   in the November 9th, 2017 deposition of Bernard L.

21   Madoff, Volume IV.  The number of discs used was

22   three.  The time is 13:26.

23           (Reading and signing of the deposition by

24   the witness was reserved and the deposition was

25   concluded at 1:26 p.m.)

CONFIDENTIAL

Page 682

1                 C E R T I F I C A T E

2    NORTH CAROLINA:

3    GUILFORD COUNTY:

4            I hereby certify that the foregoing

5    deposition was reported, as stated in the caption,

6    and the questions and answers thereto were reduced

7    to the written page under my direction; that the

8    foregoing pages 493 through 682 represent a true and

9    correct transcript of the evidence given.  I further

10   certify that I am not in any way financially

11   interested in the result of said case.

12           I have no written contract to provide

13   reporting services with any party to the case, any

14   counsel in the case, or any reporter or reporting

15   agency from whom a referral might have been made to

16   cover this deposition.  I will charge my usual and

17   customary rates to all parties in the case.

18           This, the 21st day of November, 2017.

19

20

                    K. Denise Neal

21

22                  K. Denise Neal, RPR

                    Registered Professional Reporter

23                  Notary Public No. 200517500101

24

25

CONFIDENTIAL

Page 683

1                    E R R A T A   S H E E T

2

3        Pursuant to Rule 30(7)(e) of the Federal Rules

4    of Civil Procedure, any changes in form or substance

5    which you desire to make to your deposition

6    testimony shall be entered upon the deposition with

7    a statement of the reasons given for making them.

8

9        To assist you in making any such corrections,

10   please use the form below.  If supplemental or

11   additional pages are necessary, please furnish same

12   and attach them to this errata sheet.

13                       * * * * *

14        I, the undersigned, BERNARD L. MADOFF, do hereby

15   certify that I have read the foregoing deposition

16   and that to the best of my knowledge said deposition

17   is true and accurate (with the exception of the

18   following corrections listed below).

19

20

21

22

23

24

25

CONFIDENTIAL

Page 684

```
 1   Page        Line        should read:

 2   Reason  for  change:

 3

 4   Page        Line        should read:

 5   Reason  for  change:

 6

 7   Page        Line        should read:

 8   Reason  for  change:

 9

10   Page        Line        should read:

11   Reason  for  change:

12

13   Page        Line        should read:

14   Reason  for  change:

15

16   Page        Line        should read:

17   Reason  for  change:

18

19   Page        Line        should read:

20   Reason  for  change:

21   Signature:

22   Sworn  to  and  Subscribed  before  me

23                               ,  Notary  Public.

24   This        day  of                    ,  2017.

25   My  Commission  Expires:
```

**[& - 21]**                                                                    Page 1

| & |
| --- |

**&**  495:14 499:25
503:2

| 0 |
| --- |

**00964437**  679:25
**01**  566:15,16
**0158**  506:12,22
**03**  622:6
**064**  572:7 577:23
**07**  551:20,23
553:18 558:13
**08**  558:24
**08-01789**  494:7
**0801789**  499:18

| 1 |
| --- |

**1,500,000**  504:5
**1-3-2008**  565:2
**10**  497:22 524:16
524:20 527:6
675:21
**100**  507:25 515:9
550:20 551:9
556:7 657:6
675:10
**10022**  495:7
**10111-0100**  496:8
**10173-1922**
495:16
**10573**  496:15
**10:32**  582:1
**11**  497:24 535:12
535:14,16 577:7
578:3 587:23
675:21 679:2
**11-10-83**  498:13
604:5
**11-11-83**  498:11
600:18
**11-18-83**  600:20
606:6

**11-30**  604:8
**11-30-63**  603:21
**11-30-83**  604:7,9
604:14
**11-7-08**  553:13
**11:07**  582:6
**11th**  506:3,22
507:24
**12**  496:14 498:3
558:4,8 634:23
**12-11-86**  497:19
**12-12-03**  622:16
**12-16-08**  498:19
**12-16-2008**  626:15
**12-31-07**  497:23
498:4 558:20
**12-5-86**  497:15
502:21
**12-8-08**  498:20
645:11 647:24
**1218**  658:18
**12th**  624:3
**13**  498:5 566:9,10
**13,388**  606:2,10,22
**13:08**  670:8
**13:12**  670:13
**13:26**  681:22
**13th**  622:2,25
**14**  498:7 569:13,16
**15**  498:9 571:4
577:21,22 578:7
**150**  677:23
**16**  498:11 600:9,11
600:13 606:9,10
606:19 607:5
610:4
**16th**  535:23 536:9
540:3 545:19
577:9,14 638:18
679:4

**17**  498:3,7,9,12,12
520:11 558:19
559:17,20 569:19
571:14 578:9,10
578:24,24,25
603:6,10,17,25
604:1,4,19 606:17
606:18 607:6,12
672:19
**18**  498:14 611:9,11
611:14,24 612:16
668:13,14 671:24
**18th**  606:25
608:15
**19**  498:16 611:10
611:11 612:5
628:2 668:10,11
668:13 670:15
671:5
**1909**  658:9,18
659:23
**1960**  628:9 629:3
657:23 658:5,15
660:6
**1962**  631:9,19
659:21
**1970s**  635:17
**1979**  668:23
**1980s**  508:20
509:13,23 590:5
634:20 635:17,23
**1982**  668:24
**1983**  500:18
501:13 502:12
600:18 607:1
**1986**  506:3,22
507:24 530:22
**1987**  535:23 536:9
539:6 540:3
545:19 553:19
554:2 562:3 574:2

**575**:4,5,23 577:9
577:14 679:4
**1990**  512:7
**199066**  560:23
**1992**  517:6 522:25
523:6 614:20
**1994**  570:12
**1998**  677:9
**1:26**  681:25
**1s0004-3**  623:8
**1s004-7**  622:8

| 2 |
| --- |

**2**  504:3,3
**2,307**  538:3,5
539:12,12,13,16
539:18
**20**  498:18 626:7,11
667:12,18 668:4,6
**2000s**  563:21
617:17
**2001**  568:14
**2003**  624:3,5,8
**200517500101**
682:23
**2007**  525:1 527:8
527:13,14,18,20
527:22 528:3
558:16 559:2
561:5,6,22 562:3,3
565:16
**2008**  516:20 517:7
559:2 648:16
655:10 656:14
659:21 660:15
**2017**  494:22 499:7
582:6,21 584:11
670:13 681:20
682:18 684:24
**21**  498:20 644:25
645:2,4

**[212 - 954]**                                                                 Page 2

**212**   495:17 496:9
**2154**   659:13
**21st**   682:18
**26**   582:20 584:11
**28th**   624:5
**29,000**   578:14
**290,000**   577:24
**29000030**   560:18
570:19
**2900030**   573:13
**297,903**   646:24
**299000010**   608:4

**3**
**3**   605:14
**3,000**   578:19
**3,157**   538:15
**3,357**   539:22,25
540:5 577:10
**3-31-94**   498:8
569:20
**30**   632:13,17
634:19,21 683:3
**30,000**   631:23,24
**3000**   494:20
499:10
**303-4568**   495:8
**30th**   608:16,20
**31**   500:18 502:12
**31st**   524:25 525:8
558:16
**32**   678:5
**33**   584:23
**330,000**   578:22
**332**   578:17
**340**   495:15
**38**   500:18 679:23
**39**   502:12 594:7,11
594:15 595:4
658:1,8,15,16,20
660:1 661:11

**393**   611:14,16
**396**   612:7

**4**
**40**   632:13,18
634:19,21
**400**   559:20,23
560:8
**45**   496:7
**46**   501:17
**465**   495:6
**49**   658:10,14,20
659:22,24,25
660:12 661:12
**493**   682:8
**498**   564:23
**499**   497:3

**5**
**5**   497:24 659:15,18
673:18,19
**50**   518:6
**500**   504:7 675:9,9
675:10
**502**   497:14
**504**   497:16
**505**   497:18
**520**   497:4
**524**   497:22
**535**   497:24
**547-5695**   495:17
**558**   498:3
**56**   527:9,10,21,25
**566**   498:5
**569**   498:7
**571**   498:9
**579**   497:5
**582**   497:6
**588**   656:8
**589**   649:10
**589-4621**   496:9

**591**   649:25 650:1
**593**   650:3
**595**   650:9
**597**   650:11 657:17
657:19,21
**599**   650:14 657:15

**6**
**6**   526:5,9 672:12
**600**   498:11
**6000020**   608:4
**603**   498:12
**611**   498:14,16
**626**   498:18
**63**   603:21
**64**   562:12
**644**   498:20
**646**   506:16
**667**   497:7
**678**   497:8
**682**   682:8
**69**   596:4 620:20
**691**   658:18

**7**
**7**   683:3
**7-16-87**   497:25
498:10 571:15
572:18,19
**70**   621:22,23
622:22 623:16
**703**   647:4 648:21
674:9,17
**70s**   530:11 635:22
**72**   621:22 622:11
623:7 624:2
**75**   494:20 499:10
595:10
**75,892,366.08**
594:22
**750**   604:23 605:10
605:11

**78,544,284.62**
597:16
**785**   578:17

**8**
**8-28-03**   622:19
**8-31-0**   566:14
**8-31-01**   498:6
568:4,7
**80s**   510:4 530:11
530:20 590:25
**81**   668:23
**83**   603:24
**85**   618:16
**869**   597:21,22
599:8
**87**   527:16 528:6
551:20,21,21
553:20 556:19,22
557:15 575:9,12
**89**   497:14 502:20
**8:43**   494:22 499:8
**8th**   648:16 656:13

**9**
**9,000**   622:3
**90**   497:16 504:22
504:25 638:14
641:11 669:9
**908**   495:8
**90s**   512:8 563:22
669:9
**91**   497:18 505:14
505:17
**914**   496:16
**92**   564:7 579:22
638:8
**935-6857**   496:16
**950**   549:20,24
550:1
**954**   549:21 550:10
550:11,18

**[958 - amanda]**                                           Page 3

**958**  552:1
**959**  555:10
**960**  525:5
**99**  509:13
**9993115**  557:24
**9th**  494:21 499:7
  582:6 670:13
  681:20

**a**

**a.m.**  494:22
**abbreviated**  568:3
  568:6
**ability**  518:11
  534:4 567:13
**able**  510:5 512:14
  518:12 525:18,19
  541:12,13 546:12
  546:17 554:25
  590:20 632:4
  677:6
**absurdity**  634:25
**abuse**  642:6
**account**  502:4
  508:24,25 509:5
  510:3 518:3,23
  519:8 523:12,13
  526:19 534:9
  537:10,19 540:23
  540:23,24,25
  541:13,14,15,16
  541:17,19,22
  542:3 543:13,15
  545:2,6,7,10,15
  546:13 547:3,12
  547:15,22 548:21
  554:7,17,22
  557:23 560:17,18
  568:23 570:3,8,19
  573:7,13 578:13
  578:24 580:7
  583:24 584:4

**585:10** 587:10
  590:14 595:8,12
  596:17 597:3,10
  598:13 599:24
  600:3 601:17,20
  602:15,16,16
  603:4,5 607:23,24
  608:3 609:12
  617:22,22,23
  618:7 622:8 623:7
  623:10,13,24
  635:11 647:4,4,6
  648:22 657:13
  659:5 667:24
  673:8,17,19 674:8
  674:9,17 679:22
**accountant**  613:8
  613:17,20,22,23
  614:9,9
**accountants**  614:5
  618:8 669:25
  671:14
**accounts**  541:25
  554:9,12,14,18
  559:13 583:10,13
  583:19,21 584:7
  585:4 586:15
  590:16 599:3
  602:14 608:11
  613:7 614:12,16
  614:20,22,22,24
  618:24 621:2
  623:21 624:19
  625:3 657:11
  661:22 662:13
**accurate**  502:6,15
  564:8 629:1
  683:17
**acknowledge**
  654:6

**act**  536:17
**acted**  529:10
**acting**  590:13
  601:5
**action**  581:21,21
  643:17 647:12
**activities**  508:1,5
**activity**  497:25
  503:1 536:7,17
  538:8 542:17
  543:23,24 544:4
  544:25 545:20
  547:8 548:2,3,6
  551:4 561:7 595:8
  597:15 600:2
  614:15 679:3
**actual**  503:3
  505:11 511:24
  512:7 573:25
  574:10 598:12
  636:16 637:3,22
**adding**  598:18,19
**addition**  555:23
**additional**  681:10
  683:11
**adjust**  615:1
  619:23
**adjusted**  646:17
**adjusting**  615:14
  616:4
**admitted**  642:11
  642:11,20
**adt**  570:16
**advisory**  520:12
  672:16 673:4,16
  674:18
**afein**  496:10
**affect**  522:11
**ag**  568:17
**agency**  601:23
  682:15

**agent**  509:3 534:8
  592:2,12,22
  609:24 611:4,6
**aggregate**  527:25
  562:20
**aggregated**  527:9
**agitated**  677:14
**ago**  515:3
**agree**  499:5
  520:11,19 521:8
  524:23 538:9
  539:15 548:15
  552:16 557:2
  560:17 569:8
  600:23 606:9
  623:18 624:23
  628:4,11,25 641:2
  650:8,11,13
  658:13
**agreement**  523:20
  592:13 625:12,19
  634:16,25 660:6
**agrees**  628:22
**ags**  571:18
**ahead**  549:19
  551:25 572:6,7
  592:23 618:5,19
  650:3 672:7
**airlines**  542:9
**akratenstein**
  495:18
**alert**  574:19
**alive**  618:7
**allied**  545:6
**allow**  664:8
**allowed**  518:2
  664:2
**alter**  522:12
**aluminum**  542:24
**amanda**  496:4
  500:4 566:20

**[amanda - available]**                                                      Page 4

638:17 672:8
674:22 681:6
**amanda's** 674:4
**amc** 578:12
**america** 501:1,3,5
501:8 502:13,17
542:8 582:25
588:15 599:12,14
599:18,21 680:25
**american** 544:16
**amount** 504:7,8
526:3,9,21 527:1
538:3 560:22
606:1,17 647:2,9
**amounted** 631:23
**amounts** 522:20
522:21 528:1
561:1 625:1 656:7
659:2
**amr** 537:23
538:18 540:5
542:20 549:2
572:22 573:3,10
575:19,22,22
577:8,13
**analyze** 661:8
**analyzing** 661:18
**andrew** 495:13
499:24 652:19
678:21 681:17
**anger** 678:4
**angry** 638:23
639:2,4
**ann** 495:12
**annette** 568:10,10
568:13 575:17
614:14 617:9
662:12 668:17
670:24
**annette's** 560:11
670:23

**annual** 632:13
**answer** 500:23
548:7 551:23
553:3 556:15
583:23 584:15
585:5,7,11,19
587:2,4 609:14
610:2,18 630:22
635:2 639:12,20
664:7,14 665:11
669:10
**answered** 588:20
**answers** 579:7
682:6
**anybody** 522:1
643:19 644:9
670:20
**anyway** 644:14
**apart** 653:8,8
**apartment** 625:16
625:21
**apologize** 504:25
653:4
**apparently** 670:17
**appeal** 677:23,24
**appear** 509:7,7
527:2 549:25
552:21 569:22
597:4 607:4,5
652:23 678:8
**appearances**
495:1 496:1
677:13
**appeared** 502:4
602:13 613:11
**appears** 500:18
524:22,25 539:15
539:22 557:24
645:9,10,11 647:8
649:19

**applicant** 494:6
499:12,14
**approximately**
499:8
**april** 515:16
582:14,20 584:11
587:2
**arb** 571:20 590:25
**arbitrage** 515:25
617:22
**area** 511:12 617:6
**areas** 566:21
**arose** 595:8
**arrangement**
531:17 611:6
**arrangements**
532:5,6 588:24
**arrest** 625:15
**arrested** 676:13
**asha** 511:19
**aside** 558:1
**asked** 520:23
523:22,24 579:8
579:12 582:10
583:10 584:10
585:3 587:2 614:2
628:19 635:1
640:1,7 665:2,9,12
666:8 669:24
672:8 673:7
677:22 678:20
679:4
**asking** 546:19
577:18 585:9,18
593:25 604:18
616:8 624:21,23
629:24 630:17
631:9 634:1,6
636:9 637:11,19
639:11,14 664:9
666:15 668:22,23

668:24
**asks** 681:15
**aspect** 640:19
**assigned** 541:22
**assist** 683:9
**associates** 495:11
**assorted** 504:4
**assume** 559:3
560:11 568:12
585:17 604:21
612:13 621:18
635:25 637:6
647:3
**assuming** 574:6,6
595:7 598:9
604:14 607:21
613:12 620:3
624:15 627:9
653:11
**assured** 580:4,8
**atd** 570:3
**attach** 683:12
**attached** 595:14
**attention** 620:9
**attorney** 625:12
625:17
**attorney's** 625:6
625:14,23
**attorneys** 499:20
643:12,12,25
676:15
**august** 624:5
**authenticate**
579:21
**automated** 539:4
539:6 675:8
**automatic** 580:18
**automation** 539:2
676:4
**available** 530:6,10
567:20 674:11

