**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, NY  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Marc E. Hirschfield
Richard J. Bernard
Geraldine E. Ponto
Marc Skapof

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-_____ (BRL) |
| v. | |
| FGLS Equity LLC | |
| Defendant. | |

## COMPLAINT

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"),[1] and the substantively consolidated estate of Bernard L.

Madoff individually ("Madoff"), by and through his undersigned counsel, for his complaint (the

"Complaint"), states as follows:

### NATURE OF PROCEEDING

1.       This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Madoff.  Over the course of the scheme, there were more than 8,000 client accounts at BLMIS.

In early December 2008, BLMIS generated client account statements for its approximately 4,900

open client accounts.  When added together, these statements purport that clients of BLMIS had

approximately $65 billion invested with BLMIS.  In reality, BLMIS had assets on hand worth a

small fraction of that amount.  On March 12, 2009, Madoff admitted to the fraudulent scheme

and pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in prison.

The within defendant FGLS Equities LLC ("Defendant") received avoidable transfers from

BLMIS.

2.       Within the 90 days prior to the Filing Date (defined below), Defendant received

the amount of $2,350,000.00 from BLMIS.  As a result of this preference payment, Defendant is

in a more favorable position than other defrauded customers of BLMIS.

3.       This adversary proceeding is brought pursuant to sections 78fff(b), 78fff-1(a) and

78fff-2(c)(3) of SIPA, sections 105(a), 502(d), 544, 547, 550(a) and 551 of title 11 of the United

States Code (the "Bankruptcy Code") and other applicable law, for avoidance of preferential

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

transfers in connection with certain transfers of property by BLMIS to or for the benefit of

Defendant. The Trustee seeks to set aside such transfers and preserve and recover the property

for the benefit of BLMIS' defrauded customers.

## JURISDICTION AND VENUE

4.      This is an adversary proceeding commenced before the same Court before whom

the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is

pending. The SIPA Proceeding was originally brought in the United States District Court for the

Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff*

*Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has

been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28

U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (F) and

(O).

6.      Venue in this district is proper under 28 U.S.C. § 1409.

## DEFENDANT

7.      Defendant FGLS Equity LLC is a limited liability corporation that was formed

under the laws of the state of New York. Its principal place of business is located at 440 Park

Avenue South, 10th Floor, New York, New York 10016. Defendant holds a BLMIS account in

the name, "FGLS Equity LLC," with the account address reported as c/o Marc Bogatin, Esq.,

277 Broadway, Suite 900, New York, New York 10007.

## BACKGROUND, THE TRUSTEE AND STANDING

8.      On December 11, 2008 (the "Filing Date"),[2] Madoff was arrested by federal

agents for violation of the criminal securities laws, including, *inter alia*, securities fraud,

investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and

Exchange Commission ("SEC") filed a complaint in the District Court which commenced the

District Court Proceeding against Madoff and BLMIS.  The District Court Proceeding remains

pending in the District Court.  The SEC complaint alleged that Madoff and BLMIS engaged in

fraud through the investment advisor activities of BLMIS.

9.      On December 12, 2008, The Honorable Louis L. Stanton of the District Court

entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of

BLMIS.

10.      On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC

consented to a combination of its own action with an application of the Securities Investor

Protection Corporation ("SIPC").  Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC

filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its

obligations to securities customers as they came due and, accordingly, its customers needed the

protections afforded by SIPA.

11.      Also on December 15, 2008, Judge Stanton granted the SIPC application and

entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

a.      appointed the Trustee for the liquidation of the business of BLMIS

pursuant to section 78eee(b)(3) of SIPA;

---

[2] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is
filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court
"in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced
before the date on which such application was filed, the term 'filing date' means the date on which such proceeding

    b.        appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to

section 78eee(b)(3) of SIPA; and

    c.        removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

    12.    By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of

BLMIS.

    13.    At a Plea Hearing on March 12, 2009 in the case captioned *United States v.*

*Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information

filed against him by the United States Attorneys' Office for the Southern District of New York.

