

Page 1

1    .UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Lead Case No. 08-99000-smb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    Adv. Case No. 08-01789-smb

6    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

7    In the Matter of:

8

9    SECURITIES INVESTOR PROTECTION CORPORATION,

10                   Plaintiff,

11            v.

12    BERNARD L. MADOFF INVESTMENT SECURITIES, LLC, et al.,

13                   Defendants.

14    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

15    Adv. Case No. 09-01161-smb

16    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

17    PICARD,

18                   Plaintiff,

19            v.

20    KINGATE GLOBAL FUND, LTD. et al.,

21                   Defendants.

22    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

23

24

25

1              United States Bankruptcy Court

2              One Bowling Green

3              New York, NY  10004

4

5              October 31, 2018

6              10:15 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  MATTHEW

1    HEARING re Trustees Motion For Limited Additional Discovery

2    Based On Prior Orders Authorizing Deposition of Bernard L.

3    Madoff.

4

5    HEARING re Trustee's Motion for Issuance of Letter of

6    Request.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    MCDERMOTT WILL & EMORY LLP

4         Attorneys for Sage

5         340 Madison Avenue

6         New York, NY 10173

7

8    BY:  ANDREW B. KRATENSTEIN

9

10   HUNTON ANDREWS KURTH LLP

11        Attorneys for Ed Zraick et al.

12        200 Park Avenue

13        New York, NY 10166

14

15   BY:  ROBERT A. RICH

16

17   SCHULTE ROTH & ZABEL LLP

18        Attorneys for Counterparty

19        919 Third Avenue

20        New York, NY 10022

21

22   BY:  JENNIFER M. OPHEIM

23

24

25

1   BAKER HOSTETLER

2        Attorneys for BLMIS Trustee

3        45 Rockefeller Plaza

4        New York, NY 10111

5

6   BY:  MARSHALL J. MATTERA

7        AMANDA E. FEIN

8        JOANNA WASICK

9        STACY A. BELL

10       MELISSA L. KOSACK

11       DAVID J. SHEEHAN (TELEPHONICALLY)

12

13  CLEARY GOTTLEIB STEEN & HAMILTON LLP

14       Attorneys for HSBC Bank Bermuda

15       One Liberty Plaza

16       New York, NY 10006

17

18  BY:  JESSA DEGROOTE

19

20  CHAITMAN LLP

21       Attorneys for Saren-Lawrence, Nelson, et al.

22       465 Park Avenue

23       New York, NY 10022

24

25  BY:  HELEN DAVIS CHAITMAN, ESQ.

1   DENTONS US LLP

2        Attorneys for

3        1221 Avenue of the Americas

4        New York, NY 10020

5

6   BY:  CAROLE NEVILLE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                    P R O C E E D I N G S

2              THE COURT:  Good morning, please be seated.

3    Madoff, the HSBC matter first.  I'll hear from the movants.

4              MS. DEGROOTE:  Your Honor, I believe the Trustee

5    is movant.

6              THE COURT:  Okay, go ahead.

7              MR. MATTERA:  Good morning, Your Honor.  Marshall

8    Mattera of Baker Hostetler for the Trustee, and I'm here

9    with my colleague Joanna Wasick.

10             THE COURT:  Thank you.

11             MR. MATTERA:  We're here this morning, Your Honor,

12   because the Trustee has moved in adversary proceeding 09-

13   01161, titled Picard v. Ceretti, et al, for the issuance of

14   a letter of request under the Hague Convention for the

15   examination under oath of Mr. Craig Perry.

16             The Trustee seeks this examination to assist in

17   proving his claims to avoid and recover over $926 million in

18   fraudulent transfers from BLMIS to the Kingate Funds.

19   Proceeding under the Hague Convention is appropriate, given

20   that Mr. Perry is in Bermuda and has refused to testify

21   voluntarily.

22             Here, the letter of request should be issued

23   because the Trustee seeks information that is both highly

24   relevant to the claims and defenses in this proceeding, and

25   proportional to the needs --

Page 8

1            THE COURT:  What makes you think he knows

2    anything?

3            MR. MATTERA:  Your Honor, HSBC was custodian for

4    the Kingate Funds for the entirety of their operations.  And

5    Mr. Perry was employed by both HSBC and its predecessor, the

6    Bank of Bermuda, since at least 2001 through the present.

7            Part of Mr. Perry's duties were to oversee the

8    role of HSBC as custodian for the Kingate Funds, and that

9    included, among other things, managing the Kingate Funds'

10   bank accounts.  This will bear on some important issues in

11   the case, which I'll get to.

12           THE COURT:  Like what?  If he's managing the bank

13   account, what do you think he would know?

14           MR. MATTERA:  Well, first, Your Honor, I would

15   point to the transfers, which are an essential element of

16   the Trustee's fraudulent transfer claims.

17           THE COURT:  And you're saying they're not agreed

18   to?

19           MR. MATTERA:  Yes, I am, Your Honor.  Despite Mr.

20   Perry's assertions to the contrary, if you look at the

21   allegations in the complaint and the corresponding answers

22   in the Kingate Funds' amended answer, you'll see that the

23   amounts that the Kingate Funds admitted were different than

24   the amounts that the Trustee alleged in the complaint.

25           In addition, you'll see in those admissions by the

Page 9

1    Kingate Funds that some of those admissions were only on

2    information and belief.  And because Mr. Perry was the

3    senior account manager and HSBC was the custodian, we

4    actually believe that he and HSBC are the best source of

5    this information as to the flows into and out of the Kingate

6    Funds.

7           And as I said, HSBC served as custodian for the

8    Kingate Funds for the entire time they operated for more

9    than a decade.  Your Honor, the Trustee has not yet deposed

10   someone from HSBC, and Mr. Perry was identified as most

11   appropriate as a result of the Trustee's investigation,

12   which included a document review where a number of names

13   were considered and, as I said, Mr. Perry was identified as

14   most appropriate.  The information the Trustee seeks also --

15   excuse me, Your Honor, the information sought by the Trustee

16   also will bear on the Kingate Funds' state of mind and

17   business relationships.  Mr. Perry can testify as to his and

18   HSBC's communications with and knowledge relating to the

19   Kingate Funds.

20          He also can testify regarding the Kingate Funds'

21   agents, Ceretti, Grosso, KML, and others involved in the

22   management and operation of the enterprise, of which the

23   Kingate Funds were a part.

24          THE COURT:  How would he know about the state of

25   mind of Kingate?

1          MR. MATTERA:  Your Honor, as part of HSBC's role

2     as custodian, HSBC necessarily communicated both directly

3     with the Kingate Funds and with their agents including its

4     managers.

5          THE COURT:  Is there evidence of communications

6     between Mr. Perry and say, Ceretti and Grosso?

7          MR. MATTERA:  Yes, there is, Your Honor.

8          THE COURT:  Okay.

9          MR. MATTERA:  And these communications will bear

10    on the Kingate Funds' state of mind, including the central

11    element of actual knowledge to the Trustee's fraudulent

12    transfer claims.  The information also will bear on the

13    agency relationships by which the Kingate Funds' agents'

14    knowledge may be imputed to the Kingate Funds, according to

15    the principles set forth in this Court's decision denying

16    the Kingate Funds' motion to dismiss.

17         As to Mr. Perry's position on relevance, Your

18    Honor, he largely does not dispute it, as demonstrated in

19    the Trustee's response and exhibits.  As to the arguments

20    Mr. Perry does make, they do not have merit and I'd like to

21    briefly highlight a few of them here.

22         THE COURT:  Go ahead.

23         MR. MATTERA:  First, HSBC's dismissal under this

24    Court's ruling on comity and extraterritoriality does not

25    change the fact that HSBC served as custodian for the

Page 11

1    Kingate Funds, and that Mr. Perry, as the senior account

2    manager at HSBC responsible for the Kingate Funds, acquired

3    information that is relevant to the Trustee's claims.

4                 Second, Mr. Perry's testimony regarding HSBC's

5    actions, knowledge, and communications after Madoff's arrest

6    will bear on the events and facts that preceded Madoff's

7    arrest.  For example, HSBC froze the Kingate Funds' bank

8    accounts --

9                 THE COURT:  When did they freeze it?

10                MR. MATTERA:  I believe they froze the bank

11   accounts after Madoff's arrest, but --

12                THE COURT:  Okay, after -- I thought you said that

13   they froze it before his arrest and --

14                MR. MATTERA:  Yes, there was a hold in place, and

15   that hold was put in place on the Kingate Funds' bank

16   accounts, prior to Madoff's arrest.

17                THE COURT:  When was that?  Do you know?

18                MR. MATTERA:  I don't know exactly, Your Honor.

19   But what I will say is that after Madoff's arrest, HSBC

20   unfroze those bank accounts and certain transfers that had

21   been initiated prior to Madoff's arrest then were enabled to

22   flow to the recipients where they were directed prior to the

23   arrest.

24                And so, getting that information, which relates to

25   events after Madoff's arrest, will provide the Trustee with

Page 12

1    information that will assist with proving his fraudulent

2    transfer claims.

3            Third, Mr. Perry does not dispute that the warning

4    issued by HSBC about Madoff and HSBC's backing off when

5    threatened by Ceretti and Grosso are relevant to this

6    proceeding.

7            THE COURT:  Well, they say it was from another

8    HSBC.

9            MR. MATTERA:  They do say that, but as senior

10   account manager for the Kingate Funds at HSBC, Mr. Perry

11   would have knowledge of any serious warnings related to the

12   Kingate Funds.  Nor does Mr. -- and in addition, Your Honor,

13   Mr. Perry does not deny that he has knowledge of this topic.

14           The Trustee is entitled to ask Mr. Perry about

15   this, which will bear on Kingate Funds' knowledge and

16   business relationships.  Your Honor, turning to

17   proportionality, there too none of Mr. Perry's arguments

18   have any merit.  Mr. Perry, as the party opposing discovery,

19   has the burden of justifying any restrictions on it, and he

20   justifies no restrictions here.

21           THE COURT:  Well, but proportionality is built

22   into the request, right?  You have to make a request that's

23   proportional.

24           MR. MATTERA:  Yes, Your Honor.  Under the case law

25   --

1          THE COURT:  If you're arguing that there's an

2    undue burden in complying, other than he's got to show up to

3    the deposition.

4          MR. MATTERA:  I'm not aware of any genuine dispute

5    as to burden here.  What the Trustee has to show and has

6    shown is that he is seeking relevant information.  And then,

7    the party opposing discovery, Mr. Perry, has the burden to

8    justify any restrictions on it, for example, by showing that

9    there's an undue burden or expense.

10          Mr. Perry principally argues that the Trustee can

11   seek similar information from the Kingate Funds' joint

12   liquidators, but as senior account manager, with oversight

13   over HSBC's role as custodian for the Kingate Funds, Mr.

