**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>    Plaintiff,<br><br>  v.<br><br>CITIBANK, N.A., CITIBANK NORTH AMERICA, INC., AND CITIGROUP GLOBAL MARKETS LIMITED,<br><br>    Defendants. | Adv. Pro. No. 10-05345 (SMB) |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO**
**FILE AN AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND.................................................................................................2

A.    Procedural History ........................................................................................2

    1.    Initial Proceedings in the Bankruptcy Court..................................2

    2.    Proceedings in the District Court...................................................3

    3.    Subsequent Proceedings in the Bankruptcy Court.........................4

B.    The Proposed Amended Complaint ...............................................................5

    1.    The PAC Plausibly Alleges Defendants Received the Subsequent Transfers from Prime Fund While Willfully Blinding Themselves to Fraud at BLMIS. .......................................6

        a.    Fairfield Sentry Leverage Deal .......................................6

        b.    CGMI Managing Director Investigates BLMIS and Believes it is a Fraud ....................................................9

        c.    Defendants Demand Indemnification Against Fraud at BLMIS in the Prime Fund Credit Deal ......................................10

        d.    The Proposed Tremont Deal: CGMI's Concerns Regarding BLMIS's Self-Custody, Impossible Trade Volumes and Phantom Counterparties Prevent Defendants from Making Additional BLMIS-Related Investments ......................................11

        e.    CGMI Schedules a Meeting with Madoff to Address its Fraud Concerns ...................................................12

        f.    Defendants Cease Investigating Their Suspicions of Fraud at BLMIS .......................................13

        g.    Pretextual Madoff Meeting..........................................14

        h.    Defendants Refuse to Renew the Prime Fund Credit Deal Without Indemnification Against Fraud ......................15

    2.    The PAC Plausibly Alleges the Initial Transfers from BLMIS to Prime Fund Were Avoided or Avoidable ..................................15

a.    The Settlement Agreement Provides that the Initial Transfers to Prime Fund Were Avoided ........................................................15

b.    The PAC Plausibly Alleges That the Transfers to Prime Fund are Avoidable ..................................................................................16

(1)    Tremont was Closely Tied to Madoff and BLMIS ............16

(2)    Tremont Had Evidence Madoff Was Engaged In a Fraud ................................................................................16

(a)    Tremont Knew of Trade Impossibilities ...............16

(b)    Tremont Was Repeatedly Warned About Fraud at BLMIS ................................................................17

(c)    Tremont Knew BLMIS Lacked Third-Party Oversight ................................................................17

(3)    Tremont Exempted BLMIS From Its High Due Diligence Standards, Prevented Third Parties from Conducting Their Own Due Diligence and Fabricated Stories About BLMIS .......................................................18

(4)    Tremont Avoided Questions and Fabricated Answers about BLMIS's Purported Options Trading .....................18

(5)    Tremont Co-Managed Kingate Global ..............................19

ARGUMENT .............................................................................................................19

LEGAL STANDARD GOVERNING MOTIONS TO AMEND A PLEADING ........................19

THE COURT SHOULD GRANT THE TRUSTEE'S MOTION TO AMEND IN LIGHT OF THE INTERVENING CHANGE IN LAW AND THE ADDITIONAL FACTS ALLEGED ............................................................................................................20

NO FUTILITY, UNDUE DELAY, BAD FAITH, OR UNDUE PREJUDICE EXISTS .............22

A.    Amending the Complaint Would Not Be Futile Because the Trustee Has Alleged Facts Sufficient to Survive a Motion to Dismiss......................................22

1.    Good Faith or Knowledge of the Avoidability of the Initial Transfer .......23

a.    The Trustee Sufficiently Pleads that Defendants Subjectively Believed There Was a High Probability of Fraud at BLMIS.........24

b.    Defendants Deliberately Avoided Confirming BLMIS's Fraud....27

2.      Avoidability ............................................................................................31

3.      The Proposed Amendments Relate Back.....................................................34

B.      No Undue Delay or Bad Faith Can be Shown Where Defendants Acquiesced to the Trustee Waiting to Amend the Complaint Until Legal Standards Were Resolved............................................................................................................37

C.      Defendants Cannot Demonstrate Undue Prejudice...............................................38

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)...................................................................................20

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
  624 F. Supp. 2d 292 (S.D.N.Y. 2009).............................................................35, 36

*Agerbrink v. Model Serv. LLC*,
  155 F. Supp. 3d 448 (S.D.N.Y. 2016).............................................................38, 39

*Alexander Interactive, Inc. v. Adorama, Inc.*,
  No. 12 Civ. 6608, 2014 WL 113728 (S.D.N.Y. Jan. 13, 2014).............................20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................22

*Blagman v. Apple, Inc.*,
  No. 12 Civ. 5453 (ALC) (JCF), 2014 WL 2106489 (S.D.N.Y. May 19, 2014)......20

*Block v. First Blood Assocs.*,
  988 F.2d 344 (2d Cir. 1993).................................................................................39

*In re Chaus Secs. Litig.*,
  801 F. Supp. 1257 (S.D.N.Y. 1992)......................................................................36

*Commander Oil Corp. v. Barlo Equip. Corp.*,
  215 F.3d 321 (2d Cir. 2000).................................................................................37

*Dougherty v. Town of N. Hempstead Bd. Of Zoning Appeals*,
  282 F.3d 83 (2d Cir. 2002)...................................................................................22

*In re Dreier LLP*,
  452 B.R. 391 (Bankr. S.D.N.Y. 2011)..................................................................23

*Enron Corp. v. Granite Constr. Co. (In re Enron Corp.)*,
  No. 03-93172 (AJG), 2006 WL 2400369 (Bankr. S.D.N.Y. May 11, 2006).........37

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*,
  726 F.3d 62 (2d Cir. 2013)...................................................................................22

*Fish v. GreatBanc Tr. Co.*,
    749 F.3d 671 (7th Cir. 2014) ...................................................................23, 24

*Fjord v. AMR Corp. (In re AMR Corp.)*,
    506 B.R. 368 (Bankr. S.D.N.Y. 2014) ...................................................................19

*Foman v. Davis*,
    371 U.S. 178 (1962)...................................................................19

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    No. 02 Civ. 5068 (JFK), 2008 WL 9359652 (S.D.N.Y. Mar. 17, 2008) ................................21

*Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*,
    665 F. Supp. 2d 239 (S.D.N.Y. 2009)...................................................................39

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*,
    No. 16-CV-5393 (KMW), 2018 WL 1115517 (S.D.N.Y. Feb. 26, 2018)...............................39

*Local 802, Associated Musicians of Greater NY v. Parker Meridien Hotel*,
    145 F.3d 85 (2d Cir. 1998)...................................................................19

*M.E.S., Inc. v. Safeco Ins. Co. of Am.*,
    No. 10-CV-02798 (PKC)(VMS), 2014 WL 2931398 (E.D.N.Y. June 27,
    2014) ...................................................................39

*In re Madoff Sec.*,
    No. 12-mc-115 (JSR) (S.D.N.Y.), ECF No. 552 ...................................................................4

*Margel v. E.G.L. Gem Lab Ltd.*,
    No. 04 Civ. 1514 (PAC) (HBP), 2010 WL 445192 (S.D.N.Y. Feb. 8, 2010) ........................20

*Mayle v. Felix*,
    545 U.S. 644 (2005)...................................................................35

*Metzeler v. Bouchard Transp. Co., Inc. (In re Metzeler)*,
    66 B.R. 977 (Bankr. S.D.N.Y. 1986)...................................................................37

*Milanese v. Rust-Oleum Corp.*,
    244 F. 3d 104 (2d Cir. 2001)...................................................................19

*Monahan v. N.Y.C. Dep't of Corr.*,
    214 F.3d 275 (2d Cir. 2000)...................................................................39

*In re Optimal U.S. Litig.*,
    No. 10 CIV 4095 SAS, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011)...................................27

*Pagano v. Pergament*,
    No. 11-CV-2360 (SJF), 2012 WL 1828854 (E.D.N.Y. May 16, 2012) ................................35

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
    Adv. Pro. No. 08-01789 (SMB), 2018 WL 4833984 (Bankr. S.D.N.Y. Oct. 3,
    2018) ................................................................................................................... *passim*

*Picard v. Ceretti (In re BLMIS)*,
    Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug.
    11, 2015) ........................................................................................................................31

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011)........................................................................................20

*Picard v. Legacy Capital Ltd. (In re BLMIS)*,
    548 B.R. 13 (Bankr. S.D.N.Y. 2016) ..........................................................................5, 21

*Picard v. Magnify (In re BLMIS)*,
    583 B.R. 829 (Bankr. S.D.N.Y. 2018) ............................................................................20

*Picard v. Mendelow (In re BLMIS)*,
    560 B.R. 208 (Bankr. S.D.N.Y. 2016) ................................................................... *passim*

*Picard v. Merkin (In re BLMIS)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ................................................................... *passim*

*Picard v. Peter Madoff (In re BLMIS)*,
    468 B.R. 620 (Bankr. S.D.N.Y. 2012) ............................................................................36

*Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*,
    No. 13 Civ. 1654 (RA), 2015 WL 4097927 (S.D.N.Y. July 6, 2015) ...................................38

*S.S. Silberblatt, Inc. v. E. Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co., Inc.*,
    608 F.2d 28 (2d Cir.1979)................................................................................................19

*SIPC v. BLMIS (In re Madoff)*,
    Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov.
    22, 2016) ...........................................................................................................................4

*SIPC v. BLMIS (In re Madoff)*,
    501 B.R. 26 (S.D.N.Y. 2013).....................................................................................21, 31

*SIPC v. BLMIS (In re Madoff)*,
    513 B.R. 222 (S.D.N.Y. 2014)........................................................................................3, 4

*SIPC v. BLMIS (In re Madoff)*,
    516 B.R. 18 (S.D.N.Y. 2014)....................................................................................2, 3, 21

*SIPC v. BLMIS. (In re Madoff)*,
    590 B.R. 200 (Bankr. S.D.N.Y. 2018) .....................................................................4, 36, 38

*Soley v. Wasserman*,
No. 08 Civ. 9262 (KMW) (FM), 2013 WL 6244146 (S.D.N.Y. Dec. 3, 2013) .....................19

*State Teachers Ret. Bd. v. Fluor Corp.*,
654 F.2d 843 (2d Cir. 1981)...........................................................................................37, 39

*State v. United Parcel Serv., Inc.*,
253 F. Supp. 3d 583 (S.D.N.Y. 2017)...................................................................................27

*United States v. A 10th Century Cambodian Sandstone Sculpture*,
No. 12 CIV. 2600 GBD, 2013 WL 1290515 (S.D.N.Y. Mar. 28, 2013)................................21

*United States v. Fofanah*,
765 F.3d 141 (2d Cir. 2014)...........................................................................................27, 28

*United States v. Giovannetti*,
919 F.2d 1223 (7th Cir. 1990) ..............................................................................................23

*United States v. Kozeny*,
664 F. Supp. 2d 369 (S.D.N.Y. 2009), *aff'd,* 667 F.3d 122 (2d Cir. 2011) ............................23

*United States v. Reyes*,
302 F.3d 48 (2d Cir. 2002).....................................................................................................23

*Vulcan Soc. of Westchester Cty., Inc. v. Fire Dep't of City of White Plains*,
82 F.R.D. 379 (S.D.N.Y. 1979) .............................................................................................22

