# EXHIBIT A

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the estate of Bernard L. Madoff, | Adv. Pro. No. 10-05345 (SMB) |
| Plaintiff, | |
| v. | |
| Citibank N.A., Citicorp North America, Inc. and Citigroup Global Markets Limited, | **PROPOSED AMENDED COMPLAINT** |
| Defendants. | |

Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), 15

U.S.C. §§ 78aaa *et seq.*, and the substantively consolidated chapter 7 estate of Bernard L. Madoff

("Madoff"), by and through his undersigned counsel, for this Amended Complaint against

Citibank N.A. ("Citibank"), Citicorp North America, Inc. ("Citicorp") (along with Citibank,

"Defendants"), and Citigroup Global Markets Limited, alleges the following:

## I.    NATURE OF THE PROCEEDING

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS "customer property," as defined by SIPA § 78*lll*(4), that was stolen as part of the

massive Ponzi scheme perpetrated by Madoff and others.

2.    With this Amended Complaint, the Trustee seeks to recover at least $343,084,590

of BLMIS customer property that Defendants received as subsequent transfers (the "Subsequent

Transfers") from Rye Select Broad Market Prime Fund, L.P. ("Prime Fund").  Defendant

Citigroup Global Markets Limited also received approximately $130 million in subsequent

transfers of BLMIS customer property from Fairfield Sentry Limited ("Fairfield

Sentry").[1]  Prime Fund and Fairfield Sentry were among the various investment vehicles that

invested all or substantially all their assets with BLMIS's investment advisory business ("BLMIS

Feeder Funds").

---

[1] Pursuant to a Stipulated Order, the Bankruptcy Court has dismissed the Trustee's claims to recover approximately $130 million in subsequent transfers that Defendant Citigroup Global Markets Limited received from Fairfield Sentry Limited. *See Picard v. Citibank, N.A. et al.*, Adv. Pro. No. 10-05345 (SMB), ECF No. 107.  The Trustee has appealed the orders dismissing those claims and reserves the right to further amend his pleadings if the pending appeal is successful.  *Picard v. BLMIS (In re BLMIS)*, No. 17-02292 (2d Cir. filed Sep. 27, 2017).

3.      Defendants received the Subsequent Transfers between June 16, 2005 and March 26, 2008 as repayment of funds they loaned to Prime Fund to invest with BLMIS's investment advisory business (the "Prime Fund Credit Deal"), along with payments of interest and fees.

4.      Prior to entering the Prime Fund Credit Deal, Defendants recognized facts suggesting a high probability that BLMIS's investment advisory business (the "IA Business") was a fraud and was misappropriating its customers' assets.

5.      Defendants conducted their BLMIS-related business primarily through their affiliate and sister entity, Citigroup Global Markets, Incorporated ("CGMI"). Defendants, CGMI, and their key personnel were sophisticated investors with particular expertise in the options and derivative markets. Thus, they were well-positioned to, and did, identify evidence causing them to believe there was a high probability of fraud at BLMIS. Specifically, they were concerned that BLMIS was not trading securities as it claimed because, among other things, CGMI repeatedly tried but could not find any evidence BLMIS was executing the billions of dollars of options trades it purported to make. They were also concerned that BLMIS insisted on maintaining physical control and full discretion over Prime Fund's assets without an independent custodian, which created an unusual risk that BLMIS could misappropriate those assets and misreport its purported trades.

6.      CGMI also identified evidence suggesting that BLMIS was fabricating its investment performance. First, CGMI performed a quantitative analysis that identified empirical evidence demonstrating that BLMIS's investment strategy was not capable of producing its purported returns. At around the same time, Leon Gross, a CGMI managing director, conducted a separate analysis and similarly concluded that BLMIS was either fabricating its purported returns or lying about its stated investment strategy. Harry Markopolos, a CGMI customer,

3

asked Gross to analyze BLMIS's purported returns. Markopolos discovered that BLMIS was

operating a Ponzi scheme, alerted the Securities and Exchange Commission ("SEC") to his

discovery, and cited Gross as someone who the SEC should contact regarding the mathematical

reasons Gross believed BLMIS was a fraud.

7.    Recognizing the foregoing facts, Defendants were unwilling to enter the Prime

Fund Credit Deal unless it included unique provisions to reimburse them for losses associated

with BLMIS's fraud. Specifically, they demanded that Prime Fund's general partner, Tremont

Partners, Inc. ("Tremont Partners"), indemnify Defendants against fraud at BLMIS. This

indemnification did not protect Defendants from losses incurred due to a decline in Prime Fund's

fair market value, but was designed specifically to protect Defendants in the event of the fraud it

suspected at BLMIS. Tremont Partners agreed.

8.    After entering the Prime Fund Credit Deal, Defendants, through their agent,

CGMI, had further suspicions of fraud as they were confronted with additional indicia that

BLMIS was not trading securities and was misappropriating assets. However, despite their

efforts to allay their concerns of misappropriation associated with BLMIS's self-custody of the

IA Business assets, Defendants unable to independently verify that BLMIS maintained

segregated customer accounts, or even that the assets existed in any account. Similarly, despite

looking, Defendants were unable to find any evidence that BLMIS was in fact making the

options trades it reported to its IA Business customers.

9.    CGMI, acting on behalf of Defendants, was never able to verify that BLMIS

maintained customer assets in segregated accounts or that BLMIS traded options as reported on

customer statements. Yet, despite these critical concerns, Defendants abandoned any interest in

determining whether their suspicions of fraud at BLMIS were true because they were guaranteed

protection through the indemnification provision of the Prime Fund Credit Deal.

10.    In January 2007, as the Prime Fund Credit Deal was approaching its expiration,

Tremont Partners again indicated that it would like to renew the deal, but without the critical

fraud indemnification provision.  Without the fraud indemnification provision, Defendants were

unwilling to loan money to Prime Fund for the purpose of investing with BLMIS.

11.    The Prime Fund Credit Deal terminated on March 26, 2008, and Defendants

received subsequent transfers of $301,023,382 of BLMIS customer property on the same day.

## II.    **JURISDICTION AND VENUE**

12.    This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment*

*Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred

to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C.

§ 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

13.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H) and (O).  The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

14.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

15.    This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-

2(c)(3), 11 U.S.C. §§ 105(a), and 550(a), and other applicable law.

16.    On December 8, 2010, the Trustee filed his original complaint against Defendants seeking the recovery of subsequent transfers from the BLMIS Feeder Funds. *See* ECF No. 1. On July 26, 2011, Defendants filed a motion to dismiss the Trustee's complaint. (ECF Nos. 18-21). Under Federal Rule of Civil Procedure 12(h), Defendants waived their right to assert lack of personal jurisdiction as a defense by failing to raise it in their motion to dismiss.

## III.    BACKGROUND, THE TRUSTEE AND STANDING

17.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the SEC commenced the District Court Proceeding.

18.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

19.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

(a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

(c)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

20.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

6

21.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

22.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

23.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

24.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

25.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of the IA Business.

26.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing Customer Property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

27.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

28.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.    DEFENDANTS AND NON-PARTIES

### A. Defendant Citibank N.A.

29.    Defendant Citibank is a commercial bank, and wholly owned subsidiary of Citigroup Inc. ("Citigroup"). Defendant Citibank has its principal place of business at 399 Park Avenue, New York, NY 10022. In 2005, Citibank had approximately 900 branches in the United States and had net income of approximately $8.8 billion.

30.    Citibank is subject to personal jurisdiction in this judicial district because it purposefully availed itself of the laws and protections of the United States and the State of New York by, among other things, having its primary office in New York.

31.    Citibank served as lender in connection with the Prime Fund Credit Deal, a revolving credit facility extended to Prime Fund, a BLMIS Feeder Fund, and its general partner, Tremont Partners.

32.    Citibank entered into the Prime Fund Credit Deal on or about June 15, 2005 when it executed a revolving credit and security agreement among Prime Fund, Tremont Partners, Citicorp, CAFCO, a conduit commercial lender for Citigroup, and itself (the "Revolving Credit Agreement").

33.    The Revolving Credit Agreement provided it "SHALL BE DEEMED TO BE A CONTRACT MADE UNDER THE LAWS OF THE STATE OF NEW YORK, AND FOR ALL PURPOSES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF SAID STATE," memorializing connections between Citibank and New York.

34.    On or about March 26, 2008, when the parties terminated the Prime Fund Credit Deal, Citibank executed a termination agreement (the "Termination Agreement"), governed by New York law. It provided: "THIS TERMINATION AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK."

35.    Citibank derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

9

36.     Citibank should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to N.Y. C.P.L.R. §§ 301 and 302 and Rule 7004.

**B.  Defendant Citicorp**

37.     Defendant Citicorp is a Delaware corporation and has its principal place of business at 388 Greenwich Street, New York, NY, 10013.  Citicorp is a non-bank holding company and a subsidiary of Citicorp Banking Corporation, in turn a subsidiary of Citigroup. Citibank uses Citicorp to book and assign capital for certain leveraged loans and bridge loans.

38.     Citicorp is subject to personal jurisdiction in this judicial district because it purposefully availed itself of the laws and protections of the United States and the State of New York by, among other things, having its primary office in New York.

39.     Citicorp was a party to the Revolving Credit Agreement, which by its terms was made under and governed by New York law, and served as agent for Citibank in connection with the Prime Fund Credit Deal.

40.     Citicorp derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

41.     Citicorp should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to N.Y. C.P.L.R. §§ 301 and 302 and Rule 7004.

**C.  Defendant Citigroup Global Markets Limited**

42.     Citigroup Global Markets Limited is an investment banking and securities brokerage company with principal offices at Citigroup Centre, 33 Canada Square, Canary Wharf, London E14 5LB, United Kingdom.  Citigroup Global Markets Limited has additional offices throughout Europe.  Citigroup Global Markets Limited is a subsidiary of Citigroup Global Markets Europe Limited, a subsidiary of Citigroup Global Markets Europe Finance Limited,

10

which is owned by Citigroup Global Markets Switzerland Holdings GmbH, which is owned by

Citigroup Financial Products, Inc., a wholly owned subsidiary of Citigroup Global Markets

Holding, Inc., a wholly owned subsidiary of Citigroup. Citigroup Global Markets Limited is one

of two Citigroup subsidiaries principally responsible for conducting Citigroup's securities

operations abroad.

43.    In 2005, Citigroup Global Markets Limited entered into an offshore swap

transaction with Auriga International Limited ("Auriga") related to another BLMIS Feeder Fund,

Fairfield Sentry, in which Citigroup Global Markets Limited agreed to pay Auriga two-times the

returns on a hypothetical investment in Fairfield Sentry in exchange for fees (the "Fairfield

Sentry Leverage Deal"). In connection with the Fairfield Sentry Leverage Deal, Citigroup

Global Markets Limited invested in and redeemed from Fairfield Sentry.

44.    CGMI personnel were authorized to perform trading management services and

sign transaction agreements on Citigroup Global Markets Limited's behalf. And CGMI

performed certain services in connection with the Fairfield Sentry Leverage Deal on Citigroup

Global Markets Limited's behalf, including conducting due diligence on BLMIS and Fairfield

Sentry and executing relevant transaction documents.

**D. Non-Party Citigroup, Inc.**

45.    Non-party Citigroup Inc. ("Citigroup"), is the ultimate parent corporation to

Defendants. Likewise, it is the ultimate parent company of related non-party entities, CGMI, and

CAFCO, as alleged below.

46.    Citigroup, a holding company organized under Delaware law in 1988, is one of

the largest financial institutions in the world. Citigroup has more than 200 million customer

accounts and does business in approximately 100 countries. Citigroup's institutional clients

include large multinational corporations, public sector entities, "ultra-high-net-worth"

households, and investment managers. In 2005, Citigroup was the most profitable financial services company in the world. By 2006 Citigroup had 300,000 employees worldwide, revenues of approximately $90 billion and assets of $1.9 trillion.

### 1. Citigroup Segments

47.    During the relevant period, Citigroup had a complex corporate structure with numerous legal entities that operated across several of its business segments. Entities and personnel in these Citigroup segments shared information, worked together on risk assessment issues, collaborated on transactions, and generally operated as a cohesive unit. Specifically, personnel from at least three Citigroup entities – Citibank, CGMI, and Citigroup Global Markets Limited – operated across multiple Citigroup segments to conduct Defendants' BLMIS-related transactions described herein. The primary segments involved in those transactions were Corporate and Investment Banking ("Investment Banking") and Alternative Investments.

48.    The Investment Banking segment provided various investment and commercial banking services and products, including advisory services, trading, institutional brokerage, and lending services, to corporations, governments, institutions, and investors. Investment Banking had net income of approximately $6.9 billion on revenues of $23.9 billion in 2005.

49.    The Alternative Investments segment managed capital on behalf of Citigroup and investors and offered products ranging from private equity to structured products and managed futures. Alternative Investment had net income of approximately $1.4 billion on revenues of $3.4 billion in 2005.

### 2. Through its Alternative Investment Segment and Products, Citigroup Was a Sophisticated Financial Services Provider with Substantial Expertise in the Options Trading Market

50.    Citigroup has a long history in the derivatives industry. In the late 1980's, it was among the first to introduce structured credit, and in the early 1990's it launched its first hedge

12

fund platform. By 2004, Citigroup had significant expertise in and a comprehensive understanding of the equity derivatives market, including options-based derivative transactions.

51.    In 2005, Citigroup was one of the top five derivative dealers in the United States. By 2007, Citigroup, together with four other major banks, was responsible for generating 97% of all notional amounts of derivative contracts, including swaps and options, in the United States. In addition, Citigroup was a major counterparty for over-the-counter ("OTC") options contracts. In 2009, Citigroup held itself out as a "leader in the options market, currently executing over 10% of industry options volume."

52.    Non-party CGMI and Defendant Citigroup Global Markets Limited were Citigroup subsidiaries working in the Alternative Investment segment whose focus and expertise was with derivative products including forwards and futures, swaps, and options (using both exchange-listed and OTC). CGMI and Citigroup Global Markets Limited personnel were highly sophisticated and experienced in the derivatives industry.

53.    As an example of Citigroup's sophistication in the derivatives market, in 2004, CGMI prepared and published a comprehensive guide to equity derivatives for fund managers, analysts, investors and other financial professionals (the "Derivatives Guide"). The Derivatives Guide contains a detailed discussion of equity derivatives and covers topics regarding forwards and futures, equity swaps, options, option applications, hedging with derivatives, and the risks associated with derivatives.

54.    The Derivatives Guide was written with the assistance of several CGMI employees, including Joseph Elmlinger, Global Head of Equity Derivatives, Leon Gross, Global Head of Equity Derivatives Research and Strategy, and Richard Burns, Global Head of Equity Structured Products and Structured Fund Products. As alleged below, Elmlinger and Burns were

involved in Citibank's BLMIS-related transactions. As further alleged below, Gross reported

directly to Elmlinger and received a warning that the IA Business was a Ponzi scheme. In

addition, applying his own expertise, Gross concluded that BLMIS's investment strategy could

not generate its purported returns.

55.    Citigroup's Alternative Investment entities, including CGMI and Citigroup

Global Markets Limited, typically worked in close partnership with other Citigroup business

lines, including Investment Banking. Citigroup also worked in close partnership with Tremont

Partners and Fairfield Greenwich Group.

3. **Defendants Worked Together and With Other Citigroup Entities on the Prime Fund Credit Deal and Other BLMIS-Related Transactions**

# Relevant Citigroup Entities



56.    Citigroup considered itself and its subsidiaries to be "one company" that worked to "integrate [its] products and services." As explained in its 2005 Annual Statement, Citigroup

sought to "provid[e] integrated solutions by leveraging teams from across the firm and around the world" and "to bridge [their] businesses so all of the company is working in unison."

57.     Consistent with this business plan, and as alleged below, Defendants acted through their agent, non-party CGMI, in all respects material to the Prime Fund Credit Deal. CGMI conducted the due diligence on Prime Fund and BLMIS in connection with the Prime Fund Credit Deal, negotiated the terms of the initial loan as well as the terms of each renewal, and executed the agreements governing the deal.

### E.  Non-Party CAFCO, LLC

58.     Non-party CAFCO, LLC ("CAFCO") is a Delaware company, a wholly owned subsidiary of Citigroup, and a conduit commercial lender for Citigroup. CAFCO was the "Conduit Lender" in the Prime Fund Credit Deal and party to the Revolving Credit Agreement.

### F.  Non-Party Citigroup Global Markets, Inc.

59.     Non-party Citigroup Global Markets, Inc. (previously defined as "CGMI") is Citigroup's primary United States-based brokerage and securities arm and has its principal offices at 390-388 Greenwich Street, New York, NY 10013. CGMI is incorporated and headquartered in New York. CGMI is an indirect wholly owned subsidiary of Citigroup Global Markets Holdings, Inc., which is a wholly owned subsidiary of Citigroup.

