# EXHIBIT B

10-05310-cgm   Doc 1-1   Filed 12/07/10   Entered 12/07/10 21:03:33   Case Caption
Pg 1 of 2

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York  10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Marc Skapof
Email: mskapof@bakerlaw.com
Marc D. Powers
Email: mpowers@bakerlaw.com
Eric R. Fish
Email: efish@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>   Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL)<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>   Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>   Plaintiff, | Adv. Pro. No. _____ (BRL) |

v.

TREMONT GROUP HOLDINGS, INC.;
TREMONT PARTNERS, INC.; TREMONT
(BERMUDA) LIMITED; RYE SELECT BROAD
MARKET FUND, L.P.; RYE SELECT BROAD
MARKET PRIME FUND, L.P.; RYE SELECT
BROAD MARKET PORTFOLIO LIMITED; RYE
SELECT BROAD MARKET INSURANCE
PORTFOLIO, LDC; RYE SELECT BROAD
MARKET INSURANCE FUND, L.P.; RYE
SELECT BROAD MARKET XL FUND, L.P.;
RYE SELECT BROAD MARKET XL
PORTFOLIO LIMITED; TREMONT
ARBITRAGE FUND, L.P.; TREMONT
ARBITRAGE FUND IRELAND; TREMONT
EMERGING MARKETS FUND – IRELAND;
TREMONT EQUITY FUND – IRELAND;
TREMONT INTERNATIONAL INSURANCE
FUND, L.P.; TREMONT LONG/SHORT
EQUITY FUND, L.P.; TREMONT MARKET
NEUTRAL FUND, L.P.; TREMONT MARKET
NEUTRAL FUND II, L.P.; TREMONT MARKET
NEUTRAL FUND LIMITED; TREMONT
OPPORTUNITY FUND LIMITED; TREMONT
OPPORTUNITY FUND II, L.P.; TREMONT
OPPORTUNITY FUND III, L.P.; RYE SELECT
EQUITIES FUND; TREMONT MULTI
MANAGER FUND; LIFEINVEST
OPPORTUNITY FUND LDC; OPPENHEIMER
ACQUISITION CORP.; MASSMUTUAL
HOLDING LLC; MASSACHUSETTS MUTUAL
LIFE INSURANCE CO.; SANDRA L. MANZKE
AND ROBERT I. SCHULMAN,

Defendants.

# COMPLAINT

# FILE UNDER SEAL

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Marc Skapof
Email: mskapof@bakerlaw.com
Marc D. Powers
Email: mpowers@bakerlaw.com
Eric R. Fish
Email: efish@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT<br>SECURITIES LLC,<br><br>       Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL)<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>       Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation<br>of Bernard L. Madoff Investment Securities LLC,<br><br>       Plaintiff, | Adv. Pro. No. _____ (BRL) |

v.

TREMONT GROUP HOLDINGS, INC.;
TREMONT PARTNERS, INC.; TREMONT
(BERMUDA) LIMITED; RYE SELECT BROAD
MARKET FUND, L.P.; RYE SELECT BROAD
MARKET PRIME FUND, L.P.; RYE SELECT
BROAD MARKET PORTFOLIO LIMITED; RYE
SELECT BROAD MARKET INSURANCE
PORTFOLIO, LDC; RYE SELECT BROAD
MARKET INSURANCE FUND, L.P.; RYE
SELECT BROAD MARKET XL FUND, L.P.;
RYE SELECT BROAD MARKET XL
PORTFOLIO LIMITED; TREMONT
ARBITRAGE FUND, L.P.; TREMONT
ARBITRAGE FUND IRELAND; TREMONT
EMERGING MARKETS FUND – IRELAND;
TREMONT EQUITY FUND – IRELAND;
TREMONT INTERNATIONAL INSURANCE
FUND, L.P.; TREMONT LONG/SHORT
EQUITY FUND, L.P.; TREMONT MARKET
NEUTRAL FUND, L.P.; TREMONT MARKET
NEUTRAL FUND II, L.P.; TREMONT MARKET
NEUTRAL FUND LIMITED; TREMONT
OPPORTUNITY FUND LIMITED; TREMONT
OPPORTUNITY FUND II, L.P.; TREMONT
OPPORTUNITY FUND III, L.P.; RYE SELECT
EQUITIES FUND; TREMONT MULTI
MANAGER FUND; LIFEINVEST
OPPORTUNITY FUND LDC; OPPENHEIMER
ACQUISITION CORP.; MASSMUTUAL
HOLDING LLC; MASSACHUSETTS MUTUAL
LIFE INSURANCE CO.; SANDRA L. MANZKE
AND ROBERT I. SCHULMAN,

Defendants.

Irving H. Picard, (the "Trustee"), as trustee for the liquidation of the business of Bernard

L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"), and the substantively consolidated estate of Bernard L.

Madoff individually ("Madoff"), by and through his undersigned counsel, for his Complaint,

states as follows:

## NATURE OF THE ACTION

1.      For fifteen years, many of the Defendants named in this Complaint helped funnel
more than $4 billion into the single largest investor fraud in history.   The Defendants
substantially aided, enabled and helped to sustain the massive Ponzi scheme orchestrated by
Bernard Madoff ("Madoff"), in order to reap financial windfalls from their clients' investments.
Through their headquarters in Rye, New York, they managed the second largest group of feeder
funds next to the Fairfield Greenwich group of companies ("Fairfield"), and assisted Madoff in
his fraud.   In turn, these Defendants collectively received more than $2.1 billion in avoidable
transfers from BLMIS that should be recovered by the Trustee for distribution in accordance
with the Trustee's statutory authority.

2.      The Defendants include a number of investment funds and affiliates associated
with the multi-billion dollar money management company now known as Tremont Group
Holdings, Inc.  Defendants include: Tremont Group Holdings, Inc. itself ("Tremont Group"), its
management arms Tremont Partners, Inc. ("Tremont Partners") and Tremont (Bermuda) Limited
("Tremont Bermuda") (all three entities collectively shall be referred to herein as "Tremont");
Tremont Group's parent corporation, Oppenheimer Acquisition Corp. ("Oppenheimer");
Oppenheimer's parent corporations, MassMutual Holding LLC ("MassMutual Holding") and
Massachusetts Mutual Life Insurance Company ("Mass Mutual") (Oppenheimer, MassMutual
Holding and Mass Mutual collectively shall be referred to as "Parents"); Tremont Group's
founder and former CEO, Sandra L. Manzke ("Manzke"); Tremont Group's former President
and CEO, Robert Schulman ("Schulman"); four Tremont-managed funds that were directly
invested with BLMIS and received a number of fraudulent conveyances (collectively, and as
described more fully later in the Complaint, the "Rye Funds"); another fund, Rye Select Broad

Market Insurance Fund, L.P., which was directly invested with BLMIS that did not receive fraudulent conveyances, but should have its claim against the estate denied and subordinated due to the actions of the Defendants ("Rye Insurance"); and over a dozen Tremont-managed funds that were indirect investors with BLMIS through their investments in the Rye Funds (collectively, and as described more fully later in the Complaint, the "XL Funds" and "Tremont Funds").  All of these Defendants assisted Madoff to greater and lesser degrees in perpetuating the fraud and benefitted from the revenue Madoff generated for them.

3.      For years, the Defendants were repeatedly warned and given the opportunity to uncover – through information in their own possession or publicly available – that BLMIS's success could be the result of fraud.  Nonetheless, these Defendants ignored this information and many other obvious warning signs of fraud.

4.      If the Defendants were ignorant of the fraud, it was because they failed in their due diligence and investment management obligations.  They quite simply did not want to know, remaining willfully ignorant in order to maximize their own profits and serve their own self-interest.  The Ponzi scheme was highly profitable for the Defendants until its collapse, as Tremont earned more than $180 million dollars in fees in the six years preceding the collapse of the scheme – and as much as $240 million over the life of the Madoff relationship – as well as the caché of being one of the largest and most profitable hedge funds in the world.  Yet every cent of the billions they accepted in withdrawals and fees over the course of their relationship with Madoff was money stolen from other BLMIS customers.

**Tremont Seeks the "Palm Beach Crowd"**

5.      Beginning in 1994, Tremont Advisers, Inc., which is now known as Tremont Group, founded The Broad Market Fund, L.P. (which later changed its name to the American

Masters Broad Market Fund, L.P. in 1999, and then to Defendant Rye Select Broad Market Fund, LP. in 2006) ("Broad Market Fund").  The Broad Market Fund became one of the largest and longest running Madoff feeder funds.  Like other Madoff feeder funds, this fund was created for the purpose of opening an account in BLMIS's Investment Advisory business ("IA Business") and "feeding" investors' monies to Madoff for investing.  In this account, just as for all the other BLMIS accounts opened for Tremont, Madoff had full trading authority and discretion.  Due to the success of the Broad Market Fund and the returns it purportedly generated, Tremont increased the investors and investments in the various funds they created over time to invest with BLMIS and greatly profited from the fees generated by those investments.  By the time Madoff's scheme collapsed in December 2008, Tremont had given Madoff at least $4 billion through their various funds.

6.      Despite purporting to be an experienced organization which had a sophisticated plan for conducting due diligence on money managers, Tremont did not perform independent, reasonable, or meaningful quantitative, operational, structural, or risk-management due diligence on Madoff or his purported investment strategy prior to or after investing many billions of dollars.  Nor did they fulfill their fiduciary duties to their funds and their investors by performing what they promised to do.  Tremont and Parents did not conduct any reasonable analysis as to whether Madoff's stated returns were even possible based on the strategy he purported to use.  They also did not seriously consider the significant operational deficiencies of Madoff's operations, many of which were highly suspicious and placed Defendants on inquiry notice of fraud.  The Defendants wrongly relied on Madoff's reputation and consciously disregarded many badges of fraud, instead relying on Madoff's history of steady returns and failing to perform proper and required due diligence.

7.     A telling illustration of Tremont's lack of investigation and their preference for investors who did not ask critical questions is an internal email exchange from October 2008. The email exchange is between two Tremont employees discussing the type of detailed information certain institutional investors would require before investing with Madoff.  One employee stated: "Unlike the Palm Beach crowd, institutions won't invest on faith.  They can't." In other words, Tremont primarily sought out certain non-critical institutional investors and wealthy individuals who were unlikely to perform any of their own diligence, and instead would rely on Tremont's answers and purported analysis.   Despite holding themselves out as investment experts which performed exclusive, state-of-the-art due diligence, Tremont failed miserably in their responsibilities and continued to invest with BLMIS despite numerous indicia of fraud.

8.     Though Tremont and Parents never performed independent, meaningful, and reasonable due diligence prior to or after creating their first Madoff investment vehicle, the "success" of their early Rye Funds and the profits earned by Tremont and Tremont's management - including Manzke and Schulman - led to the creation of numerous, additional Madoff feeder funds aimed at marketing Madoff and his purported investment strategy to foreign investors, as well as for leveraging Madoff's consistently positive returns.   Specifically, subsequent to the creation of the Broad Market Fund, Tremont created additional Madoff investment vehicles: Defendants Rye Select Broad Market Prime Fund, L.P., Rye Select Broad Market Portfolio Fund Limited, Rye Select Broad Market Insurance Portfolio, LDC, and Rye Insurance.  These "single-manager funds," as they were known to Tremont, were close to 100% invested with BLMIS.  To even further maximize profits, "multi-manager" funds under the Tremont umbrella – *i.e.,* funds of funds that utilized multiple money managers – also invested a

portion of their assets under management with BLMIS, indirectly through one or more of the Rye Funds. In other words, a large percentage of Tremont's business was built upon the fiction created by Madoff's Ponzi scheme.

9.    For almost fifteen years, Tremont and Parents were successful in blindly relying on Madoff to drive their funds' returns, and more importantly, their profits. They did whatever it took, and ignored whatever they saw that seemed suspicious, in order to expand the Madoff-related profits. Tremont entered into loans and "swap" agreements in an effort to leverage and increase Madoff's purported returns from his strategy. Independent, reasonable due diligence and fulfilling its fiduciary obligations were replaced by Tremont's financial incentive to remain blissfully, and thus willfully, ignorant.

### Lack of "Best Industry Practices" Leads Customer to Question "Legitimacy of the Whole Bernie Thing"

10.    Defendants were aware of the numerous questions surrounding Madoff and BLMIS. In reviewing the investments in 2006, Tremont admitted that Madoff's operation "does not represent the best industry practices." Nevertheless, they continued to pour investor monies into what they knew or should have known was a fraud.

11.    Even some of Tremont's investors raised questions regarding Madoff. For example, in October 2007, one client could not reconcile why his returns were different from the returns of someone with a direct BLMIS account. In communications with Tremont, the client went as far as to state: "[. . .] Makes me concerned about the legitimacy of the whole Bernie thing."

### Oppenheimer and Mass Mutual Acquire Tremont

12.    Tremont's success due to investments with BLMIS led to their being acquired by Defendant Oppenheimer, a subsidiary of Defendants MassMutual Holding and Mass Mutual, for

over $140 million in 2001.  Though the Parents had an opportunity to perform their own due diligence of Madoff's purported strategy, Tremont's success blinded the Parents to obvious questions as to the legitimacy of Madoff's profits, as well as the questions and substantial red flags surrounding Madoff and his operations.

13.     None of the Parents performed meaningful or reasonable due diligence on Madoff, his operations, his consistent returns, or his purported investment strategy prior to or subsequent to the acquisition.  That acquisition was also very profitable to both Manzke and Schulman personally, as they signed lucrative multi-year employment agreements with Oppenheimer's other subsidiary, OppenheimerFunds, Inc. ("OppenheimerFunds"), and had their shares in Tremont purchased at the closing.

**Extraordinary Withdrawals and Profits**

14.     Prior to the collapse, all Defendants, directly and indirectly, via the Rye Funds' withdrawals, received more than $2.1 billion in transfers from BLMIS, including approximately $1.9 billion in the six years prior to the SIPA Proceeding, as defined below.  These vast amounts invested with BLMIS through the Rye Funds resulted in extraordinary fees of over $180 million for Tremont, Manzke, and Schulman in the six years prior to the bankruptcy, which in turn benefitted the Parents.  All told, the Trustee estimates that Tremont received up to $240 million in fees during the life of their investments with BLMIS.

15.     Defendants knew or should have known that they were profiting from fraud for a multitude of reasons, as alleged herein.  Defendants were aware, or at the very least should have been aware, of the following red flags putting them on notice that Madoff was a fraud:

    a.     Tremont and the Parents never questioned Madoff's returns showing consistent, positive results, even when the stock market suffered serious downturns due to,

among other things, the Russian market crisis in 1998, the 9/11 terrorist attacks, the burst of the

tech bubble from 2000-2002, and the 2007-2008 collapse of the financial and housing markets.

This is despite the Madoff strategy supposedly being tied, or correlated, to the overall direction

of the equity markets;

b.       BLMIS's equity trading volumes were an implausibly high percentage

of the entire market; its options trading volumes also often exceeded the entire daily volume of

reported option trades on listed exchanges;

c.       BLMIS's billions of dollars in purported trades never caused any

noticeable price displacement in the market;

d.       Madoff had the uncanny ability to buy equities at some of their lowest

prices for the day and sell them near their highest prices;

e.       Confirmations and monthly statements showed that trades purportedly

made by BLMIS for the Rye Funds fell outside the reported daily ranges of the high and low

prices for these stocks and options;

f.       Madoff would not disclose the identities of his options counterparties

even though BLMIS was trading these options as agent for the Rye Funds.  In addition, the

trade confirmations created by BLMIS and received by Tremont had other abnormalities about

Madoff's options trading that should have caused Tremont to ask more questions about the

mythical counterparties that Madoff refused to disclose;

g.       Madoff's lack of transparency and secrecy had analysts wondering how

they could replicate Madoff's performance and Tremont's own clients asking questions;

h.      BLMIS reported a large number of trades having settlement dates that
were clearly wrong.   In addition, there were eight instances of trades being made on the
weekends;

i.      BLMIS's compensation and organizational structure deviated from well-
established industry practices and Madoff left millions – if not billions – of dollars on the table
that he could have easily charged for his management services.   Instead, Madoff allowed
"feeders" such as Tremont to receive these fees;

j.      BLMIS served as both custodian and executing broker of its customers'
funds and securities, which meant that there was no independent third party that could verify
either the actual existence of customer assets at BLMIS or that transactions for the Rye and
Tremont Funds were actually occurring;

k.      BLMIS, which had billions of dollars under management, was
purportedly being audited by a small, unknown accounting firm located in a strip mall in
Rockland County, New York;

l.      Madoff converted all of his equities to Treasury bills on a quarterly and
year-end basis in another effort to avoid regulatory filing requirements;

m.      BLMIS only mailed paper confirmations days after trades were
purportedly executed, which was a significant departure from the industry practice of allowing
electronic real-time access to trade information;

n.      BLMIS account statements and trade confirmations showed
inconsistencies with Madoff's purported trading strategy; and

16.     In addition, other professionals and institutions involved with the securities industry were able to analyze Madoff, his trading strategy, and his operations and concluded they were problematic.

17.     Through this action, therefore, the Trustee seeks a judgment in the aggregate amount of at least $2.1 billion against the Defendants, avoiding and recovering the preferential payments, fraudulent transfers, fictitious profits, and subsequent transfers they received, as well as disallowance and equitable subordination of their claims against the estate.  The Trustee also seeks additional amounts to prevent any unjust enrichment on the part of Tremont, Oppenheimer, MassMutual Holding, Mass Mutual, Manzke, and Schulman.

## JURISDICTION AND VENUE

18.     Based upon the Trustee's ongoing investigation, it appears that there were more than 8,000 customer accounts at BLMIS over the life of the scheme.  In early December 2008, BLMIS generated account statements for its approximately 4,900 active customer accounts. These statements in the aggregate reflected that BLMIS customers had approximately $65 billion in capital held by BLMIS in their accounts.  In reality, BLMIS had customer assets on hand worth a fraction of that amount.  Customer accounts had not accrued any real profits because no investments were ever made for them.  When the Ponzi scheme came to light on December 11, 2008, investors had lost approximately $20 billion in principal.

19.     The Trustee brings this adversary proceeding pursuant to his authority under sections 78fff(b) and 78fff-2(c)(3) of SIPA, sections 105(a), 502(d), 510(c), 544, 547, 548(a), 550(a), and 551 of title 11, *et seq.*, United States Code, § 101 (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270) (McKinney 2001), New York Civil Practice Law and Rules 203(g) and 208(13) (McKinney 2001), and other applicable law,

for the avoidance and recovery of fictitious profits, preferences, fraudulent conveyances, disallowance of and/or equitable subordination of the customer claims filed by some of the Defendants.  The Trustee seeks, among other things, to set aside and recover all avoidable transfers, collect damages caused by the Defendants, preserve the stolen customer property for the benefit of BLMIS's defrauded customers, and recover all stolen property from the Defendants, in whatever form it may now or in the future exist.

20.     This is an adversary proceeding brought in the Court in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending.  The Securities Investor Protection Corporation ("SIPC") originally brought the SIPA Proceeding in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding").  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA § 78eee(b)(2)(A), (b)(4).

21.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O).

22.     Venue in this district is proper under 28 U.S.C. § 1409.

23.     This Court has personal jurisdiction over all of the Defendants captioned herein under NY CPLR § 301 and § 302 and Bankruptcy Rule 7004.

## THE TRUSTEE, HIS POWERS AND STANDING

24.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously with Madoff's arrest on December 11, 2008, the Securities and Exchange Commission ("SEC") filed a complaint in the District

Court against Madoff, which remains pending.  The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

25.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS.

26.     On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of SIPC.  Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging*, inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

27.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

a.     appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;

b.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

c.     removed the case to this Court pursuant to section 78eee(b)(4) of SIPA;

d.     removed the Receiver for BLMIS.

28.     Pursuant to section 78*lll*(7)(B) of SIPA, the Filing Date is deemed to be the date of the filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

29.     By orders, dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.  The Trustee subsequently was also appointed as trustee of the estate of Bernard L. Madoff personally.

30.     By virtue of his appointment under SIPA, the Trustee has the responsibility of recovering and paying out Customer Property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway.  However, such assets will not be sufficient to fully reimburse the BLMIS customers for the billions of dollars that they invested with BLMIS.  Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recovery from BLMIS accountholders who received preferences, non-existent principal, and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme, and from any entities or individuals to which BLMIS accountholders subsequently transferred those funds.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) section 78fff-2(c)(1) of SIPA .

31.     To this end, the Trustee is bringing this action against the Defendants to recover almost $2 billion in avoidable transfers received by them or on their behalf between December 11, 2002, and December 11, 2008.  A large portion of these avoidable transfers consisted of withdrawals taken from BLMIS by the Rye Funds.  Many of these withdrawals were for redemptions by their investors or were subsequently transferred to other named Defendants.  In addition, over $180 million of those withdrawals were then transferred to Tremont, Parents, Manzke and Schulman in the form of management, administrative, and other fees, bonuses, profits, compensation, dividends and partnership distributions.

32. Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA. Pursuant to section 78fff(b) of SIPA, "Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 [of the Bankruptcy Code]" are applicable to this case "[t]o the extent consistent with [SIPA]."

33. In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

34. The Trustee is a real party in interest and has standing to bring these claims pursuant to section 78fff-1 of SIPA and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

a.    The Defendants received "Customer Property" as defined by section 78lll(4) of SIPA;

b.    BLMIS incurred losses as a result of the claims set forth herein;

c.    BLMIS customers were injured as a result of the conduct detailed herein;

d.    SIPC cannot by statute advance funds to the Trustee to fully reimburse all customers for their losses;

e.    The Trustee will not be able to satisfy all claims;

f.    The Trustee, as bailee of Customer Property, can sue on behalf of the customers-bailors;

g.    As of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted. As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a

-15-

distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

       h.       SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such customers, collectively, "Accountholders"). SIPC has expressly conferred upon the Trustee the power to enforce its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

       i.       The Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

## THE DEFENDANTS

### A.    The Rye Funds

35.    Defendant Rye Select Broad Market Fund, L.P. ("Broad Market Fund") is a Delaware limited partnership organized in May 1994 under its original name of "American Masters Broad Market Fund, LP." The Broad Market Fund's principal place of business during the relevant period was located at 555 Theodore Fremd Avenue, Rye, New York 10580.

36.    The Broad Market Fund, which had a stated objective of seeking long term capital growth through, *inter alia,* investments primarily in securities through selected investment advisers, had a direct account with BLMIS that opened in 1994, with account number 1T0027. During all relevant times, almost all of the monies invested in the Broad Market Fund were given to Madoff and deposited with BLMIS. For all intents and purposes, upon information and belief, the Broad Market Fund is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.

08-01789-smb Doc 183-1-e-2 Filed 12/07/11 Entered 12/14/18 21:24:51 Exhibit R
10-05310-mg Doc 1-3 Filed 12/07/11 Entered 12/07/11 05:33 Main Document
without Table of Contents Pg 20 of 332 Pg 17 of 136

37.     Defendant Rye Select Broad Market Prime Fund, L.P. ("Prime Fund") is a Delaware limited partnership organized in May 1997 under its original name of "American Masters Broad Market Prime Fund, LP" (subsequently renamed "American Masters Broad Market Prime Fund, LP" in or around 1999, and then its current name of "Rye Select Broad Market Prime Fund, LP" in or around 2006). Prime Fund's principal place of business during the relevant period was located at 555 Theodore Fremd Avenue, Rye, New York 10580. The Prime Fund had a stated objective of providing investors with long-term capital growth through, *inter alia*, levered investments managed by selected advisers or managers.

38.     Prime Fund had a direct account with BLMIS that opened in 1997, with account number 1C1260. During all times applicable to this action, virtually 100% of the monies invested in the Prime Fund were given to Madoff and invested with BLMIS. In essence, the Prime Fund was a vehicle through which its investors made leveraged investments in BLMIS, which was generally twice the performance of the Broad Market Fund. The Prime Fund accomplished its leverage through various credit facilities and vehicles, including a loan from Citibank. For all intents and purposes, upon information and belief, the Prime Fund is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.

39.     Defendant Rye Select Broad Market Portfolio Limited ("Portfolio Limited Fund") is an open-ended investment company organized as an exempted company under the laws of the Cayman Islands in 2001 under its original name of "American Masters Broad Market Fund II Limited." The Portfolio Limited Fund's registered office during the relevant period was located in the Cayman Islands, c/o Trulaw Corporate Services Ltd., P.O. Box 866, George Town, Grand Cayman. Defendant Tremont (Bermuda) Limited is the investment manager for the Portfolio Limited Fund. Tremont (Bermuda) Limited delegated substantially all of its investment

management duties to Tremont Partners, which served as "sub-advisor." Tremont Partners was responsible for selecting investment managers, negotiating fee arrangements with those managers, allocating assets among managers, and monitoring the Portfolio Limited Fund's investments. The Portfolio Limited Fund had a direct account with BLMIS that opened in 2001, with account number 1FR080. During all times applicable to this action, virtually 100% of the monies invested in the Portfolio Limited Fund were given to Madoff and deposited with BLMIS.

40.     Defendant Rye Select Broad Market Insurance Portfolio LDC ("Insurance Portfolio LDC Fund") is an open-ended investment company registered in the Cayman Islands as an exempted limited duration company in 1997 under its original name of "Tremont-Broad Market Fund LDC." Insurance Portfolio LDC Fund's principal office during the relevant period was located at Walkers SPV Limited, Walker House, KY1-9002, Mary Street, George Town, Grand Cayman, Cayman Islands. Tremont (Bermuda) Limited is Portfolio Limited Fund's investment manager. Tremont (Bermuda) Limited delegated substantially all of its investment management duties to Tremont Partners, which served as "sub-advisor." Tremont Partners was responsible for selecting investment managers, negotiating fee arrangements with those managers, allocating assets among managers, and monitoring the Portfolio Limited Fund's investments. The Insurance Portfolio LDC Fund had a direct account with BLMIS that opened in 1997, with account number 1FR010. Virtually 100% of the monies invested in the Insurance Portfolio LDC Fund were given to Madoff and deposited with BLMIS. For all intents and purposes, upon information and belief, the Insurance Portfolio LDC Fund is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein. The Insurance Portfolio LDC Fund is now being liquidated in the Cayman Islands.

41.     Collectively, the Broad Market Fund, Prime Fund, Portfolio Limited Fund, and Insurance Portfolio LDC Fund shall be referred to herein as the "Rye Funds."  Each of them, which received transfers from BLMIS as outlined in Exhibits **A and B**, is currently winding down its affairs and its assets have been converted mostly to cash.

42.     The Rye Funds, which were managed in and intentionally took advantage of the benefits of conducting transactions in the State of New York, have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

### B.     Rye Insurance

43.     Defendant Rye Select Broad Market Insurance Fund, L.P. ("Rye Insurance") is a Delaware limited partnership organized in 2008.  Rye Insurance's principal place of business during the relevant period was located at 555 Theodore Fremd Avenue, Rye, New York 10580.

44.     Rye Insurance had a direct account with BLMIS that opened in or around October 2008, with account number 1R0252.  Rye Insurance made one deposit to its account at BLMIS of $40 million in or around October 2008, and did not withdraw any amounts thereafter.  Rye Insurance is named as a defendant herein because it has filed a customer claim with the Trustee, which should be denied and subordinated due to the imputed acts of Tremont.  For all intents and purposes, upon information and belief, Rye Insurance is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.

45.     Rye Insurance, which was managed in and intentionally took advantage of the benefits of conducting transactions in the State of New York, has submitted itself to the jurisdiction of this Court for purposes of this proceeding.

### C.    Tremont

46.    Tremont Group Holdings, Inc. ("Tremont Group") is a Delaware corporation with its corporate headquarters during the relevant period located at 555 Theodore Fremd Avenue, Rye, NY 10580.  Tremont Group is an investment management firm formed in or around 1987, and since in or about October 2001, has been a wholly-owned subsidiary of Oppenheimer Acquisition Corporation.    Originally known as Lynch Asset Management Corporation, the corporation changed its name several times: to Tremont Advisers, Inc. in 1991, to Tremont Capital Management, Inc. in 2003, and to Tremont Group Holdings, Inc. in 2006.    Tremont Group held itself out both in writing and orally as an established leader in the investment management of fund of hedge fund products and multi-manager portfolios.  According to its web site (prior to the collapse of BLMIS), Tremont Group was "at the forefront in setting the standard in the industry for fund of hedge funds investment management."  Tremont Group claimed to have over $7.7 billion in assets under management as of September 2008.  Since 2001, Tremont Group has had five directors, two from Tremont management, two from Oppenheimer, and one from Mass Mutual.

47.    Tremont Partners, Inc. ("Tremont Partners") is a Connecticut corporation with its headquarters during the relevant period located at 555 Theodore Fremd Avenue, Rye, NY 10580 and is a wholly owned subsidiary of the Tremont Group.    Tremont Partners is the General Partner and investment manager of the Broad Market Fund, Prime Fund, Rye Insurance, and the Rye Select Broad Market XL Fund, L.P. (alleged herein below).   In addition, Tremont Partners was delegated substantially all of the responsibilities of investment manager for the Portfolio Limited Fund and Insurance Portfolio LDC Fund.  Tremont Partners is an investment adviser registered with the SEC under the Investment Advisers Act of 1940 ("Advisers Act").  Tremont

Partners, had as it board members Tremont management, including Defendant Robert Schulman who served on it during the relevant time period until his termination in 2008.

48.     Pursuant to sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, as General Partner to the Broad Market Fund, Prime Fund, and Rye Insurance – which are all Delaware limited partnerships – Tremont Partners is liable for all obligations incurred by Broad Market Fund, Prime Fund, and Rye Insurance while serving as General Partner.

49.     Tremont (Bermuda) Limited ("Tremont Bermuda") is a Bermuda corporation that, upon information and belief, during the relevant period was located c/o Tremont Partners at 555 Theodore Fremd Avenue, Rye, NY 10580.  Tremont Bermuda served as investment manager for the Portfolio Limited Fund and the Insurance Portfolio LDC Fund.  These funds paid Tremont Bermuda monthly management fees based on an annual percentage rate of the funds' net asset value.   Tremont Bermuda delegated all or substantially all of its investment manager responsibilities to Tremont Partners.

50.     The various divisions and corporate entities under the Tremont umbrella involve the same decision-makers and were controlled by the same individuals and entities.

51.     Tremont, which conducted their business in New York and was headquartered in New York, intentionally took advantage of the benefits of conducting transactions in the State of New York, and have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

D.      **Oppenheimer, MassMutual Holding and Mass Mutual**

52.     Oppenheimer Acquisition Corporation ("Oppenheimer") is a Delaware corporation with its principal offices located at Two World Financial Center New York, New York 10281.  Oppenheimer was incorporated in 1990 and is a subsidiary of the Mass Mutual

and the parent company of OppenheimerFunds, which, according to its web site, "is one of the nation's largest and most respected asset management companies." Upon information and belief, Oppenheimer was created in 1999 to acquire businesses in the financial services industry, including the mutual fund complex of Oppenheimer funds and the Tremont Group. The board, upon information and belief, during the relevant period, consisted of top executives of MassMutual Holding and/or Mass Mutual.

53. Prior to the purchase of Tremont Group, Oppenheimer claimed that it conducted a due diligence review of the operations of Tremont. This due diligence review revealed that Tremont was heavily invested with BLMIS.

54. Defendant MassMutual Holding LLC ("MassMutual Holding") is the parent company of Oppenheimer and its principal place of business is located at 1295 State Street, Springfield, Massachusetts 01111. The current Chairman (since 2007), former Chief Executive Officer (from June 2005-December 2009) and director (since 2005) of Mass Mutual, Stuart H. Reese ("Reese"), was also the Chairman, Director, President and Chief Executive Officer of MassMutual Holding from 2005-2009. He was also the Chairman (2005-2009) and director (1999-2009) of Oppenheimer.

55. Defendant Massachusetts Mutual Life Insurance Company ("Mass Mutual") is the parent company of MassMutual Holding. Its headquarters are located at 1295 State Street, Springfield, Massachusetts 01111. Mass Mutual is a mutually owned financial protection, accumulation and income management company. According to Mass Mutual's 2009 Annual Report, "MassMutual provides products and services to help meet the financial needs of individual and business clients, including life insurance, disability income insurance, long term care insurance, annuities, executive benefits, benefit funding vehicles and trust services." Mass

Mutual refers to itself, including its subsidiaries, such as OppenheimerFunds and Tremont, as the "MassMutual Financial Group."  In addition, after Oppenheimer's acquisition of Tremont, Mass Mutual with and through Oppenheimer exercised dominion and control over the business activities of Tremont.

56.     Oppenheimer and Mass Mutual both intentionally took advantage of the benefits of conducting transactions in the State of New York, and have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

57.     Below is a diagram of the Tremont and Parents relationship:



### E.     **Manzke and Schulman**

58.     Sandra L. Manzke, a/k/a Sandra L. Manzke Platt ("Manzke") is an individual who, upon information and belief, resides at 2279 Ridgewood Circle, Royal Palm Beach, Florida 33441.  Manzke founded Tremont Group in 1984 and served as Chief Executive Officer until she left Tremont in 2005.  Manzke was responsible for beginning Tremont's long relationship with Madoff, and personally benefitted from the fees Tremont charged their clients for their Madoff

investments. Manzke also personally benefitted from Oppenheimer's acquisition of Tremont Group in 2001.

59. Robert I. Schulman ("Schulman") is an individual who, upon information and belief, resides at 18 Green Valley Road, Armonk, New York 10504. Schulman joined Tremont in 1994. He served as President, co-CEO, and then sole CEO until he left the organization in July 2008. Schulman also served as Director for Tremont Group, Tremont Partners, and Tremont Bermuda. Significantly, Schulman also headed Tremont Group's Rye Investment Management division, which was responsible for managing single manager funds, including the Rye Funds that invested almost exclusively with BLMIS. Schulman was largely responsible for the Tremont Group's relationship with BLMIS, which steadily grew over time. He generally would meet with Madoff at least once or twice a year. Schulman also personally benefitted greatly from the fees Tremont charged to their clients for their Madoff investments, as well as from Oppenheimer's acquisition of Tremont Group in 2001.

60. Manzke and Schulman, who operated Tremont in and intentionally took advantage of the benefits of conducting transactions in the State of New York, have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

**F.      XL Funds**

61. The Rye Select Broad Market XL Fund, L.P. ("XL LP") is a Delaware limited partnership formed on July 13, 2006, with its principal place of business during the relevant period located at 555 Theodore Fremd Avenue, Rye, NY 10580. Tremont Partners acted as the General Partner of XL LP and was responsible for its day-to-day operations and investment management. XL LP sought to provide investors with long-term growth and a return linked to a three times levered exposure to the economic performance of the Broad Market Fund. XL LP

sought to obtain this return through synthetic investments in Broad Market Fund provided by swap transactions with financial institutions.

62.     Rye Select Broad Market XL Portfolio Limited ("XL Portfolio") is a Cayman Islands exempted company that was incorporated with limited liability in the Cayman Islands on February 10, 2006.  XL Portfolio's registered office during the relevant period was located at Walkers SPV Limited, Walker House, KY1-9002, Mary Street, George Town, Grand Cayman, Cayman Islands.  Tremont Partners acted as the investment manager for XL Portfolio. Similar to the domestic XL LP, XL Portfolio sought to provide investors with capital growth through exposure, on an approximate three times levered basis, to the Portfolio Limited Fund. Also like XL LP,  XL Portfolio sought to achieve this return through synthetic investments in Portfolio Limited Fund provided by swap transactions with financial institutions. The XL Funds were managed and overseen by the same individuals at Tremont responsible for the Rye Funds.  For all intents and purposes, upon information and belief, the XL Funds are insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.

63.     Upon information and belief, Madoff would not allow BLMIS customers to utilize leverage, or margin, directly in their accounts at BLMIS. As a result, the XL Funds entered into total return swaps with other financial institutions such as Lehman Brothers, HSBC, Fortis Bank, Scotia Bank, and ABN Amro, which provided a synthetic investment for XL LP in the Broad Market Fund and for XL Portfolio in the Portfolio Limited Fund.  Both Broad Market Fund and Portfolio Limited Fund invested substantially all of their capital with BLMIS.

64.     Every transfer made by BLMIS that made its way to XL LP and XL Portfolio is a recoverable subsequent transfer of stolen BLMIS customer property. In addition, upon information and belief, Prime Fund transferred approximately  $285 million to XL LP over the

life of the swap... To the extent the money transferred by Prime Fund to XL LP originated directly or indirectly from BLMIS, it too is a recoverable subsequent transfer of stolen BLMIS customer property.

65.     XL LP and XL Portfolio, which were managed in and intentionally took advantage of the benefits of conducting transactions in the State of New York, have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

### G.     Tremont Funds

66.     Tremont Arbitrage Fund, L.P. ("Arbitrage Fund"), Tremont Arbitrage Fund Ireland ("Arbitrage Ireland"), Tremont Emerging Markets Fund – Ireland ("Emerging Markets – Ireland"), Tremont Equity Fund – Ireland ("Equity Fund – Ireland"), Tremont International Insurance Fund, L.P. ("International Insurance Fund"), Tremont Long/Short Equity Fund, L.P. ("Long/Short Fund"), Tremont Market Neutral Fund, L.P. ("Market Neutral Fund"), Tremont Market Neutral Fund II, L.P. ("Market Neutral II Fund"), Tremont Market Neutral Fund Limited ("Market Neutral Limited"), Tremont Opportunity Fund Limited ("Opportunity Limited"), Tremont Opportunity Fund II, L.P. ("Opportunity II Fund"), Tremont Opportunity Fund III, L.P. ("Opportunity III Fund"), Rye Select Equities Fund ("Equities Fund"), Tremont Multimanager Fund ("Multimanager Fund"), and LifeInvest Opportunity Fund LDC ("LifeInvest") are all funds of funds managed, advised, and/or overseen by Tremont Partners in Rye, New York, which were invested with BLMIS through the Rye Funds and/or XL Funds and accepted subsequent transfers through the Rye Funds and/or XL Funds.

67.     Collectively, the Arbitrage Fund, Arbitrage Ireland, Emerging Markets – Ireland, Equity Fund – Ireland, Long/Short Fund, Market Neutral Fund, Market Neutral II Fund, Market Neutral Limited, Opportunity Limited, Opportunity II Fund, Opportunity III Fund, Equities

Fund, Multimanager Fund, and LifeInvest shall be referred to herein as the "Tremont Funds."
Upon information and belief, many of these funds are in the process of winding down their
affairs and attempting to convert their assets to mostly cash.

68.     As described more particularly below, the Tremont Funds collectively received
millions of dollars of transfers from BLMIS indirectly through redemptions in the Rye Funds, in
which the Tremont Funds were invested.  These funds received redemptions from the Rye Funds,
which were fraudulent transfers of Customer Property.  The Tremont Funds are subsequent
transferees of stolen Customer Property under the applicable bankruptcy laws.

69.     The Tremont Funds, which were managed in and intentionally took advantage of
the benefits of conducting transactions in the State of New York, have submitted themselves to
the jurisdiction of this Court for purposes of this proceeding.

## THE PONZI SCHEME

70.     Founded in 1959, BLMIS began operations as a sole proprietorship of Madoff and
later, effective January 2001, formed as a limited liability company wholly owned by Madoff.
Since approximately 1986, BLMIS operated from its principal place of business at 885 Third
Avenue, New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran
BLMIS together with several family members and a number of additional employees.  BLMIS
was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities
Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78*o*(b).  By that registration, BLMIS is a
member of SIPC.  BLMIS had three business units: the IA Business, market making and
proprietary trading.  The IA Business was the locus of the fraud.

71.     Outwardly, Madoff ascribed the IA Business's consistent investment success to a
proprietary investment strategy called the "split-strike conversion" strategy.  Pursuant to that
strategy, Madoff purported to invest client funds in a basket of common stocks within the S&P

100 Index – a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100 Index. He also asserted that he would carefully time purchases and sales to maximize value, and correspondingly, BLMIS customers' funds would, intermittently, be out of the equity markets. While out of the market, those funds were purportedly invested in United States Treasury bills or in mutual funds holding Treasury bills.

72.     The second part of the split-strike conversion strategy was the hedge of Madoff's stock purchases with option contracts. Those option contracts functioned as a "collar," limiting both the potential gains and the potential losses. Madoff purported to use proceeds from the sale of one option contract (a call option: the right of a third party to buy stock through BLMIS) to finance the cost of purchasing another (a put option: the right of BLMIS to sell stock to a third party). Madoff told BLMIS customers that when he exited the market he would close out all equity and option positions, and invest all the resulting cash in U.S. Treasuries. Madoff also told IA Business customers, including Tremont, that these "round-trips" into the market would occur between four and ten times each year.

73.     BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in such account statements never occurred, and the profits reported were entirely fictitious. Madoff has admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the split-strike conversion strategy on any trading platform on which BLMIS reasonably could have traded securities. Madoff's split-strike conversion strategy was entirely fictitious.

74.     Prior to his arrest, Madoff assured customers and regulators that he purchased and sold the put and call options over-the-counter ("OTC") rather than through an exchange. Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold *any* of the options he purported to buy and sell. There is no evidence that Madoff traded options through any of the options exchanges. The Options Clearing Corporation, which clears all option contracts based upon the stocks of S&P 100 companies, has no record of the IA Business having bought or sold <u>any</u> exchange-listed options on behalf of any of IA Business customers.

75.     For all periods relevant hereto, BLMIS was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options. Rather BLMIS used its IA Business customers' deposits to pay redemptions and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

76.     The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains, but, in reality, due to the siphoning and diversion of new investments to pay requests for payments or redemptions from other BLMIS accountholders, BLMIS did not have the funds to pay investors on account of their new investments. BLMIS was only able to survive for as long as it did by using the stolen principal invested by subsequent customers to pay earlier customers.

77.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors and to lure other investors into the Ponzi scheme.

78.     Madoff's scheme continued until December 2008, when the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

79.     At his Plea Hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Plea Allocution of Bernard L. Madoff at 23, United States v. Madoff, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50) ("Madoff Plea Allocution"). Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

80.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a Plea Hearing on August 11, 2009 in the case entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had begun at BLMIS since at least the 1980's. Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11).

81.     Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

82. As alleged more fully below, Tremont provided Madoff with more investors and much needed capital, as it ramped up operations and eventually invested more than $4 billion into the scheme over time, earning tens of millions in fees annually for providing Madoff with fresh money.

## HISTORY OF TREMONT AND THEIR RELATIONSHIP WITH BLMIS

### A. Manzke, Schulman, and the Beginnings of the Rye Funds

83. Manzke is one of the founders and a former CEO of Tremont Group. Upon information and belief, in 1984 Manzke founded Lynch Asset Management Corporation, the initial predecessor to what is now the Tremont Group. Manzke was initially CEO and later co-CEO beginning in 2000 with Schulman.

84. Tremont Group's initial focus was on consulting for pension funds and traditional asset management, and Manzke grew the company steadily over time. Upon information and belief, Tremont Group – known at the time as Tremont Advisers, Inc. – went public in 1992 and was traded on the NASDAQ exchange until approximately October 2001, when it was acquired by Oppenheimer. At the time of the acquisition, upon information and belief, Tremont Group had approximately 65 employees, advised on more than $8 billion in alternative investments, and managed more than $1.5 billion of client assets in its proprietary Rye and Tremont Funds.

85. Manzke learned about Madoff in 1991 through Leon Meyers, the former Chairman of Tremont Group, who already had his own personal account with BLMIS. Tremont's first investment with BLMIS came in the form of a proprietary product called "Tremont Advisers L.P." However, Meyers left Tremont Group in 1992, taking that fund with him and renaming it the "Mosaic Fund LP." Manzke continued her relationship with Madoff, however, and in 1994 Tremont founded what became one of the largest and longest running

Madoff feeder funds – American Masters Broad Market Fund, L.P. Despite Manzke's years of experience, Tremont failed to conduct independent or meaningful due diligence on Madoff, his operations, and his purported investment strategy. Prior to investing and thereafter, Tremont did not reasonably investigate whether Madoff's reported returns were plausible based on the strategy he claimed to use. Neither did Tremont reasonably address the serious deficiencies and risks of fraud evidenced by Madoff's operations. Instead of performing basic due diligence as the industry leader they held themselves out to be and touted in their marking materials, Tremont wrongly relied on Madoff's reputation and their own appetite for consistent returns.

86.     Defendant Schulman joined Tremont as President and Chief Operating Officer of what became Tremont Group in 1994 – the year the Broad Market Fund was established. In 2000 he became co-CEO with Manzke, and then sole CEO in 2005, after Manzke's departure. In addition, Schulman served as President of Rye Investment Management, the division of the Tremont Group that was responsible for supervising the single manager funds, which invested with Madoff. Schulman's involvement with Tremont's investments with BLMIS was direct and consistent throughout his tenure there until July 2008.

87.     Manzke left Tremont in 2005 before the conclusion of her five year employment agreement with OppenheimerFunds and founded another investment adviser, Maxam Capital Management LLC, a competing Madoff feeder fund. Upon information and belief, Manzke received $3.5 million in severance payments from Tremont in the two years following her termination. Tremont, however, through Schulman and others, continued their relationship with Madoff and continued to exploit Madoff's consistent returns even after Manzke's departure.

**B.**   **Acceptance of Madoff's Strategy and Terms to Fuel Expansion of Rye Funds**

88.   During his long tenure at Tremont, Schulman developed a close business relationship with Madoff, having regular meetings and discussions with both Madoff and his top lieutenant, Frank DiPascali.   Upon information and belief, Schulman met with Madoff approximately four or five times per year on average between 1995 and 2000.   Upon information and belief, Schulman, as well as other Tremont officers and personnel, also had numerous meetings with Madoff thereafter.

89.   Tremont's investments with BLMIS, including the Rye Funds' accounts, grew exponentially with Schulman at the helm.   Despite his close business relationship with BLMIS and Madoff, Schulman was provided only vague or inconsistent descriptions by Madoff of the split-strike conversion strategy.   For example, Madoff gave Schulman vague and murky stories regarding his supposed trading counterparties, and refused to explain why and when he would enter and exit the market.

90.   Schulman shielded Madoff from investor inquiries and enforced Tremont's policy prohibiting investors from meeting Madoff.   For instance, when one potential investor seeking to invest $30-40 million inquired about the "possibility of meeting Bernie," Tremont Group's Chief Operating Officer (and later President), Barry Colvin ("Colvin"), told Schulman in a November 2001 email that he told the investor "no one gets in to see Bernie."   Schulman responded in kind: "Never meets Bernie – may get in over time if there is more to the relationship – commit [sic] to nothing."   Even when exceptions were made to this general policy, Schulman and Tremont carefully orchestrated meetings.   Schulman or one of the Tremont officers would always be present, making sure that the types of questions asked would not offend or be too probing of Madoff.   Madoff was known to throw customers and potential customers out of his office if the

questions became too controversial. Upon information and belief, Tremont, including Schulman, made sure not to ruffle Madoff's feathers.

91.     In order to keep capitalizing on the ostensible success of the Broad Market Fund, Tremont established the Portfolio Limited Fund and the Insurance Portfolio LDC for foreign investors. In addition, the Prime Fund was established for domestic investors who sought to leverage investments with Madoff. To accomplish this leverage, the Prime Fund opened a $300 million credit facility from Citibank that began in 2005, which was terminated in or around March 2008. The investments made with BLMIS were so successful that Tremont kept expanding their exposure to BLMIS. By September 2008, BLMIS was managing more than $4 billion of assets fed to it by the Rye Funds. This amount comprised approximately 60% of Tremont Group's *total* assets under management. In addition, at the time of the Ponzi scheme's collapse, Tremont had no less than twenty separate funds that at least partially relied on BLMIS for their growth and performance.

92.     Throughout this expansion, Schulman, Manzke and the other Tremont and Parents Defendants chose to blindly accept Madoff's representations about the purported strategy. They also willfully accepted Madoff's oft-repeated claim − to avoid reasonable due diligence – that everything being done was pursuant to a proprietary, confidential "black box" strategy. Schulman and these other Defendants willfully elected not to jeopardize their millions of dollars in fees for the billions invested by the Rye Funds.

### C.     The XL Funds and Tremont Funds

93.     Due to the success of the leveraged Prime Fund, Tremont established two "extra-leveraged" funds: the domestic XL LP and the off-shore XL Portfolio. These funds sought to

provide investors with an investment that would triple the normal Madoff performance through total return swaps.

94.    A swap is a bilateral financial transaction where one counterparty "swaps" the cash flows of a single asset or basket of assets in exchange for cash flows from the other counterparty.  As a result, a swap allows the party receiving the total return to gain exposure and the upside return from a reference asset without actually having to own it.  A key feature of a swap is that the parties do not need to transfer actual ownership of the underlying reference assets.  This allows greater flexibility and reduced up-front capital to execute a valuable trade.

95.    In connection with a swap, in order to hedge its exposure to pay the promised return to the other party, a financial institution may use cash collateral from the swap counterparty plus its own funds to purchase the underlying asset – in this case, the Rye Fund interests.  In exchange for promising to provide the total return based on the feeder fund interests, the financing institution often charges the swap counterparty a higher "borrowing" rate than if it had simply lent money to the investor.

96.    The swap market is mostly institutional and OTC.  Market participants often include, among others, investment banks, commercial banks, mutual funds, hedge funds, funds of funds, private equity funds and pension funds.  Swaps are popular with some hedge funds because they get the benefit of a large exposure with the potential for significant upside gain with reduced cash outlay.

97.    Under the XL Funds' swap agreements, the swap counterparties – consisting of financial institutions such as Lehman Brothers, HSBC, Fortis Bank, Scotia Bank, and ABN Amro – generally agreed to pay the XL Funds, on a three times leveraged basis, an amount equal to the increase in the net asset value of the Broad Market Fund or Portfolio Fund.  The XL LP's

swaps were based on the performance of the Broad Market Fund, while the XL Portfolio's swaps were based on the performance of the Portfolio Fund, less fees and other charges. In exchange, the XL Funds paid the swap counterparties financing charges.

98. The financial institution swap counterparties, although not legally obligated to do so, generally invested in the Broad Market Fund or Portfolio Limited Fund to hedge their exposure to the XL Funds under the swaps. Under these swaps, which were evidenced by confirmations, the XL Funds themselves did not invest in the Rye Funds, but rather transferred cash collateral to the financial institutions under the swaps in order to receive the leveraged performance of those funds. The financial institutions used the cash collateral and their own cash to make direct investments in the Broad Market and Portfolio Limited Funds.

99. Although the financial institution swap counterparties were the direct investors in the Broad Market Fund and Portfolio Limited Fund, the purpose of these transactions was clear: to permit Tremont to leverage their investments with BLMIS, which, in turn, would generate more fees and profits and great Madoff returns.

100. All transfers made from BLMIS to the Rye Funds which were subsequently transferred to the XL Funds are recoverable subsequent transfers of stolen BLMIS customer property.

101. Beyond the single-manager Rye Funds and XL Funds that invested almost all of their capital with BLMIS, Tremont managed a number of multi-manager funds of funds. The Tremont Funds were not invested directly with BLMIS, but rather had indirect investments with BLMIS through the Rye Funds, as well as the XL Funds. Even with their multi-manager funds, a large percentage of Tremont's business consisted of handing off investor capital to Madoff,

watching the accounts steadily and consistently grow on paper, and collecting fees based on these fake returns.

102. All transfers made from BLMIS to Rye Funds or XL Funds which were subsequently transferred to the Tremont Funds are recoverable subsequent transfers of stolen BLMIS customer property.

### D. Tremont Makes Two Hundred Forty Million Dollars from BLMIS's Fraud

103. Despite the lack of independent, meaningful, or reasonable due diligence or active oversight, Tremont made tens of millions of dollars in fees annually based on little more than their ability to take investor money and hand it over to Madoff. These fees made continuing business with Madoff very lucrative, providing millions of reasons to look the other way from Madoff's fraud.

104. Specifically, the Broad Market Fund paid Tremont Partners a monthly management fee based on the net asset value of the fund at the annual rate of 1.0%. Between 2003 and 2007, Tremont made approximately $28.5 million in management fees and $10.3 million in additional administrative fees for managing the Broad Market Fund. In addition, it is estimated that Tremont received more than $20 million in management and administration fees from their management of the Broad Market Fund in 2008 prior to the BLMIS collapse.

105. The Prime Fund paid a monthly management fee at the annual rate of 1.5% of each investor's capital account. Between 2003 and 2007, Tremont made approximately $49.4 million in management fees and $9.7 million in additional administrative fees for managing the Prime Fund. In addition, it is estimated that Tremont received more than $10 million in management and administration fees from their management of the Prime Fund in 2008 prior to the BLMIS collapse.

106.    The Portfolio Limited Fund paid a monthly management fee calculated at annual rates of 1.5%, 1.75%, and 2.25% of month-end net asset value, depending on the class of shares being held.  Between 2003 and 2007, Tremont made approximately $40 million in management fees and more than $2.75 million in additional administrative fees for managing the Portfolio Limited Fund.  In addition, it is estimated that Tremont received more than $13 million in management and administration fees from their management of the Portfolio Limited Fund in 2008 prior to the BLMIS collapse.

107.    The Insurance Portfolio LDC Fund paid monthly management fees of either 1.50% or 1.75% of month-end net asset value of the fund, depending on when the investor was admitted into the fund.  Tremont also took monthly administrative fees based on annual rates of between .20% and .50%.  Between 2003 and 2007, Tremont made more than $6.77 million in management fees and almost $1 million in additional administrative fees for managing the Insurance Portfolio LDC Fund.  In addition, it is estimated that Tremont received more than $3 million in management and administrative fees from their management of the Insurance Portfolio LDC Fund in 2008 prior to the BLMIS collapse.

108.    In total, the Trustee estimates that Tremont received more than $180 million in management and administration fees between 2003 and the collapse of the scheme in 2008.  The Trustee also estimates that throughout the life of the Madoff relationship, Tremont collected a total close to $240 million in management and administrative fees from the Rye Funds beyond that six year period.

109.    Tremont also took fees from the Tremont Funds and the XL Funds, which made the Madoff investments even more profitable.  In fact, due to the way in which Tremont managed several funds that invested in BLMIS indirectly through the Rye Funds, it appears that

-39-

Tremont charged multiple fees for the same Madoff investments.  In an email from September 2004, a Tremont officer noted his disagreement with charging basis points, *i.e.*, fees twice, explaining that "[t]he main issue is that Tremont charges on the Bernie fund an admin fee of 150 bp and on the offshore an additional 190bp's so in effect charging twice over on the same assets."  The email, however, also explained the justification for the double dipping: "Barry [Colvin] feels strongly that there are enough reasons why we can charge this fee twice to get access to Bernie i.e., funds closed so limited capacity, track record etc."  This email correspondence makes clear that Tremont was exploiting their relationship with, and limited access to Madoff, in order to reap as much profit as possible, rationalizing that their access to Madoff was worth the fees charged.

110.    Tremont's Madoff investments were the most profitable part of their business, and those investments dwarfed all of their non-Madoff investments.  According to a Tremont financial report from September 2008, Tremont Group Holdings had total revenues of $109.5 million in fiscal year 2007.  From those revenues, Tremont made more than $54 million from their Rye Investment Management division.  Additionally, from the total of $78 million Tremont received in management fees, over $52 million came from Rye Investment Management.  Out of close to $12 million earned in administrative fees, more than $9.7 million came from Rye Investment Management.  For 2007, Tremont reported investments with Madoff of over $1.2 billion.  These Madoff-related investments were almost 60% of Tremont's total capital raised in 2007.

## CONTROL OF TREMONT BY OPPENHEIMER AND MASS MUTUAL

### A.      The Acquisition

111.     Tremont Group (then known as "Tremont Advisers, Inc.") was acquired in 2001 for approximately $145 million by Oppenheimer, the parent of OppenheimerFunds and a part of the Mass Mutual family.   Upon information and belief, Oppenheimer entered into this transaction because it was looking to expand into the lucrative hedge fund business to provide clients with alternative investments.  As Oppenheimer focused on traditional investments such as mutual funds, Tremont Group provided access to the highly lucrative fund of hedge fund business.

112.     Prior to and after the acquisition, both Oppenheimer and Mass Mutual had multiple and recurring opportunities to perform independent, meaningful and reasonable due diligence on BLMIS.   Oppenheimer received and reviewed Tremont Group's information package, including many documents provided by Tremont Group's representative in the transaction, Putnam Lovell.   For example, Oppenheimer would have had access to any agreement between Tremont or their funds and Madoff, as well as financial information related to the BLMIS-related investments.

113.     Instead of focusing on Madoff's strategy, which in turn drove Tremont's profits, Oppenheimer focused mostly on the numbers associated with the deal and the synergies of offering Tremont's funds to their clients.  Oppenheimer was seemingly blinded by the potential of millions of dollars in fees that it could extract from Tremont's investors, the goodwill created by offering additional investment choices to its customers, and the increase in value Tremont Group would bring to Oppenheimer and its ultimate parent, Mass Mutual, over time.

Oppenheimer continually ignored many red flags raised by Madoff's operations and purported performance.

114.    Upon information and belief, Oppenheimer spent a few months conducting due diligence into Tremont Group prior to July 2001.  According to a Proxy Statement filed by Tremont Group with the SEC on August 20, 2001, Oppenheimer was given access to a "data room" that contained a number of materials relevant to the transaction, including legal contracts, corporate documents, regulatory filings, and financial statements.

115.    In Putnam Lovell's fairness opinion, which was delivered at the time the merger agreement was executed and incorporated in the filed Proxy Statement, Tremont's reliance on a single investment manager was clearly and specifically addressed.  Oppenheimer and Mass Mutual were fully aware of the major role Madoff played in the business they were buying.

116.    Oppenheimer also had numerous meetings with Schulman, Manzke, and Tremont's representatives at Putnam Lovell.  Oppenheimer had access to material information as early as 2001, when it analyzed Madoff and the purported investment strategy, and was on actual and/or inquiry notice regarding serious red flags relating to among other things (as alleged in further detail herein): Madoff's suspiciously consistent rates of return for an S&P 100 strategy; impossible trading volumes; the lack of identifiable counterparties; Madoff's "strip mall" auditor; inexplicable trading anomalies; Madoff's suspicious ability to almost always buy low and sell high when he went into and exited the market; and, the fact that Madoff left hundreds of millions annually in fees for Tremont (and other feeder funds) that reasonably were his to receive as the real investment manager and strategist.

117.    Oppenheimer executives, including Kurt Wolfgruber ("Wolfgruber"), the Director of Domestic Equities at OppenheimerFunds at the time (and later Chief Investment Officer and

President), had the opportunity to meet with Madoff and review the BLMIS facilities for about one hour.  Upon information and belief, Oppenheimer chose to blindly accept Madoff's vague explanations of his lucrative split-strike strategy without pressing him for more specificity.  Oppenheimer was content with the consistency of the returns Madoff produced for Tremont and did not seek or want to upset that lucrative relationship.

118.    Oppenheimer's comfort with Madoff was in spite of two industry reports that were published during the time Oppenheimer was supposedly conducting its due diligence for the acquisition.  These industry reports included a May 2001 article in *Barron's* entitled *Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum*, as well as a May 2001 article in *MAR/Hedge*, a widely read industry newsletter, entitled *Madoff Tops Charts; Skeptics Ask How*.  These articles raised questions about Madoff's legitimacy, the secrecy surrounding Madoff, and how he was able to achieve the consistent returns claimed based upon the investment strategy Madoff employed.

119.    Tremont knew of these reports, and the Parents should have been aware of them as well.  On May 7, 2001, Colvin sent an internal email to a long list of Tremont employees alerting them to "a few press articles regarding Bernie Madoff" in recent news.  The email instructs employees to direct any questions from outside the firm about the article to Tremont Group's management and to decline any comment.  Like Tremont, neither Oppenheimer nor Mass Mutual conducted any inquiry into the suspicions raised by the articles.  They did not speak with the authors or otherwise perform any independent, reasonable, or meaningful due diligence in direct response.

120.    On July 10, 2001, Oppenheimer and Tremont Group entered into a merger agreement pursuant to which Oppenheimer acquired Tremont Group for $145.3 million.

Oppenheimer financed the transaction using cash on hand and, if necessary, capital contributions by Oppenheimer's ultimate parent, Mass Mutual.

121.    Upon information and belief, Mass Mutual and Oppenheimer both viewed the acquisition of Tremont as an opportunity to integrate and combine key segments of their respective businesses.  John V. Murphy ("Murphy"), a former Mass Mutual executive who was Chairman and CEO of OppenheimerFunds at the time of the deal, upon information and belief, personally advised Oppenheimer and negotiated and closed the Tremont Group acquisition without the assistance of a Wall Street financial adviser.

122.    Upon information and belief, Murphy was also an executive vice president and director of MassMutual Holding from 2000-2008.  Upon information and belief, he was also a director, along with Reese and Howard Gunton, at Oppenheimer from 2001-2005.

123.    The *Financial Times* reported on July 11, 2001, after the acquisition was announced, that Murphy said, "It's a win-win deal . . . .  It provides us with retail product, it provides us with institutional product and provides the insurance wrap that MassMutual needs for its offshore product."  According to the *Wall Street Journal* that same day, Murphy also stated that Tremont would help expand Oppenheimer's relatively small institutional business, as well as provide investment strategies for Mass Mutual's large pools of investment money. Wolfgruber was quoted in the *New York Times* on July 11, 2001, as exclaiming that "Tremont fits perfectly with our goal of extending both our product line and our client base."  The *American Banker* reported on July 12, 2001, that Schulman welcomed the acquisition by the Mass Mutual family because "[i]nsurance companies, family offices, and brokerages are our most robust channels."

124.     Schulman and Manzke personally benefited from Oppenheimer's acquisition of Tremont Group, as they entered into five year multi-million dollar employment agreements with OppenheimerFunds as part of the acquisition, whereby they would both retain their position for five years after the merger.  Manzke and Schulman were to receive salaries of $500,000 each and would be eligible for discretionary bonuses of up to 150% of their base salaries.  Oppenheimer could not risk losing Manzke or Schulman, which would have meant losing the lucrative relationship with BLMIS – which is what they were ultimately purchasing.  Upon information and belief, Manzke received up to $16 million and Schulman received more than $8 million from the sale of their Tremont shares and options as part of the acquisition.

**B.     Oppenheimer and Mass Mutual's Direction and Control of Tremont Group**

125.     Upon information and belief, after the 2001 acquisition, Tremont's operations, including the marketing and investment activities of the Rye Funds, were brought under the direction and control of Oppenheimer, and ultimately Mass Mutual.  As alleged herein, Tremont's leaders became employees of OppenheimerFunds, Tremont Group's officers reported to officers of Oppenheimer, and Oppenheimer executives sat on Tremont Group's Board of Directors.  In addition, Tremont Group had offices at OppenheimerFunds, marketed itself as an "Oppenheimer Funds Company," and Tremont and OppenheimerFunds together marketed and managed funds named "Oppenheimer Tremont."  Those entities were under the ultimate control of Mass Mutual, which also invested in funds managed by Tremont that were indirectly invested with BLMIS.

126.     When Oppenheimer's acquisition of the Tremont Group was completed in or around October 2001, Tremont Group posted a press release on its website at that time noting that the acquisition "brings together Tremont, a leader in providing advisory services,

information and investment products to the global alternative investment industry, with OAC's subsidiary OppenheimerFunds, Inc., one of the country's largest and most respected asset management firms."

127.    Murphy stated in the press release: "The combination of [Tremont's] unique product offerings with our vast distribution network will open up the world of alternative investing to a new segment of investors."   Murphy also said that Tremont's fund of funds approach would be "especially appealing to our high net-worth shareholders."

128.    After the acquisition, upon information and belief, Oppenheimer and its officers directly controlled and/or dominated many aspects of Tremont's decision-making process.

129.    Manzke and Schulman were hired as executives of OppenheimerFunds and enjoyed similar benefits as other OppenheimerFunds executives.   Oppenheimer, MassMutual Holding, and Mass Mutual controlled the Tremont Group Board of Directors.   Murphy served on Tremont's Board of Directors, along with Wolfgruber and Mass Mutual Executive Vice President Gunton.   After Gunton left the Board, Michael T. Rollings ("Rollings") replaced him in 2006 as the Mass Mutual representative. Tremont Group at all times after the acquisition held itself out as an "OppenheimerFunds Company" and was required to keep offices at OppenheimerFunds headquarters.

130.    Tremont Group advertised themselves as "an OppenheimerFunds Company" and made payments to Parents of at least $10 million in the form of dividends from Tremont's management fees.   Upon information and belief, this dividend was directly or indirectly made from the Rye Funds, which received withdrawals from BLMIS.   This makes Oppenheimer a subsequent transferee of Customer Property.

131.     Schulman, Manzke, and other Tremont Group officers had regular meetings with Oppenheimer and OppenheimerFunds.  Upon information and belief, Manzke, Schulman, and other officers of Tremont Group reported to and took direction from the Parents.

132.     As another part of this high degree of integration between the businesses, OppenheimerFunds employees also served in management positions with Tremont.   Lynn Keeshan, who had served as Vice President at OppenheimerFunds, served as Tremont Partners' Chief Financial Officer and Senior Vice President.    Margaret Weaver, another OppenheimerFunds employee, also assumed a high level management role, becoming Senior Vice President and Director of Human Resources of Tremont Partners.  Jessica Campbell, an OppenheimerFunds officer, upon information and belief, became a principal financial and operational officer responsible for SEC reporting at Tremont.

133.     The pervasiveness of Oppenheimer's influence over Tremont and their operations is further demonstrated by the listing of Oppenheimer, OppenheimerFunds, and Mass Mutual as "control persons" on Tremont Partners' Uniform Application for Investment Advisers Registration filed with the SEC.  In addition, Oppenheimer and Tremont jointly launched funds with names reflecting Oppenheimer's ownership and integration with Tremont Group, such as the "Oppenheimer Tremont Market Neutral Fund," "Oppenheimer Tremont Opportunity Fund," "OFI Low Correlation Hedge Fund," and "OFI Tremont Core Strategies Hedge Fund."  The OFI Tremont Core Strategies Hedge Fund illustrates the intentional integration and commingling of business functions that Murphy, Wolfgruber, Manzke, and Schulman quickly achieved: Tremont managed its portfolio, Murphy served as trustee, Mass Mutual acted as registered agent for service of process and Oppenheimer furnished the principal place of business and headquarters.

134.    Oppenheimer plainly and clearly advertised its control, as well as that of Mass
Mutual, over Tremont in registration statements filed with the SEC.  For instance, in a filing on
behalf of OFI Tremont Core Strategies Hedge Fund on February 7, 2007, Oppenheimer stated
that Tremont's portfolio manager was responsible for day-to-day management of the funds,
Oppenheimer was controlled by Mass Mutual, and that Tremont was controlled by both
Oppenheimer and Mass Mutual.

135.    Tremont also emphasized their inter-connection to OppenheimerFunds, as well as
Mass Mutual, in their marketing materials provided to investors.  For example, in describing its
privacy policy in its private placement memoranda for various funds, Tremont Group stated:

> Tremont is made up of certain entities, including its investment
> advisory and broker-dealer subsidiaries, and, in turn, is part of a
> larger corporate affiliation owned by the OppenheimerFunds group
> and Massachusetts Mutual Life Insurance Company. The Tremont
> entities and, in some cases, its ownership affiliates often work
> together to provide the financial products and services offered to
> Tremont Clients. By sharing information about Tremont's Clients
> among these companies and affiliates, Tremont can serve Clients
> more efficiently. Tremont is permitted to share information
> concerning Client account history and experiences within and
> among the companies that comprise Tremont and its subsidiaries
> and affiliates.

136.    Based on Oppenheimer's domination and control of Tremont and the Rye Funds,
after the 2001 acquisition, Tremont and the Rye Funds became mere instrumentalities of
Oppenheimer.  Despite this domination and control, however, Oppenheimer did nothing but
encourage Tremont and the Rye Funds to continue feeding investor funds to BLMIS.
Oppenheimer should have directed and required Tremont and the Rye Funds to conduct
reasonable, independent, and meaningful due diligence.  Instead, upon information and belief, it
encouraged further investments with BLMIS despite being on notice of fraud.

C.    **The Role of Mass Mutual**

137.    Mass Mutual, through its control of Oppenheimer and MassMutual Holding, controlled Tremont.  Mass Mutual's 2009 Annual Report notes that Tremont Group is a wholly-owned subsidiary of Oppenheimer, and an indirect subsidiary of Mass Mutual.

138.    Mass Mutual appointed its own representatives on both the boards of directors of Oppenheimer and Tremont Group, as well as key employees who controlled Tremont Group. For instance, Gunton was a director of Tremont Group from in or about 2001 to 2005.  Rollings, who served as Vice President of Mass Mutual in 2005 and Executive Vice President and Chief Financial Officer of Mass Mutual from 2006 through 2009, became a director of Tremont Group in 2005. Rollings was also an executive vice president and director of MassMutual Holding since 2003. Murphy, who was a director of Tremont Group from 2001 to 2009, was not only an OppenheimerFunds executive from 2001 through 2009, but also was an Executive Vice President of Mass Mutual for the same period.

139.    Mass Mutual's majority stock ownership of MassMutual Holding, which owned Oppenheimer, and its installation of its own officers in high level executive positions at Oppenheimer, enabled Mass Mutual to dominate, direct, and control all aspects of Oppenheimer and Oppenheimer's subsidiaries, including OppenheimerFunds and Tremont Group.

140.    This substantial overlap between business entities, as well as Mass Mutual's dominion and control, is consistent with Mass Mutual's operation and marketing of itself as a single, integrated financial services company comprised of its life insurance business and its investment subsidiaries, such as OppenheimerFunds and Tremont Group.  Indeed, Mass Mutual had investments in the Tremont Funds, including Opportunity Fund Limited (through its

subsidiary MassMutual Mercuries Life Insurance Co. Ltd.), the Opportunity Fund III, and the International Insurance Fund.

141.    In addition, through OppenheimerFunds, Tremont was directed not to sell insurance products.  As insurance products were the main products of Mass Mutual's business, it is only logical to conclude that such a direction came from Mass Mutual itself.

142.    Mass Mutual's interest in Tremont Group began even prior to the acquisition. According to an article in the Boston Globe published on May 5, 2009, Mass Mutual executive Ann Melissa Dowling sought the opinion of a consultant, Lee Hennessee of the Hennessee Group, regarding Tremont Group prior to the 2001 acquisition.  According to the article, Hennessee noted that Tremont Group was heavily concentrated in Madoff investments.

143.    Mass Mutual was far more than a simple parent corporation allowing its subsidiary to operate independently.  Mass Mutual was involved in the acquisition and then dominated and controlled Oppenheimer, which in turn dominated and controlled the Tremont Group thereafter.  Upon information and belief, Oppenheimer and Tremont Group became mere instrumentalities for Mass Mutual's expansion into alternative investments, including BLMIS.

144.    Illustrative of this domination and control wielded by Oppenheimer and Mass Mutual, as well as the inter-connectedness of the various entities, is a lawsuit brought in Delaware Chancery Court (No. 4791-VCL) by Mass Mutual, MassMutual Holding, Tremont, the Rye Funds, and XL LP for equitable apportionment, breach of contract, and ancillary declaratory relief against primary and excess directors' and officers' ("D&O") liability insurers that sold Mass Mutual D&O insurance.  That lawsuit seeks coverage for insurance policies covering all of the named insureds – which include Mass Mutual, MassMutual Holding, Tremont, the Rye Funds, and XL LP – for lawsuits brought against them by investors related to their management

08-01789-smb Doc 183-3 Filed 12/14/18 Entered 12/14/18 21:24:51 Exhibit R
without Table of Contents Pg 51 of 136
10-05310-smb Doc 1-3 Filed 12/07/10 Entered 12/07/10 05:33 Main Document
Pg 54 of 332 Pg 51 of 136

of the funds invested with BLMIS.  In other words, Mass Mutual purchased insurance policies on behalf of its subsidiaries and funds that are a part of the Mass Mutual family – including Tremont, the Rye Funds, XL LP, and Oppenheimer – and the Mass Mutual family is suing together in one lawsuit to enforce that coverage for all of the entities affected by the BLMIS investments.

145.    For all of the foregoing reasons, the corporate veils should be pierced and liabilities of Tremont, the Rye Funds, the XL Funds, and the Tremont Funds, should be the liabilities of Oppenheimer, MassMutual Holding and Mass Mutual, jointly and severally.

## TREMONT'S DUE DILIGENCE REPRESENTATIONS TO INVESTORS WENT UNFULFILLED

146.    Tremont Group marketed itself as an experienced manager of funds of hedge funds.  On its website, Tremont Group claimed it had years of experience in the financial industry and was "one of the 'old timers' in the hedge fund arena."  Tremont Group's web site also described itself as having an intensive due diligence and selection process for its managers.

> Tremont selects managers for our funds of hedge funds from the pool of available managers that have passed through our exhaustive multi-stage due diligence process.  In order to screen through and organize the sizable universe of hedge funds, our Investment Management analysts utilize our Tremont Investment Management System (TIMS), a comprehensive, proprietary database enabling us to capture both qualitative and performance-based quantitative information on hedge fund managers and to compare managers to their peer groups using underlying TASS [Trading Advisors Selection System] data.

147.    Tremont Group's web site at one time also touted the TASS system as part of "The Tremont Advantage":

> The integration of TASS makes Tremont the most comprehensive source of hedge fund data and market intelligence, distinguished by two key qualities: exhaustive data gathering and attention to detail. For each hedge fund manager, the TASS Database tracks

over 150 fields of information and it is one of the only sources for assets under management since inception. Since 1990, TASS has made it a practice to interview managers personally, incorporating strategy information into its database, with regular reviews and updates. TASS does not rely solely on the managers as the source of performance data. Our data team checks every submission for logic and **consistency,** with monthly follow-ups to ensure timely reporting. (Emphasis added).

148.    A Tremont Partners "Investment Advisor Compliance Manual and Supervisory Procedures," dated October 5, 2004 ("Compliance Manual"), discussed due diligence procedures.  The Manual states:

> Prior to Managers being included in client portfolios they must undergo a level of review and examination by manager research personnel from the investment management staff.  Those individuals are also responsible for continuing to monitor those Managers included in those portfolios in a manner reasonably consistent with the steps taken in the initial investigation.

The Manual also discusses the steps Tremont Partners would take in selecting a new manager for a fund investment: creating a due diligence questionnaire, interviewing the manager, and having a formal meeting of Tremont's Investment Committee for final determination.  At that time, the Investment Committee had seven members, including Schulman, Colvin, and Cynthia Nicoll (identified below).

149.    In addition, the Compliance Manual discussed ongoing monitoring:

> In terms of ongoing due diligence and monitoring, manager research personnel are expected to be in regular contact with Managers regarding their performance, market exposure and outlook.  In addition to performance monitoring, such personnel are expected to perform operational monitoring which may include examining and analyzing changes made to Managers staffs, policies, and internal controls.

150.    The Private Placement Memorandum for the Broad Market Fund set forth a summary of the responsibilities of Tremont Partners, the general partner. Tremont Partners was

"responsible for the day-to-day administration and operation" of the Broad Market Fund. Tremont Partners "had the primary responsibility for monitoring the ongoing activities of the Investment Advisor or Investment Advisors."

151. Tremont's literature referred to a four-step investment process. Step 1 was Manager Sourcing Selection and Monitoring. According to the materials, this approach required both a qualitative interview process, a quantitative research process, and an operational and business risk interview process. Part of Step 1 also included "[i]nsist[ing] on operational and business **best practices to eliminate the 'fraud or mismanagement put'** and "monitor[ing] with ongoing qualitative and quantitative research to understand linear and non-linear beta, and alpha." (Emphasis added). This first step was an important precursor to the next three steps Tremont noted: Asset Allocation, Portfolio Construction, and Performance and Risk Attribution.

152. Cynthia Nicoll ("Nicoll"), Tremont's Chief Investment Officer from on or about October 2005 through May 2008, stated in a 2006 meeting with Oppenheimer that Tremont did not permit investment with managers who were unable to demonstrate how they captured returns. This was untrue as to Madoff, because Tremont had very little understanding as to how Madoff was able to capture the extraordinarily consistent returns from a traditionally low rate of return performance, pedestrian investment strategy. Schulman stated during that same meeting that Tremont aimed to differentiate itself from competitors by touting their comprehensive investment process, managing to clients' risk level, and avoiding public mistakes.

153. On information and belief, none of investments made by Tremont with BLMIS ever underwent any "exhaustive multi-stage" due diligence process. Tremont did not, on information and belief, independently, meaningfully, or reasonably analyze or test any qualitative or performance based information on Madoff. When it came to investments with

Madoff, Tremont did not exhibit minimal, let alone the industry standard, "attention to detail" that it touted as a reason to invest with them. On information and belief, Tremont did not reasonably or independently "track over 150 fields of information," and did not adequately check submissions from BLMIS for "logic and consistency." They also knew that BLMIS's IA Business at BLMIS did not exhibit "best practices" for a manager.

154. On information and belief, when it came to Madoff, Tremont willfully disregarded their fiduciary duties to their investors and their own due diligence processes. They abandoned their systematic approach to investments and the monitoring of their hedge fund managers. Tremont did *not* insist on operational and business best practices designed to eliminate fraud and mismanagement. Tremont, as well as the other Defendants, essentially looked the other way when it came to Madoff.

155. Tremont also failed to monitor the Madoff-related investments. If they had, Tremont should and/or would have noticed a number of peculiarities and inconsistencies that would put them on notice that Madoff was committing fraud.

156. Instead, Tremont created funds for investment with Madoff without regard to due diligence, and continued growing those investments based on little more than Madoff's performance and blind trust based on Tremont's long personal relationship with him. When it came to Madoff, Tremont did not comply with their own policies and procedures, made exceptions to accommodate Madoff for their own self interest, ignored best practices, and otherwise disregarded or failed to fully perform their claimed due diligence and monitoring in connection with a quantitative research process, operational risk analysis, fraud and mismanagement.

157.    Defendants Parents, Rye Funds, XL Funds, and Tremont Funds, through the imputation of Tremont's knowledge and activities to them as a matter of law, buried their collective heads in the proverbial sand and refused to reasonably inquire into many red flags well known to them and many others throughout the financial and hedge fund industries.

## TREMONT IGNORES NUMEROUS RED FLAGS

158.    Tremont and their management were aware of many of the troubling questions surrounding Madoff well before Madoff's fraud was revealed.  For example, an email from a foreign client of Tremont describing a May 2003 meeting with Madoff attended by Schulman, Nicoll, and Senior Vice President, Jim Mitchell ("Mitchell"), set forth a number of suspicious facts concerning Madoff.  These included: (1) the fact that Madoff left all investor relations "to the likes of Tremont and Fairfield [Greenwich Group] and hardly grants direct meetings with end investors; (2) Madoff did not earn a fee apart from small commissions on trades; (3) annual reports will show only treasury bills at the end of each year – "zero transparency"; (4) Madoff was self-clearing and had custody of the securities; and (5) the returns were "exceptionally stable with only 7 negative months since 1990."

159.    The above red flags, as well as a number of others enumerated below, put the Defendants on inquiry notice that Madoff was committing fraud.

### A.    Madoff's Unrealistic Consistency

160.    The Defendants' understanding of Madoff's purported investment strategy was that Madoff was undertaking a split-strike conversion strategy.  This strategy involved the purchase of a basket of stocks in the S&P 100 index, while simultaneously purchasing S&P 100 put options to protect investors from a decline in the market.  Madoff also purportedly sold out-of-the money S&P 100 index call options in an effort to finance the costs of the purchase of the put

options, which in turn was supposed to limit the upside potential of the portfolio. Madoff's consistency of performance was so improbable that Tremont should have known that it was simply impossible.

161. Although ostensibly employing a strategy involving the purchase and sale of S&P 100 equities, Madoff's returns bore virtually no correlation with the S&P 100. Attached to the Complaint as Exhibit **D** is a graph depicting the value of investments in two Madoff feeder funds (Rye Select and Fairfield Sentry), compared to an investment in the S&P 100 Index between 1995 and 2007. As the graph shows and as one would expect, the Madoff feeder funds are highly correlated to each other. In contrast, both funds' returns bear little to no relationship to the S&P 100 Index, with a correlation of approximately 0.33, with 1.0 being a perfect correlation and 0.0 being no correlation. Given that the stocks purportedly bought were all part of the S&P 100, there should have been a much higher correlation.

162. Madoff's reported profits also were remarkably consistent even during periods of severe downturns in the equities market. Exhibit **E** shows two-month returns for the Broad Market Fund, S&P 100 Index, and 10-Year U.S. Treasuries for all two-month periods in which the S&P declined by more than 10% from 1995 to 2007. During these market downturns, the Broad Market Fund produced positive returns similar to risk-free Treasuries; completely opposite from the performance of the equity markets. The Broad Market Fund achieved these returns despite holding S&P equities during these downturns. Instead of conducting independent due diligence of this facially suspicious record on returns during severe market downturns, Tremont and Parents turned a blind eye and relied solely on Madoff's explanations for something which made no sense.

163.    The Broad Market Fund performance further evidences this continuously waving red flag.  Between 1996 and 2008, the Broad Market Fund's returns consistently ranged between 9.5% and 18.3%, regardless of how the S&P 100 was performing.  For example, in 2000, the S&P 100 was down 13.4%, but the Broad Market Fund had a positive return of 14.9%.  In 2001, the S&P 100 was down by 14.9%, but the Broad Market Fund was up 13.1%.  In 2002, the S&P 100 was down by 23.9%, but the Broad Market Fund was up by 12.2%.  While world financial markets were collapsing in 2008 and the S&P 100 plummeted nearly 37% through November 2008, the Broad Market Fund was up by 9.5%.  These funds, dependent upon Madoff's success, outperformed the S&P 100 in years where the S&P 100 was double-digit negative by an outstanding 28% to 46%, despite being an equity strategy that was purportedly correlated and based upon the S&P 100.

164.    Nor did Tremont quantitatively analyze Madoff's performance against commonly recognized metrics used in the industry in evaluating the performance and risks associated with hedge fund managers.  Such financial tools include Sharpe ratio, volatility, percent positive months, average negative rate of return, and maximum drawdown.  Had Tremont employed any of these kinds of metrics, they would have determined that Madoff's uncanny consistency with little risk was likely a fraud.  Even without employing them, common sense dictated that Madoff's steady, consistent returns over such a long time period were simply impossible.

**B.      Improbable Equities Trading Volume**

165.    The Rye Funds' several account statements from BLMIS regularly indicated that BLMIS's trades in a particular stock alone accounted for a large percentage of that stock's trading volume on the listed markets.  This meant that BLMIS's trades for <u>all</u> of its IA Business customers often approached the entire volume of equity trades on the listed markets. Manzke and Schulman understood that during the last six years before the scheme's collapse, Madoff was

supposedly managing $12-$15 billion for BLMIS customers and generally traded them at the same time. Analyzing the Rye Funds' statements should have caused sophisticated hedge fund managers and advisers like Tremont and Parents to question how the Madoff customers' transactions could have exceeded the total volume listed as traded on a particular day.

166.     Each time Madoff supposedly entered the market, he purportedly purchased between 35-50 of the stocks comprising the S&P 100 for the Rye Funds' accounts.  Between 1998 and 2008, there were 29 occasions where the stocks Madoff purchased for the Rye Funds alone accounted for more than 10% of the trading volume for those stocks on the entire composite volume for those stocks traded.  In addition, over that same period of time, there were over 500 occasions where the stocks Madoff allegedly purchased accounted for 6-10% of the entire volume of the entire composite volume.  In light of Tremont's knowledge that Madoff claimed to enter and exit the market for all the IA Business customers at the same time, and their awareness that he managed collectively around $15 billion, a sophisticated manager such as Tremont should have questioned how Madoff's alleged trades could account for such a high percentage of the total volume traded on the exchanges of a particular stock.

167.     There also were instances where the purported purchase or sale of securities at the prices BLMIS claimed was improbable given the trades recorded on that day.  Attached as Exhibit **F** are a number of graphs showing a random sampling of instances of such improbable transactions.  For instance, as illustrated in Exhibit **F**, a falsified trade confirmation reported the purchase by BLMIS of 125,550 shares of Bristol Myers Squibb Co. on March 5, 1999, at the price of $63.71 per share on behalf of the Rye Funds.  However, only 600 shares of Bristol Myers Squibb traded on that date at or below $63.71.

168.    The same anomalies are apparent in looking at purported sales of stock by BLMIS on behalf of the Rye Funds.  As also illustrated in <u>Exhibit F</u>, Madoff purported to sell 155,509 shares of American Express on behalf of the Rye Funds at a price of $51.64 per share on June 22, 2004.  However, only 1,200 *total* shares of American Express were sold at or above the price of $51.64 on June 22, 2004.

169.    Tremont, as the pioneer and purported industry leader in due diligence, investment monitoring, and best practices, knew or should have known that such glaring irregularities concerning such improbable trades and implausible trading volumes were indicia of fraud.  With the billions Tremont understood Madoff to be trading on behalf of customers like themselves, Tremont was on notice that they needed to conduct further inquiry.  Tremont did not conduct any such reasonable inquiry.

### C.    Impossible Options Volumes

170.    Defendants were also on inquiry notice that the volume of Madoff's purported options trading for the Rye Funds was impossible.  S&P 100 Index options, such as those used in Madoff's split-strike conversion strategy, must be traded on the Chicago Board Options Exchange ("CBOE") under the symbol OEX.  Further, these options and the associated trade confirmations from BLMIS had CUSIP numbers, which are unique security identification numbers that identify the company or issuer and the type of security, which corresponded to the S&P 100 Index options that were traded on the CBOE.

171.    When comparing the volume of OEX options that BLMIS was purportedly trading on behalf of the Rye Funds with the CBOE volume, BLMIS traded more OEX option contracts than the **entire** volume of the CBOE for those contracts on a number of occasions.  Upon information and belief, for the period from 1998 to 2008, out of a total of 846 options

transactions, 711 of them – over 84% – were greater than the total volume traded that day on the CBOE for that particular option contract.

172.    A graph demonstrating the comparison between the volume of OEX put options BLMIS purported traded on behalf of the Rye Funds and the volume of those same put options traded on the entire exchange between 2001 and 2008 is striking.  As shown in Exhibit **G,** the volume of OEX100 put options completely dwarfs the volume of OEX put options traded on the entire CBOE

173.    In addition, as shown in Exhibit **H**, the volume of OEX100 call options BLMIS purportedly traded on behalf of the Rye Funds in relation to the volume of those same call options traded on the entire exchange, was a huge red flag signaling likely fraudulent trading activity. There was rarely a time when BLMIS claimed it traded fewer OEX100 call options for the Rye Funds, alone, than were traded on the entire CBOE.

174.    An analysis of the purported options trading volume against the CBOE volume – which easily could have and should have been performed by Tremont – confirms that they did not perform independent and reasonable due diligence, or any follow-up, concerning the Madoff trading activities.  Even if it was to be believed that Madoff executed some or all of the reported options trades on the OTC market, it still would be virtually impossible for a single counterparty on an OTC trade to engage in a transaction exceeding the entire volume of the CBOE.  Had the Defendants conducted independent and reasonable due diligence, they would have confirmed that the options trading reflected on their account statements, as well as the strategy, were all a sham.

### D.    Lack of Strategy Footprint

175.    A reasonable quantitative review like the one consistently marketed by Tremont would have also focused on how Madoff could have traded billions of dollars without ever affecting any market.  Madoff's strategy involved moving billions of dollars into the market over the course of one or more days, and then selling all of those securities over a similar time span. It was the Defendants' understanding that by the mid 2000s, Madoff moved $12-$15 billion into and then out of the equities and options markets a number of different times per year.  The Defendants never independently investigated how these trades could be accomplished without any impact on the price of the securities bought and sold, without any market footprint, and without anyone "on the Street" knowing or even hearing about Madoff's alleged trading activity.

176.    The purchase and sale of $12-$15 billion of stocks in a short period of time would have, under normal market conditions, resulted in adverse stock price movements, cutting into the alleged profits from the transactions. Upon information and belief, Tremont did not conduct independent or reasonable due diligence into whether the prices Madoff obtained for these large transactions were in fact at depressed, medium, or high daily prices for the stock transactions in question.

177.    Upon information and belief, the Defendants did not inquire as to why Madoff's purported trades never caused even a small ripple in the market.  Such displacement was never observed, of course, because the trading did not occur.  Based on the lack of any observable market reaction, the Defendants were on inquiry notice that Madoff's alleged trades were not happening.

178.    When Madoff purportedly exited the market, he claimed to have placed his customers' assets in Treasuries or mutual funds invested in Treasuries.   The movement of

billions of dollars in and out of the market also should have materially affected the price of Treasuries. This was another piece of a basic reasonable quantitative review that Tremont chose not to perform.

### E.     Madoff's Uncanny Ability to Buy Low and Sell High

179.    Madoff account information reveals that, upon information and belief, he bought equities below the daily price midpoint nearly 78% of the time and sold those same equities above the daily price midpoint over 71% of the time. In short, Madoff demonstrated an almost supernatural ability to consistently buy low and sell high. Tremont purportedly reviewed their statements regularly, yet did not bother to inquire as to how Madoff was able to accomplish this statistical improbability.

180.    An example of this red flag is depicted on the chart attached as Exhibit I. As this exhibit shows, relative to the range of possible intraday market prices in March 2003, Madoff purchased equities at low prices on March 12th, 13th, and 14th of 2003, and then sold them at prices close to their highs on March 19th, 20th, and 21st. This red flag would have and should have put a reasonable money manager on inquiry notice that Madoff may be illegitimately backdating trades, front-running, or capitalizing on inside information.

### F.     Trading Outside of Daily Price Ranges

181.    The Rye Funds received trade confirmations from BLMIS reflecting securities transactions that could not have occurred, because they took place outside of the range of stock and options prices for such securities traded in the market on the days in question.

182.    There were, upon information and belief, 560 instances from 1998 to 2008 where the purported equities purchased for the Rye Funds' accounts were completely outside the range of the high and low for the stock on the days purportedly purchased. Similarly, there were, upon

08-01789-smb Doc 183-2 Filed 12/14/18 Entered 12/14/18 21:24:51 Exhibit B
without Table of Contents Pg 66 of 332 Pg 63 of 136

10-05310-smb Doc 1-3 Filed 12/07/11 Entered 12/07/11 05:33:24 Main Document
Pg 66 of 332 Pg 63 of 136

information and belief, 64 instances of purported options transactions that were completely outside the high and low daily ranges.

183.     Upon information and belief, there were over 600 instances of highly questionable and impossible information on purported trades that Tremont missed or failed to question as part of their highly touted due diligence procedures.

### G.     Options Trading with Mythical Counterparties

184.     There were multiple irregularities with the options trading executed by BLMIS, apart from the volume impossibilities alleged above.   Another glaring red flag was Madoff's secrecy regarding the identity of the counterparties on the options transactions.   Madoff would not disclose the identities of these counterparties, and Tremont simply accepted Madoff's vague descriptions of the counterparties without seeking further information.

185.     The Rye Funds, as BLMIS customers, each executed an agreement entitled "Terms and Conditions for Option Hedging Transactions."   This agreement describes the relationship between BLMIS and the Rye Funds: "The following instructions establishes the terms and conditions under which Bernard L. Madoff Investment Securities LLC (BLMIS) will effect, *as agent*, the client's transactions". (Emphasis added).   However, in spite of the fact that BLMIS was choosing the counterparty on behalf of the Rye Funds principal accounts, it was the understanding of the Rye Funds that the counterparty risk was borne by the Rye Funds themselves rather than the broker-dealer BLMIS.   Curiously, Tremont had no specific understanding of the counterparties to these transactions.   Upon information and belief, at no time did Tremont seek out or have any discussions with any purported counterparties.   Nor did Tremont review any documentation concerning these counterparty relationships or transactions. This is despite the fact that Rye Funds being the "principals on the transactions and thereby

having full financial exposure on the trades, not BLMIS as the "agent." By this failure, Tremont allowed its Rye Funds and their investors to be exposed to billions of dollars of potential losses were the counterparties to fail or break the trades.

186. Schulman and Manzke willingly accepted Madoff's refusal to disclose the names of the counterparties even though the Rye Funds bore significant financial risk. Moreover, if BLMIS was simply acting as the Rye Funds' agent, there would be no legitimate reason to withhold such vital information from the Rye Funds' fiduciary risk management responsibilities.

187. The Rye Funds' options trade confirmations contained other significant anomalies that contradicted Madoff's representations. First, Madoff claimed to Schulman that the options trades were done OTC and not through the CBOE. In the OTC market, unlike CBOE trades, the counterparty is generally listed and identified on the confirmation. None of BLMIS's options trade confirmations sent to, received, and reviewed by Tremont ever identified the counterparty, which is contrary to the representation that these option transactions were done OTC. In addition, options traded on the CBOE have an identifier number known as a CUSIP number. The CUSIP number allows traders to quickly access electronic information regarding particular options by simply inputting the CUSIP number in commonly used data terminals. By contrast, OTC options are private transactions that are not readily assigned any CUSIP number, especially not options contracts with marked similarities to those options trading on the CBOE. Despite this fundamental difference, the trade confirmations BLMIS sent to Tremont for review were clear errors that went unheeded. They included CUSIP numbers, similar to those identifying options on the CBOE, even though the ostensible trades were represented to be private, OTC transactions.

188.     Additionally, even though BLMIS was to act as the Rye Funds' agent, many trade confirmations received by Tremont were coded as "principal" transactions - meaning that BLMIS, as opposed to the Rye Funds, was the party on the other side of the equities transactions. This was glaringly inconsistent with the terms of the relationship between BLMIS and the Rye Funds as outlined in the terms and conditions of BLMIS's trading.  This is yet one more instance of Tremont ignoring Madoff's inconsistencies.

189.     Despite these abnormalities, Madoff refused to disclose the names of the counterparties to the options trades.  This was despite Rule 10b-10 of the Securities Exchange Act, which requires the disclosure of counterparties on agency transactions upon request. According to Schulman, Madoff told him that the options counterparties were major financial institutions in Europe.  Such non-specific information required independent due diligence, including contacting these counterparties for verification of identities and activities.

190.     Not only did Tremont fail to confirm any of this information or independently question why they were not being provided with their counterparties, but Tremont and their officers – including Schulman – at times also falsely led others to believe they knew the counterparties. For example, in their aggressive quest to leverage hundreds of millions of dollars for Madoff in 2007, Tremont advised a representative of J.P. Morgan Chase ("Chase") that "we know the general characteristics and minimum credit rating" of the counterparties and that the counterparties "frequently post collateral" with BLMIS.  Obviously this "knowledge" was fiction, as Tremont never saw evidence of collateral or credit ratings.  This "knowledge" was merely a recitation of the unverified information provided to them by Madoff himself.

### H.       Madoff's Lack of Transparency and Secrecy

191.     Madoff's lack of transparency on all aspects of the strategy, his unwillingness to
allow genuine due diligence, and his unprecedented levels of secrecy were all well known to the
Defendants.   Instead of independently questioning why Madoff was so secretive, Defendants
were willingly complicit in advancing this lack of transparency in direct contrast to their own
best practices.  Defendants indulged Madoff's "don't ask, don't tell" policies.

192.      In an interview with the PBS television program, "Frontline," which aired in
2009, Manzke admitted that even though she regularly advocated for more openness and
transparency in the hedge fund industry, Defendants didn't apply those standards when it came
to Madoff:

> MARTIN SMITH: [voice-over] Manzke says everyone operated by Madoff's
> secrecy rules.
>
> [on camera] Did Madoff say to you, "Don't put me in your prospectus"?
>
> SANDRA MANZKE: Yes. He did.
>
> MARTIN SMITH: Do you think that's right? Do you think that's appropriate?
>
> SANDRA MANZKE: I don't know. Every one of my clients knew that this was a
> Madoff feeder fund, and-
>
> MARTIN SMITH: So why not put it in a prospectus, then?
>
> SANDRA MANZKE: That was one of, always, Bernie's conditions of getting an
> account.
>
> MARTIN SMITH: But you've publicly called for transparency. That's
> transparency.
>
> SANDRA MANZKE: Yes. But many funds and investors were very secretive.
> They didn't mention that they had money with Madoff. It was something you
> didn't talk about.

10-05310-smg  Doc C-183  Filed 12/07/11  Entered 12/07/11 21:05:33  Main Document
without Table of Contents  Pg 67 of 136

(Transcript from *Frontline* program on "The Madoff Affair," available online at http://www.pbs.org/wgbh/pages/frontline/madoff/etc/script.html.)

193.    Manzke's broadcast interview confirmed that Defendants ignored issues of lack of transparency to accommodate Madoff's "conditions" to investing.  Manzke's interview is also consistent with other internal documentation demonstrating Defendants' compliance with Madoff's demand for secrecy.  In one email from December 2000, a Tremont employee responded to a number of questions from a current or potential investor in Germany.  According to the email, Madoff indicated that Tremont should not use his name, "as he was managing money only for family and friends." Upon information and belief, Tremont knew that statement was false as they understood then that Madoff was managing billions for dozens of feeder funds worldwide.  These foreign feeder funds with scores of institutional, European and other sophisticated investors were not "friends and family."

194.    Clients and potential clients of Tremont voiced their concerns about Madoff's lack of transparency.  For instance, in May 2004, according to an internal Tremont email, a potential investor "was still concerned about Tremont's relationship with Madoff, saying that there was no transparency there and that it was prone to a blow-up that would destabilize Tremont. . . ."  Tremont scoffed at the suggestion that Madoff lacked transparency, even though they knew or should have known better.  A Tremont employee noted in response: "Some misconceptions never die, it seems."

195.    Yet another potential investor brought up the same transparency issues in a February 2005 email.  The potential investor noted that it had been an investor in "Fairfield" (likely Fairfield Sentry) a few years earlier, "but didn't get transparency, and feel that they were not seeing the operation."  Instead of actually trying to get transparency from Madoff, however,

Tremont's focus was on the money. The response was that if they could "address some of their transparency questions that might mean a lot of money for Bernie." Once again, the Defendants' main concern was feeding "a lot of money" to Madoff, as opposed to actually understanding what Madoff really was doing with that money.

196.    On or around May 31, 2006, Mitchell, who worked in Tremont's London office and served on Tremont's Investment Committee at the time, met with the CEO of a client. In an email describing the meeting, Mitchell noted that "[o]ne issue came very clear": that this client was "nervous" after meeting with Tremont regarding Madoff, to whom they refused to grant access. "They have $70m with Madoff, and we derive over $1m in fees from this." Despite being an investor for four years, however, "they have a new team of players that have questions and get spooked easily." Instead of actually questioning Madoff's strategy or performing reasonable and independent due diligence into why clients, investors, and potential investors were concerned, Tremont simply looked to deflect these concerns.

197.    In October 2007, one client whose father-in-law had a direct account with BLMIS, posed questions regarding the returns generated by his father-in-law's account and the client's investment with the Rye Funds. The client was unable to reconcile his returns with the significantly different returns of his father-in-law's direct BLMIS account, when they both supposedly were traded the same way and at the same time by Madoff. The client wondered: *"Makes me concerned about the legitimacy of the whole Bernie thing."* (Emphasis added.) Schulman and Darren Johnston ("Johnston"), who spent much of his time marketing and promoting the Rye Funds as Vice President and Manager of Rye Investment Management, tried to explain away the discrepancies. But the client was unconvinced and remained troubled by his analysis and, upon information and belief, redeemed his investments shortly thereafter. The

Defendants, however, continued blindly investing with Madoff, failing to conduct any reasonable or independent due diligence into Madoff's legitimacy.

198.    As the inevitable collapse of the Ponzi scheme drew closer, questions about Madoff continued.    In March 2008, Citibank sought for the first time indemnification for manager fraud – i.e., fraud on the part of Madoff – as a condition for extending a credit line to the Prime Fund.    Until that time, Citibank had been providing financing for Prime Fund for approximately three years.    Instead of admitting to themselves that this was a major red flag, Tremont sought out another bank that would continue providing leverage to exploit Madoff's returns.

199.    Defendants were on inquiry notice that Madoff was being deceptive and going to extraordinary lengths to remain cloaked in secrecy.    Defendants did not legitimately investigate in response, and continued to facilitate Madoff's deceptive practices in exchange for tens of millions of dollars in fees annually.

## I.    <u>Settlement and Trade Anomalies</u>

200.    Apart from options trades that exceeded the daily trade volumes of the same contracts on the CBOE and equity trades executed outside the daily price range of the composite tape, there were other abnormalities easily discoverable on the monthly statements and confirmations that Tremont received for the Rye Funds.    There were numerous instances of purported settlement dates for options and equities transactions that were inconsistent with the standard market convention.

201.    Specifically, upon information and belief, there were 941 instances where the purported settlement date for an options transaction was indicated to settle <u>three</u> days after the trade.    Any person with a modicum of understanding of the options markets knows that

settlement of options transactions is <u>one</u> day after the trade, not three.   These clearly inappropriate settlement periods occurred in over 25% of all the options transactions in the Rye Funds from 1998 to 2008.

202.   Similarly, upon information and belief, there were 1,096 instances in the Rye Funds' trade confirmations sent by BLMIS to Tremont that reflected settlement dates in equities that were outside of the standard market convention.   While an equity transaction settles <u>three</u> days after a trade occurs, Tremont was given documents in these instances reflecting equities settlements <u>four</u> days after the trade.

203.   In addition, upon information and belief, there were eight instances where options were supposedly settled on weekend days.   Had Tremont been properly monitoring the Rye Funds, they should have questioned even **one** trade that supposedly settled on a weekend.   Yet, upon information and belief, Tremont ignored all eight such instances.

### J.   <u>BLMIS's Odd Organizational and Compensation Structures</u>

204.   In a deviation from well-established structure and remuneration practices in the hedge fund industry, Madoff ran the IA Business as a division of his broker-dealer business, BLMIS.   Many other managers employing a specific investment strategy utilized a stand-alone hedge fund structure.   This, in and of itself, was highly unusual.

205.   In addition, Madoff and BLMIS charged no management or successful performance fees for his services, like almost all hedge fund managers.   Madoff provided BLMIS feeder fund managers such as Tremont, Ezra Merkin ("Merkin") and Fairfield – which also did little more than market and funnel billions to BLMIS – a large windfall allowing them to collect hundreds of millions in fees.   The compensation structure itself was a red flag that there was fraud and used as an inducement for funds to keep feeding Madoff billions.

206. The only revenue claimed to be generated for the services conducted by the IA Business was a four-cent per share "brokerage commission" for each purported equity trade made in the IA Business customer accounts, and a $1 per option contract executed. In contrast, other hedge fund managers routinely charge fees equal to 1% to 2% of assets under management, along with performance fees equal to 10% to 20% of profits generated for the fund. The compensation arrangement between Madoff and feeder funds run by Tremont,. Fairfield, and J. Ezra Merkin had Madoff leaving hundreds of millions, if not billions, of dollars on the proverbial table, and allowed the feeder funds to reap extraordinary and suspiciously high rewards for little investment strategy contribution.

207. The difference in compensation is huge. For example, the total amount of Tremont's assets under management with BLMIS is believed to have ranged from approximately $1.9 billion to $3.5 billion between December 2005 and December 2007. Madoff, as a hedge fund manager, could have charged between approximately $110 million and $220 million in total fees, depending on whether he charged 1% of assets under management plus a 10% performance fee ("1 and 10"), or 2% of assets under management plus a 20% performance fee ("2 and 20"), for his profitable services.

208. Either a "1 and 10" or "2 and 20" compensation arrangement would have been customary in the hedge fund industry during the relevant time period. In contrast, charging four cents per share commissions on the purported equity trades and $1 per contract on the fictitious options transactions, Madoff received approximately $44 million in total compensation in the form of commissions. In other words, Madoff left anywhere from around $66 million to almost $176 million on the table just in Tremont-related compensation during the two-year period December 31, 2005 to December 31, 2007.

209. When expanded to include the entirety of BLMIS's IA Business customers, it is clear that this compensation arrangement forfeited hundreds of millions – if not *billions* – of dollars that Madoff easily could have charged for his management services. Defendants' willful acceptance of this atypical and highly suspicious organizational and commission structure was motivated by Tremont and Parents own self interest, which led them to perform no independent, meaningful, or reasonable due diligence. The "explanations" that Madoff would give for this – that he did not want to do paperwork or "run a hedge fund" – lacked any degree of credibility. Instead of keeping this money for himself, Madoff allowed his "feeders" to receive these fees, relying on their avarice and greed to induce their assistance and complacency in perpetuating the scheme.

### K.    No Independent Custodian

210. BLMIS functioned as investment adviser, executing broker and custodian of securities. This cozy arrangement eliminated another frequently utilized risk control in investment management, where the adviser is usually independent from the custodian. This separates the customer assets that the adviser is trading from the actual custody and possession of the cash and securities in the customers' accounts, which are the responsibilities of the custodian.

211. Tremont and Parents were well aware that this requirement by Madoff to allow BLMIS to act in all three capacities was both irregular and highly suspicious. Yet, they consciously chose to do nothing in response. The Defendants accepted this unusual practice and never verified that the securities purportedly purchased for the Rye Funds actually existed.

212. Additionally, Madoff forced all IA Business customers to custody all of their managed assets at BLMIS. It is the forcing of the customer to use BLMIS as both custodian and

executing broker that should have raised a red flag. Typically, institutional customers, including hedge funds, maintain separate relationships with a custodian and an executing broker.

### L.   **BLMIS's Strip Mall Auditors**

213.   BLMIS, which reputedly ran one of the world's largest money management firms, was purportedly audited by Friehling & Horowitz ("F&H"), a tiny three-person operation located in a strip mall in Rockland County, New York. In fact, it was a one-man shop consisting of David Friehling, a Certified Public Accountant. The other two employees were an assistant and a semi-retired accountant living in Florida. Defendants were on inquiry notice that this small firm did not have the bona fides, and was otherwise not even minimally equipped, capable, or competent to conduct legitimate domestic and international audits for an entity such as BLMIS. On November 3, 2009, David Friehling pled guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue laws, and making false filings with the SEC in connection with his involvement in Madoff's scheme.

214.   F&H had been reporting to the American Institute of Certified Public Accountants ("AICPA") for fifteen years prior to the collapse of Madoff's scheme that it did *not* conduct audits. AICPA, which has more than 350,000 individual members, monitors most firms that audit private companies, such as BLMIS. Some 33,000 firms enroll in the AICPA's peer review program, in which experienced auditors assess each firm's audit quality each year. F&H was enrolled in the program but had not submitted to a review since 1993 because the firm had been informing AICPA - every year, for fifteen years - that it in fact did <u>not</u> perform audits. Meanwhile, F&H claimed to do just that for BLMIS.

215.   The Defendants were specifically aware and suspicious of the problems associated with BLMIS's auditors. Tremont's internal documentation shows that concerns were

raised about F&H by investors and potential investors, who wanted to know specifically what other clients were audited by F&H.  Internal documents further reveal that Tremont themselves questioned the use of this auditor.

216.   Manzke admitted during the Frontline interview that these auditors were suspicious:

> MARTIN SMITH: And as for due diligence, no one seemed to question the fact that Madoff's accountant was a one-man operation in this strip mall an hour's drive north of New York.
>
> [on camera] Did you ask him why he had such a small accounting firm?
>
> SANDRA MANZKE, Founder, Tremont Capital, 1984-'05: Yeah. I mean, that was his- it was his family, you know, business, that it was an accounting firm that his father-in-law had used for years and he continued to use it.
>
> MARTIN SMITH: And it didn't bother you that it was this small thing.
>
> SANDRA MANZKE: *Of course, it bothered you. I mean, every- you know, those are the kind of things that it would bother you.* But that was one of the conditions of doing business, that you accepted that …

(Transcript from *Frontline* program on "The Madoff Affair," available online at http://www.pbs.org/wgbh/pages/frontline/madoff/etc/script.html) (Emphasis added.)

Manzke's comments indicate that Tremont and Parents accepted "conditions" imposed by Madoff they knew to be troubling and indicative of potential fraud in exchange for the chance to do business with him and generate millions in fees.

**M.   Madoff Evaded SEC Filing Requirements**

217.   After registering with the SEC as an investment adviser in 2006, BLMIS was required to file a Form 13F at the end of each quarter disclosing the securities it held on behalf of its IA Business customers.  From that point forward, at the end of each quarter, Madoff purported to convert the entire portfolio of the IA Business to Treasury bills to avoid this

reporting requirement. This artificially forced liquidation of his equity and option positions at the end of calendar quarters was inconsistent with his strategy, and should have caused the Defendants be suspicious and inquire as to why the liquidations were necessary. There was no legitimate market timing reason designed to maximize returns for Madoff to go to cash at every quarter or year. The conversion to Treasuries was anticipated to be done only when necessary to avoid a downturn in the market, and not on a quarterly basis to avoid a regulatory reporting requirement.

218. Had Tremont and Parents properly questioned this incongruous activity, it would have been apparent that Madoff exited the equity and option markets in order to avoid BLMIS having to report the equities on required 13F filings.

### N.     <u>Old Fashioned Paper Trade Tickets and Statements</u>

219. Madoff was known as technologically savvy, and was a trading pioneer for his use of technology in electronic trading platforms. Yet, BLMIS never sent a single electronic trade confirmation to any IA Business account holder, including the Rye Funds. Nor did BLMIS allow customers online access to their accounts electronically. Rather, Madoff's firm provided only paper monthly statements and confirmations which it sent by standard postal mail.

220. Instead of providing electronic access to their trade information, the Rye Funds waited several days for their paper trade confirmations to arrive. Upon information and belief, although Tremont did ask BLMIS at least once for electronic trade tickets, that request was ignored and Tremont never pressed the issue. Once again, the Defendants ignored a striking incongruity.

### O.     Account Statement Inconsistencies with Madoff's Purported Strategy

221.     On a number of separate occasions, account statements received by Tremont from BLMIS purported to show gains on behalf of the various Rye Funds resulting from transactions inconsistent with Madoff's supposed split-strike conversion strategy. Certain of these transactions involved short term option trading that resulted in substantial gains for the Rye Funds.

222.     For example, in 2002, the Portfolio Limited Fund participated in one of these trades generating more than $6.4 million in gains. This transaction represented approximately 30% of the total return earned for that fund in 2002. Such short term gains were achieved by speculating in the options market, a strategy which contradicts the nature of the split-strike conversion strategy, subjected the clients to increased risk in excess of that implied in the split-strike conversion strategy, and should have raised a red flag for a sophisticated money manager such as Tremont. From 1996 to 2008, upon information and belief, the Rye Funds benefitted in excess of $130 million in gains from these transactions.

### DEFENDANTS IGNORED RED FLAGS DISCUSSED IN 2006 TREMONT DUE DILIGENCE EFFORTS

223.     In mid-2006, more than ten years since first giving investor funds to Madoff for investment, Tremont conducted additional due diligence on Madoff and created a more comprehensive Due Diligence Questionnaire. This due diligence was, upon information and belief, a façade to give themselves cover and BLMIS a clean bill of health. Tremont's own documentation reveals that their due diligence efforts were in fact outcome determinative.

224.     In a May 2006 email, Nicoll and Thomas Sandlow ("Sandlow"), Tremont Group's Senior Vice President and Director of Manager Research, discussed whether they had a Due Diligence Questionnaire for BLMIS and realized none had ever been created. Sandlow

responded: "I think we should do one.  Isn't it our biggest investment?"  Incredibly, although Tremont had been feeding their Rye Funds' investor monies to BLMIS since 1994, making Madoff the company's largest manager in terms of assets under management, it was not until May 2006 that Tremont identified this deficiency and performed any meaningful due diligence on Madoff.  In another May 2006 email chain, Nicoll noted that she would not suggest a Madoff investment for an investor because Tremont did "not have a full ddq."

225.   A few months later, in August 2006, Nicoll and Sandlow exchanged additional emails regarding BLMIS due diligence.   When Nicoll directed that Due Diligence Questionnaires be created for a client on four separate funds, including the Broad Market Fund, Sandlow curiously responded that "[w]e cannot do that for Madoff."  Nicoll responded that they "do need a ddq on Madoff. . . Come sit with me and I will write down your issues and I will get them into the ddq properly and sign off on it myself."

226.   When Tremont finally began preparing these Due Diligence Questionnaires, those questionnaires themselves raised numerous red flags.  Specifically, a combined Due Diligence Questionnaire for multiple Rye Funds and Tremont Funds from 2006 noted "an inherent risk in having the Investment Advisor to the Fund also being a broker dealer."  The questionnaire also noted that all trades are executed through the investment advisor and that all positions are custodied with the same investment advisor.

227.   A questionnaire for the Broad Market Fund states that the "biggest drawback" is the "lack of transparency regarding the signals used by the investment advisor."   This questionnaire further states that there is no true prime broker, as all trades are executed at Madoff's own desk and his IA Business keeps custody of them.

228.    As part of these efforts, Nicoll had Tremont's head of operational risk, Michael

Lynch ("Lynch"), prepare an Operational Due Diligence Review report.  Lynch was responsible

for reviewing operations for new managers, as well as existing mangers.  At Nicoll's behest,

Lynch investigated the operations of BLMIS in 2006 and prepared a report.

229.    Lynch's 2006 Operational Due Diligence Review, noted a number of issues and

concerns that again put Tremont on notice that Madoff's operations were fraudulent.  For

example, the report opined in its Summary that the Rye Funds'

> relationship with Madoff, while identical to other Madoff
> relationships, **does not represent the best industry practices**.  In
> particular, the Fund maintains accounts at Madoff Securities and
> Madoff in turn trades the funds at those accounts for the benefit of
> the fund.  Effectively, this is akin to investing in a hedge fund and
> having that hedge fund be its own prime broker.

The report also noted that Madoff's brother, Peter, was head of compliance.  This was

problematic as an internal control for the obvious lack of independence as a blood relative.

230.    Lynch's Due Diligence Review also noted the following additional abnormalities

and/or recommendations:

- **Counterparty Risk:** The counterparties to Madoff's option trades are not
  listed on the trade ticket.  "Madoff has communicated that they utilize 12-
  20 different counterparties for options transactions depending on how they
  are invested" and each counterparty has a minimum rating of A1.
  Moreover, the information regarding counterparties "is not documented by
  Madoff Securities but this is information that has been provided to us by
  Bernard Madoff."  Lynch also noted that BLMIS did not enter into ISDA
  agreements with the counterparties.

- **Auditors:** Friehling & Horowitz as the auditors: "Friehling and Horowitz
  are not well known in the hedge fund industry and they are a small local
  firm in the New York area that does not specialize in investment firms."

- **Paper Trade Tickets:** Tremont and its administrators should receive "an
  electronic feed of information and monthly statements in electronic
  format."  This would allow Tremont and its administrator to track
  individual positions and for automation of the monthly reconciliation

process.  "**Currently, Tremont will spot-check a handful of the positions in the portfolio monthly.**  If an electronic delivery of trade information was in place, this would be a very easy procedure to implement utilizing the BB interface for pricing."  Madoff's only excuse for not providing electronic information was that he was "not comfortable sending out information prior to fully entering into a position" (emphasis added.)

231.     Despite these waving flags, Lynch sought to mitigate these issues by noting Tremont's longstanding relationship with Madoff and the fact that "the IA has been registered with the NASD since 1960 and has had no significant regulatory issues."  Lynch cited the NASD registration as a reason to dismiss the possibility of fraud: "Given that the NASD is regularly verifying that the trades that Madoff is placing on Tremont's behalf are valid gives us assurances that Madoff is not falsifying any activity for our portfolios."  However, blind reliance on regulatory organizations such as the NASD, or FINRA as it is now known, or the SEC, does not substitute for the basic, independent due diligence Tremont promised and marketed to their investors.

232.     Tremont also never confirmed that the NASD or SEC was regularly verifying the trades that were being made for the IA Business.  Upon information and belief, they did not ask to review any of the many FINRA or SEC exit examination reports often given to broker-dealers upon completion of the regulatory examination.  These reports typically identify potential areas of concern to the regulators, weak internal controls and compliance or supervision, possible rule and securities laws violations, and the scope of the examinations.  After these reports identify issues, it is typical for the regulator to have the broker-dealer correct or "clean up" the sources of concern and activities.  The fact that Tremont never insisted upon seeing any of them shows their ineptitude or submissiveness.  Tremont substituted blind reliance on assured strict regulatory oversight, which was unreasonable and in fact never existed.

233.     Moreover, the records that BLMIS filed with the NASD and the SEC for many years made no mention of this separate IA Business.  Even when the SEC required BLMIS in 2006 to separately register the IA Business, BLMIS continued its lies by understating both the amount of advisory customers and the assets under management in the IA Business.  A review of BLMIS's Form ADV filings should have caused Tremont to seriously question Madoff's reporting of the size of his customer base, feeder funds and assets under management based on their relationship with Madoff.  They were in a unique position to obtain information concerning BLMIS's operations and question the information he provided to the SEC.  Nevertheless, Tremont failed to conduct an adequate investigation, or made no investigation at all, choosing instead to remain willfully ignorant.

234.     An internal email exchange from October 2008 between a Tremont employee and Mitchell illustrates the utter lack of due diligence when it came to Madoff.  The email states that Tremont needed to improve the quality of Madoff information they provided to their clients: "Unlike the Palm Beach crowd, institutions won't invest on faith.  They can't."  Even after investing billions of dollars of their investors' monies over the previous fourteen years, Tremont still had many unanswered questions regarding Madoff to the point where they did not believe savvy investors would invest in BLMIS.  This email indicates that only those who performed little or no independent diligence and invested on "faith" would hand their money over to Tremont to invest with Madoff.

235.     Numerous indicia of fraud concerning BLMIS gave Defendants actual and/or constructive knowledge of BLMIS's fraud.  These indicia of fraud, and Defendants' willful and deliberate decision to continue investing with BLMIS despite them, demonstrates a motive and opportunity to commit fraud, and/or conscious misbehavior or recklessness amounting to

fraudulent intent.  Given the Defendants' actual or constructive knowledge of these indicia of fraud, the Defendants were neither innocent nor good faith investors

## SECURITIES INDUSTRY PARTICIPANTS HEED THE RED FLAGS

236.    Other managers in the financial industry saw BLMIS for what it was.  Many financial institutions, managers, and industry advisers that conducted reasonable due diligence flatly refused to deal with BLMIS and Madoff because they had serious concerns that the IA Business operations were not legitimate.

237.    For example, as early as 2002, Cambridge Associates LLC ("Cambridge") consistently recommended that clients stay away from Madoff and Madoff-related feeder funds due to lack of transparency, a fear of front-running the market, and a general inability to understand how the strategy could produce cash-like, bond-like consistency of returns, in an equity strategy.  In one document, Cambridge stated that "it felt illegal and that Madoff was not transparent", while also suggesting that "[i]t might be interesting to compile some historic hedge fund fraud/scams for them to mull over."

238.    In 2003, a team from Société Génerale's investment bank performed due diligence on BLMIS and found that the numbers did not add up.  Société Génerale then forbade its investment bank from doing business with BLMIS.  In contrast, Defendants, who had more visibility into the reported trading activity on their account statements and through meetings with Madoff, continued to do lucrative business with BLMIS until Madoff was arrested.

239.    In mid-2003, Acorn Partners LP ("Acorn") – a fund of funds and investment adviser for high net worth individuals – conducted due diligence of Madoff and found it likely that BLMIS's account statements were generated as part of a fraudulent scheme, and "that fraudulent activity was highly likely."  Shortly after Madoff was arrested, in a letter to investors,

Acorn described the indicia of fraud that led it to conclude years prior that Madoff was a fraud. Many of the reasons given were the red flags alleged above. Acorn saw these indicia of fraud as "not merely warning lights, but a smoking gun."

240.    Well-known investor Jim Simons, and his investment fund, Renaissance Technologies Corp. ("Renaissance"), also determined that Madoff was possibly a fraud in 2003. Although Renaissance had invested with BLMIS, when they analyzed the options trading, they concluded that the volume purportedly being traded and the lack of known counterparties did not jibe. They calculated that if Madoff did his options trading in one day, he would have been doing 100% of the options trading. Even assuming Madoff spread the options trading over three days, Madoff still could not have traded the volume of options he claimed. According to one Renaissance employee, "[n]one of it seems to add up."

241.    Renaissance also spoke with several market makers in OTC equity options, none of whom claimed to see any significant volume being traded on the days when Madoff claimed to be executing his options strategy. In other words, Madoff never left a "footprint." Renaissance also determined that whichever counter party would have been willing to trade the basket of options Madoff purportedly was trading, it would have had to do so at unfavorable prices. To Renaissance, this options trading did not make any sense because it was difficult to understand which financial institution would want to continually enter into unfavorable trading positions.

242.    Beyond the options issues, in November 2003, a Renaissance employee noted that "Madoff allows an outside group [Fairfield Greenwich] to make $100 million per year in fees for doing absolutely nothing." The employee went on: "The point is that as we don't know why he does what he does we have no idea if there are conflicts in his business that could come to some

regulator's attention. Throw in that his brother-in-law is his auditor and his son is also high up in the organization . . . and you have the risk of some nasty allegations, the freezing of accounts, etc., etc." The employee proposed that "unless we can figure out a way to get comfortable with the regulatory tail risk in a hurry, we get out." Indeed, Renaissance made a decision in November 2003 to cash out all of its BLMIS investments.

243.   Aksia, LLC ("Aksia"), an independent hedge fund research and advisory firm, recommended to its clients in 2007 not to invest with BLMIS, Madoff, or any of his feeder funds because of certain red flags. Simon Fludgate, head of operational due diligence at Aksia, concluded that the stock holdings reported in the quarterly statements BLMIS filed with the SEC appeared too small to support the size of the assets BLMIS claimed to be managing. In September 2007, Aksia prepared an Investment Review of Madoff feeder fund Fairfield Sentry. In that report, Aksia concluded that the fund's description of how returns were generated was implausible. In fact, Aksia's review of Fairfield Sentry led to the conclusion that either (a) Madoff's IA Business was used to supply capital to Madoff's wholesale market making business, *or* (b) that "[t]he Feeder Funds are part of a financial game and the approximately 1.1 billion per year of gross excess returns . . . do not really exist."

244.   In reaching this conclusion, Aksia found, among other things, that (1) the return stream of Fairfield Sentry did not appear to be possible under the split strike strategy; (2) Fairfield Sentry's quarterly 13F filings uncovered $0 equity holdings every quarter except for one, even though Aksia was told that Madoff's strategy sometimes lasts for as long as eight months; (3) the use of the United States mail instead of electronic means to provide position and trading execution information was suspicious; (4) based on the amount under management for feeder funds, "the required trade sizes are huge and inconsistent with the size of the S&P100

options market;" (5) Madoff chose "to earn a small 4 cents a share" when he could have earned hundreds of millions more by managing a hedge fund himself; and (6) Madoff chose "to earn a paltry 4 cents a share" when he could have funded the strategy as a proprietary trading position and earned over one billion dollars.

245.   Albourne Partners Limited ("Albourne"), an independent consultant on hedge funds and alternative investments, advised clients for a decade that they should steer clear of Madoff.   In a December 15, 2008, commentary released just days after Madoff's scheme was revealed, Albourne noted that its view on Madoff "never wavered."   To Albourne, although it was not clear Madoff was a fraud, "we concluded that, where a client had a holding, it should redeem."   Albourne noted that it believed Madoff's returns were "too good to be true" in that Albourne could not "think of a group of funds trading easily marked-to-market assets which appeared to have weathered so many different types of storms with such apparently consistent risk-adjusted returns."   In addition, according to the Albourne report, Madoff's operations were "built around obsessive secrecy" to the extent that one of BLMIS's former employees had no idea how Madoff made his money.

246.   Albourne also noted that over time, "it became clear that there were multiple Madoff feeders and that in total their AUM [assets under management] exceeded the publicly assumed scale of the firm."   According to Albourne, it was extremely unusual for a fund manager to significantly understate its assets under management.   The Albourne report also explained that Madoff's purported strategy involved not only equities trading, but options. "Given the supposed size of the assets under management, it would have been difficult to execute the strategy due to the risk of market impact."

247.   Albourne's post-arrest report is consistent with other Albourne reports prior to the revelation of the fraud.  Earlier in 2008, Albourne specifically reviewed the Prime Fund for a particular Albourne client.  The April 11, 2008, report lists only two positives of this fund, while listing many more negatives.  In addition to the issues alleged above, Albourne mentioned that Albourne had monitored many volatility arbitrage managers, so it would expect Madoff's "simple strategy" to be replicated by others.  Of course, it was not.

248.   Albourne also found "strange" the fact that BLMIS prided itself for being "at the forefront of computerized trading," yet the Prime Fund's management was content with receiving paper trade confirmations by mail a few days after the purported trade dates.  It noted that the investment advisory agreement prohibited the Prime Fund's management from disclosing the identity of the Investment Manager.  Further, Albourne questioned why all trades were exited at year-end to facilitate easy auditing.  "It cannot be but suboptimal for a manager to put the audit process ahead of the investment strategy, i.e., potentially missing a trading opportunity."

249.   Cambridge, Société Génerale, Acorn, Renaissance, Aksia and Albourne all determined that something was simply not right in Denmark, and either pulled their investments or refused to recommend investments to others with BLMIS.  These money managers and investors, who were similarly situated to Defendants, may not have specifically known of Madoff's fraud, but they determined through basic, ordinary due diligence then utilized in the industry that Madoff's performance was inconsistent with his purported strategy and the way markets behave generally.

250.   These entities had even less information than Schulman, Manzke, Tremont and Parents, which had far greater access to Madoff and information about his operations.  The

difference between these entities and the Defendants, however, was that they did not rely on Madoff for their profits. Instead of willfully ignoring the red flags showing Madoff to be a fraud, these entities saw Madoff through objective eyes – and the number of unanswered questions caused them to run the other direction.

## EMERGING INDUSTRY STANDARDS AND THE *BAYOU PONZI* SHOULD HAVE PUT TREMONT ON HIGH ALERT

251.     Tremont's tepid efforts to analyze and monitor investments with Madoff were contrary to industry standards at the time. The hedge fund industry, and Tremont and Parents in particular, should have determined by early in the new millennium that BLMIS was fraudulent. By then, Rye Funds had a half dozen years of BLMIS performance and statistics upon which it could perform the type of quantitative analysis alleged above. Tremont and Parents should have been on heightened alert of manager fraud after the collapse of the Bayou Group Fund several years later.

252.     In the early 2000s the Bayou Group Fund ("Bayou"), headed by Samuel Israel, appeared to be one of the highly successful hedge funds riding the rise in the stock market following the tech bubble collapse. It was discovered in 2005, however, that Bayou was a $400 million Ponzi scheme. This fraud attracted much media attention and almost everyone in the hedge fund industry knew about it. The Bayou fraud forewarned the financial industry that a lack of adequate due diligence could result in financial disaster for investors.

253.     Bayou had a number of obvious variables and indicia of fraud in common with BLMIS. Despite purporting to have 9 to 10 figures of assets under management, neither Bayou nor BLMIS was audited by a large, well-known accounting firm; Bayou had an in-house accountant and BLMIS had F&H. Both Bayou and BLMIS provided their customers extraordinarily and consistently positive, but not necessarily spectacular, returns, with no

volatility. The reported returns were so consistent, that they were effectively impossible. Neither investment manager charged a performance fee, which is how many hedge fund managers earn their remuneration.

254. Tremont and Parents were well aware of Bayou, which should have put them on high alert. The Bayou fraud caused many hedge funds to reconsider the adequacy of their due diligence and set in place heightened or additional mechanisms for uncovering or preventing fraud. In the winter of 2006, the Greenwich Roundtable presented its *Best Practices in Hedge Fund Investing: Due Diligence for Global Macro and Managed Futures Strategies.* That publication noted in its Introduction that the Bayou fraud transpired shortly after the organization's initial publication, *Best Practices in Hedge Fund Investment*, and that the Bayou fraud "offers a valuable context in which to evaluate both the substance and purpose of our *Best Practices* series."

255. The initial *Best Practices* publication provided a checklist that identified lines of inquiry for hedge fund managers.

> Ironically, one of the lessons of Bayou was not just the need for alertness to the possibility of fraud but how many experienced investors believed their judgment and experience were sufficient to dispense with mundane checklists. By my count, a casual reader of our *Best Practices* document would have had between eight and ten points where they should have been alarmed enough to stop and intensively scrutinize what they were investigating or been comfortable stopping the due diligence process outright. As explained, the document contained a checklist and clear patterns of inquiry on the key subjects. However, it had an important subtext too. Be careful. Be focused and diligent. Exercise particular caution in areas where you are less familiar or uncertain. Do your own homework. Don't be rushed or shortchange your work for any reason. Let your investment conviction be built in calibrated work steps but always trust your gut in the end. These are the lessons of the Bayou debacle but they were also the "lessons" of the *Best Practices* publication which preceded it.

(The Greenwich Roundtable Presents: *Best Practices in Hedge Fund Investing: Due Diligence for Global Macro and Managed Futures Strategies* (Winter 2006), at 6 (Introduction by Spencer Boggess).)

256.    The remainder of the *Best Practices* guide includes chapters on the following topics: (1) Strategy, Investment Process and Market Opportunity; (2) Team and Organization; (3) Fee Structure and Terms; (4) Risk Management; (5) Management Company, Fund Structure and Asset Base; (6) Quantitative Review; (7) Operations and Transparency; (8) Third Parties (including subsections on auditors, prime broker/futures clearing merchant, administrator, and marketing relationships); and (9) Intuition, Judgment and Experience.

257.    The lessons of Bayou and the practices promoted by the Greenwich Roundtable are also the lessons of Madoff.  Yet those lessons were not heeded by Tremont or Parents. Ironically, the Roundtable materials guide names Nancy Solnik of Tremont as one of its authors. Solnik's name also appears in the publication as a Best Practices Subcommittee Member.

258.    Upon information and belief, Solnik was employed by Tremont beginning in or around 2002.  According to Tremont biographical information, Solnik was a member of Tremont's Investment Management Department and held the titles of Vice President and Senior Analyst with her responsibilities including "identifying and evaluating new managers, conducting due diligence of prospective funds, including analyzing investment philosophy and historical performance, monitoring the investment style of approved managers and recommending specific funds for inclusion into Tremont portfolios."  She also was a portfolio manager for funds that were not invested with Madoff.

259.    Had Tremont implemented years earlier the *Best Practices* recommended by the Greenwich Roundtable – which Tremont personnel actively participated in drafting – they surely

would have conducted meaningful due diligence and like many others alleged herein been suspicious of fraud. Tremont failed to follow the industry standards that their own personnel played a role in developing, choosing greed over caution and allowing Bayou-type history to repeat itself.

## VOIDABLE TRANSFERS FROM BLMIS

### A.  Initial Transfers to the Rye Funds

260.    During the relevant period, and as set forth in Exhibit **A**, the Broad Market Fund, Prime Fund, Portfolio Limited Fund, and Insurance Portfolio LDC Fund (collectively, "Rye Funds") held accounts at BLMIS and its IA Business. Upon information and belief, for each Rye Fund Account, Tremont executed a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options, (collectively, the "Account Agreements"), and delivered such documents to BLMIS at its principal place of business at 885 Third Avenue, New York, New York.

261.    The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York. The Accounts were held in New York, New York, and Tremont consistently wired funds to BLMIS's account at JPMorgan Chase & Co., Account #XXXXX1703 (the "BLMIS Bank Account") in New York, New York, for application to the Accounts and the conducting of trading activities on behalf of the Rye Funds.

262.    Between the time that the Broad Market Fund opened its first account with BLMIS in or around 1994 and the Filing Date, Tremont directed deposits to BLMIS on behalf of the Rye Funds through multiple checks and wire transfers into the BLMIS Bank Account.

263. The Rye Funds are initial transferees of BLMIS. In addition, based on its position as general partner of the Rye Funds, Tremont Partners is also an initial transferee from accounts held by the Rye Funds. Moreover, due to their domination and control of the Rye Funds and Tremont Partners, the bad faith and knowledge of the Rye Funds and Tremont Partners should be imputed to Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual.

The Transfers

264. Since 1994, BLMIS transferred at least $2.1 billion to, or for the benefit of, the Rye Funds in the form of withdrawals from their BLMIS accounts (the "Transfers") as set forth in Exhibits **A** and **B**. Under the circumstances set forth above, the Rye Funds, Tremont Partners, Tremont Group, and the Parents knew or should have known of fraudulent activity in their own accounts, and/or that the Transfers were made for a fraudulent purpose.

265. More specifically, of these Transfers, upon information and belief, BLMIS made transfers totaling approximately $1.01 billion to, or for the benefit of, the Prime Fund; approximately $628.2 million to, or for the benefit of, the Portfolio Limited Fund; approximately $384.1 million to, or for the benefit of, the Broad Market Fund; and approximately $130.1 million to, or for the benefit of, the Insurance Portfolio LDC Fund. See Exhibits **A** and **B**.

266. The Transfers are avoidable and recoverable under sections 544, 547, 548, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of DCL sections 273 – 279 and NY CPLR 203(g) and 213(8). The Transfers were directly or indirectly made to, or for the benefit of, the Rye Funds and include, but are not limited to, the Transfers listed in Exhibits **A** and **B**.

Two Year Transfers

267.     During the two years prior to the Filing Date, BLMIS transferred a total of approximately $959.6 million to or for the benefit of the Rye Funds ("Two Year Transfers"). The Two Year Transfers are set forth more fully in Exhibits **A and B**.  Under the circumstances set forth above, the Rye Funds, Tremont Partners, Tremont Group, and the Parents knew or should have known of fraudulent activity in their own accounts, and/or that the Two Year Transfers were made for a fraudulent purpose.

268.     More specifically, of the Two Year Transfers, upon information and belief, BLMIS made transfers totaling approximately $495 million to, or for the benefit of, the Prime Fund; approximately $354.5 million to, or for the benefit of, the Portfolio Limited Fund; approximately $60 million to, or for the benefit of, the Broad Market Fund; and approximately $50 million to, or for the benefit of, the Insurance Portfolio LDC Fund.  See Exhibits **A and B**.

269.     The Two Year Transfers are avoidable and recoverable under sections 548, 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3).  The Two Year Transfers were directly or indirectly made to, or for the benefit of, the Rye Funds and include, but are not limited to, the Two Year Transfers listed in Exhibit **B**.

Six Year Transfers

270.     During the six years prior to the Filing Date, BLMIS made payments to, or for the benefit of, the Rye Funds of more than $1.9 billion (the "Six Year Transfers").  See Exhibits **A and B**.  Under the circumstances set forth above, the Rye Funds, Tremont Partners, Tremont Group, and the Parents knew or should have known of fraudulent activity in their own accounts, and/or that the Six Year Transfers were made for a fraudulent purpose.

08-01789-smb Doc 183-3 Filed 12/07/18 Entered 12/14/18 21:24:51 Exhibit R
without Table of Contents Pg 92 of 136
10-05310-smb Doc 1-3 Filed 12/04/18 Entered 12/04/18 Pg 95 of 332

271.     More specifically, of the Six Year Transfers, BLMIS made transfers totaling approximately $945 million to, or for the benefit of, the Prime Fund; approximately $617.9 million to, or for the benefit of, the Portfolio Limited Fund; approximately $252 million to, or for the benefit of, the Broad Market Fund; and approximately $93.9 million to, or for the benefit of, the Insurance Portfolio LDC Fund.  See Exhibits **A** and **B**.

272.     The Six Year Transfers are avoidable and recoverable under sections 544, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of DCL sections 273 – 279.  The Six Year Transfers were directly or indirectly made to, or for the benefit of, the Defendants and include, but are not limited to, the Six Year Transfers listed in Exhibit **B**.

### Preference Period Transfers

273. During the 90-day period prior to the Filing Date—the preference period—the Portfolio Limited Fund, the Broad Market Fund, and Insurance Portfolio LDC Fund received transfers from BLMIS constituting the return of principal in an amount totaling approximately $324.6 million (the "Preference Period Transfers").  See Exhibits **A** and **B**.  More specifically, of the Preference Period Transfers, upon information and belief, BLMIS transferred approximately $275.7 million to, or for the benefit of, the Portfolio Limited Fund; approximately $40 million to, or for the benefit of, the Broad Market Fund; and approximately $8.9 million to, or for the benefit of, the Insurance Portfolio LDC Fund.  The Preference Period Transfers were directly or indirectly made to, or for the benefit of, the Portfolio Limited Fund, Broad Market Fund, and Insurance Portfolio LDC Fund, and include, but are not limited to, the Preference Period Transfers listed in Exhibit **B**.

-92-

274.  The Preference Period Transfers are avoidable and recoverable under sections 547, 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**B.      Subsequent Transfers**

275.  Throughout the entire history of the Rye Funds since 1994, upon information and belief, some portion of the Transfers made by BLMIS to the various Rye Funds were then subsequently transferred ("Subsequent Transfers") to various entities, including but not limited to, the XL Funds, Tremont Funds, Tremont, Parents, Manzke, and/or Schulman.  Upon information and belief, a portion of the Subsequent Transfers were made within 90 days of the Filing Date ("Preference Period Subsequent Transfers").

276.  Tremont's actual or constructive knowledge of the fraudulent nature of these subsequent transfers is imputed to the XL Funds, Tremont Funds, Manzke, Schulman, and Parents.  The Subsequent Transfers are discussed with more particularity below.

Subsequent Transfers: XL Funds

277.  Of the Subsequent Transfers, upon information and belief, XL LP received transfers from the Prime Fund in the amount of approximately $285.3 million, including a transfer of approximately $203 million from the Prime Fund, in or around March 2008.  Those amounts, upon information and belief, were initially transferred from BLMIS to the Prime Fund, which had received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

278.  Of the Subsequent Transfers, upon information and belief, XL LP also received transfers in the amount of approximately $46.7 million from the Broad Market Fund, including a subsequent transfer of approximately $32 million in the third quarter of 2007.  Those amounts,

upon information and belief, were initially transferred from BLMIS to the Broad Market Fund, which had received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

279.    Of the Subsequent Transfers, upon information and belief, XL LP and XL Portfolio received transfers based on synthetic investments in the Broad Market and Portfolio Limited Funds provided through various total return swap transactions by the swap counterparty. To the extent the swap counterparty used funds received from, or made available for use directly or indirectly from BLMIS, to transfer funds to XL LP and XL Portfolio, the monies received by XL LP and XL Portfolio are recoverable Subsequent Transfers.

### Subsequent Transfers: Tremont Funds

280.    Upon information and belief, Opportunity III Fund was indirectly invested with BLMIS through the Prime Fund and the Broad Market Fund.  Of the Subsequent Transfers, upon information and belief, Opportunity III Fund received transfers from the Broad Market Fund totaling approximately $130 million, as well as transfers from the Prime Fund totaling approximately $88.3 million.  The Broad Market Fund and Prime Fund received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

281.    Upon information and belief, Opportunity Limited was indirectly invested with BLMIS through the Portfolio Fund and XL Portfolio.  Of the Subsequent Transfers, upon information and belief, Opportunity Limited received transfers totaling approximately $76.3 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

282.    In addition, upon information and belief, as part of the Subsequent Transfers, Opportunity Limited received transfers totaling approximately $9.1 million from XL Portfolio, which, upon information and belief, received transfers from the Portfolio Limited Fund and/or

swap counterparties. The swap counterparties, upon information and belief, received the subsequent transfers from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

283. Upon information and belief, Opportunity II Fund was indirectly invested with BLMIS through the Prime Fund, the Broad Market Fund, and XL LP. Of the Subsequent Transfers, upon information and belief, Opportunity II Fund received transfers from the Prime Fund totaling approximately $13.6 million, as well as transfers from the Broad Market Fund totaling approximately $13.4 million. The Prime Fund and Broad Market Fund received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

284. In addition, upon information and belief, as part of the Subsequent Transfers, Opportunity II Fund received transfers totaling approximately $2.4 million from XL LP, which, upon information and belief, received transfers from the Broad Market Fund and/or swap counterparties. The swap counterparties, upon information and belief, received the subsequent transfers from the Broad Market Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

285. Upon information and belief, Market Neutral Limited was indirectly invested with BLMIS through the Portfolio Limited Fund, as well as XL Portfolio. Of the Subsequent Transfers, upon information and belief, Market Neutral Limited received transfers totaling approximately $91.8 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

286. In addition, upon information and belief, as part of the Subsequent Transfers, Market Neutral Limited received transfers totaling approximately $10 million from XL Portfolio, which, upon information and belief, received transfers from the Portfolio Limited Fund and/or

swap counterparties. The swap counterparties, upon information and belief, received the subsequent transfers from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

287. Upon information and belief, Market Neutral Fund was indirectly invested with BLMIS through the Prime Fund and the Broad Market Fund. Of the Subsequent Transfers, upon information and belief, Market Neutral Fund received transfers from the Broad Market Fund totaling approximately $39.5 million, as well as transfers from the Prime Fund totaling approximately $8 million. The Broad Market Fund and Prime Fund received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

288. Upon information and belief, LifeInvest was indirectly invested with BLMIS through the Insurance Portfolio LDC Fund. Of the Subsequent Transfers, upon information and belief, LifeInvest received transfers totaling approximately $20.3 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

289. Upon information and belief, Long/Short Fund was indirectly invested with BLMIS through the Prime Fund and the Broad Market Fund. Of the Subsequent Transfers, upon information and belief, Long/Short Fund received transfers from the Prime Fund totaling approximately $12.1 million, as well as transfers from the Broad Market Fund totaling approximately $10.8 million. The Prime Fund and Broad Market Fund received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

290. Upon information and belief, International Insurance Fund was indirectly invested with BLMIS through the Prime Fund. Of the Subsequent Transfers, upon information and belief, International Insurance Fund received transfers totaling approximately $9.4 million from the Prime Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

291.    Upon information and belief, Equity Fund – Ireland was indirectly invested with BLMIS through the Portfolio Limited Fund and XL Portfolio.  Of the Subsequent Transfers, upon information and belief, Equity Fund – Ireland received transfers totaling approximately $5 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

292.    In addition, upon information and belief, as part of the Subsequent Transfers, Equity Fund – Ireland received transfers totaling approximately $740,000 from XL Portfolio, which, upon information and belief, received transfers from the Portfolio Limited Fund and/or swap counterparties.  The swap counterparties, upon information and belief, received the subsequent transfers from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

293.    Upon information and belief, Market Neutral II Fund was indirectly invested with BLMIS through the Prime Fund, the Broad Market Fund, and XL LP.  Of the Subsequent Transfers, upon information and belief, Market Neutral II Fund received transfers from the Prime Fund totaling approximately $36.1 million, as well as transfers from the Broad Market Fund totaling approximately $36.4 million.  The Prime Fund and Broad Market Fund received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

294.    In addition, upon information and belief, as part of the Subsequent Transfers, Market Neutral II Fund received subsequent transfers totaling approximately $10.3 million from XL LP, which, upon information and belief, received transfers from the Broad Market Fund and/or swap counterparties.  The swap counterparties, upon information and belief, received the subsequent transfers from the Broad Market Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

295. Upon information and belief, Arbitrage Ireland was indirectly invested with BLMIS through the Portfolio Limited Fund. Of the Subsequent Transfers, upon information and belief, Arbitrage Ireland received transfers totaling approximately $8.6 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A and B.**

296. Upon information and belief, Multimanager Fund was indirectly invested with BLMIS through the Portfolio Limited Fund and XL Portfolio Fund. Of the Subsequent Transfers, upon information and belief, Multimanager Fund received transfers totaling approximately $7.4 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

297. In addition, of the Subsequent Transfers, upon information and belief, Multimanager Fund received subsequent transfers totaling approximately $6.1 million from XL LP, which, upon information and belief, received transfers from the Broad Market Fund and/or swap counterparties. The swap counterparties, upon information and belief, received the subsequent transfers from the Broad Market Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

298. Upon information and belief, Emerging Markets – Ireland was indirectly invested with BLMIS through the Portfolio Limited Fund. Of the Subsequent Transfers, upon information and belief, Emerging Markets – Ireland received transfers totaling approximately $4.3 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

299. Upon information and belief, Arbitrage Fund was indirectly invested with BLMIS through the Broad Market Fund. Of the Subsequent Transfers, upon information and belief, the

08-01789-smb Doc 183-1 Filed 12/07/18 Entered 12/14/18 21:24:51 Exhibit B
without Table of Contents Pg 102 of 332 Pg 99 of 136
10-05310-smb Doc 1-3 Filed 12/07/10 Entered 12/07/10 14:05:33 Main Document
Pg 102 of 332 Pg 99 of 136

Arbitrage Fund received transfers totaling approximately $3.1 million from the Broad Market Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

300.   Upon information and belief, Equities Fund was indirectly invested with BLMIS through the Prime Fund.  Of the Subsequent Transfers, upon information and belief, Equities Fund received transfers totaling approximately $1 million from the Prime Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

### Subsequent Transfers: Fees

301.   Upon information and belief, of the Subsequent Transfers, Tremont Partners received transfers in the form of management and administrative fees from the Rye Funds, which received initial transfers from BLMIS.  The Trustee estimates these fees to be more than $240 million since 1994.  Manzke and Schulman, upon information and belief, received a portion of these fees as subsequent transfers.  Upon information and belief, as part of the Subsequent Transfers, a portion of those fees were also transferred from Tremont Partners to Tremont Group.

302.   Upon information and belief, as part of the Subsequent Transfers, Tremont Group's Parents received transfers from Tremont Group in the form of a dividend between $10-35 million.  As noted above, upon information and belief, that dividend originated from transfers from BLMIS to the Rye Funds, which were then transferred to Tremont Partners and/or Tremont Group.

### Preference Period Subsequent Transfers

303.   Of the Preference Period Subsequent Transfers, upon information and belief, Opportunity III Fund received subsequent transfers totaling approximately $40.4 million from the Broad Market Fund, which received preferential transfers from BLMIS as set forth in Exhibits **A** and **B**.

304.    Of the Preference Period Subsequent Transfers, upon information and belief, Arbitrage Ireland received subsequent transfers totaling approximately $3.5 million from the Portfolio Limited Fund, which had received preferential transfers from BLMIS as set forth in Exhibits **A and B**.

305.    Of the Preference Period Subsequent Transfers, upon information and belief, Opportunity Limited received subsequent transfers totaling approximately $6.1 million from XL Portfolio, which, upon information and belief received subsequent transfers from the Portfolio Limited Fund and/or swap counterparties.  The swap counterparties, upon information and belief, received the subsequent transfers from the Portfolio Limited Fund, which had received preferential transfers from BLMIS as set forth in Exhibits **A and B**.

306.    Of the Preference Period Subsequent Transfers, upon information and belief, Market Neutral received subsequent transfers totaling approximately $2.3 million from the Broad Market Fund, which  received preferential transfers from BLMIS as set forth in Exhibits **A and B**.

307.    Of the Preference Period Subsequent Transfers, upon information and belief, Market Neutral Limited received subsequent transfers totaling approximately $1 million from the Portfolio Limited Fund, which received preferential transfers from BLMIS as set forth in Exhibits **A and B**.

308.    To the extent that Tremont Partners, Tremont Group, or the Parents took fees from the Rye Funds within 90 days prior to the Filing Date, those fees are recoverable as Preference Period Subsequent Preferences.

<u>Conclusion</u>

309.    Under the circumstances set forth above, the XL Funds, Tremont Funds, Tremont Partners, Tremont Group, Parents, Manzke, and Schulman knew or should have known of fraudulent activity in the Rye Funds' accounts and/or that the Transfers and Subsequent Transfers were made and/or received with a fraudulent purpose.

310.    All of the Subsequent Transfers, or the value thereof, are recoverable from the XL Funds, Tremont Funds, Manzke, Schulman, Tremont Group, and/or Parents pursuant to section 550(a) of the Bankruptcy Code.

311.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

312.    The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information regarding the Transfers and Subsequent Transfers and any additional transfers, and (ii) seek recovery of such additional transfers.

## **<u>CUSTOMER CLAIMS</u>**

313.    The Trustee has received Customer Claims from the Prime Fund, the Portfolio Limited Fund, the Broad Market Fund, the Insurance Portfolio LDC Fund, and Rye Insurance ("Defendants' Claims"). Defendants' Claims are summarized in <u>Exhibit **C**</u>.

314.    In response to the Prime Fund's Customer Claim, the Trustee issued a Notice of Trustee's Determination of Claim. <u>See Exhibit **C**.</u> The Trustee is not aware of any objections to that Determination being filed with the Court. The remainder of the Defendant's claims have not yet been determined. <u>See Exhibit **C**</u>.

315.    On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying

Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12). The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating. The Trustee intends to resolve the Customer Claims and any related objections to the Trustee's determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

## COUNT ONE
## PREFERENTIAL TRANSFERS (INITIAL TRANSFEREES) - 11 U.S.C. §§ 547(b), 550 AND 551

### Against Broad Market Fund, Portfolio Limited Fund and Insurance Portfolio LDC Fund

316. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

317. At the time of each of the Preference Period Transfers, the Portfolio Limited Fund, Broad Market Fund, and Insurance Portfolio LDC Fund were each a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

318. Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

319. Each of the Preference Period Transfers was to or for the benefit of the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund.

320. Each of the Preference Period Transfers was made for or on account of an antecedent debt owed by BLMIS to the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund before such transfer was made.

321.    Each of the Preference Period Transfers was made while BLMIS was insolvent.

322.    Each of the Preference Period Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

323.    Each of the Preference Period Transfers enabled the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund to receive more than each of them would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

324.    Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund pursuant to section 550(a)(1) of the Bankruptcy Code.

325.    As a result of the foregoing, pursuant to sections 547(b), 550(a)(1), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside and (c) recovering the Preference Period Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TWO
## PREFERENTIAL TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) - 11 U.S.C. §§ 547(b), 550 AND 551

### Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual

326.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

327.    At the time of each of the Preference Period Transfers, the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund each was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

328.    Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

329.    Each of the Preference Period Transfers was to or for the benefit of the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund.

330.    Each of the Preference Period Transfers was made for or on account of an antecedent debt owed by BLMIS to the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund before such transfer was made.

331.    Each of the Preference Period Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

332.    Each of the Preference Period Transfers enabled the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund to receive more than each of them would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

333.    Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Broad Market Fund pursuant to section 550(a)(1) of the Bankruptcy Code.

334.     Tremont Partners served as the general partner to the Broad Market Fund during the Preference Period.  For all intents and purposes, the Broad Market Fund is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein. As a general partner to the Broad Market Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, for all obligations the Broad Market Fund incurred while Tremont Partners was serving as general partner.

335.     Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Portfolio Limited Fund, Broad Market Fund, Insurance Portfolio LDC Fund and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund and Tremont Partners.

336.     As a result of the foregoing, pursuant to sections 547(b), 550(a)(1), and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside; (c) recovering the Preference Period Transfers to the Broad Market Fund, or the value thereof, from Tremont Partners for the benefit of the estate of BLMIS; and (d) recovering the Preference Period Transfers to Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund, or the value thereof, from Tremont Group and Parents for the benefit of the estate of BLMIS.

## COUNT THREE
## PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREES) - 11 U.S.C. §§ 547(b), 550 AND 551

### *Against Arbitrage Ireland, Market Neutral Fund, Opportunity Limited, Opportunity III Fund, Tremont, and/or Parents*

337.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

338.    At the time of each of the Preference Period Transfers, the Portfolio Limited Fund, Broad Market Fund, and Insurance Portfolio LDC Fund were "creditors" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

339.    Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

340.    Each of the Preference Period Transfers was to or for the benefit of the Portfolio Limited Fund, Broad Market Fund, and Insurance Portfolio LDC Fund.

341.    Each of the initial transfers made during the Preference Period was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

342.    Each of the initial transfers made during Preference Period was made while BLMIS was insolvent.

343.    Each of the Preference Period Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

344.    Each of the Preference Period Transfers enabled the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund to receive more than each of the funds would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the

transfers had not been made, and (iii) the applicable fund received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

345. Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code.

346. Upon information and belief, Arbitrage Ireland, Market Neutral Fund, Opportunity Limited, Opportunity III Fund, Tremont, and/or Parents were immediate or mediate transferees of some portion of the Preference Period Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.

347. Each of the Preference Period Subsequent Transfers were made directly or indirectly to or for the benefit of Arbitrage Ireland, Market Neutral Fund, Opportunity Limited, Opportunity III Fund, Tremont and/or Parents.

348. As a result of the foregoing, pursuant to sections 547(b), 550(a)(2), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the subsequent transfers made during the Preference Period, or the value thereof, from Arbitrage Ireland, Market Neutral Fund, Opportunity Limited, Opportunity III Fund, Tremont, and/or Parents, for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) – 11 U.S.C. §§ 548(a)(1)(A), 550 AND 551

### *Against the Rye Funds*

349. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

350. The Two Year Transfers to the Rye Funds were made on or within two years before the Filing Date.

-107-

351.     The Two Year Transfers to the Rye Funds were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS's then existing or future creditors.

352.     The Two Year Transfers to the Rye Funds constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Rye Funds pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

353.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers to the Rye Funds, (b) directing that the Two Year Transfers to the Rye Funds be set aside, and (c) recovering the Two Year Transfers to the Rye Funds, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS.

## COUNT FIVE
## FRAUDULENT TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) – 11 U.S.C. §§ 548(a)(1)(A), 550 AND 551

### *Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

354.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

355.     The Two Year Transfers to the Rye Funds were made on or within two years before the filing date.

356.     The Two Year Transfers to the Rye Funds were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS's then existing or future creditors.

357.     The Two Year Transfers to the Rye Funds constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and

recoverable from the Rye Funds pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

358.    Tremont Partners served as the general partner to the Broad Market Fund and the Prime Fund during the two years preceding the Filing Date.  For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein.  As general partner of the Broad Market Fund and the Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all obligations incurred by the Broad Market Fund and the Prime Fund while Tremont Partners was serving as general partner.

359.    Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

360.    As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a)(1), and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers to the Rye Funds; (b) directing that the Two Year Transfers to the Rye Funds be set aside; (c) recovering the Two Year Transfers to the Broad Market Fund and the Prime Fund, or the value thereof, from Tremont Partners for the benefit of the estate of BLMIS; and (d) recovering the Two Year Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS.

## COUNT SIX
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) – 11 U.S.C. §§ 548(a)(1)(B), 550 AND 551

### *Against the Rye Funds*

361.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

362.    The Two Year Transfers to the Rye Funds were made on or within two years before the Filing Date.

363.    BLMIS received less than reasonably equivalent value in exchange for each of the Two Year Transfers.

364.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

365.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

366.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

367.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Rye Funds pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

368.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside,

and (c) recovering the Two Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT SEVEN
## FRAUDULENT TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) – 11 U.S.C. §§ 548(a)(1)(B), 550 AND 55

### *Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

369.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

370.     The Two Year Transfers to the Rye Funds were made on or within two years before the Filing Date.

371.     BLMIS received less than reasonably equivalent value in exchange for each of the Two Year Transfers.

372.     At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

373.     At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

374.     At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

375.     Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Rye Funds pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

376.     Tremont Partners served as general partner to the Broad Market Fund and Prime Fund during the two years preceding the Filing Date.  For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein.  As general partner of the Broad Market Fund and Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, for all obligations the Broad Market Fund and Prime Fund incurred while Tremont Partners was serving as general partner.

377.     Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

378.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a)(1), and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers to the Rye Funds be set aside; (c) recovering the Two Year Transfers to the Broad Market Fund and Prime Fund, or the value thereof, from Tremont Partners, for the benefit of the estate of BLMIS; and (d) recovering the Two Year Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS.

## COUNT EIGHT
### FRAUDULENT TRANSFER (INITIAL TRANSFEREES) – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551

### *Against the Rye Funds*

379.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

380.    At all times relevant to the Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

381.    The Six Year Transfers were made by BLMIS and transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Rye Funds in furtherance of a fraudulent investment scheme.

382.    The Six Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

383.    The Six Year Transfers were received by the Rye Funds with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

384.    As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or

the value thereof, from the Rye Funds for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Rye Funds.

## COUNT NINE
## FRAUDULENT TRANSFER (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551

### *Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

385.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

386.    At all times relevant to the Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

387.    The Six Year Transfers were made by BLMIS and transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Rye Funds in furtherance of a fraudulent investment scheme.

388.    The Six Year Transfers were received by the Rye Funds with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

389.    Tremont Partners served as the general partner to the Broad Market Fund and the Prime Fund during the two years preceding the Filing Date.  For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein.  As general partner of the Broad Market Fund and the Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403(b) of the

Delaware Code, for all obligations incurred by the Broad Market Fund and the Prime Fund while Tremont Partners was serving as general partner.

390.    Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

391.    As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers to the Broad Market Fund and the Prime Fund, or the value thereof, from Tremont Partners, for the benefit of the estate of BLMIS and to return to injured customers; (d) recovering the Six Year Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS and (e) recovering attorneys' fees from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual.

## COUNT TEN
### FRAUDULENT TRANSFER (INITIAL TRANSFEREE) -- NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551

### *Against the Rye Funds*

392.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

393.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

394.    BLMIS did not receive fair consideration for the Six Year Transfers.

395.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year Transfers.

396.    The Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

397.    As a result of the foregoing, pursuant to DCL sections 273, 278 and 279, sections 544(b), 550, 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT ELEVEN
## FRAUDULENT TRANSFER (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) -- NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551

### Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual

398.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

399.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

400.    BLMIS did not receive fair consideration for the Six Year Transfers.

401.   BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year Transfers.

402.   The Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

403.   Tremont Partners served as general partner to the Broad Market Fund and Prime Fund during the six years preceding the Filing Date.   For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein.   As general partner to the Broad Market Fund and Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, for all obligations incurred by the Broad Market Fund and Prime Fund while serving as general partner.

404.   Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

405.   As a result of the foregoing, pursuant to DCL sections 273, 278 and 279, sections 544(b), 550, 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers to the Broad Market Fund and Prime Fund, or the value thereof, from Tremont Partners, for the benefit of the estate of BLMIS; and (d) recovering the Six Year Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS.

## COUNT TWELVE
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) —NEW YORK DEBTOR
## AND CREDITOR LAW §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against the Rye Funds*

406.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

407.    At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section

502(e).

408.    BLMIS did not receive fair consideration for the Six Year Transfers.

409.    At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or

was about to engage in a business or transaction for which the property remaining in its hands

after each of the Six Year Transfers was an unreasonably small capital.

As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279, sections

544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee

is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that

the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value

thereof, from the Rye Funds for the benefit of the estate of BLMIS.

## COUNT THIRTEEN
## FRAUDULENT TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) —NEW YORK DEBTOR AND CREDITOR LAW §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

410. The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

411. At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

412. BLMIS did not receive fair consideration for the Six Year Transfers.

413. At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital. Tremont Partners served as general partner to the Broad Market Fund and Prime Fund during the six years preceding the Filing Date. For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein. As general partner to the Broad Market Fund and Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, for all obligations incurred by the Broad Market Fund and Prime Fund while serving as general partner.

414. Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

415.     As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers to the Broad Market Fund and Prime Fund, or the value thereof, from Tremont Partners, for the benefit of the estate of BLMIS, and to return to injured customers; and (d) recovering the Six Year Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS.

## COUNT FOURTEEN
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) -NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551

### *Against the Rye Funds*

416.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

417.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

418.     BLMIS did not receive fair consideration for the Six Year Transfers.

419.     At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

420.     As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78ff-2(c)(3) of SIPA, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS.

### COUNT FIFTEEN
### FRAUDULENT TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) -NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a) AND 551

*Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

421.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

422.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

423.     BLMIS did not receive fair consideration for the Six Year Transfers.

424.     At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

425.     Tremont Partners served as general partner to the Broad Market Fund and Prime Fund during the six years preceding the Filing Date.  For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein.  As general partner to the Broad Market Fund and Prime

Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, for all obligations incurred by the Broad Market Fund and Prime Fund while serving as general partner.

426.    Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

427.    As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, section 78ff-2(c)(3) of SIPA, sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers to the Broad Market Fund and Prime Fund, or the value thereof, from Tremont Partners, for the benefit of the estate of BLMIS, and to return to injured customers; and (d) recovering the Six Year Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS.

### COUNT SIXTEEN
### RECOVERY OF THE TRANSFERS (INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551

#### *Against the Rye Funds*

428.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

429.    At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

08-01789-smb Doc 183-3 Filed 12/14/18 Entered 12/14/18 21:24:51 Exhibit R without Table of Contents Pg 123 of 136

Pg 126 of 332

430.    At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

431.    The Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Transfers to or for the benefit of the Rye Funds in furtherance of a fraudulent investment scheme.

432.    The Rye Funds received the Transfers with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

433.    As a result of the foregoing, pursuant to NY CPLR 203(g), 213(8), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS, and to return to injured customers; and (d) recovering attorneys' fees from the Rye Funds.

**COUNT SEVENTEEN**
**RECOVERY OF THE TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551**

*Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

434.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

435.    At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

436.    At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

437.    The Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Transfers to or for the benefit of the Rye Funds in furtherance of a fraudulent investment scheme.

438.    The Rye Funds received the Transfers with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

439.    Tremont Partners served as general partner to the Broad Market Fund and Prime Fund.  For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein.  As general partner to the Broad Market Fund and Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, for all obligations incurred by the Broad Market Fund and Prime Fund while serving as general partner.

440.    Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

441.    As a result of the foregoing, pursuant to NY CPLR 203(g), 213(8), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; and (c)

recovering the Transfers to the Broad Market Fund and Prime Fund, or the value thereof, from Tremont Partners for the benefit of the estate of BLMIS, and to return to injured customers; (d) recovering the Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS; and (e) recovering attorneys' fees from the Rye Funds.

**COUNT EIGHTEEN**
**RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)(1), AND 551**

*Against XL LP, XL Portfolio, the Tremont Funds, Tremont Partners, Tremont Group, Tremont Bermuda, Oppenheimer, MassMutual Holding, Mass Mutual, Manzke, and/or Schulman*

442.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

443.    Each of the Transfers are avoidable under sections 544 and 548 of the Bankruptcy Code, DCL sections 273-276 and SIPA § 78fff-2(c)(3).

444.    At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

445.    At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

446.    The Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of the Rye Funds in furtherance of a fraudulent investment scheme.

447.    Upon information and belief, XL LP, XL Portfolio, the Tremont Funds, Tremont

Partners, Tremont Group, Tremont Bermuda, Oppenheimer, MassMutual Holding, Mass Mutual,

Manzke, and/or Schulman (the "Subsequent Transferee Defendants") received Subsequent

Transfers, which are recoverable pursuant to Section 550(a) of the Bankruptcy Code.

448.    Each of the Subsequent Transfers was made directly or indirectly to, or for the

benefit of, the Subsequent Transferee Defendants.

449.    The Subsequent Transferee Defendants are immediate or mediate transferees of

the Transfers.

450.    The Subsequent Transferees received the Subsequent Transfers with actual intent

to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future

creditors of BLMIS.

451.    In addition, Tremont Partners served as general partner to XL LP. For all intents

and purposes, upon information and belief, XL LP is insolvent, and its assets are insufficient to

satisfy any judgment on the claims asserted herein. As general partner to XL LP, Tremont

Partners is liable, pursuant to sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, for

all obligations incurred by XL LP while serving as general partner.

452.    As a result of the foregoing, pursuant to NY CPLR 203(g), 213(8), sections 276,

276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and

551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a)

directing that the Subsequent Transfers be set aside; and (b) recovering the Subsequent

Transfers, or the value thereof, from the Subsequent Transferee Defendants for the benefit of the

estate of BLMIS; and (c) recovering attorneys' fees from the Subsequent Transferee Defendants.

## COUNT NINETEEN
## DISALLOWANCE OF RYE FUNDS' AND RYE INSURANCE'S SIPA CLAIMS

453.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

454.    The Rye Funds and Rye Insurance have filed Customer Claims.    The Prime Fund's Customer Claim has been determined, while the remaining Customer Claims have not been determined.    See Exhibit **C**.

455.    The Customer Claims of the Rye Funds and Rye Insurance should not be allowed pursuant to section 502(d) of the Bankruptcy Code, as the Rye Funds and Rye Insurance who filed the Customer Claims are the recipients of transfers of BLMIS' property which are avoidable and recoverable under sections 544, 547, 548 and/or 550(a) of the Bankruptcy Code, DCL sections 273, 274, 275 and 276 and SIPA § 78fff-2(c)(3) as set forth above, and the Rye Funds have not returned the transfers to the Trustee.

456.    The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating.    As a result of the foregoing, the Trustee intends to resolve the Customer Claims of the Rye Funds and Rye Insurance and any related objections through the mechanisms contemplated by the Claims Procedures Order.

## COUNT TWENTY
## EQUITABLE SUBORDINATION OF
## CUSTOMER CLAIMS

457.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

458.    The Defendants herein engaged in inequitable conduct, including behavior described in this Complaint, which has resulted in injury to the customers and creditors of the estate and has conferred an unfair advantage on each of the Rye Funds and Rye Insurance.

459.    Based on the Defendants' inequitable conduct as described above, the customers of BLMIS have been misled as to the true financial condition of the debtor, customers have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them because of the conduct of the Defendants.

460.    The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the Rye Funds, Rye Insurance, or any of the other Defendants, directly or indirectly against the estate – and only to the extent such claims are allowed – are subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

461.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

## COUNT TWENTY-ONE
## UNJUST ENRICHMENT

### Against Tremont Group, Tremont Partners, Tremont Bermuda, Oppenheimer, MassMutual Holding, Mass Mutual, Manzke and Schulman

462.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

463.    Tremont Group, Tremont Partners, Tremont Bermuda, Oppenheimer, and Manzke, Schulman ("Management Defendants") have been unjustly enriched.   They have wrongfully and unconscionably benefitted from the receipt of stolen money from BLMIS and the Rye Funds, for which they did not in good faith provide fair value.   These Defendants were further unjustly enriched as a result of recklessly enabling Madoff's fraudulent scheme.

464.    Tremont Partners earned more than $180 million in fees during the six year period, which in turn was distributed to Tremont Group, Tremont Bermuda, Oppenheimer, and Manzke, Schulman in the form of distributions, dividends, salaries, bonuses, and other compensation.  None of this money has been returned to the Trustee for equitable distribution to BLMIS customers who lost billions of dollars in the Ponzi scheme.

465.    As described above, the Management Defendants were constantly faced with evidence that BLMIS was a fraud.  They knew the consistency of Madoff's returns were, statistically, too good to be true.  They knew that there were questions about Madoff's lack of transparency.

466.    Faced with the prospect of losing hundreds of millions of dollars in fees, the Management Defendants chose to ignore the compelling evidence of Madoff's fraud and provide convenient excuses for Madoff's inconsistencies.  As a result, they have been unjustly enriched by over $180 million that rightfully belongs to BLMIS customers.

467.    Equity and good conscience require full restoration of the monies received by the Management Defendants, directly and indirectly, from BLMIS and any assets derived from those monies.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

A.      On the First Claim for Relief, pursuant to sections 547, 550(a) and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, from the Broad Market Fund, Portfolio Limited Fund, and Insurance Portfolio LDC for the benefit of the estate of BLMIS;

**B.** On the Second Claim for Relief, pursuant to sections 547, 550(a) and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS;

**C.** On the Third Claim for Relief, pursuant to sections 547, 550(a) and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) directing that the Preference Period Subsequent Transfers be set aside, and (b) recovering the Preference Period Subsequent Transfers, or the value thereof, from the Arbitrage Ireland, Market Neutral Fund, Opportunity Limited, and Opportunity III Fund, Tremont and/or Parents for the benefit of the estate of BLMIS;

**D.** On the Fourth Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS;

**E.** On the Fifth Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Tremont Partners, Tremont Group,

Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS;

F.      On the Sixth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS;

G.      On the Seventh Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS;

H.      On the Eighth Claim for Relief, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Rye Funds;

I.      On the Ninth Claim for Relief, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state

law: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual;

**J.**     On the Tenth Claim for Relief, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550, 551, and 1107 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS;

**K.**     On the Eleventh Claim for Relief, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550, 551, and 1107 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS;

**L.**     On the Twelfth Claim for Relief, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS;

**M.** On the Thirteenth Claim for Relief, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550, and 551 of the Bankruptcy Code, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Six Year Transfers, (b) directing the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS;

**N.** On the Fourteenth Claim for Relief, pursuant to New York Debtor and Creditor Law §§ 275, 278 and/or 279 and Bankruptcy Code §§ 544(b), 550, 551, and 1107: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS;

**O.** On the Fifteenth for Relief, pursuant to New York Debtor and Creditor Law §§ 275, 278 and/or 279 and Bankruptcy Code §§ 544(b), 550, 551, and 1107, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS;

**P.** On the Sixteenth Claim for Relief, pursuant to NY CPLR 203(g), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value

thereof, from the Rye Funds for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Rye Funds;

**Q.** On the Seventeenth Claim for Relief, pursuant to NY CPLR 203(g), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual;

**R.** On the Eighteenth Claim for Relief, pursuant to NY CPLR 203(g), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) directing that the Subsequent Transfers be set aside, (b) recovering the Subsequent Transfers, or the value thereof, from XL LP, XL Portfolio, the Tremont Funds, Tremont Partners, Tremont Group, Tremont Bermuda, Oppenheimer, MassMutual Holding, Mass Mutual, Manzke, and/or Schulman, for the benefit of the estate of BLMIS, and (c) recovering attorneys' fees from XL LP, XL Portfolio, the Tremont Funds, Tremont Partners, Tremont Group, Tremont Bermuda, Oppenheimer, MassMutual Holding, Mass Mutual, Manzke, and/or Schulman;

**S.** On the Nineteenth Claim for Relief, that the claim or claims of the Rye Funds and Rye Insurance be disallowed;

**T.**     On the Twentieth Claim for Relief, that the claim or claims of the Rye Funds, Rye
Insurance, and any of the other Defendants be subordinated for distribution purposes pursuant
to sections 510(c)(1) and 105(a) of the Bankruptcy Code;

**U.**     On the Twenty-First Claim for Relief, compensatory, exemplary, and punitive
damages in excess of $2.1 billion, with the specific amount to be determined at trial;

**V.**     On all Claims for Relief, pursuant to common law and N.Y. CPLR 5001 and 5004
awarding the Trustee prejudgment interest from the date on which the Transfers were received;

**W.**     On all Claims for Relief, establishment of a constructive trust over the proceeds of
the transfers in favor of the Trustee for the benefit of BLMIS's estate;

**X.**     On all Claims for Relief, assignment of Defendants' income tax refunds from the
United States, state and local governments paid on fictitious profits during the course of the
scheme;

**Y.**     Awarding the Trustee all applicable interest, costs, and disbursements of this
action; and

**Z.**     Granting Plaintiff such other, further, and different relief as the Court deems just,
proper, and equitable.


Dated:  December 7, 2010

New York, New York                          s/ Marc D. Powers
                                            Baker & Hostetler LLP
                                            45 Rockefeller Plaza
                                            New York, New York 10111
                                            Telephone: (212) 589-4200
                                            Facsimile: (212) 589-4201
                                            David J. Sheehan
                                            Email: dsheehan@bakerlaw.com
                                            Keith R. Murphy
                                            Email: kmurphy@bakerlaw.com
                                            Marc Skapof

Email: mskapof@bakerlaw.com
Marc D. Powers
Email: mpowers@bakerlaw.com
Eric R. Fish
Email: efish@bakerlaw.com
Anagha S. Apte
Email: aapte@bakerlaw.com

and

Dean D. Hunt
Email: dhunt@bakerlaw.com
Marie L. Carlisle
Email: mcarlisle@bakerlaw.com

1000 Louisiana Avenue, Suite 2000
Houston, Texas  77002-5009
Telephone: (713) 751-1600
Facsimile: (713) 751-1717

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC and Bernard L. Madoff*

**EXHIBIT A**
**SUMMARY OF TRANSFERS BY BLMIS IA ACCOUNT - TREMONT**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 |
|---|---|---|---|---|---|
| Account Number | Account Name | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 1C1260 | RYE SELECT BROAD MARKET PRIME FUND, LP | - | 495,000,000 | 945,000,000 | 1,010,000,000 |
| 1FR010 | RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC | 8,913,228 | 50,060,603 | 93,932,290 | 130,152,177 |
| 1FR080 | RYE SELECT BROAD MARKET PORTFOLIO LIMITED | 275,689,103 | 354,571,757 | 617,944,432 | 628,231,909 |
| 1R0252 | RYE SELECT BROAD MARKET INSURANCE FUND LP | - | - | - | - |
| 1T0027 | RYE SELECT BROAD MARKET FUND LP | 40,000,000 | 60,000,000 | 252,000,000 | 384,140,000 |
| | Total: | $324,602,331 | $959,632,359 | $1,908,876,722 | $2,152,524,086 |

Page 1 of 1 - Tremont

MADC1135_00000001

BLMIS ACCOUNT NO. 1C1260 - GE-RETH & CO / MONEY MARKET PRIME FUND, LP

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 7/2/1997 | CHECK WIRE | 21,300,000 | 21,300,000 | - | - | - | 21,300,000 | - | - | - | - |
| 8/4/1997 | CHECK WIRE | 4,800,000 | 4,800,000 | - | - | - | 26,100,000 | - | - | - | - |
| 9/4/1997 | CHECK WIRE | 4,200,000 | 4,200,000 | - | - | - | 30,300,000 | - | - | - | - |
| 9/4/1997 | CHECK WIRE | 2,208,000 | 2,208,000 | - | - | - | 32,508,000 | - | - | - | - |
| 10/2/1997 | CHECK WIRE | 1,655,000 | 1,655,000 | - | - | - | 34,163,000 | - | - | - | - |
| 10/6/1997 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 40,163,000 | - | - | - | - |
| 11/5/1997 | CHECK WIRE | 18,679,000 | 18,679,000 | - | - | - | 58,842,000 | - | - | - | - |
| 12/3/1997 | CHECK WIRE | 11,875,000 | 11,875,000 | - | - | - | 70,717,000 | - | - | - | - |
| 1/6/1998 | CHECK WIRE | 26,703,000 | 26,703,000 | - | - | - | 97,420,000 | - | - | - | - |
| 2/3/1998 | CHECK WIRE | 11,500,000 | 11,500,000 | - | - | - | 108,920,000 | - | - | - | - |
| 2/4/1998 | CHECK WIRE | 9,000,000 | 9,000,000 | - | - | - | 117,920,000 | - | - | - | - |
| 3/5/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 122,920,000 | - | - | - | - |
| 3/5/1998 | CHECK WIRE | 14,000,000 | 14,000,000 | - | - | - | 136,920,000 | - | - | - | - |
| 4/3/1998 | CHECK WIRE | 9,000,000 | 9,000,000 | - | - | - | 145,920,000 | - | - | - | - |
| 5/5/1998 | CHECK WIRE | 7,500,000 | 7,500,000 | - | - | - | 153,420,000 | - | - | - | - |
| 6/2/1998 | CHECK WIRE | 13,250,000 | 13,250,000 | - | - | - | 166,670,000 | - | - | - | - |
| 6/3/1998 | CHECK WIRE | 5,050,000 | 5,050,000 | - | - | - | 171,720,000 | - | - | - | - |
| 7/6/1998 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 174,720,000 | - | - | - | - |
| 7/6/1998 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 186,720,000 | - | - | - | - |
| 8/13/1998 | CHECK WIRE | 20,350,000 | 20,350,000 | - | - | - | 207,070,000 | - | - | - | - |
| 9/30/1998 | CHECK WIRE | (17,000,000) | - | (17,000,000) | - | - | 190,070,000 | - | - | - | (17,000,000) |
| 10/2/1998 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 193,070,000 | - | - | - | - |
| 11/3/1998 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 199,070,000 | - | - | - | - |
| 12/2/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 204,070,000 | - | - | - | - |
| 12/3/1998 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 205,070,000 | - | - | - | - |
| 1/5/1999 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 212,070,000 | - | - | - | - |
| 1/7/1999 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 214,070,000 | - | - | - | - |
| 2/3/1999 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 221,070,000 | - | - | - | - |
| 3/2/1999 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 227,070,000 | - | - | - | - |
| 4/6/1999 | CHECK WIRE | 5,500,000 | 5,500,000 | - | - | - | 232,570,000 | - | - | - | - |
| 5/4/1999 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 235,570,000 | - | - | - | - |
| 8/4/1999 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 241,570,000 | - | - | - | - |
| 12/3/1999 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 243,570,000 | - | - | - | - |
| 1/6/2000 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 249,570,000 | - | - | - | - |
| 2/2/2000 | CHECK WIRE | 9,000,000 | 9,000,000 | - | - | - | 258,570,000 | - | - | - | - |
| 2/2/2000 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 259,570,000 | - | - | - | - |
| 3/1/2000 | CHECK WIRE | 13,225,000 | 13,225,000 | - | - | - | 272,795,000 | - | - | - | - |
| 4/11/2000 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 287,795,000 | - | - | - | - |
| 5/3/2000 | CHECK WIRE | 12,750,000 | 12,750,000 | - | - | - | 300,545,000 | - | - | - | - |
| 6/2/2000 | CHECK WIRE | 13,500,000 | 13,500,000 | - | - | - | 314,045,000 | - | - | - | - |
| 7/5/2000 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 326,045,000 | - | - | - | - |
| 8/3/2000 | CHECK WIRE | 2,500,000 | 2,500,000 | - | - | - | 328,545,000 | - | - | - | - |
| 9/1/2000 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 338,545,000 | - | - | - | - |
| 10/3/2000 | CHECK WIRE | 12,500,000 | 12,500,000 | - | - | - | 351,045,000 | - | - | - | - |
| 11/3/2000 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 363,045,000 | - | - | - | - |
| 1/3/2001 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 378,045,000 | - | - | - | - |
| 1/8/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 383,045,000 | - | - | - | - |
| 2/5/2001 | CHECK WIRE | 42,000,000 | 42,000,000 | - | - | - | 425,045,000 | - | - | - | - |
| 3/5/2001 | CHECK WIRE | 26,000,000 | 26,000,000 | - | - | - | 451,045,000 | - | - | - | - |
| 3/30/2001 | CHECK WIRE | (22,000,000) | - | (22,000,000) | - | - | 429,045,000 | - | - | - | (22,000,000) |
| 5/2/2001 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 431,045,000 | - | - | - | - |
| 7/2/2001 | CHECK WIRE | (18,000,000) | - | (18,000,000) | - | - | 413,045,000 | - | - | - | (18,000,000) |
| 7/12/2001 | CHECK WIRE | 14,000,000 | 14,000,000 | - | - | - | 427,045,000 | - | - | - | - |
| 8/3/2001 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 430,045,000 | - | - | - | - |
| 10/1/2001 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 442,045,000 | - | - | - | - |
| 11/2/2001 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 454,045,000 | - | - | - | - |
| 11/5/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 459,045,000 | - | - | - | - |
| 1/2/2002 | CHECK WIRE | (8,000,000) | - | (8,000,000) | - | - | 451,045,000 | - | - | - | (8,000,000) |
| 9/23/2002 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 461,045,000 | - | - | - | - |
| 6/28/2004 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 451,045,000 | - | - | (10,000,000) | (10,000,000) |
| 10/1/2004 | CHECK WIRE | (110,000,000) | - | (110,000,000) | - | - | 341,045,000 | - | - | (110,000,000) | (110,000,000) |

MADC1135_00000002

BLMIS ACCOUNT NO. 1C1260 - SECURITIES MARKET PRIME FUND, LP

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 3/31/2005 | CHECK WIRE | (180,000,000) | - | (180,000,000) | - | - | 161,045,000 | - | - | (180,000,000) | (180,000,000) |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 181,045,000 | - | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 201,045,000 | - | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 221,045,000 | - | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 241,045,000 | - | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 261,045,000 | - | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 281,045,000 | - | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 301,045,000 | - | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 321,045,000 | - | - | - | - |
| 6/16/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 341,045,000 | - | - | - | - |
| 7/7/2005 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 361,045,000 | - | - | - | - |
| 12/28/2005 | CHECK WIRE | (15,000,000) | - | (15,000,000) | - | - | 346,045,000 | - | - | (15,000,000) | (15,000,000) |
| 2/10/2006 | CHECK WIRE | 35,000,000 | 35,000,000 | - | - | - | 381,045,000 | - | - | - | - |
| 3/3/2006 | CHECK WIRE | 18,000,000 | 18,000,000 | - | - | - | 399,045,000 | - | - | - | - |
| 6/30/2006 | CHECK WIRE | (30,000,000) | - | (30,000,000) | - | - | 369,045,000 | - | - | (30,000,000) | (30,000,000) |
| 8/28/2006 | CHECK WIRE | (35,000,000) | - | (35,000,000) | - | - | 334,045,000 | - | - | (35,000,000) | (35,000,000) |
| 9/26/2006 | CHECK WIRE | (50,000,000) | - | (50,000,000) | - | - | 284,045,000 | - | - | (50,000,000) | (50,000,000) |
| 11/8/2006 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 264,045,000 | - | - | (20,000,000) | (20,000,000) |
| 12/27/2006 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 244,045,000 | - | (20,000,000) | (20,000,000) | (20,000,000) |
| 10/1/2007 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 254,045,000 | - | - | - | - |
| 12/3/2007 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 264,045,000 | - | - | - | - |
| 3/25/2008 | CHECK WIRE | (475,000,000) | - | (475,000,000) | - | - | (210,955,000) | - | (475,000,000) | (475,000,000) | (475,000,000) |
| | Total: | | $ 799,045,000 | $ (1,010,000,000) | $ - | $ - | $ (210,955,000) | $ - | $ (495,000,000) | $ (945,000,000) | $ (1,010,000,000) |

MADC1135_00000003

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 2/21/1997 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 500,000 | - | - | - | - |
| 2/26/1997 | CHECK WIRE | 400,000 | 400,000 | - | - | - | 900,000 | - | - | - | - |
| 3/11/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 899,997 | - | - | - | (3) |
| 3/31/1997 | W/H TAX DIV PEP | (21) | - | (21) | - | - | 899,976 | - | - | - | (21) |
| 4/1/1997 | W/H TAX DIV KO | (41) | - | (41) | - | - | 899,935 | - | - | - | (41) |
| 4/7/1997 | CHECK WIRE | 1,025,000 | 1,025,000 | - | - | - | 1,924,935 | - | - | - | - |
| 4/9/1997 | W/H TAX DIV WMT | (18) | - | (18) | - | - | 1,924,917 | - | - | - | (18) |
| 4/15/1997 | W/H TAX DIV C | (35) | - | (35) | - | - | 1,924,882 | - | - | - | (35) |
| 4/16/1997 | W/H TAX DIV IWP | (14) | - | (14) | - | - | 1,924,868 | - | - | - | (14) |
| 4/17/1997 | CHECK WIRE | 150,000 | 150,000 | - | - | - | 2,074,868 | - | - | - | - |
| 4/24/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (43) | - | (43) | - | - | 2,074,824 | - | - | - | (43) |
| 5/1/1997 | W/H TAX DIV BEL | (38) | - | (38) | - | - | 2,074,786 | - | - | - | (38) |
| 5/1/1997 | W/H TAX DIV BMY | (46) | - | (46) | - | - | 2,074,741 | - | - | - | (46) |
| 5/1/1997 | W/H TAX DIV AIT | (37) | - | (37) | - | - | 2,074,704 | - | - | - | (37) |
| 5/1/1997 | W/H TAX DIV T | (63) | - | (63) | - | - | 2,074,640 | - | - | - | (63) |
| 5/9/1997 | W/H TAX DIV AXP | (13) | - | (13) | - | - | 2,074,627 | - | - | - | (13) |
| 5/12/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (35) | - | (35) | - | - | 2,074,592 | - | - | - | (35) |
| 5/16/1997 | W/H TAX DIV DIS | (11) | - | (11) | - | - | 2,074,581 | - | - | - | (11) |
| 5/19/1997 | W/H TAX DIV CCI | (77) | - | (77) | - | - | 2,074,505 | - | - | - | (77) |
| 6/2/1997 | W/H TAX DIV COL | (4) | - | (4) | - | - | 2,074,501 | - | - | - | (4) |
| 6/2/1997 | W/H TAX DIV F | (160) | - | (160) | - | - | 2,074,341 | - | - | - | (160) |
| 6/2/1997 | W/H TAX DIV INTC | (13) | - | (13) | - | - | 2,074,327 | - | - | - | (13) |
| 6/10/1997 | W/H TAX DIV MOB | (129) | - | (129) | - | - | 2,074,199 | - | - | - | (129) |
| 6/10/1997 | W/H TAX DIV AN | (108) | - | (108) | - | - | 2,074,091 | - | - | - | (108) |
| 6/10/1997 | W/H TAX DIV IBM | (71) | - | (71) | - | - | 2,074,019 | - | - | - | (71) |
| 6/11/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 2,074,014 | - | - | - | (5) |
| 7/7/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 7,074,014 | - | - | - | - |
| 7/8/1997 | CHECK WIRE | 250,000 | 250,000 | - | - | - | 7,324,014 | - | - | - | - |
| 7/9/1997 | W/H TAX DIV HWP | (42) | - | (42) | - | - | 7,323,972 | - | - | - | (42) |
| 7/14/1997 | W/H TAX DIV WMT | (46) | - | (46) | - | - | 7,323,927 | - | - | - | (46) |
| 7/18/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (50) | - | (50) | - | - | 7,323,877 | - | - | - | (50) |
| 7/25/1997 | W/H TAX DIV GE | (250) | - | (250) | - | - | 7,323,627 | - | - | - | (250) |
| 8/1/1997 | W/H TAX DIV T | (156) | - | (156) | - | - | 7,323,472 | - | - | - | (156) |
| 8/1/1997 | W/H TAX DIV AIT | (89) | - | (89) | - | - | 7,323,383 | - | - | - | (89) |
| 8/1/1997 | W/H TAX DIV BMY | (111) | - | (111) | - | - | 7,323,271 | - | - | - | (111) |
| 8/1/1997 | W/H TAX DIV BEL | (94) | - | (94) | - | - | 7,323,177 | - | - | - | (94) |
| 8/5/1997 | CHECK WIRE | 50,000 | 50,000 | - | - | - | 7,373,177 | - | - | - | - |
| 8/8/1997 | W/H TAX DIV AXP | (30) | - | (30) | - | - | 7,373,147 | - | - | - | (30) |
| 8/20/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 7,373,143 | - | - | - | (3) |
| 8/22/1997 | W/H TAX DIV DIS | (26) | - | (26) | - | - | 7,373,117 | - | - | - | (26) |
| 9/4/1997 | CHECK WIRE | 700,000 | 700,000 | - | - | - | 8,073,117 | - | - | - | - |
| 9/12/1997 | W/H TAX DIV MMM | (203) | - | (203) | - | - | 8,072,915 | - | - | - | (203) |
| 9/12/1997 | W/H TAX DIV MCD | (55) | - | (55) | - | - | 8,072,860 | - | - | - | (55) |
| 9/19/1997 | W/H TAX DIV AIG | (50) | - | (50) | - | - | 8,072,810 | - | - | - | (50) |
| 9/23/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (36) | - | (36) | - | - | 8,072,774 | - | - | - | (36) |
| 9/26/1997 | W/H TAX DIV NB | (227) | - | (227) | - | - | 8,072,547 | - | - | - | (227) |
| 9/29/1997 | CHECK WIRE | (150,000) | - | (150,000) | - | - | 7,922,547 | - | - | - | (150,000) |
| 10/1/1997 | W/H TAX DIV S | (82) | - | (82) | - | - | 7,922,465 | - | - | - | (82) |
| 10/1/1997 | W/H TAX DIV MRK | (505) | - | (505) | - | - | 7,921,960 | - | - | - | (505) |
| 10/1/1997 | W/H TAX DIV KO | (314) | - | (314) | - | - | 7,921,646 | - | - | - | (314) |
| 10/7/1997 | W/H TAX DIV PEP | (175) | - | (175) | - | - | 7,921,471 | - | - | - | (175) |
| 10/10/1997 | W/H TAX DIV SLB | (86) | - | (86) | - | - | 7,921,385 | - | - | - | (86) |
| 10/14/1997 | W/H TAX DIV WMT | (141) | - | (141) | - | - | 7,921,244 | - | - | - | (141) |
| 10/15/1997 | W/H TAX DIV IWP | (129) | - | (129) | - | - | 7,921,115 | - | - | - | (129) |
| 10/15/1997 | W/H TAX DIV C | (255) | - | (255) | - | - | 7,920,860 | - | - | - | (255) |
| 10/22/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (79) | - | (79) | - | - | 7,920,781 | - | - | - | (79) |
| 10/27/1997 | W/H TAX DIV GE | (827) | - | (827) | - | - | 7,919,954 | - | - | - | (827) |
| 11/3/1997 | CHECK WIRE | (120,000) | - | (120,000) | - | - | 7,799,954 | - | - | - | (120,000) |
| 11/3/1997 | W/H TAX DIV AMY | (375) | - | (375) | - | - | 7,799,579 | - | - | - | (375) |
| 11/3/1997 | W/H TAX DIV AIT | (308) | - | (308) | - | - | 7,799,271 | - | - | - | (308) |
| 11/3/1997 | W/H TAX DIV BEL | (591) | - | (591) | - | - | 7,798,679 | - | - | - | (591) |
| 11/3/1997 | W/H TAX DIV T | (523) | - | (523) | - | - | 7,798,156 | - | - | - | (523) |
| 11/10/1997 | W/H TAX DIV AXP | (105) | - | (105) | - | - | 7,798,051 | - | - | - | (105) |
| 11/20/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 7,798,041 | - | - | - | (11) |
| 11/21/1997 | W/H TAX DIV DIS | (87) | - | (87) | - | - | 7,797,954 | - | - | - | (87) |
| 12/1/1997 | W/H TAX DIV MCD | (56) | - | (56) | - | - | 7,797,897 | - | - | - | (56) |
| 12/15/1997 | W/H TAX DIV KO | (344) | - | (344) | - | - | 7,797,553 | - | - | - | (344) |
| 12/17/1997 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (69) | - | (69) | - | - | 7,797,484 | - | - | - | (69) |
| 12/19/1997 | W/H TAX DIV AIG | (51) | - | (51) | - | - | 7,797,433 | - | - | - | (51) |
| 12/24/1997 | W/H TAX DIV NB | (270) | - | (270) | - | - | 7,797,163 | - | - | - | (270) |
| 1/2/1998 | W/H TAX DIV MRK | (541) | - | (541) | - | - | 7,796,623 | - | - | - | (541) |

MADC1135_00000004

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET PRIME INSURANCE PORTFOLIO LDC

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 1/2/1998 | W/H TAX DIV PEP | (191) | - | (191) | - | - | 7,796,432 | - | - | - | (191) |
| 1/12/1998 | CHECK WIRE | 2,200,000 | 2,200,000 | - | - | - | 9,996,432 | - | - | - | - |
| 1/15/1998 | W/H TAX DIV C | (262) | - | (262) | - | - | 9,996,169 | - | - | - | (262) |
| 1/20/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 9,996,169 | - | - | - | (1) |
| 2/19/1998 | W/H TAX DIV CCI | (335) | - | (335) | - | - | 9,995,833 | - | - | - | (335) |
| 2/24/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 9,995,824 | - | - | - | (9) |
| 2/25/1998 | W/H TAX DIV MTR | (87) | - | (87) | - | - | 9,995,737 | - | - | - | (87) |
| 3/2/1998 | W/H TAX DIV INTC | (63) | - | (63) | - | - | 9,995,673 | - | - | - | (63) |
| 3/2/1998 | W/H TAX DIV F | (643) | - | (643) | - | - | 9,995,030 | - | - | - | (643) |
| 3/5/1998 | CHECK WIRE | 1,400,000 | 1,400,000 | - | - | - | 11,395,030 | - | - | - | - |
| 3/6/1998 | W/H TAX DIV BA | (184) | - | (184) | - | - | 11,394,846 | - | - | - | (184) |
| 3/10/1998 | W/H TAX DIV JNJ | (385) | - | (385) | - | - | 11,394,461 | - | - | - | (385) |
| 3/10/1998 | W/H TAX DIV AN | (492) | - | (492) | - | - | 11,393,969 | - | - | - | (492) |
| 3/10/1998 | W/H TAX DIV IBM | (248) | - | (248) | - | - | 11,393,722 | - | - | - | (248) |
| 3/10/1998 | W/H TAX DIV XON | (1,286) | - | (1,286) | - | - | 11,392,436 | - | - | - | (1,286) |
| 3/10/1998 | W/H TAX DIV GM | (474) | - | (474) | - | - | 11,391,962 | - | - | - | (474) |
| 3/10/1998 | W/H TAX DIV MOB | (582) | - | (582) | - | - | 11,391,380 | - | - | - | (582) |
| 3/11/1998 | W/H TAX DIV BAC | (302) | - | (302) | - | - | 11,391,078 | - | - | - | (302) |
| 3/12/1998 | W/H TAX DIV MMM | (281) | - | (281) | - | - | 11,390,798 | - | - | - | (281) |
| 3/13/1998 | W/H TAX DIV ARC | (312) | - | (312) | - | - | 11,390,486 | - | - | - | (312) |
| 3/16/1998 | W/H TAX DIV DD | (459) | - | (459) | - | - | 11,390,027 | - | - | - | (459) |
| 3/17/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (34) | - | (34) | - | - | 11,389,992 | - | - | - | (34) |
| 4/3/1998 | W/H TAX DIV SLB | (123) | - | (123) | - | - | 11,389,869 | - | - | - | (123) |
| 4/6/1998 | W/H TAX DIV WMT | (233) | - | (233) | - | - | 11,389,637 | - | - | - | (233) |
| 4/15/1998 | W/H TAX DIV HWP | (195) | - | (195) | - | - | 11,389,442 | - | - | - | (195) |
| 4/22/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (42) | - | (42) | - | - | 11,389,400 | - | - | - | (42) |
| 5/1/1998 | W/H TAX DIV T | (725) | - | (725) | - | - | 11,388,675 | - | - | - | (725) |
| 5/1/1998 | W/H TAX DIV BEL | (789) | - | (789) | - | - | 11,387,886 | - | - | - | (789) |
| 5/1/1998 | W/H TAX DIV AIT | (461) | - | (461) | - | - | 11,387,425 | - | - | - | (461) |
| 5/1/1998 | W/H TAX DIV BMY | (514) | - | (514) | - | - | 11,386,911 | - | - | - | (514) |
| 5/6/1998 | CHECK WIRE | 2,250,000 | 2,250,000 | - | - | - | 13,636,911 | - | - | - | - |
| 5/8/1998 | W/H TAX DIV AXP | (148) | - | (148) | - | - | 13,636,763 | - | - | - | (148) |
| 5/19/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (27) | - | (27) | - | - | 13,636,736 | - | - | - | (27) |
| 5/22/1998 | W/H TAX DIV DIS | (138) | - | (138) | - | - | 13,636,597 | - | - | - | (138) |
| 6/5/1998 | W/H TAX DIV BA | (213) | - | (213) | - | - | 13,636,384 | - | - | - | (213) |
| 6/9/1998 | W/H TAX DIV JNJ | (508) | - | (508) | - | - | 13,635,877 | - | - | - | (508) |
| 6/10/1998 | W/H TAX DIV IBM | (94) | - | (94) | - | - | 13,635,783 | - | - | - | (94) |
| 6/10/1998 | W/H TAX DIV GM | (398) | - | (398) | - | - | 13,635,385 | - | - | - | (398) |
| 6/10/1998 | W/H TAX DIV AN | (798) | - | (798) | - | - | 13,634,587 | - | - | - | (798) |
| 6/10/1998 | W/H TAX DIV XON | (1,104) | - | (1,104) | - | - | 13,633,483 | - | - | - | (1,104) |
| 6/10/1998 | W/H TAX DIV MOB | (189) | - | (189) | - | - | 13,633,294 | - | - | - | (189) |
| 6/11/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 13,633,282 | - | - | - | (11) |
| 6/11/1998 | W/H TAX DIV BAC | (367) | - | (367) | - | - | 13,632,916 | - | - | - | (367) |
| 6/12/1998 | W/H TAX DIV MMM | (326) | - | (326) | - | - | 13,632,590 | - | - | - | (326) |
| 6/12/1998 | W/H TAX DIV MCD | (94) | - | (94) | - | - | 13,632,496 | - | - | - | (94) |
| 6/12/1998 | W/H TAX DIV DD | (622) | - | (622) | - | - | 13,631,874 | - | - | - | (622) |
| 6/19/1998 | W/H TAX DIV AIG | (83) | - | (83) | - | - | 13,631,792 | - | - | - | (83) |
| 6/26/1998 | W/H TAX DIV NB | (548) | - | (548) | - | - | 13,631,243 | - | - | - | (548) |
| 6/30/1998 | W/H TAX DIV NT | (49) | - | (49) | - | - | 13,631,194 | - | - | - | (49) |
| 6/30/1998 | W/H TAX DIV PEP | (298) | - | (298) | - | - | 13,630,896 | - | - | - | (298) |
| 7/1/1998 | AMOCO CORP  CANCEL W/H | 798 | - | 798 | - | - | 13,631,694 | - | - | - | - |
| 7/1/1998 | W/H TAX DIV MRK | (819) | - | (819) | - | - | 13,630,875 | - | - | - | (819) |
| 7/1/1998 | W/H TAX DIV KO | (570) | - | (570) | - | - | 13,630,306 | - | - | - | (570) |
| 7/1/1998 | AMOCO CORP  W/H TAX DIV | (399) | - | (399) | - | - | 13,629,907 | - | - | - | (399) |
| 7/7/1998 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 14,629,907 | - | - | - | - |
| 7/10/1998 | W/H TAX DIV SLB | (143) | - | (143) | - | - | 14,629,763 | - | - | - | (143) |
| 7/13/1998 | W/H TAX DIV WMT | (265) | - | (265) | - | - | 14,629,498 | - | - | - | (265) |
| 7/15/1998 | W/H TAX DIV C | (398) | - | (398) | - | - | 14,629,100 | - | - | - | (398) |
| 7/15/1998 | W/H TAX DIV HWP | (258) | - | (258) | - | - | 14,628,842 | - | - | - | (258) |
| 7/22/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 14,628,824 | - | - | - | (18) |
| 7/27/1998 | W/H TAX DIV GE | (1,496) | - | (1,496) | - | - | 14,627,328 | - | - | - | (1,496) |
| 8/3/1998 | W/H TAX DIV BEL | (915) | - | (915) | - | - | 14,626,413 | - | - | - | (915) |
| 8/3/1998 | W/H TAX DIV T | (813) | - | (813) | - | - | 14,625,601 | - | - | - | (813) |
| 8/3/1998 | W/H TAX DIV BMY | (596) | - | (596) | - | - | 14,625,005 | - | - | - | (596) |
| 8/3/1998 | W/H TAX DIV AIT | (502) | - | (502) | - | - | 14,624,502 | - | - | - | (502) |
| 8/3/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 14,624,499 | - | - | - | (4) |
| 8/10/1998 | W/H TAX DIV AXP | (167) | - | (167) | - | - | 14,624,332 | - | - | - | (167) |
| 9/4/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 14,624,327 | - | - | - | (5) |
| 9/11/1998 | W/H TAX DIV MCD | (87) | - | (87) | - | - | 14,624,240 | - | - | - | (87) |
| 9/30/1998 | W/H TAX DIV PEP | (51) | - | (51) | - | - | 14,624,189 | - | - | - | (51) |
| 10/15/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 14,624,186 | - | - | - | (3) |

MADC1135_00000005

Exhibit B

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Transfers | Column 12 Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/23/1998 | CHECK WIRE | 600,000 | 600,000 | - | - | - | 15,224,186 | - | - | - | - |
| 11/23/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 15,224,183 | - | - | - | (3) |
| 12/11/1998 | W/H TAX DIV MCD | (43) | - | (43) | - | - | 15,224,140 | - | - | - | (43) |
| 12/15/1998 | W/H TAX DIV KO | (256) | - | (256) | - | - | 15,223,885 | - | - | - | (256) |
| 12/18/1998 | W/H TAX DIV AIG | (40) | - | (40) | - | - | 15,223,845 | - | - | - | (40) |
| 12/23/1998 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 15,223,834 | - | - | - | (10) |
| 12/23/1998 | W/H TAX DIV BAC | (539) | - | (539) | - | - | 15,223,296 | - | - | - | (539) |
| 1/4/1999 | W/H TAX DIV PEP | (133) | - | (133) | - | - | 15,223,163 | - | - | - | (133) |
| 1/4/1999 | W/H TAX DIV ONE | (303) | - | (303) | - | - | 15,222,859 | - | - | - | (303) |
| 1/4/1999 | W/H TAX DIV MRK | (452) | - | (452) | - | - | 15,222,408 | - | - | - | (452) |
| 1/5/1999 | CHECK WIRE | (300,000) | - | (300,000) | - | - | 14,922,408 | - | - | - | (300,000) |
| 1/11/1999 | W/H TAX DIV WMT | (118) | - | (118) | - | - | 14,922,290 | - | - | - | (118) |
| 1/22/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 14,922,289 | - | - | - | (2) |
| 2/11/1999 | CHECK WIRE | 1,325,000 | 1,325,000 | - | - | - | 16,247,289 | - | - | - | - |
| 2/16/1999 | W/H TAX DIV PG | (349) | - | (349) | - | - | 16,246,940 | - | - | - | (349) |
| 2/16/1999 | W/H TAX DIV TXN | (51) | - | (51) | - | - | 16,246,889 | - | - | - | (51) |
| 2/24/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 16,246,879 | - | - | - | (10) |
| 2/26/1999 | W/H TAX DIV C | (608) | - | (608) | - | - | 16,246,271 | - | - | - | (608) |
| 3/1/1999 | W/H TAX DIV F | (824) | - | (824) | - | - | 16,245,447 | - | - | - | (824) |
| 3/1/1999 | W/H TAX DIV INTC | (99) | - | (99) | - | - | 16,245,348 | - | - | - | (99) |
| 3/1/1999 | W/H TAX DIV WFC | (442) | - | (442) | - | - | 16,244,906 | - | - | - | (442) |
| 3/3/1999 | W/H TAX DIV KO | (201) | - | (201) | - | - | 16,244,705 | - | - | - | (201) |
| 3/4/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 16,244,705 | - | - | - | (1) |
| 3/8/1999 | CHECK WIRE | 600,000 | 600,000 | - | - | - | 16,844,705 | - | - | - | - |
| 3/9/1999 | W/H TAX DIV JNJ | (493) | - | (493) | - | - | 16,844,211 | - | - | - | (493) |
| 3/10/1999 | W/H TAX DIV IBM | (315) | - | (315) | - | - | 16,843,897 | - | - | - | (315) |
| 3/10/1999 | W/H TAX DIV GM | (493) | - | (493) | - | - | 16,843,404 | - | - | - | (493) |
| 3/10/1999 | W/H TAX DIV XON | (885) | - | (885) | - | - | 16,842,518 | - | - | - | (885) |
| 3/15/1999 | W/H TAX DIV DD | (586) | - | (586) | - | - | 16,841,932 | - | - | - | (586) |
| 3/31/1999 | W/H TAX DIV PEP | (294) | - | (294) | - | - | 16,841,638 | - | - | - | (294) |
| 3/31/1999 | W/H TAX DIV MCD | (99) | - | (99) | - | - | 16,841,539 | - | - | - | (99) |
| 4/1/1999 | W/H TAX DIV ONE | (766) | - | (766) | - | - | 16,840,773 | - | - | - | (766) |
| 4/1/1999 | W/H TAX DIV KO | (608) | - | (608) | - | - | 16,840,165 | - | - | - | (608) |
| 4/14/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 16,840,153 | - | - | - | (12) |
| 4/15/1999 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 18,840,153 | - | - | - | - |
| 4/19/1999 | W/H TAX DIV WMT | (351) | - | (351) | - | - | 18,839,802 | - | - | - | (351) |
| 4/26/1999 | W/H TAX DIV GE | (462) | - | (462) | - | - | 18,839,340 | - | - | - | (462) |
| 5/5/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 18,839,336 | - | - | - | (4) |
| 5/10/1999 | CHECK WIRE | 1,800,000 | 1,800,000 | - | - | - | 20,639,336 | - | - | - | - |
| 5/14/1999 | W/H TAX DIV PG | (133) | - | (133) | - | - | 20,639,203 | - | - | - | (133) |
| 5/24/1999 | W/H TAX DIV TXN | (11) | - | (11) | - | - | 20,639,192 | - | - | - | (11) |
| 5/28/1999 | W/H TAX DIV C | (168) | - | (168) | - | - | 20,639,024 | - | - | - | (168) |
| 6/1/1999 | W/H TAX DIV INTC | (103) | - | (103) | - | - | 20,638,921 | - | - | - | (103) |
| 6/1/1999 | W/H TAX DIV WFC | (332) | - | (332) | - | - | 20,638,589 | - | - | - | (332) |
| 6/1/1999 | W/H TAX DIV F | (194) | - | (194) | - | - | 20,638,395 | - | - | - | (194) |
| 6/1/1999 | W/H TAX DIV LU | (36) | - | (36) | - | - | 20,638,359 | - | - | - | (36) |
| 6/3/1999 | CHECK WIRE | 8,000,000 | 8,000,000 | - | - | - | 28,638,359 | - | - | - | - |
| 6/4/1999 | W/H TAX DIV BA | (223) | - | (223) | - | - | 28,638,136 | - | - | - | (223) |
| 6/8/1999 | W/H TAX DIV JNJ | (609) | - | (609) | - | - | 28,637,527 | - | - | - | (609) |
| 6/10/1999 | W/H TAX DIV GM | (538) | - | (538) | - | - | 28,636,989 | - | - | - | (538) |
| 6/10/1999 | W/H TAX DIV XON | (1,639) | - | (1,639) | - | - | 28,635,350 | - | - | - | (1,639) |
| 6/10/1999 | W/H TAX DIV MOB | (744) | - | (744) | - | - | 28,634,606 | - | - | - | (744) |
| 6/10/1999 | W/H TAX DIV IBM | (225) | - | (225) | - | - | 28,634,381 | - | - | - | (225) |
| 6/14/1999 | W/H TAX DIV DD | (666) | - | (666) | - | - | 28,633,715 | - | - | - | (666) |
| 6/16/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (21) | - | (21) | - | - | 28,633,694 | - | - | - | (21) |
| 7/7/1999 | CHECK WIRE | 11,500,000 | 11,500,000 | - | - | - | 40,133,694 | - | - | - | - |
| 7/12/1999 | W/H TAX DIV WMT | (394) | - | (394) | - | - | 40,133,301 | - | - | - | (394) |
| 7/14/1999 | W/H TAX DIV HWP | (288) | - | (288) | - | - | 40,133,013 | - | - | - | (288) |
| 7/21/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (44) | - | (44) | - | - | 40,132,969 | - | - | - | (44) |
| 7/26/1999 | W/H TAX DIV GE | (2,087) | - | (2,087) | - | - | 40,130,882 | - | - | - | (2,087) |
| 8/2/1999 | W/H TAX DIV BEL | (1,083) | - | (1,083) | - | - | 40,129,799 | - | - | - | (1,083) |
| 8/2/1999 | W/H TAX DIV T | (1,238) | - | (1,238) | - | - | 40,128,561 | - | - | - | (1,238) |
| 8/2/1999 | W/H TAX DIV AIT | (607) | - | (607) | - | - | 40,127,954 | - | - | - | (607) |
| 8/2/1999 | W/H TAX DIV BMY | (750) | - | (750) | - | - | 40,127,204 | - | - | - | (750) |
| 8/5/1999 | CHECK WIRE | 5,800,000 | 5,800,000 | - | - | - | 45,927,204 | - | - | - | - |
| 8/5/1999 | W/H TAX DIV AIG | (14) | - | (14) | - | - | 45,927,191 | - | - | - | (14) |
| 8/10/1999 | W/H TAX DIV AXP | (177) | - | (177) | - | - | 45,927,014 | - | - | - | (177) |
| 8/16/1999 | W/H TAX DIV TXN | (22) | - | (22) | - | - | 45,926,992 | - | - | - | (22) |
| 8/24/1999 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (43) | - | (43) | - | - | 45,926,949 | - | - | - | (43) |
| 8/27/1999 | W/H TAX DIV C | (308) | - | (308) | - | - | 45,926,641 | - | - | - | (308) |
| 9/1/1999 | W/H TAX DIV INTC | (69) | - | (69) | - | - | 45,926,572 | - | - | - | (69) |

MADC1135_00000006

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 9/1/1999 | W/H TAX DIV WFC | (220) | - | (220) | - | - | 45,926,352 | - | - | - | (220) |
| 9/1/1999 | W/H TAX DIV F | (370) | - | (370) | - | - | 45,925,983 | - | - | - | (370) |
| 9/1/1999 | W/H TAX DIV LU | (41) | - | (41) | - | - | 45,925,942 | - | - | - | (41) |
| 9/3/1999 | W/H TAX DIV BA | (89) | - | (89) | - | - | 45,925,853 | - | - | - | (89) |
| 9/7/1999 | W/H TAX DIV JNJ | (506) | - | (506) | - | - | 45,925,347 | - | - | - | (506) |
| 9/8/1999 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 55,925,347 | - | - | - | - |
| 9/10/1999 | W/H TAX DIV OM | (212) | - | (212) | - | - | 55,925,135 | - | - | - | (212) |
| 9/10/1999 | W/H TAX DIV IBM | (142) | - | (142) | - | - | 55,924,993 | - | - | - | (142) |
| 9/10/1999 | W/H TAX DIV XON | (659) | - | (659) | - | - | 55,924,334 | - | - | - | (659) |
| 9/10/1999 | W/H TAX DIV MOB | (289) | - | (289) | - | - | 55,924,045 | - | - | - | (289) |
| 9/13/1999 | W/H TAX DIV MMM | (289) | - | (289) | - | - | 55,923,756 | - | - | - | (289) |
| 9/13/1999 | W/H TAX DIV DD | (266) | - | (266) | - | - | 55,923,489 | - | - | - | (266) |
| 9/15/1999 | W/H TAX DIV MCD | (230) | - | (230) | - | - | 55,923,259 | - | - | - | (230) |
| 9/17/1999 | W/H TAX DIV AIG | (274) | - | (274) | - | - | 55,922,985 | - | - | - | (274) |
| 9/24/1999 | W/H TAX DIV BAC | (2,753) | - | (2,753) | - | - | 55,920,231 | - | - | - | (2,753) |
| 9/30/1999 | W/H TAX DIV PEP | (699) | - | (699) | - | - | 55,919,533 | - | - | - | (699) |
| 9/30/1999 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (39) | - | (39) | - | - | 55,919,493 | - | - | - | (39) |
| 10/1/1999 | W/H TAX DIV KO | (1,397) | - | (1,397) | - | - | 55,918,096 | - | - | - | (1,397) |
| 10/1/1999 | W/H TAX DIV ONE | (1,706) | - | (1,706) | - | - | 55,916,390 | - | - | - | (1,706) |
| 10/1/1999 | W/H TAX DIV MRK | (2,455) | - | (2,455) | - | - | 55,913,935 | - | - | - | (2,455) |
| 10/6/1999 | CHECK WIRE | 8,500,000 | 8,500,000 | - | - | - | 64,413,935 | - | - | - | - |
| 10/12/1999 | W/H TAX DIV WMT | (783) | - | (783) | - | - | 64,413,152 | - | - | - | (783) |
| 10/13/1999 | W/H TAX DIV HWP | (576) | - | (576) | - | - | 64,412,576 | - | - | - | (576) |
| 10/20/1999 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 64,412,564 | - | - | - | (12) |
| 10/25/1999 | W/H TAX DIV GE | (4,046) | - | (4,046) | - | - | 64,408,517 | - | - | - | (4,046) |
| 11/1/1999 | W/H TAX DIV AIT | (1,214) | - | (1,214) | - | - | 64,407,303 | - | - | - | (1,214) |
| 11/1/1999 | W/H TAX DIV BMY | (1,509) | - | (1,509) | - | - | 64,405,794 | - | - | - | (1,509) |
| 11/1/1999 | W/H TAX DIV BEL | (2,096) | - | (2,096) | - | - | 64,403,698 | - | - | - | (2,096) |
| 11/1/1999 | W/H TAX DIV T | (2,445) | - | (2,445) | - | - | 64,401,254 | - | - | - | (2,445) |
| 11/5/1999 | CHECK WIRE | 6,500,000 | 6,500,000 | - | - | - | 70,901,254 | - | - | - | - |
| 11/10/1999 | W/H TAX DIV AXP | (354) | - | (354) | - | - | 70,900,899 | - | - | - | (354) |
| 11/17/1999 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 70,900,885 | - | - | - | (14) |
| 12/1/1999 | W/H TAX DIV BA | (223) | - | (223) | - | - | 70,900,662 | - | - | - | (223) |
| 12/7/1999 | W/H TAX DIV JNJ | (637) | - | (637) | - | - | 70,900,025 | - | - | - | (637) |
| 12/8/1999 | CHECK WIRE | 5,800,000 | 5,800,000 | - | - | - | 76,700,025 | - | - | - | - |
| 12/10/1999 | W/H TAX DIV MOB | (778) | - | (778) | - | - | 76,699,247 | - | - | - | (778) |
| 12/10/1999 | W/H TAX DIV IBM | (382) | - | (382) | - | - | 76,698,865 | - | - | - | (382) |
| 12/10/1999 | W/H TAX DIV GM | (569) | - | (569) | - | - | 76,698,297 | - | - | - | (569) |
| 12/10/1999 | W/H TAX DIV XON | (1,851) | - | (1,851) | - | - | 76,696,446 | - | - | - | (1,851) |
| 12/13/1999 | W/H TAX DIV MMM | (1,116) | - | (1,116) | - | - | 76,695,330 | - | - | - | (1,116) |
| 12/14/1999 | W/H TAX DIV DD | (597) | - | (597) | - | - | 76,694,733 | - | - | - | (597) |
| 12/17/1999 | W/H TAX DIV DIS | (716) | - | (716) | - | - | 76,694,017 | - | - | - | (716) |
| 12/31/1999 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (46) | - | (46) | - | - | 76,693,970 | - | - | - | (46) |
| 1/5/2000 | CHECK WIRE | 9,700,000 | 9,700,000 | - | - | - | 86,393,970 | - | - | - | - |
| 1/11/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 86,393,970 | - | - | - | (1) |
| 2/1/2000 | W/H TAX DIV BEL | (1,211) | - | (1,211) | - | - | 86,392,758 | - | - | - | (1,211) |
| 2/8/2000 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 93,392,758 | - | - | - | - |
| 2/14/2000 | W/H TAX DIV TXN | (194) | - | (194) | - | - | 93,392,564 | - | - | - | (194) |
| 2/15/2000 | W/H TAX DIV PG | (2,436) | - | (2,436) | - | - | 93,390,128 | - | - | - | (2,436) |
| 2/24/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 93,390,120 | - | - | - | (8) |
| 2/25/2000 | W/H TAX DIV F | (3,089) | - | (3,089) | - | - | 93,387,031 | - | - | - | (3,089) |
| 3/1/2000 | W/H TAX DIV F | (3,494) | - | (3,494) | - | - | 93,383,537 | - | - | - | (3,494) |
| 3/1/2000 | W/H TAX DIV LU | (344) | - | (344) | - | - | 93,383,192 | - | - | - | (344) |
| 3/1/2000 | W/H TAX DIV WFC | (2,040) | - | (2,040) | - | - | 93,381,152 | - | - | - | (2,040) |
| 3/1/2000 | W/H TAX DIV NTC | (574) | - | (574) | - | - | 93,380,578 | - | - | - | (574) |
| 3/3/2000 | W/H TAX DIV BA | (700) | - | (700) | - | - | 93,379,878 | - | - | - | (700) |
| 3/7/2000 | W/H TAX DIV JNJ | (2,239) | - | (2,239) | - | - | 93,377,640 | - | - | - | (2,239) |
| 3/8/2000 | CHECK WIRE | 4,500,000 | 4,500,000 | - | - | - | 97,877,640 | - | - | - | - |
| 3/10/2000 | W/H TAX DIV XOM | (8,675) | - | (8,675) | - | - | 97,868,964 | - | - | - | (8,675) |
| 3/10/2000 | W/H TAX DIV IBM | (1,204) | - | (1,204) | - | - | 97,867,760 | - | - | - | (1,204) |
| 3/10/2000 | W/H TAX DIV GM | (1,835) | - | (1,835) | - | - | 97,865,925 | - | - | - | (1,835) |
| 3/10/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 97,865,908 | - | - | - | (17) |
| 3/14/2000 | W/H TAX DIV DD | (2,094) | - | (2,094) | - | - | 97,863,814 | - | - | - | (2,094) |
| 3/23/2000 | W/H TAX DIV HD | (189) | - | (189) | - | - | 97,863,625 | - | - | - | (189) |
| 3/31/2000 | W/H TAX DIV PEP | (831) | - | (831) | - | - | 97,862,794 | - | - | - | (831) |
| 4/3/2000 | W/H TAX DIV KO | (2,713) | - | (2,713) | - | - | 97,860,082 | - | - | - | (2,713) |
| 4/10/2000 | W/H TAX DIV WMT | (1,753) | - | (1,753) | - | - | 97,858,328 | - | - | - | (1,753) |
| 4/25/2000 | W/H TAX DIV GE | (2,816) | - | (2,816) | - | - | 97,855,512 | - | - | - | (2,816) |
| 4/28/2000 | W/H TAX DIV MWD | (368) | - | (368) | - | - | 97,855,144 | - | - | - | (368) |
| 4/28/2000 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (51) | - | (51) | - | - | 97,855,093 | - | - | - | (51) |
| 5/5/2000 | CHECK WIRE | 3,500,000 | 3,500,000 | - | - | - | 101,355,093 | - | - | - | - |

MADC1135_00000007

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 5/12/2000 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 101,355,083 | - | - | - | (10) |
| 6/1/2000 | W/H TAX DIV INTC | (279) | - | (279) | - | - | 101,354,804 | - | - | - | (279) |
| 6/1/2000 | W/H TAX DIV WFC | (1,022) | - | (1,022) | - | - | 101,353,782 | - | - | - | (1,022) |
| 6/9/2000 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 104,353,782 | - | - | - | - |
| 6/12/2000 | W/H TAX DIV XOM | (10,237) | - | (10,237) | - | - | 104,343,545 | - | - | - | (10,237) |
| 6/12/2000 | W/H TAX DIV DD | (2,415) | - | (2,415) | - | - | 104,341,131 | - | - | - | (2,415) |
| 6/12/2000 | W/H TAX DIV GM | (909) | - | (909) | - | - | 104,340,222 | - | - | - | (909) |
| 6/12/2000 | W/H TAX DIV IBM | (656) | - | (656) | - | - | 104,339,566 | - | - | - | (656) |
| 6/13/2000 | W/H TAX DIV T | (1,651) | - | (1,651) | - | - | 104,337,915 | - | - | - | (1,651) |
| 6/21/2000 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (35) | - | (35) | - | - | 104,337,880 | - | - | - | (35) |
| 7/10/2000 | W/H TAX DIV WMT | (515) | - | (515) | - | - | 104,337,365 | - | - | - | (515) |
| 7/18/2000 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 104,337,363 | - | - | - | (2) |
| 8/3/2000 | W/H TAX DIV AIG | (12) | - | (12) | - | - | 104,337,351 | - | - | - | (12) |
| 8/7/2000 | CHECK WIRE | 7,500,000 | 7,500,000 | - | - | - | 111,837,351 | - | - | - | - |
| 8/15/2000 | W/H TAX DIV PG | (1,531) | - | (1,531) | - | - | 111,835,821 | - | - | - | (1,531) |
| 8/15/2000 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (53) | - | (53) | - | - | 111,835,768 | - | - | - | (53) |
| 8/21/2000 | W/H TAX DIV TXN | (210) | - | (210) | - | - | 111,835,558 | - | - | - | (210) |
| 8/24/2000 | W/H TAX DIV MER | (752) | - | (752) | - | - | 111,834,806 | - | - | - | (752) |
| 8/25/2000 | W/H TAX DIV C | (3,858) | - | (3,858) | - | - | 111,830,948 | - | - | - | (3,858) |
| 9/1/2000 | W/H TAX DIV INTC | (837) | - | (837) | - | - | 111,830,110 | - | - | - | (837) |
| 9/1/2000 | W/H TAX DIV LU | (428) | - | (428) | - | - | 111,829,682 | - | - | - | (428) |
| 9/1/2000 | W/H TAX DIV WFC | (2,222) | - | (2,222) | - | - | 111,827,460 | - | - | - | (2,222) |
| 9/11/2000 | W/H TAX DIV XOM | (5,343) | - | (5,343) | - | - | 111,822,117 | - | - | - | (5,343) |
| 9/11/2000 | W/H TAX DIV IBM | (1,467) | - | (1,467) | - | - | 111,820,651 | - | - | - | (1,467) |
| 9/15/2000 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (33) | - | (33) | - | - | 111,820,618 | - | - | - | (33) |
| 10/2/2000 | W/H TAX DIV KO | (1,639) | - | (1,639) | - | - | 111,818,979 | - | - | - | (1,639) |
| 10/5/2000 | W/H TAX DIV AV | (1) | - | (1) | - | - | 111,818,978 | - | - | - | (1) |
| 10/10/2000 | W/H TAX DIV WMT | (1,050) | - | (1,050) | - | - | 111,817,929 | - | - | - | (1,050) |
| 10/11/2000 | W/H TAX DIV HWP | (1,090) | - | (1,090) | - | - | 111,816,839 | - | - | - | (1,090) |
| 10/18/2000 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 111,816,830 | - | - | - | (9) |
| 10/25/2000 | W/H TAX DIV GE | (9,250) | - | (9,250) | - | - | 111,807,580 | - | - | - | (9,250) |
| 10/27/2000 | W/H TAX DIV IBM | (1,563) | - | (1,563) | - | - | 111,806,017 | - | - | - | (1,563) |
| 11/1/2000 | W/H TAX DIV T | (5,726) | - | (5,726) | - | - | 111,800,291 | - | - | - | (5,726) |
| 11/1/2000 | W/H TAX DIV PHA | (1,050) | - | (1,050) | - | - | 111,799,241 | - | - | - | (1,050) |
| 11/1/2000 | W/H TAX DIV VZ | (7,177) | - | (7,177) | - | - | 111,792,065 | - | - | - | (7,177) |
| 11/1/2000 | W/H TAX DIV BMY | (3,320) | - | (3,320) | - | - | 111,788,745 | - | - | - | (3,320) |
| 11/10/2000 | W/H TAX DIV AXP | (728) | - | (728) | - | - | 111,788,016 | - | - | - | (728) |
| 11/15/2000 | CHECK WIRE | 4,500,000 | 4,500,000 | - | - | - | 116,288,016 | - | - | - | - |
| 12/1/2000 | CHECK WIRE | (22,000,000) | - | (22,000,000) | - | - | 94,288,016 | - | - | - | (22,000,000) |
| 12/12/2000 | W/H TAX DIV JNJ | (646) | - | (646) | - | - | 94,287,371 | - | - | - | (646) |
| 12/18/2000 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (99) | - | (99) | - | - | 94,287,271 | - | - | - | (99) |
| 1/10/2001 | CHECK WIRE | 18,000,000 | 18,000,000 | - | - | - | 112,287,271 | - | - | - | - |
| 1/18/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (33) | - | (33) | - | - | 112,287,239 | - | - | - | (33) |
| 1/30/2001 | W/H TAX DIV MWD | (726) | - | (726) | - | - | 112,286,512 | - | - | - | (726) |
| 2/1/2001 | W/H TAX DIV VZ | (3,040) | - | (3,040) | - | - | 112,283,472 | - | - | - | (3,040) |
| 2/1/2001 | W/H TAX DIV PHA | (460) | - | (460) | - | - | 112,283,012 | - | - | - | (460) |
| 2/7/2001 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 124,283,012 | - | - | - | - |
| 2/12/2001 | W/H TAX DIV TXN | (293) | - | (293) | - | - | 124,282,719 | - | - | - | (293) |
| 2/15/2001 | W/H TAX DIV PG | (2,392) | - | (2,392) | - | - | 124,280,326 | - | - | - | (2,392) |
| 2/22/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (21) | - | (21) | - | - | 124,280,306 | - | - | - | (21) |
| 2/23/2001 | W/H TAX DIV C | (5,512) | - | (5,512) | - | - | 124,274,794 | - | - | - | (5,512) |
| 3/1/2001 | W/H TAX DIV LU | (328) | - | (328) | - | - | 124,274,466 | - | - | - | (328) |
| 3/1/2001 | W/H TAX DIV WFC | (3,154) | - | (3,154) | - | - | 124,271,312 | - | - | - | (3,154) |
| 3/1/2001 | W/H TAX DIV INTC | (1,083) | - | (1,083) | - | - | 124,270,229 | - | - | - | (1,083) |
| 3/8/2001 | W/H TAX DIV PFE | (5,625) | - | (5,625) | - | - | 124,264,604 | - | - | - | (5,625) |
| 3/9/2001 | CHECK WIRE | 12,900,000 | 12,900,000 | - | - | - | 137,164,604 | - | - | - | - |
| 3/9/2001 | W/H TAX DIV XOM | (11,753) | - | (11,753) | - | - | 137,152,851 | - | - | - | (11,753) |
| 3/12/2001 | W/H TAX DIV IBM | (1,844) | - | (1,844) | - | - | 137,151,007 | - | - | - | (1,844) |
| 3/13/2001 | W/H TAX DIV T | (1,503) | - | (1,503) | - | - | 137,149,504 | - | - | - | (1,503) |
| 3/19/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (46) | - | (46) | - | - | 137,149,458 | - | - | - | (46) |
| 3/22/2001 | W/H TAX DIV HD | (166) | - | (166) | - | - | 137,149,291 | - | - | - | (166) |
| 3/30/2001 | W/H TAX DIV PEP | (381) | - | (381) | - | - | 137,148,910 | - | - | - | (381) |
| 4/2/2001 | W/H TAX DIV MRK | (1,365) | - | (1,365) | - | - | 137,147,545 | - | - | - | (1,365) |
| 4/2/2001 | W/H TAX DIV KO | (800) | - | (800) | - | - | 137,146,745 | - | - | - | (800) |
| 4/9/2001 | W/H TAX DIV WMT | (2,179) | - | (2,179) | - | - | 137,144,566 | - | - | - | (2,179) |
| 4/11/2001 | W/H TAX DIV HWP | (1,142) | - | (1,142) | - | - | 137,143,424 | - | - | - | (1,142) |
| 4/24/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 137,143,413 | - | - | - | (10) |
| 4/27/2001 | W/H TAX DIV MWD | (1,783) | - | (1,783) | - | - | 137,141,630 | - | - | - | (1,783) |
| 4/30/2001 | W/H TAX DIV JPM | (4,485) | - | (4,485) | - | - | 137,137,145 | - | - | - | (4,485) |
| 5/1/2001 | W/H TAX DIV T | (989) | - | (989) | - | - | 137,136,156 | - | - | - | (989) |
| 5/1/2001 | W/H TAX DIV PHA | (1,092) | - | (1,092) | - | - | 137,135,064 | - | - | - | (1,092) |

MADC1135_00000008

Exhibit B

**BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 5/1/2001 | W/H TAX DIV VZ | (7,325) | - | (7,325) | - | - | 137,127,739 | - | - | - | (7,325) |
| 5/1/2001 | W/H TAX DIV BMY | (3,737) | - | (3,737) | - | - | 137,124,002 | - | - | - | (3,737) |
| 5/2/2001 | W/H TAX DIV TYC | (156) | - | (156) | - | - | 137,123,846 | - | - | - | (156) |
| 5/10/2001 | W/H TAX DIV AXP | (739) | - | (739) | - | - | 137,123,107 | - | - | - | (739) |
| 5/15/2001 | W/H TAX DIV PG | (3,184) | - | (3,184) | - | - | 137,119,923 | - | - | - | (3,184) |
| 6/20/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (74) | - | (74) | - | - | 137,119,849 | - | - | - | (74) |
| 7/9/2001 | W/H TAX DIV WMT | (1,986) | - | (1,986) | - | - | 137,117,862 | - | - | - | (1,986) |
| 7/11/2001 | W/H TAX DIV XOM | (193) | - | (193) | - | - | 137,117,669 | - | - | - | (193) |
| 7/11/2001 | W/H TAX DIV HWP | (431) | - | (431) | - | - | 137,117,239 | - | - | - | (431) |
| 7/12/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 142,117,239 | - | - | - | - |
| 7/23/2001 | W/H TAX DIV MWD | (2,757) | - | (2,757) | - | - | 142,114,482 | - | - | - | (2,757) |
| 7/25/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 142,114,474 | - | - | - | (8) |
| 7/25/2001 | W/H TAX DIV GE | (16,708) | - | (16,708) | - | - | 142,097,766 | - | - | - | (16,708) |
| 7/31/2001 | W/H TAX DIV JPM | (7,155) | - | (7,155) | - | - | 142,090,611 | - | - | - | (7,155) |
| 8/1/2001 | W/H TAX DIV PHA | (1,867) | - | (1,867) | - | - | 142,088,744 | - | - | - | (1,867) |
| 8/1/2001 | W/H TAX DIV BMY | (5,496) | - | (5,496) | - | - | 142,083,247 | - | - | - | (5,496) |
| 8/1/2001 | W/H TAX DIV TYC | (246) | - | (246) | - | - | 142,083,001 | - | - | - | (246) |
| 8/1/2001 | W/H TAX DIV VZ | (10,901) | - | (10,901) | - | - | 142,072,100 | - | - | - | (10,901) |
| 8/10/2001 | W/H TAX DIV AXP | (1,133) | - | (1,133) | - | - | 142,070,967 | - | - | - | (1,133) |
| 8/15/2001 | W/H TAX DIV PG | (2,373) | - | (2,373) | - | - | 142,068,594 | - | - | - | (2,373) |
| 8/24/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (52) | - | (52) | - | - | 142,068,542 | - | - | - | (52) |
| 9/4/2001 | TRANS TO 1FR08030 (1FR080) | (4,000,000) | - | - | - | (4,000,000) | 138,068,542 | - | - | - | - |
| 9/13/2001 | W/H TAX DIV HD | (1,076) | - | (1,076) | - | - | 138,067,466 | - | - | - | (1,076) |
| 9/28/2001 | W/H TAX DIV PEP | (2,969) | - | (2,969) | - | - | 138,064,497 | - | - | - | (2,969) |
| 9/28/2001 | W/H TAX DIV BAC | (10,265) | - | (10,265) | - | - | 138,054,232 | - | - | - | (10,265) |
| 10/1/2001 | W/H TAX DIV KO | (5,114) | - | (5,114) | - | - | 138,049,118 | - | - | - | (5,114) |
| 10/1/2001 | W/H TAX DIV MRK | (9,302) | - | (9,302) | - | - | 138,039,816 | - | - | - | (9,302) |
| 10/2/2001 | CHECK WIRE | (3,000,000) | - | (3,000,000) | - | - | 135,039,816 | - | - | - | (3,000,000) |
| 10/9/2001 | W/H TAX DIV WMT | (3,615) | - | (3,615) | - | - | 135,036,201 | - | - | - | (3,615) |
| 10/10/2001 | W/H TAX DIV HWP | (1,810) | - | (1,810) | - | - | 135,034,391 | - | - | - | (1,810) |
| 10/15/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (124) | - | (124) | - | - | 135,034,267 | - | - | - | (124) |
| 10/25/2001 | W/H TAX DIV GE | (18,482) | - | (18,482) | - | - | 135,015,785 | - | - | - | (18,482) |
| 10/26/2001 | W/H TAX DIV MWD | (3,024) | - | (3,024) | - | - | 135,012,761 | - | - | - | (3,024) |
| 10/31/2001 | CHECK WIRE | (4,000,000) | - | (4,000,000) | - | - | 131,012,761 | - | - | - | (4,000,000) |
| 10/31/2001 | W/H TAX DIV JPM | (7,790) | - | (7,790) | - | - | 131,004,971 | - | - | - | (7,790) |
| 11/1/2001 | W/H TAX DIV TYC | (283) | - | (283) | - | - | 131,004,688 | - | - | - | (283) |
| 11/1/2001 | W/H TAX DIV BMY | (6,214) | - | (6,214) | - | - | 130,998,474 | - | - | - | (6,214) |
| 11/1/2001 | W/H TAX DIV PHA | (1,980) | - | (1,980) | - | - | 130,996,495 | - | - | - | (1,980) |
| 11/1/2001 | W/H TAX DIV VZ | (11,997) | - | (11,997) | - | - | 130,984,498 | - | - | - | (11,997) |
| 11/1/2001 | W/H TAX DIV T | (1,501) | - | (1,501) | - | - | 130,982,996 | - | - | - | (1,501) |
| 11/9/2001 | W/H TAX DIV AXP | (1,224) | - | (1,224) | - | - | 130,981,773 | - | - | - | (1,224) |
| 11/15/2001 | W/H TAX DIV PG | (5,572) | - | (5,572) | - | - | 130,976,200 | - | - | - | (5,572) |
| 11/19/2001 | W/H TAX DIV TXN | (435) | - | (435) | - | - | 130,975,765 | - | - | - | (435) |
| 11/19/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 130,975,757 | - | - | - | (8) |
| 11/21/2001 | W/H TAX DIV C | (9,339) | - | (9,339) | - | - | 130,966,418 | - | - | - | (9,339) |
| 12/3/2001 | W/H TAX DIV MCD | (94) | - | (94) | - | - | 130,966,324 | - | - | - | (94) |
| 12/3/2001 | W/H TAX DIV INTC | (1,583) | - | (1,583) | - | - | 130,964,741 | - | - | - | (1,583) |
| 12/3/2001 | W/H TAX DIV WFC | (5,168) | - | (5,168) | - | - | 130,959,573 | - | - | - | (5,168) |
| 12/6/2001 | W/H TAX DIV PFE | (5,280) | - | (5,280) | - | - | 130,954,293 | - | - | - | (5,280) |
| 12/10/2001 | W/H TAX DIV IBM | (2,823) | - | (2,823) | - | - | 130,951,470 | - | - | - | (2,823) |
| 12/10/2001 | W/H TAX DIV XOM | (18,490) | - | (18,490) | - | - | 130,932,981 | - | - | - | (18,490) |
| 12/14/2001 | W/H TAX DIV DD | (119) | - | (119) | - | - | 130,932,862 | - | - | - | (119) |
| 12/31/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (23) | - | (23) | - | - | 130,932,839 | - | - | - | (23) |
| 1/2/2002 | TRANS TO 1FR08010 (1FR080) | (61,000,000) | - | - | - | (61,000,000) | 69,932,839 | - | - | - | - |
| 1/7/2002 | W/H TAX DIV WMT | (626) | - | (626) | - | - | 69,932,213 | - | - | - | (626) |
| 1/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 69,932,205 | - | - | - | (8) |
| 1/25/2002 | W/H TAX DIV MWD | (1,533) | - | (1,533) | - | - | 69,930,672 | - | - | - | (1,533) |
| 2/1/2002 | W/H TAX DIV SBC | (5,173) | - | (5,173) | - | - | 69,925,498 | - | - | - | (5,173) |
| 2/1/2002 | W/H TAX DIV BMY | (1,038) | - | (1,038) | - | - | 69,924,460 | - | - | - | (1,038) |
| 2/1/2002 | W/H TAX DIV VZ | (6,267) | - | (6,267) | - | - | 69,918,193 | - | - | - | (6,267) |
| 2/11/2002 | W/H TAX DIV TXN | (256) | - | (256) | - | - | 69,917,937 | - | - | - | (256) |
| 2/15/2002 | W/H TAX DIV PG | (3,377) | - | (3,377) | - | - | 69,914,560 | - | - | - | (3,377) |
| 2/21/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 69,914,555 | - | - | - | (4) |
| 2/21/2002 | TRANS TO 1FR08030 (1FR080) | (10,000,000) | - | - | - | (10,000,000) | 59,914,555 | - | - | - | - |
| 2/22/2002 | W/H TAX DIV C | (5,647) | - | (5,647) | - | - | 59,908,908 | - | - | - | (5,647) |
| 3/1/2002 | W/H TAX DIV WFC | (3,081) | - | (3,081) | - | - | 59,905,827 | - | - | - | (3,081) |
| 3/1/2002 | W/H TAX DIV INTC | (951) | - | (951) | - | - | 59,904,876 | - | - | - | (951) |
| 3/6/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 59,904,876 | - | - | - | (0) |
| 3/7/2002 | W/H TAX DIV PFE | (5,625) | - | (5,625) | - | - | 59,899,251 | - | - | - | (5,625) |
| 3/11/2002 | W/H TAX DIV IBM | (1,659) | - | (1,659) | - | - | 59,897,592 | - | - | - | (1,659) |
| 3/11/2002 | W/H TAX DIV XOM | (10,832) | - | (10,832) | - | - | 59,886,760 | - | - | - | (10,832) |

MADC1135_00000009

**BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET PRIME INDEX INSURANCE PORTFOLIO LDC**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Transfers | Column 12 Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/11/2002 | W/H TAX DIV BUD | (1,209) | - | (1,209) | - | - | 59,885,551 | - | - | - | (1,209) |
| 3/12/2002 | W/H TAX DIV JNJ | (2,359) | - | (2,359) | - | - | 59,883,192 | - | - | - | (2,359) |
| 3/14/2002 | W/H TAX DIV DD | (2,489) | - | (2,489) | - | - | 59,880,704 | - | - | - | (2,489) |
| 3/15/2002 | W/H TAX DIV AIG | (315) | - | (315) | - | - | 59,880,389 | - | - | - | (315) |
| 3/22/2002 | W/H TAX DIV BAC | (2,752) | - | (2,752) | - | - | 59,877,636 | - | - | - | (2,752) |
| 3/27/2002 | CHECK WIRE | (2,000,000) | - | (2,000,000) | - | - | 57,877,636 | - | - | - | (2,000,000) |
| 3/28/2002 | W/H TAX DIV HD | (772) | - | (772) | - | - | 57,876,864 | - | - | - | (772) |
| 4/1/2002 | W/H TAX DIV MRK | (5,375) | - | (5,375) | - | - | 57,871,489 | - | - | - | (5,375) |
| 4/1/2002 | W/H TAX DIV KO | (3,353) | - | (3,353) | - | - | 57,868,136 | - | - | - | (3,353) |
| 4/1/2002 | W/H TAX DIV PEP | (1,676) | - | (1,676) | - | - | 57,866,459 | - | - | - | (1,676) |
| 4/1/2002 | W/H TAX DIV ONE | (903) | - | (903) | - | - | 57,865,556 | - | - | - | (903) |
| 4/10/2002 | W/H TAX DIV MO | (8,382) | - | (8,382) | - | - | 57,857,173 | - | - | - | (8,382) |
| 4/18/2002 | W/H TAX DIV WMT | (2,242) | - | (2,242) | - | - | 57,854,931 | - | - | - | (2,242) |
| 4/23/2002 | FIDELITY SPARTAN   U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 57,854,922 | - | - | - | (9) |
| 4/25/2002 | W/H TAX DIV GE | (5,239) | - | (5,239) | - | - | 57,849,683 | - | - | - | (5,239) |
| 4/26/2002 | W/H TAX DIV MMD | (1,690) | - | (1,690) | - | - | 57,847,993 | - | - | - | (1,690) |
| 4/26/2002 | W/H TAX DIV MDT | (465) | - | (465) | - | - | 57,847,527 | - | - | - | (465) |
| 4/30/2002 | W/H TAX DIV JPM | (4,521) | - | (4,521) | - | - | 57,843,007 | - | - | - | (4,521) |
| 5/1/2002 | W/H TAX DIV TYC | (169) | - | (169) | - | - | 57,842,837 | - | - | - | (169) |
| 5/1/2002 | W/H TAX DIV PHA | (1,171) | - | (1,171) | - | - | 57,841,667 | - | - | - | (1,171) |
| 5/1/2002 | W/H TAX DIV SBC | (6,110) | - | (6,110) | - | - | 57,835,557 | - | - | - | (6,110) |
| 5/1/2002 | W/H TAX DIV VZ | (7,059) | - | (7,059) | - | - | 57,828,498 | - | - | - | (7,059) |
| 5/1/2002 | W/H TAX DIV BMY | (3,654) | - | (3,654) | - | - | 57,824,844 | - | - | - | (3,654) |
| 5/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 57,824,836 | - | - | - | (8) |
| 5/15/2002 | W/H TAX DIV PG | (1,741) | - | (1,741) | - | - | 57,823,095 | - | - | - | (1,741) |
| 5/24/2002 | W/H TAX DIV C | (3,381) | - | (3,381) | - | - | 57,819,715 | - | - | - | (3,381) |
| 6/3/2002 | W/H TAX DIV INTC | (479) | - | (479) | - | - | 57,819,235 | - | - | - | (479) |
| 6/3/2002 | W/H TAX DIV WFC | (3,496) | - | (3,496) | - | - | 57,815,739 | - | - | - | (3,496) |
| 6/3/2002 | W/H TAX DIV PFE | (6,088) | - | (6,088) | - | - | 57,809,651 | - | - | - | (6,088) |
| 6/10/2002 | W/H TAX DIV GE | (11,631) | - | (11,631) | - | - | 57,798,021 | - | - | - | (11,631) |
| 6/10/2002 | W/H TAX DIV IBM | (1,945) | - | (1,945) | - | - | 57,796,075 | - | - | - | (1,945) |
| 6/10/2002 | W/H TAX DIV BUD | (858) | - | (858) | - | - | 57,795,218 | - | - | - | (858) |
| 6/11/2002 | W/H TAX DIV JNJ | (1,670) | - | (1,670) | - | - | 57,793,548 | - | - | - | (1,670) |
| 6/12/2002 | W/H TAX DIV DD | (1,937) | - | (1,937) | - | - | 57,791,611 | - | - | - | (1,937) |
| 6/25/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 57,791,606 | - | - | - | (6) |
| 7/1/2002 | TRANS TO 1FR08030 *(1FR080)* | (9,490,000) | - | | - | (9,490,000) | 48,301,606 | - | - | - | |
| 7/10/2002 | W/H TAX DIV MO | (1,407) | - | (1,407) | - | - | 48,300,198 | - | - | - | (1,407) |
| 7/15/2002 | W/H TAX DIV USB | (453) | - | (453) | - | - | 48,299,745 | - | - | - | (453) |
| 7/19/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 48,299,737 | - | - | - | (8) |
| 7/25/2002 | W/H TAX DIV GE | (2,166) | - | (2,166) | - | - | 48,297,572 | - | - | - | (2,166) |
| 7/26/2002 | W/H TAX DIV MDT | (88) | - | (88) | - | - | 48,297,483 | - | - | - | (88) |
| 7/26/2002 | W/H TAX DIV MWD | (302) | - | (302) | - | - | 48,297,181 | - | - | - | (302) |
| 7/26/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 48,297,179 | - | - | - | (2) |
| 7/31/2002 | W/H TAX DIV JPM | (825) | - | (825) | - | - | 48,296,354 | - | - | - | (825) |
| 8/1/2002 | W/H TAX DIV PHA | (205) | - | (205) | - | - | 48,296,149 | - | - | - | (205) |
| 8/1/2002 | W/H TAX DIV VZ | (1,246) | - | (1,246) | - | - | 48,294,904 | - | - | - | (1,246) |
| 8/1/2002 | W/H TAX DIV BMY | (651) | - | (651) | - | - | 48,294,253 | - | - | - | (651) |
| 8/1/2002 | W/H TAX DIV T | (171) | - | (171) | - | - | 48,294,082 | - | - | - | (171) |
| 8/1/2002 | W/H TAX DIV SBC | (1,065) | - | (1,065) | - | - | 48,293,018 | - | - | - | (1,065) |
| 8/9/2002 | W/H TAX DIV AXP | (121) | - | (121) | - | - | 48,292,896 | - | - | - | (121) |
| 8/19/2002 | W/H TAX DIV MON | (0) | - | (0) | - | - | 48,292,896 | - | - | - | (0) |
| 8/19/2002 | W/H TAX DIV TXN | (316) | - | (316) | - | - | 48,292,580 | - | - | - | (316) |
| 8/23/2002 | W/H TAX DIV C | (8,234) | - | (8,234) | - | - | 48,284,346 | - | - | - | (8,234) |
| 8/26/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 48,284,342 | - | - | - | (4) |
| 9/3/2002 | W/H TAX DIV WFC | (4,163) | - | (4,163) | - | - | 48,280,179 | - | - | - | (4,163) |
| 9/3/2002 | CHECK WIRE | (4,000,000) | - | (4,000,000) | - | - | 44,280,179 | - | - | - | (4,000,000) |
| 9/3/2002 | W/H TAX DIV INTC | (1,158) | - | (1,158) | - | - | 44,279,021 | - | - | - | (1,158) |
| 9/5/2002 | W/H TAX DIV G | (1,450) | - | (1,450) | - | - | 44,277,572 | - | - | - | (1,450) |
| 9/5/2002 | W/H TAX DIV PFE | (7,091) | - | (7,091) | - | - | 44,270,481 | - | - | - | (7,091) |
| 9/6/2002 | W/H TAX DIV BA | (1,218) | - | (1,218) | - | - | 44,269,263 | - | - | - | (1,218) |
| 9/9/2002 | W/H TAX DIV BUD | (1,450) | - | (1,450) | - | - | 44,267,813 | - | - | - | (1,450) |
| 9/10/2002 | W/H TAX DIV IBM | (2,190) | - | (2,190) | - | - | 44,265,624 | - | - | - | (2,190) |
| 9/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 44,265,615 | - | - | - | (9) |
| 9/10/2002 | W/H TAX DIV XOM | (13,399) | - | (13,399) | - | - | 44,252,216 | - | - | - | (13,399) |
| 9/10/2002 | W/H TAX DIV JNJ | (1,731) | - | (1,731) | - | - | 44,250,485 | - | - | - | (1,731) |
| 9/12/2002 | W/H TAX DIV DD | (2,959) | - | (2,959) | - | - | 44,247,526 | - | - | - | (2,959) |
| 10/17/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 44,247,518 | - | - | - | (8) |
| 11/4/2002 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 50,247,518 | - | - | - | |
| 11/15/2002 | W/H TAX DIV CL | (474) | - | (474) | - | - | 50,247,044 | - | - | - | (474) |
| 11/15/2002 | W/H TAX DIV PG | (1,646) | - | (1,646) | - | - | 50,245,398 | - | - | - | (1,646) |
| 11/18/2002 | W/H TAX DIV TXN | (168) | - | (168) | - | - | 50,245,229 | - | - | - | (168) |

MADC1135_00000010

Exhibit B

**BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Transfers | Column 12 Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/22/2002 | W/H TAX DIV C | (4,196) | - | (4,196) | - | - | 50,241,033 | - | - | - | (4,196) |
| 11/25/2002 | W/H TAX DIV GS | (264) | - | (264) | - | - | 50,240,770 | - | - | - | (264) |
| 11/27/2002 | W/H TAX DIV MER | (657) | - | (657) | - | - | 50,240,113 | - | - | - | (657) |
| 12/17/2002 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 51,240,113 | - | - | - | - |
| 1/6/2003 | W/H TAX DIV IBM | (1,188) | - | (1,188) | - | - | 51,238,924 | - | - | (1,188) | (1,188) |
| 1/6/2003 | W/H TAX DIV XOM | (7,269) | - | (7,269) | - | - | 51,231,655 | - | - | (7,269) | (7,269) |
| 1/6/2003 | W/H TAX DIV BA | (477) | - | (477) | - | - | 51,231,178 | - | - | (477) | (477) |
| 1/6/2003 | W/H TAX DIV HCA | (53) | - | (53) | - | - | 51,231,125 | - | - | (53) | (53) |
| 1/6/2003 | W/H TAX DIV G | (807) | - | (807) | - | - | 51,230,318 | - | - | (807) | (807) |
| 1/6/2003 | W/H TAX DIV UTX | (382) | - | (382) | - | - | 51,229,936 | - | - | (382) | (382) |
| 1/6/2003 | W/H TAX DIV PFE | (2,676) | - | (2,676) | - | - | 51,227,261 | - | - | (2,676) | (2,676) |
| 1/6/2003 | W/H TAX DIV JNJ | (770) | - | (770) | - | - | 51,226,491 | - | - | (770) | (770) |
| 1/6/2003 | W/H TAX DIV BUD | (797) | - | (797) | - | - | 51,225,694 | - | - | (797) | (797) |
| 1/6/2003 | W/H TAX DIV WFC | (2,251) | - | (2,251) | - | - | 51,223,442 | - | - | (2,251) | (2,251) |
| 1/6/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (53) | - | (53) | - | - | 51,223,390 | - | - | (53) | (53) |
| 1/6/2003 | W/H TAX DIV INTC | (627) | - | (627) | - | - | 51,222,763 | - | - | (627) | (627) |
| 1/6/2003 | W/H TAX DIV DD | (1,167) | - | (1,167) | - | - | 51,221,596 | - | - | (1,167) | (1,167) |
| 1/10/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 51,221,593 | - | - | (3) | (3) |
| 1/31/2003 | W/H TAX DIV MWD | (1,090) | - | (1,090) | - | - | 51,220,502 | - | - | (1,090) | (1,090) |
| 2/3/2003 | W/H TAX DIV SBC | (3,947) | - | (3,947) | - | - | 51,216,555 | - | - | (3,947) | (3,947) |
| 2/3/2003 | W/H TAX DIV PHA | (1,364) | - | (1,364) | - | - | 51,215,191 | - | - | (1,364) | (1,364) |
| 2/3/2003 | W/H TAX DIV VZ | (4,640) | - | (4,640) | - | - | 51,210,551 | - | - | (4,640) | (4,640) |
| 2/10/2003 | W/H TAX DIV TXN | (287) | - | (287) | - | - | 51,210,264 | - | - | (287) | (287) |
| 2/14/2003 | W/H TAX DIV CL | (779) | - | (779) | - | - | 51,209,485 | - | - | (779) | (779) |
| 2/14/2003 | W/H TAX DIV PFE | (7,244) | - | (7,244) | - | - | 51,202,241 | - | - | (7,244) | (7,244) |
| 2/14/2003 | W/H TAX DIV PG | (4,141) | - | (4,141) | - | - | 51,198,100 | - | - | (4,141) | (4,141) |
| 2/27/2003 | W/H TAX DIV OS | (433) | - | (433) | - | - | 51,197,667 | - | - | (433) | (433) |
| 2/28/2003 | W/H TAX DIV C | (8,120) | - | (8,120) | - | - | 51,189,546 | - | - | (8,120) | (8,120) |
| 2/28/2003 | W/H TAX DIV MER | (1,071) | - | (1,071) | - | - | 51,188,476 | - | - | (1,071) | (1,071) |
| 3/3/2003 | W/H TAX DIV INTC | (1,045) | - | (1,045) | - | - | 51,187,430 | - | - | (1,045) | (1,045) |
| 3/3/2003 | W/H TAX DIV WFC | (4,001) | - | (4,001) | - | - | 51,183,429 | - | - | (4,001) | (4,001) |
| 3/4/2003 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 56,183,429 | - | - | - | - |
| 3/5/2003 | W/H TAX DIV 1/31/03 G | (1,347) | - | (1,347) | - | - | 56,182,083 | - | - | (1,347) | (1,347) |
| 3/7/2003 | W/H TAX DIV BA | (1,104) | - | (1,104) | - | - | 56,180,979 | - | - | (1,104) | (1,104) |
| 3/7/2003 | W/H TAX DIV MSFT | (5,266) | - | (5,266) | - | - | 56,175,713 | - | - | (5,266) | (5,266) |
| 3/10/2003 | W/H TAX DIV BUD | (1,266) | - | (1,266) | - | - | 56,174,446 | - | - | (1,266) | (1,266) |
| 3/10/2003 | W/H TAX DIV XOM | (12,149) | - | (12,149) | - | - | 56,162,297 | - | - | (12,149) | (12,149) |
| 3/10/2003 | W/H TAX DIV UTX | (884) | - | (884) | - | - | 56,161,413 | - | - | (884) | (884) |
| 3/10/2003 | W/H TAX DIV IBM | (1,978) | - | (1,978) | - | - | 56,159,436 | - | - | (1,978) | (1,978) |
| 3/11/2003 | W/H TAX DIV JNJ | (4,764) | - | (4,764) | - | - | 56,154,672 | - | - | (4,764) | (4,764) |
| 3/12/2003 | W/H TAX DIV MMM | (1,486) | - | (1,486) | - | - | 56,153,186 | - | - | (1,486) | (1,486) |
| 3/14/2003 | W/H TAX DIV DD | (2,778) | - | (2,778) | - | - | 56,150,408 | - | - | (2,778) | (2,778) |
| 3/17/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (62) | - | (62) | - | - | 56,150,347 | - | - | (62) | (62) |
| 4/7/2003 | W/H TAX DIV WMT | (3,656) | - | (3,656) | - | - | 56,146,691 | - | - | (3,656) | (3,656) |
| 4/9/2003 | W/H TAX DIV HPQ | (2,305) | - | (2,305) | - | - | 56,144,385 | - | - | (2,305) | (2,305) |
| 4/15/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 56,144,368 | - | - | (17) | (17) |
| 5/9/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 56,144,361 | - | - | (7) | (7) |
| 5/19/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 56,144,350 | - | - | (12) | (12) |
| 5/28/2003 | W/H TAX DIV MER | (900) | - | (900) | - | - | 56,143,450 | - | - | (900) | (900) |
| 5/30/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 56,143,448 | - | - | (2) | (2) |
| 6/2/2003 | W/H TAX DIV PFE | (3,374) | - | (3,374) | - | - | 56,140,074 | - | - | (3,374) | (3,374) |
| 6/2/2003 | W/H TAX DIV INTC | (487) | - | (487) | - | - | 56,139,587 | - | - | (487) | (487) |
| 6/5/2003 | W/H TAX DIV PFE | (8,079) | - | (8,079) | - | - | 56,131,508 | - | - | (8,079) | (8,079) |
| 6/9/2003 | W/H TAX DIV BUD | (1,097) | - | (1,097) | - | - | 56,130,411 | - | - | (1,097) | (1,097) |
| 6/10/2003 | W/H TAX DIV UTX | (844) | - | (844) | - | - | 56,129,567 | - | - | (844) | (844) |
| 6/10/2003 | W/H TAX DIV XOM | (11,320) | - | (11,320) | - | - | 56,118,247 | - | - | (11,320) | (11,320) |
| 6/10/2003 | W/H TAX DIV JNJ | (4,799) | - | (4,799) | - | - | 56,113,448 | - | - | (4,799) | (4,799) |
| 6/12/2003 | W/H TAX DIV BUD | (1,800) | - | (1,800) | - | - | 56,111,649 | - | - | (1,800) | (1,800) |
| 6/12/2003 | W/H TAX DIV MMM | (2,406) | - | (2,406) | - | - | 56,109,243 | - | - | (2,406) | (2,406) |
| 6/12/2003 | W/H TAX DIV MMM | (1,650) | - | (1,650) | - | - | 56,107,593 | - | - | (1,650) | (1,650) |
| 6/20/2003 | W/H TAX DIV AIG | (1,013) | - | (1,013) | - | - | 56,106,580 | - | - | (1,013) | (1,013) |
| 6/25/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 56,106,576 | - | - | (4) | (4) |
| 6/26/2003 | W/H TAX DIV WD | (1,157) | - | (1,157) | - | - | 56,105,419 | - | - | (1,157) | (1,157) |
| 6/27/2003 | W/H TAX DIV BAC | (7,906) | - | (7,906) | - | - | 56,097,513 | - | - | (7,906) | (7,906) |
| 6/30/2003 | W/H TAX DIV PEP | (2,286) | - | (2,286) | - | - | 56,095,227 | - | - | (2,286) | (2,286) |
| 7/1/2003 | W/H TAX DIV MRK | (6,623) | - | (6,623) | - | - | 56,088,603 | - | - | (6,623) | (6,623) |
| 7/1/2003 | W/H TAX DIV ONE | (2,049) | - | (2,049) | - | - | 56,086,555 | - | - | (2,049) | (2,049) |
| 7/1/2003 | W/H TAX DIV KO | (4,546) | - | (4,546) | - | - | 56,082,008 | - | - | (4,546) | (4,546) |
| 7/1/2003 | W/H TAX DIV ALL | (1,150) | - | (1,150) | - | - | 56,080,858 | - | - | (1,150) | (1,150) |
| 7/3/2003 | W/H TAX DIV SLB | (703) | - | (703) | - | - | 56,080,155 | - | - | (703) | (703) |
| 7/7/2003 | W/H TAX DIV WMT | (1,533) | - | (1,533) | - | - | 56,078,622 | - | - | (1,533) | (1,533) |

MADC1135_00000011

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Transfers | Column 12 Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/8/2003 | W/H TAX DIV MO | (10,969) | - | (10,969) | - | - | 56,067,654 | - | - | (10,969) | (10,969) |
| 7/9/2003 | W/H TAX DIV HPQ | (2,026) | - | (2,026) | - | - | 56,065,627 | - | - | (2,026) | (2,026) |
| 7/10/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 56,065,625 | - | - | (2) | (2) |
| 7/21/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 56,065,623 | - | - | (2) | (2) |
| 7/31/2003 | W/H TAX DIV MWD | (1,950) | - | (1,950) | - | - | 56,063,673 | - | - | (1,950) | (1,950) |
| 8/1/2003 | W/H TAX DIV SBC | (9,729) | - | (9,729) | - | - | 56,053,945 | - | - | (9,729) | (9,729) |
| 8/1/2003 | W/H TAX DIV VZ | (8,160) | - | (8,160) | - | - | 56,045,785 | - | - | (8,160) | (8,160) |
| 8/1/2003 | TRANS FROM 1T002730 (1T0027) | 2,000,000 | - | - | 2,000,000 | - | 58,045,785 | - | - | - | - |
| 8/15/2003 | W/H TAX DIV CL | (1,017) | - | (1,017) | - | - | 58,044,767 | - | - | (1,017) | (1,017) |
| 8/15/2003 | W/H TAX DIV PG | (4,500) | - | (4,500) | - | - | 58,040,267 | - | - | (4,500) | (4,500) |
| 8/18/2003 | W/H TAX DIV TXN | (281) | - | (281) | - | - | 58,039,986 | - | - | (281) | (281) |
| 8/22/2003 | W/H TAX DIV C | (13,929) | - | (13,929) | - | - | 58,026,057 | - | - | (13,929) | (13,929) |
| 8/27/2003 | W/H TAX DIV MER | (1,130) | - | (1,130) | - | - | 58,024,927 | - | - | (1,130) | (1,130) |
| 8/28/2003 | W/H TAX DIV GS | (883) | - | (883) | - | - | 58,024,044 | - | - | (883) | (883) |
| 9/2/2003 | W/H TAX DIV INTC | (1,007) | - | (1,007) | - | - | 58,023,036 | - | - | (1,007) | (1,007) |
| 9/2/2003 | W/H TAX DIV WFC | (5,723) | - | (5,723) | - | - | 58,017,314 | - | - | (5,723) | (5,723) |
| 9/4/2003 | W/H TAX DIV PFE | (5,615) | - | (5,615) | - | - | 58,011,698 | - | - | (5,615) | (5,615) |
| 9/5/2003 | W/H TAX DIV G | (1,263) | - | (1,263) | - | - | 58,010,436 | - | - | (1,263) | (1,263) |
| 9/5/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 58,010,422 | - | - | (13) | (13) |
| 9/5/2003 | W/H TAX DIV BA | (670) | - | (670) | - | - | 58,009,752 | - | - | (670) | (670) |
| 9/9/2003 | W/H TAX DIV BUD | (1,399) | - | (1,399) | - | - | 58,008,353 | - | - | (1,399) | (1,399) |
| 9/10/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 58,008,353 | - | - | (0) | (0) |
| 9/10/2003 | W/H TAX DIV XOM | (12,851) | - | (12,851) | - | - | 57,995,502 | - | - | (12,851) | (12,851) |
| 9/10/2003 | W/H TAX DIV IBM | (2,148) | - | (2,148) | - | - | 57,993,355 | - | - | (2,148) | (2,148) |
| 9/12/2003 | W/H TAX DIV PFE | (1,687) | - | (1,687) | - | - | 57,991,668 | - | - | (1,687) | (1,687) |
| 9/19/2003 | W/H TAX DIV AIG | (447) | - | (447) | - | - | 57,991,221 | - | - | (447) | (447) |
| 9/23/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 57,991,215 | - | - | (5) | (5) |
| 9/26/2003 | W/H TAX DIV BAC | (3,227) | - | (3,227) | - | - | 57,987,988 | - | - | (3,227) | (3,227) |
| 9/29/2003 | CHECK WIRE | (23,000,000) | - | (23,000,000) | - | - | 34,987,988 | - | - | (23,000,000) | (23,000,000) |
| 9/30/2003 | W/H TAX DIV PEP | (1,748) | - | (1,748) | - | - | 34,986,240 | - | - | (1,748) | (1,748) |
| 9/30/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 34,986,238 | - | - | (2) | (2) |
| 10/1/2003 | W/H TAX DIV MRK | (2,195) | - | (2,195) | - | - | 34,984,043 | - | - | (2,195) | (2,195) |
| 10/1/2003 | W/H TAX DIV KO | (3,468) | - | (3,468) | - | - | 34,980,575 | - | - | (3,468) | (3,468) |
| 10/1/2003 | W/H TAX DIV ONE | (1,869) | - | (1,869) | - | - | 34,978,706 | - | - | (1,869) | (1,869) |
| 10/1/2003 | W/H TAX DIV VIA.B | (499) | - | (499) | - | - | 34,978,206 | - | - | (499) | (499) |
| 10/8/2003 | W/H TAX DIV HPQ | (1,564) | - | (1,564) | - | - | 34,976,642 | - | - | (1,564) | (1,564) |
| 10/9/2003 | W/H TAX DIV MO | (8,995) | - | (8,995) | - | - | 34,967,647 | - | - | (8,995) | (8,995) |
| 10/14/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 34,967,646 | - | - | (1) | (1) |
| 10/17/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 34,967,646 | - | - | (0) | (0) |
| 10/31/2003 | W/H TAX DIV MWD | (1,243) | - | (1,243) | - | - | 34,966,403 | - | - | (1,243) | (1,243) |
| 11/3/2003 | W/H TAX DIV VZ | (5,374) | - | (5,374) | - | - | 34,961,029 | - | - | (5,374) | (5,374) |
| 11/3/2003 | W/H TAX DIV SBC | (1,666) | - | (1,666) | - | - | 34,959,363 | - | - | (1,666) | (1,666) |
| 11/3/2003 | W/H TAX DIV SBC | (4,707) | - | (4,707) | - | - | 34,954,656 | - | - | (4,707) | (4,707) |
| 11/7/2003 | W/H TAX DIV MSFT | (11,836) | - | (11,836) | - | - | 34,942,820 | - | - | (11,836) | (11,836) |
| 11/14/2003 | W/H TAX DIV PG | (3,977) | - | (3,977) | - | - | 34,938,842 | - | - | (3,977) | (3,977) |
| 11/17/2003 | W/H TAX DIV TXN | (256) | - | (256) | - | - | 34,938,586 | - | - | (256) | (256) |
| 11/24/2003 | W/H TAX DIV GS | (764) | - | (764) | - | - | 34,937,822 | - | - | (764) | (764) |
| 11/25/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 34,937,814 | - | - | (9) | (9) |
| 11/26/2003 | W/H TAX DIV C | (12,308) | - | (12,308) | - | - | 34,925,505 | - | - | (12,308) | (12,308) |
| 11/26/2003 | W/H TAX DIV MER | (1,049) | - | (1,049) | - | - | 34,924,456 | - | - | (1,049) | (1,049) |
| 12/1/2003 | W/H TAX DIV MCD | (3,420) | - | (3,420) | - | - | 34,921,036 | - | - | (3,420) | (3,420) |
| 12/1/2003 | W/H TAX DIV INTC | (913) | - | (913) | - | - | 34,920,122 | - | - | (913) | (913) |
| 12/1/2003 | W/H TAX DIV WFC | (5,222) | - | (5,222) | - | - | 34,914,900 | - | - | (5,222) | (5,222) |
| 12/4/2003 | W/H TAX DIV PFE | (7,932) | - | (7,932) | - | - | 34,906,968 | - | - | (7,932) | (7,932) |
| 12/5/2003 | W/H TAX DIV G | (1,092) | - | (1,092) | - | - | 34,905,876 | - | - | (1,092) | (1,092) |
| 12/9/2003 | W/H TAX DIV IBM | (1,209) | - | (1,209) | - | - | 34,904,667 | - | - | (1,209) | (1,209) |
| 12/9/2003 | W/H TAX DIV JNJ | (4,838) | - | (4,838) | - | - | 34,899,829 | - | - | (4,838) | (4,838) |
| 12/10/2003 | W/H TAX DIV IBM | (1,857) | - | (1,857) | - | - | 34,897,973 | - | - | (1,857) | (1,857) |
| 12/10/2003 | W/H TAX DIV XOM | (11,347) | - | (11,347) | - | - | 34,886,625 | - | - | (11,347) | (11,347) |
| 12/10/2003 | W/H TAX DIV UTX | (1,069) | - | (1,069) | - | - | 34,885,556 | - | - | (1,069) | (1,069) |
| 12/12/2003 | W/H TAX DIV MMM | (964) | - | (964) | - | - | 34,884,593 | - | - | (964) | (964) |
| 12/15/2003 | W/H TAX DIV DD | (2,352) | - | (2,352) | - | - | 34,882,241 | - | - | (2,352) | (2,352) |
| 12/31/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 34,882,225 | - | - | (16) | (16) |
| 1/2/2004 | W/H TAX DIV ONE | (396) | - | (396) | - | - | 34,881,829 | - | - | (396) | (396) |
| 1/2/2004 | W/H TAX DIV PEP | (401) | - | (401) | - | - | 34,881,428 | - | - | (401) | (401) |
| 1/5/2004 | W/H TAX DIV WMT | (570) | - | (570) | - | - | 34,880,858 | - | - | (570) | (570) |
| 1/6/2004 | W/H TAX DIV DIS | (638) | - | (638) | - | - | 34,880,220 | - | - | (638) | (638) |
| 1/7/2004 | W/H TAX DIV HPQ | (359) | - | (359) | - | - | 34,879,861 | - | - | (359) | (359) |
| 1/8/2004 | W/H TAX DIV IBM | - | - | - | - | - | 34,879,861 | - | - | - | - |
| 1/9/2004 | W/H TAX DIV MO | (2,064) | - | (2,064) | - | - | 34,877,796 | - | - | (2,064) | (2,064) |
| 1/15/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 34,877,795 | - | - | (1) | (1) |

MADC1135_00000012

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 1/30/2004 | W/H TAX DIV MWD | (653) | - | (653) | - | - | 34,877,142 | - | - | (653) | (653) |
| 2/2/2004 | W/H TAX DIV VZ | (2,599) | - | (2,599) | - | - | 34,874,542 | - | - | (2,599) | (2,599) |
| 2/2/2004 | W/H TAX DIV SBC | (2,518) | - | (2,518) | - | - | 34,872,024 | - | - | (2,518) | (2,518) |
| 2/5/2004 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 39,872,024 | - | - | - | - |
| 2/17/2004 | W/H TAX DIV PG | (3,952) | - | (3,952) | - | - | 39,868,072 | - | - | (3,952) | (3,952) |
| 2/26/2004 | W/H TAX DIV GS | (724) | - | (724) | - | - | 39,867,348 | - | - | (724) | (724) |
| 2/27/2004 | W/H TAX DIV MER | (1,019) | - | (1,019) | - | - | 39,866,329 | - | - | (1,019) | (1,019) |
| 2/27/2004 | W/H TAX DIV C | (13,433) | - | (13,433) | - | - | 39,852,897 | - | - | (13,433) | (13,433) |
| 3/1/2004 | W/H TAX DIV INTC | (1,684) | - | (1,684) | - | - | 39,851,213 | - | - | (1,684) | (1,684) |
| 3/1/2004 | W/H TAX DIV WFC | (4,950) | - | (4,950) | - | - | 39,846,263 | - | - | (4,950) | (4,950) |
| 3/5/2004 | W/H TAX DIV PFE | (8,397) | - | (8,397) | - | - | 39,837,866 | - | - | (8,397) | (8,397) |
| 3/5/2004 | W/H TAX DIV BA | (886) | - | (886) | - | - | 39,836,980 | - | - | (886) | (886) |
| 3/5/2004 | W/H TAX DIV G | (1,035) | - | (1,035) | - | - | 39,835,945 | - | - | (1,035) | (1,035) |
| 3/9/2004 | W/H TAX DIV JNJ | (4,629) | - | (4,629) | - | - | 39,831,315 | - | - | (4,629) | (4,629) |
| 3/9/2004 | W/H TAX DIV BUD | (1,146) | - | (1,146) | - | - | 39,830,169 | - | - | (1,146) | (1,146) |
| 3/10/2004 | W/H TAX DIV XOM | (10,756) | - | (10,756) | - | - | 39,819,413 | - | - | (10,756) | (10,756) |
| 3/10/2004 | W/H TAX DIV IBM | (1,760) | - | (1,760) | - | - | 39,817,652 | - | - | (1,760) | (1,760) |
| 3/10/2004 | W/H TAX DIV UTX | (638) | - | (638) | - | - | 39,817,014 | - | - | (638) | (638) |
| 3/12/2004 | W/H TAX DIV MMM | (1,182) | - | (1,182) | - | - | 39,815,832 | - | - | (1,182) | (1,182) |
| 3/15/2004 | W/H TAX DIV DD | (2,229) | - | (2,229) | - | - | 39,813,603 | - | - | (2,229) | (2,229) |
| 4/6/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (42) | - | (42) | - | - | 39,813,561 | - | - | (42) | (42) |
| 4/8/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 39,813,561 | - | - | (0) | (0) |
| 4/30/2004 | W/H TAX DIV MWD | (1,461) | - | (1,461) | - | - | 39,812,101 | - | - | (1,461) | (1,461) |
| 4/30/2004 | W/H TAX DIV JPM | (1,121) | - | (1,121) | - | - | 39,810,979 | - | - | (1,121) | (1,121) |
| 5/3/2004 | W/H TAX DIV SBC | (5,533) | - | (5,533) | - | - | 39,805,446 | - | - | (5,533) | (5,533) |
| 5/3/2004 | W/H TAX DIV VZ | (5,624) | - | (5,624) | - | - | 39,799,822 | - | - | (5,624) | (5,624) |
| 5/14/2004 | W/H TAX DIV PG | (4,301) | - | (4,301) | - | - | 39,795,522 | - | - | (4,301) | (4,301) |
| 5/17/2004 | W/H TAX DIV TXN | (251) | - | (251) | - | - | 39,795,271 | - | - | (251) | (251) |
| 5/26/2004 | W/H TAX DIV C | (1,081) | - | (1,081) | - | - | 39,794,190 | - | - | (1,081) | (1,081) |
| 5/27/2004 | W/H TAX DIV GS | (768) | - | (768) | - | - | 39,793,422 | - | - | (768) | (768) |
| 5/28/2004 | W/H TAX DIV C | (14,008) | - | (14,008) | - | - | 39,779,413 | - | - | (14,008) | (14,008) |
| 6/1/2004 | W/H TAX DIV WFC | (5,253) | - | (5,253) | - | - | 39,774,160 | - | - | (5,253) | (5,253) |
| 6/1/2004 | W/H TAX DIV INTC | (1,750) | - | (1,750) | - | - | 39,772,410 | - | - | (1,750) | (1,750) |
| 6/4/2004 | W/H TAX DIV G | (1,098) | - | (1,098) | - | - | 39,771,312 | - | - | (1,098) | (1,098) |
| 6/4/2004 | W/H TAX DIV PFE | (8,749) | - | (8,749) | - | - | 39,762,563 | - | - | (8,749) | (8,749) |
| 6/7/2004 | W/H TAX DIV WMT | (2,580) | - | (2,580) | - | - | 39,759,983 | - | - | (2,580) | (2,580) |
| 6/7/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (20) | - | (20) | - | - | 39,759,963 | - | - | (20) | (20) |
| 6/8/2004 | W/H TAX DIV JNJ | (5,738) | - | (5,738) | - | - | 39,754,226 | - | - | (5,738) | (5,738) |
| 6/9/2004 | W/H TAX DIV BUD | (1,217) | - | (1,217) | - | - | 39,753,009 | - | - | (1,217) | (1,217) |
| 6/10/2004 | W/H TAX DIV XOM | (11,944) | - | (11,944) | - | - | 39,741,065 | - | - | (11,944) | (11,944) |
| 6/10/2004 | W/H TAX DIV IBM | (2,101) | - | (2,101) | - | - | 39,738,964 | - | - | (2,101) | (2,101) |
| 6/10/2004 | W/H TAX DIV UTX | (877) | - | (877) | - | - | 39,738,087 | - | - | (877) | (877) |
| 6/11/2004 | W/H TAX DIV BA | (752) | - | (752) | - | - | 39,737,335 | - | - | (752) | (752) |
| 6/14/2004 | W/H TAX DIV MMM | (1,354) | - | (1,354) | - | - | 39,735,981 | - | - | (1,354) | (1,354) |
| 6/14/2004 | W/H TAX DIV DD | (2,365) | - | (2,365) | - | - | 39,733,615 | - | - | (2,365) | (2,365) |
| 6/18/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 39,733,615 | - | - | (1) | (1) |
| 6/24/2004 | W/H TAX DIV HD | (1,344) | - | (1,344) | - | - | 39,732,271 | - | - | (1,344) | (1,344) |
| 6/30/2004 | W/H TAX DIV PEP | (2,764) | - | (2,764) | - | - | 39,729,507 | - | - | (2,764) | (2,764) |
| 7/1/2004 | W/H TAX DIV KO | (4,269) | - | (4,269) | - | - | 39,725,239 | - | - | (4,269) | (4,269) |
| 7/7/2004 | W/H TAX DIV HPQ | (1,720) | - | (1,720) | - | - | 39,723,519 | - | - | (1,720) | (1,720) |
| 7/9/2004 | W/H TAX DIV MO | (9,740) | - | (9,740) | - | - | 39,713,778 | - | - | (9,740) | (9,740) |
| 7/26/2004 | W/H TAX DIV GE | (1,579) | - | (1,579) | - | - | 39,712,199 | - | - | (1,579) | (1,579) |
| 8/18/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (74) | - | (74) | - | - | 39,712,125 | - | - | (74) | (74) |
| 8/23/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 39,712,124 | - | - | (1) | (1) |
| 9/7/2004 | W/H TAX DIV WMT | (3,072) | - | (3,072) | - | - | 39,709,052 | - | - | (3,072) | (3,072) |
| 9/10/2004 | W/H TAX DIV UTX | (1,034) | - | (1,034) | - | - | 39,708,018 | - | - | (1,034) | (1,034) |
| 9/13/2004 | W/H TAX DIV MMM | (1,595) | - | (1,595) | - | - | 39,706,423 | - | - | (1,595) | (1,595) |
| 9/14/2004 | W/H TAX DIV MSFT | (6,447) | - | (6,447) | - | - | 39,699,976 | - | - | (6,447) | (6,447) |
| 9/16/2004 | W/H TAX DIV DD | (1,434) | - | (1,434) | - | - | 39,698,542 | - | - | (1,434) | (1,434) |
| 9/17/2004 | W/H TAX DIV AIG | (1,467) | - | (1,467) | - | - | 39,697,075 | - | - | (1,467) | (1,467) |
| 9/24/2004 | W/H TAX DIV BAC | (13,966) | - | (13,966) | - | - | 39,683,108 | - | - | (13,966) | (13,966) |
| 9/30/2004 | W/H TAX DIV PEP | (2,948) | - | (2,948) | - | - | 39,680,160 | - | - | (2,948) | (2,948) |
| 10/1/2004 | W/H TAX DIV KO | (4,554) | - | (4,554) | - | - | 39,675,606 | - | - | (4,554) | (4,554) |
| 10/1/2004 | W/H TAX DIV VIA.B | (791) | - | (791) | - | - | 39,674,814 | - | - | (791) | (791) |
| 10/1/2004 | W/H TAX DIV MRK | (6,410) | - | (6,410) | - | - | 39,668,405 | - | - | (6,410) | (6,410) |
| 10/6/2004 | W/H TAX DIV HPQ | (1,835) | - | (1,835) | - | - | 39,666,569 | - | - | (1,835) | (1,835) |
| 10/12/2004 | W/H TAX DIV MO | (11,328) | - | (11,328) | - | - | 39,655,241 | - | - | (11,328) | (11,328) |
| 11/3/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (83) | - | (83) | - | - | 39,655,158 | - | - | (83) | (83) |
| 11/4/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 39,655,158 | - | - | (0) | (0) |
| 11/9/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 39,655,158 | - | - | (0) | (0) |
| 11/24/2004 | W/H TAX DIV MER | (577) | - | (577) | - | - | 39,654,581 | - | - | (577) | (577) |

MADC1135_00000013

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC

Exhibit B

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 12/1/2004 | W/H TAX DIV WFC | (2,990) | - | (2,990) | - | - | 39,651,591 | - | - | (2,990) | (2,990) |
| 12/1/2004 | W/H TAX DIV INTC | (950) | - | (950) | - | - | 39,650,641 | - | - | (950) | (950) |
| 12/3/2004 | W/H TAX DIV PFE | (7,659) | - | (7,659) | - | - | 39,642,982 | - | - | (7,659) | (7,659) |
| 12/3/2004 | W/H TAX DIV BA | (960) | - | (960) | - | - | 39,642,022 | - | - | (960) | (960) |
| 12/7/2004 | W/H TAX DIV JNJ | (1,932) | - | (1,932) | - | - | 39,640,090 | - | - | (1,932) | (1,932) |
| 12/10/2004 | W/H TAX DIV IBM | (1,824) | - | (1,824) | - | - | 39,638,266 | - | - | (1,824) | (1,824) |
| 12/10/2004 | W/H TAX DIV XOM | (10,513) | - | (10,513) | - | - | 39,627,753 | - | - | (10,513) | (10,513) |
| 12/13/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (67) | - | (67) | - | - | 39,627,686 | - | - | (67) | (67) |
| 12/14/2004 | W/H TAX DIV DD | (2,054) | - | (2,054) | - | - | 39,625,632 | - | - | (2,054) | (2,054) |
| 12/16/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 39,625,631 | - | - | (1) | (1) |
| 12/31/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (15) | - | (15) | - | - | 39,625,617 | - | - | (15) | (15) |
| 1/3/2005 | W/H TAX DIV WMT | (1,031) | - | (1,031) | - | - | 39,624,585 | - | - | (1,031) | (1,031) |
| 2/2/2005 | CHECK WIRE | (8,900,000) | - | (8,900,000) | - | - | 30,724,585 | - | - | (8,900,000) | (8,900,000) |
| 2/14/2005 | W/H TAX DIV TXN | (314) | - | (314) | - | - | 30,724,271 | - | - | (314) | (314) |
| 2/18/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 30,724,257 | - | - | (14) | (14) |
| 2/24/2005 | W/H TAX DIV CS | (131) | - | (131) | - | - | 30,724,126 | - | - | (131) | (131) |
| 2/25/2005 | W/H TAX DIV C | (16,575) | - | (16,575) | - | - | 30,707,551 | - | - | (16,575) | (16,575) |
| 2/28/2005 | W/H TAX DIV MER | (1,057) | - | (1,057) | - | - | 30,706,494 | - | - | (1,057) | (1,057) |
| 3/1/2005 | W/H TAX DIV INTC | (3,688) | - | (3,688) | - | - | 30,702,806 | - | - | (3,688) | (3,688) |
| 3/1/2005 | W/H TAX DIV WFC | (6,027) | - | (6,027) | - | - | 30,696,779 | - | - | (6,027) | (6,027) |
| 3/4/2005 | W/H TAX DIV G | (1,181) | - | (1,181) | - | - | 30,695,597 | - | - | (1,181) | (1,181) |
| 3/4/2005 | W/H TAX DIV MWD | (1,487) | - | (1,487) | - | - | 30,694,110 | - | - | (1,487) | (1,487) |
| 3/7/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 30,694,105 | - | - | (5) | (5) |
| 3/8/2005 | W/H TAX DIV JNJ | (6,168) | - | (6,168) | - | - | 30,687,937 | - | - | (6,168) | (6,168) |
| 3/8/2005 | W/H TAX DIV PFE | (10,422) | - | (10,422) | - | - | 30,677,514 | - | - | (10,422) | (10,422) |
| 3/9/2005 | W/H TAX DIV BUD | (1,457) | - | (1,457) | - | - | 30,676,057 | - | - | (1,457) | (1,457) |
| 3/10/2005 | W/H TAX DIV XOM | (12,669) | - | (12,669) | - | - | 30,663,387 | - | - | (12,669) | (12,669) |
| 3/10/2005 | W/H TAX DIV MSFT | (6,318) | - | (6,318) | - | - | 30,657,069 | - | - | (6,318) | (6,318) |
| 3/10/2005 | W/H TAX DIV UTX | (1,745) | - | (1,745) | - | - | 30,655,325 | - | - | (1,745) | (1,745) |
| 3/10/2005 | W/H TAX DIV IBM | (2,141) | - | (2,141) | - | - | 30,653,183 | - | - | (2,141) | (2,141) |
| 3/14/2005 | W/H TAX DIV DD | (2,544) | - | (2,544) | - | - | 30,650,639 | - | - | (2,544) | (2,544) |
| 3/14/2005 | W/H TAX DIV MMM | (2,248) | - | (2,248) | - | - | 30,648,390 | - | - | (2,248) | (2,248) |
| 3/18/2005 | W/H TAX DIV AIG | (2,156) | - | (2,156) | - | - | 30,646,234 | - | - | (2,156) | (2,156) |
| 3/24/2005 | W/H TAX DIV HD | (1,428) | - | (1,428) | - | - | 30,644,807 | - | - | (1,428) | (1,428) |
| 3/28/2005 | W/H TAX DIV BAC | (11,911) | - | (11,911) | - | - | 30,632,896 | - | - | (11,911) | (11,911) |
| 3/31/2005 | W/H TAX DIV PEP | (2,599) | - | (2,599) | - | - | 30,630,297 | - | - | (2,599) | (2,599) |
| 4/1/2005 | W/H TAX DIV MRK | (5,425) | - | (5,425) | - | - | 30,624,872 | - | - | (5,425) | (5,425) |
| 4/1/2005 | W/H TAX DIV KO | (3,508) | - | (3,508) | - | - | 30,621,364 | - | - | (3,508) | (3,508) |
| 4/1/2005 | W/H TAX DIV VIA.B | (791) | - | (791) | - | - | 30,620,573 | - | - | (791) | (791) |
| 4/7/2005 | W/H TAX DIV HPQ | (784) | - | (784) | - | - | 30,619,789 | - | - | (784) | (784) |
| 4/8/2005 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 33,619,789 | - | - | - | - |
| 4/11/2005 | W/H TAX DIV MO | (7,790) | - | (7,790) | - | - | 33,611,999 | - | - | (7,790) | (7,790) |
| 4/13/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (66) | - | (66) | - | - | 33,611,933 | - | - | (66) | (66) |
| 4/25/2005 | W/H TAX DIV GE | (15,212) | - | (15,212) | - | - | 33,596,721 | - | - | (15,212) | (15,212) |
| 5/2/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (21) | - | (21) | - | - | 33,596,700 | - | - | (21) | (21) |
| 6/6/2005 | W/H TAX DIV WMT | (1,039) | - | (1,039) | - | - | 33,595,661 | - | - | (1,039) | (1,039) |
| 6/10/2005 | W/H TAX DIV UTX | (494) | - | (494) | - | - | 33,595,167 | - | - | (494) | (494) |
| 6/13/2005 | W/H TAX DIV MMM | (708) | - | (708) | - | - | 33,594,459 | - | - | (708) | (708) |
| 6/17/2005 | W/H TAX DIV AIG | (1,725) | - | (1,725) | - | - | 33,592,734 | - | - | (1,725) | (1,725) |
| 6/20/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (53) | - | (53) | - | - | 33,592,681 | - | - | (53) | (53) |
| 6/23/2005 | W/H TAX DIV HD | (1,155) | - | (1,155) | - | - | 33,591,526 | - | - | (1,155) | (1,155) |
| 6/24/2005 | W/H TAX DIV BAC | (9,635) | - | (9,635) | - | - | 33,581,891 | - | - | (9,635) | (9,635) |
| 6/30/2005 | W/H TAX DIV PEP | (2,350) | - | (2,350) | - | - | 33,579,541 | - | - | (2,350) | (2,350) |
| 7/1/2005 | W/H TAX DIV ALL | (1,169) | - | (1,169) | - | - | 33,578,372 | - | - | (1,169) | (1,169) |
| 7/1/2005 | W/H TAX DIV VIA.B | (633) | - | (633) | - | - | 33,577,739 | - | - | (633) | (633) |
| 7/1/2005 | W/H TAX DIV MRK | (4,339) | - | (4,339) | - | - | 33,573,400 | - | - | (4,339) | (4,339) |
| 7/1/2005 | W/H TAX DIV KO | (3,331) | - | (3,331) | - | - | 33,570,069 | - | - | (3,331) | (3,331) |
| 7/6/2005 | W/H TAX DIV HPQ | (1,244) | - | (1,244) | - | - | 33,568,825 | - | - | (1,244) | (1,244) |
| 7/8/2005 | W/H TAX DIV SLB | (699) | - | (699) | - | - | 33,568,126 | - | - | (699) | (699) |
| 7/11/2005 | W/H TAX DIV MO | (7,989) | - | (7,989) | - | - | 33,560,137 | - | - | (7,989) | (7,989) |
| 7/25/2005 | W/H TAX DIV GE | (12,318) | - | (12,318) | - | - | 33,547,819 | - | - | (12,318) | (12,318) |
| 9/2/2005 | CHECK WIRE | 80,000,000 | 80,000,000 | - | - | - | 113,547,819 | - | - | - | - |
| 9/8/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (231) | - | (231) | - | - | 113,547,588 | - | - | (231) | (231) |
| 9/12/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 113,547,584 | - | - | (4) | (4) |
| 9/30/2005 | W/H TAX DIV PEP | (2,725) | - | (2,725) | - | - | 113,544,859 | - | - | (2,725) | (2,725) |
| 9/30/2005 | W/H TAX DIV S | (455) | - | (455) | - | - | 113,544,403 | - | - | (455) | (455) |
| 10/3/2005 | W/H TAX DIV KO | (7,660) | - | (7,660) | - | - | 113,536,744 | - | - | (7,660) | (7,660) |
| 10/5/2005 | W/H TAX DIV HPQ | (2,776) | - | (2,776) | - | - | 113,533,967 | - | - | (2,776) | (2,776) |
| 10/11/2005 | W/H TAX DIV MO | (19,751) | - | (19,751) | - | - | 113,514,217 | - | - | (19,751) | (19,751) |
| 10/12/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (96) | - | (96) | - | - | 113,514,120 | - | - | (96) | (96) |
| 10/13/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 113,514,119 | - | - | (1) | (1) |

MADC1135_00000014

Exhibit B

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET PRIME INDEX INSURANCE PORTFOLIO LDC

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Transaction Amount Reported in Customer Statement | | | | | | 90-Day | 2-Year | 6-Year | Full History |
| Date | Transaction Description | | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | Preferential Transfers | Fraudulent Transfers | Fraudulent Transfers | Fraudulent Transfers |
| 10/14/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 113,514,118 | - | - | (1) | (1) |
| 10/19/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 113,514,118 | - | - | (0) | (0) |
| 10/25/2005 | W/H TAX DIV GE | (20,541) | - | (20,541) | - | - | 113,493,578 | - | - | (20,541) | (20,541) |
| 10/31/2005 | W/H TAX DIV MWD | (2,425) | - | (2,425) | - | - | 113,491,152 | - | - | (2,425) | (2,425) |
| 11/15/2005 | W/H TAX DIV ABT | (3,705) | - | (3,705) | - | - | 113,487,447 | - | - | (3,705) | (3,705) |
| 11/15/2005 | W/H TAX DIV PG | (12,252) | - | (12,252) | - | - | 113,475,195 | - | - | (12,252) | (12,252) |
| 11/17/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 113,475,183 | - | - | (12) | (12) |
| 11/21/2005 | W/H TAX DIV TXN | (629) | - | (629) | - | - | 113,474,554 | - | - | (629) | (629) |
| 11/21/2005 | W/H TAX DIV GS | (1,403) | - | (1,403) | - | - | 113,473,152 | - | - | (1,403) | (1,403) |
| 11/23/2005 | W/H TAX DIV C | (28,633) | - | (28,633) | - | - | 113,444,518 | - | - | (28,633) | (28,633) |
| 11/23/2005 | W/H TAX DIV MER | (2,244) | - | (2,244) | - | - | 113,442,274 | - | - | (2,244) | (2,244) |
| 11/30/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 113,442,266 | - | - | (8) | (8) |
| 12/1/2005 | W/H TAX DIV INTC | (6,136) | - | (6,136) | - | - | 113,436,130 | - | - | (6,136) | (6,136) |
| 12/1/2005 | W/H TAX DIV WFC | (11,085) | - | (11,085) | - | - | 113,425,045 | - | - | (11,085) | (11,085) |
| 12/2/2005 | W/H TAX DIV BA | (2,525) | - | (2,525) | - | - | 113,422,520 | - | - | (2,525) | (2,525) |
| 12/2/2005 | W/H TAX DIV PFE | (17,836) | - | (17,836) | - | - | 113,404,684 | - | - | (17,836) | (17,836) |
| 12/8/2005 | W/H TAX DIV MSFT | (9,305) | - | (9,305) | - | - | 113,395,379 | - | - | (9,305) | (9,305) |
| 12/9/2005 | W/H TAX DIV XOM | (23,183) | - | (23,183) | - | - | 113,372,196 | - | - | (23,183) | (23,183) |
| 12/12/2005 | W/H TAX DIV CVX | (12,972) | - | (12,972) | - | - | 113,359,224 | - | - | (12,972) | (12,972) |
| 12/12/2005 | W/H TAX DIV UTX | (2,880) | - | (2,880) | - | - | 113,356,344 | - | - | (2,880) | (2,880) |
| 12/12/2005 | W/H TAX DIV IBM | (4,039) | - | (4,039) | - | - | 113,352,305 | - | - | (4,039) | (4,039) |
| 12/12/2005 | W/H TAX DIV MMM | (4,241) | - | (4,241) | - | - | 113,348,064 | - | - | (4,241) | (4,241) |
| 12/13/2005 | W/H TAX DIV JNJ | (12,548) | - | (12,548) | - | - | 113,335,515 | - | - | (12,548) | (12,548) |
| 12/15/2005 | W/H TAX DIV KO | (7,260) | - | (7,260) | - | - | 113,328,255 | - | - | (7,260) | (7,260) |
| 12/15/2005 | W/H TAX DIV HD | (2,693) | - | (2,693) | - | - | 113,325,562 | - | - | (2,693) | (2,693) |
| 12/15/2005 | W/H TAX DIV TWX | (2,955) | - | (2,955) | - | - | 113,322,608 | - | - | (2,955) | (2,955) |
| 12/16/2005 | W/H TAX DIV AIG | (4,881) | - | (4,881) | - | - | 113,317,727 | - | - | (4,881) | (4,881) |
| 12/16/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 113,317,721 | - | - | (6) | (6) |
| 12/22/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 113,317,702 | - | - | (19) | (19) |
| 12/23/2005 | W/H TAX DIV BAC | (25,245) | - | (25,245) | - | - | 113,292,457 | - | - | (25,245) | (25,245) |
| 12/30/2005 | W/H TAX DIV S | (926) | - | (926) | - | - | 113,291,532 | - | - | (926) | (926) |
| 12/30/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 113,291,522 | - | - | (10) | (10) |
| 1/3/2006 | W/H TAX DIV WMT | (3,110) | - | (3,110) | - | - | 113,288,412 | - | - | (3,110) | (3,110) |
| 1/3/2006 | W/H TAX DIV MRK | (10,659) | - | (10,659) | - | - | 113,277,753 | - | - | (10,659) | (10,659) |
| 1/3/2006 | W/H TAX DIV PEP | (5,543) | - | (5,543) | - | - | 113,272,210 | - | - | (5,543) | (5,543) |
| 1/3/2006 | W/H TAX DIV VIA.B | (1,414) | - | (1,414) | - | - | 113,270,796 | - | - | (1,414) | (1,414) |
| 1/4/2006 | W/H TAX DIV IIPQ | (2,905) | - | (2,905) | - | - | 113,267,892 | - | - | (2,905) | (2,905) |
| 1/6/2006 | W/H TAX DIV DIS | (6,968) | - | (6,968) | - | - | 113,260,924 | - | - | (6,968) | (6,968) |
| 1/13/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 113,260,914 | - | - | (10) | (10) |
| 1/31/2006 | W/H TAX DIV MS | (3,579) | - | (3,579) | - | - | 113,257,335 | - | - | (3,579) | (3,579) |
| 1/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 113,257,329 | - | - | (6) | (6) |
| 2/1/2006 | W/H TAX DIV I | (3,716) | - | (3,716) | - | - | 113,253,613 | - | - | (3,716) | (3,716) |
| 2/1/2006 | W/H TAX DIV VZ | (3,233) | - | (3,233) | - | - | 113,250,380 | - | - | (3,233) | (3,233) |
| 2/13/2006 | W/H TAX DIV TXN | (584) | - | (584) | - | - | 113,249,796 | - | - | (584) | (584) |
| 2/15/2006 | W/H TAX DIV PG | (11,444) | - | (11,444) | - | - | 113,238,352 | - | - | (11,444) | (11,444) |
| 2/15/2006 | W/H TAX DIV ABT | (5,164) | - | (5,164) | - | - | 113,233,188 | - | - | (5,164) | (5,164) |
| 2/23/2006 | W/H TAX DIV GS | (1,381) | - | (1,381) | - | - | 113,231,807 | - | - | (1,381) | (1,381) |
| 2/24/2006 | W/H TAX DIV C | (29,983) | - | (29,983) | - | - | 113,201,824 | - | - | (29,983) | (29,983) |
| 2/28/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 113,201,810 | - | - | (14) | (14) |
| 2/28/2006 | W/H TAX DIV MER | (2,762) | - | (2,762) | - | - | 113,199,048 | - | - | (2,762) | (2,762) |
| 3/1/2006 | W/H TAX DIV WFC | (10,339) | - | (10,339) | - | - | 113,188,709 | - | - | (10,339) | (10,339) |
| 3/1/2006 | W/H TAX DIV INTC | (7,267) | - | (7,267) | - | - | 113,181,442 | - | - | (7,267) | (7,267) |
| 3/3/2006 | W/H TAX DIV BA | (2,982) | - | (2,982) | - | - | 113,178,459 | - | - | (2,982) | (2,982) |
| 3/7/2006 | W/H TAX DIV PFE | (21,418) | - | (21,418) | - | - | 113,157,041 | - | - | (21,418) | (21,418) |
| 3/7/2006 | W/H TAX DIV UPS | (5,037) | - | (5,037) | - | - | 113,152,004 | - | - | (5,037) | (5,037) |
| 3/9/2006 | W/H TAX DIV MSFT | (10,017) | - | (10,017) | - | - | 113,141,987 | - | - | (10,017) | (10,017) |
| 3/10/2006 | W/H TAX DIV TGT | (1,105) | - | (1,105) | - | - | 113,140,883 | - | - | (1,105) | (1,105) |
| 3/10/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 113,140,876 | - | - | (6) | (6) |
| 3/10/2006 | W/H TAX DIV CVX | (12,246) | - | (12,246) | - | - | 113,128,630 | - | - | (12,246) | (12,246) |
| 3/10/2006 | W/H TAX DIV UTX | (2,673) | - | (2,673) | - | - | 113,125,957 | - | - | (2,673) | (2,673) |
| 3/10/2006 | W/H TAX DIV XOM | (23,977) | - | (23,977) | - | - | 113,101,980 | - | - | (23,977) | (23,977) |
| 3/10/2006 | W/H TAX DIV IBM | (3,799) | - | (3,799) | - | - | 113,098,181 | - | - | (3,799) | (3,799) |
| 3/13/2006 | W/H TAX DIV MMM | (4,065) | - | (4,065) | - | - | 113,094,116 | - | - | (4,065) | (4,065) |
| 3/14/2006 | W/H TAX DIV JNJ | (12,029) | - | (12,029) | - | - | 113,082,087 | - | - | (12,029) | (12,029) |
| 3/15/2006 | W/H TAX DIV TWX | (2,828) | - | (2,828) | - | - | 113,079,259 | - | - | (2,828) | (2,828) |
| 3/16/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 113,079,257 | - | - | (2) | (2) |
| 3/17/2006 | W/H TAX DIV AIG | (4,672) | - | (4,672) | - | - | 113,074,585 | - | - | (4,672) | (4,672) |
| 3/23/2006 | W/H TAX DIV HD | (3,811) | - | (3,811) | - | - | 113,070,774 | - | - | (3,811) | (3,811) |
| 3/24/2006 | W/H TAX DIV BAC | (28,167) | - | (28,167) | - | - | 113,042,607 | - | - | (28,167) | (28,167) |
| 3/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 113,042,594 | - | - | (13) | (13) |
| 3/31/2006 | W/H TAX DIV PEP | (5,267) | - | (5,267) | - | - | 113,037,327 | - | - | (5,267) | (5,267) |

MADC1135_00000015

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported on Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 3/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 113,037,327 | - | - | (0) | (0) |
| 3/31/2006 | W/H TAX DIV S | (918) | - | (918) | - | - | 113,036,409 | - | - | (918) | (918) |
| 4/3/2006 | W/H TAX DIV WMT | (5,238) | - | (5,238) | - | - | 113,031,171 | - | - | (5,238) | (5,238) |
| 4/3/2006 | W/H TAX DIV KO | (7,894) | - | (7,894) | - | - | 113,023,277 | - | - | (7,894) | (7,894) |
| 4/3/2006 | W/H TAX DIV MRK | (10,260) | - | (10,260) | - | - | 113,013,017 | - | - | (10,260) | (10,260) |
| 4/5/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 113,013,016 | - | - | (1) | (1) |
| 4/5/2006 | W/H TAX DIV HPQ | (2,826) | - | (2,826) | - | - | 113,010,190 | - | - | (2,826) | (2,826) |
| 4/7/2006 | W/H TAX DIV SLB | (1,711) | - | (1,711) | - | - | 113,008,479 | - | - | (1,711) | (1,711) |
| 4/7/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 113,008,477 | - | - | (1) | (1) |
| 4/10/2006 | W/H TAX DIV MO | (20,701) | - | (20,701) | - | - | 112,987,776 | - | - | (20,701) | (20,701) |
| 4/21/2006 | W/H TAX DIV MCD | (5) | - | (5) | - | - | 112,987,771 | - | - | (5) | (5) |
| 4/25/2006 | W/H TAX DIV OXE | (31,987) | - | (31,987) | - | - | 112,955,784 | - | - | (31,987) | (31,987) |
| 4/28/2006 | CXL W/H TAX DIV SLB | 1,711 | - | 1,711 | - | - | 112,957,495 | - | - | - | - |
| 4/28/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 112,957,484 | - | - | (11) | (11) |
| 4/28/2006 | W/H TAX DIV MS | (3,594) | - | (3,594) | - | - | 112,953,890 | - | - | (3,594) | (3,594) |
| 4/28/2006 | W/H TAX DIV MDT | (1,417) | - | (1,417) | - | - | 112,952,473 | - | - | (1,417) | (1,417) |
| 5/1/2006 | W/H TAX DIV JPM | (10,753) | - | (10,753) | - | - | 112,941,720 | - | - | (10,753) | (10,753) |
| 5/1/2006 | W/H TAX DIV VZ | (14,674) | - | (14,674) | - | - | 112,927,046 | - | - | (14,674) | (14,674) |
| 5/1/2006 | W/H TAX DIV T | (15,862) | - | (15,862) | - | - | 112,911,185 | - | - | (15,862) | (15,862) |
| 5/5/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 112,911,173 | - | - | (12) | (12) |
| 5/10/2006 | W/H TAX DIV AXP | (1,864) | - | (1,864) | - | - | 112,909,309 | - | - | (1,864) | (1,864) |
| 5/10/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 112,909,305 | - | - | (4) | (4) |
| 5/15/2006 | W/H TAX DIV ABT | (5,564) | - | (5,564) | - | - | 112,903,741 | - | - | (5,564) | (5,564) |
| 5/15/2006 | W/H TAX DIV PG | (12,725) | - | (12,725) | - | - | 112,891,016 | - | - | (12,725) | (12,725) |
| 5/22/2006 | W/H TAX DIV CAT | (2,124) | - | (2,124) | - | - | 112,888,892 | - | - | (2,124) | (2,124) |
| 5/22/2006 | W/H TAX DIV TXN | (509) | - | (509) | - | - | 112,888,293 | - | - | (509) | (509) |
| 5/24/2006 | W/H TAX DIV MER | (2,812) | - | (2,812) | - | - | 112,885,481 | - | - | (2,812) | (2,812) |
| 5/25/2006 | W/H TAX DIV OS | (1,941) | - | (1,941) | - | - | 112,883,540 | - | - | (1,941) | (1,941) |
| 5/26/2006 | W/H TAX DIV C | (30,442) | - | (30,442) | - | - | 112,853,098 | - | - | (30,442) | (30,442) |
| 5/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (47) | - | (47) | - | - | 112,853,051 | - | - | (47) | (47) |
| 5/31/2006 | W/H TAX DIV UPS | (5,129) | - | (5,129) | - | - | 112,847,923 | - | - | (5,129) | (5,129) |
| 6/1/2006 | W/H TAX DIV INTC | (7,311) | - | (7,311) | - | - | 112,840,612 | - | - | (7,311) | (7,311) |
| 6/1/2006 | W/H TAX DIV WFC | (11,112) | - | (11,112) | - | - | 112,829,500 | - | - | (11,112) | (11,112) |
| 6/2/2006 | W/H TAX DIV BA | (3,037) | - | (3,037) | - | - | 112,826,463 | - | - | (3,037) | (3,037) |
| 6/5/2006 | W/H TAX DIV WMT | (5,275) | - | (5,275) | - | - | 112,821,188 | - | - | (5,275) | (5,275) |
| 6/6/2006 | W/H TAX DIV PFE | (22,134) | - | (22,134) | - | - | 112,799,054 | - | - | (22,134) | (22,134) |
| 6/6/2006 | W/H TAX DIV BMY | (6,834) | - | (6,834) | - | - | 112,792,220 | - | - | (6,834) | (6,834) |
| 6/8/2006 | W/H TAX DIV MSFT | (10,021) | - | (10,021) | - | - | 112,782,199 | - | - | (10,021) | (10,021) |
| 6/9/2006 | W/H TAX DIV XOM | (24,569) | - | (24,569) | - | - | 112,757,630 | - | - | (24,569) | (24,569) |
| 6/12/2006 | W/H TAX DIV IBM | (5,871) | - | (5,871) | - | - | 112,751,760 | - | - | (5,871) | (5,871) |
| 6/12/2006 | W/H TAX DIV UTX | (1,639) | - | (1,639) | - | - | 112,750,121 | - | - | (1,639) | (1,639) |
| 6/12/2006 | W/H TAX DIV MMM | (4,139) | - | (4,139) | - | - | 112,745,982 | - | - | (4,139) | (4,139) |
| 6/13/2006 | W/H TAX DIV JNJ | (13,918) | - | (13,918) | - | - | 112,732,064 | - | - | (13,918) | (13,918) |
| 6/15/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (20) | - | (20) | - | - | 112,732,044 | - | - | (20) | (20) |
| 6/15/2006 | W/H TAX DIV TWX | (2,813) | - | (2,813) | - | - | 112,729,231 | - | - | (2,813) | (2,813) |
| 6/22/2006 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 117,729,231 | - | - | - | - |
| 6/22/2006 | W/H TAX DIV HD | (4,049) | - | (4,049) | - | - | 117,725,182 | - | - | (4,049) | (4,049) |
| 6/23/2006 | W/H TAX DIV BAC | (29,242) | - | (29,242) | - | - | 117,695,940 | - | - | (29,242) | (29,242) |
| 6/30/2006 | W/H TAX DIV S | (928) | - | (928) | - | - | 117,695,012 | - | - | (928) | (928) |
| 6/30/2006 | W/H TAX DIV PEP | (6,078) | - | (6,078) | - | - | 117,688,934 | - | - | (6,078) | (6,078) |
| 6/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (68) | - | (68) | - | - | 117,688,866 | - | - | (68) | (68) |
| 7/3/2006 | W/H TAX DIV KO | (5,533) | - | (5,533) | - | - | 117,683,333 | - | - | (5,533) | (5,533) |
| 7/3/2006 | W/H TAX DIV AIG | (4,892) | - | (4,892) | - | - | 117,678,441 | - | - | (4,892) | (4,892) |
| 7/3/2006 | W/H TAX DIV MRK | (10,257) | - | (10,257) | - | - | 117,668,183 | - | - | (10,257) | (10,257) |
| 7/3/2006 | W/H TAX DIV CVX | (14,621) | - | (14,621) | - | - | 117,653,562 | - | - | (14,621) | (14,621) |
| 7/5/2006 | W/H TAX DIV HPQ | (2,855) | - | (2,855) | - | - | 117,650,707 | - | - | (2,855) | (2,855) |
| 7/7/2006 | W/H TAX DIV SLB | (1,966) | - | (1,966) | - | - | 117,648,741 | - | - | | |
| 7/10/2006 | W/H TAX DIV MO | (14,279) | - | (14,279) | - | - | 117,634,461 | - | - | (14,279) | (14,279) |
| 7/14/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 117,634,442 | - | - | (19) | (19) |
| 7/21/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 117,634,437 | - | - | (5) | (5) |
| 7/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (33) | - | (33) | - | - | 117,634,404 | - | - | (33) | (33) |
| 7/31/2006 | W/H TAX DIV MS | (1,548) | - | (1,548) | - | - | 117,632,855 | - | - | (1,548) | (1,548) |
| 8/7/2006 | CXL W/H TAX DIV SLB | 1,966 | - | 1,966 | - | - | 117,634,822 | - | - | - | - |
| 8/15/2006 | W/H TAX DIV ABT | (2,397) | - | (2,397) | - | - | 117,632,425 | - | - | (2,397) | (2,397) |
| 8/15/2006 | W/H TAX DIV PG | (9,700) | - | (9,700) | - | - | 117,622,725 | - | - | (9,700) | (9,700) |
| 8/17/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 117,622,707 | - | - | (18) | (18) |
| 8/21/2006 | W/H TAX DIV CAT | (1,004) | - | (1,004) | - | - | 117,621,704 | - | - | (1,004) | (1,004) |
| 8/21/2006 | W/H TAX DIV TXN | (442) | - | (442) | - | - | 117,621,261 | - | - | (442) | (442) |
| 8/23/2006 | W/H TAX DIV MER | (2,114) | - | (2,114) | - | - | 117,619,147 | - | - | (2,114) | (2,114) |
| 8/24/2006 | W/H TAX DIV OS | (1,480) | - | (1,480) | - | - | 117,617,667 | - | - | (1,480) | (1,480) |
| 8/25/2006 | W/H TAX DIV C | (23,026) | - | (23,026) | - | - | 117,594,641 | - | - | (23,026) | (23,026) |

MADC1135_00000016

Exhibit B

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET XL PORTFOLIO LTD (FORMERLY XL INSURANCE PORTFOLIO LDC)

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| Date | Transaction Description | | | | | | | | | | |
| 9/1/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (20) | - | (20) | - | - | 117,594,621 | - | - | (20) | (20) |
| 9/1/2006 | W/H TAX DIV BA | (2,283) | - | (2,283) | - | - | 117,592,337 | - | - | (2,283) | (2,283) |
| 9/1/2006 | W/H TAX DIV WFC | (8,998) | - | (8,998) | - | - | 117,583,339 | - | - | (8,998) | (8,998) |
| 9/1/2006 | W/H TAX DIV INTC | (5,534) | - | (5,534) | - | - | 117,577,805 | - | - | (5,534) | (5,534) |
| 9/5/2006 | W/H TAX DIV PFE | (16,670) | - | (16,670) | - | - | 117,561,135 | - | - | (16,670) | (16,670) |
| 9/5/2006 | W/H TAX DIV WMT | (3,966) | - | (3,966) | - | - | 117,557,169 | - | - | (3,966) | (3,966) |
| 9/6/2006 | W/H TAX DIV UPS | (3,856) | - | (3,856) | - | - | 117,553,313 | - | - | (3,856) | (3,856) |
| 9/11/2006 | W/H TAX DIV CVX | (10,994) | - | (10,994) | - | - | 117,542,319 | - | - | (10,994) | (10,994) |
| 9/11/2006 | W/H TAX DIV IBM | (4,313) | - | (4,313) | - | - | 117,538,006 | - | - | (4,313) | (4,313) |
| 9/11/2006 | W/H TAX DIV XOM | (18,250) | - | (18,250) | - | - | 117,519,756 | - | - | (18,250) | (18,250) |
| 9/11/2006 | W/H TAX DIV UTX | (2,465) | - | (2,465) | - | - | 117,517,291 | - | - | (2,465) | (2,465) |
| 9/12/2006 | W/H TAX DIV JNJ | (10,466) | - | (10,466) | - | - | 117,506,825 | - | - | (10,466) | (10,466) |
| 9/12/2006 | W/H TAX DIV MMM | (3,112) | - | (3,112) | - | - | 117,503,713 | - | - | (3,112) | (3,112) |
| 9/14/2006 | W/H TAX DIV MSFT | (7,502) | - | (7,502) | - | - | 117,496,211 | - | - | (7,502) | (7,502) |
| 9/15/2006 | W/H TAX DIV TWX | (2,259) | - | (2,259) | - | - | 117,493,952 | - | - | (2,259) | (2,259) |
| 9/15/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 117,493,945 | - | - | (7) | (7) |
| 9/15/2006 | W/H TAX DIV AIG | (4,047) | - | (4,047) | - | - | 117,489,899 | - | - | (4,047) | (4,047) |
| 9/21/2006 | W/H TAX DIV HD | (2,918) | - | (2,918) | - | - | 117,486,981 | - | - | (2,918) | (2,918) |
| 9/22/2006 | W/H TAX DIV BAC | (24,153) | - | (24,153) | - | - | 117,462,828 | - | - | (24,153) | (24,153) |
| 9/27/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (24) | - | (24) | - | - | 117,462,804 | - | - | (24) | (24) |
| 9/29/2006 | W/H TAX DIV S | (710) | - | (710) | - | - | 117,462,094 | - | - | (710) | (710) |
| 9/29/2006 | W/H TAX DIV PEP | (4,677) | - | (4,677) | - | - | 117,457,417 | - | - | (4,677) | (4,677) |
| 10/2/2006 | W/H TAX DIV MRK | (7,713) | - | (7,713) | - | - | 117,449,704 | - | - | (7,713) | (7,713) |
| 10/2/2006 | W/H TAX DIV KO | (6,030) | - | (6,030) | - | - | 117,443,675 | - | - | (6,030) | (6,030) |
| 10/4/2006 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 107,443,675 | - | - | (10,000,000) | (10,000,000) |
| 10/4/2006 | W/H TAX DIV HPQ | (2,097) | - | (2,097) | - | - | 107,441,577 | - | - | (2,097) | (2,097) |
| 10/10/2006 | W/H TAX DIV MO | (17,044) | - | (17,044) | - | - | 107,424,533 | - | - | (17,044) | (17,044) |
| 10/17/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (25) | - | (25) | - | - | 107,424,508 | - | - | (25) | (25) |
| 10/25/2006 | W/H TAX DIV GE | (24,645) | - | (24,645) | - | - | 107,399,863 | - | - | (24,645) | (24,645) |
| 10/26/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 107,399,856 | - | - | (7) | (7) |
| 10/27/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 107,399,856 | - | - | (0) | (0) |
| 10/30/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 107,399,851 | - | - | (5) | (5) |
| 10/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 107,399,850 | - | - | (0) | (0) |
| 11/20/2006 | W/H TAX DIV TXN | (733) | - | (733) | - | - | 107,399,118 | - | - | (733) | (733) |
| 11/20/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 107,399,117 | - | - | (0) | (0) |
| 11/22/2006 | W/H TAX DIV C | (27,993) | - | (27,993) | - | - | 107,371,124 | - | - | (27,993) | (27,993) |
| 11/22/2006 | W/H TAX DIV MER | (2,695) | - | (2,695) | - | - | 107,368,429 | - | - | (2,695) | (2,695) |
| 11/27/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 107,368,427 | - | - | (2) | (2) |
| 11/30/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 107,368,426 | - | - | (1) | (1) |
| 1/2/2007 | W/H TAX DIV MRK | (9,665) | - | (9,665) | - | - | 107,358,761 | - | (9,665) | (9,665) | (9,665) |
| 1/2/2007 | W/H TAX DIV PEP | (5,894) | - | (5,894) | - | - | 107,352,867 | - | (5,894) | (5,894) | (5,894) |
| 1/2/2007 | W/H TAX DIV WMT | (4,871) | - | (4,871) | - | - | 107,347,996 | - | (4,871) | (4,871) | (4,871) |
| 1/3/2007 | W/H TAX DIV EXC | (3,018) | - | (3,018) | - | - | 107,344,978 | - | (3,018) | (3,018) | (3,018) |
| 1/3/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 107,344,977 | - | (1) | (1) | (1) |
| 1/3/2007 | W/H TAX DIV MSFT | (10,058) | - | (10,058) | - | - | 107,334,919 | - | (10,058) | (10,058) | (10,058) |
| 1/3/2007 | W/H TAX DIV XOM | (22,182) | - | (22,182) | - | - | 107,312,737 | - | (22,182) | (22,182) | (22,182) |
| 1/3/2007 | W/H TAX DIV TGT | (1,164) | - | (1,164) | - | - | 107,311,573 | - | (1,164) | (1,164) | (1,164) |
| 1/3/2007 | W/H TAX DIV BAC | (29,940) | - | (29,940) | - | - | 107,281,633 | - | (29,940) | (29,940) | (29,940) |
| 1/3/2007 | W/H TAX DIV UTX | (3,142) | - | (3,142) | - | - | 107,278,491 | - | (3,142) | (3,142) | (3,142) |
| 1/3/2007 | W/H TAX DIV HD | (5,402) | - | (5,402) | - | - | 107,273,088 | - | (5,402) | (5,402) | (5,402) |
| 1/3/2007 | W/H TAX DIV IBM | (10,958) | - | (10,958) | - | - | 107,262,130 | - | (10,958) | (10,958) | (10,958) |
| 1/3/2007 | W/H TAX DIV WB | (12,827) | - | (12,827) | - | - | 107,249,302 | - | (12,827) | (12,827) | (12,827) |
| 1/3/2007 | W/H TAX DIV IBM | (5,274) | - | (5,274) | - | - | 107,244,029 | - | (5,274) | (5,274) | (5,274) |
| 1/3/2007 | W/H TAX DIV K2 | (7,443) | - | (7,443) | - | - | 107,236,585 | - | (7,443) | (7,443) | (7,443) |
| 1/3/2007 | W/H TAX DIV HPQ | (2,590) | - | (2,590) | - | - | 107,233,996 | - | (2,590) | (2,590) | (2,590) |
| 1/3/2007 | W/H TAX DIV BA | (2,910) | - | (2,910) | - | - | 107,231,085 | - | (2,910) | (2,910) | (2,910) |
| 1/3/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 107,231,074 | - | (11) | (11) | (11) |
| 1/3/2007 | W/H TAX DIV MMM | (3,967) | - | (3,967) | - | - | 107,227,108 | - | (3,967) | (3,967) | (3,967) |
| 1/3/2007 | W/H TAX DIV S | (873) | - | (873) | - | - | 107,226,234 | - | (873) | (873) | (873) |
| 1/3/2007 | W/H TAX DIV JNJ | (12,935) | - | (12,935) | - | - | 107,213,300 | - | (12,935) | (12,935) | (12,935) |
| 1/3/2007 | W/H TAX DIV PFE | (20,530) | - | (20,530) | - | - | 107,192,769 | - | (20,530) | (20,530) | (20,530) |
| 1/3/2007 | W/H TAX DIV TWX | (2,641) | - | (2,641) | - | - | 107,190,128 | - | (2,641) | (2,641) | (2,641) |
| 1/3/2007 | W/H TAX DIV MCD | (14,013) | - | (14,013) | - | - | 107,176,115 | - | (14,013) | (14,013) | (14,013) |
| 1/3/2007 | W/H TAX DIV INTC | (6,716) | - | (6,716) | - | - | 107,169,399 | - | (6,716) | (6,716) | (6,716) |
| 1/3/2007 | W/H TAX DIV AIG | (5,042) | - | (5,042) | - | - | 107,164,357 | - | (5,042) | (5,042) | (5,042) |
| 1/3/2007 | W/H TAX DIV CVX | (13,452) | - | (13,452) | - | - | 107,150,905 | - | (13,452) | (13,452) | (13,452) |
| 1/4/2007 | W/H TAX DIV UPS | (4,915) | - | (4,915) | - | - | 107,145,990 | - | (4,915) | (4,915) | (4,915) |
| 1/10/2007 | W/H TAX DIV MO | (5,804) | - | (5,804) | - | - | 107,140,186 | - | (5,804) | (5,804) | (5,804) |
| 1/12/2007 | W/H TAX DIV DIS | (7,667) | - | (7,667) | - | - | 107,132,519 | - | (7,667) | (7,667) | (7,667) |
| 1/25/2007 | W/H TAX DIV GE | (19,728) | - | (19,728) | - | - | 107,112,790 | - | (19,728) | (19,728) | (19,728) |
| 1/29/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (24) | - | (24) | - | - | 107,112,767 | - | (24) | (24) | (24) |

MADC1135_00000017

Exhibit B

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET PRIME INDEX INSURANCE PORTFOLIO LDC

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 1/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 107,112,766 | - | (1) | (1) | (1) |
| 2/6/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 107,112,763 | - | (3) | (3) | (3) |
| 2/13/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 107,112,756 | - | (7) | (7) | (7) |
| 2/16/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 107,112,753 | - | (3) | (3) | (3) |
| 2/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 107,112,750 | - | (4) | (4) | (4) |
| 2/22/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 107,112,749 | - | (0) | (0) | (0) |
| 2/23/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 107,112,748 | - | (1) | (1) | (1) |
| 2/27/2007 | W/H TAX DIV CMCSA | (4) | - | (4) | - | - | 107,112,744 | - | (4) | (4) | (4) |
| 2/28/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 107,112,738 | - | (6) | (6) | (6) |
| 3/1/2007 | W/H TAX DIV COP | (4,274) | - | (4,274) | - | - | 107,108,464 | - | (4,274) | (4,274) | (4,274) |
| 3/6/2007 | W/H TAX DIV UPS | (2,833) | - | (2,833) | - | - | 107,105,631 | - | (2,833) | (2,833) | (2,833) |
| 3/9/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 107,105,620 | - | (11) | (11) | (11) |
| 3/12/2007 | W/H TAX DIV CVX | (3,997) | - | (3,997) | - | - | 107,101,623 | - | (3,997) | (3,997) | (3,997) |
| 3/12/2007 | W/H TAX DIV MMM | (3,508) | - | (3,508) | - | - | 107,098,115 | - | (3,508) | (3,508) | (3,508) |
| 3/12/2007 | W/H TAX DIV TGT | (662) | - | (662) | - | - | 107,097,453 | - | (662) | (662) | (662) |
| 3/12/2007 | W/H TAX DIV UTX | (974) | - | (974) | - | - | 107,096,478 | - | (974) | (974) | (974) |
| 3/13/2007 | W/H TAX DIV JNJ | (10,619) | - | (10,619) | - | - | 107,085,859 | - | (10,619) | (10,619) | (10,619) |
| 3/15/2007 | W/H TAX DIV TWX | (2,110) | - | (2,110) | - | - | 107,083,749 | - | (2,110) | (2,110) | (2,110) |
| 3/15/2007 | W/H TAX DIV WB | (10,231) | - | (10,231) | - | - | 107,073,518 | - | (10,231) | (10,231) | (10,231) |
| 3/16/2007 | W/H TAX DIV AIG | (4,070) | - | (4,070) | - | - | 107,069,448 | - | (4,070) | (4,070) | (4,070) |
| 3/22/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (26) | - | (26) | - | - | 107,069,422 | - | (26) | (26) | (26) |
| 3/22/2007 | W/H TAX DIV HD | (4,522) | - | (4,522) | - | - | 107,064,901 | - | (4,522) | (4,522) | (4,522) |
| 3/23/2007 | W/H TAX DIV BAC | (24,043) | - | (24,043) | - | - | 107,040,857 | - | (24,043) | (24,043) | (24,043) |
| 3/28/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 107,040,852 | - | (5) | (5) | (5) |
| 3/30/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 107,040,849 | - | (3) | (3) | (3) |
| 3/30/2007 | W/H TAX DIV PEP | (5,525) | - | (5,525) | - | - | 107,035,325 | - | (5,525) | (5,525) | (5,525) |
| 3/30/2007 | W/H TAX DIV S | (809) | - | (809) | - | - | 107,034,515 | - | (809) | (809) | (809) |
| 4/2/2007 | W/H TAX DIV MRK | (9,468) | - | (9,468) | - | - | 107,025,047 | - | (9,468) | (9,468) | (9,468) |
| 4/2/2007 | W/H TAX DIV WMT | (6,130) | - | (6,130) | - | - | 107,018,917 | - | (6,130) | (6,130) | (6,130) |
| 4/2/2007 | W/H TAX DIV KO | (7,932) | - | (7,932) | - | - | 107,010,985 | - | (7,932) | (7,932) | (7,932) |
| 4/4/2007 | W/H TAX DIV HPQ | (2,513) | - | (2,513) | - | - | 107,008,472 | - | (2,513) | (2,513) | (2,513) |
| 4/10/2007 | W/H TAX DIV MO | (20,496) | - | (20,496) | - | - | 106,987,976 | - | (20,496) | (20,496) | (20,496) |
| 4/19/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (36) | - | (36) | - | - | 106,987,939 | - | (36) | (36) | (36) |
| 4/19/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 106,987,939 | - | (0) | (0) | (0) |
| 4/25/2007 | W/H TAX DIV GE | (27,880) | - | (27,880) | - | - | 106,960,059 | - | (27,880) | (27,880) | (27,880) |
| 5/4/2007 | W/H TAX DIV CVS | (732) | - | (732) | - | - | 106,959,327 | - | (732) | (732) | (732) |
| 5/15/2007 | W/H TAX DIV PG | (12,977) | - | (12,977) | - | - | 106,946,350 | - | (12,977) | (12,977) | (12,977) |
| 5/21/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 106,946,331 | - | (19) | (19) | (19) |
| 5/23/2007 | W/H TAX DIV MER | (3,435) | - | (3,435) | - | - | 106,942,896 | - | (3,435) | (3,435) | (3,435) |
| 5/24/2007 | W/H TAX DIV OS | (1,005) | - | (1,005) | - | - | 106,941,891 | - | (1,005) | (1,005) | (1,005) |
| 5/25/2007 | W/H TAX DIV C | (30,621) | - | (30,621) | - | - | 106,911,270 | - | (30,621) | (30,621) | (30,621) |
| 5/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 106,911,263 | - | (8) | (8) | (8) |
| 6/1/2007 | W/H TAX DIV INTC | (7,606) | - | (7,606) | - | - | 106,903,656 | - | (7,606) | (7,606) | (7,606) |
| 6/1/2007 | W/H TAX DIV BA | (3,171) | - | (3,171) | - | - | 106,900,486 | - | (3,171) | (3,171) | (3,171) |
| 6/1/2007 | W/H TAX DIV WFC | (10,992) | - | (10,992) | - | - | 106,889,493 | - | (10,992) | (10,992) | (10,992) |
| 6/1/2007 | W/H TAX DIV COP | (7,895) | - | (7,895) | - | - | 106,881,598 | - | (7,895) | (7,895) | (7,895) |
| 6/4/2007 | W/H TAX DIV WMT | (6,238) | - | (6,238) | - | - | 106,875,361 | - | (6,238) | (6,238) | (6,238) |
| 6/5/2007 | W/H TAX DIV PFE | (24,035) | - | (24,035) | - | - | 106,851,326 | - | (24,035) | (24,035) | (24,035) |
| 6/5/2007 | W/H TAX DIV UPS | (5,038) | - | (5,038) | - | - | 106,846,288 | - | (5,038) | (5,038) | (5,038) |
| 6/6/2007 | W/H TAX DIV TYC | (2,324) | - | (2,324) | - | - | 106,843,964 | - | (2,324) | (2,324) | (2,324) |
| 6/11/2007 | W/H TAX DIV IBM | (6,979) | - | (6,979) | - | - | 106,836,985 | - | (6,979) | (6,979) | (6,979) |
| 6/11/2007 | W/H TAX DIV CVX | (14,547) | - | (14,547) | - | - | 106,822,438 | - | (14,547) | (14,547) | (14,547) |
| 6/11/2007 | W/H TAX DIV UTX | (3,179) | - | (3,179) | - | - | 106,819,259 | - | (3,179) | (3,179) | (3,179) |
| 6/11/2007 | W/H TAX DIV XOM | (23,152) | - | (23,152) | - | - | 106,796,107 | - | (23,152) | (23,152) | (23,152) |
| 6/12/2007 | W/H TAX DIV JNJ | (13,890) | - | (13,890) | - | - | 106,782,217 | - | (13,890) | (13,890) | (13,890) |
| 6/12/2007 | W/H TAX DIV JNJ | (4,188) | - | (4,188) | - | - | 106,778,030 | - | (4,188) | (4,188) | (4,188) |
| 6/14/2007 | W/H TAX DIV MSFT | (10,104) | - | (10,104) | - | - | 106,767,925 | - | (10,104) | (10,104) | (10,104) |
| 6/15/2007 | W/H TAX DIV TWX | (2,478) | - | (2,478) | - | - | 106,765,448 | - | (2,478) | (2,478) | (2,478) |
| 6/15/2007 | W/H TAX DIV WB | (12,214) | - | (12,214) | - | - | 106,753,234 | - | (12,214) | (12,214) | (12,214) |
| 6/15/2007 | W/H TAX DIV AIG | (5,038) | - | (5,038) | - | - | 106,748,196 | - | (5,038) | (5,038) | (5,038) |
| 6/15/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 106,748,188 | - | (8) | (8) | (8) |
| 6/21/2007 | W/H TAX DIV HD | (5,398) | - | (5,398) | - | - | 106,742,790 | - | (5,398) | (5,398) | (5,398) |
| 6/22/2007 | W/H TAX DIV BAC | (29,313) | - | (29,313) | - | - | 106,713,478 | - | (29,313) | (29,313) | (29,313) |
| 6/29/2007 | W/H TAX DIV S | (845) | - | (845) | - | - | 106,712,632 | - | (845) | (845) | (845) |
| 6/29/2007 | W/H TAX DIV PEP | (7,221) | - | (7,221) | - | - | 106,705,411 | - | (7,221) | (7,221) | (7,221) |
| 6/29/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 106,705,393 | - | (18) | (18) | (18) |
| 7/2/2007 | W/H TAX DIV KO | (7,916) | - | (7,916) | - | - | 106,697,477 | - | (7,916) | (7,916) | (7,916) |
| 7/2/2007 | W/H TAX DIV MRK | (9,531) | - | (9,531) | - | - | 106,687,946 | - | (9,531) | (9,531) | (9,531) |
| 7/5/2007 | W/H TAX DIV HPQ | (2,530) | - | (2,530) | - | - | 106,685,416 | - | (2,530) | (2,530) | (2,530) |
| 7/10/2007 | W/H TAX DIV MO | (16,785) | - | (16,785) | - | - | 106,668,631 | - | (16,785) | (16,785) | (16,785) |
| 7/17/2007 | CXL W/H TAX DIV TYC | 2,324 | - | - | - | - | 106,670,954 | - | - | - | - |

MADC1135_00000018

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 7/17/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (25) | - | (25) | - | - | 106,670,930 | - | (25) | (25) | (25) |
| 8/6/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (23) | - | (23) | - | - | 106,670,907 | - | (23) | (23) | (23) |
| 8/24/2007 | W/H TAX DIV C | (12,664) | - | (12,664) | - | - | 106,658,242 | - | (12,664) | (12,664) | (12,664) |
| 9/4/2007 | W/H TAX DIV WMT | (2,531) | - | (2,531) | - | - | 106,655,711 | - | (2,531) | (2,531) | (2,531) |
| 9/4/2007 | W/H TAX DIV WFC | (4,938) | - | (4,938) | - | - | 106,650,773 | - | (4,938) | (4,938) | (4,938) |
| 9/4/2007 | W/H TAX DIV INTC | (3,136) | - | (3,136) | - | - | 106,647,637 | - | (3,136) | (3,136) | (3,136) |
| 9/5/2007 | W/H TAX DIV PFE | (9,753) | - | (9,753) | - | - | 106,637,884 | - | (9,753) | (9,753) | (9,753) |
| 9/7/2007 | W/H TAX DIV BA | (1,239) | - | (1,239) | - | - | 106,636,645 | - | (1,239) | (1,239) | (1,239) |
| 9/10/2007 | W/H TAX DIV XOM | (9,447) | - | (9,447) | - | - | 106,627,198 | - | (9,447) | (9,447) | (9,447) |
| 9/10/2007 | W/H TAX DIV UTX | (1,558) | - | (1,558) | - | - | 106,625,640 | - | (1,558) | (1,558) | (1,558) |
| 9/10/2007 | W/H TAX DIV CVX | (5,903) | - | (5,903) | - | - | 106,619,737 | - | (5,903) | (5,903) | (5,903) |
| 9/10/2007 | W/H TAX DIV IBM | (2,655) | - | (2,655) | - | - | 106,617,082 | - | (2,655) | (2,655) | (2,655) |
| 9/13/2007 | W/H TAX DIV MSFT | (4,027) | - | (4,027) | - | - | 106,613,055 | - | (4,027) | (4,027) | (4,027) |
| 9/14/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (30) | - | (30) | - | - | 106,613,026 | - | (30) | (30) | (30) |
| 9/18/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 106,613,023 | - | (3) | (3) | (3) |
| 9/26/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 106,613,005 | - | (17) | (17) | (17) |
| 10/1/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 106,612,995 | - | (11) | (11) | (11) |
| 10/1/2007 | W/H TAX DIV KO | (3,007) | - | (3,007) | - | - | 106,609,988 | - | (3,007) | (3,007) | (3,007) |
| 10/1/2007 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 96,609,988 | - | (10,000,000) | (10,000,000) | (10,000,000) |
| 10/10/2007 | W/H TAX DIV MO | (6,950) | - | (6,950) | - | - | 96,603,038 | - | (6,950) | (6,950) | (6,950) |
| 10/25/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (18,355) | - | (18,355) | - | - | 96,584,683 | - | (18,355) | (18,355) | (18,355) |
| 10/31/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 96,584,674 | - | (9) | (9) | (9) |
| 11/7/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 96,584,666 | - | (8) | (8) | (8) |
| 11/13/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 96,584,649 | - | (17) | (17) | (17) |
| 11/15/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 96,584,643 | - | (6) | (6) | (6) |
| 11/21/2007 | W/H TAX DIV C | (8,010) | - | (8,010) | - | - | 96,576,633 | - | (8,010) | (8,010) | (8,010) |
| 11/21/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 96,576,628 | - | (4) | (4) | (4) |
| 11/21/2007 | W/H TAX DIV MER | (944) | - | (944) | - | - | 96,575,684 | - | (944) | (944) | (944) |
| 11/30/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 96,575,672 | - | (12) | (12) | (12) |
| 12/3/2007 | W/H TAX DIV MCD | (7,804) | - | (7,804) | - | - | 96,567,868 | - | (7,804) | (7,804) | (7,804) |
| 12/3/2007 | W/H TAX DIV COP | (1,990) | - | (1,990) | - | - | 96,565,878 | - | (1,990) | (1,990) | (1,990) |
| 12/10/2007 | W/H TAX DIV UTX | (1,409) | - | (1,409) | - | - | 96,564,469 | - | (1,409) | (1,409) | (1,409) |
| 12/10/2007 | W/H TAX DIV EXC | (1,233) | - | (1,233) | - | - | 96,563,237 | - | (1,233) | (1,233) | (1,233) |
| 12/10/2007 | W/H TAX DIV CVX | (5,339) | - | (5,339) | - | - | 96,557,898 | - | (5,339) | (5,339) | (5,339) |
| 12/11/2007 | W/H TAX DIV JNJ | (10,100) | - | (10,100) | - | - | 96,547,798 | - | (10,100) | (10,100) | (10,100) |
| 12/11/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 96,547,779 | - | (19) | (19) | (19) |
| 12/12/2007 | W/H TAX DIV MMM | (3,015) | - | (3,015) | - | - | 96,544,764 | - | (3,015) | (3,015) | (3,015) |
| 12/13/2007 | W/H TAX DIV MSFT | (3,874) | - | (3,874) | - | - | 96,540,890 | - | (3,874) | (3,874) | (3,874) |
| 12/20/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 96,540,882 | - | (8) | (8) | (8) |
| 12/31/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (15) | - | (15) | - | - | 96,540,868 | - | (15) | (15) | (15) |
| 1/2/2008 | W/H TAX DIV HPQ | (584) | - | (584) | - | - | 96,540,284 | - | (584) | (584) | (584) |
| 1/2/2008 | W/H TAX DIV WMT | (1,491) | - | (1,491) | - | - | 96,538,792 | - | (1,491) | (1,491) | (1,491) |
| 1/3/2008 | W/H TAX DIV UPS | (1,849) | - | (1,849) | - | - | 96,536,943 | - | (1,849) | (1,849) | (1,849) |
| 1/28/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 96,536,937 | - | (6) | (6) | (6) |
| 2/20/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 96,536,926 | - | (11) | (11) | (11) |
| 2/22/2008 | W/H TAX DIV C | (8,808) | - | (8,808) | - | - | 96,528,119 | - | (8,808) | (8,808) | (8,808) |
| 2/28/2008 | W/H TAX DIV GS | (714) | - | (714) | - | - | 96,527,405 | - | (714) | (714) | (714) |
| 3/3/2008 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 101,527,405 | - | - | - | - |
| 3/3/2008 | W/H TAX DIV INTC | (4,094) | - | (4,094) | - | - | 101,523,311 | - | (4,094) | (4,094) | (4,094) |
| 3/3/2008 | W/H TAX DIV WFC | (5,846) | - | (5,846) | - | - | 101,517,465 | - | (5,846) | (5,846) | (5,846) |
| 3/3/2008 | W/H TAX DIV COP | (4,073) | - | (4,073) | - | - | 101,513,392 | - | (4,073) | (4,073) | (4,073) |
| 3/4/2008 | W/H TAX DIV PFE | (11,743) | - | (11,743) | - | - | 101,501,649 | - | (11,743) | (11,743) | (11,743) |
| 3/4/2008 | W/H TAX DIV UPS | (2,523) | - | (2,523) | - | - | 101,499,126 | - | (2,523) | (2,523) | (2,523) |
| 3/5/2008 | W/H TAX DIV MER | (1,606) | - | (1,606) | - | - | 101,497,520 | - | (1,606) | (1,606) | (1,606) |
| 3/7/2008 | W/H TAX DIV BA | (1,631) | - | (1,631) | - | - | 101,495,889 | - | (1,631) | (1,631) | (1,631) |
| 3/10/2008 | W/H TAX DIV EXC | (1,784) | - | (1,784) | - | - | 101,494,105 | - | (1,784) | (1,784) | (1,784) |
| 3/10/2008 | W/H TAX DIV CVX | (6,799) | - | (6,799) | - | - | 101,487,306 | - | (6,799) | (6,799) | (6,799) |
| 3/10/2008 | W/H TAX DIV UTX | (1,794) | - | (1,794) | - | - | 101,485,512 | - | (1,794) | (1,794) | (1,794) |
| 3/10/2008 | W/H TAX DIV IBM | (3,058) | - | (3,058) | - | - | 101,482,453 | - | (3,058) | (3,058) | (3,058) |
| 3/10/2008 | W/H TAX DIV XOM | (10,704) | - | (10,704) | - | - | 101,471,750 | - | (10,704) | (10,704) | (10,704) |
| 3/11/2008 | W/H TAX DIV JNJ | (6,557) | - | (6,557) | - | - | 101,465,192 | - | (6,557) | (6,557) | (6,557) |
| 3/12/2008 | W/H TAX DIV MMM | (2,039) | - | (2,039) | - | - | 101,463,154 | - | (2,039) | (2,039) | (2,039) |
| 3/13/2008 | W/H TAX DIV MSFT | (4,878) | - | (4,878) | - | - | 101,458,276 | - | (4,878) | (4,878) | (4,878) |
| 3/17/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (33) | - | (33) | - | - | 101,458,243 | - | (33) | (33) | (33) |
| 3/17/2008 | W/H TAX DIV MCD | (2,485) | - | (2,485) | - | - | 101,455,758 | - | (2,485) | (2,485) | (2,485) |
| 3/17/2008 | W/H TAX DIV TWX | (1,242) | - | (1,242) | - | - | 101,454,516 | - | (1,242) | (1,242) | (1,242) |
| 3/17/2008 | W/H TAX DIV WB | (7,177) | - | (7,177) | - | - | 101,447,339 | - | (7,177) | (7,177) | (7,177) |
| 3/19/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 101,447,339 | - | (0) | (0) | (0) |
| 3/24/2008 | W/H TAX DIV AIG | (2,854) | - | (2,854) | - | - | 101,444,484 | - | (2,854) | (2,854) | (2,854) |
| 3/27/2008 | W/H TAX DIV HD | (2,064) | - | (2,064) | - | - | 101,442,420 | - | (2,064) | (2,064) | (2,064) |
| 3/28/2008 | W/H TAX DIV BAC | (15,658) | - | (15,658) | - | - | 101,426,762 | - | (15,658) | (15,658) | (15,658) |

MADC1135_00000019

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 3/31/2008 | W/H TAX DIV PEP | (3,249) | - | (3,249) | - | - | 101,423,513 | - | (3,249) | (3,249) | (3,249) |
| 4/1/2008 | W/H TAX DIV KO | (4,261) | - | (4,261) | - | - | 101,419,252 | - | (4,261) | (4,261) | (4,261) |
| 4/1/2008 | W/H TAX DIV MRK | (4,648) | - | (4,648) | - | - | 101,414,603 | - | (4,648) | (4,648) | (4,648) |
| 4/2/2008 | W/H TAX DIV HPQ | (1,142) | - | (1,142) | - | - | 101,413,461 | - | (1,142) | (1,142) | (1,142) |
| 4/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 101,413,459 | - | (2) | (2) | (2) |
| 4/4/2008 | W/H TAX DIV KFT | (2,340) | - | (2,340) | - | - | 101,411,119 | - | (2,340) | (2,340) | (2,340) |
| 4/7/2008 | W/H TAX DIV WMT | (3,026) | - | (3,026) | - | - | 101,408,093 | - | (3,026) | (3,026) | (3,026) |
| 4/23/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 101,408,085 | - | (8) | (8) | (8) |
| 4/25/2008 | W/H TAX DIV GE | (17,223) | - | (17,223) | - | - | 101,390,863 | - | (17,223) | (17,223) | (17,223) |
| 4/25/2008 | W/H TAX DIV MDT | (689) | - | (689) | - | - | 101,390,173 | - | (689) | (689) | (689) |
| 4/30/2008 | W/H TAX DIV JPM | (6,287) | - | (6,287) | - | - | 101,383,886 | - | (6,287) | (6,287) | (6,287) |
| 4/30/2008 | W/H TAX DIV MS | (1,365) | - | (1,365) | - | - | 101,382,521 | - | (1,365) | (1,365) | (1,365) |
| 5/1/2008 | W/H TAX DIV VZ | (6,126) | - | (6,126) | - | - | 101,376,394 | - | (6,126) | (6,126) | (6,126) |
| 5/1/2008 | W/H TAX DIV T | (11,950) | - | (11,950) | - | - | 101,364,445 | - | (11,950) | (11,950) | (11,950) |
| 5/2/2008 | W/H TAX DIV BK | (1,324) | - | (1,324) | - | - | 101,363,121 | - | (1,324) | (1,324) | (1,324) |
| 5/2/2008 | W/H TAX DIV CVS | (441) | - | (441) | - | - | 101,362,680 | - | (441) | (441) | (441) |
| 5/9/2008 | W/H TAX DIV AXP | (993) | - | (993) | - | - | 101,361,687 | - | (993) | (993) | (993) |
| 5/15/2008 | W/H TAX DIV PG | (6,251) | - | (6,251) | - | - | 101,355,437 | - | (6,251) | (6,251) | (6,251) |
| 5/15/2008 | W/H TAX DIV ABT | (2,813) | - | (2,813) | - | - | 101,352,624 | - | (2,813) | (2,813) | (2,813) |
| 5/20/2008 | W/H TAX DIV CAT | (1,158) | - | (1,158) | - | - | 101,351,466 | - | (1,158) | (1,158) | (1,158) |
| 5/23/2008 | W/H TAX DIV C | (7,942) | - | (7,942) | - | - | 101,343,524 | - | (7,942) | (7,942) | (7,942) |
| 5/28/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (28) | - | (28) | - | - | 101,343,496 | - | (28) | (28) | (28) |
| 5/29/2008 | W/H TAX DIV GS | (643) | - | (643) | - | - | 101,342,852 | - | (643) | (643) | (643) |
| 6/2/2008 | W/H TAX DIV WFC | (9,259) | - | (9,259) | - | - | 101,333,593 | - | (9,259) | (9,259) | (9,259) |
| 6/2/2008 | W/H TAX DIV INTC | (4,054) | - | (4,054) | - | - | 101,329,540 | - | (4,054) | (4,054) | (4,054) |
| 6/2/2008 | W/H TAX DIV WMT | (5,202) | - | (5,202) | - | - | 101,324,338 | - | (5,202) | (5,202) | (5,202) |
| 6/2/2008 | W/H TAX DIV COP | (2,289) | - | (2,289) | - | - | 101,322,049 | - | (2,289) | (2,289) | (2,289) |
| 6/3/2008 | W/H TAX DIV UPS | (4,170) | - | (4,170) | - | - | 101,317,880 | - | (4,170) | (4,170) | (4,170) |
| 6/3/2008 | W/H TAX DIV PFE | (19,948) | - | (19,948) | - | - | 101,297,931 | - | (19,948) | (19,948) | (19,948) |
| 6/6/2008 | W/H TAX DIV BA | (2,696) | - | (2,696) | - | - | 101,295,236 | - | (2,696) | (2,696) | (2,696) |
| 6/10/2008 | W/H TAX DIV UTX | (2,965) | - | (2,965) | - | - | 101,292,271 | - | (2,965) | (2,965) | (2,965) |
| 6/10/2008 | W/H TAX DIV EXC | (2,948) | - | (2,948) | - | - | 101,289,322 | - | (2,948) | (2,948) | (2,948) |
| 6/10/2008 | W/H TAX DIV CVX | (12,594) | - | (12,594) | - | - | 101,276,728 | - | (12,594) | (12,594) | (12,594) |
| 6/10/2008 | W/H TAX DIV XOM | (19,728) | - | (19,728) | - | - | 101,256,916 | - | (19,728) | (19,728) | (19,728) |
| 6/10/2008 | W/H TAX DIV IBM | (6,318) | - | (6,318) | - | - | 101,246,598 | - | (6,318) | (6,318) | (6,318) |
| 6/12/2008 | W/H TAX DIV MMM | (3,370) | - | (3,370) | - | - | 101,243,229 | - | (3,370) | (3,370) | (3,370) |
| 6/12/2008 | W/H TAX DIV MSFT | (8,062) | - | (8,062) | - | - | 101,235,167 | - | (8,062) | (8,062) | (8,062) |
| 7/21/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (20) | - | (20) | - | - | 101,235,147 | - | (20) | (20) | (20) |
| 7/23/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 101,235,147 | - | (0) | (0) | (0) |
| 7/31/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 101,235,145 | - | (2) | (2) | (2) |
| 7/31/2008 | CHECK WIRE | (30,000,000) | - | (30,000,000) | - | - | 71,235,145 | - | (30,000,000) | (30,000,000) | (30,000,000) |
| 8/1/2008 | W/H TAX DIV CVS | (640) | - | (640) | - | - | 71,234,505 | - | (640) | (640) | (640) |
| 8/8/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 71,234,503 | - | (2) | (2) | (2) |
| 8/13/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 71,234,502 | - | (1) | (1) | (1) |
| 8/20/2008 | W/H TAX DIV CAT | (1,703) | - | (1,703) | - | - | 71,232,799 | - | (1,703) | (1,703) | (1,703) |
| 8/22/2008 | W/H TAX DIV C | (10,937) | - | (10,937) | - | - | 71,221,862 | - | (10,937) | (10,937) | (10,937) |
| 8/28/2008 | W/H TAX DIV GS | (811) | - | (811) | - | - | 71,221,051 | - | (811) | (811) | (811) |
| 10/1/2008 | CHECK WIRE | (1,250,000) | - | (1,250,000) | - | - | 69,971,051 | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) |
| 10/2/2008 | W/H TAX DIV INTC | (5,028) | - | (5,028) | - | - | 69,966,023 | (5,028) | (5,028) | (5,028) | (5,028) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 69,966,013 | (10) | (10) | (10) | (10) |
| 10/2/2008 | W/H TAX DIV BA | (1,854) | - | (1,854) | - | - | 69,964,159 | (1,854) | (1,854) | (1,854) | (1,854) |
| 10/2/2008 | W/H TAX DIV WMT | (4,726) | - | (4,726) | - | - | 69,959,433 | (4,726) | (4,726) | (4,726) | (4,726) |
| 10/2/2008 | W/H TAX DIV MSFT | (7,680) | - | (7,680) | - | - | 69,951,753 | (7,680) | (7,680) | (7,680) | (7,680) |
| 10/2/2008 | W/H TAX DIV BUD | (1,715) | - | (1,715) | - | - | 69,950,038 | (1,715) | (1,715) | (1,715) | (1,715) |
| 10/2/2008 | W/H TAX DIV MMM | (3,184) | - | (3,184) | - | - | 69,946,855 | (3,184) | (3,184) | (3,184) | (3,184) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 69,946,849 | (6) | (6) | (6) | (6) |
| 10/2/2008 | W/H TAX DIV QCOM | (624) | - | (624) | - | - | 69,946,224 | (624) | (624) | (624) | (624) |
| 10/2/2008 | W/H TAX DIV COP | (4,629) | - | (4,629) | - | - | 69,941,596 | (4,629) | (4,629) | (4,629) | (4,629) |
| 10/2/2008 | W/H TAX DIV HD | (926) | - | (926) | - | - | 69,940,670 | (926) | (926) | (926) | (926) |
| 10/2/2008 | W/H TAX DIV WFC | (6,106) | - | (6,106) | - | - | 69,934,565 | (6,106) | (6,106) | (6,106) | (6,106) |
| 10/2/2008 | W/H TAX DIV PFE | (13,718) | - | (13,718) | - | - | 69,920,847 | (13,718) | (13,718) | (13,718) | (13,718) |
| 10/2/2008 | W/H TAX DIV UPS | (3,940) | - | (3,940) | - | - | 69,916,907 | (3,940) | (3,940) | (3,940) | (3,940) |
| 10/2/2008 | W/H TAX DIV IBM | (4,345) | - | (4,345) | - | - | 69,912,562 | (4,345) | (4,345) | (4,345) | (4,345) |
| 10/2/2008 | W/H TAX DIV MCD | (3,663) | - | (3,663) | - | - | 69,908,900 | (3,663) | (3,663) | (3,663) | (3,663) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 69,908,899 | (1) | (1) | (1) | (1) |
| 10/2/2008 | W/H TAX DIV EXC | (2,786) | - | (2,786) | - | - | 69,906,113 | (2,786) | (2,786) | (2,786) | (2,786) |
| 10/2/2008 | W/H TAX DIV XOM | (18,378) | - | (18,378) | - | - | 69,887,735 | (18,378) | (18,378) | (18,378) | (18,378) |
| 10/2/2008 | W/H TAX DIV TWX | (1,967) | - | (1,967) | - | - | 69,885,768 | (1,967) | (1,967) | (1,967) | (1,967) |
| 10/2/2008 | W/H TAX DIV CVX | (11,758) | - | (11,758) | - | - | 69,874,010 | (11,758) | (11,758) | (11,758) | (11,758) |
| 10/2/2008 | W/H TAX DIV JNJ | (11,250) | - | (11,250) | - | - | 69,862,760 | (11,250) | (11,250) | (11,250) | (11,250) |

MADC1135_00000020

BLMIS ACCOUNT NO. 1FR010 - RYE SELECT BROAD MARKET INSURANCE PORTFOLIO LDC

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Transfers | Column 12 Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/2/2008 | W/H TAX DIV UTX | (2,802) | - | (2,802) | - | - | 69,859,959 | (2,802) | (2,802) | (2,802) | (2,802) |
| 10/2/2008 | W/H TAX DIV AIG | (5,125) | - | (5,125) | - | - | 69,854,833 | (5,125) | (5,125) | (5,125) | (5,125) |
| 10/2/2008 | W/H TAX DIV PEP | (5,750) | - | (5,750) | - | - | 69,849,083 | (5,750) | (5,750) | (5,750) | (5,750) |
| 10/2/2008 | W/H TAX DIV BAC | (24,727) | - | (24,727) | - | - | 69,824,355 | (24,727) | (24,727) | (24,727) | (24,727) |
| 10/28/2008 | CHECK WIRE | (7,500,000) | - | (7,500,000) | - | - | 62,324,355 | (7,500,000) | (7,500,000) | (7,500,000) | (7,500,000) |
| 11/4/2008 | W/H TAX DIV PM | (3,163) | - | (3,163) | - | - | 62,321,192 | (3,163) | (3,163) | (3,163) | (3,163) |
| 11/4/2008 | W/H TAX DIV MRK | (6,956) | - | (6,956) | - | - | 62,314,236 | (6,956) | (6,956) | (6,956) | (6,956) |
| 11/4/2008 | W/H TAX DIV HPQ | (1,702) | - | (1,702) | - | - | 62,312,534 | (1,702) | (1,702) | (1,702) | (1,702) |
| 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 62,312,533 | (2) | (2) | (2) | (2) |
| 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 62,312,532 | (1) | (1) | (1) | (1) |
| 11/4/2008 | W/H TAX DIV BAX | (1,212) | - | (1,212) | - | - | 62,311,320 | (1,212) | (1,212) | (1,212) | (1,212) |
| 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 62,311,320 | (0) | (0) | (0) | (0) |
| 11/4/2008 | W/H TAX DIV MO | (1,364) | - | (1,364) | - | - | 62,309,955 | (1,364) | (1,364) | (1,364) | (1,364) |
| 11/4/2008 | W/H TAX DIV KO | (2,129) | - | (2,129) | - | - | 62,307,826 | (2,129) | (2,129) | (2,129) | (2,129) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 62,307,825 | (1) | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 62,307,825 | (1) | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 62,307,824 | (0) | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 62,307,824 | (1) | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 62,307,823 | (1) | (1) | (1) | (1) |
| | Total: | $  274,950,000 | $  (130,152,177) | $  2,000,000 | $  (84,490,000) | | $  62,307,823 | $  (8,913,228) | $  (50,060,603) | $  (93,932,290) | $  (130,152,177) |

MADC1135_00000021

BLMIS ACCOUNT NO. 1FR080 - KINGATE GLOBAL... MARKET PORTFOLIO LIMITED

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Transfers | Column 12 Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/4/2001 | CHECK WIRE | 1,240,000 | 1,240,000 | - | - | - | 1,240,000 | - | - | - | - |
| 9/4/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 6,240,000 | - | - | - | - |
| 9/4/2001 | CHECK WIRE | 1,252,000 | 1,252,000 | - | - | - | 7,492,000 | - | - | - | - |
| 9/4/2001 | CHECK WIRE | 1,240,000 | 1,240,000 | - | - | - | 8,732,000 | - | - | - | - |
| 9/4/2001 | TRANS FROM 1FR01030 (1FR010) | 4,000,000 | - | - | 4,000,000 | - | 12,732,000 | - | - | - | - |
| 10/4/2001 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 18,732,000 | - | - | - | - |
| 10/15/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (33) | - | (33) | - | - | 18,731,967 | - | - | - | (33) |
| 11/19/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 18,731,961 | - | - | - | (6) |
| 12/10/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 23,731,961 | - | - | - | - |
| 12/31/2001 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 23,731,949 | - | - | - | (12) |
| 1/2/2002 | TRANS FROM 1FR01030 (1FR010) | 61,000,000 | - | - | 61,000,000 | - | 84,731,949 | - | - | - | - |
| 1/7/2002 | W/H TAX DIV WMT | (375) | - | (375) | - | - | 84,731,574 | - | - | - | (375) |
| 1/8/2002 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 104,731,574 | - | - | - | - |
| 1/10/2002 | CHECK WIRE | 27,000,000 | 27,000,000 | - | - | - | 131,731,574 | - | - | - | - |
| 1/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 131,731,573 | - | - | - | (1) |
| 1/25/2002 | W/H TAX DIV MWD | (225) | - | (225) | - | - | 131,731,348 | - | - | - | (225) |
| 2/1/2002 | W/H TAX DIV SBC | (758) | - | (758) | - | - | 131,730,590 | - | - | - | (758) |
| 2/1/2002 | W/H TAX DIV PHA | (152) | - | (152) | - | - | 131,730,437 | - | - | - | (152) |
| 2/1/2002 | W/H TAX DIV VZ | (916) | - | (916) | - | - | 131,729,521 | - | - | - | (916) |
| 2/8/2002 | CHECK WIRE | 8,000,000 | 8,000,000 | - | - | - | 139,729,521 | - | - | - | - |
| 2/11/2002 | W/H TAX DIV TXN | (228) | - | (228) | - | - | 139,729,294 | - | - | - | (228) |
| 2/15/2002 | W/H TAX DIV PG | (3,046) | - | (3,046) | - | - | 139,726,248 | - | - | - | (3,046) |
| 2/21/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 139,726,234 | - | - | - | (14) |
| 2/21/2002 | TRANS FROM 1FR01030 (1FR010) | 10,000,000 | - | - | 10,000,000 | - | 149,726,234 | - | - | - | - |
| 2/22/2002 | W/H TAX DIV C | (5,120) | - | (5,120) | - | - | 149,721,114 | - | - | - | (5,120) |
| 3/1/2002 | W/H TAX DIV WFC | (2,778) | - | (2,778) | - | - | 149,718,336 | - | - | - | (2,778) |
| 3/1/2002 | W/H TAX DIV INTC | (864) | - | (864) | - | - | 149,717,472 | - | - | - | (864) |
| 3/6/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 149,717,471 | - | - | - | (1) |
| 3/7/2002 | W/H TAX DIV PFE | (5,131) | - | (5,131) | - | - | 149,712,340 | - | - | - | (5,131) |
| 3/8/2002 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 155,712,340 | - | - | - | - |
| 3/11/2002 | W/H TAX DIV BUD | (1,104) | - | (1,104) | - | - | 155,711,236 | - | - | - | (1,104) |
| 3/11/2002 | W/H TAX DIV XOM | (9,926) | - | (9,926) | - | - | 155,701,309 | - | - | - | (9,926) |
| 3/11/2002 | W/H TAX DIV IBM | (1,496) | - | (1,496) | - | - | 155,699,813 | - | - | - | (1,496) |
| 3/12/2002 | W/H TAX DIV JNJ | (2,144) | - | (2,144) | - | - | 155,697,669 | - | - | - | (2,144) |
| 3/14/2002 | W/H TAX DIV DD | (2,244) | - | (2,244) | - | - | 155,695,425 | - | - | - | (2,244) |
| 3/15/2002 | W/H TAX DIV AIG | (442) | - | (442) | - | - | 155,694,984 | - | - | - | (442) |
| 3/22/2002 | W/H TAX DIV BAC | (3,855) | - | (3,855) | - | - | 155,691,129 | - | - | - | (3,855) |
| 3/28/2002 | W/H TAX DIV HD | (1,081) | - | (1,081) | - | - | 155,690,048 | - | - | - | (1,081) |
| 4/1/2002 | W/H TAX DIV KO | (4,695) | - | (4,695) | - | - | 155,685,353 | - | - | - | (4,695) |
| 4/1/2002 | W/H TAX DIV ONE | (1,265) | - | (1,265) | - | - | 155,684,089 | - | - | - | (1,265) |
| 4/1/2002 | W/H TAX DIV MRK | (7,526) | - | (7,526) | - | - | 155,676,563 | - | - | - | (7,526) |
| 4/1/2002 | W/H TAX DIV PEP | (2,347) | - | (2,347) | - | - | 155,674,215 | - | - | - | (2,347) |
| 4/3/2002 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 165,674,215 | - | - | - | - |
| 4/10/2002 | W/H TAX DIV MO | (11,736) | - | (11,736) | - | - | 165,662,479 | - | - | - | (11,736) |
| 4/18/2002 | W/H TAX DIV WMT | (3,139) | - | (3,139) | - | - | 165,659,340 | - | - | - | (3,139) |
| 4/23/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 165,659,338 | - | - | - | (2) |
| 4/25/2002 | W/H TAX DIV GE | (7,337) | - | (7,337) | - | - | 165,652,000 | - | - | - | (7,337) |
| 4/26/2002 | W/H TAX DIV MWD | (2,366) | - | (2,366) | - | - | 165,649,634 | - | - | - | (2,366) |
| 4/26/2002 | W/H TAX DIV MDT | (652) | - | (652) | - | - | 165,648,982 | - | - | - | (652) |
| 4/30/2002 | W/H TAX DIV JPM | (6,330) | - | (6,330) | - | - | 165,642,653 | - | - | - | (6,330) |
| 5/1/2002 | W/H TAX DIV BMY | (5,115) | - | (5,115) | - | - | 165,637,537 | - | - | - | (5,115) |
| 5/1/2002 | W/H TAX DIV TYC | (237) | - | (237) | - | - | 165,637,300 | - | - | - | (237) |
| 5/1/2002 | W/H TAX DIV T | (1,244) | - | (1,244) | - | - | 165,636,056 | - | - | - | (1,244) |
| 5/1/2002 | W/H TAX DIV SBC | (8,555) | - | (8,555) | - | - | 165,627,501 | - | - | - | (8,555) |
| 5/1/2002 | W/H TAX DIV PHA | (1,639) | - | (1,639) | - | - | 165,625,862 | - | - | - | (1,639) |
| 5/1/2002 | W/H TAX DIV VZ | (9,883) | - | (9,883) | - | - | 165,615,979 | - | - | - | (9,883) |
| 5/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 165,615,975 | - | - | - | (4) |
| 5/15/2002 | W/H TAX DIV PG | (2,438) | - | (2,438) | - | - | 165,613,537 | - | - | - | (2,438) |
| 5/24/2002 | W/H TAX DIV C | (5,313) | - | (5,313) | - | - | 165,608,224 | - | - | - | (5,313) |
| 6/3/2002 | W/H TAX DIV INTC | (754) | - | (754) | - | - | 165,607,470 | - | - | - | (754) |
| 6/3/2002 | W/H TAX DIV WFC | (5,494) | - | (5,494) | - | - | 165,601,977 | - | - | - | (5,494) |
| 6/5/2002 | CHECK WIRE | 11,000,000 | 11,000,000 | - | - | - | 176,601,977 | - | - | - | - |
| 6/6/2002 | W/H TAX DIV PFE | (9,566) | - | (9,566) | - | - | 176,592,410 | - | - | - | (9,566) |
| 6/10/2002 | W/H TAX DIV XOM | (18,276) | - | (18,276) | - | - | 176,574,134 | - | - | - | (18,276) |
| 6/10/2002 | W/H TAX DIV BUD | (1,348) | - | (1,348) | - | - | 176,572,786 | - | - | - | (1,348) |
| 6/10/2002 | W/H TAX DIV IBM | (3,057) | - | (3,057) | - | - | 176,569,730 | - | - | - | (3,057) |
| 6/11/2002 | W/H TAX DIV JNJ | (2,624) | - | (2,624) | - | - | 176,567,106 | - | - | - | (2,624) |
| 6/12/2002 | W/H TAX DIV DD | (3,044) | - | (3,044) | - | - | 176,564,062 | - | - | - | (3,044) |
| 6/25/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 176,564,058 | - | - | - | (3) |
| 7/1/2002 | TRANS FROM 1FR01030 (1FR010) | 9,490,000 | - | - | 9,490,000 | - | 186,054,058 | - | - | - | - |
| 7/5/2002 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 192,054,058 | - | - | - | - |

MADC1135_00000022

BLMIS ACCOUNT NO. 1FR080 - KINGATE GLOBAL MARKET PORTFOLIO LIMITED

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Transfers | Column 12 Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/10/2002 | W/H TAX DIV MO | (2,351) | - | (2,351) | - | - | 192,051,707 | - | - | - | (2,351) |
| 7/15/2002 | W/H TAX DIV USB | (758) | - | (758) | - | - | 192,050,950 | - | - | - | (758) |
| 7/19/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 192,050,940 | - | - | - | (10) |
| 7/25/2002 | W/H TAX DIV GE | (3,618) | - | (3,618) | - | - | 192,047,322 | - | - | - | (3,618) |
| 7/26/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 192,047,321 | - | - | - | (2) |
| 7/26/2002 | W/H TAX DIV MWD | (505) | - | (505) | - | - | 192,046,816 | - | - | - | (505) |
| 7/26/2002 | W/H TAX DIV MDT | (148) | - | (148) | - | - | 192,046,668 | - | - | - | (148) |
| 7/31/2002 | W/H TAX DIV JPM | (1,378) | - | (1,378) | - | - | 192,045,290 | - | - | - | (1,378) |
| 8/1/2002 | W/H TAX DIV C | (2,081) | - | (2,081) | - | - | 192,043,209 | - | - | - | (2,081) |
| 8/1/2002 | W/H TAX DIV PHA | (342) | - | (342) | - | - | 192,042,867 | - | - | - | (342) |
| 8/1/2002 | W/H TAX DIV T | (285) | - | (285) | - | - | 192,042,582 | - | - | - | (285) |
| 8/1/2002 | W/H TAX DIV BMY | (1,088) | - | (1,088) | - | - | 192,041,494 | - | - | - | (1,088) |
| 8/1/2002 | W/H TAX DIV SBC | (1,779) | - | (1,779) | - | - | 192,039,715 | - | - | - | (1,779) |
| 8/9/2002 | W/H TAX DIV AXP | (203) | - | (203) | - | - | 192,039,513 | - | - | - | (203) |
| 8/19/2002 | W/H TAX DIV MON | (3) | - | (3) | - | - | 192,039,510 | - | - | - | (3) |
| 8/19/2002 | W/H TAX DIV TXN | (625) | - | (625) | - | - | 192,038,885 | - | - | - | (625) |
| 8/23/2002 | W/H TAX DIV C | (16,279) | - | (16,279) | - | - | 192,022,606 | - | - | - | (16,279) |
| 8/26/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 192,022,599 | - | - | - | (7) |
| 9/3/2002 | W/H TAX DIV WFC | (8,230) | - | (8,230) | - | - | 192,014,369 | - | - | - | (8,230) |
| 9/3/2002 | W/H TAX DIV INTC | (2,290) | - | (2,290) | - | - | 192,012,079 | - | - | - | (2,290) |
| 9/5/2002 | W/H TAX DIV PFE | (14,018) | - | (14,018) | - | - | 191,998,061 | - | - | - | (14,018) |
| 9/5/2002 | W/H TAX DIV G | (2,866) | - | (2,866) | - | - | 191,995,195 | - | - | - | (2,866) |
| 9/6/2002 | W/H TAX DIV BA | (2,407) | - | (2,407) | - | - | 191,992,787 | - | - | - | (2,407) |
| 9/9/2002 | CHECK WIRE | 10,500,000 | 10,500,000 | - | - | - | 202,492,787 | - | - | - | - |
| 9/9/2002 | W/H TAX DIV BUD | (2,866) | - | (2,866) | - | - | 202,489,921 | - | - | - | (2,866) |
| 9/10/2002 | W/H TAX DIV JNJ | (3,422) | - | (3,422) | - | - | 202,486,500 | - | - | - | (3,422) |
| 9/10/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 202,486,486 | - | - | - | (14) |
| 9/10/2002 | W/H TAX DIV XOM | (26,490) | - | (26,490) | - | - | 202,459,997 | - | - | - | (26,490) |
| 9/10/2002 | W/H TAX DIV IBM | (4,329) | - | (4,329) | - | - | 202,455,668 | - | - | - | (4,329) |
| 9/12/2002 | W/H TAX DIV DD | (5,850) | - | (5,850) | - | - | 202,449,818 | - | - | - | (5,850) |
| 10/1/2002 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 192,449,818 | - | - | - | (10,000,000) |
| 10/17/2002 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (45) | - | (45) | - | - | 192,449,773 | - | - | - | (45) |
| 11/15/2002 | W/H TAX DIV PG | (3,389) | - | (3,389) | - | - | 192,446,384 | - | - | - | (3,389) |
| 11/15/2002 | W/H TAX DIV CL | (977) | - | (977) | - | - | 192,445,407 | - | - | - | (977) |
| 11/18/2002 | W/H TAX DIV TXN | (347) | - | (347) | - | - | 192,445,061 | - | - | - | (347) |
| 11/22/2002 | W/H TAX DIV C | (8,642) | - | (8,642) | - | - | 192,436,418 | - | - | - | (8,642) |
| 11/25/2002 | W/H TAX DIV GS | (543) | - | (543) | - | - | 192,435,876 | - | - | - | (543) |
| 11/27/2002 | W/H TAX DIV MER | (1,353) | - | (1,353) | - | - | 192,434,523 | - | - | - | (1,353) |
| 1/6/2003 | W/H TAX DIV IBM | (2,448) | - | (2,448) | - | - | 192,432,075 | - | - | (2,448) | (2,448) |
| 1/6/2003 | W/H TAX DIV XOM | (14,970) | - | (14,970) | - | - | 192,417,105 | - | - | (14,970) | (14,970) |
| 1/6/2003 | W/H TAX DIV JNJ | (1,585) | - | (1,585) | - | - | 192,415,520 | - | - | (1,585) | (1,585) |
| 1/6/2003 | W/H TAX DIV DD | (2,403) | - | (2,403) | - | - | 192,413,117 | - | - | (2,403) | (2,403) |
| 1/6/2003 | W/H TAX DIV INTC | (1,291) | - | (1,291) | - | - | 192,411,825 | - | - | (1,291) | (1,291) |
| 1/6/2003 | W/H TAX DIV WFC | (4,637) | - | (4,637) | - | - | 192,407,189 | - | - | (4,637) | (4,637) |
| 1/6/2003 | W/H TAX DIV PFE | (5,510) | - | (5,510) | - | - | 192,401,679 | - | - | (5,510) | (5,510) |
| 1/6/2003 | W/H TAX DIV BA | (983) | - | (983) | - | - | 192,400,696 | - | - | (983) | (983) |
| 1/6/2003 | W/H TAX DIV BUD | (1,642) | - | (1,642) | - | - | 192,399,054 | - | - | (1,642) | (1,642) |
| 1/6/2003 | W/H TAX DIV UTX | (787) | - | (787) | - | - | 192,398,268 | - | - | (787) | (787) |
| 1/6/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 192,398,252 | - | - | (16) | (16) |
| 1/6/2003 | W/H TAX DIV HCA | (109) | - | (109) | - | - | 192,398,144 | - | - | (109) | (109) |
| 1/6/2003 | W/H TAX DIV C | (1,662) | - | (1,662) | - | - | 192,396,482 | - | - | (1,662) | (1,662) |
| 1/10/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 192,396,478 | - | - | (4) | (4) |
| 1/31/2003 | W/H TAX DIV MWD | (2,104) | - | (2,104) | - | - | 192,394,374 | - | - | (2,104) | (2,104) |
| 2/3/2003 | W/H TAX DIV SBC | (7,616) | - | (7,616) | - | - | 192,386,758 | - | - | (7,616) | (7,616) |
| 2/3/2003 | W/H TAX DIV VZ | (8,952) | - | (8,952) | - | - | 192,377,806 | - | - | (8,952) | (8,952) |
| 2/3/2003 | W/H TAX DIV PHA | (2,630) | - | (2,630) | - | - | 192,375,175 | - | - | (2,630) | (2,630) |
| 2/10/2003 | W/H TAX DIV TXN | (554) | - | (554) | - | - | 192,374,622 | - | - | (554) | (554) |
| 2/14/2003 | W/H TAX DIV CL | (1,503) | - | (1,503) | - | - | 192,373,119 | - | - | (1,503) | (1,503) |
| 2/14/2003 | W/H TAX DIV PFE | (13,973) | - | (13,973) | - | - | 192,359,146 | - | - | (13,973) | (13,973) |
| 2/14/2003 | W/H TAX DIV PG | (7,988) | - | (7,988) | - | - | 192,351,157 | - | - | (7,988) | (7,988) |
| 2/27/2003 | W/H TAX DIV GS | (835) | - | (835) | - | - | 192,350,322 | - | - | (835) | (835) |
| 2/28/2003 | W/H TAX DIV C | (15,664) | - | (15,664) | - | - | 192,334,659 | - | - | (15,664) | (15,664) |
| 2/28/2003 | W/H TAX DIV MER | (2,065) | - | (2,065) | - | - | 192,332,593 | - | - | (2,065) | (2,065) |
| 3/3/2003 | W/H TAX DIV INTC | (2,017) | - | (2,017) | - | - | 192,330,577 | - | - | (2,017) | (2,017) |
| 3/3/2003 | W/H TAX DIV WFC | (7,718) | - | (7,718) | - | - | 192,322,859 | - | - | (7,718) | (7,718) |
| 3/4/2003 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 197,322,859 | - | - | - | - |
| 3/5/2003 | W/H HX/05C | (2,597) | - | (2,597) | - | - | 197,320,262 | - | - | (2,597) | (2,597) |
| 3/7/2003 | W/H TAX DIV BA | (2,129) | - | (2,129) | - | - | 197,318,133 | - | - | (2,129) | (2,129) |
| 3/7/2003 | W/H TAX DIV MSFT | (10,158) | - | (10,158) | - | - | 197,307,975 | - | - | (10,158) | (10,158) |
| 3/10/2003 | W/H TAX DIV UTX | (1,705) | - | (1,705) | - | - | 197,306,270 | - | - | (1,705) | (1,705) |
| 3/10/2003 | W/H TAX DIV BUD | (2,442) | - | (2,442) | - | - | 197,303,828 | - | - | (2,442) | (2,442) |

MADC1135_00000023

BLMIS ACCOUNT NO. 1FR080 (...MARKET PORTFOLIO LIMITED

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 3/10/2003 | W/H TAX DIV XOM | (23,434) | - | (23,434) | - | - | 197,280,393 | - | - | (23,434) | (23,434) |
| 3/10/2003 | W/H TAX DIV IBM | (3,815) | - | (3,815) | - | - | 197,276,579 | - | - | (3,815) | (3,815) |
| 3/11/2003 | W/H TAX DIV JNJ | (9,189) | - | (9,189) | - | - | 197,267,389 | - | - | (9,189) | (9,189) |
| 3/12/2003 | W/H TAX DIV MMM | (2,866) | - | (2,866) | - | - | 197,264,523 | - | - | (2,866) | (2,866) |
| 3/14/2003 | W/H TAX DIV DD | (5,358) | - | (5,358) | - | - | 197,259,165 | - | - | (5,358) | (5,358) |
| 3/17/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (44) | - | (44) | - | - | 197,259,121 | - | - | (44) | (44) |
| 4/7/2003 | W/H TAX DIV WMT | (6,905) | - | (6,905) | - | - | 197,252,216 | - | - | (6,905) | (6,905) |
| 4/9/2003 | W/H TAX DIV HPQ | (4,354) | - | (4,354) | - | - | 197,247,863 | - | - | (4,354) | (4,354) |
| 4/15/2003 | W/H TAX DIV XOM | (40) | - | (40) | - | - | 197,247,822 | - | - | (40) | (40) |
| 5/9/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 197,247,819 | - | - | (3) | (3) |
| 5/19/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 197,247,815 | - | - | (4) | (4) |
| 5/28/2003 | W/H TAX DIV MER | (1,700) | - | (1,700) | - | - | 197,246,114 | - | - | (1,700) | (1,700) |
| 5/30/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 197,246,114 | - | - | (1) | (1) |
| 6/2/2003 | W/H TAX DIV WFC | (6,376) | - | (6,376) | - | - | 197,239,737 | - | - | (6,376) | (6,376) |
| 6/2/2003 | W/H TAX DIV INTC | (920) | - | (920) | - | - | 197,238,817 | - | - | (920) | (920) |
| 6/5/2003 | W/H TAX DIV PFE | (15,267) | - | (15,267) | - | - | 197,223,551 | - | - | (15,267) | (15,267) |
| 6/9/2003 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 207,223,551 | - | - | - | - |
| 6/9/2003 | W/H TAX DIV BUD | (2,072) | - | (2,072) | - | - | 207,221,478 | - | - | (2,072) | (2,072) |
| 6/10/2003 | W/H TAX DIV XOM | (21,390) | - | (21,390) | - | - | 207,200,089 | - | - | (21,390) | (21,390) |
| 6/10/2003 | W/H TAX DIV JNJ | (9,069) | - | (9,069) | - | - | 207,191,020 | - | - | (9,069) | (9,069) |
| 6/10/2003 | W/H TAX DIV UTX | (1,594) | - | (1,594) | - | - | 207,189,426 | - | - | (1,594) | (1,594) |
| 6/10/2003 | W/H TAX DIV IBM | (3,401) | - | (3,401) | - | - | 207,186,025 | - | - | (3,401) | (3,401) |
| 6/12/2003 | W/H TAX DIV DD | (4,546) | - | (4,546) | - | - | 207,181,479 | - | - | (4,546) | (4,546) |
| 6/12/2003 | W/H TAX DIV MMM | (3,117) | - | (3,117) | - | - | 207,178,362 | - | - | (3,117) | (3,117) |
| 6/20/2003 | W/H TAX DIV AIG | (1,914) | - | (1,914) | - | - | 207,176,448 | - | - | (1,914) | (1,914) |
| 6/25/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 207,176,443 | - | - | (5) | (5) |
| 6/26/2003 | W/H TAX DIV HD | (2,186) | - | (2,186) | - | - | 207,174,257 | - | - | (2,186) | (2,186) |
| 6/27/2003 | W/H TAX DIV BAC | (14,936) | - | (14,936) | - | - | 207,159,321 | - | - | (14,936) | (14,936) |
| 6/30/2003 | W/H TAX DIV PEP | (4,320) | - | (4,320) | - | - | 207,155,002 | - | - | (4,320) | (4,320) |
| 7/1/2003 | W/H TAX DIV ALL | (2,173) | - | (2,173) | - | - | 207,152,829 | - | - | (2,173) | (2,173) |
| 7/1/2003 | W/H TAX DIV KO | (8,589) | - | (8,589) | - | - | 207,144,240 | - | - | (8,589) | (8,589) |
| 7/1/2003 | W/H TAX DIV ONE | (3,870) | - | (3,870) | - | - | 207,140,369 | - | - | (3,870) | (3,870) |
| 7/1/2003 | W/H TAX DIV MRK | (12,513) | - | (12,513) | - | - | 207,127,856 | - | - | (12,513) | (12,513) |
| 7/3/2003 | W/H TAX DIV SLB | (1,328) | - | (1,328) | - | - | 207,126,528 | - | - | (1,328) | (1,328) |
| 7/7/2003 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 219,126,528 | - | - | - | - |
| 7/7/2003 | W/H TAX DIV WMT | (2,896) | - | (2,896) | - | - | 219,123,632 | - | - | (2,896) | (2,896) |
| 7/8/2003 | W/H TAX DIV MO | (20,722) | - | (20,722) | - | - | 219,102,910 | - | - | (20,722) | (20,722) |
| 7/9/2003 | W/H TAX DIV HPQ | (3,828) | - | (3,828) | - | - | 219,099,081 | - | - | (3,828) | (3,828) |
| 7/10/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 219,099,078 | - | - | (3) | (3) |
| 7/21/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 219,099,077 | - | - | (1) | (1) |
| 7/31/2003 | W/H TAX DIV MWD | (3,845) | - | (3,845) | - | - | 219,095,232 | - | - | (3,845) | (3,845) |
| 8/1/2003 | W/H TAX DIV VZ | (16,091) | - | (16,091) | - | - | 219,079,141 | - | - | (16,091) | (16,091) |
| 8/1/2003 | W/H TAX DIV SBC | (19,184) | - | (19,184) | - | - | 219,059,956 | - | - | (19,184) | (19,184) |
| 8/15/2003 | W/H TAX DIV CL | (2,006) | - | (2,006) | - | - | 219,057,950 | - | - | (2,006) | (2,006) |
| 8/15/2003 | W/H TAX DIV PG | (8,875) | - | (8,875) | - | - | 219,049,075 | - | - | (8,875) | (8,875) |
| 8/18/2003 | W/H TAX DIV TXN | (554) | - | (554) | - | - | 219,048,522 | - | - | (554) | (554) |
| 8/22/2003 | W/H TAX DIV C | (27,467) | - | (27,467) | - | - | 219,021,055 | - | - | (27,467) | (27,467) |
| 8/27/2003 | W/H TAX DIV MER | (2,229) | - | (2,229) | - | - | 219,018,825 | - | - | (2,229) | (2,229) |
| 8/28/2003 | W/H TAX DIV GS | (1,742) | - | (1,742) | - | - | 219,017,084 | - | - | (1,742) | (1,742) |
| 9/2/2003 | W/H TAX DIV WFC | (11,285) | - | (11,285) | - | - | 219,005,799 | - | - | (11,285) | (11,285) |
| 9/2/2003 | W/H TAX DIV INTC | (1,986) | - | (1,986) | - | - | 219,003,813 | - | - | (1,986) | (1,986) |
| 9/4/2003 | CHECK WIRE | 18,000,000 | 18,000,000 | - | - | - | 237,003,813 | - | - | - | - |
| 9/4/2003 | W/H TAX DIV PFE | (11,073) | - | (11,073) | - | - | 236,992,739 | - | - | (11,073) | (11,073) |
| 9/5/2003 | W/H TAX DIV G | (2,490) | - | (2,490) | - | - | 236,990,249 | - | - | (2,490) | (2,490) |
| 9/5/2003 | W/H TAX DIV BA | (1,322) | - | (1,322) | - | - | 236,988,927 | - | - | (1,322) | (1,322) |
| 9/5/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (15) | - | (15) | - | - | 236,988,912 | - | - | (15) | (15) |
| 9/9/2003 | W/H TAX DIV BUD | (2,759) | - | (2,759) | - | - | 236,986,153 | - | - | (2,759) | (2,759) |
| 9/10/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 236,986,153 | - | - | (0) | (0) |
| 9/10/2003 | W/H TAX DIV XOM | (25,341) | - | (25,341) | - | - | 236,960,812 | - | - | (25,341) | (25,341) |
| 9/10/2003 | W/H TAX DIV IBM | (4,235) | - | (4,235) | - | - | 236,956,577 | - | - | (4,235) | (4,235) |
| 9/12/2003 | W/H TAX DIV DD | (3,326) | - | (3,326) | - | - | 236,953,251 | - | - | (3,326) | (3,326) |
| 9/19/2003 | W/H TAX DIV AIG | (911) | - | (911) | - | - | 236,952,340 | - | - | (911) | (911) |
| 9/23/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 236,952,333 | - | - | (7) | (7) |
| 9/26/2003 | W/H TAX DIV BAC | (6,573) | - | (6,573) | - | - | 236,945,760 | - | - | (6,573) | (6,573) |
| 9/30/2003 | W/H TAX DIV PEP | (3,559) | - | (3,559) | - | - | 236,942,202 | - | - | (3,559) | (3,559) |
| 10/1/2003 | W/H TAX DIV KO | (7,060) | - | (7,060) | - | - | 236,935,142 | - | - | (7,060) | (7,060) |
| 10/1/2003 | W/H TAX DIV ONE | (3,804) | - | (3,804) | - | - | 236,931,337 | - | - | (3,804) | (3,804) |
| 10/1/2003 | W/H TAX DIV MRK | (4,471) | - | (4,471) | - | - | 236,926,867 | - | - | (4,471) | (4,471) |
| 10/1/2003 | W/H TAX DIV VIA.B | (985) | - | (985) | - | - | 236,925,882 | - | - | (985) | (985) |
| 10/2/2003 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 243,925,882 | - | - | - | - |
| 10/8/2003 | W/H TAX DIV HPQ | (3,184) | - | (3,184) | - | - | 243,922,698 | - | - | (3,184) | (3,184) |

MADC1135_00000024

BLMIS ACCOUNT NO. 1FR080 - MARKET PORTFOLIO LIMITED

Exhibit B

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Transfers | Column 12 Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/9/2003 | W/H TAX DIV MO | (18,308) | - | (18,308) | - | - | 243,904,390 | - | - | (18,308) | (18,308) |
| 10/14/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 243,904,380 | - | - | (9) | (9) |
| 10/31/2003 | W/H TAX DIV MWD | (2,961) | - | (2,961) | - | - | 243,901,420 | - | - | (2,961) | (2,961) |
| 11/3/2003 | W/H TAX DIV VZ | (12,804) | - | (12,804) | - | - | 243,888,616 | - | - | (12,804) | (12,804) |
| 11/3/2003 | W/H TAX DIV SBC | (11,213) | - | (11,213) | - | - | 243,877,402 | - | - | (11,213) | (11,213) |
| 11/3/2003 | W/H TAX DIV SBC | (3,969) | - | (3,969) | - | - | 243,873,433 | - | - | (3,969) | (3,969) |
| 11/5/2003 | CHECK WIRE | 8,000,000 | 8,000,000 | - | - | - | 251,873,433 | - | - | | |
| 11/7/2003 | W/H TAX DIV MSFT | (32,151) | - | (32,151) | - | - | 251,841,282 | - | - | (32,151) | (32,151) |
| 11/14/2003 | W/H TAX DIV PG | (10,826) | - | (10,826) | - | - | 251,830,456 | - | - | (10,826) | (10,826) |
| 11/17/2003 | W/H TAX DIV TXN | (693) | - | (693) | - | - | 251,829,762 | - | - | (693) | (693) |
| 11/24/2003 | W/H TAX DIV OS | (2,076) | - | (2,076) | - | - | 251,827,686 | - | - | (2,076) | (2,076) |
| 11/25/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 251,827,669 | - | - | (17) | (17) |
| 11/26/2003 | W/H TAX DIV C | (33,529) | - | (33,529) | - | - | 251,794,140 | - | - | (33,529) | (33,529) |
| 11/26/2003 | W/H TAX DIV MER | (2,829) | - | (2,829) | - | - | 251,791,312 | - | - | (2,829) | (2,829) |
| 12/1/2003 | W/H TAX DIV MCD | (9,300) | - | (9,300) | - | - | 251,782,011 | - | - | (9,300) | (9,300) |
| 12/1/2003 | W/H TAX DIV WFC | (14,200) | - | (14,200) | - | - | 251,767,811 | - | - | (14,200) | (14,200) |
| 12/1/2003 | W/H TAX DIV INTC | (2,466) | - | (2,466) | - | - | 251,765,345 | - | - | (2,466) | (2,466) |
| 12/2/2003 | CHECK WIRE | 8,000,000 | 8,000,000 | - | - | - | 259,765,345 | - | - | | |
| 12/4/2003 | W/H TAX DIV PFE | (21,594) | - | (21,594) | - | - | 259,743,751 | - | - | (21,594) | (21,594) |
| 12/5/2003 | W/H TAX DIV G | (2,969) | - | (2,969) | - | - | 259,740,782 | - | - | (2,969) | (2,969) |
| 12/9/2003 | W/H TAX DIV JNJ | (13,154) | - | (13,154) | - | - | 259,727,629 | - | - | (13,154) | (13,154) |
| 12/9/2003 | W/H TAX DIV BUD | (3,288) | - | (3,288) | - | - | 259,724,340 | - | - | (3,288) | (3,288) |
| 12/10/2003 | W/H TAX DIV XOM | (30,860) | - | (30,860) | - | - | 259,693,480 | - | - | (30,860) | (30,860) |
| 12/10/2003 | W/H TAX DIV IBM | (5,049) | - | (5,049) | - | - | 259,688,431 | - | - | (5,049) | (5,049) |
| 12/10/2003 | W/H TAX DIV UTX | (2,906) | - | (2,906) | - | - | 259,685,525 | - | - | (2,906) | (2,906) |
| 12/12/2003 | W/H TAX DIV MMM | (2,621) | - | (2,621) | - | - | 259,682,904 | - | - | (2,621) | (2,621) |
| 12/15/2003 | W/H TAX DIV DD | (6,394) | - | (6,394) | - | - | 259,676,510 | - | - | (6,394) | (6,394) |
| 12/16/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 259,676,505 | - | - | (5) | (5) |
| 12/31/2003 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 259,676,504 | - | - | (1) | (1) |
| 1/2/2004 | W/H TAX DIV ONE | (1,108) | - | (1,108) | - | - | 259,675,396 | - | - | (1,108) | (1,108) |
| 1/2/2004 | W/H TAX DIV PEP | (1,123) | - | (1,123) | - | - | 259,674,274 | - | - | (1,123) | (1,123) |
| 1/5/2004 | W/H TAX DIV WMT | (1,595) | - | (1,595) | - | - | 259,672,678 | - | - | (1,595) | (1,595) |
| 1/6/2004 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 274,672,678 | - | - | | |
| 1/6/2004 | W/H TAX DIV DIS | (1,784) | - | (1,784) | - | - | 274,670,894 | - | - | (1,784) | (1,784) |
| 1/7/2004 | W/H TAX DIV HPQ | (1,005) | - | (1,005) | - | - | 274,669,890 | - | - | (1,005) | (1,005) |
| 1/8/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 274,669,889 | - | - | (1) | (1) |
| 1/9/2004 | W/H TAX DIV MO | (5,776) | - | (5,776) | - | - | 274,664,113 | - | - | (5,776) | (5,776) |
| 1/15/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 274,664,112 | - | - | (1) | (1) |
| 1/30/2004 | W/H TAX DIV MWD | (1,879) | - | (1,879) | - | - | 274,662,233 | - | - | (1,879) | (1,879) |
| 2/2/2004 | W/H TAX DIV VZ | (7,476) | - | (7,476) | - | - | 274,654,757 | - | - | (7,476) | (7,476) |
| 2/2/2004 | W/H TAX DIV SBC | (7,243) | - | (7,243) | - | - | 274,647,514 | - | - | (7,243) | (7,243) |
| 2/17/2004 | W/H TAX DIV PG | (11,898) | - | (11,898) | - | - | 274,635,616 | - | - | (11,898) | (11,898) |
| 2/26/2004 | W/H TAX DIV OS | (2,179) | - | (2,179) | - | - | 274,633,437 | - | - | (2,179) | (2,179) |
| 2/27/2004 | W/H TAX DIV MER | (3,068) | - | (3,068) | - | - | 274,630,369 | - | - | (3,068) | (3,068) |
| 2/27/2004 | W/H TAX DIV C | (40,445) | - | (40,445) | - | - | 274,589,924 | - | - | (40,445) | (40,445) |
| 3/1/2004 | W/H TAX DIV WFC | (14,905) | - | (14,905) | - | - | 274,575,019 | - | - | (14,905) | (14,905) |
| 3/1/2004 | W/H TAX DIV INTC | (5,070) | - | (5,070) | - | - | 274,569,949 | - | - | (5,070) | (5,070) |
| 3/4/2004 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 294,569,949 | - | - | | |
| 3/5/2004 | W/H TAX DIV G | (3,116) | - | (3,116) | - | - | 294,566,833 | - | - | (3,116) | (3,116) |
| 3/5/2004 | W/H TAX DIV PFE | (25,279) | - | (25,279) | - | - | 294,541,554 | - | - | (25,279) | (25,279) |
| 3/5/2004 | W/H TAX DIV IIA | (2,667) | - | (2,667) | - | - | 294,538,887 | - | - | (2,667) | (2,667) |
| 3/9/2004 | W/H TAX DIV JNJ | (13,951) | - | (13,951) | - | - | 294,524,936 | - | - | (13,951) | (13,951) |
| 3/9/2004 | W/H TAX DIV BUD | (3,452) | - | (3,452) | - | - | 294,521,484 | - | - | (3,452) | (3,452) |
| 3/10/2004 | W/H TAX DIV UTX | (1,922) | - | (1,922) | - | - | 294,519,562 | - | - | (1,922) | (1,922) |
| 3/10/2004 | W/H TAX DIV IBM | (5,300) | - | (5,300) | - | - | 294,514,263 | - | - | (5,300) | (5,300) |
| 3/10/2004 | W/H TAX DIV XOM | (32,380) | - | (32,380) | - | - | 294,481,883 | - | - | (32,380) | (32,380) |
| 3/12/2004 | W/H TAX DIV MMM | (3,558) | - | (3,558) | - | - | 294,478,324 | - | - | (3,558) | (3,558) |
| 3/15/2004 | W/H TAX DIV DD | (6,712) | - | (6,712) | - | - | 294,471,612 | - | - | (6,712) | (6,712) |
| 3/22/2004 | CHECK WIRE | (13,000,000) | - | (13,000,000) | - | - | 281,471,612 | - | - | (13,000,000) | (13,000,000) |
| 4/6/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (60) | - | (60) | - | - | 281,471,552 | - | - | (60) | (60) |
| 4/8/2004 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 281,471,552 | - | - | (0) | (0) |
| 4/30/2004 | W/H TAX DIV MWD | (4,295) | - | (4,295) | - | - | 281,467,257 | - | - | (4,295) | (4,295) |
| 4/30/2004 | W/H TAX DIV JPM | (3,298) | - | (3,298) | - | - | 281,463,959 | - | - | (3,298) | (3,298) |
| 5/3/2004 | W/H TAX DIV VZ | (16,535) | - | (16,535) | - | - | 281,447,424 | - | - | (16,535) | (16,535) |
| 5/3/2004 | W/H TAX DIV SBC | (16,269) | - | (16,269) | - | - | 281,431,155 | - | - | (16,269) | (16,269) |
| 5/7/2004 | CHECK WIRE | 8,000,000 | 8,000,000 | - | - | - | 289,431,155 | - | - | | |
| 5/14/2004 | W/H TAX DIV PG | (12,646) | - | (12,646) | - | - | 289,418,509 | - | - | (12,646) | (12,646) |
| 5/17/2004 | W/H TAX DIV TXN | (737) | - | (737) | - | - | 289,417,772 | - | - | (737) | (737) |
| 5/26/2004 | W/H TAX DIV MER | (3,180) | - | (3,180) | - | - | 289,414,592 | - | - | (3,180) | (3,180) |
| 5/27/2004 | W/H TAX DIV GS | (2,258) | - | (2,258) | - | - | 289,412,334 | - | - | (2,258) | (2,258) |
| 5/28/2004 | W/H TAX DIV C | (41,190) | - | (41,190) | - | - | 289,371,143 | - | - | (41,190) | (41,190) |

MADC1135_00000025

Exhibit B

BLMIS ACCOUNT NO. 1FR080 - KINGATE GLOBAL MARKET PORTFOLIO LIMITED

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Transfers | Column 12 Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/1/2004 | W/H TAX DIV INTC | (5,146) | - | (5,146) | - | - | 289,365,998 | - | - | (5,146) | (5,146) |
| 6/1/2004 | W/H TAX DIV WFC | (15,446) | - | (15,446) | - | - | 289,350,551 | - | - | (15,446) | (15,446) |
| 6/4/2004 | W/H TAX DIV G | (3,229) | - | (3,229) | - | - | 289,347,322 | - | - | (3,229) | (3,229) |
| 6/4/2004 | W/H TAX DIV PFE | (25,727) | - | (25,727) | - | - | 289,321,595 | - | - | (25,727) | (25,727) |
| 6/7/2004 | W/H TAX DIV WMT | (7,585) | - | (7,585) | - | - | 289,314,010 | - | - | (7,585) | (7,585) |
| 6/7/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 289,314,000 | - | - | (10) | (10) |
| 6/8/2004 | W/H TAX DIV JNJ | (16,871) | - | (16,871) | - | - | 289,297,129 | - | - | (16,871) | (16,871) |
| 6/9/2004 | W/H TAX DIV BUD | (3,577) | - | (3,577) | - | - | 289,293,552 | - | - | (3,577) | (3,577) |
| 6/10/2004 | W/H TAX DIV UTX | (2,580) | - | (2,580) | - | - | 289,290,972 | - | - | (2,580) | (2,580) |
| 6/10/2004 | W/H TAX DIV XOM | (35,120) | - | (35,120) | - | - | 289,255,852 | - | - | (35,120) | (35,120) |
| 6/10/2004 | W/H TAX DIV IBM | (6,179) | - | (6,179) | - | - | 289,249,674 | - | - | (6,179) | (6,179) |
| 6/11/2004 | W/H TAX DIV BA | (2,211) | - | (2,211) | - | - | 289,247,462 | - | - | (2,211) | (2,211) |
| 6/14/2004 | W/H TAX DIV DD | (6,955) | - | (6,955) | - | - | 289,240,507 | - | - | (6,955) | (6,955) |
| 6/14/2004 | W/H TAX DIV MMM | (3,980) | - | (3,980) | - | - | 289,236,527 | - | - | (3,980) | (3,980) |
| 6/18/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 289,236,526 | - | - | (1) | (1) |
| 6/24/2004 | CHECK WIRE | 8,000,000 | 8,000,000 | - | - | - | 297,236,526 | - | - | - | - |
| 6/24/2004 | W/H TAX DIV HD | (4,044) | - | (4,044) | - | - | 297,232,481 | - | - | (4,044) | (4,044) |
| 6/30/2004 | W/H TAX DIV PEP | (8,317) | - | (8,317) | - | - | 297,224,164 | - | - | (8,317) | (8,317) |
| 7/1/2004 | W/H TAX DIV KO | (12,847) | - | (12,847) | - | - | 297,211,318 | - | - | (12,847) | (12,847) |
| 7/7/2004 | W/H TAX DIV HPQ | (5,177) | - | (5,177) | - | - | 297,206,141 | - | - | (5,177) | (5,177) |
| 7/9/2004 | W/H TAX DIV MO | (29,313) | - | (29,313) | - | - | 297,176,828 | - | - | (29,313) | (29,313) |
| 7/12/2004 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 312,176,828 | - | - | - | - |
| 7/26/2004 | W/H TAX DIV GE | (4,752) | - | (4,752) | - | - | 312,172,076 | - | - | (4,752) | (4,752) |
| 8/5/2004 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 332,172,076 | - | - | - | - |
| 8/18/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (74) | - | (74) | - | - | 332,172,002 | - | - | (74) | (74) |
| 8/23/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 332,172,002 | - | - | (1) | (1) |
| 9/7/2004 | W/H TAX DIV WMT | (10,375) | - | (10,375) | - | - | 332,161,627 | - | - | (10,375) | (10,375) |
| 9/10/2004 | W/H TAX DIV UTX | (3,491) | - | (3,491) | - | - | 332,158,136 | - | - | (3,491) | (3,491) |
| 9/13/2004 | W/H TAX DIV MMM | (5,387) | - | (5,387) | - | - | 332,152,749 | - | - | (5,387) | (5,387) |
| 9/14/2004 | W/H TAX DIV MSFT | (21,762) | - | (21,762) | - | - | 332,130,987 | - | - | (21,762) | (21,762) |
| 9/16/2004 | W/H TAX DIV HD | (4,839) | - | (4,839) | - | - | 332,126,148 | - | - | (4,839) | (4,839) |
| 9/17/2004 | W/H TAX DIV AIG | (4,953) | - | (4,953) | - | - | 332,121,195 | - | - | (4,953) | (4,953) |
| 9/24/2004 | W/H TAX DIV BAC | (47,140) | - | (47,140) | - | - | 332,074,054 | - | - | (47,140) | (47,140) |
| 9/30/2004 | W/H TAX DIV PEP | (9,952) | - | (9,952) | - | - | 332,064,103 | - | - | (9,952) | (9,952) |
| 10/1/2004 | W/H TAX DIV KO | (15,372) | - | (15,372) | - | - | 332,048,731 | - | - | (15,372) | (15,372) |
| 10/1/2004 | W/H TAX DIV VIA.B | (2,671) | - | (2,671) | - | - | 332,046,060 | - | - | (2,671) | (2,671) |
| 10/1/2004 | W/H TAX DIV MRK | (21,634) | - | (21,634) | - | - | 332,024,425 | - | - | (21,634) | (21,634) |
| 10/4/2004 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 342,024,425 | - | - | - | - |
| 10/6/2004 | W/H TAX DIV HPQ | (6,194) | - | (6,194) | - | - | 342,018,231 | - | - | (6,194) | (6,194) |
| 10/12/2004 | W/H TAX DIV MO | (38,236) | - | (38,236) | - | - | 341,979,995 | - | - | (38,236) | (38,236) |
| 11/2/2004 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 346,979,995 | - | - | - | - |
| 11/3/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (85) | - | (85) | - | - | 346,979,910 | - | - | (85) | (85) |
| 11/4/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 346,979,910 | - | - | (0) | (0) |
| 11/9/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 346,979,909 | - | - | (1) | (1) |
| 11/24/2004 | W/H TAX DIV MER | (1,996) | - | (1,996) | - | - | 346,977,913 | - | - | (1,996) | (1,996) |
| 12/1/2004 | W/H TAX DIV INTC | (5,285) | - | (5,285) | - | - | 346,974,628 | - | - | (5,285) | (5,285) |
| 12/1/2004 | W/H TAX DIV WFC | (10,342) | - | (10,342) | - | - | 346,964,286 | - | - | (10,342) | (10,342) |
| 12/3/2004 | W/H TAX DIV BA | (3,336) | - | (3,336) | - | - | 346,960,950 | - | - | (3,336) | (3,336) |
| 12/3/2004 | W/H TAX DIV PFE | (26,608) | - | (26,608) | - | - | 346,934,342 | - | - | (26,608) | (26,608) |
| 12/7/2004 | W/H TAX DIV JNJ | (6,711) | - | (6,711) | - | - | 346,927,631 | - | - | (6,711) | (6,711) |
| 12/10/2004 | W/H TAX DIV IBM | (6,339) | - | (6,339) | - | - | 346,921,292 | - | - | (6,339) | (6,339) |
| 12/10/2004 | W/H TAX DIV XOM | (36,531) | - | (36,531) | - | - | 346,884,762 | - | - | (36,531) | (36,531) |
| 12/13/2004 | W/H TAX DIV DD | (57) | - | (57) | - | - | 346,884,704 | - | - | (57) | (57) |
| 12/14/2004 | W/H TAX DIV DD | (7,136) | - | (7,136) | - | - | 346,877,569 | - | - | (7,136) | (7,136) |
| 12/16/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 346,877,568 | - | - | (1) | (1) |
| 12/31/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 346,877,559 | - | - | (9) | (9) |
| 1/3/2005 | W/H TAX DIV WMT | (3,609) | - | (3,609) | - | - | 346,873,949 | - | - | (3,609) | (3,609) |
| 1/5/2005 | CHECK WIRE | 25,000,000 | 25,000,000 | - | - | - | 371,873,949 | - | - | - | - |
| 2/14/2005 | W/H TAX DIV TXN | (1,163) | - | (1,163) | - | - | 371,872,787 | - | - | (1,163) | (1,163) |
| 2/24/2005 | W/H TAX DIV OS | (485) | - | (485) | - | - | 371,872,302 | - | - | (485) | (485) |
| 2/25/2005 | W/H TAX DIV C | (61,381) | - | (61,381) | - | - | 371,810,922 | - | - | (61,381) | (61,381) |
| 2/28/2005 | W/H TAX DIV MER | (3,916) | - | (3,916) | - | - | 371,807,006 | - | - | (3,916) | (3,916) |
| 3/1/2005 | W/H TAX DIV INTC | (13,656) | - | (13,656) | - | - | 371,793,350 | - | - | (13,656) | (13,656) |
| 3/1/2005 | W/H TAX DIV WFC | (22,320) | - | (22,320) | - | - | 371,771,029 | - | - | (22,320) | (22,320) |
| 3/4/2005 | W/H TAX DIV G | (4,375) | - | (4,375) | - | - | 371,766,655 | - | - | (4,375) | (4,375) |
| 3/4/2005 | W/H TAX DIV BA | (5,507) | - | (5,507) | - | - | 371,761,148 | - | - | (5,507) | (5,507) |
| 3/7/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (81) | - | (81) | - | - | 371,761,066 | - | - | (81) | (81) |
| 3/8/2005 | W/H TAX DIV PFE | (38,596) | - | (38,596) | - | - | 371,722,471 | - | - | (38,596) | (38,596) |
| 3/8/2005 | W/H TAX DIV JNJ | (22,843) | - | (22,843) | - | - | 371,699,628 | - | - | (22,843) | (22,843) |
| 3/9/2005 | W/H TAX DIV BUD | (5,397) | - | (5,397) | - | - | 371,694,232 | - | - | (5,397) | (5,397) |
| 3/10/2005 | W/H TAX DIV IBM | (7,930) | - | (7,930) | - | - | 371,686,302 | - | - | (7,930) | (7,930) |

MADC1135_00000026

BLMIS ACCOUNT NO. 1FR080 - MARKET PORTFOLIO LIMITED

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 3/10/2005 | W/H TAX DIV UTX | (6,461) | - | (6,461) | - | - | 371,679,841 | - | - | (6,461) | (6,461) |
| 3/10/2005 | W/H TAX DIV MSFT | (23,397) | - | (23,397) | - | - | 371,656,444 | - | - | (23,397) | (23,397) |
| 3/10/2005 | W/H TAX DIV XOM | (46,917) | - | (46,917) | - | - | 371,609,527 | - | - | (46,917) | (46,917) |
| 3/14/2005 | W/H TAX DIV MMM | (9,251) | - | (9,251) | - | - | 371,600,276 | - | - | (9,251) | (9,251) |
| 3/14/2005 | W/H TAX DIV DD | (9,422) | - | (9,422) | - | - | 371,590,854 | - | - | (9,422) | (9,422) |
| 3/18/2005 | W/H TAX DIV AIG | (8,872) | - | (8,872) | - | - | 371,581,982 | - | - | (8,872) | (8,872) |
| 3/24/2005 | W/H TAX DIV HD | (5,874) | - | (5,874) | - | - | 371,576,108 | - | - | (5,874) | (5,874) |
| 3/28/2005 | W/H TAX DIV BAC | (49,007) | - | (49,007) | - | - | 371,527,101 | - | - | (49,007) | (49,007) |
| 3/31/2005 | W/H TAX DIV PEP | (10,695) | - | (10,695) | - | - | 371,516,406 | - | - | (10,695) | (10,695) |
| 4/1/2005 | W/H TAX DIV MRK | (22,320) | - | (22,320) | - | - | 371,494,085 | - | - | (22,320) | (22,320) |
| 4/1/2005 | W/H TAX DIV KO | (14,432) | - | (14,432) | - | - | 371,479,653 | - | - | (14,432) | (14,432) |
| 4/1/2005 | W/H TAX DIV VIA.B | (3,255) | - | (3,255) | - | - | 371,476,398 | - | - | (3,255) | (3,255) |
| 4/7/2005 | W/H TAX DIV HPQ | (3,225) | - | (3,225) | - | - | 371,473,173 | - | - | (3,225) | (3,225) |
| 4/11/2005 | W/H TAX DIV MO | (32,052) | - | (32,052) | - | - | 371,441,121 | - | - | (32,052) | (32,052) |
| 4/13/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (39) | - | (39) | - | - | 371,441,083 | - | - | (39) | (39) |
| 4/25/2005 | W/H TAX DIV GE | (62,591) | - | (62,591) | - | - | 371,378,492 | - | - | (62,591) | (62,591) |
| 5/23/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (45) | - | (45) | - | - | 371,378,446 | - | - | (45) | (45) |
| 6/6/2005 | W/H TAX DIV WMT | (4,043) | - | (4,043) | - | - | 371,374,404 | - | - | (4,043) | (4,043) |
| 6/10/2005 | W/H TAX DIV UTX | (1,923) | - | (1,923) | - | - | 371,372,481 | - | - | (1,923) | (1,923) |
| 6/13/2005 | W/H TAX DIV MMM | (2,753) | - | (2,753) | - | - | 371,369,727 | - | - | (2,753) | (2,753) |
| 6/17/2005 | W/H TAX DIV AIG | (6,710) | - | (6,710) | - | - | 371,363,018 | - | - | (6,710) | (6,710) |
| 6/20/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (33) | - | (33) | - | - | 371,362,985 | - | - | (33) | (33) |
| 6/23/2005 | W/H TAX DIV HD | (4,495) | - | (4,495) | - | - | 371,358,490 | - | - | (4,495) | (4,495) |
| 6/24/2005 | W/H TAX DIV BAC | (37,483) | - | (37,483) | - | - | 371,321,007 | - | - | (37,483) | (37,483) |
| 6/30/2005 | W/H TAX DIV PEP | (9,144) | - | (9,144) | - | - | 371,311,864 | - | - | (9,144) | (9,144) |
| 7/1/2005 | W/H TAX DIV MRK | (16,881) | - | (16,881) | - | - | 371,294,982 | - | - | (16,881) | (16,881) |
| 7/1/2005 | W/H TAX DIV VIA.B | (2,462) | - | (2,462) | - | - | 371,292,521 | - | - | (2,462) | (2,462) |
| 7/1/2005 | W/H TAX DIV ALL | (4,547) | - | (4,547) | - | - | 371,287,974 | - | - | (4,547) | (4,547) |
| 7/1/2005 | W/H TAX DIV KO | (12,957) | - | (12,957) | - | - | 371,275,017 | - | - | (12,957) | (12,957) |
| 7/6/2005 | W/H TAX DIV HPQ | (4,839) | - | (4,839) | - | - | 371,270,178 | - | - | (4,839) | (4,839) |
| 7/8/2005 | W/H TAX DIV SLB | (2,721) | - | (2,721) | - | - | 371,267,457 | - | - | (2,721) | (2,721) |
| 7/11/2005 | W/H TAX DIV MO | (31,078) | - | (31,078) | - | - | 371,236,379 | - | - | (31,078) | (31,078) |
| 7/25/2005 | W/H TAX DIV GE | (47,920) | - | (47,920) | - | - | 371,188,458 | - | - | (47,920) | (47,920) |
| 7/29/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (83) | - | (83) | - | - | 371,188,375 | - | - | (83) | (83) |
| 7/29/2005 | CHECK WIRE | (30,000,000) | - | (30,000,000) | - | - | 341,188,375 | - | - | (30,000,000) | (30,000,000) |
| 8/8/2005 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 356,188,375 | - | - | - | - |
| 9/8/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (46) | - | (46) | - | - | 356,188,329 | - | - | (46) | (46) |
| 9/12/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 356,188,324 | - | - | (4) | (4) |
| 9/30/2005 | W/H TAX DIV S | (1,037) | - | (1,037) | - | - | 356,187,287 | - | - | (1,037) | (1,037) |
| 9/30/2005 | W/H TAX DIV PEP | (6,210) | - | (6,210) | - | - | 356,181,078 | - | - | (6,210) | (6,210) |
| 10/3/2005 | W/H TAX DIV KO | (17,443) | - | (17,443) | - | - | 356,163,634 | - | - | (17,443) | (17,443) |
| 10/5/2005 | W/H TAX DIV HPQ | (6,323) | - | (6,323) | - | - | 356,157,312 | - | - | (6,323) | (6,323) |
| 10/12/2005 | W/H TAX DIV MO | (44,977) | - | (44,977) | - | - | 356,112,335 | - | - | (44,977) | (44,977) |
| 10/12/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (116) | - | (116) | - | - | 356,112,218 | - | - | (116) | (116) |
| 10/13/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 356,112,218 | - | - | (0) | (0) |
| 10/14/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 356,112,217 | - | - | (1) | (1) |
| 10/19/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 356,112,215 | - | - | (2) | (2) |
| 10/25/2005 | W/H TAX DIV GE | (46,776) | - | (46,776) | - | - | 356,065,439 | - | - | (46,776) | (46,776) |
| 10/31/2005 | W/H TAX DIV MWD | (5,525) | - | (5,525) | - | - | 356,059,914 | - | - | (5,525) | (5,525) |
| 11/4/2005 | CHECK WIRE | (50,000,000) | - | (50,000,000) | - | - | 306,059,914 | - | - | (50,000,000) | (50,000,000) |
| 11/15/2005 | W/H TAX DIV PG | (27,898) | - | (27,898) | - | - | 306,032,016 | - | - | (27,898) | (27,898) |
| 11/15/2005 | W/H TAX DIV ABT | (8,441) | - | (8,441) | - | - | 306,023,575 | - | - | (8,441) | (8,441) |
| 11/17/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (43) | - | (43) | - | - | 306,023,532 | - | - | (43) | (43) |
| 11/21/2005 | W/H TAX DIV GS | (3,194) | - | (3,194) | - | - | 306,020,338 | - | - | (3,194) | (3,194) |
| 11/21/2005 | W/H TAX DIV TXN | (1,433) | - | (1,433) | - | - | 306,018,906 | - | - | (1,433) | (1,433) |
| 11/23/2005 | W/H TAX DIV MER | (5,110) | - | (5,110) | - | - | 306,013,796 | - | - | (5,110) | (5,110) |
| 11/23/2005 | W/H TAX DIV C | (65,199) | - | (65,199) | - | - | 305,948,598 | - | - | (65,199) | (65,199) |
| 11/30/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 305,948,594 | - | - | (4) | (4) |
| 12/1/2005 | W/H TAX DIV INTC | (25,241) | - | (25,241) | - | - | 305,923,352 | - | - | (25,241) | (25,241) |
| 12/1/2005 | W/H TAX DIV INTC | (13,972) | - | (13,972) | - | - | 305,909,381 | - | - | (13,972) | (13,972) |
| 12/2/2005 | W/H TAX DIV BA | (5,748) | - | (5,748) | - | - | 305,903,632 | - | - | (5,748) | (5,748) |
| 12/6/2005 | W/H TAX DIV PFE | (40,613) | - | (40,613) | - | - | 305,863,019 | - | - | (40,613) | (40,613) |
| 12/8/2005 | W/H TAX DIV MSFT | (18,010) | - | (18,010) | - | - | 305,845,009 | - | - | (18,010) | (18,010) |
| 12/9/2005 | W/H TAX DIV XOM | (52,788) | - | (52,788) | - | - | 305,792,221 | - | - | (52,788) | (52,788) |
| 12/12/2005 | W/H TAX DIV CVX | (25,106) | - | (25,106) | - | - | 305,767,115 | - | - | (25,106) | (25,106) |
| 12/12/2005 | W/H TAX DIV MMM | (8,209) | - | (8,209) | - | - | 305,758,907 | - | - | (8,209) | (8,209) |
| 12/12/2005 | W/H TAX DIV UTX | (5,574) | - | (5,574) | - | - | 305,753,332 | - | - | (5,574) | (5,574) |
| 12/12/2005 | W/H TAX DIV IBM | (9,197) | - | (9,197) | - | - | 305,744,135 | - | - | (9,197) | (9,197) |
| 12/13/2005 | W/H TAX DIV JNJ | (24,286) | - | (24,286) | - | - | 305,719,849 | - | - | (24,286) | (24,286) |
| 12/15/2005 | W/H TAX DIV HD | (5,212) | - | (5,212) | - | - | 305,714,637 | - | - | (5,212) | (5,212) |
| 12/15/2005 | W/H TAX DIV TWX | (5,719) | - | (5,719) | - | - | 305,708,918 | - | - | (5,719) | (5,719) |

MADC1135_00000027

BLMIS ACCOUNT NO. 1FR080 - RYE SELECT BROAD MARKET PORTFOLIO LIMITED

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 12/15/2005 | W/H TAX DIV KO | (14,052) | - | (14,052) | - | - | 305,694,866 | - | - | (14,052) | (14,052) |
| 12/16/2005 | W/H TAX DIV AIG | (9,446) | - | (9,446) | - | - | 305,685,420 | - | - | (9,446) | (9,446) |
| 12/16/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 305,685,409 | - | - | (11) | (11) |
| 12/22/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 305,685,391 | - | - | (18) | (18) |
| 12/23/2005 | W/H TAX DIV BAC | (48,861) | - | (48,861) | - | - | 305,636,531 | - | - | (48,861) | (48,861) |
| 12/28/2005 | CHECK WIRE | (15,000,000) | - | (15,000,000) | - | - | 290,636,531 | - | - | (15,000,000) | (15,000,000) |
| 12/30/2005 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 290,636,527 | - | - | (3) | (3) |
| 12/30/2005 | W/H TAX DIV S | (1,792) | - | (1,792) | - | - | 290,634,736 | - | - | (1,792) | (1,792) |
| 1/3/2006 | W/H TAX DIV MRK | (20,650) | - | (20,650) | - | - | 290,614,106 | - | - | (20,650) | (20,650) |
| 1/3/2006 | W/H TAX DIV VIA.B | (2,736) | - | (2,736) | - | - | 290,611,370 | - | - | (2,736) | (2,736) |
| 1/3/2006 | W/H TAX DIV WMT | (6,020) | - | (6,020) | - | - | 290,605,350 | - | - | (6,020) | (6,020) |
| 1/3/2006 | W/H TAX DIV PEP | (10,728) | - | (10,728) | - | - | 290,594,622 | - | - | (10,728) | (10,728) |
| 1/4/2006 | W/H TAX DIV HPQ | (5,622) | - | (5,622) | - | - | 290,589,001 | - | - | (5,622) | (5,622) |
| 1/6/2006 | W/H TAX DIV DIS | (13,486) | - | (13,486) | - | - | 290,575,515 | - | - | (13,486) | (13,486) |
| 1/13/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 290,575,496 | - | - | (19) | (19) |
| 1/31/2006 | W/H TAX DIV MS | (7,048) | - | (7,048) | - | - | 290,568,448 | - | - | (7,048) | (7,048) |
| 1/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (21) | - | (21) | - | - | 290,568,427 | - | - | (21) | (21) |
| 2/1/2006 | W/H TAX DIV F | (7,323) | - | (7,323) | - | - | 290,561,104 | - | - | (7,323) | (7,323) |
| 2/1/2006 | CHECK WIRE | (6,000,000) | - | (6,000,000) | - | - | 284,561,104 | - | - | (6,000,000) | (6,000,000) |
| 2/1/2006 | W/H TAX DIV VZ | (6,371) | - | (6,371) | - | - | 284,554,732 | - | - | (6,371) | (6,371) |
| 2/13/2006 | W/H TAX DIV TXN | (1,151) | - | (1,151) | - | - | 284,553,581 | - | - | (1,151) | (1,151) |
| 2/15/2006 | W/H TAX DIV PG | (22,556) | - | (22,556) | - | - | 284,531,045 | - | - | (22,556) | (22,556) |
| 2/15/2006 | W/H TAX DIV ABT | (10,170) | - | (10,170) | - | - | 284,520,876 | - | - | (10,170) | (10,170) |
| 2/21/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (31) | - | (31) | - | - | 284,520,845 | - | - | (31) | (31) |
| 2/23/2006 | W/H TAX DIV GS | (2,719) | - | (2,719) | - | - | 284,518,125 | - | - | (2,719) | (2,719) |
| 2/24/2006 | W/H TAX DIV C | (59,046) | - | (59,046) | - | - | 284,459,079 | - | - | (59,046) | (59,046) |
| 2/28/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 284,459,075 | - | - | (4) | (4) |
| 2/28/2006 | W/H TAX DIV MER | (5,438) | - | (5,438) | - | - | 284,453,637 | - | - | (5,438) | (5,438) |
| 2/28/2006 | CHECK WIRE | (40,000,000) | - | (40,000,000) | - | - | 244,453,637 | - | - | (40,000,000) | (40,000,000) |
| 3/1/2006 | W/H TAX DIV JNJ C | (14,312) | - | (14,312) | - | - | 244,439,325 | - | - | (14,312) | (14,312) |
| 3/1/2006 | W/H TAX DIV WFC | (20,361) | - | (20,361) | - | - | 244,418,964 | - | - | (20,361) | (20,361) |
| 3/3/2006 | W/H TAX DIV BA | (5,873) | - | (5,873) | - | - | 244,413,091 | - | - | (5,873) | (5,873) |
| 3/7/2006 | W/H TAX DIV UPS | (9,919) | - | (9,919) | - | - | 244,403,171 | - | - | (9,919) | (9,919) |
| 3/7/2006 | W/H TAX DIV PFE | (42,179) | - | (42,179) | - | - | 244,360,992 | - | - | (42,179) | (42,179) |
| 3/9/2006 | W/H TAX DIV MSFT | (19,726) | - | (19,726) | - | - | 244,341,266 | - | - | (19,726) | (19,726) |
| 3/10/2006 | W/H TAX DIV IBM | (7,481) | - | (7,481) | - | - | 244,333,785 | - | - | (7,481) | (7,481) |
| 3/10/2006 | W/H TAX DIV XOM | (47,218) | - | (47,218) | - | - | 244,286,566 | - | - | (47,218) | (47,218) |
| 3/10/2006 | W/H TAX DIV TGT | (2,175) | - | (2,175) | - | - | 244,284,391 | - | - | (2,175) | (2,175) |
| 3/10/2006 | W/H TAX DIV CVX | (24,117) | - | (24,117) | - | - | 244,260,274 | - | - | (24,117) | (24,117) |
| 3/10/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 244,260,273 | - | - | (1) | (1) |
| 3/10/2006 | W/H TAX DIV UTX | (5,264) | - | (5,264) | - | - | 244,255,009 | - | - | (5,264) | (5,264) |
| 3/13/2006 | W/H TAX DIV MMM | (8,005) | - | (8,005) | - | - | 244,247,004 | - | - | (8,005) | (8,005) |
| 3/14/2006 | W/H TAX DIV JNJ | (21,320) | - | (21,320) | - | - | 244,225,684 | - | - | (21,320) | (21,320) |
| 3/15/2006 | W/H TAX DIV TWX | (5,012) | - | (5,012) | - | - | 244,220,672 | - | - | (5,012) | (5,012) |
| 3/16/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 244,220,668 | - | - | (4) | (4) |
| 3/17/2006 | W/H TAX DIV AIG | (8,280) | - | (8,280) | - | - | 244,212,388 | - | - | (8,280) | (8,280) |
| 3/23/2006 | W/H TAX DIV IID | (6,754) | - | (6,754) | - | - | 244,205,633 | - | - | (6,754) | (6,754) |
| 3/24/2006 | W/H TAX DIV BAC | (49,923) | - | (49,923) | - | - | 244,155,710 | - | - | (49,923) | (49,923) |
| 3/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (25) | - | (25) | - | - | 244,155,685 | - | - | (25) | (25) |
| 3/31/2006 | W/H TAX DIV PEP | (9,242) | - | (9,242) | - | - | 244,146,444 | - | - | (9,242) | (9,242) |
| 3/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 244,146,443 | - | - | (1) | (1) |
| 3/31/2006 | W/H TAX DIV S | (1,611) | - | (1,611) | - | - | 244,144,832 | - | - | (1,611) | (1,611) |
| 4/3/2006 | W/H TAX DIV MRK | (18,006) | - | (18,006) | - | - | 244,126,826 | - | - | (18,006) | (18,006) |
| 4/3/2006 | W/H TAX DIV KO | (13,855) | - | (13,855) | - | - | 244,112,971 | - | - | (13,855) | (13,855) |
| 4/3/2006 | W/H TAX DIV WMT | (9,193) | - | (9,193) | - | - | 244,103,778 | - | - | (9,193) | (9,193) |
| 4/5/2006 | W/H TAX DIV HPQ | (4,959) | - | (4,959) | - | - | 244,098,819 | - | - | (4,959) | (4,959) |
| 4/5/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 244,098,816 | - | - | (3) | (3) |
| 4/7/2006 | W/H TAX DIV SLB | (3,033) | - | (3,033) | - | - | 244,095,783 | - | - | (3,033) | (3,033) |
| 4/7/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 244,095,782 | - | - | (1) | (1) |
| 4/10/2006 | W/H TAX DIV MO | (36,329) | - | (36,329) | - | - | 244,059,453 | - | - | (36,329) | (36,329) |
| 4/21/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 244,059,449 | - | - | (3) | (3) |
| 4/25/2006 | W/H TAX DIV OE | (62,993) | - | (62,993) | - | - | 243,996,456 | - | - | (62,993) | (62,993) |
| 4/28/2006 | CXL W/H TAX DIV SLB | 3,033 | - | 3,033 | - | - | 243,999,489 | - | - | - | - |
| 4/28/2006 | W/H TAX DIV MDT | (2,489) | - | (2,489) | - | - | 243,997,000 | - | - | (2,489) | (2,489) |
| 4/28/2006 | W/H TAX DIV MS | (6,313) | - | (6,313) | - | - | 243,990,687 | - | - | (6,313) | (6,313) |
| 4/28/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 243,990,682 | - | - | (5) | (5) |
| 5/1/2006 | W/H TAX DIV JPM | (18,884) | - | (18,884) | - | - | 243,971,799 | - | - | (18,884) | (18,884) |
| 5/1/2006 | W/H TAX DIV T | (27,859) | - | (27,859) | - | - | 243,943,940 | - | - | (27,859) | (27,859) |
| 5/1/2006 | W/H TAX DIV VZ | (25,773) | - | (25,773) | - | - | 243,918,167 | - | - | (25,773) | (25,773) |
| 5/5/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 243,918,159 | - | - | (8) | (8) |
| 5/10/2006 | W/H TAX DIV AXP | (3,273) | - | (3,273) | - | - | 243,914,885 | - | - | (3,273) | (3,273) |

MADC1135_00000028

BLMIS ACCOUNT NO. 1FR080 - RYE MARKET PORTFOLIO LIMITED

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 5/10/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 243,914,883 | - | - | (2) | (2) |
| 5/15/2006 | W/H TAX DIV ABT | (9,772) | - | (9,772) | - | - | 243,905,112 | - | - | (9,772) | (9,772) |
| 5/15/2006 | W/H TAX DIV PG | (22,349) | - | (22,349) | - | - | 243,882,762 | - | - | (22,349) | (22,349) |
| 5/22/2006 | W/H TAX DIV TXN | (1,052) | - | (1,052) | - | - | 243,881,710 | - | - | (1,052) | (1,052) |
| 5/22/2006 | W/H TAX DIV CAT | (3,731) | - | (3,731) | - | - | 243,877,979 | - | - | (3,731) | (3,731) |
| 5/24/2006 | W/H TAX DIV MER | (4,938) | - | (4,938) | - | - | 243,873,041 | - | - | (4,938) | (4,938) |
| 5/25/2006 | W/H TAX DIV OS | (3,410) | - | (3,410) | - | - | 243,869,631 | - | - | (3,410) | (3,410) |
| 5/26/2006 | W/H TAX DIV C | (53,467) | - | (53,467) | - | - | 243,816,164 | - | - | (53,467) | (53,467) |
| 5/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (25) | - | (25) | - | - | 243,816,140 | - | - | (25) | (25) |
| 5/31/2006 | CHECK WIRE | (30,000,000) | - | (30,000,000) | - | - | 213,816,140 | - | - | (30,000,000) | (30,000,000) |
| 5/31/2006 | W/H TAX DIV UPS | (9,007) | - | (9,007) | - | - | 213,807,133 | - | - | (9,007) | (9,007) |
| 6/1/2006 | W/H TAX DIV INTC | (12,839) | - | (12,839) | - | - | 213,794,294 | - | - | (12,839) | (12,839) |
| 6/1/2006 | W/H TAX DIV WFC | (19,515) | - | (19,515) | - | - | 213,774,779 | - | - | (19,515) | (19,515) |
| 6/2/2006 | W/H TAX DIV BA | (5,333) | - | (5,333) | - | - | 213,769,446 | - | - | (5,333) | (5,333) |
| 6/5/2006 | W/H TAX DIV WMT | (9,264) | - | (9,264) | - | - | 213,760,182 | - | - | (9,264) | (9,264) |
| 6/6/2006 | W/H TAX DIV BMY | (12,003) | - | (12,003) | - | - | 213,748,180 | - | - | (12,003) | (12,003) |
| 6/6/2006 | W/H TAX DIV PFE | (38,872) | - | (38,872) | - | - | 213,709,308 | - | - | (38,872) | (38,872) |
| 6/8/2006 | W/H TAX DIV MSFT | (17,599) | - | (17,599) | - | - | 213,691,709 | - | - | (17,599) | (17,599) |
| 6/9/2006 | W/H TAX DIV XOM | (43,148) | - | (43,148) | - | - | 213,648,561 | - | - | (43,148) | (43,148) |
| 6/12/2006 | W/H TAX DIV UTX | (2,879) | - | (2,879) | - | - | 213,645,682 | - | - | (2,879) | (2,879) |
| 6/12/2006 | W/H TAX DIV IBM | (10,310) | - | (10,310) | - | - | 213,635,372 | - | - | (10,310) | (10,310) |
| 6/12/2006 | W/H TAX DIV MMM | (7,269) | - | (7,269) | - | - | 213,628,103 | - | - | (7,269) | (7,269) |
| 6/13/2006 | W/H TAX DIV JNJ | (24,443) | - | (24,443) | - | - | 213,603,660 | - | - | (24,443) | (24,443) |
| 6/15/2006 | W/H TAX DIV TWX | (4,445) | - | (4,445) | - | - | 213,599,215 | - | - | (4,445) | (4,445) |
| 6/15/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (22) | - | (22) | - | - | 213,599,193 | - | - | (22) | (22) |
| 6/22/2006 | W/H TAX DIV HD | (6,400) | - | (6,400) | - | - | 213,592,793 | - | - | (6,400) | (6,400) |
| 6/23/2006 | W/H TAX DIV BAC | (46,220) | - | (46,220) | - | - | 213,546,573 | - | - | (46,220) | (46,220) |
| 6/30/2006 | W/H TAX DIV S | (1,630) | - | (1,630) | - | - | 213,544,944 | - | - | (1,630) | (1,630) |
| 6/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (29) | - | (29) | - | - | 213,544,915 | - | - | (29) | (29) |
| 6/30/2006 | W/H TAX DIV PEP | (9,607) | - | (9,607) | - | - | 213,535,308 | - | - | (9,607) | (9,607) |
| 6/30/2006 | CHECK WIRE | (25,000,000) | - | (25,000,000) | - | - | 188,535,308 | - | - | (25,000,000) | (25,000,000) |
| 7/3/2006 | W/H TAX DIV MRK | (16,213) | - | (16,213) | - | - | 188,519,096 | - | - | (16,213) | (16,213) |
| 7/3/2006 | W/H TAX DIV CVX | (25,678) | - | (25,678) | - | - | 188,493,418 | - | - | (25,678) | (25,678) |
| 7/3/2006 | W/H TAX DIV AIG | (7,733) | - | (7,733) | - | - | 188,485,685 | - | - | (7,733) | (7,733) |
| 7/3/2006 | W/H TAX DIV KO | (8,746) | - | (8,746) | - | - | 188,476,939 | - | - | (8,746) | (8,746) |
| 7/5/2006 | W/H TAX DIV HPQ | (4,513) | - | (4,513) | - | - | 188,472,426 | - | - | (4,513) | (4,513) |
| 7/7/2006 | W/H TAX DIV SLB | (3,108) | - | (3,108) | - | - | 188,469,318 | - | - | (3,108) | (3,108) |
| 7/10/2006 | W/H TAX DIV MO | (22,570) | - | (22,570) | - | - | 188,446,749 | - | - | (22,570) | (22,570) |
| 7/14/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 188,446,731 | - | - | (18) | (18) |
| 7/21/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 188,446,729 | - | - | (2) | (2) |
| 7/27/2006 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 168,446,729 | - | - | (20,000,000) | (20,000,000) |
| 7/31/2006 | W/H TAX DIV MS | (2,290) | - | (2,290) | - | - | 168,444,439 | - | - | (2,290) | (2,290) |
| 7/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (15) | - | (15) | - | - | 168,444,424 | - | - | (15) | (15) |
| 8/7/2006 | CXL W/H TAX DIV SLB | 3,108 | - | 3,108 | - | - | 168,447,532 | - | - | - | - |
| 8/15/2006 | W/H TAX DIV ABT | (3,545) | - | (3,545) | - | - | 168,443,987 | - | - | (3,545) | (3,545) |
| 8/15/2006 | W/H TAX DIV PG | (13,372) | - | (13,372) | - | - | 168,430,615 | - | - | (13,372) | (13,372) |
| 8/17/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (25) | - | (25) | - | - | 168,430,590 | - | - | (25) | (25) |
| 8/21/2006 | W/H TAX DIV CAT | (1,484) | - | (1,484) | - | - | 168,429,106 | - | - | (1,484) | (1,484) |
| 8/21/2006 | W/H TAX DIV TXN | (608) | - | (608) | - | - | 168,428,498 | - | - | (608) | (608) |
| 8/23/2006 | W/H TAX DIV MER | (2,915) | - | (2,915) | - | - | 168,425,583 | - | - | (2,915) | (2,915) |
| 8/24/2006 | W/H TAX DIV OS | (2,040) | - | (2,040) | - | - | 168,423,543 | - | - | (2,040) | (2,040) |
| 8/25/2006 | W/H TAX DIV C | (31,765) | - | (31,765) | - | - | 168,391,778 | - | - | (31,765) | (31,765) |
| 9/1/2006 | W/H TAX DIV INTC | (7,624) | - | (7,624) | - | - | 168,384,155 | - | - | (7,624) | (7,624) |
| 9/1/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 168,384,138 | - | - | (17) | (17) |
| 9/1/2006 | W/H TAX DIV WFC | (12,404) | - | (12,404) | - | - | 168,371,734 | - | - | (12,404) | (12,404) |
| 9/1/2006 | W/H TAX DIV BA | (3,148) | - | (3,148) | - | - | 168,368,586 | - | - | (3,148) | (3,148) |
| 9/5/2006 | W/H TAX DIV WMT | (5,468) | - | (5,468) | - | - | 168,363,119 | - | - | (5,468) | (5,468) |
| 9/5/2006 | W/H TAX DIV PFE | (23,002) | - | (23,002) | - | - | 168,340,116 | - | - | (23,002) | (23,002) |
| 9/6/2006 | W/H TAX DIV UPS | (5,316) | - | (5,316) | - | - | 168,334,800 | - | - | (5,316) | (5,316) |
| 9/8/2006 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 188,334,800 | - | - | - | - |
| 9/11/2006 | W/H TAX DIV UTX | (3,398) | - | (3,398) | - | - | 188,331,402 | - | - | (3,398) | (3,398) |
| 9/11/2006 | W/H TAX DIV CVX | (15,155) | - | (15,155) | - | - | 188,316,247 | - | - | (15,155) | (15,155) |
| 9/11/2006 | W/H TAX DIV XOM | (25,142) | - | (25,142) | - | - | 188,291,105 | - | - | (25,142) | (25,142) |
| 9/11/2006 | W/H TAX DIV IBM | (5,946) | - | (5,946) | - | - | 188,285,159 | - | - | (5,946) | (5,946) |
| 9/12/2006 | W/H TAX DIV MMM | (4,290) | - | (4,290) | - | - | 188,280,869 | - | - | (4,290) | (4,290) |
| 9/12/2006 | W/H TAX DIV JNJ | (14,427) | - | (14,427) | - | - | 188,266,443 | - | - | (14,427) | (14,427) |
| 9/14/2006 | W/H TAX DIV MSFT | (10,346) | - | (10,346) | - | - | 188,256,097 | - | - | (10,346) | (10,346) |
| 9/15/2006 | W/H TAX DIV AIG | (5,578) | - | (5,578) | - | - | 188,250,518 | - | - | (5,578) | (5,578) |
| 9/15/2006 | W/H TAX DIV TWX | (3,117) | - | (3,117) | - | - | 188,247,402 | - | - | (3,117) | (3,117) |
| 9/15/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (21) | - | (21) | - | - | 188,247,381 | - | - | (21) | (21) |
| 9/21/2006 | W/H TAX DIV HD | (4,022) | - | (4,022) | - | - | 188,243,359 | - | - | (4,022) | (4,022) |

MADC1135_00000029

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Transfers | Column 12 Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/22/2006 | W/H TAX DIV BAC | (33,295) | - | (33,295) | - | - | 188,210,064 | - | - | (33,295) | (33,295) |
| 9/26/2006 | CHECK WIRE | (30,000,000) | - | (30,000,000) | - | - | 158,210,064 | - | - | (30,000,000) | (30,000,000) |
| 9/27/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 158,210,054 | - | - | (10) | (10) |
| 9/29/2006 | W/H TAX DIV S | (979) | - | (979) | - | - | 158,209,074 | - | - | (979) | (979) |
| 9/29/2006 | W/H TAX DIV PEP | (6,433) | - | (6,433) | - | - | 158,202,641 | - | - | (6,433) | (6,433) |
| 10/2/2006 | W/H TAX DIV KO | (8,312) | - | (8,312) | - | - | 158,194,329 | - | - | (8,312) | (8,312) |
| 10/2/2006 | W/H TAX DIV MRK | (10,632) | - | (10,632) | - | - | 158,183,697 | - | - | (10,632) | (10,632) |
| 10/4/2006 | CHECK WIRE | 125,000,000 | 125,000,000 | - | - | - | 283,183,697 | - | - | - | - |
| 10/4/2006 | W/H TAX DIV HPQ | (2,891) | - | (2,891) | - | - | 283,180,806 | - | - | (2,891) | (2,891) |
| 10/10/2006 | W/H TAX DIV MO | (23,454) | - | (23,454) | - | - | 283,157,352 | - | - | (23,454) | (23,454) |
| 10/17/2006 | W/H TAX DIV | (26) | - | (26) | - | - | 283,157,325 | - | - | (26) | (26) |
| 10/25/2006 | W/H TAX DIV GE | (33,985) | - | (33,985) | - | - | 283,123,341 | - | - | (33,985) | (33,985) |
| 10/26/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 283,123,333 | - | - | (7) | (7) |
| 10/27/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 283,123,333 | - | - | (0) | (0) |
| 10/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 283,123,333 | - | - | (0) | (0) |
| 10/31/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 283,123,333 | - | - | (0) | (0) |
| 11/3/2006 | CHECK WIRE | 160,000,000 | 160,000,000 | - | - | - | 443,123,333 | - | - | - | - |
| 11/20/2006 | W/H TAX DIV TXN | (1,434) | - | (1,434) | - | - | 443,121,899 | - | - | (1,434) | (1,434) |
| 11/20/2006 | W/H TAX DIV | (16) | - | (16) | - | - | 443,121,883 | - | - | (16) | (16) |
| 11/22/2006 | W/H TAX DIV C | (54,755) | - | (54,755) | - | - | 443,067,128 | - | - | (54,755) | (54,755) |
| 11/22/2006 | W/H TAX DIV MER | (5,271) | - | (5,271) | - | - | 443,061,857 | - | - | (5,271) | (5,271) |
| 11/27/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 443,061,850 | - | - | (7) | (7) |
| 11/30/2006 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 443,061,848 | - | - | (2) | (2) |
| 1/2/2007 | W/H TAX DIV WMT | (12,907) | - | (12,907) | - | - | 443,048,941 | - | (12,907) | (12,907) | (12,907) |
| 1/2/2007 | W/H TAX DIV MRK | (25,437) | - | (25,437) | - | - | 443,023,504 | - | (25,437) | (25,437) | (25,437) |
| 1/2/2007 | W/H TAX DIV PEP | (15,563) | - | (15,563) | - | - | 443,007,940 | - | (15,563) | (15,563) | (15,563) |
| 1/3/2007 | CHECK WIRE | 75,000,000 | 75,000,000 | - | - | - | 518,007,940 | - | - | - | - |
| 1/3/2007 | W/H TAX DIV TGT | (2,277) | - | (2,277) | - | - | 518,005,663 | - | (2,277) | (2,277) | (2,277) |
| 1/3/2007 | W/H TAX DIV MSFT | (19,673) | - | (19,673) | - | - | 517,985,990 | - | (19,673) | (19,673) | (19,673) |
| 1/3/2007 | W/H TAX DIV MMM | (7,759) | - | (7,759) | - | - | 517,978,231 | - | (7,759) | (7,759) | (7,759) |
| 1/3/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 517,978,217 | - | (14) | (14) | (14) |
| 1/3/2007 | W/H TAX DIV HD | (14,266) | - | (14,266) | - | - | 517,963,950 | - | (14,266) | (14,266) | (14,266) |
| 1/3/2007 | W/H TAX DIV WB | (33,460) | - | (33,460) | - | - | 517,930,490 | - | (33,460) | (33,460) | (33,460) |
| 1/3/2007 | W/H TAX DIV INTC | (13,137) | - | (13,137) | - | - | 517,917,353 | - | (13,137) | (13,137) | (13,137) |
| 1/3/2007 | W/H TAX DIV BA | (5,693) | - | (5,693) | - | - | 517,911,660 | - | (5,693) | (5,693) | (5,693) |
| 1/3/2007 | W/H TAX DIV TWX | (6,975) | - | (6,975) | - | - | 517,904,686 | - | (6,975) | (6,975) | (6,975) |
| 1/3/2007 | W/H TAX DIV IBM | (10,316) | - | (10,316) | - | - | 517,894,370 | - | (10,316) | (10,316) | (10,316) |
| 1/3/2007 | W/H TAX DIV MCD | (27,409) | - | (27,409) | - | - | 517,866,961 | - | (27,409) | (27,409) | (27,409) |
| 1/3/2007 | W/H TAX DIV PFE | (40,158) | - | (40,158) | - | - | 517,826,803 | - | (40,158) | (40,158) | (40,158) |
| 1/3/2007 | W/H TAX DIV WFC | (21,435) | - | (21,435) | - | - | 517,805,368 | - | (21,435) | (21,435) | (21,435) |
| 1/3/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 517,805,366 | - | (2) | (2) | (2) |
| 1/3/2007 | W/H TAX DIV AIG | (2,306) | - | (2,306) | - | - | 517,803,061 | - | (2,306) | (2,306) | (2,306) |
| 1/3/2007 | W/H TAX DIV AIG | (13,315) | - | (13,315) | - | - | 517,789,745 | - | (13,315) | (13,315) | (13,315) |
| 1/3/2007 | W/H TAX DIV KO | (19,656) | - | (19,656) | - | - | 517,770,089 | - | (19,656) | (19,656) | (19,656) |
| 1/3/2007 | W/H TAX DIV BAC | (78,652) | - | (78,652) | - | - | 517,691,438 | - | (78,652) | (78,652) | (78,652) |
| 1/3/2007 | W/H TAX DIV XOM | (43,388) | - | (43,388) | - | - | 517,648,050 | - | (43,388) | (43,388) | (43,388) |
| 1/3/2007 | W/H TAX DIV HPQ | (6,799) | - | (6,799) | - | - | 517,641,250 | - | (6,799) | (6,799) | (6,799) |
| 1/3/2007 | W/H TAX DIV JNJ | (25,301) | - | (25,301) | - | - | 517,615,949 | - | (25,301) | (25,301) | (25,301) |
| 1/3/2007 | W/H TAX DIV EXC | (5,904) | - | (5,904) | - | - | 517,610,046 | - | (5,904) | (5,904) | (5,904) |
| 1/3/2007 | W/H TAX DIV CVX | (26,313) | - | (26,313) | - | - | 517,583,733 | - | (26,313) | (26,313) | (26,313) |
| 1/3/2007 | W/H TAX DIV UTX | (6,146) | - | (6,146) | - | - | 517,577,587 | - | (6,146) | (6,146) | (6,146) |
| 1/4/2007 | W/H TAX DIV UPS | (9,614) | - | (9,614) | - | - | 517,567,973 | - | (9,614) | (9,614) | (9,614) |
| 1/10/2007 | W/H TAX DIV MO | (15,207) | - | (15,207) | - | - | 517,552,766 | - | (15,207) | (15,207) | (15,207) |
| 1/12/2007 | W/H TAX DIV DIS | (20,093) | - | (20,093) | - | - | 517,532,673 | - | (20,093) | (20,093) | (20,093) |
| 1/25/2007 | W/H TAX DIV GE | (52,060) | - | (52,060) | - | - | 517,480,613 | - | (52,060) | (52,060) | (52,060) |
| 1/29/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (56) | - | (56) | - | - | 517,480,557 | - | (56) | (56) | (56) |
| 1/31/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 517,480,557 | - | (0) | (0) | (0) |
| 2/2/2007 | CHECK WIRE | 90,000,000 | 90,000,000 | - | - | - | 607,480,557 | - | - | - | - |
| 2/6/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 607,480,551 | - | (6) | (6) | (6) |
| 2/13/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 607,480,541 | - | (10) | (10) | (10) |
| 2/16/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 607,480,537 | - | (4) | (4) | (4) |
| 2/20/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 607,480,534 | - | (2) | (2) | (2) |
| 2/22/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 607,480,534 | - | (1) | (1) | (1) |
| 2/23/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 607,480,533 | - | (1) | (1) | (1) |
| 2/27/2007 | W/H TAX DIV CMCSA | (4) | - | (4) | - | - | 607,480,529 | - | (4) | (4) | (4) |
| 2/28/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 607,480,525 | - | (3) | (3) | (3) |
| 3/1/2007 | W/H TAX DIV COP | (14,300) | - | (14,300) | - | - | 607,466,225 | - | (14,300) | (14,300) | (14,300) |
| 3/2/2007 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 627,466,225 | - | - | - | - |
| 3/6/2007 | W/H TAX DIV UPS | (9,479) | - | (9,479) | - | - | 627,456,746 | - | (9,479) | (9,479) | (9,479) |
| 3/9/2007 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 627,456,737 | - | (10) | (10) | (10) |
| 3/12/2007 | W/H TAX DIV MMM | (11,737) | - | (11,737) | - | - | 627,445,000 | - | (11,737) | (11,737) | (11,737) |

MADC1135_00000030

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| Date | Transaction Description | | | | | | | | | | |
| 3/12/2007 | W/H TAX DIV UTX | (3,259) | - | (3,259) | - | - | 627,431,741 | - | (3,259) | (3,259) | (3,259) |
| 3/12/2007 | W/H TAX DIV CVX | (13,372) | - | (13,372) | - | - | 627,428,368 | - | (13,372) | (13,372) | (13,372) |
| 3/12/2007 | W/H TAX DIV TGT | (2,216) | - | (2,216) | - | - | 627,426,152 | - | (2,216) | (2,216) | (2,216) |
| 3/13/2007 | W/H TAX DIV JNJ | (35,531) | - | (35,531) | - | - | 627,390,622 | - | (35,531) | (35,531) | (35,531) |
| 3/15/2007 | W/H TAX DIV TWX | (7,060) | - | (7,060) | - | - | 627,383,561 | - | (7,060) | (7,060) | (7,060) |
| 3/15/2007 | W/H TAX DIV WB | (34,232) | - | (34,232) | - | - | 627,349,330 | - | (34,232) | (34,232) | (34,232) |
| 3/16/2007 | W/H TAX DIV AIG | (13,616) | - | (13,616) | - | - | 627,335,713 | - | (13,616) | (13,616) | (13,616) |
| 3/20/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 627,335,699 | - | (14) | (14) | (14) |
| 3/22/2007 | W/H TAX DIV HD | (15,129) | - | (15,129) | - | - | 627,320,570 | - | (15,129) | (15,129) | (15,129) |
| 3/23/2007 | W/H TAX DIV BAC | (80,444) | - | (80,444) | - | - | 627,240,126 | - | (80,444) | (80,444) | (80,444) |
| 3/28/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 627,240,113 | - | (12) | (12) | (12) |
| 3/30/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 627,240,106 | - | (7) | (7) | (7) |
| 3/30/2007 | W/H TAX DIV S | (2,782) | - | (2,782) | - | - | 627,237,324 | - | (2,782) | (2,782) | (2,782) |
| 3/30/2007 | W/H TAX DIV PEP | (18,975) | - | (18,975) | - | - | 627,218,349 | - | (18,975) | (18,975) | (18,975) |
| 4/2/2007 | W/H TAX DIV MRK | (32,518) | - | (32,518) | - | - | 627,185,831 | - | (32,518) | (32,518) | (32,518) |
| 4/2/2007 | W/H TAX DIV KO | (27,224) | - | (27,224) | - | - | 627,158,607 | - | (27,224) | (27,224) | (27,224) |
| 4/2/2007 | W/H TAX DIV WMT | (21,061) | - | (21,061) | - | - | 627,137,546 | - | (21,061) | (21,061) | (21,061) |
| 4/4/2007 | W/H TAX DIV HPQ | (8,632) | - | (8,632) | - | - | 627,128,914 | - | (8,632) | (8,632) | (8,632) |
| 4/10/2007 | W/H TAX DIV MO | (70,394) | - | (70,394) | - | - | 627,058,520 | - | (70,394) | (70,394) | (70,394) |
| 4/19/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (27) | - | (27) | - | - | 627,058,493 | - | (27) | (27) | (27) |
| 4/25/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 627,058,493 | - | (0) | (0) | (0) |
| 4/25/2007 | W/H TAX DIV GE | (93,281) | - | (93,281) | - | - | 626,965,212 | - | (93,281) | (93,281) | (93,281) |
| 4/30/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 626,965,202 | - | (10) | (10) | (10) |
| 5/4/2007 | W/H TAX DIV CVS | (2,513) | - | (2,513) | - | - | 626,962,689 | - | (2,513) | (2,513) | (2,513) |
| 5/15/2007 | W/H TAX DIV PG | (44,521) | - | (44,521) | - | - | 626,918,168 | - | (44,521) | (44,521) | (44,521) |
| 5/21/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 626,918,156 | - | (12) | (12) | (12) |
| 5/23/2007 | W/H TAX DIV MER | (11,785) | - | (11,785) | - | - | 626,906,370 | - | (11,785) | (11,785) | (11,785) |
| 5/24/2007 | W/H TAX DIV GS | (3,449) | - | (3,449) | - | - | 626,902,922 | - | (3,449) | (3,449) | (3,449) |
| 5/25/2007 | W/H TAX DIV C | (105,056) | - | (105,056) | - | - | 626,797,866 | - | (105,056) | (105,056) | (105,056) |
| 5/31/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 626,797,864 | - | (2) | (2) | (2) |
| 6/1/2007 | W/H TAX DIV COP | (27,087) | - | (27,087) | - | - | 626,770,777 | - | (27,087) | (27,087) | (27,087) |
| 6/1/2007 | W/H TAX DIV BA | (10,879) | - | (10,879) | - | - | 626,759,898 | - | (10,879) | (10,879) | (10,879) |
| 6/1/2007 | W/H TAX DIV INTC | (26,096) | - | (26,096) | - | - | 626,733,803 | - | (26,096) | (26,096) | (26,096) |
| 6/1/2007 | W/H TAX DIV WFC | (37,712) | - | (37,712) | - | - | 626,696,091 | - | (37,712) | (37,712) | (37,712) |
| 6/4/2007 | W/H TAX DIV WMT | (21,400) | - | (21,400) | - | - | 626,674,690 | - | (21,400) | (21,400) | (21,400) |
| 6/5/2007 | W/H TAX DIV PFE | (82,458) | - | (82,458) | - | - | 626,592,232 | - | (82,458) | (82,458) | (82,458) |
| 6/5/2007 | W/H TAX DIV UPS | (17,285) | - | (17,285) | - | - | 626,574,947 | - | (17,285) | (17,285) | (17,285) |
| 6/6/2007 | W/H TAX DIV WMT | (7,072) | - | (7,072) | - | - | 626,566,975 | - | - | - | - |
| 6/11/2007 | W/H TAX DIV UTX | (10,906) | - | (10,906) | - | - | 626,556,069 | - | (10,906) | (10,906) | (10,906) |
| 6/11/2007 | W/H TAX DIV XOM | (79,429) | - | (79,429) | - | - | 626,476,640 | - | (79,429) | (79,429) | (79,429) |
| 6/11/2007 | W/H TAX DIV CVX | (49,909) | - | (49,909) | - | - | 626,426,731 | - | (49,909) | (49,909) | (49,909) |
| 6/11/2007 | W/H TAX DIV IBM | (23,944) | - | (23,944) | - | - | 626,402,787 | - | (23,944) | (23,944) | (23,944) |
| 6/12/2007 | W/H TAX DIV JNJ | (47,654) | - | (47,654) | - | - | 626,355,133 | - | (47,654) | (47,654) | (47,654) |
| 6/12/2007 | W/H TAX DIV MMM | (14,367) | - | (14,367) | - | - | 626,340,766 | - | (14,367) | (14,367) | (14,367) |
| 6/14/2007 | W/H TAX DIV MSFT | (34,666) | - | (34,666) | - | - | 626,306,100 | - | (34,666) | (34,666) | (34,666) |
| 6/15/2007 | W/H TAX DIV AIG | (17,285) | - | (17,285) | - | - | 626,288,815 | - | (17,285) | (17,285) | (17,285) |
| 6/15/2007 | W/H TAX DIV TWX | (8,500) | - | (8,500) | - | - | 626,280,315 | - | (8,500) | (8,500) | (8,500) |
| 6/15/2007 | W/H TAX DIV UPS | (41,903) | - | (41,903) | - | - | 626,238,413 | - | (41,903) | (41,903) | (41,903) |
| 6/15/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 626,238,405 | - | (8) | (8) | (8) |
| 6/21/2007 | W/H TAX DIV HD | (18,519) | - | (18,519) | - | - | 626,219,885 | - | (18,519) | (18,519) | (18,519) |
| 6/22/2007 | W/H TAX DIV BAC | (100,566) | - | (100,566) | - | - | 626,119,319 | - | (100,566) | (100,566) | (100,566) |
| 6/29/2007 | W/H TAX DIV PEP | (24,775) | - | (24,775) | - | - | 626,094,545 | - | (24,775) | (24,775) | (24,775) |
| 6/29/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 626,094,533 | - | (11) | (11) | (11) |
| 6/29/2007 | W/H TAX DIV S | (2,900) | - | (2,900) | - | - | 626,091,634 | - | (2,900) | (2,900) | (2,900) |
| 7/2/2007 | W/H TAX DIV KO | (27,159) | - | (27,159) | - | - | 626,064,475 | - | (27,159) | (27,159) | (27,159) |
| 7/2/2007 | W/H TAX DIV MRK | (32,699) | - | (32,699) | - | - | 626,031,776 | - | (32,699) | (32,699) | (32,699) |
| 7/5/2007 | W/H TAX DIV HPQ | (8,680) | - | (8,680) | - | - | 626,023,096 | - | (8,680) | (8,680) | (8,680) |
| 7/10/2007 | W/H TAX DIV MO | (57,587) | - | (57,587) | - | - | 625,965,509 | - | (57,587) | (57,587) | (57,587) |
| 7/17/2007 | CXL W/H TAX DIV TYC | 7,072 | - | 7,072 | - | - | 625,973,481 | - | - | - | - |
| 7/17/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (28) | - | (28) | - | - | 625,973,453 | - | (28) | (28) | (28) |
| 8/6/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 625,973,441 | - | (12) | (12) | (12) |
| 8/24/2007 | W/H TAX DIV C | (43,471) | - | (43,471) | - | - | 625,929,970 | - | (43,471) | (43,471) | (43,471) |
| 9/4/2007 | W/H TAX DIV WFC | (16,951) | - | (16,951) | - | - | 625,913,019 | - | (16,951) | (16,951) | (16,951) |
| 9/4/2007 | W/H TAX DIV WMT | (8,688) | - | (8,688) | - | - | 625,904,331 | - | (8,688) | (8,688) | (8,688) |
| 9/4/2007 | W/H TAX DIV INTC | (10,765) | - | (10,765) | - | - | 625,893,566 | - | (10,765) | (10,765) | (10,765) |
| 9/5/2007 | W/H TAX DIV PFE | (33,477) | - | (33,477) | - | - | 625,860,089 | - | (33,477) | (33,477) | (33,477) |
| 9/7/2007 | W/H TAX DIV BA | (4,253) | - | (4,253) | - | - | 625,855,836 | - | (4,253) | (4,253) | (4,253) |
| 9/10/2007 | W/H TAX DIV UTX | (5,347) | - | (5,347) | - | - | 625,850,490 | - | (5,347) | (5,347) | (5,347) |
| 9/10/2007 | W/H TAX DIV IBM | (9,113) | - | (9,113) | - | - | 625,841,376 | - | (9,113) | (9,113) | (9,113) |
| 9/10/2007 | W/H TAX DIV XOM | (32,429) | - | (32,429) | - | - | 625,808,948 | - | (32,429) | (32,429) | (32,429) |
| 9/10/2007 | W/H TAX DIV CVX | (20,262) | - | (20,262) | - | - | 625,788,686 | - | (20,262) | (20,262) | (20,262) |

MADC1135_00000031

Exhibit B

BLMIS ACCOUNT NO. 1FR080 [...] MARKET PORTFOLIO LIMITED

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 9/13/2007 | W/H TAX DIV MSFT | (13,822) | - | (13,822) | - | - | 625,774,864 | - | (13,822) | (13,822) | (13,822) |
| 9/14/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (41) | - | (41) | - | - | 625,774,823 | - | (41) | (41) | (41) |
| 9/18/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 625,774,823 | - | (1) | (1) | (1) |
| 9/26/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 625,774,806 | - | (16) | (16) | (16) |
| 10/1/2007 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 645,774,806 | - | - | - | - |
| 10/1/2007 | W/H TAX DIV KO | (10,322) | - | (10,322) | - | - | 645,764,484 | - | (10,322) | (10,322) | (10,322) |
| 10/10/2007 | W/H TAX DIV MO | (23,854) | - | (23,854) | - | - | 645,740,630 | - | (23,854) | (23,854) | (23,854) |
| 10/25/2007 | W/H TAX DIV OIS | (62,998) | - | (62,998) | - | - | 645,677,632 | - | (62,998) | (62,998) | (62,998) |
| 10/31/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (39) | - | (39) | - | - | 645,677,592 | - | (39) | (39) | (39) |
| 11/1/2007 | CHECK WIRE | 50,000,000 | 50,000,000 | - | - | - | 695,677,592 | - | - | - | - |
| 11/7/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 695,677,574 | - | (18) | (18) | (18) |
| 11/13/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 695,677,561 | - | (13) | (13) | (13) |
| 11/15/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 695,677,557 | - | (5) | (5) | (5) |
| 11/21/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 695,677,557 | - | (0) | (0) | (0) |
| 11/21/2007 | W/H TAX DIV MER | (3,448) | - | (3,448) | - | - | 695,674,108 | - | (3,448) | (3,448) | (3,448) |
| 11/21/2007 | W/H TAX DIV C | (29,260) | - | (29,260) | - | - | 695,644,848 | - | (29,260) | (29,260) | (29,260) |
| 11/30/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 695,644,840 | - | (7) | (7) | (7) |
| 12/3/2007 | CHECK WIRE | 30,000,000 | 30,000,000 | - | - | - | 725,644,840 | - | - | - | - |
| 12/3/2007 | W/H TAX DIV COP | (7,271) | - | (7,271) | - | - | 725,637,570 | - | (7,271) | (7,271) | (7,271) |
| 12/3/2007 | W/H TAX DIV MCD | (30,122) | - | (30,122) | - | - | 725,607,448 | - | (30,122) | (30,122) | (30,122) |
| 12/10/2007 | W/H TAX DIV CVX | (20,606) | - | (20,606) | - | - | 725,586,842 | - | (20,606) | (20,606) | (20,606) |
| 12/10/2007 | W/H TAX DIV UTX | (5,437) | - | (5,437) | - | - | 725,581,404 | - | (5,437) | (5,437) | (5,437) |
| 12/10/2007 | W/H TAX DIV EXC | (4,758) | - | (4,758) | - | - | 725,576,647 | - | (4,758) | (4,758) | (4,758) |
| 12/11/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (28) | - | (28) | - | - | 725,576,619 | - | (28) | (28) | (28) |
| 12/11/2007 | W/H TAX DIV JNJ | (38,969) | - | (38,969) | - | - | 725,537,650 | - | (38,969) | (38,969) | (38,969) |
| 12/12/2007 | W/H TAX DIV MMM | (11,632) | - | (11,632) | - | - | 725,526,018 | - | (11,632) | (11,632) | (11,632) |
| 12/13/2007 | W/H TAX DIV MSFT | (14,953) | - | (14,953) | - | - | 725,511,065 | - | (14,953) | (14,953) | (14,953) |
| 12/20/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 725,511,055 | - | (10) | (10) | (10) |
| 12/31/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 725,511,036 | - | (19) | (19) | (19) |
| 1/2/2008 | CHECK WIRE | 30,000,000 | 30,000,000 | - | - | - | 755,511,036 | - | - | - | - |
| 1/2/2008 | W/H TAX DIV HPQ | (2,324) | - | (2,324) | - | - | 755,508,712 | - | (2,324) | (2,324) | (2,324) |
| 1/2/2008 | W/H TAX DIV WMT | (5,936) | - | (5,936) | - | - | 755,502,776 | - | (5,936) | (5,936) | (5,936) |
| 1/3/2008 | W/H TAX DIV UPS | (7,137) | - | (7,137) | - | - | 755,495,640 | - | (7,137) | (7,137) | (7,137) |
| 1/28/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (41) | - | (41) | - | - | 755,495,599 | - | (41) | (41) | (41) |
| 2/1/2008 | CHECK WIRE | 25,000,000 | 25,000,000 | - | - | - | 780,495,599 | - | - | - | - |
| 2/20/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (15) | - | (15) | - | - | 780,495,584 | - | (15) | (15) | (15) |
| 2/22/2008 | W/H TAX DIV C | (36,101) | - | (36,101) | - | - | 780,459,482 | - | (36,101) | (36,101) | (36,101) |
| 2/28/2008 | W/H TAX DIV GS | (2,925) | - | (2,925) | - | - | 780,456,557 | - | (2,925) | (2,925) | (2,925) |
| 3/3/2008 | CHECK WIRE | 30,000,000 | 30,000,000 | - | - | - | 810,456,557 | - | - | - | - |
| 3/3/2008 | W/H TAX DIV WFC | (23,963) | - | (23,963) | - | - | 810,432,594 | - | (23,963) | (23,963) | (23,963) |
| 3/3/2008 | W/H TAX DIV INTC | (16,782) | - | (16,782) | - | - | 810,415,813 | - | (16,782) | (16,782) | (16,782) |
| 3/3/2008 | W/H TAX DIV COP | (16,693) | - | (16,693) | - | - | 810,399,120 | - | (16,693) | (16,693) | (16,693) |
| 3/4/2008 | W/H TAX DIV UPS | (10,342) | - | (10,342) | - | - | 810,388,779 | - | (10,342) | (10,342) | (10,342) |
| 3/4/2008 | W/H TAX DIV PFE | (48,135) | - | (48,135) | - | - | 810,340,643 | - | (48,135) | (48,135) | (48,135) |
| 3/5/2008 | W/H TAX DIV MER | (6,581) | - | (6,581) | - | - | 810,334,062 | - | (6,581) | (6,581) | (6,581) |
| 3/7/2008 | W/H TAX DIV BA | (6,685) | - | (6,685) | - | - | 810,327,377 | - | (6,685) | (6,685) | (6,685) |
| 3/10/2008 | W/H TAX DIV XOM | (43,873) | - | (43,873) | - | - | 810,283,504 | - | (43,873) | (43,873) | (43,873) |
| 3/10/2008 | W/H TAX DIV EXC | (7,312) | - | (7,312) | - | - | 810,276,192 | - | (7,312) | (7,312) | (7,312) |
| 3/10/2008 | W/H TAX DIV CVX | (27,870) | - | (27,870) | - | - | 810,248,322 | - | (27,870) | (27,870) | (27,870) |
| 3/10/2008 | W/H TAX DIV UTX | (7,354) | - | (7,354) | - | - | 810,240,968 | - | (7,354) | (7,354) | (7,354) |
| 3/11/2008 | W/H TAX DIV JNJ | (12,535) | - | (12,535) | - | - | 810,228,432 | - | (12,535) | (12,535) | (12,535) |
| 3/11/2008 | W/H TAX DIV JNJ | (26,878) | - | (26,878) | - | - | 810,201,555 | - | (26,878) | (26,878) | (26,878) |
| 3/12/2008 | W/H TAX DIV MMM | (8,357) | - | (8,357) | - | - | 810,193,198 | - | (8,357) | (8,357) | (8,357) |
| 3/13/2008 | W/H TAX DIV MSFT | (19,994) | - | (19,994) | - | - | 810,173,204 | - | (19,994) | (19,994) | (19,994) |
| 3/17/2008 | W/H TAX DIV MCD | (10,185) | - | (10,185) | - | - | 810,163,020 | - | (10,185) | (10,185) | (10,185) |
| 3/17/2008 | W/H TAX DIV TWX | (5,092) | - | (5,092) | - | - | 810,157,927 | - | (5,092) | (5,092) | (5,092) |
| 3/17/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 810,157,917 | - | (10) | (10) | (10) |
| 3/17/2008 | W/H TAX DIV WB | (29,416) | - | (29,416) | - | - | 810,128,501 | - | (29,416) | (29,416) | (29,416) |
| 3/19/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 810,128,500 | - | (1) | (1) | (1) |
| 3/24/2008 | W/H TAX DIV AIG | (11,700) | - | (11,700) | - | - | 810,116,801 | - | (11,700) | (11,700) | (11,700) |
| 3/27/2008 | W/H TAX DIV HD | (8,461) | - | (8,461) | - | - | 810,108,340 | - | (8,461) | (8,461) | (8,461) |
| 3/28/2008 | W/H TAX DIV BAC | (64,180) | - | (64,180) | - | - | 810,044,159 | - | (64,180) | (64,180) | (64,180) |
| 3/31/2008 | W/H TAX DIV PEP | (13,319) | - | (13,319) | - | - | 810,030,841 | - | (13,319) | (13,319) | (13,319) |
| 4/1/2008 | W/H TAX DIV MRK | (19,054) | - | (19,054) | - | - | 810,011,787 | - | (19,054) | (19,054) | (19,054) |
| 4/1/2008 | W/H TAX DIV KO | (17,466) | - | (17,466) | - | - | 809,994,322 | - | (17,466) | (17,466) | (17,466) |
| 4/2/2008 | W/H TAX DIV HPQ | (4,680) | - | (4,680) | - | - | 809,989,642 | - | (4,680) | (4,680) | (4,680) |
| 4/4/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 809,989,639 | - | (3) | (3) | (3) |
| 4/4/2008 | W/H TAX DIV KFT | (9,589) | - | (9,589) | - | - | 809,980,049 | - | (9,589) | (9,589) | (9,589) |
| 4/7/2008 | W/H TAX DIV WMT | (12,405) | - | (12,405) | - | - | 809,967,645 | - | (12,405) | (12,405) | (12,405) |
| 4/23/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 809,967,634 | - | (11) | (11) | (11) |
| 4/25/2008 | W/H TAX DIV GE | (70,594) | - | (70,594) | - | - | 809,897,039 | - | (70,594) | (70,594) | (70,594) |

MADC1135_00000032

Exhibit B

BLMIS ACCOUNT NO. 1FR080 (MARKET PORTFOLIO LIMITED)

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 4/25/2008 | W/H TAX DIV MDT | (2,917) | - | (2,917) | - | - | 809,894,123 | - | (2,917) | (2,917) | (2,917) |
| 4/30/2008 | W/H TAX DIV MS | (5,775) | - | (5,775) | - | - | 809,888,347 | - | (5,775) | (5,775) | (5,775) |
| 4/30/2008 | W/H TAX DIV JPM | (26,602) | - | (26,602) | - | - | 809,861,745 | - | (26,602) | (26,602) | (26,602) |
| 5/1/2008 | W/H TAX DIV VZ | (25,922) | - | (25,922) | - | - | 809,835,823 | - | (25,922) | (25,922) | (25,922) |
| 5/1/2008 | W/H TAX DIV WFC | (50,560) | - | (50,560) | - | - | 809,785,264 | - | (50,560) | (50,560) | (50,560) |
| 5/2/2008 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 819,785,264 | - | - | | |
| 5/2/2008 | W/H TAX DIV CVS | (1,867) | - | (1,867) | - | - | 819,783,397 | - | (1,867) | (1,867) | (1,867) |
| 5/2/2008 | W/H TAX DIV BK | (5,600) | - | (5,600) | - | - | 819,777,797 | - | (5,600) | (5,600) | (5,600) |
| 5/9/2008 | W/H TAX DIV AXP | (4,200) | - | (4,200) | - | - | 819,773,596 | - | (4,200) | (4,200) | (4,200) |
| 5/15/2008 | W/H TAX DIV PG | (26,447) | - | (26,447) | - | - | 819,747,150 | - | (26,447) | (26,447) | (26,447) |
| 5/15/2008 | W/H TAX DIV ABT | (11,901) | - | (11,901) | - | - | 819,735,249 | - | (11,901) | (11,901) | (11,901) |
| 5/20/2008 | W/H TAX DIV CAT | (4,900) | - | (4,900) | - | - | 819,730,348 | - | (4,900) | (4,900) | (4,900) |
| 5/23/2008 | W/H TAX DIV C | (33,603) | - | (33,603) | - | - | 819,696,746 | - | (33,603) | (33,603) | (33,603) |
| 5/28/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (28) | - | (28) | - | - | 819,696,717 | - | (28) | (28) | (28) |
| 5/29/2008 | W/H TAX DIV OS | (2,722) | - | (2,722) | - | - | 819,693,995 | - | (2,722) | (2,722) | (2,722) |
| 6/2/2008 | W/H TAX DIV INTC | (17,151) | - | (17,151) | - | - | 819,676,844 | - | (17,151) | (17,151) | (17,151) |
| 6/2/2008 | W/H TAX DIV WFC | (39,443) | - | (39,443) | - | - | 819,637,401 | - | (39,443) | (39,443) | (39,443) |
| 6/2/2008 | W/H TAX DIV WMT | (22,158) | - | (22,158) | - | - | 819,615,243 | - | (22,158) | (22,158) | (22,158) |
| 6/2/2008 | W/H TAX DIV COP | (9,748) | - | (9,748) | - | - | 819,605,495 | - | (9,748) | (9,748) | (9,748) |
| 6/3/2008 | W/H TAX DIV PFE | (84,971) | - | (84,971) | - | - | 819,520,524 | - | (84,971) | (84,971) | (84,971) |
| 6/3/2008 | W/H TAX DIV UPS | (17,762) | - | (17,762) | - | - | 819,502,762 | - | (17,762) | (17,762) | (17,762) |
| 6/6/2008 | W/H TAX DIV BA | (11,483) | - | (11,483) | - | - | 819,491,280 | - | (11,483) | (11,483) | (11,483) |
| 6/10/2008 | W/H TAX DIV XOM | (84,026) | - | (84,026) | - | - | 819,407,253 | - | (84,026) | (84,026) | (84,026) |
| 6/10/2008 | W/H TAX DIV UTX | (12,631) | - | (12,631) | - | - | 819,394,622 | - | (12,631) | (12,631) | (12,631) |
| 6/10/2008 | W/H TAX DIV IBM | (26,912) | - | (26,912) | - | - | 819,367,710 | - | (26,912) | (26,912) | (26,912) |
| 6/10/2008 | W/H TAX DIV EXC | (12,559) | - | (12,559) | - | - | 819,355,151 | - | (12,559) | (12,559) | (12,559) |
| 6/10/2008 | W/H TAX DIV JNJ | (17,398) | - | (17,398) | - | - | 819,337,754 | - | (17,398) | (17,398) | (17,398) |
| 6/10/2008 | W/H TAX DIV CVX | (53,645) | - | (53,645) | - | - | 819,284,109 | - | (53,645) | (53,645) | (53,645) |
| 6/12/2008 | W/H TAX DIV MMM | (14,353) | - | (14,353) | - | - | 819,269,755 | - | (14,353) | (14,353) | (14,353) |
| 6/12/2008 | W/H TAX DIV MSFT | (34,340) | - | (34,340) | - | - | 819,235,415 | - | (34,340) | (34,340) | (34,340) |
| 7/1/2008 | CHECK WIRE | (75,000,000) | - | (75,000,000) | - | - | 744,235,415 | (75,000,000) | (75,000,000) | (75,000,000) | (75,000,000) |
| 7/1/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 744,235,405 | (10) | (10) | (10) | (10) |
| 7/21/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 744,235,401 | (4) | (4) | (4) | (4) |
| 7/23/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 744,235,401 | (1) | (1) | (1) | (1) |
| 8/1/2008 | W/H TAX DIV CVS | (2,551) | - | (2,551) | - | - | 744,232,850 | - | (2,551) | (2,551) | (2,551) |
| 8/4/2008 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 764,232,850 | - | - | | |
| 8/8/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 764,232,846 | - | (4) | (4) | (4) |
| 8/13/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 764,232,846 | - | (0) | (0) | (0) |
| 8/20/2008 | W/H TAX DIV CAT | (6,793) | - | (6,793) | - | - | 764,226,053 | - | (6,793) | (6,793) | (6,793) |
| 8/22/2008 | W/H TAX DIV C | (43,624) | - | (43,624) | - | - | 764,182,429 | - | (43,624) | (43,624) | (43,624) |
| 8/28/2008 | W/H TAX DIV OS | (3,235) | - | (3,235) | - | - | 764,179,194 | - | (3,235) | (3,235) | (3,235) |
| 9/2/2008 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 774,179,194 | - | - | | |
| 10/1/2008 | CHECK WIRE | (65,000,000) | - | (65,000,000) | - | - | 709,179,194 | (65,000,000) | (65,000,000) | (65,000,000) | (65,000,000) |
| 10/2/2008 | W/H TAX DIV WFC | (24,354) | - | (24,354) | - | - | 709,154,840 | (24,354) | (24,354) | (24,354) | (24,354) |
| 10/2/2008 | W/H TAX DIV QCOM | (3,167) | - | (3,167) | - | - | 709,151,674 | (3,167) | (3,167) | (3,167) | (3,167) |
| 10/2/2008 | W/H TAX DIV BUD | (6,839) | - | (6,839) | - | - | 709,144,834 | (6,839) | (6,839) | (6,839) | (6,839) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 709,144,825 | (10) | (10) | (10) | (10) |
| 10/2/2008 | W/H TAX DIV HD | (4,700) | - | (4,700) | - | - | 709,140,124 | (4,700) | (4,700) | (4,700) | (4,700) |
| 10/2/2008 | W/H TAX DIV MCD | (15,758) | - | (15,758) | - | - | 709,124,366 | (15,758) | (15,758) | (15,758) | (15,758) |
| 10/2/2008 | W/H TAX DIV COP | (18,462) | - | (18,462) | - | - | 709,105,905 | (18,462) | (18,462) | (18,462) | (18,462) |
| 10/2/2008 | W/H TAX DIV JNJ | (48,122) | - | (48,122) | - | - | 709,057,782 | (48,122) | (48,122) | (48,122) | (48,122) |
| 10/2/2008 | W/H TAX DIV UPS | (16,880) | - | (16,880) | - | - | 709,040,902 | (16,880) | (16,880) | (16,880) | (16,880) |
| 10/2/2008 | W/H TAX DIV EXC | (11,935) | - | (11,935) | - | - | 709,028,967 | (11,935) | (11,935) | (11,935) | (11,935) |
| 10/2/2008 | W/H TAX DIV IBM | (17,330) | - | (17,330) | - | - | 709,011,638 | (17,330) | (17,330) | (17,330) | (17,330) |
| 10/2/2008 | W/H TAX DIV WMT | (20,247) | - | (20,247) | - | - | 708,991,390 | (20,247) | (20,247) | (20,247) | (20,247) |
| 10/2/2008 | W/H TAX DIV MSFT | (32,889) | - | (32,889) | - | - | 708,958,501 | (32,889) | (32,889) | (32,889) | (32,889) |
| 10/2/2008 | W/H TAX DIV BAC | (106,166) | - | (106,166) | - | - | 708,852,336 | (106,166) | (106,166) | (106,166) | (106,166) |
| 10/2/2008 | W/H TAX DIV INTC | (20,056) | - | (20,056) | - | - | 708,832,280 | (20,056) | (20,056) | (20,056) | (20,056) |
| 10/2/2008 | W/H TAX DIV BA | (7,394) | - | (7,394) | - | - | 708,824,886 | (7,394) | (7,394) | (7,394) | (7,394) |
| 10/2/2008 | W/H TAX DIV XOM | (78,675) | - | (78,675) | - | - | 708,746,211 | (78,675) | (78,675) | (78,675) | (78,675) |
| 10/2/2008 | W/H TAX DIV TWX | (8,450) | - | (8,450) | - | - | 708,737,762 | (8,450) | (8,450) | (8,450) | (8,450) |
| 10/2/2008 | W/H TAX DIV AIG | (21,998) | - | (21,998) | - | - | 708,715,763 | (21,998) | (21,998) | (21,998) | (21,998) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 708,715,762 | (2) | (2) | (2) | (2) |
| 10/2/2008 | W/H TAX DIV PEP | (24,638) | - | (24,638) | - | - | 708,691,124 | (24,638) | (24,638) | (24,638) | (24,638) |
| 10/2/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 708,691,112 | (12) | (12) | (12) | (12) |
| 10/2/2008 | W/H TAX DIV MMM | (13,640) | - | (13,640) | - | - | 708,677,472 | (13,640) | (13,640) | (13,640) | (13,640) |
| 10/2/2008 | W/H TAX DIV CVX | (50,266) | - | (50,266) | - | - | 708,627,205 | (50,266) | (50,266) | (50,266) | (50,266) |
| 10/2/2008 | W/H TAX DIV UTX | (12,004) | - | (12,004) | - | - | 708,615,202 | (12,004) | (12,004) | (12,004) | (12,004) |
| 10/2/2008 | W/H TAX DIV PFE | (54,715) | - | (54,715) | - | - | 708,560,487 | (54,715) | (54,715) | (54,715) | (54,715) |
| 11/4/2008 | FIDELITY SPARTAN  U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 708,560,486 | (1) | (1) | (1) | (1) |
| 11/4/2008 | W/H TAX DIV KO | (9,123) | - | (9,123) | - | - | 708,551,363 | (9,123) | (9,123) | (9,123) | (9,123) |

MADC1135_00000033

BLMIS ACCOUNT NO. 1FR080 - MARKET PORTFOLIO LIMITED

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 11/4/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 708,551,363 | (0) | (0) | (0) | (0) |
| 11/4/2008 | W/H TAX DIV PM | (13,553) | - | (13,553) | - | - | 708,537,810 | (13,553) | (13,553) | (13,553) | (13,553) |
| 11/4/2008 | W/H TAX DIV MRK | (29,804) | - | (29,804) | - | - | 708,508,006 | (29,804) | (29,804) | (29,804) | (29,804) |
| 11/4/2008 | W/H TAX DIV BAX | (5,192) | - | (5,192) | - | - | 708,502,814 | (5,192) | (5,192) | (5,192) | (5,192) |
| 11/4/2008 | W/H TAX DIV HPQ | (7,278) | - | (7,278) | - | - | 708,495,536 | (7,278) | (7,278) | (7,278) | (7,278) |
| 11/4/2008 | W/H TAX DIV MO | (5,442) | - | (5,442) | - | - | 708,490,094 | (5,442) | (5,442) | (5,442) | (5,442) |
| 12/1/2008 | CHECK WIRE | (210,000,000) | - | (210,000,000) | - | - | 498,490,094 | (210,000,000) | (210,000,000) | (210,000,000) | (210,000,000) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 498,490,093 | (1) | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 498,490,093 | (0) | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 498,490,092 | (1) | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 498,490,092 | (0) | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 498,490,091 | (1) | (1) | (1) | (1) |
| | Total: | $ 1,042,232,000 | $ (628,231,909) | $ 84,490,000 | $ - | $ - | 498,490,091 | $ (275,689,103) | $ (354,571,757) | $ (617,944,432) | $ (628,231,909) |

MADC1135_00000034

BLMIS ACCOUNT NO. 1R0252 - RYE SELECT BROAD MARKET INSURANCE FUND LP

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 10/1/2008 | CHECK WIRE | 40,000,000 | 40,000,000 | - | - | - | 40,000,000 | - | - | - | - |
| | Total: | | $ 40,000,000 | $ - | $ - | $ - | $ 40,000,000 | $ - | $ - | $ - | $ - |

MADC1135_00000035

BLMIS ACCOUNT NO. 1T0027 (GIBRALTAR BREAD MARKET FUND LP)

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Fraudulent Transfers | Column 11 6-Year Fraudulent Transfers | Column 12 Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/6/1994 | CHECK WIRE | 1,200,000 | 1,200,000 | - | - | - | 1,200,000 | - | - | - | - |
| 1/6/1994 | CHECK WIRE | 4,566,000 | 4,566,000 | - | - | - | 5,766,000 | - | - | - | - |
| 2/3/1994 | CHECK WIRE | 900,000 | 900,000 | - | - | - | 6,666,000 | - | - | - | - |
| 2/23/1994 | CHECK WIRE | 250,000 | 250,000 | - | - | - | 6,916,000 | - | - | - | - |
| 3/8/1994 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 7,416,000 | - | - | - | - |
| 3/28/1994 | CHECK WIRE | 250,000 | 250,000 | - | - | - | 7,666,000 | - | - | - | - |
| 4/5/1994 | CHECK WIRE | 1,900,000 | 1,900,000 | - | - | - | 9,566,000 | - | - | - | - |
| 5/4/1994 | CHECK WIRE | 700,000 | 700,000 | - | - | - | 10,266,000 | - | - | - | - |
| 5/5/1994 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 14,266,000 | - | - | - | - |
| 6/15/1994 | CHECK WIRE | 150,000 | 150,000 | - | - | - | 14,416,000 | - | - | - | - |
| 7/1/1994 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 14,916,000 | - | - | - | - |
| 7/14/1994 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 16,416,000 | - | - | - | - |
| 10/4/1994 | CHECK WIRE | 3,250,000 | 3,250,000 | - | - | - | 19,666,000 | - | - | - | - |
| 12/2/1994 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 21,666,000 | - | - | - | - |
| 12/5/1994 | RETURN CK WIRE 12/2/94 | (2,000,000) | (2,000,000) | - | - | - | 19,666,000 | - | - | - | - |
| 12/8/1994 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 21,666,000 | - | - | - | - |
| 1/3/1995 | TRANS TO 1T002930 (1T0029) | (9,250,000) | - | - | - | (9,250,000) | 12,416,000 | - | - | - | - |
| 1/5/1995 | CHECK WIRE | 880,000 | 880,000 | - | - | - | 13,296,000 | - | - | - | - |
| 1/9/1995 | CHECK WIRE | 390,000 | 390,000 | - | - | - | 13,686,000 | - | - | - | - |
| 1/11/1995 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 14,186,000 | - | - | - | - |
| 2/8/1995 | CHECK WIRE | (590,000) | - | (590,000) | - | - | 13,596,000 | - | - | - | (590,000) |
| 3/3/1995 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 14,096,000 | - | - | - | - |
| 3/7/1995 | CHECK WIRE | 600,000 | 600,000 | - | - | - | 14,696,000 | - | - | - | - |
| 4/3/1995 | CHECK WIRE | 650,000 | 650,000 | - | - | - | 15,346,000 | - | - | - | - |
| 4/4/1995 | CHECK WIRE | 850,000 | 850,000 | - | - | - | 16,196,000 | - | - | - | - |
| 4/10/1995 | CHECK WIRE | 130,000 | 130,000 | - | - | - | 16,326,000 | - | - | - | - |
| 5/3/1995 | CHECK WIRE | 2,200,000 | 2,200,000 | - | - | - | 18,526,000 | - | - | - | - |
| 6/5/1995 | CHECK WIRE | 747,625 | 747,625 | - | - | - | 19,273,625 | - | - | - | - |
| 6/6/1995 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 20,273,625 | - | - | - | - |
| 6/7/1995 | CHECK WIRE | 200,000 | 200,000 | - | - | - | 20,473,625 | - | - | - | - |
| 6/30/1995 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 22,473,625 | - | - | - | - |
| 6/30/1995 | CHECK WIRE | 950,000 | 950,000 | - | - | - | 23,423,625 | - | - | - | - |
| 8/3/1995 | CHECK WIRE | 1,400,000 | 1,400,000 | - | - | - | 24,823,625 | - | - | - | - |
| 9/5/1995 | CHECK WIRE | 4,300,000 | 4,300,000 | - | - | - | 29,123,625 | - | - | - | - |
| 10/1/1995 | CHECK WIRE | (1,350,000) | - | (1,350,000) | - | - | 27,773,625 | - | - | - | (1,350,000) |
| 10/2/1995 | CHECK WIRE | 300,000 | 300,000 | - | - | - | 28,073,625 | - | - | - | - |
| 11/6/1995 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 29,073,625 | - | - | - | - |
| 12/4/1995 | CHECK WIRE | 2,644,000 | 2,644,000 | - | - | - | 31,717,625 | - | - | - | - |
| 12/4/1995 | CHECK WIRE | 1,370,000 | 1,370,000 | - | - | - | 33,087,625 | - | - | - | - |
| 1/4/1996 | CHECK WIRE | 1,700,000 | 1,700,000 | - | - | - | 34,787,625 | - | - | - | - |
| 1/4/1996 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 36,787,625 | - | - | - | - |
| 1/8/1996 | CHECK WIRE | 150,000 | 150,000 | - | - | - | 36,937,625 | - | - | - | - |
| 1/12/1996 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 37,437,625 | - | - | - | - |
| 2/2/1996 | CHECK WIRE | 990,000 | 990,000 | - | - | - | 38,427,625 | - | - | - | - |
| 2/6/1996 | CHECK WIRE | 950,000 | 950,000 | - | - | - | 39,377,625 | - | - | - | - |
| 3/7/1996 | CHECK WIRE | 1,300,000 | 1,300,000 | - | - | - | 40,677,625 | - | - | - | - |
| 3/29/1996 | CHECK WIRE | (1,000,000) | - | (1,000,000) | - | - | 39,677,625 | - | - | - | (1,000,000) |
| 4/1/1996 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 41,177,625 | - | - | - | - |
| 4/3/1996 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 41,677,625 | - | - | - | - |
| 4/29/1996 | CHECK WIRE | (2,200,000) | - | (2,200,000) | - | - | 39,477,625 | - | - | - | (2,200,000) |
| 5/2/1996 | CHECK WIRE | 790,000 | 790,000 | - | - | - | 40,267,625 | - | - | - | - |
| 8/2/1996 | CHECK WIRE | 2,950,000 | 2,950,000 | - | - | - | 43,217,625 | - | - | - | - |
| 9/5/1996 | CHECK WIRE | 1,770,000 | 1,770,000 | - | - | - | 44,987,625 | - | - | - | - |
| 9/10/1996 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 46,987,625 | - | - | - | - |
| 9/10/1996 | CHECK WIRE | 1,600,000 | 1,600,000 | - | - | - | 48,587,625 | - | - | - | - |
| 10/3/1996 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 50,587,625 | - | - | - | - |
| 10/3/1996 | CHECK WIRE | 1,300,000 | 1,300,000 | - | - | - | 51,887,625 | - | - | - | - |
| 10/3/1996 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 53,887,625 | - | - | - | - |
| 11/5/1996 | CHECK WIRE | 3,500,000 | 3,500,000 | - | - | - | 57,387,625 | - | - | - | - |
| 11/7/1996 | CHECK WIRE | (500,000) | - | (500,000) | - | - | 56,887,625 | - | - | - | (500,000) |
| 1/8/1997 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 60,887,625 | - | - | - | - |
| 1/8/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 65,887,625 | - | - | - | - |

MADC1135_00000036

BLMIS ACCOUNT NO. 1T0027 (POTAMKIN ROAD MARKET FUND LP)

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
| 1/13/1997 | CHECK WIRE | 2,500,000 | 2,500,000 | - | - | - | 68,387,625 | - | - | - | - |
| 2/4/1997 | CHECK WIRE | 2,500,000 | 2,500,000 | - | - | - | 70,887,625 | - | - | - | - |
| 2/4/1997 | CHECK WIRE | 2,200,000 | 2,200,000 | - | - | - | 73,087,625 | - | - | - | - |
| 2/10/1997 | CHECK WIRE | 3,700,000 | 3,700,000 | - | - | - | 76,787,625 | - | - | - | - |
| 2/11/1997 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 79,787,625 | - | - | - | - |
| 2/11/1997 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 82,787,625 | - | - | - | - |
| 3/4/1997 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 85,787,625 | - | - | - | - |
| 3/31/1997 | CHECK WIRE | (3,000,000) | - | (3,000,000) | - | - | 82,787,625 | - | - | - | (3,000,000) |
| 4/4/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 87,787,625 | - | - | - | - |
| 4/4/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 92,787,625 | - | - | - | - |
| 7/7/1997 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 96,787,625 | - | - | - | - |
| 7/11/1997 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 97,787,625 | - | - | - | - |
| 8/4/1997 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 98,787,625 | - | - | - | - |
| 8/6/1997 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 100,287,625 | - | - | - | - |
| 9/4/1997 | CHECK WIRE | 500,000 | 500,000 | - | - | - | 100,787,625 | - | - | - | - |
| 10/6/1997 | CHECK WIRE | 3,900,000 | 3,900,000 | - | - | - | 104,687,625 | - | - | - | - |
| 11/5/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 109,687,625 | - | - | - | - |
| 12/3/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 114,687,625 | - | - | - | - |
| 12/3/1997 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 119,687,625 | - | - | - | - |
| 12/31/1997 | CHECK WIRE | (15,000,000) | - | (15,000,000) | - | - | 104,687,625 | - | - | - | (15,000,000) |
| 1/9/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 109,687,625 | - | - | - | - |
| 2/3/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 114,687,625 | - | - | - | - |
| 2/3/1998 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 116,687,625 | - | - | - | - |
| 3/5/1998 | CHECK WIRE | (1,000,000) | - | (1,000,000) | - | - | 115,687,625 | - | - | - | (1,000,000) |
| 4/1/1998 | CHECK WIRE | (1,500,000) | - | (1,500,000) | - | - | 114,187,625 | - | - | - | (1,500,000) |
| 5/5/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 119,187,625 | - | - | - | - |
| 5/5/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 124,187,625 | - | - | - | - |
| 5/5/1998 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 125,187,625 | - | - | - | - |
| 10/2/1998 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 130,187,625 | - | - | - | - |
| 1/8/1999 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 131,187,625 | - | - | - | - |
| 1/8/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 136,187,625 | - | - | - | - |
| 2/2/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 141,187,625 | - | - | - | - |
| 2/2/1999 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 144,187,625 | - | - | - | - |
| 3/1/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 149,187,625 | - | - | - | - |
| 3/1/1999 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 150,687,625 | - | - | - | - |
| 4/1/1999 | CHECK WIRE | 1,500,000 | 1,500,000 | - | - | - | 152,187,625 | - | - | - | - |
| 5/4/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 157,187,625 | - | - | - | - |
| 7/8/1999 | CHECK WIRE | (3,000,000) | - | (3,000,000) | - | - | 154,187,625 | - | - | - | (3,000,000) |
| 8/3/1999 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 157,187,625 | - | - | - | - |
| 8/3/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 162,187,625 | - | - | - | - |
| 9/2/1999 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 166,187,625 | - | - | - | - |
| 10/1/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 171,187,625 | - | - | - | - |
| 10/4/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 176,187,625 | - | - | - | - |
| 11/2/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 181,187,625 | - | - | - | - |
| 11/2/1999 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 186,187,625 | - | - | - | - |
| 11/2/1999 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 188,187,625 | - | - | - | - |
| 12/2/1999 | CHECK WIRE | 2,500,000 | 2,500,000 | - | - | - | 190,687,625 | - | - | - | - |
| 2/4/2000 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 193,687,625 | - | - | - | - |
| 10/2/2000 | CHECK WIRE | (32,000,000) | - | (32,000,000) | - | - | 161,687,625 | - | - | - | (32,000,000) |
| 11/1/2000 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 141,687,625 | - | - | - | (20,000,000) |
| 11/2/2000 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 145,687,625 | - | - | - | - |
| 12/1/2000 | CHECK WIRE | (8,000,000) | - | (8,000,000) | - | - | 137,687,625 | - | - | - | (8,000,000) |
| 12/4/2000 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 138,687,625 | - | - | - | - |
| 12/5/2000 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 143,687,625 | - | - | - | - |
| 2/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 148,687,625 | - | - | - | - |
| 2/2/2001 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 150,687,625 | - | - | - | - |
| 3/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 155,687,625 | - | - | - | - |
| 3/2/2001 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 157,687,625 | - | - | - | - |
| 3/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 162,687,625 | - | - | - | - |
| 3/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 167,687,625 | - | - | - | - |
| 3/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 172,687,625 | - | - | - | - |
| 3/30/2001 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 152,687,625 | - | - | - | (20,000,000) |

MADC1135_00000037

BLMIS ACCOUNT NO. 1T0027 - P&S GROUP / BROAD MARKET FUND LP

| | | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 | Column 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |

| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Fraudulent Transfers | 6-Year Fraudulent Transfers | Full History Fraudulent Transfers |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/2/2001 | CHECK WIRE | (3,000,000) | | (3,000,000) | - | - | 149,687,625 | | | | (3,000,000) |
| 7/12/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 154,687,625 | - | - | - | - |
| 8/3/2001 | CHECK WIRE | 3,000,000 | 3,000,000 | - | - | - | 157,687,625 | - | - | - | - |
| 9/7/2001 | CHECK WIRE | 4,000,000 | 4,000,000 | - | - | - | 161,687,625 | - | - | - | - |
| 10/3/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 166,687,625 | - | - | - | - |
| 10/3/2001 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 167,687,625 | - | - | - | - |
| 11/2/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 172,687,625 | - | - | - | - |
| 12/4/2001 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 174,687,625 | - | - | - | - |
| 12/4/2001 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 179,687,625 | - | - | - | - |
| 1/2/2002 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 159,687,625 | - | - | - | (20,000,000) |
| 2/1/2002 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 164,687,625 | - | - | - | - |
| 2/1/2002 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 169,687,625 | - | - | - | - |
| 6/30/2003 | CHECK WIRE | (12,000,000) | - | (12,000,000) | - | - | 157,687,625 | - | - | (12,000,000) | (12,000,000) |
| 7/3/2003 | CHECK WIRE | 2,000,000 | 2,000,000 | - | - | - | 159,687,625 | - | - | - | - |
| 8/6/2003 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 164,687,625 | - | - | - | - |
| 8/13/2003 | TRANS TO 1FR01030 (1FR010) | (2,000,000) | | - | - | (2,000,000) | 162,687,625 | - | - | - | - |
| 1/2/2004 | CHECK WIRE | (21,000,000) | - | (21,000,000) | - | - | 141,687,625 | - | - | (21,000,000) | (21,000,000) |
| 5/27/2004 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 131,687,625 | - | - | (10,000,000) | (10,000,000) |
| 12/31/2004 | CHECK WIRE | (36,000,000) | - | (36,000,000) | - | - | 95,687,625 | - | - | (36,000,000) | (36,000,000) |
| 3/1/2005 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 105,687,625 | - | - | - | - |
| 7/29/2005 | CHECK WIRE | (25,000,000) | - | (25,000,000) | - | - | 80,687,625 | - | - | (25,000,000) | (25,000,000) |
| 9/29/2005 | CHECK WIRE | (25,000,000) | - | (25,000,000) | - | - | 55,687,625 | - | - | (25,000,000) | (25,000,000) |
| 12/28/2005 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 35,687,625 | - | - | (20,000,000) | (20,000,000) |
| 1/30/2006 | CHECK WIRE | (28,000,000) | - | (28,000,000) | - | - | 7,687,625 | - | - | (28,000,000) | (28,000,000) |
| 5/3/2006 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 17,687,625 | - | - | - | - |
| 8/28/2006 | CHECK WIRE | (15,000,000) | - | (15,000,000) | - | - | 2,687,625 | - | - | (15,000,000) | (15,000,000) |
| 9/6/2006 | CHECK WIRE | 185,000,000 | 185,000,000 | - | - | - | 187,687,625 | - | - | - | - |
| 10/4/2006 | CHECK WIRE | 150,000,000 | 150,000,000 | - | - | - | 337,687,625 | - | - | - | - |
| 11/3/2006 | CHECK WIRE | 50,000,000 | 50,000,000 | - | - | - | 387,687,625 | - | - | - | - |
| 1/4/2007 | CHECK WIRE | 90,000,000 | 90,000,000 | - | - | - | 477,687,625 | - | - | - | - |
| 1/30/2007 | CHECK WIRE | (20,000,000) | - | (20,000,000) | - | - | 457,687,625 | - | (20,000,000) | (20,000,000) | (20,000,000) |
| 3/2/2007 | CHECK WIRE | 40,000,000 | 40,000,000 | - | - | - | 497,687,625 | - | - | - | - |
| 4/3/2007 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 517,687,625 | - | - | - | - |
| 5/2/2007 | CHECK WIRE | 40,000,000 | 40,000,000 | - | - | - | 557,687,625 | - | - | - | - |
| 6/4/2007 | CHECK WIRE | 25,000,000 | 25,000,000 | - | - | - | 582,687,625 | - | - | - | - |
| 7/3/2007 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 602,687,625 | - | - | - | - |
| 8/2/2007 | CHECK WIRE | 40,000,000 | 40,000,000 | - | - | - | 642,687,625 | - | - | - | - |
| 9/5/2007 | CHECK WIRE | 50,000,000 | 50,000,000 | - | - | - | 692,687,625 | - | - | - | - |
| 10/1/2007 | CHECK WIRE | 30,000,000 | 30,000,000 | - | - | - | 722,687,625 | - | - | - | - |
| 12/3/2007 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 732,687,625 | - | - | - | - |
| 1/2/2008 | CHECK WIRE | 20,000,000 | 20,000,000 | - | - | - | 752,687,625 | - | - | - | - |
| 2/1/2008 | CHECK WIRE | 25,000,000 | 25,000,000 | - | - | - | 777,687,625 | - | - | - | - |
| 3/3/2008 | CHECK WIRE | 15,000,000 | 15,000,000 | - | - | - | 792,687,625 | - | - | - | - |
| 3/28/2008 | CHECK WIRE | 75,000,000 | 75,000,000 | - | - | - | 867,687,625 | - | - | - | - |
| 3/28/2008 | CHECK WIRE | 100,000,000 | 100,000,000 | - | - | - | 967,687,625 | - | - | - | - |
| 3/28/2008 | CHECK WIRE | 100,000,000 | 100,000,000 | - | - | - | 1,067,687,625 | - | - | - | - |
| 3/28/2008 | CHECK WIRE | 100,000,000 | 100,000,000 | - | - | - | 1,167,687,625 | - | - | - | - |
| 3/28/2008 | CHECK WIRE | 100,000,000 | 100,000,000 | - | - | - | 1,267,687,625 | - | - | - | - |
| 3/28/2008 | CHECK WIRE | 100,000,000 | 100,000,000 | - | - | - | 1,367,687,625 | - | - | - | - |
| 5/2/2008 | CHECK WIRE | 55,000,000 | 55,000,000 | - | - | - | 1,422,687,625 | - | - | - | - |
| 6/3/2008 | CHECK WIRE | 65,000,000 | 65,000,000 | - | - | - | 1,487,687,625 | - | - | - | - |
| 7/8/2008 | CHECK WIRE | 75,000,000 | 75,000,000 | - | - | - | 1,562,687,625 | - | - | - | - |
| 8/4/2008 | CHECK WIRE | 75,000,000 | 75,000,000 | - | - | - | 1,637,687,625 | - | - | - | - |
| 9/2/2008 | CHECK WIRE | 40,000,000 | 40,000,000 | - | - | - | 1,677,687,625 | - | - | - | - |
| 9/25/2008 | CHECK WIRE | (40,000,000) | - | (40,000,000) | - | - | 1,637,687,625 | (40,000,000) | (40,000,000) | (40,000,000) | (40,000,000) |
| 11/3/2008 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 1,647,687,625 | - | - | - | - |
| | Total: | $ 2,043,077,625 | $ (384,140,000) | $ - | $ - | $ (11,250,000) | $ 1,647,687,625 | $ (40,000,000) | $ (60,000,000) | $ (252,000,000) | $ (384,140,000) |

MADC1135_00000038

Exhibit C

Customer Claims, Determinations and Objections

| Account Number | Date Claim Received | Claim Number | Account Name | Date of Determination Letter | Date of Objection | 502(d) |
|---|---|---|---|---|---|---|
| 1C1260 | 6/24/2009 | 011041 | Rye Select Broad Market Prime Fund, LP | 10/8/2010 | No objection filed | Yes |
| 1C1260 | 6/29/2009 | 013043 | Rye Select Broad Market Prime Fund, LP | 10/8/2010 | No objection filed | Yes |
| 1FR010 | 3/4/2009 | 006230 | Rye Select Insurance Portfolio, LDC | N/A | N/A | Yes |
| 1FR080 | 3/4/2009 | 006238 | Rye Select Broad Market Portfolio Limited | N/A | N/A | Yes |
| 1T0027 | 3/4/2009 | 006237 | Rye Select Broad Market Fund, LP | N/A | N/A | Yes |
| 1R0252 | 3/4/2009 | 006255 | Rye Select Broad Market Insurance Fund, LP | N/A | N/A | Yes |



**Value of Investment in Madoff Feeder Funds and S&P 100 Index
1995 - 2007**

| Correlation | | | |
|---|---|---|---|
| | S&P 100 | Rye Select | Fairfield |
| **S&P 100** | 1.00 | | |
| **Rye Select** | 0.33 | 1.00 | |
| **Fairfield** | 0.30 | 0.97 | 1.00 |

— S&P 100        — Fairfield Sentry        — Rye Select

MADC1135_00000040

## Performance of Rye Select and Other Instruments
## During Periods of Market Stress

|  | | Two Month Rolling Returns | | |
| --- | --- | --- | --- | --- |
| Month End | S&P 100 | All Hedge Funds | 10 Year Treasury | Rye Select |
| 8/31/1998 | -15.0% | -6.7% | 0.9% | 1.4% |
| 3/31/2001 | -17.3% | -1.1% | 0.8% | 1.3% |
| 9/30/2001 | -14.3% | -1.8% | 0.8% | 2.1% |
| 7/31/2002 | -13.3% | -2.5% | 0.8% | 3.6% |
| *Average Annual Returns* | | | | |
| 1995 - 2002 | 9.6% | 12.5% | 5.7% | 14.8% |

MADC1135_00000041

## Summary of Impossible Equity Trades
### Tremont Accounts
### January 1996 - December 2007

| | Equity | Date | Buy/Sell | Volume Tremont [a] | Volume Market [b] | Volume Outlying [c] |
|---|---|---|---|---|---|---|
| 1 | Bell Atlantic Corp | 01/19/99 | Buy | 75,192 | 8,101,300 | 600 |
| 2 | Cisco Systems | 01/20/99 | Buy | 46,475 | 18,238,000 | 4,000 |
| 3 | Bristol Myers Squibb | 03/05/99 | Buy | 125,550 | 3,233,900 | 600 |
| 4 | Wells Fargo | 03/05/99 | Buy | 105,300 | 4,283,800 | 8,100 |
| 5 | Texas Instruments | 03/03/00 | Buy | 40,560 | 6,605,600 | 600 |
| 6 | Microsoft | 04/17/02 | Sell | 317,667 | 27,581,400 | 76,400 |
| 7 | Pfizer | 05/01/02 | Buy | 464,250 | 15,881,100 | 71,400 |
| 8 | Oracle Corporation | 07/07/03 | Buy | 503,595 | 29,498,718 | 200 |
| 9 | American Express | 06/22/04 | Sell | 155,509 | 3,105,200 | 1,200 |
| 10 | Citigroup | 08/18/04 | Buy | 531,525 | 11,609,400 | 99,200 |

**Notes:** Data was reviewed for the following months: 07/96, 01/97, 09/97, 10/98, 1/99, 3/99, 6/99 ,1/00, 3/00, 1/01, 4/02, 5/02, 7/02, 3/03, 6/03, 7/03, 9/03, 10/03, 6/04, 8/04. The equities in the chart are a representation of the findings.

a. Tremont Volume is the combined volume of equities traded from Rye Select Broad Market, Rye Select Broad Market Prime Fund, Rye Select Broad Market Insurance Portfolio LDC, and Rye Select Broad Market Portfolio Limited.

b. Market Volume is the total volume reported in the NYSE TAQ database.

c. Outlying Volume is the number of market shares whose price was less than or equal to the Tremont price for buys and the number of market shares whose price was greater than or equal to the Tremont price for sells.

**Sources:** Bloomberg LP, NYSE TAQ Database, Rye Select Broad Market trade records.

MADC1135_00000042



**Bell Atlantic Corp. (Verizon) Intraday Prices**
**Tremont Funds Purchase Price vs. Volume Weighted Average Price**
**January 19, 1999**

| | Volume | |
| --- | --- | --- |
| Tremont | Market | Market Price ≤ Tremont Price |
| 75,192 | 8,101,300 | 600 |

| | Prices | | |
| --- | --- | --- | --- |
| Tremont | High | Low | VWAP |
| $56.84 | $58.44 | $55.88 | $57.77 |

- Minute-by-Minute VWAP
- Daily VWAP
- Tremont Purchase Price

**Sources:** Bloomberg LP, NYSE TAQ Database, Rye Select Broad Market trade records.

MADC1135_00000043



Cisco Systems Inc. Intraday Prices
Tremont Funds Purchase Price vs. Volume Weighted Average Price
January 20, 1999

| | Volume | |
|---|---|---|
| Tremont | Market | Market Price < Tremont Price |
| 46,475 | 18,238,000 | 4,000 |

| | Prices | | |
|---|---|---|---|
| Tremont | High | Low | VWAP |
| $105.34 | $109.94 | $104.94 | $108.04 |

· Minute-by-Minute VWAP
— Daily VWAP
— Tremont Purchase Price

Sources: Bloomberg LP, NYSE TAQ Database, Rye Select Broad Market trade records.

MADC1135_00000044



**Bristol Myers Squibb Intraday Prices**
**Tremont Funds Purchase Price vs. Volume Weighted Average Price**
**March 5, 1999**

| | Volume | |
|---|---|---|
| Tremont | Market | Market Price ≤ Tremont Price |
| 125,550 | 3,233,900 | 600 |

| | Prices | | |
|---|---|---|---|
| Tremont | High | Low | VWAP |
| $63.71 | $66.50 | $61.00 | $65.52 |

- · Minute-by-Minute VWAP
- — Daily VWAP
- — Tremont Purchase Price

Sources: Bloomberg LP, NYSE TAQ Database, Rye Select Broad Market trade records.

MADC1135_00000045



Wells Fargo Intraday Prices
Tremont Funds Purchase Price vs. Value Weighted Average Price
March 5, 1999

| | Volume | |
|---|---|---|
| | Tremont | Market |
| | 105,300 | 4,283,800 |

| Market Price < Tremont Price | 8,100 |

| | Prices | | | |
|---|---|---|---|---|
| | Tremont | High | Low | VWAP |
| | $38.46 | $39.19 | $38.00 | $38.85 |

- Minute-by-Minute VWAP
- Daily VWAP
- Tremont Purchase Price

Sources: Bloomberg LP, NYSE TAQ Database, Rye Select Broad Market trade records.

MADC1135_00000046



MADC1135_00000047



## Microsoft Intraday Prices
### Tremont Funds Sale Price vs. Volume Weighted Average Price
### April 17, 2002

| | Volume | |
|---|---|---|
| Tremont | Market | Market Price > Tremont Price |
| 317,667 | 27,581,400 | 76,400 |

| | Prices | | |
|---|---|---|---|
| Tremont | High | Low | VWAP |
| $58.16 | $58.28 | $56.42 | $57.07 |

- · Minute-by-Minute VWAP
- — Daily VWAP
- — Tremont Sale Price

Sources: Bloomberg LP, NYSE TAQ Database, Rye Select Broad Market trade records.

MADC1135_00000048



Pfizer Intraday Prices
Tremont Funds Purchase Price vs. Volume Weighted Average Price
May 1, 2002

Sources: Bloomberg LP, NYSE TAQ Database, Rye Select Broad Market trade records.

• Minute-by-Minute VWAP
— Daily VWAP
— Tremont Purchase Price

| | Volume | |
|---|---|---|
| Tremont | Market | Market Price < Tremont Price |
| 464,250 | 15,881,100 | 71,400 |

| | Prices | | |
|---|---|---|---|
| Tremont | High | Low | VWAP |
| $36.59 | $37.64 | $36.53 | $37.14 |

MADC1135_00000049



## Oracle Corporation Intraday Prices
### Tremont Funds Purchase Price vs. Volume Weighted Average Price
### July 7, 2003

| | Volume | |
|---|---|---|
| | Market | Market Price ≤ Tremont Price |
| Tremont | | |
| 503,595 | 29,498,718 | 200 |

| | Prices | | |
|---|---|---|---|
| Tremont | High | Low | VWAP |
| $12.28 | $12.76 | $12.29 | $12.50 |

Sources: Bloomberg LP, NYSE TAQ Database, Rye Select Broad Market trade records.

•  Minute-by-Minute VWAP
—— Daily VWAP
—— Tremont Purchase Price

MADC1135_00000050



American Express Intraday Prices
Tremont Funds Sale Price vs. Volume Weighted Average Price
June 22, 2004

| | Volume | |
|---|---|---|
| Tremont | Market | Market Price ≥ Tremont Price |
| 155,509 | 3,105,200 | 1,200 |

| | Prices | | |
|---|---|---|---|
| Tremont | High | Low | VWAP |
| $51.64 | $51.65 | $51.14 | $51.37 |

•  Minute-by-Minute VWAP

———  Daily VWAP

———  Tremont Sale Price

Sources: Bloomberg LP, NYSE TAQ Database, Rye Select Broad Market trade records.

MADC1135_00000051



**Citigroup Intraday Prices**
**Tremont Funds Purchase Price vs. Volume Weighted Average Price**
**August 18, 2004**

| | Volume | |
|---|---|---|
| | Market | Market Price ≤ Tremont Price |
| Tremont | 11,609,400 | |
| 531,525 | | 99,200 |

| | Prices | | |
|---|---|---|---|
| | High | Low | VWAP |
| Tremont | $45.65 | $45.05 | $45.47 |
| $45.07 | | | |

• Minute-by-Minute VWAP
— Daily VWAP
— Tremont Purchase Price

Sources: Bloomberg L.P., NYSE TAQ Database, Rye Select Broad Market trade records.

MADC1135_00000052



Volume

Tremont Group Holdings - Historic Option Activity compared to CBOE 2001-2008 (Puts Only)

Red line indicates Tremont Group Holdings
Black line indicates CBOE Option Volume
- Option Volume (Accounts 1C1260, 1FR010, 1FR080, 1R0252, and 1T0027)

MADC1135_00000053



Tremont Group Holdings - Historic Option Activity compared to CBOE 2001-2008 (Calls Only)

Blue line indicates Tremont Group Holdings - Option Volume (Accounts 1C1260, 1FR010, 1FR080, 1RO352, and 1T0027)
Black line indicates CBOE Option Volume

MADC1135_00000054



Weighted Average Equity Purchase Price v. High-Low Price Range
Rye Select Broad Market
March 2003

**Sources:** Rye Select Broad Market Trade Records and Bloomberg L.P.

MADC1135_00000055

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Marc Skapof
Email: mskapof@bakerlaw.com
Marc D. Powers
Email: mpowers@bakerlaw.com
Eric R. Fish
Email: efish@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>       Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL)<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF<br><br>       Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>       Plaintiff, | Adv. Pro. No. _____ (BRL) |

v.

TREMONT  GROUP HOLDINGS, INC.;
TREMONT PARTNERS, INC.; TREMONT
(BERMUDA) LIMITED; RYE SELECT BROAD
MARKET FUND, L.P.; RYE SELECT BROAD
MARKET PRIME FUND, L.P.; RYE SELECT
BROAD MARKET PORTFOLIO LIMITED; RYE
SELECT BROAD MARKET INSURANCE
PORTFOLIO, LDC; RYE SELECT BROAD
MARKET INSURANCE FUND, L.P.; RYE
SELECT BROAD MARKET XL FUND, L.P.;
RYE SELECT BROAD MARKET XL
PORTFOLIO LIMITED; TREMONT
ARBITRAGE FUND, L.P.; TREMONT
ARBITRAGE FUND IRELAND; TREMONT
EMERGING MARKETS FUND – IRELAND;
TREMONT  EQUITY FUND – IRELAND;
TREMONT INTERNATIONAL INSURANCE
FUND, L.P.; TREMONT  LONG/SHORT
EQUITY FUND, L.P.; TREMONT MARKET
NEUTRAL FUND, L.P.; TREMONT  MARKET
NEUTRAL FUND II, L.P.; TREMONT  MARKET
NEUTRAL FUND LIMITED; TREMONT
OPPORTUNITY FUND LIMITED; TREMONT
OPPORTUNITY FUND II, L.P.; TREMONT
OPPORTUNITY FUND III, L.P.; RYE SELECT
EQUITIES FUND; TREMONT MULTI
MANAGER FUND; LIFEINVEST
OPPORTUNITY FUND LDC; OPPENHEIMER
ACQUISITION CORP.; MASSMUTUAL
HOLDING LLC; MASSACHUSETTS MUTUAL
LIFE INSURANCE CO.; SANDRA L. MANZKE
AND ROBERT I. SCHULMAN,

Defendants.

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION .................................................................................1

Tremont Seeks the "Palm Beach Crowd"...........................................................3

Lack of "Best Industry Practices" Leads Customer to Question "Legitimacy of the Whole
    Bernie Thing"..................................................................................................5

Oppenheimer and Mass Mutual Acquire Tremont...............................................6

Extraordinary Withdrawals and Profits ..............................................................6

JURISDICTION AND VENUE.............................................................................9

THE TRUSTEE, HIS POWERS AND STANDING ...........................................10

THE DEFENDANTS ...........................................................................................14

    A.     The Rye Funds.........................................................................14

    B.     Rye Insurance .........................................................................17

    C.     Tremont ..................................................................................17

    D.     Oppenheimer, MassMutual Holding and Mass Mutual...........19

    E.     Manzke and Schulman............................................................22

    F.     XL Funds ................................................................................23

    G.     Tremont Funds........................................................................25

THE PONZI SCHEME ........................................................................................26

HISTORY OF TREMONT AND THEIR RELATIONSHIP WITH BLMIS............30

    A.     Manzke, Schulman, and the Beginnings of the Rye Funds .................30

    B.     Acceptance of Madoff's Strategy and Terms to Fuel Expansion of Rye
        Funds ......................................................................................31

    C.     The XL Funds and Tremont Funds...........................................33

CONTROL OF TREMONT BY OPPENHEIMER AND MASS MUTUAL............38

    A.     The Acquisition ......................................................................38

    B.     Oppenheimer and Mass Mutual's Direction and Control of Tremont Group ......43

    C.     The Role of Mass Mutual .......................................................46

TREMONT'S DUE DILIGENCE REPRESENTATIONS TO INVESTORS WENT
    UNFULFILLED ................................................................................................48

TREMONT IGNORES NUMEROUS RED FLAGS .............................................52

    A.     Madoff's Unrealistic Consistency ..........................................53

    B.     Improbable Equities Trading Volume ......................................55

    C.     Impossible Options Volumes ..................................................56

# TABLE OF CONTENTS

(continued)

Page

D.  Lack of Strategy Footprint.................................................................58

E.  Madoff's Uncanny Ability to Buy Low and Sell High .......................59

F.  Trading Outside of Daily Price Ranges.............................................59

G.  Options Trading with Mythical Counterparties.................................60

H.  Madoff's Lack of Transparency and Secrecy....................................63

I.  Settlement and Trade Anomalies........................................................66

J.  BLMIS's Odd Organizational and Compensation Structures ...........67

K.  No Independent Custodian .................................................................69

L.  BLMIS's Strip Mall Auditors.............................................................70

M.  Madoff Evaded SEC Filing Requirements .........................................71

N.  Old Fashioned Paper Trade Tickets and Statements .........................72

O.  Account Statement Inconsistencies with Madoff's Purported Strategy ..............72

DEFENDANTS IGNORED RED FLAGS DISCUSSED IN 2006 TREMONT DUE
DILIGENCE EFFORTS.................................................................................73

SECURITIES INDUSTRY PARTICIPANTS HEED THE RED FLAGS .....................77

EMERGING INDUSTRY STANDARDS AND THE *BAYOU PONZI* SHOULD HAVE
PUT TREMONT ON HIGH ALERT...............................................................82

VOIDABLE TRANSFERS FROM BLMIS ...........................................................85

A.  Initial Transfers to the Rye Funds .....................................................85

B.  Subsequent Transfers.........................................................................89

CUSTOMER CLAIMS .......................................................................................98

COUNT ONE: PREFERENTIAL TRANSFERS (INITIAL TRANSFEREES) - 11 U.S.C.
§§ 547(b), 550 AND 551 *AGAINST BROAD MARKET FUND, PORTFOLIO
LIMITED FUND AND INSURANCE PORTFOLIO LDC FUND* ....................98

COUNT TWO: PREFERENTIAL TRANSFERS (GENERAL PARTNER AND
CORPORATE PARENT LIABILITY) - 11 U.S.C. §§ 547(b), 550 AND 551
*AGAINST TREMONT PARTNERS, TREMONT GROUP, OPPENHEIMER,
MASSMUTUAL HOLDING AND MASS MUTUAL* .....................................100

COUNT THREE: PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREES) -
11 U.S.C. §§ 547(b), 550 AND 551 AGAINST ARBITRAGE IRELAND,
MARKET NEUTRAL FUND, OPPORTUNITY LIMITED, OPPORTUNITY III
FUND, TREMONT, AND/OR PARENTS.................................................102

COUNT FOUR: FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) – 11
U.S.C. §§ 548(a)(1)(A), 550 AND 551 AGAINST THE RYE FUNDS.....................104

# TABLE OF CONTENTS
(continued)

Page

COUNT FIVE: FRAUDULENT TRANSFERS (GENERAL PARTNER AND
CORPORATE PARENT LIABILITY) – 11 U.S.C. §§ 548(a)(1)(A), 550 AND
551 AGAINST TREMONT PARTNERS, TREMONT GROUP,
OPPENHEIMER, MASSMUTUAL HOLDING AND MASS MUTUAL ...................104

COUNT SIX: FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) – 11 U.S.C.
§§ 548(a)(1)(B), 550 AND 551 AGAINST THE RYE FUNDS....................................106

COUNT SEVEN: FRAUDULENT TRANSFERS (GENERAL PARTNER AND
CORPORATE PARENT LIABILITY) – 11 U.S.C. §§ 548(a)(1)(B), 550 AND 55
AGAINST TREMONT PARTNERS, TREMONT GROUP, OPPENHEIMER,
MASSMUTUAL HOLDING AND MASS MUTUAL ..................................................107

COUNT EIGHT: FRAUDULENT TRANSFER (INITIAL TRANSFEREES) – NEW
YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279,
AND 11 U.S.C. §§ 544, 550(a) AND 551 AGAINST THE RYE FUNDS ..................109

COUNT NINE: FRAUDULENT TRANSFER (GENERAL PARTNER AND
CORPORATE PARENT LIABILITY) – NEW YORK DEBTOR AND
CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544,
550(a) AND 551 AGAINST TREMONT PARTNERS, TREMONT GROUP,
OPPENHEIMER, MASSMUTUAL HOLDING AND MASS MUTUAL ...................110

COUNT TEN: FRAUDULENT TRANSFER (INITIAL TRANSFEREE) -- NEW YORK
DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11
U.S.C. §§ 544, 550(A), AND 551 AGAINST THE RYE FUNDS...............................111

COUNT ELEVEN: FRAUDULENT TRANSFER (GENERAL PARTNER AND
CORPORATE PARENT LIABILITY) -- NEW YORK DEBTOR AND
CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544,
550(A), AND 551 AGAINST TREMONT PARTNERS, TREMONT GROUP,
OPPENHEIMER, MASSMUTUAL HOLDING AND MASS MUTUAL ..................112

COUNT TWELVE: FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) —
NEW YORK DEBTOR AND CREDITOR LAW §§274, 278 AND/OR 279,
AND 11 U.S.C. §§ 544, 550(a), AND 551 AGAINST THE RYE FUNDS .................114

COUNT THIRTEEN: FRAUDULENT TRANSFERS (GENERAL PARTNER AND
CORPORATE PARENT LIABILITY) —NEW YORK DEBTOR AND
CREDITOR LAW §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a),
AND 551 AGAINST TREMONT PARTNERS, TREMONT GROUP,
OPPENHEIMER, MASSMUTUAL HOLDING AND MASS MUTUAL ..................114

COUNT FOURTEEN: FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) -
NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279,
AND 11 U.S.C. §§ 544, 550(a) AND 551 AGAINST THE RYE FUNDS ..................116

# TABLE OF CONTENTS

(continued)

**Page**

COUNT FIFTEEN: FRAUDULENT TRANSFERS (GENERAL PARTNER AND
CORPORATE PARENT LIABILITY) -NEW YORK DEBTOR AND
CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a)
AND 551 AGAINST TREMONT PARTNERS, TREMONT GROUP,
OPPENHEIMER, MASSMUTUAL HOLDING AND MASS MUTUAL ...................117

COUNT SIXTEEN: RECOVERY OF THE TRANSFERS (INITIAL TRANSFEREE) –
NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW
YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279,
AND 11 U.S.C. §§ 544, 550(a)(1), AND 551 AGAINST THE RYE FUNDS .............118

COUNT SEVENTEEN: RECOVERY OF THE TRANSFERS (GENERAL PARTNER
AND CORPORATE PARENT LIABILITY) – NEW YORK CIVIL
PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK DEBTOR AND
CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11 U.S.C. §§ 544,
550(a)(1), AND 551 AGAINST TREMONT PARTNERS, TREMONT GROUP,
OPPENHEIMER, MASSMUTUAL HOLDING AND MASS MUTUAL ...................119

COUNT EIGHTEEN: RECOVERY OF SUBSEQUENT TRANSFERS  – NEW YORK
CIVIL PROCEDURE LAW AND RULES 203(g), 213(8), NEW YORK
DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, AND 11
U.S.C. §§ 544, 550(a)(1), AND 551 AGAINST XL LP, XL PORTFOLIO, THE
TREMONT FUNDS, TREMONT PARTNERS, TREMONT GROUP,
TREMONT BERMUDA, OPPENHEIMER, MASSMUTUAL HOLDING,
MASS MUTUAL, MANZKE, AND/OR SCHULMAN ................................................121

COUNT NINETEEN: DISALLOWANCE OF RYE FUNDS' AND RYE
INSURANCE'S SIPA CLAIMS ..................................................................................122

COUNT TWENTY: EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS .............123

COUNT TWENTY-ONE: UNJUST ENRICHMENT AGAINST TREMONT GROUP,
TREMONT PARTNERS, TREMONT BERMUDA, OPPENHEIMER,
MASSMUTUAL HOLDING, MASS MUTUAL, MANZKE AND SCHULMAN ......124

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff individually ("Madoff"), by and through his undersigned counsel, for his Complaint, states as follows:

## NATURE OF THE ACTION

1.      For fifteen years, many of the Defendants named in this Complaint helped funnel more than $4 billion into the single largest investor fraud in history.  The Defendants substantially aided, enabled and helped to sustain the massive Ponzi scheme orchestrated by Bernard Madoff ("Madoff"), in order to reap financial windfalls from their clients' investments. Through their headquarters in Rye, New York, they managed the second largest group of feeder funds next to the Fairfield Greenwich group of companies ("Fairfield"), and assisted Madoff in his fraud.  In turn, these Defendants collectively received more than $2.1 billion in avoidable transfers from BLMIS that should be recovered by the Trustee for distribution in accordance with the Trustee's statutory authority.

2.      The Defendants include a number of investment funds and affiliates associated with the multi-billion dollar money management company now known as Tremont Group Holdings, Inc.  Defendants include: Tremont Group Holdings, Inc. itself ("Tremont Group"), its management arms Tremont Partners, Inc. ("Tremont Partners") and Tremont (Bermuda) Limited ("Tremont Bermuda") (all three entities collectively shall be referred to herein as "Tremont"); Tremont Group's parent corporation, Oppenheimer Acquisition Corp. ("Oppenheimer"); Oppenheimer's parent corporations, MassMutual Holding LLC ("MassMutual Holding") and Massachusetts Mutual Life Insurance Company ("Mass Mutual") (Oppenheimer, MassMutual

Holding and Mass Mutual collectively shall be referred to as "Parents"); Tremont Group's founder and former CEO, Sandra L. Manzke ("Manzke"); Tremont Group's former President and CEO, Robert Schulman ("Schulman"); four Tremont-managed funds that were directly invested with BLMIS and received a number of fraudulent conveyances (collectively, and as described more fully later in the Complaint, the "Rye Funds"); another fund, Rye Select Broad Market Insurance Fund, L.P., which was directly invested with BLMIS that did not receive fraudulent conveyances, but should have its claim against the estate denied and subordinated due to the actions of the Defendants ("Rye Insurance"); and over a dozen Tremont-managed funds that were indirect investors with BLMIS through their investments in the Rye Funds (collectively, and as described more fully later in the Complaint, the "XL Funds" and "Tremont Funds"). All of these Defendants assisted Madoff to greater and lesser degrees in perpetuating the fraud and benefitted from the revenue Madoff generated for them.

3.      For years, the Defendants were repeatedly warned and given the opportunity to uncover – through information in their own possession or publicly available – that BLMIS's success could be the result of fraud. Nonetheless, these Defendants ignored this information and many other obvious warning signs of fraud.

4.      If the Defendants were ignorant of the fraud, it was because they failed in their due diligence and investment management obligations. They quite simply did not want to know, remaining willfully ignorant in order to maximize their own profits and serve their own self-interest. The Ponzi scheme was highly profitable for the Defendants until its collapse, as Tremont earned more than $180 million dollars in fees in the six years preceding the collapse of the scheme – and as much as $240 million over the life of the Madoff relationship – as well as the caché of being one of the largest and most profitable hedge funds in the world. Yet every

cent of the billions they accepted in withdrawals and fees over the course of their relationship
with Madoff was money stolen from other BLMIS customers.

**Tremont Seeks the "Palm Beach Crowd"**

5.      Beginning in 1994, Tremont Advisers, Inc., which is now known as Tremont
Group, founded The Broad Market Fund, L.P. (which later changed its name to the American
Masters Broad Market Fund, L.P. in 1999, and then to Defendant Rye Select Broad Market
Fund, LP. in 2006) ("Broad Market Fund").  The Broad Market Fund became one of the largest
and longest running Madoff feeder funds.  Like other Madoff feeder funds, this fund was created
for the purpose of opening an account in BLMIS's Investment Advisory business ("IA
Business") and "feeding" investors' monies to Madoff for investing.  In this account, just as for
all the other BLMIS accounts opened for Tremont, Madoff had full trading authority and
discretion.  Due to the success of the Broad Market Fund and the returns it purportedly
generated, Tremont increased the investors and investments in the various funds they created
over time to invest with BLMIS and greatly profited from the fees generated by those
investments.  By the time Madoff's scheme collapsed in December 2008, Tremont had given
Madoff at least $4 billion through their various funds.

6.      Despite purporting to be an experienced organization which had a sophisticated
plan for conducting due diligence on money managers, Tremont did not perform independent,
reasonable, or meaningful quantitative, operational, structural, or risk-management due diligence
on Madoff or his purported investment strategy prior to or after investing many billions of
dollars.  Nor did they fulfill their fiduciary duties to their funds and their investors by performing
what they promised to do.  Tremont and Parents did not conduct any reasonable analysis as to
whether Madoff's stated returns were even possible based on the strategy he purported to use.
They also did not seriously consider the significant operational deficiencies of Madoff's

operations, many of which were highly suspicious and placed Defendants on inquiry notice of fraud. The Defendants wrongly relied on Madoff's reputation and consciously disregarded many badges of fraud, instead relying on Madoff's history of steady returns and failing to perform proper and required due diligence.

7.     A telling illustration of Tremont's lack of investigation and their preference for investors who did not ask critical questions is an internal email exchange from October 2008. The email exchange is between two Tremont employees discussing the type of detailed information certain institutional investors would require before investing with Madoff. One employee stated: "Unlike the Palm Beach crowd, institutions won't invest on faith. They can't." In other words, Tremont primarily sought out certain non-critical institutional investors and wealthy individuals who were unlikely to perform any of their own diligence, and instead would rely on Tremont's answers and purported analysis. Despite holding themselves out as investment experts which performed exclusive, state-of-the-art due diligence, Tremont failed miserably in their responsibilities and continued to invest with BLMIS despite numerous indicia of fraud.

8.     Though Tremont and Parents never performed independent, meaningful, and reasonable due diligence prior to or after creating their first Madoff investment vehicle, the "success" of their early Rye Funds and the profits earned by Tremont and Tremont's management - including Manzke and Schulman - led to the creation of numerous, additional Madoff feeder funds aimed at marketing Madoff and his purported investment strategy to foreign investors, as well as for leveraging Madoff's consistently positive returns. Specifically, subsequent to the creation of the Broad Market Fund, Tremont created additional Madoff investment vehicles: Defendants Rye Select Broad Market Prime Fund, L.P., Rye Select Broad

Market Portfolio Fund Limited, Rye Select Broad Market Insurance Portfolio, LDC, and Rye Insurance. These "single-manager funds," as they were known to Tremont, were close to 100% invested with BLMIS. To even further maximize profits, "multi-manager" funds under the Tremont umbrella – *i.e.,* funds of funds that utilized multiple money managers – also invested a portion of their assets under management with BLMIS, indirectly through one or more of the Rye Funds. In other words, a large percentage of Tremont's business was built upon the fiction created by Madoff's Ponzi scheme.

9.     For almost fifteen years, Tremont and Parents were successful in blindly relying on Madoff to drive their funds' returns, and more importantly, their profits. They did whatever it took, and ignored whatever they saw that seemed suspicious, in order to expand the Madoff-related profits. Tremont entered into loans and "swap" agreements in an effort to leverage and increase Madoff's purported returns from his strategy. Independent, reasonable due diligence and fulfilling its fiduciary obligations were replaced by Tremont's financial incentive to remain blissfully, and thus willfully, ignorant.

### Lack of "Best Industry Practices" Leads Customer to Question "Legitimacy of the Whole Bernie Thing"

10.     Defendants were aware of the numerous questions surrounding Madoff and BLMIS. In reviewing the investments in 2006, Tremont admitted that Madoff's operation "does not represent the best industry practices." Nevertheless, they continued to pour investor monies into what they knew or should have known was a fraud.

11.     Even some of Tremont's investors raised questions regarding Madoff. For example, in October 2007, one client could not reconcile why his returns were different from the returns of someone with a direct BLMIS account. In communications with Tremont, the client

went as far as to state: "[. . .] Makes me concerned about the legitimacy of the whole Bernie thing."

### Oppenheimer and Mass Mutual Acquire Tremont

12.    Tremont's success due to investments with BLMIS led to their being acquired by Defendant Oppenheimer, a subsidiary of Defendants MassMutual Holding and Mass Mutual, for over $140 million in 2001.  Though the Parents had an opportunity to perform their own due diligence of Madoff's purported strategy, Tremont's success blinded the Parents to obvious questions as to the legitimacy of Madoff's profits, as well as the questions and substantial red flags surrounding Madoff and his operations.

13.    None of the Parents performed meaningful or reasonable due diligence on Madoff, his operations, his consistent returns, or his purported investment strategy prior to or subsequent to the acquisition.  That acquisition was also very profitable to both Manzke and Schulman personally, as they signed lucrative multi-year employment agreements with Oppenheimer's other subsidiary, OppenheimerFunds, Inc. ("OppenheimerFunds"), and had their shares in Tremont purchased at the closing.

### Extraordinary Withdrawals and Profits

14.    Prior to the collapse, all Defendants, directly and indirectly, via the Rye Funds' withdrawals, received more than $2.1 billion in transfers from BLMIS, including approximately $1.9 billion in the six years prior to the SIPA Proceeding, as defined below.  These vast amounts invested with BLMIS through the Rye Funds resulted in extraordinary fees of over $180 million for Tremont, Manzke, and Schulman in the six years prior to the bankruptcy, which in turn benefitted the Parents.  All told, the Trustee estimates that Tremont received up to $240 million in fees during the life of their investments with BLMIS.

15.     Defendants knew or should have known that they were profiting from fraud for a multitude of reasons, as alleged herein.  Defendants were aware, or at the very least should have been aware, of the following red flags putting them on notice that Madoff was a fraud:

a.      Tremont and the Parents never questioned Madoff's returns showing consistent, positive results, even when the stock market suffered serious downturns due to, among other things, the Russian market crisis in 1998, the 9/11 terrorist attacks, the burst of the tech bubble from 2000-2002, and the 2007-2008 collapse of the financial and housing markets. This is despite the Madoff strategy supposedly being tied, or correlated, to the overall direction of the equity markets;

b.      BLMIS's equity trading volumes were an implausibly high percentage of the entire market; its options trading volumes also often exceeded the entire daily volume of reported option trades on listed exchanges;

c.      BLMIS's billions of dollars in purported trades never caused any noticeable price displacement in the market;

d.      Madoff had the uncanny ability to buy equities at some of their lowest prices for the day and sell them near their highest prices;

e.      Confirmations and monthly statements showed that trades purportedly made by BLMIS for the Rye Funds fell outside the reported daily ranges of the high and low prices for these stocks and options;

f.      Madoff would not disclose the identities of his options counterparties even though BLMIS was trading these options as agent for the Rye Funds.  In addition, the trade confirmations created by BLMIS and received by Tremont had other abnormalities about

Madoff's options trading that should have caused Tremont to ask more questions about the mythical counterparties that Madoff refused to disclose;

g.      Madoff's lack of transparency and secrecy had analysts wondering how they could replicate Madoff's performance and Tremont's own clients asking questions;

h.      BLMIS reported a large number of trades having settlement dates that were clearly wrong.  In addition, there were eight instances of trades being made on the weekends;

i.      BLMIS's compensation and organizational structure deviated from well-established industry practices and Madoff left millions – if not billions – of dollars on the table that he could have easily charged for his management services.  Instead, Madoff allowed "feeders" such as Tremont to receive these fees;

j.      BLMIS served as both custodian and executing broker of its customers' funds and securities, which meant that there was no independent third party that could verify either the actual existence of customer assets at BLMIS or that transactions for the Rye and Tremont Funds were actually occurring;

k.      BLMIS, which had billions of dollars under management, was purportedly being audited by a small, unknown accounting firm located in a strip mall in Rockland County, New York;

l.      Madoff converted all of his equities to Treasury bills on a quarterly and year-end basis in another effort to avoid regulatory filing requirements;

m.      BLMIS only mailed paper confirmations days after trades were purportedly executed, which was a significant departure from the industry practice of allowing electronic real-time access to trade information;

n.   BLMIS account statements and trade confirmations showed inconsistencies with Madoff's purported trading strategy; and

16.   In addition, other professionals and institutions involved with the securities industry were able to analyze Madoff, his trading strategy, and his operations and concluded they were problematic.

17.   Through this action, therefore, the Trustee seeks a judgment in the aggregate amount of at least $2.1 billion against the Defendants, avoiding and recovering the preferential payments, fraudulent transfers, fictitious profits, and subsequent transfers they received, as well as disallowance and equitable subordination of their claims against the estate.  The Trustee also seeks additional amounts to prevent any unjust enrichment on the part of Tremont, Oppenheimer, MassMutual Holding, Mass Mutual, Manzke, and Schulman.

## JURISDICTION AND VENUE

18.   Based upon the Trustee's ongoing investigation, it appears that there were more than 8,000 customer accounts at BLMIS over the life of the scheme.  In early December 2008, BLMIS generated account statements for its approximately 4,900 active customer accounts. These statements in the aggregate reflected that BLMIS customers had approximately $65 billion in capital held by BLMIS in their accounts.  In reality, BLMIS had customer assets on hand worth a fraction of that amount.  Customer accounts had not accrued any real profits because no investments were ever made for them.  When the Ponzi scheme came to light on December 11, 2008, investors had lost approximately $20 billion in principal.

19.   The Trustee brings this adversary proceeding pursuant to his authority under sections 78fff(b) and 78fff-2(c)(3) of SIPA, sections 105(a), 502(d), 510(c), 544, 547, 548(a), 550(a), and 551 of title 11, *et seq.*, United States Code, § 101 (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270) (McKinney 2001), New York

Civil Practice Law and Rules 203(g) and 208(13) (McKinney 2001), and other applicable law, for the avoidance and recovery of fictitious profits, preferences, fraudulent conveyances, disallowance of and/or equitable subordination of the customer claims filed by some of the Defendants. The Trustee seeks, among other things, to set aside and recover all avoidable transfers, collect damages caused by the Defendants, preserve the stolen customer property for the benefit of BLMIS's defrauded customers, and recover all stolen property from the Defendants, in whatever form it may now or in the future exist.

20.     This is an adversary proceeding brought in the Court in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending. The Securities Investor Protection Corporation ("SIPC") originally brought the SIPA Proceeding in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA § 78eee(b)(2)(A), (b)(4).

21.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O).

22.     Venue in this district is proper under 28 U.S.C. § 1409.

23.     This Court has personal jurisdiction over all of the Defendants captioned herein under NY CPLR § 301 and § 302 and Bankruptcy Rule 7004.

## THE TRUSTEE, HIS POWERS AND STANDING

24.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously with Madoff's arrest on December 11, 2008, the Securities and Exchange Commission ("SEC") filed a complaint in the District

Court against Madoff, which remains pending. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

25. On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS.

26. On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of SIPC. Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

27. Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

      a. appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;

      b. appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and

      c. removed the case to this Court pursuant to section 78eee(b)(4) of SIPA;

      d. removed the Receiver for BLMIS.

28. Pursuant to section 78*lll*(7)(B) of SIPA, the Filing Date is deemed to be the date of the filing of the petition within the meanings of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

29. By orders, dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested

person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.  The Trustee subsequently was also appointed as trustee of the estate of Bernard L. Madoff personally.

30.     By virtue of his appointment under SIPA, the Trustee has the responsibility of recovering and paying out Customer Property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway.  However, such assets will not be sufficient to fully reimburse the BLMIS customers for the billions of dollars that they invested with BLMIS.  Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recovery from BLMIS accountholders who received preferences, non-existent principal, and/or payouts of fictitious profits to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme, and from any entities or individuals to which BLMIS accountholders subsequently transferred those funds.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) section 78fff-2(c)(1) of SIPA .

31.     To this end, the Trustee is bringing this action against the Defendants to recover almost $2 billion in avoidable transfers received by them or on their behalf between December 11, 2002, and December 11, 2008.  A large portion of these avoidable transfers consisted of withdrawals taken from BLMIS by the Rye Funds.  Many of these withdrawals were for redemptions by their investors or were subsequently transferred to other named Defendants.  In addition, over $180 million of those withdrawals were then transferred to Tremont, Parents, Manzke and Schulman in the form of management, administrative, and other fees, bonuses, profits, compensation, dividends and partnership distributions.

32.     Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA.  Pursuant to section 78fff(b) of SIPA, "Chapters 1, 3, 5 and Subchapters I and II of Chapter 7 [of the Bankruptcy Code]" are applicable to this case "[t]o the extent consistent with [SIPA]."

33.     In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

34.     The Trustee is a real party in interest and has standing to bring these claims pursuant to section 78fff-1 of SIPA and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

    a.      The Defendants received "Customer Property" as defined by section 78lll(4) of SIPA;

    b.      BLMIS incurred losses as a result of the claims set forth herein;

    c.      BLMIS customers were injured as a result of the conduct detailed herein;

    d.      SIPC cannot by statute advance funds to the Trustee to fully reimburse all customers for their losses;

    e.      The Trustee will not be able to satisfy all claims;

    f.      The Trustee, as bailee of Customer Property, can sue on behalf of the customers-bailors;

    g.      As of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted. As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a distinct and

palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

h.    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such customers, collectively, "Accountholders").  SIPC has expressly conferred upon the Trustee the power to enforce its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

i.    The Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

## THE DEFENDANTS

### A.    The Rye Funds

35.    Defendant Rye Select Broad Market Fund, L.P. ("Broad Market Fund") is a Delaware limited partnership organized in May 1994 under its original name of "American Masters Broad Market Fund, LP."  The Broad Market Fund's principal place of business during the relevant period was located at 555 Theodore Fremd Avenue, Rye, New York 10580.

36.    The Broad Market Fund, which had a stated objective of seeking long term capital growth through, *inter alia,* investments primarily in securities through selected investment advisers, had a direct account with BLMIS that opened in 1994, with account number 1T0027. During all relevant times, almost all of the monies invested in the Broad Market Fund were given to Madoff and deposited with BLMIS.  For all intents and purposes, upon information and belief, the Broad Market Fund is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.

-14-

37.     Defendant Rye Select Broad Market Prime Fund, L.P. ("Prime Fund") is a Delaware limited partnership organized in May 1997 under its original name of "American Masters Broad Market Prime Fund, LP" (subsequently renamed "American Masters Broad Market Prime Fund, LP" in or around 1999, and then its current name of "Rye Select Broad Market Prime Fund, LP" in or around 2006).  Prime Fund's principal place of business during the relevant period was located at 555 Theodore Fremd Avenue, Rye, New York 10580.  The Prime Fund had a stated objective of providing investors with long-term capital growth through, *inter alia*, levered investments managed by selected advisers or managers.

38.     Prime Fund had a direct account with BLMIS that opened in 1997, with account number 1C1260.  During all times applicable to this action, virtually 100% of the monies invested in the Prime Fund were given to Madoff and invested with BLMIS.  In essence, the Prime Fund was a vehicle through which its investors made leveraged investments in BLMIS, which was generally twice the performance of the Broad Market Fund.  The Prime Fund accomplished its leverage through various credit facilities and vehicles, including a loan from Citibank.  For all intents and purposes, upon information and belief, the Prime Fund is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.

39.     Defendant Rye Select Broad Market Portfolio Limited ("Portfolio Limited Fund") is an open-ended investment company organized as an exempted company under the laws of the Cayman Islands in 2001 under its original name of "American Masters Broad Market Fund II Limited."  The Portfolio Limited Fund's registered office during the relevant period was located in the Cayman Islands, c/o Trulaw Corporate Services Ltd., P.O. Box 866, George Town, Grand Cayman.  Defendant Tremont (Bermuda) Limited is the investment manager for the Portfolio Limited Fund.   Tremont (Bermuda) Limited delegated substantially all of its investment

10-05310-brm   Doc 1-1   Filed 12/07/18   Entered 12/07/18 21:24:51   Main Document
Pg 16 of 38

management duties to Tremont Partners, which served as "sub-advisor." Tremont Partners was responsible for selecting investment managers, negotiating fee arrangements with those managers, allocating assets among managers, and monitoring the Portfolio Limited Fund's investments. The Portfolio Limited Fund had a direct account with BLMIS that opened in 2001, with account number 1FR080. During all times applicable to this action, virtually 100% of the monies invested in the Portfolio Limited Fund were given to Madoff and deposited with BLMIS.

40.     Defendant Rye Select Broad Market Insurance Portfolio LDC ("Insurance Portfolio LDC Fund") is an open-ended investment company registered in the Cayman Islands as an exempted limited duration company in 1997 under its original name of "Tremont-Broad Market Fund LDC." Insurance Portfolio LDC Fund's principal office during the relevant period was located at Walkers SPV Limited, Walker House, KY1-9002, Mary Street, George Town, Grand Cayman, Cayman Islands. Tremont (Bermuda) Limited is Portfolio Limited Fund's investment manager. Tremont (Bermuda) Limited delegated substantially all of its investment management duties to Tremont Partners, which served as "sub-advisor." Tremont Partners was responsible for selecting investment managers, negotiating fee arrangements with those managers, allocating assets among managers, and monitoring the Portfolio Limited Fund's investments. The Insurance Portfolio LDC Fund had a direct account with BLMIS that opened in 1997, with account number 1FR010. Virtually 100% of the monies invested in the Insurance Portfolio LDC Fund were given to Madoff and deposited with BLMIS. For all intents and purposes, upon information and belief, the Insurance Portfolio LDC Fund is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein. The Insurance Portfolio LDC Fund is now being liquidated in the Cayman Islands.

41.     Collectively, the Broad Market Fund, Prime Fund, Portfolio Limited Fund, and Insurance Portfolio LDC Fund shall be referred to herein as the "Rye Funds." Each of them, which received transfers from BLMIS as outlined in <u>Exhibits **A** and **B**</u>, is currently winding down its affairs and its assets have been converted mostly to cash.

42.     The Rye Funds, which were managed in and intentionally took advantage of the benefits of conducting transactions in the State of New York, have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

### B.     Rye Insurance

43.     Defendant Rye Select Broad Market Insurance Fund, L.P. ("Rye Insurance") is a Delaware limited partnership organized in 2008. Rye Insurance's principal place of business during the relevant period was located at 555 Theodore Fremd Avenue, Rye, New York 10580.

44.     Rye Insurance had a direct account with BLMIS that opened in or around October 2008, with account number 1R0252. Rye Insurance made one deposit to its account at BLMIS of $40 million in or around October 2008, and did not withdraw any amounts thereafter. Rye Insurance is named as a defendant herein because it has filed a customer claim with the Trustee, which should be denied and subordinated due to the imputed acts of Tremont. For all intents and purposes, upon information and belief, Rye Insurance is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.

45.     Rye Insurance, which was managed in and intentionally took advantage of the benefits of conducting transactions in the State of New York, has submitted itself to the jurisdiction of this Court for purposes of this proceeding.

### C.     Tremont

46.     Tremont Group Holdings, Inc. ("Tremont Group") is a Delaware corporation with its corporate headquarters during the relevant period located at 555 Theodore Fremd Avenue,

Rye, NY 10580. Tremont Group is an investment management firm formed in or around 1987, and since in or about October 2001, has been a wholly-owned subsidiary of Oppenheimer Acquisition Corporation. Originally known as Lynch Asset Management Corporation, the corporation changed its name several times: to Tremont Advisers, Inc. in 1991, to Tremont Capital Management, Inc. in 2003, and to Tremont Group Holdings, Inc. in 2006. Tremont Group held itself out both in writing and orally as an established leader in the investment management of fund of hedge fund products and multi-manager portfolios. According to its web site (prior to the collapse of BLMIS), Tremont Group was "at the forefront in setting the standard in the industry for fund of hedge funds investment management." Tremont Group claimed to have over $7.7 billion in assets under management as of September 2008. Since 2001, Tremont Group has had five directors, two from Tremont management, two from Oppenheimer, and one from Mass Mutual.

47. Tremont Partners, Inc. ("Tremont Partners") is a Connecticut corporation with its headquarters during the relevant period located at 555 Theodore Fremd Avenue, Rye, NY 10580 and is a wholly owned subsidiary of the Tremont Group. Tremont Partners is the General Partner and investment manager of the Broad Market Fund, Prime Fund, Rye Insurance, and the Rye Select Broad Market XL Fund, L.P. (alleged herein below). In addition, Tremont Partners was delegated substantially all of the responsibilities of investment manager for the Portfolio Limited Fund and Insurance Portfolio LDC Fund. Tremont Partners is an investment adviser registered with the SEC under the Investment Advisers Act of 1940 ("Advisers Act"). Tremont Partners, had as it board members Tremont management, including Defendant Robert Schulman who served on it during the relevant time period until his termination in 2008.

48.     Pursuant to sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, as General Partner to the Broad Market Fund, Prime Fund, and Rye Insurance – which are all Delaware limited partnerships – Tremont Partners is liable for all obligations incurred by Broad Market Fund, Prime Fund, and Rye Insurance while serving as General Partner.

49.     Tremont (Bermuda) Limited ("Tremont Bermuda") is a Bermuda corporation that, upon information and belief, during the relevant period was located c/o Tremont Partners at 555 Theodore Fremd Avenue, Rye, NY 10580.  Tremont Bermuda served as investment manager for the Portfolio Limited Fund and the Insurance Portfolio LDC Fund.  These funds paid Tremont Bermuda monthly management fees based on an annual percentage rate of the funds' net asset value.   Tremont Bermuda delegated all or substantially all of its investment manager responsibilities to Tremont Partners.

50.     The various divisions and corporate entities under the Tremont umbrella involve the same decision-makers and were controlled by the same individuals and entities.

51.     Tremont, which conducted their business in New York and was headquartered in New York, intentionally took advantage of the benefits of conducting transactions in the State of New York, and have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

**D.     Oppenheimer, MassMutual Holding and Mass Mutual**

52.     Oppenheimer Acquisition Corporation ("Oppenheimer") is a Delaware corporation with its principal offices located at Two World Financial Center New York, New York 10281.  Oppenheimer was incorporated in 1990 and is a subsidiary of the Mass Mutual and the parent company of OppenheimerFunds, which, according to its web site, "is one of the nation's largest and most respected asset management companies."  Upon information and belief, Oppenheimer was created in 1999 to acquire businesses in the financial services industry,

including the mutual fund complex of Oppenheimer funds and the Tremont Group. The board, upon information and belief, during the relevant period, consisted of top executives of MassMutual Holding and/or Mass Mutual.

53. Prior to the purchase of Tremont Group, Oppenheimer claimed that it conducted a due diligence review of the operations of Tremont. This due diligence review revealed that Tremont was heavily invested with BLMIS.

54. Defendant MassMutual Holding LLC ("MassMutual Holding") is the parent company of Oppenheimer and its principal place of business is located at 1295 State Street, Springfield, Massachusetts 01111. The current Chairman (since 2007), former Chief Executive Officer (from June 2005-December 2009) and director (since 2005) of Mass Mutual, Stuart H. Reese ("Reese"), was also the Chairman, Director, President and Chief Executive Officer of MassMutual Holding from 2005-2009. He was also the Chairman (2005-2009) and director (1999-2009) of Oppenheimer.

55. Defendant Massachusetts Mutual Life Insurance Company ("Mass Mutual") is the parent company of MassMutual Holding. Its headquarters are located at 1295 State Street, Springfield, Massachusetts 01111. Mass Mutual is a mutually owned financial protection, accumulation and income management company. According to Mass Mutual's 2009 Annual Report, "MassMutual provides products and services to help meet the financial needs of individual and business clients, including life insurance, disability income insurance, long term care insurance, annuities, executive benefits, benefit funding vehicles and trust services." Mass Mutual refers to itself, including its subsidiaries, such as OppenheimerFunds and Tremont, as the "MassMutual Financial Group." In addition, after Oppenheimer's acquisition of Tremont, Mass

Mutual with and through Oppenheimer exercised dominion and control over the business activities of Tremont.

56.     Oppenheimer and Mass Mutual both intentionally took advantage of the benefits of conducting transactions in the State of New York, and have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

57.     Below is a diagram of the Tremont and Parents relationship:



### E.   **Manzke and Schulman**

58.   Sandra L. Manzke, a/k/a Sandra L. Manzke Platt ("Manzke") is an individual who, upon information and belief, resides at 2279 Ridgewood Circle, Royal Palm Beach, Florida 33441.  Manzke founded Tremont Group in 1984 and served as Chief Executive Officer until she left Tremont in 2005.  Manzke was responsible for beginning Tremont's long relationship with Madoff, and personally benefitted from the fees Tremont charged their clients for their Madoff

investments.  Manzke also personally benefitted from Oppenheimer's acquisition of Tremont Group in 2001.

59.     Robert I. Schulman ("Schulman") is an individual who, upon information and belief, resides at 18 Green Valley Road, Armonk, New York 10504.  Schulman joined Tremont in 1994.  He served as President, co-CEO, and then sole CEO until he left the organization in July 2008.  Schulman also served as Director for Tremont Group, Tremont Partners, and Tremont Bermuda.  Significantly, Schulman also headed Tremont Group's Rye Investment Management division, which was responsible for managing single manager funds, including the Rye Funds that invested almost exclusively with BLMIS.  Schulman was largely responsible for the Tremont Group's relationship with BLMIS, which steadily grew over time.  He generally would meet with Madoff at least once or twice a year.  Schulman also personally benefitted greatly from the fees Tremont charged to their clients for their Madoff investments, as well as from Oppenheimer's acquisition of Tremont Group in 2001.

60.     Manzke and Schulman, who operated Tremont in and intentionally took advantage of the benefits of conducting transactions in the State of New York, have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

**F.      XL Funds**

61.     The Rye Select Broad Market XL Fund, L.P. ("XL LP") is a Delaware limited partnership formed on July 13, 2006, with its principal place of business during the relevant period located at 555 Theodore Fremd Avenue, Rye, NY 10580.  Tremont Partners acted as the General Partner of XL LP and was responsible for its day-to-day operations and investment management. XL LP sought to provide investors with long-term growth and a return linked to a three times levered exposure to the economic performance of the Broad Market Fund. XL LP

sought to obtain this return through synthetic investments in Broad Market Fund provided by swap transactions with financial institutions.

62.     Rye Select Broad Market XL Portfolio Limited ("XL Portfolio") is a Cayman Islands exempted company that was incorporated with limited liability in the Cayman Islands on February 10, 2006.  XL Portfolio's registered office during the relevant period was located at Walkers SPV Limited, Walker House, KY1-9002, Mary Street, George Town, Grand Cayman, Cayman Islands.  Tremont Partners acted as the investment manager for XL Portfolio. Similar to the domestic XL LP, XL Portfolio sought to provide investors with capital growth through exposure, on an approximate three times levered basis, to the Portfolio Limited Fund. Also like XL LP,  XL Portfolio sought to achieve this return through synthetic investments in Portfolio Limited Fund provided by swap transactions with financial institutions. The XL Funds were managed and overseen by the same individuals at Tremont responsible for the Rye Funds.  For all intents and purposes, upon information and belief, the XL Funds are insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.

63.     Upon information and belief, Madoff would not allow BLMIS customers to utilize leverage, or margin, directly in their accounts at BLMIS. As a result, the XL Funds entered into total return swaps with other financial institutions such as Lehman Brothers, HSBC, Fortis Bank, Scotia Bank, and ABN Amro, which provided a synthetic investment for XL LP in the Broad Market Fund and for XL Portfolio in the Portfolio Limited Fund.  Both Broad Market Fund and Portfolio Limited Fund invested substantially all of their capital with BLMIS.

64.     Every transfer made by BLMIS that made its way to XL LP and XL Portfolio is a recoverable subsequent transfer of stolen BLMIS customer property. In addition, upon information and belief, Prime Fund transferred approximately  $285 million to XL LP over the

life of the swap... To the extent the money transferred by Prime Fund to XL LP originated directly or indirectly from BLMIS, it too is a recoverable subsequent transfer of stolen BLMIS customer property.

65.     XL LP and XL Portfolio, which were managed in and intentionally took advantage of the benefits of conducting transactions in the State of New York, have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

### G.     Tremont Funds

66.     Tremont Arbitrage Fund, L.P. ("Arbitrage Fund"), Tremont Arbitrage Fund Ireland ("Arbitrage Ireland"), Tremont Emerging Markets Fund – Ireland ("Emerging Markets – Ireland"), Tremont Equity Fund – Ireland ("Equity Fund – Ireland"), Tremont International Insurance Fund, L.P. ("International Insurance Fund"), Tremont Long/Short Equity Fund, L.P. ("Long/Short Fund"), Tremont Market Neutral Fund, L.P. ("Market Neutral Fund"), Tremont Market Neutral Fund II, L.P. ("Market Neutral II Fund"), Tremont Market Neutral Fund Limited ("Market Neutral Limited"), Tremont Opportunity Fund Limited ("Opportunity Limited"), Tremont Opportunity Fund II, L.P. ("Opportunity II Fund"), Tremont Opportunity Fund III, L.P. ("Opportunity III Fund"), Rye Select Equities Fund ("Equities Fund"), Tremont Multimanager Fund ("Multimanager Fund"), and LifeInvest Opportunity Fund LDC ("LifeInvest") are all funds of funds managed, advised, and/or overseen by Tremont Partners in Rye, New York, which were invested with BLMIS through the Rye Funds and/or XL Funds and accepted subsequent transfers through the Rye Funds and/or XL Funds.

67.     Collectively, the Arbitrage Fund, Arbitrage Ireland, Emerging Markets – Ireland, Equity Fund – Ireland, Long/Short Fund, Market Neutral Fund, Market Neutral II Fund, Market Neutral Limited, Opportunity Limited, Opportunity II Fund, Opportunity III Fund, Equities Fund, Multimanager Fund, and LifeInvest shall be referred to herein as the "Tremont Funds."

Upon information and belief, many of these funds are in the process of winding down their affairs and attempting to convert their assets to mostly cash.

68.      As described more particularly below, the Tremont Funds collectively received millions of dollars of transfers from BLMIS indirectly through redemptions in the Rye Funds, in which the Tremont Funds were invested.  These funds received redemptions from the Rye Funds, which were fraudulent transfers of Customer Property.  The Tremont Funds are subsequent transferees of stolen Customer Property under the applicable bankruptcy laws.

69.      The Tremont Funds, which were managed in and intentionally took advantage of the benefits of conducting transactions in the State of New York, have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

## THE PONZI SCHEME

70.      Founded in 1959, BLMIS began operations as a sole proprietorship of Madoff and later, effective January 2001, formed as a limited liability company wholly owned by Madoff.  Since approximately 1986, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees.  BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78*o*(b).  By that registration, BLMIS is a member of SIPC.  BLMIS had three business units: the IA Business, market making and proprietary trading.  The IA Business was the locus of the fraud.

71.      Outwardly, Madoff ascribed the IA Business's consistent investment success to a proprietary investment strategy called the "split-strike conversion" strategy.  Pursuant to that strategy, Madoff purported to invest client funds in a basket of common stocks within the S&P 100 Index – a collection of the 100 largest publicly traded companies.  Madoff claimed that his

basket of stocks would mimic the movement of the S&P 100 Index. He also asserted that he would carefully time purchases and sales to maximize value, and correspondingly, BLMIS customers' funds would, intermittently, be out of the equity markets. While out of the market, those funds were purportedly invested in United States Treasury bills or in mutual funds holding Treasury bills.

72. The second part of the split-strike conversion strategy was the hedge of Madoff's stock purchases with option contracts. Those option contracts functioned as a "collar," limiting both the potential gains and the potential losses. Madoff purported to use proceeds from the sale of one option contract (a call option: the right of a third party to buy stock through BLMIS) to finance the cost of purchasing another (a put option: the right of BLMIS to sell stock to a third party). Madoff told BLMIS customers that when he exited the market he would close out all equity and option positions, and invest all the resulting cash in U.S. Treasuries. Madoff also told IA Business customers, including Tremont, that these "round-trips" into the market would occur between four and ten times each year.

73. BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in such account statements never occurred, and the profits reported were entirely fictitious. Madoff has admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a <u>single purchase or sale</u> of securities in connection with the split-strike conversion strategy on any trading platform on which BLMIS reasonably could have traded securities. Madoff's split-strike conversion strategy was entirely fictitious.

74.     Prior to his arrest, Madoff assured customers and regulators that he purchased and sold the put and call options over-the-counter ("OTC") rather than through an exchange.  Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold *any* of the options he purported to buy and sell.  There is no evidence that Madoff traded options through any of the options exchanges.  The Options Clearing Corporation, which clears all option contracts based upon the stocks of S&P 100 companies, has no record of the IA Business having bought or sold <u>any</u> exchange-listed options on behalf of any of IA Business customers.

75.     For all periods relevant hereto, BLMIS was operated as a Ponzi scheme.  The money received from investors was not invested in stocks and options.  Rather BLMIS used its IA Business customers' deposits to pay redemptions and to make other avoidable transfers.  Madoff also used his customers' investments to enrich himself, his associates, and his family.

76.     The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains, but, in reality, due to the siphoning and diversion of new investments to pay requests for payments or redemptions from other BLMIS accountholders, BLMIS did not have the funds to pay investors on account of their new investments.  BLMIS was only able to survive for as long as it did by using the stolen principal invested by subsequent customers to pay earlier customers.

77.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors and to lure other investors into the Ponzi scheme.

78.     Madoff's scheme continued until December 2008, when the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

79.     At his Plea Hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Plea Allocution of Bernard L. Madoff at 23, United States v. Madoff, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50) ("Madoff Plea Allocution"). Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

80.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a Plea Hearing on August 11, 2009 in the case entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had begun at BLMIS since at least the 1980's. Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11).

81.     Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

82. As alleged more fully below, Tremont provided Madoff with more investors and much needed capital, as it ramped up operations and eventually invested more than $4 billion into the scheme over time, earning tens of millions in fees annually for providing Madoff with fresh money.

### HISTORY OF TREMONT AND THEIR RELATIONSHIP WITH BLMIS

**A.** **Manzke, Schulman, and the Beginnings of the Rye Funds**

83. Manzke is one of the founders and a former CEO of Tremont Group. Upon information and belief, in 1984 Manzke founded Lynch Asset Management Corporation, the initial predecessor to what is now the Tremont Group. Manzke was initially CEO and later co-CEO beginning in 2000 with Schulman.

84. Tremont Group's initial focus was on consulting for pension funds and traditional asset management, and Manzke grew the company steadily over time. Upon information and belief, Tremont Group – known at the time as Tremont Advisers, Inc. – went public in 1992 and was traded on the NASDAQ exchange until approximately October 2001, when it was acquired by Oppenheimer. At the time of the acquisition, upon information and belief, Tremont Group had approximately 65 employees, advised on more than $8 billion in alternative investments, and managed more than $1.5 billion of client assets in its proprietary Rye and Tremont Funds.

85. Manzke learned about Madoff in 1991 through Leon Meyers, the former Chairman of Tremont Group, who already had his own personal account with BLMIS. Tremont's first investment with BLMIS came in the form of a proprietary product called "Tremont Advisers L.P." However, Meyers left Tremont Group in 1992, taking that fund with him and renaming it the "Mosaic Fund LP." Manzke continued her relationship with Madoff, however, and in 1994 Tremont founded what became one of the largest and longest running Madoff feeder funds – American Masters Broad Market Fund, L.P. Despite Manzke's years of

experience, Tremont failed to conduct independent or meaningful due diligence on Madoff, his operations, and his purported investment strategy. Prior to investing and thereafter, Tremont did not reasonably investigate whether Madoff's reported returns were plausible based on the strategy he claimed to use. Neither did Tremont reasonably address the serious deficiencies and risks of fraud evidenced by Madoff's operations. Instead of performing basic due diligence as the industry leader they held themselves out to be and touted in their marking materials, Tremont wrongly relied on Madoff's reputation and their own appetite for consistent returns.

86.     Defendant Schulman joined Tremont as President and Chief Operating Officer of what became Tremont Group in 1994 – the year the Broad Market Fund was established. In 2000 he became co-CEO with Manzke, and then sole CEO in 2005, after Manzke's departure. In addition, Schulman served as President of Rye Investment Management, the division of the Tremont Group that was responsible for supervising the single manager funds, which invested with Madoff. Schulman's involvement with Tremont's investments with BLMIS was direct and consistent throughout his tenure there until July 2008.

87.     Manzke left Tremont in 2005 before the conclusion of her five year employment agreement with OppenheimerFunds and founded another investment adviser, Maxam Capital Management LLC, a competing Madoff feeder fund. Upon information and belief, Manzke received $3.5 million in severance payments from Tremont in the two years following her termination. Tremont, however, through Schulman and others, continued their relationship with Madoff and continued to exploit Madoff's consistent returns even after Manzke's departure.

**B.     Acceptance of Madoff's Strategy and Terms to Fuel Expansion of Rye Funds**

88.     During his long tenure at Tremont, Schulman developed a close business relationship with Madoff, having regular meetings and discussions with both Madoff and his top lieutenant, Frank DiPascali. Upon information and belief, Schulman met with Madoff

approximately four or five times per year on average between 1995 and 2000.  Upon information and belief, Schulman, as well as other Tremont officers and personnel, also had numerous meetings with Madoff thereafter.

89.     Tremont's investments with BLMIS, including the Rye Funds' accounts, grew exponentially with Schulman at the helm.  Despite his close business relationship with BLMIS and Madoff, Schulman was provided only vague or inconsistent descriptions by Madoff of the split-strike conversion strategy.  For example, Madoff gave Schulman vague and murky stories regarding his supposed trading counterparties, and refused to explain why and when he would enter and exit the market.

90.     Schulman shielded Madoff from investor inquiries and enforced Tremont's policy prohibiting investors from meeting Madoff.  For instance, when one potential investor seeking to invest $30-40 million inquired about the "possibility of meeting Bernie," Tremont Group's Chief Operating Officer (and later President), Barry Colvin ("Colvin"), told Schulman in a November 2001 email that he told the investor "no one gets in to see Bernie."  Schulman responded in kind: "Never meets Bernie – may get in over time if there is more to the relationship – commit [sic] to nothing."  Even when exceptions were made to this general policy, Schulman and Tremont carefully orchestrated meetings.  Schulman or one of the Tremont officers would always be present, making sure that the types of questions asked would not offend or be too probing of Madoff.  Madoff was known to throw customers and potential customers out of his office if the questions became too controversial.  Upon information and belief, Tremont, including Schulman, made sure not to ruffle Madoff's feathers.

91.     In order to keep capitalizing on the ostensible success of the Broad Market Fund, Tremont established the Portfolio Limited Fund and the Insurance Portfolio LDC for foreign

investors. In addition, the Prime Fund was established for domestic investors who sought to leverage investments with Madoff. To accomplish this leverage, the Prime Fund opened a $300 million credit facility from Citibank that began in 2005, which was terminated in or around March 2008. The investments made with BLMIS were so successful that Tremont kept expanding their exposure to BLMIS. By September 2008, BLMIS was managing more than $4 billion of assets fed to it by the Rye Funds. This amount comprised approximately 60% of Tremont Group's *total* assets under management. In addition, at the time of the Ponzi scheme's collapse, Tremont had no less than twenty separate funds that at least partially relied on BLMIS for their growth and performance.

92.     Throughout this expansion, Schulman, Manzke and the other Tremont and Parents Defendants chose to blindly accept Madoff's representations about the purported strategy. They also willfully accepted Madoff's oft-repeated claim − to avoid reasonable due diligence – that everything being done was pursuant to a proprietary, confidential "black box" strategy. Schulman and these other Defendants willfully elected not to jeopardize their millions of dollars in fees for the billions invested by the Rye Funds.

C.      **The XL Funds and Tremont Funds**

93.     Due to the success of the leveraged Prime Fund, Tremont established two "extra-leveraged" funds: the domestic XL LP and the off-shore XL Portfolio. These funds sought to provide investors with an investment that would triple the normal Madoff performance through total return swaps.

94.     A swap is a bilateral financial transaction where one counterparty "swaps" the cash flows of a single asset or basket of assets in exchange for cash flows from the other counterparty. As a result, a swap allows the party receiving the total return to gain exposure and the upside return from a reference asset without actually having to own it. A key feature of a

swap is that the parties do not need to transfer actual ownership of the underlying reference assets. This allows greater flexibility and reduced up-front capital to execute a valuable trade.

95.     In connection with a swap, in order to hedge its exposure to pay the promised return to the other party, a financial institution may use cash collateral from the swap counterparty plus its own funds to purchase the underlying asset – in this case, the Rye Fund interests.   In exchange for promising to provide the total return based on the feeder fund interests, the financing institution often charges the swap counterparty a higher "borrowing" rate than if it had simply lent money to the investor.

96.     The swap market is mostly institutional and OTC.   Market participants often include, among others, investment banks, commercial banks, mutual funds, hedge funds, funds of funds, private equity funds and pension funds.   Swaps are popular with some hedge funds because they get the benefit of a large exposure with the potential for significant upside gain with reduced cash outlay.

97.     Under the XL Funds' swap agreements, the swap counterparties – consisting of financial institutions such as Lehman Brothers, HSBC, Fortis Bank, Scotia Bank, and ABN Amro – generally agreed to pay the XL Funds, on a three times leveraged basis, an amount equal to the increase in the net asset value of the Broad Market Fund or Portfolio Fund.  The XL LP's swaps were based on the performance of the Broad Market Fund, while the XL Portfolio's swaps were based on the performance of the Portfolio Fund, less fees and other charges.  In exchange, the XL Funds paid the swap counterparties financing charges.

98.     The financial institution swap counterparties, although not legally obligated to do so, generally invested in the Broad Market Fund or Portfolio Limited Fund to hedge their exposure to the XL Funds under the swaps.   Under these swaps, which were evidenced by

confirmations, the XL Funds themselves did not invest in the Rye Funds, but rather transferred cash collateral to the financial institutions under the swaps in order to receive the leveraged performance of those funds. The financial institutions used the cash collateral and their own cash to make direct investments in the Broad Market and Portfolio Limited Funds.

99. Although the financial institution swap counterparties were the direct investors in the Broad Market Fund and Portfolio Limited Fund, the purpose of these transactions was clear: to permit Tremont to leverage their investments with BLMIS, which, in turn, would generate more fees and profits and great Madoff returns.

100. All transfers made from BLMIS to the Rye Funds which were subsequently transferred to the XL Funds are recoverable subsequent transfers of stolen BLMIS customer property.

101. Beyond the single-manager Rye Funds and XL Funds that invested almost all of their capital with BLMIS, Tremont managed a number of multi-manager funds of funds. The Tremont Funds were not invested directly with BLMIS, but rather had indirect investments with BLMIS through the Rye Funds, as well as the XL Funds. Even with their multi-manager funds, a large percentage of Tremont's business consisted of handing off investor capital to Madoff, watching the accounts steadily and consistently grow on paper, and collecting fees based on these fake returns.

102. All transfers made from BLMIS to Rye Funds or XL Funds which were subsequently transferred to the Tremont Funds are  recoverable subsequent transfers of stolen BLMIS customer property.

### D.    Tremont Makes Two Hundred Forty Million Dollars from BLMIS's Fraud

103.    Despite the lack of independent, meaningful, or reasonable due diligence or active oversight, Tremont made tens of millions of dollars in fees annually based on little more than their ability to take investor money and hand it over to Madoff.  These fees made continuing business with Madoff very lucrative, providing millions of reasons to look the other way from Madoff's fraud.

104.    Specifically, the Broad Market Fund paid Tremont Partners a monthly management fee based on the net asset value of the fund at the annual rate of 1.0%.  Between 2003 and 2007, Tremont made approximately $28.5 million in management fees and $10.3 million in additional administrative fees for managing the Broad Market Fund.  In addition, it is estimated that Tremont received more than $20 million in management and administration fees from their management of the Broad Market Fund in 2008 prior to the BLMIS collapse.

105.    The Prime Fund paid a monthly management fee at the annual rate of 1.5% of each investor's capital account.  Between 2003 and 2007, Tremont made approximately $49.4 million in management fees and $9.7 million in additional administrative fees for managing the Prime Fund.   In addition, it is estimated that Tremont received more than $10 million in management and administration fees from their management of the Prime Fund in 2008 prior to the BLMIS collapse.

106.    The Portfolio Limited Fund paid a monthly management fee calculated at annual rates of 1.5%, 1.75%, and 2.25% of month-end net asset value, depending on the class of shares being held.  Between 2003 and 2007, Tremont made approximately $40 million in management fees and more than $2.75 million in additional administrative fees for managing the Portfolio Limited Fund.   In addition, it is estimated that Tremont received more than $13 million in

management and administration fees from their management of the Portfolio Limited Fund in 2008 prior to the BLMIS collapse.

107.    The Insurance Portfolio LDC Fund paid monthly management fees of either 1.50% or 1.75% of month-end net asset value of the fund, depending on when the investor was admitted into the fund.  Tremont also took monthly administrative fees based on annual rates of between .20% and .50%.  Between 2003 and 2007, Tremont made more than $6.77 million in management fees and almost $1 million in additional administrative fees for managing the Insurance Portfolio LDC Fund.  In addition, it is estimated that Tremont received more than $3 million in management and administrative fees from their management of the Insurance Portfolio LDC Fund in 2008 prior to the BLMIS collapse.

108.    In total, the Trustee estimates that Tremont received more than $180 million in management and administration fees between 2003 and the collapse of the scheme in 2008.  The Trustee also estimates that throughout the life of the Madoff relationship, Tremont collected a total close to $240 million in management and administrative fees from the Rye Funds beyond that six year period.

109.    Tremont also took fees from the Tremont Funds and the XL Funds, which made the Madoff investments even more profitable.  In fact, due to the way in which Tremont managed several funds that invested in BLMIS indirectly through the Rye Funds, it appears that Tremont charged multiple fees for the same Madoff investments.  In an email from September 2004, a Tremont officer noted his disagreement with charging basis points, *i.e.*, fees twice, explaining that "[t]he main issue is that Tremont charges on the Bernie fund an admin fee of 150 bp and on the offshore an additional 190bp's so in effect charging twice over on the same assets."  The email, however, also explained the justification for the double dipping: "Barry

[Colvin] feels strongly that there are enough reasons why we can charge this fee twice to get access to Bernie i.e., funds closed so limited capacity, track record etc." This email correspondence makes clear that Tremont was exploiting their relationship with, and limited access to Madoff, in order to reap as much profit as possible, rationalizing that their access to Madoff was worth the fees charged.

110. Tremont's Madoff investments were the most profitable part of their business, and those investments dwarfed all of their non-Madoff investments. According to a Tremont financial report from September 2008, Tremont Group Holdings had total revenues of $109.5 million in fiscal year 2007. From those revenues, Tremont made more than $54 million from their Rye Investment Management division. Additionally, from the total of $78 million Tremont received in management fees, over $52 million came from Rye Investment Management. Out of close to $12 million earned in administrative fees, more than $9.7 million came from Rye Investment Management. For 2007, Tremont reported investments with Madoff of over $1.2 billion. These Madoff-related investments were almost 60% of Tremont's total capital raised in 2007.

## CONTROL OF TREMONT BY OPPENHEIMER AND MASS MUTUAL

### A. The Acquisition

111. Tremont Group (then known as "Tremont Advisers, Inc.") was acquired in 2001 for approximately $145 million by Oppenheimer, the parent of OppenheimerFunds and a part of the Mass Mutual family. Upon information and belief, Oppenheimer entered into this transaction because it was looking to expand into the lucrative hedge fund business to provide clients with alternative investments. As Oppenheimer focused on traditional investments such as mutual funds, Tremont Group provided access to the highly lucrative fund of hedge fund business.

112.     Prior to and after the acquisition, both Oppenheimer and Mass Mutual had multiple and recurring opportunities to perform independent, meaningful and reasonable due diligence on BLMIS.   Oppenheimer received and reviewed Tremont Group's information package, including many documents provided by Tremont Group's representative in the transaction, Putnam Lovell.   For example, Oppenheimer would have had access to any agreement between Tremont or their funds and Madoff, as well as financial information related to the BLMIS-related investments.

113.     Instead of focusing on Madoff's strategy, which in turn drove Tremont's profits, Oppenheimer focused mostly on the numbers associated with the deal and the synergies of offering Tremont's funds to their clients.   Oppenheimer was seemingly blinded by the potential of millions of dollars in fees that it could extract from Tremont's investors, the goodwill created by offering additional investment choices to its customers, and the increase in value Tremont Group would bring to Oppenheimer and its ultimate parent, Mass Mutual, over time. Oppenheimer continually ignored many red flags raised by Madoff's operations and purported performance.

114.     Upon information and belief, Oppenheimer spent a few months conducting due diligence into Tremont Group prior to July 2001.   According to a Proxy Statement filed by Tremont Group with the SEC on August 20, 2001, Oppenheimer was given access to a "data room" that contained a number of materials relevant to the transaction, including legal contracts, corporate documents, regulatory filings, and financial statements.

115.     In Putnam Lovell's fairness opinion, which was delivered at the time the merger agreement was executed and incorporated in the filed Proxy Statement, Tremont's reliance on a

single investment manager was clearly and specifically addressed. Oppenheimer and Mass Mutual were fully aware of the major role Madoff played in the business they were buying.

116. Oppenheimer also had numerous meetings with Schulman, Manzke, and Tremont's representatives at Putnam Lovell. Oppenheimer had access to material information as early as 2001, when it analyzed Madoff and the purported investment strategy, and was on actual and/or inquiry notice regarding serious red flags relating to among other things (as alleged in further detail herein): Madoff's suspiciously consistent rates of return for an S&P 100 strategy; impossible trading volumes; the lack of identifiable counterparties; Madoff's "strip mall" auditor; inexplicable trading anomalies; Madoff's suspicious ability to almost always buy low and sell high when he went into and exited the market; and, the fact that Madoff left hundreds of millions annually in fees for Tremont (and other feeder funds) that reasonably were his to receive as the real investment manager and strategist.

117. Oppenheimer executives, including Kurt Wolfgruber ("Wolfgruber"), the Director of Domestic Equities at OppenheimerFunds at the time (and later Chief Investment Officer and President), had the opportunity to meet with Madoff and review the BLMIS facilities for about one hour. Upon information and belief, Oppenheimer chose to blindly accept Madoff's vague explanations of his lucrative split-strike strategy without pressing him for more specificity. Oppenheimer was content with the consistency of the returns Madoff produced for Tremont and did not seek or want to upset that lucrative relationship.

118. Oppenheimer's comfort with Madoff was in spite of two industry reports that were published during the time Oppenheimer was supposedly conducting its due diligence for the acquisition. These industry reports included a May 2001 article in *Barron's* entitled *Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum*, as well as a

May 2001 article in *MAR/Hedge*, a widely read industry newsletter, entitled *Madoff Tops Charts; Skeptics Ask How*. These articles raised questions about Madoff's legitimacy, the secrecy surrounding Madoff, and how he was able to achieve the consistent returns claimed based upon the investment strategy Madoff employed.

119. Tremont knew of these reports, and the Parents should have been aware of them as well. On May 7, 2001, Colvin sent an internal email to a long list of Tremont employees alerting them to "a few press articles regarding Bernie Madoff" in recent news. The email instructs employees to direct any questions from outside the firm about the article to Tremont Group's management and to decline any comment. Like Tremont, neither Oppenheimer nor Mass Mutual conducted any inquiry into the suspicions raised by the articles. They did not speak with the authors or otherwise perform any independent, reasonable, or meaningful due diligence in direct response.

120. On July 10, 2001, Oppenheimer and Tremont Group entered into a merger agreement pursuant to which Oppenheimer acquired Tremont Group for $145.3 million. Oppenheimer financed the transaction using cash on hand and, if necessary, capital contributions by Oppenheimer's ultimate parent, Mass Mutual.

121. Upon information and belief, Mass Mutual and Oppenheimer both viewed the acquisition of Tremont as an opportunity to integrate and combine key segments of their respective businesses. John V. Murphy ("Murphy"), a former Mass Mutual executive who was Chairman and CEO of OppenheimerFunds at the time of the deal, upon information and belief, personally advised Oppenheimer and negotiated and closed the Tremont Group acquisition without the assistance of a Wall Street financial adviser.

122. Upon information and belief, Murphy was also an executive vice president and director of MassMutual Holding from 2000-2008. Upon information and belief, he was also a director, along with Reese and Howard Gunton, at Oppenheimer from 2001-2005.

123. The *Financial Times* reported on July 11, 2001, after the acquisition was announced, that Murphy said, "It's a win-win deal . . . . It provides us with retail product, it provides us with institutional product and provides the insurance wrap that MassMutual needs for its offshore product." According to the *Wall Street Journal* that same day, Murphy also stated that Tremont would help expand Oppenheimer's relatively small institutional business, as well as provide investment strategies for Mass Mutual's large pools of investment money. Wolfgruber was quoted in the *New York Times* on July 11, 2001, as exclaiming that "Tremont fits perfectly with our goal of extending both our product line and our client base." The *American Banker* reported on July 12, 2001, that Schulman welcomed the acquisition by the Mass Mutual family because "[i]nsurance companies, family offices, and brokerages are our most robust channels."

124. Schulman and Manzke personally benefited from Oppenheimer's acquisition of Tremont Group, as they entered into five year multi-million dollar employment agreements with OppenheimerFunds as part of the acquisition, whereby they would both retain their position for five years after the merger. Manzke and Schulman were to receive salaries of $500,000 each and would be eligible for discretionary bonuses of up to 150% of their base salaries. Oppenheimer could not risk losing Manzke or Schulman, which would have meant losing the lucrative relationship with BLMIS – which is what they were ultimately purchasing. Upon information and belief, Manzke received up to $16 million and Schulman received more than $8 million from the sale of their Tremont shares and options as part of the acquisition.

### B.     Oppenheimer and Mass Mutual's Direction and Control of Tremont Group

125.    Upon information and belief, after the 2001 acquisition, Tremont's operations, including the marketing and investment activities of the Rye Funds, were brought under the direction and control of Oppenheimer, and ultimately Mass Mutual.   As alleged herein, Tremont's leaders became employees of OppenheimerFunds, Tremont Group's officers reported to officers of Oppenheimer, and Oppenheimer executives sat on Tremont Group's Board of Directors.   In addition, Tremont Group had offices at OppenheimerFunds, marketed itself as an "Oppenheimer Funds Company," and Tremont and OppenheimerFunds together marketed and managed funds named "Oppenheimer Tremont."   Those entities were under the ultimate control of Mass Mutual, which also invested in funds managed by Tremont that were indirectly invested with BLMIS.

126.    When Oppenheimer's acquisition of the Tremont Group was completed in or around October 2001, Tremont Group posted a press release on its website at that time noting that the acquisition "brings together Tremont, a leader in providing advisory services, information and investment products to the global alternative investment industry, with OAC's subsidiary OppenheimerFunds, Inc., one of the country's largest and most respected asset management firms."

127.    Murphy stated in the press release: "The combination of [Tremont's] unique product offerings with our vast distribution network will open up the world of alternative investing to a new segment of investors."   Murphy also said that Tremont's fund of funds approach would be "especially appealing to our high net-worth shareholders."

128.    After the acquisition, upon information and belief, Oppenheimer and its officers directly controlled and/or dominated many aspects of Tremont's decision-making process.

129.    Manzke and Schulman were hired as executives of OppenheimerFunds and enjoyed similar benefits as other OppenheimerFunds executives.  Oppenheimer, MassMutual Holding, and Mass Mutual controlled the Tremont Group Board of Directors.  Murphy served on Tremont's Board of Directors, along with Wolfgruber and Mass Mutual Executive Vice President Gunton.  After Gunton left the Board, Michael T. Rollings ("Rollings") replaced him in 2006 as the Mass Mutual representative. Tremont Group at all times after the acquisition held itself out as an "OppenheimerFunds Company" and was required to keep offices at OppenheimerFunds headquarters.

130.    Tremont Group advertised themselves as "an OppenheimerFunds Company" and made payments to Parents of at least $10 million in the form of dividends from Tremont's management fees.  Upon information and belief, this dividend was directly or indirectly made from the Rye Funds, which received withdrawals from BLMIS.  This makes Oppenheimer a subsequent transferee of Customer Property.

131.    Schulman, Manzke, and other Tremont Group officers had regular meetings with Oppenheimer and OppenheimerFunds.  Upon information and belief, Manzke, Schulman, and other officers of Tremont Group reported to and took direction from the Parents.

132.    As another part of this high degree of integration between the businesses, OppenheimerFunds employees also served in management positions with Tremont.  Lynn Keeshan, who had served as Vice President at OppenheimerFunds, served as Tremont Partners' Chief Financial Officer and Senior Vice President.  Margaret Weaver, another OppenheimerFunds employee, also assumed a high level management role, becoming Senior Vice President and Director of Human Resources of Tremont Partners.  Jessica Campbell, an

OppenheimerFunds officer, upon information and belief, became a principal financial and operational officer responsible for SEC reporting at Tremont.

133.    The pervasiveness of Oppenheimer's influence over Tremont and their operations is further demonstrated by the listing of Oppenheimer, OppenheimerFunds, and Mass Mutual as "control persons" on Tremont Partners' Uniform Application for Investment Advisers Registration filed with the SEC.  In addition, Oppenheimer and Tremont jointly launched funds with names reflecting Oppenheimer's ownership and integration with Tremont Group, such as the "Oppenheimer Tremont Market Neutral Fund," "Oppenheimer Tremont Opportunity Fund," "OFI Low Correlation Hedge Fund," and "OFI Tremont Core Strategies Hedge Fund."  The OFI Tremont Core Strategies Hedge Fund illustrates the intentional integration and commingling of business functions that Murphy, Wolfgruber, Manzke, and Schulman quickly achieved: Tremont managed its portfolio, Murphy served as trustee, Mass Mutual acted as registered agent for service of process and Oppenheimer furnished the principal place of business and headquarters.

134.    Oppenheimer plainly and clearly advertised its control, as well as that of Mass Mutual, over Tremont in registration statements filed with the SEC.  For instance, in a filing on behalf of OFI Tremont Core Strategies Hedge Fund on February 7, 2007, Oppenheimer stated that Tremont's portfolio manager was responsible for day-to-day management of the funds, Oppenheimer was controlled by Mass Mutual, and that Tremont was controlled by both Oppenheimer and Mass Mutual.

135.    Tremont also emphasized their inter-connection to OppenheimerFunds, as well as Mass Mutual, in their marketing materials provided to investors.  For example, in describing its privacy policy in its private placement memoranda for various funds, Tremont Group stated:

> Tremont is made up of certain entities, including its investment
> advisory and broker-dealer subsidiaries, and, in turn, is part of a

larger corporate affiliation owned by the OppenheimerFunds group and Massachusetts Mutual Life Insurance Company. The Tremont entities and, in some cases, its ownership affiliates often work together to provide the financial products and services offered to Tremont Clients. By sharing information about Tremont's Clients among these companies and affiliates, Tremont can serve Clients more efficiently. Tremont is permitted to share information concerning Client account history and experiences within and among the companies that comprise Tremont and its subsidiaries and affiliates.

136. Based on Oppenheimer's domination and control of Tremont and the Rye Funds, after the 2001 acquisition, Tremont and the Rye Funds became mere instrumentalities of Oppenheimer. Despite this domination and control, however, Oppenheimer did nothing but encourage Tremont and the Rye Funds to continue feeding investor funds to BLMIS. Oppenheimer should have directed and required Tremont and the Rye Funds to conduct reasonable, independent, and meaningful due diligence. Instead, upon information and belief, it encouraged further investments with BLMIS despite being on notice of fraud.

### C.    The Role of Mass Mutual

137. Mass Mutual, through its control of Oppenheimer and MassMutual Holding, controlled Tremont. Mass Mutual's 2009 Annual Report notes that Tremont Group is a wholly-owned subsidiary of Oppenheimer, and an indirect subsidiary of Mass Mutual.

138. Mass Mutual appointed its own representatives on both the boards of directors of Oppenheimer and Tremont Group, as well as key employees who controlled Tremont Group. For instance, Gunton was a director of Tremont Group from in or about 2001 to 2005. Rollings, who served as Vice President of Mass Mutual in 2005 and Executive Vice President and Chief Financial Officer of Mass Mutual from 2006 through 2009, became a director of Tremont Group in 2005. Rollings was also an executive vice president and director of MassMutual Holding since 2003. Murphy, who was a director of Tremont Group from 2001 to 2009, was not only an

OppenheimerFunds executive from 2001 through 2009, but also was an Executive Vice President of Mass Mutual for the same period.

139.     Mass Mutual's majority stock ownership of MassMutual Holding, which owned Oppenheimer, and its installation of its own officers in high level executive positions at Oppenheimer, enabled Mass Mutual to dominate, direct, and control all aspects of Oppenheimer and Oppenheimer's subsidiaries, including OppenheimerFunds and Tremont Group.

140.     This substantial overlap between business entities, as well as Mass Mutual's dominion and control, is consistent with Mass Mutual's operation and marketing of itself as a single, integrated financial services company comprised of its life insurance business and its investment subsidiaries, such as OppenheimerFunds and Tremont Group.  Indeed, Mass Mutual had investments in the Tremont Funds, including Opportunity Fund Limited (through its subsidiary MassMutual Mercuries Life Insurance Co. Ltd.), the Opportunity Fund III, and the International Insurance Fund.

141.     In addition, through OppenheimerFunds, Tremont was directed not to sell insurance products.  As insurance products were the main products of Mass Mutual's business, it is only logical to conclude that such a direction came from Mass Mutual itself.

142.     Mass Mutual's interest in Tremont Group began even prior to the acquisition. According to an article in the Boston Globe published on May 5, 2009, Mass Mutual executive Ann Melissa Dowling sought the opinion of a consultant, Lee Hennessee of the Hennessee Group, regarding Tremont Group prior to the 2001 acquisition.  According to the article, Hennessee noted that Tremont Group was heavily concentrated in Madoff investments.

143.     Mass Mutual was far more than a simple parent corporation allowing its subsidiary to operate independently.  Mass Mutual was involved in the acquisition and then

dominated and controlled Oppenheimer, which in turn dominated and controlled the Tremont Group thereafter. Upon information and belief, Oppenheimer and Tremont Group became mere instrumentalities for Mass Mutual's expansion into alternative investments, including BLMIS.

144. Illustrative of this domination and control wielded by Oppenheimer and Mass Mutual, as well as the inter-connectedness of the various entities, is a lawsuit brought in Delaware Chancery Court (No. 4791-VCL) by Mass Mutual, MassMutual Holding, Tremont, the Rye Funds, and XL LP for equitable apportionment, breach of contract, and ancillary declaratory relief against primary and excess directors' and officers' ("D&O") liability insurers that sold Mass Mutual D&O insurance. That lawsuit seeks coverage for insurance policies covering all of the named insureds – which include Mass Mutual, MassMutual Holding, Tremont, the Rye Funds, and XL LP – for lawsuits brought against them by investors related to their management of the funds invested with BLMIS. In other words, Mass Mutual purchased insurance policies on behalf of its subsidiaries and funds that are a part of the Mass Mutual family – including Tremont, the Rye Funds, XL LP, and Oppenheimer – and the Mass Mutual family is suing together in one lawsuit to enforce that coverage for all of the entities affected by the BLMIS investments.

145. For all of the foregoing reasons, the corporate veils should be pierced and liabilities of Tremont, the Rye Funds, the XL Funds, and the Tremont Funds, should be the liabilities of Oppenheimer, MassMutual Holding and Mass Mutual, jointly and severally.

## TREMONT'S DUE DILIGENCE REPRESENTATIONS TO INVESTORS WENT UNFULFILLED

146. Tremont Group marketed itself as an experienced manager of funds of hedge funds. On its website, Tremont Group claimed it had years of experience in the financial

industry and was "one of the 'old timers' in the hedge fund arena." Tremont Group's web site

also described itself as having an intensive due diligence and selection process for its managers.

> Tremont selects managers for our funds of hedge funds from the pool of available managers that have passed through our exhaustive multi-stage due diligence process. In order to screen through and organize the sizable universe of hedge funds, our Investment Management analysts utilize our Tremont Investment Management System (TIMS), a comprehensive, proprietary database enabling us to capture both qualitative and performance-based quantitative information on hedge fund managers and to compare managers to their peer groups using underlying TASS [Trading Advisors Selection System] data.

147. Tremont Group's web site at one time also touted the TASS system as part of

"The Tremont Advantage":

> The integration of TASS makes Tremont the most comprehensive source of hedge fund data and market intelligence, distinguished by two key qualities: exhaustive data gathering and attention to detail. For each hedge fund manager, the TASS Database tracks over 150 fields of information and it is one of the only sources for assets under management since inception. Since 1990, TASS has made it a practice to interview managers personally, incorporating strategy information into its database, with regular reviews and updates. TASS does not rely solely on the managers as the source of performance data. Our data team checks every submission for logic and **consistency,** with monthly follow-ups to ensure timely reporting. (Emphasis added).

148. A Tremont Partners "Investment Advisor Compliance Manual and Supervisory

Procedures," dated October 5, 2004 ("Compliance Manual"), discussed due diligence

procedures. The Manual states:

> Prior to Managers being included in client portfolios they must undergo a level of review and examination by manager research personnel from the investment management staff. Those individuals are also responsible for continuing to monitor those Managers included in those portfolios in a manner reasonably consistent with the steps taken in the initial investigation.

The Manual also discusses the steps Tremont Partners would take in selecting a new manager for a fund investment: creating a due diligence questionnaire, interviewing the manager, and having a formal meeting of Tremont's Investment Committee for final determination.  At that time, the Investment Committee had seven members, including Schulman, Colvin, and Cynthia Nicoll (identified below).

149.   In addition, the Compliance Manual discussed ongoing monitoring:

> In terms of ongoing due diligence and monitoring, manager research personnel are expected to be in regular contact with Managers regarding their performance, market exposure and outlook.  In addition to performance monitoring, such personnel are expected to perform operational monitoring which may include examining and analyzing changes made to Managers staffs, policies, and internal controls.

150.   The Private Placement Memorandum for the Broad Market Fund set forth a summary of the responsibilities of Tremont Partners, the general partner. Tremont Partners was "responsible for the day-to-day administration and operation" of the Broad Market Fund. Tremont Partners "had the primary responsibility for monitoring the ongoing activities of the Investment Advisor or Investment Advisors."

151.   Tremont's literature referred to a four-step investment process.  Step 1 was Manager Sourcing Selection and Monitoring.  According to the materials, this approach required both a qualitative interview process, a quantitative research process, and an operational and business risk interview process.  Part of Step 1 also included "[i]nsist[ing] on operational and business **best practices to eliminate the 'fraud or mismanagement put'** and "monitor[ing] with ongoing qualitative and quantitative research to understand linear and non-linear beta, and alpha." (Emphasis added).  This first step was an important precursor to the next three steps Tremont noted: Asset Allocation, Portfolio Construction, and Performance and Risk Attribution.

152. Cynthia Nicoll ("Nicoll"), Tremont's Chief Investment Officer from on or about October 2005 through May 2008, stated in a 2006 meeting with Oppenheimer that Tremont did not permit investment with managers who were unable to demonstrate how they captured returns. This was untrue as to Madoff, because Tremont had very little understanding as to how Madoff was able to capture the extraordinarily consistent returns from a traditionally low rate of return performance, pedestrian investment strategy. Schulman stated during that same meeting that Tremont aimed to differentiate itself from competitors by touting their comprehensive investment process, managing to clients' risk level, and avoiding public mistakes.

153. On information and belief, none of investments made by Tremont with BLMIS ever underwent any "exhaustive multi-stage" due diligence process. Tremont did not, on information and belief, independently, meaningfully, or reasonably analyze or test any qualitative or performance based information on Madoff. When it came to investments with Madoff, Tremont did not exhibit minimal, let alone the industry standard, "attention to detail" that it touted as a reason to invest with them. On information and belief, Tremont did not reasonably or independently "track over 150 fields of information," and did not adequately check submissions from BLMIS for "logic and consistency." They also knew that BLMIS's IA Business at BLMIS did not exhibit "best practices" for a manager.

154. On information and belief, when it came to Madoff, Tremont willfully disregarded their fiduciary duties to their investors and their own due diligence processes. They abandoned their systematic approach to investments and the monitoring of their hedge fund managers. Tremont did *not* insist on operational and business best practices designed to eliminate fraud and mismanagement. Tremont, as well as the other Defendants, essentially looked the other way when it came to Madoff.

155.     Tremont also failed to monitor the Madoff-related investments.  If they had, Tremont should and/or would have noticed a number of peculiarities and inconsistencies that would put them on notice that Madoff was committing fraud.

156.     Instead, Tremont created funds for investment with Madoff without regard to due diligence, and continued growing those investments based on little more than Madoff's performance and blind trust based on Tremont's long personal relationship with him. When it came to Madoff, Tremont did not comply with their own policies and procedures, made exceptions to accommodate Madoff for their own self interest, ignored best practices, and otherwise disregarded or failed to fully perform their claimed due diligence and monitoring in connection with a quantitative research process, operational risk analysis, fraud and mismanagement.

157.     Defendants Parents, Rye Funds, XL Funds, and Tremont Funds, through the imputation of Tremont's knowledge and activities to them as a matter of law, buried their collective heads in the proverbial sand and refused to reasonably inquire into many red flags well known to them and many others throughout the financial and hedge fund industries.

**TREMONT IGNORES NUMEROUS RED FLAGS**

158.     Tremont and their management were aware of many of the troubling questions surrounding Madoff well before Madoff's fraud was revealed.  For example, an email from a foreign client of Tremont describing a May 2003 meeting with Madoff attended by Schulman, Nicoll, and Senior Vice President, Jim Mitchell ("Mitchell"), set forth a number of suspicious facts concerning Madoff.  These included: (1) the fact that Madoff left all investor relations "to the likes of Tremont and Fairfield [Greenwich Group] and hardly grants direct meetings with end investors; (2) Madoff did not earn a fee apart from small commissions on trades; (3) annual reports will show only treasury bills at the end of each year – "zero transparency"; (4) Madoff

was self-clearing and had custody of the securities; and (5) the returns were "exceptionally stable with only 7 negative months since 1990."

159.    The above red flags, as well as a number of others enumerated below, put the Defendants on inquiry notice that Madoff was committing fraud.

A.    **Madoff's Unrealistic Consistency**

160.    The Defendants' understanding of Madoff's purported investment strategy was that Madoff was undertaking a split-strike conversion strategy.    This strategy involved the purchase of a basket stocks in the S&P 100 index, while simultaneously purchasing S&P 100 put options to protect investors from a decline in the market.    Madoff also purportedly sold out-of-the money S&P 100 index call options in an effort to finance the costs of the purchase of the put options, which in turn was supposed to limit the upside potential of the portfolio.    Madoff's consistency of performance was so improbable that Tremont should have known that it was simply impossible.

161.    Although ostensibly employing a strategy involving the purchase and sale of S&P 100 equities, Madoff's returns bore virtually no correlation with the S&P 100.    Attached to the Complaint as Exhibit **D** is a graph depicting the value of investments in two Madoff feeder funds (Rye Select and Fairfield Sentry), compared to an investment in the S&P 100 Index between 1995 and 2007.    As the graph shows and as one would expect, the Madoff feeder funds are highly correlated to each other.    In contrast, both funds' returns bear little to no relationship to the S&P 100 Index, with a correlation of approximately 0.33, with 1.0 being a perfect correlation and 0.0 being no correlation.    Given that the stocks purportedly bought were all part of the S&P 100, there should have been a much higher correlation.

162.    Madoff's reported profits also were remarkably consistent even during periods of severe downturns in the equities market.    Exhibit **E** shows two-month returns for the Broad

Market Fund, S&P 100 Index, and 10-Year U.S. Treasuries for all two-month periods in which the S&P declined by more than 10% from 1995 to 2007. During these market downturns, the Broad Market Fund produced positive returns similar to risk-free Treasuries; completely opposite from the performance of the equity markets. The Broad Market Fund achieved these returns despite holding S&P equities during these downturns. Instead of conducting independent due diligence of this facially suspicious record on returns during severe market downturns, Tremont and Parents turned a blind eye and relied solely on Madoff's explanations for something which made no sense.

163. The Broad Market Fund performance further evidences this continuously waving red flag. Between 1996 and 2008, the Broad Market Fund's returns consistently ranged between 9.5% and 18.3%, regardless of how the S&P 100 was performing. For example, in 2000, the S&P 100 was down 13.4%, but the Broad Market Fund had a positive return of 14.9%. In 2001, the S&P 100 was down by 14.9%, but the Broad Market Fund was up 13.1%. In 2002, the S&P 100 was down by 23.9%, but the Broad Market Fund was up by 12.2%. While world financial markets were collapsing in 2008 and the S&P 100 plummeted nearly 37% through November 2008, the Broad Market Fund was up by 9.5%. These funds, dependent upon Madoff's success, outperformed the S&P 100 in years where the S&P 100 was double-digit negative by an outstanding 28% to 46%, despite being an equity strategy that was purportedly correlated and based upon the S&P 100.

164. Nor did Tremont quantitatively analyze Madoff's performance against commonly recognized metrics used in the industry in evaluating the performance and risks associated with hedge fund managers. Such financial tools include Sharpe ratio, volatility, percent positive months, average negative rate of return, and maximum drawdown. Had Tremont employed any

of these kinds of metrics, they would have determined that Madoff's uncanny consistency with little risk was likely a fraud. Even without employing them, common sense dictated that Madoff's steady, consistent returns over such a long time period were simply impossible.

### B. Improbable Equities Trading Volume

165. The Rye Funds' several account statements from BLMIS regularly indicated that BLMIS's trades in a particular stock alone accounted for a large percentage of that stock's trading volume on the listed markets. This meant that BLMIS's trades for <u>all</u> of its IA Business customers often approached the entire volume of equity trades on the listed markets. Manzke and Schulman understood that during the last six years before the scheme's collapse, Madoff was supposedly managing $12-$15 billion for BLMIS customers and generally traded them at the same time. Analyzing the Rye Funds' statements should have caused sophisticated hedge fund managers and advisers like Tremont and Parents to question how the Madoff customers' transactions could have exceeded the total volume listed as traded on a particular day.

166. Each time Madoff supposedly entered the market, he purportedly purchased between 35-50 of the stocks comprising the S&P 100 for the Rye Funds' accounts. Between 1998 and 2008, there were 29 occasions where the stocks Madoff purchased for the Rye Funds <u>alone</u> accounted for more than 10% of the trading volume for those stocks on the entire composite volume for those stocks traded. In addition, over that same period of time, there were over 500 occasions where the stocks Madoff allegedly purchased accounted for 6-10% of the entire volume of the entire composite volume. In light of Tremont's knowledge that Madoff claimed to enter and exit the market for all the IA Business customers at the same time, and their awareness that he managed collectively around $15 billion, a sophisticated manager such as Tremont should have questioned how Madoff's alleged trades could account for such a high percentage of the total volume traded on the exchanges of a particular stock.

167. There also were instances where the purported purchase or sale of securities at the prices BLMIS claimed was improbable given the trades recorded on that day. Attached as Exhibit **F** are a number of graphs showing a random sampling of instances of such improbable transactions. For instance, as illustrated in Exhibit **F**, a falsified trade confirmation reported the purchase by BLMIS of 125,550 shares of Bristol Myers Squibb Co. on March 5, 1999, at the price of $63.71 per share on behalf of the Rye Funds. However, only 600 shares of Bristol Myers Squibb traded on that date at or below $63.71.

168. The same anomalies are apparent in looking at purported sales of stock by BLMIS on behalf of the Rye Funds. As also illustrated in Exhibit **F**, Madoff purported to sell 155,509 shares of American Express on behalf of the Rye Funds at a price of $51.64 per share on June 22, 2004. However, only 1,200 *total* shares of American Express were sold at or above the price of $51.64 on June 22, 2004.

169. Tremont, as the pioneer and purported industry leader in due diligence, investment monitoring, and best practices, knew or should have known that such glaring irregularities concerning such improbable trades and implausible trading volumes were indicia of fraud. With the billions Tremont understood Madoff to be trading on behalf of customers like themselves, Tremont was on notice that they needed to conduct further inquiry. Tremont did not conduct any such reasonable inquiry.

## C.     Impossible Options Volumes

170. Defendants were also on inquiry notice that the volume of Madoff's purported options trading for the Rye Funds was impossible. S&P 100 Index options, such as those used in Madoff's split-strike conversion strategy, must be traded on the Chicago Board Options Exchange ("CBOE") under the symbol OEX. Further, these options and the associated trade confirmations from BLMIS had CUSIP numbers, which are unique security identification

numbers that identify the company or issuer and the type of security, which corresponded to the S&P 100 Index options that were traded on the CBOE.

171.    When comparing the volume of OEX options that BLMIS was purportedly trading on behalf of the Rye Funds with the CBOE volume, BLMIS traded more OEX option contracts than the **entire** volume of the CBOE for those contracts on a number of occasions. Upon information and belief, for the period from 1998 to 2008, out of a total of 846 options transactions, 711 of them – over 84% – were greater than the total volume traded that day on the CBOE for that particular option contract.

172.    A graph demonstrating the comparison between the volume of OEX put options BLMIS purported traded on behalf of the Rye Funds and the volume of those same put options traded on the entire exchange between 2001 and 2008 is striking.  As shown in Exhibit **G,** the volume of OEX100 put options completely dwarfs the volume of OEX put options traded on the entire CBOE

173.    In addition, as shown in Exhibit **H**, the volume of OEX100 call options BLMIS purportedly traded on behalf of the Rye Funds in relation to the volume of those same call options traded on the entire exchange, was a huge red flag signaling likely fraudulent trading activity. There was rarely a time when BLMIS claimed it traded fewer OEX100 call options for the Rye Funds, alone, than were traded on the entire CBOE.

174.    An analysis of the purported options trading volume against the CBOE volume – which easily could have and should have been performed by Tremont – confirms that they did not perform independent and reasonable due diligence, or any follow-up, concerning the Madoff trading activities.  Even if it was to be believed that Madoff executed some or all of the reported options trades on the OTC market, it still would be virtually impossible for a single counterparty

on an OTC trade to engage in a transaction exceeding the entire volume of the CBOE. Had the Defendants conducted independent and reasonable due diligence, they would have confirmed that the options trading reflected on their account statements, as well as the strategy, were all a sham.

### D.   Lack of Strategy Footprint

175.    A reasonable quantitative review like the one consistently marketed by Tremont would have also focused on how Madoff could have traded billions of dollars without ever affecting any market. Madoff's strategy involved moving billions of dollars into the market over the course of one or more days, and then selling all of those securities over a similar time span. It was the Defendants' understanding that by the mid 2000s, Madoff moved $12-$15 billion into and then out of the equities and options markets a number of different times per year. The Defendants never independently investigated how these trades could be accomplished without any impact on the price of the securities bought and sold, without any market footprint, and without anyone "on the Street" knowing or even hearing about Madoff's alleged trading activity.

176.    The purchase and sale of $12-$15 billion of stocks in a short period of time would have, under normal market conditions, resulted in adverse stock price movements, cutting into the alleged profits from the transactions. Upon information and belief, Tremont did not conduct independent or reasonable due diligence into whether the prices Madoff obtained for these large transactions were in fact at depressed, medium, or high daily prices for the stock transactions in question.

177.    Upon information and belief, the Defendants did not inquire as to why Madoff's purported trades never caused even a small ripple in the market. Such displacement was never observed, of course, because the trading did not occur. Based on the lack of any observable

market reaction, the Defendants were on inquiry notice that Madoff's alleged trades were not happening.

178.    When Madoff purportedly exited the market, he claimed to have placed his customers' assets in Treasuries or mutual funds invested in Treasuries.  The movement of billions of dollars in and out of the market also should have materially affected the price of Treasuries.  This was another piece of a basic reasonable quantitative review that Tremont chose not to perform.

### E.    Madoff's Uncanny Ability to Buy Low and Sell High

179.    Madoff account information reveals that, upon information and belief, he bought equities below the daily price midpoint nearly 78% of the time and sold those same equities above the daily price midpoint over 71% of the time.  In short, Madoff demonstrated an almost supernatural ability to consistently buy low and sell high.  Tremont purportedly reviewed their statements regularly, yet did not bother to inquire as to how Madoff was able to accomplish this statistical improbability.

180.    An example of this red flag is depicted on the chart attached as Exhibit **I**.  As this exhibit shows, relative to the range of possible intraday market prices in March 2003, Madoff purchased equities at low prices on March 12th, 13th, and 14th of 2003, and then sold them at prices close to their highs on March 19th, 20th, and 21st.  This red flag would have and should have put a reasonable money manager on inquiry notice that Madoff may be illegitimately backdating trades, front-running, or capitalizing on inside information.

### F.    Trading Outside of Daily Price Ranges

181.    The Rye Funds received trade confirmations from BLMIS reflecting securities transactions that could not have occurred, because they took place outside of the range of stock and options prices for such securities traded in the market on the days in question.

-59-

182.    There were, upon information and belief, 560 instances from 1998 to 2008 where the purported equities purchased for the Rye Funds' accounts were completely outside the range of the high and low for the stock on the days purportedly purchased. Similarly, there were, upon information and belief, 64 instances of purported options transactions that were completely outside the high and low daily ranges.

183.    Upon information and belief, there were over 600 instances of highly questionable and impossible information on purported trades that Tremont missed or failed to question as part of their highly touted due diligence procedures.

### G.    Options Trading with Mythical Counterparties

184.    There were multiple irregularities with the options trading executed by BLMIS, apart from the volume impossibilities alleged above. Another glaring red flag was Madoff's secrecy regarding the identity of the counterparties on the options transactions. Madoff would not disclose the identities of these counterparties, and Tremont simply accepted Madoff's vague descriptions of the counterparties without seeking further information.

185.    The Rye Funds, as BLMIS customers, each executed an agreement entitled "Terms and Conditions for Option Hedging Transactions." This agreement describes the relationship between BLMIS and the Rye Funds: "The following instructions establishes the terms and conditions under which Bernard L. Madoff Investment Securities LLC (BLMIS) will effect, *as agent*, the client's transactions". (Emphasis added). However, in spite of the fact that BLMIS was choosing the counterparty on behalf of the Rye Funds principal accounts, it was the understanding of the Rye Funds that the counterparty risk was borne by the Rye Funds themselves rather than the broker-dealer BLMIS. Curiously, Tremont had no specific understanding of the counterparties to these transactions. Upon information and belief, at no time did Tremont seek out or have any discussions with any purported counterparties. Nor did

Tremont review any documentation concerning these counterparty relationships or transactions. This is despite the fact that Rye Funds being the "principals on the transactions and thereby having full financial exposure on the trades, not BLMIS as the "agent." By this failure, Tremont allowed its Rye Funds and their investors to be exposed to billions of dollars of potential losses were the counterparties to fail or break the trades.

186.    Schulman and Manzke willingly accepted Madoff's refusal to disclose the names of the counterparties even though the Rye Funds bore significant financial risk. Moreover, if BLMIS was simply acting as the Rye Funds' agent, there would be no legitimate reason to withhold such vital information from the Rye Funds' fiduciary risk management responsibilities.

187.    The Rye Funds' options trade confirmations contained other significant anomalies that contradicted Madoff's representations. First, Madoff claimed to Schulman that the options trades were done OTC and not through the CBOE. In the OTC market, unlike CBOE trades, the counterparty is generally listed and identified on the confirmation. None of BLMIS's options trade confirmations sent to, received, and reviewed by Tremont ever identified the counterparty, which is contrary to the representation that these option transactions were done OTC. In addition, options traded on the CBOE have an identifier number known as a CUSIP number. The CUSIP number allows traders to quickly access electronic information regarding particular options by simply inputting the CUSIP number in commonly used data terminals. By contrast, OTC options are private transactions that are not readily assigned any CUSIP number, especially not options contracts with marked similarities to those options trading on the CBOE. Despite this fundamental difference, the trade confirmations BLMIS sent to Tremont for review were clear errors that went unheeded. They included CUSIP numbers, similar to those identifying

options on the CBOE, even though the ostensible trades were represented to be private, OTC transactions.

188.    Additionally, even though BLMIS was to act as the Rye Funds' agent, many trade confirmations received by Tremont were coded as "principal" transactions - meaning that BLMIS, as opposed to the Rye Funds, was the party on the other side of the equities transactions. This was glaringly inconsistent with the terms of the relationship between BLMIS and the Rye Funds as outlined in the terms and conditions of BLMIS's trading.  This is yet one more instance of Tremont ignoring Madoff's inconsistencies.

189.    Despite these abnormalities, Madoff refused to disclose the names of the counterparties to the options trades.  This was despite Rule 10b-10 of the Securities Exchange Act, which requires the disclosure of counterparties on agency transactions upon request. According to Schulman, Madoff told him that the options counterparties were major financial institutions in Europe.  Such non-specific information required independent due diligence, including contacting these counterparties for verification of identities and activities.

190.    Not only did Tremont fail to confirm any of this information or independently question why they were not being provided with their counterparties, but Tremont and their officers – including Schulman – at times also falsely led others to believe they knew the counterparties. For example, in their aggressive quest to leverage hundreds of millions of dollars for Madoff in 2007, Tremont advised a representative of J.P. Morgan Chase ("Chase") that "we know the general characteristics and minimum credit rating" of the counterparties and that the counterparties "frequently post collateral" with BLMIS.  Obviously this "knowledge" was fiction, as Tremont never saw evidence of collateral or credit ratings.  This "knowledge" was merely a recitation of the unverified information provided to them by Madoff himself.

H.    **Madoff's Lack of Transparency and Secrecy**

191.    Madoff's lack of transparency on all aspects of the strategy, his unwillingness to allow genuine due diligence, and his unprecedented levels of secrecy were all well known to the Defendants.  Instead of independently questioning why Madoff was so secretive, Defendants were willingly complicit in advancing this lack of transparency in direct contrast to their own best practices.  Defendants indulged Madoff's "don't ask, don't tell" policies.

192.    In an interview with the PBS television program, "Frontline," which aired in 2009, Manzke admitted that even though she regularly advocated for more openness and transparency in the hedge fund industry, Defendants didn't apply those standards when it came to Madoff:

> MARTIN SMITH: [voice-over] Manzke says everyone operated by Madoff's secrecy rules.
>
> [on camera] Did Madoff say to you, "Don't put me in your prospectus"?
>
> SANDRA MANZKE: Yes. He did.
>
> MARTIN SMITH: Do you think that's right? Do you think that's appropriate?
>
> SANDRA MANZKE: I don't know. Every one of my clients knew that this was a Madoff feeder fund, and-
>
> MARTIN SMITH: So why not put it in a prospectus, then?
>
> SANDRA MANZKE: That was one of, always, Bernie's conditions of getting an account.
>
> MARTIN SMITH: But you've publicly called for transparency. That's transparency.
>
> SANDRA MANZKE: Yes. But many funds and investors were very secretive. They didn't mention that they had money with Madoff. It was something you didn't talk about.

(Transcript from *Frontline* program on "The Madoff Affair," available online at http://www.pbs.org/wgbh/pages/frontline/madoff/etc/script.html.)

193.    Manzke's broadcast interview confirmed that Defendants ignored issues of lack of transparency to accommodate Madoff's "conditions" to investing.  Manzke's interview is also consistent with other internal documentation demonstrating Defendants' compliance with Madoff's demand for secrecy.  In one email from December 2000, a Tremont employee responded to a number of questions from a current or potential investor in Germany.  According to the email, Madoff indicated that Tremont should not use his name, "as he was managing money only for family and friends." Upon information and belief, Tremont knew that statement was false as they understood then that Madoff was managing billions for dozens of feeder funds worldwide.   These foreign feeder funds with scores of institutional, European and other sophisticated investors were not "friends and family."

194.    Clients and potential clients of Tremont voiced their concerns about Madoff's lack of transparency.  For instance, in May 2004, according to an internal Tremont email, a potential investor "was still concerned about Tremont's relationship with Madoff, saying that there was no transparency there and that it was prone to a blow-up that would destabilize Tremont. . . ."  Tremont scoffed at the suggestion that Madoff lacked transparency, even though they knew or should have known better.  A Tremont employee noted in response: "Some misconceptions never die, it seems."

195.    Yet another potential investor brought up the same transparency issues in a February 2005 email.  The potential investor noted that it had been an investor in "Fairfield" (likely Fairfield Sentry) a few years earlier, "but didn't get transparency, and feel that they were not seeing the operation."  Instead of actually trying to get transparency from Madoff, however,

Tremont's focus was on the money. The response was that if they could "address some of their transparency questions that might mean a lot of money for Bernie." Once again, the Defendants' main concern was feeding "a lot of money" to Madoff, as opposed to actually understanding what Madoff really was doing with that money.

196. On or around May 31, 2006, Mitchell, who worked in Tremont's London office and served on Tremont's Investment Committee at the time, met with the CEO of a client. In an email describing the meeting, Mitchell noted that "[o]ne issue came very clear": that this client was "nervous" after meeting with Tremont regarding Madoff, to whom they refused to grant access. "They have $70m with Madoff, and we derive over $1m in fees from this." Despite being an investor for four years, however, "they have a new team of players that have questions and get spooked easily." Instead of actually questioning Madoff's strategy or performing reasonable and independent due diligence into why clients, investors, and potential investors were concerned, Tremont simply looked to deflect these concerns.

197. In October 2007, one client whose father-in-law had a direct account with BLMIS, posed questions regarding the returns generated by his father-in-law's account and the client's investment with the Rye Funds. The client was unable to reconcile his returns with the significantly different returns of his father-in-law's direct BLMIS account, when they both supposedly were traded the same way and at the same time by Madoff. The client wondered: *"Makes me concerned about the legitimacy of the whole Bernie thing."* (Emphasis added.) Schulman and Darren Johnston ("Johnston"), who spent much of his time marketing and promoting the Rye Funds as Vice President and Manager of Rye Investment Management, tried to explain away the discrepancies. But the client was unconvinced and remained troubled by his analysis and, upon information and belief, redeemed his investments shortly thereafter. The

Defendants, however, continued blindly investing with Madoff, failing to conduct any reasonable or independent due diligence into Madoff's legitimacy.

198.    As the inevitable collapse of the Ponzi scheme drew closer, questions about Madoff continued.   In March 2008, Citibank sought for the first time indemnification for manager fraud – i.e., fraud on the part of Madoff – as a condition for extending a credit line to the Prime Fund.   Until that time, Citibank had been providing financing for Prime Fund for approximately three years.   Instead of admitting to themselves that this was a major red flag, Tremont sought out another bank that would continue providing leverage to exploit Madoff's returns.

199.    Defendants were on inquiry notice that Madoff was being deceptive and going to extraordinary lengths to remain cloaked in secrecy.   Defendants did not legitimately investigate in response, and continued to facilitate Madoff's deceptive practices in exchange for tens of millions of dollars in fees annually.

### I.    Settlement and Trade Anomalies

200.    Apart from options trades that exceeded the daily trade volumes of the same contracts on the CBOE and equity trades executed outside the daily price range of the composite tape, there were other abnormalities easily discoverable on the monthly statements and confirmations that Tremont received for the Rye Funds.   There were numerous instances of purported settlement dates for options and equities transactions that were inconsistent with the standard market convention.

201.    Specifically, upon information and belief, there were 941 instances where the purported settlement date for an options transaction was indicated to settle three days after the trade.   Any person with a modicum of understanding of the options markets knows that settlement of options transactions is one day after the trade, not three.   These clearly

inappropriate settlement periods occurred in over 25% of all the options transactions in the Rye Funds from 1998 to 2008.

202.    Similarly, upon information and belief, there were 1,096 instances in the Rye Funds' trade confirmations sent by BLMIS to Tremont that reflected settlement dates in equities that were outside of the standard market convention.  While an equity transaction settles three days after a trade occurs, Tremont was given documents in these instances reflecting equities settlements four days after the trade.

203.    In addition, upon information and belief, there were eight instances where options were supposedly settled on weekend days.  Had Tremont been properly monitoring the Rye Funds, they should have questioned even **one** trade that supposedly settled on a weekend.  Yet, upon information and belief, Tremont ignored all eight such instances.

**J.    BLMIS's Odd Organizational and Compensation Structures**

204.    In a deviation from well-established structure and remuneration practices in the hedge fund industry, Madoff ran the IA Business as a division of his broker-dealer business, BLMIS.  Many other managers employing a specific investment strategy utilized a stand-alone hedge fund structure.  This, in and of itself, was highly unusual.

205.    In addition, Madoff and BLMIS charged no management or successful performance fees for his services, like almost all hedge fund managers.  Madoff provided BLMIS feeder fund managers such as Tremont, Ezra Merkin ("Merkin") and Fairfield – which also did little more than market and funnel billions to BLMIS – a large windfall allowing them to collect hundreds of millions in fees.  The compensation structure itself was a red flag that there was fraud and used as an inducement for funds to keep feeding Madoff billions.

206.    The only revenue claimed to be generated for the services conducted by the IA Business was a four-cent per share "brokerage commission" for each purported equity trade

made in the IA Business customer accounts, and a $1 per option contract executed.  In contrast, other hedge fund managers routinely charge fees equal to 1% to 2% of assets under management, along with performance fees equal to 10% to 20% of profits generated for the fund.  The compensation arrangement between Madoff and feeder funds run by Tremont,. Fairfield, and J. Ezra Merkin had Madoff leaving hundreds of millions, if not billions, of dollars on the proverbial table, and allowed the feeder funds to reap extraordinary and suspiciously high rewards for little investment strategy contribution.

207.    The difference in compensation is huge.  For example, the total amount of Tremont's assets under management with BLMIS is believed to have ranged from approximately $1.9 billion to $3.5 billion between December 2005 and December 2007.  Madoff, as a hedge fund manager, could have charged between approximately $110 million and $220 million in total fees, depending on whether he charged 1% of assets under management plus a 10% performance fee ("1 and 10"), or 2% of assets under management plus a 20% performance fee ("2 and 20"), for his profitable services.

208.    Either a "1 and 10" or "2 and 20" compensation arrangement would have been customary in the hedge fund industry during the relevant time period.  In contrast, charging four cents per share commissions on the purported equity trades and $1 per contract on the fictitious options transactions, Madoff received approximately $44 million in total compensation in the form of commissions.  In other words, Madoff left anywhere from around $66 million to almost $176 million on the table just in Tremont-related compensation during the two-year period December 31, 2005 to December 31, 2007.

209.    When expanded to include the entirety of BLMIS's IA Business customers, it is clear that this compensation arrangement forfeited hundreds of millions – if not *billions* – of

dollars that Madoff easily could have charged for his management services. Defendants' willful acceptance of this atypical and highly suspicious organizational and commission structure was motivated by Tremont and Parents own self interest, which led them to perform no independent, meaningful, or reasonable due diligence. The "explanations" that Madoff would give for this – that he did not want to do paperwork or "run a hedge fund" – lacked any degree of credibility. Instead of keeping this money for himself, Madoff allowed his "feeders" to receive these fees, relying on their avarice and greed to induce their assistance and complacency in perpetuating the scheme.

### K. No Independent Custodian

210. BLMIS functioned as investment adviser, executing broker and custodian of securities. This cozy arrangement eliminated another frequently utilized risk control in investment management, where the adviser is usually independent from the custodian. This separates the customer assets that the adviser is trading from the actual custody and possession of the cash and securities in the customers' accounts, which are the responsibilities of the custodian.

211. Tremont and Parents were well aware that this requirement by Madoff to allow BLMIS to act in all three capacities was both irregular and highly suspicious. Yet, they consciously chose to do nothing in response. The Defendants accepted this unusual practice and never verified that the securities purportedly purchased for the Rye Funds actually existed.

212. Additionally, Madoff forced all IA Business customers to custody all of their managed assets at BLMIS. It is the forcing of the customer to use BLMIS as both custodian and executing broker that should have raised a red flag. Typically, institutional customers, including hedge funds, maintain separate relationships with a custodian and an executing broker.

L.    **BLMIS's Strip Mall Auditors**

213.    BLMIS, which reputedly ran one of the world's largest money management firms, was purportedly audited by Friehling & Horowitz ("F&H"), a tiny three-person operation located in a strip mall in Rockland County, New York.  In fact, it was a one-man shop consisting of David Friehling, a Certified Public Accountant.  The other two employees were an assistant and a semi-retired accountant living in Florida.  Defendants were on inquiry notice that this small firm did not have the bona fides, and was otherwise not even minimally equipped, capable, or competent to conduct legitimate domestic and international audits for an entity such as BLMIS. On November 3, 2009, David Friehling pled guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue laws, and making false filings with the SEC in connection with his involvement in Madoff's scheme.

214.    F&H had been reporting to the American Institute of Certified Public Accountants ("AICPA") for fifteen years prior to the collapse of Madoff's scheme that it did *not* conduct audits.  AICPA, which has more than 350,000 individual members, monitors most firms that audit private companies, such as BLMIS.  Some 33,000 firms enroll in the AICPA's peer review program, in which experienced auditors assess each firm's audit quality each year.  F&H was enrolled in the program but had not submitted to a review since 1993 because the firm had been informing AICPA - every year, for fifteen years - that it in fact did <u>not</u> perform audits. Meanwhile, F&H claimed to do just that for BLMIS.

215.    The Defendants were specifically aware and suspicious of the problems associated with BLMIS's auditors.  Tremont's internal documentation shows that concerns were raised about F&H by investors and potential investors, who wanted to know specifically what other clients were audited by F&H.  Internal documents further reveal that Tremont themselves questioned the use of this auditor.

-70-

216.    Manzke admitted during the Frontline interview that these auditors were suspicious:

> MARTIN SMITH: And as for due diligence, no one seemed to question the fact that Madoff's accountant was a one-man operation in this strip mall an hour's drive north of New York.
>
> [on camera] Did you ask him why he had such a small accounting firm?
>
> SANDRA MANZKE, Founder, Tremont Capital, 1984-'05: Yeah. I mean, that was his- it was his family, you know, business, that it was an accounting firm that his father-in-law had used for years and he continued to use it.
>
> MARTIN SMITH: And it didn't bother you that it was this small thing.
>
> SANDRA MANZKE: *Of course, it bothered you. I mean, every- you know, those are the kind of things that it would bother you.* But that was one of the conditions of doing business, that you accepted that …

(Transcript from *Frontline* program on "The Madoff Affair," available online at

http://www.pbs.org/wgbh/pages/frontline/madoff/etc/script.html) (Emphasis added.)

Manzke's comments indicate that Tremont and Parents accepted "conditions" imposed by Madoff they knew to be troubling and indicative of potential fraud in exchange for the chance to do business with him and generate millions in fees.

**M.    Madoff Evaded SEC Filing Requirements**

217.    After registering with the SEC as an investment adviser in 2006, BLMIS was required to file a Form 13F at the end of each quarter disclosing the securities it held on behalf of its IA Business customers.    From that point forward, at the end of each quarter, Madoff purported to convert the entire portfolio of the IA Business to Treasury bills to avoid this reporting requirement.    This artificially forced liquidation of his equity and option positions at the end of calendar quarters was inconsistent with his strategy, and should have caused the Defendants be suspicious and inquire as to why the liquidations were necessary.    There was no legitimate market timing reason designed to maximize returns for Madoff to go to cash at every

quarter or year. The conversion to Treasuries was anticipated to be done only when necessary to avoid a downturn in the market, and not on a quarterly basis to avoid a regulatory reporting requirement.

218.    Had Tremont and Parents properly questioned this incongruous activity, it would have been apparent that Madoff exited the equity and option markets in order to avoid BLMIS having to report the equities on required 13F filings.

### N.    Old Fashioned Paper Trade Tickets and Statements

219.    Madoff was known as technologically savvy, and was a trading pioneer for his use of technology in electronic trading platforms. Yet, BLMIS never sent a single electronic trade confirmation to any IA Business account holder, including the Rye Funds. Nor did BLMIS allow customers online access to their accounts electronically. Rather, Madoff's firm provided only paper monthly statements and confirmations which it sent by standard postal mail.

220.    Instead of providing electronic access to their trade information, the Rye Funds waited several days for their paper trade confirmations to arrive. Upon information and belief, although Tremont did ask BLMIS at least once for electronic trade tickets, that request was ignored and Tremont never pressed the issue. Once again, the Defendants ignored a striking incongruity.

### O.    Account Statement Inconsistencies with Madoff's Purported Strategy

221.    On a number of separate occasions, account statements received by Tremont from BLMIS purported to show gains on behalf of the various Rye Funds resulting from transactions inconsistent with Madoff's supposed split-strike conversion strategy. Certain of these transactions involved short term option trading that resulted in substantial gains for the Rye Funds.

222.   For example, in 2002, the Portfolio Limited Fund participated in one of these trades generating more than $6.4 million in gains.  This transaction represented approximately 30% of the total return earned for that fund in 2002.  Such short term gains were achieved by speculating in the options market, a strategy which contradicts the nature of the split-strike conversion strategy, subjected the clients to increased risk in excess of that implied in the split-strike conversion strategy, and should have raised a red flag for a sophisticated money manager such as Tremont.  From 1996 to 2008, upon information and belief, the Rye Funds benefitted in excess of $130 million in gains from these transactions.

**DEFENDANTS IGNORED RED FLAGS DISCUSSED IN 2006
TREMONT DUE DILIGENCE EFFORTS**

223.   In mid-2006, more than ten years since first giving investor funds to Madoff for investment, Tremont conducted additional due diligence on Madoff and created a more comprehensive Due Diligence Questionnaire.  This due diligence was, upon information and belief, a façade to give themselves cover and BLMIS a clean bill of health.  Tremont's own documentation reveals that their due diligence efforts were in fact outcome determinative.

224.   In a May 2006 email, Nicoll and Thomas Sandlow ("Sandlow"), Tremont Group's Senior Vice President and Director of Manager Research, discussed whether they had a Due Diligence Questionnaire for BLMIS and realized none had ever been created.  Sandlow responded: "I think we should do one.  Isn't it our biggest investment?"  Incredibly, although Tremont had been feeding their Rye Funds' investor monies to BLMIS since 1994, making Madoff the company's largest manager in terms of assets under management, it was not until May 2006 that Tremont identified this deficiency and performed any meaningful due diligence on Madoff.  In another May 2006 email chain, Nicoll noted that she would not suggest a Madoff investment for an investor because Tremont did "not have a full ddq."

225.    A few months later, in August 2006, Nicoll and Sandlow exchanged additional emails regarding BLMIS due diligence.    When Nicoll directed that Due Diligence Questionnaires be created for a client on four separate funds, including the Broad Market Fund, Sandlow curiously responded that "[w]e cannot do that for Madoff."  Nicoll responded that they "do need a ddq on Madoff. . . Come sit with me and I will write down your issues and I will get them into the ddq properly and sign off on it myself."

226.    When Tremont finally began preparing these Due Diligence Questionnaires, those questionnaires themselves raised numerous red flags.  Specifically, a combined Due Diligence Questionnaire for multiple Rye Funds and Tremont Funds from 2006 noted "an inherent risk in having the Investment Advisor to the Fund also being a broker dealer."  The questionnaire also noted that all trades are executed through the investment advisor and that all positions are custodied with the same investment advisor.

227.    A questionnaire for the Broad Market Fund states that the "biggest drawback" is the "lack of transparency regarding the signals used by the investment advisor."  This questionnaire further states that there is no true prime broker, as all trades are executed at Madoff's own desk and his IA Business keeps custody of them.

228.    As part of these efforts, Nicoll had Tremont's head of operational risk, Michael Lynch ("Lynch"), prepare an Operational Due Diligence Review report.  Lynch was responsible for reviewing operations for new managers, as well as existing mangers.  At Nicoll's behest, Lynch investigated the operations of BLMIS in 2006 and prepared a report.

229.    Lynch's 2006 Operational Due Diligence Review, noted a number of issues and concerns that again put Tremont on notice that Madoff's operations were fraudulent.  For example, the report opined in its Summary that the Rye Funds'

relationship with Madoff, while identical to other Madoff relationships, **does not represent the best industry practices**. In particular, the Fund maintains accounts at Madoff Securities and Madoff in turn trades the funds at those accounts for the benefit of the fund. Effectively, this is akin to investing in a hedge fund and having that hedge fund be its own prime broker.

The report also noted that Madoff's brother, Peter, was head of compliance. This was problematic as an internal control for the obvious lack of independence as a blood relative.

230. Lynch's Due Diligence Review also noted the following additional abnormalities and/or recommendations:

- **Counterparty Risk:** The counterparties to Madoff's option trades are not listed on the trade ticket. "Madoff has communicated that they utilize 12-20 different counterparties for options transactions depending on how they are invested" and each counterparty has a minimum rating of A1. Moreover, the information regarding counterparties "is not documented by Madoff Securities but this is information that has been provided to us by Bernard Madoff." Lynch also noted that BLMIS did not enter into ISDA agreements with the counterparties.

- **Auditors:** Friehling & Horowitz as the auditors: "Friehling and Horowitz are not well known in the hedge fund industry and they are a small local firm in the New York area that does not specialize in investment firms."

- **Paper Trade Tickets:** Tremont and its administrators should receive "an electronic feed of information and monthly statements in electronic format." This would allow Tremont and its administrator to track individual positions and for automation of the monthly reconciliation process. "**Currently, Tremont will spot-check a handful of the positions in the portfolio monthly.** If an electronic delivery of trade information was in place, this would be a very easy procedure to implement utilizing the BB interface for pricing." Madoff's only excuse for not providing electronic information was that he was "not comfortable sending out information prior to fully entering into a position" (emphasis added.)

231. Despite these waving flags, Lynch sought to mitigate these issues by noting Tremont's longstanding relationship with Madoff and the fact that "the IA has been registered with the NASD since 1960 and has had no significant regulatory issues." Lynch cited the NASD

registration as a reason to dismiss the possibility of fraud: "Given that the NASD is regularly verifying that the trades that Madoff is placing on Tremont's behalf are valid gives us assurances that Madoff is not falsifying any activity for our portfolios." However, blind reliance on regulatory organizations such as the NASD, or FINRA as it is now known, or the SEC, does not substitute for the basic, independent due diligence Tremont promised and marketed to their investors.

232.    Tremont also never confirmed that the NASD or SEC was regularly verifying the trades that were being made for the IA Business.  Upon information and belief, they did not ask to review any of the many FINRA or SEC exit examination reports often given to broker-dealers upon completion of the regulatory examination.  These reports typically identify potential areas of concern to the regulators, weak internal controls and compliance or supervision, possible rule and securities laws violations, and the scope of the examinations.  After these reports identify issues, it is typical for the regulator to have the broker-dealer correct or "clean up" the sources of concern and activities.  The fact that Tremont never insisted upon seeing any of them shows their ineptitude or submissiveness.  Tremont substituted blind reliance on assured strict regulatory oversight, which was unreasonable and in fact never existed.

233.    Moreover, the records that BLMIS filed with the NASD and the SEC for many years made no mention of this separate IA Business.  Even when the SEC required BLMIS in 2006 to separately register the IA Business, BLMIS continued its lies by understating both the amount of advisory customers and the assets under management in the IA Business.  A review of BLMIS's Form ADV filings should have caused Tremont to seriously question Madoff's reporting of the size of his customer base, feeder funds and assets under management based on their relationship with Madoff.  They were in a unique position to obtain information concerning

BLMIS's operations and question the information he provided to the SEC. Nevertheless, Tremont failed to conduct an adequate investigation, or made no investigation at all, choosing instead to remain willfully ignorant.

234.     An internal email exchange from October 2008 between a Tremont employee and Mitchell illustrates the utter lack of due diligence when it came to Madoff. The email states that Tremont needed to improve the quality of Madoff information they provided to their clients: "Unlike the Palm Beach crowd, institutions won't invest on faith. They can't." Even after investing billions of dollars of their investors' monies over the previous fourteen years, Tremont still had many unanswered questions regarding Madoff to the point where they did not believe savvy investors would invest in BLMIS. This email indicates that only those who performed little or no independent diligence and invested on "faith" would hand their money over to Tremont to invest with Madoff.

235.     Numerous indicia of fraud concerning BLMIS gave Defendants actual and/or constructive knowledge of BLMIS's fraud. These indicia of fraud, and Defendants' willful and deliberate decision to continue investing with BLMIS despite them, demonstrates a motive and opportunity to commit fraud, and/or conscious misbehavior or recklessness amounting to fraudulent intent. Given the Defendants' actual or constructive knowledge of these indicia of fraud, the Defendants were neither innocent nor good faith investors

### SECURITIES INDUSTRY PARTICIPANTS HEED THE RED FLAGS

236.     Other managers in the financial industry saw BLMIS for what it was. Many financial institutions, managers, and industry advisers that conducted reasonable due diligence flatly refused to deal with BLMIS and Madoff because they had serious concerns that the IA Business operations were not legitimate.

237.    For example, as early as 2002, Cambridge Associates LLC ("Cambridge") consistently recommended that clients stay away from Madoff and Madoff-related feeder funds due to lack of transparency, a fear of front-running the market, and a general inability to understand how the strategy could produce cash-like, bond-like consistency of returns, in an equity strategy.  In one document, Cambridge stated that "it felt illegal and that Madoff was not transparent", while also suggesting that "[i]t might be interesting to compile some historic hedge fund fraud/scams for them to mull over."

238.    In 2003, a team from Société Génerale's investment bank performed due diligence on BLMIS and found that the numbers did not add up.  Société Génerale then forbade its investment bank from doing business with BLMIS.  In contrast, Defendants, who had more visibility into the reported trading activity on their account statements and through meetings with Madoff, continued to do lucrative business with BLMIS until Madoff was arrested.

239.    In mid-2003, Acorn Partners LP ("Acorn") – a fund of funds and investment adviser for high net worth individuals – conducted due diligence of Madoff and found it likely that BLMIS's account statements were generated as part of a fraudulent scheme, and "that fraudulent activity was highly likely."  Shortly after Madoff was arrested, in a letter to investors, Acorn described the indicia of fraud that led it to conclude years prior that Madoff was a fraud. Many of the reasons given were the red flags alleged above.  Acorn saw these indicia of fraud as "not merely warning lights, but a smoking gun."

240.    Well-known investor Jim Simons, and his investment fund, Renaissance Technologies Corp. ("Renaissance"), also determined that Madoff was possibly a fraud in 2003. Although Renaissance had invested with BLMIS, when they analyzed the options trading, they concluded that the volume purportedly being traded and the lack of known counterparties did not

jibe. They calculated that if Madoff did his options trading in one day, he would have been doing 100% of the options trading. Even assuming Madoff spread the options trading over three days, Madoff still could not have traded the volume of options he claimed. According to one Renaissance employee, "[n]one of it seems to add up."

241.  Renaissance also spoke with several market makers in OTC equity options, none of whom claimed to see any significant volume being traded on the days when Madoff claimed to be executing his options strategy. In other words, Madoff never left a "footprint." Renaissance also determined that whichever counter party would have been willing to trade the basket of options Madoff purportedly was trading, it would have had to do so at unfavorable prices. To Renaissance, this options trading did not make any sense because it was difficult to understand which financial institution would want to continually enter into unfavorable trading positions.

242.  Beyond the options issues, in November 2003, a Renaissance employee noted that "Madoff allows an outside group [Fairfield Greenwich] to make $100 million per year in fees for doing absolutely nothing." The employee went on: "The point is that as we don't know why he does what he does we have no idea if there are conflicts in his business that could come to some regulator's attention. Throw in that his brother-in-law is his auditor and his son is also high up in the organization . . . and you have the risk of some nasty allegations, the freezing of accounts, etc., etc." The employee proposed that "unless we can figure out a way to get comfortable with the regulatory tail risk in a hurry, we get out." Indeed, Renaissance made a decision in November 2003 to cash out all of its BLMIS investments.

243.  Aksia, LLC ("Aksia"), an independent hedge fund research and advisory firm, recommended to its clients in 2007 not to invest with BLMIS, Madoff, or any of his feeder funds

because of certain red flags. Simon Fludgate, head of operational due diligence at Aksia, concluded that the stock holdings reported in the quarterly statements BLMIS filed with the SEC appeared too small to support the size of the assets BLMIS claimed to be managing. In September 2007, Aksia prepared an Investment Review of Madoff feeder fund Fairfield Sentry. In that report, Aksia concluded that the fund's description of how returns were generated was implausible. In fact, Aksia's review of Fairfield Sentry led to the conclusion that either (a) Madoff's IA Business was used to supply capital to Madoff's wholesale market making business, *or* (b) that "[t]he Feeder Funds are part of a financial game and the approximately 1.1 billion per year of gross excess returns . . . do not really exist."

244.    In reaching this conclusion, Aksia found, among other things, that (1) the return stream of Fairfield Sentry did not appear to be possible under the split strike strategy; (2) Fairfield Sentry's quarterly 13F filings uncovered $0 equity holdings every quarter except for one, even though Aksia was told that Madoff's strategy sometimes lasts for as long as eight months; (3) the use of the United States mail instead of electronic means to provide position and trading execution information was suspicious; (4) based on the amount under management for feeder funds, "the required trade sizes are huge and inconsistent with the size of the S&P100 options market;" (5) Madoff chose "to earn a small 4 cents a share" when he could have earned hundreds of millions more by managing a hedge fund himself; and (6) Madoff chose "to earn a paltry 4 cents a share" when he could have funded the strategy as a proprietary trading position and earned over one billion dollars.

245.    Albourne Partners Limited ("Albourne"), an independent consultant on hedge funds and alternative investments, advised clients for a decade that they should steer clear of Madoff. In a December 15, 2008, commentary released just days after Madoff's scheme was

revealed, Albourne noted that its view on Madoff "never wavered."  To Albourne, although it was not clear Madoff was a fraud, "we concluded that, where a client had a holding, it should redeem."  Albourne noted that it believed Madoff's returns were "too good to be true" in that Albourne could not "think of a group of funds trading easily marked-to-market assets which appeared to have weathered so many different types of storms with such apparently consistent risk-adjusted returns."  In addition, according to the Albourne report, Madoff's operations were "built around obsessive secrecy" to the extent that one of BLMIS's former employees had no idea how Madoff made his money.

246.   Albourne also noted that over time, "it became clear that there were multiple Madoff feeders and that in total their AUM [assets under management] exceeded the publicly assumed scale of the firm."  According to Albourne, it was extremely unusual for a fund manager to significantly understate its assets under management.  The Albourne report also explained that Madoff's purported strategy involved not only equities trading, but options.  "Given the supposed size of the assets under management, it would have been difficult to execute the strategy due to the risk of market impact."

247.   Albourne's post-arrest report is consistent with other Albourne reports prior to the revelation of the fraud.  Earlier in 2008, Albourne specifically reviewed the Prime Fund for a particular Albourne client.  The April 11, 2008, report lists only two positives of this fund, while listing many more negatives.  In addition to the issues alleged above, Albourne mentioned that Albourne had monitored many volatility arbitrage managers, so it would expect Madoff's "simple strategy" to be replicated by others.  Of course, it was not.

248.   Albourne also found "strange" the fact that BLMIS prided itself for being "at the forefront of computerized trading," yet the Prime Fund's management was content with

receiving paper trade confirmations by mail a few days after the purported trade dates. It noted that the investment advisory agreement prohibited the Prime Fund's management from disclosing the identity of the Investment Manager. Further, Albourne questioned why all trades were exited at year-end to facilitate easy auditing. "It cannot be but suboptimal for a manager to put the audit process ahead of the investment strategy, i.e., potentially missing a trading opportunity."

249.    Cambridge, Société Génerale, Acorn, Renaissance, Aksia and Albourne all determined that something was simply not right in Denmark, and either pulled their investments or refused to recommend investments to others with BLMIS. These money managers and investors, who were similarly situated to Defendants, may not have specifically known of Madoff's fraud, but they determined through basic, ordinary due diligence then utilized in the industry that Madoff's performance was inconsistent with his purported strategy and the way markets behave generally.

250.    These entities had even less information than Schulman, Manzke, Tremont and Parents, which had far greater access to Madoff and information about his operations. The difference between these entities and the Defendants, however, was that they did not rely on Madoff for their profits. Instead of willfully ignoring the red flags showing Madoff to be a fraud, these entities saw Madoff through objective eyes – and the number of unanswered questions caused them to run the other direction.

## EMERGING INDUSTRY STANDARDS AND THE *BAYOU PONZI* SHOULD HAVE PUT TREMONT ON HIGH ALERT

251.    Tremont's tepid efforts to analyze and monitor investments with Madoff were contrary to industry standards at the time. The hedge fund industry, and Tremont and Parents in particular, should have determined by early in the new millennium that BLMIS was fraudulent.

By then, Rye Funds had a half dozen years of BLMIS performance and statistics upon which it could perform the type of quantitative analysis alleged above. Tremont and Parents should have been on heightened alert of manager fraud after the collapse of the Bayou Group Fund several years later.

252.    In the early 2000s the Bayou Group Fund ("Bayou"), headed by Samuel Israel, appeared to be one of the highly successful hedge funds riding the rise in the stock market following the tech bubble collapse. It was discovered in 2005, however, that Bayou was a $400 million Ponzi scheme. This fraud attracted much media attention and almost everyone in the hedge fund industry knew about it. The Bayou fraud forewarned the financial industry that a lack of adequate due diligence could result in financial disaster for investors.

253.    Bayou had a number of obvious variables and indicia of fraud in common with BLMIS. Despite purporting to have 9 to 10 figures of assets under management, neither Bayou nor BLMIS was audited by a large, well-known accounting firm; Bayou had an in-house accountant and BLMIS had F&H. Both Bayou and BLMIS provided their customers extraordinarily and consistently positive, but not necessarily spectacular, returns, with no volatility. The reported returns were so consistent, that they were effectively impossible. Neither investment manager charged a performance fee, which is how many hedge fund managers earn their remuneration.

254.    Tremont and Parents were well aware of Bayou, which should have put them on high alert. The Bayou fraud caused many hedge funds to reconsider the adequacy of their due diligence and set in place heightened or additional mechanisms for uncovering or preventing fraud. In the winter of 2006, the Greenwich Roundtable presented its *Best Practices in Hedge Fund Investing: Due Diligence for Global Macro and Managed Futures Strategies*. That

publication noted in its Introduction that the Bayou fraud transpired shortly after the organization's initial publication, *Best Practices in Hedge Fund Investment*, and that the Bayou fraud "offers a valuable context in which to evaluate both the substance and purpose of our *Best Practices* series."

255.   The initial *Best Practices* publication provided a checklist that identified lines of inquiry for hedge fund managers.

> Ironically, one of the lessons of Bayou was not just the need for alertness to the possibility of fraud but how many experienced investors believed their judgment and experience were sufficient to dispense with mundane checklists.  By my count, a casual reader of our *Best Practices* document would have had between eight and ten points where they should have been alarmed enough to stop and intensively scrutinize what they were investigating or been comfortable stopping the due diligence process outright.  As explained, the document contained a checklist and clear patterns of inquiry on the key subjects.  However, it had an important subtext too.  Be careful.  Be focused and diligent.  Exercise particular caution in areas where you are less familiar or uncertain.  Do your own homework.  Don't be rushed or shortchange your work for any reason.  Let your investment conviction be built in calibrated work steps but always trust your gut in the end.  These are the lessons of the Bayou debacle but they were also the "lessons" of the *Best Practices* publication which preceded it.

(The Greenwich Roundtable Presents: Best Practices in Hedge Fund Investing: Due Diligence for Global Macro and Managed Futures Strategies (Winter 2006), at 6 (Introduction by Spencer Boggess).)

256.   The remainder of the *Best Practices* guide includes chapters on the following topics: (1) Strategy, Investment Process and Market Opportunity; (2) Team and Organization; (3) Fee Structure and Terms; (4) Risk Management; (5) Management Company, Fund Structure and Asset Base; (6) Quantitative Review; (7) Operations and Transparency; (8) Third Parties (including subsections on auditors, prime broker/futures clearing merchant, administrator, and marketing relationships); and (9) Intuition, Judgment and Experience.

257.    The lessons of Bayou and the practices promoted by the Greenwich Roundtable are also the lessons of Madoff.  Yet those lessons were not heeded by Tremont or Parents. Ironically, the Roundtable materials guide names Nancy Solnik of Tremont as one of its authors. Solnik's name also appears in the publication as a Best Practices Subcommittee Member.

258.    Upon information and belief, Solnik was employed by Tremont beginning in or around 2002.   According to Tremont biographical information, Solnik was a member of Tremont's Investment Management Department and held the titles of Vice President and Senior Analyst with her responsibilities including "identifying and evaluating new managers, conducting due diligence of prospective funds, including analyzing investment philosophy and historical performance, monitoring the investment style of approved managers and recommending specific funds for inclusion into Tremont portfolios."  She also was a portfolio manager for funds that were not invested with Madoff.

259.    Had Tremont implemented years earlier the *Best Practices* recommended by the Greenwich Roundtable – which Tremont personnel actively participated in drafting – they surely would have conducted meaningful due diligence and like many others alleged herein been suspicious of fraud.  Tremont failed to follow the industry standards that their own personnel played a role in developing, choosing greed over caution and allowing Bayou-type history to repeat itself.

## **VOIDABLE TRANSFERS FROM BLMIS**

### A.    **Initial Transfers to the Rye Funds**

260.    During the relevant period, and as set forth in Exhibit **A**, the Broad Market Fund, Prime Fund, Portfolio Limited Fund, and Insurance Portfolio LDC Fund (collectively, "Rye Funds") held accounts at BLMIS and its IA Business.  Upon information and belief, for each Rye Fund Account, Tremont executed a Customer Agreement, an Option Agreement, and/or a

Trading Authorization Limited to Purchases and Sales of Securities and Options, (collectively, the "Account Agreements"), and delivered such documents to BLMIS at its principal place of business at 885 Third Avenue, New York, New York.

261.    The Account Agreements were to be performed in New York, New York through securities trading activities that would take place in New York, New York.  The Accounts were held in New York, New York, and Tremont consistently wired funds to BLMIS's account at JPMorgan Chase & Co., Account #XXXXX1703 (the "BLMIS Bank Account") in New York, New York, for application to the Accounts and the conducting of trading activities on behalf of the Rye Funds.

262.    Between the time that the Broad Market Fund opened its first account with BLMIS in or around 1994 and the Filing Date, Tremont directed deposits to BLMIS on behalf of the Rye Funds through multiple checks and wire transfers into the BLMIS Bank Account.

263.    The Rye Funds are initial transferees of BLMIS.  In addition, based on its position as general partner of the Rye Funds, Tremont Partners is also an initial transferee from accounts held by the Rye Funds.  Moreover, due to their domination and control of the Rye Funds and Tremont Partners, the bad faith and knowledge of the Rye Funds and Tremont Partners should be imputed to Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual.

The Transfers

264.    Since 1994, BLMIS transferred at least $2.1 billion to, or for the benefit of, the Rye Funds in the form of withdrawals from their BLMIS accounts (the "Transfers") as set forth in Exhibits **A and B**.  Under the circumstances set forth above, the Rye Funds, Tremont Partners, Tremont Group, and the Parents knew or should have known of fraudulent activity in their own accounts, and/or that the Transfers were made for a fraudulent purpose.

265.   More specifically, of these Transfers, upon information and belief, BLMIS made transfers totaling approximately $1.01 billion to, or for the benefit of, the Prime Fund; approximately $628.2 million to, or for the benefit of, the Portfolio Limited Fund; approximately $384.1 million to, or for the benefit of, the Broad Market Fund; and approximately $130.1 million to, or for the benefit of, the Insurance Portfolio LDC Fund.  See Exhibits **A** and **B**.

266.   The Transfers are avoidable and recoverable under sections 544, 547, 548, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of DCL sections 273 – 279 and NY CPLR 203(g) and 213(8).   The Transfers were directly or indirectly made to, or for the benefit of, the Rye Funds and include, but are not limited to, the Transfers listed in Exhibits **A** and **B**.

Two Year Transfers

267.   During the two years prior to the Filing Date, BLMIS transferred a total of approximately $959.6 million to or for the benefit of the Rye Funds ("Two Year Transfers"). The Two Year Transfers are set forth more fully in Exhibits **A** and **B**.   Under the circumstances set forth above, the Rye Funds, Tremont Partners, Tremont Group, and the Parents knew or should have known of fraudulent activity in their own accounts, and/or that the Two Year Transfers were made for a fraudulent purpose.

268.   More specifically, of the Two Year Transfers, upon information and belief, BLMIS made transfers totaling approximately $495 million to, or for the benefit of, the Prime Fund; approximately $354.5 million to, or for the benefit of, the Portfolio Limited Fund; approximately $60 million to, or for the benefit of, the Broad Market Fund; and approximately $50 million to, or for the benefit of, the Insurance Portfolio LDC Fund.  See Exhibits **A** and **B**.

269.   The Two Year Transfers are avoidable and recoverable under sections 548, 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3).  The Two Year Transfers were directly or indirectly made to, or for the benefit of, the Rye Funds and include, but are not limited to, the Two Year Transfers listed in Exhibit **B**.

Six Year Transfers

270.   During the six years prior to the Filing Date, BLMIS made payments to, or for the benefit of, the Rye Funds of more than $1.9 billion (the "Six Year Transfers").  See Exhibits **A and B**.  Under the circumstances set forth above, the Rye Funds, Tremont Partners, Tremont Group, and the Parents knew or should have known of fraudulent activity in their own accounts, and/or that the Six Year Transfers were made for a fraudulent purpose.

271.   More specifically, of the Six Year Transfers, BLMIS made transfers totaling approximately $945 million to, or for the benefit of, the Prime Fund; approximately $617.9 million to, or for the benefit of, the Portfolio Limited Fund; approximately $252 million to, or for the benefit of, the Broad Market Fund; and approximately $93.9 million to, or for the benefit of, the Insurance Portfolio LDC Fund.  See Exhibits **A and B**.

272.   The Six Year Transfers are avoidable and recoverable under sections 544, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of DCL sections 273 – 279.  The Six Year Transfers were directly or indirectly made to, or for the benefit of, the Defendants and include, but are not limited to, the Six Year Transfers listed in Exhibit **B**.

Preference Period Transfers

273.   During the 90-day period prior to the Filing Date—the preference period—the Portfolio Limited Fund, the Broad Market Fund, and Insurance Portfolio LDC Fund received

transfers from BLMIS constituting the return of principal in an amount totaling approximately $324.6 million (the "Preference Period Transfers"). See Exhibits **A and B**. More specifically, of the Preference Period Transfers, upon information and belief, BLMIS transferred approximately $275.7 million to, or for the benefit of, the Portfolio Limited Fund; approximately $40 million to, or for the benefit of, the Broad Market Fund; and approximately $8.9 million to, or for the benefit of, the Insurance Portfolio LDC Fund. The Preference Period Transfers were directly or indirectly made to, or for the benefit of, the Portfolio Limited Fund, Broad Market Fund, and Insurance Portfolio LDC Fund, and include, but are not limited to, the Preference Period Transfers listed in Exhibit **B**.

274.   The Preference Period Transfers are avoidable and recoverable under sections 547, 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

### B.   Subsequent Transfers

275.   Throughout the entire history of the Rye Funds since 1994, upon information and belief, some portion of the Transfers made by BLMIS to the various Rye Funds were then subsequently transferred ("Subsequent Transfers") to various entities, including but not limited to, the XL Funds, Tremont Funds, Tremont, Parents, Manzke, and/or Schulman. Upon information and belief, a portion of the Subsequent Transfers were made within 90 days of the Filing Date ("Preference Period Subsequent Transfers").

276.   Tremont's actual or constructive knowledge of the fraudulent nature of these subsequent transfers is imputed to the XL Funds, Tremont Funds, Manzke, Schulman, and Parents. The Subsequent Transfers are discussed with more particularity below.

<u>Subsequent Transfers: XL Funds</u>

277.     Of the Subsequent Transfers, upon information and belief, XL LP received transfers from the Prime Fund in the amount of approximately $285.3 million, including a transfer of approximately $203 million from the Prime Fund, in or around March 2008.  Those amounts, upon information and belief, were initially transferred from BLMIS to the Prime Fund, which had received initial transfers from BLMIS as set forth in <u>Exhibits **A** and **B**</u>.

278.     Of the Subsequent Transfers, upon information and belief, XL LP also received transfers in the amount of approximately $46.7 million from the Broad Market Fund, including a subsequent transfer of approximately $32 million in the third quarter of 2007.  Those amounts, upon information and belief, were initially transferred from BLMIS to the Broad Market Fund, which had received initial transfers from BLMIS as set forth in <u>Exhibits **A** and **B**</u>.

279.     Of the Subsequent Transfers, upon information and belief, XL LP and XL Portfolio received transfers based on synthetic investments in the Broad Market and Portfolio Limited Funds provided through various total return swap transactions by the swap counterparty. To the extent the swap counterparty used funds received from, or made available for use directly or indirectly from BLMIS, to transfer funds to XL LP and XL Portfolio, the monies received by XL LP and XL Portfolio are recoverable Subsequent Transfers.

<u>Subsequent Transfers: Tremont Funds</u>

280.     Upon information and belief, Opportunity III Fund was indirectly invested with BLMIS through the Prime Fund and the Broad Market Fund.  Of the Subsequent Transfers, upon information and belief, Opportunity III Fund received transfers from the Broad Market Fund totaling approximately $130 million, as well as transfers from the Prime Fund totaling

approximately $88.3 million. The Broad Market Fund and Prime Fund received initial transfers from BLMIS as set forth in Exhibits **A and B**.

281.    Upon information and belief, Opportunity Limited was indirectly invested with BLMIS through the Portfolio Fund and XL Portfolio. Of the Subsequent Transfers, upon information and belief, Opportunity Limited received transfers totaling approximately $76.3 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A and B**.

282.    In addition, upon information and belief, as part of the Subsequent Transfers, Opportunity Limited received transfers totaling approximately $9.1 million from XL Portfolio, which, upon information and belief, received transfers from the Portfolio Limited Fund and/or swap counterparties. The swap counterparties, upon information and belief, received the subsequent transfers from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A and B**.

283.    Upon information and belief, Opportunity II Fund was indirectly invested with BLMIS through the Prime Fund, the Broad Market Fund, and XL LP. Of the Subsequent Transfers, upon information and belief, Opportunity II Fund received transfers from the Prime Fund totaling approximately $13.6 million, as well as transfers from the Broad Market Fund totaling approximately $13.4 million. The Prime Fund and Broad Market Fund received initial transfers from BLMIS as set forth in Exhibits **A and B**.

284.    In addition, upon information and belief, as part of the Subsequent Transfers, Opportunity II Fund received transfers totaling approximately $2.4 million from XL LP, which, upon information and belief, received transfers from the Broad Market Fund and/or swap counterparties. The swap counterparties, upon information and belief, received the subsequent

transfers from the Broad Market Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

285.    Upon information and belief, Market Neutral Limited was indirectly invested with BLMIS through the Portfolio Limited Fund, as well as XL Portfolio.  Of the Subsequent Transfers, upon information and belief, Market Neutral Limited received transfers totaling approximately $91.8 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

286.    In addition, upon information and belief, as part of the Subsequent Transfers, Market Neutral Limited received transfers totaling approximately $10 million from XL Portfolio, which, upon information and belief, received transfers from the Portfolio Limited Fund and/or swap counterparties.  The swap counterparties, upon information and belief, received the subsequent transfers from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

287.    Upon information and belief, Market Neutral Fund was indirectly invested with BLMIS through the Prime Fund and the Broad Market Fund.  Of the Subsequent Transfers, upon information and belief, Market Neutral Fund received transfers from the Broad Market Fund totaling approximately $39.5 million, as well as transfers from the Prime Fund totaling approximately $8 million.  The Broad Market Fund and Prime Fund received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

288.    Upon information and belief, LifeInvest was indirectly invested with BLMIS through the Insurance Portfolio LDC Fund.  Of the Subsequent Transfers, upon information and belief, LifeInvest received transfers totaling approximately $20.3 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

289.     Upon information and belief, Long/Short Fund was indirectly invested with BLMIS through the Prime Fund and the Broad Market Fund.  Of the Subsequent Transfers, upon information and belief, Long/Short Fund received transfers from the Prime Fund totaling approximately $12.1 million, as well as transfers from the Broad Market Fund totaling approximately $10.8 million.  The Prime Fund and Broad Market Fund received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

290.     Upon information and belief, International Insurance Fund was indirectly invested with BLMIS through the Prime Fund.  Of the Subsequent Transfers, upon information and belief, International Insurance Fund received transfers totaling approximately $9.4 million from the Prime Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

291.     Upon information and belief, Equity Fund – Ireland was indirectly invested with BLMIS through the Portfolio Limited Fund and XL Portfolio.  Of the Subsequent Transfers, upon information and belief, Equity Fund – Ireland received transfers totaling approximately $5 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

292.     In addition, upon information and belief, as part of the Subsequent Transfers, Equity Fund – Ireland received transfers totaling approximately $740,000 from XL Portfolio, which, upon information and belief, received transfers from the Portfolio Limited Fund and/or swap counterparties.  The swap counterparties, upon information and belief, received the subsequent transfers from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

293.     Upon information and belief, Market Neutral II Fund was indirectly invested with BLMIS through the Prime Fund, the Broad Market Fund, and XL LP.  Of the Subsequent

Transfers, upon information and belief, Market Neutral II Fund received transfers from the Prime Fund totaling approximately $36.1 million, as well as transfers from the Broad Market Fund totaling approximately $36.4 million. The Prime Fund and Broad Market Fund received initial transfers from BLMIS as set forth in Exhibits **A and B**.

294. In addition, upon information and belief, as part of the Subsequent Transfers, Market Neutral II Fund received subsequent transfers totaling approximately $10.3 million from XL LP, which, upon information and belief, received transfers from the Broad Market Fund and/or swap counterparties. The swap counterparties, upon information and belief, received the subsequent transfers from the Broad Market Fund, which received initial transfers from BLMIS as set forth in Exhibits **A and B**.

295. Upon information and belief, Arbitrage Ireland was indirectly invested with BLMIS through the Portfolio Limited Fund. Of the Subsequent Transfers, upon information and belief, Arbitrage Ireland received transfers totaling approximately $8.6 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A and B.**

296. Upon information and belief, Multimanager Fund was indirectly invested with BLMIS through the Portfolio Limited Fund and XL Portfolio Fund. Of the Subsequent Transfers, upon information and belief, Multimanager Fund received transfers totaling approximately $7.4 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A and B**.

297. In addition, of the Subsequent Transfers, upon information and belief, Multimanager Fund received subsequent transfers totaling approximately $6.1 million from XL LP, which, upon information and belief, received transfers from the Broad Market Fund and/or swap counterparties. The swap counterparties, upon information and belief, received the

subsequent transfers from the Broad Market Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

298.    Upon information and belief, Emerging Markets – Ireland was indirectly invested with BLMIS through the Portfolio Limited Fund.   Of the Subsequent Transfers, upon information and belief, Emerging Markets – Ireland received transfers totaling approximately $4.3 million from the Portfolio Limited Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

299.    Upon information and belief, Arbitrage Fund was indirectly invested with BLMIS through the Broad Market Fund.  Of the Subsequent Transfers, upon information and belief, the Arbitrage Fund received transfers totaling approximately $3.1 million from the Broad Market Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

300.    Upon information and belief, Equities Fund was indirectly invested with BLMIS through the Prime Fund.  Of the Subsequent Transfers, upon information and belief, Equities Fund received transfers totaling approximately $1 million from the Prime Fund, which received initial transfers from BLMIS as set forth in Exhibits **A** and **B**.

Subsequent Transfers: Fees

301.    Upon information and belief, of the Subsequent Transfers, Tremont Partners received transfers in the form of management and administrative fees from the Rye Funds, which received initial transfers from BLMIS.  The Trustee estimates these fees to be more than $240 million since 1994.  Manzke and Schulman, upon information and belief, received a portion of these fees as subsequent transfers.  Upon information and belief, as part of the Subsequent Transfers, a portion of those fees were also transferred from Tremont Partners to Tremont Group.

302.    Upon information and belief, as part of the Subsequent Transfers, Tremont Group's Parents received transfers from Tremont Group in the form of a dividend between $10-35 million.  As noted above, upon information and belief, that dividend originated from transfers from BLMIS to the Rye Funds, which were then transferred to Tremont Partners and/or Tremont Group.

### Preference Period Subsequent Transfers

303.    Of the Preference Period Subsequent Transfers, upon information and belief, Opportunity III Fund received subsequent transfers totaling approximately $40.4 million from the Broad Market Fund, which received preferential transfers from BLMIS as set forth in Exhibits **A** and **B**.

304.    Of the Preference Period Subsequent Transfers, upon information and belief, Arbitrage Ireland received subsequent transfers totaling approximately $3.5 million from the Portfolio Limited Fund, which had received preferential transfers from BLMIS as set forth in Exhibits **A** and **B**.

305.    Of the Preference Period Subsequent Transfers, upon information and belief, Opportunity Limited received subsequent transfers totaling approximately $6.1 million from XL Portfolio, which, upon information and belief received subsequent transfers from the Portfolio Limited Fund and/or swap counterparties.  The swap counterparties, upon information and belief, received the subsequent transfers from the Portfolio Limited Fund, which had received preferential transfers from BLMIS as set forth in Exhibits **A and B**.

306.    Of the Preference Period Subsequent Transfers, upon information and belief, Market Neutral received subsequent transfers totaling approximately $2.3 million from the Broad

Market Fund, which received preferential transfers from BLMIS as set forth in <u>Exhibits **A and B**</u>.

307.     Of the Preference Period Subsequent Transfers, upon information and belief, Market Neutral Limited received subsequent transfers totaling approximately $1 million from the Portfolio Limited Fund, which received preferential transfers from BLMIS as set forth in <u>Exhibits **A and B**</u>.

308.     To the extent that Tremont Partners, Tremont Group, or the Parents took fees from the Rye Funds within 90 days prior to the Filing Date, those fees are recoverable as Preference Period Subsequent Preferences.

<u>Conclusion</u>

309.     Under the circumstances set forth above, the XL Funds, Tremont Funds, Tremont Partners, Tremont Group, Parents, Manzke, and Schulman knew or should have known of fraudulent activity in the Rye Funds' accounts and/or that the Transfers and Subsequent Transfers were made and/or received with a fraudulent purpose.

310.     All of the Subsequent Transfers, or the value thereof, are recoverable from the XL Funds, Tremont Funds, Manzke, Schulman, Tremont Group, and/or Parents pursuant to section 550(a) of the Bankruptcy Code.

311.     To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

312.     The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information regarding the Transfers and Subsequent Transfers and any additional transfers, and (ii) seek recovery of such additional transfers.

## CUSTOMER CLAIMS

313.    The Trustee has received Customer Claims from the Prime Fund, the Portfolio Limited Fund, the Broad Market Fund, the Insurance Portfolio LDC Fund, and Rye Insurance ("Defendants' Claims").  Defendants' Claims are summarized in Exhibit **C**.

314.    In response to the Prime Fund's Customer Claim, the Trustee issued a Notice of Trustee's Determination of Claim.  See Exhibit **C**.  The Trustee is not aware of any objections to that Determination being filed with the Court.  The remainder of the Defendant's claims have not yet been determined.  See Exhibit **C**.

315.    On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12).  The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating.  The Trustee intends to resolve the Customer Claims and any related objections to the Trustee's determination of such claims through a separate hearing as contemplated by the Claims Procedures Order.

## COUNT ONE
## PREFERENTIAL TRANSFERS (INITIAL TRANSFEREES) - 11 U.S.C. §§ 547(B), 550 AND 551

### *Against Broad Market Fund, Portfolio Limited Fund and Insurance Portfolio LDC Fund*

316.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

317.    At the time of each of the Preference Period Transfers, the Portfolio Limited Fund, Broad Market Fund, and Insurance Portfolio LDC Fund were each a "creditor" of BLMIS

within the meaning of section 101(10) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

318.    Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

319.    Each of the Preference Period Transfers was to or for the benefit of the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund.

320.    Each of the Preference Period Transfers was made for or on account of an antecedent debt owed by BLMIS to the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund before such transfer was made.

321.    Each of the Preference Period Transfers was made while BLMIS was insolvent.

322.    Each of the Preference Period Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

323.    Each of the Preference Period Transfers enabled the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund to receive more than each of them would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

324.    Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund pursuant to section 550(a)(1) of the Bankruptcy Code.

325.    As a result of the foregoing, pursuant to sections 547(b), 550(a)(1), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment against the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside and (c) recovering the Preference Period Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT TWO
## PREFERENTIAL TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) - 11 U.S.C. §§ 547(B), 550 AND 551

### *Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

326.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

327.    At the time of each of the Preference Period Transfers, the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund each was a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

328.    Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to section 78fff-2(c)(3) of SIPA.

329.    Each of the Preference Period Transfers was to or for the benefit of the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund.

330.    Each of the Preference Period Transfers was made for or on account of an antecedent debt owed by BLMIS to the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund before such transfer was made.

331. Each of the Preference Period Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

332. Each of the Preference Period Transfers enabled the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund to receive more than each of them would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

333. Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the Broad Market Fund pursuant to section 550(a)(1) of the Bankruptcy Code.

334. Tremont Partners served as the general partner to the Broad Market Fund during the Preference Period. For all intents and purposes, the Broad Market Fund is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein. As a general partner to the Broad Market Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, for all obligations the Broad Market Fund incurred while Tremont Partners was serving as general partner.

335. Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Portfolio Limited Fund, Broad Market Fund, Insurance Portfolio LDC Fund and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund and Tremont Partners.

336. As a result of the foregoing, pursuant to sections 547(b), 550(a)(1), and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of the

Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside; (c) recovering the Preference Period Transfers to the Broad Market Fund, or the value thereof, from Tremont Partners for the benefit of the estate of BLMIS; and (d) recovering the Preference Period Transfers to Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund, or the value thereof, from Tremont Group and Parents for the benefit of the estate of BLMIS.

## COUNT THREE
## PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREES) - 11 U.S.C. §§ 547(B), 550 AND 551

### Against Arbitrage Ireland, Market Neutral Fund, Opportunity Limited, Opportunity III Fund, Tremont, and/or Parents

337.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

338.    At the time of each of the Preference Period Transfers, the Portfolio Limited Fund, Broad Market Fund, and Insurance Portfolio LDC Fund were "creditors" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

339.    Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

340.    Each of the Preference Period Transfers was to or for the benefit of the Portfolio Limited Fund, Broad Market Fund, and Insurance Portfolio LDC Fund.

341.    Each of the initial transfers made during the Preference Period was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

342. Each of the initial transfers made during Preference Period was made while BLMIS was insolvent.

343. Each of the Preference Period Transfers was made during the preference period under section 547(b)(4) of the Bankruptcy Code.

344. Each of the Preference Period Transfers enabled the Portfolio Limited Fund, Broad Market Fund, and/or Insurance Portfolio LDC Fund to receive more than each of the funds would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable fund received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

345. Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code.

346. Upon information and belief, Arbitrage Ireland, Market Neutral Fund, Opportunity Limited, Opportunity III Fund, Tremont, and/or Parents were immediate or mediate transferees of some portion of the Preference Period Transfers pursuant to section 550(a)(2) of the Bankruptcy Code.

347. Each of the Preference Period Subsequent Transfers were made directly or indirectly to or for the benefit of Arbitrage Ireland, Market Neutral Fund, Opportunity Limited, Opportunity III Fund, Tremont and/or Parents.

348. As a result of the foregoing, pursuant to sections 547(b), 550(a)(2), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the subsequent transfers made during the Preference Period, or the value thereof, from Arbitrage Ireland, Market Neutral Fund, Opportunity Limited, Opportunity III Fund, Tremont, and/or Parents, for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) – 11 U.S.C. §§ 548(A)(1)(A), 550 AND 551

### *AGAINST tHE RYE FUNDS*

349.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

350.   The Two Year Transfers to the Rye Funds were made on or within two years before the Filing Date.

351.   The Two Year Transfers to the Rye Funds were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS's then existing or future creditors.

352.   The Two Year Transfers to the Rye Funds constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Rye Funds pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

353.   As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers to the Rye Funds, (b) directing that the Two Year Transfers to the Rye Funds be set aside, and (c) recovering the Two Year Transfers to the Rye Funds, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS.

## COUNT FIVE
## FRAUDULENT TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) – 11 U.S.C. §§ 548(A)(1)(A), 550 AND 551

### *Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

354.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

355.    The Two Year Transfers to the Rye Funds were made on or within two years before the filing date.

356.    The Two Year Transfers to the Rye Funds were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS's then existing or future creditors.

357.    The Two Year Transfers to the Rye Funds constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Rye Funds pursuant to section 550(a) of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA.

358.    Tremont Partners served as the general partner to the Broad Market Fund and the Prime Fund during the two years preceding the Filing Date.  For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein.  As general partner of the Broad Market Fund and the Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403(b) of the Delaware Code, for all obligations incurred by the Broad Market Fund and the Prime Fund while Tremont Partners was serving as general partner.

359.    Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

360.    As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a)(1), and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers to the Rye Funds; (b) directing that the Two Year Transfers to the Rye Funds be set aside; (c) recovering the Two Year Transfers to the

Broad Market Fund and the Prime Fund, or the value thereof, from Tremont Partners for the benefit of the estate of BLMIS; and (d) recovering the Two Year Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS.

**COUNT SIX**
**FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) – 11 U.S.C. §§ 548(A)(1)(B), 550 AND 551**

***Against the Rye Funds***

361.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

362.     The Two Year Transfers to the Rye Funds were made on or within two years before the Filing Date.

363.     BLMIS received less than reasonably equivalent value in exchange for each of the Two Year Transfers.

364.     At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

365.     At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

366.     At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

367.     Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Rye Funds pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

368.     As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS, and to return to injured customers.

### COUNT SEVEN
### FRAUDULENT TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) – 11 U.S.C. §§ 548(A)(1)(B), 550 AND 55

*Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

369.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

370.     The Two Year Transfers to the Rye Funds were made on or within two years before the Filing Date.

371.     BLMIS received less than reasonably equivalent value in exchange for each of the Two Year Transfers.

372.     At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

373.     At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

374.     At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

375. Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Rye Funds pursuant to section 550(a)(1) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

376. Tremont Partners served as general partner to the Broad Market Fund and Prime Fund during the two years preceding the Filing Date. For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein. As general partner of the Broad Market Fund and Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, for all obligations the Broad Market Fund and Prime Fund incurred while Tremont Partners was serving as general partner.

377. Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

378. As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a)(1), and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers to the Rye Funds be set aside; (c) recovering the Two Year Transfers to the Broad Market Fund and Prime Fund, or the value thereof, from Tremont Partners, for the benefit of the estate of BLMIS; and (d) recovering the Two Year Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS.

10-05310-brl   Doc 1-1   Filed 12/07/10   Entered 12/07/10 05:33   Main Document
Pg 112 of 138

## COUNT EIGHT
## FRAUDULENT TRANSFER (INITIAL TRANSFEREES) – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-A, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A) AND 551

### *Against the Rye Funds*

379.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

380.     At all times relevant to the Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

381.     The Six Year Transfers were made by BLMIS and transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Rye Funds in furtherance of a fraudulent investment scheme.

382.     The Six Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

383.     The Six Year Transfers were received by the Rye Funds with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

384.     As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or

the value thereof, from the Rye Funds for the benefit of the estate of BLMIS, and (d) recovering

attorneys' fees from the Rye Funds.

**COUNT NINE**
**FRAUDULENT TRANSFER (GENERAL PARTNER AND CORPORATE PARENT**
**LIABILITY) – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-A, 278**
**AND/OR 279, AND 11 U.S.C. §§ 544, 550(A) AND 551**

***Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass***
***Mutual***

385.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

386.    At all times relevant to the Six Year Transfers, there have been one or more

creditors who have held and still hold matured or unmatured unsecured claims against BLMIS

that were and are allowable under section 502 of the Bankruptcy Code or that were and are not

allowable only under section 502(e) of the Bankruptcy Code.

387.    The Six Year Transfers were made by BLMIS and transferees with the actual

intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers

to or for the benefit of the Rye Funds in furtherance of a fraudulent investment scheme.

388.    The Six Year Transfers were received by the Rye Funds with actual intent to

hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future

creditors of BLMIS.

389.    Tremont Partners served as the general partner to the Broad Market Fund and the

Prime Fund during the two years preceding the Filing Date.  For all intents and purposes, the

Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any

judgment on the claims asserted herein.  As general partner of the Broad Market Fund and the

Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403(b) of the

-110-

Delaware Code, for all obligations incurred by the Broad Market Fund and the Prime Fund while
Tremont Partners was serving as general partner.

390.    Due to their domination and control over Tremont Partners and the Rye Funds,
liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents,
who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

391.    As a result of the foregoing, pursuant to DCL sections 276, 276-a, 278 and/or 279,
sections 544(b), 550(a), and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections
15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law, the
Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b)
directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers to the
Broad Market Fund and the Prime Fund, or the value thereof, from Tremont Partners, for the
benefit of the estate of BLMIS and to return to injured customers; (d) recovering the Six Year
Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer,
MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS and (e) recovering
attorneys' fees from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and
Mass Mutual.

## COUNT TEN
## FRAUDULENT TRANSFER (INITIAL TRANSFEREE) -- NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551

### *Against the Rye Funds*

392.    The Trustee incorporates by reference the allegations contained in the previous
paragraphs of the Complaint as if fully rewritten herein.

393.    At all relevant times there was and is at least one or more creditors who held and
hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

394.    BLMIS did not receive fair consideration for the Six Year Transfers.

395.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year Transfers.

396.    The Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

397.    As a result of the foregoing, pursuant to DCL sections 273, 278 and 279, sections 544(b), 550, 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS, and to return to injured customers.

## COUNT ELEVEN
### FRAUDULENT TRANSFER (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) -- NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551

### *Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

398.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

399.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

400.    BLMIS did not receive fair consideration for the Six Year Transfers.

401.   BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year Transfers.

402.   The Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

403.   Tremont Partners served as general partner to the Broad Market Fund and Prime Fund during the six years preceding the Filing Date.  For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein.  As general partner to the Broad Market Fund and Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, for all obligations incurred by the Broad Market Fund and Prime Fund while serving as general partner.

404.   Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

405.   As a result of the foregoing, pursuant to DCL sections 273, 278 and 279, sections 544(b), 550, 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers to the Broad Market Fund and Prime Fund, or the value thereof, from Tremont Partners, for the benefit of the estate of BLMIS; and (d) recovering the Six Year Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS.

## COUNT TWELVE
## FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) —NEW YORK DEBTOR AND CREDITOR LAW §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551

### *Against the Rye Funds*

406.　　The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

407.　　At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

408.　　BLMIS did not receive fair consideration for the Six Year Transfers.

409.　　At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS.

## COUNT THIRTEEN
## FRAUDULENT TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) —NEW YORK DEBTOR AND CREDITOR LAW §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551

### *Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

410.　　The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

411. At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

412. BLMIS did not receive fair consideration for the Six Year Transfers.

413. At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

Tremont Partners served as general partner to the Broad Market Fund and Prime Fund during the six years preceding the Filing Date. For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein. As general partner to the Broad Market Fund and Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, for all obligations incurred by the Broad Market Fund and Prime Fund while serving as general partner.

414. Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

415. As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers to the Broad Market Fund and Prime Fund, or the value thereof, from Tremont Partners, for the benefit

of the estate of BLMIS, and to return to injured customers; and (d) recovering the Six Year Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS.

**COUNT FOURTEEN**
**FRAUDULENT TRANSFERS (INITIAL TRANSFEREES) -NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A) AND 551**

**Against the Rye Funds**

416.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

417.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

418.     BLMIS did not receive fair consideration for the Six Year Transfers.

419.     At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

420.     As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78ff-2(c)(3) of SIPA, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS.

## COUNT FIFTEEN
## FRAUDULENT TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) - NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A) AND 551

### *Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

421.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

422.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

423.    BLMIS did not receive fair consideration for the Six Year Transfers.

424.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

425.    Tremont Partners served as general partner to the Broad Market Fund and Prime Fund during the six years preceding the Filing Date.  For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein.  As general partner to the Broad Market Fund and Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, for all obligations incurred by the Broad Market Fund and Prime Fund while serving as general partner.

426.    Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

427. As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, section 78ff-2(c)(3) of SIPA, sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers to the Broad Market Fund and Prime Fund, or the value thereof, from Tremont Partners, for the benefit of the estate of BLMIS, and to return to injured customers; and (d) recovering the Six Year Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS.

## COUNT SIXTEEN
### RECOVERY OF THE TRANSFERS (INITIAL TRANSFEREE) – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(G), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-A, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(A)(1), AND 551

### *Against the Rye Funds*

428. The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

429. At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

430. At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

431. The Transfers were made by BLMIS and the transferees with the actual intent to hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Transfers to or for the benefit of the Rye Funds in furtherance of a fraudulent investment scheme.

432.     The Rye Funds received the Transfers with actual intent to hinder, delay, or

defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

433.     As a result of the foregoing, pursuant to NY CPLR 203(g), 213(8), sections 276,

276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1),

and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a)

avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering

the Transfers or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS,

and to return to injured customers; and (d) recovering attorneys' fees from the Rye Funds.

### COUNT SEVENTEEN
### RECOVERY OF THE TRANSFERS (GENERAL PARTNER AND CORPORATE PARENT LIABILITY) – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(G), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-A, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(A)(1), AND 551

*Against Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding and Mass Mutual*

434.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of the Complaint as if fully rewritten herein.

435.     At all times relevant to the Transfers, the fraudulent scheme perpetrated by

BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

436.     At all times relevant to the Transfers, there have been one or more creditors who

have held and still hold matured or unmatured unsecured claims against BLMIS that were and

are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only

under section 502(e).

437.     The Transfers were made by BLMIS and the transferees with the actual intent to

hinder, delay, or defraud the creditors of BLMIS. BLMIS made the Transfers to or for the benefit

of the Rye Funds in furtherance of a fraudulent investment scheme.

438.    The Rye Funds received the Transfers with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

439.    Tremont Partners served as general partner to the Broad Market Fund and Prime Fund.  For all intents and purposes, the Broad Market Fund and Prime Fund are insolvent, and their assets are insufficient to satisfy any judgment on the claims asserted herein.  As general partner to the Broad Market Fund and Prime Fund, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, for all obligations incurred by the Broad Market Fund and Prime Fund while serving as general partner.

440.    Due to their domination and control over Tremont Partners and the Rye Funds, liability of the Rye Funds and Tremont Partners is imputed to Tremont Group and the Parents, who are jointly and severally liable for the obligations of the Rye Funds and Tremont Partners.

441.    As a result of the foregoing, pursuant to NY CPLR 203(g), 213(8), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, SIPA § 78fff-2(c)(3), sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, and other applicable state law, the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; and (c) recovering the Transfers to the Broad Market Fund and Prime Fund, or the value thereof, from Tremont Partners for the benefit of the estate of BLMIS, and to return to injured customers; (d) recovering the Transfers to all of the Rye Funds, or the value thereof, from Tremont Group, Oppenheimer, MassMutual Holding, and Mass Mutual for the benefit of the estate of BLMIS; and (e) recovering attorneys' fees from the Rye Funds.

**COUNT EIGHTEEN**
**RECOVERY OF SUBSEQUENT TRANSFERS – NEW YORK CIVIL PROCEDURE**
**LAW AND RULES 203(G), 213(8), NEW YORK DEBTOR AND CREDITOR LAW §§**
**276, 276-A, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(A)(1), AND 551**

*Against Xl LP, Xl Portfolio, The Tremont Funds, Tremont Partners, Tremont Group, Tremont*
*Bermuda, Oppenheimer, MassMutual Holding, Mass Mutual, Manzke, and/or Schulman*

442.    The Trustee incorporates by reference the allegations contained in the previous
paragraphs of the Complaint as if fully rewritten herein.

443.    Each of the Transfers are avoidable under sections 544 and 548 of the Bankruptcy
Code, DCL sections 273-276 and SIPA § 78fff-2(c)(3).

444.    At all times relevant to the Transfers, the fraudulent scheme perpetrated by
BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

445.    At all times relevant to the Transfers, there have been one or more creditors who
have held and still hold matured or unmatured unsecured claims against BLMIS that were and
are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only
under section 502(e).

446.    The Transfers were made by BLMIS and the transferees with the actual intent to
hinder, delay, or defraud the creditors of BLMIS.   BLMIS made the Transfers to or for the
benefit of the Rye Funds in furtherance of a fraudulent investment scheme.

447.    Upon information and belief, XL LP, XL Portfolio, the Tremont Funds, Tremont
Partners, Tremont Group, Tremont Bermuda, Oppenheimer, MassMutual Holding, Mass Mutual,
Manzke, and/or Schulman (the "Subsequent Transferee Defendants") received Subsequent
Transfers, which are recoverable pursuant to Section 550(a) of the Bankruptcy Code.

448.    Each of the Subsequent Transfers was made directly or indirectly to, or for the
benefit of, the Subsequent Transferee Defendants.

449.    The Subsequent Transferee Defendants are immediate or mediate transferees of the Transfers.

450.    The Subsequent Transferees received the Subsequent Transfers with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

451.    In addition, Tremont Partners served as general partner to XL LP.  For all intents and purposes, upon information and belief, XL LP is insolvent, and its assets are insufficient to satisfy any judgment on the claims asserted herein.  As general partner to XL LP, Tremont Partners is liable, pursuant to sections 15-306(a) and 17-403 of Title 6 of the Delaware Code, for all obligations incurred by XL LP while serving as general partner.

452.    As a result of the foregoing, pursuant to NY CPLR 203(g), 213(8), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) directing that the Subsequent Transfers be set aside; and (b) recovering the Subsequent Transfers, or the value thereof, from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS; and (c) recovering attorneys' fees from the Subsequent Transferee Defendants.

## COUNT NINETEEN
## DISALLOWANCE OF RYE FUNDS' AND RYE INSURANCE'S SIPA CLAIMS

453.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

454.    The Rye Funds and Rye Insurance have filed Customer Claims.  The Prime Fund's Customer Claim has been determined, while the remaining Customer Claims have not been determined.  See Exhibit **C**.

455.   The Customer Claims of the Rye Funds and Rye Insurance should not be allowed pursuant to section 502(d) of the Bankruptcy Code, as the Rye Funds and Rye Insurance who filed the Customer Claims are the recipients of transfers of BLMIS' property which are avoidable and recoverable under sections 544, 547, 548 and/or 550(a) of the Bankruptcy Code, DCL sections 273, 274, 275 and 276 and SIPA § 78fff-2(c)(3) as set forth above, and the Rye Funds have not returned the transfers to the Trustee.

456.   The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating.  As a result of the foregoing, the Trustee intends to resolve the Customer Claims of the Rye Funds and Rye Insurance and any related objections through the mechanisms contemplated by the Claims Procedures Order.

### COUNT TWENTY
### EQUITABLE SUBORDINATION OF
### CUSTOMER CLAIMS

457.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

458.   The Defendants herein engaged in inequitable conduct, including behavior described in this Complaint, which has resulted in injury to the customers and creditors of the estate and has conferred an unfair advantage on each of the Rye Funds and Rye Insurance.

459.   Based on the Defendants' inequitable conduct as described above, the customers of BLMIS have been misled as to the true financial condition of the debtor, customers have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them because of the conduct of the Defendants.

460.   The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by the

Rye Funds, Rye Insurance, or any of the other Defendants, directly or indirectly against the estate – and only to the extent such claims are allowed – are subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

461.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

## COUNT TWENTY-ONE
## UNJUST ENRICHMENT

### *Against Tremont Group, Tremont Partners, Tremont Bermuda, Oppenheimer, MassMutual Holding, Mass Mutual, Manzke and Schulman*

462.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

463.    Tremont Group, Tremont Partners, Tremont Bermuda, Oppenheimer, and Manzke, Schulman ("Management Defendants") have been unjustly enriched.  They have wrongfully and unconscionably benefitted from the receipt of stolen money from BLMIS and the Rye Funds, for which they did not in good faith provide fair value.  These Defendants were further unjustly enriched as a result of recklessly enabling Madoff's fraudulent scheme.

464.    Tremont Partners earned more than $180 million in fees during the six year period, which in turn was distributed to Tremont Group, Tremont Bermuda, Oppenheimer, and Manzke, Schulman in the form of distributions, dividends, salaries, bonuses, and other compensation.  None of this money has been returned to the Trustee for equitable distribution to BLMIS customers who lost billions of dollars in the Ponzi scheme.

465.    As described above, the Management Defendants were constantly faced with evidence that BLMIS was a fraud.  They knew the consistency of Madoff's returns were, statistically, too good to be true.  They knew that there were questions about Madoff's lack of transparency.

466.    Faced with the prospect of losing hundreds of millions of dollars in fees, the Management Defendants chose to ignore the compelling evidence of Madoff's fraud and provide convenient excuses for Madoff's inconsistencies. As a result, they have been unjustly enriched by over $180 million that rightfully belongs to BLMIS customers.

467.    Equity and good conscience require full restoration of the monies received by the Management Defendants, directly and indirectly, from BLMIS and any assets derived from those monies.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

**A.**    On the First Claim for Relief, pursuant to sections 547, 550(a) and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, from the Broad Market Fund, Portfolio Limited Fund, and Insurance Portfolio LDC for the benefit of the estate of BLMIS;

**B.**    On the Second Claim for Relief, pursuant to sections 547, 550(a) and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS;

**C.**    On the Third Claim for Relief, pursuant to sections 547, 550(a) and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) directing that the Preference Period

Subsequent Transfers be set aside, and (b) recovering the Preference Period Subsequent Transfers, or the value thereof, from the Arbitrage Ireland, Market Neutral Fund, Opportunity Limited, and Opportunity III Fund, Tremont and/or Parents for the benefit of the estate of BLMIS;

**D.**     On the Fourth Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS;

**E.**     On the Fifth Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS;

**F.**     On the Sixth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS;

**G.**     On the Seventh Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b)

of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS;

    **H.**    On the Eighth Claim for Relief, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Rye Funds;

    **I.**    On the Ninth Claim for Relief, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual;

    **J.**    On the Tenth Claim for Relief, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550, 551, and 1107 of the Bankruptcy Code and section 78fff-2(c)(3) of SIPA: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be

set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds

for the benefit of the estate of BLMIS;

**K.**  On the Eleventh Claim for Relief, pursuant to DCL sections 273, 278 and/or 279,

sections 544(b), 550, 551, and 1107 of the Bankruptcy Code, section 78fff-2(c)(3) of SIPA,

sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state

law: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year

Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from

Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual

for the benefit of the estate of BLMIS;

**L.**  On the Twelfth Claim for Relief, pursuant to DCL sections 274, 278 and/or 279,

sections 544(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Six

Year Transfers, (b) directing the Six Year Transfers be set aside, and (c) recovering the Six

Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of

BLMIS;

**M.**  On the Thirteenth Claim for Relief, pursuant to DCL sections 274, 278 and/or

279, sections 544(b), 550, and 551 of the Bankruptcy Code, sections 15-306(a) and 17-403(b)

of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the

Six Year Transfers, (b) directing the Six Year Transfers be set aside, and (c) recovering the Six

Year Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer,

MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS;

**N.**  On the Fourteenth Claim for Relief, pursuant to New York Debtor and Creditor

Law §§ 275, 278 and/or 279 and Bankruptcy Code §§ 544(b), 550, 551, and 1107: (a) avoiding

and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside,

and (c) recovering the Six Year Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS;

O.      On the Fifteenth for Relief, pursuant to New York Debtor and Creditor Law §§ 275, 278 and/or 279 and Bankruptcy Code §§ 544(b), 550, 551, and 1107, sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS;

P.      On the Sixteenth Claim for Relief, pursuant to NY CPLR 203(g), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from the Rye Funds for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Rye Funds;

Q.      On the Seventeenth Claim for Relief, pursuant to NY CPLR 203(g), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), sections 15-306(a) and 17-403(b) of Title 6 of the Delaware Code, and other applicable state law: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, (c) recovering the Transfers, or the value thereof, from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from Tremont Partners, Tremont Group, Oppenheimer, MassMutual Holding, and/or Mass Mutual;

**R.** On the Eighteenth Claim for Relief, pursuant to NY CPLR 203(g), sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a)(1), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) directing that the Subsequent Transfers be set aside, (b) recovering the Subsequent Transfers, or the value thereof, from XL LP, XL Portfolio, the Tremont Funds, Tremont Partners, Tremont Group, Tremont Bermuda, Oppenheimer, MassMutual Holding, Mass Mutual, Manzke, and/or Schulman, for the benefit of the estate of BLMIS, and (c) recovering attorneys' fees from XL LP, XL Portfolio, the Tremont Funds, Tremont Partners, Tremont Group, Tremont Bermuda, Oppenheimer, MassMutual Holding, Mass Mutual, Manzke, and/or Schulman;

**S.** On the Nineteenth Claim for Relief, that the claim or claims of the Rye Funds and Rye Insurance be disallowed;

**T.** On the Twentieth Claim for Relief, that the claim or claims of the Rye Funds, Rye Insurance, and any of the other Defendants be subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code;

**U.** On the Twenty-First Claim for Relief, compensatory, exemplary, and punitive damages in excess of $2.1 billion, with the specific amount to be determined at trial;

**V.** On all Claims for Relief, pursuant to common law and N.Y. CPLR 5001 and 5004 awarding the Trustee prejudgment interest from the date on which the Transfers were received;

**W.** On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLMIS's estate;

10-05310-brl Doc 1-1 Filed 12/07/10 Entered 12/14/18 21:24:51 Main Document
Pg 331 of 332

**X.** On all Claims for Relief, assignment of Defendants' income tax refunds from the United States, state and local governments paid on fictitious profits during the course of the scheme;

**Y.** Awarding the Trustee all applicable interest, costs, and disbursements of this action; and

**Z.** Granting Plaintiff such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: December 7, 2010

New York, New York
                            _s/ Marc D. Powers_
                            Baker & Hostetler LLP
                            45 Rockefeller Plaza
                            New York, New York 10111
                            Telephone: (212) 589-4200
                            Facsimile: (212) 589-4201
                            David J. Sheehan
                            Email: dsheehan@bakerlaw.com
                            Keith R. Murphy
                            Email: kmurphy@bakerlaw.com
                            Marc Skapof
                            Email: mskapof@bakerlaw.com
                            Marc D. Powers
                            Email: mpowers@bakerlaw.com
                            Eric R. Fish
                            Email: efish@bakerlaw.com
                            Anagha S. Apte
                            Email: aapte@bakerlaw.com

                            and

                            Dean D. Hunt
                            Email: dhunt@bakerlaw.com
                            Marie L. Carlisle
                            Email: mcarlisle@bakerlaw.com

                            1000 Louisiana Avenue, Suite 2000
                            Houston, Texas 77002-5009
                            Telephone: (713) 751-1600
                            Facsimile: (713) 751-1717

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and Bernard L. Madoff*