**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Marco Molina
Matthew D. Feil
Andrew M. Serrao
Victoria L. Stork

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff,<br><br>Plaintiff,<br><br>v.<br><br>SQUARE ONE FUND LTD.,<br><br>Defendant. | Adv. Pro. No. 10-04330 (SMB)<br><br>**<u>AMENDED COMPLAINT</u>** |

# TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ...........................................................................................1

II.   JURISDICTION AND VENUE .....................................................................................5

III.  BACKGROUND, THE TRUSTEE, AND STANDING................................................6

IV.   BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY .........9

    A.    BLMIS ...............................................................................................................9

    B.    The Ponzi Scheme...........................................................................................10

        1.    Madoff's Investment Strategy.................................................................11

        2.    BLMIS's Fee Structure ...........................................................................13

        3.    BLMIS's Market Execution.....................................................................13

        4.    The Collapse of the Ponzi Scheme .........................................................15

V.    DEFENDANT SQUARE ONE ....................................................................................15

VI.   ESTENNE'S KNOWLEDGE IS IMPUTED TO SQUARE ONE...................................16

VII.  ESTENNE WAS HIGHLY QUALIFIED TO UNCOVER BLMIS'S FRAUD ..............17

    A.    Estenne Is an Expert at Spotting Investment Fraud and Conducting
        Investment Due Diligence.................................................................................18

    B.    At Partners Advisers, Estenne Practiced What He Preached...............................20

VIII. ESTENNE UNCOVERED BLMIS'S FRAUD.............................................................22

    A.    In October 1999, Estenne First Suspected BLMIS Was Not Trading
        Securities..........................................................................................................22

        1.    The Estenne Study Showed Estenne that BLMIS's Purported
            Performance Did Not Correlate to the Market as It Should Have ............23

        2.    The Estenne Study Showed Estenne that BLMIS Did Not Exit the
            Market during Downturns.........................................................................25

        3.    The Estenne Study Showed Estenne that BLMIS Posted Implausibly
            Consistent Returns over a Ten-Year Period...............................................26

        4.    The Estenne Study Showed Estenne that the SSC Strategy's Purported
            Performance Did Not Comport with Its Risk/Return Profile....................27

# TABLE OF CONTENTS
## (continued)

**Page**

5.     The Estenne Study Showed Estenne that the SSC Strategy Did Not Comport with Madoff's Purported Performance and Abilities..................28

B.     Estenne Deliberately Avoided Confirming His Suspicions that BLMIS Was Not Trading Securities ...........................................................29

    1.     Estenne Abandoned His Principle that Investment Transparency Is "Critical" ...............................................................29

    2.     Estenne Abandoned His Principle that Ongoing Investment Due Diligence Is "Paramount" ............................................31

    3.     Estenne Abandoned His Principle that the "Proper" Investment Fundamentals Require an Independent Custodian.....................32

C.     Estenne Acquired Actual Knowledge that BLMIS Was Not Trading Securities on Behalf of Square One in or around 2003 .........................33

    1.     The Diligence Officer Confronts Estenne with Concerns about BLMIS ...........................................................................33

    2.     Estenne Blacklisted BLMIS from the ART Fund......................35

    3.     Estenne Shielded His Money from Madoff .................................35

D.     Estenne Covered for Madoff...............................................................37

    1.     Estenne Actively Hid Square One's Business Operations from His Diligence Officer ....................................................................38

    2.     Estenne Allowed Madoff to Have Unchecked Custody of Square One's Investment Funds .............................................................38

E.     Estenne Resisted the Trustee's Efforts to Learn about Estenne's BLMIS-Related Diligence......................................................................39

IX.     THE TRANSFERS ....................................................................................40

X.     THE COUNTS...........................................................................................41

COUNT ONE:  FRAUDULENT TRANSFERS – BANKRUPTCY CODE §§ 105(a), 548(a)(1)(A), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)................41

COUNT TWO: FRAUDULENT TRANSFERS – BANKRUPTCY CODE §§ 105(a), 548(a)(1)(B), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)............................42

**TABLE OF CONTENTS**
**(continued)**

**Page**

COUNT THREE: FRAUDULENT TRANSFERS – DCL §§ 276, 276-a, 278
AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551,
AND SIPA § 78fff-(2)(c)(3) .................................................................................43

COUNT FOUR: FRAUDULENT TRANSFERS – DCL §§ 273 AND 278 AND/OR
279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND
SIPA § 78fff-(2)(c)(3) .........................................................................................44

COUNT FIVE: FRAUDULENT TRANSFERS – DCL §§ 274, 278, AND/OR 279,
BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA §
78fff-(2)(c)(3) .....................................................................................................45

COUNT SIX: FRAUDULENT TRANSFERS – DCL §§ 275, 278 AND/OR 279,
BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA §
78fff-(2)(c)(3) .....................................................................................................46

COUNT SEVEN: UNDISCOVERED FRAUDULENT TRANSFERS – C.P.L.R.
203(g), 213(8), DCL §§ 276, 276-a, 278 AND/OR 279, BANKRUPTCY
CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3) .........47

XI.    PRAYERS FOR RELIEF ................................................................................48

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"),[1] under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[2] and the estate of Bernard L. Madoff ("Madoff"), individually, by and through his undersigned counsel, brings this Amended Complaint against Square One Fund Ltd. ("Square One"), and states as follows:

## I.    NATURE OF THE ACTION

1.    This adversary proceeding arises from the approximately $65 billion Ponzi scheme that Madoff perpetrated through BLMIS.

2.    The Trustee seeks to avoid and recover $25,852,737 in transfers of Customer Property[3] (the "Transfers") that Square One received from BLMIS between December 15, 1998 and December 11, 2008[4] (the "Relevant Period").

3.    Square One is a British Virgin Islands ("BVI") investment fund that invested exclusively with BLMIS during the Relevant Period through investment advisory account 1FR048 (the "Square One BLMIS IA Account"), as set forth in Exhibit A.

4.    Non-defendant Luc Estenne is a Belgian national and well-known investment management professional in the European investment community. Estenne created Square One and served as its director and manager throughout the Relevant Period and continues to serve in this capacity to this day.

---

[1] Hereinafter, "BLMIS" includes the sole proprietorship that preceded Bernard L. Madoff Investment Securities LLC.

[2] Hereinafter, references to SIPA will omit title 15.

[3] SIPA § 78*lll*(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

[4] Hereinafter, December 11, 2008 is referred to as the "Filing Date."

5.      Throughout the Relevant Period, Estenne: (i) ran a highly successful investment advisory firm, Partners Advisers S.A. ("Partners Advisers"), in Geneva, Switzerland that managed the Luxembourg-based Absolute Return Target Fund (the "ART Fund"); (ii) held himself out to investors as an expert in investment due diligence and investment fraud detection; (iii) authored a book chapter that teaches hedge fund investors how to conduct exhaustive due diligence and avoid investment advisers who employ risky strategies; (iv) spoke at numerous industry conferences as an expert on myriad investment due diligence matters, such as "How to spot fraud?" and "What is the psychology behind manager impropriety?"; and (v) contributed to many investment periodicals on the topics of investment due diligence and fraud detection.

6.      Estenne's experience and teachings on appropriate due diligence standards as well as his savvy for spotting investment fraud helped him recognize that BLMIS's investment advisory business was a fraudulent operation.  Estenne began suspecting BLMIS was not trading securities in October 1999, when, on Square One's behalf, he conducted a quantitative analysis that compared BLMIS's purported returns to the returns of the Standard & Poor's ("S&P") 500 Index over a ten-year period (the "Estenne Study").  The Estenne Study showed Estenne that it was virtually impossible for BLMIS to achieve its reported returns through the investment strategy BLMIS purported to employ.

7.      Soon after conducting the Estenne Study, Estenne learned additional facts that further suggested to him, based on his sophistication, teachings, and principles, that BLMIS was not trading securities.  For instance: (i) Madoff reprimanded Estenne for disclosing BLMIS's role in Square One's offering materials and demanded that Estenne immediately delete these disclosures, which ran afoul of Estenne's teaching that "you have to question what you are doing investing with" someone who is not transparent with investors; (ii) BLMIS demanded exclusive

2

custody of Square One's investment assets and control of Square One's operations, which ran afoul of Estenne's teaching that investment funds should have "independent" custodians to safeguard against fraud; and (iii) BLMIS refused to identify to Estenne the counterparties to the options trades it purported to make on Square One's behalf, which ran afoul of Estenne's teaching that investors must "monitor[] . . . counterparty risk" to safeguard against fraud.

