**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>    Plaintiff,<br><br>v.<br><br>BAM L.P., MICHAEL MANN, and MERYL MANN,<br><br>    Defendants. | Adv. Pro. No. 10-04390 (SMB) |

**STATEMENT OF MATERIAL FACTS
IN SUPPORT OF TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

  Plaintiff Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated chapter 7 estate of Bernard L. Madoff, in support of his motion for summary judgment in the above-pending adversary proceeding against defendants BAM L.P., Michael Mann, and Meryl Mann, respectfully submits this statement of material facts for which there is no genuine issue to be tried under Local Bankruptcy Rule 7056-1.

I.      **Procedural History**

    A.      **The SIPA Case**

    1.      On December 11, 2008, Bernard L. Madoff was arrested and the Securities and Exchange Commission ("SEC") initiated an action against him after he confessed to committing fraud through BLMIS. *United States v. Madoff*, 586 F. Supp. 2d 240, 244–45 (S.D.N.Y. 2009).

    2.      The Securities Investor Protection Corporation ("SIPC") petitioned for a protective decree, placing BLMIS into liquidation, appointing the Trustee, and removing the SIPA liquidation to the bankruptcy court. *See SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. Dec. 15, 2008), ECF Nos. 5, 6.

    3.      On June 10, 2009, this Court entered an order substantively consolidating the Chapter 7 estate of Madoff into the SIPA liquidation. Consent Order, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. June 10, 2009) ("*Main Case*"), ECF No. 252.

    B.      **The Manns' BLMIS Accounts and this Adversary Proceeding**

    4.      In December 1995, Defendant Michael Mann opened an account at BLMIS. The Mann Account was assigned account number 1CM363 in the name of "Michael Mann and Meryl Mann J/T Wros" (the "Mann Account"). Defendants Michael Mann and Meryl Mann are joint tenants of the "Michael Mann and Meryl Mann Joint Tenancy with Right of Survivorship" and beneficial owners of the Mann Account, with an account address in Great Neck, New York. *See* Answer ¶¶ 2, 8–9, Declaration of David J. Sheehan, Ex. 8.

    5.      Michael Mann subsequently opened another account at BLMIS in March 1999, assigned account number 1CM579, in the name of "BAM, L.P." (the "BAM Account, and together with the Mann Account, again the "Accounts"). Defendant Michael Mann is the sole general partner of BAM L.P. *See* Answer ¶¶ 2, 8.

6. Defendants received monthly account statements, trade confirmations, quarterly portfolio management reports, and other communications from BLMIS for their accounts. *See* Answer ¶¶ 26, 32. Prior to BLMIS's collapse, Defendants did not have any knowledge or notice of any wrongdoing or fraudulent intent on the part of BLMIS.

7. On November 30, 2010, the Trustee filed a complaint commencing this adversary proceeding to avoid and recover $9,678,157 in fraudulent transfers to Defendants during the six years prior to the liquidation. Complaint, ECF No. 1.

8. On January 25, 2012, the Trustee amended the Complaint to assert claims to avoid obligations. Amended Complaint, Sheehan Decl. Ex. 7. The parties subsequently entered into a Stipulation and Order dismissing the Obligations Counts against all Defendants with prejudice and dismissing the Trustee's claims against defendants Betsy Mann Polatsch and Adam Mann without prejudice. Stipulation and Order, ECF No. 46.

