**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

**Hearing Date & Time:** To be determined by Court

**Opposition Deadline:** February 26, 2019

**Time:** 4:00pm

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br><br>          v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br><br>                    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff,<br><br>                    Plaintiff,<br><br>          v.<br><br>NATIXIS FINANCIAL PRODUCTS LLC,<br><br>                    Defendant. | Adv. Pro. No. 10-05353 (SMB) |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S**
**MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ...................................................................1

**PROCEDURAL BACKGROUND**............................................................3

I. INITIAL PROCEEDINGS IN THE BANKRUPTCY COURT ...........................3

II. DISTRICT COURT PROCEEDINGS.................................................................3

III. SUBSEQUENT PROCEEDINGS IN THE BANKRUPTCY COURT ............4

IV. TRUSTEE'S AMENDED CLAIMS FOR RECOVERY...................................5

    A.      IXIS-Paris Identified Indicia of Fraud at BLMIS ...................................5

    B.      IXIS-Paris Made False Statements and Material Omissions ..................8

    C.      Defendant Identified Indicia of Fraud Prior to Investing in a Feeder Fund...........10

    D.      Following the Groupement Deal, Defendant Amassed Additional Evidence Suggesting a High Probability of Fraud................................11

    E.      Faced with Mounting Evidence of Fraud, Defendant Conducted No Further Meaningful Diligence on BLMIS ..........................15

    F.      Defendant and IXIS-Paris Were Motivated to Turn Away from the Fraud .........16

    G.      Defendant, IXIS-Paris, and Natexis Were Significantly Intertwined, and Shared Duties, Board Members, and Risk ............................17

    H.      The Initial Transfers BLMIS Made to Groupement Are Avoidable.....................18

**ARGUMENT**.....................................................................................................**19**

I. LEGAL STANDARD GOVERNING MOTIONS TO AMEND A PLEADING .............19

II. AN INTERVENING CHANGE IN LAW SUPPORTS GRANTING THE MOTION ....20

III. NO FUTILITY, UNDUE DELAY, BAD FAITH, OR UNDUE PREJUDICE EXISTS.22

    A.      Amending the Complaint Would Not Be Futile Because the Trustee Has Alleged Facts Sufficient to Survive a Motion to Dismiss.....................................22

    B.      No Undue Delay or Bad Faith Can Be Shown Where Defendants Acquiesced to the Trustee Waiting to Amend Until Legal Standards Were Resolved ............38

    C.      Defendants Cannot Demonstrate Undue Prejudice................................................39

**CONCLUSION** .................................................................................................**40**

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

**Page(s)**

*Agerbrink v. Model Serv. LLC*,
    155 F. Supp. 3d 448 (S.D.N.Y. 2016)........................................................................39

*Alexander Interactive, Inc. v. Adorama, Inc.*,
    No. 12-cv-6608, 2014 WL 113728 (S.D.N.Y. Jan. 13, 2014)................................20

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)......................................................................................20

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010)....................................................................27

*Baker v. Latham Sparrowbush Assocs.*,
    72 F.3d 246 (2d Cir. 1995).......................................................................................37

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................20

*Blagman v. Apple, Inc.*,
    No. 12-cv-5453, 2014 WL 2106489 (S.D.N.Y. May 19, 2014)............................20

*Degulis v. LXR Biotechnology, Inc.*,
    928 F. Supp. 1301 (S.D.N.Y. 1999)........................................................................38

*Fischkoff v. Iovance Biotheraputics, Inc.*,
    No. 17-cv-5041, 2018 WL 5074659 (S.D.N.Y. Oct. 18, 2018)............................19

*Fish v. GreatBanc Tr. Co.*,
    749 F.3d 671 (7th Cir. 2014) ...................................................................................23

*Gowan v. Patriot Grp. LLC (In re Dreier LLP)*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011).....................................................................23

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    No. 02-cv-5068, 2008 WL 9359652 (S.D.N.Y. Mar. 17, 2008)...........................22

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*,
    No. 16-cv-5393 (KMW), 2018 WL 1115517 (S.D.N.Y. Feb. 26, 2018)...............39

*Kirschner v. Wachovia Capital Markets, LLC (In re Le-Nature's Inc.)*,
    No. 08-cv-1518, 2009 WL 3571331 (W.D. Pa. Sept. 16, 2009)............................38

*M.E.S., Inc. v. Safeco Ins. Co. of Am.*,
    No. 10-cv-02798 (PKC)(VMS), 2014 WL 2931398 (E.D.N.Y. June 27, 2014) .............39, 40

*Margel v. E.G.L. Gem Lab Ltd.*,
No. 04-cv-1514, 2010 WL 445192 (S.D.N.Y. Feb. 8, 2010) ................................................20

*Milanese v. Rust-Oleum Corp.*,
244 F.3d 104 (2d Cir. 2001) .................................................................................................19

*In re Optimal U.S. Litig.*,
No. 10-cv-4095 (SAS), 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) ...........................27, 37

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
Adv. Pro. No. 12-1576 (SMB), 2018 WL 4833984 (Bankr. S.D.N.Y. Oct. 3,
2018) ................................................................................................................. *passim*

*Picard v. Ceretti (In re BLMIS)*,
Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug.
11, 2015) ........................................................................................................... *passim*

*Picard v. Legacy Cap. Ltd. (In re BLMIS)*,
548 B.R. 13 (Bankr. S.D.N.Y. 2016) ...........................................................................5, 22, 25

*Picard v. Magnify, Inc. (In re BLMIS)*,
583 B.R. 829 (Bankr. S.D.N.Y. 2018) .................................................................................21

*Picard v. Mendelow (In re BLMIS)*,
560 B.R. 208 (Bankr. S.D.N.Y. 2016) .......................................................................... *passim*

*Picard v. Merkin (In re BLMIS)*,
440 B.R. 243 (Bankr. S.D.N.Y. 2011) .................................................................................37

*Picard v. Merkin (In re BLMIS)*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014) .......................................................................... *passim*

*SIPC v. BLMIS (In re Madoff Sec.)*,
501 B.R. 26 (S.D.N.Y. 2013) ...........................................................................................21, 30

*SIPC v. BLMIS (In re BLMIS)*,
513 B.R. 222 (S.D.N.Y. 2014) ...........................................................................................3, 4

*SIPC v. BLMIS (In re BLMIS)*,
516 B.R. 18 (S.D.N.Y. 2014) ......................................................................................... *passim*

*SIPC v. BLMIS (In re BLMIS)*,
590 B.R. 200 (Bankr. S.D.N.Y. 2018) ...............................................................................1, 4

*SIPC v. R.D. Kushnir & Co.*,
274 B.R. 768 (N.D. Ill. 2002) ............................................................................................38

*State Teachers Ret. Bd. v. Fluor Corp.*,
    654 F.2d 843 (2d Cir. 1981)........................................................................38, 39

*New York v. United Parcel Serv., Inc.*,
    253 F. Supp. 3d 583 (S.D.N.Y. 2017)....................................................................27

*Sys. Fed'n No. 152 v. Pa. R.R. Co.*,
    272 F. Supp. 971 (S.D.N.Y. 1967)........................................................................21

*Tuosto v. Philip Morris USA Inc.*,
    672 F. Supp. 2d 350 (S.D.N.Y. 2009)....................................................................21

*United States v. Dambelly*,
    714 F. App'x 87 (2d Cir. 2018) ..........................................................................28

*United States v. Fofanah*,
    765 F.3d 141 (2d Cir. 2014)..................................................................20, 27, 28

*United States v. Giovannetti*,
    919 F.2d 1223 (7th Cir. 1990) ............................................................................23

*United States v. Josleyn*,
    206 F.3d 144 (1st Cir. 2000)................................................................................37

*United States v. Kozeny*,
    664 F. Supp. 2d 369 (S.D.N.Y. 2009), *aff'd*, 667 F.3d 122 (2d Cir. 2011) ............................23

*United States v. Ramsey*,
    785 F.2d 184 (7th Cir. 1986) ..............................................................................20

*United States v. Reyes*,
    302 F.3d 48 (2d Cir. 2002)..................................................................................23

*U.S. ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*,
    889 F.2d 1248 (2d Cir. 1989)..............................................................................21

**Statutes**

11 U.S.C. § 546(e) ..................................................................................................5

11 U.S.C. § 548....................................................................................................5, 21

11 U.S.C. § 550 ............................................................................................ *passim*

Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ........................................1

**Rules**

Fed. R. Bankr. P. 2004............................................................................................14

iv

Fed. R. Bankr. P. 7015 ................................................................................................1

Fed. R. Bankr. P. 7021 ................................................................................................1

Fed. R. Civ. P. 12(b)(6) .............................................................................................19

Fed. R. Civ. P. 15 ...................................................................................................1, 21

Fed. R. Civ. P. 21 .........................................................................................................1

**Other Authorities**

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1484 (3d ed.) ......................................39

Irving H. Picard (the "**Trustee**"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("**BLMIS**") and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("**SIPA**"), 15 U.S.C. §§ 78aaa, *et seq.*, by and through his undersigned counsel, respectfully submits this Memorandum of Law in Support of Trustee's Motion for Leave to File an Amended Complaint (the "**Motion**") under Federal Rules of Civil Procedure 15 and 21, made applicable to this action by Federal Rules of Bankruptcy Procedure 7015 and 7021. Through this Motion and pursuant to this Court's June 2018 Decision and Order,[1] the Trustee seeks leave to file a proposed amended complaint (the "**PAC**").

## PRELIMINARY STATEMENT

As the PAC alleges, Natixis Financial Products LLC ("**Defendant**") received subsequent transfers from Groupement,[2] one of many funds that invested with BLMIS (generally, the "**Feeder Funds**"). Defendant was a Groupement shareholder and redeemed from Groupement over $141.8 million in customer property when it was subjectively aware of facts suggesting a high probability of fraud at BLMIS or that BLMIS's reported trades were fictitious. Defendant ignored these storm warnings fraud so that it, its executives, and its employees could benefit financially.

Defendant and its parent, Natixis S.A. ("**IXIS-Paris**"), operated together in their common business line, the CIB Division. IXIS-Paris made its own foray into Feeder Fund investing via Tensyr, an investment vehicle designed to provide levered returns on Sentry formed as a limited company under the laws of Jersey. With Fairfield Greenwich Group ("**Fairfield**"), the manager

---

[1] *SIPC v. BLMIS (In re BLMIS)*, 590 B.R. 200 (Bankr. S.D.N.Y. 2018) ("***Discovery Decision***"); *Picard v. Natixis*, Adv. Pro. No. 10-05353 (SMB) (Bankr. S.D.N.Y. June 19, 2018), ECF No. 164 ("**Discovery Order**"). Future references to *Picard v. Natixis*, Adv. Pro. No. 10-05353 (SMB) (Bankr. S.D.N.Y.) docket entries shall be identified as the "**Natixis Docket**."

