# **EXHIBIT 4**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-01364 (SMB) |
| Plaintiff, | |
| v. | |
| HSBC BANK PLC, et al., | |
| Defendants. | |

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE

Presenting his compliments to the appropriate judicial authorities of Austria, this Request is made by The Honorable Judge Stuart M. Bernstein, of the United States Bankruptcy Court for the Southern District of New York, which is located at One Bowling Green, New York, NY 10004-1408, United States of America to the Bundesministerium für Verfassung, Reformen, Deregulierung und Justiz, Museumstraße 7, 1070 Vienna, Austria.

Specifically, the Court requests assistance in obtaining testimonial and documentary evidence from Marius Steurer, a representative of **steurer "CC" GmbH (FN 241556f)**.

A copy of the transcript of the examination and the certification of the Bundesministerium für Verfassung, Reformen, Deregulierung und Justiz should be returned to the plaintiff's legal counsel, Oren J. Warshavsky, Baker & Hostetler LLP, 45 Rockefeller Plaza, New York, NY 10111, United States (on behalf of the Honorable Stuart M. Bernstein).

In light of the international law and comity that exists between the United States and Austria, the undersigned applicant respectfully submits this request.

## INTRODUCTION

This Request seeks evidence for use in the above-named proceeding pending before this Court, which alleges claims arising under the Securities Investor Protection Act of 1970, the United States Bankruptcy Code, and the New York Debtor and Creditor Law. The purpose of this Request is to obtain documentary and testimonial evidence from Marius Steurer for use as evidence in a trial of this proceeding in this Court. The Court has not yet made a determination of the merits of the plaintiff's, Irving H. Picard's, claims and allegations asserted in this action, which are set forth below.

## SECTION I

1. **SENDER:**

> Oren J. Warshavsky, Esq.
> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, New York

> *As authorized by:*

> The Honorable Stuart M. Bernstein
> United States Bankruptcy Judge
> United States Bankruptcy Court for the Southern District of New York
> One Bowling Green
> New York, NY 10004-1408

2. **CENTRAL AUTHORITY OF REQUESTED STATE**

Bundesministerium für Verfassung, Reformen, Deregulierung und Justiz
Museumstraße 7
1070 Vienna
Austria

3. **PERSON TO WHOM THE EXECUTED REQUEST IS TO BE RETURNED**

*Plaintiff's Legal Counsel:*

Oren J. Warshavsky, Esq.
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111

*On behalf of:*

The Honorable Stuart M. Bernstein
United States Bankruptcy Judge
United States Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, NY 10004-1408

## SECTION II

4. **SPECIFICATION OF DATE BY WHICH THE REQUESTING AUTHORITY REQUIRES RECEIPT OF THE RESPONSE TO THE LETTER OF REQUEST**

A response is requested as soon as possible in order to ensure that the evidence may be obtained before the deadline for all fact discovery to be completed in the case, which is currently July 3, 2019.

5. **a. REQUESTING JUDICIAL AUTHORITY:**

The Honorable Stuart M. Bernstein
United States Bankruptcy Judge
United States Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, NY 10004-1408

**b. TO THE COMPETENT AUTHORITY OF THE REPUBLIC OF AUSTRIA**

Bundesministerium für Verfassung, Reformen, Deregulierung und Justiz
Museumstraße 7
1070 Vienna
Austria

**c. NAME OF THE CASE AND ANY IDENTIFYING NUMBER**

*Picard v. HSBC Bank plc, et al., Adv. Pro. No. 09-01364 (SMB)*

**6.    NAMES AND ADDRESSES OF THE PARTIES AND THEIR REPRESENTATIVES:**

| Plaintiff: Irving H. Picard<br>Trustee for the Substantively Consolidated Liquidation of Bernard L. Madoff Investment Securities, LLC | Legal Representatives<br><br>Oren J. Warshavsky, Esq.<br>Baker & Hostetler LLP<br>45 Rockefeller Plaza<br>New York, New York 10111<br>United States of America<br>Tel: +1.212.589.4200<br>Fax: +1.212.589.4201<br>Email: owarshavsky@bakerlaw.com<br><br>Dr. Ferdinand Graf<br>Graf & Pitkowitz Rechtsanwälte GmbH,<br>Stadiongasse 2,<br>1010 Vienna<br>Austria<br>Tel: (01) 401-17-0<br>Fax: (01) 401-17-40<br>Email:  f.graf@gpp.at |
| --- | --- |

| Defendant: Alpha Prime Fund Limited<br>A corporation formed under the laws of Bermuda with a registered address at Bank of Bermuda Building, 6 Front Street, Hamilton HM11 | Legal Representatives<br><br>Dr. Christian Hausmaninger<br>Hausmaninger Kletter<br>Franz Josefs-Kai 3<br>1010 Vienna<br>Austria<br>Tel: (01) 513-95-40<br>Fax: (01) 513-94-40-12 |
| --- | --- |

|  | Todd Duffy<br>DuffyAmedeo LLC<br>275 7th Ave.<br>New York, New York 10001<br>United States of America<br>Tel: +1.212.729.5832<br>Fax: +1.212.208.2437 |
|---|---|
| **Persons to Be Examined:**<br><br>Marius Steurer<br>DOB 30 July 1970<br>Kaudersstraße 65,<br>1220 Vienna<br>Austria | **Legal Representative**<br><br>Unknown |

## 7.  NATURE AND PURPOSE OF THE PROCEEDINGS AND SUMMARY OF THE FACTS:

### A.  NATURE OF THE PROCEEDINGS

This adversary proceeding arises from the massive Ponzi scheme orchestrated by Bernard L. Madoff ("Madoff").  Madoff was the sole owner, founder, chairman, and chief executive officer of Bernard L. Madoff Investment Securities ("BLMIS").  Through BLMIS, Madoff received billions of dollars in investments from customers and generated account statements purportedly showing that securities were purchased and sold on behalf of these customers. Although Madoff seemingly produced consistent investment returns for his customers, no securities were purchased or sold on any customer's behalf.  It was a Ponzi scheme: Madoff satisfied his customers' redemption requests with the deposits of other customers.  This scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

On December 11, 2008, Madoff was arrested by federal agents for his violations of criminal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. In March 2009, Madoff admitted to having operated a Ponzi scheme and pleaded guilty to all charges filed against him. In June 2009, Madoff was sentenced to 150 years in prison.

On December 15, 2008, Judge Stanton of the United States District Court for the Southern District of New York appointed Irving H. Picard ("Trustee") as Trustee for the liquidation of BLMIS pursuant to the United States Securities Investor Protection Act of 1970 ("SIPA"). Under SIPA, the Trustee has the general powers of a bankruptcy trustee relating to the recovery and distribution of customer property. Pursuant to these powers, the Trustee is responsible for recovering and distributing customer property, assessing claims against BLMIS, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors.

As part of his statutory duty to recover customer property, the Trustee is empowered under the United States Bankruptcy Code (the "Bankruptcy Code") to bring "avoidance actions" to recover transfers of funds made by BLMIS prior to its collapse. *See* 11 U.S.C. §§ 544, 547, 548(a)(1), 550. The term "avoid" means to undo a transfer so that it may be returned to the BLMIS estate for equitable distribution to BLMIS's customers. By this and some one thousand other avoidance actions the Trustee has brought in connection with the liquidation of BLMIS, the Trustee seeks to maximize the recovery of fraudulently transferred funds and, consequently, the ultimate distribution to Madoff's defrauded customers, which is the purpose of this action. All sums recovered by the Trustee are distributed to customers with approved customer claims; neither the Trustee nor his counsel is compensated from the fund of customer property.

**B.**    **SUMMARY OF THE FACTS AND ALLEGATIONS PLEADED BY THE TRUSTEE**[1]

In *Picard v. HSBC Bank plc, et al.*, Adv. Pro. No. 09-01364 (SMB) (Bankr. S.D.N.Y.), the Trustee seeks to avoid and recover the initial transfers BLMIS made to defendant Alpha Prime Fund Ltd. ("Alpha Prime"), a Bermuda fund whose day-to-day operational tasks were performed in Austria. The Trustee also seeks to recover transfers made by BLMIS to other funds invested with BLMIS that were subsequently transferred to other defendants in the United States, including defendant HSBC Bank U.S.A., N.A. and certain of its affiliates. These claims are based on both federal law and sections 273, 274, 275, 276, 276-a, 278, and 279 of New York State's Debtor and Creditor Law, which provide the Trustee with remedies similar to those provided by the Bankruptcy Code and are made applicable to bankruptcy cases under Section 544 of the Bankruptcy Code.

The Trustee also asserts claims to disallow, pursuant to U.S. statutory law, specifically 11 U.S.C. § 502(d), and to equitably subordinate, pursuant to 11 U.S.C. §§ 510(c) and 105(a), portions of Alpha Prime's customer claim.

