**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Seanna R. Brown

*Attorneys for Irving H. Picard, Trustee for*
*the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the estate of*
*Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-04287 (SMB) |
| v. | **AMENDED COMPLAINT** |
| CARDINAL MANAGEMENT, INC., and DAKOTA GLOBAL INVESTMENTS, LTD., | |
| Defendants. | |

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[1] and substantively consolidated estate of

Bernard L. Madoff ("Madoff"), through the Trustee's undersigned counsel, for his Amended

Complaint (the "Complaint") against defendant Cardinal Management, Inc. ("Cardinal") states as

follows:

## I.      NATURE OF THE ACTION

1.      This adversary proceeding arises from Cardinal's participation in the massive

Ponzi scheme masterminded by Madoff and enabled by others, including Cardinal, by funneling

other people's money to Madoff while ignoring clear indicia of fraud.

2.      Cardinal received more than $28 million in customer property, as defined by SIPA

§ 78*lll*(4), directly from BLMIS during the two-year period prior to December 11, 2008 (the

"Filing Date").

3.      Cardinal was owned, managed, and controlled by Christian Brustlein and Gabriel

Charbonnier, along with their respective wives, Dominique Brustlein-Bobst and Nathalie Davies-

Charbonnier.

4.      At all relevant times, the Brustleins and Charbonniers were agents of Cardinal and

acted within the scope of their agency at the direction of, on behalf of, for the benefit of, and/or

with the consent of Cardinal.  Accordingly, the Brustleins' and Charbonniers' conduct and

knowledge are imputed to Cardinal.

5.      These individuals were sophisticated investment industry professionals with

considerable experience in the hedge fund industry, including prior experience with BLMIS

---

[1] For convenience, subsequent references to SIPA shall omit "15 U.S.C."

feeder funds.  As a result, they were well-positioned to identify and appreciate the indicia of fraud

surrounding BLMIS.

6.      Beginning at least as early as 1996, the Brustleins and Charbonniers managed

and/or worked for wealth management and financial services companies that invested in and

monitored the performance of BLMIS feeder funds such as Kingate Global Fund Ltd. ("Kingate

Global"), Kingate Euro Fund Ltd. ("Kingate Euro" and with Kingate Global, the "Kingate

Funds"),[2] and Fairfield Sentry Ltd. ("Fairfield Sentry").[3]  Through direct contact with the feeder

funds' principals, the Brustleins and Charbonniers knew each of these funds invested all or

substantially all of their assets with BLMIS's investment advisory business (the "IA Business"),

which purportedly executed a split strike conversion strategy (the "SCC strategy").  They learned

that BLMIS served as the exclusive investment adviser, prime broker, and custodian for its IA

Business, eliminating independent checks and balances on BLMIS's operation.

7.      From their prior experience, the Brustleins and Charbonniers learned that Madoff

did not charge industry standard management and performance fees, and instead allowed the

BLMIS feeder funds to claim these fees for themselves.

8.      The Brustleins and Charbonniers understood they too could collect millions in fees

for funneling investor money to Madoff and sought to replicate this business model by creating

their own BLMIS feeder fund.  To that end, they created a structure in which they would control

Cardinal, which opened a direct investment account with BLMIS, along with two other funds that

fed into Cardinal, and a management company through which they could charge management

fees.  Through this structure, on information and belief, the Brustleins and Charbonniers collected

---

[2] The Trustee has a separate action pending against Kingate Global Fund Ltd. and Kingate Euro Fund Ltd.,
captioned *Picard v. Ceretti*, Adv. Pro. No. 09-1161 (SMB), ECF No. 100.
[3] The Trustee has a separate action pending against Fairfield Sentry, captioned *Picard v. Fairfield Sentry Limited*,
Adv. Pro. No. 09-1239 (SMB), ECF No. 23.

approximately $11 million in management fees during the three and a half years Cardinal was

invested with Madoff.  In return for those fees, the Brustleins and Charbonniers knew investors

expected the Brustleins' and Charbonniers' management company to conduct diligence in

selecting and monitoring investment managers and to continually monitor those investments.

9.      After they created Cardinal and obtained a direct IA Business customer account

with BLMIS, the Brustleins and Charbonniers recognized and understood numerous trading

impossibilities which appeared on the customer statements and trade confirmations, indicating

Madoff was not trading securities as he purported.  As agents of Cardinal, the Brustleins and

Charbonniers reviewed Cardinal's BLMIS account statements and trade confirmations as they

received them.  These account statements and trade confirmations revealed trades that were

impossible and did not happen.  For example, BLMIS purportedly traded for Cardinal's account

outside of a stock's daily price range and purportedly executed options trades that exceeded the

daily traded volume on the Chicago Board Options Exchange (the "CBOE").  BLMIS also

purportedly traded for Cardinal's account when Cardinal had insufficient funds in its IA Business

customer account even though it had no margin agreement with BLMIS and was not charged

interest for BLMIS's extension of credit.

10.      Throughout their experience with BLMIS—first through their contact with BLMIS

feeder funds and later through their ownership, management, and control of Cardinal—the

Brustleins and Charbonniers were confronted with these and other indicia of fraud suggesting a

high probability that Madoff could not possibly have been executing the SSC strategy, and thus

was either lying about his strategy, or fabricating his returns.

11.    Despite recognizing evidence of fraud at BLMIS, as agents of Cardinal, the Brustleins and Charbonniers continued to funnel investors' money to BLMIS and were rewarded with millions of dollars in fees for doing so.

12.    By this action, the Trustee seeks to recover from Cardinal the avoidable fraudulent transfers of approximately $28 million that it received prior to the Filing Date. These transfers consisted of customer property, none were taken by Cardinal in good faith, and all were taken by Cardinal at a time when it was willfully blind to fraud at BLMIS. Alternatively, Cardinal received these funds under circumstances that did or should have put it on inquiry notice of fraud at BLMIS. Cardinal must return these transfers to the BLMIS estate for ratable distribution to customers with allowed claims by the Trustee in accordance with SIPA.

## II.    **JURISDICTION AND VENUE**

13.    This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and (e)(1), and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4).

14.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

15.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

16.     This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-

2(c)(3), 11 U.S.C. §§ 105(a), 502(d), 510(c), 548(a), 550(a) and 551.

## III.    BACKGROUND, THE TRUSTEE, AND STANDING

17.     On the Filing Date, Madoff was arrested by federal agents for criminal violations

of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire

fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the

District Court Proceeding.

18.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District

Court alleging, among other things, that BLMIS could not meet its obligations to securities

customers as they came due and its customers needed the protections afforded by SIPA.

19.     Also on December 15, 2008, Judge Stanton granted SIPC's application and

entered an order pursuant to SIPA, which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS
        pursuant to SIPA § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
        SIPA § 78eee(b)(3); and

(c)     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

20.     By orders dated December 23, 2008 and February 4, 2009, respectively, this

Court approved the Trustee's bond and found that the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

21.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff,

and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the

SIPA Proceeding.

22.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

23.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

24.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

25.     On November 8, 2012, in the case captioned *United States v. Lipkin*, Case No. 10-CR-223 (LTS), Irwin Lipkin, a former controller for BLMIS, pleaded guilty to a two-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and falsifying statements in relation to documents required by Employee Retirement Income Security Act.  Lipkin admitted to helping Madoff falsify BLMIS's books and records since as early as the mid-1970s.

26.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of the IA Business.

27.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

28.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

29.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

30.     The Trustee has standing to object to customer and creditor claims under SIPA §§ 78fff-1(a) and 78fff(b), and 11 U.S.C. § 502(a), because the Trustee has the power and authority to discharge obligations to a customer to the extent they are established to the satisfaction of the

Trustee under SIPA §§ 78*lll*(2) and 78fff-2(b).  By his objection, the Trustee seeks disallowance

of any customer and general creditor claims that are unenforceable against the Debtors or their

property under (i) SIPA § 78fff-2(b), because such claims have not been established to his

satisfaction; (ii) SIPA § 78*lll*(2), because such claims are not entitled to a distribution *pari passu*

with other customers; and (iii) 11 U.S.C. § 502(b)(1), because such claims are otherwise

unenforceable under applicable law.

