# EXHIBIT 4

                                                              Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-99000-smb

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    ADMINISTRATIVE CASE RE: 08-01789 (SECURITIES INVEST-

8    ADVERSARY PROCEEDING),

9

10           Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13   Adv. Case No. 10-04995-smb

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

16   MADOFF INVESTMENT SECURITIES LLC,

17                  Plaintiff,

18           v.

19   TRUST u/art FOURTH o/w/o ISRAEL WILENITZ,

20                  Defendants.

21   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

22

23

24

25

Page 2

1    Adv. Case No. 10-05184-smb

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

4    MADOFF INVESTMENT SECURITIES LLC,

5                    Plaintiff,

6            v.

7    LAURA ANN SMITH REVOCABLE LIVING TRUST et al,

8                    Defendants.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11   Adv. Case No. 10-04352-smb

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

14   MADOFF INVESTMENT SECURITIES LLC,

15                   Plaintiff,

16           v.

17   RAR ENTREPRENEURIAL FUND. LTD. et al.,

18                   Defendants.

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20

21

22

23

24

25

```
                                                            Page 3

 1                     U.S. Bankruptcy Court

 2                     One Bowling Green

 3                     New York, NY  10004

 4

 5                     May 17, 2016

 6                     10:51 AM

 7

 8

 9    B E F O R E :

10    HON STUART M. BERNSTEIN

11    U.S. BANKRUPTCY JUDGE

12

13

14

15    Hearing re:  10-04995-smb, 10-05184-smb, 10-04352-smb The

16    Trustee's Request For Leave To File A Motion For a

17    Protective Order in Wilentiz.

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde
```

```
                                                              Page 4

 1    A P P E A R A N C E S :

 2

 3    WINDELS MARX LANE & MITTENDORF, LLP

 4         Special Counsel to Irving H. Picard, as Trustee

 5         156 West 56th Street

 6         New York, NY 10019

 7

 8    BY:  KIM M. LONGO

 9         JOHN J. TEPEDINO

10

11    BAKER HOSTETLER

12         Attorney for the Trustee

13         45 Rockefeller Plaza

14         New York, NY 10111

15

16    BY:  EDWARD J. JACOBS

17         NICHOLAS J. CREMONA

18

19    CHAITMAN LLP

20         Attorney for Defendants

21         465 Park Avenue

22         New York, NY 10022

23

24    BY:  HELEN DAVIS CHAITMAN, ESQ.

25
```

Page 5

1    ALSO PRESENT TELEPHONICALLY:

2    KEVIN H. BELL

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

P R O C E E D I N G S

1

2          THE COURT:  Madoff. Wait, I have one more...

3          MR. JACOBS:  Good morning, Your Honor.  Edward

4    Jacobs on behalf of the Trustee.  I believe we're here this

5    morning to discuss our April 6th letter seeking a protective

6    order concerning certain discovery served by the defendant

7    in the Wilenitz matter.  Just to avoid any confusion from

8    the start, there are 19 discovery requests at issue, but in

9    the version served by the Defendant they're numbered 1

10   through 18, and one of them is unnumbered.  So, by my count

11   there are 19 requests in total.  And they span a number of

12   various topics, and I'm prepared to go through them each

13   specifically today as briefly as I can.

14          But before I do, I would like to just provide a

15   little bit of context to the Court, which I think would be

16   helpful about what's been happening in discovery in this

17   case.  The Wilenitz matter is a case with a demand amount

18   of, approximately, $280,000.  To be fair, Ms. Chaitman has

19   told us that she intends to serve this identical discovery

20   in all of her over 100 cases, so that would obviously

21   implicate a number of other defendants with various demand

22   amounts.

23          So, we feel that it's critically important that we

24   have the issues resolved as quickly as possible so we don't

25   needlessly have to duplicate litigation by arguing about

Page 7

1    these same things in all of those cases.

2            What the Trustee has done in discovery in this

3    case is quite remarkable, and I believe unprecedented, and

4    we're very proud of it.  Without even receiving a discovery

5    request, we provide every single defendant with what we

6    refer to as their core account documents, which are their

7    customer statements, the cash activity of their accounts,

8    their correspondence files with all of their correspondence

9    to and from BLMIS over the life of their account; the

10    account opening and closing documents; and in addition to

11    that all of the applicable financial statements from BLMIS's

12    financial institutions showing the bank transfer records

13    from those independent third parties with respect to the

14    cash activity in each and every single account.

15            Where we don't have a complete set of customer

16    statements, we produce portfolio management reports, which

17    contain exactly the same information of the cash activity

18    over the life of the account.  Where we don't have those, we

19    produce spiral notebooks where various employees over time

20    at BMOIS kept meticulous notes of that cash transaction

21    activity.

22            And we provide that to every defendant.  Wilenitz

23    is no exception.  We produced, I believe, approximately,

24    19,000 records that we've indexed to make it easy for the

25    defendant to navigate exactly what's in that --

Page 8

1              THE COURT:  19,000 records for Wilenitz?

2              MR. JACOBS:  For the Wilenitz accounts, correct,

3    over the life of their accounts.  And that includes all of

4    the items that I just discussed.

5              In addition to that, obviously, it is the

6    Trustee's burden of proof to prove that BLMIS was operating

7    a fraudulent Ponzi scheme and was insolvent.  So, as the

8    Court I believe --

9              THE COURT:  Why do you have to prove insolvency?

10   You don't have to prove insolvency for an intentional

11   fraudulent transfer.  These are good faith cases.

12             MR. JACOBS:  Right.  Well, that is, I believe, our

13   burden in the bad faith actions as well.

14             THE COURT:  Why?  To prove insolvency in an actual

15   fraudulent transfer claim -- I've never heard of that.

16             MR. JACOBS:  Well, that may very well be correct,

17   Your Honor, but nonetheless, we have endeavored to make all

18   of BMOIS's financial records available.

19             THE COURT:  Let me ask, Ms. Chaitman, do you think

20   that insolvency is an issue in these cases?  Since their

21   limited to intentional fraudulent transfers?

22             MS. CHAITMAN:  I do, Your Honor.

23             THE COURT:  Why?

24             MS. CHAITMAN:  If, in fact, they could only

25   recover transfers made within the last two years, then the

Page 9

1    insolvency wouldn't be an issue.  However, they are going

2    back to the 1980s...

3            THE COURT:  But not in the good faith cases.

4            MS. CHAITMAN:  ...to calculate...

5            THE COURT:  Oh, but those aren't -- I see what

6    you're saying.  But, you know, we've been through that one

7    already.  And those aren't transfers in the sense that we've

8    been talking about.  And I think the District Court judge

9    agreed that those weren't transfers in the sense that the

10   Court's own conveyance laws mean transfers.

11           MS. CHAITMAN:  Here's my thinking, Judge, and

12   perhaps you'll disagree with me, but the Trustee makes a

13   determination of what each defendant's net equity is.

14           THE COURT:  Right.

15           MS. CHAITMAN:  He does that by going back to the

16   inception of the original account.  In my opinion, he has to

17   establish that Madoff was insolvent in 1980 because

18   otherwise, how can he invalidate a position that the

19   Defendant or the Defendant's grandfather had in 1980?  I

20   think he has to prove -- I think the Trustee has to prove

21   that Madoff was insolvent and operating a Ponzi scheme for

22   the entire period for which he's netting out --

23           THE COURT:  Well, I agree that he has to prove he

24   was operating a Ponzi scheme because the transfers have be

25   made in connection with the Ponzi scheme to get the Ponzi

Page 10

1    scheme assumption, but it doesn't sound to me like he's got

2    to prove that Madoff was insolvent to compute net equity by

3    going back and figuring out what was really in the

4    transferor's account in the amount that was actually

5    credited to the transferee account.  And, again, I use

6    transfer, and transferor, and transferee -- not in the sense

7    used in the Bankruptcy Code; just to describe what happened.

8    But, all right.

9            MR. JACOBS:  Well, Your Honor, back in 2009, as

10    I'm sure you're aware, we negotiated with a large group of

11    defendants a procedures order that governs all of the good

12    faith actions; and in connection with that there was an

13    order entered that I refer to as the procedures order that

14    allows the Trustee to make available large amounts of data

15    through an electronic data room and could submit a summary

16    report of that information concerning relevant topics

17    through a summary or an expert report.

18            That's exactly what we've done with respect to the

19    Ponzi.  As Ms. Chaitman knows, we have an expert named Mr.

20    Dubinsky, who offers a very comprehensive report on that

21    subject, and all of the data that he considered and utilized

22    in connection with his opinions have been made available to

23    every defendant through an electronic data room that

24    contains, approximately, 4 million records.

25            That report has not yet been served in the

Page 11

1    Wilenitz matter, but a copy of that report has been served

2    to Ms. Chaitman on behalf of some of her other clients in

3    different proceedings.  And in Section 4C of the procedures

4    order, that permits the Trustee to handle the voluminous

5    nature of discovery that's potentially relevant in this case

6    in that fashion.

7            THE COURT:  Well, does Ms. Chaitman or any other -

8    - clients or any other defendant have the ability to look at

9    the same documents that your expert looked at and draw their

10   own conclusions?

11           MR. JACOBS:  Absolutely.  Every single document --

12   what we've endeavored to do, Your Honor, is that what we

13   refer to as Electronic Data Room 1 contains all of the

14   underlying documents considered by Mr. Dubinsky and we're

15   also building upon that in including documents that our

16   other experts who we may offer to prove transactions and who

17   do other functions, all of those documents as well.  So,

18   that's approximately 4 million records.  Not pages, but

19   records.

20           And it's an enormous amount of data that I believe

21   is unprecedented, at least in my career, and for that reason

22   we've structured the data room in a very organized fashion

23   with issue trees.  So if you're a participant who's

24   accessing the data room, you'll see something that you might

25   be familiar with already in terms of like, an Outlook email

Page 12

1    folder tree that has topics, broken down documents,

2    financials, third party records; and then each of those

3    trees can be broken down further to drill down to J.P.

4    Morgan statements.  You know, Chicago Options Trading

5    information, Depository Trust Clearing Corporation

6    documents; all of those types of things.  It's also

7    searchable.

8         So, absolutely the Defendant has the ability to

9    conduct whatever investigation they believe is relevant to

10   the claims of their defenses, the same that our expert did,

11   and they have access to all the same information that our

12   expert did.  And we did that to be transparent and to

13   provide any data that any litigant believes that they should

14   have access to.

15        So, that's the starting point of where we are in

16   discovery.  And then because Section 4C of the procedures

17   order allows us to provide a summary report, we do that.

18   And Mr. Dubinsky painstakingly analyzes the Ponzi scheme and

19   the IA business specifically, but also the other aspects of

20   BLMIS's businesses as well.  And issues of insolvency are

21   also part of his analysis to the extent they may bear on the

22   Ponzi scheme or on other proofs we may have, or have had at

23   some point in our cases.

24        But all of the financials are considered, the

25   Ponzi scheme is considered, the stock-trading activity or

Page 13

1    lack thereof in the IA business is considered, in addition

2    to the activities of House Five proprietary trading function

3    of BLMIS and the market-making function of BLMIS.

