# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF,

Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 09-01364 (SMB) |
| Plaintiff, | |
| v. | |
| HSBC BANK PLC, *et al.*, | |
| Defendants. | |

## **REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE**

Presenting his compliments to the appropriate judicial authorities of Austria, this Request is made by The Honorable Judge Stuart M. Bernstein, of the United States Bankruptcy Court for the Southern District of New York, which is located at One Bowling Green, New York, NY 10004-1408, United States of America, to the Bundesministerium für Verfassung, Reformen, Deregulierung und Justiz, Museumstraße 7, 1070 Vienna, Austria.

Specifically, the Court requests assistance in obtaining testimonial and documentary evidence from Stefan Radel, a representative of **Project Partners Consulting & Managementgesellschaft mbH (FN 132615y)**.

A copy of the transcript of the examination and the certification of the Bundesministerium für Verfassung, Reformen, Deregulierung und Justiz should be returned to the plaintiff's legal counsel, Oren J. Warshavsky, Baker & Hostetler LLP, 45 Rockefeller Plaza, New York, NY 10111, United States (on behalf of the Honorable Stuart M. Bernstein).

In light of the international law and comity that exists between the United States and Austria, the undersigned applicant respectfully submits this request.

## INTRODUCTION

This Request seeks evidence for use in the above-named proceeding pending before this Court, which alleges claims arising under the Securities Investor Protection Act of 1970, the United States Bankruptcy Code, and the New York Debtor and Creditor Law. The purpose of this Request is to obtain documentary and testimonial evidence from Stefan Radel for use as evidence in a trial of this proceeding in this Court. The Court has not yet made a determination of the merits of the plaintiff's, Irving H. Picard's, claims and allegations asserted in this action, which are set forth below.

## SECTION I

1. **SENDER:**

   Oren J. Warshavsky, Esq.
   Baker & Hostetler LLP
   45 Rockefeller Plaza
   New York, New York

*As authorized by:*

The Honorable Stuart M. Bernstein
United States Bankruptcy Judge
United States Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, NY 10004-1408

## 2. CENTRAL AUTHORITY OF REQUESTED STATE

Bundesministerium für Verfassung, Reformen, Deregulierung und Justiz
Museumstraße 7
1070 Vienna
Austria

## 3. PERSON TO WHOM THE EXECUTED REQUEST IS TO BE RETURNED

*Plaintiff's Legal Counsel:*

Oren J. Warshavsky, Esq.
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111

*On behalf of:*

The Honorable Stuart M. Bernstein
United States Bankruptcy Judge
United States Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, NY 10004-1408

## <u>SECTION II</u>

## 4. SPECIFICATION OF DATE BY WHICH THE REQUESTING AUTHORITY REQUIRES RECEIPT OF THE RESPONSE TO THE LETTER OF REQUEST

A response is requested as soon as possible in order to ensure that the evidence may be obtained before the deadline for all fact discovery to be completed in the case, which is currently July 3, 2019.

5.   **a. REQUESTING JUDICIAL AUTHORITY:**

The Honorable Stuart M. Bernstein
United States Bankruptcy Judge
United States Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, NY 10004-1408

**b. TO THE COMPETENT AUTHORITY OF THE REPUBLIC OF
AUSTRIA**

Bundesministerium für Verfassung, Reformen, Deregulierung und Justiz
Museumstraße 7
1070 Vienna
Austria

**c. NAME OF THE CASE AND ANY IDENTIFYING NUMBER**

*Picard v. HSBC Bank plc, et al., Adv. Pro. No. 09-01364 (SMB)*

6.   **NAMES AND ADDRESSES OF THE PARTIES AND THEIR
REPRESENTATIVES:**

| Plaintiff: Irving H. Picard | Legal Representatives |
|---|---|
| Trustee for the Substantively Consolidated Liquidation of Bernard L. Madoff Investment Securities, LLC | Oren J. Warshavsky, Esq. Baker & Hostetler LLP 45 Rockefeller Plaza New York, New York 10111 United States of America Tel: +1.212.589.4200 Fax: +1.212.589.4201 Email: owarshavsky@bakerlaw.com<br><br>Dr. Ferdinand Graf Graf & Pitkowitz Rechtsanwälte GmbH, Stadiongasse 2, 1010 Vienna Austria Tel: (01) 401-17-0 Fax: (01) 401-17-40 Email:  f.graf@gpp.at |

| Defendant: Alpha Prime Fund Limited | Legal Representatives |
|---|---|
| A corporation formed under the laws of Bermuda with a registered address at Bank of Bermuda Building, 6 Front Street, Hamilton HM11 | Dr. Christian Hausmaninger<br>Hausmaninger Kletter<br>Franz Josefs-Kai 3<br>1010 Vienna<br>Austria<br>Tel: (01) 513-95-40<br>Fax: (01) 513-94-40-12<br><br>Todd Duffy, Esq.<br>DuffyAmedeo LLC<br>275 7th Ave.<br>New York, New York 10001<br>United States of America<br>Tel: +1.212.729.5832<br>Fax: +1.212.208.2437 |

| Person to Be Examined: | Legal Representative |
|---|---|
| Stefan Radel<br>DOB 26 February1967<br>Address: Penzinger Straße 80/4,<br>1140 Vienna<br>Austria | Unknown |

## 7.   NATURE AND PURPOSE OF THE PROCEEDINGS AND SUMMARY OF THE FACTS:

### A.   NATURE OF THE PROCEEDINGS

This adversary proceeding arises from the massive Ponzi scheme orchestrated by Bernard L. Madoff ("Madoff"). Madoff was the sole owner, founder, chairman, and chief executive officer of Bernard L. Madoff Investment Securities ("BLMIS"). Through BLMIS, Madoff received billions of dollars in investments from customers and generated account statements purportedly showing that securities were purchased and sold on behalf of these customers. Although Madoff seemingly produced consistent investment returns for his customers, no securities were purchased or sold on any customer's behalf. It was a Ponzi scheme: Madoff

satisfied his customers' redemption requests with the deposits of other customers. This scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

On December 11, 2008, Madoff was arrested by federal agents for his violations of criminal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. In March 2009, Madoff admitted to having operated a Ponzi scheme and pleaded guilty to all charges filed against him. In June 2009, Madoff was sentenced to 150 years in prison.

