**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04390 (SMB) |
| Plaintiff, | |
| v. | |
| Michael Mann, Meryl Mann and BAM L.P., | |
| Defendants. | |

**DEFENDANTS' OBJECTIONS, RESPONSES AND COUNTERSTATEMENTS OF MATERIAL FACTS PURSUANT TO FED. R. CIV. P. 56, FED. R. BANKR. P. 7056 AND LOCAL RULE 7056-1 TO TRUSTEE'S STATEMENT OF MATERIAL FACTS**

**DENTONS US LLP**
Arthur H. Ruegger
1221 Avenue of the Americas
New York, New York 10016
Telephone: 212 768-6700
Facsimile: 212 768-6800
arthur.ruegger@dentons.com

*Attorneys for the Defendants*

Defendants Michael and Meryl Mann and BAM L.P. (the "Defendants")[1] submit this Defendants' Objections, Responses and Counterstatements of Material Facts Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056 and Local Rule 7056-1 to Trustee's Statement of Material Facts (the "DSMF") pursuant to Federal Rule of Civil Procedure 56, as incorporated by Federal Rule of Bankruptcy Procedure 7056, and Local Rule 7056-1 to object to and to correct the Statement of Material Facts In Support of Trustee's Motion for Summary Judgment, filed by Irving H. Picard (the "Trustee"), the trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), on December 21, 2018 (the "Trustee SOMF")(ECF No. 142) in support of the Trustee's motion for summary judgment in the above-pending adversary proceeding against Defendants.

As shown below, many of the Trustee's alleged facts are legal arguments that belong in the Trustee's memorandum, not in a Statement of Material Facts, and to the extent the Trustee's statements reflect facts, those facts are often either not material, incorrectly reported or not supported by admissible evidence.

## I.      PROCEDURAL HISTORY

### A.      The SIPA Case

1.       On December 11, 2008, Bernard L. Madoff was arrested and the Securities and Exchange Commission ("SEC") initiated an action against him after he confessed to committing fraud through BLMIS. *United States v. Madoff*, 586 F. Supp. 2d 240, 244–45 (S.D.N.Y. 2009).

---

[1] Defendants have not consented to the entry of a final order by the Bankruptcy Court and timely requested a jury trial. As the Court is aware, the Defendants contend they have not waived their right to a jury trial as their claims have been disallowed and the Court lacks jurisdiction to enter a final order in this proceeding. The Defendants have filed a Notice of Appeal and Motion for Leave to Appeal from this Court's Memorandum and Order date January 18, 2019. Accordingly, the Defendants have prepared their responses and objections under protest and with a reservation of rights. Nothing herein should be deemed a waiver of the Defendants' right to a jury trial or submission to the equitable jurisdiction of the Bankruptcy Court for final adjudication of this motion.

**DEFENDANTS' OBJECTION**

The Trustee is incorrect about the timing of the action and the confession and imprecise about the nature of the fraud. In addition, the case cited by the Trustee involves unrelated issues of the nature and conditions of detention of Madoff pending trial.

**DEFENDANTS' COUNTERSTATEMENT**

On December 11, 2008, Bernard L. Madoff was arrested on a criminal complaint alleging one count of securities fraud. *U.S. v Madoff*, 1:08-mj-02735 UA (S.D.N.Y. Dec. 11, 2008) [ECF Nos. 1, 2]

On December 11, 2008, an action was commenced against Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard Madoff by the Securities and Exchange Commission ("SEC") in the United States District Court for the Southern District of New York (the "District Court") alleging violations of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 (the " '34 Act") and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940. *SEC v. Madoff*, Case 1:08-cv-10791-LLS (S.D.N.Y. Dec. 11, 2008 [ECF No. 1].

On March 10, 2009, a criminal Information was filed in the District Court charging Bernard L. Madoff ("Madoff") with eleven felonies including securities fraud, investment adviser fraud, mail fraud, wire fraud, three counts of money laundering, false statements, perjury, false filings with the SEC, and theft from an employee benefit plan. *United States v. Bernard L. Madoff,* 09 Cr. 213 (DC)(S.D.N.Y Mar. 10, 2009)[ECF No. 38]. Madoff pleaded guilty to all counts. *See* Transcript of Plea Hearing, 09 cr. 213 (DC) [ECF No.38] (hereinafter "Madoff Plea Transcript") (Declaration of David J. Sheehan in Support of Trustee's Motion for Summary Judgment, sworn to December 21, 2018 [ECF No. 143] ("Sheehan Dec.") Ex. 14.)

2.      The Securities Investor Protection Corporation ("SIPC") petitioned for a protective

decree, placing BLMIS into liquidation, appointing the Trustee, and removing the SIPA liquidation

to the bankruptcy court.  *See SEC v. Madoff*, No. 08-cv-10791 (S.D.N.Y. Dec. 15, 2008), ECF

Nos. 5, 6.

**NO DISPUTE**

3.      On June 10, 2009, this Court entered an order substantively consolidating the

Chapter 7 estate of Madoff into the SIPA liquidation. Consent Order, *Sec. Inv'r Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 0801789

(Bankr. S.D.N.Y. June 10, 2009) ("Main Case"), ECF No. 252.

**DEFENDANTS' OBJECTION**

The statement is undisputed but subject to clarification.

**DEFENDANTS' COUNTERSTATEMENT**

On June 10, 2009, this Court entered an order substantively consolidating the Chapter 7

estate of Madoff into the SIPA liquidation. Consent Order, *Sec. Inv'r Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No.

0801789 (Bankr. S.D.N.Y. June 10, 2009), ECF No. 252. The order substantively

consolidating the Chapter 7 estate of Madoff into the SIPA liquidation was subject to the

following important limitation:

Notwithstanding the substantive consolidation of the Madoff estate into the BLMIS SIPA
Proceeding, the Chapter 7 Trustee shall remain Chapter 7 trustee of the Madoff estate and
shall continue to have all powers, rights, claims and interests of a Chapter 7 trustee to bring
claims under Chapters 5 and 7 of the Bankruptcy Code in consultation with the SIPA
Trustee and SIPC. Further, all powers, rights, claims and interests of the Madoff estate are
expressly preserved, including without limitation all Chapter 5 and Chapter 7 powers,
rights, claims and/or interests.
ECF No. 252. at ¶4

B.    **The Manns' BLMIS Accounts and the Adversary Proceeding**

4.    In December 1995, Defendant Michael Mann opened an account at BLMIS. The Mann Account was assigned account number 1CM363 in the name of "Michael Mann and Meryl Mann J/T Wros" (the "Mann Account"). Defendants Michael Mann and Meryl Mann are joint tenants of the "Michael Mann and Meryl Mann Joint Tenancy with Right of Survivorship" and beneficial owners of the Mann Account, with an account address in Great Neck, New York. See Answer ¶¶ 2, 8–9, Declaration of David J. Sheehan, Ex. 8.

**DEFENDANTS' OBJECTION**

Disputed in part. The Defendants' April 16, 2014 Answer relied upon is incorrect in several key parts and should be deemed amended to conform to the evidence, of among other matters, that in December 1995, Michael and Meryl Mann opened an account with Bernard L. Madoff (as previously defined "Madoff") operating as a sole proprietorship. Account Documents. (Declaration  of Arthur H. Ruegger in Opposition to Trustee's Motion for Summary Judgment, sworn to February 22, 2019 ("Ruegger Dec."), Ex. A.

In addition, Defendants object in general to the Trustee's citation to the Defendants' April 16, 2014 Answer.  Prior to the filing of the Trustee's motion for summary judgment, the parties had agreed that their respective prior pleadings would be deemed amended to embrace the parties' contentions in the Proposed Pretrial Order, filed November 27, 2018 (Proposed Pretrial Order, Section IV., p. 20; Sheehan Dec. Ex. 12).  Consequently, there was no need for either side to amend their pleadings to conform to the facts uncovered in discovery or otherwise.  The Proposed Pretrial Order identified the account documents and the payment records, which are part of the Trustee's records.   The Trustee, however, has repeatedly cited in his Trustee SOMF to the Defendants' 2014 Answer as support for -- what both sides now know are -- outdated or incorrect factual statements.  Having agreed

that the parties' pleadings would be deemed amended to embrace their respective contentions, the Trustee should be estopped from any reliance on outdated and incorrect allegations in the Defendants' 2014 Answer that both sides know are erroneous.  Although the Trustee is well aware of the facts and the legal arguments regarding the source of the payments and the consequences therefrom, the Defendants will amend their answer to conform to the evidence if the Court so requires.

**DEFENDANTS' COUNTERSTATEMENT**

Bernard L. Madoff operated as a sole proprietorship until January 1, 2001.  *See* Complaint. *Picard v. BAM, L.P.,* No. 11-cv-07667 (JSR) (S.D.N.Y. Jan. 25, 2012), ¶   [ ECF No. 9]. On December 16, 1995, Michael and Meryl Mann as Joint Tenants With Right of Survivorship opened an account with Bernard L. Madoff Investment Securities, the trade name of the sole proprietorship.   It was assigned Account No. 1CM363 (the "Mann Account").  *See*  Mann Account Documents. Ruegger Dec. Ex. A.

5.      Michael Mann subsequently opened another account at BLMIS in March 1999, assigned account number 1CM579, in the name of "BAM, L.P." (the "BAM Account, and together with the Mann Account, again the "Accounts"). Defendant Michael Mann is the sole general partner of BAM L.P. See Answer ¶¶ 2, 8.

**DEFENDANTS' OBJECTION**

Disputed in part.  The statement is partially incorrect and should be amended to conform to the evidence that the account was not opened with BLMIS,  which had not been formed at the time.  Defendants also object to the Trustee's citation to Defendants' 2014 Answer (*see* Objection to Trustee SOMF ¶ 4, above).

**DEFENDANTS' COUNTERSTATEMENT**

Bernard L. Madoff operated as a sole proprietorship until January 1, 2001. *See* Complaint.

