**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-04390 (SMB) |
| Plaintiff, | |
| v. | |
| Michael Mann, Meryl Mann and BAM L.P. | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION**
**TO TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

DENTONS US LLP
Arthur H. Ruegger
1221 Avenue of the Americas
New York, New York 10016
Telephone: 212 768-6700
Facsimile: 212 768-6800
Email: arthur.ruegger@dentons.com

*Attorneys for the Defendants*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................ 1

LEGAL STANDARD......................................................................................................... 7

FACTUAL BACKGROUND ............................................................................................. 8

    I.    THE TRANSFERS IN QUESTION WERE NOT THE DEBTOR'S
         PROPERTY ........................................................................................................9

    II.   THE DEFENDANTS HAVE UNASSAILABLE DEFENSES TO THE
         TRUSTEE'S CLAIMS .....................................................................................11

         A.   The Withdrawal Payments Satisfied Unavoidable Obligations At the Time
             of The Transfers ...................................................................................... 14

         B.   The Statute Of Repose Limits Avoidance Of Both Obligations And The
             Payments Made In Satisfaction Of The Obligations............................... 16

         C.   The Defendants Have Valid Causes of Action Under Federal and State
             Securities Laws Release of Which Constitutes Value ........................... 19

         D.   Earlier Madoff-Related Decisions, Often Cited by the Trustee, Do Not
             Negate The Above Defenses................................................................... 21

    III.  RES JUDICATA DOES NOT BAR THE DEFENSES ...................................25

         A.   These are not the "same" cause of action.............................................. 25

         B.   There has been no final judgment on the merits. .................................. 27

         C.   The avoidance claim defenses could not have been litigated before the
             Trustee. ................................................................................................... 28

    IV.  MADOFF'S OPERATIONS WERE NOT A CLASSIC PONZI SCHEME...................28

CONCLUSION............................................................................................................... 34

110077776

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In Re 1031 Tax Group, LLC*,
  439 B.R. 47 (Bankr. S.D.N.Y. 2010) ....................................................................33

*45 John NY, LLC v. HS 45 John LLC (In re HS 45 John LLC)*,
  585 B.R. 64 (Bankr. S.D.N.Y. 2018) ....................................................................25

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012) ..................................................................................19

*Ades-Berg Investors v. Breeden (In re Bennett Funding Group, Inc.)*,
  439 F.3d 155 (2d Cir. 2006) ................................................................................29

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970) ..............................................................................................7

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ............................................................................................19

*Azrielli v. Cohen Law Offices*,
  21 F.3d 512 (2d Cir.1994) .....................................................................................8

*Bear Stearns Securities Corp. v. Gredd*,
  275 B.R. 190 (S.D.N.Y. 2002) ..............................................................................9

*In re Bernard L. Madoff Inv. Sec. LLC*,
  424 B.R. 122 (Bankr. S.D.N.Y 2010) ..................................................................29

*In re Bernard L. Madoff Inv. Sec. LLC*,
  779 F.3d 74 (2d Cir. 2015) ..................................................................................27

*In re Bernard L. Madoff Investment Securities LLC*,
  490 B.R. 46 (S.D.N.Y. 2013) ..............................................................................26

*Beyah v. Coughlin*,
  789 F.2d 986 (2d Cir. 1986) ..................................................................................7

*In re BLMIS*,
  654 F.3d 229 (2d Cir. 2011) .............................................................12, 13, 26, 28

*Brown Media Corp. v. K&L Gates, LLP*,
  854 F.3d 150 (2d Cir. 2017) .......................................................................5, 25, 26

110077776

*Burgos v. Hopkins*,
   14 F.3d 787 (2d Cir. 1994) ........................................................................28

*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*,
   137 S. Ct. 2042 (2017) .............................................................................16

*Cant v. A.G. Becker & Co.*,
   384 F. Supp. 814 (N.D. Ill. 1974) ............................................................20

*In re Canton*,
   2007 WL 2848513 (Bankr. W.D. Wash. March 21, 2007) ...................6, 27

*Carney v. Lopez*,
   933 F. Supp. 2d 365 (D. Conn 2013) ........................................................33

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*,
   439 B.R. 284 (S.D.N.Y. 2010) .................................................................29

*Computer Assocs. International, Inc., v. Altai, Inc.*,
   126 F.3d 365 (2d Cir. 1997) .....................................................................28

*Davidson v. Capuano*,
   792 F.2d 275 (2d Cir. 1986) .....................................................................28

*DeFlora Lake Dev. Assocs., Inc. v. Hyde Park (In re DeFlora Lake Dev. Assocs., Inc.)*,
   571 B.R. 587 (Bankr. S.D.N.Y. 2017) .....................................................27

*DeFlora Lake Dev. Assocs. v. Hyde Park (In re DeFlora Lake Dev. Assocs.)*,
   571 B.R. 587 (Bankr. S.D.N.Y. 2017) .....................................................26

*Donell v. Kowell*,
   533 F.3d 762 (9th Cir.), *cert. denied*, 555 U.S. 1047 (2008) ..................30

*In re Dreier LLP*,
   429 B.R. 112 (Bankr. S.D. N.Y. 2010) ......................................................9

*In re Dreier LLP*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011) ......................................................24

*FDIC v. Giammettei*,
   34 F.3d 51 (2d Cir. 1994) ...........................................................................8

*Freeman v. Marine Midland Bank-New York*,
   419 F. Supp. 440 (E.D.N.Y. 1976) ...........................................................20

*Geltzer v. Brizinova (In re Brizinova)*,
   592 B.R. 442 (Bankr. E.D.N.Y. 2018) .....................................................23

iv

*Gowan v. Amaranth Advisors LLC (In re Dreier LLP)*,
   Adv. 10 03493 (SMB), 10-05447 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y
   2014) ...............................................................................................................33

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085 (2d Cir. 1995)...........................................................................29

*Kardon v. National Gypsum Co.*,
   69 F. Supp. 512 (E.D. Pa. 1946) ...................................................................20

*Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litigation)*,
   2018 WL 6329139 (S.D.N.Y. Nov. 30, 2018) ............................................... *passim*

*Mattel, Inc. v. Adventure Apparel*,
   No. 00 CIV. 4085, 2001 WL 1035140 (S.D.N.Y. Sept. 7, 2001)...........................10

*McHale v. Boulder Capital LLC (In re The 1031 Tax Group, LLC)*,
   439 B.R. 7 (Bankr. S.D.N.Y 2010) (Trustee Mem. pp. 13 - 14) ...........................11

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006)........................................................................................20

*Michael Grecco Prods. v. Valuewalk LLC*,
   2018 WL 5831311 (S.D.N.Y. Nov. 6, 2018) .............................................8

*Mills v. Electric Auto-Lite Co.*,
   396 U.S. 375 (1970)......................................................................................20

*Moran v. Goldfarb*,
   2012 WL 2930210 (S.D.N.Y. July 16, 2012) .......................................33

*N.L.R.B. v. United Technologies Corp.*,
   706 F.2d 1254 (2d Cir. 1983)...........................................................................2

*Picard v. Avellino (In re Bernard L. Madoff Inv. Securities LLC)*,
   557 B.R. 89 (Bankr. S.D.N.Y. 2016)..........................................................1, 3, 10

*Picard v. Fairfield Greenwich Ltd.*,
   762 F.3d 199 (2d Cir. 2014)..........................................................................11

*In re Picard v. Ida Fishman (In re Bernard L. Madoff Investment Securities LLC)*,
   773 F.3d 411 (2d Cir. 2014)......................................................................... *passim*

*Picard v. Lowrey*,
   2019 WL 479185 (S.D.N.Y. Feb. 7, 2019)..........................................24

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
   440 B.R. 243 (Bankr. S.D.N.Y. 2010) ...............................................29

110077776

*Ruben v. Mason*,
    387 F.3d 183 (2d Cir. 2004)................................................................................7

*Schnorr v. Schubert*,
    2005 WL 2019878 (W.D. Okla. Aug. 18, 2005) ....................................................20

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir.) (Posner, J.), cert. denied, 516 U.S. 1028 (1995)................................30

*SEC v. Zandford*,
    535 U.S. 813 (2002)................................................................................19

*Securities Investor Protection Corp v. BLMIS LLC*,
    476 B.R. 715 (S.D.N.Y. 2012)..................................................................21, 24, 30

*Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.)*,
    84 F.3d 1286 (10th Cir. 1996) ....................................................................30

*SIPC v. BLMIS (In re BLMIS)*,
    499 B.R. 416 (S.D.N.Y. 2013)..............................................................21, 22, 23, 24

*St. Pierre v. Dyer*,
    208 F.3d 394 (2d Cir. 2000)......................................................................27

*TM Patents, L.P. v. IBM*,
    121 F. Supp. 2d 349 (S.D.N.Y. 2000)..............................................................26

*In re Tribune Co. Fraudulent Conveyance Litigation*,
    2019 WL 294807 (S.D.N.Y. Jan. 23, 2019) ...................................................2, 3, 18

*In re Trinsum Grp, Inc.*
    460 B.R. 379 (Bankr. S.D.N.Y.2011) ..............................................................18

*U.S. v. Ron Pair Enters*,
    489 U.S. 235 (1989)................................................................................24

*United States v. Fox*,
    721 F.2d 32 (2d Cir.1983)..........................................................................10

*United States v. U.S. Smelting Co.*,
    339 U.S. 186, 70 S. Ct. 537, 94 L. Ed. 750 (1950)................................................23

**Statutes**

11 U.S.C. § 108................................................................................16

11 U.S.C. § 546(a) ............................................................................13

11 U.S.C. § 546(e) ................................................................. *passim*

110077776

11 U.S.C. § 547 ........................................................................................................... 26

11 U.S.C. § 548 ................................................................................................... 6, 25, 26

11 U.S.C. § 548(a) ............................................................................................... *passim*

