**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05355 (SMB) |
| Plaintiff, | |
| v. | |
| ABN AMRO BANK (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED) and | |
| ABN AMRO CUSTODIAL SERVICES (IRELAND) LTD. (f/k/a FORTIS PRIME FUND SOLUTIONS CUSTODIAL SERVICES (IRELAND) LTD.), | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR LEAVE TO**
**FILE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND .............................................................................................................5

    A.    Procedural Background.......................................................................................5

        1.    Initial Proceedings in the Bankruptcy Court.................................................5

        2.    Proceedings in the District Court..................................................................6

        3.    Subsequent Proceedings in the Bankruptcy Court.........................................7

    B.    The Proposed Amended Complaint ........................................................................8

ARGUMENT ................................................................................................................9

LEGAL STANDARD GOVERNING MOTIONS TO AMEND A PLEADING..........................9

I.    THE TRUSTEE'S MOTION TO AMEND SHOULD BE GRANTED IN LIGHT OF THE INTERVENING CHANGE IN LAW AND THE ADDITIONAL FACTS ALLEGED ................................................................................................................10

II.    NO FUILITY, UNDUE DELAY, BAD FAITH, OR UNDUE PREJUDICE EXISTS .......12

    A.    Amendment Is Not Futile.....................................................................................12

        1.    The PSAC Alleges Defendants Subjectively Believed there was a High Probability of Fraud at BLMIS, and Deliberately Avoided Confirming Its Suspicions. .......................................................................................................12

            (a)    The PSAC Adequately Pleads Facts Demonstrating Fortis' Willful Blindness to the High Probability to the Risk of Fraud at BLMIS ..........14

                (i)    By 2003, Fortis Employees Identified the Risk of Fraud at BLMIS But Continued to Profit from BLMIS While Eliminating Its Legal Obligation to Confirm Its Suspicions. ........14

                    (1)    Fortis Employees' Own Words and Actions Demonstrate Their Subjective Belief of a High Probability of Fraud at BLMIS. .........................................15

                    (2)    In 2003, Fortis Took Affirmative Actions to Avoid Having to Confirm Its Suspicions and Limit Its Potential Exposure If BLMIS Was Engaging in Fraud. ....17

# TABLE OF CONTENTS

**Page**

(ii) By 2006 Fortis Multi-Management Reaffirmed the High
Probability of Fraud at BLMIS and Redeemed Its Customers'
Investment Where It Could Not Avoid Liability ...........................20

  (1) Fortis Multi-Management Recognized the High
Probability of Fraud at BLMIS ..........................................20

    a. Fortis Multi-Management Learns in 2006 that
Tremont Exempted BLMIS From Its Standard
Due Diligence ...........................................................22

    b. Fortis Multi-Management Learned That Tremont
Did Not Possess Minimal Information About
Madoff's Trades and Operations ..............................23

    c. In 2006, Fortis Multi-Management Redeemed
Investments From Tremont Feeder Funds Where It
Could Not Avoid Liability ..........................................26

(iii) Already Aware of the High Probability of Fraud at BLMIS, In
2007 Fortis Entered into the Swap Transaction After
Obtaining Special Protections to Minimize its Risk .....................27

  (1) Beyond the Facts that Fortis Already Knew Suggesting
Fraud, Fortis Became Aware of Inconsistent and
Contradictory Stories As To How BLMIS Purported to
Trade Options....................................................................28

  (2) To Avoid Confirming BLMIS Was Engaging in Fraud
And Proceed With the Swap Transaction, Fortis
Obtained Special Protections to Minimize its Risk ..........30

(b) The PSAC Amply Establishes Defendants' Willful Blindness to
BLMIS's Fraud.......................................................................32

  (i) The PSAC Alleges Defendants Were Subjectively Aware of a
High Probability of Fraud at BLMIS .............................................32

  (ii) The PSAC Alleges Defendants Deliberately Avoided
Confirming the Fraud...................................................................33

2. The Trustee's Complaint Adequately Alleges Avoidability of the Initial
Transfers .................................................................................34

B. No Undue Delay or Bad Faith Can be Shown Where Defendants Acquiesced to
the Trustee Waiting to Amend the Complaint Until Legal Standards Were
Resolved..................................................................................37

# TABLE OF CONTENTS

**Page**

C.    Defendants Cannot Demonstrate Undue Prejudice....................................................38

CONCLUSION..............................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)...................................................................................10

*Agerbrink v. Model Serv. LLC*,
    155 F. Supp. 3d 448 (S.D.N.Y. 2016)..............................................................38, 39

*Alexander Interactive, Inc. v. Adorama, Inc.*,
    No. 12 Civ. 6608, 2014 WL 113728 (S.D.N.Y. Jan. 13, 2014)..............................10

*Blagman v. Apple, Inc.*,
    No. 12 Civ. 5453 (ALC) (JCF), 2014 WL 2106489 (S.D.N.Y. May 19, 2014).....................10

*Block v. First Blood Assocs.*,
    988 F.2d 344 (2d Cir. 1993)................................................................................39

*Commander Oil Corp. v. Barlo Equip. Corp.*,
    215 F.3d 321 (2d Cir. 2000).................................................................................37

*In re Dreier LLP*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011)................................................................13

*Fish v. GreatBanc Tr. Co.*,
    749 F.3d 671 (7th Cir. 2014) ..............................................................................13

*Fjord v. AMR Corp. (In re AMR Corp.)*,
    506 B.R. 368 (Bankr. S.D.N.Y. 2014)..................................................................9

*Foman v. Davis*,
    371 U.S. 178 (1962).............................................................................................9

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    No. 02 Civ. 5068 (JFK), 2008 WL 9359652 (S.D.N.Y. Mar. 17, 2008) ................11

*Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*,
    665 F. Supp. 2d 239 (S.D.N.Y. 2009)..................................................................39

*Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*,
    No. 16-CV-5393 (KMW), 2018 WL 1115517 (S.D.N.Y. Feb. 26, 2018).............39

*Local 802, Associated Musicians of Greater NY v. Parker Meridien Hotel*,
    145 F.3d 85 (2d Cir. 1998)...................................................................................9

*M.E.S., Inc. v. Safeco Ins. Co. of Am.*,
    No. 10- CV-02798 (PKC) (VMS), 2014 WL 2931398 (E.D.N.Y. June 27,
    2014)..................................................................................................................39

*Margel v. E.G.L. Gem Lab Ltd.*,
    No. 04 Civ. 1514 (SAC) (HBP), 2010 WL445192 (S.D.N.Y. Feb. 8, 2010) .........10

*Milanese v. Rust-Oleum Corp.*,
    244 F.3d 104 (2d Cir. 2001) .................................................................................9

*Monahan v. N.Y.C. Dep't of Corr.*,
    214 F.3d 275 (2d Cir. 2000) ...............................................................................39

*In re Optimal U.S. Litig.*,
    No. 10 CIV 4095 SAS, 2011 WL 4908745 (S.D.N.Y. Oct. 14, 2011) .............19, 32

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    347 F. App'x 617 (2d Cir. 2009) ........................................................................12

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
    Adv. Pro. No. 12-1576 (SMB), 2018 WL 4833984 (Bankr. S.D.N.Y. Oct. 3,
    2018) ................................................................................................... *passim*

*Picard v. Ceretti (In re BLMIS)*,
    Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug.
    11, 2015) .............................................................................................. *passim*

*Picard v. Katz*,
    462 B.R. 447 (S.D.N.Y. 2011) ..........................................................................10

*Picard v. Legacy Capital Ltd. (In re BLMIS)*,
    548 B.R. 13 (Bankr. S.D.N.Y. 2016) ..............................................................8, 11

*Picard v. Magnify (In re BLMIS)*,
    583 B.R. 829 (Bankr. S.D.N.Y. 2018) ...............................................................10

*Picard v. Mendelow (In re BLMIS)*,
    560 B.R. 208 (Bankr. S.D.N.Y. 2016) ...........................................10, 11, 38, 39

*Picard v. Merkin (In re BLMIS)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ................................................... *passim*

*Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*,
    No. 13 Civ. 1654 (RA), 2015 WL 4097927 (S.D.N.Y. July 6, 2015) ..................38

*S.S. Silberblatt, Inc. v. E. Harlem Pilot Block-Bldg. 1 House Dev. Fund. Co., Inc.*,
    608 F.2d 28 (2d Cir. 1979) ................................................................................10

*SIPC v. BLMIS (In re Madoff)*,
    2018 WL 2734825 (Bankr. S.D.N.Y. June 5, 2018) .............................................8

*SIPC v. BLMIS (In re Madoff)*,
    501 B.R. 26 (S.D.N.Y. 2013) .......................................................................11, 34

*SIPC v. BLMIS (In re Madoff)*,
    513 B.R. 222 (S.D.N.Y. 2014) ........................................................................6, 7

*SIPC v. BLMIS (In re Madoff)*,
    516 B.R. 18 (S.D.N.Y. 2014) ...........................................................6, 8, 11, 40

*SIPC v. BLMIS (In re Madoff)*,
    590 B.R. 200 (Bankr. S.D.N.Y. 2018) ...............................................................38

*SIPC v. BLMIS (In reMadoff)*,
  2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) ........................................................8, 9

*Soley v. Wasserman*,
  No. 08 Civ. 9262 (KMW) (FM), 2013 WL 6244146 (S.D.N.Y. Dec. 3, 2013) ....................10

*State Teachers Ret. Bd. v. Fluor Corp.*,
  654 F.2d 843 (2d Cir. 1981)..............................................................................................38, 39

*State v. United Parcel Serv., Inc.*,
  253 F. Supp. 3d 583 (S.D.N.Y. 2017)......................................................................................33

*United States v. Fofanah*,
  765 F.3d 141 (2d Cir. 2014) (Leval, J., concurring)..........................................................33, 34

*United States v. Giovannetti*,
  919 F.2d 1223 (7th Cir. 1990) ..................................................................................................13

*United States v. Kozeny*,
  664 F. Supp. 2d 369 (S.D.N.Y. 2009), *aff'd*, 667 F.3d 122 (2d Cir. 2011) ...........................13

*United States v. Nektalov*,
  461 F.3d 309 (2d Cir. 2006)......................................................................................................33

*United States v. Reyes*,
  302 F.3d 48 (2d Cir. 2002)........................................................................................................13

## Statutes

11 U.S.C. § 544 ................................................................................................................................9

11 U.S.C. § 546(e) .......................................................................................................................6, 8

11 U.S.C. § 546(g) ...........................................................................................................................6

11 U.S.C. § 547 ................................................................................................................................9

11 U.S.C. § 548(a)(1)(A) ..............................................................................................................6, 9

11 U.S.C. § 548(a)(1)(B) ..................................................................................................................9

11 U.S.C. § 548(c) .....................................................................................................................6, 11

11 U.S.C. § 550 ................................................................................................................................9

11 U.S.C. § 550(a) .........................................................................................................................11

11 U.S.C. § 550(a)(2) .....................................................................................................................11

11 U.S.C. § 550(b) ...........................................................................................................6, 11, 12

11 U.S.C. § 550(b)(1) .....................................................................................................................11

15 U.S.C. §§ 78aaa *et seq.* ...............................................................................................................1

28 U.S.C. § 157 ................................................................................................................................6

## Rules

Fed. R. Bankr. P. 7015 ................................................................................................1, 9

Fed. R. Civ. P. 12(b)(6) ...................................................................................................12

Fed. R. Civ. P. 15 .......................................................................................................1, 12

Fed. R. Civ. P. 15(a)(2) ...............................................................................................1, 9

## Other Authorities

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1484 (3d ed.) .........................................39

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) .........................................39

Irving H. Picard, as Trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("*BLMIS*") and the Chapter 7 estate of Bernard L. Madoff ("*Madoff*"), under the Securities Investor Protection Act ("*SIPA*"), 15 U.S.C. §§ 78aaa *et seq.*, respectfully submits this Memorandum of Law in Support of the Trustee's Motion for Leave to File Second Amended Complaint under Rule 15 of the Federal Rules of Civil Procedure and Rule 7015 of the Federal Rules of Bankruptcy Procedure (the "*Motion to Amend*").  With this motion, the Trustee submits a proposed second amended complaint (the "*PSAC*") against ABN AMRO Bank (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions (Ireland) Ltd.) (n/k/a ABN AMRO Retained Custodial Services (Ireland) Limited) ("*Fortis Fund Bank*") and ABN AMRO Custodial Services (Ireland) Ltd. (f/k/a Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.) ("*Fortis Fund Services*," and together with Fortis Fund Bank, the "*Defendants*").  The PSAC seeks to recover subsequent transfers Defendants received from funds run by Tremont Partners, Inc. ("*Tremont*"), including BLMIS feeder funds ("*Feeder Funds*"), that invested all or substantially all their assets with BLMIS's investment advisory business ("*IA Business*").

