**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Case No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| -against- | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 10-05286 (SMB) |
| Plaintiff, | |
| -against- | |
| LEGACY CAPITAL LTD., | |
| Defendant. | |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

**STEVENS & LEE, P.C.**
485 Madison Avenue, 20th Floor
New York, New York  10022
Nicholas F. Kajon, Esq.
Telephone:  (212) 537-0403
Facsimile:  (610) 371-1223
nfk@stevenslee.com

*Attorneys for Legacy Capital Ltd.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

PROCEDURAL HISTORY.....................................................................................4

STATEMENT OF FACTS ......................................................................................6

ARGUMENT ........................................................................................................6

  I.  STANDARD OF REVIEW .............................................................................6

  II.  THE TRUSTEE HAS FAILED TO ESTABLISH THE ELEMENTS OF THE
      PONZI SCHEME PRESUMPTION AS A MATTER OF LAW ...................................6

    A.  The Trustee Has Failed To Prove That BLMIS Was Engaged In "Little Or No"
       Legitimate Business Operations And That There Were "Little Or No" Profits
       Or Earnings From The Legitimate Business Operations ...........................................8

     1.  The Trustee Has Failed To Prove That BLMIS's IA Business Should Be
        Considered Separate From The Proprietary Trading Business.................................8

     2.  The Trustee Relies Selectively On Allocutions To Argue That There Were No
        Legitimate Business Operations, But Ignores Conflicting Evidence
        Indicating That Actual Trading Was Taking Place................................................10

    B.  The Trustee Has Failed To Offer Any Facts Regarding The Accounts From
       Which Legacy Was Paid Or To Prove That The Payments To Legacy
       Consisted Of Other Customers' Funds ..................................................................13

  III.  THE TRUSTEE HAS FAILED TO PROVE THAT LEGACY'S
      WITHDRAWALS CONSISTED SOLELY OF FICTITIOUS PROFIts ......................14

  IV.  THE TRUSTEE HAS FAILED TO PROVE THAT THE WITHDRAWALS
      FROM THE LEGACY ACCOUNT WERE ACTUALLY TRANSFERRED
      TO LEGACY ...........................................................................................16

  V.  SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE LEGACY HAS A
      COMPLETE DEFENSE pursuant to section 548(c) ...................................................18

    A.  Legacy's Value Defense Exceeds The Amount Sought By The Trustee ........................18

    B.  The Securities Exchange Act Of 1934 Preserves The Right Of An Innocent
       Victim To Enforce The Obligations Under A Securities Contract ............................20

    C.  The Trustee Did Not Seek To Avoid Obligations In The Amended Complaint
       And Is Now Time-Barred From Doing So ..............................................................24

CONCLUSION....................................................................................................25

SL1 1574590v2 106906.00001

# TABLE OF AUTHORITIES

CASES

*Astor Holdings, Inc. v. Roski*,
   325 F. Supp. 2d 251 (S.D.N.Y. 2003) ..................................................................20

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
   397 B.R. 1 (Bankr. S.D.N.Y. 2007) .......................................................................7

*In re Bernard L. Madoff Inv. Sec.*
   *LLC*, 542 B.R. 100 (Bankr. S.D.N.Y. 2015) ........................................................7

*In re Bernard L. Madoff Inv. Sec. LLC.*,
   721 F.3d 57-58 (2d Cir. 2013) .............................................................................24

*In re Bernard L. Madoff Inv. Sec. LLC*,
   773 F.3d 411 (2d Cir. 2014)...........................................................................21, 22

*Bernard Madoff Inv. Sec. LLC v. J. Ezra Merkin (In re Bernard L. Madoff Inv.*
   *Sec. LLC)*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ..................................................................7

*Butner v. United States*,
   440 U.S. 48 (1979) ...............................................................................................20

*California Pub. Empls. Retirement Sys. v. ANZ Secs., Inc.*,
   *137 S. Ct. 2042 (2017)* ...................................................................................18, 19

*Freeman v. Marine Midland Bank-N.Y.*,
   419 F. Supp. 440 (E.D.N.Y. 1976) ......................................................................24

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
   Case No. 08-15051, 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014).....................6, 7, 10, 14

*Kapila v. TD Bank, N.A. (In re Pearlman)*,
   440 B.R. 900 (Bankr. M.D. Fla. 2010) ..................................................................7

*Lehman Bros. Holding v. JP Morgan Chase Bank, N.A. (In re Lehman Bros.*
   *Holdings Inc.)*,
   469 B.R. 425 (Bankr. S.D.N.Y. 2012) ................................................................24

*Myers v. Blumenthal*,
   534 B.R. 6 (D. Neb. 2015) ...................................................................................16

*Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*,
   557 B.R. 89 (Bankr. S.D.N.Y. 2016) .....................................................................7

*Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Investment Securities LLC)*,
    548 B.R. 13 (Bankr. S.D.N.Y. Mar. 14, 2016) .................................................1, 4

*Picard v. Lowrey, et al.*,
    18 civ. 5381 (PAE) decided February 7, 2019.........................................23

*Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013)....................................................18

*Ritchie Cap. Mgmt., LLC v. Stoebner*,
    Civ. No. 12–3038 (SRN), 2013 WL 2455981 (D. Minn. June 6, 2013), *aff'd on different grounds* 779 F.3d 857......................................16

*Schlossberg v. Abell (In re Abell)*,
    549 B.R. 631 (Bankr. D. Md. 2016) ...........................................18

*Schwind v. EW & Assocs., Inc.*,
    357 F. Supp. 2d 691 (S.D.N.Y. 2005)..........................................20

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    Adv. Proc. No. 08–01789 (SMB), 2018 WL 1442312 (Bank. S.D.N.Y. March 22, 2018)....................................................8

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    Adv. Proc. No. 10-04946 (SMB), 2018 WL 3078149 (Bank. S.D.N.Y. June 19, 2018)....................................................7

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
    563 B.R. 737 (Bankr. S.D.N.Y. 2017)..........................................6

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    499 B.R. 416 (S.D.N.Y. 2013)..............................................21, 23

*Silverman v. Meister Seelig & Fein, LLP (In re Agape World, Inc.)*,
    467 B.R. 556 (Bankr. E.D.N.Y. 2012)..........................................7

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    No. 11-MD-2296 (RJS), 2018 WL 6329139 (S.D.N.Y. Nov. 30, 2018), *reconsideration denied*, No. 11MD2296 (DLC), 2019 WL 549380 (S.D.N.Y. Feb. 12, 2019) ....................................................22, 25

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    No. 11MD2296 (DLC), 2019 WL 294807 (S.D.N.Y. Jan. 23, 2019) ....................23

iii

*Wagner v. Oliva (In re Vaughan Co. Realtors)*,
    500 B.R. 778 (N. Mex. 2013) ................................................................16

*Wiand v. Waxenberg*,
    611 F. Supp. 2d 1299 (M.D. Fla. 2009) ..............................................7

