# EXHIBIT A

CONFIDENTIAL

Page 494

1                 UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF NEW YORK
2
3
        In re:                        )
4                                     )
        SECURITIES INVESTOR           )
5       PROTECTION CORPORATION,       )
                                      )
6           Plaintiff-Applicant,      )
                                      )
7       vs.                           )   08-01789 (SMB)
                                      )
8       BERNARD L. MADOFF             )
        INVESTMENT SECURITIES, LLC,   )
9                                     )
            Defendant.                )
10                                    )
                                      )
11      In re:                        )
                                      )
12      BERNARD L. MADOFF,            )
                                      )
13          Debtor.                   )
                                      )
14
15                     CONFIDENTIAL
16            Videotaped Deposition of BERNARD L.
17      MADOFF, VOLUME IV, taken on behalf of the Customers,
18      before K. Denise Neal, Registered Professional
19      Reporter and Notary Public, at the Federal
20      Correctional Institution, 3000 Old Highway 75,
21      Butner, North Carolina, on the 9th day of November,
22      2017, commencing at 8:43 a.m.
23
24
25                     * * * * *

Page 495

```
 1    APPEARANCES OF COUNSEL:

 2

 3        On Behalf of the Customers:

 4             HELEN DAVIS CHAITMAN, Esq.

 5             Chaitman, LLP

 6             465 Park Avenue

 7             New York, New York  10022

 8             (908) 303-4568

 9             hchaitman@chaitmanllp.com

10

11        On Behalf of Sage Associates, Sage Realty,

12        Malcolm Sage, Martin Sage and Ann Passer Sage

13             ANDREW B. KRATENSTEIN, Esq.

14             McDermott Will & Emery, LLP

15             340 Madison Avenue

16             New York, New York  10173-1922

17             (212) 547-5695

18             akratenstein@mwe.com

19

20

21

22

23

24

25
```

CONFIDENTIAL

Page 496

1    APPEARANCES OF COUNSEL:

2

3        On Behalf of the Trustee:

4            AMANDA E. FEIN, Esq.

5            STACY DASARO, Esq.

6            Baker Hostetler

7            45 Rockefeller Plaza

8            New York, New York    10111-0100

9            (212) 589-4621

10           afein@bakerlaw.com

11

12       On Behalf of the Deponent:

13           PETER A. GOLDMAN, Esq.

14           12 Fairlawn Parkway

15           Rye Brook, New York    10573

16           (914) 935-6857

17           pagoldman@gmail.com

18

19       Videographer:

20           Bob Collier, CLVS

21

22                      * * * * *

23

24

25

CONFIDENTIAL

Page 497

1                          CONTENTS

2    THE WITNESS:  BERNARD L. MADOFF        EXAMINATION

3              BY MS. CHAITMAN                 499

4              BY MS. FEIN                     520

5              BY MR. GOLDMAN                  579

6              BY MS. FEIN                     582

7              BY MS. CHAITMAN                 667

8              BY MR. KRATENSTEIN              678

9

10                      *  *  *  *  *

11

12                    INDEX OF EXHIBITS

13   FOR THE CUSTOMERS:                       PAGE

14   Exhibit Number 89, Schwab blotters -       502

15     12-5-86

16   Exhibit Number 90, Securities transaction  504

17     report

18   Exhibit Number 91, NSCC trade reporting    505

19     blotter - 12-11-86

20

21   FOR THE TRUSTEE:

22   Exhibit Number 10, Customer statement -    524

23     12-31-07

24   Exhibit Number 11, House 5 daily stock     535

25     Record activity - 7-16-87

CONFIDENTIAL

Page 498

1            INDEX OF EXHIBITS (Continued)

2    FOR THE TRUSTEE:                                    PAGE

3    Exhibit Number 12, House 17 stock record        558

4       summary through 12-31-07

5    Exhibit Number 13, Stock record summary -       566

6       8-31-01

7    Exhibit Number 14, House 17 stock record        569

8       summary - 3-31-94

9    Exhibit Number 15, House 17 stock record        571

10      summary - 7-16-87

11   Exhibit Number 16, Confirmation - 11-11-83      600

12   Exhibit Number 17, House 17 stock record        603

13      summary - 11-10-83

14   Exhibit Number 18, Cash and securities          611

15      blotter

16   Exhibit Number 19, Cash and securities          611

17      blotter

18   Exhibit Number 20, Proffer meeting              626

19      document - 12-16-08

20   Exhibit Number 21, Report - 12-8-08             644

21

22

23

24

25

CONFIDENTIAL

Page 499

1          THE VIDEOGRAPHER:  We're now on the

2     record.  Please note that the microphones are

3     sensitive and may pick up whispering and private

4     conversations.  Recording will continue until all

5     the parties agree to go off the record.  My name is

6     Bob Collier representing Veritext Legal Solutions.

7     Today's date is November 9th, 2017 and the time is

8     approximately 8:43.

9               This deposition is being held at Butner

10    Federal Correction Facility located at 3000 Old 75

11    Highway, Butner, North Carolina and is being taken

12    by counsel for the Plaintiff-Applicant.  The caption

13    of this case is Securities Investor Protection

14    Corporation, Plaintiff-Applicant v. Bernard L.

15    Madoff Investment Securities, LLC, Defendant.

16              This case is being held in the United

17    States Bankruptcy Court, Southern District of New

18    York, Case Number 0801789 (SMB).  The name of the

19    witness is Bernard L. Madoff.  At this time the

20    attorneys present in the room will identify

21    themselves and the parties they represent.

22              MS. CHAITMAN:  Helen Davis Chaitman on

23    behalf of numerous Defendants.

24              MR. KRATENSTEIN:  Andrew Kratenstein of

25    McDermott Will & Emery, LLP on behalf of the Sage

CONFIDENTIAL

Page 500

1   Defendants.

2          MS. DASARO:   Stacy Dasaro, Baker

3   Hostetler, on behalf of the Trustee.

4          MS. FEIN:   Amanda Fein, Baker Hostetler,

5   on behalf of the Trustee.

6          MR. GOLDMAN:   Peter Goldman on behalf of

7   the witness, Mr. Madoff.

8          THE VIDEOGRAPHER:   Our court reporter,

9   Denise Neal, representing Veritext Legal Solutions,

10  will swear in the witness and we can proceed.

11                BERNARD L. MADOFF,

12  having been first duly sworn, was examined and

13  testified as follows:

14                EXAMINATION

15  BY MS. CHAITMAN:

16      Q.   Good morning, Mr. Madoff.   Yesterday you

17  identified a document which was marked as

18  Exhibit 38, which appears to be a January 31, 1983

19  statement bearing the name National Westminster

20  Bank?

21      A.   Uh-huh.

22      Q.   And it shows --

23          MR. GOLDMAN:   You've got to answer yes or

24  no, Bernie.

25          THE WITNESS:   Says National Bank of North

CONFIDENTIAL

Page 501

1    America.

2         Q.  (By Ms. Chaitman)  Excuse me.  National

3    Bank of North America.  Thank you.  And was this

4    generated by your firm or was it generated by

5    National Bank of North America?

6         A.  I believe it was generated by my firm.

7         Q.  Did you receive on a monthly basis from

8    National Bank of North America statements showing

9    the securities transactions conducted in that month

10   for your firm?

11        A.  I don't recall whether we received one.  I

12   don't know.  I mean, you know, you're talking about

13   1983.  I don't know what the policy was.  Typically

14   we would receive statements from the banks at the

15   end of a month.

16        Q.  Okay, okay.  And, for example, here is

17   Exhibit 46, which is another statement that was

18   generated by your firm as well; right?

19        A.  Yes.

20        Q.  And do you know how the information was

21   obtained that was incorporated into these

22   statements?

23        A.  Well, these statements were generated by

24   us.  They're showing the transactions according to

25   our records as they're done.

CONFIDENTIAL

Page 502

1      Q.  Okay, okay.

2      A.  They're not the bank's records.  So these

3  are just, you know, the transactions as they

4  appeared in this account.

5      Q.  Okay.  And you testified yesterday that

6  these all reflect accurate transactions that were

7  fulfilled --

8      A.  That's correct.

9      Q.  -- is that correct?

10     A.  Yes.

11     Q.  Okay.  And I'm showing you again

12  Exhibit 39, which is a January 31, 1983 statement of

13  transactions with National Bank of North America.

14     A.  Yes.

15     Q.  And is that an accurate reflection of the

16  transactions that were done in that prior month for

17  National Bank of North America?

18     A.  Correct.

19     Q.  Okay.  Now, let me show you what I'm going

20  to mark as Exhibit 89.  These are it says Schwab

21  blotters for 12-5-86 and it says house five.

22          MS. FEIN:  Thank you.

23          MR. KRATENSTEIN:  Thank you.

24     Q.  (By Ms. Chaitman)  Can you tell me what

25  this document is?

CONFIDENTIAL

Page 503

1      A.   It looks like the activity that took place

2   in the Charles Schwab & Company.

3      Q.   Okay.  And, again, would these be actual

4   transactions that were conducted by your firm?

5      A.   They would be.

6      Q.   Okay.  And would you have received in the

7   ordinary course of business some documentation from

8   Schwab evidencing these same transactions?

9           MS. FEIN:  Objection.

10          THE WITNESS:  It depends upon what period

11   of time.  I mean, people stopped using

12   confirmations.  Broker-to-broker confirmations were

13   eliminated after a certain period of time.  I don't

14   know when that was.  Before that period we received

15   confirmations on every trade every day.

16          After that there were no confirmations

17   because the trades went to the clearing corporation

18   and those trades were all netted, which is a

19   practice so that the transaction that you did with

20   Schwab doesn't -- would not be what you would

21   receive from the clearing corporation because they

22   net all the -- from market makers like Madoff what

23   happens is they take all of the transactions, all

24   the transactions that you had in a particular

25   security, so if we had every trade that we did with

CONFIDENTIAL

Page 504

1   say in General Motors for any of the thousands of

2   brokers that exist that buys and sells, if you sold,

3   for example, 2 million -- if you brought 2 million

4   shares from assorted brokers and then you sold

5   1,500,000 shares, they would send you what they call

6   a balance order at the end of the day that said you

7   bought or sold 500 shares, which is the net amount.

8        And they would give you the dollar amount

9   of the net practice.  And -- and the person

10  guaranteeing the trade became the clearing

11  corporation.

12       Q.  (By Ms. Chaitman)  Was there a system in

13  place at your firm to verify the information you

14  received on a daily basis from the clearing

15  corporation?

16       A.  Yes, you know, there was.  I can't tell you

17  exactly what it was because I'm not part of the back

18  office operation.

19       Q.  Okay.  But there was such a system in

20  place?

21       A.  Yes.

22       (Exhibit Number 90 was marked for

23  identification.)

24       Q.  (By Ms. Chaitman)  I'm going to show you

25  what I've marked as Exhibit 90, and I apologize.  I

Page 505

1   only have one copy of this, but I'll show it to

2   everybody after you identify it.  Can you tell me

3   what this is?

4        A.   It reflects the securities we bought for

5   Vanguard and Wells Fargo.

6        Q.   During this -- the period indicated?

7        A.   During that period of time, right.

8        Q.   Okay.  And is this a report that was also

9   generated by your firm?

10       A.   Correct.

11       Q.   Okay.  And were these transactions actual

12  transactions?

13       A.   Yes.  They were.

14            (Exhibit Number 91 was marked for

15  identification.)

16       Q.   (By Ms. Chaitman)  Okay.  I'd like to show

17  you what I've marked as Exhibit 91.  Can you tell me

18  what this document is?

19       A.   It looks like a trade reporting blotter

20  under National Securities Clearing Corporation.

21       Q.   Okay.  Now, is the National Securities

22  Clearing Corporation generally referred to as NSCC?

23       A.   Correct.

24       Q.   And was NSCC the precursor to DTC, the

25  Depository Trust Company?

CONFIDENTIAL

Page 506

1        A.   Yes, then they merged.

2        Q.   Okay.  So what does this document reflect?

3   It reflects trade date December 11th, 1986.  Can you

4   tell me what this document shows?

5        A.   It would show the transactions that we did

6   with other brokerage firms in the street but not

7   reflect any customer transactions.

8        Q.   Okay.  And is there an indication on this

9   document as to which brokerage firms were on the

10  other side of these transactions?

11       A.   I don't believe so.

12       Q.   The member number ID of 0158, was that your

13  member number?

14       A.   No.  Oh, yes.

15       Q.   The first column on the left?

16       A.   No.  That's -- ours was 646.  This member

17  ID would be -- refer to another brokerage firm.

18       Q.   So this document -- which I don't represent

19  is complete.  I just printed out a portion of it.

20  The column on the left represents another brokerage

21  firm and this lists all the transactions done on

22  December 11th, 1986 by your firm with 0158?

23       A.   Let me just look at this.  Yes.

24            MS. FEIN:  It looks like there -- on

25  future pages there might be others.

CONFIDENTIAL

Page 507

1          MS. CHAITMAN:  Right, right.  I just

2    wanted to clarify this.

3          MS. FEIN:  Understood.

4          MS. CHAITMAN:  Yeah.  I didn't print out

5    complete.

6          THE WITNESS:  These are the transactions

7    of the market making or proprietary trading side of

8    the firm.

9          Q.  (By Ms. Chaitman)  Okay.  As a matter of

10   fact, Mr. Kratenstein just pointed out to me if you

11   look on page two there are other numbers in the

12   left-hand column.  Do you see that?

13         A.  Yes.  You mean other ID numbers?

14         Q.  Yes.

15         A.  Yes.

16         Q.  So that means -- I didn't notice that, so

17   this lists transactions with all the other firms and

18   they're identified by their code number?

19         A.  That is correct.

20         Q.  And were these all legitimate transactions?

21         A.  Yes.

22         Q.  And they were all executed?

23         A.  Yes.

24         Q.  Now, would -- as of December 11th, 1986

25   would this kind of report reflect 100 percent of the

Page 508

1    trading activities of your firm or were there

2    other --

3         A.   No.

4         Q.   Okay.  So what other categories of

5    activities were there that are not reflected on a

6    report like this?

7         A.   If we were trading with a client, you know,

8    out of our own inventory principal, it would not be

9    reflected on this -- on this report.

10        Q.   Anything else?

11        A.   I don't believe so.

12        Q.   If you were doing convertible bond trading,

13   would that show up on this report --

14             MS. FEIN:  Objection.

15        Q.   (By Ms. Chaitman)  -- or would that be on a

16   different report?

17        A.   I do not believe it would be on this

18   report.

19        Q.   Do you recall that your firm generated

20   reports which -- in the 1980s which showed all of

21   the convertible bond purchases and sale on a daily

22   basis?

23        A.   It would reflect, be reflected in a

24   customer's account if -- and it would be reflected

25   in the firm's account, in the firm's trading --

CONFIDENTIAL

Page 509

1    you'd have to look at the trading ledger for the

2    firm.  It depends upon also whether we did it as

3    principal or whether we did it as agent.  Most of

4    our trades were done as principal.  We're selling

5    out of our own inventory account to the customer.

6              I don't know exactly where that would

7    appear, but it would not appear -- these are what's

8    called street side transactions, as I said, mostly

9    from a market making proprietary trading side of the

10   firm, broker-to-broker trades.

11        Q.  Okay.  You had testified previously that

12   with respect to the convertible bond trading,

13   99 percent of it in the 1980s was done in the

14   over-the-counter market?

15            MS. FEIN:  Objection.

16        Q.  (By Ms. Chaitman)  Do you recall that?

17        A.  Depends upon the bond.  The bonds,

18   convertible bonds traded -- most convertible bonds

19   traded in the over-the-counter market.  Some of them

20   were traded on an exchange, but the great majority

21   of them would trade over the counter.

22        Q.  Okay.  Now, if I wanted to find a record on

23   any specific date in the 1980s of the volume and

24   specific transactions that you did in the

25   over-the-counter market, what document would I look

CONFIDENTIAL

Page 510

1   for?

2        A.   You'd have to look at the firm trading

3   account records and blotters, but I don't -- and if

4   you're talking about period in the '80s, I doubt

5   whether or not you would be able to find them

6   because the record retention period was six years in

7   the industry.  So there would be no reason the firm

8   would keep those.

9        Q.   Now, Mr. Madoff, I believe you're aware

10  that there were microfilm records that the Trustee

11  found?

12       A.   Yes.

13       Q.   Do you recall how it came about that some

14  of your records were microfilmed?

15       A.   It depends upon what the policy of the firm

16  was at that -- during that period of time.  I mean,

17  there was a -- there was a lot of confusion within

18  the industry as to whether you had to microfilm

19  records or whether you would put them -- send the

20  records to a place like Stone Mountain, which was an

21  off premises places.

22            Everybody had a different policy, so -- and

23  I'm not particularly aware of what our firm's policy

24  was.  It's not something I would be involved in.

25       Q.   Okay.  Was the decision to microfilm

Page 511

1   records your decision or did someone else in your

2   firm make that decision?

3        A.  It wasn't my decision, no.

4        Q.  It was not?

5        A.  No.

6        Q.  Okay.  So is it fair to say that you didn't

7   instruct your staff as to what should be microfilmed

8   and what should not be microfilmed?

9        A.  No.

10       Q.  Did you ever seek to verify that documents

11  were being microfilmed?

12       A.  Probably not.  It's not an area that I

13  would be involved in.  That would be something that

14  somebody in the systems department would make those

15  decisions or someone in the operations department.

16       Q.  Okay.  Can you think of anyone in

17  particular who would have been responsible for that?

18       A.  It varied, you know, over the years.  No.

19       Q.  Okay.  There was a person named Asha,

20  A-s-h-a.  Do you recall that name?

21       A.  No.

22       Q.  Okay.  Do you know you've testified

23  previously that the -- all of the trading that you

24  did except for the split strike was actual trading?

25            MS. FEIN:  Objection to form.

Page 512

1          MS. CHAITMAN:  I'm just trying to lay the

2     background.

3          THE WITNESS:  Yes.

4          Q.  (By Ms. Chaitman)  You testified to that

5     yesterday.  Okay.

6          A.  Up to a certain period of time.  There were

7     actual trades done in split strike prior to 1990,

8     some period in the '90s.

9          Q.  Okay, okay, okay.  So just to clarify, when

10    you started the split strike for some period of time

11    you actually did the trades?

12         A.  Correct.

13         Q.  And at some point which you haven't been

14    able to specify you stopped doing the trades?

15         A.  Correct.

16         Q.  Okay.  Now, I want to ask you something

17    about that, Mr. Madoff.  Is it your understanding

18    from your experience in the securities business that

19    it was illegal for you to send a customer statement

20    to a customer which said in essence I've purchased

21    five shares of IBM for you when, in fact, you hadn't

22    actually made that purchase?

23         A.  Was it what?

24         Q.  Was there anything improper or illegal

25    about your in a sense selling a short, a naked short

CONFIDENTIAL

Page 513

1  to a client?

2          MS. FEIN:  Objection.

3          THE WITNESS:  No.

4      Q.  (By Ms. Chaitman)  Can you explain to me

5  why that was not illegal?

6      A.  Short selling is a very common practice and

7  a significant part of the stock market, whether it

8  be an over-the-counter transaction or whether it be

9  an exchange-traded transaction.

10          That is -- as a matter of fact, there are

11  -- you can look at any one of the financial records

12  that are produced, you know, by the media and get

13  what the open short positions are in every

14  particular security.  So the concept of selling

15  short has been in existence since the securities

16  started trading in the market maker.

17      Q.  And the fact that you did that, that you

18  may have done naked short selling --

19      A.  Right.

20      Q.  -- was that illegal or improper?

21      A.  No.

22      Q.  Okay.  So is it fair to say that because

23  you were a market maker, you had not only the right

24  but also the obligation --

25      A.  That is correct.

CONFIDENTIAL

Page 514

1          MS. FEIN:  Objection.

2      Q.   (By Ms. Chaitman)  -- to sell?

3      A.   The rule was that if you were a registered

4  market maker, you were required to post on a regular

5  and continuous basis a two-sided market, meaning

6  what you're willing to buy and what you're willing

7  to sell.  And in order to -- in order to continue to

8  be a registered market maker, you had to honor that

9  quote.  Otherwise, it would be a violation of the

10 SEC.

11     Q.   Okay.  But you say it's not a violation of

12 any SEC rule to indicate on a customer statement

13 that the customer owns certain securities when you

14 hadn't actually purchased them?

15     A.   Of course.

16     Q.   It's not -- that's not improper?

17     A.   No.

18     Q.   Okay.  So what was improper, if anything,

19 about the fact that with respect to the split

20 strike, at a certain point in time you stopped

21 buying the securities shown on the statements?

22          MS. FEIN:  Objection.

23          THE WITNESS:  What was improper was when

24 we reported our -- when we gave the SEC our

25 financial statements, you would have to show what

CONFIDENTIAL

Page 515

1   your -- you wouldn't -- you wouldn't show whether

2   you were long or short for any particular customer.

3   That policy was changed many, many years ago, but

4   you had to reflect the liability of what was

5   involved in your total short positions.

6        Q.   (By Ms. Chaitman)   Okay.   So just to be

7   clear, if you sent customer A a statement which

8   showed that he had a portfolio worth a million

9   dollars in various Fortune 100 company stocks and

10   you did not own those stocks at that time, you would

11   have had to reflect on your FOCUS report to the SEC

12   that you owed that customer a million dollars worth

13   of stocks?

14        MS. FEIN:   Objection.   Helen, we covered

15   this on the first day of Mr. Madoff's testimony back

16   in April.

17        MS. CHAITMAN:   Okay.

18        MS. FEIN:   So I just want to put on the

19   record that this is day one testimony.

20        MS. CHAITMAN:   Okay.

21        THE WITNESS:   You would -- if the firm was

22   short to a customer, you would reflect on -- you

23   would reflect -- that would reflect what your open

24   position was that's a short position; but if you had

25   an arbitrage transaction in that particular

CONFIDENTIAL

Page 516

1   security, you would net the long positions versus

2   the short position of the firm, both the market

3   making, proprietary and the customer transaction.

4   Plus, you would have to take options into

5   consideration.  You'd have to -- there were certain

6   exemptions and instructions of how you treated your

7   capital.

8          Q.  (By Ms. Chaitman)  Okay.  But, in fact, you

9   never disclosed to the SEC that you had naked short

10  positions.  Is that fair to say?

11         A.  During the period where we didn't sell the

12  stock, that is correct.

13         Q.  Where you didn't buy the stock you mean?

14         A.  Didn't buy the stock.

15         Q.  Okay, okay.  And in your mind is that what

16  was illegal about what you did?

17         A.  Correct.

18         Q.  Okay.  Now, in all the years you were in

19  business prior to the global economic collapse in

20  2008, did you ever find yourself unable to satisfy a

21  customer demand for a withdrawal from a --

22             MS. FEIN:  Objection.  This is not only --

23  it's outside the scope of the day two deposition.

24  We didn't enter the order today, but this was all --

25  these were things that were covered on the day one

CONFIDENTIAL

Page 517

1    deposition.

2              MS. CHAITMAN:  Okay.  You've made your

3    record.

4              THE WITNESS:  No.

5         Q.  (By Ms. Chaitman)  So you're sure that

6    there was never a time from 1992 when you started

7    the split strike until 2008 when you were unable to

8    satisfy a customer demand for a redemption?

9         A.  That's correct.

10         Q.  Did you ever need to take in a new

11    customer's money in order to pay money to an

12    existing customer?

13         A.  No.

14         Q.  In the entire time you were in business?

15         A.  Up until the collapse of the financial

16    market.

17         Q.  Okay.  Now, did you make margin loans to

18    some customers?

19         A.  Yes.

20         Q.  And were those margin loans in your view

21    debts from the customers to you?

22         A.  Of course, yes.

23         Q.  And why is that?  Tell us what a margin

24    loan is.

25         A.  Margin loan is regulations set by the

CONFIDENTIAL

Page 518

1    Federal Reserve.  If a customer wants to buy --

2    wants to buy securities, he is allowed to pledge,

3    you know, other securities in his account, you know,

4    to purchase it.  So the margin rates varied.  I

5    believe in the period of time that you're talking

6    about it would be 50 percent, but again, it depends

7    upon the securities, whether they were bond, whether

8    they were -- you know, the type of bond, whether or

9    not they had options involved with it.

10                It was a complicated practice, but

11    basically it was the customer's ability to borrow to

12    be able to purchase more securities without posting

13    cash for that particular transaction.  So he was --

14    it's similar to when you have a house and you take a

15    mortgage loan out to buy the house or to expand the

16    house.  Well, use it for whatever you want.  Those

17    regulations are set by the Federal Reserve Board.

18         Q.  Okay.  And would you have made a margin

19    loan to someone who didn't own any securities?

20         A.  No.

21         Q.  So is it fair to say that almost by

22    definition if you made a margin loan to a customer,

23    that customer had real securities in his account?

24                MS. FEIN:  Objection.

25                THE WITNESS:  Yes.

CONFIDENTIAL

Page 519

1      Q.  (By Ms. Chaitman)  And do you recall that

2  you made substantial margin loans to the Sages?

3      A.  That I can't recall.

4      Q.  Okay.  But it would be reflected on their

5  statements; wouldn't it?

6      A.  You could figure it out from the statement,

7  yes.  You'd see by whether it had a debit balance in

8  their account --

9      Q.  Okay.

10     A.  -- past the settlement date of the

11  transaction.

12     Q.  Okay.  And was it your practice to insist

13  that margin loans be repaid by customers?

14     A.  Yes.

15     MS. CHAITMAN:  I have nothing further.

16  Thank you very much, Mr. Madoff.

17     MS. FEIN:  Okay.  We can get started if

18  that's okay with you.  Would you prefer that we take

19  a break now?

20     THE WITNESS:  No, no.  I'm fine.

21     MS. FEIN:  Okay.

22     MR. GOLDMAN:  You want something to drink?

23     THE WITNESS:  Anything, water or Pepsi is

24  fine.

25     MR. GOLDMAN:  You want water or Pepsi?

CONFIDENTIAL

Page 520

1              THE WITNESS:  Pepsi.

2              MS. CHAITMAN:  Do you need a dollar?

3              MR. GOLDMAN:  No.

4                          EXAMINATION

5      BY MS. FEIN:

6          Q.  Good morning, Mr. Madoff.

7          A.  Good morning.

8          Q.  When -- I want to define a couple of terms

9      up front so when we talk about them later, you know

10     what I'm referring to; but if I ask a question about

11     the IA business or house 17, would you agree that

12     that's referring to your investment advisory

13     business?

14         A.  Yes.

15         Q.  And if I ask a question about market making

16     or proprietary trading or house five, I might use

17     those terms somewhat interchangeably.  I might use

18     house five to refer to the market marking and

19     proprietary trading business, but do you agree that

20     we can use those terms?

21         A.  Yes.

22         Q.  And yesterday I believe Mr. Kratenstein

23     asked for clarification about what -- at my request,

24     so thank you, about what a real trade was and you

25     had -- and we have that term defined.  We can use

CONFIDENTIAL

Page 521

1  that term today as well?

2        A.  Yes.

3        Q.  For the period of time where your

4  customers' statements showed trades that where the

5  underlying securities weren't purchased, what term

6  would you refer to those as?

7        A.  Basically, short.

8        Q.  Okay.  Would you agree that can we say that

9  the statements at least were fake statements?  They

10  showed transactions that didn't occur?

11        A.  Well, depends upon -- I have to think

12  about, you know, how you would define that.  In

13  other words, because selling short is -- is not

14  considered a legitimate trade or a trade that was

15  not real, in other words, let me just for the record

16  make sure that you understand that when a brokerage

17  firm sells short, all right, that is no different

18  than a broker selling stock long as to whether or

19  not it's legal.

20            In other words, that is -- it's a valid

21  transaction.  I noticed in the GA -- in the expert

22  witness, I guess it would have been referred to as

23  the Dubinsky report and in the Trustee's reports

24  that I have seen, they consistently refer to short

25  sales as fake or illegitimate transactions.

CONFIDENTIAL

Page 522

1          Anybody in the industry would not

2   understand using that terminology because if you

3   sell -- if you make a short sale through a brokerage

4   firm, the brokerage firm is under the same

5   obligation to deliver those securities to you if you

6   request them as long and you have -- and you have

7   the same obligation to pay for those securities.

8          There is no difference between whether the

9   transaction was actually purchased or not.  If the

10  broker said that he sold you the stock, whether he's

11  long or short does not affect his obligation, does

12  not alter his obligation to honor that transaction

13  upon your request.

14          So you can't say -- otherwise, if you ever

15  had -- went into court with that and said this is a

16  fake transaction, this is a real transaction, they

17  would not know what you're talking about.

18          Q.  I understand.  We spoke yesterday a bit and

19  we're going to talk about it today as well that

20  there are amounts listed on customer statements

21  where you hadn't purchased the amounts that are

22  listed --

23          A.  Correct.

24          Q.  -- correct?  So and that would be I believe

25  it's your testimony after 1992 that you would have

CONFIDENTIAL

Page 523

1  customer statements that showed transactions that

2  didn't have the underlying securities purchased by

3  your firm; correct?

4      A.  We would show short positions on a customer

5  statement at any time, you know, that it took place,

6  even if it was before 1992 because that's a --

7  there's no brokerage firm that does a market making

8  or proprietary trading.  Well, there's no -- let me

9  clarify that.

10         There is not a brokerage firm in existence

11  probably that sells stock short to a customer from

12  his principal account if he's, in fact, maintaining

13  a market making or proprietary trading account.  So

14  I know -- I'm not sure if I'm confusing you or not,

15  but it is a perfectly legal -- a short sale or a

16  naked short sale, which by definition is the same

17  thing, is a perfectly legal transaction.

18         So I could sell stock short.  As a matter

19  of fact, and I probably shouldn't go into all this.

20  I don't know, but during my proffer agreement, my

21  proffer session, the prosecutor in the presence of

22  the SEC and the Trustee asked me to explain my

23  market making business or my business in general.

24  And during that period of time he asked me whether

25  or not we ever sold stock to a customer short.

CONFIDENTIAL

Page 524

1          And I said, of course, there was periods of

2     time where we sold stock short to a customer.  And

3     he didn't seem to understand that.  As a matter of

4     fact, I had turned to the SEC people that were there

5     and my own lawyer and said please explain to him,

6     you know, how the market making worked, that they

7     were sort of shocked.

8          I can understand the prosecutor not

9     understanding that, certainly not a prosecutor that

10    was handling a securities case.  So I don't know

11    whether he was going through some exercise or not,

12    but that's how -- they seemed to be focusing in on

13    whether or not we ever sold short.  I said if you're

14    a market maker, you had to sell short at times.  I

15    don't know if I've clarified that or not.

16              (Trustee's Exhibit Number 10 was marked

17    for identification.)

18         Q.  (By Ms. Fein)  I'll try -- I'm going to try

19    a different way.  So I'm handing you what's been

20    marked as Trustee's Exhibit 10.  And --

21              MS. CHAITMAN:  Thank you.

22         Q.  (By Ms. Fein)  -- this appears to be a

23    customer statement.  Would you agree?

24         A.  Yes.

25         Q.  And it appears to be dated December 31st,

CONFIDENTIAL

Page 525

1  2007.  Do you see that?

2       A.  Yes.

3       Q.  This customer statement -- if you turn to

4  the third page of the document, the Bates number is

5  960.  Do you see that page?

6       A.  Yes.

7       Q.  This customer statement shows the purchase

8  of U.S. treasuries on December 31st.  Do you see

9  that transaction?

10      A.  Yes.

11      Q.  You previously testified that the

12  individual transactions shown on customer statements

13  like these weren't always -- I understand your

14  position with respect to shorts, but if we went to

15  where you held Treasury bills for this period or

16  went to where you held the securities for the period

17  shown on these statements, we wouldn't necessarily

18  be able to find those securities at the DTC.

19          We wouldn't necessarily be able to find

20  those treasuries held at a depository or a

21  third-party firm; correct?

22          MS. CHAITMAN:  Objection to form.

23          THE WITNESS:  If I said on treasuries, we

24  never went short treasuries.  So if, in fact, you

25  went to locate them, you would find them.

CONFIDENTIAL

Page 526

1        Q.   (By Ms. Fein)   So for the treasuries shown

2   on your customer statements, you've told us in the

3   past that you did not have -- the amount of

4   treasuries you said you purchased was between

5   two-and-a-half and $6 billion.   Do you remember

6   that?

7        A.   Depends upon the period of time.

8        Q.   Right.   You said over any period of time,

9   two-and-a-half to $6 billion was the amount of

10  treasuries that you would have had on hand.   Do you

11  remember that?

12       MS. CHAITMAN:   I think you're misstating

13  his testimony, but it stands.   Bernie, you testify

14  as to what you believe --

15       MS. FEIN:   What you understood.

16       MS. CHAITMAN:   -- not what --

17       THE WITNESS:   During this period of time

18  if we said that we had -- if a Treasury transaction

19  was in a client's account, that transaction was --

20  that transaction was actually bought or it was held,

21  the equivalent amount, at a third-party depository,

22  which would be DTC or another brokerage firm like a

23  Morgan Stanley or a Fidelity and so on.

24       Q.   (By Ms. Fein)   So the same -- you're saying

25  that this same -- the same Treasury bill, the same

CONFIDENTIAL

Page 527

1   due date, the same CUSIP number, the same amount,

2   that that information would appear on a third-party

3   financial statement or a DTC record?

4       A.   Right, correct.

5       Q.   So for the period of time that this

6   Exhibit 10 refers to --

7       A.   Uh-huh.

8       Q.   -- December 2007, your customer statements

9   showed $56 billion in treasuries aggregated?

10      A.   56 billion dollars?

11      Q.   Yes, your customer statements.

12      A.   During what period of time?

13      Q.   December 2007 when this statement --

14      A.   Oh, this is 2007.

15      Q.   Yes.

16      A.   I thought you were looking at an '87 date.

17      Q.   I see.  Okay.  So is your testimony

18  somewhat different since this is a 2007 statement?

19      A.   Yes, yes, right.

20      Q.   Okay.  So in the 2007 time frame would you

21  say -- I mean, did you have $56 billion of

22  treasuries in 2007?

23      A.   No.

24      Q.   And the treasuries that would be shown on

25  your individual statements that aggregate to the 56

CONFIDENTIAL

Page 528

1    billion, those amounts wouldn't be something that

2    your firm held; correct?

3          A.   Not in 2007, no.

4          Q.   Understood.

5          A.   I've taught you -- we were on the last

6    date, which was '87.

7          Q.   Got it.  I'm glad you clarified so we're on

8    the same page.

9          A.   All right.

10         Q.   Let's see.  I wanted to ask -- we've

11   discussed a bit about clearing firms in the past

12   couple of days.  The BLMIS back office had the

13   capability to receive and deliver securities; right?

14         A.   Yes.

15         Q.   And is that -- and you refer to BLMIS as a

16   self-clearing firm for that reason?

17         A.   Correct.

18         Q.   If you were a firm that did not have that

19   back office capability, would you rely on a

20   third-party clearing firm to clear your

21   transactions?

22              MS. CHAITMAN:  Objection to form.

23              THE WITNESS:  Yes.  Would I or would

24   someone in general?

25              MS. FEIN:  Thank you.  I'm going to

CONFIDENTIAL

Page 529

1   rephrase the question.

2            THE WITNESS:  Yes.

3        Q.  (By Ms. Fein)  Thank you.  Would a firm

4   that had -- did not have the back office capability

5   to receive and deliver securities need to rely on a

6   third-party clearing firm like Merrill Lynch or Bear

7   Stearns?

8        A.  Correct.

9        Q.  For this firm that uses a third-party

10  clearing firm, there were brokerage firms that acted

11  this way; right?

12       A.  Correct.

13       Q.  And would that brokerage firm basically use

14  Bear Stearns or Merrill Lynch as a back office to

15  receive and deliver the securities?

16       A.  Correct.

17           MS. CHAITMAN:  Objection to form.

18       Q.  (By Ms. Fein)  If the trades were cleared

19  through a third-party clearing firm, would that firm

20  issue statements to -- to the statements of the

21  holders of those underlying securities?

22           MS. CHAITMAN:  Objection to form.  I don't

23  know what time period you're questioning him about.

24  He's testified that the practice has varied through

25  the decades.  Can you just give him a time period?

CONFIDENTIAL

Page 530

1        Q.  (By Ms. Fein)  Understood, yes.  Did the

2    practice of back office operations of receiving and

3    delivering securities change over time?

4        A.  Yes.

5        Q.  Was one part of that change that DTC and

6    other depositories were available after a certain

7    period?

8        A.  Correct.

9        Q.  Would you say that would -- the time period

10   where depositories were available was sometime in

11   the '70s or '80s?

12       A.  No.

13       Q.  What time frame do you recall?

14       A.  Well, I don't -- well, there was -- there

15   were always clearing firms like a Bear Stearns that

16   would -- that would operate during the period of

17   time you're talking about, but DTC came into

18   existence later.  So did National Securities

19   Clearing Corporation come into existence later.  It

20   would be sometime probably in the '80s.

21       Q.  Okay.  I believe we looked at a document

22   with Ms. Chaitman from 1986 that had National

23   Securities Clearing Corp on it.  Is that date --

24       A.  Then that would probably be, you know, when

25   National Securities Clearing Corporation existed was

CONFIDENTIAL

Page 531

1    in operations.

2         Q.  Do you recall was the DTC also in operation

3    around that time?

4         A.  It came in after.  I don't know exactly

5    what the date was, but National Securities Clearing

6    Corporation was not a depository.

7         Q.  Understood.

8         A.  It just cleared the transactions.

9         Q.  Okay.  So the difference between -- so DTC

10   would -- was a depository in that it held the

11   securities?

12        A.  Yes.

13            MS. CHAITMAN:  It helped them?

14            MS. FEIN:  Held.

15            THE WITNESS:  It depends upon the

16   security, whether it was a bond or not, and also it

17   depends upon you if you had a clearing arrangement

18   with a bank or another brokerage firm, even after

19   the clearing corporation or DTC came into existence

20   you might use any one of the other clearing firms.

21        Q.  (By Ms. Fein)  Understood.  But BLMIS

22   didn't need to use -- strike that.  Typically

23   because BLMIS was a self-clearing firm for every day

24   transactions, it wouldn't rely on a third-party

25   clearing firm; correct?

CONFIDENTIAL

Page 532

1          MS. CHAITMAN:  Objection to form.

2          THE WITNESS:  No.  That's not correct.

3          Q.  (By Ms. Chaitman)  Okay.  Please tell me.

4          A.  In other words, it depends upon -- we had

5   arrangements as most brokerage firms would have

6   arrangements, particularly market making firms, with

7   all sorts of clearing firms, whether it be a Bear

8   Stearns, a Goldman Sachs or whether it be a bank,

9   any number of banks that clear or they would clear

10  themselves.

11          And depending upon the type of transaction

12  that they were doing, for example, if it was a

13  Treasury bill transaction, only certain brokerage

14  firms are registered to deal in treasuries.

15          So you would have to use like a Bank of New

16  York, for example, one or a Goldman Sachs and so on.

17  So there is no general rule as to -- and it also

18  depends upon how you were dealing with that other

19  firm and what you in general do business with that

20  other firm.  I don't know if I'm confusing a little,

21  but it varies.

22          Q.  If you -- you held securities at DTC;

23  correct?

24          A.  Some securities, yes.

25          Q.  If -- and what was the difference between

CONFIDENTIAL

Page 533

1  why you would hold a security at DTC or elsewhere

2  other than the fact that DTC didn't clear a certain

3  security or couldn't hold a certain security for

4  you, like treasuries?

5      A.   It depends upon who the securities -- who

6  the contra-side of the securities we bought or sold,

7  depending upon what brokerage firm we were dealing

8  with.  It depends upon the type of security and that

9  we were dealing with it, what we planned to do with

10 the security, in other words, whether we would be a

11 long-term holder of the security, whether there was

12 a customer involved in the transaction.

13          There's any number of reasons why we would

14 do a -- the same reason -- there was different

15 reasons why we buy and sell through different

16 brokerage firms and, for example, also depends upon

17 where that firm is located.

18          So, for example, if we're dealing with a

19 firm in Chicago, we would use a different clearing

20 facility, whether it be a bank or a firm that's

21 located in Chicago because -- and then, again, it

22 depends upon the period of time whether people are

23 using physical securities or they were not using

24 physical securities.  In other words, there were --

25 you know, some customers wanted to take possession

1   of securities.  The industry, you know, is trying to

2   eliminate the movement of securities back and forth.

3   And it depends upon how the security was being paid

4   and whether this contra-party had the ability to

5   pay.

6         Some, for example, customer transactions,

7   they would want you to deliver the securities to

8   them or to a clearing agent against payment.  Other

9   customers had the money in their account.  So

10  there's any number of -- look, I was the chairman of

11  a clearing corporation, you know, and was the

12  founder of a clearing corporation, so I'm maybe more

13  familiar with this than the average person is.

14        I hope I'm not confusing you, but there's

15  any number of reasons why a transaction gets cleared

16  in one form or another.

17        Q.   Okay.

18        A.   If it makes you feel any better, Dubinsky

19  has no clue either.

20        Q.   Thank you.  We're trying to figure it out.

21  I'm trying to figure it out.

22        A.   It's difficult.  I understand.  I'm not --

23        Q.   Thank you.  I want to look at some

24  documents with you that maybe will help.  I think we

25  want to make sure we're getting it right.  I do.

CONFIDENTIAL

Page 535

1      A.   That's fine.

2      Q.   So let me show you a document.  You've said

3  in the past you kept stock records; correct?

4      A.   Correct.

5      Q.   And the stock records would show where the

6  securities were held; correct?

7      A.   Correct.

8      Q.   We're going to take a look at one now.  The

9  stock records would also show your inventory for

10  your long and short positions; right?

11      A.   Correct.

12      (Trustee's Exhibit Number 11 was marked

13  for identification.)

14      MR. KRATENSTEIN:  This is 11?

15      Q.   (By Ms. Fein)  So what you're looking at is

16  Trustee 11.  And I want to go through some of these

17  column headings with you.

18      A.   Uh-huh.

19      Q.   Are you familiar with this document?

20      A.   Yes.

21      Q.   Is this the type of document that you would

22  have prepared around the date listed, which is

23  July 16th, 1987?

24      A.   Yes.

25      Q.   Would this have been prepared in your

CONFIDENTIAL

Page 536

1    ordinary course of business?

2         A.  Would this what?

3         Q.  Have been prepared in your ordinary course

4    of business?

5         A.  Yes.

6         Q.  The title reads house five daily stock

7    record activity --

8         A.  Correct.

9         Q.  -- for -- thank you -- July 16th, 1987?

10        A.  Yes.

11        Q.  If you look at the columns below --

12            MS. CHAITMAN:  I'm sorry.  Where does it

13   say that?

14            MS. FEIN:  The first line on the top.

15            MS. CHAITMAN:  Oh, I see.  Okay.

16        Q.  (By Ms. Fein)  Do you see the first column

17   on the left, last act, is that last activity?

18        A.  Yes.

19        Q.  The column directly right next to that,

20   safekeeping?

21        A.  Safekeeping, right.

22        Q.  And what's under that, STRT?  Do you know

23   what that refers to?

24        A.  No.

25        Q.  Okay.  The next one, safekeeping owner?

CONFIDENTIAL

Page 537

1        A.   Correct.

2        Q.   The next column, transfer STRT.   Start

3    maybe, do you think?

4        A.   I don't know whether that's start or

5    street.   I don't know whether --

6        Q.   Okay.   And then looks like transfer owner

7    in the next line?

8        A.   Correct.

9        Q.   Okay.   If you go over a couple of columns

10   do you see securities/account name --

11       A.   Yes.

12       Q.   -- in the middle of the page?

13       A.   Uh-huh.

14       Q.   Okay.   And then next to that what I think

15   is previous balance?

16       A.   Correct.

17       Q.   Current long/short?

18       A.   Correct.

19       Q.   New balance and account number, do you see

20   that?

21       A.   Yes.

22       Q.   So looking at this first transaction, the

23   security name is AMR Corp?

24       A.   Uh-huh.

25       Q.   And the trader says Peter, dash, trading?

CONFIDENTIAL

Page 538

1        A.   Correct.

2        Q.   In the previous balance column do you see

3   an amount, 2,307 L?

4        A.   Okay.

5        Q.   Do you think that would be 2,307 long?

6        A.   Correct.

7        Q.   And then if you keep going across it looks

8   like there was some activity on this date.  Do you

9   agree?

10        A.   Yes.

11        Q.   In the long and short position?

12        A.   Uh-huh.

13        Q.   And the new balance --

14        A.   Yes.

15        Q.   -- is 3,157 long.  Do you see that?

16        A.   Yep.

17        Q.   So looking at this trade, can we just go

18   underneath where it says AMR Corp and Peter trading?

19   The next line, Prudential Bach Sec, Inc.?

20        A.   Correct.

21        Q.   Do you know what that refers to?

22        A.   Prudential Bache Securities.  That's

23   another brokerage firm.

24        Q.   Okay.  And do you see below that SIAC?

25        A.   Correct.

CONFIDENTIAL

Page 539

1          Q.   What does that refer to on this report?

2          A.   Securities Industry Automation Corp.

3     That's -- they keep the clearing records.  It's an

4     automated system.

5          Q.   Okay.  So at this -- for this date,

6     July 1987, this automated records system was in

7     place based on this report; right?

8          A.   Correct.

9          Q.   And the line below that looks like DTC?

10         A.   Yes.

11         Q.   Do you see in the previous balance column

12    the 2,307 long, if you go down to DTC it has 2,307

13    S.  Would that be 2,307 short?  I can show you.

14         A.   Okay, yes.

15         Q.   Do you agree that's the -- that appears to

16    be the same holding in that 2,307 long is your

17    firm's balance and the DTC is holding that security.

18    That's what's reflected in 2,307 short?

19         A.   Yes.

20         Q.   Okay.  And then the new balance column, I

21    think you'll see the same thing somewhat.  It

22    appears there's a total of 3,357 long at the end of

23    the day?

24         A.   Uh-huh.

25         Q.   And DTC is holding 3,357 short.  Do you see

CONFIDENTIAL

Page 540

1   that?

2       A.   Yep.

3       Q.   So if on this date, July 16th, 1987, you

4   had -- does this show that your firm would have an

5   inventory of 3,357 shares of AMR Corp?

6       A.   I'm a little bit confused myself with this

7   because this is not a record that, you know, I would

8   work with typically.  I don't know whether this is a

9   complete record.  This is -- it seems to be

10  reflecting the market making department, their

11  trades.  So does this show -- this looks like the

12  market -- all the market making trades.

13      Q.   Okay.

14      A.   Because I did -- these people, Peter,

15  Martin Joel, Mark, those -- it's identifying trading

16  that took place in the market making.  I don't see

17  any customer transactions on here.

18      Q.   Okay.  The customer transactions, your

19  testimony is the customer transactions would come

20  out of your inventory; right?

21      A.   Yeah, but this is -- not out of the -- I

22  don't see the investment.  That would be the

23  investment account, not the market making account.

24  This house five account is the market making

25  account.  So we also have a -- you know, an

CONFIDENTIAL

Page 541

 1   inventory here.  These are not inventory

 2   transactions.  These are the market making, the

 3   market makers' transactions.

 4        Q.  Okay.  You told us the stock records would

 5   show the inventory of long and short positions for a

 6   certain time; right?

 7        A.  Of market makers.

 8        Q.  So let's go back then.  Because of the

 9   inventory documents that you kept, why don't you

10   talk about the other documents that would show your

11   trading inventory?

12        A.  Well, you should be able to -- if you --

13   you should be able to find an account that showed

14   the inventory in the trading account, you know, in

15   the market making account, in -- not market -- the

16   investment account.  Do you have records that show

17   whether the investment account was long or short?

18        Q.  I'm not sure what you're referring to when

19   you say investment account.  Can you give me more

20   information about it?

21        A.  For example, that would be the firm itself.

22   There's not a market maker assigned to that account.

23        Q.  Okay.  So for --

24        A.  And there are other -- there are individual

25   trading accounts.  This is -- from looking at this

CONFIDENTIAL

Page 542

1    record here, it's showing particularly market

2    makers.  You see it's identified.  I don't see a

3    record that shows what the investment account is.

4    You'd also have to look at -- you'd also have to

5    have something that would reflect option trading and

6    convertible bond trading if, in fact, there was a

7    convertible bond transaction.

8          Q.   Do you see the entry for America West

9    Airlines about one, two, three, four, five down?

10         A.   Yes.  That's a bond, right.

11         Q.   Okay.  A convertible bond; right?

12         A.   Right.

13         Q.   And the traders listed here would be

14   trading in your house five business; right?

15         A.   Correct.

16         Q.   It doesn't -- this report doesn't show the

17   activity of a single trader.  It shows multiple

18   traders; right?

19         A.   If there was a -- if there were multiple

20   traders, it's in here.  And then this AMR shows --

21   where is it again?  Peter.

22         Q.   Okay.

23         A.   That would be my brother.

24         Q.   Okay.  And then if you look to the aluminum

25   company transaction, which is four down?

CONFIDENTIAL

Page 543

1          A.   Martin Joel, right.

2          Q.   That's another trader in your firm?

3          A.   Yes, uh-huh.

4          Q.   And the one below that, Mark, dash,

5     trading, would that be another trader in your firm?

6          A.   Yes.

7          Q.   And you see a few lines down closer to the

8     end of the page David, dash, trading?

9          A.   Correct.

10         Q.   And Margaret, dash, trading?

11         A.   Correct.  Those are all market makers.

12         Q.   Okay.  And did those traders also trade for

13    your proprietary account as well?

14         A.   Sometimes.  Sometimes I would trade for the

15    investment account.

16         Q.   Okay.  So this report shows your -- it

17    shows more than one trader trading on the same day

18    in a variety of securities; right?

19         A.   Correct.

20         Q.   And it shows that there's a previous

21    balance in the security and a new balance.  So it is

22    showing that there are some held positions.  It's

23    not just reflecting the daily activity.  It's

24    reflecting the activity before that date as well and

25    then it has a previous balance column?

CONFIDENTIAL

Page 544

1        A.   In that, for that particular trader.  It's

2   not showing the global position for the firm.

3        Q.   Well, the trader that's listed as the last

4   activity trader, the trader on this day --

5        A.   Correct.

6        Q.   -- it doesn't mean -- you wouldn't say that

7   this report means that the trader listed as the only

8   trader in that security; right?

9             MS. CHAITMAN:   Objection to form.

10            THE WITNESS:   In other words, we had in

11   some securities there could be multiple traders, you

12   know, trading it.  So and those, those names would

13   be there also.  For example, you would see Martin

14   Joel and there could be Peter and so on.

15             Here, for example, you see if you go down

16   to American Express, you see Peter for trading and

17   then there's Prudential Bache.  You know, that's

18   another -- another street side transaction.  I don't

19   know -- I don't know how to explain.

20        Q.   (By Ms. Chaitman)  No, no.  I think here's

21   where we're misunderstanding each other.

22        A.   Right, okay.

23        Q.   There's a previous balance column that's

24   here, which means that there's a held position

25   before this daily activity starts; right?

CONFIDENTIAL

Page 545

1      A.   In that particular trading trader's

2   account.

3      Q.   But these -- these aren't listed by trader.

4   They're listed by security; right?

5      A.   I know, but if I did -- for example, if I

6   traded in Allied for the firm's investment account

7   for not a market maker's account, you know, that

8   would not be reflected here.  This is looking at --

9   at what the trades were before and after in a

10  particular trader's account.

11         If there is no -- so if you look at any one

12  of these transactions, you know, you would have to

13  also find a stock record that reflected the -- that

14  reflected these other traders' securities or the

15  firm's investment account.

16      Q.   Okay.  So my understanding was because if

17  you look next to Peter's name, there's a date?

18      A.   Right.

19      Q.   And the date is July 16th, 1987?

20      A.   Right.  That would be the last activity

21  that that trader traded the security.

22      Q.   But why would it be any different?  Why

23  couldn't it be that other traders had traded that

24  same security on a prior date?  This is just showing

25  that that's the last trader that traded in it;

CONFIDENTIAL

Page 546

1    right?

2         A.   I'm not really sure.  I don't know.  I

3    don't know what you're trying to -- I don't know

4    what you're trying to identify.

5         Q.   Okay.  Well, I'm trying to identify where

6    your securities are held and this report shows --

7         A.   That I understand, but --

8         Q.   Okay.

9         A.   -- I don't know, you know, if you -- I

10   don't know if these are all the records that reflect

11   what you're trying to do.  In other words, you'd

12   have to -- do you have -- have you been able to find

13   records for the investment account, you know, and

14   other stock record?

15             This is not necessarily just all the --

16   just all the trading that took place in the firm

17   itself.  I don't see where you would be able to

18   identify that.

19         Q.   Okay.  Well, that's why we're asking you.

20         A.   I don't know.

21         Q.   Because this is a stock record and you told

22   us that stock records showed where securities were

23   held, we thought that the stock records that we had

24   would show where those securities were held, but --

25         A.   If you have all the stock records.

CONFIDENTIAL

Page 547

1          Q.   Okay.  But, I mean, you're referring to

2   something different, which is something for an

3   investment account.  I'm not sure I understand what

4   that document would look like.

5          A.   It would look -- it would be the same as

6   this.

7          Q.   So even though this shows your market

8   making activity, you're saying that there's another

9   document that would show something else?  Are you

10  saying that -- what would be on that document?

11  Would it have trader names?

12         A.   It would say investment account and it

13  might have my name on it or someone else's name on

14  it, probably -- I did most of the trading for the

15  investment account.

16         Q.   Okay.

17         A.   It could have my brother's name on it.

18         Q.   Okay.  But this has your brother's name on

19  it; right?

20         A.   In his capacity as a market maker.  He

21  traded as a market maker and he also traded for the

22  firm's investment account.

23         Q.   Is that the same as proprietary trading?

24         A.   Correct.

25         Q.   Okay.  So it's your position that you'd

CONFIDENTIAL

Page 548

1   have a different house five report for market making

2   activity than you would for other legitimate

3   activity that was also going on at your firm on the

4   same day, same time?

5       A.   House five typically refers to the market

6   making activity.  I don't know what the -- I don't

7   really know the answer to that, how you would

8   identify that.

9       Q.   Well, when we spoke earlier today --

10      A.   Understand that I'm not from the back

11  office, so I don't -- I understand the global

12  concept of what we do; but as far as working records

13  or how our firm kept certain records, that's not

14  something -- I'm not a -- wasn't a clerk.

15      Q.   Okay.  So you agree that this report shows

16  that positions were held at DTC; right?

17      A.   It shows the position that -- it shows what

18  is held at -- if it says -- if it says that it was

19  held at DTC, then the security was held at DTC for

20  this particular transaction, this particular

21  account.  If we had a trading inventory in the same

22  -- if we had a position in the same security, it

23  might be held through another broker.  It might be

24  held at Morgan Stanley.  It might be held through

25  one of our clearing banks.

CONFIDENTIAL

Page 549

1          In other words, I could -- I do a trade,

2     the firm could do a transaction in AMR and we could

3     have it in three different locations depending upon

4     who we bought the security, bought and sold the

5     security for and whether the trade was cleared

6     in-house or whether it was cleared through another

7     -- through another -- another brokerage firm.  And,

8     you know, you can't -- there's no general rule.

9          Q.  So you're saying there isn't a document

10    that would show --

11         A.  Yeah.  There are documents that would show

12    that but, you know, it wouldn't necessarily -- for

13    example, if we had it at another brokerage firm, you

14    know, there would be a document that would show

15    that, you know, it's at that particular firm.  You

16    have to -- you'd have to -- you'd have to present to

17    me -- and I can't tell you what all these records --

18    whether you have a complete set of records there.

19         Q.  So will you turn ahead to page ending in

20    950?  It's the same document.  It's about -- I'm

21    sorry.  Ending in 954, so it's four pages in.

22              MR. KRATENSTEIN:  I just realized

23    something.

24              MS. CHAITMAN:  It has 950 on every page.

25              MR. KRATENSTEIN:  All of our copies appear

CONFIDENTIAL

Page 550

1    to have 950.

2            MS. FEIN:  You know, there are two numbers

3    listed.

4            MR. KRATENSTEIN:  Oh, you're looking at

5    the top number.

6            MS. FEIN:  So I'm referring to the number

7    that's changing, yes.

8            MR. KRATENSTEIN:  So what number are you

9    on?

10           MS. CHAITMAN:  954.

11           MS. FEIN:  954.

12           MR. KRATENSTEIN:  Thank you.  Sorry.

13           THE WITNESS:  What am I looking at now?

14       Q.  (By Ms. Fein)  So there's a transaction for

15   Continental Investment it looks like Corp Mass in

16   the middle of the page?

17       A.  What page am I on?

18       Q.  954.  I'll show you.  Do you see that?

19       A.  Yes.

20       Q.  This has it looks like 100 long is the

21   balance, the new balance, and on the other side of

22   the transaction it doesn't say DTC.  It says

23   Shearson Lehman Brothers, Inc.  Do you see that?

24       A.  Correct.

25       Q.  Would that be another place that you held

CONFIDENTIAL

Page 551

1   securities at this time?

2        A.   Could be.

3        Q.   Okay.  So this report doesn't just show DTC

4   activity.  It shows other places where securities

5   are held beyond DTC; right?

6        A.   I can't tell from this.

7        Q.   Well, is this transaction, this Lehman

8   Brothers transaction showing that Lehman Brothers is

9   holding the 100 shares for you?

10       A.   I'm not sure whether this is -- whether

11  Lehman -- this looks like we bought the stock from

12  Lehman, the other side.

13       Q.   So the counterparty?

14       A.   Would be the counterparty, I believe.

15  That's what it looks like to me.

16       Q.   Okay.  So this report has some -- will show

17  some counterparties as well then?

18       A.   Yes.

19       Q.   Okay.

20       A.   Is this '87 or '07?

21       Q.   '87.  This is '87.

22       A.   Okay, okay.

23       Q.   Would your answer change for '07?

24       A.   No.

25       Q.   Okay.  Will you go ahead forward two more

CONFIDENTIAL

Page 552

1    pages, actually, it's four more ending at 958?

2        A.   Uh-huh.

3        Q.   Do you see in the middle of the page MCI

4    Communications Corp?  Is that a bond trade that you

5    see?

6        A.   I'm looking at the wrong page.

7        Q.   Oh.

8        A.   Yes.  A bond trade.

9        Q.   Okay.  So this report shows market making

10   -- actually, let me back up.  Initially we defined

11   house five as encompassing the market making and

12   proprietary trading businesses of your firm; right?

13       A.   I believe that's correct, yes.

14       Q.   Okay.  This report shows some transactions

15   in securities and some transactions in bonds.  Do

16   you agree?

17       A.   Yes.  Well, I see here MCI sub convert,

18   yes, correct.

19       Q.   And this trade actually has SIAC?

20       A.   Yes.

21       Q.   Does this appear to have SIAC on the other

22   side?

23       A.   Uh-huh.

24       Q.   Could you -- can you explain trading?  Did

25   SIAC just keep track of the trades or were they a

Page 553

1    counterparty to trades as well?

2         A.   No.   They weren't a counterparty of the

3    trade.   I can't -- I can't answer that question

4    because I'm not sure myself.

5         Q.   Okay.

6         A.   SIAC you understand doesn't hold

7    securities.

8         Q.   Understood.

9         A.   Okay.

10        Q.   If you look down a few more lines to Medco

11   Research, Inc --

12        A.   Right.

13        Q.   -- WTSX 11-7-08, that would be a warrants

14   trade?

15        A.   Yes.

16        Q.   And so tell me about the type of trading

17   that you were doing at this time period.

18        A.   In '07?

19        Q.   In 1987.

20        A.   '87?

21             MR. GOLDMAN:   You mean money market or the

22   IA, I mean, in the market?   Pardon me.   Which?

23        Q.   (By Ms. Fein)   In the house five

24   business --

25             MR. GOLDMAN:   Oh, all right.

CONFIDENTIAL

Page 554

1        Q.   (By Ms. Fein)   -- what trading were you

2   doing in 1987?

3        A.   Sort of beats me.  I don't know.  I did a

4   little bit of everything.  I wasn't -- I really --

5   I'm not sure that I considered myself a market maker

6   at that time.  I traded for the firm's investment

7   account.

8        Q.   Okay.

9        A.   And I also traded for customer accounts as

10   well.

11       Q.   When you say you traded for customer

12   accounts, is that what you referred to when we were

13   talking about the inventory where you would move

14   trades from inventory into customer accounts or are

15   you talking about something different?

16       A.   No.  Well, it could be a journal.  If we

17   had securities in an investment account and we had

18   any number of investment accounts depending upon

19   what the firm, whether we considered it a long-term

20   transaction or it was just, you know, part of a --

21   of trading for a client, there are various forms of

22   trading that we did for the investment account, you

23   know.  So I don't know how to -- I'm not sure what

24   you're trying -- maybe if I knew what you were

25   trying to find out, I'd make it -- might be able to

CONFIDENTIAL

Page 555

```
1    help you with that --

2         Q.  Okay.

3         A.  -- but I don't know.

4         Q.  Well, when you -- so you're saying you

5    weren't doing much market making during this time

6    frame, but you were trading -- you were doing some

7    proprietary trading it sounds like?

8         A.  Correct.

9         Q.  Okay.  Will you turn to the next page?  It

10   ends in 959.  It's here.  Do you see the County of

11   Nassau on Series A transaction listed?

12        A.  Uh-huh.

13        Q.  And then under there it says Bernard, dash,

14   trading?

15        A.  Correct.

16        Q.  Would this be a trade -- this means that

17   there's a -- would that be your trade that's

18   showing?

19        A.  It might be, yes.  Well, if it says me, I

20   mean, it meant that I did that, that I did that

21   particular transaction.

22        Q.  So this report does show trades that you

23   were doing in addition to your other traders?

24        A.  Correct.

25        Q.  I guess I'm trying to understand why you
```

CONFIDENTIAL

Page 556

1    would say that this wouldn't represent the trades in

2    your firm.  It has the trades that you were doing.

3    It has the trades your other traders were doing.  It

4    shows who the counterparties are.  It shows where

5    the securities are held.

6            I understand if you're saying it's not

7    100 percent comprehensive, but I'm trying to figure

8    out what this report shows and what it doesn't show.

9    Do you understand that?

10           MR. KRATENSTEIN:  Object to the form of

11   the question.

12           THE WITNESS:  I'm not sure I understand

13   it.  I'm saying that I don't know if you'll -- if

14   these are the only records that reflect that.  I

15   can't answer your question.

16           Q.  (By Ms. Fein)  Okay.  Got it.  But it does

17   reflect trades that you were doing --

18           A.  Some of the trades.

19           Q.  -- in July '87?

20           A.  Yes.

21           Q.  Okay.

22           A.  Are we back -- oh, yeah.  These are '87

23   you're talking about?

24           Q.  Yeah.

25           A.  Okay.

CONFIDENTIAL

Page 557

1          Q.   And it shows a counterparty or would you

2     agree this report shows where the securities are

3     held that are listed here?

4          A.   Yes.

5          Q.   Okay.  Do you see any other counterparties

6     listed on this page other than the ones we've

7     reviewed so far?

8          A.   I see Smith Barney.

9          Q.   Okay.

10         A.   I also see SIAC.

11         Q.   Uh-huh.

12         A.   Now, I don't know whether SIAC is

13    representing -- represents other traders or whether

14    that's sort of a netting process.  I don't know.

15    That was done in '87.

16         Q.   Okay, yeah.  Do you see in the second entry

17    the Microsoft Corp?  It says Peter, trading, and

18    then Goldman Sachs underneath it?

19         A.   Correct.

20         Q.   Would that be another counterparty?

21         A.   Yes.

22         Q.   And do you see across from the names of the

23    counterparties they have different account numbers

24    as well?  So DTC appears to have the number 9993115?

25         A.   Uh-huh.

CONFIDENTIAL

Page 558

1        Q.   Okay, okay.  We can put this document aside

2    for now.

3        A.   Thank you.

4             (Trustee's Exhibit Number 12 was marked

5    for identification.)

6        Q.   (By Ms. Fein)  We've spent enough time with

7    it; right?  So I'm going to show you what's being

8    marked as Trustee Exhibit 12.  Oh, yeah.  You have

9    to share a copy.  These are big.

10            MS. CHAITMAN:  Okay.

11       Q.   (By Ms. Fein)  Okay.  Mr. Madoff, do you

12   see the date at the top of the page?

13       A.   '07.

14       Q.   Uh-huh.

15       A.   Yes.

16       Q.   Yeah.  This is December 31st, 2007; is that

17   right?

18       A.   Right.

19       Q.   Is the title house 17 stock record summary

20   through 12-31-07?

21       A.   Yes.

22       Q.   And do you see the handwriting on the same

23   line run -- it looks like one and then illegible

24   '08?

25       A.   Right.

CONFIDENTIAL

Page 559

1      Q.   So would this document have been prepared

2   in late 2007 or early 2008?

3      A.   Yes.  I assume, right.

4      Q.   Okay.  This report is another stock record,

5   correct, and it shows some of the same columns that

6   we were looking at on the last stock record.  Do you

7   see at the top of the page?

8      A.   Yes.

9      Q.   Do you recognize from this page there are

10  some IA customer names on here?

11     A.   Uh-huh, yes.

12     Q.   And do you recognize that there are

13  customer accounts listed on the right-hand side of

14  the page?

15     A.   Yes.

16     Q.   This report would have been generated by

17  your house 17 staff most likely; right?

18     A.   Correct.

19     Q.   And the computer system you were using on

20  the house 17 side was an AS/400?

21     A.   Correct.

22     Q.   Would this report have been generated by

23  the AS/400 system?

24     A.   I believe so.

25     Q.   That's the same system that generated the

CONFIDENTIAL

Page 560

1    customer statements and trade confirmations; right?

2        A.   I don't know.  I don't know what generated

3    the -- what system generated the trade, market

4    making.

5        Q.   I'm sorry.  I was referring to IA customer

6    trade confirmations and customer statements.

7        A.   Yeah.  That would be -- that would be the

8    AS/400.

9        Q.   Okay.  Do you know who would be reviewing a

10   report like this?

11       A.   No.  I assume someone in Annette's

12   department.

13       Q.   Do you see underneath the security listed

14   there are customer names and then an entry below

15   that that says clearing banks?

16       A.   Correct.

17       Q.   Do you agree that number for account number

18   29000030 is not a customer account number; right?

19   The customer numbers typically have letters?

20       A.   No.  That looks like -- that looks like the

21   number they use for the clearing banks.

22       Q.   Okay.  The amount next to the clearing bank

23   number looks like 199066; right?

24       A.   Correct.

25       Q.   And I can represent to you that the four

CONFIDENTIAL

Page 561

1   amounts in the long position equal the same as

2   what's shown here in the short position?

3       A.   That's correct.

4       Q.   We looked at a customer statement from

5   December 2007 and we talked about at this time in

6   December 2007 the customer statements showed

7   activity where the underlying securities hadn't been

8   purchased; right?

9       A.   Correct.

10          MS. CHAITMAN:   Objection.   I do not

11   believe that the -- the split strike statements for

12   December ever showed securities.

13          MS. FEIN:   Excuse me?   So you mean because

14   I should have said treasuries instead of securities?

15          MS. CHAITMAN:   Yeah, yeah.

16          MS. FEIN:   So there were securities shown

17   as sold and then there were treasuries shown as

18   purchased on the December statement that we

19   reviewed.

20          MS. CHAITMAN:   Okay, okay.

21      Q.   Okay.   And I can be clearer.   So the

22   customer statements in December 2007 would have

23   shown -- would have shown treasuries that hadn't

24   been purchased; right?

25          MS. CHAITMAN:   Objection to form.   He's

CONFIDENTIAL

Page 562

1    already testified that they have been.

2          MS. FEIN:  No.  That's not correct, not in

3    2007.  He said in 1987 that was true and in 2007 it

4    was not true.

5          MS. CHAITMAN:  No.  He said that he had --

6          MS. FEIN:  The record can speak for

7    itself.  It's okay.  The record can speak for

8    itself.

9          MS. CHAITMAN:  Okay.  You're

10   misrepresenting what he said.

11         MS. FEIN:  Okay.  I'm going to continue --

12         MS. CHAITMAN:  He said he didn't buy 64

13   billion, but he didn't say he didn't maintain the

14   portfolio.  It's very different.

15         MS. FEIN:  We can have this conversation

16   offline.

17         MS. CHAITMAN:  Okay, okay.

18         MS. FEIN:  I'm talking about what is

19   represented on the customer statements and the

20   aggregate.  We talked about the number that was

21   represented on the customer statements, not the fact

22   that there were treasuries purchased at that time.

23   Okay.

24         MS. CHAITMAN:  Okay.

25      Q.   (By Ms. Fein)  Okay.  The term clearing

CONFIDENTIAL

Page 563

1    bank here is used where you would typically have a

2    counterparty listed for where the securities were

3    held; right?

4            MR. KRATENSTEIN:  Object to form.

5            THE WITNESS:  It's the balancing number,

6    yes.

7        Q.  (By Ms. Fein)  Okay.  And what do you mean

8    by the balancing number?

9        A.  In other words, it typically would balance.

10   In other words, you would always have the -- if it

11   didn't balance, it would be -- it would be a broken

12   trade.  Typically your long -- your long side would

13   always equal, always be represented on the short

14   position, should be the same.

15       Q.  Okay.

16       A.  When they use the term clearing banks,

17   that's not one single bank.  It's just, you know,

18   any number of clearing banks that the transactions

19   were custodied at.  And these -- I don't know why

20   you're looking -- I mean, I've already stated that

21   before that during this period in, you know, 2000s

22   or certainly post-'90s in general, that there were

23   times that I wasn't purchasing the securities.

24       Q.  Okay.  So when clearing banks is used here,

25   it's not --

Page 564

1      A.  It doesn't --

2      Q.  -- it doesn't mean the same thing as it

3  would if it showed DTC?

4      A.  No.  It wouldn't -- that would -- that was

5  a fraud period, in other words.  So there's nothing

6  -- I can -- I'm perfectly willing, I've already

7  stated that anything post-'92 period is not going to

8  be accurate in my records.

9      Q.  Okay.  So the term clearing banks here is

10 used as a place holder for the other side of the

11 transaction; right?

12     A.  Correct.

13     Q.  Okay.  I don't know.  We've been going a

14 while.  Would you like to take a break or do you

15 want to keep going?

16     A.  I'm fine.

17         MS. FEIN:  Okay.

18         MR. KRATENSTEIN:  Are you done with this

19 one?

20         MS. FEIN:  I think -- oh, you know what?

21 I have one more.  I have one more thing I want to

22 look at.  Thank you.  Sorry.  Can you turn -- I can

23 help you turn to the page, but the page is 498.  Let

24 me help you figure it out.  There you go.

25     Q.  (By Ms. Fein)  Do you see the transaction

Page 565

1  for the Treasury bill listed on this page due

2  1-3-2008?

3        A.   Uh-huh.

4        Q.   And at the bottom of that entry there's the

5  term clearing banks again?

6        A.   Correct.

7        Q.   And in this context it's being used as a

8  place holder or filler --

9        A.   Right.

10       Q.   -- counterparty for the trade; right?

11       A.   Uh-huh.

12       Q.   Okay.  So this trade is not -- is one that

13  didn't happen in the market; right?

14       A.   Correct.

15       Q.   And would that be true for the entries that

16  show this clearing banks on this report in 2007,

17  would that be true for those trades?

18       A.   Correct.

19            MS. FEIN:  We'll try to go quickly.  There

20  are a couple more reports of this size.  So we're

21  going to mark one more, but we're done with this

22  one.

23            MR. KRATENSTEIN:  I know all about trying

24  to go quickly through reports.

25            MS. FEIN:  I'm not going to match your

CONFIDENTIAL

Page 566

1   speed.  I promise.

2           MS. DASARO:  This is a full one.

3           MS. FEIN:  Okay.  So we have excerpts of

4   this one --

5           MR. KRATENSTEIN:  Okay.

6           MS. FEIN:  -- because it's very large.

7           MR. KRATENSTEIN:  Thank you.

8           MS. CHAITMAN:  So what number is this?

9           MS. FEIN:  This is Number 13.

10          (Trustee's Exhibit Number 13 was marked

11  for identification.)

12          MR. GOLDMAN:  Do you have the date because

13  this is sort of marked out.  I just want to make

14  sure.  It looks like 8-31-0 --

15          MS. FEIN:  '01.

16          MR. GOLDMAN:  '01?

17          MS. FEIN:  Yes.  It is, I know.  It's

18  easier on some pages to read than others.

19          MS. CHAITMAN:  I'd just like to make a

20  statement for the record.  Amanda, you objected to

21  some of the areas of our questioning on the basis

22  that it was not a part of the day two subjects.

23  And, in fact, I had covered the T-bill issue in the

24  day one topics and you had an opportunity to fully

25  cross-examine Mr. Madoff on them, so --

CONFIDENTIAL

Page 567

1            MS. FEIN:  Understood.  These reports are

2    really part of the microfilm report

3    cross-examination because that's one of the day two

4    topics, but I understand your position.

5            MS. CHAITMAN:  Right.  And, in fact, if

6    you had produced these documents in a timely manner

7    to us, we could have questioned him about them, but

8    you certainly could have.

9            MS. FEIN:  I should clarify.  These

10   documents are in the data room.  The reports that

11   we're going through are all in the data room.

12           MS. CHAITMAN:  Right.  So then you had the

13   ability to question him about them during the day

14   one depositions.

15           MS. FEIN:  And this is part of the day two

16   topics with respect to the microfilm reports that

17   I'm questioning him on.  That's -- that's why

18   they're part of these topics.

19           MS. CHAITMAN:  If this was in the data

20   room, wasn't it available to you when you were

21   questioning him?

22           MS. FEIN:  This is in response to your

23   questioning.  This is my cross-examination.

24           MS. CHAITMAN:  Okay.  And I think it's not

25   within the scope of the day two.

Page 568

1        MS. FEIN:  Understood.

2        Q.  (By Ms. Fein)  Okay.  So, Mr. Madoff, this

3   report is entitled abbreviated stock record summary

4   through 8-31-01.  Do you see that at the top of the

5   page?  I'm sorry.  Let me get it ready for you.

6   This report that I'm holding, abbreviated stock

7   record summary through 8-31-01?

8        A.  Uh-huh.

9        Q.  And on the left it says distribution,

10  Annette.  Do you believe that's referring to Annette

11  Bongiorno?

12       A.  I assume so because I don't think we have

13  another person named Annette.

14       Q.  And this is 2001.  If you look at the first

15  transaction --

16       A.  Right.

17       Q.  -- do you see Daimler Chrysler AG listed as

18  the security?

19       A.  Correct.

20       Q.  And at the bottom do you see customer names

21  listed after that?

22       A.  Yes.

23       Q.  And customer account numbers listed to the

24  left -- I'm sorry -- to the right of that; right?

25       A.  Yes.

CONFIDENTIAL

Page 569

1       Q.   At the bottom of this entry do you see

2  clearing banks listed on the other side?

3       A.   Yes.

4       Q.   And would that be used as a place holder

5  counterparty because there wasn't a counterparty to

6  this trade?

7       A.   That's correct.

8       Q.   Do you agree that this report shows IA

9  customer holdings?

10      A.   Right.

11           MS. FEIN:   Okay.  We can be finished with

12  that document.

13           (Trustee's Exhibit Number 14 was marked

14  for identification.)

15      Q.   (By Ms. Chaitman)  Yes.  We're all set with

16  that.  This is Trustee Exhibit 14.

17           MR. KRATENSTEIN:   Excuse me.

18      Q.   (By Ms. Chaitman)  Is the title of this

19  document house 17 stock record summary through

20  3-31-94?

21      A.   Yes.

22      Q.   Does it appear similar to the other stock

23  record summaries we reviewed previously?

24      A.   Uh-huh.

25      Q.   It has the same column headings; right?

CONFIDENTIAL

Page 570

1      A.   Right.

2      Q.   The first security that's listed under

3  security account name, ATD, Ltd.  Do you see that?

4      A.   Yes.

5      Q.   And then do you see customer names listed

6  underneath the security.

7      A.   Yes.

8      Q.   And customer account numbers that are

9  listed on the right-hand side; right?

10     A.   Yes.

11     Q.   So would this be referring to customer

12  positions in -- in 1994 when this report was put

13  together?

14     A.   Correct.

15     Q.   And do you see the clearing bank's entry at

16  the end of the -- at the end of the ADT security

17  list?

18     A.   Uh-huh, yes.

19     Q.   And the account number 29000030, do you see

20  that?

21     A.   Yes.

22     Q.   Would this also be a place holder

23  counterparty?

24     A.   Yes.

25        MS. FEIN:  So I think we're done with that

CONFIDENTIAL

Page 571

1   one.

2              (Discussion off the record.)

3              MS. FEIN:  Okay.  I'm going to mark this

4   Exhibit 15.

5              MS. CHAITMAN:  Will you be sending us a

6   complete set of these exhibits?

7              MS. FEIN:  That's no problem.

8              MS. CHAITMAN:  Okay.

9              MS. FEIN:  Sorry it's so large.  It's just

10  -- whoops.

11         Q.  (By Ms. Fein)  Okay.  Do you see in the

12  middle of the page the title of this report?

13         A.  Yes.

14         Q.  Is it house 17 stock record summary through

15  7-16-87?

16         A.  Yes.

17         Q.  Do you see the first trade listed under the

18  title AGS Computers, Inc. sub deb conv?

19         A.  Correct.

20         Q.  Is that a convertible arb trade?

21         A.  Yes.

22         Q.  And do you see IA customers listed

23  underneath that?

24         A.  Uh-huh.

25         Q.  Okay.  Do you see at the end of that same

CONFIDENTIAL

Page 572

1  set the term clearing banks used?

2          A.   I don't see.  Oh, yes.

3          Q.   Okay.  Would that be used as a filler

4  counterparty in this report?

5          A.   Yes.

6          Q.   And if you turn ahead to page ending -- I

7  think it's two pages ahead ending in 064.  Sorry

8  about this.  Do you see a transaction in -- oh, you

9  know what?  The pages for this one so that it would

10 print out so we could read it, it's three pages per

11 on your copy.  His copy has a page --

12              MR. KRATENSTEIN:  Okay.  Could you just

13 show us where to go?

14              MS. FEIN:  No problem.

15              MR. KRATENSTEIN:  Thank you.

16              MS. CHAITMAN:  So what is the date of this

17 document?

18              MR. KRATENSTEIN:  7-16-87.

19              MS. CHAITMAN:  7-16-87.

20              MS. FEIN:  This is the --

21              MR. KRATENSTEIN:  Thank you very much.

22         Q.   (By Ms. Fein)  Do you see the AMR Corp

23 transaction listed at the bottom of the page?

24         A.   Uh-huh.

25         Q.   Okay.  And do you see clearing banks listed

CONFIDENTIAL

Page 573

1    at the end of that transaction or at the bottom of

2    the -- I'm sorry.  Let me back up.  Is there a list

3    of IA customers underneath the AMR Corp listing

4    security?

5         A.  Yes.

6         Q.  And do you see there on the right-hand

7    column there are IA account numbers listed?

8         A.  Correct.

9         Q.  Do you see the clearing banks entry at the

10   bottom of the AMR Corp transaction or the long

11   positions?

12        A.  Correct.

13        Q.  And do you see the account number 2900030?

14        A.  Yes.

15        Q.  Would this be a filler counterparty that

16   was used on your reports?

17        A.  When you say filler counterparty, why --

18   what are you referring to?

19        Q.  Well, what we were referring to on the

20   earlier reports is that those trades didn't occur,

21   but you needed to have another side to the

22   transaction; right?

23        A.  If, in fact -- if, in fact, it was during a

24   period that we were not doing the transaction, the

25   actual transaction.

CONFIDENTIAL

Page 574

1      Q.  Okay.

2      A.  You're talking about a period now in 1987

3  that we did the transactions.

4      Q.  Okay.

5      A.  So that would be -- when you say a filler,

6  I'm assuming you're assuming that the trade wasn't

7  done.

8      Q.  Okay.

9      A.  That doesn't mean that every time we used

10  clearing banks that there wasn't an actual trade

11  being done.

12      Q.  Okay.

13      A.  What I had said originally, I was

14  explaining to you, it would be a balancing number.

15  It should always -- it would always balance.  If

16  didn't balance, there would be a break in the

17  transaction.  That's -- so if that didn't balance,

18  it didn't match the number of shares bought, it

19  would alert the -- whoever was running the records

20  that there's an error, you know, that we're missing

21  something there.

22      Q.  Okay.

23      A.  You also have to understand that when

24  you're talking about treasuries, for example, there

25  were treasuries that were bought under the firm's

CONFIDENTIAL

Page 575

1   name, you know, at a place like Morgan Stanley or

2   Fidelity and so on that would not be reflected

3   necessarily on my books and records.

4        Q.   You mean in the 1987 time frame?

5        A.   Not in the 1987.  In the later period.

6        Q.   Okay.  What do you mean they wouldn't be

7   reflected on your books and records?

8        A.   In other words, I'm not sure how they

9   handled -- even in the '87 period, I'm not sure, you

10  know, how those treasuries were handled, you know,

11  whether they were bought.  Depends upon how they

12  were purchased.  You'd have to ask -- during '87

13  wouldn't be Frank DiPascali because he wasn't

14  handling that.  You'd have to speak to someone else

15  who would know that.  I don't know how they handled

16  that transaction.

17       Q.   Would Annette maybe know?

18       A.   Probably not, not during that period.

19       Q.   Okay.  So this is a trade in AMR Corp

20  that's listed?

21       A.   Uh-huh.

22       Q.   AMR Corp was -- the DTC held AMR Corp

23  securities in 1987 because we saw that on the

24  earlier report we reviewed; right?

25       A.   Correct.

CONFIDENTIAL

Page 576

1          MR. KRATENSTEIN:  Object to the form.

2          Q.   (By Ms. Fein)  But it's your testimony that

3    these shares weren't -- is it your testimony that

4    these shares were not held at DTC even though DTC

5    could hold the securities?

6          A.   I don't see the DTC.

7          Q.   Right.

8          A.   No.  I don't see DTC.

9          Q.   It just says clearing banks; right?

10         A.   Clearing banks, right.

11         Q.   And it's --

12         A.   So that could be any number of five

13   different clearing banks we had and, you know,

14   probably eight different clearing banks that were

15   used to -- as a depository to clear the transaction.

16         Q.   Wouldn't you need to know who was on -- who

17   was holding the securities for your transactions?

18   Why would it show up as clearing banks?

19         A.   It would.  There would be a subsidiary

20   ledger that would show that.

21         Q.   Okay.

22         A.   The stock record only shows -- just like at

23   DTC, you know, it's just one entity.  There were

24   subsidiary ledgers that would show where the

25   securities were held.

CONFIDENTIAL

Page 577

1      Q.  But these securities listed here wouldn't

2  be held at DTC or else you would show DTC on the

3  other side; right?  So it has to be held at another

4  clearing firm?

5      A.  That's correct.

6      Q.  Okay.  I'm just going to go back to show

7  you something on Exhibit 11.  All right.  So the

8  first transaction in AMR Corp, the balance held at

9  DTC as shown on this report for July 16th, 1987 is

10  3,357; correct?

11      A.  Uh-huh.

12      Q.  If you look at the short position shown on

13  the AMR Corp trade here for the same date,

14  July 16th, 1987, how many shares does it say are

15  held at the clearing banks?

16      A.  It looks like --

17          MS. CHAITMAN:  When you say here, what

18  document are you asking to look at?

19          MS. FEIN:  Sorry.  So now we're looking

20  at --

21          MS. CHAITMAN:  Exhibit 15?

22          MS. FEIN:  -- Exhibit 15, page ending in

23  064.

24          THE WITNESS:  Is that 290,000 or --

25          MS. FEIN:  I think it's -- let me just

CONFIDENTIAL

Page 578

1   make sure.

2           MS. CHAITMAN:  So I can't read this.

3   Trustee Exhibit 11 is house five?  Is that what it

4   says at the top?

5           MR. KRATENSTEIN:  Yes.

6           MS. FEIN:  It does.

7           MS. CHAITMAN:  And Trustee Exhibit 15 is

8   house five also?

9           MS. FEIN:  House 17.

10          MS. CHAITMAN:  House 17, okay.

11      Q.  (By Ms. Fein)  So just to be clear, we're

12  looking at the AMC security at the bottom of that

13  transaction.  It says clearing banks.  The account

14  number listed is 29,000, three zero, and then

15  there's a short position listed.  What short are

16  they showing?

17      A.  332, right, 785.

18      Q.  Yes.  So for the same date that you had a

19  little over 3,000 shares held at DTC as shown on

20  your house five stock record summary --

21      A.  Correct.

22      Q.  -- this shows over 330,000 shares in the

23  same security; right?

24      A.  In the 17 -- in the 17 account.

25      Q.  Right.  On the house 17 side?

CONFIDENTIAL

Page 579

1        A.  Right, right.

2            MS. FEIN:  Okay.  Now is a good time to

3    take a break if that's okay with everyone.

4                        EXAMINATION

5    BY MR. GOLDMAN:

6        Q.  I have two questions.  They're quick

7    questions.  I don't know if the answers are long,

8    but Ms. Chaitman asked you earlier on about

9    confirmations on transactions.

10       A.  Yeah.  What?  Oh, I didn't know you were

11   talking to me.

12       Q.  Ms. Chaitman asked you some questions about

13   confirmations, whether you got confirmations.

14   Sometimes you did get confirmations, sometimes you

15   didn't --

16       A.  Yes.

17       Q.  -- at the time you were looking through all

18   the transactions that occurred?

19       A.  Correct.

20       Q.  Was there a procedure or protocol in place

21   to authenticate that the transactions actually

22   occurred?  This is prior to '92.  Did you get

23   something back from whoever you contracted to have

24   the transaction performed?

25       A.  If it was -- if it was a -- if the

CONFIDENTIAL

Page 580

1  transaction was handled through NSCC, if it was part

2  of the C&S netting practice.  I'm not sure that I

3  understand the question.

4      Q.  Okay.  How did -- how were you assured that

5  the order, whether it was a purchase or a sale,

6  actually occurred if you have it listed on your

7  account that's your own internal records?  How were

8  you assured that the transaction actually occurred?

9      A.  That was handled, would have been handled

10  by the what we call the P&S department, the purchase

11  and sales department.  And they would typically

12  either get a confirmation or if it went through the

13  clearing house, you know, and, again, depending upon

14  if that was during the netting period or not, you

15  would get what they call a balance order from the

16  clearing corporation.

17          It also -- also depends upon whether or not

18  we had an automatic interface with the firm that was

19  on the other side of the transaction.

20      Q.  But there was some procedure or protocol in

21  place?

22      A.  Oh, yeah.  Of course, yes.

23      Q.  And the second question I have, did you

24  send your clients, customers, clients quarterly or

25  monthly financial statements?

CONFIDENTIAL

Page 581

1        A.   They had --

2        Q.   Statements of transactions?

3        A.   Some clients got them quarterly and some

4   clients got them monthly.

5        Q.   Okay.

6        A.   Depends upon whether they requested them,

7   when they requested them.

8        Q.   And if there were short transactions that

9   occurred for that particular client or customer, was

10  it indicated on the statement that it was a short

11  transaction?

12       A.   No.

13       Q.   Nothing.  Just --

14       A.   No brokers indicated to the customer

15  because the customer didn't care whether it was a

16  short transaction or it was a long transaction.

17  They didn't care whether the broker was short or

18  whether he was long.  They looked -- the ownership

19  rights were the same.  In other words, you were

20  entitled to the dividend.  You were entitled to a

21  stock split or any action, corporate action.

22            MR. GOLDMAN:  Okay.  Thanks.

23            MR. KRATENSTEIN:  Take a break?

24            MS. DASARO:  Yes, thanks.

25            THE VIDEOGRAPHER:  Going off the record.

CONFIDENTIAL

Page 582

1    The time is 10:32.

2              (A recess was taken.)

3              THE VIDEOGRAPHER:  Back on the record.

4    This begins tape number two in the deposition of

5    Bernard L. Madoff in Butner, North Carolina on

6    November 9th, 2017.  The time is 11:07.

7              FURTHER EXAMINATION

8    BY MS. FEIN:

9         Q.  Mr. Madoff, do you remember yesterday Mr.

10   Kratenstein asked you about a list of banks where

11   you performed clearing functions?

12        A.  Correct.

13        Q.  You provided us a list when we met with you

14   in April and I can show it to you --

15        A.  Uh-huh.

16        Q.  -- if you want to see it, if it helps

17   refresh your recollection about what those firms

18   are.

19        A.  Right.

20        Q.  This just the testimony from April 26,

21   2017.

22        A.  Uh-huh.

23        Q.  Do you see around line ten there's a list

24   that includes Meadowbrook National Bank, Commercial

25   Bank of North America, Irving Trust Company, Bank of

Page 583

1   New York, Bankers Trust, Manufacturers Hanover,

2   Chase Manhattan, Marine Midland, Chemical Bank,

3   JPMorgan Bank, Continental Illinois Bank and M&T

4   Bank?

5        A.   Yeah.

6        Q.   Do you recall any firms -- scratch that.

7   Do you see right below that in the testimony --

8   well, actually, here.  You listed what services

9   those banks provided to you on the next page.  And

10  then you were asked do they have custodial accounts

11  where you maintain securities for customers.

12            Did this list of banks we just went

13  through, did any of those have custodial accounts

14  where securities were maintained for customers?

15       A.   Okay.  What is the question?

16       Q.   The list of banks that we just reviewed --

17       A.   Right.

18       Q.   -- did any of those banks have custodial

19  accounts where you maintained securities for

20  customers?

21       A.   When you say did they have accounts they

22  maintained for customers, they would have -- no.

23  The answer would be that they would have usually one

24  account for the firm.  They wouldn't -- they

25  wouldn't have -- they wouldn't identify them by

CONFIDENTIAL

Page 584

1    customers.  That was the same practice with DTC.   In

2    other words, there was -- I don't know what the

3    terminology would be because my brain isn't working,

4    but they would have one account.  They wouldn't

5    break it out by clients.

6         Q.  This question was and my question to you,

7    did you have custodial accounts where you maintained

8    securities for customers?

9         A.  Yes.

10        Q.  Okay.  When you were asked -- so this

11   deposition took place on April 26, 2017.  You

12   remember you were under oath for that deposition;

13   right?

14        A.  Correct.

15        Q.  And the answer to the question you provided

16   then --

17             MR. GOLDMAN:  Why don't you read it?

18             MS. FEIN:  Sure.

19             MR. GOLDMAN:  Thanks.

20             MS. FEIN:  Yeah.

21             MR. KRATENSTEIN:  Tell us where you are.

22   I have it here, so --

23             MS. FEIN:  Okay, sure.  I'm on page 33.

24             MR. KRATENSTEIN:  Yes.

25             MS. FEIN:  And the line is line six.

CONFIDENTIAL

Page 585

1          MR. KRATENSTEIN:   Thank you.

2          Q.   (By Ms. Fein)  This right here.  You were

3   asked by Ms. Chaitman about this list of banks.  Did

4   they have custodial accounts where you maintained

5   securities for customers.  Your answer, not that I'm

6   aware of, no.  So I guess I'm trying to understand

7   why your answer is different today?

8          A.   I'm not sure that it's different.  When you

9   say do I own -- when you're asking was I own --

10  maintain a custodial account for a customer, it

11  would be -- the answer would be yes.  It depends

12  upon the period you're talking about.  The stock

13  records would show -- the stock record would show

14  the customers that we had securities for.  That's on

15  the stock record.

16          That's the only record that we would

17  maintain of that.  And I would assume that the

18  question you were asking when you say did we have --

19  did the banks have custodial, the answer would be,

20  you know, they wouldn't know who our customers were.

21  They would just have -- they would just -- the firm

22  is the customer.

23          We don't tell the bank that these

24  securities -- that these securities that we're

25  clearing through you are for John Jones.  No one

CONFIDENTIAL

Page 586

1   does that.  We don't identify that.  And they don't

2   -- for example, they don't -- they don't have a

3   record of who the clients were.  It's the same thing

4   with DTC.

5           Q.  I understand that.

6           A.  Oh, okay.

7           Q.  I do understand that.

8           A.  That's the question.  I'm not sure what

9   your question was.

10          Q.  Okay.  Well, my question is you --

11          A.  I don't think it's -- what I'm saying, I

12  don't know that my response to Helen Chaitman is

13  different than what I had made then.  At least I

14  don't see the difference.

15          Q.  Well, this refers to accounts you would

16  have, your firm would have --

17          A.  Right.

18          Q.  -- where you maintain securities for

19  customers.

20          A.  Right.

21          Q.  Not that they would be segregated

22  necessarily.

23          A.  Oh.

24          Q.  Just that you maintain the securities for

25  customers.

CONFIDENTIAL

Page 587

1        A.   Right.

2        Q.   And when you were asked in April the answer

3   to that question was no, but it sounds like today

4   your answer is different?

5            MR. KRATENSTEIN:   I object to the form of

6   the question.

7            MS. CHAITMAN:   Yeah.   I think what he was

8   saying was I think the way the first -- the way my

9   question was worded, he thought does he maintain at

10  an institution account for Mrs. Jones and Mrs. Brown

11  and --

12           MS. FEIN:   Okay.   Your interpretation

13  notwithstanding --

14           MR. KRATENSTEIN:   Just for the record,

15  you're interpreting his testimony, too, so --

16           MS. FEIN:   I was just trying to read it

17  and then understand what it said.

18       Q.   (By Ms. Fein)   Okay.   So is your testimony

19  today that the banks that we listed -- actually, let

20  me go back.   That set of banks that we went over

21  didn't include NatWest; right?

22       A.   What do you mean didn't include it?

23       Q.   So you listed 11 banks during your

24  testimony that day.   NatWest wasn't one of them;

25  right?   And the list is here.

CONFIDENTIAL

Page 588

1    A.  Because it would have been NatWest took

2    over -- as I said, I believe I said in the other

3    testimony earlier, these banks merged with each

4    other.  So, for example, Meadowbrook National Bank

5    became NatWest at one point in time, you know.

6        Q.  Okay.  So --

7        A.  NatWest would have been one of them.

8    Again, this was -- I said pretty much covers it.  I

9    was giving a list of the banks that I had remembered

10   that I was familiar with, but Meadowbrook National

11   was merged with NatWest the same way that Chase

12   Manhattan and Manufacturers became Chase Manhattan

13   and then Chase Manhattan became JP Morgan.

14       Q.  Okay.  I had thought National Bank of North

15   America had merged with NatWest.  Does that ring a

16   bell for you?

17       A.  No.  Nat -- oh, I don't know.  I don't

18   remember.

19       Q.  Okay, okay.  Understood.

20       A.  I mean, my question was answered just that

21   I had other facilities, clearing facilities through

22   banks and brokerage firms.  I didn't list them all.

23   It was just that -- just saying that besides being a

24   self-clearing firm, I also had arrangements and did,

25   in fact, clear certain transactions through other

CONFIDENTIAL

Page 589

1   entities.

2        Q.  So if you were clearing transactions

3   through those other entities, you wouldn't be

4   relying on your back office for the purposes of

5   delivery of the securities or --

6        A.  Well, the back office would eventually --

7   they would start with us, you know.  Like we bought

8   the stock, but we would give instructions to the

9   counterparty, deliver the securities to this broker

10  or this bank and so on and so on.  It depends upon

11  the transaction.

12          I mean, we were the one that would actually

13  buy the securities, but then again there were times

14  that we would call them depending upon what it was.

15  Like if it was a Treasury instrument, we would

16  typically just call JPMorgan or Bank of New York and

17  they would actually buy the transaction.

18       Q.  And did you say where would you be keeping

19  track of --

20       A.  We would have an internal record of that

21  somewhere at the firm.

22       Q.  Okay.

23       A.  Whether -- and, again, it depends upon at

24  what stage it was and what our ordination was and

25  what the bank's -- we had direct interfaces with

Page 590

1   some of these banks and brokerage firms the same way

2   that we had -- that we had direct interfaces with

3   NCC and DTC and so on and so forth.

4        Q.   Okay.  So your -- for the period of time

5   let's say the 1980s --

6        A.   Uh-huh.

7        Q.   -- it's your testimony those transactions

8   were taking place in the market; right?

9        A.   Yeah.

10       Q.   They were taking place within your house

11  five business; is that right?

12       A.   It depends upon who would -- who we were

13  acting for.  If it was -- and whether it was just a

14  transaction coming out of the inventory account of

15  the firm, you know, out of the -- and we had any

16  number -- we had different trading accounts

17  depending upon the strategy and who was handling it.

18  So there was internal records somewhere in the firm.

19            I mean, obviously, you know, we had to have

20  some record, you know, and to be able to track it.

21  And then there was the stock record which showed

22  the -- usually the global picture but, again, you

23  can have any number of stock records.

24       Q.   Okay.  The trades shown on your convertible

25  arb customer statements in the '80s --

CONFIDENTIAL

Page 591

1        A.   Right.

2        Q.   -- would have -- so tell me, you're saying

3   there's more than one place that those trades could

4   have originated?

5        A.   Correct.

6        Q.   Is there more than one place that those

7   trades would have been cleared through?

8        A.   Yes.   Again, depends upon whether the

9   entity or the bank was also a market maker in the

10  security depending upon where they were located and

11  so on.  So, in other words, the bank -- these banks

12  and other brokerage firms like a Bear Stearns or a

13  low roads, they're also, you know, competitors of

14  ours.  In other words, they're also doing the same

15  thing that we're doing.

16           And there are any number of ways that you

17  do a -- that you can buy or sell transactions.  You

18  can actually go out into the market -- into the

19  street to buy the security.

20           We might do a swap with a particular firm,

21  which is -- I don't want to bore you with all the

22  details, but the same way that when you're doing a

23  convertible transaction trade, you can rather than

24  put the bond into conversion to convert it into

25  stock, which would eventually have to go to -- if

CONFIDENTIAL

Page 592

1    you did that, you would have to put it through

2    whoever the -- whoever was the conversion agent, you

3    know, for that particular security.  You could also

4    go to -- we would -- we could go to another broker,

5    another market maker and swap, in other words, swap

6    our bond for stock, you know, that it was

7    convertible into because then they may be doing the

8    opposite side of the transaction that we do.

9              These are things that in the Dubinsky

10   report he seemed to be totally unaware of.  Like he

11   made statements, well, I contacted the conversion

12   agent of the particular security that we -- the bond

13   and they didn't have any agreement in place with

14   Madoff as if that was the only way that you could

15   exchange.

16              The idea is when you're doing a convertible

17   trade if you do it depending upon, again, what the

18   strategy you're using, if it's strictly to buy the

19   bond for the client and then sell the common stock,

20   you know, short, you know, against that, and then

21   you're going to -- you either convert it physically

22   by sending it to the conversion agent or you can, in

23   fact, go ahead and exchange with another market

24   maker in that particular bond and say okay, look, I

25   want to -- I'll exchange my bond.

CONFIDENTIAL

Page 593

1          He may want the bond and he's willing to

2     give me stock for it and then you do a stock swap.

3     And when I say short, you know, you're talking about

4     it's like a short exempt transaction.  In other

5     words, I'm selling stock, you know, that -- which is

6     short, which I don't have the stock at the time but

7     I have a bond at the time.

8          Q.  So are you saying that where your various

9     bonds and securities cleared would be dependent on

10    the type of bond or security in part, right, because

11    some places wouldn't clear certain --

12         A.  Right.

13         Q.  -- certain bonds or certain securities?

14         A.  Well, any bank would -- any bank would

15    clear any transaction that you do, but depending

16    upon what you want to do.  If I was looking to

17    convert the bond into common stock, which means I'm

18    going to exchange the bond position, then the bank

19    itself might have -- you know, if they're a market

20    maker they might be willing to say okay, look,

21    Madoff wants to convert -- he wants to exchange the

22    bond for stock.

23         You know, we'll give him the stock --

24    they'll give me the stock from their inventory to

25    satisfy what I'm asking him to do and take the bond

CONFIDENTIAL

Page 594

1    into their inventory.  Did I lose you or not?

2          MS. FEIN:  Okay.  No.  So we looked at an

3    exhibit yesterday, maybe also today.  Maybe it's in

4    this other pile.

5          MR. KRATENSTEIN:  What number are you

6    looking for?

7          MS. FEIN:  I'm looking for 39.  It's in

8    that other pile.  I wanted to look at one document

9    that we looked at yesterday, but I don't see it.

10   Thank you.

11         MR. KRATENSTEIN:  You want 39?

12         MS. FEIN:  Yeah.  Didn't see it there.

13         (Discussion off the record.)

14     Q.  (By Ms. Fein)  So looking at this

15   Exhibit 39 that we reviewed yesterday, thank you, do

16   you see -- this looks like a customer statement,

17   right, for the most part other than the client?

18     A.  Right.

19     Q.  This format I should say.

20     A.  Uh-huh.

21     Q.  Do you see where it says balance forward,

22   $75,892,366.08?  There's a debit balance listed?

23     A.  Right.

24     Q.  Do you know why there would be a debit

25   balance on this report?

Page 595

1          MS. CHAITMAN:  I'm sorry.  Show me where

2   you are.

3          MS. FEIN:  Just the first line of Exhibit

4   39, yeah.

5          MS. CHAITMAN:  The debit, I see.

6          MS. FEIN:  Yeah.

7          THE WITNESS:  It might be, I'm assuming it

8   arose from activity that occurred in that account.

9       Q.  (By Ms. Fein)  Okay.  That would mean that

10  the bank had owed you 75 million and change; right?

11      A.  Based upon deliveries, what was taking

12  place in the account.  See, this -- these securities

13  would have been -- these received and delivered

14  would have monies attached to it and all, which

15  doesn't show on the statement but it would be on

16  another, another statement depending on what was --

17  what was flowing through.  Obviously, it represents,

18  you know, the debits and credits that were involved

19  in these transactions.

20          MS. FEIN:  Okay.

21          MR. KRATENSTEIN:  I mean, if you look at

22  later -- if I could, if you look at later pages

23  there are debit and credit numbers listed on some of

24  the pages.

25          MS. FEIN:  I do see that, yes.

CONFIDENTIAL

Page 596

1          MR. KRATENSTEIN:  Okay.

2          MS. FEIN:  Thank you.

3     Q.  (By Ms. Fein)  At the end of the report if

4     you look at the page ending in 69, do you see where

5     security positions is listed?

6     A.  Uh-huh.

7     Q.  And then there are a number of positions

8     that follow from that?

9     A.  Correct.

10    Q.  A couple of pages later, it's the last page

11    of the document, it says end of positions?

12    A.  Right.

13    Q.  And there's a long and a short and a

14    difference?

15    A.  Uh-huh.

16    Q.  Would this list of security positions be

17    the securities that were listed in this account at

18    the time?

19         MS. CHAIRMAN:  Objection to form.

20         THE WITNESS:  I'm not sure I understand.

21    Q.  (By Ms. Fein)  Well, my question is --

22    A.  Yeah.  I see this.

23    Q.  -- typically at the bottom of your customer

24    statements and similar statements you would have

25    security positions and then you would have the

CONFIDENTIAL

Page 597

1    securities or other bonds that would be --

2        A.   Right.

3        Q.   -- listed in your account.  Does that

4    appear to be true here as well?

5        A.   I'm not sure whether this represents market

6    value of the securities or whether it represents a

7    customer statement.  Our customer statements

8    reflected balances from the buying and the selling

9    and then there's a market value of the securities in

10   the account if you looked on the statement.  I don't

11   know what -- I don't know what this represents.

12       Q.   Okay.  Because there's like -- there are

13   two different balances listed, so I was trying to

14   figure out why they were different.  If you look at

15   new balance, which is at the end of this activity,

16   you see $78,544,284.62?

17       A.   Uh-huh.

18       Q.   And then --

19            MS. CHAITMAN:  I'm sorry.  Which page is

20   that?

21            MS. FEIN:  Oh, on page 869.

22            MS. CHAITMAN:  869.

23       Q.   (By Ms. Fein)  Right before you get to the

24   security positions listed.  And then at the end of

25   the report, the end of positions, those figures are

CONFIDENTIAL

Page 598

1    different, right, on the last page for the security

2    positions?

3        A.   It would -- it would seem to me that this

4    is -- one of them is representing, this typically

5    would be representing what the market, the current

6    market of these positions were.

7        Q.   Okay.  That's your understanding of why

8    they're different?

9        A.   I'm assuming.  Typically on a customer

10   statement you would have the opening balance, like

11   you would have the opening balance and closing

12   balance is for the actual money flows out of the

13   account.  And then at the end of -- the end of the

14   statement it shows what the open and long and short

15   positions are and what the current market value of

16   those are on a mark-to-market basis.

17       Q.   Okay.

18       A.   I mean, you can figure it out by adding up

19   what -- by just doing the math and adding up if it

20   tells you, for example, if it's showing you --

21   whether or not it's showing you, you know, prices of

22   the securities.

23       Q.   Uh-huh.

24       A.   At least that's the way the customer

25   statement normally occurs.

Page 599

1        Q.    Okay.

2        A.    I'm not familiar with what -- necessarily

3    how the clearing accounts are handled on our books

4    and records.

5        Q.    Okay.  But these security positions that

6    are listed here, you see there are some long

7    positions and some short positions listed starting

8    on page 869 and then through the next couple of

9    pages?

10        A.    Right.

11        Q.    Would that mean that National Bank of North

12    America owned those -- owned -- the long positions

13    would be securities owned by National Bank of North

14    America?

15        A.    No, not owned.  Being cleared through

16    there.

17        Q.    So this document --

18        A.    It's not National Bank of North America.

19    That's a client of ours.  You know, we're not buying

20    and selling the stock for National Bank of North

21    America.

22        Q.    Okay.

23        A.    We're buying it for customers, transactions

24    being cleared through that account.

25        Q.    Okay.  So this is -- you're saying this

CONFIDENTIAL

Page 600

1    document shows the clearing that --

2        A.  It's showing the activity that flowed

3    through that account.

4        Q.  Okay.  So they were not an IA customer of

5    yours; right?

6        A.  No.

7            MS. FEIN:  Okay.

8            MR. KRATENSTEIN:  Thank you very much.

9            (Trustee's Exhibit Number 16 was marked

10   for identification.)

11       Q.  (By Ms. Fein)  I'm marking as Exhibit 16 a

12   document I'm about to hand to you that's being

13   marked as Exhibit 16.  Do you recognize what kind of

14   document this is?

15       A.  It's a customer confirmation.

16       Q.  Do you see, can you read the trade date

17   there?

18       A.  1983, 11-11-83.

19       Q.  And the settlement date looks like

20   11-18-83; is that right?

21       A.  Uh-huh, yes.

22       Q.  Under the security description would you

23   agree that it's showing a preferred -- preferred

24   convertible security?

25       A.  Right, yes.

CONFIDENTIAL

Page 601

1        Q.  And for the capacity code, do you see the

2    number two?

3        A.  Yes.

4        Q.  And that -- those are trades where you're

5    acting as principal; right?

6        A.  Correct, yes.

7             MR. KRATENSTEIN:  In other words, that's

8    what the capacity code means, two equals principal?

9             MS. FEIN:  That's right.

10            THE WITNESS:  You have to look at the back

11   of the confirmation to see that.

12       Q.  (By Ms. Fein)  The customer listed is

13   George Scheer Special.  Do you see that information?

14       A.  Yes.

15       Q.  And where it says we sold, does it mean

16   that your --

17       A.  Sold is from our principal account.

18       Q.  Okay.  So where -- can you explain to me

19   kind of how this trade would end up in your

20   principal account before it got to the customer

21   statement?

22       A.  We are selling the stock.  Typically on an

23   agency transaction it would say -- it would refer to

24   what the customer bought and sold.  This would have

25   confused Dubinsky.

CONFIDENTIAL

Page 602

1    Q.   I'm not confused about that point.  Let me

2    back up.

3    A.   Okay.

4    Q.   My only question is would this -- where

5    would this trade have originated on the market?

6    A.   Well, to begin --

7    Q.   Like who would have been the trader in your

8    business or elsewhere?

9    A.    I don't know who the trader could have

10    been.  Typically it depends upon the transaction.

11   The transaction could have been we a had bought the

12   stock first, you know.  We could have had it in

13   inventory, which would have appeared in one of the

14   firm's trading accounts or in our investment

15   account.  And then we would sell it from a trading

16   account or investment account to the client as

17   principal.

18   Q.   Okay.

19   A.   That's -- it could be any number of -- or

20   we can go out and buy it into this -- buy it from

21   the street, you know, and then it flows from Goldman

22   Sachs, who's a market maker, you know, selling it to

23   us.  And I could originate the trade, according if

24   Goldman Sachs's market making department, and buy

25   the stock.

CONFIDENTIAL

Page 603

1          So it goes from step one, from Goldman,

2    who's selling it as principal to Madoff, who's

3    buying it as principal, and Madoff in turn is

4    selling it from my principal account to the customer

5    account.

6          (Trustee's Exhibit Number 17 was marked

7    for identification.)

8          Q.  (By Ms. Fein)  Okay.  I'm going to mark or

9    I'm going to show you what's been marked as

10   Trustee's 17.

11          MS. DASARO:  I just want to make sure.

12          MR. KRATENSTEIN:  Thank you.

13          MS. CHAITMAN:  Thank you.

14          Q.  (By Ms. Fein)  Is this another one of the

15   stock record documents that your firm maintained?

16          A.  Yes.

17          Q.  And would this be for house 17, your IA

18   customers?

19          A.  I can't read the --

20          Q.  Look at the --

21          MS. CHAITMAN:  Page 63, 11-30-63?  Is that

22   the date?

23          MS. FEIN:  No.  If you look at the -- it's

24   '83, yes.

25          THE WITNESS:  This is house 17.  This is

Page 604

1   house 17, so --

2       Q.  (By Ms. Fein)  Okay.  Here, just to be

3   clear, will you read the title of the document

4   starting with the house 17?

5       A.  Stock record summary through 11-10-83.

6       Q.  Okay.

7       A.  Or 11-30-83.  I can't read it.

8       Q.  Okay.  Yeah.  I think it's 11-30.

9       A.  Yeah, 11-30-83.

10      Q.  Okay.  For your IA customers were these

11  typically run at month end?

12      A.  Yes.

13      Q.  These type of reports?

14      A.  I'm assuming if it says through 11-30-83,

15  that would be the month end.

16      Q.  For this report; right?

17      A.  For this report.

18      Q.  I'm asking you if you know more generally

19  if for house 17 these reports were typically run at

20  the end of the month?

21      A.  I assume so, but I can't be sure.

22      Q.  Okay.  I'm going to show you a different

23  page, page 750.  And if you look toward the bottom

24  of the page --

25      A.  Uh-huh.

CONFIDENTIAL

Page 605

1        Q.   -- do you see a transaction in -- I'm

2    sorry -- in the middle of the page in International

3    Harvester?

4        A.   Yes.

5        Q.   Okay.  I'd like you to look again on this

6    page.

7        A.   Uh-huh.

8        Q.   The International Harvester transaction.

9        A.   Right.

10           MS. CHAITMAN:  Is this 750?

11           MS. FEIN:  This is 750, yes.

12           MS. CHAITMAN:  Okay.

13        Q.   (By Ms. Fein)  Preferred series A

14    convertible, $3?

15        A.   Uh-huh.

16        Q.   Do you see that transaction?

17        A.   Right.

18        Q.   If you look about six lines up from the

19    bottom, there is the customer that we looked at,

20    George Scheer Special.  Do you see that?

21        A.   Right.

22        Q.   Actually, look down here.  I know it's

23    listed a couple of different places, but I'm

24    referring to the one right down at the bottom.

25        A.   I see.  Okay.

CONFIDENTIAL

Page 606

1      Q.   Six lines up.   Okay.   Do you see the amount

2      for this looks like 13,388 --

3      A.   Right.

4      Q.   -- long?

5      A.   Uh-huh.

6      Q.   And the trade date is 11-18-83?

7      A.   Uh-huh.

8      Q.   If you look at what's been marked as

9      Exhibit 16, would you agree that this trade shown on

10     the first page of Exhibit 16 is also 13,388 shares

11     for George Scheer Special?

12     A.   Right.

13     Q.   The security description is the same;

14     right?

15     A.   Uh-huh.

16     Q.   Okay.   So do you think this is -- do you

17     think that the amount shown on Exhibit 17, the

18     transaction shown on Exhibit 17 for George Scheer is

19     the same as the one shown on Exhibit 16?

20     A.   I want to make sure I can find it.

21     Q.   Sure.

22     A.   13,388.   The shares seems to be the same.

23     Q.   And this --

24     A.   And the monies.

25     Q.   -- date listed looks like November 18th,

CONFIDENTIAL

Page 607

1   1983 --

2       A.   Right, okay.

3       Q.   -- is the settlement date.  So does this

4   transaction appear to match the -- the transaction

5   in Exhibit 16 appear to march the report in

6   Exhibit 17?

7       A.   The shares match.  I don't see monies.

8       Q.   Right, no.  I don't think that they put it

9   on this report.

10      A.   Okay, right, right.

11      Q.   Okay.  If you go to the next page of

12  Exhibit 17, this is the end of that same

13  transaction.  Do you see who's on -- who's listed at

14  the bottom of the page?

15      A.   Correct.

16      Q.   What entity is listed?

17      A.   National Westminster Bank.  Is that what

18  it's saying?

19      Q.   Yes.  What's your understanding of how

20  National Westminster Bank was related to this trade?

21      A.   I'm assuming the trade must have cleared

22  through the bank.

23      Q.   Okay.  Do you see the account number?

24  There's two entries and two account numbers for

25  National Westminster Bank that are listed at the

CONFIDENTIAL

Page 608

1    bottom of the transaction?

2         A.   Right.

3         Q.   The account number for the first reads

4    299000010 and the second, 6000020.  Do you see that?

5         A.   Uh-huh.

6         Q.   Do you know why there would be two entries

7    here for National Westminster Bank?

8         A.   I don't have a clue.

9         Q.   Okay.

10        A.   They must have two different types of trade

11   clearing accounts that can handle it.

12        Q.   Okay.  So we know how we had discussed

13   whether this would be a month-end report.  The

14   transaction that we're looking at is dated

15   November 18th and this report is dated

16   November 30th.

17             And there are many other transactions

18   listed on here, but do you think that that would

19   mean it would encompass at least more than just the

20   day, November 30th?  At least it has other days of

21   the month that are also listed here?

22             MS. CHAITMAN:  Objection.

23        Q.   (By Ms. Chaitman)  Other transactions?

24        A.   I'm not sure.

25        Q.   Okay.  That's fine.  I don't know if you

CONFIDENTIAL

Page 609

1    thought it was most certainly a month-end report

2    based on that, but the transactions listed on this

3    stock record summary, if you look at other

4    transactions on the page, they also have National

5    Westminster Bank USA --

6         A.    Uh-huh.

7         Q.    -- listed underneath each security.

8         A.    Okay.

9         Q.    Would it be typical that all the

10   transactions would have the same clearing bank for

11   all the transactions that would be listed on a

12   single for every customer account?

13        A.    Could be.  It depends upon -- you know, the

14   answer is I have no idea why we would choose one

15   bank or the other.  Again, it depends upon, you

16   know, any number of things.  I don't know.  It's not

17   something that I would be familiar with.

18        Q.    Right.  We went over a number of banks

19   earlier, though, and this report only lists one.  So

20   I was just trying to understand why it might be that

21   there's only one listed?

22        A.    That could be -- I don't know.  I mean, it

23   could be typically, you know, why they use one

24   particular bank or clearing agent or broker depends

25   upon the fee structure, depends upon whether they

CONFIDENTIAL

Page 610

1    were a market maker also in that, depends upon -- I

2    don't know the answer to that question.

3         Q.   Okay.  That's fine.  The transaction we

4    were looking at in Exhibit 16 was a transaction you

5    did as principal; right?

6         A.   Mostly all of ours were principal, right.

7         Q.   So if National Westminster was shown as the

8    clearing firm --

9         A.   Right.

10        Q.   -- would that mean National Westminster --

11   it wouldn't mean National Westminster was the

12   counterparty to the transaction; right?

13        A.   No.

14        Q.   Okay.

15        A.   I mean, it theoretically could be, but I

16   don't know.  Again, they may have been a market

17   maker.  They may have been a -- I don't know the

18   answer to that.

19        Q.   You were a self-clearing firm; right?

20        A.   Correct.

21        Q.   So I guess I'm trying to understand why all

22   the transactions that are shown on the report would

23   have not cleared through you or wouldn't have

24   gone --

25        A.   Because they're not going to -- because

CONFIDENTIAL

Page 611

1    they're not going to -- we don't convert ourselves.

2    In other words, we don't handle the conversion of

3    the security.  We don't handle the delivering the

4    bond to the clearing agent to actually exchange it

5    for stock.  In other words, that -- we don't have an

6    arrangement with -- with the conversion agent to

7    actually do that.

8             MS. FEIN:  Okay, okay.  We can move on.

9    I'm going to show you two documents, Trustee's 18,

10   Trustee's 19.

11            (Trustee's Exhibit Numbers 18 and 19 were

12   marked for identification.)

13            MR. KRATENSTEIN:  Just want to make sure I

14   get these right.  So which is 18?  Ends in 393?

15            MS. FEIN:  That's correct, yes.

16            MR. KRATENSTEIN:  Eighteen is 393?

17            MS. FEIN:  That's right.  Here, let me get

18   this out of your way.

19        Q.  (By Ms. Fein)  Do you recognize?

20        A.  Not really.  It says -- it says cash and

21   securities blotter.  Is that what --

22        Q.  Uh-huh.

23        A.  Right.

24        Q.  Are you looking at Exhibit 18 then?

25        A.  Yes.

CONFIDENTIAL

Page 612

1        Q.   Okay.  Both documents show roll number and
2   then contents and then documents at the top of the
3   page.  Do you see that?

4        A.   Uh-huh.

5        Q.   Okay.  If you look at Exhibit 19, do you
6   see -- can you turn the -- look at the second page
7   of it ending in 396.  Can you read the note at the
8   bottom of the page, the handwritten note?

9        A.   Do not microfilm trading blotters?

10       Q.   Yeah.  And the line right above it.

11       A.   As per BLM.

12       Q.   Okay.  Do you -- does BLM refer to you?

13       A.   I would assume so.

14       Q.   Do you know whose handwriting this is?

15       A.   No.

16       Q.   If you go back to Exhibit 18, other page --

17       A.   Uh-huh.

18       Q.   -- do you see at the bottom of the page
19   where it says shred the Xs only --

20       A.   Okay.

21       Q.   -- the handwritten note?  Do you know whose
22   handwriting that is?

23       A.   No.

24       Q.   Do you know why you would shred cash and
25   securities blotters during this time period?

CONFIDENTIAL

Page 613

1              MR. KRATENSTEIN:  Object to form.

2              THE WITNESS:  No.

3              MS. FEIN:  Okay.

4              THE WITNESS:  I don't even know what they

5     were used for.

6              Q.  (By Ms. Fein)  Okay.  I'm going to ask a

7     couple of questions about the Sage accounts.  Paul

8     Koenigsberg was an accountant; right?

9              A.  Yes.

10             Q.  And he -- we looked at some letters where

11    it appeared that he did work for the Sages; right?

12             A.  I'm assuming he did.  I said I don't know

13    whether Paul --

14             Q.  Right.

15             A.  Was Paul Koenigsberg or could have been

16    Paul somebody else.

17             Q.  Okay.  Was Paul Koenigsberg an accountant

18    for other BLMIS customers?

19             A.  Yes.

20             Q.  Was he an accountant for Carl Shapiro?

21             A.  Yes.

22             Q.  Was he an accountant for Norman Levy?

23             A.  At one -- he was an accountant for them,

24    for Norman Levy in the later years.

25             Q.  Okay.

CONFIDENTIAL

Page 614

1      A.   And same thing with -- who's the other one

2   you asked?

3      Q.   Carl Shapiro.

4      A.   Carl Shapiro, Norman Levy, yes.  Their

5   accountants had died, so they switched over.  And

6   then in -- Shapiro moved from Price Waterhouse to --

7   because the partner that handled Price Waterhouse

8   moved to London.  So he took Paul Koenigsberg on as

9   an accountant.  And Levy's accountant died and he

10  moved over to Paul Koenigsberg.

11     Q.   Did Carl Shapiro and Norman Levy have short

12  against the box accounts with you?

13     A.   Yes.

14     Q.   Did Annette handle some of the

15  correspondence and other activity related to those

16  accounts?

17     A.   Yes.

18     Q.   Were Carl Shapiro and Norman Levy two of

19  the customers you identified as having backdated

20  transactions in their accounts before 1992?

21     A.   Well, let me make sure you understand

22  backdating accounts because backdating accounts

23  occur in a number of ways.  One of them was -- well,

24  there's a -- backdating accounts can refer to an as

25  of transaction.  As a market making firm, it's a

CONFIDENTIAL

Page 615

1   very common occurrence to have to adjust both a

2   price and a date on a confirmation based upon

3   typically an error that is being made by the market

4   making firm or the originating firm, meaning like

5   Schwab.  Schwab gives us an order to buy and sell

6   stock from a particular customer.

7          And either Schwab makes an error or his

8   customer makes an error as to doing the trade on the

9   wrong day or the wrong time or the price.  And then

10  there's usually a discussion that takes place

11  between both parties.  And then a decision is made

12  to put the trade back to a certain date and that's

13  what it refers to as an as of transaction.

14          So you're adjusting it and the error might

15  be -- might be the market maker or it might be the

16  originating broker who gave us the order.  That's

17  one.  Then there is the backdating trade where there

18  is a dispute between the customer and myself.

19          And then, of course, there's the totally

20  illegal transaction of backdating a transaction,

21  which is what -- what the -- I don't know whether it

22  was Dubinsky or Picard that happened, but I had

23  explained backdating trades to -- in the past.  And

24  I don't know.  You'd have to -- it depends upon

25  which transaction.

CONFIDENTIAL

Page 616

1      Q.  Okay.

2      A.  But a backdating trade in itself doesn't on

3  the face of it because you are backdating a trade by

4  adjusting a price or the date, but it doesn't

5  necessarily on the face mean it's an illegal trade.

6      Q.  No, and I didn't ask that.

7      A.  Okay.

8      Q.  I was actually just asking about if Carl

9  Shapiro and Norman Levy were two of the customers

10  that had those transactions?

11      A.  Yes, yes.

12      MS. FEIN:  Okay.  That was my question.

13      MR. KRATENSTEIN:  I'm going to object to

14  the form of that question.

15      Q.  (By Ms. Fein)  Okay.  You testified about a

16  meeting with members of the Sage family yesterday?

17      A.  Yes.

18      Q.  How many meetings do you remember with

19  them?

20      A.  A number of meetings, you know.  As to how

21  many, I don't know.  It depends upon -- you know, I

22  remember, you know, the meeting where they wanted to

23  change the strategy, where they wanted to make the

24  decisions themselves.  That happened.  That was one

25  meeting I remember because it was a meeting that

CONFIDENTIAL

Page 617

1    there was a lot of discussions whether it was the

2    right thing to do, but they wanted to do it --

3         Q.   Okay.

4         A.   -- because of tax break.  And then there

5    were other meetings that they came up just because

6    they were in the area.  And the family was -- I

7    mean, I was friendly with the mother and the family,

8    so they felt free to come up.  And also they said

9    that they came up to visit with Annette depending

10   upon -- they were not necessarily unique.  And then

11   they would come and visit me to say hello.

12        Q.   Okay.  And did you have a good sense of

13   when that meeting took place, the one you testified

14   about directed trading?

15        A.   I was trying to think of that, you know,

16   myself.  I don't remember.  There was -- there were

17   meetings and I know as recently as the 2000s.

18             And then there certainly must have been

19   meetings prior to that depending upon -- you can see

20   yourself depending upon when it started,

21   transactions changed when it went from a convertible

22   bond arbitrage account to a split strike account and

23   then to an account where they were just doing tax

24   planning and changed the style of trade they wanted

25   to do.

CONFIDENTIAL

Page 618

1        Q.  Okay.  But I guess you're saying then

2   before that meeting you wouldn't have taken trade

3   direction from the Sages; right?

4            MR. KRATENSTEIN:  Object to form.  Go

5   ahead.

6            THE WITNESS:  Depends upon whether the

7   father was alive and he was running the account with

8   me or -- I mean, they were accountants, the family,

9   for a very long period of time.

10       Q.  (By Ms. Chaitman)  Okay.  But it wasn't

11  your typical practice to take trade direction;

12  right?

13       A.  That's correct.

14       Q.  Okay.  That was my -- what I was trying to

15  get at.  Okay.  I'd like you to take a look at a

16  document we reviewed yesterday, Exhibit 85.

17            MR. KRATENSTEIN:  Hang on a minute.

18            MS. FEIN:  Oh, sure.

19            MR. KRATENSTEIN:  Okay.  Go ahead.

20       Q.  (By Ms. Fein)  In the second paragraph we

21  went over some language yesterday and I'd like to

22  ask you about one sentence, but let's look a little

23  earlier.  Do you see this sentence says as of the

24  last statements we received in March the accounts

25  were a little off of the usual benchmark?

CONFIDENTIAL

Page 619

1        A.   Correct.

2        Q.   Can you read the next two sentences after

3   that?

4        A.   I can't find them.

5        Q.   Oh, so the next one would be since then our

6   main holding, eBay, has dropped significantly.

7        A.   Right, okay.   I see it.

8        Q.   And then the next, as that holding is a

9   long-term one, I was hoping you had shorted it

10  against the box a while back.   Do you see that?

11       A.   Yes, uh-huh.

12       Q.   That statement is in the past tense; right?

13       A.   I was hoping you had shorted it against the

14  box, okay.

15       Q.   It's referring to something that would have

16  happened before you got this letter; right?

17            MR. KRATENSTEIN:   Objection to the form of

18  the question.

19            THE WITNESS:   Yes.   I think what they're

20  referring to is sometimes even if I had felt that

21  they should have been sold regardless of what they

22  had -- they were doing tax planning, obviously,

23  shorting against the box to adjust whether they were

24  going to get long-term gain, short-term gains and so

25  on and depending upon when you closed out the

CONFIDENTIAL

Page 620

1   transaction, in other words, covered the short, that

2   would trigger a tax event.  So if, in fact -- again,

3   I'm assuming because this -- you know, if, in fact,

4   they originally wanted to keep the trade open but

5   then there was a market event that happened, you

6   know, then I felt that it wasn't -- it didn't make

7   any sense to worry about the tax treatment because

8   if they -- if I didn't go short against the box, the

9   stock was going to go down, I would pay no attention

10  to it.

11        Q.  Right.

12        A.  Technically a client could call me up and

13  say to me, which did happen at the time, well, you

14  shouldn't have -- you should have followed my

15  instructions even though you would have lost money

16  for me to do that.  That's not an unusual situation.

17  So I don't remember what happened here, but that's

18  probably what happened.

19        Q.  Okay.  All right.  So we can look at

20  Exhibit 69.

21        A.  Uh-huh.

22        Q.  This is another of the letters we reviewed

23  yesterday; right?

24        A.  Right.

25        Q.  Do you see -- it's a long sentence, but the

CONFIDENTIAL

Page 621

1    last sentence of the first paragraph, with respect

2    to other positions in these accounts please note

3    that Pharmacia will become long-term this January.

4    Do you see that sentence?

5          A.  Yes.

6          Q.  And then do you see just under that unless

7    you deem that these stocks must be shorted prior to

8    these dates due to various considerations, it would

9    be to our tax benefit that these positions not be

10   shorted?

11         A.  Right.

12         Q.  That's not a direction to you about what to

13   do with the trade; right?

14         MR. KRATENSTEIN:  Object to form.

15         Q.  (By Ms. Fein)  In other words, this is left

16   in your discretion; correct?

17         MR. KRATENSTEIN:  Object to the form.

18         THE WITNESS:  I assume that's what they're

19   saying, right.

20         Q.  (By Ms. Fein)  Okay.  I just want to look

21   at two of the documents we went through.  These

22   exhibits, Exhibits 70 and 72, were looked at in

23   connection with this same letter.  And on Exhibit 70

24   do you see an R. J. Reynolds Tobacco HLDS?

25         A.  Right.

Page 622

1    Q.   Okay.  And what date is that transaction?

2    A.   January 13th.

3    Q.   And it's 9,000 shares purchased?

4    A.   Yes.

5         MR. KRATENSTEIN:  What year was that?

6         THE WITNESS:  '03.

7    Q.   (By Ms. Fein)  Okay.  And do you see the

8    account number listed, 1S004-7?

9    A.   Yes.

10   Q.   Okay.  And you were shown the trade

11   confirmation in Exhibit 72 in connection with this

12   customer statement?

13   A.   Right, uh-huh.

14   Q.   What's the date of the trade indicated on

15   this confirmation on the first page?

16   A.   12-12-03.

17   Q.   And what's the date indicated on the second

18   page of the confirmation?

19   A.   8-28-03.

20   Q.   Okay.  Can you see either of those trades

21   on the customer statement that we reviewed in

22   Exhibit 70, any of the -- either of those trade

23   dates?

24   A.   I see that Reynolds has a trade date of

25   January 13th.

Page 623

1      Q.   Okay.  So no?

2      A.   And what's the other one?  Broadcom?

3      Q.   Yeah.  No.  We're just looking at the RJR

4  Reynolds trade.

5      A.   Okay.

6      Q.   If you look on the trade confirmation,

7  Exhibit 72, do you see the account number is

8  1S0004-3?

9      A.   On this, yes.

10      Q.   So this is a different account?

11      A.   Uh-huh.

12      Q.   These confirmations pertain to a different

13  account and a different time frame; right?

14      A.   Right.

15      Q.   They're not the ones that are shown on the

16  statement in Exhibit 70; right?  And take your time.

17      A.   Okay.

18      Q.   Do you agree?

19      A.   The statement is -- it says -- I'm not --

20  you lost me.

21      Q.   So the statement is for accounts ending in

22  dash seven; right?

23      A.   Right.

24      Q.   But the confirmations are for an account

25  ending in dash three; right?

CONFIDENTIAL

Page 624

1      A.   Correct.

2      Q.   And the trade date shown on Exhibit 72 is

3  December 12th, 2003?

4      A.   Uh-huh.

5      Q.   And August 28th, 2003?

6      A.   Uh-huh.

7      Q.   But the customer statement that was shown

8  is for January 2003; right?

9      A.   Right.

10      Q.   Okay.  So these transactions don't match

11  the statement in the confirm; right?

12      A.   You know, to tell you the truth, you've

13  sort of lost me on this whole thing.

14      Q.   Okay.

15      A.   I'm assuming if you told me they don't

16  match, they don't match.

17      Q.   Well, the dates are different and the trade

18  -- the number of the trade is different and the

19  accounts are different right?

20      A.   Okay.  All right.

21      Q.   Okay.  Well, I'm asking you.

22      A.   Ask me what?

23      Q.   I'm asking you do you agree that the trade

24  dates are different?

25      A.   Yes, yes.

Page 625

1      Q.   The amounts are different?

2      A.   Yes.

3      Q.   And the accounts are different?

4      A.   Yes.

5      Q.   Okay.  You mentioned earlier today meeting,

6   a proffer meeting with the United States Attorney's

7   Office.  Do you remember that reference?

8      A.   Yes.

9      Q.   Okay.  Do you recall when that meeting took

10  place?

11     A.   There were two meetings with the U.S.

12  Attorney.  One was the proffer agreement, which was,

13  I think, I believe the first meeting.  That took

14  place down at the U.S. Attorney's office, which was

15  made shortly after my arrest.  Then there was a

16  second meeting that took place in my apartment where

17  the U.S. Attorney was not present.

18          He was on a speakerphone.  And that

19  included a whole length of proffer agreement

20  meeting.  There were all sorts of people there in my

21  apartment.

22     Q.   Do you remember did the meeting take place

23  in a conference room in the United States Attorney's

24  office, the December meeting?

25     A.   Yes, yes.

CONFIDENTIAL

Page 626

1      Q.  Do you remember how long it was?

2      A.  A long time.  Started in the morning and

3  went through lunch.

4      Q.  Okay.  I'm going to mark -- I'm going to

5  show you what's been marked as Exhibit --

6          MR. KRATENSTEIN:  What number?

7          MS. FEIN:  20.

8          MS. CHAITMAN:  Do you have a copy for

9  Peter?

10          MS. FEIN:  Yeah.

11          (Trustee's Exhibit Number 20 was marked

12  for identification.)

13      Q.  (By Ms. Chaitman)  If you look at the

14  bottom of the first page there's a date listed,

15  investigation on 12-16-2008, the bottom of the first

16  page?

17      A.  Yes.

18      Q.  Does that sound about right when the

19  meeting took place that you remember?

20      A.  Yes.

21      Q.  Okay.  So this would be the same week, a

22  few days after you confessed; right?

23      A.  Correct.

24      Q.  We're just going to take a look at a couple

25  of individual statements here.

CONFIDENTIAL

Page 627

1          MS. CHAITMAN:  I just want to put on the

2     record that I object to any questioning about this

3     document because, number one, it's obviously

4     inadmissible for good reasons.  Number two, it's

5     redacted more than it's not redacted and it's

6     impossible to know what -- obviously, we have no

7     idea what's said in the redacted sections.

8          And I think for you to ask Mr. Madoff

9     about something that hasn't been redacted, assuming

10    this is even a legitimate document -- for example,

11    I'm sure that you're going to ask him about what

12    hasn't been redacted on page three, but it may be

13    that in the blacked out part underneath it, it

14    contradicts what's said and what's there.

15          MS. FEIN:  Understood.  If we had the

16    full, unredacted document, that would be our

17    preference as well.

18          MS. CHAITMAN:  Right, but I think any

19    questioning about this document is a waste of time

20    because it's --

21          MS. FEIN:  I understand your objection.

22          MS. CHAITMAN:  Okay.

23     Q.   (By Ms. Fein)  If you turn to page seven of

24    the document, the pages are marked at the top.

25     A.   Okay.

CONFIDENTIAL

Page 628

1        Q.   Do you see the first sentence?

2        A.   When Madoff began a retail business in 19

3    -- yes.

4        Q.   Uh-huh.  Do you agree with that statement?

5        A.   Yes.

6        MS. FEIN:  Okay.

7        MR. GOLDMAN:  Read that question back?

8        Q.   (By Ms. Fein)  Sure.  The first statement,

9    Madoff began a retail business in about 1960.  He

10   had about a dozen clients, all of whom were family

11   and friends.  Do you agree with the statement?

12       MR. GOLDMAN:  Well, I'm going to object to

13   it.  It says it morphed into a fraud.

14       MS. FEIN:  I didn't -- I didn't ask about

15   that sentence.

16       MR. KRATENSTEIN:  First sentence, just

17   first sentence.

18       MR. GOLDMAN:  Oh, I'm sorry.

19       MS. FEIN:  I only asked about the first

20   sentence.  Sorry.

21       MR. KRATENSTEIN:  Do you want to reask the

22   question if he agrees with that sentence, the first

23   sentence?

24       Q.   (By Ms. Fein)  Sure.  Mr. Madoff, do you

25   agree to the first sentence on page seven, that that

Page 629

1  is an accurate reflection of your business?

2       A.  Madoff began a retail business in about

3  1960.

4       Q.  Yes.

5       A.  He had about a dozen clients, all of whom

6  were family and friends, yes.

7       Q.  Do you recall making that statement at your

8  proffer meeting?

9       A.  Yes.

10      Q.  The next sentence after that, can you read

11  that?

12          MR. GOLDMAN:  That's what I'm going to

13  object to.  You know, this is a memorialization of

14  what someone thinks they heard.  We don't know who

15  wrote it; okay?  There are certain characterizations

16  in here such as that which are his conclusions or

17  her conclusions, whoever wrote it.  And I think it's

18  unfair to ask him.

19          If there's something in here that you want

20  to ask him whether he actually said something, I

21  don't have an objection to that.  And if you could

22  point to where he said it in the report, that's

23  fine; but I'm going to object to these

24  characterizations and then asking him whether those

25  are correct or not.

CONFIDENTIAL

Page 630

1              MS. FEIN:  I understand.

2              MR. GOLDMAN:  Okay.

3              MS. FEIN:  I understand.  I'm going to ask

4      about the statements that are here.

5              MR. GOLDMAN:  Okay.

6          Q.  (By Ms. Fein)  And I just want to really

7      know if you recall making the statements at the

8      meeting?

9              MR. GOLDMAN:  I want to make sure, though,

10     when you ask him did he make the statement and if

11     he -- I don't want -- what I object to is the

12     characterization that he's made the statement.  I

13     haven't seen quotation marks anywhere in here that

14     Mr. Madoff said this.

15             MS. FEIN:  Right.

16             MR. GOLDMAN:  If you can point to that and

17     ask him, that's fine, but the other -- asking him

18     about someone else's conclusions I just think is

19     inappropriate.

20             MS. FEIN:  Okay.  Well, if I -- I don't

21     plan to ask --

22             MR. GOLDMAN:  And he'll answer

23     accordingly.  Okay.

24             MS. FEIN:  -- much more about that.  It's

25     about whether he recalls making the statements that

Page 631

1   are here.

2           MR. GOLDMAN:  Okay.

3       Q.  (By Ms. Fein)  So if you want to read the

4   text on page seven.  You don't have to read it out

5   loud.  You can read it to yourself, but I did want

6   to ask.  So the statement the retail business

7   morphed into a fraud as time went by, do you recall

8   making that statement at the proffer meeting?

9       A.  You're asking if I said in 1962 all the

10  clients lost virtually their entire investment?

11      Q.  No.  The sentence before that, the retail

12  business morphed into a fraud as time went by.

13          MR. GOLDMAN:  Do you recall saying that?

14          THE WITNESS:  I don't remember saying

15  that.

16          MR. FEIN:  Okay.

17          MR. GOLDMAN:  Okay.  Let's go on.

18      Q.  (By Ms. Fein)  Do you -- if you look down a

19  bit on the page, so it refers to in 1962 Madoff's

20  retail business was wiped out in the new issue

21  collapse.  And the following sentence, all his

22  clients lost virtually their entire investment,

23  which amounted to a total of $30,000.  Madoff felt

24  he had to pay them back, so he borrowed $30,000 from

25  his father-in-law to do so.  Do you recall making

CONFIDENTIAL

Page 632

1   that statement?

2        A.   Yes.

3        Q.   His father-in-law was not pleased by this

4   development.   Madoff was able to pay all these

5   clients back and start the market making business.

6   Do you recall making that statement?

7        A.   Yes.

8        Q.   At about this time he took in new retail

9   clients.   These clients were also family and

10  friends.   Do you recall making that statement?

11       A.   Yes.

12       Q.   He began to falsely report returns of

13  30 percent, 40 percent annual to these customers.

14  Do you recall making that statement?

15       A.   Wait a minute.   After this time he took in

16  new retail clients.   He had to falsely -- no.  I did

17  not say he had to falsely report returns of 30 to

18  40 percent.   Definitely didn't ever say that.

19       Q.   Okay.   If you look at page four of the

20  document, go back a couple of pages, my next

21  questions are on page four.

22       A.   Okay.   I'm still looking at that last

23  question --

24       Q.   Sure.

25       A.   -- because I can't imagine having said

Page 633

1    that.

2          Q.   Okay.

3          A.   Where are we now?

4          Q.   Page four.

5          A.   So I have to go back?

6          Q.   Yes.

7          A.   Okay.

8          Q.   I think it's one more back.  It's on the

9    back, yep.  There.  The first sentence that is

10   unredacted, the fraud entailed Madoff taking in

11   funds from investors, holding those funds and paying

12   them out to investors seeking redemptions.  Do you

13   recall making that statement?

14          MS. CHAITMAN:  I would suggest that you

15   read through the whole unredacted portion, Bernie,

16   before you respond.

17          THE WITNESS:  The fraud entailed Madoff

18   taking in funds from investors, holding those funds

19   and paying them out to investors seeking

20   redemptions, essentially a Ponzi scheme.

21          MR. GOLDMAN:  See, the other part of the

22   problem with that is that we don't have any dates.

23          THE WITNESS:  Yeah.

24          MR. GOLDMAN:  I don't know when the dates

25   are.

CONFIDENTIAL

Page 634

1          MS. FEIN:  I'm just asking if he remembers

2     making the statements.  I can't make any.  I was not

3     involved in -- I was not -- yeah.

4          MR. GOLDMAN:  So I just think it's unfair

5     ask him that question.

6          MS. FEIN:  I'm asking if he recalls the

7     statements that are here and that's really it.

8          MR. GOLDMAN:  Okay, all right.

9          THE WITNESS:  Let's put it this way.

10    Depending upon what period of time they were talking

11    about, I could have made that statement because I'd

12    made that statement a number of times since then;

13    but I certainly was not talking about it, you know,

14    in the early periods of time because I was very

15    clear and forthright in everything I said at the

16    proffer agreement and at the other meeting.

17          And nothing has changed in my story.  So I

18    -- just the same reason I would not have mentioned

19    anything about the 30 or 40 percent, I certainly

20    could have said that, for example, in 1980s my

21    clients were making 30 or 40 percent because that

22    was what was common at that time when interest rates

23    were 12 percent at that period of time.

24          So I can tell you that referring to this

25    proffer agreement, it was an absurdity.  The

CONFIDENTIAL

Page 635

1   questions that were asked by me, by people who I

2   knew knew the answer, you know, and, you know, it

3   was obvious that that they were trying to paint a

4   picture that was not the case.  And I'm still pissed

5   off by it, quite frankly.

6        Q.   I'm going to ask you about a couple more

7   questions.

8        MR. GOLDMAN:   Okay.  Ask the question.

9        Q.   (By Ms. Fein)  So the next sentence, you

10  just read the first two sentences.  The next

11  sentence, customers received both monthly account

12  statements and trade confirmations reflecting trades

13  that never took place.  Do you recall making that

14  statement at the proffer meeting?

15       A.   No.

16       Q.   Madoff began engaging in fraud in earnest

17  in the 1970s.  The 1980s saw a large expansion in

18  the retail, i.e., fraudulent portion of the

19  business.  Do you recall making that statement at

20  the meeting?

21       A.   Let me go back and read it.  I certainly

22  never said that fraud took place in the '70s because

23  it did not.  In the 1980s there was a large

24  expansion in the retail business and in the, i.e.,

25  parentheses, fraudulent.  I assume that's not my

CONFIDENTIAL

Page 636

1    statement.  That's the interpretation statement

2    because why would they -- the fact that if I

3    understand English properly, when someone says with

4    parentheses, i.e., fraudulent, that's someone's

5    interpretation of what he claims I said was

6    fraudulent.

7         Q.   Okay.

8         A.   Which -- so I never said it was fraudulent.

9         Q.   I'm just asking about your recollection.

10   Okay.

11        A.   My recollection was I explained what was

12   happening in the business, but as far as the dates

13   are concerned, you know, I do not recall ever saying

14   that.

15        Q.   Okay.  The next sentence, as there was no

16   actual trading, nothing cleared through DTCC or any

17   clearing firm and the only records of the purported

18   trades are the paper confirmations.  Do you recall

19   saying that at the proffer meeting?

20        A.   No.  I do not.

21        Q.   If you turn back one page to page three,

22   the second paragraph on page three begins when

23   Madoff first began the retail business.  Do you see

24   that sentence?

25        A.   Uh-huh.

08-01789-cgm   Doc 18525-2   Filed 03/01/19   Entered 03/01/19 13:02:42   Kajon
08-01789-smb   Doc 18151   Decl Filed 12/10/18   Entered 12/10/18 18:04:08   Exhibit D
Pg 145 of 231

Exhibit A8   Pg 145 of 231

CONFIDENTIAL

Page 637

1      Q.   Okay.   The statement when Madoff first

2   began the retail business he did initially engage in

3   some actual trades.   Soon, however, he began to

4   engage in fraud as to the entire retail business.

5   Do you recall making that statement?

6      A.   No.   Again, I assume if I'm reading this

7   correctly, this is somebody interpreting what I

8   said.

9      Q.   Understood.   Do you recall saying this at

10   the proffer meeting, though?   I'm not saying that

11   it's verbatim.   I'm asking if you recall discussing

12   this?

13      A.   I remember discussing the fact the business

14   was small and also that I started -- I started a

15   retail business, discussing trade position, yes.

16   Was paying ridiculously high returns, no.   I never

17   said that because they were not --

18      Q.   I'm only talking about the second

19   paragraph.   I'm not asking about the first

20   paragraph.

21      A.   Okay.   When Madoff first began the retail

22   business, he initially engaged in some actual

23   trades.   Again, that's someone interpreting what I

24   said.   Began to engage in the fraud, no.   Virtually

25   the entire life of the retail business was simply

CONFIDENTIAL

Page 638

1    not trade.  No, I don't recall saying this.

2         Q.  Okay.  And you were just reading the last

3    sentence on page three that's unredacted, for

4    virtually the entire life of the retail business?

5    Is that what you were referring to?

6         A.  Not during -- not during an earlier period.

7    I was referring -- if I was saying that, I was

8    referring to post-'92 period.

9         Q.  When you say if I was saying that, you mean

10   if you said --

11        A.  What I'm saying is that I never would have

12   said, you know, anything other than what I always

13   had said, that the fraud began in, you know, in the

14   post-'90 period.  So I don't know -- and I have a

15   pretty good memory, so I do not remember saying

16   anything like that.

17             MR. GOLDMAN:  Amanda, this is a

18   memorialization of the proffer on the 16th?  Is that

19   what it is?

20             MS. FEIN:  Yes.

21             MR. GOLDMAN:  Okay.

22        Q.  (By Ms. Fein)  You mentioned that it made

23   you angry to think about this meeting somewhat;

24   right?

25        A.  Excuse me?

CONFIDENTIAL

Page 639

1      Q.  You mentioned that it made you kind of

2   angry to think about this meeting; right?

3          MR. KRATENSTEIN:  Object to form.

4          THE WITNESS:  I'm angry because there were

5   interpretations here of what I said that were --

6   were not true.  I was very clear about what I said

7   and I was very forthright what I said.  I would have

8   no reason to change that after the fact.

9          And the -- the way this -- what happened

10  at this meeting was a lot of the -- a lot of this

11  was someone asking me questions like saying so this

12  is what happened?  And I had to go -- had to answer

13  back and say no, this is -- that is not what

14  happened.  And they were asking me questions which

15  to me sounded totally ridiculous.

16          And as a matter of fact, I do remember

17  specifically turning to the two SEC people were

18  there who were very well aware of me and my business

19  and I looked at them and said help me out here.  I

20  mean, do you really expect me to answer these

21  questions, explain what is a short sale, what does a

22  market maker do?

23          And it was like, you know, a smoking gun

24  type of thing.  And yeah, I was pissed off at it

25  because I knew, you know, that it made no sense.

CONFIDENTIAL

Page 640

1    And they were embarrassed when I turned and asked

2    them.  I mean, for someone who was a senior person

3    at the SEC to sit there, you know, looking very

4    quiet and sheepish when Marc Litt, who knows nothing

5    at all, who is the prosecutor, about the securities

6    business or at least claimed not to know, you know,

7    asked me what is a short sale, what does a market

8    maker do?  You know, so you sold stock to a customer

9    that you didn't own?

10        Q.   (By Ms. Fein)  So the SEC -- you're saying

11   and the SEC people in the room knew you.  They knew

12   of your reputation?

13        A.   Of course.  There was no one in the

14   industry that didn't know me, you know, at that

15   time.  You know, so --

16        Q.   Yeah.  Well, you had a very good reputation

17   in the industry; right?

18        A.   Before I -- before this fiasco, yes, but it

19   was in every aspect of the industry.  So it was --

20   it just -- it infuriated me when David went through

21   this theater the other day.  So did the SEC lie?

22   Did the FBI lie he said?  I said I didn't say that

23   they lied.  I said they misinterpreted, you know,

24   what I said or maybe they just don't understand

25   anything.

Page 641

1      Q.  Well, the statements, I won't represent

2   everything that we looked at, but you'll agree that

3   some of the statements we looked at didn't say

4   anything about market making certainly or short

5   sales; right?

6           MR. GOLDMAN:  We don't know that because

7   so much is redacted.

8           MS. FEIN:  I'm saying just the statements

9   that we looked at.

10          MS. CHAITMAN:  But it's a meaningless

11  question due to the fact that 90 percent of it is

12  redacted.

13          MS. FEIN:  If you want to object to the

14  question, you can object to the question.

15          MR. KRATENSTEIN:  Objection.

16          THE WITNESS:  Yes.  I mean, to me this

17  document is nothing.  You know, it's just -- look,

18  I've always felt that this -- you know, this whole

19  thing, the GAO report -- not the GAO report.  I had

20  no problem with the GAO report.  I had a problem

21  with Dubinsky's report and Picard.

22          Picard has made a whole series of

23  statements which the GAO report, his own report

24  proved totally, you know, false, like the firm used

25  it as a piggy bank, that I never made any money, the

Page 642

1   firm was never profitable, you know.  And he totally

2   ignored his own expert witness, you know, Lubbe and

3   Lozard.  You know, I read -- talk about getting

4   pissed off, that's how you get pissed off, making

5   statements, you know, that were totally untrue

6   that -- but look, I don't want to abuse you for

7   that, but this -- there are things here that make no

8   sense at all.

9        And I have no reason -- I have no -- you

10  know, I have no ax to grind.  It's not like, you

11  know, I'm not admitted of a fraud.  I admitted to a

12  fraud.  I said that.  So, you know, there's no

13  reason for me to say things that were not the case

14  because I've already been sentenced, totally

15  unfairly because they're trying to make me the

16  poster boy of Wall Street, which everyone is aware

17  of; but the -- you know, there are certain -- well,

18  it's not important.

19        So yes, I am pissed off because they did

20  enough -- I admitted to doing enough things that

21  were totally embarrassing and wrong that I regret,

22  obviously, but there gets to be a point where enough

23  is enough because it's an insult to my intelligence,

24  you know, for someone who's supposed to be an expert

25  witness, you know, to not -- you know, to make

Page 643

1    statements that it looked -- on the face of it look

2    ridiculous.  And there were other expert witnesses

3    of reports I've read who said that themselves that

4    the Dubinsky report is preposterous or that the --

5    Picard has made statements that are totally

6    ridiculous.

7              I can't believe that he has -- that he had

8    the nerve to even say these things and then hold

9    himself out as, you know, being a legitimate and

10    honest, you know, person.  I mean, for this whole

11    idea with the short sale fiasco I've spoken to

12    numerous attorneys that -- you know, SEC attorneys

13    that have said what?

14              Is he saying that a short sale is a

15    fictitious transaction?  It's not an honest

16    transaction?  You know, I'm considering starting a

17    class action.  And there are people that can turn

18    around and say look, you know what?

19              Anybody that lost money in a short sale in

20    the market, had nothing to do with me, if they lost

21    money in a short sale based upon his expert, you

22    know, witnesses and himself say, well, that's not a

23    legitimate transaction.  So, therefore, I'll sue

24    Charles Schwab because, you know, it's so -- I've

25    had people tell me, well known attorneys much major

CONFIDENTIAL

Page 644

1   and much bigger than your firm who've said now,

2   Bernie, nobody could say, he couldn't possibly say

3   that.  He couldn't possibly be basing his case that

4   a fraud -- you know, that a short sale is a

5   fictitious transaction and a fraud.

6           He may get a bankruptcy judge who probably

7   knows less than him make that statement, you know,

8   or not do anything about it; but the people that say

9   they don't understand how anybody could do that

10  because it makes them look like a fool.  And I know

11  he's not, so I don't understand why he would, you

12  know, try and ruin his reputation, which is what

13  he's doing, by submitting a report like that.  Well,

14  anyway, I've said my peace.

15          MS. FEIN:  Okay.

16          MR. GOLDMAN:  Do you have another question

17  for him?

18          MS. FEIN:  I do.

19          THE WITNESS:  Peter, can you get me a

20  water or soda?  I'm losing my voice here.

21          MR. GOLDMAN:  Yeah, yeah.  I'd get you a

22  scotch, but I don't think --

23          THE WITNESS:  I don't drink, so we'll go

24  with -- I'm considering it.

25          (Trustee's Exhibit Number 21 was marked

Page 645

1   for identification.)

2         MR. KRATENSTEIN:  21?

3         Q.  (By Ms. Fein)  Yeah.  This has been marked

4   as Exhibit 21.  You can look through the document,

5   but I have a couple of questions on this first page

6   before -- this first page that you're looking at

7   now, so you just tell me when you're ready.

8         A.  Okay.

9         Q.  So this appears to be -- the first page

10  appears to be a form with handwritten notes and the

11  date appears to be 12-8-08.  Do you see that?

12        A.  Thank you.  Yes.

13        Q.  Do you recognize this form?

14        A.  Yes.

15        Q.  What was it called?

16        A.  I don't know what it was -- I don't know

17  that it had any name.

18        Q.  You didn't have something that you would

19  call it?

20        A.  No.

21        Q.  Okay.  Who worked on it?

22        A.  This looks like Jodi Crupi.

23        Q.  And when you say -- are you referring to

24  the handwriting?

25        A.  Yes.  I know she kept this kind of report.

CONFIDENTIAL

Page 646

1    Q.   Okay.  Was this report kept regularly by

2    Jodi?

3    A.   Yes.

4    Q.   Was it kept on a daily basis?

5    A.   I believe so.

6    Q.   Was it kept by your firm in the ordinary

7    course of business?

8    A.   Not on the market making or proprietary

9    side, no.

10   Q.   For the IA business was this kept, was

11   this --

12   A.   Yes.

13   Q.   -- report kept in the ordinary course of

14   your business?

15   A.   Yes.

16   Q.   What was the form used for?

17   A.   Adjusted for, you know, what was -- what

18   was requested to be sent out in the way of checks

19   that were requested by clients and what checks had

20   come in.  So she -- she or other people that worked

21   in this or that department could keep track of

22   monies in and monies out.

23   Q.   Does the first -- underneath the date

24   there's a figure, 297,903, balance forward.  Do you

25   see that?

CONFIDENTIAL

Page 647

1        A.   Yes.

2        Q.   Does that refer to a positive cash amount?

3        A.   I assume it would refer to a cash balance

4    in the 703 account, bank account.

5        Q.   Okay.

6        A.   Which was a Morgan -- JPMorgan account.

7        Q.   Okay.  And next to wiring out at like the

8    bottom half of the page it appears that there's a

9    large amount of money that's being wired out on this

10   date?

11       A.   By the way, I want to correct my statement

12   about starting a class action because I --

13       Q.   You don't plan on doing that?

14       A.   I would love to, but it's a little bit

15   preposterous.  So let's say just so that I can get

16   out of here early, not this meeting, although I

17   wouldn't mind that either, but I don't want Picard

18   to get nervous, which I'm sure he wouldn't anyhow.

19       Q.   Do you see that there are substantial sums

20   in the wiring out --

21       A.   Correct.

22       Q.   -- category?  Okay.  Would you have seen

23   this document at or around the time that it's dated,

24   12-8-08?

25       A.   I typically saw this regularly.

CONFIDENTIAL

Page 648

1          Q.   Okay.  And would this document give you

2     information about customer withdrawals and deposits?

3          A.   Yes.

4          Q.   And would it give you information about the

5     financial health of the firm with respect to the

6     customer side?

7          A.   Would it give me --

8               MS. CHAITMAN:  Objection to form.

9               THE WITNESS:  It would give me a picture

10    of what was about to happen with monies in and out

11    of the firm, but it was never really a concern

12    because the firm -- this side of the firm always

13    had -- you know, it was liquid enough to handle

14    whatever withdrawals were coming out.

15         Q.   (By Ms. Fein)  But at this time, so

16    December 8th, 2008, that wouldn't be the case;

17    right?

18         A.   No.

19         Q.   Okay.  So would this document be an

20    indication for you that you knew that perhaps you

21    wouldn't have a lot of funds left in the 703

22    account?

23         A.   At this period of time there was no one on

24    Wall Street that didn't know what was going to

25    happen to Wall Street unless they weren't breathing.

Page 649

1    Probably Dubinsky had no clue.

2         Q.   I'm talking with respect to your firm,

3    though, not with respect to Wall Street but just

4    with respect to your firm at that time?

5         A.   Yes.   It was very obvious to us there was a

6    crisis coming.

7         Q.   Okay.   So there are handwritten notes on

8    the pages that follow this first page of the

9    document.   If you just look at that first -- the

10   page ending in 589, do you recognize that

11   handwriting?

12        A.   No.   This actually looks like my

13   handwriting.

14        Q.   Okay.

15        A.   That right there?

16        Q.   Yeah, yeah.

17        A.   Yeah.

18        Q.   Okay.   And then if you go forward another

19   page there's also handwriting.   It appears the

20   handwriting on this document in general, so you can

21   look at it.

22        A.   I want to look at these notes for a second.

23        Q.   Sure.

24        A.   Okay.

25        Q.   Okay.   On the page ending in 591, is that

Page 650

1    also your handwriting, 591?

2        A.   Oh, yes.

3        Q.   And if you flip ahead to page 593, it looks

4    like every other page is blank.  So I'm only

5    referring to the ones that have handwriting on them.

6    Does that also look like your handwriting?

7        A.   Yes.

8        Q.   Okay.  Would you agree your handwriting is

9    also on page 595?

10       A.   Yes.

11       Q.   Would you agree your handwriting is on 597?

12       A.   Uh-huh, yes.

13       Q.   And would you agree your handwriting is on

14   599?

15       A.   Yes.

16       Q.   Okay.  And if you'd just look through the

17   remaining pages, if you can just confirm that's your

18   handwriting, too?  If you see any that's not yours,

19   let me know.

20       A.   You know, I have a question.

21       Q.   Uh-huh.

22       A.   Oh, these are not -- I don't understand how

23   -- it looks like there's two -- two pages made to

24   look just like one.  For example, on the first

25   page --

CONFIDENTIAL

Page 651

1     Q.  Oh, that's just the copying.  That's just

2   the copying, yeah.

3     A.  Okay.  So in other words -- okay.  It has

4   nothing to do with the --

5     Q.  The original.

6     A.  -- the original, the first page.

7     Q.  That's right.

8     A.  All right.

9     Q.  Oh, this is a single document in terms of

10  this was found in one place, but I --

11    A.  But this is -- this report --

12    Q.  Right.

13    A.  -- would normally not have this on the

14  other side.

15    Q.  Understood, right.  That's just an issue of

16  the copying.  That's just an issue of --

17    A.  Oh, okay.  All right, okay.

18        MS. FEIN:  Right, right.  I can't speak to

19  that process.

20        MR. KRATENSTEIN:  Just for the record, you

21  took a single-sided document and made it

22  double-sided?  That's what happened?  In other

23  words, the documents were found single-sided in a

24  row and then for the purposes of this deposition

25  you've double-sided them?

CONFIDENTIAL

Page 652

1          MS. FEIN:  That's my understanding.  I

2     would say that the Bates are consecutive.

3          MR. KRATENSTEIN:  Okay.

4          MS. FEIN:  So when we printed it, it was

5     printed double-sided.  I can't make representations

6     about what the original looked like because we're

7     looking at the copy from the files.

8          MR. KRATENSTEIN:  Okay.

9          THE WITNESS:  In other words, they're not

10    -- the dates are not related to each other

11    because --

12         Q.  (By Ms. Fein)  You don't believe that the

13    dates are related to one another?

14         A.  This in itself was --

15         MR. GOLDMAN:  Say page one of the

16    document.

17         THE WITNESS:  This page of the copy,

18    Jodi's handwriting, had nothing to do with the

19    other.  In other words, what Andrew is saying is

20    true.  They probably took -- it would probably be

21    like taking this document and putting it, you know,

22    on the other side of this document and making it

23    appear as if they're the same document and they're

24    not.

25         Q.  (By Ms. Fein)  I know we certainly didn't

CONFIDENTIAL

Page 653

1  doctor the document.  This was -- my understanding

2  is this was found together.  The fact that it's

3  double-sided as opposed to single-sided is, you

4  know, an oversight; but -- and I apologize that it's

5  double-sided, but I'm saying that this was found as

6  a single document.

7       A.   Yeah, but they could have been ten days

8  apart or two weeks apart.

9       Q.   Well, I wanted to ask you.  That was my

10  question for you.

11      A.   I'm assuming because Jodi would not -- none

12  of this has anything to do -- stuff that's in my

13  handwriting has nothing to do with Jodi with what

14  was on this page.  She would keep this page.  All

15  right.  And there would be another one for another

16  day for that page.  This here looks like you can

17  tell from the lines this was on a legal pad.

18           It was my notes for myself, all right, as

19  to any number of things, but it's not related to

20  this document.  They may have found this document in

21  Jodi's office and this could have been in my

22  briefcase.

23      Q.   This document was found together.  I don't

24  want to quibble with you about that.  I do -- you

25  should look at the last page of the document.  On

CONFIDENTIAL

Page 654

1   the last page of the document also is another --

2   it's a printout.  It's not handwritten notes.  So I

3   understand not all the pages are handwritten that

4   you're seeing here.  I wanted to ask you about the

5   notes and if they were your handwriting?

6       A.  I will acknowledge that the notes are in my

7   handwriting --

8       Q.  Okay.

9       A.  -- but there's nothing in my handwriting

10  has nothing to do with that original Jodi's document

11  because, in other words --

12      Q.  You don't think they were close in time.

13  Is that what you're saying?

14      A.  No.  This would -- they were probably not

15  close in time.  They may be a couple of dates in

16  time.  Obviously, it would -- it would have nothing

17  to do with Jodi, you know.

18      Q.  I understand that, I understand that.

19      A.  Okay.

20      Q.  The handwritten notes you're saying are not

21  -- you don't -- it wouldn't have involved Jodi's

22  process at all --

23      A.  That's correct.

24      Q.  -- because it's your notes.  I understand

25  that, yes.

CONFIDENTIAL

Page 655

1          MR. KRATENSTEIN:  Just so we're all clear,

2     Jodi's notes on the first page and then on the pages

3     thereafter, it's Mr. Madoff's handwritten notes.

4          THE WITNESS:  Right.

5          Q.   (By Ms. Fein)  Do you have a recollection

6     of making any of the notes that are here?

7          A.   Yes.  It's my handwriting, so --

8          Q.   Do you recall -- do you recall making these

9     notes?  Do you recall going through the exercise of

10    making these notes in 2008?

11         A.   Yes, yes.

12         Q.   What do you recall about it?

13         A.   These are notes -- well, that at the end I

14    was considering sending out monies, paying bonuses

15    to people, sending out checks to -- I was planning

16    to send out checks because I knew the firm was -- we

17    were going out of business.  And I had written the

18    checks and, as a matter of fact, I put them in my

19    drawer.

20              It was actually, I think, I wrote these

21    notes, you know, prior to me making the decision

22    that the firm was -- well, it was in conjunction was

23    going out of business.  I wanted to sort of -- I

24    owed traders money for what was due to them, so on

25    and so forth.  So I wrote out checks, put them in my

CONFIDENTIAL

Page 656

1    drawer and called my lawyer because I was planning

2    at that time to turn myself in.  And he said don't

3    send the checks out.  So I left them in the drawer

4    and then they never did go out.  That's what I

5    recall.

6        Q.  So do you think you could have looked at

7    the amounts listed on the first page of the document

8    in 588 so that you knew how much money you had for

9    writing the checks?

10       A.  Yes.  That's certainly possible.

11       Q.  So the handwritten notes were made around

12   the same time, you wouldn't say necessarily on the

13   same day, but around the same time as December 8th,

14   2008?

15       A.  Right, yes, uh-huh.  Or sometime

16   afterwards, you know.

17       Q.  After you would have seen the report --

18       A.  Yes.

19       Q.  -- from Jodi?

20       A.  Well, no.  It could have been made prior.

21   I just don't know.  I mean, my head was sort of up

22   my wherever at that time, but I don't -- obviously,

23   I can see from the notes here that it was what I had

24   planned to do was paying out traders and so on; but

25   then there were things on here, on notes that would

CONFIDENTIAL

Page 657

1   have nothing to do that would have had to be done.

2   It was things to myself trying to figure out where I

3   stood afterwards.

4        Q.   Okay.

5        A.   If you look at -- see, it says I can't make

6   -- I wrote can't make traders 100 percent whole.  I

7   was referring to the fact that I didn't have enough

8   money to cover, you know, what I owed the traders in

9   their compensation.

10       Q.   Is that employees or traders?

11       A.   Employees, and employees also had accounts

12   with me.  So I was -- you know, I couldn't --

13   couldn't cover everything that was in their account.

14       Q.   And you're referring to page Bates ending

15   in 599; right?

16       A.   Yes, correct.

17       Q.   Okay.  On page ending 597, one page before

18   the one you're looking at, I think, can you find the

19   one ending in 597 for me?

20       A.   Which one?

21       Q.   597.  I think it's the other way.

22       A.   Yes.

23       Q.   The first line looks like 1960, dash,

24   present.  And then I can't -- I'm not sure.  Average

25   or --

CONFIDENTIAL

Page 658

1           A.   Looks like average, 39 million.

2           Q.   Okay.  Do you know what that would be

3    referring to?

4           A.   I think it refers to what the profit of the

5    firm was over a certain period of time from 1960 to

6    present.

7           Q.   Okay.  And do you see down -- there are

8    calculations on the right side.  One says equal 39

9    mill per year and then to the left of that, 1909

10   divided by 49 years?

11          A.   Yeah.  I'm trying to figure out what

12   they're referring to.

13          Q.   But you agree that the calculation, it does

14   say 49 years; right?

15          A.   Doesn't it say 39 years?  It says 1960 to

16   present average equals 39 million.

17          Q.   Uh-huh.  And then look at underneath where

18   you have 691, 1218 over 1909.  Do you see that?

19          A.   Right.

20          Q.   Divided, and that looks like 49 equals 39

21   mill per year.  Do you see that?

22          A.   Right.

23          Q.   Okay.  And below that it looks like it says

24   without draw.  Do you see that, without draw?

25          A.   I think it refers to the profit of the

Page 659

1   firm.

2        Q.   Okay.  But does draw refer to amounts taken

3   out by your employees?

4        A.   Draw was money that -- no.  It was either I

5   had a draw account, which is typical that I drew

6   money out.  I didn't have a -- it was like a salary

7   that I would draw out of the firm.  And I'm not real

8   sure what this is referring to, my draw or the

9   traders' draw or a combination thereof.

10        Q.   Okay.  Do you see where the line under

11   draw, it looks like it says draw five mill per -- do

12   you see that?  It looks like the last line next to

13   the calculation ending in 2154?

14        A.   Right.

15        Q.   Was the 5 million draw something that you

16   received?

17        A.   I don't know.  It could be.  It could have

18   been my draw.  I know I didn't draw 5 million a

19   year, so it could have been my draw.  It could have

20   been mine plus other people's draw.  I'm not sure.

21        Q.   Okay.  1962 to December 2008 is about -- is

22   49 years; right?

23        A.   Uh-huh, right, yeah.  The 1909 divided by

24   49 is -- it looks -- to me it would look like how

25   much the firm, you know, grew over a 49-year period,

CONFIDENTIAL

Page 660

1    39-year period, something like that.

2         Q.   Okay.  Forty-nine years is about how long

3    your business was going on; right?

4         A.   Correct.

5         Q.   Okay.  And there were references to your

6    firm starting in 1960 in the proffer agreement that

7    we looked at or the proffer statement?

8         A.   Yeah.  It looked to me like I was trying to

9    calculate how much the firm made or how much they

10   showed on their focus reports.  I don't recall.

11        Q.   Okay.  But the calculations taking place

12   over 49 years; right?

13        A.   Right, which was the life of the firm.

14        Q.   Uh-huh.  So these notes were written in

15   December 2008; right?

16        A.   I can't -- I can't be sure.  I can't say

17   for certain what period.  There's so many different

18   notes and --

19        Q.   Okay.

20        A.   -- some of them are related, some of them

21   are not related to each other.

22        Q.   Okay.  But would this have been part of the

23   same exercise we were talking about, thinking about

24   writing out checks and what you were going to do

25   about the end of the firm?

CONFIDENTIAL

Page 661

1           MS. CHAITMAN:  Objection to form.

2           THE WITNESS:  Well, I certainly know -- I

3    certainly know that there are notes here that refer

4    to how much employees would do from their trading

5    profits, their draws, things of that sort.

6           MS. FEIN:  Uh-huh.

7           THE WITNESS:  That -- you know, there were

8    certain things that I was trying to analyze how much

9    the firm had made, how much -- things of that sort.

10          Q.   (By Ms. Fein)  Okay.  So you think the firm

11   -- so you think the firm on average made 39 million

12   a year for the 49 years it was in business?

13          A.   Again, I don't know whether that was

14   including money that was taken out in compensation

15   by my -- you know, by me alone, by my family or by

16   the employees.  I can't really -- I can't really

17   tell from looking at it just like this.  It was --

18   I'm just analyzing various things.

19               And most of it deals with monies with the

20   checks that I was planning to send out, which I

21   would have determined by looking at how much money

22   people had in their accounts.

23          Q.   Okay.  And it looks like it refers to what

24   -- so these would have been notes -- let me ask.

25   Were these notes you made to yourself?

CONFIDENTIAL

Page 662

1      A.   Notes I was writing to myself, yeah.

2      Q.   Yes, okay.  Was anyone else present when

3   you were making them that you recall?

4      A.   No.

5      Q.   Okay.  Do you recall where you were when

6   you made them?

7      A.   No.  It could have been in my office.  It

8   could have been when I was home.  I don't know.

9      Q.   But did you share them with anyone else

10  after you made them?

11     A.   No.  I would have had to get the

12  information from Annette as to how much money people

13  had in their accounts because I had to get them from

14  because that's not something that I ever had off the

15  top of my head.

16     Q.   Okay.  Mr. Madoff, did you have any

17  meetings to prepare for this deposition?

18     A.   Meetings?

19     Q.   Uh-huh.

20     A.   No.  You mean --

21     Q.   Did you meet with Mr. Goldman to prepare

22  for your deposition today?

23     A.   No.  Oh, today he came -- I met with him

24  the day before yesterday, but it wasn't necessarily

25  in relation to that.  He came down here earlier.

Page 663

1    Q.  So you've not had any -- you're saying you

2    have not had meetings to prepare for your

3    deposition?

4    A.  Peter Goldman came down.  We discussed this

5    -- you know, my situation in general, I mean, from

6    how I was feeling.

7         MS. CHAITMAN:  You don't have to talk

8    about anything confidential that you --

9         THE WITNESS:  No, no.

10        MR. GOLDMAN:  Yeah.  We had a meeting.

11        THE WITNESS:  Well, you can find out who

12   was here to visit me.  That's all.

13   Q.  (By Ms. Fein)  Okay.  Did you meet with Ms.

14   Chaitman or Mr. Kratenstein to prepare for your

15   deposition?

16   A.  Mister who?

17   Q.  Mr. Kratenstein.

18   A.  They were down here yesterday.  Not

19   yesterday, the day before yesterday.  Is this the

20   second day or the third day?  Yesterday.

21   Q.  How long did you meet with them?

22   A.  An hour or two.

23   Q.  What did you guys discuss?

24        MR. KRATENSTEIN:  I'm going to object.

25   Hang on.  I'm going to object.  What we discussed

Page 664

1    with Mr. Madoff is our work product because we're

2    allowed to talk to people.  So I consider that our

3    work product.  So my view is any discussions we had

4    with Mr. Madoff are work product that go to our

5    mental impressions.  So I object to that question.

6    I'll leave it to Mr. Goldman as to whether he's

7    going to instruct not to answer.

8         I'll allow you to talk about the -- I

9    don't have an objection to subject matter or asking

10   him of any documents we used to refresh recollection

11   or anything like that, but I do have an objection to

12   discussions, substance of discussions.

13         MS. FEIN:  So are you directing him not to

14   answer on the basis of your work product?

15         MR. KRATENSTEIN:  It's our work product,

16   our mental impressions and our discussions with him

17   that reveal as mental impressions our work product.

18   And I would ask that an instruction be given that he

19   should not disclose that information.

20         MS. FEIN:  Any information related to your

21   work product; right?

22         MR. KRATENSTEIN:  Yes, yes.

23         MS. FEIN:  Understood.

24         MR. GOLDMAN:  Ask the question and then

25   we'll -- if I have an objection, then we'll -- I'll

CONFIDENTIAL

Page 665

1    decide which direction I'll go.

2        Q.  (By Ms. Fein)  I think I asked how long you

3    met with Ms. Chaitman and Mr. Kratenstein, if you

4    recall.

5        A.  I guess it would be probably a couple of

6    hours.

7        Q.  Were you shown any documents during the

8    meeting?

9        A.  I asked what the meeting was going to be

10   about.

11           MR. GOLDMAN:  Bernie, just try and answer

12   the question.  She asked you if you saw any

13   documents.  So it's either --

14           THE WITNESS:  I guess I saw documents,

15   yes.

16       Q.  (By Ms. Fein)  Do you -- were they any of

17   the documents that we reviewed today or yesterday?

18       A.  To tell you the truth, I don't even know

19   what I saw.  I saw documents.  I don't know whether

20   they were the same as the ones that you had or not.

21   I don't know.

22           MS. FEIN:  Okay.  We would ask to see any

23   documents that you showed Mr. Madoff during the

24   course of your meeting with him.

25       Q.  (By Ms. Fein)  Did you have any -- any

Page 666

1  other preparation for your deposition with Ms.

2  Chaitman or Mr. Kratenstein before this week?

3      A.  I'd never met Mr. Kratenstein until that

4  original meeting.

5      Q.  Okay.  Did you discuss the Sages at your

6  meeting?

7      A.  Did I discuss the Sages?  I discussed what

8  my relationship -- he asked what my relationship was

9  with the Sages and who I met with, so I told him.

10      Q.  And were you shown any documents to refresh

11  your recollection about the Sages or any meetings

12  you had with them?

13      A.  I was familiar with -- with the Sages.

14  They knew I was familiar with the Sages.  I'm not

15  sure I understand what you're asking me.

16      Q.  The question was have you looked at any

17  documents?

18      A.  Yes.  I looked at documents.  I saw -- you

19  know, I saw confirmations, you know, and statements

20  of trades, not all, certainly not as much as I've

21  seen today.

22      MS. FEIN:  Understood.  All right.  I

23  think we're all set.  Thank you, Mr. Madoff.

24      THE WITNESS:  Okay.

25      MS. CHAITMAN:  I just have a few questions

CONFIDENTIAL

Page 667

1    and then --

2           MR. KRATENSTEIN:  And I have a couple.

3                  FURTHER EXAMINATION

4    BY MS. CHAITMAN:

5           Q.  Okay.  Mr. Madoff, how were the traders

6    compensated at your firm?

7           A.  They got -- they basically got a percentage

8    of their market making profits, proprietary trading

9    profits.

10          Q.  What was the percentage?  Did it vary per

11   person?

12          A.  Typically it was 20 percent of their net

13   trading profits.  That was after commissions and

14   expenses related to their trading.

15          Q.  The commissions would have been payable to

16   whom?

17          A.  To their -- which --

18          Q.  When you say after, typically 20 percent of

19   their net?

20          A.  Oh, depends upon where the transaction was

21   executed.  If it was -- if the transaction was

22   cleared, there would be -- that would be deducted.

23   If there was interest, it would be charged to their

24   account depending upon whether we had bank loans

25   out, things like that.  They were -- if the -- if it

CONFIDENTIAL

Page 668

1    was a transaction that was laid off on the floor of

2    an exchange, there would be commissions -- there

3    would be commissions paid on that so they would --

4    that would be deducted.  Their 20 percent was a net

5    net.

6        Q.  So it was 20 percent of the profits they

7    generated.  Is that a fair --

8        A.  That's correct.

9        Q.  Okay.  If you could just take a look?  You

10   can look at my copy of Trustee's Exhibit 19.  This

11   is -- just take a look at this.  It's 19 and --

12           MS. FEIN:  Marked copy.

13       Q.  (By Ms. Chaitman)  19 and 18, yeah.  Do you

14   recognize the handwriting on Exhibit 18 where it

15   says hold?

16       A.  It looks like it's the same as -- like it's

17   Annette or it could be Jodi.  You know, I can't

18   really tell from that.

19       Q.  Okay.

20       A.  Yeah.  Looks like two different

21   handwriting.  One is printed and one is like script.

22       Q.  Right.  And one is asking you -- one is

23   asking you about documents in 1979 to '81 and the

24   other is asking you about documents in 1982.  Do you

25   see that?

Page 669

1      A.   Yes.

2      Q.   Okay.  Do you remember what your desires

3  were with respect to what documents would be

4  shredded and what documents would be held?

5      A.   Not really.

6      Q.   Were you trying to conceal evidence of a

7  crime?

8      A.   Well, let's put it this way.  There was no

9  crime prior to '90 -- to the '90s.  So that's easy

10  for me to answer.

11     Q.   Okay.  So what -- do you remember why you

12  would have said to hold certain documents and shred

13  others?

14     A.   You know, we had no general policy with

15  retaining -- as I've said numerous times, the

16  retention period for documents on Wall Street is six

17  years.  That's an industry requirement.  So you're

18  not required to hold documents more than six years

19  and most firms shred immediately after that because

20  they just don't want to store the documents.

21          As far as the -- but as I've said numerous

22  times, we held customer-related documents relating

23  to cost basis for customers, tax basis for customers

24  because that -- we would constantly be asked to --

25  for information from the clients' accountants, you

CONFIDENTIAL

Page 670

1    know, or a tax lawyer, which could happen at any

2    given time.

3             MS. CHAITMAN:  Do you have to stop?

4             THE VIDEOGRAPHER:  Yes.  I do.

5             MS. CHAITMAN:  Okay.

6             THE VIDEOGRAPHER:  This marks the end of

7    disc number two in the deposition of Bernard L.

8    Madoff.  Going off the record.  The time is 13:08.

9             (A recess was taken.)

10            THE VIDEOGRAPHER:  Back on the record.

11   This begins disc number three in the deposition of

12   Bernard L. Madoff in Butner, North Carolina on

13   November 9th, 2017.  The time is 13:12.

14            Q.  (By Ms. Chaitman)  So Mr. Madoff, if you

15   look at Exhibit 19 --

16            A.  Yes.

17            Q.  Okay.  You apparently gave instructions to

18   shred the C&S statements.  Do you see that?

19            A.  Number one, I don't know that I gave that

20   -- I don't believe that I gave anybody instructions

21   as to what to shred, what not to shred.  I mean,

22   it's not -- I would have no interaction with these

23   people.  So somebody in Annette's office like either

24   Annette or some other employee, some of the other

25   people would tell people what to shred, what not to

CONFIDENTIAL

Page 671

1    shred.  My instructions were to shred anything that

2    we did not need to have in the future, so --

3         Q.  Right.  Okay.  So consistent with that

4    where it says hold at the second half of the first

5    page of Trustee's Exhibit 19, there are several

6    items which are hold and they're all EOM customer

7    ledgers.

8         A.  Yes.

9         Q.  Is that consistent with the strategy you've

10   described?

11        A.  It would -- holding a customer ledger would

12   be because a customer ledger would typically have

13   all the pricing information, the information we

14   would need to supply to their accountants.

15        Q.  Okay.

16        A.  So there was no reason to hold.

17        Q.  Okay.

18        A.  The other things here are -- involve

19   brokerage firms that we bought and sold stock to.

20   So there's no reason for that because once the trade

21   settles, there's no reason to have anything related

22   to the counterparties.

23        Q.  Okay.  Similarly, if you look at Trustee's

24   Exhibit 18, are the documents that you -- that have

25   the X next to them, which the handwriting which is

CONFIDENTIAL

Page 672

1    unidentified says shred the Xs only, were those

2    specific to customers or were they general?

3         A.   They would need -- we wouldn't have any

4    reason to have them because once the trade settles,

5    it settles.  So there's no reason to hold anything.

6         Q.   Okay, okay.  Now --

7              MR. KRATENSTEIN:  Go ahead.

8         Q.   (By Ms. Chaitman)  Now, Amanda asked you

9    several questions about the T-bills that you held?

10        A.   Right.

11        Q.   And you had previously testified that you

12   maintained a portfolio of about $6 billion of

13   T-bills?

14        A.   Correct.

15        Q.   And did you buy those with money invested

16   through the investment advisory business?

17        A.   Correct.

18        Q.   So it was -- those T-bills were purchased

19   with house 17 customer money?

20        A.   Yes.

21        Q.   Okay.  And you've previously described how

22   those were maintained at --

23        A.   Morgan Stanley, Fidelity.

24        Q.   -- Bear Stearns, Morgan Stanley, Fidelity,

25   Lehman and JPMorgan Chase --

CONFIDENTIAL

Page 673

1          A.   Correct.

2          Q.   -- right?  Okay.  And was it your intention

3     to keep that money for the benefit of the investment

4     advisory customers?

5          A.   That was the only reason.  It was money

6     that, you know, we would have needed to settle with

7     clients if they asked us for money from their

8     account.

9          Q.   Okay.  And, in fact, do you recall

10    testifying that you kept those T-bills to maturity?

11         A.   I don't remember, you know.  They were

12    basically short-term instruments, so we would

13    normally keep them until we needed the money to pay

14    out or whether they expired.

15         Q.   Okay, okay.  Now, so is it fair to say that

16    if an investment advisory customer wanted to close

17    out his or her account and you had to come up with

18    $5 million in cash, that if you didn't have

19    $5 million sitting in a bank account, you would have

20    liquidated one of the T-bills to pay it?

21              MS. FEIN:  Objection.

22         Q.   (By Ms. Chaitman)  Pardon?

23         A.   Yes.

24              MS. CHAITMAN:  Okay.  What's your

25    objection?

CONFIDENTIAL

Page 674

1          MS. FEIN:   That was -- it was testifying.

2    It was your testimony, not Mr. Madoff's.

3          Q.   (By Ms. Chaitman)   Mr. Madoff, would you be

4    good enough to cure Amanda's objection and could you

5    say that in your own words?   I don't want to put

6    words in your mouth.

7          A.   My plan was that if I needed money to

8    settle a customer's account, I would typically

9    either take the money out of the 703 bank account,

10   which is typically where we kept all clients'

11   monies, or if there wasn't immediate cash available,

12   which there was most of the time, I would then

13   liquidate T-bills.

14         Q.   Okay.   And, again, those T-bills were

15   purchased with money --

16         A.   It was always purchased with money from the

17   703 account.

18         Q.   Okay.   And that was the investment advisory

19   customers' money?

20         A.   Correct.

21         Q.   Now, you were talking about the ledgers.

22   Amanda was showing you some ledgers and I believe

23   you testified that there was subsidiary ledgers for

24   each institution that you did business with?

25         A.   There were -- there were either ledgers or

CONFIDENTIAL

Page 675

1   documents.  You know, there were statements.  So

2   that's what -- I'm not -- I don't recall what -- and

3   it changed all the time, you know, how -- what the

4   practice was of firms sending out statements

5   because, again, it depended upon what stage the

6   clearing cycles were in, in other words, whether --

7   how the DTC worked, how NSCC worked and whether we

8   had automated interfaces with firms.

9            We had 500 interfaces with -- not 500.  We

10  had over 100 interfaces with 500 different brokerage

11  firms.  Everything was done, you know, on computer.

12  So there was no -- there was no exchanging of

13  confirmations.  There was no cash in settlement,

14  things of that sort.

15           And the firm themselves, the operations

16  department had their own policies of how they --

17  what records they have, which I, quite frankly, am

18  not even familiar with.  I have no idea with some of

19  these C&S, cash and securities settlements.  I don't

20  know what they relate to.

21           Q.   Okay.  But with the 10 or 11 banks that

22  you've named that you had custodial relationships

23  with, is it fair to say that you would have had

24  records showing what securities were held at each

25  institution?

CONFIDENTIAL

Page 676

1        A.   As a general rule, yes, but I don't know.

2   Again, it depends upon the time frame involved

3   because all of that changed over the years depending

4   upon what the various interfaces of automation was

5   available to firms.

6        Q.   Right, right.  So if you could do it

7   through the internet, you wouldn't need to have the

8   paper copies; is that right?

9        A.   Correct.

10        Q.   Okay.  I understand that.

11        A.   You know, I want to go on the record of

12   stating, by the way, relating to that, when this

13   thing -- when I first got arrested I requested, you

14   know, all the records that were available to the

15   firm.  I requested it to my attorneys, who then

16   requested the Trustee send me all the documents that

17   they had.

18            And my purpose was that I was -- if I

19   wanted -- I would need to go to trial to demonstrate

20   when the crime started and what was involved and

21   what was -- how much was made and lost.  And the

22   only thing that they -- and they never produced

23   anything.  I shouldn't say never.  All they produced

24   was a box exactly this size that was delivered up to

25   me while I was in -- you know, in jail.  And I

CONFIDENTIAL

Page 677

1   complained.

2        I said how am I going to -- how am I going

3   to piece everything together?  How am I going to

4   demonstrate what really -- what really occurred

5   financially and so on?  I said, well, that's all

6   that they were able to produce to me.

7        Q.   Ike Sorkin?

8        A.   Ike Sorkin.  And they produced records that

9   went back no longer than 1998.  And that was even --

10  you know, they said we don't have any bank records.

11  We don't have this and that.  They complained.  They

12  complained to the judge, I guess, prior to my

13  sentencing.  It was one of my court appearances.

14  And Chin insisted, got agitated and insisted to the

15  prosecutor, said instruct -- you know, give them the

16  records.

17       And they said, well, we can't find any.

18  The records were very sloppy.  You know, you would

19  have the impression that we didn't have any records

20  and that the records were scraps of paper.  And this

21  -- you know, so when I was sentenced, you know, I

22  couldn't -- as a matter of fact, I was asked do you

23  want to appeal when I had this 150-year sentence.

24       I said how am I going to appeal?  I said I

25  don't have any records.  I said where in the hell

CONFIDENTIAL

Page 678

1   are the records?  And I said I've got warehouses

2   full of records.  I said, you know, how can they not

3   produce the records?  He said Bernie, what do you

4   want me to tell you?  So you can imagine my anger

5   when I was notified by you that there were 32

6   million pages of goddamn documents.  I'm looking at

7   these documents now and all of a sudden miraculously

8   these documents appear.

9          Now, you can't possibly tell me that you

10  didn't know, not you individually, that the Trustee,

11  you know, did not know that these documents existed

12  because I have -- I was paying rent on something

13  like eight warehouses to say nothing of the whole

14  basement of the Lipstick Building where I knew there

15  were records, you know.

16         And I'm not talking about necessarily, you

17  know, what I'm seeing here.  So how does that

18  happen?  I mean, you know, I don't understand it.

19         MS. CHAITMAN:  You know what, Bernie?  I

20  asked the same question.  Okay.  I have no further

21  questions and I'm going to turn to Andrew.

22         MR. KRATENSTEIN:  I will be, I hope,

23  brief.

24               FURTHER EXAMINATION

25  BY MR. KRATENSTEIN:

CONFIDENTIAL

Page 679

1    Q.   So Ms. Fein showed you a document, Mr.

2    Madoff, that she marked as Exhibit Number 11, which

3    was a house number five daily stock record activity

4    for July 16th, 1987.  And she asked you some

5    questions about a County of Nassau, it's third from

6    the bottom, a County of Nassau bond.  Is that a

7    municipal bond, the County of Nassau bond?

8    A.   Yes.

9    Q.   Okay.  And did your firm do -- trade in

10   municipal bonds?

11   A.   No.

12   Q.   Did you have municipal bonds in your

13   custody, your firm's custody?

14   A.   Yes.

15   Q.   Okay.  So what was your -- what did your

16   firm do with respect to municipal bonds?  Can you

17   describe?

18   A.   The clients used them as either margin or

19   with instructions to sell them to go into -- rather

20   than sending in cash to a strategy, they sent them

21   bonds to either be liquidated or to use as

22   collateral for a margin account.

23   Q.   I'm going to show you Exhibit 38, which we

24   showed you yesterday.  And just take a look at that

25   page.  I've opened it to page MF 00964437, which you

CONFIDENTIAL

Page 680

1   might recall yesterday towards the bottom of that

2   page I showed you the RCA Corp convertible

3   debenture.  And there are a whole bunch of positions

4   around that.  Do you see that?

5        A.  Where am I looking?  Here?

6        Q.  So bottom, if you look -- we talked about

7   this yesterday, but there are -- fourth up from the

8   bottom do you see the RCA Corp bond?

9        A.  Yes.

10       Q.  And then all around that do you see

11   municipal bonds like for Puerto Rico, Pennsylvania,

12   Oregon?

13       A.  Right, uh-huh.

14       Q.  Do you see that?

15       A.  Yes.

16       Q.  And they all have different maturities,

17   different yield dates --

18       A.  Right.

19       Q.  -- right?  So what are these?

20       A.  They're municipal bonds.

21       Q.  And are these the types of bonds you were

22   just describing?

23       A.  Yes.

24       Q.  And are these all real securities that were

25   held at the National Bank of North America for your

CONFIDENTIAL

Page 681

1   firm?

2        A.   Yes.

3           MR. KRATENSTEIN:   Thank you very much.

4   That's all I have.

5           MS. CHAITMAN:  .Okay.   I'd just like to put

6   on the record the discussion that I had with Amanda

7   that we will be continuing your deposition so long

8   as your health continues once we get further

9   documents from the Trustee.   We're negotiating to

10  get additional documents that we now know the

11  Trustee has.

12          MS. FEIN:   We just want to put on the

13  record that we would reserve a right to

14  cross-examine on any documents that Ms. Chaitman

15  asks about.

16          MS. CHAITMAN:   Of course, of course.

17  Okay.   Thank you so much.   Andrew and I are going to

18  run.

19          THE VIDEOGRAPHER:   We are off the record

20  in the November 9th, 2017 deposition of Bernard L.

21  Madoff, Volume IV.   The number of discs used was

22  three.   The time is 13:26.

23          (Reading and signing of the deposition by

24  the witness was reserved and the deposition was

25  concluded at 1:26 p.m.)

Page 682

```
 1              C E R T I F I C A T E
 2   NORTH CAROLINA:
 3   GUILFORD COUNTY:
 4            I hereby certify that the foregoing
 5   deposition was reported, as stated in the caption,
 6   and the questions and answers thereto were reduced
 7   to the written page under my direction; that the
 8   foregoing pages 493 through 682 represent a true and
 9   correct transcript of the evidence given.  I further
10   certify that I am not in any way financially
11   interested in the result of said case.
12            I have no written contract to provide
13   reporting services with any party to the case, any
14   counsel in the case, or any reporter or reporting
15   agency from whom a referral might have been made to
16   cover this deposition.  I will charge my usual and
17   customary rates to all parties in the case.
18            This, the 21st day of November, 2017.
19
20
21                    K. Denise Neal
22                    K. Denise Neal, RPR
                      Registered Professional Reporter
23                    Notary Public No. 200517500101
24
25
```

CONFIDENTIAL

Page 683

1              E R R A T A   S H E E T

2

3       Pursuant to Rule 30(7)(e) of the Federal Rules

4    of Civil Procedure, any changes in form or substance

5    which you desire to make to your deposition

6    testimony shall be entered upon the deposition with

7    a statement of the reasons given for making them.

8

9       To assist you in making any such corrections,

10   please use the form below.  If supplemental or

11   additional pages are necessary, please furnish same

12   and attach them to this errata sheet.

13                      * * * * *

14       I, the undersigned, BERNARD L. MADOFF, do hereby

15   certify that I have read the foregoing deposition

16   and that to the best of my knowledge said deposition

17   is true and accurate (with the exception of the

18   following corrections listed below).

19

20

21

22

23

24

25

CONFIDENTIAL

Page 684

 1   Page        Line        should read:

 2   Reason for change:

 3

 4   Page        Line        should read:

 5   Reason for change:

 6

 7   Page        Line        should read:

 8   Reason for change:

 9

10   Page        Line        should read:

11   Reason for change:

12

13   Page        Line        should read:

14   Reason for change:

15

16   Page        Line        should read:

17   Reason for change:

18

19   Page        Line        should read:

20   Reason for change:

21   Signature:

22   Sworn to and Subscribed before me

23                          , Notary Public.

24   This        day of              , 2017.

25   My Commission Expires:

CONFIDENTIAL

**[& - 21]**

| & |
|---|
| **&**  495:14 499:25 503:2 |

| 0 |
|---|
| **00964437**  679:25 |
| **01**  566:15,16 |
| **0158**  506:12,22 |
| **03**  622:6 |
| **064**  572:7 577:23 |
| **07**  551:20,23 553:18 558:13 |
| **08**  558:24 |
| **08-01789**  494:7 |
| **0801789**  499:18 |

| 1 |
|---|
| **1,500,000**  504:5 |
| **1-3-2008**  565:2 |
| **10**  497:22 524:16 524:20 527:6 675:21 |
| **100**  507:25 515:9 550:20 551:9 556:7 657:6 675:10 |
| **10022**  495:7 |
| **10111-0100**  496:8 |
| **10173-1922**  495:16 |
| **10573**  496:15 |
| **10:32**  582:1 |
| **11**  497:24 535:12 535:14,16 577:7 578:3 587:23 675:21 679:2 |
| **11-10-83**  498:13 604:5 |
| **11-11-83**  498:11 600:18 |
| **11-18-83**  600:20 606:6 |

**11-30**  604:8
**11-30-63**  603:21
**11-30-83**  604:7,9 604:14
**11-7-08**  553:13
**11:07**  582:6
**11th**  506:3,22 507:24
**12**  496:14 498:3 558:4,8 634:23
**12-11-86**  497:19
**12-12-03**  622:16
**12-16-08**  498:19
**12-16-2008**  626:15
**12-31-07**  497:23 498:4 558:20
**12-5-86**  497:15 502:21
**12-8-08**  498:20 645:11 647:24
**1218**  658:18
**12th**  624:3
**13**  498:5 566:9,10
**13,388**  606:2,10,22
**13:08**  670:8
**13:12**  670:13
**13:26**  681:22
**13th**  622:2,25
**14**  498:7 569:13,16
**15**  498:9 571:4 577:21,22 578:7
**150**  677:23
**16**  498:11 600:9,11 600:13 606:9,10 606:19 607:5 610:4
**16th**  535:23 536:9 540:3 545:19 577:9,14 638:18 679:4

**17**  498:3,7,9,12,12 520:11 558:19 559:17,20 569:19 571:14 578:9,10 578:24,24,25 603:6,10,17,25 604:1,4,19 606:17 606:18 607:6,12 672:19
**18**  498:14 611:9,11 611:14,24 612:16 668:13,14 671:24
**18th**  606:25 608:15
**19**  498:16 611:10 611:11 612:5 628:2 668:10,11 668:13 670:15 671:5
**1909**  658:9,18 659:23
**1960**  628:9 629:3 657:23 658:5,15 660:6
**1962**  631:9,19 659:21
**1970s**  635:17
**1979**  668:23
**1980s**  508:20 509:13,23 590:5 634:20 635:17,23
**1982**  668:24
**1983**  500:18 501:13 502:12 600:18 607:1
**1986**  506:3,22 507:24 530:22
**1987**  535:23 536:9 539:6 540:3 545:19 553:19 554:2 562:3 574:2

**575:**4,5,23 577:9 577:14 679:4
**1990**  512:7
**199066**  560:23
**1992**  517:6 522:25 523:6 614:20
**1994**  570:12
**1998**  677:9
**1:26**  681:25
**1s0004-3**  623:8
**1s004-7**  622:8

| 2 |
|---|
| **2**  504:3,3 |
| **2,307**  538:3,5 539:12,12,13,16 539:18 |
| **20**  498:18 626:7,11 667:12,18 668:4,6 |
| **2000s**  563:21 617:17 |
| **2001**  568:14 |
| **2003**  624:3,5,8 |
| **200517500101**  682:23 |
| **2007**  525:1 527:8 527:13,14,18,20 527:22 528:3 558:16 559:2 561:5,6,22 562:3,3 565:16 |
| **2008**  516:20 517:7 559:2 648:16 655:10 656:14 659:21 660:15 |
| **2017**  494:22 499:7 582:6,21 584:11 670:13 681:20 682:18 684:24 |
| **21**  498:20 644:25 645:2,4 |

CONFIDENTIAL

**[212 - 954]**

**212**  495:17 496:9
**2154**  659:13
**21st**  682:18
**26**  582:20 584:11
**28th**  624:5
**29,000**  578:14
**290,000**  577:24
**29000030**  560:18
570:19
**2900030**  573:13
**297,903**  646:24
**299000010**  608:4

**3**

**3**  605:14
**3,000**  578:19
**3,157**  538:15
**3,357**  539:22,25
540:5 577:10
**3-31-94**  498:8
569:20
**30**  632:13,17
634:19,21 683:3
**30,000**  631:23,24
**3000**  494:20
499:10
**303-4568**  495:8
**30th**  608:16,20
**31**  500:18 502:12
**31st**  524:25 525:8
558:16
**32**  678:5
**33**  584:23
**330,000**  578:22
**332**  578:17
**340**  495:15
**38**  500:18 679:23
**39**  502:12 594:7,11
594:15 595:4
658:1,8,15,16,20
660:1 661:11

**393**  611:14,16
**396**  612:7

**4**

**40**  632:13,18
634:19,21
**400**  559:20,23
560:8
**45**  496:7
**46**  501:17
**465**  495:6
**49**  658:10,14,20
659:22,24,25
660:12 661:12
**493**  682:8
**498**  564:23
**499**  497:3

**5**

**5**  497:24 659:15,18
673:18,19
**50**  518:6
**500**  504:7 675:9,9
675:10
**502**  497:14
**504**  497:16
**505**  497:18
**520**  497:4
**524**  497:22
**535**  497:24
**547-5695**  495:17
**558**  498:3
**56**  527:9,10,21,25
**566**  498:5
**569**  498:7
**571**  498:9
**579**  497:5
**582**  497:6
**588**  656:8
**589**  649:10
**589-4621**  496:9

**591**  649:25 650:1
**593**  650:3
**595**  650:9
**597**  650:11 657:17
657:19,21
**599**  650:14 657:15

**6**

**6**  526:5,9 672:12
**600**  498:11
**6000020**  608:4
**603**  498:12
**611**  498:14,16
**626**  498:18
**63**  603:21
**64**  562:12
**644**  498:20
**646**  506:16
**667**  497:7
**678**  497:8
**682**  682:8
**69**  596:4 620:20
**691**  658:18

**7**

**7**  683:3
**7-16-87**  497:25
498:10 571:15
572:18,19
**70**  621:22,23
622:22 623:16
**703**  647:4 648:21
674:9,17
**70s**  530:11 635:22
**72**  621:22 622:11
623:7 624:2
**75**  494:20 499:10
595:10
**75,892,366.08**
594:22
**750**  604:23 605:10
605:11

**78,544,284.62**
597:16
**785**  578:17

**8**

**8-28-03**  622:19
**8-31-0**  566:14
**8-31-01**  498:6
568:4,7
**80s**  510:4 530:11
530:20 590:25
**81**  668:23
**83**  603:24
**85**  618:16
**869**  597:21,22
599:8
**87**  527:16 528:6
551:20,21,21
553:20 556:19,22
557:15 575:9,12
**89**  497:14 502:20
**8:43**  494:22 499:8
**8th**  648:16 656:13

**9**

**9,000**  622:3
**90**  497:16 504:22
504:25 638:14
641:11 669:9
**908**  495:8
**90s**  512:8 563:22
669:9
**91**  497:18 505:14
505:17
**914**  496:16
**92**  564:7 579:22
638:8
**935-6857**  496:16
**950**  549:20,24
550:1
**954**  549:21 550:10
550:11,18

[958 - amanda]

**958** 552:1
**959** 555:10
**960** 525:5
**99** 509:13
**9993115** 557:24
**9th** 494:21 499:7
582:6 670:13
681:20

**a**

**a.m.** 494:22
**abbreviated** 568:3
568:6
**ability** 518:11
534:4 567:13
**able** 510:5 512:14
518:12 525:18,19
541:12,13 546:12
546:17 554:25
590:20 632:4
677:6
**absurdity** 634:25
**abuse** 642:6
**account** 502:4
508:24,25 509:5
510:3 518:3,23
519:8 523:12,13
526:19 534:9
537:10,19 540:23
540:23,24,25
541:13,14,15,16
541:17,19,22
542:3 543:13,15
545:2,6,7,10,15
546:13 547:3,12
547:15,22 548:21
554:7,17,22
557:23 560:17,18
568:23 570:3,8,19
573:7,13 578:13
578:24 580:7
583:24 584:4

585:10 587:10
590:14 595:8,12
596:17 597:3,10
598:13 599:24
600:3 601:17,20
602:15,16,16
603:4,5 607:23,24
608:3 609:12
617:22,22,23
618:7 622:8 623:7
623:10,13,24
635:11 647:4,4,6
648:22 657:13
659:5 667:24
673:8,17,19 674:8
674:9,17 679:22
**accountant** 613:8
613:17,20,22,23
614:9,9
**accountants** 614:5
618:8 669:25
671:14
**accounts** 541:25
554:9,12,14,18
559:13 583:10,13
583:19,21 584:7
585:4 586:15
590:16 599:3
602:14 608:11
613:7 614:12,16
614:20,22,22,24
618:24 621:2
623:21 624:19
625:3 657:11
661:22 662:13
**accurate** 502:6,15
564:8 629:1
683:17
**acknowledge**
654:6

**act** 536:17
**acted** 529:10
**acting** 590:13
601:5
**action** 581:21,21
643:17 647:12
**activities** 508:1,5
**activity** 497:25
503:1 536:7,17
538:8 542:17
543:23,24 544:4
544:25 545:20
547:8 548:2,3,6
551:4 561:7 595:8
597:15 600:2
611:15 679:3
**actual** 503:3
505:11 511:24
512:7 573:25
574:10 598:12
636:16 637:3,22
**adding** 598:18,19
**addition** 555:23
**additional** 681:10
683:11
**adjust** 615:1
619:23
**adjusted** 646:17
**adjusting** 615:14
616:4
**admitted** 642:11
642:11,20
**adt** 570:16
**advisory** 520:12
672:16 673:4,16
674:18
**afein** 496:10
**affect** 522:11
**ag** 568:17
**agency** 601:23
682:15

**agent** 509:3 534:8
592:2,12,22
609:24 611:4,6
**aggregate** 527:25
562:20
**aggregated** 527:9
**agitated** 677:14
**ago** 515:3
**agree** 499:5
520:11,19 521:8
524:23 538:9
539:15 548:15
552:16 557:2
560:17 569:8
600:23 606:9
623:18 624:23
628:4,11,25 641:2
650:8,11,13
658:13
**agreement** 523:20
592:13 625:12,19
634:16,25 660:6
**agrees** 628:22
**ags** 571:18
**ahead** 549:19
551:25 572:6,7
592:23 618:5,19
650:3 672:7
**airlines** 542:9
**akratenstein**
495:18
**alert** 574:19
**alive** 618:7
**allied** 545:6
**allow** 664:8
**allowed** 518:2
664:2
**alter** 522:12
**aluminum** 542:24
**amanda** 496:4
500:4 566:20

[amanda - available]    Page 4

638:17 672:8
674:22 681:6
amanda's 674:4
amc 578:12
america 501:1,3,5
501:8 502:13,17
542:8 582:25
588:15 599:12,14
599:18,21 680:25
american 544:16
amount 504:7,8
526:3,9,21 527:1
538:3 560:22
606:1,17 647:2,9
amounted 631:23
amounts 522:20
522:21 528:1
561:1 625:1 656:7
659:2
amr 537:23
538:18 540:5
542:20 549:2
572:22 573:3,10
575:19,22,22
577:8,13
analyze 661:8
analyzing 661:18
andrew 495:13
499:24 652:19
678:21 681:17
anger 678:4
angry 638:23
639:2,4
ann 495:12
annette 568:10,10
568:13 575:17
614:14 617:9
662:12 668:17
670:24
annette's 560:11
670:23

annual 632:13
answer 500:23
548:7 551:23
553:3 556:15
583:23 584:15
585:5,7,11,19
587:2,4 609:14
610:2,18 630:22
635:2 639:12,20
664:7,14 665:11
669:10
answered 588:20
answers 579:7
682:6
anybody 522:1
643:19 644:9
670:20
anyway 644:14
apart 653:8,8
apartment 625:16
625:21
apologize 504:25
653:4
apparently 670:17
appeal 677:23,24
appear 509:7,7
527:2 549:25
552:21 569:22
597:4 607:4,5
652:23 678:8
appearances
495:1 496:1
677:13
appeared 502:4
602:13 613:11
appears 500:18
524:22,25 539:15
539:22 557:24
645:9,10,11 647:8
649:19

applicant 494:6
499:12,14
approximately
499:8
april 515:16
582:14,20 584:11
587:2
arb 571:20 590:25
arbitrage 515:25
617:22
area 511:12 617:6
areas 566:21
arose 595:8
arrangement
531:17 611:6
arrangements
532:5,6 588:24
arrest 625:15
arrested 676:13
asha 511:19
aside 558:1
asked 520:23
523:22,24 579:8
579:12 582:10
583:10 584:10
585:3 587:2 614:2
628:19 635:1
640:1,7 665:2,9,12
666:8 669:24
672:8 673:7
677:22 678:20
679:4
asking 546:19
577:18 585:9,18
593:25 604:18
616:8 624:21,23
629:24 630:17
631:9 634:1,6
636:9 637:11,19
639:11,14 664:9
666:15 668:22,23

668:24
asks 681:15
aspect 640:19
assigned 541:22
assist 683:9
associates 495:11
assorted 504:4
assume 559:3
560:11 568:12
585:17 604:21
612:13 621:18
635:25 637:6
647:3
assuming 574:6,6
595:7 598:9
604:14 607:21
613:12 620:3
624:15 627:9
653:11
assured 580:4,8
atd 570:3
attach 683:12
attached 595:14
attention 620:9
attorney 625:12
625:17
attorney's 625:6
625:14,23
attorneys 499:20
643:12,12,25
676:15
august 624:5
authenticate
579:21
automated 539:4
539:6 675:8
automatic 580:18
automation 539:2
676:4
available 530:6,10
567:20 674:11

[available - bills]                                                        Page 5

676:5,14
avenue  495:6,15
average  534:13
  657:24 658:1,16
  661:11
aware  510:9,23
  585:6 639:18
  642:16
ax  642:10

**b**

b  495:13
bach  538:19
bache  538:22
  544:17
back  504:17
  515:15 528:12,19
  529:4,14 530:2
  534:2 541:8
  548:10 552:10
  556:22 573:2
  577:6 579:23
  582:3 587:20
  589:4,6 601:10
  602:2 612:16
  615:12 619:10
  628:7 631:24
  632:5,20 633:5,8,9
  635:21 636:21
  639:13 670:10
  677:9
backdated  614:19
backdating  614:22
  614:22,24 615:17
  615:20,23 616:2,3
background  512:2
baker  496:6 500:2
  500:4
bakerlaw.com
  496:10
balance  504:6
  519:7 537:15,19

538:2,13 539:11
539:17,20 543:21
543:21,25 544:23
550:21,21 563:9
563:11 574:15,16
574:17 577:8
580:15 594:21,22
594:25 597:15
598:10,11,12
646:24 647:3
balances  597:8,13
balancing  563:5,8
  574:14
bank  500:20,25
  501:3,5,8 502:13
  502:17 531:18
  532:8,15 533:20
  560:22 563:1,17
  582:24,25,25
  583:2,3,3,4 585:23
  588:4,14 589:10
  589:16 591:9,11
  593:14,14,18
  595:10 599:11,13
  599:18,20 607:17
  607:20,22,25
  608:7 609:5,10,15
  609:24 641:25
  647:4 667:24
  673:19 674:9
  677:10 680:25
bank's  502:2
  570:15 589:25
bankers  583:1
bankruptcy  494:1
  499:17 644:6
banks  501:14
  532:9 548:25
  560:15,21 563:16
  563:18,24 564:9
  565:5,16 569:2

572:1,25 573:9
574:10 576:9,10
576:13,14,18
577:15 578:13
582:10 583:9,12
583:16,18 585:3
585:19 587:19,20
587:23 588:3,9,22
590:1 591:11
609:18 675:21
barney  557:8
based  539:7
  595:11 609:2
  615:2 643:21
basement  678:14
basically  518:11
  521:7 529:13
  667:7 673:12
basing  644:3
basis  501:7 504:14
  508:22 514:5
  566:21 598:16
  646:4 664:14
  669:23,23
bates  525:4 652:2
  657:14
bear  529:6,14
  530:15 532:7
  591:12 672:24
bearing  500:19
beats  554:3
began  628:2,9
  629:2 632:12
  635:16 636:23
  637:2,3,21,24
  638:13
begins  582:4
  636:22 670:11
behalf  494:17
  495:3,11 496:3,12
  499:23,25 500:3,5

500:6
believe  501:6
  506:11 508:11,17
  510:9 518:5
  520:22 522:24
  526:14 530:21
  551:14 552:13
  559:24 561:11
  568:10 588:2
  625:13 643:7
  646:5 652:12
  670:20 674:22
bell  588:16
benchmark
  618:25
benefit  621:9
  673:3
bernard  494:8,12
  494:16 497:2
  499:14,19 500:11
  555:13 582:5
  670:7,12 681:20
  683:14
bernie  500:24
  526:13 633:15
  644:2 665:11
  678:3,19
best  683:16
better  534:18
beyond  551:5
big  558:9
bigger  644:1
bill  526:25 532:13
  565:1 566:23
billion  526:5,9
  527:9,10,21 528:1
  562:13 672:12
bills  525:15 672:9
  672:13,18 673:10
  673:20 674:13,14

**[bit - cash]**                                                                                      Page 6

bit  522:18 528:11
   540:6 554:4
   631:19 647:14
blacked  627:13
blank  650:4
blm  612:11,12
blmis  528:12,15
   531:21,23 613:18
blotter  497:19
   498:15,17 505:19
   611:21
blotters  497:14
   502:21 510:3
   612:9,25
board  518:17
bob  496:20 499:6
bond  508:12,21
   509:12,17 518:7,8
   531:16 542:6,7,10
   542:11 552:4,8
   591:24 592:6,12
   592:19,24,25
   593:1,7,10,17,18
   593:22,25 611:4
   617:22 679:6,7,7
   680:8
bonds  509:17,18
   509:18 552:15
   593:9,13 597:1
   679:10,12,16,21
   680:11,20,21
bongiorno  568:11
bonuses  655:14
books  575:3,7
   599:3
bore  591:21
borrow  518:11
borrowed  631:24
bottom  565:4
   568:20 569:1
   572:23 573:1,10

578:12 596:23
   604:23 605:19,24
   607:14 608:1
   612:8,18 626:14
   626:15 647:8
   679:6 680:1,6,8
bought  504:7
   505:4 526:20
   533:6 549:4,4
   551:11 574:18,25
   575:11 589:7
   601:24 602:11
   671:19
box  614:12 619:10
   619:14,23 620:8
   676:24
boy  642:16
brain  584:3
break  519:19
   564:14 574:16
   579:3 581:23
   584:5 617:4
breathing  648:25
brief  678:23
briefcase  653:22
broadcom  623:2
broken  563:11
broker  503:12,12
   509:10,10 521:18
   522:10 548:23
   581:17 589:9
   592:4 609:24
   615:16
brokerage  506:6,9
   506:17,20 521:16
   522:3,4 523:7,10
   526:22 529:10,13
   531:18 532:5,13
   533:7,16 538:23
   549:7,13 588:22
   590:1 591:12

671:19 675:10
brokers  504:2,4
   581:14
brook  496:15
brother  542:23
brother's  547:17
   547:18
brothers  550:23
   551:8,8
brought  504:3
brown  587:10
building  678:14
bunch  680:3
business  503:7
   512:18 516:19
   517:14 520:11,13
   520:19 523:23,23
   532:19 536:1,4
   542:14 553:24
   590:11 602:8
   628:2,9 629:1,2
   631:6,12,20 632:5
   635:19,24 636:12
   636:23 637:2,4,13
   637:15,22,25
   638:4 639:18
   640:6 646:7,10,14
   655:17,23 660:3
   661:12 672:16
   674:24
businesses  552:12
butner  494:21
   499:9,11 582:5
   670:12
buy  514:6 516:13
   516:14 518:1,2,15
   533:15 562:12
   589:13,17 591:17
   591:19 592:18
   602:20,20,24
   615:5 672:15

buying  514:21
   597:8 599:19,23
   603:3
buys  504:2

                 c

c  682:1,1
c&s  580:2 670:18
   675:19
calculate  660:9
calculation  658:13
   659:13
calculations  658:8
   660:11
call  504:5 580:10
   580:15 589:14,16
   620:12 645:19
called  509:8
   645:15 656:1
capability  528:13
   528:19 529:4
capacity  547:20
   601:1,8
capital  516:7
caption  499:12
   682:5
care  581:15,17
carl  613:20 614:3
   614:4,11,18 616:8
carolina  494:21
   499:11 582:5
   670:12 682:2
case  499:13,16,18
   524:10 635:4
   642:13 644:3
   648:16 682:11,13
   682:14,17
cash  498:14,16
   518:13 611:20
   612:24 647:2,3
   673:18 674:11
   675:13,19 679:20

[categories - closing]                                                    Page 7

| | | | |
|---|---|---|---|
| **categories** 508:4 | 562:5,9,12,17,24 | **chase** 583:2 | 530:23,25 531:5 |
| **category** 647:22 | 566:8,19 567:5,12 | 588:11,12,13 | 531:17,19,20,23 |
| **certain** 503:13 | 567:19,24 569:15 | 672:25 | 531:25 532:7 |
| 512:6 514:13,20 | 569:18 571:5,8 | **checks** 646:18,19 | 533:19 534:8,11 |
| 516:5 530:6 | 572:16,19 577:17 | 655:15,16,18,25 | 534:12 539:3 |
| 532:13 533:2,3 | 577:21 578:2,7,10 | 656:3,9 660:24 | 548:25 560:15,21 |
| 541:6 548:13 | 579:8,12 585:3 | 661:20 | 560:22 562:25 |
| 588:25 593:11,13 | 586:12 587:7 | **chemical** 583:2 | 563:16,18,24 |
| 593:13 615:12 | 595:1,5 597:19,22 | **chicago** 533:19,21 | 564:9 565:5,16 |
| 629:15 642:17 | 603:13,21 605:10 | **chin** 677:14 | 569:2 570:15 |
| 658:5 660:17 | 605:12 608:22,23 | **choose** 609:14 | 572:1,25 573:9 |
| 661:8 669:12 | 618:10 626:8,13 | **chrysler** 568:17 | 574:10 576:9,10 |
| **certainly** 524:9 | 627:1,18,22 | **civil** 683:4 | 576:13,14,18 |
| 563:22 567:8 | 633:14 641:10 | **claimed** 640:6 | 577:4,15 578:13 |
| 609:1 617:18 | 648:8 661:1 663:7 | **claims** 636:5 | 580:13,16 582:11 |
| 634:13,19 635:21 | 663:14 665:3 | **clarification** | 585:25 588:21,24 |
| 641:4 652:25 | 666:2,25 667:4 | 520:23 | 589:2 599:3 600:1 |
| 656:10 661:2,3 | 668:13 670:3,5,14 | **clarified** 524:15 | 608:11 609:10,24 |
| 666:20 | 672:8 673:22,24 | 528:7 | 610:8,19 611:4 |
| **certify** 682:4,10 | 674:3 678:19 | **clarify** 507:2 | 636:17 675:6 |
| 683:15 | 681:5,14,16 | 512:9 523:9 567:9 | **clerk** 548:14 |
| **chairman** 534:10 | **chaitmanllp.com** | **class** 643:17 | **client** 508:7 513:1 |
| 596:19 | 495:9 | 647:12 | 554:21 581:9 |
| **chaitman** 495:4,5 | **change** 530:3,5 | **clear** 515:7 528:20 | 592:19 594:17 |
| 497:3,7 499:22,22 | 551:23 595:10 | 532:9,9 533:2 | 599:19 602:16 |
| 500:15 501:2 | 616:23 639:8 | 576:15 578:11 | 620:12 |
| 502:24 504:12,24 | 684:2,5,8,11,14,17 | 588:25 593:11,15 | **client's** 526:19 |
| 505:16 507:1,4,9 | 684:20 | 604:3 634:15 | **clients** 580:24,24 |
| 508:15 509:16 | **changed** 515:3 | 639:6 655:1 | 581:3,4 584:5 |
| 512:1,4 513:4 | 617:21,24 634:17 | **cleared** 529:18 | 586:3 628:10 |
| 514:2 515:6,17,20 | 675:3 676:3 | 531:8 534:15 | 629:5 631:10,22 |
| 516:8 517:2,5 | **changes** 683:4 | 549:5,6 591:7 | 632:5,9,9,16 |
| 519:1,15 520:2 | **changing** 550:7 | 593:9 599:15,24 | 634:21 646:19 |
| 524:21 525:22 | **characterization** | 607:21 610:23 | 669:25 673:7 |
| 526:12,16 528:22 | 630:12 | 636:16 667:22 | 674:10 679:18 |
| 529:17,22 530:22 | **characterizations** | **clearer** 561:21 | **close** 654:12,15 |
| 531:13 532:1,3 | 629:15,24 | **clearing** 503:17,21 | 673:16 |
| 536:12,15 544:9 | **charge** 682:16 | 504:10,14 505:20 | **closed** 619:25 |
| 544:20 549:24 | **charged** 667:23 | 505:22 528:11,16 | **closer** 543:7 |
| 550:10 558:10 | **charles** 503:2 | 528:20 529:6,10 | **closing** 598:11 |
| 561:10,15,20,25 | 643:24 | 529:19 530:15,19 | |

CONFIDENTIAL

clue  534:19 608:8
    649:1
clvs  496:20
code  507:18 601:1
    601:8
collapse  516:19
    517:15 631:21
collateral  679:22
collier  496:20
    499:6
column  506:15,20
    507:12 535:17
    536:16,19 537:2
    538:2 539:11,20
    543:25 544:23
    569:25 573:7
columns  536:11
    537:9 559:5
combination
    659:9
come  530:19
    540:19 617:8,11
    646:20 673:17
coming  590:14
    648:14 649:6
commencing
    494:22
commercial
    582:24
commission
    684:25
commissions
    667:13,15 668:2,3
common  513:6
    592:19 593:17
    615:1 634:22
communications
    552:4
company  503:2
    505:25 515:9
    542:25 582:25

compensated
    667:6
compensation
    657:9 661:14
competitors
    591:13
complained  677:1
    677:11,12
complete  506:19
    507:5 540:9
    549:18 571:6
complicated
    518:10
comprehensive
    556:7
computer  559:19
    675:11
computers  571:18
conceal  669:6
concept  513:14
    548:12
concern  648:11
concerned  636:13
concluded  681:25
conclusions
    629:16,17 630:18
conducted  501:9
    503:4
conference  625:23
confessed  626:22
confidential
    494:15 663:8
confirm  624:11
    650:17
confirmation
    498:11 580:12
    600:15 601:11
    615:2 622:11,15
    622:18 623:6
confirmations
    503:12,12,15,16

560:1,6 579:9,13
    579:13,14 623:12
    623:24 635:12
    636:18 666:19
    675:13
confused  540:6
    601:25 602:1
confusing  523:14
    532:20 534:14
confusion  510:17
conjunction
    655:22
connection  621:23
    622:11
consecutive  652:2
consider  664:2
consideration
    516:5
considerations
    621:8
considered  521:14
    554:5,19
considering
    643:16 644:24
    655:14
consistent  671:3,9
consistently
    521:24
constantly  669:24
contacted  592:11
contents  497:1
    612:2
context  565:7
continental  550:15
    583:3
continue  499:4
    514:7 562:11
continued  498:1
continues  681:8
continuing  681:7

continuous  514:5
contra  533:6
    534:4
contract  682:12
contracted  579:23
contradicts  627:14
conv  571:18
conversation
    562:15
conversations
    499:4
conversion  591:24
    592:2,11,22 611:2
    611:6
convert  552:17
    591:24 592:21
    593:17,21 611:1
convertible  508:12
    508:21 509:12,18
    509:18 542:6,7,11
    571:20 590:24
    591:23 592:7,16
    600:24 605:14
    617:21 680:2
copies  549:25
    676:8
copy  505:1 558:9
    572:11,11 626:8
    652:7,17 668:10
    668:12
copying  651:1,2
    651:16
corp  530:23
    537:23 538:18
    539:2 540:5
    550:15 552:4
    557:17 572:22
    573:3,10 575:19
    575:22,22 577:8
    577:13 680:2,8

CONFIDENTIAL

[corporate - customers]    Page 9

corporate 581:21
corporation 494:5
  499:14 503:17,21
  504:11,15 505:20
  505:22 530:19,25
  531:6,19 534:11
  534:12 580:16
correct 502:8,9,18
  505:10,23 507:19
  512:12,15 513:25
  516:12,17 517:9
  522:23,24 523:3
  525:21 527:4
  528:2,17 529:8,12
  529:16 530:8
  531:25 532:2,23
  535:3,4,6,7,11
  536:8 537:1,8,16
  537:18 538:1,6,20
  538:25 539:8
  542:15 543:9,11
  543:19 544:5
  547:24 550:24
  552:13,18 555:8
  555:15,24 557:19
  559:5,18,21
  560:16,24 561:3,9
  562:2 564:12
  565:6,14,18
  568:19 569:7
  570:14 571:19
  573:8,12 575:25
  577:5,10 578:21
  579:19 582:12
  584:14 591:5
  596:9 601:6
  607:15 610:20
  611:15 618:13
  619:1 621:16
  624:1 626:23
  629:25 647:11,21

654:23 657:16
  660:4 668:8
  672:14,17 673:1
  674:20 676:9
  682:9
correction 499:10
correctional
  494:20
corrections 683:9
  683:18
correctly 637:7
correspondence
  614:15
cost 669:23
counsel 495:1
  496:1 499:12
  682:14
counter 509:14,19
  509:21,25 513:8
counterparties
  551:17 556:4
  557:5,23 671:22
counterparty
  551:13,14 553:1,2
  557:1,20 563:2
  565:10 569:5,5
  570:23 572:4
  573:15,17 589:9
  610:12
county 555:10
  679:5,6,7 682:3
couple 520:8
  528:12 537:9
  565:20 596:10
  599:8 605:23
  613:7 626:24
  632:20 635:6
  645:5 654:15
  665:5 667:2
course 503:7
  514:15 517:22

524:1 536:1,3
  580:22 615:19
  640:13 646:7,13
  665:24 681:16,16
court 494:1
  499:17 500:8
  522:15 677:13
cover 657:8,13
  682:16
covered 515:14
  516:25 566:23
  620:1
covers 588:8
credit 595:23
credits 595:18
crime 669:7,9
  676:20
crisis 649:6
cross 566:25 567:3
  567:23 681:14
crupi 645:22
cure 674:4
current 537:17
  598:5,15
cusip 527:1
custodial 583:10
  583:13,18 584:7
  585:4,10,19
  675:22
custodied 563:19
custody 679:13,13
customary 682:17
customer 497:22
  506:7 509:5
  512:19,20 514:12
  514:13 515:2,7,12
  515:22 516:3,21
  517:8,12 518:1,22
  518:23 522:20
  523:1,4,11,25
  524:2,23 525:3,7

525:12 526:2
  527:8,11 533:12
  534:6 540:17,18
  540:19 554:9,11
  554:14 559:10,13
  560:1,5,6,14,18,19
  561:4,6,22 562:19
  562:21 568:20,23
  569:9 570:5,8,11
  581:9,14,15
  585:10,22 590:25
  594:16 596:23
  597:7,7 598:9,24
  600:4,15 601:12
  601:20,24 603:4
  605:19 609:12
  615:6,8,18 622:12
  622:21 624:7
  640:8 648:2,6
  669:22 671:6,11
  671:12 672:19
  673:16
customer's 508:24
  517:11 518:11
  674:8
customers 494:17
  495:3 497:13
  517:18,21 519:13
  521:4 533:25
  534:9 571:22
  573:3 580:24
  583:11,14,20,22
  584:1,8 585:5,14
  585:20 586:19,25
  599:23 603:18
  604:10 613:18
  614:19 616:9
  632:13 635:11
  669:23,23 672:2
  673:4 674:19

[cycles - described]                                                                 Page 10

cycles  675:6

**d**

daily  497:24
  504:14 508:21
  536:6 543:23
  544:25 646:4
  679:3
daimler  568:17
dasaro  496:5
  500:2,2 566:2
  581:24 603:11
dash  537:25 543:4
  543:8,10 555:13
  623:22,25 657:23
data  567:10,11,19
date  499:7 506:3
  509:23 519:10
  527:1,16 528:6
  530:23 531:5
  535:22 538:8
  539:5 540:3
  543:24 545:17,19
  545:24 558:12
  566:12 572:16
  577:13 578:18
  600:16,19 603:22
  606:6,25 607:3
  615:2,12 616:4
  622:1,14,17,24
  624:2 626:14
  645:11 646:23
  647:10
dated  524:25
  608:14,15 647:23
dates  621:8 622:23
  624:17,24 633:22
  633:24 636:12
  652:10,13 654:15
  680:17
david  543:8
  640:20

davis  495:4 499:22
day  494:21 503:15
  504:6 515:15,19
  516:23,25 531:23
  539:23 543:17
  544:4 548:4
  566:22,24 567:3
  567:13,15,25
  587:24 608:20
  615:9 640:21
  653:16 656:13
  662:24 663:19,20
  663:20 682:18
  684:24
days  528:12
  608:20 626:22
  653:7
deal  532:14
dealing  532:18
  533:7,9,18
deals  661:19
deb  571:18
debenture  680:3
debit  519:7 594:22
  594:24 595:5,23
debits  595:18
debtor  494:13
debts  517:21
decades  529:25
december  506:3
  506:22 507:24
  524:25 525:8
  527:8,13 558:16
  561:5,6,12,18,22
  624:3 625:24
  648:16 656:13
  659:21 660:15
decide  665:1
decision  510:25
  511:1,2,3 615:11
  655:21

decisions  511:15
  616:24
deducted  667:22
  668:4
deem  621:7
defendant  494:9
  499:15
defendants  499:23
  500:1
define  520:8
  521:12
defined  520:25
  552:10
definitely  632:18
definition  518:22
  523:16
deliver  522:5
  528:13 529:5,15
  534:7 589:9
delivered  595:13
  676:24
deliveries  595:11
delivering  530:3
  611:3
delivery  589:5
demand  516:21
  517:8
demonstrate
  676:19 677:4
denise  494:18
  500:9 682:22
department
  511:14,15 540:10
  560:12 580:10,11
  602:24 646:21
  675:16
depended  675:5
dependent  593:9
depending  532:11
  533:7 549:3
  554:18 580:13

589:14 590:17
  591:10 592:17
  593:15 595:16
  617:9,19,20
  619:25 634:10
  667:24 676:3
depends  503:10
  509:2,17 510:15
  518:6 521:11
  526:7 531:15,17
  532:4,18 533:5,8
  533:16,22 534:3
  575:11 580:17
  581:6 585:11
  589:10,23 590:12
  591:8 602:10
  609:13,15,24,25
  610:1 615:24
  616:21 618:6
  667:20 676:2
deponent  496:12
deposition  494:16
  499:9 516:23
  517:1 582:4
  584:11,12 651:24
  662:17,22 663:3
  663:15 666:1
  670:7,11 681:7,20
  681:23,24 682:5
  682:16 683:5,6,15
  683:16
depositions  567:14
depositories  530:6
  530:10
depository  505:25
  525:20 526:21
  531:6,10 576:15
deposits  648:2
describe  679:17
described  671:10
  672:21

describing 680:22
description 600:22
606:13
desire 683:5
desires 669:2
details 591:22
determined
661:21
development
632:4
died 614:5,9
difference 522:8
531:9 532:25
586:14 596:14
different 508:16
510:22 521:17
524:19 527:18
533:14,15,19
545:22 547:2
548:1 549:3
554:15 557:23
562:14 576:13,14
585:7,8 586:13
587:4 590:16
597:13,14 598:1,8
604:22 605:23
608:10 623:10,12
623:13 624:17,18
624:19,24 625:1,3
660:17 668:20
675:10 680:16,17
difficult 534:22
dipascali 575:13
direct 589:25
590:2
directed 617:14
directing 664:13
direction 618:3,11
621:12 665:1
682:7

directly 536:19
disc 670:7,11
disclose 664:19
disclosed 516:9
discretion 621:16
discs 681:21
discuss 663:23
666:5,7
discussed 528:11
608:12 663:4,25
666:7
discussing 637:11
637:13,15
discussion 571:2
594:13 615:10
681:6
discussions 617:1
664:3,12,12,16
dispute 615:18
distribution 568:9
district 494:1
499:17
divided 658:10,20
659:23
dividend 581:20
doctor 653:1
document 498:19
500:17 502:25
505:18 506:2,4,9
506:18 509:25
525:4 530:21
535:2,19,21 547:4
547:9,10 549:9,14
549:20 558:1
559:1 569:12,19
572:17 577:18
594:8 596:11
599:17 600:1,12
600:14 604:3
618:16 627:3,10
627:16,19,24

632:20 641:17
645:4 647:23
648:1,19 649:9,20
651:9,21 652:16
652:21,22,23
653:1,6,20,20,23
653:25 654:1,10
656:7 679:1
documentation
503:7
documents 511:10
534:24 541:9,10
549:11 567:6,10
603:15 611:9
612:1,2 621:21
651:23 664:10
665:7,13,14,17,19
665:23 666:10,17
666:18 668:23,24
669:3,4,12,16,18
669:20,22 671:24
675:1 676:16
678:6,7,8,11 681:9
681:10,14
doing 508:12
512:14 532:12
553:17 554:2
555:5,6,23 556:2,3
556:17 573:24
591:14,15,22
592:7,16 598:19
615:8 617:23
619:22 642:20
644:13 647:13
dollar 504:8 520:2
dollars 515:9,12
527:10
double 651:22,25
652:5 653:3,5
doubt 510:4

dozen 628:10
629:5
draw 658:24,24
659:2,4,5,7,8,9,11
659:11,15,18,18
659:19,20
drawer 655:19
656:1,3
draws 661:5
drew 659:5
drink 519:22
644:23
dropped 619:6
dtc 505:24 525:18
526:22 527:3
530:5,17 531:2,9
531:19 532:22
533:1,2 539:9,12
539:17,25 548:16
548:19,19 550:22
551:3,5 557:24
564:3 575:22
576:4,4,6,8,23
577:2,2,9 578:19
584:1 586:4 590:3
675:7
dtcc 636:16
dubinsky 521:23
534:18 592:9
601:25 615:22
643:4 649:1
dubinsky's 641:21
due 527:1 565:1
621:8 641:11
655:24
duly 500:12

**e**

e 496:4 682:1,1
683:1,1,1,3
earlier 548:9
573:20 575:24

[earlier - expert]

579:8 588:3
609:19 618:23
625:5 638:6
662:25
early 559:2 634:14
647:16
earnest 635:16
easier 566:18
easy 669:9
ebay 619:6
economic 516:19
eight 576:14
678:13
eighteen 611:16
either 534:19
580:12 592:21
615:7 622:20,22
647:17 659:4
665:13 670:23
674:9,25 679:18
679:21
eliminate 534:2
eliminated 503:13
else's 547:13
630:18
embarrassed
640:1
embarrassing
642:21
emery 495:14
499:25
employee 670:24
employees 657:10
657:11,11 659:3
661:4,16
encompass 608:19
encompassing
552:11
ends 555:10
611:14

engage 637:2,4,24
engaged 637:22
engaging 635:16
english 636:3
entailed 633:10,17
enter 516:24
entered 683:6
entire 517:14
631:10,22 637:4
637:25 638:4
entities 589:1,3
entitled 568:3
581:20,20
entity 576:23
591:9 607:16
entries 565:15
607:24 608:6
entry 542:8
557:16 560:14
565:4 569:1
570:15 573:9
eom 671:6
equal 561:1
563:13 658:8
equals 601:8
658:16,20
equivalent 526:21
errata 683:12
error 574:20
615:3,7,8,14
esq 495:4,13 496:4
496:5,13
essence 512:20
essentially 633:20
event 620:2,5
eventually 589:6
591:25
everybody 505:2
510:22
evidence 669:6
682:9

evidencing 503:8
exactly 504:17
509:6 531:4
676:24
examination 497:2
500:14 520:4
567:3,23 579:4
582:7 667:3
678:24
examine 566:25
681:14
examined 500:12
example 501:16
504:3 532:12,16
533:16,18 534:6
541:21 544:13,15
545:5 549:13
574:24 586:2
588:4 598:20
627:10 634:20
650:24
exception 683:17
excerpts 566:3
exchange 509:20
513:9 592:15,23
592:25 593:18,21
611:4 668:2
exchanging
675:12
excuse 501:2
561:13 569:17
638:25
executed 507:22
667:21
exempt 593:4
exemptions 516:6
exercise 524:11
655:9 660:23
exhibit 497:14,16
497:18,22,24
498:3,5,7,9,11,12

498:14,16,18,20
500:18 501:17
502:12,20 504:22
504:25 505:14,17
524:16,20 527:6
535:12 558:4,8
566:10 569:13,16
571:4 577:7,21,22
578:3,7 594:3,15
595:3 600:9,11,13
603:6 606:9,10,17
606:18,19 607:5,6
607:12 610:4
611:11,24 612:5
612:16 618:16
620:20 621:23
622:11,22 623:7
623:16 624:2
626:5,11 644:25
645:4 668:10,14
670:15 671:5,24
679:2,23
exhibits 497:12
498:1 571:6
621:22,22
exist 504:2
existed 530:25
678:11
existence 513:15
523:10 530:18,19
531:19
existing 517:12
expand 518:15
expansion 635:17
635:24
expect 639:20
expenses 667:14
experience 512:18
expert 521:21
642:2,24 643:2,21

CONFIDENTIAL

[expired - firm]

expired   673:14
expires   684:25
explain   513:4
  523:22 524:5
  544:19 552:24
  601:18 639:21
explained   615:23
  636:11
explaining   574:14
express   544:16

**f**

f   682:1
face   616:3,5 643:1
facilities   588:21
  588:21
facility   499:10
  533:20
fact   507:10 512:21
  513:10,17 514:19
  516:8 523:12,19
  524:4 525:24
  533:2 542:6
  562:21 566:23
  567:5 573:23,23
  588:25 592:23
  620:2,3 636:2
  637:13 639:8,16
  641:11 653:2
  655:18 657:7
  673:9 677:22
fair   511:6 513:22
  516:10 518:21
  668:7 673:15
  675:23
fairlawn   496:14
fake   521:9,25
  522:16
false   641:24
falsely   632:12,16
  632:17

familiar   534:13
  535:19 588:10
  599:2 609:17
  666:13,14 675:18
family   616:16
  617:6,7 618:8
  628:10 629:6
  632:9 661:15
far   548:12 557:7
  636:12 669:21
fargo   505:5
father   618:7
  631:25 632:3
fbi   640:22
federal   494:19
  499:10 518:1,17
  683:3
fee   609:25
feel   534:18
feeling   663:6
fein   496:4 497:4,6
  500:4,4 502:22
  503:9 506:24
  507:3 508:14
  509:15 511:25
  513:2 514:1,22
  515:14,18 516:22
  518:24 519:17,21
  520:5 524:18,22
  526:1,15,24
  528:25 529:3,18
  530:1 531:14,21
  535:15 536:14,16
  550:2,6,11,14
  553:23 554:1
  556:16 558:6,11
  561:13,16 562:2,6
  562:11,15,18,25
  563:7 564:17,20
  564:25 565:19,25
  566:3,6,9,15,17

567:1,9,15,22
568:1,2 569:11
570:25 571:3,7,9
571:11 572:14,20
572:22 576:2
577:19,22,25
578:6,9,11 579:2
582:8 584:18,20
584:23,25 585:2
587:12,16,18
594:2,7,12,14
595:3,6,9,20,25
596:2,3,21 597:21
597:23 600:7,11
601:9,12 603:8,14
603:23 604:2
605:11,13 611:8
611:15,17,19
613:3,6 616:12,15
618:18,20 621:15
621:20 622:7
626:7,10 627:15
627:21,23 628:6,8
628:14,19,24
630:1,3,6,15,20,24
631:3,16,18 634:1
634:6 635:9
638:20,22 640:10
641:8,13 644:15
644:18 645:3
648:15 651:18
652:1,4,12,25
655:5 661:6,10
663:13 664:13,20
664:23 665:2,16
665:22,25 666:22
668:12 673:21
674:1 679:1
681:12
felt   617:8 619:20
  620:6 631:23

641:18
fiasco   640:18
  643:11
fictitious   643:15
  644:5
fidelity   526:23
  575:2 672:23,24
figure   519:6
  534:20,21 556:7
  564:24 597:14
  598:18 646:24
  657:2 658:11
figures   597:25
files   652:7
filler   565:8 572:3
  573:15,17 574:5
financial   513:11
  514:25 517:15
  527:3 580:25
  648:5
financially   677:5
  682:10
find   509:22 510:5
  516:20 525:18,19
  525:25 541:13
  545:13 546:12
  554:25 606:20
  619:4 657:18
  663:11 677:17
fine   519:20,24
  535:1 564:16
  608:25 610:3
  629:23 630:17
finished   569:11
firm   501:4,6,10,18
  503:4 504:13
  505:9 506:17,21
  506:22 507:8
  508:1,19 509:2,10
  510:2,7,15 511:2
  515:21 516:2

CONFIDENTIAL

[firm - general]                                                          Page 14

521:17 522:4,4
523:3,7,10 525:21
526:22 528:2,16
528:18,20 529:3,6
529:9,10,13,19,19
531:18,23,25
532:19,20 533:7
533:17,19,20
538:23 540:4
541:21 543:2,5
544:2 546:16
548:3,13 549:2,7
549:13,15 552:12
554:19 556:2
577:4 580:18
583:24 585:21
586:16 588:24
589:21 590:15,18
591:20 603:15
610:8,19 614:25
615:4,4 636:17
641:24 642:1
644:1 646:6 648:5
648:11,12,12
649:2,4 655:16,22
658:5 659:1,7,25
660:6,9,13,25
661:9,10,11 667:6
675:15 676:15
679:9,16 681:1
**firm's** 508:25,25
510:23 539:17
545:6,15 547:22
554:6 574:25
602:14 679:13
**firms** 506:6,9
507:17 528:11
529:10 530:15
531:20 532:5,6,7
532:14 533:16
582:17 583:6

588:22 590:1
591:12 669:19
671:19 675:4,8,11
676:5
**first** 500:12
506:15 515:15
536:14,16 537:22
568:14 570:2
571:17 577:8
587:8 595:3
602:12 606:10
608:3 621:1
622:15 625:13
626:14,15 628:1,8
628:16,17,19,22
628:25 633:9
635:10 636:23
637:1,19,21 645:5
645:6,9 646:23
649:8,9 650:24
651:6 655:2 656:7
657:23 671:4
676:13
**five** 502:21 512:21
520:16,18 536:6
540:24 542:9,14
548:1,5 552:11
553:23 576:12
578:3,8,20 590:11
659:11 679:3
**flip** 650:3
**floor** 668:1
**flowed** 600:2
**flowing** 595:17
**flows** 598:12
602:21
**focus** 515:11
660:10
**focusing** 524:12
**follow** 596:8 649:8

**followed** 620:14
**following** 631:21
683:18
**follows** 500:13
**fool** 644:10
**foregoing** 682:4,8
683:15
**form** 511:25
525:18 528:22
529:17,22 532:1
534:16 544:9
556:10 561:25
563:4 576:1 587:5
596:19 613:1
616:14 618:4
619:17 621:14,17
639:3 645:10,13
646:16 648:8
661:1 683:4,10
**format** 594:19
**forms** 554:21
**forth** 534:2 590:3
655:25
**forthright** 634:15
639:7
**fortune** 515:9
**forty** 660:2
**forward** 551:25
594:21 646:24
649:18
**found** 510:11
651:10,23 653:2,5
653:20,23
**founder** 534:12
**four** 542:9,25
549:21 552:1
560:25 632:19,21
633:4
**fourth** 680:7
**frame** 527:20
530:13 555:6

575:4 623:13
676:2
**frank** 575:13
**frankly** 635:5
675:17
**fraud** 564:5
628:13 631:7,12
633:10,17 635:16
635:22 637:4,24
638:13 642:11,12
644:4,5
**fraudulent** 635:18
635:25 636:4,6,8
**free** 617:8
**friendly** 617:7
**friends** 628:11
629:6 632:10
**front** 520:9
**fulfilled** 502:7
**full** 566:2 627:16
678:2
**fully** 566:24
**functions** 582:11
**funds** 633:11,11
633:18,18 648:21
**furnish** 683:11
**further** 519:15
582:7 667:3
678:20,24 681:8
682:9
**future** 506:25
671:2

**g**

**ga** 521:21
**gain** 619:24
**gains** 619:24
**gao** 641:19,19,20
641:23
**general** 504:1
523:23 528:24
532:17,19 549:8

[general - held]    Page 15

563:22 649:20
663:5 669:14
672:2 676:1
**generally** 505:22
604:18
**generated** 501:4,4
501:6,18,23 505:9
508:19 559:16,22
559:25 560:2,3
668:7
**george** 601:13
605:20 606:11,18
**getting** 534:25
642:3
**give** 504:8 529:25
541:19 589:8
593:2,23,24 648:1
648:4,7,9 677:15
**given** 664:18
670:2 682:9 683:7
**gives** 615:5
**giving** 588:9
**glad** 528:7
**global** 516:19
544:2 548:11
590:22
**gmail.com** 496:17
**go** 499:5 523:19
535:16 537:9
538:17 539:12
541:8 544:15
551:25 564:24
565:19,24 572:13
577:6 587:20
591:18,25 592:4,4
592:23 602:20
607:11 612:16
618:4,19 620:8,9
631:17 632:20
633:5 635:21
639:12 644:23

649:18 656:4
664:4 665:1 672:7
676:11,19 679:19
**goddamn** 678:6
**goes** 603:1
**going** 502:19
504:24 522:19
524:11,18 528:25
535:8 538:7 548:3
558:7 562:11
564:7,13,15
565:21,25 567:11
571:3 577:6
581:25 592:21
593:18 603:8,9
604:22 610:25
611:1,9 613:6
616:13 619:24
620:9 626:4,4,24
627:11 628:12
629:12,23 630:3
635:6 648:24
655:9,17,23 660:3
660:24 663:24,25
664:7 665:9 670:8
677:2,2,3,24
678:21 679:23
681:17
**goldman** 496:13
497:5 500:6,6,23
519:22,25 520:3
532:8,16 553:21
553:25 557:18
566:12,16 579:5
581:22 584:17,19
602:21,24 603:1
628:7,12,18
629:12 630:2,5,9
630:16,22 631:2
631:13,17 633:21
633:24 634:4,8

635:8 638:17,21
641:6 644:16,21
652:15 662:21
663:4,10 664:6,24
665:11
**good** 500:16 520:6
520:7 579:2
617:12 627:4
638:15 640:16
674:4
**great** 509:20
**grew** 659:25
**grind** 642:10
**guaranteeing**
504:10
**guess** 521:22
555:25 585:6
610:21 618:1
665:5,14 677:12
**guilford** 682:3
**gun** 639:23
**guys** 663:23

**h**

**h** 511:20 683:1
**half** 526:5,9 647:8
671:4
**hand** 507:12
526:10 559:13
570:9 573:6
600:12
**handing** 524:19
**handle** 608:11
611:2,3 614:14
648:13
**handled** 575:9,10
575:15 580:1,9,9
599:3 614:7
**handling** 524:10
575:14 590:17
**handwriting**
558:22 612:14,22

645:24 649:11,13
649:19,20 650:1,5
650:6,8,11,13,18
652:18 653:13
654:5,7,9 655:7
668:14,21 671:25
**handwritten**
612:8,21 645:10
649:7 654:2,3,20
655:3 656:11
**hang** 618:17
663:25
**hanover** 583:1
**happen** 565:13
620:13 648:10,25
670:1 678:18
**happened** 615:22
616:24 619:16
620:5,17,18 639:9
639:12,14 651:22
**happening** 636:12
**happens** 503:23
**harvester** 605:3,8
**hchaitman** 495:9
**he'll** 630:22
**head** 656:21
662:15
**headings** 535:17
569:25
**health** 648:5 681:8
**heard** 629:14
**held** 499:9,16
525:15,16,20
526:20 528:2
531:10,14 532:22
535:6 543:22
544:24 546:6,23
546:24 548:16,18
548:19,19,23,24
548:24 550:25
551:5 556:5 557:3

[held - information]    Page 16

| | | | |
|---|---|---|---|
| 563:3 575:22 | hour  663:22 | 662:19 680:13 | **immediately** |
| 576:4,25 577:2,3,8 | **hours**  665:6 | **i** | 669:19 |
| 577:15 578:19 | **house**  497:24 | | **important**  642:18 |
| 669:4,22 672:9 | 498:3,7,9,12 | **i.e.**  635:18,24 | **impossible**  627:6 |
| 675:24 680:25 | 502:21 518:14,15 | 636:4 | **impression**  677:19 |
| **helen**  495:4 | 518:16 520:11,16 | **ia**  520:11 553:22 | **impressions**  664:5 |
| 499:22 515:14 | 520:18 536:6 | 559:10 560:5 | 664:16,17 |
| 586:12 | 540:24 542:14 | 569:8 571:22 | **improper**  512:24 |
| **hell**  677:25 | 548:1,5 549:6 | 573:3,7 600:4 | 513:20 514:16,18 |
| **hello**  617:11 | 552:11 553:23 | 603:17 604:10 | 514:23 |
| **help**  534:24 555:1 | 558:19 559:17,20 | 646:10 | **inadmissible** |
| 564:23,24 639:19 | 569:19 571:14 | **ibm**  512:21 | 627:4 |
| **helped**  531:13 | 578:3,8,9,10,20,25 | **idea**  592:16 | **inappropriate** |
| **helps**  582:16 | 580:13 590:10 | 609:14 627:7 | 630:19 |
| **high**  637:16 | 603:17,25 604:1,4 | 643:11 675:18 | **include**  587:21,22 |
| **highway**  494:20 | 604:19 672:19 | **identification** | **included**  625:19 |
| 499:11 | 679:3 | 504:23 505:15 | **includes**  582:24 |
| **hlds**  621:24 | **huh**  500:21 527:7 | 524:17 535:13 | **including**  661:14 |
| **hold**  533:1,3 553:6 | 535:18 537:13,24 | 558:5 566:11 | **incorporated** |
| 576:5 643:8 | 538:12 539:24 | 569:14 600:10 | 501:21 |
| 668:15 669:12,18 | 543:3 552:2,23 | 603:7 611:12 | **index**  497:12 |
| 671:4,6,16 672:5 | 555:12 557:11,25 | 626:12 645:1 | 498:1 |
| **holder**  533:11 | 558:14 559:11 | **identified**  500:17 | **indicate**  514:12 |
| 564:10 565:8 | 565:3,11 568:8 | 507:18 542:2 | **indicated**  505:6 |
| 569:4 570:22 | 569:24 570:18 | 614:19 | 581:10,14 622:14 |
| **holders**  529:21 | 571:24 572:24 | **identify**  499:20 | 622:17 |
| **holding**  539:16,17 | 575:21 577:11 | 505:2 546:4,5,18 | **indication**  506:8 |
| 539:25 551:9 | 582:15,22 590:6 | 548:8 583:25 | 648:20 |
| 568:6 576:17 | 594:20 596:6,15 | 586:1 | **individual**  525:12 |
| 619:6,8 633:11,18 | 597:17 598:23 | **identifying**  540:15 | 527:25 541:24 |
| 671:11 | 600:21 604:25 | **ignored**  642:2 | 626:25 |
| **holdings**  569:9 | 605:7,15 606:5,7 | **ike**  677:7,8 | **individually** |
| **home**  662:8 | 606:15 608:5 | **illegal**  512:19,24 | 678:10 |
| **honest**  643:10,15 | 609:6 611:22 | 513:5,20 516:16 | **industry**  510:7,18 |
| **honor**  514:8 | 612:4,17 619:11 | 615:20 616:5 | 522:1 534:1 539:2 |
| 522:12 | 620:21 622:13 | **illegible**  558:23 | 640:14,17,19 |
| **hope**  534:14 | 623:11 624:4,6 | **illegitimate**  521:25 | 669:17 |
| 678:22 | 628:4 636:25 | **illinois**  583:3 | **information** |
| **hoping**  619:9,13 | 650:12,21 656:15 | **imagine**  632:25 | 501:20 504:13 |
| **hostetler**  496:6 | 658:17 659:23 | 678:4 | 527:2 541:20 |
| 500:3,4 | 660:14 661:6 | **immediate**  674:11 | 601:13 648:2,4 |

[information - know]                                                    Page 17

662:12 664:19,20
669:25 671:13,13
**infuriated** 640:20
**initially** 552:10
637:2,22
**insist** 519:12
**insisted** 677:14,14
**institution** 494:20
587:10 674:24
675:25
**instruct** 511:7
664:7 677:15
**instruction** 664:18
**instructions** 516:6
589:8 620:15
670:17,20 671:1
679:19
**instrument** 589:15
**instruments**
673:12
**insult** 642:23
**intelligence**
642:23
**intention** 673:2
**interaction** 670:22
**interchangeably**
520:17
**interest** 634:22
667:23
**interested** 682:11
**interface** 580:18
**interfaces** 589:25
590:2 675:8,9,10
676:4
**internal** 580:7
589:20 590:18
**international**
605:2,8
**internet** 676:7
**interpretation**
587:12 636:1,5

**interpretations**
639:5
**interpreting**
587:15 637:7,23
**inventory** 508:8
509:5 535:9 540:5
540:20 541:1,1,5,9
541:11,14 548:21
554:13,14 590:14
593:24 594:1
602:13
**invested** 672:15
**investigation**
626:15
**investment** 494:8
499:15 520:12
540:22,23 541:16
541:17,19 542:3
543:15 545:6,15
546:13 547:3,12
547:15,22 550:15
554:6,17,18,22
602:14,16 631:10
631:22 672:16
673:3,16 674:18
**investor** 494:4
499:13
**investors** 633:11
633:12,18,19
**involve** 671:18
**involved** 510:24
511:13 515:5
518:9 533:12
595:18 634:3
654:21 676:2,20
**irving** 582:25
**issue** 529:20
566:23 631:20
651:15,16
**items** 671:6

**iv** 494:17 681:21

**j**

**j** 621:24
**jail** 676:25
**january** 500:18
502:12 621:3
622:2,25 624:8
**jodi** 645:22 646:2
653:11,13 654:17
656:19 668:17
**jodi's** 652:18
653:21 654:10,21
655:2
**joel** 540:15 543:1
544:14
**john** 585:25
**jones** 585:25
587:10
**journal** 554:16
**jp** 588:13
**jpmorgan** 583:3
589:16 647:6
672:25
**judge** 644:6
677:12
**july** 535:23 536:9
539:6 540:3
545:19 556:19
577:9,14 679:4

**k**

**k** 494:18 682:22
**keep** 510:8 538:7
539:3 552:25
564:15 620:4
646:21 653:14
673:3,13
**keeping** 589:18
**kept** 535:3 541:9
548:13 645:25
646:1,4,6,10,13

673:10 674:10
**kind** 507:25
600:13 601:19
639:1 645:25
**knew** 554:24
635:2,2 639:25
640:11,11 648:20
655:16 656:8
666:14 678:14
**know** 501:12,12
501:13,20 502:3
503:14 504:16
508:7 509:6
511:18,22 513:12
518:3,3,8 520:9
521:12 522:17
523:5,14,20 524:6
524:10,15 529:23
530:24 531:4
532:20 533:25
534:1,11 536:22
537:4,5 538:21
540:7,8,25 541:14
544:12,17,19,19
545:5,7,12 546:2,3
546:3,9,9,10,13,20
548:6,7 549:8,12
549:14,15 550:2
554:3,20,23,23
555:3 556:13
557:12,14 560:2,2
560:9 563:17,19
563:21 564:13,20
565:23 566:17
572:9 574:20
575:1,10,10,15,15
575:17 576:13,16
576:23 579:7,10
580:13 584:2
585:20,20 586:12
588:5,17 589:7

CONFIDENTIAL

[know - listed]                                                           Page 18

590:15,19,20
591:13 592:3,6,20
592:20 593:3,5,19
593:23 594:24
595:18 597:11,11
598:21 599:19
602:9,12,21,22
604:18 605:22
608:6,12,25
609:13,16,16,22
609:23 610:2,16
610:17 612:14,21
612:24 613:4,12
615:21,24 616:20
616:21,21,22
617:15,17 620:3,6
624:12 627:6
629:13,14 630:7
633:24 634:13
635:2,2 636:13
638:12,13,14
639:23,25 640:3,6
640:6,8,14,14,15
640:23 641:6,17
641:18,24 642:1,2
642:3,5,10,11,12
642:17,24,25,25
643:9,10,12,16,18
643:22,24 644:4,7
644:10,12 645:16
645:16,25 646:17
648:13,24 650:19
650:20 652:21,25
653:4 654:17
655:21 656:16,21
657:8,12 658:2
659:17,18,25
661:2,3,7,13,15
662:8 663:5
665:18,19,21
666:19,19 668:17

669:14 670:1,19
673:6,11 675:1,3
675:11,20 676:1
676:11,14,25
677:10,15,18,21
677:21 678:2,10
678:11,11,15,17
678:18,19 681:10
knowledge 683:16
known 643:25
knows 640:4 644:7
koenigsberg 613:8
613:15,17 614:8
614:10
kratenstein
495:13 497:8
499:24,24 502:23
507:10 520:22
535:14 549:22,25
550:4,8,12 556:10
563:4 564:18
565:23 566:5,7
569:17 572:12,15
572:18,21 576:1
578:5 581:23
582:10 584:21,24
585:1 587:5,14
594:5,11 595:21
596:1 600:8 601:7
603:12 611:13,16
613:1 616:13
618:4,17,19
619:17 621:14,17
622:5 626:6
628:16,21 639:3
641:15 645:2
651:20 652:3,8
655:1 663:14,17
663:24 664:15,22
665:3 666:2,3
667:2 672:7

678:22,25 681:3

l

l 494:8,12,16
497:2 499:14,19
500:11 538:3
582:5 670:7,12
681:20 683:14
laid 668:1
language 618:21
large 566:6 571:9
635:17,23 647:9
late 559:2
law 631:25 632:3
lawyer 524:5
656:1 670:1
lay 512:1
leave 664:6
ledger 509:1
576:20 671:11,12
ledgers 576:24
671:7 674:21,22
674:23,25
left 506:15,20
507:12 536:17
568:9,24 621:15
648:21 656:3
658:9
legal 499:6 500:9
521:19 523:15,17
653:17
legitimate 507:20
521:14 548:2
627:10 643:9,23
lehman 550:23
551:7,8,11,12
672:25
length 625:19
letter 619:16
621:23
letters 560:19
613:10 620:22

levy 613:22,24
614:4,11,18 616:9
levy's 614:9
liability 515:4
lie 640:21,22
lied 640:23
life 637:25 638:4
660:13
line 536:14 537:7
538:19 539:9
558:23 582:23
584:25,25 595:3
612:10 657:23
659:10,12 684:1,4
684:7,10,13,16,19
lines 543:7 553:10
605:18 606:1
653:17
lipstick 678:14
liquid 648:13
liquidate 674:13
liquidated 673:20
679:21
list 570:17 573:2
582:10,13,23
583:12,16 585:3
587:25 588:9,22
596:16
listed 522:20,22
535:22 542:13
544:3,7 545:3,4
550:3 555:11
557:3,6 559:13
560:13 563:2
565:1 568:17,21
568:23 569:2
570:2,5,9 571:17
571:22 572:23,25
573:7 575:20
577:1 578:14,15
580:6 583:8

[listed - majority]

587:19,23 594:22
595:23 596:5,17
597:3,13,24 599:6
599:7 601:12
605:23 606:25
607:13,16,25
608:18,21 609:2,7
609:11,21 622:8
626:14 656:7
683:18
**listing**  573:3
**lists**  506:21 507:17
609:19
**litt**  640:4
**little**  532:20 540:6
554:4 578:19
618:22,25 647:14
**llc**  494:8 499:15
**llp**  495:5,14
499:25
**loan**  517:24,25
518:15,19,22
**loans**  517:17,20
519:2,13 667:24
**locate**  525:25
**located**  499:10
533:17,21 591:10
**locations**  549:3
**london**  614:8
**long**  515:2 516:1
521:18 522:6,11
533:11 535:10
537:17 538:5,11
538:15 539:12,16
539:22 541:5,17
550:20 554:19
561:1 563:12,12
573:10 579:7
581:16,18 596:13
598:14 599:6,12
606:4 618:9 619:9

619:24 620:25
621:3 626:1,2
660:2 663:21
665:2 681:7
**longer**  677:9
**look**  506:23
507:11 509:1,25
510:2 513:11
534:10,23 535:8
536:11 542:4,24
545:11,17 547:4,5
553:10 564:22
568:14 577:12,18
592:24 593:20
594:8 595:21,22
596:4 597:14
601:10 603:20,23
604:23 605:5,18
605:22 606:8
609:3 612:5,6
618:15,22 620:19
621:20 623:6
626:13,24 631:18
632:19 641:17
642:6 643:1,18
644:10 645:4
649:9,21,22 650:6
650:16,24 653:25
657:5 658:17
659:24 668:9,10
668:11 670:15
671:23 679:24
680:6
**looked**  530:21
561:4 581:18
594:2,9 597:10
605:19 613:10
621:22 639:19
641:2,3,9 643:1
652:6 656:6 660:7
660:8 666:16,18

**looking**  527:16
535:15 537:22
538:17 541:25
545:8 550:4,13
552:6 559:6
563:20 577:19
578:12 579:17
593:16 594:6,7,14
608:14 610:4
611:24 623:3
632:22 640:3
645:6 652:7
657:18 661:17,21
678:6 680:5
**looks**  503:1 505:19
506:24 537:6
538:7 539:9
540:11 550:15,20
551:11,15 558:23
560:20,20,23
566:14 577:16
594:16 600:19
606:2,25 645:22
649:12 650:3,23
653:16 657:23
658:1,20,23
659:11,12,24
661:23 668:16,20
**lose**  594:1
**losing**  644:20
**lost**  620:15 623:20
624:13 631:10,22
643:19,20 676:21
**lot**  510:17 617:1
639:10,10 648:21
**loud**  631:5
**love**  647:14
**low**  591:13
**lozard**  642:3
**lubbe**  642:2

**lunch**  626:3
**lynch**  529:6,14

**m**

**m&t**  583:3
**madison**  495:15
**madoff**  494:8,12
494:17 497:2
499:15,19 500:7
500:11,16 503:22
510:9 512:17
519:16 520:6
558:11 566:25
568:2 582:5,9
592:14 593:21
603:2,3 627:8
628:2,9,24 629:2
630:14 631:23
632:4 633:10,17
635:16 636:23
637:1,21 662:16
664:1,4 665:23
666:23 667:5
670:8,12,14 674:3
679:2 681:21
683:14
**madoff's**  515:15
631:19 655:3
674:2
**main**  619:6
**maintain**  562:13
583:11 585:10,17
586:18,24 587:9
**maintained**
583:14,19,22
584:7 585:4
603:15 672:12,22
**maintaining**
523:12
**major**  643:25
**majority**  509:20

[maker - member]

**maker** 513:16,23
514:4,8 524:14
541:22 547:20,21
554:5 591:9 592:5
592:24 593:20
602:22 610:1,17
615:15 639:22
640:8
**maker's** 545:7
**makers** 503:22
541:3,7 542:2
543:11
**making** 507:7
509:9 516:3
520:15 523:7,13
523:23 524:6
532:6 540:10,12
540:16,23,24
541:2,15 547:8
548:1,6 552:9,11
555:5 560:4
602:24 614:25
615:4 629:7 630:7
630:25 631:8,25
632:5,6,10,14
633:13 634:2,21
635:13,19 637:5
641:4 642:4 646:8
652:22 655:6,8,10
655:21 662:3
667:8 683:7,9
**malcolm** 495:12
**manhattan** 583:2
588:12,12,13
**manner** 567:6
**manufacturers**
583:1 588:12
**marc** 640:4
**march** 607:5
618:24

**margaret** 543:10
**margin** 517:17,20
517:23,25 518:4
518:18,22 519:2
519:13 679:18,22
**marine** 583:2
**mark** 502:20
540:15 543:4
565:21 571:3
598:16 603:8
626:4
**marked** 500:17
504:22,25 505:14
505:17 524:16,20
535:12 558:4,8
566:10,13 569:13
600:9,13 603:6,9
606:8 611:12
626:5,11 627:24
644:25 645:3
668:12 679:2
**market** 503:22
507:7 509:9,14,19
509:25 513:7,16
513:23 514:4,5,8
516:2 517:16
520:15,18 523:7
523:13,23 524:6
524:14 532:6
540:10,12,12,16
540:23,24 541:2,3
541:7,15,15,22
542:1 543:11
545:7 547:7,20,21
548:1,5 552:9,11
553:21,22 554:5
555:5 560:3
565:13 590:8
591:9,18 592:5,23
593:19 597:5,9
598:5,6,15,16

**602**:5,22,24 610:1
610:16 614:25
615:3,15 620:5
632:5 639:22
640:7 641:4
643:20 646:8
667:8
**marking** 520:18
600:11
**marks** 630:13
670:6
**martin** 495:12
540:15 543:1
544:13
**mass** 550:15
**match** 565:25
574:18 607:4,7
624:10,16,16
**math** 598:19
**matter** 507:9
513:10 523:18
524:3 639:16
655:18 664:9
677:22
**maturities** 680:16
**maturity** 673:10
**mcdermott** 495:14
499:25
**mci** 552:3,17
**meadowbrook**
582:24 588:4,10
**mean** 501:12
503:11 507:13
510:16 516:13
527:21 544:6
547:1 553:21,22
555:20 561:13
563:7,20 564:2
574:9 575:4,6
587:22 588:20
589:12 590:19

**595**:9,21 598:18
599:11 601:15
608:19 609:22
610:10,11,15
616:5 617:7 618:8
638:9 639:20
640:2 641:16
643:10 656:21
662:20 663:5
670:21 678:18
**meaning** 514:5
615:4
**meaningless**
641:10
**means** 507:16
544:7,24 555:16
593:17 601:8
**meant** 555:20
**medco** 553:10
**media** 513:12
**meet** 662:21
663:13,21
**meeting** 498:18
616:16,22,25,25
617:13 618:2
625:5,6,9,13,16,20
625:22,24 626:19
629:8 630:8 631:8
634:16 635:14,20
636:19 637:10
638:23 639:2,10
647:16 663:10
665:8,9,24 666:4,6
**meetings** 616:18
616:20 617:5,17
617:19 625:11
662:17,18 663:2
666:11
**member** 506:12
506:13,16

[members - new]                                                          Page 21

members  616:16
memorialization
    629:13 638:18
memory  638:15
mental  664:5,16
    664:17
mentioned  625:5
    634:18 638:22
    639:1
merged  506:1
    588:3,11,15
merrill  529:6,14
met  582:13 662:23
    665:3 666:3,9
mf  679:25
microfilm  510:10
    510:18,25 567:2
    567:16 612:9
microfilmed
    510:14 511:7,8,11
microphones
    499:2
microsoft  557:17
middle  537:12
    550:16 552:3
    571:12 605:2
midland  583:2
mill  658:9,21
    659:11
million  504:3,3
    515:8,12 595:10
    658:1,16 659:15
    659:18 661:11
    673:18,19 678:6
mind  516:15
    647:17
mine  659:20
minute  618:17
    632:15
miraculously
    678:7

misinterpreted
    640:23
misrepresenting
    562:10
missing  574:20
misstating  526:12
mister  663:16
misunderstanding
    544:21
money  517:11,11
    534:9 553:21
    598:12 620:15
    641:25 643:19,21
    647:9 655:24
    656:8 657:8 659:4
    659:6 661:14,21
    662:12 672:15,19
    673:3,5,7,13 674:7
    674:9,15,16,19
monies  595:14
    606:24 607:7
    646:22,22 648:10
    655:14 661:19
    674:11
month  501:9,15
    502:16 604:11,15
    604:20 608:13,21
    609:1
monthly  501:7
    580:25 581:4
    635:11
morgan  526:23
    548:24 575:1
    588:13 647:6
    672:23,24
morning  500:16
    520:6,7 626:2
morphed  628:13
    631:7,12
mortgage  518:15

mother  617:7
motors  504:1
mountain  510:20
mouth  674:6
move  554:13
    611:8
moved  614:6,8,10
movement  534:2
multiple  542:17
    542:19 544:11
municipal  679:7
    679:10,12,16
    680:11,20
mwe.com  495:18

              n

naked  512:25
    513:18 516:9
    523:16
name  499:5,18
    500:19 511:20
    537:10,23 545:17
    547:13,13,17,18
    570:3 575:1
    645:17
named  511:19
    568:13 675:22
names  544:12
    547:11 557:22
    559:10 560:14
    568:20 570:5
nassau  555:11
    679:5,6,7
nat  588:17
national  500:19,25
    501:2,5,8 502:13
    502:17 505:20,21
    530:18,22,25
    531:5 582:24
    588:4,10,14
    599:11,13,18,20
    607:17,20,25

608:7 609:4 610:7
    610:10,11 680:25
natwest  587:21,24
    588:1,5,7,11,15
ncc  590:3
neal  494:18 500:9
    682:22
necessarily  525:17
    525:19 546:15
    549:12 575:3
    586:22 599:2
    616:5 617:10
    656:12 662:24
    678:16
necessary  683:11
need  517:10 520:2
    529:5 531:22
    576:16 671:2,14
    672:3 676:7,19
needed  573:21
    673:6,13 674:7
negotiating  681:9
nerve  643:8
nervous  647:18
net  503:22 504:7,9
    516:1 667:12,19
    668:4,5
netted  503:18
netting  557:14
    580:2,14
never  516:9 517:6
    525:24 635:13,22
    636:8 637:16
    638:11 641:25
    642:1 648:11
    656:4 666:3
    676:22,23
new  494:1 495:7,7
    495:16,16 496:8,8
    496:15 499:17
    517:10 532:15

[new - okay]

537:19 538:13
539:20 543:21
550:21 583:1
589:16 597:15
631:20 632:8,16
nine  660:2
normally  598:25
651:13 673:13
norman  613:22,24
614:4,11,18 616:9
north  494:21
499:11 500:25
501:3,5,8 502:13
502:17 582:5,25
588:14 599:11,13
599:18,20 670:12
680:25 682:2
notary  494:19
682:23 684:23
note  499:2 612:7,8
612:21 621:2
notes  645:10 649:7
649:22 653:18
654:2,5,6,20,24
655:2,3,6,9,10,13
655:21 656:11,23
656:25 660:14,18
661:3,24,25 662:1
notice  507:16
noticed  521:21
notified  678:5
notwithstanding
587:13
november  494:21
499:7 582:6
606:25 608:15,16
608:20 670:13
681:20 682:18
nscc  497:18
505:22,24 580:1
675:7

number  497:14,16
497:18,22,24
498:3,5,7,9,11,12
498:14,16,18,20
499:18 504:22
505:14 506:12,13
507:18 524:16
525:4 527:1 532:9
533:13 534:10,15
535:12 537:19
550:5,6,8 554:18
557:24 558:4
560:17,17,18,21
560:23 562:20
563:5,8,18 566:8,9
566:10 569:13
570:19 573:13
574:14,18 576:12
578:14 582:4
590:16,23 591:16
594:5 596:7 600:9
601:2 602:19
603:6 607:23
608:3 609:16,18
612:1 614:23
616:20 622:8
623:7 624:18
626:6,11 627:3,4
634:12 644:25
653:19 670:7,11
670:19 679:2,3
681:21
numbers  507:11
507:13 550:2
557:23 560:19
568:23 570:8
573:7 595:23
607:24 611:11
numerous  499:23
643:12 669:15,21

o

oath  584:12
object  556:10
563:4 576:1 587:5
613:1 616:13
618:4 621:14,17
627:2 628:12
629:13,23 630:11
639:3 641:13,14
663:24,25 664:5
objected  566:20
objection  503:9
508:14 509:15
511:25 513:2
514:1,22 515:14
516:22 518:24
525:22 528:22
529:17,22 532:1
544:9 561:10,25
596:19 608:22
619:17 627:21
629:21 641:15
648:8 661:1 664:9
664:11,25 673:21
673:25 674:4
obligation  513:24
522:5,7,11,12
obtained  501:21
obvious  635:3
649:5
obviously  590:19
595:17 619:22
627:3,6 642:22
654:16 656:22
occur  521:10
573:20 614:23
occurred  579:18
579:22 580:6,8
581:9 595:8 677:4
occurrence  615:1

occurs  598:25
office  504:18
528:12,19 529:4
529:14 530:2
548:11 589:4,6
625:7,14,24
653:21 662:7
670:23
offline  562:16
oh  506:14 527:14
536:15 550:4
552:7 553:25
556:22 558:8
564:20 572:2,8
579:10 580:22
586:6,23 588:17
597:21 618:18
619:5 628:18
650:2,22 651:1,9
651:17 662:23
667:20
okay  501:16,16
502:1,1,5,11,19
503:3,6 504:19
505:8,11,16,21
506:2,8 507:9
508:4 509:11,22
510:25 511:6,16
511:19,22 512:5,9
512:9,9,16 513:22
514:11,18 515:6
515:17,20 516:8
516:15,15,18
517:2,17 518:18
519:4,9,12,17,18
519:21 521:8
527:17,20 530:21
531:9 532:3
534:17 536:15,25
537:6,9,14 538:4
538:24 539:5,14

[okay - page]                                                                    Page 23

539:20 540:13,18
541:4,23 542:11
542:22,24 543:12
543:16 544:22
545:16 546:5,8,19
547:1,16,18,25
548:15 551:3,16
551:19,22,22,25
552:9,14 553:5,9
554:8 555:2,9
556:16,21,25
557:5,9,16 558:1,1
558:10,11 559:4
560:9,22 561:20
561:20,21 562:7,9
562:11,17,17,23
562:24,25 563:7
563:15,24 564:9
564:13,17 565:12
566:3,5 567:24
568:2 569:11
571:3,8,11,25
572:3,12,25 574:1
574:4,8,12,22
575:6,19 576:21
577:6 578:10
579:2,3 580:4
581:5,22 583:15
584:10,23 586:6
586:10 587:12,18
588:6,14,19,19
589:22 590:4,24
592:24 593:20
594:2 595:9,20
596:1 597:12
598:7,17 599:1,5
599:22,25 600:4,7
601:18 602:3,18
603:8 604:2,6,8,10
604:22 605:5,12
605:25 606:1,16

607:2,10,11,23
608:9,12,25 609:8
610:3,14 611:8,8
612:1,5,12,20
613:3,6,17,25
616:1,7,12,15
617:3,12 618:1,10
618:14,15,19
619:7,14 620:19
621:20 622:1,7,10
622:20 623:1,5,17
624:10,14,20,21
625:5,9 626:4,21
627:22,25 628:6
629:15 630:2,5,20
630:23 631:2,16
631:17 632:19,22
633:2,7 634:8
635:8 636:7,10,15
637:1,21 638:2,21
644:15 645:8,21
646:1 647:5,7,22
648:1,19 649:7,14
649:18,24,25
650:8,16 651:3,3
651:17,17 652:3,8
654:8,19 657:4,17
658:2,7,23 659:2
659:10,21 660:2,5
660:11,19,22
661:10,23 662:2,5
662:16 663:13
665:22 666:5,24
667:5 668:9,19
669:2,11 670:5,17
671:3,15,17,23
672:6,6,21 673:2,9
673:15,15,24
674:14,18 675:21
676:10 678:20
679:9,15 681:5,17

old    494:20 499:10
once    671:20 672:4
    681:8
ones    557:6 623:15
    650:5 665:20
open    513:13
    515:23 598:14
    620:4
opened    679:25
opening    598:10,11
operate    530:16
operation    504:18
    531:2
operations    511:15
    530:2 531:1
    675:15
opportunity
    566:24
opposed    653:3
opposite    592:8
option    542:5
options    516:4
    518:9
order    504:6 514:7
    514:7 516:24
    517:11 580:5,15
    615:5,16
ordinary    503:7
    536:1,3 646:6,13
ordination    589:24
oregon    680:12
original    651:5,6
    652:6 654:10
    666:4
originally    574:13
    620:4
originate    602:23
originated    591:4
    602:5
originating    615:4
    615:16

outside    516:23
oversight    653:4
owed    515:12
    595:10 655:24
    657:8
owned    599:12,12
    599:13,15
owner    536:25
    537:6
ownership    581:18
owns    514:13

                    p

p&s    580:10
p.m.    681:25
pad    653:17
page    497:13 498:2
    507:11 525:4,5
    528:8 537:12
    543:8 549:19,24
    550:16,17 552:3,6
    555:9 557:6
    558:12 559:7,9,14
    564:23,23 565:1
    568:5 571:12
    572:6,11,23
    577:22 583:9
    584:23 596:4,10
    597:19,21 598:1
    599:8 603:21
    604:23,23,24
    605:2,6 606:10
    607:11,14 609:4
    612:3,6,8,16,18
    622:15,18 626:14
    626:16 627:12,23
    628:25 631:4,19
    632:19,21 633:4
    636:21,21,22
    638:3 645:5,6,9
    647:8 649:8,10,19
    649:25 650:3,4,9

[page - places]                                                                    Page 24

650:25 651:6
652:15,17 653:14
653:14,16,25
654:1 655:2 656:7
657:14,17,17
671:5 679:25,25
680:2 682:7 684:1
684:4,7,10,13,16
684:19
**pages** 506:25
549:21 552:1
566:18 572:7,9,10
595:22,24 596:10
599:9 627:24
632:20 649:8
650:17,23 654:3
655:2 678:6 682:8
683:11
**pagoldman** 496:17
**paid** 534:3 668:3
**paint** 635:3
**paper** 636:18
676:8 677:20
**paragraph** 618:20
621:1 636:22
637:19,20
**pardon** 553:22
673:22
**parentheses**
635:25 636:4
**park** 495:6
**parkway** 496:14
**part** 504:17 513:7
530:5 554:20
566:22 567:2,15
567:18 580:1
593:10 594:17
627:13 633:21
660:22
**particular** 503:24
511:17 513:14

515:2,25 518:13
544:1 545:1,10
548:20,20 549:15
555:21 581:9
591:20 592:3,12
592:24 609:24
615:6
**particularly**
510:23 532:6
542:1
**parties** 499:5,21
615:11 682:17
**partner** 614:7
**party** 525:21
526:21 527:2
528:20 529:6,9,19
531:24 534:4
682:13
**passer** 495:12
**paul** 613:7,13,15
613:16,17 614:8
614:10
**pay** 517:11 522:7
534:5 620:9
631:24 632:4
673:13,20
**payable** 667:15
**paying** 633:11,19
637:16 655:14
656:24 678:12
**payment** 534:8
**peace** 644:14
**pennsylvania**
680:11
**people** 503:11
524:4 533:22
540:14 625:20
635:1 639:17
640:11 643:17,25
644:8 646:20
655:15 661:22

662:12 664:2
670:23,25,25
**people's** 659:20
**pepsi** 519:23,25
520:1
**percent** 507:25
509:13 518:6
556:7 632:13,13
632:18 634:19,21
634:23 641:11
657:6 667:12,18
668:4,6
**percentage** 667:7
667:10
**perfectly** 523:15
523:17 564:6
**performed** 579:24
582:11
**period** 503:10,13
503:14 505:6,7
510:4,6,16 512:6,8
512:10 516:11
518:5 521:3
523:24 525:15,16
526:7,8,17 527:5
527:12 529:23,25
530:7,9,16 533:22
553:17 563:21
564:5,7 573:24
574:2 575:5,9,18
580:14 585:12
590:4 612:25
618:9 634:10,23
638:6,8,14 648:23
658:5 659:25
660:1,17 669:16
**periods** 524:1
634:14
**person** 504:9
511:19 534:13
568:13 640:2

643:10 667:11
**pertain** 623:12
**peter** 496:13 500:6
537:25 538:18
540:14 542:21
544:14,16 557:17
626:9 644:19
663:4
**peter's** 545:17
**pharmacia** 621:3
**physical** 533:23,24
**physically** 592:21
**picard** 615:22
641:21,22 643:5
647:17
**pick** 499:3
**picture** 590:22
635:4 648:9
**piece** 677:3
**piggy** 641:25
**pile** 594:4,8
**pissed** 635:4
639:24 642:4,4,19
**place** 503:1 504:13
504:20 510:20
523:5 539:7
540:16 546:16
550:25 564:10
565:8 569:4
570:22 575:1
579:20 580:21
584:11 590:8,10
591:3,6 592:13
595:12 615:10
617:13 625:10,14
625:16,22 626:19
635:13,22 651:10
660:11
**places** 510:21
551:4 593:11
605:23

CONFIDENTIAL

[plaintiff - provide]                                    Page 25

**plaintiff** 494:6
  499:12,14
**plan** 630:21
  647:13 674:7
**planned** 533:9
  656:24
**planning** 617:24
  619:22 655:15
  656:1 661:20
**plaza** 496:7
**please** 499:2 524:5
  532:3 621:2
  683:10,11
**pleased** 632:3
**pledge** 518:2
**plus** 516:4 659:20
**point** 512:13
  514:20 588:5
  602:1 629:22
  630:16 642:22
**pointed** 507:10
**policies** 675:16
**policy** 501:13
  510:15,22,23
  515:3 669:14
**ponzi** 633:20
**portfolio** 515:8
  562:14 672:12
**portion** 506:19
  633:15 635:18
**position** 515:24,24
  516:2 525:14
  538:11 544:2,24
  547:25 548:17,22
  561:1,2 563:14
  567:4 577:12
  578:15 593:18
  637:15
**positions** 513:13
  515:5 516:1,10
  523:4 535:10

541:5 543:22
  548:16 570:12
  573:11 596:5,7,11
  596:16,25 597:24
  597:25 598:2,6,15
  599:5,7,7,12 621:2
  621:9 680:3
**positive** 647:2
**possession** 533:25
**possible** 656:10
**possibly** 644:2,3
  678:9
**post** 514:4 563:22
  564:7 638:8,14
**poster** 642:16
**posting** 518:12
**practice** 503:19
  504:9 513:6
  518:10 519:12
  529:24 530:2
  580:2 584:1
  618:11 675:4
**precursor** 505:24
**prefer** 519:18
**preference** 627:17
**preferred** 600:23
  600:23 605:13
**premises** 510:21
**preparation** 666:1
**prepare** 662:17,21
  663:2,14
**prepared** 535:22
  535:25 536:3
  559:1
**preposterous**
  643:4 647:15
**presence** 523:21
**present** 499:20
  549:16 625:17
  657:24 658:6,16
  662:2

**pretty** 588:8
  638:15
**previous** 537:15
  538:2 539:11
  543:20,25 544:23
**previously** 509:11
  511:23 525:11
  569:23 672:11,21
**price** 614:6,7
  615:2,9 616:4
**prices** 598:21
**pricing** 671:13
**principal** 508:8
  509:3,4 523:12
  601:5,8,17,20
  602:17 603:2,3,4
  610:5,6
**print** 507:4 572:10
**printed** 506:19
  652:4,5 668:21
**printout** 654:2
**prior** 502:16 512:7
  516:19 545:24
  579:22 617:19
  621:7 655:21
  656:20 669:9
  677:12
**private** 499:3
**probably** 511:12
  523:11,19 530:20
  530:24 547:14
  575:18 576:14
  620:18 644:6
  649:1 652:20,20
  654:14 665:5
**problem** 571:7
  572:14 633:22
  641:20,20
**procedure** 579:20
  580:20 683:4

**proceed** 500:10
**process** 557:14
  651:19 654:22
**produce** 677:6
  678:3
**produced** 513:12
  567:6 676:22,23
  677:8
**product** 664:1,3,4
  664:14,15,17,21
**professional**
  494:18 682:22
**proffer** 498:18
  523:20,21 625:6
  625:12,19 629:8
  631:8 634:16,25
  635:14 636:19
  637:10 638:18
  660:6,7
**profit** 658:4,25
**profitable** 642:1
**profits** 661:5
  667:8,9,13 668:6
**promise** 566:1
**properly** 636:3
**proprietary** 507:7
  509:9 516:3
  520:16,19 523:8
  523:13 543:13
  547:23 552:12
  555:7 646:8 667:8
**prosecutor** 523:21
  524:8,9 640:5
  677:15
**protection** 494:5
  499:13
**protocol** 579:20
  580:20
**proved** 641:24
**provide** 682:12

[provided - record]                                           Page 26

**provided** 582:13
    583:9 584:15
**prudential** 538:19
    538:22 544:17
**public** 494:19
    682:23 684:23
**puerto** 680:11
**purchase** 512:22
    518:4,12 525:7
    580:5,10
**purchased** 512:20
    514:14 521:5
    522:9,21 523:2
    526:4 561:8,18,24
    562:22 575:12
    622:3 672:18
    674:15,16
**purchases** 508:21
**purchasing** 563:23
**purported** 636:17
**purpose** 676:18
**purposes** 589:4
    651:24
**pursuant** 683:3
**put** 510:19 515:18
    558:1 570:12
    591:24 592:1
    607:8 615:12
    627:1 634:9
    655:18,25 669:8
    674:5 681:5,12
**putting** 652:21

**q**

**quarterly** 580:24
    581:3
**question** 520:10
    520:15 529:1
    553:3 556:11,15
    567:13 580:3,23
    583:15 584:6,6,15
    585:18 586:8,9,10

**587**:3,6,9 588:20
    596:21 602:4
    610:2 616:12,14
    619:18 628:7,22
    632:23 634:5
    635:8 641:11,14
    641:14 644:16
    650:20 653:10
    664:5,24 665:12
    666:16 678:20
**questioned** 567:7
**questioning**
    529:23 566:21
    567:17,21,23
    627:2,19
**questions** 579:6,7
    579:12 613:7
    632:21 635:1,7
    639:11,14,21
    645:5 666:25
    672:9 678:21
    679:5 682:6
**quibble** 653:24
**quick** 579:6
**quickly** 565:19,24
**quiet** 640:4
**quite** 635:5 675:17
**quotation** 630:13
**quote** 514:9

**r**

**r** 621:24 682:1
    683:1,1
**rates** 518:4 634:22
    682:17
**rca** 680:2,8
**read** 566:18
    572:10 578:2
    584:17 587:16
    600:16 603:19
    604:3,7 612:7
    619:2 628:7

**629**:10 631:3,4,5
    633:15 635:10,21
    642:3 643:3
    683:15 684:1,4,7
    684:10,13,16,19
**reading** 637:6
    638:2 681:23
**reads** 536:6 608:3
**ready** 568:5 645:7
**real** 518:23 520:24
    521:15 522:16
    659:7 680:24
**realized** 549:22
**really** 546:2 548:7
    554:4 567:2
    611:20 630:6
    634:7 639:20
    648:11 661:16,16
    668:18 669:5
    677:4,4
**realty** 495:11
**reask** 628:21
**reason** 510:7
    528:16 533:14
    634:18 639:8
    642:9,13 671:16
    671:20,21 672:4,5
    673:5 684:2,5,8,11
    684:14,17,20
**reasons** 533:13,15
    534:15 627:4
    683:7
**recall** 501:11
    508:19 509:16
    510:13 511:20
    519:1,3 530:13
    531:2 583:6 625:9
    629:7 630:7 631:7
    631:13,25 632:6
    632:10,14 633:13
    635:13,19 636:13

**636**:18 637:5,9,11
    638:1 655:8,8,9,12
    656:5 660:10
    662:3,5 665:4
    673:9 675:2 680:1
**recalls** 630:25
    634:6
**receive** 501:7,14
    503:21 528:13
    529:5,15
**received** 501:11
    503:6,14 504:14
    595:13 618:24
    635:11 659:16
**receiving** 530:2
**recess** 582:2 670:9
**recognize** 559:9
    559:12 600:13
    611:19 645:13
    649:10 668:14
**recollection**
    582:17 636:9,11
    655:5 664:10
    666:11
**record** 497:25
    498:3,5,7,9,12
    499:2,5 509:22
    510:6 515:19
    517:3 521:15
    527:3 536:7 540:7
    540:9 542:1,3
    545:13 546:14,21
    558:19 559:4,6
    562:6,7 566:20
    568:3,7 569:19,23
    571:2,14 576:22
    578:20 581:25
    582:3 585:13,15
    585:16 586:3
    587:14 589:20
    590:20,21 594:13

[record - representing]                                                    Page 27

603:15 604:5
609:3 627:2
651:20 670:8,10
676:11 679:3
681:6,13,19
recording 499:4
records 501:25
502:2 510:3,10,14
510:19,20 511:1
513:11 535:3,5,9
539:3,6 541:4,16
546:10,13,22,23
546:25 548:12,13
549:17,18 556:14
564:4 574:19
575:3,7 580:7
585:13 590:18,23
599:4 636:17
675:17,24 676:14
677:8,10,16,18,19
677:20,25 678:1,2
678:3,15
redacted 627:5,5,7
627:9,12 641:7,12
redemption 517:8
redemptions
633:12,20
reduced 682:6
refer 506:17
520:18 521:6,24
528:15 539:1
601:23 612:12
614:24 647:2,3
659:2 661:3
reference 625:7
references 660:5
referral 682:15
referred 505:22
521:22 554:12
referring 520:10
520:12 541:18

547:1 550:6 560:5
568:10 570:11
573:18,19 605:24
619:15,20 634:24
638:5,7,8 645:23
650:5 657:7,14
658:3,12 659:8
refers 527:6
536:23 538:21
548:5 586:15
615:13 631:19
658:4,25 661:23
reflect 502:6 506:2
506:7 507:25
508:23 515:4,11
515:22,23,23
542:5 546:10
556:14,17
reflected 508:5,9
508:23,24 519:4
539:18 545:8,13
545:14 575:2,7
597:8
reflecting 540:10
543:23,24 635:12
reflection 502:15
629:1
reflects 505:4
506:3
refresh 582:17
664:10 666:10
regardless 619:21
registered 494:18
514:3,8 532:14
682:22
regret 642:21
regular 514:4
regularly 646:1
647:25
regulations 517:25
518:17

relate 675:20
related 607:20
614:15 652:10,13
653:19 660:20,21
664:20 667:14
669:22 671:21
relating 669:22
676:12
relation 662:25
relationship 666:8
666:8
relationships
675:22
rely 528:19 529:5
531:24
relying 589:4
remaining 650:17
remember 526:5
526:11 582:9
584:12 588:18
616:18,22,25
617:16 620:17
625:7,22 626:1,19
631:14 637:13
638:15 639:16
669:2,11 673:11
remembered
588:9
remembers 634:1
rent 678:12
repaid 519:13
rephrase 529:1
report 497:17
498:20 505:8
507:25 508:6,9,13
508:16,18 515:11
521:23 539:1,7
542:16 543:16
544:7 546:6 548:1
548:15 551:3,16
552:9,14 555:22

556:8 557:2 559:4
559:16,22 560:10
565:16 567:2
568:3,6 569:8
570:12 571:12
572:4 575:24
577:9 592:10
594:25 596:3
597:25 604:16,17
607:5,9 608:13,15
609:1,19 610:22
629:22 632:12,17
641:19,19,20,21
641:23,23 643:4
644:13 645:25
646:1,13 651:11
656:17
reported 514:24
682:5
reporter 494:19
500:8 682:14,22
reporting 497:18
505:19 682:13,14
reports 508:20
521:23 565:20,24
567:1,10,16
573:16,20 604:13
604:19 643:3
660:10
represent 499:21
506:18 556:1
560:25 641:1
682:8
representations
652:5
represented
562:19,21 563:13
representing
499:6 500:9
557:13 598:4,5

CONFIDENTIAL

[represents - sale]

Page 28

represents 506:20
  557:13 595:17
  597:5,6,11
reputation 640:12
  640:16 644:12
request 520:23
  522:6,13
requested 581:6,7
  646:18,19 676:13
  676:15,16
required 514:4
  669:18
requirement
  669:17
research 553:11
reserve 518:1,17
  681:13
reserved 681:24
respect 509:12
  514:19 525:14
  567:16 621:1
  648:5 649:2,3,4
  669:3 679:16
respond 633:16
response 567:22
  586:12
responsible
  511:17
result 682:11
retail 628:2,9
  629:2 631:6,11,20
  632:8,16 635:18
  635:24 636:23
  637:2,4,15,21,25
  638:4
retaining 669:15
retention 510:6
  669:16
returns 632:12,17
  637:16

reveal 664:17
reviewed 557:7
  561:19 569:23
  575:24 583:16
  594:15 618:16
  620:22 622:21
  665:17
reviewing 560:9
reynolds 621:24
  622:24 623:4
rico 680:11
ridiculous 639:15
  643:2,6
ridiculously
  637:16
right 501:18 505:7
  507:1,1 513:19,23
  521:17 526:8
  527:4,19 528:9,13
  529:11 534:25
  535:10 536:19,21
  539:7 540:20
  541:6 542:10,11
  542:12,14,18
  543:1,18 544:8,22
  544:25 545:4,18
  545:20 546:1
  547:19 548:16
  551:5 552:12
  553:12,25 558:7
  558:17,18,25
  559:3,13,17 560:1
  560:18,23 561:8
  561:24 563:3
  564:11 565:9,10
  565:13 567:5,12
  568:16,24,24
  569:10,25 570:1,9
  570:9 573:6,22
  575:24 576:7,9,10
  577:3,7 578:17,23

578:25 579:1,1
  582:19 583:7,17
  584:13 585:2
  586:17,20 587:1
  587:21,25 590:8
  590:11 591:1
  593:10,12 594:17
  594:18,23 595:10
  596:12 597:2,23
  598:1 599:10
  600:5,20,25 601:5
  601:9 604:16
  605:9,17,21,24
  606:3,12,14 607:2
  607:8,10,10 608:2
  609:18 610:5,6,9
  610:12,19 611:14
  611:17,23 612:10
  613:8,11,14 617:2
  618:3,12 619:7,12
  619:16 620:11,19
  620:23,24 621:11
  621:13,19,25
  622:13 623:13,14
  623:16,22,23,25
  624:8,9,11,19,20
  626:18,22 627:18
  630:15 634:8
  638:24 639:2
  640:17 641:5
  648:17 649:15
  651:7,8,12,15,17
  651:18,18 653:15
  653:18 655:4
  656:15 657:15
  658:8,14,19,22
  659:14,22,23
  660:3,12,13,15
  664:21 666:22
  668:22 671:3
  672:10 673:2

676:6,6,8 680:13
  680:18,19 681:13
rights 581:19
ring 588:15
rjr 623:3
roads 591:13
rockefeller 496:7
roll 612:1
room 499:20
  567:10,11,20
  625:23 640:11
row 651:24
rpr 682:22
ruin 644:12
rule 514:3,12
  532:17 549:8
  676:1 683:3
rules 683:3
run 558:23 604:11
  604:19 681:18
running 574:19
  618:7
rye 496:15

s

s 511:20 539:13
  683:1
sachs 532:8,16
  557:18 602:22
sachs's 602:24
safekeeping
  536:20,21,25
sage 495:11,11,12
  495:12,12 499:25
  613:7 616:16
sages 519:2 613:11
  618:3 666:5,7,9,11
  666:13,14
salary 659:6
sale 508:21 522:3
  523:15,16 580:5
  639:21 640:7

[sale - seeing]

643:11,14,19,21
644:4
**sales** 521:25
580:11 641:5
**satisfy** 516:20
517:8 593:25
**saw** 575:23 635:17
647:25 665:12,14
665:19,19 666:18
666:19
**saying** 526:24
547:8,10 549:9
555:4 556:6,13
586:11 587:8
588:23 591:2
593:8 599:25
607:18 618:1
621:19 631:13,14
636:13,19 637:9
637:10 638:1,7,9
638:11,15 639:11
640:10 641:8
643:14 652:19
653:5 654:13,20
663:1
**says** 500:25
502:20,21 537:25
538:18 548:18,18
550:22 555:13,19
557:17 560:15
568:9 576:9 578:4
578:13 594:21
596:11 601:15
604:14 611:20,20
612:19 618:23
623:19 628:13
636:3 657:5 658:8
658:15,23 659:11
668:15 671:4
672:1

**scheer** 601:13
605:20 606:11,18
**scheme** 633:20
**schwab** 497:14
502:20 503:2,8,20
615:5,5,7 643:24
**scope** 516:23
567:25
**scotch** 644:22
**scraps** 677:20
**scratch** 583:6
**script** 668:21
**sec** 514:10,12,24
515:11 516:9
523:22 524:4
538:19 639:17
640:3,10,11,21
643:12
**second** 557:16
580:23 608:4
612:6 618:20
622:17 625:16
636:22 637:18
649:22 663:20
671:4
**sections** 627:7
**securities** 494:4,8
497:16 498:14,16
499:13,15 501:9
505:4,20,21
512:18 513:15
514:13,21 518:2,3
518:7,12,19,23
521:5 522:5,7
523:2 524:10
525:16,18 528:13
529:5,15,21 530:3
530:18,23,25
531:5,11 532:22
532:24 533:5,6,23
533:24 534:1,2,7

535:6 537:10
538:22 539:2
543:18 544:11
545:14 546:6,22
546:24 551:1,4
552:15 553:7
554:17 556:5
557:2 561:7,12,14
561:16 563:2,23
575:23 576:5,17
576:25 577:1
583:11,14,19
584:8 585:5,14,24
585:24 586:18,24
589:5,9,13 593:9
593:13 595:12
596:17 597:1,6,9
598:22 599:13
611:21 612:25
640:5 675:19,24
680:24
**security** 503:25
513:14 516:1
531:16 533:1,3,3,8
533:10,11 534:3
537:23 539:17
543:21 544:8
545:4,21,24
548:19,22 549:4,5
560:13 568:18
570:2,3,6,16 573:4
578:12,23 591:10
591:19 592:3,12
593:10 596:5,16
596:25 597:24
598:1 599:5
600:22,24 606:13
609:7 611:3
**see** 507:12 519:7
525:1,5,8 527:17
528:10 536:15,16

537:10,19 538:2
538:15,24 539:11
539:21,25 540:16
540:22 542:2,2,8
543:7 544:13,15
544:16 546:17
550:18,23 552:3,5
552:17 555:10
557:5,8,10,16,22
558:12,22 559:7
560:13 564:25
568:4,17,20 569:1
570:3,5,15,19
571:11,17,22,25
572:2,8,22,25
573:6,9,13 576:6,8
582:16,23 583:7
586:14 594:9,12
594:16,21 595:5
595:12,25 596:4
596:22 597:16
599:6 600:16
601:1,11,13 605:1
605:16,20,25
606:1 607:7,13,23
608:4 612:3,6,18
617:19 618:23
619:7,10 620:25
621:4,6,24 622:7
622:20,24 623:7
628:1 633:21
636:23 645:11
646:25 647:19
650:18 656:23
657:5 658:7,18,21
658:24 659:10,12
665:22 668:25
670:18 680:4,8,10
680:14
**seeing** 654:4
678:17

**[seek - shows]**

seek 511:10
seeking 633:12,19
seen 521:24
  630:13 647:22
  656:17 666:21
segregated 586:21
self 528:16 531:23
  588:24 610:19
sell 514:2,7 516:11
  522:3 523:18
  524:14 533:15
  591:17 592:19
  602:15 615:5
  679:19
selling 509:4
  512:25 513:6,14
  513:18 521:13,18
  593:5 597:8
  599:20 601:22
  602:22 603:2,4
sells 504:2 521:17
  523:11
send 504:5 510:19
  512:19 580:24
  655:16 656:3
  661:20 676:16
sending 571:5
  592:22 655:14,15
  675:4 679:20
senior 640:2
sense 512:25
  617:12 620:7
  639:25 642:8
sensitive 499:3
sent 515:7 646:18
  679:20
sentence 618:22
  618:23 620:25
  621:1,4 628:1,15
  628:16,17,20,22
  628:23,25 629:10

631:11,21 633:9
635:9,11 636:15
636:24 638:3
677:23
sentenced 642:14
  677:21
sentences 619:2
  635:10
sentencing 677:13
series 555:11
  605:13 641:22
services 583:8
  682:13
session 523:21
set 517:25 518:17
  549:18 569:15
  571:6 572:1
  587:20 666:23
settle 673:6 674:8
settlement 519:10
  600:19 607:3
  675:13
settlements 675:19
settles 671:21
  672:4,5
seven 623:22
  627:23 628:25
  631:4
shapiro 613:20
  614:3,4,6,11,18
  616:9
share 558:9 662:9
shares 504:4,5,7
  512:21 540:5
  551:9 574:18
  576:3,4 577:14
  578:19,22 606:10
  606:22 607:7
  622:3
shearson 550:23

sheepish 640:4
sheet 683:12
shocked 524:7
short 512:25,25
  513:6,13,15,18
  515:2,5,22,24
  516:2,9 521:7,13
  521:17,24 522:3
  522:11 523:4,11
  523:15,16,18,25
  524:2,13,14
  525:24 535:10
  537:17 538:11
  539:13,18,25
  541:5,17 561:2
  563:13 577:12
  578:15,15 581:8
  581:10,16,17
  592:20 593:3,4,6
  596:13 598:14
  599:7 614:11
  619:24 620:1,8
  639:21 640:7
  641:4 643:11,14
  643:19,21 644:4
  673:12
shorted 619:9,13
  621:7,10
shorting 619:23
shortly 625:15
shorts 525:14
show 502:19
  504:24 505:1,16
  506:5 508:13
  514:25 515:1
  523:4 535:2,5,9
  539:13 540:4,11
  541:5,10,16
  542:16 546:24
  547:9 549:10,11
  549:14 550:18

551:3,16 555:22
556:8 558:7
565:16 572:13
576:18,20,24
577:2,6 582:14
585:13,13 595:1
595:15 603:9
604:22 611:9
612:1 626:5
679:23
showed 508:20
  515:8 521:4,10
  523:1 527:9
  541:13 546:22
  561:6,12 564:3
  590:21 660:10
  665:23 679:1,24
  680:2
showing 501:8,24
  502:11 542:1
  543:22 544:2
  545:24 551:8
  555:18 578:16
  598:20,21 600:2
  600:23 674:22
  675:24
shown 514:21
  525:12,17 526:1
  527:24 561:2,16
  561:17,23,23
  577:9,12 578:19
  590:24 606:9,17
  606:18,19 610:7
  610:22 622:10
  623:15 624:2,7
  665:7 666:10
shows 500:22
  506:4 525:7 542:3
  542:17,20 543:16
  543:17,20 546:6
  547:7 548:15,17

[shows - statements]                                                         Page 31

| | | | |
|---|---|---|---|
| 548:17 551:4 | 653:6 | sort 524:7 554:3 | started 512:10 |
| 552:9,14 556:4,4,8 | sit 640:3 | 557:14 566:13 | 513:16 517:6 |
| 557:1,2 559:5 | sitting 673:19 | 624:13 655:23 | 519:17 617:20 |
| 569:8 576:22 | situation 620:16 | 656:21 661:5,9 | 626:2 637:14,14 |
| 578:22 598:14 | 663:5 | 675:14 | 676:20 |
| 600:1 | six 510:6 584:25 | sorts 532:7 625:20 | starting 599:7 |
| shred 612:19,24 | 605:18 606:1 | sound 626:18 | 604:4 643:16 |
| 669:12,19 670:18 | 669:16,18 | sounded 639:15 | 647:12 660:6 |
| 670:21,21,25 | size 565:20 676:24 | sounds 555:7 | starts 544:25 |
| 671:1,1 672:1 | sloppy 677:18 | 587:3 | stated 563:20 |
| shredded 669:4 | small 637:14 | southern 494:1 | 564:7 682:5 |
| siac 538:24 552:19 | smb 494:7 499:18 | 499:17 | statement 497:22 |
| 552:21,25 553:6 | smith 557:8 | speak 562:6,7 | 500:19 501:17 |
| 557:10,12 | smoking 639:23 | 575:14 651:18 | 502:12 512:19 |
| side 506:10 507:7 | soda 644:20 | speakerphone | 514:12 515:7 |
| 509:8,9 533:6 | sold 504:2,4,7 | 625:18 | 519:6 523:5 |
| 544:18 550:21 | 522:10 523:25 | special 601:13 | 524:23 525:3,7 |
| 551:12 552:22 | 524:2,13 533:6 | 605:20 606:11 | 527:3,13,18 561:4 |
| 559:13,20 563:12 | 549:4 561:17 | specific 509:23,24 | 561:18 566:20 |
| 564:10 569:2 | 601:15,17,24 | 672:2 | 581:10 594:16 |
| 570:9 573:21 | 619:21 640:8 | specifically 639:17 | 595:15,16 597:7 |
| 577:3 578:25 | 671:19 | specify 512:14 | 597:10 598:10,14 |
| 580:19 592:8 | solutions 499:6 | speed 566:1 | 598:25 601:21 |
| 646:9 648:6,12 | 500:9 | spent 558:6 | 619:12 622:12,21 |
| 651:14 652:22 | somebody 511:14 | split 511:24 512:7 | 623:16,19,21 |
| 658:8 | 613:16 637:7 | 512:10 514:19 | 624:7,11 628:4,8 |
| sided 514:5 651:21 | 670:23 | 517:7 561:11 | 628:11 629:7 |
| 651:22,23,25 | someone's 636:4 | 581:21 617:22 | 630:10,12 631:6,8 |
| 652:5 653:3,3,5 | somewhat 520:17 | spoke 522:18 | 632:1,6,10,14 |
| signature 682:20 | 527:18 539:21 | 548:9 | 633:13 634:11,12 |
| 684:21 | 638:23 | spoken 643:11 | 635:14,19 636:1,1 |
| significant 513:7 | soon 637:3 | stacy 496:5 500:2 | 637:1,5 644:7 |
| significantly 619:6 | sorkin 677:7,8 | staff 511:7 559:17 | 647:11 660:7 |
| signing 681:23 | sorry 536:12 | stage 589:24 675:5 | 683:7 |
| similar 518:14 | 549:21 550:12 | stands 526:13 | statements 501:8 |
| 569:22 596:24 | 560:5 564:22 | stanley 526:23 | 501:14,22,23 |
| similarly 671:23 | 568:5,24 571:9 | 548:24 575:1 | 514:21,25 519:5 |
| simply 637:25 | 572:7 573:2 | 672:23,24 | 521:4,9,9 522:20 |
| single 542:17 | 577:19 595:1 | start 537:2,4 589:7 | 523:1 525:12,17 |
| 563:17 609:12 | 597:19 605:2 | 632:5 | 526:2 527:8,11,25 |
| 651:9,21,23 653:3 | 628:18,20 | | 529:20,20 560:1,6 |

[statements - tax]                                                                Page 32

561:6,11,22
562:19,21 580:25
581:2 590:25
592:11 596:24,24
597:7 618:24
626:25 630:4,7,25
634:2,7 635:12
641:1,3,8,23 642:5
643:1,5 666:19
670:18 675:1,4
states  494:1
499:17 625:6,23
stating  676:12
stearns  529:7,14
530:15 532:8
591:12 672:24
step  603:1
stock  497:24 498:3
498:5,7,9,12 513:7
516:12,13,14
521:18 522:10
523:11,18,25
524:2 535:3,5,9
536:6 541:4
545:13 546:14,21
546:22,23,25
551:11 558:19
559:4,6 568:3,6
569:19,22 571:14
576:22 578:20
581:21 585:12,13
585:15 589:8
590:21,23 591:25
592:6,19 593:2,2,5
593:6,17,22,23,24
599:20 601:22
602:12,25 603:15
604:5 609:3 611:5
615:6 620:9 640:8
671:19 679:3

stocks  515:9,10,13
621:7
stone  510:20
stood  657:3
stop  670:3
stopped  503:11
512:14 514:20
store  669:20
story  634:17
strategy  590:17
592:18 616:23
671:9 679:20
street  506:6 509:8
537:5 544:18
591:19 602:21
642:16 648:24,25
649:3 669:16
strictly  592:18
strike  511:24
512:7,10 514:20
517:7 531:22
561:11 617:22
strt  536:22 537:2
structure  609:25
stuff  653:12
style  617:24
sub  552:17 571:18
subject  664:9
subjects  566:22
submitting  644:13
subscribed  684:22
subsidiary  576:19
576:24 674:23
substance  664:12
683:4
substantial  519:2
647:19
sudden  678:7
sue  643:23
suggest  633:14

summaries  569:23
summary  498:4,5
498:8,10,13
558:19 568:3,7
569:19 571:14
578:20 604:5
609:3
sums  647:19
supplemental
683:10
supply  671:14
supposed  642:24
sure  517:5 521:16
523:14 534:25
541:18 546:2
547:3 551:10
553:4 554:5,23
556:12 566:14
575:8,9 578:1
580:2 584:18,23
585:8 586:8
596:20 597:5
603:11 604:21
606:20,21 608:24
611:13 614:21
618:18 627:11
628:8,24 630:9
632:24 647:18
649:23 657:24
659:8,20 660:16
666:15
swap  591:20 592:5
592:5 593:2
swear  500:10
switched  614:5
sworn  500:12
684:22
system  504:12,19
539:4,6 559:19,23
559:25 560:3

systems  511:14

t

t  566:23 672:9,13
672:18 673:10,20
674:13,14 682:1,1
683:1,1
take  503:23 516:4
517:10 518:14
519:18 533:25
535:8 564:14
579:3 581:23
593:25 618:11,15
623:16 625:22
626:24 668:9,11
674:9 679:24
taken  494:17
499:11 582:2
618:2 659:2
661:14 670:9
takes  615:10
talk  520:9 522:19
541:10 642:3
663:7 664:2,8
talked  561:5
562:20 680:6
talking  501:12
510:4 518:5
522:17 530:17
554:13,15 556:23
562:18 574:2,24
579:11 585:12
593:3 634:10,13
637:18 649:2
660:23 674:21
678:16
tape  582:4
taught  528:5
tax  617:4,23
619:22 620:2,7
621:9 669:23
670:1

[technically - told]                                                                            Page 33

technically 620:12
tell 502:24 504:16
    505:2,17 506:4
    517:23 532:3
    549:17 551:6
    553:16 584:21
    585:23 591:2
    624:12 634:24
    643:25 645:7
    653:17 661:17
    665:18 668:18
    670:25 678:4,9
tells 598:20
ten 582:23 653:7
tense 619:12
term 520:25 521:1
    521:5 533:11
    554:19 562:25
    563:16 564:9
    565:5 572:1 619:9
    619:24,24 621:3
    673:12
terminology 522:2
    584:3
terms 520:8,17,20
    651:9
testified 500:13
    502:5 509:11
    511:22 512:4
    525:11 529:24
    562:1 616:15
    617:13 672:11
    674:23
testify 526:13
testifying 673:10
    674:1
testimony 515:15
    515:19 522:25
    526:13 527:17
    540:19 576:2,3
    582:20 583:7

587:15,18,24
588:3 590:7 674:2
    683:6
text 631:4
thank 501:3
    502:22,23 519:16
    520:24 524:21
    528:25 529:3
    534:20,23 536:9
    550:12 558:3
    564:22 566:7
    572:15,21 585:1
    594:10,15 596:2
    600:8 603:12,13
    645:12 666:23
    681:3,17
thanks 581:22,24
    584:19
theater 640:21
theoretically
    610:15
thereof 659:9
thereto 682:6
thing 523:17
    539:21 564:2,21
    586:3 591:15
    614:1 617:2
    624:13 639:24
    641:19 676:13,22
things 516:25
    592:9 609:16
    642:7,13,20 643:8
    653:19 656:25
    657:2 661:5,8,9,18
    667:25 671:18
    675:14
think 511:16
    521:11 526:12
    534:24 537:3,14
    538:5 539:21
    544:20 564:20

567:24 568:12
570:25 572:7
577:25 586:11
587:7,8 604:8
606:16,17 607:8
608:18 617:15
619:19 625:13
627:8,18 629:17
630:18 633:8
634:4 638:23
639:2 644:22
654:12 655:20
656:6 657:18,21
658:4,25 661:10
661:11 665:2
    666:23
thinking 660:23
thinks 629:14
third 525:4,21
    526:21 527:2
    528:20 529:6,9,19
    531:24 663:20
    679:5
thought 527:16
    546:23 587:9
    588:14 609:1
thousands 504:1
three 542:9 549:3
    572:10 578:14
    623:25 627:12
    636:21,22 638:3
    670:11 681:22
time 499:7,19
    503:11,13 505:7
    510:16 512:6,10
    514:20 515:10
    517:6,14 518:5
    521:3 523:5,24
    524:2 526:7,8,17
    527:5,12,20
    529:23,25 530:3,9

530:13,17 531:3
533:22 541:6
548:4 551:1
553:17 554:6
555:5 558:6 561:5
562:22 574:9
575:4 579:2,17
582:1,6 588:5
590:4 593:6,7
596:18 612:25
615:9 618:9
620:13 623:13,16
626:2 627:19
631:7,12 632:8,15
634:10,14,22,23
640:15 647:23
648:15,23 649:4
654:12,15,16
656:2,12,13,22
658:5 670:2,8,13
674:12 675:3
676:2 681:22
timely 567:6
times 524:14
    563:23 589:13
    634:12 669:15,22
title 536:6 558:19
    569:18 571:12,18
    604:3
tobacco 621:24
today 516:24
    521:1 522:19
    548:9 585:7 587:3
    587:19 594:3
    625:5 662:22,23
    665:17 666:21
today's 499:7
told 526:2 541:4
    546:21 624:15
    666:9

[top - trigger]    Page 34

top  536:14 550:5
  558:12 559:7
  568:4 578:4 612:2
  627:24 662:15
topics  566:24
  567:4,16,18
total  515:5 539:22
  631:23
totally  592:10
  615:19 639:15
  641:24 642:1,5,14
  642:21 643:5
track  552:25
  589:19 590:20
  646:21
trade  497:18
  503:15,25 504:10
  505:19 506:3
  509:21 520:24
  521:14,14 538:17
  543:12,14 549:1,5
  552:4,8,19 553:3
  553:14 555:16,17
  560:1,3,6 563:12
  565:10,12 569:6
  571:17,20 574:6
  574:10 575:19
  577:13 591:23
  592:17 600:16
  601:19 602:5,23
  606:6,9 607:20,21
  608:10 615:8,12
  615:17 616:2,3,5
  617:24 618:2,11
  620:4 621:13
  622:10,14,22,24
  623:4,6 624:2,17
  624:18,23 635:12
  637:15 638:1
  671:20 672:4
  679:9

traded  509:18,19
  509:20 513:9
  545:6,21,23,25
  547:21,21 554:6,9
  554:11
trader  537:25
  542:17 543:2,5,17
  544:1,3,4,4,7,8
  545:3,21,25
  547:11 602:7,9
trader's  545:1,10
traders  542:13,18
  542:20 543:12
  544:11 545:14,23
  555:23 556:3
  557:13 655:24
  656:24 657:6,8,10
  659:9 667:5
trades  503:17,18
  509:4,10 512:7,11
  512:14 521:4
  529:18 540:11,12
  545:9 552:25
  553:1 554:14
  555:22 556:1,2,3
  556:17,18 565:17
  573:20 590:24
  591:3,7 601:4
  615:23 622:20
  635:12 636:18
  637:3,23 666:20
trading  507:7
  508:1,7,12,25
  509:1,9,12 510:2
  511:23,24 513:16
  520:16,19 523:8
  523:13 537:25
  538:18 540:15
  541:11,14,25
  542:5,6,14 543:5,8
  543:10,17 544:12

544:16 545:1
  546:16 547:14,23
  548:21 552:12,24
  553:16 554:1,21
  554:22 555:6,7,14
  557:17 590:16
  602:14,15 612:9
  617:14 636:16
  661:4 667:8,13,14
transaction
  497:16 503:19
  513:8,9 515:25
  516:3 518:13
  519:11 521:21
  522:9,12,16,16
  523:17 525:9
  526:18,19,20
  532:11,13 533:12
  534:15 537:22
  542:7,25 544:18
  548:20 549:2
  550:14,22 551:7,8
  554:20 555:11,21
  564:11,25 568:15
  572:8,23 573:1,10
  573:22,24,25
  574:17 575:16
  576:15 577:8
  578:13 579:24
  580:1,8,19 581:11
  581:16,16 589:11
  589:17 590:14
  591:23 592:8
  593:4,15 601:23
  602:10,11 605:1,8
  605:16 606:18
  607:4,4,13 608:1
  608:14 610:3,4,12
  614:25 615:13,20
  615:20,25 620:1
  622:1 643:15,16

643:23 644:5
  667:20,21 668:1
transactions  501:9
  501:24 502:3,6,13
  502:16 503:4,8,23
  503:24 505:11,12
  506:5,7,10,21
  507:6,17,20 509:8
  509:24 521:10,25
  523:1 525:12
  528:21 531:8,24
  534:6 540:17,18
  540:19 541:2,3
  545:12 552:14,15
  563:18 574:3
  576:17 579:9,18
  579:21 581:2,8
  588:25 589:2
  590:7 591:17
  595:19 599:23
  608:17,23 609:2,4
  609:10,11 610:22
  614:20 616:10
  617:21 624:10
transcript  682:9
transfer  537:2,6
treasuries  525:8
  525:20,23,24
  526:1,4,10 527:9
  527:22,24 532:14
  533:4 561:14,17
  561:23 562:22
  574:24,25 575:10
treasury  525:15
  526:18,25 532:13
  565:1 589:15
treated  516:6
treatment  620:7
trial  676:19
trigger  620:2

CONFIDENTIAL

[true - unredacted]                                                Page 35

| true 562:3,4 | 627:23 636:21 | **u** | undersigned |
|---|---|---|---|
| 565:15,17 597:4 | 643:17 656:2 | u.s. 525:8 625:11 | 683:14 |
| 639:6 652:20 | 678:21 | 625:14,17 | understand |
| 682:8 683:17 | turned 524:4 | uh 500:21 527:7 | 521:16 522:2,18 |
| trust 505:25 | 640:1 | 535:18 537:13,24 | 524:3,8 525:13 |
| 582:25 583:1 | turning 639:17 | 538:12 539:24 | 534:22 546:7 |
| trustee 496:3 | two 507:11 514:5 | 543:3 552:2,23 | 547:3 548:10,11 |
| 497:21 498:2 | 516:23 526:5,9 | 555:12 557:11,25 | 553:6 555:25 |
| 500:3,5 510:10 | 542:9 550:2 | 558:14 559:11 | 556:6,9,12 567:4 |
| 523:22 535:16 | 551:25 566:22 | 565:3,11 568:8 | 574:23 580:3 |
| 558:8 569:16 | 567:3,15,25 572:7 | 569:24 570:18 | 585:6 586:5,7 |
| 578:3,7 676:16 | 579:6 582:4 | 571:24 572:24 | 587:17 596:20 |
| 678:10 681:9,11 | 597:13 601:2,8 | 575:21 577:11 | 609:20 610:21 |
| trustee's 521:23 | 607:24,24 608:6 | 582:15,22 590:6 | 614:21 627:21 |
| 524:16,20 535:12 | 608:10 611:9 | 594:20 596:6,15 | 630:1,3 636:3 |
| 558:4 566:10 | 614:18 616:9 | 597:17 598:23 | 640:24 644:9,11 |
| 569:13 600:9 | 619:2 621:21 | 600:21 604:25 | 650:22 654:3,18 |
| 603:6,10 611:9,10 | 625:11 627:4 | 605:7,15 606:5,7 | 654:18,24 666:15 |
| 611:11 626:11 | 635:10 639:17 | 606:15 608:5 | 676:10 678:18 |
| 644:25 668:10 | 650:23,23 653:8 | 609:6 611:22 | understanding |
| 671:5,23 | 663:22 668:20 | 612:4,17 619:11 | 512:17 524:9 |
| truth 624:12 | 670:7 | 620:21 622:13 | 545:16 598:7 |
| 665:18 | type 518:8 532:11 | 623:11 624:4,6 | 607:19 652:1 |
| try 524:18,18 | 533:8 535:21 | 628:4 636:25 | 653:1 |
| 565:19 644:12 | 553:16 593:10 | 650:12,21 656:15 | understood 507:3 |
| 665:11 | 604:13 639:24 | 658:17 659:23 | 526:15 528:4 |
| trying 512:1 534:1 | types 608:10 | 660:14 661:6 | 530:1 531:7,21 |
| 534:20,21 546:3,4 | 680:21 | 662:19 680:13 | 553:8 567:1 568:1 |
| 546:5,11 554:24 | typical 609:9 | unable 516:20 | 588:19 627:15 |
| 554:25 555:25 | 618:11 659:5 | 517:7 | 637:9 651:15 |
| 556:7 565:23 | typically 501:13 | unaware 592:10 | 664:23 666:22 |
| 585:6 587:16 | 531:22 540:8 | underlying 521:5 | unfair 629:18 |
| 597:13 609:20 | 548:5 560:19 | 523:2 529:21 | 634:4 |
| 610:21 617:15 | 563:1,9,12 580:11 | 561:7 | unfairly 642:15 |
| 618:14 635:3 | 589:16 596:23 | underneath | unidentified 672:1 |
| 642:15 657:2 | 598:4,9 601:22 | 538:18 557:18 | unique 617:10 |
| 658:11 660:8 | 602:10 604:11,19 | 560:13 570:6 | united 494:1 |
| 661:8 669:6 | 609:23 615:3 | 571:23 573:3 | 499:16 625:6,23 |
| turn 525:3 549:19 | 647:25 667:12,18 | 609:7 627:13 | unredacted |
| 555:9 564:22,23 | 671:12 674:8,10 | 646:23 658:17 | 627:16 633:10,15 |
| 572:6 603:3 612:6 | | | 638:3 |

CONFIDENTIAL

[untrue - witnesses]                                              Page 36

| | | | |
|---|---|---|---|
| untrue 642:5 | videotaped 494:16 | 655:23 673:16 | 609:5 610:7,10,11 |
| unusual 620:16 | view 517:20 664:3 | 676:19 | whispering 499:3 |
| usa 609:5 | violation 514:9,11 | wants 518:1,2 | who've 644:1 |
| use 518:16 520:16 | virtually 631:10 | 593:21,21 | whoops 571:10 |
| 520:17,20,25 | 631:22 637:24 | warehouses 678:1 | willing 514:6,6 |
| 529:13 531:20,22 | 638:4 | 678:13 | 564:6 593:1,20 |
| 532:15 533:19 | visit 617:9,11 | warrants 553:13 | wiped 631:20 |
| 560:21 563:16 | 663:12 | waste 627:19 | wired 647:9 |
| 609:23 679:21 | voice 644:20 | water 519:23,25 | wiring 647:7,20 |
| 683:10 | volume 494:17 | 644:20 | withdrawal |
| uses 529:9 | 509:23 681:21 | waterhouse 614:6 | 516:21 |
| usual 618:25 | vs 494:7 | 614:7 | withdrawals |
| 682:16 | | way 524:19 529:11 | 648:2,14 |
| usually 583:23 | **w** | 587:8,8 588:11 | witness 497:2 |
| 590:22 615:10 | | 590:1 591:22 | 499:19 500:7,10 |
| | wait 632:15 | 592:14 598:24 | 500:25 503:10 |
| **v** | wall 642:16 | 611:18 634:9 | 507:6 512:3 513:3 |
| | 648:24,25 649:3 | 639:9 646:18 | 514:23 515:21 |
| v 499:14 | 669:16 | 647:11 657:21 | 517:4 518:25 |
| valid 521:20 | want 512:16 | 669:8 676:12 | 519:20,23 520:1 |
| value 597:6,9 | 515:18 518:16 | 682:10 | 521:22 525:23 |
| 598:15 | 519:22,25 520:8 | ways 591:16 | 526:17 528:23 |
| vanguard 505:5 | 534:7,23,25 | 614:23 | 529:2 531:15 |
| varied 511:18 | 535:16 564:15,21 | we've 528:10 | 532:2 544:10 |
| 518:4 529:24 | 566:13 582:16 | 557:6 558:6 | 550:13 556:12 |
| varies 532:21 | 591:21 592:25 | 564:13 | 563:5 577:24 |
| variety 543:18 | 593:1,16 594:11 | week 626:21 666:2 | 595:7 596:20 |
| various 515:9 | 603:11 606:20 | weeks 653:8 | 601:10 603:25 |
| 554:21 593:8 | 611:13 621:20 | wells 505:5 | 613:2,4 618:6 |
| 621:8 661:18 | 627:1 628:21 | went 503:17 | 619:19 621:18 |
| 676:4 | 629:19 630:6,9,11 | 522:15 525:14,16 | 622:6 631:14 |
| vary 667:10 | 631:3,5 641:13 | 525:24,25 580:12 | 633:17,23 634:9 |
| verbatim 637:11 | 642:6 647:11,17 | 583:12 587:20 | 639:4 641:16 |
| verify 504:13 | 649:22 653:24 | 609:18 617:21 | 642:2,25 644:19 |
| 511:10 | 669:20 674:5 | 618:21 621:21 | 644:23 648:9 |
| veritext 499:6 | 676:11 677:23 | 626:3 631:7,12 | 652:9,17 655:4 |
| 500:9 | 678:4 681:12 | 640:20 677:9 | 661:2,7 663:9,11 |
| versus 516:1 | wanted 507:2 | west 542:8 | 665:14 666:24 |
| videographer | 509:22 528:10 | westminster | 681:24 |
| 496:19 499:1 | 533:25 594:8 | 500:19 607:17,20 | witnesses 643:2,22 |
| 500:8 581:25 | 616:22,23 617:2 | 607:25 608:7 | |
| 582:3 670:4,6,10 | 617:24 620:4 | | |
| 681:19 | 653:9 654:4 | | |

[worded - zero]

**worded**  587:9
**words**  521:13,15
    521:20 532:4
    533:10,24 544:10
    546:11 549:1
    563:9,10 564:5
    575:8 581:19
    584:2 591:11,14
    592:5 593:5 601:7
    611:2,5 620:1
    621:15 651:3,23
    652:9,19 654:11
    674:5,6 675:6
**work**  540:8 613:11
    664:1,3,4,14,15,17
    664:21
**worked**  524:6
    645:21 646:20
    675:7,7
**working**  548:12
    584:3
**worry**  620:7
**worth**  515:8,12
**writing**  656:9
    660:24 662:1
**written**  655:17
    660:14 682:7,12
**wrong**  552:6 615:9
    615:9 642:21
**wrote**  629:15,17
    655:20,25 657:6
**wtsx**  553:13

**x**

**x**  671:25
**xs**  612:19 672:1

**y**

**yeah**  507:4 540:21
    549:11 556:22,24
    557:16 558:8,16
    560:7 561:15,15

579:10 580:22
583:5 584:20
587:7 590:9
594:12 595:4,6
596:22 604:8,9
612:10 623:3
626:10 633:23
634:3 639:24
640:16 644:21,21
645:3 649:16,16
649:17 651:2
653:7 658:11
659:23 660:8
662:1 663:10
668:13,20
**year**  622:5 658:9
    658:21 659:19,25
    660:1 661:12
    677:23
**years**  510:6
    511:18 515:3
    516:18 613:24
    658:10,14,15
    659:22 660:2,12
    661:12 669:17,18
    676:3
**yep**  538:16 540:2
    633:9
**yesterday**  500:16
    502:5 512:5
    520:22 522:18
    582:9 594:3,9,15
    616:16 618:16,21
    620:23 662:24
    663:18,19,19,20
    665:17 679:24
    680:1,7
**yield**  680:17
**york**  494:1 495:7
    495:7,16,16 496:8
    496:8,15 499:18

532:16 583:1
589:16

**z**

**zero**  578:14

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.