# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>     Plaintiff-Applicant,<br><br>  -v-<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>     Defendant. | Adv. Pro. No. 08-01789 (SMB)<br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>     Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities, LLC,<br><br>     Plaintiff,<br><br>  -v-<br><br>JAMES LOWREY, et al.,<br><br>     Defendants. | 18 Civ. 5381 (PAE)<br><br>Adv. Pro. No. 10-04387 (SMB) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities, LLC,<br><br>     Plaintiff,<br><br>  -v-<br><br>SOUTH FERRY BUILDING COMPANY, et al.,<br><br>     Defendants. | 18 Civ. 5430 (PAE)<br><br>Adv. Pro. No. 10-04488 (SMB) |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities, LLC, | 18 Civ. 5452 (PAE) |
| Plaintiff, | Adv. Pro. No. 10-04350 |
| -v- | |
| SOUTH FERRY #2 LP, et al., | |
| Defendants. | |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities, LLC, | 18 Civ. 5453 (PAE) |
| Plaintiff, | Adv. Pro. No. 10-05110 (SMB) |
| -v- | OPINION & ORDER |
| UNITED CONGREGATIONS MESORA, | |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

This litigation arises out of the infamous Ponzi scheme carried out by Bernard L. Madoff. Plaintiff Irving H. Picard ("Picard" or the "Trustee"), as trustee for the liquidation of the Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, and the substantively consolidated estate of Bernard L. Madoff under Chapter 7 of the United States Bankruptcy Code, moves for summary judgment on claims to avoid and recover certain transfers. He argues that such transfers are subject to avoidance under 11 U.S.C. § 548(a)(1)(A) because Madoff made them with the intent to "hinder, delay or defraud," *id.*, its creditors. Defendants, recipients of those transfers, are various brokerage customers of BLMIS. Each, without knowledge of Madoff's scheme, invested money and withdrew in transfers more than he, she, or it invested. They cross-move for summary judgment and assert that they are entitled to retain the money transferred to them. On cross-

2

motions for summary judgment, the Bankruptcy Court entered a Report and Recommendation (the "Report"). It set forth various proposed conclusions of law and recommended that the Court grant the Trustee's motion for judgment and deny defendants' cross-motion for judgment.

Defendants object to the Report. They request that the Court grant summary judgment to them and deny the Trustee's motion for summary judgment. The Trustee asks that the Court adopt the Report in full and enter a final judgment in his favor. For the reasons that follow, the Court, on *de novo* review, adopts the Bankruptcy Court's recommendation, grants summary judgment to the Trustee, and denies summary judgment to defendants.

## I. Background[1]

### A. Factual Background to the Bankruptcy Court's Report

The Madoff Ponzi scheme has been the subject of numerous decisions by courts in this Circuit. *See, e.g., In re BLMIS*, 424 B.R. 122, 125–32 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011) ("*Net Equity Decision*"); *Picard v. Ida Fishman Revocable Trust (In re BLMIS)*, 773 F.3d 411, 415–17 (2d Cir. 2014) ("*Ida Fishman*"), *cert. denied*, 135 S. Ct. 2858 & 2859 (2015); *SIPC v. BLMIS (In re BLMIS)*, 499 B.R. 416, 419 (S.D.N.Y. 2013) ("*Antecedent Debt Decision*"), *certification for interlocutory appeal denied*, 987 F. Supp. 2d 309 (S.D.N.Y.

---

[1] Unless otherwise specified, all docket entries refer to the docket in case number 18 Civ. 5381, the first of four substantively consolidated cases assigned to this Court. The Court draws its account of the facts from the parties' submissions, including defendants' joint memorandum of law in support of their objections to the Bankruptcy Court's Report, *see* Dkt. 3-1 ("Def. Mem."), the Trustee's response to defendants' objections, *see* Dkt. 4 ("Trustee Mem."), letters from the parties identifying supplemental legal authority, *see* Dkts. 22, 23, 27, and joint stipulations the parties submitted in each Avoidance Action. These joint stipulations consist of the joint statement of undisputed facts in Adv. Proc. No. 10-04387, Dkt. 75 ("Lowrey Stip."); the joint statement of undisputed facts in Adv. Proc. No. 10-04488, Dkt. 83 ("South Ferry Stip."), the joint statement of undisputed facts in Adv. Proc. No. 10-04350, Dkt. 90 ("South Ferry #2 Stip."); and the joint statement of undisputed facts in Adv. Proc. No. 10-05110, Dkt. 57 ("Mesora Stip."). Like the parties and the Bankruptcy Court, for ease of reference the Court will refer to the Lowrey Stip. unless citation to a case-specific stipulation is necessary.

2013); *see also In re Bernard L. Madoff Inv. Secs., LLC*, No. 15 Civ. 1151 (PAE), 2016 WL

183492 (S.D.N.Y. Jan. 14, 2016) ("*Inter-Account Transfer Decision*"). The Court assumes

familiarity with those decisions and sets out here only those facts relevant to the instant dispute.

### 1.    The Madoff Ponzi Scheme

For many years, Madoff operated a fraudulent investment business, BLMIS, initially as

BLMIS's sole member and later as its chairman and chief executive. Lowrey Stip. ¶ 1. BLMIS

was an investment firm that collected brokerage customers' funds and purported to invest those

funds on behalf of the customers. But Madoff never invested that money. Instead, he used

principal infused by "new and existing customers to fund withdrawals of principal and supposed

profit made by other customers." *Net Equity Decision*, 654 F.3d at 232. This Ponzi scheme did

not generate legitimate profits for BLMIS's customers. When BLMIS's customers "withdrew

money from their accounts . . . they did not actually receive returns on successful investments,

but instead only the very money that they and others had deposited . . . for the purpose of

purchasing securities." *Picard v. Greiff*, 476 B.R. 715, 718 (S.D.N.Y. 2012) ("*Greiff*"). To

conceal Madoff's fraud, BLMIS "generated fictitious paper account statements and trading

records." *Net Equity Decision* at 231–32.

Madoff's scheme was exposed in 2008, when the infusion of new capital was unable to

support the withdrawals sought by customers. In the end, "the final customer statements issued

by BLMIS falsely recorded nearly $64.8 billion of net investments and related fictitious gains."

*Id.* at 232.

### 2.    The SIPA Trustee and the Statutory Framework

On December 11, 2008, Madoff was arrested on federal criminal charges. Lowrey Stip.

¶ 2. The same day, the Securities and Exchange Commission ("SEC") initiated proceedings

against BLMIS and Madoff in this District. *See SEC v. Bernard L. Madoff Inv. Secs. LLC et al.*,
No. 08 Civ. 10791. After Madoff's arrest, a court in this District granted an application by the
Securities Investor Protection Corporation ("SIPC"), filed pursuant to SIPA § 78eee(a)(4)(B) and
based on BLMIS's inability to meet its obligations to securities customers as they came due.
Lowrey Stip. ¶ 5. That court issued a protective order under SIPA and appointed Irving Picard
as Trustee for BLMIS's liquidation. *Net Equity Decision*, 654 F.3d at 233. On December 15,
2008, the SEC consented to combine its own action with SIPC's application pursuant to SIPA §
78eee(a)(4)(A). Lowrey Stip. ¶ 4.

