# EXHIBIT G

2019 WL 294807
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE: TRIBUNE COMPANY
FRAUDULENT CONVEYANCE LITIGATION

11md2296 (DLC)
|
12cv2652 (DLC)
|
12cv6055 (DLC)
|
Signed 01/23/2019

**Attorneys and Law Firms**

For the Trustee: David M. Zensky, Mitchell P. Hurley, Deborah J. Newman, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Michael L. Waldman, Mark A. Hiller, Robbins, Russel, Englert, Orseck, Untereiner & Sauber LLP, 1801 K Street, N.W., Suite 411L, Washington, DC 20006, Jeffrey T. Golenbock, Douglas L. Furth, Golencok Eiseman Assor Bell & Peskoe LLP, 437 Madison Ave, New York, NY 10022, Robert J. Lack, Hal Neier, Amy C. Brown, Jeffrey R. Wang, Friedman Kaplan Seiler & Adelman LLP, 7 Times Square, New York, NY 10036.

For the Independent Directors: Matthew R. Kipp, Donna L. McDevitt, Jason T. Manning, Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Chicago, Illinois 60606.

For Samuel Zell, EGI-TRG, LLC, Equity Group Investments, LLC, and Sam Investment Trust: David J. Bradford, Catherine L. Steege, Daniel J. Weiss, Andrew W. Vail, Jenner & Block LLP, 353 North Clark Street, Chicago, Illinois 60654.

For GreatBanc Trust Company: Roger H. Stetson, William J. Barrett, Jack O. Snyder, Jr., Barack Ferrazzano Kirschbaum & Nagelberg LLP, 200 West Madison Street, Suite 3900, Chicago, IL 60606.

For Morgan Stanley & Co. LLC: Jonathan D. Polkes, Michael F. Walsh, Stacy Nettleton, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153.

For Merrill Lynch, Pierce, Fenner & Smith Inc.: Daniel L. Cantor, Evan M. Jones, Daniel S. Shamah, O'Melveny & Myers LLP, 7 Times Square, New York, NY 10036.

For Citigroup Global Markets Inc.: Andrew G. Gordon, Kira A. Davis, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019.

For Duff & Phelps, LLC: Steven V. D'Amore, Michael S. Pullos, Winston & Strawn LLP, 35 W. Wacker Drive, Chicago, IL 60601.

For Valuation Research Corporation: Richard W. Reinthaler, David Neier, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166.

## OPINION & ORDER

DENISE COTE, United States District Judge

**\*1 Background**...———

Procedural History...———

Discussion...———
I. General Principles of Law...———

    A. Avoidance of Transfers and Preference Payments...———

    B. DGCL Sections 160 and 173...———

    C. Corporate Directors' Fiduciary Duties...———

    D. Aiding and Abetting Breach of Fiduciary Duty...———

    E. Unjust Enrichment...———

    F. Professional Malpractice...———

    G. In Pari Delicto...———

II. Independent Directors (Motion 1)...———

    A. Breach of Fiduciary Duty...———

    B. DGCL Sections 160 and 173...———

    C. Unjust Enrichment...———

In re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)

2019 WL 294807

D. Equitable Subordination...—

E. Avoidance of Indemnification Obligations...—

III. Zell Defendants (Motion 2)...—

A. Breach of Fiduciary Duty...—

B. DGCL Sections 160 and 173...—

C. Aiding and Abetting Liability...—

D. Avoidance of Indemnification Obligations to Zell...—

E. Alter Ego Liability...—

F. Avoidance of EGI and EGI-TRB Fraudulent Transfers and Preference Payments...—

G. Unjust Enrichment...—

H. Equitable Subordination...—

IV. Advisor Defendants (Motions 8-10)...—

A. Aiding and Abetting Breach of Fiduciary Duty...—

  1. Morgan Stanley...—

  2. VRC...—

  3. Duff & Phelps...—

  4. Affirmative Defense - In Pari Delicto...—

B. Professional Malpractice...—

C. Unjust Enrichment...—

D. In Pari Delicto...—

E. Fraudulent Transfers...—

  1. Constructive Fraudulent Transfers...—

  2. Actual Fraudulent Transfer...—

Conclusion...—

On July 23, 2012, the Tribune Company ("Tribune" or the "Company") emerged from bankruptcy. The reorganization plan confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") transferred certain claims of the bankruptcy estate to Tribune's litigation trust, whose board later selected Marc S. Kirschner as litigation trustee (the "Trustee"), to recover assets for the benefit of Tribune's creditors. This Opinion addresses motions to dismiss filed in two actions being pursued by the Trustee.

In Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Dennis J. FitzSimons, et al., 12cv2652 (the "FitzSimons Action"), which was originally filed on November 1, 2010 in the Bankruptcy Court as Official Committee of Unsecured Creditors of Tribune Company, et al. v. FitzSimons, et al., and was transferred to this district on March 20, 2012, the Trustee asserts a claim of intentional fraudulent transfer of assets and various other claims against several individuals and entities. Most but not all defendants have moved to dismiss the claims against them. Opinions of January 6, 2017 and November 30, 2018 addressed some of the motions to dismiss. See In re Tribune Co. Fraudulent Conveyance Litig., 11md2296 (RJS), 2018 WL 6329139 (S.D.N.Y. Nov. 30, 2018) ("the November 2018 Opinion"); In re Tribune Co. Fraudulent Conveyance Litig., 11md2296 (RJS), 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) ("the January 2017 Opinion"). Familiarity with those Opinions is assumed.

In Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Citigroup Global Markets Inc. and Merrill, Lynch, Pierce, Fenner, & Smith, Inc., 12cv6055 (the "Citigroup Action"), which was originally filed in the Bankruptcy Court for the District of Delaware on April 2, 2012 as Official Committee of Unsecured Creditors v. Citigroup Global Markets, Inc. and Merrill, Lynch, Pierce, Fenner & Smith Inc., and was transferred to this district on August 8, 2012, the Trustee asserts claims for aiding and abetting breaches of fiduciary duties and other claims against Citigroup Global Markets, Inc. ("Citigroup") and Merrill, Lynch, Pierce, Fenner, and Smith, Inc. ("MLPFS").

**\*2** This Opinion resolves most of the remaining motions to dismiss in the FitzSimons and Citigroup Actions.[1] These motions are granted or denied for the following reasons.

In re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)

2019 WL 294807

## Background

This lawsuit arises out of the 2007 leveraged buyout ("LBO") of Tribune and its subsequent bankruptcy in 2008. Prior to filing for bankruptcy in 2008, Tribune was "America's largest media and entertainment company," owning numerous radio and television stations and major newspapers, including the Chicago Tribune and the Los Angeles Times. In the years preceding the 2007 LBO, the newspaper publishing business, which made up approximately 75% of Tribune's revenues, experienced a consistent decline in circulation and profits.

## Retention of MLPFS and Citigroup and 2006 Recapitalization

Tribune retained the services of MLPFS in October 2005, and later Citigroup, to assist with a strategic review of its business, including evaluation of potential strategic transactions. Both advisors' retention agreements expressly provided that they would be permitted to participate as lenders in any strategic transaction in which the Company engaged.

In May 2006, with the advice of MLPFS and Citigroup, Tribune engaged in a leveraged recapitalization. Following the May 2006 transaction, 33% of Tribune stock was held by two constellations of family trusts and foundations: (1) the Chandler Trusts, which owned 20% of Tribune stock, and (2) the Robert R. McCormick Foundation ("McCormick Foundation") and the Cantigny Foundation (together with the McCormick Foundation, the "Foundations"), which collectively owned approximately 13% of Tribune stock.

Tribune had an eleven-member board of directors (the "Board"), which was chaired by Tribune's President and Chief Executive Officer ("CEO"), Dennis FitzSimons ("FitzSimons"), who also served as Chairman of the McCormick Foundation and a board member of the Cantigny Foundation. The Board also included three trustees and/or beneficiaries of the Chandler Trusts: Jeffrey Chandler, Roger Goodan, and William Stinehart Jr. (the "Chandler Directors"). Finally, the Board included seven independent members who neither served as Tribune officers nor were affiliated with the Chandler Trusts or the Foundations (the "Independent Directors").[2]

## Formation of Special Committee and Retention of Morgan Stanley

In June of 2006, soon after the recapitalization, William Stinehart, Jr. ("Stinehart"), acting in his capacity as a trustee of the Chandler Trusts, wrote to the Board expressing dismay over the Company's deteriorating business. Stinehart "demanded" that a special committee of independent directors be formed to "take prompt decisive action to enhance stockholder value." Accordingly, in September 2006, the Board established a special committee of the seven Independent Directors to explore the possibility of further strategic transactions to keep the Company afloat (the "Special Committee").

*3 In October of 2006, Morgan Stanley was retained to act as financial advisor to the Special Committee. Morgan Stanley's engagement letter provided for a $7.5 million fee contingent upon the preparation of an opinion concerning, or the closing of, a financial transaction, recapitalization, or restructuring plan for Tribune, as well as an additional discretionary fee. Morgan Stanley ultimately received more than $10 million in fees and expenses for its work advising the Special Committee. Morgan Stanley's engagement letter, unlike the Citigroup and MLPFS retainers, provided that it would not participate as a lender in any potential LBO.

MLPFS and Citigroup solicited bids from third parties that expressed an interest in pursuing a strategic transaction with the Company and advised the Company respecting the bids. MLPFS and Citigroup representatives also met regularly with the Special Committee in the months leading up to approval of the LBO.

## Zell Bids for Tribune

In January 2007, private-equity investor Sam Zell ("Zell") emerged as a bidder for Tribune. On February 2, 2007, Zell, in association with Equity Group Investments ("EGI"), a company in which he owned a controlling interest, proposed that EGI-TRB, LLC ("EGI-TRB"), an affiliate of EGI created for the purpose of consummating the LBO, buy all of Tribune's outstanding stock pursuant to a merger. Over the course of the next several weeks, Zell negotiated his proposal with Tribune and the Special Committee, which sought the views of the Chandler Trusts

In re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)
2019 WL 294807

and the Foundations on a number of occasions. Zell and EGI also negotiated directly with the Chandler Trusts.

As the Company negotiated the LBO with Zell, its financial advisors harbored doubts about the wisdom of the transaction which they did not share with either the Company or its Special Committee. A managing director at MLPFS expressed doubts given the amount of debt the LBO would require Tribune to take on. Similarly, a senior member of Citigroup's leveraged finance team wrote to Citigroup's principal advisor to Tribune that she was "extremely uncomfortable with Zell" and "very concerned" about the potential increase in debt in light of the Company's declining earnings. Citigroup and MLPFS also expressed concerns about February 2007 financial projections ("the February 2007 Projections") put together by three Tribune officers, commenting that the "Tribune Management Projections [were] generally more aggressive than Wall Street research," and were "[a]bove consensus for Revenues and EBITDA through 2007." The Trustee alleges that MLPFS and Citigroup lobbied aggressively for the Zell proposal despite these doubts.

**Proposed Two-Step Transaction**
On March 4, 2007, Zell and EGI submitted a revised proposal for a two-step LBO transaction. In the first step ("Step One"), Tribune would borrow approximately $7 billion and execute a tender offer, purchasing about 50% of Tribune's outstanding shares at $34 per share. In the second step ("Step Two"), Tribune would borrow another $3.7 billion, purchase its remaining shares, and merge with the newly formed Tribune Employee Stock Ownership Plan ("ESOP"). At the conclusion of the LBO, Tribune would become a private company, wholly owned by the ESOP. Zell's proposal also included financial benefits that would be awarded to the Officer Defendants,[3] and to the officers and directors of Tribune's subsidiaries, if the LBO were consummated.

Just weeks earlier, on February 13, 2007, the Board had hired accounting firm Duff & Phelps, LLC ("Duff & Phelps") to provide a solvency opinion for the LBO in exchange for a fee of $1.25 million. Duff & Phelps was given full access to all documents relevant to Tribune's financial condition to assist it in preparing the solvency opinion. On February 26, 2007, the Board hired GreatBanc Trust Company ("GreatBanc") to serve as

trustee of the ESOP and to evaluate the LBO transaction on the ESOP's behalf. Half of GreatBanc's total fee was made contingent upon a shareholder vote in favor of the merger. Duff & Phelps also agreed to provide a separate, but substantially identical, solvency opinion to GreatBanc to assist it in assessing the LBO. The February 26 engagement letter between GreatBanc and Tribune explicitly provided that GreatBanc was to engage Duff & Phelps as its financial advisor, but that letter was later superseded by a direct letter of engagement between GreatBanc and Duff & Phelps dated March 8, 2007. Tribune agreed to pay $1 million to Duff & Phelps for the work it performed for GreatBanc.

**\*4** Duff & Phelps formed two teams to work on the LBO: a "solvency team" which performed a solvency analysis for Tribune, and an "ESOP team," which performed analysis for GreatBanc. GreatBanc and Duff & Phelps representatives participated in a meeting with the Special Committee on March 21, 2007.

By March 28, 2007, however, Duff & Phelps advised the Board that it could not provide an opinion as to Tribune's post-LBO solvency unless it incorporated what the Duff & Phelps team concluded was an impermissible consideration: $1 billion in tax savings that Tribune expected would result from converting the Company into a subchapter S corporation following the LBO. In a March 19 meeting, Duff & Phelps had advised GreatBanc that there was "no case law to support considering tax savings of the ESOP in [determining] solvency." Without considering the anticipated tax savings, Duff & Phelps' analysis found that, using the low-end estimate of Tribune's post-LBO value, its liabilities would exceed its assets by $300 million. Before the end of March, the Board terminated Duff & Phelps' engagement to issue a solvency opinion.

**April 1, 2007 Approval of LBO**
Instead of issuing a solvency opinion, on April 1, 2007, for a fee of $750,000, Duff & Phelps issued a "viability opinion" for GreatBanc's benefit, taking into account the projected tax savings, in which it concluded that "the fair market value of Tribune's assets would exceed the value of its liabilities on a post-transaction basis" and that Tribune "would be able to pay its debts as they became due."[4] Duff & Phelps acknowledged that it had done nothing to evaluate the likelihood that the ESOP would be able to

realize the tax savings. The viability opinion "expressly disclaimed" that it was a solvency opinion, stating:

> The Determinations are not intended to be, and do not conform to, (a) determinations of insolvency as promulgated by § 101(29)(A) of the U.S. Bankruptcy Code or (b) determinations of fraudulent transfers under the Uniform Fraudulent Transfer Act and other state laws dealing with fraudulent conveyance and the Determinations do not include the standard analyses and determinations typically included in a standard Duff & Phelps solvency opinion.

