**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05286 (SMB) |
| Plaintiff, | |
| v. | |
| LEGACY CAPITAL LTD., | |
| Defendant. | |

<u>**LEGACY CAPITAL LTD.'S RESPONSE TO TRUSTEE'S STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL BANKRUPTCY RULE 7056-1**</u>

Pursuant to Federal Rule of Civil Procedure 56 and Local Bankruptcy Rule 7056-1, Legacy Capital Ltd. ("Legacy") respectfully responds to the Trustee's Statement of Material Facts as follows:

1.    <u>Statement</u>: The plea allocutions of Madoff and BLMIS employees Frank DiPascali, David Kugel, Irwin Lipkin, and Eric Lipkin, attached as exhibits to the Declaration of Oren J. Warshavsky in Support of the Trustee's Motion for Summary Judgment ("Warshavsky Decl."), establish that BLMIS did not conduct legitimate operations from its IA Business.

1

Response:   This statement is disputed because: (1) the statement does not specify the period of time to which it refers; (2) the statement is based upon an incomplete characterization of these plea allocutions; and (3) the plea allocutions should also be considered in the context of the other conflicting testimony and evidence discussed in Legacy's memorandum of law in opposition to summary judgment (the "Legacy Brief"), the Declaration of Nicholas Kajon (the "Kajon Declaration") and the Declaration of Rafael Mayer (the "Mayer Declaration").

2.    Statement: At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal action filed against him by the United States Attorney for the Southern District of New York. Plea Allocution of Bernard L. Madoff, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (the "Madoff Allocution"), ECF No. 143-1; also attached as Exhibit 1 to Warshavsky Decl.

Response:    This statement is not disputed.

3.    Statement: At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Madoff Allocution, Tr. 23:14-23; 31:25-32:1.

Response:    The accuracy of the quote is not disputed, but the substance of the quoted language is disputed because: (1) the statement does not specify the period of time to which it refers; (2) the statement is based upon an incomplete characterization of these plea allocutions; and (3) the plea allocutions should also be considered in the context of the other conflicting testimony and evidence discussed in the Legacy Brief, the Kajon Declaration, and the Mayer Declaration.

4.    Statement: Madoff further testified at the plea hearing that he never invested his clients' funds in securities, that he used funds on hand in the JP Morgan account to pay customer redemptions,  and that he created false trading confirmations and client account statements to cover up the fact  that he had not executed trades on behalf of BLMIS investment advisory clients.  Madoff stated:

The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual

2

trading accounts with me that I would invest their money in shares of common stock, options, and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false for many years up and until I was arrested on December 11, 2008, I never invested these funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds. The victims of my scheme included individuals, charitable organizations, trusts, pension funds, and hedge funds.

Madoff Allocution, Tr. 24:9-24.

Response:    The accuracy of the quote is not disputed, but the substance of the quoted language is disputed because: (1) the statement does not specify the period of time to which it refers; (2) the statement is based upon an incomplete characterization of these plea allocutions; and (3) the plea allocutions should also be considered in the context of the other conflicting testimony and evidence discussed in the Legacy Brief, the Kajon Declaration, and the Mayer Declaration.

5.    Statement: Madoff further detailed his strategy as follows:

Through the split strike conversion strategy, I promised to clients and prospective clients that client funds would be invested in a basket of common stocks within the Standard & Poors 100 index, a collection of the 100 largest publicly-traded companies in terms of their market capitalization. I promised I would select a basket of stocks that would closely mimic the price movements of the Standard & Poors 100 index. I promised I would opportunistically time those purchases and would be out of the market intermittently, investing client funds during these periods in United States Government-issued securities, such as United States Treasury bills. In addition, I promised that as part of the split strike conversion strategy, I would hedge the investments I made in the basket of common stocks by using client funds to buy and sell option contracts related to those stocks, thereby limiting the potential client losses caused by unpredictable changes in stock prices. In fact, I never made those investments I promised clients, who believed they were invested with me in the split strike conversion strategy.

Madoff Allocution at 25:25-26:18.

