**CHAITMAN LLP**
465 Park Avenue
New York, New York 10022
Phone & Fax: (888) 759-1114
Helen Davis Chaitman
Gregory M. Dexter
hchaitman@chaitmanllp.com
gdexter@chaitmanllp.com
*Attorneys for Defendants-Appellants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br>         Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br>         Defendant. | SIPA LIQUIDATION <br><br> (Substantively Consolidated) <br><br> Adv. Pro. No. 08-1789 (SMB) |
| In re: <br><br> BERNARD L. MADOFF, <br><br>         Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br>         Plaintiff, <br><br> v. <br><br> DEFENDANTS LISTED ON ECF No. 14283, <br><br>         Defendants-Appellants. | Adv. Pro. Nos. listed on ECF No. 14283. |

## <u>APPENDIX ON BEHALF OF DEFENDANTS-APPELLANTS</u>

### <u>VOLUME II OF II</u>

### <u>(PAGES AA202 – AA335)</u>

## TABLE OF CONTENTS

*Irving H. Picard v. Wilenitz, et al.* Adv. Pro. No. 10-04995          **Page**

Letter to Hon. Stuart M. Bernstein from Helen Davis Chaitman requesting
permission to appeal dated January 16, 2019, ECF No. 126 .......................... AA1

Declaration of Helen Davis Chaitman dated January 16, 2019, ECF No. 126-1 ...... AA9

Exhibit 1:  Hon. Frank Maas' January 2, 2019 Order, ECF No. 126-2........... AA13

Exhibit 2:  Joint Letter to Hon. Frank Maas from Helen Davis Chaitman
and Maximillian S. Shifrin dated September 20, 2019, ECF No. 126-3......... AA21

Exhibit A:  Excerpts from transcript of proceedings before Hon.
Stuart M. Bernstein on June 29, 2017..................................................... AA29

Exhibit B:  Excerpts from transcript of proceedings before Hon.
Stuart M. Bernstein on May 17, 2016..................................................... AA38

Exhibit C:  Excerpts from transcript of proceedings before Hon. Frank
Maas on December 13, 2016 .................................................................. AA47

Exhibit D:  Excerpts from transcript of telephone conference before
Hon. Frank Maas on January 5, 2017 ................................................... AA57

Exhibit E:  Excerpts from transcript of proceedings before Hon. Stuart
M. Bernstein on July 25, 2018............................................................... AA62

Exhibit F:  Letter to Maximillian S. Shifrin from Helen Davis
Chaitman dated September 14, 2018 ..................................................... AA69

Attachment:  Expert Report of Lisa Collura dated May 14, 2015
Exhibit 3:  List of Known BLMIS/Bernard L. Madoff Bank and
Brokerage Accounts .................................................................. AA72

Exhibit 3:  Email to Hon. Frank Maas from Maximillian S. Shifrin dated
November 19, 2018, ECF No. 126-4............................................................. AA76

Exhibit 4:  Transcript of proceedings before the Hon. Stuart M. Bernstein
on May 17, 2016, ECF No. 126-5 .................................................................. AA79

Exhibit 5:  Hon. Frank Maas' January 4, 2017 Order, ECF No. 126-6........... AA159

Exhibit 6:  Hon. Frank Maas' March 15, 2017 Order, ECF No. 126-7........... AA164

Exhibit 7:  Excerpts from transcript of proceedings before the Hon. Frank
Maas on November 19, 2018, ECF No. 126-8 ............................................... AA172

# TABLE OF CONTENTS

| *Irving H. Picard v. Wilenitz, et al.* **Adv. Pro. No. 10-04995** | **Page** |
|---|---|
| Exhibit 8:  November 20, 2018 letter from Helen Davis Chaitman to the Hon. Frank Maas, ECF No. 126-9 | AA177 |
| Exhibit A:  Letter to Hon. Stuart M. Bernstein from Helen Davis Chaitman dated July 24, 2017 | AA183 |
| Exhibit A:  Excerpts from transcript of proceedings before Hon. Stuart M. Bernstein on June 29, 2017 | AA190 |
| Exhibit B:  Omitted due to size, Excel spreadsheet:  Bernard L. Madoff Investment Securities, LLC, Microfilm Reel Inventory as of June 28, 2017, Microfilm Inventory Color-Coded | AA194 |
| Exhibit C:  Hon. Stuart M. Bernstein's December 1, 2017 Order Implementing the Court's November 29, 2017 Bench Ruling | AA196 |
| Exhibit 9:  Excerpts from transcript of proceedings before the Hon. Stuart M. Bernstein on July 26, 2017, ECF No. 126-10 | AA199 |
| Letter to the Hon. Stuart M. Bernstein from Maximillian S. Shifrin, entered January 22, 2019, ECF No. 127 | AA202 |
| Exhibit A:  Transcript of Proceedings before Hon. Frank Maas, on November 19, 2018, ECF 127-1 | AA207 |
| Letter to Hon. Stuart M. Bernstein from Helen Davis Chaitman, entered January 25, 2019 ECF No. 129 | AA284 |
| Exhibit A:  Expert Report of Lisa Collura, dated January 16, 2019, ECF No. 129-1 | AA290 |
| Exhibit 3:  List of Known BLMIS/Bernard L. Madoff Bank and Brokerage Accounts | AA324 |
| Exhibit 12:  Treasury Bill Activity in JPMC G 13414 Account | AA328 |
| Hon. Stuart M. Bernstein's February 15, 2019 Order Granting Leave to Appeal Discovery Arbitrator's January 2, 2019 Order, ECF No. 130 | AA333 |

Baker&Hostetler LLP

45 Rockefeller Plaza
New York, NY 10111

T  212.589.4200
F  212.589.4201
www.bakerlaw.com

January 22, 2019

**VIA ECF AND ELECTRONIC MAIL**

Honorable Stuart M. Bernstein
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Room 723
New York, New York  10004-1408
Bernstein.chambers@nysb.uscourts.gov

Re:     *Picard v. Wilenitz*, Adv. Pro. No. 10-04995 (SMB)

Dear Judge Bernstein:

        We are counsel to Irving H. Picard, as trustee ("Trustee") for the substantively
consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the
Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* and the estate of Bernard L.
Madoff.  We write in response to Ms. Chaitman's January 16, 2019 letter and accompanying
declaration requesting permission to appeal Judge Maas's January 2, 2019 Order (the "January
2019 Order").[1]

        The Court should decline to review the January 2019 Order and thereby provide finality
to this longstanding discovery dispute.  *See* Order Appointing a Discovery Arbitrator, ECF No.
14227, Adv. Pro. No. 08-01789 (providing that Discovery Arbitrator's rulings are reviewed "at
the discretion of the Court").  As the Court is aware, Ms. Chaitman has litigated her request for
"trading records" multiple times and in multiple contexts.  Since the parties originally agreed to
arbitrate this dispute in 2016, Ms. Chaitman has filed three motions before Judge Maas resulting
in three separate orders governing the "trading records" issue—two of which denying Ms.
Chaitman's renewed motions to compel additional documents.  In the interim, after Judge Maas
denied her second motion, Ms. Chaitman separately (and improperly) raised the dispute multiple
times before this Court.   Over the course of nearly three years, the Trustee has produced over
300,000 documents totaling 4.8 million pages, including the restoration of over 200 microfilm
reels and the application of approximately 250 search terms across the same BLMIS Database to

_____

[1] The complete transcript from the November 19, 2018 arbitration before Judge Maas is attached as Exhibit
A.

**AA202**

which Ms. Chaitman now seeks wholesale access.  These productions supplemented the four
million documents provided in E-Data Room 1, including approximately 260,000 third-party
financial records that have been available to Ms. Chaitman since before she served her first
request for production of documents.

In denying Ms. Chaitman's renewed motion to compel for the second consecutive time,
Judge Maas carefully considered this entire record and rejected the same arguments and
accusations Ms. Chaitman has lodged repeatedly for years (and lodges again here).  Specifically,
Judge Maas concluded that: (i) "the Trustee has repeatedly tried to accommodate Ms.
Chaitman's requests for BLMIS trading records"; (ii) Ms. Chaitman's "assertion that the Trustee
has proceeded in bad faith is utterly unsupported by the record"; and (iii) "there is no basis for
requiring the Trustee to supplement the extensive efforts that he has already undertaken."
January 2019 Order at 5-7, Chaitman Decl. Ex. 1.  Given Judge Maas's familiarity with the
underlying record, as well as the Court's own experience with this dispute over the years, there is
no reason to second-guess Judge Maas's findings.

Nor is there any basis to sanction what would essentially amount to an interlocutory
appeal of a discovery order, which federal law does not permit.  *See* 28 U.S.C. §1292
(articulating standard for appealing interlocutory orders).  In fact, Ms. Chaitman's attempt in a
separate adversary proceeding to certify for appeal a discovery order entered by this Court was
rejected by Judge Carter.  *See* Order Denying Motion for Leave to Appeal, *Picard v. Saren-
Lawrence*, Adv. Pro. No. 10-04898, ECF No. 118, at 8 (denying motion because "reversal of the
Bankruptcy Court's discovery ruling would not materially advance the termination of the
Trustee's efforts to recover the fictitious transfers made by Madoff" and the "discovery ruling
does not contain a controlling legal issue"); *see also Tylena M. v. Heartshare Children's
Services*, 220 F.R.D. 38, 39 (S.D.N.Y. 2004) (according "the substantial deference due to a
magistrate judge's resolution of discovery disputes" and concluding that ruling was not "clearly
erroneous or contrary to law").  The same principles should guide the Court here.  Ms. Chaitman
has already taken multiple bites of this apple, and she should not be afforded *de novo* review of
Judge Maas's third "trading records" related order merely because the parties elected to arbitrate
the dispute.  Indeed, this Court's review of the January 2019 Order would defeat the purpose of
referring the dispute to Judge Maas in the first place.

In any event, even if the Court were to grant appellate review, Ms. Chaitman's four
principal arguments on appeal are a collection of irrelevant distractions that would not warrant
reversal.  *First*, Ms. Chaitman's assertion that the Court had already "ordered" the Trustee to
produce the trading records is both false and inconsequential.  On May 16, 2016, the Court held a
pre-motion conference pursuant to Local Bankruptcy Rule 7007 and authorized Ms. Chaitman to
file a motion to compel, which she eventually filed on August 29, 2016.  After fully briefing the
motion in this Court, the parties referred the dispute to Judge Maas, who subsequently issued the
three orders referenced above.  If the Court had already ordered production of "trading records"
in May of 2016, then Ms. Chaitman's August 2016 motion to compel and subsequent arbitrations
would have been completely unnecessary.  Regardless, in the January 2019 Order, Judge Maas
validated the Trustee's extensive productions and implicitly concluded that the Trustee has

**AA203**

complied with all applicable orders.  As such, even if Ms. Chaitman's characterization of the
May 16, 2016 conference is correct (which it is not), it would not provide a basis to disturb Judge
Maas's ruling.

*Second,* given Ms. Chaitman's expansive request for over 30 million documents, the
question of whether it would be burdensome for the Trustee to produce these materials is
inapposite.  The threshold inquiry regarding the scope of discovery is not whether the production
would be burdensome; it is whether the discovery is relevant and proportional.  *See* Fed. R. Civ.
P. 26(b)(1).  A mere showing that a production would not be burdensome to a producing party
does not entitle litigants to irrelevant and disproportional discovery.  On its face, Ms. Chaitman's
request for the wholesale production of 30 million documents falls well outside the scope of Fed.
R. Civ. P. 26, and Judge Maas expressly concluded that the efforts undertaken by the Trustee to
identify and produce actual "trading records" through various search terms and microfilm
restorations were "extensive."  *See* January 2019 Order at 7.[2]  Accordingly, there is no basis to
compel the production of 30 million additional documents, irrespective of burden considerations.

*Third*, Judge Maas's conclusion that Ms. Chaitman has failed to show that any of
BLMIS's legitimate trading activity was done for the benefit of investment advisory customers,
while true, was similarly not integral to Judge Maas's ultimate denial of Ms. Chaitman's motion.
*See* January 2019 Order at 7.  Judge Maas expressly stated that, "*even if [real trading] were
proven*, there [has] been no showing that the efforts that the Trustee already has undertaken in an
effort to locate pre-1992 BLMIS trading records are inadequate."  *Id.* (emphasis added).  A
contrary finding on appeal regarding any real trading at BLMIS would therefore not warrant a
different result on the merits of this dispute.

*Fourth*, Judge Maas did not "fail to consider" that Ms. Chaitman requested access to the
Queens warehouse; he expressly concluded that Ms. Chaitman had not "demonstrated that the
warehouse is likely to contain any documents that would be of use to her . . . ."  January 2019
Order at 6.  Given Ms. Chaitman's failure to make this showing, Judge Maas correctly concluded
that there was no basis to compel the Trustee to search the materials in the warehouse or permit
Ms. Chaitman to review those same materials herself.  As further elaborated by Judge Maas:

> [Ms. Chaitman] has known for years that the BLMIS Database contains approximately 30
> million documents, only a fraction of which have been copied to E-Data Room 1, and
> that the Trustee has thousands of boxes of hard copy documents and thousands of items

---

[2] Ms. Chaitman falsely states that she "provided the Trustee with a list of all known firms with which
Madoff/BLMIS traded or custodied securities," but that the Trustee "has never made a search of the records in his
exclusive control to produce these documents."  Letter at 6.  As detailed in the January 2019 Order, the Trustee
produced documents responsive to two of Ms. Chaitman's 22 broad search terms, which confirmed that the
documents were largely irrelevant.  At a subsequent meet and confer, the parties agreed to use specific account
numbers as search terms in lieu of bank names, and the Trustee produced approximately 10,000 documents
responsive to those search terms. *See* January 2019 Order at 5.

of electronic media that have not been processed.  In fact, she has been given indices
confirming the existence of these additional materials.

*See* January 2019 Order at 5-6.  Judge Maas therefore recognized that Ms. Chaitman has had
meaningful access to the materials in the warehouse for years and that her last-ditch effort to
prolong this dispute by offering to visit the warehouse herself rang hollow.

In fact, in his March 15, 2017 order denying Ms. Chaitman's second motion to compel,
Judge Maas concluded that the indices produced by the Trustee in December of 2016 "should
have enabled Ms. Chaitman to formulate more focused requests for trading records."  *See*
January 2019 Order at 4.  Despite Judge Maas's directives, Ms. Chaitman never consulted these
indices and only made the warehouse an issue *after* the November 19, 2018 arbitration.  Judge
Maas himself took issue with this enlarged request in his Order, which he said was "based on a
contorted view of the record."  *See* January 2019 Order at 5 ("Also largely unexplained is why
the application to be given access to this massive database morphed only one day later into a
request that the Trustee wade through the 13,000 boxes of documents in the warehouse.")

Based on the foregoing, the Trustee respectfully requests that the Court decline any
further review of Judge Maas's various orders and refuse any further indulgence of Ms.
Chaitman's various accusations.  Ms. Chaitman has had ample opportunity to pursue this
discovery, and the Trustee has produced hundreds of thousands of documents in response to her
requests.  It is time for the Court to definitively put this dispute to rest and permit these cases to
move forward unencumbered.

Respectfully submitted,

*/s/ Maximillian S. Shifrin*

Maximillian S. Shifrin

cc:     Helen Davis Chaitman (via email)

**AA205**

# Exhibit A

Picard v Trust U-Art Fourth          Conference 11/19/2018

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------x

SECURITIES INVESTOR PROTECTION :
CORPORATION,                        Adv. Pro. No.
                                :   08-01789(SMB)
          Plaintiff-Applicant,

                                :   SIPA LIQUIDATION
          v.

                                :   (Substantively
BERNARD L. MADOFF INVESTMENT         Consolidated)
SECURITIES, LLC,                :

          Defendant.            :
-------------------------------x
In Re:                          :
BERNARD L. MADOFF,              :
          Debtor.              :
-------------------------------x

IRVING H. PICARD, Trustee       :
for the Liquidation of
Bernard L. Madoff Investment    :
Securities LLC,                     Adv. Pro. No.
                                :   10-04995(SMB)
          Plaintiff,

                                :
          v.

                                :
TRUST U/ART FOURTH O/W/O ISRAEL
WILENITZ, EVELYN BEREZIN        :
WILENITZ, individually, and as
Trustee and Beneficiary of the :
Trust U/ART FOURTH O/W/O ISRAEL
WILENITZ and SARA SEIMS, as     :
Trustee of the Trust U/Art
Fourth O/W/O Israel Wilenitz,  :

          Defendants.           :
-------------------------------x
                  CONFERENCE
          Monday, November 19, 2018

**AA207**

Picard v Trust U-Art Fourth            Conference 11/19/2018

Page 2

1              TRANSCRIPT OF PROCEEDINGS as

2      reported by NANCY C. BENDISH, Certified Court

3      Reporter, RMR, CRR and Notary Public of the

4      States of New York and New Jersey, at JAMS

5      offices, 620 Eighth Avenue, 34th Floor, New

6      York, New York on Monday, November 19, 2018,

7      commencing at 10:23 a.m.

8

       B E F O R E:

9

10          HON. FRANK MAAS (RET.), Arbitrator
                 fmaas@jamsadr.com
11          JAMS
            620 Eighth Avenue
12          34th Floor
            New York, New York  10018
13

14      A P P E A R A N C E S:

15

            BAKER HOSTETLER LLP
16          45 Rockefeller Plaza
            14th Floor
17          New York, New York  10111-0100
            BY:  MAXIMILLIAN S. SHIFRIN, ESQ.
18                mshifrin@bakerlaw.com
                 NICHOLAS J. CREMONA, ESQ.
19                 ncremona@bakerlaw.com
            For the Trustee Irving Picard

20

21          CHAITMAN LLP
            465 Park Avenue
22          New York, New York  10022
            BY:  HELEN DAVIS CHAITMAN, ESQ.
23                hchaitman@chaitmanllp.com
                 GREGORY M. DEXTER, ESQ.
24                gdexter@chaitmanllp.com
            For the Defendants

25

**AA208**

Picard v Trust U-Art Fourth            Conference 11/19/2018

Page 3

1              JUDGE MAAS:  Good morning,

2    everyone.  We're here for Ms. Chaitman's motion

3    seeking to compel the Trustee to share access to

4    the entire database that the Trustee has

5    assembled.  So the floor is yours, Ms. Chaitman.

6              MS. CHAITMAN:  Your Honor, as I

7    laid out in our submission, we have been trying

8    for over two years to get access to all the

9    trading records, and we have not been able to do

10   so.  These records are absolutely essential for

11   us to prove the defense that in fact Madoff was

12   purchasing securities.  And we have already

13   established that we can prove it with respect to

14   some, but without a complete set of the trading

15   records it's impossible to do it.

16              So, what we really need is all the

17   trading records going back as far as they have

18   them.  And just to be absolutely clear, we're

19   talking about third-party documents; we're not

20   talking about Madoff-generated documents.  These

21   are documents bearing the letterhead of Bank of

22   New York Mellon, JPMorgan Chase, Fidelity,

23   Lehman Brothers, Bear Stearns et cetera.  So

24   these are documents whose authenticity

25   presumably cannot be questioned.

Picard v Trust U-Art Fourth          Conference 11/19/2018

                                                        Page 4

 1               JUDGE MAAS:  I thought one of the

 2     problems you faced with third-party documents is

 3     that they would only go back six years, and you

 4     were looking for records that went back further.

 5     My impression was that you were more interested

 6     in the opposite, the Madoff Securities records.

 7     But I understand that that's not what you're

 8     seeking.

 9               MS. CHAITMAN:  No.  And even if we

10     can only go back six years, Your Honor, and I

11     think that that's -- the Trustee served

12     subpoenas on all the institutions that did

13     business with Madoff, as I understand it.  And

14     obviously he did that presumably in 2009.  So if

15     it went back six years, it would be to 2002 or

16     '3.  It's possible that Madoff kept records

17     earlier than that.  In other words, he might

18     have had people who just microfilmed records

19     from an earlier period.

20               So, I'm not interested in any

21     records other than third-party trading records.

22     But we haven't been able to get them.  I mean,

23     to take just one example, BNY Mellon, there are

24     certain statements but only for the year 2008, I

25     believe 2007 and '8, in the e-data room and

Picard v Trust U-Art Fourth          Conference 11/19/2018

Page 5

1    there's no indication that the earliest

2    statement we have was the first statement.

3              So, at one point within the last

4    six months the Trustee had offered all defense

5    counsel access to the BLMIS database, which

6    seemed to me the easiest and least burdensome

7    way for the Trustee to comply with this request.

8    I don't know how anything in that database can

9    be privileged from the Trustee's perspective.

10   But if there's some way to segregate the trading

11   records, that would be fine.  It's just that the

12   Trustee hasn't done that.

13             What the Trustee has done is given

14   me specific limited productions, which don't

15   really resolve the problem.  I need to have

16   access to a database of all of the third-party

17   records.

18             MR. SHIFRIN:  Your Honor, so

19   there's a lot I can say in response to that.  I

20   think the first thing I think is worth

21   emphasizing is that there is a history to this

22   dispute.

23             JUDGE MAAS:  Some of which I'm

24   part of.

25             MR. SHIFRIN:  Yes, exactly.  And

Picard v Trust U-Art Fourth                    Conference 11/19/2018

                                                                    Page 6

 1    we did our best to articulate with as much

 2    detail as possible in the two-and-a-half page

 3    submission the relevant history.

 4            Everything contained in our

 5    portion of that joint statement is 100 percent

 6    accurate.  I stand by every single word in that

 7    joint statement, and if that version of events

 8    is the accurate story, then a lot of what Ms.

 9    Chaitman wrote in her position, in her portion

10    of the joint statement, cannot be.  There's some

11    conflict there.  And I submit to you that our

12    effort to build a comprehensive chronology there

13    should speak for itself.

14            Now, I don't want to restate

15    everything we wrote in our joint statement, but

16    I just want to emphasize certain core realities

17    here.

18            First, there is an order governing

19    this dispute.  It's the March 2017 order that

20    Your Honor entered.  It governs Ms. Chaitman's

21    requests for any additional documents.  The

22    thrust of that order is that the Trustee has

23    produced comprehensive indices detailing the

24    BLMIS data in the Trustee's possession and that

25    Ms. Chaitman, if she wanted any additional

08-04995-smb   Doc 1227-3   Filed 01/22/19   Entered 01/22/19 13:59:48   Exhibit A
November 19, 2018 Transcript   Pg 8 of 78
Picard v Trust U-Art Fourth                Conference 11/19/2018

                                                      Page 7

 1    documents, was to use those indices and

 2    specifically state what she wanted and where she

 3    thought those documents were located.

 4              JUDGE MAAS:  But one of the things

 5    she says is that she can't save the search, I

 6    think she said she can't print directly and,

 7    therefore, has to put in requests to the

 8    Trustee.  It does seem a little unwieldy.

 9              MR. SHIFRIN:  Your Honor, I think

10    Your Honor's question might be conflating the

11    E-Data Room 1, which is a separate database --

12              JUDGE MAAS:  Probably, right.

13              MR. SHIFRIN:  -- and then the rest

14    of our data.  So that --

15              JUDGE MAAS:  Let me -- and forgive

16    me for interrupting.  To the extent that Ms.

17    Chaitman tells me now she's only interested in

18    third-party records, those are not in the e-data

19    room, or they are?

20              MR. SHIFRIN:  There are many

21    third-party documents in E-Data Room 1.  But

22    E-Data Room 1, the primary purpose of that

23    database is a vehicle for producing the

24    documents that the Trustee's case-wide experts

25    relied on in connection with their reports,

Page 8

1    considered in connection with their reports.

2    They are effectively Rule 26 disclosures/

3    productions, and we affirmatively make those

4    documents available.  That was the purpose of

5    E-Data Room 1.  That is not the entire universe

6    of the Trustee's data.  There is considerably

7    more.

8              Now, the BLMIS database is an

9    internal Relativity database that contains the

10   processed data, processed BLMIS data in the

11   Trustee's possession.  Now, we've articulated

12   this to Ms. Chaitman many times.

13             That includes virtually every

14   single hard copy and electronic document

15   recovered from the operative floors of the

16   Lipstick Building.  All of those documents are

17   processed and in the BLMIS database.  But,

18   again, that is not the entirety of the Trustee's

19   data.  There are unscanned boxes, there are

20   unprocessed pieces of media, there is a

21   warehouse in Queens.

22             Again, we have disclosed all of

23   this for years.  We have specifically stated all

24   of this to Ms. Chaitman for years.  She and

25   every other defendant is on notice of all of

**AA214**

Page 9

1   this.

2           So the BLMIS database is, again,

3   just a fraction of all of the data.  But the

4   indices that we produced to her two years ago

5   are a comprehensive itemization of all of the

6   BLMIS data in the Trustee's possession.  That

7   includes what's in the BLMIS database and also

8   includes the unprocessed, unscanned boxes of

9   hard copy documents and unprocessed pieces of

10  media.

11          So she has -- not to be cute, Your

12  Honor, but she has the keys to the kingdom and

13  she has had it for two years.  And that brings

14  me to my second point.  So the first point is

15  there is a governing order that required Ms.

16  Chaitman to use those indices.

17          My second point is that she has

18  never complied with it since it was entered.

19  She has never once referenced, let alone used

20  the indices to lodge specific informed requests

21  that Your Honor required that she do.  Not a

22  single time.  I have never heard her even

23  mention the indices to me or acknowledge their

24  existence.  Every single time I have brought it

25  up in letters, in emails, in representations to

Picard v Trust U-Art Fourth              Conference 11/19/2018

---

Page 10

1   the Court, Ms. Chaitman ignores it.  That's what

2   she's done.  And she does it in the joint

3   statement here.  I mean, we've exchanged our

4   versions of the joint statement multiple times.

5   She knew that we were going to emphasize the

6   index.  There is zero reference to the indices

7   in her portion of the joint statement.  So, she

8   has never used the indices despite having them

9   for two years.

10              The third point I want to

11  emphasize is that notwithstanding Ms. Chaitman's

12  failures to use those indices, we have, for the

13  last year and a half, nevertheless continued to

14  negotiate with her in good faith in an attempt

15  to get her the documents that she has wanted.

16  We have written her letters explaining -- she

17  has requested that we run search terms.  We

18  wrote back saying there's an order governing

19  this dispute, you're not complying it, you're

20  not using the indices we gave to you, your

21  search terms are otherwise unreasonable, but we

22  are willing to sit and meet and confer with you

23  in good faith.

24              And for months it was this

25  tortured process where she refused to do it.

---

**AA216**

1  Nevertheless, over the course of those months,

2  we ended up producing tens of thousands of more

3  documents, most recently in connection with the

4  November 2017 meet and confer.  We didn't have

5  to do any of that given her failure to abide by

6  her end of the obligation under the March 2017

7  order, but we did it anyway.

8            And in connection with this

9  November 2017 meet and confer that Ms. Chaitman

10  raised, we have -- the parties sat --

11            JUDGE MAAS:  That was the one

12  where there was a tentative offer to make the

13  database available?

14            MR. SHIFRIN:  No, Your Honor.  So

15  let me briefly take a tangent and address that.

16            JUDGE MAAS:  Yes.

17            MR. SHIFRIN:  The Trustee had,

18  several months ago, filed a motion for an

19  omnibus proceeding to address the Ponzi scheme

20  that involved multiple defendants and multiple

21  cases, and Ms. Chaitman was one of them.

22            JUDGE MAAS:  Right.

23            MR. SHIFRIN:  And in connection

24  with the negotiations surrounding that motion,

25  there were several over the summer, the Trustee

Picard v Trust U-Art Fourth          Conference 11/19/2018

Page 12

1    suggested that he may be willing to give

2    defendants access to that database or otherwise

3    produce those documents.  I don't think we were

4    floating access to the database.  If anything,

5    we were floating a potential production.  In

6    exchange for defendants' agreement to certain

7    terms or certain aspects of the Trustee's

8    motion.

9              Those negotiations fell apart.

10   Ms. Chaitman and her joint defendants or

11   colleagues, however you want to phrase it,

12   disagreed with our offer and everything just

13   fell apart and now that motion has morphed into

14   something else; it's a motion for additional

15   discovery.  So, that's neither here nor there.

16             But the November 2017 meet and

17   confer had to do -- that was the last time --

18             JUDGE MAAS:  Give me the date

19   again.

20             MR. SHIFRIN:  November 2017.

21   November 14th, 2017.

22             JUDGE MAAS:  Right.

23             MR. SHIFRIN:  The parties met face

24   to face.  Ms. Chaitman, again, never used the

25   indices, she never wrote the letter to the

Picard v Trust U-Art Fourth         Conference 11/19/2018

Page 13

 1   Trustee, in accordance with Your Honor's order,

 2   saying exactly what she wanted and where she

 3   thought it was located.  But we nevertheless sat

 4   down with her because we didn't want to burden

 5   Your Honor or Judge Bernstein with any further

 6   motion practice.  We wanted to resolve this and

 7   we wanted to get her everything that she wanted.

 8   And at that meet and confer the parties came to

 9   an agreement on certain search terms run

10   targeting third-party documents.

11              I memorialized that in several

12   writings, and we fulfilled our end of the

13   bargain fully.  We produced all those documents.

14   In fact, what we actually said we would do is

15   produce the, quote unquote, responsive

16   documents, but we ended up second-guessing that

17   and decided, in an effort to be fully

18   transparent, we gave Ms. Chaitman every document

19   that hit on those terms.

20              So after we fulfilled our end of

21   the bargain, what does Ms. Chaitman do?  She

22   files a motion for sanctions before Judge

23   Bernstein or she attempts to file a motion for

24   sanctions before Judge Bernstein.

25              This was inexplicable.  We did

08-01789-cgm   Doc 18578-3   Filed 03/18/19   Entered 03/18/19 13:30:42   Appendix
10-04995-smb   Doc 327-3   Filed 01/22/19   Entered 01/22/19 13:59:45   Exhibit 3
November 19, 2018 Transcript        Pg 22 of 137        Pg 15 of 78
Pg 22 of 137        Pg 15 of 78
Picard v Trust U-Art Fourth              Conference 11/19/2018

```
                                                      Page 14
 1    exactly what we agreed.  And at that hearing --
 2    it was a 7007 conference -- Ms. Chaitman first
 3    said, oh, well, the Trustee actually -- he only
 4    ran the search terms in the third-party
 5    documents and not the entire BLMIS database.
 6              Your Honor, I assure you, that was
 7    the agreement that was reached but,
 8    nevertheless, immediately after that hearing the
 9    Trustee said, we have no objection to that.
10    We'll run those same search terms across the
11    BLMIS database and we'll produce those
12    documents.  We have since done that.
13              So under any interpretation of
14    what happened at the November 2017 meet and
15    confer, Ms. Chaitman has everything that she
16    bargained for, negotiated for, asked for.  We
17    have given her everything that she has asked for
18    and she nevertheless continues to insist that
19    we're not giving her everything.  And it's --
20    frankly, it's -- she just asserts it without any
21    basis and she's been doing this for two years.
22              Now, Your Honor, we have produced
23    in total since the December 2016 arbitration
24    first before Your Honor approximately 300,000
25    documents, 4.8 million pages of documents.  We
```

**AA220**

Page 15

1    have no interest in concealing any records.  We

2    have every interest in giving Ms. Chaitman what

3    she wants.  But I will tell Your Honor, it is

4    hard for me to believe that there is much of a

5    good faith interest in these documents

6    themselves given Ms. Chaitman's conduct.

