**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (SMB) |
| Plaintiff, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05286 (SMB) |
| Plaintiff, | |
| v. | |
| LEGACY CAPITAL LTD., | |
| Defendant. | |

## TRUSTEE'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities*
*LLC and the Estate of Bernard L. Madoff*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ...............................................................................................................2

I.      THE TRUSTEE HAS MET HIS BURDEN TO SHOW THAT THE PONZI
        SCHEME PRESUMPTION APPLIES...........................................................................2

        A.      The Ponzi Scheme Presumption Applies Even if BLMIS Made Some
                Legitimate Trades .......................................................................................5

        B.      Legacy Has Failed to Demonstrate That Its Transfers Were Not Related to
                the Ponzi scheme..........................................................................................7

II.     THE TRUSTEE HAS DEMONSTRATED THE SOURCE OF THE FUNDS
        USED TO PAY LEGACY...............................................................................13

III.    ALL TRANSFERS WERE MADE TO LEGACY OR FOR ITS BENEFIT AND
        ARE RECOVERABLE BY THE TRUSTEE....................................................14

IV.     LEGACY HAS NO 548(c) DEFENSE.............................................................15

        A.      Legacy's Purported Federal and State Law Claims or BLMIS's
                Obligations Do Not Constitute "Value" Under Section 548(c)...........................15

        B.      Legacy's Interpretation of the *546(e) Decision* is Meritless.................................19

CONCLUSION................................................................................................20

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adams v. Ellis*,
    No. 09 Civ. 1329 (PKC), 2012 WL 693568 (S.D.N.Y. Mar. 2, 2012), *aff'd*,
    536 F. App'x 144 (2d Cir. 2013) ............................................................................9

*Ames Merch. Corp. v. Nikko Am., Inc. (In re Ames Dep't Stores, Inc.)*,
    No. 03–08310 (REG), 2011 WL 1239804 (Bankr. S.D.N.Y. Mar. 28, 2011)........................15

*Armstrong v. Collins*,
    No. 01 Civ. 2437 (PAC), 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010) ..................................3

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
    397 B.R. 1 (S.D.N.Y. 2007)........................................................................................3

*In re Bernard L. Madoff Inv. Sec. LLC*,
    654 F.3d 229 (2d Cir. 2011)........................................................................16, 18

*In re Bernard L. Madoff Inv. Sec. LLC*,
    773 F.3d 411 (2d Cir. 2014)........................................................................19, 20

*Bonded Fin. Servs. Inc. v. European Am. Bank*,
    838 F.2d 890 (7th Cir. 1988) ............................................................................15

*California Pub. Empls. Retirement Sys. v. ANZ Sec., Inc.*,
    137 S. Ct. 2042 (2017).........................................................................17, 18

*Fed. Hous. Fin. Agency v. Merrill Lynch & Co.*,
    No. 11 Civ. 6202 (DLC), 2014 WL 798385 (S.D.N.Y. Feb. 28, 2014) ..................................12

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
    130 F.3d 52 (2d Cir. 1997).........................................................................14

*Golden Pacific Bancorp v. F.D.I.C.*,
    No. 95 Civ. 9281 (NRB), 2002 WL 31875395 (S.D.N.Y. Dec. 26, 2002)..............................9

*Gowan v. Amaranth Advisors LLC (In re Dreier LLP)*,
    No. 08-15051 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014) ........................2, 3, 7

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*,
    310 B.R. 500 (Bankr. S.D.N.Y. 2002).................................................................5, 6

*Jobin v. McKay*,
    84 F.3d 1330 (10th Cir. 1996) ............................................................................6

*Knight v. U.S. Fire Ins. Co.*,
 804 F.2d 9 (2d Cir. 1986) .................................................................................10

*Lane Capital Mgt., Inc. v. Lane Capital Mgt., Inc.*,
 15 F. Supp. 2d 389 (S.D.N.Y. 1998), *aff'd*, 192 F.3d 337 (2d Cir. 1999) ..............16

*Lepore v. Hartford Fire Ins. Co.*,
 No. 18 Civ. 689 (KPF), 2019 WL 1129614 (S.D.N.Y. Mar. 12, 2019) ................10

*Lloyd v. Am. Export Lines, Inc.*,
 580 F.2d 1179 (3d Cir. 1978).............................................................................11

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986)....................................................................................8, 12

*Mergers and Acquisition Services Inc. v. Eli Global LLC*,
 No. 15 Civ. 3723 (GHW), 2017 WL 1157132 (S.D.N.Y. Mar. 27, 2017) ............10

*New World Solutions, Inc. v. NameMedia, Inc.*,
 150 F. Supp. 3d 287 (S.D.N.Y. 2015)................................................................10

*Picard v. Cohen*,
 Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 ....................................17, 19

*Picard v. Greiff*,
 476 B.R. 715 (S.D.N.Y. 2012)...............................................................16, 18, 20

*Picard v. Lowrey*,
 No. 18 Civ. 5381 (PAE), 2019 WL 479185 (S.D.N.Y. Feb. 7, 2019)........17, 19, 20

*Picard v. Lowrey*,
 Adv. Pro. No. 10-04387 (SMB), 2018 WL 1442312 (Bankr. S.D.N.Y. March
 22, 2018) .....................................................................................................17, 19

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*,
 458 B.R. 87 (Bankr. S.D.N.Y. 2011)...................................................................3

*Pompeo v. Estate of Hudson*,
 No. 11 Civ. 6899 (SDW)(MCA), 2013 WL 2182304 (D.N.J. May 20, 2013) .........7

*Scholes v. Lehmann*,
 56 F.3d 750 (7th Cir. 1995) ...............................................................................6

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
 No. 08-01789 (SMB), (Bankr. S.D.N.Y. July 25, 2018) .......................................4

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Bernard L. Madoff*),
No. 08-01789 (SMB), 2019 WL 654293 (Bankr. S.D.N.Y. Feb. 15, 2019)........................8, 13

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Bernard L. Madoff*), 531 B.R. 439 (Bankr. S.D.N.Y. 2015) ...............................................................16, 19

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff Sec.*),
499 B.R. 416 (S.D.N.Y. 2013) ...................................................................................16, 17, 18