676:5,14
**avenue** 495:6,15
**average** 534:13
657:24 658:1,16
661:11
**aware** 510:9,23
585:6 639:18
642:16
**ax** 642:10

**b**

**b** 495:13
**bach** 538:19
**bache** 538:22
544:17
**back** 504:17
515:15 528:12,19
529:4,14 530:2
534:2 541:8
548:10 552:10
556:22 573:2
577:6 579:23
582:3 587:20
589:4,6 601:10
602:2 612:16
615:12 619:10
628:7 631:24
632:5,20 633:5,8,9
635:21 636:21
639:13 670:10
677:9
**backdated** 614:19
**backdating** 614:22
614:22,24 615:17
615:20,23 616:2,3
**background** 512:2
**baker** 496:6 500:2
500:4
**bakerlaw.com**
496:10
**balance** 504:6
519:7 537:15,19

538:2,13 539:11
539:17,20 543:21
543:21,25 544:23
550:21,21 563:9
563:11 574:15,16
574:17 577:8
580:15 594:21,22
594:25 597:15
598:10,11,12
646:24 647:3
**balances** 597:8,13
**balancing** 563:5,8
574:14
**bank** 500:20,25
501:3,5,8 502:13
502:17 531:18
532:8,15 533:20
560:22 563:1,17
582:24,25,25
583:2,3,3,4 585:23
588:4,14 589:10
589:16 591:9,11
593:14,14,18
595:10 599:11,13
599:18,20 607:17
607:20,22,25
608:7 609:5,10,15
609:24 641:25
647:4 667:24
673:19 674:9
677:10 680:25
**bank's** 502:2
570:15 589:25
**bankers** 583:1
**bankruptcy** 494:1
499:17 644:6
**banks** 501:14
532:9 548:25
560:15,21 563:16
563:18,24 564:9
565:5,16 569:2

572:1,25 573:9
574:10 576:9,10
576:13,14,18
577:15 578:13
582:10 583:9,12
583:16,18 585:3
585:19 587:19,20
587:23 588:3,9,22
590:1 591:11
609:18 675:21
**barney** 557:8
**based** 539:7
595:11 609:2
615:2 643:21
**basement** 678:14
**basically** 518:11
521:7 529:13
667:7 673:12
**basing** 644:3
**basis** 501:7 504:14
508:22 514:5
566:21 598:16
646:4 664:14
669:23,23
**bates** 525:4 652:2
657:14
**bear** 529:6,14
530:15 532:7
591:12 672:24
**bearing** 500:19
**beats** 554:3
**began** 628:2,9
629:2 632:12
635:16 636:23
637:2,3,21,24
638:13
**begins** 582:4
636:22 670:11
**behalf** 494:17
495:3,11 496:3,12
499:23,25 500:3,5

500:6
**believe** 501:6
506:11 508:11,17
510:9 518:5
520:22 522:24
526:14 530:21
551:14 552:13
559:24 561:11
568:10 588:2
625:13 643:7
646:5 652:12
670:20 674:22
**bell** 588:16
**benchmark**
618:25
**benefit** 621:9
673:3
**bernard** 494:8,12
494:16 497:2
499:14,19 500:11
555:13 582:5
670:7,12 681:20
683:14
**bernie** 500:24
526:13 633:15
644:2 665:11
678:3,19
**best** 683:16
**better** 534:18
**beyond** 551:5
**big** 558:9
**bigger** 644:1
**bill** 526:25 532:13
565:1 566:23
**billion** 526:5,9
527:9,10,21 528:1
562:13 672:12
**bills** 525:15 672:9
672:13,18 673:10
673:20 674:13,14

**[bit - cash]**

**bit** 522:18 528:11
540:6 554:4
631:19 647:14
**blacked** 627:13
**blank** 650:4
**blm** 612:11,12
**blmis** 528:12,15
531:21,23 613:18
**blotter** 497:19
498:15,17 505:19
611:21
**blotters** 497:14
502:21 510:3
612:9,25
**board** 518:17
**bob** 496:20 499:6
**bond** 508:12,21
509:12,17 518:7,8
531:16 542:6,7,10
542:11 552:4,8
591:24 592:6,12
592:19,24,25
593:1,7,10,17,18
593:22,25 611:4
617:22 679:6,7,7
680:8
**bonds** 509:17,18
509:18 552:15
593:9,13 597:1
679:10,12,16,21
680:11,20,21
**bongiorno** 568:11
**bonuses** 655:14
**books** 575:3,7
599:3
**bore** 591:21
**borrow** 518:11
**borrowed** 631:24
**bottom** 565:4
568:20 569:1
572:23 573:1,10

**bought** 578:12 596:23
604:23 605:19,24
607:14 608:1
612:8,18 626:14
626:15 647:8
679:6 680:1,6,8
**bought** 504:7
505:4 526:20
533:6 549:4,4
551:11 574:18,25
575:11 589:7
601:24 602:11
671:19
**box** 614:12 619:10
619:14,23 620:8
676:24
**boy** 642:16
**brain** 584:3
**break** 519:19
564:14 574:16
579:3 581:23
584:5 617:4
**breathing** 648:25
**brief** 678:23
**briefcase** 653:22
**broadcom** 623:2
**broken** 563:11
**broker** 503:12,12
509:10,10 521:18
522:10 548:23
581:17 589:9
592:4 609:24
615:16
**brokerage** 506:6,9
506:17,20 521:16
522:3,4 523:7,10
526:22 529:10,13
531:18 532:5,13
533:7,16 538:23
549:7,13 588:22
590:1 591:12

**brokers** 504:2,4
581:14
**brook** 496:15
**brother** 542:23
**brother's** 547:17
547:18
**brothers** 550:23
551:8,8
**brought** 504:3
**brown** 587:10
**building** 678:14
**bunch** 680:3
**business** 503:7
512:18 516:19
517:14 520:11,13
520:19 523:23,23
532:19 536:1,4
542:14 553:24
590:11 602:8
628:2,9 629:1,2
631:6,12,20 632:5
635:19,24 636:12
636:23 637:2,4,13
637:15,22,25
638:4 639:18
640:6 646:7,10,14
655:17,23 660:3
661:12 672:16
674:24
**businesses** 552:12
**butner** 494:21
499:9,11 582:5
670:12
**buy** 514:6 516:13
516:14 518:1,2,15
533:15 562:12
589:13,17 591:17
591:19 592:18
602:20,20,24
615:5 672:15

**buying** 514:21
597:8 599:19,23
603:3
**buys** 504:2

**c**

**c** 682:1,1
**c&s** 580:2 670:18
675:19
**calculate** 660:9
**calculation** 658:13
659:13
**calculations** 658:8
660:11
**call** 504:5 580:10
580:15 589:14,16
620:12 645:19
**called** 509:8
645:15 656:1
**capability** 528:13
528:19 529:4
**capacity** 547:20
601:1,8
**capital** 516:7
**caption** 499:12
682:5
**care** 581:15,17
**carl** 613:20 614:3
614:4,11,18 616:8
**carolina** 494:21
499:11 582:5
670:12 682:2
**case** 499:13,16,18
524:10 635:4
642:13 644:3
648:16 682:11,13
682:14,17
**cash** 498:14,16
518:13 611:20
612:24 647:2,3
673:18 674:11
675:13,19 679:20

**categories** 508:4
**category** 647:22
**certain** 503:13
  512:6 514:13,20
  516:5 530:6
  532:13 533:2,3
  541:6 548:13
  588:25 593:11,13
  593:13 615:12
  629:15 642:17
  658:5 660:17
  661:8 669:12
**certainly** 524:9
  563:22 567:8
  609:1 617:18
  634:13,19 635:21
  641:4 652:25
  656:10 661:2,3
  666:20
**certify** 682:4,10
  683:15
**chairman** 534:10
  596:19
**chaitman** 495:4,5
  497:3,7 499:22,22
  500:15 501:2
  502:24 504:12,24
  505:16 507:1,4,9
  508:15 509:16
  512:1,4 513:4
  514:2 515:6,17,20
  516:8 517:2,5
  519:1,15 520:2
  524:21 525:22
  526:12,16 528:22
  529:17,22 530:22
  531:13 532:1,3
  536:12,15 544:9
  544:20 549:24
  550:10 558:10
  561:10,15,20,25

562:5,9,12,17,24
566:8,19 567:5,12
567:19,24 569:15
569:18 571:5,8
572:16,19 577:17
577:21 578:2,7,10
579:8,12 585:3
586:12 587:7
595:1,5 597:19,22
603:13,21 605:10
605:12 608:22,23
618:10 626:8,13
627:1,18,22
633:14 641:10
648:8 661:1 663:7
663:14 665:3
666:2,25 667:4
668:13 670:3,5,14
672:8 673:22,24
674:3 678:19
681:5,14,16
**chaitmanllp.com**
  495:9
**change** 530:3,5
  551:23 595:10
  616:23 639:8
  684:2,5,8,11,14,17
  684:20
**changed** 515:3
  617:21,24 634:17
  675:3 676:3
**changes** 683:4
**changing** 550:7
**characterization**
  630:12
**characterizations**
  629:15,24
**charge** 682:16
**charged** 667:23
**charles** 503:2
  643:24

**chase** 583:2
  588:11,12,13
  672:25
**checks** 646:18,19
  655:15,16,18,25
  656:3,9 660:24
  661:20
**chemical** 583:2
**chicago** 533:19,21
**chin** 677:14
**choose** 609:14
**chrysler** 568:17
**civil** 683:4
**claimed** 640:6
**claims** 636:5
**clarification**
  520:23
**clarified** 524:15
  528:7
**clarify** 507:2
  512:9 523:9 567:9
**class** 643:17
  647:12
**clear** 515:7 528:20
  532:9,9 533:2
  576:15 578:11
  588:25 593:11,15
  604:3 634:15
  639:6 655:1
**cleared** 529:18
  531:8 534:15
  549:5,6 591:7
  593:9 599:15,24
  607:21 610:23
  636:16 667:22
**clearer** 561:21
**clearing** 503:17,21
  504:10,14 505:20
  505:22 528:11,16
  528:20 529:6,10
  529:19 530:15,19

530:23,25 531:5
531:17,19,20,23
531:25 532:7
533:19 534:8,11
534:12 539:3
548:25 560:15,21
560:22 562:25
563:16,18,24
564:9 565:5,16
569:2 570:15
572:1,25 573:9
574:10 576:9,10
576:13,14,18
577:4,15 578:13
580:13,16 582:11
585:25 588:21,24
589:2 599:3 600:1
608:11 609:10,24
610:8,19 611:4
636:17 675:6
**clerk** 548:14
**client** 508:7 513:1
  554:21 581:9
  592:19 594:17
  599:19 602:16
  620:12
**client's** 526:19
**clients** 580:24,24
  581:3,4 584:5
  586:3 628:10
  629:5 631:10,22
  632:5,9,9,16
  634:21 646:19
  669:25 673:7
  674:10 679:18
**close** 654:12,15
  673:16
**closed** 619:25
**closer** 543:7
**closing** 598:11

**clue** 534:19 608:8
    649:1
**clvs** 496:20
**code** 507:18 601:1
    601:8
**collapse** 516:19
    517:15 631:21
**collateral** 679:22
**collier** 496:20
    499:6
**column** 506:15,20
    507:12 535:17
    536:16,19 537:2
    538:2 539:11,20
    543:25 544:23
    569:25 573:7
**columns** 536:11
    537:9 559:5
**combination**
    659:9
**come** 530:19
    540:19 617:8,11
    646:20 673:17
**coming** 590:14
    648:14 649:6
**commencing**
    494:22
**commercial**
    582:24
**commission**
    684:25
**commissions**
    667:13,15 668:2,3
**common** 513:6
    592:19 593:17
    615:1 634:22
**communications**
    552:4
**company** 503:2
    505:25 515:9
    542:25 582:25

**compensated**
    667:6
**compensation**
    657:9 661:14
**competitors**
    591:13
**complained** 677:1
    677:11,12
**complete** 506:19
    507:5 540:9
    549:18 571:6
**complicated**
    518:10
**comprehensive**
    556:7
**computer** 559:19
    675:11
**computers** 571:18
**conceal** 669:6
**concept** 513:14
    548:12
**concern** 648:11
**concerned** 636:13
**concluded** 681:25
**conclusions**
    629:16,17 630:18
**conducted** 501:9
    503:4
**conference** 625:23
**confessed** 626:22
**confidential**
    494:15 663:8
**confirm** 624:11
    650:17
**confirmation**
    498:11 580:12
    600:15 601:11
    615:2 622:11,15
    622:18 623:6
**confirmations**
    503:12,12,15,16

    560:1,6 579:9,13
    579:13,14 623:12
    623:24 635:12
    636:18 666:19
    675:13
**confused** 540:6
    601:25 602:1
**confusing** 523:14
    532:20 534:14
**confusion** 510:17
**conjunction**
    655:22
**connection** 621:23
    622:11
**consecutive** 652:2
**consider** 664:2
**consideration**
    516:5
**considerations**
    621:8
**considered** 521:14
    554:5,19
**considering**
    643:16 644:24
    655:14
**consistent** 671:3,9
**consistently**
    521:24
**constantly** 669:24
**contacted** 592:11
**contents** 497:1
    612:2
**context** 565:7
**continental** 550:15
    583:3
**continue** 499:4
    514:7 562:11
**continued** 498:1
**continues** 681:8
**continuing** 681:7

**continuous** 514:5
**contra** 533:6
    534:4
**contract** 682:12
**contracted** 579:23
**contradicts** 627:14
**conv** 571:18
**conversation**
    562:15
**conversations**
    499:4
**conversion** 591:24
    592:2,11,22 611:2
    611:6
**convert** 552:17
    591:24 592:21
    593:17,21 611:1
**convertible** 508:12
    508:21 509:12,18
    509:18 542:6,7,11
    571:20 590:24
    591:23 592:7,16
    600:24 605:14
    617:21 680:2
**copies** 549:25
    676:8
**copy** 505:1 558:9
    572:11,11 626:8
    652:7,17 668:10
    668:12
**copying** 651:1,2
    651:16
**corp** 530:23
    537:23 538:18
    539:2 540:5
    550:15 552:4
    557:17 572:22
    573:3,10 575:19
    575:22,22 577:8
    577:13 680:2,8

**[corporate - customers]**                                                                 Page 9

corporate  581:21
corporation  494:5
  499:14 503:17,21
  504:11,15 505:20
  505:22 530:19,25
  531:6,19 534:11
  534:12 580:16
correct  502:8,9,18
  505:10,23 507:19
  512:12,15 513:25
  516:12,17 517:9
  522:23,24 523:3
  525:21 527:4
  528:2,17 529:8,12
  529:16 530:8
  531:25 532:2,23
  535:3,4,6,7,11
  536:8 537:1,8,16
  537:18 538:1,6,20
  538:25 539:8
  542:15 543:9,11
  543:19 544:5
  547:24 550:24
  552:13,18 555:8
  555:15,24 557:19
  559:5,18,21
  560:16,24 561:3,9
  562:2 564:12
  565:6,14,18
  568:19 569:7
  570:14 571:19
  573:8,12 575:25
  577:5,10 578:21
  579:19 582:12
  584:14 591:5
  596:9 601:6
  607:15 610:20
  611:15 618:13
  619:1 621:16
  624:1 626:23
  629:25 647:11,21

654:23 657:16
  660:4 668:8
  672:14,17 673:1
  674:20 676:9
  682:9
correction  499:10
correctional
  494:20
corrections  683:9
  683:18
correctly  637:7
correspondence
  614:15
cost  669:23
counsel  495:1
  496:1 499:12
  682:14
counter  509:14,19
  509:21,25 513:8
counterparties
  551:17 556:4
  557:5,23 671:22
counterparty
  551:13,14 553:1,2
  557:1,20 563:2
  565:10 569:5,5
  570:23 572:4
  573:15,17 589:9
  610:12
county  555:10
  679:5,6,7 682:3
couple  520:8
  528:12 537:9
  565:20 596:10
  599:8 605:23
  613:7 626:24
  632:20 635:6
  645:5 654:15
  665:5 667:2
course  503:7
  514:15 517:22

524:1 536:1,3
  580:22 615:19
  640:13 646:7,13
  665:24 681:16,16
court  494:1
  499:17 500:8
  522:15 677:13
cover  657:8,13
  682:16
covered  515:14
  516:25 566:23
  620:1
covers  588:8
credit  595:23
credits  595:18
crime  669:7,9
  676:20
crisis  649:6
cross  566:25 567:3
  567:23 681:14
crupi  645:22
cure  674:4
current  537:17
  598:5,15
cusip  527:1
custodial  583:10
  583:13,18 584:7
  585:4,10,19
  675:22
custodied  563:19
custody  679:13,13
customary  682:17
customer  497:22
  506:7 509:5
  512:19,20 514:12
  514:13 515:2,7,12
  515:22 516:3,21
  517:8,12 518:1,22
  518:23 522:20
  523:1,4,11,25
  524:2,23 525:3,7