At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment

advisory side of [BLMIS]."  Plea Allocution of Bernard L. Madoff at 23, *United States v.*

*Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50).  Additionally,

Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed

criminal."  *Id.*  Madoff was sentenced on June 29, 2009 to 150 years in prison.

    14.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to

participating in and conspiring to perpetuate the Ponzi scheme.  At a Plea Hearing on August 11,

2009 in the case entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali pled

guilty to a ten-count criminal information.  Among other things, DiPascali admitted that the

fictitious scheme had begun at BLMIS since at least the 1980s.  Plea Allocution of Frank

---

was commenced." 15 U.S.C. § 78*lll*(7)(B).  Thus, even though the application for a protective decree was filed on
December 15, 2008, the Filing Date in this action is December 11, 2008.

DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009)
(Docket No. 11).

15.     As the Trustee appointed under SIPA, the Trustee is charged with recovering and
paying out customer property to BLMIS' customers, assessing claims, and liquidating any other
assets of the firm for the benefit of the estate and its creditors.  The Trustee is in the process of
marshalling BLMIS' assets, and the liquidation of BLMIS' assets is well underway.  However,
such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars
that they invested with BLMIS over the years.  Consequently, the Trustee must use his authority
under SIPA and the Bankruptcy Code to pursue recovery from customers who received
preferences and/or payouts of fictitious profits to the detriment of other defrauded customers
whose money was consumed by the Ponzi scheme.  Absent this or other recovery actions, the
Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA
section 78fff-2(c)(1).

16.     Pursuant to section 78fff-1(a), the Trustee has the general powers of a bankruptcy
trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant
to SIPA section 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the
Bankruptcy Code apply to this proceeding to the extent consistent with SIPA.

17.     Pursuant to sections 78fff(b) and 78*lll*(7)(B) of SIPA, the Filing Date is deemed to
be the date of the filing of the petition within the meaning of section 547 of the Bankruptcy
Code.

The Trustee has standing to bring these claims pursuant to section 78fff-1(a) of
SIPA and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other
reasons:

a.      the Defendants received "Customer Property" as defined in 15 U.S.C.

§78*lll*(4);

b.      BLMIS incurred losses as a result of the claims set forth herein;

c.      BLMIS' customers were injured as a result of the conduct detailed herein;

d.      SIPC has not reimbursed, and statutorily cannot fully reimburse, all

customers for all of their losses;

e.      the Trustee will not be able to fully satisfy all claims;

f.      the Trustee, as bailee of customer property, can sue on behalf of the

customer bailors; and

g.      The Trustee is the assignee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers,

collectively, "Accountholders").  As of the date hereof, the Trustee has received multiple express

unconditional assignments of the applicable Accountholders' causes of action, which actions

could have been asserted against Defendant.  As assignee, the Trustee stands in the shoes of

persons who have suffered injury in fact and a distinct and palpable loss for which the Trustee is

entitled to reimbursement in the form of monetary damages.  The Trustee brings this action on

behalf of, among others, those defrauded customers of BLMIS who invested more money in

BLMIS than they withdrew; and

h.      SIPC is the subrogee of claims paid, and to be paid, to customers of

BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon

the Trustee enforcement of its rights of subrogation with respect to payments it has made and is

making to customers of BLMIS from SIPC funds.

## THE FRAUDULENT PONZI SCHEME

18.     Founded in 1959, BLMIS began operations as a sole proprietorship of Madoff and

later, effective January 2001, formed as a New York limited liability company wholly owned by

Madoff.  Since in or about 1986, BLMIS operated from its principal place of business at 885

Third Avenue, New York, New York.  Madoff, as founder, proprietor, chairman, and chief

executive officer, ran BLMIS together with several family members and a number of additional

employees.  BLMIS was registered with the SEC as a securities broker-dealer under section

15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b).  By that registration, BLMIS

is a member of SIPC.  BLMIS had three business units: investment advisory (the "IA Business"),

market making and proprietary trading.

19.     For certain accounts in the IA Business, BLMIS purported to participate in a

capital appreciation/depreciation strategy, depending on whether the customer sought to generate

gains or losses.  For example, the strategy was executed by either purporting to purchase small

groups of securities near lows and then purporting to sell those same securities at highs, or by

purporting to short-sell securities near highs and then purporting to repurchase those securities

near lows.