14   Perry has unique information that the Kingate Funds would

15   not possess.

16          For example, Mr. Perry would have knowledge

17   relating to the flows of monies from BLMIS to the Kingate

18   Funds' bank accounts at HSBC, and in fact, as I believe I

19   may have mentioned earlier, HSBC as custodian and manager of

20   the Kingate Funds' bank accounts is the best source of this

21   information.

22          Mr. Perry's knowledge will supplement, for

23   example, the information the Kingate Funds have admitted to

24   only on information and belief.  Mr. Perry also has unique

25   knowledge relating to the Kingate Funds and their agents.

Page 14

1    That knowledge includes, but is not limited to, knowledge

2    regarding communications with both the Kingate Funds and

3    with their agents.

4            The Trustee also is entitled to corroborate

5    information received from a party opponent and is not

6    precluded from seeking similar information from multiple

7    sources.  This is particularly true here, where the amount

8    in controversy is over $926 million.

9            HSBC played a highly important role as custodian

10   to the Kingate Funds for years and Mr. Perry, as senior

11   account manager for the Kingate Funds is a vital source of

12   this information.  For these reasons and those outlined in

13   the Trustee's motion and response papers, the Trustee

14   respectfully requests that the letter of request be issued.

15           THE COURT:  Thank you.

16           MS. DEGROOTE:  Your Honor, Jessa DeGroote for HSBC

17   Bank Bermuda.  Your Honor, as the Trustee said, he asked

18   this Court to issue a letter of request to Bermuda, so that

19   he can depose Mr. Perry, a senior employee of HSBC Bank

20   Bermuda on 16 topics of trial testimony.

21           HSBC Bank Bermuda is no longer a party, as Your

22   Honor is aware.  We were dismissed under the ET and comity

23   decision --

24           THE COURT:  So what?  If you were a party, he'd

25   just serve a notice of deposition.

1           MS. DEGROOTE:  Yes, Your Honor.  What's more

2    important though, is that even when HSBC Bank Bermuda was a

3    party, as it originally was in this complaint, there were no

4    allegations that HSBC Bank Bermuda had knowledge of Madoff's

5    fraud.  That was not alleged against HSBC Bank Bermuda --

6           THE COURT:  Well, in Paragraph 225 of the

7    complaint, there is the allegation of the warning from an

8    analyst, I think, from HSBC Monaco.

9           MS. DEGROOTE:  Yes.

10          THE COURT:  About Madoff and at least the

11   allegation is that he was threatened or that HSBC was

12   threatened with a loss -- possible loss of business if this

13   was pursued.

14          MS. DEGROOTE:  That's right.  Your Honor, there is

15   an allegation that HSBC issued a warning.  HSBC Bank Bermuda

16   specifically defined in the complaint to be Bank Bermuda.

17   So we know whoever HSBC is, it was not Bank Bermuda.

18          To the extent that the Trustee has issues with

19   regard to that warning, the Kingate Funds admitted in their

20   answer that they received a warning from HSBC and they

21   referred to the content of that warning.

22          To the extent the Trustee wants to ask about this

23   conversation between Ceretti and an HSBC Monaco employee,

24   there's no reason to believe that Mr. Perry, an employee of

25   HSBC Bank Bermuda, would be privy to a conversation between

1    a European HSBC entity and someone involved in Kingate

2    Funds.

3                THE COURT:  So why wouldn't -- why isn't it

4    reasonable to assume the possibility that the HSBC Monaco

5    employee would call up Perry and say, this is your account?

6    I got this warning, what do you want me to do?

7                MS. DEGROOTE:  Your Honor, there's no allegation

8    whatsoever that that's what occurred.  The allegation --

9                THE COURT:  No, but that's why they want to take

10   this deposition.  What you're telling me is, he doesn't know

11   anything, but you don't know that until the person is

12   deposed.

13               MS. DEGROOTE:  Yes, Your Honor.  It's not simply a

14   matter of what is known, it's a matter of what's relevant at

15   the trial.  In Bermuda, there can only be a trial

16   deposition.  There cannot be a discovery deposition to fish

17   around and try to figure out what Mr. Perry might know about

18   allegations that don't exist in the complaint.

19               So given that, the fact that there's no allegation

20   that Mr. Perry was involved in that, or that even HSBC Bank

21   Bermuda was involved in that, is important to the scope of

22   what's relevant here.  And what's relevant here are the

23   transfers that the Trustee's seeking to recover.  As the

24   Trustee said at the outset of his argument what they're

25   seeking to recover is $926 million.

Page 17

```
 1              That's what's alleged in Paragraph 3 of the

 2    complaint.  And if you look at Paragraph 3 of the Kingate

 3    Funds' answer, they explicitly admit that they withdrew

 4    approximately $926 million from Madoff.  That's what's

 5    admitted.

 6              THE COURT:  Well, they say approximately, but

 7    okay.

 8              MS. DEGROOTE:  Your Honor, to the extent that

 9    there's any type of rounding error with the transfers,

10    deposing Mr. Perry to get oral testimony about a rounding

11    error is not going to be productive.  These transfers

12    occurred over a decade ago.  To think that he would have

13    recollection off the top of his head beyond those documents

14    --

15              THE COURT:  So isn't -- you know, isn't the simple

16    answer that if he doesn't know, say I don't know, and it'll

17    be a 10-minute deposition?

18              MS. DEGROOTE:  Your Honor, to the extent that

19    there are some concerns about something that's specifically

20    relevant, that's true.  But the 16 topics of request that

21    the Trustee proposes to ask Mr. Perry about go far beyond

22    the transfers.  They go far beyond Kingate Funds' state of

23    mind.

24              And what many of them really get at is HSBC.  And

25    that can be seen -- one of the requests is for internal
```

Page 18

1    communications at HSBC.  Now HSBC Bank Bermuda's knowledge

2    is not imputed to the Kingate Funds under Your Honor's

3    motion to dismiss.

4              THE COURT:  It may or may not be.  That's -- you

5    know, that's an issue.  I know they weren't one of the

6    management defendants who were referred to, but they made --

7    you know, if they acquired knowledge in the -- within the

8    scope of their agency, then it's imputed.

9              MS. DEGROOTE:  Well, Your Honor, there's two

10   issues with that.  First, there's no allegation whatsoever

11   that HSBC Bank Bermuda had any knowledge or that that

12   knowledge was imputed.  But beyond that, there's no

13   allegation that HSBC Bank Bermuda had an agency relationship

14   with the Kingate Funds, such that the imputation could

15   exist.

16             And in fact, the allegation is that there was a

17   custodial agreement, a contractual relationship between the

18   two.  So with respect to trying to take a trial deposition

19   of Mr. Perry for --

20             THE COURT:  Well, you call it a trial deposition.

21   And as I understand it, I apply our rules, and if the

22   Bermuda Court believes and it doesn't want to grant comity

23   for whatever reason, then it doesn't grant comity.

24             MS. DEGROOTE:  Your Honor, the Court --

25             THE COURT:  Isn't this an argument you should be

Page 19

1    making in Bermuda if I grant the motion?

2              MS. DEGROOTE:  Your Honor, there are two prongs to

3    that.  The first is that in the United States when we're

4    looking at it in the first instance in this Court as the

5    Court with the knowledge of the case, with the knowledge of

6    what would be relevant at a trial before Your Honor, your

7    best position to not only rely on the principles under Rule

8    26, but to also, applying principles of comity, send a

9    request to Bermuda that is within the scope of what they

10   allow there.

11             And you can see that in the Blagman case, which we

12   had cited in our opposition, the court not only looked to

13   the principles under Rule 26, but the court also looked to

14   what the United Kingdom in that instance allows.  The United

15   Kingdom also only allows trial deposition testimony.

16             THE COURT:  What do you mean by a trial deposition

17   testimony?

18             MS. DEGROOTE:  Your Honor, what Bermuda allows is

19   that if a witness is unavailable at trial, such as Mr. Perry

20   because he's resident in Bermuda, he's unavailable at trial,

21   the Trustee can go to Bermuda and depose Mr. Perry as if

22   he's on the witness stand at trial, such that the deposition

23   testimony could then be used at trial as opposed to live

24   (indiscernible) that --

25             THE COURT:  We have the same rule for unavailable

Page 20

1    witnesses here.  So suppose Mr. Perry says, yeah, Grosso

2    told me that I can't believe this is really trading.  It

3    must be something else.  That would -- could use that in

4    this trial, right?

5              MS. DEGROOTE:  Your Honor, that would depend on

6    your own rulings on hearsay and other issues.  However --

7              THE COURT:  Well, if everybody's present and he's

8    being cross-examined, couldn't I accept that if he was

9    unavailable?  He's obviously going to be unavailable, right?

10   So whatever he says in the context of this deposition, where

11   both parties are present, would presumably be admissible.

12             MS. DEGROOTE:  Yes, Your Honor.  I understand what

13   you're saying.  With Mr. Perry's deposition in Bermuda, it's

14   not an issue of whether that would be admissible in court

15   here later.  And of course, Your Honor could admit it in

16   part, exclude it in part, or whatever the issues may be.

17             The matter is, at this point in time, given that

18   the Trustee cannot take a discovery deposition of Mr. Perry,

19   given that it should be appropriately tailored to the issues

20   at trial and relevant to what will be presented at trial,

21   how should the letter of request be framed such that there's

22   due regard to the laws of Bermuda, and so that under our own

23   principles of discovery, the request is not overbroad, which

24   as it stands now, it is?

25             THE COURT:  Mm hmm.

1          MS. DEGROOTE:  Your Honor, the --

2          THE COURT:  Tell me the parts of the request that

3    aren't overbroad and are proper.

4          MS. DEGROOTE:  Yes, Your Honor.  With regard to

5    the Trustee's argument that it's the Kingate Funds' state of

6    mind that's at issue, and Your Honor asked how can Mr. Perry

7    know about the Kingate Funds' state of mind?  And the answer

8    to that is any external communications that Mr. Perry had

9    with the Kingate Funds.  And that's requests 9 and 11.

10   Those are the requests that go to external communications

11   between Mr. Perry and third parties, whose knowledge may be

12   imputed to the Kingate Funds as it stands now.

13          However, even looking at those requests as they

14   currently stand, the requests themselves do not give fair

15   notice or tie-in to the specific issues of the case, such

16   that in the form as they stand now, they're fit to be sent

17   in a letter of request.

18          However, those are the two issues, the external

19   communications, those are the two that could actually

20   potentially bear on the Kingate Funds' state of mind if

21   properly framed.

22          Your Honor, with respect to those, we know that

23   the Trustee knows how to make a specific letter of request.

24   We saw it with the request that Your Honor issued to Ms.

25   Salahuddin.  And we see here that some of the communications

Page 22

1    involved communications between Ms. Salahuddin and other

2    entities, including presumably HSBC.