**Statutes**

11 U.S.C. § 546(e) ........................................................................................................................3

11 U.S.C. § 546(g) ........................................................................................................................3

11 U.S.C. § 548..............................................................................................................................5

11 U.S.C. § 548(c) ..................................................................................................................3, 21

11 U.S.C. § 550..............................................................................................................................5

11 U.S.C. § 550(a) ......................................................................................................................21

11 U.S.C. §550(a)(2).....................................................................................................................21

11 U.S.C. § 550(b) ..............................................................................................................3, 21, 23

11 U.S.C. § 550(b)(1) ...................................................................................................................21

15 U.S.C. §§ 78aaa *et seq*. ............................................................................................................1

28 U.S.C. § 157 ................................................................................................................3

**Rules**

Fed. R. Bankr. P. 7015 ...............................................................................................1, 19

Fed. R. Civ. P.  12(b)(6) ...................................................................................................22

Fed. R. Civ. P. 15 ...............................................................................................1, 22, 38

Fed. R. Civ. P. 15(a) .........................................................................................................4

Fed. R. Civ. P. 15(a)(2) ...................................................................................................19

Fed. R. Civ. P. 26 ............................................................................................................40

Fed. R. Civ. P. 26(d)(1) .....................................................................................................4

**Other Authorities**

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1484 (3d ed.) ........................................39

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) ........................................39

Irving H. Picard, as Trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the Chapter 7 estate of Bernard L. Madoff ("Madoff"), under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, respectfully submits this Memorandum of Law in Support of the Trustee's Motion for Leave to File an Amended Complaint under Rule 15 of the Federal Rules of Civil Procedure and Rule 7015 of the Federal Rules of Bankruptcy Procedure.  With this motion, the Trustee submits a proposed amended complaint (the "PAC") against Citibank N.A. ("Citibank") and Citicorp North America, Inc. ("Citicorp") (collectively "Defendants").  The PAC seeks to recover subsequent transfers Defendants received from Rye Select Broad Market Prime Fund, L.P. ("Prime Fund"), a BLMIS feeder fund of Tremont Group Holdings, Inc.  ("Tremont Group"), and its management arm, Tremont Partners (with Tremont Group, "Tremont"), that invested all or substantially all its assets with BLMIS's investment advisory business ("IA Business").

## PRELIMINARY STATEMENT

Defendants received approximately $343 million in subsequent transfers from BLMIS in the few years before it collapsed.  They received these transfers through Prime Fund, as repayment of a loan Defendants made to Prime Fund so it could invest with BLMIS (the "Prime Fund Credit Deal").  During the diligence process, Defendants became concerned that BLMIS was not trading securities as it purported to do and was instead misappropriating its customers' assets.  Instead of investigating these concerns, Defendants obtained an indemnification from Prime Fund's general partner, Tremont Partners, protecting them against fraud by BLMIS.  Once indemnified, Defendants refused to act on their suspicions of fraud at BLMIS even when confronted with more and more evidence that, as would soon become known to the world, BLMIS was fabricating trades and misappropriating assets.

The facts show that Defendants were *only* willing to lend Prime Fund money to invest

with BLMIS because of this indemnification. For example, even during the pendency of their indemnified loan to Prime Fund, Defendants refused another (un-indemnified) opportunity to loan funds to BLMIS investors, citing the likelihood – and their explicit belief – that Madoff was misappropriating Prime Fund's assets and was not trading as he purported. At the same time, Defendants expressed a desire to renew the Prime Fund Credit Deal. The material difference between these two deals was that in the Prime Fund Credit Deal, Defendants were indemnified against the fraud they believed was occurring at BLMIS.

After April 2006, with the Prime Fund loan and indemnification in place, Defendants stopped investigating their suspicions of fraud at BLMIS and instead repeatedly renewed the Prime Fund Credit Deal. Tellingly, in March 2008, when Tremont Partners stopped indemnifying Defendants against fraud at BLMIS, Defendants immediately terminated the Prime Fund Credit Deal.

## **FACTUAL BACKGROUND**

### A.    **Procedural History**

#### *1.    Initial Proceedings in the Bankruptcy Court*

The Trustee filed a complaint on December 8, 2010 seeking to recover over $425 million of subsequent transfers received by Defendants and Citigroup Global Markets Limited.[1]

Following several stipulations extending Defendants' time to respond, Defendants and Citigroup

---

[1] Compl., *Picard v. Citibank, N.A. (In re Madoff)*, Adv. Pro. No. 10-05345 (SMB) (Bankr. S.D.N.Y. Dec. 8, 2010), ECF No. 1 (filed under seal); ECF No. 9 (redacted). Future references to docket entries of *Picard v. Citibank, N.A. (In re Madoff)*, Adv. Pro. No. 10-05345 (SMB) (Bankr. S.D.N.Y.) shall be identified as "Citibank Docket." Citigroup Global Markets Limited is still listed in the caption of the PAC, even though all claims against it have been eliminated in the PAC following the Bankruptcy Court's dismissal of the subsequent transfers it received from Fairfield Sentry Limited. *See* Stipulated Final Order, Citibank Docket, ECF No. 107. The Trustee has appealed the orders dismissing those claims and reserves the right to further amend his pleadings to reinstate those claims if the pending appeal is successful.

Global Markets Limited moved to dismiss the complaint on July 26, 2011 based on, among other

things, Sections 546(e) and 546(g) of the Bankruptcy Code, and whether the Trustee met his

burden of pleading the good faith standard at the time—inquiry notice.[2]

### 2.    *Proceedings in the District Court*

After Defendants moved to dismiss the complaint, hundreds of other defendants in the

Trustee's adversary proceedings moved to withdraw the reference under 28 U.S.C. § 157.  As

relevant here, issues withdrawn by the District Court included whether the Trustee had the

burden of pleading lack of "good faith" under sections 548(c) and 550(b) (the "Good Faith

Issue") and whether the Trustee's claims to recover subsequent transfers were barred by the

presumption against extraterritoriality.[3]  Defendants sought withdrawal of the reference on the

Good Faith Issue, but did not move on extraterritoriality grounds.[4]

In April 2014, the District Court ruled that the Trustee has the burden of pleading that

transferees willfully blinded themselves to circumstances suggesting fraud.  *SIPC v. BLMIS (In

re Madoff)*, 516 B.R. 18, 22-24 (S.D.N.Y. 2014) (the "*Good Faith Decision*").

Three months later, the District Court concluded that because section 550(b) does not

apply extraterritorially, the Trustee must plead certain facts to establish that the subsequent

transfers he seeks to recover are "domestic" transfers.  *SIPC v. BLMIS (In re Madoff)*, 513 B.R.

222, 232 n.4 (S.D.N.Y. 2014) (the "*District Court ET Decision*").  Alternatively, the District

Court held that recovery of subsequent transfers received from an entity in foreign liquidation

---

[2] *See* Mem. of Law on Mot. to Dismiss Compl. at 27, Citibank Docket, ECF No. 21 ("If the Complaint fails to plead facts sufficient to show that the transferee was placed on inquiry notice, then, as a matter of law, the transferee will be deemed to have received the challenged transfer in good faith.").

[3] Motions to withdraw the reference were also filed, and the District Court ultimately entered consolidated decisions, concerning the application of Bankruptcy Code sections 546(e) and 546(g) to BLMIS transfers.

[4] *See* Mem. of Law on Mot. to Withdraw the Reference, Citibank Docket, ECF No. 30.

proceedings would violate principles of international comity. *Id.* at 231–32. Following these decisions, the District Court returned the cases to this Court.[5]

3.    *Subsequent Proceedings in the Bankruptcy Court*

In view of the altered pleading standards, the Trustee filed the Omnibus Motion for Leave to Replead Pursuant to Federal Rule Civil Procedure 15(a) and Court Order Authorizing Limited Discovery Pursuant to Federal Rule of Civil Procedure 26(d)(1) (the "Omnibus Motion")[6] in August 2014.

In September 2014, at a status conference on the Omnibus Motion, defense counsel argued that pending motions to dismiss based on extraterritoriality should be addressed prior to the Trustee's request for discovery.[7] In December 2014, the Court agreed, and stayed proceedings on the Omnibus Motion until after the extraterritoriality proceedings concluded.[8]

In November 2016, this Court issued its ruling on extraterritoriality (the "*Bankruptcy Court ET Decision*").[9] In July 2017, this Court ordered proceedings "solely on the Good Faith

---

[5] *See* Order Entered July 10, 2014, *In re Madoff Sec.*, No. 12-mc-115 (JSR) (S.D.N.Y.), ECF No. 552.

[6] Mem. of Law on Omnibus Mot., *SIPC v. BLMIS. (In re Madoff)*, 590 B.R. 200 (Bankr. S.D.N.Y. 2018) (Adv. Pro. No. 08-01789 (SMB)), ECF No. 7827 (defined above, "Omnibus Motion"); *see also* Decl. of Regina Griffin, *In re Madoff*, 590 B.R. 200 (Adv. Pro. No. 08-01789 (SMB)), ECF No. 7828. Future references to the docket of *In re Madoff*, 590 B.R. 200 (Adv. Pro. No. 08-01789 (SMB)), shall be identified as "Main Docket."

[7] Hr'g Tr. of Sept. 17, 2014 at 16:14–17, Main Docket (Nov. 11, 2014), ECF No. 8636 ("it is not fair to the vast majority of the defendants who have *prima facie* good motions to dismiss on extraterritoriality, to subject them to [discovery]").

[8] *See* Order at ¶ 14, Main Docket, ECF No. 8800 ("December 10 Scheduling Order") (staying proceedings on the Trustee's request for discovery and to replead based on good faith until after the Court ruled on the Defendants' motion to dismiss based on extraterritoriality). The December 10 Scheduling Order was subsequently modified three times. *See* Main Docket, ECF Nos. 8990, 9350, 9720. None of the subsequent orders modified the original paragraph 14 of the December 10 Order concerning discovery and repleading as to good faith. *See also* Hr'g Tr. of Sept. 17, 2014 at 27:17–25, Main Docket (Nov. 11, 2014), ECF No. 8636.

[9] *See SIPC v. BLMIS (In re Madoff)*, Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689, at *36 (Bankr. S.D.N.Y. Nov. 22, 2016).

Limited Discovery Issue" of the Omnibus Motion.[10]   In June 2018, the Court denied the

Trustee's request for limited discovery concerning good faith.[11]  Thus, the Trustee now moves

for leave to amend his pleading to comport with the new standard articulated in the *Good Faith*

*Decision* without any additional discovery on that issue.

B.    **The Proposed Amended Complaint**

Pursuant to the Court's June 5, 2018 Decision and the June 19, 2018 Order, the Trustee

seeks leave to file an amended complaint in this matter to set forth additional relevant facts

sufficient to meet the Trustee's pleading burden.[12]  As required by the *Good Faith Decision* and

this Court's opinions in *Kingate*,[13] *Merkin*,[14] and *Legacy*,[15] to state a claim under 11 U.S.C. §§

548 and 550, the Trustee now must plead particularized allegations that initial transferees had

actual knowledge of BLMIS's fraud or willfully blinded themselves to circumstances indicating

a high probability of fraud at BLMIS and that subsequent transferees similarly willfully blinded

themselves.[16]  For the reasons set forth below, the Trustee should be permitted to file the PAC.