60.     CGMI, as agent for Defendants and CAFCO, performed nearly all material aspects of the Prime Fund Credit Deal, including key business roles. Paul Donlin, a CGMI employee, was the Business Manager for the Prime Fund Credit Deal. Bruce Clark and Marc Adelman, both CGMI employees, were the Business Sponsors for the Prime Fund Credit Deal. Matthew Nicholls and Thomas Fontana, both CGMI employees, were designated as the Client Coverage Banker and Portfolio Manager, respectively, for the Prime Fund Credit Deal.

61.    CGMI, as agent for Defendants and CAFCO, performed the initial due diligence
on BLMIS, Prime Fund, and Tremont in connection with the Prime Fund Credit Deal. Donlin
submitted a memorandum in May 2005 describing the Prime Fund Credit Deal and informing
Citigroup's internal approval committee that he approved of the deal from both a business and
risk perspective ("May 2005 Memo").

62.    CGMI, as agent for Defendants and CAFCO, negotiated the terms of the Prime
Fund Credit Deal and each subsequent renewal thereafter. Specifically, CGMI's Adelman and
Nicholls were the individuals who primarily communicated directly with Tremont regarding the
terms, operation and renewals of the Prime Fund Credit Deal.

63.    CGMI, as agent for Defendants and CAFCO, executed agreements with Prime
Fund and Tremont governing the Prime Fund Credit Deal. These agreements include the
Revolving Credit Agreement, several amendments renewing and/or altering the terms of the
Prime Fund Credit Deal, an account control agreement, a side letter agreement, and a termination
agreement.

64.    CGMI, as agent for Defendant Citibank and Citigroup Global Markets Limited,
also evaluated the Fairfield Sentry Deal and executed certain agreements associated with that
deal.

65.    CGMI, as agent for Defendants, also evaluated and rejected a proposed BLMIS-
related structured product involving Tremont's BLMIS Feeder Funds due to its concerns of fraud
and misappropriation of customer property by BLMIS.

66.    CGMI had significant duties related to the Prime Fund Credit Deal and the
Fairfield Sentry Leverage Deal, performed various tasks and functions related to those deals for
the unified benefit of Citibank and Citicorp, and acted within the scope of its agency at the

17

direction of, on behalf of, for the benefit of, and/or with the consent of Citibank and Citicorp.

Accordingly, CGMI's conduct and knowledge are imputed to Citibank and Citicorp.

### G. Non-Party Tremont Partners, Inc.

67.    Non-party Tremont Partners, a Connecticut corporation, was Prime Fund's

general partner and investment manager. Tremont Partners' parent company is Tremont Capital

Management, Inc. ("TCM"), located in Rye, New York (together with its successors, "Tremont

Group", and collectively with Tremont Partners, "Tremont"). TCM's parent company is

Oppenheimer Funds, Inc. ("Oppenheimer"), and Oppenheimer's parent company is

Massachusetts Mutual Life Insurance Company, headquartered in Massachusetts. As alleged

more fully below in paragraph 263, by order dated September 22, 2011, this Court approved a

settlement among the Trustee, Tremont and others (collectively, as defined below, the "Tremont

Settling Defendants"), under which the Tremont Settling Defendants agreed to pay the Trustee

$1.025 billion for the benefit of the customer property estate.

### H. Non-Party Prime Fund

68.    Non-party Prime Fund[2] is a Delaware limited partnership organized in May 1997

with its registered office in Rye, New York. Prime Fund was operated and controlled by

Tremont Partners and, as a BLMIS Feeder Fund, invested substantially all its assets with

BLMIS.

69.    Prime Fund invested substantially all of the loan proceeds from the Prime Fund

Credit Deal in its customer account with the IA Business. This enabled Prime Fund to provide

its own investors with increased – or levered – returns by a factor of approximately 1.5 times.

---

[2] Prime Fund's original name was "American Masters Broad Market Prime Fund, LP," and subsequently renamed "American Masters Broad Market Prime Fund, LP in or around 1999, and then took its current name, "Rye Select Broad Market Prime Fund, LP," in or around 2006.

### I.  Non-Party Fairfield Greenwich Group

70.     Non-party Fairfield Greenwich Group ("FGG") is a New York company that
operated and managed Fairfield Sentry, a BLMIS Feeder Fund.  In 1983, United States citizens
and residents, Walter Noel and Jeffrey Tucker, founded FGG, a New York-based *de facto*
partnership.  At all relevant times, Fairfield Sentry was operated almost entirely by personnel at
FGG's New York City headquarters who maintained final control of Fairfield Sentry's bank
accounts and relationships with Fairfield Sentry's back office service providers, including
Fairfield Sentry's investment with BLMIS.

### J.  Non-Party Fairfield Sentry

71.     Non-party Fairfield Sentry is a hedge fund incorporated in the British Virgin
Islands and had its headquarters and primary business operations in New York.  Fairfield Sentry
was the largest BLMIS Feeder Fund and filed a SIPA customer claim against the BLMIS estate
for over $6.2 billion.  By orders dated June 7 and June 10, 2011, this Court approved a settlement
among the Trustee, Fairfield Sentry, and others (the "Fairfield Settlement Agreement").

### K.  Non-Party Auriga

72.     Non-party Auriga International Limited ("Auriga") is a British Virgin Islands
hedge fund that invested substantially all its assets directly and indirectly with Fairfield Sentry.

## V.  BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.  BLMIS

73.     Madoff founded BLMIS in 1960 as a sole proprietorship.  In 2001, Madoff
registered BLMIS as a New York limited liability company.  At all relevant times, Madoff
controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

74.     In compliance with 15 U.S.C. § 78$o$(b)(1) and SEC Rule 15b1-3, and regardless
of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008.  Public

records obtained from the Central Registration Depository of the Financial Industry Regulatory

Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer from January

19, 1960 through December 31, 2008. At all times, BLMIS was assigned CRD No. 2625.

SIPC's Membership Management System database ("MMS") also reflects BLMIS's registration

with the SEC as a securities broker-dealer from January 19, 1960 through December 31, 2008.

On December 30, 1970, BLMIS became a member of SIPC and continued its membership

without any change in status until the Filing Date. SIPC membership is contingent on

registration of the broker-dealer with the SEC.

75.    For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker dealer operation, and the IA Business.

76.    BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced

Madoff to register.

77.    For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

78.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment

Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management of $11.7 billion. BLMIS filed its last Form ADV in January 2008,

reporting that its IA Business still had only 23 customer accounts with total assets under

management of $17.1 billion. In reality, Madoff grossly understated these numbers. In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in assets under management. At all times, BLMIS's Form ADVs were publicly available.

**B. The Ponzi Scheme**

79.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, Joanne Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

80.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

81.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one employee was an administrative assistant, and one was a semi-retired accountant living in Florida.

21

82.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling
& Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for
Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these
fictitious annual audited financial statements prepared by Friehling & Horowitz.

*Madoff's Investment Strategy*

83.    BLMIS purported to execute two primary investment strategies for IA Business
customers: the convertible arbitrage strategy and the split strike conversion ("SSC") strategy.
For a limited group of IA Business customers, primarily consisting of Madoff's close friends and
their families, Madoff also purportedly purchased securities that were held for a certain time and
then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate
business operations using any of these strategies.

84.    The convertible arbitrage investment strategy was supposed to generate profits by
taking advantage of the pricing mismatches that can occur between the equity and bond/preferred
equity markets. Investors were told they would gain profits from a change in the expectations
for the stock or convertible security over time. In the 1970s this strategy represented a
significant portion of the total IA Business accounts, but by the early 1990s the strategy was
purportedly used in only a small percentage of IA Business accounts.

85.    From 1992 forward, Madoff began telling IA Business customers that he
employed the SSC strategy for their accounts, even though in reality BLMIS never traded any
securities for its IA Business customers. All funds received from IA Business customers were
commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These
commingled funds were not used to trade securities, but rather to make distributions to, or
payments for, other customers, to benefit Madoff and his family personally, and to prop up
Madoff's proprietary trading business.

86.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected substantial gains on the customers' principal investments.

87.    The SSC strategy purported to involve: (i) the purchase of a group or basket of equities (the "Basket") intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P Index call options.

88.    The put options were to control the downside risk of price changes in the Basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option would entail a loss for BLMIS.

89.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to outperform the market, because in a rising market, calls would be exercised by the counterparty.

90.    The simultaneous purchase of puts and calls to hedge a securities position is commonly referred to as a "collar." The purpose of the collar is to limit exposure to volatility in the stock market and flatten out returns on investment.

91.    For the SSC strategy to be deployed as Madoff claimed, the total value of each of the puts and calls purchased for the Basket had to equal the notional value of the Basket. For example, to properly implement a collar to hedge the $11.7 billion of assets under management that Madoff publicly reported in 2006 would have required the purchase of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

23

92.    Moreover, at all times that BLMIS reported its total assets under management, publicly available information about the volume of exchange-traded options showed that the volume of options contracts necessary to form the collar and implement the SSC strategy exceeded the available options.

93.    Sophisticated or professional investors, including Defendants, knew that Madoff could not be using the SSC strategy because his returns drastically outperformed the market. Not only did BLMIS regularly show gains when the S&P 100 Index was down (at times significantly), it would also post gains that exceeded (at times, significantly) the S&P 100 Index's performance. Such results were impossible if BLMIS had actually been implementing the SSC strategy. As alleged in detail below, Defendants conducted an analytical study of Madoff's purported returns that further demonstrated to them that Madoff could not achieve his purported returns using the SSC strategy.

*BLMIS's Fee Structure*

94.    BLMIS charged commissions on purportedly executed trades rather than management and performance fees based on the value of assets under management. By using this commission-based structure, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

*BLMIS's Market Timing*

95.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he achieved market execution by intermittently taking customer funds out of the market. During those times, Madoff purported to invest BLMIS customer funds in U.S. Treasury Bills ("Treasury Bills") or mutual funds invested in Treasury Bills.

24

96.    BLMIS's market timing, as reported on its customer statements, showed an uncanny ability to buy low and sell high, an ability so uncanny, that any sophisticated or professional investor, including Defendants and CGMI, could see it was statistically impossible. BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every quarter and year end.

97.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win every time. Yet this is precisely what BLMIS's customer statements reported.

98.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the SSC strategy, which relied on holding long positions rather than on short-term speculative trading.

99.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

100.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing

Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any

trades in any exchange-listed options.

*The Collapse of the Ponzi Scheme*

101.    The Ponzi scheme collapsed in December 2008, when BLMIS customers'

requests for redemptions overwhelmed the flow of new investments.

102.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased

none of the securities listed on the IA Business customers' fraudulent statements, and that the IA

Business operated as a Ponzi scheme.

103.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## VI.    DEFENDANTS WILLFULLY BLINDED THEMSELVES TO FRAUD AT BLMIS

### A.    Defendants Subjectively Believed There Was a High Probability That BLMIS's IA Business Was a Fraud and Misappropriating Customer Assets

104.    CGMI learned of the probability of fraud at BLMIS as a result of its involvement

with three BLMIS-related deals: (1) the Fairfield Sentry Leverage Deal; (2) the Prime Fund

Credit Deal (which involves the transfers presently at issue in this proceeding); and (3) a

proposed Tremont leverage deal ("Proposed Tremont Deal"), which Defendants rejected.

Throughout the due diligence it conducted in connection with these deals, CGMI recognized

indicia of fraud and repeatedly expressed two primary concerns: the first was that BLMIS was

not and could not be trading options; the second was that the money invested and left under

BLMIS's unfettered control could be stolen and disappear – two of the fundamental elements of

BLMIS's Ponzi scheme.

26

1.    **The Fairfield Sentry Leverage Deal: CGMI, Citigroup Global Markets Limited and Citibank First Identified the Impossibility of BLMIS's Purported Trades and Suspected BLMIS's Misappropriation of Assets in Early 2005**

105.    Beginning in March 2005, CGMI, Citigroup Global Markets Limited, and Citibank began to negotiate terms with FGG around a swap transaction between Citigroup Global Markets Limited, Citibank (which served as the Escrow Agent), and Auriga, which became the Fairfield Sentry Leverage Deal.

106.    Under the Fairfield Sentry Leverage Deal, which was executed on or about April 28, 2005, Auriga provided Citigroup Global Markets Limited with approximately $140 million in collateral in exchange for leverage that allowed Auriga to recover returns equal to two-times what it would have earned had it invested the collateral directly in Fairfield Sentry. In addition to the collateral it received, Citigroup Global Markets Limited collected interest and fee payments from Auriga. To generate the returns it owed Auriga under the deal, Citigroup Global Markets Limited invested the $140 million in collateral, along with $140 million of its own funds, in Fairfield Sentry.

107.    Samir Mathur ("Mathur"), a managing director at CGMI, and Rajiv Sennar, who worked with the Fund and Multi-Asset Derivatives group at CGMI led, the due diligence on Fairfield Sentry and BLMIS in connection with the Fairfield Sentry Leverage Deal. Mathur, Sennar, and their team identified multiple indicia of fraud at BLMIS that led them to suspect BLMIS was not making the securities trades it claimed to make on behalf of Fairfield Sentry.

108.    Specifically, CGMI was concerned that it was unable to identify any evidence of BLMIS's purported billions of dollars of options transactions, including who served as its counterparties. CGMI was also concerned because BLMIS neglected to use an independent custodian to safeguard customer assets (including cash and securities) invested with the IA

27

Business. At the same time, CGMI performed a quantitative analysis that demonstrated BLMIS could not achieve its purported investment returns using the SSC strategy. Despite its suspicions of fraud, CGMI facilitated the Fairfield Sentry Leverage Deal and executed some of the relevant transaction documents on behalf of Defendant Citibank and Citigroup Global Markets Limited.

a.  CGMI Learned BLMIS's Purported Trades Were Impossible, a Concern Exacerbated by BLMIS's Lack of Independent Custody or Oversight

109.  From the very outset of their pre-investment due diligence on Fairfield Sentry, CGMI employees, on behalf of Citigroup Global Markets Limited and Citibank, recognized that BLMIS's lack of an independent custodian meant BLMIS had unchecked control over Fairfield Sentry's assets. CGMI understood the absence of this key industry-standard safeguard created a serious risk that BLMIS could misreport its trades and misappropriate its customers' assets.

110.  In addition to identifying a risk of fraud surrounding BLMIS's lack of an independent custodian, CGMI also had serious concerns about the lack of any evidence to substantiate the existence of BLMIS's purported billions of dollars of options trades.

111.  In a March 10, 2005 memorandum from the Global Hybrid Trading Desk (the "March 10, 2005 Memo"), CGMI provided a summary of the proposed Fairfield Sentry Leverage Deal. The March 10, 2005 Memo included a description of the Fairfield Sentry Leverage Deal's proposed terms and a discussion of the key actors in the deal, and annexed documents, including preliminary information concerning due diligence CGMI personnel performed on Fairfield Sentry.

112.  In the March 10, 2005 Memo, CGMI noted that one of the integral elements of the SSC strategy was the purchase and sale of S&P 100 Index options used to create a collar to hedge the basket of equities. As explained in the memorandum and attached materials, BLMIS purported to construct the collar by purchasing S&P 100 Index put options in an amount equal to

the value of the basket of equities and selling S&P 100 Index call options in an equal amount. The March 10, 2005 Memo also noted that Fairfield Sentry had $5.1 billion in assets, at least 95% of which was invested through BLMIS's SSC strategy.

113.    Based on this information, CGMI knew BLMIS purported to purchase at least $4.8 billion in S&P 100 Index put options and sell at least $4.8 billion in S&P 100 Index call options each time it entered the market, which occurred six to seven times per year.

114.    As part of one of the largest and most sophisticated financial institutions in the world, and itself a major dealer in the options market, CGMI knew that $4.8 billion is an astonishingly large volume of S&P 100 Index options. The volume of S&P 100 Index options transactions BLMIS purported to execute solely on behalf of Fairfield Sentry regularly dwarfed the total volume of S&P 100 Index options traded on the Chicago Board Options Exchange ("CBOE"), where they are standardized and known as "OEX" options.

115.    CGMI employees, such as Elmlinger, were familiar with the volume of S&P 100 Index options exchanged on the markets, and Elmlinger later used his expertise to serve on the Membership/Risk Committee of the OCC where the volume of options traded was well-known and documented.

116.    One of the documents attached to the March 10, 2005 Memo was a due diligence questionnaire prepared by FGG for its investors that claimed BLMIS executed these options trades on the OTC market. Based on their expertise and experience in the options markets, CGMI personnel knew that OTC transactions involve significantly higher transaction costs than trading standardized OEX options on the exchange because the parties must negotiate each OTC transaction individually.