8.    Rather than confront Madoff about these indicia of fraud, or select a different investment manager for Square One, Estenne abandoned his contemporaneous investment due diligence teachings and fraud-detection principles and looked the other way.   Estenne's motivations for looking the other way included that he: (i) was pocketing sizable management fees that Madoff inexplicably left on the proverbial table; (ii) was leveraging his connection to BLMIS to increase his profile in the European investment management industry; and (iii) intended to grow Square One into a multi-billion dollar BLMIS "feeder fund" similar to major BLMIS feeder funds such as Fairfield Sentry Ltd. and Kingate Euro Fund Ltd.

9.    In or around 2002, Estenne's suspicions that BLMIS was not trading securities came to a head when a senior officer who co-headed Partners Advisers' diligence operations (the "Diligence Officer") told Estenne that BLMIS's purported investment performance did not make sense.   Separately and independently from Square One, the Diligence Officer attended two marketing presentations by BLMIS feeder funds.  The Diligence Officer left those presentations unsure how the BLMIS feeder funds' impressive investment returns were possible, given that BLMIS purportedly employed an investment strategy that tracked the S&P 100 Index, which had underperformed significantly in the wake of the bursting of the "dotcom bubble" and the 9/11 attacks.  He was also concerned that the BLMIS feeder fund representatives with whom he spoke could not answer basic diligence questions concerning BLMIS.  The Diligence Officer's concerns

grew after he spoke to professionals he trusted in the investment community, who told him they had similar concerns about BLMIS and, as a result, categorically refused to invest in BLMIS feeder funds.

10.    The Diligence Officer reported these concerns in person to Estenne and recommended to Estenne that Partners Advisers "blacklist" all BLMIS feeder funds from the ART Fund's investment portfolio, through which Partners Advisers' investors and principals (including Estenne and the Diligence Officer) invested their own money.

11.    In 2003, soon after his conversation with the Diligence Officer, Estenne took deliberate measures to protect himself and his brand—Partners Advisers—from BLMIS's fraud. First, Estenne prohibited Partners Advisers from adding BLMIS feeder funds to the ART Fund's investment portfolio, going as far as to instruct Partners Advisers' employees not to take any calls or meetings with BLMIS or any BLMIS feeder fund.  Second, Estenne directed Partners Advisers to drop Square One from the ART Fund's investment portfolio, thereby protecting his own money, even though Square One was significantly outperforming the other investments in the portfolio.

12.    Estenne, however, did not close the Square One BLMIS IA Account.  He continued to invest Square One's investment assets (consisting of other people's money) exclusively with BLMIS for the remainder of the Relevant Period, pocketing hundreds of thousands of dollars in management fees generated by those doomed investments and increasing his profile and stature in the European investment management industry.

13.    Estenne's decisions to blacklist BLMIS from Partners Advisers' investments and eliminate his personal exposure to Square One, coupled with the numerous indicia of fraud at BLMIS that he saw, analyzed, and understood in the years prior, indicate that by 2003 Estenne

knew, or at least suspected to a high probability, that BLMIS was not trading securities on behalf of Square One.

14.     During the remainder of the Relevant Period, Estenne took deliberate measures to keep regulators, colleagues, and investors from uncovering BLMIS's fraud, including concealing Square One's investments with BLMIS from the Diligence Officer and refusing to hire an independent custodian that could verify whether BLMIS was trading securities for Square One, as BLMIS purported to do.

15.     After the Filing Date, Estenne submitted a customer claim on Square One's behalf. The Trustee, in an effort to determine the allowability of Square One's customer claim, requested that Estenne provide information and documents concerning Square One and its BLMIS-related diligence.  Instead of responding to the Trustee's request or submitting materials in support of Square One's customer claim, Estenne directed Square One to withdraw its customer claim.

16.     Estenne's actual knowledge of, or willful blindness to, BLMIS's fraud can be imputed to Square One because, at all relevant times, Estenne authorized all significant business decisions for Square One and directed and controlled its daily activities, including its dealings and investments with BLMIS.

## II.    JURISDICTION AND VENUE

17.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

5

18.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H), and (O). The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

19.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

20.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3),

Bankruptcy Code[5] §§ 105(a), 544(b), 548(a), 550(a) and 551, the New York Fraudulent

Conveyance Act (N.Y. Debt. & Cred. § 270 *et seq.* (McKinney 2001) ("DCL")), the New York

Civil Practice Law and Rules (McKinney 2003) ("C.P.L.R."), and other applicable law.[6]

## III.    BACKGROUND, THE TRUSTEE, AND STANDING

21.     On the Filing Date, Madoff was arrested by federal agents for criminal violations

of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire

fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the

District Court Proceeding.

22.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court

alleging, among other things, that BLMIS could not meet its obligations to securities customers as

they came due and its customers needed the protections afforded by SIPA.

---

[5] "Bankruptcy Code" means 11 U.S.C. § 101 *et seq.*

[6] Until a final determination on appeal of the applicable measure and burden of proof concerning a defendant's knowledge in connection with the applicability of Bankruptcy Code § 546(e) to the Trustee's claims to avoid and recover transfers made within six years of the Filing Date, the Trustee asserts avoidance and recovery claims under Bankruptcy Code §§ 547, 548(a)(1)(B), 544(b)(1), 550 and 551, and applicable provisions of the DCL.

23.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

(c)     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

24.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

25.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

26.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

27.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

28. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

29. On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

30. As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS and Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

31. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

32. The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including Bankruptcy Code §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and

recover transfers under Bankruptcy Code §§ 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.     BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.     BLMIS

33.     Madoff founded BLMIS in 1960 as a sole proprietorship.   In 2001, Madoff registered BLMIS as a New York limited liability company.   At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

34.     In compliance with SIPA § 78$o$(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008.   Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continual registration as a securities broker-dealer from January 19, 1960 through December 31, 2008.   At all times, BLMIS was assigned Central Registration Depository Number 2625.   SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer from January 19, 1960 through December 31, 2008.   On December 30, 1970, BLMIS became a member of SIPC and continued its membership without any change in status until the Filing Date.   SIPC membership is contingent on registration of the broker-dealer with the SEC.

35.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business.

36.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.   BLMIS's website omitted the investment advisory business entirely.   BLMIS did not

register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

37.    For more than twenty (20) years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its investment advisory business.

38.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had twenty-three (23) customer accounts with total assets under management of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its investment advisory business still had only twenty-three (23) customer accounts with total assets under management of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in assets under management.  At all times, BLMIS's Form ADVs were publicly available.

###    B.    The Ponzi Scheme

39.    At all relevant times, Madoff operated the investment advisory business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The investment advisory business had no legitimate business operations and produced no profits or earnings.  Several family members and a few employees assisted Madoff, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn (Jodi) Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

40.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the investment advisory business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary

trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the investment advisory business to continue operating.

41.    To provide cover for BLMIS's fraudulent investment advisory business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one employee was an administrative assistant, and one was a semi-retired accountant living in Florida.

42.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### 1.    Madoff's Investment Strategy

43.    BLMIS purported to execute two primary investment strategies for investment advisory business customers:  the convertible arbitrage strategy and the split strike conversion strategy ("SSC Strategy").  For a limited group of investment advisory business customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

44.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  BLMIS told investors they would gain profits from a change in the expectations

11

for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total investment advisory business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of investment advisory business accounts.

45.     From 1992 forward, Madoff began telling investment advisory business customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for them.  All funds received from investment advisory business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

46.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to investment advisory business customers that typically reflected substantial gains on the customers' principal investments.

47.     The SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P 100 Index call options.

48.     The put options were to control the downside risk of price changes in the basket of securities.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option would entail a loss for BLMIS.

49.     The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to outperform the market, because in a rising market, calls would be exercised by the counterparty.

50.    The simultaneous purchase of puts and calls to hedge a securities position is commonly referred to as a "collar." The purpose of the collar is to limit exposure to volatility in the stock market and flatten out returns on investment.

51.    For the SSC Strategy to be deployed as Madoff claimed, the total value of each of the puts and calls purchased for the basket of securities had to equal the notional value of the basket of securities. For example, to properly implement a collar to hedge the $11.7 billion of assets under management that Madoff publicly reported in 2006 would have required the purchase of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

52.    Moreover, at all times that BLMIS reported its total assets under management, publicly available information about the volume of exchange-traded options showed that the volume of options contracts necessary to form the collar and implement the SSC Strategy exceeded the available options.