9. In a consolidated ruling on "Antecedent Debt" in which Defendants were participating parties, the District Court held that an avoidance defendant cannot give "value for the transfers of [alleged] fictitious profits received, as "satisfaction of . . . antecedent debt" under Section 548(c). *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec.* (*In re Madoff Sec.*), 499 B.R. 416, 423 (S.D.N.Y. 2013) (the "*Antecedent Debt Decision*"). The District Court had previously affirmed this same principle in *Picard v. Greiff*, 476 B.R. 715 (S.D.N.Y. 2012), and the Bankruptcy Court subsequently reaffirmed it in *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec.)*, 531 B.R. 439, 471 (Bankr. S.D.N.Y. 2015) (the "*Omnibus Good Faith Decision*").[1]

---

[1] Further affirmed in *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5–10 (Bankr. S.D.N.Y. Apr. 25, 2016); *Picard v. Lowrey*, Adv. Pro. Nos. 10-04387, 10-0448, 10-04350, 10-05110, 2018 WL 1442312, at *5–8 (Bankr. S.DN.Y. Mar. 22, 2018); *Picard v. Goldenberg*, Adv. Pro. No. 10-04946 (SMB), 2018 WL 3078149, at *4 (Bankr. S.D.N.Y. June 19, 2018)

- 3 -

10. By virtue of a Second Circuit decision, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff Sec.*), the Trustee's avoidance and recovery claims are limited to the two-year period preceding the liquidation. 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015).

11. Accordingly, the Trustee seeks to avoid and recover from Defendants $2,250,000 transferred to the Mann Account and $563,000 transferred to the BAM Account within the two-year period preceding the liquidation.

12. On April 16, 2014, Defendants answered the Trustee's Amended Complaint. Defendants asserted 34 affirmative defenses, including those pertaining to (i) jurisdiction, standing, and ripeness (Third, Fifth, and Sixth Affirmative Defenses); (ii) value and antecedent debt (Eighth, Fifteenth, Sixteenth, Twenty-First, and Twenty-Second Affirmative Defenses); (iii) BLMIS's purported solvency (Fourteenth Affirmative Defense); (iv) section 546(e) of the Bankruptcy Code and other limitations (Twelfth, Nineteenth, Twentieth, and Twenty-Fifth Affirmative Defenses); (v) section 278 of the New York Debtor and Creditor Law (Seventeenth and Eighteenth Affirmative Defenses); (vi) various remedies, adjustments, and setoffs they claim they are entitled to under federal or state law (Twenty-First, Twenty-Second, Twenty-Third, and Twenty-Seventh Affirmative Defenses). *Id.* at 19–25. In addition, Defendants did not admit the Trustee's specific allegations concerning the Ponzi scheme conducted by BLMIS. *Id.* at ¶¶ 23–37.

13. The Trustee conducted discovery on all claims, including serving Requests for Production, Interrogatories, and Requests for Admission. Pretrial Order at 9. The Trustee also served subpoenas on Defendants' financial institutions for documents supporting Defendants' receipt of the relevant transfers from BLMIS.

14. Defendants admit they made and received the transfers from BLMIS in connection with their accounts, as set forth in Exhibit B to the Amended Complaint. *See* Answer at ¶ 43 ("Defendants admit that it made certain transfers and received certain transfers from BLMIS prior to December 8, 2008. Defendants respectfully refers the Court to Columns 10 and 11 [of the Amended Complaint] for the complete contents thereof.").

15. Specifically, over the life of the Mann Account, Defendant Michael Mann deposited a total of $14,850,000 into the Mann Account and withdrew a total of $20,650,000 from the Mann Account. Of these withdrawals from the Mann Account, $2,250,000 was withdrawn within the two-year period before the liquidation. *See* Joint Pretrial Order ¶ 8, Sheehan Decl. Ex. 12; Amended Complaint Ex. B; Opp'n to the Trustee's Motion *in limine*, ECF Nos. 126, 126-3 ("Michael Mann and BAM L.P. have admitted that the transactions listed in the [Amended] Complaint are accurate.") Tr. of Nov. 28, 2018 Hr'g ("Nov. 28, 2018 Tr.") at 7, Sheehan Decl. Ex. 10 (conceding that Defendants "don't contest" the relevant account activity and that therefore it is "not an issue at trial").