[2] Any terms not defined herein shall have the meaning ascribed to them in the PAC.

of BLMIS's largest feeder fund, Sentry, IXIS-Paris created Tensyr.  While creating and launching Tensyr, IXIS-Paris recognized flagrant inconsistencies and informational gaps about BLMIS that all strongly indicated to IXIS-Paris that BLMIS was a fraud.

Fitch, Moody's, and S&P (collectively, the "**Rating Agencies**"), which were enlisted to assess Tensyr's investment risk, highlighted to IXIS-Paris numerous indicia of fraud.  IXIS-Paris knew if it allowed the Rating Agencies to conduct independent diligence or if it gave truthful answers about BLMIS, the Rating Agencies would uncover more evidence of fraud and refuse to rate Tensyr.  To prevent this, IXIS-Paris blocked them from meeting Madoff and fabricated stories about BLMIS.  Among other things, IXIS-Paris falsely told the Rating Agencies that BLMIS's purported OTC options counterparties identities were A-rated "major global banks."  In reality, IXIS-Paris had no knowledge of any counterparty's identity, let alone creditworthiness.  IXIS-Paris undertook no investigation and conducted no diligence to confirm or dispel its concerns. IXIS-Paris did not merely turn away from the bright red lights of fraud, it prevented others from seeing them.

While, as more fully described below, IXIS-Paris's knowledge about Madoff's fraud is imputed to Defendant, Defendant itself also had significant evidence showing discrepancies, contradictions, and illegality that led it to subjectively suspect BLMIS's trading and operations were fraudulent and the trades it reported were fictitious.  Rather than take a closer look at Madoff and BLMIS, Defendant turned the other way, comforted not by an understanding of Madoff's split-strike conversion strategy or BLMIS's operations, but by the promise of greater rewards.

2

## PROCEDURAL BACKGROUND

### I.    INITIAL PROCEEDINGS IN THE BANKRUPTCY COURT

The Trustee filed the Complaint on December 8, 2010 seeking recovery of approximately $430 million of subsequent transfers received by Defendant, among others.[3]  In 2011, Defendant and other entities moved to dismiss the Complaint, based on, among other things, whether the Trustee met his burden of pleading the good faith standard at the time, inquiry notice.

### II.    DISTRICT COURT PROCEEDINGS

Beginning in late 2011, defendants in the hundreds of BLMIS-related adversary proceedings, including Defendant here,[4] moved to withdraw the reference on the basis that, among other reasons: (i) the Trustee bears the burden of pleading lack of "good faith" under section 550(b) (the "**Good Faith Issue**"); and (ii) the Trustee's claims to recover subsequent transfers are barred by the presumption against extraterritoriality (the "**Extraterritoriality Issue**").

In April 2014, the District Court issued its Good Faith Issue decision.[5]  Diverging from longstanding precedent establishing an inquiry notice standard to recover fraudulent transfers, the District Court ruled that in a SIPA proceeding, in order for his claims to survive a motion to dismiss, the Trustee now bears the burden of pleading that both the initial and subsequent transferees willfully blinded themselves to circumstances suggesting fraud.[6]

Three months later, the District Court issued its decision on the Extraterritoriality Issue.[7] In concluding that section 550(b) does not apply extraterritorially, the District Court held that to

---

[3] Natixis Docket, (Bankr. S.D.N.Y. Dec. 8, 2010), ECF No. 1.

[4] Natixis Docket, (Bankr. S.D.N.Y. Dec. 20, 2011), ECF No. 34.

[5] *SIPC v. BLMIS (In re Madoff Sec.)*, 516 B.R. 18 (S.D.N.Y. 2014) (the "***Good Faith Decision***").

[6] *Id.* at 22–24.

[7] *SIPC v. BLMIS (In re Madoff Sec.)*, 513 B.R. 222 (S.D.N.Y. 2014) (the "***District Court Extraterritoriality Decision***").

survive a motion to dismiss, the Trustee must plead certain facts to establish that the subsequent

transfers he seeks to recover are "domestic" transfers.[8]  The District Court further noted its view

that subsequent transfers received from an entity in foreign liquidation proceedings could also be

dismissed based on principles of international comity.[9]  Following this decision, all matters that

had been withdrawn to the District Court were returned to this Court.[10]

## III.    SUBSEQUENT PROCEEDINGS IN THE BANKRUPTCY COURT

Recognizing the *Good Faith* and *District Court Extraterritoriality Decisions* articulated

new pleading standards for a subsequent transfer recovery claim, in August 2014, the Trustee filed

an omnibus motion seeking leave to amend his complaints and for additional discovery on good

faith.[11]  In 2018, this Court recognized that this omnibus motion could not be determined until

after the resolution of the legal standards concerning extraterritoriality.[12]

In November 2016, this Court's Extraterritoriality Issue decision ordered dismissal of

certain subsequent transfer claims in this case on the basis of international comity and others on

the basis of extraterritoriality.[13]

---

[8] *Id.* at 232 n.4.

[9] *Id.* at 231-32.

[10] *See* Order, *SIPC v. BLMIS (In re Madoff Sec.)*, No. 12-mc-115 (JSR) (S.D.N.Y. entered July 10, 2014), ECF No. 552.

[11] *SIPC v. BLMIS (In re BLMIS)*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Aug. 28, 2014), ECF No. 7827.

[12] *Discovery Decision,* 590 B.R. at 205, n.4.

[13] *SIPC v. BLMIS (In re BLMIS)*, Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689, at *15–16, *36–37 (Bankr. S.D.N.Y. Nov. 22, 2016) (the "***Bankruptcy Court Extraterritoriality Decision***").  Should the Second Circuit reverse this decision, the Trustee reserves his rights to amend as to any affected claims or transfers.  The Trustee also reserves all rights to appeal the *Good Faith Decision* and the District Court's decision regarding the pleading burden and standard.

Under the standard articulated by the *Good Faith Decision* and subsequently applied by this Court in other cases,[14] for the Trustee to avoid Bankruptcy Code section 546(e)'s safe harbor, and thus state a claim under sections 544, 547, or 548(a)(1)(B), the Trustee now must plead particularized allegations that initial transferees had actual knowledge of Madoff's fraud.  To state a claim under sections 548(a)(1)(A) or 550, the Trustee must plead that initial and subsequent transferees were both willfully blind to circumstances indicating a high probability of fraud at BLMIS.  For the reasons set forth below, when taken as true and all inferences made in the Trustee's favor, the PAC plausibly alleges facts evincing Groupement's actual knowledge and Defendant's willful blindness.

Accordingly, pursuant to the Discovery Order, the Trustee now seeks leave to amend his Complaint to comport with the pleading burden the *Good Faith Decision* set forth.

## IV.    TRUSTEE'S AMENDED CLAIMS FOR RECOVERY

This is a story of a parent and subsidiary each identifying and turning away from fraud. Due to how their structure and operation, the parent's knowledge is imputed to the subsidiary.

### A.    IXIS-Paris Identified Indicia of Fraud at BLMIS

In mid-2006, IXIS-Paris began discussions with Fairfield to create and manage Tensyr. During this process, IXIS-Paris identified many indicia of fraud at BLMIS.  Instead of investigating, IXIS-Paris made up stories about BLMIS to hide Madoff's scheme and allow IXIS-Paris to sell interests in Tensyr.

IXIS-Paris and Fairfield engaged the public Rating Agencies to assess Tensyr and provide a rating that would give investors assurances that the investment was safe. PAC at ¶ 185.  Knowing

---

[14] *See, e.g., Picard v. BNP Paribas S.A. (In re BLMIS)*, Adv. Pro. No. 12-1576 (SMB), 2018 WL 4833984 (Bankr. S.D.N.Y. Oct. 3, 2018); *Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13 (Bankr. S.D.N.Y. 2016); *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ("***Kingate***"); *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("***Merkin II***").

Madoff did not want to be investigated, IXIS-Paris sought to assure him his secrets would remain safe. To allay his concerns, IXIS-Paris drafted for Fairfield a list of arguments that Fairfield then made to Madoff, intended to prove to Madoff that no one would discover his involvement with Tensyr. *Id.* ¶ 222. For example, there would be "no public information," any rating "won't be published or announced," and BLMIS itself would not be rated. *Id.* These assurances worked and "Uncle Bernie" blessed the deal. *Id.* ¶ 224.

Almost immediately, the Rating Agencies told IXIS-Paris that by reviewing documents IXIS-Paris supplied them, the Rating Agencies identified obvious indicia of fraud at BLMIS. *Id.* ¶ 186. Among others, these indicia included BLMIS's lack of identifiable counterparties and the fact that Madoff simultaneously served as investment adviser, broker, and custodian. *Id.* ¶¶ 198–99. Because of these issues, the Rating Agencies demanded to meet Madoff. *Id.* ¶¶ 199, 225. Instead of facilitating this basic request in connection with rating a near-half-billion-dollar transaction, IXIS-Paris prevented the Rating Agencies from even speaking to Madoff or anyone else at BLMIS. *Id.* ¶ 230. When Fitch told IXIS-Paris that these refusals were "suspicious" and it would not rate Tensyr without meeting Madoff, IXIS-Paris told Fairfield, "We have fired Fitch." *Id.* ¶¶ 226–28.

As to Madoff concurrently serving as broker, adviser, and custodian, the Rating Agencies told IXIS-Paris that this lack of transparency rendered it impossible to verify the existence of assets BLMIS purportedly held or the legitimacy of the trades Madoff reported. *Id.* ¶ 198. Madoff's serving in all three key capacities bothered IXIS-Paris because it violated French financial law. *Id.* ¶ 115. IXIS-Paris also found it "very bizarre" that Citco was Sentry's custodian in name only and that Madoff actually retained control over the IA Business assets without a contract governing the

6

Citco-BLMIS relationship. *Id.* ¶ 207. However strange IXIS-Paris found this to be, it made no further inquiries on this subject.

The Rating Agencies demanded IXIS-Paris reveal one of BLMIS's purported options counterparties. *Id.* ¶ 210. But IXIS-Paris and Fairfield knew neither their identities nor possessed any information about their creditworthiness. *Id.* ¶ 211. IXIS-Paris also knew from its review of materials that Defendant sent to IXIS-Paris at its request that U.S. securities law required BLMIS to give Fairfield the counterparties names but did not do so. *Id.* ¶ 213. IXIS-Paris did nothing to find out why.