Alpha Prime is a BLMIS feeder fund operated by sophisticated directors and service providers. The Trustee alleges that these directors and service providers either knew that BLMIS was engaged in fraud or were aware of evidence strongly indicating fraud. This alleged knowledge or willful blindness notwithstanding, the Trustee contends that Alpha Prime, its managers, directors, and service providers, worked as a single-purpose entity whose primary goal was to generate fees by investing and/or facilitating the investment of hundreds of millions of dollars with BLMIS. Alpha Prime received transfers of Customer Property, as defined by

---

[1] The Court's summary is derived from the plaintiff's allegations in its Proffered Second Amended Complaint and do not necessarily denote the Court's views of the allegations or reflect findings by this Court.

SIPA, of approximately $83,170,000.  Through a partial settlement, Trustee avoided and recovered the transfers Alpha Prime received in the two years prior to the filing of the SIPA proceeding.  The partial settlement allowed the Parties to litigate the Trustee's claims to avoid and recover transfers made to Alpha Prime in the six years prior to the filing of the SIPA Proceeding and the treatment—the subordination, disallowance, or, if allowed, the priority—that Alpha Prime's customer claim and claims under section 502(h) of the Bankruptcy Code should be given.  These claims will affect the value of the BLMIS estate and the amounts available to the Trustee for equitable distribution to BLMIS customers with allowed claims.

In the early 1990s, Madoff turned to European investors to augment the flow of funds into his scheme.  The Trustee alleges that, among others, Sonja Kohn, an Austrian investment professional with personal and professional ties to Madoff, helped attract new European investors to BLMIS.  In 1993, Kohn was hired as an advisor and consultant for Unicredit Bank Austria AG ("Bank Austria").  The Trustee further contends that Kohn, together with Stefan Zapotocky of Bank Austria, established the Primeo Fund ("Primeo"), which was ultimately (through direct and indirect channels) invested exclusively with BLMIS.  Zapotocky's Bank Austria colleagues, Peter Fischer and Ursula Radel-Leszczynski, were appointed to Primeo's board of directors along with Kohn and Zapotocky.  Primeo's apparent success led to the establishment of a network of feeder funds whose sole purpose was to direct investments into BLMIS.  Alpha Prime was one such fund.

In June 2003, Alpha Prime opened BLMIS customer account 1FR097, and began soliciting investments.  The Trustee alleges that Alpha Prime and Primeo shared not only a common broker and investment strategy, but were founded, serviced, and managed by the same individuals and entities.

Primeo and its service providers delegated many of their duties to BLMIS, concentrating in BLMIS the functions of investment adviser, custodian, and broker-dealer responsible for initiating and executing securities trades.  A 2002 sub-custody agreement effectively transferred control of Primeo's assets to Madoff.  Primeo's directors and service providers were, nevertheless, still responsible for ensuring the integrity of the fund's investments, assessing the fund's performance, and ensuring that BLMIS's investment strategy aligned with the fund's objectives.

The Trustee alleges that as early as 1995, Bank Austria executives presented Primeo's directors and officers with evidence that Madoff was engaged in fraud.  In 1995, a high-ranking Bank Austria executive ("BA Executive No. 1") visited Madoff in New York.  During that meeting, the Trustee contends that Madoff explained that he used data from his market-making clients to observe the direction of the market and achieve his returns.  After meeting with Madoff, BA Executive No. 1 purportedly urged Kohn and Zapotocky to refrain from investing with BLMIS because its returns were based on Madoff trading ahead of his clients' investments—an illegal strategy.

In 1996, another Bank Austria employee ("BA Executive No. 2") allegedly met with Madoff in New York.  During this visit, Madoff purportedly explained that he enticed large institutional investors to use his market making business by not charging those investors a fee. With those institutional investors in the fold, Madoff could advantage his own trades over those of his clients by sequencing trade execution.  Upon his return, the Trustee alleges that BA Executive No. 2 told Kohn and another Bank Austria supervisor that he was convinced Madoff was engaged in illegal front running.

The Trustee contends that by June 2001 evidence of Madoff's involvement in securities fraud was known by Primeo's board of directors.  An internal memorandum prepared by a Bank Austria affiliate, and disseminated to Primeo's directors, summarized discussions with Madoff and Frank DiPascali during meetings in New York on March 21, 2000 and June 14, 2001. DiPascali's description of Madoff's investment strategy, specifically as it applied to Primeo included the following:

> maybe we can predict only the next 10 or 15 minutes but we watch the market continuously and if we get an order to buy a large stake of an equity which is quoted currently at 40$ with a limit up to 44$, there can't be anything wrong with buying [sic] same stock for our portfolio at 41$ or 42$.

At the same time, the Trustee contends, Primeo's customer statements were replete with data showing Madoff's trading strategy to be impossible.  These impossible transactions, the Trustee alleges, were reported on Primeo's customer statements which were provided to the fund's directors and service providers, all of whom were sophisticated financial professionals, and were thus aware of these impossible trades.

The Trustee further alleges that additional evidence of Madoff's illegal activity was known to Primeo's directors.  In 2002, a Bank Austria executive ("BA Executive No. 3") attempted to replicate Madoff's strategy to see whether he could replicate Madoff's results.  The test results yielded returns of only one to two percent annually, whereas Madoff purported to yield returns as high as eighteen percent annually.   The Trustee further contends that when BA Executive No. 3 approached Kohn with the test results, Kohn assured the executive that even if Madoff's results were obtained through illegal activity, such conduct went undetected by authorities in the United States and was therefore not a cause for concern.

The Trustee contends that, despite persistent warning signs and "red flags" concerning BLMIS, Radel-Leszcynski, Kohn, Zapotocky, and others created Alpha Prime for the purpose of

collecting money for exclusive investments with BLMIS.  As with Primeo, Alpha Prime's account opening documents gave BLMIS complete authority to buy, sell, and trade in U.S. securities for Alpha Prime.  Alpha Prime also shared five directors with Primeo, including Kohn, Zapotocky, Radel-Leszcynski, Fischer, and Nigel Fielding.  Alpha Prime's directors, managers and service providers worked together as divisions of a single organization, just as they did with Primeo.

The Trustee contends that by the middle of 2005, Alpha Prime and its directors accordingly knew that, among other things:

      (a)     BLMIS's returns could not be replicated and appeared to be a product of illegal front running;

      (b)     BLMIS's operational structure was vulnerable to fraud because it subverted checks and balances;

      (c)     BLMIS customer statements showed impossible options trades; and

      (d)     BLMIS customer statements showed trades outside published price ranges.

## SECTION III

### 8.  EVIDENCE TO BE OBTAINED AND PURPOSE

Alpha Prime's knowledge of, or willful blindness to, BLMIS's fraud is a central element of the Trustee's claims to avoid and recover transfers to Alpha Prime and is a consideration central to the Trustee's claims to disallow and equitably subordinate a portion of Alpha Prime's customer claim and claims under section 502(h) of the Bankruptcy Code.  The Trustee contends that Alpha Prime acted through its officers and directors, as well as through its service providers, which acted as agents to Alpha Prime, and accordingly acquired knowledge of Madoff's fraud through these officers, directors, and agents.

11

In furtherance of the claims and defenses in the action, the parties have exchanged and produced evidence for use at trial pursuant to the U.S. Federal Rules of Civil Procedure. During the course of these proceedings, evidence emerged that the server hosting Alpha Prime's email system allegedly failed at some point in 2007, before the revelation of Madoff's fraud. Alpha Prime has disclosed that an Austrian company called Project Partners Consulting & Managementgesellschaft mbH ("Project Partners") hosted the Alpha Prime server and provided other information technology services to Alpha Prime. Project Partners—in conjunction with another Austrian information technology services company, steurer "CC" GmbH ("Steurer")—purportedly attempted to repair the server and recover information from it.

The Trustee contends that Alpha Prime's account of both the timing and the circumstances surrounding the alleged failure of the email server has changed several times. The Trustee further contends that although Alpha Prime was aware of the possibility that it may be the subject of an avoidance action by the Trustee—which triggers a binding obligation under applicable state and federal law to preserve evidence—Alpha Prime terminated its relationship with Project Partners in late 2008 or early 2009, after the revelation of Madoff's fraud, without directing Project Partners to preserve the Alpha Prime documents. This, in the Trustee's view, indicates that records might have been destroyed in bad faith on behalf of Alpha Prime or under the direction of persons acting for (or whose actions are attributable to) Alpha Prime. Considering the information currently known to the Trustee, the Trustee contends that the server contained evidence of Alpha Prime's knowledge of Madoff's fraud.

By this Request, the Bankruptcy Court seeks testimony regarding (1) the alleged server failure; (2) the relationship and interaction between persons acting for (or whose actions are attributable to) Alpha Prime, on the one hand, and persons acting for Project Partners and Steurer

on the other hand; and (3) any efforts to collect and preserve any electronically stored information affected by the server failure and the events that follow. Such testimony is probative of whether Alpha Prime took the necessary steps to preserve evidence, as required by law.