IV.    **BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY**

A.    **BLMIS**

31.    Madoff founded BLMIS in 1960 as a sole proprietorship.  In 2001, Madoff

registered BLMIS as a New York limited liability company.  At all relevant times, Madoff

controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

32.    In compliance with 15 U.S.C. § 78*o*(b)(1) and SEC Rule 15b1-3, and regardless

of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008.  Public

records obtained from the Central Registration Depository of the Financial Industry Regulatory

Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer from January

19, 1960 through December 31, 2008.  At all times, BLMIS was assigned CRD No. 2625.

SIPC's Membership Management System Database also reflects BLMIS's registration with the

SEC as a securities broker-dealer from January 1, 1960 through December 31, 2008.  On

December 30, 1970, BLMIS became a member of SIPC and continued its membership without

any change in status until the Filing Date.  SIPC Membership is contingent on registration of the

broker-dealer with the SEC.

33.    For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker-dealer operation, and the IA Business.

34.     BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced

Madoff to register.

35.     For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

36.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment

Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management of $11.7 billion.  BLMIS filed its last Form ADV in January 2008,

reporting that its IA Business still had only 23 customer accounts with total assets under

management of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In 2008,

BLMIS had over 4,900 active customer accounts with a purported value of approximately $68

billion in assets under management.  At all times, BLMIS's Form ADVs were publicly available.

**B.     THE PONZI SCHEME**

37.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using

money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had

no legitimate business operations and produced no profits or earnings.  Madoff was assisted by

several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David

Kugel, Annette Bongiorno, Joanne Crupi, and others, who pleaded to, or were found guilty of,

assisting Madoff in carrying out the fraud.

38.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent

activity.  It was funded, in part, by money taken from the IA Business customer deposits, but

fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

39.    To provide cover for BLMIS's fraudulent IA business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one employee was an administrative assistant, and one was a semi-retired accountant living in Florida.

40.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

*Madoff's Investment Strategy*

41.    BLMIS purported to execute two primary investment strategies for IA Business customers: the convertible arbitrage strategy and SSC strategy. For a limited group of IA Business customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

42.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s, this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of IA Business accounts.

43.    From 1992 forward, Madoff began telling IA Business customers that he employed the SSC strategy for their accounts, even though in reality BLMIS never traded any securities for its IA Business customers.  All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

44.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected substantial gains on the customers' principal investments.

45.    The SSC strategy purported to involve: (i) the purchase of a group or basket of equities (the "Basket") intended to highly correlate to the Standard & Poor's 100 Index (the "S&P 100 Index"), (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P Index call options.

46.    The put options were to control the downside risk of price changes in the Basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option would entail a loss for BLMIS.

47.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to outperform the market, because in a rising market, calls would be exercised by the counterparty.

48.    The simultaneous purchase of puts and calls to hedge a securities position is commonly referred to as a "collar."  The purpose of the collar is to limit exposure to volatility in the stock market and flatten out returns on investment.

49.    For the SSC strategy to be deployed as Madoff claimed, the total value of each of the puts and calls purchased for the Basket had to equal the notional value of the Basket.  For example, to properly implement a collar to hedge the $11.7 billion of assets under management that Madoff publicly reported in 2006 would have required the purchase of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

50.    Moreover, at all times that BLMIS reported its total assets under management, publicly available information about the volume of exchange-traded options showed that the volume of options contracts necessary to form the collar and implement the SSC strategy exceeded the available options.

51.    Sophisticated or professional investors, including Cardinal, knew that Madoff could not be using the SSC strategy because his returns regularly and consistently outperformed the market.  Not only did BLMIS regularly show gains when the S&P 100 Index was down (at times significantly), it would also post gains that exceeded (at times, significantly) the S&P 100 Index's performance.  Such results were impossible if BLMIS had actually been implementing the SSC strategy.

*BLMIS's Fee Structure*

52.     BLMIS charged commissions on individual (purported) trades rather than

management and performance fees based on the value of assets under management.  By using a

commission-based structure, Madoff inexplicably walked away from hundreds of millions of

dollars in fees.

*BLMIS's Market Timing*

53.     Madoff lied to customers when he told them that he carefully timed securities

purchases and sales to maximize value.  Madoff explained that he achieved market timing by

intermittently taking customer funds out of the market.  During those times, Madoff purported to

invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds

invested in Treasury Bills.

54.     BLMIS's market timing, as reported on its customer statements, showed an

uncanny ability to buy low and sell high such that any sophisticated or professional investor,

including Cardinal, could see it was statistically impossible.  BLMIS's customer statements also

showed, without fail, a total withdrawal from the market at every quarter and year-end.

55.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5

of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that

showed, among other things, financial information on customer activity, cash on hand, and assets

and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were

undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck

with the then-prevailing market conditions.  It would be impossible to automatically sell all

positions at fixed times, independent of market conditions, and win every time.  Yet this is

precisely what BLMIS's customer statements reported.

56.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the SSC strategy, which relied on holding long positions rather than on short-term speculative trading.

57.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

58.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

*The Collapse of the Ponzi Scheme*

59.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

60.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

61.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.    **DEFENDANT**

62.    Defendant Cardinal is an International Business Company organized under the laws of St. Lucia, with its registered address at 7 Mongiraud Street, Castries, British West Indies, St. Lucia.

63.    At all relevant times, Cardinal was a customer of BLMIS's IA Business.

64.    Cardinal was directly owned by Fidelity International Private Foundation ("Fidelity"), a foundation incorporated under the laws of the Netherlands.

65.    At all relevant times, the Brustleins and Charbonniers were the ultimate beneficiaries of and the individuals who controlled Fidelity.

66.    Brustlein and Charbonnier were agents authorized to act on behalf of Cardinal.

67.    Acting within the scope of their authority and with its consent, the Brustleins and Charbonniers dominated and controlled Cardinal as its agents.

68.    Cardinal informed BLMIS that Brustlein and Charbonnier were agents of Cardinal authorized to act on Cardinal's behalf.

69.    As agents for Cardinal, Brustlein and Charbonnier managed all material aspects of Cardinal's BLMIS account.  Brustlein and Charbonnier opened Cardinal's BLMIS account, by among other things, delivering account opening documents to BLMIS in New York, including a Customer Agreement, Option Agreement, and Trading Authorization Limited to Purchases and Sales of Securities and Options.

70.    Brustlein, as agent for Cardinal, redeemed each of the transfers from BLMIS's account at JPMorgan Chase Bank in New York, New York, #XXXXXXXXXXX1703 (the "703 Account").

71. Substantially all of the funds Cardinal invested with BLMIS originated from Rafale Partners, Inc. ("Rafale"), an investment firm founded and owned by Brustlein and Charbonnier.

72. Rafale invested in Cardinal through Dakota Global Investments, Ltd. ("Dakota"),[4] which is a private mutual fund organized under the laws of the British Virgin Islands.

73. Rafale was managed by Broadgate Management Ltd. ("Broadgate"), which was also owned by Brustlein and Charbonnier. Broadgate charged a fixed management fee of 3% per annum, calculated and paid monthly on Rafale's net assets.

## VI.    **PERSONAL JURISDICTION**

74. Cardinal is subject to personal jurisdiction in this judicial district under New York Civil Practice Law & Rules §§ 301 and/or 302 (McKinney 2001) and Federal Rule of Bankruptcy Procedure Rule 7004. Cardinal knowingly accepted the rights, benefits, and privileges of conducting and profiting from business and/or transactions in the United States and New York and should reasonably expect to be subject to New York jurisdiction.

75. Cardinal purposely availed itself of the laws and protections of the United States and New York State by, among other things, knowingly investing with New York-based BLMIS.

76. Cardinal maintained minimum contacts with New York in connection with the claims alleged herein, including but not limited to conducting transactions in New York, investing with BLMIS in New York, investing pursuant to agreements made in New York, investing pursuant to agreements delivered to BLMIS headquarters in New York,

---

[4] Pursuant to a Stipulated Order, the Bankruptcy Court has dismissed the Trustee's claims to recover approximately $24 million in subsequent transfers that Defendant Dakota Global Investments, Ltd. received from Cardinal Management, Inc. *See Picard v. Cardinal et al.*, Adv. Pro. No. 10-04287 (SMB), ECF No. 85. The Trustee has appealed the orders dismissing those claims and reserves the right to further amend his pleadings if the pending appeal is successful. *Picard v. BLMIS (In re BLMIS)*, No. 17-02292 (2d Cir. filed Sep. 27, 2017).

communicating with persons in New York, sending funds to and receiving funds from BLMIS in

New York, deriving significant revenue from New York, utilizing New York banks, and the

filing of customer claims in the Bankruptcy Court seeking to recover funds allegedly lost through

BLMIS.