4            As the Court, I'm sure, is aware, Rule 26 of the

5    Federal Rules of Civil Procedure governs discovery and our

6    actions, and that rule was recently amended in December of

7    2015.  The standard that discovery must be reasonably

8    calculated to lead to admissible evidence no longer exists

9    in the rule.  It was specifically eliminated.  And it was

10   replaced with language that says that discovery served must

11   be relevant and proportionate to the needs of the case.  And

12   what does proportionate mean?

13           Section B1 actually lists factors that the Court

14   should consider in determining whether discovery is

15   proportionate, and those include, and I quote, "the

16   importance of the issues at stake in the litigation, the

17   amount in controversy, the parties' relative access to

18   information, the parties' resources, the importance of the

19   discovery in resolving the issues, and whether the burden or

20   expense of the proposed discovery outweigh its likely

21   benefit.

22           We submit, Your Honor, that upon an examination of

23   all 19 of these requests, the overwhelming majority of them

24   to begin with have no relevance to this litigation or these

25   claims.

Page 14

1          THE COURT:  Which ones do?

2          MR. JACOBS:  There is a group of requests that

3    arguably have relevance to...  And in discussions with Ms.

4    Chaitman yesterday I know that she believes they have

5    relevance to whether or not BLMIS was operating a Ponzi

6    scheme, and those are 13, 14, 15, 16, 17, and 18.

7          In addition to that there are three requests that

8    ask for the Trustee to identify any instance of a factual

9    error in any of BLMIS's books and records over any time

10   period, which are objectionable for a number of reasons I

11   would like to discuss with the Court Further -- but those

12   may arguably have relevance as well.  Those are 2, 3, and 5.

13         But with respect to those requests in particular,

14   I would state for the Court that the Defendant in this

15   action submitted an affidavit in connection with her claim

16   stating that she had done a reconciliation of her customer

17   statements with her own bank accounts and that those bank

18   accounts confirmed that the customer statements for the

19   relevant accounts were accurate.

20         So, the issue of whether BLMIS's books and records

21   are accurate or inaccurate with respect to cash activity is

22   not an issue in dispute in this case.

23         THE COURT:  Well, it is, though.  It is.  Because

24   at the end of the day, you have to prove the amount of the

25   fictitious profits, basically -- the extent of liability.

Page 15

1    And that involves transfers that occurred long before the

2    two-year period.  Were there transfers from other accounts

3    in this case?  Interaccount transfers?

4            MR. JACOBS:  There were interaccount transfers in

5    this case, Your Honor.

6            THE COURT:  All right.  You would have to prove

7    that the Trustee -- or those account transfers were

8    correctly computed.

9            MR. JACOBS:  From a net equity perspective, we

10   absolutely agree, yes.

11           THE COURT:  Yeah.  So, all I'm saying is although

12   the claim only reaches back two years, you still have to

13   compute whether you call it net equity or fictitious

14   profits, that still has to be demonstrated so that you know

15   the scope of the liability.

16           MR. JACOBS:  That's correct, Your Honor.  And as

17   you may recall from the (indiscernible) trial, we submit

18   experts whose specific function is to do that.

19           THE COURT:  Okay, but the Defendants are entitled

20   to see the data --

21           MR. JACOBS:  That's absolutely right.  And we have

22   already produced in this litigation, without even having

23   received a document request, 100 percent of that data.  So

24   the Defendants have all of those records that we intend to

25   rely upon in order to prove both the net equity and to trace

Page 16

1    the transfers.

2              THE COURT:  So, you produce the records of other

3    accounts, for instance, the transferor accounts?

4              MR. JACOBS:  We do, Your Honor.  We call that our

5    initial disclosure production.  In every case where there's

6    an interaccount transfer, we replicate our production of the

7    CADs, which I described earlier, for any related accounts.

8    And by related accounts, to be clear, in our mind that means

9    any account that transferred money to the sued upon account.

10   We do provide all of that documentation.

11             And also, the only additional possible discovery

12   that I believe would be relevant to the issues of transfers

13   and net equity are the Defendants' own bank records.  And as

14   Your Honor I know is aware, this Defendant in addition to

15   others, have vigorously contested our right to those

16   documents.  The Court has rejected those objections.  That's

17   no longer an issue in this case, although I think we're

18   going to be talking about that in some others again later.

19             But in any event, our position is that the bank

20   records have limited utility.  Our experts will submit

21   reports that detail exactly why BLMIS's books and records

22   are accurate and reliable for the cash activity, transaction

23   activity for every relevant account over the life of the

24   account.  Those reports have not yet been submitted but I

25   can promise the Defendant and the Court that they will be

Page 17

1    forthcoming in the expert phase of discovery in this case.

2            If it pleases the Court, I just would like to turn

3    to some of the other categories of request that are at issue

4    today.  Well, first, let me finish my response to the

5    request that the Court asked about -- the small handful of

6    requests, maybe -- I'm bad at math on the spot but 6 to 8

7    that actually would potentially go to issues of the Ponzi

8    scheme.

9            THE COURT:  You didn't list that as your arguably

10   relevant criteria.

11           MR. JACOBS:  I'm sorry?

12           THE COURT:  I asked you which of the requests were

13   arguably relevant.

14           MR. JACOBS:  Right.

15           THE COURT:  You told me 13 through 18 and maybe 2,

16   3, and 5 with a caveat.

17           MR. JACOBS:  Correct.  And to specifically further

18   address 13, 14, 15, 16, 17, and 18, there is one request

19   that asks for the Trustee in an interrogatory response to

20   set forth the basis of -- that BLMIS was insolvent over

21   every year going back to, I believe, 1982.  Obviously, we

22   don't believe that is an appropriate request.  The burden

23   clearly would not outweigh any likely benefit, given the

24   fact that --

25           THE COURT:  Well, the Trustee has to prove...

Page 18

1   Apparently, you agree with Ms. Chaitman that the Trustee has

2   to prove --

3           MR. JACOBS:  To be clear on the record, I don't

4   agree with her characterization of our burdens of proof.

5   But Mr. (indiscernible) does address issues of insolvency in

6   BLMIS's financials in his report in painstaking detail.  So,

7   to the extent that information is relevant or would be

8   relevant at any point in time, it's something that we

9   provided through the summary report, which the procedures

10  order allows us to do.  And we've also made available all of

11  the underlying documentation that's referenced in that

12  report.

13          THE COURT:  Okay.  Have you produced the report,

14  the insolvency report?

15          MR. JACOBS:  Not in this case, Your Honor.  Not

16  yet.  We are not yet in expert discovery.  But Ms. Chaitman

17  does have a copy from other cases that are further advanced

18  and substantively the report --

19          THE COURT:  It sounds like the basis of the

20  Trustee's opinion is the expert report.

21          MS. CHAITMAN:  Do you want me to...?

22          THE COURT:  Well, why don't you finish and then

23  we'll hear from you.

24          MR. JACOBS:  Okay.  So, that request, in essence,

25  we're saying is burdensome to the extent that she's asking

Page 19

1    us to prematurely provide our report, we will provide our

2    report.  Ms. Chaitman will have an opportunity to consider

3    all of the records our expert considers.  She'll have an

4    opportunity to depose Mr. Dubinsky, although she hasn't yet

5    deposed him in any other case.  And at a minimum, the

6    Defendants should have to start with the voluminous

7    discovery we've already provided before more is demanded.

8    And I think that is a principle that is expressly baked into

9    Rule 26, particularly in light of the recent amendment,

10   where the purpose of the amendment is to ensure that

11   litigants don't get to engage in endless and abuse of

12   discovery.  And I think that that request falls into that

13   category of needless abuse of discovery, particularly given

14   everything we've already provided.

15           The same is true within that group of requests --

16   there are several requests that ask for stock trading

17   records for the market-making side of the business, and the

18   proprietary trading side of the business, and the IA side of

19   the business.  However, our contention is there were no

20   stocks ever traded for any IA investment advisory customer.

21   And that request asks for that documentation going back to,

22   I believe, 1982.

23           Your Honor, the Wilenitz accounts were opened in

24   2003, so how can any stock trading activity for any part of

25   the business, however unconnected it may be to this

Page 20

1    Defendant's IA account, have any relevance beyond 2003 as an

2    initial matter?  But even with respect to the documents

3    post-2003, again, our expert report does a very

4    comprehensive analysis of how the AI business was conducting

5    a Ponzi scheme when those docs were traded.

6            THE COURT:  Are you arguing that the requests are

7    irrelevant or that they're premature because they're really

8    expert discovery type requests?

9            MR. JACOBS:  Both, Your Honor.  I think that while

10   the relevance issue is murky -- I'm not contesting that that

11   request may be relevant; what I'm contesting is that the

12   request is not proportionate to the needs of the case.  The

13   Defendant should have to make an explicit showing as to how

14   or why that particular discovery is needed.  And, first and

15   foremost, they need to review and consider the voluminous

16   discovery precisely on that topic we've already provided.

17           So, for example, on my call with Ms. Chaitman

18   yesterday we tried to resolve some of these issues to

19   hopefully not burden the Court and we couldn't.  But we

20   discussed that in 2014, we produced to Ms. Chaitman all of

21   the DTCC records that we had showing daily stock positions

22   at BLMIS -- any part of the business going back to 2002.

23   She has that information.

24           Apparently that didn't satisfy her, so she's

25   served this request, which clearly under the proportionality

Page 21

1    standards of Rule 26, we should not have to answer.  Because

2    it is the burden of the requesting party to show the

3    relevance of the request after an objection has been made.

4    So we're objecting that it's disproportionate to the needs

5    of the case, it's burdensome, it's of questionable relevance

6    because there's been no showing as to how that would further

7    the Defendant's ability to defend against our claims.

8            THE COURT:  All right, let me hear from Ms.

9    Chaitman generally and then we'll go through each of the

10   requests.  It's just easier to do it that way.

11           MS. CHAITMAN:  Sure.  If I can just begin, Your

12   Honor, by explaining one thing:  I had proposed to Baker &

13   Hostetler a couple of months ago that we enter into a

14   consent order with respect to all of my cases -- it's a

15   little bit less than 100 -- that discovery served in one

16   case would be applicable in all cases.  In other words, I

17   said, don't force me to serve 100 discovery demands that are

18   identical in all of my cases.  Let's just agree that I can

19   serve them in any case but the demands and the responses and

20   any court rulings relating to those, unless there's a reason

21   to distinguish one defendant from another, would be

22   applicable in all cases.

23           They didn't get back to me on this.  This would

24   simplify all of this a great deal.  Otherwise, Your Honor,

25   we're all going to be burdened, you most of all.  It's just

Page 22

1    silly.  And, you know, what I tried to do with this -- with

2    Wilenitz -- yes, every account is different, but the fact of

3    the matter is I represent defendants in 100 cases and we

4    ought to be able to do this in a reasonable way.

5              THE COURT:  I don't disagree with you.  I don't

6    want to do this 100 times.  And nobody does, so...

7              MS. CHAITMAN:  Exactly.  So, may I submit to --

8              THE COURT:  Well, have the same discovery requests

9    been served in every case?

10             MS. CHAITMAN:  I haven't done it yet because I had

11   asked for a conference with you to try to resolve this.