On December 15, 2008, Judge Stanton of the United States District Court for the Southern District of New York appointed Irving H. Picard ("Trustee") as Trustee for the liquidation of BLMIS pursuant to the United States Securities Investor Protection Act of 1970 ("SIPA"). Under SIPA, the Trustee has the general powers of a bankruptcy trustee relating to the recovery and distribution of customer property. Pursuant to these powers, the Trustee is responsible for recovering and distributing customer property, assessing claims against BLMIS, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors.

As part of his statutory duty to recover customer property, the Trustee is empowered under the United States Bankruptcy Code (the "Bankruptcy Code") to bring "avoidance actions" to recover transfers of funds made by BLMIS prior to its collapse. *See* 11 U.S.C. §§ 544, 547, 548(a)(1), 550. The term "avoid" means to undo a transfer so that it may be returned to the BLMIS estate for equitable distribution to BLMIS's customers. By this and some one thousand other avoidance actions the Trustee has brought in connection with the liquidation of BLMIS, the Trustee seeks to maximize the recovery of fraudulently transferred funds and, consequently, the ultimate distribution to Madoff's defrauded customers, which is the purpose of this action. All

sums recovered by the Trustee are distributed to customers with approved customer claims; neither the Trustee nor his counsel is compensated from the fund of customer property.

**B.**   **SUMMARY OF THE FACTS AND ALLEGATIONS PLEADED BY THE TRUSTEE**[1]

In *Picard v. HSBC Bank plc, et al.*, Adv. Pro. No. 09-01364 (SMB) (Bankr. S.D.N.Y.), the Trustee seeks to avoid and recover the initial transfers BLMIS made to defendant Alpha Prime Fund Ltd. ("Alpha Prime"), a Bermuda fund whose day-to-day operational tasks were performed in Austria.  The Trustee also seeks to recover transfers made by BLMIS to other funds invested with BLMIS that were subsequently transferred to other defendants in the United States, including defendant HSBC Bank U.S.A., N.A. and certain of its affiliates.  Those claims are based on both federal law and sections 273, 274, 275, 276, 276-a, 278, and 279 of New York State's Debtor and Creditor Law, which provide the Trustee with remedies similar to those provided by the Bankruptcy Code and are made applicable to bankruptcy cases under Section 544 of the Bankruptcy Code.

The Trustee also asserts claims to disallow, pursuant to U.S. statutory law, specifically 11 U.S.C. § 502(d), and to equitably subordinate, pursuant to 11 U.S.C. §§ 510(c) and 105(a), portions of Alpha Prime's customer claim.

The Trustee alleges that Alpha Prime is a BLMIS feeder fund operated by sophisticated directors and service providers.  (*See, e.g.*, Am. Compl. ¶¶ 194, 224.)  These directors and service providers, the Trustee contends either knew that BLMIS was engaged in fraud or were aware of evidence strongly indicating fraud.  (Am. Compl. ¶¶ 171, 193.)  The Trustee's

---

[1] The Court's summary is derived from the plaintiff's allegations in its Amended Complaint filed on December 5, 2010 ("Am. Compl.") [ECF No. 170] and do not necessarily denote the Court's views of the allegations or reflect findings by this Court.

complaint alleges that Alpha Prime received transfers of Customer Property, as defined by SIPA, of more than $80,000,000. (*Id*. ¶ 334.)

In the early 1990s, the Trustee, contends, Madoff turned to European investors to augment the flow of funds into his scheme. (Am. Compl. ¶¶ 2-7.) The Trustee alleges that, among others, Sonja Kohn, an Austrian investment professional with personal and professional ties to Madoff, helped attract new European investors to BLMIS. (*Id*. ¶¶ 5-7.) In 1993, Kohn was hired as an advisor and consultant for Unicredit Bank Austria AG. (*Id*. ¶ 7.) In the early 1990s, Kohn and others created a variety of BLMIS feeder funds, including Primeo Fund ("Primeo"). (*Id*. ¶¶ 7, 57, 230.) Primeo's apparent success, the Trustee alleges, led to the establishment of a network of feeder funds whose sole purpose was to direct investments into BLMIS. Alpha Prime was one such fund. (*Id*. ¶ 60.) In June 2003, Alpha Prime opened BLMIS customer account 1FR097, and began soliciting investments. *(Id.* ¶ 232.)

The Trustee alleges that Primeo and its service providers delegated many of their duties to BLMIS, concentrating in BLMIS the functions of investment adviser, custodian, and broker-dealer responsible for initiating and executing securities trades. (Am. Compl. ¶ 126.) Primeo's directors and service providers were, nevertheless, still responsible, according to the Trustee's pleadings, for ensuring the integrity of the fund's investments, assessing the fund's performance, and ensuring that BLMIS's investment strategy aligned with the fund's objectives. *(Id.* ¶¶ 70-73, 75-76.) As with Primeo, Alpha Prime's account opening documents allegedly gave BLMIS complete authority to buy, sell, and trade in U.S. securities for Alpha Prime. (*Id*. ¶ 126.)

The Trustee alleges that Primeo's customer statements were replete with data showing Madoff's trading strategy to be impossible. (Am. Compl. ¶¶ 17-18, 144-226.) These impossible transactions, the Trustee contends, were reported on Primeo's customer statements which were

provided to the fund's directors and service providers, all of whom were sophisticated financial professionals, and were thus aware of these impossible trades. (*Id.*)

The Trustee contends that by the middle of 2005, Alpha Prime and its directors accordingly knew that, among other things:

(a) BLMIS's returns could not be replicated and appeared to be a product of illegal front running (Am. Compl. ¶ 19);

(b) BLMIS's operational structure was vulnerable to fraud because it subverted checks and balances (Am Compl. ¶ 18);

(c) BLMIS customer statements showed impossible options trades (Am. Compl. ¶¶ 155-160); and

(d) BLMIS customer statements showed trades outside published price ranges (Am. Compl. ¶¶ 161-165).