*Picard v. BAM, L.P.,* No. 11-cv-07667 (JSR) (S.D.N.Y. Jan. 25, 2012), ¶ [ ECF No. 9]  (the

"Complaint").

In March 1999, Michael Mann opened an account with Bernard L. Madoff acting as  a sole

proprietorship, in the name of BAM L.P., which account was assigned account number

1CM579. *See* BAM Account Documents. Ruegger Dec. Ex. B.   Defendant Michael Mann

is the sole general partner of BAM L.P.

6.      Defendants received monthly account statements, trade confirmations, quarterly

portfolio management reports, and other communications from BLMIS for their accounts. See

Answer ¶¶ 26, 32. Prior to BLMIS's collapse, Defendants did not have any knowledge or notice

of any wrongdoing or fraudulent intent on the part of BLMIS.

### DEFENDANTS' OBJECTION

The statement is partially incorrect and should be amended to conform to the evidence that

the Defendants received communications from Bernard L. Madoff Investment Securities.

Defendants also object to the Trustee's citation to Defendants' 2014 Answer (*see* Objection

to Trustee SOMF ¶ 4, above).

### DEFENDANTS' COUNTERSTATEMENT

The Defendants received monthly account statements, trade confirmations, quarterly

portfolio management reports and other communications from Bernard L. Madoff acting

as a sole proprietor.  Thereafter, the Defendants received monthly account statements, trade

confirmations, quarterly portfolio management reports and other communications from

Bernard L. Madoff Investment Securities and BLMIS.  Prior to BLMIS's collapse,

Defendants did not have any knowledge or notice of any wrongdoing or fraudulent intent

on the part of BLMIS.

7.      On November 30, 2010, the Trustee filed a complaint commencing this adversary

proceeding to avoid and recover $9,678,157 in fraudulent transfers to Defendants during the six years prior to the liquidation. *See* Complaint, ECF No. 1.

**DEFENDANTS' OBJECTION**

Although the statement is true insofar as describing the original complaint, it is subject to clarification. The description of the actual scope of the original complaint is material only to demonstrate the extent to which the Trustee's alleged avoidance powers have been curtailed by the sections of the Bankruptcy Code that afford defenses to avoidance claims. Defendants also object to the Trustee's citation to his Amended Complaint, which is not admissible evidence within the meaning of Fed. R. Civ. P. 56(c)(1)(A).

**DEFENDANTS' COUNTERSTATEMENT**

On November 30, 2010, the Trustee filed a complaint commencing this adversary proceeding to avoid and recover at least $9,678,157 in transfers during the six years prior to the liquidation made to the holders of the Mann Account, the BAM Account and a third account, an Individual Retirement Account ("IRA") in the name of NTC & Co., LLP as custodian of the Individual Retirement Account f/b/o Michael Mann. The original complaint sought to avoid transfers on seven counts including two counts to avoid transfers made within two years of the filing of the petition under Sections 548(a)(1)(A) and (B) of the Bankruptcy Code, four counts to avoid transfers made within six years of the filing of the petition under New York Debtor and Creditor Law and Section 544 of the Bankruptcy Code and one count to avoid subsequent transfers from the IRA by NTC & Co. *See* [Original] Complaint, *Picard v. BAM, L.P.*, Adv. Pro. No. 10-04390 (SMB) (Bankr. S.D.N.Y. Nov. 30, 2010), ECF No. 1.

8.      On January 25, 2012, the Trustee amended the Complaint to assert claims to avoid obligations. Amended Complaint, Sheehan Decl. Ex. 7. The parties subsequently entered into a

Stipulation and Order dismissing the Obligations Counts against all Defendants with prejudice and dismissing the Trustee's claims against defendants Betsy Mann Polatsch and Adam Mann without prejudice. Stipulation and Order, ECF No. 46.

### DEFENDANTS' OBJECTION

Although the statement is true insofar as describes the Stipulation and Order, it is subject to substantial clarification.

### DEFENDANTS' COUNTERSTATEMENT

On January 25, 2012, the Trustee amended the complaint primarily to assert claims to avoid obligations.

On August 19, 2015, the Trustee and the Defendants entered into a Stipulation and Order dismissing the Obligations Counts against all Defendants with prejudice (¶ 6); dismissing the Trustee's claims against defendants Betsy Mann Polatsch and Adam Mann without prejudice (¶.6); and dismissing all claims against the Defendants pursuant to Sections 548(a)(1)(B) of the Bankruptcy Code, four counts to avoid transfers made within six years of the filing of the petition under New York Debtor and Creditor Law and Section 544 of the Bankruptcy Code, and one count to avoid subsequent transfers from the IRA by NTC & Co. with prejudice (¶ 8).  *See* Stipulation and Order. *Picard v. Mann*, Adv. Pro. No. 10-04390 (SMB), [ECF No. 46].

By virtue of the Second Circuit decision, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),* 773 F.3d 411 (2d Cir. 2014), cert. denied, 135 S. Ct. 2859 (2015) (the "*Section 546(e) Decision*") and the Stipulation and Order, the Trustee's avoidance powers were sharply curtailed by application of the safe harbor defense provision of the Bankruptcy Code.

By virtue of the Stipulation and Order, the obligations of the broker to its customers are unavoidable.

9.      In a consolidated ruling on Antecedent Debt in which Defendants were participating parties, the District Court held that an avoidance defendant cannot give "value for the transfers of [alleged] fictitious profits received, as "satisfaction of . . . antecedent debt" under Section 548(c). *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. (In re Madoff Sec.)*, 499 B.R. 416, 423 (S.D.N.Y. 2013) (the "*Antecedent Debt Decision*"). The District Court had previously affirmed this same principle in *Picard v. Greiff*, 476 B.R. 715 (S.D.N.Y. 2012), and the Bankruptcy Court subsequently reaffirmed it in *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec.)*, 531 B.R. 439, 471 (Bankr. S.D.N.Y. 2015) (the "*Omnibus Good Faith Decision*"). [2]

## DEFENDANTS' OBJECTION

Disputed in its entirety, including the footnote, on several grounds. *First*, this statement is legal argument, not a material fact. *Second,* the cited bases are court decisions, not facts from the record.  Under Federal Rule of Civil Procedure 56(c)(1)(A), the Trustee's motion for summary judgment may be based on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  *Third,* the statements must be based on admissible evidence, Fed. R. Civ. P. 56(c)(2).  The holding or findings of a court does not qualify as material facts.

---

[2] Further affirmed in *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5–10 (Bankr. S.D.N.Y. Apr. 25, 2016); *Picard v. Lowrey*, Adv. Pro. Nos. 10-04387, 10-0448, 10-04350, 10-05110, 2018 WL 1442312, at *5–8 (Bankr. S.DN.Y. Mar. 22, 2018); *Picard v. Goldenberg*, Adv. Pro. No. 10-04946 (SMB), 2018 WL 3078149, at *4 (Bankr. S.D.N.Y. June 19, 2018)

"[J]udicial findings of fact are inadmissible hearsay," *Penree v. Watson*, 2017 U.S. Dist. LEXIS 126856, 2017 WL 3437680, at *3 (N.D.N.Y. Aug. 10, 2017)) to the extent they are offered for the truth of the findings. *See Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993); *United States v. Boulware*, 384 F.3d 794, 806 (9th Cir. 2004); *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1287 (11th Cir. 2001); *United States v. Nelson*, 365 F. Supp. 2d 381, 388 (S.D.N.Y. 2005)("[J]udicial findings generally do not fall under the hearsay exception established by Rule 803(8)(C)"); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 323 (E.D.N.Y. 2001). The hearsay exception for public records, Fed. R. Evid. 803(8), does not apply to factual findings in a judicial document. *U.S. Steel, LLC,* 261 F.3d at 1287; *Nipper,* 7 F.3d at 417; *Blue Cross & Blue Shield of N.J., Inc.*, 141 F. Supp. 2d at 323.

The *Antecedent Debt Decision* and *Picard v. Greiff* have been superseded and overruled by the decision of the Second Circuit Court of Appeals in *Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411 (2d Cir. 2014).

The decision is not binding under the doctrine of law of the case because it is not final. See *Geltzer v. Brizinova (In re Brizinova)*, 592 B.R. 442 (Bankr. E.D. N.Y. 2018) citing *Colvin v. Keen,* 900 F.3d 63, 68 (2d Cir. 2018) )("the Supreme Court long ago noted that '"[w]e think that [the law of the case doctrine] requires a final judgment to sustain the application of the rule . . . just as it does for the kindred rule of res judicata."' *United States v. U.S. Smelting Co.*, 339 U.S. 186, 198-99, 70 S. Ct. 537, 94 L. Ed. 750 (1950)") (additional citations omitted).

*Finally,* this is an isolated and selected citation to one of many issues addressed by the court. Accordingly, the statement does not accurately reflect the entirety of the decision.

10.     By virtue of a Second Circuit decision, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),* the Trustee's avoidance and recovery claims are limited to the two-year period preceding the liquidation. 773 F.3d 411 (2d Cir. 2014), cert. denied, 135 S. Ct. 2859 (2015).

**DEFENDANTS' OBJECTION**

The statement is true but requires clarification.  The cited Second Circuit decision (often referred to as the "*Section 546(e) Decision*") sharply curtailed the Trustee's avoidance powers with respect to both scope and time pursuant to the safe-harbor defense for securities transactions under Section 546(e) of the Bankruptcy Code.  *See* Stipulation and Order.  [ECF No. 46].

**DEFENDANTS' COUNTERSTATEMENT**

By virtue of a Second Circuit decision, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),* the Trustee's avoidance and recovery claims under Sections 548(a)(1)(A) and 550 of the Bankruptcy Code are limited to the avoidance and recovery of transfers made within the two-year period preceding the commencement of the SIPA liquidation proceeding. 773 F.3d 411 (2d Cir. 2014), cert. denied, 135 S. Ct. 2859 (2015).

11.     Accordingly, the Trustee seeks to avoid and recover from Defendants $2,250,000 transferred to the Mann Account and $563,000 transferred to the BAM Account within the two-year period preceding the liquidation.