11 U.S.C. § 548(a)(1) ........................................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) .................................................................................... 1, 9, 11

11 U.S.C. § 548(c) ................................................................................................ *passim*

11 U.S.C. § 548(d)(2)(A) .......................................................................................... 2, 16

11 U.S.C. § 550 ......................................................................................................... 1, 9

11 U.S.C. § 741(8) ...................................................................................................... 14

15 U.S.C. § 77ff ........................................................................................................ 5, 32

15 U.S.C. § 77l(a)(2) .................................................................................................. 20

15 U.S.C. §§ 78aaa *et seq.* ........................................................................................... 2

15 U.S.C. § 78cc ......................................................................................................... 20

15 U.S.C. § 78eee(a)(3) .............................................................................................. 10

15 U.S.C. § 78fff-1(a) ................................................................................................. 22

15 U.S.C. § 78fff-2(c)(3) ........................................................................................ 10, 29

15 U.S.C. § 78fff-4(b) ................................................................................................ 10

15 U.S.C. § 78fff(b) .................................................................................................... 29

15 U.S.C. § 78j ....................................................................................................... 19, 32

15 U.S.C. § 78j(b) ................................................................................................ 5, 19, 32

15 U.S.C. § 78lll ......................................................................................................... 10

15 U.S.C. § 78lll(5) .................................................................................................... 10

N.Y.U.C.C. § 8-501(b)(1) & cmt. 2 ........................................................................... 14

**Other Authorities**

17 C.F.R. § 240.10b-5 .................................................................................... 5, 19, 20, 32

110077776

Fed. R. Bankr. P. 7056 ...............................................................................................................1

Fed. R. Civ. P. 56 ..................................................................................................................1, 7

Fed. R. Civ. P. 56(c) ................................................................................................................7

Fed. R. Civ. P. 56(e) ................................................................................................................7

Fed. R. Civ. P. 56(f)(1) .......................................................................................................1, 11

Local Bankruptcy Rule 7056-1 ................................................................................................1

Black's Law Dictionary 1198 (8th ed. 2004)...........................................................................29

110077776

Michael Mann, Meryl Mann and BAM L.P., (the "Defendants")[1], through their counsel, respectfully submit this Defendants' Memorandum in Opposition to Trustee's Motion for Summary Judgment, together with Defendants' Objections, Responses and Counterstatements of Material Facts Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056 and Local Rule 7056-1 to Trustee's Statement of Material Facts (the "DSMF") and the Declaration of Arthur H. Ruegger sworn to February 22, 2019 ("Ruegger Dec.") in opposition to the Motion For Summary Judgment, dated December 21, 2018, filed by Irving Picard (the "Trustee"), as trustee of Bernard L. Madoff Investment Securities LLC ("BLMIS").[2]   In opposition to the Trustee's Motion, the Defendants respectfully represent as follows:

## PRELIMINARY STATEMENT

The Court should not grant the Trustee's Motion for the reasons set forth below.  Indeed, several of those reasons warrant granting summary judgment to the Defendants pursuant to Fed. R. Civ. P. 56(f)(1).  These reasons include:

- The transfers at issue were not "an interest of the debtor in property" (11 U.S.C. § 548(a)), but instead were from an account in the name of the individual, Bernard L. Madoff;[3]
- Having dismissed with prejudice any claim to avoid BLMIS' obligations, those obligations are unavoidable and any transfers related thereto to the Defendants were

---

[1] Defendants have not consented to the entry of a final order by the Bankruptcy Court and timely requested a jury trial. As the Court is aware, the Defendants contend they have not waived their right to a jury trial as their claims have been disallowed and the Court lacks jurisdiction to enter a final order in this proceeding.  The Defendants have filed a Notice of Appeal and Motion for Leave to Appeal from this Court's Memorandum and Order date January 18, 2019. Accordingly, the Defendants have prepared their responses and objections under protest and with a reservation of rights.  Nothing herein should be deemed a waiver of the Defendants' right to a jury trial or submission to the equitable jurisdiction of the Bankruptcy Court for final adjudication of this motion.

[2] On December 21, 2018, the Trustee moved for summary judgment on his remaining causes of action against the Defendants under sections 548(a)(1)(A) and 550 of the Bankruptcy Code seeking to avoid and recover allegedly intentionally fraudulent transfers made to the Defendants within two years of the filing date of the BMIS liquidation. The parties have not stipulated to the operative facts.

[3] Picard v. Avellino (In re Bernard L. Madoff Inv. Securities LLC), 557 B.R. 89, 110 (Bankr. S.D.N.Y. 2016)

*per se* for reasonably equivalent value, giving rise to a complete defense under 11 U.S.C. § 548(c);[4]

- Even assuming *arguendo* the Trustee had pleaded and was pursuing a claim to avoid its obligations, the Trustee cannot avoid obligations arising before the two-year reach-back period of 11 U.S.C. § 548(a)(1), and in Defendants' case all transfers were in amounts totaling less than the pre-reach-back obligations;

- "As a matter of law, satisfaction of an antecedent debt constitutes . . . value" under 11 U.S.C. § 548(d)(2)(A);[5] and

- For multiple reasons the Trustee cannot rely on principles of *res judicata*, including: (a) Defendants' SIPA claims[6] were not the "same claim" as the Trustee's avoidance claim,[7] (b) there was no prior "final judgment on the merits,"[8] and other absent elements discussed below.

Specifically, a threshold reason the Court should deny the Trustee's Motion, and instead grant summary judgment to the Defendants, is that the Trustee has not presented <u>any</u> usable evidence that the alleged transfers constituted "an interest of the debtor in property" (11 U.S.C. § 548(a)). Indeed, the Trustee cannot present any such evidence because the transfers were not by BLMIS but rather were via checks written on a Chase account in the name of Bernard L. Madoff. The Trustee has no evidence that those checks were the debtor's or customer property prior to the transfer. *See* DSMF pp. 15 - 19; responses to the Statement of Material Facts in Support of Trustee's Motion for Summary Judgment, filed December 21, 2018 [ECF No. 142] (the "Trustee SOMF") ¶¶ 14 - 16. Unlike the Trustee's motion papers, the Defendants have presented the evidence of the checks written to them on the account in the name of Bernard L. Madoff (which checks were produced by the Trustee) as evidence of the transfers and bear the Trustee's bates

---

[4] *See, e.g., Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litigation),* 2018 WL 6329139 at *17 (S.D.N.Y. Nov. 30, 2018) (Sullivan, C.J., sitting by designation).

[5] See, e.g., In re Tribune Co. Fraudulent Conveyance Litigation, 2019 WL 294807 at *32 (S.D.N.Y. Jan. 23, 2019).

[6] The Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA").

[7] *N.L.R.B. v. United Technologies Corp.,* 706 F.2d 1254, 1259 (2d Cir. 1983).

[8] Id.

2

110077776

stamp numbers.  Ruegger Dec. Exs. C & H.  Recognizing the Trustee lacks authority to avoid transfers of the individual debtor's property, the Defendants are entitled to summary judgment and an order dismissing the Trustee's adversary proceeding. *See Pickard v. Avellino (In re Bernard L. Madoff Inv. Securities LLC),* 557 B.R. 89, 109 (Bankr. S.D.N.Y. 2016) ("*Avellino*"); *see also* Substantive Consolidation Order [ECF No. 252] ¶ 4. [9]

Another reason the Trustee is not entitled to summary judgment is his failure to demonstrate that the Defendants' affirmative defenses are unsupported by the record or fail as a matter of law.  Specifically, for example, and as confirmed by recent  decisions in this jurisdiction,[10] the Defendants can retain the their withdrawal payments because they gave "value" within the meaning of Section 548(c) of the Bankruptcy Code to the debtor in exchange for the withdrawal payments.  "Value" in this case can be determined and proven on several, independent grounds -- all of which are supported by and consistent with the relevant case precedent, the Bankruptcy Code, the Securities Investment Protection Act ("SIPA") and federal and state securities laws.

The controlling precedent is the Second Circuit decision of *In re Picard v. Ida Fishman (In re Bernard L. Madoff Investment Securities LLC),* 773 F.3d 411 (2d Cir. 2014) (the "*Section 546(e) Decision*").  In that decision, the Second Circuit upheld the validity of both (1) the agreements between the Defendants and their broker represented by their account documents and (2)

---

[9] The Substantive  Consolidation Order, ¶ 4 provides: "Notwithstanding the substantive consolidation of the Madoff estate into the BLMIS SIPA Proceeding, the Chapter 7 Trustee shall remain Chapter 7 Trustee of the Madoff estate and shall continue to have all powers, rights, claims and interests of a Chapter 7 trustee to bring claims under Chapters 5 and 7  of the Bankruptcy Code in consultation with the SIPA Trustee and SIPC.  Further, all powers, rights, claims and interests of the Madoff estate are expressly preserved, including without limitation all Chapter 5 and 7 powers, rights, claims and/or interests."

[10] See Kirschner v. Fitzsimmons (In re Tribune Company Fraudulent Conveyance Litig.), 2018 WL 6329139 (RJS) (S.D.N.Y. Nov. 30 2018) and In re Tribune Company Fraudulent Conveyance Litig., 2019 WL 294807 (S.D.N.Y. Jan. 23, 2019).

3

entitlements giving rise to the broker's obligations to the Defendants reflected in the reports to the Defendants on their statements, trade confirmation and other documents. Further, the Second Circuit conclusively determined that the transfers, made in response to good faith customers' requests for withdrawals, were payments made "in connection with" those securities contracts and constituted settlement payments to the customer, both of which were entitled to the protections of the safe harbor for securities transactions under Bankruptcy Code Section 546(e), notwithstanding the broker's failure to perform.[11] *Id.* at 421 - 22.