## PRELIMINARY STATEMENT

As the Court is aware, years after the Trustee filed his complaints commencing these actions, the District Court rendered decisions that substantially altered the Trustee's pleading burdens and the standards governing the "good faith" defense.  Given the intervening change in law governing his claims, the Trustee respectfully submits that "justice so requires" granting him leave to replead his complaints under Federal Rule of Civil Procedure 15(a)(2), made applicable to these adversary proceedings by Federal Rule of Bankruptcy Procedure 7015, to meet these new pleading burdens and standards set forth by the District Court.

Granting leave to amend will not be futile because the PSAC provides additional non-conclusory factual allegations confirming that the Defendants were willfully blind to the high probability of fraud at BLMIS.  The PSAC alleges that Defendants were part of a global financial institution with employees, entities and business groups who worked together as one unified entity ("*Fortis*") to provide services to clients worldwide including among other things, financing, hedge fund services and investment management services.  The PSAC alleges that, for at least ten years before Defendants ever entered into the transactions at issue here, Fortis profited from BLMIS-related transactions in two different ways:  (i) Fortis' Funds Services unit provided services to numerous BLMIS Feeder Funds, including serving as administrator to Harley International (Cayman) Ltd. ("*Harley*"); and (ii) Fortis' investment management arm, Fortis Multi-Management, selected Madoff to manage tens of millions of dollars of Fortis customers' investments through Tremont's feeder funds.

Having engaged in these BLMIS-related transactions for years, Fortis was better positioned than most investors to gather information about Madoff's purported investment strategy, trading and custody operations.  Since 2003, Fortis employees internally acknowledged the high probability of fraud at BLMIS, in particular, that Madoff might not be engaging in the trades he claimed and/or may have misappropriated customer's assets.  On multiple occasions Fortis employees across various entities communicated to senior management and top credit and compliance committees that they were "concerned," "extremely uncomfortable" and "nervous" about BLMIS, and that they could not obtain information that would independently verify Madoff's trades or custody of customers' assets.  Several employees openly expressed concerns about Fortis' own exposure and potential liability for any fraud Madoff might be committing.

Fortis never could confirm what it internally dubbed the fundamental "Madoff issue" –
that Madoff might not be engaging in the trades he reported or holding the assets he purported to
hold.  In response to Fortis' inquiries seeking concrete information that would enable it to verify
even one aspect of BLMIS's trading or custody operations, the answers Madoff and his
employees gave were evasive, uninformative, and most notably, contained not a single shred of
provable detail that would allow Fortis to verify Madoff's trades and custody of customer assets.
Fortis Multi-Management likewise had the same experience when it attempted to glean basic
information about BLMIS's operations from Tremont.  Fortis Multi-Management came to learn
that Tremont – which marketed its due diligence experience and capabilities to investors – did
not have a full due diligence questionnaire completed on BLMIS.  In fact, Tremont personnel
appeared to lack minimal information about Madoff's trading and custody operations, unsure of
material terms of options trades to which Tremont had supposedly been a party for years.

Fortis did not respond to employees' concerns and suspicions either by seeking to
confirm them or by permanently terminating all transactions with BLMIS.  Instead, for each
Madoff-related transaction, Fortis weighed its own potential exposure to the risk of fraud against
the immediate profit and benefit to Fortis of continuing that transaction.  Where Fortis perceived
it could minimize or shift the risk of loss away from Fortis, it turned a blind eye to the potential
for fraud to continue profiting from Madoff-related transactions.  But where a particular
transaction could expose Fortis to liability to others for the potential fraud, Fortis heeded the
warnings of employees and business partners, and in one case, terminated a BLMIS-related
transaction that had been going on for years.  Fortis' actions in doing so confirmed its awareness
of the high degree of probability of fraud at BLMIS.

When it came to the administrator services Fortis was providing to Harley, employees understood Fortis Fund Bahamas had a duty under Bahamian law to independently verify Madoff's trades and custody of Harley's assets or else face legal responsibility for any fraud by BLMIS.  But Fortis did not in fact take further steps to seek that verification; instead, Fortis sought to *eliminate* that duty altogether in 2003 by taking the unusual step of moving the legal jurisdiction of both Fortis Fund Bahamas and Harley itself out of the Bahamas to the Cayman Islands, where the laws did not impose legal responsibility on Fortis for Madoff's acts as custodian.

In the case of Fortis Multi-Management's investment with Tremont's Feeder Funds, Fortis could not avoid its responsibility to investors for selecting Madoff to manage their investments.  Faced with its own awareness of the high degree of probability of fraud at BLMIS, the warnings of its new business partner, and no ability to shift or minimize its own exposure, in 2007, Fortis Multi-Management terminated its investment with the Tremont's Feeder Funds.

Thus, already having acquired knowledge of facts suggesting the high probability of fraud at BLMIS from its long course of prior dealings with BLMIS, Fortis nevertheless decided in 2007 to enter into a swap transaction with Tremont's Rye Select Broad Market XL Fund ("*Rye XL Fund*") and to hedge its obligations thereunder by investing in Rye Select Broad Market Fund ("*Broad Market Fund*").  But once again, Fortis entered into these transactions – pursuant to which it received the subsequent transfers at issue – only after mitigating its own potential exposure to the fraud risk through special rights and other built-in protections in its agreements with the Tremont funds.

The protections Fortis obtained for itself in the Swap Transaction and related agreements with Tremont's funds included:  (i) cash collateral rights that ensured that one-third of any cash

investment Fortis Fund Bank exposed to Madoff through Tremont's Feeder Funds would be

Tremont's cash collateral; (ii) a broad indemnification provision requiring Tremont's funds to

hold Fortis, its affiliates and employees harmless for liability and attorneys' fees they might

incur in connection with any investigation or lawsuit, which would include an investigation or

lawsuit involving BLMIS; (iii) a prescient "Claw-back Obligation" requiring Tremont's funds to

reimburse Fortis for any liability it may incur as a result of an action brought under insolvency

laws to recover funds Defendants received in connection with Fortis Fund Bank's investment in

Broad Market Fund; and (iv) the special right to early redemption of Fortis' investments in

Tremont's Feeder Funds in the very specific event that BLMIS should come under investigation

for breach of securities laws or regulations.  Notably, these special protections Defendants

obtained were not enjoyed by most individual Tremont investors, and based on public filings,

appear to have permitted Defendants to recover more than half of its claimed "losses" relating to

BLMIS's fraud thus far.

Finally, the Motion to Amend should be granted as there is no undue delay, bad faith, or

undue prejudice because Defendants willingly consented to postponing the Trustee's motion

until after the District Court had resolved the relevant legal standards, and this Court had

resolved the issues concerning extraterritoriality and the Trustee's omnibus motion for limited

discovery.

## **BACKGROUND**

A.   **Procedural Background**

1.   *Initial Proceedings in the Bankruptcy Court*

The Trustee filed a complaint on December 8, 2010 seeking to recover approximately

$267 million of subsequent transfers received by Defendants, and other then-defendants Rye XL

Fund and Rye Select Broad Market XL Portfolio Limited.[1]

2.    *Proceedings in the District Court*

In late 2011, similar to hundreds of other defendants in the Trustee's adversary

proceedings, Fortis moved to withdraw the reference under 28 U.S.C. § 157.[2]  As relevant here,

issues withdrawn by the District Court included whether the Trustee had the burden of pleading

lack of "good faith" under sections 548(c) and 550(b) (the "*Good Faith Issue*") and whether the

Trustee's claims to recover subsequent transfers were barred by the presumption against

extraterritoriality (the "*Extraterritoriality Issue*").[3]

In April 2014, the District Court ruled that the Trustee has the burden of pleading that

transferees willfully blinded themselves to circumstances suggesting fraud.  *SIPC v. BLMIS (In*

*re Madoff)*, 516 B.R. 18, 22-24 (S.D.N.Y. 2014) (the "*Good Faith Decision*").

Three months later, the District Court concluded that because section 550(b) of the

Bankruptcy Code does not apply extraterritorially, the Trustee must plead certain facts to

establish that the subsequent transfers he seeks to recover are "domestic" transfers.  *SIPC v.*

*BLMIS (In re Madoff)*, 513 B.R. 222, 232 n.4 (S.D.N.Y. 2014) (the "*District Court ET*

---

[1] Compl., *Picard v. ABN AMRO Bank (Ireland) Ltd. (In re Madoff)*, Adv. Pro. No. 10-05355 (SMB) (Bankr. S.D.N.Y. Dec. 8, 2010), ECF No. 1 (filed under seal).  Future references to docket entries of *Picard v. ABN AMRO Bank (Ireland) Ltd. (In re Madoff)*, Adv. Pro. No. 10-05355 (SMB) (Bankr. S.D.N.Y.) shall be identified as "Fortis Docket." The Trustee subsequently filed an amended complaint and a notice of voluntary dismissal dismissing Fortis' co-defendants, including Rye XL Fund and Rye Select Broad Market XL Portfolio Limited.  Fortis Docket, ECF Nos. 42, 50.

[2] *See* Mem. of Law on Mot. To Withdraw the Reference, Fortis Docket, ECF No. 19.

[3] Motions to withdraw the reference were also filed, and the District Court ultimately entered consolidated decisions concerning the application of Bankruptcy Code sections 546(e) and 546(g) to BLMIS transfers.  In July 2012, the Trustee filed his amended complaint addressing issues related to, *inter alia*, Section 546(g) of the Bankruptcy Code. *See* Am. Compl., Fortis Docket, ECF No. 42.  Defendants moved to dismiss the amended complaint based on section 546(g).  The District Court held that the safe harbor of Section 546(g) applied only to initial transfers of redemption payments, and limited the Trustee's ability to pursue the avoidability of those transfers to claims brought pursuant to 11 U.S.C. § 548(a)(1)(A).  The District Court also held that the safe harbor does not apply to initial transfers for funding collateral payments, and otherwise denied the motion to dismiss.  *See* Order, No. 12 MC 115 (JSR), ECF No. 451 (S.D.N.Y. Mar. 14, 2013).