## STATUTES, RULES & REGULATIONS

11 U.S.C. ................................................................................................24

11 U.S.C. § 101(5), (12) ........................................................................19

11 U.S.C. § 101(5)(A) ............................................................................22

11 U.S.C. § 546(a)(1) .............................................................................24

11 U.S.C.§ 548(a)(1)(A) .....................................................................1, 18

11 U.S.C. § 548(d)(2)(A) ........................................................................19

15 U.S.C. § 78bb(a)(2) ...........................................................................20

15 U.S.C. § 78cc(b) ................................................................................23

Section 548 of the Bankruptcy Code ..........................................18, 19, 22

Section 548(c) of the Bankruptcy Code ..........................................Passim

Fed. R. Civ. P. 56(a) ................................................................................6

Federal Rule of Bankruptcy Procedure 7056 ...........................................6

Rule 56 of the Federal Rules of Civil Procedure .....................................6

Section 8-501(b)(1) of the New York Uniform Commercial Code ...........20

Section 13 of the Securities Act of 1933 ................................................18

Securities Exchange Act of 1934 .......................................................4, 20

Securities Investor Protection Act, 15 U.S.C. §§ 78*aaa–lll* .....................1

iv

Legacy Capital Ltd. ("Legacy") respectfully submits this memorandum of law in opposition to the motion of Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78*aaa–lll*, and the estate of Bernard L. Madoff ("Madoff"), for summary judgment, dated December 21, 2018 (Dkt. Nos. 190-93) (the "Motion").

## PRELIMINARY STATEMENT

Legacy does not dispute that in the two years prior to December 11, 2008 (the "Filing Date") it received some funds in excess of the funds it had invested with BLMIS ("Excess Funds").    However, Legacy has unwaveringly disputed the Trustee's contention that these Excess Funds are all recoverable from Legacy as "fictitious profits" (a term not defined under the Bankruptcy Code) under 11 U.S.C. § 548(a)(1)(A).    As set forth below, the Trustee fails in his attempt to prove this contention on summary judgment, and the Motion should be denied.

On June 28, 2017, more than one and a half years ago, the Trustee asked this Court for leave to move for summary judgment.    Noting that the issues raised by this action seemed to be a "very account specific matter," the Court suggested that the Trustee "ought to just think about trying the case."  (Transcript of June 28, 2017 Hr'g at 12:25-13:1 (Dkt. No. 166).)  The Trustee's counsel advised the Court that he would decide whether the Trustee still planned to proceed with a summary judgment motion and "get back to the Court within the next few days."  (*Id*. at 13:21-22.)  The Trustee never did get back to the Court following that pre-motion conference. Instead, after eighteen months of total silence in this adversary proceeding, on December 21, 2018, the Trustee filed his Motion that is fatally flawed in numerous respects.

1

The Trustee's Motion reads as though, like Rip Van Winkle, he had fallen asleep for an extended period and not realized that there have been developments in this case over the past few years that need to be accounted for and addressed. The Trustee ignores these developments.

For example, the Trustee's Motion relies almost exclusively on the allocutions of Bernard Madoff, Frank DiPascali and David Kugel to argue that from "the early 1990s through 2008," BLMIS "never engaged in securities trades reported in customer statements." (Trustee's Memorandum of Law in Support of Motion for Summary Judgment (the "Trustee Br.") (Dkt. No. 191) at 9.) In making this indefensibly broad, categorical argument, the Trustee does not even mention all the contrary testimony, including but not limited to Madoff's own conflicting deposition testimony that BLMIS traded in U.S. Treasury bills for customer accounts right up until the 2008 collapse of BLMIS. *See* Argument, Section II.A below. Furthermore, and consistent with the testimony that U.S. Treasury bills were traded for customer accounts, there is ample evidence of actual trading in U.S. Treasury bills for BLMIS's investment advisory ("IA") business that has been supplied by third-party broker-dealers, including Bear Stearns, Fidelity, Lehman Brothers, JPMorgan Chase and Morgan Stanley. *See* Argument, Section II.A below. The Trustee cannot make this evidence go away by simply ignoring it. The contrary evidence creates numerous disputed issues of fact that preclude an award of summary judgment.

Further, in computing his "fictitious profits" figure of $86.5 million against Legacy, the Trustee fails to justify how he is accounting for the predecessor accounts that were closed and rolled over to open the Legacy account in 2000. In particular, at least one of those predecessor accounts was created in the early 1990s, which the evidence indicates may be a period when more substantial actual trading was being conducted for BLMIS's IA accounts. The Trustee

2

does nothing to meet his burden, simply assuming without evidence that there were no legitimate trades in the predecessor accounts to the Legacy account.  *See* Argument Section II.B below.

Critically, the Trustee also does not offer any evidence specific to Legacy to meet his burden of showing that no legitimate trades were being conducted on Legacy's behalf.  Even a cursory review of some of the available evidence demonstrates that, consistent with Madoff's testimony, BLMIS was conducting actual trades in U.S. Treasury bills on behalf of Legacy's account.  In Section III below, and in the accompanying declaration of Rafael Mayer, dated February 28, 2019 (the "Mayer Declaration"), Legacy describes several examples of these actual trades, which can be corroborated based upon third-party brokerage records and sometimes tied to specific CUSIP numbers.[1]  Accordingly, the Trustee has not met his burden of proof with respect to the alleged $86.5 million "fictitious profits" figure.  At a minimum, some meaningful portion of these Excess Funds are not fictitious.  Ultimately, the Trustee bears the burden to prove what Legacy withdrew in excess of its deposits, but less the proceeds of legitimate securities transactions.  Because at least some of the amounts withdrawn by Legacy came from trading profits, and not principal deposits from other investors, the Trustee is not entitled to summary judgment.

In addition, the Trustee's Motion is silent about what bank account or accounts were supposedly used to pay redemptions to Legacy.  *See* Section II.B.  Without specific bank account information, the Trustee has no way to show that the redemptions paid to Legacy were paid from principal deposits made by other investors into that same account.  There simply is no proof at all offered by the Trustee with respect to the source of funds used to pay Legacy's redemptions from

---

[1] A CUSIP number is a recognized identifier of securities assigned by CUSIP Global Services.  This system of securities identification has been in place since 1968.

SL1 1574590v2 106906.00001

its account.  This failure of proof further dooms the Trustee's Motion.  Indeed, as explained in Section IV, the Trustee fails even to demonstrate that Legacy actually received all of the withdrawals he seeks to recover.

Finally, as detailed in Section V, Legacy has a complete defense to this case under Section 548(c) of the Bankruptcy Code, because the Securities Exchange Act of 1934, of which SIPA is a part, expressly preserves the right of an innocent victim to enforce the obligations under a securities contract even where the counterparty procured the contract by fraud.

## **PROCEDURAL HISTORY**

On December 6, 2010, the Trustee filed a complaint (Dkt. No. 1) and commenced this action against Legacy and other now-dismissed defendants, seeking to avoid and recover certain transfers from BLMIS.  On July 2, 2015, the Trustee filed an amended complaint (the "Am. Compl.") (Dkt. No. 112) seeking to (i) avoid $213,180,068 in transfers to or for the benefit of Legacy, of which the Trustee alleged that $86,505,850 comprised fictitious profits, transferred in the two years prior to the Filing Date, and (ii) recover approximately $6,601,079 in alleged subsequent transfers from co-defendant Khronos LLC ("Khronos").  (Am. Compl. ¶¶ 142, 144, 151.)  Legacy and Khronos thereafter filed motions to dismiss the Amended Complaint on July 30, 2015.  (Dkt. Nos. 115-19.)  The matter was fully briefed by the parties, and oral argument was held before this Court on October 28, 2015.