A brief primer on SIPA is useful here. SIPA liquidations are distinct from ordinary
bankruptcy actions. "In a SIPA liquidation, a fund of 'customer property,' separate from the
general estate of the failed broker-dealer, is established for priority distribution *exclusively
among customers*. The customer property fund consists of cash and securities received or held
by the broker-dealer on behalf of customers, except securities registered in the name of
individual customers." *Id.* at 233 (citing 15 U.S.C. § 78*lll*(4)) (emphasis added). Under SIPA,
customers of the failed broker-dealer are to "share ratably in such customer property on the basis
and to the extent of their respective net equities." 15 U.S.C. § 78fff–2(c)(1)(B).

The term "net equity," in turn, is defined as

> the dollar amount of the account or accounts of a customer, to be determined by—
> (A) calculating the sum which would have been owed by the debtor to such
> customer if the debtor had liquidated, by sale or purchase on the filing date—(i) all
> securities positions of such customer . . . ; minus (B) any indebtedness of such
> customer to the debtor on the filing date . . . .

*Id.* § 78*lll*(11). Often, in SIPA liquidations, "the assets in the customer property fund are
insufficient to satisfy every customer's 'net equity' claim." *Net Equity Decision*, 654 F.3d at
233. In those cases, the "SIPC advances money to the SIPA trustee to satisfy promptly each

customer's valid 'net equity' claim," up to a maximum of $500,000 per customer for claims for

securities, and up to $250,000 per customer for claims of cash. *Id.*

SIPA trustees are assigned specific duties, but also enjoy "the general powers of a

bankruptcy trustee." *Net Equity Decision*, 654 F.3d at 231 (citing 15 U.S.C. § 78fff–1).

Relevant here, under the Bankruptcy Code, SIPA trustees may

> avoid any transfer . . . of an interest of the debtor in property, or any obligation . . .
> incurred by the debtor, that was made or incurred on or within 2 years before the
> date of the filing of the petition, if the debtor voluntarily or involuntarily [ ] made
> such transfer or incurred such obligation with actual intent to hinder, delay, or
> defraud any entity to which the debtor was or became . . . indebted."

11 U.S.C. § 548(a)(1)(A); *see also Ida Fishman*, 773 F.3d at 414 (citing 15 U.S.C. § 78fff–

2(c)(3)); *Net Equity Decision*, 654 F.3d at 424 & n.10. This authority is limited in two relevant

ways. First, the transferee may prevent the Trustee from avoiding fraudulent transfers if the

transferee "takes for value and in good faith." 11 U.S.C. § 548(c). Second, avoidance actions

may be taken only to recover funds transferred within two years of the date of the filing of the

petition (the "reach-back period"). 11 U.S.C. § 548(a)(1).

### 3.    The Transfers to Defendants

By the time Madoff's Ponzi scheme was exposed in 2008, some brokerage customers had

withdrawn from their accounts more money than they initially invested, while others had not

withdrawn even the amount of the principal initially invested. A customer who deposited more

than he or she withdrew has a "net equity" claim for the difference. Those customers who

withdrew more than they deposited would have a net equity of zero. *See Inter-Account Transfer*

*Decision*, 2016 WL 183492, at *1. Other courts have described customer withdrawals in excess

of that customer's initial investment as "fictitious profits," *Antecedent Debt Decision*, 499 B.R.

at 421, because such proceeds were not based on legitimate securities transactions.

Defendants are among those investors who withdrew more money than they deposited in their respective BLMIS accounts. In other words, each received fictitious profits and has a net equity of zero. Defendants are: James Lowrey, the estate of Marianne Lowrey, Turtle Cay Partners, and Coldbrook Associates Partnership (the "Lowrey Defendants"); South Ferry Building Company, Emmanuel Gettinger, Abraham Wolfson, and Zev Wolfson (the "South Ferry Defendants"); South Ferry #2 LP, Emmanuel Gettinger, Aaron Wolfson, and Abraham Wolfson (the "South Ferry #2 Defendants"); and United Congregations Mesora ("Mesora"). *See* Def. Mem., Add. A.

It is undisputed that defendants acted in good faith and without knowledge of Madoff's fraud. At the time of each withdrawal, each defendant believed that the amounts of the withdrawal represented legitimate profits BLMIS had generated by using the money that defendant had invested to trade securities. Lowrey Stip. ¶¶ 43–44. In fact, as reviewed above, the withdrawals came from principal deposits of other investors. Transfers by BLMIS to investors like defendants were necessary for Madoff to perpetrate his fraudulent scheme, by creating the illusion of a profitable investment firm and thereby inducing new investors to deposit money with BLMIS. *See Antecedent Debt Decision*, 499 B.R. at 420.

### 4.    The Trustee's Avoidance Actions Under Section 548(a)(1)

In 2010, the Trustee filed four adversary proceedings against defendants. The Trustee sought to avoid and recover, consistent with the two-year reach-back provisions of § 548(a)(1) of the Bankruptcy Code, the fictitious profits that defendants had received in excess of the amount that they invested with BLMIS. *See* Adv. Proc. No. 10-04387 (Lowrey Defendants); Adv. Proc. No. 10-04488 (South Ferry Defendants); Adv. Proc. No. 10-04350 (South Ferry #2 Defendants); Adv. Proc. No. 10-05110 (Mesora). The Trustee stipulated that defendants had opened their

7

accounts with BLMIS and made withdrawals in good faith, without knowledge of Madoff's

scheme. Lowrey Stip. ¶¶ 42–43. The Trustee further asserted, and defendants do not dispute,

that BLMIS had transferred the funds at issue "with the actual intent to hinder, delay, or defraud

some or all of [BLMIS's] then existing and/or future creditors." *Id.* ¶ 44. The Trustee seeks to

recover a total of $9,520,673 from the Lowrey Defendants; $6,620,000 from the South Ferry

Building Company Defendants; $21,955,000 from the South Ferry #2 Defendants; and

$3,200,000 from Mesora.[2]

      Defendants asserted common affirmative defenses before the Bankruptcy Court and

this Court. They principally argue that they are entitled to retain the fraudulent transfers because

they received these from BLMIS in exchange "for value" under § 548(c), and thus, the transfers

may not be clawed back. As detailed below, *see infra* pp. 15–16, defendants argue that they

gave BLMIS "value" in two alternative forms: First, BLMIS received value for each transfer

"through the satisfaction or discharge of the broker's contractual and legal obligations under

state law to pay Defendants the securities entitlements reported by the broker." Def. Br. at 7.

Second, "each payment also discharged state and federal tort claims for fraud and breach of

fiduciary duty that each Defendant held at the time of transfer." *Id.* at 7–8.

      The parties agreed to partially consolidate the adversary proceedings involving the

defendants, and to litigate their cross-motions for summary judgment based on a stipulated

---

[2] Specifically, the Trustee seeks to recover the following from each defendant:

1. Turtle Cay Partners: $7,845,089. *See* Lowrey Stip. ¶¶ 17–24.
2. Coldbrook Associates Partnership: $1,093,402. *See id.* ¶¶ 25–32.
3. James Lowrey and Marianne Lowrey: $582,182. *See id.* ¶¶ 26–40.
4. South Ferry Defendants: $6,620,000. *See* South Ferry Stip. ¶¶ 17–26.
5. South Ferry #2 Defendants: $21,955,000. *See* South Ferry #2 Stip. ¶¶ 17–26.
6. Mesora: $3,200,000. *See* Mesora Stip. ¶ 16.

factual record. On December 6, 2017, the Bankruptcy Court heard arguments on the cross-

motions. On March 22, 2018, the Bankruptcy Court issued the Report. It recommended that

judgment be entered for the Trustee, and the defendants' cross-motion for summary judgment be

denied.