On April 1, 2007, the same day Duff & Phelps produced its viability opinion for GreatBanc, GreatBanc's ESOP Committee approved the LBO. Also on that day, the Special Committee unanimously recommended that the Board approve the LBO. Accordingly, a majority of the Board -- six of the Independent Directors and FitzSimons -- voted to approve the transaction, causing Tribune to enter into a merger agreement with EGI-TRB. Dudley S. Taft, the seventh Independent Director, was absent and the Chandler Directors abstained. No director cast a dissenting vote.

Tribune then executed a voting agreement and registration rights agreement with the Chandler Trusts in which the Trusts agreed to vote their shares in favor of the LBO in exchange for preferential registration rights. This agreement "virtually guaranteed shareholder approval for the LBO." On April 2, Tribune publicly announced that it had agreed to Zell and EGI's proposal.

Step One Closes on June 4, 2007
Knowing that a solvency opinion would be required before the transaction could close, Tribune management began soliciting bids from other valuation firms. At least one such firm told Tribune that it could not provide a solvency opinion. On April 11, Tribune formally engaged a "lesser known solvency opinion firm", Valuation Research Corporation ("VRC"), to provide two solvency opinions that would be presented to the Board prior to the consummation of each step of the LBO.

*5 Internally, VRC executives expressed doubts about the transaction, noting that it was "[h]ighly [u]nusual (because of S-Corp ESOP tax benefits) and highly leveraged." One executive commented: "This may be just acceptable risk levels, but we will need to be compensated." Another noted that the fact that another firm declined to bid on the contract "[r]aises the risk by itself." VRC eventually charged Tribune $1.5 million -- the highest fee it had ever charged for a solvency opinion.

VRC's engagement letter provided that it would deviate from the "standard" definition of fair value and rely on a definition of fair value that included Tribune's anticipated tax savings. VRC had never before worked on a solvency opinion that incorporated this definition of fair value. The engagement letter also stated that VRC would rely upon the reasonableness of Tribune's financial forecasts and its determination that it would receive the projected tax benefits. The letter added that VRC would "advise" the Company if it came to believe that any such forecasts were "unreasonable."

VRC initially submitted draft solvency opinions to the Officer Defendants that took into account all the debt that Tribune would acquire upon consummation of the LBO. The Officer Defendants, however, instructed VRC that they should ignore the debt that would be incurred at Step Two of the transaction when issuing the Step One solvency opinion. VRC agreed, and delivered its Step One solvency opinion to Tribune on May 24, 2007.

Meanwhile, on April 23, 2007, EGI-TRB made a $250 million investment in Tribune in exchange for nearly 1.5 million shares of Tribune common stock and a $200 million exchangeable promissory note, payable at Step Two. On May 9, 2007, Zell was appointed as a member of Tribune's Board. On June 4, 2007, the directors and officers of Tribune's subsidiaries agreed to guarantee the LBO debt against the subsidiaries' assets, and Step One of the LBO closed. Upon the close of Step One, the Chandler Directors left the Board.

Step Two Closes on December 20, 2007
As early as March 2007, Tribune's performance was falling well short of the February 2007 Projections. The

In re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)

2019 WL 294807

Officer Defendants updated those projections in October 2007 ("October Projections"), after Step One of the LBO had been completed. Taking into account the October Projections, VRC concluded that it could not issue a solvency opinion unless Tribune could represent that it would be able to refinance debt that was set to mature in 2014 and 2015. In a December 2, 2007 telephone call, certain Officer Defendants represented to VRC that Morgan Stanley had agreed that Tribune could refinance its debt in 2014, even in a "downside" scenario. The Officer Defendants confirmed this representation in writing in a letter to VRC dated December 20, 2007. Morgan Stanley, however, had told Officer Defendant Chandler Bigelow that it was unable to make such a representation. On December 18, 2007, VRC issued its Step Two solvency opinion, relying in part on the Officer Defendants' representations and the October Projections, although VRC's internal projections differed significantly.

In September 2007, Tribune officers asked Morgan Stanley to "reengage with the board" concerning Step Two of the LBO. An internal email among Morgan Stanley representatives indicated that the scope of the work would be "i) reviewing the 5/9/07 solvency opinion rendered by [VRC], ii) replicating their analysis, and iii) making sure that VRC (based on their initial analysis) would still render today an opinion that Tribune remains a solvent entity." Morgan Stanley performed a number of independent internal valuations showing that Tribune would be insolvent after Step Two under reasonable assumptions. After performing those valuations, Morgan Stanley representatives attended meetings of both the Board and the Special Committee, including one in which VRC representatives made a presentation to the Board regarding its solvency opinion. Morgan Stanley did not disclose its internal valuations to the Board or the Special Committee at those meetings or at any time.

*6 On December 11, 2007, Officer Defendant Chandler Bigelow forwarded an email to a Morgan Stanley representative which contained a series of questions from the lead banks financing the LBO. One of those questions was:

> VRC indicates that it is relying, in part, on a representation from Tribune which states that based upon recent discussions with

Morgan Stanley, the Company would be able to refinance debt in its downside forecasts without the need for additional asset sales. Did VRC meet with someone from Morgan Stanley and does VRC know whether Morgan Stanley understands that Tribune is relying upon its view?

Morgan Stanley did not contact VRC, the Board, or the Special Committee to alert them that it had not, and could not, make such a representation.

As provided for in their engagement letters with the Board, Citigroup and MLPFS participated in the LBO as lenders. In connection with this role, Citigroup and MLPFS performed their own internal solvency analyses in the days leading up to Step Two, which concluded that Tribune would be insolvent under various scenarios after Step Two. Despite concerns about the viability of the transaction, the LBO lenders, including Citigroup and MLPFS, went forward with Step Two because they believed they were contractually obligated to do so and the Officer Defendants had threatened them with litigation. Neither Citigroup nor MLPFS disclosed their internal solvency analyses to the Board or the Special Committee.

On December 18, 2007, the Special Committee recommended that the Board rely on VRC's Step Two solvency opinion and effectuate Step Two of the LBO. The Board did not hold an additional vote as to whether Tribune should proceed with Step Two. On December 20, the directors and officers of Tribune's subsidiaries guaranteed the additional debt necessary for Step Two and the Company completed Step Two, repurchasing its remaining 119 million shares of common stock at $34 per share. As anticipated, at the close of Step Two, Tribune, now a private company, carried a debt burden of $13.7 billion.

Filing for Bankruptcy: December 8, 2008
Following Step Two, Zell was named President, CEO, and Chairman of the Tribune Board. Soon after the LBO was completed, Tribune experienced serious financial difficulties. Specifically, between 2007 and 2008, the Company experienced significant declines in advertising

In re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)
2019 WL 294807

revenue that made it difficult to service its new debt and missed the projected growth rate forecasted in the October Projections. As a result of this financial distress, Tribune and many of its subsidiaries filed for Chapter 11 bankruptcy on December 8, 2008.

### Procedural History

On October 27, 2010, the Bankruptcy Court granted standing to the Official Committee of Unsecured Creditors of Tribune (the "Unsecured Creditors") to assert claims on behalf of Tribune's bankruptcy estate. The Unsecured Creditors initiated a number of adversary proceedings in the Bankruptcy Court, including the FitzSimons Action on November 1, 2010, against Tribune's directors, officers, shareholders, and financial advisors to claw back funds transferred during the LBO.

Separately, Tribune's creditors filed numerous civil actions in venues across the country against a variety of individuals and entities associated with Tribune. On December 19, 2011, pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation (the "MDL Panel") consolidated approximately forty federal and state cases involving more than 5,000 defendants in the Southern District of New York before the Honorable Richard Holwell. See In re Tribune Co. Fraudulent Conveyance Litig., 831 F. Supp. 2d 1371 (J.P.M.L. 2011). [5] On February 9, 2012, the consolidated action was reassigned to the Honorable William Pauley.

*7 Of particular relevance to this Opinion, on March 20, 2012, the MDL Panel transferred the FitzSimons Action to the Southern District of New York to proceed as part of the MDL. The motions to dismiss claims in the FitzSimons Action are the primary subject of this Opinion. Similarly, on August 8, 2012, the MDL Panel transferred yet another adversary proceeding from the Bankruptcy Court -- the Citigroup Action -- to this district to proceed as part of the MDL. Finally, on May 21, 2013, the MDL Panel transferred another eighteen actions from the Bankruptcy Court to this district (the "Tag-Along Actions") to proceed as part of the MDL.

On July 23, 2012, the Bankruptcy Court confirmed a plan for Tribune's reorganization and transferred certain of the Unsecured Creditors' claims to the Trustee. On March 27,

2013, the MDL and all related motions were transferred to the Honorable Richard Sullivan.

On September 23, 2013, Judge Sullivan granted the defendants' motion to dismiss the individual creditors' state-law fraudulent conveyance claims (the "Phase One Motions") brought in forty-one of the related MDL actions against the Tribune shareholders who had received payouts through the LBO (the "Creditor Actions"), finding that Section 362(a)(1) of the Bankruptcy Code deprives individual creditors of standing to challenge the same transactions that the Unsecured Creditors were simultaneously seeking to avoid. In re Tribune Co. Fraudulent Conveyance Litig., 499 B.R. 310 (S.D.N.Y. 2013). On September 30, 2013, the parties in those actions filed a joint notice of appeal, and on March 29, 2016, the Court of Appeals for the Second Circuit affirmed Judge Sullivan's decision on different grounds, holding that the individual creditors' state law fraudulent conveyance claims were preempted by the Section 546(e) safe harbor provision of the Bankruptcy Code. In re Tribune Co. Fraudulent Conveyance Litig., 818 F.3d 98 (2d Cir. 2016). On July 22, 2016, the Second Circuit denied rehearing en banc, and the Second Circuit's mandate issued on August 1, 2016.

On September 9, 2016, the plaintiffs in the Creditor Actions filed a petition for a writ of certiorari with the United States Supreme Court. See Deutsche Bank Tr. Co. Ams., et al. v. Robert R. McCormick Found., et al., No. 16-317. Around the same time, the Supreme Court granted certiorari in Merit Management Group, LP v. FTI Consulting, Inc., a Seventh Circuit case that had rejected the Second Circuit's interpretation of Section 546(e) in an earlier case and had held that "the section 546(e) safe harbor [does not] protect[ ] transfers that are simply conducted through financial institutions (or the other entities named in section 546(e) ), where the entity is neither the debtor nor the transferee but only the conduit." 830 F.3d 690, 691 (7th Cir. 2016) (emphasis in original). On February 27, 2018, the Supreme Court unanimously affirmed the Seventh Circuit's decision in Merit Management. See Merit Mgmt. Grp., LP v. FTI Consulting, Inc., 138 S. Ct. 883 (2018).

Subsequently, on April 3, 2018, Justice Kennedy and Justice Thomas issued a statement concerning the petition for certiorari in the Creditor Actions, advising the parties that

consideration of the petition for certiorari [would] be deferred for an additional period of time ... [to] allow the Court of Appeals or the District Court to consider whether to recall the mandate, entertain a Federal Rule of Civil Procedure 60(b) motion to vacate the earlier judgment, or provide any other available relief in light of [the Supreme Court's] decision in Merit Management ... given the possibility that there might not be a quorum in the [Supreme] Court.

*8 Deutsche Bank Tr. Co. Americas v. Robert R. McCormick Found., 138 S. Ct. 1162, 1162–63 (2018). On May 15, 2018, the Second Circuit recalled the mandate in the Creditor Actions "in anticipation of further panel review."

Meanwhile, on June 4, 2013, the Trustee moved as the "successor plaintiff" to the Unsecured Creditors in both the FitzSimons Action and the Citigroup Action to amend the operative complaints, a motion which was granted on July 22, 2013. On August 2, 2013, the Trustee filed the fifth amended complaint in the FitzSimons Action ("FAC") and the first amended complaint in the Citigroup Action ("the Citigroup Complaint"). The Background section of this Opinion is drawn from the FAC and the Citigroup Complaint, which are substantially identical in all respects that are material to this Opinion. On November 20, 2013, Judge Sullivan granted the Trustee leave to file amended complaints in each of the Tag-Along Actions, which the Trustee did on December 5, 2013.

Pursuant to a scheduling order issued by Judge Sullivan on April 24, 2014, defendants in the FitzSimons Action, the Citigroup Action, and the Tag-Along Actions filed twelve separate motions to dismiss. Judge Sullivan imposed a stay of discovery pending resolution of the motions, which are referred to as the "Phase Two Motions".

On January 6, 2017, Judge Sullivan granted the shareholder defendants' motion to dismiss Count 1 of the FAC, which sought to avoid billions of dollars

paid to Tribune's shareholders during the LBO as actual fraudulent conveyances under the Bankruptcy Code. The January 2017 Opinion declined to impute the intent of Tribune's officers to Tribune for purposes of the Trustee's actual fraudulent conveyance claim, and determined that, although the Independent Directors' intent could be imputed to the Company, the Trustee had not sufficiently alleged that the Independent Directors acted with fraudulent intent. Following the January 2017 Opinion, Judge Sullivan partially lifted the discovery stay to allow document discovery to proceed.

On November 30, 2018, Judge Sullivan granted five additional motions to dismiss filed by subsidiary director and officer Durham J. Monsma,[6] the Chandler Trusts and the Foundations, the Chandler Directors, certain Tribune executives who were involuntarily terminated within one year of the LBO, and other Tribune employees who received payments within one year of Tribune's bankruptcy filing. This Opinion addressed motions brought in the FitzSimons Action and in the Tag-Along Actions. On December 1, 2018, this case was reassigned to this Court.

At a conference held on January 14, 2019, the Court discussed the schedule that would apply to this litigation. Following a decision on the pending motions to dismiss or substantially all of them, the parties will be permitted two months for mediation, with depositions and the completion of fact discovery to follow.