Response:    The accuracy of the quote is not disputed, but the substance of the quoted

3

language is disputed because: (1) the statement does not specify the period of time to which it refers; (2) the statement is based upon an incomplete characterization of these plea allocutions; and (3) the plea allocutions should also be considered in the context of the other conflicting testimony and evidence discussed in the Legacy Brief, the Kajon Declaration, and the Mayer Declaration.

6.    Statement: BLMIS investment advisory customers received account statements from BLMIS that purported to reflect securities transactions and investment returns that appeared as though their investments with BLMIS were profitable. Madoff explained:

> To further cover up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me.

Madoff Allocution, Tr. 27:9-16.

Response:    The accuracy of the quote is not disputed, but the substance of the quoted language is disputed because: (1) the statement does not specify the period of time to which it refers; (2) the statement is based upon an incomplete characterization of these plea allocutions; and (3) the plea allocutions should also be considered in the context of the other conflicting testimony and evidence discussed in the Legacy Brief, the Kajon Declaration, and the Mayer Declaration.

7.    Statement: Madoff stated that he "never promised a specific rate of return to [his] client [sic]." Madoff Allocution at 25:18-19.

Response:    This statement is not disputed.

8.    Statement: Madoff stated that the proprietary trading and market making businesses were engaged in legitimate trading. Madoff Allocution at 25:6-11. Madoff also stated that funds from his investment advisory business were transferred to the proprietary trading and market making businesses, via his affiliated London entity. Madoff Allocution at 29:12-22.

4

Response:    This statement is not disputed.

9.    Statement: On December 20, 2016, Madoff was deposed by the defendants in numerous adversary proceedings brought by the Trustee. Transcript of the Deposition of Bernard L. Madoff, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-1789 (Bankr. S.D.N.Y. Dec. 20, 2016) (the "Madoff Dep."); also attached as Exhibit 2 to Warshavsky Decl.

Response:    This statement is not disputed.

10.    Statement: At his deposition, Madoff testified that his purported split-strike conversion strategy began around 1992 and BLMIS never engaged in the split-strike conversation securities trades reported in customer statements. Madoff Dep. 18:16-21; 19:8-17; 26:21-27:1; 83:25-84:8; 92:4-11.

Response:    This statement is disputed because it is based upon an incomplete characterization of Madoff's testimony and should be considered in the context of the other conflicting testimony and evidence discussed in the Legacy Brief, the Kajon Declaration, and the Mayer Declaration.

11.    Statement: At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal action charging him with participating in and conspiring to perpetuate the Ponzi scheme. Plea Allocution of Frank DiPascali, Jr., *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (the "DiPascali Allocution"), ECF No. 143-2; also attached as Exhibit 3 to Warshavsky Decl. DiPascali stated:

> The clients were told that the strategy involved purchasing what we call basket of blue chip stocks. Hedging those investments by buying and selling option contracts, getting in and out of the market at opportune times and investing in government securities at other times. . . .From at least the early 1990s through December of 2008, there was one simple fact that Bernie Madoff knew, that I knew, and that other people knew but that we never told the clients nor did we tell the regulators like the SEC. No purchases of [sic] sales of securities were actually taking place in their accounts. It was all fake. It was all fictitious. It was wrong and I knew it was wrong at the time, sir.

DiPascali Allocution, Tr. 45:25-46: 15.

Response:    The accuracy of the quote is not disputed, but the substance of the quoted language is disputed because: (1) the statement does not specify what exactly is meant by "early

5

1990s"; (2) the statement is based upon an incomplete characterization of these plea allocutions; and (3) the plea allocutions should also be considered in the context of the other conflicting testimony and evidence discussed in the Legacy Brief, the Kajon Declaration, and the Mayer Declaration.

12.    <u>Statement:</u> At the plea hearing, DiPascali testified that he had been instructed to falsely represent to clients that security trading was occurring in their investment accounts when in fact, no trades were being made. DiPascali explained:

> From our office in Manhattan at Bernie Madoff's direction, and together with others, I represented to hundreds, if not thousands, of clients that security trades were being placed in their accounts when in fact no trades were taking place at all.

DiPascali Allocution, Tr. 46:21-25.

> . . . .