7              If someone has these comprehensive

8    indices in their possession and refuses to use

9    them, and the way she has conducted herself over

10   the last two years, it strikes me that she has

11   more of an interest in perpetuating disputes and

12   perpetuating this specter of impropriety on

13   behalf of the Trustee, which she has spent years

14   cultivating.  And I think, frankly, Your Honor,

15   I've been involved in this dispute for well over

16   two years, that has always been apparent to me,

17   that that is her primary objective.  She thinks

18   she can leverage that specter of impropriety in

19   defense of her cases.  I think it's

20   inappropriate, I think it's improper, and that's

21   one of the things we want to put a stop to here

22   today.

23              So, just to crystallize the

24   Trustee's request here.  I think, with respect,

25   Your Honor should enter an order that does the

**AA221**

1   following two things at a minimum.  One is deny

2   Ms. Chaitman's request for 30 million documents

3   as inconsistent with Rule 26, which it is.

4                JUDGE MAAS:  When you say 30

5   million documents, what are you referring to?

6                MR. SHIFRIN:  I'm referring to the

7   BLMIS database.

8                Deny that request as inconsistent

9   with both Rule 26 and Your Honor's March 2017

10  order, which she continues to ignore.

11               JUDGE MAAS:  Let me just interrupt

12  you for a second.

13               MR. SHIFRIN:  Sure.

14               JUDGE MAAS:  Hard drives are now

15  made in multi-terabytes.  I assume you could

16  take the entire BLMIS database and hand it to

17  her on a couple of hard drives, if not just one

18  hard drive.  And then she'd have to load it onto

19  a platform and she could manipulate the data,

20  and I'm not using that in a negative sense, but

21  analyze the data to her heart's content.  And

22  presumably at her client's expense.  Why isn't

23  that a solution to the problem?

24               MR. SHIFRIN:  At her client's

25  expense?

Picard v Trust U-Art Fourth          Conference 11/19/2018

```
                                                    Page 17
 1                JUDGE MAAS:  Well, except for the
 2     cost of the hard drives.  You know, if I told
 3     the Trustee provide the entire database and then
 4     it's her problem dealing with it.
 5                MR. SHIFRIN:  Well, Your Honor, I
 6     have a number of issues with that.
 7                JUDGE MAAS:  One of the points she
 8     made is that presumably there's nothing in there
 9     that's privileged or work product.
10                MR. SHIFRIN:  Well, that's not
11     true, first of all.  There's 30 million
12     documents in there and we can't be sure -- these
13     documents were collected from the Lipstick
14     Building at a hectic time when attorneys
15     descended on the premises, along with the FBI
16     and consultants and a lot got scooped into the
17     processing process, and there is absolutely work
18     product in there.
19                MS. CHAITMAN:  You mean the
20     Trustee's work product?
21                MR. SHIFRIN:  Yes.  The Trustee's
22     or Trustee's consultants.  There were attorneys
23     there and it was a time when a lot of documents
24     were being collected for processing and things
25     got scooped up into that process that were not
```

**AA223**

Page 18

 1   intended to be scooped up into that.  It would

 2   be an effort to undertake, on our part, to

 3   isolate those documents.

 4           But putting that aside, Your

 5   Honor, there are rules governing discovery, and

 6   I certainly don't need to tell Your Honor this,

 7   but Rule 26, there are threshold requirements,

 8   relevance, proportionality, and not only that,

 9   there is an order governing this dispute.  So I

10   think there has to be some semblance of process,

11   procedure here such that Ms. Chaitman can't just

12   ignore orders, can't just ignore the Federal

13   Rules and make requests that in any other

14   context would be denied.

15           JUDGE MAAS:  On page 2 of her

16   September 14th letter, which is Exhibit F of the

17   joint letter, there's a list of institutions

18   with whom Madoff presumably did business.  And a

19   list of the number of documents.  And on the

20   third page she says, "Despite our repeated

21   requests, you've refused to produce to us the

22   documents constituting the" --

23           MR. SHIFRIN:  Yes.

24           JUDGE MAAS:  I thought I heard you

25   say that in fact you have now produced all those

Picard v Trust U-Art Fourth          Conference 11/19/2018

Page 19

1   documents?  Maybe I misunderstood.

2             MR. SHIFRIN:  No, not all of

3   those.  Again, there's a lot of history there.

4   This took place between the March 2017 order and

5   the November 2017 meet and confer.

6             After the March 2017 order was

7   entered, three months later I want to say, and

8   that's an approximation, Ms. Chaitman came to us

9   and offered us these 22 or so search terms that

10  were based on very well-known financial

11  institutions.  But again, that -- so let's just

12  stop there for a second and take note that that

13  itself was a violation of -- was not in

14  compliance with the March 2017 order.

15            We told her that.  We told her

16  that this is not consistent with what Judge Maas

17  asked you to do if you wanted anymore documents.

18  However, we will run these numbers for you, and

19  we did.  There are a series of letters that --

20  we didn't want to burden the record here, Your

21  Honor, but we are happy to supplement the record

22  with every single letter that was exchanged,

23  every single email, and there were many in the

24  interim period between March 2017 and November

25  2017, where we told her that these 22 very broad

Picard v Trust U-Art Fourth              Conference 11/19/2018

                                                  Page 20

 1    search terms came on 5 million documents.  1.5

 2    million of those documents were already

 3    available to her in E-Data Room 1.  And we asked

 4    her to use those documents that were already

 5    available to her and narrow her focus.

 6              Your Honor, if you can imagine,

 7    BLMIS was a broker-dealer.  Running the search

 8    term "Fidelity" across the BLMIS database is

 9    going to retrieve an enormous volume of data

10    that's irrelevant and not proportional and is, I

11    would think, not interesting to Ms. Chaitman.

12              JUDGE MAAS:  But also which

13    needn't be reviewed before you turn it over,

14    right, because it's not going to contain

15    privileged information.

16              MR. SHIFRIN:  Well, this is,

17    again, in the same database that might contain

18    work product, right?  I don't know if

19    necessarily those search terms would hit on the

20    work product, but that is always an issue when

21    we run those search terms across the BLMIS

22    database.

23              But, Your Honor, just to fast

24    forward or flash forward --

25              JUDGE MAAS:  More importantly,

Page 21

1    it's not necessarily going to generate trading

2    records, correct?

3              MR. SHIFRIN:  No, well, I mean --

4    no, not necessarily.  It might, but it's also

5    going to generate calendar appointments, emails,

6    all sorts of irrelevant data.

7              Now, just to -- this is probably

8    an important piece of information.  There are 30

9    million documents in the BLMIS database.  29

10   million of those documents are ESI.  Now, what

11   do I mean by that?  Every single electronic

12   document recovered from the operative floors of

13   the Lipstick Building is in the BLMIS database.

14   That includes every file from the network, from

15   employees' hard drives, everything.  Everything.

16   Everything on any thumb drives lying around,

17   floppy disks, CDs, all of that was processed and

18   is in the BLMIS database.  Probably personal

19   items.  It contains the full assortment of what

20   employees kept in the ordinary course, pictures

21   of kids, take-out menus.  Everything.

22             So, Ms. Chaitman's search terms

23   were too broad, we stated our objections and,

24   again, I'm happy to supplement the record with

25   our response to the letter that you're currently

**AA227**

Page 22

1   looking at, but later on, again in an effort to

2   resolve the dispute, we offered her documents

3   responsive to two of those search terms, I

4   believe it was Meadowbrook and Morgan Stanley.

5   And we produced those documents to her.

6              Ms. Chaitman immediately

7   complained that they included irrelevant

8   information, that they included irrelevant

9   documents, and that's what ended up leading to

10  the meet and confer.  She finally said, okay,

11  I'm not getting what I want, let's meet and

12  confer.  Again, in the months preceding we were

13  requesting this meet and confer over and over

14  again and Ms. Chaitman was refusing.

15             So, we made a good faith effort to

16  produce documents notwithstanding her failure to

17  comply with the March 2017 order.

18             JUDGE MAAS:  Meadowbrook and

19  Morgan Stanley were just to test the waters?

20             MR. SHIFRIN:  I think Meadowbrook

21  the universe was particularly small.

22             JUDGE MAAS:  Right.

23             MR. SHIFRIN:  With Morgan Stanley,

24  I think we sort of came to a compromise.  I

25  believe we eliminated -- this was after Ms.

**AA228**

Picard v Trust U-Art Fourth            Conference 11/19/2018

Page 23

 1    Chaitman complained that the Meadowbrook

 2    population contained irrelevant information.  We

 3    said to her that's because it included both ESI

 4    and the hard copy scanned records.  We said to

 5    her that the ESI is likely to contain irrelevant

 6    information so let's put that to the side and

 7    we'll give you the documents that hit on the

 8    scanned hard copy documents and we produced

 9    those.  And she agreed.  And we did that in

10    advance of one of Madoff's depositions.  And

11    that led to the meet and confer.

12              So, Your Honor, getting back to

13    the relief that we're seeking here, I think the

14    only correct outcome here is that a request for

15    the production of -- the wholesale production of

16    30 million documents, irrespective of relevance,

17    irrespective of proportionality, irrespective of

18    any of the limiting factors in Rule 26, and

19    irrespective of the March 2017 order, should be

20    denied outright.  That, we respectfully request,

21    be the first finding that Your Honor makes.

22              The second finding that we would

23    respectfully request is that the Court finally

24    put to rest this notion that we are out of

25    compliance with orders and that we're concealing

1   records.  We have complied with every single

2   order, we have -- again, I have documented that

3   long history in our half of the joint statement.

4   We have made every effort to produce to Ms.

5   Chaitman everything that she's asked for, and we

6   have made every effort to negotiate with her in

7   good faith.  And I think we at this point, given

8   Ms. Chaitman's -- if you forgive me, outlandish

9   accusations in court, in writings, in letters,

10  in filings accusing us and my colleagues of

11  impropriety I think is unwarranted and we would

12  appreciate something that definitively states

13  the Trustee is not engaged in that kind of

14  behavior.  I think we are entitled to that.

15  That's number two.

16          Number three, Your Honor, we want

17  some finality here; we want ultimate resolution.

18  We have no interest in concealing anything from

19  Ms. Chaitman.  I think there is something that

20  we can offer here that puts to rest this

21  dispute.  And here is what we propose.

22          There are 30 million documents in

23  the BLMIS database, that's what you're asking

24  for.  Again, this includes documents that you

25  have recently complained about multiple times

Page 25

1   are irrelevant, they're not what you want,

2   they're emails.  You say you don't want emails.

3   The population of one million scanned hard copy

4   documents, that is most likely, in our view, to

5   contain what you're looking for, Ms. Chaitman.

6               So what we would like to offer

7   here today is twofold.  One, we will produce the

8   one million documents, scanned hard copy

9   documents, in the BLMIS database.  And, number

10  two, in anticipation of making this offer before

11  Your Honor and with your involvement, given the

12  state of the relationship over the last several

13  months, we have devoted a number of attorneys to

14  reviewing that population of one million

15  documents in an effort to identify for Ms.

16  Chaitman anything that can be conceivably a

17  third-party record that reflects securities

18  trading.

19              Now, we define that broadly,

20  anything that looks like a third-party record

21  and contains securities holdings or securities

22  trading, we are in the process of finalizing

23  that review and marking those documents.  And we

24  will produce to her not just those documents

25  that we mark, but the entire population of

1   scanned hard copy documents that we reviewed so

2   she can either accept our representations that

3   these are the documents that she might be

4   interested in, or review the entire population

5   and check our work.  She's welcome to do that.

6           But, Your Honor, that offer I

7   think has to be contingent on a couple of

8   things.  One, that it be construed as a

9   voluntary production that we are not obligated

10  to make, given Ms. Chaitman's failure to comply

11  with Rule 26 and Your Honor's March 2017 order,

12  and that this should definitively end this

13  dispute and we can all move on and the Trustee

14  can move on with the prosecution of its cases

15  without this being the distraction that it has

16  been for the last two years.

17           I think that is an equitable

18  result and, frankly, I don't think what

19  objection Ms. Chaitman could have to that.

20           MS. CHAITMAN:  Well, there are

21  several million that are listed just in this hit

22  chart that we had communicated about.  Are the

23  million pages among the several million in this

24  hit chart?

25           MR. SHIFRIN:  Yes.  So, those

Picard v Trust U-Art Fourth                Conference 11/19/2018

                                                        Page 27

 1   search terms were run across the entire BLMIS

 2   database.

 3            MS. CHAITMAN:  Right.

 4            MR. SHIFRIN:  So that would hit on

 5   both the scanned hard copy documents and also

 6   hit on ESI.  But the ESI is what you've

 7   historically complained about because it hits on

 8   emails and calendar entries and stuff you don't

 9   want.  But to the extent that those search

10   results hit on the scanned paper then, yes, that

11   would be included in this production.

12            MS. CHAITMAN:  Well, is the

13   million pages, is that complete?  Or you've just

14   selected this out?  I mean --

15            MR. SHIFRIN:  I can represent to

16   you what those million documents are.  It is,

17   generally speaking, every single hard copy loose

18   piece of paper that the Trustee recovered from

19   the operative floors of the Lipstick Building in

20   2008, early 2009, when he was appointed and his

21   consultants and his attorneys came in there and

22   took control of that stuff.  That's all we can

23   represent to you.  That's what BLMIS kept on

24   those floors.

25            Whether it's complete, whether it

AA233

Page 28

1    includes every potential trading record, we can

2    never, Your Honor, and we said this in December

3    of 2016, we can never make that kind of a

4    representation with this much data.  How can we

5    know?  How can we know there's not something on

6    some floppy disk hidden at the warehouse?  We

7    can never be sure.  But I think that is a

8    reasonable solution to this problem.

9                JUDGE MAAS:  Ms. Chaitman?

10               MR. DEXTER:  Why do you think the

11   hard copy documents are more likely to be

12   relevant documents than the ESI?

13               MR. SHIFRIN:  Well, I can respond

14   to that.  I think it's because Ms. Chaitman is

15   looking for third-party records, some of which

16   are old, right.  Are they going to be in ESI or

17   are they going to likely -- to the extent BLMIS

18   maintained them, they probably received them

19   from the third parties over the years and kept

20   them somewhere on the premises.

21               MS. CHAITMAN:  Or scanned them and

22   kept Microsoft copies of them.

23               JUDGE MAAS:  You mean microfilm.

24               MS. CHAITMAN:  Microfilm, yes.

25               MR. SHIFRIN:  Which we have

**AA234**

Page 29

1    restored and produced to her as part of events

2    that preceded the March 2017 order from the

3    earlier time periods.

4              JUDGE MAAS:  So, in terms of

5    microfilm or microfiche, Mr. Jacobs represented

6    that there were a number of reels, I forget the

7    exact number, that potentially might contain

8    trading records, and those were restored or put

9    in electronic form and produced.

10             MR. SHIFRIN:  Um-hum.

11             JUDGE MAAS:  I take it among the

12   microfilm documents you're not aware of anything

13   else that potentially contains trading records?

14   Is that accurate?

15             MR. SHIFRIN:  Absolutely, Your

16   Honor, but -- well, let me just -- we have to go

17   back in time and start from where we were in

18   December of 2016.  At the time, and this is part

19   of the problem, Ms. Chaitman's definition of

20   trading records has evolved over time to include

21   other things.  In December of 2016 we were

22   talking about pre-1992 records.  And if you read

23   the transcript from December of 2016 the focus

24   was on clearinghouse records.

25             But what we did do in the

Page 30

1    aftermath of the December 2016 arbitration, and

2    this is all reflected in Your Honor's March 2017

3    order, we restored all known pre-1992 microfilm

4    reels.  And at first we ran search terms across

5    those documents, but when Ms. Chaitman

6    complained we just produced every document

7    restored from those reels.

8              MS. CHAITMAN:  Can I just make

9    that distinction.  These are pre-1992.  I was

10   focusing on a different issue, Your Honor,

11   because one of the issues that the Trustee's

12   expert, Mr. Dubinsky, dealt with was pre-1992

13   trading and I was focusing on that issue.

14             But isn't it true that there are

15   hundreds and hundreds of microfilm reels that

16   have not been produced or -- these were --

17             MR. SHIFRIN:  Your Honor, the

18   microfilm --

19             MR. CREMONA:  My understanding,

20   excuse me, is that Judge Bernstein directed you

21   that after we produced those microfilm reels

22   that were restored to review them and then

23   identify documents you found relevant and

24   justify at that point why additional reels

25   should be restored at the expense of the

**AA236**

08-01789-cgm  Doc 18578-3  Filed 03/18/19  Entered 03/18/19 13:30:42  Appendix
        Vol 1 Pg 39 of 137   Pg 32 of 78
08-04995-smb  Doc 275-3  Filed 01/22/19  Entered 01/22/19 13:59:46  Exhibit A
November 19, 2018 Transcript   Pg 39 of 137

Picard v Trust U-Art Fourth              Conference 11/19/2018

Page 31

1   Trustee, after the considerable expense and

2   effort that was undertaken to restore those

3   reels.

4          That undertaking by you was never

5   done, and it was never articulated to the Court

6   and in subsequent meetings with the defense

7   group that, as far as I am aware, and I was at

8   the meetings, that was somewhat abandoned by

9   your group.

10          MS. CHAITMAN:  To be precise, what

11  Judge Bernstein said was that, I think it was

12  900 some odd reels that were not pre-1992, and

13  Judge Bernstein -- you represented or

14  Mr. Sheehan said he'd never reviewed those

15  reels.  And Judge Bernstein asked what was on

16  them and Mr. Sheehan said he couldn't say and

17  Judge Bernstein said I could select 20 of those

18  reels without being assessed personally for it

19  or my clients, but that after that we would be

20  assessed for it.  And Mr. Kratenstein and I

21  selected a couple of those reels and they were

22  not productive and we didn't follow up on that.

23          Instead we've been focusing -- so

24  those have never been explored and I'm not

25  raising that now.  What I'm really asking for is

08-01789-cgm Doc 18578-3 Filed 03/18/19 Entered 03/18/19 13:30:42 Appendix
Pg 40 of 137
08-04995-smb Doc 227-3 Filed 01/22/19 Entered 01/22/19 13:59:46 Exhibit A-
Vol 2 Pg 33 of 78
November 19, 2018 Transcript
Picard v Trust U-Art Fourth                 Conference 11/19/2018

```
                                               Page 32
 1   all of the third-party trading records, which is
 2   precisely what we had the meet and confer about.
 3             JUDGE MAAS:  Some of those might
 4   be on the microfilm.
 5             MS. CHAITMAN:  They may very well
 6   be, and it may be that I'm going to come back
 7   and ask for them, Your Honor, but I'm trying to
 8   do this one step at a time because it's so
 9   massive.  And it just seemed to me the BLMIS
10   database was the easiest approach, if we could
11   establish -- it's been frustrating to me that
12   even though Baker has acknowledged it had all
13   these hits for these names, it didn't produce
14   them.
15             JUDGE MAAS:  It produced them for
16   Meadowbrook and for Morgan Stanley.
17             MS. CHAITMAN:  You know what, I
18   don't -- it may be my failing, but I don't
19   remember the conversations that --
20             MR. SHIFRIN:  I can refresh your
21   memory, Ms. Chaitman.  We produced those
22   documents.
23             JUDGE MAAS:  When?
24             MR. SHIFRIN:  Specifically for
25   Meadowbrook.  This was in late October, early
```

1   November, before the meet and confer.

2              MS. CHAITMAN:  Well, Meadowbrook

3   is different from Morgan Stanley.  I mean --

4              MR. SHIFRIN:  We produced some of

5   those as well.  Again, I want to reiterate what

6   I said before.  We produced those documents, we

7   produced the Meadowbrook documents, and Ms.

8   Chaitman complained that she's not interested in

9   emails.  There was a ton of irrelevant materials

10  in those productions precisely because they're

11  so broad.

12             So that's when we said, all right,

13  we'll produce Morgan Stanley as well, but since

14  you're complaining about the ESI, the emails

15  that you're getting in these productions, let's

16  put the ESI to the side and we'll give you the

17  hits within the scanned paper, and we produced

18  those to you.

19             MS. CHAITMAN:  Okay.  I think that

20  it would be -- rather than you screening them, I

21  think if you just would produce all the

22  documents with the hits and I will -- if it's

23  burdensome for me, so be it.  I just would like

24  to see every document in BLMIS's database that

25  names these institutions.

**AA239**

Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 34

1            MR. SHIFRIN:  Your Honor, we have
2    stated our objections to those search terms in
3    letters that we can submit to you and I can
4    repeat them here.
5            JUDGE MAAS:  Well, Chase is going
6    to give you more than a million hits, 348,000 of
7    them unique.  Irving Trust, which hasn't existed
8    in a long time, has even larger numbers of
9    unique hits, as does Lehman.
10           MR. SHIFRIN:  Right.
11           JUDGE MAAS:  One of the problems
12   is that that's likely to give you a lot of
13   irrelevant material.  I thought there was talk
14   of also running it with account numbers.
15           MR. SHIFRIN:  That's what we did
16   in the aftermath of the November 2017 meet and
17   confer.  Just to reiterate and clarify what we
18   did, the parties agreed and I stand by this
19   representation, that we would run the account
20   numbers within the Rule 2004 database.
21           Now that, Your Honor, it's
22   important to understand, is separate from the
23   BLMIS database.  These are documents that the
24   Trustee subpoenaed and obtained in connection
25   with their Rule 2004 investigation years ago.

Page 35

1          MS. CHAITMAN:  That was never my

2     intent and it was never confirmed by me in

3     writing.  I understood you were going to search

4     the BLMIS database.

5          MR. SHIFRIN:  I understand that's

6     your impression of the meeting.  I'll just

7     emphasize that Ms. Chaitman subsequently served

8     a formal document request.  We responded that we

9     would do exactly what I said we would do.  There

10    are several writings, emails that confirmed this

11    and, Ms. Chaitman, I have sent those writings to

12    you to prove that this was our understanding of

13    the agreement.

14          But in any event, after you

15    complained that we didn't run those search terms

16    in the BLMIS database, we immediately did so and

17    produced those documents.  So you have

18    everything that you asked for under your

19    interpretation of what happened there at the

20    November 2017 meet and confer.

21          JUDGE MAAS:  I want to make sure I

22    understand this.

23          MR. SHIFRIN:  Sure.

24          JUDGE MAAS:  You ran against the

25    Rule 2004 database all of these search terms

Page 36

1    with account numbers?

2                MR. SHIFRIN:  No, no, no.  These

3    were account numbers, known account numbers for

4    BLMIS/Madoff accounts.  And we sent those

5    accounts to Ms. Chaitman, those account numbers

6    to Ms. Chaitman.

7                JUDGE MAAS:  Okay.  And some of

8    those account numbers, for example, may have

9    involved Fidelity?

10               MR. SHIFRIN:  Yeah, may have.  And

11   I don't have the full list in front of me, but

12   BLMIS had dozens of accounts.

13               JUDGE MAAS:  Okay.  Did I hear you

14   say that you also eventually ran it against the

15   BLMIS database?

16               MR. SHIFRIN:  Yes.  So, again, our

17   understanding, and I think this was quite clear

18   again in many writings, was that we would run

19   those search terms in the Rule 2004 database.

20               When Ms. Chaitman went to Judge

21   Bernstein and tried to move for sanctions

22   against us, she stated for the first time that

23   the Trustee said he would run those search terms

24   in the BLMIS database and didn't.  That was the

25   first I had heard that.

Page 37

```
 1              Two hours, probably less, after

 2      that hearing I emailed Ms. Chaitman, and I can

 3      forward you this string of emails, saying

 4      precisely that I did not know this is what you

 5      wanted.  We have no objection.

 6              JUDGE MAAS:  I think I actually

 7      have that email string.

 8              MR. SHIFRIN:  Yes.  We have no

 9      objection to running those search terms in the

10      BLMIS database.  And a couple of weeks later, I

11      forget exactly when, we produced all those

12      documents.

13              So, this is an important point to

14      stop and consider.  Even under Ms. Chaitman's

15      interpretation of what happened at the November

16      meet and confer, she has what she asked for and

17      now she's moving for sanctions.  So, this is

18      what I mean by it's inexplicable.

19              JUDGE MAAS:  So it sounds like,

20      Ms. Chaitman, in a focused way of doing this,

21      the Trustee, in two steps, ran it against both

22      of the databases, the 2004 database and the

23      BLMIS database using the account numbers and

24      produced all those records, electronic or hard

25      copy.
```

Page 38

1              MR. SHIFRIN:  Yes.

2              JUDGE MAAS:  Why isn't that

3    sufficient?  Well, before I ask why isn't that

4    sufficient, have you reviewed those materials?

5              MS. CHAITMAN:  Yes.  And the

6    records are not complete.  Well, they may not be

7    complete in the Trustee's possession.

8              JUDGE MAAS:  Right.

9              MS. CHAITMAN:  But what I would

10   like is for all of the documents that were the

11   hits, and it may be burdensome for me to go

12   through it, but I'd like to go through those.

13   Some of the documents may not be legible.  If

14   you put an account number in, it may not be

15   legible in the document, it may not be

16   responsive.  And it's important enough for my

17   clients that I'd like to have every hit and let

18   me go through it and satisfy myself.

19             MR. SHIFRIN:  There is an

20   important point that's worth emphasizing here.

21   The ESI is fully searchable, so that the

22   searching is reliable.  There are no issues with

23   searching.

24             If there are issues with search

25   term hits not retrieving every document and any

```
                                        Page 39
 1   issues with handwriting or really old pieces of
 2   scanned paper, it's going to be in the scanned
 3   paper.  We're offering to give you all of that.
 4   So, any search term problems you have are
 5   resolved by virtue of us giving you the one
 6   million scanned pieces of paper.
 7              But with respect to the ESI,
 8   you've run the account numbers for the key
 9   accounts, all known accounts that BLMIS
10   maintained, and you have all those documents.
11   Searching for Morgan Stanley or Fidelity or
12   whatever it is, is going to give you a ton of
13   irrelevant information, and I think our
14   objections are valid, Your Honor.
15              JUDGE MAAS:  Is there -- I'm
16   sorry.
17              MR. SHIFRIN:  No, it's okay.
18   Please.
19              JUDGE MAAS:  Is there a principal
20   outside institution such as Fidelity or Morgan
21   Stanley with which BLMIS traded?  In other
22   words --
23              MS. CHAITMAN:  There are.
24              JUDGE MAAS:  -- there are maybe 15
25   entities listed here, maybe a few more.  I'm
```

Picard v Trust U-Art Fourth              Conference 11/19/2018

```
                                               Page 40
 1   asking whether one of these was the principal

 2   outside brokerage firm that BLMIS was using.

 3            MR. SHIFRIN:  I don't want to

 4   speculate.  I have colleagues who specialize in

 5   that.

 6            JUDGE MAAS:  Let me ask Ms.

 7   Chaitman based on her review.  Is there one of

 8   these that you think is more likely to yield

 9   trading records?

10            MS. CHAITMAN:  The terms that are

11   listed here are not complete.  For example, we

12   just found Bank of New York Mellon trading

13   records that are very important for some of our

14   clients.  And, you know, this list says Chase is

15   actually -- doesn't include JPMorgan Chase.  I

16   mean, in theory it should pick it up, but I

17   don't know that it did, because there would be

18   many more than 916,000 --

19            JUDGE MAAS:  But you furnished

20   this list, right?

21            MS. CHAITMAN:  Yes.  But this was

22   done probably two years ago.

23            JUDGE MAAS:  Okay.  But if it's

24   not complete, the fault lies with you, not with

25   the Trustee.
```

08-01789-cgm   Doc 18578-3   Filed 03/18/19   Entered 03/18/19 13:30:42   Appendix
08-04995-smb   Doc 127-3   Filed 01/22/19   Entered 01/22/19 13:59:48   Exhibit A
November 19, 2018 Transcript   Pg 49 of 137   Pg 42 of 78

Picard v Trust U-Art Fourth            Conference 11/19/2018

Page 41

 1               MS. CHAITMAN:  No, I know, but I

 2      thought you were asking me whether there were

 3      institutions that are not on here.  The answer

 4      is yes.

 5               JUDGE MAAS:  Well, I appreciate

 6      knowing that, but what I'm asking is whether

 7      it's on the list or not, is there a particular

 8      institution that predominated in terms of

 9      trading, to your understanding?

10               MS. CHAITMAN:  I don't think there

11      is one institution.  I mean, Madoff has

12      testified that he bought T-bills with investment

13      advisory customers' money and that he did that

14      through JPMorgan Chase, Bear Stearns, Lehman

15      Brothers, Morgan Stanley.

16               JUDGE MAAS:  Do that more slowly.

17               MS. CHAITMAN:  JPMorgan Chase,

18      Bear Stearns, Lehman Brothers.

19               JUDGE MAAS:  Right.

20               MS. CHAITMAN:  Morgan Stanley, and

21      Fidelity.  But I just realized that that is not

22      complete because we just found some statements

23      from Bank of New York Mellon which were T-bills

24      that were purchased with investment advisory

25      customers' money.  So --

08-01789-cgm    Doc 18578-3    Filed 03/18/19    Entered 03/18/19 13:30:42    Appendix
10-04995-smb    Doc 252-3    Filed 01/22/19    Entered 01/22/19 13:59:46    Exhibit A3
November 19, 2018 Transcript    Pg 43 of 78
Vol 1 Pg 50 of 137

Picard v Trust U-Art Fourth              Conference 11/19/2018

Page 42

1              JUDGE MAAS:  He testified, I

2    thought I read someplace, that he bought -- I'm

3    hesitating because I want to say six billion.

4              MS. CHAITMAN:  He did.  That's

5    what he testified, that he maintained a

6    portfolio of six billion.  It was a billion and

7    a half at four institutions.  But what I'm

8    saying is since his testimony I have actually

9    found records of T-bills that were purchased at

10   Bank of New York Mellon, which he hadn't

11   mentioned.

12             JUDGE MAAS:  Presumably you have

13   those records.

14             MS. CHAITMAN:  I just have them

15   for 2008.

16             MR. CREMONA:  Your Honor, I think

17   it's important to correct the record.

18   Respectfully, that's speculation and unsupported

19   conjecture.  It's our position that no trades

20   were made on behalf of IA customers.