*Sender v. Simon*,
84 F.3d 1299 (10th Cir. 1996) ...........................................................................................6

*Silverman v. Cullin*,
633 F. App'x 16 (2d Cir. 2016) ........................................................................................19

*In re Tribune Co. Fraudulent Conveyance Litig.*,
No. 11-md-2296 (RJS), 2018 WL 6329139 (S.D.N.Y. Nov. 30, 2018), *recons. denied*, No. 11-md-2296 (DLC), 2019 WL 549380 (S.D.N.Y. Feb. 12, 2019).......................18

*Wiand v. Lee*,
753 F.3d 1194 (11th Cir. 2014) ...........................................................................................7

*Wing v. Layton*,
957 F. Supp. 2d 1307 (D. Utah 2013) ................................................................................6

*Wright v. Kelly*,
No. 95 Civ. 0688, 1998 WL 912026 (W.D.N.Y. Oct. 16, 1998)...........................................12

*Zazzali v. AFA Fin. Grp., LLC* (*In re DBSI, Inc.*),
477 B.R. 504 (Bankr. D. Del. 2012) ....................................................................................7

## Statutes

11 U.S.C. § 546(e) .........................................................................................................19

11 U.S.C. § 548(a) ....................................................................................................17, 19

11 U.S.C. § 548(c) .......................................................................................16, 17, 18, 20

11 U.S.C. § 550..............................................................................................................14

## Rules

Fed. R. Bankr. P. 7056....................................................................................................1

Fed. R. Civ. P. 8(c) ......................................................................................................16

Fed. R. Civ. P. 56 .........................................................................................................1

Fed. R. Civ P. 56(c) ...........................................................................................9, 10, 12

Fed. R. Evid. 804(b)(1) ............................................................................................11

Fed. R. Evid. 807(a) .................................................................................................12

**Other Authorities**

5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1394
   (2d ed.1990) ........................................................................................................16

Irving H. Picard (the "Trustee"), trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa–*lll*, and the estate of Bernard L. Madoff, respectfully submits this reply memorandum of law in further support of the Trustee's motion under Fed. R. Civ. P. 56, as incorporated by Fed. R. Bankr. P. 7056 (the "Motion"), for summary judgment as to Count One of the Trustee's Amended Complaint, to avoid and recover the amounts BLMIS fraudulently transferred to defendant Legacy Capital, Ltd. ("Legacy") and for which Legacy failed to provide value.

## PRELIMINARY STATEMENT

In its successful motion to dismiss, Legacy declared that "the Madoff fraud was a Ponzi scheme," and that Legacy was "just another victim" of that scheme. When answering the Trustee's complaint, Legacy admitted the transfers it received and BNP received for Legacy's benefit, and asserted a single affirmative defense: prejudgment interest on its claims "in the event that" the *Antecedent Debt Decision* (defined below) gets reversed. Legacy then stipulated to each transfer into and out of its and its predecessors' BLMIS accounts.

Legacy ignores its prior admissions. It also ignores the plea allocutions by Madoff and his co-conspirators, which conclusively demonstrate that BLMIS was a Ponzi scheme, and that, at least as early as 1992, no real trades were made for any of the IA customers. Instead, Legacy baldly asserts that the Trustee is not entitled to the Ponzi scheme presumption. Yet all the admissible evidence—including that relied upon by Legacy—indisputably shows that BLMIS was a Ponzi scheme, and that Legacy withdrew more money than it deposited from that scheme.

Without admissible evidence to help it, Legacy engages in sophistry, pointing to five treasury bill trades that BLMIS could have made for Legacy. These trades were not made on the same day or in the same amounts shown on Legacy's BLMIS statements. Rather, more than ten

years after Madoff's collapse, Rafael Mayer—a witness who claims neither expertise nor direct

knowledge—compared BLMIS's brokerage account statements and Legacy's account statements

and trade confirmations.  Mr. Mayer concludes that it is possible that BLMIS could have: (i)

purchased these treasury bills; (ii) sold them to Legacy; (iii) at a later time purchased them from

Legacy; and (iv) sold the treasury bills or let them mature.  Putting aside Mr. Mayer's lack of

personal knowledge and the fact that these purported trades do not actually match the treasuries

in BLMIS's brokerage accounts, Legacy's "evidence" is comprised of Mr. Mayer's speculation

about the very documents—account statements and confirmations—Madoff and others admit

were fraudulently created to deceive customers.  Madoff's fabricated documents do not prove the

existence of trades; and they certainly do not give this Court a reason to treat the transfers to

Legacy differently than those to other Ponzi scheme victims.

This is a strict liability case.  Legacy's admissions are binding.  There is no admissible

evidence suggesting that the fake account statements are real.  The Trustee is entitled to

summary judgment on Legacy's fictitious profits.

## **ARGUMENT**

## I.    **THE TRUSTEE HAS MET HIS BURDEN TO SHOW THAT THE PONZI SCHEME PRESUMPTION APPLIES**

Legacy—which previously admitted Madoff ran a Ponzi scheme[1]— contests the Ponzi

scheme presumption, arguing that the Trustee has failed to demonstrate that Madoff's Ponzi

scheme meets the four-factor test articulated in *Gowan v. Amaranth Advisors LLC (In re Dreier*

*LLP)*, No. 08-15051 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014).  (Legacy's

Opposition to the Trustee's Motion ("Opp.") at 6-7, ECF No. 199.)  But *Dreier* was clear that the

---

[1](Legacy's Reply to Memorandum of Law in Further Support of Its Motion to Dismiss the Amended Complaint at 16, ECF No. 126.)

four-factor test is only one of many ways to show a Ponzi scheme, and explained that, while

"[s]ome courts have discussed a four factor test . . .

> [o]thers have identified badges in favor of finding a Ponzi scheme,
> including the absence of any legitimate business connected to the
> investment program, the unrealistic promises of low risk and high returns,
> commingling investor money, the use of agents and brokers paid high
> commissions to perpetuate the scheme, misuse of investor funds, the
> "payment" of excessively large fees to the perpetrator and the use of false
> financial statements.