525:12 526:2
  527:8,11 533:12
  534:6 540:17,18
  540:19 554:9,11
  554:14 559:10,13
  560:1,5,6,14,18,19
  561:4,6,22 562:19
  562:21 568:20,23
  569:9 570:5,8,11
  581:9,14,15
  585:10,22 590:25
  594:16 596:23
  597:7,7 598:9,24
  600:4,15 601:12
  601:20,24 603:4
  605:19 609:12
  615:6,8,18 622:12
  622:21 624:7
  640:8 648:2,6
  669:22 671:6,11
  671:12 672:19
  673:16
customer's  508:24
  517:11 518:11
  674:8
customers  494:17
  495:3 497:13
  517:18,21 519:13
  521:4 533:25
  534:9 571:22
  573:3 580:24
  583:11,14,20,22
  584:1,8 585:5,14
  585:20 586:19,25
  599:23 603:18
  604:10 613:18
  614:19 616:9
  632:13 635:11
  669:23,23 672:2
  673:4 674:19

**cycles** 675:6

**d**

**daily** 497:24
504:14 508:21
536:6 543:23
544:25 646:4
679:3
**daimler** 568:17
**dasaro** 496:5
500:2,2 566:2
581:24 603:11
**dash** 537:25 543:4
543:8,10 555:13
623:22,25 657:23
**data** 567:10,11,19
**date** 499:7 506:3
509:23 519:10
527:1,16 528:6
530:23 531:5
535:22 538:8
539:5 540:3
543:24 545:17,19
545:24 558:12
566:12 572:16
577:13 578:18
600:16,19 603:22
606:6,25 607:3
615:2,12 616:4
622:1,14,17,24
624:2 626:14
645:11 646:23
647:10
**dated** 524:25
608:14,15 647:23
**dates** 621:8 622:23
624:17,24 633:22
633:24 636:12
652:10,13 654:15
680:17
**david** 543:8
640:20

**davis** 495:4 499:22
**day** 494:21 503:15
504:6 515:15,19
516:23,25 531:23
539:23 543:17
544:4 548:4
566:22,24 567:3
567:13,15,25
587:24 608:20
615:9 640:21
653:16 656:13
662:24 663:19,20
663:20 682:18
684:24
**days** 528:12
608:20 626:22
653:7
**deal** 532:14
**dealing** 532:18
533:7,9,18
**deals** 661:19
**deb** 571:18
**debenture** 680:3
**debit** 519:7 594:22
594:24 595:5,23
**debits** 595:18
**debtor** 494:13
**debts** 517:21
**decades** 529:25
**december** 506:3
506:22 507:24
524:25 525:8
527:8,13 558:16
561:5,6,12,18,22
624:3 625:24
648:16 656:13
659:21 660:15
**decide** 665:1
**decision** 510:25
511:1,2,3 615:11
655:21

**decisions** 511:15
616:24
**deducted** 667:22
668:4
**deem** 621:7
**defendant** 494:9
499:15
**defendants** 499:23
500:1
**define** 520:8
521:12
**defined** 520:25
552:10
**definitely** 632:18
**definition** 518:22
523:16
**deliver** 522:5
528:13 529:5,15
534:7 589:9
**delivered** 595:13
676:24
**deliveries** 595:11
**delivering** 530:3
611:3
**delivery** 589:5
**demand** 516:21
517:8
**demonstrate**
676:19 677:4
**denise** 494:18
500:9 682:22
**department**
511:14,15 540:10
560:12 580:10,11
602:24 646:21
675:16
**depended** 675:5
**dependent** 593:9
**depending** 532:11
533:7 549:3
554:18 580:13

589:14 590:17
591:10 592:17
593:15 595:16
617:9,19,20
619:25 634:10
667:24 676:3
**depends** 503:10
509:2,17 510:15
518:6 521:11
526:7 531:15,17
532:4,18 533:5,8
533:16,22 534:3
575:11 580:17
581:6 585:11
589:10,23 590:12
591:8 602:10
609:13,15,24,25
610:1 615:24
616:21 618:6
667:20 676:2
**deponent** 496:12
**deposition** 494:16
499:9 516:23
517:1 582:4
584:11,12 651:24
662:17,22 663:3
663:15 666:1
670:7,11 681:7,20
681:23,24 682:5
682:16 683:5,6,15
683:16
**depositions** 567:14
**depositories** 530:6
530:10
**depository** 505:25
525:20 526:21
531:6,10 576:15
**deposits** 648:2
**describe** 679:17
**described** 671:10
672:21

CONFIDENTIAL

**[describing - earlier]**                                                                         Page 11

**describing** 680:22
**description** 600:22
  606:13
**desire** 683:5
**desires** 669:2
**details** 591:22
**determined**
  661:21
**development**
  632:4
**died** 614:5,9
**difference** 522:8
  531:9 532:25
  586:14 596:14
**different** 508:16
  510:22 521:17
  524:19 527:18
  533:14,15,19
  545:22 547:2
  548:1 549:3
  554:15 557:23
  562:14 576:13,14
  585:7,8 586:13
  587:4 590:16
  597:13,14 598:1,8
  604:22 605:23
  608:10 623:10,12
  623:13 624:17,18
  624:19,24 625:1,3
  660:17 668:20
  675:10 680:16,17
**difficult** 534:22
**dipascali** 575:13
**direct** 589:25
  590:2
**directed** 617:14
**directing** 664:13
**direction** 618:3,11
  621:12 665:1
  682:7

**directly** 536:19
**disc** 670:7,11
**disclose** 664:19
**disclosed** 516:9
**discretion** 621:16
**discs** 681:21
**discuss** 663:23
  666:5,7
**discussed** 528:11
  608:12 663:4,25
  666:7
**discussing** 637:11
  637:13,15
**discussion** 571:2
  594:13 615:10
  681:6
**discussions** 617:1
  664:3,12,12,16
**dispute** 615:18
**distribution** 568:9
**district** 494:1
  499:17
**divided** 658:10,20
  659:23
**dividend** 581:20
**doctor** 653:1
**document** 498:19
  500:17 502:25
  505:18 506:2,4,9
  506:18 509:25
  525:4 530:21
  535:2,19,21 547:4
  547:9,10 549:9,14
  549:20 558:1
  559:1 569:12,19
  572:17 577:18
  594:8 596:11
  599:17 600:1,12
  600:14 604:3
  618:16 627:3,10
  627:16,19,24

**632:20 641:17**
  645:4 647:23
  648:1,19 649:9,20
  651:9,21 652:16
  652:21,22,23
  653:1,6,20,20,23
  653:25 654:1,10
  656:7 679:1
**documentation**
  503:7
**documents** 511:10
  534:24 541:9,10
  549:11 567:6,10
  603:15 611:9
  612:1,2 621:21
  651:23 664:10
  665:7,13,14,17,19
  665:23 666:10,17
  666:18 668:23,24
  669:3,4,12,16,18
  669:20,22 671:24
  675:1 676:16
  678:6,7,8,11 681:9
  681:10,14
**doing** 508:12
  512:14 532:12
  553:17 554:2
  555:5,6,23 556:2,3
  556:17 573:24
  591:14,15,22
  592:7,16 598:19
  615:8 617:23
  619:22 642:20
  644:13 647:13
**dollar** 504:8 520:2
**dollars** 515:9,12
  527:10
**double** 651:22,25
  652:5 653:3,5
**doubt** 510:4

**dozen** 628:10
  629:5
**draw** 658:24,24
  659:2,4,5,7,8,9,11
  659:11,15,18,18
  659:19,20
**drawer** 655:19
  656:1,3
**draws** 661:5
**drew** 659:5
**drink** 519:22
  644:23
**dropped** 619:6
**dtc** 505:24 525:18
  526:22 527:3
  530:5,17 531:2,9
  531:19 532:22
  533:1,2 539:9,12
  539:17,25 548:16
  548:19,19 550:22
  551:3,5 557:24
  564:3 575:22
  576:4,4,6,8,23
  577:2,2,9 578:19
  584:1 586:4 590:3
  675:7
**dtcc** 636:16
**dubinsky** 521:23
  534:18 592:9
  601:25 615:22
  643:4 649:1
**dubinsky's** 641:21
**due** 527:1 565:1
  621:8 641:11
  655:24
**duly** 500:12

---

**e**

**e** 496:4 682:1,1
  683:1,1,1,3
**earlier** 548:9
  573:20 575:24

CONFIDENTIAL

579:8 588:3
609:19 618:23
625:5 638:6
662:25
**early** 559:2 634:14
647:16
**earnest** 635:16
**easier** 566:18
**easy** 669:9
**ebay** 619:6
**economic** 516:19
**eight** 576:14
678:13
**eighteen** 611:16
**either** 534:19
580:12 592:21
615:7 622:20,22
647:17 659:4
665:13 670:23
674:9,25 679:18
679:21
**eliminate** 534:2
**eliminated** 503:13
**else's** 547:13
630:18
**embarrassed**
640:1
**embarrassing**
642:21
**emery** 495:14
499:25
**employee** 670:24
**employees** 657:10
657:11,11 659:3
661:4,16
**encompass** 608:19
**encompassing**
552:11
**ends** 555:10
611:14

**engage** 637:2,4,24
**engaged** 637:22
**engaging** 635:16
**english** 636:3
**entailed** 633:10,17
**enter** 516:24
**entered** 683:6
**entire** 517:14
631:10,22 637:4
637:25 638:4
**entities** 589:1,3
**entitled** 568:3
581:20,20
**entity** 576:23
591:9 607:16
**entries** 565:15
607:24 608:6
**entry** 542:8
557:16 560:14
565:4 569:1
570:15 573:9
**eom** 671:6
**equal** 561:1
563:13 658:8
**equals** 601:8
658:16,20
**equivalent** 526:21
**errata** 683:12
**error** 574:20
615:3,7,8,14
**esq** 495:4,13 496:4
496:5,13
**essence** 512:20
**essentially** 633:20
**event** 620:2,5
**eventually** 589:6
591:25
**everybody** 505:2
510:22
**evidence** 669:6
682:9

**evidencing** 503:8
**exactly** 504:17
509:6 531:4
676:24
**examination** 497:2
500:14 520:4
567:3,23 579:4
582:7 667:3
678:24
**examine** 566:25
681:14
**examined** 500:12
**example** 501:16
504:3 532:12,16
533:16,18 534:6
541:21 544:13,15
545:5 549:13
574:24 586:2
588:4 598:20
627:10 634:20
650:24
**exception** 683:17
**excerpts** 566:3
**exchange** 509:20
513:9 592:15,23
592:25 593:18,21
611:4 668:2
**exchanging**
675:12
**excuse** 501:2
561:13 569:17
638:25
**executed** 507:22
667:21
**exempt** 593:4
**exemptions** 516:6
**exercise** 524:11
655:9 660:23
**exhibit** 497:14,16
497:18,22,24
498:3,5,7,9,11,12

498:14,16,18,20
500:18 501:17
502:12,20 504:22
504:25 505:14,17
524:16,20 527:6
535:12 558:4,8
566:10 569:13,16
571:4 577:7,21,22
578:3,7 594:3,15
595:3 600:9,11,13
603:6 606:9,10,17
606:18,19 607:5,6
607:12 610:4
611:11,24 612:5
612:16 618:16
620:20 621:23
622:11,22 623:7
623:16 624:2
626:5,11 644:25
645:4 668:10,14
670:15 671:5,24
679:2,23
**exhibits** 497:12
498:1 571:6
621:22,22
**exist** 504:2
**existed** 530:25
678:11
**existence** 513:15
523:10 530:18,19
531:19
**existing** 517:12
**expand** 518:15
**expansion** 635:17
635:24
**expect** 639:20
**expenses** 667:14
**experience** 512:18
**expert** 521:21
642:2,24 643:2,21

expired 673:14
expires 684:25
explain 513:4
523:22 524:5
544:19 552:24
601:18 639:21
explained 615:23
636:11
explaining 574:14
express 544:16

**f**

f 682:1
face 616:3,5 643:1
facilities 588:21
588:21
facility 499:10
533:20
fact 507:10 512:21
513:10,17 514:19
516:8 523:12,19
524:4 525:24
533:2 542:6
562:21 566:23
567:5 573:23,23
588:25 592:23
620:2,3 636:2
637:13 639:8,16
641:11 653:2
655:18 657:7
673:9 677:22
fair 511:6 513:22
516:10 518:21
668:7 673:15
675:23
fairlawn 496:14
fake 521:9,25
522:16
false 641:24
falsely 632:12,16
632:17

familiar 534:13
535:19 588:10
599:2 609:17
666:13,14 675:18
family 616:16
617:6,7 618:8
628:10 629:6
632:9 661:15
far 548:12 557:7
636:12 669:21
fargo 505:5
father 618:7
631:25 632:3
fbi 640:22
federal 494:19
499:10 518:1,17
683:3
fee 609:25
feel 534:18
feeling 663:6
fein 496:4 497:4,6
500:4,4 502:22
503:9 506:24
507:3 508:14
509:15 511:25
513:2 514:1,22
515:14,18 516:22
518:24 519:17,21
520:5 524:18,22
526:1,15,24
528:25 529:3,18
530:1 531:14,21
535:15 536:14,16
550:2,6,11,14
553:23 554:1
556:16 558:6,11
561:13,16 562:2,6
562:11,15,18,25
563:7 564:17,20
564:25 565:19,25
566:3,6,9,15,17

567:1,9,15,22
568:1,2 569:11
570:25 571:3,7,9
571:11 572:14,20
572:22 576:2
577:19,22,25
578:6,9,11 579:2
582:8 584:18,20
584:23,25 585:2
587:12,16,18
594:2,7,12,14
595:3,6,9,20,25
596:2,3,21 597:21
597:23 600:7,11
601:9,12 603:8,14
603:23 604:2
605:11,13 611:8
611:15,17,19
613:3,6 616:12,15
618:18,20 621:15
621:20 622:7
626:7,10 627:15
627:21,23 628:6,8
628:14,19,24
630:1,3,6,15,20,24
631:3,16,18 634:1
634:6 635:9
638:20,22 640:10
641:8,13 644:15
644:18 645:3
648:15 651:18
652:1,4,12,25
655:5 661:6,10
663:13 664:13,20
664:23 665:2,16
665:22,25 666:22
668:12 673:21
674:1 679:1
681:12
felt 617:8 619:20
620:6 631:23

641:18
fiasco 640:18
643:11
fictitious 643:15
644:5
fidelity 526:23
575:2 672:23,24
figure 519:6
534:20,21 556:7
564:24 597:14
598:18 646:24
657:2 658:11
figures 597:25
files 652:7
filler 565:8 572:3
573:15,17 574:5
financial 513:11
514:25 517:15
527:3 580:25
648:5
financially 677:5
682:10
find 509:22 510:5
516:20 525:18,19
525:25 541:13
545:13 546:12
554:25 606:20
619:4 657:18
663:11 677:17
fine 519:20,24
535:1 564:16
608:25 610:3
629:23 630:17
finished 569:11
firm 501:4,6,10,18
503:4 504:13
505:9 506:17,21
506:22 507:8
508:1,19 509:2,10
510:2,7,15 511:2
515:21 516:2

**[firm - general]**                                                                 Page 14

521:17 522:4,4
523:3,7,10 525:21
526:22 528:2,16
528:18,20 529:3,6
529:9,10,13,19,19
531:18,23,25
532:19,20 533:7
533:17,19,20
538:23 540:4
541:21 543:2,5
544:2 546:16
548:3,13 549:2,7
549:13,15 552:12
554:19 556:2
577:4 580:18
583:24 585:21
586:16 588:24
589:21 590:15,18
591:20 603:15
610:8,19 614:25
615:4,4 636:17
641:24 642:1
644:1 646:6 648:5
648:11,12,12
649:2,4 655:16,22
658:5 659:1,7,25
660:6,9,13,25
661:9,10,11 667:6
675:15 676:15
679:9,16 681:1
**firm's** 508:25,25
510:23 539:17
545:6,15 547:22
554:6 574:25
602:14 679:13
**firms** 506:6,9
507:17 528:11
529:10 530:15
531:20 532:5,6,7
532:14 533:16
582:17 583:6

588:22 590:1
591:12 669:19
671:19 675:4,8,11
676:5
**first** 500:12
506:15 515:15
536:14,16 537:22
568:14 570:2
571:17 577:8
587:8 595:3
602:12 606:10
608:3 621:1
622:15 625:13
626:14,15 628:1,8
628:16,17,19,22
628:25 633:9
635:10 636:23
637:1,19,21 645:5
645:6,9 646:23
649:8,9 650:24
651:6 655:2 656:7
657:23 671:4
676:13
**five** 502:21 512:21
520:16,18 536:6
540:24 542:9,14
548:1,5 552:11
553:23 576:12
578:3,8,20 590:11
659:11 679:3
**flip** 650:3
**floor** 668:1
**flowed** 600:2
**flowing** 595:17
**flows** 598:12
602:21
**focus** 515:11
660:10
**focusing** 524:12
**follow** 596:8 649:8