20.     For other accounts, Madoff described the IA Business' strategy as a "split-strike

conversion" strategy.  Madoff promised these clients that their funds would be invested in a

basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest U.S.

publicly traded companies.  The basket of stocks would be intended to mimic the movement of

the S&P 100 Index.  Madoff asserted that he would carefully time purchases and sales to

maximize value, but this meant that the clients' funds would intermittently be out of the market,

at which times they would purportedly be invested in U.S. issued securities and money market

funds.  The second part of the split-strike conversion strategy was the hedge of such purchases

21.      Although clients of the IA Business received monthly or quarterly statements
purportedly showing the securities that were held in – or had been traded through – their
accounts, as well as the growth of and profit from those accounts over time, the trades reported
on these statements were a complete fabrication.  The security purchases and sales depicted in
the account statements virtually never occurred and the profits reported were entirely fictitious.
At his Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he
claimed to have purchased for customer accounts.  *See* Plea Allocution of Bernard L. Madoff at
3, *United States v. Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50).
Indeed, based on the Trustee's investigation to date and with the exception of isolated individual
trades for certain clients other than Defendant, there is no record of BLMIS having cleared any
purchase or sale of securities on behalf of the IA Business at the Depository Trust & Clearing
Corporation, the clearing house for such transactions.

22.      Prior to his arrest, Madoff assured clients and regulators that he conducted all
trades on the over-the-counter market after hours.  To bolster that lie, Madoff periodically wired
tens of millions of dollars to BLMIS' affiliate, Madoff Securities International Ltd. ("MSIL"), a
London based entity substantially owned by Madoff and his family.  There are no records that
MSIL ever used the wired funds to purchase securities for the accounts of the IA Business
clients.

23.     Additionally, based on the Trustee's investigation to date, there is no evidence that BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased and sold.

24.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff and his co-conspirators concealed the ongoing fraud in an effort to hinder, delay or defraud other current and prospective customers of BLMIS.  The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to – or payments on behalf of – other investors.  The money sent to BLMIS for investment, in short, was simply used to keep the scheme going and to enrich Madoff, his associates and others, including Defendant, until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

25.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors and to lure other investors into the Ponzi scheme.

26.     During the scheme, certain investors requested and received distributions of the so-called "profits" listed for their accounts which were nothing more than fictitious profits. Other investors, from time to time, redeemed or closed their accounts, or removed portions of purportedly available funds, and were paid consistently with the statements they had been receiving.  Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

27.    When payments were made to or on behalf of these investors, including Defendant, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains.  In reality, BLMIS had not invested the investors' principal as reflected in customer statements.  In an attempt to conceal the ongoing fraud and thereby hinder, delay or defraud other current and prospective investors, BLMIS paid to or on behalf of certain investors the inflated amounts reflected in the falsified financial statements, including principal and/or fictitious profits.

28.    BLMIS used the funds deposited from new investments to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers.  Due to the siphoning and diversion of new investments to fund redemptions requested by other investors, BLMIS did not have the funds to pay investors on account of their new investments.  BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

29.    In an effort to hinder, delay or defraud authorities from detecting the fraud, BLMIS did not register as an Investment Advisor until September 2006.

30.    In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration.  The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.  In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $65 billion under management.

31.    Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New

32.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS.  At all relevant times, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## THE TRANSFERS

33.     According to BLMIS' records, an account (No. 1F0178) was maintained with BLMIS as set forth on Exhibit A (the "Account").   Upon information and belief, for the Account, Defendant executed a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements"), and delivered such documents to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.

34.     The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.  The Account was held in New York, New York, and Defendant sent funds to BLMIS and/or to BLMIS' account at JPMorgan Chase & Co., Account #xxxxxxxxxxx1703 (the "BLMIS Bank Account") in New York, New York for application to the Account and the purported conducting of trading activities.  Between the date the account was opened and the Filing Date, Defendant made deposits to BLMIS through checks and/or wire transfers into the BLMIS Bank Account and/or received inter-account transfers from other BLMIS accounts.