3            That's not included in the request to Ms.

4    Salahuddin in that very specific request.  So to the extent

5    that there's something that Mr. Perry needs to corroborate

6    with regard to those communications, that's not clear.  And

7    with respect to request number 11, it's similarly overbroad,

8    asking about all possible communications with regard to the

9    accounts, without being tailored to the specific claims and

10   defenses at issue in this case.

11           However, given what's at issue here, fraudulent

12   transfers and the Kingate Funds' state of mind, those are

13   the two requests that could potentially be relevant.

14           THE COURT:  11 and which one?

15           MS. DEGROOTE:  9 and 11, Your Honor.  The request

16   in the middle is also about communications, but it's about

17   internal communications at HSBC Bank Bermuda, which is not -

18   -

19           THE COURT:  Well, how about 16, HSBC's review of

20   BLMIS?  You don't think that's relevant?

21           MS. DEGROOTE:  No, Your Honor, because as it

22   stands now, there's no allegation that HSBC Bank Bermuda had

23   knowledge of Madoff's fraud or that that knowledge would be

24   imputed to the Kingate Funds.  So what that type of request

25   looks like is an overbroad request to get at issues

Page 23

1    involving HSBC that aren't necessarily relevant to this

2    particular case.  And even to the extent Your Honor could

3    find that relevant, as broadly as it stands now, all of

4    HSBC's review of Madoff is far too broad.

5              THE COURT:  Okay, thank you.

6              MS. DEGROOTE:  Yes, Your Honor.

7              MR. MATTERA:  Your Honor, I'd like to respond.

8              THE COURT:  Go ahead.

9              MR. MATTERA:  So first of all, as I believe Your

10   Honor recognized, the applicable discovery principles that

11   apply to the Court's decision as to whether to issue the

12   letter of request are in Federal Rule of Civil Procedure 26.

13             THE COURT:  Yeah, but the argument is that's true,

14   but I also have to consider the rules of the jurisdiction

15   which you want to take the deposition under principles of

16   comity.  And the argument is that the deposition has to be

17   directly relevant or more relevant to the actual issues in

18   the case than a discovery deposition would be in the United

19   States.

20             MR. MATTERA:  Your Honor, yes to the extent that

21   is the argument, we would disagree.

22             THE COURT:  Why?

23             MR. MATTERA:  We --

24             THE COURT:  I know you disagree.

25             MR. MATTERA:  We believe that the only discovery

1   principles you have to look at for purposes of your decision

2   here today are those that are in Federal Rule of Civil

3   Procedure 26.

4           THE COURT:  Well, a decision from the Southern

5   District in which the -- it was a magistrate judge, also

6   referred to the re-statement of foreign judgments, I think,

7   and principles of comity.

8           MR. MATTERA:  Your Honor, as a practical matter,

9   the way that we envision this issue being dealt with is by

10  both the Bermuda examiner and the Bermuda court.  And they

11  can deal with the interpretation of Bermuda law.

12          THE COURT:  For example, you're asking -- one of

13  the categories is HSBC's fees for acting as Kingate Funds'

14  custodian.  What's the relevance of that under any

15  circumstances?

16          MR. MATTERA:  Yes, Your Honor.  There are a couple

17  of points with respect to the relevance of that topic.

18  Number one, HSBC's fees are -- will bear on the Kingate

19  Funds' business relationships.

20          THE COURT:  How?

21          MR. MATTERA:  If HSBC was paid, then for example -

22  -

23          THE COURT:  Well, they were certainly paid.  They

24  weren't doing this for nothing.

25          MR. MATTERA:  Yes, Your Honor.  They were paid.

Page 25

1   And to the extent that they were paid, the Kingate Funds and

2   the Kingate Funds' agents had leverage over HSBC.  And this

3   fact informed the actions that lied under both HSBC's

4   warning regarding the Kingate Funds, and also HSBC's backing

5   off when pressure was exerted by Kingate --

6            THE COURT:  So why don't you just ask him whether

7   Ceretti or Grosso or anybody from the management companies

8   ever told HSBC that if you question Madoff in words or

9   substance, you're going to lose business?  Isn't that what

10  you're going at here?

11           MR. MATTERA:  That is part of what we're going at

12  here, yes, and that's an important point --

13           THE COURT:  So why don't you just ask them that

14  question?  Why do you need custodial fees for?

15           MR. MATTERA:  Well, Your Honor --

16           THE COURT:  They had a business relationship.

17           MR. MATTERA:  They did have a business

18  relationship and the fees do bear on that business

19  relationship.

20           THE COURT:  I don't understand how it bears on any

21  issue on the case.

22           MR. MATTERA:  Well, Your Honor, for example --

23           THE COURT:  Or might lead to even discoverable

24  evidence.

25           MR. MATTERA:  Well, for example, Your Honor --

Page 26

1          THE COURT:  Or admissible evidence.

2          MR. MATTERA:  I would direct the Court to the

3    allegation of the Trustee's complaint, which is Paragraph

4    225.

5          THE COURT:  I'm familiar with 225.

6          MR. MATTERA:  And so, Your Honor, among other

7    things, in your decision denying the Kingate Funds' motion

8    to dismiss, you analyzed that allegation.

9          THE COURT:  But that was analyzed to the extent

10   that showing that there was an attempt to deflect inquiry

11   into Madoff through threats of loss of business, through

12   firing the individuals.  The amount of the custodial fees,

13   how is that relevant?  Were you asking questions about how

14   much they were paid?

15         MR. MATTERA:  Well, to the -- first of all, Your

16   Honor, and this actually is not restricted to the issue of

17   fees, but it goes to the flow of funds generally into --

18         THE COURT:  Well, but you can't sue them as a

19   subsequent transferee.  Those claims have been dismissed,

20   for the time being anyway.

21         MR. MATTERA:  Yes, Your Honor.  But to the extent

22   that we are examining the flows of money into and out of the

23   Kingate Funds, Mr. Perry and HSBC offer a unique source of

24   information, and that's to provide context and an

25   explanation to help understand --

1          THE COURT:  Well, I don't have a problem

2     necessarily with you asking him what Kingate paid to BLMIS

3     and what BLMIS paid to Kingate, but what is the subsequent

4     transfer of funds from BLMIS have to do with anything?

5          MR. MATTERA:  Yes, Your Honor.  First of all, I

6     would say that the transfers between BLMIS and the Kingate

7     Funds are the most important ones at issue for the Trustee.

8     What I would also say is that the fees still are relevant,

9     even though they're not as --

10          THE COURT:  Why?  I keep asking you and you

11     haven't told me.

12          MR. MATTERA:  They're relevant because it goes to

13     Ceretti and Grosso's state of mind, for example.

14          THE COURT:  How?

15          MR. MATTERA:  Because Ceretti and Grosso, knowing

16     how important this relationship was for HSBC, given the

17     amount of fees that they were receiving, knew that they

18     could push back and exert pressure on HSBC for them to back

19     down and to back down on this warning that they had issued

20     regarding Madoff.

21          THE COURT:  But I thought Kingate admitted that

22     that's what occurred.

23          MR. MATTERA:  We can go to the admission itself,

24     Your Honor.  But I believe that I could say that they did

25     not admit in entirety that allegation of the complaint.

1          THE COURT:  So why don't you just ask Perry

2    whether or not he is aware of this warning or whether there

3    was an internal discussion about the warning or things like

4    that?  I still don't understand what you need the custodial

5    fees for?

6          MR. MATTERA:  Well, Your Honor, our position is

7    that it's relevant.

8          THE COURT:  I understand your position and I

9    reject positions all the time, so just tell me why it's

10   relevant.

11         MR. MATTERA:  Beyond what I've said, Your Honor, I

12   would just say that it goes to HSBC's relationship with the

13   Kingate Funds as custodian, how they were compensated --

14         THE COURT:  But don't you have the custodial

15   agreement?

16         MR. MATTERA:  We do have the custodial agreement.

17         THE COURT:  What more do you have to know?

18         MR. MATTERA:  We -- and we can -- and we would

19   like to, as outlined in our papers, ask Mr. Perry about the

20   performance of the custodian agreement, which, by the way --

21         THE COURT:  What does that mean?

22         MR. MATTERA:  It means how the Kingate Funds' bank

23   accounts were managed and how the funds flowed in and out of

24   those bank accounts, which will bear directly on the

25   transfers.  In addition, as part of HSBC's role as custodian

1    it necessarily communicated with both the Kingate Funds and

2    their agents and those communications will bear on the

3    Kingate Funds' state of mind under the principles that

4    you've elaborated on.

5              THE COURT:  Okay, I've got it.

6              MR. MATTERA:  And I would also say that, as to

7    this particular paragraph relating to the fees, that's

8    something where the Kingate -- where the Trustee would

9    consider a compromise to narrow it.  But --

10             THE COURT:  You can always confer on the request,

11   but it sounds like either that hasn't happened --

12             MR. MATTERA:  That has happened, Your Honor, and

13   actually we asked if any compromise at all would be possible

14   to avoid the need to take Your Honor's time.

15             THE COURT:  Okay.

16             MR. MATTERA:  And the answer to that was no.

17             THE COURT:  All right.  Look, I'm here to reserve

18   a decision.  There's going to be some discovery in this

19   case.  It seems to me that any communications regarding

20   BLMIS, communications with Ceretti and Grosso about BLMIS,

21   things like that are obviously germane.  There is a dispute

22   I'm told about the amount that -- the specific amount of the

23   transfers.  I don't know why Perry can't authenticate those

24   documents that show the transfers.

25             Is this issue, the warning which is sort of a sub-

Page 30

1    issue of just these communications about BLMIS?  Now for all

2    I know that BLMI -- HSBC shared the same computer system.

3    There were emails.  This person from Monaco called up Perry,

4    who was the manager of the account.  Telling me he doesn't

5    know anything, it's much better if he says that at a

6    deposition.  Some of this stuff is a little far afield, like

7    the custodial fees and things like that.  So I'll reserve

8    decision.  If you can come up with an agreement, that's

9    fine, but otherwise, I'll just decide it.  All right?

10             MS. DEGROOTE:  Yes, Your Honor.

11             THE COURT:  Okay, thanks.

12             MR. MATTERA:  Thank you, Your Honor.

13             THE COURT:  I'll hear the other Madoff matter now.

14   The Trustee's motion for additional discovery.

15             MS. BELL:  Good morning, Your Honor.  Stacey Bell

16   for the Trustee.  I am here with my colleague Amanda Fein,

17   Baker Hostetler.

18             This Court is intimately familiar with the

19   Trustee's efforts to streamline the remaining good faith

20   actions now totaling 140 actions, so I won't belabor the

21   procedural history here, Your Honor.