---

[10] Order at ¶¶ 1, 4, Main Docket (July 24, 2017), ECF No. 16428.  That order deferred proceedings on the issue of leave to replead concerning the Good Faith Issue in the Omnibus Motion until after the Court's disposition on the Trustee's request for limited discovery.

[11] Main Docket, 2018 WL 2734825 (Bankr. S.D.N.Y. June 5, 2018); Order Denying the Trustee's Mot. for Disc., Main Docket (June 19, 2018), ECF No. 17696.

[12] The Trustee's PAC also removes the claims dismissed by the Bankruptcy Court ET Decision and makes conforming changes to background allegations.

[13] *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*").

[14] *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin II*").

[15] *Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13 (Bankr. S.D.N.Y. 2016) ("*Legacy*").

[16] By seeking to file an amended pleading, the Trustee does not concede that the District Court's decisions regarding the pleading burden and standards for Defendants' good faith is correct.  The Trustee intends to appeal those decisions at the appropriate time.

5

       1.      *The PAC Plausibly Alleges Defendants Received the Subsequent Transfers from Prime Fund While Willfully Blinding Themselves to Fraud at BLMIS.*

The PAC plausibly alleges that Defendants received the subsequent transfers while willfully blinding themselves to fraud at BLMIS.  Defendants and their conduit lender, CAFCO, LLC ("CAFCO"), entered the Prime Fund Credit Deal in June 2005.  (Declaration of Seanna R. Brown in Support of the Trustee's Motion for Leave to File an Amended Complaint, dated Dec. 14, 2018 ("Brown Decl.") Ex. A ("PAC") at ¶ 176.)  Under that deal, Defendants and CAFCO agreed to loan Prime Fund up to $300 million to invest with BLMIS's IA Business.  (PAC at ¶¶ 176-78.)

In negotiating and executing the terms of Prime Fund Credit Deal, Defendants worked closely with and acted primarily through their affiliate and sister entity, Citigroup Global Markets, Incorporated ("CGMI").  CGMI personnel handled substantially all the work associated with the Prime Fund Credit Deal, including negotiating its terms and renewals, conducting the due diligence, preparing and submitting the internal deal memorandum, and executing the agreements governing the deal.  (*Id.* at ¶¶ 56-57, 60-66.)

Defendants, CGMI, and their key personnel involved with Defendants' BLMIS-related business were sophisticated and experienced investment industry professionals with particular expertise in the options and derivative markets.  (*Id.* at ¶¶ 50-545.)  Armed with this expertise, these individuals were well-positioned to, and did, identify evidence suggesting a high probability that BLMIS was not trading securities as it purported to do and was misappropriating its customers' assets.  (*Id.* at ¶¶ 104, 106-74, 180-85, and 188-227.)

       a.      *Fairfield Sentry Leverage Deal*

Prior to entering the Prime Fund Credit Deal, Defendants developed concerns of fraud at BLMIS in connection with a swap transaction between Citigroup Global Markets Limited,

Citibank, and Auriga International Limited (the "Fairfield Sentry Leverage Deal"). (*Id.* at ¶¶

105-74.) While conducting due diligence for that deal in early 2005, CGMI personnel identified

facts that caused them to suspect BLMIS was not executing the securities trades it purported to

make on behalf of its customers and that it was misappropriating its customers' assets. (*Id.*)

CGMI recognized that BLMIS purported to trade an astonishingly large volume of S&P

100 Index options. (*Id.* at ¶¶ 111-14.) CGMI was familiar with the volume of S&P 100 Index

options trading and understood that it was highly unlikely, if not impossible, for BLMIS to

regularly trade billions of dollars of S&P 100 Index options as it purported to do. (*Id.* at 114-17.)

CGMI became more concerned when Fairfield Greenwich Group ("FGG"), which operated and

managed Fairfield Sentry, could not provide any specific or verifiable information about the

identity or number of counterparties with whom BLMIS purportedly traded these options

contracts. (*Id.* at ¶¶ 117, 126-27, 133-34.) Moreover, despite inquiring internally at CGMI,

itself a major player in the options markets, and with contacts at other firms, CGMI personnel

could not find anyone in the industry aware of BLMIS trading options. (*Id.* at ¶¶ 117, 165-67,

199-200.)

As part of its due diligence on the Fairfield Sentry Leverage Deal, CGMI performed a

quantitative analysis examining the returns BLMIS purported to earn for Fairfield Sentry using

the Split Strike Conversion ("SSC") strategy over a 14-year period between 1990 and 2005 (the

"Quantitative Analysis"). (*Id.* at ¶¶ 136-54.) The results of the Quantitative Analysis

demonstrated empirically to CGMI that BLMIS could not have achieved its purported returns

using the SSC strategy. (*Id.* at ¶¶ 141-54.) The analysis was circulated internally on March 10,

2005 with a memorandum regarding the Fairfield Sentry Leverage Deal and again to key

decision makers on March 30, 2005. (*Id.* at ¶ 137.)

7

CGMI also recognized that BLMIS lacked an independent custodian and understood that without this standard industry safeguard there was no independent oversight preventing BLMIS from misreporting trades or misappropriating assets. (*Id.* at ¶ 109.) Coupled with the indicia of fraud it previously identified, CGMI began to suspect BLMIS was misappropriating its customers' assets instead of investing them. (*Id.* at ¶ 118.) By March 2005, CGMI began to raise these concerns with FGG. (*Id.* at ¶¶ 118-21, 126-27.) For example, the day after CGMI circulated the Quantitative Analysis, Marc Fisher explained to FGG that Citibank was concerned about the absence of controls preventing BLMIS from stealing Fairfield Sentry's assets. (*Id.* at ¶ 118-19.)

Even after conducting on-site due diligence at FGG, CGMI informed FGG that it remained concerned BLMIS was not making the options trades it reported and that the assets left under BLMIS's unfettered control would disappear. (*Id.* at ¶¶ 120-21.) CGMI sought to meet directly with Madoff, but FGG explained that would not be possible. (*Id.* at ¶ 121.) Thus, CGMI continued to try to address its concerns with FGG. CGMI sought additional information from FGG aimed at substantiating the existence of BLMIS's purported trades, including under whose name BLMIS executed its purported trades at the Depository Trust & Clearing Corporation ("DTCC") and how many counterparties BLMIS used in its purported trades. (*Id.* ¶¶ 126-27.)

CGMI memorialized some of its concerns about fraud at BLMIS in a March 30, 2005 memorandum (the "March 30, 2005 Memo") to the Capital Markets Approval Committee ("CMAC"), a key approval committee for Citigroup's subsidiaries, including Defendants. (*Id.* at ¶¶ 128-30.) The March 30, 2005 Memo noted that "Madoff is both Prime Broker and Custodian of the SSC assets of Sentry" and concluded with a succinct unqualified sentence: "There is a

8

fraud risk." (*Id.* at ¶ 131.) CGMI, however, did not disclose in the March 30, 2005 Memo that it

could not find any specific or verifiable information about BLMIS's purported counterparties,

despite asking FGG. (*Id.* at ¶ 133.) CGMI instead misrepresented that "[t]here should be no

counterparty risk associated with [the Fairfield Sentry Leverage Deal]," a conclusion it could not

credibly make without knowing the identities of the purported counterparties. (*Id.* at ¶ 134.)

The Fairfield Sentry Leverage Deal was an important deal for Citigroup Global Markets

Limited and Citibank. (*Id.* at ¶ 122.) It was also an important deal for Fisher personally, who

stood to get credit internally for the deal and promised FGG he would promote their products at

Citibank if they got the Fairfield Sentry Leverage Deal done. (*Id.*) Despite CGMI's questions

about the legitimacy of BLMIS's purported trades, the lack of information about BLMIS's

purported counterparties, and the risk of fraud identified in the March 30, 2005 Memo,

Defendants' executed the Fairfield Sentry Leverage Deal in April 2005. (*Id.* at ¶¶ 106, 108.)

> b.    *CGMI Managing Director Investigates BLMIS and Believes it is a Fraud*

At around the same time, CGMI's Global Head of Equity Derivatives Research and

Strategy, Leon Gross, was asked by a CGMI customer named Harry Markopolos to investigate

whether BLMIS was a fraud. (*Id.* at ¶¶ 155-56.) Gross analyzed BLMIS's purported returns and

found that they were not the result of the SSC strategy as BLMIS claimed. (*Id.* ¶¶ 155, 159-64.)

Gross also investigated whether anyone was aware of BLMIS trading index options.

Despite BLMIS's claims that it regularly traded billions of dollars of S&P 100 Index options,

Gross was unable to find anyone at CGMI's index options desk or any of its equity derivative

salespeople who had heard of BLMIS trading options. (*Id.* at ¶¶ 165-66.) In November 2005,

Markopolos submitted evidence to the SEC showing that the IA Business was a massive Ponzi

scheme, and urged the SEC to speak to Gross, who he identified as a derivatives expert that

believed BLMIS was a fraud.  (*Id.* at ¶¶ 169-70.)

        c.      *Defendants Demand Indemnification Against Fraud at BLMIS in the Prime Fund Credit Deal*

CGMI began negotiating the Prime Fund Credit Deal with Tremont in March 2005.  (*Id.* at ¶ 175.)  Already concerned about fraud at BLMIS, Defendants were unwilling to rely solely on a security interest in Prime Fund's BLMIS IA Account as collateral because it knew BLMIS maintained custody of those assets.  (*Id.* at ¶¶ 175-80.)  Instead, Defendants demanded an indemnification from Prime Fund's General Partner, Tremont Partners, designed to protect Defendants from the financial consequences if BLMIS was revealed to be a fraud.  (*Id.* at ¶ 177.)  CGMI described this indemnification as Defendants' "primary mitigant of fraud by the Investment Advisor [BLMIS]. . . ."  (*Id.* at ¶ 181.)  Notably, CGMI acknowledged that the indemnification did not protect Defendants if Prime Fund was unable to repay Defendants "due to a decline in the fair market value of the assets purchased in adherence to the Investment Strategy."  (*Id.* at ¶ 182.)  To reinforce the strength of this indemnity, Defendants also required that Tremont Partners remain a wholly owned subsidiary of Oppenheimer Funds, which Defendants estimated had over $135 billion in assets under management.  (*Id.* at ¶¶ 184-85.)

With this indemnification in place, Defendants entered the Prime Fund Credit Deal confident they would be fully compensated even if BLMIS was fabricating its purported trades and misappropriating Prime Fund's assets.  (*Id.* at ¶¶ 181-82, 186.)  The indemnity enabled Defendants to turn a blind eye to their well-founded suspicions of fraud at BLMIS.  (*Id.* at ¶ 186.)

d.     *The Proposed Tremont Deal: CGMI's Concerns Regarding
BLMIS's Self-Custody, Impossible Trade Volumes and Phantom
Counterparties Prevent Defendants from Making Additional
BLMIS-Related Investments*

In December 2005, Tremont asked CGMI to consider an additional BLMIS-related deal

(the "Proposed Tremont Deal"). (*Id.* at ¶ 187.) Unlike the Prime Fund Credit Deal, under the

Proposed Tremont Deal Defendants would be exposed to fraud at BLMIS without an

indemnification. (*Id.* at ¶ 188.) Thus, CGMI knew it would have to resolve its existing concerns

of fraud at BLMIS before it could accept the Proposed Tremont Deal. (*Id.* at ¶¶ 188-91.)