29

117.    Understanding that it was highly unlikely, if not impossible, for BLMIS regularly to trade billions of dollars of S&P 100 Index options on the OTC market, CGMI personnel became concerned these trades were not real. Specifically, as alleged in more detail below, Elmlinger, Burns, Gross and Ramesh Gupta, CGMI's Global Head of Equity Market Risk, were each unable to identify any counterparties or other evidence to substantiate the existence of these purported trades.

118.    Based on these facts, coupled with BLMIS's lack of independent custody or oversight, CGMI began to suspect BLMIS was misappropriating its customers' assets instead of investing them. By March 2005, CGMI felt the need to raise these concerns with FGG. Specifically, on March 11, 2005, in a telephone call with FGG's Kim Perry, Marc Fisher explained that Citibank was afraid the assets in Fairfield Sentry's IA Business customer account could disappear. Perry relayed these concerns to FGG personnel in an internal email, explaining:

> The concerns that Citibank has are primarily credit concerns as opposed to performance risk concerns. i.e. *could the money disappear from the account in any one day*, leaving Citibank exposed with a $150 million loan and no collateral. They are not necessarily concerned about transparency to the portfolio, *they just would feel more comfortable if there were some sort of control on money leaving the account*. (emphasis supplied)

119.    As explained in Perry's email, Citibank's central concern from the beginning was that there was no independent custodian or other control mechanism preventing BLMIS from stealing Fairfield Sentry's assets; "i.e. could the money disappear from the account in any one day . . . ."

120.    On or around March 22, 2005, Fisher along with CGMI personnel, including Mathur and Gupta, visited FGG's New York City office as part of their due diligence on Fairfield Sentry and BLMIS. Two days later, on March 24, 2005, Fisher advised FGG's Perry that they remained concerned about fraud because BLMIS was the custodian of Fairfield

30

Sentry's assets. Perry informed his FGG colleagues of CGMI's continued concerns about the

"theoretical fraud risk given that Madoff is the custodian of the assets," and noted that "the head

of trading at Citicorp ha[d] agreed to assume this [fraud] risk." Perry assured his FGG

colleagues that despite these concerns, both he and Fisher expected the deal to close, noting that

the final step would only involve a "senior sign-off" that was merely a "formality."

121.    CGMI's concerns about fraud did not surprise FGG's Chief Operating Officer and

Managing Partner, Rob Blum, who commented internally that he and FGG co-founder, Jeffrey

Tucker, "figured they'd choke on the fraud risk . . . ."

122.    According to FGG's Perry, this was an important deal for Citigroup Global

Markets Limited, Citibank and for Fisher personally. Fisher promised to promote FGG's funds

internally at Citigroup in return for FGG's help in getting the Fairfield Sentry Leverage Deal

executed. Specifically, in a March 24, 2005 email to FGG co-founder, Tucker, Perry wrote:

> The p&l for this trade will go to Fishers (sic) book and it is also an
> important trade for Citi and him. If we get the deal done he has
> promised me he will try either to help us get FGG products
> distributed there or he will use Irongate in some of their structured
> products.

123.    To address its remaining concerns, CGMI asked FGG to arrange a meeting with

Madoff or someone else at BLMIS. FGG explained that such a meeting would not be possible.

CGMI's Mathur was "disappointed" that they could not meet with BLMIS prior to entering the

Fairfield Sentry Leverage Deal because "the more we could find out more directly it's better . . .

."

124.    Unable to meet with Madoff or anyone else at BLMIS, Mathur asked FGG for

public information about BLMIS that he could distribute to members of the CGMI credit

committee to, in Mathur's words, "help make the case" and get the credit committee "comfortable" with BLMIS.

125.   In response to this request, FGG gave Mathur information gathered from public journals, newspapers and BLMIS's website. None of this information explained that BLMIS was the broker dealer, investment adviser, and had custody of IA Business customer property, or refuted Fisher's concern that Madoff could walk away with the money. The public information about BLMIS did not satisfy CGMI's fraud concerns.

126.   On the morning of March 30, 2005, in advance of an internal CGMI management meeting scheduled for that day regarding the Fairfield Sentry Leverage Deal, Mathur requested a telephone call with FGG's Head of Risk Management, Amit Vijayvergiya. Mathur sought to discuss CGMI's concerns that: (1) BLMIS was not making the options trades it claimed it was making; and (2) the money invested and left under Madoff's unfettered control could disappear.

127.   According to Vijayvergiya, in advance of the management meeting Mathur wanted to revisit several topics CGMI had previously discussed with FGG during the in-person due diligence meeting at FGG on March 22, 2005, including:

> 1) in whose name are the stocks and options positions held at DTCC
> [the Depository Trust & Clearing Corporation]
> 2) what happens to assets in the event of BLM[IS] bankruptcy
> 3) [what is the] name of BLM[IS]'s accountant
> 4) # [number] of options counterparties

128.   On the same day that Mathur contacted Vijayvergiya, prior to Citibank's internal management meeting, CGMI formally memorialized some of its concerns about fraud at BLMIS in a March 30, 2005 memorandum prepared by the Global Hybrid Trading Desk to the Fast Track Capital Markets Approval Committee (the "March 30, 2005 Memo").

129.    The Capital Markets Approval Committee ("CMAC") was a key approval committee responsible for reviewing proposed structured financing products, among other things, of Citigroup's subsidiaries. Any new and/or complex products in Citigroup's Investment Banking businesses had to be reviewed and approved by CMAC. This approval committee was made up of senior representatives from across Citigroup's market risk, credit risk, legal, accounting, and tax departments (as well as other departments) with the responsibility of evaluating proposed transactions from each of these perspectives.

130.    CMAC was responsible for ensuring that relevant risks were identified and understood and could be measured, managed and reported in accordance with applicable business policies and practices. According to Citigroup policy, if a transaction raised potential accounting, tax, legal, compliance, regulatory, or appropriateness issues for Citigroup or its clients – or otherwise created the potential for reputational risk – CMAC would evaluate the risks to ensure that Citigroup would be comfortable completing the transaction.

131.    In the March 30, 2005 Memo, CGMI disclosed the fact that "Madoff is both Prime Broker and Custodian of the SSC assets of Sentry" and concluded "[t]here is a fraud risk."

132.    According to Perry, the Fairfield Sentry Deal drew so much attention because it was one of Citigroup's first leverage deals involving a single manager fund.

133.    CGMI omitted its concerns about BLMIS's purported options transactions from the March 30, 2005 Memo. Specifically, the March 30, 2005 Memo did not disclose that CGMI was unable to determine the identity of a single options counterparty despite requesting this information. Mathur did not recall ever disclosing this issue to CMAC.

134.    Instead of informing CMAC that Fairfield Sentry failed to provide the requested identities of BLMIS's option counterparties, CGMI misrepresented that "[t]here should be no

33

counterparty risk associated with this transaction." CGMI could not credibly reach this conclusion without knowing the identity of BLMIS's purported counterparties.

135.    CGMI remained concerned about these very same fraud risks at BLMIS even after Citigroup Global Markets Limited and Citibank entered the Fairfield Sentry Leverage Deal.

> b.    CGMI Performed a Quantitative Analysis Showing Madoff Could
> Not Have Obtained His Purported Returns Using the SSC Strategy

136.    In addition to its concerns of fraud surrounding BLMIS's lack of an independent custodian and lack of evidence substantiating BLMIS's purported options trades, CGMI also had reason to doubt that the SSC strategy was even capable of producing BLMIS's purported returns. As part of its initial due diligence on Fairfield Sentry in March 2005, CGMI performed a quantitative analysis (the "Quantitative Analysis") that demonstrated the SSC strategy was not capable of producing BLMIS's purported returns.

137.    The Quantitative Analysis was circulated internally at CGMI with the March 10, 2005 Memo from the Citigroup Global Hybrid Trading Desk and again on March 30, 2005 to the Fast Track CMAC Committee with the March 30, 2005 Memo.

138.    The Quantitative Analysis examined the returns BLMIS purported to earn for Fairfield Sentry over the 170-month period from December 1990 through January 2005 (the "Sample Period"). Both the March 10, 2005 Memo and the March 30, 2005 Memo contain a table listing these individual monthly returns, along with certain industry standard performance metrics and a description of the SSC strategy.

139.    The March 10, 2005 and the March 30, 2005 Memos explained that the SSC strategy involved the purchase of a basket of stocks selected from the S&P 100 Index. Those stock positions were hedged by a collar.

140.    The SSC strategy was more fully explained in the materials attached to the March 10, 2005 Memo, including the Fairfield Sentry private placement memorandum ("PPM"). By signing the Fairfield Sentry subscription agreement on behalf of Citigroup Global Markets Limited, Mathur affirmed having read the Fairfield Sentry PPM. The PPM explained that the basket of stocks was selected from the S&P 100 Index and "intended to highly correlate to the S&P 100 Index." It further explained that the purchase of the S&P 100 Index put options creates a floor to protect the stock basket from downside risk. The sale of S&P 100 Index call options finances the purchase of the puts, but acts as a ceiling capping the potential gains from the stock basket.

141.    Based on these descriptions, and its considerable expertise, CGMI understood that the returns should not be as positive as the S&P 100 Index in a bull market and not as negative as the S&P 100 Index in a bear market, but overall the SSC strategy's returns should generally correlate with the direction of the S&P 100 Index.

142.    The Quantitative Analysis included a returns analysis, which examined the number and percentage of positive and negative monthly returns for Fairfield Sentry during the Sample Period. It showed that BLMIS purported to generate positive returns for Fairfield Sentry in 164 out of 170 months, or 96.5% of the time. Thus, during a period of more than 14 years, Fairfield Sentry posted negative monthly returns in just six months, or 3.5% of the time.

143.    The S&P 100 Index posted positive returns in just 107 of the 170 months in the Sample Period, or roughly only 63% of the time. It suffered losses in 63 of the 170 months. BLMIS purported to earn positive returns during 57 of those 63 months, despite the fact the SSC strategy invested in S&P 100 Index stocks "intended to highly correlate to the S&P 100 Index."

35

144.    CGMI understood that the SSC strategy was designed to limit potential losses through the purchase of S&P 100 Index put options. CGMI also understood that because the exercise of the put options could not turn losses into gains, it was highly unlikely the SSC strategy could consistently produce positive returns in months when the S&P 100 Index was down. CGMI's Quantitative Analysis revealed, however, that BLMIS purported to do precisely that – earning positive returns in more than 90% of the months the S&P 100 Index was down.

145.    The disconnect between the SSC strategy and its purported returns was further revealed by the drawdown figures in the return analysis section of CGMI's Quantitative Analysis. A drawdown occurs when a fund experiences a loss in a month that brings its net asset value ("NAV") below its previous high.

146.    Fairfield Sentry experienced a total of seven drawdowns during the 170 month Sample Period. CGMI's Quantitative Analysis analyzes the five largest of these drawdowns, which ranged between -0.5% and -0.2%. The analysis revealed that in all but one case, Fairfield Sentry had recovered all of the losses within one or two months.

147.    By contrast, the worst drawdown the S&P 100 Index suffered during the Sample Period was -49.37% - nearly 100 times worse than Fairfield Sentry. This occurred in September 2002 and the S&P 100 Index had not yet recovered from this drawdown by the end of the Sample Period 28 months later in January 2005. Meanwhile, during September 2002, BLMIS inexplicably purported to generate a gain of .1% using the SSC strategy in a month when the S&P 100 Index was down almost 50%.

148.    CGMI's Quantitative Analysis also includes a drawup analysis. A drawup occurs when a fund experiences a gain in the current month that brings the NAV for the fund above its previous high value.

36

149.    The Quantitative Analysis highlighted that Fairfield Sentry's largest drawup was an astounding 134% rise. Even more remarkably, it lasted for 83 consecutive months. In other words, BLMIS purported to earn positive returns for nearly seven years, without suffering a single negative month.

150.    Fairfield Sentry's purported 83-month drawup began in September 1995 and continued until August 2002. This drawup period revealed that despite purportedly employing a strategy designed to correlate to movements of the S&P 100 Index, BLMIS claimed to generate returns impervious to the most drastic and unpredictable market declines. These included the September 11, 2001 terrorist attacks – an event no investor could have predicted – and the dot-com bubble bust in April 2000 through March 2001.

151.    The Quantitative Analysis also included a section analyzing the volatility of BLMIS's purported returns. This portion of the analysis highlighted the Sharpe ratio, which is a metric commonly used in the hedge fund industry to show how well a trading strategy compensates an investor for risk. A higher Sharpe ratio indicates the investment is generating more return relative to the amount of risk.

152.    As a sophisticated and experienced global financial institution, CGMI knew that had BLMIS been implementing the SSC strategy as it purported to do, the volatility of its returns would have been similar to the volatility of the S&P 100 Index, and their Sharpe ratios would also be similar. BLMIS's purported returns and Sharpe ratio, however, bore no correlation to the returns or volatility of the S&P 100 Index.

153.    The Quantitative Analysis made this disparity between BLMIS's purported returns and the returns of the S&P 100 Index explicitly clear to CGMI. Based on its own calculations in the Quantitative Analysis, CGMI knew that the Sharpe ratio for BLMIS's

purported returns during the 170 month Sample Period was a remarkable 2.9. This stood in stark contrast to the Sharpe ratio for the S&P 100 Index during the 170 month Sample Period, which was approximately 0.53. Based on its considerable expertise and experience in evaluating investment strategies, CGMI knew that the SSC strategy could not produce a Sharpe ratio nearly five and a half times higher than the S&P 100 Index to which it was supposedly correlated.

154.    CGMI performed the Quantitative Analysis as part of its initial due diligence on Fairfield Sentry. The results of this analysis demonstrated empirically to CGMI that BLMIS could not achieve the investment returns it purported to earn using the SSC strategy. CGMI sent the Quantitative Analysis to the Fast Track CMAC Committee with the March 30, 2005 Memo. In the last line of that memorandum, CGMI concluded: "There is a fraud risk."

c.    <u>CGMI Managing Director Learns There Is a High Probability of Fraud at BLMIS – "The Returns Are Not the Returns or the Strategy Is Not the Strategy"</u>

155.    Around the same time CGMI produced the Quantitative Analysis, Gross, a managing director at CGMI, conducted his own analysis of BLMIS's SSC strategy and its purported returns. Gross quickly concluded that "either the returns are not the returns or the strategy is not the strategy" or there was something else going on. Gross conducted his investigation after being approached by Harry Markopolos, a CGMI customer, who asked Gross in his capacity as a CGMI representative to analyze BLMIS's trading strategy and its purported returns.

156.    Gross began working in the derivatives research group at CGMI in or around 1997. By 2005 he was the Global Head of Equity Derivative Strategy and reported directly to Joseph Elmlinger, Global Head of Equity Derivatives at CGMI.

157.    One of Gross's responsibilities in this role was to support the sales group by
meeting directly with customers to provide data regarding options and help them perform certain
analyses.  Specifically, according to Gross, the "data we provided to customers primarily had to
do with option pricing, option volatilities, et cetera" including "both on indices and individual
names."

158.    Gross first met Markopolos sometime in the late 1990s, when Markopolos was
working at Rampart Securities, Inc. in Boston.  Thereafter, Gross met with Markopolos "maybe
once every year or two," either in Boston or in CGMI's New York office.  Gross described his
relationship with Markopolos as "no different than any other customer I spoke to."

159.    In 2005, sometime prior to November 7th, Markopolos met with Gross at CGMI's
New York offices.  Markopolos showed Gross a description of BLMIS's SSC strategy and
information regarding the investment returns BLMIS purported to produce by employing that
strategy.

160.    Markopolos asked Gross to analyze the data and determine whether it was
possible to produce BLMIS's purported returns using the SSC strategy.  He also asked Gross
whether anyone at CGMI was familiar with BLMIS trading index options.

161.    Although he was "skeptical that [the SSC strategy] as described could generate
those returns," Gross nevertheless attempted to "reconcile" what he recognized as "a discrepancy
between the strategy and the returns. . . ."

162.    Gross investigated six or seven different possibilities to explain the discrepancy
between the SSC strategy and the returns BLMIS purported to earn on behalf of its customers,
including Prime Fund and Fairfield Sentry.  Among the possibilities that Gross considered were
adjusting the parameters of the SSC strategy's purported options collar and considering possible

39

alternative strategies, including whether BLMIS could have produced its purported returns through market timing or "buying individual options, and selling index options," or "buying stocks and shorting the index."

163.    As part of his investigation into BLMIS's purported returns, Gross explained that he conducted a "mathematical analysis," which included:

> seeing what the average return of the S&P was, seeing what the standard deviation was, seeing if you, you know, had different amounts of all cash or collars, how wide it would be, what the returns would look like, et cetera, seeing on average, you know, what the volatility difference was between the puts and the calls, and would you make or lose money doing that. . . .