### 2.    BLMIS's Fee Structure

53.    BLMIS charged commissions on purportedly executed trades rather than management and performance fees based on the value of assets under management. By using this commission-based structure, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### 3.    BLMIS's Market Execution

54.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he achieved market execution by intermittently taking customer funds out of the market. During those times, Madoff purported to invest BLMIS customer funds in U.S. Treasury Bills ("USTB") or mutual funds invested in USTB.

55.    BLMIS's customer statements, however, did not show an ability to time the market. Rather, the customer statements showed an uncanny ability to buy low and sell high—an ability so uncanny that any sophisticated or professional investor, including Square One, could see it was statistically impossible.    BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every quarter- and year-end.

56.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.    BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.    But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.    It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win every time.    Yet this is precisely what BLMIS's customer statements reported.

57.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the SSC Strategy, which relied on holding long positions rather than on short-term speculative trading.

58.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.    There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

59.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing

Corporation. The Options Clearing Corporation has no records showing that BLMIS's investment advisory business cleared any trades in any exchange-listed options.

### 4. The Collapse of the Ponzi Scheme

60.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

61.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the investment advisory business customers' fraudulent statements, and that the investment advisory business operated as a Ponzi scheme.

62.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.    DEFENDANT SQUARE ONE

63.     Square One incorporated in the BVI on December 15, 1998.

64.     Square One opened the Square One BLMIS IA Account on December 29, 1998.

65.     Square One exclusively invested with BLMIS and received all the Transfers from BLMIS through the Square One BLMIS IA Account.

66.     Square One initially operated under the name ISIS Worldwide Ltd., but changed its name to Square One Fund Ltd. in April 1999.

67.     Square One maintains an address at Ansbacher (BVI) Limited, International Trust Building, Wickhams Cay 1, Road Town, Tortola, BVI.

68.     Square One is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the State of New York by, among other things, knowingly investing funds with BLMIS and receiving the Transfers from BLMIS. By deliberately investing with BLMIS and receiving the Transfers directly from BLMIS

in New York, Square One knowingly accepted the rights, benefits, and privileges of conducting business and transactions in the United States and New York. Square One regularly communicated with BLMIS employees in New York regarding the Square One BLMIS IA Account. Square One maintained minimum contacts and/or general business contacts with the United States and New York in connection with the Square One BLMIS IA Account.

69.    Square One executed BLMIS account opening agreements, including a "Customer Agreement," "Option Agreement," and "Trading Authorization Limited to Purchases and Sales of Securities and Options," and delivered these documents to BLMIS at its headquarters at 885 Third Avenue, New York, New York. By executing these documents, Square One agreed that: (i) its investments would be governed by New York law; (ii) any disputes would be arbitrated before the American Arbitration Association, the New York Stock Exchange, Inc., an arbitration facility provided by any other exchange of which BLMIS was a member, the National Association of Securities Dealers, Inc., or the Municipal Securities Rule Making Board; and (iii) where applicable, its transactions would be subject to the provisions of the Securities Exchange Act of 1934, as amended, and the Commodities Exchange Act, as amended, to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

70.    Square One remains a going concern.

## VI.    ESTENNE'S KNOWLEDGE IS IMPUTED TO SQUARE ONE

71.    Estenne founded Square One after he gained access to BLMIS's investment advisory business during an in-person meeting with DiPascali in New York in 1998.

72.    Estenne served as Square One's director throughout the Relevant Period.

73.    Estenne managed Square One throughout the Relevant Period. On information and belief, he founded Square One's investment manager, Square Asset Management Ltd. ("SAM"),

in 1999.  Estenne controlled SAM at all relevant times and was its sole representative.  Through

SAM, Estenne charged Square One's investors management fees of 1.25% on an annualized basis

for Square One's Class B shares and 2% on an annualized basis for Square One's Class C shares.

Estenne, through SAM, did not, however, charge Square One's investors performance fees.

74.    Estenne was responsible for conducting investment due diligence on Square One's

behalf throughout the Relevant Period.

75.    Estenne communicated with BLMIS on Square One's behalf throughout the

Relevant Period.

76.    Estenne drafted Square One's offering materials throughout the Relevant Period.

77.    Estenne marketed Square One to investors throughout the Relevant Period.

78.    Estenne hired Square One's service providers throughout the Relevant Period.  In

1999, he hired HSBC Bank of Bermuda Limited, f/k/a Bank of Bermuda Limited, to serve as

Square One's administrator, and HSBC Securities Services (Luxembourg) S.A., f/k/a Bank of

Bermuda (Luxembourg) S.A. (together with HSBC Bank of Bermuda Limited, "Bank of

Bermuda"),[7] to serve as Square One's custodian.   In 2006, Estenne hired Circle Partners

Investment Support Services, B.V. to serve as Square One's administrator after Bank of Bermuda

resigned from that role.

## VII.    ESTENNE WAS HIGHLY QUALIFIED TO UNCOVER BLMIS'S FRAUD

79.    Estenne is a sophisticated investment professional.   He received his MBA

(Commercial Engineer Degree) with distinction from the Catholic University of Louvain

(Belgium) in 1990.  From 1991 to 1993, Estenne worked for JP Morgan Bank's Global Technology

---

[7] The Trustee has named these parties as defendants in a separate adversary proceeding styled *Picard v. HSBC Bank Plc, et al.*, Adv. Pro. No. 09-01364 (SMB) (Bankr. S.D.N.Y. 2009).

and Operation group in Brussels. From 1994 to 1996, Estenne was an officer of Bank Brussels

Lambert in New York and Brussels.

80.     Estenne is best known in the European investment management community as the

founder and CEO of Partners Advisers, a Geneva-based investment advisory firm that provides

global hedge fund investment advisory services and was named Switzerland's "Most Trusted

Investment Management Company of the Year" in the 2014 International Hedge Fund Awards.

81.     Estenne's LinkedIn profile touts that certain of his "[s]pecialties" are "[h]edge fund

research and management of portfolios of hedge funds" and "[g]eneral management of a hedge

fund research and advisory company."

### A.      Estenne Is an Expert at Spotting Investment Fraud and Conducting Investment Due Diligence

82.     Throughout the Relevant Period, Estenne held himself out to investors as an expert

at spotting investment fraud and conducting investment due diligence. For example, in April 2004,

Estenne spoke as a "due diligence specialist[]" at the EuroHedge summit in Paris on issues such

as "How to spot fraud?[,]" "Why do funds fail?[,]" "What is the psychology behind manager

impropriety?[,]" and "What are the structural issues?"

83.     Estenne also held himself out as an expert on issues concerning investment due

diligence, fraud detection, and risk management at dozens of other industry conferences and to

industry periodicals throughout the Relevant Period, including, but not limited to, the following:

> (a)     In March 1998, Estenne was part of a three-person panel of investment professionals who spoke at a conference about the importance of transparency when evaluating an investment adviser and an investment portfolio;
>
> (b)     In September 2000, in the article titled "Short-term investors: The tide begins to turn" MAR/Hedge cited Estenne as an authority on hedge fund investments and, specifically, how investors should conduct diligence on hedge funds and diversify their hedge fund investments; and

> (c)     In April 2001, at the "International Private Banking & Family Office"
> conference in Brussels, Estenne gave a presentation titled "Why do Family
> Offices Invest in Hedge Funds?" that included topics such as "How to select
> hedge funds" and "How to construct hedge funds."

84.     In 2000, Estenne authored a book chapter titled "Risk Management Issues for the Family Office" in the book "Managing Hedge Fund Risk" in which he, among other things, teaches investors how to avoid investing in a fraud.  He authored a second version of this book chapter in 2005 (together with the first version, the "Book Chapter").

85.     Estenne teaches in the Book Chapter that it is "paramount" that investors conduct both pre-investment and ongoing due diligence on investment advisers "to identify which risks are taken by hedge fund managers in order to generate their performance, and how these risks are measured and managed."  The Book Chapter identifies thirty (30) risk factors that investors should study as part of their diligence of investment advisers and strategies.  These risk factors include "*Counterparty risk*," "*Correlation risk*," "*Assets under management risk*," "*Concentration risk*," "*Erratic markets risk*," and "*Transparency*."