16. Similarly, over the life of the BAM Account, Defendant Michael Mann, on behalf of BAM L.P., deposited a total of $1,920,007 into the BAM Account and withdrew a total of $3,551,000 from the BAM Account. Of these withdrawals from the BAM Account, $563,000 was withdrawn within the two-year period before the liquidation. *See* Joint Pretrial Order at ¶ 9; Amended Complaint Ex. B.

17. Discovery concluded in December 2015. Defendants did not disclose any witnesses or serve any expert reports on either the case-in-chief or rebuttal expert deadlines. Nor did they depose any of the Trustee's experts.

18.	On October 26, 2018, Defendants filed a motion to withdraw the reference of the Mann Action to the District Court, claiming they have a right to have a jury hear their claims.

19.	While that motion was pending, the Bankruptcy Court set a trial date for December 3, 2018. ECF No. 108.

20.	Defendants filed an emergency motion for a stay of the trial, claiming that the Bankruptcy Court did not have jurisdiction to hear the matter. *See* Defendants' Memorandum Of Law, ECF No. 121-1. The Bankruptcy Court adjourned the trial date *sine die* while the parties briefed the issue of whether the Bankruptcy Court has jurisdiction to hear the case as a result of the Defendants' withdrawal of their customer claims with prejudice, discussed below.

21.	The question of the Bankruptcy Court's jurisdiction in this matter has been fully briefed and the parties are awaiting a decision.

C.	**Defendants' Customer Claims**

22.	On December 23, 2008, the Bankruptcy Court entered the Claims Procedures Order. Order, *Main Case*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 23, 2008), ECF No. 12.

23.	In June 2009, Defendants filed customer claims with the Trustee seeking to recover the purported balance in their BLMIS accounts as stated on their last account statements as of November 30, 2008. Specifically, Michael Mann and Meryl Mann filed a customer claim for BLMIS Account No. 1CM363 in the amount of $7,192,467, designated as Claim #009823 (the "Mann Customer Claim"), and Michael Mann filed claim #009822 on behalf of BAM L.P. for Account No. 1CM579 in the amount of $724,533.85 (the "BAM Customer Claim," and together with the Mann Customer Claim, the "Customer Claims"). *See* Sheehan Decl. Exs. 1, 2; Answer ¶¶ 51–52.

24. In August 2009, the Trustee issued a Notice of Trustee's Determination of Claim with respect to the Mann Customer Claim, and in October 2009, the Trustee issued a Notice of Trustee's Determination of Claim with respect to the BAM Customer Claim (the "Determinations"). Sheehan Decl. Exs. 3, 4.

25. The Determinations state the following:

> Your claim is DENIED. No securities were ever purchased for your account . . . [b]ased on the Trustee's analysis, the amount of money you withdrew from your BLMIS account at BLMIS . . . is greater than the amount that was deposited with BLMIS . . . . As noted, no securities were ever purchased for your account. Any and all profits reported to you by BLMIS on account statements were fictitious. Since there were no profits to use either to purchase securities or to pay you any money beyond the amount that was deposited into your BLMIS account, the amount of money you received in excess of deposits in your account [] was taken from other customers and given to you.

*Id.*

26. The Determinations provide schedules listing the date, transaction description (*i.e.*, check, check wire), and amount of each withdrawal and deposit transaction between BLMIS and Defendants. *Id.*

27. In September 2009, Michael Mann and Meryl Mann filed objections to the Determinations (the "Objections"). Sheehan Decl. Exs. 5, 6.

28. In the Objections, the Manns argued that the Trustee's use of the net investment method was improper because the Trustee was bound by the amounts showing on their last statements, that the Trustee's calculation wrongly extended beyond the limitations period for avoidance of a claim under federal or state law, and that the Manns are entitled to interest and damages under federal securities law. *Id.*

29. In October 2009, the Trustee brought a motion before the Bankruptcy Court seeking to affirm his calculation of net equity for customer claims in this case using a cash in/cash out methodology. The legal basis for the Trustee's motion was that Madoff was

conducting a Ponzi scheme. *Main Case*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. June 10, 2009), ECF No. 524.