Also, in connection with creating Tensyr, Fairfield sent IXIS-Paris BLMIS's 2006 Form ADV filed with the SEC, which contradicted what IXIS-Paris and Defendant knew about BLMIS from their own dealings with several Feeder Funds. The Form ADV was clear and IXIS-Paris understood BLMIS was subject to criminal and civil liability for making false statements or omissions in its Form ADV. *Id.* ¶ 191.

Among other things, the Form ADV materially understated BLMIS's AUM, saying it managed $11.7 billion, but IXIS-Paris and Defendant knew BLMIS held over $14 billion. *Id.* ¶ 196. The Form ADV stated BLMIS clients could choose who executed their trades, but IXIS-Paris knew Madoff dictated only BLMIS would. *Id.* ¶ 192. The Form ADV also represented no one solicited clients for BLMIS, but IXIS-Paris knew Fairfield, like the other Feeder Funds, functioned to solicit clients for BLMIS. *Id.* ¶ 193. Defendant sent an article to IXIS-Paris that also explained: "feeder funds … provide all the … marketing for [BLMIS], raise the capital and deal with investors, says Madoff." *Id.*

7

Instead of attempting to reconcile these blatant contradictions, IXIS-Paris pressed ahead with Tensyr by pushing the Rating Agencies to provide Tensyr a rating and working with Fairfield to sell interests in Tensyr.

IXIS-Paris conducted no diligence on BLMIS and Madoff in connection with Tensyr but simply acted as an intermediary, gathering information from other sources and packaging it for the Rating Agencies. Just prior to Tensyr's funding in December 2006, IXIS-Paris sought documents from Fairfield about BLMIS "for our compliance department," but admitted that this request was "a mere formality." *Id.* ¶ 189. In other words, less than a week before launching a $432 million fund, the CIB Division had not even vetted BLMIS. *Id.*

### B.    IXIS-Paris Made False Statements and Material Omissions

IXIS-Paris took the final step in satisfying the Rating Agencies and securing for Tensyr a top investment rating: drafting the Tensyr Rating Memo, which spun a specific, soothing story that spoke to the Rating Agencies' concerns about BLMIS. This story, of course, was a tall tale IXIS-Paris created to enable it to sell more Tensyr interests and increase profits on all interests it sold.

Neither IXIS-Paris nor Fairfield had any information about who BLMIS's purported counterparties were. IXIS-Paris did know, however, that the Rating Agencies did not give investment vehicles top ratings unless their managers' options counterparties were themselves at least A-rated. *Id.* ¶¶ 211, 233.

To "get around" this Rating Agency requirement and secure for Tensyr a top rating, IXIS-Paris falsely wrote in the Tensyr Rating Memo that BLMIS's "internal credit policy is to only deal with A or above rated counterparties on the OTC American put options" and that BLMIS purportedly purchased those options "from various major global banks (8 to 12)." *Id.* ¶ 234.

IXIS-Paris represented that a Fairfield affiliate checked BLMIS's purported trades a "few hours" after execution, that BLMIS reported positions to Fairfield daily, and that Citco

8

independently checked the reported positions. *Id.* ¶¶ 241–42.  None of this was true.  Worse, IXIS-Paris submitted these materially false representations to the Rating Agencies despite Fairfield's explicitly warning IXIS-Paris that they were wrong. *Id.* ¶¶ 242–43.

IXIS-Paris knew the truth: (i) because BLMIS mailed paper statements several days after purportedly trading, *no party* could independently verify BLMIS's purported trades within a "few hours," let alone within a few days; (ii) because BLMIS controlled all of its IA Business customer assets by simultaneously serving as broker, investment adviser, and custodian no party could independently verify Tensyr's assets; and (iii) by refusing to immediately generate and produce trade tickets, BLMIS violated federal securities laws. *Id.* ¶ 245.

IXIS-Paris wrote that BLMIS segregated client assets. *Id.* ¶ 246.  Before Tensyr was rated and launched, however, IXIS-Paris sent an email to Fairfield, saying it believed this was a misrepresentation but decided not to act because doing so would draw the Rating Agencies' attention. *Id.*  Although IXIS-Paris knew this was a material misrepresentation of the "credit risk" that jeopardized customer assets, it did not correct investors' incorrect understanding of how BLMIS did, or did not, safeguard them.  Instead, in the same email about its misrepresenting this significant risk, IXIS-Paris pressed Fairfield to hurry up and sell the remaining capacity of Tensyr's riskiest tranche of notes, to IXIS-Paris's benefit. *Id.* ¶ 247.

IXIS-Paris minimized BLMIS's apparent importance to the Tensyr deal by writing that Madoff had only "time and price" discretion, meaning he only had the ability to choose when and at what price he traded for his IA Business customers. *Id.* ¶ 236.  IXIS-Paris said Madoff was limited by powers of attorney Sentry granted to him, which IXIS-Paris said dictated "which stock or option must be purchased and their respective amount." *Id.*  IXIS-Paris wrote and submitted these statements knowing they were false. *Id.* ¶ 237.

9

Beyond these fictions, the Tensyr Rating Memo acknowledged that BLMIS's fee structure was highly unusual. IXIS-Paris admitted that BLMIS earned $108 million per year from Sentry's business, which was 20% lower than Fairfield earned from Sentry. *Id.* ¶ 217. BLMIS, would have earned $132 million more *per year* had it simply charged industry-standard fees. *Id.* ¶ 218.

In sum, IXIS-Paris identified numerous indicia of fraud and willfully blinded itself to the truth by conducting no actual diligence once it discovered this evidence. It also prevented the Rating Agencies from conducting their own investigation and foisted upon them a downright fake story about BLMIS. IXIS-Paris did so because the truth so obviously revealed Madoff's fraud.

### C.    Defendant Identified Indicia of Fraud Prior to Investing in a Feeder Fund

Before, during, and after IXIS-Paris's creation of Tensyr, Defendant independently uncovered indicia of fraud at BLMIS and consciously turned away from confirming that it was a fraud or that BLMIS's customer statements and trade tickets reflected fraudulent trading.

In November 2003, Defendant completed a transaction in which it invested in Groupement (the "**Groupement Deal**," Defendant's 2006 deal with Harley, the "**Harley Deal**," and all deals in which Defendant invested with the Feeder Funds, the "**Defendant Deals**"). Prior to closing the Groupement Deal, Groupement's manager, Access, sent Defendant Groupement's BLMIS account opening documents and trade tickets, and an investor presentation Access had prepared in 2002 (the "**Access Madoff Deck**"). *Id.* ¶ 102. This deck consisted of, among other things, a brief legal opinion Access's counsel drafted, two background memoranda that Access's head of marketing drafted, and industry articles. *Id.*

The Access Madoff Deck contained contradictions concerning BLMIS's operations that Defendant could not reconcile. For example, its background memos said BLMIS was "solely compensated by the bid/offer spread," while an appended article stated that BLMIS did not charge commissions but also that it did not derive its profits just from the bid/offer spread. *Id.* ¶ 107.

10

Another appended article reflected an additional divergence, stating that BLMIS charged commissions. *Id.* Further complicating matters for Defendant, some Groupement trade tickets Access gave Defendant reflected commissions, while others did not.[15] *Id.*

Defendant clearly read and understood these contradictions, which it ignored by representing in an January 2006 Approval Memo that Madoff made money from "a bid/offer spread on transactions." *Id.* ¶ 108.

Beyond these inconsistencies, the Access Madoff Deck also revealed that BLMIS served as custodian, investment adviser, and executing broker, meaning there was no independent oversight to ensure trades were made and assets secured. *Id.* ¶ 114.

### D. Following the Groupement Deal, Defendant Amassed Additional Evidence Suggesting a High Probability of Fraud

Following its investment in Groupement, Defendant monitored monthly reports from the fund, consisting of BLMIS customer statements and trade tickets, and other trade reports, which revealed that Madoff's stated strategy could not produce BLMIS's posted returns.

Statistical measures Defendant touted in its Approval Memos revealed BLMIS was not using its purported strategy to generate returns. When entering the Harley Deal in 2006, for example, Defendant utilized two common financial statistical measures, correlation and the Sharpe ratio, each of which definitively revealed Madoff was lying about his strategy: if his returns were legitimate, then he could not have been trading pursuant to the strategy; but if he was trading using the strategy, then he reported fictitious returns.

---

[15] The background memoranda attached to the Access Madoff Deck also stated that BLMIS did not charge its customers anything for options trades. This highly unusual altruism itself suggested fraud at BLMIS because it would mean Madoff provided services integral to Madoff's strategy but forewent millions in fees, something no rational manager would do.

Defendant knew from the Access Madoff Deck that Madoff's strategy's purported equity Basket had to be closely correlated to the S&P 100 Index, BLMIS's benchmark.[16] *Id.* ¶ 138. Defendant knew that the purported options collar would not have materially altered the Basket's correlation with S&P 100 Index. *Id.* ¶ 139. The strategy's returns, however, diverged so greatly from its benchmark that they reflected very low correlation. *Id.* ¶ 141. Among other things, Defendant knew: (i) the Feeder funds  largest peak-to-trough drop a Feeder Fund reported was -0.71% compared to -44.72% over the same time period for the S&P 500 Index, an outperformance by *a factor of 63*; (ii) no Feeder Fund reported a single down quarter over its lifetime, compared to years in which the S&P 100 Index was down; and (iii) Feeder Fund Herald reported gains of nearly 11%, 10%, and 8%, in 2000, 2001, and 2002, respectively, while the S&P 100 Index lost 13%, 14%, and 23% during those respective years, meaning that Herald outperformed the S&P 100 Index by more than 80 percentage points. *Id.* ¶¶ 143–47.

Defendant and IXIS-Paris also knew funds employing a strategy very similar to Madoff's did not come close to this sort of low volatility, positive return performance. This included a fund, Gateway, which an article in the Access Madoff Deck highlighted and whose investment manager IXIS-Paris purchased. *Id.* ¶ 150. The information about Gateway presented Defendant with stark contrast between the Feeder Funds' returns and those of a fund that was legitimately trading. For example, from April 2003 to November 2008, Gateway's correlation coefficient to the S&P 100 Index was very high, 0.91, approaching "perfect" correlation at 1.0; in contrast, Groupement's correlation coefficient was 0.11, meaning it bore virtually no correlation to the index. *Id.* ¶ 151–54.

---

[16] The S&P 500 Index, due to overlap and weighting, is very similar to the S&P 100 Index. PAC at ¶ 137.