The evidence sought in this Letter of Request is intended for use at trial as evidence in support of the Trustee's pleadings and claims to avoid fraudulent transfers to Alpha Prime and to subordinate or disallow Alpha Prime's customer claim. The Trustee seeks to depose Mr. Blahut because Mr. Blahut is Project Partners's managing director and is believed to have first-hand knowledge of the evidence sought in this application.

The Trustee has informed Alpha Prime's counsel of his intent to conduct an examination of persons acting for and on behalf of Steurer. Additionally, in subsection 13 below, this Letter of Request requests, in relevant part, that Alpha Prime's counsel be afforded the opportunity to ask follow-up questions at the examination in order to give Alpha Prime a full and fair opportunity to challenge the Trustee's allegations.

While this Court expresses no view as to the merits or otherwise of the amended complaint or related motions in the above-captioned case, it believes the evidence sought here will be relevant to and either support or contradict material facts relevant to the amended complaint and motions.

## 9. IDENTITY AND ADDRESS OF PERSON TO BE EXAMINED

Marius Steurer
Kaudersstraße 65
1220 Vienna
Austria

### 10. STATEMENT OF THE SUBJECT MATTER ABOUT WHICH THE PERSON WILL BE EXAMINED

The Requests includes a request for the oral examination under oath of Mr. Marius Steurer.  A copy of the specific questions to be put the witness together with a schedule of defined terms is attached hereto as Exhibit A.

### 11. DOCUMENTS AND OTHER EVIDENCE TO BE OBTAINED

None.

### 12. REQUIREMENT THAT THE EVDIENCE BE GIVEN UNDER OATH OR AFFIRMATION

This Court requests that Mr. Steurer's testimony be taken under oath.  Pursuant to United States Federal Rule of Evidence 603, this Court requests that the witness, Mr. Steurer, be required to declare that he will testify truthfully, by oath or affirmation administered in a form calculated to awaken his conscience and impress his mind with the duty to do so.  Specifically, the Court requests that the duly appointed official require the witness to provide his deposition testimony under the following oath: "I, Marius Steurer, swear that the testimony I am about to give is the truth, the whole truth, and nothing but the truth," or the corresponding wording for an oath under Austrian law.

### 13. SPECIAL PROCEDURES OR METHODS TO BE FOLLOWED

This Court requests: (1) that the examination be taken orally; (2) that the examination be taken in the presence of a commercial stenographer and videographer selected by the Trustee or the court; (3) that the videographer be permitted to record the examination by audio and visual means; (4) that the stenographer be allowed to record a verbatim transcript of the examination; (5) that the Trustee's counsel be allowed to use an interpreter selected by the Trustee to be able to follow and participate in the examination; (6) that counsel for both the Trustee and Alpha Prime be notified as soon as possible of the date, time and place of the examination, along with

any other pertinent information, including what court is presiding over the deposition; (7) that

counsel for both the Trustee and Alpha Prime be permitted to ask follow up questions of Mr.

Radel; and (8) that the witness be examined as soon as possible to ensure that the evidence may

be obtained before the deadline for all fact discovery to be completed in the case, which is

currently July 3, 2019.  In the event that—due to mandatory provisions of Austrian law—the

taking of evidence according to some or all of the procedures described above is prohibited, this

Court requests that it be taken in such manner as provided by Austrian law for the formal taking

of testimonial evidence in civil proceedings.

### 14. REQUEST FOR THE NOTIFICATION OF THE TIME AND PLACE FOR THE EXECUTION OF THE REQUEST AND IDENTITY AND ADDRESS OF ANY PERSON TO BE NOTIFIED

Clerk of the United States Bankruptcy Court
for the Southern District of New York
One Bowling Green
New York, New York 10004-1408
United States of America

Oren J. Warshavsky
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York, 10111
United States of America
Tel: +1.212.589.4200
Fax: +1.212.589.4201
Email: owarshavsky@bakerlaw.com

Dr. Ferdinand Graf
Graf & Pitkowitz Rechtsanwälte GmbH, Stadiongasse 2,
1010 Vienna
Austria
Tel: (01) 401-17-0
Fax: (01) 401-17-40
Email:  f.graf@gpp.at

Dr. Christian Hausmaninger
Hausmaninger Kletter
Franz Josefs-Kai 3
1010 Vienna
Austria
Tel: (01) 513-95-40
Fax: (01) 513-94-40-12

Todd Duffy
DuffyAmedeo LLC
275 7th Ave.
New York, New York 10001
Tel: +1.212.729.5832
Fax: +1.212.208.2437

**15. REQUEST FOR ATTENDANCE OR PARTICIPATION OF JUDICIAL PERONSONNEL OF THE REQUESTING AUTHORITY AT THE EXECTION OF THE LETTER OF RQUEST**

None.

**16. FEES AND COSTS**

It is requested that once the Request is executed, the Austrian judicial authority submit a

note of reimbursable fees and costs to this Court and to Plaintiff's legal representative as follows:

The Honorable Stuart M. Bernstein
United States Bankruptcy Judge
United States Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, NY 10004-1408

Oren J. Warshavsky, Esq.
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
Tel: +1.212.589.4200
Fax: +1.212.589.4201
Email: owarshavsky@bakerlaw.com

The Bankruptcy Court will guarantee that Plaintiff will reimburse the Austrian judicial

authority in full for all costs incurred in the taking of the evidence sought.

## SECTION IV

The Bankruptcy Court expresses its gratitude and states that the courts of the United States are authorized by statute, 28 U.S.C. Section 1782 of the United States Code, to extend similar assistance to the tribunals of Austria and shall be ready and willing to provide reciprocal assistance in a similar case when required.

The Bankruptcy Court takes this opportunity to extend to the judicial authorities of Austria the assurances of the highest consideration.

Dated: _____, 2019   _____
  New York, New York    HON. STUART M. BERNSTEIN
             UNITED STATES BANKRUPTCY JUDGE

**Official Seal of the United States Bankruptcy Court for the Southern District of New York:**

**Exhibit A**

**Definitions**

**The witness shall please review these terms prior to the provision of testimony:**

**A.**    The term "Alpha Prime" refers to Alpha Prime Fund Limited and anyone acting on behalf of or for the benefit of Alpha Prime Fund Limited, including, without limitation, its current and former parents, subsidiaries, divisions, officers, directors, principals, managers, members, shareholders, agents, representatives, employees, attorneys, nominees, servants, predecessors, successors, and affiliates.

**B.**    The term "BA Worldwide" refers to BA Worldwide Fund Management Limited, including, without limitation, its current and former parents, subsidiaries, divisions, officers, directors, principals, partners, managers, members, shareholders, agents, representatives, employees, attorneys, nominees, servants, predecessors, successors, and affiliates.

**C.**    The term "ESI" refers to all electronically stored information on computers, servers or storage devices that includes, without limitation, emails, calendars, contacts, documents, spreadsheets, PDFs, text messages, databases, metadata, and digital images.

**D.**    The term "November 29 Letter" refers to the letter dated November 29, 2018 from Marius Steurer with the subject, "Mail server incident/Attachment removal," a copy of which is attached hereto as Attachment 1.

**E.**    The term "November 30 Letter" refers to the letter dated November 30, 2018 from Stephan Blahut, managing director of Project Partners, to Peter Fischer, a copy of which is attached hereto as Attachment 2.

**F.**    The term "Project Partners" refers to Project Partners Consulting & Managementgesellschaft mbH, including, without limitation, its current and former parents, subsidiaries, divisions, officers, directors, principals, partners, managers, members, shareholders, agents, representatives, employees, attorneys, nominees, servants, predecessors, successors, and affiliates.

**G.**    The term "RAID-5 Server" refers to the RAID-5 server, referred to in the November 30 Letter, operated by Project Partners that hosted Alpha Prime's ESI.

**H.**    The term "RAID-1 Server" refers to the RAID-1 server, referred to in the November 30 Letter, operated by Project Partners following the destruction of the RAID-5 Server.

**I.**    The term "Steurer" refers to steurer "CC" GmbH, including, without limitation, its current and former parents, subsidiaries, divisions, officers, directors, principals, partners, managers, members, shareholders, agents, representatives, employees, attorneys, nominees, servants, predecessors, successors, and affiliates

**J.**     The terms "Communicate," "Communications," and "Communicating" shall include in person conversations, telephonic communications, emails, written correspondence, instant messaging, social media, and any and all other forms of communications.

## Questions to Be Put to Witness

1.     The first paragraph of the November 29 Letter refers to you. Are you the author of the letter?

2.     If you are not the author of the November 29 Letter, can you identify the author of the letter?

3.     Did anyone else assist in the preparation of the November 29 Letter? Who?

4.     The letter is addressed to "Sir or Madam." Who is the intended recipient of the letter?

5.     What was the purpose of the November 29 Letter?

6.     Are you familiar with an entity known as Alpha Prime Fund Limited? If yes, how did you become familiar with Alpha Prime Fund Limited? If yes, what do you know about it?