77.    The Customer Agreement governing Cardinal's investments with BLMIS was

made in the State of New York and is subject to New York law.

78.    Cardinal knew that Madoff's investment strategy purportedly bought and sold

U.S. equities, U.S. options, and Treasury Bills traded on U.S. exchanges, and that the decisions

regarding which U.S. securities to buy and sell and when were made by Madoff in New York.

79.    Transactions on behalf of Cardinal were to be subject to U.S. securities laws,

including the Securities Exchange Act of 1934, the Commodities Exchange Act, the rules and

regulations of the SEC, and the Board of Governors of the Federal Reserve System.

80.    Disputes regarding transactions in Cardinal's BLMIS account were to be

determined by arbitration pursuant to the Federal Arbitration Act and New York law, before the

American Arbitration Association, the National Association of Securities Dealers, Inc., or any

other arbitration facility provided by an exchange of which Madoff was a member.

81.    Cardinal knowingly invested with BLMIS in New York.

82.    On behalf of Cardinal, Brustlein directed the transfer of all funds to and

withdrawal of money from the 703 Account in New York.

83.    Brustlein, as agent for Cardinal, met with Madoff in the United States regarding

Cardinal's investment with BLMIS.

84.    Cardinal corresponded with Madoff and BLMIS in the United States via

telephone, letter, and facsimile about the investment relationship and each of the transfers to and

from BLMIS, including receiving and reviewing the monthly account statements sent from BLMIS in New York.

85.    Cardinal filed customer claims in the SIPA Proceeding seeking to recover funds it allegedly lost on its investments with BLMIS, whereby it submitted to the jurisdiction of this Court.

## VII.    **CARDINAL WAS OWNED, MANAGED, AND CONTROLLED BY SOPHISTICATED AND EXPERIENCED ASSET MANAGEMENT PROFESSIONALS**

86.    Cardinal was indirectly owned, but fully managed and controlled by the Brustleins and Charbonniers.  The Brustleins and Charbonniers were experienced and sophisticated hedge fund and private wealth managers.

87.    Brustlein has at least 37 years of experience in the hedge fund and wealth management industry.  After earning a Master of Science in Economics from the Business School of the University of Lausanne (Switzerland), Brustlein began his professional career in 1981 as an auditor with Arthur Andersen, S.A. in Geneva.

88.    Brustlein worked as a portfolio manager from 1983 through 1989 at MM. Pictet & Cie Banquiers.

89.    Brustlein managed Pictet Bank and Trust, Ltd. in his role as vice president from 1985 through 1987.

90.    In 1989, Brustlein created Citco Financial Services (Lausanne) SA, a company actively involved in the field of wealth management, where he served as board member and managing director.

91.    Brustlein created various investment funds in the hedge fund sector.

92.     In 1998, Brustlein and his wife, Dominique Brustlein-Bobst, co-founded Brustlein & Cie, a financial engineering firm specializing in wealth structuring, mergers and acquisitions, real estate investments, and the succession of family businesses.

93.     Gabriel Charbonnier worked as an independent financial consultant since at least as early as 1994.  Before that, he was a managing director of Citco Financial Services (Lausanne) S.A.  Charbonnier also served as a private wealth manager and vice chairman of Pictet Bank and Trust in the Bahamas and worked in the audit department of Arthur Anderson S.A. in Geneva.

94.     Charbonnier was a partner of Charbonnier & Cie, a Swiss asset management business formed in 2001.

95.     In 2006, Charbonnier became president of Biltmore Capital, S.A., a financial services firm involved in acquisition, management, and brokerage activities.

96.     Together, Brustlein and Charbonnier headed T.H.E. Family Office ("The Family Office"), a Geneva-based wealth management firm.  The Family Office invested in funds, funds of funds, and early-stage private equity deals, including Kingate Global.  Charbonnier was president of The Family Office.  Brustlein was vice president, managing director, and a board member of The Family Office.

97.     Nathalie Davies-Charbonnier left her position at HSBC Republic in September 2003 to join Banque Syz & Co., S.A. ("Banque Syz") and launch its Hedge Advisory Group, where she worked until at least 2010.

## VIII.   THE BRUSTLEINS AND CHARBONNIERS HAD A LONG HISTORY OF DEALINGS WITH BLMIS FEEDER FUNDS

98.     From their experience in the European investment community generally, and their work with feeder funds that invested with BLMIS, the Brustleins and Charbonniers became intimately familiar with Madoff's purported SSC strategy and consistent investment performance.

99.     As early as 1996, Brustlein and Charbonnier, in their capacities at The Family
Office and various other investment firms, directed investments to BLMIS through the Kingate
Funds.  They also monitored these investments through, among other things, obtaining regular
reports showing the net asset value, monthly performance, and year-to-date performance of each
of the funds' share classes.

100.     As early as 1998, Davies-Charbonnier directed investments to BLMIS through
Kingate Global in her capacity at HSBC Republic.  She also monitored these investments by, for
example, obtaining regular reports from Kingate Global's administrators reflecting the trades
BLMIS purported to make on behalf of Kingate Global.

101.     In or around September 2003, Davies-Charbonnier left HSBC Republic to join
Banque Syz where she co-founded the Hedge Advisory Group—a unit dedicated to providing
active advisory services for private clients investing in hedge funds.  In this capacity, she
continued to direct and monitor investments with BLMIS through Kingate Global and Fairfield
Sentry, another BLMIS feeder fund that invested substantially all its assets with BLMIS.

102.     Davies-Charbonnier developed a close working relationship with principals who
controlled those funds, including Federico Ceretti and Andres Piedrahita.  Ceretti, along with
business partner Carlo Grosso, created the Kingate Funds to solicit investors for BLMIS
primarily from continental Europe.  Piedrahita was a principal of the Fairfield Greenwich Group,
which operated and controlled Fairfield Sentry.

103.     For example, on October 16, 2003, Davies-Charbonnier wrote to Piedrahita, "I am
looking for some Madoff, and since we are starting to do good business together I thought I
would go to you first to ask for Fairfield Sentry approx. usd 10 mio.  Please let me know if you
would do me that favour."  Piedrahita responded, "I can give you 10 mill of B shares (1% and 20)

-21-

because [it] is you I will give you back 20% of the incentive fee (keep it between us) let me know."

104.    Additionally, Davies-Charbonnier's Hedge Advisory Group at Banque Syz actively categorized, tracked, and compared the performance of numerous hedge funds, including BLMIS feeder funds, on a regular basis.  The Hedge Advisory Group prepared a "Weekly Scoreboard" report for the bank and its clients, which tracked the total assets under management, current and historical performance, cumulative average rates of return, volatility, and Sharpe ratios on Fairfield Sentry's, Kingate Global's, and Kingate Euro's purported performance with BLMIS.

105.    Over time, the Brustleins and Charbonniers wanted a direct account with BLMIS so that they could reap the benefits of its impossibly consistent returns.  By the time the Brustleins and Charbonniers created Cardinal and opened its account with BLMIS, they knew Madoff purported to use the SSC strategy and understood how it was supposed to work.  After meeting with Brustlein in July 2005, for example, just after Cardinal made its first BLMIS deposit, representatives of Access International Advisors, who administered another BLMIS feeder fund, commented that Brustlein had a very specific interpretation of the BLMIS process, which was not known by the "crowd."

## IX.    THE BRUSTLEINS AND CHARBONNIERS CREATED CARDINAL TO CAPITALIZE ON FEES WHICH THEY EITHER SUBJECTIVELY BELIEVED OR SHOULD HAVE KNOWN WERE INDICIA OF MADOFF'S FRAUD

106.    Based on their experience in the investment industry, the Brustleins and Charbonniers understood BLMIS used an unusual and unheard of fee structure, whereby Madoff inexplicably walked away from hundreds of millions of dollars in management and performance fees that investment managers traditionally charge their investors.

107.    The Brustleins and Charbonniers also knew that investment managers typically charge two types of fees for managing a client's assets: management fees and performance fees. These fees compensate managers for managing the portfolio. The management fee is usually a fixed percentage of the total assets under management, while the performance fee is based on the profits that are realized, compensating the manager for successful performance.

108.    The Brustleins and Charbonniers knew that instead of charging a customary 1% to 2% management fee and a customary 10% to 20% performance fee, BLMIS purportedly charged a transaction-based "commission" for trades: $0.04 per share on stock transactions, and $1.00 per option contract. This allowed the BLMIS feeder funds to claim for themselves the management and performance fees Madoff left on the table.