12             THE COURT:  Well, why don't we go through these

13   discovery requests and maybe we can pare down what you're

14   entitled to ask for in future cases, and this'll provide

15   some guidance in all the cases.  The results can be the same

16   unless some case has a nuance -- like Wilenitz only goes

17   back to 2003; maybe some other case goes back to 1986 or

18   whatever.

19             MS. CHAITMAN:  If I can say, Your Honor -- I'm

20   happy to go through these with you now, but I would like to

21   make a formal motion because --

22             THE COURT:  A formal motion for what?  To compel

23   discovery?

24             MS. CHAITMAN:  Yes.  Because it's important for

25   the record to contain an order.  I mean, these go to

Page 23

1   affirmative defenses that we have in the case.  If, in fact,

2   the Court is not going to permit discovery on some of the

3   affirmative defenses, then in a sense, the Court is striking

4   an affirmative defense.  And I think that in order to

5   protect the record, we ought to be able to go through the

6   process of a motion, briefing, and then a formal order.

7           THE COURT:  Well, I'm not going to tell you can't

8   make a motion to compel discovery, but that said, maybe we

9   can go through these and we can talk about them.

10          MS. CHAITMAN:  Okay.

11          THE COURT:  Some of the argument that I'm getting

12  from Jacobs seems to suggest that discovery may be relevant

13  but it's really expert discovery.  And that you should take

14  the deposition of the expert, ask he or she what she relied

15  on, and then ask for those documents, I guess.  Although it

16  sounds like they've been produced or made available anyway.

17          MS. CHAITMAN:  What I'm trying to flesh out, Your

18  Honor -- I think --

19          THE COURT:  But the Trustee's not going to do your

20  work.

21          MS. CHAITMAN:  I'm not asking the Trustee --

22          THE COURT:  Well, but you are.  For example, one

23  of these or maybe a couple of these said, "Identify every

24  instance in which there was an error in any account,"

25  putting aside the relevancy of that.  You could do the same

Page 24

1    analysis that the Trustee did and come up with --

2              MS. CHAITMAN:  I couldn't possibly do it.  What

3    I'm asking the Trustee to do, as you know from the profit

4    withdrawal issues, there's a great deal of question as to

5    the accuracy of the records.  And the Trustee's own expert

6    has said that these records are riddled with fraud and that

7    they're not reliable.  That was the basis of the Second

8    Circuit's ruling.

9              THE COURT:  Now that the dollars are in and the

10   dollars are out, it would deem reliable by the Second

11   Circuit, because that was the basis of the net decision.

12             MS. CHAITMAN:  But there was no factual record

13   before the Court.  There was certainly no --

14             THE COURT:  Let me ask the question -- putting

15   aside the profit withdrawal issue, if the records were

16   riddled with fraud but your records are right, your clients'

17   records are right, what difference does it make?  Do you

18   think I'm going to draw an inference -- do you think I'm

19   going to try in every single case whether or not as a

20   general matter the records were accurate in every sense?

21             MS. CHAITMAN:  Judge, here's the problem:  Let's

22   just review the --

23             THE COURT:  And Wilenitz agreed that he received

24   the --

25             MS. CHAITMAN:  No, no, no, but Mr. Jacobs didn't

Page 25

1    clarify what he was saying.  For the period from 2000 on,

2    she had the bank records.  And her SIPA claim said she

3    compared her bank records to the statements.  But the

4    account predated that.  This was --

5            MR. JACOBS:  The accounts were opened in 2003,

6    Your Honor.

7            MS. CHAITMAN:  But it was a successor account.  It

8    had transfers into it from other accounts.

9            THE COURT:  But they would've only occurred after

10   2003, right?

11           MS. CHAITMAN:  No, the prior accounts were in the

12   1990s.

13           THE COURT:  All right.

14           MS. CHAITMAN:  So, if I can just explain...

15           THE COURT:  I said, you are entitled to go back...

16   Any information relating to the computation of the amount of

17   fictitious profits.  And if that involved transfers in old

18   accounts that went back to the 1980s, you're entitled to see

19   that.  I don't dispute that.

20           MS. CHAITMAN:  Right.  But here's my point, Your

21   Honor:  The DTC of trading records exists from 2002 on.

22   There is no evidence either way of trading prior to that.

23   No documentary evidence.  With respect to third party bank

24   records, the J.P. Morgan Chase account records, the Trustee

25   has those from December 1998 on.

Page 26

1          So, again, we have a vacuum of any third party

2     records which, in my opinion, are more reliable than

3     Madoff's records, for any transfers predating December 1998.

4     Now, the clients don't have these.  First of all, a lot of

5     these clients received this money from someone else, through

6     an interaccount transfer, so it's not even that they can say

7     with personal knowledge that they recall or don't recall

8     something.

9          THE COURT:  But I thought Mr. Jacob said --

10     basically, all of the data that you would need to answer

11     these interrogatories or I guess document requests,

12     whichever, have been provided.

13          MS. CHAITMAN:  Your Honor, here's the thing:

14     There are, whatever, 4 million pages of documents in the e-

15     data room, but I want the Trustee to commit in writing to a

16     position which I can then use to either move to dismiss the

17     complaint because there'll be an utter failure or proof, or

18     whatever.  I'm entitled to know whether...

19          First of all, he has no records other than

20     Madoff's own records.  If in the course of his work as a

21     Trustee there have been 150 instances where he has concluded

22     that there were factual errors in the reports, you don't

23     think that that's important for you to know?  Not

24     necessarily for Wilenitz but...

25          THE COURT:  But if we're trying the Wilenitz case

Page 27

```
 1    and there are no factual errors vis-a-vis Wilenitz...

 2              MS. CHAITMAN:  But there are, because how does the

 3    Trustee --

 4              THE COURT:  Well, fine.  No, he could find that

 5    out.

 6              MS. CHAITMAN:  No, no, no, but how does the

 7    Trustee...  The Trustee's going to come in and say that for

 8    the period prior to December 1998, I'm relying on Madoff's

 9    internal records.

10              THE COURT:  Right.

11              MS. CHAITMAN:  And he's refusing to tell me

12    whether he's found that Madoff's internal records are

13    reliable.  We know, for example, one of his profit

14    withdrawal experts said that...  Forgive me, but I don't

15    remember the exact number.  I think the expert concluded

16    that there were 47 entries which were inconsistent with the

17    conclusion that he reached.  And he concludes that that was

18    simply a mistake.

19              Well, okay.  So, how many times in the records, in

20    Madoff's internal records were there mistakes?

21              THE COURT:  Ms. Chaitman, I hear what you're

22    saying but I'm saying that unless the mistakes are in the

23    account of the particular adversary proceeding at issue, the

24    fact that there are mistakes in other accounts or other

25    records doesn't matter.
```

Page 28

```
1              MS. CHAITMAN:  But if you have no one with

2      personal knowledge, putting aside the rules of evidence,

3      which I think the Trustee can't even deal with, I don't

4      think the Trustee can even prove anything based on the rules

5      of evidence.  But let's assume that you let it in, just for

6      the weight of it, okay?  Let's say that -- how is Evelyn

7      Berezin Wilenitz, who inherited this account from her

8      deceased husband, how is she supposed to know whether he

9      realized there was a mistake in 1983 or whatever the year

10     was?  It's impossible.

11             THE COURT:  But you get the records...

12             MS. CHAITMAN:  But what do we compare them

13     against?

14             THE COURT:  How would we know there's a mistake

15     unless he's got two sets of records for the same

16     transaction, which indicates a mistake?

17             MS. CHAITMAN:  What I'm saying is that the

18     profitable withdrawal expert for the Trustee concluded that

19     there were 47 or whatever it was mistakes in Madoff's

20     account records.

21             THE COURT:  Were there any in the Wilenitz

22     account?

23             MS. CHAITMAN:  No, because he was looking at a

24     different issue.  But what I'm saying to you is that if

25     these reports were generated by people who were careless,
```

Page 29

 1   incompetent to do the job, deliberately motivated to

 2   misrepresent what was going on in the transactions, that's

 3   relevant.

 4           THE COURT:  So you can ask him at a deposition.

 5   That sounds like expert discovery.

 6           MS. CHAITMAN:  No, because I'm...  If the Trustee

 7   -- if it's been brought to his attention that the internal

 8   records are full of factual errors, I think he has an

 9   obligation to disclose that.

10           THE COURT:  I think I disagree.  Let's go through

11   the request...  As I said, you can make a motion to compel.

12   I can't tell you that you can't --

13           MS. CHAITMAN:  Yeah, I'd like to at the end of

14   this, just so we have a clear record of what the rulings

15   are.

16           THE COURT:  All right.  With respect to one, list

17   the name and address...  Well, I don't have to read it.

18   It's in there.

19           MS. CHAITMAN:  Yeah.

20           THE COURT:  I'm looking at Document 63-1.

21           MR. JACOBS:  Right.

22           THE COURT:  Is there an objection to that?

23           MR. JACOBS:  Yes, Your Honor.  This request is

24   like the other...  As the Court pointed out with respect to

25   other requests, this request is essentially seeking our work

Page 30

1    product.

2              THE COURT:  That was my reaction when I saw it.

3              MR. JACOBS:  And I explained to Ms. Chaitman on

4    the phone yesterday that, as she knows, there are

5    potentially upcoming depositions of BLMIS employees

6    happening in the PW context.  She has a right to transcripts

7    of those depositions or to participate.

8              THE COURT:  Does she have the right to ask you who

9    you spoke to?  Forgetting about what they said.

10             MR. JACOBS:  She absolutely doesn't.  That's our

11   investigatory work product.  And any mental impressions, or

12   memos, or notes that we took during our investigation are

13   work product that are shielded from discovery.

14             THE COURT:  Certainly, when you asked for witness

15   statements, that sounded like Hickman v.  Taylor, which was

16   the issue in that case.

17             MS. CHAITMAN:  You know what, Judge?  The reason I

18   want to brief that issue is that a SIPA trustee has specific

19   obligations to investigate the debtor and report to the

20   creditor body on what he finds.  And I think that there's a

21   very strong issue there.  This is not a typical adversary.

22   This is an adversary who's appointed pursuant to a federal

23   statute, which was intended to protect the customers.

24             THE COURT:  Well, the same is true of a trustee,

25   as a representative of the estate.

Page 31

1           MS. CHAITMAN:  I know, but there are SIPA overlays

2    here.  Let's just hypothesize that the Trustee has come to

3    realize that Madoff's internal records are completely

4    unreliable.  Is he then allowed to conceal that information

5    from the Defendants and pursue discovery, asking the Court

6    to rely upon documents that the Trustee has already

7    determined are completely unreliable?

8           THE COURT:  Isn't it really for me to determine

9    whether or not the records...  I assume the Trustee is going

10   to try and prove the cases through the records, whether or

11   not the records are credible.

12          MS. CHAITMAN:  Yes, but wouldn't you be -- you

13   wouldn't be influenced by the fact that the Trustee comes in

14   and says, I've determined -- I found 1,000 errors in this

15   body of documents?

16          THE COURT:  Is it your position that the Trustee

17   can make no mistake in this case?

18          MS. CHAITMAN:  It's not the Trustee's mistake;

19   it's the Madoff records...