## SECTION III

### 8. EVIDENCE TO BE OBTAINED AND PURPOSE

Alpha Prime's knowledge of, or willful blindness to, BLMIS's fraud is a central element of the Trustee's claims to avoid and recover transfers to Alpha Prime and is a consideration central to the Trustee's claims to disallow and equitably subordinate a portion of Alpha Prime's customer claim and claims under section 502(h) of the Bankruptcy Code. The Trustee contends that Alpha Prime acted through its officers and directors, as well as through its service providers, which acted as agents to Alpha Prime, and accordingly acquired knowledge of Madoff's fraud through these officers, directors, and agents.

In furtherance of the claims and defenses in the action, the parties have exchanged and produced evidence for use at trial pursuant to the U.S. Federal Rules of Civil Procedure. During the course of these proceedings, evidence emerged that the server hosting Alpha Prime's email system allegedly failed at some point in 2007, before the revelation of Madoff's fraud. Alpha

Prime has disclosed that an Austrian company called Project Partners Consulting &
Managementgesellschaft mbH ("Project Partners") hosted the Alpha Prime server and provided
other information technology services to Alpha Prime.  Project Partners—in conjunction with
another Austrian information technology services company, steurer "CC" GmbH ("Steurer")—
purportedly attempted to repair the server and recover information from it.

 The Trustee contends that Alpha Prime's account of both the timing and the
circumstances surrounding the alleged failure of the email server has changed several times.  The
Trustee further contends that although Alpha Prime was aware of the possibility that it may be
the subject of an avoidance action by the Trustee—which triggers a binding obligation under
applicable state and federal law to preserve evidence—Alpha Prime terminated its relationship
with Project Partners in late 2008 or early 2009, after the revelation of Madoff's fraud, without
directing Project Partners to preserve the Alpha Prime documents.  This, in the Trustee's view,
indicates that records might have been destroyed in bad faith on behalf of Alpha Prime or under
the direction of persons acting for (or whose actions are attributable to) Alpha Prime.
Considering the information currently known to the Trustee, the Trustee contends that the server
contained evidence of Alpha Prime's knowledge of Madoff's fraud.

 By this Request, the Bankruptcy Court seeks testimony regarding (1) the alleged server
failure; (2) the relationship and interaction between persons acting for (or whose actions are
attributable to) Alpha Prime, on the one hand, and persons acting for Project Partners and Steurer
on the other hand; and (3) any efforts to collect and preserve any electronically stored
information affected by the server failure and the events that follow.  Such testimony is probative
of whether Alpha Prime took the necessary steps to preserve evidence, as required by law.

The evidence sought in this Letter of Request is intended for use at trial as evidence in support of the Trustee's pleadings and claims to avoid fraudulent transfers to Alpha Prime and to subordinate or disallow Alpha Prime's customer claim.  The Trustee seeks to depose Mr. Blahut because Mr. Blahut is Project Partners's managing director and is believed to have first-hand knowledge of the evidence sought in this application.

The Trustee has informed Alpha Prime's counsel of his intent to conduct an examination of persons acting for and on behalf of Project Partners.  Additionally, in subsection 13 below, this Letter of Request requests, in relevant part, that Alpha Prime's counsel be afforded the opportunity to ask follow-up questions at the examination in order to give Alpha Prime a full and fair opportunity to challenge the Trustee's allegations.

While this Court expresses no view as to the merits or otherwise of the amended complaint or related motions in the above-captioned case, it believes the evidence sought here will be relevant to and either support or contradict material facts relevant to the amended complaint and motions.

### 9.    IDENTITY AND ADDRESS OF PERSON TO BE EXAMINED

Stefan Radel
Penzinger Straße 80/4,
1140 Vienna
Austria

### 10. STATEMENT OF THE SUBJECT MATTER ABOUT WHICH THE PERSON WILL BE EXAMINED

The Requests includes a request for the oral examination under oath of Mr. Stefan Radel. A copy of the specific questions to be put the witness together with a schedule of defined terms is attached hereto as Exhibit A.

### 11. DOCUMENTS AND OTHER EVIDENCE TO BE OBTAINED

None.

### 12. REQUIREMENT THAT THE EVDIENCE BE GIVEN UNDER OATH OR AFFIRMATION

This Court requests that Mr. Radel's testimony be taken under oath.  Pursuant to United States Federal Rule of Evidence 603, this Court requests that the witness, Mr. Radel, be required to declare that he will testify truthfully, by oath or affirmation administered in a form calculated to awaken his conscience and impress his mind with the duty to do so.  Specifically, the Court requests that the duly appointed official require the witness to provide his deposition testimony under the following oath: "I, Stefan Radel, swear that the testimony I am about to give is the truth, the whole truth, and nothing but the truth," or the corresponding wording for an oath under Austrian law.

### 13. SPECIAL PROCEDURES OR METHODS TO BE FOLLOWED

This Court requests: (1) that the examination be taken orally; (2) that the examination be taken in the presence of a commercial stenographer and videographer selected by the Trustee or the court; (3) that the videographer be permitted to record the examination by audio and visual means; (4) that the stenographer be allowed to record a verbatim transcript of the examination; (5) that the Trustee's counsel be allowed to use an interpreter selected by the Trustee to be able to follow and participate in the examination; (6) that counsel for both the Trustee and Alpha Prime be notified as soon as possible of the date, time and place of the examination, along with any other pertinent information, including what court is presiding over the deposition; (7) that counsel for both the Trustee and Alpha Prime be permitted to ask follow up questions of Mr. Radel; and (8) that the witness be examined as soon as possible to ensure that the evidence may be obtained before the deadline for all fact discovery to be completed in the case, which is currently July 3, 2019.  In the event that—due to mandatory provisions of Austrian law—the taking of evidence according to some or all of the procedures described above is prohibited, this

Court requests that it be taken in such manner as provided by Austrian law for the formal taking

of testimonial evidence in civil proceedings.