**NO DISPUTE**

12.     On April 16, 2014, Defendants answered the Trustee's Amended Complaint. Defendants asserted 34 affirmative defenses, including those pertaining to (i) jurisdiction, standing, and ripeness (Third, Fifth, and Sixth Affirmative Defenses); (ii) value and antecedent debt (Eighth, Fifteenth, Sixteenth, Twenty-First, and Twenty-Second Affirmative Defenses); (iii)

BLMIS's purported solvency (Fourteenth Affirmative Defense); (iv) section 546(e) of the Bankruptcy Code and other limitations (Twelfth, Nineteenth, Twentieth, and Twenty-Fifth Affirmative Defenses); (v) section 278 of the New York Debtor and Creditor Law (Seventeenth and Eighteenth Affirmative Defenses); (vi) various remedies, adjustments, and setoffs they claim they are entitled to under federal or state law (Twenty-First, Twenty-Second, Twenty-Third, and Twenty-Seventh Affirmative Defenses). Id. at 19–25. In addition, Defendants did not admit the Trustee's specific allegations concerning the Ponzi scheme conducted by BLMIS. Id. at ¶¶ 23–37.

### DEFENDANTS' OBJECTION

The Defendants object to this statement on several grounds. *First,* the Defendants object to characterization of the affirmative defenses as incomplete and misleading.

*Second,* the evidence provided in the discovery period reveals that accounts were established with the Madoff sole proprietorship and payments were made to the Defendants from an account in the name of Bernard L. Madoff, not BLMIS. Accordingly, the Defendants have asserted additional defenses. (See Defendants' Objection to the Trustee SOMF ¶4, above).

### DEFENDANTS' COUNTERSTATEMENT

Defendants' 2014 Answer did not admit to the allegations in the complaint with respect to the operations of BLMIS or the content of the applications, pleas and other documents referred to in the Complaint that were intended to establish the Trustee's case. Defendants expressly denied that the adversary proceeding arose from a Ponzi scheme. ¶1 In addition, the Defendants' 2014 Answer specifically preserved the Defendants' defenses under Section 548(c) and 546(e) of the Bankruptcy Code, as settlement payments (20th affirmative defense) and satisfaction of antecedent debts (21st affirmative defense) and all limitations periods (12th affirmative defense). *See* Answer *Picard v. Mann*, Adv. Pro. No.

10-04390 (SMB), [ECF No.40]

In addition, the Defendants expressly objected to Bankruptcy Court's jurisdiction to enter

a final order in the adversary proceeding stating:

This Court lacks jurisdiction of the final adjudication of claims asserted in the Complaint

under *Stern v. Marshall*, 131 S.Ct. 2594 (2011) and its progeny. The asserted claims are

not core proceedings and Defendants do not consent to entry of a final order and judgment

by the Bankruptcy Court. Defendants further demand a jury trial (Defendants' 2014

Answer, Third Affirmative Defense).

13.    The Trustee conducted discovery on all claims, including serving Requests for

Production, Interrogatories, and Requests for Admission. Pretrial Order at 9. The Trustee also

served subpoenas on Defendants' financial institutions for documents supporting Defendants'

receipt of the relevant transfers from BLMIS.

**DEFENDANTS' OBJECTION**

This statement warrants clarification. The Trustee may have sought documents related to

the Defendants' receipt of the transfers at issue in this adversary proceeding, but that

discovery effort is not material (Fed. R. Evid. 401 and 403). Defendants also object to the

inference that the financial institutions provided any proof related to the transfer or even

responded to the subpoenas. That statement is not supported by admissible evidence within

the meaning of Fed. R. Civ. P. 56(c). Furthermore, as detailed below, Defendants object

to the statement on the grounds that the transfers were not transfers of BLMIS property.

14.    Defendants admit they made and received the transfers from BLMIS in connection

with their accounts, as set forth in Exhibit B to the Amended Complaint. See Answer at ¶ 43

("Defendants admit that it made certain transfers and received certain transfers from BLMIS prior

to December 8, 2008. Defendants respectfully refers the Court to Columns 10 and 11 [of the

Amended Complaint] for the complete contents thereof.").

**DEFENDANTS' OBJECTION**

Disputed.  To the extent that the Defendants previously identified the transfers as transfers
of BLMIS property or by BLMIS, Defendants' admission was in error and directly
contradicted by documentary evidence produced by the Trustee.  The Defendants received
check transfers payable to Michael and Meryl Mann from an account in the name of
Bernard L. Madoff.  (*See* Mann Account Checks. Ruegger Dec.  Ex. C).  The Defendants
did not receive these transfers from BLMIS property.  See SOMF ¶15.

**DEFENDANTS' COUNTERSTATEMENT**

On April 16, 2003, December 16, 2004, March 20, 2005, March 7, 2007 and October 24,
2007, Defendants received checks payable to Michael and Meryl Mann J/T WROS written
on Chase Account 6301428151 509  (the "509 Account") in the name of Bernard L.
Madoff. (*See* Mann Account Checks. Ruegger Dec. Ex. C).

15.     Specifically, over the life of the Mann Account, Defendant Michael Mann
deposited a total of $14,850,000 into the Mann Account and withdrew a total of $20,650,000 from
the Mann Account. Of these withdrawals from the Mann Account, $2,250,000 was withdrawn
within the two-year period before the liquidation. See Joint Pretrial Order ¶ 8, Sheehan Decl. Ex.
12; Amended Complaint Ex. B; Opp'n to the Trustee's Motion in limine, ECF Nos. 126, 126-3
("Michael Mann and BAM L.P. have admitted that the transactions listed in the [Amended]
Complaint are accurate.") Tr. of Nov. 28, 2018 Hr'g ("Nov. 28, 2018 Tr.") at 7, Sheehan Decl. Ex.
10 (conceding that Defendants "don't contest" the relevant account activity and that therefore it is
"not an issue at trial").

**DEFENDANTS' OBJECTION**

The Trustee entered a Stipulation and Order dismissing with prejudice all claims to avoid

any obligations against all the Defendants (Trustee SOMF ¶ 8), rendering unavoidable all

of the BLMIS's obligations to the Defendants.  Moreover, assuming *arguendo* BLMIS's

obligations were avoidable had there been no Stipulation, under Section 548(a)(1) of the

Bankruptcy Code a trustee is barred from avoiding obligations incurred and transfers made

before the two-year reach-back period, *In re Tribune Fraudulent Conveyance Litig.,* 2018

WL 6329139 at *15 - *16 (S.D.N.Y. Nov. 30, 2018) (Sullivan, C.J., sitting by

designation)[3].   With all relevant obligations being unavoidable, the Trustee cannot avoid

the transfers based thereon, and thus the sums Michael Mann deposited or withdrew over

the life of the Mann Account are irrelevant (Fed. R. Evid. 401, 403).

Moreover, what the Defendants deposited or withdrew over the life of the accounts is

relevant only to customer claims and for purposes of customer claims allowance, the

Defendants do not contest the transactions.   What occurred over the life of the account is

not relevant to avoidance of obligations or transfers, which is determined at the time of the

transfer.

**DEFENDANTS' COUNTERSTATEMENT**

On November 30, 2006, the approximate date of the applicable two year statute of repose

fixed by section 548(a)(1) of the Bankruptcy Code, the account statement for the Mann

Account reported a positive balance of $6,305,190.  Thereafter, Michael Mann made a

deposit of $1,500,000 and two withdrawals totaling $2,250,000.  (See Mann November

30, 2006 Account Statement.  Ruegger Dec. Ex. D).

On the date of each withdrawal from the account during the two-year period before the

BLMIS liquidation, the statements for the Mann Account reported a positive balance in

---

[3] *See also In re Tribune Fraudulent Conveyance Litig.,* 2019 WL 294807 at *21 (S.D.N.Y. Jan. 23, 2019) (Cote, D.J.)

excess of the withdrawal amounts, each balance representing an unavoidable obligation from the broker to its customers. Thus, on February 28, 2007, before the withdrawal on March 7, 2007 of $250,000, the Mann Account reported a balance of $7,665,327. On September 30, 2007, before the withdrawal of $2,000,000 on October 24, 2007 from the Mann Account, the statement reported a balance of $8,327,789. (See Mann Statements. Ruegger Dec. Ex. E).

The Mann's withdrawal requests were paid with checks dated March 7, 2007 and October 24, 200 written on the Chase 509 Account in the name of Bernard L. Madoff. (See Mann Checks. Ruegger Dec. Ex. C). In addition, the Defendants received checks payable to Michael and Meryl Mann JT WROS written on the 509 Account dated April 16, 2003, December 16, 2004 and March 20, 2005. (*See* Mann Checks. Ruegger Dec. Ex. C).

16.    Similarly, over the life of the BAM Account, Defendant Michael Mann, on behalf of BAM L.P., deposited a total of $1,920,007 into the BAM Account and withdrew a total of $3,551,000 from the BAM Account. Of these withdrawals from the BAM Account, $563,000 was withdrawn within the two-year period before the liquidation. See Joint Pretrial Order at ¶ 9; Amended Complaint Ex. B.

**DEFENDANTS' OBJECTION**

*See* Objection above to Trustee SOMF ¶ 15.

With all relevant obligations being unavoidable, the Trustee cannot avoid the transfers based thereon and the sums Michael Mann deposited or withdrew over the life of the BAM Account are irrelevant to the avoidance of transfers based on unavoidable obligations.

Moreover, what the Defendants deposited or withdrew over the life of the accounts is

relevant to allowance or disallowance of customer claims, but not to avoidance of obligations or transfers, which is determined at the time of the transfer.

**DEFENDANTS' COUNTERSTATEMENT**

On November 30, 2006, the approximate date of the applicable two-year statute of repose fixed by Section 548(a)(1) of the Bankruptcy Code, the statement for the BAM account reported a balance of $1,091,896.12, which represented an unavoidable obligation from the broker to its customer. (See November 30, 2006 Account Statement. Ruegger Dec. Ex. F). Thereafter, BAM withdrew a total of $563,000.