With the *Section 546(e) Decision* as a foundation, the grounds for finding the Defendants' "value" defense are clear.[12]

First, the *Section 546(e) Decision* recognized BLMIS owed obligations to the Defendants as its customers arising from enforceable securities contracts (their account documents) and securities entitlements reported to them at the time of each withdrawal. *Id.* at 418-19. Insofar as the Trustee has not retained a claim cannot seek to avoid BLMIS' obligations to the Defendants, those obligations are unavoided and unavoidable obligations. "[T]ransfers made in satisfaction of unavoidable obligations are *per se* made for . . . value," *see Kirschner v. Fitzsimmons (In re Tribune Company Fraudulent Conveyance Litig.),* 2018 WL 6329139 (RJS) at *17 (S.D.N.Y. Nov.

---

[11] Among the critical holdings of the *Section 546(e) Decision* are: (a) application of a Bankruptcy Code defense, (b) derived from securities laws (773 F.3d at 420 n. 3), (c) in this SIPA proceeding (d) to limit the Trustee's avoidance powers even though (e) the broker failed to execute the promised trades, and (f) the broker may have been operating a Ponzi scheme. *Id.* at 422. There is no basis for asserting that these rulings do not apply equally to the Section 548(c) "value" defense.

This supersedes and effectively overrules the district court cases on which the Trustee bases his Motion.

[12] The Trustee cannot rely on case law that has been superseded by the *Section 546(e) Decision*. He also cannot rely on the decisions on summary judgment in other cases involving good-faith defendants to make his case or defeat summary judgment for Defendants. The Defendants in this case, unlike other defendants, have contested the Trustee's prima facie case for avoidance of the Defendants' withdrawal payments. The Defendants here rely also on recent case law reaffirming that Section 548(a) operates as a statute of repose to bar avoidance of obligations incurred more than two years before the filing and that avoidance of obligations constitutes per se "value" within the meaning of Section 548(c) of the Bankruptcy Code. Significantly, unlike the defendants in the cases relied upon by the Trustee, the Defendants have not conceded that BLMIS or its predecessor was operated as Ponzi scheme.

110077776

30 2018).   The withdrawal payments constitute a dollar for dollar satisfaction of the broker's obligations to the extent of customer's request.

Second, even if the Trustee could avoid any BLMIS obligations to the Defendants, that claim would only pertain to obligations occurring after the beginning of the two-year reach-back period in Section 548(a)(1).  *Id.* at *17.  The Defendants have demonstrated that the balance in their respective accounts at the beginning of that reach-back period fully covered the withdrawal demands at the time of each payment.  The Trustee has no countervailing evidence; his mechanical net equity computation, applicable to SIPA claims adjudication, does not identify or account for the legal obligations justifying transfers to good faith defendants.

As a final ground for finding "value," there can be no dispute the record establishes the broker's breach of customer/broker agreement recognized in the *Section 546(e) Decision*.  The Securities and Exchange Commission's ("SEC") action against BLMIS that commenced the case, the criminal indictments and guilty pleas, which have been made a part of the record by the Trustee and the Defendants, all establish the broker's breach of the customer/broker contracts and violation of federal securities laws (15 U.S.C. §§ 78j(b) and 77ff, and 17 C.F.R. § 240.10b-5) and state securities law.  The breaches afford the Defendants remedies under the Bankruptcy Code and federal and state law that insulate the transfers from avoidance.

In short, based on several alternative grounds, Defendants gave "value" within the meaning of Section 548(c), which is a complete defense to the Trustee's claim.

The Trustee's efforts to prevail on summary judgment by foreclosing Defendants from making and proving their defenses pursuant to the doctrine of *res judicata* are also unavailing.  The elements for application of *res judicata* have been described as "whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same," *Brown Media Corp. v. K&L*

110077776

*Gates, LLP,* 854 F.3d 150, 157 (2d Cir. 2017)  Here, among other reasons discussed below, there can be little rational dispute (i) the Defendants' SIPA claims were not the "same" as the Trustee's avoidance claims; (ii) there was no final judgment on the merits, and (iii) the Section 548 defenses were not litigated and could not have been litigated in the SIPA administrative proceeding.  The doctrine is simply not applicable to the unopposed voluntary withdrawal of a customer claim.[13]

Finally, there are a number of facts in this case related to whether BLMIS acted as a Ponzi scheme *vis à vis* the Defendants, *which the parties dispute*, and which not only warrant denying the Trustee's Motion but also warrant rejecting the holdings of several prior decisions where the Ponzi scheme label *was not in dispute*.  Based on the Defendants' account statements, there is no evidence that the Defendants were promised or received exorbitant rates of return or that their returns were dependent on redemption within a defined period.  The Defendants were free to use their brokerage account as they needed--to deposit and withdraw funds for any reason or no reason.  The Manns had their account for more than a decade before the fraud was discovered and made their last deposit of $1,500,000 shortly before they made the withdrawals that are the subject of this litigation.  The evidence also demonstrates that his operations made it possible for Madoff to meet withdrawal requests for decades without soliciting new depositors.  As established by the pleas and documentary evidence, Madoff made redemptions from assets, including cash in an account in his name (and/or the trade name of his sole proprietorship) and under his control, securities held in various accounts and proceeds of and interest earned on those securities, including US Treasuries, other securities, commercial paper and short term investments.  This account, which held billions of dollars, enabled Madoff to meet every redemption until the market

---

[13] *See In re Canton,* 2007 WL 2848513 at *3 (Bankr. W.D. Wash. March 21, 2007) (voluntary withdrawal of a claim is not a judgment on the merits; *res judicata* does not apply)

110077776

collapsed in 2008. As a result, the critical feature of a Ponzi scheme -- that early redeeming investors are paid with later investors' money -- is not a feature of Madoff's fraudulent activity.

Based on the above as more fully discussed below, summary judgment should be denied to the Trustee and granted to the Defendants, dismissing this adversary proceeding with prejudice.

## **LEGAL STANDARD**

Under Fed. R. Civ. P. 56, made applicable to this proceeding by Fed. R. Bankr. P. 7056, a motion for summary judgment should not be granted unless the court finds there are no material issues of fact to be tried and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

The party seeking summary judgment bears the burden of establishing that no genuine dispute as to a material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The court may rely on material that would be admissible or useable at trial. *See Ruben v. Mason,* 387 F.3d 183, 188 (2d Cir. 2004). Where a summary judgment motion is supported or opposed by affidavits, those "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *Beyah v. Coughlin*, 789 F.2d 986, 989-90 (2d Cir. 1986) (summary judgment denied; movant proffered no statements sworn to by anyone who had knowledge of the facts asserted").[14]

In considering the record, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *Id.* at 989. However, undisputed facts do not always lead to a single, inevitable conclusion. When undisputed facts are capable of supporting

---

[14] Here, the Trustee's "evidence" consists in large part of judicial pronouncements, which have a place in a legal memorandum, but not a statement of facts. As shown in the Defendants' opposition to the Trustee's Statement of Material Undisputed Facts (as previously defined, the "DSMF"), the Trustee misstates and mischaracterizes testimony, quotes testimony out of context, and omits critical facts.

7

conflicting yet plausible inferences--inferences that are capable of leading a factfinder to different outcomes in a litigation--then the choice between those inferences is not for the court on summary judgment. *See Azrielli v. Cohen Law Offic*es, 21 F.3d 512, 517 (2d Cir.1994) (stating that "all choices between available inferences are matters to be left for a jury, not matters to be decided by the court on summary judgment").

On a motion for summary judgment, where, as here, the plaintiff is testing the affirmative defenses, then the plaintiff also bears the burden of not only establishing his prima facie case, but also demonstrating that all affirmative defenses are unsupported by the record or fail as a matter of law.  *See FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994*); Michael Grecco Prods. v. Valuewalk LLC,* 2018 WL 5831311, at *32-33 (S.D.N.Y. Nov. 6, 2018).

Denial of the Trustee's Motion is justified based solely on his lack of admissible supporting evidence and failure to make his *prima facie* case.

### FACTUAL BACKGROUND

The facts underlying the Trustee's Motion are fully set forth in the Defendants' Statement of Material Facts filed herewith, are discussed in the Argument section below, and need not be summarized here.  Those facts include that the Defendants received transfers from an account in the name of and under the control of Bernard L. Madoff, not BLMIS.  At the time of each withdrawal payment to the Defendants, the balances in their accounts reflected in their statements exceeded the payment amounts.  These account statements and other documents sent to the Defendants evidenced obligations of the broker to the Defendants under state and federal securities laws.

Moreover, contrary to the Trustee's mantra that no securities were ever purchased for the Defendants and other customers, the evidence demonstrates that although Madoff did not execute the split strike conversion strategy that he promised customers after the early 1990s, he kept

8

billions dollars in securities, including U.S. Treasury securities, purchased with customer funds,

which together with interest earned thereon, short term investments and cash, he used to meet

customer redemptions for more than a decade.

## I.    THE TRANSFERS IN QUESTION WERE NOT THE DEBTOR'S PROPERTY

The Trustee's remaining claims against the Defendants are claims under Sections

548(a)(1)(A) and Section 550 of the Bankruptcy Code. 11 U.S.C. §§ 548(a)(1)(A) and 550.

Section 548(a)(1)(A) provides in relevant part:

> (1) The trustee may avoid any transfer… of an interest of the debtor in
> property, or any obligation… incurred by the debtor, that was made or
> incurred on or within 2 years before the date of the filing of the petition,
> if the debtor voluntarily or involuntarily—
>
> A) made such transfer or incurred such obligation with actual intent to
> hinder, delay, or defraud any entity to which the debtor was or became,
> on or after the date that such transfer was made or such obligation was
> incurred, indebted;

As a threshold matter, the statute requires that the transfer involve property of the debtor.