*Decision*").  Alternatively, the District Court held that recovery of subsequent transfers received

from an entity in foreign liquidation proceedings would violate principles of international

comity. *Id.* at 231-32.  Following these decisions, the District Court returned the cases to this

Court.[4]

### 3.    Subsequent Proceedings in the Bankruptcy Court

In view of the altered pleading standards for a subsequent transfer recovery claim

articulated in the *Good Faith Decision* and *District Court ET Decision*, the Trustee filed the

Omnibus Motion for Leave to Replead Pursuant to Federal Rule of Civil Procedure 15(a) and

Court Order Authorizing Limited Discovery Pursuant to Federal Rule of Civil Procedure

26(d)(1) (the "*Omnibus Motion*")[5] in August 2014.

In September 2014, at a status conference on the Omnibus Motion, defense counsel

argued that pending motions to dismiss based on extraterritoriality should be addressed prior to

the Trustee's request for discovery.[6]  The Court agreed, and stayed proceedings on the Omnibus

Motion until after the extraterritoriality proceedings concluded.[7]

---

[4] *See* Order Entered July 10, 2014, *In re Madoff Sec.*, No. 12-mc-115 (JSR) (S.D.N.Y.), ECF No. 552.

[5] Mem. of Law on Omnibus Mot., *SIPC v. BLMIS.  (In re Madoff)*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. Aug. 28, 2014), ECF No. 7827 (defined above, "*Omnibus Motion*").  Future references to the docket of Adv. Pro. No. 08-01789 (SMB) shall be identified as "*Main Docket*".  *See also* Decl. of Regina Griffin, Main Docket, ECF No. 7828.

[6] Hr'g Tr. of Sept. 17, 2014 at 16:14–17, Main Docket, ECF No. 8636 ("it is not fair to the vast majority of the defendants who have prima facie good motions to dismiss on extraterritoriality, to subject them to [discovery]").

[7] *See* Order at ¶ 14, Main Docket, ECF No. 8800 ("December 10 Scheduling Order") (staying proceedings on the Trustee's request for discovery and to replead based on good faith until after the Court ruled on the Defendants' motion to dismiss based on extraterritoriality).  The December 10 Scheduling Order was subsequently modified three times. *See* Main Docket, ECF Nos. 8990, 9350, 9720.  None of the subsequent orders modified the original paragraph 14 of the December 10 Order concerning discovery and repleading as to good faith.  *See also* Hr'g Tr. of Sept. 17, 2014 at 27:17–25, Main Docket, ECF No. 8636.

In December 2014, Fortis and other participating defendants renewed their motion to dismiss, seeking dismissal on extraterritoriality and comity grounds.[8]  The Trustee opposed those motions and submitted proffered allegations with specific facts suggesting a domestic transfer in support of his opposition.[9]  Thereafter, defendants filed their omnibus reply brief, and many, including Fortis, filed case-specific supplemental reply briefs.[10]

In November 2016, this Court issued its ruling on extraterritoriality (the "*Bankruptcy Court ET Decision*").[11]  In July 2017, this Court ordered proceedings "solely on the Good Faith Limited Discovery Issue" of the Omnibus Motion.[12]  In June 2018, the Court denied the Trustee's request for limited discovery concerning good faith.[13]  Thus, the Trustee now moves for leave to amend his complaint to comport with the new standard articulated in the *Good Faith Decision* without any additional discovery on that issue.

### B.    <u>The Proposed Amended Complaint</u>

As required by the *Good Faith Decision* and subsequently applied by this Court in other cases,[14] for the Trustee to avoid Bankruptcy Code section 546(e)'s safe harbor, and thus state a

---

[8] *See* Main Docket, ECF No. 8903; Fortis Docket, ECF No. 86.

[9] Fortis Docket, ECF No. 97.  The Trustee also filed proffered amended complaints or proffered allegations in each adversary proceeding that was included in the omnibus extraterritoriality briefing before the Bankruptcy Court.

[10] Main Docket, ECF No. 11542; Fortis Docket, ECF Nos. 101, 102.

[11] *See SIPC v. BLMIS (In re Madoff)*, 2016 WL 6900689, at *15–16, *36–37 (Bankr. S.D.N.Y. Nov. 22, 2016).  Should the Second Circuit reverse this decision, the Trustee reserves his rights to amend as to any affected claims or transfers. The Trustee also reserves all rights to appeal the *Good Faith Decision* and the District Court's decision regarding the pleading burden and standard.

[12] Order at ¶¶ 1, 4, Main Docket, ECF No. 16428.  That order deferred proceedings on the issue of leave to replead concerning the Good Faith Issue in the Omnibus Motion until after the Court's disposition on the Trustee's request for limited discovery.

[13] *SIPC v. BLMIS (In re Madoff)*, 2018 WL 2734825 (Bankr. S.D.N.Y. June 5, 2018); Order Denying the Trustee's Mot. for Disc., Main Docket (June 19, 2018), ECF No. 17696.

[14] *See, e.g., Picard v. BNP Paribas S.A. (In re BLMIS)*, Adv. Pro. No. 12-1576 (SMB), 2018 WL 4833984 (Bankr. S.D.N.Y. Oct. 3, 2018) ("*BNP*"); *Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13 (Bankr. S.D.N.Y. 2016) ("*Legacy*"); *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*"); *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ("*Merkin II*").

claim under sections 544, 547, or 548(a)(1)(B), the Trustee now must plead particularized

allegations that initial transferees had actual knowledge of Madoff's fraud.  To state a claim

under sections 548(a)(1)(A) or 550, the Trustee must plead that initial and subsequent transferees

were both willfully blind to circumstances indicating a high probability of fraud at BLMIS.

 Pursuant to the Court's June 5, 2018 Decision and the June 19, 2018 Order, the Trustee

seeks leave to file an amended complaint in this matter to set forth additional relevant facts

sufficient to meet the Trustee's pleading burden.[15]

 For the reasons set forth below, the Trustee should be permitted to file the PSAC.

## ARGUMENT

## LEGAL STANDARD GOVERNING MOTIONS TO AMEND A PLEADING

 Federal Rule of Civil Procedure 15(a)(2), made applicable here by Federal Rule of

Bankruptcy Procedure 7015, provides that when a party requires leave of court to amend its

pleading: "[t]he court should freely give leave when justice so requires."  It is well settled in the

Second Circuit that Federal Rule of Civil Procedure 15(a)(2) is a "generally lenient" standard

that favors adjudication on the merits.  *Fjord v. AMR Corp.  (In re AMR Corp.)*, 506 B.R. 368,

382 (Bankr. S.D.N.Y. 2014).  Accordingly, leave to amend "should not be denied unless there is

evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility."  *Milanese v.

Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182

(1962)).  And while the Second Circuit has repeatedly noted that the trial court has "broad"

discretion in ruling on a motion to amend, *Local 802, Associated Musicians of Greater NY v.

Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998), a motion to amend must be granted

---

[15] The Trustee's PSAC also removes the claims dismissed by the *Bankruptcy Court ET Decision* and makes conforming changes to background allegations.

where "the plaintiff has at least colorable grounds for relief." *Soley v. Wasserman*, No. 08 Civ. 9262 (KMW) (FM), 2013 WL 6244146, at *1 (S.D.N.Y. Dec. 3, 2013) (quoting *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block-Bldg. 1 House Dev. Fund. Co., Inc.*, 608 F.2d 28, 42 (2d Cir. 1979)).

"An intervening change in pleading standards may justify leave to amend." *Picard v. Mendelow (In re BLMIS)*, 560 B.R. 208, 221 (Bankr. S.D.N.Y. 2016) (citing *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 71 (2d Cir. 2012)). The burden is on the party opposing leave to amend to demonstrate that there is evidence of either bad faith, undue prejudice, or futility.[16]

## I

## THE TRUSTEE'S MOTION TO AMEND
## SHOULD BE GRANTED IN LIGHT OF THE INTERVENING CHANGE
## IN LAW AND THE ADDITIONAL FACTS ALLEGED

The Trustee seeks leave to amend his complaint on the well-accepted ground of an intervening change in pleading standards. At the time the initial complaint was filed, the burden of asserting and proving the affirmative defense of good faith, as to both initial and subsequent transferees, was on the defendant, and an objective reasonable investor standard applied. *See Merkin II*, 515 B.R. at 138.

In 2014, almost four years after the filing of the complaint, the District Court held that the Trustee must plead that the initial transferee knew of or "turned a blind eye to facts that suggest a high probability of fraud." *Picard v. Magnify (In re BLMIS)*, 583 B.R. 829, 841 (Bankr. S.D.N.Y. 2018) (collecting cases); *Picard v. Katz*, 462 B.R. 447, 455 (S.D.N.Y. 2011) (finding

---

[16] *See, e.g. Blagman v. Apple, Inc.*, No. 12 Civ. 5453 (ALC) (JCF), 2014 WL 2106489, at *3 (S.D.N.Y. May 19, 2014) (bad faith); *Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12 Civ. 6608, 2014 WL 113728, at *4 (S.D.N.Y. Jan. 13, 2014) (futility); *Margel v. E.G.L. Gem Lab Ltd.*, No. 04 Civ. 1514 (SAC) (HBP), 2010 WL445192, at *3 (S.D.N.Y. Feb. 8, 2010) (undue prejudice).

lack of good faith requires showing defendants either "intentionally [chose] to blind [themselves] to the 'red flags' that suggest a high probability of fraud," or acted with "'willful blindness' to the truth").[17]  The District Court further held that the same willful blindness legal standard and same pleading burden applies to recovery of subsequent transfers under section 550(a)(2).  *Good Faith Decision*, 516 B.R. at 22-23. Section 550(a) provides that the Trustee may recover subsequent transfers, subject to the defense that the transfers were received "in good faith," "for value," and without knowledge of the avoidability of the transfer avoided.  11 U.S.C. § 550(b)(1).[18]

This Court has recognized that there was good cause in granting motions brought on similar grounds to the instant motion. *See, e.g., Mendelow*, 560 B.R. at 223.[19]  Where, as here, the original complaint has grown "stale due to the unusually drawn out procedural history" of a case, a trustee should be permitted to add new facts and allegations.  *See Grand River Enters. Six Nations, Ltd. v. Pryor*, No. 02 Civ. 5068 (JFK), 2008 WL 9359652, at *3 (S.D.N.Y. Mar. 17, 2008) (granting motion for leave to amend where rulings and subsequent decisions on appeal delayed proceedings for several years).

For the reasons set forth below, the Trustee respectfully submits that the additional facts alleged in his proposed second amended complaint meets the new willful blindness pleading standards.

---

[17] In a separate decision, the District Court held that the Trustee need not obtain a fully litigated judgment of avoidance before pursuing a subsequent transfer claim.  *SIPC v. BLMIS (In re Madoff)*, 501 B.R. 26, 33-34 (S.D.N.Y. 2013).