This Court issued a decision on March 14, 2016 granting Legacy's motion to dismiss in part and Khronos's motion to dismiss in full.  *Picard v. Legacy Capital Ltd.* (*In re Bernard L. Madoff Investment Securities LLC*), 548 B.R. 13, 35 (Bankr. S.D.N.Y. Mar. 14, 2016) (Dkt. No. 134).  On April 12, 2016, this Court entered an order (a) dismissing Count One of the Amended Complaint against Legacy without prejudice, except to the extent Count One sought to

4

avoid and recover fictitious profits transferred to or for the benefit of Legacy within two years of the BLMIS filing date; (b) dismissing Counts Two through Seven of the Amended Complaint against Legacy without prejudice; and (c) dismissing the Amended Complaint against Khronos with prejudice.  (Dkt. No. 137.)  Legacy thereafter filed its answer to the Amended Complaint (the "Answer") on May 16, 2016, specifically denying that the Trustee was entitled to the relief sought in Count I and preserving defenses under section 548(c).  (Dkt. No. 139.)

On September 7, 2016, the Trustee filed a motion for judgment on the pleadings as to the sole remaining count of the Amended Complaint.  (Dkt. Nos. 141-43.)  On October 7, 2016, Legacy filed its opposition brief.  (Dkt. No. 147.)  On October 25, 2016, the Trustee filed his reply brief.  (Dkt. No. 149.)  At a hearing held on November 3, 2016, this Court denied the Trustee's Motion for Judgment on the Pleadings.

By letter dated June 20, 2017, the Trustee sought a pre-motion conference for leave to file a motion for summary judgment, which conference was conducted on June 28, 2017.  At that conference, Legacy referred to newly-discovered evidence that in fact there had been trading in customer accounts, including Madoff's recent testimony.  (Transcript of June 28, 2017 Hr'g at 5-8 (Dkt. No. 166).)  As a result, the Court recommended that, rather than moving for summary judgment, the Trustee should consider scheduling a trial.  (*Id.* at 11-13.)  The Trustee agreed to consult with counsel and "get back to the Court in the next few days."  (*Id.* at 13.)  In the intervening one and a half years, the Trustee made absolutely no effort to schedule a trial, move for summary judgment or get back to the Court on those issues until the Trustee filed the Motion on December 21, 2018.[2]

---

[2] The first indication that the Trustee intended to file the Motion was an email to that effect sent at 6:48 p.m. on December 19, 2018.

SL1 1574590v2 106906.00001

## STATEMENT OF FACTS

Legacy respectfully refers the Court to its Response to the Trustee's Statement of Material Facts Pursuant to Local Bankruptcy Rule 7056-1 in Support of Plaintiff's Motion for Summary Judgment ("CSMF") for a summary of the relevant disputed and undisputed facts.

## ARGUMENT

### I.    STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, governs summary judgment motions.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As explained in *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*:

> The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law.  If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials.  In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party.

Case No. 08-15051 (SMB), 2014 WL 47774, at *8 (Bankr. S.D.N.Y. Jan. 3, 2014) (internal quotations omitted); *see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 563 B.R. 737, 742 (Bankr. S.D.N.Y. 2017).

### II.    THE TRUSTEE HAS FAILED TO ESTABLISH THE ELEMENTS OF THE PONZI SCHEME PRESUMPTION AS A MATTER OF LAW

The record before this Court on the Trustee's Motion is insufficient to prove as a matter of law that all the elements of the Ponzi scheme presumption have been satisfied.  Courts generally apply a four-factor test in determining the existence of a Ponzi scheme:  (1) deposits were made by investors, (2) the debtor conducted little or no legitimate business operations as

6

represented to investors, (3) the purported business operation of the debtor produced little or no profits or earnings, and (4) the source of payments to investors was from cash infused by new investors. *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Case No. 08-15051, 2014 WL 47774, at \*9 (Bankr. S.D.N.Y. Jan. 3, 2014). If the Trustee cannot prove each of the four factors, then he is required to show BLMIS's fraudulent intent with regard to each of the specific transfers that he seeks to recover. *See id.* at \*14 (ruling that trustee failed to meet burden as a matter of law).[3]

If the Ponzi scheme presumption is found to apply, and is not rebutted, then "all transfers made in furtherance of that Ponzi scheme are presumed to have been made with fraudulent intent" and the Trustee is relieved of his burden to show intent with regard to specific transfers. *Id.* For the reasons set forth below, the Trustee has failed to prove that the presumption should apply to all BLMIS transfers and has failed to offer any proof with respect to the specific transfers he seeks to recover from Legacy. In the alternative, the facts set forth herein are sufficient to rebut the Ponzi scheme presumption in this particular action. Accordingly, the Trustee's Motion for summary judgment should be denied.[4]

---

[3] *See also Silverman v. Meister Seelig & Fein, LLP (In re Agape World, Inc.)*, 467 B.R. 556, 570 (Bankr. E.D.N.Y. 2012) ("The sole exception to the Ponzi scheme presumption is where the transfers at issue are so unrelated to the Ponzi scheme that the transfers do not serve to further the Ponzi scheme."); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (Bankr. S.D.N.Y. 2007) (finding that fund was a Ponzi scheme but noting that courts must be certain that transfers sought to be avoided are in fact related to the scheme); *accord Kapila v. TD Bank, N.A. (In re Pearlman)*, 440 B.R. 900, 904 (Bankr. M.D. Fla. 2010) (finding no Ponzi scheme under the four-factor test); *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1313-19 (M.D. Fla. 2009) (finding issue of material fact as to whether scheme constituted a Ponzi scheme under the four-factor test).

[4] Legacy is not aware of any BLMIS decisions after the Madoff deposition testimony and other relevant evidence came to light in which this Court (or any other court) has ruled that the Trustee has met his burden of proving that the Ponzi scheme presumption applies to BLMIS. Unlike this Motion, in prior decisions involving application of the Ponzi scheme presumption to BLMIS, courts have based their decisions on the Trustee's pleadings and have not been asked to evaluate the sufficiency of the Trustee's proof, *see, e.g., Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC)*, 557 B.R. 89, 95 (Bankr. S.D.N.Y. 2016); *In re Bernard L. Madoff Inv. Sec.* LLC, 542 B.R. 100, 102 (Bankr. S.D.N.Y. 2015); *Bernard Madoff Inv. Sec. LLC v. J. Ezra Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 125 (Bankr. S.D.N.Y. 2014); or defendants have stipulated to the Ponzi scheme presumption, thereby relieving the Trustee of his burden of proof, *see, e.g., Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv.