### B.    Legal Background to the Bankruptcy Court's Report

Several cases in this District have addressed the critical question before the Bankruptcy

Court: whether, as defendants claim, the discharge of an antecedent debt, in the context of a

Ponzi scheme, qualifies as "for value" within the meaning of § 548(c).

Judge Rakoff first considered that question in *Picard v. Greiff*, 476 B.R. 715, 718

(S.D.N.Y. 2012). He observed that "every circuit court to address this issue has concluded that

an investor's profits from a Ponzi scheme, whether paper profits or actual transfers, are not 'for

value.'" *Id.* at 725 (citing *Donell v. Kowell*, 533 F.3d 762, 771–72 (9th Cir. 2008); *Scholes v.*

*Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995); *In re Hedged-Invs. Assocs.*, 84 F.3d 1286, 1290

(10th Cir. 1996)). Judge Rakoff joined that authority. He held that "those transfers from

[BLMIS] to defendants that exceeded the return of defendants' principal . . . were not 'for

value.' . . . [T]he transfers must be assessed on the basis of what they really were; and they really

were artificial transfers designed to further the fraud . . . ." *Id.*

In *Antecedent Debt Decision*, Judge Rakoff reaffirmed this holding and elaborated on

his reasoning. There, recipients of transfers from BLMIS had argued that they held "federal and

state law claims" against BLMIS that were discharged by the transfers, and that these claims

constituted "antecedent debts." 499 B.R.at 421. In other words, the transferees argued they were

entitled to retain the transfers under § 548(c) insofar as those transfers compensated them for

state and federal claims that they held against BLMIS. *Id.* at 422. Judge Rakoff acknowledged

that "in non-SIPA cases, payments in satisfaction of claims have been recognized as providing value to the estate." *Id.* However, consistent with *Greiff*, and for the reasons elaborated in detail below, *see infra* p. 16–20, Judge Rakoff again held that in the context of a SIPA liquidation, "only a defendant's investment of principal may count as 'value' with respect to the customer property estate for purposes of section 548(c)." 499 B.R.at 422. Therefore, the recipient of a transfer from BLMIS receiving fictitious profits did not give "value," and those transfers could be avoided under § 548(a)(1)(A).

In *Antecedent Debt Decision*, Judge Rakoff also adopted a method for calculating a transferee's fraudulent transfer exposure. ·As noted, § 548(a)(1) of the Bankruptcy Code limits transfers subject to avoidance to those made "within 2 years before the date of the filing of the petition . . . ." The Trustee proposed, and Judge Rakoff accepted, a "Net Investment Method" for calculating the total value of the fraudulent transfers within this period. Under this method, a defendant's exposure is calculated as follows:

> First, amounts transferred by [BLMIS] to a given defendant at any time are netted against the amounts invested by that defendant in [BLMIS] at any time. Second, if the amount transferred to the defendants exceeds the amount invested, the Trustee may recover these net profits from that defendant to the extent that such monies were transferred to that defendant in the two years prior to [BLMIS'] filing for bankruptcy. Any net profits in excess of the amount transferred during the two-year period are protected recovery by the Bankruptcy Code's statute of limitations. *See* 11 U.S.C. § 548(a)(1).

*Greiff*, 476 B.R. at 729. Transferees argued that this method violated § 548(a)(1), on the ground that it permitted the Trustee effectively to avoid withdrawals made before the two-year reach-back period by considering such withdrawals in liability calculations. Judge Rakoff rejected this argument. He held that "[t]he concept of harm or benefit to the estate is separate from the concept of the reach-back period, which merely serves to allow finality to ancient transactions." *Antecedent Debt Decision*, 499 B.R. at 427. He added: "[T]here is no reason why a line should

be drawn at the beginning of the reach-back period in determining whether a transfer was for value." *Id.*

The defendants in the instant consolidated adversary proceedings were parties to *Antecedent Debt Decision.* Judge Rakoff had initially referred certain cases to the bankruptcy court pursuant to 28 U.S.C. § 157(a), but later withdrew this reference to decide whether "transfers made by [BLMIS] that the Trustee seeks to avoid were made in exchange for value, such as antecedent debts that [BLMIS] owed to the Antecedent Debt Defendants at the time of the transfers." *See* No. 12-MC-115 (JSR), Dkt. 107 ("May 12, 2012 Order"). The Lowrey Defendants were parties to one such withdrawn proceeding. *See id.,* Ex. A. And the other defendants here participated through joinders. All defendants submitted a consolidated brief to the District Court arguing that they were entitled to retain disputed transfers under § 528(c) and urging Judge Rakoff to reject the Net Investment Method. *See* No. 12-MC-115 (JSR), Dkt. 199 ("Defendants' 2012 Mem.").

After the decision in *Antecedent Debt Decision* issued, several defendants in that proceeding—including all defendants here—moved to certify an interlocutory appeal. *See* No. 12-MC 115 (JSR), Dkt. 491 ("Motion for Interlocutory Appeal"). They again argued that the satisfaction of state and federal claims constitutes "value" under § 548(c), such that recipients of transfers from BLMIS were entitled to retain the money transferred. The Trustee opposed the motion. *See* No. 12-MC-115 (JSR), Dkt. 504 ("Trustee's Mem. of Law in Opposition to Motion for Interlocutory Appeal"). Judge Rakoff declined to certify an interlocutory appeal, explaining that he was "not of the opinion that there is a substantial ground for difference of opinion as to the holding of the Opinion and Order, substantially for the reasons stated in the Trustee's memorandum of law in opposition to the motion." *SIPC v. BLMIS,* 987 F. Supp. 2d 309, 311

(S.D.N.Y. 2013). Subsequent decisions arising out of the BLMIS bankruptcy have uniformly

incorporated the reasoning of *Antecedent Debt Decision. See, e.g., Net Equity Decision*, 654

F.3d at 234–39 (affirming the use of Trustee's proposed Net Investment Method, endorsed in

*Antecedent Debt Decision); Inter-Account Transfer Decision*, 2016 WL 183492, at *13; *Picard*

*v. Cohen*, Adv. Proc. No. 10-04311 (SMB), 2016 WL 1695296, at *7–15 (Bankr. S.D.N.Y. Apr.

25, 2016) (Report & Recommendation) ("*Cohen*"), *adopted by* No. 16 Civ. 5513 (LTS), slip op.

(S.D.N.Y. Feb. 24, 2016).

### C.    The Bankruptcy Court's Decision

The Bankruptcy Court here considered—against the background of this case authority,

in particular *Antecedent Debt Decision*—defendants' claim to be entitled to retain the fraudulent

transfers. After reviewing the governing precedents, the Bankruptcy Court recommended

granting summary judgment in the Trustee's favor and denying defendants' cross-motion for

summary judgment. It held, based on the parties' stipulation that BLMIS had made the disputed

transfers with "actual intent to hinder, delay, or defraud" creditors, § 548(a)(1)(A), that the

Trustee had made out a prima facie case to avoid and recover the transfers. Report at 11.