### Discussion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Cohen v. Rosicki, Rosicki & Assocs., 897 F.3d 75, 80 (2d Cir. 2018) (citation omitted). A claim to relief is plausible when the factual allegations in a complaint "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Progressive Credit Union v. City of New York, 889 F.3d 40, 48 (2d Cir. 2018) (citation omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Carlin v. Davidson Fink LLP, 852 F.3d 207, 212 (2d Cir. 2017). The plaintiff must plead enough facts to "nudge[ ] [his] claims across the line from conceivable

2019 WL 294807

to plausible...." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

**\*9** When a party moves to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R. Civ. P., a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." LaFaro v. N.Y. Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009) (citation omitted). "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016) (citation omitted). A court may also consider documents that are "integral to the complaint." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect." Id. A court may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit...." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000). A court may also take judicial notice of "relevant matters of public record." Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012).

**I. General Principles of Law**
Before addressing the individual motions to dismiss, the legal standards governing many of the claims are set forth. This section of the Opinion describes the law of avoidance of transfers and preference payments under the Bankruptcy Code, Delaware General Corporate Law Sections 160 and 173, corporate directors' fiduciary duties, aiding and abetting a breach of fiduciary duty, unjust enrichment, professional malpractice, and the affirmative defense of in pari delicto.

**A. Avoidance of Transfers and Preference Payments**
Under certain circumstances, the Bankruptcy Code authorizes a bankruptcy trustee to avoid transfers of the debtor's property and "obligation[s] ... incurred by the debtor" that were made or incurred by the debtor within two years prior to its filing for bankruptcy. 11 U.S.C. § 548(a)(1). This includes an actual fraudulent conveyance, which occurs when

> the debtor voluntarily or involuntarily -- (A) made such

> transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted....

Id. § 548(a)(1)(A).

Because a Section 548(a)(1)(A) claim sounds in fraud, a plaintiff asserting such a claim must satisfy the heightened pleading standards of Rule 9(b), Fed. R. Civ. P. See, e.g., In re Sharp Int'l Corp., 403 F.3d 43, 56 (2d Cir. 2005) (applying Rule 9(b) to New York state intentional fraudulent conveyance statute); see also In re Lyondell Chemical Co., 554 B.R. 635, 652 (S.D.N.Y. 2016) (applying Rule 9(b) to a Section 548(a)(1)(A) claim). Rule 9(b) provides, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Under Rule 9(b), "though mental states may be pleaded generally, Plaintiffs must nonetheless allege facts that give rise to a strong inference of fraudulent intent." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 171 (2d Cir. 2015) (citation omitted). A "strong inference" of fraud may be established by alleging facts showing either (1) a "motive and opportunity to commit the fraud"; or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 306 (2d Cir. 2015) (securities law); see also Adelphia Recovery Trust v. Bank of Am., N.A., 624 F. Supp. 2d 292, 308 (S.D.N.Y. 2009) (applying "motive and opportunity" test to the pleading of a Section 548 claim). A complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Blanford, 794 F.3d at 306 (citing Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007) ).

**\*10** "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case[.]" In re Sharp Int'l Corp., 403 F.3d at 56 (badges applied to pleading of state law claim of intentional fraudulent

conveyance); see also In re Kaiser, 722 F.2d 1574, 1582 (2d Cir. 1983) (badges applied in finding actual fraud); Lyondell, 554 B.R. at 652-53 (listing badges of fraud) (citing Uniform Fraudulent Transfer Act § 4, 7A U.L.A. at 653); see also 5 Collier on Bankruptcy ¶ 548.04[1] (16th ed. 2016). While "[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254–55 (1st Cir. 1991) (citation omitted).

The Code also allows for the avoidance of constructive fraudulent conveyances, which occur when

> the debtor voluntarily or involuntarily ... received less than a reasonably equivalent value in exchange for such transfer or obligation and ... (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay such as debts matured; or (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

In connection with constructive fraudulent conveyances, "the question of reasonably equivalent value is determined by the value of the consideration exchanged between the parties at the time of the conveyance or incurrence of debt which is challenged." In re NextWave Personal Commc'ns, Inc., 200 F.3d 43, 56 (2d Cir. 1999) (citation and emphasis omitted). A court should consider both direct and indirect benefits flowing to the debtor as a result of the exchange in determining if there was reasonably equivalent value. Mellon Bank, N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 646–47 (3d Cir. 1991); Rubin v. Mfrs. Hanover Trust Co., 661 F.2d 979, 991–92 (2d Cir. 1981).

The Bankruptcy Code also authorizes a bankruptcy trustee to avoid "preference" payments. Pursuant to Section 547(b),

> The trustee may avoid any transfer of an interest of the debtor in property -- (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made -- (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) that enables such creditor to receive more than such creditor would receive if -- (A) the case were a case under Chapter 7 [of the Bankruptcy Code]; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

There are exceptions to these rights to avoid transfers, including the exception contained in Section 546(e):

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as

defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

*11 Id. § 546(e) (emphasis supplied).

**B. DGCL Sections 160 and 173**
Section 174 of the Delaware General Corporation Law ("DGCL") provides that corporate directors are "jointly and severally liable" for "any wilful or negligent violation" of Section 160 or 173 of the DGCL that occurred "under [their] administration." Del. Code Ann. tit. 8, § 174(a). DGCL Section 160 forbids a Delaware corporation from "purchas[ing] or redeem[ing] its own shares of capital stock ... when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation[.]" Id. § 160. Section 173 requires corporations that pay dividends to comply with related provisions of Delaware law. Id. § 173. Related provision Section 170 limits the payment of dividends to circumstances when the corporation has a "surplus." [7] Id. § 170(a)(1).

Pursuant to the Delaware doctrine of "independent legal significance," any

action taken in accordance with different sections of [the DGCL] are acts of independent legal significance even though the end result may be the same under different sections. The mere fact that the result of actions taken under one section may be the same as the result of action taken under another section does not require that the legality of the result must be tested by the requirements of the second section.

Orzeck v. Englehart, 195 A.2d 375, 377 (Del. 1963). The doctrine of legal independent significance has been repeatedly described as a "formalistic" method of reasoning, Quadrant Structured Prod. Co. v. Vertin, 102 A.3d 155, 201 (Del. Ch. 2014), that allows a corporation to "resort to one section [of the DGCL] without having to answer for the consequences that would have arisen from invocation of a different section." Rauch v. RCA Corp., 861 F.2d 29, 31 (2d Cir. 1988). This doctrine "provide[s] a board with substantial discretion in determining the proper method by which to structure a material corporate transaction." Esopus Creek Value LP v. Hauf, 913 A.2d 593, 603 (Del. Ch. 2006).

**C. Corporate Directors' Fiduciary Duties**
Tribune is a Delaware corporation and Delaware law provides the standards governing several corporate duties at issue here. See VantagePoint Venture Partners 1996 v. Examen, Inc., 871 A.2d 1108, 1113 (Del. 2005). Under Delaware law, corporate directors owe two overlapping fiduciary duties to the corporation: the duty of care and the duty of loyalty. See, e.g., In re Walt Disney Co. Derivative Litig., 907 A.2d 693, 745 (Del. Ch. 2005) ("Disney I"), aff'd, In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 52 (Del. 2006) ("Disney II").

The duty of care requires a corporate director to "use that amount of care which ordinarily careful and prudent" directors would use "in similar circumstances and consider all material information reasonably available in making business decisions...." Disney I, 907 A.2d at 749 (citation

omitted). The duty of loyalty requires a corporate director to act in the best interests of the corporation and to remain free of conflicts when making corporate business decisions. Id. at 751. "The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders." Id.

*12 The "requirement to act in good faith[,]" while sometimes listed as a separate fiduciary duty, is actually "a subsidiary element" of the duty of loyalty. Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006) (citation omitted). The Court therefore construes the Trustee's claim that Tribune's directors breached their duty of good faith as another claim that the directors breached their duty of loyalty.

Corporate directors ordinarily owe fiduciary duties to the corporation and its shareholders. When a corporation becomes insolvent, however, the corporation's "creditors take the place of the shareholders as the residual beneficiaries of any increase in value." N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 101 (Del. 2007).

Delaware corporate directors' business decisions are ordinarily protected by the business judgment rule, which "presumes that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." Disney II, 906 A.2d at 52 (citation omitted). The presumption arising from the business judgment rule "can be rebutted if the plaintiff shows that the directors breached their fiduciary dut[ies]...." Id. Once the presumption has been rebutted, "the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders." Id. (citation omitted). If a plaintiff fails to rebut the presumption, that plaintiff "is not entitled to any remedy unless the transaction constitutes waste[;]" that is, the plaintiff must show that "the board's decision ... cannot be attributed to any rational business purpose." Id. at 74 (citation omitted).

### D. Aiding and Abetting Breach of Fiduciary Duty
All parties agree that Delaware law applies to the Trustee's claims for aiding and abetting Tribune's directors, officers, and major shareholders' breaches of fiduciary

duty.[8] The elements of a claim of aiding and abetting a breach of fiduciary duty under Delaware law are: "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by the defendants, and (iv) damages proximately caused by the breach." RBC Capital Markets, LLC v. Jervis, 129 A.3d 816, 861 (Del. 2015).

The Delaware Supreme Court has made clear that

> [i]t is the aider and abettor that must have acted with scienter. The aider and abettor must act knowingly, intentionally, or with reckless indifference; that is, with an illicit state of mind. To establish scienter, the plaintiff must demonstrate that the aider and abettor has active or constructive knowledge that their conduct was legally improper.

Id. at 862 (citation omitted). "Knowing participation in a fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." Gatz v. Ponsoldt, 925 A.2d 1265, 1276 (Del. 2007) (citation omitted). A third party may be liable for aiding and abetting a breach of fiduciary duty "when [the] third party, for improper motives of its own, misleads the directors into breaching their duty of care." In re Rural Metro Corp., 88 A.3d 54, 99 (Del. Ch. 2014).

### E. Unjust Enrichment
*13 The parties dispute which jurisdiction's law applies to the Trustee's various claims for unjust enrichment. The Independent Directors and Zell assume that Delaware law governs the unjust enrichment claims against them. Morgan Stanley, Citigroup, and MLPFS contend that the unjust enrichment claims against them are governed by New York law. The Trustee argues that Illinois law should apply to all of its unjust enrichment claims.

All parties agree that Delaware choice of law principles apply because this action was originally filed in Delaware, and "when a case is transferred the choice of law rules

of the state in which the case was initially filed transfer with it." In re Coudert Bros. LLP, 673 F.3d 180, 186 (2d Cir. 2012). Delaware courts apply a two-part choice of law analysis. "[F]irst, the court determines whether there is an actual conflict of law between the proposed jurisdictions." Bell Helicopter Textron, Inc. v. Arteaga, 113 A.3d 1045, 1050 (Del. 2015) (citation omitted). If the result would be the same under the law of both jurisdictions, then there is a "false conflict, and the Court should avoid the choice-of-law analysis altogether." Deuley v. DynCorp Intern., Inc., 8 A.3d 1156, 1161 (Del. 2010) (citation omitted). "If there is an actual conflict, the court determines which jurisdiction has the most significant relationship to the occurrence and the parties based on the factors ... listed in the Restatement (Second) of Conflict of Laws." Bell Helicopter Textron, Inc., 113 A.3d at 1050. The four factors, which are "evaluated according to their relative importance with respect to the particular issue," are:

(1) the place where the injury occurred;

(2) the place where the conduct causing the injury occurred;

(3) the domicil[e], residence, nationality, place of incorporation and place of business of the parties; and

(4) the place where the relationship, if any, between the parties is centered.

Id.

Under Delaware law, "[u]njust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010) (citation omitted). The elements of a Delaware unjust enrichment claim are: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." Id.

"In Illinois, to state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." Cleary v. Phillip Morris, Inc., 656 F.3d 511, 516 (7th Cir. 2011) (citation omitted); see also HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc., 131

Ill.2d 145, 160 (1989). There is "uncertainty" under Illinois law whether proof of unjust enrichment

> requires proving that the defendant has been enriched at the expense of the plaintiff by having committed a tort, breach of contract, or other unlawful act, or instead whether it is enough that it would be 'unjust' to allow the defendant to retain the benefit that he obtained at the plaintiff's expense.

Macon Cty., Ill. v. MERSCORP, Inc., 742 F.3d 711, 713–14 (7th Cir. 2014). Cf. Platt v. Brown, 872 F.3d 848, 853 (7th Cir. 2017) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim -- and, of course, unjust enrichment will stand or fall with the related claim." (citation omitted) ).

**\*14** Accordingly, there is also uncertainty in Illinois law as to whether a claim for unjust enrichment survives where there is an adequate remedy at law for the claimed harm. Compare Bd. of Highway Comm'rs, Bloomington Twp. v. City of Bloomington, 253 Ill. 164, 174 (1911) ("The right to recover is governed by principles of equity, although the action is at law."), and Partipilo v. Hallman, 156 Ill. App. 3d 806, 809–10 (Ill. App. 1987) (rejecting claim that unjust enrichment is unavailable where there exists an adequate remedy at law), with Season Comfort Corp. v. Ben A. Borenstein Co., 281 Ill. App. 648, 656 (Ill. App. 1995) ("It is axiomatic that an unjust enrichment claim is viable only when there is no adequate remedy at law."). What is clear, however, is the following:

> When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract. In determining whether a claim falls outside a contract, the subject matter of the contract governs, not whether the contract

In re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)

2019 WL 294807

contains terms or provisions related
to the claim.

Utility Audit, Inc. v. Horace Mann Service Corp., 383
F.3d 683, 688-89 (7th Cir. 2004) (citation omitted); see also
Cohen v. Am. Sec. Ins. Co., 735 F.3d 601, 615 (7th Cir.
2013); People ex rel. Hartigan v. E&E Hauling, Inc., 153
Ill.2d 473, 497 (1992).