> Most of the time the clients' money just simply went into a bank account in New York that Bernie Madoff controlled. Between the early '90s and December '08 at Bernie Madoff's direction, and together with others, I did [the] follow[ing] things: On a regular basis I told clients over the phones and using wires that transactions on national securities exchanges were taking place in their account when I knew that no such transactions were indeed taking place. I also took steps to conceal from clients, from the SEC, and from auditors the fact that no actual security trades were taking place and to perpetuate the illusion that they actually were. On a regular basis I used hindsight to file historical prices on stocks then I used those prices to post purchase of sales to customer accounts as if they had been executed in realtime. On a regular basis I added fictitious trade data to account statements of certain clients to reflect the specific rate of earn return that Bernie Madoff had directed for that client.

DiPascali Allocution, Tr. 47:5-22.

> . . . .

> I knew no trades were happening. I knew I was participating in a fraudulent scheme. I knew what was happening was criminal and I did it anyway.

DiPascali Allocution, Tr. 52:2-5.

<u>Response:</u>    The accuracy of the quote is not disputed, but the substance of the quoted language is disputed because: (1) by its own terms, this testimony is a description of what

6

DiPascali says occurred "most of the time" – a phrase that is imprecise and not explained; (ii) the statement does not specify what exactly is meant by "early '90s"; (2) the statement is based upon an incomplete characterization of these plea allocutions; and (3) the plea allocutions should also be considered in the context of the other conflicting testimony and evidence discussed in the Legacy Brief, the Kajon Declaration, and the Mayer Declaration.

13.    Statement: At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel,* No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal action charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Plea Allocution of David L. Kugel, *United States v. Kugel*, No. 10- CR-228 (LTS) (S.D.N.Y. Nov. 21, 2011) (the "Kugel Allocution"), ECF No. 143-3; also attached as Exhibit 4 to Warshavsky Decl.

Response:    This statement is not disputed. The statement is not relevant to the question of whether BLMIS was a Ponzi scheme.

14.    Statement: As far as back as the 1970s, there is no evidence that the purported investment transactions reflected in the customer statements of BLMIS's IA Business customers ever occurred, and in fact the evidence reveals that those transactions did not and could not have occurred. (Kugel Allocution, Tr. 32:4-12 ("Specifically, beginning in the early '70s, until the collapse of BLMIS in December 2008, I helped create fake, backdated trades. I provided historical trade information . . . to create fake trades that, when included on the account statements and trade confirmations of Investment Advisory clients, gave the appearance of profitable trading when in fact no trading had actually occurred.").)

Response:    This statement is disputed because Kugel's statement that "no trading had actually occurred" is not based upon personal knowledge. The statement also conflicts with testimony and evidence discussed in the Legacy Brief, the Kajon Declaration, and the Mayer Declaration.

15.    Statement: At a plea hearing on November 8, 2012, in the case captioned *United States v. Lipkin,* No. 10-CR-228 (LTS), Irwin Lipkin, a former BLMIS accountant, pleaded guilty to a two-count criminal action charging him with securities fraud, falsifying the records of BLMIS, and making false statements in relation to documents required by ERISA. Plea Allocution of Irwin Lipkin, *United States v. Irwin Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. Nov. 8, 2012) (the "Irwin Lipkin Allocution"), ECF No. 281; also attached as Exhibit 5 to Warshavsky Decl.

Response:    This statement is not disputed.

16.    Statement: BLMIS's revenue was falsely inflated through fraudulent bookkeeping entries and annual audited reports. (Irwin Lipkin Allocution, Tr. 30:23-31:3, 31:10-18, 31:24-32:5)

Response:    This statement is not disputed.

17.    Statement: At a plea hearing on June 6, 2011, in the case captioned *United States v. Eric S. Lipkin,* No. 10-CR-228 (LTS), Eric Lipkin, a former BLMIS payroll clerk, pleaded guilty to a six- count criminal action charging him with bank fraud, falsifying the records of BLMIS, conspiracy, and making false statements to facilitate a theft concerning ERISA. Plea Allocution of Eric S. Lipkin, *United States v. Eric S. Lipkin*, No. 10-CR-228 (LTS) (S.D.N.Y. June 6, 2011) (the "Eric Lipkin Allocution"), ECF No. 138; also attached as Exhibit 6 to Warshavsky Decl.