21             JUDGE MAAS:  I understand the

22   dispute and I understand that Ms. Chaitman's

23   position either at the omnibus hearing or

24   individual trials will be that any trading that

25   occurred had to be for the benefit of a

**AA248**

Picard v Trust U-Art Fourth              Conference 11/19/2018

```
                                                      Page 43

 1   particular Madoff customer or that it should be

 2   attributed at a minimum to a Madoff customer,

 3   and there is no way that the two sides are going

 4   to agree about that.

 5             But part of your objection is that

 6   these requests are overbroad, and what I was

 7   trying to explore is whether we can test the

 8   waters and see whether they are overbroad.  So,

 9   for example, picking Bear Stearns and giving Ms.

10   Chaitman all of the documents that are hits,

11   which is 653,000 documents, and if she can find

12   trading records that haven't been produced, that

13   would inform the discussion.  If she can't, that

14   also would inform the discussion.

15             MS. CHAITMAN:  I believe that

16   that's a good idea.

17             JUDGE MAAS:  Let me hear from

18   counsel first for the Trustee.

19             MR. SHIFRIN:  One thing that's

20   worth emphasizing here is that the account

21   numbers that we ran were account numbers for all

22   known BLMIS/Madoff banks.  There were about a

23   hundred of them, give or take.  So more than

24   just the names of the banks.

25             If we're running account numbers
```

**AA249**

10-04995-smb Doc 352-13 Filed 01/22/19 Entered 01/22/19 13:59:46 Exhibit 13
November 19, 2018 Transcript Pg 45 of 78
Picard v Trust U-Art Fourth

Page 44

1    across ESI and we're searching for trading

2    records, I think the documents that contain the

3    account numbers are the ones that are actually

4    going to be a third-party record because a

5    third-party record is going to contain the

6    account information, right?

7              JUDGE MAAS:  Right.

8              MR. SHIFRIN:  If we're searching

9    for the names of the institutions, you're going

10   to get calendar appointments, emails, and I know

11   Your Honor would like to explore what this

12   population looks like, but we've done this

13   already with two of the search terms and Ms.

14   Chaitman is on record for complaining about what

15   was in there.

16             Again, if there are going to be

17   additional -- I can't obviously state this

18   definitively, I could never say this

19   definitively, but if we're dealing with search

20   terms here, the documents that are amenable to

21   problems with search terms are the hard copy

22   documents.  And we are prepared to give her all

23   of those, with the subset of that population of

24   documents that we have identified as potentially

25   of interest to Ms. Chaitman, without

80-04995-smb   Doc 1227-13  Filed 01/22/19  Entered 01/22/19 13:59:46  Exhibit M
November 19, 2018 Transcript    Pg 46 of 78

                                                    Page 45

1    representing that they actually reflect real

2    trading activity, without representing anything

3    about them, simply in an effort to identify

4    documents that are arguably responsive to Ms.

5    Chaitman's request, and she can sort through it.

6                MS. CHAITMAN:  May I just ask, are

7    you saying that you're going to give me all the

8    documents with hits including group in this

9    column?

10               MR. SHIFRIN:  We will give you --

11   if we produce all of the scanned hard copy

12   documents --

13               MS. CHAITMAN:  Is that this

14   column?  I don't know the term, scanned hard

15   copy.

16               MR. SHIFRIN:  That's the entire

17   BLMIS database.  The scanned hard copy are a

18   subset of the entire BLMIS database.

19               MS. CHAITMAN:  Right.

20               JUDGE MAAS:  A fairly small subset

21   by comparison, right?

22               MR. SHIFRIN:  Right, because ESI,

23   just by its nature, is enormous.  I mean, we're

24   dealing with an enormous volume of data.  One

25   million hard copy pieces of documents, and

**AA251**

Page 46

1    that's not pages, by the way, that's every

2    scanned piece of paper, every piece of paper

3    recovered from an entire company from three

4    floors, 17th, 18th 19th floor, every piece of

5    document, every hard copy document coming from

6    every office, work space, et cetera.

7                 So, to the extent there are

8    documents within that population, that one

9    million document population that would hit on

10   those search terms, they would be included,

11   absolutely.

12                MS. CHAITMAN:  Let me just, if I

13   may, Your Honor, may I ask a question?

14                JUDGE MAAS:  Yes.

15                MS. CHAITMAN:  Let's assume that

16   there was someone in Madoff's offices who would

17   annually collect all third-party statements,

18   let's just assume that, and put them in a

19   warehouse in Queens.  That would not be

20   encompassed in this, right?

21                MR. SHIFRIN:  Anything that's

22   unprocessed and not in the BLMIS database, so an

23   unscanned box of documents, no, that wouldn't be

24   encompassed in this.

25                JUDGE MAAS:  But you also have

Picard v Trust U-Art Fourth          Conference 11/19/2018

                                                    Page 47

 1     indices that the Trustee furnished, I think at
 2     my direction, so that you could go through the
 3     indices and say there may be something in box
 4     63.
 5               MR. SHIFRIN:  And they're
 6     substantive, too.
 7               JUDGE MAAS:  And I gather that
 8     hasn't happened.
 9               MR. SHIFRIN:  Not once.  And there
10     are descriptors in each line item that tell you
11     what's in the box.
12               JUDGE MAAS:  And the Trustee
13     further went through that exercise -- correct me
14     if I'm wrong -- and found some microfiche that
15     potentially was responsive and restored all of
16     those.
17               MR. SHIFRIN:  We restored all
18     pre-1992 microfilm reels because that's what she
19     was after at the time and we produced all
20     documents restored from those microfilm reels.
21     In fact, Ms. Chaitman now has all documents
22     contained and stored on every single microfilm
23     reel that the Trustee has restored.  So there's
24     no --
25               MS. CHAITMAN:  But that's just the

Page 48

1   pre-1992.

2              MR. SHIFRIN:  Well, no, that

3   includes some post-'92 as well.  Every microfilm

4   reel that we restored and processed, you have

5   all those documents.  The only documents you

6   don't have are the reels that we did not restore

7   and did not process, but that dispute you raised

8   with Judge Bernstein and he gave you

9   instructions.

10             MS. CHAITMAN:  Right.  That's

11  about a thousand reels that haven't been

12  restored and processed.

13             MR. SHIFRIN:  I don't have the

14  numbers before me, but something along those

15  lines.  But there's no microfilm document that

16  Ms. Chaitman doesn't have.

17             JUDGE MAAS:  When you say it was

18  raised with Judge Bernstein and he ruled, what

19  specifically did he rule?

20             MR. SHIFRIN:  Again, this is a

21  part of how this dispute has been kind of

22  muddied.  Ms. Chaitman, in our view, improperly

23  raised the microfilm issue before Judge

24  Bernstein in connection with some briefing

25  relating to the Madoff deposition.  This was

**AA254**

08-01789-cgm   Doc 18578-3   Filed 03/18/19   Entered 03/18/19 13:30:42   Appendix
08-04995-smb   Doc 1278-3   Filed 01/22/19   Entered 01/22/19 13:39:46   Exhibit A
November 19, 2018 Transcript   Pg 50 of 78
Vol 1 Pg 57 of 137
Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 49

```
 1   approximately three months after Your Honor
 2   entered the March 2017 order.
 3              In that briefing she reiterated
 4   her usual accusations that we're hiding trading
 5   records.  In our view she was improperly
 6   circumventing Your Honor's March 2017 order.
 7   That's what she did.
 8              Now, for a variety of reasons, at
 9   that first hearing it took -- Judge Bernstein
10   wasn't aware of the March 2017 order.  We had a
11   subsequent hearing and one of the first things
12   that Judge Bernstein said at the subsequent
13   hearing was that part of the problem, and I'm
14   paraphrasing what he said, is that I learn
15   something new each time you guys come here.
16   What he was referring to was Your Honor's March
17   2017 order.
18              And on the basis of that order, he
19   didn't order anything but he suggested that Ms.
20   Chaitman identify a small number of reels.  The
21   Trustee restored those reels, produced those
22   documents, and if Ms. Chaitman can identify
23   something in there that gives reason to suspect
24   there are additional documents of interest on
25   these other reels, she can make that showing.
```

Page 50

1            She later identified five reels;

2    we restored those, we produced those documents

3    and then she abandoned the effort.  So as far as

4    we're concerned we discharged our obligations in

5    connection with that separation.

6            Your Honor, frankly, we've done

7    this in every conceivable context, in every

8    conceivable way.  We have constantly and

9    consistently complied with every order, with

10   every suggestion.  I think we've done more than

11   we had to.  I think in retrospect, given the

12   headaches that this has created, I think it

13   probably would have been better to simply refuse

14   to negotiate with Ms. Chaitman further until she

15   complied with the March 2017 order.  I think we,

16   arguably, made a mistake by engaging with her

17   because that just led to all of this and has

18   drawn this dispute out more than it needed to

19   be.

20           JUDGE MAAS:  So let me just make

21   sure I understand the ask, Ms. Chaitman.  You

22   want every third-party document that's

23   responsive -- let me rephrase that.

24           You want every third-party

25   document on the list on pages 2 and 3 of the

Page 51

1    joint September 14th letter.  It's not a joint

2    letter, I misspoke.

3              MS. CHAITMAN:  It's Exhibit F.

4              JUDGE MAAS:  Yes, it's Exhibit F.

5    Plus some other institutions which were not

6    listed --

7              MS. CHAITMAN:  Right.

8              JUDGE MAAS:  -- to be given to you

9    in toto.  Is that the ask?

10              MS. CHAITMAN:  The ask is, yes,

11   the column which says documents with hits,

12   including group.  And then there are a few

13   institutions of which I'm aware now which were

14   not included in this.

15              JUDGE MAAS:  But when you got it

16   for Meadowbrook and Morgan Stanley, I gather

17   there was a lot of irrelevant material in there.

18              MS. CHAITMAN:  I'll go through it.

19              JUDGE MAAS:  That's fine, but were

20   there any additional trading records that you

21   found?

22              MS. CHAITMAN:  You know, I don't

23   have a recollection, Your Honor, I apologize.  I

24   don't remember the Morgan Stanley at all.  My

25   recollection is the Meadowbrook didn't have

Page 52

1   anything that was evidence of a trading record,

2   but I don't remember the Morgan Stanley.  I know

3   that according to Mr. Madoff a substantial

4   amount of trading was done through Morgan

5   Stanley.  And it may be that those are in hard

6   copy boxes in the Queens warehouse and I'll just

7   have to check that index.

8          MR. SHIFRIN:  Your Honor, part of

9   the -- sorry, go ahead.

10         JUDGE MAAS:  Go ahead.

11         MR. SHIFRIN:  Part of the problem

12  here is what Ms. Chaitman just said suggests

13  that this is going to be drawn out.  She has had

14  nearly two years to use these indices.  At some

15  point time's up.  And I think if we're offering

16  all of the scanned hard copy documents and

17  putting the resources and the hours and the

18  attorney time to review those documents for Ms.

19  Chaitman and identify records that are of

20  interest, given everything else in our joint

21  statement, given everything else we have done

22  over the last two years, I think we've satisfied

23  our obligations under the rules.  I think we

24  need some finality and ultimate resolution here.

25  Otherwise we're going to be back here in a few

**AA258**

Page 53

1    months.

2                JUDGE MAAS:  One of the issues

3    that arose when you were talking to Judge

4    Bernstein about the omnibus hearing was that

5    there were a large number of Ms. Chaitman's

6    clients where discovery was closed and I think

7    seven where it was open.  Maybe it wasn't just

8    Ms. Chaitman's clients, but there was an issue,

9    I read, in relation to the omnibus hearing about

10   how many folks still had time to take further

11   discovery.

12               I guess one question I have is

13   where are Ms. Chaitman's cases -- I should ask

14   you, Ms. Chaitman -- in terms of discovery

15   deadlines?

16               MS. CHAITMAN:  Well, this is all

17   pursuant to a discovery demand that was served

18   when discovery was opening all of my clients'

19   cases and Judge Bernstein has consistently

20   treated it that way.  There are other issues

21   that are open.  I've subpoenaed a number of

22   traders and Judge Bernstein has stayed my

23   ability to take the discovery from those

24   traders, but he has recognized repeatedly that

25   the subpoenas were served within the time frame

Page 54

1    that the case management orders permitted.

2              MR. SHIFRIN:  Your Honor, just to

3    respond to that, there are -- the document

4    requests that served as the basis for this

5    dispute years ago was not served timely in every

6    single case.  Specifically there are three cases

7    that are trial ready, the two Nelson cases and

8    the Saren-Lawrence case.  This dispute is not

9    applicable to those cases.

10             MS. CHAITMAN:  Right, except for

11   those three, yeah.  I agree, there are three

12   cases that are trial ready.

13             JUDGE MAAS:  Anything else from

14   either side?

15             MR. SHIFRIN:  I could say more.  I

16   don't want to repeat myself, but just as long as

17   the relief that we're requesting is clear.  Ms.

18   Chaitman's request here is for 30 million

19   documents, that's what she requested in her

20   papers.  I think that should be denied outright,

21   again on the basis of Rule 26 and the March 2017

22   order.

23             We would like something in writing

24   that states the Trustee has complied with all

25   orders given the chronology that we have

Page 55

1   provided to Your Honor, which I think is a

2   sufficient basis to make that conclusion and

3   will hopefully prevent Ms. Chaitman from coming

4   to court another day and continuing to lodge

5   these accusations against the Trustee and my

6   colleagues and myself.

7            Number three, Your Honor, we

8   think, again, our offer of producing the million

9   scanned hard copy documents, we want that to be

10  understood as a voluntary production, not

11  something that's ordered, because I think under

12  the relevant rules and given the context of this

13  dispute, we have discharged our obligations

14  multiple times.  So this is really yet another

15  offer of good faith production of documents to

16  give Ms. Chaitman what she wants, but it is on

17  condition that this be ultimately resolved after

18  that production is made, and I don't know

19  whether we can formally preclude Ms. Chaitman

20  from raising this issue again, but I think some

21  sort of statement that this discharges the

22  Trustee's obligations under her requests and

23  under her motion would be most appreciated.

24            JUDGE MAAS:  Anything else, Ms.

25  Chaitman?

Picard v Trust U-Art Fourth              Conference 11/19/2018

                                                    Page 56

  1              MS. CHAITMAN:  Yes, Your Honor, if
  2    I may.  While I'm sure it would be appreciated,
  3    I don't think it's warranted at this point in
  4    time, Your Honor, because there is a painful
  5    history of what I believe has been a deliberate
  6    attempt to mislead the Court and the defendants
  7    about what was in the data room, what
  8    constituted the Trustee's production.  Judge
  9    Bernstein himself said to Mr. Sheehan, you had
 10    two orders to produce these documents and you
 11    didn't.  I have quoted to Judge Bernstein the
 12    transcripts where representatives of Baker have
 13    stood up and said every single trading record is
 14    in the e-data room and the judge saying, well,
 15    if there's anything -- any trading records that
 16    aren't in the e-data room, put them in
 17    immediately.  And you've heard today that the
 18    e-data room was never supposed to contain all
 19    the trading records.  Well, that's something
 20    that they've now stated but they never stated
 21    that to Judge Bernstein two years ago.
 22              MR. SHIFRIN:  That's false.
 23              MS. CHAITMAN:  Well, it's all
 24    documented.
 25              MR. SHIFRIN:  It is.

Page 57

1           JUDGE MAAS:  Wait, let Ms.

2    Chaitman speak.

3           MS. CHAITMAN:  I just think that

4    there's a history here and I don't think that

5    there's a basis on which you can make a finding

6    about that because there's a long history and

7    most of it has been before Judge Bernstein.

8           JUDGE MAAS:  Go ahead.

9           MR. SHIFRIN:  Your Honor, this is

10   what we effectively want to put a stop to.  The

11   problem is that Ms. Chaitman is taking advantage

12   of the length of this dispute, the various

13   different contexts that she's raised it, and she

14   is taking comments by Judge Bernstein and by

15   counsel to the Trustee completely out of

16   context.  And I assure you that if you read

17   those quotes that she has in her letter, if you

18   read the entire transcript, you will come to a

19   different conclusion, I assure you.

20          So I am happy to simply supplement

21   the record and give Your Honor the benefit of

22   the complete context that Ms. Chaitman is not

23   providing, and it will show that Judge Bernstein

24   never ordered us to produce anything.  That was

25   a 7007 conference where Ms. Chaitman was

8004995-smb   Doc 18578-3   Filed 01/22/19   Entered 01/22/19 13:59:48   Exhibit 3
November 19, 2018 Transcript

Page 58

1   requesting permission to file a motion to

2   compel.  Judge Bernstein tried to sort it out

3   for us, as he often does.  It didn't work.  He

4   gave her --

5            JUDGE MAAS:  Is that the one where

6   he suggested either make a motion or come back

7   to me?  Or something else?

8            MR. SHIFRIN:  I believe so.  He

9   authorized her to make a motion at the end of

10   that conference.  And the quote that Ms.

11   Chaitman says, oh, if there are additional

12   trading records and he has to add them to the

13   database, I'm paraphrasing, if read the context

14   there it doesn't mean what Ms. Chaitman says it

15   means.  That was not an order.  He authorized

16   her to file a motion to compel.  If that was an

17   order, why would we be here right now?

18            She subsequently filed a motion to

19   compel and it was subsequently brought before

20   Your Honor and it subsequently led to the

21   December arbitration and all the orders that

22   followed.

23            The other comment that she

24   routinely cites where Judge Bernstein said there

25   are two orders ordering you to produce

Page 59

1   documents, one of those being Your Honor's

2   order, and the other was he was alluding to the

3   conference that Ms. Chaitman says was an order,

4   but he was doing that on the basis of

5   misinformation that Ms. Chaitman brought to

6   Judge Bernstein.  And this was the conference

7   with respect to the microfilm that I was

8   speaking about earlier, and when we clarified

9   the record at the next hearing, he abandoned

10  that.

11             JUDGE MAAS:  Send me the

12  transcript of those two conferences.

13             MR. SHIFRIN:  Absolutely.

14             JUDGE MAAS:  And I will await

15  receiving the transcript of this conference, and

16  then I will rule.  Thank you all.

17             MR. SHIFRIN:  Thank you very much,

18  Your Honor.

19             MS. CHAITMAN:  Thank you, Judge.

20             (Conference concluded 11:25 a.m.)

21                        -o0o-

22

23

24

25

Page 60

```
 1                    C E R T I F I C A T E

 2          .

 3               I, NANCY C. BENDISH, a Certified

 4     Court Reporter and Notary Public of the States

 5     of New Jersey and New York, do hereby certify

 6     that the foregoing is a true and accurate

 7     transcript of the proceedings as taken

 8     stenographically by and before me at the time,

 9     place, and on the date hereinbefore set forth.

10               I DO FURTHER CERTIFY that I am

11     neither a relative nor employee nor attorney nor

12     counsel of any party in this action and that I

13     am neither a relative nor employee of such

14     attorney or counsel, and that I am not

15     financially interested in the event nor outcome

16     of this action.

17

18               _____

19               Nancy C. Bendish, CCR, RMR, CRR
                 Realtime Systems Administrator
20               Certificate No. XI00836

21

22

23     Dated:  November 20, 2018

24

25
```

08-01789-cgm Doc 18578-3 Filed 03/18/19 Entered 03/18/19 13:30:42 Appendix
Vol 2 Pg 69 of 137
Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 61

08-04995-smb   Doc 18578-3   Filed 03/22/19   Entered 03/22/19 13:39:43   Exhibit 4
November 19, 2018 Transcript                   Pg 62 of 78

**A**

**a.m**
2:7 59:20
**abandoned**
31:8 50:3 59:9
**abide**
11:5
**ability**
53:23
**able**
3:9 4:22
**absolutely**
3:10,18 17:17 29:15
  46:11 59:13
**accept**
26:2
**access**
3:3,8 5:5,16 12:2,4
**account**
34:14,19 36:1,3,5,8
  37:23 38:14 39:8
  43:20,21,25 44:3,6
**accounts**
36:4,5,12 39:9,9
**accurate**
6:6,8 29:14 60:6
**accusations**
24:9 49:4 55:5
**accusing**
24:10
**acknowledge**
9:23
**acknowledged**
32:12
**action**
60:12,16
**activity**
45:2
**add**
58:12
**additional**
6:21,25 12:14 30:24
  44:17 49:24 51:20
  58:11
**address**

11:15,19
**Administrator**
60:19
**Adv**
1:4,15
**advance**
23:10
**advantage**
57:11
**advisory**
41:13,24
**affirmatively**
8:3
**aftermath**
30:1 34:16
**ago**
9:4 11:18 34:25 40:22
  54:5 56:21
**agree**
43:4 54:11
**agreed**
14:1 23:9 34:18
**agreement**
12:6 13:9 14:7 35:13
**ahead**
52:9,10 57:8
**alluding**
59:2
**amenable**
44:20
**amount**
52:4
**analyze**
16:21
**annually**
46:17
**answer**
41:3
**anticipation**
25:10
**anymore**
19:17
**anyway**
11:7
**apart**

12:9,13
**apologize**
51:23
**apparent**
15:16
**applicable**
54:9
**appointed**
27:20
**appointments**
21:5 44:10
**appreciate**
24:12 41:5
**appreciated**
55:23 56:2
**approach**
32:10
**approximately**
14:24 49:1
**approximation**
19:8
**arbitration**
14:23 30:1 58:21
**Arbitrator**
2:10
**arguably**
45:4 50:16
**arose**
53:3
**articulate**
6:1
**articulated**
8:11 31:5
**aside**
18:4
**asked**
14:16,17 19:17 20:3
  24:5 31:15 35:18
  37:16
**asking**
24:23 31:25 40:1 41:2
  41:6
**aspects**
12:7
**assembled**

3:5
**asserts**
14:20
**assessed**
31:18,20
**assortment**
21:19
**assume**
16:15 46:15,18
**assure**
14:6 57:16,19
**attempt**
10:14 56:6
**attempts**
13:23
**attorney**
52:18 60:11,14
**attorneys**
17:14,22 25:13 27:21
**attributed**
43:2
**authenticity**
3:24
**authorized**
58:9,15
**available**
8:4 11:13 20:3,5
**Avenue**
2:5,11,21
**await**
59:14
**aware**
29:12 31:7 49:10 51:13

**B**

**B**
2:8
**back**
3:17 4:3,4,10,15 10:18
  23:12 29:17 32:6
  52:25 58:6
**Baker**
2:15 32:12 56:12
**Bank**
3:21 40:12 41:23 42:10

08-01789-cgm  Doc 18578-3  Filed 03/18/19  Entered 03/18/19 13:30:42  Appendix
08-01789-smb  Doc 18578-3  Filed 03/18/19  Entered 03/18/19 13:30:42  Exhibit M
November 19, 2018 Transcript    Vol 4  Pg 70 of 137    Pg 63 of 78
Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 62

**BANKRUPTCY**
1:1
**banks**
43:22,24
**bargain**
13:13,21
**bargained**
14:16
**based**
19:10 40:7
**basis**
14:21 49:18 54:4,21
55:2 57:5 59:4
**Bear**
3:23 41:14,18 43:9
**bearing**
3:21
**behalf**
15:13 42:20
**behavior**
24:14
**believe**
4:25 15:4 22:4,25
43:15 56:5 58:8
**Bendish**
2:2 60:3,19
**Beneficiary**
1:19
**benefit**
42:25 57:21
**BEREZIN**
1:18
**Bernard**
1:7,11,14
**Bernstein**
13:5,23,24 30:20 31:11
31:13,15,17 36:21
48:8,18,24 49:9,12
53:4,19,22 56:9,11,21
57:7,14,23 58:2,24
59:6
**best**
6:1
**better**
50:13

**billion**
42:3,6,6
**BLMIS**
5:5 6:24 8:8,10,17 9:2
9:6,7 14:5,11 16:7,16
20:7,8,21 21:9,13,18
24:23 25:9 27:1,23
28:17 32:9 34:23 35:4
35:16 36:12,15,24
37:10,23 39:9,21 40:2
45:17,18 46:22
**BLMIS's**
33:24
**BLMIS/Madoff**
36:4 43:22
**BNY**
4:23
**bought**
41:12 42:2
**box**
46:23 47:3,11
**boxes**
8:19 9:8 52:6
**briefing**
48:24 49:3
**briefly**
11:15
**brings**
9:13
**broad**
19:25 21:23 33:11
**broadly**
25:19
**broker-dealer**
20:7
**brokerage**
40:2
**Brothers**
3:23 41:15,18
**brought**
9:24 58:19 59:5
**build**
6:12
**Building**
8:16 17:14 21:13 27:19

**burden**
13:4 19:20
**burdensome**
5:6 33:23 38:11
**business**
4:13 18:18

_____

**C**

**C**
2:2,14 60:1,1,3,19
**calendar**
21:5 27:8 44:10
**case**
54:1,6,8
**case-wide**
7:24
**cases**
11:21 15:19 26:14
53:13,19 54:6,7,9,12
**CCR**
60:19
**CDs**
21:17
**certain**
4:24 6:16 12:6,7 13:9
**certainly**
18:6
**Certificate**
60:20
**Certified**
2:2 60:3
**certify**
60:5,10
**cetera**
3:23 46:6
**Chaitman**
2:21,22 3:5,6 4:9 6:9
6:25 7:17 8:12,24
9:16 10:1 11:9,21
12:10,24 13:18,21
14:2,15 15:2 17:19
18:11 19:8 20:11 22:6
22:14 23:1 24:5,19
25:5,16 26:19,20 27:3
27:12 28:9,14,21,24

30:5,8 31:10 32:5,17
32:21 33:2,8,19 35:1
35:7,11 36:5,6,20
37:2,20 38:5,9 39:23
40:7,10,21 41:1,10,17
41:20 42:4,14 43:10
43:15 44:14,25 45:6
45:13,19 46:12,15
47:21,25 48:10,16,22
49:20,22 50:14,21
51:3,7,10,18,22 52:12
52:19 53:14,16 54:10
55:3,16,19,25 56:1,23
57:2,3,11,22,25 58:11
58:14 59:3,5,19
**Chaitman's**
3:2 6:20 10:11 15:6
16:2 21:22 24:8 26:10
29:19 37:14 42:22
45:5 53:5,8,13 54:18
**chart**
26:22,24
**Chase**
3:22 34:5 40:14,15
41:14,17
**check**
26:5 52:7
**chronology**
6:12 54:25
**circumventing**
49:6
**cites**
58:24
**clarified**
59:8
**clarify**
34:17
**clear**
3:18 36:17 54:17
**clearinghouse**
29:24
**client's**
16:22,24
**clients**
31:19 38:17 40:14 53:6

Picard v Trust U-Art Fourth                   Conference 11/19/2018

53:8
**clients'**
53:18
**closed**
53:6
**colleagues**
12:11 24:10 40:4 55:6
**collect**
46:17
**collected**
17:13,24
**column**
45:9,14 51:11
**come**
32:6 49:15 57:18 58:6
**coming**
46:5 55:3
**commencing**
2:7
**comment**
58:23
**comments**
57:14
**communicated**
26:22
**company**
46:3
**comparison**
45:21
**compel**
3:3 58:2,16,19
**complained**
22:7 23:1 24:25 27:7
30:6 33:8 35:15
**complaining**
33:14 44:14
**complete**
3:14 27:13,25 38:6,7
40:11,24 41:22 57:22
**completely**
57:15
**compliance**
19:14 23:25
**complied**
9:18 24:1 50:9,15

54:24
**comply**
5:7 22:17 26:10
**complying**
10:19
**comprehensive**
6:12,23 9:5 15:7
**compromise**
22:24
**concealing**
15:1 23:25 24:18
**conceivable**
50:7,8
**conceivably**
25:16
**concerned**
50:4
**concluded**
59:20
**conclusion**
55:2 57:19
**condition**
55:17
**conduct**
15:6
**conducted**
15:9
**confer**
10:22 11:4,9 12:17
13:8 14:15 19:5 22:10
22:12,13 23:11 32:2
33:1 34:17 35:20
37:16
**conference**
1:24 14:2 57:25 58:10
59:3,6,15,20
**conferences**
59:12
**confirmed**
35:2,10
**conflating**
7:10
**conflict**
6:11
**conjecture**

42:19
**connection**
7:25 8:1 11:3,8,23
34:24 48:24 50:5
**consider**
37:14
**considerable**
31:1
**considerably**
8:6
**considered**
8:1
**consistent**
19:16
**consistently**
50:9 53:19
**Consolidated**
1:7
**constantly**
50:8
**constituted**
56:8
**constituting**
18:22
**construed**
26:8
**consultants**
17:16,22 27:21
**contain**
20:14,17 23:5 25:5
29:7 44:2,5 56:18
**contained**
6:4 23:2 47:22
**contains**
8:9 21:19 25:21 29:13
**content**
16:21
**context**
18:14 50:7 55:12 57:16
57:22 58:13
**contexts**
57:13
**contingent**
26:7
**continued**

10:13
**continues**
14:18 16:10
**continuing**
55:4
**control**
27:22
**conversations**
32:19
**copies**
28:22
**copy**
8:14 9:9 23:4,8 25:3,8
26:1 27:5,17 28:11
37:25 44:21 45:11,15
45:17,25 46:5 52:6,16
55:9
**core**
6:16
**CORPORATION**
1:4
**correct**
21:2 23:14 42:17 47:13
**cost**
17:2
**counsel**
5:5 43:18 57:15 60:12
60:14
**couple**
16:17 26:7 31:21 37:10
**course**
11:1 21:20
**court**
1:1 2:2 10:1 23:23 24:9
31:5 55:4 56:6 60:4
**created**
50:12
**CREMONA**
2:18 30:19 42:16
**CRR**
2:3 60:19
**crystallize**
15:23
**cultivating**
15:14

**AA269**

08-01789-smb  Doc 18578-3  Filed 03/18/19  Entered 03/18/19 13:30:42  Appendix
08-04995-smb  Doc 185-3  Filed 02/21/19  Entered 02/21/19 13:39:45  Exhibit A
November 19, 2018 Pg 72 of 137  Pg 65 of 78