2014 WL 47774, at *9.  This Court explained that these badges are merely characteristics of

Ponzi schemes "but a Ponzi scheme can exist without them.  At bottom, the label Ponzi scheme

applies 'to any sort of inherently fraudulent arrangement under which the debtor-transferor must

utilize after-acquired investment funds to pay off previous investors in order to forestall

disclosure of the fraud.'"  *Id.* (citing *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv.

Fund Ltd.)*, 397 B.R. 1, 12 (S.D.N.Y. 2007) and *Armstrong v. Collins*, No. 01 Civ. 2437 (PAC),

2010 WL 1141158, at *23 (S.D.N.Y. Mar. 24, 2010)).

Distinguishing its facts from the BLMIS liquidation, *Dreier* cited *Picard v. Madoff (In re

Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 104 (Bankr. S.D.N.Y. 2011) for the proposition

that "[t]he breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the

application of the Ponzi scheme presumption to the facts of this case, particularly in light of

Madoff's criminal admission.  2014 WL 47774, at *12.  Marc Dreier did not admit to running a

Ponzi scheme, *id.* at *11, and the *Dreier* Court found no evidence comparable to the magnitude

and global renown of Madoff's scheme warranting the Ponzi scheme presumption.

Here, the Trustee relies on allocutions of Madoff, Frank DiPascali, his co-conspirator,

David Kugel, a BLMIS manager and trader for 38 years, Irwin Lipkin and Enrica Cotellessa-

Pitz, BLMIS employees and controllers since 1964 and 1978, respectively, and Eric Lipkin, a 16-

year employee of the IA business, all of whom were associated with Madoff's scheme and

3

pleaded guilty in connection therewith.  These allocutions state that Madoff ran a Ponzi scheme

through his investment advisory business and detail the scheme, including that: (1) although

investors were told their money was invested, no such investments occurred (Trustee's Local

Rule 7056.1 Statement of Undisputed Material Facts ("Stmt.") ¶¶ 4, 5, 10, 11, ECF No. 192); (2)

instead of being invested, investors' money was deposited into a single Chase bank account (*id.* ¶

4, 12); (3) when investors sought to redeem their purported profits, they received their or other

investors' money being held in the Chase account (*id.* ¶ 4); and (4) BLMIS issued false account

statements and trade confirmation to cover up the fact that it made no trades.  (*id.* ¶ 6, 12, 14.)

These allocutions satisfy the Ponzi scheme presumption.[2]

Legacy argues that Madoff testified that "he did not have a need to use customer funds to

redeem other customers."  (Opp. at 13.)  This misrepresents Madoff's testimony.  During his

deposition, Madoff explained that the difference between the $19 billion investors deposited and

the $64 billion in paper profits was the approximate 12% fake returns on investors' principal

between 1992 and 2008.  (Declaration of Nicholas F. Kajon Ex. B (Transcript of Apr. 26, 2017

Deposition of Madoff) at 134-35, ECF No. 199.)  Legacy's account shows that it withdrew $86.5

million more than it deposited.  There were no profits earned on principal investments, and when

Madoff's scheme ended there was a $19 billion shortfall in customer property.  That is because

customers who withdrew profits, like Legacy, received the principal investments of other

customers.

---

[2] This Court previously explained that the Trustee could meet his burden and make out a *prima facie* case by relying on the allocutions. *See* Tr. of Conference re Motion for Order Establishing Omnibus Proceeding for Ponzi Scheme 63:10-11, *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (SMB), (Bankr. S.D.N.Y. July 25, 2018), ECF No. 17877 ("you can make out your prima facie case pretty simply where there's allocution . . . ."). Counsel for Legacy appeared at this hearing.

A.    **The Ponzi Scheme Presumption Applies Even if BLMIS Made Some Legitimate Trades**

Legacy incorrectly argues that if any legitimate business profits made their way into the

IA business, the Ponzi scheme presumption would no longer apply.  First, Legacy's position that

Madoff's proprietary trading or market-making business profits should be allocated to IA

customers is factually and legally unsupportable.  In fact, the evidence Legacy relies on shows

the opposite—the IA business supported the proprietary trading and market making businesses.

(Opp. at 9.)  Furthermore, Madoff's allocution is clear that the IA business was the only "vehicle

of [his] wrongdoing," (Warshavsky Decl. Ex. 1 (Transcript of Madoff's Plea Allocution) 25:6-

10, Dec. 21, 2018, ECF Nos. 193-1), and any expenses "associated with the operation of the

fraudulent investment advisory business would not be paid from the operations of the legitimate

proprietary trading and market making businesses."  (*Id.* 29:19-22, 30:7-10).

But even if some legitimate profits trickled into the IA business, it wouldn't rebut the

Ponzi scheme presumption.  Courts regularly apply the Ponzi scheme presumption where a

debtor ran a legitimate business alongside a Ponzi scheme.  For example, in *Gredd v. Bear,*

*Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, defendant Bear Stearns argued that the

Ponzi presumption: (i) only applies when the payments sought to be avoided are made to early

investors and (ii) is inapplicable if the transfers were part of a legitimate business transaction.

310 B.R. 500, 506 (Bankr. S.D.N.Y. 2002).  Even though the perpetrator, Michael Berger, was

operating a Ponzi scheme, Bear Stearns argued that Berger legitimately short sold technology

stocks separate from the Ponzi scheme.  The court rejected that argument, explaining:

> Bear Stearns asserts that a classic Ponzi scheme is destined to
> collapse because it has no real business at its core.  Accordingly,
> Bear Stearns urges that the presumption of the debtor's fraudulent
> intent is limited to cases where the debtor has no legitimate
> operations.  I disagree.  When a debtor operating a Ponzi scheme
> makes a payment with the knowledge that future creditors will not

5

> be paid, that payment is presumed to have been made with actual
> intent to hinder, delay or defraud other creditors—regardless of
> whether the payments were made to early investors, or whether the
> debtor was engaged in a strictly classic Ponzi scheme.

*Id.* at 509.  The court cited several cases in which the Ponzi presumption was applied to schemes

involving legitimate and illegitimate businesses and concluded that the argument that "fraudulent

intent cannot be presumed . . . because the . . . payments at issue were made in connection with a

legitimate business outside of the Ponzi scheme . . . is ludicrous." *Id.* at 509-11.