**followed** 620:14
**following** 631:21
683:18
**follows** 500:13
**fool** 644:10
**foregoing** 682:4,8
683:15
**form** 511:25
525:22 528:22
529:17,22 532:1
534:16 544:9
556:10 561:25
563:4 576:1 587:5
596:19 613:1
616:14 618:4
619:17 621:14,17
639:3 645:10,13
646:16 648:8
661:1 683:4,10
**format** 594:19
**forms** 554:21
**forth** 534:2 590:3
655:25
**forthright** 634:15
639:7
**fortune** 515:9
**forty** 660:2
**forward** 551:25
594:21 646:24
649:18
**found** 510:11
651:10,23 653:2,5
653:20,23
**founder** 534:12
**four** 542:9,25
549:21 552:1
560:25 632:19,21
633:4
**fourth** 680:7
**frame** 527:20
530:13 555:6

575:4 623:13
676:2
**frank** 575:13
**frankly** 635:5
675:17
**fraud** 564:5
628:13 631:7,12
633:10,17 635:16
635:22 637:4,24
638:13 642:11,12
644:4,5
**fraudulent** 635:18
635:25 636:4,6,8
**free** 617:8
**friendly** 617:7
**friends** 628:11
629:6 632:10
**front** 520:9
**fulfilled** 502:7
**full** 566:2 627:16
678:2
**fully** 566:24
**functions** 582:11
**funds** 633:11,11
633:18,18 648:21
**furnish** 683:11
**further** 519:15
582:7 667:3
678:20,24 681:8
682:9
**future** 506:25
671:2

| g |
| --- |

**ga** 521:21
**gain** 619:24
**gains** 619:24
**gao** 641:19,19,20
641:23
**general** 504:1
523:23 528:24
532:17,19 549:8

563:22 649:20
663:5 669:14
672:2 676:1
**generally**  505:22
604:18
**generated**  501:4,4
501:6,18,23 505:9
508:19 559:16,22
559:25 560:2,3
668:7
**george**  601:13
605:20 606:11,18
**getting**  534:25
642:3
**give**  504:8 529:25
541:19 589:8
593:2,23,24 648:1
648:4,7,9 677:15
**given**  664:18
670:2 682:9 683:7
**gives**  615:5
**giving**  588:9
**glad**  528:7
**global**  516:19
544:2 548:11
590:22
**gmail.com**  496:17
**go**  499:5 523:19
535:16 537:9
538:17 539:12
541:8 544:15
551:25 564:24
565:19,24 572:13
577:6 587:20
591:18,25 592:4,4
592:23 602:20
607:11 612:16
618:4,19 620:8,9
631:17 632:20
633:5 635:21
639:12 644:23

649:18 656:4
664:4 665:1 672:7
676:11,19 679:19
**goddamn**  678:6
**goes**  603:1
**going**  502:19
504:24 522:19
524:11,18 528:25
535:8 538:7 548:3
558:7 562:11
564:7,13,15
565:21,25 567:11
571:3 577:6
581:25 592:21
593:18 603:8,9
604:22 610:25
611:1,9 613:6
616:13 619:24
620:9 626:4,4,24
627:11 628:12
629:12,23 630:3
635:6 648:24
655:9,17,23 660:3
660:24 663:24,25
664:7 665:9 670:8
677:2,2,3,24
678:21 679:23
681:17
**goldman**  496:13
497:5 500:6,6,23
519:22,25 520:3
532:8,16 553:21
553:25 557:18
566:12,16 579:5
581:22 584:17,19
602:21,24 603:1
628:7,12,18
629:12 630:2,5,9
630:16,22 631:2
631:13,17 633:21
633:24 634:4,8

635:8 638:17,21
641:6 644:16,21
652:15 662:21
663:4,10 664:6,24
665:11
**good**  500:16 520:6
520:7 579:2
617:12 627:4
638:15 640:16
674:4
**great**  509:20
**grew**  659:25
**grind**  642:10
**guaranteeing**
504:10
**guess**  521:22
555:25 585:6
610:21 618:1
665:5,14 677:12
**guilford**  682:3
**gun**  639:23
**guys**  663:23

**h**

**h**  511:20 683:1
**half**  526:5,9 647:8
671:4
**hand**  507:12
526:10 559:13
570:9 573:6
600:12
**handing**  524:19
**handle**  608:11
611:2,3 614:14
648:13
**handled**  575:9,10
575:15 580:1,9,9
599:3 614:7
**handling**  524:10
575:14 590:17
**handwriting**
558:22 612:14,22

645:24 649:11,13
649:19,20 650:1,5
650:6,8,11,13,18
652:18 653:13
654:5,7,9 655:7
668:14,21 671:25
**handwritten**
612:8,21 645:10
649:7 654:2,3,20
655:3 656:11
**hang**  618:17
663:25
**hanover**  583:1
**happen**  565:13
620:13 648:10,25
670:1 678:18
**happened**  615:22
616:24 619:16
620:5,17,18 639:9
639:12,14 651:22
**happening**  636:12
**happens**  503:23
**harvester**  605:3,8
**hchaitman**  495:9
**he'll**  630:22
**head**  656:21
662:15
**headings**  535:17
569:25
**health**  648:5 681:8
**heard**  629:14
**held**  499:9,16
525:15,16,20
526:20 528:2
531:10,14 532:22
535:6 543:22
544:24 546:6,23
546:24 548:16,18
548:19,19,23,24
548:24 550:25
551:5 556:5 557:3

**[held - information]**                                                     Page 16

563:3 575:22
576:4,25 577:2,3,8
577:15 578:19
669:4,22 672:9
675:24 680:25
**helen** 495:4
499:22 515:14
586:12
**hell** 677:25
**hello** 617:11
**help** 534:24 555:1
564:23,24 639:19
**helped** 531:13
**helps** 582:16
**high** 637:16
**highway** 494:20
499:11
**hlds** 621:24
**hold** 533:1,3 553:6
576:5 643:8
668:15 669:12,18
671:4,6,16 672:5
**holder** 533:11
564:10 565:8
569:4 570:22
**holders** 529:21
**holding** 539:16,17
539:25 551:9
568:6 576:17
619:6,8 633:11,18
671:11
**holdings** 569:9
**home** 662:8
**honest** 643:10,15
**honor** 514:8
522:12
**hope** 534:14
678:22
**hoping** 619:9,13
**hostetler** 496:6
500:3,4

**hour** 663:22
**hours** 665:6
**house** 497:24
498:3,7,9,12
502:21 518:14,15
518:16 520:11,16
520:18 536:6
540:24 542:14
548:1,5 549:6
552:11 553:23
558:19 559:17,20
569:19 571:14
578:3,8,9,10,20,25
580:13 590:10
603:17,25 604:1,4
604:19 672:19
679:3
**huh** 500:21 527:7
535:18 537:13,24
538:12 539:24
543:3 552:2,23
555:12 557:11,25
558:14 559:11
565:3,11 568:8
569:24 570:18
571:24 572:24
575:21 577:11
582:15,22 590:6
594:20 596:6,15
597:17 598:23
600:21 604:25
605:7,15 606:5,7
606:15 608:5
609:6 611:22
612:4,17 619:11
620:21 622:13
623:11 624:4,6
628:4 636:25
650:12,21 656:15
658:17 659:23
660:14 661:6

662:19 680:13

**i**

**i.e.** 635:18,24
636:4
**ia** 520:11 553:22
559:10 560:5
569:8 571:22
573:3,7 600:4
603:17 604:10
646:10
**ibm** 512:21
**idea** 592:16
609:14 627:7
643:11 675:18
**identification**
504:23 505:15
524:17 535:13
558:5 566:11
569:14 600:10
603:7 611:12
626:12 645:1
**identified** 500:17
507:18 542:2
614:19
**identify** 499:20
505:2 546:4,5,18
548:8 583:25
586:1
**identifying** 540:15
**ignored** 642:2
**ike** 677:7,8
**illegal** 512:19,24
513:5,20 516:16
615:20 616:5
**illegible** 558:23
**illegitimate** 521:25
**illinois** 583:3
**imagine** 632:25
678:4
**immediate** 674:11

**immediately**
669:19
**important** 642:18
**impossible** 627:6
**impression** 677:19
**impressions** 664:5
664:16,17
**improper** 512:24
513:20 514:16,18
514:23
**inadmissible**
627:4
**inappropriate**
630:19
**include** 587:21,22
**included** 625:19
**includes** 582:24
**including** 661:14
**incorporated**
501:21
**index** 497:12
498:1
**indicate** 514:12
**indicated** 505:6
581:10,14 622:14
622:17
**indication** 506:8
648:20
**individual** 525:12
527:25 541:24
626:25
**individually**
678:10
**industry** 510:7,18
522:1 534:1 539:2
640:14,17,19
669:17
**information**
501:20 504:13
527:2 541:20
601:13 648:2,4

662:12 664:19,20
669:25 671:13,13
**infuriated** 640:20
**initially** 552:10
637:2,22
**insist** 519:12
**insisted** 677:14,14
**institution** 494:20
587:10 674:24
675:25
**instruct** 511:7
664:7 677:15
**instruction** 664:18
**instructions** 516:6
589:8 620:15
670:17,20 671:1
679:19
**instrument** 589:15
**instruments**
673:12
**insult** 642:23
**intelligence**
642:23
**intention** 673:2
**interaction** 670:22
**interchangeably**
520:17
**interest** 634:22
667:23
**interested** 682:11
**interface** 580:18
**interfaces** 589:25
590:2 675:8,9,10
676:4
**internal** 580:7
589:20 590:18
**international**
605:2,8
**internet** 676:7
**interpretation**
587:12 636:1,5

**interpretations**
639:5
**interpreting**
587:15 637:7,23
**inventory** 508:8
509:5 535:9 540:5
540:20 541:1,1,5,9
541:11,14 548:21
554:13,14 590:14
593:24 594:1
602:13
**invested** 672:15
**investigation**
626:15
**investment** 494:8
499:15 520:12
540:22,23 541:16
541:17,19 542:3
543:15 545:6,15
546:13 547:3,12
547:15,22 550:15
554:6,17,18,22
602:14,16 631:10
631:22 672:16
673:3,16 674:18
**investor** 494:4
499:13
**investors** 633:11
633:12,18,19
**involve** 671:18
**involved** 510:24
511:13 515:5
518:9 533:12
595:18 634:3
654:21 676:2,20
**irving** 582:25
**issue** 529:20
566:23 631:20
651:15,16
**items** 671:6

**iv** 494:17 681:21

| **j** |
| --- |

**j** 621:24
**jail** 676:25
**january** 500:18
502:12 621:3
622:2,25 624:8
**jodi** 645:22 646:2
653:11,13 654:17
656:19 668:17
**jodi's** 652:18
653:21 654:10,21
655:2
**joel** 540:15 543:1
544:14
**john** 585:25
**jones** 585:25
587:10
**journal** 554:16
**jp** 588:13
**jpmorgan** 583:3
589:16 647:6
672:25
**judge** 644:6
677:12
**july** 535:23 536:9
539:6 540:3
545:19 556:19
577:9,14 679:4

| **k** |
| --- |

**k** 494:18 682:22
**keep** 510:8 538:7
539:3 552:25
564:15 620:4
646:21 653:14
673:3,13
**keeping** 589:18
**kept** 535:3 541:9
548:13 645:25
646:1,4,6,10,13

673:10 674:10
**kind** 507:25
600:13 601:19
639:1 645:25
**knew** 554:24
635:2,2 639:25
640:11,11 648:20
655:16 656:8
666:14 678:14
**know** 501:12,12
501:13,20 502:3
503:14 504:16
508:7 509:6
511:18,22 513:12
518:3,3,8 520:9
521:12 522:17
523:5,14,20 524:6
524:10,15 529:23
530:24 531:4
532:20 533:25
534:1,11 536:22
537:4,5 538:21
540:7,8,25 541:14
544:12,17,19,19
545:5,7,12 546:2,3
546:3,9,9,10,13,20
548:6,7 549:8,12
549:14,15 550:2
554:3,20,23,23
555:3 556:13
557:12,14 560:2,2
560:9 563:17,19
563:21 564:13,20
565:23 566:17
572:9 574:20
575:1,10,10,15,15
575:17 576:13,16
576:23 579:7,10
580:13 584:2
585:20,20 586:12
588:5,17 589:7

**[know - listed]**                                                           Page 18

590:15,19,20
591:13 592:3,6,20
592:20 593:3,5,19
593:23 594:24
595:18 597:11,11
598:21 599:19
602:9,12,21,22
604:18 605:22
608:6,12,25
609:13,16,16,22
609:23 610:2,16
610:17 612:14,21
612:24 613:4,12
615:21,24 616:20
616:21,21,22
617:15,17 620:3,6
624:12 627:6
629:13,14 630:7
633:24 634:13
635:2,2 636:13
638:12,13,14
639:23,25 640:3,6
640:6,8,14,14,15
640:23 641:6,17
641:18,24 642:1,2
642:3,5,10,11,12
642:17,24,25,25
643:9,10,12,16,18
643:22,24 644:4,7
644:10,12 645:16
645:16,25 646:17
648:13,24 650:19
650:20 652:21,25
653:4 654:17
655:21 656:16,21
657:8,12 658:2
659:17,18,25
661:2,3,7,13,15
662:8 663:5
665:18,19,21
666:19,19 668:17

669:14 670:1,19
673:6,11 675:1,3
675:11,20 676:1
676:11,14,25
677:10,15,18,21
677:21 678:2,10
678:11,11,15,17
678:18,19 681:10
**knowledge** 683:16
**known** 643:25
**knows** 640:4 644:7
**koenigsberg** 613:8
613:15,17 614:8
614:10
**kratenstein**
495:13 497:8
499:24,24 502:23
507:10 520:22
535:14 549:22,25
550:4,8,12 556:10
563:4 564:18
565:23 566:5,7
569:17 572:12,15
572:18,21 576:1
578:5 581:23
582:10 584:21,24
585:1 587:5,14
594:5,11 595:21
596:1 600:8 601:7
603:12 611:13,16
613:1 616:13
618:4,17,19
619:17 621:14,17
622:5 626:6
628:16,21 639:3
641:15 645:2
651:20 652:3,8
655:1 663:14,17
663:24 664:15,22
665:3 666:2,3
667:2 672:7

678:22,25 681:3

**l**

**l** 494:8,12,16
497:2 499:14,19
500:11 538:3
582:5 670:7,12
681:20 683:14
**laid** 668:1
**language** 618:21
**large** 566:6 571:9
635:17,23 647:9
**late** 559:2
**law** 631:25 632:3
**lawyer** 524:5
656:1 670:1
**lay** 512:1
**leave** 664:6
**ledger** 509:1
576:20 671:11,12
**ledgers** 576:24
671:7 674:21,22
674:23,25
**left** 506:15,20
507:12 536:17
568:9,24 621:15
648:21 656:3
658:9
**legal** 499:6 500:9
521:19 523:15,17
653:17
**legitimate** 507:20
521:14 548:2
627:10 643:9,23
**lehman** 550:23
551:7,8,11,12
672:25
**length** 625:19
**letter** 619:16
621:23
**letters** 560:19
613:10 620:22

**levy** 613:22,24
614:4,11,18 616:9
**levy's** 614:9
**liability** 515:4
**lie** 640:21,22
**lied** 640:23
**life** 637:25 638:4
660:13
**line** 536:14 537:7
538:19 539:9
558:23 582:23
584:25,25 595:3
612:10 657:23
659:10,12 684:1,4
684:7,10,13,16,19
**lines** 543:7 553:10
605:18 606:1
653:17
**lipstick** 678:14
**liquid** 648:13
**liquidate** 674:13
**liquidated** 673:20
679:21
**list** 570:17 573:2
582:10,13,23
583:12,16 585:3
587:25 588:9,22
596:16
**listed** 522:20,22
535:22 542:13
544:3,7 545:3,4
550:3 555:11
557:3,6 559:13
560:13 563:2
565:1 568:17,21
568:23 569:2
570:2,5,9 571:17
571:22 572:23,25
573:7 575:20
577:1 578:14,15
580:6 583:8

587:19,23 594:22
595:23 596:5,17
597:3,13,24 599:6
599:7 601:12
605:23 606:25
607:13,16,25
608:18,21 609:2,7
609:11,21 622:8
626:14 656:7
683:18
**listing** 573:3
**lists** 506:21 507:17
609:19
**litt** 640:4
**little** 532:20 540:6
554:4 578:19
618:22,25 647:14
**llc** 494:8 499:15
**llp** 495:5,14
499:25
**loan** 517:24,25
518:15,19,22
**loans** 517:17,20
519:2,13 667:24
**locate** 525:25
**located** 499:10
533:17,21 591:10
**locations** 549:3
**london** 614:8
**long** 515:2 516:1
521:18 522:6,11
533:11 535:10
537:17 538:5,11
538:15 539:12,16
539:22 541:5,17
550:20 554:19
561:1 563:12,12
573:10 579:7
581:16,18 596:13
598:14 599:6,12
606:4 618:9 619:9