35.    During the 90 days prior to the Filing Date, BLMIS made payments (collectively, the "Transfers") totaling the amount of $2,350,000.00 to the Defendant. The Transfers were made to or for the benefit of the Defendant and are set forth on Exhibit B annexed hereto.

36.    The Transfers represent the return of principal received during the 90 days prior to the Filing Date, and are avoidable and recoverable under sections 544, 547, 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA section 78fff-2(c)(3).

37.    The Trustee's investigation is ongoing and the Trustee reserves the right to (i) supplement the information regarding the Transfers, and any additional transfers and (ii) seek recovery of such additional transfers.

38.    To the extent that any of the avoidance and/or recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

## CUSTOMER CLAIMS

39.    On or about June 25, 2009, Defendant filed a customer claim with the Trustee which the Trustee has designated as Claim # 011505 (the "Customer Claim").

## COUNT ONE
## PREFERENTIAL TRANSFER - 11 U.S.C. §§ 547(b), 550 AND 551

40.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

41.    At the time of each of the Preference Period Transfers received within the 90 days prior to the Filing Date, Defendant was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

42.    Each of the Preference Period Transfers constitutes a transfer of an interest of

BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant

to section 78fff-2(c)(3) of SIPA.

43.    Each of the Preference Period Transfers was to or for the benefit of Defendant.

44.    Each of the Preference Period Transfers was made for or on account of an

antecedent debt owed by BLMIS before such transfer was made.

45.    Each of the Preference Period Transfers was made while BLMIS was insolvent.

46.    Each of the Preference Period Transfers was made within 90 days of the Filing

Date.

47.    Each of the Preference Period Transfers enabled Defendant to receive more than

the Defendant would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code,

(ii) the transfers had not been made, and (iii) Defendant received payment of such debt to the

extent provided by the provisions of the Bankruptcy Code.

48.    Each of the Preference Period Transfers constituted a preferential transfer

avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable

from Defendant pursuant to section 550(a) and section 78fff-2(c)(3) of SIPA.

49.    As a result of the foregoing, pursuant to sections 547(b), 550, and 551 of the

Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against

Defendant: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the

Preference Period Transfers be set aside and (c) recovering the Preference Period Transfers, or

the value thereof, for the benefit of the estate of BLMIS.

## COUNT TWO
## DISALLOWANCE OF DEFENDANT'S SIPA CLAIM

50.     To the extent applicable, the Trustee incorporates by reference the allegations

contained in the previous paragraphs of this Complaint as if fully rewritten herein.

51.     On or about June 25, 2009, Defendant filed a Customer Claim in the SIPA

proceeding.

52.     Defendant's Customer Claim should not be allowed pursuant to section 502(d) of

the Bankruptcy Code.  Defendant is the recipient of Transfers of BLMIS' property which are

avoidable and recoverable under sections 547 and 550 of the Bankruptcy Code, and Defendant

has not returned the Transfers to the Trustee.

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in favor

of the Trustee and against Defendant as follows:

i.     On the First Claim for Relief, pursuant to sections 547, 550(a) and 551 of the

Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Preference

Period Transfers, (b) directing that the Preference Period Transfers be set aside, and

(c) recovering the Preference Period Transfers, or the value thereof, from Defendant for the

benefit of the estate of BLMIS;

ii.     On the Second Claim for Relief, the Defendant's Customer Claim should not be

allowed pursuant to section 502(d) of the Bankruptcy Code unless and until the Transfers are

paid or turned over;

iii.     On all Claims for Relief, pursuant to federal common law awarding the Trustee

prejudgment interest from the date on which the Transfers were received;

iv.     On all Claims for Relief, establishment of a constructive trust over the proceeds of

the Transfers in favor of the Trustee for the benefit of BLMIS' estate;

     v.      On all Claims for Relief, awarding the Trustee all applicable interest, costs, and disbursements of this action; and

vi.      On all Claims for Relief, granting Plaintiff such other, further, and different relief as the Court deems just, proper and equitable.