22             THE COURT:  Down from 147?

23             MS. BELL:  Yes, we're down to 140, Your Honor.

24             THE COURT:  Okay.

25             MS. BELL:  Today we're here on the Trustee's

1   motion for limited additional discovery in the 91 good faith

2   cases that participated in Bernard Madoff's deposition.  By

3   this motion, the Trustee is seeking exactly what the two

4   deposition orders contemplated; follow-up discovery arising

5   out of Madoff's testimony.

6           THE COURT:  Well, it contemplated the possibility

7   of follow-up discovery, based upon what Madoff testified to.

8           MS. BELL:  Yes, Your Honor.  I agree.  And we've

9   set forth in our papers the issues that we thought that

10  Madoff testified to when we winnowed down those issues

11  consistent with the Court's directive of the last hearing to

12  come up with six issues and six witness, six fact witnesses,

13  former BLMIS employees that would be able to testify on

14  those issues.

15          And Your Honor, defendants were able to get the

16  testimony they sought from Madoff and now that that

17  deposition is over, the balance of the deposition orders is

18  ripe allowing the parties to take this limited discovery to

19  address the specific issues raised by Madoff.

20          Madoff, for the first time at these depositions,

21  went on record with details about how the securities

22  transactions that he purportedly executed for his investment

23  advisory business, how some of those transactions were real.

24          THE COURT:  But if that was relevant, why didn't

25  you take his deposition eight years ago?

Page 32

1           MS. BELL:  Your Honor, the Trustee had no

2      intention of taking Mr. Madoff's deposition.  The reason we

3      want this additional discovery is coming out of defendant's

4      request two years ago to take Mr. Madoff's deposition and

5      from the very beginning, the Trustee made clear that to the

6      extent that deposition was allowed, then the Trustee should

7      be given the opportunity to rebut that testimony.  More than

8      that --

9           THE COURT:  Go ahead.

10          MS. BELL:  More than that, Your Honor, I think

11     with respect to Mr. Madoff's plea allocution, and there are

12     a number of inconsistencies and I don't want to take the

13     Court's time to go through that, but the testimony that

14     Madoff gave at the deposition was inconsistent with the

15     testimony that was given at the -- all of the evidence that

16     was presented at the criminal trial.

17          THE COURT:  When was the criminal trial?

18          MS. BELL:  The criminal trial ended in 2014.

19          THE COURT:  So why didn't you want to take his

20     deposition in 2014 after you saw these inconsistencies?

21          MS. BELL:  Because the issues around this

22     deposition became ripe only after Madoff's deposition

23     concluded.  And that, Your Honor, did not happen until July

24     of this year when we were in this Court and we had a

25     discussion.  Because as of the last testimony that Madoff

Page 33

1   gave on November 9th of 2017, Ms. Chaitman left that

2   deposition open.

3           THE COURT:  Well --

4           MS. BELL:  The deposition did not conclude until

5   July of this year.  And seven plus weeks after that decision

6   was made, then the Trustee moved for the -- made this motion

7   for limited discovery.

8           THE COURT:  Well, let me talk about the specific

9   topics that you want to go into.  One of the areas that you

10   want to take additional discovery on concerns this

11   convertible arbitrage trading and the issue of whether those

12   were legitimate trades, right?

13           MS. BELL:  Yes, Your Honor.

14           THE COURT:  And you're saying that issue only came

15   out of the deposition of Madoff?

16           MS. BELL:  Yes, Your Honor.  Mr. Madoff -- so I

17   think just the backdrop here.  In his allocution on Page 27

18   of the allocution, he allocuted that the split strike

19   conversion strategy wasn't real.  But he also said, "as well

20   as other individual clients I defrauded who believed they

21   had invested in securities through me".  His allocution was

22   not limited to the split strike conversion strategy.  For

23   the first time on record we had Mr. Madoff saying the

24   convertible arbitrage strategy was real.  So --

25           THE COURT:  So can I ask you a question, then?

Page 34

1    Why in 2013 did Dubinsky spend 20 pages talking about how

2    the convertible arbitrage strategy was unreal?

3              MS. BELL:  Mr. Dubinsky, Your Honor, is the

4    Trustee's fraud insolvency expert.

5              THE COURT:  Why did he even address the issue?

6              MS. BELL:  He addressed the issue because we were

7    attempting to address all the purported strategies that

8    Madoff had at BLMIS or that customers believed that

9    transactions were being executed through those strategies.

10   The issue for the Trustee is not whether convertible arb was

11   a topic that should be covered, itis the details that Madoff

12   gave with respect to those convertible arb transactions.

13              And if you stay with convertible arb, Your Honor,

14   what would not be part of the record if this discovery is

15   not allowed is, for example, Mr. Kugel's testimony, where he

16   said from the 1970s he was providing fake information to Ms.

17   Bongiorno to his --

18              THE COURT:  I thought he allocuted to that.

19              MS. BELL:  He allocuted to that, but again, in the

20   same way that Madoff's allocution was very generalized, Mr.

21   Kugel's allocution was similarly generalized.  And though

22   the Trustee intends to rely on that, there were more

23   specifics that were given at the criminal trial about

24   exactly the mechanics of the fraud, the mechanics of how

25   these convertible arb transactions were back dated and

1    fabricated and that testimony would not be part of this

2    record.

3          And so, what we would be left with on this record

4    is simply the mastermind of the fraud explaining why these

5    transactions were real.  We would not have the benefit of

6    the very people who executed and this came out of Mr.

7    Madoff's deposition.

8          Those transactions are purported transactions.

9    Mr. Kugel was one of them, Ms. Bongiorno was another,

10   (indiscernible) was --

11         THE COURT:  Can I ask you a question?  You just

12   read from Page 27 of the allocution in which Madoff suggests

13   that the fraud was not limited to the split strike

14   conversion and he was sending false statements to other

15   customers, right?

16         MS. BELL:  Just the language that I read, Your

17   Honor.  He suggested he left room open, for it wasn't just

18   the split strike conversion.

19         THE COURT:  Okay.  Did anybody ask him about that

20   at the deposition?

21         MS. BELL:  About Page 27 of --?

22         THE COURT:  About this statement, you know,

23   because everything up until then is just talking about the

24   split strike conversion strategy and that was the Ponzi

25   scheme.

1            MS. BELL:  But --

2            THE COURT:  I read the allocution again yesterday.

3     That's basically what he said.  And then, he has this zinger

4     in the allocution.  Did anybody ask him about what he was

5     talking about?

6            MS. BELL:  Here's what I'll say, Your Honor.  The

7     questions around whether the convertible arb transactions

8     actually occurred, those questions were asked at the

9     deposition and Mr. Madoff's testimony was that those

10    transactions occurred.  But then on the other side of that

11    we have Mr. Kugel's re-allocution from 2011 where he said

12    those transactions didn't take place.

13           THE COURT:  But you've always had it.  You've had

14    that, you know, now for several years.  That's the argument.

15    And yet, you knew what Madoff -- I mean, basically Madoff

16    testified consistently with his allocution.  It started in

17    1992.  It was part of the split strike conversion strategy.

18    And you always knew what Kugel said, but you never took

19    their depositions.

20           MS. BELL:  Your Honor, the issue did not become

21    ripe before Madoff's testimony was completed.  But I also

22    don't believe that Madoff gave testimony --

23           THE COURT:  But why not?  You spent -- why did

24    Dubinsky spend 20 pages in 2013 articulating why the

25    conversion strategy was -- I'm sorry, the arbitrage, the

Page 37

1    convertible arbitrage trading was also phony?

2          MS. BELL:  Your Honor, I'll answer this question

3    in this way.  Mr. Madoff's testimony was not consistent with

4    the plea allocution.  He, for example, tried to walk back in

5    the deposition that there was even a Ponzi scheme.  He

6    claims he was solvent until 2008.  That's -- insolvency is

7    part -- is one of the badges of Ponzi.  He claimed that --

8          THE COURT:  Yeah, but you're going to prove that

9    through a valuation expert, not through Madoff's testimony

10   or Kugel's testimony or Bongiorno's testimony.

11         MS. BELL:  Yes, Your Honor, but it's the Trustee's

12   position that the inconsistency within Madoff's testimony,

13   the mastermind of the fraud, that should not be the only

14   factual record that's developed in these cases.  And so, the

15   Trustee should be given the opportunity in the same way that

16   the Defendants took Mr. Madoff's deposition.  Though they

17   had his plea allocution, the Trustee should be given the

18   opportunity to explore and to rebut Mr. Madoff's testimony.

19         THE COURT:  If you remember, I only allowed the

20   deposition in those cases where discovery was still open.

21         MS. BELL:  Although, Your Honor, for day two

22   deposition a number of cases were added, the Defendants --

23         THE COURT:  With the Trustee's consent.

24         MS. BELL:  Yes, Your Honor.  We ultimately

25   consented.  We objected initially and then we ultimately

Page 38

1   consented.

2          THE COURT:  Okay.

3          MS. BELL:  And that is consistent with what we're

4   seeking to do here, is to develop a full record on a single

5   track, so that the Trustee for the cases that participated

6   in Madoff's deposition --

7          THE COURT:  Yeah, but you know, you're going to

8   have a different -- you're trying these cases on different

9   records.  You have 55 cases where discovery is closed and

10  you're not seeking additional discovery.  And those cases

11  were not involved in Madoff's deposition, so that's an

12  entirely different record than the record you're talking

13  about now.

14         MS. BELL:  That is exactly right, Your Honor.  But

15  these cases revolve around Madoff's deposition and the

16  Trustee's -- the Trustee should be afforded the opportunity

17  to not only rebut his testimony, but so that the Court can

18  evaluate his credibility with more than just his say so,

19  because I think what we'll be left with, then, is just Mr.

20  Madoff's say so.  Now I don't think the starting point is

21  when the Trustee initiated these (indiscernible).

22         THE COURT:  But Madoff -- for instance, Madoff

23  says that his convertible arbitrage trading was legitimate.

24  You're going to have Dubinsky testify that he's gone through

25  all the records, everything he did, and here's why it's not

Page 39

```
 1    legitimate.  And you're going to ask me not to believe

 2    Madoff.  And then, Feingold will testify about whatever he's

 3    going to testify about.  But that's -- it's almost like a

 4    battle of the experts at this point.

 5              MS. BELL:  Except Mr. Madoff is a fact witness,

 6    Your Honor.  And so, the Trustee should be afforded fact

 7    witnesses who worked with him on that very strategy.  He's a

 8    career liar.  We know that.  He's a known liar.  And so, I -

 9    -

10              THE COURT:  So aren't you just going to make that

11    argument?

12              MS. BELL:  And we will, Your Honor.  We -- but we

13    should be afforded the opportunity to do both, to make that

14    argument, but also to have some other witnesses by which

15    Your Honor could evaluate Madoff's credibility.  I think

16    without --

17              THE COURT:  But that was true with his allocution,

18    wasn't it?

19              MS. BELL:  No, Your Honor, because this record now

20    as developed contains five days of deposition testimony, now

21    un-refuted by another fact witness, certainly the experts

22    will be given the opportunity to review his testimony and

23    can refute that.  But the battle of the experts would be

24    between Dubinsky and Feingold, not between Dubinsky and

25    Madoff.
```

Page 40

1              Madoff, Madoff's testimony is inconsistent with

2       everything else in the record with the criminal trial

3       testimony.  And so, we would have Madoff saying that the

4       convertible arbitrage transactions are real, but we would

5       not have Bongiorno's testimony that says she got tickets

6       from Kugel to fabricate these trades that appeared on the

7       customer statements.