Defendants requested that Tremont provide access to Madoff for an initial due diligence

meeting with annual or semi-annual updates. (*Id.* at ¶ 189.) Tremont declined this request. (*Id.*)

Unable to meet with Madoff, CGMI sought to resolve its concerns of fraud at BLMIS through

Tremont and FGG. (*Id.* ¶¶ 190-216.) Specifically, CGMI attempted, unsuccessfully, to identify

any evidence substantiating: (i) the existence of customer assets BLMIS purportedly held; and

(ii) the securities trades BLMIS purportedly made on behalf of its customers. (*Id.*)

Despite multiple due diligence sessions and calls with Tremont's senior management,

CGMI was unable to obtain any independent verification that BLMIS maintained segregated

customer accounts, or even that the assets existed in any account. (*Id.* at ¶¶ 192-96.) CGMI

made similar requests to FGG, asking to see, for example, "[v]erification of the presence of

securities and options trades in Fairfield [Sentry's] account with Madoff." (*Id.* ¶¶ 214-15.)

Despite this relatively simple request, FGG was unable to show CGMI any such proof. (*Id.* ¶

216.)

After additional fruitless attempts to independently identify evidence that BLMIS was

actually making the options trades it reported to its customers, CGMI became increasingly

concerned. (*Id.* at ¶¶ 198-99.) Despite repeated requests from CGMI, neither Tremont nor FGG

11

were able to provide any information – such as the names of even one or two purported

counterparties or copies of trade confirmations reflecting this basic information – demonstrating

that BLMIS was not fabricating these trades.  (*Id.* at ¶¶ 202-05.)

> e.    *CGMI Schedules a Meeting with Madoff to Address its Fraud
> Concerns*

Having failed to address its long-standing concerns of fraud at BLMIS through due

diligence directed at Tremont and FGG, CGMI again demanded that Tremont arrange a due

diligence meeting between CGMI and Madoff as a prerequisite to the Proposed Tremont Deal.

(*Id.* at ¶¶ 200-201; 217.)  CGMI explained to Tremont that its concerns about the options

transactions had become a critical issue and the stated purpose of this meeting with Madoff was

to obtain some proof those trades were real.  (*Id.* at ¶ 219.)  Three of the individuals CGMI

intended to send to this meeting had openly expressed concerns about the complete lack of

evidence supporting BLMIS's purported options trades.  (*Id.* at ¶¶ 218, 222.)

Tremont and Madoff agreed to meet with CGMI and scheduled a meeting for April 26,

2006.  (*Id.* at ¶ 221.)  This meeting never occurred.  (*Id.* at ¶ 224.)  Between late March and the

scheduled meeting, CGMI learned of further indicia of fraud surrounding BLMIS.  (*Id.* at ¶¶

206-16.)  For example, CGMI received a report from KPMG, dated April 17, 2006, which

identified discrepancies between the prices BLMIS reported for certain options transactions and

the market prices reported by independent sources.  (*Id.* at ¶¶ 206-07.)  Then, on April 20, 2006,

CGMI visited FGG specifically to identify evidence that BLMIS was actually trading securities

and maintaining its customers' assets in segregated accounts as BLMIS purported.  (*Id.* at ¶¶

208-15.)

CGMI left the April 20, 2006 meeting at FGG without having seen any information to

allay its concerns that BLMIS was fabricating the trades it purported to make on behalf of its

customers. (*Id.* at ¶ 225.) That same day, less than a week before it was scheduled to meet with

Madoff, CGMI informed Tremont that it could not proceed with the Proposed Tremont Deal.

(*Id.* at ¶ 226-27.) Having determined that its concerns of fraud at BLMIS were insurmountable,

CGMI abandoned the scheduled meeting with Madoff. (*Id.*)

As CGMI explained to Tremont, two fundamental roadblocks prevented it from

proceeding with the Proposed Tremont Deal: (i) the fact that BLMIS maintained control of the

assets instead of using an independent custodian; and (ii) the lack of evidence surrounding

BLMIS's purported billions of dollars of options transactions. (*Id.* at ¶ 226.) These were the

same two concerns CGMI identified before entering the Prime Fund Credit Deal.

Despite rejecting the Proposed Tremont Deal, CGMI simultaneously explained to

Tremont that it did not want its stated suspicions of fraud at BLMIS to jeopardize the Prime

Fund Credit Deal. (*Id.* at ¶¶ 228-29.) CGMI and Defendants drew a distinction between the

Proposed Tremont Deal and the Prime Fund Credit Deal. (*Id.* at ¶ 228.) While unwilling to

enter the Proposed Tremont Deal without an indemnification, CGMI and Defendants were

nevertheless content to renew and even increase the Prime Fund Credit Deal where they were

indemnified against fraud at BLMIS. (*Id.* at ¶¶ 228-29.)

> f.    *Defendants Cease Investigating Their Suspicions of Fraud at BLMIS*

From this point forward, CGMI and Defendants abandoned their efforts to investigate

their persistent suspicions of fraud at BLMIS, including their attempts to identify evidence of

BLMIS's purported trading activity or its purported counterparties. (*Id.* at ¶¶ 231-35.) Instead,

CGMI and Defendants focused their attention on assessing whether Tremont Partners, the entity

responsible for indemnifying them, was able to pay Prime Fund's obligations under the facility if

BLMIS misappropriated Prime Fund's assets. (*Id.* at ¶¶ 237-38.) By June 2006, Defendants and

13

CGMI were prepared to renew the Prime Fund Credit Deal without any further investigation into their suspicions of fraud at BLMIS.  (*Id.* at ¶ 238.)  Their willingness to do so, however, was contingent on an examination of Tremont Partners audited financial statements.  (*Id.* at ¶ 238.)

### g.    Pretextual Madoff Meeting

Defendants and CGMI became concerned when, in May 2006, they learned that Tremont Partners did not yet have audited financial statements for 2004 or 2005.  (*Id.* ¶¶ 239-40.)  Unable to confirm Tremont Partners' financial strength and its ability to indemnify Defendants if BLMIS was revealed to be a fraud, CGMI requested a meeting with Madoff.  (*Id.* at ¶¶ 242-43.)  After receiving the audited financial statements, the objective of this meeting, however, differed significantly from the meeting CGMI and Defendants abandoned in April 2006.  (*Id.* at ¶¶ 242-50.)  Instead of demanding proof that BLMIS was not fabricating its trades, as was the stated purpose of the abandoned April meeting, CGMI described this meeting as a "corporate overview" of BLMIS.  (*Id.* at ¶ 248.)  Although CGMI had not obtained any additional information about BLMIS's purported counterparties, it was no longer seeking to address what it previously considered as a critical issue of obtaining proof of their identities.  (*Id.* at ¶¶ 246-48.)  Moreover, instead of sending personnel who openly expressed concerns about BLMIS, as CGMI intended to do before abandoning the meeting scheduled for April 20, 2006 (*Id.* ¶¶ 200-201, 222-23.), CGMI sent the "Business Sponsor" for the Prime Fund Credit Deal, accompanied by two individuals assigned to his Business Area, all of whom had a direct interest in renewing and increasing the Prime Fund Credit Deal.  (*Id.* ¶¶ 250-51.)

Three days before these CGMI personnel attended this "corporate overview" meeting with Madoff, CGMI instructed its lawyers to draft the requisite renewal and increase documentation for the Prime Fund Credit Deal.  (*Id.* at ¶ 251.)  Shortly after this meeting, the Prime Fund Credit Deal was renewed from November 30, 2006 to December 29, 2006 and then

14

renewed again to December 13, 2007, with an increased limit of $400 million.  (*Id.* at ¶ 252.)

        h.     *Defendants Refuse to Renew the Prime Fund Credit Deal Without Indemnification Against Fraud*

In October 2007, as the Prime Fund Credit Deal was again approaching expiration, Tremont sought to renew the deal, but with one crucial difference.  (*Id.* at ¶ 254.)  Tremont insisted on "eradicat[ing]" the indemnification against fraud at BLMIS.  (*Id.*)

Removing the indemnification was a deal-breaker for Defendants.  (*Id.* at ¶¶ 253-54.)  From the outset of the Prime Fund Credit Deal, Defendants were not willing to lend money to Prime Fund to invest with BLMIS without a third-party indemnification against fraud.  (*Id.* at ¶ 253.)  With Tremont unwilling to agree to a continued indemnification, and the Defendants requirement of the indemnification to protect against "manager fraud," Tremont and Defendants reached an impasse.  (*Id.* at ¶¶ 258-59.)  Consequently, the Prime Fund Credit Deal terminated on March 26, 2008 and Defendants received subsequent transfers of $301 million of BLMIS Customer Property on March 26, 2008.  (*Id.* at ¶ 260.)

        2.     *The PAC Plausibly Alleges the Initial Transfers from BLMIS to Prime Fund Were Avoided or Avoidable*

In addition to pleading sufficient facts regarding Defendants' receipt of subsequent transfers from Prime Fund in bad faith, the PAC plausibly alleges that the initial transfers from BLMIS to Prime Fund were avoided or avoidable.

        a.     *The Settlement Agreement Provides that the Initial Transfers to Prime Fund Were Avoided*

In 2010, the Trustee sued Tremont for avoidance and recovery of $2.1 billion of initial transfers from BLMIS that constituted customer property under SIPA (Brown Decl. Ex. B

("Tremont Complaint")), which is incorporated by reference into the PAC.[17]  (PAC at ¶¶ 261, 330.)  In 2011, the Bankruptcy Court approved a settlement between the Trustee and Tremont, which provides that the transfers made to Prime Fund, were "deemed avoided."  (*Id.* at ¶ 263.)

> b.    *The PAC Plausibly Alleges That the Transfers to Prime Fund are Avoidable*

Notwithstanding the provisions of the settlement agreement, the PAC plausibly alleges that the initial transfers are avoidable because Tremont had actual knowledge that BLMIS was not trading securities.  Alternatively, the PAC plausibly alleges that the initial transfers are avoidable because Tremont was willfully blind to the fact that BLMIS was not trading securities.

> (1)    *Tremont was Closely Tied to Madoff and BLMIS*

Tremont's founder and first CEO, Sandra Manzke, first met Madoff in 1991.  (*Id.* at ¶ 264.)  After selecting Madoff as a money manager, Manzke and Tremont's later co-CEO, Robert Schulman, had regular contact with Madoff, including quarterly visits to BLMIS.  (*Id.* at ¶ 264.)  Schulman had a longstanding, unusually close relationship with Madoff, which Tremont touted in its marketing materials to investors.  (*Id.* at ¶ 265.)  Their relationship was so close that Madoff sought Schulman's advice on individual hiring decisions at BLMIS.  (*Id.*)

> (2)    *Tremont Had Evidence Madoff Was Engaged In a Fraud*

> (a)    *Tremont Knew of Trade Impossibilities*

Tremont regularly received customer statements, trade tickets, and other information from BLMIS.  (*Id.* at ¶ 281.)  Tremont reviewed and analyzed this information, which reflected obvious quantitative trade impossibilities and other indications of BLMIS's fraud, including but not limited to the following:

- Tremont's monthly analytic summaries showed that it knew the positions and

---

[17] Compl., *Picard v. Tremont Group Holdings, Inc. (In re BLMIS*), (Adv. Pro. No. 10-05310) (Bankr. S.D.N.Y. Dec. 7, 2010) ECF No. 1.

prices BLMIS reported to Tremont differed from prices Bloomberg reported.  (*Id.* at ¶ 282.)