164.    After considering and analyzing various possibilities, Gross concluded that the SSC strategy was not capable of producing the returns BLMIS purported to achieve. Specifically, he concluded "that the returns weren't generated by the strategy, they were either generated by something else – that something was amiss there."

165.    Gross also investigated the second question that Markopolos asked him – whether anyone at CGMI had ever heard of Madoff trading index options. Gross asked the index options desk whether anyone was familiar with Madoff trading index options, and the answer was no. He asked specifically whether anyone had heard of Bernie Madoff or Madoff trading as a counterparty for OEX options or any other index product, either on an exchange or over the counter. The answer Gross received was that nobody was aware of any options trades involving Madoff.

166.    Gross also asked the equity derivative salespeople at CGMI whether they were familiar with Madoff as a customer or someone who is active in the market. Like the traders, the salespeople informed Gross that they were not familiar with Madoff as someone who trades in the options markets.

167.    Gross knew Gupta because they shared information about options transactions that they both needed to perform analyses for their jobs.  Gupta was also searching for evidence of BLMIS's purported options transactions.  In or around May 2005, like Gross, Gupta inquired internally at CGMI to see if anyone was familiar with Madoff trading index options.  Gupta also checked with at least one contact outside of CGMI and its sister Citigroup entities.  Specifically, Gupta checked with a contact at Credit Suisse First Boston and received a similar response – they were not aware of any evidence that Madoff was trading index options.

168.    Gupta, who participated in the due diligence on both Fairfield Sentry in connection with the Fairfield Sentry Leverage Deal and Prime Fund in connection with the Proposed Tremont Deal, was known by his colleagues to have concerns about Madoff's purported options transactions and was described internally by his colleagues at CGMI as being "wary" of the Fairfield Sentry Leverage Deal.  Based on these concerns, Gupta was a vocal proponent of requiring a personal meeting with Madoff as a prerequisite to any additional investments in Prime Fund.

169.    After having met with Gross, Markopolos made a submission to the SEC on November 7, 2005, titled "The World's Largest Hedge Fund is a Fraud," detailing the evidence he gathered demonstrating fraud at BLMIS.  In that submission, Markopolos identified several derivatives experts that would support his assertion that the BLMIS IA Business was a fraud. Specifically, Markopolos identified "[s]ome derivatives experts that the SEC should call to hear their opinions of how and why BM [Bernard Madoff] is a fraud and some insights into the mathematical reasons behind their belief . . . ."

170.    Gross was the first of three derivative experts that Markopolos suggested the SEC should interview.  Based on his previous conversations with Gross, Markopolos offered a candid

preview of Gross's conclusions, including Gross's disbelief that investment industry

professionals believed Madoff's purported returns were legitimate and that the SEC had not

taken action against BLMIS. Specifically, in his November 7, 2005 submission to the SEC,

Markopolos wrote:

> Leon [Gross] can't believe that the SEC hasn't shut down Bernie
> Madoff yet. He's also amazed that FOF's [Funds of Funds] actually
> believe this stupid options strategy is capable of earning a positive
> return much less a 12% net average annual return. He thinks the
> strategy would have trouble earning 1% net much less 12% net.

171.    Gross reached these conclusions after meeting with Markopolos in 2005. When

asked in 2010 about this portion of Markopolos's submission to the SEC, Gross admitted that

five years later he could not recall whether "that is his [Markopolos] paraphrasing me or my own

words, but I do remember saying something is wrong here."

172.    Gross further recalled telling Markopolos he "didn't think that this strategy was

capable of – this strategy as described was capable of returning – of giving the returns. I

believed at best, it could either do something that looked like the risk-free rate or something

[that] looked like market or something in between."

173.    Gross and Markopolos remained in contact even after Markopolos left Rampart to

begin a career as a Certified Fraud Investigator. The two continued to meet at CGMI's offices

on at least two subsequent occasions before Madoff's fraud was publicly revealed and

maintained contact via email.

174.    In June 2007, for example, Markopolos sent Gross an email asking whether Gross

had heard anything regarding Madoff's Ponzi scheme beginning to collapse due to a shortage of

new cash inflows. Markopolos forwarded Gross information about Wickford Fund, L.P. and

Wickford Offshore Fund, Ltd., which were BLMIS Feeder Funds advertising leveraged returns

on Madoff's SSC strategy through Fairfield Sentry and Greenwich Sentry.  Specifically,

Markopolos wrote to Gross:

> Leon,
>
> Long time no hear but I know you'll love this.  Wickford is offering
> a HSBC swap on Bernie Madoff that provides 3.0 – 3.25 X's
> exposure to Bernie Madoff….If Madoff is allowing a 3rd party
> marketer to pitch this sort of product, my guess is that he's running
> low on new investors cash in-flows and needs to feed the Ponzi beast
> or face ruin.  Any insight on your part on what you might be hearing?
> Is Madoff running short of new cash?
>
> We all know how Ponzi Schemes turn out[.]

### 2. The Prime Fund Credit Deal: CGMI's Concerns of Fraud are Reaffirmed By a $300 Million Revolving Credit Facility in June 2005

175.    Based on the BLMIS fraud concerns that became apparent to CGMI following its

due diligence on BLMIS and Fairfield Sentry, CGMI was unwilling to further expose itself to

fraud at BLMIS.  Thus, when CGMI, on behalf of Defendants and CAFCO, their conduit

commercial lender, began negotiating a revolving credit facility (the Prime Fund Credit Deal)

with Tremont Partners in March 2005, CGMI demanded unique contractual terms to protect

Defendants from bearing loss should BLMIS be revealed as a fraud.

176.    The Prime Fund Credit Deal involved a revolving credit facility that was first

executed on June 15, 2005.  Under the Prime Fund Credit Deal, Defendants provided Prime Fund

with a $300 million line of credit, collateralized by all of Prime Fund's assets, and, in return,

Prime Fund paid Defendants fees and interest.

177.    Because Prime Fund was almost entirely invested in BLMIS, CGMI also

demanded a unique contractual indemnification provision related directly to fraud at BLMIS.

This provision was designed specifically to ensure that Defendants and CAFCO would be fully

repaid in the event that BLMIS misappropriated Prime Fund's assets or was not trading securities as purported.

178.    As per the terms of the Prime Fund Credit Deal, Prime Fund used all or substantially all of the funds it received from Defendants to invest further with BLMIS. This additional investment enabled Prime Fund to provide its shareholders with leveraged returns of approximately one and a half times the returns they would otherwise earn on their principal, less certain fees and interest. An investment of $100, for example, would earn the returns of a $150 investment, less fees and interest.

179.    Negotiations for this deal were led primarily by Adelman and Nicholls. Adelman was a CGMI employee and director in the Global Securitized Markets group. Nicholls was a CGMI employee, a managing director in the Corporate & Investment Banking group and a director in the Global Financial Institutions Corporate Banking group.

180.    After initial negotiations, CGMI submitted a memorandum to CMAC on May 31, 2005 (previously defined as the "May 2005 Memo") regarding its concerns of fraud at BLMIS. As CGMI explained in the May 2005 Memo: "CMAC approval [was] requested to pursue the Facility due to the unique circumstances of how the assets of the Fund [would] be held, and the corresponding reliance on indemnities provided by Tremont Partners, Inc. (the 'General Partner' of the Fund) for the payment of the obligations of the Fund."

181.    As CGMI acknowledged in the May 2005 Memo, the indemnity was the "primary mitigant of fraud by the Investment Advisor [BLMIS]. . . ." Under the terms of the indemnity, Tremont Partners and Prime Fund agreed to indemnify Defendants and CAFCO from any losses incurred in connection with any "Event of Default," which included: (i) any SEC action taken to revoke BLMIS's broker/dealer registration; (ii) any major indictment or enforcement action

44

taken against BLMIS; (iii) an action to appoint a receiver for BLMIS; (iv) BLMIS's inability to

pay debts as they came due; and (v) any action to adjudicate BLMIS insolvent or bankrupt.

182.    The indemnification was designed to shift the risk away from Defendants and free

them from any financial consequences if BLMIS was revealed to be a fraud. As CGMI stated in

the May 2005 Memo, "the General Partner [Tremont Partners] . . . shall be liable for losses

resulting from . . . any fraud by the Investment Advisor [BLMIS]." Notably, CGMI

acknowledged in the May 2005 Memo that the indemnification does not protect Defendants from

Prime Fund's inability to repay Defendants "due to a decline in the fair market value of the

assets purchased in adherence to the Investment Strategy. . . ." In other words, CGMI and

Defendants were more concerned about fraud at BLMIS than with BLMIS making bad

investments.

183.    The May 2005 Memo acknowledged "the unique reliance on the General

Partner's [Tremont Partners'] indemnity" in approving the deal despite the unusual credit risks

identified by CGMI.

184.    CGMI also considered that the indemnification in favor of Defendants was

reinforced by Tremont Partners' relationship with Oppenheimer Funds. CGMI's approval of the

Prime Fund Credit Deal was also contingent on Tremont Partners' affiliation with Oppenheimer

Funds. After CGMI identified the indemnity from Tremont Partners as the primary mitigant of

fraud at BLMIS, it explained that Tremont Partners and its parent, TCM, "will be required, under

the Facility documents, to continue to be, [] wholly owned subsidiar[ies] of OFI [Oppenheimer

Funds]." CGMI further explained to CMAC that Tremont Partners and TCM oversaw "over $13

billion in assets," and their parent company, Oppenheimer Funds, was "one of the nation's

largest mutual fund managers with over $135 billion in assets under management . . . ."

185.    On June 10, 2005, CGMI's Adelman wrote to Tremont Partners to memorialize

certain points regarding Defendants' approval of the deal, including that they "approved this deal

with the knowledge that Tremont is part of the Oppenheimer family. We would want the right to

reconsider that if Tremont were no longer an affiliate of OFI [Oppenheimer Funds]." This

requirement was also incorporated into the terms of the Prime Fund Credit Deal. Specifically,

the deal required Prime Fund to repay any funds it had borrowed under the deal within thirty

days if Tremont or Oppenheimer Funds ceased to be wholly owned subsidiaries of Oppenheimer

Acquisition Corporation, or if Oppenheimer Funds ceased to be an affiliate of Tremont.

186.    Instead of taking affirmative steps to investigate and confirm their well-founded

suspicions that BLMIS was a fraud, Defendants chose to forego further due diligence and engage

in a beneficial business relationship with Prime Fund, while avoiding the risk of loss as a result

of BLMIS's fraud through indemnity. The indemnity enabled Defendants to turn a blind eye to

the substantiated fraud risk at BLMIS while repeatedly renewing and increasing the Prime Fund

Credit Deal.

### 3. Proposed Tremont Deal: Defendants' Fears Regarding BLMIS's Self-Custody, Impossible Volume of Trades, and Phantom Counterparties Prevent Defendants From Entering Into a New Leverage Deal With Tremont That Would Expose Them to Fraud at BLMIS

187.    On December 16, 2005, Tremont's Darren Johnston emailed CGMI's Nicholls to

explore a separate and new lending deal to provide "leverage on Madoff" (previously defined as

the "Proposed Tremont Deal").

188.    Unlike the Prime Fund Credit Deal, under the Proposed Tremont Deal the

Defendants would own shares of one of Tremont's BLMIS Feeder Funds and have no

46

indemnification against fraud at BLMIS. The prospect of having direct exposure to fraud at

BLMIS motivated CGMI to ask Tremont whether CGMI could conduct direct due diligence on

BLMIS, including meeting with Madoff and other BLMIS personnel.

189.    On December 20, 2005, Tremont's Kelly emailed Robert Schulman, Tremont's

CEO asking:

> What type of access can we provide to Madoff to allow a credit
> provider (Citi) to perform due diligence? They are asking for an
> initial DDQ meeting and subsequent updates on a semi-annual or
> annual basis.

Schulman responded unequivocally, "Can't do it."

190.    Unable to meet directly with Madoff, before agreeing to the Proposed Tremont

Deal, CGMI sought to resolve its concerns about BLMIS's lack of an independent custodian or

evidence of purported options trading. Nicholls involved his CGMI colleagues, Mathur and

Sennar, who worked on the Fairfield Sentry Deal and were familiar with CGMI's concerns of

fraud at BLMIS.

191.    On January 30, 2006, Sennar emailed Tremont's Johnston reminding him that

CGMI needed to resolve its internal control function's persistent concerns of fraud at BLMIS

before it could proceed with the Proposed Tremont Deal. Specifically, Sennar wrote:

> [A]s we indicated in previous conversations, in order to get the deal
> approved we need to figure out how to address the due diligence
> questions our internal control functions have.

>      a.    CGMI Attempts to Resolve Its Persistent Concerns of Fraud
>            Relating to BLMIS's Lack of an Independent Custodian

192.    By February 2006, CGMI and Tremont had held several conference calls and at

least two due diligence sessions to discuss CGMI's concerns of fraud surrounding the Proposed

Tremont Deal. Tremont was unable to satisfy CGMI that BLMIS maintained segregated

customer accounts, or that the assets existed in any account.

193.    On February 16, 2006, Johnston sent Sennar a copy of the Prime Fund Pledge

Agreement that purported to show that Prime Fund's BLMIS IA Business account was held as a

"segregated customer account." Johnston wrote:

> The attached agreement between [Prime Fund] and Citicorp., for the
> current lending facility [Prime Fund Credit Deal], as the most recent
> document, shows the account at Bernard L. Madoff Investment
> Securities LLC . . . to be structured as a 'segregated customer
> account.'

194.    The Pledge Agreement required that BLMIS maintain segregated customer

accounts, but Johnston offered no bank records or other independent verification that BLMIS did

in fact maintain segregated customer accounts.

195.    Sennar next requested a telephone call with Schulman, which occurred on or

about February 27, 2006. During that call, Schulman, Johnston, and Sennar discussed BLMIS's

custody of Prime Fund's assets and BLMIS's internal controls to prevent fraud or

misappropriation of those assets.

196.    Following the phone call, in an attempt to "provide support to [CGMI's]

concerns," Johnston emailed Sennar and Mathur copies of an "Independent Auditors' Report on

Internal Control" and BLMIS's "Statement of Financial Condition" prepared by BLMIS's

auditors, Friehling & Horowitz. The reports did not concern BLMIS's IA Business, or provide

any information as to whether BLMIS segregated customer assets in the customer accounts and

did not quell CGMI's fraud concerns.

     b.  CGMI's Due Diligence Uncovers No Evidence of BLMIS's
        Purported Billions of Dollars in Options Trades

197.    CGMI obtained no verifiable information that BLMIS conducted options trading

from its due diligence commenced in March 2005 and continuing into 2006.

198.    CGMI's Gupta and Gross inquired internally and with other firms but were unable to identify anyone who had heard of BLMIS trading S&P 100 Index options.

199.    CGMI's Mathur also conducted a search for any evidence substantiating the existence of BLMIS's purported options trades. Mathur knew that BLMIS purported to execute billions of dollars of S&P 100 Index options trades each time it implemented the SSC strategy. Based on his due diligence in connection with the Fairfield Sentry Leverage Deal, Mathur also knew BLMIS purported to execute at least $4.8 billion worth of S&P 100 Index options on behalf of Fairfield Sentry alone. Mathur contacted CGMI's own trading desk to inquire whether they were aware of anyone trading index options with BLMIS. CGMI's trading desk informed Mathur that "they have not been counterparties to these kind of options, and they did not know of anybody else who would be the counterparties for these kind of options."

200.    Mathur's efforts to "make a case" for internal approval of the Proposed Tremont Deal were unsuccessful because, as Burns and Elmlinger indicated, CGMI was still concerned about BLMIS's purported options trades and the identity of the counterparties.

201.    Burns, Elmlinger and Mathur agreed to seek a meeting directly with Madoff in an attempt to resolve CGMI's long-standing concerns of fraud at BLMIS. Mathur hoped that due to the size of the Proposed Tremont Deal ($300 million), Madoff would be willing to meet with them.

202.    Contemporaneously, in March 2006, CGMI identified apparent discrepancies between the prices BLMIS reported to Fairfield Sentry for its purported options transactions and the prices reported by Bloomberg. On March 23, 2006, CGMI's Vishal Mishra questioned FGG's Vijayvergiya about these apparent price discrepancies, which related to options transactions BLMIS purported to make on October 21, 2005 on behalf of Fairfield Sentry.

49

Mishra also asked whether those purported options transactions were done OTC, and if so, whether CGMI could get copies of the trade confirmations.