86.     In the Book Chapter, Estenne also teaches investors to demand transparency from their investment adviser.  He writes that the "best transparency level usually available takes the form of monthly or quarterly portfolio snapshots," and encourages investors to conduct periodic in-person diligence visits to obtain "a vote of confidence on the ethics" of the investment adviser.

87.     Estenne made similar recommendations during a March 1998 conference as part of a panel that discussed, among other things, how to select fund managers.  The panel explained that a fund manager's "transparency" is one of the "critical issues" in an investor's selection process and warned that "[i]f a fund manager will not tell you what he is doing, you have to question what you are doing investing with him[.]"

19

88.     In the Book Chapter, Estenne also teaches that the custodian of an investment fund should be independent from the investment adviser to maintain the security of the assets and ensure that they are valued accurately.  Estenne writes that independent custody "ensure[s] control of assets, independent [net asset value] calculation and accuracy of financial statements."

## B.     At Partners Advisers, Estenne Practiced What He Preached

89.     In or around 2000, Estenne doubled down on his investment diligence expertise and his ability to spot investment fraud by promising to personally invest in the same Luxembourg-based investment vehicle that Partners Advisers offered its customers: the ART Fund.  He later referred to this policy as his way of putting his "money where [his] mouth is."

90.     Estenne provided cutting-edge due diligence services to the ART Fund's investors by implementing "best practice procedures and controls" at Partners Advisers.  He hired qualified diligence personnel at Partners Advisers to monitor the ART Fund's investments and understand the relevant markets and securities underlying those investments.  These individuals reconciled the ART Fund's customer statements and trade confirmations with public investment records and reverse-engineered the underlying investment strategies.

91.     Estenne set up investment committees at Partners Advisers consisting of analysts for each of the funds in which the ART Fund invested.  These committees convened monthly to discuss the performance and investment strategies of the underlying fund investments.  They also graded each of the investments on a scale between one and five, and updated the score based on their ongoing diligence and oversight.

92.     Estenne required Partners Advisers' personnel to conduct at least four diligence visits each year with the investment advisers with whom the ART Fund invested.  Partners Advisers' website explains that "face-to-face meetings and on-the-ground work are of essence" when selecting an investment adviser and conducting ongoing diligence.  Many of these face-to-

20

face visits occurred in New York, where Estenne maintained an apartment to accommodate these visits.

93.     Partners Advisers describes thorough ongoing diligence procedures on its website, which states: "Once an investment is made, our team closely monitors performance and portfolio information and holds regular monitoring meetings with our fund managers to ensure a continued close and detailed dialogue."   The website also explains how Partners Advisers continues to analyze and monitor the risks associated with the investment, noting that: "At each step of the process, we identify, analyze, monitor and aggregate financial and operational risks at a fund and portfolio-level."

94.     Counterparty risk is one of the risks Estenne, at Partners Advisers, closely monitored during the Relevant Period.  Estenne said during a 2010 interview with Opalesque TV (an internet news outlet focused on investing and hedge funds) that: "So many of the aspects which were a surprise to people in terms of counterparty risk . . . were things we [at Partners Advisers] were already aware of and monitoring" before the 2008 financial crisis.

95.     Estenne, at Partners Advisers, also provided the ART Fund's investors with transparency into the underlying investments.  Partners Advisers' website states: "We believe that an open dialogue, relevant transparency and value-adding reporting are the necessary conditions to develop real partnerships with our co-investors."   To this end, Partners Advisers published annual audited financial reports that provided significant insight into the underlying investments' performance and how the relevant investment strategies worked.

96.     Estenne also directed Partners Advisers to hire financial institutions that were independent from underlying investment advisers to safeguard the ART Fund's assets and perform other custodial tasks.

## VIII.   ESTENNE UNCOVERED BLMIS'S FRAUD

97.    When it came to Square One, Estenne significantly deviated from his teachings and the investment principles he contemporaneously taught and practiced because he knew, or at the very least suspected to a high probability, that BLMIS was not trading securities on behalf of Square One.

### A.    In October 1999, Estenne First Suspected BLMIS Was Not Trading Securities

98.    Estenne memorialized his understanding of the SSC Strategy in an exhibit to Square One's June 1, 1999 offering memorandum (the "SSC Exhibit"), stating in relevant part that:

> [BLMIS] offers investors access through different funds to a non traditional investment strategy which is often described as a split-strike conversion. This underlying strategy which invests exclusively in the United States in highly liquid securities with no leverage consists of either: (i) purchasing equity shares; (ii) selling related out-of-the-money call options which represent a number of underlying shares equal to the number of shares purchased; (iii) buying related out-of-the-money or at-the-money put options representing the same number of underlying shares when the manager believes the market is due to strengthen; or (iv) remaining in cash or USTB when he believes the market is due to weaken.

99.    The SSC Exhibit explains that the SSC Strategy's "attractive[ness]" is the "downside protection" provided by put options designed to liquidate securities positions in the event "the price [*sic*] of the stocks decline." But the SSC Exhibit notes the SSC Strategy's drawback is that "the upside potential is limited" because to purchase the put options BLMIS must sell call options, which act as a ceiling that caps the potential gains from the stock basket.

100.    In or around October 1999, Estenne (through Partners Advisers and on Square One's behalf) conducted the Estenne Study, a sophisticated quantitative analysis comparing the performance of the SSC Strategy to the performance of the S&P 500 Index over 118 months from January 1990 to October 1999.

101.    The Estenne Study showed Estenne—a self-described expert at conducting due diligence and spotting investment fraud—that it was virtually impossible for BLMIS to achieve its purported performance through the SSC Strategy.

### 1.    The Estenne Study Showed Estenne that BLMIS's Purported Performance Did Not Correlate to the Market as It Should Have

102.    Based on the SSC Exhibit's description, Estenne knew the SSC Strategy involved the purchase of a basket of S&P 100 Index equities selected to create, as Estenne put it, "a high degree of correlation with the general market."

103.    The Estenne Study, however, revealed an unexpected and inexplicable lack of correlation between BLMIS's purported returns and the performance of the S&P 100 Index.

104.    The Estenne Study analyzed the degree to which BLMIS's purported returns correlated to the performance of the S&P 500 Index.  Because the S&P 100 Index is comprised of the larger companies included in the S&P 500 Index, Estenne understood the SSC Strategy should also have a "high degree of correlation" with the S&P 500 Index.

105.    In a section titled "Correlation Analysis," the Estenne Study shows that BLMIS's purported returns lacked the expected correlation to the S&P 500 Index.  Specifically, this section shows that in the months that the S&P 500 Index posted a negative return (38 of 118 months), the SSC Strategy posted a positive return 92% of the time (35 of those 38 months) with an average monthly return of 1.03%.

106.    This lack of correlation was particularly evident in August 1990, when the S&P 500 Index posted a loss of approximately 9.43% and the SSC Strategy posted a gain of 5.14%, and in August 1998, when the S&P 500 Index posted a loss of 14.58% and the SSC Strategy posted a gain of 0.28%.

107.   The Estenne Study also contains a "Linear Correlation Analysis" that further demonstrates BLMIS's purported performance was not correlated to the S&P 500 Index. This section includes a scatterdiagram (pictured below) that plots the monthly returns of the S&P 500 Index against the SSC Strategy's purported monthly returns during the sample period.



108.   The scatterdiagram (with BLMIS's returns on the vertical axis and the S&P 500 Index's returns on the horizontal axis) illustrates BLMIS's purported ability to generate positive returns independent of the S&P 500 Index's gyrations. The varied performance of the S&P 500 Index is depicted in the scatterdiagram by the distribution of data points on both sides of the vertical axis. If there were a high degree of correlation between BLMIS's purported returns and the S&P 500 Index—as the SSC Exhibit states there should be—the scatterdiagram would show a similar distribution of data points above and below the horizontal axis. Instead, nearly all of the data points appear above the horizontal axis because BLMIS purported to generate positive returns regardless of whether the S&P 500 Index was up or down.

109.   The scatterdiagram's R-Squared coefficient further illustrates this lack of correlation. The R-Squared coefficient here measures the percentage of the SSC Strategy's

movements that can be explained by movements in the S&P 500 Index. This coefficient is obtained through a regression analysis that measures how close the data points pictured above are to the line representing the mean.

110.    As pictured above, the R-Squared coefficient for the scatterdiagram is 0.05. This means that 5% of the changes in BLMIS's purported returns can be explained by contemporaneous changes in the S&P 500 Index's returns.