30. On March 1, 2010, the Bankruptcy Court ruled that net equity customer claims in this case must be calculated on a cash in/cash out basis. The basis for the Court's holding was that:

> Rather than engage in legitimate trading activity, Madoff used customer funds to support operations and fulfill other investors' requests for distributions of profits to perpetuate his Ponzi scheme. Thus, any payment of "profit" to a BLMIS customer came from another BLMIS customer's initial investment. Even if a BLMIS customer could afford the initial fake purchase of securities reported on his customer statement, [15] without additional customer deposits, any later "purchases" could be afforded only by virtue of recorded fictional profits. Given that in Madoff's fictional world no trades were actually executed, customer funds were never exposed to the uncertainties of price fluctuation, and account statements bore no relation to the United States securities market at any time. As such, the only verifiable transactions were the customers' cash deposits into, and cash withdrawals out of, their particular accounts. Ultimately, customer requests for payments exceeded the inflow of new investments, resulting in the Ponzi scheme's inevitable collapse.

Net Equity Decision, 424 B.R. at 128.

31. In its subsequent order, the Court further held that "the objections to the determinations of customer claims, as listed on Exhibit A to the Trustee's Motion [Dkt. No. 530], are expunged insofar as those objections are based upon using the Final Customer Statements rather than the Net Investment Method to determine Net Equity." *Main Case*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. June 10, 2009), ECF No. 2020 (the "Net Equity Order"). The Net Equity Order further provided that the Bankruptcy Court "shall retain jurisdiction with respect to the remainder of the claimants' objections" and "the Trustee shall in due course schedule a hearing or hearings regarding the remainder of the claimants' objections in accordance with the Claims Procedures Order." *Id.*

- 8 -

32. The Manns' claims were listed on Exhibit A to the Trustee's motion. Under the Net Equity Order, the claims of Michael and Meryl Mann were disallowed to the extent they exceed net equity and the portions of the objections based on last statement were expressly expunged. Defendants' remaining objections remained pending and unresolved.

33. On appeal, the Second Circuit affirmed the Net Investment Method. *See In re Bernard L. Madoff Inv. Sec.*, 654 F.3d 229 (2011), *cert. dismissed sub nom. Sterling Equities Assocs. v. Picard*, 566 U.S. 1032 (2012), *cert. denied sub nom. Ryan v. Picard*, 567 U.S. 934 (2012). In the subsequent *Antecedent Debt Decision*, the District Court validated the net equity formula to determine avoidance liability, explaining that "amounts transferred by Madoff Securities to a given defendant at any time are netted against the amounts invested by that defendant in Madoff Securities at any time." 499 B.R. at 423.

34. Between 2009 and 2014, the Trustee litigated various issues relating to the cash in/cash out methodology, including whether claimants were entitled to interest on their net equity claims and whether to include fictitious profits in the calculation of transfers between BLMIS accounts. *See Sec. Inv'r Prot. Corp. v. 2427 Parent Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 779 F.3d 74 (2d Cir. 2015) (rejecting argument that Trustee's claims do not account for time value of money); *In re BLMIS*, 697 F. App'x 708 (2d. Cir. 2017) (affirming Trustee's inter-account transfer methodology in summary order).

35. On June 1, 2018, Defendants filed notices to withdraw their Objections. *See* Notice of Withdrawal, *Main Case*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 1, 2018), ECF Nos. 17630, 17623.

36. On July 27, 2018, the Trustee moved to strike the withdrawals, asserting that a claimant may not unilaterally withdraw its claim or objection under Rule 3006 of the Federal

Rules of Bankruptcy Procedure and Rule 41 of the Federal Rules of Civil Procedure. *See* Trustee's Motion To Strike, *Main Case*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. July 27, 2018), ECF No. 17864.