The Access Madoff Deck article noted that compared to the Feeder Funds, Gateway "experienced far greater volatility and lower returns during the same period." *Id.* ¶ 150. Comparing these funds' monthly returns also highlighted the obvious improbability of BLMIS's returns. From April 2003 to November 2008, Gateway posted negative monthly returns 28% of the time; on the other hand, Groupement was down just once in 68 months. *Id.* ¶ 151. While Gateway's performance indicates real trading (including actual loss risk, like all equity strategies reflect), no Feeder Fund with which Defendant invested could say the same about BLMIS.

Another statistical measure, the Sharpe ratio, showed Defendant that Madoff's returns were not legitimate. Sharpe ratios reflect risk taken compared to returns received, with a higher number reflecting a better risk-return ratio. *Id.* ¶ 155. Beyond reviewing multiple Feeder Funds' Sharpe ratios, Defendant utilized this statistical measure in its December 2006 Approval Memo. *Id.* ¶ 159. Each Sharpe ratio Defendant reviewed revealed to it a complete uncoupling of BLMIS's risk-adjusted returns from those of BLMIS's benchmark. For example, from inception to April 2007, Herald's Sharpe ratio was five times the S&P 500 Index's. *Id.* ¶ 160. A strategy designed to be highly correlated with an index should not diverge with it so greatly over the course of a decade.

Beyond this, in July 2004, two CIB Division Ph.D. quantitative analysts who had, after reviewing Sentry's reported performance, determined trading using Madoff's purported strategy could not generate the returns BLMIS posted. *Id.* ¶ 135. They were "of the opinion that something else is going on that they don't understand," and hypothesized that Madoff gave Sentry favorable returns in exchange for providing the IA Business with liquidity. *Id.* This alone shows Defendant subjectively knew BLMIS falsified returns and trades on its customer statements.

Defendant also knew BLMIS reported impossible options transactions. In 2003, Defendant reviewed Groupement's BLMIS account opening documents, which required BLMIS to trade

13

options on a public exchange.[17] *Id.* ¶ 111.  In a Rule 2004 deposition taken in this case, Eric Raiten,

Defendant's Managing Director and the U.S. head of the CIB Division's structured products arm,

the Structured Fund Products Group ("**SFPG**"), testified that Defendant, which had expertise in

options trading and markets, regularly reviewed all trades reported on the monthly customer

statements and trade tickets it received from the Feeder Funds. *Id.* ¶ 119.  Each BLMIS trade ticket

Defendant reviewed reflected a CUSIP number, indicating all options were exchange-traded. *Id.* ¶

132.  More than 100 times in a one-year period for just two Feeder Funds, Defendant saw reported

trading in just their accounts that exceeded the exchange's volume. *Id.* ¶¶ 121–23.  Raiten admitted

in his deposition that Defendant recognized the exchange had insufficient volume for BLMIS to

conduct the reported trades. *Id.* ¶ 125.

Knowing this, Defendant's monthly review of all BLMIS trades revealed Madoff was

purporting to trade in impossible volumes.  For example, from May 2005 to May 2006,

Groupement's account statements reflected 40 instances (or 95% of those) in which Madoff

purported to execute trades at volumes greater than existed on the exchange for Groupement alone,

including seven times the tickets' volume was more than 1,000% greater than was available. *Id.* ¶

121.  Defendant also knew that BLMIS's reported trading for Harley's account during the same

period reflected over 80% of reported options trades exceeding the exchange's volume; in one

instance, Harley's purported volume was *26,000%* of the exchange's. *Id.* ¶ 122.

These purported Groupement and Harley trades do not reflect occasional, difficult-to-

discern instances of over-volume trading, but an obvious pattern of impossible trades.

---

[17] Later, in August 2006, Madoff began to tell some clients that he traded OTC and not listed.  IXIS-Paris later
learned through its creation of Tensyr that Madoff purported to make OTC, not listed, trades. *Id.* ¶ 129.

Raiten testified at his deposition that both he and "most market participants" would agree that there is "more liquidity in the exchange instrument than in the OTC instrument." *Id.* ¶ 124.  Defendant therefore knew it was impossible for BLMIS to trade options on the exchange in the volumes Madoff reported. *Id.* ¶ 125.  Raiten further testified that IXIS-Paris believed that Madoff must have been trading OTC, which gave him "satisfaction" on the issue. *Id.*  This belies Groupement's account opening documents mandating that Madoff only made listed trades. *Id.* ¶ 111.  Raiten, moreover, admitted in his deposition that the OTC market's volume never exceeds the exchange, meaning Defendant knew Madoff could not be making the options trades he purported to make in the OTC market, either. *Id.* ¶ 125.  That Defendant knew these reported trades were impossible evinces Defendant knew the trades did not happen.

> ### E.    Faced with Mounting Evidence of Fraud, Defendant Conducted No Further Meaningful Diligence on BLMIS

For several years, Defendant continued to amass information that demonstrated Madoff was not actually trading or that the BLMIS's customer statements reported fictitious trades. Instead of making further inquiries into these fraud warnings, Defendant turned the other way.

For example, in January 2006, when entering the Harley Deal, Defendant submitted another Approval Memo that stated the only diligence it conducted or relied upon was the Access Madoff Deck and BLMIS's website. *Id.* ¶¶ 162–63.  Because the BLMIS website excluded any discussion of the IA Business, Defendant, thus, relied only on the Access Madoff Deck (by then already several years old) and conducted no further due diligence. *Id.* ¶ 163.

A few months later, a client requested an increase in the size of an existing Defendant Deal. Because of this, Defendant's credit committee required an in-person meeting with Madoff. *Id.* ¶ 164.  Raiten visited Madoff at his offices but admitted in his deposition that the meeting lasted less than one hour; no other BLMIS personnel attended; and Raiten requested no materials from

15

Madoff either before or during the meeting (and Madoff provided none). *Id.* ¶ 165. Raiten avoided the questions that went to the heart of Defendant's subjective fears of Madoff's fraud.

Defendant cannot produce evidence of any further due diligence about any of its subjective suspicions or knowledge of indicia of fraud. Defendant confirmed this in a filing it made to FINRA in connection with an investigation into Defendant's BLMIS involvement. Defendant told the regulator that it produced "all files concerning due diligence conducted by [Defendant] of funds directly or indirectly invested in B[L]MIS accounts, including … all memoranda or reports concerning the results of the review . . . ." *Id.* ¶ 167. The production is void of any indication Defendant conducted any other investigation to confirm or dispel its concerns about BLMIS.

### F.    Defendant and IXIS-Paris Were Motivated to Turn Away from the Fraud

As shown, Defendant and IXIS-Paris knowingly disregarded indicia of fraud at BLMIS to profit at their clients' expense. Defendant and IXIS-Paris appreciated the high probability of fraud, deliberately ignored it, and worked to prevent others from learning the truth about Madoff. Defendant was incentivized to ignore these indicia because of the risk protections it put in place, as well as strong financial incentives for itself and, as detailed below, its employees.

*First*, Defendant structured the Defendant Deals so that its clients bore the first risk of loss. *Id.* ¶ 172. For example, Defendant structured the Groupement Deal so that it would not suffer any losses unless the fund's value fell by more than half. *Id.* ¶ 173. Because of this structure, Defendant believed it had such little risk that statistical calculations it touted in an October 2006 Approval Memo indicated that the odds that Defendant would lose money on a Defendant Deal were nearly impossible. *Id.* ¶ 179. It strains credulity that Defendant believed a legitimate fund with real-world risks could eliminate its downside exposure to such a degree.

*Second*, any remaining losses would be covered by Defendant's $75 million fraud insurance policy or parent IXIS-Paris's $100 million fraud insurance. *Id.* ¶ 172.

16

*Third*, Defendant's and IXIS-Paris's officers, directors, and employees making and overseeing their investment decisions stood to be personally enriched from entering the Defendant Deals and Tensyr. They also knew once they received their bonuses, they would never be forced to repay them, regardless of what happened with the BLMIS: the entities, not the employees, bore the risk of civil and criminal liability. The Defendant's and IXIS-Paris's fraud insurance policies also covered these officers and directors in the event they were personally sued. *Id.* ¶ 170.

For example, the head of the CIB Division's Capital Markets group, Nicolas Fourt, responsible for IXIS-Paris's and Defendant's structured products group, was paid just over €1.03 million in 2004. *Id.* When the CIB Division attributed its 45% revenue increase from 2004 to 2005 to its hedge fund structured products (like the Defendant Deals), Fourt saw a commensurate compensation increase, rising 47% to almost €1.52 million. *Id.* The CIB Division, moreover, guaranteed Fourt's compensation for 2007 and 2008. *Id.* As such, immediate financial gain was more than sufficient motivation for people like Fourt to blind themselves to Madoff's fraud; they had no personal risk, and Defendant's risk was covered as well.

### G. Defendant, IXIS-Paris, and Natexis Were Significantly Intertwined, and Shared Duties, Board Members, and Risk

Due to overlapping operations and management, including shared board members, Natexis's and IXIS-Paris's knowledge regarding Madoff, BLMIS, and the Feeder Funds is imputed to Defendant.

IXIS-Paris, Defendant, and Natexis shared a common board member, Anthony Orsatelli, who served, among other roles, as Chairman of IXIS-Paris's Executive Board, Defendant's Board Chairman, and as a member of Natexis's board. *Id.* ¶ 83. In October 2003, Orsatelli signed a guarantee on IXIS-Paris's behalf in favor of Defendant. *Id.* ¶¶ 85. As further explained below, the

17

knowledge IXIS-Paris's employees had regarding the Feeder Funds, Madoff, and BLMIS is imputed to Orsatelli.

The CIB Division's member entities operated together under common control and shared operations, including risk management and oversight functions, by common CIB Division committees for new product, credit, and risk approval. These committees reviewed and approved every Defendant Deal and Tensyr. *Id.* ¶¶ 77–85, 100.

As members of the CIB Division, IXIS-Paris and Defendant shared significant duties and information relating to Feeder Fund investments and risk management, and shared numerous officers and directors who served as their agents. *Id.* ¶¶ 86–99. Indeed, large transactions the Defendant entered, like the Defendant Deals, required IXIS-Paris's approval, and Defendant, IXIS-Paris, and their respective employees and officers collaborated on the Groupement Deal and other Feeder Fund transactions. *Id.* ¶¶ 99–100.

### H.    The Initial Transfers BLMIS Made to Groupement Are Avoidable

The Trustee commenced an adversary proceeding against Groupement, its service providers—a variety of entities run as Access and UBS—and others (the "**UBS Avoidance Action**")[18] seeking to avoid and recover approximately $350 million in transfers to Groupement.