7.     What is your understanding of Alpha Prime's business?

8.     Are you familiar with an entity known as BA Worldwide Fund Management? If yes, how did you become familiar with BA Worldwide Fund Management? If yes, what do you know about it?

9.     Are you familiar with a person named Christian Hausmaninger? If yes, how did you become familiar with Dr. Hausmaninger? If yes, what do you know about him?

10.     Are you familiar with a person named Peter Fischer? If yes, how did you become familiar with Mr. Fischer? If yes, what do you know about him?

11.     Are you familiar with a person named Ursula Radel-Leszczynski? If yes, how did you become familiar with Dr. Radel-Leszczynski? If yes, what do you know about her?

12.     Are you familiar with a person named Stefan Zapotocky? If yes, how did you become familiar with Mr. Zapotocky? If yes, what do you know about him?

13.     With whom did you communicate at Project Partners?

14.     When were you directed to draft the November 29 letter?

15.     Did Christian Hausmaninger direct you to draft the November 29 Letter?

16.     Did Peter Fischer direct you to draft the November 29 Letter?

17.     Did Ursula Radel-Leszczynski direct you to draft the November 29 Letter?

18.     Did Stefan Zapotocky direct you to draft the November 29 Letter?

19.     Did Todd Duffy direct you to draft the November 29 Letter?

20.     Did Project Partners direct you to draft the November 29 Letter?

21.     Did you provide a draft of the November 29 Letter to Christian Hausmaninger before you executed the letter? If so, did he have any edits to the letter?

22.     Did you provide a draft of the November 29 Letter to Peter Fischer before you executed the letter? If so, did he have any edits to the letter?

23.     Did you provide a draft of the November 29 Letter to Ursula Radel-Leszczynski before you executed the letter? If so, did she have any edits to the letter?

24.     Did you provide a draft of the November 29 Letter to Stefan Zapotocky before you executed the letter? If so, did he have any edits to the letter?

25.     Did you provide a draft of the November 29 Letter to Todd Duffy before you executed the letter? If so, did he have any edits to the letter?

26.     Did you provide a draft of the November 29 Letter to Project Partners before you executed the letter? If so, did anyone at Project Partners have any edits to the letter?

27.     Did you communicate with Christian Hausmaninger before drafting the November 29 Letter?

28.     Did you communicate with Peter Fischer before drafting the November 29 Letter?

29.     Did you communicate with Ursula Radel-Leszczynski before drafting the November 29 Letter?

30.     Did you communicate with Stefan Zapotocky before drafting the November 29 Letter?

31.     Did you communicate with Todd Duffy before drafting the November 29 Letter?

32.     Did you communicate with anyone at Project Partners before drafting the November 29 Letter?

33.     The November 29 Letter references an entity known as 3Ware. How did you become familiar with 3Ware? What do you know about 3Ware?

34.     Did you communicate with anyone at 3Ware before drafting the November 29 Letter?

35.     Who directed Steurer to investigate its actions in October 2007 related to its work with Project Partners?  What was Steurer asked to do?

36.     How many Steurer employees participated in the activities described in the November 29
        Letter?

37.     When did you become aware of Alpha Prime's investments with Bernard L. Madoff
        Investment Securities?

38.     The November 29 Letter states that Steurer destroys its data after seven years. Was the
        data relating to the event described in the November 29 Letter destroyed?  If so, when
        was the data destroyed?  If data was destroyed, was Alpha Prime informed prior to its
        destruction?

39.     If any information relating to the events described in the November 29 Letter was
        destroyed, what information did you rely upon in drafting the November 29 Letter?

40.     The November 29 Letter refers to "additional information." Can you please describe what
        "additional information" you used "to remember various details of the incident"?

41.     Can you please describe the "incident" referred to in the first paragraph of the second
        page of the November 29 Letter?

42.     From where did you obtain the "additional information" that you relied upon to help draft
        the November 29 Letter?

43.     The second paragraph of the second page of the November 29 Letter states that "3Ware,
        the seller of the RAID controller, was contacted and sent a repair script, which did not
        work, however." Did you draft this paragraph?

44.     What is a RAID controller?

45.     The second paragraph of the second page of the November 29 Letter states that "3Ware
        . . . was contacted." Do you know who contacted 3Ware? If so, who?

46.     How do you know a repair script was sent by 3Ware?

47.     How do you know the repair script sent by 3Ware did not work?

48.     The second paragraph on page two of the November 29 Letter states that "[t]he server
        failure affected about 10 clients of PP." How do you know Project Partners' server failure
        affected about 10 of its clients?

49.     In the fourth paragraph of the November 29 Letter you state that "although you do not
        precisely remember the recovery process, I assume I reacted as always." Can you please
        describe what you do recall of the recovery process?

50.     Referring again the same sentence in the fourth paragraph of the November 29 Letter,
        why do you "assume you reacted as always"?  What does "reacted as always" mean?

51.    Does Steurer have a standardized response to data recovery work? What does this response consist of?

52.    Please describe, based on your actual recollection, the steps you took in October 2007 to recover the data stored on the Project Partners' RAID-5 Server?

53.    If you do not precisely remember the recovery process related to Project Partners' RAID-5 Server, how were you able to draft the November 29, 2018 Letter?

54.    How do you know a loss of data occurred?

55.    Did Steurer have an agreement, contract, or any other relationship with Alpha Prime?

56.    If so, what were the parties' obligations under the contract or what did the relationship entail?

57.    Did Steurer have an agreement, contract, or any other relationship with BA Worldwide?

58.    If so, what were the parties' obligations under the contract or what did the relationship entail?

59.    The November 29 Letter at paragraph 3 of page 1 states that Steurer provided "general network maintenance, general firewall maintenance, [and] server installation," services to Project Partners. Did Steurer provide any other services to Project Partners?

60.    Did Steurer install the RAID-5 Server?

61.    Did Steurer install the RAID-1 Server?

62.    The November 29 Letter at paragraph 3 on page 1 states that Steurer was contacted by Project Partners on or about October 12, 2007 regarding an incident with the RAID-5 Server. What services did Project Partners ask Steurer to provide?

63.    Describe Steurer's experience in recovering data from RAID-5 Servers and RAID-1 Servers prior to the 2007 incident. Did Steurer provide similar recovery services for Project Partners in the past? If so, please describe those incidents and if and how they differed from the 2007 incident.

**Questions Concerning the Mechanical Failure of the RAID-5 Server**

64.    Can you describe the difference between a RAID-5 server and a RAID-1 server?

65.    How was the disk array in the RAID-5 Server configured?

66.    What type of ESI was held on the RAID-5 Server? (e.g., documents, emails, calendars, or other ESI?)

67.    Was the ESI stored on the RAID-5 Server backed up? If so, where was the information
backed up?  And could that back-up be used to restore the ESI contained on the RAID-5
Server?

68.    If the ESI stored on the RAID-5 server was not backed up, can you explain why that was
the case?

69.    The November 30 Letter states that the RAID-5 Server crashed because Project Partners
"removed a wrong disk by mistake." What does "removed a wrong disk" mean and why
would that cause a server to crash? Why did the remaining drives not continue to
operate?

70.    Was the RAID-5 Server's parity information used to rebuild the lost data? If not, why
not?

71.    Was the disk that was removed from the RAID-5 Server physically damaged?

72.    Were any of the other disks in the RAID-5 Server physically damaged?

73.    What procedures did Steurer use to repair or reconstruct the RAID-5 Server?

74.    In the data recovery process, were the disks in the RAID-5 Server imaged? If not, why
not?

75.    In the fourth paragraph of the second page of the November 29 Letter the author states
that "I am sure that I built the controller and the RAID into our recovery PC and accessed
them in read only mode. Recovery software can then be used to try to access and recover
lost content." Were you personally involved with those actions? Did you recall taking
those steps when you wrote the November 29 Letter? On what do you base your certainty
that you took these steps?

76.    To which recovery software do you refer in the fourth paragraph of the second page of
the November 29 Letter?

77.    How did the ESI recovery process work?

78.    The November 29 Letter states at paragraph 6 on page two that "a fresh system was
installed on new hard disks to have the system ready once the data was recovered." Do
you personally recall installing a "fresh system"?

79.    What does the process of installing a "fresh system," referred to in the sixth paragraph of
page 2 of the November 29 Letter entail?

80.    Does the RAID-5 Server still exist?

81.    If not, do you know how was it disposed of?  And where is the ESI that was on the
RAID-5 Server now located?

82.  Have you seen the November 30 Letter before?  If yes, when? Who was present? What was discussed?

83.  The November 30 Letter states at the second paragraph on page two that Project Partners "continued to work with a new RAID-1 server to which the company Steurer had loaded the recovered data of the clients."  Were you aware of this fact?

84.  Do you know whether any data was recovered from the RAID-5 Server?  If so, what percentage of data was recovered and what percentage was not recoverable?

85.  Can you describe the data recovered from the RAID-5 server?

86.  Do you know whether any of the data recovered from the RAID-5 server was transferred to Project Partners' RAID-1 server?