109.    The fact that Madoff was inexplicably abandoning hundreds of millions of dollars in fees should have been a major red flag that experienced and sophisticated investment management professionals like the Brustleins and Charbonniers should have investigated. The Brustleins and Charbonniers did not question Madoff's fee structure before opening Cardinal's BLMIS account, but instead determined to seize the opportunity to collect management fees for themselves.

110.    In November 2004, they asked Fritz Keller, a consultant for The Family Office, to arrange a meeting with Madoff in New York. Keller knew Madoff and his brother Peter Madoff personally and agreed to facilitate the introduction.

111.    Keller informed Madoff and Peter Madoff that Brustlein and Charbonnnier were interested in investing up to $200 million with Madoff. Madoff agreed to meet with Keller, Brustlein, and Charbonnier in London in December 2004.

112.    In January 2005, Brustlein wrote a letter to Madoff informing him that he had raised $10 million to $15 million to invest with BLMIS and asked for instructions on how to transfer the funds.

113.    The Brustleins and Charbonniers incorporated Cardinal in St. Lucia on February 4, 2005.  Less than two weeks later, they opened BLMIS account number 1FR119 in Cardinal's name (the "Account"), as set forth in Exhibit A.

114.    The Brustleins and Charbonniers created a corporate structure that allowed them to accomplish their objective to collect the lucrative management fees Madoff declined to charge.

115.    The Brustleins and Charbonniers, through Broadgate, charged a fixed management fee of 3% per annum, at the very least.  This fee was calculated based on the net asset value of Rafale, which invested substantially all of its assets in BLMIS feeder funds, including Cardinal.  In consideration for this fee, on information and belief, investors expected Broadgate to fulfill its management duties and exercise diligence in selecting and monitoring investment managers.  The Brustleins and Charbonniers understood that investors relied upon Broadgate to conduct diligence on BLMIS.

116.    On information and belief, the Brustleins and Charbonniers ultimately collected approximately $11 million in management fees based on the amount invested with BLMIS through Cardinal.

117.    BLMIS records reflect that Cardinal was included on an internal list comprised of a small group of individuals and entities with some of the largest IA Business accounts.  This list was maintained by Jodi Crupi, a BLMIS employee responsible for managing money transferred in and out of the IA Business.  Madoff credited the individuals and entities on this list with twenty-nine IA Business accounts that brought approximately $14 billion into the Ponzi scheme.

-24-

X.    **CARDINAL WILFULLY BLINDED ITSELF TO OR SHOULD HAVE KNOWN OF IMPOSSIBILITIES AND OTHER INDICIA OF FRAUD SURROUNDING BLMIS**

118.    In July 2005, Cardinal made its first deposit into the Account in the amount of $15 million.  By the time Madoff's fraud was revealed, Cardinal had deposited over $100 million into the Account, as set forth in Exhibit B.

119.    Once Cardinal funded the Account, the Brustleins and Charbonniers, as agents for Cardinal, monitored its investment with Madoff.  Brustlein, on multiple occasions, asked Madoff to send statements for the Account to Cardinal's mailing address.  When Cardinal did not receive statements for the Account during a particular period, Brustlein promptly asked Madoff to resend the statements via fax or email.  Brustlein also met with Madoff in person and visited his offices in New York.

120.    Cardinal's monthly account statements, which the Brustleins and Charbonniers, as agents for Cardinal, received and monitored, contained evidence of impossibilities regarding BLMIS's purported trading strategy and performance.

121.    These impossibilities are not facts "suggestive" of fraud or "warning signs" that should have led to further inquiry—they are quantitative evidence demonstrating that BLMIS was reporting non-existent securities transactions and that Madoff's customer statements were false.  Any one of these impossibilities shows that BLMIS could not possibly have been executing the securities trades it purported to make.

122.    In addition to the trading impossibilities revealed on the customer statements, the Brustleins and Charbonniers, as agents for Cardinal, recognized other indicia of fraud relating to Madoff's misrepresentations and deviations from the SSC strategy.  Nevertheless, as agents for Cardinal, they deliberately chose to ignore each one of these impossibilities and other indicia of fraud to continue leveraging Madoff's fictional performance and churn fees for themselves.

-25-

Alternatively, as sophisticated professionals, they should have known of these impossibilities and other indicia of fraud.

### A. Cardinal's BLMIS Account Statements and Trade Confirmations Contained Trades Outside the Daily Price Range

123.    The Brustleins and Charbonniers, as agents for Cardinal, received and reviewed account statements and trade confirmations, and promptly asked Madoff for statements that they did not receive.  These statements reflected execution prices for equities and options outside the daily price range of reported trades—transactions that literally could not have occurred.  For some of these purported equities and options trades, including the examples below, the fictional prices at which the trades were executed yielded Cardinal a profit.

124.    Cardinal's account statement and trade confirmations for the month of September 2005 reported a sale of 7,451 shares of Hewlett Packard Co. (HPQ) at an executed share price of $29.14 on September 26, 2005.  Publicly available data shows that the daily price range for Hewlett Packard Co. stock on that date ranged from a low of $28.65 to a high of $29.10.

125.    Cardinal's account statement and trade confirmations for the month of September 2005 also reported a sale of 16,437 shares of Cisco Systems, Inc. (CSCO) at an executed share price of $18.19 on September 26, 2005.  Publicly available data shows that the daily price range for Cisco Systems, Inc. stock on that date ranged from a low of $17.87 to a high of $18.18.

126.    Cardinal's account statement and trade confirmations for the month of December 2006 reported a sale of 10,412 shares of Merck & Co. (MRK) at an executed share price of $44.61 on December 22, 2006.  Publicly available data shows that the daily price range for Merck & Co. stock on that date ranged from a low of $42.78 to a high of $43.42.

127.    Cardinal's account statement and trade confirmations for the month of January 2006 reported a purchase of 585 call options at an executed share price of $1.95 on January 27,

2006.  Publicly available data shows that the daily price range for those call options on that date

ranged from a low of $2.15 to a high of $3.60.

128.    Cardinal's account statement and trade confirmations for the month of September

2007 reported a sale of 685 put options at an executed share price of $0.25 on September 20,

2007.  Publicly available data shows that the daily price range for those put options on that date

ranged from a low of $0.05 to a high of $0.10.

129.    Based on the impossibility of the trades reflected in Cardinal's account statements

and trade confirmations, it was clear to the Brustleins and Charbonniers that BLMIS could not

have been making the trades it claimed.  Nevertheless, as agents for Cardinal, they deliberately

chose to ignore this inescapable fact.  Alternatively, they should have known of this impossibility.

### B.    Cardinal's Account Statements Showed Virtually Impossible "Perfect" Timing of Trades

130.    Cardinal's account statements and trade confirmations showed that BLMIS almost

always purchased shares in the lower half of the daily price range and sold shares in the upper

half of the daily price range.

131.    The stock prices reflected on Cardinal's account statements and trade

confirmations, which the Brustleins and Charbonniers, as agents for Cardinal, requested,

received, and reviewed, demonstrated the virtual impossibility of Madoff's purported market

timing.

132.    To explain his purported ability to time the market with astonishing consistency,

Madoff represented to investors like Cardinal that he was "time-slicing," which involved

purchasing or selling stocks at specific intervals over the course of a trading day.  If, however,

BLMIS was actually purchasing or selling stocks throughout a trading day, the reported prices

necessarily would have gravitated toward the daily midpoint.  In contrast, however, the prices

reported on Cardinal's account statements and trade confirmations almost always reflected an optimal price point.

133.    For example, Cardinal's account statements and trade confirmations indicated that 83% of the time BLMIS purported to purchase stocks for Cardinal at a price below the daily midpoint price.  Similarly, Cardinal's account statements and trade confirmations indicated that 72% of the time BLMIS purported to sell stocks for Cardinal at a price above the daily midpoint price.

134.    Based on their experience and sophistication, the Brustleins and Charbonniers knew achieving these statistics while trading even a single equity is virtually impossible, but Madoff claimed to trade in baskets containing 35 to 40 equities.  To achieve these purported results, Madoff would have had to enter the market at the optimal time of the day, not just for one equity, but for 35 or 40 equities simultaneously, six or seven times a year, for thousands of accounts.