20          THE COURT:  No.  No.  Yes, the Trustee has

21   statutory duties under SIPA, but the Trustee is also a

22   litigant.  And I don't think that either as a claim

23   determining person, who's certainly following an objection,

24   or as a plaintiff in an adversary proceeding, that the

25   Trustee has additional duties beyond the ordinary litigation

Page 32

1    duties to bear his soul and to file a complaint and say, you

2    know, I really don't think that I have a claim here but I'm

3    going to file it.

4            But in any event, I agree that Number 1 sounds

5    like it's work product, assuming it's material prepared in

6    anticipation of litigation, and I realize the Trustee has

7    certain SIPA duties to do this without regard to litigation,

8    but also has litigation duties and it's...

9            MS. CHAITMAN:  All right, so I'd like to brief

10   that issue, Your Honor.  And Number 2 goes to the same

11   issue.

12           THE COURT:  Let me just read this.  I think Number

13   2 is irrelevant and goes beyond the proportionality

14   standards -- the new rules.  If the records in your case are

15   right, it doesn't matter if the other records are wrong.

16   And if the records in your case are wrong, it doesn't matter

17   that all the other records are right.  It's about your case

18   that we're trying.

19           MS. CHAITMAN:  But, Your Honor --

20           THE COURT:  And I don't think that under the

21   federal rules of evidence I can draw -- infer a pattern and

22   practice of negligence or improper record-keeping, which is

23   really what you're asking me to do.

24           MS. CHAITMAN:  Well, I think what I'd like to do

25   is put this in a motion and lay out the rules of evidence.

Page 33

1    Because when you compare what the rules of evidence permit

2    with -- it's unusual in my experience for a trustee to be

3    relying upon records that go back as far as these records,

4    that were prepared in connection with a Ponzi scheme by

5    people who were either obviously criminals or paid to

6    overlook what they were seeing.

7              THE COURT:  You know -- and maybe this motion that

8    you're contemplating would be a good way to narrow the

9    overall scope of discovery...  By the way, again, I come

10   back to the point that I don't think solvency is relevant.

11   And if you want to set up some sort of omnibus procedure and

12   maybe we can just cut those -- not out of all these cases.

13   I may be wrong but this is an intentional fraudulent

14   transferred case; solvency or insolvency is simply not

15   relevant.  It's not an element of the claim.

16             MR. JACOBS:  Right.  Your Honor, may I confer

17   internally with my colleagues, and can we get back to the

18   Court about that proposal, which makes perfect sense?

19             THE COURT:  Yeah, I'm just throwing that one out.

20   Three, again, it's the same thing -- it's errors in other

21   persons' accounts.  And it sounds to me that at the end of

22   the day, the Trustee has produced all this information

23   anyway.  So, you can do the same analysis, can't you?

24             MS. CHAITMAN:  How would we know, Your Honor, if

25   there was a mistake in a statement that was prepared in

Page 34

1    1983?

2              THE COURT:  Well, how would the Trustee know?

3              MS. CHAITMAN:  Because he might have found

4    conflicting evidence.  In fact, as I said, as one example,

5    his expert on the profit withdrawal issue said that there

6    were, I think, 47 entries which were inconsistent, and he's

7    concluded that those were mistakes.

8              THE COURT:  Right.  So, the expert's -- and you'll

9    get all of the entries the expert looked at and you'll get

10    the account statements, and you can do the same analysis.

11             MS. CHAITMAN:  But that's limiting...  Then I'm

12    only getting what the expert got.  And there may be a whole

13    body of evidence which disproves the expert's conclusions.

14             THE COURT:  That's speculative.  But I think that

15    maybe in response to the motion I have to understand what's

16    in the data room, and what's being produced.  I know that

17    you've told me it many times.

18             MR. JACOBS:  Yes.

19             THE COURT:  And it kind of rolls over my head

20    sometimes.  But I mean, the bottom line is if you can do the

21    same analysis with the same data, because --

22             MS. CHAITMAN:  I can't.

23             THE COURT:  Let me just finish.  Then why does the

24    Trustee have to do this?  Putting aside the relevance

25    questions.

Page 35

1          MS. CHAITMAN:  Because the Trustee is in a unique

2    position to have investigated the Debtor with, you know,

3    hundreds of millions of dollars of expert assistance, and he

4    has unique access to the employees, and he has the ability

5    to know information that there's no way I could ever

6    duplicate.

7          THE COURT:  Like what?  I mean, it might take time

8    and money, I understand that, but I just don't understand --

9          MS. CHAITMAN:  Like someone coming in and saying,

10   you know, we falsified these entries.  We just made them up.

11   Because some of these --

12         THE COURT:  Well, obviously, they're all false.

13         MS. CHAITMAN:  Well, you're saying the deposits

14   and withdrawals --

15         THE COURT:  Right, those are not.

16         MS. CHAITMAN:  Okay.  But what I'm saying to you

17   is it may very well be...  I happen to believe, based on

18   what people have told me, certainly with respect to the

19   profit withdrawals, that these were not received.  They may

20   have been received by somebody else but they weren't

21   received by the customers.

22         THE COURT:  Well, then the customer denies that

23   they received it.  I just...  You know, you're certainly

24   entitled to know whether the records regarding the

25   particular defendant are correct, but if there was a mistake

Page 36

1   or a phony record on somebody else's account in 1986, I just

2   don't...  It's just not relevant.  And, as I said, you can

3   probably do the same analysis anyway.

4           Number 4 is the same thing.  A lot of this is in,

5   what is it, the Calura report or the Greenblatt report?

6           MR. JACOBS:  Well, both of those reports cross-

7   reference each other, so I tend to view it, personally at

8   least, as a comprehensive report.  But the issue with PW

9   here, Your Honor, is that obviously the request is seeking

10  that documentation across the entire body of customer

11  accounts, right, at all periods in time, and as a --

12          THE COURT:  Let me ask you a question, though, on

13  this one.  Does Wilenitz have any profit withdrawal...?

14          MR. JACOBS:  It does not.  Not in this --

15          THE COURT:  Well, how can you ask for that in this

16  case?

17          MS. CHAITMAN:  I think that, first of all, what I

18  intended to do, Your Honor, was have one set of

19  interrogatories that would cover all of my clients.

20          THE COURT:  But in this case -- you're telling me

21  you're going to make a motion to compel.

22          MR. JACOBS:  Right.

23          THE COURT:  Are you going to make a motion to

24  compel on Question Number 4, where there are no PW entries

25  in this particular defendant's...?

Page 37

1     MS. CHAITMAN:  I need to go back.  I don't recall

2   at this moment whether the predecessor account had PW

3   entries.

4     THE COURT:  Okay, fair enough.

5     MR. JACOBS:  The predecessor accounts did not have

6   any PW actions.  I checked that in preparation for this

7   hearing.

8     THE COURT:  All right.  Well, she's entitled to

9   check that and --

10     MR. JACOBS:  But, Your Honor --

11     THE COURT:  (indiscernible) have been made

12   available.

13     MR. JACOBS:  But this illustrates nicely the exact

14   reason why a standing order allowing discovery served by Ms.

15   Chaitman to apply in every single case just can't possibly

16   be workable.

17     THE COURT:  Well, I don't want to go through this

18   100 times.

19     MR. JACOBS:  I agree, Your Honor.  And if I may,

20   you know, the protective order that Your Honor issued in the

21   Nelson cases regarding discovery served, which is at issue

22   here as well, concerning the Trustee's compensation, is a

23   perfect example.  And I had a call with Ms. Chaitman

24   yesterday where I said, I understand you want to preserve

25   that issue in all of your cases.  We'll stipulate to that so

Page 38

1    that it doesn't need to be re-litigated.  But we're

2    litigating in two District Courts.  We've litigated it here.

3    We've litigated it before Judge (indiscernible).  We've

4    litigated it before Judge Rakoff.  There has to be an end at

5    some point to litigation on the same issue.

6            So, we're happy to stipulate as orders are

7    entered, and I understand the Defendant's desire to want to

8    preserve their right to appeal.  We have no objection to

9    that.  But we can't have a standing order that everything in

10   one case applies to the other.

11           I also asked Ms. Chaitman, based on my

12   representation that we would stipulate to that effect, that

13   she withdraw this discovery and she refused.  So here we are

14   having yet another hearing.

15           THE COURT:  Why don't we get back to the requests?

16           MS. CHAITMAN:  Which one are you up to now?

17           THE COURT:  Five.

18           MS. CHAITMAN:  You're up to five?

19           THE COURT:  I mean, I don't even know what that

20   means.  But it's more of this kind of all of the records

21   type thing.  I'll decide whether or not the records

22   accurately prove that the Trustee has to prove in a

23   particular --

24           MR. JACOBS:  In this request, Your Honor, Ms.

25   Chaitman raises this "riddled with fraud" accusation in

Page 39

1    various contexts.

2              THE COURT:  It's (indiscernible)...

3              MR. JACOBS:  I have no idea.

4              MS. CHAITMAN:  It's from the original Dubinsky

5    report.

6              MR. JACOBS:  I checked that report.  I was not

7    able to find it there.  So, to me, this request --

8              THE COURT:  You can't do a text search?  It's text

9    searchable, isn't it?

10             MR. JACOBS:  It is.  It's a PDF text-searchable

11   report.  I checked both the earlier report and the current

12   report, which has been revised.  I couldn't find it.  But I

13   mean, this request to me is also in addition objectionable

14   for that reason.  It's just nonsensical.  I mean, how do I

15   even respond to this?

16             THE COURT:  I agree.  Number 6...why do you have

17   to know every customer whose claim has not been paid?  Ms.

18   Chaitman?

19             MS. CHAITMAN:  I have a series of questions which

20   go to this issue, Your Honor.

21             THE COURT:  Well, I understand the argument,

22   although I've dealt with it already, about the Trustee's

23   standing.  Is that what this is going to?

24             MS. CHAITMAN:  No.  The net equity decision was

25   rendered without any factual record.  And I want to have in

Page 40

1    the record the facts with respect to, as of this point in

2    time, what claims have been paid in full, what claims have

3    not been paid in full, and what claims have been sold.

4                THE COURT:  How is that relevant to the Wilenitz

5    case?

6                MS. CHAITMAN:  Well, it's relevant to all of the

7    cases because --

8                THE COURT:  Well, let's deal with Wilenitz.  This

9    is a discovery request.  And in every case, even if you use

10   the same discovery, it's going to have to be relevant for

11   that particular case.

12               MS. CHAITMAN:  Right.

13               THE COURT:  So, how is that relevant to Wilenitz?

14               MS. CHAITMAN:  It's relevant to all the cases

15   because I think that the net equity decision was based upon

16   certain misconceptions of what the factual record would

17   ultimately show.  We have never had an opportunity to go to

18   the Second Circuit with a developed factual record, and I'm

19   anticipating that we will have that opportunity at the end

20   of these adversary proceedings.

21               THE COURT:  Well, you're not going to use this

22   adversary proceeding to create a record to go back and

23   seek...  It's probably too late now, but some sort of

24   reconsideration --

25               MS. CHAITMAN:  No, but certainly with respect to

Page 41

1    whether it's appropriate to allow a SIPA trustee to claw

2    back from innocent customers.  That is an issue the Second

3    Circuit has not yet determined, and I think that it's

4    relevant for the Second Circuit to know the facts about who

5    the claimants are, how many claims have been sold and are

6    owned by hedge funds or other speculative organizations...