### 14. REQUEST FOR THE NOTIFICATION OF THE TIME AND PLACE FOR THE EXECUTION OF THE REQUEST AND IDENTITY AND ADDRESS OF ANY PERSON TO BE NOTIFIED

Clerk of the United States Bankruptcy Court
for the Southern District of New York
One Bowling Green
New York, New York 10004-1408
United States of America

Oren J. Warshavsky
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York, 10111
United States of America
Tel: +1.212.589.4200
Fax: +1.212.589.4201
Email: owarshavsky@bakerlaw.com

Dr. Ferdinand Graf
Graf & Pitkowitz Rechtsanwälte GmbH, Stadiongasse 2,
1010 Vienna
Austria
Tel: (01) 401-17-0
Fax: (01) 401-17-40
Email:  f.graf@gpp.at

Dr. Christian Hausmaninger
Hausmaninger Kletter
Franz Josefs-Kai 3
1010 Vienna
Austria
Tel: (01) 513-95-40
Fax: (01) 513-94-40-12

Todd Duffy
DuffyAmedeo LLC
275 7th Ave.
New York, New York 10001
Tel: +1.212.729.5832
Fax: +1.212.208.2437

**15. REQUEST FOR ATTENDANCE OR PARTICIPATION OF JUDICIAL PERONSONNEL OF THE REQUESTING AUTHORITY AT THE EXECTION OF THE LETTER OF REQUEST**

None.

**16. FEES AND COSTS**

It is requested that once the Request is executed, the Austrian judicial authority submit a note of reimbursable fees and costs to this Court and to Plaintiff's legal representative as follows:

>  The Honorable Stuart M. Bernstein
>  United States Bankruptcy Judge
>  United States Bankruptcy Court for the Southern District of New York
>  One Bowling Green
>  New York, NY 10004-1408
>
>  Oren J. Warshavsky, Esq.
>  Baker & Hostetler LLP
>  45 Rockefeller Plaza
>  New York, NY 10111
>  Tel: +1.212.589.4200
>  Fax: +1.212.589.4201
>  Email: owarshavsky@bakerlaw.com

The Bankruptcy Court will guarantee that Plaintiff will reimburse the Austrian judicial authority in full for all costs incurred in the taking of the evidence sought.

## SECTION IV

The Bankruptcy Court expresses its gratitude and states that the courts of the United States are authorized by statute, 28 U.S.C. Section 1782 of the United States Code, to extend similar assistance to the tribunals of Austria and shall be ready and willing to provide reciprocal assistance in a similar case when required.

The Bankruptcy Court takes this opportunity to extend to the judicial authorities of

Austria the assurances of the highest consideration.


Dated: _____, 2019                 _____
      New York, New York                         HON. STUART M. BERNSTEIN
                                       UNITED STATES BANKRUPTCY JUDGE


**Official Seal of the United States Bankruptcy Court for the Southern District of New York:**

## Exhibit A

## Definitions

## The witness shall please review these terms before providing testimony:

**A.**    The term "Alpha Prime" refers to Alpha Prime Fund Limited and anyone acting on behalf of or for the benefit of Alpha Prime Fund Limited, including, without limitation, its current and former parents, subsidiaries, divisions, officers, directors, principals, managers, members, shareholders, agents, representatives, employees, attorneys, nominees, servants, predecessors, successors, and affiliates.

**B.**    The term "BA Worldwide" refers to BA Worldwide Fund Management Limited, including, without limitation, its current and former parents, subsidiaries, divisions, officers, directors, principals, partners, managers, members, shareholders, agents, representatives, employees, attorneys, nominees, servants, predecessors, successors, and affiliates.

**C.**    The term "Bank Austria" refers to UniCredit Bank Austria AG, including, without limitation, its current and former parents, subsidiaries, divisions, officers, directors, principals, partners, managers, members, shareholders, agents, representatives, employees, attorneys, nominees, servants, predecessors, successors, and affiliates.

**D.**    The terms "Communicate," "Communications," and "Communicating" shall include in-person conversations, telephonic communications, emails, written correspondence, instant messaging, social media, and any and all other forms of communications.

**E.**    The term "ESI" refers to all electronically stored information on computers, servers or storage devices that includes, without limitation, emails, calendars, contacts, documents, spreadsheets, PDFs, text messages, databases, metadata, and digital images.

**F.**    The term "November 30 Letter" refers to the letter dated November 30, 2018 from Stephan Blahut, managing director of Project Partners, to Peter Fischer, a copy of which is attached hereto as Attachment 1.

**G.**    The term "Primeo" refers to Primeo Fund, including, without limitation, its subsidiaries, divisions, officers, directors, principals, partners, managers, members, shareholders, agents, representatives, employees, attorneys, nominees, servants, predecessors, successors, and affiliates.

**H.**    The term "Project Partners" refers to Project Partners Consulting & Managementgesellschaft mBH, including, without limitation, its current and former parents, subsidiaries, divisions, officers, directors, principals, partners, managers, members, shareholders, agents, representatives, employees, attorneys, nominees, servants, predecessors, successors, and affiliates.

**I.**    The term "RAID-5 Server" refers to the RAID-5 server, referred to in the November 30 Letter, operated by Project Partners that hosted Alpha Prime's ESI.

**J.**    The term "RAID-1 Server" refers to the RAID-1 server, referred to in the November 30 Letter, operated by Project Partners following the destruction of the RAID-5 Server.

**K.**    The term "Steurer" refers to steurer "CC" GmbH, including, without limitation, its subsidiaries, divisions, officers, directors, principals, partners, managers, members, shareholders, agents, representatives, employees, attorneys, nominees, servants, predecessors, successors, and affiliates.

## Questions to Be Put to Witness

1.    What is the nature of Project Partners' business?

2.    The November 30 Letter was signed by Stephan Blahut. Do you know if he was the author of the November 30 Letter?

3.    If Mr. Blahut was not the author of the November 30 Letter, can you identify who the author is?

4.    Do you know if anyone assisted in the preparation of the November 30 Letter? Who?

5.    What was the purpose of the November 30 Letter? Do you understand why Project Partners was asked to provide the November 30 Letter?

6.    Are you familiar with an entity known as Alpha Prime Fund Limited? If yes, how did you become familiar with Alpha Prime Fund Limited? If yes, what do you know about it?

7.    What is your understanding of Alpha Prime's business?

8.    Are you familiar with an entity known as BA Worldwide Fund Management? If yes, how did you become familiar with BA Worldwide Fund Management? If yes, what do you know about it?

9.    The November 30 Letter is addressed to Peter Fischer? Who is he? How did you become familiar with Mr. Fischer? What do you know about him?

10.    The November 30 letter indicates that Project Partners had contact with Ursula Radel-Leszczynski? Who is she? What do you know about her?