On the date of each withdrawal from the account during the two-year period, the BAM statement reported a positive balance in excess of the withdrawal amounts, each balance reflecting unavoidable obligations from BLMIS to its customers, including BAM. Thus, on March 31, 2007 before the April 17, 2007 withdrawal of $88,000, BAM's account statement reported a balance of $1,132,452. On June 30, 2007 before BAM withdrew $300,000 on July 25, 2007, the BAM Account balance of $1,075,738. On September 30, 2007 before BAM made a withdrawal of $50,000 on October 24, 2007, the BAM Account a reported a balance of $801,193. On December 31, 2007, before BAM made a $15,000 withdrawal from its account, the reported BAM Account balance was $775,127.75. Finally, on March 31, 2008, before the last withdrawal on April 23, 2008 of $110,000, the BAM account reported a balance of $762,516. (*See* BAM Statements. Ruegger Dec. Ex. G).

The BAM withdrawal requests were paid with checks dated April 17, 2007, July 25, 2007, October 24, 2007, January 23, 2008 and April 23, 2008 and written on the 509 Account in the name of Bernard L. Madoff. (See BAM Checks Ruegger Dec. Ex. H). In addition,

BAM received checks payable to BAM written on the Chase 509 Account on April 25, 2000, October 12, 2000, April 23, 2002, June 25, 2002, April 16, 2003, January 6, 2004, March 2, 2005 April 8, 2005 and January 5, 2006.  (Ruegger Dec. Ex. H).

17.     Discovery concluded in December 2015.  Defendants did not disclose any witnesses or serve any expert reports on either the case-in-chief or the rebuttal expert deadlines. Nor did they depose any of the Trustee's experts.

### DEFENDANTS OBJECTION & COUNTERSTATEMENT

The Trustee's statement is incorrect.  Defendants have listed Michael Mann as a witness. S*ee* Proposed Joint Pretrial Order, *Picard v. BAM L.P.*, Adv. No. 10-04390 (SMB)     .

18.     On October 26, 2018, Defendants filed a motion to withdraw the reference of the Mann Action to the District Court, claiming they have a right to have a jury hear their claims.

### DEFENDANTS' OBJECTION

This statement is not supported by reference to any evidence and it is not material to the outcome of this motion (Fed. R. Evid. 401, 403).

### DEFENDANTS' COUNTERSTATEMENT

Defendants timely requested a trial by jury and did not consent to entry of a final order by the Bankruptcy Court. *See*  Answer, Third Affirmative Defense.

19.     While that motion was pending, the Bankruptcy Court set a trial date for December 3, 2018. ECF No. 108.

### DEFENDANTS' OBJECTION

This statement is not relevant to the outcome of this motion (Fed. R. Evid. 401, 403)**.**

20.     Defendants filed an emergency motion for a stay of the trial, claiming that the Bankruptcy Court did not have jurisdiction to hear the matter. See Defendants' Memorandum Of

Law, ECF No. 121-1. The Bankruptcy Court adjourned the trial date *sine die* while the parties

briefed the issue of whether the Bankruptcy Court has jurisdiction to hear the case as a result of

the Defendants' withdrawal of their customer claims with prejudice, discussed below.

### DEFENDANTS' OBJECTION

This statement is not supported by reference to any evidence and it is not material Fed. R.

Civ. P. 56(c); Fed. R. Evid. 401, 403)

21.     The question of the Bankruptcy Court's jurisdiction in this matter has been fully

briefed and the parties are awaiting a decision.

### DEFENDANTS' OBJECTION

This statement is no longer accurate. See. Memorandum and Order dated January 18, 2019.

The Defendants have filed a notice of appeal from this order and a motion for leave to

appeal with the District Court.

### C.      Defendants' Customer Claims

22.     On December 23, 2008, the Bankruptcy Court entered the Claims Procedures

Order. Order, Main Case, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Dec. 23, 2008), ECF

No. 12.

### NO DISPUTE

23.     In June 2009, Defendants filed customer claims with the Trustee seeking to recover

the purported balance in their BLMIS accounts as stated on their last account statements as of

November 30, 2008. Specifically, Michael Mann and Meryl Mann filed a customer claim for

BLMIS Account No. 1CM363 in the amount of $7,192,467, designated as Claim #009823 (the

"Mann Customer Claim"), and Michael Mann filed claim #009822 on behalf of BAM L.P. for

Account No. 1CM579 in the amount of $724,533.85 (the "BAM Customer Claim," and together

with the Mann Customer Claim, the "Customer Claims"). See Sheehan Decl. Exs. 1, 2; Answer ¶¶

51–52.

**NO DISPUTE**.

24.    In August 2009, the Trustee issued a Notice of Trustee's Determination of Claim

with respect to the Mann Customer Claim, and in October 2009, the Trustee issued a Notice of

Trustee's Determination of Claim with respect to the BAM Customer Claim (the

"Determinations"). Sheehan Decl. Exs. 3, 4.

**NO DISPUTE**

25.    The Determinations state the following:

Your claim is DENIED. No securities were ever purchased for your account . . . [b]ased on
the Trustee's analysis, the amount of money you withdrew from your BLMIS account at
BLMIS . . . is greater than the amount that was deposited with BLMIS . . . . As noted, no
securities were ever purchased for your account. Any and all profits reported to you by
BLMIS on account statements were fictitious. Since there were no profits to use either to
purchase securities or to pay you any money beyond the amount that was deposited into
your BLMIS account, the amount of money you received in excess of deposits in your
account [] was taken from other customers and given to you.

*Id.*

**DEFENDANTS' OBJECTION**

The statement is accurate insofar as it reflects a small portion of the Determination, but

misleading. The Determinations also state that Determination could be subject to judicial

review and reversal.  Moreover, the Determinations are merely part of an administrative

procedure.  The Trustee's Determinations were tested in court and superseded by two

Second Circuit decisions, which became final orders. *See In re Bernard L. Madoff*

*Investment Securities LLC*, 654 F.3d 229 (2d Cir. 2011) and *In re Bernard L. Madoff Inv.*

*Sec. LLC*, 779 F.3d 74 (2d Cir. 2015)  Letters of Determination. Ruegger Dec. Ex. I.

**DEFENDANTS' COUNTERSTATEMENT**

On August 28, 2009, the Trustee issued a Notice of Trustee's Determination of Claim with

respect to the Mann Customer Claim (the "Mann Determination"). The Mann

Determination states:

> Should a final and unappealable court order determining that Trustee is incorrect in his
> interpretation of "net equity" and its corresponding application to the determination of
> customer claims, the Trustee will be bound by that order and will apply it retroactively to
> all previously determined customer claim in accordance with the Court's order. Nothing
> in this Notice of Trustee's Determination of Claim shall be construed as a waiver of any
> rights or claims held by you in having your customer claim re-determined in accordance
> with any such Court order.
> See Mann Determination Letter. Ruegger Dec. Ex I. ¶

26.     The Determinations provide schedules listing the date, transaction description (i.e.,

check, check wire), and amount of each withdrawal and deposit transaction between BLMIS and

Defendants. *Id.*

**DEFENDANTS' OBJECTION**

The Defendants do not object to the statement insofar as the schedules list dates, transaction

type and amounts. However, the schedules do not reflect the identity of the parties. BLMIS

did not make the distributions to the Defendants.    Moreover, the schedules were provided

solely to establish whether the Manns and/or BAM L.P. had a customer claim for

distribution from  the BLMIS estate.

**DEFENDANTS' COUNTERSTATEMENT**

The Determinations  provide schedules listing the date and transaction description and

amount of each withdrawal and deposit transactions solely for purposes of determining the

allowance or disallowance of customer claims in the SIPA administrative proceeding using

the net investment method.

27.     In September 2009, Michael Mann and Meryl Mann filed objections to the

Determinations (the "Objections"). Sheehan Decl. Exs. 5, 6.

**NO DISPUTE.**

28.     In the Objections, the Manns argued that the Trustee's use of the net investment method was improper because the Trustee was bound by the amounts showing on their last statements, that the Trustee's calculation wrongly extended beyond the limitations period for avoidance of a claim under federal or state law, and that the Manns are entitled to interest and damages under federal securities law. Id.

**DEFENDANTS' OBJECTION**

Defendants object to this statement as irrelevant given the Second Circuit's later decision on net equity (Fed. R. Evid. 401, 403). In addition, Defendants object to the Trustee's characterization of the Objections to the extent that statement is incomplete and misleading. In the Objections, the Defendants contended that: the calculation was unsubstantiated and incorrect; the Trustee's use of the Net Investment Method was inconsistent with the purpose and goals of SIPA; the use of the net investment method was inconsistent with definition of net equity under SIPA and the Rules promulgated under SIPA; the determination was contrary to SIPC's own policies and practices and goes "beyond any limitations period for avoidance of a claim under either state or federal law;" and even if his methodology is adopted, the Trustee should have adjusted his calculation to account for interest and damages caused by Madoff.  *In Bernard L. Madoff Investment Securities LLC,* Adv.Pro No. 08-01879 (SMB).[ECF Nos.461 and 815].

29.     In October 2009, the Trustee brought a motion before the Bankruptcy Court seeking to affirm his calculation of net equity for customer claims in this case using a cash in/cash out methodology. The legal basis for the Trustee's motion was that Madoff was conducting a Ponzi scheme. Main Case, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. June 10, 2009), ECF No. 524.

**DEFENDANTS' OBJECTION**

Defendants object to the second sentence of this statement is legal argument, not a material

fact. Fed. R. Civ. P. 56(c).