*Bear Stearns Securities Corp. v. Gredd*, 275 B.R. 190, 198-99 (S.D.N.Y. 2002)(Because

Manhattan Investment Fund never had an ownership interest in securities purchased to cover short

sales by operation of law, the transfers could not be avoided under Bankruptcy Code section 548

even if the fund had actually intended to hinder, delay or defraud its creditors when it entered into

the short-sale transactions.) *See also In re Dreier LLP*, 429 B.R. 112, 125 (Bankr. S.D. N.Y. 2010)

("If the transfer did not involve property of the debtor under non-bankruptcy law, the trustee cannot

avoid and recover the transfer or its value."). In this case, the property transferred was not property

of BLMIS.

The Defendants have submitted evidence in the form of the checks, produced by the

Trustee, that were written on an account at Chase (the "509 Account") in the name and control of

Bernard L. Madoff. This account was the source of the withdrawal payments to the Defendants

110077776

from the commencement of their relationship with Madoff operating as a sole proprietor and with

BLMIS.  *See* Ruegger Dec. Exs. C & H; DSMF pp. 15 - 19, responses to Trustee SOMF ¶¶ 14 -

16.

It is undisputed that the debtor in these proceedings is BLMIS, not Madoff individually or

his sole proprietorship.   In *Avellino*, 557 B.R. 89, this Court described the critical difference

between the debtor and the individual:

> The "debtor" in a SIPA liquidation proceedings is "a member of SIPC
> with respect to whom an application for a protective decree has been
> filed under section 78eee(a)(3) of this title." SIPA § 78111(5). SIPC
> filed an application for a protective decree against "Bernard L. Madoff
> Investment Securities LLC," and the District Court's order identifies
> the Defendant as "Bernard L. Madoff Investment Securities LLC."  The
> predecessor business, which was not a defendant or even mentioned in
> the District Court's Order, was conducted in the name of Bernard L.
> Madoff. (Uniform Application for Broker-Dealer Registration (Form
> BD), dated Jan. 12, 2001, at 9.) **The SIPA debtor was BLMIS, the
> limited liability company, and not Madoff's sole proprietorship, an
> entity that had no legal existence separate from Madoff.** *See United
> States v. Fox,* 721 F.2d 32, 36 (2d Cir.1983); *Mattel, Inc. v. Adventure
> Apparel,* No. 00 CIV. 4085, 2001 WL 1035140, at *5 n. 2 (S.D.N.Y.
> Sept. 7, 2001)

*Id.* at 108 (emphasis added).  See also SIPA § 78lll defining "debtor" as a "member of

SIPC with respect to whom an application for a protective decree has been filed under section

78eee(a)(3) of this title or a direct payment procedure has been instituted under section 78fff-4(b)

of this title."

At the time of the transfers in question here, the Defendants' account agreements had been

made with the sole proprietorship and withdrawals were paid from the 509 Account in Madoff's

own name and under his control.  Ruegger Dec. Exs. A, B, C, H, J, K;, DSMF pp. 14 -19,

responding to Trustee SOMF ¶¶ 14 - 16.

These transfers are not saved by the legal fiction of SIPA § 78fff-2(c)(3).  That Section of

SIPA has a limited purpose. It is meant to deal with the fact because money held by a broker on

10

110077776

behalf of its customers is not the broker's property under state law; it would not be recoverable by

an ordinary trustee in bankruptcy.  SIPA circumvents that particular problem with the fiction that

confers standing on the Trustee by treating customer property held by the broker as though it were

property of the debtor.  *Picard v. Fairfield Greenwich Ltd*., 762 F.3d 199, 213 (2d Cir. 2014).  The

section does not convert individual's property into debtor property.[15]

In sum, the Trustee has failed to satisfy his prima facie burden by establishing a "transfer .

. . of an interest of the debtor in property" within the meaning of section 548(a)(1)(A).[16]

Consequently, the Trustee is not entitled to summary judgment and, instead, summary judgment

should be granted to the Defendants dismissing the adversary proceeding per Fed. R. Civ. P.

56(f)(1).

## II.    THE DEFENDANTS HAVE UNASSAILABLE DEFENSES TO THE TRUSTEE'S CLAIMS

The Defendants submit their defenses in this case are well-established. The cornerstone

to any analysis of those defenses, however, is the *Section 546(e) Decision.*  In that decision, the

Second Circuit unequivocally held that account documents executed by the Defendants fell within

the definition of "securities contracts:"

> On their face, the Account Documents are agreements by which
> BLMIS will "acquire or dispose of securities" on behalf of its
> customers. The Customer Agreement established the broker-customer
> relationship, and the Trading Authorization authorized BLMIS to trade
> in securities for the customer's account. A-2147-49, A-2144. These
> documents also specify the terms by which BLMIS will acquire and
> dispose of securities for the customer. Were it not for the Account
> Documents, there would be no basis for a customer to make deposits or

---

[15] Nor is the Trustee's required *prima facie* showing satisfied by citation to *McHale v. Boulder Capital LLC (In re The 1031 Tax Group, LLC),* 439 B.R. 7 (Bankr. S.D.N.Y 2010) (Trustee Mem. pp. 13 - 14), a case which is not factually or legally related to the BLMIS liquidation or this adversary proceeding and which is, therefore, an inapposite citation.

[16] In the Statement of Material Undisputed Facts, the Trustee claims that Madoff or the employees designated the account from which withdrawals were made as a BLMIS account.  However, none did so See DSMF pp. 45 - 47, responding to Trustee SOMF ¶¶ 62 - 63.

> request withdrawals. Thus, the transfers at issue originated with, and
> could not have been possible but for, the relationship created by the
> Account Documents. Accordingly, we conclude that they fall within
> the statute's broad definition of "securities contract." See §
> 741(7)(A)(i).

773 F.3d at 418-19.

The court rejected one by one all the Trustee's arguments that he will invariably make here

again. First, the court rejected the Trustee's argument that the securities law safe-harbor under

Section 546(e) was inapplicable because BLMIS never initiated, executed, completed or settled

the securities transactions it promised on the grounds that "the definition of securities contract does

not depend on the broker's performance, because the breach of contract neither changes nor

nullifies the nature of the underlying agreement. " *Id*. at 420.[17]  Similarly, the court rejected the

argument that agreements were not securities contracts because the account documents did not

specify a specific security on the grounds that securities laws provided for master agreements. *Id*

at 420-21.  The court also rejected the argument that the documents created at best a quasi-contract

and were not in satisfaction of a contractual obligation. The court concluded in response: "We

similarly have little difficulty concluding that the payments BLMIS made to its customers were

made "in connection with" the securities contracts identified above." *Id.* at 421.

Finally, the Second Circuit rejected the argument, which Trustee will invariably make

again, that to allow customers to retain the fictitious profits Madoff arbitrarily bestowed on them

amounts to giving legal effect to his fraud and undermines the 2011 "Net Equity Decision" of *In*

*re BLMIS*, 654 F.3d 229 (2d Cir. 2011), *see Section 546(e) Decision*, 773 F.3d at 417.  That

decision rejected the customer's last statement as the basis for a customer claim and affirmed the

---

[17] The Court expressly tied its rejection of the Trustee's argument in this regard to the same principle in securities law.
See *Section 546(e) Decision*, 773 F.3d at 420 n.3.

Trustee's methodology in computing the customer claim by netting all withdrawals against the

customer's deposits.   The Second Circuit distinguished between the claims allowance process

governed by SIPA and the avoidance defenses governed by the Bankruptcy Code as arising from

different statutory schemes:

> There [in the Net Equity Decision, 654 F.3d 229], we faced the question
> of how to calculate each BLMIS customer's "net equity," as that term
> is defined in SIPA. *Id.* at 233. We said that it would be "absurd" to
> calculate customers' net equity using BLMIS's fictitious account
> statements, because that would "have the ... effect of treating fictitious
> and arbitrarily assigned paper profits as real and would give legal effect
> to Madoff's machinations." *Id.* at 235. According to the Trustee, this
> case is similar….
>
> This argument, albeit compelling, is ultimately not convincing. In our
> earlier decision, we interpreted "net equity" in a manner that would
> harmonize it with the SIPA statutory framework as a whole. *See In re
> BLMIS,* 654 F.3d at 237. Section 546(e), however, is part of the
> Bankruptcy Code, not SIPA, and was not in issue in *In re BLMIS*.

773 F.3d at 423.

Significantly, the Second Circuit viewed the limitations on the Trustee's avoidance powers

as an intentional balance against equitable considerations. *Id.* ("[i]n enacting the Bankruptcy Code,

Congress struck careful balances between the need for an equitable result for the debtor and its

creditors, and the need for finality.[citation omitted].   For example, a bankruptcy trustee can

recover fraudulent transfers under § 548(a)(1) only when the transfers took place within two years

of the petition date.   In addition, avoidance claims must be brought "two years after the entry of

the order for relief" at the latest.   11 U.S.C. § 546(a). These statutes of limitations reflect that, at a

certain point, the need for finality is paramount even in light of countervailing equity

considerations").

For purposes of testing "value" under Section 548(c), if there were securities contracts to

which the challenged payments related (as the Second Circuit has conclusively determined), or if

the challenged payments were settlement payments responsive to customers' instructions to the broker to liquidate a portion of what they were told their accounts contained (as the Second Circuit has conclusively determined), the inescapable corollary is that there was an exchange of legally cognizable consideration at the time of transfer, notwithstanding the broker's fraud. *Section 546(e) Decision*, 773 F.3d at 422. Value in this context is not the assertion of a claim for payment from the estate.