[18] To meet this requirement, the Trustee must similarly allege that the subsequent transferees willfully blinded themselves to a high probability of fraud at BLMIS.  *See Legacy*, 548 B.R. at 38 ("The District Court equated a lack of good faith under Bankruptcy Code § 548(c) with willful blindness and stated that the same standard applies to non-investors as well as investors under sections 548(c) and 550(b)").

[19] *See also* Order Granting Mot. For Leave to File A Fourth Amended Compl. *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB) (Bankr. S.D.N.Y. Mar. 17, 2014), ECF No. 99.

**II**

**NO FUTILITY, UNDUE DELAY, BAD FAITH,**
**OR UNDUE PREJUDICE EXISTS**

A.    **Amendment Is Not Futile**

Leave to amend should be granted here because the proposed second amended complaint

sets forth facts that permit this Court to reasonably infer that Defendants are liable for the

misconduct alleged.  Granting leave to amend is only futile when a "plaintiff cannot address the

deficiencies identified by the court and allege facts sufficient to support the claim." *Panther*

*Partners, Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009).

In order to demonstrate that amendment is not futile under Federal Rule of Civil

Procedure 15, and thus that the Trustee states a plausible claim under Federal Rule of Civil

Procedure 12(b)(6) to recover subsequent transfers in this case, the Trustee must plausibly allege

that the subsequent transferee either (1) "lacked good faith;" or (2) "received the subsequent

transfer with knowledge that the initial transfer was avoidable" and that (3) "the initial transfer is

avoidable." *BNP*, 2018 WL 4833984, at *18.  Leave to amend should be granted here because

the PSAC sets forth facts that would permit this Court to reasonably infer that Defendants

received subsequent transfers, which were comprised of avoidable initial transfers, with the

requisite lack of good faith and knowledge.

> 1.    *The PSAC Alleges Defendants Subjectively Believed there was a High*
> *Probability of Fraud at BLMIS, and Deliberately Avoided Confirming Its*
> *Suspicions*

The Trustee must plead either that:  "the subsequent transferee lacked good faith or []

received the subsequent transfer with knowledge that the initial transfer was avoidable." *BNP*

2018 WL 4833984, at *19.  According to this Court, knowledge and good faith are two distinct,

but overlapping, elements under section 550(b). *Id*. To plead knowledge, the Trustee must allege

12

that Defendants "possessed knowledge of facts that suggest a transfer may be fraudulent." *Id*.[20]

Willful blindness requires the Trustee to plead that: (1) the defendants subjectively believed

there was a high probability that a fact existed and (2) the defendants took deliberate actions to

avoid learning of that fact. *Id*.

Willful blindness, also known as deliberate ignorance or conscious avoidance, is a well-

established and commonly-utilized doctrine in criminal law. *United States v. Reyes*, 302 F.3d

48, 54 (2d Cir. 2002). *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 684 (7th Cir. 2014) ("[W]illful

blindness is a concept taken from criminal law and the often-given 'ostrich' instruction."). The

ostrich instruction "is designed for cases in which there is evidence that the defendant, knowing

or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does

not acquire full or exact knowledge of the nature and extent of those dealings." *United States v.

Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990).[21] Willful blindness "connotes a strong

suspicion but some level of doubt or uncertainty of the existence of a fact and the deliberate

failure to acquire knowledge of its existence." *Merkin II*, 515 B.R. at 140.

As an initial matter, it is important to note that willful blindness can rarely be determined

as a matter of law.[22] Thus, here the Court should not prematurely determine whether Defendants

were in fact willfully blind and should grant leave to amend because the proposed amended

complaint sufficiently alleges that Defendants received subsequent transfers from BLMIS while

willfully blinding themselves to the fraud.

---

[20] Alternatively, to plead a lack of good faith, the Trustee must "allege that each Defendant willfully blinded itself to facts suggesting a high probability of fraud at BLMIS." *BNP*, 2018 WL 4833984, at *19.

[21] *See also United States v. Kozeny*, 664 F. Supp. 2d 369, 388 (S.D.N.Y. 2009), *aff'd*, 667 F.3d 122 (2d Cir. 2011); *In re Dreier LLP*, 452 B.R. 391, 450 (Bankr. S.D.N.Y. 2011).

[22] *See Fish*, 749 F.3d at 685. ("Consistent with these observations, we have said that finding the line between "willful blindness" and "reason to know" may be like finding the horizon over Lake Michigan in a snowstorm….In other words, only rarely could that line be drawn as a matter of law.") (citations omitted).

(a)    *The PSAC Adequately Pleads Facts Demonstrating Fortis' Willful Blindness to the High Probability of the Risk of Fraud at BLMIS*

The Trustee sufficiently alleges that Defendants received the Subsequent Transfers at a time they believed there was a high probability of fraud at BLMIS.

Before Defendants ever entered into the transactions at issue in 2007 pursuant to which it received the Subsequent Transfers, Fortis the global financial institution profited and gained knowledge for more than ten years from two different types of Madoff-related transactions. First, Fortis's hedge fund services unit, including Defendants, provided services to numerous Madoff Feeder Funds over several years. These services included serving as administrator to Harley, while BLMIS served as the fund's investment adviser, broker dealer and custodian. Additionally, Fortis' investment management arm, later known as Fortis Multi-Management, selected BLMIS to manage tens of millions of dollars of Fortis customers' investments through the Tremont Feeder Funds.

Through these BLMIS-related transactions, Fortis employees were well positioned to glean information about Madoff and his operations. Since at least 2003, Fortis employees were well aware of facts suggesting the high probability that Madoff could be engaging in fraud – in particular, that Madoff might not be engaging in the trades he claimed and/or may have misappropriated customers' assets.

(i)    By 2003, Fortis Employees Identified the Risk of Fraud at BLMIS But Continued to Profit from BLMIS While Eliminating Its Legal Obligation to Confirm Its Suspicions

Since the late 1990s, Fortis had been providing administrator services and financing to Harley, a BLMIS Feeder Fund that Madoff served in the triple capacities of investment adviser, broker-dealer and custodian. (PSAC. at ¶¶ 91-93). Through this relationship, Fortis employees became aware of facts that led them to believe there was a high probability that Madoff might

14

not be trading and/or have custody of Harley's assets – in other words, that BLMIS might be engaging in fraud.

In carrying out their duties, Fortis employees regularly communicated directly with Madoff and his employees at BLMIS's IA Business.  (*Id.* at ¶¶ 94-95).  Fortis became aware that BLMIS's operations were set up in a highly unique way without a single independent party involved in the handling of customers' securities trades or assets.  (*Id.* at ¶ 96).  Fortis' employees, sophisticated and experienced financial professionals who provided an array of services to the growing industry of hedge funds, were aware that this arrangement was anomalous and created the opportunity for fraud.  (*Id.* at ¶¶ 97, 103, 110, 112-17).

> (1)    Fortis Employees' Own Words and Actions Demonstrate
> Their Subjective Belief of a High Probability of Fraud at BLMIS

By 2003, Fortis employees became increasingly concerned about their inability to obtain any tangible information about BLMIS's operations that would enable Fortis to independently verify that BLMIS in fact had custody of Harley's assets and was engaging in the trades that appeared on Harley's customer statements.  (PSAC ¶ 97).  These concerns about Madoff were at the fore of Fortis' employees' minds in 2003, due to a change in Bahamian law that made Fortis, as Harley's administrator, legally responsible for the acts of Harley's custodian, BLMIS.  These new Bahamian laws imposed on administrators the obligation to verify that all of a fund's service providers – including in this case, Madoff – are "fit and proper" (*Id.* at ¶¶ 98-99), and also imposed on Fortis Fund Bahamas an ongoing obligation to report to the Bahamas Securities Commission if it "knows or has reason to believe" that an investment fund "is carrying on business in a manner that is or is likely to be prejudicial to investors or creditors of the investment fund."  (*Id.* at ¶ 100).

In July 2003, a key Fortis executive, Sue Novo (COO of Fortis Fund Solutions, Managing Director of Fortis Fund Isle of Man), wrote an email to Brenda Buckley (the Global Head of Financing and Risk at Fortis Funds worldwide and Managing Director of Defendant Fortis Fund Bank), to address concerns that Buckley had apparently raised previously about Madoff, and in particular what steps Fortis should take as Harley's administrator given that BLMIS's unique setup created the capacity for fraud.  (*Id.* at ¶ 103).

Novo informed Buckley that she was "quite right" to raise her concerns about BLMIS, and to question how Fortis could proceed to continue to work with BLMIS "within our principles."  (*Id.* at ¶ 103).  Novo informed Buckley that she believed Fortis could continue to provide administrator services to Harley, but would need greater visibility into BLMIS's trading and custody operations to confirm they were in fact taking place.  Novo wrote "we probably should be trade blotter matching and also we need to consider the 'control' of the assets with regard to segregation versus pooled accounts, restrictions on money movements/transfers, Insurance cover for the assets should the broker go bust, in particular if we have a lien/charge over them."  (*Id.* at ¶ 103).  A follow up email sent that same day reveals that in addition to Fortis seeking to confirm Madoff's trades, Novo wanted verifiable information to confirm Madoff's custody of customer assets, and that BLMIS was in fact segregating those assets in the manner he purportedly claimed, due to concerns about the consequences to Harley's investments in the event of a BLMIS bankruptcy.  (*Id.* at ¶¶ 104, 106-07).

Notably, Novo's email to Buckley contained a warning that Fortis, as Harley's administrator, needed "to be very careful" in seeking verification of BLMIS's trades and custody of customer assets, because Harley was still under Bahamian jurisdiction and legally responsible for any misconduct by the Fund's custodian, Madoff.  (*Id.* at ¶ 105).  Novo's email exchange

16

with Buckley was circulated to numerous other Fortis employees, including Rhonda Eldridge

(Managing Director of Fortis Funds Group; Director of Fortis Funds Bahamas and Fortis USA;

member of Fortis internal credit committees) in New York.

One day later, Eldridge sent a letter directly to BLMIS asking for confirmation that

Harley's funds were segregated, and also requesting BLMIS supply Fortis with a standard

industry report prepared by service providers to describe what controls BLMIS had in place to

protect its customers' securities from fraud.  (*Id.* at ¶ 108).  In response, a BLMIS employee sent

a brief letter containing a bare recital repeating that "all security positions held are segregated for

the exclusive benefit of Harley International Limited."  (*Id.* at ¶ 109).  BLMIS's response

contained no details about BLMIS's trading or custody operations that would enable Fortis to

independently verify that Harley's assets were in fact in BLMIS's possession or that they were

segregated from other customers' assets and BLMIS's own funds.  *Id.*

> (2)    In 2003, Fortis Took Affirmative Actions to Avoid Having
> to Confirm Its Suspicions and Limit Its Potential Exposure If
> BLMIS Was Engaging in Fraud

In e-mails dated between August 29 and September 1, 2003, Fortis employees confirmed

that BLMIS's response to their requests had not provided the assurances and information Fortis

employees required to independently verify BLMIS's trades and custody of Harley's assets.  (*Id.*

at ¶ 110).  Fortis employees escalated their concerns about BLMIS to senior management and

committees, urging substantial affirmative actions be taken to limit or reduce potential liability to

Fortis Fund Bahamas in the event BLMIS was engaging in fraud.  (*Id.* at ¶¶ 111-15).