7

### A. The Trustee Has Failed To Prove That BLMIS Was Engaged In "Little Or No" Legitimate Business Operations And That There Were "Little Or No" Profits Or Earnings From The Legitimate Business Operations

The Trustee has failed to prove that BLMIS conducted little or no legitimate business operations and that BLMIS produced little or no profits from such activity. The Trustee relies on the allocutions of Madoff and several former BLMIS employees in support of his erroneous assertion that BLMIS engaged in no legitimate trading on behalf of its IA customers after the early 1990s. (Trustee Br. at 6-7.) The Trustee, however, completely ignores all that has been discovered since the allocutions, including contradictory deposition testimony by Madoff and documentary evidence that shows that BLMIS was engaged in legitimate trading activity both in connection with the market-making side of its business, as well as the IA business. The Trustee also fails to address evidence that, contrary to the Trustee's characterizations, the market-making and IA businesses were not hermetically sealed off from one another. The Trustee fails to grapple with the implications of this evidence in connection with his Motion and has thus failed to establish elements (2) and (3) of the Ponzi scheme presumption.

### 1. The Trustee Has Failed To Prove That BLMIS's IA Business Should Be Considered Separate From The Proprietary Trading Business

It is undisputed that all of BLMIS's business operations were conducted through a single legal entity: Bernard L. Madoff Investment Securities LLC. It is also undisputed that, in addition to the IA business, which was rife with fraud, BLMIS conducted a legitimate market-making business. (Trustee's Statement of Material Facts Pursuant to Local Bankruptcy Rule 7056-1 in Support of Plaintiff's Motion for Summary Judgment ("SMF") ¶ 23 (Dkt. No. 192); *see also* Declaration of Oren J. Warshavsky, dated December 21, 2018 (Dkt. No. 193)

---

Proc. No. 10-04946 (SMB), 2018 WL 3078149, at **1-2 (Bank. S.D.N.Y. June 19, 2018); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Proc. No. 08–01789 (SMB), 2018 WL 1442312, **1-2 (Bank. S.D.N.Y. March 22, 2018).

SL1 1574590v2 106906.00001

(the "Warshavsky Decl.") Ex. 1 (Madoff Plea Hr'g Tr. at 25:6-11); Declaration of Nicholas F. Kajon, dated March 1, 2019 (the "Kajon Decl.") Ex. A (11/09/17 Madoff Dep. Tr. at 507:6-8).) It is the Trustee's burden to prove that the Ponzi scheme was separate from the legitimate trading at BLMIS, and that the IA business was not receiving financial support from the other business units of BLMIS.  He has failed to do so.

To the contrary, there is evidence in the record that, as part of the fraud, Madoff comingled funds from these two businesses by, for example, transferring funds from his IA business to his market-making business and transferring commissions charged to his IA clients to the operating account for the market-making side of his business.  (SMF ¶ 8.)  At her plea hearing, Ms. Contellessa-Pitz allocuted that, from about 1999 through 2008, she made "false and inaccurate entries in the books and records of BLMIS relating to transfers of funds from BLMIS's Investment Advisory business" by, at the direction of Madoff, booking "transfers improperly to the accounts of BLMIS's Proprietary Trading and Market Making businesses, and record[ing] these false entries in BLMIS's Trading Ledgers, General Ledgers, and other supporting books and records or BLMIS's Proprietary Trading and Market Making businesses." (Warshavsky Decl. Ex. 7 (Contellessa-Pitz Plea Hr'g Tr. at 31:12-24).)

In broad terms, the evidence demonstrates that these two "business units" that were operated by the same LLC were not, in fact, operated as distinct businesses.  BLMIS did not even register with the SEC as an investment advisor until August 2006.  (Warshavsky Decl. Ex. 5 (I. Lipkin Plea Hr'g Tr. at 41:1-8).)  Accordingly, the Trustee has failed to meet his burden that the legitimate business activity conducted by BLMIS—including the trading done by the market-making side of the business—should not be considered in determining whether the Ponzi scheme presumption should apply.  Indeed, both of BLMIS's business units were engaged in the

9

trading of securities and BLMIS customers anticipated that there were significant advantages to be gained by the IA customers because of the substantial operations of the market making side of BLMIS. Thus, unlike *In re Dreier*, which involved a law practice functionally distinct from the sale of fraudulent notes, here, the IA customers expected that their accounts would benefit from the market-making business conducted by BLMIS, and all such activity should be considered as part of the analysis of legitimate business activity being conducted for purposes of application of the Ponzi scheme presumption. *See* 2014 WL 47774, at *10. BLMIS's market-making business was a substantial business, and thus, in the absence of undisputed evidence that it was entirely separate from the IA business, the Trustee cannot meet his burden of demonstrating as a matter of undisputed fact that BLMIS had little or no legitimate business operations or profits.

> **2.      The Trustee Relies Selectively On Allocutions To Argue That There Were No Legitimate Business Operations, But Ignores Conflicting Evidence Indicating That Actual Trading Was Taking Place**

The Trustee's Motion relies almost exclusively on the allocutions of Madoff, Frank DiPascali and David Kugel to argue that, beginning in the early 1990s, BLMIS "never engaged in securities trades reported in customer statements."[5] (Trustee Br. at 9; *see also id.* at 7 (Madoff allocuted that he "did not execute trades on behalf of his investment advisory clients").) The Trustee, however, ignores the evidence that has come to light since these allocutions that contradicts this basic premise underlying the Motion. It is notable that, after more than a decade

---

[5] Some of the allocutions relied on by the Trustee are not based on personal knowledge and, therefore are not admissible. (*See, e.g.*, Warshavsky Decl. Ex. 5 (I. Lipkin Plea Hr'g Tr. at 30:12-21) ("I would like the court to know that at no time before I retired was I ever aware of Mr. Madoff or anyone else in the company was engaged in the Ponzi scheme reported in the media. My belief in Bernie Madoff's trading skills were such that I encouraged my own family to invest their money in accounts managed by Mr. Madoff."); *see also id.* Ex. 7 (Contellessa-Pitz Plea Hr'g Tr. at 34:3-5) ("at the time I committed these crimes I did not know that Madoff and others were stealing investors' money instead of actually investing the money through securities trading.").) Some of the other allocutions involved falsifying documents in connection with an audit, creating fake payroll documents and falsifying information in connection with his personal construction loan application, but did not involve evidence regarding whether Madoff was engaged in actual trading activity or a Ponzi scheme. (*See, e.g.*, id. Ex. 6 (E. Lipkin Plea Hr'g Tr. at 32:5-33:11).)

SL1 1574590v2 106906.00001

since the collapse of BLMIS and after spending more than a billion dollars in legal fees, the Trustee never affirmatively sought to depose Madoff to inquire about his business operations or the fraud. (*See, e.g.*, Kajon Decl. Ex. B (4/26/17 Madoff Dep. Tr. at 108:4-13).) Contrary to the Trustee's arguments, the following evidence indicates that legitimate trading activity was taking place for IA customer accounts:

*First*, following his allocution, Madoff testified under oath at his depositions that he consistently purchased Treasury bills with IA customer funds, including during periods after 1992. (*See, e.g.*, Kajon Decl. Ex. B (4/26/17 Madoff Dep. Tr. at 19:3-10); *see also* Warshavsky Decl. Ex. 2 (12/20/16 Madoff Dep. Tr. at 161:11-25; 162:5-12).) Madoff instructed Frank DiPascali to maintain a portfolio of Treasury securities of up to $6 billion using the 703 account money because "we would never keep the money in cash." (Kajon Decl. Ex. B (4/26/17 Madoff Dep. Tr. at 44:8-15); *see also id.* at 55:13-20.) Madoff testified that consistently through 2008, money in IA accounts was invested in interest-bearing Treasury bills. (Warshavsky Decl. Ex. 2 (12/20/16 Madoff Dep. Tr. at 162:5-12).) The investments in Treasury bills bore an interest rate of approximately 3-4%, which was money earned by the IA customers' funds. (*Id.* at 19:11-21.) While Madoff acknowledged that the IA customer statements often reflected the ownership of securities that BLMIS, in fact, had not bought in connection with the purported split-strike conversion strategy, the account statements also reflected the ownership of Treasury securities that he actually did purchase. (*Id.* 19:22-20:1.) Madoff's testimony about actual trading in Treasury bills is consistent with the activity reflected in the Legacy account statements and in third-party documents, as discussed in Argument Section III below.