The Bankruptcy Court then considered—and rejected—defendants' claims to have an

affirmative defense. As to the argument that defendants had given "value" for the transfers

within the meaning of § 548(c), the Bankruptcy Court held that this argument was "previously

raised or adopted by the Defendants and rejected by the District Court expressly or by

implication." Report at 14. It noted that the defendants in this action here had been parties to

*Antecedent Debt Decision*, which had rejected virtually identical arguments. *See* Report at 16

tbl.2 (comparing arguments in Defendants' 2012 Memorandum against arguments made in their

memorandum of law before the Bankruptcy Court). Thus, the Bankruptcy Court stated, the law

of the case doctrine foreclosed defendants' "for value" arguments, barring contrary subsequent controlling authority. And, it held, no such authority exists. Defendants had, in particular, pointed to *Ida Fishman*, 773 F.3d 411 (2d Cir. 2014), which held that claims to avoid certain transfers must be dismissed because the transfers were protected by the safe harbor of a separate provision of the Bankruptcy Code, § 546(e). But the transfer at issue in *Ida Fishman* did not include intentional fraudulent transfers under § 548(a)(1)(A), such as those here. As to such transfers, the Bankruptcy Court concluded after extensive analysis that *Antecedent Debt Decision* remains good law, and is law of the case. *See* Report at 22–31. It therefore recommended that defendants' "for value" defense be rejected.

Defendants also argued that the Trustee's proposed method of calculating their fraudulent transfer exposure—the Net Investment Model—violated the two-year reach-back limitation imposed by § 548(a)(1). The Bankruptcy Court again determined that Judge Rakoff had rejected that very argument in *Antecedent Debt Decision*. Defendants argued that the later decision in *California Public Employees' Retirement System v. ANZ Securities, Inc.*, 137 S. Ct. 2042 (2017) ("*CalPERS*"), called the Net Investment Method into question. But, on its review, the Bankruptcy Court determined that "*CalPERS* does not represent intervening law mandating a reexamination or modification of the reasoning or the result reached in the *Antecedent Debt Decision*." Report at 34.

The Bankruptcy Court therefore recommended, on the basis of *Antecedent Debt Decision*, granting summary judgment in favor of the Trustee on his avoidance claims and denying defendants' cross-motion for summary judgment.

On June 14, 2018, defendants timely filed objections to the Bankruptcy Court's Report.

*See* Dkt. 3.  On June 29, 2018, the Trustee filed his memorandum of law in opposition.  On

August 28, 2018, the Court held argument on the parties' cross-motions.

## II.    Applicable Legal Standards

A court should grant summary judgment only when the submissions, taken together,

"show[] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment

bears the burden of demonstrating the absence of material factual questions; in making this

determination, the court must view all facts "in the light most favorable" to the non-movant.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d

130, 132 (2d Cir. 2008).  To survive a motion for summary judgment, the opposing party must

establish a genuine issue of material fact by "citing to particular parts of materials in the record."

Fed. R. Civ. P. 56(c)(1).  "A party may not rely on mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment," because "conclusory

allegations or denials cannot by themselves create a genuine issue of material fact where none

would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Only "disputes over facts that might affect the outcome of the suit under the governing law" will

preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).

In a proceeding in which a bankruptcy court has issued proposed findings of fact and

conclusions of law, "[t]he district judge shall make a *de novo* review upon the record or, after

additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of

law to which specific written objection has been made." Fed. R. Bankr. P. 9033; *see also*

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1958 (2015); *Stern v. Marshall*, 564 U.S.

462, 475 (2011). "The district judge may accept, reject, or modify the proposed findings of fact

or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge

with instructions. *Id.*

## III.    Discussion

Defendants' objections to the Bankruptcy Court's Report fall into three broad categories:

First, defendants argue that they are entitled to summary judgment on their affirmative defense

that they took "for value" under § 548(c), and that the Bankruptcy Court erred in holding to the

contrary. Second, defendants argue that the Bankruptcy Court wrongly granted an "unpleaded

claim" when it stated that BLMIS had violated the SEC's financial responsibility rules. Third,

they argue they are entitled to summary judgment because the Trustee's method of calculating

the fraudulent transfer exposure is inconsistent with § 548(a)'s two-year reach-back period. The

Court addresses each argument in turn.

### A.    The "For Value" Defense

Defendants do not dispute that the Trustee has made out a *prima facie* case to avoid the

fraudulent transfers. *See* Def. Mem. at 19. Nor could they: Defendants concede that BLMIS

operated a Ponzi scheme and made certain transfers to defendants "with the actual intent to

hinder, delay, or defraud some or all of [BLMIS's] then existing and/or future creditors."

Lowrey Stip. ¶ 44; *see also* 11 U.S.C. § 548(a)(1)(A). The Trustee is thus entitled to summary

judgment on his avoidance claims unless defendants can establish an affirmative defense to

them.

Defendants claim to have such an affirmative defense. They argue as follows: SIPA

incorporates the defenses set forth in the Bankruptcy Code, including 11 U.S.C. § 548(c). Def.

Mem. at 16–18. Under § 548(c), the recipient of a fraudulent transfer may retain the funds

transferred if he or she "takes for value and in good faith." It is undisputed that defendants took

in good faith. *See* Lowrey ¶¶ 42–44. And, as to the decisive "value" requirement, defendants

argue that "value" properly is determined at the time the transfer is made, not via hindsight,

during the SIPA liquidation, after the Ponzi quality of BLMIS had been uncovered. Def. Mem.

at 18; *see also id.* ("[T]he dispositive question for the value defense is whether, from the

transferee's perspective, the obligation was valid and enforceable against the transferor at the

time of the transfer."). Defendants argue that they held several valid obligations at the time of

BLMIS's transfer to them: The claim to have held a state law right, under N.Y.U.C.C. § 8-

501(b)(1), to payment from BLMIS for the full value of the securities positions that BLMIS

falsely reported to its customers. *Id.* at 19–20. Alternatively, defendants claims that, given

BLMIS's fraudulent conduct, they held state law tort claims for fraud and breach of fiduciary

duty against BLMIS. *Id.* at 20. In defendants' view, each of these claims was a valid and

enforceable antecedent debt. And, they argue, § 28(a) and § 29(b) of the Securities and

Exchange Act of 1934 (the "1934 Act") expressly preserve defendants' rights as to these state-

law claims by giving defendants the option to enforce BLMIS's obligations notwithstanding

Madoff's fraudulent Ponzi scheme. Def. Mem. at 19–22. Thus, defendants argue, BLMIS

satisfied obligations to them when it made the transfers.

The Trustee counters that these arguments were all raised and—rightly—rejected by

Judge Rakoff in *Greiff* and *Antecedent Debt Decision*, and indeed have been uniformly rejected

by other courts in this District. *See Cohen*, 2016 WL 1695296, at *5–10, *adopted by* No. 16 Civ.

5513 (LTS), slip op. (S.D.N.Y. Feb. 24, 2016). Because defendants were parties to *Antecedent*

*Debt Decision*, the Trustee argues, that decision is law of the case and the Court should not revisit it here.