To prevail on a claim for unjust enrichment in New
York, a plaintiff must establish "(1) that the defendant
benefitted; (2) at the plaintiff's expense; and (3) that equity
and good conscience require restitution." Myun-Uk Choi
v. Tower Research Capital LLC, 890 F.3d 60, 69 (2d Cir.
2018). The theory of unjust enrichment, however, "lies as
a quasi-contract claim. It is an obligation the law creates
in the absence of any agreement." Beth Israel Med. Ctr.
V. Horizon Blue Cross and Blue Shield of New Jersey,
Inc., 448 F.3d 573, 586 (2d Cir. 2006) (citation omitted)
(emphasis in original). "It is impermissible ... to seek
damages in an action sounding in quasi contract where
the suing party has fully performed on a valid written
agreement, the existence of which is undisputed, and the
scope of which clearly covers the dispute between the
parties." Id. at 587 (citation omitted).

> [U]njust enrichment is not a
> catchall cause of action to be used
> when others fail. It is available
> only in unusual situations when,
> though the defendant has not
> breached a contract nor committed
> a recognized tort, circumstances
> create an equitable obligation
> running from the defendant to the
> plaintiff. Typical cases are those in
> which the defendant, though guilty
> of no wrongdoing, has received
> money to which he or she is
> not entitled. An unjust enrichment
> claim is not available where it
> simply duplicates, or replaces, a
> conventional contract or tort claim.

Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790
(2012) (citation omitted).

F. Professional Malpractice

The parties dispute whether New York or Illinois law
applies to the Trustee's claims for professional malpractice
against Morgan Stanley, Citigroup, and MLPFS.[9] Under
New York law, "professional malpractice is a species of
negligence. As such, its general elements are (1) negligence,
(2) which is the proximate cause of (3) damages." Hydro
Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 15
(2d. Cir. 2000) (citation omitted). "It is a well-established
principle that a simple breach of contract is not to
be considered a tort unless a legal duty independent
of the contract itself has been violated." Dormitory
Auth. v. Samson Construction Co., 30 N.Y.3d 704, 711
(2018) (citation omitted). "[A] legal duty independent of
contractual obligations may be imposed by law as an
incident to the parties' relationship and ... several types of
defendants -- including professionals -- can be held liable
in tort for failure to exercise reasonable care, irrespective
of their contractual duties." Id. (citation omitted). Thus,
professionals "may be subject to tort liability for failure to
exercise reasonable care, irrespective of their contractual
duties." Hydro Investors, Inc., 227 F.3d at 17 (citation
omitted). "There is no reason why financial advisers,
unlike lawyers, doctors, and accountants, should be
exempt from liability for negligent performance of their
professional duties." Am. Tissue, Inc. v. Donaldson,
Lufkin & Jenrette Sec. Corp., 351 F. Supp. 2d 79, 99 n.21
(S.D.N.Y. 2004).

*15 Generally, the scope of recovery in negligence
actions in New York is limited by the economic loss rule.
Under this rule, a defendant is not liable to a plaintiff for
the latter's economic loss in the absence of any personal
injury or property damage unless there exists "a special
relationship that requires the defendant to protect against
the risk of [such economic] harm to the plaintiff." 532
Madison Ave. Gourmet Foods, Inc. v. Finlandia Center,
Inc., 96 N.Y.2d 280, 289 (2001). "[C]ourts have applied
the economic loss rule to prevent the recovery of damages
that are inappropriate because they actually lie in the
nature of breach of contract as opposed to tort." Hydro
Investors, Inc., 227 F.3d at 16. In cases where professional
standards create a duty independent of contractual duties,
however, the economic loss rule will typically not apply
to limit the recovery of damages for economic loss. "[T]he
better course is to recognize that the rule allows such
recovery in the limited class of cases involving liability for

In re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)

2019 WL 294807

the violation of a professional duty. To hold otherwise would in effect bar recovery in many types of malpractice actions." Id. at 18.

Illinois courts similarly consider professional malpractice to be a species of a negligence action. A cause of action based on professional negligence in Illinois requires: "(1) the existence of a professional relationship, (2) a breach of duty arising from that relationship, (3) causation, and (4) damages." SK Partners I, LP v. Metro Consultants, Inc., 944 N.E.2d 414, 416 (Ill. App. 2011) (citation omitted). In Illinois, "[i]n professional negligence cases, the plaintiff bears a burden to establish the standard of care...." Studt v. Sherman Health Systems, 951 N.E.2d 1131, 1136 (Ill. 2011) (citation omitted). Illinois courts, "in determining whether the economic loss doctrine applies to a case of professional malpractice, focus[ ] on the ultimate result of the professional's work." Fireman's Fund Ins. Co. v. SEC Donohue, Inc., 176 Ill.2d 160, 169 (1997). Specifically, courts look to whether the result of the work is a "tangible object," in which case the economic loss doctrine applies. Id. If the result of the work is intangible, the economic loss doctrine does not apply. Compare 2314 Lincoln Park W. Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd., 136 Ill.2d 302, 315 (1990) (architects) with Congregation of the Passion, Holy Cross Province v. Touche Ross & Co., 159 Ill.2d 137, 163-64 (1994) (accountants). Moreover, the "duty to observe reasonable professional competence exists independently of any contract." Congregation of the Passion, Holy Cross Province, 159 Ill.2d at 164. Thus, in order to avoid the economic loss doctrine in a claim for professional malpractice, a plaintiff must allege that that "the ultimate result of the defendant's work is intangible" and that "the defendant ... breached a duty owed to the plaintiff independent of any contract." In re Michaels Stores Pin Pad Litigation, 830 F. Supp. 2d 518, 529 (N.D. Ill. 2011).

G. In Pari Delicto

GreatBanc, Duff & Phelps, VRC, Morgan Stanley, Citigroup, and MLPFS (the "Advisor Defendants") have asserted the affirmative defense of in pari delicto against the Trustee's claims for aiding and abetting a breach of fiduciary duty, professional malpractice, and unjust enrichment. As noted, all parties agree that the aiding and abetting claims are governed by Delaware law. In Delaware, "under the in pari delicto doctrine, a party is barred from recovering damages if his losses are

substantially caused by activities the law forbade him to engage in." In re Am. Int'l. Grp., Inc. Consol. Derivative Litig., 976 A.2d 872, 883 (Del. Ch. 2009) ("AIG") (citation omitted). "A basic tenet of corporate law, derived from principles of agency law, is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself." Stewart v. Wilmington Trust SP Servs., Inc., 112 A.3d 271, 302-03 (Del. Ch. 2015).

*16 Under the "adverse interest exception," however, a corporation may "sue its co-conspirators when the corporate agent responsible for the wrongdoing was acting solely to advance his own personal financial interest, rather than that of the corporation itself." AIG, 976 A.2d at 891 (emphasis supplied). This exception derives from principles of agency law regarding the imputation of an agent's knowledge to a corporation. Id. at 891 n.50. It is a narrow exception. A court applying Delaware law will only impute knowledge of wrongdoing to an employer "when the employee has totally abandoned the employer's interests, such as by stealing from it or defrauding it." Hecksher v. Fairwinds Baptist Church, Inc., 115 A.3d 1187, 1205 (Del. 2015). Otherwise, "Delaware law adheres to th[e] general rule of imputation -- of holding a corporation liable for the acts of its agents -- even when the agent acts fraudulently or causes injury to third persons through illegal conduct." Stewart, 112 A.3d at 303. Accordingly, "[b]ecause most instances of fraud or illegal misconduct by corporate actors confer at least some benefit on the corporation, the adverse interest exception may not apply even when the 'benefit' enjoyed by the corporation is outweighed by the long-term damage that is done when the agent's mischief comes to light." Id.

The Advisor Defendants also assert the defense of in pari delicto with respect to the Trustee's claims of unjust enrichment and professional malpractice. These parties disagree as to whether Illinois or New York law applies to these claims.

In Illinois, "courts will not aid a plaintiff who bases his cause of action on an illegal act." King v. First Capital Fin. Servs. Corp., 215 Ill.2d 1, 35 (2005); see also Vine Street Clinic v. HealthLink, Inc., 222 Ill.2d 276, 297 (2005); Tovar v. Paxton Community Memorial Hospital, 29 Ill. App. 3d 218, 221 (Ill. App. 1975). "[W]hen the plaintiff is as culpable as the defendant, if not more so, the law will

2019 WL 294807

let the losses rest where they fell." Peterson v. McGladrey & Pullen, LLP, 676 F.3d 594, 596 (7th Cir. 2012). Under Illinois law, "fraud by corporate managers is imputed to the corporation where managers are not stealing from the company -- that is, from its current stockholders -- but instead are turning the company into an engine of theft against outsiders." Id. at 599 (citation omitted); see also Parmalat Capital Finance Ltd. v. Grant Thornton Intern., 756 F.3d 549, 553 (7th Cir. 2014) ("fraud committed by the corporation's managers had to be imputed to the corporation because they were acting on its behalf (albeit unlawfully)").

In New York, "[t]he doctrine of in pari delicto mandates that the courts will not intercede to resolve a dispute between two wrongdoers." Kirschner v. KPMG, LLP, 15 N.Y.3d 446, 464 (2010). Like Illinois and Delaware, New York recognizes the so-called "adverse interest exception" to the in pari delicto doctrine. Under that rule, "management misconduct will not be imputed to the corporation if the officer acted entirely in his own interests and adversely to the interests of the corporation." In re CBI Holding Co., Inc., 529 F.3d 432, 448 (2d Cir. 2008) (citation omitted). This is a narrow exception. In order for it to apply, the manager must have "totally abandoned" his corporation's interests. Id. (citation omitted). The adverse interest exception "cannot be invoked merely because [the agent] has a conflict of interest or because he is not acting primarily for his principal." Kirschner, 15 N.Y.3d at 466 (citation omitted). New York law "reserves this most narrow of exceptions for those cases -- outright theft or looting or embezzlement -- where the insider's misconduct benefits only himself or a third party; i.e., where the fraud is committed against a corporation rather than on its behalf." Id. at 466-67 (emphasis in original).

## II. Independent Directors (Motion 1)

The Independent Directors move to dismiss each of the claims alleged against them in the FAC. Those claims are for (1) breach of fiduciary duty (Count Three); (2) violations of Sections 160 and 173 of the DGCL (Count Two); (3) unjust enrichment (Count Thirty-One); (4) equitable subordination of claims filed in the Tribune bankruptcy proceeding (Count Thirty-Three); and (5) avoidance of certain obligations to the Independent Directors as actual and/or constructive fraudulent conveyances (Count Thirty-Six).

### A. Breach of Fiduciary Duty

*17 The FAC asserts that the Independent Directors breached their fiduciary duties of care and loyalty to the Company and its creditors by, inter alia, "acting in their own interests" by approving the LBO, failing "to adequately analyze the impact that the LBO would have on the Company," and generally furthering the LBO "for a purpose other than a genuine effort to advance the welfare of Tribune."[10] The FAC also alleges that each of the Independent Directors received at least $295,732 -- and one received up to $3,431,892 -- for selling their Tribune shares in connection with the LBO, while Tribune's creditors gained nothing. The Independent Directors received at least some of those payments at Step Two of the LBO. The Independent Directors principally argue that they received no more benefit per share from the LBO than Tribune's other shareholders.

It is unnecessary to address whether the FAC states a claim for a breach of the duty of care since its claim for a breach of the duty of loyalty survives. As found in the November 2018 Opinion, the FAC adequately pleads that Tribune was rendered insolvent by, and at, Step Two of the LBO. 2018 WL 6329139, at *10. The consequences of this finding cannot be overstated. When a corporation becomes insolvent, the corporation's "creditors take the place of the shareholders as the residual beneficiaries of any increase in value." Gheewalla, 930 A.2d at 101. Because the duty of loyalty compels directors to maintain "an undivided and unselfish loyalty to the corporation[,]" Guth v. Loft, Inc., 5 A.2d 503, 510 (Del. 1939) (emphasis supplied), a director of an insolvent corporation is interested in a transaction if he or she receives a personal benefit not shared by all of the insolvent corporation's creditors. See also In re Healthco Int'l, Inc., 208 B.R. 288, 303 (Bankr. D. Mass. 1997); Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488, 510 (N.D. Ill. 1988). The Independent Directors do not dispute this point in their reply brief.

In moving to dismiss Count Three, the Independent Directors argue that the Trustee's claim is barred by the exculpatory charter provision found in Tribune's Amended and Restated Certificate of Incorporation, which was adopted pursuant to DGCL Section 102(b)(7), and expressly exculpates Tribune's directors from money damages for breaches of the duty of care. "[C]ourts routinely examine" Section 102(b)(7)

8525-8    Filed 03/01/19    Entered 03/01/19 13:02:42    Kajon
Decl.    Exhibit G    Pg 18 of 32

re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)

2019 WL 294807

exculpatory provisions on motions to dismiss. In re Merck & Co. Sec., Derivative & ERISA Litig., 493 F.3d 393, 402 n.5 (3d Cir. 2007); see also, e.g., In re BH S & B Holdings LLC, 420 B.R. 112, 145 (Bankr. S.D.N.Y. 2009), aff'd as modified, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); In re Bank of Am. Corp. Sec., Derivative & ERISA Litig., 757 F. Supp. 2d 260, 336 n.18 (S.D.N.Y. 2010). But, for this exculpatory provision to apply, "the court must find that the factual basis for the claim solely implicates a violation of the duty of care." Chen v. Howard-Anderson, 87 A.3d 648, 676 (Del. Ch. 2014) (citation omitted) (emphasis in original). Here, the FAC adequately alleges a violation of the duty of loyalty, rendering the exculpatory provision immaterial.

The Independent Directors also argue for the first time in their reply that the FAC fails to allege that the payments they received in connection with the LBO were material to "any" of them, let alone "a majority of them." (Emphasis in original.) To be sure, several Delaware courts have held that a plaintiff must do more than allege "pecuniary self-interest"; he or she must also allege facts that would enable "the Court to infer that the interest was of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties without being influenced by her overriding personal interest." In re Gen. Motors (Hughes) Shareholder Litig., No. CIV.A. 20269, 2005 WL 1089021, at *8 (Del. Ch. May 4, 2005), aff'd, 897 A.2d 162 (Del. 2006) (citation omitted). But federal pleading standards govern this motion, and the amounts of money each of the Independent Directors allegedly received for their shares are sufficient to "allow[] the court to draw the reasonable inference" that each of the Independent Directors was interested in the Step Two transaction. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); see also In re Healthco, 208 B.R. at 303 (the "materiality of [the directors'] financial interests should be determined by the jury" given that they received "fairly considerable" payments for their shares).