Response:    This statement is not disputed.

18.    Statement:  BLMIS created fake reports that replicated those of the Depository Trust & Clearing Corporation ("DTC"), which provides clearance for nearly all equity, bond, government securities, mortgage-backed securities, money market instruments, and over-the-counter derivative transactions in the U.S. Market. The purpose of these fake DTC reports was to purportedly confirm non-existent positions in the IA accounts, and the fake reports were given to auditors and the SEC to mislead them. (Eric Lipkin Allocution, Tr. 32:4-10, 34:1-5.)

Response:    This statement is disputed because: (1) the statement does not specify the

period of time to which it refers; (2) the statement is based upon an incomplete characterization of

these plea allocutions; and (3) the plea allocutions should also be considered in the context of the

other conflicting testimony and evidence discussed in the Legacy Brief, the Kajon Declaration,

and the Mayer Declaration.

19.    Statement: At a plea hearing on December 19, 2011, in the case captioned *United States v. Cotellessa-Pitz,* No. 10-CR-228 (LTS), Enrica Cotellessa-Pitz, a former BLMIS accountant and comptroller, pleaded guilty to a four-count criminal action charging her with conspiracy to falsify the records of BLMIS, conspiracy to obstruct the IRS in the collection of income taxes, and conspiracy to make false filings with the SEC. Plea Allocution of Enrica Cotellessa-Pitz, *United States v. Cotellessa-Pitz*, No. 10-CR-228 (LTS) (S.D.N.Y. Dec. 19, 2011) (the "Cotellessa-Pitz Allocution"), ECF No. 89-8, also attached as Exhibit 7 to Warshavsky Decl.

Response:    This statement is not disputed.

8

20.    Statement: Investment advisory customer money was funneled to BLMIS's proprietary trading and market making businesses to falsely inflate their revenue and hide their losses. Cotellessa-Pitz Allocution, Tr. 31:12-32:12.

Response:    This statement is not disputed.

21.    Statement: Beginning in the early 1990s, Madoff represented to IA Business customers that he was using a split strike conversion strategy based on blue-chip securities. (Madoff Dep. 18:16-21; 19:8-17; 26:21-27:1; DiPascali Allocution, Tr. 45:21-25, 46:1-8; Madoff Allocution, Tr. 25:18- 24.) The split strike conversion strategy purportedly involved buying a basket of stocks at opportune times and hedging those investments by concurrently selling call options and buying put options on the index. (DiPascali Allocution, Tr. 45:21-25, 46:1-8; Madoff Allocution, Tr. 26:7-16.)

Response:    This statement is not disputed.

22.    Statement: From the time Madoff purported to adhere to a split-strike conversion strategy in the early 1990s through 2008, BLMIS never engaged in the split-strike conversion securities trades reported in customer statements.  (DiPascali Allocution, Tr. 46:9-17; Madoff Allocution, Tr. 24:9-17, 26:16-21.)

Response:  This statement is disputed because it does not precisely define what is meant by "early 1990s," and to the extent that it implies that BLMIS never engaged in securities trades. The statement also conflicts with testimony and evidence discussed in the Legacy Brief, the Kajon Declaration, and the Mayer Declaration.

23.    Statement: In connection with its opposition to the Trustee's request for leave to file a motion for summary judgment, Legacy claimed that it came into possession of new facts that brought into question whether BLMIS was engaged in actual trading, relying on the Declaration of Steve Maslow (the "Maslow Declaration"), a former Bear Stearns employee, which was submitted in May 2017 in support of papers filed by Ms. Helen Chaitman in a number of unrelated adversary proceedings. (*See* Hr'g Summ. J. Conference, Tr. 5:1-22, ECF No. 166.) The Maslow Declaration states *only* that BLMIS executed trades with Bear Stearns between 1985 and 1999 and that "[i]t was general knowledge in the industry that Madoff was a huge market maker in NASDAQ ('over- the-counter') securities." (Maslow Declaration ¶¶ 4, 5, attached as Exhibit 8 to Warshavsky Decl.) The Maslow Declaration does not mention the IA Business, nor did Mr. Maslow claim to have any knowledge of or relationship with the IA Business. That Madoff made legitimate securities trades on behalf of his market making business is not in dispute.