Vol 1 Pg 72 of 137

Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 64

| | | | |
|---|---|---|---|
| **currently** | **December** | 2:23 28:10 | 50:25 54:3 |
| 21:25 | 14:23 28:2 29:18,21,23 | **different** | **documented** |
| **customer** | 30:1 58:21 | 30:10 33:3 57:13,19 | 24:2 56:24 |
| 43:1,2 | **decided** | **directed** | **documents** |
| **customers** | 13:17 | 30:20 | 3:19,20,21,24 4:2 6:21 |
| 42:20 | **defendant** | **direction** | 7:1,3,21,24 8:4,16 9:9 |
| **customers'** | 1:8 8:25 | 47:2 | 10:15 11:3 12:3 13:10 |
| 41:13,25 | **defendants** | **directly** | 13:13,16 14:5,12,25 |
| **cute** | 1:22 2:24 11:20 12:2 | 7:6 | 14:25 15:5 16:2,5 |
| 9:11 | 12:10 56:6 | **disagreed** | 17:12,13,23 18:3,19 |
| | **defendants'** | 12:12 | 18:22 19:1,17 20:1,2 |
| **D** | 12:6 | **discharged** | 20:4 21:9,10 22:2,5,9 |
| **data** | **defense** | 50:4 55:13 | 22:16 23:7,8,16 24:22 |
| 6:24 7:14 8:6,10,10,19 | 3:11 5:4 15:19 31:6 | **discharges** | 24:24 25:4,8,9,15,23 |
| 9:3,6 16:19,21 20:9 | **define** | 55:21 | 25:24 26:1,3 27:5,16 |
| 21:6 28:4 45:24 56:7 | 25:19 | **disclosed** | 28:11,12 29:12 30:5 |
| **database** | **definition** | 8:22 | 30:23 32:22 33:6,7,22 |
| 3:4 5:5,8,16 7:11,23 | 29:19 | **disclosures/** | 34:23 35:17 37:12 |
| 8:8,9,17 9:2,7 11:13 | **definitively** | 8:2 | 38:10,13 39:10 43:10 |
| 12:2,4 14:5,11 16:7 | 24:12 26:12 44:18,19 | **discovery** | 43:11 44:2,20,22,24 |
| 16:16 17:3 20:8,17,22 | **deliberate** | 12:15 18:5 53:6,11,14 | 45:4,8,12,25 46:8,23 |
| 21:9,13,18 24:23 25:9 | 56:5 | 53:17,18,23 | 47:20,21 48:5,5 49:22 |
| 27:2 32:10 33:24 | **demand** | **discussion** | 49:24 50:2 51:11 |
| 34:20,23 35:4,16,25 | 53:17 | 43:13,14 | 52:16,18 54:19 55:9 |
| 36:15,19,24 37:10,22 | **denied** | **disk** | 55:15 56:10 59:1 |
| 37:23 45:17,18 46:22 | 18:14 23:20 54:20 | 28:6 | **doing** |
| 58:13 | **deny** | **disks** | 14:21 37:20 59:4 |
| **databases** | 16:1,8 | 21:17 | **dozens** |
| 37:22 | **deposition** | **dispute** | 36:12 |
| **date** | 48:25 | 5:22 6:19 10:19 15:15 | **drawn** |
| 12:18 60:9 | **depositions** | 18:9 22:2 24:21 26:13 | 50:18 52:13 |
| **Dated** | 23:10 | 42:22 48:7,21 50:18 | **drive** |
| 60:23 | **descended** | 54:5,8 55:13 57:12 | 16:18 |
| **DAVIS** | 17:15 | **disputes** | **drives** |
| 2:22 | **descriptors** | 15:11 | 16:14,17 17:2 21:15,16 |
| **day** | 47:10 | **distinction** | **Dubinsky** |
| 55:4 | **despite** | 30:9 | 30:12 |
| **deadlines** | 10:8 18:20 | **distraction** | |
| 53:15 | **detail** | 26:15 | **E** |
| **dealing** | 6:2 | **DISTRICT** | **E** |
| 17:4 44:19 45:24 | **detailing** | 1:1 | 2:8,8,14,14 60:1,1 |
| **dealt** | 6:23 | **document** | **e-data** |
| 30:12 | **devoted** | 8:14 13:18 21:12 30:6 | 4:25 7:11,18,21,22 8:5 |
| **Debtor** | 25:13 | 33:24 35:8 38:15,25 | 20:3 56:14,16,18 |
| 1:12 | **DEXTER** | 46:5,5,9 48:15 50:22 | **earlier** |

08-01789-cgm Doc 18578-3 Filed 03/18/19 Entered 03/18/19 13:30:42 Appendix
Vol 2 Pg 73 of 137 Pg 66 of 78
November 19, 2018 Transcript
Picard v Trust U-Art Fourth                Conference 11/19/2018

Page 65

4:17,19 29:3 59:8

**earliest**
5:1

**early**
27:20 32:25

**easiest**
5:6 32:10

**effectively**
8:2 57:10

**effort**
6:12 13:17 18:2 22:1
  22:15 24:4,6 25:15
  31:2 45:3 50:3

**Eighth**
2:5,11

**either**
26:2 42:23 54:14 58:6

**electronic**
8:14 21:11 29:9 37:24

**eliminated**
22:25

**email**
19:23 37:7

**emailed**
37:2

**emails**
9:25 21:5 25:2,2 27:8
  33:9,14 35:10 37:3
  44:10

**emphasize**
6:16 10:5,11 35:7

**emphasizing**
5:21 38:20 43:20

**employee**
60:11,13

**employees**
21:20

**employees'**
21:15

**encompassed**
46:20,24

**ended**
11:2 13:16 22:9

**engaged**
24:13

**engaging**
50:16

**enormous**
20:9 45:23,24

**enter**
15:25

**entered**
6:20 9:18 19:7 49:2

**entire**
3:4 8:5 14:5 16:16 17:3
  25:25 26:4 27:1 45:16
  45:18 46:3 57:18

**entirety**
8:18

**entities**
39:25

**entitled**
24:14

**entries**
27:8

**equitable**
26:17

**ESI**
21:10 23:3,5 27:6,6
  28:12,16 33:14,16
  38:21 39:7 44:1 45:22

**ESQ**
2:17,18,22,23

**essential**
3:10

**establish**
32:11

**established**
3:13

**et**
3:23 46:6

**EVELYN**
1:18

**event**
35:14 60:15

**events**
6:7 29:1

**eventually**
36:14

**evidence**

52:1

**evolved**
29:20

**exact**
29:7

**exactly**
5:25 13:2 14:1 35:9
  37:11

**example**
4:23 36:8 40:11 43:9

**exchange**
12:6

**exchanged**
10:3 19:22

**excuse**
30:20

**exercise**
47:13

**Exhibit**
18:16 51:3,4

**existed**
34:7

**existence**
9:24

**expense**
16:22,25 30:25 31:1

**expert**
30:12

**experts**
7:24

**explaining**
10:16

**explore**
43:7 44:11

**explored**
31:24

**extent**
7:16 27:9 28:17 46:7

---

**F**

**F**
2:8 18:16 51:3,4 60:1

**face**
12:23,24

**faced**

4:2

**fact**
3:11 13:14 18:25 47:21

**factors**
23:18

**failing**
32:18

**failure**
11:5 22:16 26:10

**failures**
10:12

**fairly**
45:20

**faith**
10:14,23 15:5 22:15
  24:7 55:15

**false**
56:22

**far**
3:17 31:7 50:3

**fast**
20:23

**fault**
40:24

**FBI**
17:15

**Federal**
18:12

**fell**
12:9,13

**Fidelity**
3:22 20:8 36:9 39:11
  39:20 41:21

**file**
13:23 21:14 58:1,16

**filed**
11:18 58:18

**files**
13:22

**filings**
24:10

**finality**
24:17 52:24

**finalizing**
25:22

08-01789-cgm  Doc 18578-3  Filed 03/18/19  Entered 03/18/19 13:30:42  Appendix
Vol 2  Pg 74 of 137
08-01789-smb  Doc 18578-3  Filed 03/18/19  Entered 03/18/19 13:33:43  Exhibit A
November 19, 2018 Transcript  Pg 67 of 78
Picard v Trust U-Art Fourth          Conference 11/19/2018

Page 66

| | | | |
|---|---|---|---|
| **finally** | 58:22 | 40:19 47:1 | 6:18 9:15 10:18 18:5,9 |
| 22:10 23:23 | **following** | **further** | **governs** |
| **financial** | 16:1 | 4:4 13:5 47:13 50:14 | 6:20 |
| 19:10 | **foregoing** | 53:10 60:10 | **GREGORY** |
| **financially** | 60:6 | | 2:23 |
| 60:15 | **forget** | **G** | **group** |
| **find** | 29:6 37:11 | **gather** | 31:7,9 45:8 51:12 |
| 43:11 | **forgive** | 47:7 51:16 | **guess** |
| **finding** | 7:15 24:8 | **gdexter@chaitmanll...** | 53:12 |
| 23:21,22 57:5 | **form** | 2:24 | **guys** |
| **fine** | 29:9 | **generally** | 49:15 |
| 5:11 51:19 | **formal** | 27:17 | |
| **firm** | 35:8 | **generate** | **H** |
| 40:2 | **formally** | 21:1,5 | **H** |
| **first** | 55:19 | **getting** | 1:13 |
| 5:2,20 6:18 9:14 14:2 | **forth** | 22:11 23:12 33:15 | **half** |
| 14:24 17:11 23:21 | 60:9 | **give** | 10:13 24:3 42:7 |
| 30:4 36:22,25 43:18 | **forward** | 12:1,18 23:7 33:16 | **hand** |
| 49:9,11 | 20:24,24 37:3 | 34:6,12 39:3,12 43:23 | 16:16 |
| **five** | **found** | 44:22 45:7,10 55:16 | **handwriting** |
| 50:1 | 30:23 40:12 41:22 42:9 | 57:21 | 39:1 |
| **flash** | 47:14 51:21 | **given** | **happened** |
| 20:24 | **four** | 5:13 11:5 14:17 15:6 | 14:14 35:19 37:15 47:8 |
| **floating** | 42:7 | 24:7 25:11 26:10 | **happy** |
| 12:4,5 | **Fourth** | 50:11 51:8 52:20,21 | 19:21 21:24 57:20 |
| **floor** | 1:18,20,21 | 54:25 55:12 | **hard** |
| 2:5,12,16 3:5 46:4 | **fraction** | **gives** | 8:14 9:9 15:4 16:14,17 |
| **floors** | 9:3 | 49:23 | 16:18 17:2 21:15 23:4 |
| 8:15 21:12 27:19,24 | **frame** | **giving** | 23:8 25:3,8 26:1 27:5 |
| 46:4 | 53:25 | 14:19 15:2 39:5 43:9 | 27:17 28:11 37:24 |
| **floppy** | **FRANK** | **go** | 44:21 45:11,14,17,25 |
| 21:17 28:6 | 2:10 | 4:3,10 29:16 38:11,12 | 46:5 52:5,16 55:9 |
| **fmaas@jamsadr.com** | **frankly** | 38:18 47:2 51:18 52:9 | **hchaitman@chaitm...** |
| 2:10 | 14:20 15:14 26:18 50:6 | 52:10 57:8 | 2:23 |
| **focus** | **front** | **going** | **headaches** |
| 20:5 29:23 | 36:11 | 3:17 10:5 20:9,14 21:1 | 50:12 |
| **focused** | **frustrating** | 21:5 28:16,17 32:6 | **hear** |
| 37:20 | 32:11 | 34:5 35:3 39:2,12 | 36:13 43:17 |
| **focusing** | **fulfilled** | 43:3 44:4,5,9,16 45:7 | **heard** |
| 30:10,13 31:23 | 13:12,20 | 52:13,25 | 9:22 18:24 36:25 56:17 |
| **folks** | **full** | **good** | **hearing** |
| 53:10 | 21:19 36:11 | 3:1 10:14,23 15:5 | 14:1,8 37:2 42:23 49:9 |
| **follow** | **fully** | 22:15 24:7 43:16 | 49:11,13 53:4,9 59:9 |
| 31:22 | 13:13,17 38:21 | 55:15 | **heart's** |
| **followed** | **furnished** | **governing** | 16:21 |

**AA272**

08-01789-cgm Doc 18578-3 Filed 03/18/19 Entered 03/18/19 13:30:42 Appendix
Vol 4 Pg 75 of 137
08-04995-smb Doc 152-13 Filed 01/22/19 Entered 01/22/19 23:33:46 Exhibit M Pg 68 of 78

November 19, 2018 Transcript
Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 67

hectic
17:14
**HELEN**
2:22
hereinbefore
60:9
hesitating
42:3
hidden
28:6
hiding
49:4
historically
27:7
history
5:21 6:3 19:3 24:3 56:5
57:4,6
hit
13:19 20:19 23:7 26:21
26:24 27:4,6,10 38:17
46:9
hits
27:7 32:13 33:17,22
34:6,9 38:11,25 43:10
45:8 51:11
holdings
25:21
**HON**
2:10
Honor
3:6 4:10 5:18 6:20 7:9
9:12,21 11:14 13:5
14:6,22,24 15:3,14,25
17:5 18:5,6 19:21
20:6,23 23:12,21
24:16 25:11 26:6 28:2
29:16 30:10,17 32:7
34:1,21 39:14 42:16
44:11 46:13 49:1 50:6
51:23 52:8 54:2 55:1
55:7 56:1,4 57:9,21
58:20 59:18
Honor's
7:10 13:1 16:9 26:11
30:2 49:6,16 59:1

hopefully
55:3
**HOSTETLER**
2:15
hours
37:1 52:17
hundred
43:23
hundreds
30:15,15

——————— **I** ———————

**IA**
42:20
idea
43:16
identified
44:24 50:1
identify
25:15 30:23 45:3 49:20
49:22 52:19
ignore
16:10 18:12,12
ignores
10:1
imagine
20:6
immediately
14:8 22:6 35:16 56:17
important
21:8 34:22 37:13 38:16
38:20 40:13 42:17
importantly
20:25
impossible
3:15
impression
4:5 35:6
improper
15:20
improperly
48:22 49:5
impropriety
15:12,18 24:11
inappropriate

15:20
include
29:20 40:15
included
22:7,8 23:3 27:11
46:10 51:14
includes
8:13 9:7,8 21:14 24:24
28:1 48:3
including
45:8 51:12
inconsistent
16:3,8
index
10:6 52:7
indication
5:1
indices
6:23 7:1 9:4,16,20,23
10:6,8,12,20 12:25
15:8 47:1,3 52:14
individual
42:24
individually
1:19
inexplicable
13:25 37:18
inform
43:13,14
information
20:15 21:8 22:8 23:2,6
39:13 44:6
informed
9:20
insist
14:18
institution
39:20 41:8,11
institutions
4:12 18:17 19:11 33:25
41:3 42:7 44:9 51:5
51:13
instructions
48:9
intended

18:1
intent
35:2
interest
15:1,2,5,11 24:18
44:25 49:24 52:20
interested
4:5,20 7:17 26:4 33:8
60:15
interesting
20:11
interim
19:24
internal
8:9
interpretation
14:13 35:19 37:15
interrupt
16:11
interrupting
7:16
investigation
34:25
investment
1:7,14 41:12,24
**INVESTOR**
1:3
involved
11:20 15:15 36:9
involvement
25:11
irrelevant
20:10 21:6 22:7,8 23:2
23:5 25:1 33:9 34:13
39:13 51:17
irrespective
23:16,17,17,19
**Irving**
1:13 2:19 34:7
isolate
18:3
**Israel**
1:18,20,21
issue
20:20 30:10,13 48:23

Picard v Trust U-Art Fourth                         Conference 11/19/2018

Page 68

53:8 55:20
**issues**
17:6 30:11 38:22,24
39:1 53:2,20
**item**
47:10
**itemization**
9:5
**items**
21:19

### J

**J**
2:18
**Jacobs**
29:5
**JAMS**
2:4,11
**Jersey**
2:4 60:5
**joint**
6:5,7,10,15 10:2,4,7
12:10 18:17 24:3 51:1
51:1 52:20
**JPMorgan**
3:22 40:15 41:14,17
**judge**
3:1 4:1 5:23 7:4,12,15
11:11,16,22 12:18,22
13:5,22,24 16:4,11,14
17:1,7 18:15,24 19:16
20:12,25 22:18,22
28:9,23 29:4,11 30:20
31:11,13,15,17 32:3
32:15,23 34:5,11
35:21,24 36:7,13,20
37:6,19 38:2,8 39:15
39:19,24 40:6,19,23
41:5,16,19 42:1,12,21
43:17 44:7 45:20
46:14,25 47:7,12 48:8
48:17,18,23 49:9,12
50:20 51:4,8,15,19
52:10 53:2,3,19,22
54:13 55:24 56:8,11

56:14,21 57:1,7,8,14
57:23 58:2,5,24 59:6
59:11,14,19
**justify**
30:24

### K

**kept**
4:16 21:20 27:23 28:19
28:22
**key**
39:8
**keys**
9:12
**kids**
21:21
**kind**
24:13 28:3 48:21
**kingdom**
9:12
**knew**
10:5
**know**
5:8 17:2 20:18 28:5,5
32:17 37:4 40:14,17
41:1 44:10 45:14
51:22 52:2 55:18
**knowing**
41:6
**known**
30:3 36:3 39:9 43:22
**Kratenstein**
31:20

### L

**L**
1:7,11,14
**laid**
3:7
**large**
53:5
**larger**
34:8
**late**
32:25

**leading**
22:9
**learn**
49:14
**led**
23:11 50:17 58:20
**legible**
38:13,15
**Lehman**
3:23 34:9 41:14,18
**length**
57:12
**let's**
19:11 22:11 23:6 33:15
46:15,18
**letter**
12:25 18:16,17 19:22
21:25 51:1,2 57:17
**letterhead**
3:21
**letters**
9:25 10:16 19:19 24:9
34:3
**leverage**
15:18
**lies**
40:24
**limited**
5:14
**limiting**
23:18
**line**
47:10
**lines**
48:15
**Lipstick**
8:16 17:13 21:13 27:19
**Liquidation**
1:5,14
**list**
18:17,19 36:11 40:14
40:20 41:7 50:25
**listed**
26:21 39:25 40:11 51:6
**little**

7:8
**LLC**
1:7,15
**LLP**
2:15,21
**load**
16:18
**located**
7:3 13:3
**lodge**
9:20 55:4
**long**
24:3 34:8 54:16 57:6
**looking**
4:4 22:1 25:5 28:15
**looks**
25:20 44:12
**loose**
27:17
**lot**
5:19 6:8 17:16,23 19:3
34:12 51:17
**lying**
21:16

### M

**M**
2:23
**Maas**
2:10 3:1 4:1 5:23 7:4
7:12,15 11:11,16,22
12:18,22 16:4,11,14
17:1,7 18:15,24 19:16
20:12,25 22:18,22
28:9,23 29:4,11 32:3
32:15,23 34:5,11
35:21,24 36:7,13 37:6
37:19 38:2,8 39:15,19
39:24 40:6,19,23 41:5
41:16,19 42:1,12,21
43:17 44:7 45:20
46:14,25 47:7,12 48:8
48:17 50:20 51:4,8,15
51:19 52:10 53:2
54:13 55:24 57:1,8

08-01789-cgm Doc 18578-3 Filed 03/18/19 Entered 03/18/19 13:30:42 Appendix
Pg 77 of 137
08-01789-smb Doc 18578-3 Filed 01/22/19 Entered 01/22/19 13:39:48 Exhibit 3
Vol 1 Pg 77 of 137
November 19, 2018 Transcript Pg 70 of 78
Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 69

58:5 59:11,14
**Madoff**
1:7,11,14 3:11 4:6,13
4:16 18:18 41:11 43:1
43:2 48:25 52:3
**Madoff's**
23:10 46:16
**Madoff-generated**
3:20
**maintained**
28:18 39:10 42:5
**making**
25:10
**management**
54:1
**manipulate**
16:19
**March**
6:19 11:6 16:9 19:4,6
19:14,24 22:17 23:19
26:11 29:2 30:2 49:2
49:6,10,16 50:15
54:21
**mark**
25:25
**marking**
25:23
**massive**
32:9
**material**
34:13 51:17
**materials**
33:9 38:4
**MAXIMILLIAN**
2:17
**Meadowbrook**
22:4,18,20 23:1 32:16
32:25 33:2,7 51:16,25
**mean**
4:22 10:3 17:19 21:3
21:11 27:14 28:23
33:3 37:18 40:16
41:11 45:23 58:14
**means**
58:15

**media**
8:20 9:10
**meet**
10:22 11:4,9 12:16
13:8 14:14 19:5 22:10
22:11,13 23:11 32:2
33:1 34:16 35:20
37:16
**meeting**
35:6
**meetings**
31:6,8
**Mellon**
3:22 4:23 40:12 41:23
42:10
**memorialized**
13:11
**memory**
32:21
**mention**
9:23
**mentioned**
42:11
**menus**
21:21
**met**
12:23
**microfiche**
29:5 47:14
**microfilm**
28:23,24 29:5,12 30:3
30:15,18,21 32:4
47:18,20,22 48:3,15
48:23 59:7
**microfilmed**
4:18
**Microsoft**
28:22
**million**
14:25 16:2,5 17:11
20:1,2 21:9,10 23:16
24:22 25:3,8,14 26:21
26:23,23 27:13,16
34:6 39:6 45:25 46:9
54:18 55:8

**minimum**
16:1 43:2
**misinformation**
59:5
**mislead**
56:6
**misspoke**
51:2
**mistake**
50:16
**misunderstood**
19:1
**Monday**
1:25 2:6
**money**
41:13,25
**months**
5:4 10:24 11:1,18 19:7
22:12 25:13 49:1 53:1
**Morgan**
22:4,19,23 32:16 33:3
33:13 39:11,20 41:15
41:20 51:16,24 52:2,4
**morning**
3:1
**morphed**
12:13
**motion**
3:2 11:18,24 12:8,13
12:14 13:6,22,23
55:23 58:1,6,9,16,18
**move**
26:13,14 36:21
**moving**
37:17
**mshifrin@bakerlaw....**
2:18
**muddied**
48:22
**multi-terabytes**
16:15
**multiple**
10:4 11:20,20 24:25
55:14

| N |
| --- |

**N**
2:14
**names**
32:13 33:25 43:24 44:9
**Nancy**
2:2 60:3,19
**narrow**
20:5
**nature**
45:23
**ncremona@bakerla...**
2:19
**nearly**
52:14
**necessarily**
20:19 21:1,4
**need**
3:16 5:15 18:6 52:24
**needed**
50:18
**needn't**
20:13
**negative**
16:20
**negotiate**
10:14 24:6 50:14
**negotiated**
14:16
**negotiations**
11:24 12:9
**neither**
12:15 60:11,13
**Nelson**
54:7
**network**
21:14
**never**
9:18,19,22 10:8 12:24
12:25 28:2,3,7 31:4,5
31:14,24 35:1,2 44:18
56:18,20 57:24
**nevertheless**
10:13 11:1 13:3 14:8
14:18

08-01789-cgm Doc 18578-3 Filed 03/18/19 Entered 03/18/19 13:30:42 Appendix
Vol 2 Pg 78 of 137
November 19, 2018 Transcript Pg 71 of 78
Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 70

**new**
1:1 2:4,4,5,6,12,12,17
  2:17,22,22 3:22 40:12
  41:23 42:10 49:15
  60:5,5
**NICHOLAS**
2:18
**Notary**
2:3 60:4
**note**
19:12
**notice**
8:25
**notion**
23:24
**notwithstanding**
10:11 22:16
**November**
1:25 2:6 11:4,9 12:16
  12:20,21 14:14 19:5
  19:24 33:1 34:16
  35:20 37:15 60:23
**number**
17:6 18:19 24:15,16
  25:9,13 29:6,7 38:14
  49:20 53:5,21 55:7
**numbers**
19:18 34:8,14,20 36:1
  36:3,3,5,8 37:23 39:8
  43:21,21,25 44:3
  48:14

---

**O**

**O**
2:8
**O/W/O**
1:18,20,21
**o0o-**
59:21
**objection**
14:9 26:19 37:5,9 43:5
**objections**
21:23 34:2 39:14
**objective**
15:17

**obligated**
26:9
**obligation**
11:6
**obligations**
50:4 52:23 55:13,22
**obtained**
34:24
**obviously**
4:14 44:17
**occurred**
42:25
**October**
32:25
**odd**
31:12
**offer**
11:12 12:12 24:20 25:6
  25:10 26:6 55:8,15
**offered**
5:4 19:9 22:2
**offering**
39:3 52:15
**office**
46:6
**offices**
2:5 46:16
**oh**
14:3 58:11
**okay**
22:10 33:19 36:7,13
  39:17 40:23
**old**
28:16 39:1
**omnibus**
11:19 42:23 53:4,9
**once**
9:19 47:9
**ones**
44:3
**open**
53:7,21
**opening**
53:18
**operative**

8:15 21:12 27:19
**opposite**
4:6
**order**
6:18,19,22 9:15 10:18
  11:7 13:1 15:25 16:10
  18:9 19:4,6,14 22:17
  23:19 24:2 26:11 29:2
  30:3 49:2,6,10,17,18
  49:19 50:9,15 54:22
  58:15,17 59:2,3
**ordered**
55:11 57:24
**ordering**
58:25
**orders**
18:12 23:25 54:1,25
  56:10 58:21,25
**ordinary**
21:20
**outcome**
23:14 60:15
**outlandish**
24:8
**outright**
23:20 54:20
**outside**
39:20 40:2
**overbroad**
43:6,8

---

**P**

**P**
2:14,14
**page**
6:2 18:15,20
**pages**
14:25 26:23 27:13 46:1
  50:25
**painful**
56:4
**paper**
27:10,18 33:17 39:2,3
  39:6 46:2,2
**papers**

54:20
**paraphrasing**
49:14 58:13
**Park**
2:21
**part**
5:24 18:2 29:1,18 43:5
  48:21 49:13 52:8,11
**particular**
41:7 43:1
**particularly**
22:21
**parties**
11:10 12:23 13:8 28:19
  34:18
**party**
60:12
**people**
4:18
**percent**
6:5
**period**
4:19 19:24
**periods**
29:3
**permission**
58:1
**permitted**
54:1
**perpetuating**
15:11,12
**personal**
21:18
**personally**
31:18
**perspective**
5:9
**phrase**
12:11
**Picard**
1:13 2:19
**pick**
40:16
**picking**
43:9

08-01789-cgm  Doc 18578-3  Filed 03/18/19  Entered 03/18/19 13:30:42  Appendix
Vol 4  Pg 79 of 137
Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 71

| | | | |
|---|---|---|---|
| **pictures**<br>21:20 | **potentially**<br>29:7,13 44:24 47:15 | **problems**<br>4:2 34:11 39:4 44:21 | 24:21<br>**prosecution** |
| **piece**<br>21:8 27:18 46:2,2,4 | **practice**<br>13:6 | **procedure**<br>18:11 | 26:14<br>**PROTECTION** |
| **pieces**<br>8:20 9:9 39:1,6 45:25 | **pre-1992**<br>29:22 30:3,9,12 31:12 | **proceeding**<br>11:19 | 1:3<br>**prove** |
| **place**<br>19:4 60:9 | 47:18 48:1 | **proceedings**<br>2:1 60:7 | 3:11,13 35:12<br>**provide** |
| **Plaintiff**<br>1:16 | **preceded**<br>29:2 | **process**<br>10:25 17:17,25 18:10 | 17:3<br>**provided** |
| **Plaintiff-Applicant**<br>1:5 | **preceding**<br>22:12 | 25:22 48:7 | 55:1<br>**providing** |
| **platform**<br>16:19 | **precise**<br>31:10 | **processed**<br>8:10,10,17 21:17 48:4 | 57:23<br>**Public** |
| **Plaza**<br>2:16 | **precisely**<br>32:2 33:10 37:4 | 48:12 | 2:3 60:4<br>**purchased** |
| **Please**<br>39:18 | **preclude**<br>55:19 | **processing**<br>17:17,24 | 41:24 42:9<br>**purchasing** |
| **Plus**<br>51:5 | **predominated**<br>41:8 | **produce**<br>12:3 13:15 14:11 18:21 | 3:12<br>**purpose** |
| **point**<br>5:3 9:14,14,17 10:10 | **premises**<br>17:15 28:20 | 22:16 24:4 25:7,24<br>32:13 33:13,21 45:11 | 7:22 8:4<br>**pursuant** |
| 24:7 30:24 37:13<br>38:20 52:15 56:3 | **prepared**<br>44:22 | 56:10 57:24 58:25 | 53:17<br>**put** |
| **points**<br>17:7 | **presumably**<br>3:25 4:14 16:22 17:8 | **produced**<br>6:23 9:4 13:13 14:22<br>18:25 22:5 23:8 29:1 | 7:7 15:21 23:6,24 29:8<br>33:16 38:14 46:18 |
| **Ponzi**<br>11:19 | 18:18 42:12 | 29:9 30:6,16,21 32:15<br>32:21 33:4,6,7,17 | 56:16 57:10<br>**puts** |
| **population**<br>23:2 25:3,14,25 26:4 | **prevent**<br>55:3 | 35:17 37:11,24 43:12<br>47:19 49:21 50:2 | 24:20<br>**putting** |
| 44:12,23 46:8,9 | **primary**<br>7:22 15:17 | **producing**<br>7:23 11:2 55:8 | 18:4 52:17 |
| **portfolio**<br>42:6 | **principal**<br>39:19 40:1 | **product**<br>17:9,18,20 20:18,20 | ——————<br>**Q** |
| **portion**<br>6:5,9 10:7 | **print**<br>7:6 | **production**<br>12:5 23:15,15 26:9 | **Queens**<br>8:21 46:19 52:6 |
| **position**<br>6:9 42:19,23 | **privileged**<br>5:9 17:9 20:15 | 27:11 55:10,15,18<br>56:8 | **question**<br>7:10 46:13 53:12 |
| **possession**<br>6:24 8:11 9:6 15:8 38:7 | **Pro**<br>1:4,15 | **productions**<br>5:14 8:3 33:10,15 | **questioned**<br>3:25 |
| **possible**<br>4:16 6:2 | **probably**<br>7:12 21:7,18 28:18 | **productive**<br>31:22 | **quite**<br>36:17 |
| **post-'92**<br>48:3 | 37:1 40:22 50:13 | **proportional**<br>20:10 | **quote**<br>13:15 58:10 |
| **potential**<br>12:5 28:1 | **problem**<br>5:15 16:23 17:4 28:8<br>29:19 49:13 52:11<br>57:11 | **proportionality**<br>18:8 23:17<br>**propose** | **quoted**<br>56:11 |

08-01789-cgm   Doc 18578-3   Filed 03/18/19   Entered 03/18/19 13:30:42   Appendix
November 19, 2018   Pg 80 of 137   Pg 73 of 78
Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 72

**quotes**
57:17

---

**R**

**R**
2:8,14 60:1
**raised**
11:10 48:7,18,23 57:13
**raising**
31:25 55:20
**ran**
14:4 30:4 35:24 36:14
37:21 43:21
**reached**
14:7
**read**
29:22 42:2 53:9 57:16
57:18 58:13
**ready**
54:7,12
**real**
45:1
**realities**
6:16
**realized**
41:21
**really**
3:16 5:15 31:25 39:1
55:14
**Realtime**
60:19
**reason**
49:23
**reasonable**
28:8
**reasons**
49:8
**received**
28:18
**receiving**
59:15
**recognized**
53:24
**recollection**
51:23,25

**record**
19:20,21 21:24 25:17
25:20 28:1 42:17 44:4
44:5,14 52:1 56:13
57:21 59:9
**records**
3:9,10,15,17 4:4,6,16
4:18,21,21 5:11,17
7:18 15:1 21:2 23:4
24:1 28:15 29:8,13,20
29:22,24 32:1 37:24
38:6 40:9,13 42:9,13
43:12 44:2 49:5 51:20
52:19 56:15,19 58:12
**recovered**
8:15 21:12 27:18 46:3
**reel**
47:23 48:4
**reels**
29:6 30:4,7,15,21,24
31:3,12,15,18,21
47:18,20 48:6,11
49:20,21,25 50:1
**reference**
10:6
**referenced**
9:19
**referring**
16:5,6 49:16
**reflect**
45:1
**reflected**
30:2
**reflects**
25:17
**refresh**
32:20
**refuse**
50:13
**refused**
10:25 18:21
**refuses**
15:8
**refusing**
22:14