Similarly, in *Wing v. Layton*, 957 F. Supp. 2d 1307 (D. Utah 2013), the receiver for

VesCor Capital Corp. moved for summary judgment on the Ponzi scheme presumption for

transfers to Layton, who managed various VesCor real estate projects.  Layton argued, among

other things, that the two real estate projects with which he was most involved—KOJO and

Sienna Office Park—were profitable and not associated with the Ponzi scheme, and therefore the

Ponzi scheme presumption should not apply to the transfers VesCor made to him.  The *Layton*

Court rejected arguments similar to those Legacy makes here:

> First, the fact that the KOJO and Siena Office Park projects might have been
> profitable—which the Receiver strongly disputes—misses the point.
> [L]egitimate business activity does not insulate companies from a finding
> that they were operated as part of a Ponzi scheme. . . . Ponzi schemes
> sometimes use legitimate operations to attract investors, but this does not
> insulate those operations from the taint of the Ponzi scheme.

*Id.* at 1315 (citing *Jobin v. McKay*, 84 F.3d 1330, 1332 (10th Cir. 1996) (Ponzi scheme existed

where its perpetrator used the company's legitimate computer sales and leasing operations as a

front); *Sender v. Simon*, 84 F.3d 1299, 1302 (10th Cir. 1996) (Ponzi scheme existed where hedge

fund's "trading resulted in net profits in a few years," though "in most years  . . . realized net

trading losses"); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) (Posner, J.) ("It is no

answer that some or for that matter all of [Phillip's] profit may have come from 'legitimate'

trades made by the corporations.  They were not legitimate.  The money used for the trades came

6

from investors gulled by fraudulent representations.")).[3]  Here, Legacy cannot even argue, like

Layton, that it was associated with Madoff's legitimate businesses.

As this Court explained in *Dreier*:

> [t]he logic for applying a presumption of actual intent to defraud in
> the Ponzi scheme scenario is tied to the fact that a Ponzi scheme
> "cannot work forever." When the pool of investors runs dry—as it
> will—the operator knows that the scheme will collapse and that
> those still invested in the enterprise will lose their money.

2014 WL 47774, at *10 (citation omitted).  That is precisely why the existence of some

legitimate trades in a Ponzi scheme will not affect the Ponzi scheme presumption.

**B.      Legacy Has Failed to Demonstrate That Its Transfers Were Not Related to
          the Ponzi scheme**

Legacy also cannot show that its transfers were unrelated to Madoff's Ponzi scheme.  In

fact, Legacy has represented to this Court that it "is not special," but "just another BLMIS victim

that was deceived."  (Stmt. ¶ 27.)  But now Legacy does an about-face claiming that the Court

should treat the transfers to Legacy differently by accepting as true purported U.S. Treasury bill

positions listed on its customer statements.  (Opp. at 11-12, 14-15.)  In so doing, Legacy asks this

Court to ignore the plea allocutions of Madoff, DiPascali, Kugel, and Eric Lipkin, which avow

that no trading took place on behalf of IA customers and that the customer statements and trade

confirmations were false.  (Stmt. ¶¶ 3-6, 11-12.)  Instead of presenting competent evidence of a

genuine issue of material fact, Legacy speculates that the very same fake trade confirmations and

customer account statements support its case.  (*Id.* ¶¶ 5-6, 11-14, 17-18.)  "If the factual context

---

[3] There are numerous other cases in which the debtor maintained legitimate operations, but the
Ponzi scheme presumption still applied.  *See, e.g.*, *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir.
2014); *Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*, 477 B.R. 504, 511 (Bankr. D. Del. 2012);
*Pompeo v. Estate of Hudson*, No. 11 Civ. 6899 (SDW)(MCA), 2013 WL 2182304, at *8 (D.N.J.
May 20, 2013).

renders [Legacy's] claims implausible . . . [Legacy] must offer more persuasive evidence to

support [its] claims than would otherwise be necessary." *Matsushita Elec. Indus. Co. Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Legacy's claim that BLMIS actually traded treasuries for Legacy relies on Madoff's

testimony that BLMIS purchased treasuries for cash management purposes. (*See, e.g.*, Kajon

Decl. Ex. B 19:11-21, 44:8-15, 55:13-20.) But this testimony confirms that customer statements

"reflected the ownership of securities that [BLMIS] wasn't buying." (*Id.* 19:25-20:1.) In

denying a motion for additional discovery on BLMIS's purported treasuries trading, this Court

recently reached the same conclusion: "Some defendants have further argued that BLMIS

allocated some of those U.S. Treasury transactions to customers. But Madoff *never* said

this." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, No.

08-01789 (SMB), 2019 WL 654293, at *11 (Bankr. S.D.N.Y. Feb. 15, 2019) (emphasis added).

Legacy relies on the fake customer statements and trade confirmations that BLMIS

employees created to perpetrate the fraud. Legacy did not create these documents and does not

provide the testimony of anyone competent to testify about those documents other than Madoff,

who testified that BLMIS's IA business was perpetrating a fraud by, *inter alia*, providing false

statements and confirmations since 1992. Thus, Legacy's "evidence" of "actual trades executed

by BLMIS on behalf of Legacy's account" does not create a genuine issue of material fact.

Legacy submits Mr. Mayer's declaration to "show" there was actual trading in Legacy's

account. Mr. Mayer was not identified as an expert,[4] and though his declaration purports to be

based on personal knowledge, he did not work at BLMIS or create the documents at issue. Thus,

---

[4] Legacy has not identified any experts. Expert discovery concluded on July 20, 2017. (First Am.
Case Mgmt. Plan ¶ 2(f), ECF No. 153.)

Mr. Mayer is opining that BLMIS traded securities for Legacy based on his review of BLMIS's documents produced in discovery.