619:24 620:25
621:3 626:1,2
660:2 663:21
665:2 681:7
**longer** 677:9
**look** 506:23
507:11 509:1,25
510:2 513:11
534:10,23 535:8
536:11 542:4,24
545:11,17 547:4,5
553:10 564:22
568:14 577:12,18
592:24 593:20
594:8 595:21,22
596:4 597:14
601:10 603:20,23
604:23 605:5,18
605:22 606:8
609:3 612:5,6
618:15,22 620:19
621:20 623:6
626:13,24 631:18
632:19 641:17
642:6 643:1,18
644:10 645:4
649:9,21,22 650:6
650:16,24 653:25
657:5 658:17
659:24 668:9,10
668:11 670:15
671:23 679:24
680:6
**looked** 530:21
561:4 581:18
594:2,9 597:10
605:19 613:10
621:22 639:19
641:2,3,9 643:1
652:6 656:6 660:7
660:8 666:16,18

**looking** 527:16
535:15 537:22
538:17 541:25
545:8 550:4,13
552:6 559:6
563:20 577:19
578:12 579:17
593:16 594:6,7,14
608:14 610:4
611:24 623:3
632:22 640:3
645:6 652:7
657:18 661:17,21
678:6 680:5
**looks** 503:1 505:19
506:24 537:6
538:7 539:9
540:11 550:15,20
551:11,15 558:23
560:20,20,23
566:14 577:16
594:16 600:19
606:2,25 645:22
649:12 650:3,23
653:16 657:23
658:1,20,23
659:11,12,24
661:23 668:16,20
**lose** 594:1
**losing** 644:20
**lost** 620:15 623:20
624:13 631:10,22
643:19,20 676:21
**lot** 510:17 617:1
639:10,10 648:21
**loud** 631:5
**love** 647:14
**low** 591:13
**lozard** 642:3
**lubbe** 642:2

**lunch** 626:3
**lynch** 529:6,14

**m**

**m&t** 583:3
**madison** 495:15
**madoff** 494:8,12
494:17 497:2
499:15,19 500:7
500:11,16 503:22
510:9 512:17
519:16 520:6
558:11 566:25
568:2 582:5,9
592:14 593:21
603:2,3 627:8
628:2,9,24 629:2
630:14 631:23
632:4 633:10,17
635:16 636:23
637:1,21 662:16
664:1,4 665:23
666:23 667:5
670:8,12,14 674:3
679:2 681:21
683:14
**madoff's** 515:15
631:19 655:3
674:2
**main** 619:6
**maintain** 562:13
583:11 585:10,17
586:18,24 587:9
**maintained**
583:14,19,22
584:7 585:4
603:15 672:12,22
**maintaining**
523:12
**major** 643:25
**majority** 509:20

**[maker - member]**                                                                                    Page 20

**maker** 513:16,23
514:4,8 524:14
541:22 547:20,21
554:5 591:9 592:5
592:24 593:20
602:22 610:1,17
615:15 639:22
640:8
**maker's** 545:7
**makers** 503:22
541:3,7 542:2
543:11
**making** 507:7
509:9 516:3
520:15 523:7,13
523:23 524:6
532:6 540:10,12
540:16,23,24
541:2,15 547:8
548:1,6 552:9,11
555:5 560:4
602:24 614:25
615:4 629:7 630:7
630:25 631:8,25
632:5,6,10,14
633:13 634:2,21
635:13,19 637:5
641:4 642:4 646:8
652:22 655:6,8,10
655:21 662:3
667:8 683:7,9
**malcolm** 495:12
**manhattan** 583:2
588:12,12,13
**manner** 567:6
**manufacturers**
583:1 588:12
**marc** 640:4
**march** 607:5
618:24

**margaret** 543:10
**margin** 517:17,20
517:23,25 518:4
518:18,22 519:2
519:13 679:18,22
**marine** 583:2
**mark** 502:20
540:15 543:4
565:21 571:3
598:16 603:8
626:4
**marked** 500:17
504:22,25 505:14
505:17 524:16,20
535:12 558:4,8
566:10,13 569:13
600:9,13 603:6,9
606:8 611:12
626:5,11 627:24
644:25 645:3
668:12 679:2
**market** 503:22
507:7 509:9,14,19
509:25 513:7,16
513:23 514:4,5,8
516:2 517:16
520:15,18 523:7
523:13,23 524:6
524:14 532:6
540:10,12,12,16
540:23,24 541:2,3
541:7,15,15,22
542:1 543:11
545:7 547:7,20,21
548:1,5 552:9,11
553:21,22 554:5
555:5 560:3
565:13 590:8
591:9,18 592:5,23
593:19 597:5,9
598:5,6,15,16

**margaret** — 602:5,22,24 610:1
610:16 614:25
615:3,15 620:5
632:5 639:22
640:7 641:4
643:20 646:8
667:8
**marking** 520:18
600:11
**marks** 630:13
670:6
**martin** 495:12
540:15 543:1
544:13
**mass** 550:15
**match** 565:25
574:18 607:4,7
624:10,16,16
**math** 598:19
**matter** 507:9
513:10 523:18
524:3 639:16
655:18 664:9
677:22
**maturities** 680:16
**maturity** 673:10
**mcdermott** 495:14
499:25
**mci** 552:3,17
**meadowbrook**
582:24 588:4,10
**mean** 501:12
503:11 507:13
510:16 516:13
527:21 544:6
547:1 553:21,22
555:20 561:13
563:7,20 564:2
574:9 575:4,6
587:22 588:20
589:12 590:19

595:9,21 598:18
599:11 601:15
608:19 609:22
610:10,11,15
616:5 617:7 618:8
638:9 639:20
640:2 641:16
643:10 656:21
662:20 663:5
670:21 678:18
**meaning** 514:5
615:4
**meaningless**
641:10
**means** 507:16
544:7,24 555:16
593:17 601:8
**meant** 555:20
**medco** 553:10
**media** 513:12
**meet** 662:21
663:13,21
**meeting** 498:18
616:16,22,25,25
617:13 618:2
625:5,6,9,13,16,20
625:22,24 626:19
629:8 630:8 631:8
634:16 635:14,20
636:19 637:10
638:23 639:2,10
647:16 663:10
665:8,9,24 666:4,6
**meetings** 616:18
616:20 617:5,17
617:19 625:11
662:17,18 663:2
666:11
**member** 506:12
506:13,16

members 616:16
memorialization
629:13 638:18
memory 638:15
mental 664:5,16
664:17
mentioned 625:5
634:18 638:22
639:1
merged 506:1
588:3,11,15
merrill 529:6,14
met 582:13 662:23
665:3 666:3,9
mf 679:25
microfilm 510:10
510:18,25 567:2
567:16 612:9
microfilmed
510:14 511:7,8,11
microphones
499:2
microsoft 557:17
middle 537:12
550:16 552:3
571:12 605:2
midland 583:2
mill 658:9,21
659:11
million 504:3,3
515:8,12 595:10
658:1,16 659:15
659:18 661:11
673:18,19 678:6
mind 516:15
647:17
mine 659:20
minute 618:17
632:15
miraculously
678:7

misinterpreted
640:23
misrepresenting
562:10
missing 574:20
misstating 526:12
mister 663:16
misunderstanding
544:21
money 517:11,11
534:9 553:21
598:12 620:15
641:25 643:19,21
647:9 655:24
656:8 657:8 659:4
659:6 661:14,21
662:12 672:15,19
673:3,5,7,13 674:7
674:9,15,16,19
monies 595:14
606:24 607:7
646:22,22 648:10
655:14 661:19
674:11
month 501:9,15
502:16 604:11,15
604:20 608:13,21
609:1
monthly 501:7
580:25 581:4
635:11
morgan 526:23
548:24 575:1
588:13 647:6
672:23,24
morning 500:16
520:6,7 626:2
morphed 628:13
631:7,12
mortgage 518:15

mother 617:7
motors 504:1
mountain 510:20
mouth 674:6
move 554:13
611:8
moved 614:6,8,10
movement 534:2
multiple 542:17
542:19 544:11
municipal 679:7
679:10,12,16
680:11,20
mwe.com 495:18

**n**

naked 512:25
513:18 516:9
523:16
name 499:5,18
500:19 511:20
537:10,23 545:17
547:13,13,17,18
570:3 575:1
645:17
named 511:19
568:13 675:22
names 544:12
547:11 557:22
559:10 560:14
568:20 570:5
nassau 555:11
679:5,6,7
nat 588:17
national 500:19,25
501:2,5,8 502:13
502:17 505:20,21
530:18,22,25
531:5 582:24
588:4,10,14
599:11,13,18,20
607:17,20,25

608:7 609:4 610:7
610:10,11 680:25
natwest 587:21,24
588:1,5,7,11,15
ncc 590:3
neal 494:18 500:9
682:22
necessarily 525:17
525:19 546:15
549:12 575:3
586:22 599:2
616:5 617:10
656:12 662:24
678:16
necessary 683:11
need 517:10 520:2
529:5 531:22
576:16 671:2,14
672:3 676:7,19
needed 573:21
673:6,13 674:7
negotiating 681:9
nerve 643:8
nervous 647:18
net 503:22 504:7,9
516:1 667:12,19
668:4,5
netted 503:18
netting 557:14
580:2,14
never 516:9 517:6
525:24 635:13,22
636:8 637:16
638:11 641:25
642:1 648:11
656:4 666:3
676:22,23
new 494:1 495:7,7
495:16,16 496:8,8
496:15 499:17
517:10 532:15

537:19 538:13
539:20 543:21
550:21 583:1
589:16 597:15
631:20 632:8,16
**nine** 660:2
**normally** 598:25
651:13 673:13
**norman** 613:22,24
614:4,11,18 616:9
**north** 494:21
499:11 500:25
501:3,5,8 502:13
502:17 582:5,25
588:14 599:11,13
599:18,20 670:12
680:25 682:2
**notary** 494:19
682:23 684:23
**note** 499:2 612:7,8
612:21 621:2
**notes** 645:10 649:7
649:22 653:18
654:2,5,6,20,24
655:2,3,6,9,10,13
655:21 656:11,23
656:25 660:14,18
661:3,24,25 662:1
**notice** 507:16
**noticed** 521:21
**notified** 678:5
**notwithstanding**
587:13
**november** 494:21
499:7 582:6
606:25 608:15,16
608:20 670:13
681:20 682:18
**nscc** 497:18
505:22,24 580:1
675:7

**number** 497:14,16
497:18,22,24
498:3,5,7,9,11,12
498:14,16,18,20
499:18 504:22
505:14 506:12,13
507:18 524:16
525:4 527:1 532:9
533:13 534:10,15
535:12 537:19
550:5,6,8 554:18
557:24 558:4
560:17,17,18,21
560:23 562:20
563:5,8,18 566:8,9
566:10 569:13
570:19 573:13
574:14,18 576:12
578:14 582:4
590:16,23 591:16
594:5 596:7 600:9
601:2 602:19
603:6 607:23
608:3 609:16,18
612:1 614:23
616:20 622:8
623:7 624:18
626:6,11 627:3,4
634:12 644:25
653:19 670:7,11
670:19 679:2,3
681:21
**numbers** 507:11
507:13 550:2
557:23 560:19
568:23 570:8
573:7 595:23
607:24 611:11
**numerous** 499:23
643:12 669:15,21

**o**

**oath** 584:12
**object** 556:10
563:4 576:1 587:5
613:1 616:13
618:4 621:14,17
627:2 628:12
629:13,23 630:11
639:3 641:13,14
663:24,25 664:5
**objected** 566:20
**objection** 503:9
508:14 509:15
511:25 513:2
514:1,22 515:14
516:22 518:24
525:22 528:22
529:17,22 532:1
544:9 561:10,25
596:19 608:22
619:17 627:21
629:21 641:15
648:8 661:1 664:9
664:11,25 673:21
673:25 674:4
**obligation** 513:24
522:5,7,11,12
**obtained** 501:21
**obvious** 635:3
649:5
**obviously** 590:19
595:17 619:22
627:3,6 642:22
654:16 656:22
**occur** 521:10
573:20 614:23
**occurred** 579:18
579:22 580:6,8
581:9 595:8 677:4
**occurrence** 615:1

**occurs** 598:25
**office** 504:18
528:12,19 529:4
529:14 530:2
548:11 589:4,6
625:7,14,24
653:21 662:7
670:23
**offline** 562:16
**oh** 506:14 527:14
536:15 550:4
552:7 553:25
556:22 558:8
564:20 572:2,8
579:10 580:22
586:6,23 588:17
597:21 618:18
619:5 628:18
650:2,22 651:1,9
651:17 662:23
667:20
**okay** 501:16,16
502:1,1,5,11,19
503:3,6 504:19
505:8,11,16,21
506:2,8 507:9
508:4 509:11,22
510:25 511:6,16
511:19,22 512:5,9
512:9,9,16 513:22
514:11,18 515:6
515:17,20 516:8
516:15,15,18
517:2,17 518:18
519:4,9,12,17,18
519:21 521:8
527:17,20 530:21
531:9 532:3
534:17 536:15,25
537:6,9,14 538:4
538:24 539:5,14

| | | | |
|---|---|---|---|
| 539:20 540:13,18 | 607:2,10,11,23 | **old** 494:20 499:10 | **outside** 516:23 |
| 541:4,23 542:11 | 608:9,12,25 609:8 | **once** 671:20 672:4 | **oversight** 653:4 |
| 542:22,24 543:12 | 610:3,14 611:8,8 | 681:8 | **owed** 515:12 |
| 543:16 544:22 | 612:1,5,12,20 | **ones** 557:6 623:15 | 595:10 655:24 |
| 545:16 546:5,8,19 | 613:3,6,17,25 | 650:5 665:20 | 657:8 |
| 547:1,16,18,25 | 616:1,7,12,15 | **open** 513:13 | **owned** 599:12,12 |
| 548:15 551:3,16 | 617:3,12 618:1,10 | 515:23 598:14 | 599:13,15 |
| 551:19,22,22,25 | 618:14,15,19 | 620:4 | **owner** 536:25 |
| 552:9,14 553:5,9 | 619:7,14 620:19 | **opened** 679:25 | 537:6 |
| 554:8 555:2,9 | 621:20 622:1,7,10 | **opening** 598:10,11 | **ownership** 581:18 |
| 556:16,21,25 | 622:20 623:1,5,17 | **operate** 530:16 | **owns** 514:13 |
| 557:5,9,16 558:1,1 | 624:10,14,20,21 | **operation** 504:18 | |
| 558:10,11 559:4 | 625:5,9 626:4,21 | 531:2 | **p** |
| 560:9,22 561:20 | 627:22,25 628:6 | **operations** 511:15 | **p&s** 580:10 |
| 561:20,21 562:7,9 | 629:15 630:2,5,20 | 530:2 531:1 | **p.m.** 681:25 |
| 562:11,17,17,23 | 630:23 631:2,16 | 675:15 | **pad** 653:17 |
| 562:24,25 563:7 | 631:17 632:19,22 | **opportunity** | **page** 497:13 498:2 |
| 563:15,24 564:9 | 633:2,7 634:8 | 566:24 | 507:11 525:4,5 |
| 564:13,17 565:12 | 635:8 636:7,10,15 | **opposed** 653:3 | 528:8 537:12 |
| 566:3,5 567:24 | 637:1,21 638:2,21 | **opposite** 592:8 | 543:8 549:19,24 |
| 568:2 569:11 | 644:15 645:8,21 | **option** 542:5 | 550:16,17 552:3,6 |
| 571:3,8,11,25 | 646:1 647:5,7,22 | **options** 516:4 | 555:9 557:6 |
| 572:3,12,25 574:1 | 648:1,19 649:7,14 | 518:9 | 558:12 559:7,9,14 |
| 574:4,8,12,22 | 649:18,24,25 | **order** 504:6 514:7 | 564:23,23 565:1 |
| 575:6,19 576:21 | 650:8,16 651:3,3 | 514:7 516:24 | 568:5 571:12 |
| 577:6 578:10 | 651:17,17 652:3,8 | 517:11 580:5,15 | 572:6,11,23 |
| 579:2,3 580:4 | 654:8,19 657:4,17 | 615:5,16 | 577:22 583:9 |
| 581:5,22 583:15 | 658:2,7,23 659:2 | **ordinary** 503:7 | 584:23 596:4,10 |
| 584:10,23 586:6 | 659:10,21 660:2,5 | 536:1,3 646:6,13 | 597:19,21 598:1 |
| 586:10 587:12,18 | 660:11,19,22 | **ordination** 589:24 | 599:8 603:21 |
| 588:6,14,19,19 | 661:10,23 662:2,5 | **oregon** 680:12 | 604:23,23,24 |
| 589:22 590:4,24 | 662:16 663:13 | **original** 651:5,6 | 605:2,6 606:10 |
| 592:24 593:20 | 665:22 666:5,24 | 652:6 654:10 | 607:11,14 609:4 |
| 594:2 595:9,20 | 667:5 668:9,19 | 666:4 | 612:3,6,8,16,18 |
| 596:1 597:12 | 669:2,11 670:5,17 | **originally** 574:13 | 622:15,18 626:14 |
| 598:7,17 599:1,5 | 671:3,15,17,23 | 620:4 | 626:16 627:12,23 |
| 599:22,25 600:4,7 | 672:6,6,21 673:2,9 | **originate** 602:23 | 628:25 631:4,19 |
| 601:18 602:3,18 | 673:15,15,24 | **originated** 591:4 | 632:19,21 633:4 |
| 603:8 604:2,6,8,10 | 674:14,18 675:21 | 602:5 | 636:21,21,22 |
| 604:22 605:5,12 | 676:10 678:20 | **originating** 615:4 | 638:3 645:5,6,9 |
| 605:25 606:1,16 | 679:9,15 681:5,17 | 615:16 | 647:8 649:8,10,19 |
| | | | 649:25 650:3,4,9 |