Date:  November 12, 2010
        New York, New York

Of Counsel:

**BAKER & HOSTETLER LLP**
PNC Center
1900 East 9th Street, Suite 3200
Cleveland, OH 44114-3482
Mary M. Bittence
E-mail:mbittence@bakerlaw.com
Brian A. Bash
Email: bbash@bakerlaw.com
Thomas M. Wearsch
Email: twearsh@bakerlaw.com
Telephone:  (216) 621-0200
Fax:  (216) 696-0740

By: */s/* Marc E. Hirschfield
      */s/* Richard J. Bernard
      */s/* Geraldine E. Ponto
      */s/* Marc Skapof
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Marc E. Hirschfield
Email:  mhirschfield@bakerlaw.com
Richard J. Bernard
Email: rbernard@bakerlaw.com
Geraldine E. Ponto
Email: gponto@bakerlaw.com
Marc Skapof
Email: mskapof@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*

Exhibit A

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| FGLS EQUITY LLC  C/O STEVEN MENDELOW | 1F0178 |

MADC1228_00000001

Exhibit B

BLMIS ACCOUNT NO. 1F0178 - CARL J. SHAPIRO OR STEVEN MENDELOW

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |
| 11/1/2002 | TRANS FROM 1ZA54230 (1ZA542) | 3,149,075 [1] | - | - | - | - | - | - | - | - |
| 12/24/2002 | CHECK | (100,000) | - | (100,000) | - | - | (100,000) | - | - | - |
| 1/3/2003 | CHECK | 95,000 | 95,000 | - | - | - | (5,000) | - | - | - |
| 3/6/2003 | CHECK | 300,000 | 300,000 | - | - | - | 295,000 | - | - | - |
| 4/9/2003 | CHECK | 40,000 | 40,000 | - | - | - | 335,000 | - | - | - |
| 4/23/2003 | CHECK | 40,000 | 40,000 | - | - | - | 375,000 | - | - | - |
| 5/9/2003 | CHECK | 20,000 | 20,000 | - | - | - | 395,000 | - | - | - |
| 6/5/2003 | CHECK | 90,000 | 90,000 | - | - | - | 485,000 | - | - | - |
| 6/10/2003 | CHECK | 200,000 | 200,000 | - | - | - | 685,000 | - | - | - |
| 7/21/2003 | CHECK | 500,000 | 500,000 | - | - | - | 1,185,000 | - | - | - |
| 7/31/2003 | CHECK | 300,000 | 300,000 | - | - | - | 1,485,000 | - | - | - |
| 8/12/2003 | CHECK | 185,000 | 185,000 | - | - | - | 1,670,000 | - | - | - |
| 9/4/2003 | CHECK | (800,000) | - | (800,000) | - | - | 870,000 | - | - | - |
| 9/12/2003 | CHECK | 500,000 | 500,000 | - | - | - | 1,370,000 | - | - | - |
| 9/23/2003 | CHECK | 525,000 | 525,000 | - | - | - | 1,895,000 | - | - | - |
| 10/14/2003 | CHECK | 170,000 | 170,000 | - | - | - | 2,065,000 | - | - | - |
| 11/6/2003 | CHECK | 200,000 | 200,000 | - | - | - | 2,265,000 | - | - | - |
| 11/18/2003 | CHECK | (300,000) | - | (300,000) | - | - | 1,965,000 | - | - | - |
| 11/26/2003 | CHECK | 615,000 | 615,000 | - | - | - | 2,580,000 | - | - | - |
| 12/5/2003 | CHECK | 270,000 | 270,000 | - | - | - | 2,850,000 | - | - | - |
| 12/17/2003 | CHECK | (50,000) | - | (50,000) | - | - | 2,800,000 | - | - | - |
| 1/16/2004 | CHECK | (860,000) | - | (860,000) | - | - | 1,940,000 | - | - | - |
| 1/26/2004 | CHECK | (60,000) | - | (60,000) | - | - | 1,880,000 | - | - | - |