8              THE COURT:  Well, but you have that information

9       already.

10             MS. BELL:  But it's not a part of this record,

11      Your Honor.

12             THE COURT:  Well, you said though you're going to

13      try and use the criminal transcripts to prove your case.

14             MS. BELL:  Well, Your Honor, unless the Court is

15      telling us that it's admissible now and we'd be happy to

16      take such a ruling.

17             THE COURT:  I'm not saying anything, but --

18             MS. BELL:  And we're not sure who the ultimate

19      trier of facts will be on these issues as well, because a

20      number of the cases, as Your Honor is well aware, defendants

21      have moved to withdraw the reference.

22             And so, we're simply asking for a truncated time

23      period.  We have cut the time in half or more than that from

24      when we started this in February. going back to February and

25      then we tried again in July.  Your Honor, we're asking for

Page 41

1    90 days to depose six fact witnesses who worked with --

2              THE COURT:  It's not a timing question.  The case

3    has been going on for 10 years. Whether it's 90 days or 120

4    days, that doesn't matter at this point, right?

5              MS. BELL:  But Madoff's deposition just ended,

6    Your Honor and so I think the starting point really is not

7    (indiscernible).

8              THE COURT:  And then, when one of these witnesses

9    testifies to something there's going to be another motion to

10   reopen discovery or extend the discovery order?

11             MS. BELL:  No, Your Honor, and I don't think this

12   is a motion to reopen discovery.  It's a continuation of

13   what we started with Madoff's deposition and contemplated

14   under the deposition orders.  And so, I think that's the

15   key.  It's the deposition orders and the Trustee's position.

16             And Your Honor, that position is not inconsistent

17   with the course of dealings between the parties and among

18   the parties.  In fact, Ms. Chaitman's memos (indiscernible)

19   in support of her motion to take Mr. Madoff's deposition.

20   She included the Trustee's request and she said, I recognize

21   that the Trustee wants to take this additional discovery.

22             And I quote, from Page 4 of that memo, she said,

23   "We would assume that the Court would permit all parties to

24   take any discovery they deem appropriate based upon Madoff's

25   testimony."  We know of no authority which would prohibit

Page 42

1    that, nor do we know of any, Your Honor.  I think the

2    requests were fair --

3            THE COURT:  Well, how is she -- well, I should ask

4    her, but how is it that she's opposing the motion, then?

5            MS. BELL:  That's our question, too, Your Honor.

6    And we don't think there is a proper basis for opposing this

7    motion, in light of the dealings between the party, the

8    Trustee has consistently made his position clear.  That was

9    the reason Paragraph L was included in that order, because

10   we recognized that there would need to be an opportunity for

11   a fact witness, a fact witness, not an expert witness to

12   counter Mr. Madoff.

13           Mr. Madoff was proffered as a fact witness, though

14   he tried to rehabilitate himself in that deposition.  And

15   so, Your Honor, and I'd just like to point out that what the

16   Trustee seeks is not as significant.  Again, I think time is

17   important because that's what the Court raised last time we

18   were here, that there was no end to this, that there were a

19   number of witnesses.

20           And the Trustee really took the time to go through

21   the specific issues that we wanted to ask these witnesses

22   about, how much time we thought that this would take and

23   really narrowed the population of cases.  When we started

24   this, this motion was about 155 cases.  We're down to 91

25   cases and only 57 of those 91 we would be seeking this

Page 43

1    discovery in.  Not all of them because there is a

2    practicality component as well.

3         The Trustee still gets to do this in 33 or 34 of

4    these cases because fact discovery is open.  And so, you

5    have Madoff's deposition at issue in all of these cases, but

6    some are proceeding on a different record.  And so, we think

7    for that reason as well.

8         THE COURT:  And as I pointed out, some are

9    proceeding without the Madoff deposition.  So we just have

10   different -- my point is, there are different records for

11   different groups of cases.

12        MS. BELL:  But the cases that are proceeding do

13   not have this fact component of Madoff's deposition.  And

14   so, they're proceeding based on the expert testimony.  And

15   so, that's one group of cases.  So if you put these cases

16   into two buckets, yes, one has Madoff deposition.  And so,

17   if the deposition is, if the defense counsel attempts to use

18   the deposition on the other side, then certainly those

19   cases, we would seek to exclude that.

20        But here, where Madoff's deposition is at play,

21   where Madoff for the first time has gone on record, he's

22   gone on -- he's contested the Trustee's expert's findings.

23   He has tried to rehabilitate himself.  He's given

24   explanations of a number of documents around a number of

25   topics.

1           At the very least, the Trustee should be afforded

2     the opportunity to talk to the very people who were working

3     with Madoff at the time on the issues that will be at play

4     in any good faith adversary proceeding about the Ponzi

5     scheme.

6           And so, Your Honor, if you would, we included in

7     our motion papers, but the numbers have since changed.  And

8     so I'd like to hand up to the Court, if you would just -- a

9     sheet that shows what we're looking for in these

10    proceedings, what the relief sought is.  And it's in your

11    binder, but because we've settled, it's over.

12           THE COURT:  So have you given it to all the

13    parties?

14           MS. BELL:  We will, Your Honor.

15           THE COURT:  Well, what is this, just the gross

16    numbers that were on page 16?

17           MS. BELL:  It's just an adjustment in the number,

18    Your Honor.  There's --

19           THE COURT:  All right.

20           MS. BELL:  As I indicated when we started, we're

21    now down to 140 cases.  When we started this in February, we

22    were at 145.

23           THE COURT:  I don't know if the numbers actually

24    drive this issue.

25           MS. BELL:  But I think this goes to the

1    practicality point, Your Honor, that we are, in some of the

2    cases that have Madoff's deposition testimony at issue, we

3    would be having this discovery in any event, and in others

4    of the cases with that same deposition testimony, we would

5    not.  And Paragraph L of the deposition orders really

6    contemplated exactly what the Trustee is seeking to do here.

7            And there is no recent basis in our opinion, Your

8    Honor, that this motion should be denied.  Unless the Court

9    has any further questions.

10           THE COURT:  Well, what about this issue of expert

11   reports and expert testimony?

12           MS. BELL:  Your Honor, the Trustee is seeking to -

13   - well, with respect to the supplementation of the expert

14   reports, Rule 2060 of the Federal Rules of Civil Procedure

15   allows us to do that.  And so, it's --

16           THE COURT:  So you don't need me to decide that?

17           MS. BELL:  That is our position, Your Honor.  And

18   I think we should start by saying if you look at the chart,

19   of the 91 cases, there are 77 cases where the Trustee will

20   be serving these expert reports.  On 66 cases, where expert

21   reports have not yet been served, and 11 cases that are the

22   cases from Ms. Chaitman where we have a stipulation that

23   allows the Trustee to reset.

24           And so, we're asking for the Court to set a

25   uniform expert date after fact discovery has completed.  But

Page 46

1   it's the Trustee's view that based on the issues raised by

2   Madoff at his deposition, that the Trustee would like to

3   have the testimony of two additional experts, again, around

4   the issue of convertible arb, because Mr. Madoff spends a

5   considerable amount of time dealing with the convertible arb

6   strategy.

7           And, as Your Honor pointed out, Mr. Dubinsky did

8   have several pages dedicated to the convertible arb strategy

9   in his expert report.  But Mr. Dubinsky came on after the

10  fact.  He is a certified fraud examiner.  He is a forensic

11  accountant.  He is looking at the books and records at BLMIS

12  from the outside and he's looking in.  What we're proposing

13  to do here is have an expert, because Mr. Madoff gave

14  significant testimony around what the industry would've

15  done, what was typical in the industry.

16          So really, it would be a customs and practices

17  expert who can talk about what in real time, and the time

18  about which Madoff testified --

19          THE COURT:  I don't understand, either the trades

20  took place or they didn't take place, and as I understand

21  it, Dubinsky said I looked at the books and records and

22  they're not documented.  They didn't take place.

23          MS. BELL:  That's right, Your Honor.  But what

24  this expert would do would be able to -- so Mr. Madoff gave

25  testimony, for example, around average pricing and why that

Page 47

1    was normal in the industry.  This expert from his experience

2    and his expertise could talk about whether that was in fact

3    normal in the 1980s.

4         And so, there's -- he's doing something different

5    than what Mr. Dubinsky's done, certainly, but it's to

6    counter the testimony that we've received from Mr. Madoff.

7    And in the normal litigation, we would have Mr. Madoff first

8    and then we would have the experts reviewing all of the

9    facts in the case and opining and giving their expert

10   opinion.

11        THE COURT:  That's why I don't understand why you

12   didn't take his deposition eight years ago, but --

13        MS. BELL:  Because again, Your Honor, it's not --

14   the Trustee still maintains that Mr. Madoff is not a

15   credible witness.  And I think the deposition transcripts

16   will show that there is some credibility issues.  And I go

17   back to, to the extent that this -- the Trustee's request is

18   denied, the Court will then need to choose what part of

19   Madoff's testimony to give credit to and what parts to

20   ignore.

21        And I don't see how that can be done without

22   certain other witnesses being part of this record, so that a

23   fulsome record could be created either for a trial in this

24   Court or in the district court.  The Trustee's request for

25   the additional expert is around the same issues.

1          THE COURT:  Let me ask you a question.  When he

2     allocuted that the fraud began in 19 -- or the Ponzi scheme

3     began in 1992, does the Trustee accept that?

4          MS. BELL:  No, Your Honor.  We think the Ponzi

5     scheme began from --

6          THE COURT:  So why didn't you take discovery at

7     that point, to develop that -- because that's been a part of

8     your case for the last eight years.

9          MS. BELL:  But what's also been a part of our case

10    Your Honor, is the allocution of Mr. Kugel from 2011, the

11    allocution of Mr. Lipkin from 2012.

12         THE COURT:  Okay, but all the -- the allocutions

13    are admissible, right?

14         MS. BELL:  Yes, Your Honor, but what's different

15    here is there are details in the record.  Mr. Kugel will

16    testify how he fabricated the convertible arb transactions.

17         THE COURT:  So why didn't you take that deposition

18    earlier?

19         MS. BELL:  Because that deposition became ripe,

20    Your Honor, after Mr. Madoff's testimony concluded, not

21    before that, because it was always the Trustee's -- it was

22    always the Trustee's expectation to be able to rely on the

23    plea allocutions of these witnesses.