- BLMIS's returns were unrealistically consistent.  (Tremont Compl. at ¶¶ 160-64.)

- Tremont estimated the amount of assets BLMIS purported to manage and calculated whether there was sufficient volume in each instrument for Madoff to be able to execute trades.  (PAC at ¶ 283-84.)

- The volume of BLMIS's purported equities trades was improbable.  (Tremont Compl. 165-69; PAC at ¶¶ 279-84.)

- The volume of BLMIS's purported options trades was impossible.  (Tremont Compl., ¶¶ 170-74; PAC at ¶¶ 279-84; 306.)

- BLMIS's timing of trades was improbable.  (Tremont Compl. ¶¶ 179-180.)

- BLMIS reported hundreds of option and equity trades conducted at prices outside of the daily reported range.  (Tremont Compl. ¶¶ 181-83.)

(b)    <em>Tremont Was Repeatedly Warned About Fraud at BLMIS</em>

Tremont received repeated and direct warnings of fraud about Madoff.  For example, in April 2001, one investor wrote to Schulman, "I know you are sick of answering this but man is it hot out here with the Bernie fraud rumors," and questioned Madoff's practice of going to cash at year-end every year and use of such a "small" auditor.  (PAC at ¶ 267.)  Other investors expressed concerns to Tremont regarding BLMIS's lack of transparency, absence of third-party custodian, and exceptionally stable returns, among other things.  (*Id.* at ¶¶ 267-78.)  The warnings of BLMIS's fraud continued until 2008, when Madoff was arrested.  (*Id.* at ¶ 278.)

(c)    <em>Tremont Knew BLMIS Lacked Third-Party Oversight</em>

Tremont knew that BLMIS deviated from well-established industry practice by acting as investment adviser, prime broker, and custodian of its clients' assets, while also using a virtually unknown auditor, Friehling & Horowitz.  (*Id.* at ¶ 293.)  Tremont recognized the risk of BLMIS's lack of independent oversight, and it avoided questions from investors that dealt with

17

asset verification.  (*Id.* at ¶¶ 297-98; Tremont Compl. at ¶¶ 210-12.)

> (3)    *Tremont Exempted BLMIS From Its High Due Diligence Standards, Prevented Third Parties from Conducting Their Own Due Diligence and Fabricated Stories About BLMIS*

Tremont was a sophisticated manager with industry-leading due diligence standards.

(PAC at ¶ 286.)  It often implemented those procedures when placing its clients' assets with

third-party managers.  (*Id.* at ¶¶ 285-86.)  Yet, when it came to BLMIS, Tremont made an

exception from its due diligence standards.  (*Id.* at ¶ 287.)  Tremont executives ensured that even

Tremont's own personnel did not conduct meaningful due diligence on BLMIS or Madoff.  *Id.*

Tremont also shielded Madoff from third parties, often rejecting any requests to visit or

speak with Madoff.  (*Id.* at ¶¶ 300-01.)  At least one institutional investor redeemed its BLMIS

investments because of Madoff's opacity and refusals to meet.  (*Id.* at ¶¶ 267, 270-71.)  Tremont

also refused to allow its administrator to receive the Tremont BLMIS Feeder Fund confirmations

directly from BLMIS and intervened to limit contact between Madoff and Tremont's auditor,

Ernst & Young.  (*Id.* at ¶ 303.)  This deliberate shielding of Madoff continued when Tremont

replaced Ernst & Young with KPMG.  (*Id.* at ¶ 304.)

> (4)    *Tremont Avoided Questions and Fabricated Answers about BLMIS's Purported Options Trading*

Tremont knew that BLMIS did not provide straight answers about its purported options

trades, the central part of the SSC Strategy.  When faced with questions about BLMIS's

purported options trading, Tremont flip-flopped on the OTC/listed option trading question,

sometimes telling investors that BLMIS traded OTC options and sometimes telling them BLMIS

traded exchange listed options.  (*Id.* at ¶¶ 306-08.)  Tremont also failed to identify, or conduct

due diligence on, BLMIS's purported options counterparties.  (*Id.* at ¶ 309.)  At times, Tremont

fabricated information to tell investors about these purported counterparties.  (*Id.* at ¶¶ 312-13.)

(5)      *Tremont Co-Managed Kingate Global*

From the inception of their respective BLMIS investment accounts, Federico Ceretti and

Carlo Grosso worked closely with Manzke to create Kingate Global and its manager, Kingate

Management Limited (collectively, "Kingate").  (*Id.* at ¶ 323.)  Manzke introduced Ceretti and

Grosso to Madoff in 1993 and was a Kingate Global director and manager from 1995 until about

2004.  *Id*.  Through its affiliate, Tremont Bermuda, Tremont and Kingate Management Limited

("KML") shared information pursuant to co-management and consulting agreements beginning

as early as 2002.  (*Id.* at ¶¶ 324-27.)  The Tremont-Kingate relationship continued through the

revelation of Madoff's fraud.  (*Id.* at ¶ 324.)

## ARGUMENT

## LEGAL STANDARD GOVERNING MOTIONS TO AMEND A PLEADING

Federal Rule of Civil Procedure 15(a)(2), made applicable here by Federal Rule of

Bankruptcy Procedure 7015, provides that when a party requires leave of court to amend its

pleading: "[t]he court should freely give leave when justice so requires."  It is well settled in the

Second Circuit that Federal Rule of Civil Procedure 15(a)(2) is a "generally lenient" standard

that favors adjudication on the merits.  *Fjord v. AMR Corp. (In re AMR Corp.)*, 506 B.R. 368,

382 (Bankr. S.D.N.Y. 2014).  Accordingly, leave to amend "should not be denied unless there is

evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility."  *Milanese v.

Rust-Oleum Corp.*, 244 F. 3d 104, 110 (2d Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182

(1962)).  And while the Second Circuit has repeatedly noted that the trial court has "broad"

discretion in ruling on a motion to amend,  *Local 802, Associated Musicians of Greater NY v.

Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998), a motion to amend must be granted

where "the plaintiff has at least colorable grounds for relief."  *Soley v. Wasserman*, No. 08 Civ.

9262 (KMW) (FM), 2013 WL 6244146, at *1 (S.D.N.Y. Dec. 3, 2013) (quoting *S.S. Silberblatt,*

19

*Inc. v. E. Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co., Inc.,* 608 F.2d 28, 42 (2d Cir.1979)).

"An intervening change in pleading standards may justify leave to amend." *Picard v.

Mendelow (In re BLMIS)*, 560 B.R. 208, 221 (Bankr. S.D.N.Y. 2016) (citing *Absolute Activist

Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012)). The burden is on the party

opposing leave to amend to demonstrate that there is evidence of either bad faith, undue

prejudice, or futility. *See*, *e.g.*, *Blagman v. Apple, Inc.*, No. 12 Civ. 5453 (ALC) (JCF), 2014 WL

2106489, at *3 (S.D.N.Y. May 19, 2014) (bad faith); *Alexander Interactive, Inc. v. Adorama,

Inc.*, No. 12 Civ. 6608, 2014 WL 113728, at *4 (S.D.N.Y. Jan. 13, 2014) (futility); *Margel v.

E.G.L. Gem Lab Ltd.*, No. 04 Civ. 1514 (PAC) (HBP), 2010 WL 445192, at *3 (S.D.N.Y. Feb. 8,

2010) (undue prejudice).

## THE COURT SHOULD GRANT THE TRUSTEE'S MOTION TO AMEND IN LIGHT OF THE INTERVENING CHANGE IN LAW AND THE ADDITIONAL FACTS ALLEGED

The Trustee seeks leave to amend his complaint on the well-accepted grounds of an

intervening change in pleading standards. At the time the initial complaint was filed, the burden

of asserting and proving the affirmative defense of good faith, as to both initial and subsequent

transferees, was on the defendant, and an objective reasonable investor standard applied. *See

Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 138 (Bankr. S.D.N.Y. 2014) ("*Merkin II*"). As

such, the complaint alleged facts sufficient to meet that standard. *See e.g.* Compl. at ¶ 110.

In 2014, almost four years after the filing of the complaint, the District Court held that the

Trustee must plead that the initial transferee knew of or "turned a blind eye to facts that suggest a

high probability of fraud." *Picard v. Magnify (In re BLMIS)*, 583 B.R. 829, 841 (Bankr.

S.D.N.Y. 2018) (collecting cases); *Picard v. Katz*, 462 B.R. 447, 455 (S.D.N.Y. 2011) (finding

lack of good faith requires showing defendants either "intentionally [chose] to blind [themselves]

to the 'red flags' that suggest a high probability of fraud," or acted with "'willful blindness' to

the truth").[18]

The District Court further held that the same willful blindness legal standard and same pleading burden applies to recovery of subsequent transfers under section 550(a)(2). *Good Faith Decision*, 516 B.R. at 22–23. Section 550(a) provides that the Trustee may recover subsequent transfers, subject to the defense that the transfers were received "in good faith," "for value," and without knowledge of the avoidability of the transfer avoided. 11 U.S.C. § 550(b)(1). To meet this requirement, the Trustee must similarly allege that the subsequent transferees willfully blinded themselves to a high probability of fraud at BLMIS. *See Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 38 (Bankr. S.D.N.Y. 2016) *("Legacy")* ("The District Court equated a lack of good faith under Bankruptcy Code § 548(c) with willful blindness and stated that the same standard applies to non-investors as well as investors under sections 548(c) and 550(b)").

This Court has recognized that there was good cause in granting motions brought on similar grounds to the instant motion. *See, e.g.*, *Mendelow*, 560 B.R. at 224; *see also* Order Granting Mot. For Leave To File A Fourth Amended Compl., *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Mar. 17, 2014), ECF No. 99. Where, as here, the original complaint has grown "stale due to the unusually drawn out procedural history" of a case, a trustee should be permitted to add new facts and allegations. *See Grand River Enters. Six Nations, Ltd. v. Pryor*, No. 02 Civ. 5068 (JFK), 2008 WL 9359652, at *3 (S.D.N.Y. Mar. 17, 2008) (granting motion for leave to amend where rulings and subsequent decisions on appeal delayed proceedings for several years). Moreover, leave to amend should be permitted as this would be the Trustee's first amendment of the complaint in this action. *See United States v. A*

---

[18] In a separate decision, the District Court held that the Trustee need not obtain a fully litigated judgment of avoidance before pursuing a subsequent transfer claim. *SIPC v. BLMIS (In re Madoff)*, 501 B.R. 26, 33–34 (S.D.N.Y. 2013).

*10th Century Cambodian Sandstone Sculpture*, No. 12 CIV. 2600 GBD, 2013 WL 1290515, at

*10 (S.D.N.Y. Mar. 28, 2013) (granting leave to amend where it was "the Government's first

request to amend its complaint with facts collected pursuant to its ongoing investigation");

*Vulcan Soc. of Westchester Cty., Inc. v. Fire Dep't of City of White Plains*, 82 F.R.D. 379, 386

(S.D.N.Y. 1979) (motion to amend granted where, amongst other things, it was "the first time

leave of the court to amend ha[d] been sought.").