203.    Mishra and Vijayvergiya had a telephone call on March 23, 2006 to address these issues. Following that call, CGMI made additional requests to both FGG and Tremont for any evidence substantiating the existence of BLMIS's purported options transactions. On March 24, 2006, Mishra asked Vijayvergiya to give CGMI just one or two names of counterparties that have traded options with BLMIS. Mishra also asked whether CGMI could visit FGG's offices to inspect the purported option trade confirmations Fairfield Sentry received from BLMIS.

204.    At the same time, CGMI personnel contacted Tremont in an attempt to obtain information about BLMIS's purported counterparties. Specifically, on March 24, 2006, Tremont's Kelly sent an internal email to Schulman about this request, stating: "[d]o you know who the counterparties to [M]adoffs options are? City (sic) has asked around and can't find anyone who admits to being a counterparty."

205.    These requests to Tremont and FGG demonstrate that CGMI had serious concerns that BLMIS was fabricating the options trades it claimed to be executing. The proof of the trades that CGMI sought – the names of one or two counterparties and to inspect Fairfield Sentry's copies of the purported trade confirmations – would not provide the detail necessary to conduct any type of analytical review or ongoing due diligence.

206.    CGMI's concerns regarding BLMIS's purported options trades were further amplified when Citibank received the results of a KPMG Independent Accountants' Report dated April 17, 2006 (the "KPMG Report"). The KPMG Report was required under the terms of the Prime Fund Credit Deal for the purpose of valuing Prime Fund's assets, which it had pledged as collateral to Defendants for the revolving credit facility.

207.    The KPMG Report compared the prices and noted discrepancies that BLMIS

reported for its purported OTC S&P 100 Index option transactions on October 31, 2005, against

the prices reported by two independent sources – Bloomberg and Interactive Data Corporation

("IDC").

208.    On April 18, 2006, the day after the KPMG Report was issued, CGMI's Mishra

wrote to FGG's Vijayvergiya, copying Mathur and Gupta, regarding five topics CGMI sought to

discuss when they met with FGG at a meeting scheduled for April 20, 2006.

209.    According to Mathur, the topics outlined in Mishra's email and discussed at the

meeting, "continued to be the sort of questions that we had in our mind." The first two topics

were concerned solely with substantiating the existence of BLMIS's purported trades.

210.    To satisfy the first item on the meeting agenda, CGMI requested

"[c]onfirm[ation]s of options with counterparties[.]" This request relates back to CGMI's March

23, 2006 email in which Mishra questioned Vijayvergiya about the options price discrepancies

and requested the opportunity to inspect the confirmations of BLMIS's purported options

transactions.

211.    According to Mathur, "all of the relevant people" from CGMI, including himself,

Gupta and Mishra, attended this meeting with Vijayvergiya at FGG's offices. They asked to see

the types of confirmations Fairfield Sentry received from BLMIS regarding the purported

options transactions.

212.    FGG showed them a few examples of what Fairfield Sentry received from BLMIS

a couple of days after BLMIS purportedly executed a particular options transaction. Mathur

described these as "typed up" documents reflecting information about particular options trades.

He explained that these documents did not contain any information identifying BLMIS's

counterparties to these purported transactions. According to Mathur, none of the documents they were shown at this meeting contained any information identifying BLMIS's purported counterparties.

213.    Despite its importance to CGMI, FGG provided no information about the identities of the counterparties to the billions of dollars of options trades BLMIS purported to execute. Mathur testified, "[w]e never got to know who the eventual counterparties are on the options. So that part never got resolved."

214.    The second item CGMI requested to see and discuss with FGG was the auditor's report for Fairfield Sentry. CGMI sought the details regarding the auditor's verification that BLMIS was actually trading options and securities and maintaining a segregated account for Fairfield Sentry. Specifically, CGMI indicated it wanted to discuss each of the following items:

    i.    "Auditor's verification of OTC options details with counterparties"

    ii.    "Verification of the presence of securities and option trades in Fairfield [Sentry's] account with Madoff"

    iii.    "Verification of segregation of securities and trades in Fairfield[] [Sentry's] accounts with other accounts at Madoff"

215.    Unable to obtain any direct proof that BLMIS was actually trading securities on Fairfield Sentry's behalf, CGMI sought to examine verifications that such proof existed from PricewaterhouseCoopers LLP ("PWC"), Fairfield Sentry's auditor. Mathur explained that CGMI sought these verifications "just to make sure that those securities exist or the options exist in that particular account."

216.    "Ideally," Mathur testified, "we would have liked some kind of report from PWC or something like that which verified for sure saying that they have checked on all of this." CGMI, however, received no such assurances from PWC or FGG. Instead, CGMI left the April 20, 2006 meeting at FGG without having seen any information to allay its concerns that BLMIS

was fabricating the trades it purported to make on behalf of the BLMIS Feeder Funds. While the

April 20, 2006 meeting with FGG "did not raise any new flags," Mathur concluded, "it did not

give us [CGMI] the answer we were looking for."

     c.     CGMI Schedules a Meeting with Madoff to Address Its Fraud
            Concerns

217.    Due to its concerns that BLMIS was not trading securities and could

misappropriate assets because of the lack of independent oversight, CGMI again demanded that

Tremont arrange a due diligence meeting with Madoff as a prerequisite to any new deal

involving an investment in one of Tremont's BLMIS Feeder Funds.

218.    According to Mathur, Burns and Elmlinger viewed the Proposed Tremont Deal as

an opportunity to revisit and resolve their persistent, unresolved concerns about BLMIS's

purported options transactions. Similarly, Gupta's colleagues knew that he shared these same

concerns and described him internally as being "wary" of the Fairfield Sentry Leverage Deal.

Gupta was a vocal proponent of meeting with Madoff as a requirement to any new investments

in Prime Fund.

219.    On March 27, 2006, Johnston sent an email to Schulman regarding CGMI's

request for a meeting with Madoff. According to Johnston, the identity of BLMIS's purported

options counterparties was now a "critical issue" for CGMI. Johnston further explained in his

email that follows that CGMI was seeking some proof that the purported trades existed:

> The critical issue with them would be who the counterparty(ies) are
> to the option trades as they see know (sic) trades with Citi, a new
> hire from Credit Suisse did not know of trades and they have even
> asked around a little trying to find out. They mentioned trying to
> get proof such as a sample confirm or even talking to the
> counterparty if they are unable to find out directl[y].

> Let me know if any dates work or if this question could be answered
> in a way to satisfy Citi – no sense meeting if it is the deal breaker . .
> . .

220.    As a sophisticated financial institution, and itself a major dealer in the options markets, CGMI understood it was highly improbable BLMIS could trade billions of dollars of S&P 100 Index options six or seven times a year without leaving a trace in the industry. Thus, by March 2006, CGMI reached the point where it required a meeting directly with Madoff to get proof that the options trades were not fabricated.

221.    Tremont initially refused to arrange such a meeting. However, it ultimately agreed to do so, and scheduled a meeting between CGMI personnel and Madoff for April 26, 2006 at BLMIS.

222.    On April 4, 2006, CGMI informed Tremont that it intended to bring the following four individuals to meet with Madoff regarding the critical issue of obtaining proof of BLMIS's purported options trades: Elmlinger; Burns; Gupta; and Elena Matrullo, Global Head of Credit Control Center.

223.    According to CGMI, allowing these four senior personnel to attend the meeting with Madoff "would really help [its] case."

224.    Less than a week before this scheduled meeting with Madoff, however, CGMI unexpectedly informed Tremont that its concerns of fraud at BLMIS were insurmountable. CGMI declined the Proposed Tremont Deal prior to meeting with Madoff despite Mathur, Elmlinger and Burns all agreeing that a meeting with Madoff would provide a broader opportunity to address CGMI's suspicions of fraud.

225.    On April 20, 2006, shortly after Gupta and Mishra left the due diligence meeting with Fairfield Sentry without having resolved any of their concerns, Nicholls informed Tremont that Defendants could not proceed with the Proposed Tremont Deal.

226.    Two "fundamental roadblocks" prompted Defendants' refusal to proceed with the Proposed Tremont Deal. As documented internally at Tremont by Johnston, Nicholls explained the two roadblocks as follows:

> The two key issues, 1) custody of the trading account is with Madoff and not with a 3rd party and 2) lack of transparency regarding how Madoff executes his volume of options remain fundamental roadblocks to their sr. risk management people – more so now with our proposal to increase further Citi's sheer exposure to Madoff.

227.    These are the same concerns of fraud at BLMIS that CGMI and Defendants had been unable to resolve since 2005.

228.    As Johnston explained to Tremont's senior management, CGMI and Defendants drew a distinction between the Proposed Tremont Deal and the Prime Fund Credit Deal. While unwilling to enter the Proposed Tremont Deal (which lacked indemnification), CGMI and Defendants were nevertheless very happy to continue, and even grow, the Prime Fund Credit Deal where Defendants and CAFCO were indemnified against fraud at BLMIS.

229.    Johnston emailed Schulman and Kelly to relay CGMI and Defendants' continued enthusiasm for the Prime Fund Credit Deal despite their stated concerns of fraud at BLMIS, explaining that: "Matthew [Nicholls] hopes this doesn't affect our current relationship where he is extremely happy working and growing Prime [Fund]'s conduit lending facility (where they [Defendants] have much greater asset coverage)."

### B. Defendants Took Deliberate Actions to Avoid Confirming Their Subjective Belief That BLMIS's IA Business Was a Fraud and Misappropriating Assets

#### 1. To Avoid Confirming the Truth, CGMI Abandoned Its Scheduled April Meeting With Madoff

230.    At the time CGMI declined the Proposed Tremont Deal, CGMI had finally been granted the opportunity to address its concerns of fraud directly with Madoff.

231.    Having already concluded there was a high probability of fraud at BLMIS, a meeting with Madoff could jeopardize Defendants' existing deals; both because it could confirm their suspicions of fraud at BLMIS were true, and because it could upset or spook Madoff.  In either event, Defendants risked the potential loss of their two existing BLMIS-related deals (the Fairfield Sentry Leverage Deal and the Prime Fund Credit Deal).

232.    As Nicholls explained to Tremont, CGMI hoped that its rejection of the Proposed Tremont Deal did not threaten Defendants' relationship with Tremont because they were extremely happy with the Prime Fund Credit Deal where Tremont Partners had agreed to indemnify Defendants and CAFCO against fraud at BLMIS.  Defendants and Tremont knew, however, that deal was set to expire on June 13, 2006, and would need to be renewed within two months in order to continue.  Had CGMI confirmed its suspicions of fraud at BLMIS, it could have jeopardized Defendants' ability to renew this deal, despite having obtained a fraud indemnification from Tremont Partners.

233.    Similarly, confirming its suspicions of fraud could have cost Citigroup Global Markets Limited its Fairfield Sentry Leverage Deal.  Although Citigroup Global Markets Limited was partially exposed to fraud at BLMIS under that deal, it had already booked certain profits under its mark-to-market accounting system.  Based on the terms of the Fairfield Sentry Leverage Deal, Citigroup Global Markets Limited figured to receive a minimum profit of $8 million, unless it terminated the deal early.  Citigroup Global Markets Limited recorded this minimum profit on its balance sheet on or around the closing date, which was on or about April 28, 2005.

234.    According to Mathur and Mishra, had Citigroup Global Markets Limited terminated the Fairfield Sentry Leverage Deal in April 2006, it would not yet have earned that

minimum amount and consequently would have had to report a loss under its mark-to-market

accounting scheme. This would have also lead to a bad "RoRaP," which is a metric Citigroup

used to measure the returns earned from use of capital off the company's balance sheet.

235.    Citigroup Global Markets Limited did not cancel the Fairfield Sentry Leverage

Deal in April 2006. It did, however, take certain measures to reduce its exposure to BLMIS

under that deal, and subsequently provided notice on September 18, 2008 that it was exercising

its right of early termination to terminate the deal early.

### 2. In Deciding to Renew the Prime Fund Credit Deal, CGMI Took Active Steps to Avoid Confirming the Truth of Fraud at BLMIS and Instead Strengthened Its Fraud Indemnification

236.    On April 12, 2006, Tremont informed Nicholls that it was interested in increasing

the size of the Prime Fund Credit Deal from $300 million to $450 million. Nicholls replied that

Defendants and CGMI had started the approval process for this request and indicated they would

be in touch shortly. On April 17, 2006, CGMI's Adelman informed Tremont that Defendants

and CGMI would simultaneously consider the requested increase and a one-year renewal of the

facility.

237.    Adelman explained to Tremont that this combined renewal and increase would

require another credit due diligence review. In contrast to the due diligence in connection with

the Proposed Tremont Deal – which had lasted months and failed to resolve CGMI's and

Defendants' concerns of fraud at BLMIS – Adelman told Tremont that Defendants and CGMI

could "comfortably" handle the due diligence on the renewal and increase in two to four weeks.

238.    On June 1, 2006, Defendants and CGMI were prepared to renew and increase the

Prime Fund Credit Deal without further investigation of their concerns of fraud at BLMIS. Their

willingness to do so, however, was contingent on a review of Tremont Partners' 2004 and 2005

audited financial statements, which CGMI had already requested. These statements would allow

CGMI to evaluate Tremont Partners' financial strength and its ability to indemnify Defendants in the event of fraud at BLMIS. Instead of continuing to investigate the indicia of fraud at BLMIS they cited as fundamental roadblocks to the Proposed Tremont Deal, Defendants and CGMI immediately shifted the focus of their due diligence to assessing the security of the indemnification from Tremont Partners – their "primary mitigant of fraud" by BLMIS.

239.    Tremont Partners, however, did not yet have audited financial reports for either 2004 or 2005. This became an obstacle to renewing and increasing the Prime Fund Credit Deal. CGMI was concerned about the delays with Tremont Partners' audited financial statements, and in turn, uncertain about the strength of the indemnification. As Tremont internally noted on May 9, 2006, "Citi is concerned about the delay in the 2004 audited financials" and "Citi will not consider the waiver or the increase until this issue has been resolved."

240.    As a provisional measure, Tremont Partners sent its 2004 and 2005 unaudited financials to Nicholls and Adelman that same day. In internal communications, however, Tremont recognized that even after having received the unaudited financial statements for Tremont Partners, CGMI was "becoming increasingly uncomfortable" and was "very unsettled that the 2004 audit is not yet completed."

### 3.  CGMI's Pretextual Meeting With Madoff

241.    In light of its concerns about Tremont Partners' inability to produce audited financial statements confirming the strength of the indemnification, CGMI expressed renewed interest in meeting with Madoff. The planning for this new meeting differed significantly from the prior abandoned meeting with Madoff both in terms of the CGMI participants and the topics for discussion. CGMI's meeting with Madoff, which occurred in November 2006, turned out to be no more than a check-the-box exercise where CGMI sought only basic information that amounted to a "corporate overview" of BLMIS.

242.    CGMI's renewed interest in meeting with Madoff first surfaced on or around June 6, 2006. Following a call with Adelman regarding renewing and increasing the Prime Fund Credit Deal, Johnston sent an internal Tremont email on June 7, 2006 explaining that "they [CGMI] clearly do require the 2004 and 2005 audited FS [financial statements] for TPI [Tremont Partners] by July 31st and are also now seeking a Madoff meeting." In contrast to CGMI's demand for production of Tremont Partners' audited financial statements – which Adelman explained was a requirement – Johnston "sensed some wiggle room" regarding the request to meet with Madoff.

243.    "With respect to the Madoff meeting," Johnston explained, "their [CGMI's] interest is to 'resolve internal wonder' remaining from their due diligence related to 3X leverage on how Madoff executes the trades." Johnston and Adelman agreed that Tremont and CGMI needed to discuss "what specifically they're [CGMI] hoping to accomplish with a meeting. . . ." Adelman "directed" Tremont's CEO, Schulman, to speak with CGMI's Nicholls "to flush out this request."

244.    In September 2006, CGMI followed up with Tremont regarding a meeting with Madoff. Tremont advised CGMI to prepare their list of proposed questions to Madoff for its review. Pending review of CGMI's proposed questions to Madoff, Tremont remained noncommittal about whether it was willing to arrange a meeting between CGMI and Madoff.

245.    On October 11, 2006, Nicholls sent Tremont a proposed "due diligence agenda" for its requested meeting with Madoff. Missing from the agenda, however, were any questions concerning CGMI's two primary concerns of fraud at BLMIS, namely details regarding options trades and verification of the assets.

246.    Prior to abandoning the scheduled April 26, 2006 meeting with Madoff, CGMI informed Tremont that the critical issue was obtaining proof of the identities of BLMIS's

purported options counterparties, through "a sample confirm or even talking to the counterparty
if they are unable to find out directl[y]."

247.    Since CGMI demanded the meeting with Madoff in March 2006, CGMI had not
obtained proof that BLMIS's purported options transactions were real and not fabricated. It had
not spoken to any counterparties to BLMIS's purported transactions. It had not even learned the
identity of any such purported counterparties.