111.    As an expert in due diligence and fraud detection, Estenne understood that this lack of correlation between BLMIS's reported performance and the S&P 500 Index meant BLMIS's purported returns were not possible under the SSC Strategy.

**2.    The Estenne Study Showed Estenne that BLMIS Did Not Exit the Market during Downturns**

112.    In the SSC Exhibit, Estenne explains to Square One's investors that a key component of the SSC Strategy is that BLMIS will exit the market and either "remain[] in cash or USTB when [BLMIS] believes the market is due to weaken[.]"

113.    But the Estenne Study showed Estenne that BLMIS did not exit the market during downturns. During the thirty-eight (38) months that the S&P 500 Index posted investment losses, BLMIS purported to earn 1.03% average monthly returns. Estenne understood that because USTBs yield minimal investment returns and cash yields even less, BLMIS could not have averaged monthly returns of 1.03% by exiting the market and holding either cash or USTBs. Estenne understood that, to produce those investment returns, BLMIS would have had to remain in the market during these downturns, in contravention to the SSC Exhibit's description of the SSC Strategy.

114.    The Estenne Study's returns analysis for the months March 1994 and July 1996 highlights the dissonance between the SSC Strategy's expected performance and BLMIS's

purported returns.  During each of those months the S&P 500 Index lost 4.57% of its value, which signaled a significant market downturn that should have resulted in BLMIS exiting the market and holding cash and/or USTBs.  BLMIS, however, posted significant positive gains of 1.52% in March 1994 and 1.92% in July 1996, indicating that BLMIS did not leave the market to hold cash or USTBs during those months.

115.    Based on these inconsistencies between the SSC Strategy and its purported results, Estenne understood that BLMIS's purported returns were not possible under the SSC Strategy.

### 3.    The Estenne Study Showed Estenne that BLMIS Posted Implausibly Consistent Returns over a Ten-Year Period

116.    The Estenne Study showed Estenne that BLMIS posted implausibly consistent positive returns for nearly ten years.  Specifically, the Estenne Study showed Estenne that BLMIS posted positive monthly returns in 114 of the 118 months in the sample period (roughly 97% of the time) and only suffered negative returns in four months (roughly 3% of the time), never falling below returns of negative 0.55% in any one of the four down months.

117.    The regression analysis Estenne conducted to obtain the R-Squared coefficient also revealed that BLMIS's t-statistic ("t-stat") for the sample period was 13.15.  This t-stat measures the consistency of BLMIS's positive monthly returns during the sample period.  It is known in the investment management industry that a t-stat of 2.0 indicates that an investor can be approximately 95% confident that the investment manager's performance was not by chance.  A t-stat of 13.15 indicates that BLMIS was virtually certain to yield its average positive monthly returns from the sample period irrespective of what the market was doing.

118.    Estenne understood that BLMIS's purported returns were even better than the Estenne Study showed.  The Estenne Study analyzed the reported investment returns of Fairfield Sentry Ltd., and those reported returns already accounted for the deduction of the investment

fund's management and performance fees. Thus, while the Estenne Study revealed that BLMIS purported to generate implausibly consistent, positive returns over a ten-year period, it actually understated BLMIS's purported performance during the sample period.

119.    As an expert in due diligence and fraud detection, Estenne understood that it was virtually impossible for Madoff, or any investment adviser, to generate positive returns with this level of consistency over the sample period of 118 months.

### 4.    The Estenne Study Showed Estenne that the SSC Strategy's Purported Performance Did Not Comport with Its Risk/Return Profile

120.    The Estenne Study also contained a "Risk/Return Profiles" graph (pictured below) that analyzed the correlation between investment performance and investment risk for the SSC Strategy and seven different indices during the sample period.



121.    The "Risk/Return Profiles" graph, with risk depicted on the x-axis and returns depicted on the y-axis, shows that the SSC Strategy (illustrated by the red circle) had a lower risk

profile than all the selected indices during the sample period.  At the same time, it had a larger return profile than any of the selected indices.

122.    As an expert in due diligence and fraud detection, Estenne understood this result was highly improbable because risk and investment returns are typically directly proportional.  Thus, because the SSC Strategy had a lower risk profile than any of the selected indices in the Risk/Return Profiles graph, Estenne expected the SSC Strategy to also have comparatively lower returns than the indices contained in the graph.  The fact that BLMIS purported to earn higher returns with less risk further showed Estenne that BLMIS's purported returns were not possible under the SSC Strategy.

5.    **The Estenne Study Showed Estenne that the SSC Strategy Did Not Comport with Madoff's Purported Performance and Abilities**

123.    As set forth in the SSC Exhibit, the SSC Strategy purported to use a collar to limit downside risk at the expense of capping potential gains.  Essentially, the collar acted as an insurance policy to limit losses in the event that the basket of S&P 100 Index securities BLMIS purportedly purchased suffered negative returns.

124.    But the Estenne Study showed Estenne that BLMIS suffered losses in only four (4) of the 118 months examined.  The SSC Strategy's collar, therefore, could only have limited losses in four (4) months, while potentially capping gains in the other 114 months.

125.    As an expert in due diligence and fraud detection, Estenne understood that it was nonsensical for Madoff to offer an investment strategy that featured (according to the SSC Exhibit) an "attractive level of downside protection" at the cost of "limit[ing]" investment gains, since Madoff purported to obtain positive returns approximately 97% of the time over a ten-year period.

### B. Estenne Deliberately Avoided Confirming His Suspicions that BLMIS Was Not Trading Securities

126.    Following his review of the Estenne Study, Estenne recognized additional evidence that caused him to suspect there was a high probability BLMIS was not trading securities on behalf of Square One.

127.    Rather than confirm his suspicions that BLMIS was a fraud, Estenne looked the other way.  He had much to lose by confronting his suspicions that Madoff was a fraud.  As a new and unproven investment manager, aspiring to make a name for himself in the competitive Geneva investment management industry, Estenne knew Square One's investment with BLMIS allowed him to provide European investors rare access to Bernard Madoff.  Square One's investment in BLMIS also provided Estenne (through SAM) with a consistent and significant revenue stream by way of management fees.  Further, Estenne desired to build Square One's BLMIS investment into a multi-billion-dollar operation like BLMIS feeder funds Fairfield Sentry Ltd and Kingate Euro Fund Ltd.  To compete with these larger, more established BLMIS feeder funds, Estenne did not charge performance fees and used this fact to market Square One to European investors seeking to invest with BLMIS.

128.    By ignoring his suspicions that BLMIS was a fraud, Estenne managed Square One inconsistently with, or totally contrary to, his investment principles and teachings.

### 1. Estenne Abandoned His Principle that Investment Transparency Is "Critical"

129.    On December 13, 1999, DiPascali informed Estenne that Madoff demanded that Square One remove all references to BLMIS from Square One's offering memorandum.

130.    The offering memorandum defined Square One's "investment objective" as "provid[ing] investors with access to the trading strategy of Madoff Securities [BLMIS]."  The offering memorandum further explained to investors BLMIS's importance as Square One's

"Investment Advisor." In that role, BLMIS would "manage all of the Fund's assets and [would] have complete and absolute authority to make trading decisions for the Fund."

131. Estenne responded to DiPascali that even though he had previously "never been told" to do such a thing, he was "ready to correct what [BLMIS] want[ed]" and that he "regret[ted] any inconvenience [that Square One's disclosures about BLMIS] might have create[d]."

132. Estenne knew that Madoff's requirement to hide BLMIS's identity and role in Square One was indicative of fraud but, on information and belief, acceded to Madoff's demands of secrecy.

133. By acquiescing to Madoff's demand for secrecy, Estenne abandoned his investment principle that it is "critical" to select investment advisers who are transparent with their customers as well as his investment principle that "[i]f a fund manager will not tell you what he is doing, you have to question what you are doing investing with him."

134. Estenne also acquiesced to BLMIS's purported practice of entering into thousands of trades on behalf of Square One in the over-the-counter options market without ever identifying to Square One the counterparties to those trades. BLMIS's refusal to identify these purported counterparties made it impossible for Square One to assess their creditworthiness. And Square One's Trading Authorization Agreement with BLMIS makes clear that if the purported counterparty were to default, Square One bore the risk (not BLMIS).