37.     The Bankruptcy Court granted the Trustee's motion, holding the withdrawals were "stricken and have no legal effect." Order, *Main Case*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Oct. 4, 2018), ECF No. 18051.

38.     On the eve of trial before the Bankruptcy Court, Defendants made an oral motion to withdraw their claims with prejudice. Nov. 28, 2018 Tr. at 16.

39.     During the hearing, this Court suggested the Trustee to move for summary judgment. *See* Nov. 28, 2018 Tr. at 25–26. The Court again authorized the Trustee to move for summary judgment at a hearing on December 19, 2018. Tr. of Dec. 19, 2018 Hr'g at 31–32, Sheehan Decl. Ex. 11.

40.     On December 19, 2018, the Court entered an order granting Defendants' motion to withdraw their claims with prejudice (the "Withdrawal Order"). Sheehan Decl. Ex. 13.

41.     The Withdrawal Order was an adjudication on the merits that BLMIS conducted a Ponzi scheme, that Defendants received fictitious profits instead of legitimate distributions, and that money Defendants received came from other BLMIS customers.

## II.     BLMIS Operated a Ponzi Scheme Through Its Investment Advisory Business

42.     While Defendants' accounts were open, BLMIS was headquartered at 885 Third Avenue, New York, New York and operated its investment advisory business in that location. BLMIS was registered with the Securities and Exchange Commission as a broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b). *See* Answer ¶ 23. In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration, which represented, *inter alia*, that BLMIS had 23 customer accounts and

assets under management of approximately $17.1 billion. *See* Answer ¶ 35 (referring the Court to the referenced Application "for the complete contents therein").

43. The plea allocutions of Madoff and BLMIS employees Frank DiPascali, David Kugel, Eric Lipkin, Irwin Lipkin, and Enrica Cotellessa-Pitz establish that BLMIS conducted a Ponzi scheme. *See* Sheehan Decl. Exs. 14 through 19. The allocutions establish that no securities were purchased for customer accounts and that customer redemptions were paid from money on hand in BLMIS's bank account at JPMorgan until the scheme collapsed.

44. On March 12, 2010, Madoff admitted to a fraudulent scheme and pleaded guilty to eleven counts including securities fraud, investment adviser fraud, mail fraud, wire fraud, three counts of money laundering, false statements, perjury, false filings with the SEC, and theft from an employee benefit plan. Answer at ¶¶ 1, 12 (referring the Court to the relevant transcript dated March 12, 2009, and "other filings and pleadings in that case for the complete contents therein").

45. At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal action filed against him by the United States Attorney for the Southern District of New York. Plea Allocution of Bernard L. Madoff, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (the "Madoff Allocution"), ECF No. 143-1, Sheehan Decl. Ex. 14; *see also* Answer ¶ 17 (referring the Court to the plea allocution).

46. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Madoff Allocution at 23:14–23, 31:25–32:1.

47. Madoff further testified at the plea hearing that he never invested his clients' funds in securities, that he used funds on hand in the JPMorgan account to pay customer

- 11 -

redemptions, and that he created false trading confirmations and client account statements to cover up the fact that he had not executed trades on behalf of BLMIS investment advisory clients. Madoff stated:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options, and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false for many years up and until I was arrested on December 11, 2008, I never invested these funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds. The victims of my scheme included individuals, charitable organizations, trusts, pension funds, and hedge funds.

Madoff Allocution at 24:9–24.

48. Madoff further detailed his strategy as follows:

> Through the split strike conversion strategy, I promised to clients and prospective clients that client funds would be invested in a basket of common stocks within the Standard & Poors 100 index, a collection of the 100 largest publicly-traded companies in terms of their market capitalization. I promised I would select a basket of stocks that would closely mimic the price movements of the Standard & Poors 100 index. I promised I would opportunistically time those purchases and would be out of the market intermittently, investing client funds during these periods in United States Government-issued securities, such as United States Treasury bills. In addition, I promised that as part of the split strike conversion strategy, I would hedge the investments I made in the basket of common stocks by using client funds to buy and sell option contracts related to those stocks, thereby limiting the potential client losses caused by unpredictable changes in stock prices. In fact, I never made those investments I promised clients, who believed they were invested with me in the split strike conversion strategy.