The Trustee filed a Proffered Amended Complaint in the UBS Avoidance Action (the "**Proffered UBS Amended Complaint**").[19] The PAC incorporates by reference the Proffered UBS Amended Complaint, which contains allegations that the initial transfers BLMIS made to Groupement are avoidable. PAC ¶ 251.

---

[18] *Picard v. UBS AG (In re BLMIS)*, Adv. Pro. No. 10-04285 (SMB).

[19] *Id.*, (Bankr. S.D.N.Y. June 26, 2015), ECF No. 210, and attached to the PAC as Exhibit B.

18

Among other things, while Access touted its strong due diligence practices, it excluded Madoff from scrutiny. Access excused Madoff from background checks, did not require him to open his office for regular meetings, and allowed him to report trades on a delayed basis by mailing hard copy paper tickets, all in contravention of Access's normal processes.

A Swiss bank that invested in another Access Feeder Fund raised concerns with Access over impossible options volumes, so Theodore Dumbauld, who drafted the Access Madoff Deck's attached memos, investigated and concluded BLMIS could not be trading the options as reported. Access's co-chairman demanded a second opinion and Dumbauld engaged an outside expert, who in just four days identified serious indicia of fraud at BLMIS. The expert recommended redeeming all investments with BLMIS, but Access refused.

## ARGUMENT

## I.    LEGAL STANDARD GOVERNING MOTIONS TO AMEND A PLEADING

Federal Rule of Civil Procedure 15 provides that when a party seeks leave of court to amend its pleading, "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave "should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). As this Court recently explained, "amendments are favored because they 'tend to facilitate a proper decision on the merits.'" *Picard v. Mendelow (In re BLMIS)*, 560 B.R. 208, 221 (Bankr. S.D.N.Y. 2016) (citations omitted).

When evaluating for futility a motion for leave to amend, a court must determine whether the amended pleading could survive a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Fischkoff v. Iovance Biotherapuetics, Inc.*, No. 17-cv-5041, 2018 WL 5074659 (S.D.N.Y. Oct. 18, 2018) (citing *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)). In such a circumstance, a court must accept all factual allegations in the complaint as true and draw

19

all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). "For a complaint to be sufficient, the claim asserted must be one that, in light of the factual allegations, is at least 'plausible.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184–85 (2d Cir. 2012) (citation omitted). A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Mendelow*, 560 B.R. at 225 (quoting *Iqbal*, 556 U.S. at 678).

The burden is on the party opposing leave to amend to demonstrate that one or more of the grounds supporting denial exists. *See, e.g.*, *Blagman v. Apple, Inc.*, No. 12-cv-5453, 2014 WL 2106489, at *3 (S.D.N.Y. May 19, 2014) (bad faith); *Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12-cv-6608, 2014 WL 113728, at *3 (S.D.N.Y. Jan. 13, 2014) (futility); *Margel v. E.G.L. Gem Lab Ltd.*, No. 04-cv-1514, 2010 WL 445192, at *3 (S.D.N.Y. Feb. 8, 2010) (undue prejudice).

Cases involving willful blindness have typically progressed beyond the discovery or trial phases. *United States v. Fofanah*, 765 F.3d 141, 144 (2d Cir. 2014) ("A conscious avoidance instruction permits a jury to find that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming the fact").

Accordingly, this Court should not prematurely weigh the facts to determine whether Defendant was willfully blind. The Trustee has sufficiently alleged facts that would permit this Court to draw the reasonable inference that Defendant suspected "things were not what they seemed … yet shut [its] eyes for fear of finding what [it] would learn . . . ." *United States v. Ramsey*, 785 F.2d 184, 190 (7th Cir. 1986) (citation omitted). This is sufficient to grant the Motion.

## II.    AN INTERVENING CHANGE IN LAW SUPPORTS GRANTING THE MOTION

The Trustee seeks leave to amend his Complaint on the well-accepted grounds of an intervening change in pleading standards. "An intervening change in pleading standards may

justify leave to amend." *Mendelow*, 560 B.R. at 221; *see U.S. ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 889 F.2d 1248, 1255 (2d Cir. 1989) (leave to add affirmative defense granted where it was a "fairly close" question whether defense must be pled, but there was "little legitimate surprise" to plaintiffs, and who suffered no "significant prejudice"); *Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d 350, 366 (S.D.N.Y. 2009) (granting leave to replead following appellate court's clarifying applicable law); *Sys. Fed'n No. 152 v. Pa. R.R. Co.*, 272 F. Supp. 971, 974 (S.D.N.Y. 1967) (finding Rule 15(a) amendments appropriate "particularly for the purpose of interposing an intervening change in the law").

When the Trustee filed the Complaint, Defendant had the burden of asserting and proving the affirmative defense of good faith as to both initial and subsequent transferees under an objective inquiry notice standard. *Merkin II*, 515 B.R. at 138. Four years later, the *Good Faith Decision* substantially revised the pleading standards and burdens for avoidance and recovery actions under Bankruptcy Code sections 548 and 550, holding that the Trustee must plead that the initial transferee knew of or "turned a blind eye to facts that suggest a high probability of fraud." *Picard v. Magnify, Inc. (In re BLMIS)*, 583 B.R. 829, 841 (Bankr. S.D.N.Y. 2018) (collecting cases).[20]

The *Good Faith Decision* further held that the same legal standard and pleading burden for willful blindness applies to recovery of subsequent transfers under Bankruptcy Code section 550(a)(2). 516 B.R. at 22–23. Section 550(a) provides that the Trustee may recover subsequent transfers, subject to the defense that the transfers were received "in good faith," "for value," and without knowledge of the avoidability of the transfer avoided. 11 U.S.C. § 550(b)(1). To meet this

---

[20] In a separate decision, the District Court held that the Trustee need not obtain a fully litigated judgment of avoidance before pursuing a subsequent transfer claim. *SIPC. v. BLMIS (In re Madoff Sec.)*, 501 B.R. 26, 33–34 (S.D.N.Y. 2013).

requirement, the Trustee must similarly allege that the subsequent transferees willfully blinded themselves to a high probability of fraud at BLMIS. *See Legacy*, 548 B.R. at 38 ("The District Court equated lack of good faith under Bankruptcy Code § 548(c) with willful blindness … and stated that the same standard applies to non-investors as well as investors under sections 548(a) and 550(b)").

This Court has recognized that there was good cause in granting motions brought on similar grounds to the instant motion. *See, e.g.*, *Mendelow*, 560 B.R. at 224; *see also* Order, *Picard v. Ceretti*, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Mar. 17, 2014), ECF No. 99 (granting leave to amend based, in part, on change in law and new facts). In particular, as here, where the original complaint has grown "stale due to the unusually drawn out procedural history" of a case, a trustee should be permitted to add new facts and allegations. *See Grand River Enters. Six Nations, Ltd. v. Pryor*, No. 02-cv-5068, 2008 WL 9359652, at *3 (S.D.N.Y. Mar. 17, 2008) (granting leave to add allegations related to extant claims). Leave to amend should, moreover, be permitted as this would be the Trustee's first amendment of the Complaint in this action.

## III. NO FUTILITY, UNDUE DELAY, BAD FAITH, OR UNDUE PREJUDICE EXISTS

### A.    <u>Amending the Complaint Would Not Be Futile Because the Trustee Has Alleged Facts Sufficient to Survive a Motion to Dismiss</u>

The Trustee must plead that either "the subsequent transferee lacked good faith or [] received the subsequent transfer with knowledge that the initial transfer was avoidable." *BNP*, 2018 WL 4833984, at *19. According to this Court, knowledge and good faith are two distinct, but overlapping, elements under section 550(b). *Id*. To plead knowledge, the Trustee must allege that Defendant "possessed knowledge of facts that suggest a transfer may be fraudulent." *Id*. Alternatively, to plead a lack of good faith, the Trustee must "allege that each Defendant willfully blinded itself to facts suggesting a high probability of fraud at BLMIS." *Id*. Willful blindness

22

requires the Trustee to plead that defendants: (1) subjectively believed there was a high probability that a fact existed; and (2) took deliberate actions to avoid learning of that fact. *Id.*

Willful blindness, also known as deliberate ignorance or conscious avoidance, is a well-established and commonly-utilized doctrine in criminal law. *United States v. Reyes*, 302 F.3d 48, 54 (2d Cir. 2002); *accord Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 684 (7th Cir. 2014).  The "ostrich instruction," typically found in the criminal context, "is designed for cases in which there is evidence that the defendant, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings." *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990); *see also United States v. Kozeny*, 664 F. Supp. 2d 369, 388 (S.D.N.Y. 2009), *aff'd*, 667 F.3d 122 (2d Cir. 2011); *Gowan v. Patriot Grp. LLC (In re Dreier LLP)*, 452 B.R. 391, 450 (Bankr. S.D.N.Y. 2011).  Willful blindness "connotes a strong suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire knowledge of its existence." *Merkin II*, 515 B.R. at 140 (emphasis in original).

Here, the Trustee must plausibly allege Defendant was willfully blind to Madoff's "operating a Ponzi scheme, or was not actually trading securities, or that the trades reported in the monthly customer statements were fictitious."  *BNP*, 2018 WL 4833984, at *22.

Willful blindness can rarely be determined as a matter of law. *Fish*, 749 F.3d at 671 ("finding the line between 'willful blindness' and 'reason to know' may be like finding the horizon over Lake Michigan in a snowstorm . . . . In other words, only rarely could that line be drawn as a matter of law") (quotations omitted).

23

Accordingly, this Court should not prematurely determine whether the Defendant was willfully blind. Instead, it should accept the Trustee's allegations as true and make all inferences in his favor, and only determine whether the PAC plausibly alleges Defendant was willfully blind.

### 1. The Trustee Sufficiently Pleads that Defendant Subjectively Believed There Was a High Probability of Fraud at BLMIS

The Trustee sufficiently alleges that Defendant believed there was a high probability that BLMIS was a fraud or that its customer statements reflected fraudulent trades. The Trustee alleges that during its BLMIS-related deals, Defendant developed a concern that BLMIS was not making its purported options trades and that BLMIS was a fraud. Defendant learned as early as 2004 that BLMIS's purported trades were impossible and that BLMIS lacked independent oversight to ensure it was not misreporting trades or misappropriating customer assets. Indeed, Defendant and IXIS-Paris each raised these concerns, which only increased as they learned more about BLMIS over the years of investing with the Feeder Funds. IXIS-Paris was so concerned about both these issues that it plainly lied to the Rating Agencies about them.