87.  Why was the data from the RAID-5 Server loaded to a RAID-1 server?

88.  After Steurer loaded data to the RAID-1 Server, did Steurer continue to maintain the RAID-1 Server?

89.  Does the RAID-1 Server still exist?

90.  Was Steurer ever asked to preserve the RAID-1 server?

91.  Was Steurer ever asked to preserve other ESI belonging to Alpha Prime?

92.  If so, who asked Steurer to preserve Alpha Prime's ESI?

93.  Was any Alpha Prime ESI ever preserved? If so, can you please describe the location of any preserved Alpha Prime ESI?

94.  Did Steurer give Alpha Prime's preserved ESI to anyone?

95.  Does Steurer still have any preserved Alpha Prime ESI?

96.  The November 29 Letter states in the final paragraph on page 2 that any documents related to Steurer's efforts to recover data from the RAID-5 Server were destroyed.  Does Steurer have a formal document retention policy?

97.  If yes, for how long does Steurer preserve records relating to its work on behalf of clients?

**Questions Concerning the Webmail Client Referred to on Pages 3-7 of the November 29 Letter**

98.  Did Steurer provide webmail services to Alpha Prime?

99.  Did anyone ask Steurer to examine Alpha Prime's webmail?  If so, who?

100. Why was Steurer asked to examine Alpha Prime's webmail?

101. When was Steurer asked to examine Alpha Prime's webmail?

102. Who instructed Steurer to undertake the "test email created on 23 November 2018" ("Test Email")?

103. What was the purpose of the Test Email?

104. What is Horde webmail?

105. How were you able to replicate the conduct of Horde webmail on the Project Partners' server in November 2018?

106. What was the purpose of the "default option" on the Horde webmail?

107. In the middle of the third page of the November 29 Letter, you state "the purpose of these option certainly was to save memory space on the server at a time when not every mail box had 50GB." Can you please describe what you mean by "not every mail box had 50 GB"?

108. How do you know "not every mail box had 50GB?"

109. At the bottom of the third page of the November 29 Letter, there is a paragraph that runs into the fourth page which states, "As you can see it says 'prompt every time an attachment is sent; default to NO.' The question was why nobody paid attention to it. This is explained by the following screenshots." Can you please explain what this means?

110. Is it your position that "nobody paid attention" to the prompt to save attachments?

111. What is the basis of your belief that "nobody paid attention" to the prompt to save attachments?

112. Did Steurer host or maintain the RAID-5 server?

113. Did Steurer host or maintain the RAID-1 server?

114. If Steurer neither hosted nor maintained either the RAID-5 or the RAID-1 servers, why was it asked to examine the email attachment issue in connection with the November 29 Letter?

115. Who asked Steurer to explain the email attachment/deletion issue associated with Project Partners and Horde webmail?

116. Was it Christian Hausmaninger?

117.    If yes, what did he ask?

118.    Was it Peter Fischer?

119.    If yes, what did he ask?

120.    Was it Stefan Zapotocky?

121.    If yes, what did he ask?

122.    Was it Ursula Radel-Lezczynski?

123.    If yes, what did she ask?

124.    The November 29 Letter states at the top of page three, "We have to try to get to the bottom of this text (test email created on 23 November 2018)." Who is "we"?

125.    The November 29 Letter states that the test email was created on November 23, 2018. Is this how the webmail client behaved and looked in 2007?

126.    If yes, how can you be certain?

127.    If no, how would the webmail client differ in appearance in 2007?

128.    How would you know if anyone at Alpha Prime noticed the "Save attachments with message in sent mail folder" prompt?

129.    How would you know if anyone at Alpha Prime "enlarged the [webmail client] window or switch[ed] to full screen"?

130.    Do you know what the resolutions of Alpha Prime's monitors were in 2007?

**Attachment 1**

<u>Certified Translation from the German Language</u>



# STEURER|"CC"
## Creative Consulting G.m.b.H
### Kauderstrasse 65, A-1220 VIENNA
Phone: 0676 83820820 / Email: <u>office@steurer.cc</u>

Attn.
Project Partners Consulting &
Managementgesellschaft m.b.H. ("PP")

| | |
|---|---|
| Name | Steurer Marius |
| Phone | +43-676 83820820 |
| Fax | +1-2402016478 |
| Email | <u>marius@steurer.cc</u> |

**Subject:**
**Mail server incident**
**Attachment removal**

Dear Sir or Madam:

1.    I, Marius Steurer, born July 30, 1970, am a shareholder and managing director of steurer "CC" GmbH, company number FN 241556f, with its registered office in Vienna and its business address at Kauderstrasse 65, 1220 Vienna.

2.    Since its formation in 2003, steurer "CC" GmbH has been engaged in the provision of IT services and in management consulting in the fields of information technology and accounting.

3.    From 2003 onwards, we repeatedly engaged in business with Project Partners Consulting & Managementgesellschaft m.b.H. ("PP"). We provided the following services to PP: general network maintenance, general firewall maintenance, server installation - all services on request, no maintenance contract. This means our services were only used when internal IT needed help.

Page 1                                          Date: November 29, 2018

APF_00016376

# STEURER|"CC"

## Creative Consulting G.m.b.H
Kauderstrasse 65, A-1220 VIENNA
Phone: 0676 83820820 / Email: office@steurer.cc

**Mail server incident: October 2007**

In October 2007, on or about October 12, PP informed us by phone of the
incident described below. When contacted now I was able to remember various
details of the incident using additional information.

**Start of the incident - steurer "CC" GmbH was not yet involved.**
During a change of disks on PP's RAID-5 server a wrong (working) disk was
removed by mistake, which caused a server crash. 3Ware, the seller of the
RAID controller, was contacted and sent a repair script, which did not
work, however. The server failure affected about 10 clients of PP, which
made it absolutely necessary to get the server to work again.

Since we were in possession of data recovery equipment, the server was
delivered to us to check it and/or to recover what could be recovered.

Although I do not precisely remember the recovery process, I assume that I
reacted as always: After internal IT had attempted to repair the server, I
did not even try to boot the system because I know that a start of such
systems could have even worse effects.

I am sure that I built the controller and the RAID into our recovery PC and
accessed them in read only mode. Recovery software can then be used to try
to access and recover lost content.

In parallel, a fresh system was installed on new hard disks to have the
system ready once the data was recovered. I am sure the recovery process
took quite some time because the complete regular file system as well as
fragments are scanned and an attempt is made to recover consistent data. It
may have taken up to two or three days - but I am not sure about that.

I am almost 100% sure that a loss of data occurred - this is almost
inevitable with such an incident. Since we destroy our data after seven
years, I cannot search our then communication.

Any other details of the process and of the steps taken are no longer
available because any related documents date eleven years back and were
therefore destroyed.

Page 2                                    Date: November 29, 2018

APF_00016377

# STEURER|"CC"

## Creative Consulting G.m.b.H
Kauderstrasse 65, A-1220 VIENNA
Phone: 0676 83820820 / Email: office@steurer.cc

**Attachments in the Horde webmail:**

We have to try to get to the bottom of this text (test email created on 23 November 2018).

---

**sent-mail: xxxxxxxxx (3 of 3)**

Mark as:          Move | Copy this message to
Delete | Reply | Reply all | Forward | Redirect | View thread | Blacklist | Whitelist | Message source | Save as | Print
**Date:** Fri, Nov 23, 2018 11:12:28 +0100 (11:12:28 CET)
**From:** Networkadmin
**To:**       @steurer.cc
**Subject:** xxxxxx
**Part(s)** Download all attachments (as ZIP files)
**Header entries:** All

    1  unnamed [text/plain] 0.00 KB
    2  unnamed [text/plain] 0.10 KB
[Attachment stripped: original attachment type: "image/png", name: "vlcsnap-2017-04-26-13h22m50s355.png"]
Delete | Reply | Reply all | Forward | Redirect | View thread | Blacklist | Whitelist | Message source | Save as | Print
Mark as:          Move | Copy this message to

---

This is conduct by the webmail client (Horde webmail) on PP's server. This is the default option (by Horde) after installation. The purpose of this option certainly was to save memory space on the server at a time when not every mail box had 50GB - but only very limited space was available.

(Screenshot of default option)

**Webmail options**

**New message**

When sending mail or expanding addresses what domain should we append to unqualified addresses (email addresses without "@")?

☑  Compose new messages in a separate window?
☐  Compose messages with a WYSIWYG editor by default (if browser supports the feature)?
**Composing stationery and form responses.**
☐  Check spelling before sending a message?
 3    Spelling errors per page when checking spelling
☐  Display confirmation after sending a message?
☑  Include original message in a reply?
☐  Include message header in a reply?
How to attribute quoted lines in a reply?
 Quote by %f:
Draft folder:
 None
☑  Should the compose window be closed after saving a draft?
☐  Save drafts as unseen?
☐  Set priority when composing new messages?
Your default charset for composing new messages:
 Default
You default encryption method for sending messages:
 No encryption
 When saving sent-mail, should we save attachment data?
 Prompt every time an attachment is sent; default to NO          ←
Request a read receipt?
 Ask

Save options       Undo changes       Return to options

As you can see it says "Prompt every time an attachment is sent; default to NO". The question was why nobody paid attention to it. This is explained by

APF_00016378

# STEURER|"CC"

## Creative Consulting G.m.b.H
Kauderstrasse 65, A-1220 VIENNA
Phone: 0676 83820820 / Email: office@steurer.cc

the following screenshots. Clicking on "new message", you will see this
window...