135.    Madoff's time-slicing explanation was not credible for an additional reason.  Had Madoff purchased billions of dollars' worth of 35 to 40 equities as he purported to do, the market impact of this volume of purchases would have driven the price of the equities up, making it highly improbable for Madoff to frequently purchase below the daily midpoint.  Similarly, had he sold billions of dollars' in equities as he purported to do, the market impact of this volume of sales would have driven the price of the equities down, making it highly improbable for him to frequently sell above the daily midpoint.

136.    As sophisticated and experienced investment professionals, the Brustleins and Charbonniers understood that Madoff's time-slicing explanation could not explain his ability to consistently purchase below and sell above the midpoint.  As agents for Cardinal, the Brustleins

-28-

and Charbonniers deliberately chose to ignore this inescapable fact. Alternatively, they should have known of this impossibility.

### C. Cardinal's BLMIS Account Statements Reflected Impossible Option Trading Volumes

137. Cardinal's account statements, which the Brustleins and Charbonniers received and reviewed as agents for Cardinal, showed that Madoff could not have executed the number of options trades required by his SSC strategy because the volume of put and call options purportedly bought and sold by BLMIS exceeded the daily volume of the CBOE, the only exchange on which such options are traded.

138. The trade confirmations for Cardinal's account had Committee on Uniform Security Identification Procedures ("CUSIP") numbers. These numbers uniquely identify a company, issuer, and type of security, and indicate that the options reflected were traded on the CBOE.

139. On more than 90 occasions during the 41 months Cardinal was invested with BLMIS, the options volume reported to Cardinal significantly exceeded the total volume of comparable options contracts traded on the CBOE.

140. Cardinal's account statements and trade confirmations showed that the volume of options contracts supposedly traded by Madoff routinely exceeded the total number of contracts for options with the same purchase date, strike price, and expiration date traded on the CBOE. This occurred on 92 occasions between 2005 and 2008: two times in 2005, 24 times in 2006, 25 times in 2007, and 41 times in 2008.

141. On November 15, 2006, for example, BLMIS purportedly bought a total of 1,536 OEX put options on Cardinal's behalf, when the total volume traded on the CBOE for all such

contracts that day was 1,222, exceeding the total daily volume of options traded by approximately 126%.

142.    On March 15, 2007, BLMIS purportedly sold a total of 1,998 OEX put options on Cardinal's behalf, when the total volume traded on the CBOE for all such contracts that day was 422, exceeding the total daily volume of such options traded by approximately 473%.

143.    On June 12, 2007, BLMIS purportedly sold a total of 2,025 OEX call options on Cardinal's behalf, when the total volume traded on the CBOE for all such contracts that day was 498, exceeding the total daily volume of such options traded by approximately 407%.

144.    On August 15, 2008, just two weeks before Cardinal withdrew $4,000,000 from BLMIS, BLMIS purportedly sold a total of 1,124 OEX put options on Cardinal's behalf when the total volume traded on the CBOE for all such contracts that day was 31, exceeding the total daily volume of options traded by approximately 3,625%.

145.    In total, 92 of the 295 options transactions (approximately 31%) BLMIS purported to complete on Cardinal's behalf exceeded the volume of options actually traded on the CBOE on the purported trade date.

146.    As sophisticated and experienced investment professionals, the Brustleins and Charbonniers understood it was impossible for Madoff to execute the volume of options trades he reported in the Account's statements.  Nevertheless, as agents for Cardinal, they deliberately chose to ignore this inescapable fact.  Alternatively, they should have known of this impossibility.

### D.    Madoff Could Not Have Been Trading OTC Options as he Claimed

147.    At times, Madoff claimed to execute OTC options trades with a network of counterparties he refused to identify.  At other times, he claimed simply that the OTC counterparties were large, European financial institutions or American pension funds.  Option

trades in the OTC market place are accomplished by a private contract between a party and a
counterparty. This would have required BLMIS to enter into private, individually negotiated,
arm's length contracts on behalf of its customer—Cardinal—with willing counterparties. If the
counterparty failed to perform, the BLMIS customer bore the risk. Madoff claimed
counterparties deposited Treasury Bills as collateral for performance. But no such agreements
were ever provided to BLMIS customers, nor did Madoff ever provide confirmation of where
and how those Treasury Bills were posted.

148.    To allegedly perform the options trades, BLMIS required Cardinal to execute an
Option Agreement and Trading Authorization Limited to Purchases and Sales of Securities,
under which BLMIS served as Cardinal's agent in executing any options trade. Under these
Agreements, Cardinal agreed to hold BLMIS harmless from any and all losses arising from
options transactions BLMIS entered into on its behalf. As a result, Cardinal could not look to
BLMIS if an option counterparty failed to perform. Unless the counterparties were reliable,
sufficiently capitalized, and liquid, the options could be rendered useless in hedging Cardinal's
investments.

149.    Cardinal did not review, comment on, modify, negotiate, or reject any draft or
final counterparty agreement, which they would have done had they thought the trades were
actually happening as BLMIS purported.

150.    Moreover, the Brustleins and Charbonniers, based on their sophistication and
expertise, knew Madoff's claim that BLMIS traded with counterparties in the OTC market was
facially implausible. When the entire CBOE did not trade the volume necessary to hedge
Madoff's SSC strategy, Madoff could not have found enough individual counterparties who were
willing to trade tens of billions of dollars in S&P 100 Index options.

151.    Based on Cardinal's trade confirmations, Madoff could not have been trading
OTC options because: (a) Cardinal's trade confirmations possessed CUSIP numbers for CBOE
traded options; (b) in the OTC market, option counterparties are typically identified on trade
confirmations, and none of the option trade confirmations received by the Brustleins and
Charbonniers, as agents for Cardinal, identified the counterparty; and (c) trading options in the
OTC market is more expensive than trading on the CBOE and no such costs were reflected on
BLMIS trade confirmations.  Nevertheless, as agents for Cardinal, the Brustleins and
Charbonniers deliberately chose to ignore these inescapable facts.  Alternatively, they should
have known of these impossibilities.

**E.    The SSC Strategy BLMIS Purported to Employ Could Not Yield the Results Reported on Cardinal's Account Statements**

152.    The Account's statements the Brustleins and Charbonniers requested, received,
and reviewed, as agents for Cardinal, showed Madoff was not executing the SSC strategy because
the returns in the Account were too good to be true, reflecting a pattern of abnormal consistency
and profitability that was impossible to achieve in the marketplace.  The Brustleins and
Charbonniers knew this was impossible based on their sophistication and experience in the
finance industry, including their prior experience with BLMIS feeder fund investments.

153.    Based on their understanding of the SSC strategy, the Brustleins and
Charbonniers knew that it could not have eliminated market volatility.  At best, the strategy
would have smoothed out peaks and valleys in the returns generated by the basket of S&P 100
Index stocks, but the strategy's performance should have been strongly correlated to the S&P
100 Index when BLMIS was in the market because it consisted of S&P 100 Index stocks.

154.    It was impossible for BLMIS's investors to obtain any gains on their investments,
let alone double-digit gains, when the S&P 100 Index was down significantly.  This is because

downswings in the market were hedged only by put options. BLMIS could not have turned

investment losses into double-digit gains by exercising put options—they could have only

created a floor to limit their losses. Based on the Brustlein's and Charbonnier's sophistication

and decades of experience in the investment industry, they understood that the SSC strategy

could not generate double-digit gains while the S&P 100 Index suffered significant declines.

155.    Similarly, they also understood it was impossible for the SSC strategy to

outperform the S&P 100 Index during a major upswing, as the call options BLMIS sold would

have been exercised during a significant market upswing, putting a ceiling on gains. Incredibly,

based on the Account's statements the Brustleins and Charbonniers requested, received, and

reviewed as agents for Cardinal, not a single counterparty ever exercised a single call option with

BLMIS, not even when BLMIS's purported returns outperformed the S&P 100 Index.