7          THE COURT:  Why is that relevant to whether or not

8    Wilenitz is liable for fraudulent transfer?

9          MS. CHAITMAN:  Because, in my opinion, the Ponzi

10    scheme exception to the affirmative defense, which has

11    existed in fraudulent transfer law since Elizabeth I -- that

12    is that you cannot recover an intentional fraudulent

13    transfer from a creditor who takes in good faith on account

14    of an antecedent debt.

15          THE COURT:  And for value.

16          MS. CHAITMAN:  And for value.  And it's

17    indisputable that a customer of an SEC regulated broker is a

18    creditor of the broker -- just as if you have a bank account

19    at Chase Manhattan Bank, that you have a debtor creditor --

20          THE COURT:  No question your clients would

21    probably defraud it.

22          MS. CHAITMAN:  No, no, no, it's not a question

23    defraud it.  They were good faith creditors who took

24    withdrawals on account of an antecedent debt.

25          THE COURT:  Well, but that issue's been litigated,

Page 42

1   and in every --

2             MS. CHAITMAN:  But --

3             THE COURT:  Let me finish.  In every Ponzi scheme

4   case that I've seen, SIPA and non-SIPA, fictitious profits

5   are just not valued.  So, even if there was an obligation to

6   restore the principal or whatever, you don't pay value for

7   fictitious profits.

8             MS. CHAITMAN:  Well, there are two comments on

9   that, Your Honor.  I think that you may be grouping together

10  cases where someone was an equity investor in a Ponzi scheme

11  and cases where someone was a good faith creditor of a Ponzi

12  schemer.  And I think that the law should be different with

13  respect to those two categories.  And I think that the first

14  statute, Elizabeth in 1571, recognized that difference.

15  That difference is incorporated into the Bankruptcy Code,

16  it's incorporated into the state fraudulent transfer -- the

17  Uniform Fraudulent Transfer Law.  And, in fact, both the

18  Minnesota Supreme Court and the Texas Supreme Court have now

19  held that it doesn't matter whether it's a Ponzi scheme; if

20  the creditor has given value and takes the money in good

21  faith, it's not recoverable as a clawback.

22            THE COURT:  If you're talking about the

23  (indiscernible) case in the Supreme Court in Texas, I rode

24  that decision, and that's a creditor who provided dollar for

25  dollar value in terms of advertising for whatever it was

Page 43

1    paid, and it happened to be paid in a Ponzi scheme.  But you

2    don't provide dollar for dollar value for fictitious

3    profits, and that's the difference.

4           But look, I hear you.  Make your motion.  I'm

5    probably going to deny it because it's not relevant to

6    whether or not Wilenitz is liable for a fraudulent transfer.

7    Okay?  Number 7.  This is a similar type of request.

8           MR. JACOBS:  Yes, Your Honor.  I think 6, 7, 8,

9    and 9 all relate to the claims activities.  Some of the

10   requests purport to demand us to produce documentation on

11   behalf of the Madoff Victims Fund, which is separately

12   administered by the Department of Justice.  The Trustee has

13   no legal responsibility for the administration of that fund,

14   which goes well beyond claims of SIPA customers.  So that

15   obviously is completely objectionable, and we couldn't

16   comply even if we were ordered.

17          And, generally, I do believe that these requests,

18   6, 7 -- the unnumbered request, and 8 and 9...

19          THE COURT:  Which is unnumbered?  What page is it?

20          MR. JACOBS:  It's between 7 and 8.

21          THE COURT:  Oh, I see, I see.  Yeah, between 7 and

22   8.

23          MR. JACOBS:  I do believe that these are seeking

24   discovery and furtherance of the standing issue that this

25   court rejected in omnibus decisions on the motions to

Page 44

1    dismiss --

2              THE COURT:  Well, that's what I thought.

3              MR. JACOBS:  And discovery should additionally be

4    prohibited on that basis as well, Your Honor.  You analyzed

5    the law very meticulously, and I believe you didn't reach

6    the issue of whether the sufficiency of the customer fund is

7    determined as of the filing date for purposes of the

8    statute.  However, you did note that there is controlling

9    law in this jurisdiction stating that it is.  And,

10   furthermore, you found it's a factual --

11             THE COURT:  Oh, I was adding (indiscernible)...

12             MR. JACOBS:  Correct.  Persuasive law.

13             THE COURT:  Judge Rakoff adopted it.

14             MR. JACOBS:  Right.  And in addition to that, as a

15   factual matter, you did find that the Trustee does have

16   insufficient funds.  And I can reiterate to you, as I

17   believe you recently heard in our last omnibus update, to

18   date we've recovered, approximately, 11.1 billion.

19             THE COURT:  Well, you can certainly tell her the

20   aggregate number because it's in the report.  I think

21   it's...  Let me just see.  You can give her the aggregate

22   number of assets you had, and claims you paid, and unpaid

23   claims because it's arguably relevant.  I didn't really

24   decide the issue; I just...  Based on everything I had seen,

25   it looked like -- and even the Second Circuit agreed that it

Page 45

1   looked like the estate was insolvent.

2           MR. JACOBS:  Right.  I understand, Your Honor.

3   And, in fact, I think there's public interest in that

4   information as well.  And as we respond in each and every

5   discovery request --

6           THE COURT:  And it's in your report anyway.

7           MR. JACOBS:  It's in our reports.  It's also on

8   our website, which is regularly updated, madofftrustee.com.

9           THE COURT:  And so you agree she could get that

10  information.  Let's move on to...  Let's get off of what we

11  agree with.

12          MR. JACOBS:  All right.

13          THE COURT:  The question regarding Picard's

14  compensation we dealt with already.

15          MS. CHAITMAN:  Yeah, okay, but see, here's another

16  thing, Your Honor.  Unless and until we have an order saying

17  --

18          THE COURT:  There is an order.  It was the omnibus

19  motion order in all these adversary proceedings.  We covered

20  that issue.  You preserve that issue.

21          MS. CHAITMAN:  Okay.  But, for example, with the

22  subpoenas we're having the same issue.  We don't have an

23  order which says, I've held in the Sarah Lawrence case that

24  -- there's no defense to the subpoenas, and that's

25  applicable in all these other cases.  I need to have that in

Page 46

1    the record.

2              THE COURT:  It's applicable to all the cases.

3              MS. CHAITMAN:  Okay, can I submit an order on

4    that?

5              THE COURT:  It's already embodied in the order in

6    the omnibus motion, isn't it?

7              MS. CHAITMAN:  I don't believe so, Your Honor.

8              MR. JACOBS:  I think Ms. Chaitman is raising an

9    additional issue.  The Rule 45 bank subpoenas that we

10   litigated in Wilenitz and Sarah Lawrence --

11             THE COURT:  Well, I was talking about this issue

12   with Mr. Picard's company --

13             MR. JACOBS:  That is absolutely correct.  I agree

14   with Your Honor.  It is made applicable to every proceeding

15   by your decision in the omnibus proceeding.

16             THE COURT:  Well, the only thing I would say with

17   the bank --

18             MS. CHAITMAN:  But the Trustee objected --

19             THE COURT:  Stop.  The only thing I would say with

20   the bank subpoenas is if a defendant admits that they

21   received the particular transfers and the amounts are

22   accurate, then I might conclude that there's no entitlement

23   to the bank records based on the position the Trustee's

24   taken.  But every one of these responses to requests for

25   admission say, it's accurate but we didn't receive it, or

Page 47

1    it's accurate to the extent it agrees with the records of

2    our accountants, and those are not answers.

3              That's the issue I have.  If you just say, yeah,

4    they're accurate, then they're accurate.

5              MS. CHAITMAN:  You allowed subpoenas to be served

6    in cases where there were blanket admissions as to --

7              THE COURT:  That is not correct.

8              MR. JACOBS:  That is factually incorrect, Your

9    Honor.

10             THE COURT:  You can show me and I will reconsider

11   it, but --

12             MS. CHAITMAN:  Well, the documents have been

13   produced but --

14             THE COURT:  I went through every one of those

15   requests and Sarah Lawrence was in a different position

16   because Sarah Lawrence said, they're right to the extent

17   they agree with the reference my account takes.

18             MS. CHAITMAN:  Right.

19             THE COURT:  Others said, yes, they accurately

20   reflect what I put in, or something like that, and what came

21   out, but I didn't receive them.  You know, it was that kind

22   of stuff.

23             MR. JACOBS:  That was the Wilenitz matter.

24             THE COURT:  That was in a lot of them; it wasn't

25   just Wilenitz.  And then, you know, it just makes it more

Page 48

1    difficult.

2           MS. CHAITMAN:  So you want to do those on a one by

3    one basis?

4           THE COURT:  Well, if you are...  I'll continue to

5    go through them one on one, but I will tell you that if I

6    see those kind of answers, that's going to be the end of it.

7    All right, next is --

8           MS. CHAITMAN:  Can we go to one other thing, if I

9    can just interject?

10          THE COURT:  Sure.

11          MS. CHAITMAN:  Because this came up with a lot of

12   the subpoenas.  You had entered an order in Sarah Lawrence

13   that if there was a subpoena to which I objected, I would

14   ask for a meet and confer, and the subpoena would not be

15   served until you -- if the meet and confer was unsuccessful,

16   which of course it would be, we would then ask for a

17   conference and until you resolved it, the Trustee would not

18   serve the subpoena.

19          THE COURT:  No, these were subpoenas that were

20   served already because you were seeking protection from the

21   subpoenas.  The Trustee said he was going to serve

22   subpoenas; he was concerned about (indiscernible).  And then

23   the original, I don't want to say agreement, but the

24   original proposal that either before or after these were

25   served, the Trustee would send either a request for

Page 49

1   admission or proposed stipulations regarding the withdrawals

2   and the deposits into the account during, I guess, the two-

3   year period or the three-year period, whatever it was.  You

4   weren't being asked to stipulate to all of the withdrawals

5   and deposits.

6           And if you admitted that they were accurate, then

7   that was it; he didn't need the records.  But if you didn't

8   admit that they were accurate or there was some issue

9   relating to an affirmative defense, then he would need the

10  records.

11          In terms of the procedure that I thought was being

12  set up, you'd confer -- and that just seems to be futile at

13  this point because we're not getting anywhere with

14  conferring.  If it couldn't be resolved, you'd immediately

15  write me a letter and hold a conference like this, and I'd

16  resolve it.  But that just wasn't working.

17          MS. CHAITMAN:  But what's happened is that the

18  Trustee is now serving subpoenas before he even serves

19  discovery demands, or at the same time that he serves

20  discovery demands, so that my clients are not even given an

21  opportunity to admit or deny the transfer...

22          MR. JACOBS:  Your Honor, may I address that?

23          THE COURT:  Yes.

24          MR. JACOBS:  The Defendants have an opportunity to

25  admit to the transfers in their answer.  And any day of the

Page 50

1    week we will accept an amended answer that admits to those

2    factual issues.  There is no obligation in the federal rules

3    that discovery be served in any particular order.  Given the

4    history, as the Court very aptly notes, with Ms. Chaitman on

5    these cases and the needless litigation that has occurred on

6    this issue, yes, we are serving bank subpoenas at the

7    earliest possible date.  Because these are delay tactics,

8    it's causing unnecessary litigation, and the documents are

9    being destroyed.  And I know that the Defendants will use

10   the destruction of those documents against us, as Ms.