11.    Are you familiar with a person named Christian Hausmaninger? If yes, how did you become familiar with Dr. Hausmaninger? If yes, what do you know about him?

12.    Are you familiar with a person named Stefan Zapotocky? If yes, how did you become familiar with Mr. Zapotocky? If yes, what do you know about him?

13.    The November 30 Letter states that Peter Fischer asked for an opinion on an apparent server crash in 2007, do you know why Peter Fischer made that request?

14.    When did Peter Fischer ask for the opinion on the apparent server crash?

15.   Did you discuss the apparent server crash with Mr. Fischer or anyone else purporting to act on Alpha Prime's behalf before then?

16.   Did you provide a draft of the November 30 Letter to Peter Fischer before you executed the letter? If so, did he have any edits to the letter?

17.   Did you provide a draft of the November 30 Letter to Christian Hausmaninger before you executed the letter? If so, did he have any edits to the letter?

18.   Did you provide a draft of the November 30 Letter to Ursula Radel-Leszczynski before you executed the letter? If so, did she have any edits to the letter?

19.   Did you provide a draft of the November 30 Letter to Stefan Zapotocky before you executed the letter? If so, did he have any edits to the letter?

20.   Did you provide a draft of the November 30 Letter to Todd Duffy before you executed the letter? If so, did he have any edits to the letter?

21.   Did you communicate with Peter Fischer before drafting the November 30 Letter?  If so, what did you discuss?

22.   Did you communicate with Christian Hausmaninger before drafting the November 30 Letter?  If so, what did you discuss?

23.   Did you communicate with Ursula Radel-Leszczynski before drafting the November 30 Letter? If so, what did you discuss?

24.   Did you communicate with Stefan Zapotocky before drafting the November 30 Letter?  If so, what did you discuss?

25.   Did you communicate with Todd Duffy before drafting the November 30 Letter?  If so, what did you discuss?

26.   What responsibilities did you have with Project Partners?

27.   Were you involved with Project Partners' provision of services to BA Worldwide Fund Management?

28.   Were you involved with Project Partners' provision of services to Alpha Prime?

29.   Were you involved with the RAID-5 server crash and the attempted recovery of data?

30.   Were you employed by Project Partners at the time BA Worldwide and Project Partners entered into the contract?

31.   The November 30 Letter states that BA Worldwide "instructed us to host the 'Alphaprimefund.com' domain and paid us for our services."  What was Project Partners' relationship with BA Worldwide? Who at BA Worldwide instructed Project Partners to host the Alphaprimefund.com domain?

32.    According to Alpha Prime, Project Partners hosted Alpha Prime's email through its "contractual obligations" to BA Worldwide Fund Management, can you describe those "contractual obligations"?

33.    Pursuant to the "contractual obligations" between Project Partners and BA Worldwide, what services was Project Partners to provide to Alpha Prime?

34.    Why were the services Project Partners provided to Alpha Prime pursuant to "contractual obligations" between BA Worldwide and Project Partners?

35.    What were the beginning date and end date of the contract between Project Partners and BA Worldwide?

36.    What were the beginning date and end date of the contract by which Project Partners provided services to Alpha Prime?

37.    Was there a separate agreement between Project Partners and Alpha Prime separate from the "contractual obligations" to BA Worldwide?  If so, what was the date of the agreement?

38.    Please describe the research referred to in the statement in the November 30 Letter that "I was able to research that from 2005 until the end of 2008 the company BA Worldwide Fund Management . . . instructed us to host the 'Alphaprimefund.com' domain and paid us for our services."

39.    In performing the research, what documents or materials did you review?

40.    Did you speak with anyone as part of performing the research?  If so, who?

41.    How did you locate the two invoices (dated 20 March 2006 and 11 February 2007) attached to the November 30 Letter in connection with preparing that letter? Were you able to find any additional Project Partners invoices to BA Worldwide and/or Alpha Prime?  If so, where were these not included with the November 30 Letter?

42.    Were copies of the two invoices supplied to you in connection with your preparation of the November 30 Letter? If so, by whom, and what was the subject matter of any communications concerning the invoices?

43.    Did Project Partners maintain a file concerning BA Worldwide? If so, where is it located?

44.    Did Project Partners maintain a file concerning Alpha Prime? If so, where is it located?

45.    Did you review any files in connection with the preparation of the November 30 Letter? If so, which files? For what purpose? Did you do so at anyone's direction?

46.    With reference to the statement in the November 30 Letter that "from 2007 onwards, there was also email correspondence through the domain," please explain what this means?

47.  With reference to the statement in the November 30 Letter that "[n]o documents were stored on the server," where was email correspondence stored?

48.  With reference to the statement in the November 30 Letter that "[n]o documents were stored on the server," describe the data that Project Partners was seeking to recover or restore in October 2007.

49.  Please describe the "data (emails) available on our server" referred to in the November 30 Letter.

50.  Is "alphaprimefund.com" as referred to in the Project Partners invoice dated 20 March 2006 Alpha Prime's email account?

51.  Is it "alphaprimefund.com" as referred to in the Project Partners invoice dated 20 March 2006 Alpha Prime's website address?

52.  What services are referred to in the item "Traffic 1.6.2003 bis 31.5.05 – 0,32 GB à 36,-*" listed in the Project Partners invoice dated 20 March 2006?

53.  What is "alphaprimeofund.com" referred to in the Project Partners invoice dated 11 February 2007? Is "alphaprimeofund.com" different from "alphaprimefund.com" referred to in the invoice dated 20 March 2006?

54.  Did Project Partners at any time from 2003 through December 2008 host the email server of Primeo? If yes, were the services Project Partners provided to Primeo the same as those provided to Alpha Prime?  Did Primeo only use a webmail client?  If different from Alpha Prime, why?

55.  Did Project Partners at any time from 2003 through December 2008 host BA Worldwide's email server?

56.  Did Project Partners at any time from 2003 through December 2008 host Bank Austria's email server?

57.  Who at BA Worldwide instructed Project Partners to host alphaprimefund.com?

58.  The November 30 Letter states that one of the main BA Worldwide contacts was Wilhelm Holzer. Did you have any communications with Mr. Holzer?  If so, what was the subject matter of those communications?