30.     On March 1, 2010, the Bankruptcy Court ruled that net equity customer claims in

this case must be calculated on a cash in/cash out basis. The basis for the Court's holding was that:

> Rather than engage in legitimate trading activity, Madoff used customer funds to support
> operations and fulfill other investors' requests for distributions of profits to perpetuate his
> Ponzi scheme. Thus, any payment of "profit" to a BLMIS customer came from another
> BLMIS customer's initial investment. Even if a BLMIS customer could afford the initial
> fake purchase of securities reported on his customer statement, 15 without additional
> customer deposits, any later "purchases" could be afforded only by virtue of recorded
> fictional profits. Given that in Madoff's fictional world no trades were actually executed,
> customer funds were never exposed to the uncertainties of price fluctuation, and account
> statements bore no relation to the United States securities market at any time. As such, the
> only verifiable transactions were the customers' cash deposits into, and cash withdrawals
> out of, their particular accounts. Ultimately, customer requests for payments exceeded the
> inflow of new investments, resulting in the Ponzi scheme's inevitable collapse.
> Net Equity Decision, 424 B.R. at 128.

**DEFENDANTS' OBJECTION**

Disputed in its entirety.  Court holdings and findings of fact are inadmissible hearsay.  See

the response above to the Trustee SOMF ¶ 9.  In addition, this is an isolated and selected

citation to one of many issues addressed by the court. Accordingly it does not even

accurately reflect the entirety of the decision.  Moreover, the decision was also overruled

in several aspects.  The court concluded incorrectly that the payments would not be

afforded the protections of Section 546(e) of the Bankruptcy Code.  Finally, the citation to

the case is not proper.

31.     In its subsequent order, the Court further held that "the objections to the

determinations of customer claims, as listed on Exhibit A to the Trustee's Motion [Dkt. No. 530],

are expunged insofar as those objections are based upon using the Final Customer Statements

rather than the Net Investment Method to determine Net Equity." Main Case, Adv. Pro. No. 08-

01789 (Bankr. S.D.N.Y. June 10, 2009), ECF No. 2020 (the "Net Equity Order"). The Net Equity Order further provided that the Bankruptcy Court "shall retain jurisdiction with respect to the remainder of the claimants' objections" and "the Trustee shall in due course schedule a hearing or hearings regarding the remainder of the claimants' objections in accordance with the Claims Procedures Order." *Id.*

### DEFENDANTS' OBJECTION

Disputed.  Defendants do not dispute that the Mann Claim and Objection were disallowed and expunged insofar as they were based in the last statement rather than the Net Investment Method.  However, court holdings and findings of fact are inadmissible hearsay.  See the response above to the Trustee SOMF ¶ 9.  The holding of a court does not qualify as a material fact.

32.     The Manns' claims were listed on Exhibit A to the Trustee's motion. Under the Net Equity Order, the claims of Michael and Meryl Mann were disallowed to the extent they exceed net equity and the portions of the objections based on last statement were expressly expunged. Defendants' remaining objections remained pending and unresolved.

**DEFENDANTS' OBJECTION**.  The Defendants object to the last sentence of the statement to the extent that it does not indicate what remaining objections actually remained unresolved and implies that such objections remain pending and unresolved.

33.     On appeal, the Second Circuit affirmed the Net Investment Method.  *See In re Bernard L. Madoff Inv. Sec.,* 654 F.3d 229 (2011), *cert. dismissed sub nom. Sterling Equities Assocs. v. Picard*, 566 U.S. 1032 (2012), *cert. denied sub nom. Ryan v. Picard*, 567 U.S. 934 (2012).  In the subsequent Antecedent Debt Decision, the District Court validated the net equity formula to determine avoidance liability, explaining that "amounts transferred by Madoff

Securities to a given defendant at any time are netted against the amounts invested by that defendant in Madoff Securities at any time." 499 B.R. at 423.

**DEFENDANTS' OBJECTION**

Disputed. Court holdings and findings of fact are inadmissible hearsay. See the response above to the Trustee SOMF ¶ 9. Furthermore, the *Antecedent Debt Decision* and *Picard v. Greiff* have been superseded and overruled by the decision of the Second Circuit Court of Appeals in *Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411 (2d Cir. 2014).

34.      Between 2009 and 2014, the Trustee litigated various issues relating to the cash in/cash out methodology, including whether claimants were entitled to interest on their net equity claims and whether to include fictitious profits in the calculation of transfers between BLMIS accounts. *See Sec. Inv'r Prot. Corp. v. 2427 Parent Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 779 F.3d 74 (2d Cir. 2015) (rejecting argument that Trustee's claims do not account for time value of money); In re BLMIS, 697 F. App'x 708 (2d. Cir. 2017) (affirming Trustee's inter-account transfer methodology in summary order).

**DEFENDANTS' OBJECTION**

Disputed. The Defendants do not deny that certain court rulings disposed of their objections to the Trustee's determination. However, court holdings and findings of fact are inadmissible hearsay. See the response above to the Trustee SOMF ¶ 9.

**DEFENDANTS' COUNTERSTATEMENT**

Between 2009 and 2014, the Trustee litigated various issues relating to the cash in/cash out methodology, including whether claimants were entitled to interest on their net equity claims and the ruling in *Sec. Inv'r Prot. Corp. v. 2427 Parent Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 779 F.3d 74 (2d Cir. 2015) together with the net equity decision and the acceptance of the dates and amount of the transactions in the accounts, disposed of

Defendants' Objections to the trustee's determination.

35.     On June 1, 2018, Defendants filed notices to withdraw their Objections. See Notice
of Withdrawal, Main Case, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 1, 2018), ECF
Nos. 17630, 17623.

### DEFENDANTS' OBJECTION

This is not a material fact that affects the outcome of the litigation (Fed. R. Evid. 401, 403).

36.     On July 27, 2018, the Trustee moved to strike the withdrawals, asserting that a
claimant may not unilaterally withdraw its claim or objection under Rule 3006 of the Federal Rules
of Bankruptcy Procedure and Rule 41 of the Federal Rules of Civil Procedure. See Trustee's
Motion To Strike, Main Case, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. July 27, 2018),
ECF No. 17864.

### DEFENDANTS' OBJECTION

This is not a material fact that affects the outcome of the litigation (Fed. R. Evid. 401, 403).

37.     The Bankruptcy Court granted the Trustee's motion, holding the withdrawals were
"stricken and have no legal effect." Order, Main Case, Adv. Pro. No. 08-01789 (SMB) (Bankr.
S.D.N.Y. Oct. 4, 2018), ECF No. 18051.

### DEFENDANTS' OBJECTION

Disputed.  Court holdings and findings of fact are inadmissible hearsay.  See the response
above to the Trustee SOMF ¶ 9.    In addition, this is an isolated and selected citation to
one of many issues addressed by the court.  Accordingly, it does not even accurately reflect
the entirety of the ruling.

38.     On the eve of trial before the Bankruptcy Court, Defendants made an oral motion
to withdraw their claims with prejudice. Nov. 28, 2018 Tr. at 16.

**DEFENDANTS' OBJECTION**

The transcript will clearly reveal that the motion was made at the invitation of the Court.

Neither the timing of the motion nor the motion itself was planned by the Defendants.

Nov. 28, 2018 Transcript, Sheehan Dec. Ex. 10...

39.     During the hearing, this Court suggested the Trustee to move for summary judgment. See Nov. 28, 2018 Tr. at 25–26.  The Court again authorized the Trustee to move for summary judgment at a hearing on December 19, 2018.  Tr. of Dec. 19, 2018 Hr'g at 31–32, Sheehan Decl. Ex. 11.

**DEFENDANTS' OBJECTION**

The Defendants do not dispute the fact that the Court made certain statements on the record, but they dispute any inference by reference to courtroom colloquy that the statements reflect a pre-determination of the outcome of the motion.

40.     On December 19, 2018, the Court entered an order granting Defendants' motion to withdraw their claims with prejudice (the "Withdrawal Order"). Sheehan Decl. Ex. 13.

**DEFENDANTS' OBJECTION**

The Defendants do not deny that the Court entered an order.  However, the statement is subject to clarification.  The Court directed the Trustee to prepare a plain vanilla order. Consequently, the order itself simply dismisses the claims and objections with prejudice. There are no conditions imposed on the dismissal and no statements regarding the consequence of dismissal.  The Trustee did not object to the dismissal of claims and objections.  The title of the order was supplied by the Trustee and is in violation of the Court's directive. *Picard v. BAM*, Adv. No. 10-04390 (SMB).

**DEFENDANTS' COUNTERSTATEMENT**

On December 19, 2018, the Court entered an order granting Defendants' motion to withdraw their claims with prejudice (the "Withdrawal Order"). As directed by the Court, the order simply approves dismissal of the customer claims and the Objections. There are no findings of fact or conditions with respect to the dismissal. The Trustee did not object to the withdrawal of the Claims or Objections. *Picard v. BAM*, Adv. No. 10-04390 (SMB).

41.     The Withdrawal Order was an adjudication on the merits that BLMIS conducted a Ponzi scheme that Defendants received fictitious profits instead of legitimate distributions, and that money Defendants received came from other BLMIS customers.

**DEFENDANTS' OBJECTION**

Disputed. This is legal argument, not a fact that material or otherwise. It has no place in the statement of material undisputed fact and belongs in the Trustee's memorandum of law. The Defendants dispute the legal conclusion.

**II.    BLMIS OPERATED A PONZI SCHEME THROUGH ITS INVESTMENT ADVISORY BUSINESS**

42.     While Defendants' accounts were open, BLMIS was headquartered at 885 Third Avenue, New York, New York and operated its investment advisory business in that location. BLMIS was registered with the Securities and Exchange Commission as a broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). See Answer ¶ 23. In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration, which represented, inter alia, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion. See Answer ¶ 35 (referring the Court to the referenced Application "for the complete contents therein").

**DEFENDANTS' OBJECTION**

Disputed in part.  For several reasons, there is no admissible evidence in the record to support the majority of the statements.  *First,* Defendants object to any citation by the Trustee to Defendants' 2014 Answer (*see* Objection to Trustee SOMF ¶ 4, above).  *Second*, Paragraph 23 of that 2014 Answer merely admitted BLMIS was a broker-dealer registered with the SEC and a member of SIPC, and denied knowledge or information as to the remainder of the Complaint's paragraph 23.  *Third,* paragraph 35 of the 2014 Answer denied knowledge or information as to that paragraph of the Complaint but refers the Court to a document that is not in evidence.  *Finally,* the statement is inaccurate with respect to the description of BLMIS and the Defendants' accounts.  BLMIS did not exist until January 2001.  The Mann account was opened in 1995.  The BAM account was opened in 1999. The accounts predate the formation of BLMIS; Ruegger Dec. Exs. A & B.