A.   **The Withdrawal Payments Satisfied Unavoidable Obligations At the Time of The Transfers**

The Trustee focuses solely on the avoidance of *transfers* and ignores the fact that the Bankruptcy Code extends protection to both the *obligations* incurred -- by virtue of the broker/customer relationship and legitimized by the *Section 546( 3 ) Decision* -- and the payments made in satisfaction of those obligations. The Second Circuit specifically recognized that the account documents created obligations from the broker to the customer to reimburse its customers upon a request for withdrawal:

> "Additionally, because the Account Documents obligate BLMIS to reimburse its customers upon a request for withdrawal, they also fit the definition of "securities contract" in § 741(7)(A)(xi), which includes, again quite expansively, "any security agreement or arrangement related to any agreement or transaction referred to in this subparagraph, including any guarantee or reimbursement obligation by or to a stockbroker.".

*Id*. at 419.

Moreover, the broker incurred those obligations each time the customer requested a withdrawal payment. The specific transfers to customers made in satisfaction of the obligations were "settlement payments" pursuant to Section 741(8) of the Bankruptcy Code that are protected from avoidance even if the payments were stolen from another customer:

> Each time a customer requested a withdrawal from BLMIS, he or she intended that BLMIS dispose of securities and remit payment to the

14

> customer. See N.Y.U.C.C. § 8-501(b)(1) & cmt. 2 (broker's written
> crediting of securities to a customer's account creates an enforceable
> securities entitlement). The statutory definition and *Enron* compel the
> conclusion that, for example, if I instruct my broker to sell my shares
> of ABC Corporation and remit the cash, that payment is a "settlement"
> even if the broker may have failed to execute the trade and sent me cash
> stolen from another client. As the district court correctly concluded,
> because the customer granted BLMIS discretion to liquidate securities
> in their accounts to the extent necessary to implement their sell orders
> or withdrawal requests, each transfer in respect of such an order or
> request constituted a settlement payment.

*Id.* at 422-23

In this case, the Trustee cannot avoid any obligations, including those incurred during the

two years before the filing of the SIPA liquidation, because he dismissed his claims to avoid

obligations (added in the amendment to the complaint), with prejudice by stipulation so ordered

by the Court.

On the date of each withdrawal from the account during the two-year period before the

filing of the BLMIS liquidation, the Mann statement showed a positive balance. Thus, on February

28, 2007, before the withdrawal on March 7, 2007 of $250,000, the Mann Account showed a

balance of $7,665,327 (Ruegger Dec. Ex. E). On September 30, 2007, before the withdrawal of

$2,000,000 from the Mann Account, the statement showed a balance of $8,327,789. (Ruegger Dec.

Ex. E; see DSMF pp. 14 - 19, responding to Trustee SOMF ¶¶ 14 - 16).

Similarly, on the date of each withdrawal from the account during the two-year period, the

BAM statement showed a positive balance. Thus, on March 31, 2007 before the April 17, 2007

withdrawal of $88,000, BAM's account statement showed a balance of $1,132,452 (Ruegger Dec.

Ex. G). On June 30, 2007, before BAM withdrew $300,000 on July 25, 2007, the BAM Account

balance was $1,075,738 (Ruegger Dec. Ex. G). On September 30, 2007 before BAM made a

withdrawal of $50,000 on October 24, 2007, the BAM Account showed a balance of $801,193

(Ruegger Dec. Ex. G). On December 31, 2007, before BAM made a $15,000 withdrawal from its

15

account, the BAM Account balance was $775,127.75 (Ruegger Dec. Ex. G).  Finally, on March

31, 2008, before the last withdrawal on April 23, 2008 of $110,000, the BAM account showed a

balance of $762,516. (Ruegger Dec. Ex. G; see also DSMF pp. 14 - 19, responding to Trustee

SOMF ¶¶ 14 - 16.

    These obligations evidenced by the statements and other documents sent to the Defendants

are valid antecedent debts within the meaning of Section 548(d)(2)(A).  Payments made in

satisfaction of those debts constitute value under Section 548(c).

> ### B.    The Statute Of Repose Limits Avoidance Of Both Obligations And The Payments Made In Satisfaction Of The Obligations

    The Supreme Court in *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc*., 137 S. Ct.

2042 (2017) distinguished between a statute of limitations (that is intended to encourage diligent

prosecution of known claims by setting a time within which an action must be brought) and a

statute of repose (that frees a potential defendant from liability after the legislatively determined

period of time) *Id*.  A statute of repose "reflects the legislative objective to give a defendant a

complete defense to any suit after a certain period."   In the context of the avoidance claims in a

bankruptcy case, Section 108 fixes the time by which the Trustee must bring the avoidance action.

Section 548(a)(1) of the Bankruptcy Code shields the Defendants from liability for transfers made

and obligations incurred on or within 2 years of the filing of the BLMIS liquidation.  11 U.S.C. §

548(a)(1).

    In contrast to the computation for net equity and the allowance or disallowance of claims,

which extends back in this case to the first transaction in the account, Section 548(a) mandates that

the computation of net account balances for avoidance purposes begin on December 11, 2006.  As

shown by Defendants, the broker's unavoided liability at that point exceeded the subsequent

withdrawal payments to them.  Specifically, on November 30, 2006, the approximate date of the

110077776

applicable two-year statute of repose fixed by section 548(a) of the Bankruptcy Code, the statement

for Mann Account reflected a balance of $6,305,190 (Ruegger Dec. Ex. D), well above the amount

of withdrawals over the next two years. Similarly, on that same November 30, 2006 date, the

BAM statement showed a balance of $1,091,896.12 (Ruegger Dec. Ex. F). Withdrawals were well

below that sum: between April 17, 2007 and April 23, 2008, BAM requested and received

$563,000 (Ruegger Dec. Ex. H; see generally DSMF pp. 14 - 19, responding to Trustee SOMF ¶¶

14 - 16).

Two recent District Court decisions in the Tribune Fraudulent Conveyance litigation affirm

the application of the statute of repose to limit the Trustee's power to avoid obligations to the

Defendants incurred prior to the two-year reach back period **and** confirm the Defendants' position

that satisfaction of an unavoidable obligation constitutes "value" within the meaning Section

548(c).

In *Kirschner,* Circuit Court Judge Sullivan dismissed the trustee's claims to avoid

executive severance obligations and payments following the executives' termination, 2018 WL

6329139. The court held that the obligations giving rise to those payments arose more than two

years before the Tribune's bankruptcy filing and were therefore not avoidable under statute of

repose of 11 U.S.C. § 548(a)(1), *Id.* at *14 - 15. The Tribune's obligations to make those payments

were incurred with the adoption of a plan for executives more than two years before the filing.

Based on the language of the Bankruptcy Code and relevant precedent, the court held that for

purposes of Section 548(a), a debt or obligation[18] is incurred when a contract or agreement is

formed, not when the payment is actually due. *Id.* Because the obligations were incurred more

---

[18] The court determined that debt and obligation were equivalent terms.

110077776

than two years before the filing, pursuant to Section 548(a)(1) those obligations were unavoidable. *Id.*

The trustee also sought to avoid the transfers made pursuant to the executive plan within the reach-back period. The court dismissed those claims as well for a reason equally applicable in this case: "transfers made in satisfaction of unavoidable obligations are *per se* made for reasonably equivalent value."  *Id.* at *17 citing *In re Trinsum Grp, Inc.* 460 B.R. 379, 388 (Bankr. S.D.N.Y.2011) (transfers made in satisfaction of an underlying obligation are presumed to be made for value).

The effect of the statute of repose was raised again in *(In re Tribune Company Fraudulent Conveyance Litig.)*, 2019 WL 294807 (S.D.N.Y Jan. 23, 2019) in the context of avoidance of indemnification obligations.  Because the indemnification obligations were incurred more than two years before the bankruptcy filing in the company's certificate of incorporation, they, like the severance obligations, were not subject to avoidance under Section 548(a). *Id.* at *21. The statute of repose applies to all claims under Section 548(a) and bars a trustee from avoiding both the obligation incurred more than two years before the filing and the payments that satisfied the antecedent obligation under Section 548(c).

On November 30, 2006, the approximate date of the applicable two-year statute of repose fixed by Section 548(a)(1), there was a stated balance in the Mann Account of $6,305,190.04 (Ruegger Dec. Ex. D p. 4) . In the two-year period between December 11, 2006 and the filing date, Mr. Mann withdrew only $2,250,000. (Ruegger Dec. Exs. C, J; see DSMF pp. 14 - 19 responding to Trustee SOMF ¶¶ 14 - 16).  The payments satisfied in small part the outstanding obligation of the broker to the Manns and their entitlement to payment under the securities contracts.

On November 30, 2006, the BAM statement for its account showed a balance of $1,091,896.12. (Ruegger Dec. Ex. F).  Thereafter, BAM withdrew $563,000 during the two-year

18

period before the filing of the SIPA liquidation.  (Ruegger Dec. Ex. K).  The payments satisfied in

small part the outstanding obligation of the broker to BAM and its entitlement to payment under

the securities contracts.  In both cases, the Defendants have asserted an absolute defense to their

alleged transfer liability.

### C.    The Defendants Have Valid Causes of Action Under Federal and State Securities Laws Release of Which Constitutes Value

The Defendants have consistently asserted their defenses to the Trustee's avoidance claims

because, as a SIPA case, this is a securities fraud case.  The admissions in the Amended Complaint

with respect to BLMIS' fraudulent conduct,  the criminal indictments, plea allocutions and the

SEC action commencing the BLMIS liquidation all allege violations of the securities laws, putting

this case and the remedies available to the defrauded customers squarely within the purview of

Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "34 Act").  A customer

defrauded by BLMIS has valid state and federal law claims, which are rights to payment (debts of

the debtor), constituting value under section 548(c).

Section 10(b) of the 34 Act makes it "unlawful for any person . . . to use or employ, in

connection with the purchase or sale of any security . . ., any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C.