Buckley wrote to Roger Hanson and several other Fortis employees on September 1,

2003 that she was "still extremely uncomfortable" providing financing to any party investing in

BLMIS through Harley without a separate, independent stream of trade information to allow

reconciliation of trades in Harley.  (*Id.* at ¶ 114).  Buckley also advocated that there should be

"pressure on Madoff to give the assurances we need" or else Fortis should insist that another custodian for Harley be appointed to replace BLMIS. In her email, Buckley noted that she had reported her concerns to senior management personnel and other members of Fortis' Investment Bank Credit Committee. (*Id.* at ¶ 115).

Buckley was responding to the email of Roger Hanson, who had earlier written that Fortis' "Head Office" itself would have to confirm if Fortis could lend money to be invested in Harley "which is managed by a broker dealer [BLMIS] with no independent custodian." (*Id.* at ¶ 112). That Hanson believed top Fortis management itself would need to sign off on such a transaction demonstrates the high degree of fraud risk he perceived existed at BLMIS. *See Merkin II*, 515 B.R. at 141 (finding willful blindness where defendant "saw and appreciated" disquieting facts including Madoff's self-clearing and self-custody).

Both Buckley and Hanson urged that, at a minimum, Fortis had to change the legal jurisdiction of the Fortis entity providing administrator services to Harley to mitigate Fortis' exposure under Bahamian law for any malfeasance by Madoff. (PSAC ¶¶ 111-13, 115). Hanson went so far as to state that if Fortis could not transfer Harley out of Bahamian jurisdiction, Fortis "will have no alternative than to resign from the [administrator] engagement." (*Id.* at ¶ 112).

By September 2003, Fortis was aware of the high probability of fraud at BLMIS, and that it could not fulfill its duty under Bahamian Law to verify Madoff's trades and custody of customer assets. Fortis was therefore faced with a choice at this time: (i) should Fortis continue its profitable BLMIS-related transactions, and face potential liability under Bahamian law if their suspicions about Madoff were confirmed; (ii) or should Fortis discontinue altogether providing services to Madoff Feeder Funds because it was unable to fulfill its duty to verify Madoff's trades and custody of assets and, as required by Bahamian law. (*Id.* at ¶¶ 99-100).

Fortis chose neither of these options.  Instead, Fortis chose a third option, permitting Fortis to continue to provide administrator services to Harley, while at the same time minimizing Fortis' exposure to the potential risk of fraud at BLMIS.  (*Id.* at ¶ 118).  Rather than fulfill its duty under Bahamian law to verify Madoff's trades and custody, Fortis sought to eliminate that duty altogether by undertaking the unusual step of moving the legal jurisdiction of the administrator as well as Harley itself out of the Bahamas to the Cayman Islands – where the laws did not impose legal responsibility on Fortis for Madoff's acts as custodian.  (*Id.* at ¶ 122).

But eliminating potential liability to Fortis required more than simply moving the Fortis entity providing the administration services out of the Bahamas.  (*Id.* at ¶ 119).  To circumvent the Bahamian law that made Fortis liable for Madoff's actions as Harley's custodian, Harley itself had to change jurisdictions.  To facilitate the transition, Fortis even covered Harley's expenses and (that of one investor's lender).  (*Id.* at ¶¶ 119-20).

Thus, as early as 2003, the Trustee alleges Fortis "saw and appreciated" facts indicating "some probability" of a "fraudulent operation" at BLMIS.  *Merkin* II, 515 at 141.  And although Fortis "raised internally all of the critical questions about the risk" that Madoff might be engaging in fraud, it failed to further investigate those risks or terminate the connection with BLMIS, similar to the Defendants in *In re Optimal U.S. Litig.*, No. 10 CIV 4095 SAS, 2011 WL 4908745, at *7 (S.D.N.Y. Oct. 14, 2011).  As in *Optimal*, Fortis' own communications both internally and with BLMIS indicated their concerns that Madoff was not actually trading or might not have custody of customers' assets, and these concerns "went to the heart of Madoff's Ponzi scheme because they concerned the existence of the assets supposedly held by Madoff, Madoff's self-custody and Madoff's secrecy." *Id.*

19

Fortis never received any of the verifications its employees wanted to confirm that Madoff's trades were real, and customers' assets were properly custodied, and instead chose to turn a blind eye once it perceived its legal liability for the risk of fraud at BLMIS was obviated. In fact, in 2004, more than a year after Fortis changed the legal jurisdiction of Harley, many Fortis employees and internal committees continued to warn and recommend against continuing further Madoff related transactions because of the "Madoff issue." (PSAC ¶¶ 125-28).

> (ii)    By 2006 Fortis Multi-Management Reaffirmed the High Probability of Fraud at BLMIS and Redeemed Its Customers' Investment Where It Could Not Avoid Liability

In addition to Fortis' relationship with BLMIS through Harley, Fortis' investment management arm, later known as Fortis Multi-Management, had in 2001 selected BLMIS to manage tens of millions of dollars of Fortis customers' investments through Tremont's Feeder Funds. (PSAC ¶ 130). Through this investment relationship, Fortis Multi-Management learned of facts that suggested the high probability of fraud at BLMIS that were subsequently echoed by the warnings of its newly-acquired affiliate Cadogan. Accordingly, in 2007, Fortis Multi-Management chose to redeem its entire investment with the Tremont Feeder Funds. Unlike the earlier Harley predicament, it was not possible for Fortis to mitigate its own potential liability for the risk of fraud at BLMIS because it had selected Madoff to manage their investments.

> (1)    Fortis Multi-Management Recognized the High Probability of Fraud at BLMIS

Beginning in or around 2001, Fortis Multi-Management (then known as MeesPierson) selected Madoff, through Tremont's Feeder Funds, to manage tens of millions of Fortis customers' investments. *Id*. By 2006, when Fortis Multi-Management was formed by Fortis to assume MeesPierson and its investments, it had upwards of $70 million of Fortis investor assets under BLMIS's management. (*Id.* at ¶ 133).

In May 2006, Mark Geene[23] of Fortis Multi-Management informed Tremont that Fortis

had been internally discussing its investments with Madoff "at length," "especially the opaque

structure/process" surrounding BLMIS and wished to meet with both Tremont and BLMIS

personnel.  (*Id.* at ¶ 134).[24]   Geene requested that Tremont set up a meeting with Madoff to

obtain further information about BLMIS's strategy and operations.  (*Id.* at ¶ 134).  Tremont

employees had to inform Geene that they were unable to get Madoff to agree to a meeting with

Fortis Multi-Management, and would instead have to settle for a meeting with Tremont

executives where they could discuss outstanding questions.  (*Id.* at ¶ 135).

That meeting between Fortis Multi-Management and Tremont to discuss BLMIS did not

go well.  (*Id.* at ¶¶ 136, 142).  Prior to the meeting, Geene sent Tremont a number of questions

about Madoff's trading and custody operations.  (*Id.* at ¶¶ 137-38).  As recounted by a Tremont

executive, Tremont's discussion at the meeting left Geene "nervous" and Geene and his

colleagues had reported their "apprehensions" about Madoff back to the head of Fortis Multi-

Management.  (*Id.* at ¶ 142).  Tremont personnel stated after the meeting that they would have to

get Fortis Multi-Management "comfortable with Madoff" or risk losing Fortis Multi-

Management's $70 million investment – and more significantly the $1 million management fee

that Tremont derived annually from those investments.  *Id.*

---

[23] Geene was a securities investment manager with over a decade of experience analyzing investment strategies and trading large volumes of derivative securities for a pension fund. (PSAC ¶ 136).

[24] Fortis Multi-Management was aware that in May 2003, MeesPierson employees had identified red flags at BLMIS that they noted in an internal memorandum in a May 15, 2003 memorandum (the "*Mees Memo*"). (PSAC ¶ 132). Among other things, MeesPierson noted Madoff's secrecy and "zero transparency;" BLMIS's exceptionally stable returns; the fact that these returns were inconsistent with the split strike conversion strategy Madoff purported to execute; and, of course, the continuing fact that BLMIS's trades and assets could not be verified.  MeesPierson recognized that the concerns they identified went to the legality of Madoff's operations and whether BLMIS had been engaging in broker-dealer "wrongdoing."  Nonetheless, these exceptionally stable returns meant that Tremont remained profitable. *Id.*

Tremont was never able to get Fortis Multi-Management "comfortable" with Madoff.  In

fact, the more Geene questioned Tremont to obtain conclusive facts that would verify BLMIS's

trades and custody of customers' assets, the more it became clear that Tremont had excepted

BLMIS from its due diligence standards, and did not itself possess any meaningful information

to ensure that Madoff was not engaging in fraud.

a.    Fortis Multi-Management Learns in 2006 that Tremont
        Exempted BLMIS From Its Standard Due Diligence

Because Tremont had selected Madoff to manage its investors' assets, Tremont owed a

fiduciary duty of care and diligence to investors in making that selection.  (PSAC ¶ 131).  Fortis

Multi-Management was aware of that fact, as it owed the same duties of care in selecting

Tremont, and consequently Madoff, to manage its customers' investments.  *Id.*

Tremont touted its due diligence expertise in investigating the quality of an investor

manager's personnel, assessing key risk factors associated with the investment, and continuously

monitoring the investment and the managers.  (*Id.* at ¶¶ 292-93).  Indeed, Tremont sold that due

diligence expertise to Fortis Multi-Management under a separate contract, pursuant to which it

was obligated to provide diligence reports on managers Fortis Multi-Management identified.  (*Id.*

at ¶ 134).  It became apparent to Fortis Multi-Management that Tremont had not brought its due

diligence expertise to bear on BLMIS.

In July 2006, at Fortis Multi-Management's request, Tremont provided more than a

dozen due diligence reports related to different investment managers identified by Geene.  (*Id.* at

¶ 152).  But when Fortis Multi-Management requested a full due diligence report on BLMIS in

August 2006, Tremont employees acknowledged internally that "[w]e cannot do that for

Madoff."  (*Id.* at ¶ 153).  Tremont had to inform Fortis Multi-Management that it did not yet

have a full due diligence report on BLMIS – despite Tremont's obligation to Fortis Multi-

Management to prepare such reports, and despite the fact that Tremont already had more than $2 billion invested with Madoff. (*Id.* at ¶¶ 153-54).

It took until December 2006, more than four months after Geene's request, for Tremont to complete the due diligence report on BLMIS.[25]  Tremont's apparent exception of BLMIS from standard due diligence procedures was indicative that Tremont had not fulfilled its due diligence duties to its investors.  The implications of this were not lost on Fortis Multi-Management, which had requested the due diligence report on Madoff to fulfill of its own duties of diligence and care to its investors. (*Id.* at ¶ 154).

> b.  Fortis Multi-Management Learned That Tremont Did Not Possess Minimal Information About Madoff's Trades and Operations

Fortis Multi-Management soon learned why Tremont did not have a full due diligence report on BLMIS readily available in 2006 when it had them on dozens of other managers.  In response to Fortis Multi-Management's diligence questions seeking verifiable details that might confirm Madoff's trades and custody of customer assets, it became apparent that Tremont lacked information about even the most basic logistics of Madoff's operations. (PSAC ¶¶ 136-42).