*Second*, Madoff testified that BLMIS purchased the Treasury securities through accounts that were held at Bear Stearns, Fidelity, Lehman Brothers, JPMorgan Chase, and Morgan

Stanley.  (Kajon Decl. Ex. B (4/26/17 Madoff Dep. Tr. at 46:9-19); *see also id.* Ex. A (11/09/17 Madoff Dep. Tr. at 483:11-14).)  This testimony was corroborated by documents produced by these third-party banks, consistently reflecting significant trading and positions in Treasury securities during the relevant period.  (*See, e.g.*, Mayer Decl. Exs. 3-7)

*Third*, Madoff's deposition testimony that there was legitimate trading taking place is also consistent with the testimony of Steve Maslow, a former Managing Director/Principal at Bear Stearns, who testified that during the time that he worked at Bear Stearns from 1985 through 1999, BLMIS did a "huge amount of business" with Bear Stearns, "all of which involved trading of real securities."  (Warshavsky Decl. Ex. 8 (Declaration of Steve Maslow, dated May 11, 2017, ¶¶ 1, 4).)  The Trustee's argument that this evidence should be disregarded because it "does not mention the IA business" is unpersuasive.  (SMF ¶ 23.)  Mr. Maslow did not differentiate between the market-making business and the IA business, and so this issue is simply unaddressed in the declaration.  In addition, the Trustee's argument that this declaration is not relevant because it covers the period before the Legacy account was opened also misses the mark.  (*See* Trustee Br. at 9.)  As the Trustee's own expert recognizes, the calculation of Legacy's Excess Funds involves various predecessor accounts, the earliest of which was opened in 1992, which is within the time frame discussed in the Maslow Declaration.  (*See* Warshavsky Decl. Ex. 9 (Greenblatt Report ¶ 24).)

*Finally*, related to the above point, the Trustee has failed to prove when the alleged Ponzi scheme began—he merely relies on Madoff's allocution to state that it was in the "early 90s." (Trustee Br. at 9.)  However, during his depositions, Madoff testified that the fraud began at some point in 1993 as more money poured in for the split-strike strategy and BLMIS was unable to put that additional money to work.  (Kajon Decl. Ex. B (4/26/17 Madoff Dep. Tr. at

12

11:14-12:4); *see also id.* 18:3-25 (indicating that there was trading in the split-strike conversion strategy until the end of 1993 or early 1994).)  Thus, since at least one of the pre-Legacy accounts was open by 1992, the Trustee has failed to offer evidence to establish that there were no actual trades in that predecessor account.

**B.      The Trustee Has Failed To Offer Any Facts Regarding The Accounts From Which Legacy Was Paid Or To Prove That The Payments To Legacy Consisted Of Other Customers' Funds**

In addition to failing to account for the evidence of legitimate trading activity, the Trustee also has offered no evidence establishing the bank accounts from which Legacy was paid; nor has he made any effort to trace the source of the funds used to pay Legacy to determine whether the source was cash infused by other BLMIS customers, or proceeds of actual trading activity. Accordingly, the Trustee has failed to establish element (4) of the Ponzi scheme presumption.

The scant evidence provided by the Trustee regarding the payments to Legacy includes that:  (i) BLMIS investment advisory customer funds were deposited into an unidentified "bank account at JPMorgan Chase Bank" (SMF ¶ 24); and (ii) when BLMIS investment advisory customers submitted redemption requests, they would be satisfied by deposits held at BLMIS's unidentified "bank accounts at JPMorgan" (*id.*).  The Trustee does not specify the "accounts" at JPMorgan that were used to satisfy the redemption requests or indicate what other trading activity may have occurred in any such accounts.  In sum, the Trustee says nothing at all about the source of the funds used to pay the Legacy redemptions.

Further, Madoff testified at his deposition that he did not have a need to use customer funds to redeem other customers:

> Q:      Now, when SIPC is using here the phrase Ponzi scheme, if you accept for a moment that a Ponzi scheme is a nonexistent business in which people

13

> invest where the sole source of paying returns on their investments is investments from new investors–

A:    Uh-huh

Q:    -on that definition was the split strike ever a Ponzi scheme?  In other words, did you ever need new cash from new customers in order to redeem other customers?

A:    No

Q:    Did you ever need new cash from new customers to pay the earnings that were reported on the statements?

A:    No. . .

(Kajon Decl. Ex. B (4/26/17 Madoff Dep. Tr. at 107:14-108:4); *see also id.* Ex. A (11/09/17 Madoff Dep. Tr. at 517:10-13) (Madoff testifying that he never had to obtain additional customer money in order to pay an existing customer).)

The Trustee in *In re Dreier* "offered evidence that Dreier LLP's Wachovia accounts on occasion were funded with investor proceeds, and implied that the outflow from Wachovia to Account 5966 always consisted entirely of the same investor proceeds."  2014 WL 4774, at *14. The court held that because the trustee "did not conduct an analysis or trace the flow of funds moving in and out of Wachovia or the sources of those funds," she failed to prove that the funds at issue were derived from other customers' property.  *Id.*  Here, the failure of proof is even more egregious.  The Trustee has failed to offer any admissible evidence of the source of the funds used to pay Legacy.  Accordingly, there is no evidence that Legacy was paid with other customers' funds, and the Trustee's Motion should be denied.

## III.    THE TRUSTEE HAS FAILED TO PROVE THAT LEGACY'S WITHDRAWALS CONSISTED SOLELY OF FICTITIOUS PROFITS

The Declaration of Rafael Mayer sets forth five straightforward examples of legitimate trades in U.S. Treasury bills during the less than eight-year period from the creation of the

14

Legacy account until the collapse of BLMIS.[6]  These examples of actual trades for the Legacy account illustrate that the Trustee has failed to conduct any serious, specific analysis of the Legacy account to prove his $86.5 million "fictitious profits" figure, instead relying on generalities and platitudes.  Faced with these specific examples of actual trading in the Legacy account, it is evident that the scant evidence offered by the Trustee cannot sustain the Trustee's burden to prove that Legacy's Excess Funds consisted solely of other customers' funds.[7]

The examples set forth in the Mayer Declaration are not in any way comprehensive, as a more comprehensive analysis would demonstrate many additional actual trades in the Legacy account.  Rather, these examples suffice to illustrate the Trustee's utter failure to analyze the trading reflected in the Legacy account statements to evaluate the extent to which actual trades are reflected therein.  Despite hiring at least four experts in this case, the Trustee does not proffer the opinion of any expert to support his contention that there was never any trading in Legacy's account.[8]  Because of the Trustee's failure of analysis and of proof, and in the face of the countervailing evidence, the Trustee cannot possibly meet his burden on summary judgment.