The Trustee is correct. *Antecedent Debt Decision* considered and rejected the very arguments that defendants now make to support their "for value" defense. There, as here, the recipients of transfers argued "that the federal and state law claims that they assert they hold against [BLMIS] constitute 'antecedent debts,' as the Bankruptcy Code defines 'debt' as 'liability on a claim.'" 499 B.R. at 421 (quoting 11 U.S.C. § 101(12)). Judge Rakoff there recognized that a "[c]laim," as defined by the Bankruptcy Code, means "'right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.'" *Id.* (quoting 11 U.S.C. § 101(5)(A)). He further acknowledged the argument by the defendants there that "[s]ince satisfaction of an antecedent debt constitutes 'value' . . . they are entitled to retain transfers in excess of their initial investments under section 548(c) to the extent that those transfers compensate them for state and federal claims that they hold against [BLMIS]." *Id.* at 422.

Judge Rakoff, however, rejected this argument. He first disputed the premise, advanced by the recipients of fictitious Madoff profits, that they possessed valid and enforceable claims in the first place. He recognized that, in non-SIPA cases involving Ponzi schemes, "payments in satisfaction of claims have been recognized as providing value to the estate." *Id.* In such cases, defendants had given value "'in the form of their initial investments, and have tort claims of rescission to recover all of their initial investment based on fraudulent inducement.'" *Id.* (quoting *In re Bayou Gr., LLC*, 439 B.R. 284, 309 (S.D.N.Y. 2010)). But, Judge Rakoff noted, even in those cases, courts have routinely rejected claims to recover interest in excess of

17

the investor's principal, because "where defendants seek rescission and have received full repayment on the principal investment, they have no freestanding interest claim." *Id.* (citing *In re Bayou*, 439 B.R. at 337). And, applied here, that principle does not assist transferees, Judge Rakoff noted: Because defendants have recovered their initial investment with BLMIS, their claims to recoup more would not qualify as antecedent debts in the first place.

More fundamentally, Judge Rakoff disagreed with the recipients' premise that, in a SIPA liquidation, the satisfaction of antecedent debts constitutes giving "value." He explained that, in a SIPA proceeding, unlike in other liquidation proceedings, there are two separate estates: the debtor's general estate, and a separate estate consisting of customer property, held by the debtor, to be distributed exclusively among customers based on their net equity claims. *Id.* at 419–21; *see also SIPC v. 2427 Parent Corp. (In re BLMIS)*, 779 F.3d 74, 77 (2d Cir. 2015) ("In a SIPA liquidation, a fund of customer property, separate from the broker-dealer's general estate, is established for priority distribution exclusively among customers."); *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010) (summary order) ("Generally, SIPA liquidations involve two kinds of claimants: customers and general unsecured creditors. To protect customers of failed brokerages, their claims are satisfied from a customer property estate, which is separate from the general estate used to satisfy the claims of general unsecured creditors."). Because the assets of a customer property estate may be used only to satisfy the customers' net equity claims on a priority basis, Judge Rakoff reasoned, "to the extent that payments of defendants' state and federal law claims would discharge an antecedent debt, that debt runs against [BLMIS's] general estate, not the customer property estate." *Antecedent Debt Decision*, 499 B.R. at 424. Thus, even assuming the antecedent debts were valid, they "cannot be the basis

of the retention of customer property under section 548(c)." *Id.* Judge Rakoff thereby rejected the precise argument that defendants advance here.

Relatedly, the defendants here also argue that the Trustee, in avoiding BLMIS's intentionally fraudulent transfers, asserted power unavailable to a trustee under the Bankruptcy Code. *See* Def. Mem. at 31–32. Judge Rakoff addressed—and rejected—this argument, too. He noted that "while SIPA provides that a trustee is 'vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under [the Bankruptcy Code],'" SIPA also provides that the provisions of the Bankruptcy Code apply only to the extent those provisions are consistent with SIPA. 499 B.R. at 423 (quoting 15 U.S.C. § 78fff-1(a)). Thus, while a SIPA trustee has the same authority to avoid transfers as a bankruptcy trustee, "those powers must be interpreted through the lens of SIPA's statutory scheme." *Id.*

As to the claim by defendants here that provisions of the 1934 Act preserve their causes of action against BLMIS, *see* Def. Mem. at 19–22, Judge Rakoff, in *Antecedent Debt Decision*, addressed and disposed of that argument, too, as a basis for defeating the Trustee's avoidance actions. "[T]he fact that defendants' state and federal law claims cannot provide value against the separate customer property estate does not mean that those claims are not preserved," he noted. "[N]othing the Court has stated herein deprives the defendant of the ability to make a claim against [BLMIS's] general estate; rather, the Court finds merely that a defendant cannot assert such a claim as value against the *customer property estate*." *Id.* at 424–25 (emphasis added) (citing *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010)). Put differently, Judge Rakoff reasoned, the provisions of the 1934 Act allow any federal and state claims against BLMIS's general estate, but they do not permit those claims to run against a

customer-property estate in a SIPA liquidation, which proceeds by distributing this estate solely

to customers according to their net equity. This conclusion, Judge Rakoff held, is the "logical

application of the policy motivating SIPA." *Id.* at 425. In a SIPA liquidation, "it is often the

case that the universe of funds available consists primarily of customer investments of principal,

which . . . are no longer sufficient to reimburse all customers." *Id.* In such cases, Judge Rakoff

explained, "it is also likely that each and every customer has a claim against the debtor" for

various state law claims sounding in tort. *Id.* In SIPA, Congress made "the policy decision . . .

to attempt to treat each investor equitably by providing for recovery of customer property and

pro rata distributions based on each customer's net-equity claim, rather than merely letting those

who came out ahead retain the amounts obtained." *Id.*

In sum, *Antecedent Debt Decision* systematically considered and squarely rejected the

very statutory arguments that defendants now make in support of an affirmative "for value"

defense. And as the Bankruptcy Court correctly recognized, that decision is not merely on-point

precedent—it is law of this very case. That is because the defendants here participated in the

litigation before Judge Rakoff and made effectively the same arguments there as here. *See*

Report at 16 tbl.2 (identifying arguments before Judge Rakoff that are reprised here).

Defendants are bound by *Antecedent Debt Decision. See* Trustee's Mem., Ex. A.[3]

As law of the case, *Antecedent Debt Decision* precludes defendants—except in

narrowly limited circumstances—from pursuing the claims (here, the affirmative defenses) that

---

[3] Defendants argue that *Antecedent Debt Decision* did not foreclose their argument here under
§ 29(b) of the 1934 Act, to wit, that it permits them to enforce their state-law contractual rights
against BLMIS by pressing claims for more than net equity against the customer property estate.
Def. Mem. at 40. That is wrong. *Antecedent Debt Decision* rejected this very argument. *See*
499 B.R. at 422 n.6 (discussing defendants' rights under § 29(b) of the 1934 Act and concluding
that "such claims cannot provide value as against the [BLMIS] customer property estate under
SIPA").

they earlier pursued.  Reconsideration of a previous order is "an 'extraordinary remedy to be

employed sparingly in the interests of finality and conservation of scarce judicial resources.'"

*Anwar v. Fairfield Greenwich Ltd.*, 800 F. Supp. 2d 571, 572 (S.D.N.Y. 2011) (quoting *In re*

*Health Mgmt. Sys. Inc. Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)).  "The major

grounds justifying reconsideration are an intervening change of controlling law, the availability

of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl.*

*Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citation omitted).