B. DGCL Sections 160 and 173

*18 In Count Two, the FAC alleges that the Independent Directors violated Sections 160 and/or 173 of the DGCL by willfully or negligently "approv[ing] and/or facilitati[ng]" the transfer of property to Tribune's shareholders while Tribune was insolvent. The November 2018 Opinion concluded that the Trustee has failed to allege that Tribune's capital was impaired or that Tribune

lacked a "surplus" at Step One of the LBO. 2018 WL 6329139, at *12. Thus, the only question is whether the FAC states a claim for a violation of DGCL Sections 160 and 173 in connection with Step Two.

The motion to dismiss the Section 173 claim is granted. Section 173 concerns the payment of dividends; the FAC asserts that the Step Two payments were purchases of stock. A dividend is "a distribution by a corporation to its shareholders of a share of the earnings of the corporation." In re IAC/InterActive Corp., 948 A.2d 471, 511 (Del. Ch. 2008) (citation omitted). A purchase of stock cannot reasonably be construed as a distribution of earnings to the corporation's shareholders. Where the stockholder is surrendering his entire interest, "it is a contradiction of terms to characterize the transaction as a dividend, which presupposes persisting ownership rights." In re Lukens' Estate, 246 F.2d 403, 406 (3d Cir. 1957).

The claim premised on Section 160, which addresses a "purchase or rede[mption]" of stock, must also be dismissed. Because Step Two of the LBO was a merger transaction governed by DGCL Section 251, the Trustee is barred by Delaware's doctrine of independent legal significance from challenging the validity of the Step Two transaction by means of Section 160. The certificate of merger for the transaction explains that Tribune and the GreatBanc Trust Company -- as the trustee of the Tribune ESOP -- "approved, adopted, certified, executed and acknowledged" the merger agreement "in accordance with the provisions of Section 251 of the DGCL."

The Trustee protests that the FAC does not mention Section 251 of the DGCL. But Tribune's certificate of merger, as a document filed with the Delaware Secretary of State that is essential to the corporate transaction on which the FAC is based, is properly considered on a motion to dismiss.

Nor is it surprising that the certificate of merger refers to the Step Two transaction as a merger. The FAC does so as well. For example, it describes Step Two as a transaction in which "Tribune would incur approximately $3.7 billion in additional debt to purchase its remaining outstanding shares for $34 per share in a go-private merger following certain regulatory and shareholder approvals." (Emphasis supplied.)

TLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    17

Moreover, the transaction at issue here is nearly identical to the transaction analyzed in Rauch, where the Second Circuit held that "under the Delaware General Corporation Law, a conversion of shares to cash that is carried out in order to accomplish a merger is legally distinct from a redemption of shares by a corporation[,]" and is therefore governed by DGCL Section 251. 861 F.2d at 30. In so ruling, the Second Circuit rejected "[p]laintiff's contention that the transaction was essentially a redemption rather than a merger." Id. at 31. As the Second Circuit observed, the corporation "chose to convert its stock to cash to accomplish the desired merger, and in the process chose not to redeem the Preferred Stock. It had every right to do so in accordance with Delaware law." Id. As stated in QC Holdings, Inc. v. Allconnect, Inc., No. CV 2017-0715 (JTL), 2018 WL 4091721 (Del. Ch. Aug. 28, 2018),

> *19 Section 251(b)(5) of the DGCL recognizes that shares need not be converted into consideration from one of the constituent corporations; the merger agreement can specify that shares will be converted into the right to receive "cash, property, rights or securities of any other corporation or entity ..., which cash, property, rights or securities of any other corporation or entity may be in addition to or in lieu of shares or other securities of the surviving or resulting corporation."

Id. at *8 (quoting Del. Code Ann. tit. 8, § 251).

The Trustee argues that Rauch is "inapposite" since the corporation at issue in Rauch was solvent at the time of the transaction. But the Trustee cites no authority supporting the proposition that the doctrine of independent legal significance should apply only to claims brought against solvent corporations. In applying the doctrine of independent legal significance the Second Circuit explicitly distinguished mergers, governed by DGCL Section 251, from "[r]edemption[s] ... governed by sections 151(b) and 160(a) of the Delaware General Corporation Law." Rauch, 861 F.2d at 31 (emphasis supplied). Section 160(a) bars a corporation from redeeming stock when, among other things, the capital of the corporation is impaired. Del. Code Ann. tit. 8, § 160(a).

Finally, the Trustee laments that if "technical compliance with other aspects of the DGCL permitted shareholders to raid 'the corporate treasury' at the expense of the creditors, it would render Sections 160 and 173 toothless...." To be sure, a corporate board's discretion

in determining how to structure a transaction "remains bounded by fundamental principles of equity ... [since] 'inequitable action does not become permissible simply because it is legally possible.' " Hauf, 913 A.2d at 603) (quoting Schnell v. Chris-Craft Indus., Inc., 285 A.2d 437, 439 (Del. 1971) ). But the claim that the Trustee asserts in Count Two is a claim for relief pursuant to DGCL Sections 160 and 173, not a claim for equitable relief. Accordingly, because Tribune structured Step Two as a merger, rather than a purchase or redemption of stock, the DGCL Section 160 claim is barred by the doctrine of independent legal significance and must be dismissed.

### C. Unjust Enrichment

In Count Thirty-One, the Trustee asserts a claim for unjust enrichment against the Independent Directors. The Trustee seeks "restitution" from these defendants and an order "disgorging" all transfers obtained by the defendants "as a result of their wrongful conduct and breaches of fiduciary duties." The Independent Directors move to dismiss this claim because Delaware law does not support a claim for unjust enrichment where a plaintiff has an adequate remedy at law, and the unjust enrichment claim is preempted by Section 546(e) of the Bankruptcy Code.

The parties rely on different bodies of law when addressing this motion. The Trustee asserts that Illinois law applies, while the Independent Directors rely on Delaware law in moving to dismiss this claim.[11]

As described above, the first step in a Delaware choice of law analysis is to determine whether there is an actual conflict between the laws of the proposed jurisdictions. Also as set forth above, these two jurisdictions have different elements for an unjust enrichment claim. Of note, Illinois may not require dismissal of that claim when a plaintiff has an adequate remedy at law. See, e.g., Macon Cty., 742 F.3d at 713–14.

*20 Weighing the four relevant factors under Delaware's choice of law analysis, Illinois has the most significant relationship to the occurrence at issue here. While Tribune is a Delaware corporation, its headquarters were located in Chicago, Illinois during the relevant time-period. The critical decisions regarding the LBO were made in Chicago, and five of the seven Independent Directors lived in Illinois.[12] The injury can be said to have occurred in

both Delaware and Illinois, the jurisdictions in which the corporation was incorporated and had its principal place of business. Because the conduct at issue took place in Illinois, however, it has the stronger relationship to the parties in connection with this claim.

The Trustee's unjust enrichment claim against the Independent Directors will therefore be analyzed under Illinois law. The Independent Directors do not contend that the existence of a remedy at law bars the Trustee's unjust enrichment claim under Illinois law. They argue, however, that the claim for unjust enrichment must be dismissed if the breach of fiduciary duty claim is dismissed. As already described, that claim has not been dismissed. Finally, they contend that the Trustee's unjust enrichment claim is preempted by Section 546(e) of the Bankruptcy Code.

Pursuant to Section 546(e),

> a trustee may not avoid a transfer that is a margin payment ... or settlement payment ... made by or to (or for the benefit of) a ... financial institution, financial participant, ... or that is a transfer made by or to (or for the benefit of) a ... financial institution, financial participant, ... in connection with a securities contract, ... that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e). Section 548(a)(1)(A) allows the Trustee to bring actual fraudulent conveyance claims against the debtor. 11 U.S.C. § 548(a)(1)(A).

At the time the briefs on this motion were filed, the law in the Second Circuit was that Section 546(e) applied to any transaction involving one of the financial entities listed in that section, "even as a conduit." In re Quebecor World (USA) Inc., 719 F.3d 94, 100 (2d Cir. 2013). In the intervening years, however, the Supreme Court issued its opinion in Merit Management, concluding that "the relevant transfer for purposes of the Section 546(e) safe-harbor inquiry is the overarching transfer that the trustee

seeks to avoid under one of the substantive avoidance provisions[,]" regardless of whether that transfer passed through the hands of any conduit or intermediary financial entity. 138 S. Ct. at 893 (emphasis supplied). The defendants in the related Creditor Actions have argued in the appeal now pending before the Second Circuit that the transfers associated with the LBO are still covered by Section 546(e), despite the Supreme Court's holding in Merit Management, because Tribune, as a principal to the transaction at issue, was both a "financial institution" and a "financial participant" as those terms apply to Section 546(e). It is anticipated that the Court of Appeals will reach this issue when it renders its decision in the Creditor Actions appeal. Since the Independent Directors' motion to dismiss the claim for breach of a fiduciary duty is otherwise denied, the Court declines to resolve this issue pending the Second Circuit's forthcoming opinion in that case.

### D. Equitable Subordination
In Count Thirty-Three, the Trustee asserts a claim for equitable subordination of all claims filed by the Independent Directors in the underlying bankruptcy action. Although the Independent Directors move to dismiss this count, their motion is entirely derivative of their motion to dismiss Counts Three and Thirty-One. Having concluded that the Trustee plausibly alleges that the Independent Directors violated their fiduciary duties to Tribune as alleged in Count Three, the motion to dismiss Count Thirty-Three is denied.

### E. Avoidance of Indemnification Obligations
*21 In Count Thirty-Six, the Trustee seeks to avoid Tribune's indemnification obligations to the Independent Directors as actual or constructive fraudulent conveyances. This motion to dismiss is granted.

Tribune's indemnification obligations were originally set forth in Article Twelfth of Tribune's Amended and Restated Certificate of Incorporation, which is dated June 12, 2000 (the "June 2000 Certificate"). A corporation's certificate of incorporation is properly considered on a motion to dismiss, since it is a publicly filed document and the source of the indemnification right from which this claim emanates. Tribune therefore incurred the indemnification obligations to the Independent Directors as of the later of two dates: (1) June 12, 2000, or (2) the

date on which each of the Independent Directors became a director of Tribune. See November 2018 Opinion, 2018 WL 6329139, at *15. Since Tribune filed for bankruptcy on December 8, 2008, and the FAC alleges that all of the Independent Directors were directors of Tribune as of at least September 2006, the Trustee cannot state a claim for avoidance of Tribune's indemnification obligations to the Independent Directors.

To bring the indemnification obligation within the two-year period, the Trustee raises several arguments that were rejected in the November 2018 Opinion. See id. at *12–16. The analysis rejecting those arguments is incorporated here. It is worth reiterating that just as with the obligations underlying the severance payments at issue there, "the mere fact that Tribune 'reaffirmed' its obligations" in a 2007 document (the "December 2007 Certificate") "does not alter the reality that Tribune incurred its obligation ... at an earlier date." Id. at *14. Nor does the fact that the surviving company "expressly assumed Tribune's obligations" in 2007 alter the outcome of the analysis.[13] Id. at *15. The assumption "simply reflected a result that would have occurred by operation of law in any event." Id. (citation omitted); see also Del. Code Ann. tit. 8, § 259.

The Trustee argues that the assumption, which was mandated by law, did not preclude the surviving corporation from amending or terminating its indemnification obligations. But, the fact that Tribune could have terminated its indemnification obligations does not alter the conclusion that Tribune originally incurred those obligations more than two years before its bankruptcy.

## III. Zell Defendants (Motion 2)

Zell, EGI, EGI-TRB, and Sam Investment Trust ("SIT") (collectively, the "Zell Defendants") move to dismiss each of the claims alleged against them in the FAC. Those claims are: (1) breach of fiduciary duty (Count Five); (2) violations of Sections 160 and 173 of the DGCL (Count Two); (3) aiding and abetting Tribune's directors, officers and/or major shareholders' breach of their fiduciary duties to Tribune (Count Six); (4) avoidance of indemnification obligations to Zell as actual and/or fraudulent conveyances (Count Thirty-Six); (5) alter ego liability (Count Eight); (6) avoidance of a series of transactions between Tribune, EGI, and EGI-TRB as fraudulent transfers and/or preference payments (Counts

Seven, Nine, Ten, and Eleven); (7) unjust enrichment (Count Thirty-One); and (8) recharacterization of a note transferred by Tribune to EGI-TRB as equity and equitable subordination of claims filed by the Zell Defendants in the Tribune bankruptcy proceeding (Counts Thirty-Two and Thirty-Three).

### A. Breach of Fiduciary Duty

**\*22** In Count Five of the FAC, the Trustee alleges that Zell breached his fiduciary duties to Tribune by "propos[ing]," negotiating, and facilitating the LBO. Zell did not join Tribune's Board until May 9, 2007. Zell's fiduciary obligations to Tribune therefore began on May 9, 2007, which was more than a month after the Board voted to approve the LBO. See In re Walt Disney Co., No. CIV.A. 15452, 2004 WL 2050138, at *4 (Del. Ch. Sept. 10, 2004). Accordingly, the motion to dismiss is granted to the extent it seeks to hold Zell liable for a breach of fiduciary duty prior to May 9, 2007, which would include liability for proposing the LBO transaction.

The motion to dismiss the claim that Zell breached his fiduciary duties to Tribune by facilitating the consummation of Step Two of the LBO is, however, denied. Zell does not dispute that he was interested in the LBO. As the person who originally proposed the LBO and who controlled EGI-TRB, which entered into the merger agreement with Tribune, Zell had a unique relationship to the LBO transaction. As a fiduciary who appears "on both sides" of the transaction, Zell was "classic[ally]" interested in the LBO. Disney I, 907 A.2d at 751.