Response:  The statement is disputed because it mischaracterizes a single statement by Legacy's counsel at a single court conference and further mischaracterizes the context for Mr.

9

Maslow's statements. The Court is respectfully referred to the Legacy Brief, the Kajon Declaration, and the Mayer Declaration for a more complete statement of the information relied on by Legacy in opposition to this motion.

24.    Statement: BLMIS investment advisory customer funds were not used to engage in any securities transactions in furtherance of its purported investment strategies as set forth above, but instead were deposited by BLMIS into a bank account at JPMorgan Chase Bank ("JPMorgan"). (Madoff Allocution, Tr. 24:17-22; DiPascali Allocution, Tr. 47:5-7.)

Response: The statement is disputed to the extent that it implies that BLMIS never engaged in securities trades and the statement is unclear as to what account at JPMorgan it is referring to. Further, the reference to a single JPMorgan account conflicts with plaintiff's reference to multiple accounts in paragraph 25 below. The statement also conflicts with testimony and evidence discussed in the Legacy Brief, the Kajon Declaration, and the Mayer Declaration.

25.    Statement: When BLMIS investment advisory customers submitted redemption requests seeking to withdraw funds they believed they held in their BLMIS accounts, BLMIS would use the commingled customer deposits held at BLMIS's bank accounts at JPMorgan, to satisfy their requests. (Madoff Allocution, Tr. 24:18-22 ("When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds."))

Response: The statement is disputed because in the quoted language Madoff suggests that he would sometimes redeem investors from funds that belonged to those particular investors. The statement also is disputed because it is based upon an incomplete characterization of the plea allocution and because the plea allocutions should be considered in the context of the other conflicting testimony and evidence discussed in the Legacy Brief, the Kajon Declaration, and the Mayer Declaration.

26.    Statement: BLMIS made all transfers to Legacy, much like to other customers and creditors, with the actual intent to defraud, as required under section 548(a)(1)(A) of the Bankruptcy Code. Indeed, Legacy has alleged that it was defrauded by BLMIS. In its

10

motion to withdraw the reference, Legacy stated that it was an "innocent investor[] that can only fairly be considered [a] victim of what is now acknowledged to be one of the biggest frauds in U.S. history." (Br. Mot. to Withdraw Reference at 1, ECF No. 35.)

Response:  This statement is disputed because it is a legal conclusion.  For all the reasons

set forth in the Legacy Brief, plaintiff has failed to come forward with undisputed evidence to

establish this legal conclusion on summary judgment.

27.   Statement: In its motion to dismiss the Amended Complaint, Legacy stated that it "is not special," but "just another BLMIS victim that was deceived into believing that such a highly regulated and well regarded lion of Wall Street could not possibly be engaged in an undetected fraud on such a massive scale." (Reply Br. Mot. Dismiss Am. Complaint at 8, ECF No. 126.)

Response:  This statement is not disputed.

28.   Statement: Defendant Legacy Capital is a British Virgin Islands Corporation, with its principal place of business in care of Hamilton Trust & Management Company Limited, Level 1, Palm Grove House, Wickham's Cay 1, Road Town, Tortola VG1110, British Virgin Islands. (Ans. ¶ 32; ECF No. 139.) Legacy commenced operations in 2000 as a single-purpose vehicle to invest in BLMIS through Account No. 1FR071.  (*Id.* ¶ 33.)

Response:  This statement is not disputed.

29.   Statement: In 2000, Legacy established BLMIS account number 1FR071 (the "Legacy Account") with deposits from two other BLMIS accounts: 1FN027 and 1FR055.  (Joint Stipulation and Order as to Undisputed Transfers (the "Joint Stipulation"), ECF No. 155.)

Response:  This statement is not disputed.

30.   Statement: Montpellier International LDC ("Montpellier") maintained BLMIS account no. 1FN027, the balance of which was transferred to the Legacy Account on or about October 2, 2000. (Joint Stipulation ¶ 1.) Olympus Assets LDC ("Olympus"), maintained BLMIS account no. 1FR034, the balance of which was transferred to Montpellier's BLMIS account on or about January 4, 1999.  (*Id.* ¶ 2.)