**reiterate**
33:5 34:17
**reiterated**
49:3
**relating**
48:25
**relation**
53:9
**relationship**
25:12
**relative**
60:11,13
**Relativity**
8:9
**relevance**
18:8 23:16
**relevant**
6:3 28:12 30:23 55:12
**reliable**
38:22
**relied**
7:25
**relief**
23:13 54:17
**remember**
32:19 51:24 52:2
**repeat**
34:4 54:16
**repeated**
18:20
**repeatedly**
53:24
**rephrase**
50:23
**reported**
2:2
**Reporter**
2:3 60:4
**reports**
7:25 8:1
**represent**
27:15,23
**representation**
28:4 34:19
**representations**

**9:25 26:2**
**representatives**
56:12
**represented**
29:5 31:13
**representing**
45:1,2
**request**
5:7 15:24 16:2,8 23:14
23:20,23 35:8 45:5
54:18
**requested**
10:17 54:19
**requesting**
22:13 54:17 58:1
**requests**
6:21 7:7 9:20 18:13,21
43:6 54:4 55:22
**required**
9:15,21
**requirements**
18:7
**resolution**
24:17 52:24
**resolve**
5:15 13:6 22:2
**resolved**
39:5 55:17
**resources**
52:17
**respect**
3:13 15:24 39:7 59:7
**respectfully**
23:20,23 42:18
**respond**
28:13 54:3
**responded**
35:8
**response**
5:19 21:25
**responsive**
13:15 22:3 38:16 45:4
47:15 50:23
**rest**
7:13 23:24 24:20

08-01789-cgm   Doc 18578-3   Filed 03/18/19   Entered 03/18/19 13:30:42   Appendix
Vol 2   Pg 81 of 137
November 19, 2018 Transcript                                   Pg 74 of 78
Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 73

**restate**
6:14
**restore**
31:2 48:6
**restored**
29:1,8 30:3,7,22,25
   47:15,17,20,23 48:4
   48:12 49:21 50:2
**result**
26:18
**results**
27:10
**RET**
2:10
**retrieve**
20:9
**retrieving**
38:25
**retrospect**
50:11
**review**
25:23 26:4 30:22 40:7
   52:18
**reviewed**
20:13 26:1 31:14 38:4
**reviewing**
25:14
**right**
7:12 11:22 12:22 20:14
   20:18 22:22 27:3
   28:16 33:12 34:10
   38:8 40:20 41:19 44:6
   44:7 45:19,21,22
   46:20 48:10 51:7
   54:10 58:17
**RMR**
2:3 60:19
**Rockefeller**
2:16
**room**
4:25 7:11,19,21,22 8:5
   20:3 56:7,14,16,18
**routinely**
58:24
**rule**

8:2 16:3,9 18:7 23:18
   26:11 34:20,25 35:25
   36:19 48:19 54:21
   59:16
**ruled**
48:18
**rules**
18:5,13 52:23 55:12
**run**
10:17 13:9 14:10 19:18
   20:21 27:1 34:19
   35:15 36:18,23 39:8
**running**
20:7 34:14 37:9 43:25

--- **S** ---

**S**
2:14,17
**sanctions**
13:22,24 36:21 37:17
**SARA**
1:20
**Saren-Lawrence**
54:8
**sat**
11:10 13:3
**satisfied**
52:22
**satisfy**
38:18
**save**
7:5
**saying**
10:18 13:2 37:3 42:8
   45:7 56:14
**says**
7:5 18:20 40:14 51:11
   58:11,14 59:3
**scanned**
23:4,8 25:3,8 26:1 27:5
   27:10 28:21 33:17
   39:2,2,6 45:11,14,17
   46:2 52:16 55:9
**scheme**
11:19

**scooped**
17:16,25 18:1
**screening**
33:20
**search**
7:5 10:17,21 13:9 14:4
   14:10 19:9 20:1,7,19
   20:21 21:22 22:3 27:1
   27:9 30:4 34:2 35:3
   35:15,25 36:19,23
   37:9 38:24 39:4 44:13
   44:19,21 46:10
**searchable**
38:21
**searching**
38:22,23 39:11 44:1,8
**second**
9:14,17 16:12 19:12
   23:22
**second-guessing**
13:16
**securities**
1:3,7,15 3:12 4:6 25:17
   25:21,21
**see**
33:24 43:8
**seeking**
3:3 4:8 23:13
**segregate**
5:10
**SEIMS**
1:20
**select**
31:17
**selected**
27:14 31:21
**semblance**
18:10
**Send**
59:11
**sense**
16:20
**sent**
35:11 36:4
**separate**

7:11 34:22
**separation**
50:5
**September**
18:16 51:1
**series**
19:19
**served**
4:11 35:7 53:17,25
   54:4,5
**set**
3:14 60:9
**seven**
53:7
**share**
3:3
**she'd**
16:18
**Sheehan**
31:14,16 56:9
**SHIFRIN**
2:17 5:18,25 7:9,13,20
   11:14,17,23 12:20,23
   16:6,13,24 17:5,10,21
   18:23 19:2 20:16 21:3
   22:20,23 26:25 27:4
   27:15 28:13,25 29:10
   29:15 30:17 32:20,24
   33:4 34:1,10,15 35:5
   35:23 36:2,10,16 37:8
   38:1,19 39:17 40:3
   43:19 44:8 45:10,16
   45:22 46:21 47:5,9,17
   48:2,13,20 52:8,11
   54:2,15 56:22,25 57:9
   58:8 59:13,17
**show**
57:23
**showing**
49:25
**side**
23:6 33:16 54:14
**sides**
43:3
**simply**

| | | | |
|---|---|---|---|
| 45:3 50:13 57:20 | **specter** | **stored** | 16:13 17:12 28:7 35:21 |
| **single** | 15:12,18 | 47:22 | 35:23 50:21 56:2 |
| 6:6 8:14 9:22,24 19:22 | **speculate** | **story** | **surrounding** |
| 19:23 21:11 24:1 | 40:4 | 6:8 | 11:24 |
| 27:17 47:22 54:6 | **speculation** | **strikes** | **suspect** |
| 56:13 | 42:18 | 15:10 | 49:23 |
| **SIPA** | **spent** | **string** | **Systems** |
| 1:5 | 15:13 | 37:3,7 | 60:19 |
| **sit** | **stand** | **stuff** | |
| 10:22 | 6:6 34:18 | 27:8,22 | **T** |
| **six** | **Stanley** | **submission** | **T** |
| 4:3,10,15 5:4 42:3,6 | 22:4,19,23 32:16 33:3 | 3:7 6:3 | 60:1,1 |
| **slowly** | 33:13 39:11,21 41:15 | **submit** | **T-bills** |
| 41:16 | 41:20 51:16,24 52:2,5 | 6:11 34:3 | 41:12,23 42:9 |
| **small** | **start** | **subpoenaed** | **take** |
| 22:21 45:20 49:20 | 29:17 | 34:24 53:21 | 4:23 11:15 16:16 19:12 |
| **solution** | **state** | **subpoenas** | 29:11 43:23 53:10,23 |
| 16:23 28:8 | 7:2 25:12 44:17 | 4:12 53:25 | **take-out** |
| **someplace** | **stated** | **subsequent** | 21:21 |
| 42:2 | 8:23 21:23 34:2 36:22 | 31:6 49:11,12 | **taken** |
| **somewhat** | 56:20,20 | **subsequently** | 60:7 |
| 31:8 | **statement** | 35:7 58:18,19,20 | **talk** |
| **sorry** | 5:2,2 6:5,7,10,15 10:3 | **subset** | 34:13 |
| 39:16 52:9 | 10:4,7 24:3 52:21 | 44:23 45:18,20 | **talking** |
| **sort** | 55:21 | **substantial** | 3:19,20 29:22 53:3 |
| 22:24 45:5 55:21 58:2 | **statements** | 52:3 | **tangent** |
| **sorts** | 4:24 41:22 46:17 | **substantive** | 11:15 |
| 21:6 | **states** | 47:6 | **targeting** |
| **sounds** | 1:1 2:4 24:12 54:24 | **Substantively** | 13:10 |
| 37:19 | 60:4 | 1:6 | **tell** |
| **SOUTHERN** | **stayed** | **sufficient** | 15:3 18:6 47:10 |
| 1:1 | 53:22 | 38:3,4 55:2 | **tells** |
| **space** | **Stearns** | **suggested** | 7:17 |
| 46:6 | 3:23 41:14,18 43:9 | 12:1 49:19 58:6 | **tens** |
| **speak** | **stenographically** | **suggestion** | 11:2 |
| 6:13 57:2 | 60:8 | 50:10 | **tentative** |
| **speaking** | **step** | **suggests** | 11:12 |
| 27:17 59:8 | 32:8 | 52:12 | **term** |
| **specialize** | **steps** | **summer** | 20:8 38:25 39:4 45:14 |
| 40:4 | 37:21 | 11:25 | **terms** |
| **specific** | **stood** | **supplement** | 10:17,21 12:7 13:9,19 |
| 5:14 9:20 | 56:13 | 19:21 21:24 57:20 | 14:4,10 19:9 20:1,19 |
| **specifically** | **stop** | **supposed** | 20:21 21:22 22:3 27:1 |
| 7:2 8:23 32:24 48:19 | 15:21 19:12 37:14 | 56:18 | 29:4 30:4 34:2 35:15 |
| 54:6 | 57:10 | **sure** | 35:25 36:19,23 37:9 |

08-01789-cgm Doc 18578-3 Filed 03/18/19 Entered 03/18/19 13:30:42 Appendix
Vol 2 Pg 83 of 137 Pg 76 of 78
November 19, 2018 Transcript
Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 75

40:10 41:8 44:13,20
44:21 46:10 53:14
**test**
22:19 43:7
**testified**
41:12 42:1,5
**testimony**
42:8
**Thank**
59:16,17,19
**theory**
40:16
**thing**
5:20 43:19
**things**
7:4 15:21 16:1 17:24
26:8 29:21 49:11
**think**
4:11 5:20,20 7:6,9 12:3
15:14,19,20,24 18:10
20:11 22:20,24 23:13
24:7,11,14,19 26:7,17
26:18 28:7,10,14
31:11 33:19,21 36:17
37:6 39:13 40:8 41:10
42:16 44:2 47:1 50:10
50:11,12,15 52:15,22
52:23 53:6 54:20 55:1
55:8,11,20 56:3 57:3
57:4
**thinks**
15:17
**third**
10:10 18:20 28:19
**third-party**
3:19 4:2,21 5:16 7:18
7:21 13:10 14:4 25:17
25:20 28:15 32:1 44:4
44:5 46:17 50:22,24
**thought**
4:1 7:3 13:3 18:24
34:13 41:2 42:2
**thousand**
48:11
**thousands**

11:2
**three**
19:7 24:16 46:3 49:1
54:6,11,11 55:7
**threshold**
18:7
**thrust**
6:22
**thumb**
21:16
**time**
9:22,24 12:17 17:14,23
29:3,17,18,20 32:8
34:8 36:22 47:19
49:15 52:18 53:10,25
56:4 60:8
**time's**
52:15
**timely**
54:5
**times**
8:12 10:4 24:25 55:14
**today**
15:22 25:7 56:17
**told**
17:2 19:15,15,25
**ton**
33:9 39:12
**tortured**
10:25
**total**
14:23
**toto**
51:9
**traded**
39:21
**traders**
53:22,24
**trades**
42:19
**trading**
3:9,14,17 4:21 5:10
21:1 25:18,22 28:1
29:8,13,20 30:13 32:1
40:9,12 41:9 42:24

43:12 44:1 45:2 49:4
51:20 52:1,4 56:13,15
56:19 58:12
**transcript**
2:1 29:23 57:18 59:12
59:15 60:7
**transcripts**
56:12
**transparent**
13:18
**treated**
53:20
**trial**
54:7,12
**trials**
42:24
**tried**
36:21 58:2
**true**
17:11 30:14 60:6
**Trust**
1:18,20,21 34:7
**Trustee**
1:13,19,21 2:19 3:3,4
4:11 5:4,7,12,13 6:22
7:8 11:17,25 13:1
14:3,9 15:13 17:3
24:13 26:13 27:18
31:1 34:24 36:23
37:21 40:25 43:18
47:1,12,23 49:21
54:24 55:5 57:15
**Trustee's**
5:9 6:24 7:24 8:6,11,18
9:6 12:7 15:24 17:20
17:21,22 30:11 38:7
55:22 56:8
**trying**
3:7 32:7 43:7
**turn**
20:13
**two**
3:8 9:4,13 10:9 14:21
15:10,16 16:1 22:3
24:15 25:10 26:16

37:1,21 40:22 43:3
44:13 52:14,22 54:7
56:10,21 58:25 59:12
**two-and-a-half**
6:2
**twofold**
25:7

---

**U**

**U/Art**
1:18,20,21
**ultimate**
24:17 52:24
**ultimately**
55:17
**Um-hum**
29:10
**understand**
4:7,13 34:22 35:5,22
42:21,22 50:21
**understanding**
30:19 35:12 36:17 41:9
**understood**
35:3 55:10
**undertake**
18:2
**undertaken**
31:2
**undertaking**
31:4
**unique**
34:7,9
**UNITED**
1:1
**universe**
8:5 22:21
**unprocessed**
8:20 9:8,9 46:22
**unquote**
13:15
**unreasonable**
10:21
**unscanned**
8:19 9:8 46:23
**unsupported**

08-01789-cgm Doc 18578-3 Filed 03/18/19 Entered 03/18/19 13:30:42 Appendix
Vol 2 Pg 84 of 137
10-04995-smb Doc 152-13 Filed 01/22/19 Entered 01/22/19 13:59:48 Exhibit M
November 19, 2018 transcript Pg 77 of 78

Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 76

42:18
**unwarranted**
24:11
**unwieldy**
7:8
**use**
7:1 9:16 10:12 15:8
20:4 52:14
**usual**
49:4

**V**

**v**
1:6,17
**valid**
39:14
**variety**
49:8
**various**
57:12
**vehicle**
7:23
**version**
6:7
**versions**
10:4
**view**
25:4 48:22 49:5
**violation**
19:13
**virtually**
8:13
**virtue**
39:5
**volume**
20:9 45:24
**voluntary**
26:9 55:10

**W**

**Wait**
57:1
**want**
6:14,16 10:10 12:11
13:4 15:21 19:7,20

22:11 24:16,17 25:1,2
27:9 33:5 35:21 40:3
42:3 50:22,24 54:16
55:9 57:10
**wanted**
6:25 7:2 10:15 13:2,6,7
13:7 19:17 37:5
**wants**
15:3 55:16
**warehouse**
8:21 28:6 46:19 52:6
**warranted**
56:3
**wasn't**
49:10 53:7
**waters**
22:19 43:8
**way**
5:7,10 15:9 37:20 43:3
46:1 50:8 53:20
**we'll**
14:10,11 23:7 33:13,16
**we're**
3:2,18,19 14:19 23:13
23:25 39:3 43:25 44:1
44:8,19 45:23 49:4
50:4 52:15,25 54:17
**we've**
8:11 10:3 31:23 44:12
50:6,10 52:22
**weeks**
37:10
**welcome**
26:5
**well-known**
19:10
**went**
4:4,15 36:20 47:13
**wholesale**
23:15
**Wilenitz**
1:18,19,20,21
**willing**
10:22 12:1
**word**

6:6
**words**
4:17 39:22
**work**
17:9,17,20 20:18,20
26:5 46:6 58:3
**worth**
5:20 38:20 43:20
**wouldn't**
46:23
**writing**
35:3 54:23
**writings**
13:12 24:9 35:10,11
36:18
**written**
10:16
**wrong**
47:14
**wrote**
6:9,15 10:18 12:25

**X**

**x**
1:2,9,12,23
**XI00836**
60:20

**Y**

**yeah**
36:10 54:11
**year**
4:24 10:13
**years**
3:8 4:3,10,15 8:23,24
9:4,13 10:9 14:21
15:10,13,16 26:16
28:19 34:25 40:22
52:14,22 54:5 56:21
**yield**
40:8
**York**
1:1 2:4,6,6,12,12,17,17
2:22,22 3:22 40:12
41:23 42:10 60:5

**Z**

**zero**
10:6

**0**

**08-01789(SMB)**
1:4

**1**

**1**
7:11,21,22 8:5 20:3
**1.5**
20:1
**10-04995(SMB)**
1:15
**10:23**
2:7
**100**
6:5
**10018**
2:12
**10022**
2:22
**10111-0100**
2:17
**11:25**
59:20
**14th**
2:16 12:21 18:16 51:1
**15**
39:24
**17th**
46:4
**18th**
46:4
**19**
1:25 2:6
**19th**
46:4

**2**

**2**
18:15 50:25
**20**
31:17 60:23

08-01789-cgm   Doc 18578-3   Filed 03/18/19   Entered 03/18/19 13:30:42   Appendix
November 19, 2018 Transcript   Pg 78 of 78

08-04995-smb   Doc 85-13   Filed 01/22/19   Entered 01/22/19 13:39:48   Exhibit M -
Vol 2   Pg 85 of 137

Picard v Trust U-Art Fourth                    Conference 11/19/2018

Page 77

**2002**
 4:15
**2004**
 34:20,25 35:25 36:19
  37:22
**2007**
 4:25
**2008**
 4:24 27:20 42:15
**2009**
 4:14 27:20
**2016**
 14:23 28:3 29:18,21,23
  30:1
**2017**
 6:19 11:4,6,9 12:16,20
  12:21 14:14 16:9 19:4
  19:5,6,14,24,25 22:17
  23:19 26:11 29:2 30:2
  34:16 35:20 49:2,6,10
  49:17 50:15 54:21
**2018**
 1:25 2:6 60:23
**22**
 19:9,25
**26**
 8:2 16:3,9 18:7 23:18
  26:11 54:21
**29**
 21:9

------------- **3** -------------

**3**
 4:16 50:25
**30**
 16:2,4 17:11 21:8
  23:16 24:22 54:18
**300,000**
 14:24
**348,000**
 34:6
**34th**
 2:5,12

------------- **4** -------------

**4.8**
 14:25
**45**
 2:16
**465**
 2:21

------------- **5** -------------

**5**
 20:1

------------- **6** -------------

**620**
 2:5,11
**63**
 47:4
**653,000**
 43:11

------------- **7** -------------

**7007**
 14:2 57:25

------------- **8** -------------

**8**
 4:25

------------- **9** -------------

**900**
 31:12
**916,000**
 40:18

# CHAITMAN LLP

## 465 PARK AVENUE
## NEW YORK, NY 10022
### (888) 759-1114
#### TELEPHONE & FAX

*HELEN DAVIS CHAITMAN*
hchaitman@chaitmanllp.com

January 25, 2019

**VIA ECF AND FEDERAL EXPRESS**

The Honorable Stuart M. Bernstein, U.S.B.J.
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004-1408

> Re:    *In re Bernard L. Madoff, Investment Securities, LLC,* **Adv. Pro. No. 08-01789;**
> *Irving H. Picard v. Wilenitz*, **Adv. Pro. No. 10-04995 (SMB)**

Dear Judge Bernstein:

I write on behalf of Defendants listed on ECF No. 14283[1] ("Defendants") in response to the Trustee's letter of January 22, 2019 which was filed in *Picard v. Wilenitz*, Adv. Pro. No. 10-04995, ECF No. 127,[2] in opposition to Defendants' request to appeal Judge Maas' January 2, 2019 Order denying Defendants' most recent motion to compel with respect to third-party trading records evidencing the trading activities of Madoff and BLMIS for the period from 1980 – 2008 (the "Trading Records"). *See* ECF No. 18354. Defendants' request was filed pursuant to the procedures set forth in the October 4, 2016 Order Appointing a Discovery Arbitrator (the "Order Appointing Arbitrator"). *See* ECF No. 14227.

## I.    The Court should permit an appeal and 28 U.S.C. § 1292 is inapplicable

The Trustee, citing 28 U.S.C. § 1292, argues that "federal law does not permit" "an interlocutory appeal of a discovery order." *Wilenitz*, ECF No. 127 at 2. However, the Order Appointing Arbitrator expressly permits appeals of Judge Maas' orders and outlines the procedure for pursuing such appeals. *See* ECF No. 14227, ¶ 10 ("Any party may request an appeal of any ruling of the Discovery Arbitrator by submitting a letter to the Court . . . ."). If Defendants' rights to appeal were restricted as suggested by the Trustee, then Defendants would never have consented to bring matters before the Discovery Arbitrator and certainly the Order Appointing Arbitrator would not have expressly provided for *de novo* review of the Discovery Arbitrator's findings of fact and conclusions of law. *See* ECF No. 14227, ¶ 10.

---

[1] Unless otherwise indicated, all ECF references are to the main docket in the BLMIS liquidation, Adv. Pro. No. 08-01789.

[2] The Trustee's letter was filed on the *Wilenitz* docket, but not on the main docket in the BLMIS liquidation.

{00038921 3 }

**AA284**

# CHAITMAN LLP

The Honorable Stuart M. Bernstein
January 25, 2019
Page 2

This Court's authority to enter the Order Appointing Arbitrator is derived from Fed. R. Bankr. P. 9019(c), ECF No. 14227 at 2, which provides that a discovery arbitrator can be appointed pursuant to "stipulation of the parties." Fed. R. Bankr. P. 9019(c). Here, the parties have stipulated to an appeals procedure pursuant to the Order Appointing Arbitrator. Defendants have complied with the relevant procedure, *see* ECF No. 14227, and this Court would be without authority to impose on Defendants the unstipulated appellate hurdles urged by the Trustee. *See, e.g.*, *In re Jorgensen*, 66 B.R. 104, 108 (B.A.P. 9th Cir. 1986) ("The court may appoint an arbitrator only with the stipulation of the parties.").

Not only would 28 U.S.C. § 1292 be displaced by the Order Appointing Arbitrator, but there is no basis to believe that the statute has any relevance whatsoever in the first place as it says nothing of appeals to the Bankruptcy Court. Rather than governing appeals to the Bankruptcy Court, 28 U.S.C. § 1292 is concerned with appeals to the district court and to the court of appeals. There is no case of which we are aware in which 28 U.S.C. § 1292 has governed an appeal of an arbitrator's order to the Bankruptcy Court.

The Trustee's citation to District Judge Carter's Order Denying Motion for Leave to Appeal, entered in *Picard v. Saren Lawrence*, Adv. Pro. No. 10-04898, ECF No. 118, is equally unavailing because that Order concerned an appeal to the District Court from this Court. In that case, the Trustee was permitted by this Court to broadly pursue discovery of highly personal and confidential financial information of parties and non-parties alike, some of which was duplicative and cumulative, and a large volume of which consisted of irrelevant information. Thus, if anything, that case merely demonstrates the unfairness of permitting the Trustee to employ his limitless legal budget to continue to conceal material evidence from the Defendants.

## II.   Defendants should be granted permission to appeal the January 2, 2019 Order

The Trustee makes four arguments as to why the January 2, 2019 Order should not be reversed.

First, the Trustee argues that the January 2, 2019 Order does not contravene the Orders of this Court. According to the Trustee, "[i]f the Court had already ordered production of 'trading records' in May of 2016, then Ms. Chaitman's August 2016 motion to compel and subsequent arbitrations would have been completely unnecessary." *Wilenitz*, ECF No. 127 at 2. In fact, this is true: if the Trustee had complied with this Court's orders and had not embarked upon a campaign to conceal material evidence, the proceedings before Judge Maas would have been unnecessary.

Starting in May 2016, this Court ordered the Trustee to produce to the Defendants all the Trading Records, *See, e.g.*, May 17, 2016 Transcript at 69:19-22 (THE COURT: "Well, if the

**AA285**

# CHAITMAN LLP

The Honorable Stuart M. Bernstein
January 25, 2019
Page 3

Trustee has additional documents, he's got to supplement the disclosure or the production, which he does by adding them to the data room . . . .").[3]

But the Trustee ignored this Court's order. Then, again, on June 29, 2017, this Court ordered the Trustee to produce the Trading Records. *See, e.g.*, June 29, 2017 Transcript[4] at 74:14-15 (there are "two orders directing you to turn over the documents"). Again, the Trustee ignored this Court's order. Thus, the Trustee's argument is simply incorrect and the Trustee does not even dispute that Judge Maas is without authority to enter orders that contravene the Orders of this Court.

Second, the Trustee again ignores the relevant issue by suggesting that Defendants have made no showing that their discovery requests are "relevant and proportional." *Wilenitz*, ECF No. 127 at 3. However, this Court obviously recognized the relevance of the Trading Records because it ordered the Trustee to produce them. Similarly, Judge Maas held that the Trading Records go to "significant" issues in the case. Given their obvious relevance, Rule 26 requires disclosure in light of the minimal to nonexistent burden that would be imposed on the Trustee by simply sharing access to an existing database and allowing Defendants' counsel to inspect the warehouses of documents which are under the Trustee's exclusive control. The Trustee has never contended that compliance with this Court's orders would be unduly burdensome and any such contention would be preposterous.

The Trustee misstates the facts in footnote 2 of his letter. We repeatedly asked the Trustee to produce all Trading Records of a whole list of firms. Instead, the Trustee simply told us how many "hits" there were but refused to produce the documents. *See, e.g.*, Ex. F to the September 20, 2018 Joint Letter to Judge Maas, which is Chaitman Decl., January 16, 2019, as Ex. 2.

Third, the Trustee argues that it does not matter whether BLMIS actually engaged in real trading for its customers because Defendants have not shown that the Trustee's efforts to identify pre-1992 trading records have been inadequate. *Wilenitz*, ECF No. 127 at 3. First of all, Defendants have sought Trading Records for the entire period from 1980 – 2008. Defendants have not limited their requests to a specific time period. Their request is co-extensive with the time period the Trustee applies to calculate net equity. Moreover, Defendants have already set forth at length on numerous occasions why the Trustee's productions have been inadequate,[5] and the Trustee's efforts are *per se* inadequate because they do not comply with the previous Orders of this Court requiring the Trustee to produce all Trading Records. Finally, the high relevancy of the Trading Records compels reversal. The Trustee has a mass of documents that he has refused to produce because they are inconsistent with the representations he has made to this Court, the

---

[3] The Trustee emailed this transcript to Judge Maas on Nov. 19, 2018. The transmittal letter is attached to the Chaitman Decl, January 16, 2019 as Ex. 3. The transcript is Chaitman Decl., January 16, 2019 as Ex. 4.

[4] Ex. A to the September 20, 2018 Joint Letter to Judge Maas, which is Chaitman Decl., January 16, 2019 as Ex. 2.

[5] *See, e.g.*, Exhibit A to Defendants' November 20, 2018 Letter to Judge Maas, which is Chaitman Decl., January 16, 2019 as Ex. 8.

**AA286**

# CHAITMAN LLP

The Honorable Stuart M. Bernstein
January 25, 2019
Page 4

District Court, and the Second Circuit.  However, there is no justification for protecting the Trustee and his counsel by allowing them to conceal material evidence.

The Court will recall that, contrary to the Trustee's continuous representations that Madoff never purchased securities with investment advisory customers' money, Madoff testified in his deposition that he maintained a portfolio of $6 billion of T-bills that he purchased with investment advisory customers' money and that, in addition, he invested such customers' money in various other securities such as commercial paper.  When I brought this fact to the Court's attention in 2018, Mr. Sheehan acknowledged the truth of this, for the first time in nine years – although he only confessed to the T-bills Madoff had purchased in 2007 – 2008.  Madoff also testified concerning Mr. Dubinsky's expert report and totally destroyed Mr. Dubinsky's credibility because his report was patently false in numerous respects (despite the fact that the Trustee paid Mr. Dubinsky over $30 million to prepare his report).

In the face of Madoff's truthful testimony, the Trustee was compelled to have new expert reports prepared.  Just last week, the Trustee produced an entirely new expert report of Mr. Dubinsky and an entirely new expert report of Lisa Collura who now admits what Defendants have been alleging for years: that Madoff used investment advisory customers' money to purchase various kinds of securities; that he used investment advisory customers' money to purchase securities at brokerage accounts with Bear Stearns, Fidelity, Lehman Brothers, Morgan Stanley, Bank of New York, JPMorgan Chase and M&T Securities.  Collura also admits that the investment advisory customers' money appreciated.  The Expert Report of Lisa Collura, dated January 16, 2019, is annexed hereto as Ex. 3.  *See id.*, Ex. 3.  Collura admits that Madoff invested funds in the 703 Account at JPMorgan Chase.  She admits that Madoff comingled funds between the investment advisory business and the proprietary trading business.  *See id.*, ¶ 47, n.28, ¶ 57.  And she documents the more than $16 billion T-bills that Madoff purchased through JPMorgan Chase just in 2007 – 2008.  *See id.*, Ex. 12.  Thus, Defendants' previous representation that Madoff never purchased securities with investment advisory customers' money has now been proven false, and the Trustee should not be permitted to further conceal the Trading Records.  Defendants are entitled to compliance with this Court's orders.  And they are entitled to see all the Trading Records, not simply the ones that the Trustee has finally decided to disclose.

Fourth, there is no indication in the January 2, 2019 Order that Judge Maas considered Defendants' offer to search the Trustee's warehouses themselves rather than force the Trustee to "rummage through all of the boxes in the warehouse."  January 2, 2019 Order, ECF No. 18354 at 7.  Obviously, however, this would not be an undue burden when the Trustee and his law firm have been paid over $1 billion to date and when the documents sought will prove that the Trustee has misrepresented material facts concerning Madoff's fraud from the inception of his appointment.

## III.   Conclusion

The Trustee's misrepresentation of material facts and deliberate concealment of the Trading Records compels reversal of the January 2, 2019 Order.  The public, the customers, and the courts, are entitled to the truth about Madoff's fraud.  The Trustee and his counsel acted in

{00038921 3 }

**AA287**

# CHAITMAN LLP

contempt of this Court's orders because they have wanted to conceal the truth from the public, the customers, and the courts.  It would be a disgrace to the legal system to allow the Trustee, who, with his firm, has been compensated in excess of $1 billion, to continue to misrepresent the nature of Madoff's fraud by concealing material evidence.

Defendants are entitled to production of all of the Trading Records under the Trustee's control covering the period from 1980 – 2008.