Federal Rule of Civil Procedure 56(c)(4) requires that a declaration opposing summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Mr. Mayer has no personal knowledge regarding BLMIS's brokerage statements attached to his declaration. Instead, Mr. Mayer reviewed these documents over a decade after they were created and now opines that, despite the unequivocal testimony to the contrary, five trades in Legacy's account were real. According to Mr. Mayer, from looking at Legacy's BLMIS account statements and trade confirmations, as well BLMIS's brokerage statements, he can now distinguish real transactions from fake ones, and he identifies five such transactions. This does not constitute personal knowledge. *See Golden Pacific Bancorp v. F.D.I.C.*, No. 95 Civ. 9281 (NRB), 2002 WL 31875395, at *10 (S.D.N.Y. Dec. 26, 2002) (declaration based in part on review of discovery documents is not based on personal knowledge); *Adams v. Ellis*, No. 09 Civ. 1329 (PKC), 2012 WL 693568, at *7 (S.D.N.Y. Mar. 2, 2012) (internal citations and quotation marks omitted), *aff'd*, 536 F. App'x 144 (2d Cir. 2013) ("As regards the audits and the paycheck delay, [plaintiff's declaration] offers only her belief that the defendants were involved in or aware of these events. As noted, affidavits on information and belief are not sufficient in opposition to a summary judgment motion and are therefore disregarded."). Legacy is not suggesting that Mr. Mayer had contemporaneous knowledge of which of Legacy's trades were real and which were fake.

Moreover, the Mayer Declaration "describes five examples of what *appear to be* actual trades executed by BLMIS on behalf of Legacy's account." (Declaration of Rafael Mayer in

9

Opposition to Trustee's Motion ¶ 3, March 1, 2019, ECF No, 199-11 (emphasis added).)  This

conjectural language is repeated throughout the declaration.  (*See id.* ¶¶ 6, 14, 16, 25, 26, 33, 41.)

Rather than making the required showing that BLMIS engaged in actual securities trading for

Legacy, Mayer offers speculation and unwarranted inferences.  The Mayer Declaration is thus

based on nothing but surmise and does not satisfy the requirements of Rule 56(c)(4).  *See, e.g.*,

*New World Solutions, Inc. v. NameMedia, Inc.*, 150 F. Supp. 3d 287, 305 (S.D.N.Y. 2015)

(summary judgment materials containing hearsay, speculation, or conclusory statements run

afoul of Rule 56(c)(4)); *Lepore v. Hartford Fire Ins.  Co.*, No. 18 Civ. 689 (KPF), 2019 WL

1129614, at *4 (S.D.N.Y. Mar. 12, 2019) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12

(2d Cir. 1986)) ("nonmoving party may not rely on 'mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment'").  Accordingly, the Trustee

objects to the Mayer Declaration under Fed. R. Civ. P. 56(c)(2)[5] and seeks to have that

declaration stricken.[6]

    Even if the Court considers the Mayer Declaration, the documents Mayer cites fail to

show Madoff traded for Legacy.  If the trades set forth in the Mayer Declaration were "actual

trades," the purchase dates, purchase prices, sale dates, and sale prices for each of the five trades

identified would match across BLMIS's brokerage account statements and Legacy's customer

statements and trade confirmations.  They never do.  For example, the documents submitted as

evidence of the 2002 trade identified in the Mayer Declaration indicates that U.S. Treasury bills

---

[5] "A party may object that the material cited to support or dispute a fact cannot be presented in a
form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

[6] The 2010 Committee Notes to Rule 56(c)(2) state that after a Rule 56(c)(2) objection "[t]here is
no need to make a separate motion to strike."  *See also In Mergers and Acquisition Services Inc.
v. Eli Global LLC*, No. 15 Civ. 3723 (GHW), 2017 WL 1157132, at *16 (S.D.N.Y. Mar. 27, 2017).

with a maturity date of July 25, 2002 were purchased in BLMIS's Morgan Stanley account on

May 9, 2002 at a price of $99.6439 per unit, but Legacy's BLMIS account did not purportedly

purchase Treasury bills with the same maturity date until May 20, 2002 at a price of $99.69 per

unit. Similarly, Treasury bills with maturity dates of August 25, 2005 and September 1, 2005

were purportedly sold by Legacy on May 24, 2005, but the Morgan Stanley account statements

indicate that these Treasury bills were not redeemed by BLMIS until their maturity dates.

There are over 17,000 purported trades in the Legacy and pre-Legacy accounts. There

are over 1,800 purported trades of treasury bills. Mr. Mayer shows a coincidence where he

speculates five trades *could* have been made by alluding to industry practices. As stated, Mr.

Mayer has not been qualified as an expert. More important, Mr. Mayer's speculation about what

BLMIS *could have* been doing runs counter to the testimony of Madoff, Kugel and DiPascali—

people running the scheme about which Mr. Mayer is speculating. DiPascali, for example,

clearly explains that the purported Treasury bill transactions were fake. (*See* DiPascali Trial Tr.

4802:23-4805:2, *United States of America v. Bonventre*, 10 Cr. 228 (S.D.N.Y. Dec. 4, 2013),

ECF No. 856, attached as Ex. 1 to the Reply Declaration of Oren J. Warshavsky, March 22, 2019

("Warshavsky Reply Decl."); DiPascali Trial Tr. 4929:17-4933:13, *United States of America v.

Bonventre*, 10 Cr. 228 (S.D.N.Y. Dec. 5, 2013), ECF No. 858, Warshavsky Reply Decl. Ex.

2.)[7] This fraudulent activity included: (i) preparing false information by researching historical

---

[7] DiPascali's trial testimony is admissible under Fed. R. Evid. 804(b)(1). According to Legacy,
BLMIS and its employees were Legacy's agent in providing investment advisory services
including the purported trades, and therefore satisfy the "predecessor-in-interest" provision of Fed.
R. Evid. 804(b)(1)(B). *See Lloyd v. Am. Export Lines, Inc.*, 580 F.2d 1179, 1187 (3d Cir. 1978)
("the previous party having like motive to develop the testimony about the same material facts is,
in the final analysis, a predecessor in interest to the present party."). DiPascali, who is deceased,
was a government witness in a criminal trial where the facts and issues were similar to those in
dispute here and multiple defense counsel had an adequate opportunity to cross-examine him.

treasuries prices, (ii) determining the price BLMIS needed; (iii) writing up tickets for the AS/400

system; (iv) putting through a buy ticket approximately equal to the cash credit balance in an IA

customer account; and (iv) producing a false confirmation and an entry on an IA customer

statement reflecting ownership of treasuries.  (Warshavsky Reply Decl. Ex. 2 4932:13-4933:13.)