**[page - places]**                                                    Page 24

650:25 651:6
652:15,17 653:14
653:14,16,25
654:1 655:2 656:7
657:14,17,17
671:5 679:25,25
680:2 682:7 684:1
684:4,7,10,13,16
684:19
**pages**  506:25
549:21 552:1
566:18 572:7,9,10
595:22,24 596:10
599:9 627:24
632:20 649:8
650:17,23 654:3
655:2 678:6 682:8
683:11
**pagoldman**  496:17
**paid**  534:3 668:3
**paint**  635:3
**paper**  636:18
676:8 677:20
**paragraph**  618:20
621:1 636:22
637:19,20
**pardon**  553:22
673:22
**parentheses**
635:25 636:4
**park**  495:6
**parkway**  496:14
**part**  504:17 513:7
530:5 554:20
566:22 567:2,15
567:18 580:1
593:10 594:17
627:13 633:21
660:22
**particular**  503:24
511:17 513:14

515:2,25 518:13
544:1 545:1,10
548:20,20 549:15
555:21 581:9
591:20 592:3,12
592:24 609:24
615:6
**particularly**
510:23 532:6
542:1
**parties**  499:5,21
615:11 682:17
**partner**  614:7
**party**  525:21
526:21 527:2
528:20 529:6,9,19
531:24 534:4
682:13
**passer**  495:12
**paul**  613:7,13,15
613:16,17 614:8
614:10
**pay**  517:11 522:7
534:5 620:9
631:24 632:4
673:13,20
**payable**  667:15
**paying**  633:11,19
637:16 655:14
656:24 678:12
**payment**  534:8
**peace**  644:14
**pennsylvania**
680:11
**people**  503:11
524:4 533:22
540:14 625:20
635:1 639:17
640:11 643:17,25
644:8 646:20
655:15 661:22

662:12 664:2
670:23,25,25
**people's**  659:20
**pepsi**  519:23,25
520:1
**percent**  507:25
509:13 518:6
556:7 632:13,13
632:18 634:19,21
634:23 641:11
657:6 667:12,18
668:4,6
**percentage**  667:7
667:10
**perfectly**  523:15
523:17 564:6
**performed**  579:24
582:11
**period**  503:10,13
503:14 505:6,7
510:4,6,16 512:6,8
512:10 516:11
518:5 521:3
523:24 525:15,16
526:7,8,17 527:5
527:12 529:23,25
530:7,9,16 533:22
553:17 563:21
564:5,7 573:24
574:2 575:5,9,18
580:14 585:12
590:4 612:25
618:9 634:10,23
638:6,8,14 648:23
658:5 659:25
660:1,17 669:16
**periods**  524:1
634:14
**person**  504:9
511:19 534:13
568:13 640:2

643:10 667:11
**pertain**  623:12
**peter**  496:13 500:6
537:25 538:18
540:14 542:21
544:14,16 557:17
626:9 644:19
663:4
**peter's**  545:17
**pharmacia**  621:3
**physical**  533:23,24
**physically**  592:21
**picard**  615:22
641:21,22 643:5
647:17
**pick**  499:3
**picture**  590:22
635:4 648:9
**piece**  677:3
**piggy**  641:25
**pile**  594:4,8
**pissed**  635:4
639:24 642:4,4,19
**place**  503:1 504:13
504:20 510:20
523:5 539:7
540:16 546:16
550:25 564:10
565:8 569:4
570:22 575:1
579:20 580:21
584:11 590:8,10
591:3,6 592:13
595:12 615:10
617:13 625:10,14
625:16,22 626:19
635:13,22 651:10
660:11
**places**  510:21
551:4 593:11
605:23

**[plaintiff - provide]**                                   Page 25

**plaintiff** 494:6
  499:12,14
**plan** 630:21
  647:13 674:7
**planned** 533:9
  656:24
**planning** 617:24
  619:22 655:15
  656:1 661:20
**plaza** 496:7
**please** 499:2 524:5
  532:3 621:2
  683:10,11
**pleased** 632:3
**pledge** 518:2
**plus** 516:4 659:20
**point** 512:13
  514:20 588:5
  602:1 629:22
  630:16 642:22
**pointed** 507:10
**policies** 675:16
**policy** 501:13
  510:15,22,23
  515:3 669:14
**ponzi** 633:20
**portfolio** 515:8
  562:14 672:12
**portion** 506:19
  633:15 635:18
**position** 515:24,24
  516:2 525:14
  538:11 544:2,24
  547:25 548:17,22
  561:1,2 563:14
  567:4 577:12
  578:15 593:18
  637:15
**positions** 513:13
  515:5 516:1,10
  523:4 535:10

541:5 543:22
  548:16 570:12
  573:11 596:5,7,11
  596:16,25 597:24
  597:25 598:2,6,15
  599:5,7,7,12 621:2
  621:9 680:3
**positive** 647:2
**possession** 533:25
**possible** 656:10
**possibly** 644:2,3
  678:9
**post** 514:4 563:22
  564:7 638:8,14
**poster** 642:16
**posting** 518:12
**practice** 503:19
  504:9 513:6
  518:10 519:12
  529:24 530:2
  580:2 584:1
  618:11 675:4
**precursor** 505:24
**prefer** 519:18
**preference** 627:17
**preferred** 600:23
  600:23 605:13
**premises** 510:21
**preparation** 666:1
**prepare** 662:17,21
  663:2,14
**prepared** 535:22
  535:25 536:3
  559:1
**preposterous**
  643:4 647:15
**presence** 523:21
**present** 499:20
  549:16 625:17
  657:24 658:6,16
  662:2

**pretty** 588:8
  638:15
**previous** 537:15
  538:2 539:11
  543:20,25 544:23
**previously** 509:11
  511:23 525:11
  569:23 672:11,21
**price** 614:6,7
  615:2,9 616:4
**prices** 598:21
**pricing** 671:13
**principal** 508:8
  509:3,4 523:12
  601:5,8,17,20
  602:17 603:2,3,4
  610:5,6
**print** 507:4 572:10
**printed** 506:19
  652:4,5 668:21
**printout** 654:2
**prior** 502:16 512:7
  516:19 545:24
  579:22 617:19
  621:7 655:21
  656:20 669:9
  677:12
**private** 499:3
**probably** 511:12
  523:11,19 530:20
  530:24 547:14
  575:18 576:14
  620:18 644:6
  649:1 652:20,20
  654:14 665:5
**problem** 571:7
  572:14 633:22
  641:20,20
**procedure** 579:20
  580:20 683:4

**proceed** 500:10
**process** 557:14
  651:19 654:22
**produce** 677:6
  678:3
**produced** 513:12
  567:6 676:22,23
  677:8
**product** 664:1,3,4
  664:14,15,17,21
**professional**
  494:18 682:22
**proffer** 498:18
  523:20,21 625:6
  625:12,19 629:8
  631:8 634:16,25
  635:14 636:19
  637:10 638:18
  660:6,7
**profit** 658:4,25
**profitable** 642:1
**profits** 661:5
  667:8,9,13 668:6
**promise** 566:1
**properly** 636:3
**proprietary** 507:7
  509:9 516:3
  520:16,19 523:8
  523:13 543:13
  547:23 552:12
  555:7 646:8 667:8
**prosecutor** 523:21
  524:8,9 640:5
  677:15
**protection** 494:5
  499:13
**protocol** 579:20
  580:20
**proved** 641:24
**provide** 682:12

**[provided - record]** Page 26

provided   582:13
583:9 584:15
prudential   538:19
538:22 544:17
public   494:19
682:23 684:23
puerto   680:11
purchase   512:22
518:4,12 525:7
580:5,10
purchased   512:20
514:14 521:5
522:9,21 523:2
526:4 561:8,18,24
562:22 575:12
622:3 672:18
674:15,16
purchases   508:21
purchasing   563:23
purported   636:17
purpose   676:18
purposes   589:4
651:24
pursuant   683:3
put   510:19 515:18
558:1 570:12
591:24 592:1
607:8 615:12
627:1 634:9
655:18,25 669:8
674:5 681:5,12
putting   652:21

**q**

quarterly   580:24
581:3
question   520:10
520:15 529:1
553:3 556:11,15
567:13 580:3,23
583:15 584:6,6,15
585:18 586:8,9,10

587:3,6,9 588:20
596:21 602:4
610:2 616:12,14
619:18 628:7,22
632:23 634:5
635:8 641:11,14
641:14 644:16
650:20 653:10
664:5,24 665:12
666:16 678:20
questioned   567:7
questioning
529:23 566:21
567:17,21,23
627:2,19
questions   579:6,7
579:12 613:7
632:21 635:1,7
639:11,14,21
645:5 666:25
672:9 678:21
679:5 682:6
quibble   653:24
quick   579:6
quickly   565:19,24
quiet   640:4
quite   635:5 675:17
quotation   630:13
quote   514:9

**r**

r   621:24 682:1
683:1,1
rates   518:4 634:22
682:17
rca   680:2,8
read   566:18
572:10 578:2
584:17 587:16
600:16 603:19
604:3,7 612:7
619:2 628:7

629:10 631:3,4,5
633:15 635:10,21
642:3 643:3
683:15 684:1,4,7
684:10,13,16,19
reading   637:6
638:2 681:23
reads   536:6 608:3
ready   568:5 645:7
real   518:23 520:24
521:15 522:16
659:7 680:24
realized   549:22
really   546:2 548:7
554:4 567:2
611:20 630:6
634:7 639:20
648:11 661:16,16
668:18 669:5
677:4,4
realty   495:11
reask   628:21
reason   510:7
528:16 533:14
634:18 639:8
642:9,13 671:16
671:20,21 672:4,5
673:5 684:2,5,8,11
684:14,17,20
reasons   533:13,15
534:15 627:4
683:7
recall   501:11
508:19 509:16
510:13 511:20
519:1,3 530:13
531:2 583:6 625:9
629:7 630:7 631:7
631:13,25 632:6
632:10,14 633:13
635:13,19 636:13

636:18 637:5,9,11
638:1 655:8,8,9,12
656:5 660:10
662:3,5 665:4
673:9 675:2 680:1
recalls   630:25
634:6
receive   501:7,14
503:21 528:13
529:5,15
received   501:11
503:6,14 504:14
595:13 618:24
635:11 659:16
receiving   530:2
recess   582:2 670:9
recognize   559:9
559:12 600:13
611:19 645:13
649:10 668:14
recollection
582:17 636:9,11
655:5 664:10
666:11
record   497:25
498:3,5,7,9,12
499:2,5 509:22
510:6 515:19
517:3 521:15
527:3 536:7 540:7
540:9 542:1,3
545:13 546:14,21
558:19 559:4,6
562:6,7 566:20
568:3,7 569:19,23
571:2,14 576:22
578:20 581:25
582:3 585:13,15
585:16 586:3
587:14 589:20
590:20,21 594:13

**[record - representing]**

603:15 604:5
609:3 627:2
651:20 670:8,10
676:11 679:3
681:6,13,19
**recording** 499:4
**records** 501:25
502:2 510:3,10,14
510:19,20 511:1
513:11 535:3,5,9
539:3,6 541:4,16
546:10,13,22,23
546:25 548:12,13
549:17,18 556:14
564:8 574:19
575:3,7 580:7
585:13 590:18,23
599:4 636:17
675:17,24 676:14
677:8,10,16,18,19
677:20,25 678:1,2
678:3,15
**redacted** 627:5,5,7
627:9,12 641:7,12
**redemption** 517:8
**redemptions**
633:12,20
**reduced** 682:6
**refer** 506:17
520:18 521:6,24
528:15 539:1
601:23 612:12
614:24 647:2,3
659:2 661:3
**reference** 625:7
**references** 660:5
**referral** 682:15
**referred** 505:22
521:22 554:12
**referring** 520:10
520:12 541:18

547:1 550:6 560:5
568:10 570:11
573:18,19 605:24
619:15,20 634:24
638:5,7,8 645:23
650:5 657:7,14
658:3,12 659:8
**refers** 527:6
536:23 538:21
548:5 586:15
615:13 631:19
658:4,25 661:23
**reflect** 502:6 506:2
506:7 507:25
508:23 515:4,11
515:22,23,23
542:5 546:10
556:14,17
**reflected** 508:5,9
508:23,24 519:4
539:18 545:8,13
545:14 575:2,7
597:8
**reflecting** 540:10
543:23,24 635:12
**reflection** 502:15
629:1
**reflects** 505:4
506:3
**refresh** 582:17
664:10 666:10
**regardless** 619:21
**registered** 494:18
514:3,8 532:14
682:22
**regret** 642:21
**regular** 514:4
**regularly** 646:1
647:25
**regulations** 517:25
518:17

**relate** 675:20
**related** 607:20
614:15 652:10,13
653:19 660:20,21
664:20 667:14
669:22 671:21
**relating** 669:22
676:12
**relation** 662:25
**relationship** 666:8
666:8
**relationships**
675:22
**rely** 528:19 529:5
531:24
**relying** 589:4
**remaining** 650:17
**remember** 526:5
526:11 582:9
584:12 588:18
616:18,22,25
617:16 620:17
625:7,22 626:1,19
631:14 637:13
638:15 639:16
669:2,11 673:11
**remembered**
588:9
**remembers** 634:1
**rent** 678:12
**repaid** 519:13
**rephrase** 529:1
**report** 497:17
498:20 505:8
507:25 508:6,9,13
508:16,18 515:11
521:23 539:1,7
542:16 543:16
544:7 546:6 548:1
548:15 551:3,16
552:9,14 555:22

556:8 557:2 559:4
559:16,22 560:10
565:16 567:2
568:3,6 569:8
570:12 571:12
572:4 575:24
577:9 592:10
594:25 596:3
597:25 604:16,17
607:5,9 608:13,15
609:1,19 610:22
629:22 632:12,17
641:19,19,20,21
641:23,23 643:4
644:13 645:25
646:1,13 651:11
656:17
**reported** 514:24
682:5
**reporter** 494:19
500:8 682:14,22
**reporting** 497:18
505:19 682:13,14
**reports** 508:20
521:23 565:20,24
567:1,10,16
573:16,20 604:13
604:19 643:3
660:10
**represent** 499:21
506:18 556:1
560:25 641:1
682:8
**representations**
652:5
**represented**
562:19,21 563:13
**representing**
499:6 500:9
557:13 598:4,5

[represents - sale]                                                             Page 28

**represents** 506:20
  557:13 595:17
  597:5,6,11
**reputation** 640:12
  640:16 644:12
**request** 520:23
  522:6,13
**requested** 581:6,7
  646:18,19 676:13
  676:15,16
**required** 514:4
  669:18
**requirement**
  669:17
**research** 553:11
**reserve** 518:1,17
  681:13
**reserved** 681:24
**respect** 509:12
  514:19 525:14
  567:16 621:1
  648:5 649:2,3,4
  669:3 679:16
**respond** 633:16
**response** 567:22
  586:12
**responsible**
  511:17
**result** 682:11
**retail** 628:2,9
  629:2 631:6,11,20
  632:8,16 635:18
  635:24 636:23
  637:2,4,15,21,25
  638:4
**retaining** 669:15
**retention** 510:6
  669:16
**returns** 632:12,17
  637:16

**reveal** 664:17
**reviewed** 557:7
  561:19 569:23
  575:24 583:16
  594:15 618:16
  620:22 622:21
  665:17
**reviewing** 560:9
**reynolds** 621:24
  622:24 623:4
**rico** 680:11
**ridiculous** 639:15
  643:2,6
**ridiculously**
  637:16
**right** 501:18 505:7
  507:1,1 513:19,23
  521:17 526:8
  527:4,19 528:9,13
  529:11 534:25
  535:10 536:19,21
  539:7 540:20
  541:6 542:10,11
  542:12,14,18
  543:1,18 544:8,22
  544:25 545:4,18
  545:20 546:1
  547:19 548:16
  551:5 552:12
  553:12,25 558:7
  558:17,18,25
  559:3,13,17 560:1
  560:18,23 561:8
  561:24 563:3
  564:11 565:9,10
  565:13 567:5,12
  568:16,24,24
  569:10,25 570:1,9
  570:9 573:6,22
  575:24 576:7,9,10
  577:3,7 578:17,23

578:25 579:1,1
582:19 583:7,17
584:13 585:2
586:17,20 587:1
587:21,25 590:8
590:11 591:1
593:10,12 594:17
594:18,23 595:10
596:12 597:2,23
598:1 599:10
600:5,20,25 601:5
601:9 604:16
605:9,17,21,24
606:3,12,14 607:2
607:8,10,10 608:2
609:18 610:5,6,9
610:12,19 611:14
611:17,23 612:10
613:8,11,14 617:2
618:3,12 619:7,12
619:16 620:11,19
620:23,24 621:11
621:13,19,25
622:13 623:13,14
623:16,22,23,25
624:8,9,11,19,20
626:18,22 627:18
630:15 634:8
638:24 639:2
640:17 641:5
648:17 649:15
651:7,8,12,15,17
651:18,18 653:15
653:18 655:4
656:15 657:15
658:8,14,19,22
659:14,22,23
660:3,12,13,15
664:21 666:22
668:22 671:3
672:10 673:2