| 2/26/2004 | CHECK | (150,000) | - | (150,000) | - | - | 1,730,000 | - | - | - |
| 3/4/2004 | CHECK | (25,000) | - | (25,000) | - | - | 1,705,000 | - | - | - |
| 3/29/2004 | CHECK | 230,000 | 230,000 | - | - | - | 1,935,000 | - | - | - |
| 4/21/2004 | CHECK | 500,000 | 500,000 | - | - | - | 2,435,000 | - | - | - |
| 6/23/2004 | CHECK | (600,000) | - | (600,000) | - | - | 1,835,000 | - | - | - |
| 7/1/2004 | CHECK | 150,000 | 150,000 | - | - | - | 1,985,000 | - | - | - |
| 9/14/2004 | CHECK | 135,000 | 135,000 | - | - | - | 2,120,000 | - | - | - |
| 10/1/2004 | CHECK | 460,000 | 460,000 | - | - | - | 2,580,000 | - | - | - |
| 10/28/2004 | CHECK | 525,000 | 525,000 | - | - | - | 3,105,000 | - | - | - |
| 11/2/2004 | CHECK | 75,000 | 75,000 | - | - | - | 3,180,000 | - | - | - |
| 11/8/2004 | CHECK | 550,000 | 550,000 | - | - | - | 3,730,000 | - | - | - |
| 11/23/2004 | CHECK | 50,000 | 50,000 | - | - | - | 3,780,000 | - | - | - |
| 12/13/2004 | CHECK | 50,000 | 50,000 | - | - | - | 3,830,000 | - | - | - |
| 1/26/2005 | CHECK | (500,000) | - | (500,000) | - | - | 3,330,000 | - | - | - |
| 2/1/2005 | CHECK | 150,000 | 150,000 | - | - | - | 3,480,000 | - | - | - |
| 2/25/2005 | CHECK | (65,000) | - | (65,000) | - | - | 3,415,000 | - | - | - |
| 5/9/2005 | CHECK | 150,000 | 150,000 | - | - | - | 3,565,000 | - | - | - |
| 5/20/2005 | CHECK | 100,000 | 100,000 | - | - | - | 3,665,000 | - | - | - |
| 6/14/2005 | CHECK | 1,170,000 | 1,170,000 | - | - | - | 4,835,000 | - | - | - |
| 6/24/2005 | CHECK | 425,000 | 425,000 | - | - | - | 5,260,000 | - | - | - |
| 7/20/2005 | CHECK | 50,000 | 50,000 | - | - | - | 5,310,000 | - | - | - |
| 8/17/2005 | CHECK | 100,000 | 100,000 | - | - | - | 5,410,000 | - | - | - |
| 8/24/2005 | CHECK | 170,000 | 170,000 | - | - | - | 5,580,000 | - | - | - |
| 9/1/2005 | CHECK | (70,000) | - | (70,000) | - | - | 5,510,000 | - | - | - |
| 9/7/2005 | CHECK | (500,000) | - | (500,000) | - | - | 5,010,000 | - | - | - |
| 9/26/2005 | CHECK | 150,000 | 150,000 | - | - | - | 5,160,000 | - | - | - |
| 11/4/2005 | CHECK | 325,000 | 325,000 | - | - | - | 5,485,000 | - | - | - |
| 12/2/2005 | CHECK | 1,000,000 | 1,000,000 | - | - | - | 6,485,000 | - | - | - |
| 12/23/2005 | CHECK | 75,000 | 75,000 | - | - | - | 6,560,000 | - | - | - |
| 1/11/2006 | CHECK | 200,000 | 200,000 | - | - | - | 6,760,000 | - | - | - |
| 1/17/2006 | CHECK | (4,350,000) | - | (4,350,000) | - | - | 2,410,000 | - | - | - |
| 2/6/2006 | CHECK | 450,000 | 450,000 | - | - | - | 2,860,000 | - | - | - |
| 4/4/2006 | CHECK | 100,000 | 100,000 | - | - | - | 2,960,000 | - | - | - |
| 5/31/2006 | CHECK | 250,000 | 250,000 | - | - | - | 3,210,000 | - | - | - |
| 6/19/2006 | CHECK | 250,000 | 250,000 | - | - | - | 3,460,000 | - | - | - |
| 7/26/2006 | CHECK | (200,000) | - | (200,000) | - | - | 3,260,000 | - | - | - |