24              In addition to that, Your Honor, these witnesses

25    might not always be available.  And so, we're left with,

1   again, the allocution of Mr. Kugel, of Mr. Lipkin, and a

2   number of other former employees.  But we have Mr. Madoff's

3   deposition testimony, where he is challenging exactly what

4   they've allocuted to and we don't get the opportunity then

5   to have those witnesses come in.

6           THE COURT:  But his allocution challenged it

7   because he said the Ponzi scheme began in 1992.  Kugel says

8   it started in 1979 or whatever.  You have a challenge right

9   there.  Why didn't you --

10          MS. BELL:  Not in the same --

11          THE COURT:  Why didn't you discover it then?

12          MS. BELL:  Not in the same way, Your Honor.  But

13  we didn't know that that was his testimony until he gave

14  that testimony.  And that testimony, that deposition got

15  completed, was completed in 2018.  July of this year.

16          THE COURT:  You didn't know it was his testimony?

17  It was his allocution.

18          MS. BELL:  Yes, Your Honor.  But he -- in his

19  allocution, he did not challenge David Kugel.  Here, he

20  challenged, in his deposition he said Mr. Kugel was

21  responsible for convertible arb, but maybe he was confused.

22          THE COURT:  Is Kugel in jail?

23          MS. BELL:  He's not, Your Honor.  So unless the

24  Court has any further questions, I will turn it over to Mr.

25  Kratenstein.

1          THE COURT:  Thank you.

2          MS. BELL:  Thank you, Your Honor.

3          MR. KRATENSTEIN:  Good morning, Your Honor.  May

4   it please the Court, Andrew Kratenstein for the Sage

5   defendants.

6          The last time we were here, Your Honor enunciated

7   the standard that the Trustee had to meet on this motion,

8   and you've more or less re-enunciated it in your questions

9   to the Trustee's counsel.

10          You said, "If you're going to make the motion that

11   they've made today, you have to show specifically what it is

12   that Madoff said that is new that you couldn't have

13   anticipated with due diligence or taking that discovery."

14   That standard is of course, as you know, consistent with the

15   case law as well.

16          And by the way, it's also what Paragraph L, we

17   believe, of Madoff's deposition order contemplated,

18   something that couldn't have been anticipated, not something

19   that easily could have been anticipated.  And Your Honor has

20   already better than I could, laid out why all of this could

21   be anticipated.

22          The argument that the Trustee has made really

23   rests on two inter-related fictions.  The first fiction is

24   that Madoff's testimony somehow changed the trajectory of

25   the case such that what they want now was unanticipated and

Page 51

1    that they then had to wait until the end of Madoff's

2    deposition to depose his underlings, that this argument that

3    it wasn't ripe.

4           THE COURT:  Well, you know, just on that latter

5    point, I don't think it was unreasonable to wait until the

6    end of his deposition to make a motion based upon what his

7    deposition revealed as a reason for additional discovery.

8           MR. KRATENSTEIN:  Well, let's -- I think, when the

9    Madoff deposition order was entered -- I will speak of my

10   contemplation, you have your own contemplation of what

11   happened -- I don't think anybody expected it would take as

12   long as it did.  And I don't think anybody thought though

13   that we'd be here in 2018 talking about taking another

14   however long of discovery of all of these people.

15          I think the important point, and I want to go back

16   to a point that opposing counsel, Ms. Bell just made, which

17   is what would happen in a normal case.  Well, let's talk

18   about what would happen in a normal case.

19          In a normal case, at least in every normal case

20   I've been involved with, you don't necessarily depose the

21   boss first, you often depose the underlings first.  And in a

22   normal case, as we all know, if you're going to put forth an

23   expert, you need to make sure that all of the factual

24   evidence on which that expert is relying is admissible.

25          So if they're going to put in Dubinsky, who

1    identified as "key individuals" in quotes, he had a whole

2    section on it in his report, basically everybody they wanted

3    to depose now, and as you noted, put in however many

4    paragraphs and pages on convertible bond arbitrage being

5    fictitious, they knew in 2013, they knew then that that was

6    an issue in this case and, as you've said, they should've

7    taken that testimony if they wanted it.

8           Kugel's testimony was not a secret.  That criminal

9    trial occurred in 2014.  So all of this could have and

10   should have been done.  The notion that it wasn't ripe, that

11   they didn't know, that there were specific nooks and

12   crannies of Madoff's testimony that they want to rebut is

13   not an excuse to not have gone out and taken the depositions

14   of these people who everybody knew were his key underlings.

15   They chose not to do that.

16          THE COURT:  Was Kugel mentioned in the mandatory

17   disclosures as a person with knowledge of the facts?

18          MR. KRATENSTEIN:  I don't recall if he was -- he

19   was not mentioned in ours because we didn't think he had

20   something relevant to our case.  However, there was public -

21   - certainly public information out there.  There were others

22   who weren't mentioned, including Bongiorno and Crupi.  But

23   certainly by the time, by 2014, no later than 2014,

24   obviously earlier than that, Dubinsky's testimony was public

25   information.

1            If they wanted to re-do the criminal trial in this

2    case or recreate that record in this case, which they had

3    every opportunity to do, I mean, that's another phrase that

4    kept coming up, we'd like an opportunity to do this.  You

5    had that opportunity.  You had three years at least of

6    opportunity to take this discovery and they didn't do it.

7            These issues were clearly in the case from the

8    beginning.  We put this in our papers.  You know the

9    chronology.  And they waited to bring this all up until

10   February of 2018 for the first time saying, when they tried

11   to consolidate everything, we want to take all this

12   discovery.

13           By the way, they made that motion, I'll just go

14   off on a second on that, they didn't even come to us first

15   before they made that motion.  They didn't even confer.

16   They just filed it with Your Honor.

17           THE COURT:  What are you --

18           MR. KRATENSTEIN:  The motion.

19           THE COURT:  You're willing to agree to any

20   discovery?

21           MR. KRATENSTEIN:  No, no, no, no, no.  The motion

22   -- I'm not, but the motion that -- we would've told them --

23   my point is, we would've told them, if they had come to us

24   and said, here's what we want to do.  We would've told them

25   back in February, as we did when we opposed, here are all

Page 54

1    the problems we had with them, then we had long

2    negotiations, a long process, you lived through it with us

3    in some ways.

4              But all that time got wasted by their litigation

5    choices.  They had made tactical litigation decisions.  They

6    also made a tactical litigation decision not let people

7    intervene in Cohen way back when because they wanted to keep

8    everybody separate.  Now they want everybody together.

9              THE COURT:  Yeah, but there were good reasons for

10   that, I thought.  And in that particular case, the people

11   who wanted to intervene were -- just kind of circumvent the

12   procedure and glom on to another case so they could make

13   their arguments.

14             MR. KRATENSTEIN:  And that's fine.  But my point

15   is that they'd made certain tactical decisions, for whatever

16   reasons they made them.  But they have to live with them.

17   If any of us had come forward and said, I want to now take

18   six to 10 more depositions --

19             THE COURT:  Ms. Chaitman wants to take 27.

20             MR. KRATENSTEIN:  Well, she's -- but she's -- the

21   difference, and I'll let her speak for herself, here's the

22   key difference -- she served those subpoenas when fact

23   discovery wasn't open.  That's the difference.  So, I'll

24   just quickly on the other factors relevant to Your Honor's

25   determination and then I'll let my co-defendant speak. We

Page 55

1    oppose the motion, which is actually a factor.

2             There's prejudice to us.  I mean, the notion that

3    this is limited discovery, we disagree with that.  This is a

4    number of depositions, multi-day depositions, three of the

5    people are in prison.  I went to the Madoff deposition and I

6    deposed him.  That was a big burden and expense.  We did it

7    because we felt like we needed to do it, but it wasn't

8    cheap.  It wasn't burden-less.

9             This is a major endeavor that they want us to go

10   on, whether it's 90 days or 120 days.  Our clients don't

11   have a blank check to pay for all of this.  They do.

12            THE COURT:  So would you object if the deposition

13   was limited to Bongiorno and Sala was not in prison, I

14   guess?

15            MR. KRATENSTEIN:  Well, you know, I'm --

16            THE COURT:  They seem to be the two most

17   knowledgeable people when I was going through the

18   transcripts and the profit withdrawal.

19            MR. KRATENSTEIN:  Well, I would object to

20   Bongiorno because, and I brought this up before, and Sala,

21   but on Bongiorno, you know, I came to this Court in December

22   of 2016 and said, you know, she was just deposed in profit

23   withdrawal.  I really don't want to go through all that

24   again in this case.  Would you let us use her profit

25   withdrawal transcript in this case?  They said no.  It was

Page 56

1    Your Honor's order.  They were entitled to do that and you

2    sided with them.  That was fine.  But I said at that

3    hearing, because they said we will want to take an omnibus

4    deposition of Bongiorno.

5           I said, on the record, at that hearing, then

6    please tell us soon.  Please do it soon because the clock is

7    ticking and we should take that deposition now or soon if

8    you're going to do that and they didn't.  They waited.  They

9    said, we want to wait.  They did say that.  Your Honor

10   didn't rule.

11          But you know, we made our position clear that you

12   should not wait.  You should not wait until fact discovery

13   periods are over.  You should be taking these depositions.

14   And we don't just get to go back and forth with more

15   depositions each time somebody says something.  At some

16   point there has to be an end.  So unless Your Honor has more

17   questions, I'll cede it to my co-defendant.  Thank you.

18          THE COURT:  Thanks.

19          MR. RICH:  Good morning, Your Honor.

20          THE COURT:  Good morning.

21          MR. RICH:  Robert Rich, Hunton Andrews Kurth on

22   behalf of Edward A. Zraick et al.

23          I just want to remind the Court this is not the

24   first time that an issue has come up based on the language

25   of these Madoff orders.  Two years ago I asked for some very

Page 57

1    limited discovery on the basis of these orders about US

2    Treasury securities and some trading.  And as you might

3    recall, the Trustee vigorously opposed them.

4              THE COURT:  Well, the depositions weren't complete

5    at that point, right?

6              MR. RICH:  The depositions were not complete.  And

7    I know that the Trustee argued today, and they say what they

8    argued in their briefs was that they were only arguing it

9    was premature.  That is not what they argued.  In fact, they

10   said, they only argued that if I was going to make that

11   motion on the basis of the orders, it had to be after the

12   deposition.

13             But then they went on.  They said, even if I had

14   made it then, the deposition order's provision committing

15   potential follow-up discovery based on Madoff's testimony

16   should be construed only as permitting discovery that could

17   not have been pursued without his testimony and they said,

18   surely the defendants not in Madoff testimony to justify the

19   discovery requests for documents concerning securities

20   trading.