## NO FUTILITY, UNDUE DELAY, BAD FAITH, OR UNDUE PREJUDICE EXISTS

### A.    Amending the Complaint Would Not Be Futile Because the Trustee Has Alleged Facts Sufficient to Survive a Motion to Dismiss

Leave to amend should be granted here because the PAC sets forth facts that permit this

Court to reasonably infer that Defendants are liable for the misconduct alleged.  "An amendment

to a pleading will be futile if a proposed claim would not withstand a motion to dismiss pursuant

to Rule 12(b)(6)."  *Dougherty v. Town of N. Hempstead Bd. Of Zoning Appeals*, 282 F.3d 83, 88

(2d Cir. 2002).  To survive a motion to dismiss, a complaint must plead "enough facts to state a

claim to relief that is plausible on its face."  *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits

Ltd.*, 726 F.3d 62, 71 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  A claim is facially plausible where "the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Mendelow*, 560 B.R. at 225 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

In order to demonstrate that his amendment is not futile under Federal Rule of Civil

Procedure 15 and thus, that he states a plausible claim, pursuant to Federal Rule of Civil

Procedure 12(b)(6), to recover subsequent transfers in this case, the Trustee must plausibly allege

that the subsequent transferee either (1) "lacked good faith;" or (2) "received the subsequent

transfer with knowledge that the initial transfer was avoidable" and that (3) "the initial transfer is

avoidable." *Picard v. BNP Paribas S.A. (In re BLMIS)*, Adv. Pro. No. 08-01789 (SMB), 2018 WL 4833984, at *18 (Bankr. S.D.N.Y. Oct. 3, 2018) ("*BNP*"). Leave to amend should be granted here because the PAC sets forth facts that would permit this Court to reasonably infer that Defendants received subsequent transfers, which were comprised of avoidable initial transfers, with the requisite lack of good faith and knowledge.

### 1.    *Good Faith or Knowledge of the Avoidability of the Initial Transfer*

The Trustee must plead either that: "the subsequent transferee lacked good faith or [] received the subsequent transfer with knowledge that the initial transfer was avoidable." *Id.* at *19. According to this Court, knowledge and good faith are two distinct, but overlapping, elements under section 550(b). *Id.* To plead knowledge, the Trustee must allege that Defendants "possessed knowledge of facts that suggest a transfer may be fraudulent." *Id.* Alternatively, to plead a lack of good faith, the Trustee must "allege that each Defendant willfully blinded itself to facts suggesting a high probability of fraud at BLMIS." *Id.* Willful blindness requires the Trustee to plead that: (1) the defendants subjectively believed there was a high probability that a fact existed and (2) the defendants took deliberate actions to avoid learning of that fact. *Id.*

Willful blindness, also known as deliberate ignorance or conscious avoidance, is a well-established and commonly-utilized doctrine in criminal law. *United States v. Reyes*, 302 F.3d 48, 54 (2d Cir. 2002); *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 684 (7th Cir. 2014) ("[W]illful blindness is a concept taken from criminal law and the often-given 'ostrich' instruction."). The ostrich instruction, "is designed for cases in which there is evidence that the defendant, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings." *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990); *see also United States v. Kozeny*, 664 F. Supp. 2d 369, 388 (S.D.N.Y. 2009), *aff'd,* 667 F.3d 122 (2d Cir. 2011); *In re Dreier LLP*, 452 B.R.

23

391, 450 (Bankr. S.D.N.Y. 2011). Willful blindness "connotes a strong suspicion but *some* level

of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire knowledge

of its existence." *Merkin II,* 515 B.R. at 140.

As an initial matter, it is important to note that willful blindness can rarely be determined

as a matter of law. *Fish*, 749 F.3d at 685 ("Consistent with these observations, we have said that

finding the line between "willful blindness" and "reason to know" may be like finding the

horizon over Lake Michigan in a snowstorm . . . . In other words, only rarely could that line be

drawn as a matter of law.") (citations omitted). Thus, here the court should not prematurely

determine whether the Defendants were in fact willfully blind and should grant leave to amend.

> *a.       The Trustee Sufficiently Pleads that Defendants Subjectively
> Believed There Was a High Probability of Fraud at BLMIS*

The Trustee sufficiently alleges that Defendants believed there was a high probability that

BLMIS was a fraud in that it was not trading securities and was misappropriating its customers'

assets. The Trustee alleges that during the course of executed and contemplated BLMIS-related

deals, Defendants developed two primary concerns that: (i) BLMIS was not making its purported

options trades; and (ii) money invested with Madoff could disappear at any moment. The

Trustee alleges that as early as 2005, Defendants learned that BLMIS's purported trades were

impossible and that BLMIS lacked independent oversight to ensure that it was not misreporting

trades or misappropriating customer assets. Indeed, Defendants specifically raised these

concerns with FGG, and their concerns only increased as they learned more about BLMIS when

they entered the Prime Fund Credit Deal and contemplated entering the Proposed Tremont Deal.

Defendants and CGMI learned that BLMIS purported to trade an astonishingly large

volume of S&P 100 Index options that was highly unlikely, if not impossible, to regularly trade

on the OTC market. Given CGMI and Defendants' expertise and experience in the equity

derivatives market – both as major dealers in the options market who published a comprehensive

guide on equity derivatives, and also with a CGMI employee who would later use his expertise

to serve on the Membership/Risk Committee of the Options Clearing Corporation where the

volume of options traded was well-known and documented – Defendants were aware of and

appreciated the impossibility of the large volume purportedly traded by BLMIS. *See Merkin II*,

515 B.R. at 141 (finding willful blindness where defendant "saw and appreciated" quantitative

facts including that the purported volume of option transactions was impossible).

Prior to entering the Prime Fund Credit Deal, Defendants performed a Quantitative

Analysis that showed it was impossible for BLMIS to achieve its purported investment returns

using the SSC Strategy. Defendants saw and appreciated the results of the Quantitative Analysis,

which were consistent with Gross's findings that BLMIS's purported returns could not be the

result of the SSC strategy as BLMIS claimed. This Court has found such allegations sufficiently

satisfy the first prong of willful blindness. *See id.* (finding willful blindness sufficiently alleged

where defendant "saw and appreciated" quantitative facts).

Defendants' actions immediately following the Quantitative Analysis further demonstrate

that they appreciated the results and discrepancies it revealed. For example, the day after the

Quantitative Analysis was circulated, CGMI requested additional information from FGG aimed

at verifying that BLMIS's purported trades were real, including whose name BLMIS used to

execute its purported trades at the DTCC. CGMI's communications with FGG reveal that

Defendants were particularly concerned that FGG could not provide any specific or verifiable

information about the identity or number of counterparties with whom BLMIS purportedly

traded options. Despite their investigation, Defendants could not find any evidence of BLMIS

trading options or the identities of its purported counterparties, thereby increasing Defendants'

subjective recognition of the high probability that BLMIS's purported trades were not real.

Defendants also knew BLMIS lacked third-party oversight, which they understood was a standard industry safeguard to prevent fraud. The PAC alleges that during negotiations for the Fairfield Sentry Leverage Deal, CGMI recognized that BLMIS lacked an independent custodian and could thus misappropriate customer assets because of its unchecked control. Throughout various communications with FGG, Defendants revealed their concerns that there were no controls preventing BLMIS from stealing its customers' assets.

Defendants' memorialized their subjective belief of fraud at BLMIS in at least two internal memoranda regarding BLMIS transactions. Both memoranda concluded there was a fraud risk associated with BLMIS. More significantly, Defendants' refusal to rely solely on assets held by BLMIS as collateral for the Prime Fund Credit Deal, and their insistence that Tremont Partners indemnify them, speaks volumes about the degree of Defendants' suspicion of fraud at BLMIS. Indeed, the indemnification, which Defendants relied on as their "primary mitigant of fraud," did not protect against Prime Fund's inability to repay Defendants due to market loss. Clearly, Defendants were more concerned about BLMIS stealing Prime Fund's money than they were about Madoff making bad investment decisions.

Defendants' suspicion of fraud at BLMIS was amplified in early 2006 while considering the Proposed Tremont Deal. CGMI could not find any evidence substantiating the existence of BLMIS's purported options trades or verify the existence of any account containing BLMIS customer assets. By March 2006, CGMI's suspicion of fraud at BLMIS had reached the point where they demanded a meeting with Madoff to get proof that his purported options trades were not fabricated. Yet, they abandoned the Madoff meeting in April 2006 and later extended the Prime Fund Credit Deal because, as explained below, they turned a blind eye to fraud at BLMIS.

In April 2006, Defendants rejected a proposed BLMIS-related deal specifically citing their concerns of fraud at BLMIS. At the same time, Defendants expressed their desire to continue, and even increase, the Prime Fund Credit Deal where they were indemnified. From that point forward, Defendants ceased investigating their suspicions of fraud at BLMIS, including avoiding an opportunity to raise these concerns directly with BLMIS, and repeatedly renewed the Prime Fund Credit Deal. In March 2008, however, when Tremont Partners declined to renew Defendants' indemnification, they terminated the Prime Fund Credit Deal.

As in *In re Optimal U.S. Litig.*, No. 10 CIV 4095 SAS, 2011 WL 4908745, at *7 (S.D.N.Y. Oct. 14, 2011), the Trustee alleges here that Defendants "raised internally all of the critical questions about the risk that Madoff was running a Ponzi scheme," yet failed to further investigate those risks or decline the Prime Fund Credit Deal. Defendants' own communications with FGG and Tremont prior to turning a blind eye to their suspicions indicated their concerns that Madoff was not conducting actual trades with real counterparties – and Defendants concerns "went to the heart of Madoff's Ponzi scheme because they concerned the existence of the assets supposedly held by Madoff, Madoff's self-custody and Madoff's secrecy." *Id.* at 8.

> b.    *Defendants Deliberately Avoided Confirming BLMIS's Fraud*

The Trustee also alleges facts sufficient to establish the second prong of willful blindness – that Defendants consciously avoided learning of BLMIS's fraud. "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *State v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 667 (S.D.N.Y. 2017) (citations omitted). Importantly, however, "the standard does not require proof of an identifiable 'affirmative act'" and merely refers to a requisite state of mind. *Id.* at 667; *see also United States v. Fofanah*, 765 F.3d 141, 150 (2d Cir. 2014) (Leval, J., concurring) ("A finding that a defendant's ignorance of

27

incriminating facts was a conscious choice on the defendant's part in no way requires a finding that the defendant took affirmative steps to avoid gaining the knowledge.").

Accordingly, where, as here, the Trustee alleges that Defendants appreciated facts indicating a high probability of fraud yet consciously decided to enter the Prime Fund Credit Deal without confirming their suspicions, the Trustee has sufficiently alleged deliberate avoidance. *See Fofanah*, 765 F.3d at 150 (conscious avoidance "means only, as we have repeatedly stated in reciting the standard, that there must be evidence from which a jury could find that the defendant was aware of a high probability of the critical incriminating facts and consciously decided to act without confirming them.").

The Trustee alleges that Defendants suspected BLMIS was not making its purported trades and was misappropriating its customers' assets, yet they entered into and repeatedly renewed the Prime Fund Credit Deal after obtaining unique indemnification terms. According to Defendants, the indemnification served as their "primary mitigant of fraud," which enabled them to turn away from their identified suspicions. Such conscious decisions to act without confirming their suspicions constitute deliberate avoidance for purposes of willful blindness. *See id.* The indemnification made the Prime Fund Credit Deal possible and lucrative for Defendants.