248.    Despite CGMI's persistent suspicions surrounding Madoff's purported billions of
dollars of S&P 100 Index options transactions, it was no longer interested in getting the answers
it once sought from Madoff. Instead, CGMI wanted to ask Madoff about "the competitive
environment," "key financial and business risks facing the Company," the "[s]tructure of
information technology function," and a "[s]ummary of corporate governance issues and the
application of other federal and state laws." As Nicholls characterized the agenda, "[t]here are a
number of questions, but this essentially boils down to a corporate overview."

249.    Tremont contacted Madoff to arrange a meeting with CGMI. CGMI's agenda for
the Madoff meeting avoided any mention of BLMIS's purported options transactions, verifying
Prime Fund's assets and BLMIS's purported trading activity.

250.    For this meeting, CGMI planned to send Thomas Fontana, Bruce Clark, and
Nicholls. Clark was the Business Sponsor for the Prime Fund Credit Deal, and Nicholls and
Fontana were assigned to Clark's Business Area. On information and belief, all three of these
individuals had a direct economic interest in renewing and increasing the Prime Fund Credit
Deal.

251.    On November 27, 2006, Fontana, Clark and Nicholls, along with Schulman and
Rupert Allan, President of Rye Investment Management, met with Madoff at BLMIS's offices.

As further indication this meeting was a check-the-box exercise, three days before the meeting took place, CGMI had already instructed its lawyers to draft the requisite renewal and increase documentation for the Prime Fund Credit Deal.

252.    Shortly after the meeting with Madoff, the Prime Fund Credit Deal was renewed from November 30, 2006 to December 29, 2006, and subsequently renewed to December 13, 2007 with an increase in the limit of the facility from $300 million to $400 million.

VII.    **DEFENDANTS NEED INDEMNIFICATION AGAINST BLMIS'S FRAUD AND REFUSE TO RENEW THE PRIME FUND CREDIT DEAL WITHOUT IT**

253.    From the outset of the Prime Fund Credit Deal, Defendants were unwilling to loan money to Prime Fund for the purpose of investing in BLMIS without an indemnification insulating them from bearing the costs of fraud at BLMIS. Despite the fact they subjectively believed there was a high probability of fraud at BLMIS in that it was not trading securities and was misappropriating assets, Defendants actively avoided confirming the truth, choosing instead to rely on the indemnification. When Tremont took the indemnification from Tremont Partners off the table, Defendants responded by refusing to renew the Prime Fund Credit Deal.

254.    In October 2007, two months before the Prime Fund Credit Deal was set to expire, Tremont proposed new terms that would "eradicate" the indemnification Tremont Partners provided to Defendants. For the first time, Tremont proposed to renew the credit facility, but without the terms CGMI had previously acknowledged were the "primary mitigant of fraud" for Defendants and CAFCO. Without such an indemnification, the extent of Defendants and CAFCO's recovery under the Prime Fund Credit Deal in the event of fraud at BLMIS would be limited to Prime Fund's assets. This was unacceptable to Defendants because they subjectively believed there was a high probability of fraud at BLMIS in that it was misappropriating these assets.

61

255.    On November 7, 2007, Tremont's Johnston asked internally about the status of negotiations with CGMI regarding the renewal: "Citi going to walk or is it the same TPI [Tremont Partners] GP [General Partner] issue?" Later that day, Kelly responded, "limited recourse issue. We may have to walk." The "limited recourse issue" referred to Tremont's demand to remove the Tremont Partners indemnification from the Prime Fund Credit Deal and include a provision specifically stating that Defendants and CAFCO would have "no recourse" against Tremont Partners for any obligations Prime Fund owed to them.

256.    On December 13, 2007, unable to agree on a long-term renewal that included the fraud indemnification, the parties renewed the Prime Fund Credit Deal, but only for three months to March 31, 2007. In return for this three-month renewal, Tremont not only agreed to maintain Tremont Partners' indemnification, it also agreed to increase the fees Prime Fund paid to Defendants. The "Program Fee" and the "Liquidity Fee," specifically, were increased by 60% and 67%, respectively.

257.    After Tremont Partners executed the three-month renewal, Tremont internally acknowledged that one of its action items was to "Negotiate with Citi with goal of having TPI [Tremont Partners] out and better rate." The "goal of having TPI out" refers to cancellation of the fraud indemnification Tremont Partners provided to Defendants and CAFCO. Tremont also sought alternate leverage providers, "for a better solution" in case negotiations with CGMI proved to be unsuccessful.

258.    On March 10, 2008, Tremont sent an internal email explaining that Defendants required the indemnification against fraud at BLMIS, and noting that they were calculating final payments. Specifically, the email stated:

Product Management
- Prime – **Citi needs indemnification from manager fraud**…Citi
clarifying final payments due for possible 3/31 repayment.
(Emphasis supplied).

259.    With Defendants unwilling to renew the Prime Fund Credit Deal without the

manager fraud indemnification, the parties reached an impasse. Thus, on or about March 12,

2008, Tremont informed CGMI that it intended to repay the loan principal on March 26, 2008 in

advance of the March 31, 2008 expiration of the Prime Fund Credit Deal and asked CGMI to

calculate the outstanding interest.

260.    To fund the repayment to Defendants, on March 25, 2008, Prime Fund withdrew

$475 million from its BLMIS account and transferred $301 million to Defendants the next day,

March 26, 2008.  That same day, the parties also executed a Termination Agreement.

## VIII.    TREMONT KNEW OR WAS WILLFULLY BLIND THAT BLMIS WAS A FRAUD

261.    On December 7, 2010, the Trustee filed a complaint commencing an adversary

proceeding against, among others, Tremont and several Tremont funds invested wholly or in part

with BLMIS, including Prime Fund, (collectively, the "Tremont Feeder Funds"), seeking to

avoid and recover $2.1 billion of initial transfers from BLMIS that constitute customer property

under SIPA (the "Tremont Complaint").[3]  The Trustee incorporates by reference the factual

allegations in the Tremont Complaint, as supplemented below.

262.    Tremont created, managed, and operated a number of Tremont Feeder Funds that

invested directly with BLMIS, including Prime Fund, Rye Select Broad Market Fund L.P.

("Broad Market Fund"), Rye Select Broad Market Fund Limited, and Rye Select Broad Market

---

[3] *Picard v. Tremont Group Holdings, Inc. et al. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 10-05310,
ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010).

Insurance Portfolio, LDC. The knowledge of Tremont officers and directors acquired either

directly, or through authorizing and adopting the findings of Tremont's senior management, is

imputed to the Tremont Feeder Funds.

263.    In a September 22, 2011 order, this Court approved a settlement between the

Trustee and more than a dozen of the Tremont Feeder Funds, their affiliates, and a former chief

executive (collectively, the "Tremont Settling Defendants") that obligated the Tremont Settling

Defendants to pay the Trustee $1.025 billion for the benefit of the customer property estate (the

"Tremont Settlement"). The Tremont Settlement also permitted the Trustee to pursue the

recovery of subsequent transfers until the estate was made whole. The Tremont Settlement also

specifically provides that the transfers made to the Tremont Feeder Funds, including Prime Fund,

were "deemed avoided."

**A.    Tremont's Senior Executives Had a Close Relationship with Madoff**

264.    Sandra Manzke founded Tremont in the mid-1980s and first met Madoff in 1991.

Until her departure in 2004, Manzke served as Tremont's CEO and then co-CEO, and helped

select money managers, including Madoff. Robert Schulman joined Tremont in 1994 and held

various high-level positions, including president, co-CEO, and ultimately sole CEO. Manzke

and Schulman had regular contact with Madoff, including at least quarterly visits to BLMIS.

265.    Schulman had a special relationship with Madoff, which Tremont described as its

"competitive edge." At least once, Madoff even sought Schulman's advice and counsel on

individual hiring decisions at BLMIS. Tremont vice president Chris Cichella told a potential

investor in June 2006 that Schulman was "intimately familiar" with Madoff based on "a 10+ year

relationship."

266.    Investors took notice of the relationship between Schulman and Madoff. For

example, a prospective investor who met with Tremont in May 2007 referenced the "friendly

64

relationship between Bob and Bernie" and noted that, "[f]or Tremont, it goes back to the relationship between Bob Schulman [CEO Tremont] and Bernie. Bob has been there many times and has worked w/ Bernie is [sic] business since the 1980s."

### B.   Tremont Saw and Understood Information Evidencing Madoff Was Engaged in a Fraud

#### 1.   Tremont Received Repeated, Direct Fraud Warnings About Madoff

267.    Tremont received warnings of BLMIS's fraudulent operation from clients as early as April 2001, when an investor in the Broad Market Fund and Prime Fund wrote to Schulman: "I know you are sick of answering this but man is it hot out there with the Bernie fraud rumors." The investor questioned why Madoff "need[ed] to go to cash at year-end every year" and used such a "small" firm as its auditor.

268.    On April 25, 2003, sales vice president and Tremont Investment Committee member Jim Mitchell relayed to Schulman a discussion Mitchell had with another concerned investor about "associating Madoff with broker-dealer wrongdoing of late." The following month, Mitchell, Schulman, and the investor visited Madoff. The investor's meeting notes (which he shared with Tremont), characterized BLMIS's operation as "controversial" and expressed numerous concerns that included: (i) Madoff's unwillingness to meet with investors; (ii) that BLMIS charged no management fees; (iii) Madoff's going to cash at every year end; (iv) the absence of a third party custodian; and (vi) BLMIS's "exceptionally stable" returns "with only 7 negative months since 1990."

269.    Mitchell, obviously aware of these concerns, retained these notes and years later forwarded them to Tremont vice president and manager responsible for product line management and oversight Darren Johnston, cautioning to keep them secret: "Don't attach this – but it's an interesting set of notes from a meeting years back…."

270.    In March 2004, the investor who emailed Schulman in 2001 about the "Bernie

fraud rumors" emailed him again, this time to redeem his Tremont Feeder Fund investments,

explaining:

> My motivation for doing this is not due to some new buzz out there
> for as you know that is a constant din but rather that I can no longer
> ignore my core instincts as an investor in which I have the [sic] battle
> the fact that I really don't know what is going on, what a [sic] do
> know is I am in an investment program that no one else in history
> has been able to make work, return series is flat out too good given
> how efficient the underlying securities are priced and he doesn't
> charge a fee all compounded by it seems every stone I turn over is
> another multi billion $ [M]adoff feeder. I . . . found that my inability
> to rationalize & be intellectually honest on why I was invested
> bothered me more than it has in the past . . . .

271.    When Madoff's scheme collapsed, the investor sent an email expressing his view

that Tremont had information that BLMIS was a fraud, saying, "HOLY SH## !!!!!!!!!!!!!!!!!!!!

THE WORLD IS NOW RIGHT !!!" and that "Bob Schulman & all the feeder groups could be

going to jail over this…." (Emphasis in original.)

272.    In May 2004, Cichella emailed senior vice president Rob Rosenbaum that

investment advisory firm RogersCasey (where Manzke had been a partner and other Tremont

personnel previously worked) was "concerned about Tremont's relationship with Madoff" and

would thus recommend that its client not invest with Tremont.  Cichella said RogersCasey would

not reconsider its position because BLMIS "was prone to a blow-up that would destabilize

Tremont . . . ."  RogersCasey's notes explained,

> [a]lthough Tremont claims to receive access to Madoff's positions,
> the magnitude of the exposure and the truth of Tremont's
> transparency remain extremely disconcerting. . . . The Madoff
> exposure is a potential disaster. . . . Tremont's products will still see
> their reputations vaporized when Madoff rolls over like a big ship.

273.    In March 2007, representatives from Tremont's potential client, Agile Group

("Agile"), while conducting due diligence, met with Johnston, product management senior vice

president Patrick Kelly, and portfolio manager Brian Marsh. Agile's notes from the meeting (the "Agile Notes") reflect that Agile peppered Tremont with numerous questions regarding operational and trading anomalies indicating fraud at BLMIS or its reporting fictional trades. This included queries about its auditors, the lack of information on options trading, identity of counterparties to the purported options transactions, BLMIS's assets under management ("AUM"), BLMIS's inexplicable use of paper trade tickets and account statements, the inability to verify BLMIS's assets, and BLMIS's going in and out of the market in large transactions with no overall effect on the market for the securities it purportedly traded.

274.    The Agile Notes reflect that Agile and Tremont discussed whether BLMIS was a fraud and whether it could be a Ponzi scheme. Tremont told Agile that it had always been able to redeem large dollar amounts on demand, prompting Agile to write, "[e]ither Madoff owns what he owns or they are fictitious. But if it is a Ponzi scheme, every dollar profit has been realized."

275.    A month later, Agile employee Mariah Quish sent Tremont follow-up questions concerning BLMIS. Addressing Agile's request, Tremont chose not to go on record, but instead Johnston instructed internally: "We should give answers by phone rather than email . . . ." After speaking with Johnston and Hodges, Quish reported she found Tremont's "level of secrecy combined with a faith-based view on Madoff difficult to understand."

276.    As set forth in the Tremont Complaint, beginning in October 2007, another Tremont Feeder Fund investor repeatedly complained to Schulman that there were inexplicable differences between his returns and those of a family member who had a direct account at BLMIS, beyond those attributable to fee differences. The investor forwarded to Schulman an

email from that family member that stated, "Makes me concerned about the legitamacy [sic] of the whole Bernie thing."

277.    ABN AMRO Bank N.V. ("ABN") sought BLMIS fraud protection in connection with the renegotiation of a 2006 swap agreement under which ABN provided leverage to certain Tremont Feeder Funds (the "ABN Swap"). Once that agreement was in effect, ABN began to receive copies of BLMIS's monthly statements and trade confirmations. After analyzing these records, ABN reported to Johnston, Kelly, and head of product management and investment advisory board member Stuart Pologe that ABN had "trust" issues with Madoff, which it termed "a key issue in the transaction." Because of this, ABN demanded a modification of the ABN Swap to grant it the right to redeem expeditiously its investments if Madoff came under investigation. Johnston wrote to Schulman and others at Tremont that ABN's proposed (and later accepted) modification was "to cover fraud."

278.    Tremont senior management repeatedly chose to ignore warnings that Madoff's trading might not be real. As late as October 2008, Tremont sales rep Adrian Gordon reported to Johnston, Marsh, and Mitchell that a prospective institutional investor was "loathe to give his stamp of approval to [Madoff's] strategy when he has no idea what trades actually take place." A month later, Gordon emailed the Tremont global sales team that another potential investor believed Madoff was "probably a pyramid structure."

### 2.    Tremont's Own Reporting Showed that BLMIS's Purported Trades Were Impossible

279.    As alleged in the Tremont Complaint and below, despite exempting BLMIS from the due diligence it conducted on other managers, Tremont nevertheless had abundant facts demonstrating that BLMIS reported fictitious trades.

280.    Tremont prepared reports regarding the Tremont Feeder Funds' performance on a regular basis. Those reports, and the documents on which they were based, facially disclosed impossible trading.

281.    Tremont regularly received from BLMIS customer statements, trade tickets, and other information. According to Johnston, Tremont "monitor[s] all trade activity (we receive each trade confirmation), we send position reports to RiskMetrics so we may analyze exposures, and [Schulman] has regular dialogue with Bernie." Tremont executives, such as Johnston, vice president of Investor Services Harry Hodges, and others reviewed BLMIS's statements and other data, and checked the purported trades' prices against the securities' daily highs and lows against third-party sources, including Bloomberg.

282.    Tremont's senior management prepared monthly analytic summaries based on these BLMIS documents, which showed that Tremont knew the positions and prices BLMIS reported differed from prices Bloomberg reported. In 2006, Tremont's auditor similarly found and reported to Tremont more than 20 such differences.

283.    Tremont also estimated the amount BLMIS had in AUM and calculated whether or not there was sufficient volume in each instrument for Madoff to be able to execute such trades. Given that Tremont knew BLMIS had "well in excess of $20 billion" in AUM by May 2003, and that it "monitored all trade activity," Tremont must have seen dozens, if not hundreds, of trades in which there was insufficient volume for Madoff to complete the transactions.

284.    For example, on June 20, 2003, Madoff purportedly traded stocks for the Tremont Feeder Fund accounts, including American International Group, PepsiCo, and Wal-Mart. By extrapolating these Tremont accounts' value as a percentage of BLMIS's estimated AUM during the prior month, as it said it did, Tremont would have seen that BLMIS's traded volume in these

69

stocks would have been 161%, 150%, and 148% of the market's reported volumes,

respectively. In all, on just one day, Tremont would have seen Madoff purported to trade more

than 100% of the reported volume in 18 different stocks, each a glaring impossibility.