135. By acquiescing to BLMIS's refusal to disclose to Square One the counterparties to the options trades BLMIS purportedly made on behalf of Square One, Estenne abandoned his investment principle that transparency on counterparties to investment deals is critical to avoiding myriad investment risks, such as fraud.

### 2. Estenne Abandoned His Principle that Ongoing Investment Due Diligence Is "Paramount"

136.    On June 1, 1999, Estenne (through SAM) entered into the Investment Management Delegation Agreement with BLMIS.  Per this Agreement, Estenne (through SAM) delegated all "duties, obligations, functions, powers and discretions" over the Square One BLMIS IA Account to BLMIS but pledged to "control" and "review" BLMIS in this regard.

137.    Square One's offering memorandum also provides that Estenne (through SAM) was "responsible for overseeing the activities" of BLMIS.

138.    On information and belief, neither Estenne nor SAM conducted meaningful due diligence on BLMIS or the Square One BLMIS IA Account any time after the Estenne Study.

139.    Estenne, on information and belief, never hired anyone to work for SAM in the Relevant Period.  Philippe Hostettler, a Swiss investment professional, is the only individual other than Estenne who appears to have acted for SAM.  In 1999, Estenne signed the Investment Management Delegation Agreement on behalf of SAM.  Hostettler later told the Trustee, however, that he only signed the Investment Management Delegation Agreement as a favor to Estenne and that he never worked for SAM in any capacity.

140.    BLMIS's records do not show that Estenne or SAM communicated with BLMIS (through telephone, facsimile, electronic mail, regular mail, etc.) concerning due diligence on the Square One BLMIS IA Account.

141.    BLMIS's records do not show that Estenne or SAM conducted any diligence visits to BLMIS, even though Estenne (on behalf of Partners Advisers) regularly visited New York to conduct diligence on other managers and used an apartment in Manhattan to accommodate these visits.

142.    BLMIS's records do not show that Estenne or SAM met with Madoff.

143.    Estenne also ensured that others could not conduct meaningful due diligence on the Square One BLMIS IA Account. When Partners Advisers launched the ART Fund in 2000, Estenne directed Partners Advisers to add Square One to the ART Fund's investment portfolio. But he exempted Square One from the typical pre-investment and ongoing diligence procedures at Partners Advisers. For this reason, the Diligence Officer, whose tasks included vetting every investment in the ART Fund's portfolio, never vetted Square One and did not know that Square One invested in BLMIS until after the Filing Date.

144.    Estenne's disregard of ongoing investment due diligence on BLMIS and the Square One BLMIS IA Account runs contrary to his investment principles and practices, such as that: (i) "face-to-face meetings and on-the-ground work are of essence" when selecting an investment adviser and when conducting ongoing diligence; (ii) ongoing investment diligence is "paramount" and that at "each step of the process" an investor must "identify, analyze, monitor and aggregate financial and operational risks at a fund and portfolio-level[;]" and (iii) it is crucial to "monitor[] performance and portfolio information" by, among other things, reconciling customer statements and trade confirmations with public investment records and reverse-engineering the underlying investment strategies.

### 3.    Estenne Abandoned His Principle that the "Proper" Investment Fundamentals Require an Independent Custodian

145.    Estenne hired Bank of Bermuda as Square One's custodian in 1999.

146.    Also in 1999, Estenne directed Square One to make BLMIS the sub-custodian of the Square One BLMIS IA Account. Under the sub-custody agreement, BLMIS had exclusive custody of Square One's assets.

147.    Estenne knew that giving BLMIS custody of Square One's investment assets increased the risk of fraud and misappropriation because BLMIS already acted as Square One's

investment adviser, broker, and *de facto* manager. He wrote in the Book Chapter that giving custody of the investment assets to a financial institution that is independent of the investment adviser is necessary to "ensure control of assets, independent [net asset value] calculation and accuracy of financial statements."

148.   Giving the investment adviser custody of the investment assets also runs contrary to industry practices. At all relevant times, it was common industry practice for an independent third-party custodian to hold the actual funds and/or securities and for an independent third-party broker to execute the transactions. This is why investment advisers typically hire reputable independent prime brokers to act as both the broker and custodian. This way, even though the investment adviser is deciding how best to invest client funds, the securities and cash are securely in the custody of an independent third party.

### C.   Estenne Acquired Actual Knowledge that BLMIS Was Not Trading Securities on Behalf of Square One in or around 2003

149.   In 2003, Estenne learned of more information that, combined with his pre-existing suspicions of fraud at BLMIS, gave him actual knowledge that BLMIS was not trading securities on behalf of Square One.

#### 1.   The Diligence Officer Confronts Estenne with Concerns about BLMIS

150.   In 2002, Partners Advisers sought to add investments to the ART Fund's portfolio that could produce "attractive returns" in bear market conditions. For this purpose and around that time, the Diligence Officer attended separate presentations by Fairfield Greenwich Group and FIM Limited, each of which managed several large BLMIS feeder funds.

151.   Fairfield Greenwich Group and FIM Limited each pitched to the Diligence Officer their respective BLMIS feeder funds during their respective presentations. Among other things, they showed the Diligence Officer these feeder funds' consistently positive returns in recent years

and told the Diligence Officer that: (i) these feeder funds each invested all, or substantially all, of their assets with BLMIS; (ii) BLMIS employed a conservative investment strategy designed to track the S&P 100 Index; and (iii) BLMIS served as the broker, investment adviser, and custodian to each of their funds.

152.    The Diligence Officer asked Fairfield Greenwich Group and FIM Limited basic questions about the size and make-up of BLMIS's investment advisory business.  The presenters were unable to answer these questions due to BLMIS's utter lack of transparency with respect to its investment advisory business.

153.    The Diligence Officer also asked Fairfield Greenwich Group and FIM Limited how BLMIS's investment returns were possible when its strategy purportedly tracked the S&P 100 Index, which in recent years had suffered significant investment losses due to the bursting of the "dotcom bubble" and the 9/11 attacks.  Once again, the presenters were unable to answer the Diligence Officer's questions.

154.    The Diligence Officer left each presentation very concerned that neither he nor the presenters could ascertain how BLMIS's purported investment performance was possible.

155.    Following these presentations, the Diligence Officer talked to several investment professionals that he trusted about his BLMIS-related concerns, in hopes of attaining clarity as to how BLMIS's strategy worked and whether BLMIS feeder funds were safe investments.  These professionals told the Diligence Officer they had blacklisted BLMIS feeder funds because the professionals' exhaustive diligence could not explain how BLMIS's purported investment returns were possible and that they were concerned that BLMIS offered its investment advisory business's investors no transparency.

156.    The Diligence Officer came away from these conversations with the belief that no one could explain to him how BLMIS's investment returns were possible.

157.    After he conducted his BLMIS-related diligence, the Diligence Officer reported his concerns, and those of the professionals with whom he spoke, to Estenne.  The Diligence Officer then recommended to Estenne that Partners Advisers "blacklist" all BLMIS feeder funds and Madoff-related investments from its managed portfolio.

### 2.    Estenne Blacklisted BLMIS from the ART Fund

158.    Estenne immediately agreed with the Diligence Officer's recommendation to have Partners Advisers blacklist BLMIS feeder funds from its managed investments without questions or resistance and without seeking a second opinion.

159.    From that point through the Filing Date, at Estenne's instruction, it was Partners Advisers' official policy to not: (i) consider BLMIS feeder funds during internal meetings; (ii) attend presentations concerning BLMIS feeder funds; or (iii) accept or return calls from BLMIS feeder fund managers.

### 3.    Estenne Shielded His Money from Madoff

160.    After agreeing to have Partners Advisers blacklist BLMIS feeder funds from its managed investments, Estenne shielded his own money from BLMIS.

161.    From the ART Fund's inception in November 2000, Estenne personally invested in the ART Fund as part of Partners Advisers' "alignment of interests" program, in which Estenne and the rest of the Partners Advisers' management team invested their personal funds in the same investment portfolio as their ART Fund investors.  In the Relevant Period, Estenne publicly touted that this alignment of interests program meant that he "put [his] money where [his] mouth is."

162.    In its 2001 Abbreviated Audited Annual Report, the ART Fund disclosed that it held shares in Square One as of December 31, 2001.  The ART Fund made the same disclosure in another Abbreviated Audited Annual Report as of December 31, 2002.