Madoff Allocution at 25:25–26:18.

49. BLMIS investment advisory customers received account statements from BLMIS that purported to reflect securities transactions and investment returns that appeared as though their investments with BLMIS were profitable. Madoff explained:

> To further cover up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me.

Madoff Allocution at 27:9–16.

50. Madoff stated that he "never promised a specific rate of return to [his] client [sic]." Madoff Allocution at 25:18–19.

51. Madoff stated that the proprietary trading and market making businesses were engaged in legitimate trading. Madoff Allocution at 25:6–11. Madoff also stated that funds from his investment advisory business were transferred to the proprietary trading and market making businesses, via his affiliated London entity. Madoff Allocution at 29:12–22.

52. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal action charging him with participating in and conspiring to perpetuate the Ponzi scheme. Plea Allocution of Frank DiPascali, Jr., *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (the "DiPascali Allocution"), ECF No. 143-2, Sheehan Decl. Ex. 15. DiPascali stated:

> The clients were told that the strategy involved purchasing what we call basket of blue chip stocks. Hedging those investments by buying and selling option contracts, getting in and out of the market at opportune times and investing in government securities at other times. . . . From at least the early 1990s through December of 2008, there was one simple fact that Bernie Madoff knew, that I knew, and

>that other people knew but that we never told the clients nor did we tell the regulators like the SEC. No purchases or [sic] sales of securities were actually taking place in their accounts. It was all fake. It was all fictitious. It was wrong and I knew it was wrong at the time, sir.

DiPascali Allocution at 46:9–15.

    53. At the plea hearing, DiPascali testified that he had been instructed to falsely represent to clients that security trading was occurring in their investment accounts when in fact, no trades were being made. DiPascali explained:

>From our office in Manhattan at Bernie Madoff's direction, and together with others, I represented to hundreds, if not thousands, of clients that security trades were being placed in their accounts when in fact no trades were taking place at all.

DiPascali Allocution at 46:21–25.

. . . .

>Most of the time the clients' money just simply went into a bank account in New York that Bernie Madoff controlled. Between the early '90s and December '08 at Bernie Madoff's direction, and together with others, I did [the] follow[ing] things: On a regular basis I told clients over the phones and using wires that transactions on national securities exchanges were taking place in their account when I knew that no such transactions were indeed taking place. I also took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were. On a regular basis I used hindsight to file historical prices on stocks then I used those prices to post purchase or [sic] sales to customer accounts as if they had been executed in realtime. On a regular basis I added fictitious trade data to account statements of certain clients to reflect the specific rate of earn return that Bernie Madoff had directed for that client.

DiPascali Allocution at 47:5–22.

. . . .

>I knew no trades were happening. I knew I was participating in a fraudulent scheme. I knew what was happening was criminal and I did it anyway.

- 14 -

DiPascali Allocution at 52:4–5.

54. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal action charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Plea Allocution of David L. Kugel, *United States v. Kugel*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011) (the "Kugel Allocution"), ECF No. 143-3, Sheehan Decl. Ex. 16.

55. As far as back as the 1970s, there is no evidence that the purported investment transactions reflected in the customer statements of BLMIS's investment advisory business customers ever occurred, and in fact the evidence reveals that those transactions did not and could not have occurred. Kugel Allocution at 32:4–12 ("Specifically, beginning the early '70s, until the collapse of BLMIS in December 2008, I helped create fake, backdated trades. I provided historical trade information . . . to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred.").