These facts closely parallel *Merkin II*. There, the Court found the Trustee adequately alleged the first prong of willful blindness because defendants "saw and appreciated" quantitative facts showing a high probability of fraud at BLMIS. *Merkin II*, 515 B.R. at 141, 144 (finding willful blindness adequately pleaded where Trustee alleged quantitative red flags, and defendant "saw them, understood them and purposely ignored them"). For example, the defendant there knew that the reported volume of BLMIS options transactions was impossible, that BLMIS's returns "were too good to be true," and that BLMIS "used an unusual fee structure" that cost investors (and earned Madoff) millions less than under a "typical fee structure." *Id.* The defendant also knew that BLMIS served as both broker and custodian, meaning there was no third-party oversight of customer assets, and BLMIS's returns "lacked any correlation to the performance of

24

the [S&P Indices]." *Id.* This knowledge led the defendant to recognize "'*some probability*' ... that

BLMIS was a fraud." *Id.* at 140 (emphasis in original). This Court accordingly concluded the

Trustee adequately alleged that the defendant was "aware of facts that raised a high probability

that BLMIS was a fraudulent operation." *Id.* at 141; *Legacy*, 548 B.R. at 33, 35 (first prong of

willful blindness adequately alleged where defendant "strongly suspected that, at a minimum,

BLMIS' option trades were not real" because of an awareness of "market impossibilities and

indicia of fraud" including "impossible option trades," "impossible rates of return," an "unusual

fee structure," a "lack of transparency and controls," and "trades inconsistent with the SSC

strategy"). The same conclusion follows here.

*First*, like in *Merkin II*, Defendant learned that BLMIS purported to purchase an impossibly

large volume of S&P 100 Index options. Defendant reviewed multiple Feeder Funds' trade tickets;

from May 2005 to May 2006, for Groupement alone, BLMIS reported trading in volumes greater

than that of the exchange 95% of the time. PAC ¶ 121. Defendant recognized the impossibility

that BLMIS was trading such a large volume of options because it had significant options expertise

and experience and because dedicated employees reviewed every BLMIS trade ticket. *Id.* ¶¶ 119–

20.

*Second*, two CIB Division analysts determined it was impossible to achieve BLMIS's

reported returns. Indeed, the analysts were convinced that "something else is going on that they

don't understand" and theorized that Madoff gave Sentry favorable returns in exchange for

providing liquidity to the IA Business. *Id.* ¶ 135. Like *Merkin II*, returns that were "too good to

be true" suggested to Defendant that "BLMIS was a fraudulent operation." 515 B.R. at 141.

*Third*, IXIS-Paris admitted BLMIS charged clients far less than the industry norm—

leaving more than $100 million on the table each year because of it—and earned far less money

25

from Sentry than Fairfield did, a highly "unusual fee structure." *See id.* Defendant also knew that it did not understand how BLMIS made money. When BLMIS purported to trade equities, Defendant was unsure if BLMIS charged clients a commission or took the bid/offer spread. PAC ¶107–08. Defendant told its approval committees BLMIS paid itself through the spread, knowing other materials contradicted this explanation. *Id.* Defendant *knew* BLMIS did not charge clients for trading options, an integral portion of Madoff's strategy and an inexplicably altruistic gesture on Madoff's part, considering the millions he could have made annually had he done so. *Id.* ¶ 55.

*Fourth*, Defendant knew BLMIS lacked third-party oversight, a vital industry safeguard to prevent fraud. Defendant and IXIS-Paris recognized BLMIS lacked an independent custodian and could thus put customer assets at risk, in addition to its being a violation of French financial law. *Id.* ¶¶ 113–17. IXIS-Paris raised with Fairfield its oversight concerns but proceeded with the Tensyr transaction without receiving adequate answers. *Id.* ¶¶ 202–09.

This risk was compounded when Madoff later said he traded OTC and not on the exchange, because IXIS-Paris knew Madoff refused to divulge BLMIS's purported OTC options counterparties to anyone. This put the money Defendant and IXIS-Paris invested in the Feeder Funds at risk because they would have no recourse if BLMIS vanished. *Id.* ¶¶ 129–31, 214. Furthermore, Defendant and IXIS-Paris knew federal securities regulations required BLMIS to disclose this information upon request but that it did not do so. Id. ¶¶ 129, 213, 215. IXIS-Paris repeatedly raised with Fairfield the absence of information about counterparties. Id. ¶¶ 210–15. Despite making inquiries, IXIS-Paris could not find any evidence of BLMIS's purported counterparties, thereby increasing Defendant's subjective recognition of the high probability of fraud at BLMIS. *Id.*

*Fifth*, Defendant knew Madoff's strategy was wholly decoupled from its benchmark index, even though they should have been correlated by design. From multiple sources, Defendant knew BLMIS's returns should have been highly correlated with the S&P 100 Index and that the collar should not have materially affected correlation. *Id.* ¶¶ 137–39. BLMIS's returns, however, diverged so greatly from this benchmark that they reflected very low correlation. *Id*. ¶¶ 134–54.

Considering these facts, Defendant, like the defendant in *Merkin II*, was "aware of facts that raised a high probability that BLMIS was a fraudulent operation." 515 B.R. at 141; *see also In re Optimal U.S. Litig.*, No. 10-cv-4095 (SAS), 2011 WL 4908745, at *7 (S.D.N.Y. Oct. 14, 2011) (scienter adequately alleged where defendant raised "critical questions" about risk at BLMIS, including issues that "went to the heart of Madoff's Ponzi scheme because they concerned the existence of the assets supposedly held by Madoff, Madoff's self-custody and Madoff's secrecy"); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 408–411 (S.D.N.Y. 2010) (scienter adequately pleaded where defendants had access to and reviewed BLMIS trade tickets and other documents reflecting trading impossibilities and other indicia of fraud).

### 2.    *Defendant Deliberately Acted to Avoid Confirming Fraud*

The Trustee also establishes the second prong of willful blindness: Defendant took deliberate actions to avoid confirming BLMIS's fraud. "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *New York v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 667 (S.D.N.Y. 2017) (citations omitted). Importantly, "the standard does not require proof of an identifiable 'affirmative act'" and merely refers to a requisite state of mind. *Id.*; *see also Fofanah*, 765 F.3d at 150 (Leval, J., concurring) ("Our statements that the evidence must support a finding that the defendant 'consciously' or 'deliberately' avoided referred to a requisite state of mind, not to a need for affirmative acts" and further determining that a "finding that a

27

defendant's ignorance of incriminating facts was a conscious choice on the defendant's part in no way requires a finding that the defendant took affirmative steps to avoid gaining the knowledge."); *United States v. Dambelly*, 714 F. App'x 87, 88–89 (2d Cir. 2018) (*held*, showing defendant "actively did something to avoid knowledge" not required). Accordingly, where, as here, the Trustee alleges that Defendant was aware of a high probability of critical incriminating facts and consciously decided to enter and consider BLMIS-related deals without confirming its suspicions, the Trustee has sufficiently alleged deliberate avoidance. *See Fofanah*, 765 F.3d at 150 (Leval, J., concurring) (conscious avoidance "means only, as we have repeatedly stated in reciting the standard, that there must be evidence from which a jury could find that the defendant was aware of a high probability of the critical incriminating facts and consciously decided to act without confirming them.").

The PAC alleges that prior to entering the Groupement Deal, Defendant knew of critical incriminating facts that led it to conclude there were significant risks of fraud associated with BLMIS. As discussed above, Defendant suspected BLMIS was not making the trades it purported to make. Yet, Defendant proceeded with the Groupement Deal knowing (i) its clients would be the first exposed to loss; (ii) it had fraud insurance to ensure repayment if its principal was invaded; and (iii) entering into this and the other Defendant Deals enriched Defendant and its employees. PAC ¶¶ 169–75. Such conscious decisions to act without confirming suspicions adequately alleges deliberate avoidance for purposes of willful blindness. *See Fofanah*, 765 F.3d at 150 (Leval, J., concurring).

Upon closing the Groupement Deal in 2003, Defendant continued to turn a blind eye to avoid confirming its suspicions of fraud at BLMIS. The PAC alleges Defendant limited its diligence to a marketing piece, the Access Madoff Deck, which contained multitudes of internal

28

contradictions and controverted other information about BLMIS of which Defendant was or became aware. *See* PAC ¶¶ 102–12, 162–68. Faced with these discrepancies, Defendant conducted no other diligence, as it explicitly told FINRA, even as it entered further Defendant Deals. *Id.*

Even when presented with the opportunity to ask Madoff about its fraud concerns, Defendant did not. Instead, it held a perfunctory meeting with him that lasted under an hour; Defendant probed no areas and asked no questions that might have confirmed its suspicions. *Id.* ¶¶ 164–66. IXIS-Paris went a step further; after learning of myriad indicia of fraud, it blatantly lied to the Rating Agencies by creating stories to deflect hard questions about those same indicia of fraud. This included writing a false narrative about BLMIS's counterparties, Madoff's discretion to trade, how purported trades were verified and by whom, and the safety of IA Business assets.

By 2006 at the latest, Defendant and IXIS-Paris had no interest in asking Madoff the questions concerning the high probability of fraud at BLMIS; IXIS-Paris had crossed into the territory of crafting pure fiction for the investing public. This Court has held that the cessation of due diligence is consistent with willful blindness. *Merkin II*, 515 B.R. at 141–42. There, the Trustee alleged defendants compiled diligence on Madoff that contained significant red flags suggesting a high probability of fraud at BLMIS. *Id.* at 141. Rather than confront suspicions about Madoff, defendants ignored them. *Id.* at 141–42. The Trustee alleged that defendants had made their "peace" with Madoff and ceased asking questions and the Court found willful blindness sufficiently pleaded. *Id.* at 141–42, 146.

Similarly, here, Defendant's and IXIS-Paris's ongoing relationship with the Feeder Funds and BLMIS exposed them to critical facts that subjectively led them to believe there was a high probability BLMIS was not trading or was reporting fictitious trades. Defendant and IXIS-Paris,

however, ceased their due diligence before ever confirming or dispelling their concerns. Unlike in *BNP*, the Trustee's allegations show that Defendant received information that caused it to suspect fraud, and conducted no further investigation. *BNP*, 2018 WL 4833984, at *26.

In *Kingate*, where defendants "fabricated stories to placate" a Feeder Fund's shareholders and "soothe shareholder anxieties," including fabricating a story regarding the number and quality of purported OTC counterparties, this Court found such actions indicated actual knowledge of Madoff's fraud. *Kingate,* 2015 WL 4734749, at *14. Here, IXIS-Paris crafted virtually identical fictions about counterparties (and many other things) to mollify the Rating Agencies' concerns.