Webmail :: New message - Mozilla Firefox

https://ssl.steurer.cc/horde/imp/compose.php?thismailbox=INBOX&uniq=1542

**New message**

| | Send | Save draft | | Cancel message |
|---|---|---|---|---|
| Identity | networkadmin | | (standard identity) | |

To
Cc
Bcc
Subject
Charset　Western European (ISO-8859-1)

Address book　　　　　　Expand names　　　　Special characters　　　Attachments

☑ Save a copy in "sent-mail"
☐ Request a read receipt
　Switch to HTML composition

Text

Send　　Save draft　　Cancel message

... but nothing in respect of attachments - except for the paperclip to
insert an attachment.

Page 4　　　　　　　　　　　　Date: November 29, 2018

APF_00016379

# STEURER|"CC"

## Creative Consulting G.m.b.H
Kauderstrasse 65, A-1220 VIENNA
Phone: 0676 83820820 / Email: office@steurer.cc

When you click on the paperclip, the window moves and you can add an attachment.

Webmail :: New message - Mozilla Firefox

https://ssl.steurer.cc/horde/imp/compose.php?thismailbox=INBOX&uniq=1542

| | |
|---|---|
| Identity | networkadmin@steurer.cc (standard identity) |
| To | |
| Cc | |
| Bcc | |
| Subject | |
| Charset | Western European (ISO-8859-1) |

Address book          Expand names          Special characters          Attachments

☑ Save a copy in "sent-mail"
☐ Request a read receipt
    Switch to HTML composition

Text

Send     Save draft     Cancel message
Encryption options: No encryption

### Attachments

**File 1:** Search... No file selected. Attachment          Update

When you are done, you send the email – and you do not see...

Page 5                                        Date: November 29, 2018

APF_00016380

# STEURER|"CC"

## Creative Consulting G.m.b.H

Kauderstrasse 65, A-1220 VIENNA
Phone: 0676 83820820 / Email: office@steurer.cc

... these lines BELOW the attachment.

Webmail :: New message - Mozilla Firefox

https://ssl.steurer.cc/horde/imp/compose.php?thismailbox=INBOX&uniq=1542

Bcc

Subject

Charset    Western European (ISO-8859-1)

Address book          Expand names          Special characters          Attachments

☒ Save a copy in "sent-mail"
☐ Request a read receipt
   Switch to HTML composition

Text

Send      Save draft      Cancel message
Encryption options: No encryption

**Attachments**

File 1: Search... No file selected. Attachment                              Update
(Maximum attachment size: 37,748,736 Bytes)
Save attachments with message in sent-mail folder?    No
Link attachments?                              No

**THIS** would be the "Prompt every time an attachment is sent; default to NO"
option. When reconstructing it I thought that a POPUP or something similar
would pop up. But the test showed that the line **IS** the prompt. Would you
change the options to "Always save attachments", this line would be
missing.

Page 6                                    Date: November 29, 2018

APF_00016381

# STEURER|"CC"

## Creative Consulting G.m.b.H

Kauderstrasse 65, A-1220 VIENNA
Phone: 0676 83820820 / Email: office@steurer.cc

This image explains why this option was never noticed.

Of course, you could have enlarged the window or switch to full screen, but we must not forget that we are talking about an incident that happened eleven years ago. Smaller monitors, less resolution. The "new message" window had a default size of 730px - and at the time that would have been plausible with a monitor of, for example, 1024x768 or 1280x960. But this is all speculation and I cannot reconstruct it because I am not in possession of necessary information.

Best regards

steurer "CC" GmbH

Signed
Marius Steurer

**Marius Steurer**

Digitally signed by Marius
Steurer
DN:c=AT, st=Vienna, l= Vienna
o=steurer CC GmbH, cn=Marius
Steurer, email=marius@steurer.cc
Date: 11/29/2018 19:45:32
+01'00'

With reference to my oath I hereby certify that the above is a correct translation of the German text produced to me.

Vienna, this 12th day of December 2018

Die genaue Übereinstimmung der vorstehenden Übersetzung mit der angehefteten Ablichtung bestätige ich unter Berufung auf meinen Eid.

Wien, am 12.12.2018

Mag. Annette Fragner

# STEURER "CC"
## Creative Consulting G.m.b.H
Kaudersstrasse 65, A-1220 WIEN
Tel: 0676 83820820 / Email: office@steurer.cc

| | |
|---|---|
| z.Hd.<br>Firma Project Partners Consulting &<br>Managementgesellschaft m.b.H.(„PP")| **Name**    Steurer Marius<br><br>Telefon    +43-676 83820820<br>Fax        +1-2402016478<br>E-Mail     marius@steurer.cc |

**Betreff :**
**Mailservervorfall**
**Attachment Entfernung**

Sehr geehrte Damen und Herren,

1.    Ich, Marius Steurer, geboren am 30.7.1970, bin geschäftsführender Gesellschafter der Firma steurer „CC" GmbH, FN 241556f, mit dem Sitz in Wien und der Geschäftsanschrift Kaudersstraße 65, 1220 Wien.

2.    Die Firma steurer „CC" GmbH beschäftigt sich seit ihrer Gründung 2003 mit der Erbringung von IT-Dienstleistungen sowie der Unternehmensberatung im IT-Bereich und Buchhaltung.

3.    Mit der Firma Project Partners Consulting & Managementgesellschaft m.b.H. („PP") standen wir ab 2003 immer wieder in Geschäftsverbindung. Wir erbrachten folgende Leistungen für PP: Netzwerkpflege allgemein, Firewallpflege allgemein, Serverinstallation – alle Leistungen auf Zuruf, kein Wartungsvertrag. Wir wurden also nur hinzugezogen, wenn die hauseigene IT Hilfe brauchte.

Seite Nr. 1                                    Datum: 2018-11-29

APF_00016383

# STEURER|"CC"

### Creative Consulting|G.m.b.H
Kaudersstrasse 65, A-1220 WIEN
Tel: 0676 83820820 / Email: office@steurer.cc

**Mailservervorfall: Oktober 2007**

Im Oktober 2007 - es muss um den 12.10. herum gewesen sein, wurden wir von
PP über nachfolgenden Vorfall telefonisch informiert, woran ich mich nur
durch die gegenständliche Kontaktaufnahme, mit Hilfe von zusätzlichen
Informationen wieder an Details erinnern konnte.

**Start des Vorfalls - steurer „CC'' GmbH war noch nicht involviert.**
Während eines Plattenwechsels auf dem RAID-5 Server der Firma PP sei
irrtümlich eine falsche (funktionierende) Platte entfernt worden, was zu
einem Serverabsturz führte.  Der Verkäufer des RAID Controllers, 3Ware, sei
kontaktiert worden und hätte ein Reparatur-Skript geschickt, was aber nicht
funktionierte. Der Serverausfall betreffe rund 10 Kunden der Firma PP, es
sei daher dringend, den Server wieder zum Laufen zu bringen.

Nachdem wir über Equipment zur Datenrettung verfügt haben, wurde uns der
Server gebracht um zu prüfen bzw zu retten, was zu retten ist.

Auch wenn ich mich nicht genau an diesen Rettungsvorgang erinnern kann,
gehe ich davon aus, dass ich genauso wie immer reagiert habe: ich habe nach
den Reparaturversuchen der hauseigenen IT nicht einmal mehr versucht das
System zu booten, da ich weiß, wenn solche Systeme gestartet werden, die
Auswirkungen noch schlimmer sein könnten.

In diesem Fall habe ich sicher den Controller und das RAID in unseren
Recovery PC eingebaut und im „read only'' - also nur lesen Modus darauf
zugegriffen. Mit einer Recoverysoftware kann nun versucht werden auf
verlorene Inhalte zuzugreifen und diese zu retten.

Parallel dazu wurde auf neuen Festplatten ein frisches System aufgesetzt um
dieses sofort zur Verfügung zu haben,  sobald die Daten gerettet wären. Der
Wiederherstellungsvorgang hat sicher einiges an Zeit in Anspruch genommen,
da hier das komplette reguläre Filesystem sowie Fragmente gescannt werden
und so versucht wird, konsistente Daten wieder zu erhalten. Das kann bis zu
2 oder 3 Tage gedauert haben - kann es aber nicht mit Bestimmtheit sagen.

Ich traue mich zu fast 100% Sicherheit zu sagen, dass ein Datenverlust
stattgefunden hat - das ist bei so einem Vorfall beinahe unvermeidlich. Da
wir unsere Daten nach Ablauf von 7 Jahren vernichten, ist es mir auch nicht
möglich, die damalige Kommunikation zu durchsuchen.