156.    The purported returns reflected in Cardinal's BLMIS account statements varied

drastically from the S&P 100 Index throughout the life of the investment, as shown in the table

below:

**Cardinal's Monthly Rates of Return with BLMIS vs. S&P 100 Rates of Return**

| Month-Year | Account Monthly ROR | S&P 100 ROR |
|---|---|---|
| Jul-05 | 0.20% | 2.60% |
| Aug-05 | 0.30% | **-1.45%** |
| Sep-05 | 1.10% | 0.45% |
| Oct-05 | 2.20% | **-1.77%** |
| Nov-05 | 0.80% | 3.20% |
| Dec-05 | 0.90% | **-0.79%** |
| Jan-06 | 1.00% | 1.54% |
| Feb-06 | 0.20% | 0.35% |
| Mar-06 | 1.90% | 1.19% |
| Apr-06 | 1.30% | 1.38% |
| May-06 | 0.90% | **-2.47%** |
| Jun-06 | 1.00% | **-0.28%** |
| Jul-06 | 1.50% | 1.58% |
| Aug-06 | 1.00% | 2.26% |
| Sep-06 | 1.00% | 2.99% |
| Oct-06 | 0.60% | 3.31% |
| Nov-06 | 0.90% | 1.42% |
| Dec-06 | 1.20% | 1.66% |
| Jan-07 | 0.50% | 0.96% |
| Feb-07 | **-0.20%** | **-3.46%** |
| Mar-07 | 2.20% | 0.96% |
| Apr-07 | 1.30% | 4.73% |
| May-07 | 0.90% | 3.20% |
| Jun-07 | 0.90% | **-1.38%** |
| Jul-07 | 0.50% | **-2.46%** |
| Aug-07 | 0.50% | 1.73% |
| Sep-07 | 1.30% | 3.93% |
| Oct-07 | 0.60% | 1.39% |
| Nov-07 | 1.50% | **-4.47%** |
| Dec-07 | 0.40% | **-0.92%** |
| Jan-08 | 1.10% | **-6.21%** |
| Feb-08 | 0.10% | **-4.58%** |
| Mar-08 | 0.50% | 0.01% |
| Apr-08 | 1.20% | 4.45% |
| May-08 | 1.00% | **-0.29%** |
| Jun-08 | 0.30% | **-9.08%** |
| Jul-08 | 1.10% | 0.49% |
| Aug-08 | 1.00% | 1.19% |
| Sep-08 | 1.10% | **-8.01%** |
| Oct-08 | 0.20% | **-14.59%** |
| Nov-08 | 1.30% | **-6.74%** |

157.   Cardinal's account statements consistently reflected positive returns regardless of market fluctuations.  For example, in January 2008, the S&P 100 Index suffered a loss of 6.21%.  Despite this significant decline, Cardinal's investment with BLMIS purportedly earned a positive rate of return of 1.10%.  Similarly, the last several months prior to the discovery of Madoff's fraud coincided with the recession and housing crisis of 2008.  During this period, the S&P 100 Index suffered significant losses of 8.01% in September 2008, 14.59% in October 2008, and 6.74% in November 2008.  Nevertheless, Cardinal's investment with BLMIS purportedly earned positive rates of return in each of those months of 1.10%, .20%, and 1.30% respectively.

158.   Based on the "collar," the Brustleins and Charbonniers knew that the SSC strategy could limit losses in a down market but could not transform the market's double-digit losses into positive gains.  For example, if the S&P 100 Index fell, the SSC strategy collar could protect the equity positions from sizeable losses, but could not generate substantial profits.  Nevertheless, Cardinal's investment with BLMIS purported to do precisely this.  Cardinal's investment with BLMIS spanned 41 months from July 2005 through November 2008.  During these 41 months, the S&P 100 Index suffered 17 months of negative returns.  Cardinal's investment with BLMIS, however, purported to earn positive returns in 16 of these 17 months or over 94% of the time.

159.   Even before the Brustleins and Charbonniers created Cardinal, they were aware that BLMIS purported to earn positive returns in months when the S&P 100 Index was down.  For example, beginning at least as early as 2001, Brustlein and Charbonnier managed investments into Kingate Global through The Family Office, which they operated as vice president and president, respectively.  During the 44-month period between December 2001 and July 2005, the S&P 100 Index posted positive returns in only 24 months, or roughly 54.5% of the time.  It suffered losses in 20 of the 44 months.  BLMIS purported to earn positive rates of return

during 17 of the 20 months, or 85% of the time, even though the SSC strategy invested in S&P

100 Index stocks intended to highly correlate to the S&P 100 Index.

160.     Based on their knowledge and understanding of the SSC strategy, it was clear to

the Brustleins and Charbonniers BLMIS could not have been making the trades it claimed.  As

agents for Cardinal, they deliberately chose to ignore this inescapable fact.  Alternatively, they

should have known of this impossibility.

### F.    The Dividend Activity Shown on Cardinal's Account Statements Was Impossible

161.     During periods that BLMIS was purportedly out of the market, BLMIS claimed to

invest in the Fidelity Spartan U.S. Treasury Money Market Fund (the "Fidelity Spartan Fund").

BLMIS purported to do so notwithstanding the fact that the Fidelity Spartan Fund changed its

name in August 2005.  Nevertheless, Cardinal's Account statements, which were received and

reviewed by the Brustleins and Charbonniers, as agents for Cardinal, purported to show

transactions with a fund that no longer existed.

162.     The Fidelity Spartan Fund issued dividend payments only once a month, either at

month's beginning or end.  But Cardinal's account statements often reported multiple dividend

payments by the Fidelity Spartan Fund in a calendar month, on dates that did not correspond with

published dividend payments.  In February 2007, for example, Cardinal's Account statements

reported six dividend payments from the Fidelity Spartan Fund.

163.     Cardinal's account statements almost always showed fictitious dividend payments.

Out of a total of 100 dividend payments from the Fidelity Spartan Fund over the life of the

Account, 98 were made at an improper time.  These improper dividends were reported on nearly

75% of the Account's statements the Brustleins and Charbonniers received, as agents for

Cardinal.  As agents for Cardinal, the Brustleins and Charbonniers deliberately chose to ignore

these impossible dividend payments.  Alternatively, they should have known of this impossibility.

### G.    Cardinal's Account Statements Reflected Negative Cash Balances

164.    Madoff appeared to execute the SSC strategy in a manner such that it would have

left his account holders, including Cardinal, with a negative cash balance.  This could occur for

one of three principal reasons: (i) Madoff did not liquidate a sufficient number of Treasury Bills

to generate enough cash to purchase a basket of equities; (ii) the account satisfied a redemption

request while in the market, i.e., BLMIS did not purport to sell anything to provide a withdrawal,

but simply withdrew money, creating a negative cash event; or (iii) BLMIS purported to

purchase put options before selling the corresponding call options, the sale of which was

supposed to finance the purchase of the put options according to the SSC strategy.

165.    As reflected on the Account's statements and trade confirmations, which the

Brustleins and Charbonniers received and reviewed, as agents of Cardinal, the Account went into

a negative cash position for significant amounts of money on at least eight separate occasions.

166.    Over a three-day period in November 2005, for example, the Account had an

average negative cash balance of more than $461,000.

167.    Over a two-day period in January 2006, the Account had an average negative cash

balance of more than $4.1 million.

168.    Between April 22, 2008 and April 23, 2008, the Account had an average negative

cash balance of nearly $1.4 million.

169.    Between May 22, 2008 and May 23, 2008, the Account had an average negative

cash balance of more than $1.3 million.

170.    Acting as agents of Cardinal, the Brustleins and Charbonniers knew Cardinal did not have a margin agreement with BLMIS. Contrary to industry standards, Madoff never charged Cardinal any interest for what appeared to be the extension of substantial lines of credit to finance the SSC strategy for Cardinal's benefit. As agents for Cardinal, the Brustleins and Charbonniers deliberately chose to ignore this fact. Alternatively, they should have known this was indicia of fraud at BLMIS.

**H.    BLMIS's Operational Structure Was Vulnerable to Fraud Because it Subverted Checks and Balances**

171.    BLMIS's operational structure was vulnerable to fraud because no independent broker or custodian verified the existence or value of the assets BLMIS purported to purchase on behalf of its customers.

172.    Based on their experience with other BLMIS feeder funds, the Brustleins and Charbonniers knew that BLMIS's acted: (i) as the investment adviser that implemented the SSC strategy; (ii) the broker that executed the trades pursuant to the SSC strategy; and (iii) the custodian of the accounts.

173.    They also knew it was standard industry practice for an independent third-party custodian to hold the actual funds and/or securities and for an independent third-party broker to execute the transactions.

174.    As sophisticated and experienced investment professionals, the Brustleins and Charbonniers understood that using a third-party broker and custodian is a necessary check on the investment adviser. If there is a third-party custodian, client assets are safe even if the investment vehicle becomes insolvent. But if the investment adviser acts as the custodian, the relationship is rife with the possibility of fraud because the adviser could misreport trades or misappropriate assets.