11   Chaitman has alluded to earlier today, and making

12   allegations we can't prove our cases.

13            THE COURT:  I'm not going to tell the Trustee that

14   he can't serve subpoenas.  If there's a subpoena served,

15   there's nothing that stops you from amending the answer or

16   just submitting an affidavit that says, yeah, I agree that

17   these are the deposits, and these are the withdrawals, and

18   either the schedule that's attached to the complaint or

19   whatever paragraph it's alleged in.

20            MR. JACOBS:  And I will reiterate, we are happy to

21   receive that on an unambiguous stipulation or omitted answer

22   any day of the week and we will scale a discovery.

23            THE COURT:  It just hasn't worked and I don't want

24   to go through that again.  It just hasn't worked.  Ten

25   relates to the Court's compensation arrangement, 11 relates

Page 51

1    to the Court's compensation...

2              MS. CHAITMAN:  Right, and 12 does.

3              THE COURT:  Well, 12 relates to other attorneys'

4    compensation.  And I go with that in the omnibus decision --

5              MS. CHAITMAN:  Right.  Okay.  So, 13...

6              THE COURT:  I think that the Trustee supplied the

7    list, didn't you?

8              MR. JACOBS:  We did supply --

9              MS. CHAITMAN:  He supplied the list but it was a

10   list of all the employees; it didn't break it down by

11   what...

12             MR. JACOBS:  That's not correct, Your Honor.  We

13   responded to this...  I don't believe we had to --

14             THE COURT:  Where is that attached?

15             MR. JACOBS:  It's attached to our responses to

16   these requests that we attached to our letter, which is

17   dated May 4th.  That's the list that has every employee that

18   we could identify making a reasonable search --

19             THE COURT:  Do you have a list that -- not

20   creating a list, but do you have a list that breaks down

21   which of the divisions the employee worked for?

22             MR. JACOBS:  We do and we've provided it

23   specifically.

24             THE COURT:  Where?

25             MR. JACOBS:  And here's the issue:  I don't

Page 52

```
 1    believe it's before the Court in any of the party's filings,

 2    but all of that documentation is in the data room, which is

 3    our objection to having to even respond to the request.

 4            THE COURT:  Well, if it's in the data room -- I

 5    mean, even if she makes a motion to compel, if you'd

 6    convince me that it's been turned over or made available --

 7            MR. JACOBS:  It has.  We endeavored to

 8    specifically -- we identified for Ms. Chaitman the payroll

 9    records for January 2008 that list all of the employees,

10    which was part of the request; we identified an internal

11    BLMIS list, which breaks out each employee by their

12    division; and then she objected that we hadn't given her

13    addresses and phone numbers, so we endeavored to compile the

14    list that you see attached to our responses and our May 4th

15    letter, which is before you now.  That's a list we were able

16    to create upon a reasonable search to the best of our

17    knowledge.

18            THE COURT:  And as I understand it, you provided a

19    list, which identifies which of the employees work for which

20    division?

21            MR. JACOBS:  We did.  It already was in the data

22    room and always available to Ms. Chaitman.  We reproduced it

23    and identified it by Bates Number.

24            THE COURT:  Ms. Chaitman, you've got to look at

25    this stuff before you --
```

Page 53

1           MS. CHAITMAN:  Yeah, I did.  I will go back and

2    look at it again.  I do not believe that it broke it down

3    that way, but I will look at it.

4           THE COURT:  All right.  14 I think is permissible.

5    That goes back to the computation of net equity, which is

6    basically the same as the computation of fictitious profits.

7           MR. JACOBS:  Right.

8           THE COURT:  And, you know, she's entitled to

9    inquire to how you computed the net equity in a particular

10   account.  Now, it may make sense -- I don't know how you're

11   going to do this with one expert and however many cases you

12   have at this point, but she's certainly entitled to ask how

13   did you compute the next equity in the transferor account

14   back in whenever it was.

15          MR. JACOBS:  I don't disagree, Your Honor.  That's

16   a subject of expert reports that will be proffered in expert

17   discovery.  There are three.

18          THE COURT:  Yeah, I mean, some of this may be

19   relevant but premature.  That's all I'm suggesting.

20          MS. CHAITMAN:  But why do I have to wait for an

21   expert report?  This is a factual issue.  I don't even think

22   --

23          THE COURT: But you've gotten the information

24   already.

25          MR. JACOBS: We've produced 100 percent of the

Page 54

1    underlying documentation.

2                THE COURT:  It's been produced.  If you want to go

3    and do it...  My response is if it's been produced and you

4    can make this determination, then go ahead and make it.

5                MS. CHAITMAN:  It hasn't been, Your Honor.  Again,

6    we're dealing with the period prior to December 1998, when

7    there are no checks.  So, how can an expert testify that

8    something was deposited --

9                THE COURT:  But that's his problem.  He can only

10   produce what he has.

11               MS. CHAITMAN:  But the point is -- he didn't say

12   here that he's not producing it because he doesn't have it.

13   If that were in the record, it would be different.  He's

14   objecting to producing it.

15               MR. JACOBS:  I'm objecting to this request in its

16   current form as being burdensome under the proportionality

17   standards of Rule 26 when, by court order, we are permitted

18   to provide all of the underlying documentation and an expert

19   summary report on this exact issue, which we have done and

20   we will do.

21               THE COURT:  As I had said, if you have provided

22   the information or provided access to the information,

23   that's --

24               MS. CHAITMAN:  Right, and if Ms. Chaitman believes

25   there are holes in the records or incomplete analyses, she

Page 55

1    is more than able to examine those experts and conduct

2    expert discovery on those exact issues at that time.  But

3    until she has raised a bona fide dispute, I don't believe

4    that Rule 26 entitles defendants to blanket discovery on

5    broad issues like this without a demonstration of the need

6    under the proportionality standards of the rule.

7            MS. CHAITMAN:  Judge?

8            THE COURT:  Yeah?

9            MS. CHAITMAN:  This is not proportionality.  The

10   Trustee's going to come in and say that even Berezin

11   Wilenitz has a negative net equity based on transactions

12   which occurred prior to December 1998...

13           THE COURT:  I agree with you.  But he's saying

14   he's produced that information.

15           MS. CHAITMAN:  But no, they don't have the

16   information.  What he's saying is his expert is going to

17   say, you know, I conclude --

18           THE COURT:  Does he have to tell you what he

19   doesn't have, or does he have to simply say, I will produce

20   everything that I have that's responsive to this request?

21   And then you ask the expert at a deposition, you know, what

22   records did you review?  Did you review -- did you compare

23   the account statements in 1998 with bank statements?  And

24   he'll say, well, I didn't have any bank statements.  And

25   then you can raise that at trial -- that his report, in

Page 56

1    terms of the computation of net equity in the transfer

2    account is not accurate and, therefore, you can't know what

3    the fictitious profits were, if any, that he's suing for in

4    this case.

5            MS. CHAITMAN:  Okay.  I mean, it just delays the

6    process.  Because I believe that I would be entitled to

7    dismiss all of the complaints where the Trustee has no third

8    party records to prove...  Just as a matter of the rules of

9    evidence, you can't prove a payment to someone through an

10   expert report.

11           THE COURT:  Well, I don't know how the expert...

12   If the expert had no records, I don't know how the expert

13   came up with the report.  So, obviously, the expert has some

14   records and is probably extrapolating --

15           MS. CHAITMAN:  The expert has Madoff statements.

16           THE COURT:  I agree with you...  Let me just

17   finish it off on this.  I agree with you that you were

18   entitled to inquire into the computation of fictitious

19   profits, which may go back to the beginning of time.  On the

20   other hand, the Trustee can only produce what he has.  I'm

21   told the Trustee has made that available.  And then the next

22   step is to ask the expert what he relied on and what he

23   didn't have to determine what the gaps are in the evidence

24   if you can't determine it from what the Trustee's produced.

25           If you are concerned that the Trustee is suddenly

Page 57

1   going to show up with records that he didn't produce, you

2   know, that's true in every case.  And then I guess we'll

3   have a fight over whether or not these documents were ever

4   made available to you.  Let's move on.

5           15 is this insolvency issue.  And maybe in

6   response to the motion to compel...well, I guess there are

7   other lawyers involved on this issue.

8           MR. JACOBS:  Yes.  And I would...

9           THE COURT:  Maybe it's a good omnibus issue.

10          MR. JACOBS:  Yes, I believe that you suggested

11   that earlier and I think we would love to confer about that.

12          THE COURT:  Except in certain streamlined cases,

13   if insolvency is irrelevant.  I remember when I saw this

14   issue, it just struck me that it's irrelevant in an

15   intentional fraudulent transfer case.

16          MS. CHAITMAN:  Okay, so, 16, Your Honor, goes to

17   the issue that I had raised with you once and you said you

18   were familiar with --

19          THE COURT:  I thought that information has been

20   provided already, though.  Didn't you provide the DTC

21   records?

22          MR. JACOBS:  We have, Your Honor, going back to

23   2002 -- maybe it was 2003; I'd need to check, but one of

24   those two years for sure.

25          THE COURT:  Is that the last year or the first

Page 58

1    year that you have records?

2            MR. JACOBS:  Yeah.  So, what we did -- because I

3    think it's helpful, I'd love to explain very briefly -- we

4    did rule 2004 subpoena DTC.  They produced records to us.

5    Ms. Chaitman has copies of those productions.  We also

6    restored all of the live data on the active DTC terminal

7    that BLMIS used.  Ms. Chaitman has all of that data.

8            DTC had also made a similar production to the SEC;

9    Ms. Chaitman also has a copy of that production.  And,

10   collectively, those records show daily trading positions

11   going back to 2002.

12           THE COURT:  So, what more do you need?

13           MS. CHAITMAN:  Your Honor, let's just hypothesize

14   we're talking about someone whose net equity is calculated

15   over a period beginning in 1982, okay?  The only way, in my

16   opinion, that the Trustee could conceivably be entitled to

17   this Ponzi scheme presumption, which would allow him to void

18   transfers going back to 1982, is if Madoff was operating a

19   Ponzi scheme in 1982.

20           THE COURT:  Right.

21           MS. CHAITMAN:  And I'm entitled -- let's assume,

22   for example, that he had 200 employees, six of them were

23   involved in the Ponzi scheme, 194 of them were involved in a

24   legitimate trading business, and the legitimate trading

25   business did $16 trillion, and the Ponzi scheme in 1982 did

Page 59

1    half a million.

2            THE COURT:  Mm hmm.

3            MS. CHAITMAN:  You could very reasonably determine

4    that the Ponzi scheme presumption cannot apply to that year.

5            THE COURT:  Okay.  I'm not arguing with you but I

6    thought that whatever records they had had been turned over.

7            MS. CHAITMAN:  No, they have internal records that

8    they have not turned over.  They have monthly reports as to

9    what the trading volume was in the market making unit, in

10   the investment advisory unit, and in the --

11           THE COURT:  Well, the investment advisory but

12   there's no trader.

13           MS. CHAITMAN:  Excuse me, I mean the market making

14   and the proprietary trading.