59.  The November 30 Letter states that one of the main BA Worldwide contacts was Rainer Aster? Did you have any communications with Mr. Aster, if so, what was the subject matter of those communications?

60.  The November 30 Letter states that one of the main BA Worldwide contacts was Ursula Radel-Leszczynski? Did you have any communications with Dr. Radel-Leszczynski?  If so, what was the subject matter of those communications?

61.    With reference to the November 30 Letter, can you explain how the RAID-5 server was configured to host Alpha Prime's electronic data?

62.    Did Project Partners archive Alpha Prime's ESI? If yes how was Alpha Prime's ESI archived?

63.    Did Alpha Prime instruct Project Partners as to how its ESI was to be maintained? If so, what instructions did Alpha Prime provide to Project Partners?

64.    Did BA Worldwide instruct Project Partners as to how its ESI was to be maintained? If so, what instructions did BA Worldwide provide to Project Partners?

65.    Please describe Project Partners' data retention practices with respect to Alpha Prime's ESI.

66.    Please describe Project Partners' data destruction practices with respect to Alpha Prime's ESI.

67.    The November 30 Letter states, "In October 2007, our server crashed because we removed a wrong disk by mistake." Is "our server" the RAID-5 server?

68.    What is the "wrong disk"?

69.    How did the removal of "one wrong disk" cause the RAID-5 server to crash?

70.    The November 30 Letter states, "We informed Dr. Radel thereof." Why did you inform Dr. Radel? Did you inform Wilhelm Holzer? Did you inform Rainer Aster?

71.    Has Project Partners experienced similar server crashes prior to or after the crash referenced in the November 30 Letter? Are these types of server crashes common?

72.    Who did you contact at 3-Ware, as referred to in the November 30 Letter, in your efforts to repair the RAID-5 server?

73.    The November 30 Letter references a "webmail platform" used by Alpha Prime. What webmail platform did Alpha Prime use? Did Alpha Prime access email in any other manner? If no, why did Alpha Prime use only webmail?

74.    Was Project Partners involved with configuring Alpha Prime's webmail platform?

75.    Please describe the information you considered in reaching the conclusion set forth in the November 30 Letter that "it appears that the webmail platform was actually used in default mode." Where is that information located?

76.    Are you familiar with the default settings for Alpha Prime's email with respect to attachments?

77.    Did Project Partners ever review the email default settings with a representative from Alpha Prime or BA Worldwide? If so, when?

78.    Did the default settings include stripping attachments from outgoing emails?  If so, were the stripped attachments saved? Where would they have been saved?

79.    The November 30 Letter states that Dr. Radel informed Project Partners that "there was no more money to further use" its services. On what date did that occur?

80.    In what form—email, letter, telephone, in-person conversation, or otherwise—were the communications in which Dr. Radel informed Project Partners that "there was no more money to further use" Project Partners' services?

81.    What actions did Project Partners take when Dr. Radel informed it "at the end of 2008" that "there was no more money to further use [Project Partners'] services"?

82.    On what date did Project Partners "hand over to Dr. Radel" the "two DVDs" referred to in the November 30 Letter.

83.    Did Project Partners keep a record of the transmittal of the "two DVDs" it "handed over to Dr. Radel"?

84.    Who requested that the "two DVDs" be created?

85.    What were the instructions given to you regarding what to include on the "two DVDs"? Who instructed you?

86.    What type of information was included on the "two DVDs"? Was it all information on the RAID-1 server, or something different? Please explain.

87.    What file formats were used to store the information included on the "two DVDs"? Did this information retain its original metadata when transferred onto the DVDs? How much data was stored on each of the DVDs?

88.    On what date was the contract between Project Partners and BA Worldwide terminated?

89.    According to the November 30 Letter, the RAID-5 server "was disposed of." When was it disposed of?  Describe the procedure by which the RAID-5 server was "disposed of" and the new RAID-1 server was installed. What measures were taken to ensure all recovered data from the RAID-5 server were properly transferred to the RAID-1 server?

90.    Was there discussion between Project Partners and Alpha Prime or BA Worldwide about the RAID-5 server being "disposed of"?

91.    What steps did Project Partners take to fix the RAID-5 server?

92.    According to the November 30 Letter, Project Partners asked "the company Steurer" to "reproduce their recollections" of the server crash in October 2007. When did Project Partners communicate with Steurer about the preparation of its statement attached to the November 30 Letter? Please identify the people involved with those communications. In what form were the communications?

93. Are you familiar with a person named Marius Steurer?

94. Was Marius Steurer personally involved with the efforts in October 2007 to recover or restore data from the Project Partners server? If so, please describe his involvement.

95. Please describe the method by which you "confirmed" for purposes of the November 30 Letter, that "the company Steurer had, in 2007, "loaded the recovered data of the clients."

96. What percentage of the lost data from 2007 was recovered?

97. Please describe the method by which you "confirmed" for purposes of the November 30 Letter that "[t]he old server was disposed of."

98. Was Christian Hausmaninger involved with the communications between Project Partners and Steurer in connection with the November 30 Letter? If so, please describe his involvement.

99. Was Ursula Radel-Leszczynski involved with the communications between Project Partners and Steurer in connection with the November 30 Letter? If so, please describe her involvement.

100. Was Peter Fischer involved with the communications between Project Partners and Steurer in connection with the November 30 Letter? If so, please describe his involvement.

101. Was Stefan Zapotocky involved with the communications between Project Partners and Steurer in connection with the November 30 Letter? If so, please describe his involvement.

102. Was Todd Duffy involved with the communications between Project Partners and Steurer in connection with the November 30 Letter? If so, please describe his involvement.

103. Does Project Partners have standardized procedures for backing up client data?  If so, what do these procedures consist of?

104. Was the ESI stored on the RAID-5 Server backed up?

105. If not, why was the ESI stored on the RAID-5 Server not backed up?

106. Why did Project Partners retain Steurer to help recover the lost ESI?

107. Please explain why the RAID-5 Server was replaced with a RAID-1 server.

108. For how long was Alpha Prime's ESI stored on the RAID-1 server?

109. Please explain the process by which Alpha Prime's ESI was transferred from the RAID-1 server to DVDs at or about "the end of 2008," as set forth in the November 30 Letter.