**DEFENDANTS' COUNTERSTATEMENT**

BLMIS was headquartered at 885 Third Avenue, New York, New York and operated its investment advisory business in that location.  BLMIS was registered with the Securities and Exchange Commission as a broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). Complaint.  *Picard v. BAM L.P.*  ¶

43.    The plea allocutions of Madoff and BLMIS employees Frank DiPascali, David Kugel, Eric Lipkin, Irwin Lipkin, and Enrica Cotellessa-Pitz establish that BLMIS conducted a Ponzi scheme.  *See* Sheehan Decl. Exs. 14 through 19.  The allocutions establish that no securities were purchased for customer accounts and that customer redemptions were paid from money on hand in BLMIS's bank account at JPMorgan until the scheme collapsed.

**DEFENDANTS' OBJECTION**

Disputed.  This is legal argument, not a fact that is material or otherwise.  It belongs in the

Trustee's memorandum of law but has no place in the statement of material undisputed facts.

In addition, it is not an accurate statement.  None of the named parties were charged with or pleaded guilty to conducting a Ponzi scheme, and their allocutions do not suffice to prove a Ponzi scheme was being conducted.  The guilty pleas establish that BLMIS did not execute the split strike conversion strategy that BLMIS promised the customers and that the customers were victims of securities fraud and investment advisor fraud.  The plea allocutions do not establish the factors regularly associated with Ponzi schemes and the evidence is contrary to establishing the primary feature of a Ponzi scheme -- that early redeeming investors are paid with later investors' funds.  The plea allocutions of Madoff and the employees establish that they either conspired to and/or did commit securities fraud and investment advisor fraud.

Finally, the Trustee did not depose these employees in connection with their BLMIS activities.

**DEFENDANTS' COUNTERSTATEMENT**

BLMIS, from time to time, engaged in fraudulent activities, but lacked the characteristics of a classic Ponzi scheme.  The factors that are usually present in such cases are not present here.

The Manns were not promised and did not receive exorbitant returns.  The portfolio managements reports sent to the Defendants reported the percentage return on a monthly basis and at the end of each year on an annual basis.  The portfolio management reports provided to the Defendants indicated that the annual returns on the Mann Account over the period from January 2002 through 2008 ranged between 13.62% and 10.23 %.  See  Mann

Portfolio Management Reports.  Ruegger Dec. Ex. J.  The portfolio management reports provided to BAM indicated that the percentage annual returns on the Mann Account over the period from January 2002 through 2008 ranged between 13.96% and 10.4%.  See BAM Portfolio Management Reports.  Ruegger Dec. Ex. K.

The Manns were not early redeeming investors.  As the transaction statements and Account Documents demonstrate, withdrawals and deposits could be made and were made at the discretion of the customers at any time.  The Mann and BAM Accounts remained active account though and including 2008.

Contrary to the statements of the Trustee, Madoff was engaged in active trading of U.S. Treasury Securities and other securities.[4]  See Trading Records, Ruegger Dec. Ex. L.

A Chase bank: Account No. 140-081703 (the "703 Account") maintained in the name of Bernard L. Madoff or Bernard L. Madoff Investment Securities controlled by Madoff held customer deposits, proceeds of sales of securities, short term commercial paper and derivatives and interest earned on deposits.  In November 2006 this account held and invested over $10 billion dollars.  As late as September of 2008, this account accumulated, from all sources over $11 billion dollars.  This account enabled Madoff to meet the redemption requests of customers for years until the market collapse at the end of 2008. In sum, it is inaccurate to say that early redeeming depositors were paid with later depositors funds. Chase Account Statements, Ruegger Dec. Ex. M.

Madoff and the BLMIS employees admitted to conspiring to and/or committing securities fraud and investment advisor fraud.  Their criminal acts form the legal predicate for the Defendants' defenses under federal and state securities laws.

---

[4] The accompanying trading records (Ruegger Dec. Ex. L) represent a sampling of trading records that the Defendants could find in the Trustee's data base.

44.     On March 12, 2010, Madoff admitted to a fraudulent scheme and pleaded guilty to eleven counts including securities fraud, investment adviser fraud, mail fraud, wire fraud, three counts of money laundering, false statements, perjury, false filings with the SEC, and theft from an employee benefit plan. Answer at ¶¶ 1, 12 (referring the Court to the relevant transcript dated March 12, 2009, and "other filings and pleadings in that case for the complete contents therein").

### DEFENDANTS' OBJECTION

The statement is not supported by admissible evidence.  The 2014 Answer denied knowledge or information as to that plea agreement, and referred the Court to a document that is not in evidence.

45.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal action filed against him by the United States Attorney for the Southern District of New York. Plea Allocution of Bernard L. Madoff, United States v. Madoff, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (the "Madoff Allocution"), ECF No. 143-1, Sheehan Decl. Ex. 14; see also Answer ¶ 17 (referring the Court to the plea allocution).

### DEFENDANTS OBJECTION

Disputed in part, for several reasons.

*First,* Defendants object to any citation by the Trustee to Defendants' 2014 Answer (*see* Objection to Trustee SOMF ¶ 4, above).

*Second,*  Paragraph 17 of that 2014 Answer denied knowledge or information as to the allegations of the Complaint's paragraph 17, and referred the Court to the March 12, 2009 allocution of Bernard Madoff for the statements made that day.

*Finally,* the Trustee does not describe the counts to which Madoff pleaded guilty, which are related primarily to securities and investment advisor fraud.

**DEFENDANTS' COUNTERSTATEMENT**

On March 10, 2009, a criminal Information was filed in the District Court against Madoff. United States v. Bernard L. Madoff, 09 Cr. 213 (DC)(S.D.N.Y  Mar. 10, 2009)[ECF No. 38].  At his plea hearing, Madoff pleaded guilty to 11 criminal charges: (1) securities fraud, (2)  investment advisor fraud, (3) mail fraud, (4) wire fraud; (5) international money laundering (6) a second count of international money laundering, (7) money laundering; (8) making false statement to the SEC, (9) perjury, (10) false filing with the SEC and (11) theft from an employee benefit plan, (11) theft from an employee benefit plan.  Madoff was not charged with and did not plead guilty to perpetrating a Ponzi scheme.  Madoff Plea Transcript at 15 -18; Sheehan Dec. Ex. 14.

46.    At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Madoff Allocution at 23:14–23, 31:25–32:1.

**DEFENDANTS' OBJECTION**

Under Fed. R. Evid. 804 a plea statement is admissible as an exception to the hearsay rules if, when made, it would expose the declarant to criminal liability or if supported by corroborating circumstances that clearly indicate its trust worthiness, it is offered in a criminal case as one that tends to expose the declarant to criminal liability.  There are limits on the admissibility applicable here.  Rule 804 does not allow admission of non-self-inculpatory statements even if they are made within a broader narrative that is generally self-inculpatory.  When a statement implicates someone else along with the declarant it has less credibility that ordinary hearsay evidence. The court must consider whether each statement, not just the whole confession is truly self-exculpatory.  *See United States v. Centracchio*, 265 F.3d 518 (7th Cir. 2001).  Moreover, statements  made to shift the blame or to curry favor are not sufficiently self-inculpatory to be admissible.  *United States v.*

*Tropeano,* 252 F.3d 653 (2d Cir. 2001).    In this section of the hearing, Madoff read his

own statement in which he was trying to deflect blame from his sons who operated other

parts of the business.

Madoff was not charged with and did not plead guilty to perpetrating a Ponzi scheme.

Without a record basis as to Bernard Madoff's understanding of the terms used in his

allocution, including without limitation the term "Ponzi scheme," his use of and opinion as

to such terms should not be relied upon to conclude BLMIS' operations fell within or

without any legal or other profile for a Ponzi scheme, Fed. R. Evid. 403, 601, 701.

47.    Madoff further testified at the plea hearing that he never invested his clients' funds

in securities, that he used funds on hand in the JPMorgan account to pay customer redemptions,

and that he created false trading confirmations and client account statements to cover up the fact

that he had not executed trades on behalf of BLMIS investment advisory clients. Madoff stated:

> The essence of my scheme was that I represented to clients and prospective clients who
> wished to open investment advisory and individual trading accounts with me that I would
> invest their money in shares of common stock, options, and other securities of large well-
> known corporations, and upon request, would return to them their profits and principal.
> Those representations were false for many years up and until I was arrested on December
> 11, 2008, I never invested these funds in the securities, as I had promised. Instead, those
> funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to
> receive the profits they believed they had earned with me or to redeem their principal, I
> used the money in the Chase Manhattan bank account that belonged to them or other clients
> to pay the requested funds. The victims of my scheme included individuals, charitable
> organizations, trusts, pension funds, and hedge funds.

Madoff Allocution at 24:9–24.

### DEFENDANTS' OBJECTION

Disputed.    Defendants object to the Trustee's interpretation of Madoff's statement.

Madoff's testimony and the testimony of his employees is that he did not execute the split

strike conversion strategy that he promised customers.  The evidence related to the trading

records is that Madoff did, in fact, purchase and trade in securities and that he used the

funds generated therefrom, including interest and the proceeds of the sale of the securities,

to make redemption payments.   See Trading Records, Ruegger Dec. Ex. L.  Moreover, the

703 Account statements demonstrated that the account held funds from multiple sources

including proceeds of securities trading.

### DEFENDANTS' COUNTERSTATEMENT

 Although Madoff testified that he did not execute the split strike conversion strategy that

he promised customers, he did actively trade in U.S. Treasury securities as well as other

securities, commercial paper, derivatives and other investments. The proceeds of securities,

interest earned on investments and cash deposits enabled Madoff to meet the customer

withdrawal requests. Trading records, Chase Account records Ruegger Dec. Ex . M.