§ 78j(b).  Rule 10b-5, which implements this provision, forbids the use, "in connection with the

purchase or sale of any security," of "any device, scheme, or artifice to defraud" or any other "act,

practice, or course of business" that "operates . . . as a fraud or deceit." 17 C.F.R. § 240.10b-5

(2000).  The Supreme Court recognized in *Affiliated Ute Citizens of Utah v. United States*, 406

U.S. 128 at 151 (1972),[19] based on the SEC's broad reading of the statute, that a broker who accepts

---

[19] Recognized as superseded by statute on other grounds (measure of damages) by *Acticon AG v. China N. E. Petroleum Holdings Ltd.,* 692 F.3d 34, 38 (2d Cir. 2012).

110077776

payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b-5.  Accord *SEC v. Zandford*, 535 U.S. 813, 819 (2002); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 n.10 (2006) (same); *Schnorr v. Schubert*, 2005 WL 2019878, at *5 (W.D. Okla. Aug. 18, 2005) ("[U]nfulfilled promises to purchase securities qualify as actual purchases" for purposes of Rule 10b-5.)

The remedies for securities fraud are not limited to recovery of principal, but also include compensation for loss of time value of money in the form of interest.  Principal and interest are also recoverable in the case of misrepresentation in connection with the sale of securities under the Securities Act of 1933.  15 U.S.C. § 77l(a)(2).  Section 29(b) of the 1934 Act expressly permits an innocent victim of a fraud to elect to stand on his or her contractual rights even where they have been procured by the counterparty's fraud or, alternatively, to maintain an action for money damages against the counterparty -- here, for example, based on Madoff Securities' fraudulent brokerage account statements and transfer confirmations.  *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 388-89 (1970) (the aggrieved party may elect to sue for damages under section 29(b) rather than rescind the contract) (cited by *Freeman v. Marine Midland Bank-New York*, 419 F. Supp. 440 (E.D.N.Y. 1976) ("[Section 29(b)] make[s] [fraudulent] contracts voidable at the option of the innocent party.  This interpretation has permitted the investor, at his option, to void the contract as a defense to a lender's suit, to sue on the contract for damages, to enforce the contract, or to seek rescission."); *Kardon v. National Gypsum Co.*, 69 F. Supp. 512, 514 (E.D. Pa. 1946) ("Congress meant the original statute to be interpreted as providing for civil suits under it. .... [And] such suits would include not only actions for rescission but also for money damages."); *Cant v. A.G. Becker & Co.*, 384 F. Supp. 814, 816 (N.D. Ill. 1974) (in lieu of the rescission remedy under Section 29(b), the plaintiff is entitled to an award of monetary damages, interest, and costs to restore him to the

20

position he would have been had it not been for the defendant's wrongful activity, i.e., to be "placed in a posture which assumes that he had the opportunity to utilize his funds in a reasonable manner.").

**D.**     **Earlier Madoff-Related Decisions, Often Cited by the Trustee, Do Not Negate The Above Defenses**

The Trustee can be expected to cite both *Securities Investor Protection Corp v. BLMIS LLC*, 476 B.R. 715 (S.D.N.Y. 2012)(the "*Greiff Decision*")[20] and the *SIPC v. BLMIS (In re BLMIS)*, 499 B.R. 416 (S.D.N.Y. 2013) (the "*Antecedent Debt Decision*") in an effort to negate the above-described defenses.  Neither case does so.[21]  The unavoidable obligations remain fully enforceable and, therefore, give rise to a complete defense under Section 548(c) to the Trustee's attempts to avoid and recover the related payments to the Defendants.  The fact that a securities customer is legally entitled to stand on the securities contract -- an obligation incurred by the broker -- necessarily means that payments from the broker to the customer will discharge its obligations to him or her under non-bankruptcy law.  This provided value to the debtor at the time of the transfers under Section 548(c) in the same manner as the severance and indemnity payments provided value to the debtor at issue in the *Tribune* cases.

Thus, in the *Greiff Decision,* Judge Rakoff considered the value defense on a motion to dismiss, which as a matter of law prevented the court from considering the defense except to the extent it was raised in the pre-answer motion on the face of the complaint.  In this limited review,

---

[20] The Trustee and this Court continue to rely on the earlier District Court decision that rejected a value defense based on securities laws claims using Ponzi scheme case law or equitable considerations without considering the effect of the subsequent *Section 546(e) Decision*.

The obvious attraction of the Ponzi scheme cases to the Trustee is that good-faith defendants have allowed value claims limited to the investment principal without regard to the nature of the fraud.  The *Section 546(e) Decision* focuses on the nature of the fraud.

[21] In the *Antecedent Debt Decision*, the court recognized the limitation on recovery of transfers to the two-year period but did not address the limitation on avoiding obligations.

21

the *Greiff Decision* did not address the consequence of unavoidable obligations or the securities

law implications of the fraudulent conduct.   Moreover, it borrowed heavily from cases that did

not involve securities contracts and transactions, and -- without any basis in the language of the

relevant statures or case law precedent -- imposed the priority distribution scheme for distribution

of property under SIPA on the Section 548(c) defense under the Bankruptcy Code.   The Second

Circuit affirmed the District Court's application of the Section 546(e) defense, but its reasoning

in that affirmation (that net equity and avoidance actions are based on completely different

statutory schemes) overrules the District Court's preliminary rejection of the value defense,

*Section 546(e) Decision,* 773 F3d at 422-23.

Similarly, in the *Antecedent Debt Decision*, decided within the limited factual and legal

context of a motion to dismiss, the district court denied the good faith defendants' motion to

dismiss the complaints on two separate theories, both of which limit the good-faith defendant's

value defense to deposited principal, 499 B.R. at 430.   In cases involving Ponzi schemes,

payments to investors up to the amount of their principal are recognized as providing "value" to

the estate under a theory of restitution.   *Id.* at 423.   In SIPA cases, one measure used for the claim

for return of principal is based on net equity. *Id.* at 423.   In the *Antecedent Debt Decision*, the

court's stated basis for importing the customer claims distribution scheme into the avoidance

statute is SIPA section 78fff-1(a) even though, by that Section's express language, the statute

merely conveys standing on the Trustee to pursue avoidance claims and only when customer

property is insufficient to pay certain claims referenced in the section of the statute.[22]

---

[22] SIPA Section 78fff-1(a) states: "Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11."

110077776

Nevertheless, the court reads a limitation of net equity on defenses into that section of SIPA stating: "[t]he definition of net equity and the definition of claims that can provide "value" to the customer property estate are inherently intertwined where the customer property estate is created as a priority estate intended to compensate customers only for their net equity claims." *Id.* at 424.

The *Antecedent Debt Decision* does not determine the outcome of this case for several reasons.[23]  First, the district court's decision was superseded and overruled by the *Section 546(e) Decision*.  The Second Circuit specifically considered the application of Section 546(e) in the context of the Trustee's responsibilities and his avoidance powers under the identical SIPA provisions considered by the district court in the *Antecedent Debt Decision*.  Nevertheless, the circuit court recognized the Section 546(e) safe-harbor defense limits the Trustee's avoidance powers:  "Under SIPA, a trustee is empowered to "recover" (or claw back) money paid out by the debtor, as long as the money "would have been customer property" had the payment not occurred, and the transfers could be avoided under the Bankruptcy Code." 773 F.3d at 414 (Citing SIPA § 78fff–2(c)(3)).  Section 546(e) established an exception to a trustee's clawback power under the Bankruptcy Code and section 548(c) provides another such exception.

Further, the Second Circuit in the *Section 546(e) Decision* concluded that the payments to the Defendants (and other good faith investors) were on account of securities contracts and settlements payments as defined and applied under the Bankruptcy Code and securities laws notwithstanding that BLMIS may have operated a Ponzi scheme.  *Id.* at 421-22.  In addition, the *Section 546(e) Decision* expressly delinked the SIPA distribution scheme and net equity from

---

[23] The decision is not binding under the doctrine of law of the case because it is not a final decision.  *See Geltzer v. Brizinova (In re Brizinova)*, 592 B.R. 442, 455 (Bankr. E.D.N.Y. 2018) ("the Supreme Court long ago noted that '"[w]e think that [the law of the case doctrine] requires a final judgment to sustain the application of the rule . . . just as it does for the kindred rule of res judicata." (citing *United States v. U.S. Smelting Co.*, 339 U.S. 186, 198-99, 70 S. Ct. 537, 94 L. Ed. 750 (1950)") (additional citations omitted).

bankruptcy defenses: "In our earlier [*Net Equity Decision*], we interpreted "net equity" in a manner that would harmonize it with the SIPA statutory framework as a whole. . . . Section 546(e), however, is part of the Bankruptcy Code, not SIPA, and was not in issue in [the *Net Equity Decision*]." 773 F.3d at 423.

The *Antecedent Debt Decision* departs from well-established principles of statutory interpretation by interposing its extraneous considerations into a statute that is clear on its face. The Supreme Court in *U.S. v. Ron Pair Enters*, 489 U.S. 235 (1989) explained that the "plain meaning of legislation should be conclusive, except in the 'rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " *Id.* at 242 (citations omitted). There is no Ponzi scheme exception in Section 548(c). *In re Dreier LLP,* 452 B.R. 391, 448 (Bankr. S.D.N.Y. 2011). There is no SIPA exception or case law precedent for imposing the SIPA distribution scheme on Section 548(c). To the extent that transfers to innocent net-winner customers are protected by bankruptcy laws, net-loser customers have no legitimate expectation of additional recovery at net-winner expense. In the BLMIS case, the Trustee's avoidance powers are necessarily limited by time, jurisdictional constraints, and the types of enforceable claims and defenses under Section 548(c).[24]

In short, the weight of case law in this jurisdiction does not negate the defenses described above.