One of the areas of questioning that Fortis Multi-Management targeted to verify BLMIS's activities concerned the options trades Madoff purportedly made to limit the losses on customers' equity trades. (*Id.* at ¶ 139).[26]  Fortis Multi-Management was aware from Tremont that Madoff acquired options for his customers through "over the counter" or "OTC"

---

[25] Even then, Tremont personnel had advised Fortis Multi-Management that the diligence report on BLMIS would not be as fulsome as other diligence reports Tremont had provided to Geene.  (PSAC ¶ 153).

[26] Having previously traded large volumes of options for a pension fund, Geene was experienced in the logistics necessary to acquire the volume of options needed to hedge the multi-billion dollar investments of Madoff's customers.  (PSAC at ¶¶ 136, 138).

transactions, rather than over an exchange.  (*Id.* at ¶ 175).[27]  In May through October 2006,

Geene posed a series of questions to Tremont to gain details about the OTC trades that could

confirm they were actually taking place – including identifying some of the basic material terms

of OTC options trades Madoff executed on behalf of Tremont.  (*Id.* at ¶¶ 138-41, 146).  Yet

Tremont, who had been a party to these OTC options trades for years, could not readily answer

Fortis Multi Management's questions about its own trades.  (*Id.* at ¶ 146).

For example, Tremont could not promptly answer Geene's questions as to whether

Madoff's OTC agreements had basic collateral provisions.[28]  Tremont reported that Geene

"apparently used to trade options for a pension account and believes Madoff's size is a concern –

he used Goldman going bankrupt in a 'what if' scenario.)"  (*Id.* at ¶ 138).  Geene knew that

trading at the volume Madoff reported exposed BLMIS's investors' assets to massive risk should

a major counterparty to the options go bankrupt and fail to perform its option obligations – like

Lehman Brothers did in 2008.  (*Id.* at ¶ 141).

In August 2006, Fortis Multi-Management continued to pursue details from Tremont

about Madoff's OTC transaction collateral provisions, asking Tremont: "with respect to

collateral [sic]:  how often exchanged (daily/weekly), how conservative are the haircuts, does

Madoff use minimum [thresholds] and why does Tremont not see the exchange of collateral

[*sic*]?" (*Id.* at ¶ 147).  As the account holder of the options in question, Tremont itself should

have been directly involved in exchanging cash collateral with the counterparty – or at least

should have been aware of its cash moving back and forth with another party.  (*Id.* at ¶ 148).

---

[27] OTC options transactions are private contracts between the two counterparties to the transaction which, like all contracts, have material terms that must be defined in the parties' agreement, including the underlying obligations of the parties to the transactions, events of default and termination events.  (PSAC ¶ 145).

[28] Collateral in derivative securities transactions is typically cash margin posted by the seller of an option to protect the buyer in the event that its counterparty (the seller) defaults in fulfilling its contractual obligations.  (PSAC ¶ 145).

That Tremont itself was not involved in any of the practicalities of standard collateral exchanges with its options counterparties – and that Tremont's employees did not appear to understand the terms of collateral provisions in force for more than a decade – was further indicative that the OTC trades might not actually be taking place.

Other due diligence queries Fortis Multi-Management posed to Tremont throughout 2006 in order to obtain some verifiable evidence of Madoff's trading and custody operations included a series of detailed questions about how BLMIS priced, negotiated and executed the options trades for customers.[29]  (*Id.* at ¶¶ 148-49).  Likely based on his own trading experience, Geene sought information to confirm a realistic process through which BLMIS could possibly execute the enormous volume of options trades required to hedge all of Madoff's investors' equities trades.[30]  *Id.*

Additionally, Geene informed Tremont that Fortis Multi-Management wanted a third-party opinion letter affirming that, in the case of a bankruptcy or default of BLMIS, Tremont's accounts "could not be touched."  (*Id.* at ¶ 151).  Geene noted that Tremont's CEO had mentioned a "Depository Account" for investor funds, for which Fortis Multi-Management wanted "clear indication of separation."  *Id.*  Once again, Fortis Multi-Management's query to

---

[29] For example, Geene asked Tremont:

> Option grid:  do the investment banks quote for puts as well as calls and on both sides (buy/sell)?  How will he hedge the basis risk:  for instance when hitting Goldman for puts with 2B he cannot instanteniously [*sic*] trade 2B in equities the same second:  does he average is [*sic*], is he using his time slicing methodology (still:  basis risk (or alpha??) remains.  Does he have to do calls with the same investment bank (later that day based upon the same grid?)? (PSAC ¶ 149).

[30] Geene also asked Tremont's CEO if he could "elaborate a bit on the 'hiding of trades' between Feeder trades and Madoff Securities trades as he has to trade for the Feeder before his own trading."  (PSAC ¶ 150).  From the fairly suspicious language Geene quoted about "hiding of trades," it seems he was probing for verifiable details to confirm or refute suspicions that Madoff's trading activities might involve a conflict of interest or perhaps worse, potential illegal activity.  *Id.*

Tremont sought confirmable information that could verify BLMIS's empty assurances that customers' assets were "segregated" and protected in the event of a BLMIS bankruptcy from the claims of other creditors.  *Id.*

Throughout the summer and fall of 2006, Geene and others at Fortis Multi-Management asked Tremont a host of additional detailed questions about BLMIS's operations.  Tremont employees were repeatedly unable to answer Geene's questions and passed Fortis Multi-Management queries up the chain to Tremont's CEO to answer.  Because Madoff was a fraud and the purported trading was fictitious, Tremont's CEO was ultimately not able to provide concrete answers with verifiable information that could satisfy Fortis Multi-Management's operational diligence queries.

     c.  In 2006, Fortis Multi-Management Redeemed Investments From Tremont Feeder Funds Where It Could Not Avoid Liability

By October 2006, Fortis Multi-Management made it clear that it was unhappy with Tremont's inability to answer their diligence questions about BLMIS.  (PSAC ¶ 156).  In an internal Tremont email dated October 9, 2006, Johnston of Tremont informed Tremont CEO Schulman and others that Fortis Multi-Management "may now not be investing in XL after all (concerns with counterparty risk, cost of leverage, liquidity)."  *Id.*

After purchasing a 70% interest in New York-based Cadogan in November 2006, Fortis Multi-Management's concerns about BLMIS were echoed back to them by their new business partner.  (*Id.* at ¶ 158).[31]  Like Fortis, Cadogan had separately identified similar red flags at

---

[31] Notably, Fortis had acquired Cadogan in order to allow it to conduct its hedge fund due diligence in house, rather than rely on third parties such as Tremont.  (PSAC ¶ 158).

BLMIS that led Cadogan to be so highly skeptical of Madoff that Cadogan had a policy against investing customer assets in any Madoff feeder funds.  (*Id.* at ¶¶ 159-61).[32]

Fortis itself did not adopt a permanent "no-Madoff" policy like Cadogan.  Instead, Fortis continued to engage in a risk-benefit analysis for each BLMIS transaction depending on the potential liability it might face for fraud at BLMIS.  Here, having selected BLMIS to manage its customers' investments, Fortis' potential liability to customers was clear if its suspicions of fraud at BLMIS were realized.  (*Id.* at ¶ 164).  Accordingly, not only did Fortis decline to invest in the new Tremont Rye XL leveraged fund, but in fact, Fortis Multi-Management pulled out the entirety of its remaining $56 million investment with Tremont in February 2007.  (*Id.* at ¶ 163).  Both Fortis Multi-Management and Cadogan jointly decided to redeem Fortis investors' funds from Tremont in light of the red flags they had identified about BLMIS, as well as "[t]he unwillingness of the Madoff organization to provide sufficient transparency to evaluate the investment."  *Id.*

Thus, Fortis' awareness of the high degree of risk of fraud at BLMIS was confirmed by Fortis Multi-Management's decision to redeem out of Tremont – despite its history of profitable and extraordinarily stable returns.

> (iii)    Already Aware of the High Probability of Fraud at BLMIS, in 2007 Fortis Entered into the Swap Transaction After Obtaining Special Protections to Minimize its Risk

In 2006, Fortis employees on behalf of Fortis Fund Bank began pursuing the Swap Transaction.  At this point, Fortis as an entity was aware of the high risk of fraud at BLMIS that

---

[32] In December 2006, Fortis Multi-Management advised the managers of another Madoff feeder fund, Kingate, that it would be "politically difficult" for Fortis Multi-Management to invest anymore in any Madoff feeder funds under Cadogan's no-Madoff policy.  (PSAC ¶ 162).

was acquired from its prior experience involving Harley and the Tremont Feeder Funds. (PSAC ¶ 167).[33]

Employees working on the Swap Transaction performed a *pro forma* exercise of conducting "diligence" on the proposed Swap Transaction. (*Id.* at ¶ 168). In doing so, Fortis became aware that Madoff's story about where BLMIS traded customers' options was shifting, contradicted not only by what BLMIS itself told Fortis years earlier, but also by what Tremont was contemporaneously telling Fortis and other investors. (*Id.* at ¶ 169). This fact only further compounded the probability of fraud at BLMIS.

> (1)    Beyond the Facts that Fortis Already Knew Suggesting Fraud, Fortis Became Aware of Inconsistent and Contradictory Stories As To How BLMIS Purported to Trade Options

Since at least 2001, BLMIS had confirmed to Fortis employees fulfilling administrator duties for Harley that Madoff traded options exclusively OTC and not on an exchange. (PSAC ¶¶ 170-72). This same representation was repeated by Tremont to Fortis Multi-Management in August and December 2006.[34] (*Id.* at ¶¶ 173-75).

While the claim that the trading was exclusively OTC had always been consistent from both BLMIS and Tremont, by the end of 2006 Fortis stopped internally reporting that was the case. In connection with the Swap Transaction, Fortis prepared a credit application in November 2006 that omitted <u>any</u> details about where BLMIS traded its options – a striking omission given

---

[33] This knowledge is imputable to Defendants in two ways: (i) because of the personal knowledge of specific Fortis employees who became involved in negotiating and obtaining credit approval for the new Swap Transaction were some the same employees who had, with respect to Harley, urged management to take steps to minimize Fortis' exposure to the risk of fraud at BLMIS; and (ii) through agency principles, strengthened here as a result of Fortis' "Act as One" policy and practice, and through its global management risk network through which all such risks are shared. (PSAC ¶¶ 224-42).

[34] Tremont's November 30, 2006 Due Diligence Questionnaire also provided further detail about the "counterparty risk" BLMIS's investors were exposed to under the OTC options. (PSAC ¶ 174).

the importance of options trading to BLMIS's purported strategy, and the attendant counterparty

risk posed by the OTC trades.  (*Id.* at ¶¶ 176-77).

Fortis personnel then prepared a second credit application one and one-half months later

for a different Madoff Feeder Fund containing specifics about where BLMIS's options trades

took place – but for the first time, Fortis reported that BLMIS's options trades were not

exclusively OTC, but rather "may be effected in the over-the-counter market <u>or</u> on a registered

options exchange."  (*Id.* at ¶ 178).  This statement however was contrary to what BLMIS had

represented to Fortis since at least 2001, as well as what Tremont's due diligence questionnaire

reported in late 2006– that the trades took place OTC.