---

[6] In particular, the Mayer Declaration details May 2002 and May 2005 trades for the Legacy account executed by BLMIS through Morgan Stanley (Mayer Decl. ¶¶ 4, 12); March 2007 and June 2007 trades for the Legacy account executed by BLMIS through JPMorgan (id. ¶¶ 23-24); and a November 2007 trade executed for the Legacy account through Lehman Brothers and JPMorgan (id. ¶¶ 38-44).  As shown by the documents supporting the Mayer Declaration, these actual trades are corroborated by third-party brokerage statements and can be matched based on maturity dates, quantities and securities prices; and, in certain instances, there is enough information provided by the documents to allow for a CUSIP number match.

[7] Legacy anticipates that the Trustee will attempt to minimize the extent of BLMIS's trading in U.S. Treasury bills. However, in general, Legacy's BLMIS statements consistently reflect that most of the value in its account was held in U.S. Treasury bills as each month drew to a close.  (*See, e.g.*, Mayer Decl. Ex. 28 (Legacy BLMIS account statement for the month ending 9/30/07).)  Since the withdrawals from Legacy's account during the two-year lookback period all took place in the beginning of the month, the portion of the Legacy account value tied to U.S. Treasuries immediately preceding the withdrawals is significant.  (*See, e.g.*, Warshavsky Decl. Ex. 9 (Greenblatt Report, Ex. 4D at 16) (showing two withdrawals from the Legacy account on October 4, 2007).)  In any event, whether characterized as significant or not, the Trustee utterly fails to address any of the actual trading in the Legacy account.

[8] The Greenblatt expert report relied on by the Trustee in support of his Motion calculates account balances, but does not offer an expert opinion on trading or lack thereof.  (*See generally* Warshavsky Decl. Ex. 9.)

15

* * *

For all the reasons set forth above, the Trustee has failed to meet his burden of proving that he is entitled to the benefit of the Ponzi scheme presumption.  Instead, the Trustee has treated the Ponzi scheme presumption as if it were a magical incantation.  But the Trustee's bald assertion of the Ponzi scheme presumption is not a substitute for addressing the evidence, and his assertion of the presumption does not withstand scrutiny.  In the alternative, if the Court were to determine that the Trustee has established facts sufficient to prove the Ponzi scheme presumption (which he has not), then the facts summarized above are sufficient to rebut that presumption, returning the burden of proof to the Trustee - a burden that he cannot possibly meet on summary judgment because of all the contrary evidence discussed above.  *See generally Myers v. Blumenthal*, 534 B.R. 6, 17 (D. Neb. 2015) ("[A] Ponzi presumption, if applicable, is rebuttable, and is not conclusive of fraudulent intent"); *Ritchie Cap. Mgmt., LLC v. Stoebner*, Civ. No. 12–3038 (SRN), 2013 WL 2455981, at *3 (D. Minn. June 6, 2013) (referring to the Ponzi scheme presumption as a "rebuttable presumption"), *aff'd on different grounds* 779 F.3d 857; *Wagner v. Oliva (In re Vaughan Co. Realtors)*, 500 B.R. 778, 789 (N. Mex. 2013) (finding a Ponzi scheme when the Ponzi presumption was not rebutted by defendants).

## IV.    THE TRUSTEE HAS FAILED TO PROVE THAT THE WITHDRAWALS FROM THE LEGACY ACCOUNT WERE ACTUALLY TRANSFERRED TO LEGACY

The Trustee bears the burden to prove that he is entitled to recover any avoidable fraudulent transfers from Legacy and has failed to meet that burden.  The Trustee relies exclusively on the expert report submitted by Mr. Greenblatt to state that Legacy withdrew $86,505,850 in excess of principal from the Legacy Account.  (SMF ¶ 36.)  The Trustee contends, but fails to prove, that all of the transfers he seeks to avoid were in fact transferred to Legacy.  The Trustee's mere allegation that all these amounts were transferred to Legacy cannot

16

be credited on a motion for summary judgment and, in any event, the allegation is incorrect.  The Trustee entirely overlooks the fact that half of all withdrawals during the relevant period were paid to an entity wholly unrelated to Legacy that is no longer a defendant herein ("Former Defendant").  As a result, the Trustee fails to provide any evidence as to which amounts wired out of Legacy's account were actually transferred to Legacy, as opposed to Former Defendant. (CSMF ¶¶ 36, 38.)  For each withdrawal from the Legacy account within the two-year lookback period, there are two wires out of Legacy's account on the same date, in equal amounts.  (*See* Warshavsky Decl. Ex. 9 (Greenblatt Report, Ex. 4D).)  Legacy asserts that, in September 2007, one of two $50 million withdrawals was wired to Former Defendant, not Legacy;[9] in October 2007, one of two $27 million withdrawals was wired to Former Defendant; and in June 2008, one of two $10 million withdrawals was wired to Former Defendant.  (CSMF ¶¶ 36, 38.)  Even assuming arguendo that there were $86.5 million in transfers of fictitious profits (which Legacy does not concede), the only way Legacy could have received the entire $86.5 million within the two-year reach-back period would be if Legacy received (a) the second $50 million transfer (for which there is no evidence) and (b) 100% of the other transfers aggregating $74 million, when in fact only half of such transfers were paid to Legacy.  As a result, the Trustee's contention that Legacy received $86.5 million in fictitious profits within the two-year reach-back period is patently false even if all profits were in fact fictitious as the Trustee contends but is unable to prove.  Because the Trustee has not offered any proof that all the amounts he seeks to recover were, in fact, transferred to Legacy, he is not entitled to recover those amounts from Legacy.

---

[9] According to Greenblatt's analysis, the first of these two $50 million withdrawals was wholly on account of invested principal, while the second $50 million withdrawal was on account of approximately $38.5 million of invested principal and approximately $12.5 million in profits. The Trustee offers no evidence as to which of these two $50 million transfers was made to Legacy as opposed to Former Defendant, which under the Trustee's theory of the case should be a critical fact.

17

## V. SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE LEGACY HAS A COMPLETE DEFENSE PURSUANT TO SECTION 548(C)

### A. Legacy's Value Defense Exceeds The Amount Sought By The Trustee

This Court previously entered an order granting Legacy's motion to dismiss, limiting the Trustee to avoidance of actual fraudulent transfers under Section 548(a)(1)(A) "made or incurred on or within 2 years before the date of the filing of the petition." (Dkt. No. 137.) Section 548(a)(1) establishes a statute of repose which cannot be circumvented by any equitable claims to circumvent the two-year reach-back period set forth therein. These obligations are set and remain "invulnerable." 5 Collier on Bankruptcy ¶548.09[1][a] (16th ed. 2017). As the Trustee is limited to a two-year reach-back period, the Court must consider the value of Legacy's unavoidable contract and tort obligations existing on account of the antecedent debt reflected in Legacy's account statements issued prior to the two-year reach-back period.