To escape the law of the case doctrine, defendants argue that several decisions

involving BLMIS issued after *Antecedent Debt Decision* reflect a change in the law.  Defendants

chiefly rely on *Ida Fishman, supra*, also involving BLMIS.  There, the Trustee sought to avoid

certain transfers under a separate provision of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(B).  It

allows the recovery of transfers made without a "reasonably equivalent value in exchange for

such transfer" under certain circumstances.  That provision—unlike § 548(a)(1)(A), at issue

here—"is aimed at 'constructive fraud' and does not require proof of fraudulent intent." 773

F.3d at 416.

In *Ida Fishman*, the recipients of transfers moved to dismiss the Trustee's avoidance

claims as barred by another provision of the Bankruptcy Code not implicated here, 11 U.S.C.

§ 546(e).  That provision prevents a bankruptcy trustee from avoiding certain securities-related

payments *or* "settlement payments" made by a stockbroker, including payments made in

connection with a securities contract and settlement payments. *See* 773 F.3d at 416; 11 U.S.C.

§ 546(e). The *Ida Fishman* defendants argued that a "securities contract" within the meaning of

§ 546(e) had been created by three documents that BLMIS customers were required to execute

when they opened accounts with BLMIS.  The Second Circuit agreed, because those documents

had stated that BLMIS would "acquire or dispose of securities" on behalf of customers, and had

specified the terms by which BLMIS would do so. *Id.* at 418.

And the Second Circuit held the § 546(e) safe harbor applied for a second reason:

Those transfers had been "settlement payments" under § 546(e). The Circuit rejected the

Trustee's argument that the transfers could not be considered settlement payments because

BLMIS had never actually traded securities. It explained that the term "settlement payment" is

broadly construed "to apply to 'the transfer of cash or securities made to complete [a] securities

transaction." *Ida Fishman*, 773 F.3d at 422 (quoting *Enron Creditors Recovery Corp. v. Alfa,*

*S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011)) (alterations in *Ida Fishman*). Thus, if a

customer instructs her broker to sell shares and remit cash to the customer, the payment is a

settlement "even if the broker may have failed to execute the trade" and sent cash "stolen from

another client." *Id.*

Drawing on the latter part of the reasoning in *Ida Fishman*, defendants argue that

*Antecedent Debt Decision* is methodologically in tension with *Ida Fishman*. Defendants note

that *Ida Fishman* construed the Bankruptcy Code terms "in connection with a securities contract"

or "settlement payment" separately from SIPA, whereas *Antecedent Debt Decision* construed the

Bankruptcy Code term "value" by considering the interplay between SIPA and the Bankruptcy

Code.

This argument is unpersuasive as a basis for reconsidering *Antecedent Debt Decision*.

*Ida Fishman* interpreted § 546(e), which, the Second Circuit recognized, was "expressly

inapplicable," 773 F.3d at 416, to the provision the Trustee invokes here to avoid BLMIS's

fraudulent transfers: § 548(a)(1)(A). That BLMIS's transfers were "settlement payments" within

the meaning of one statutory provision does not logically suggest that defendants gave "value"

within the meaning of a separate statutory provision when they received intentional fraudulent

transfers of money.  Defendants argue that *Ida Fishman* determined that "the Bankruptcy Code

controls avoidance of transfers in a SIPA avoidance proceeding."  Def. Mem. at 32.  That

argument, however, overreads the Circuit's decision.  *Ida Fishman* emphasized the distinct goals

of SIPA, versus the Bankruptcy Code, in considering a time-bar component of § 546(e).  *See* 773

F.3d at 423.  But SIPA and the Bankruptcy Code "are not so easily separated with respect to

other aspects of fraudulent transfer litigation."  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv.*

*Sec. LLC (In re Bernard L. Madoff)*, 531 B.R. 439, 470 (Bankr. S.D.N.Y. 2015) ("*Omnibus*

*Good Faith Decision*").  "Unlike § 546(e), there is no clear statutory direction that the

satisfaction of claims against the general estate provides value for the fraudulent transfer of

fictitious profits from the deposits made by other customers."  *Id.*

      Defendants' thesis that because a transfer constitutes a "settlement payment" under

§ 546(e) it necessarily conferred value on BLMIS within the meaning of § 548(c) is, at root, an

*ipse dixit*.  The two issues are distinct matters of statutory construction, and very different.  As

the Bankruptcy Court correctly observed in its Report here, the Second Circuit did not, in *Ida*

*Fishman* or elsewhere, upset "the general rule in Ponzi scheme cases limiting value to principal

deposits."  Report at 30 (citing *Silverman v. Cullin*, 633 F. App'x 16, 17 (2d Cir. 2016)

(summary order) ("Other courts of appeal have held that payments of 'interest' to Ponzi scheme

investors should be treated as fraudulent transfers, because 'fair consideration' is not present in

the context of such schemes. . . .  While we have not addressed this issue, the prevailing view in

the district and the bankruptcy courts in this Circuit has agreed with this consensus.")).

Accordingly, the Court holds, the Trustee is correct that *Ida Fishman* does not justify or require

reconsideration of *Antecedent Debt Decision*.

Defendants next rely on *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir.

2014. There, the BLMIS Trustee sought to enjoin settlements between BLMIS feeder funds and

their customers pursuant to 11 U.S.C. § 105(a). The Trustee argued that the settlements impaired

his ability to recover fraudulent transfers from the settling feeder fund defendants. 762 F.3d at

204–05. The District Court refused to enjoin the settlements and the Second Circuit, affirming,

found no abuse of discretion. The Circuit observed that "[a] SIPA trustee has no greater legal

interest in unadjudicated fraudulent transfers than does a trustee in bankruptcy." *Id.* at 212.

Defendants argue that, under *Fairfield*, until property is avoided and recovered under

the Bankruptcy Code, it does not become property of the estate—or, in the context of SIPA, part

of the customer property fund. On this basis, defendants argue, the Bankruptcy Court "wrongly

treated the Trustee's claims as if the property sought was already in the SIPA customer estate

and as though the value defense should be applied as if they submitted net equity claims for

those sums in the later SIPA proceeding." Def. Mem. at 4–5. This argument is unpersuasive.

*Fairfield* does not limit the ability of a trustee in any liquidation to seek to recover intentionally

fraudulent transfers such as those at issue here. Nor is *Fairfield* in tension with Judge Rakoff's

reasoning in *Antecedent Debt Decision*. On the contrary, it is defendants' construction that is

problematic, in that, as the Trustee notes, defendants suggest that "the only property that could

be recovered would be property that had already been recovered." Trustee's Mem. at 33. Such

a reading would gut the Bankruptcy Code's avoidance provisions.[4]

---

[4] Defendants also argue that the Bankruptcy Court disregarded, in addition to *Fairfield*, the
decision in *Sharp Int'l Corp. v. State St. Bank & Tr. Co.*, 403 F.3d 43, 54–55 (2d Cir. 2005). But
that decision was handed down years before *Antecedent Debt Decision*. It does not qualify as
subsequent intervening authority that would justify the Court to reexamine *Antecedent Debt
Decision*. Indeed, in *Greiff*—on which *Antecedent Debt Decision* relied—Judge Rakoff
addressed *Sharp* at length and found it inapposite. *See* 476 B.R. at 723 n.8.