Directors who have a conflict of interest relating to a proposed transaction are obligated to "totally abstain from participating in the board's consideration of that transaction." In re Tri-Star Pictures, Inc., Litig., No. CIV. A. 9477, 1995 WL 106520, at *3 (Del. Ch. Mar. 9, 1995) (citing Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983) ). And, "no per se rule unqualifiedly and categorically relieves a director from liability solely because that director refrains from voting on the challenged transaction." Id. (emphasis in original). "[A] director who does not attend or participate in the board's deliberations or approval of a proposal ... [may also be held liable] where the absent director plays a role in the negotiation, structuring, or approval of the proposal." Valeant Pharm. Int'l v. Jerney, 921 A.2d 732, 753 (Del. Ch. 2007).

In re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)

2019 WL 294807

The FAC asserts that, "in the days leading up to the LBO," Zell "capitalized on his influence over JPMorgan" while it "weigh[ed] the pros and cons of backing out of the LBO." Specifically, in a December 19, 2007 telephone conversation with a JPMorgan Vice Chairman, Zell "could not have been any clearer and more confident that the company [wa]s solvent, no financial issues in year 1" and "said all the right things" when asked for confirmation that he was "going to make good on his commitment" to "make this deal work...." The Vice Chairman concluded that "[i]t was the kind of call [JPMorgan] needed to proceed given our concerns."

These allegations support a claim that Zell breached his fiduciary duties to Tribune by advocating for consummation of Step Two despite the fact that he was interested in the transaction. The FAC plausibly alleges that, had JPMorgan declined to fund Step Two, Step Two would have "failed to close." [14]

Zell's reliance on Citron v. E.I. Du Pont de Nemours & Co., 584 A.2d 490 (Del. Ch. 1990), is unavailing. There, the Delaware Chancery Court concluded that the plaintiff failed

> to show how [the director's] limited role in bringing the two sides together on terms that addressed the specific concerns identified by the Merger Committee and its advisors, caused any actionable harm ... [in light of the fact that the director was] not one of the persons whose decisionmaking actions caused [the merger] to come about.

**\*23** Id. at 499 n.12. Here, Zell was allegedly instrumental in convincing JPMorgan to fund Step Two of the LBO.

Finally, Zell argues that he could not have breached his fiduciary duty to Tribune in helping to consummate Step Two since Tribune had already committed to the LBO transaction, in its entirety, prior to Zell joining the Board. As explained in the November 2018 Opinion, however, "the LBO was not a unitary transaction that occurred, or became inevitable, on April 1, 2007." 2018 WL 6329139, at \*9. The FAC alleges that "the Step One

Commitment Letter and Step Two Commitment Letter explicitly conditioned the borrowing under these facilities on the continued existence of the financing commitments (for both Step One and Step Two) set out in the Merger Agreement." Accordingly, the motion to dismiss the fiduciary duty claim against Zell is denied.

**B. DGCL Sections 160 and 173**
In Count Two of the FAC, the Trustee alleges that Zell violated Sections 160 and/or 173 of the DGCL. For the reasons described in connection with the motion to dismiss these claims against the Independent Directors, the DGCL claims against Zell are also dismissed.

**C. Aiding and Abetting Liability**
In Count Six of the FAC, the Trustee alleges that the Zell Defendants aided and abetted Tribune's officers, directors, and the Chandler Trusts and the Foundations in breaching their fiduciary duties to Tribune. As noted by the Zell Defendants, the focus of this claim is on the period before the Board committed the Company to the LBO, and thus a period when Zell was negotiating as an outside investor. [15]

The motion to dismiss is granted. As explained in the November 2018 Opinion, the FAC fails to allege that Tribune was insolvent as of May 9, 2007. Thus, during the relevant time, Tribune was solely obligated to maximize shareholder value, without regard to Tribune's creditors. See Gheewalla, 930 A.2d at 101. The FAC does not allege that Tribune or its fiduciaries breached their fiduciary duties to Tribune's shareholders by failing to maximize shareholder value, let alone that the Zell Defendants had actual knowledge of such a breach. [16] Accordingly, Count Six fails to plead that Zell and the other Zell Defendants aided and abetted a breach of fiduciary duty during this period.

**D. Avoidance of Indemnification Obligations to Zell**
**\*24** In Count Thirty-Six, the Trustee seeks to avoid Tribune's indemnification obligations to Zell as actual or constructive fraudulent conveyances. In a footnote, Zell incorporates by reference the arguments made by the Independent Directors that Count Thirty-Six fails to state a claim. Because Zell did not become a director of Tribune until May 9, 2007 -- less than two years before Tribune filed for bankruptcy on December 8, 2008 -- this

claim against Zell is not barred by the applicable two-year look-back period, even though it has been dismissed as to the Independent Directors. See 11 U.S.C. § 548(a) (1). Similarly, the remaining arguments made by the Independent Directors may apply differently to Zell than they apply to those defendants. In light of Zell's failure to independently address these issues, Zell's motion to dismiss Count Thirty-Six is denied.

### E. Alter Ego Liability

The Zell Defendants move to dismiss Count Eight, in which the Trustee alleges that at all relevant times EGI-TRB was the alter ego of Zell, SIT, and EGI "such that EGI-TRB's corporate form should be set aside for purposes of this action" and Zell, SIT, and EGI held liable for all liabilities of EGI-TRB in this action. This motion is granted.

The parties agree that Delaware law applies to this claim. Under Delaware law, a plaintiff asserting an alter ego claim must show both a "mingling of ... operations" and an "overall element of injustice or unfairness." NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 176 (2d Cir. 2008) (quoting Harco Nat. Ins. Co. v. Green Farms, Inc., No. CIV. A. 1131, 1989 WL 110537, at *5 (Del. Ch. Sept. 19, 1989) ). The mingling of operations and the element of injustice or unfairness must be connected; that is, a plaintiff must demonstrate, for example, that "the corporation was used to engage in conduct that was inequitable, or prohibited, or an unfair trade practice, or illegal...." NetJets Aviation, Inc., 537 F.3d at 177.

The Trustee's allegations of "injustice or unfairness" boil down to a conclusory claim that EGI-TRB was "used as an instrument of fraud in an effort to insulate Zell, the Sam Investment Trust, and EGI from liability relating to or arising from the LBO." The creation of EGI-TRB for the "purpose of consummating the LBO," however, does not allege a plausible claim of injustice or unfairness in connection with the purported mingling of operations. See EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V., No. CIV.A. 3184 (VCP), 2008 WL 4057745, at *13 (Del. Ch. Sept. 2, 2008) (the assertion that the "use of the corporate form to obtain limited liability" itself supports alter ego jurisdiction is "unconvincing").

The Trustee asserts that "it would be a gross miscarriage of justice" if the Trustee were unable to claw back the fraudulent transfers that are the subject matter of

Counts Seven and Nine given EGI-TRB's insolvency. But the Trustee cannot rely solely on the transfers made in connection with the LBO that are the subject of his fraudulent conveyance claims against EGI-TRB -- asserted in Counts Seven and Nine and discussed next -- as the basis for his allegation that the Zell Defendants used EGI-TRB to work some sort of injustice. As explained in Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260 (D. Del. 1989), the "underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." Id. at 268. Moreover, the Trustee cannot rely on the fact that Tribune may have acted unjustly in transferring assets to EGI-TRB to meet his obligation to plausibly allege that the Zell Defendants created or used EGI-TRB to achieve an unjust end.

### F. Avoidance of EGI and EGI-TRB Fraudulent
### Transfers and Preference Payments

In Counts Seven, Nine, Ten, and Eleven, the Trustee has sued Zell, EGI, and EGI-TRB seeking to avoid the following series of transactions between Tribune and either EGI-TRB or EGI as fraudulent transfers and preference payments. First, in connection with Step One, EGI-TRB received a $200 million unsecured subordinated note that was exchangeable for Tribune stock at Tribune's option (the "Exchangeable Note"). Second, at the close of Step Two, Tribune transferred to EGI-TRB money or assets worth $206,418,859 (the "Exchangeable Note Transfer") to satisfy its purported debt obligation under the Exchangeable Note (the "Exchangeable Note Obligation"). Third, Tribune transferred money or assets worth approximately $2.5 million to EGI-TRB for its legal fees and other expenses in connection with the LBO ("the EGI-TRB Fee Transfers"). Fourth, EGI-TRB sold or redeemed 1,470,588 shares of Tribune stock in connection with Step Two of the LBO, for which it received $50,000,000 (the "EGI-TRB Stock Sale," and together with the EGI-TRB Fee Transfers, the Exchangeable Note Obligation, and the Exchangeable Note Transfer, the "EGI-TRB Transfers"). And fifth, within 90 days prior to December 8, 2008, Tribune made payments of not less than $586,759 to EGI to reimburse EGI for expenses allegedly incurred in connection with the LBO (the "EGI Reimbursements").

**\*25** Zell's motion to dismiss Count Nine is granted. The Trustee seeks to recover the Exchangeable Note Transfer and the EGI-TRB Fee Transfers as preference payments

against both EGI-TRB and Zell. The Trustee names Zell in Count Nine as the "alter ego" of EGI-TRB, and alleges that "[t]he Exchangeable Note Transfer and certain of the EGI-TRB Fee Transfers were made for the benefit of Zell and/or EGI-TRB...." As discussed, the FAC fails to plead a plausible claim of alter ego liability. Moreover, the FAC does not allege any facts to support a finding that the Exchangeable Note Transfer and the EGI-TRB Fee Transfers were made for Zell's benefit.

The Court declines to rule on the remainder of the motion to dismiss these counts. EGI and EGI-TRB's arguments for dismissal principally rely on the application of Section 546(e) of the Bankruptcy Code.[17] As explained, these issues will await clarification through the Second Circuit's decision on the pending appeal in the Creditor Actions.

### G. Unjust Enrichment

In Count Thirty-One, the FAC asserts a claim for unjust enrichment against the Zell Defendants. The Trustee seeks restitution and an order "disgorging" all transfers obtained by the defendants "as a result of their wrongful conduct and breaches of fiduciary duties."

For the reasons explained above, Illinois law applies to the Trustee's unjust enrichment claim. Of note, Zell lives in Illinois, EGI is "located" in Illinois, SIT is an Illinois trust, and EGI-TRB, while incorporated in Delaware, is "located" in Illinois.

SIT's motion to dismiss Count Thirty-One is granted. The Trustee fails to allege that SIT received any benefit at all from the LBO. Moreover, the Trustee's unjust enrichment claim against SIT is tied to the Trustee's aiding and abetting and alter ego liability claims against SIT, both of which are dismissed. The FAC does allege, however, that the other Zell Defendants were enriched by the LBO. It alleges that Zell received at least $77,452 in cash proceedings in connection with the LBO, that EGI received the EGI Reimbursements, and that EGI-TRB received, inter alia, the EGI-TRB Fee Transfers and the payments in connection with the EGI-TRB Stock Sale.[18]

The Court declines to resolve the remaining Zell Defendants' motion to dismiss Count Thirty-One. The motion incorporates by reference all of the Independent Directors' arguments, including their argument that the unjust enrichment claim is preempted by Section 546(e)

of the Bankruptcy Code. That issue may be governed by the Second Circuit's forthcoming opinion in the Creditor Actions appeal.

### H. Equitable Subordination

*26 In Counts Thirty-Two and Thirty-Three, the Trustee moves, respectively, to recharacterize the Exchangeable Note as equity and to subordinate the claims filed by the Zell Defendants in the Tribune bankruptcy proceeding. The Zell Defendants briefly argue that both claims must be dismissed on the grounds that the FAC fails to state a claim of inequitable conduct against them, "so there is no basis for subordination."

The Zell Defendants' motion to dismiss Count Thirty-Two is denied. On its face, Count Thirty-Two pleads a claim for "recharacteriz[ing]" the Exchangeable Note "as equity pursuant to Section 105 of the Bankruptcy Code."[19]

Zell's motion to dismiss Count Thirty-Three is also denied, since, as explained above, the FAC plausibly alleges that Zell acted inequitably in breaching his fiduciary duty to Tribune. EGI, EGI-TRB, and SIT's motion to dismiss Count-Thirty Three is granted, since, as explained above, the Trustee does not adequately allege that they engaged in any inequitable conduct.

### IV. Advisor Defendants (Motions 8-10)

#### A. Aiding and Abetting Breach of Fiduciary Duty

In Counts Sixteen, Nineteen, and Twenty-One of the FAC, and Count One of the Citigroup Complaint, the Trustee has asserted claims against each of the Advisor Defendants for aiding and abetting the breach by the Tribune directors and officers ("the D&O Defendants") of their fiduciary duties.[20] For the reasons that follow, the motions to dismiss these claims are granted.

All parties agree that Delaware law applies to the Trustee's claims for aiding and abetting the D&O Defendants' breaches of fiduciary duty. The elements of aiding and abetting a breach of fiduciary duty under Delaware law, which are set forth above, include "knowing participation" in the principal's breach. Three of the Advisor Defendants contend that the Trustee has failed to adequately plead their "knowing participation" in the D&O Defendants' breach of fiduciary duty.[21] Knowing

participation requires proof that the third party "act[ed] with the knowledge that the conduct advocated or assisted constitutes such a breach." Gatz, 925 A.2d at 1276. After addressing whether the FAC has adequately pleaded the knowing participation of the Advisor Defendants in the breach, the separate argument raised by each of the Advisor Defendants regarding their affirmative defense of in pari delicto is addressed.

### 1. Morgan Stanley

Count Twenty-One of the FAC alleges that Morgan Stanley aided and abetted the D&O Defendants' breaches of fiduciary duties by advising the Special Committee on the LBO, recommending and supporting the LBO when it knew that it was likely to render the Company insolvent, failing to disclose its internal valuations showing that Step Two would likely render the Company insolvent, and failing to alert the Board or the Special Committee as to the falsity of statements made by Tribune Officers to VRC that Morgan Stanley had represented that Tribune would be able to refinance its debt. The FAC alleges that Morgan Stanley, like all of the Advisor Defendants, had serious doubts about Tribune's post-LBO solvency. Notwithstanding those doubts, Morgan Stanley supported the LBO transaction in order to earn its contingency fee.