Response:  This statement is not disputed.

31.   Statement: HCH Management Company Limited ("HCH") maintained BLMIS account no. 1FR055, the balance of which was transferred to the Legacy Account on or about October 2, 2000.  (*Id.* ¶ 3.)

Response:  This statement is not disputed.

32.    Statement: The Montpellier, Olympus and HCH BLMIS accounts are referred to as the "Pre- Legacy Accounts."

Response:  This statement requires no response because it is not a statement of fact.

33.    Statement: Legacy admitted that BLMIS transferred $213,180,068 from the Legacy Account. (Ans. ¶ 2.)

Response:  This statement is not disputed.

34.    Statement: Of the $213,180,068 that BLMIS transferred from the Legacy Account, Legacy admitted that $126,674,218 constituted the return of principal.  (Ans. ¶ 142.)

Response:  This statement is not disputed.

35.    Statement: During the two years prior to December 11, 2008 (the "Two-Year Period"), BLMIS made transfers from the Legacy Account in the amount of $174,000,000.  (Ans. ¶ 144.)

Response:  This statement is not disputed.

36.    Statement: During the Two-Year Period, Legacy withdrew $86,505,850 in excess of principal from the Legacy Account. (Expert Report of Matthew B. Greenblatt, CPA/CFF, CFE  (the "Greenblatt Report") ¶ 45, attached as Exhibit 9 to Warshavsky Decl.)

Response:  This statement is disputed insofar as it implies that these withdrawals were all transferred to Legacy and to the extent that it implies that all transfers consisted entirely of "fictitious profits."  Legacy clarifies that these transfers were not all made to Legacy and states that plaintiff has not offered any proof to meet his burden of showing that these amounts were received by Legacy.  Paragraph 45 of the Greenblatt Report states only that $86,505,850 was withdrawn by Legacy.  It does not state or offer any proof as to whether these amounts were transferred to Legacy.  Legacy states that, in September 2007, one of two $50 million withdrawals was not transferred to Legacy; in October 2007, one of two $27 million withdrawals was not transferred to Legacy; and in June 2008, one of two $10 million withdrawals was not transferred to Legacy.

37.    Statement: Exhibit A to the Joint Stipulation reflects each withdrawal from and

12

deposit into the Pre-Legacy Accounts and Legacy Account. (Joint Stipulation, Ex. A.) Legacy stipulated that each of the transfers reflected in Exhibit A is undisputed. (*Id.* ¶ 4.)

Response:  This statement is not disputed.

38.    Statement: It is therefore undisputed that, during the Two-Year Period, Legacy withdrew $86,505,850 in excess of principal deposited in the Accounts ($213,180,068 in transfers Legacy received from BLMIS less the $126,674,218 of principal Legacy deposited with BLMIS). (Joint Stipulation, Ex. A.; Ans. ¶¶ 142 and 144; *see also* Greenblatt Report ¶ 45.)

Response:  This statement is disputed insofar as it implies that these withdrawals were all transferred to Legacy and to the extent that it implies that all transfers consisted entirely of "fictitious profits."  Legacy clarifies that these transfers were not all made to Legacy and states that plaintiff has not offered any proof to meet his burden of showing that these amounts were received by Legacy.  Paragraph 45 of the Greenblatt Report states only that $86,505,850 was withdrawn by Legacy.  It does not state or offer any proof as to whether these amounts were transferred to Legacy.  Legacy states that, in September 2007, one of two $50 million withdrawals was not transferred to Legacy; in October 2007, one of two $27 million withdrawals was not transferred to Legacy; and in June 2008, one of two $10 million withdrawals was not transferred to Legacy.

Dated:  March 1, 2019
New York, New York

Respectfully submitted,

**STEVENS & LEE, P.C.**

By:  /s/ Nicholas F. Kajon
Nicholas F. Kajon
485 Madison Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 537-0403
Facsimile: (610) 371-1223

*Attorneys for Legacy Capital Ltd.*

13

14