Respectfully submitted,

*/s/Helen Davis Chaitman*

Helen Davis Chaitman

HDC:leb
Enclosures (as stated)
cc:    Maximillian S. Shifrin, Esq. (*via email only*)
       Nicholas J. Cremona, Esq. (*via email only*)

10-04995-smb   Doc 1293-1   Filed 01/25/19   Entered 01/25/19 16:04:57   Exhibit A
Pg 9 of 40

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |

---

## EXPERT REPORT OF
## LISA M. COLLURA, CPA, CFE, CFF

**Reconciliation of Cash Transactions**
**for All BLMIS Customers and**
**Analysis of IA Business Cash Activity**

**January 16, 2019**

## TABLE OF CONTENTS

I. PROFESSIONAL BACKGROUND ................................................................. 2

II. SCOPE OF ASSIGNMENT .......................................................................... 2

III. METHODOLOGY ....................................................................................... 4

IV. SUMMARY OF FINDINGS AND CONCLUSIONS ......................................... 6

V. RECONCILIATION OF CASH TRANSACTIONS FOR ALL BLMIS CUSTOMERS ......... 8

    A.    OVERVIEW        8
    B.    BLMIS BANK ACCOUNTS        8
    C.    RESULTS OF RECONCILIATION        13

VI. ANALYSIS OF HANDWRITTEN LEDGERS AND OTHER DOCUMENTS ................... 14

    A.    OVERVIEW        14
    B.    ANALYSIS OF HANDWRITTEN DOCUMENTS IN THE 10 YEAR PERIOD        17
    C.    ANALYSIS OF HANDWRITTEN DOCUMENTS IN THE PRE-10 YEAR PERIOD        19
    D.    RESULTS OF ANALYSIS        21

VII. ANALYSIS OF NON-CUSTOMER ACTIVITY IN THE 703 ACCOUNT ................... 21

    A.    OVERVIEW        21
    B.    SHORT-TERM INVESTING ACTIVITY IN THE 703 ACCOUNT        22
    C.    ACTIVITY IN BROKERAGE ACCOUNTS        25
    D.    RESULTS OF ANALYSIS        28

VIII. INTEREST EARNED ON TREASURY BILLS ............................................... 29

    A.    OVERVIEW        29
    B.    RESULTS OF ANALYSIS        29

IX. SIGNATURE AND RIGHT TO MODIFY ....................................................... 31

X. LIST OF EXHIBITS ................................................................................... 32

## I. PROFESSIONAL BACKGROUND

1.        I am a Senior Managing Director in the Forensic and Litigation Consulting practice
of FTI Consulting, Inc. ("FTI"), with 25 years of experience in accounting, auditing and
litigation consulting services.  I specialize in providing forensic accounting and financial fraud
investigative services in connection with internal investigations on behalf of trustees, boards of
directors and audit committees of companies.

2.        I have extensive experience in conducting large-scale, fact-finding investigations
into fraudulent financial transactions, including tracing significant flows of funds between
accounts and entities.  During my career at FTI, I have assisted in the investigation of several of
the largest fraud cases in the United States.

3.        I am a Certified Public Accountant (CPA), a Certified Fraud Examiner (CFE), a
member of the American Institute of Certified Public Accountants (AICPA), and am Certified
in Financial Forensics (CFF) by the AICPA.  My curriculum vitae, attached as **Exhibit 1** to this
report, further describes my professional credentials, experience, and qualifications, including
my testimony in the last four years.

## II. SCOPE OF ASSIGNMENT

4.        Bernard L. Madoff Investment Securities LLC ("BLMIS") was an investment firm
owned and operated by Bernard L. Madoff ("Madoff").  On December 11, 2008, Madoff was
arrested for violating multiple securities laws in connection with running a Ponzi scheme
through the investment advisory business of BLMIS (the "IA Business").   On December 15,
2008, Irving H. Picard was appointed as the Trustee for the liquidation of the business of
BLMIS, and Baker & Hostetler LLP was retained as his counsel.  Shortly thereafter, FTI was
retained by Baker & Hostetler LLP, on behalf of the Trustee, to analyze, among other things,
the financial affairs of BLMIS and to assist the Trustee with the liquidation of BLMIS.  As part
of our engagement, FTI was tasked with the exercise of reconstructing the books and records of

**AA292**

BLMIS, including all records of the cash transactions related to the BLMIS IA Business customer accounts as far back as the records allow.

5.      Matthew B. Greenblatt, also a Senior Managing Director at FTI, and a team of professionals working under his supervision, was specifically tasked with creating chronological listings of all cash and principal transactions, including cash deposit and withdrawal transactions, for every BLMIS customer account, as set forth more fully in the Expert Report of Matthew B. Greenblatt regarding the Methodology for the Principal Balance Calculation (the "Principal Balance Calculation Report").

6.      The sources of cash deposit and withdrawal transactions related to BLMIS customer accounts include customer statements and other relevant information available within BLMIS's records, including Portfolio Management Reports, Portfolio Management Transaction Reports, spiral-bound notebooks, and a data table from BLMIS's computer system referred to as the "Checkbook File," which is the only available BLMIS record of cash transactions for the time period from December 1, 2008 through December 11, 2008. *See* Principal Balance Calculation Report for further discussion regarding these sources. For purposes of my report, I use the term "customer statements" to refer to these sources collectively.

7.      I, along with a team working under my supervision, was specifically tasked with performing forensic analyses to determine the following:

- Whether the cash deposit and withdrawal transactions as reflected on the customer statements for all BLMIS customers reconciled to available BLMIS bank records;

- Whether handwritten ledgers and other documents maintained by BLMIS employees consistently reflected customer cash deposit and withdrawal transactions;

- The purpose of the activity in the primary bank account used for BLMIS customer deposits and withdrawals that I did *not* reconcile to cash transactions reflected on the BLMIS customer statements, including investments in Treasury Bills; and

**AA293**

- Whether interest earned on Treasury Bills purchased directly or indirectly with funds from the primary bank account used for BLMIS customer deposits and withdrawals was sufficient to pay BLMIS customer withdrawals.

8.      For purposes of this report, I use the term "reconciled" to indicate when I have matched, agreed and/or determined consistency between cash deposits and withdrawals reflected on BLMIS customer statements to information or data per another source (*e.g.,* amounts on BLMIS bank records, and/or handwritten ledgers maintained by BLMIS employees).

9.      FTI is being compensated at a rate of $670 per hour for my professional time incurred in performing the work necessary to prepare this report.  FTI's fees are not contingent on the conclusions reached in this report or the outcome of the subject litigation.


**III. METHODOLOGY**

10.      To determine whether the cash deposit and withdrawal transactions reflected on the customer statements for all BLMIS customers reconciled to available BLMIS bank records, I, using my experience as a forensic accountant and investigator, along with my staff, first identified and gathered the relevant and available records related to the BLMIS bank accounts. We then performed the following:

- Reviewed hundreds of thousands of pages of records related to BLMIS's bank accounts, including monthly bank statements, cancelled checks and deposit slips, obtained from BLMIS's files and/or produced by third-party financial institutions, which cover a ten-year period from December 1998 to December 2008;
- Analyzed close to 150,000 transactions reflected within these bank records; and
- Reconciled the cash deposit and withdrawal transactions reflected on the BLMIS customer statements to the cash transactions reported in the available BLMIS bank records.

11.      Next, I reviewed available handwritten ledgers and other documents maintained by BLMIS employees to determine whether they consistently reflected customer cash deposits and

**AA294**

cash withdrawals for both the period when BLMIS bank records were available (*i.e.*, December 1998 – December 2008) and the period when such records were not available (*i.e.*, prior to December 1998). My team and I first identified all available handwritten documents within BLMIS's records that reflected cash activity in and out of BLMIS bank accounts. We then performed the following:

- Analyzed the handwritten documents for each month-end day during the ten-year period from December 1998 to December 2008 and reconciled the cash activity reflected on these handwritten documents to available BLMIS bank records and cash deposits and withdrawals reflected on BLMIS customer statements; and

- Analyzed the handwritten documents for each month-end day prior to December 1998, which were available back to December 1990, and reconciled BLMIS customer cash deposits and withdrawals reflected on BLMIS customer statements to the cash activity reflected on these handwritten documents.

12.    Next, I examined the activity in the primary bank account used for BLMIS customer deposits and withdrawals (as further described below and defined as the "703 Account") that I did *not* reconcile to cash transactions reflected on the BLMIS customer statements, and I performed the following based on available bank records:

- Analyzed transactions relating to short-term investments made directly from the 703 Account to determine: (a) the types, amounts, and timing of these short-term investments, and (b) the related income earned on the investments;

- Analyzed other transactions in the 703 Account, including transfers to and from bank and brokerage accounts held in the name of BLMIS or Madoff, to determine: (a) the amounts and timing of the flow of funds between the 703 Account and the brokerage accounts, (b) the types, amounts, and timing of investments made from these brokerage accounts, and (c) the related income earned on investments in the brokerage accounts; and

- Determined whether these non-customer transactions were for BLMIS's cash management purposes.

**AA295**

13.       Finally, to determine whether interest earned on Treasury Bills purchased directly or indirectly with funds from the 703 Account was sufficient to pay BLMIS customer withdrawals, I first determined the total amount of interest earned on the Treasury Bills each year during the ten-year period from December 1998 to December 2008.  I then compared the annual interest amounts to the total amount of BLMIS customer withdrawals each year during the same ten-year period.

14.       The documents and data that I considered in connection with this report are listed in **Exhibit 2**.  I reserve the right to supplement my report based on any additional documents or information received.

## IV. SUMMARY OF FINDINGS AND CONCLUSIONS

15.       Based on the forensic analyses performed, as described above and throughout this report, as well as my skills, knowledge, experience, education and training that I applied to the documents and information available to me as of the date of this report, my findings and conclusions are summarized as follows:

- I reconciled 99% of the approximately 225,000 cash deposit and withdrawal transactions reflected on all BLMIS customer statements during the time period of December 1998 to December 2008 to the available BLMIS bank records for the same time period, demonstrating that the customer statements accurately reflected BLMIS customer cash transactions.  The remaining 1% that I was unable to reconcile consists primarily of withdrawal transactions for which copies of the related cancelled checks were not available.  Based on the results of my reconciliation of 99% of the cash transactions, I can reasonably infer that I would have been able to reconcile these withdrawal transactions had copies of the related cancelled checks been available.  Further, based on my review of the activity in BLMIS bank accounts used for customer cash transactions, from December 1998 to December 2008, customer deposits were made into one bank account from which BLMIS customer withdrawals were directly or indirectly made.

6

**AA296**

- Handwritten documents maintained by BLMIS employees during the period when
  BLMIS bank records were available (from December 1998 to December 2008)
  reflected BLMIS customer cash deposits and withdrawals, which I reconciled to
  both BLMIS bank records and BLMIS customer statements.  Of the approximately
  4,700 cash deposit and cash withdrawal transactions dated month-end between
  December 1998 and December 2008 reflected on BLMIS customer statements, I
  reconciled over 99% to the handwritten documents and the BLMIS bank records.
  Therefore, I can reasonably conclude that these handwritten documents can be
  relied upon as an indication of BLMIS customer cash activity in the absence of
  BLMIS bank records during the period prior to December 1998.

- Handwritten documents between December 14, 1990 and November 1998 reflected
  a consistent pattern of cash activity where BLMIS customer cash deposits were
  reflected on the handwritten documents as deposits into bank accounts used by the
  IA Business for cash transactions with customers, and customer cash withdrawals
  were reflected on the handwritten documents as outflows from these same bank
  accounts.  Of the approximately 5,000 cash deposit and cash withdrawal
  transactions dated month-end between December 1990 and November 1998
  reflected on BLMIS customer statements, I reconciled approximately 94% to the
  handwritten documents.

- The activity in the 703 Account that I did not reconcile to BLMIS customer cash
  transactions consisted of investing activity for BLMIS's cash management purposes,
  including purchases and sales of Treasury Bills, directly from the 703 Account and
  through brokerage accounts.

- From 1999 to 2008, the annual interest earned on Treasury Bills purchased directly
  and indirectly with funds from the 703 Account ranged from 0% to 1% of annual
  withdrawals from BLMIS customer accounts and was therefore insufficient to pay
  BLMIS customer withdrawals.

**AA297**

# V. RECONCILIATION OF CASH TRANSACTIONS FOR ALL BLMIS CUSTOMERS

A. *OVERVIEW*

16.　　　As set forth in the Principal Balance Calculation Report, a team from FTI working under Mr. Greenblatt's supervision created chronological listings of all cash and principal transactions, including cash deposit and withdrawal transactions, for every BLMIS customer account. I was tasked with reconciling the customer cash deposit and withdrawal transactions to available BLMIS bank records to assist in the determination of whether the cash transactions reflected on the customer statements for all BLMIS customers were fairly and accurately represented (the "Global Reconciliation").

B. *BLMIS BANK ACCOUNTS*

17.　　　My team and I reviewed available bank records for more than 90 bank and brokerage accounts in the name of either BLMIS or Madoff,[1] and found that, primarily, the following three bank accounts were used by BLMIS for customer deposits and withdrawals during at least the ten-year period from December 1998 to December 2008:[2]

- JPMorgan Chase account #xxxxx1703 (the "703 Account")[3]
- JPMorgan Chase account #xxxxxxxxx1509 (the "509 Account")
- Bankers Trust account #xx-xx0-599 (the "BT Account")

18.　　　Records for these three accounts consist of monthly bank statements, copies of deposited checks, deposit slips, and cancelled checks. Records related to the 703 Account and the 509 Account were available from December 1998 to December 2008 and were obtained from

---

[1] *See* **Exhibit 3** for a listing of known bank accounts held by BLMIS and/or Madoff.
[2] Between January 2006 and April 2006, there were four customer withdrawal transactions totaling $262,000,000 that were paid from account #xxx-xxx6-621 held at the Bank of New York (the "BONY 621 Account"). The BONY 621 Account was one of the primary operating bank accounts used by BLMIS's proprietary trading and market making businesses (the "Proprietary Trading Business"). In June 2006, there were two transfers totaling $261,816,950 from the 703 Account to the BONY 621 Account to reimburse the BONY 621 Account for funding the withdrawals to customers.
[3] Personal Identifying Information has been redacted throughout this report and the accompanying exhibits.

**AA298**

BLMIS's files as well as from JPMorgan Chase & Co. ("JPMC").[4]   In addition to hard copy

documents, JPMC produced an electronic file that provides details of wire transfers in and out

of the 703 Account from January 1, 2002 to December 11, 2008 (the "JPMC Wire File").[5]

Records related to the BT Account were available from December 1998 to May 1999 and were

obtained from BLMIS's files.[6]

19.         In the aggregate, FTI had available bank records related to the BLMIS bank accounts

used for customer deposits and withdrawals for a ten-year period from December 1998 to

December 2008 (the "10 Year Period").   To assist in our analysis of these bank records, which

included copies of monthly bank statements and cancelled checks, we captured the transaction

information from these records and converted the information into an electronic format

through the use of a combination of Optical Character Recognition (OCR) software and manual

entry.   This electronic data, which accurately reflects the underlying records, became the basis

for our reconciliation of the cash transactions reported in the BLMIS bank records to the cash

deposits and withdrawals reflected on BLMIS customer statements.

---

[4] The October 1999 bank statement for the 509 Account could not be located.  However, I was able to use other available documents, such as the 703 Account statements, to estimate the activity in the 509 Account during October 1999.  In addition, there is activity reflected on the monthly bank statements for the 703 Account and 509 Account for which corresponding copies of deposited checks, deposit slips and/or cancelled checks were missing from the documents produced by JPMC and/or could not be located in BLMIS's records.  As reflected in my summary of findings and other results described throughout my report, these missing documents had a minimal impact on my overall analysis and reconciliation.

[5] This file was missing data for transactions dated December 11, 2004 to December 31, 2004.  However, I was able to use other available documents, such as the 703 Account statements, to obtain the necessary information to complete our analysis and reconciliation.

[6] Statements for June through August 1999, October 1999, December 1999 and July 2000 for the BT Account were also found in BLMIS's records.  However, May 1999 appears to be the last month of significant activity in the BT Account. There was no activity in the account during the months of June through August 1999, and the statements for these months showed an ending balance of $26,523.  In October 1999, the only transaction in the account was to transfer the $26,523 remaining balance to the 703 Account and zero out the BT Account.  The December 1999 and July 2000 statements for the BT Account both showed a zero balance.

**AA299**

10-04995-smb    Doc 1273-1    Filed 01/25/19    Entered 01/25/19 16:04:37    Exhibit A
Pg 102 of 137

**The 703 Account**

20.         Based on my review of the available BLMIS bank records, I determined that the 703

Account was the primary bank account used for BLMIS customer deposits and withdrawals.[7]

My team and I reviewed and analyzed every one of the transactions reported in the available

monthly bank statements for the 703 Account from December 1998 to December 2008 to

determine, among other things, whether the transactions were related to a BLMIS customer

deposit or withdrawal.

21.         The results of my analysis of the activity in the 703 Account from the available bank

records for December 1998 to December 2008 are set forth in an Excel spreadsheet titled "JPMC

703 Account Activity – December 1998 to December 2008" which is attached as **Exhibit 4**.

22.         In conducting our reconciliation of the cash transactions reported in the 703

Account bank records to the cash transactions reflected on the BLMIS customer statements, we

first matched transactions based on the transaction date and amount, but also manually

reviewed thousands of transactions to confirm our results.  In addition, there were instances

when we reconciled multiple transactions on the BLMIS customer statements to a single

transaction on the BLMIS bank statements.  For example, a deposit into the 703 Account that

related to multiple BLMIS customers appeared as one transaction on the monthly bank

statement for the 703 Account.  In that case, we reconciled the 703 Account transaction to a

combination of multiple BLMIS customer transactions.[8]

23.         FTI assigned a unique identification number to each of the transactions reported on

the available 703 Account bank statements.  *See* "703 ID" in the first column of the detail tab of

Excel spreadsheet "JPMC 703 Account Activity – December 1998 to December 2008" (attached

as **Exhibit 4**).  FTI also assigned a unique identification number to each one of the customer

deposit and withdrawal transactions for every BLMIS customer account.  *See* "CM ID" in a

---

[7] Based on available bank statements, the 703 Account was held in the name of Bernard L. Madoff until September
2002, when the name on the 703 Account was changed to Bernard L. Madoff Investment Securities.

[8] As another example, BLMIS withheld certain amounts from foreign account holders and made payments to the
Internal Revenue Service on behalf of these customers.  In these cases, we reconciled one payment from the 703
Account to multiple related transactions per the BLMIS customer statements.

**AA300**

separate column of the detail tab of **Exhibit 4**.  Once a specific transaction reported in a 703

Account statement was matched to a specific customer deposit or withdrawal transaction

reflected on the BLMIS customer statements, we recorded the corresponding unique CM ID in

the respective column of **Exhibit 4**.  This matching formed a link between the cash transactions

per the bank records and the cash transactions per the customer statements.  This link ensured

that no two customer cash transactions were incorrectly matched to the same cash transaction

per the bank records or vice versa.

24.        Based on my review of the activity in the 703 Account from December 1998 to

December 2008, I determined that approximately 97% of the inflows into the account during

this period consisted of customer deposits and approximately 98% of the outflows from this

account during this period consisted of customer withdrawals.  **Figure 1** below is a flowchart

summarizing the activity in the 703 Account from December 1998 to December 2008.  The

results of my analysis support that from December 1998 to December 2008, BLMIS customer

deposits were made into one account - the 703 Account - an account from which BLMIS

customer withdrawals were made.  *See* **Section VII** below for further discussion of the

remaining activity in the 703 Account (*i.e.,* other than customer deposits or withdrawals).

**Figure 1**
**Flowchart of Activity in the 703 Account**
**December 1998 – December 2008**



**AA301**

**The 509 Account**

25.      Based on my review of the available bank records related to the 509 Account, I determined that the 509 Account was a disbursement account funded by the 703 Account.[9]  On a daily basis, funds were transferred from the 703 Account to the 509 Account to cover the total amount of checks clearing the 509 Account on that day.  Thus, from December 1998 to December 2008, the inflows into the 509 Account consisted solely of transfers from the 703 Account, and the outflows from the 509 Account were solely in the form of checks.

26.      My team and I performed an analysis of the activity in the 509 Account, similar to the analysis we performed with respect to the 703 Account, to determine whether the outflows from the 509 Account were related to BLMIS customer withdrawals.  However, in this case, our analysis relied more heavily on our review of the cancelled checks because the statements themselves lacked the necessary detail.  The results of my analysis of the activity in the 509 Account from the available bank records for December 1998 to December 2008 are set forth in an Excel spreadsheet titled "JPMC 509 Account Activity – December 1998 to December 2008" which is attached as **Exhibit 5**.

27.      Based on my review of the activity in the 509 Account from December 1998 to December 2008, I determined that 100% of the inflows into the 509 Account were transfers from the 703 Account, the account consisting primarily of customer deposits, and over 99% of the checks written from the 509 Account consisted of customer withdrawals.  **Figure 2** below is a flowchart summarizing the activity in the BLMIS 509 Account.

**Figure 2**
**Flowchart of Activity in the 509 Account**
**December 1998 – December 2008**



---

[9] Based on available bank statements, the 509 Account was held in the name of Bernard L. Madoff until September 2002, when the name on the 509 Account was changed to Bernard L. Madoff Investment Securities.

**AA302**

**The BT Account**

28.        Based on my review of the available bank records related to the BT Account, from at least December 1998 through May 1999, the BT Account was also funded by transfers from the 703 Account.  Outflows from the BT Account were in the form of both checks and wire transfers.

29.        My team and I performed a reconciliation analysis of the activity in the BT Account, similar to those described above, to determine whether the outflows from the BT Account were related to BLMIS customer withdrawals.  The results of my analysis of the activity in the BT Account from the available bank records for December 1998 to May 1999 are set forth in an Excel spreadsheet titled "BT 599 Account Activity – December 1998 to May 1999" which is attached as **Exhibit 6**.

30.        Based on my review of the activity in the BT Account during this period, I determined that 100% of the inflows into the BT Account were transfers from the 703 Account, the account consisting primarily of customer deposits, and that over 97% of the outflows from the BT Account were related to customer withdrawals.  **Figure 3** below is a flowchart summarizing the activity in the BT Account:

**Figure 3**
**Flowchart of Activity in the BT Account**
**December 1998 – May 1999**

C.    *RESULTS OF RECONCILIATION*

31.        I reconciled 99% of the approximately 225,000 cash deposit and withdrawal transactions reflected on all BLMIS customer statements during the time period of December 1998 to December 2008 to the available BLMIS bank records for the same time period,

**AA303**

demonstrating that the customer statements accurately reflected BLMIS customer cash transactions.  The majority of the remaining 1%, or approximately 2,200 transactions, consist primarily of withdrawal transactions for which copies of the related cancelled checks were not available.  Based on the results of my reconciliation of 99% of the cash transactions, I can reasonably infer that I would have been able to reconcile these withdrawal transactions had the related cancelled checks been available.  Only 13 transactions of this remaining 1% (representing less than 0.006% of the approximately 225,000 cash transactions) were reflected on the customer statements, but could not be reconciled to available BLMIS bank records.

32.        Based on my review of the activity in the three BLMIS bank accounts used for customer cash transactions from December 1998 to December 2008, customer deposits were made into one account – the 703 Account – from which BLMIS customer withdrawals were made directly, or indirectly through the 509 Account or the BT Account.  Further, I saw no disbursement of funds for the purchase of stocks or equities on behalf of customers of the IA Business, nor did I see any receipt of funds from the sale of stocks or equities.  Instead, I saw billions of dollars of inflows from customers depositing funds into the IA Business and billions of dollars of outflows to customers in the form of withdrawals.


## VI. ANALYSIS OF HANDWRITTEN LEDGERS AND OTHER DOCUMENTS

*A.  OVERVIEW*

33.        My team and I identified all available handwritten documents within BLMIS's records that reflected cash activity in and out of BLMIS bank accounts, including BLMIS customer cash deposits and withdrawals.  We identified two types of handwritten documents:

- **Handwritten Ledgers** – the Handwritten Ledgers contained multiple days' worth of activity on a single page, with the specific activity from each day handwritten on one line.  We identified Handwritten Ledgers in BLMIS's records that covered an

14

**AA304**

18-year period from December 14, 1990 through December 11, 2008.[10]  **Figure 4**

below is an example of a Handwritten Ledger for days in June and July 2003.  *See*

*also* **Exhibit 7**.

**Figure 4**
**Example of a Handwritten Ledger**

- **Daily Sheets** – the Daily Sheets contained information similar to the information on

  the Handwritten Ledgers, however, on the Daily Sheets, the activity for a given day

  was included on a separate page and the amounts were rounded to the nearest

  thousand.  We identified Daily Sheets in BLMIS's records that covered nearly a 15-

---

[10]  There were no missing Handwritten Ledgers during this 18-year period.  Beginning in 2003, two versions of
Handwritten Ledgers existed in BLMIS's records for many of the month-end periods under review.  I reviewed and
analyzed all available versions of the Handwritten Ledgers.

15

MADTSS01059432

**AA305**

year period from April 4, 1994 through December 11, 2008.[11] **Figure 5** below are examples of Daily Sheets. *See also* **Exhibit 8.1** for an example of Daily Sheets pre-November 1998 and **Exhibit 8.2** for an example of a Daily Sheet post-November 1998.[12]

**Figure 5**
**Examples of Daily Sheets**

Pre-November 1998                    Post-November 1998



MADTSS00244687                              MADTSS01309801

34.     Each Handwritten Ledger and Daily Sheet identified the banking institution to which the handwritten document related, including JPMorgan Chase[13] and Bankers Trust,[14] the

---

[11] Daily Sheets for only four business days were missing across this nearly 15-year time period: 9/28/1995, 1/12/1998, 5/11/1998, and 8/15/2003.

[12] The Daily Sheets were completely handwritten until mid-November 1998 when the BLMIS employees began using a pre-printed template.

[13] Referred to on the handwritten documents as predecessor banks to JPMorgan Chase, including "MH" (for Manufacturers Hanover), "Chemical" (for Chemical Bank), "C.M." (for Chase Manhattan), or "Chase."

[14] Referred to on the handwritten documents as "B.T." or "Bankers."

two banking institutions used by the IA Business for cash transactions with customers.  I
performed the following related to these handwritten documents:

- Analyzed month-end Handwritten Ledgers and month-end Daily Sheets for the 10
  Year Period and reconciled the activity reflected on these documents to BLMIS bank
  records and BLMIS customer deposits and withdrawals with month-end dates
  reflected on customer statements,[15] to determine the reliability of these documents
  during the period prior to December 1998 (the "Pre-10 Year Period") when BLMIS
  bank records were not available.

- Analyzed month-end Handwritten Ledgers and month-end Daily Sheets for the
  Pre-10 Year Period and reconciled BLMIS customer deposits and withdrawals with
  month-end dates reflected on customer statements to the cash activity reflected on
  these handwritten documents,[16] to determine if these handwritten documents
  consistently reflected customer cash deposits and withdrawals.

B. _ANALYSIS OF HANDWRITTEN DOCUMENTS IN THE 10 YEAR PERIOD_

35.         My team and I analyzed the activity reflected on the month-end Handwritten

Ledgers and month-end Daily Sheets during the 10 Year Period and reconciled this activity to

BLMIS bank records and BLMIS customer cash transactions reflected on customer statements.

During the 10 Year Period, the activity on both the Handwritten Ledgers and Daily Sheets was

primarily related to JPMorgan Chase.  There were also documents reflecting activity for

Bankers Trust and Bank of New York in December 1998 and early 1999.  The following

---

[15]  The month-end documents consisted of 128 Handwritten Ledgers and 128 Daily Sheets from December 1998 to
November 2008.  In addition, when applicable, we analyzed the handwritten documents, bank records and customer
statements for the days before or after the month-end date being analyzed, or on a date that was identified in the
transaction description as reflected on the BLMIS customer statements.
[16]  These month-end documents consisted of 162 Handwritten Ledgers and 162 Daily Sheets from April 1994 to
November 1998 and 66 Handwritten Ledgers from December 1990 to March 1994.  Again, as noted above, when
applicable, we analyzed the handwritten docu`ments and customer statements for the days before or after the
month-end date being analyzed, or on a date that was identified in the transaction description as reflected on the
BLMIS customer statements.

**AA307**

categories of cash activity for a given day were included in both the Handwritten Ledgers and

Daily Sheets (with some variations in column headings or line items):

- "Checks Out" – customer withdrawals via check (separately for the 703 Account,
  the 509 Account, and when applicable, the BT Account);

- "My Deposits" – customer deposits via check (into the 703 Account);

- "Wires" – each wire transfer was listed separately, with a BLMIS customer name, or
  abbreviated name, noted next to or near the amount (703 Account and BT Account);

- "Tony In" / "Tony Out" – increases or decreases in loan balances;[17]

- "Trans" – transfers between banking institutions;[18]

- Check Returns, Stop Payments; and

- Balance – running balance on the Handwritten Ledgers and daily beginning and
  ending balance on the Daily Sheets.

36.      I reconciled customer cash activity reflected in the categories listed above to BLMIS

bank records and customer cash activity reflected on BLMIS customer statements.[19]  Of the

approximately 4,700 cash deposit and cash withdrawal transactions dated month-end between

December 1998 and December 2008 reflected on BLMIS customer statements, I reconciled over

99% to both the handwritten documents and the BLMIS bank records.  Therefore, I can

reasonably conclude that these handwritten documents can be relied upon as an indication of

BLMIS customer cash activity in the absence of BLMIS bank records during the period prior to

December 1998.  Further, based on my analysis of these documents, I found that the

information contained on the Handwritten Ledgers was consistent with the information

contained on the Daily Sheets.[20]

---

[17] From December 1998 through March 1999.
[18] From December 1998 through April 1999.
[19] There were instances when we reconciled multiple transactions reflected in the BLMIS bank records and/or BLMIS customer statements to a single amount reflected on the Handwritten Ledgers and/or Daily Sheets.  For example, customer cash withdrawals written via check from the 509 Account that related to cash withdrawals from multiple BLMIS customer accounts appeared as one amount on the Handwritten Ledgers.  In this case, we reconciled the amount of "Checks Out" to a combination of multiple BLMIS customer cash withdrawal transactions.
[20] *See also* trial testimony of Winifier Jackson, 1105:13 – 1105:16, *United States v. Bonventre et al.*, No. 10 Cr. 228 (LTS) (S.D.N.Y.).

**AA308**

37.        In addition, I noted that non-customer related transactions were reflected on the
handwritten documents, including, for example, transfers to/from other BLMIS or Madoff bank
accounts.  I reconciled this activity to the BLMIS bank records.  I also noted certain transactions
reflected in the BLMIS bank records that were not included in the handwritten documents.
These transactions included bank charges, fees or other bank adjustments, and transfers from
the 703 Account to the Proprietary Trading Business.

38.        *See* **Exhibit 9** for an example of my analysis and reconciliation of the handwritten
documents for one month-end during the 10 Year Period.


C.    <u>*ANALYSIS OF HANDWRITTEN DOCUMENTS IN THE PRE-10 YEAR PERIOD*</u>

39.        My team and I also analyzed the activity reflected on the month-end Handwritten
Ledgers and month-end Daily Sheets during the Pre-10 Year Period.  From April 1994 through
November 1998, we compared the month-end cash deposits and withdrawals reflected on
BLMIS customer statements to month-end activity on the Handwritten Ledgers and Daily
Sheets.  From December 1990 through March 1994, we compared the month-end cash deposits
and withdrawals reflected on BLMIS customer statements to month-end activity on the
Handwritten Ledgers (as the Daily Sheets were not available during this time period).  *See*
**Exhibit 10** for an example of my analysis and reconciliation of the handwritten documents for
one month-end during the Pre-10 Year Period.