Mr. Mayer's unqualified speculation about what *could* have happened is inadmissible, and, in

any event, cannot create a genuine issue of fact when all those with actual knowledge testified to

the contrary. *Matsushita*, 475 U.S. at 586-87 (internal quotations and citations removed) ("When

the moving party has carried its burden under Rule 56(c), its opponent must do more than simply

show that there is some metaphysical doubt as to the material facts.").

Legacy fares no better in its efforts to create a genuine factual dispute by discrediting the

plea allocutions of Madoff and other BLMIS employees and relying instead on Madoff's

deposition taken years later.  In his deposition testimony, Madoff equivocates and is inconsistent

on the details of the fraud.  Where Madoff never wavers, however, is the start date of the Ponzi

scheme: 1992. (*See* Warshavsky Decl. Ex. 2 (Transcript of Dec. 20, 2016 Deposition of Madoff)

18:16-21, 19:8-20:4, 26:21-27:1, 92:4-19, 149:10-17, 160:21-161:8; Kajon Decl. Ex. B 11:5-9,

---

Courts adopt a "realistically generous approach . . . admitting testimony where it appears in the
former suit a party having like motive to cross-examine about the same matters as the present party
would have, was accorded an adequate opportunity for such examination." *Fed. Hous. Fin. Agency
v. Merrill Lynch & Co.*, No. 11 Civ. 6202 (DLC), 2014 WL 798385, at *1 (S.D.N.Y. Feb. 28,
2014) (internal quotations omitted). The criminal defendant's liberty was at stake and they
therefore had substantial motive to cross examine DiPascali. *See Wright v. Kelly*, No. 95 Civ.
0688, 1998 WL 912026, at *6 (W.D.N.Y. Oct. 16, 1998). DiPascali's criminal trial testimony can
also be admitted under the "residual" exception of Fed. R. Evid. 807(a) because it: (i) has the
equivalent circumstantial guarantees of trustworthiness; (ii) is offered as evidence of a material
fact; (iii) is more probative on the point for which it is offered than any other evidence the
proponent can obtain through reasonable efforts; and (iv) admitting it will best serve the purposes
of the Rules of Evidence and the interests of justice.  Fed. R. Evid. 807(a).

17:20-18:11,[8] 91:3-24, 122:14-123:4, 127:21-128:14, 134:05-135:2); *In re Madoff*, 2019 WL

654293, at *7 (internal citations omitted) ("Madoff allocuted that, '[t]o the best of my

recollection, my fraud began in the early 1990s.' Madoff's deposition testimony was consistent

with his allocution.  He stated on multiple occasions that his Ponzi scheme did not begin until

1992.").  While Madoff claims he traded for certain clients in 1993 (*see* Kajon Decl. Ex. B. 92:7-

22)—a claim the Trustee disputes—Legacy has produced no evidence that Madoff traded for it

or its predecessors.  All Legacy offers is conjecture that actual trading could have occurred in its

BLMIS account.

## II.    THE TRUSTEE HAS DEMONSTRATED THE SOURCE OF THE FUNDS USED TO PAY LEGACY

Ignoring its prior admissions, Legacy frivolously argues that the Trustee has failed to

offer evidence concerning the account from which Legacy was paid.  The Amended Complaint,

however, identifies the source of the BLMIS funds by stating that Legacy "sent/received funds

to/from BLMIS in New York, and wired funds to BLMIS's account at JPMorgan Chase,

Account #xxxxxxxxxxx1703, in New York, New York, for application to its account at BLMIS

and to conduct trading activities . . . ."  (Am. Compl. ¶ 37, ECF No. 112.)  Legacy admitted this

allegation.  (Answer ¶ 37, ECF No. 139).  This should end the inquiry.

Madoff's allocution further explained that "[w]hen clients wished to receive the profits

they believed they had earned with me or to redeem their principal, I used the money in the

Chase Manhattan bank account that belonged to them or other clients to pay the requested

---

[8] Although in this excerpt Madoff refers to 1993 and 1994 as the start time of the scheme, he also refers to the "Mideast Crisis at that time," and, based on his testimony (Warshavsky Decl. Ex. 2 20:1-2), this crisis refers to the Gulf War, which ended in 1991.  Accordingly, and based on certain other evidence including David Kugel's allocution that the fraud began in the 70s, the Trustee believes that the Ponzi scheme started well before 1992.

funds." (Stmt. ¶ 4.)  The parties stipulated in January 2017 that "BLMIS and/or Madoff made

certain transfers to or for the benefit of Legacy," and "Exhibit A to this Stipulation accurately

sets forth the *cash deposits and cash withdrawals* from the Montpellier, Olympus, HCH, and

Legacy *BLMIS* accounts." (Stipulation and Order at 2, ¶ 4, ECF No. 155 (emphasis added).)

On November 11, 2016, the Trustee produced all the documents showing that the

transfers to Legacy came from BLMIS's 703 Account. (*See* Warshavsky Reply Decl. Exs. 3-5).

The Trustee also served the expert report of Lisa Collura on February 20, 2017, which concluded

that "[d]uring the Two Year Period, the customer statement for the Legacy Capital Account

reflected six cash withdrawal transactions totaling $174,000,000.  These cash withdrawal

transactions were in the form of wire transfers from the 703 Account." (Warshavsky Reply

Decl. Ex. 6 ¶ 22.)  These are the same six transactions reflected on the bank statements produced

to Legacy and attached as Exhibits 3-5 to the Warshavsky Reply Declaration.  Notably, Legacy

never served a rebuttal report nor chose to depose Ms. Collura.

III.    **ALL TRANSFERS WERE MADE TO LEGACY OR FOR ITS BENEFIT AND
        ARE RECOVERABLE BY THE TRUSTEE**

The Trustee need not prove that Legacy received every transfer, as Legacy suggests.

(Opp. at 17.)  Transfers made to a third party for Legacy's benefit can be recovered from Legacy.