676:6,6,8 680:13
  680:18,19 681:13
**rights** 581:19
**ring** 588:15
**rjr** 623:3
**roads** 591:13
**rockefeller** 496:7
**roll** 612:1
**room** 499:20
  567:10,11,20
  625:23 640:11
**row** 651:24
**rpr** 682:22
**ruin** 644:12
**rule** 514:3,12
  532:17 549:8
  676:1 683:3
**rules** 683:3
**run** 558:23 604:11
  604:19 681:18
**running** 574:19
  618:7
**rye** 496:15

**s**

**s** 511:20 539:13
  683:1
**sachs** 532:8,16
  557:18 602:22
**sachs's** 602:24
**safekeeping**
  536:20,21,25
**sage** 495:11,11,12
  495:12,12 499:25
  613:7 616:16
**sages** 519:2 613:11
  618:3 666:5,7,9,11
  666:13,14
**salary** 659:6
**sale** 508:21 522:3
  523:15,16 580:5
  639:21 640:7

**[sale - seeing]**

643:11,14,19,21
644:4
**sales** 521:25
580:11 641:5
**satisfy** 516:20
517:8 593:25
**saw** 575:23 635:17
647:25 665:12,14
665:19,19 666:18
666:19
**saying** 526:24
547:8,10 549:9
555:4 556:6,13
586:11 587:8
588:23 591:2
593:8 599:25
607:18 618:1
621:19 631:13,14
636:13,19 637:9
637:10 638:1,7,9
638:11,15 639:11
640:10 641:8
643:14 652:19
653:5 654:13,20
663:1
**says** 500:25
502:20,21 537:25
538:18 548:18,18
550:22 555:13,19
557:17 560:15
568:9 576:9 578:4
578:13 594:21
596:11 601:15
604:14 611:20,20
612:19 618:23
623:19 628:13
636:3 657:5 658:8
658:15,23 659:11
668:15 671:4
672:1

**scheer** 601:13
605:20 606:11,18
**scheme** 633:20
**schwab** 497:14
502:20 503:2,8,20
615:5,5,7 643:24
**scope** 516:23
567:25
**scotch** 644:22
**scraps** 677:20
**scratch** 583:6
**script** 668:21
**sec** 514:10,12,24
515:11 516:9
523:22 524:4
538:19 639:17
640:3,10,11,21
643:12
**second** 557:16
580:23 608:4
612:6 618:20
622:17 625:16
636:22 637:18
649:22 663:20
671:4
**sections** 627:7
**securities** 494:4,8
497:16 498:14,16
499:13,15 501:9
505:4,20,21
512:18 513:15
514:13,21 518:2,3
518:7,12,19,23
521:5 522:5,7
523:2 524:10
525:16,18 528:13
529:5,15,21 530:3
530:18,23,25
531:5,11 532:22
532:24 533:5,6,23
533:24 534:1,2,7

535:6 537:10
538:22 539:2
543:18 544:11
545:14 546:6,22
546:24 551:1,4
552:15 553:7
554:17 556:5
557:2 561:7,12,14
561:16 563:2,23
575:23 576:5,17
576:25 577:1
583:11,14,19
584:8 585:5,14,24
585:24 586:18,24
589:5,9,13 593:9
593:13 595:12
596:17 597:1,6,9
598:22 599:13
611:21 612:25
640:5 675:19,24
680:24
**security** 503:25
513:14 516:1
531:16 533:1,3,3,8
533:10,11 534:3
537:23 539:17
543:21 544:8
545:4,21,24
548:19,22 549:4,5
560:13 568:18
570:2,3,6,16 573:4
578:12,23 591:10
591:19 592:3,12
593:10 596:5,16
596:25 597:24
598:1 599:5
600:22,24 606:13
609:7 611:3
**see** 507:12 519:7
525:1,5,8 527:17
528:10 536:15,16

537:10,19 538:2
538:15,24 539:11
539:21,25 540:16
540:22 542:2,2,8
543:7 544:13,15
544:16 546:17
550:18,23 552:3,5
552:17 555:10
557:5,8,10,16,22
558:12,22 559:7
560:13 564:25
568:4,17,20 569:1
570:3,5,15,19
571:11,17,22,25
572:2,8,22,25
573:6,9,13 576:6,8
582:16,23 583:7
586:14 594:9,12
594:16,21 595:5
595:12,25 596:4
596:22 597:16
599:6 600:16
601:1,11,13 605:1
605:16,20,25
606:1 607:7,13,23
608:4 612:3,6,18
617:19 618:23
619:7,10 620:25
621:4,6,24 622:7
622:20,24 623:7
628:1 633:21
636:23 645:11
646:25 647:19
650:18 656:23
657:5 658:7,18,21
658:24 659:10,12
665:22 668:25
670:18 680:4,8,10
680:14
**seeing** 654:4
678:17

**seek** 511:10
**seeking** 633:12,19
**seen** 521:24
  630:13 647:22
  656:17 666:21
**segregated** 586:21
**self** 528:16 531:23
  588:24 610:19
**sell** 514:2,7 516:11
  522:3 523:18
  524:14 533:15
  591:17 592:19
  602:15 615:5
  679:19
**selling** 509:4
  512:25 513:6,14
  513:18 521:13,18
  593:5 597:8
  599:20 601:22
  602:22 603:2,4
**sells** 504:2 521:17
  523:11
**send** 504:5 510:19
  512:19 580:24
  655:16 656:3
  661:20 676:16
**sending** 571:5
  592:22 655:14,15
  675:4 679:20
**senior** 640:2
**sense** 512:25
  617:12 620:7
  639:25 642:8
**sensitive** 499:3
**sent** 515:7 646:18
  679:20
**sentence** 618:22
  618:23 620:25
  621:1,4 628:1,15
  628:16,17,20,22
  628:23,25 629:10

631:11,21 633:9
  635:9,11 636:15
  636:24 638:3
  677:23
**sentenced** 642:14
  677:21
**sentences** 619:2
  635:10
**sentencing** 677:13
**series** 555:11
  605:13 641:22
**services** 583:8
  682:13
**session** 523:21
**set** 517:25 518:17
  549:18 569:15
  571:6 572:1
  587:20 666:23
**settle** 673:6 674:8
**settlement** 519:10
  600:19 607:3
  675:13
**settlements** 675:19
**settles** 671:21
  672:4,5
**seven** 623:22
  627:23 628:25
  631:4
**shapiro** 613:20
  614:3,4,6,11,18
  616:9
**share** 558:9 662:9
**shares** 504:4,5,7
  512:21 540:5
  551:9 574:18
  576:3,4 577:14
  578:19,22 606:10
  606:22 607:7
  622:3
**shearson** 550:23

**sheepish** 640:4
**sheet** 683:12
**shocked** 524:7
**short** 512:25,25
  513:6,13,15,18
  515:2,5,22,24
  516:2,9 521:7,13
  521:17,24 522:3
  522:11 523:4,11
  523:15,16,18,25
  524:2,13,14
  525:24 535:10
  537:17 538:11
  539:13,18,25
  541:5,17 561:2
  563:13 577:12
  578:15,15 581:8
  581:10,16,17
  592:20 593:3,4,6
  596:13 598:14
  599:7 614:11
  619:24 620:1,8
  639:21 640:7
  641:4 643:11,14
  643:19,21 644:4
  673:12
**shorted** 619:9,13
  621:7,10
**shorting** 619:23
**shortly** 625:15
**shorts** 525:14
**show** 502:19
  504:24 505:1,16
  506:5 508:13
  514:25 515:1
  523:4 535:2,5,9
  539:13 540:4,11
  541:5,10,16
  542:16 546:24
  547:9 549:10,11
  549:14 550:18

551:3,16 555:22
  556:8 558:7
  565:16 572:13
  576:18,20,24
  577:2,6 582:14
  585:13,13 595:1
  595:15 603:9
  604:22 611:9
  612:1 626:5
  679:23
**showed** 508:20
  515:8 521:4,10
  523:1 527:9
  541:13 546:22
  561:6,12 564:3
  590:21 660:10
  665:23 679:1,24
  680:2
**showing** 501:8,24
  502:11 542:1
  543:22 544:2
  545:24 551:8
  555:18 578:16
  598:20,21 600:2
  600:23 674:22
  675:24
**shown** 514:21
  525:12,17 526:1
  527:24 561:2,16
  561:17,23,23
  577:9,12 578:19
  590:24 606:9,17
  606:18,19 610:7
  610:22 622:10
  623:15 624:2,7
  665:7 666:10
**shows** 500:22
  506:4 525:7 542:3
  542:17,20 543:16
  543:17,20 546:6
  547:7 548:15,17

**[shows - statements]**                                                      Page 31

548:17 551:4
552:9,14 556:4,4,8
557:1,2 559:5
569:8 576:22
578:22 598:14
600:1
**shred** 612:19,24
669:12,19 670:18
670:21,21,25
671:1,1 672:1
**shredded** 669:4
**siac** 538:24 552:19
552:21,25 553:6
557:10,12
**side** 506:10 507:7
509:8,9 533:6
544:18 550:21
551:12 552:22
559:13,20 563:12
564:10 569:2
570:9 573:21
577:3 578:25
580:19 592:8
646:9 648:6,12
651:14 652:22
658:8
**sided** 514:5 651:21
651:22,23,25
652:5 653:3,3,5
**signature** 682:20
684:21
**significant** 513:7
**significantly** 619:6
**signing** 681:23
**similar** 518:14
569:22 596:24
**similarly** 671:23
**simply** 637:25
**single** 542:17
563:17 609:12
651:9,21,23 653:3

653:6
**sit** 640:3
**sitting** 673:19
**situation** 620:16
663:5
**six** 510:6 584:25
605:18 606:1
669:16,18
**size** 565:20 676:24
**sloppy** 677:18
**small** 637:14
**smb** 494:7 499:18
**smith** 557:8
**smoking** 639:23
**soda** 644:20
**sold** 504:2,4,7
522:10 523:25
524:2,13 533:6
549:4 561:17
601:15,17,24
619:21 640:8
671:19
**solutions** 499:6
500:9
**somebody** 511:14
613:16 637:7
670:23
**someone's** 636:4
**somewhat** 520:17
527:18 539:21
638:23
**soon** 637:3
**sorkin** 677:7,8
**sorry** 536:12
549:21 550:12
560:5 564:22
568:5,24 571:9
572:7 573:2
577:19 595:1
597:19 605:2
628:18,20

**sort** 524:7 554:3
557:14 566:13
624:13 655:23
656:21 661:5,9
675:14
**sorts** 532:7 625:20
**sound** 626:18
**sounded** 639:15
**sounds** 555:7
587:3
**southern** 494:1
499:17
**speak** 562:6,7
575:14 651:18
**speakerphone**
625:18
**special** 601:13
605:20 606:11
**specific** 509:23,24
672:2
**specifically** 639:17
**specify** 512:14
**speed** 566:1
**spent** 558:6
**split** 511:24 512:7
512:10 514:19
517:7 561:11
581:21 617:22
**spoke** 522:18
548:9
**spoken** 643:11
**stacy** 496:5 500:2
**staff** 511:7 559:17
**stage** 589:24 675:5
**stands** 526:13
**stanley** 526:23
548:24 575:1
672:23,24
**start** 537:2,4 589:7
632:5

**started** 512:10
513:16 517:6
519:17 617:20
626:2 637:14,14
676:20
**starting** 599:7
604:4 643:16
647:12 660:6
**starts** 544:25
**stated** 563:20
564:7 682:5
**statement** 497:22
500:19 501:17
502:12 512:19
514:12 515:7
519:6 523:5
524:23 525:3,7
527:3,13,18 561:4
561:18 566:20
581:10 594:16
595:15,16 597:7
597:10 598:10,14
598:25 601:21
619:12 622:12,21
623:16,19,21
624:7,11 628:4,8
628:11 629:7
630:10,12 631:6,8
632:1,6,10,14
633:13 634:11,12
635:14,19 636:1,1
637:1,5 644:7
647:11 660:7
683:7
**statements** 501:8
501:14,22,23
514:21,25 519:5
521:4,9,9 522:20
523:1 525:12,17
526:2 527:8,11,25
529:20,20 560:1,6

[statements - tax]                                                              Page 32

561:6,11,22
562:19,21 580:25
581:2 590:25
592:11 596:24,24
597:7 618:24
626:25 630:4,7,25
634:2,7 635:12
641:1,3,8,23 642:5
643:1,5 666:19
670:18 675:1,4
**states** 494:1
499:17 625:6,23
**stating** 676:12
**stearns** 529:7,14
530:15 532:8
591:12 672:24
**step** 603:1
**stock** 497:24 498:3
498:5,7,9,12 513:7
516:12,13,14
521:18 522:10
523:11,18,25
524:2 535:3,5,9
536:6 541:4
545:13 546:14,21
546:22,23,25
551:11 558:19
559:4,6 568:3,6
569:19,22 571:14
576:22 578:20
581:21 585:12,13
585:15 589:8
590:21,23 591:25
592:6,19 593:2,2,5
593:6,17,22,23,24
599:20 601:22
602:12,25 603:15
604:5 609:3 611:5
615:6 620:9 640:8
671:19 679:3

**stocks** 515:9,10,13
621:7
**stone** 510:20
**stood** 657:3
**stop** 670:3
**stopped** 503:11
512:14 514:20
**store** 669:20
**story** 634:17
**strategy** 590:17
592:18 616:23
671:9 679:20
**street** 506:6 509:8
537:5 544:18
591:19 602:21
642:16 648:24,25
649:3 669:16
**strictly** 592:18
**strike** 511:24
512:7,10 514:20
517:7 531:22
561:11 617:22
**strt** 536:22 537:2
**structure** 609:25
**stuff** 653:12
**style** 617:24
**sub** 552:17 571:18
**subject** 664:9
**subjects** 566:22
**submitting** 644:13
**subscribed** 684:22
**subsidiary** 576:19
576:24 674:23
**substance** 664:12
683:4
**substantial** 519:2
647:19
**sudden** 678:7
**sue** 643:23
**suggest** 633:14

**summaries** 569:23
**summary** 498:4,5
498:8,10,13
558:19 568:3,7
569:19 571:14
578:20 604:5
609:3
**sums** 647:19
**supplemental**
683:10
**supply** 671:14
**supposed** 642:24
**sure** 517:5 521:16
523:14 534:25
541:18 546:2
547:3 551:10
553:4 554:5,23
556:12 566:14
575:8,9 578:1
580:2 584:18,23
585:8 586:8
596:20 597:5
603:11 604:21
606:20,21 608:24
611:13 614:21
618:18 627:11
628:8,24 630:9
632:24 647:18
649:23 657:24
659:8,20 660:16
666:15
**swap** 591:20 592:5
592:5 593:2
**swear** 500:10
**switched** 614:5
**sworn** 500:12
684:22
**system** 504:12,19
539:4,6 559:19,23
559:25 560:3

**systems** 511:14

**t**

**t** 566:23 672:9,13
672:18 673:10,20
674:13,14 682:1,1
683:1,1
**take** 503:23 516:4
517:10 518:14
519:18 533:25
535:8 564:14
579:3 581:23
593:25 618:11,15
623:16 625:22
626:24 668:9,11
674:9 679:24
**taken** 494:17
499:11 582:2
618:2 659:2
661:14 670:9
**takes** 615:10
**talk** 520:9 522:19
541:10 642:3
663:7 664:2,8
**talked** 561:5
562:20 680:6
**talking** 501:12
510:4 518:5
522:17 530:17
554:13,15 556:23
562:18 574:2,24
579:11 585:12
593:3 634:10,13
637:18 649:2
660:23 674:21
678:16
**tape** 582:4
**taught** 528:5
**tax** 617:4,23
619:22 620:2,7
621:9 669:23
670:1

**technically** 620:12
**tell** 502:24 504:16
  505:2,17 506:4
  517:23 532:3
  549:17 551:6
  553:16 584:21
  585:23 591:2
  624:12 634:24
  643:25 645:7
  653:17 661:17
  665:18 668:18
  670:25 678:4,9
**tells** 598:20
**ten** 582:23 653:7
**tense** 619:12
**term** 520:25 521:1
  521:5 533:11
  554:19 562:25
  563:16 564:9
  565:5 572:1 619:9
  619:24,24 621:3
  673:12
**terminology** 522:2
  584:3
**terms** 520:8,17,20
  651:9
**testified** 500:13
  502:5 509:11
  511:22 512:4
  525:11 529:24
  562:1 616:15
  617:13 672:11
  674:23
**testify** 526:13
**testifying** 673:10
  674:1
**testimony** 515:15
  515:19 522:25
  526:13 527:17
  540:19 576:2,3
  582:20 583:7