MADC1228_00000002

Exhibit B

BLMIS ACCOUNT NO. 1FR077 – GUY FELTON EQUITY G.C. C/O STEVEN MENDELOW

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |
| 8/15/2006 | CHECK | 200,000 | 200,000 | - | - | - | 3,460,000 | - | - | - |
| 9/15/2006 | CHECK | 200,000 | 200,000 | - | - | - | 3,660,000 | - | - | - |
| 9/20/2006 | CHECK | 350,000 | 350,000 | - | - | - | 4,010,000 | - | - | - |
| 10/18/2006 | CHECK | 275,000 | 275,000 | - | - | - | 4,285,000 | - | - | - |
| 11/10/2006 | CHECK | (100,000) | - | (100,000) | - | - | 4,185,000 | - | - | - |
| 11/21/2006 | CHECK | (300,000) | - | (300,000) | - | - | 3,885,000 | - | - | - |
| 12/11/2006 | CHECK | 200,000 | 200,000 | - | - | - | 4,085,000 | - | - | - |
| 12/19/2006 | CHECK | (450,000) | - | (450,000) | - | - | 3,635,000 | - | - | - |
| 1/12/2007 | CHECK | 185,000 | 185,000 | - | - | - | 3,820,000 | - | - | - |
| 1/16/2007 | CHECK | 240,000 | 240,000 | - | - | - | 4,060,000 | - | - | - |
| 1/31/2007 | CHECK | 115,000 | 115,000 | - | - | - | 4,175,000 | - | - | - |
| 1/31/2007 | CHECK | 550,000 | 550,000 | - | - | - | 4,725,000 | - | - | - |
| 1/31/2007 | CHECK | 55,000 | 55,000 | - | - | - | 4,780,000 | - | - | - |
| 1/31/2007 | CANCEL CHECK | (550,000) | (550,000) | - | - | - | 4,230,000 | - | - | - |
| 2/5/2007 | CHECK | (65,000) | - | (65,000) | - | - | 4,165,000 | - | - | - |
| 2/14/2007 | CHECK | 100,000 | 100,000 | - | - | - | 4,265,000 | - | - | - |
| 3/9/2007 | CHECK | 85,000 | 85,000 | - | - | - | 4,350,000 | - | - | - |
| 4/2/2007 | CHECK | 175,000 | 175,000 | - | - | - | 4,525,000 | - | - | - |
| 4/9/2007 | CHECK | (50,000) | - | (50,000) | - | - | 4,475,000 | - | - | - |
| 4/13/2007 | CHECK | 600,000 | 600,000 | - | - | - | 5,075,000 | - | - | - |
| 5/7/2007 | CHECK | (100,000) | - | (100,000) | - | - | 4,975,000 | - | - | - |
| 5/11/2007 | CHECK | (500,000) | - | (500,000) | - | - | 4,475,000 | - | - | - |
| 5/21/2007 | CHECK | (100,000) | - | (100,000) | - | - | 4,375,000 | - | - | - |
| 6/8/2007 | CHECK | (250,000) | - | (250,000) | - | - | 4,125,000 | - | - | - |
| 6/21/2007 | CHECK | 300,000 | 300,000 | - | - | - | 4,425,000 | - | - | - |
| 8/14/2007 | CHECK | 50,000 | 50,000 | - | - | - | 4,475,000 | - | - | - |
| 8/28/2007 | CHECK | (50,000) | - | (50,000) | - | - | 4,425,000 | - | - | - |
| 9/10/2007 | CHECK | 125,000 | 125,000 | - | - | - | 4,550,000 | - | - | - |
| 9/26/2007 | CHECK | (50,000) | - | (50,000) | - | - | 4,500,000 | - | - | - |
| 11/9/2007 | CHECK | 350,000 | 350,000 | - | - | - | 4,850,000 | - | - | - |
| 11/30/2007 | CHECK | (300,000) | - | (300,000) | - | - | 4,550,000 | - | - | - |
| 12/6/2007 | CHECK | (50,000) | - | (50,000) | - | - | 4,500,000 | - | - | - |