21             And the Court denied my motion, not on the basis

22   that it was premature, it said that asking for securities

23   trading records at this stage of the case was inexplicable.

24   And so, my motion was denied.

25             THE COURT:  What was the document number that you

Page 58

1    were just reading from in your case?

2              MR. RICH:  I was reading from the Trustee's brief.

3    It's -- I have -- it's Document Number 68 in the Zraick

4    case.

5              THE COURT:  Okay.

6              MR. RICH:  Also, the Trustee keeps raising now

7    that, oh well, this was contemplated all along, that we

8    would have these omnibus discovery issues on convertible

9    arbitrage and whatnot.  If you recall, I was up here while

10   discovery was still open asking for 12 more days to get my

11   expert -- rebuttal expert reported on convertible arbitrage.

12   They fought it tooth and nail.  We had an evidentiary

13   hearing.  And at no point did they say, well, oh, you could

14   just submit this later.  Why were we fighting?  If I could

15   submit another expert report on convertible arbitrate, then

16   I would've just waited and it wouldn't have mattered.

17             So what they're saying now is completely

18   inconsistent with what they said then.

19             I just want to end with even if for some reason,

20   even if discovery was open and they were requesting this,

21   just based on the proportionality rules it should certainly

22   be denied in this case.  There's $285,000 at issue.  They

23   haven't pursued cases that are under $500,000.

24             THE COURT:  Yeah, but you know, unfortunately

25   you're caught in this omnibus proceeding.  You know, and I

Page 59

1    don't know what to -- to deny, you mean go through it case

2    by case and decide whether or not it's appropriate in a

3    particular case based on the amount of the damages?

4              MR. RICH:  I think we may (indiscernible) omnibus

5    proceeding, but we've had plenty of one -- we did a

6    deposition of their expert.  It's extremely expensive for my

7    clients already.  You know, I don't know what they want to

8    do next.  You know, I think the proportionality rules are

9    directed against just this kind of economically irrational

10   client.  I think that's exactly what it's aimed to prevent.

11   So Your Honor, we respectfully request that you deny the

12   Trustee's motion.  Unless the Court has questions, I'll cede

13   the podium.

14             THE COURT:  No, thank you.

15             MR. RICH:  Thank you.

16             MS. NEVILLE:  Good morning, Your Honor.  Carole

17   Neville from Dentons --

18             THE COURT:  Good morning.

19             MS. NEVILLE:  -- on behalf of Madoff clients.  I

20   have two points.  One is, I gave you the transcript of

21   Annette Bongiorno, in which she testified she had nothing to

22   do with the convertible arbitrage after 1992 and that she

23   believed the tickets from Google were real, and that she had

24   no memory of the dates.  So --

25             THE COURT:  Was this at the PW proceeding or the

Page 60

1    federal trial?

2            MS. NEVILLE:  It's in the PW proceeding.  I agree

3    that you're not going to use it for that, but let's get

4    real.  This woman, this is a 10-year back question they're

5    asking her.  She already said she doesn't have knowledge of

6    that and she didn't remember the dates and she believed the

7    tickets were real.

8            So what's the deposition about?  The real thing

9    that I have an issue with is submitting four additional

10   expert reports on topics that I don't know anything about.

11   And the 14 cases include some of mine.  So during the period

12   of time when the Madoff deposition was occurring, expert

13   reports had already been served.

14           What are the four reports they want to add?  And

15   so that means that I now get an opportunity to add all new

16   expert reports and oppose additional people who --?  This

17   could go on forever.

18           We have asked for very simple additional discovery

19   in those long meetings that we had with the Trustee and the

20   Trustee agreed, but we have gotten none of it.  That he

21   would give us access to the BLMIS database, never happened.

22           And therefore, fighting me tooth and nail on

23   confirmations, which they first admitted they had during

24   those conferences we had.

25           THE COURT:  What does this have to do with the

Page 61

1    Trustee's motion?  Let's get back to that.

2              MS. NEVILLE:  Well, what I said in here was that

3    they're asking for --

4              THE COURT:  Because I'll tell you, I've been

5    through this before.  You're going to tell me they didn't

6    give you discovery and they're going to tell me they did

7    give you discovery and that's just a collateral issue --

8              MS. NEVILLE:  Okay --

9              THE COURT:  -- that you should iron out.  And if

10   there's a specific problem you can bring it to my attention.

11             MS. NEVILLE:  Will do, will do.

12             THE COURT:  Don't tell me you're relying on --

13             MS. NEVILLE:  But the issue that I have right now

14   is that four additional expert reports were not contemplated

15   by the order, were said in all other respects a scheduling

16   order would remain in place.  So in my cases, where the

17   expert reports have been served, I think it violates the

18   order in Rule 16.

19             THE COURT:  Okay, thank you.

20             MS. CHAITMAN:  Good morning, Your Honor.

21             THE COURT:  Good morning.

22             MS. CHAITMAN:  Helen Davis Chaitman on behalf of a

23   number of defendants.

24             Three things, Your Honor, as you're painfully

25   aware I'm sure, I served the subpoenas on traders

1    approximately two years ago. You have stayed my going

2    forward with those because the Trustee became absolutely

3    hysterical when I served the subpoenas.  I hope that the

4    documents the traders have have been preserved, but that's

5    discovery which I served in a timely manner.

6           I would like to proceed with it.  It doesn't make

7    sense if Your Honor's even considering the Trustee's

8    request, which I think should be denied, based on the

9    history of these cases, I think I should at least have the

10   opportunity to take this discovery first.

11          THE COURT:  Well, putting aside priority of

12   discovery, you're arguing that your discovery isn't even

13   implicated by these proceedings. You served it timely.  You

14   want relief from the stay, so to speak, to go ahead with

15   these depositions.

16          MS. CHAITMAN:  I want to follow up with that

17   discovery, because what if these people say something that I

18   could ask Bongiorno about, and you do allow the Trustee to

19   depose Bongiorno?  Certainty I should have priority over the

20   Trustee if you're going to grant the Trustee his motion to

21   any extent.

22          THE COURT:  I don't state practice as priority,

23   but I don't think there's priority in federal practice.

24          MS. CHAITMAN:  It's not a question of priority,

25   it's fairness and logic.  Because this is, first of all, as

Page 63

1    you indicated, Your Honor, in 2013 if not earlier from the

2    Trustee's perspective and certainly with the Dubinsky

3    Report, the issue of whether there was trading, legitimate

4    trading for investment advisor customers prior to the split

5    strike strategy, as Madoff testified, as he allocuted, has

6    been in the case from inception.

7            When we answered the complaints we raised every

8    single one of these issues.  So none of this should be a

9    surprise to the Trustee.  The Trustee had more than enough

10   time to take whatever discovery the Trustee wanted.

11   Certainly there isn't an issue that the Trustee didn't have

12   the financial resources to do this.

13           The other point I'd like to make, which Your

14   Honor's also painfully aware of, is I've been asking for

15   trading records.  That issue is now, as you may know, before

16   Magistrate Judge Moss.  We have a meeting with him in two

17   weeks.  But we don't have the body of trading records that

18   we would need to ask questions of Annette Bongiorno.  And

19   again, this is a request that I made in, I think 2015.  I

20   can't remember when I made it.  It's certainly more than two

21   years ago.

22           So I would suggest, Your Honor, that you don't

23   even consider the Trustee's request until I have had the

24   opportunity on behalf of the large number of defendants I

25   represent, until I've had the opportunity to take the

Page 64

1    discovery, which I asked for in a timely manner, and to

2    which I'm absolutely entitled.

3           And finally, there was a quotation, which was

4    nice, of a brief that I submitted to Your Honor.  As Your

5    Honor knows, there have been a few occasions where you've

6    actually disagreed with my arguments, and that was one of

7    them.  I made that argument, and you didn't consider it --

8    you considered it and rejected it.  So it's nice that the

9    Trustee --

10          THE COURT:  So you want me to be consistent?

11          MS. CHAITMAN:  Well, it's nice that the Trustee is

12   relying upon it's something I asked for three years ago that

13   you didn't give me.  But the fact of the matter is, every

14   proceeding that we've had where I've been in Court with you

15   you've made it very clear that any discovery following

16   Madoff's deposition was going to be very, very limited and

17   you were going to strictly scrutinize whether it was an

18   issue that could not have reasonably been anticipated.  And

19   I just don't think that those criteria have been met here.

20          THE COURT:  Okay, thank you.

21          MS. OPHEIM:  Your Honor, May I respond?

22          THE COURT:  Yes. I'm sorry, who are you?

23          MS. OPHEIM:  I'm Jennifer Opheim.  I'm from

24   Schulte, Orth & Zabel on behalf of the counterparty.  I'll

25   be very brief.

1          We don't have any opposition to the relief that

2     the Trustee requests.  We just request that any order

3     authorizing the depositions contain the same limitations

4     previously included in orders.  So far as I know there have

5     been no objections to that request.

6          THE COURT:  Thank you.

7          MS. OPHEIM:  Thank you.

8          MS. BELL:  Your Honor, I'll start where Ms.

9     Chaitman left off.  You did not deny that request.

10          THE COURT:  Let me ask you something that Mr. Rich

11     said, that frankly I hadn't considered.  Should I be

12     considering the request on a case-by-case basis in

13     connection with principles of proportionality?  So for

14     instance in his case, legal fees, and I don't know if he's

15     been getting legal fees in these cases, probably well

16     exceeds the amount of the claims in the case.

17          Should I say in a case like that, you know, enough

18     is enough, let's just try this case?  You're seeking less

19     than $300,000, which I'm sure is a substantial amount to the

20     defendants.  But considering what you're asking for, maybe I

21     should just look at this on a case-by-case basis, based, for

22     instance, on the amount of the damages or the amount of the

23     claim.

24          MS. BELL:  Your Honor, I have two responses to

25     that. One is, this case was almost $1 million, but with the

Page 66

1    546(e) decision the case got knocked down to $285,000.

2              THE COURT:  Okay, so now it's $300,000.

3              MS. BELL:  But, so these defendants are actually

4    net winners for much more than $285,000, and they're net

5    losers who haven't been made whole.  But I think more than

6    that, Your Honor --

7              THE COURT:  So you're saying notwithstanding

8    546(e) and the Second Circuit's decision, I should consider

9    them liable for $1 million?

10             MS. BELL:  Not at all, Your Honor.  I think the

11   point I'm making is, it is not personal why this lawsuit was

12   instituted, but --

13             THE COURT:  Well, they probably used most of that

14   money to pay legal fees already, so.

15             MS. BELL:  I'll restrain myself from responding,

16   Your Honor, but --

17             THE COURT:  No, but what about the argument that

18   these should be considered on case-by-case basis in

19   connection with proportionality and the other

20   considerations.