After closing the Prime Fund Credit Deal, Defendants continued to avoid confirming their suspicions of fraud at BLMIS. Initially, Defendants ceased asking Tremont any questions about the existence of BLMIS's options trades or its purported segregated accounts, until presented with a new opportunity to provide additional leverage to BLMIS under a separate deal, the Proposed Tremont Deal. Faced with the same unanswered concerns of fraud and suspicions that BLMIS was not trading securities and was misappropriating assets, Defendants requested a meeting with Madoff to address their suspicions of fraud.

In the weeks leading up to the scheduled meeting with Madoff, however, CGMI learned additional information that led it to conclude that its concerns of fraud were insurmountable.  For example, CGMI received a KPMG report showing price discrepancies concerning BLMIS's purported options trades.  And, despite visiting FGG's offices to identify proof of BLMIS's purported trades, CGMI left having not resolved its concerns that BLMIS was fabricating trades and misappropriating assets.  Despite knowing that Madoff was the best person to address these concerns, CGMI abandoned a meeting with Madoff that was just six days away and rejected that deal, citing fundamental roadblocks associated with fraud at BLMIS.  Yet, at the same time, Defendants made it clear to Tremont Partners that they were happy to look past these same suspicions to renew the Prime Fund Credit Deal, where the indemnification allowed Defendants to recover from Tremont Partners' assets that were not exposed to BLMIS.

In response to Tremont Partners' subsequent request to increase the lending limit under the Prime Fund Credit Deal, Defendants chose not to re-visit their BLMIS-related fraud concerns, and instead, focused their due diligence on verifying the security of Tremont Partners' assets, which would be used to indemnify Defendants in the event that Prime Fund defaulted on the credit facility due to BLMIS's fraud.  Defendants were primarily concerned with ensuring that they were protected from fraud, which is logical given their belief that there was a high probability that BLMIS was not trading securities.

When Tremont Partners lacked the audited financials necessary to verify its assets, Defendants requested to meet with Madoff.  However, when Defendants ultimately met with Madoff in November 2007, they did not address their fundamental roadblocks – opting instead to conduct a general "corporate overview."  The nature of Defendant's meeting with Madoff in November 2007 demonstrates that Defendants did not want to confirm the truth of their

29

suspicions.  First, Defendants did not send the outspoken CGMI skeptics who had previously questioned the legitimacy of BLMIS's operation.  Second, the meeting with Madoff amounted to nothing more than a check-the-box meeting where the agenda included neither of Defendants primary concerns since before they entered into the Prime Fund Credit Deal, that: (i) BLMIS was not, and could not, be making the options trades it purported to make; and (ii) the assets invested and left under BLMIS's unfettered control could be stolen and disappear.

As of late April 2006, Defendants had no interest in asking Madoff for proof that his purported trades were real or any of the other questions that caused them to believe there was a high probability of fraud.  This Court has held that the cessation of due diligence is consistent with willful blindness.  *Merkin II*, 515 B.R. at 141.  In *Merkin II*, the Trustee alleged that Merkin compiled diligence suggesting a high probability of fraud at BLMIS.  *Id.*  Rather than confront these suspicions, he ignored them.  *Id.* at 141-42.  Having made his "peace" with Madoff, Merkin ceased asking questions.  *Id.* at 141-42.

Similarly, here, Defendants' diligence revealed critical facts that led them to believe there was a high probability BLMIS was not trading securities; however, Defendants ceased their due diligence and never received the verifications they initially sought that the trades were real. Unlike this Court's holding in *BNP*, the Trustee's allegations show that Defendants engaged in some due diligence, suspected fraud, then ceased that due diligence upon receiving the fraud indemnification.  *See BNP*, 2018 WL 4833984, at *26.  Defendants were happy to turn a blind eye for as long as Tremont agreed to indemnify them against BLMIS's fraud.  When Tremont later requested another renewal without the indemnification, Defendants refused to renew the Prime Fund Credit Deal without "indemnification from manager fraud."  (PAC at ¶ 258.)

2.    *Avoidability*

The Trustee's PAC sufficiently alleges the avoidability of the initial transfers to Prime

Fund because (1) the initial transfers have already been deemed avoided and (2) the PAC, which

incorporates the Tremont Complaint, alleges facts that establish the avoidability of the initial

transfers.  *See BNP*, 2018 WL 4833984, at *18 (finding subsequent transferee sufficiently

alleged avoidability by incorporation of separate complaint); *SIPC v. BLMIS (In re Madoff)*, 501

B.R. 26, 36 (S.D.N.Y. 2013) (same).

First, the initial transfers have already been "deemed avoided" by the settlement

agreement in the Tremont Complaint, which this Court approved.  (PAC at ¶ 263.)

Second, the Trustee alleges facts in the PAC, which sufficiently plead that the initial

transfers are avoidable because Tremont had actual knowledge that Madoff was not trading

securities.  Alternatively, the PAC alleges that Tremont willfully blinded itself to this fact.

The allegations in the PAC regarding Tremont mirror those regarding the defendants in

the Trustee's Fourth Amended Complaint in *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-

1161 (SMB), 2015 WL 4734749, at *14-15 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*").[19]  In

*Kingate,* this Court found that the Trustee sufficiently alleged defendants' actual knowledge

based on the defendants' monitoring of the BLMIS Feeder Funds' performance on a regular

basis, which disclosed impossible trades.  *Id*. at *14, 29.  Here, the Trustee similarly alleges that

---

[19] As an initial matter, KML's knowledge should be imputed to Tremont.  Tremont and KML shared information with each other regarding BLMIS in a number of ways, including: (i) in Manzke's role as director and manager of Kingate Global; (ii) through KML and Tremont Bermuda's co-management agreement; and (iii) through KML and Tremont Bermuda's consulting agreement.  In *Kingate*, this court held that the Trustee's Fourth Amended Complaint sufficiently pleaded actual knowledge as to the defendants, including Ceretti and Grosso.  By virtue of the relationships between KML, Kingate Global, and Tremont, Kingate's knowledge that the IA Business was a fraud, and that many of the entries in the statements and trade confirmations depicted trades that could not have occurred, should be imputed to Tremont.

31

Tremont analyzed BLMIS information reflecting the same obvious quantitative impossibilities demonstrating those trades "could not have taken place." *Id.* at *29; (PAC ¶¶ 279-84).

As in *Kingate*, Tremont's executives also deliberately prevented transparency into BLMIS and access to Madoff by deflecting investors' inquiries, implying that they feared what might be discovered. *Kingate*, 2015 WL 4734749, at *30; (PAC at ¶¶ 300-04). Among other things, Tremont prohibited leverage providers from contacting Madoff. (PAC at ¶ 301.) While Tremont made an exception for Defendants here, they did so only after denying Defendants' initial requests to meet with Madoff, and later acquiesced to a meeting Defendants described as a mere "corporate overview." (*Id.* at ¶¶ 189, 248.) Tremont executives even took measures to prevent their own personnel and auditors from conducting Tremont's standard due diligence. (*Id.* at ¶¶ 285-92, 302-03.) Like *Kingate*, Tremont also lied to shareholders to address issues for which it knew there were no legitimate explanations, such as who Madoff's option counterparties were and how BLMIS executed its options trades. (*Id.* at ¶¶ 312-17.)

In *Kingate*, this Court found that similar allegations that Ceretti and Grosso took steps to deflect inquiries to Madoff and fabricated stories to placate shareholders supported a finding that the Trustee sufficiently alleged actual knowledge. *Kingate*, 2015 WL 4734749, at *14. As with *Kingate*, Tremont did all this knowing that BLMIS did not satisfy Tremont's standard due diligence requirements and having received numerous warnings that Madoff was a fraud. (PAC at ¶¶ 267-78, 285-99.)

Alternatively, the PAC sufficiently alleges that Tremont was willfully blind to the truth of BLMIS's fraud. The Trustee sufficiently alleges that Tremont subjectively believed there was a high probability that BLMIS was not trading securities as purported because, like Merkin, Tremont saw and appreciated various warning signs indicating that BLMIS was a fraud,

including "that the volume of options transactions that Madoff reported were impossible," "that BLMIS' returns were too good to be true," "Madoff's use of a strip mall accounting firm," and that "BLMIS used an unusual fee structure and exceeded the total volume of option trades in the market." *Merkin II*, 515 B.R. at 141; (PAC ¶¶ 284, 293.) This Court held that the awareness and appreciation of such facts was sufficient to plead that a defendant believed there was a high probability that BLMIS was a fraudulent operation." *Merkin II*, 515 B.R. at 141.

The Trustee similarly alleges in the PAC that Tremont was aware of and appreciated the same facts this Court found sufficient to allege the first prong of willful blindness in *Merkin II*. For example, the Trustee alleges that Tremont was aware of and appreciated the impossibilities of BLMIS's trade activity due to its review, preparation, or comparison of: (1) reports concerning the performance of the Tremont BLMIS Feeder Funds (PAC at ¶¶ 280-81); (2) customer statements and trade tickets (*id.* at ¶¶ 281); and (3) monthly analytic summaries that reported differences between the prices reported by BLMIS versus those reported by a third-party source (*id.* at ¶ 282). Tremont also knew, based on its own estimation, that the volume of trades reported by Madoff were impossible. (*Id.* at ¶ 23.) Tremont appreciated the fact that Madoff's returns were too good to be true and raised concerns regarding Madoff's use of a strip mall accounting firm (Tremont Compl. at ¶¶ 215-216) and unusual fee structure (Tremont Compl. at ¶¶ 204-209). As in *Merkin II*, the Trustee alleges that Tremont saw these facts, understood them and purposely ignored them. (Tremont Compl. at ¶ 158); (PAC at ¶¶ 278-84,15, 29-31, 38-41, 45); *see also Merkin II*, 515 B.R. at 144.

Lastly, the Trustee alleges that Tremont deliberately avoided learning the truth about BLMIS, thereby sufficiently alleging the second prong of willful blindness. The Trustee alleges that Tremont had close ties with Madoff and BLMIS. (PAC at ¶¶ 264-66.) Tremont's CEOs,

Manzke and Schulman, regularly communicated with Madoff, including at least during quarterly

visits to BLMIS. (*Id.* at ¶ 264.) Schulman and Madoff had a particularly close relationship – so

close that Madoff even sought Schulman's advice on individual hiring decisions at BLMIS. (*Id.*

at ¶ 265.) In this respect, and in others, Manzke, Schulman and the Tremont BLMIS Feeder

Funds are analogous to the defendants in *Kingate*, 2015 WL 4734749 at *14-15, and *Merkin II,*

515 B.R. at 128. Indeed, Manzke was responsible for introducing Ceretti and Grosso to Madoff

in the early 1990's. *Kingate*, 2015 WL 4734749 at *3. Despite its close relationship to Madoff

and BLMIS, Tremont refused to ask any hard questions regarding Madoff's business, focused on

appeasing Madoff, and avoided institutional client due diligence in favor of the "Palm Beach

Crowd," which was less likely to ask questions. (Tremont Compl. at ¶¶ 5-9.)

In *Merkin II*, the Trustee alleged that when Madoff refused to answer Merkin's questions,

Merkin did not press Madoff, but instead stated that he had "made [his] peace with Bernie." 515

B.R. at 142. Additionally, Merkin told investors with inquiries "don't ask so many questions.

Sit tight." *Id.* This Court found such statements sufficient to plead that Merkin took deliberate

actions to avoid learning the truth. Similarly, here, the Trustee alleges in the PAC that Tremont

deliberately prevented any transparency into Madoff and BLMIS throughout the Tremont-

BLMIS relationship, noting categories of information "ya don't ask." (PAC at ¶ 287.)