**C.     Tremont Exempted BLMIS From Its High Due Diligence Standards,
Prevented Third Parties From Conducting Their Own Due Diligence and
Fabricated Stories About BLMIS**

**1.     Tremont Consistently Excluded Madoff From Its Due Diligence
Practices**

285.    The vast majority of Tremont's business involved placing its clients' assets with

third-party managers. With respect to most of them, Tremont implemented due diligence

procedures, investigated the quality of the management personnel, assessed key risk factors

associated with the investment, and continuously monitored the investment and the managers.

286.    As a sophisticated manager with industry-leading due diligence standards,

Tremont positioned itself at the forefront of initiatives to improve monitoring of investment

managers in light of frauds that preceded Madoff. Tremont claimed that its comprehensive

operational risk evaluation served to mitigate any possibility of misrepresentation or fraudulent

activity.

287.    Despite these claims and fraud warnings, Tremont exempted BLMIS from its due

diligence standards. To ensure that Tremont's employees did not conduct any meaningful due

diligence on BLMIS and Madoff, Mitchell laid out in an email that three of the most critical

questions about Madoff's operations "ya don't ask": (1) BLMIS's AUM, (2) how Madoff

generated his returns, and (3) who Madoff's auditors were. Tremont's executives deliberately

prevented any transparency into Madoff and BLMIS throughout the Tremont-BLMIS

relationship.

288.    According to the SEC, Schulman conducted the due diligence on Madoff but on no other managers. The SEC concluded that because "Schulman conducted the due diligence, he would be able to control what areas and information [was] reviewed or not reviewed." This was an "outlier" in Tremont's procedures. In her notes, Agile's Quish wrote this was strange, finding that it was "as if the friendly relationship between Bob and Bernie is enough to cement" billions in business between Tremont and BLMIS.

289.    Tremont also conducted no due diligence on F&H, in contrast to its written due diligence policies and procedures, in which Tremont reported it would speak with a fund's auditor. Tremont's top investment managers knew, as set forth in a 2006 internal memo, that F&H was a "small firm" that was "not specialized in investment firms [and] broker/dealers."

290.    Johnston told Agile in 2007 that an unnamed Tremont representative had visited F&H just a few months before, "to make sure they exist," a pitiful swat at diligence. The SEC found that Tremont's due diligence materials turned over to the Commission "did not reveal any evidence of conversations with Madoff's auditors."

291.    In August 2006, Chief Investment Officer Cynthia Nicoll raised the need to conduct "full due diligence" on BLMIS, but research director Thomas Sandlow told her, "We cannot do that for Madoff."

292.    In an unusually candid response to one strategic consulting firm, Tremont's Pologe admitted that Tremont had "no manager due dili[gence] process for" its BLMIS investments and referred to Tremont's dealings with BLMIS as "a highly vulnerable, highly profitable business." Pologe noted: "We make a lot of money off this, though."

**2.    BLMIS Failed Tremont's Requirements for Third-Party Oversight Yet Tremont Made an Exception for Madoff**

293.    Tremont's senior management knew BLMIS deviated from Tremont's own due diligence requirements and well-established industry practice by acting as investment adviser, prime broker and custodian of its clients' assets, while also using a virtually unknown auditor in a Rockland County strip mall, F&H, and that as a result, BLMIS could be faking its securities holdings, customers statements, and trade tickets.

294.    Tremont's due diligence standards considered independent oversight of its outside managers to be critical. For example, in June 2008, Tremont rejected a manager with whom it was considering investing because, as stated in an internal memo, a "key part of any due diligence process is being able to verify the information provided by the Fund with independent parties, in this instance there aren't any independent parties to speak with to verify what the partners of [the fund] are doing."

295.    After Madoff's arrest, the SEC investigated Tremont and found Tremont had rejected another outside money manager because of a lack of operational infrastructure and the presence of only one person who was responsible for all operational duties. Yet, the SEC noted, Tremont continued its investment with BLMIS, although "all operational guidelines with respect to trading and execution were controlled by one individual."

296.    Tremont knowingly made BLMIS the sole exception to its requirement of third-party oversight of its money managers.

297.    Tremont executives, including Johnston, Cichella, and Mitchell were unwilling to respond in writing to investors' questions about third-party asset verification. This included at least one pointed question from an investor who asked Mitchell, because the BLMIS account statements were "generated by Madoff, how do I get comfort that the money is really there?"

72

This investor also stated, "the accounting firm [F&H] doing the audit being a small firm made me a bit uneasy." Mitchell replied, "What is your telephone number?"

298.    Dealing with another investor question about asset verification, Johnston emailed Cichella that this would "lead closer to BLMIS which [Tremont] strictly wants to avoid." Cichella replied: "Keep in mind, they are looking for independent (of [Tremont] or Madoff) verification of the assets in a tangible form [so] … it would be great if you could convince them" that the assets existed.

299.    On or about October 1, 2008, Tremont senior management met with the managers of competing BLMIS feeder fund Fairfield Sentry Limited concerning a possible investment with BLMIS through Fairfield Sentry. Tremont's notes acknowledged that Fairfield Sentry also did not satisfy Tremont's due diligence requirements, including lack of independent oversight at BLMIS, no third-party prime broker, and F&H's "material percentage of their annual revenue from Madoff." Tremont nevertheless determined that an investment would be acceptable, solely because it was a Madoff feeder, stating: "Given the structure of the Madoff relationship, this investment requires an exception approval from the Investment Committee."

### 3.    Tremont Consistently Shielded Madoff From Third Parties

300.    Tremont consistently shielded Madoff from questions by third parties conducting their own due diligence on BLMIS, calling it "Firm policy" not to provide access. On January 24, 2004, Mitchell asked Schulman whether a potential client could visit Madoff. Schulman resounded: "They cannot and WILL NOT VISIT MADOFF please make it clear that this is OFF the table." (Emphasis in original.) On June 16, 2006, Mitchell, after being informed that an investor had been "relentless on meeting Bernie," emailed Tremont investment relationship assistant vice president Roy Soares, "[o]ur own analysts don't get to see Madoff – why should [investors]."

301.    In swap agreements with three leverage-provider banks, Tremont included the provision that if a bank contacted Madoff, Tremont had the right to cancel the swap without paying an early termination fee.

302.    Tremont even restricted which of its employees could contact BLMIS. In a September 2002 email, the message was relayed internally: "DON'T SEND ANY CORRESPONDENCE TO BERNARD MADOFF. ONLY [Soares], [Schulman] AND [Hammond] ARE ALLOWED TO SEND ANYTHING TO HIM!" (Emphasis in original.)

303.    Tremont even refused to allow its administrator to receive the Tremont Feeder Fund customer statements and trade tickets directly from BLMIS, as Tremont arranged with its other managers. Tremont also intervened to limit contact between Madoff and Tremont's auditor, Ernst & Young ("EY"). In May 2006, internal Tremont emails discussing EY's request for BLMIS's "internal control letter" and questioning whether an audit report was prepared for Madoff, revealed that Tremont acted as the go-between "[t]o keep the minimum amount of people contacting Madoff."

304.    This deliberate shielding of Madoff continued when Tremont replaced EY with KPMG and reported to potential clients that "there is no contact" between KPMG and BLMIS.

### 4.    Tremont Avoided Questions and Fabricated Answers About BLMIS's Purported Options Trading

305.    Madoff purportedly purchased put options to hedge equity risk and sold call options to help pay for the put options. Tremont's senior management knew that the options trades were a central part of the SSC strategy. In response to evidence on the face of BLMIS's trade tickets that the options were suspect, Tremont sought to hide the issues and evidence from investors through deflection and fabrication.

a.    <u>Divergent Answers on Over-the-Counter/Listed Trading Questions</u>

306.    As described in the Tremont Complaint, Tremont knew that Madoff could not be trading options over-the-counter ("OTC") as he represented, in light of (i) the CUSIP numbers on BLMIS's trade confirmations, which indicated the options were exchange-traded, and (ii) the lack of counterparty information that should be on all OTC trade confirmations. Tremont also knew that Madoff had not entered into any ISDA agreements with any counterparties – a basic requirement for all OTC option trades. Tremont further knew Madoff could not be trading all of his options on the exchange, in light of the insufficient volume of listed options trades to support BLMIS's AUM. As explained above, Tremont senior management, including Hodges, reviewed and analyzed the BLMIS trade tickets.

307.    Rather than openly acknowledge these impossibilities, Tremont would flip-flop on the question of whether BLMIS traded options OTC or traded them on the Chicago Board Options Exchange.

308.    For example, a Prime Fund and Broad Market Fund due diligence questionnaire ("DDQ") from November 2006 stated that "options [] are traded on a recognized exchange." In contrast, in November 2007, in response to a statement by HSBC Bank that it was under the impression that BLMIS traded options OTC, Johnston wrote, "our understanding is also that they are OTC." On yet another occasion, Broad Market Fund's July 2007 DDQ equivocated, stating options "may be either listed or OTC."

    b.    Failure to Conduct Any Diligence on Purported Options
           Counterparties and Covering up the Truth With Fabrications

309.    Tremont similarly failed to conduct any diligence as to the lack of OTC counterparties on BLMIS's trade confirmations, knowing there was no legitimate explanation.

310.    Tremont senior management stated on certain occasions that Madoff purportedly traded options with the counterparties as agent for the Tremont Feeder Funds. This meant that

the Tremont Feeder Funds, not BLMIS, bore the risks involved with trading and settling with those purported counterparties. Tremont senior management knew that if one or more counterparties defaulted on an OTC put option that BLMIS attempted to exercise, that default would leave the Tremont Feeder Funds directly exposed to loss.

311.    Tremont senior management knew it had to conduct counterparty due diligence to insulate against default risk, but Tremont never took the first step of getting the purported counterparties' names.

312.    Tremont instead covered up for Madoff's fabrications with fabrications of its own, which changed as needed to pacify others. In October 2006, Soares emailed Fortis Bank, relaying information provided by Schulman that Broad Market Fund had 12 counterparties, "which Madoff must use in relation to his put options trades." In March 2007, senior management told Agile that Schulman "has seen the counterparty names – he just does not want to disclose it." In a deposition, Schulman finally admitted that Tremont never tried to identify any purported counterparties

313.    In a June 2007 email, Kelly told JPMorgan Chase ("JPM"), which was considering a Tremont Feeder Fund investment, that "we do know the [counterparties'] general characteristics such as number and minimum credit rating." A month later, Mitchell told a different investor, "[o]ption counterparties are typical banks," and named Goldman Sachs and JPM among them, all clear fabrications.

314.    The September 2008 collapse of Lehman Brothers Inc. and its affiliates and subsidiaries (collectively, "Lehman") – one of the largest OTC derivatives counterparties at the time – led to industry and investor panic. Many Tremont clients understandably worried about their Lehman exposure, in light of BLMIS's purported billions of dollars in options holdings.

76

315.    By contrast, Tremont's senior management was seemingly unconcerned from the outset by these monumental events. They knew that if BLMIS's OTC option positions were real, a crash of a major options counterparty would have catastrophic effects on the Tremont Feeder Funds. For example, in 2007, Mitchell detailed to an investor how, if a counterparty to an options trade such as Bear, Stearns defaulted, "then the option (otc) is gone." Upon learning of Lehman's demise, however, Tremont never appears to have even asked Madoff about this sudden and potentially business-destroying counterparty exposure.

316.    Tremont instead worked to avoid and deceive investors. To one client trying to assess its Lehman exposure and exposure to other potentially precariously positioned counterparties, Johnston simply stated, "We are not responding to this."

317.    Mitchell crafted an answer to investors asking whether the Tremont Feeder Funds had Lehman risk, stating internally that "the line we should follow is that ... [w]e do not discuss our counterparty arrangements as we are contractually bound not to." In reply, Johnston went a step further, indicating his certainty that the "answer is 'no exposure.'" These statements were misleading by implying Tremont knew of actual counterparty arrangements and could assure the investors that Tremont's counterparties presented no risk.

318.    To date, Lehman is the largest bankruptcy in the history of the entire world. It is beyond reason that Tremont would view Lehman's collapse as a non-event vis-à-vis its BLMIS accounts, its investors' inquiries as an annoyance, and a total lack of effect on its investments as legitimate, if Tremont's senior management actually believed its BLMIS options positions were real. The knowledge of Tremont's officers and directors acquired either directly, or through authorizing and adopting the findings of senior management, is imputed to Tremont.

**D.    Tremont's Executives Had a Powerful Motive to Hide What They Knew About BLMIS and Madoff**

319.    Tremont's profitability and, as it turned out, its very existence, depended on BLMIS. The Tremont Feeder Funds benefitted from BLMIS's incredibly consistent, positive returns, which enhanced their investment track records and ability to attract business partners and clients. This led to the Tremont Feeder Funds' AUM increasing rapidly. For example, from its inception in January 1994 to November 2008, Broad Market Fund's AUM increased from $5.9 million to approximately $2.4 billion, a 407-fold increase.

320.    Tremont's revenues grew along with its AUM; during this period, Tremont received at least $255 million in fees from its BLMIS-facing products.

321.    Chief Financial Officer Lynn Keeshan noted that Tremont was "highly dependent" on Madoff, which accounted for "all of the profits of the firm." Cichella said Prime Fund's "only reason for being is as a $2b feeder into Madoff." Pologe said BLMIS was Tremont's "crack addiction business." Tremont's parent company concluded that "the economics of Tremont's business [was] Madoff."

322.    Tremont did nothing more to earn its fees through its BLMIS Feeder Funds than provide access to BLMIS. Pologe acknowledged Tremont "just sell[s] access [to BLMIS] for 2% management fee . . . . We make a lot of money off this." As Schulman told Mitchell, for some customers, on top of the management fee, Tremont levied "a 50 basis point surcharge for them to access Madoff."

323.    Fees were a powerful reason for funds like Tremont to ignore what they knew about BLMIS. As noted by Albourne Partners in late 2008, "[w]e have been advised by some of the [funds invested in BLMIS] that they are not interested in knowing more about the product due to the fees they are earning on the product."

### E.    Tremont Co-Managed Kingate Global

324.    From the inception of their respective BLMIS investment accounts, Federico

Ceretti and Carlo Grosso worked closely with Manzke to create Kingate Global and its manager,

Kingate Management Limited (collectively, "Kingate").[4]  Manzke introduced Ceretti and Grosso

to Madoff in 1993 and was a Kingate Global director and manager from 1995 until 2004.

325.    The Tremont-Kingate relationship continued through the revelation of Madoff's

fraud.  Kingate Management and Tremont affiliate Tremont (Bermuda) Ltd. ("Tremont

Bermuda") co-managed Kingate Global and split its management fees, which provided Tremont

with a significant portion of its income.  From 2002 to 2006, for example, Kingate Global

earnings comprised 17% of Tremont's BLMIS-derived revenues.  Between 1998 and 2008,

Tremont received over $40 million in fees for funneling investor assets to Kingate Global.

326.    Under several agreements the parties entered together, Tremont Bermuda assisted

"Co-Manager Kingate … in the performance of its duties under the Kingate Co-Manager

Agreement and managing the investment and reinvestment of the assets of [Kingate Global] …."

327.    Tremont Bermuda and Kingate Management were co-agents to Kingate Global

through their conduct and the operation of the various agreements entered into by the parties.

328.    Kingate's knowledge that Madoff's BLMIS operation was a fraud, and that many

of the entries in the statements and trade confirmations depicted trades that could not have

occurred may be imputed to Tremont.

---

[4] The factual allegations in the Trustee's Fourth Amended Complaint against Kingate Global Fund, Ltd. and
concerning the role of Kingate Management Limited are incorporated by reference. *Picard v. Ceretti, et al. (In re
Bernard L. Madoff Inv. Sec's)*, 09-01161 (SMB) (Bankr. S.D.N.Y.) (ECF No. 100).

## IX. THE TRANSFERS

329.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

330.    The Trustee's discovery and investigation is ongoing and the Trustee reserves the right to: (i) supplement the information on the initial and subsequent transfers discussed below and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

### A. Prime Fund

#### 1. Initial Transfers from BLMIS to Prime Fund

331.    The Trustee commenced a separate adversary proceeding against Prime Fund, and other defendants in the Bankruptcy Court, under the caption, *Picard v. Tremont Group Holdings, Inc., et al.*, No. 10- 05310 (SMB) (the "Tremont Avoidance Action"), seeking to avoid and recover initial transfers of customer property from BLMIS to Prime Fund in the approximate amount of $1.01 billion (the "Prime Fund Initial Transfers"). The Trustee incorporates by reference the allegations contained in the Tremont Avoidance Action as if fully set forth herein.