163.    But in 2003, after Estenne's decision to have Partners Advisers blacklist BLMIS feeder funds from its managed investments, Estenne directed the ART Fund to redeem its investments in Square One.  This redemption is captured in the ART Fund's 2003 Abbreviated Annual Report, reported as of December 31, 2003, which indicates that the ART Fund no longer held shares in Square One.  The ART Fund's annual reports for the remainder of the Relevant Period similarly indicate that the ART Fund no longer held shares in Square One.

164.    On information and belief, Estenne eliminated his personal exposure to BLMIS when the ART Fund dropped Square One from its investment portfolio.  His attorneys represented to the Trustee in 2010 that Estenne did not have any personal exposure to Square One or BLMIS as of the Filing Date.

165.    Estenne's decision to drop Square One from the ART Fund's portfolio came at a time when Square One was significantly outperforming the S&P 100 Index, as indicated in the below chart:



166.    Estenne's decision to drop Square One from the ART Fund's portfolio also came at a time when Square One was one of the portfolio's few bright spots. The ART Fund's audited annual reports described the fund's performance during the bear market between 2000 and 2002 as "disappointing," having posted investment returns of 7.0% in 2001, and 1.5% in 2002. By contrast, Square One posted returns of 13.8% in 2001, and 12.0% in 2002. The chart below contrasts these varying performances by comparing a $100 investment in Square One with a $100 investment in the ART Fund between December 2000 and December 2002:



167.    After Estenne liquidated his exposure to Square One and BLMIS, he continued to invest Square One's assets (consisting of other people's money) exclusively with BLMIS, taking management fees off the top of those investments and raising his profile in the investment management industry.

**D.    Estenne Covered for Madoff**

168.    Estenne covered for Madoff by preventing others from conducting meaningful diligence into the Square One BLMIS IA Account.

### 1. Estenne Actively Hid Square One's Business Operations from His Diligence Officer

169. Between 2004 and the Filing Date, Estenne routinely had Partners Advisers personnel assist him with Square One's business activities. Partners Advisers employee Timothée Henry handled back-office functions with respect to Square One and periodically corresponded with BLMIS in this capacity. And Partners Advisers employee Sandra Demuth performed certain administrative functions with respect to Square One and periodically corresponded with BLMIS in this capacity.

170. Estenne never asked the Diligence Officer to lend his extensive investment due diligence expertise to Square One's business activities during this period.

171. The Diligence Officer believes Estenne kept him away from Square One's business activities because of the serious diligence-related concerns about BLMIS that the Diligence Officer had previously reported to Estenne.

### 2. Estenne Allowed Madoff to Have Unchecked Custody of Square One's Investment Funds

172. In June 2006, Bank of Bermuda resigned as Square One's custodian.

173. From that point through the Filing Date, Estenne never hired a replacement custodian for Square One. As a result, no independent financial institution was responsible for: (i) overseeing BLMIS's custody of Square One's investment funds; (ii) verifying the existence or the value of the assets that BLMIS purported to trade on Square One's behalf; or (iii) verifying that BLMIS properly segregated Square One's assets from the other assets held at BLMIS or BLMIS's proprietary assets.

174. As an expert in due diligence and fraud detection, Estenne understood this unchecked self-custody structure eliminated a critical control in both the brokerage and investment

management industries by excluding an independent custodian whose functions would include securing and confirming the actual existence of securities purchased.

175.    Estenne wrote in the Book Chapter that independent custody of an investment fund's assets was essential to "ensure control of assets, independent [net asset value] calculation and accuracy of financial statements" and warned that allowing investment advisers to "move assets and open accounts where and when they want" leaves investment funds vulnerable to risks such as fraud.

176.    Square One is the only known BLMIS feeder fund that invested with BLMIS without using an independent third-party custodian to at least provide the façade of oversight into BLMIS's custody of the investment assets.

**E.**    **Estenne Resisted the Trustee's Efforts to Learn about Estenne's BLMIS-Related Diligence**

177.    In March 2009, Square One filed a customer claim with this Court to recover approximately $25 million in purported investment losses.

178.    Between 2009 and 2010, the Trustee requested documents and information tied to the Square One BLMIS IA Account so that the Trustee could determine Square One's customer claim.  Neither Square One nor Estenne responded to these requests.

179.    In July 2010, the Trustee asked Square One and Estenne to submit records concerning BLMIS-related due diligence.  Neither Square One nor Estenne responded to these requests.

180.    In August 2010, Square One voluntarily withdrew its customer claim.

IX.    **THE TRANSFERS**

181.    Prior to the Filing Date, BLMIS transferred $25,852,737 to Square One, as set forth in Exhibit B.

182.    Square One received all of the Transfers under circumstances in which it had actual knowledge of, or was willfully blind to, BLMIS's fraud.

183.    The Transfers were and continue to be Customer Property.

184.    The Transfers are avoidable and recoverable under Bankruptcy Code §§ 544, 548, 550(a), and 551, applicable provisions of SIPA, particularly § 78fff-2(c)(3), and applicable provisions of C.P.L.R. 203(g) and 213(8) (McKinney 2001) and DCL §§ 273 – 279 (McKinney 2001).

185.    During the six years prior to the Filing Date, of the total Transfers, BLMIS made transfers to Square One that amount to $24,271,620 (the "Six-Year Transfers"), as set forth in Exhibit B.

186.    The Six-Year Transfers are avoidable and recoverable under Bankruptcy Code §§ 544, 550(a), and 551, applicable provisions of SIPA, particularly 78fff-2(c)(3), and applicable provisions of DCL §§ 273–279.

187.    During the two years prior to the Filing Date, of the total Transfers, BLMIS made transfers to Square One in the amount of $6,410,000 (the "Two-Year Transfers"), as set forth in Exhibit B.

188.    The Two-Year Transfers are avoidable and recoverable under Bankruptcy Code §§ 548, 550(a), and 551, applicable provisions of SIPA, particularly § 78fff-2(c)(3) and applicable provisions of DCL §§ 273–279.

189.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

40

190.   The Trustee's investigation is ongoing and the Trustee reserves the right to: (i) supplement the information regarding the Transfers and any additional transfers; and (ii) seek recovery of such additional transfers.

## X.   THE COUNTS

### COUNT ONE:  FRAUDULENT TRANSFERS – BANKRUPTCY CODE §§ 105(a), 548(a)(1)(A), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

191.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

192.   Each of the Two-Year Transfers was made on or within two years before the Filing Date.

193.   Each of the Two-Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of Bankruptcy Code §§ 101(54) and 548(a), and SIPA § 78fff-2(c)(3).

194.   BLMIS made each of the Two-Year Transfers with the actual intent to hinder, delay, or defraud some or all of BLMIS's then-existing or future creditors.  BLMIS made the Two-Year Transfers to or for the benefit of Square One, in furtherance of a fraudulent investment scheme.

195.   Each of the Two-Year Transfers constitutes a fraudulent transfer that the Trustee may avoid under Bankruptcy Code §§ 548(a)(1)(A), and recover from Square One, under Bankruptcy Code § 550(a) and SIPA § 78fff-(2)(c)(3).

196.   As a result of the foregoing, under Bankruptcy Code §§ 105(a), 548(a)(1)(A), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside; (c) recovering the Two-Year Transfers, or the value thereof, from Square One for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee

41

all profits, including any and all management fees, incentive fees, commissions, or other compensation and/or remuneration received by Square One, related to, arising from, or concerning the Two-Year Transfers; (e) imposing a constructive trust the Two-Year Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

### COUNT TWO: FRAUDULENT TRANSFERS – BANKRUPTCY CODE §§ 105(a), 548(a)(1)(B), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

197.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

198.    Each of the Two-Year Transfers was made on or within two years before the Filing Date.

199.    Each of the Two-Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of Bankruptcy Code §§ 101(54) and 548(a), and SIPA § 78fff-2(c)(3).

200.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two-Year Transfers.

201.    At the time of each of the Two-Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two-Year Transfers.

202.    At the time of each of the Two-Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with BLMIS was an unreasonably small capital.

203.    At the time of each of the Two-Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

204.    Each of the Two-Year Transfers constitutes a fraudulent transfer that the Trustee

may avoid under Bankruptcy Code §§ 105(a) and 548(a)(1)(B) and recover from Square One,

under Bankruptcy Code § 550(a) and SIPA § 78fff-(2)(c)(3).