56. At a plea hearing on November 8, 2012, in the case captioned *United States v. Lipkin,* No. 10-CR-228 (LTS), Irwin Lipkin, a former BLMIS accountant, pleaded guilty to a two-count criminal action charging him with securities fraud, falsifying the records of BLMIS, and making false statements in relation to documents required by ERISA. Plea Allocution of Irwin Lipkin, *United States v. Irwin Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 8, 2012) (the "Irwin Lipkin Allocution"), ECF No. 288, Sheehan Decl. Ex. 17.

57. BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and annual audited reports. Irwin Lipkin Allocution at 30:23–31:3, 31:10–18, 31:24–32:5.

58. At a plea hearing on June 6, 2011, in the case captioned *United States v. Eric S. Lipkin,* No. 10-CR-228 (LTS), Eric Lipkin, a former BLMIS payroll clerk, pleaded guilty to a six-count criminal action charging him with bank fraud, falsifying the records of BLMIS, conspiracy, and making false statements to facilitate a theft concerning ERISA. Plea Allocution of Eric S. Lipkin, *United States v. Eric S. Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. June 6, 2011) (the "Eric Lipkin Allocution"), ECF No. 148, Sheehan Decl. Ex. 18.

59. BLMIS created fake reports that replicated those of the Depository Trust & Clearing Corporation ("DTC"), which provides clearance for nearly all equity, bond, government securities, mortgage-backed securities, money market instruments, and over-the-counter derivative transactions in the U.S. Market. The purpose of these fake DTC reports was to purportedly confirm non-existent positions in the investment advisory accounts, and the fake reports were given to auditors and the SEC to mislead them. Eric Lipkin Allocution at 32:4–10, 34:1–5.

60. At a plea hearing on December 19, 2011, in the case captioned *United States v. Cotellessa-Pitz,* No. 10-CR-228 (LTS), Enrica Cotellessa-Pitz, a former BLMIS accountant and comptroller, pleaded guilty to a four-count criminal action charging her with conspiracy to falsify the records of BLMIS, conspiracy to obstruct the IRS in the collection of income taxes, and conspiracy to make false filings with the SEC. Plea Allocution of Enrica Cotellessa-Pitz, *United States v. Cotellessa-Pitz*, No. 10-CR-228 (LTS) (S.D.N.Y. Dec. 19, 2011) (the "Cotellessa-Pitz Allocution"), ECF No. 89-8, Sheehan Decl. Ex. 19.

61. Investment advisory customer money was funneled to BLMIS's proprietary trading and market making businesses to falsely inflate their revenue and hide their losses. Cotellessa-Pitz Allocution, Tr. 31:12–32:12.

62. BLMIS investment advisory customer funds were not used to engage in any securities transactions in furtherance of its purported investment strategies as set forth above, but instead were deposited by BLMIS into a bank account at JPMorgan Chase Bank ("JPMorgan"). Madoff Allocution at 24:17–22; DiPascali Allocution at 47:5–7.

63. When BLMIS investment advisory customers submitted redemption requests seeking to withdraw funds they believed they held in their BLMIS accounts, BLMIS would use the commingled customer deposits held at BLMIS's bank accounts at JPMorgan to satisfy their requests. Madoff Allocution at 24:18–22 ("When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.").

64. BLMIS made all transfers to Defendants, much like to other customers and creditors, with the actual intent to defraud, as required under section 548(a)(1)(A) of the Bankruptcy Code. *See* Defendants' Opposition to Motion in Limine at 7, ECF No. 126 ("Fraudulent intent is not disputed here, rather it is the nature of the fraud that is at issue").

Date: New York, New York  
December 21, 2018

*/s/ David J. Sheehan*  
Baker & Hostetler LLP  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Email: dsheehan@bakerlaw.com  
Dean D. Hunt  
Email: dhunt@bakerlaw.com  
Lan Hoang  
Email: lhoang@bakerlaw.com  
Nicholas J. Cremona  
Email: ncremona@bakerlaw.com  
Seanna R. Brown  
Email: sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*