Like IXIS-Paris, the *Kingate* defendants "took steps to deflect inquiries directed at Madoff implying that they feared he might be discovered," and turned away curious investors and third parties that might "ask all sort[s] of questions" if they visited BLMIS. *Id.* Scuttling investigations into BLMIS evinces subjective knowledge of fraud. *Id.* at *15.

### 3. *The Initial Transfers Are Avoidable*

The incorporated Proffered UBS Amended Complaint establishes the initial transfers' avoidability. *See BNP*, 2018 WL 4833984, at *18 (finding incorporation of separate complaint setting out allegations regarding initial transfers' avoidability sufficient for subsequent transferee to allege avoidability); *In re Madoff Sec.*, 501 B.R. at 36 (where Trustee's complaint incorporated by reference other complaints against initial transferees, including allegations concerning initial transfers' avoidability, and alleged subsequent transfers' outright avoidability, *held*, Trustee sufficiently pleaded avoidability for purposes of Bankruptcy Code section 550(a)(2)). Here, the Proffered UBS Amended Complaint contains allegations showing Groupement's actual knowledge that are markedly similar to the allegations this Court found compelling in *Kingate*, 2015 WL 4734749, at *15, including that Access employees and consultants reviewed BLMIS's

purported trading activity, concluded it was impossible, and communicated their conclusions to Access's principals, who ignored their findings.

###### 4. *Defendant and its Directors, Officers, and Employees Were Incentivized to Take Excessive Risks and Ignore Suspicions About BLMIS*

As noted, Defendant's risk was limited by (i) the Defendant Deals' structure, which exposed Defendant's customers to the first risk of loss, and (ii) fraud insurance that covered Defendant's investments. These backstops incentivized Defendant to take advantage of great potential upside and protected them (or so they thought) from any risk in investing with BLMIS, despite the warning signs.

The incentives to push forward with the Defendant Deals were strong for Defendant's employees, who sought significant financial bonuses for closing hundreds of millions of dollars' worth of transactions with the Feeder Funds. *See* PAC ¶¶ 169–71. These individuals were aware that the Natixis Group would bear any risk for long after their annual bonuses were paid.

While it is difficult to discern the level of risk a financial institution finds acceptable in exchange for certain rewards, those tradeoffs are more easily defined with respect to individual bankers, who are financially incentivized to take large, short-term risks while effectively shielded from personal liability.

In the financial services industry, compensation is disproportionately based on cash bonuses, awarded stock options, and deferred compensation which are determined anew each year based on an employee's performance during that period.[21]  Wall Street bonuses generally vastly

---

[21] *See* Jian Cai, *et al.*, *Compensation and Risk Incentives in Banking and Finance*, FED. RES. BANK OF CLEV. ECON. COMM. (Sept. 24, 2010), *available at* https://www.clevelandfed.org/newsroom-and-events/publications/economic-commentary/ economic-commentary-archives/2010-economic-commentaries/ec-201013-compensation-and-risk-incentives-in-banking-and-finance.aspx.

exceed base salaries, and such excesses multiply as one rises through a bank's ranks.[22]  Indeed, discretionary bonuses are "the lifeblood of many investment banks."[23]

In any given year, an individual banker stands to make substantial sums of money for identifying and consummating hedge fund investments for clients/structuring hedge fund transactions.  These employees are paid annually based in large measure on the quantity and size of transactions made and related revenues collected.  In this regard, the purpose of these compensation structures is to align the interests of a bank's management with its shareholders by tying annual compensation to the bank's short-term revenues.

While these individual bankers are incentivized each year to bolster their immediate performance, however, there is virtually no chance they will be made to return the salaries and bonuses they earn based on that performance if the relevant loans, investments, or deals subsequently fail, go into default, or are even found to be fraudulent.  Bankers, moreover, are nearly immune from legal risk for forays into fraud: Only a single banker went to jail in the wake of the financial crisis.[24]  Although 49 financial institutions paid $190 billion in fines and

---

[22] National Commission on the Causes of the Financial and Economic Crisis in the United States, *Financial Crisis Inquiry Report*, at 64 (quoting FDIC Chair Sheila Bair, the financial "crisis has shown that most financial-institution compensation systems were not properly linked to risk management [,which] … allows high short-term profits to be translated into generous bonus payments, without regard to any longer-term risks.")

[23] Renae Merle, *Wall Street's average bonus in 2017? Three times what most U.S. households made all year*, WASH. POST (Mar. 26, 2018), *available at* https://www.washingtonpost.com/news/business/wp/2018/03/26/wall-streets-average-bonus-in-2017-three-times-what-most-u-s-households-made-all-year/?noredirect=on&utm_term= .177d2c3cfadd; *see also* OFF. N.Y.S. COMPTROLLER, *The Securities Industry in New York City*, Report 6-2018, at 5 (Oct. 2017) ("[B]onuses remain an important part of the compensation packages paid to securities industry employees.  OSC estimates that bonuses account for about one-third of the average salary of industry employees working in New York City"), *available at* https://www.osc.state.ny.us/osdc/rpt6-2018.pdf.

[24] Jesse Eisinger, *Why Only One Top Banker Went to Jail for the Financial Crisis*, N.Y. TIMES (Apr. 30, 2014), *available at* https://www.nytimes.com/2014/05/04/magazine/only-one-top-banker-jail-financial-crisis.html.

settlements between 2009 and 2015, it was the banks' shareholders—not the individual bankers—who bore that cost.[25]

Because there is, thus, limited downside and unlimited upside for bankers when entering into financial transactions, they are incentivized to take increasing risks.  This is because "compensation structures that heavily reward short-term performance (for example, through bonuses) may encourage managers to take opportunities that would boost immediate profitability but risk future financial health.  After all, managers do not need to stay with one firm forever."[26]

Leading up to the 2008 market crash and the revelation of Madoff's fraud, this combination of rewards for shorts-term performance plus lack of longer-term accountability proved particularly lucrative to persons whose job it was to create and sell financial products.  Recent estimates indicate that the average bonus for securities industry employees who worked in New York in the last twenty years was the greatest in 2006, immediately preceding the financial crisis.[27]

William C. Dudley, the President and Chief Executive Officer of the Federal Reserve Bank of New York until 2018, stressed that these "misaligned incentives contributed greatly to the financial crisis and continue to affect bank conduct and behavior."[28]  Dudley derided "[c]ompensation practices at financial firms that rewarded volume and short-term performance

---

[25] William D. Cohan, *How Wall Street's Bankers Stayed Out of Jail*, THE ATLANTIC (Sept. 2015), *available at* https://www.theatlantic.com/magazine/archive/2015/09/how-wall-streets-bankers-stayed-out-of-jail/399368/.

[26] Cai, *supra*, n.21; *see also* Andrew G. Haldane, *Control rights (and wrongs)*, BANK OF ENGLAND (Oct. 24, 2011) (describing banks' "interesting incentives … [b]ecause volatility increases the upside return without affecting the downside risk.  If banks seek to maximise shareholder value, they will seek bigger and riskier bets"), *available at* https://www.bis.org/ review/r111026a.pdf.

[27] *See* OFF. N.Y.S. COMPTROLLER, *New York City Securities Industry Bonus Pool* (Mar. 26, 2018), *available at* https://www.osc.state.ny.us/press/releases/mar18/wall-st-bonuses-2018-sec-industry-bonus-pool.pdf.

[28] William C. Dudley, *The Importance of Incentives in Ensuring a Resilient and Robust Financial System*, FED. RES. BANK OF N.Y. (Mar. 26, 2018), *available at* https://www.newyorkfed.org/newsevents/speeches/ 2018/dud180326.

over longer-term, sustainable returns," and cited several examples of "costly breakdowns that were driven, in part, by poor incentives" for bank employees.[29]

This was also true for Defendant, as it sought to grow its revenue from structured products then and employees and executives made aggressive moves to increase their compensation.  For example, as noted above, the executive overseeing Defendant's and IXIS-Paris's structured products arm saw his compensation grow equally with that of this division, which was responsible for the Feeder Fund deals Defendant and IXIS-Paris entered. PAC ¶ 170.

Accordingly, even if Defendant itself was not predisposed to risk investing in something it suspected was a fraud, with unverifiable trades, individual bankers stood to gain from the Defendant Deals' upside and could not lose if they failed or BLMIS was engaged in fraud.

### 5.    *IXIS-Paris's Knowledge Is Imputed to Defendant*

As the PAC describes, Natexis's and IXIS-Paris's knowledge regarding BLMIS and Madoff is imputed to Defendant because as members of the CIB Division and the SFPG, these entities shared common control and directors, an intertwined committee and corporate structure, and information, responsibilities, and overlapping roles as part of various considered and executed Feeder Fund deals.

Responsible for all structured hedge fund products, the SFPG highlights the Natixis Group's goal of creating a unified, cross-entity platform for all its CIB Division entities, including IXIS-Paris and Defendant, to share information, duties, responsibilities, financial obligations, and comprehensive risk management functions for its structured products businesses. PAC ¶ 87.  The Feeder Fund deals were no exception.

---

[29] *Id.*; *see also Financial Crisis Inquiry Report*, *supra* n.22, at 291 (regarding Bear, Stearns' failure, "[i]ts executive and employee compensation system was based largely on return on equity, creating incentives to use excessive leverage and to focus on short-term gains such as annual growth goals").

Key Defendant and IXIS-Paris executives served in management positions for the cross-entity SFPG. Eric Raiten, Defendant's chief financial engineering and managing director, served as the SFPG's U.S. head, while Laurent Dubois, IXIS-Paris's Executive Committee member and head of Structured Products and Alternative Assets, served as its global head. *Id.* ¶¶ 88–89. Other SFPG members included, among others: Emmanuel Lefort, the IXIS-Paris senior manager who, along with Dubois, was responsible for the Tensyr deal; Bernard Abdo, a Defendant structurer who served as Access's primary contact for all proposed and executed SFPG deals involving Groupement and other Access Feeder Funds; and Sophie Souliac Deschamps, the Natixis Group's co-head of Structured Alternative Investments. *Id.* ¶¶ 88–96.