Sonstige Details des Ablaufs und der durchgeführten Schritte sind nicht
mehr verfügbar, da es sich um Unterlagen handelt die bereits 11 Jahre
zurückliegen und somit vernichtet wurden.

Seite Nr. 2                    Datum: 2018-11-29

**APF_00016384**

# STEURER "CC"

## Creative Consulting G.m.b.H

Kaudersstrasse 65, A-1220 WIEN
Tel: 0676 83820820 / Email: office@steurer.cc

**Anhänge im Horde Webmail:**

Hier geht es darum, dass dieser Text hinterfragt wird.(Test Mail erstellt am 23.11.2018

| sent mail: xxxxxxxxx (3 von 3) | | |
|---|---|---|

Markieren als: [  ▾]    Verschiebe | Kopiere  diese Nachricht nach    [  ▾]
Löschen | Antworten | Allen Antworten | Weiterleiten | Umleiten | Thema Anzeigen | Ausschlussliste | Positivliste | Quelltext | Speichern unter | Drucken

**Datum:** Fri, 23 Nov 2018 11:12:28 +0100 (11:12:28 CET)
**Von:** Networkadmin ...
**An:** ...@steurer.cc
**Betreff:** xxxxxxxx
**Teil(e):** Alle Anhänge (als ZIP-Datei) herunterladen 🗎
Kopfeinträge: Alle

🗎  1 unbenannt [text/plain] 0,00 KB 🖫

🗎  2 unbenannt [text/plain] 0,10 KB 🖫

[Anhang entfernt: Ehemaliger Anhangstyp: "image/png", Name: "vlcsnap-2017-04-26-13h22m50s355.png"]

Löschen | Antworten | Allen Antworten | Weiterleiten | Umleiten | Thema Anzeigen | Ausschlussliste | Positivliste | Quelltext | Speichern unter | Drucken
Markieren als: [  ▾]    Verschiebe | Kopiere  diese Nachricht nach    [  ▾]

Es handelt es sich hier um ein Verhalten des Webmail Clients (Horde Webmail) auf dem Server der Firma PP. Dies ist die default Einstellung (Seitens Horde) nach der Installation die zur damaligen Zeit sicher den Zweck hatte den Speicherplatz am Server zu sparen als noch nicht jedes Postfach 50GB Größe hatte – sondern noch sehr eingeschränkter Platz zur Verfügung stand.

(Screenshot Default Einstellung)

**Einstellungen für Webmail**

**Neue Nachricht**

Welche Domain soll beim Verschicken von Nachrichten oder Suchen von Adressen an unvollständige Adressen (ohne "@"-Zeichen) gehängt werden?
[                    ]

☑ Neue Nachrichten in separatem Fenster verfassen?
☐ Nachrichten standardmäßig mit einem WYSIWYG-Editor erstellen (falls der Browser diesen unterstützt)?
**Erstellen Sie Formatvorlagen und Standardantworten.**
☐ Rechtschreibung vor dem Versenden von Nachrichten überprüfen?
[3]  Rechtschreibfehler pro Seite bei der Rechtschreibprüfung.
☐ Bestätigung nach dem Versenden von Nachrichten anzeigen?
☑ Originalnachricht in die Antwort einfügen?
☐ Nachrichtenkopf in die Antwort einfügen?
Wie sollen Zitatantworten markiert werden? ⚙
[Zitat von %f:            ]
Entwürfe-Ordner:
[Keine            ▾]
☑ Soll das Nachrichtenfenster nach dem Speichern eines Entwurfes geschlossen werden?
☐ Enwürfe als ungelesen speichern?
☐ Priorität beim Erstellen von neuen Nachrichten setzen?
Ihr Standardzeichensatz beim Erstellen von neuen Nachrichten:
[Standard            ▾]
Ihre Standard-Verschlüsselungsmethode beim Verschicken von Nachrichten:
[Keine Verschlüsselung            ▾]
Sollen Anhänge mitgespeichert werden, wenn gesendete Nachrichten gespeichert werden? ⚙
[Jedesmal nachfragen, standardmäßig NEIN ▾]  ⬅
Lesebestätigungen anfordern? ⚙
[Nachfragen ▾]

[Einstellungen speichern]  [Änderungen rückgängig machen]  [Zurück zu Einstellungen]

Wie man sieht steht dort „Jedesmal nachfragen, standardmäßig NEIN". Hier kam nun die Frage auf, warum das niemand beachtet hat – die nachfolgenden

Seite Nr. 3                              Datum: 2018-11-29

APF_00016385

# STEURER|"CC"

### Creative Consulting|G.m.b.H
Kaudersstrasse 65, A-1220 WIEN
Tel: 0676 83820820 / Email: office@steurer.cc

Screenshots erklären das. Beim Klicken auf neue Nachricht sieht man dieses
Fenster...



...aber nichts bezüglich Anhänge – außer die Büroklammer für das Einfügen
eines Attachments.

Seite Nr. 4                              Datum: 2018-11-29

APF_00016386

# STEURER "CC"
### Creative Consulting G.m.b.H
Kaudersstrasse 65, A-1220 WIEN
Tel: 0676 83820820 / Email: office@steurer.cc

Klickt man auf die Büroklammer, verschiebt sich das Fenster und man kann
ein Attachment hinzufügen.



Wenn man fertig ist, sendet man das Mail - und dabei übersieht man....

Seite Nr. 5                         Datum: 2018-11-29

APF_00016387

# STEURER|"CC"
### Creative Consulting|G.m.b.H
Kaudersstrasse 65, A-1220 WIEN
Tel: 0676 83820820 / Email: office@steurer.cc

...diese Zeilen UNTER dem Attachment.

Webmail :: Neue Nachricht - Mozilla Firefox

ⓘ 🔒 https://ssl.steurer.cc/horde/imp/compose.php?thismailbox=INBOX&uniq=154⋯  ••• ♡ ☰ ☆

| Bcc | | 🔲 |
| Betreff | | 🔲 |
| Zeichensatz | Westeuropäisch (ISO-8859-1) ⌄ | |

Adressbuch        Namen suchen        Sonderzeichen        Anhänge        🔲

☑ Kopie speichern in "sent-mail"
☐ Lesebestätigung anfordern
☑ Zum HTML-Modus wechseln

Text

Senden | Entwurf speichern | Nachricht verwerfen        🔲
Verschlüsselungs-Einstellungen: Keine Verschlüsselung        ⌄        🔲

## Anhänge

Datei 1:  Durchsuchen...  Keine Datei ausgewählt.  Anhang ⌄    Aktualisierung  🔲
(Maximale Anhanggröße: 37,748,736 Bytes)

Anhänge zusammen mit Nachrichten im Ordner für gesendete Nachrichten speichern?   Nein ⌄  🔲
Anhänge verlinken?   Nein ⌄  🔲

**DAS** wäre die „Jedesmal nachfragen, standardmäßig NEIN'' Option. Als ich das jetzt nachvollzogen habe, dachte ich, dass ein POPUP oder ähnliches erscheinen würde. Aber der Test hat gezeigt, dass die Zeile die Nachfrage **IST**. Würde man in den Einstellungen auf  „Anhänge immer speichern'' stellen, würde diese Zeile fehlen.

Seite Nr. 6                    Datum: 2018-11-29

APF_00016388

# STEURER "CC"

## Creative Consulting G.m.b.H

Kaudersstrasse 65, A-1220 WIEN
Tel: 0676 83820820 / Email: office@steurer.cc

Dieses Erscheinungsbild erklärt mir, warum diese Option nie bemerkt wurde.

Man hätte natürlich das Fester groß machen können oder auf Vollbild gehen.
Aber man darf auch nicht vergessen, dass wir hier von einem 11 Jahre
zurückliegenden Vorfall sprechen. Kleinere Bildschirme, geringere
Auflösung. Das „Neue Nachricht'' Fester hat eine default Größe von 730px
Höhe – und das wäre bei einem Bildschirm mit zB 1024x768 oder 1280x960 zur
damaligen Zeit plausibel gewesen. Aber das ist alles Spekulation und von
mir nicht nachvollziehbar, da ich diese Informationen nicht besitze.

Mit freundlichen Grüßen

steurer „CC'' GmbH

gez
Marius Steurer

Marius
Steurer

Digital unterschrieben von Marius
Steurer
DN: c=AT, st=Wien, l=Wien,
o=steurer CC GmbH, cn=Marius
Steurer, email=marius@steurer.cc
Datum: 2018.11.29 19;45:32
+01'00'

APF_00016389



APF_00016390

**Attachment 2**

Certified Translation from the German Language





Consulting & Managementges.m.b.H.