-38-

175.    Acting as agents for Cardinal, the Brustleins and Charbonniers deliberately disregarded this irregular structure and did nothing to independently verify that Madoff had actual custody of securities or that he maintained Cardinal's assets in a segregated account. Alternatively, they should have known this was indicia of fraud at BLMIS.

### I.    Cardinal's Account Statements and Trade Confirmations Reflected Option Transaction Anomalies

176.    Based on their sophistication and experience, the Brustleins and Charbonniers knew it was common industry practice for option trades to settle on the business day following execution, referred to as "T+1."

177.    Cardinal's account statements and trade confirmations, which the Brustleins and Charbonniers received and reviewed as agents of Cardinal, regularly showed options transactions that purportedly settled as many as three days after execution.  This delay allowed Madoff time to fabricate trades to report on the customer statements days after they purportedly took place.

178.    Out of 304 options transactions entered into on behalf of Cardinal, 229 (approximately 75%) were not reported within the standard T+1.

179.    As agents for Cardinal, the Brustleins and Charbonniers deliberately chose to ignore that this practice allowed Madoff time to fabricate trades on the customer statements. Alternatively, they should have known this was indicia of fraud at BLMIS.

### J.    BLMIS's Volume of Assets Under Management Was Too Large to Execute the SSC Strategy

180.    By August 2007, the Brustleins and Charbonniers knew that Madoff purported to manage at least $7.6 billion in assets based solely on Fairfield Sentry and the Kingate funds. Additionally, BLMIS publicly disclosed through its form ADV and annual amendments filed with the SEC that it was managing approximately $11.7 billion as of July 2006, $13.2 billion as of December 2006, and $17.1 billion as of December 2007.

-39-

181.    In the financial markets, scalability is the ability of an investment strategy to handle higher trading volumes or increased assets under management.  As assets under management increased for BLMIS, it would become more difficult for Madoff to find opportunities of a scale proportional to the increasing assets under management.

182.    Madoff's SSC strategy, which purportedly capitalized on inefficiencies in the market, was limited because there were fewer opportunities for inefficiencies with the most efficiently-traded and tracked stocks in the S&P 100 market.  The SSC strategy was further limited by the available volume of stock in S&P 100 companies.

183.    The Brustleins and Charbonniers knew the SSC strategy was not scalable for the amount of assets BLMIS purported to manage.  Based on their sophistication, experience, and understanding of the SSC strategy, they knew that to execute the strategy with $7.6 billion in AUM, BLMIS would have needed approximately $7.6 billion in notional value of call options.  The Brustleins and Charbonniers knew that there were not enough options in the entire market to implement Madoff's purported SSC strategy, but acting as agents of Cardinal, they deliberately chose to ignore this fact.  Alternatively, they should have known of this impossibility.

184.    In addition, despite the large trading volumes reported, Madoff's SSC strategy did not leave any "footprint" in the market.  BLMIS purportedly traded billions of dollars' worth of S&P 100 Index stocks, and at times BLMIS reported trades in S&P 100 Index stocks that represented nearly the entire volume of trades made in the market.  BLMIS also purported to enter and exit the market six to seven times every year, each time over the span of just a few days.

185.    Due to the billions of dollars Madoff purported to trade, the Brustleins and Charbonniers knew Madoff's entry and exit from the market would materially impact the

average price of the S&P 100 Index stocks he purported to trade. But they deliberately chose to ignore that there was no noticeable impact on market prices from Madoff's purported trading activity. Alternatively, they should have known of this impossibility.

**K.    Cardinal Knew BLMIS's Outdated Trade Reporting Practices Were Vulnerable to Fraud**

186.    Cardinal knew Madoff's use of delayed paper statements and their own lack of real-time access to account information was atypical and warranted further investigation in light of the other red flags of fraud surrounding BLMIS.

187.    BLMIS's practice of not providing real-time electronic access to account information deviated from standard industry practice and ran counter to Madoff's reputation as a pioneer of electronic record-keeping in the market making business. Typical investment management industry operating procedures allow clients to obtain account statements, balances, and other details through the Internet. By at least June of 2000—years before the opening of the Cardinal account—the practice of granting clients electronic access to their accounts was mainstream, particularly as a result of the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001, which permits the use of electronic records to satisfy compliance with statutes and regulations.

188.    Throughout the 2000s, consumers were conducting transactions and accessing their checking and savings accounts through online access.

189.    BLMIS, however, used outmoded technology, providing the Brustleins and Charbonniers, as agents of Cardinal, with printed account statements and paper trading confirmations that were sent via U.S. mail, three to four days after the purported trades occurred.

190.    Based on their sophistication and experience, the Brustleins and Charbonniers, as agents of Cardinal, recognized the value of having real-time access to account statements and

knew the lack of such access provided Madoff with the opportunity to manufacture fictitious

trades and manipulate and/or adjust reported prices based on hindsight. Yet, they deliberately

chose to ignore this inescapable fact. Alternatively, they should have known that this was indicia

of fraud at BLMIS.

L.    **Cardinal's Statements and Trade Confirmations Showed BLMIS Deviated
      from the SSC Strategy**

191.    The Cardinal account statements and trade confirmations, which the Brustleins

and Charbonniers received and reviewed, as agents for Cardinal, exhibited short-term options

trades that did not hedge any existing equity investment. Because these trades were purely

speculative, they were facially inconsistent with the SSC strategy in that they created precisely

the market exposure the SSC strategy was supposed to avoid.

192.    Under the SSC strategy, options trades were intended to hedge the underlying

equities, not to generate profit. In some cases, the account statements and trade confirmations

Cardinal received showed the opposite. These deviations permitted Madoff to further

manufacture his stated returns.

193.    Cardinal's account statements showed at least six short-term, one-sided,

speculative options trades that did not hedge any existing equity investment.

194.    As an illustration, in 2008, Cardinal purportedly participated in two unhedged

options trades generating more than $1.4 million in gains. These two transactions alone

amounted to approximately 11% of the total return purportedly earned by Cardinal in 2008.

195.    Based on their sophistication and expertise, as well as their experience investing

with BLMIS feeder funds, the Brustleins and Charbonniers understood that any speculative

option transaction deviated from the SSC strategy and exposed Cardinal's assets to downside

risk.

196.    In addition, BLMIS appeared to engage in option transactions that were
unbalanced because BLMIS failed to adjust corresponding hedges when it purportedly sold a
stock before the rest of the basket.  The Brustleins and Charbonniers knew that unbalanced
hedges similarly deviated from the SSC strategy.

197.    The Cardinal account statements showed five early sales from a basket before the
rest of the basket was liquidated.  These included three early sales that were not accompanied by
a corresponding sale of put options and purchase of call options on the same trade date.  For
example, in May 2007, Madoff purported to purchase a basket of S&P 100 Index stocks for
Cardinal which included over 16,000 shares of 3M Company.  According to Cardinal's Account
statements, BLMIS purported to sell the shares of 3M Company on May 16, 2007, but did not
purport to sell the remaining stocks in the basket until June 21, 2007.  Despite the early sale of
the 3M Company shares, BLMIS never purported to change the corresponding option hedges.  In
light of this early sale of 3M Company shares, the corresponding option hedges should have been
rebalanced to protect against exposure to market risk.  However, no such adjustment was
reflected in the customer statements or trade confirmations.

198.    In addition, BLMIS's exits from the market did not always comport with the SSC
strategy.  Various SEC reporting requirements are triggered when securities are invested in the
market at either quarter-end or year-end.  To evade those reporting requirements, BLMIS
purported to liquidate all investments at those times and invested the proceeds in Treasury Bills,
and BLMIS account statements reported investments only in Treasury Bills at quarter-end and
year-end.

199.    BLMIS's practice of exiting the market according to calendar, rather than market
or economic indicators, was a badge of fraud.  The Brustleins and Charbonniers knew that

-43-

Madoff touted "market timing" as a cornerstone of the SSC strategy and that BLMIS's practice

of exiting the market at quarter-end and year-end contravened that strategy because it locked

BLMIS into prevailing market conditions, regardless of whether they were favorable.  The SSC

strategy, based on long positions hedged by options contracts, themselves subject to expiration,

could not be implemented effectively under these circumstances.

200.    Based on BLMIS's deviations from the SSC strategy, including its speculative

and unbalanced options transactions and its yearly and quarterly exits from the market, the

Brustleins and Charbonniers knew Madoff was misrepresenting how he executed the SSC

strategy and achieved BLMIS's purported performance, but deliberately chose to ignore this

inescapable fact.  Alternatively, they should have known that this was indicia of fraud at BLMIS.