15           MR. JACOBS:  We have turned over everything that

16   we have.  We scoured the ends of the earth, we have been in

17   discussion with DTC to try to find out if there are more

18   documents.  Ms. Chaitman subpoenaed DTC.  She obviously has

19   subpoena power.  She can go out into the world and conduct

20   third-party discovery...

21           THE COURT:  Okay, but she's entitled also to ask

22   you what documents you have.

23           MR. JACOBS:  Your Honor, we didn't make 4 million

24   records available because we're trying to hide anything.  We

25   have made everything we have available within the parameters

Page 60

1    of what is readily accessible and reasonable under the

2    federal rules of civil procedure.  Well beyond that.  But we

3    have made everything on this issue that we have available.

4           And, again, Mr. Dubinsky in his report, as Ms.

5    Chaitman knows, again, it hasn't been served here yet --

6    goes through a painstaking analysis of how the IA business

7    never conducted trades.  It also goes through a painstaking

8    analysis of how cash infusions from the Ponzi scheme propped

9    up House Five, which is the --

10          THE COURT:  Right, but she's still entitled to the

11   records.

12          MR. JACOBS:  She has all of the records.

13          THE COURT:  All right, then if she has them, she

14   has them.

15          MS. CHAITMAN:  Well, why can't he -- if he claims

16   that there are monthly reports for the legitimate trading

17   units, why can't he just give me the Bates Numbers?  Why do

18   I have to go on a fishing expedition through 4 million pages

19   of documents and then come back and say, they're not here?

20          THE COURT:  Wouldn't he have to do the same thing?

21          MR. JACOBS:  That's exactly what this is, Your

22   Honor, a fishing expedition.

23          MS. CHAITMAN:  They know where they are.

24          MR. JACOBS:  One of the exact criteria under Rule

25   26B2 is she has equal access to the records that we do.

Page 61

1           THE COURT:  And, again, this comes back to my

2    understanding of the records.  If you have tables of content

3    or indices...

4           MR. JACOBS:  I do.

5           THE COURT:  I don't want to see them now.

6           MR. JACOBS:  Okay.

7           THE COURT:  If you have those things and somebody

8    can look at them and see the subject matter of what they

9    want to look at, figure out what to look at, fine.

10          MR. JACOBS:  There is a subfolder in Data Room 1

11   that is called DTC that has all of those records.

12          MS. CHAITMAN:  I'm not asking for -- I have the

13   DTC records.

14          THE COURT:  She wants other non-DTC records.

15          MR. JACOBS:  To the extent we have them in

16   addition to publicly available information that we obtain,

17   it's all in the data room clearly labeled.

18          THE COURT:  You'll have to show me when the time

19   comes.  17 -- these are the number of employees that work

20   for each unit.

21          MR. JACOBS:  Yes, Your Honor.  And as I had

22   mentioned before, we provided a specific chart that contains

23   this exact information, even though I believe we're not

24   obligated to because it had already been made available in

25   the data room and could've been found with the click of a

Page 62

1    mouse.

2              MS. CHAITMAN:  I've asked for each year of the

3    operation.  I have it only for the last year.

4              MR. JACOBS:  To the extent we have it, again, the

5    Defendant has equal access to those documents.  We shouldn't

6    have to do their work for them.

7              THE COURT:  And how would she know who's working

8    for which division each year?

9              MR. JACOBS:  Your Honor, how would we know?  The

10   Trustee doesn't have personal knowledge.  We would have to

11   do an investigation, which is what the Defenders would do.

12             THE COURT:  This is interrogatory.  How would you

13   do that investigation?

14             MR. JACOBS:  We would do exactly what Ms. Chaitman

15   would have to do and start searching through the document

16   repository to find supporting documentation that would

17   answer those questions based on our best ability, without

18   personal knowledge of having been present at the time.

19             THE COURT:  Well, you know, that's an aspect of

20   the case.  Nobody really has personal knowledge, who's

21   involved in the case at this point.

22             MR. JACOBS:  Right.

23             THE COURT:  Everything is through records.

24             MR. JACOBS:  But also, Your Honor, what's the

25   relevance?  What is the relevance?

Page 63

1              THE COURT:  Well, her argument, though, is that it

2      wasn't a Ponzi scheme if, of the 200 employees, 190 were

3      working for the so-called legitimate divisions of BLMIS, and

4      those divisions were generating a lot of money.  Now, that's

5      probably not the case...

6              MR. JACOBS:  Right.

7              THE COURT:  ...in terms of generating money; I

8      don't know about the number of employees, from everything

9      I've seen.  But, you know, I guess it's relevant to whether

10     or not there was a Ponzi scheme on the date of a transfer.

11             MR. JACOBS:  Well, all of the financial

12     information concerning the House Five's operations is in the

13     data room in a folder...in various folders.  That's

14     available to the Defendants -- as it's discussed in the

15     report of Mr. Dubinsky.

16             THE COURT:  I didn't understand 19.

17             MS. CHAITMAN:  You didn't understand the

18     interrogatory?

19             THE COURT:  Yeah.  I just had a note here, I

20     didn't understand.  Let me read it again.

21             MR. JACOBS:  Well, Your Honor --

22             THE COURT:  Let me just read it.

23             MR. JACOBS:  Okay.

24             THE COURT:  Oh, the reason I guess I didn't

25     understand it is I didn't think BLMIS held any stock.

Page 64

1          MS. CHAITMAN:  Well, it was Madoff until 2001, and

2     then nit was BLMIS.  There were times when Madoff did trades

3     equal to 10 percent of the daily volume on the New York

4     Stock Exchange.  He had a huge portfolio of securities.

5          So, what I'm asking is -- I mean, let's assume

6     that every security which was listed on the split strike

7     conversion customer statements was actually held in huge

8     volumes by Madoff at the time.  It simply wasn't allocated

9     to the investment advisory --

10          THE COURT:  But I thought it wasn't held.  I

11     thought he never engaged in a securities transaction.

12          MS. CHAITMAN:  Only -- what the Trustee has said,

13     he never engaged in securities transactions in the

14     investment advisory business.

15          THE COURT:  Right.

16          MS. CHAITMAN:  He had huge stock positions with

17     the same securities...  I mean, I've been able to do this

18     with the DTC records.  I can show that every security that

19     was listed on an investment advisory customer statement was

20     held by Madoff at that time.

21          THE COURT:  Mm hmm.

22          MS. CHAITMAN:  But the point is, I can't go back

23     before 2002, and I'm asking the Trustee if he has the

24     records to give that to me.

25          THE COURT:  So, how is this interrogatory

Page 65

1    different from, I think it was 16 he was talking about?  16

2    doesn't ask to identify the specific stock but...

3            MS. CHAITMAN:  I'm just getting the volume.

4    Because one of the arguments will be that the investment

5    advisory volume was X percent of the total and, therefore,

6    this was not a Ponzi scheme.

7            THE COURT:  And what does 18 relate to?

8            MS. CHAITMAN:  18 relates to the specific

9    securities.  In other words, the Trustee's position is that

10   Madoff did not own the securities that were shown on the

11   statements.  And, in fact, I've already established that

12   Madoff did own the securities that were shown on the

13   statement; not in the volume that was on the statement.

14           THE COURT:  Owned them in its own name?

15           MS. CHAITMAN:  Madoff's or BLMIS.  Yeah, for that

16   period it's BLMIS, yes.  Yeah, they held securities.  They

17   were a huge securities dealer.  So then how do you decide

18   whose securities they were?

19           THE COURT:  Well, BLMIS held it in its own name,

20   right?

21           MS. CHAITMAN:  Yeah.  But the thing is if you buy

22   100 shares of IBM today from Merrill Lynch, they don't have

23   to actually get the securities and stick them in your

24   pigeonhole.  They have them on account; they owe it to you.

25           THE COURT:  And how is this relevant to the

Page 66

1    lawsuit?

2              MS. CHAITMAN:  Because there's no...  The basis of

3    the Trustee's argument is that there were no securities ever

4    purchased.  There was one entity, whether it was Madoff as

5    the sole proprietor or BLMIS, there was one entity operating

6    a company with 200 employees, of which a very small

7    percentage were involved in the investment advisory

8    business.  If that entity held securities positions, who's

9    to say that they couldn't have been allocated to Mrs.

10   Wilenitz?

11             MR. JACOBS:  I think that is a tenuous assertion

12   at best.  And Ms. Chaitman again needs to make a showing

13   that those securities were actually held on behalf of the IA

14   business customer and her defendant, I think, in order to

15   show an entitlement to discovery.

16             THE COURT:  How would she show the allocation, or

17   how would you show that they weren't --

18             MR. JACOBS:  Well, I mean, Ms. Chaitman says she's

19   done an inventory of the DTC records and it looks like there

20   might've been a stock held at some point in connection with

21   some function of BLMIS that matches the name of a stock

22   appearing on a customer statement.  That's not proof that

23   the stock was ever bought or sold on behalf of that customer

24   for their account.

25             THE COURT:  But what would you have to show to

Page 67

1    prove that?  I'm assuming in the best of circumstances you

2    have BLMIS owning 100 shares of IBM.

3              MR. JACOBS:  Right.

4              THE COURT:  And the Wilenitz account statement

5    showing 50 shares of IBM.

6              MR. JACOBS:  Right.  Well, as is discussed at

7    length in our expert report, one example is that many of the

8    customer statements reflect purported stock trades that

9    couldn't have been possible given the price and the amount

10   purported to have been sold as reflected on the customer

11   statements.

12             THE COURT:  But she's saying something different

13   on this one.  She's saying there was an actual trade and

14   BLMIS owned an actual stock from one of its other

15   businesses.

16             MR. JACOBS:  Right.

17             THE COURT:  One of the (indiscernible) divisions.

18             MR. JACOBS:  Right.

19             THE COURT:  And then she's saying, you know what?

20   I realize this is supposition at this point.  The Wilenitz

21   account statement shows the same stock.

22             MR. JACOBS:  Right.

23             THE COURT:  So, there was actually a purchase, and

24   who's to know whether or not that purchase or a portion of

25   that purchase was allocated to Wilenitz?  In my example,

Page 68

1    BLMIS bought 100 shares of IBM and 50 shares show up on

2    Wilenitz.

3              MR. JACOBS:  Right.

4              THE COURT:  Who's to say he didn't actually own

5    that stock?

6              MR. JACOBS:  I would love to be able to --

7              THE COURT:  Which I guess would be relevant to his

8    net equity claim or his claim in the SIRA case.

9              MR. JACOBS:  I wish I could give you a

10   satisfactory answer but in the time that we have today, I

11   can't replicate the report of our expert, which, in

12   painstaking detail goes through all of the reasons why we

13   believe there was never a security traded in connection with

14   the fraudulent Ponzi scheme being operated and the IA

15   business.

16             THE COURT:  So, how does she test that conclusion?

17             MR. JACOBS:  She tests that conclusion the same

18   way our expert does, by examining the underlying records.

19   All of those records again have been made available to Ms.

20   Chaitman.  They're in the data room.  Those other records

21   are expert reports.

22             THE COURT:  Maybe that's the answer.  If there are

23   records -- because they do have the DTC records, at least

24   from the period when Wilenitz was investing.  If the records

25   show that BLMIS actually owned something, and the same stock

Page 69

1    shows up in Wilenitz's account statement, you can make the

2    argument that he actually owned that stock.  But you can do

3    that (indiscernible) and the information has been made

4    available to you.