110.   Did Project Partners ever transfer or copy Alpha Prime's ESI from any of Project Partners' servers other than the 2008 transfer from the RAID-1 server to DVDs as set forth in the November 30 Letter? If so, who requested the transfer? What type of ESI was transferred? In what format was it produced? Describe the usual process of retrieving archived emails from Project Partner's servers.

111.   Does the RAID-1 server still exist?

112.   If so, where is it located? Does it still contain Alpha Prime's ESI?

113.   If not, is the ESI that was kept on the RAID-1 server preserved? Where and how was it preserved?

114.   Did Alpha Prime provide instructions on what was to be preserved from the RAID-1 server? If so, what were the instructions given?

115.   If Alpha Prime did not provide instructions on what was to be preserved from the RAID-1 server, did anyone else give instructions? If so, who gave the instructions and what were the instructions given?

116.   Does Project Partners know about the litigation between Alpha Prime and the Trustee? If yes, explain your knowledge of the litigation.

117.   Does Project Partners know about the litigation between Alpha Prime and HSBC? If yes, explain your knowledge of the litigation.

118.   Does Project Partners know about the litigation between Primeo and the Trustee? If yes, explain your knowledge of the litigation.

119.   Does Project Partners know about the litigation between Primeo and HSBC? If yes, explain your knowledge of the litigation.

120.   Was Project Partners asked to preserve Alpha Prime's ESI because of the Trustee's lawsuit?

121.   Was Project Partners asked to preserve Alpha Prime's ESI beyond that which has been discussed already? Who asked? When? Why?

122.   Does Project Partners still have the preserved Alpha Prime ESI?

123.   Was Project Partners asked to preserve Alpha Prime's ESI because of the litigation between Alpha Prime and HSBC?

124.   If so, who asked Project Partners to preserve the ESI?

125.   Was Project Partners asked to preserve Primeo's ESI because of the litigation between the Trustee and Primeo?

126.   If so, who asked Project Partners to preserve the ESI?

127.    Was Project Partners asked to preserve Primeo's ESI because of the litigation between Primeo and HSBC?

128.    If so, who asked Project Partners to preserve the ESI?

129.    Has Project Partners communicated with Peter Fischer since the termination of the contract with BA Worldwide Fund Management? If so, when? What was the subject matter of the communications?

130.    Has Project Partners communicated with Ursula Radel-Leszczynski since the termination of the contract with BA Worldwide Fund Management? If so, when? What was the subject matter of the communications?

131.    Has Project Partners communicated with Christian Hausmaninger since the termination of the contract with BA Worldwide Fund Management? If so, when? What was the subject matter of the communications?

132.    Has Project Partners communicated with Stefan Zapotocky since the termination of the contract with BA Worldwide Fund Management? If so, when? What was the subject matter of the communications?

133.    Has Project Partners communicated with Todd Duffy since the termination of the contract with BA Worldwide Fund Management? If so, when? What was the subject matter of the communications?

# Attachment 1

<u>Certified Translation from the German Language</u>





Consulting & Managementges.m.b.H.

Josefsplatz 6
1010 Vienna

+43 (0)1 219 8900
project@partners.at
DVR 1054180
ATU 41007405
FN 132615y

Mr. Peter Fischer
Top Consult GmbH
Alserstrasse 23/15
1090 Vienna

By email: Peter.fischer@top-consult-gmbh.at

Vienna, November 30, 2018

Dear Mr. Fischer,

You asked me for my opinion on an apparent server crash at our company in 2007 and on the effects that crash had on a fund called Alpha Prime Fund Ltd. My investigations have produced the following results:

To begin with, I would like to advise that I am a shareholder and managing director of Project Partners Consulting & Managementgesellschaft mbH (PP). PP is engaged in the provision of IT services.

As regards Alpha Prime Fund Ltd, I was able to research that from 2005 until the end of 2008 the company BA Worldwide Fund Management (BWFM), with its registered office in the BVI, instructed us to host the "Alphaprimefund.com" domain and paid us for our services. I was able to find two related invoices which I attach hereto.

Initially, hosting took place via a RAID-5 server which serviced about ten clients in aggregate. From 2007 onwards, there was also email correspondence through the domain. No documents were stored on the server. The BWFM contacts were Messrs. Holzer and Aster and, occasionally, Dr. Radel.

In October 2007, our server crashed because we removed a wrong disk by mistake. We informed Dr. Radel thereof. Initially, we attempted to repair the server with the assistance of the company 3-Ware, the seller of the RAID controller, but our attempt failed. We thereupon contacted Steurer GmbH to recover our data. The details of this recovery are set out in the

APF_00016369

attached statement by the company Steurer whom we asked to reproduce their recollections of this incident.

I can confirm that after the crash we continued to work with a new RAID-1 server to which the company Steurer had loaded the recovered data of the clients. The old server was disposed of.

As far as we remember the events that occurred more than ten years ago, Steurer's statement describes a very plausible data recovery process that correctly reflects such emergency measures; it appears that the webmail platform was actually used in default mode, which explains why attachments were not saved when emails were sent by webmail.

At the end of 2008 Dr. Radel told us that there was no more money to further use our services. All data (emails) available on our server were thereupon burnt to two DVDs and handed over to Dr. Radel. All Alpha Prime data was then deleted from our server for reasons of data protection; this is a standard process we choose when relationships with clients are terminated.

We hope the above information was useful for you and remain

With best regards,


[Signature]
Mag (FH) Stephan Blahut
Managing Director


With reference to my oath I hereby certify that the above is a correct translation of the German text produced to me.

Die genaue Übereinstimmung der vorstehenden Übersetzung mit der angehefteten Ablichtung bestätige ich unter Berufung auf meinen Eid.

Vienna, this 12th day of December 2018

Wien, am 12.12.2018

Mag. Annette Fragner



PROJECT
PARTNERS
Consulting & Managementges.m.b.H.