48.    Madoff further detailed his strategy as follows:

Through the split strike conversion strategy, I promised to clients and prospective clients
that client funds would be invested in a basket of common stocks within the Standard &
Poors 100 index, a collection of the 100 largest publicly-traded companies in terms of their
market capitalization. I promised I would select a basket of stocks that would closely mimic
the price movements of the Standard & Poors 100 index. I promised I would
opportunistically time those purchases and would be out of the market intermittently,
investing client funds during these periods in United States Government-issued securities,
such as United States Treasury bills. In addition, I promised that as part of the split strike
conversion strategy, I would hedge the investments I made in the basket of common stocks
by using client funds to buy and sell option contracts related to those stocks, thereby
limiting the potential client losses caused by unpredictable changes in stock prices. In fact,
I never made those investments I promised clients, who believed they were invested with
me in the split strike conversion strategy.

Madoff Allocution at 25:25–26:18.

### DEFENDANTS' OBJECTION

Defendants object to the use of this part of the plea hearing, which was not essential to or

part of the confession to the crimes charged.  Defendants admit that Madoff made this

statement, but submit it is subject to different interpretations.  Madoff's testimony and the

testimony of his employees is that he did not execute the split strike conversion strategy

that he promised customers.  The evidence is that Madoff did purchase and trade in securities and that he used the funds generated therefrom, including interest and the proceeds of the sale of the securities to make redemption payments. See  Ruegger Dec. Exs. L & M.

49.     BLMIS investment advisory customers received account statements from BLMIS that purported to reflect securities transactions and investment returns that appeared as though their investments with BLMIS were profitable. Madoff explained:

> To further cover up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me.

Madoff Allocution at 27:9–16.

### DEFENDANTS' OBJECTION

Disputed in part.  Madoff made this statement as he pleaded guilty to securities fraud.  The evidence is that Madoff did purchase and trade in securities and that he used the funds generated therefrom, including interest and the proceeds of the sale of the securities, to make redemption payments.

50.     Madoff stated that he "never promised a specific rate of return to [his] client [sic]." Madoff Allocution at 25:18–19.

**NO DISPUTE.**  Madoff did not promise his customers exorbitant rates of return.

51.     Madoff stated that the proprietary trading and market making businesses were engaged in legitimate trading. Madoff Allocution at 25:6–11. Madoff also stated that funds from his investment advisory business were transferred to the proprietary trading and market making businesses, via his affiliated London entity. Madoff Allocution at 29:12–22.

**DEFENDANTS' OBJECTION**

This statement is inadmissible hearsay as, in this section of the hearing, Madoff was

reading his own statement where he was not pleading guilty to a crime but instead was

trying to deflect blame from his sons who operated other parts of the business.

52.     At a plea hearing on August 11, 2009, in the case captioned *United States v.*

*DiPascali,* Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded

guilty to a ten-count criminal action charging him with participating in and conspiring to

perpetuate the Ponzi scheme. Plea Allocution of Frank DiPascali, Jr., *United States v. DiPascali*,

No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (the "DiPascali Allocution"), ECF No. 143-2,

Sheehan Decl. Ex. 15. DiPascali stated:

> The clients were told that the strategy involved purchasing what we call basket of blue chip
> stocks. Hedging those investments by buying and selling option contracts, getting in and
> out of the market at opportune times and investing in government securities at other times.
> . . .From at least the early 1990s through December of 2008, there was one simple fact that
> Bernie Madoff knew, that I knew, and that other people knew but that we never told the
> clients nor did we tell the regulators like the SEC. No purchases or [sic] sales of securities
> were actually taking place in their accounts. It was all fake. It was all fictitious. It was
> wrong and I knew it was wrong at the time, sir.

DiPascali Allocution at 46:9–15.

**DEFENDANTS' OBJECTION**

Disputed in part.  The statement that DiPascali was charged with "participating in and

conspiring to perpetuate the Ponzi scheme" is inaccurate.  DiPascali was charged with

conspiracy to commit securities fraud and investment advisory fraud, among other federal

crimes.  Neither DiPascali nor Madoff were charged with perpetrating a Ponzi scheme.

Mr. DiPascali entered into a cooperation agreement with the Government and throughout

his statement to the court he tried to shift the blame to Madoff and curry favor by

incriminating other employees.  *See* Fed. R. Evid. 804 and the other authorities cited above

in the Objection to the Trustee's SOMF ¶ 46.

**DEFENDANTS' COUNTERSTATEMENT**

On August 11, 2009, a criminal Information was filed against Frank DiPascali. *United States v. Frank DiPascali*, 09 cr 764 (RJS)(S.D.N.Y Aug. 11, 2009).  DiPascali pleaded guilty to ten charges including: (1) conspiracy to commit securities fraud, investment advisory fraud, falsify the books and records of an investment fund, mail fraud, and money laundering; (2) securities fraud; (3) investment advisor fraud (4) falsifying broker/dealer books;(5) falsifying investment advisor books and records;(6) mail fraud;(7) wire fraud; (8) money laundering; (9) Perjury; and (10) income tax evasion.  Mr. DiPascali entered into a cooperation agreement with the Government to assist with the investigation of BLMIS.  *See* DiPascali Plea Transcript at 40-41; Sheehan Dec. Ex 15.

Mr. DiPascali was not charged with conspiracy to perpetuate a Ponzi scheme.  None of the crimes for which Mr. DiPascali was charged required him to testify that BLMIS was a Ponzi scheme, or that early redeeming investors were paid with later investors' money or that redemptions were made with other peoples' money and he did not so testify.  *See* DiPascali Plea Transcript at 18-20, 21-27; Sheehan Dec. Ex. 15.

53.     At the plea hearing, DiPascali testified that he had been instructed to falsely represent to clients that security trading was occurring in their investment accounts when in fact, no trades were being made. DiPascali explained:

> From our office in Manhattan at Bernie Madoff's direction, and together with others, I represented to hundreds, if not thousands, of clients that security trades were being placed in their accounts when in fact no trades were taking place at all.

DiPascali Allocution at 46:21–25.

> . . . .
> Most of the time the clients' money just simply went into a bank account in New York that Bernie Madoff controlled. Between the early '90s and December '08 at Bernie Madoff's direction, and together with others, I did [the] follow[ing] things: On a regular basis I told

clients over the phones and using wires that transactions on national securities exchanges were taking place in their account when I knew that no such transactions were indeed taking place. I also took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were. On a regular basis, I used hindsight to file historical prices on stocks then I used those prices to post purchase or [sic] sales to customer accounts as if they had been executed in realtime. On a regular basis, I added fictitious trade data to account statements of certain clients to reflect the specific rate of earn return that Bernie Madoff had directed for that client.

DiPascali Allocution at 47:5–22.

. . . .

I knew no trades were happening. I knew I was participating in a fraudulent scheme. I knew what was happening was criminal and I did it anyway.

DiPascali Allocution at 52:4–5.

**DEFENDANTS' OBJECTION**

These statements are inadmissible. The Trustee relies on that part of the plea where DiPascali, as the first cooperating witness, points the finger at others and makes the kind of exculpatory comments that are inadmissible hearsay. *See* Fed. R. Evid. 804 and the other authorities cited above in the Objection to the Trustee's SOMF ¶ 46.

54.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel, N*o. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal action charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Plea Allocution of David L. Kugel, *United States v. Kugel*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011) (the "Kugel Allocution"), ECF No. 143-3, Sheehan Decl. Ex. 16.

**DEFENDANTS' OBJECTION**

Defendants object to the limited description of guilty plea. The statement is accurate but incomplete. *See* Fed. R. Evid. 804 and the other authorities cited above in the Objection to the Trustee's SOMF ¶ 46.

**DEFENDANTS' COUNTERSTATEMENT**

On or about November 11, a Superseding Information was filed against David Kugel. *United States v. David Kugel*, 10 CR 228 (LTS).  At his plea hearing on that date, Mr. Kugel admitted to six charges: (1) conspiracy to commit securities fraud, falsify books and records of a broker dealer and falsify books and record of an investment advisor; (2) conspiracy to commit bank fraud; (3) securities fraud; (4) falsify broker/dealer books; (5) falsifying investment advisor books and records; and (6) bank fraud.  Mr. Kugel entered into a cooperation agreement with the Government.  (Kugel Plea Transcript at 24).  As a result of his assistance in providing evidence against other employees, Mr .Kugel served no jail time.  (See Kugel Plea Transcript at 14-16, Sheehan Dec. Ex. 16).

None of the charges described at the hearing required Mr. Kugel to testify that he was engaged in a Ponzi scheme or that BLMIS used other peoples' money to satisfy redemptions, nor did he so testify.  (Kugel Plea Transcript, Sheehan Dec. Ex. 16).

55.    As far as back as the 1970s, there is no evidence that the purported investment transactions reflected in the customer statements of BLMIS's investment advisory business customers ever occurred, and in fact, the evidence reveals that those transactions did not and could not have occurred.  Kugel Allocution at 32:4–12 ("Specifically, beginning the early '70s, until the collapse of BLMIS in December 2008, I helped create fake, backdated trades.  I provided historical trade information . . . to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred.").

**DEFENDANTS' OBJECTION**

Mr. Kugel's testimony is at odds with testimony of other witnesses with respect to the start date of the fraud.  Both Madoff and DiPascali testified that the fraud began in the 1990's.

His testimony and the testimony of his co-conspirators is that they did not execute the split

strike conversion strategy.

56.    At a plea hearing on November 8, 2012, in the case captioned *United States v.*

*Lipkin,* No. 10-CR-228 (LTS), Irwin Lipkin, a former BLMIS accountant, pleaded guilty to a two-

count criminal action charging him with securities fraud, falsifying the records of BLMIS, and

making false statements in relation to documents required by ERISA.  See Plea Allocution of Irwin

Lipkin, *United States v. Irwin Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 8, 2012) (the "Irwin

Lipkin Allocution"), ECF No. 288, Sheehan Dec. Ex. 17.