---

[24] The Defendants expect the Trustee in his Reply will also cite to the recent decision by Judge Engelmayer in *Picard v. Lowrey,* 2019 WL 479185 (S.D.N.Y. Feb. 7, 2019), which adhered to rulings in the *Greiff Decision* and the *Antecedent Debt Decision.* Judge Engelmayer's decision, however, does not help the Trustee's Motion here in that (i) there was no dispute as to the Ponzi scheme label (which Defendants vigorously dispute here), (ii) Judge Engelmayer considered the *Greiff Decision* and the *Antecedent Debt Decision* to be controlling as law of the case (which we demonstrated above is incorrect); and (iii) perhaps because the matter was *sub judice* before the above-cited decisions in the *Tribune* case*,* Judge Engelmayer discussed transfer-avoidance, but did not address the need to avoid obligations under Section 548(a)(1).

## III.    RES JUDICATA DOES NOT BAR THE DEFENSES

The Trustee devotes a fair section of his motion for summary judgment attempting to foreclose the Defendants' evidence and defenses on a twisted application of the doctrine of *res judicata*.    The Trustee's argument is that the bare order simply approving withdrawal of the Defendants claim, without more, operates to establish that the preliminary conclusions that the Trustee alleged in his letter denying the claim as a final determination of the facts alleged therein and to bar the Defendants from objecting to them.    The argument is without merit for a number of reasons.

As noted above, the prerequisites for application of *res judicata* have been listed as: "whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same," *Brown Media,* 854 F.3d at 157  The Trustee bears the burden of establishing that res judicata bars the Defendants from raising fact disputes or defenses in the adversary proceeding *45 John NY, LLC v. HS 45 John LLC (In re HS 45 John LLC),* 585 B.R. 64, 78 (Bankr. S.D.N.Y. 2018).

**A.    These are not the "same" cause of action.** ¶The two "claims" or "causes of action" at issue here cannot be called the "same" under any stretch of imagination.    The prior claim was (a) by the Defendants, (b) under SIPA, (c) against the SIPA customer estate, (d) determined by a SIPA trustee (the Trustee) and (e) resolved, initially by the Trustee, and ultimately by the final judicial decision on "net equity" grounds. *Net Equity Decision,* 654 F.3d 229.  The current claim, on the other hand, is (a) by the Trustee, (b) under the Bankruptcy Code avoidance sections and federal securities laws, (c) against the Defendants (d) to be determined by the federal courts and (e) resolved ultimately on the merits of such issues as the Section 548 "value" and other defenses. These two claims could scarcely be more different.

110077776

As Judge Rakoff held in *In re Bernard L. Madoff Investment Securities LLC*, 490 B.R. 46 (S.D.N.Y. 2013), resolution of the claims did not conclusively determine the issues that arise in the avoidance action:

> Determining the amounts of customers' net equity claims does not require the Bankruptcy Court to conclusively resolve any of the issues that arise in an avoidance action, much less the action in its entirety. See generally 11 U.S.C. §§ 547, 548. In this liquidation proceeding, the Bankruptcy Court has rejected many customer claims simply because the customer, according to the Trustee's calculations, had no net equity. The Second Circuit has affirmed the Bankruptcy Court's decision and approved the Trustee's method for determining net equity claims. See generally In *re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir.2011). Nonetheless, **these decisions have not resolved important issues that avoidance actions raise, and thus they have not bound the parties as res judicata.** Accordingly, the fact that certain defendants have filed net equity claims, standing alone, does not empower the Bankruptcy Court to finally decide the Trustee's avoidance actions.(emphasis added)

> *Id*. at 54.

As noted above, the Second Circuit also recognized that the claims allowance and the avoidance proceedings were determined under different statutory schemes. *See Section 546(e) Decision*, 773 F. 2d at 423; *accord DeFlora Lake Dev. Assocs. v. Hyde Park (In re DeFlora Lake Dev. Assocs.),* 571 B.R. 587, 597 (Bankr. S.D.N.Y. 2017)(denying the *res judicata* effect when the two actions derived from two different legal schemes even though there may be some overlapping facts)*; Brown Media.*, 854 F.3d 157-158 (standard *res judicata* is "awkward" in the bankruptcy context); *TM Patents, L.P. v. IBM*, 121 F. Supp. 2d 349, 360-64 (S.D.N.Y. 2000) (denying application of *res judicata* because (a) then issue of ownership could not have been brought up in the bankruptcy and (b) the facts and evidence needed to support both claims were not related in time, space or origin).

Therefore, the first, essential element for *res judicata*, the "same" claim" or "cause of action," is absent and the doctrine cannot apply.

26

B.    <u>**There has been no final judgment on the merits.**</u> ¶Simply stated, there has not

yet been any "final judgment on the merits." A voluntary withdrawal of a claim in no way

implicates the merits of that claim. *In re Canton*, 2007 WL 2848513 at *3 (Bankr. W.D. Wash.

March 21, 2007) ("There is nothing in this case, or any published case that the Court could find,

holding that the voluntary withdrawal of a proof of claim acts as a judgment on the merits;"

voluntary withdrawal of a claim held not a judgment on the merits; *res judicata* does not apply).

This is just as true when dismissals are based on standing or limitations grounds.  *St. Pierre v.*

*Dyer,* 208 F.3d 394, 406 (2d Cir. 2000) (no *res judicata* effect from dismissal of prior suit on

standing grounds); *DeFlora Lake Dev. Assocs., Inc. v. Hyde Park (In re DeFlora Lake Dev.*

*Assocs., Inc.)*, 571 B.R. 587, 597 (Bankr. S.D.N.Y. 2017) (dismissal on limitations grounds was

not a decision on the merits; *res judicata* not applicable).

Even assuming *arguendo* the Trustee's determinations were "judgments on the merits,"

there is no reason to consider those rulings "final".   The Letters of Determination expressly

recognized the possibility that the Trustee's interpretation of net equity could be reviewed by a

court:

> Should a final and unappealable court order determine that the Trustee
> is incorrect in his interpretation of "net equity" and its corresponding
> application to the determination of customer claims, the Trustee will be
> bound by that order and will apply it retroactively to all previously
> determined customer claims in accordance with the Court's order.  See
> DSMF.

(Ruegger Dec. Ex. I).

Thus, this presents a second, fatal defect to the Trustee's attempt to invoke *res judicata*.[25]

---

[25] The Letters of Determination were also superseded by at least two Second Circuit cases, which affirmed the Trustee methodology for the computations of claim using the net investment method without adjustment for interest, time value of money and the like instead of the last statement without the findings that the Trustee seeks to impose on the Defendants from the much earlier letters.  See *Net Equity Decision,* 654 F.3d 229; *In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74 (2d Cir. 2015).

27

**C.**     **The avoidance claim defenses could not have been litigated before the Trustee.**¶

The rulings on "net equity," finally decided by the *Net Equity Decision* (654 F.3d 229), completed

any litigation on the Defendants' (and all other good-faith defendants') claims under SIPA.  There

was nothing left to litigate in the SIPA proceeding, as the avoidance proceedings and all relevant

issues therein including defenses were being litigated in the adversary proceedings.  The Trustee

would have had no authority to issue a judgment on the merits of the avoidance claims and

defenses.  *See Computer Assocs. International, Inc., v. Altai, Inc.,* 126 F.3d 365, 370 (2d Cir. 1997)

("*Res judicata* will not apply where 'the initial forum did not have the power to award the full

measure of relief sought in the later litigation' ") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790

(2d Cir. 1994) and *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir. 1986)).

This presents a third fatal defect to any invocation of *res judicata*.  For these reasons and

those set forth above, the Trustee's attempt to invoke the *res judicata* doctrine should be rejected.

## IV.    MADOFF'S OPERATIONS WERE NOT A CLASSIC PONZI SCHEME

Although the Trustee is eager to characterize the BLMIS operations as a Ponzi scheme,

few of the essential characteristics of the classic Ponzi scheme are present in this case.  There is

no evidence that good faith depositors were induced by unrealistic promises of high return.  The

Defendants each received returns that were generally at an average of 11%. (Ruegger Dec. Exs. J

& K).  The Manns were not early depositors who were paid out with later depositors' funds.  The

Manns' account was opened in January 1996 and the last deposit of $1,500,000 was made in

January 2007 shortly before last withdrawals in March and October of 2007 (Ruegger Dec. Ex. J).

These good-faith depositors used their accounts as anyone would use a brokerage account.

Although there are several characteristics of a classic Ponzi scheme, one feature has been

identified as the critical feature that differentiates a Ponzi scheme from other frauds:  a Ponzi

scheme is a fraudulent scheme in which money contributed by later investors is used to pay off

28

high returns to original or early investors.  *See Ades-Berg Investors v. Breeden (In re Bennett Funding Group, Inc.)*, 439 F.3d 155 n.2 (2d Cir. 2006) citing Black's Law Dictionary 1198 (8th ed. 2004); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995) ("A Ponzi scheme is a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors.") quoted by *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC*), 439 B.R. 284, 307 (S.D.N.Y. 2010).  The trustee cannot establish the existence of that critical feature in the BLMIS operations.

The Trustee's argument begins with his bold assertion that there is no dispute that BLMIS was engaged in Ponzi scheme. Trustee's Memorandum at 10.  However, virtually all the decisions in this SIPA case that he cites to support the assertion were decided on motions to dismiss where the Court was required to take the "facts' pled by the Trustee as true, but not to test them.  In *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122 (Bankr. S.D.N.Y 2010), the Bankruptcy Court (not the district court as the trustee asserts) drew the facts of the BLMIS scheme from the Trustee's memorandum and declarations coupled with the criminal allocutions of Madoff and DiPascali. *Id* at 126 n.11.  In sum, these cases demonstrate that the Trustee has been consistent in asserting, but never actually proving, that BLMIS, was operated as a Ponzi scheme.[26]  For the Second Circuit in

---

[26] The characterization of BLMIS as a Ponzi scheme is intended to afford the Trustee the broadest power to avoid and recover transfers.  In that spirit, for example, the Bankruptcy Court flatly rejected the idea that Section 546(e) should apply to shield any transfers from avoidance.  *See e.g. Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243, 267-68 (Bankr. S.D.N.Y. 2010) ("Further, in the context of a SIPA proceeding, applying the safe harbor provision would eliminate most avoidance powers granted to a trustee under SIPA, negating its remedial purpose. See SIPA §§ 78fff(b), 78fff-2(c)(3). Simply stated, the transfers sought to be avoided emanate from Madoff's massive Ponzi scheme, and the safe harbor provision "does not insulate transactions like these from attack." (citations omitted).