Already aware of the high probability of fraud at BLMIS, Fortis employees were on

notice that critical information about BLMIS's strategy was starting to shift and contradict

previous representations.[35]  Rather than seeking to resolve the inconsistencies and to verify

where the options trades were in fact taking place, Fortis chose to blind itself to this and all of the

other facts of which it was aware suggesting the high probability of fraud at BLMIS to enter into

the Swap Transaction and to hedge its obligations by investing in Broad Market Fund – but not

before first obtaining certain special rights and built-in protections that would minimize

Defendants' losses if BLMIS were in fact engaging in fraud as discussed in more detail below.

---

[35] The extent to which Fortis was willing to blind itself to the indicia of fraud at BLMIS, including its disregard with respect to the shifting stories about Madoff's options trades, is demonstrated further by representations it made to others.  While in January 2007, Fortis reported internally that BLMIS traded options either over an exchange or OTC, in September 2007, Fortis represented to a third party that BLMIS "only trades exchange listed options." (PSAC ¶¶ 183-84).  Notably, Fortis made this statement while attempting to negotiate a credit default swap with AIG to offload some of its $1 billion Madoff risk, at a time when markets were in turmoil and OTC trading was particularly risky because of counterparty risk.  (*Id.* at ¶¶ 185-86).  This represented a third conflicting version of facts with respect to a critical component of Madoff's strategy that was not consistent with what BLMIS and Tremont were telling others at the time, and demonstrates Fortis's willingness to blind itself to material inconsistencies and other indicia of fraud at BLMIS.  (PSAC at ¶¶ 187-88).

(2)    To Avoid Confirming BLMIS Was Engaging in Fraud And
Proceed With the Swap Transaction, Fortis Obtained Special
Protections to Minimize its Risk

In proceeding with the Swap Transaction, Fortis obtained certain "special rights" and

built-in protections that protected Fortis in the event of a fraud at BLMIS – protections that other

individual Tremont investors did not enjoy.  (PSAC¶¶ 197-214).

To begin with, the Swap Transaction contained collateral provisions that provided that

one-third of any cash that Fortis invested in Tremont's Feeder Funds – and thereby exposed to

risk of fraud at BLMIS – would not be Fortis' own money but in fact was Rye XL Fund's own

cash collateral.  (*Id.* at ¶ 197-200).  The Swap Transaction granted Fortis Fund Bank a "first

priority continuing security interest in, lien on and right of Set-off" against all collateral Rye XL

Fund transferred to it.  (*Id.* at ¶ 199).  This built in protection meant that Fortis was limiting its

own exposure to the risk of fraud at BLMIS by at least one-third of the total amount it invested

in Broad Market Fund – at the same time Tremont's individual investors' entire investments

were at risk of fraud at BLMIS.  (*Id.* at ¶¶ 197-200).

The Swap Transaction also contained a broad indemnification provision that required

Rye XL Fund to hold harmless Fortis Fund Bank, its affiliates and employees in the event that

they should become "involved in any capacity in any action, proceeding or investigation brought

by or against any person … in connection with any matter referred to in this Agreement or any

Transaction."  (*Id.* at ¶¶ 201-04).  This last clause is sufficiently broad enough to cover this

action involving a liquidation proceeding of BLMIS.  Notably, the indemnification provision not

only protects Fortis and its employees against liability, it also requires Rye XL Fund to

reimburse them on ten days-notice for any out of pocket expenses, including attorneys' fees.  (*Id.*

at ¶¶ 203-04).

Fortis also negotiated a very specific "Claw-Back" provision in the Swap Transaction that provided that, in the event Fortis Fund Bank is required to return any funds it invested with Broad Market Fund "whether pursuant to the terms of the investment in the Fund, any insolvency law, regulation, court order or otherwise"), Rye XL Fund must repay that amount to Defendant Fortis Fund Bank ("*Claw-back Obligation*")." (*Id.* at ¶¶ 205-07). This provision demonstrates that Fortis and Tremont anticipated that there was the potential risk that BLMIS or Broad Market Fund could end up in bankruptcy, and that Fortis Fund Bank could conceivably be sued in a claw-back action. (*Id.* at ¶ 208).

Another "special right" Fortis obtained in the Swap Transaction was the early right to redeem its investment in Broad Market Fund much faster (almost a full month) than Tremont feeder fund's other individual investors in the very specific event that Madoff should come to be investigated for securities law violations. (*Id.* at ¶¶ 211-13). Notably, Fortis came to enjoy this "Special Right of Redemption" by way of a "most favored nations" clause[36] in the Swap Transaction,[37] which in and of itself was a red flag of fraud. With this clause's insertion, Fortis knew that at least one other investor in Tremont's funds had anticipated that Madoff could come under investigation by federal regulators for securities fraud or other illegal conduct and had gone to the length of demanding contractual protections for that eventuality. (*Id.* at ¶¶ 211-14).

When Madoff's fraud was revealed and confirmed in December 2008, at least some of Fortis' built-in protections and special rights worked as anticipated. Based on publicly available settlement information, on information and belief, Fortis to date has recovered more than

---

[36] A "most favored nations" clause is a contractual provision in which one party (here, Tremont) agrees to give another party (here, Fortis Fund Bank) the best terms it makes available to any other later party.

[37] The "most favored nations" clause was triggered in September 2007, when Tremont entered into an agreement with another leverage provider, ABN AMRO Bank N.V., presently known as the Royal Bank of Scotland, and agreed to give it the special right to redeem half of its investment on five days' notice – a full month before other investors could seek to redeem their investments in the event Madoff was to be investigated. (PSAC ¶ 212).

$334,930,851.03 of its investments in the Tremont Feeder Funds, which represents 51% of its claimed losses.  (*Id.* at ¶¶ 215-19).

> (b)    *The PSAC Amply Establishes Defendants' Willful Blindness to BLMIS's Fraud*
>
> (i)    The PSAC Alleges Defendants Were Subjectively Aware of a High Probability of Fraud at BLMIS

Since at least 2003, Defendants had recognized the "Madoff issue"—that Madoff could not be verified as making the trades he purported or holding the assets he claimed—and had raised questions that "went to the heart of Madoff's Ponzi scheme because they concerned the existence of the assets supposedly held by Madoff, Madoff's self-custody and Madoff's secrecy."  *Optimal,* 2011 WL 4908745 at *8.  By 2003, Fortis employees explicitly acknowledged their concern about whether Madoff was in fact making the trades that he reported having made.  And these concerns were only exacerbated:  as Fortis employees asked more questions about the purported options trades, they learned enough to be suspicious as to whether BLMIS was engaging in options trades at all.  *Cf. BNP*, 2018 WL 4833984 at *53 (finding the Trustee's allegations "did not imply a subjective belief in the high probability that Madoff was operating a Ponzi scheme, *or was not actually trading securities, or that the trades reported in the monthly customer statements were fictitious*").  (emphasis added)

Notably, Fortis asked only enough questions of BLMIS to recognize the risk of what Madoff was *not* doing – providing any information from which Fortis could verify its custody of assets or performance of the trades reported on statements.  It deliberately took action to avoid delving further and risk confirming the nature and scope of Madoff's fraud.  This is the very definition of willful blindness.  Whether or not Defendants were correct in suspecting exactly the type of fraud they willfully blinded themselves to is irrelevant.  *See United States v. Nektalov*, 461 F.3d 309, 315 (2d Cir. 2006) (finding "[t]he culpability of the willfully blind

defendant lies in his averting his eyes to what he thinks he sees, not in the objective accuracy of his vision").

     (ii)  The PSAC Alleges Defendants Deliberately Avoided Confirming the Fraud

  The Trustee also alleges facts sufficient to establish the second aspect of willful blindness – that Defendants consciously avoided learning of BLMIS's fraud.  "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."  *State v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 667 (S.D.N.Y. 2017) (citations omitted). Importantly, however, "the standard does not require proof of an identifiable 'affirmative act'" and merely refers to a requisite state of mind. *Id*. at 667.[38]  Regardless, Fortis *did* undertake affirmative acts to deliberately avoid learning about Madoff's fraud.  The transfer of Harley's jurisdiction to escape administrator liability to investors is one such example. Defendants' insistence on special protections to proceed with the Swap Transaction is another.

  Where, as here, the Trustee alleges that Fortis time and again appreciated facts indicating a high probability of fraud and made the decision to reduce its exposure to the fraud rather than seek to confirm its suspicions, the Trustee has sufficiently alleged deliberate avoidance.[39]

---

[38] *See also United States v. Fofanah*, 765 F.3d 141, 150 (2d Cir. 2014) (Leval, J., concurring) ("A finding that a defendant's ignorance of incriminating facts was a conscious choice on the defendant's part in no way requires a finding that the defendant took affirmative steps to avoid gaining the knowledge.").

[39] *See Fofanah*, 765 F.3d at 150 (conscious avoidance "means only, as we have repeatedly stated in reciting the standard, that there must be evidence from which a jury could find that the defendant was aware of a high probability of the critical incriminating facts and consciously decided to act without confirming them").

33

      2.     *The Trustee's Complaint Adequately Alleges Avoidability of the Initial Transfers*

The Trustee's PSAC sufficiently alleges the avoidability of the initial transfers to Prime

Fund and Broad Market Fund because (1) the initial transfers have already been deemed avoided

and (2) the PSAC, which incorporates the Tremont Complaint,[40] alleges facts that establish the

avoidability of the initial transfers. *See BNP*, 2018 WL 4833984, at *18 (finding subsequent

transferee sufficiently alleged avoidability by incorporation of separate complaint); *SIPC v.

BLMIS (In re Madoff)*, 501 B.R. at 36 (same).

First, the initial transfers have already been "deemed avoided" by the settlement

agreement in the Tremont Complaint, which this Court approved. (PSAC at ¶ 269).

Second, the Trustee alleges facts in the PSAC, which sufficiently plead that the initial

transfers are avoidable because Tremont had actual knowledge that Madoff was not trading

securities. Alternatively, the PSAC alleges that Tremont willfully blinded itself to this fact.

The allegations in the PSAC regarding Tremont mirror those regarding the defendants in

the Trustee's Fourth Amended Complaint in *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-

1161 (SMB), 2015 WL 4734749, at *14-15 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*").[41] In

*Kingate*, this Court found that the Trustee sufficiently alleged those defendants' actual

knowledge based on the defendants' monitoring of the BLMIS Feeder Funds' performance on a

---

[40] In 2010, the Trustee sued Tremont for avoidance and recovery of $2.1 billion of initial transfers from BLMIS that constituted customer property under SIPA (the "*Tremont Complaint*").[40] (PSAC ¶ 268). The Tremont Complaint is incorporated by reference into the PSAC.