The two-year reach-back period cannot be tolled or equitably expanded because Section 548(a) is a statute of repose. "Many courts have confronted this issue and rejected the idea that §548(a)(1) is a statute of limitations subject to equitable tolling." *Schlossberg v. Abell* (*In re Abell*), 549 B.R. 631, 657-59 (Bankr. D. Md. 2016). As the Second Circuit recognizes, a statutory reach-back limit such as Section 548 vests "a *substantive* right in those protected [here, Legacy] to be free from liability after a legislatively-determined period of time." *Police & Fire Ret. Sys. v. IndyMac MBS, Inc.,* 721 F.3d 95, 106 (2d Cir. 2013).

As the Supreme Court recently explained, a statute of repose draws lines at the beginning of the reach-back period. *California Pub. Empls. Retirement Sys. v. ANZ Secs., Inc., 137 S. Ct. 2042 (2017) ("CalPERS")*. In *CalPERS*, the Supreme Court held that Section 13 of the Securities Act of 1933 ("1933 Act") was a statute of repose not subject to tolling, and therefore dismissed petitioner's untimely claim for relief. *CalPERS*, 137 S. Ct. at 2049-51. The 1933 Act

18

contained a one-year statute of limitations and a separate provision mandating that an action thereunder could not be brought "more than three years after the security was bona fide offered to the public." Relying on the plain text of this sentence and the overall structure of the section, the Supreme Court held that the three-year provision was a statute of repose for two reasons. First, the statute "runs from the defendant's last culpable act (the offering of the securities), not from the accrual of the claim (the plaintiff's discovery of the defect in the registration statement)." *Id.* at 2049. Second, such a "pairing of a shorter statute of limitations and a longer statute of repose is a common feature of statutory time limits." *Id*. The same is true of the Bankruptcy Code provisions applicable to the Trustee's claims here: Section 546(a) sets the two-year time period within which the avoidance action must be filed, while Section 548(a) prescribes the two years of transfers or obligations that may be challenged, whereas transfers made or obligations incurred before such two-year reach-back period may not be challenged by the Trustee.

Section 548 of the Bankruptcy Code provides that "a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." *See* 11 U.S.C. §548(c). "Value" is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ." 11 U.S.C. § 548(d)(2)(A). Thus, a transfer is an exchange for value where the debtor owes the transferee a debt or obligation including an existing contractual obligation or tort liability on a claim. 11 U.S.C. § 101(5), (12).

The BLMIS bankruptcy petition was filed on December 10, 2008. The obligations due from BLMIS to Legacy are therefore preserved as they existed on December 10, 2006, which is

19

documented in the account statements maintained and distributed by BLMIS. The most recent account statement prior to the beginning of the two-year lookback period was sent to Legacy in December 2006, showing that Legacy held securities valued at $199,197,675.10 as of November 30, 2006 with BLMIS. (Mayer Decl. Ex. 1.)

The Trustee cannot avoid a transfer to the extent that the transferee gave value to BLMIS. As detailed below, Legacy held an enforceable state law right against BLMIS for full payment of its securities entitlements under Section 8-501(b)(1) of the New York Uniform Commercial Code. Importantly, Legacy held an actionable claim for the funds in its account managed by BLMIS as of the two year reach-back period which is unavoidable by the Trustee. Because the value of Legacy's claim on account of its statement exceeds $86.5 million, this operates as a complete defense to the Trustee's claim against Legacy.[10]

### B.    The Securities Exchange Act Of 1934 Preserves The Right Of An Innocent Victim To Enforce The Obligations Under A Securities Contract

Section 28(a)(2) of the 1934 Act, of which SIPA is a part, expressly preserves all of Legacy's rights and remedies arising under state law. 15 U.S.C. § 78bb(a)(2); *see also Butner v. United States*, 440 U.S. 48, 56 (1979) (creditor "afforded in federal bankruptcy court the same protection he would have under state law"). At all times prior to the reach-back period, Legacy had state law rights to payment from BLMIS that are enforceable defenses to the Trustee's claims.

---

[10] Legacy has preserved this defense. First, in its Answer, Legacy asserted a defense under Section 548(c), although the substance of the 548(c) defense asserted in the Answer differs from the defense formulated in this opposition. Second, Legacy raised and preserved the Section 548(c) value defense in its opposition to the Trustee's motion for judgment on the pleadings. (Dkt. No. 147 at Pt. III & Ex. A)  In any event, "[n]umerous courts have held that 'absent prejudice to the plaintiff, a defendant may raise an affirmative defense in a motion for summary judgment for the first time.'" *Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 698 (S.D.N.Y. 2005) (*citing Steinberg v. Columbia Pictures Indus.*, 663 F.Supp. 706, 715 (S.D.N.Y.1987). *See also Astor Holdings, Inc. v. Roski*, 325 F. Supp. 2d 251, 260 (S.D.N.Y. 2003) (*citing Curry v. City of Syracuse*, 316 F.3d 324, 330-31 (2d Cir.2003) (permitting consideration of collateral estoppel defense raised for first time in reply memorandum of summary judgment briefing, when district court had given plaintiff leave to file sur-reply)).

SL1 1574590v2 106906.00001

The Trustee may argue that Legacy's position is undermined by Judge Rakoff's decision in *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 499 B.R. 416 (S.D.N.Y. 2013) (the "*Antecedent Debt Decision*"), which held that only the principal amount and not any "fictitious profits" could be counted as "value" under Section 548(c).   However, the *Antecedent Debt Decision* rested on two grounds that were explicitly rejected by the Second Circuit the following year in *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 419 (2d Cir. 2014) (hereinafter, the "*Section 546(e) Decision*"), *viz.*, (1) BLMIS's customer contracts were not enforceable by innocent customers because of BLMIS's fraud, and (2) the priority of customer net equity claims in SIPA cases precludes giving effect to the value defense under Section 548(c) beyond the amount of the customer's principal deposits.   Neither premise withstands scrutiny under the *Section 546(e) Decision*.   Moreover, the *Antecedent Debt Decision* arose in connection with a motion to dismiss the complaint, where the Trustee's allegations had to be accepted as true.

In the *Section 546(e) Decision* the Second Circuit opined that:

> The Trustee again contends that these transfers did not constitute 'settlement payment[s]' because BLMIS never engaged in actual securities trading.  But we have held that the statutory definition should be broadly construed to apply to 'the transfer of cash or securities made to complete [a] securities transaction.'  *Enron*, 651 F.3d at 334 (citations omitted).  That is what the BLMIS clients received.  Each time a customer requested a withdrawal from BLMIS, he or she intended that BLMIS dispose of securities and remit payment to the customer.  *See* N.Y.U.C.C. § 8-501(b)(1) & cmt. 2 (broker's written crediting of securities to a customer's account creates an enforceable securities entitlement).  The statutory definition and *Enron* compel the conclusion that, for example, if I instruct my broker to sell my shares of ABC Corporation and remit the cash, that payment is a 'settlement' even if the broker may have failed to execute the trade and sent me cash stolen from another client.  As the district court correctly concluded, because the customer granted BLMIS discretion to liquidate securities in their accounts to the extent necessary to implement their sell orders or withdrawal requests, each transfer in respect of a such an order or request constituted a settlement payment.