Finally, defendants argue that even if *Antecedent Debt Decision* remains good law—

and it clearly does—it is inapplicable here because it arose in a distinct procedural context. As

defendants note, *Antecedent Debt Decision* resolved a motion to dismiss under Federal Rule of

Civil Procedure 12(b)(6). Accordingly, Judge Rakoff assumed the truth of the factual allegations

in the Trustee's complaint, which did not plead the affirmative defenses on which defendants

here rely. By contrast, defendants note, the instant litigation arises out of cross-motions for

summary judgment based on stipulated facts. Defendants argue that *Antecedent Debt Decision*

assumed that they were "investors in the business of Madoff Securities," Def. Mem. at 39,

whereas it is stipulated here that defendants were "innocent retail securities customers of the

Broker," *id.*; *see also* Lowrey Stip. ¶¶ 9–10. Defendants argue that this distinction matters

because securities customers enjoy rights that equity investors do not: (1) state law rights to

receive full payment of reported securities entitlements; and (2) the federal protections of § 29(b)

of the 1934 Act, which ensures BLMIS's obligations despite Madoff's fraud. Def. Mem. at 39

n.18.

Defendants' attempt thus to cabin *Antecedent Debt Decision* to apply only to equity

investors is unavailing. As Judge Rakoff explicitly explained in *Greiff* (on which *Antecedent

Debt Decision* relied) the distinction between equity investors and other creditors who seek to

enforce by law BLMIS's false representation about their purported gains or profits—including

customers of a brokerage firm who seek to retain fraudulent transfers—is a "distinction without a

difference." 476 B.R. at 726. Rather, customers of BLMIS "faced the same risk as equity

investors" in BLMIS because they "contracted for another to use its best efforts to try to generate

a profit." *Id.* Judge Rakoff explained:

> Any entitlement defendants had to return on their investment, then, depended on a
> representation that [BLMIS] had in fact generated a profit. The complaints allege

> that [BLMIS's] representations in this regard were wholly fraudulent. Thus,
> defendants, in effect, ask the Court to enforce the scheme on the ground that the
> vehicle of this particular Ponzi scheme . . . styled itself as a stockbroker. Such a
> distinction pays only lip service to the underlying realities of the Ponzi scheme, and
> the Court rejects it.

*Id.* at 726. Therefore, even if defendants are correct that *Antecedent Debt Decision* treated them,

based on the pleadings, as equity investors as opposed to brokerage customers, *Greiff* makes

clear that this distinction is of no moment.

For all the reasons above, *Antecedent Debt Decision*'s holding remains law of the case.

Accordingly, defendants cannot prevail on their affirmative defense that they gave "value" in

exchange for the fraudulent transfers.

### B.    SEC Financial Responsibility Rules

Next, defendants argue that the Bankruptcy Court improperly ruled for the Trustee and

against defendants on a claim he had not pled—under the SEC's financial responsibility rules.

They argue that the Trustee lacked standing to pursue such a claim, and that the Bankruptcy

Court was wrong to resolve it.

This argument is meritless, and is quickly dispatched. The Bankruptcy Court's Report

does indeed discuss the SEC's "Customer Protection Rule," promulgated in 17 C.F.R.

§ 240.15c3-3.[5] That Rule requires broker-dealers like BLMIS to segregate and protect customer

---

[5] The Bankruptcy Court cited to subsections (b) and (e), which provide, in relevant part:

> (b)  Physical possession or control of securities.
>
>> (1)  A broker or dealer shall promptly obtain and shall thereafter
>> maintain the physical possession or control of all fully-paid
>> securities . . . carried by a broker or dealer for the account of
>> customers.
>> . . .
>
> (e)  Special reserve bank accounts for the exclusive benefit of customers . . . .

property from their other operations.  It thereby ensures that customer property held by a broker

will be available for distribution to customers if the firm fails.  *See Broker-Dealers; Maintenance*

*of Certain Basic Reserves,* Exchange Act Release No. 34-9856, 1972 WL 125352, at *2 (Nov.

13, 1972) (a rationale behind the Rule is to "facilitate the liquidations of insolvent broker-dealers

and to protect customer assets in the event of a SIPA liquidation through a clear delineation in

---

(1) Every broker or dealer must maintain with a bank . . . at all times
when deposits are required or hereinafter specified a "Special
Reserve Bank Account for the Exclusive Benefit of Customers"
(hereinafter referred to as the Customer Reserve Bank Account . . .
separate from . . . any other bank account of the broker or dealer.
Such broker or dealer must at all times maintain in the Customer
Reserve Bank Account . . . through deposits made therein, cash
and/or qualified securities in amounts computed in accordance with
the formula attached as Exhibit A (17 CFR 240.15C3-3a), as applied
to [the] customer account[].

(2)    With respect to each computation required pursuant to
paragraph (e)(1) of this section, a broker or dealer must not accept
or use any of the amounts under items comprising Total Credits
under the formula referred to in paragraph (e)(1) of this section
except for the specified purposes indicated under items comprising
Total Debits under the formula, and, to the extent Total Credits
exceed Total Debits, at least the net amount thereof must be
maintained in the Customer Reserve Bank Account . . . pursuant to
paragraph (e)(1) of this section.

(3)  Reserve Bank Account computations.

(i)  Computations necessary to determine the amount
required to be deposited in the Customer Reserve
Bank Account . . . as specified in paragraph (e)(1) of
this section must be made weekly, as of the close of
the last business day of the week, and the deposit so
computed must be made no later than one hour after
the opening of banking business on the second
following business day . . . .

17 C.F.R. § 240.15c3-3(b) & (e).

Rule 15c3-3 of specifically identifiable property of customers"). Violations of this Rule may

trigger a SIPA liquidation. *See* SIPA § 78eee(b)(1)(C). As noted, in the event of a SIPA

liquidation, the pool of customer funds is to be returned to the broker's customers. *See* SIPA

§ 78*lll*(4) (defining "customer property" broadly to include "cash and securities . . . at any time

received, acquired, or held by or for the account of a debtor from or for the securities accounts of

a customer, and the proceeds of any such property transferred by the debtor, including property

unlawfully converted").

 Defendants mischaracterize the use to which the Bankruptcy Court put the SEC's

Customer Protection Rule. The Bankruptcy Court did not resolve, to the defendants' detriment,

an unpleaded claim for violations of that Rule. Rather, the Bankruptcy Court discussed the Rule

in the course of evaluating defendants' "for value" arguments. The Bankruptcy Court concluded

that the Rule reflected Congress's intent to create a pool of customer funds, separate from the

broker's own assets, that may be returned to customers upon liquidation of the brokerage firm.

The Rule thus, in the Bankruptcy Court's view, lent further support to its conclusion that

customer property does not belong to the debtor brokerage firm and cannot be used by the debtor

to satisfy its own antecedent debts. This form of legal analysis by the Bankruptcy Court was

entirely proper.

## C.    Calculation of Defendants' Fraudulent Transfer Exposure

 Finally, defendants object to the method by which the Bankruptcy Court recommended

calculating their exposure for the fraudulent transfers. Section 548(a)(1) of the Bankruptcy Code

allows trustees to avoid transfer made "within 2 years before the date of the filing of the petition

. . ." In *Greiff*, Judge Rakoff interpreted this provision. He adopted the Trustee's proposed "Net

Investment Method" for calculating exposure for transfers occurring within the two-year reach-

back period set forth in § 548(a)(1):

> As for the calculation of how much the Trustee may recover under these claims,
> the Court adopts the two-step approach set forth in *Donell v. Kowell*, 533 F.3d 762,
> 771–72 (9th Cir. 2008). First, amounts transferred by [BLMIS] to a given
> defendant at any time are netted against the amounts invested by that defendant in
> [BLMIS] at any time. Second, if the amount transferred to the defendant exceeds
> the amount invested, the Trustee may recover these net profits from that defendant
> to the extent that such monies were transferred to that defendant in the two years
> prior to [BLMIS] filing for bankruptcy. Any net profits in excess of the amount
> transferred during the two-year period are protected from recovery by the
> Bankruptcy Code's statute of limitations. *See* 11 U.S.C. § 548(a)(1).