**\*27** The Delaware Supreme Court has held that a financial advisor aids and abets a Board's breach of fiduciary duty by misleading the Board or by failing to disclose material information, including by failing to disclose "its knowledge that the Board and Special Committee were uninformed about [the company's] value." Jervis, 129 A.3d at 862. The FAC alleges that Morgan Stanley had material information that it purposely failed to disclose. This is sufficient to satisfy the Trustee's burden to plead that Morgan Stanley knowingly participated in the D&O Defendants' alleged breaches of fiduciary duties.

Morgan Stanley objects that it was not engaged to provide a solvency analysis and therefore had no obligation to disclose its own internal valuations of Tribune. The letter of engagement between Morgan Stanley and Tribune specifically provided, however, that Morgan Stanley was to advise the Special Committee "in connection with ... a possible sale, merger or other strategic

business combination involving a change of control of the Company...." [22] Morgan Stanley's "anticipated responsibilities" included

> (i) reviewing the analyses and presentations of the Company's financial advisors; (ii) representing the Committee throughout the process; (iii) making recommendations to the Committee to improve the process and (iv) providing the Committee a fairness opinion in accordance with our customary practice.

Information that Morgan Stanley had to suggest that the LBO would lead to Tribune's insolvency would thus have been relevant to the services for which it was engaged.

Morgan Stanley next contends that it had no knowledge of the officers' representation of its position to VRC with regard to the refinancing of Tribune's debt. Morgan Stanley contends that its position was in fact misrepresented to VRC and that this misrepresentation was actively concealed from Morgan Stanley. This is only one of several allegations against Morgan Stanley, and its exclusion from the FAC would not alter the above analysis. In any event, the FAC asserts that a Tribune officer forwarded to Morgan Stanley notice that VRC was relying on its representation. In that forwarded email, which is quoted in the FAC, one of the lead banks financing the LBO stated:

> VRC indicates that it is relying, in part, on a representation from Tribune which states that based upon recent discussions with Morgan Stanley, the Company would be able to refinance debt in its downside forecasts without the need for additional assets sales.

This allegation supports a plausible inference that Morgan Stanley was in fact aware that VRC was relying on the characterization of its view.

## 2. VRC

Count Sixteen of the FAC alleges that VRC aided and abetted the D&O Defendants' breaches of fiduciary duty by, among other things, preparing a solvency opinion that deviated from recognized industry standards and relying upon unreasonable financial projections prepared by the Officer Defendants. The Trustee has adequately alleged that VRC knowingly participated in the D&O Defendants' breaches of their fiduciary duties. The FAC contains particularized allegations about the shortcomings of VRC's solvency analysis and VRC executives' lack of comfort with the "risk" associated with supplying a solvency opinion. The Trustee alleges that VRC was in regular and direct communication with the D&O Defendants and accepted direction from the Officer Defendants. These allegations are more than sufficient to support a plausible inference that VRC had "actual or constructive knowledge that [its] conduct was legally improper." Jervis, 129 A.3d at 862 (citation omitted).

**\*28** VRC contends in its motion to dismiss that it performed its analysis according to contractually mandated definitions. The degree to which it complied with its contractual obligations may only be resolved at a later stage of this litigation. But, as a legal matter, compliance with contractual obligations is not a defense against knowing participation in a fiduciary's breach of duty.

## 3. Duff & Phelps

Count Nineteen of the FAC alleges that Duff & Phelps aided and abetted the D&O Defendants' breaches of fiduciary duties by participating in Tribune Board meetings, issuing the fairness opinion to GreatBanc, and issuing the viability opinion to GreatBanc. Because none of these allegations support a plausible inference that Duff & Phelps "knowingly participated" in the alleged breaches of fiduciary duties, Count Nineteen against Duff & Phelps is dismissed.

The Trustee has not alleged facts sufficient to support a plausible inference that Duff & Phelps acted with an "illicit state of mind." Jervis, 129 A.3d at 862 (citation omitted). [23] There is no allegation that Duff & Phelps provided inaccurate or incomplete information to GreatBanc or Tribune. To the contrary, the FAC asserts that it actively called attention to what it believed to be the flaws in Tribune's proposed solvency analysis and declined to issue a solvency opinion. The viability opinion that it eventually issued to GreatBanc expressly disclaimed that it was a solvency opinion. That opinion also made clear that its analysis was predicated on the assumption that the proposed tax savings would be realized. Duff & Phelps expressed no opinion as to the likelihood of realizing those savings. In short, none of the conduct described in the FAC gives rise to a plausible inference that Duff & Phelps acted with the requisite scienter. Accordingly, Duff & Phelps' motion to dismiss the aiding and abetting claim against it in Count 19 of the FAC is granted.

## 4. Affirmative Defense - In Pari Delicto

As an affirmative defense, each of the Advisor Defendants contends that the Trustee's claims for aiding and abetting a breach of fiduciary duty are barred by the doctrine of in pari delicto. [24] Delaware law governs this defense. As discussed above, in pari delicto bars a party from recovering damages where his losses are "substantially caused by activities the law forbade him to engage in." AIG, 976 A.2d at 883 (citation omitted). The Advisor Defendants are alleged to have aided and abetted unlawful activity on the part of Tribune's Officers and Independent Directors. The general rule in Delaware is that "knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself." Stewart, 112 A.3d at 302-03. There is no contention here that the D&O Defendants were not acting within the scope of their authority. Therefore, the illegal activities of Tribune's Officers and Independent Directors are imputed to Tribune.

**\*29** As a general matter, "[t]he pleading requirements in the Federal Rules of Civil Procedure ... do not compel a litigant to anticipate potential affirmative defenses, ... and to affirmatively plead facts in avoidance of such defenses." Abbas v. Dixon, 480 F.3d 636, 640 (2d Cir. 2007). When

raising an affirmative defense at the Rule 12(b)(6) stage, therefore, the defendant bears the burden of showing that the plaintiff's claims are foreclosed as a matter of law based on the facts alleged in the complaint. See, e.g., Petersen Energía Inversora S.A.U. v. Argentine Republic and YPF S.A., 895 F.3d 194, 212 (2d Cir. 2018) (act of state doctrine); Thea v. Kleinhandler, 807 F.3d 492, 501 (2d Cir. 2015) (statute of limitations); Chen v. Major League Baseball, 798 F.3d 72, 81 (2d Cir. 2015) (FLSA exemption).

The FAC adequately pleads each of the facts essential to the affirmative defense of in pari delicto. That doctrine contains an exception known as the adverse interest exception, the elements of which are also described above, and it is on that exception that the Trustee principally relies. Because the Trustee had no duty to anticipate the affirmative defense he certainly had no duty to plead the facts essential to an exception to the defense. The relevant question for this motion to dismiss, therefore, is not whether the Trustee has adequately pleaded the adverse interest exception, but rather, whether the Advisor Defendants have shown that the applicability of that exception is foreclosed by facts alleged in the FAC. Reading all of the facts in the FAC in the light most favorable to the plaintiff, the Advisor Defendants have met that burden.

Reliance on the "adverse interest exception" will require a showing by the Trustee at trial that the D&O Defendants acted "solely to advance [their] own personal financial interest, rather than that of the corporation itself." AIG, 976 A.2d at 891. The series of transactions at the core of the FAC precludes Tribune from relying on the adverse interest exception. The Special Committee, the Board, and the highest ranking officers of the Company are alleged to have participated in a scheme that brought money into the corporation at the same time as the scheme was lining their own pockets. From the LBO, Tribune received an injection of new capital from Zell's investment and anticipated tax benefits that would accrue from the conversion of the Company to an S corporation owned by an ESOP.

As then-Vice Chancellor Leo Strine has explained, the in pari delicto doctrine would be gutted if it allowed the corporation to recover for the harm that it experienced "because the corporate action was motivated at least in part by the disloyal interests of the [corporation's] fiduciaries." AIG, 976 A.2d at 892. "Allowing corporations to sue co-conspirators whenever such an argument can be ginned up would give corporations a gaping exception from the in pari delicto doctrine, putting them on a different plane from actual human beings." Id. The in pari delicto doctrine gives corporations "a strong incentive to comply with the law" and thereby serves an important public purpose. Id. at 893. While a corporation may "go after its own directors, officers, and employees," it "must live with the consequences of having had a corporate governance structure" that permitted those individuals to "enmesh" the company in unlawful activity. Id. at 895. See also Zazzali v. Hirschler Fleischer, P.C., 482 B.R. 495, 513 (D. Del. 2012) (rejecting adverse-interest exception and granting motion to dismiss brought by corporate counsel where corporate insider scheme "conferred some benefit" on corporation).

*30  The Trustee argues that, because Tribune was rendered insolvent by the LBO, any potential corporate benefit must be considered from the perspective of the creditors. The Trustee is wrong. The central question is whether the Company benefitted from the infusion of cash at Step Two of the LBO. Having benefited from that material component of the transaction, the Company may not assert an adverse interest exception to the in pari delicto defense. The relevant question is simply whether the transaction had some corporate purpose, regardless of whether the ultimate outcome was a net harm or a net benefit to Tribune or its creditors. Accordingly, the Trustee's claims against the Advisor Defendants for aiding and abetting breaches of fiduciary duties are barred by the in pari delicto doctrine and must be dismissed.

### B. Professional Malpractice

Defendants VRC, Morgan Stanley, Citigroup, and MLPFS have moved to dismiss the professional malpractice claims asserted against them in Counts Seventeen and Twenty-Two of the FAC and Count Two of the Citigroup Complaint. They principally rely on their defense of in pari delicto. For the reasons set forth below, the Trustee's claims are barred by that doctrine and the claims against each of these defendants for professional malpractice must be dismissed.

It is nonetheless worth addressing one of the parties' additional arguments. Morgan Stanley, Citigroup, and MLPFS rely on New York law and argue that New York

law does not recognize a cause of action for professional malpractice against financial advisors. They are wrong.

As explained above, the first step in a Delaware choice of law analysis is to determine whether there is an "actual conflict" between the laws of the two proposed jurisdictions. Bell Helicopter Textron, Inc., 113 A.3d at 1050. The Trustee asserts that Illinois law applies to its professional malpractice claims against VRC, Morgan Stanley, Citigroup, and Merrill. VRC, which is headquartered in Wisconsin, agrees with the Trustee that Illinois law applies to the claims against it.

There is no actual conflict between the laws of New York and Illinois with respect to these professional malpractice claims.[25] Although labeled "professional malpractice," the Trustee's claims against the Advisor Defendants in Counts Seventeen and Twenty-Two of the FAC and Count Two of the Citigroup Complaint are, at their core, claims for negligence. As described above, both jurisdictions require a plaintiff to plead that the defendant breached some professional duty that arises independently of any contract in order to avoid application of the economic loss rule. Although Illinois law has the additional requirement that "the ultimate result of the defendant's work [be] intangible," In re Michaels Stores Pin Pad Litigation, 830 F. Supp. 2d at 529, that requirement is clearly met here.

Morgan Stanley, Citigroup, and MLFPS argue that New York courts have confined professional malpractice claims to certain fields such as law, accounting, and medicine that require "extensive formal learning and training, licensure and regulation indicating a qualification to practice, a code of conduct imposing standards beyond those accepted in the marketplace and a system of discipline for violation of those standards." Chase Scientific Research, Inc. v. NIA Group, Inc., 96 N.Y.2d 20, 29 (2001). This limitation is only relevant, however, in the context of N.Y. C.P.L.R. § 214(6), which provides a shorter statute of limitations period for certain professional malpractice claims (three years) as opposed to the statute of limitations for claims based on contractual liability or for which no limitation is specified by law (six years). N.Y. C.P.L.R. § 213. The distinction "implements the Legislature's intention to benefit a discrete group of persons affected by the concerns that motivated the shortened statute of limitations." Chase Scientific Research, Inc., 96 N.Y.2d at 29.

**\*31** "There is no reason why financial advisers, unlike lawyers, doctors, and accountants, should be exempt from liability for negligent performance of their professional duties." Am. Tissue, Inc., 351 F. Supp. 2d at 99 n.21. The Trustee's claim for professional malpractice must therefore be treated as a simple cause of action for negligence.[26]

### C. Unjust Enrichment
In Count Thirty-One of the FAC, the Trustee asserts claims for unjust enrichment against, among others, VRC, GreatBanc, Duff & Phelps, and Morgan Stanley. These claims are based generally upon defendants' "wrongful acts and omissions" and "the wrongful receipt of payments and distributions from Tribune at a time when Tribune was insolvent or became insolvent as a result of the LBO."

The Trustee contends that Illinois law governs its claims for unjust enrichment, while the Advisor Defendants, with the exception of VRC, contend that the claim is governed by New York law. As already described, in both jurisdictions a claim for unjust enrichment may not be pursued where the claim falls within the scope of a written agreement. Beth Israel Med. Ctr., 448 F.3d at 586; Utility Audit, Inc., 383 F.3d at 688-89. The relevant question presented by the Advisor Defendants' motions to dismiss, therefore, is whether the scope of the parties' engagement letters covers the dispute.

Each of the four Advisor Defendants against which the Trustee asserts claims for unjust enrichment signed letters of engagement with Tribune that cover this dispute. Additionally, to the extent that any extra-contractual duties were owed, the Trustee's claim for unjust enrichment is duplicative of his other claims sounding in tort and seeks no additional recovery beyond what is sought pursuant to those claims. In any event, for the reasons next discussed, any claim for unjust enrichment would be barred by the affirmative defense of in pari delicto. Accordingly, the Trustee has failed to state a claim for unjust enrichment against any of the Advisor Defendants.

### D. In Pari Delicto
This Opinion has already concluded that the Trustee's aiding and abetting claims against the Advisor Defendants

2019 WL 294807

are barred by the doctrine of in pari delicto under Delaware law. The laws of Illinois and New York compel the same conclusion with regard to the Trustee's claims for professional malpractice and unjust enrichment.

The doctrine of in pari delicto and the adverse interest exception to that doctrine are substantially the same under the law of Illinois, New York, and Delaware, as applicable to the facts alleged in the FAC. The conclusion already reached that, based on the allegations in the FAC, the LBO had a corporate purpose and provided some corporate benefit, thus precludes the application of the adverse interest exception under the laws of all three jurisdictions. The allegations in the Citigroup Complaint similarly support this inference. Accordingly, the Trustee's claims against the Advisor Defendants for professional malpractice and unjust enrichment are barred by the doctrine of in pari delicto and must be dismissed.