40.        Based on my analysis of month-end dates, the handwritten documents in the Pre-10
Year Period reflected similar categories of cash activity as described above in the section
regarding my analysis of the 10 Year Period.  More specifically, in the Pre-10 Year Period, I
found a consistent pattern of cash activity where BLMIS customer cash deposits were reflected
on the handwritten documents as deposits into bank accounts used by the IA Business for cash
transactions with customers (*i.e.,* accounts at JPMorgan Chase and Bankers Trust), and
customer cash withdrawals were reflected on the handwritten documents as outflows from
these same bank accounts.  Of the approximately 5,000 cash deposit and cash withdrawal

**AA309**

transactions dated month-end between December 1990 and November 1998 reflected on BLMIS customer statements, I reconciled approximately 94% to the handwritten documents.[21]

41.        I also reviewed handwritten notebooks maintained by BLMIS employees that included notes and instructions on various topics, including, but not limited to, how to "Write your check card," which appears to be detailed instructions on preparing the Handwritten Ledgers.  One of these notebooks contained the date "8-1-83" on the cover.[22]  Based on my review, the step-by-step instructions followed the columns and information contained on the available Handwritten Ledgers.

42.        BLMIS employees used the balance reflected on the Handwritten Ledgers for the JPMorgan Chase account to perform the monthly bank reconciliation of the balance in the 703 Account, referred to in BLMIS's records as "Bank Reconcilements."  Dan Bonventre, who, along with Ruth Madoff, was responsible for the reconciliation of the balance in the 703 Account,[23] stated in his criminal trial testimony that "Jodi kept cash figures on index cards [*i.e.*, the Handwritten Ledgers] and … when it was completed, [I] would go downstairs and take a look at her cards just to make sure that the balance she showed on the card was the same as the one that we were using to do this reconciliation [of the 703 Account]."[24]  Based on my review of the available Bank Reconcilements for months in the Pre-10 Year Period (available back to January 1995), these documents reconciled "Our Balance," which agreed to the balance reflected on the Handwritten Ledgers, to the "Bank Balance," which agreed to the 703 Account balance per available bank reports.

---

[21] Compared to the 10 Year Period, I noted in the Pre-10 Year Period more instances of BLMIS customer cash transactions not reflected on the handwritten documents.  More specifically, I identified customer cash withdrawals dated month-end totaling approximately $112 million that were missing from the month-end handwritten documents in the Pre-10 Year Period.  Of this total, $106 million, or approximately 95%, related to cash withdrawals from two BLMIS customer accounts – 1L0027 held by NORMAN F LEVY and 1FN007 held by BANQUE FINAMA.  Similarly, I identified customer cash deposits dated month-end totaling approximately $25 million that were missing from the month-end handwritten documents in the Pre-10 Year Period.  Of this total, $12 million, or close to 50%, related to cash deposits in 1L0027 held by NORMAN LEVY.

[22] *See* MADTSS00976520 – MADTSS00976598.

[23] *See* trial testimony of Daniel Bonventre, 9558:16 – 9559:6; 9830:16 – 9830:21.  *See also* trial testimony of Frank DiPascali, 4964:1 – 4964:2.

[24] *See* trial testimony of Daniel Bonventre, 9565:18 – 9566:1.  *See also* trial testimony of Daniel Bonventre, 10079:2 – 10079:6.

**AA310**

D. *RESULTS OF ANALYSIS*

43.        Based on my review and analysis of the month-end Handwritten Ledgers and
month-end Daily Sheets during the 10 Year Period, I found that these documents reflected
BLMIS customer cash deposits and cash withdrawals, which I reconciled to both BLMIS bank
records and BLMIS customer statements.  Therefore, I can reasonably conclude that these
handwritten documents can be relied upon as an indication of BLMIS customer cash activity in
the absence of BLMIS bank records during the Pre-10 Year Period.

44.        Based on my review and analysis of the handwritten documents for month-ends in
the Pre-10 Year period back to December 14, 1990, I found a consistent pattern of cash activity
where BLMIS customer cash deposits were reflected on the handwritten documents as deposits
into bank accounts used by the IA Business for cash transactions with customers, and customer
cash withdrawals were reflected on the handwritten documents as outflows from these same
bank accounts.  This customer cash activity is consistent with the activity in the 10 Year Period.
Also consistent with the 10 Year Period, I saw no disbursement of funds for the purchase of
stocks or equities on behalf of customers of the IA Business, nor did I see any receipt of funds
from the sale of stocks or equities reflected on the month-end handwritten documents that I
analyzed from the Pre-10 Year Period.

## VII. ANALYSIS OF NON-CUSTOMER ACTIVITY IN THE 703 ACCOUNT

A. *OVERVIEW*

45.        As noted above, **Exhibit 4** to this report sets forth the results of my analysis of the
activity in the 703 Account based on available bank records for the 10 Year Period, defined
above as the period December 1998 to December 2008.  **Exhibit 4** includes a summary of the
703 Account activity which separates the activity into three categories: 1) Customer
Transactions, 2) Investment Flows, and 3) Other Transactions.

46.        My Global Reconciliation, as described in **Section V** above, covers the first category
– Customer Transactions.  This section of my report will address the other two categories –
Investment Flows and Other Transactions.  Specifically, I was asked to identify and analyze

**AA311**

this remaining activity in the 703 Account that I did not reconcile to BLMIS customer cash deposits or withdrawals, to determine whether this activity was for BLMIS's cash management purposes.[25]  To do this, I performed the following:

- Analyzed transactions relating to short-term investments made directly from the 703 Account to determine: (a) the types, amounts, and timing of these short-term investments, and (b) the related income earned on the investments; and

- Analyzed other transactions in the 703 Account, including transfers to and from bank and brokerage accounts held in the name of BLMIS or Madoff, to determine: (a) the amounts and timing of the flow of funds between the 703 Account and the brokerage accounts, (b) the types, amounts, and timing of investments made from these brokerage accounts, and (c) the related income earned on investments in the brokerage accounts.

B.  *SHORT-TERM INVESTING ACTIVITY IN THE 703 ACCOUNT*

47.        As indicated in **Figure 1** in **Section V** above, 0.4% of the inflows into the 703 Account during the 10 Year Period was income from short-term investments made directly from the 703 Account.  BLMIS invested excess cash in the 703 Account on a regular basis, to earn interest rather than having excess cash sit idle.[26]  The types of investments made from the 703 Account, as described further below and as summarized on **Exhibit 11**, are short-term, highly liquid, and low-risk investments.[27]  The activity described below represents different types of investments used to earn interest on excess cash and supports that the short-term investments made from the 703 Account were made for BLMIS's cash management purposes and not on behalf of any individual BLMIS customer.[28]

---

[25] For purposes of my report, cash management refers to managing excess cash in the 703 Account by investing funds to earn interest, while maintaining liquidity for when funds are needed.

[26] *See also* trial testimony of Walter Tiletnick, 3604:19 – 3606:22.

[27] *See also* **Exhibit 17** for a schedule of the combined IA Business monthly cash and investment balances.  This exhibit also includes the monthly amount of net customer cash deposits and withdrawals.

[28] Between December 1998 and March 2005, transfers from the 703 Account to the Proprietary Trading Business equaled, or approximated, the interest earned on short-term investments in the 703 Account.

**AA312**

<u>**Overnight Sweeps**</u>

48.         An overnight sweep generally occurs for amounts that exceed a certain level in a
bank account.  Excess amounts in a bank account get swept into a higher interest-earning
investment at the close of each business day.  Between February 2002 and December 2008, there
were overnight sweeps from the 703 Account on a daily basis, and contained "OVERNIGHT",
"SWEEP" and/or "END-OF-DAY" in the transaction description.  The amount swept overnight
was transferred back into the 703 Account the next day along with interest that was earned
overnight.

<u>**Overnight Deposits**</u>

49.         An overnight deposit is another means by which excess cash in a bank account is
invested.  An overnight deposit is a short-term account that earns a fixed interest rate for a one
day term.  Between December 1998 and December 2008, there were overnight deposits from
the 703 Account on a daily basis, and contained "NASSAU DEPOSIT TAKEN" or
"JPMORGAN CHASE & CO DEP TAKEN" in the transaction description.  The amount of the
prior business day's deposit plus interest earned was transferred back into the 703 Account the
next day.

<u>**Commercial Paper**</u>

50.         Commercial paper is another short-term investment option to invest excess cash in a
bank account.  Commercial paper is an unsecured investment that typically matures within 30
days or less.  Between December 1998 and February 2006, there were purchases of commercial
paper from the 703 Account that matured within 1 to 7 days and contained "PURCH OF/SALE
OF CHEM COMM PAPER" or "PURH OF/SALE OF JPMORGAN CHASE CP" in the
transaction description.  When the commercial paper matured, the amount of the original
investment was transferred back into the 703 Account along with interest that was earned on
the short-term investment.

**AA313**

## Certificates of Deposit

51.      There were two other types of short-term investments that I have categorized as
Certificates of Deposit (CDs) for purposes of summarizing the activity in the 703 Account, as
shown on **Exhibit 4**.[29]  Generally, CDs refer to time deposits with a bank.

- Between December 1998 and September 2005, there were investments of funds in
  the 703 Account with a reference to a "PURCHASE", "MATURITY" and
  "INTEREST" by "TICKET" number.  These short-term investments were held for 6
  to 90 days.  When the investments matured, the amount of the corresponding
  purchase (matched by ticket number) was transferred back into the 703 Account
  along with interest that was earned during the time the amount was invested (again
  matched by ticket number).

- Between August 2006 and August 2008, there were investments of funds in the 703
  Account with references in the transaction description to "BOOK TRANSFER
  DEBIT A/C: D323522B45."  These short-term investments were held for 6 to 28 days.
  When the investment matured, the amount of the original investment plus interest
  earned was transferred back into the 703 Account.  The amounts invested in this
  type of short-term investment between August 2006 and August 2008 were close to
  $1 billion to over $3 billion.  During this same time period, customer cash deposits
  were exceeding customer cash withdrawals, contributing to excess cash in the 703
  Account, further supporting the use of these short-term investments for cash
  management purposes.[30]

## Treasury Bills

52.      Consistent with the other short-term investments described above, excess cash from
the 703 Account was invested in Treasury Bills.[31]  The majority of the investments in Treasury

---

[29]  *See* trial testimony of Frank DiPascali, 4960:15 – 4961:13.  *See also* MADTSS01318062.
[30]  *See* **Exhibit 17.**
[31]  *See* trial testimony of Frank DiPascali, 4931:12 – 4931:23.

**AA314**

Bills made directly from the 703 Account occurred between March 2007 and August 2008 - a time period when customer cash deposits were exceeding customer cash withdrawals, contributing to excess cash in the 703 Account.[32]

53.        Treasury Bills are low-risk, highly liquid investments that are easily converted to cash.  Investments in Treasury Bills were made via transfers from the 703 Account to a broker, National Financial Services Corp. ("NFS").  NFS would then deliver the Treasury Bills to a custody account held at JPMorgan Chase by BLMIS ("JPMC G 13414 Account").  When the Treasury Bills held in BLMIS's JPMC G 13414 Account were sold or redeemed, the cash proceeds from the sale or redemption of the Treasury Bills were transferred from NFS to the 703 Account.

54.        Treasury Bills purchased from the 703 Account were held for periods ranging from six days to four and a half months.  Through September 2008, Treasury Bills purchased from the 703 Account were held to maturity, rather than being sold early.  Beginning in October 2008, when customer withdrawals were exceeding customer deposits and BLMIS had an increasing need for cash, Treasury Bills purchased from the 703 Account were sold prior to maturity, further supporting the use of Treasury Bills as a cash management tool by BLMIS.

55.        Approximately $110 million of earnings on Treasury Bills held in the JPMC G 13414 Account (*i.e.*, the difference between the purchase price of the Treasury Bills and the proceeds received when redeemed or sold) was received in the 703 Account between June 2007 and November 2008.  *See* **Exhibit 12** for the detail of the purchases and sales/redemptions of Treasury Bills held in the JPMC G 13414 Account, including the interest earned on each sale.

C.    *ACTIVITY IN BROKERAGE ACCOUNTS*

56.        In addition to the short-term investments made directly from the 703 Account as described above, BLMIS also made investments with funds transferred from the 703 Account to certain brokerage accounts held by BLMIS or Madoff for BLMIS's cash management purposes.  The "Other Transactions" section of the summary of activity in the 703 Account attached as

---

[32] *See* **Exhibit 17**.

**AA315**

**Exhibit 4** includes line items for other incoming and outgoing wires and other incoming and

outgoing checks.  **Exhibit 13**, which is a schedule detailing these other incoming and outgoing

wires and other incoming and outgoing checks, shows that a significant portion of this other

activity relates to transfers to and from the 703 Account and eight brokerage accounts held by

BLMIS or Madoff at various financial institutions (the "8 Brokerage Accounts").

57.        The 8 Brokerage Accounts, which, as further discussed below, were used by BLMIS

for cash management purposes, received funds solely from the 703 Account and invested these

funds primarily in money market funds, Treasury Bills, and other low-risk, US government

securities.[33]  The 8 Brokerage Accounts transferred funds back to the 703 Account, as well as to

the Proprietary Trading Business.[34]  **Figure 6** below is a flowchart of the activity in the 8

Brokerage Accounts:

---

[33] *See also* trial testimony of Frank DiPascali, 4961:22 – 4962:9.

[34] I identified instances where the transfers from certain of the 8 Brokerage Accounts to the Proprietary Trading
Business equaled the interest earned in the brokerage account from which the transfer to the Proprietary Trading
Business was made.  For example, on November 26, 2004, there were two transfers from one of the 8 Brokerage
Accounts (the Bear Stearns 698 Account) to the Proprietary Trading Business (BONY 621 Account) totaling
$13,805,109.  Available handwritten notes from BLMIS's records reference "$13,805,108.64 from Bear on Friday
11/26," and a supporting calculation of this total amount includes "Interest for 2004 from BEST T-B Acct" of
$8,277,708 "thru Nov." This exact amount appears on the monthly account statement for the Bear Stearns 698
Account for the period ending October 29, 2004 as Year to Date income on government securities.  *See* PUBLIC-
USAO_1013122; PUBLIC-USAO_0960238; BSTSAC0000162.

**AA316**

Figure 6
Flowchart of Activity in 8 Brokerage Accounts



58.    **Exhibit 14** is a summary chart of the 8 Brokerage Accounts and **Exhibit 15.1 –**

**Exhibit 15.8** contain the detailed activity in each of the 8 Brokerage Accounts.  These exhibits

identify the types of securities held in each of the 8 Brokerage Accounts, including various

types of US government securities, which are unlike the equity securities purportedly held in

the BLMIS customer accounts.

59.    To further support that the 8 Brokerage Accounts were used for cash management

purposes by BLMIS, I analyzed the timing of the transfers between the 703 Account and the 8

Brokerage Accounts.  Based on this analysis, I found that transfers were made *from* the 703

Account to the 8 Brokerage Accounts when the combined 703 Account and short-term

investments balance was increasing.  For example, as of the end of November 1999, the

combined 703 Account and short-term investments balance had increased to over $1 billion.

During the next month, in December 1999, BLMIS transferred a total of $300 million to two of

27

**AA317**

the 8 Brokerage Accounts, which, in turn, invested the funds in various government securities.
*See* **Exhibit 15.3**, **Exhibit 15.5** and **Exhibit 17**.

60.       Conversely, transfers were made *to* the 703 Account from the 8 Brokerage Accounts
when the combined 703 Account and short-term investments balance was decreasing.  For
example, as of the end of September 2001, the combined 703 Account and short-term
investments balance decreased to approximately $100 million from close to $500 million earlier
in 2001.  During the next month, in October 2001, BLMIS transferred over $200 million to the
703 Account from two of the 8 Brokerage Accounts.  *See* **Exhibit 15.1**, **Exhibit 15.5** and **Exhibit
17**.

61.       In addition, I noted that while there were over 30,000 customer cash deposits into
the 703 Account on over 2,000 different days between December 1998 and December 2008
(based on my analysis of the 703 Account described above in **Section V**), there were only 21
transfers from the 703 Account to the 8 Brokerage Accounts on only 14 different days during
this same period.  Further, the transfers from the 703 Account to the 8 Brokerage Accounts
were made in large, round dollar denominations (*i.e.*, all but two were between $25 million and
$150 million), and were used to purchase large quantities of money market funds and debt
instruments, such as Treasury Bills and other government securities.

D.   _RESULTS OF ANALYSIS_

62.       Based on my analyses described above, I have concluded that the investing activity
in the 703 Account and the 8 Brokerage Accounts, including purchases and sales of Treasury
Bills, was for BLMIS's cash management purposes.  Further, in all my analyses described
above, I did not see any reference to specific BLMIS customers in transaction descriptions for
the 703 Account short-term investments or activity in the 8 Brokerage Accounts, and therefore,
I have also concluded that this activity was not for any particular customer account.[35]

---

[35] *See also* trial testimony of Frank DiPascali, 4803:23 – 4804:12.

28

**AA318**

## VIII. INTEREST EARNED ON TREASURY BILLS

### A. *OVERVIEW*

63.       I was asked to determine whether the interest earned on Treasury Bills (*i.e.*, the difference between the proceeds received and the purchase price of the Treasury Bills) purchased directly or indirectly with funds from the 703 Account was sufficient to pay BLMIS customer withdrawals.  To do this, I first determined the total amount of interest earned on Treasury Bills held in the JPMC G 13414 Account and in six of the 8 Brokerage Accounts each year during the 10 Year Period.  *See* **Exhibit 12** and **Exhibit 16**.  I then compared the annual interest amounts to the total amount of BLMIS customer withdrawals each year and calculated the interest as a percentage of total customer withdrawals.

### B. *RESULTS OF ANALYSIS*

64.       The annual interest earned on Treasury Bills held in the JPMC G 13414 Account and six of the 8 Brokerage Accounts ranged from 0% to 1% of the annual customer withdrawals during the 10 Year Period.  More specifically, during 1999, there was no interest earned on Treasury Bills, while there were over $17 billion in customer withdrawals.  In 2000, there was approximately $229,000 earned on Treasury Bills compared to over $25 billion in customer withdrawals, representing .001%.  For each year from 2001 – 2008, total annual interest on Treasury Bills ranged from $1.8 million to $73.2 million compared to customer withdrawals that ranged from $3.5 *billion* to $37.6 *billion*.  **Figure 7** below is a graphical depiction of the annual comparison.  *See also* **Exhibit 18**.

**AA319**

**Figure 7**

**Interest Earned on IA Business Treasury Bills  vs. Total BLMIS Customer Withdrawals**



65.        Therefore, I conclude that the interest earned on Treasury Bills purchased directly or indirectly with funds from the 703 Account was insufficient to pay BLMIS customer withdrawals.

**AA320**

## IX. SIGNATURE AND RIGHT TO MODIFY

66.      This report and the exhibits contained herein present my findings and the bases

thereof.  To the extent that any additional information is produced by any party, I reserve the

right to incorporate such additional information into my report or to modify my report as

necessary.

By:

Lisa M. Collura, CPA, CFE, CFF
January 16, 2019

**AA321**

# X. LIST OF EXHIBITS

Exhibit 1:   Curriculum Vitae
Exhibit 2:   Documents Considered
Exhibit 3:   List of Known BLMIS/Bernard L. Madoff Bank and Brokerage Accounts
Exhibit 4:   Excel Spreadsheet "JPMC 703 Account Activity – December 1998 to December 2008"
Exhibit 5:   Excel Spreadsheet "JPMC 509 Account Activity – December 1998 to December 2008"
Exhibit 6:   Excel Spreadsheet "BT 599 Account Activity – December 1998 to May 1999"
Exhibit 7:   Example of a Handwritten Ledger
Exhibit 8.1:  Example of Daily Sheets Pre-November 1998
Exhibit 8.2:  Example of a Daily Sheet Post-November 1998
Exhibit 9:   Example of Analysis of Handwritten Documents in 10 Year Period
Exhibit 10: Example of Analysis of Handwritten Documents in Pre-10 Year Period
Exhibit 11: Summary Chart of Short-Term Investments in the 703 Account
Exhibit 12: Treasury Bill Activity in JPMC G 13414 Account
Exhibit 13: Detail of Other Wires and Checks in/out of the 703 Account
Exhibit 14: Summary Chart of the 8 Brokerage Accounts
Exhibit 15.1: Bear Stearns 698 Account Activity
Exhibit 15.2: Fidelity 043 Account Activity
Exhibit 15.3: Lehman 398 Account Activity
Exhibit 15.4: Lehman 152 Account Activity
Exhibit 15.5: Morgan Stanley 719 Account Activity
Exhibit 15.6: BONY 239 Account Activity
Exhibit 15.7: Lehman 435 Account Activity
Exhibit 15.8: M&T 039 Account Activity
Exhibit 16: Treasury Bill Activity in Six of the 8 Brokerage Accounts
Exhibit 17: IA Business Monthly Cash & Investment Balances
Exhibit 18: Interest Earned on Treasury Bills vs. Total BLMIS Customer Withdrawals

**AA322**

# EXHIBIT 3

**EXHIBIT 3**

### List of Known BLMIS/Madoff Bank and Brokerage Accounts

| Name on Account Statement - 1 | Name on Account Statement - 2 | Date of Name Change | Banking / Financial Institution[1] | Account Number | Earliest Available Statement[2] | Latest Available Statement |
|---|---|---|---|---|---|---|
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bank of America | xxx-x8229 | Dec-06 | Feb-09 |
| Bernard L. Madoff | No Change | n/a | Bank of America | xxxx-x-x0329 | Dec-98 | Jun-01 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bank of New York | xx4239 | Mar-05 | May-07 |
| Master Trust - Master Custody Account / Bernard L Madoff | Custodian Account / Bernard L Madoff | Dec-00 | Bank of New York | xx6715 | Jul-99 | Jun-09 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bank of New York | xxx-xx0052 | May-08 | Dec-08 |
| Bernard L. Madoff | No Change | n/a | Bank of New York | xxx-xxx1050 | Jul-99 | May-09 |
| Bernard L Madoff / Ruth Madoff | No Change | n/a | Bank of New York | xxx-xxx2156 | Jan-02 | Dec-02 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bank of New York | xxx-xxx2-393 | Jul-99 | Jan-09 |
| Bernard L. Madoff / Ruth Madoff | No Change | n/a | Bank of New York | xxxxxx2690 | Dec-97 | Jul-10 |
| Bernard L. Madoff | No Change | n/a | Bank of New York | xxx-xxx3-878 | Jan-98 | Apr-00 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bank of New York | xxx-xxx4-391 | May-03 | Jan-09 |
| Bernard L. Madoff | No Change | n/a | Bank of New York | xxx-xxx6-412 | Jun-99 | May-09 |
| Bernard L. Madoff | Bernard L Madoff Investment Securities LLC | May-01 | Bank of New York | xxx-xxx6-621 | Jan-98 | Jan-09 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bank of New York | xxx-xxx6-918 | Sep-03 | Feb-09 |
| Bernard L. Madoff | Bernard L Madoff Investment Securities LLC | May-01 | Bank of New York | xxx-xxx7-065 | Jun-00 | Aug-07 |
| Bernard L. Madoff | Bernard L Madoff Investment Securities LLC | May-01 | Bank of New York | xxx-xxx7-826 | Jan-98 | Jan-09 |
| Bernard L. Madoff | Bernard L Madoff Investment Securities LLC | May-01 | Bank of New York | xxx-xxx9-934 | Jan-98 | Jan-09 |
| Bernard L Madoff Securities LLC | No Change | n/a | Bank of New York / Pershing LLC (Imperial Capital) | xxx-xx7646 | Apr-08 | Dec-08 |
| Bernard L Madoff Securities | No Change | n/a | Bank of New York / Pershing LLC (Janco Partners Inc) | xxx-xx2296 | Mar-05 | Dec-08 |
| Bernard L. Madoff | No Change | n/a | Bank of New York / Pershing LLC (Link Brokers Derivatives Corporation) | xxx-xx1141 | Oct-08 | Dec-08 |
| Bernard L Madoff Inv Sec LLC c/o Bernard L Madoff Inv Sec LLC | No Change | n/a | Bank of New York / Pershing LLC (Merriman Curhan Ford) | xxx-xx0425 | Dec-07 | Dec-08 |
| Bernard L Madoff Inv Sec LLC c/o Bernard L Madoff Inv Sec L | No Change | n/a | Bank of New York / Pershing LLC (Merriman Curhan Ford) | xxx-xx3028 | Jun-06 | Sep-08 |
| Bernard L Madoff Inv Sec LLC c/o Bernard L Madoff Inv Sec LLC | No Change | n/a | Bank of New York / Pershing LLC (Merriman Curhan Ford) | xxx-xx5612 | Aug-08 | Sep-08 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bank of New York / Pershing LLC (Pali Capital Inc) | xxx-xx5078 | Mar-08 | Dec-08 |
| Bernard L. Madoff | No Change | n/a | Bank of Tokyo | xxx-xx0025 | Nov-98 | Dec-98 |
| Bernard L. Madoff | No Change | n/a | Bankers Trust Company | xx-xx0-417 | Dec-98 | Jan-01 |
| Bernard L. Madoff | No Change | n/a | Bankers Trust Company | xx-xx0-599 | Dec-98 | Jul-00 |
| Madoff, Bernard L. | No Change | n/a | Banque Nationale de Paris | xxx-xxxxxx-xxx-x00-47 | Nov-98 | Mar-00 |
| Bernard L. Madoff Inv LLC | No Change | N/a | Barclays / Lehman | xxx1370 | May-07 | Aug-08 |
| Bernard L. Madoff | No Change | n/a | Barclays / Lehman | xxx8820 | Sep-04 | Dec-05 |
| Bernard L Madoff Inv Sec | No Change | n/a | Barclays / Lehman | xxx-x1151 | Dec-06 | Feb-07 |
| Bernard L. Madoff | No Change | n/a | Barclays / Lehman | xxx-x1172 | Feb-05 | Jun-07 |
| Bernard L Madoff Inv Sec | No Change | n/a | Barclays / Lehman | xxx-x1574 | Dec-06 | Dec-06 |
| Bernard L. Madoff | No Change | n/a | Barclays / Lehman | xxx-x3646 | Oct-06 | Nov-07 |
| Bernard L Madoff Inv Sec | No Change | n/a | Barclays / Lehman | xxx-x3680 | Jul-07 | Jul-08 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Barclays / Lehman | xxx-x4435 | May-07 | Nov-08 |
| Bernard L. Madoff | No Change | n/a | Barclays / Lehman | xxx-x6152 | Jun-03 | May-06 |
| Bernard L Madoff Inv Sec | No Change | n/a | Barclays / Lehman | xxx-x7981 | Feb-07 | May-07 |
| Bernard L Madoff Inv Sec | No Change | n/a | Barclays / Lehman | xxx-x8624 | Jan-07 | May-07 |
| Bernard L. Madoff | No Change | n/a | Barclays / Lehman | xxx-x4398 | Jan-00 | Nov-08 |
| Mr ou Mme Bernard Madoff | No Change | n/a | Barclays Bank PLC | xxxxxx x 01 01 | Dec-03 | Nov-08 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bear Stearns | xxx-xxxx1 418 | May-05 | Sep-08 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bear Stearns | xxx-xxxx1 JJ4 | May-05 | Mar-08 |
| Bernard L. Madoff | Bernard L Madoff Investment Securities LLC | May-04 | Bear Stearns | xxx-x2698 | Jun-98 | Apr-06 |
| Bernard Madoff Securities LLC | No Change | n/a | Bear Stearns Securities Corp (American Technology Research) | xxx-xxxx9 999 | May-07 | Dec-08 |

**AA324**

08-01789-cgm    Doc 18578-3    Filed 03/18/19    Entered 03/18/19 13:30:42    Appendix
10-04995-smb    Doc 1273-1    Filed 01/25/19    Entered 01/25/19 16:34:34    Exhibit
Vol II Pg 124 of 137    Pg 127 of 137

EXHIBIT 3

**List of Known BLMIS/Madoff Bank and Brokerage Accounts**

| Name on Account Statement - 1 | Name on Account Statement - 2 | Date of Name Change | Banking / Financial Institution[1] | Account Number | Earliest Available Statement[2] | Latest Available Statement |
|---|---|---|---|---|---|---|
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bear Stearns Securities Corp (Cohmad Securities Corp) | xxx-xxxx1 018 | May-01 | Feb-06 |
| Madoff Investment Securities FAO Madoff Inv Securities | No Change | n/a | Bear Stearns Securities Corp (Friedman, Billings Ramsey & Co) | xxx-xxxx2 R55 | Apr-06 | Mar-08 |
| Madoff Investment | No Change | n/a | Bear Stearns Securities Corp (Gabelli & Company Inc) | xxx-xxxx7 125 | Apr-08 | Sep-08 |
| Bernard L Madoff Sec LLC | No Change | n/a | Bear Stearns Securities Corp (Johnson Rice & Co LLC) | xxx-x3396 | May-05 | Dec-07 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bear Stearns Securities Corp (Miller Tabak + Co LLC) | xxx-xxxx8 976 | Jun-05 | Sep-08 |
| Bernard L Madoff | No Change | n/a | Bear Stearns Securities Corp (Miller Tabak Roberts Securities LLC) | xxx-xxxx7 S10 | Jan-07 | Dec-08 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bear Stearns Securities Corp (Needham & Company LLC) | xxx-xxxx3 605 | Jul-07 | Mar-08 |
| Bernard L Madoff Investments Securities LLC | No Change | n/a | Bear Stearns Securities Corp (Order Execution Services LLC) | xxx-xxxx6 001 | Jan-05 | Jan-07 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Bear Stearns Securities Corp (Pali Capital Inc) | xxx-xxxx6 400 | Jan-07 | Mar-08 |
| Bernard L Madoff Investment | No Change | n/a | CIBC | xxx-x0217 | Dec-08 | Apr-09 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | CIBC | xxxxxx0626 | Dec-05 | Dec-05 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | CIBC | xxxxxx7326 | Dec-05 | Dec-05 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Citi Smith Barney | xxx-xxxx31-12 | Apr-06 | Aug-08 |
| Bernard L. Madoff | No Change | n/a | Citigroup | xxx-xxx46-11 | Aug-99 | Sep-08 |
| Bernard L. Madoff | No Change | n/a | Commerce Bank NA / TD Bank NA | xxx-xx0814 | Dec-08 | Dec-08 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Credit Suisse | xG8DD | Feb-05 | Dec-08 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Credit Suisse | xxx-xx9386 | Apr-08 | May-09 |
| Bernard L. Madoff Investment Securities | No Change | n/a | Fidelity | xxx-xx0027 | May-05 | May-05 |
| B L Madoff Investment Sec | No Change | n/a | Fidelity | xxx-xx2622 | Nov-92 | Jan-09 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Fidelity | xxx-xx6507 | May-93 | Jul-94 |
| Bernard L. Madoff | No Change | n/a | Fidelity | xxx-xx9043 | Aug-98 | May-09 |
| Madoff Investment Securities FAO Bernard L Madoff | No Change | n/a | Fidelity / National Financial Services (Batenkill Capital) | xxx-xx0150 | Jan-05 | Sep-05 |
| Bernard L Madoff Invst Secs | Bernard L. Madoff Invst Sec / Broker Dealer A/C | Oct-05 | Fidelity / National Financial Services (Gordon Haskett Capital Corp) | xxx-xx7532 | Mar-07 | Mar-07 |
| Bernard L Madoff Invst Secs LLC / Madoff | No Change | n/a | Fidelity / National Financial Services (Kaufman Brothers LP) | xxx-xx0425 | Oct-08 | Nov-08 |
| Bernard Madoff Invst Secs LLC | No Change | n/a | Fidelity / National Financial Services (Ladenburg Thalmann & Co Inc) | xxx-xx1185 | Jan-08 | Jan-08 |
| Bernard L Madoff Securities | No Change | n/a | Fidelity / National Financial Services (Thomas Weisel Partners) | xxx-xx7520 | May-06 | Nov-08 |
| Madoff | Broker Dealer Crd Acct Madoff | Oct-05 | Fidelity / National Financial Services (Tradetrek Securities) | xxx-xx2437 | Mar-06 | Apr-08 |
| Bernard L Madoff Inv Sec LLC | No Change | n/a | Jeffries & Co (Merriman Curhan Ford) | xxx-x8302 | Mar-06 | Jun-06 |
| Bernard Madoff Securities | No Change | n/a | Fox-Pitt, Kelton | xxx-xx1904 | Jul-08 | Aug-08 |
| Bernard L. Madoff Investment Securities | No Change | n/a | JPMorgan Chase | x x3414 | Apr-02 | Dec-08 |
| Bernard L. Madoff | Bernard L. Madoff Investment Securities | Sep-02 | JPMorgan Chase | x x4276 | Apr-98 | May-01 |
| Bernard L. Madoff | No Change | n/a | JPMorgan Chase | x 0686 | Dec-92 | May-98 |
| Bernard L. Madoff Investment Securities | No Change | n/a | JPMorgan Chase | xxxx9466 | Sep-07 | Feb-09 |
| Bernard L. Madoff | No Change | n/a | JPMorgan Chase | xxx-xx0700 | Dec-98 | Apr-02 |
| Bernard L. Madoff | No Change | n/a | JPMorgan Chase | xxx-xx1535 | Dec-98 | Apr-02 |
| Bernard L. Madoff | No Change | n/a | JPMorgan Chase | xxx-xx1543 | Dec-98 | Apr-02 |
| Bernard L. Madoff | Bernard L Madoff Investment Securities | Sep-02 | JPMorgan Chase | xxxxx1703 | Dec-98 | Mar-09 |
| Bernard Madoff / Ruth Madoff | No Change | n/a | JPMorgan Chase | xxxxxxxx8765 | Dec-01 | Nov-08 |
| Bernard L Madoff | Bernard L Madoff Investment Securities | Sep-02 | JPMorgan Chase | xxxxxxxxx1509 | Dec-98 | Mar-09 |
| Bernard L. Madoff - Expense | No Change | n/a | JPMorgan Chase | xxxx-xxxxx7-509 | Dec-98 | Feb-01 |