Section 550(a) of the Bankruptcy Code permits a trustee to recover an avoided transfer from one

of three entities: the initial transferee, a subsequent transferee, and "the entity for whose benefit

such transfer was made."  Section 550 groups initial transferees with entities for whose benefit a

transfer was made and subjects them both to strict liability for the recovery of an avoided

transfer.  *See* 11 U.S.C. § 550; *In re Finley, Kumble, Wagner, Heine, Underberg, Manley,*

*Myerson & Casey*, 130 F.3d 52, 57 (2d Cir. 1997).  "The 'paradigm' transfer beneficiary [is] a

party whose indemnification obligations or whose debts are extinguished or reduced by the

14

transfer: that is 'someone who receives the benefit but not the money.'" *Ames Merch. Corp. v. Nikko Am., Inc. (In re Ames Dep't Stores, Inc.)*, No. 03–08310 (REG), 2011 WL 1239804, at *5 (Bankr. S.D.N.Y. Mar. 28, 2011) (internal citations omitted); *see also Bonded Fin. Servs. Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988).

The Trustee pleaded, "[o]n July 26, 2004, Legacy Capital entered into a credit agreement with BNP Paribas – Dublin Branch . . . for a $100 million line of credit secured by the Legacy Capital Account" at BLMIS.  (Am. Compl. ¶ 140.)  The Trustee also pleaded that "[a]s part of Legacy[ ]'s repayment of the secured loan, from September 2007 to June 2008, BLMIS transferred to BNP Paribas $87 million of Customer Property from the Legacy Capital Account." (*Id.* ¶ 141.)  Legacy admitted both allegations.  (*See* Answer ¶¶ 140-41.)  Legacy also admitted that "during the two years prior to the Filing Date, BLMIS made transfers from the Legacy Capital Account in the amount of $174,000,000, and . . . that such amount included $87,000,000 transferred directly to Legacy Capital and $87,000,000 transferred to BNP Paribas.  (*Id.*  ¶ 144.) Thus, Legacy has already admitted that of the $174 million in total two-year transfers, Legacy received half, and BNP received the other half to pay off Legacy's loan.  Further, as stated, Legacy stipulated to the same.  Thus, the entire sum of the two-year transfers was made to Legacy or for Legacy's benefit and all fictitious profits included in those transfers are subject to the Trustee's recovery.

## IV.    LEGACY HAS NO 548(c) DEFENSE

### A.    Legacy's Purported Federal and State Law Claims or BLMIS's Obligations Do Not Constitute "Value" Under Section 548(c)

Legacy claims the fictitious profits it received were on account of purported "obligations owed to Legacy at the time of the transfers," including state law claims for fraud, breach of fiduciary duty and breach of contract.  (Opp. at 18-25.)  Legacy concludes that the fictitious

15

profits it received were "for value" under section 548(c). Although the Trustee addresses this

argument on the merits, Legacy waived this defense by failing to raise it in its answer.[9]

As the District Court held in *Picard v. Greiff*, "even if the defendants had enforceable

claims," under federal or state law, "a conclusion that satisfaction of those claims gave 'value' to

[BLMIS] would conflict with SIPA." 476 B.R. 715, 727 (S.D.N.Y. 2012); *see also Sec. Inv'r*

*Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, (*In re Madoff Sec.*), 499 B.R. 416, 422 n.6

(S.D.N.Y. 2013) ("*Antecedent Debt Decision*"); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv.*

*Sec. LLC (In re Bernard L. Madoff)*, 531 B.R. 439, 476 n.26 (Bankr. S.D.N.Y. 2015) ("*Omnibus*

*Good Faith Decision*"). This is because SIPA "prioritizes net equity claims over general creditor

claims." *Greiff*, 476 B.R. at 727; *see also In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229,

233 (2d Cir. 2011) ("*Net Equity Decision*").

Customers like Legacy who have no net equity claims, may not retain fictitious profits of

customer property based on their purported claims. Legacy may have valid claims and payment

on those claims could discharge an antecedent debt, but "that debt runs against [BLMIS's]

general estate, not the customer property estate, and therefore cannot be the basis of the retention

of customer property under section 548(c)." *Antecedent Debt Decision*, 499 B.R. at 424.

With respect to BLMIS's obligations to Legacy, this Court has ruled that the "argument

that payment in satisfaction of an unavoided obligation provides value misses the point. An

obligation may be valid, but payments in excess of principal are avoidable and recoverable (in all

---

[9] *Lane Capital Mgt., Inc. v. Lane Capital Mgt., Inc.*, 15 F. Supp. 2d 389, 397 (S.D.N.Y. 1998), *aff'd*, 192 F.3d 337 (2d Cir. 1999) ("Because defendant has not raised the defense . . . until [summary judgment] and has made no effort to amend its answer, . . . it is barred from doing so.") (citing Fed. R. Civ. P. 8(c); 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1394 at 776–81 (2d ed.1990) (failure to plead affirmative defense ordinarily results in waiver of that defense)).

Ponzi scheme cases) and violate the priority rules of SIPA (in SIPA Ponzi scheme cases)."
*Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *12 n.17; *see also*
*Antecedent Debt Decision,* 499 B.R. at 421 n.4.  Indeed, "[e]ven if BLMIS owed obligations to
[Legacy], the customers did not, and the use of their property to pay fictitious profits was not
supported by value."  *Picard v. Lowrey,* Adv. Pro. No. 10-04387 (SMB), 2018 WL 1442312, at
*12 (Bankr. S.D.N.Y. March 22, 2018) (citation omitted), *adopted by* No. 18 Civ. 5381 (PAE),
2019 WL 479185 (S.D.N.Y. Feb. 7, 2019).