587:15,18,24
  588:3 590:7 674:2
  683:6
**text** 631:4
**thank** 501:3
  502:22,23 519:16
  520:24 524:21
  528:25 529:3
  534:20,23 536:9
  550:12 558:3
  564:22 566:7
  572:15,21 585:1
  594:10,15 596:2
  600:8 603:12,13
  645:12 666:23
  681:3,17
**thanks** 581:22,24
  584:19
**theater** 640:21
**theoretically**
  610:15
**thereof** 659:9
**thereto** 682:6
**thing** 523:17
  539:21 564:2,21
  586:3 591:15
  614:1 617:2
  624:13 639:24
  641:19 676:13,22
**things** 516:25
  592:9 609:16
  642:7,13,20 643:8
  653:19 656:25
  657:2 661:5,8,9,18
  667:25 671:18
  675:14
**think** 511:16
  521:11 526:12
  534:24 537:3,14
  538:5 539:21
  544:20 564:20

567:24 568:12
  570:25 572:7
  577:25 586:11
  587:7,8 604:8
  606:16,17 607:8
  608:18 617:15
  619:19 625:13
  627:8,18 629:17
  630:18 633:8
  634:4 638:23
  639:2 644:22
  654:12 655:20
  656:7 657:18,21
  658:4,25 661:10
  661:11 665:2
  666:23
**thinking** 660:23
**thinks** 629:14
**third** 525:4,21
  526:21 527:2
  528:20 529:6,9,19
  531:24 663:20
  679:5
**thought** 527:16
  546:23 587:9
  588:14 609:1
**thousands** 504:1
**three** 542:9 549:3
  572:10 578:14
  623:25 627:12
  636:21,22 638:3
  670:11 681:22
**time** 499:7,19
  503:11,13 505:7
  510:16 512:6,10
  514:20 515:10
  517:6,14 518:5
  521:3 523:5,24
  524:2 526:7,8,17
  527:5,12,20
  529:23,25 530:3,9

530:13,17 531:3
  533:22 541:6
  548:4 551:1
  553:17 554:6
  555:5 558:6 561:5
  562:22 574:9
  575:4 579:2,17
  582:1,6 588:5
  590:4 593:6,7
  596:18 612:25
  615:9 618:9
  620:13 623:13,16
  626:2 627:19
  631:7,12 632:8,15
  634:10,14,22,23
  640:15 647:23
  648:15,23 649:4
  654:12,15,16
  656:2,12,13,22
  658:5 670:2,8,13
  674:12 675:3
  676:2 681:22
**timely** 567:6
**times** 524:14
  563:23 589:13
  634:12 669:15,22
**title** 536:6 558:19
  569:18 571:12,18
  604:3
**tobacco** 621:24
**today** 516:24
  521:1 522:19
  548:9 585:7 587:3
  587:19 594:3
  625:5 662:22,23
  665:17 666:21
**today's** 499:7
**told** 526:2 541:4
  546:21 624:15
  666:9

CONFIDENTIAL

**top** 536:14 550:5
558:12 559:7
568:4 578:4 612:2
627:24 662:15
**topics** 566:24
567:4,16,18
**total** 515:5 539:22
631:23
**totally** 592:10
615:19 639:15
641:24 642:1,5,14
642:21 643:5
**track** 552:25
589:19 590:20
646:21
**trade** 497:18
503:15,25 504:10
505:19 506:3
509:21 520:24
521:14,14 538:17
543:12,14 549:1,5
552:4,8,19 553:3
553:14 555:16,17
560:1,3,6 563:12
565:10,12 569:6
571:17,20 574:6
574:10 575:19
577:13 591:23
592:17 600:16
601:19 602:5,23
606:6,9 607:20,21
608:10 615:8,12
615:17 616:2,3,5
617:24 618:2,11
620:4 621:13
622:10,14,22,24
623:4,6 624:2,17
624:18,23 635:12
637:15 638:1
671:20 672:4
679:9

**traded** 509:18,19
509:20 513:9
545:6,21,23,25
547:21,21 554:6,9
554:11
**trader** 537:25
542:17 543:2,5,17
544:1,3,4,4,7,8
545:3,21,25
547:11 602:7,9
**trader's** 545:1,10
**traders** 542:13,18
542:20 543:12
544:11 545:14,23
555:23 556:3
557:13 655:24
656:24 657:6,8,10
659:9 667:5
**trades** 503:17,18
509:4,10 512:7,11
512:14 521:4
529:18 540:11,12
545:9 552:25
553:1 554:14
555:22 556:1,2,3
556:17,18 565:17
573:20 590:24
591:3,7 601:4
615:23 622:20
635:12 636:18
637:3,23 666:20
**trading** 507:7
508:1,7,12,25
509:1,9,12 510:2
511:23,24 513:16
520:16,19 523:8
523:13 537:25
538:18 540:15
541:11,14,25
542:5,6,14 543:5,8
543:10,17 544:12

544:16 545:1
546:16 547:14,23
548:21 552:12,24
553:16 554:1,21
554:22 555:6,7,14
557:17 590:16
602:14,15 612:9
617:14 636:16
661:4 667:8,13,14
**transaction**
497:16 503:19
513:8,9 515:25
516:3 518:13
519:11 521:21
522:9,12,16,16
523:17 525:9
526:18,19,20
532:11,13 533:12
534:15 537:22
542:7,25 544:18
548:20 549:2
550:14,22 551:7,8
554:20 555:11,21
564:11,25 568:15
572:8,23 573:1,10
573:22,24,25
574:17 575:16
576:15 577:8
578:13 579:24
580:1,8,19 581:11
581:16,16 589:11
589:17 590:14
591:23 592:8
593:4,15 601:23
602:10,11 605:1,8
605:16 606:18
607:4,4,13 608:1
608:14 610:3,4,12
614:25 615:13,20
615:20,25 620:1
622:1 643:15,16

643:23 644:5
667:20,21 668:1
**transactions** 501:9
501:24 502:3,6,13
502:16 503:4,8,23
503:24 505:11,12
506:5,7,10,21
507:6,17,20 509:8
509:24 521:10,25
523:1 525:12
528:21 531:8,24
534:6 540:17,18
540:19 541:2,3
545:12 552:14,15
563:18 574:3
576:17 579:9,18
579:21 581:2,8
588:25 589:2
590:7 591:17
595:19 599:23
608:17,23 609:2,4
609:10,11 610:22
614:20 616:10
617:21 624:10
**transcript** 682:9
**transfer** 537:2,6
**treasuries** 525:8
525:20,23,24
526:1,4,10 527:9
527:22,24 532:14
533:4 561:14,17
561:23 562:22
574:24,25 575:10
**treasury** 525:15
526:18,25 532:13
565:1 589:15
**treated** 516:6
**treatment** 620:7
**trial** 676:19
**trigger** 620:2

| true  562:3,4 | 627:23 636:21 | **u** | undersigned |
| --- | --- | --- | --- |
| 565:15,17 597:4 | 643:17 656:2 | **u.s.**  525:8 625:11 | 683:14 |
| 639:6 652:20 | 678:21 | 625:14,17 | understand |
| 682:8 683:17 | turned  524:4 | uh  500:21 527:7 | 521:16 522:2,18 |
| trust  505:25 | 640:1 | 535:18 537:13,24 | 524:3,8 525:13 |
| 582:25 583:1 | turning  639:17 | 538:12 539:24 | 534:22 546:7 |
| trustee  496:3 | two  507:11 514:5 | 543:3 552:2,23 | 547:3 548:10,11 |
| 497:21 498:2 | 516:23 526:5,9 | 555:12 557:11,25 | 553:6 555:25 |
| 500:3,5 510:10 | 542:9 550:2 | 558:14 559:11 | 556:6,9,12 567:4 |
| 523:22 535:16 | 551:25 566:22 | 565:3,11 568:8 | 574:23 580:3 |
| 558:8 569:16 | 567:3,15,25 572:7 | 569:24 570:18 | 585:6 586:5,7 |
| 578:3,7 676:16 | 579:6 582:4 | 571:24 572:24 | 587:17 596:20 |
| 678:10 681:9,11 | 597:13 601:2,8 | 575:21 577:11 | 609:20 610:21 |
| trustee's  521:23 | 607:24,24 608:6 | 582:15,22 590:6 | 614:21 627:21 |
| 524:16,20 535:12 | 608:10 611:9 | 594:20 596:6,15 | 630:1,3 636:3 |
| 558:4 566:10 | 614:18 616:9 | 597:17 598:23 | 640:24 644:9,11 |
| 569:13 600:9 | 619:2 621:21 | 600:21 604:25 | 650:22 654:3,18 |
| 603:6,10 611:9,10 | 625:11 627:4 | 605:7,15 606:5,7 | 654:18,24 666:15 |
| 611:11 626:11 | 635:10 639:17 | 606:15 608:5 | 676:10 678:18 |
| 644:25 668:10 | 650:23,23 653:8 | 609:6 611:22 | understanding |
| 671:5,23 | 663:22 668:20 | 612:4,17 619:11 | 512:17 524:9 |
| truth  624:12 | 670:7 | 620:21 622:13 | 545:16 598:7 |
| 665:18 | type  518:8 532:11 | 623:11 624:4,6 | 607:19 652:1 |
| try  524:18,18 | 533:8 535:21 | 628:4 636:25 | 653:1 |
| 565:19 644:12 | 553:16 593:10 | 650:12,21 656:15 | understood  507:3 |
| 665:11 | 604:13 639:24 | 658:17 659:23 | 526:15 528:4 |
| trying  512:1 534:1 | types  608:10 | 660:14 661:6 | 530:1 531:7,21 |
| 534:20,21 546:3,4 | 680:21 | 662:19 680:13 | 553:8 567:1 568:1 |
| 546:5,11 554:24 | typical  609:9 | unable  516:20 | 588:19 627:15 |
| 554:25 555:25 | 618:11 659:5 | 517:7 | 637:9 651:15 |
| 556:7 565:23 | typically  501:13 | unaware  592:10 | 664:23 666:22 |
| 585:6 587:16 | 531:22 540:8 | underlying  521:5 | unfair  629:18 |
| 597:13 609:20 | 548:5 560:19 | 523:2 529:21 | 634:4 |
| 610:21 617:15 | 563:1,9,12 580:11 | 561:7 | unfairly  642:15 |
| 618:14 635:3 | 589:16 596:23 | underneath | unidentified  672:1 |
| 642:15 657:2 | 598:4,9 601:22 | 538:18 557:18 | unique  617:10 |
| 658:11 660:8 | 602:10 604:11,19 | 560:13 570:6 | united  494:1 |
| 661:8 669:6 | 609:23 615:3 | 571:23 573:3 | 499:16 625:6,23 |
| turn  525:3 549:19 | 647:25 667:12,18 | 609:7 627:13 | unredacted |
| 555:9 564:22,23 | 671:12 674:8,10 | 646:23 658:17 | 627:16 633:10,15 |
| 572:6 603:3 612:6 | | | 638:3 |

**untrue** 642:5
**unusual** 620:16
**usa** 609:5
**use** 518:16 520:16
  520:17,20,25
  529:13 531:20,22
  532:15 533:19
  560:21 563:16
  609:23 679:21
  683:10
**uses** 529:9
**usual** 618:25
  682:16
**usually** 583:23
  590:22 615:10

**v**

**v** 499:14
**valid** 521:20
**value** 597:6,9
  598:15
**vanguard** 505:5
**varied** 511:18
  518:4 529:24
**varies** 532:21
**variety** 543:18
**various** 515:9
  554:21 593:8
  621:8 661:18
  676:4
**vary** 667:10
**verbatim** 637:11
**verify** 504:13
  511:10
**veritext** 499:6
  500:9
**versus** 516:1
**videographer**
  496:19 499:1
  500:8 581:25
  582:3 670:4,6,10
  681:19

**videotaped** 494:16
**view** 517:20 664:3
**violation** 514:9,11
**virtually** 631:10
  631:22 637:24
  638:4
**visit** 617:9,11
  663:12
**voice** 644:20
**volume** 494:17
  509:23 681:21
**vs** 494:7

**w**

**wait** 632:15
**wall** 642:16
  648:24,25 649:3
  669:16
**want** 512:16
  515:18 518:16
  519:22,25 520:8
  534:7,23,25
  535:16 564:15,21
  566:13 582:16
  591:21 592:25
  593:1,16 594:11
  603:11 606:20
  611:13 621:20
  627:1 628:21
  629:19 630:6,9,11
  631:3,5 641:13
  642:6 647:11,17
  649:22 653:24
  669:20 674:5
  676:11 677:23
  678:4 681:12
**wanted** 507:2
  509:22 528:10
  533:25 594:8
  616:22,23 617:2
  617:24 620:4
  653:9 654:4

655:23 673:16
  676:19
**wants** 518:1,2
  593:21,21
**warehouses** 678:1
  678:13
**warrants** 553:13
**waste** 627:19
**water** 519:23,25
  644:20
**waterhouse** 614:6
  614:7
**way** 524:19 529:11
  587:8,8 588:11
  590:1 591:22
  592:14 598:24
  611:18 634:9
  639:9 646:18
  647:11 657:21
  669:8 676:12
  682:10
**ways** 591:16
  614:23
**we've** 528:10
  557:6 558:6
  564:13
**week** 626:21 666:2
**weeks** 653:8
**wells** 505:5
**went** 503:17
  522:15 525:14,16
  525:24,25 580:12
  583:12 587:20
  609:18 617:21
  618:21 621:21
  626:3 631:7,12
  640:20 677:9
**west** 542:8
**westminster**
  500:19 607:17,20
  607:25 608:7

609:5 610:7,10,11
**whispering** 499:3
**who've** 644:1
**whoops** 571:10
**willing** 514:6,6
  564:6 593:1,20
**wiped** 631:20
**wired** 647:9
**wiring** 647:7,20
**withdrawal**
  516:21
**withdrawals**
  648:2,14
**witness** 497:2
  499:19 500:7,10
  500:25 503:10
  507:6 512:3 513:3
  514:23 515:21
  517:4 518:25
  519:20,23 520:1
  521:22 525:23
  526:17 528:23
  529:2 531:15
  532:2 544:10
  550:13 556:12
  563:5 577:24
  595:7 596:20
  601:10 603:25
  613:2,4 618:6
  619:19 621:18
  622:6 631:14
  633:17,23 634:9
  639:4 641:16
  642:2,25 644:19
  644:23 648:9
  652:9,17 655:4
  661:2,7 663:9,11
  665:14 666:24
  681:24
**witnesses** 643:2,22

CONFIDENTIAL

**[worded - zero]**                                                                 Page 37

| | | |
|---|---|---|
| **worded** 587:9 | 579:10 580:22 | 532:16 583:1 |
| **words** 521:13,15 | 583:5 584:20 | 589:16 |
| 521:20 532:4 | 587:7 590:9 | **z** |
| 533:10,24 544:10 | 594:12 595:4,6 | **zero** 578:14 |
| 546:11 549:1 | 596:22 604:8,9 | |
| 563:9,10 564:5 | 612:10 623:3 | |
| 575:8 581:19 | 626:10 633:23 | |
| 584:2 591:11,14 | 634:3 639:24 | |
| 592:5 593:5 601:7 | 640:16 644:21,21 | |
| 611:2,5 620:1 | 645:3 649:16,16 | |
| 621:15 651:3,23 | 649:17 651:2 | |
| 652:9,19 654:11 | 653:7 658:11 | |
| 674:5,6 675:6 | 659:23 660:8 | |
| **work** 540:8 613:11 | 662:1 663:10 | |
| 664:1,3,4,14,15,17 | 668:13,20 | |
| 664:21 | **year** 622:5 658:9 | |
| **worked** 524:6 | 658:21 659:19,25 | |
| 645:21 646:20 | 660:1 661:12 | |
| 675:7,7 | 677:23 | |
| **working** 548:12 | **years** 510:6 | |
| 584:3 | 511:18 515:3 | |
| **worry** 620:7 | 516:18 613:24 | |
| **worth** 515:8,12 | 658:10,14,15 | |
| **writing** 656:9 | 659:22 660:2,12 | |
| 660:24 662:1 | 661:12 669:17,18 | |
| **written** 655:17 | 676:3 | |
| 660:14 682:7,12 | **yep** 538:16 540:2 | |
| **wrong** 552:6 615:9 | 633:9 | |
| 615:9 642:21 | **yesterday** 500:16 | |
| **wrote** 629:15,17 | 502:5 512:5 | |
| 655:20,25 657:6 | 520:22 522:18 | |
| **wtsx** 553:13 | 582:9 594:3,9,15 | |
| **x** | 616:16 618:16,21 | |
| **x** 671:25 | 620:23 662:24 | |
| **xs** 612:19 672:1 | 663:18,19,19,20 | |
| **y** | 665:17 679:24 | |
| **yeah** 507:4 540:21 | 680:1,7 | |
| 549:11 556:22,24 | **yield** 680:17 | |
| 557:16 558:8,16 | **york** 494:1 495:7 | |
| 560:7 561:15,15 | 495:7,16,16 496:8 | |
| | 496:8,15 499:18 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.