| 12/19/2007 | CHECK | (250,000) | - | (250,000) | - | - | 4,250,000 | - | - | - |
| 12/26/2007 | CHECK | (100,000) | - | (100,000) | - | - | 4,150,000 | - | - | - |
| 1/16/2008 | CHECK | 125,000 | 125,000 | - | - | - | 4,275,000 | - | - | - |
| 2/8/2008 | CHECK | 100,000 | 100,000 | - | - | - | 4,375,000 | - | - | - |
| 2/28/2008 | CHECK | 525,000 | 525,000 | - | - | - | 4,900,000 | - | - | - |
| 4/7/2008 | CHECK | 700,000 | 700,000 | - | - | - | 5,600,000 | - | - | - |
| 4/7/2008 | CHECK | (700,000) | - | (700,000) | - | - | 4,900,000 | - | - | - |
| 4/25/2008 | CHECK | 750,000 | 750,000 | - | - | - | 5,650,000 | - | - | - |
| 5/23/2008 | CHECK | (200,000) | - | (200,000) | - | - | 5,450,000 | - | - | - |
| 5/28/2008 | CHECK | (125,000) | - | (125,000) | - | - | 5,325,000 | - | - | - |
| 6/2/2008 | STOP PAYMENT | 125,000 | - | 125,000 | - | - | 5,450,000 | - | - | - |
| 6/9/2008 | CHECK | (125,000) | - | (125,000) | - | - | 5,325,000 | - | - | - |
| 6/12/2008 | CHECK | 200,000 | 200,000 | - | - | - | 5,525,000 | - | - | - |
| 6/30/2008 | CHECK | 500,000 | 500,000 | - | - | - | 6,025,000 | - | - | - |
| 8/5/2008 | CHECK | (300,000) | - | (300,000) | - | - | 5,725,000 | - | - | - |
| 8/22/2008 | CHECK | 300,000 | 300,000 | - | - | - | 6,025,000 | - | - | - |
| 9/2/2008 | CHECK | (325,000) | - | (325,000) | - | - | 5,700,000 | - | - | - |
| 9/16/2008 | CHECK | 100,000 | 100,000 | - | - | - | 5,800,000 | - | - | - |
| 9/24/2008 | CHECK | (1,225,000) | - | (1,225,000) | - | - | 4,575,000 | (375,000) | - | - |
| 9/29/2008 | CHECK | 850,000 | 850,000 | - | - | - | 5,425,000 | - | - | - |
| 10/16/2008 | CHECK | (125,000) | - | (125,000) | - | - | 5,300,000 | (125,000) | - | - |
| 10/31/2008 | CHECK | (250,000) | - | (250,000) | - | - | 5,050,000 | (250,000) | - | - |
| 11/5/2008 | CHECK | (1,200,000) | - | (1,200,000) | - | - | 3,850,000 | (1,200,000) | - | - |

MADC1228_00000003

Exhibit B

BLMIS ACCOUNT NO. 1FR078 - GUY EQUITY PLC C/O STEVEN MENDELOW

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Conveyances |
| 11/26/2008 | CHECK | (400,000) | - | (400,000) | - | - | 3,450,000 | (400,000) | - | - |
| 12/11/2008 | CHECK | (300,000) | - | (300,000) | - | - | 3,150,000 | - | - | - |
| 4/15/2009 | CANCEL CHECK NOT FUNDED PER TRUSTEE | 300,000 | - | 300,000 | - | - | 3,450,000 | - | - | - |
| | Total: | | $ 19,645,000 | $ (16,195,000) | $ - | $ - | $ 3,450,000 | $ (2,350,000) | $ - | $ - |

[1] Although BLMIS statements reflect that funds were transferred into this account on this date, these funds consisted entirely of fictitious profits which were never achieved and thus no funds were actually transferred into the account on this date. Accordingly, the account balance has remained unchanged.

MADC1228_00000004