21             MS. BELL:  So Your Honor, my second response to

22   that is Mr. Hunt can decide not to participate or not to use

23   Madoff's deposition in testimony.  The discovery, and I

24   think part of what's missing from what the defendants have

25   presented is, we're not seeking -- this is not a case where

Page 67

1    the Trustee has allowed discovery to lapse and where simply

2    years after the case started seeking to take depositions of

3    folks that we think are important to the case.  That's not

4    this.

5            This is a situation where the defendants, six

6    years after the cases were started, they sought to take the

7    deposition of a key person, the mastermind of the fraud, and

8    after that request was made, the Trustee was clear, the

9    Trustee was consistent that to the extent that the Court

10   would allow this deposition to go forward, the Trustee

11   should be afforded the opportunity to rebut.  And so --

12           THE COURT:  I agree with you that that was the

13   Trustee's position and still is the Trustee's position.

14           MS. BELL:  And Your Honor, I think the Trustee's

15   position is more than fair.  In fact, I think it's the only

16   right position, because otherwise how can we -- how can Your

17   Honor evaluate Mr. Madoff's testimony and determine what

18   part of Mr. Madoff's testimony to credit, to give -- where

19   is he credible, and where is he not?

20           I also want to go back to the criminal trial

21   testimony and why the Trustee didn't do this in 2013.  The

22   Trustee had to be ready to go.  There are a number of

23   intervening events that changed the course of how these

24   cases were litigated, with the motions to withdraw the

25   reference and the omnibus proceedings in the district court.

Page 68

1          But the Trustee was not waiting for the criminal

2    trial to end to get his case in chief ready.  The Trustee

3    had to retain an expert.  The Trustee had to look through

4    the books and records of the Debtors.  The trustee had to

5    rely on the alloctions of the former BLMIS employees.

6    These employees were not available to the Trustee until last

7    year or the year before when the cert was denied.  And so I

8    think it's unfair and unreasonably not true.

9          THE COURT:  Well, that may be true of the ones

10   that are incarcerated, but there are witnesses that were

11   never charged, and never a cert, that aren't incarcerated.

12         MS. BELL:  That's true, Your Honor, but I think

13   the vast majority of the ones that we've proposed have

14   either been -- they're either in prison or they were charged

15   and they allocuted.  But I also want to tie --

16         THE COURT:  But you're also asking to take

17   discovery of those who are always available, right?

18         MS. BELL:  Yes, Your Honor.  I think there would

19   be one or two witnesses that would fall into that category.

20   Now, Your Honor, what the Trustee's seeking to do, it's not

21   as the Defendants suggest, that is it's something that's

22   never-ending.  It's six topics from six witnesses.  They

23   took Mr. Madoff's depositions over five days. We could take

24   these six depositions in far less time.

25         THE COURT:  Can I say, the PW proceeding was one

1    issue.  And I think Ms. Bongiorno's deposition was something

2    like 250 or 300 pages of transcript.  So these are not 10-

3    page depositions.

4              MS. BELL:  But we can agree, Your Honor, to limit

5    those depositions, and the Trustee's amenable to that I

6    think for the specific points, and we've tied Mr. Madoff's

7    testimony.  And you asked whether if you chose to give

8    simply two depositions, if we did Ms. Bongiorno and Ms.

9    Sala.  Mr. Madoff testified that Mr. Bonventre was the only

10   other person who knew about the whole operations of the

11   firm.

12             THE COURT:  Well, he's in jail, right?

13             MS. BELL:  Yes. Yes, Your Honor, he is.  There is

14   also significant testimony about Ms. Pruthi and what she did

15   with the books and records of BLMIS.

16             THE COURT:  She has refused to testify, as I

17   understand.

18             MS. BELL:  Your Honor, I think she would be

19   willing to testify as part of these proceedings.  And I

20   don't want to speak out of school here, but Ms. Bon--

21             THE COURT:  So why didn't you take her deposition

22   with respect to the PW proceeding?

23             MS. BELL:  Your Honor, I can't answer the question

24   with respect to Ms. Pruthi and how -- what role she played

25   in the PW.  I don't know if Ms. (indiscernible) was

Page 70

1    (indiscernible) --

2            THE COURT:  My recollection is she didn't want to

3    testify, but okay.

4            MS. BELL:  Sorry, Ms. Browning's in the courtroom,

5    Your Honor, if you will hear from her she can answer that.

6            MS. BROWNING:  Your Honor, at that time Ms. Pruthi

7    was refusing to testify, because the criminal convictions

8    were still not final.  I think since those two convictions

9    have become final, and her current position is that she

10   would be willing to testify.  So it has changed since that

11   time.

12           MS. BELL:  Your Honor, and with respect to all the

13   witnesses that we've identified, Mr. Madoff specifically

14   mentioned them in his five days of deposition where the

15   primary area of responsibility that they had.

16           THE COURT:  But he identified at least -- well,

17   you have identified at least two of them in your mandatory

18   disclosures as people with knowledge, right?  Bongiorno and

19   Pruthi.

20           MS. BELL:  Yes, Your Honor.  Yes, Your Honor.  And

21   we're not -- again, our position is not that we didn't think

22   these people were relevant, or that the convertible arb

23   strategy was an issue in the case.  The Trustee was putting

24   his case together without the deposition testimony of

25   Bernard Madoff.

1          Now that that testimony has been injected into the

2    case, new issues are now in the case, there is inconsistent

3    testimony, and for us to make sense of what Mr. Madoff has

4    testified to, it seems to us that the only way to do that is

5    to have other witnesses who were at BLMIS at the time, doing

6    the very transactions about which he testified.

7          And so, just to address Mr. Hunt's point about the

8    Trustee's position in the Drake motion to reopen discovery,

9    that was very different, Your Honor.  This is, again, the

10   Trustee's not seeking to do a generalized opening of

11   discovery here.  This is tied to the specific testimony that

12   was given by Mr. Madoff, and the Trustees should be given

13   the opportunity to refute that testimony.  And again, he can

14   choose what depositions to attend.  I think it's no

15   different than PW, where, Your Honor, you thought --

16          THE COURT:  Well, that's quite a Hobson's Choice,

17   though, isn't it?  You're going to use the depositions

18   against his clients.

19          MS. BELL:  Perhaps, Your Honor, perhaps.  But as

20   Mr. Kratenstein points out, it's the nature of litigation,

21   and so certainly, again, we can agree to move forward with

22   that case without Madoff's deposition. And as we're doing,

23   as Your Honor pointed out with the other group of cases

24   where Madoff's deposition is not at play, and so there's no

25   need for this discovery.  And I think that connection has to

Page 72

```
 1   be made, because this is not the Trustee saying we need that
 2   deposition to prove our case, because that's not the right
 3   question.
 4           This is the Trustee's -- the Trustee's position is
 5   once the record consists only of Madoff's testimony, that's
 6   an unbalanced, unfair, not equal record, and the Trustee
 7   should be afforded the opportunity to make that record more
 8   fulsome, more comprehensive.  We were not sitting on our
 9   hands for ten years.  This deposition closed on July 25th of
10   2018.  At that point, this issue became ripe for the Court's
11   consideration, not before that.
12           THE COURT:  Thank you.  I'll reserve decision.
13           MR. RICH:  Your Honor --
14           MS. CHAITMAN:  Can I make one point, Your Honor?
15           MR. RICH:  Your Honor --
16           THE COURT:  Very briefly, and a single point.
17           MS. CHAITMAN:  One point, Your Honor.  The
18   testimony that Mr. Madoff gave, which was very, very
19   damaging to the Trustee, was the testimony which
20   discredited, I think completely, Mr. Dubinsky's opinion that
21   the convertible bond trading never occurred.  And the reason
22   that it was devastating to Mr. Dubinsky is not because it
23   was a he-said, she-said factual issue.
24           Madoff testified to indisputable facts, such as
25   Mr. Dubinsky said there were never convertible bond trades,
```

Page 73

1   because he would take a particular day, July 7th, 1981, he'd

2   add up all the positions, everyone bought --

3                THE COURT:  Day before my son's birthday but go

4   ahead.

5                MS. CHAITMAN:  Oh, pure coincidence.

6                THE COURT:  Okay, I remember what I was doing that

7   day.

8                MS. CHAITMAN:  You want me to depose you about it?

9   He --

10               THE COURT:  You can try.

11               MS. CHAITMAN:  If you added up all the -- this is

12   a serious point, Judge.  If you added up all the --

13               THE COURT:  I know what you're going to say, that

14   they were off-exchange trades, I understand that.

15               MS. CHAITMAN:  They were off-exchange trades, and

16   it's all expert reputation.  It's not a question of whether

17   Bongiorno, who got paid millions of dollars to settle, the

18   trustee released her of any liability on the multimillion-

19   dollar claw back claim, and she got to keep a substantial

20   amount of her wealth, it's not a question of her

21   credibility, it's a question of whether the experts can

22   substantiate or refute what Dubinsky opined.

23               So I think this is just a wild goose chase.  It

24   has nothing to do with really trying to deal with Madoff's

25   testimony.

Page 74

```
 1              THE COURT:  You've made your point.  Great point.

 2              MR. RICH:  I'm sorry, Your Honor, my clients would

 3     be jumping out of the chair if I didn't try to correct at

 4     least some of the record here.  They're net winners only by

 5     the tortured definition given by the Trustee.  I didn't --

 6              THE COURT:  And the Second Circuit, right?

 7              MR. RICH:  No, they were never sued for $1

 8     million.  There were other defendants who are now out,

 9     including their grandmother's estate that were sued, and the

10     money went to other people.  They never received that money,

11     which is what the Trustee is trying to imply here.  They've

12     spent a ton on this case, they paid a ton in estate taxes,

13     income taxes --

14              THE COURT:  Do you want to try this case?  Do you

15     want to try this case without the -- the offer was made to

16     try your case without use of the Madoff deposition, as I

17     understand it, Ms. Bell?

18              MS. BELL:  Yes, Your Honor.

19              THE COURT:  Do you want to try your case?

20              MR. RICH:  Why should I agree not to use the

21     Madoff deposition?  I believe they're entitled to discovery.

22              THE COURT:  Well, all right.  Well, you're taking

23     about saving money, okay.  Because we can try your case this

24     afternoon, if you want.

25              MR. KRATENSTEIN:  Let me make one last point, my
```

Page 75

1    one point.  Dubinsky, $30 million expert, all about the

2    verbal bond arbitrage.  If they weren't ready in 2014, why

3    weren't you ready in 2015, '16, '17, '19?

4              THE COURT:  I got it.  Decision reserved, thank

5    you.

6              (Whereupon these proceedings were concluded at

7    11:34 AM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5        Sonya                    Digitally signed by Sonya Ledanski
                                  Hyde
6        Ledanski Hyde            DN: cn=Sonya Ledanski Hyde, o, ou,
                                  email=digital@veritext.com, c=US
7                                 Date: 2018.11.27 15:57:27 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 1, 2018