The totality of the allegations in the PAC and the Tremont Complaint alternatively

demonstrate that Tremont subjectively believed there was a high probability of fraud at BLMIS

and took deliberate actions to avoid learning the truth and was thus willfully blind.

### 3.    *The Proposed Amendments Relate Back*

The PAC includes $42,061,207 of additional transfers which were paid to Defendants as

fees and interest payments pursuant to the credit facility. The additional transfers were made

pursuant to the same credit facility under which the previously pleaded transfers were made, and

thus arise out of the same "common core of operative facts."[20]  *Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 333-34 (S.D.N.Y. 2009) (new transfers relate back because they were margin loan payments arising out of certain co-borrowing facility transactions, and occurred during same time period as original transfers); *Pagano v. Pergament*, No. 11-CV-2360 (SJF), 2012 WL 1828854, at *7 (E.D.N.Y. May 16, 2012) (new transfers relate back because they were payments on the same loan, from the same sale proceeds, and "arise from the same basic facts and conduct as alleged in the Trustee's complaint").  Where new transfers are in connection with a specific agreement or group of transactions alleged in an original complaint, defendants are put "on notice of what must be defended against in the amended pleadings" and such transfers relate back.  *Adelphia*, 624 F. Supp. 2d at 333-334.

Here, the new transfers consist solely of transfers to the Defendants for interest and fees under the same credit facility as set forth in the original complaint.  Thus, both the new and previously pleaded transfers to each Defendant from Prime Fund arose out of the same credit agreement – the Prime Fund Credit Deal.

Defendants were on notice from the original complaint that the Trustee was ultimately seeking any and all transfers made to Defendants pursuant to the credit facility.  The original complaint moreover makes clear that the Trustee may in the future seek to add more like-kind transfers, by stating that the subsequent transfers being sought were only those "presently known" and that the "Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information on the . . . Citibank Two Year and Citibank Six Year Subsequent Transfers and any additional transfers, and (ii) seek recovery of such additional transfers."  *See*

---

[20] *See Mayle v. Felix*, 545 U.S. 644, 646 (2005) ("relation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims").

*Picard v. Citibank, N.A. (In re BLMIS)*, Adv. Pro. No. 10-05345 (SMB) (Bankr. S.D.N.Y. Dec.

8, 2010), ECF No. 1, at ¶¶ 178-79; 181.  This language was sufficient to give Defendants notice

that new transfers would likely be added.  *See, e.g., Picard v. Peter Madoff (In re BLMIS)*, 468

B.R. 620, 633-34 (Bankr. S.D.N.Y. 2012) (similar allegations in the Trustee's original complaint

gave sufficient notice of the Trustee's intent to seek recovery of additional transfers).

      Beyond the parties' contractual relationship with the credit facility, both the previously

pleaded and new subsequent transfers also arise out of the same "common core of operative

facts" because such transfers were received by Defendants in bad faith and with willful blindness

to Madoff's fraudulent scheme.  *See Adelphia*, 624 F. Supp. 2d at 334 (finding relation back of

new fraudulent transfers, noting that fraudulent transfer actions "often involve a common scheme

to defraud which provides a nexus for relation back" (citation omitted)); *In re Chaus Secs. Litig.*,

801 F. Supp. 1257, 1264 (S.D.N.Y. 1992) (finding accounts receivable manipulations in

amended complaint related back even though the events were distinct from those alleged in the

original complaint, because they were a "natural offshoot" of the same "basic scheme" to

defraud investors as was alleged in the original complaint).

      As bad faith recipients of customer property, the Defendants here were more than just

innocent investors "looking to payments from third parties," but rather a part of the "common

scheme to strip assets from BLMIS." *BNP*, 2018 WL 4833984, at *29.  Such allegations have

been at the heart of the Trustee's complaints from the beginning; as this Court recently

acknowledged, "the defendant's good faith has been an issue in every case from the start."  *SIPC*

*v. BLMIS (In re Madoff)*, 590 B.R. 200, 209 (Bankr. S.D.N.Y. 2018).

      Defendants were at all times in possession of their own, complete set of records setting

forth each payment out of Prime Fund for the duration of the credit facility relationship.  On

notice that the Trustee was seeking all known subsequent transfers made to the Defendants from

Prime Fund under the credit facility, Defendants at all times knew the full amount of possible

recoveries the Trustee might seek.  *See, e.g.*, *Enron Corp. v. Granite Constr. Co. (In re Enron

Corp.)*, No. 03-93172 (AJG), 2006 WL 2400369, at *12 (Bankr. S.D.N.Y. May 11, 2006)

(finding relation back of amended complaint enlarging amount of fraudulent transfer because

defendant was on notice that the particular transfer was being sought, and knew or should have

known from its own records the correct amount).

For all these reasons, these new transfers relate back even if individual fraudulent

transfers might under other circumstances be considered "separate and distinct" transactions.[21]

Both the existing and new transfers are under the same credit facility with Prime Fund to the

same Defendants; sought under the same legal theory (i.e. as fraudulently conveyed SIPA

customer property); subject to the same allegations of bad faith in connection with Madoff's

scheme; and based on the same relationship established under the credit facility agreement.

### B.    No Undue Delay or Bad Faith Can be Shown Where Defendants Acquiesced to the Trustee Waiting to Amend the Complaint Until Legal Standards Were Resolved

There is no evidence of undue delay, bad faith, or undue prejudice.  Although it has been

eight years since the Trustee filed his complaint, the mere passage of time, in the absence of bad

faith, does not warrant a denial of leave to amend.  *Commander Oil Corp. v. Barlo Equip. Corp*.,

215 F.3d 321, 333 (2d Cir. 2000) (upholding grant of leave to amend even in face of seven-year

delay); *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay . .

. absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to

---

[21] *See, e.g., Picard v. BNP Paribas S.A.*, No. 08-01789 (SMB), 2018 WL 4833984, at *28 (Bankr. S.D.N.Y. Oct. 3, 2018); *Metzeler v. Bouchard Transp. Co., Inc. (In re Metzeler)*, 66 B.R. 977, 984 (Bankr. S.D.N.Y. 1986).

deny the right to amend."). And "[d]elay is rarely fatal to a Rule 15 motion if it can be explained." *Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654 (RA) (HBP), 2015 WL 4097927, at *7 (S.D.N.Y. July 6, 2015).

The Trustee did not unduly delay or act in bad faith in bringing this motion now. The timing of this request merely reflects the procedural history of this liquidation and the intentions of the parties. Defendants agreed to adjourn the litigation on their motion to dismiss the complaint until dispositive legal issues were resolved on a case-wide basis, including the issue of good faith and extraterritoriality. The parties participated in the litigation on those standards and, in the meantime, stipulated to holding cases in abeyance pending the Court's determination of these issues. Therefore, the Trustee appropriately seeks to amend his pleading now that legal issues have been decided and this Court has determined no additional discovery will be permitted prior to amendment.[22] *See Mendelow*, 560 B.R. 208 at 223 (discussing change in legal standards applicable to Trustee's proceedings, "The Trustee should not be penalized and the defendants should not be rewarded for a delay in which everyone acquiesced.").

## C. **Defendants Cannot Demonstrate Undue Prejudice**

While prejudice to the opposing party "has been described as the most important reason for denying a motion to amend, only *undue* prejudice warrants denial of leave to amend." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016) (internal citations omitted). To ascertain whether undue prejudice exists, courts consider whether the proposed amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii)

---

[22] This Court recognized that the Trustee's Omnibus Motion could not be determined until after the resolution of the legal standards concerning extraterritoriality. *SIPC v. BLMIS (In re Madoff)*, 590 B.R. 200, 205 n.4 (Bankr. S.D.N.Y. 2018).

prevent the plaintiff from bringing a timely action in another jurisdiction." *Mendelow*, 560 B.R. at 223 (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993); *see Agerbrink*, 155 F. Supp. 3d at 454 (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000)).

Undue prejudice is a high bar, and the party opposing an amendment has the burden of proving "substantial prejudice would result were the proposed amendment to be granted." *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, No. 16-CV-5393 (KMW), 2018 WL 1115517, at *2 (S.D.N.Y. Feb. 26, 2018). Defendants "must show actual prejudice, not the possibility of prejudice." *Mendelow*, 560 B.R. at 224. "If no prejudice is found, then leave normally will be granted." Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1484 (3d ed.).

Prejudice is highly unlikely to be found where – as here – the case is in the early stage of the proceedings. *See, e.g.*, *State Teachers Ret. Bd.*, 654 F.2d at 856 (reversing denial of leave to amend where "no trial date had been set by the court," and "the amendment will not involve a great deal of additional discovery"). Whether a party had prior notice of the content amended and whether the amended complaint considers the same transaction as the claims in the original pleading are central to analyzing prejudice. *See M.E.S., Inc. v. Safeco Ins. Co. of Am.*, No. 10-CV-02798 (PKC)(VMS), 2014 WL 2931398, at *3 (E.D.N.Y. June 27, 2014) (granting leave to amend where, because proposed amended pleading "mostly elaborate[d]" on earlier pleading, defendant could not claim surprise by new claims); *see also Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 262 (S.D.N.Y. 2009); Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) (noting that courts allow amendments when "opponent could not claim surprise, but effectively should have recognized that the new matter included in the amendment would be at issue.").

39

Here, granting leave to amend would cause no prejudice at all, much less the undue prejudice that a party opposing leave to amend has the burden of demonstrating. The Trustee seeks amendment now because, almost four years after the filing of the complaint, the *Good Faith Decision* shifted the pleading burden and changed the legal standard. The extraterritoriality decisions reduced certain claims, transfers and, in some cases, parties. Throughout this litigation, Defendants have known of the Trustee's intention to amend the complaint to adhere to the changed standards. The litigation of this dispute was effectively on hold by agreement of both parties prior to the commencement of discovery.

At this juncture, the Trustee seeks to amend the complaint to tailor his allegations to the appropriate legal standard, as Defendants were well aware he would. The Trustee is not adding a single count or party; nor does the PAC contain any other surprise change in tactics or theories that could conceivably prejudice Defendants. The amended allegations concern issues that have been central to this suit for years. Moreover, this suit is still at an early stage of litigation: no defendant has responded to the complaint, no pre-trial conference has been held, no pre-trial scheduling order has been entered, and no Rule 26 discovery has been taken.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant the Trustee's request for an order allowing him to amend the complaint, and any and all other relief the Court deems just and proper.

Dated: <u>December 14, 2018</u>               By:     <u>/s/ Seanna R. Brown</u>
       New York, New York

                                        **Baker & Hostetler LLP**
                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone: 212.589.4200
                                        Facsimile: 212.589.4201
                                        David J. Sheehan
                                        Email:  dsheehan@bakerlaw.com
                                        Seanna R. Brown
                                        Email:  sbrown@bakerlaw.com
                                        Matthew D. Feil
                                        Email:  mfeil@bakerlaw.com
                                        Andres A. Munoz
                                        Email:  amunoz@bakerlaw.com
                                        Chardaie C. Charlemagne
                                        Email:  ccharlemagne@bakerlaw.com

                                        *Attorneys for Irving H. Picard, Trustee*
                                        *for the Substantively Consolidated SIPA*
                                        *Liquidation of Bernard L. Madoff*
                                        *Investment Securities LLC and the*
                                        *Estate of Bernard L. Madoff*