332.    Of the Prime Fund Initial Transfers, approximately $945 million was transferred to Prime Fund during the six years prior to the Filing Date (the "Prime Fund Six Year Transfers"). Each of the Prime Fund Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3). Each of the Prime Fund Six Year Transfers is recoverable under section 550(a)(1) of the Bankruptcy Code, and applicable provisions of the N.Y. Debt. & Cred. Law, including §§ 278 and 279, and of SIPA, particularly § 78fff-2(c)(3). Prime Fund received each of the Prime Fund Six Year Transfers with knowledge that BLMIS was not trading securities in connection with the IA Business.

333.    Of the Prime Fund Six Year Transfers, approximately $495 million was transferred to Prime Fund during the two years preceding the Filing Date (the "Prime Fund Two Year Transfers"). Each of the Prime Fund Two Year Transfers is avoidable under Bankruptcy Code section 548, and applicable provisions of SIPA, particularly § 78fff-2(c)(3). Each of the Prime Fund Two Year Transfers is recoverable under section 550(a)(1) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3). Prime Fund received each of the Prime Fund Two Year Transfers with knowledge that BLMIS was not trading securities in connection with the IA Business, or with willful blindness to circumstances suggesting a high probability of fraud at BLMIS in that it was not trading securities in connection with the IA Business.

334.    Charts setting forth the Prime Fund Initial Transfers are included as Exhibits A and B. The Prime Fund Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

## 2. Subsequent Transfers from Prime Fund to Defendants

335.    Prior to the Filing Date, Prime Fund subsequently transferred a portion of the Prime Fund Initial Transfers, directly or indirectly, to Defendants Citibank and Citicorp. Based on the Trustee's investigation to date, the Trustee seeks to avoid and recover a total of $343,084,590 that Prime Fund transferred to Citibank and Citicorp (the "Prime Fund Subsequent Transfers"). A chart setting forth the presently known Prime Fund Subsequent Transfers is attached as Exhibit C.

336.    The Prime Fund Subsequent Transfers were received by Citibank and Citicorp and are recoverable under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

81

337.   Citibank and Citicorp received the Prime Fund Subsequent Transfers with willful blindness to circumstances suggesting a high probability of fraud in BLMIS's IA Business.

338.   Because Prime Fund invested all or substantially all of its assets into the BLMIS Ponzi scheme, Prime Fund was insolvent when it made the Prime Fund Subsequent Transfers.

**COUNT ONE**
**RECOVERY OF SUBSEQUENT TRANSFERS –11 U.S.C. §§ 105(a) AND 550(a) –**
**CITIBANK AND CITICORP**

339.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

340.   Each of the Prime Fund Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

341.   Each of the Prime Fund Two Year Transfers is avoidable under Bankruptcy Code section 548, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

342.   Each of the Prime Fund Subsequent Transfers is recoverable from under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

343.   Each of the Prime Fund Subsequent Transfers was made directly or indirectly to Citibank and Citicorp.

344.   Citibank and Citicorp are immediate or mediate transferees of the Prime Fund Subsequent Transfers.

345.   Each of the Prime Fund Subsequent Transfers was received by Citibank and Citicorp at a time when they were willfully blind to circumstances suggesting a high probability of fraud at BLMIS in that it was not trading securities in connection with the IA Business.

346.   As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against

Citibank and Citicorp: (a) recovering the Prime Fund Subsequent Transfers, or the value thereof, from Citibank and Citicorp for the benefit of the estate of BLMIS; (b) directing Citibank and Citicorp to disgorge to the Trustee all profits, including any and all retrocession fees, incentive fees, or other compensation and/or remuneration received by Citibank and Citicorp related to, arising from, or concerning the Prime Fund Subsequent Transfers; (c) recovering attorneys' fees and costs from Citibank and Citicorp; and (d) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Counts One and Two in favor of the Trustee and against Citicorp and Citibank as follows:

a) Recovering the Prime Fund Subsequent Transfers, or the value thereof, from Citicorp and Citibank for the benefit of the BLMIS estate;

b) Directing Citicorp and Citibank, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all fees, interest or other compensation and/or remuneration received by Citicorp and Citibank related to or arising from, or concerning the Prime Fund Subsequent Transfers;

c) If Citicorp or Citibank challenge the avoidability of the Prime Fund Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the Prime Fund Subsequent Transfers pursuant to section 550(a) and 15 U.S.C. § 78fff-2(c)(3);

d) Awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding;

e) Awarding the Trustee prejudgment interest from the date on which the Subsequent

Transfers were received by Defendants; and

f) Granting the Trustee such other, further, and different relief as the Court deems

just, proper, and equitable.

Dated: _____, 2019          /s/ _____
      New York, New York          **Baker & Hostetler LLP**

                                        45 Rockefeller Plaza
                                        New York, New York 10111
                                        Telephone: 212.589.4200
                                        Facsimile: 212.589.4201
                                        David J. Sheehan
                                        Email:  dsheehan@bakerlaw.com
                                        Seanna R. Brown
                                        Email:  sbrown@bakerlaw.com
                                        Matthew D. Feil
                                        Email:  mfeil@bakerlaw.com
                                        Andres A. Munoz
                                        Email:  amunoz@bakerlaw.com
                                        Chardaie C. Charlemagne
                                        Email:  ccharlemagne@bakerlaw.com

                                        *Attorneys for Irving H. Picard, Trustee*
                                        *for the substantively consolidated SIPA*
                                        *Liquidation of Bernard L. Madoff*
                                        *Investment Securities LLC and the estate*
                                        *of Bernard L. Madoff*

84

**Exhibit A**

| BLMIS Account Name | BLMIS Account Number |
|---|---|
| RYE SELECT BROAD MARKET PRIME FUND, LP | 1C1260 |

Exhibit B

BLMIS ACCOUNT NO. 1C1260 - RYE SELECT BROAD MARKET PRIME FUND, LP

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported In Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/2/1997 | CHECK WIRE | 21,300,000 | 21,300,000 | - | - | - | 21,300,000 | - | - | - |
| 8/4/1997 | CHECK WIRE | 4,800,000 | 4,800,000 | | | | 26,100,000 | | | |
| 9/4/1997 | CHECK WIRE | 4,200,000 | 4,200,000 | | | | 30,300,000 | | | |
| 9/4/1997 | CHECK WIRE | 2,208,000 | 2,208,000 | | | | 32,508,000 | | | |
| 10/2/1997 | CHECK WIRE | 1,655,000 | 1,655,000 | | | | 34,163,000 | | | |
| 10/6/1997 | CHECK WIRE | 6,000,000 | 6,000,000 | | | | 40,163,000 | | | |
| 11/5/1997 | CHECK WIRE | 18,679,000 | 18,679,000 | | | | 58,842,000 | | | |
| 12/3/1997 | CHECK WIRE | 11,875,000 | 11,875,000 | | | | 70,717,000 | | | |
| 1/6/1998 | CHECK WIRE | 26,703,000 | 26,703,000 | | | | 97,420,000 | | | |
| 2/3/1998 | CHECK WIRE | 11,500,000 | 11,500,000 | | | | 108,920,000 | | | |
| 2/4/1998 | CHECK WIRE | 9,000,000 | 9,000,000 | | | | 117,920,000 | | | |
| 3/5/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | | | | 122,920,000 | | | |
| 3/5/1998 | CHECK WIRE | 14,000,000 | 14,000,000 | | | | 136,920,000 | | | |
| 4/3/1998 | CHECK WIRE | 9,000,000 | 9,000,000 | | | | 145,920,000 | | | |
| 5/5/1998 | CHECK WIRE | 7,500,000 | 7,500,000 | | | | 153,420,000 | | | |
| 6/2/1998 | CHECK WIRE | 13,250,000 | 13,250,000 | | | | 166,670,000 | | | |
| 6/3/1998 | CHECK WIRE | 5,050,000 | 5,050,000 | | | | 171,720,000 | | | |
| 7/6/1998 | CHECK WIRE | 3,000,000 | 3,000,000 | | | | 174,720,000 | | | |
| 7/6/1998 | CHECK WIRE | 12,000,000 | 12,000,000 | | | | 186,720,000 | | | |
| 8/13/1998 | CHECK WIRE | 20,350,000 | 20,350,000 | | | | 207,070,000 | | | |
| 9/30/1998 | CHECK WIRE | (17,000,000) | | (17,000,000) | | | 190,070,000 | | | |
| 10/2/1998 | CHECK WIRE | 3,000,000 | 3,000,000 | | | | 193,070,000 | | | |
| 11/3/1998 | CHECK WIRE | 6,000,000 | 6,000,000 | | | | 199,070,000 | | | |
| 12/2/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | | | | 204,070,000 | | | |
| 12/3/1998 | CHECK WIRE | 1,000,000 | 1,000,000 | | | | 205,070,000 | | | |
| 1/5/1999 | CHECK WIRE | 7,000,000 | 7,000,000 | | | | 212,070,000 | | | |
| 1/7/1999 | CHECK WIRE | 2,000,000 | 2,000,000 | | | | 214,070,000 | | | |
| 2/3/1999 | CHECK WIRE | 7,000,000 | 7,000,000 | | | | 221,070,000 | | | |
| 3/2/1999 | CHECK WIRE | 6,000,000 | 6,000,000 | | | | 227,070,000 | | | |
| 4/6/1999 | CHECK WIRE | 5,500,000 | 5,500,000 | | | | 232,570,000 | | | |
| 5/4/1999 | CHECK WIRE | 3,000,000 | 3,000,000 | | | | 235,570,000 | | | |
| 8/4/1999 | CHECK WIRE | 6,000,000 | 6,000,000 | | | | 241,570,000 | | | |
| 12/1/1999 | CHECK WIRE | 2,000,000 | 2,000,000 | | | | 243,570,000 | | | |
| 1/6/2000 | CHECK WIRE | 6,000,000 | 6,000,000 | | | | 249,570,000 | | | |
| 2/2/2000 | CHECK WIRE | 1,000,000 | 1,000,000 | | | | 250,570,000 | | | |
| 2/2/2000 | CHECK WIRE | 9,000,000 | 9,000,000 | | | | 259,570,000 | | | |
| 3/1/2000 | CHECK WIRE | 13,225,000 | 13,225,000 | | | | 272,795,000 | | | |
| 4/11/2000 | CHECK WIRE | 15,000,000 | 15,000,000 | | | | 287,795,000 | | | |
| 5/3/2000 | CHECK WIRE | 12,750,000 | 12,750,000 | | | | 300,545,000 | | | |
| 6/2/2000 | CHECK WIRE | 13,500,000 | 13,500,000 | | | | 314,045,000 | | | |
| 7/5/2000 | CHECK WIRE | 12,000,000 | 12,000,000 | | | | 326,045,000 | | | |
| 8/3/2000 | CHECK WIRE | 2,500,000 | 2,500,000 | | | | 328,545,000 | | | |
| 9/1/2000 | CHECK WIRE | 10,000,000 | 10,000,000 | | | | 338,545,000 | | | |
| 10/3/2000 | CHECK WIRE | 12,500,000 | 12,500,000 | | | | 351,045,000 | | | |
| 11/3/2000 | CHECK WIRE | 12,000,000 | 12,000,000 | | | | 363,045,000 | | | |
| 1/3/2001 | CHECK WIRE | 15,000,000 | 15,000,000 | | | | 378,045,000 | | | |
| 1/8/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | | | | 383,045,000 | | | |
| 2/5/2001 | CHECK WIRE | 42,000,000 | 42,000,000 | | | | 425,045,000 | | | |
| 3/5/2001 | CHECK WIRE | 26,000,000 | 26,000,000 | | | | 451,045,000 | | | |

BLMIS ACCOUNT NO. 1C1260 - RYE SELECT BROAD MARKET PRIME FUND, LP

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 Preference Period Initial Transfers | Column 10 Two Year Initial Transfers | Column 11 Six Year Initial Transfers |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/30/2001 | CHECK WIRE | (22,000,000) | - | (22,000,000) | - | - | 429,045,000 | - | - | - |
| 5/2/2001 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 431,045,000 | - | - | - |
| 7/2/2001 | CHECK WIRE | (18,000,000) | - | (18,000,000) | - | - | 413,045,000 | - | - | - |
| 7/12/2001 | CHECK WIRE | 14,000,000 | 14,000,000 | - | - | - | 427,045,000 | - | - | - |
| 8/3/2001 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 430,045,000 | - | - | - |
| 10/1/2001 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 442,045,000 | - | - | - |
| 11/2/2001 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 454,045,000 | - | - | - |
| 11/5/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 459,045,000 | - | - | - |
| 1/2/2002 | CHECK WIRE | (8,000,000) | - | (8,000,000) | - | - | 451,045,000 | - | - | - |
| 9/23/2002 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 461,045,000 | - | - | - |
| 6/28/2004 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 451,045,000 | - | - | (10,000,000) |
| 10/1/2004 | CHECK WIRE | (110,000,000) | - | (110,000,000) | - | - | 341,045,000 | - | - | (110,000,000) |
| 3/31/2005 | CHECK WIRE | (180,000,000) | - | (180,000,000) | - | - | 161,045,000 | - | - | (180,000,000) |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 181,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 201,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 221,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 241,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 261,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 281,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 301,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 321,045,000 | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 341,045,000 | - | - | - |
| 7/7/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 361,045,000 | - | - | - |
| 12/28/2005 | CHECK WIRE | (15,000,000) | - | (15,000,000) | - | - | 346,045,000 | - | - | (15,000,000) |
| 2/10/2006 | CHECK WIRE | 35,000,000 | 35,000,000 | - | - | - | 381,045,000 | - | - | - |
| 3/3/2006 | CHECK WIRE | 18,000,000 | 18,000,000 | - | - | - | 399,045,000 | - | - | - |
| 6/30/2006 | CHECK WIRE | (30,000,000) | - | (30,000,000) | - | - | 369,045,000 | - | - | (30,000,000) |
| 8/28/2006 | CHECK WIRE | (35,000,000) | - | (35,000,000) | - | - | 334,045,000 | - | - | (35,000,000) |
| 9/26/2006 | CHECK WIRE | (50,000,000) | - | (50,000,000) | - | - | 284,045,000 | - | - | (50,000,000) |
| 11/8/2006 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 264,045,000 | - | - | (20,000,000) |
| 12/27/2006 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 244,045,000 | - | (20,000,000) | - |
| 10/1/2007 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 254,045,000 | - | - | - |
| 12/3/2007 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 264,045,000 | - | - | - |
| 3/25/2008 | CHECK WIRE | (475,000,000) | - | (475,000,000) | - | - | (210,955,000) | - | (475,000,000) | (475,000,000) |
| | Total: | $ (475,000,000) | $ 799,045,000 | $ (1,010,000,000) | $ - | $ - | $ (210,955,000) | $ - | $ (495,000,000) | $ (945,000,000) |

Exhibit C

**SUBSEQUENT TRANSFERS FROM PRIME FUND TO CITIBANK NA AND CITICORP NORTH AMERICA INC.**

| Column 1 | Column 2 |
|----------|----------|
| Date | Amount |
| 6/16/2005 | (300,000) |
| 7/5/2005 | (334,388) |
| 8/2/2005 | (661,723) |
| 9/2/2005 | (695,639) |
| 10/3/2005 | (724,769) |
| 11/2/2005 | (824,029) |
| 12/2/2005 | (836,143) |
| 1/4/2006 | (943,678) |
| 2/2/2006 | (1,125,372) |
| 3/2/2006 | (1,048,336) |
| 4/3/2006 | (1,298,174) |
| 5/2/2006 | (1,271,913) |
| 6/2/2006 | (1,355,544) |
| 7/5/2006 | (1,370,495) |
| 8/2/2006 | (1,434,581) |
| 9/6/2006 | (1,461,703) |
| 10/3/2006 | (1,437,350) |
| 11/2/2006 | (1,449,838) |
| 12/4/2006 | (1,398,473) |
| 1/3/2007 | (1,493,187) |
| 2/2/2007 | (1,456,732) |
| 3/2/2007 | (1,314,989) |
| 4/3/2007 | (1,506,198) |
| 5/2/2007 | (1,455,167) |
| 6/4/2007 | (1,503,253) |
| 7/2/2007 | (1,497,041) |
| 8/2/2007 | (1,505,994) |
| 9/4/2007 | (1,527,718) |
| 10/2/2007 | (1,582,739) |
| 11/2/2007 | (1,541,578) |
| 12/4/2007 | (1,411,513) |
| 1/3/2008 | (1,574,196) |
| 2/4/2008 | (1,503,468) |
| 3/4/2008 | (1,215,286) |
| 3/26/2008 | (100,000,000) |
| 3/26/2008 | (100,000,000) |
| 3/26/2008 | (100,000,000) |
| 3/26/2008 | (1,023,383) |
| Total: $ | (343,084,590) |