205.    As a result of the foregoing, under Bankruptcy Code §§ 105(a), 548(a)(1)(B),

550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and

preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside; (c)

recovering the Two-Year Transfers, or the value thereof, from Square One, for the benefit of the

BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee

all profits, including any and all management fees, incentive fees, commissions, or other

compensation and/or remuneration received by Square One, related to, arising from, or concerning

the Two-Year Transfers; (e) imposing a constructive trust over the Two-Year Transfers, or their

proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs,

prejudgment interest, and any other relief the Court deems just and appropriate.

**COUNT THREE: FRAUDULENT TRANSFERS – DCL §§ 276, 276-a, 278 AND/OR 279,
BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)**

206.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

207.    At all times relevant to the Six-Year Transfers, there have been one or more

creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under

Bankruptcy Code § 502 or that are not allowable only under Bankruptcy Code § 502(e).

208.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined

under DCL § 270.

209.    Each of the Six-Year Transfers was made by BLMIS with the actual intent to

hinder, delay, or defraud some or all of BLMIS's then-existing or future creditors.  BLMIS made

the Six-Year Transfers to or for the benefit of Square One, in furtherance of a fraudulent investment scheme.

210.    Each of the Six-Year Transfers was received by Square One, with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Six-Year Transfers, and/or future creditors of BLMIS.

211.    As a result of the foregoing, under DCL §§ 276, 276-a, 278 and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Square One, for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, commissions, or other compensation and/or remuneration received by Square One, related to, arising from, or concerning the Six-Year Transfers; (e) imposing a constructive trust over the Six-Year Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

### COUNT FOUR: FRAUDULENT TRANSFERS – DCL §§ 273 AND 278 AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

212.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

213.    At all times relevant to the Six-Year Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under Bankruptcy Code § 502 or that are not allowable only under Bankruptcy Code § 502(e).

214.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under DCL § 270.

215.    BLMIS did not receive fair consideration for the Six-Year Transfers.

216.    BLMIS was insolvent at the time it made each of the Six-Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six-Year Transfers.

217.    As a result of the foregoing, under DCL §§ 273, 278 and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Square One, for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, commissions, or other compensation and/or remuneration received by Square One, related to, arising from, or concerning the Six-Year Transfers; (e) imposing a constructive trust over the Six-Year Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

## COUNT FIVE: FRAUDULENT TRANSFERS – DCL §§ 274, 278, AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

218.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

219.    At all times relevant to the Six-Year Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under Bankruptcy Code § 502 or that are not allowable only under Bankruptcy Code § 502(e).

220.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under DCL § 270.

221.    BLMIS did not receive fair consideration for the Six-Year Transfers.

222.    At the time BLMIS made each of the Six-Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six-Year Transfers was an unreasonably small capital.

223.    As a result of the foregoing, under DCL §§ 274, 278 and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Square One, for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, commissions, or other compensation and/or remuneration received by Square One, related to, arising from, or concerning the Six-Year Transfers; (e) imposing a constructive trust over the Six-Year Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

## COUNT SIX: FRAUDULENT TRANSFERS – DCL §§ 275, 278 AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

224.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

225.    At all times relevant to the Six-Year Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under Bankruptcy Code § 502 or that are not allowable only under Bankruptcy Code § 502(e).

226.    Each of the Six-Year Transfers constituted a conveyance by BLMIS as defined under DCL § 270.

227.    BLMIS did not receive fair consideration for the Six-Year Transfers.

228.    At the time BLMIS made each of the Six-Year Transfers, BLMIS had incurred, was

intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts

matured.

229.    As a result of the foregoing, under DCL §§ 275, 278 and/or 279, Bankruptcy Code

§§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:

(a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be

set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Square One, for the

benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge

to the Trustee all profits, including any and all management fees, incentive fees, commissions, or

other compensation and/or remuneration received by Square One, related to, arising from, or

concerning the Six-Year Transfers; (e) imposing a constructive trust over the Six-Year Transfers,

or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees,

costs, prejudgment interest, and any other relief the Court deems just and appropriate.

## COUNT SEVEN: UNDISCOVERED FRAUDULENT TRANSFERS – C.P.L.R. 203(g), 213(8), DCL §§ 276, 276-a, 278 AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

230.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

231.    At all relevant times, the fraudulent scheme perpetrated by BLMIS was not

reasonably discoverable by at least one unsecured customer of BLMIS, who holds matured or

unmatured unsecured claims against BLMIS that are allowable under Bankruptcy Code § 502

(except to the extent disallowed under Bankruptcy Code § 502(e)).

232.    At all times relevant to the Transfers, there have been one or more creditors holding

matured or unmatured unsecured claims against BLMIS that are allowable under Bankruptcy Code

§ 502 or that are not allowable only under Bankruptcy Code § 502(e).

233.    Each of the Transfers constituted a conveyance by BLMIS as defined under DCL § 270.

234.    Each of the Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then-existing or future creditors.  BLMIS made the Transfers to or for the benefit of Square One, in furtherance of a fraudulent investment scheme.

235.    Each of the Transfers was received by Square One, with actual intent to hinder, delay, or defraud creditors of BLMIS existing at the time of each of the Transfers, and/or future creditors of BLMIS.

236.    As a result of the foregoing, under C.P.L.R. 203(g) and 213(8), DCL §§ 276, 276-a, 278 and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from Square One, for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, commissions, or other compensation and/or remuneration received by Square One, related to, arising from, or concerning the Transfers; (e) imposing a constructive trust over the Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

## XI.    PRAYERS FOR RELIEF

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Square One as follows:

(a)    On the First Count, under Bankruptcy Code §§ 105(a), 548(a)(1)(A), 550(a), and 551, and SIPA § 78fff-2(c)(3), judgment:  (a) avoiding and preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside; (c) recovering the Two-Year Transfers, or

the value thereof, from Square One for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, commissions, or other compensation and/or remuneration received by Square One, related to, arising from, or concerning the Two-Year Transfers; (e) imposing a constructive trust the Two-Year Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

(b)     On the Second Count, under Bankruptcy Code §§ 105(a), 548(a)(1)(B), 550(a), and 551, and SIPA § 78fff-2(c)(3), judgment:  (a) avoiding and preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside; (c) recovering the Two-Year Transfers, or the value thereof, from Square One, for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, commissions, or other compensation and/or remuneration received by Square One, related to, arising from, or concerning the Two-Year Transfers; (e) imposing a constructive trust over the Two-Year Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

(c)     On the Third Count, under DCL §§ 276, 276-a, 278, and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), judgment:  (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Square One, for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, commissions, or other

compensation and/or remuneration received by Square One, related to, arising from, or concerning the Six-Year Transfers; (e) imposing a constructive trust over the Six-Year Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

(d)    On the Fourth Count, under DCL §§ 273, 278, and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Square One, for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, commissions, or other compensation and/or remuneration received by Square One, related to, arising from, or concerning the Six-Year Transfers; (e) imposing a constructive trust over the Six-Year Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

(e)    On Fifth Count, under DCL §§ 274, 278, and/or 279, Bankruptcy Code §§ 105(a) 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Square One, for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, commissions, or other compensation and/or remuneration received by Square One, related to, arising from, or concerning the Six-Year Transfers; (e) imposing a constructive trust over the Six-Year Transfers, or their proceeds, product or offspring,

in favor of the Trustee; and (f) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

(f)    On the Sixth Count, under DCL §§ 275, 278, and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Six-Year Transfers; (b) directing that the Six-Year Transfers be set aside; (c) recovering the Six-Year Transfers, or the value thereof, from Square One, for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, commissions, or other compensation and/or remuneration received by Square One, related to, arising from, or concerning the Six-Year Transfers; (e) imposing a constructive trust over the Six-Year Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

(g)    On the Seventh Count, pursuant to C.P.L.R. 203(g) and 213(8), DCL §§ 276, 276-a, 278, and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from Square One for the benefit of the BLMIS estate; (d) directing Square One, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, commissions, or other compensation and/or remuneration received by Square One related to or arising from, or concerning the Transfers; (e) imposing a constructive trust over the Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (f) awarding attorneys' fees, costs, and prejudgment interest from Square One; and (g) awarding any other relief the Court deems just and appropriate.

Date:  December 21, 2018
        New York, New York

By: */s/ Marco Molina*　　　　　

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Marco Molina
Email:  mmolina@bakerlaw.com
Matthew D. Feil
Email:  mfeil@bakerlaw.com
Andrew M. Serrao
Email:  aserrao@bakerlaw.com
Victoria L. Stork
Email:  vstork@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC and
the Estate of Bernard L. Madoff*