Together, the SFPG members shared information across offices and Natixis Group entities, collaborating to evaluate opportunities and the risk associated with various structured product transactions, including those involving the Feeder Funds. *Id.* ¶¶ 87–100. For example, in 2003, Defendant began pursuing a deal with Feeder Fund Ascot Partners, L.P., run by J. Ezra Merkin, under which IXIS-Paris would have provided leverage and then assigned the loan to Defendant. *Id.* ¶¶ 91–93. In connection with this potential deal, Merkin hosted a meeting with Raiten, Souliac Deschamps, and employees of other Defendant affiliates. *Id.* ¶ 91. Ultimately, this deal died when Madoff refused to give Merkin his blessing; however, IXIS-Paris used the institutional knowledge and experience the SFPG garnered to successfully structure a nearly identical deal two years later: Tensyr. *Id.* ¶ 93. And in 2004, having helped complete the Groupement Deal for Defendant, SFPG member Bernard Abdo assisted IXIS-Paris in formulating a potential Access Feeder Fund deal of its own, wherein IXIS-Paris would issue notes and Defendant would supply leverage. *Id.* ¶ 94. During negotiations, Abdo served as the point person between Access and executives at IXIS-

Paris, including Souliac Deschamps, facilitating requests for and receipt of information IXIS-Paris needed from Access to vet the deal. *Id.* ¶¶ 94–96.

Defendant and IXIS-Paris were intertwined in other ways.  In addition to the SFPG, they jointly participated in and shared information on the risk, credit, and compliance committees as part of the CIB Division. *Id.* ¶¶ 78–82, 84, 114, 166.  IXIS-Paris's compliance department vetted the Groupement transaction and gave its approval. *Id.* ¶ 89.  IXIS-Paris also guaranteed Defendant's payment obligations (in an agreement Orsatelli executed just days before the Groupement Deal closed) for all deals into which Defendant entered, including the Defendant Deals. *Id.* ¶ 85.  SFPG members included on their signature blocks their affiliation with that group and Defendant's marketing materials boasted about IXIS-Paris's credit rating to assure Defendant's potential clients of the safety IXIS-Paris would provide. *Id.* ¶ 80.

Defendant and IXIS-Paris also shared directors and decision-makers, authorized signatories who could bind Defendant and sanction its fund transfers and payments included executives of both Defendant and IXIS-Paris. *Id.* ¶¶ 82–86, 99–101.  Orsatelli, Chariman of Defendant's Board and IXIS-Paris's Executive Board and a member of Natexis's board, also "ma[de] decisions regarding the Bank's principal commitments, monitor[ed] developments in loans outstanding, and conduct[ed] an annual revision of risk limits." *Id.* ¶¶ 82–83.  Similarly, Nicolas Fourt, the co-head of IXIS-Paris's front office and a member of IXIS-Paris's executive committee, also served as a member of Defendant's board of directors. *Id.* ¶ 83.  The U.S. and global heads of the SFPG reported directly to Fourt. *Id.* ¶ 88.

The Natixis Group's Credit Risk department oversaw all risks and set lending limits based on the various business lines, not legal entities in those lines. *Id.* ¶ 81.  This department reported directly to Orsatelli and prepared daily and weekly reports for his review. *Id.* ¶ 82.

Knowledge obtained by Orsatelli and Fourt in this way is imputed to Defendant because though "a court must respect legal formalities," a dual agent does not "act[ ] … with blinders on as to facts learned" at another entity. *Optimal*, 2011 WL 4908745, at *8 (imputing knowledge of red flags at BLMIS from investment manager to manager-controlled entity where manager's CEO was also director of controlled entity because, as controlled entity's board member, he "brought with him the knowledge that he acquired as CEO of" the investment manager); *see also Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) (holding the "knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation" (citations omitted)); *United States v. Josleyn*, 206 F.3d 144, 159 (1st Cir. 2000) (affirming imputation of knowledge by company's director to company where "he had authority to act for the company and … was acting in that capacity with the interests of the corporation in mind").[30]

And even after deals had closed, SFPG members shared information and communicated when issues or concerns arose.  For instance, Defendant provided IXIS-Paris with a copy of the Access Madoff Deck, which IXIS-Paris in turn supplied to Fairfield. PAC ¶ 219.   And when concerns about Madoff's impossible reported option trading volumes arose, Raiten consulted with his SFPG colleagues at IXIS-Paris on the matter. *Id.* ¶¶ 124–27.

Based on these factual allegations, the Trustee should have the opportunity to prove by evidence the knowledge of and imputation to Defendant.  *See Picard v. Merkin (In re BLMIS)*, 440 B.R. 243, 260 (Bankr. S.D.N.Y. 2011) (on a motion to dismiss "where the Trustee has not had the opportunity to conduct discovery concerning the relationships between the Moving Defendants,

---

[30] An agent's knowledge is not imputed under the "adverse interest exception" if the agent "totally abandons his principal's interests and acts entirely for his own or another's purpose." *Kingate*, 2015 WL 4734749, at *15 (citing *Merkin II*, 515 B.R. at 146–47).  No such abandonment has occurred here, but where the principal is harmed "from the discovery of the fraud, rather than the fraud itself, the adverse interest exception does not apply." *Id.*

the question is not whether the Trustee has proved the existence of an agency relationship, merely whether he should have the chance to do so" (citations omitted)).  As the complex facts of this case demonstrate, imputation is generally inappropriate for determination as a matter of law prior to discovery. *See, e.g.*, *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1312 (S.D.N.Y. 1999) (holding imputation of director's knowledge to company "is a matter of fact that cannot be determined on a motion to dismiss"); *accord SIPC v. R.D. Kushnir & Co.*, 274 B.R. 768, 782 (N.D. Ill. 2002) (holding imputation arguments require "a fact intensive review of the record following trial" and are thus the type of argument inappropriate to address on a motion to dismiss); *Kirschner v. Wachovia Capital Markets, LLC (In re Le-Nature's Inc.)*, No. 08-cv-1518, 2009 WL 3571331, at *6, n.12 (W.D. Pa. Sept. 16, 2009) (because imputation questions turn on facts, "to grant a motion to dismiss without discovery in the matter would be premature").

**B.      No Undue Delay or Bad Faith Can Be Shown Where Defendants Acquiesced to the Trustee Waiting to Amend Until Legal Standards Were Resolved**

There is no evidence of undue delay, bad faith, or undue prejudice.  Although it has been eight years since the Trustee filed his complaint, the mere passage of time, in the absence of bad faith, does not warrant a denial of leave to amend. *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay … absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.").

The Trustee did not unduly delay or act in bad faith in bringing this Motion now.  The timing of this request merely reflects the procedural history of this liquidation and the intentions of the parties.  Defendant and its affiliates agreed to adjourn the litigation of their motion to dismiss the complaint until dispositive legal issues were resolved on a case-wide basis, including the Good Faith and Extraterritoriality Issues.  The parties participated in the litigation of those issues and, in the meantime, stipulated to holding this case in abeyance pending the Court's determination of

38

those issues. Therefore, the Trustee appropriately seeks to amend his pleading now that legal issues have been decided and this Court has determined no additional discovery will be permitted prior to amendment. *See Mendelow*, 560 B.R. at 223 (holding the "Trustee should not be penalized and the defendants should not be rewarded for a delay in which everyone acquiesced").

### C.    Defendants Cannot Demonstrate Undue Prejudice

While prejudice "has been described as the most important reason for denying a motion to amend, only *undue* prejudice warrants denial of leave to amend." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016) (citations omitted) (emphasis in original). To ascertain whether undue prejudice exists, courts consider whether the proposed amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Mendelow*, 560 B.R. at 223 (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).

Undue prejudice is a high bar, and the party opposing amendment has the burden of proving "substantial prejudice would result were the proposed amendment to be granted." *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, No. 16-cv-5393 (KMW), 2018 WL 1115517, at *2 (S.D.N.Y. Feb. 26, 2018) (quotation and citation omitted). Defendant "must show actual prejudice, not the possibility of prejudice." *Mendelow*, 560 B.R. at 224. Wright & Miller, 6 Fed. Prac. & Proc. Civ.

Prejudice is highly unlikely to be found where, as here, the case is in the early stage of the proceedings. *See, e.g.*, *State Teachers Ret. Bd.*, 654 F.2d at 856. Whether a party had prior notice of the content of the amended complaint and whether the amended complaint considers the same transaction as the claims in the original pleading are central to analyzing prejudice. *See M.E.S., Inc. v. Safeco Ins. Co. of Am.*, No. 10-cv-02798 (PKC)(VMS), 2014 WL 2931398, at *3 (E.D.N.Y.

June 27, 2014) ("[Defendant] cannot claim to be surprised… [or] unprepared to swiftly formulate a defense" to amended pleading's new claims primarily elaborating upon prior pleading).

The Trustee seeks to amend now because the *Good Faith Decision* shifted the pleading burden and changed the legal standard; and the *District Court* and *Bankruptcy Court Extraterritoriality Decisions* reduced certain claims, transfers, and parties.

Here, granting leave to amend would cause no prejudice, much less the undue prejudice that a party opposing leave has the burden of demonstrating. Defendant knew of the Trustee's intention to amend the complaint to adhere to the changed standards. The parties entered several stipulations to extend Defendant's time to respond to the Complaint. Natixis Docket, ECF Nos. 13, 15–17. After filing their motions to dismiss,[31] this case's original defendants moved to withdraw the reference with respect to various issues in late 2011[32] and early 2012.[33] Pending the resolution of certain dispositive legal issues, the parties (including Defendant) entered more than 30 stipulations extending the Trustee's time to respond to the motions to dismiss. *See e.g.*, Natixis Docket, ECF Nos. 37, 76, 104, 134, 161. The parties also entered three so-ordered stipulations specifically allowing the Trustee to file this Motion and the PAC.[34] Accordingly, Defendant agreed to the Trustee's waiting to amend until relevant legal standards were resolved.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests the Court grant the Trustee's Motion for an order allowing him to amend the Complaint, and any and all other relief the Court deems just and proper.

---

[31] Natixis Docket, (Bankr. S.D.N.Y. July 15 & Sept. 1, 2011), ECF Nos. 21 & 24.

[32] Natixis Docket, (Bankr. S.D.N.Y. Dec. 20, 2011), ECF No. 34.

[33] *Picard v. Natixis*, No. 11-cv-9501 (JSR) (S.D.N.Y. Jan. 10, 2012), ECF No. 6.

[34] *See, e.g.*, Natixis Docket, (Bankr. S.D.N.Y. Dec. 7, 2018), ECF No. 167.

Dated: December 28, 2018          By:    */s/ Catherine E. Woltering*
      New York, New York

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Catherine E. Woltering
Email: cwoltering@bakerlaw.com
Jonathan D. Blattmachr
Email: jblattmachr@bakerlaw.com
Matthew B. Friedman
Email: mfriedman@bakerlaw.com

**Baker & Hostetler LLP**
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
Douglas A. Vonderhaar
Email: dvonderhaar@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and the
Chapter 7 Estate of Bernard L. Madoff*

41