Josefsplatz 6
1010 Vienna

+43 (0)1 219 8900
project@partners.at
DVR 1054180
ATU 41007405
FN 132615y

Mr. Peter Fischer
Top Consult GmbH
Alserstrasse 23/15
1090 Vienna

By email: Peter.fischer@top-consult-gmbh.at

Vienna, November 30, 2018

Dear Mr. Fischer,

You asked me for my opinion on an apparent server crash at our company in 2007 and on the effects that crash had on a fund called Alpha Prime Fund Ltd. My investigations have produced the following results:

To begin with, I would like to advise that I am a shareholder and managing director of Project Partners Consulting & Managementgesellschaft mbH (PP). PP is engaged in the provision of IT services.

As regards Alpha Prime Fund Ltd, I was able to research that from 2005 until the end of 2008 the company BA Worldwide Fund Management (BWFM), with its registered office in the BVI, instructed us to host the "Alphaprimefund.com" domain and paid us for our services. I was able to find two related invoices which I attach hereto.

Initially, hosting took place via a RAID-5 server which serviced about ten clients in aggregate. From 2007 onwards, there was also email correspondence through the domain. No documents were stored on the server. The BWFM contacts were Messrs. Holzer and Aster and, occasionally, Dr. Radel.

In October 2007, our server crashed because we removed a wrong disk by mistake. We informed Dr. Radel thereof. Initially, we attempted to repair the server with the assistance of the company 3-Ware, the seller of the RAID controller, but our attempt failed. We thereupon contacted Steurer GmbH to recover our data. The details of this recovery are set out in the

APF_00016369

attached statement by the company Steurer whom we asked to reproduce their recollections of this incident.

I can confirm that after the crash we continued to work with a new RAID-1 server to which the company Steurer had loaded the recovered data of the clients. The old server was disposed of.

As far as we remember the events that occurred more than ten years ago, Steurer's statement describes a very plausible data recovery process that correctly reflects such emergency measures; it appears that the webmail platform was actually used in default mode, which explains why attachments were not saved when emails were sent by webmail.

At the end of 2008 Dr. Radel told us that there was no more money to further use our services. All data (emails) available on our server were thereupon burnt to two DVDs and handed over to Dr. Radel. All Alpha Prime data was then deleted from our server for reasons of data protection; this is a standard process we choose when relationships with clients are terminated.

We hope the above information was useful for you and remain

With best regards,


[Signature]
Mag (FH) Stephan Blahut
Managing Director


With reference to my oath I hereby certify that the above is a correct translation of the German text produced to me.

Die genaue Übereinstimmung der vorstehenden Übersetzung mit der angehefteten Ablichtung bestätige ich unter Berufung auf meinen Eid.

Vienna, this 12th day of December 2018

Wien, am 12.12.2018

Mag. Annette Fragner

APF_00016370



**Consulting & Managementges.m.b.H.**

Josefsplatz 6
1010 Wien

+43 (0)1 219 8900
project@partners.at
DVR 1054180
ATU 41007405
FN 132615y

Herrn Peter Fischer
Top Consult GmbH
Alserstrasse 23/15
1090 Wien

per eMail: Peter.fischer@top-consult-gmbh.at

Wien, 30. November 2018

Sehr geehrter Herr Fischer,

Sie haben mich gebeten, zu einem angeblichen Serverabsturz bei unserer Firma im
Jahr 2007 und dessen Auswirkungen auf einen Fonds namens Alpha Prime Fund Ltd
Stellung zu nehmen. Meine diesbezüglichen Recherchen haben folgendes ergeben:

Vorab teile ich zur Information mit, dass ich geschäftsführender Gesellschafter der
Firma Project Partners Consulting & Managementgesellschaft mbH (PP) bin; die
Firma PP beschäftigt sich mit der Erbringung von EDV-Dienstleistungen.

Zum Thema Alpha Prime Fund Ltd konnte ich recherchieren, dass uns die Firma BA
Worldwide Fund Management (BWFM) mit Sitz auf den BVI in den Jahren 2005 bis
Ende 2008 für das Hosting der Domain „Alphaprimefund.com" beauftragt und bezahlt
hat. 2 diesbezügliche Rechnungen konnte ich noch ausfindig machen und schließe ich
dieser Erklärung an.

Das Hosting lief zunächst über einen RAID-5 Server, der insgesamt rund 10 Kunden
servicierte. Ab dem Jahr 2007 kam es auch zu e-mail Verkehr über die Domain.
Dokumente wurden auf dem Server nicht abgespeichert. Ansprechpartner bei BWFM
waren die Herren Holzer und Aster und gelegentlich auch Frau Dr. Radel.

Im Oktober 2007 kam es zu einem Absturz unseres Servers durch irrtümliche
Entfernung einer falschen Platte. Wir haben Frau Dr. Radel davon informiert. Wir
haben zunächst einen Reparaturversuch mit Unterstützung der Firma 3-Ware, den
Verkäufer des RAID-Controllers, gestartet, der jedoch nicht funktioniert hat. Wir
haben daraufhin die Firma Steurer GmbH kontaktiert, um eine Datenrettung
vorzunehmen. Die Einzelheiten dieser Datenrettung entnehmen Sie bitte der
angeschlossenen Stellungnahme der Firma Steurer, die wir ersucht haben, ihre

Erinnerungen zu diesem Vorfall wiederzugeben.

Ich kann bestätigen, dass wir nach dem Absturz mit einem neuen Server RAID-1 weitergearbeitet haben, auf den die Firma Steurer die geretteten Daten der Kunden überspielt hat. Der alte Server wurde entsorgt.

Die Stellungnahme der Firma Steurer beschreibt, soweit wir uns selbst an diese über 10 Jahre zurückliegenden Vorgänge erinnern können, eine höchst plausible für solche Notmaßnahmen korrekte Vorgangsweise für die Datenwiederherstellung; die Plattform des Webmails dürfte tatsächlich wie default eingerichtet benutzt worden sein, was das Nichtspeichern der Attachments im Falle eines Versands per Webmail nachvollziehbar macht.

Ende 2008 teilte uns Frau Dr. Radel mit, dass es kein Geld mehr gäbe, unsere Services weiter in Anspruch zu nehmen. Sämtliche auf unserem Server verfügbaren Daten (e-mails) wurden daraufhin auf 2 DVDs gebrannt und Frau Dr. Radel übergeben. Alle Alpha Prime Daten wurden sodann auf unserem Server aus datenschutzrechtlichen Gründen gelöscht, ein von uns gewählter Standardvorgang bei der Beendigung von Kundenverhältnissen.

Wir hoffen, mit dieser Stellungnahme gedient zu haben und verbleiben

Mit freundlichen Grüßen,

Mag. (FH) Stephan Blahut
Geschäftsführer



APF_00016373



# PROJECT PARTNERS
### Consulting & Managementges.m.b.H.

**BA Worldwide Fund Managemen**

P.O. Box 71, Road Town, Tortola
British Virgin Islands

## Rechnung Nr.: 070201

Wien, am 11. Februar 2007

Wir freuen uns, dass unsere Leistungen zur vollsten Zufriedenheit erbracht werden konnten und verrechnen, wie vereinbart:

Verlängerung des Nutzung, sowie Hosting der Domain
**„alphaprimeofund .com"** für ein Jahr pauschal
(1.6.2006 bis 31.5.2007)    ............................................    190,-

zuzüglich 20% USt.   .........................................    38,-
                                                                     =======
SUMME    .........................................................    228,-

Wir bitten den Betrag auf unser Konto Nr. 310031-03009, bei der Erste Bank AG (BLZ 20111) einzuzahlen. Der Betrag ist sofort bei Rechnungserhalt ohne Abzüge fällig.

Mit freundlichen Grüßen,

Ihre Projekt Partners

APF_00016374



P R O J E C T
P A R T N E R S

Consulting & Managementgesellschaft m.b.H.

An
**BA Worldwide Fund Management**

P.O. Box 71, Road Town, Tortola
British Virgin Islands

## Rechnung Nr.: 060318

Wien, am 20. März 2006

Sehr geehrte Frau Dr. Fano!

Wir freuen uns, daß unsere Leistungen zu Ihrer vollsten Zufriedenheit erbracht
werden konnten, und verrechnen, wie vereinbart:

Hosting der Domain „**alphaprimefund.com**" für ein Jahr
(1.6.2005 bis 31.5.2006) *) ................................................    198,-

Traffic 1.6.2003 bis 31.5.05 – 0,32 GB à 36,- *)    ..............    11,52

========
Zuzügl. 20% USt.    .........................................................    41,90
========
SUMME    ...................................................................    € 251,42

*) Der verursachte Traffic wird aliquot den http-logs mit € 36,- pro GB im
Nachhinein verrechnet.

Wir bitten den Betrag auf unser Konto, Nr.: 310031-03009, bei der Erste Bank
AG (BLZ 20111), einzuzahlen.

Mit freundlichen Grüßen,
Ihre Project Partners

A - 1 0 1 0   W i e n   —   J o s e f s p l a t z   6
Tel.:+43 (0)1 21989 00  Fax:DW19  @:project@partners.at
DVR1054180 | ATU 41007405 | FN 132615y

APF_00016375