**M.    Cardinal Knew BLMIS's Small, Unknown Auditor Was Neither Qualified
Nor Capable of Auditing BLMIS**

201.    The Brustleins and Charbonniers knew BLMIS had billions of dollars under

management, but was audited by Friehling & Horowitz, a three-person accounting firm located in

a strip mall in Rockland County, New York.  Of the three employees at the firm, one employee

was an administrative assistant and one was a semi-retired accountant living in Florida.

202.    The purpose of an auditor is to review the financial statements of the audited firm

and determine their legitimacy in accordance with generally accepted accounting, corporate, and

government policies and principles.  Auditors, consistent with industry custom and practice, act

as a safeguard against fraud by providing independent verification of assets and financial

transactions.

203.    Information about Friehling & Horowitz's limited size, lack of professional

qualifications, and the nature of services they provided was known to Cardinal's agents.  All

accounting firms that perform audit work must enroll in the American Institute of Certified Public

Accountants' ("AICPA") peer review program. This program involves having experienced auditors assess a firm's audit quality each year. The results of these peer reviews are on the public portion of the AICPA. Friehling & Horowitz never appeared on the public peer review list because David Friehling had notified the AICPA that he did not perform audits.

204.    Based on their sophistication and experience, the Brustleins and Charbonniers, as agents of Cardinal, knew BLMIS's auditor was unqualified and incapable of performing the required domestic and international auditing functions for BLMIS. Yet, they deliberately chose to ignore this inescapable fact. Alternatively, they should have known that this was indicia of fraud at BLMIS.

## XI.    THE TRANSFERS

205.    According to BLMIS's records, Cardinal maintained and placed assets into an account with BLMIS that was designated account 1FR119, as set forth in Exhibit A.

206.    Prior to the Filing Date, BLMIS made payments or other transfers to or for the benefit of Cardinal of approximately $28 million (the "Transfers"), as set forth in Exhibit B, column 11, when Cardinal knew or should have known of, or was willfully blind to circumstances suggesting a high probability of fraud at BLMIS. Although Cardinal invested more than it withdrew from BLMIS, Cardinal is in a more favorable position than other customers of BLMIS as a result of approximately $28 million in Transfers of cash from BLMIS to or for the benefit of Cardinal.

207.    Cardinal was an initial transferee of the avoidable Transfers set forth above.

208.    The Transfers are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

209.    During the two years prior to the Filing Date, BLMIS made transfers to or for the benefit of Cardinal totaling at least $28,073,000 (the "Two Year Transfers").  *See* Exhibit B, column 10.

210.    The Two Year Transfers are avoidable and recoverable under sections 548, 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly section 78fff-2(c)(3).

211.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

212.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Transfers and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

## XII.    **CUSTOMER CLAIMS**

213.    On or about July 2, 2009, Cardinal filed a customer claim with the Trustee, which the Trustee designated as Claim # 14653.  On or about July 2, 2009, Cardinal filed a second customer claim with the Trustee, which the Trustee designated as Claim # 15267.  On or about July 7, 2009, Cardinal filed a third customer claim with the Trustee, which the Trustee designated as Claim # 70152 (collectively, the "Customer Claims").

## COUNT ONE
### FRAUDULENT TRANSFERS – 11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a) AND 551
#### *Against Cardinal*

214.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

215.    Each of the Two Year Transfers was made on or within two years before the Filing Date of the BLMIS case.

216.    Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of Bankruptcy Code §§ 101(54) and 548(a) and pursuant to SIPA § 78fff-2(c)(3).

217.    Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.  BLMIS made the Two Year Transfers to or for the benefit of Cardinal in furtherance of a fraudulent investment scheme.

218.    Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to Bankruptcy Code § 548(a)(1)(A) and recoverable from Cardinal pursuant to Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3).

219.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, from Cardinal for the benefit of the BLMIS estate; (d) directing Cardinal, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Cardinal related to or arising from, or concerning the Two Year Transfers; (e) disallowing any claim that Cardinal may have against the Debtors until such time as the Two Year Transfers are repaid to the Trustee; (f) imposing a constructive trust and/or an equitable lien over specific property over the Two Year Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (g) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate.

**COUNT TWO**
**EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS**
***Against Cardinal***

220.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

221.    Cardinal engaged in inequitable conduct, including the conduct described in this

Amended Complaint.

222.    Based on Cardinal's inequitable conduct, BLMIS's customers have been misled as

to the true financial condition of BLMIS and have been induced to invest without knowledge of

the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less

likely to recover the full amounts due to them.

223.    Cardinal's conduct enabled Madoff to prolong the Ponzi scheme that resulted in

injury to all customers and creditors of the BLMIS estate and conferred an unfair advantage on

Cardinal.

224.    Prior to the Filing Date, Cardinal benefited from the withdrawal of approximately

$28 million from BLMIS.  But for these withdrawals, there would have been additional customer

property available on the Filing Date for distribution.

225.    The Court should exercise the full extent of its equitable powers to ensure that

claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by

Cardinal, directly or indirectly against the estate, and only to the extent such claims are allowed,

are subordinated for distribution purposes pursuant to sections 510(c) and 105(a) of the

Bankruptcy Code to the allowed claims of all other customers and creditors of BLMIS.

226.    Equitable subordination, as requested herein, is consistent with the provisions and

purposes of the Bankruptcy Code.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Cardinal as follows:

i.  On the First Claim for Relief, pursuant to sections 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), judgment: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; (c) recovering the Two Year Transfers, or the value thereof, from Cardinal for the benefit of the BLMIS estate; (d) directing Cardinal, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by Cardinal related to or arising from, or concerning the Two Year Transfers; (e) disallowing any claim that Cardinal may have against the Debtors until such time as the Two Year Transfers are repaid to the Trustee; (f) imposing a constructive trust and/or an equitable lien over specific property over the Two Year Transfers, or their proceeds, product or offspring, in favor of the Trustee; and (g) awarding attorneys' fees, costs, prejudgment interest, and any other relief the Court deems just and appropriate;

ii.  On the Second Claim for Relief, subordinating all claims of Cardinal for purposes of distribution to all allowed claims of BLMIS's customers and creditors due to Cardinal's inequitable conduct pursuant to sections 105(a) and 510(c) of the Bankruptcy Code, such that no claim of Cardinal's is paid ahead of the allowed claim of any customer or creditor of BLMIS;

iii.  On all Claims for Relief, imputing the knowledge of the Brustleins and Charbonniers to Cardinal;

iv.  On all Claims for Relief, impressing Cardinal's property, or the proceeds, product and offspring of such property, with an equitable lien and/or a constructive trust in favor of the Trustee for the benefit of the estate, to the extent that the Transfers were used, in whole or in part, to purchase, improve and/or maintain such property;

-49-

v.        On all Claims for Relief, establishing a constructive trust over all Transfers and their proceeds, product, and offspring in favor of the Trustee for the benefit of the estate;

vi.       On all Claims for Relief, pursuant to federal common law, awarding the Trustee prejudgment interest from the date on which the Transfers were received;

vii.      On all Claims for Relief, awarding the Trustee's attorneys' fees, all applicable interest, costs and disbursements incurred in this proceeding; and

viii.     Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: New York, New York  
January 15, 2019

/s/ David J. Sheehan  
Baker & Hostetler LLP  
45 Rockefeller Plaza  
New York, New York 10111  
Telephone: (212) 589-4200  
Facsimile: (212) 589-4201  
David J. Sheehan  
Email: dsheehan@bakerlaw.com  
Seanna R. Brown  
Email: sbrown@bakerlaw.com  
Matthew D. Feil  
Email: mfeil@bakerlaw.com  
Frank M. Oliva  
Email: foliva@bakerlaw.com  
Chardaie C. Charlemagne  
Email: ccharlemagne@bakerlaw.com

-- and --

Baker & Hostetler LLP  
Washington Square, Suite 1100  
1050 Connecticut Avenue, N.W.  
Washington, D.C. 20036  
Telephone: (202) 861-1500  
Facsimile: (202) 861-1783  
Elizabeth A. Scully (*pro hac*)  
Email: escully@bakerlaw.com

*Attorneys for Irving H. Picard,*  
*Trustee for the SIPA Liquidation of Bernard L.*  
*Madoff Investment Securities LLC and the*  
*estate of Bernard L. Madoff*