5            And the sense I'm getting -- and I understand that

6    it's a lot of work -- is you want the Trustee to do this for

7    you, but you're going to have to do this yourself if this

8    stuff is available.

9            MS. CHAITMAN:  You know, Judge, with 4 million

10   pages of documents, the least the Trustee could do is

11   specify the specific Bates Numbers.  Because I don't want to

12   be in a position where we go to trial...  I mean, for all I

13   know, the data room is updated constantly and new documents

14   are added.  How am I going to prove at trial that certain

15   documents were not made available to me?  I mean, it's

16   impossible.  Why can't the Trustee be bound to tell me these

17   are the documents responsive to this request?

18           THE COURT:  But that doesn't solve your problem...

19   Well, if the Trustee has additional documents, he's got to

20   supplement the disclosure or the production, which he does

21   by adding them to the data room, and maybe you have a

22   continuing duty to check the data room.

23           But part of the problem is you've thrown such a

24   broad net over what you're looking for, instead of the

25   specific documents relevant -- that I think seem to be

Page 70

1    relevant to this particular case, that you run into a

2    situation where there may be documents added about something

3    but they have nothing to do with Wilenitz.

4           MR. JACOBS:  And, Your Honor, specifically to

5    respond to Ms. Chaitman's concern about the data room being

6    voluminous, and I understand that 4 million records is

7    overwhelming, but that's the reason why the procedures order

8    permits us to provide an expert summary report to support

9    our claims and to satisfy our burdens of proof, which

10   specifically discusses all of that data, identifies all of

11   the Bates Numbers of the documents that are used to support

12   various conclusions -- and at a minimum, Ms. Chaitman is

13   free to depose those experts and to test and challenge any

14   of those analyses based on any of the documents they've

15   relied upon or that she has access to in discovery.

16           And no one's challenging her right to do that.

17   What we're saying is that we shouldn't have to do more than

18   what we've already done because we have invested enormous

19   amounts of resources and time in finding a way to make all

20   of those information available to all litigants in order for

21   them to conduct their own investigations and have access to

22   the same information that we do.

23           THE COURT:  Well, you know, I started out by

24   saying, I can't tell you not to make a motion to compel, but

25   I think that if you go back, for example, and look at the

Page 71

1    omnibus decision last June, for instance, it talks about the

2    compensation issue -- it's certainly applicable to all the

3    cases which are involved.  I think you preserve that issue.

4            And I'm sure the Trustee, so the Trustee doesn't

5    have to respond to all these things, will agree, yeah, you

6    preserve the issue but you're not entitled to discovery on

7    these issues for that reason.  But there just seems to be

8    very little communication, and I don't know what the answer

9    to that is.

10           Okay, you had raised some other issues and Mr.

11    Dexter raised some issues in a letter...

12           MS. CHAITMAN:  I think that had to do with the

13    subpoenas, and I'm going to have to deal with that

14    separately.

15           THE COURT:  Well, what was that issue?  Have we

16    resolved all of the issues raised by the Trustee?

17           MR. JACOBS:  Yes, except for, Your Honor, I'd like

18    to clarify that we would also like to submit a motion for a

19    protective order on this discovery.

20           THE COURT:  Well, she's going to make a motion to

21    compel.  I'll just stay it until I resolve the motion to

22    compel.

23           MR. JACOBS:  Okay.

24           THE COURT:  I don't need a motion for a protective

25    order and a motion to compel on the same discovery.

Page 72

1          MR. JACOBS:  Right.  Well, we did ask for the

2   relief first and I believe from a fairness -- we should be

3   entitled to make --

4          THE COURT:  Do you want to wait for them to make a

5   motion for --

6          MS. CHAITMAN:  It doesn't matter.  If he wants to

7   make the motion...

8          MR. JACOBS:  I'm trying to avoid unnecessary

9   duplicate briefing.

10          THE COURT:  All I'm saying is -- maybe this is

11   wishful thinking, but if she makes the motion to compel, on

12   reflection she might not ask about Picard's compensation,

13   for example.

14          MR. JACOBS:  Okay.

15          THE COURT:  And that will save everybody the job

16   of dealing with that issue.  But I don't know if that's

17   going to be the case.

18          MS. CHAITMAN:  Judge, on Picard's compensation, I

19   understand you ruled on that and it's applicable to every

20   case.  I'm not...

21          THE COURT:  Well, if you're concerned -- I'm not

22   going to rule on it again.  If you're concerned -- if the

23   record is preserved, it's preserved.  But that doesn't seem

24   to have any effect on these cases, if I rule on something.

25   That's my only point.  It goes both ways, by the way.  Don't

Page 73

1    smirk.

2              MR. JACOBS:  No smirk here.

3              THE COURT:  Yeah, it seems that everybody seems to

4    ignore prior rulings in this case when we litigate things.

5    All right, what else from the Trustee?

6              MR. JACOBS:  That is it from our perspective, Your

7    Honor.

8              THE COURT:  Are there any other issues?

9              MS. CHAITMAN:  That's it.

10             THE COURT:  What did Mr. Dexter raise?

11             MS. CHAITMAN:  He was raising the Rule 45 subpoena

12   issue, but I want to go back...

13             THE COURT:  And what is that issue?

14             MS. CHAITMAN:  The issue is whether the Sarah

15   Lawrence order as to the procedure is going to go forward.

16   You clarified that you don't feel it's appropriate and that

17   the Trustee can serve the subpoenas.  But you're telling me

18   that if, in fact, people can stipulate to the records...I

19   mean, I just want to clarify that because --

20             THE COURT:  You know, the devil is in the details.

21   And it sounded so easy to resolve it that way but it just

22   hasn't gotten resolved.

23             MS. CHAITMAN:  No, I appreciate that.  I agree

24   with you.

25             THE COURT:  What I will not do is stay discovery

Page 74

1     pending, you know, a meet and confer, anything like that.

2     If you get discovery and you think -- or you get a notice of

3     a subpoena on a bank, and you can unconditionally say that

4     the records are the records...

5              MS. CHAITMAN:  Well, the records are the records

6     for the period covered by the bank documents.  People cannot

7     possibly stipulate to transfers ten years ago.

8              THE COURT:  Well, but then if you can't, I guess

9     he's entitled to the bank documents.  And if the answer

10    is...  We talked about this, whether there were periods that

11    could be carved out.  Even that wasn't answered clearly in

12    the...

13             MS. CHAITMAN:  But if a bank only has records

14    going back to 2006, why is the price of protecting those

15    records that you have to concede to all the transfers going

16    back to 1982?

17             THE COURT:  Yeah, but you can concede to all the

18    transfers going back to 2006 in your example.

19             MS. CHAITMAN:  We did that, and that was --

20             THE COURT:  That was not my recollection.

21             MS. CHAITMAN:  All right.

22             THE COURT:  Go back and look at your responses to

23    the nine or so cases that we dealt with, and every one of

24    them retracts or has a caveat to what is essentially an

25    admission.  And remember what we're trying to accomplish

Page 75

1    here.  You know, cut down on the issues that have to be

2    tried.  And if they don't do that, then they don't serve

3    their purpose and everybody goes about and takes discovery,

4    that's all.  All right.

5            MS. CHAITMAN:  Okay.

6            MR. JACOBS:  Your Honor, there were also

7    objections to subpoenas in three cases handled by my

8    colleague, Ms. Longo, as conflicts counsel for the Trustee.

9            MS. CHAITMAN:  It's the same issue, and at this

10   point I understand Your Honor's position so...

11           THE COURT:  Well, Wilenitz is one of them.

12           MS. CHAITMAN:  They have those documents already.

13           MR. JACOBS:  Right.  Wilenitz was part of the --

14           THE COURT:  And the RAR...

15           MR. JACOBS:  RAR is our case, and if Ms. Chaitman

16   is withdrawing the objection, we've served the subpoena...

17           THE COURT:  I haven't seen the responses to the

18   admissions or whatever.

19           MS. CHAITMAN:  With RAR we will stipulate to the

20   deposits and withdrawals for the period that --

21           THE COURT:  That's all well and good.  When you

22   send him the -- whatever it is -- the stipulation or the

23   affidavit that proves that or requires that, then ask him to

24   withdraw the subpoena.  And I guess we'll have to deal with

25   that again if he refuses to withdraw the subpoena.

Page 76

1                And the reason I say that is I've seen the

2      responses in the other cases and the non-responses.  That

3      would compel to withdraw --

4                MS. CHAITMAN:  I'm saying on the record that we

5      will stipulate to the deposits and withdrawals for the

6      period covered by the bankruptcy.

7                THE COURT:  And what I'm saying on the record is

8      when that is writing in a satisfactory form, then we'll deal

9      with it, okay?

10               MS. CHAITMAN:  Okay.

11               THE COURT:  Is there anything else?

12               MS. LONGO:  So, just to clarify, Your Honor, I'm

13     sorry, with respect to the two cases that are handled by

14     Wilenitz, is there a withdrawal of the objection in those?

15               THE COURT:  She's not withdrawing the objections.

16               MS. CHAITMAN:  I'm not withdrawing the objections.

17               MS. LONGO:  You'll go back and check...I

18     understand.

19               THE COURT:  She's going to go back and see if she

20     can stipulate to the withdrawals -- either all the

21     withdrawals and deposits or for whatever period it is.

22               MS. CHAITMAN:  Right.

23               THE COURT:  And then you may be entitled to

24     records before that, although you're only asking, I think,

25     for three years anyway.

Page 77

1          MR. JACOBS:  All of our subpoenas are different

2     depending on how long we --

3          THE COURT:  Every one I've seen is the two years

4     before the filing date and one year after.

5          MS. CHAITMAN:  Now they're going back to 2001.

6          MR. JACOBS:  Well, there are some cases --

7          THE COURT:  Well, I'm surprised they haven't.

8     I'll tell you.  Because, you know, this issue with

9     fictitious profits is the same.  And you can't just look at

10    the two years.  You've got to go all the way back to the

11    beginning of the account.  And I was surprised when they

12    limited it to two years for that reason.  I was also

13    surprised about the insolvency issue but...life is full of

14    surprises.  How was Barcelona?  Was it good?

15         MS. CHAITMAN:  Oh, my God, I loved it.

16         THE COURT:  All right, anything else?

17         MS. LONGO:  I was just going to say, to be clear,

18    our two do go back further than the two years.  So I think

19    the stipulation would have to cover all of those transfers.

20         THE COURT:  Whatever it is.  I mean, it sounds to

21    me that if you go far back enough, you're going to get a

22    response from the bank that says, we don't have the records,

23    you know, but so be it.

24         MS. CHAITMAN:  Thank you very much.

25         THE COURT:  All right.



Page 78

1           MR. JACOBS:  Thank you, Your Honor.

2           (Whereupon these proceedings were concluded at

3     12:17 PM.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 79

1              C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya Ledanski Hyde

    Digitally signed by Sonya Ledanski Hyde
    DN: cn=Sonya Ledanski Hyde, o, ou,
    email=digital1@veritext.com, c=US
    Date: 2016.05.19 16:30:11 -04'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 19, 2016