Josefsplatz 6
1010 Wien

+43 (0)1 219 8900
project@partners.at
DVR 1054180
ATU 41007405
FN 132615y

Herrn Peter Fischer
Top Consult GmbH
Alserstrasse 23/15
1090 Wien

per eMail: Peter.fischer@top-consult-gmbh.at

Wien, 30. November 2018

Sehr geehrter Herr Fischer,

Sie haben mich gebeten, zu einem angeblichen Serverabsturz bei unserer Firma im
Jahr 2007 und dessen Auswirkungen auf einen Fonds namens Alpha Prime Fund Ltd
Stellung zu nehmen. Meine diesbezüglichen Recherchen haben folgendes ergeben:

Vorab teile ich zur Information mit, dass ich geschäftsführender Gesellschafter der
Firma Project Partners Consulting & Managementgesellschaft mbH (PP) bin; die
Firma PP beschäftigt sich mit der Erbringung von EDV-Dienstleistungen.

Zum Thema Alpha Prime Fund Ltd konnte ich recherchieren, dass uns die Firma BA
Worldwide Fund Management (BWFM) mit Sitz auf den BVI in den Jahren 2005 bis
Ende 2008 für das Hosting der Domain „Alphaprimefund.com" beauftragt und bezahlt
hat. 2 diesbezügliche Rechnungen konnte ich noch ausfindig machen und schließe ich
dieser Erklärung an.

Das Hosting lief zunächst über einen RAID-5 Server, der insgesamt rund 10 Kunden
servicierte. Ab dem Jahr 2007 kam es auch zu e-mail Verkehr über die Domain.
Dokumente wurden auf dem Server nicht abgespeichert. Ansprechpartner bei BWFM
waren die Herren Holzer und Aster und gelegentlich auch Frau Dr. Radel.

Im Oktober 2007 kam es zu einem Absturz unseres Servers durch irrtümliche
Entfernung einer falschen Platte. Wir haben Frau Dr. Radel davon informiert. Wir
haben zunächst einen Reparaturversuch mit Unterstützung der Firma 3-Ware, den
Verkäufer des RAID-Controllers, gestartet, der jedoch nicht funktioniert hat. Wir
haben daraufhin die Firma Steurer GmbH kontaktiert, um eine Datenrettung
vorzunehmen. Die Einzelheiten dieser Datenrettung entnehmen Sie bitte der
angeschlossenen Stellungnahme der Firma Steurer, die wir ersucht haben, ihre

APF_00016371

Erinnerungen zu diesem Vorfall wiederzugeben.

Ich kann bestätigen, dass wir nach dem Absturz mit einem neuen Server RAID-1 weitergearbeitet haben, auf den die Firma Steurer die geretteten Daten der Kunden überspielt hat. Der alte Server wurde entsorgt.

Die Stellungnahme der Firma Steurer beschreibt, soweit wir uns selbst an diese über 10 Jahre zurückliegenden Vorgänge erinnern können, eine höchst plausible für solche Notmaßnahmen korrekte Vorgangsweise für die Datenwiederherstellung; die Plattform des Webmails dürfte tatsächlich wie default eingerichtet benutzt worden sein, was das Nichtspeichern der Attachments im Falle eines Versands per Webmail nachvollziehbar macht.

Ende 2008 teilte uns Frau Dr. Radel mit, dass es kein Geld mehr gäbe, unsere Services weiter in Anspruch zu nehmen. Sämtliche auf unserem Server verfügbaren Daten (e-mails) wurden daraufhin auf 2 DVDs gebrannt und Frau Dr. Radel übergeben. Alle Alpha Prime Daten wurden sodann auf unserem Server aus datenschutzrechtlichen Gründen gelöscht, ein von uns gewählter Standardvorgang bei der Beendigung von Kundenverhältnissen.

Wir hoffen, mit dieser Stellungnahme gedient zu haben und verbleiben

Mit freundlichen Grüßen,

Mag. (FH) Stephan Blahut
Geschäftsführer



APF_00016373



Consulting & Managementges.m.b.H.

**BA Worldwide Fund Managemen**

P.O. Box 71, Road Town, Tortola
British Virgin Islands

## <u>Rechnung Nr.: 070201</u>

Wien, am 11. Februar 2007

Wir freuen uns, dass unsere Leistungen zur vollsten Zufriedenheit erbracht werden
konnten und verrechnen, wie vereinbart:

Verlängerung des Nutzung, sowie Hosting der Domain
„**alphaprimeofund .com**" für ein Jahr pauschal
(1.6.2006 bis 31.5.2007)    ...........................................    190,-

zuzüglich 20% USt.    ..........................................................    38,-
                                                                                    =======
SUMME    ...............................................................................    228,-

Wir bitten den Betrag auf unser Konto Nr. 310031-03009, bei der Erste Bank AG (BLZ
20111) einzuzahlen. Der Betrag ist sofort bei Rechnungserhalt ohne Abzüge fällig.

Mit freundlichen Grüßen,

Ihre P r o j e k t  P a r t n e r s

A-1010 Wien – Josefsplatz 6
Tel.: +43 (0)1 219 8900 | Fax: 219 8901 | @: project@partners.at
DVR 1054180 | ATU 41007405 | FN 132615y

APF_00016374



**PROJECT PARTNERS**

Consulting & Managementgesellschaft m.b.H.

An
**BA Worldwide Fund Management**

P.O. Box 71, Road Town, Tortola
British Virgin Islands

## Rechnung Nr.: 060318

Wien, am 20. März 2006

Sehr geehrte Frau Dr. Fano!

Wir freuen uns, daß unsere Leistungen zu Ihrer vollsten Zufriedenheit erbracht werden konnten, und verrechnen, wie vereinbart:

Hosting der Domain „**alphaprimefund.com**" für ein Jahr
(1.6.2005 bis 31.5.2006) *)  ................................................  198,-

Traffic 1.6.2003 bis 31.5.05 – 0,32 GB à 36,- *)  ..............  11,52

========
Zuzügl. 20% USt.  ............................................  41,90
========
SUMME  ..........................................................  € 251,42

*) Der verursachte Traffic wird aliquot den http-logs mit € 36,- pro GB im Nachhinein verrechnet.

Wir bitten den Betrag auf unser Konto, Nr.: 310031-03009, bei der Erste Bank AG (BLZ 20111), einzuzahlen.

Mit freundlichen Grüßen,
Ihre Project Partners

A-1010 Wien – Josefsplatz 6
Tel.:+43 (0)1 21989 00  Fax:DW19  @:project@partners.at
DVR1054180 | ATU 41007405 | FN 132615y

APF_00016375