**NO DISPUTE**

57.    BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and

annual audited reports.  Irwin Lipkin Allocution at 30:23–31:3, 31:10–18, 31:24–32:5.

**DEFENDANTS' OBJECTION**

Defendants object to the characterization of the revenue as "BLMIS" revenue.  That

characterization is not part of the testimony. Irwin Lipkin was not charged with and did not

plead guilty of perpetrating or conducting a Ponzi scheme. He was charged with and

pleaded guilty to  conspiracy to commit securities fraud, falsify the books and records of a

broker/dealer, falsify the books and records of an investment advisor, making false filings

with the SEC and falsifying statements in relation to ERISA. Irwin Lipkin Plea Transcript

at 16. Sheehan Dec. Ex. 17.

58.    At a plea hearing on June 6, 2011, in the case captioned *United States v. Eric S.*

*Lipkin,* No. 10-CR-228 (LTS), Eric Lipkin, a former BLMIS payroll clerk, pleaded guilty to a six-

count criminal action charging him with bank fraud, falsifying the records of BLMIS, conspiracy,

and making false statements to facilitate a theft concerning ERISA. Plea Allocution of Eric S.

Lipkin, *United States v. Eric S. Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. June 6, 2011) (the "Eric

Lipkin Allocution"), ECF No. 148, Sheehan Decl. Ex. 18.

### DEFENDANTS' OBJECTION

Defendants object to the limited description of guilty plea.  The statement is accurate but incomplete.

### DEFENDANTS' COUNTERSTATEMENT

On June 6, 2011, a Superseding Information was filed against Eric Lipkin. *United States v. Eric Lipkin,* S3 10 Cr 288 (S.D.N.Y).   On that date, Mr. Lipkin pleaded guilty to six charges: 1) conspiracy to commit securities fraud, falsify books and records of a broker/dealer and falsify books and records of an investment advisor; (2) conspiracy to commit bank fraud; (3) falsifying broker/dealer books; (4) falsifying investment advisor books and records; (5) making false statements to facilitate a theft concerning ERISA; and (6) bank fraud.  Eric Lipkin Plea Transcript at 15-18, 18-19.  Mr. Lipkin also agreed to cooperate with the Government in its ongoing investigation of BLMIS.  (Eric Lipkin Plea Transcript at 27, Sheehan Dec. Ex. 18).

Mr. Eric Lipkin was not charged with conspiracy to perpetuate a Ponzi scheme.  None of the crimes for which Mr. Eric Lipkin was charged required him to testify that BLMIS was a Ponzi scheme, or that early redeeming investors were paid with later investors' money or that redemptions were made with other peoples' money and he did not so testify.

59.     BLMIS created fake reports that replicated those of the Depository Trust & Clearing Corporation ("DTC"), which provides clearance for nearly all equity, bond, government securities, mortgage-backed securities, money market instruments, and over-the-counter derivative transactions in the U.S. Market. The purpose of these fake DTC reports was to purportedly confirm non-existent positions in the investment advisory accounts, and the fake

reports were given to auditors and the SEC to mislead them. Eric Lipkin Allocution at 32:4–10, 34:1–5.

### DEFENDANTS' OBJECTION

Defendants object to the inference that Eric Lipkin's testimony supports the Trustee's contention that no trades were ever made by Madoff. Madoff unequivocally traded in U.S. Treasury Securities and short term derivatives in a BLMIS account among others, if not through DTC. Not all trades need be reflected on DTC records. The evidence is that BMIS did trade in securities. Trading Records. Ruegger Dec. Ex. L.

### DEFENDANTS' COUNTERSTATEMENT

The consistent testimony of Madoff and his employees is that they did not execute the split strike conversion strategy. However, the evidence from the bank accounts (*see, e.g.,* the 703 Account) and the trading records is that Madoff traded in U.S. Treasury securities and short term derivatives and other commercial paper. Ruegger Dec. Ex. L.

60.    At a plea hearing on December 19, 2011, in the case captioned *United States v. Cotellessa-Pitz,* No. 10-CR-228 (LTS), Enrica Cotellessa-Pitz, a former BLMIS accountant and comptroller, pleaded guilty to a four-count criminal action charging her with conspiracy to falsify the records of BLMIS, conspiracy to obstruct the IRS in the collection of income taxes, and conspiracy to make false filings with the SEC. Plea Allocution of Enrica Cotellessa-Pitz, *United States v. Cotellessa-Pitz,* No. 10-CR-228 (LTS) (S.D.N.Y. Dec. 19, 2011) (the "Cotellessa-Pitz Allocution"), ECF No. 89-8, Sheehan Decl. Ex. 19.

### DEFENDANTS' OBJECTION

The statement is not a complete description of the charges against Ms. Cotellessa-Pitz.

Fed. R. Evid. 403.

**DEFENDANTS' COUNTERSTATEMENT**

On December 19, 2011, an Information was filed against Enrica Cotellessa-Pitz.  *United States v. Enrica Cotellessa-Pitz, S5 10 Cr. 288 (LTS)*.  Ms. Cotellessa-Pitz pleaded guilty to four charges, including (1) conspiracy to obstruct the IRS in the assessment and collection of taxes, falsifying the books and records of a broker/dealer, falsifying the books and record of an investment advisor, and making false filings with the SEC; (2) falsifying broker/dealer books; (3) falsifying investment advisor books and records; (4) making false filing with the SEC. (Enrica Cotellessa-Pitz  Plea Transcript at 14-17).  Ms. Cotellessa-Pitz agreed to cooperate with the Government in its investigation of BLMIS (Enrica Cotellessa-Pitz Plea Transcript at 23) and as a result of her cooperation and testimony about Madoff and others, she was not given a jail time sentence.  (Enrica Cotellessa-Pitz Plea Transcript, Sheehan Dec. Ex. 19).

Ms. Cotellessa-Pitz was not charged with perpetrating a Ponzi scheme.  None of the charges against her required Ms. Cotellessa-Pitz to admit or testify that BLMIS was operated as a Ponzi scheme or that early redeeming investors were paid with later investors' money or that redemptions to customers were made with other peoples' money and she did not so admit or testify.  (Enrica Cotellessa-Pitz Plea Transcript, Sheehan Dec. Ex. 19).

61.     Investment advisory customer money was funneled to BLMIS's proprietary trading and market making businesses to falsely inflate their revenue and hide their losses. Cotellessa-Pitz Allocution, Tr. 31:12–32:12.

**NO DISPUTE**

62.     BLMIS investment advisory customer funds were not used to engage in any securities transactions in furtherance of its purported investment strategies as set forth above, but

instead were deposited by BLMIS into a bank account at JPMorgan Chase Bank ("JPMorgan"). Madoff Allocation at 24:17–22; DiPascali Allocation at 47:5–7.

**DEFENDANTS' OBJECTION**

Disputed.  Defendants object to the uses of the term "BLMIS" in this statement.  The term is not part of the testimony.  In fact, the testimony is that the account was not a BLMIS account, but rather an account either in the name of the sole proprietorship or in the name of Bernard L. Madoff and in either case under his control.  See Bank Statements.  (Ruegger Dec. Ex. M).  The testimony is that BLMIS did not execute the split strike conversion strategy.  The evidence is that US Treasury securities, among other securities, were purchased.  (See Trading Records, Ruegger Dec. Ex. L).

**DEFENDANTS' COUNTERSTATEMENT**

The consistent testimony of Madoff and his employees is that they did not execute the split strike conversion strategy. Madoff and the employees confessed to conspiring to and/or committing securities fraud and investment advisor fraud or bank fraud.  The evidence from the bank accounts (*see, e.g.,* the 703 Account) and the trading records is that Madoff has sufficient assets in cash and securities to meet redemptions until the crash in the market in 2008. (Ruegger Dec. Exs. L & M).

63.    When BLMIS investment advisory customers submitted redemption requests seeking to withdraw funds they believed they held in their BLMIS accounts, BLMIS would use the commingled customer deposits held at BLMIS's bank accounts at JPMorgan to satisfy their requests. Madoff Allocation at 24:18–22 ("When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.").

**DEFENDANTS' OBJECTION**

Disputed in part. Defendants object to the uses of the term "BLMIS" in this statement. Madoff did not use the term BLMIS in his testimony and it would not have been accurate.

**DEFENDANTS' COUNTERSTATEMENT**

In response to their requests for withdrawals, Defendants received checks written on a Chase account in the name of Bernard L. Madoff. (Mann checks, BAM checks. Ruegger Dec. Exs. C & H). Madoff also maintained an account in the name of the sole proprietorship under his control into which was deposited proceeds from the sales of securities, interest on investments, interest on deposits and customer deposits that enabled him to meet redemption requests during the time the Defendants maintained their accounts. (See 703 Account, Ruegger Dec. Ex. M).

64. BLMIS made all transfers to Defendants, much like to other customers and creditors, with the actual intent to defraud, as required under section 548(a)(1)(A) of the Bankruptcy Code. Defendants' Opposition to Motion in Limine at 7, ECF No. 126 ("Fraudulent intent is not disputed here, rather it is the nature of the fraud that is at issue").

**DEFENDANTS' OBJECTIONS**

Defendants object to the first sentence of this statement as overbroad, not a statement of material fact, and an unsupported legal conclusion that has no place in the statement of facts. Defendants also object to the characterization of the statements in the Defendants'

Motion.  Nothing therein is an admission that BLMIS made the transfers in question or that

the transfers to the Defendants bear any similarities to the transfers to any other party.

Dated: February 22, 2019
        New York, New York

**DENTONS US LLP**
By:  */s/Arthur H. Ruegger*
        Arthur H. Ruegger
1221 Avenue of the Americas
New York, New York 10020
Tel:  (212) 768-6700
Fax: (212) 768-6800
arthur.ruegger@dentons.com

*Attorneys for Defendants*