This Court has used the Ponzi scheme label to deny other defenses. See Report And Recommendation To The District Court To Grant The  Plaintiff's Motions For Summary Judgment, Deny The Defendants' Motions For Summary Judgment And Enter Money Judgments In Favor Of The Plaintiff , Picard v. Lowrey (In re BLMIS ), Nos. 10–04387,

110077776

the Section 546(e) Decision, the existence of a Ponzi scheme was completely irrelevant -- of "no moment" -- to application of the securities law defense under Section 546(e) of the Bankruptcy Code, 773 F.3d at 421. Both the Bankruptcy Court and the Trustee have refused to recognize that this precedent should apply to securities law defenses under section 548(c) of the Bankruptcy Code.

The Trustee also contends a BLMIS Ponzi scheme was unequivocally supported by the criminal pleas of Madoff himself and the BLMIS employees. However, all of these individuals were charged with securities fraud and/or conspiracy to commit securities fraud, investment advisor fraud and the like. None were charged with perpetrating a Ponzi scheme and none were required to admit or did admit to perpetrating a Ponzi scheme when the elements of each crime was described to them. Significantly, although Madoff attached the Ponzi scheme label to his fraud, neither he nor any of the other individuals testified that that later investors' deposits were used to pay off early investors.

The evidence, including the testimony of Madoff and DiPascali in their plea hearings and documentary evidence from the BLMIS records taken from the Trustee's data room, demonstrates that Madoff kept billions of dollars in cash and securities to meet customer redemptions. While it is clear that after a certain point in the early 1990s he did not execute a split strike conversion

---

10–04488, 10–04350, 10–05110 (SMB), 2018 WL1442312, *    (Bankr. S.D.N.Y. Mar. 26, 2018):

> "Judge Rakoff initially visited the antecedent debt question in *Picard v. Greiff, (In re BLMIS),* 476 B.R. 715 (S.D.N.Y. 2012) ("*Greiff*"), aff'd on other grounds, 773 F.3d 411 (2d Cir. 2014), cert. denied, 135 S. Ct. 2859 (2015). He observed that "every circuit court to address this issue has concluded that an investor's profits from a Ponzi scheme . . . are not 'for value.'" Greiff, 476 B.R. at 725 (citing *Donell v. Kowell,* 533 F.3d 762, 771-72 (9th Cir.), cert. denied, 555 U.S. 1047 (2008); *Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir.) (Posner, J.), cert. denied, 516 U.S. 1028 (1995) and *Sender v. Buchanan (In re Hedged-Invs. Assocs.,* Inc.), 84 F.3d 1286, 1290 (10th Cir. 1996)). Consequently, even if the defendants had claims against BLMIS under state or federal law, the transfers from BLMIS exceeding the return of defendants' principal were not made "for value.")

110077776

strategy with baskets of stocks and offsetting options, he constantly kept the money from customer deposits, interests, and proceeds of securities constantly invested. The cash accounts were held in his name and controlled by him.

Madoff pleaded guilty to 11 criminal charges including: (1) securities fraud, (2) investment advisor fraud, (3) mail fraud, (4) wire fraud, (5) international money laundering, (6) a second international money laundering, (7) money laundering, (8) false statement, (9) perjury, (10) false filing with the SEC and (11) theft from an employee benefit plan (Madoff March 12, 2009 guilty plea transcript (Sheehan Dec. Ex. 15) at 15 - 18). Frank DiPascali confessed to ten charges including (1) conspiracy to commit securities fraud, investment advisory fraud, falsify the books and records of an investment fund, mail fraud, and money laundering; (2) securities fraud; (3) investment advisor fraud; (4) falsifying broker/dealer books; (5) falsifying investment advisor books and records; (6) mail fraud; (7) wire fraud; (8) money laundering; (9) perjury; and (10) income tax evasion. (Sheehan Dec. Ex. 15). DiPascali testified in his apology that he thought for a long time that Bernie Madoff had other assets that he could liquidate if clients requested the return of their money. "Most of the time the clients' money just simply went into a bank account in New York that Bernie controlled" Sheehan Dec. Ex. 15, at 47, lines 5-8.

David Kugel admitted to six charges: (1) conspiracy to commit securities fraud, falsify books and records of a broker dealer 3 and falsify books and record of an investment advisor; (2) conspiracy to commit bank fraud; (3) securities fraud; (4) falsify broker/dealer books; (5) falsifying investment advisor books and records; and (6) bank fraud. (Sheehan Dec. Ex. 16). Irwin Lipkin pled guilty to two charges: (1) conspiracy to commits securities fraud, falsify books and records of a broker dealer, falsify books and records of an investment advisor, make false filing with the Securities and Exchange Commission and falsify statement in relation to documents required by ERISA; (2) a false filing with the Securities and Exchange Commission and falsified statement in

31

relation to documents required by ERISA.  (Sheehan Dec. Ex. 17).  Eric Lipkin pled guilty to six

charges: 1) conspiracy to commit securities fraud, falsify books and records of a broker/dealer and

falsify books and records of an investment advisor and conspiracy to facilitate theft concerning

ERISA; (2) defrauding a financial institution; (3) falsifying broker/dealer books; (4) falsifying

investment advisor books and records; (5) making false statements to facilitate a theft concerning

ERISA; and (6) committing bank fraud.  (Sheehan Dec. Ex. 18).  Enrica Cotellessa-Pitz pled guilty

to four criminal charges, including (1) conspiracy to obstruct the IRS in the assessment and

collection of taxes, falsifying the books and records of a broker/dealer, falsifying the books and

record of an investment advisor, and making false filing with the SEC; (2) falsifying broker/dealer

books; (3) falsifying investment advisor books and records; (4) making false filings with the SEC.

(Sheehan Dec. Ex. 19).

The pleas, which admitted to each element of a violation of 15 U.S.C. Section 78jb and

77ff, and 17 C.F.R. § 240.10b-5, clearly establish that the Defendants were victims of securities

fraud.  Rule 10b-5 promulgated under the 34 Act makes it "unlawful for any person, directly or

indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or

of any facility of any national securities exchange,

> (1)    to employ any device, scheme, or artifice to defraud,
>
> (2)    to make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the
> statements made, in the light of the circumstances under
> which they were made, not misleading, or
>
> (3)    to engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any
> person, in connection with the purchase or sale of any
> security."

The Trustee cites several cases for proposition that pleas under oath are admissible to prove

the existence of a Ponzi scheme.  Trustee Memorandum at 11.  As is often the case, the Trustee's

110077776

broad recitation of the law is not actually supported by the cases. Most of the cases cited by the Trustee are easily distinguishable. In several, the fraudster actually admitted that he ran a Ponzi scheme and/or the facts were undisputed. *See, e.*g., *In Re 1031 Tax Group, LLC*, 439 B.R. 47 (Bankr. S.D.N.Y. 2010)("Here, the facts are undisputed. Principals of the 1031 Debtors have admitted in connection with guilty pleas in federal district court that "consistent with a typical `Ponzi' scheme" so-called "lulling payments" were made to Exchangers from deposits made by later Exchangers."); *Moran v. Goldfarb,* 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012) (fraudster admitted to running a Ponzi scheme for 10 years). *Carney v. Lopez*, 933 F. Supp. 2d 365, 380 (D. Conn 2013) (defendants pled guilty to a charge of using money provided by new investors to pay out returns promised to earlier investors.) In *Gowan v. Amaranth Advisors LLC (In re Dreier LLP),* Adv. 10 03493 (SMB), 10-05447 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y 2014), also cited by the Trustee, this Court denied summary judgment on the grounds that that the pleas did not establish the key feature of a Ponzi scheme: that Marc Dreier was repaying old investors with new investor money. *Id. at *10.* As explained by this Court, when a trustee seeks to use criminal guilty pleas to prove a Ponzi scheme, as a threshold matter the trustee has the burden to establish "why the operation of a Ponzi scheme was essential to any of the counts. [A fraudster] could have "pled guilty to conspiracy, securities fraud, wire fraud and money laundering without admitting that he ran a Ponzi scheme." *Id.* at *11.

Here, the evidence in the guilty pleas is that Madoff did not execute the split strike conversion strategy that he promised clients. He did, however, continuously trade in securities with customer money and those securities appeared on the customer's account statements. The securities, together with cash from deposits, interest earned on short-term investments, and the securities were kept under Madoff's control and used to satisfy redemptions for at least fifteen years until 2008 when the financial markets collapsed.

33

In sum, there is ample record evidence that BLMIS was not operated as a classic Ponzi scheme, and that consequently, this Court should not bypass the evidentiary process to apply the customary presumptions of Ponzi scheme jurisprudence, at least until the Trustee proves the facts warranting that label or the facts are tried to a final judgment.

## **CONCLUSION**

For all these reasons, the Defendants request that the Trustee's motion for summary judgment be denied and the Defendants' be granted summary judgment in all respects.  The Defendants respectfully request that the Court dismiss the Trustee's avoidance claims against the Defendants with prejudice and grant such other and further relief as is just and proper.

Dated: February 22, 2019
        New York, New York

DENTONS US LLP
By:  */s/ Arthur H. Ruegger*
        Arthur H. Ruegger
1221 Avenue of the Americas
New York, New York 10020
Tel:  (212) 768-6700
Fax: (212) 768-6800
Email:  arthur.ruegger@dentons.com
*Attorneys for Defendants*

34