[41] As an initial matter, Kingate Management Limited ("Kingate")'s knowledge should be imputed to Tremont. Tremont and KML shared information with each other regarding BLMIS in a number of ways, including: (i) in Sandra Manzke's role as director and manager of Kingate Global; (ii) through Kingate and Tremont Bermuda's co-management agreement; and (iii) through Kingate and Tremont Bermuda's consulting agreement. In *Kingate*, this court held that the Trustee's Fourth Amended Complaint sufficiently pleaded actual knowledge as to the defendants, including Ceretti and Grosso. By virtue of the relationships between Kingate, Kingate Global, and Tremont, Kingate's knowledge that the IA Business was a fraud, and that many of the entries in the statements and trade confirmations depicted trades that could not have occurred, should be imputed to Tremont.

regular basis, which disclosed impossible trades.  *Id*. at *14, 29.  Here, the Trustee similarly

alleges that Tremont analyzed BLMIS information reflecting the same obvious quantitative

impossibilities demonstrating those trades "could not have taken place."  *Id*. at *29; (PSAC ¶¶

286-91).

    As in *Kingate*, Tremont's executives also deliberately prevented transparency into

BLMIS and access to Madoff by deflecting investors' inquiries, implying that they feared what

might be discovered.  *Kingate*, 2015 WL 4734749, at *30; (PSAC at ¶ 295).    Among other

things, Tremont prohibited leverage providers from contacting Madoff.  (PSAC at ¶ 307-08).

Tremont executives even took measures to prevent their own personnel and auditors from

conducting Tremont's standard due diligence.   (*Id*. at ¶ 309).  Like *Kingate*, Tremont also lied to

shareholders to address issues for which it knew there were no legitimate explanations, such as

who Madoff's option counterparties were and how BLMIS executed its options trades.  (*Id*. at ¶¶

312-15).

    In *Kingate*, this Court found that similar allegations that certain Kingate executives,

Ceretti and Grosso, took steps to deflect inquiries to Madoff and fabricated stories to placate

shareholders supported a finding that the Trustee sufficiently alleged actual knowledge.  *Kingate*,

2015 WL 4734749, at *14.  As with *Kingate*, Tremont did all this knowing that BLMIS did not

satisfy Tremont's standard due diligence requirements and having received numerous warnings

that Madoff was a fraud.  (PSAC at ¶¶ 273-76, 292-99).

    Alternatively, the PSAC sufficiently alleges that Tremont was willfully blind to the truth

of BLMIS's fraud.  The Trustee sufficiently alleges that Tremont subjectively believed there was

a high probability that BLMIS was not trading securities as purported because, like Merkin,

Tremont saw and appreciated various warning signs indicating that BLMIS was a fraud.[42]  This

Court held that the awareness and appreciation of such facts was sufficient to plead that a

defendant believed there was a high probability that BLMIS was a fraudulent operation.  *Merkin

II*, 515 B.R. at 141.

The Trustee similarly alleges in the PSAC that Tremont was aware of and appreciated the

same facts this Court found sufficient to allege the first prong of willful blindness in *Merkin II*.[43]

As in *Merkin II*, the Trustee alleges that Tremont saw these facts, understood them and purposely

ignored them.   (Tremont Compl. at ¶ 158); (PSAC at ¶¶ 273-85); *see also Merkin II*, 515 B.R. at

144.

Lastly, the Trustee alleges that Tremont deliberately avoided learning the truth about

BLMIS, thereby sufficiently alleging the second prong of willful blindness.  The Trustee alleges

that Tremont had close ties with Madoff and BLMIS.  (PSAC at ¶¶ 270-72).  Tremont's CEOs,

Manzke and Schulman, regularly communicated with Madoff, including at least during quarterly

visits to BLMIS.   (*Id.* at ¶ 270).  Schulman and Madoff had a particularly close relationship –

so close that Madoff even sought Schulman's advice on individual hiring decisions at BLMIS.

(*Id.* at ¶ 271).   In this respect, and in others, Manzke, Schulman and the Tremont BLMIS

Feeder Funds are analogous to the defendants in *Kingate*, 2015 WL 4734749 at *14-15, and

---

[42] These warning signs included "that the volume of options transactions that Madoff reported were impossible," "that BLMIS' returns were too good to be true," "Madoff's use of a strip mall accounting firm," and that "BLMIS used an unusual fee structure and exceeded the total volume of option trades in the market."  *Merkin II*, 515 B.R. at 141; (PSAC ¶¶ 287, 290, 296, 304, 313).

[43] For example, the Trustee alleges that Tremont was aware of and appreciated the impossibilities of BLMIS's trade activity due to its review, preparation, or comparison of:  (1) reports concerning the performance of the Tremont BLMIS Feeder Funds (PSAC at ¶¶ 287); (2) customer statements and trade tickets (PSAC at ¶ 288); and (3) monthly analytic summaries that reported differences between the prices reported by BLMIS versus those reported by a third-party source (PSAC at ¶ 282, 289).  Tremont also knew, based on its own estimation, that the volume of trades reported by Madoff were impossible.  (PSAC at ¶¶ 290-91).  Tremont appreciated the fact that Madoff's returns were too good to be true and raised concerns regarding Madoff's use of a strip mall accounting firm (Tremont Compl. at ¶¶ 215-16) and unusual fee structure (Tremont Compl. at ¶¶ 204-09).

*Merkin II,* 515 B.R. at 128.  Indeed, Manzke was responsible for introducing Ceretti and Grosso

to Madoff in the early 1990's.  *Kingate*, 2015 WL 4734749 at *3.   Despite its close relationship

to Madoff and BLMIS, Tremont refused to ask any hard questions regarding Madoff's business,

focused on appeasing Madoff, and avoided institutional client due diligence in favor of the

"Palm Beach Crowd," which was less likely to ask questions.   (Tremont Compl. at ¶¶ 5-9).

        In *Merkin II*, the Trustee alleged that when Madoff refused to answer Merkin's questions,

Merkin did not press Madoff, but instead stated that he had "made [his] peace with Bernie."  515

B.R. at 142.  Additionally, Merkin told investors with inquiries "don't ask so many questions.

Sit tight."  *Id.*  This Court found such statements sufficient to plead that Merkin took deliberate

actions to avoid learning the truth.  Similarly, here, the Trustee alleges in the PSAC that Tremont

deliberately prevented any transparency into Madoff and BLMIS throughout the Tremont-

BLMIS relationship, noting categories of information "ya don't ask."  (PSAC at ¶ 294).

        The totality of the allegations in the PSAC and the Tremont Complaint alternatively

demonstrate that Tremont subjectively believed there was a high probability of fraud at BLMIS

and took deliberate actions to avoid learning the truth and was thus willfully blind.

## B.      **No Undue Delay or Bad Faith Can be Shown Where Defendants Acquiesced to the Trustee Waiting to Amend the Complaint Until Legal Standards Were Resolved**

        There is no evidence of undue delay, bad faith, or undue prejudice.  Although it has been

eight years since the Trustee filed his complaint, the mere passage of time, in the absence of bad

faith, does not warrant a denial of leave to amend.  *Commander Oil Corp. v. Barlo Equip. Corp.*,

215 F.3d 321, 333 (2d Cir. 2000) (upholding grant of leave to amend even in face of seven-year

delay).[44]  And "[d]elay is rarely fatal to a Rule 15 motion if it can be explained." *Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654 (RA) (HBP), 2015 WL 4097927, at *7 (S.D.N.Y. July 6, 2015).

The Trustee did not unduly delay or act in bad faith in bringing this motion now.   The timing of this request merely reflects the procedural history of this liquidation and the intentions of the parties.   Defendants agreed to adjourn the litigation on their motion to dismiss the complaint until dispositive legal issues were resolved on a case-wide basis, including the issue of good faith and extraterritoriality.   The parties participated in the litigation on those standards and, in the meantime, stipulated to holding cases in abeyance pending the Court's determination of these issues.   Therefore, the Trustee appropriately seeks to amend his pleading now that those legal issues have been decided and this Court has determined no additional discovery will be permitted prior to amendment.[45]  *See Mendelow*, 560 B.R. 208 at 223 (discussing change in legal standards applicable to Trustee's proceedings, and stating that "The Trustee should not be penalized and the defendants should not be rewarded for a delay in which everyone acquiesced").

C.   <u>**Defendants Cannot Demonstrate Undue Prejudice**</u>

While prejudice to the opposing party "has been described as the most important reason for denying a motion to amend, only *undue* prejudice warrants denial of leave to amend." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016) (internal citations omitted).   To ascertain whether undue prejudice exists, courts consider whether the proposed

---

[44] *See also State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) ("Mere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.").

[45] This Court recognized that the Trustee's Omnibus Motion could not be determined until after the resolution of the legal standards concerning extraterritoriality.  *SIPC v. BLMIS (In re Madoff)*, 590 B.R. 200, 205 n.4 (Bankr. S.D.N.Y. 2018).

amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Mendelow*, 560 B.R. at 223 (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).[46]  Undue prejudice is a high bar, and the party opposing an amendment has the burden of proving "substantial prejudice would result were the proposed amendment to be granted." *Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, No. 16-CV-5393 (KMW), 2018 WL 1115517, at *2 (S.D.N.Y. Feb. 26, 2018).  Defendants "must show actual prejudice, not the possibility of prejudice." *Mendelow*, 560 B.R. at 224.  "If no prejudice is found, then leave normally will be granted."  Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1484 (3d ed.).

Prejudice is highly unlikely to be found where – as here – the case is in the early stage of the proceedings.  *See, e.g., State Teachers Ret. Bd.*, 654 F.2d at 856 (reversing denial of leave to amend where "no trial date had been set by the court," and "the amendment will not involve a great deal of additional discovery").  Whether a party had prior notice of the content amended and whether the amended complaint considers the same transaction as the claims in the original pleading are central to analyzing prejudice.  *See M.E.S., Inc. v. Safeco Ins. Co. of Am.*, No. 10-CV-02798 (PKC)(VMS), 2014 WL 2931398, at *3 (E.D.N.Y. June 27, 2014) (granting leave to amend where, because proposed amended pleading "mostly elaborate[d]" on earlier pleading, defendant could not claim surprise by new claims).[47]  Here, granting leave to amend would cause

---

[46] *See also Agerbrink*, 155 F. Supp. 3d at 454 (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000)).

[47] The amended allegations concern issues that have been central to this suit for years.  The Trustee is not adding a single count or party, nor does the PSAC contain any other surprise change in tactics or theories that could conceivably prejudice Defendants.  *See Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 262 (S.D.N.Y. 2009); Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) (noting that courts allow amendments when "opponent could not claim surprise, but effectively should have recognized that the new matter included in the amendment would be at issue.").

no prejudice at all, much less the undue prejudice that a party opposing leave to amend has the burden of demonstrating.  The Trustee seeks amendment now because, almost four years after the filing of the complaint, the *Good Faith Decision* shifted the pleading burden and changed the legal standard.  The extraterritoriality decisions reduced certain claims, transfers and, in some cases, parties.

At this juncture, the Trustee seeks to amend the complaint to tailor his allegations to the appropriate legal standard, as Defendants were well aware he would.   This suit is still at an early stage of litigation: no defendant has responded to the complaint, no pre-trial conference has been held, no pre-trial scheduling order has been entered, and no Rule 26 discovery has been taken.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant the Trustee's request for an order allowing him to amend the complaint, and any and all other relief the Court deems just and proper.

Dated: New York, New York
          February 22, 2019

*/s/ Regina Griffin*

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Regina Griffin
Email: rgriffin@bakerlaw.com
Tracy L. Cole
Email: tcole@bakerlaw.com
A. Mackenna White
Email: awhite@bakerlaw.com
Elizabeth Urda
Email: emccurrach@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*