21

*Section 546(e) Decision*, 773 F.3d at 422-23.  Here, Legacy entered into a brokerage agreement with BLMIS that gave the broker investment discretion.  Per the agreement, BLMIS regularly reported on Legacy's securities positions by sending trade confirmations and brokerage account statements.  These statements establish Legacy's statutory right to payments from BLMIS, irrespective of any fraud perpetrated by BLMIS.  *Section 546(e) Decision*, 773 F.3d at 422.

By the same logic, Section 28(a)(2) also preserved Legacy's state law claims for fraud, breach of fiduciary duty and breach of contract based on BLMIS's actions.  The Bankruptcy Code broadly defines a claim to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  The claims arising under these state law causes of action were obligations owed to Legacy at the time of the transfers rendering them antecedent debts of BLMIS, which constitute value under 11 U.S.C. § 548(c).

In a recent decision emanating from the *Tribune* bankruptcy case, District Judge Sullivan held that severance payments made to defendants within Section 548(a)'s two-year reach-back period in satisfaction of obligations arising under employment agreements entered into prior to the two-year reach-back period are transfers made in satisfaction of unavoidable obligations and are *per se* made for reasonably equivalent value.  *In re Tribune Co. Fraudulent Conveyance Litig.*, No. 11-MD-2296 (RJS), 2018 WL 6329139, at *17 (S.D.N.Y. Nov. 30, 2018), *reconsideration denied*, No. 11MD2296 (DLC), 2019 WL 549380 (S.D.N.Y. Feb. 12, 2019). Judge Sullivan reasoned that the Second Circuit treats a "debt" and an "obligation" as equivalent terms and that, for the purposes of 11 U.S.C. § 548, an "obligation" is incurred when a contract or agreement is formed.  *Id.* at *13.  In another recent decision emanating from the *Tribune*

22

bankruptcy case, District Judge Cote dismissed a trustee's attempt to avoid Tribune's indemnification obligations to its independent directors because such obligations had been incurred by the debtor more than two years before Tribune's petition date, holding that the two-year limit on the trustee's reach-back authority under Section 548(a) barred such claims. *In re Tribune Co. Fraudulent Conveyance Litig.,* No. 11MD2296 (DLC), 2019 WL 294807, at *21 (S.D.N.Y. Jan. 23, 2019). Thus, BLMIS is obligated to Legacy to uphold its antecedent claims in the amount referenced in the account statements issued to Legacy immediately prior to the beginning of the two-year lookback period.

The recent decision issued by Judge Engelmayer in *Picard v. Lowrey, et al.*, 18 civ. 5381 (PAE) decided February 7, 2019 (*see* Kajon Decl. Exhibit C), should not be applied here. In *Lowrey*, first, this Court reasoned that the parties were bound by Judge Rakoff's *Antecedent Debt Decision* because they are, in fact, the same parties to that prior decision. Upon *de novo* review in the district court, Judge Engelmayer did not revisit the arguments but rather cited the decision of Judge Rakoff and held the arguments set forth by the defendants "do not justify or require reconsideration of [the] *Antecedent Debt Decision*" and that the "*Antecedent Debt Decision's* holding remains law of the case." *Lowrey* at 23, 26. Legacy was not a party to the *Antecedent Debt Decision* and we submit to the Court that neither the *Antecedent Debt Decision* nor *Lowrey* is law of <u>this</u> case and thus cannot be binding authority. The Court here must consider the overwhelming arguments that support the proposition that Legacy gave value in the form of enforceable obligations, recognized under SIPA and the *Section 546(e) Decision*, and that the Trustee did not seek to avoid such obligations in his Amended Complaint.

Section 29(b) of SIPA protects Legacy by ensuring the enforceability of its securities contract despite fraud by BLMIS. 15 U.S.C. § 78cc(b). In fact, the presence of fraud gives an

SL1 1574590v2 106906.00001

innocent customer additional protections, including the right to either void or enforce a securities contract. *See Freeman v. Marine Midland Bank-N.Y.*, 419 F. Supp. 440, 453 (E.D.N.Y. 1976) (under section 29(b), "the investor, at his option, [may choose] to void the contract as a defense to a lender's suit, to sue on the contract for damages, to enforce the contract, or to seek rescission."). Clearly, Legacy has the right to enforce BLMIS's obligations despite BLMIS's fraud.[11]

### C. The Trustee Did Not Seek To Avoid Obligations In The Amended Complaint And Is Now Time-Barred From Doing So

In his Amended Complaint, the Trustee failed to seek avoidance under 11 U.S.C. § 548(a)(1) of the obligations BLMIS owed to Legacy as of the commencement of the two-year reach-back period. These obligations provide value to the estate, and thus a defense to any avoidance action pursuant to 11 U.S.C. § 548(c). Pursuant to 11 U.S.C. § 546(a)(1), the Trustee is now time-barred from seeking to avoid these obligations. The Trustee has not and cannot set forth any good faith basis to circumvent formal avoidance of an obligation before recovering a transfer made in satisfaction of such obligation.

An obligation "is a preliminary aspect of a transactional process that must occur prior to or as a condition of transferring property or an interest in property." *Lehman Bros. Holding v. JP Morgan Chase Bank, N.A., (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 425 (Bankr. S.D.N.Y. 2012). Where the legal predicate exists, the transfer relates back to the predicate obligation and was made in satisfaction of the original obligation. *Id.* at 445. This necessarily is an exchange for value. Since the Trustee did not seek to avoid such obligations owed by BLMIS, the

---

[11] The *in pari delicto* doctrine bars the Trustee from invoking common law to avoid BLMIS's contractual obligations. *See In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 57-58 (2d Cir. 2013) (dismissing Trustee's common law claims); *Picard v. HSBC Bank plc*, 454 B.R. 25, 37 (S.D.N.Y. 2011) (applying "the common law doctrine of *in pari delicto*, which 'bars a trustee from suing to recover for a wrong that the debtor whose estate he represents essentially took part in.'") (citations omitted).

24

unavoided obligation provides Legacy with a value defense under 11 U.S.C. § 548(c).  *See Tribune, supra,* at *17.

For the reasons set forth above, the unavoided obligations owed to Legacy as antecedent debt prior to the two year reach-back period constitute value, and thus a complete defense to the Trustee's claim against Legacy.[12]

## CONCLUSION

For the foregoing reasons, Legacy respectfully requests that the Court deny the Trustee's Motion for summary judgment, and grant Legacy such other and further relief as the Court deems just and proper.

Dated:   New York, New York
        March 1, 2019

                                    Respectfully submitted,

                                    STEVENS & LEE, P.C.

                                    By:  /s/ Nicholas F. Kajon
                                         Nicholas F. Kajon
                                         485 Madison Avenue, 20th Floor
                                         New York, New York  10022
                                         Telephone:  (212) 537-0403
                                         Facsimile:  (610) 371-1223

                                    *Attorneys for Legacy Capital Ltd.*

---

[12] As explained above, the *Net Equity Decision* does not preclude this defense in light of the Second Circuit's subsequent holding in the *Section 546(e) Decision*.

SL1 1574590v2 106906.00001