476 B.R. at 729. Defendants argue that this method is inconsistent with § 548(a)(1) because it

permits the Trustee to consider withdrawals made outside the statutory two-year reach-back

limitation, and use these withdrawals to reduce the investor's net equity. Def. Mem. at 69.

Defendants have made this argument before—without success. The Net Investment

approach was first articulated in connection with BLMIS in *Greiff*. As the Bankruptcy Court

noted, *see* Report at 32, defendants then challenged that approach in *Antecedent Debt Decision*.

*See* Defendants' 2012 Mem. at 28–29 ("[A] fatal flaw to the Trustee's approach is that time-

barred fraudulent transfer claims would be used offensively to increase the maximum fraudulent

transfer exposure of Defendants."). They argued then, as now, that § 548(a)(1) establishes a

statute of repose, precluding the Trustee from taking into account transfers executed before the

two-year reach-back period. *See id.* at 39–40 ("Like statutes of limitations, reach-back periods

are statutes of repose established by legislatures in recognition of the fact that it would be unfair

and unreasonable to force a person to litigate a particular issue more than a certain number of

years after the occurrence giving rise to the claim."). Judge Rakoff rejected that argument in

*Antecedent Debt Decision.* He explained:

> It is true that section 548(a)(1) allows the Trustee to avoid only those transfers made
> by the debtor "on or within 2 years before the date of the filing of the [bankruptcy]

petition." 11 U.S.C. § 548(a)(1)(A). Yet there is no similar limitation in section 548(c) with respect to whether a given transfer is "for value." The concept of harm or benefit to the estate is separate from the concept of the reach-back period, which merely serves to allow finality to ancient transactions. . . . Thus, there is no reason why a line should be drawn at the beginning of the reach-back period in determining whether a transfer was for value.

499 B.R. at 427 (first alteration in *Antecedent Debt Decision*). Thus, as to the Trustee's

proposed calculation method, too, *Antecedent Debt Decision* is law of the case, and forecloses

defendants' challenge absent "an intervening change of controlling law, the availability of new

evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways,*

*Ltd.*, 956 F.2d at 1255 (citation omitted).

Defendants argue that the Supreme Court's 2017 decision in *CalPERS, supra,* is

intervening authority warranting reconsideration. There, investors in various publicly-offered

securities filed a timely putative class action against underwriters of the offering, alleging

violations of § 11 of the Securities Act of 1933. 137 S. Ct. at 2047–48. Such a claim may not be

brought "more than three years after the security was bona fide offered to the public . . ." 15

U.S.C. § 77m. More than three years later, the California Public Employee's Retirement System

("CalPERS") filed a separate lawsuit bringing securities law claims identical to those in the

class-action complaint. 137 S. Ct. at 2048. The question before the Supreme Court was whether

the three-year period was a statute of limitations, which may be subject to equitable tolling, *see*

*Am. Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 559 (1974), or a statute of repose, which usually

may not be tolled, *see CTS Corp. v. Waldburger,* 134 S. Ct. 2175, 2183 (2014). The Court held

that the three-year period was a statute of repose because (1) it "runs from the defendant's last

culpable act (the offering of the securities), not from the accrual of the claim (the plaintiff's

discovery of the defect in the registration statement)," *id.* at 2049, and (2) the "pairing of a

shorter statute of limitations and a longer statute of repose is a common feature of statutory time limits," *id.*

Defendants here argue that the reasoning in *CalPERS* is inconsistent with the Trustee's calculation method. They argue that Bankruptcy Code § 546(a) imposes a statute of limitations within which the Trustee must commence the avoidance proceeding, while § 548(a) is a statute of repose that "looks back two years from the petition date to identify the transfer that may be attacked" and may not be equitably tolled. Def. Mem. at 67.

Defendants' argument misses the point. Judge Rakoff's analysis in *Antecedent Debt Decision* did not turn on whether § 548(a) was a statute of repose or a statute of limitation. And it contains no discussion of equitable tolling. Judge Rakoff acknowledged that § 548(a)(1) establishes a two-year reach-back period, and that transfers before that date may not be recovered. But, he explained, "[t]he concept of harm or benefit to the estate is separate from the concept of the reach-back period," and so there is no reason "why a line should be drawn at the beginning of the reach-back period in determining whether a transfer was for value." 499 B.R. at 427. Defendants' reliance on *CalPERS* is therefore misplaced. Allowing the Trustee to consider earlier withdrawals for purposes of calculating net equity is not in tension with, and does not require the Court to revisit, *Antecedent Debt Decision.*

**D.    Defendants' Motion for Leave to File a Reply to Trustee's Response to Objections**

One housekeeping matter remains. Defendants have moved for leave to file a reply brief to the Trustee's response to defendants' objections to the Bankruptcy Court's Report. Dkt. 8. The Federal Rules of Bankruptcy Procedure and Local Rules for the Bankruptcy Court of the Southern District of New York do not provide for reply briefs when a party objects to a Bankruptcy Court's Report and Recommendation. *See* Fed. R. Bankr. P. 9033(b). However,

courts permit parties to file reply papers if the reply "properly address[es] new materials raised in

the opposition papers so as to avoid giving unfair advantage to the answering party." *Bayway*

*Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226–27 (2d Cir. 2000) (internal

quotations omitted).

According to defendants, the Trustee argued for the first time in its opposition papers

that "the SIPA definition of 'customer property' allows him to forgo the Bankruptcy Code's

avoidance and recovery procedures." Dkt. 9 at 3. "This new argument," defendants claim, "is

central to the Trustee's claim that the Second Circuit decision in *Fairfield Greenwich* can be

circumvented and the normal requirements of the avoidance statute supplanted by a SIPA net

equity process." *Id.* at 4. The parties debate, at length, whether in fact this argument had been

raised earlier, whether in defendants' objections, in supplemental letters, or in oral argument.

There is no useful purpose served by the Court's excavating the litigation history of this

case to discern whether or not the Trustee made the precise argument earlier. Defendants'

complaint is that the Trustee has offered a new basis to purportedly distinguish *Fairfield*

*Greenwich*, a case defendants claim undermines *Antecedent Debt Decision*. But as explained

above, the Court has independently concluded that *Fairfield Greenwich* is inapposite.

Accordingly, the Court denies defendants' motion as moot.

## CONCLUSION

For the reasons stated above, the Court adopts in full the Bankruptcy Court's

recommendation, set forth in its thorough Report. The Court grants the Trustee's motion for

summary judgment and denies defendants' cross-motion for summary judgment. The Court

enters judgment in the amounts set forth on page 8, footnote 2, of this decision. The Court

further respectfully requests that the Clerk of Court terminate the motion pending at docket entry

8 in case number 18 Civ. 5381 and the motions pending at docket entry 10 in case numbers 18

Civ. 5430; 18 Civ. 5452; and 18 Civ. 5453.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: February 7, 2019
          New York, New York