E. Fraudulent Transfers

*32  In Counts Eighteen and Twenty of the FAC and Count Three of the Citigroup Complaint, the Trustee seeks avoidance and recovery of the fees paid to VRC, Morgan Stanley, Citigroup, and MLPFS ("the Advisor Fees") as actual and constructive fraudulent transfers under Sections 548(a)(1)(A) and (B) and 550(a) of the Bankruptcy Code. The text of those provisions is set forth above.

1. Constructive Fraudulent Transfers

11 U.S.C. § 548(a)(1)(B) allows the Trustee to recover, as "constructive" fraudulent transfers, those transfers in exchange for which "the debtor ... received less than a reasonably equivalent value." As a matter of law, satisfaction of an antecedent debt constitutes reasonably equivalent value. See 11 U.S.C. § 548(d)(2)(A) (defining "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor...."); In re Southeast Waffles, LLC, 702 F.3d 850, 857 (6th Cir. 2012) ("Typically, a dollar-for-dollar reduction in debt constitutes -- as a matter of law -- reasonably equivalent value for purposes of the fraudulent-transfer statutes."); In re Trinsum Group, Inc., 460 B.R. 379, 388-89 (Bankr. S.D.N.Y. 2011); 5 Collier on Bankruptcy ¶ 548.03[5] ("Payment of a pre-existing debt is value, and if the payment is dollar-for-dollar, full value is given.").

As explained in the FAC and the Citigroup Complaint, the Advisor Fees were paid to satisfy Tribune's letters of engagement with each of the Advisor Defendants. Therefore, as a matter of law, the Advisor Fees were paid in exchange for reasonably equivalent value.

The Trustee essentially contends that, because the Advisor Defendants performed their services negligently and in bad faith, no fees were owed pursuant to the engagement letters and therefore the fees were not in satisfaction of an antecedent debt. This argument is unavailing. The allegations in the FAC make clear, and the Trustee does not dispute, that each of the conditions precedent for the payment of the Advisor Fees, as set out in the engagement letters, was satisfied. Notably, no claim has been asserted against any of the Advisor Defendants for breach of their engagement letters. Rather, as discussed above, each of the Trustee's state law claims against the Advisor Defendants sounds in tort. Those tort claims have no bearing on the contractual obligations between Tribune and the Advisor Defendants.

The cases upon which the Trustee relies are readily distinguishable. There was no argument made in In re Bernard L. Madoff Inv. Securities LLC, 458 B.R. 87, 112-13 (Bankr. S.D.N.Y. 2011), that the allegedly fraudulent transfers were made in satisfaction of an antecedent debt, or that the payments were made pursuant to a pre-existing contract. Silverman v. Sound Around, Inc., 404 B.R. 710, 716 (Bankr. E.D.N.Y. 2009), only analyzed "fair consideration" under Section 272 of New York's Debtor and Creditor Law. This has limited bearing on the meaning of "reasonably equivalent value" under 11 U.S.C. § 548(a)(1)(B). See In re Dreier LLP, 453 B.R. 499, 512-13 (Bankr. S.D.N.Y. 2011) ("Unlike 'reasonably equivalent value' under the Bankruptcy Code § 548(a)(1) (B)(i), 'fair consideration' also requires that the transferee acquire the obligation or receive the conveyance in 'good faith.' " (citation omitted) ). The Trustee has failed to state a claim for avoidance of a constructive fraudulent transfer under Section 548(a)(1)(B).

2. Actual Fraudulent Transfer

*33  Section 548(a)(1)(A) of the Bankruptcy Code allows a bankruptcy trustee to recover as actual fraudulent conveyances transfers that were made "with actual intent

In re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)

2019 WL 294807

to hinder, delay, or defraud" creditors. The crux of the Trustee's actual fraudulent transfer claims against the Advisor Defendants is that each of the Advisor Fees was paid by Tribune with the goal of furthering the allegedly fraudulent LBO.

Because a Section 548(a)(1)(A) claim sounds in fraud, the Trustee must also satisfy the heightened pleading standards of Rule 9(b), Fed. R. Civ. P. The fraud at issue in an intentional fraudulent transfer claim is a fraud with respect to the transfer which a trustee seeks to avoid.

While the use of financial advisors, and the payment of their fees in connection with their services, was a necessary component of this LBO and virtually any merger, that is not sufficient to claw back those fees simply because the LBO or merger itself may have been infected with fraud or fraudulent intent. The focus of a Section 548(a)(1)(A) claim remains on the specific transfer and asks whether there was an actual intent to defraud in making that transfer.

Neither the FAC nor the Citigroup Complaint plead a fraud in connection with the payments made to the Advisor Defendants. Instead, those pleadings attempt to plead a fraud in connection with the overall LBO transaction. The badges of fraud pleaded in the complaints relate to the approval of the LBO, not to the payment of the Advisor Fees. Nor do those pleadings adequately plead an intent to defraud creditors through payments to the Advisors.

Accordingly, the Trustee has failed to state a claim for actual fraudulent conveyance against these defendants. Counts Eighteen and Twenty of the FAC and Count Three of the Citigroup Complaint are dismissed.

## Conclusion

Counts Two and Thirty-Six of the FAC against the Independent Directors are dismissed. The Independent Directors' motion to dismiss Counts Three and Thirty-Three is denied, and their motion to dismiss Count Thirty-One against them is denied without prejudice to renewal following the Second Circuit's forthcoming opinion in the Creditor Actions appeal.

Counts Two and Nine against Zell, Counts Six and Eight against the Zell Defendants, Count Thirty-One against SIT, and Count Thirty-Three against EGI, EGI-TRB, and SIT are dismissed. Zell's motion to dismiss Counts Five, Thirty-Three, and Thirty-Six is denied, and the Zell Defendants' motion to dismiss Count Thirty-Two is denied. Zell, EGI-TRB, and EGI's motion to dismiss Count Thirty-One against them and EGI-TRB's motion to dismiss Counts Seven, Nine, Ten, and Eleven against it are denied without prejudice to renewal following the Second Circuit's forthcoming opinion in the Creditor Actions appeal.

Counts Sixteen through Twenty-Two and Count Thirty-One of the FAC against VRC, Duff & Phelps, GreatBanc, and Morgan Stanley are dismissed. The counts alleged in the Citigroup Action against Citigroup and MLPFS are dismissed in their entirety.

**All Citations**

Slip Copy, 2019 WL 294807

Footnotes

1    A motion to dismiss brought by Morgan Stanley Creditor Services ("MSCS") and Morgan Stanley & Co. ("Morgan Stanley") to dismiss certain claims against them in the FitzSimons Action (Motion 11) is not addressed in this Opinion.

2    The Independent Directors are Enrique Hernandez, Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft, and Miles D. White.

3    The Officer Defendants are FitzSimons, Chandler Bigelow, Donald Grenesko, Daniel Kazan, Mark Hianik, Crane Kenney, and Harry Amsden.

4    On the same day, Duff & Phelps also provided an opinion as to the fairness of the LBO to the ESOP.

5    To date, the MDL Panel has transferred approximately seventy-five federal and state cases to the Southern District of New York as a part of the MDL.

6    Monsma was a director and officer of Southern Connecticut Newspapers, Inc. and a director TMLS1, Inc., two Tribune subsidiaries.

**In re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)**

2019 WL 294807

7   Under certain circumstances not present here, Delaware law allows corporations to pay dividends even if they do not have a "surplus." See Del. Code Ann. tit. 8, § 170(a)(2).

8   Cf. Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33, 39 (2d Cir. 2009) ("The parties' briefs assume that New York substantive law governs the issues presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law." (citation omitted) ).

9   The Trustee and defendant VRC agree that Illinois law applies to the professional malpractice claims against VRC.

10   When bringing claims against corporate directors, a plaintiff must rebut the business judgment rule by plausibly alleging that the directors breached their fiduciary duties. In anticipation of that pleading burden, the FAC alleges that Tribune's directors are not entitled to the presumption emanating from that rule due to their breach of their fiduciary duties. See In re Tower Air, 416 F.3d 229, 238 (3d Cir. 2005) (holding that plaintiff was required to plead around the business judgment rule since he expressly "declare[d] that the business judgment rule does not vitiate any of his claims" in the operative complaint).

11   While the Independent Directors assume in their opening brief that Delaware law governs the unjust enrichment claim, they abandon that assumption in their reply brief.

12   Two Independent Directors lived in California and Ohio.

13   The Trustee argues that the assumed obligations were not identical to the underlying indemnification obligations. The Court concludes that they are identical in all material respects. Compare Article Twelfth of the June 2000 Certificate with Article Eighth of the December 2007 Certificate. Both documents purport to protect Tribune's officers and directors to the fullest extent permitted by law.

14   The fact that JPMorgan may have been contractually obligated to finance the LBO as of the December 19, 2007 telephone call is insufficient to defeat this claim. The Trustee adequately pleads that JPMorgan considered backing out of the deal notwithstanding its contractual obligations.

15   In opposition to this motion, the Trustee asks that the claim that Zell aided and abetted Tribune's fiduciaries' breach of their fiduciary duties after joining the Board by "lobbying for, facilitating, and consummating" the LBO be considered "[i]n the event that the Court were to determine that Zell was not acting in his fiduciary capacity after he joined the Board." As described above, the motion to dismiss the breach of fiduciary duty claim brought against Zell for acts he undertook after joining the Board is denied. The Trustee does not allege any affirmative acts by EGI, EGI-TRB, or SIT that could plausibly support a finding that they aided or abetted any breach of Tribune's fiduciaries' fiduciary duties after Zell joined the Board.

16   To the extent that the FAC states a claim that some of Tribune's officers breached their fiduciary duties to Tribune in the lead-up to Step One, the Trustee fails to allege that Tribune's shareholders were damaged by those breaches.

17   EGI-TRB also argues that the Court should dismiss Counts Seven and Nine, which seek to avoid the EGI-TRB Transfers, because the EGI-TRB Transfers were "classic pre-petition setoff[s]" and not transfers under the Bankruptcy Code. See 11 U.S.C. § 553(a). This argument depends on the characterization of the EGI-TRB Transfers, which requires further factual development and is not proper for consideration on a motion to dismiss. Similarly, EGI-TRB's argument that the Court should dismiss Count Nine based on the Bankruptcy Code's "contemporaneous exchange for new value" defense requires further factual development regarding the intent of the parties, and is therefore not proper for consideration at this stage of the litigation. See 11 U.S.C. § 547(c)(1).

18   The Zell Defendants also argue that the existence of "contracts" governing the subject matter at issue precludes the unjust enrichment claim. The Zell Defendants did not identify these contracts in their opening brief, however, waiting until their reply to attach a April 1, 2007 securities purchase agreement between Tribune, EGI-TRB, and Zell. The reply brief does not explain how the agreement bars the unjust enrichment claim or governs any of the transfers at issue. The Court declines to consider this argument. See, e.g., United States v. Yousef, 327 F.3d 56, 115 (2d Cir. 2003).

19   While the Zell Defendants argue for the first time in their reply brief that "there is no cause of action to recharacterize debt," the Court declines to consider an argument raised for the first time in a reply brief. See Yousef, 327 F.3d at 115.

20   As discussed above, the Trustee has adequately stated a claim for breach of fiduciary duty by the Independent Directors. Additionally, certain of the Officer Defendants have not moved to dismiss the breach of fiduciary duty claims asserted against them.

21   GreatBanc, Citigroup, and MLPFS do not make a developed argument that the Trustee has failed to allege their knowing participation in the D&O Defendants' breaches of their fiduciary duties.

22   Although not attached to the FAC, the letter of engagement is integral to the complaint and is properly considered at the motion to dismiss stage. See Goel, 820 F.3d at 559.

23   Duff & Phelps contends that the Trustee's aiding and abetting claims are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b) for claims involving fraud. The Trustee's claims in Count Nineteen, however, do not sound in fraud,

**In re Tribune Company Fraudulent Conveyance Litigation, Slip Copy (2019)**

2019 WL 294807

and are thus subject only to the usual pleading standard found in Fed. R. Civ. P. 8. See Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004) (courts look to the "wording and imputations" and "gravamen" of the complaint in determining whether Rule 9(b) applies); Nat'l Union Fire Ins. Co. v. Stroh Companies, Inc., 98cv8428 (DLC), 1999 WL 619635, at *2 (S.D.N.Y. Aug. 16, 1999) ("Where the allegation made by a plaintiff is based on a legal theory other than fraud, however, the requirements of Rule 9(b) apply only where the claim sounds in or depends upon a showing of fraud.").

24    The Trustee stands in the shoes of Tribune. See In re Granite Partners, L.P., 194 B.R. 318, 323 (Bankr. S.D.N.Y. 1996) ("The trustee stands in the shoes of the debtor. He may bring any suit that the debtor could have brought before bankruptcy.") Accordingly, some courts have equated the in pari delicto doctrine with the standing analysis undertaken in Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991). See Global Crossing Estate Representative v. Winnick, 04cv2558 (GEL), 2006 WL 2212776 at *12 n.16 (S.D.N.Y. Aug. 3, 2006) (collecting cases). Whether characterized as an issue of standing or as the equitable defense of in pari delicto, the result is the same. See In re Bernard L. Madoff Investment Securities LLC, 721 F.3d 54, 63 (2d Cir. 2013); Baena v. KPMG LLP, 453 F.3d 1, 4-6 (1st Cir. 2006).

25    Although there are no differences between the laws of Illinois and New York that are material to these motions, if there were a difference, Delaware choice of law rules dictate that the law of the jurisdiction in which the defendant is headquartered and where most of the work was performed be applied. See, e.g., In re Am. Int'l Grp., Inc., 965 A.2d 763, 819-20 (Del. Ch. 2009). That jurisdiction has the strongest incentive to dictate standards for professional performance. This result also yields predictable standards of behavior for a professional.

26    Although a claim for simple negligence against each of these defendants would be barred by the indemnity agreements contained in their engagement letters, the indemnity agreements do not protect the defendants from liability for gross negligence, bad faith, or willful misconduct.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.