**EXHIBIT 3**

List of Known BLMIS/Madoff Bank and Brokerage Accounts

| Name on Account Statement - 1 | Name on Account Statement - 2 | Date of Name Change | Banking / Financial Institution[1] | Account Number | Earliest Available Statement[2] | Latest Available Statement |
|---|---|---|---|---|---|---|
| Bernard L. Madoff Investment Securities | No Change | n/a | JPMorgan Securities, Inc | xxx-xx4332 | Mar-07 | Nov-08 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | M & T Securities | xxx-xx4039 | May-07 | Mar-09 |
| Bernard L Madoff Inv Secs / Bernard L Madoff Invest Secur | No Change | n/a | Merrill Lynch | xxx-x5U55 | Oct-05 | Dec-07 |
| Bernard L Madoff Inv Secs / Bernard L Madoff Invest Secur | No Change | n/a | Merrill Lynch | xxx-x5U55 | Jul-08 | Nov-08 |
| Bernard L. Madoff | No Change | n/a | Morgan Stanley | xxx xx0719 | Dec-99 | Jul-09 |
| Bernard L. Madoff Investment Secs | No Change | n/a | Paribas | xxx-xxxxx-xxx-xx21-01 | Nov-98 | Apr-00 |
| Bernard L Madoff Inv Sec LLC | No Change | n/a | Raymond James | xxxx3532 | Nov-08 | Dec-08 |
| Bernard L Madoff Investment Securities | No Change | n/a | UBS Financial Services (previously held at ABN AMRO & The Chicago Corporation) | x xx x0733 | Mar-93 | Nov-08 |
| Bernard L Madoff Securities LLC | No Change | n/a | UBS Financial Services | xx xxx18 CG | Jan-05 | Nov-08 |
| Bernard L Madoff Investment Securities | No Change | n/a | Wachovia Capital Markets | xxxx4607 | Jan-08 | Dec-08 |
| Bernard L Madoff Investment Securities | No Change | n/a | Wall St Access | xxx-xx1975 | Apr-07 | Dec-08 |
| Bernard L Madoff Investment Securities LLC | No Change | n/a | Wall St Access | xxx-xx6906 | Jun-07 | Nov-07 |

[1]  The names in parentheses represent the financial advisor or broker-dealer associated with the listed account.

[2]  This date is based on the date of the earliest available account statement.  For some accounts, there may be non-statement documents related to the account that are dated earlier than the first available statement.

**AA326**

10-04995-smb   Doc 1291-1   Filed 01/25/19   Entered 01/25/19 16:04:37   Exhibit A
Pg 129 of 137

# EXHIBIT 12

08-01789-smb    Doc 18578-3    Filed 03/18/19    Entered 03/18/19 13:30:42    Appendix
Vol II    Pg 130 of 137
08-01789-smb    Doc 1257-3    Filed 01/25/19    Entered 01/25/19 16:54:37    Exhibit
Vol II    Pg 130 of 137

**EXHIBIT 12**

**Treasury Bill Activity in JPMC G 13414 Account - Purchases, Sales/Redemptions, and Interest**

| | | *Purchases of Treasury Bills* | | | | *Sales/Redemptions of Treasury Bills* | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CUSIP | Maturity Date | 703 ID(s)[1] | Purchase Date(s) | Total Face Value Purchased | Total Purchase Price | 703 ID(s)[1] | Sale/ Redemption Date(s) | Total Face Value Sold/Redeemed | Proceeds From Sale/Redemption | Interest (Proceeds Less Purchase Price) | Redeemed or Sold Prior to Maturity |
| 912795ZL8 | 6/14/2007 | 41739 41758 41759 41760 41761 41762 41787 | 3/13/2007 3/14/2007 3/15/2007 | $ 300,000,000 | $ 296,235,125 | 43075 | 6/14/2007 | $ 300,000,000 | $ 300,000,000 | $ 3,764,875 | Redeemed |
| 912795ZM6 | 6/21/2007 | 41781 41782 41783 41784 41785 41786 | 3/15/2007 | $ 300,000,000 | $ 296,035,083 | 43171 | 6/21/2007 | $ 300,000,000 | $ 300,000,000 | $ 3,964,917 | Redeemed |
| 912795ZU8 | 8/9/2007 | 42596 42597 42598 42599 42600 42601 | 5/9/2007 | $ 300,000,000 | $ 296,373,667 | 43844 | 8/9/2007 | $ 300,000,000 | $ 300,000,000 | $ 3,626,333 | Redeemed |
| 912795ZZ7 | 9/13/2007 | 43082 43083 43084 43085 43086 43087 | 6/14/2007 | $ 300,000,000 | $ 296,572,333 | 44295 | 9/13/2007 | $ 300,000,000 | $ 300,000,000 | $ 3,427,667 | Redeemed |
| 912795A27 | 9/20/2007 | 43188 43189 43190 43191 43192 43193 | 6/21/2007 | $ 300,000,000 | $ 296,534,417 | 44371 | 9/20/2007 | $ 300,000,000 | $ 300,000,000 | $ 3,465,583 | Redeemed |
| 912795A68 | 10/18/2007 | 43624 43625 43626 43853 43854 43855 | 7/24/2007 8/9/2007 | $ 300,000,000 | $ 296,872,625 | 44740 | 10/18/2007 | $ 300,000,000 | $ 300,000,000 | $ 3,127,375 | Redeemed |
| 912795A76 | 10/25/2007 | 43621 43622 43623 43856 43857 43858 | 7/24/2007 8/9/2007 | $ 300,000,000 | $ 296,597,302 | 44825 | 10/25/2007 | $ 300,000,000 | $ 300,000,000 | $ 3,402,698 | Redeemed |
| 912795A92 | 11/8/2007 | 43934 43935 43936 43937 | 8/15/2007 | $ 200,000,000 | $ 197,908,056 | 45008 | 11/8/2007 | $ 200,000,000 | $ 200,000,000 | $ 2,091,944 | Redeemed |
| 912795B26 | 11/15/2007 | 43956 43957 43958 43959 43960 43961 | 8/16/2007 | $ 300,000,000 | $ 296,724,000 | 45071 | 11/15/2007 | $ 300,000,000 | $ 300,000,000 | $ 3,276,000 | Redeemed |
| 912795B59 | 12/6/2007 | 44389 44390 44391 44392 44393 44394 | 9/20/2007 | $ 300,000,000 | $ 297,542,417 | 45346 | 12/6/2007 | $ 300,000,000 | $ 300,000,000 | $ 2,457,583 | Redeemed |
| 912795B67 | 12/13/2007 | 44316 44317 44318 44319 44320 44321 | 9/13/2007 | $ 300,000,000 | $ 297,027,333 | 45450 | 12/13/2007 | $ 300,000,000 | $ 300,000,000 | $ 2,972,667 | Redeemed |
| 912795B75 | 12/20/2007 | 43820 43821 43822 43823 43824 43825 | 8/7/2007 | $ 300,000,000 | $ 294,763,125 | 45574 | 12/20/2007 | $ 300,000,000 | $ 300,000,000 | $ 5,236,875 | Redeemed |

**AA328**

**Treasury Bill Activity in JPMC G 13414 Account - Purchases, Sales/Redemptions, and Interest**

| | | Purchases of Treasury Bills | | | | Sales/Redemptions of Treasury Bills | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CUSIP | Maturity Date | 703 ID(s)[1] | Purchase Date(s) | Total Face Value Purchased | Total Purchase Price | 703 ID(s)[1] | Sale/ Redemption Date(s) | Total Face Value Sold/Redeemed | Proceeds From Sale/Redemption | Interest (Proceeds Less Purchase Price) | Redeemed or Sold Prior to Maturity |
| 912795C33 | 1/17/2008 | 44756 44757 44758 44759 44760 44761 | 10/18/2007 | $ 300,000,000 | $ 296,943,917 | 46063 | 1/17/2008 | $ 300,000,000 | $ 300,000,000 | $ 3,056,083 | Redeemed |
| 912795C41 | 1/24/2008 | 44842 44843 44844 44845 44846 44847 | 10/25/2007 | $ 300,000,000 | $ 297,050,083 | 46172 | 1/24/2008 | $ 300,000,000 | $ 300,000,000 | $ 2,949,917 | Redeemed |
| 912795C58 | 1/31/2008 | 44936 44937 44938 44939 44940 44941 | 11/1/2007 | $ 300,000,000 | $ 297,103,167 | 46263 | 1/31/2008 | $ 300,000,000 | $ 300,000,000 | $ 2,896,833 | Redeemed |
| 912795C66 | 2/7/2008 | 45022 45023 45024 45025 | 11/8/2007 | $ 200,000,000 | $ 198,159,778 | 46440 | 2/7/2008 | $ 200,000,000 | $ 200,000,000 | $ 1,840,222 | Redeemed |
| 912795C90 | 2/28/2008 | 45368 45369 45370 45371 45372 45373 | 12/6/2007 | $ 300,000,000 | $ 297,921,000 | 46691 | 2/28/2008 | $ 300,000,000 | $ 300,000,000 | $ 2,079,000 | Redeemed |
| 912795D32 | 3/13/2008 | 45087 45088 45089 45090 45091 45092 | 11/15/2007 | $ 300,000,000 | $ 296,725,021 | 46899 | 3/13/2008 | $ 300,000,000 | $ 300,000,000 | $ 3,274,979 | Redeemed |
| 912795D40 | 3/20/2008 | 45422 45423 45424 45425 45426 45427 | 12/11/2007 | $ 300,000,000 | $ 297,608,333 | 47003 | 3/20/2008 | $ 300,000,000 | $ 300,000,000 | $ 2,391,667 | Redeemed |
| 912795D57 | 3/27/2008 | 45445 45446 45447 45448 | 12/12/2007 | $ 200,000,000 | $ 198,345,222 | 47091 | 3/27/2008 | $ 200,000,000 | $ 200,000,000 | $ 1,654,778 | Redeemed |
| 912795D65 | 4/3/2008 | 45464 45465 45466 45467 45468 45469 | 12/13/2007 | $ 300,000,000 | $ 297,312,000 | 47262 | 4/3/2008 | $ 300,000,000 | $ 300,000,000 | $ 2,688,000 | Redeemed |
| 912795D73 | 4/10/2008 | 45594 45595 45596 45597 45598 45599 | 12/20/2007 | $ 300,000,000 | $ 297,312,000 | 47369 | 4/10/2008 | $ 300,000,000 | $ 300,000,000 | $ 2,688,000 | Redeemed |
| 912795D81 | 4/17/2008 | 46091 46092 46093 46094 46095 46096 | 1/17/2008 | $ 300,000,000 | $ 297,679,500 | 47483 | 4/17/2008 | $ 300,000,000 | $ 300,000,000 | $ 2,320,500 | Redeemed |
| 912795D99 | 4/24/2008 | 46191 46192 46193 46194 46195 46196 | 1/24/2008 | $ 300,000,000 | $ 298,506,083 | 47579 | 4/24/2008 | $ 300,000,000 | $ 300,000,000 | $ 1,493,917 | Redeemed |
| 912795E23 | 5/1/2008 | 46342 46343 46344 46345 46346 46347 | 1/31/2008 | $ 300,000,000 | $ 298,316,500 | 47666 | 5/1/2008 | $ 300,000,000 | $ 300,000,000 | $ 1,683,500 | Redeemed |

**AA329**

**EXHIBIT 12**

**Treasury Bill Activity in JPMC G 13414 Account - Purchases, Sales/Redemptions, and Interest**

| | | | Purchases of Treasury Bills | | | Sales/Redemptions of Treasury Bills | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CUSIP | Maturity Date | 703 ID(s)[1] | Purchase Date(s) | Total Face Value Purchased | Total Purchase Price | 703 ID(s)[1] | Sale/ Redemption Date(s) | Total Face Value Sold/Redeemed | Proceeds From Sale/Redemption | Interest (Proceeds Less Purchase Price) | Redeemed or Sold Prior to Maturity |
| 912795E31 | 5/8/2008 | 46455 46456 46457 46458 | 2/7/2008 | $ 200,000,000 | $ 198,958,556 | 47773 | 5/8/2008 | $ 200,000,000 | $ 200,000,000 | $ 1,041,444 | Redeemed |
| 912795E64 | 5/29/2008 | 46704 46705 46706 46707 46708 46709 | 2/28/2008 | $ 300,000,000 | $ 298,498,500 | 48026 | 5/29/2008 | $ 300,000,000 | $ 300,000,000 | $ 1,501,500 | Redeemed |
| 912795E80 | 6/12/2008 | 46911 46912 46913 46914 46915 46916 | 3/13/2008 | $ 300,000,000 | $ 298,915,583 | 48260 | 6/12/2008 | $ 300,000,000 | $ 300,000,000 | $ 1,084,417 | Redeemed |
| 912795E98 | 6/19/2008 | 47021 47022 47023 47024 47025 47026 | 3/20/2008 | $ 300,000,000 | $ 299,393,333 | 48362 | 6/19/2008 | $ 300,000,000 | $ 300,000,000 | $ 606,667 | Redeemed |
| 912795F22 | 6/26/2008 | 47106 47107 47108 47109 | 3/27/2008 | $ 200,000,000 | $ 199,357,944 | 48465 | 6/26/2008 | $ 200,000,000 | $ 200,000,000 | $ 642,056 | Redeemed |
| 912795F30 | 7/3/2008 | 47285 47286 47287 47288 47289 47290 | 4/3/2008 | $ 300,000,000 | $ 298,976,250 | 48586 | 7/3/2008 | $ 300,000,000 | $ 300,000,000 | $ 1,023,750 | Redeemed |
| 912795F48 | 7/10/2008 | 47389 47390 47391 47392 47393 47394 | 4/10/2008 | $ 300,000,000 | $ 299,021,750 | 48680 | 7/10/2008 | $ 300,000,000 | $ 300,000,000 | $ 978,250 | Redeemed |
| 912795F55 | 7/17/2008 | 47508 47509 47510 47511 47512 47513 | 4/17/2008 | $ 300,000,000 | $ 299,207,542 | 48783 | 7/17/2008 | $ 300,000,000 | $ 300,000,000 | $ 792,458 | Redeemed |
| 912795F63 | 7/24/2008 | 47593 47594 47595 47596 47597 47598 | 4/24/2008 | $ 300,000,000 | $ 299,105,167 | 48886 | 7/24/2008 | $ 300,000,000 | $ 300,000,000 | $ 894,833 | Redeemed |
| 912795F71 | 7/31/2008 | 47688 47689 47690 47691 47692 47693 | 5/1/2008 | $ 300,000,000 | $ 298,953,500 | 48976 | 7/31/2008 | $ 300,000,000 | $ 300,000,000 | $ 1,046,500 | Redeemed |
| 912795F89 | 8/7/2008 | 47787 47788 47789 47790 | 5/8/2008 | $ 200,000,000 | $ 199,198,694 | 49091 | 8/7/2008 | $ 200,000,000 | $ 200,000,000 | $ 801,306 | Redeemed |
| 912795G39 | 8/28/2008 | 48046 48047 48048 48049 48050 48051 | 5/29/2008 | $ 300,000,000 | $ 298,589,500 | 49353 | 8/28/2008 | $ 300,000,000 | $ 300,000,000 | $ 1,410,500 | Redeemed |

**AA330**

**EXHIBIT 12**

**Treasury Bill Activity in JPMC G 13414 Account - Purchases, Sales/Redemptions, and Interest**

| | | Purchases of Treasury Bills | | | | Sales/Redemptions of Treasury Bills | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CUSIP | Maturity Date | 703 ID(s)[1] | Purchase Date(s) | Total Face Value Purchased | Total Purchase Price | 703 ID(s)[1] | Sale/ Redemption Date(s) | Total Face Value Sold/Redeemed | Proceeds From Sale/Redemption | Interest (Proceeds Less Purchase Price) | Redeemed or Sold Prior to Maturity |
| 912795G54 | 9/11/2008 | 47822 47823 47824 47825 47826 47827 48282 48283 48284 48285 48286 48287 | 5/12/2008 6/12/2008 | $ 600,000,000 | $ 596,997,125 | 49592 | 9/11/2008 | $ 600,000,000 | $ 600,000,000 | 3,002,875 | Redeemed |
| 912795G62 | 9/18/2008 | 47828 47829 47830 47831 48377 48378 48379 48380 48381 48382 | 5/12/2008 6/19/2008 | $ 500,000,000 | $ 497,410,417 | 49706 | 9/18/2008 | $ 500,000,000 | $ 500,000,000 | 2,589,583 | Redeemed |
| 912795G70 | 9/25/2008 | 48480 48481 48482 48483 | 6/26/2008 | $ 200,000,000 | $ 199,107,694 | 49816 | 9/25/2008 | $ 200,000,000 | $ 200,000,000 | 892,306 | Redeemed |
| 912795G88 | 10/2/2008 | 48605 48606 48607 48608 48609 48610 | 7/3/2008 | $ 300,000,000 | $ 298,638,792 | 49940 | 10/2/2008 | $ 300,000,000 | $ 300,000,000 | 1,361,208 | Redeemed |
| 912795G96 | 10/9/2008 | 48699 48700 48701 48702 48703 48704 | 7/10/2008 | $ 300,000,000 | $ 298,635,000 | 49965 49966 49967 49968 49969 49970 | 10/3/2008 | $ 300,000,000 | $ 299,995,000 | 1,360,000 | Sold |
| 912795H20 | 10/16/2008 | 48800 48801 48802 48803 48804 48805 | 7/17/2008 | $ 300,000,000 | $ 298,987,625 | 50097 50098 50099 50100 50101 50102 | 10/14/2008 | $ 300,000,000 | $ 299,992,000 | 1,004,375 | Sold |
| 912795H38 | 10/23/2008 | 48907 48908 48909 48910 48911 48912 | 7/24/2008 | $ 300,000,000 | $ 298,900,417 | 50158 50159 50160 50161 50162 50163 | 10/16/2008 | $ 300,000,000 | $ 299,994,167 | 1,093,750 | Sold |
| 912795H46 | 10/30/2008 | 49002 49003 49004 49005 49006 49007 | 7/31/2008 | $ 300,000,000 | $ 298,748,750 | 50244 50245 50246 50247 50248 50249 | 10/22/2008 | $ 300,000,000 | $ 299,972,000 | 1,223,250 | Sold |
| 912795H53 | 11/6/2008 | 49114 49115 49116 49117 N/A[2] | 8/7/2008 9/18/2008 | $ 300,000,000 | $ 298,743,694 | 50329 50330 50331 50332 50333 50334 | 10/29/2008 | $ 300,000,000 | $ 299,983,333 | 1,239,639 | Sold |
| 912795H95 | 12/4/2008 | 49369 49370 49371 49372 49373 49374 | 8/28/2008 | $ 300,000,000 | $ 298,685,167 | 50335 50336 50337 50338 50339 50340 | 10/29/2008 | $ 300,000,000 | $ 299,895,000 | 1,209,833 | Sold |
| 912795J28 | 12/11/2008 | 49610 49611 49612 49613 49614 49615 | 9/11/2008 | $ 300,000,000 | $ 298,763,917 | 50341 50342 50343 50344 50460 50461 | 10/29/2008 11/4/2008 | $ 300,000,000 | $ 299,879,056 | 1,115,139 | Sold |

**AA331**

**EXHIBIT 12**

**Treasury Bill Activity in JPMC G 13414 Account - Purchases, Sales/Redemptions, and Interest**

| CUSIP | Maturity Date | 703 ID(s)[1] | Purchase Date(s) | Total Face Value Purchased | Total Purchase Price | 703 ID(s)[1] | Sale/Redemption Date(s) | Total Face Value Sold/Redeemed | Proceeds From Sale/Redemption | Interest (Proceeds Less Purchase Price) | Redeemed or Sold Prior to Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | *Purchases of Treasury Bills* | | | | *Sales/Redemptions of Treasury Bills* | | | | | |
| 912795J36 | 12/18/2008 | 50364 50365 | 10/29/2008 | $ 100,000,000 | $ 99,950,000 | 50462 50463 | 11/4/2008 | $ 100,000,000 | $ 99,953,556 | $ 3,556 | Sold |
| 912795J69 | 1/8/2009 | 48827 48828 48829 48830 48863 | 7/18/2008 7/22/2008 | $ 250,000,000 | $ 247,892,708 | 50345 50346 50347 50466 50467 | 10/29/2008 11/4/2008 | $ 250,000,000 | $ 249,758,500 | $ 1,865,792 | Sold |
| 912795J77 | 1/15/2009 | 48849 48850 48851 48864 48865 | 7/21/2008 7/22/2008 | $ 250,000,000 | $ 247,743,000 | 50348 50349 50350 50468 50469 | 10/29/2008 11/4/2008 | $ 250,000,000 | $ 249,720,250 | $ 1,977,250 | Sold |
| 912795J85 | 1/22/2009 | 50366 50367 | 10/29/2008 | $ 100,000,000 | $ 99,853,611 | 50470 50471 | 11/4/2008 | $ 100,000,000 | $ 99,894,667 | $ 41,056 | Sold |
| 912795J93 | 1/29/2009 | 50368 50369 | 10/29/2008 | $ 100,000,000 | $ 99,813,444 | 50472 50473 | 11/4/2008 | $ 100,000,000 | $ 99,885,333 | $ 71,889 | Sold |
| 912795K26 | 2/5/2009 | 49616 49617 49618 49619 49620 49621 | 9/11/2008 | $ 300,000,000 | $ 297,960,375 | 50418 50419 50420 50421 50517 50518 | 11/3/2008 11/5/2008 | $ 300,000,000 | $ 299,595,556 | $ 1,635,181 | Sold |
| 912795K34 | 2/12/2009 | 49833 49834 49835 49836 | 9/25/2008 | $ 200,000,000 | $ 198,958,667 | 50474 50475 50519 50520 | 11/4/2008 11/5/2008 | $ 200,000,000 | $ 199,690,333 | $ 731,667 | Sold |
| 912795K42 | 2/19/2009 | 49725 49726 49727 49728 49729 49730 49731 49771 49772 49773 | 9/18/2008 9/22/2008 | $ 500,000,000 | $ 497,604,444 | 50422 50423 50424 50425 50426 50427 50476 50477 50558 50559 | 11/3/2008 11/4/2008 11/10/2008 | $ 500,000,000 | $ 499,193,722 | $ 1,589,278 | Sold |
| 912795K59 | 2/26/2009 | 50370 50371 | 10/29/2008 | $ 100,000,000 | $ 99,766,667 | 50560 50561 | 11/10/2008 | $ 100,000,000 | $ 99,883,000 | $ 116,333 | Sold |
| 912795K67 | 3/5/2009 | 49752 49753 | 9/19/2008 | $ 100,000,000 | $ 99,768,056 | 50574 50575 | 11/12/2008 | $ 100,000,000 | $ 99,934,083 | $ 166,028 | Sold |
| 912795K75 | 3/12/2009 | 49852 49853 49854 49855 | 9/26/2008 | $ 200,000,000 | $ 198,656,000 | 50478 50479 50576 50577 | 11/4/2008 11/12/2008 | $ 200,000,000 | $ 199,657,111 | $ 1,001,111 | Sold |
| 912795K83 | 3/19/2009 | 49992 50014 50062 50063 50131 50132 | 10/3/2008 10/6/2008 10/8/2008 10/14/2008 | $ 300,000,000 | $ 298,320,000 | 50480 50481 50482 50483 50578 50579 | 11/4/2008 11/12/2008 | $ 300,000,000 | $ 299,353,278 | $ 1,033,278 | Sold |
| | | | | $ 16,700,000,000 | $ 16,586,249,976 | **Total** | | $ 16,700,000,000 | $ 16,696,229,944 | $ 109,979,969 | |

[1] *See* **Exhibit 4** for 703 Account transactions related to the Treasury Bills. *See also* statements titled "All Trade Activity" for the JPMC G 13414 account: JPMSAA0019992-94; JPMSAA0019996-20020; and JPMSAA0020022-77.

[2] The JPMC G 13414 Account Activity Report and the Lehman 435 Account statement for September 2008 reflect two transfers of Treasury Bills having a total face value of $100 million from the Lehman 435 Account (one of the 8 Brokerage Accounts) to the JPMC G 13414 Account. According to the Lehman 435 Account statements, these Treasury Bills were purchased for a total of $99,587,972 on 8/7/2008. *See* SECSAH0001353, SECSAH0001373, and JPMSAA0020056.

**AA332**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
SECURITIES INVESTOR PROTECTION          :
CORPORATION,                            :          Adv. Proc. No. 08-01789 (SMB)
                                        :
            Plaintiff,                  :          SIPA LIQUIDATION
                                        :
        -against-                       :          (Substantively Consolidated)
                                        :
BERNARD L. MADOFF INVESTMENT            :
SECURITIES LLC,                         :
                                        :
            Defendant.                  :
------------------------------------------------------X
                                        :
In re:                                  :
                                        :
BERNARD L. MADOFF,                      :
                                        :
            Debtor.                     :
------------------------------------------------------X
                                        :
IRVING H. PICARD, trustee for the liquidation :
of Bernard L. Madoff Investment Securities    :
LLC                                     :
                                        :
            Plaintiff,                  :
                                        :
        -against-                       :          Adv. Proc. No. 10-04995 (SMB)
                                        :
TRUST U/ART FOURTH O/W/O/ ISRAEL        :
WILENITZ, *et al.*                      :
                                        :
            Defendants.                 :
------------------------------------------------------X

## ORDER GRANTING LEAVE TO APPEAL DISCOVERY ARBITRATOR'S JANUARY 2, 2019 ORDER

WHEREAS, the Court entered an *Order Appointing a Discovery Arbitrator Pursuant to Bankruptcy Rule 9019(c) and General Order M-390,* dated October 4, 2016 (as amended, the "Order Appointing Arbitrator") (ECF Adv. Proc. No. 08-1789 Doc. # 14227) appointing Frank Maas, Esq. (the "Discovery Arbitrator") as arbitrator to resolve discovery disputes that are referred to him by the Court with the consent of the parties to the dispute;

**AA333**

WHEREAS, the parties to the above-referenced adversary proceeding stipulated to submit various discovery disputes to the Discovery Arbitrator, and the Court so-ordered the stipulation. (*See Stipulated Order Approving the Special Discovery Arbitrator*, dated Oct. 17, 2016 (ECF Adv. Proc. No. 10-04995 Doc. # 75).)

WHEREAS, the Discovery Arbitrator issued the *Discovery Arbitrator's Order*, docketed Jan. 2, 2019 ("January 2019 Order") (ECF Adv. Proc. No. 10-04995 Doc. # 125), which denied the Defendants' application to compel discovery.

WHEREAS, the Defendants submitted the *Letter of Helen Davis Chaitman, Esq.*, dated Jan. 16, 2019 (ECF Adv. Proc. No. 10-04995 Doc. # 126) seeking permission to appeal the January 2019 Order to this Court.

IT IS ORDERED, that the Defendants are granted leave to appeal the January 2019 Order as set forth herein; it is further

ORDERED, that the Defendants shall file a designation of items to be included in the record on appeal and a statement of issues to be presented ("Appellants' Designation and Statement") within thirty days of the date of entry of this Order; it is further

ORDERED, that the Defendants shall file a brief ("Appellants' Brief"), not to exceed forty pages, within thirty days of the date of entry of this Order; it is further

ORDERED, that the Plaintiff shall file a designation of additional items to be included in the record within fourteen days of the filing of the Appellants' Designation and Statement; it is further

ORDERED, that the Plaintiff shall file a brief ("Appellee's Brief"), not to exceed forty pages, within fourteen days of the filing of the Appellants' Brief; it is further

ORDERED, that the Defendants may file a reply brief, not to exceed twenty pages, within seven days of the filing of the Appellee's Brief; it is further

ORDERED, that, in accordance with ¶ 10 of the Order Appointing Arbitrator, legal conclusions will be reviewed *de novo* and other matters will be reviewed in accordance with standards deemed appropriate in the Court's discretion; it is further

**AA334**

ORDERED, that the Court may schedule oral argument to the extent necessary after the conclusion of briefing.


Dated:  New York, New York
          February 15th, 2019


                                        /s/ **STUART M. BERNSTEIN**
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge

**AA335**