      Legacy argues that "[s]ection 548(a) is a statute of repose" barring the Trustee from
avoiding Legacy's "contract and tort obligations existing on account of the antecedent debt
reflected in Legacy's account statements issued prior to the two-year reach-back period."  (Opp.
at 18.)  However, the District Court previously made clear that while section 548(a)(1) permits
the avoidance of only those transfers occurring within the Two-Year Period, "there is no similar
limitation in section 548(c) . . . [and] there is no reason why a line should be drawn at the
beginning of the reach-back period in determining whether a transfer was for value."  *Antecedent
Debt Decision*, 499 B.R. at 427.  Legacy argues that the Supreme Court's decision in *California
Pub. Empls. Retirement Sys. v. ANZ Sec., Inc*., 137 S. Ct. 2042 (2017) ("*CalPERS*") requires a
different conclusion, but both this Court and the District Court already determined that
"*CalPERS* does not represent intervening law mandating a reexamination or modification of the
reasoning or the result reached in the *Antecedent Debt Decision*."  *Lowrey*, 2018 WL 1442312, at
*14; *see also Lowrey*, 2019 WL 479185, at *7, 15.  Even if section 548(a)(1) were to be
interpreted as a statute of repose, *Lowrey* explained that the Trustee's methodology in calculating
avoidance liability is wholly consistent with section 548(a) because it does not seek to avoid any
fraudulent transfers or purported "obligations" beyond the two-year look-back period.  2018 WL

17

1442312, at *14.  The Trustee's methodology does not involve equitably tolling any statutory

period.  Instead, the Trustee's claims against Legacy seek the avoidance and recovery of

transfers made on and after December 11, 2006.  Legacy's reliance on *CalPERS* is misplaced.

Equally misplaced is Legacy's reliance on *Tribune*.  In *Tribune*, the debtor incurred real

obligations when it agreed to provide severance payments to its executives if they were

involuntarily terminated after a change in control.  *In re Tribune Co. Fraudulent Conveyance

Litig.*, No. 11-md-2296 (RJS), 2018 WL 6329139, at *12 (S.D.N.Y. Nov. 30, 2018), *recons.

denied*, No. 11-md-2296 (DLC), 2019 WL 549380 (S.D.N.Y. Feb. 12, 2019).  *Tribune*, therefore,

did not involve the payment of fictitious profits.  BLMIS's account statements did not create

enforceable obligations owed by BLMIS.  *Antecedent Debt Decision*, 499 B.R. at 421 n.4.  Here,

"the transfers must be assessed on the basis of what they really were[—]artificial transfers

designed to further the fraud, rather than any true return on investments."  *Greiff*, 476 B.R. at

725; *see also Net Equity Decision*, 654 F.3d at 242 (noting that "the BLMIS customer statements

reflect impossible transactions" which the Trustee is not required to treat "as reflections of

reality").  *Tribune* has no relevance here.[10]

Thus, Legacy's purported federal and state law claims against BLMIS—whether phrased

as an "obligation" owed by BLMIS or otherwise—simply do not create any antecedent debts or

provide value under section 548(c) for the fictitious profits retained by Legacy.

---

[10] *Tribune* is further distinguishable as it is a non-SIPA constructive fraudulent conveyance case.

## B.    Legacy's Interpretation of the *546(e) Decision* is Meritless

Legacy asserts this Court's reliance on the *Antecedent Debt Decision* is inconsistent with

*In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014) ("*546(e) Decision*").[11]  Yet,

as this Court found, and the District Court twice confirmed, the *546(e) Decision* does not alter

the treatment of fictitious profits.  *See e.g., Lowrey,* 2018 WL 1442312, at *9-10, 12-13; *Lowrey*,

2019 WL 479185, at *10-11; *Cohen*, 2016 WL 1695296, at *12-13.

The *546(e) Decision* limited the Trustee's avoidance powers to claims under Bankruptcy

Code section 548(a)(1)(A).  *Omnibus Good Faith Decision*, 531 B.R. at 469 (citing *546(e)*

*Decision*, 773 F.3d at 417-23).  However, "[i]t does not follow . . . that the defendants paid value

in exchange for the fictitious profits they received." *Id.*  As *Lowrey* made clear, the *546(e)*

*Decision* neither addressed "the 'value' defense" nor "upset the general rule in Ponzi scheme

cases limiting value to principal deposits."  2018 WL 1442312, at *13.  The Second Circuit

certainly did not rule that BLMIS's payments to its customers were made for "value" under

section 548(c).  *Id.* (citing *Silverman v. Cullin*, 633 F. App'x 16, 17 (2d Cir. 2016)).  The District

Court agreed and noted that the Second Circuit stated that section 546(e) was "'expressly

inapplicable'" to claims brought under section 548(a)(1)(A), the provision the Trustee invokes

here.  *Lowrey*, 2019 WL 479185, at *11.  The District Court further rejected Legacy's

characterization of BLMIS's payments, noting that simply because "BLMIS's transfers were

'settlement payments' within the meaning of one statutory provision does not logically suggest

---

[11] Legacy contends that prior decisions, including the *Antecedent Debt Decision* and *low*, have no stare decisis effect because "Legacy was not a party to the *Antecedent Debt Decision.*" (Opp. at 23).  Given the commonality of facts and claims in this action and those that were subject to the *Antecedent Debt Decision*, that argument fails.  Legacy raises the exact issues previously considered by this Court and the District Court.  Furthermore, in its Answer, Legacy conceded that its entitlement to prejudgment interest depends on the reversal of the *Antecedent Debt Decision*.

that [Legacy] gave 'value' within the meaning of a separate statutory provision when [it] received intentional fraudulent transfers of money." *Id*; *see also Greiff*, 476 B.R. at 725. Thus, the *546(e) Decision* did not change the rule of law that Legacy may only seek the protections of section 548(c) to the extent of its principal investments.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant summary judgment on Count One of the Trustee's Complaint and enter an order avoiding the transfers of fictitious profits made by BLMIS to Legacy within the Two-Year Period and directing Legacy to return such transfers or the value thereof to the Trustee.

Dated: New York, New York
      March 22, 2019

Respectfully submitted,

**BAKER & HOSTETLER LLP**

By: s/ *Oren J. Warshavsky*
    Baker & Hostetler LLP
    45 Rockefeller Plaza
    New York, New York 10111
    Telephone: (212) 589-4200
    Facsimile: (212) 589-4201
    David J. Sheehan
    Email: dsheehan@bakerlaw.com
    Oren J. Warshavsky
    Email: owarshavsky@bakerlaw.com
    Jason S. Oliver
    Email: joliver@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff*

20