# Exhibit 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA

 4           v.                         10 Cr. 228 (LTS)

 5   DANIEL BONVENTRE,
     JEROME O'HARA,
 6   GEORGE PEREZ,
     ANNETTE BONGIORNO,
 7   JOANN CRUPI,
                                        Jury Trial
 8           Defendants.

 9   ------------------------------x
                                        New York, N.Y.
10                                      December 4, 2013
                                        9:00 a.m.
11
     Before:
12
             HON. LAURA TAYLOR SWAIN
13
                                        District Judge
14

15
             APPEARANCES
16

17   PREET BHARARA
         United States Attorney for the
18       Southern District of New York
     MATTHEW L. SCHWARTZ
19   RANDALL W. JACKSON
     JOHN T. ZACH
20       Assistant United States Attorneys

21

     GORDON MEHLER
22   SARAH LUM
         Attorneys for Defendant O'Hara
23

24   LARRY H. KRANTZ
     KIMBERLY A. YUHAS
25       Attorneys for Defendant Perez
```

```
 1              APPEARANCES

 2

 3   ANDREW J. FRISCH
     GARY VILLANUEVA
     AMANDA BASSEN
 4        Attorney for Defendant Bonventre

 5

 6   ROLAND G. RIOPELLE
     MAURICE H. SERCARZ
     ARIELLE PANKOWSKI
 7        Attorneys for Defendant Bongiorno

 8

 9   ERIC R. BRESLIN
     MELISSA S. GELLER
          Attorneys for Defendant Crupi

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Trial resumed; jury not present)

 2              (Appearances taken)

 3              THE COURT:  Good morning.  I trust you have all

 4    received copies of the order that I entered this morning in

 5    respect of Mr. Breslin's application on the Cohen testimony

 6    issue.

 7              Another housekeeping issue on my list is cross-

 8    examination list for Mr. DiPascali.

 9              MR. FRISCH:  It is Mr. Krantz, Mr. Riopelle, Mr.

10    Mehler, Mr. Breslin, and me.

11              THE COURT:  Thank you.  Is there anything else that

12    you wish to take up with me this morning before we start with

13    the jury?  Mr. Riopelle?

14              MR. RIOPELLE:  Only that the government had produced

15    an exhibit this morning with print so small that I cannot read

16    it even with my bifocal glasses.  But they have agreed to print

17    out a larger version later today, and I thank them for that,

18    your Honor.

19              THE COURT:  Sounds like a good thing.

20              The last I heard, the jury were not all present yet.

21    I am going to go back in the robing room.  Ms. Ng will check.

22    Once they are here, she will give us all that two-minute

23    warning, and then we will commence when everybody is ready.

24    Thank you.

25              (Recess)
```

```
 1            THE COURT:  Ms. Ng, would you please bring the jury

 2   in.

 3            (Jury present)

 4    FRANK DIPASCALI, JR., resumed.

 5            THE COURT:  Good morning, members of the jury.

 6   Welcome back.  Please take your seats.  Please be seated,

 7   everyone.

 8   DIRECT EXAMINATION

 9   BY MR. ZACH:

10   Q.  Mr. DiPascali, when we broke on Monday, we had been talking

11   about your time at Madoff Securities in the '70s and '80s and

12   early '90s.  Do you recall that?

13   A.  Yes, I do.

14   Q.  To refresh everyone's memory, in the 1970s were you working

15   as a clerk for Peter Madoff?

16   A.  Yes, I was.

17   Q.  In the 1970s and the 1980s, what was Ms. Bongiorno's role

18   at Madoff Securities?

19   A.  She was in charge of Bernie's customer business.

20   Q.  On Monday you described a little bit about how David Kugel

21   would prepare information for Ms. Bongiorno.  Do you recall

22   that?

23   A.  Yes.

24   Q.  One of the things that you said is that Mr. Kugel would

25   sometimes take that work home with him at night.  Do you recall
```

Case 1:10-cv-04652-LTS   Document 196   Filed 04/05/11   Page 5 of 17   161

1   that?

2   A.   Yes.

3   Q.   Would you please describe, first, what the work was that

4   Mr. Kugel was doing for Ms. Bongiorno and also what it meant to

5   take that work home at night.

6   A.   She had given him an illustration of the amount of funds

7   and for who arbitrage transactions needed to be set up for.

8   Then he would take the necessary paperwork home with him:

9   Backdated copies of The Wall Street Journal, his internal notes

10  of the terms and conditions of the various arbitrages.

11           Based on the illustrations she gave him as to how much

12  funds needed to be set up and for what groups, then he would

13  use the backdated newspapers and apply the terms and conditions

14  to certain arbitrages and come back to her with this arbitrage

15  can be done for X amount of dollars, and so on and so forth.

16  Q.   Did you observe Mr. Kugel taking his work home at night?

17  A.   Sure.

18  Q.   What did it look like when he would take it home at night?

19  A.   His briefcase with a half dozen or a dozen Wall Street

20  Journal C sections.  I don't remember the card box being in his

21  briefcase, but he would take home the necessary paperwork, the

22  index cards that he used from his arbitrages, which were on a

23  rack over his right shoulder sitting on an air conditioning

24  ledge.

25           We had this metal rack that was about three foot tall

1    where you could flip over each almost metal page.  There were

2    like six of them on a central hinge.  Each one of these metal

3    pages had little plastic insert envelopes like, and you could

4    stick index cards down those insert envelopes.

5           All his arbitrages, the terms of which were written on

6    these index cards.  It would say, for instance, what the

7    particular preferred stock was convertible into, what the

8    dividend dates were on the stock, what the dividend dates were

9    on the common, the rates of the dividends, the pertinent

10   information one would need to set up an arbitrage.

11   Q.  Can you compare briefly taking that work home at night to

12   what you observed Mr. Kugel doing when he was doing these

13   trades on his own.

14   A.  Real trades in the trading room?

15   Q.  Yes.

16   A.  In a nutshell, entirely different.  As I said the other

17   day, in order to transact business in an arbitrage, you needed

18   current quotations.  We had many vendors that would supply us

19   with quotations from various market centers.  Back in the day

20   we had a Quotron machine that showed all the New York Stock

21   Exchange securities, both bonds and stocks.

22          The meat and potatoes of the arbitrage business was

23   done in an over-the-counter environment where there was a

24   vendor that used to supply what they called the pink sheets or

25   the yellow sheets.  These were tissue-paper-thin stacks of

1  paper about 14 inches long, maybe 6 inches wide stapled on top.

2  What it was was a very rudimentary computer printout that was

3  duplicated and distributed to every dealer at like 7 o'clock in

4  the morning.

5       What the yellow sheets specifically were were an

6  alphabetized list of various securities, whether they be

7  convertible or not.  All sorts of bonds that were traded over

8  the counter would be on that list.  Next to each entry for a

9  particular convertible bond, for instance, there would be a

10  list of dealers that were making a market in that bond and

11  their phone number.

12       The way the business worked back in the day before the

13  electronic environment of linking all of these dealers together

14  was if you had a customer, let's say you were Merrill Lynch,

15  you had a customer that wanted to sell a particular bond.  You

16  went to the yellow sheets and you looked up who the market

17  makers were in that bond.  By and large, most of the time you

18  would find Madoff, because we were market makers in most things

19  back in the day.

20       Merrill Lynch's order room would call Madoff and ask

21  them to quote the bond.  David would put out a two-sided

22  bid/ask quote, the bid side being what he was willing to pay

23  for that bond, the ask side what he was willing to sell that

24  bond at.  Sometimes he only had a one-side market, which was

25  I'm only willing to be a buyer of that bond, and he would quote

1   it.

2          You can imagine the manpower involved when trying to

3   execute an order.  You would naturally, being a prudent broker

4   trying to get the best price for your customer, call five or

5   six or seven dealers to ascertain what the price is.  Then you

6   would call the dealer back that had the best price and you

7   would try to execute an order.  You not necessarily were going

8   to execute the entire order with that dealer.  You might have

9   50 bonds for sale and the guy only bought 25.  So you had to go

10  back to the second best price and make another phonecall.

11         In essence, we had 120 telephone lines in front of us.

12  There were what they call the turret system.  If you look at

13  like an old black and white movie of a phone operator with all

14  the wires, it looked just like that, except the wires were all

15  in the back and we had little buttons.  Lights would be above

16  every button, and the lights would be flashing and a little

17  buzzer would be going off under the desk to alert that you that

18  the light was flashing.

19         Most of the time during the trading day that buzzer

20  was going nonstop.  You wore a headset and you flicked a button

21  and you spoke to a brother.  You either gave out a quotation or

22  maybe you already give out a quotation or maybe you already

23  gave out a quotation and now this is the second phonecall that

24  the broker is coming back to you and literally giving you an

25  order to execute at the quotation you gave four minutes ago.

1          Your quotation is based on the stock side moving

2    around.  You're cognizant of what the security price is of the

3    common stock, and that constantly needs to be monitored so that

4    you could have a quotation that makes sense economically.  You

5    would purchase the bond on the second or the third phonecall

6    based on that moving target price of the common.

7          Now the frantic part starts.  Once you purchased that

8    bond, you've got to sell that common at that price; otherwise,

9    the numbers don't work.  If it's a New York Stock Exchange

10   listed stock that you are trying to sell, you hit down one of

11   those turrets and you start pressing a button to ring it down

12   so it rings down to your broker on the floor, and you give him

13   an order.  You stay on the phone while he's trying to execute

14   that order.

15         If it's an over-the-counter stock that needs to be

16   sold, that's a different market environment.  There is no floor

17   in the over-the-counter NASDAQ market, there is a computer

18   terminal.  When you hit up the stock on the computer terminal,

19   you see the name of the stock and you see 20 brokers.  Or, if

20   it's not a NASDAQ listed stock and it's traded over the

21   counter, it's in the pink sheets.  Now you have to flip through

22   that and find all the phone numbers of these brokers.  It is

23   not a one-man job typically.  So, there's a few people involved

24   in either looking up numbers or looking at brokers on NASDAQ.

25         In the meantime David is getting very frantic that he

1  is not going to be able to sell enough stock because he just

2  bought the bond.  There's a lot of communications between the

3  trading room and the outside world, a lot of communication

4  internally within the traders in that trading room.

5  Q.  There's a lot of activity going on?

6  A.  It's cuckoo.

7  Q.  Compared with Ms. Bongiorno's work, which was him going

8  home with some Wall Street Journals in his briefcase?

9  A.  Correct.

10 Q.  Back in the 1970s, before things became more electronic,

11 would you see runners and people coming into the office on the

12 market-making side of the business?

13 A.  Outside runners typically didn't come into the office, they

14 stayed outside the window, but yes.

15 Q.  What was the window?

16 A.  That's where receive and delivers of securities were being

17 made.  I'm not all that familiar with the process, but on

18 settlement date the brokers that you bought stock from would

19 make delivery of those shares, physical paper certificates.

20 They had these big satchels, kind of like lawyers walk around

21 with, and they made deliveries.  They would come up to your

22 office and make a delivery.

23        Your receive clerk would pull the confirmation of

24 trade out of the stock of his work for the day, of things that

25 were going to settle that day, and he would tear off -- the

1  certificate typically was attached to the confirmation that the

2  other broker presented which had his particulars as he knew it.

3  You would compare it to the particulars as you knew it.  If it

4  matched off and you were expecting that delivery at that price

5  on that day for that money, you would write him a check.  And

6  they would wait for their checks.

7  Q.  So you would see paper coming in and out of the office on a

8  regular basis for the trading that was going on in the

9  marketplace?

10  A.  Tons of paper.

11  Q.  Did you observe similar amounts of paper come in and out

12  for Ms. Bongiorno's side of the business?

13  A.  No.

14  Q.  I would like to turn back to Avellino & Bienes, which is

15  how we wrapped up on Monday, and go over those events a little

16  bit more.  On Monday you testified that Mr. Madoff was walking

17  around the area of the office between where you and Ms.

18  Bongiorno sat.  Do you recall that?

19  A.  Yes.

20  Q.  You testified that he was discussing his concerns relating

21  to the statements for A&B being off and not reflecting the

22  trading strategy that had been being represented to A&B's

23  clients, do you recall that?

24  A.  He wasn't discussing those particulars in that hallway.

25  Q.  Where would he discuss those particulars?

```
 1    A.   In Annette's office.

 2    Q.   Did you observe him discussing that with Ms. Bongiorno?

 3    A.   Yes.

 4    Q.   You also said that he was discussing the lack of a cushion,

 5    meaning that there wasn't sufficient money reflected on the

 6    statements to cover the liabilities that A&B had incurred.  Do

 7    you recall that?

 8    A.   Yes.

 9    Q.   Where did you observe them having those discussions?

10    A.   Either in Annette's office or my office.

11    Q.   We looked a document reflecting the attempt to hide other

12    Madoff clients, like A&A.  Do you remember looking at those

13    documents?

14    A.   Yes.

15    Q.   Did Mr. Madoff discuss those with Ms. Bongiorno and others?

16    A.   Yes.

17    Q.   Did you observe those discussions?

18    A.   Yes.

19    Q.   When the redoing of the statements took place, how far back

20    did the statements have to be redone?

21    A.   I think three years.

22    Q.   To be clear, how often would a statement go out?

23    A.   Every month.

24    Q.   When you say going back three years, that would be 36

25    statements, right?
```

1    A.  Correct.

2    Q.  A statement would then reflect what activity?

3    A.  It's going to show the incoming cash balance, which was the

4    closing balance of the prior month.  Then it's going to show,

5    in chronological settlement date order, all the activity,

6    whether that's a transaction or a dividend or a transfer or

7    some activity that's dated.

8        Each one of those lines of activity typically has a

9    money feature to it, a debit or a credit.  Your opening balance

10   starts here, and then all this activity occurs, and every piece

11   of that activity has a debit or credit associated to it which

12   is changing your incoming balance.  The last line on the

13   activity section of the statement is your closing cash balance.

14   Then right under that there is a listing of the security

15   positions that are residual at the end of that period.

16   Q.  Now I would like to bring up, Ms. Baskin, if we can,

17   Government Exhibit 105-B57.  Can we go back to the highlighted

18   part that we were looking at on Monday.

19       Remind us again, Mr. DiPascali, whose handwriting are

20   we looking at here?

21   A.  Most of it is mine.

22   Q.  What part of it is not?

23   A.  About half of it is mine.

24   Q.  What part is yours, first?

25   A.  The circled information that's in yellow with the

Case 1:10-cv-02296-JS   Document 56   Entered 04/08/14   Page 345 of 1

1    multicircles, the little B to the left of that, the little dash

2    three zero to the left of that.  Then the items that are

3    crossed off in the boxes to the right of the circled yellow

4    area, 4.65, 11.18, 11.29, that's all mine.  Everything else

5    that I see in that section is not mine, it's Annette's.

6           The line above that is kind of cut off on my screen is

7    also mine, where it says OEX ND, I believe.

8    Q.  To the left do you see where it says "add to December '89

9    statement"?

10   A.  Right.

11   Q.  We looked at that on Monday, right?

12   A.  Yes, we did.

13   Q.  That is in Ms. Bongiorno's handwriting?

14   A.  Yes, it is.

15   Q.  Did you have a discussion with Ms. Bongiorno about using

16   these particular securities as part of the Avellino & Bienes

17   redo?

18   A.  Yes.

19   Q.  What did you discuss with Ms. Bongiorno about this?

20   A.  There came a point in the redo of all that A&B work that

21   Bernie went to her and wanted to have treasury instruments

22   inserted on the statements.  She came to me and said, I need a

23   treasury, because I was the guy they went to in the office when

24   treasuries were discussed.  It was natural for her to come to

25   me.

08-01789-cgm Doc 18596-1 Filed 03/22/19 Entered 03/22/19 14:23:15 Exhibit 1
Case 1:10-cv-02216-JS Document 32-2 Filed 03/22/19 Page 35 of 12
Pg 16 of 180

1        So, Bernie wants to put some treasuries into this

2   work.  She gave me an amount and she gave me a time frame, and

3   I started researching treasuries in that time frame.  I quickly

4   realized that that could be problematic because treasuries, I

5   don't remember exactly what their maturity schedule was back in

6   1992, but they are typically short-term, six months or a year.

7   Q.  What is a maturity schedule?

8   A.  It's when the bond pays back the holder the principal, kind

9   of like when a savings bond matures.  You purchase it in

10  January and it ceases to exist, basically, in let's say June.

11  Where you're buying a bond that pays you interest or you buy it

12  at a discount to receive implied interest, when it matures is

13  when the principal is paid back to the holder.

14       A treasury bill is a government instrument that has

15  the shortest maturity of all government instruments, six

16  months.  They went to a year for a while and then back to six

17  months, I'm not quite sure when exactly.  Suffice it to say

18  it's less than a year, a year or less.

19       This is a project that is taking a three-year lookback

20  period, where we are doing, like you said, 36 monthly

21  statements or some number very close to that.

22       Bernie goes to Annette and says he needs treasuries,

23  Annette comes to me and says Bernie needs treasuries.  I start

24  researching treasury prices and then I realize that's no good

25  because if they go back and put treasuries into this account

1  in, let's say, 1989, then the treasuries that I'm looking at

2  are going to mature in early '90 and we are going to have to

3  get another treasury.  Then the treasuries that we buy in early

4  '90 are going to mature in mid 1990, so we are going to need

5  another treasury, and so on and so on, to complete the cycle

6  all the way to the summer of '92.

7         So, purchasing a T-bill didn't make any sense to me or

8  putting through a ticket to purchase a T-bill didn't make any

9  sense to me.  I bounced it off Bernie that you really don't

10 want a T-bill, you want a treasury note, which has a longer

11 maturity, typically three, four, five years.

12        That became somewhat problematic because treasury

13 notes paid coupon interest every six months.  If we are going

14 to put a trade into this account in the latter part of 1989,

15 then two times a year going forward she would have an interest

16 credit to have to put through the account.  If my memory serves

17 me right, a lot of this work had already been pretty much put

18 to bed, and those interest credits were going to change all the

19 cash balances.  So statements that were already kind of done

20 would have to get redone.

21 Q.  Stepping back for a second, going back and doing three

22 years worth of statements -- that's what the project was,

23 right?

24 A.  Mm-hm.

25 Q.  All of the trading in those three years of statements is

Case 1:10-cv-02225-JSR   Document 49   Filed 04/05/11   Page 1 of 1

1   fake, right?

2   A.   Sure.

3   Q.   Those trades are just being picked out of sort of

4   historical market data?

5   A.   Correct.

6   Q.   You said that the initial treasury securities you are

7   looking at matured quickly, meaning every six months or every

8   year?

9   A.   Correct.

10  Q.   Using what we have here, the STRIP interest, did you have

11  to go back and find more or less fake securities to put into

12  the statements?

13  A.   The treasury instrument known as a U.S. Treasury note

14  stripped of interest was pretty much the perfect vehicle to

15  suit Bernie's needs because it doesn't pay a coupon every six

16  months, which was one of the problems, and it has a long-term

17  maturity.  It solved the problem of once you put it into the

18  account, having to do anything else that would then for the

19  second time change all these redone statements.

20          It literally could get put into the account in the

21  December '89 time frame and just carry forward on the residual

22  section of the security positions all the way till the end of

23  '92 if you wanted to, without having to touch anything again.

24  It's a long-term treasury instrument that pays no coupon.

25  Those were the two issues that needed to be jumped over,

1   getting over the short-term nature of it and getting over the

2   coupon payment credit issue.  This was perfect.

3   Q.  It was less work for you guys to insert in these

4   statements?

5   A.  Yes, it was.

6   Q.  And it was easier to keep track of?

7   A.  Yes.

8   Q.  And it had less effect on having to change the incoming

9   balances each month?

10          MR. KRANTZ:  Objection.

11          THE COURT:  Please confer.

12          (Counsel conferred.)

13  Q.  Because the STRIP interest didn't pay a regular coupon, how

14  did that make it easier to deal with each monthly statement?

15  A.  Had a security that paid a coupon been placed instead of

16  this one, then every six months a credit for that coupon would

17  have had to be posted to the account that this was put in,

18  changing the cash balance.

19  Q.  These were all things that you discussed with Ms.

20  Bongiorno?

21  A.  Not in great detail.

22  Q.  But you provided this information to her?

23  A.  I told her this would be perfect because you don't have to

24  deal with a coupon issue and you don't have to deal with a

25  rollover issue, because things were maturing every six months,

08-01789-smb Doc 18596-1 Filed 03/27/19 Entered 03/22/19 14:23:15 Exhibit 1
Case 1:10-cv-02221-S Document 50 Entered 04/05/12 Page 39 of 15 Pg 1615

Pg 20 of 180

1  use this instead.

2  Q.  Because it would make things easier?

3  A.  Yes, sir.

4  Q.  Can we pull out of this document for a moment.  Let's blow

5  up the right-hand side of the middle section of the document.

6  There is additional handwriting on the right-hand side.  Can we

7  highlight that, Ms. Baskin.

8       Mr. DiPascali, do you recognize that handwriting?

9  A.  Yes.

10 Q.  Whose handwriting is it?

11 A.  It's Annette's.

12 Q.  Could you read it, please.

13 A.  "If this trade goes through, it must be before 11/89 or

14 opening balance must change."

15 Q.  What's an opening balance?

16 A.  It's the number that appears as the first number on the

17 statement, which is the carryforward closing balance of the

18 prior month.

19 Q.  If an opening balance changes in a given month, what effect

20 does that have on all of the statements that might have been

21 created afterward?

22 A.  They would have to change.  Your opening balance is your

23 starting point.  You are changing the starting point.  If there

24 is any activity that month, it's going to be reflected against

25 a different starting point.

1  Q.  Let's pull out of this document.  I would like to go now to

2  Government Exhibit 105-B58, if we can.  I would like to go to

3  page 13.  Looking at page 13, Mr. DiPascali, can you tell us

4  what account this is for.

5  A.  Avellino & Bienes number 5, which is A53.

6  Q.  Briefly, what was the number 5 account used for as part of

7  this redo?

8  A.  It was an account that was created to increase the value of

9  the A&B holdings.

10  Q.  What role did that play in connection with Mr. Madoff's

11  concern about there being a sufficient cushion to display as

12  part of this SEC investigation that he anticipated?

13  A.  It pretty much went exactly to that point.

14  Q.  Let's look at the date of this statement.  When is it

15  dated?

16  A.  It's a June '92 statement.

17  Q.  Can we highlight that, please.  Do you see that there is a

18  series of trades on the bottom half of the document?

19  A.  Yes.

20  Q.  What are those trades dated?

21  A.  Various dates in December.  I can't tell which year,

22  because the year is not resident on this statement.

23  Q.  Do you recognize the check marks on this document?

24  A.  On the top or the bottom?

25  Q.  Yes, on the top.

1   A.   On the top they are Annette's.

2   Q.   Let's blow up the bottom half, starting at 12.  Can we put

3   that in split screen.  Thank you, Ms. Baskin.  If we can, I

4   want to go to page 1 of the same document on the other split

5   screen.  And can we blow up the trades.

6            It is a little bit small, because it is a split

7   screen.  Can you see, Mr. DiPascali, what the first page of the

8   document says at the top?

9   A.   A&B number 5.

10  Q.   So it is the same account?

11  A.   Yes, it is.

12  Q.   Do you recognize the handwriting?

13  A.   It's Annette's.

14  Q.   What is it dated?

15  A.   12/31/91.

16  Q.   Can you remind us what the handwritten versions of these

17  statements were used for.

18  A.   That was the information that needed to be manually keyed

19  into the machine to create a statement.

20  Q.   Now let's blow up the trades that we see there.  If you

21  can, can you compare the handwritten trades to what is at the

22  top.

23  A.   They look to be the same.  I didn't block out every one of

24  them, but . . .

25  Q.   A lot of them have the same transaction number, the same

1    shares, the same date?

2    A.    Exactly.

3    Q.    The top document is dated what?

4    A.    June '92, I believe.

5    Q.    What was the bottom document?  What is the date on that?

6    A.    December of '91, I think.

7    Q.    Tell us what's happening here.

8    A.    The handwritten document is the information that's going to

9    get keyed into the machine.  The top document is the first

10   generation of the statement that would come off the printer

11   based on what was inputted into the machine.  Since the

12   computer only knows it's June of '92, it's going to accept

13   information into itself but it is not going to be in proper

14   form.

15         If you put December '91 transactions into the system,

16   a system that recognizes the time period being we are in June

17   of '92, and then you ask it to create a statement, it's going

18   to print a June '92 statement and it's going to have December

19   of '91 transactions on it.  That's what you are looking at at

20   the top.  It's a first generation statement when one is redoing

21   a statement that is backdated.  That would never be distributed

22   to anyone.  It's an internal office document.  It's a work

23   product.

24   Q.    This is working toward getting to where you want to be in

25   the statement redo?

 1   A.   It's not there yet.

 2   Q.   Let's now go look at Government Exhibit 300-2.  What are we

 3   looking at here?  What account this, first?

 4   A.   Same account, A&B 5.

 5   Q.   What is this document dated?

 6   A.   December '91.

 7   Q.   Is this the same account that we just looked at the first

 8   iterations of the redo on?

 9   A.   Correct.

10   Q.   Looking at the trades that are on this December 1991

11   statement, how do they compare to the handwritten notes and the

12   first generation statement that we just looked at?

13   A.   They appear to be the same.

14   Q.   What is this document in relation to the first two drafts

15   that we saw?

16   A.   This is either final or getting very close to a December

17   '91 statement.

18   Q.   When were these trades actually entered?

19   A.   I could tell by the other document they were entered in

20   June of '92.

21   Q.   When is this statement saying that they were entered?

22   A.   December of '91.

23   Q.   Let's be clear, again, are any of the trades on this real?

24   A.   No.

25   Q.   Why is it important that these fake trades look like they

Case 1:10-cv-02556-1-S   Document 490-2   Entered 03/23/19   Page 345 of 113   Exhibit 10

1   were done in December 1991 and not in June of 1992, when they

2   were actually picked?

3   A.   Because when you are redoing three years worth of

4   statements, you got to get it right.  Bernie wasn't about to

5   hand them one June of '92 statement and say here, this is what

6   this account looks like in June of '92.  You might as well just

7   print the word "fraud" all over the damn thing.

8   Q.   Thank you.  Let's pull out of that document.  Did there

9   come a time, Mr. DiPascali, that the fake Avellino & Bienes

10  accounts that we have been talking about and for whose

11  statements had just been done needed to be liquidated?

12  A.   Yes.

13  Q.   By liquidated, what does that mean?

14  A.   In the real world you would do transactions with counter-

15  parties to sell the securities that you currently have in

16  position for your client.  In our world we would write sale

17  tickets to things that were long.  If it showed that it was in

18  inventory, then we would write a sale ticket to convert that

19  inventory to cash.

20  Q.   In the real world if you are going to liquidate an account,

21  you would sell the securities the customer owned, get the money

22  for that stock, and give it back to the client?

23  A.   In this case it was going to the trustee, but yes.

24  Q.   There were no securities in these Avellino & Bienes

25  accounts, right?

1   A.  Correct.

2   Q.  How was it that the money was going to be returned to

3   Avellino & Bienes?

4   A.  Bernie was going to return the money from his checkbook.

5   Q.  Just going to write them a check?

6   A.  Or a wire.

7   Q.  Why did these Avellino & Bienes accounts need to be paid

8   back by Bernie to Avellino & Bienes?

9   A.  My understanding was that Frank Avellino and Mike Bienes,

10  after negotiating with the SEC, had come to some resolution

11  that they would close down the business.  The SEC -- I'm not

12  very well versed in all the court proceedings and negotiations

13  that went on, but what I do know is a trustee was appointed by

14  the court or the SEC went to the court to have a trustee

15  appointed, and a fellow by the name of Lee Richards became the

16  trustee for the Avellino & Bienes affairs.

17          His job, as I know it, was to quantify who Avellino &

18  Bienes's clients were, first of all, and, second of all,

19  determine what each client was owed that was represented by the

20  promissory notes that Frank and Mike had issued these people.

21  He had a staff of people that were going through the books and

22  records of Avellino & Bienes.  Whether that was at the SEC's

23  office or Avellino's office or the trustee's office, I have no

24  idea.

25          There was this sigh of relief, if you will, at the SEC

Case 1:10-cv-02226-RS Document 456 Filed 04/22/19 Page 26 of 179

1     when they found out -- when they started digging through the

2     Avellino & Bienes mess, they thought it was a Ponzi scheme.

3     They thought there were a thousand people that were going to

4     get harmed.  They were very excited to hear that Bernie Madoff

5     was actually the broker that was handling Avellino's business

6     and was custodying the securities.  So they appointed a

7     trustee.

8             MR. BRESLIN:  Objection, your Honor.  Move to strike.

9             THE COURT:  Sustained.  Ladies and gentlemen, you are

10    to ignore the testimony regarding what the SEC thought.  Thank

11    you.

12    Q.  Confining your answer to discussions you were having

13    between Mr. Madoff and yourself and other people at Madoff

14    Securities, what was your understanding based on those

15    discussions of why those accounts needed to be liquidated?

16    A.  Because the trustee demanded it.

17    Q.  The trustee was appointed, based on your understanding, to

18    do what?

19    A.  To instruct the broker to liquidate the holdings of A&B in

20    some orderly fashion and forward the proceeds of that

21    liquidation to him as trustee, and then his office was going to

22    be responsible for cutting checks back to the promissory

23    noteholders.

24            (Continued on next page)

25

08-01789-smb Doc 18596-1 Filed 03/22/19 Entered 03/22/19 14:23:15 Exhibit 1
Pg 28 of 180

1   Q.  And what was your understanding of how that was going to be

2   used to resolve the situation that Avellino and Bienes had with

3   the Securities and Exchange Commission?

4   A.  Can you ask me that again, please.  I'm sorry.

5   Q.  What was your understanding of the effect that would have

6   on dealing with the investigation by the Securities and

7   Exchange Commission?

8   A.  My understanding was that if the trustee received the funds

9   from the brokerage accounts and distributed the checks, that

10  the SEC and the Avellino and Bienes firm had an agreement that

11  they would cease to conduct business in the future.

12  Q.  Avellino and Bienes?

13  A.  Yes.  In effect, they would have been unwound by a trustee.

14  Q.  And was it your understanding that that would be the end of

15  the investigation?

16  A.  Yes.

17  Q.  So how did the Madoff firm go about paying back Avellino

18  and Bienes?

19  A.  We put through trading tickets that were on the sell side

20  to quantify the credits that would then be resident because the

21  securities that were resident on a statement would have been

22  converted to cash.  We looked at the value of that number and

23  the various settlement dates that that number was going to be

24  available cash to the A and B accounts.

25          And Bernie cut checks or made wires to the trustee for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  those amounts on those days and the balance in the A and B

2  accounts, after that was complete, became zero; so the accounts

3  ceased to exist on our end.

4  Q.  Now, when you say the accounts, are you referring to the

5  redone statements that you've been testifying about this

6  morning and on Monday?

7  A.  All the sale tickets that were generated -- were generated

8  to address the positions that were in the accounts because they

9  were redone.

10 Q.  And when you say doing trade tickets and sale tickets, were

11 those to really resell securities?

12 A.  No, we were just putting through paperwork.

13 Q.  To make it look like they're actually sold securities?

14 A.  Exactly.

15 Q.  And who was involved in this process of putting through

16 these fake trade sale tickets to return money via checkbook to

17 Bernie Madoff -- to Avellino and Bienes?

18 A.  Annette and I wrote a couple of tickets myself on the

19 treasuries and some of the options.

20 Q.  I'd like to show you, just the witness, Judge Swain and

21 defense counsel, what's been marked as Government

22 Exhibit 105-A374.

23         Do you recognize the handwriting on this document?

24 A.  Most of it is mine.

25 Q.  And what does this document show?

```
 1   A.   Looks like it was some instructions I was giving to someone
 2   in our back office where we were sending back treasury notes,
 3   probably, and would be receiving in return other treasury
 4   notes.   This document was written when we were swapping
 5   positions with Hadassah, which was one of Bernie's clients.
 6              MR. ZACH:   I'm going to offer A374.
 7              THE COURT:   Is there any objection?
 8              MR. MEHLER:   No objection.
 9              MR. FRISCH:   No objection.
10              MR. RIOPELLE:   No objection.
11              MR. KRANTZ:   No objection.
12              THE COURT:   Government Exhibit 105-A374 is admitted in
13   evidence.
14              (Government's Exhibit 105-A374 received in evidence)
15              MR. ZACH:   And we don't need to publish it.   We'll
16   just take it down.
17   BY MR. ZACH:
18   Q.   Now, as part of -- around the time that Madoff was paying
19   back Avellino and Bienes, were you aware of other Madoff
20   customers providing securities to Madoff to be used as
21   collateral?
22   A.   At the exact time he made the payments, no.
23   Q.   In the general time period?
24   A.   Shortly thereafter.
25   Q.   And what do you recall about that?
```

1   A.   Bernie had arranged for one of his clients, a fellow by the

2   name of Jeffrey Picower, to send into our firm a portfolio of

3   security holdings that he had that, I believe, came in from

4   Goldman Sachs.  They were large positions in very familiar

5   companies, like Hewlett Packard and American Cyanamid and

6   American Telephone, and they were deposited with Bernie.  Well,

7   Goldman Sachs made a delivery based on Mr. Picower's

8   instruction, and they were delivered to our DTC account, I

9   believe, at Madoff.

10  Q.   And who was Mr. Picower?

11  A.   He was one of Bernie's largest clients.

12  Q.   And did you, over time, gain an understanding of what those

13  securities were going to be used for?

14  A.   Yes.

15  Q.   What did you gain an understanding as to how they were

16  going to be used?

17  A.   Well, what Bernie did was he received in securities that

18  belonged to Jeffrey Picower, and he basically did two separate

19  things with them.  He -- Once those securities were received in

20  by our firm, they became part of our clearing account.  He

21  instructed Annette to receive them into Mr. Picower's account

22  at Madoff, his investment advisory account, if you will.

23         So in order to do that, she would have had to write up

24  what they call a C and S sheet, which is an illustration of the

25  security description, typically CUSIP, the position and in the

1    money box, you would put zero because they were received in for

2    free.  In other words, he wasn't buying them through us.  It

3    wasn't a transaction where Bernie was buying them from him.

4             It was just a delivery of shares from point A and we

5    were point B, and they needed to be reflected on Mr. Picower's

6    statement that that occurred just that way.  And at the end of

7    that cycle, he had a statement that showed that now Madoff was

8    holding this stock, this stock and this stock for him at the

9    Madoff brokerage house, and he no longer was holding them at

10   Goldman.

11            The second thing that he did was they took those very

12   same securities and they opened an entry in the trading room.

13   Each trader in the trading room had his own computer account.

14   So each trader every morning would get a computer run that

15   showed all that trader's positions and any profit or loss they

16   might have had on those positions for the day, for the month,

17   for the year, so on.

18            So they opened a trading account in the trading room

19   and they, through the back office, did a similar process that

20   Annette did on the investment advisory side.  They received in

21   these securities for free.  So they became resident in the

22   broker's trading account and then simultaneously, or once they

23   were registered in the broker's clearance account, they pledged

24   those securities to our bank and they borrowed against them,

25   converting them to cash.  And then they used that cash in that

1   checkbook and they paid Lee Richards, the trustee for Avellino.

2   Q.  So stepping back for a moment, Mr. Picower provided

3   securities to Madoff which appeared on his statements as if

4   they were just being custodied at Madoff Securities, right?

5   A.  Exactly that.

6   Q.  And these were real securities, right?

7   A.  Oh, yes.

8   Q.  And how did these compare to all the securities we've been

9   talking about with the A and B account?

10         MR. BRESLIN:  Objection, your Honor.  At this point,

11  asked and answered.

12         THE COURT:  Overruled.  You may answer.

13         THE WITNESS:  I can answer, your Honor?

14         THE COURT:  Yes, you may answer.

15  A.  These were real securities received in from another market

16  center, namely Goldman Sachs, and they were placed in a --

17  basically, a customer safekeeping account at Madoff for Jeffrey

18  Picower, or for one of his entities, I believe.  These

19  securities actually existed when they were on deposit in our

20  DTC account.  You could borrow against them, which they did.

21  There's a plethora of differences between entries that were

22  made to represent securities and a security.

23  Q.  And after Mr. Picower provided these securities to Madoff,

24  Madoff then went and got a loan against them, right?

25  A.  Yes.

Case 1:10-cv-02296-1S Document 36-1 Filed 04/05/14 Page 33 of 13

1   Q.  Now, to get the loan, did Mr. Madoff disclose that he

2   didn't actually own those securities, to your understanding?

3   A.  No.

4   Q.  Why not?

5   A.  Because you can't borrow with someone else's collateral.

6   Q.  And the money that was then borrowed was used to pay back

7   the trustee?

8   A.  I believe it was.

9   Q.  And who was involved -- Well, at the time, did you know who

10  was involved in getting these securities in?

11  A.  Our back office, typically, would see -- they would be the

12  first employees at Madoff that would physically see the

13  securities coming into the DTC account.

14  Q.  And who was it that participated in this process of taking

15  the securities and getting the loans?

16  A.  It would have been Dan Bonventre, Tony Tiletnick and

17  various clerks.

18  Q.  Now, Mr. DiPascali, did there come a time that you

19  understood that the Avellino and Bienes crisis had come to an

20  end?

21  A.  Yes.

22  Q.  When did that happen, approximately?

23  A.  I can't put a time frame on it, but, you know, four, five,

24  six months after everything -- the dust settled, there was

25  simply no more discussion about it.

1   Q.   Around that time period, did any sort of publication come

2   out relevant to what had been going on?

3   A.   The Wall Street Journal wrote an article on it.

4   Q.   When did the Wall Street Journal -- Well, what was the

5   article generally about?

6   A.   It was basically -- It was a dissertation as to what had

7   occurred, that the SEC was pleasantly surprised that Bernie

8   Madoff was the custodian of the assets of this entity that the

9   SEC had investigated and was concerned that they may have been

10  operating improperly, that a trustee had been appointed, that

11  there had been some negotiations between A and B and the

12  commission to close down, and that it was handled in this

13  orderly fashion with the trustee with the tremendous help of

14  Bernie Madoff.

15        There was a caricature picture of Bernie, like a

16  cartoon picture of Bernie, in the article.  It was kind of like

17  one of these, the financial community dodged a bullet here.

18  Q.   And the bullet being the investigation of Avellino --

19  A.   Yeah, that they would clearly, at least on -- the

20  appearance was that they were not operating something

21  improperly other than the technicality of not registering

22  themselves or registering the securities they were issuing, but

23  that everything else seemed to be on the up and up.

24  Q.   And did Mr. Madoff discuss this article after it came out?

25  A.   Yeah.

1   Q.   What did he say about it?

2   A.   Well, he was kind of like, his biggest concern was that the

3   caricature didn't look look him.  It makes my cheeks look too

4   big, he said.

5   Q.   What do you mean the caricature?

6   A.   They had a little like three-by-three sketch of Bernie

7   Madoff, like a profile thing, in part of the article.

8   Q.   Okay.  He didn't like the way he looked?

9   A.   He didn't like the way he looked, and he was not happy that

10  this was a -- and it was on the top part of the Wall Street

11  Journal, might have been the C section as well, might have been

12  B section, but it was a prominent article.  It wasn't something

13  that most people would just flip past.

14          So he was kind of ticked off that it actually

15  happened, but he was not upset of the verbiage of where the

16  article took the reader.

17  Q.   Did it suggest in any way that Mr. Madoff wasn't actually

18  holding securities?

19  A.   Of course not.

20  Q.   Did it in any way hint at the fraud that was going on at

21  Madoff Securities?

22  A.   No.

23  Q.   So it was, in general, a good thing for Madoff?

24  A.   In respect that it did not disclose any of the

25  irregularities, yes, but no, no disclosure to the public about

1  any customer business is ever a good thing for Madoff.  It was

2  just a general consensus that low key, under the radar is where

3  he wanted to operate.  The C section of the Wall Street Journal

4  is not under the radar.

5  Q.  And who was this article shown around to the people that

6  worked on the statement re-do's?

7  A.  I came in touch with it when Peter Madoff came flying

8  through the trading room with a copy of it under his arm,

9  looking for his brother.  For some reason, Peter assumed that

10  his brother had not yet seen the article, and that's how I

11  became aware of it.  So it was, yes, Bernie told Peter, of

12  course I saw the article, and yeah, there was discussion about

13  the article.

14  Q.  So when this was all done and over, did you feel like you

15  had dodged a bullet?

16  A.  Most certainly.

17  Q.  Now, as a result of what we've just been discussing, these

18  Avellino and Bienes accounts that we've been looking at were

19  closed, right?

20  A.  Yes.

21  Q.  And after this Avellino and Bienes crisis ended, did you

22  begin to take on a different role in the investment advisory

23  business?

24  A.  Yes.

25  Q.  What role did you take on?

08-01789-smb   Doc 18596-1   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 1
Pg 38 of 180

1   A.  Almost immediately after the funds were distributed, Bernie

2   came to me and asked me if I can do business for about a

3   thousand customers, which floored me because I had been writing

4   tickets for a couple dozen customers, and even that was

5   starting to become very laborious because they were handwritten

6   tickets.  They were -- each one needed to be key processed into

7   the system.

8           There was a lot of paperwork.  Even though my customer

9   base of accounts that I was doing option-hedging transactions

10  for, maybe it was three dozen or four dozen people by then, and

11  he turns and says he wants to explore the possibility of taking

12  on about a thousand accounts.

13  Q.  And this is in the client side of the business, right?

14  A.  Yes.

15  Q.  And when you had been doing that options hedging work, who

16  was running the IA business?

17  A.  Annette.

18  Q.  And as you began to take on -- or as you were offered new

19  responsibilities, was Ms. Bongiorno still running the IA

20  business?

21  A.  Yes.

22  Q.  Now, how did you respond to that request?

23  A.  Told him I didn't know if I could do it.  It became very

24  apparent to me very quickly that the only way you could do that

25  is to use the efficiencies of a computer.  I'll speak to the

1  computer people and see if we can do it.  I don't know.

2  Q.  So did you take on the task of trying to figure out a way

3  to manage a thousand client accounts?

4  A.  I had some brief conversations with Liz Weintraub, who was

5  the head of IT, to get her permission to talk to computer

6  people.  And she said that I should talk to Jerry about trying

7  to brainstorm with him how one would go about the processing of

8  that many accounts in that strategy that Bernie had elected to

9  use for these potential clients.

10  Q.  And were you able to come up with a way to handle managing

11  a thousand customer accounts?

12  A.  Eventually, sure.

13  Q.  Describe what you did.

14  A.  Basically, we looked at almost like creating a rubber stamp

15  or a template that you then could, through the use of the

16  computer, use as your core transaction, if you will, and then

17  apply that core transaction over and over and over and over and

18  over again to as many clients.

19      I mean, it didn't matter.  Once we built it initially,

20  it could be done for two clients, eight clients or 80,000

21  clients.  It's -- the computer has an infinite amount of, you

22  know, repetition-ability, if you will.  So we looked at if we

23  built a core architecture that's a -- my goodness, I lost the

24  word, but if we built a template that had a group of trades

25  illustrated in the template and the share quantity of those

1   trades was a simplistic, round number, then we could say, okay,

2   you have a hundred shares of Microsoft, 20 shares of Cisco, 300

3   shares of IBM, that's your template.

4          Now, do five of those for this guy, and the machine

5   would look at five times a hundred and create a ticket of 500

6   and five times 200 and create a ticket of, you know, a

7   thousand, and so on and so on.  And then you can say, all

8   right, now do 14 units for this guy, and it would do the math

9   again.  It would say 14 times a hundred, and it would create a

10  ticket of 1,400.  So if you had a template that had 20

11  purchases of various securities in a simplistic number that's

12  rounded to the nearest hundred, then you then could assign a

13  unit quantity to each and every one of your clients and the

14  machine would literally write the tickets.  So the

15  labor-intensive nature of doing what he was asking me to do

16  would be done by the machine.

17         You would determine what the unit quantities were

18  going to be used for each client by running some simple math.

19  You know what the template costs.  Let's say $1,000.  You know

20  that John's got $500 to invest.  You would simply divide a

21  thousand into the 500,000 and come up with a unit quantity,

22  five, and then do five of that template.  And when the five of

23  the template was all written to tickets, if you ran the math,

24  it would be $500,000 because five -- so you simply were

25  automating it in a very mechanical fashion.

1     And we called it batch trading. That was what we were

2   going -- because you were going to take a template and process

3   it for a batch of people or a batch of information. So we

4   eventually perfected that over the next couple of months or

5   years, even where the machine was actually reading the cash

6   credit balance of the investment advisory customers. And then

7   all I would need to do would be to give the divisor to the

8   machine, and it would divide those cash credit balances by a

9   set number.

10     It would produce a unit quantity. It would create a

11   file within itself of account number, unit quantity and then

12   you would say, okay, see this file of account number unit

13   quantity, run it against this template which we called the

14   basket. So it had a specific identifier, since every basket

15   was different, and it would then just automatically start

16   processing as many tickets as required. Sometimes we processed

17   a quarter of a million tickets in a day --

18   Q.  So this was a way --

19   A.  -- using that process.

20   Q.  So this was a way to now have hundreds and up to thousands

21   of clients without it being a manual labor-intensive process?

22   A.  Short of the mailroom facility, you could have an infinite

23   amount of clients.

24   Q.  And so you were able ultimately to be able to take on this

25   thousand clients, right?

Case 1:10-cv-02296-LS   Document 28-a   Filed 04/03/14   Page 315 of 1 13

1   A.   Well, his intention was to -- was to bring back the clients

2   that had received their money from the trustee and now offer

3   those clients the opportunity, since a lot of them knew that

4   Bernie Madoff was the investment manager, that was common

5   knowledge in a lot of circles; so they had an understanding

6   through Frank and Mike that it was Bernie Madoff that was doing

7   convertible bond arbitrage for them for years and --

8           MR. BRESLIN:  Objection, your Honor, and move to

9   strike.

10  A.   -- I've had --

11          THE COURT:  Mr. DiPascali.  The application to strike

12  is granted.  Again, members of the jury, ignore the testimony

13  as to what was in somebody else's mind.

14  Q.   Mr. DiPascali, you need to answer questions as to what you

15  saw and heard and not what is in someone else's mind, okay?

16  A.   Understood.

17  Q.   Now, what was your understanding of where these thousand

18  clients were coming from?

19  A.   They were coming from the people that had gotten paid off

20  on their promissory notes by Lee Richards, the trustee.

21  Q.   So before you testified that Avellino and Bienes went out

22  and got a bunch of -- had their own clients, right?

23  A.   Correct.

24  Q.   And now the SEC and Avellino and Bienes had agreed to shut

25  down Avellino and Bienes' customer business, right?

08-01789-smb    Doc 18596-1    Filed 03/22/19    Entered 03/22/19 14:23:15    Exhibit 1
Pg 43 of 180

1   A.   That's correct.

2   Q.   And the money was then returned to those customers by

3   Bernie Madoff?

4   A.   Correct.

5   Q.   Through the trustee?

6   A.   Yes.

7   Q.   And these new clients were those same people but now

8   dealing directly with the Madoff firm?

9   A.   Correct.

10   Q.   Now, were you involved in setting up these new accounts for

11   these former clients of Avellino and Bienes?

12   A.   I had a small role in it, yes.

13   Q.   Who played the major role in it?

14   A.   Annette's department.

15   Q.   Was Ms. Bongiorno involved?

16   A.   Yes.

17   Q.   Was Ms. Crupi involved?

18   A.   Yes.

19   Q.   Now, how big of a process was this in signing up all of

20   these former Avellino and Bienes clients?

21   A.   Pretty much a little ordeal that went on for a few months.

22   They came in a big wave; so account papers needed to go out to

23   these clients, account papers would come back.  You'd have to

24   assign an account number to the papers, and oftentimes the

25   account papers weren't filled out properly; so phone calls had

 1  to be made.

 2       Oftentimes the client, not really understanding what

 3  they were doing, would call us to try to get a handle on what

 4  they're going to be doing, you know.  So they would say, you

 5  know, I just got this --

 6       MR. RIOPELLE:  Objection, move to strike.

 7       THE COURT:  Please consult.

 8       (Counsel conferring)

 9  Q.  Mr. DiPascali, as part of the process, did you field calls

10  from clients that wanted to reopen their accounts at Madoff?

11  A.  Yes, I did.

12  Q.  And who else fielded calls from clients that wanted to

13  reopen their accounts with Bernie Madoff?

14  A.  Pretty much everyone in Annette's department and myself.

15  Q.  And what sorts of questions did you get from the clients

16  that called?

17  A.  Where do I send my check?  How do I fill out these papers?

18  What type of investment strategy are you doing?  I used to do

19  this, this and this through Avellino and Bienes.  They tell me

20  that's what we're going to be doing going forward.  It is

21  exactly that; so you had to make that differentiation to these

22  people very clear.  No, ma'am, you owned the promissory note

23  that Avellino and Bienes issued you.  You were getting a fixed

24  rate of interest every period.  That is not this.  Now you have

25  a brokerage account.  You're going to get many, many, many

Case 1:10-cv-02216-1S   Document 458-1   Filed 03/24   Page 345 of 175

1  transactions.  Most of these people that I spoke to were

2  concerned about their cash flow.

3         MR. BRESLIN:  Objection, your Honor.  Move to strike.

4         THE COURT:  Sustained.  Members of the jury, ignore

5  the testimony as to what people were concerned about in their

6  minds.  You may reformulate the question.

7  Q.  Sure.  What did they tell you they needed from the account

8  they were getting at Madoff Securities?

9  A.  They asked me to give them a better understanding about how

10 they would be receiving their quarterly checks going forward

11 because they were on a schedule when they owned their -- when

12 they owned the promissory note from A and B to receive their

13 interest quarterly.

14        So it needed to be explained that this is not

15 interest.  This is a brokerage account.  It's going to

16 fluctuate in value, hopefully, to the plus side, and that one

17 of the things we can do is we could issue a check for you every

18 quarter that's a fixed amount of money which, in effect, is no

19 different than you've been getting for 20 years.  There is no

20 guarantee, however, that you will not be dipping into your

21 principal by taking that fixed amount of money because unless

22 this account appreciates equal to or in excess of the fixed

23 amount of money you're taking, you're going to be dipping into

24 your principal.

25        To avoid that scenario, we could calculate for you

1    what the net change in your account is between two points in

2    time.  So we'll read your account at December 31 and we'll read

3    your account at March 31, and we will calculate the growth in

4    that account, quantify it and mail you a check for that amount

5    every quarter.  Some people agreed to that.  Some people wanted

6    to still stay on a fixed.  Some people said no, you know what,

7    I'm just going to leave everything alone.  Can I send you a

8    letter or a note or a phone call when I want a check?  Yes.

9    Fax me a letter.  It has to have your signature on it.  It has

10   to reference your account number.

11          So there were mechanical issues that were -- these

12   were clients that a lot of them didn't have a brokerage

13   account, that their investments were with A and B and they had

14   a different, a completely different methodology from what

15   they're going to be going and get anything the future.  You had

16   to explain to them they're not going to get a 1099INT at the

17   end of the year, where they're going to put one line on a tax

18   return; that they're going to need to do a Schedule D, which is

19   a very sometimes voluminous amount of entries.

20          And we were planning on trading a basket of 25 stocks

21   hedged with two options six or seven times a year; so you're

22   looking at a couple hundred security transactions.  Some of

23   these people had never seen anything like that.  So my advice

24   was to simply take everything we mail you and put it in a big

25   shoe box and bring it to your accountant.

Case 1:10-cv-02596-LS Document 30-1 Filed 04/03/14 Page 36 of 13471

1  Q.  Now, you said that you had to explain to them that they

2  were opening a brokerage account.  What is a brokerage account?

3  A.  It's an account that a customer has with a broker-dealer

4  where either that client gives instructions to that

5  broker-dealer to buy and sell securities for him and house it

6  in that account, or that broker-dealer has the authority to

7  purchase and sell securities on behalf of that client and

8  report same to the client and house them in that account.

9  Q.  And so as these clients called you, did you tell them that

10  you would be trading stocks in these accounts?

11  A.  Yes.

12  Q.  And did you tell them that their statements would reflect

13  the trades of stocks?

14  A.  Yes.

15  Q.  And that they could expect to receive confirmation tickets

16  and that type of thing?

17  A.  Yes.

18  Q.  And as this process happened, did you hear Ms. Bongiorno

19  having similar conversations with clients?

20  A.  Yes.

21  Q.  And did you hear Ms. Crupi having similar conversations

22  with clients?

23  A.  Yes.

24  Q.  Did you ever tell these clients that none of the trading

25  was real?

```
 1   A.   No.

 2   Q.   Were you lying to these clients?

 3   A.   Yes.

 4   Q.   Did you understand, as you spoke to these clients on the

 5   phone, that you were committing a fraud?

 6   A.   Yes.

 7   Q.   Now, I'd like to show you what's already in evidence as

 8   Government 3556-3, and I'd like to go to Page 26.  Now, looking

 9   at this account statement, I'd like to direct your attention to

10   the account number; do you see that?

11   A.   I'm sorry, the?

12   Q.   The account numbers?

13   A.   Yes, sir.

14   Q.   What type of account number is that?

15   A.   That's what we call a Z account.  It begins with 1ZA or 1ZB

16   or 1ZG or 1ZW.  Those were the account numbers that we assigned

17   to the customers that came back to Madoff with funds that they

18   had received from the trustee when A and B was unwound; so as

19   to keep track of who these people were.

20        We had just completed a procedure that converted our

21   account number system from a strictly numeric to an

22   alphanumeric format.  So it was very convenient that that

23   happened around the same time.  So we decided that, okay, we'll

24   just assign account numbers beginning with 1ZA001 to the first

25   client that mails back account papers, and then 1ZA002 to the
```

1    next person and 3 and so on.

2           So when they ran out of ZA numbers, they opened up a

3    ZB entity, and then the next account was 1ZB001. We further

4    defined the Z accounts by account type because some of them

5    were IRAs. So if you were a large IRA account, you received a

6    1ZR account number, and if you were a small IRA account, you

7    received a 1ZW account number.

8           Going back to the ZA, ZB people, if you were a large

9    account, you got a 1ZA or ZB number, and if you got were a

10   small account you got a 1ZG. Large and small were defined by

11   people that started with less than 40,000 were small. People

12   that were over 40,000 were large, and the reason for that was

13   because we, quite frankly, had no idea what we were going to do

14   with the people under 40,000 because, going back to my

15   explanation of the template, one unit of trading cost 40,000.

16          So if you sent in a check for 39,000 and the machine

17   ran the math, it would say you can't even do one unit. So we

18   would, at some later date, figure out something that we could

19   do for the ZG and the ZW accounts, which were the small

20   IRA's -- the small regular accounts, and the small IRA

21   accounts, which we eventually wound up just putting a trade

22   through every now and again to keep their P and L on pace with

23   people that did qualify for at least one unit of a templated

24   basket.

25   Q.   And so this is a ZA account, right?

```
 1   A.   That's correct.

 2   Q.   And the ZA account typically means it was an Avellino and

 3   Bienes client that was now signing up directly with Madoff

 4   Securities, right?

 5   A.   Yes.  There were, however, some clients that were

 6   introduced to our firm at around the same time that all of this

 7   activity was happening that were mistakenly labeled ZA, and

 8   they were just left that way.

 9   Q.   And as part of this process of bringing on this thousand

10   clients, you were receiving phone calls and letters from folks?

11   A.   Yeah.

12   Q.   And do you know who William Wallman is?

13   A.   I don't think so.

14   Q.   Let's turn to Page 8 of this same exhibit.  Can we blow

15   this up.  Now this is already in evidence.  Can you tell us

16   what this letter is dated?

17   A.   December 3rd, 1992.

18   Q.   Is that around the time that we've been discussing with the

19   closing of the Avellino and Bienes accounts?

20   A.   It's around the time that the accounts started to trickle

21   back in, yes.

22   Q.   And can you read for us what this letter says?

23   A.   As per our conversation last Friday, I previously invested

24   with Avellino and Bienes and would like to open a brokerage

25   account with you.  For this purpose, I have enclosed a check
```

 1   for $200,000.  The title of the account will be William

 2   Wallman.  My Social Security number is...I thank you for your

 3   attention to this matter and look forward to doing business

 4   with you.  Yours truly, William Wallman.

 5   Q.  Now, Mr. DiPascali, was this the type of correspondence

 6   that was coming into the firm around this time?

 7   A.  When the account papers came in, they typically had a check

 8   enclosed with the papers and some cover letter that was

 9   similar, if not almost exactly like this one.

10   Q.  And was Ms. Bongiorno dealing with these incoming clients

11   at this time?

12   A.  Yes.

13   Q.  What about Ms. Crupi?

14   A.  Yes.

15   Q.  And were you dealing with them as well?

16   A.  Yes.

17   Q.  You can take this down, Ms. Baskin.

18        Now, at this transition time, in late '92, early '93,

19   who was Ms. Crupi working for?

20   A.  For Annette.

21   Q.  And again, what was Ms. Bongiorno's position in late '92,

22   early '93?

23   A.  She was the head of the department that ran Bernie's

24   customer business.

25   Q.  And over time, did Ms. Crupi start doing more work with

```
 1   you?

 2   A.   Yes.

 3   Q.   And was she involved in some of the options trading that

 4   you've been talking about?

 5   A.   Eventually, yes.

 6   Q.   Now, how long did you continue to do fake options type

 7   trading in the IA business from this time in the early 1990s?

 8   A.   Until December of 2008.

 9   Q.   So that fake trading took all of the '90s and up through

10   2008?

11   A.   Correct.

12   Q.   Now, and from this time forward -- by "this time," I mean

13   the incoming thousand or so clients -- did you continue to

14   receive questions about the purported trading strategies that

15   were taking place in the investment business?

16   A.   All the time.

17   Q.   And who was responsible, over the years, for answering

18   those questions?

19   A.   I was.

20   Q.   Did other people assist in answering those questions?

21   A.   Yes.

22   Q.   Who?  Did Ms. Crupi assist in answering the questions?

23           MR. BRESLIN:  Objection, your Honor.

24           THE COURT:  Sustained.

25   Q.   Who helped you?
```

Case 1:10-cv-02596-1S    Document 49-1    Entered 4/03/14    Page 8 of 1 Exhibit 18

```
 1    A.   Answer customer questions?

 2    Q.   Yes.

 3    A.   Regarding the investment strategy, is that your question?

 4    Q.   Yes.

 5    A.   Jodi, along with other members of my staff, yeah.

 6    Q.   And over the years, did you hear Ms. Crupi speaking on the

 7    phone to clients?

 8    A.   Yes.

 9    Q.   And how -- and over those years, would you consult with her

10    about what she was saying to the clients?

11    A.   Sometimes.

12    Q.   What -- Would she ask you questions about how to respond to

13    client questions?

14    A.   She would ask me how, should I answer this client's

15    question.

16    Q.   Okay.  And did you engage in an open dialogue?

17    A.   Sure.

18    Q.   And did you ever tell these customers that the trading was

19    not actually happening?

20    A.   No.

21    Q.   And over those years did you also hear -- well, let me ask

22    you this.  So you sat near Ms. Crupi, right, when you moved to

23    the 17th floor?

24    A.   We sat at a six-person desk.

25    Q.   And where did Ms. Bongiorno sit?
```

1    A.   On the 17th floor?

2    Q.   Mmm, hmm.

3    A.   In an office on the opposite side of my facility.

4    Q.   Okay.  And from time to time would you be near

5    Ms. Bongiorno's office?

6    A.   Sure.

7    Q.   And would you overhear Ms. Bongiorno speaking on the

8    telephone?

9    A.   Sure.

10   Q.   Did you overhear her speaking to clients?

11   A.   Yes.

12   Q.   Did you ever hear Ms. Bongiorno say to a client, these

13   trades are not really happening?

14   A.   No.

15   Q.   Now, from time to time when a client called, would you be

16   unavailable to answer their questions?

17   A.   Sure.

18   Q.   And when you were not around or you didn't want to answer

19   the questions, did you ever hear an excuse given for why you

20   were not present?

21   A.   Often.

22   Q.   What excuse was often given?

23   A.   Frank was on the trading desk.

24   Q.   And was there a real trading desk that you were on?

25   A.   Wasn't doing real trading.  It was a real desk, but it was

1    not a trading desk in the classical definition of what a

2    trading desk is.

3    Q.  And did you hear Ms. Crupi give that excuse?

4    A.  Sure.

5    Q.  Now, in addition to the Avellino and Bienes customers that

6    were coming back, those Z accounts that we just looked at, were

7    other customers coming in to be signed up directly with Madoff

8    Securities as customers?

9    A.  Other customers other than the Avellino and Bienes

10   customers?

11   Q.  Yes.

12   A.  Yes.

13   Q.  And as the '90s progressed, who were some of these clients

14   who were coming in to be signed off with Madoff Securities?

15   A.  Oh, goodness.  There was hundreds of them.  Mostly, as we

16   got into the '90s, hedge funds, big European hedge funds, some

17   domestic, registered and unregistered, funds that were -- that

18   were structured to sell shares via prospectus or otherwise,

19   some offering circular, and then place whatever they raised in

20   terms of the capital they raised from their clients, with

21   various money managers, a fund to funds it's called.  And

22   that's the bulk of the dollar amount of new money customer

23   money that was entering the firm was coming from that arena.

24   Q.  Would it be fair to say -- well, let me ask you this.  Was

25   the client deposits increasing or decreasing over time in the

1    '90s?

2    A.    Increasing.

3    Q.    Now, are you familiar with a set of accounts known as the

4    RuAn Anne accounts?

5    A.    Yes.

6    Q.    What were the RuAn accounts?

7    A.    Brokerage accounts that were established at the Madoff firm

8    that were controlled by Annette and her husband.  I believe the

9    purpose of which was to --

10              MR. RIOPELLE:  Objection.

11              THE COURT:  Please consult.

12              (Counsel conferring)

13    Q.    Now, who were the clients of the RuAn account?

14    A.    Madoff's clients were the principals of RuAn, which were

15    Annette and Rudy Bongiorno.

16    Q.    And do you have a sense of approximately how many clients

17    were in those accounts?

18    A.    More than a few dozen.

19    Q.    And did you -- As you worked in the office, did you gain a

20    sense of who the composition of those clients were?

21    A.    Yes.

22    Q.    Who were they?

23    A.    They were people that I knew from the old neighborhood in

24    Howard Beach.  They were Annette's relatives.  They were

25    Annette's friends.  They were friends of friends of friends.

1 They were clients of Annette's that pretty much was friends and

2 family.

3 Q.  And what was Ms. Bongiorno's role with these accounts?

4 A.  She was the account manager of this RuAn entity, and her

5 role was to manage the assets in the RuAn account that belonged

6 to her friends and family.

7 Q.  And this was an account in the investment advisory

8 business, right?

9 A.  Correct.

10 Q.  And as with all of the other accounts in the investment

11 advisory business, was the trading in these accounts real?

12 A.  No.

13 Q.  Now, I'd like to show you -- let me ask you another

14 question.  Are you familiar with the name Jacques Amsellem?

15 A.  Yes.

16 Q.  Could you spell that?

17 A.  A-m-s-e-l-l-e-m?  And that's a good guess.

18 Q.  Who was Mr. Amsellem?

19 A.  He was a French investor and a client of Bernie's way back

20 in the day.  I heard that name probably as early as the -- as

21 the early as the late '70s, and he was -- I met him once or

22 twice in the office up in New York.

23 Q.  What happened in connection with his -- Well, did he have

24 an IA account with the business?

25 A.  Yes.

1   Q.  And what happened in connection with his account during the

2   1990s?

3   A.  Well, he died, and the account, there was -- the lawyers

4   for the estate of Jack Amsellem requested certain documents

5   from the broker, which was us.

6   Q.  And did that present -- After he died, was a review

7   conducted of his account?

8   A.  Yes.

9   Q.  Who was involved in doing that review?

10  A.  Bernie.

11  Q.  And after the review was accomplished, what conclusion was

12  reached about the state of Mr. Amsellem's account?

13  A.  He died with the account too far over where Bernie wanted

14  it to be.

15  Q.  What does that mean, to be too far over the point where

16  Bernie wanted it to be?

17  A.  All the accounts in the managed account arena were -- the

18  growth of the account was predetermined by Bernie.  So we got

19  instructions from time to time that basically said, allow this

20  account to earn X, or allow this account to earn Y.

21         So you started with this already defined objective,

22  this account has to earn 15 percent, and you put through

23  fictitious trades until you got to that point.  Well, sometimes

24  you put through fictitious trades and, for whatever reason, the

25  market takes you to a different point.  So maybe at the end of

1    a particular period, you're up 20 percent instead of 15 in that

2    account because maybe you just fell asleep at the switch and

3    didn't look at this account for a number of months and the

4    stocks you had put him into back here now have all risen; so

5    the account was up 20 percent instead of 15 percent.

6          Bernie has a set of documents that generate -- that

7    are generated to calculate exactly that, and there's a report

8    that comes out whenever Bernie wants it or regularly, monthly,

9    what have you, that illustrates the whole client base and where

10   their account is right now based on the current market

11   conditions, the mark to market of the account, and where this

12   fellow or this girl's capital should be based on a

13   predetermined rate of return.

14         So if the predetermined rate of return is 15 percent,

15   and this is a $100,000 account, it should earn $15,000 this

16   period.  Well, if it earned $20,000, then it is, quote,

17   unquote, over by five.  It's $5,000 over the expected rate of

18   return of 15.  So because you're backdating all your trade

19   tickets, it usually isn't a problem because, as you see that

20   occurring, you put through another trade ticket to mitigate

21   that overage, to bring it back to zero so that the account at

22   any point in time is exactly where Bernie wants it to be.

23         When someone dies, that's a problem because if you

24   don't know that the guy died and you find out from his lawyers

25   60 days later, it's too late.  He died, it's like musical

1    chairs.  The music stopped, and the guy died with too much

2    money in his account or too little money in his account.  It's

3    not right.  So that's what happened with Jack Amsellem, he

4    died.

5    Q.  Now, you said that Mr. Madoff would pick the rate of

6    return?

7    A.  Most certainly.

8    Q.  And then that fake trades would be made to match that rate

9    of return, right?

10    A.  Yes.

11    Q.  And was that process of a picked rate of return something

12    that was in Ms. Bongiorno's clients' accounts?

13    A.  Yes.

14    Q.  And at your time at Madoff Securities, what did

15    Ms. Bongiorno do to reach that rate of return?

16    A.  She could do a number of things.  She could continually

17    monitor the account to see where it is versus where it should

18    be and make adjusting entries in the form of buy or sell

19    tickets to get it closer to where it should be.

20    Q.  When you say should be, you mean the predetermined rate of

21    return?

22    A.  This expected rate of return we called it, yes.

23    Q.  And those adjustments were done with putting through

24    fictitious trades?

25    A.  Correct.

1    Q.   Now, I'd like to show you, just Judge Swain, defense

2    counsel, Government Exhibit 105-C117, and I'd like to go to

3    Page 2 of that.  No, not Page 2.  And can we go to Page 3.

4    Page 4, Page 5, Page 6.

5           Mr. DiPascali, do you recognize the documents that

6    have just gone across your screen?

7    A.   Yes, I do.

8    Q.   What are they?

9    A.   This last one is the response letter to the attorney's

10   inquiry of please give us the value at the date of death or the

11   alternative date.  When you're doing an estate tax return, the

12   attorney's accountants have the option of using a value exactly

13   on the date of death or six months later.  I'm not sure which

14   letter this is, but it's a response to that question.

15          MR. ZACH:  Your Honor, the government offers 105-C117.

16          THE COURT:  Any objection?

17          MR. RIOPELLE:  No objection.

18          MR. KRANTZ:  No objection.

19          MR. FRISCH:  No objection.

20          MR. BRESLIN:  All of it, or just this page?

21          MR. ZACH:  All of it.

22          THE COURT:  Document Government Exhibit 105-C117 is

23   admitted in its entirety.

24          MR. ZACH:  Thank you, your Honor.

25          (Government's Exhibit 105-C117 received in evidence)
            (Continued on next page)

1    BY MR. ZACH:

2    Q.  Can we go to page 3.  Can we show that to the jury as well.

3    What type of document are we looking at here?

4    A.  It's an internal document.  The sheet would typically be

5    found stapled to the inside folder of a customer maintenance

6    file.  It is the particulars one needs to input into the

7    computer when a customer opens their account.  They are

8    assigned an account number.  You need obviously the gentleman's

9    name and address.  Then there is some other notations here as

10   to whether the fellow gets a 1099.  The answer here is no; the

11   little e means he is exempt from that.  It's the information

12   that starts the account.

13   Q.  Let's go to the next page.  Do you recognize the

14   handwriting on this page?

15   A.  Jodi Crupi's.

16   Q.  Did Ms. Crupi play a role in addressing the problems with

17   Mr. Amsellem's account?

18   A.  I believe she worked with Annette on it, yes.

19   Q.  Do you see there is account numbers across the top?

20   A.  Mm-hm.

21   Q.  What type of accounts are those?

22   A.  The FN00130 is a long position account.  The next one is

23   FN00170, which is what is known as a short against the box

24   account.  It is associated and linked to the FN1 entity, a

25   subsidiary account of FN1.  Then there is FN230.  That's a

1   separate and distinct long position account.

2         Then there is FN270, which is again the short against

3   the box account that is linked to that second one.  Then there

4   is FN3, which is again a long position account, and FN370,

5   which is the short account linked to the FN3 account.  In

6   effect, this guy's got three accounts and three short against

7   the box accounts.  That's what it says on top.

8   Q.  Through this process did you gain an understanding of how

9   the problem was solved with respect to Mr. Amsellem's account?

10  A.  Yes.

11  Q.  How was the fact that he had too much money in his account

12  solved?

13  A.  He created a new account that didn't exist when he was

14  alive.

15  Q.  Who created the new account?

16  A.  Annette.

17  Q.  What took place in that new account?

18  A.  They looked at the positions that were open in his regular

19  accounts that had risen too much in value when he died.  So

20  they created an account, backdated, and made sale transactions

21  in that account that would, in effect, mitigate all the

22  movement in certain stocks to the up side, literally capping

23  the movement that had occurred in the primary accounts so as to

24  present the attorneys with a completely different value at the

25  date of death.

 1   Q.   Was that value higher or lower than the value that was

 2   present in the account at the time of death?

 3   A.   Lower.

 4   Q.   To be clear, the accounts that were open at the time of Mr.

 5   Amsellem's death, was the trading in those accounts real?

 6   A.   No.

 7   Q.   When that new account that brought the value of the old

 8   accounts down was created, was the trades put in that account

 9   real?

10   A.   No.

11   Q.   Can we go to the next page.  Do you recognize the

12   stationery on this page?

13   A.   It's our office stationery, yes.

14   Q.   If you look at the accounts on this page, account numbers

15   are they the same ones as we looked at on that spreadsheet that

16   Ms. Crupi wrote previously?

17   A.   There are three on this page.  They are the same as the

18   first three on the other page.

19   Q.   Are these accounts winners or losers?

20   A.   I'm sorry?

21   Q.   Are they winners or losers, these accounts?

22   A.   I can't tell by reading this whether it's a winner or a

23   loser.

24   Q.   Let's turn to the next page.  Looking at the account

25   numbers on this page, are these also account numbers that we

1    saw on that spreadsheet written by Ms. Crupi?

2    A.   Yes.

3    Q.   Looking at the account number FN270, do you see that?

4    A.   Yes, I do.

5    Q.   What does that show?

6    A.   It shows that there are two short positions, one in

7    Microsoft and one in Novell, and a cash balance.  The total

8    value of the account is a negative 1 million 722.

9    Q.   Can we highlight that, please.  When you say it is

10   negative, that means that account lost money?

11   A.   It means that the current mark to market, the current value

12   of this position in this account is negative 1 million 722.  In

13   order to close this account, you would need to buy back the two

14   short positions.  There is not enough cash in the account to do

15   that, so you would have to put up an additional million 722.

16          Because this account is linked to the other account,

17   to the FN00230 account, you would not have to put up additional

18   funds.  You would simply use the value of that other account to

19   pay down this debt or debit balance.  It has a negative value

20   on its own, which is going to be offset by the positive value

21   of the core account in part.

22   Q.   So it has the overall effect of bringing the value of the

23   account down if it were to be liquidated that day?

24   A.   If you did not have this account, the overall package would

25   be a million 722 higher.

Case 1:10-cv-02215-LS    Document 90-1    Entered 04/05/14    Page 85 of 13    Exhibit 11

```
 1   Q.  Let's go back one page.  Who is the letter addressed to?

 2   A.  A Richard Bernstein Associates, a Ms. Schwartz.

 3   Q.  Do you see there is a title R-E, "re"?

 4   A.  Yes.

 5   Q.  What is this letter re?

 6   A.  The estate of Jacques Amsellem.

 7   Q.  The term "estate," what does that usually signify when

 8   followed by of an individual's name?

 9   A.  It is the asset base of the deceased party.

10   Q.  Going to the next page, if we can, who signed this letter

11   to the estate of Mr. Amsellem?

12   A.  Annette Bongiorno.

13   Q.   We can take that down.  Did there come a time, Mr.

14   DiPascali, that you learned about efforts to make fake DTC

15   reports?

16   A.  Yes.

17   Q.  Let me start by asking you, what is the DTC?

18   A.  It stands for Depository Trust Company, I believe.  It's

19   the organization that the industry, the brokerage industry,

20   uses to act as a custodian in and a depository of securities.

21   It is in essence an electronic vault controlled by its members.

22   Q.  When did you first become aware of efforts to make these

23   fake DTC reports?

24   A.  In the '90s somewhere.

25   Q.  Who was involved, Mr. DiPascali, in generating these
```

Case 1:10-cv-02595-1S   Document 38-1   Filed 04/03/14   Page 36 of 113

 1   reports?

 2   A.   Jerry O'Hara.

 3   Q.   Were other people involved in consulting and working on

 4   this?

 5   A.   Dan Bonventre.

 6   Q.   What was the report, the fake report, that was being

 7   generated going to be used for?

 8            MR. KRANTZ:  Objection, your Honor.

 9            THE COURT:  Please consult.

10            (Counsel conferred.)

11   Q.   Now I would like to show the judge, defense counsel, and

12   the witness Government Exhibit 105-D77.  D as in dog.  Mr.

13   DiPascali, do you recognize this fax cover page?

14   A.   Yes.

15   Q.   Let's go through the pages quickly.  Where was this fax

16   cover page from?

17   A.   It was a typical fax cover page that would be found in any

18   of the offices at Madoff.

19   Q.   Do you recognize the handwriting on the document?

20   A.   I do.

21            MR. ZACH:  Your Honor, the government offers 105-D77.

22            THE COURT:  Any objection?

23            MR. KRANTZ:  Your Honor, may I consult with my

24   co-counsel for a moment?

25            THE COURT:  Yes.

```
 1                  (Counsel conferred.)

 2              THE COURT:  Counsel, I think this is going to be a

 3     time when we ought to start our morning break.  That will also

 4     let you speak more informally.

 5              Members of the jury, we will begin our morning break

 6     now.  We will resume at 11:25.  Continue to keep your thoughts

 7     to yourselves.  Enjoy your break.

 8              Ms. Ng, would you please escort the jury out.  All

 9     rise.  Mr. DiPascali, you may step down from the witness stand.

10     See you at 11:25.  Thank you.  We will reconvene at 11:25.

11     Enjoy your break.

12                  (Recess)

13              THE COURT:  Mr. Zach, you may proceed.

14              MR. ZACH:  Thank you, your Honor.

15     BY MR. ZACH:

16     Q.  Mr. DiPascali, I want to take a quick step back before we

17     get into the DTC materials and look again at Government Exhibit

18     105-C117.  Can we go to page 4.  You will remember right before

19     the break we looked at this chart.  Do you recall that, Mr.

20     DiPascali?

21     A.  I do.

22     Q.  The first thing I would like to ask you is what are the

23     dates going down the left-hand side of the column?  What years

24     do you see?

25     A.  '94, '95, '96.
```

Case 1:10-cv-02596-LS Document 30-1 Filed 04/05/11 Page 85 of 113

1  Q.  Now I would like to look in the middle at the FN-270

2  account, which is the middle, I guess the fourth column over.

3  Do you see that?

4  A.  I do.

5  Q.  Can we blow up the top part of that, Ms. Baskin.

6         Whose handwriting is this?

7  A.  Jodi.

8  Q.  Can you read what is written underneath the account number?

9  A.  It says, "Opened 12/94 W/A W/O trades."  The WAO stands for

10 with as-of trades.  The balance is a million 649,375 even.

11 Q.  What does "as-of trades" mean?

12 A.  It means a trade that was not put through the system on the

13 dates of the statement it would first appear on, very similar

14 to the other things we looked at earlier where -- this is

15 saying the account opened with as-of trades.  It started for

16 the first time in our network December of 1994 with trades that

17 had preceded that date.

18 Q.  Trades that were historical or backdated?

19 A.  Correct.

20 Q.  Can we put this in split screen, Ms. Baskin, and blow it

21 up.  Now I would like to go to page 6 of the document in the

22 bottom part of the split screen, if we can.  Can we blow up the

23 top group.

24        Mr. DiPascali, can you compare the two account numbers

25 between the handwriting on the letter that was sent to the

1  attorney's office for the state of Jacques Amsellem.

2  A.  They are the same, FN270.

3  Q.  Do you see the balance number that was handwritten by Ms.

4  Crupi?

5  A.  Yes.

6  Q.  Can you compare that to the balance on the letter next to

7  the date 5/22/95.

8  A.  It is the same, a million 649,375

9  Q.  Going back, when we had looked at the handwritten chart, we

10  saw the years going to '95 and '96, right?

11  A.  Correct.

12  Q.  On the letter at the bottom was dated July 10, 1995, do you

13  recall that?

14  A.  I don't specifically recall that date on the letter.

15  Q.  We can go back one page on the letter and below the top up.

16  Do you see the date?

17  A.  I do.

18  Q.  What is the date?

19  A.  July 10, 1995.

20  Q.  Going back to page 6, can we blow that up again.  We see

21  the balance is the same between the handwriting and the letter,

22  right?

23  A.  Correct.

24  Q.  What is different about the letter that went to the lawyers

25  on this account?  What new information do you see here?

```
 1   A.  The two short positions in Microsoft and Novell.

 2   Q.  Instead of being positive or long around $1.6 million, what

 3   do those new trades do?

 4   A.  They put the 70 account short 3 million and change.

 5   Q.  They bring the balance down to zero and then to a negative

 6   1.7 million?

 7   A.  That is correct.

 8   Q.  Again, the top piece is in Ms. Crupi's handwriting?

 9   A.  That is correct.

10   Q.  We can take that down.  Now, Ms. Baskin, just showing

11   counsel, the witness, the Court what is on the screen, I want

12   to go to 105-D77.

13        Do you remember looking at this document right before

14   lunch?  Not lunch.  Break.

15   A.  I do.

16        MR. ZACH:  The government offers 105-D77.

17        THE COURT:  Any objection?

18        MR. KRANTZ:  No objection.

19        MR. MEHLER:  No objection.

20        MR. FRISCH:  No objection.

21        MR. BRESLIN:  No objection, your Honor.

22        MR. RIOPELLE:  No objection, your Honor.

23        THE COURT:  Government Exhibit 105-D77 is admitted in

24   evidence.

25        (Government's Exhibit 105-D77 received in evidence)
```

```
1              MR. ZACH:  Your Honor, may we publish this?

2              THE COURT:  Yes, you may.

3   Q.  Mr. DiPascali, looking at this document, what is the cover

4   page?

5   A.  I don't understand the question.

6   Q.  I'm sorry.  What kind of document are we looking at?

7   A.  It's a fax cover page, who you are faxing it to and their

8   fax number.

9   Q.  Do you recognize the handwriting on the document?

10  A.  It's Jerry's.

11  Q.  Jerry who?

12  A.  Jerry O'Hara.

13  Q.  Can we blow up the fax transmission box.  Can you read who

14  the fax was sent to.

15  A.  It's to I believe ICS OFCS, I'm not sure.  Attention Tom

16  looks like Gearing.

17  Q.  Who is it from?

18  A.  Jerry O'Hara.

19  Q.  In the comments section, can you read what Mr. O'Hara has

20  written.

21  A.  "Please find font example you requested.  Thanks."

22  Q.  Can we pull out of that document, and let's go to the next

23  page.  Do you recognize what type of document this is?

24  A.  It's the cover page of a DTC report.

25  Q.  Looking at the title, the top title block, it says "The
```

1   Depository Trust Company."  Do you see that?

2   A.   I do.

3   Q.   Is that the DTC?

4   A.   Yes, it is.

5   Q.   For whose account is this?

6   A.   For Bernard Madoff broker 646.

7   Q.   Then you see at the bottom the document there is the 646

8   and a series of Xs?

9   A.   I do.

10  Q.   What does that number indicate?

11  A.   It's our clearing organization number.  It's what we are

12  known by numerically in the industry.

13  Q.   Now can we go to the next page.  First of all, do you

14  recognize any of the handwriting on this page?

15  A.   I do.

16  Q.   Whose handwriting do you recognize?

17  A.   Jerry's.

18  Q.   Where do you recognize his handwriting?

19  A.   Excuse me?

20  Q.   Where in the document do you recognize his handwriting?

21  A.   The upper left-hand corner.

22  Q.   Can we highlight that, Ms. Baskin.  What did he write?

23  A.   O-R-I-G.

24  Q.   Looking more broadly at this document, what is this?

25  A.   It's a page from the Depository Trust Company's daily

```
 1   report to broker.

 2   Q.   What is a daily report to a broker?

 3   A.   A broker who is a member of the depository has his or other

 4   customer positions being held in custody by DTC, by the

 5   depository.  This is exactly as it's headed, participant

 6   position statement.  We are the participant, broker 646,

 7   Bernard Madoff is a participant in a clearing organization.

 8   Depository Trust Company's function in that whole scenario is

 9   they are the custodian of securities for many participants.

10   This is their report to Madoff of what they are holding in

11   custody for participant 646.

12   Q.   Now I would like to direct your attention to the right side

13   of the document.  Do you see if there is anything that is

14   circled on the right side of the document?

15   A.   I do.

16   Q.   What is circled?

17   A.   Two little asterisks.

18   Q.   Can we blow that up.  Is that what you see that is circled?

19   A.   Yes.

20   Q.   Can we pull out.  Now I would like to go back to the first

21   page of the letter.  What does the comments line say again?

22   A.   "Please find font example you requested."

23   Q.   Do you know what the word "font" means?

24   A.   I do.

25   Q.   What is a font?
```

1  A.   It's a particular design of a character on a printed

2  document.

3  Q.   Ms. Baskin, can we page forward, forward, forward, and go

4  one more page, and another page, and another page.

5       All these pages that we have been looking at, what are

6  these pages of?

7  A.   They are entries that are presented to the broker by DTC I

8  believe organized by CUSIP number, which in effect is

9  alphabetical, that illustrate how many shares you have on

10 deposit with that clearing organization and the location of

11 those shares or some sort of a subsidiary definition of the

12 location.  It may not be a perfect . . .

13 Q.   What does each box typically represent?

14 A.   One security.

15 Q.   The DTC is the organization that custodies and holds

16 securities for organizations and firms?

17 A.   Yes.

18 Q.   Ms. Baskin, can we please take that document down, and can

19 we again go to a viewing that is just the witness, Judge Swain,

20 and the parties.  I would like to call up Government Exhibit

21 105-D85.

22       Do you recognize this type of cover page?

23 A.   Sure.

24 Q.   Do you recognize the handwriting on this document?

25 A.   Yes.

```
 1              MR. ZACH:  The government offers 105-D85.

 2              THE COURT:  Any objection?

 3              MR. KRANTZ:  No objection.

 4              MR. MEHLER:  No objection.

 5              MR. FRISCH:  No objection.

 6              MR. BRESLIN:  No objection, your Honor.

 7              MR. RIOPELLE:  No objection, your Honor.

 8              THE COURT:  Government Exhibit 105-D85 is admitted in

 9    evidence.

10              (Government's Exhibit 105-D85 received in evidence)

11              MR. ZACH:  Your Honor, can we publish this document as

12    well?

13              THE COURT:  Yes, you may.

14              MR. ZACH:  That you know.

15    Q.  Are we again looking at a Madoff fax cover sheet?

16    A.  Yes, we are.

17    Q.  Ms. Baskin, can we please blow up the middle box.  Who is

18    this faxed to again?

19    A.  The same person as the first one, Tom Gearing at ICS.

20    Q.  Do you recognize the handwriting on this fax?

21    A.  It's Jerry's.

22    Q.  Again going to the comments section, what is written there?

23    A.  "Please find box's layout example."

24    Q.  Can we pull out, Ms. Baskin, and can we go to the next page

25    of the document.
```

```
 1              Do you see this document?

 2   A.   I do.

 3   Q.   Can you recognize the handwriting on this?

 4   A.   No.

 5              THE COURT:  What page of the PDF?

 6              MR. ZACH:  Page 2, your Honor.

 7   Q.   What are we looking at here?  Are these boxes?

 8   A.   They are.

 9   Q.   Let's go to the next page.  Do you recognize what this is?

10   A.   It appears to be a DTC participant report that's been

11   redacted.

12   Q.   What's the only thing that's left after the redactions?

13   A.   The boxes.

14   Q.   You can take that down, Ms. Baskin.  Now I would like to

15   again pull back the viewing so it is just the Court, the

16   witness, and the parties.

17              I would like to show you Government Exhibit 105-D70.

18   Do you recognize what type of document this is?

19   A.   A DTC participant report.

20   Q.   Do you recognize the handwriting on this?

21   A.   Yes.

22   Q.   Whose handwriting is it?

23   A.   Jerry's.

24              MR. ZACH:  Your Honor, the government offers 105-D70.

25              MR. KRANTZ:  No objection.
```

```
 1              MR. MEHLER:  No objection.

 2              MR. FRISCH:  No objection.

 3              MR. BRESLIN:  No objection, your Honor.

 4              MR. RIOPELLE:  No objection, your Honor.

 5              THE COURT:  Government Exhibit 105-D70 is admitted.

 6              (Government's Exhibit 105-D70 received in evidence)

 7              THE COURT:  Do you want to display it to the jury now?

 8              MR. ZACH:  Yes.  Thank you, your Honor.  Can we please

 9    display it to the jury?

10              THE COURT:  Yes.

11              MR. ZACH:  Thank you.

12    Q.  Mr. DiPascali, could you please read the handwriting at the

13    top of the document.

14    A.  It says July 9, 1996, looks like the number 8 asterisk DTC

15    L old version colon K, as in Kevin.

16    Q.  Whose handwriting is that?

17    A.  Jerry's.

18    Q.  Now I would like to take that document down and I would

19    like to put up, again just for the parties, the witness, and

20    the Court, Government Exhibit 105-D65A.  D65A is a shortened

21    version of 105-D65.  Mr. DiPascali, do you recognize what we

22    are looking at?

23    A.  Looks like a DTC participant position statement.

24              MR. ZACH:  The government offers 105-D65A.

25              MR. KRANTZ:  No objection.
```

Case 1:10-cv-02221-LS   Document 290   Entered 04/03/14   Page 385 of 1xx 714

```
 1              MR. MEHLER:  No objection.

 2              MR. FRISCH:  No objection.

 3              MR. BRESLIN:  No objection, your Honor.

 4              MR. RIOPELLE:  No objection, your Honor.

 5              THE COURT:  Government Exhibit 105-D65A is admitted

 6    and may be displayed.

 7              (Government's Exhibit 105-D65A received in evidence)

 8    Q.  As you worked at Madoff Securities, were there attempts to

 9    perfect the fake DTC reports?

10    A.  Yes.

11              MR. MEHLER:  Objection.

12              THE COURT:  Please consult.

13              (Counsel conferred.)

14              MR. MEHLER:  Your Honor, I think we need a decision.

15              THE COURT:  Everyone please remain quietly here in the

16    courtroom while I consult with counsel.  Thank you.

17              (Continued on next page)

18

19

20

21

22

23

24

25
```

1            (In the robing room).

2            MR. MEHLER:  My objection, and I speak for Mr. Krantz

3    as well, is, as the Court and everybody knows, that is very

4    delicate topic.  Our concern is really twofold.  I think the

5    evidence will suggest that Mr. DiPascali had no involvement in

6    the DTC report until many years later.  I understand they don't

7    want to call Tom Gearing to talk about what happened with a

8    third-party vendor.  Fine.  We stipulated to it.

9            The difficulty we are having is twofold.  First of

10   all, this is the wrong witness to be testifying about

11   activities that went on years before he got involved in any

12   meaningful way.  Second, there is a deep concern that the way

13   that Mr. Zach is going to be asking the questions and has

14   already asked them imports intent to Mr. O'Hara, which is this

15   is a fake DTC report.  I believe, Mr. Zach will correct me, the

16   questions that will follow is was it perfected over the years.

17   Again, DiPascali was not involved in this at all.

18           Second, did they finally get it right, this fake DTC

19   report?  The obvious implication is that my client, Mr. O'Hara,

20   knew that this was a fake report, and it implicates the very

21   issue that is at the heart of this trial, I think for Mr.

22   Krantz as well, although he can augment my remarks.

23           MR. KRANTZ:  Your Honor, I would add, because it is an

24   issue that I think is going to recur, the problem I have is

25   with the use of the word "fake" in the question.  It suggests

1   that there was some discussion with Mr. O'Hara in this instance

2   of fakeness.  I believe there will be no such testimony that

3   there was any discussion of fakeness.  Of course, if there

4   were, that would be admissible.

5           The government is going from an absence of any

6   communication about inauthenticity or fakeness and just putting

7   it in its question, and then having the witness answer as if it

8   was openly revealed that this was a project of fakeness.  That

9   is not what the evidence has shown so far.  Mr. Zach carefully

10  avoided asking the witness, what did anyone to your knowledge

11  tell Mr. O'Hara about the project.  Nothing has come out about

12  that.  So the fakeness at the moment is in the question and the

13  witness's mind, not in the defendant's mind as established by

14  any evidence.

15          There is a problem with using the word "fake" in the

16  question to suggest misleadingly that that was discussed.  If

17  it was, he's got to bring it out and lay a foundation for it.

18  If it wasn't, then he needs a neutral term:  Reproduction of a

19  DTC report, something not suggesting criminal knowledge which

20  was never discussed.  That is the heart of the question in the

21  case.  To ask it over and over, fake this, fake that, tell us

22  what O'Hara did, gives the impression that this was an open

23  project involving fakeness, which is not what the evidence

24  shows.

25          MR. MEHLER:  Your Honor, I'm sorry to jump in again,

1   I'm sure the Court very well gets the objection.  But to give

2   it context, there is already in the record testimony from Ms.

3   Cotellessa-Pitz, I believe she dated it to the late '80s with a

4   gentleman named Kenny Hutchinson, about an effort to what she

5   talked about as reproducing the DTC report.  The Court also saw

6   in Mr. Dubinsky's testimony, look at the comments there, a

7   reference to Mr. O'Hara getting it from Kenny.

8           I agree with everything that Mr. Krantz said.  I'm

9   just saying that this is not a pie-in-the-sky objection.

10  There's already a record of alternative inferences that can be

11  drawn.  To ask it in this way is simply to put the thumb on the

12  scale.

13          MR. ZACH:  Judge, may I respond?  This objection

14  relates to a question.  Let me say what my question was and

15  where we are going, which was over time was this report

16  perfected.

17          MR. KRANTZ:  Fake report.

18          MR. ZACH:  Fake report perfected.  What we are going

19  to get at now is I expect the witness is about to testify to an

20  incident he observed where they are being compared and Bernie

21  Madoff and Mr. Bonventre are saying we got it, they are

22  comparing the two and saying they look exactly right.

23          The reason we use "fake" is because Mr. DiPascali

24  obviously understood they were fake, they were in fact fake.

25  There is really no other way to refer to it.  What we are about

1   to go through is a series of the real DTC report as compared

2   with the fake DTC report and going line by line between the two

3   through a series of documents.

4          There is no thumb on the scale.  It is just the way

5   the witness understood it, the way it was in reality, and the

6   actual question that they are objecting to is going to get to a

7   moment where he is going to testify about how it was openly

8   discussed that they were fake.  So I think the questioning is

9   appropriate.

10          MR. MEHLER:  Openly discussed with Mr. O'Hara?  That

11  is news to me after five years being on this case.

12          THE COURT:  The underlying problem, as framed by

13  defense counsel, is the implication in linking reiterations of

14  the report to Mr. O'Hara that Mr. O'Hara was in a deliberate

15  process of creating the fake reports.

16          I do recall you opened this line of questioning with

17  essentially eliciting from Mr. DiPascali that there were fake

18  reports and that they were made in-house.  Then you asked who

19  was involved in it, and Mr. O'Hara and I think Mr. Bonventre

20  were mentioned.

21          I sustain the objection.  I would permit you to go in

22  one of at least two ways.  Let me frame those ways.  One is to

23  elicit essentially from Mr. DiPascali that in talking about

24  fake reports he means reports that he understood were made at

25  Madoff, not at DTC.  Then from there on go to was there a

1    process of perfecting the reports that were made at Madoff.

2         Another way to do it would be for you to clarify on

3    the record, instead of waiting for them to do it on cross-

4    examination, that he doesn't have any direct knowledge of Mr.

5    O'Hara's level of knowledge or involvement in this, he is just

6    talking about seeing handwriting on documents that again

7    reflect reports made at Madoff.

8         I do think it is appropriate to stay away from the

9    repeated use of "fake" in the context of documents as to which

10   this witness simply can testify that Mr. O'Hara's handwriting

11   is on something.

12        MR. SCHWARTZ:  That's fine.  I just want to get a

13   little bit more clarity because this is going to be an issue as

14   we get more into the computer part of the case, which

15   unfortunately is yet to come.  We have been referring for the

16   last two months to real trades and fake trades to distinguish

17   between the two, without objection, regardless of whether the

18   witness knew --

19        MR. KRANTZ:  There have been some objections.

20        MR. SCHWARTZ:  Not to that term.  Perhaps to the

21   repeated use of the term, but not to the term.  But to

22   distinguish between two regardless of the knowledge of the

23   witness.  All the folks that were involved in the process of

24   creating the fake trades, the defense is we didn't understand

25   they were fake.  I think that is very clear to the jury.

1           (In robing room)

2           MR. SCHWARTZ:  So calling something fake versus real

3      is just a shorthand way to signify what set of documents that

4      we're talking about.  I don't think with respect to the DTC

5      reports "created in-house" is sufficient or "reproduction" is

6      sufficient because they're not reproductions.  In form, they're

7      reproductions, but in context, they're not reproductions, they

8      aren't facsimiles.  They are fake.

9           I don't think there's going to be any argument from

10     defense counsel that they are anything other than fake.  They

11     certainly will argue that their clients didn't understand them

12     to be fake or fraudulent, but I don't think in good faith

13     anyone here is going to argue that they aren't fake.

14          And so we need -- Fake may not be the word, although

15     it has been for the trades, but we need, I think going into

16     this phase of the case, a way to distinguish between real and

17     fake for these documents and documents like them.

18          MR. KRANTZ:  Your Honor, I do think this is an

19     important issue that will be quite recurring, and I strongly

20     disagree with the government's view of the use of the word

21     fake.  The word fake is a highly emotionally charged word,

22     which is why they like it so much.  If I may observe, that when

23     all of the innocent employees are on the stand, the Winnie

24     Jacksons and the Charlene Whites and the like, all of whom are

25     inputting and doing other tasks with regard to fake trades,

1   they never once formulate the question that way.  And after

2   this information was given to you, Ms. Jackson, did you input

3   the fake trade into the computer?  Yes, I did.  That is never

4   done.

5        Why?  Because they are not trying to suggest with the

6   question guilty knowledge on the participant's part.  So they

7   save it for when they want to suggest guilty knowledge on the

8   defendants' part, which would be fair if there were testimony

9   that the word fake was used, or some equivalent.  I'd have no

10  objection, but that is not the case.  And so we have just the

11  interjection of the term to suggest that's what the government

12  now knows the documents were or the witness thought they were

13  at the time, with Mr. DiPascali.

14       But that is not proof that any defendant knew of

15  fakeness at the time, and so it is misleading and prejudicial

16  to keep repeating "fake" in the questioning when referring to

17  what a defendant worked on without any proof that that was

18  discussed or made clear to them.  In the absence of that, they

19  have to use a more neutral term, in my opinion.

20       MR. JACKSON:  What term?

21       MR. KRANTZ:  And then they have to prove, directly or

22  circumstantially, that the witness had criminal knowledge.

23  They understand that.

24       THE COURT:  Do you have a vocabulary suggestion?

25       MR. KRANTZ:  Well, with the DTC reports, it's

1   reproduction or recreation or something like that.  With the

2   other trading documents --

3           MR. MEHLER:  The Court suggested a great one, the one

4   created in-house at Madoff.  Isn't that --

5           MR. KRANTZ:  With the DTC that works.  The other ones,

6   I think, respectfully, we need to think about it.  It's a big

7   question, and I'd rather not blurt it out.

8           THE COURT:  Are we going to get to computer runs that

9   are composites with, you know, fake trades and real trades

10  before lunch?

11          MR. ZACH:  Maybe if I can give a little bit of flavor

12  of what the direct is going to be, your Honor.

13          THE COURT:  I'm fine.

14          MR. ZACH:  What Mr. DiPascali is going to start

15  walking through are examples of the real DTC report that was

16  kept in the market making business, followed by the fake DTC

17  reports that were generated from his programs.  There are a

18  number -- and walking through a number of the differences.  For

19  example, the asterisks are something that they were unable to

20  perfect.  On the fake one, they spent a lot of time trying to

21  get the asterisks just right.  And on the fake ones, there are

22  now all of the trades, the fake trades, are now put on there

23  and coded specially on there in a certain way.  And so he's

24  going to walk through how the fake ones now bring in all of the

25  IA business' fake trades onto these fake book and records.

Case 1:10-cv-02596-1S   Document 32-1   Filed 04/03/14   Page 3 of 13

```
 1              THE COURT:  Okay.  So for this segment, and I do think

 2      the broader question deserves some further thought and perhaps

 3      a consultation with a thesaurus and some refinements.  For this

 4      segment, it seems to me, you can say, is this report that came

 5      from the DTC?  Is this a report that was created at Madoff

 6      Securities?  What are the differences?  So the one from DTC,

 7      the one created at Madoff Securities, and you can make your

 8      points about the differences and the refinement of the reports

 9      that were created at Madoff Securities.

10              And since the documents that you're putting up say

11      DTC on both of them, I don't think there will be any lack of

12      clarity in the testimony or the record that we're talking about

13      fabricated DTC reports, which maybe we should throw that in the

14      vocabulary hopper for further consideration.

15              MR. JACKSON:  Your Honor, can we use the word

16      fabricated?  I also have A concern.  I think we have thought

17      about this a lot, and we're avoiding using the word fraudulent

18      here, which is --

19              THE COURT:  Which is a good thing for you to do.

20              MR. RIOPELLE:  Yes, thank you.

21              MR. JACKSON:  -- which is accurate, but I don't

22      think -- I think for us, what Mr. Schwartz is saying, we have a

23      real concern about the jury being confused.  And I think one of

24      the other problems, in terms of the ones that are created

25      in-house, we haven't -- I don't know if the jury completely
```

1  understands the entire process by which DTC report arrives.

2         We've heard about DTC terminals that exist at Madoff

3  Securities.  At some point in the time period that the DTC

4  terminals were at Madoff Securities, it was possible to print

5  certain things from DTC that were actual DTC information at

6  Madoff Securities, but these are something completely

7  different.  These are fake DTC documents made at Madoff

8  Securities that have false information in them.

9         I mean, if we -- we do need, for clarity of the record

10  when we get to the end of the case, terminology that when the

11  jury is looking at Mr. DiPascali's testimony they're not

12  confused about what he was talking about with this document and

13  that document in terms of the comparison.  So if they could

14  proffer a word that they think is less --

15         MR. RIOPELLE:  Your Honor, ruled on fabricated.  Your

16  Honor may recall.  It's a long time ago now, when we had in

17  limine motions.  There were charts that had the word fabricated

18  on them.  I objected to that word.  That objection was

19  overruled.

20         THE COURT:  That's what I thought.

21         MR. RIOPELLE:  Fabricated.  I do want to say, while I

22  do not want to undermine the objection of my co-defendants.  I

23  was not jumping up every time the word fake was used because it

24  was my impression that, based on your Honor's ruling and what

25  had gone on in court all these months, that that was not going

1    to be a good objection.

2         And I feel now I'm being a little bit sandbagged,

3    frankly, with the word faked.  I don't know if there's any

4    remedy for that at this point, and I don't mean to undermine

5    that objection, but I have to say, you know, the word fake was

6    in virtually every question relating to account statements.

7    You know, I have all the same arguments that my co-defendants

8    have about what was, if anything, was in Ms. Bongiorno's head

9    at the time on this issue.  And, again, I didn't object because

10   I didn't think it would be fruitful.

11        THE COURT:  You made your record.  This particular

12   situation with these documents because the government

13   introduced them by, you know, essentially tieing them to

14   Mr. O'Hara as creator, and I'm told and it hasn't been refuted

15   here, that there isn't a record that can be made by this

16   witness that Mr. O'Hara knew that he was creating fake

17   documents, I am requiring particular caution and care of

18   language here.

19        This witness, Mr. DiPascali, said, you know, he knew

20   the reports were fake.  He knew trades he engaged in were fake.

21   He knew that things didn't exist, and so he was speaking of

22   direct knowledge of fakeness, and other witnesses who have

23   talked about trades being fake spoke from direct knowledge of

24   that.  So this is not a ruling, and everybody needs to

25   understand that, that the word "fake" can never be used again.

1      In this context, because of the way these documents were

2      introduced, I'm requiring the government to use "created" or

3      "fabricated" rather than "fake."

4              MR. ZACH:  I will use fabricated; so that everybody

5      knows.

6              MR. MEHLER:  Gosh, I thought the Court's ruling was

7      that you would use "the document created within" --

8              THE COURT:  I said "created" was one of the

9      possibilities, and I am reminded that I had already ruled that

10     "fabricated" was acceptable and, frankly, that was one of the

11     ones that was in my mind when I came up with "created," but I

12     didn't want to start another ten-minute conversation if I

13     hadn't already ruled on fabricated.

14             MR. ZACH:  Judge, I don't want us to have to come back

15     here.  When we start talking about the fake trades in the

16     fabricated, I'm still going to talk about them as the fake

17     trades because that's the way Mr. DiPascali understands it, and

18     they're fake.

19             MR. MEHLER:  Your Honor, in order not to come back

20     here again, one other slightly subsidiary issue.  Mr. Zach had

21     touched on, he mentioned that when he goes through the

22     documents that are 25 years old, 20 years old, I guess, if my

23     math is good, he shows that -- he shows a circle over two

24     asterisks.  And he says to Mr. DiPascali, what's that?  Well,

25     that's a circle and two asterisks.

 1         The idea that he is now going to be a witness

 2    interpreting what the circling of the asterisks are -- he can

 3    argue in summation -- is impermissible.  This guy had no

 4    dealings with it.  You know, I'll argue this is a third-party

 5    vendor.  It's open and notorious.  He'll argue they circled the

 6    asterisk.  Everybody has their arguments.  But for

 7    Mr. DiPascali, who never dealt with this until years later, to

 8    interpret the document, that's not permitted.

 9         THE COURT:  I believe that there was a question, the

10    thrust of which was are the circled things the font sample, and

11    since Mr. DiPascali apparently didn't create this document and

12    isn't the one who was sending them, there wasn't an objection

13    to that.  And, you know, I wasn't going to jump in on that

14    because I didn't know what the underlying record is.  But

15    Mr. DiPascali, to the extent he didn't create these documents,

16    he's just recognizing handwriting, you can make your record

17    that asterisks are circled on a particular page, but not a

18    question that goes to the intent of the creator if he doesn't

19    know.

20         MR. ZACH:  Just so the record is clear, I didn't do

21    that.

22         MR. MEHLER:  Nor am I suggesting he did.

23         MR. ZACH:  Hold on a second.

24         THE COURT:  Then I put things together in my head.

25         MR. MEHLER:  I think he's going to.

1                    MR. ZACH:  No.

2                    THE COURT:  All right.  All right.

3                    MR. MEHLER:  That's why I don't want to go back.

4                    THE COURT:  He said he's not going to.  Can we go back

5       outside.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Mr. Zach?

3          MR. ZACH:  Thank you, your Honor.

4    BY MR. ZACH:

5    Q.  Now, Mr. DiPascali, was -- did the process at Madoff

6    Securities of working on the generation of these DTC reports go

7    on for a little while?

8    A.  Yes, they did.

9    Q.  And did there come a time that these fabricated DTC reports

10   were perfected?

11   A.  Close to perfect.

12   Q.  And do you recall how you -- Well, did you observe anything

13   in connection with sort of the finalization of this process?

14   A.  There had to be a high-speed, continuous-feed laser printer

15   purchased.  There had to be off-the-shelf software that was

16   close, I think, to what they were looking to accomplish, and

17   then that had to be tweaked over many, many, many generations.

18   And there had to be the proper papers secured to print the job.

19   Q.  And did there come a time that you observed Mr. Madoff

20   looking at the results of this process and comparing a real DTC

21   report with a fabricated DTC report?

22   A.  Yes.

23   Q.  When approximately did that occur?

24   A.  I think it was in the late '90s.

25   Q.  And who was Mr. Madoff with when he was comparing this?

1    A.   It was in my office area with Mr. Bonventre, myself and my

2    staff.

3    Q.   And what was he looking at?

4    A.   He was literally holding a page up against the original and

5    the forgery to the daylight.

6            MR. MEHLER:   Objection.   Move to strike.

7            THE COURT:   Overruled.

8    Q.   He was comparing the two to the light?

9    A.   To the daylight.   He was -- he was eight inches from the

10   window with it on the Citibank side of our building.   My office

11   is -- one wall of my office, the long wall, is all windows, and

12   they were at the left side of the office and they were looking

13   at it in a light and remarking how great it was.

14   Q.   And who was remarking how great these fabricated DTC

15   reports were?

16   A.   Pretty much Bernie.

17   Q.   And who was present to observe him doing that?

18   A.   Danny, myself and the rest of my staff.

19   Q.   Now, let's look at Government Exhibit 105-A455.   And I'd

20   like to go to the next page, if we can.   Looking at this page,

21   what is this?

22   A.   Looks like the month end September '05 DTC participant

23   report.

24   Q.   And, again, you see the number 464 at the bottom?

25   A.   That is our participant number.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  And can we blow up the bottom part just to get a closer

2  look at that.  That's -- the 646, that is the participant

3  number?

4  A.  Yes.

5  Q.  And the bigger sixes, are they composed of littler sixes?

6  A.  Yes, they are.

7  Q.  And can we back out of that.  And now, I'd like to go to

8  Page -- the next page, if we can, and the next page.  Now, what

9  are we looking at here, Mr. DiPascali?

10 A.  The September 30th, 2005, participant statement.

11 Q.  And can we jump ahead -- one second.  I want to grab -- can

12 we jump ahead, Ms. Baskin, to Page 38.

13         And I'd like, if we can, to focus your attention down

14 the right side of the document, and do you see -- can you just

15 explain for us what each of these boxes means going down the

16 right side of the document?

17 A.  Well, the way the depository prints their report is

18 security specific.  So each security that you have on deposit

19 at DTC winds up inside one of these boxes.  So if you look at

20 the one on the upper left, for example, there's the CUSIP

21 number of the security, then the name of the security and the

22 last time your account at DTC had any movement in that

23 security.

24         And then there's some titled account summary, and

25 within your DTC account you have a couple of subsidiary

1   accounts.  One is an account where you would have securities

2   that are free and clearly owned by the firm, unencumbered by

3   anything, and that's called your free position.

4         There are other subaccounts that are accounts that

5   have been held aside that -- for securities that you've pledged

6   to your bank for a loan.  And DTC is linked to your bank; so

7   that when you set aside securities as collateral for a loan,

8   DTC holds those securities in what's known as a pledge account,

9   and they reference the date of the loan on this report.  And

10  then there are other entries or subaccounts that might be for

11  the benefit of customers.

12        So if you receive customer securities, for instance,

13  or you purchase customer securities and you're the custody

14  agent of those securities, they're also on deposit at DTC in an

15  account that is known as, for the benefit of customer, or seg

16  account, which stands for segregation.  Each of those little

17  subaccounts have their own little codes on this report.  010, I

18  believe, stands for your free position subaccount.  014 would

19  stand for a pledge account, and 022 would stand for a

20  segregated account.

21  Q.  Now, I want to focus on a specific example here.  About

22  one, two, three -- five down.  Ms. Baskin, can you blow up the

23  Caterpillar, Inc.  Now, looking across the top, you see where

24  it says Caterpillar, Inc., what is that the name of?

25  A.  That's the name of -- Caterpillar, Inc. is the corporation;

08-01789-cgm   Doc 18596-1   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 1
Pg 98 of 180

1   that's the name of the stock.  That is the company that makes

2   tractors.

3   Q.  And you see there's the 10 at the bottom.  Can we highlight

4   that?

5   A.  It says --

6   Q.  Sorry, 010.

7   A.  Yes.

8   Q.  And what does that indicate?

9   A.  That is the numerical title of the free position.  So

10  anything in that subaccount would be free and clear,

11  unencumbered and controlled by the broker.

12  Q.  And on the right you see there's the number 78?

13  A.  Correct.

14  Q.  Can we highlight that, Ms. Baskin.  What does the 78 stand

15  for?

16  A.  Number of shares.

17  Q.  Can we, like -- I'd like to first just pull up briefly,

18  Ms. Baskin, and I ask you, Mr. DiPascali, what is this document

19  dated?

20  A.  September 30th, 2005.

21  Q.  Now, Ms. Baskin, can we blow up the Caterpillar, Inc. and

22  put that on the split screen, and can we now call up 105-D65A.

23  And can we -- Actually, I'm sorry, Ms. Baskin.  Can we make

24  105-D65 the full screen.

25          Now, looking at this, let's turn to Page -- I believe

1    it is Page 36.  I'm sorry, Ms. Baskin.  I want to pull up

2    105 -- one second.  Sorry, your Honor.  Sorry about that.  On

3    this one, can we go to Page 36?

4            THE COURT:  "This one" being 105-D65A?

5            MR. ZACH:  Yes, 105-D65A.

6    Q.  Now, Mr. DiPascali, looking at this document, what is the

7    date on it?

8    A.  September 30th, 2005.

9    Q.  And do you see an entry for Caterpillar on this date?

10   A.  I do.

11   Q.  Where do you see that?

12   A.  Fourth box down, right-hand column.

13   Q.  Can we blow that up, please, Ms. Baskin.  Now, can we put

14   that in split screen, and I'll also call up 105-A455, Page 38,

15   which we had just been looking at.  Okay.  Thank you,

16   Miss Baskin.

17           Now, Mr. DiPascali, I'd like you to -- can you compare

18   the titles on both of these entries?

19   A.  They're identical.

20   Q.  And looking at the account summary, what is different

21   between the document that's on the top and the document that's

22   on the bottom?

23   A.  The one on the top is reflecting a segregated position of

24   158,400 shares of Caterpillar.  The one on the bottom has no

25   such position.

```
 1   Q.  Now, it also reflects shares in the 010 designation, right?

 2   A.  They both do.

 3   Q.  Mr. DiPascali, which one of these is real and which one is

 4   fabricated?

 5   A.  The one on the bottom is real.  The one on the top is a

 6   forgery.

 7   Q.  Can you explain what's real about the one on the bottom

 8   with respect to the 78 shares?

 9   A.  That's a position that the trading room held on

10   September 30th, 2005.  That was real securities purchased in

11   the trading room or somehow acquired by our firm and deposited

12   at DTC and left to sit in what's called the free position

13   because it was free and clear securities unencumbered, owned by

14   the firm.

15   Q.  And is that position reflected on the fabricated version at

16   the top?

17   A.  Yes.

18   Q.  Now, the 022 designation; do you see that?

19   A.  Yes, I do.

20   Q.  What does that refer to?

21   A.  That is the subsidiary account that we have at DTC called

22   segregated or seg.

23   Q.  What does it mean for securities to be in segregation?

24   A.  Typically, they are someone else's securities that you are

25   simply holding as a custodian.  So in effect, you are the
```

1   custodian of your client's securities, holding them in

2   segregation for whatever reason for a client, and the

3   depository is recognizing those not to be yours but to be

4   someone else's you're simply segregating for their benefit.

5        It also could be a deposit that you're mandated to

6   make at the clearinghouse of securities for membership purposes

7   or for, you know, some other technical reason that needs to be

8   segregated.  But typically, that 022 means it's segregated for

9   someone who is your customer, indicating that you don't own

10  them.

11  Q.  So Ms. Baskin, can we highlight the 22 158,000 shares.

12  What, in terms of Madoff Securities, does the 158,000 shares

13  represent?

14  A.  The position, in total, for the customers in the investment

15  advisory business, or it could be the position in total of the

16  special customers in the investment advisory business.  This

17  report has many generations, and I'm not sure of the date and

18  what the purpose of this particular printout was.

19       But this report was designed to take the positions

20  that were resident in the investment advisory department for

21  customers and take the positions that the depository recognized

22  to be the firm's positions.  And then they were melted together

23  and reproduced in a print job that had both.

24       So what sometimes happened, though, was it was

25  designed to take our entire customer stock record, which is the

1    location of all your customer positions and I'm speaking about

2    the fictitious positions, and melt it with the entire picture

3    of the business.  It also was used to take only a subset of the

4    fictitious stock record for special purposes, and melt it with

5    the entire positions of the firm.

6         For instance, that's what we did when the KPMG audit

7    was in town because they were only looking at a certain bunch

8    of clients, and Bernie was only willing to disclose to him that

9    his client list was very limited.  So this type of report was

10   produced for that purpose to -- well, first, a very customized

11   special, quote, unquote, stock record was created of only the

12   customers that Bernie wanted to show the auditor.

13   Q.  Mr. DiPascali, just what we're looking at here --

14          MR. BRESLIN:  Your Honor, may I talk to Mr. Zach?

15          THE COURT:  Did you want to consult?

16          MR. BRESLIN:  Yes, thank you.

17          THE COURT:  Okay.

18          (Counsel conferring)

19          MR. BRESLIN:  We have an understanding.

20          THE COURT:  Thank you.

21   Q.  Now, Mr. DiPascali, on this specific document, on the top

22   one, are those 158,400 shares real?

23   A.  No, sir.

24   Q.  Are those the fake trades that you previously testified

25   occurred in the IA business?

Case 1:10-cr-00228-LTS   Document 839   Filed 04/09/14   Page 103 of 173

1    A.   They are.

2    Q.   Okay.  Now, above them there is a -- there are 78 shares of

3    Caterpillar; do you see that?

4    A.   Yes.

5    Q.   Are those real?

6    A.   Yes.

7    Q.   And the total at the bottom you see -- can you highlight

8    that, Ms. Baskin.  What part of that is real and what part of

9    that is fake?

10   A.   Of the 158,478 total, 158,400 is fake.  78 is real.

11   Q.   All right.  Let's take -- and just so the record is clear,

12   the document at the top of the split screen is Government

13   Exhibit 105-D65A and the one at the bottom is 105-A455.

14        Let's -- I want to look to another -- going down to

15   the bottom document, 105-A455, can we turn to Page 89 on that

16   document, Ms. Baskin.

17        And looking at this example, do you see a company by

18   the name of KB Home?

19   A.   I do.

20   Q.   Can we blow that up.  Where do you see that?

21   A.   Third one down, left-hand column.

22   Q.   Can we blow that up, please, and put that on split screen,

23   at the bottom.  And at the top, Ms. Baskin, can we put up

24   Government Exhibit 105-D65A and go to Page 88.  And do you see,

25   Mr. DiPascali, if you can, an entry on that page for KB Home?

```
 1   A.  It's too small to read on my screen.

 2   Q.  If we can blow up that a bit.  Can we blow up the

 3   right-hand side?

 4   A.  I see it now.

 5   Q.  Where is it?

 6   A.  Third one down.

 7   Q.  Okay.  Now, Mr. DiPascali, looking at these two documents,

 8   can you tell which one is the real DTC report and which one is

 9   the fabricated one?

10   A.  One on the top is fabricated; the one on the bottom is

11   real.

12   Q.  So let's pick -- let's start with the real one on the

13   bottom.  How much stock in KB Home did the Madoff firm actually

14   have at this time period in 2005?

15   A.  39 shares.

16   Q.  Can you highlight that, please, Ms. Baskin.  And according

17   to the fabricated version, how many shares did Madoff

18   Securities have?

19   A.  564,039.

20   Q.  And how many of those shares were fake?

21   A.  564,000.

22   Q.  So the top fabricated DTC report reflects half a million

23   shares of KB Home that Madoff Securities didn't actually have?

24   A.  That's correct.

25   Q.  And, again, those half a million, approximately half a
```

```
 1   million shares, what is the DTC coding for them?

 2   A.   Segre- -- oh, 022.

 3   Q.   What does that indicate?

 4   A.   Segregation.

 5   Q.   And by segregated, does that mean that these are

 6   purportedly customer securities but being held by Madoff?

 7   A.   Typically, your segregated account is segregated for the

 8   benefit of a customer, yes.

 9   Q.   And does half a million shares, what part of the business

10   are they purportedly from?

11   A.   The IA business.

12   Q.   And per this document, is it reflecting that they are

13   actually housed in Madoff Securities' DTC account?

14   A.   That top document?

15   Q.   Yes.

16   A.   That's exactly what it's trying to indicate.

17   Q.   And were any of these securities at the Madoff DTC account?

18   A.   No, sir.

19   Q.   Did they exist at all?

20   A.   No, sir.

21   Q.   Now, I want to spend a moment and focus your attention on

22   this document between -- do you see where it says "total"?

23   A.   I do.

24   Q.   And on both documents?

25   A.   I do.
```

1   Q.  Is there a difference there in the asterisks?

2   A.  There is.

3   Q.  Was that something that was part of trying to -- was trying

4   to be perfected as part of this DTC process?

5           MR. MEHLER:  Objection.

6           MR. FRISCH:  Objection.

7           THE COURT:  Please consult.

8           (Counsel conferring)

9           MR. MEHLER:  We've resolved it, your Honor.

10          THE COURT:  Thank you.

11  Q.  Now, Mr. DiPascali, as part of this process, was the

12  asterisks a subject of discussion at Madoff Securities?

13  A.  All the different characters on the report were subject to

14  discussion, yes.

15  Q.  And what discussions were had about these asterisks?  I

16  can't say the plurals of it.  Asterisksees?

17          THE COURT:  Asterisks.

18          MR. ZACH:  Asterisks.  I think everybody knows what

19  I'm saying.

20          MR. MEHLER:  Your Honor, may I consult with Mr. Zach?

21          MR. ZACH:  About my grammar?

22          THE COURT:  Like plural of risks, S at the end, risks.

23          (Counsel conferring)

24  Q.  The symbol that we've been discussing, was that the subject

25  of discussions, the asterisk?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-04592-JGK   Document 25-9   Filed 04/03/14   Page 106 of 179

```
 1   A.  I do not specifically remember asterisk as being one of the

 2   characters on the report that was discussed in my presence.

 3   Q.  Okay.  Let's bring that down and, now, let's look at

 4   105-A455, Page 154.  And looking at the top of this, what is

 5   the date, sir?

 6   A.  September 30th, 2005.

 7   Q.  And I'd like to direct your attention to the right side of

 8   the document, if we can blow that up.  And can you tell us what

 9   the second stock on this report is?

10   A.  Tivo, T-i-v-o.

11   Q.  And how many shares of stock does this document indicate

12   Madoff Securities has of Tivo?

13   A.  200.

14   Q.  And how were they designated using the DTC code?

15   A.  They're in the free position, 010.

16   Q.  Now, what is the next security on this list?

17   A.  Tootsie Roll.

18   Q.  Tootsie Roll is a public company?

19   A.  Yes.

20   Q.  And how many shares does the Madoff Securities purport to

21   have of Tootsie Roll?

22   A.  1,100.

23   Q.  Can we blow those up, please.  And how are those shares

24   designated?

25   A.  Also in the free position.
```

1   Q.  Now, I'd like to, again, Ms. Baskin, go to the split

2   screen, and can we put that on the bottom.  Okay.  Well, let's

3   go to -- let's put at the top, if we can, 105-D65A.  Let's have

4   that take up the whole screen, if we can, actually.

5           Now, Mr. DiPascali -- I'm sorry.  I want to go to

6   Page 155 of this document, and I want you, if you can, to find

7   the -- do you see whether or not Tivo is included on this?

8   A.  I do.

9   Q.  Where is the Tivo?

10  A.  Fourth one down, right-side column.

11  Q.  Okay.  And what is this document dated?

12  A.  September 30th, 2005.

13  Q.  Is that the same date as the document we just looked at

14  with the Tivo and the Tootsie Roll?

15  A.  It is.

16  Q.  And, Ms. Baskin, can we blow up the bottom right-hand

17  corner.  Now, do you notice a security between the Tivo and the

18  Tootsie Roll?

19  A.  Toll Brothers.

20  Q.  Did you see this security on the prior version of the DTC

21  report that we looked at?

22  A.  I did not.

23  Q.  Looking at this document, approximately how many shares of

24  Toll Brothers do you see appearing?

25  A.  760,000.

1    Q.  And how many -- How are those shares designated on the

2    report?

3    A.  They're in the 022, which would be, again, the seg account.

4    Q.  So is this the real or the fabricated version of the DTC

5    report?

6    A.  This is the fabricated version.

7    Q.  These three-quarters of a million shares of Toll Brothers,

8    did they really exist?

9    A.  No.

10   Q.  What part of the business were they from?

11   A.  From the IA business.

12   Q.  Let's take that down.  Now, I'd like to go to 105-A455.

13   Again, but this time, Ms. Baskin, can we go to Page 170?

14           MR. MEHLER:  I'm sorry, what page again?

15           MR. ZACH:  170.

16   Q.  And, Mr. DiPascali, can you again look at the top of the

17   document and tell us what the date is?

18   A.  September 30th, 2005.

19   Q.  And looking at this document, do you see any type of

20   security that would relate to a treasury security?

21   A.  The bottom box on the right-hand column.

22   Q.  Can we blow that up.  Can you tell us, sir, what we're

23   looking at here?

24   A.  Well, on the upper left-hand corner of that box, again, is

25   the CUSIP number, and then there's a description.  In this

1  case, the description is the two-and-five-eighths, which is the

2  coupon rate of interest on the treasury note, with a maturity

3  of 5-15-08.  And then the word chills, I have no idea what that

4  means.  CODWT deposit, again, in this context, I have no idea

5  what that means.  The last activity date would be the exactly

6  what it says, the last time securities moved in and out of this

7  account, and then you have your account summary.

8  Q.  Okay.  And the CUSIP number for this, where is that?

9  A.  Upper left-hand corner.

10  Q.  And can we highlight that, Ms. Baskin.  Great.  I mean, can

11  we now pull out of this document, and can we now pull up what

12  is -- take this down and pull up 105-D65A and turn to Page 174.

13  Now, looking at Page 174, do you recognize what we're looking

14  at here?

15  A.  I do.

16  Q.  What is this?

17  A.  Seems to be a fake DTC report dated September 30th, '05.

18  It has the configuration of Treasury note positions, it looks

19  like.

20  Q.  Okay.  Do you recognize the CUSIP number that we had just

21  looked at?

22  A.  I actually don't remember the old one.

23  Q.  Okay.  Let's go back to the old one, which was Page 170.

24  Do you see that?

25  A.  I do.

1    Q.  And so what is the CUSIP number?

2    A.  We have highlighted here 912828.  The entire number

3    includes the AZ3; so it's a nine-digit number.

4    Q.  Okay.  Just one second.  And looking at this document, can

5    we just blow up the box for a second.  Just looking at the 100

6    and the 14; do you see that?

7    A.  I do.

8    Q.  What are the balances for those two designations?

9    A.  Well, this $13 million principal amount of that Treasury

10   note in the free position.  There's $46,500,000 of that same

11   note that is pledged to various banks, and then there is the

12   description underneath of where it's pledged.  Those codes,

13   554, 981 and 900, I believe are the bank clearance numbers.

14   And the dates that you see of 3-20-73, 3-20-73 and 5-31-01 are

15   the dates that various loan agreements were signed, and then

16   the position is the position.

17           So on the first line, what it's telling me is of the

18   46,500,000 that we've established is pledged, because it's all

19   sitting in a 014 location, the additional information is as

20   follows:  You have pledged to bank 554, a million dollars,

21   pursuant to a loan agreement dated March 1973.  You also

22   pledged to bank 981, $40,500,000 pursuant to a loan agreement

23   dated 3-20-73, and the last item is a pledge of $5 million to

24   bank 900 pursuant to a loan agreement of 5-31-01.

25           Those three items make up the 46,500, which are

1  pledged to various banks using DTC, it's like an intermediary

2  controlling custody of the asset because it's pledged now for

3  the bank because you've borrowed money against that.  You might

4  have drawn down on that bank loan.

5  Q.  So, Ms. Baskin, can we highlight the two closing balance

6  totals of 13 million and the 46 million.  And can we put that

7  in split screen on the bottom, or no?  Thank you, Ms. Baskin.

8  And now I'd like to go to 105-D65A, Page 174, and if we can

9  blow up, Ms. Baskin, the box that is the second one down on the

10  right.

11        Now, if we can, Mr. DiPascali, can you compare the

12  account -- the CUSIP number on the top document to the one on

13  the bottom document?

14  A.  They're identical.

15  Q.  And can you highlight that, please, Ms. Baskin.  And now,

16  how much money is in the 010 and the 014 on the top document?

17  A.  Same amounts, 13 million in the 010; 46.5 million in the

18  014.

19  Q.  Now, looking at the pledgee information, is that -- are the

20  amounts the same?

21  A.  In the pledgee information?  They are.

22  Q.  Is there anything that's different?

23  A.  The pledgee banks are not the same and the date of the loan

24  is not the same.  As a matter of fact, it's -- I don't even

25  recognize that to be a date.

1    Q.   Now, which one is real and which one is fabricated?

2    A.   The one on top is fabricated.

3    Q.   Now, pulling out of the top one, the fabricated one, now,

4    when we had looked at the prior example, the real one, how many

5    treasury securities did you see?

6    A.   In total?  59,500,000.

7    Q.   Okay.  Now, I'd like to pull back on the top document.  I'm

8    sorry.  Make that the full screen.  Now, do you see other

9    additional Treasury securities on the fabricated version?

10   A.   Yes.

11   Q.   What do you see on this page that's wasn't on the real DTC

12   report?

13   A.   There's a line item indicating in segregation that we hold

14   398,700,000 additional Treasury notes.

15   Q.   And where do you see that?

16   A.   It says under the pledge information, it says 022 in

17   brackets, and in the far right-hand column 398,700,000.

18   Q.   And now, I'd like to start just looking at the left-hand

19   side of the document, and just if you can just scan down the

20   left side of the document and tell us what types of securities

21   we're looking at there?

22   A.   It's an array of Treasury notes.

23   Q.   Did we see those Treasury notes on the real DTC report?

24   A.   I don't believe I did.

25   Q.   And I want to actually go back a few pages to Page 172.

1   Going back on the same day, a few pages earlier, do you see any

2   Treasury transactions on this page?

3   A.   The last two entries on the right-hand column are Treasury

4   bills.

5   Q.   And can you read the amounts that those are for?

6   A.   The fourth one down says $24,800,000 in segregation, in the

7   022 for a Treasury bill.  I can't make out the description.

8   It's unclear to me.

9   Q.   Well, just give us the amounts?

10  A.   24,800,000.  It's CUSIP number, what I call, VW8.

11  Q.   And the next one, how much is that one for?

12  A.   The next one is CUSIP WD9, and that's for $1,305,150,000.

13  Q.   Okay.  Was that billion dollars real?

14  A.   No.

15  Q.   Let's go to the next page.

16          THE COURT:  Mr. Zach, we have five minutes to the

17  break.

18          MR. ZACH:  Okay, your Honor.  Thank you.

19  Q.   Do you see any fake Treasury bills listed on this page?

20  A.   The entire page is covered with fake Treasury bills.

21  Q.   Those didn't actually exist?

22  A.   No, they didn't.

23  Q.   Can you read out some of the amounts?  Let's go down the

24  left-hand column and read out the amounts on those fake

25  treasury bills.

Case 1:10-cv-04652-GBD   Document 259-1   Filed 04/03/14   Page 115 of 173

1   A.  1,328,975,000.

2          THE COURT:  Mr. Zach?

3   A.  The next one is 1,578,200,000.  No. 3 is 1,415,600,000.

4   Then we have 1,385,275,000, and the last one in that column is

5   1,418,350,000.

6          THE COURT:  Just for a minute, let's just all stand up

7   for a second, and then we'll be in good shape for the last five

8   minutes of testimony.  Thank you for that.

9   Q.  So, Mr. DiPascali, you just read out on the right side what

10  looks to be -- my math is about as good as I can pronounce

11  asterisk -- but I'd say it's maybe in the area of $8 billion?

12  A.  Yeah, approximately.

13  Q.  That $8 billion, did that really exist?

14  A.  No, it didn't.

15  Q.  And looking on the left side, do you see additional

16  Treasury bills?

17  A.  I do.

18  Q.  And can you read out the amounts of those?

19  A.  1,305,075; 1,477,425,000; 1,305,577,000; 1,328,975,000; and

20  the last one is, 1,514,200,000.

21  Q.  So these billions and billions of dollars of Treasury

22  notes, fake Treasury notes, what part of the business were they

23  associated with?

24  A.  The investment advisory business.

25  Q.  And if this document, this DTC -- fabricated DTC report

 1    were to be provided to someone, what was the suggestion by

 2    listing these on them?

 3            MR. MEHLER:  Objection.

 4            MR. FRISCH:  Objection.

 5            THE COURT:  Please consult.

 6            (Counsel conferring)

 7            MR. ZACH:  Your Honor, this is likely a good time to

 8    take a lunch break.

 9            THE COURT:  All right, then.  Thank you.  This

10    concludes our testimony for this morning.  Members of the jury,

11    please be ready in the jury room at 2:00.  Thank you for your

12    attentive work this morning, and continue to keep your thoughts

13    to yourselves and avoid outside information.

14            Ms. Ng, would you please escort the jury out.

15            (Jury exits)

16            Mr. DiPascali, you may step down.  See you at 2:00.

17    Thank you.

18            THE WITNESS:  Thank you, your Honor.

19            (Witness temporarily excused)

20            THE COURT:  We'll reconvene at 2:00.  Thank you.

21            (Luncheon recess)

22

23

24

25

Case 1:10-cv-04209-LTS    Document 159    Filed 04/03/14    Page 33 of 179

AFTERNOON SESSION

2:10 p.m.

(Jury not present)

THE COURT:  I understand there is an application.

MR. BRESLIN:  Your Honor, a short one.  This is not
intend as any kind of criticism of Mr. Zach's doing a direct
examination of this length and breath, but there have been
times where the witness is still talking and has been
interrupted, for lack of a better word.

We believe, I believe, that how this witness speaks,
how he answers questions, doesn't answer questions, how his
mind works is itself probative.  We would want the jury to see
it rather than have the government interpose another objection
even if they were to think that he is wandering off topic.

THE COURT:  You mean another question.

MR. BRESLIN:  Right, another question, even if they
think he is wandering off topic.  We think how he speaks is
important.  I don't propose to say that Mr. Zach did this on
purpose.  It might have been a very natural reaction on his
part after a pause or a misunderstanding.  But I would just
like it if the witness could be allowed to finish his answers
in full before the next question.

THE COURT:  I hear you.  I think this is a situation
in which there needs to be a balance.  I think if left
unchecked, we would be here until February with half-hour long

Case 1:10-cv-02555-RS   Document 459   Filed 04/03/14   Page 117 of 179

1    answers.  What I would urge Mr. Zach to do is, particularly if

2    he doesn't want free association that is unchecked, be as

3    specific as possible and to the extent necessary say to the

4    witness, I am asking you about this one line, tell me about

5    this one line.  Then, if he does free associate, wait until he

6    comes up for air.

7              MR. ZACH:  Certainly, your Honor.

8              THE COURT:  Thank you.

9              Are we ready to have Mr. DiPascali brought back out?

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:10-cv-04285-LTS   Document 239   Filed 04/05/12   Page 119 of 175

```
 1              (Jury present)

 2    FRANK DIPASCALI, JR., resumed.

 3              THE COURT:  Good afternoon, members of the jury.

 4    Please take your seats.  Please be seated, everyone.

 5              Mr. Zach.

 6              MR. ZACH:  Thank you, your Honor.

 7    DIRECT EXAMINATION (continued)

 8    Q.  Mr. DiPascali, before lunch we were looking at two

 9    different sets of DTC reports.  Do you recall that?

10    A.  Yes, I do.

11    Q.  We were looking at one that was real and one that was

12    fabricated, do you recall that?

13    A.  Yes.

14    Q.  On the real DTC report, what part of the business was that

15    used in connection with?

16    A.  The proprietary trading market-making operation.

17    Q.  The information on the real DTC report, did that reflect

18    real trading that was occurring in that part of the business?

19    A.  It reflected the positions that were at the clearinghouse

20    that were the result of real trading.

21    Q.  Where did the information in the real DTC trading report

22    come from?

23    A.  DTC.

24    Q.  Were there connections between Madoff Securities and DTC?

25    By connections I mean some sort of electronic link.
```

1   A.   Yes.

2   Q.   How were Madoff Securities and the actual DTC linked?

3   A.   I don't know the specifics of it, but we would get files

4   from DTC, or at least a file that I am aware of that would come

5   via some data feed or some electronic method of receiving a

6   file that was, in essence, the same information that was on at

7   a report, on paper.

8   Q.   At times were there hardcopies of documents provided by the

9   DTC to Madoff Securities?

10  A.   Yes.

11  Q.   Setting aside the real DTC reports, I want to now talk

12  about the fabricated reports.  Where did the information in the

13  fabricated reports come from?

14  A.   From two sources:  From that data file I spoke about, which

15  is again in essence the information that's coming from the

16  depository that would wind up in total to be on the real

17  report, and then from the IA business stock record.

18        The stock record is a document that illustrates the

19  location of the securities and the position you hold for your

20  clients.  It's organized by CUSIP number.  It will list every

21  client that owns a particular security, what his or her account

22  number is, and what position that client holds on their

23  statement.

24        Then there is an illustration as to the location of

25  all those securities.  The stock record that was produced for

```
 1    the IA business simply had a location called clearing banks.

 2    It was a location that had a particular account number.  So the

 3    sum total of all of the securities illustrated as held for

 4    customer was shown to be held at this thing called clearing

 5    bank.  That is the IA stock record.

 6            Then the information, that entire block of

 7    information, along with the real data that came from the data

 8    feed of the depository, was sorted by CUSIP and melded to

 9    produce the commingled real and fake positions on one report,

10    namely, the fake report.

11    Q.  Who was it at Madoff Securities that worked to generate the

12    fabricated report?

13    A.  That actually ran the program to generate it?

14    Q.  Who worked to produce it?

15    A.  Jerry.

16    Q.  Mr. O'Hara?

17    A.  That's correct.

18    Q.  How did he go about producing it?

19    A.  There was some off the shelf software I believe purchased

20    that would give him the base architecture of what he needed to

21    do.

22            MR. MEHLER:  Your Honor, may I consult with Mr. Zach?

23            THE COURT:  Yes.

24            (Counsel conferred.)

25            MR. MEHLER:  We have resolved it, your Honor.
```

```
 1              THE COURT:  Thank you.
 2    Q.  Did Mr. O'Hara work on the program that generated these
 3    reports?
 4    A.  Yes.
 5    Q.  How were these reports printed out at Madoff Securities?
 6    A.  On a relatively high-speed continuous form-feed laser
 7    printer.
 8    Q.  Who was it that picked the printer that was going to be
 9    used to print out the fabricated DTC reports?
10    A.  I believe Jerry did.
11    Q.  Who set up the printer that was used to print off the
12    fabricated DTC reports?
13    A.  Physically set up the printer?  I don't know.
14    Q.  Who was involved in overseeing the setting up of the
15    printer?
16    A.  Jerry.
17              MR. MEHLER:  Objection.  Move to strike.
18              THE COURT:  Please consult.  Please face the window.
19              (Counsel conferred.)
20              MR. MEHLER:  I'm sorry, your Honor.
21              THE COURT:  Everyone please wait here quietly and we
22    will be back out as quickly as possible.
23              (Continued on next page)
24
25
```

```
 1                 (In the robing room).

 2                 THE COURT:  Mr. Mehler.

 3                 MR. MEHLER:  I'm sorry, Judge.  It's a variation of

 4    the same thing.  You have a series of questions that Mr. Zach

 5    is asking about the set-up of the printer and other related

 6    questions about what occurred in 1994 and 1995.  There is

 7    simply no way that this witness knows anything about that.  He

 8    didn't get involved in it until years later.

 9                 That is our objection, that he has no basis to do it.

10    I don't even think the answer is Jerry, I think it is Liz

11    Weintraub.  But I'll let Mr. Zach speak to what he is aiming

12    toward.

13                 THE COURT:  Mr. Zach.

14                 MR. ZACH:  Your Honor, first of all, Mr. DiPascali was

15    working there since 1975.  The point of this is there is a

16    special printer here that prints out DTC reports.  It was

17    installed at the office.  The person that was in charge of

18    bringing that in was Mr. O'Hara.  Mr. DiPascali is going to

19    testify to that.  I think it is entirely relevant.

20                 THE COURT:  Your offer of proof is that Mr. DiPascali

21    has personal knowledge that Mr. O'Hara was tasked with the

22    acquisition of the special printer that was used?

23                 MR. ZACH:  Yes.  My expectation is that, and that

24    paper had to be procured for it.  There was special paper.  He

25    knows about how this printer was used, yes.
```

```
 1              THE COURT:  And that Mr. DiPascali has personal

 2    knowledge --

 3              MR. ZACH:  Yes.

 4              THE COURT:  -- that Mr. O'Hara was tasked with the

 5    functions?

 6              MR. ZACH:  Yes.  He was working on it.  I'll ask the

 7    question.  I can ask him if you want --

 8              MR. JACKSON:  The question has already been asked and

 9    answered for the record.

10              THE COURT:  Which question?

11              MR. JACKSON:  The last question which Mr. Mehler

12    objected to was asked and answered, which is who was

13    responsible for setting that up.

14              THE COURT:  There was a question who was responsible

15    for setting it up.  The answer was I don't know.  Then there

16    was a question who supervised it, and the answer was O'Hara,

17    there was the motion to strike, which is why we are here.

18              Is it your representation that Mr. DiPascali has

19    personal knowledge that, as he would testify, Mr. O'Hara

20    supervised the setting up of this?

21              MR. ZACH:  Yes.  Just so I can explain, I think what

22    his response to who set it up was this isn't like a printer

23    that you would plug into your computer, it is an industrial

24    computer.  An outside company had to come in and put it in.

25    That's what he was referring to when he said who set it up.  It
```

1    is my understanding of what he was saying, who set it up, it

2    was people from the outside vendor who would provide it.  It

3    wouldn't be a guy at Madoff Securities, it's such a big

4    printer.

5             THE COURT:  On the basis of the offer of proof, the

6    motion to strike the testimony is denied.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1            (In open court)

 2    BY MR. ZACH:

 3    Q.  Can you describe the printer that was procured to print out

 4    these DTC reports.

 5    A.  I think the first one was manufactured by a company called

 6    Plantronics, but I'm not certain.  It was an IBM type printer.

 7    It was six or so feet wide, three or so feet deep, four or so

 8    feet tall.  On the left side was an area you could put an

 9    entire box of continuous feed paper into, 2,000 sheets maybe in

10    a box.  I think there was a touch pad on the upper right-hand

11    corner.  The whole center part of the unit looked like a

12    printing press type thing, with rollers and lights if you

13    opened the door.

14            It would feed the blank document up one side, go

15    through, and came out and had an automatic stacker that used to

16    make sure that it didn't get torn apart as it came out the

17    other side.  It was very quick.  If you started to print a

18    document and you had made a mistake, by the time you hit the

19    button, 60 pages might come off the thing or 40 pages.  It was

20    a high-speed printer.

21    Q.  Where was this printer located at Madoff Securities?

22    A.  In December of '08 it was in the hallway right outside my

23    office door.  We had built an alcove for it so that people

24    wouldn't knock into it.  We didn't want to dedicate an office

25    to it, so we created this cutout in the hallway and buried it

1   kind of in the wall.

2   Q.  Was there special paper required to print out these DTC

3   reports?

4   A.  For DTC it had to be green bar continuous-feed 8½-by-11.

5   Q.  Who was it that selected the paper that was used?

6   A.  Bernie wanted that paper used because it looked like DTC's

7   paper.

8   Q.  Now I would like to switch topics for a moment.  Stepping

9   back to the treasury bills that we were looking at before

10  lunch, do you recall those?

11  A.  Yes.

12  Q.  What part of the business were those big treasury bills

13  used for?

14  A.  The IA business.

15  Q.  What was the name of the strategy that was being

16  implemented in the IA business that involved those treasury

17  bills?

18  A.  It was called a split strike forward conversion.

19  Q.  Who worked on implementing that strategy?

20  A.  I was responsible for it.

21  Q.  Who helped you?

22  A.  Jodi Crupi and the rest of my staff.

23  Q.  Could you describe generally the concept of going in and

24  out of the market with respect to the split strike strategy.

25  A.  When you're going into the market, you're coming from a

1   point of cash.  We put through tickets that would indicate the

2   purchase of a big portfolio of stock, sometimes 35, sometimes

3   50 different issues.  Then we would put an option put and an

4   option call into position, which was the hedge to the

5   portfolio.  That stayed in the customer's account for a number

6   of days, sometimes a number of weeks or months.

7        Then, on Bernie's direction, we would reverse course

8   and put through tickets that would sell all those stocks in

9   that portfolio and tickets that would take off the option

10  positions that were hedging the portfolio.  At that point we

11  would take the cash, because at that point that's all that's in

12  the customer's account, and we would put through tickets to

13  purchase treasury bills because he could not be in a cash

14  position over a certain period of time.  He instructed us to

15  buy treasury bills or put through tickets to buy treasury bills

16  whenever we were out of the market.  That's the positions that

17  you saw in the DTC report.

18       That was done many times a year, but certainly at the

19  end of every quarter.  The run we were looking at is a

20  September 30, 2005 run, which would be the end of the third

21  quarter, which is why we were in treasury bills, because we

22  were, quote, out of the market.

23  Q.  As part of this strategy, the IA business would do what was

24  referred to as going into the market and purport to buy

25  securities, is that right?

```
 1   A.  Correct.

 2   Q.  Were you really buying securities?

 3   A.  No.

 4   Q.  Was this all just on paper?

 5   A.  Yes.

 6   Q.  Then, when you got out of the market, the IA business would

 7   purport to buy treasury securities, right?

 8   A.  That's correct.

 9   Q.  Did you really buy treasury securities?

10   A.  No.

11   Q.  Were those all fake?

12   A.  Yes.

13   Q.  When that activity happened, would there be communications

14   sent to customers?

15   A.  Every time.

16   Q.  Are you familiar with the term "trade confirmation"?

17   A.  Sure.

18   Q.  Would trade confirmations be sent to customers?

19   A.  Yes.

20   Q.  Would that reflect the fake trades that you just described?

21   A.  Exactly that.

22   Q.  Would account statements that we have looked at be sent to

23   customers?

24   A.  Yes.

25   Q.  Would those account statements reflect the fake trading
```

1   that you testified about?

2   A.   Yes.

3   Q.   When you sent those trade confirmations and sent those

4   account statements to clients, did you know that you were

5   committing fraud?

6   A.   Yes.

7   Q.   In terms of going in and out of the market, who would make

8   the decision to do that activity?

9   A.   Bernie made the final decision on that.

10  Q.   When you made that decision, were you looking at historical

11  prices when you were trying to get out of the market?

12  A.   Most of the time.

13  Q.   At any point was any of the trading actually real?

14  A.   No.

15  Q.   In connection with this activity in the split strike

16  account, did you receive notes from Ms. Crupi?

17  A.   Regarding the activity in the split strike accounts?

18  Q.   In the course of your work there, did you receive notes

19  from Ms. Crupi reflecting instructions from Mr. Madoff?

20  A.   Occasionally.

21  Q.   Could you describe what some of those notes said.

22  A.   Bernie would like you to get out of the market; Bernie's

23  considering getting out of the market; call Bernie, he wants to

24  see if we could use yesterday to get out of the market.  Or

25  when we were getting in the market, there would be notes of

1   similar content:  You have been out of the market too long,

2   Bernie wants to be in the market, look at last night's close,

3   things like that.

4   Q.  From time to time did other people on your staff leave you

5   notes reflecting communications from Mr. Madoff?

6   A.  Yes.

7   Q.  What was on those notes?

8   A.  Call Bernie.

9   Q.  Were the notes from Ms. Crupi more substantive?

10          MR. BRESLIN:  Objection.

11          THE COURT:  Please consult.  Actually, if you just

12   want to reformulate that.

13          MR. BRESLIN:  That would be fine, your Honor.

14          THE COURT:   Thank you.

15   Q.  Can you compare the notes you got from Ms. Crupi to the

16   notes you got from other people on your staff.

17   A.  The information on the notes from other people on the staff

18   rarely included any detail or any thought.

19   Q.  Now I would like to shift gears for a moment and ask you

20   about something at Madoff Securities that was referred to as

21   the disaster recovery program.  Do you know what I am referring

22   to when I refer to the disaster recovery program?

23   A.  Yes.

24   Q.  What was the disaster recovery program?

25   A.  It was basically a duplicate facility that would enable us,

1    if 885 Third Avenue had some sort of disaster, whether that be

2    a flood or a fire or an evacuation of the building or anything

3    in the midtown area that would preclude us from operating the

4    business in its entirety at 885, Bernie and Peter built an

5    alternative site in Queens that acted as basically a duplicate

6    operation.  It had a trading room, it had a back office, had

7    all the bells and whistles that the normal operation had.  It

8    was located at the Bulova Watch Company building, which was

9    right by LaGuardia Airport.

10   Q.  When, roughly, did the preparations begin for having this

11   backup office?

12   A.  In the '90s.  It was being utilized during 9/11.  I

13   remember being there, so it had to be in the '90s sometime.

14   Q.  Were you involved in the planning meetings for this?

15   A.  Some of the planning meetings, yes.

16   Q.  Who led the planning?

17   A.  Typically, Peter.

18   Q.  Who were some of the other Madoff Securities employees that

19   participated in the planning for the disaster recovery site?

20   A.  Certainly the heads of all the departments, which would

21   include Annette and Danny.  Liz Weintraub was instrumental.

22   Mark and Andy Madoff were in some of these meetings.  Charlie

23   Weiner was in most of these meetings.  Some of the middle

24   management people, that would be Jerry and George, some of the

25   technicians.  It depended on the topic of the meeting,

1  basically, as to who attended.

2  Q.  What was ultimately procured for the backup site for the

3  market-making and the proprietary trading side of the business?

4  A.  They could operate that entire business for almost an

5  indefinite period of time out of that other facility.  They

6  replicated 885.

7  Q.  What sorts of hardware was needed to do that?

8  A.  The same exact hardware that was over at 885.

9  Q.  How substantial was that hardware?

10  A.  Millions upon millions of dollars worth of hardware.

11  Q.  As part of this process, was a plan put together at Madoff

12  Securities for setting up the disaster recovery site?

13  A.  Not specifically for setting it up.

14  Q.  Let me show you, the judge, and counsel what's been marked

15  for identification as Government Exhibit 4000-F4.  Look at this

16  first page.  Then I would like to go to page 67.  Do you

17  recognize the document that we are looking at?

18  A.  Right.  This is called a BCP plan, business continuity

19  plan.  This is the information that was housed in a binder that

20  was given to all the department heads.  It outlined soup to

21  nuts what would occur in a disaster, who was going to be

22  responsible for what, who reported to who.  It had contact

23  phone numbers, it had emergency service phone numbers.  It had

24  all sorts of information.  It included the phone numbers.  It

25  had transit maps in it.

1          It was supposed to be a booklet, or a binder actually,

2   that the supervisory personnel had to be very familiar with.

3   If I'm not mistaken, we kept one at home and one in the office,

4   each of us.  There was a plan and procedure as to who would

5   first declare this to be an emergency where we would take

6   advantage, according to the BCP plan, of the disaster site.

7   There was a pecking order of who called who and what was put

8   into place.

9          MR. ZACH:  Your Honor, the government offers 4000-F4.

10          THE COURT:  Any objection?

11          MR. KRANTZ:  May I speak to Mr. Zach one second?

12          THE COURT:  Yes.

13          MR. RIOPELLE:  No objection.

14          (Counsel conferred.)

15          MR. KRANTZ:  No objection.

16          MR. MEHLER:  No objection.

17          MR. FRISCH:  No objection.

18          MR. BRESLIN:  No objection, your Honor.

19          MR. RIOPELLE:  No objection, your Honor.

20          THE COURT:  Government Exhibit 4000-F4 is admitted in

21   evidence.

22          (Government's Exhibit 4000-F4 received in evidence)

23          MR. ZACH:  Thank you, your Honor.  May we publish it

24   to the jury?

25          THE COURT:  Yes, you may.

1    BY MR. ZACH:

2    Q.  Can you tell us first, looking at the top part of it, read

3    the top part of the screen, if you can.

4    A.  It says "F&A department relocation."

5    Q.  What does F&A stand for?

6    A.  Frank and Annette.

7    Q.  You previously testified that the market-making and

8    proprietary trading end of the business had millions of dollars

9    of equipment bought to back it up, right?

10   A.  Correct.

11   Q.  Can we blow up at the bottom what is required for Frank and

12   Annette's business, department.  What does it say is required,

13   Mr. DiPascali?

14   A.  I'm sorry?  Excuse me.

15   Q.  What does it say is required to back up?

16   A.  Bulova equipment and provisions:  Two work stations, one

17   AS/400, one high-speed printer, one burster, one decollator,

18   and 300 boxes of paper.

19   Q.  What is a burster?

20   A.  It's a machine that when stuff comes off the printer, since

21   we use two-part paper, it separates it.

22   Q.  What is a decollator?

23   A.  The two-part paper is perforated, and it separates at the

24   perforation.  I might have those two machines reversed in their

25   duties.  But in essence, it splits paper.

 1  Q.  What is an AS/400?

 2  A.  It's the box we operated the system on.  It's the IBM

 3  computer that has all the programs in it to run the F&A

 4  department.

 5  Q.  In the event of a natural catastrophe or some sort of other

 6  disaster, is this what was needed to keep the IA business up

 7  and running?

 8  A.  Essentially, yes.

 9  Q.  Did you require any trading system?

10  A.  No.

11  Q.  Did you require phones to pick up and call brokers and

12  other people to buy securities?

13  A.  There were phones at Bulova we could have utilized.

14  Q.  What was your understanding of why this was all that was

15  needed to keep your business up and running?

16  A.  Because in a disaster we were going to go into disaster

17  mode depending on what position we were in and depending on the

18  magnitude of the disaster and how it would affect the stock

19  market.  Bernie's instructions to me were obviously that we

20  would communicate and he would have the final decision, but

21  whatever we had going in terms of the baskets would simply be

22  liquidated and then placed into treasury positions.  Then we

23  would just sit on those treasury positions for the customers

24  for the duration of the disaster.

25  Q.  During this time were there any securities that were

1  actually being traded by the IA business?

2  A.  During what time?

3  Q.  When this plan was being put together.

4  A.  If we had a disaster, the tickets that we were going to put

5  through were going to be fictitious.  It never occurred.

6  Q.  Is that why you needed the 300 boxes of paper?

7  A.  Correct.

8  Q.  Nothing else?

9      MR. KRANTZ:  I didn't hear the last question.  I'm

10  sorry.

11      MR. ZACH:  "Nothing else?"

12      THE COURT:  The question was "Nothing else?"  Was

13  there an answer?

14  A.  No, there was nothing else.

15  Q.  In comparison to the AS/400 that was listed here, what

16  sorts of trading hardware was needed for the market-making

17  business?

18  A.  I'm not all that well-versed with it, but there was a

19  trading platform written on a whole series of computers.  There

20  were all sorts of communication devices and servers.  There was

21  a ticker plant that was built which holds all the current

22  market quotes of every security that we could possibly have an

23  interest in.

24      It was a very extensive architecture, very, very

25  sophisticated digital communication devices.  It took up the

1   entire 18th floor between the equipment itself and the people

2   that managed that equipment, with the exception of some small

3   office space for some, you know, some of the back office

4   personnel.

5   Q.  Can we take down this exhibit, Ms. Baskin, and put up

6   Government Exhibit 1100-2.

7          Do you recall what this is?

8   A.  The 18th floor.

9   Q.  Can you give the witness the ability to touch the touch

10  screen.

11         Could you point out, Mr. DiPascali, where on the 18th

12  floor all of this hardware that was used for the market-making

13  and proprietary trading business was located.

14  A.  It would be all of this.  It would be that C circle area

15  and the box next to it.  The computer technicians that operated

16  that system would be in this area here.  There was monitoring

17  stations of this equipment, which would be here.  In essence,

18  all of this.

19         This was secretarial and private office space, which

20  would not be part of it.  And this was the back office area,

21  which would not be part of the physical hardware.  All of these

22  techies all had computers that went into that hardware, boxes

23  under their desks.  It was very high-tech.  I don't know the

24  specifics about the equipment used, but there was lots of it.

25         THE COURT:  Mr. Zach, would you back up and do a

1    description for the paper record.

2              MR. ZACH:  I will, your Honor.

3    Q.  Mr. DiPascali, looking at what is now 1100-2, there are

4    markings in the center of the document.

5    A.  A series of five arrows.

6    Q.  Yes.  Was that the area that you said had hardware that was

7    used for the trading?

8    A.  That was the location of the people that were monitoring

9    these systems.  They had all sorts of screens and hardware

10   around them.

11   Q.  Starting with the left, can we blow up the left side of the

12   document, Ms. Baskin, please.

13              There is a vertical column above a box that says UPS,

14   and it goes one 1, 2, 3, 4, 5, all the way up to 9.  Do you see

15   that?

16   A.  Yes.

17   Q.  What was located there?

18   A.  The computers.

19   Q.  Do you see to the right of it there are a couple of boxes

20   that say AC?  What does AC mean?

21   A.  Air conditioning.

22   Q.  For what reason was there air conditioning in that area?

23   A.  There was so much equipment, it needed to be cooled.  There

24   were monstrous what they called Liebrink air conditioning

25   units.  They were 6-foot tall.

1    Q.  That was to cool the computers?

2    A.  Yes, to cool that whole room.

3    Q.  In response to the question of where was some of the

4    trading hardware, that is one of the areas?

5    A.  Certainly.

6    Q.  Now, Ms. Baskin, can we pull out and blow up the middle

7    lower section where the marks have been made.

8         So the record is clear, there is an X over a set of

9    stations that has the number 1839 on the right-hand middle side

10   of that section.  Do you see that?

11   A.  I do.

12   Q.  So the record is clear, what was located in this area?

13   A.  That was the software writers or tech support area.  Each

14   one of those desks was kind of set up in a cubicle environment.

15   They had computers under and on their desks and screens and

16   they were linked to other equipment that was in the equipment

17   room or the computer room.

18   Q.  That, too, was part of the area where hardware was located

19   that was used in furtherance of the trading and the market-

20   making side of the business?

21   A.  Yes.

22   Q.  Now I think there were also some series of five triangles

23   at the top left that go through a room called operations?

24   A.  Correct.

25   Q.  What is there?

1   A.   That was a monitoring station.   There was an entire wall of

2   like flat screen TVs and there were three guys that -- you see

3   those three seats?   They were monitoring I don't know what

4   related to the system.   They had tons of hardware and

5   communication devices that were also back-linked into our

6   network and into the system.

7   Q.   Finally, in this part there is a long arrow going up

8   starting in a room with the number 2408 and going up through

9   another room that is unlabeled but just above a closet.   What

10  is there?

11  A.   Those were the location in the center where there is four

12  desks in a vertical rectangle.   Those were computer technicians

13  that had similar equipment.

14  Q.   Can we pull out of that, Mr. Baskin.

15       You also made a mark on the right-hand side.   What is

16  that?

17  A.   That had nothing to do with the hardware that drove the

18  trading.   Those were executive offices.

19  Q.   I think we can pull out now.   How did this amount of

20  hardware compare to what sort of computer systems were on the

21  17th floor?

22  A.   There were similar desktop units and CPUs under most desks

23  on the 17th floor.   There was an AS/400 box in the computer

24  room on the 17th floor.   There was not much more than that.

25  There was some communications to that AS/400 from outside

1   vendors, but it was not nearly as sophisticated as the 18th

2   floor computer center.

3   Q.  Let's for a moment look now at Government Exhibit 1100-1.

4   Do you recognize what this is?

5   A.  Yes.

6   Q.  Can you put a mark on where the AS/400 would be located.

7   A.  Stay with me a second, because I'm half blind.  It would be

8   in this room.  I believe ours was right here on the floor off

9   the right shoulder of that desk operator.

10  Q.  It was on the floor?

11  A.  I believe it was.

12  Q.  Were there those industrial air conditioners needed for

13  that?

14  A.  There was sometimes a temporary unit rolled into that room

15  that had this big flexible accordion thing to vent it.  That

16  was, I believe, not for the comfort of the computer but for the

17  operators.

18  Q.  To keep the room cool for the workers?

19  A.  Yes.  It was an internal room.

20  Q.  We can take that down.  Previously you had testified that

21  as the new clients came from A&B directly to Madoff Securities,

22  you had to address the logistical problems of setting up

23  accounts at Madoff Securities.  Do you recall that?

24  A.  Yes.

25  Q.  To do that, did you have to computerize a lot of the data?

1  A.  The programs necessary to input a new client into the

2  system I believe were already resident.  The task was to input

3  lots of them.  I don't think they needed to reinvent the wheel

4  to have the computer recognize a customer account.

5  Q.  Who was in charge of the IT at that time?

6  A.  Liz Weintraub.

7  Q.  Did Ms. Weintraub assist in doing that?

8  A.  No.

9  Q.  Who was it that helped set up the necessary computer

10  programs to take on this increased volume of clients?

11  A.  I don't understand your question.

12  Q.  As part of bringing in the clients, did you have to work

13  with anyone in the IT department to prepare programs so that

14  customer data could be processed and kept track of?

15  A.  I don't remember working with anyone for that specific

16  purpose.

17  Q.  During this time period were you working with computer

18  programmers to help you assist in your business?

19  A.  Absolutely.

20  Q.  Who were you working with?

21  A.  Primarily Jerry.

22  Q.  What sorts of tasks were given to Mr. O'Hara?

23  A.  We were trying to invent, as I explained before, a way of

24  being able to trade many, many, many accounts using the same

25  exact strategy.  We chose the name batch trading.  What we were

```
 1    going to do was trade everything in big batches of data.

 2    Q.  In sorting and working with that data, who did you work

 3    with?

 4             MR. MEHLER:  Objection.

 5             THE COURT:  Please consult.

 6             MR. ZACH:  I'll rephrase.

 7    Q.  Who was it you were working with in terms of the batch

 8    trading?

 9    A.  Jerry O'Hara.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   Q.  Now, at this time, did Mr. Perez work at Madoff Securities?

2   A.  He did.

3   Q.  When did Mr. Perez start working at Madoff Securities?

4   A.  It was sometime after Jerry started, but not -- certainly

5   not two or three years after.  I think it was about a year

6   after.

7   Q.  And what specifically -- what specific year was it, if you

8   recall, or whereabouts did he start?

9   A.  I believe it was prior to 1992.  I'm not sure of the year.

10  It might have been '89.  It might have been '90.  It might have

11  been '91.

12  Q.  Sometime in the late '80s, early '90s?

13  A.  I'll agree to that.

14  Q.  And Mr. O'Hara was hired before Mr. Perez?

15  A.  Yes.

16  Q.  And when Mr. Perez was hired, who did he -- who did you

17  observe him working with in the mid '90s?

18  A.  Mostly Annette and Jerry, taking instruction from Liz

19  Weintraub.

20  Q.  And was the work that was being done by those folks -- was

21  a portion of that work that was being done by those folks done

22  in connection with the IA business?

23  A.  Certainly.

24  Q.  Now, I'd like to switch to a different topic, which is, are

25  you familiar with an individual named Stanley Chais?

Case 1:10-cv-02585-ls Document 259-1 Filed 04/03/14 Page 345 of 179

```
 1    A.  Yes.

 2    Q.  How are you familiar with an individual named Stanley

 3    Chais?

 4    A.  He was one of Bernie's clients.

 5    Q.  When do you recall first becoming familiar with Mr. Chais?

 6    A.  I've heard the name as far back as certainly the '80s,

 7    early '80s.

 8    Q.  And did he -- did he have --

 9    A.  Can I correct that?

10    Q.  Of course.

11    A.  I heard that name in 1977.

12    Q.  Okay.  Do you recall how you heard that in 1977?

13    A.  Bernie said, I have a client named Stanley Chais.  His wife

14    is a writer.  She wrote a screenplay.  Threw it at me.  He

15    said, go read it, kid.  Tell me if it's any good.  Her name is

16    Pamela Chais, and I remember where I read the screenplay, which

17    was Ralph Madoff's office; so it had to be '76 or '77.

18    Q.  Did Mr. Chais have accounts with Madoff Securities?

19    A.  Yes.

20    Q.  Do you recall what types of accounts they were?

21    A.  They were Annette's accounts.  They were convertible

22    arbitrage accounts and long position accounts, then

23    subsequently hedge accounts and long position accounts, and

24    then after that, option hedge accounts and long position

25    accounts.  The business went through a few generations of
```

1     strategies.

2     Q.   Okay.  Now, you said when you first became aware of it,

3     that those accounts were being managed by Ms. Bongiorno?

4     A.   Yes.

5     Q.   Over time, did another individual at Madoff Securities take

6     a role on with respect to the Stan Chais accounts?

7     A.   Yes.

8     Q.   Who took on that role?

9     A.   Jodi.

10    Q.   And what role did Ms. Crupi take on with respect to the

11    Stanley Chais accounts?

12    A.   She became the manager of his hedge work.

13    Q.   Do you recall approximately when that was?

14    A.   I'll guess mid '90s.  It wasn't, I don't think, in the '80s

15    and it wasn't as late as the 2000s.

16    Q.   And before that, was Ms. Bongiorno the one that was

17    operating those accounts?

18    A.   Her and her staff, yes.

19    Q.   Now, I'd like to show you what's in evidence as Government

20    Exhibit 105-C122, and can we blow up the written portion of

21    that, Ms. Baskin.  Now, Mr. DiPascali, do you recognize some of

22    the handwriting on this piece of paper?

23    A.   Yes.

24    Q.   Whose handwriting do you recognize it to be?

25    A.   Jodi's.

08-01789-smb   Doc 18596-1   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 1
Case 1:10-cv-04652-CM   Document 59   Filed 04/03/14   Page 23 of 175
Pg 148 of 180

 1   Q.  Could you read for us -- Let's blow up the top half, if we

 2   can, Miss Baskin.  Can you read for us what it says?

 3   A.  It's titled hedges.  One, figure out as if it's an

 4   arbitrage.  Do not, underlined, count weekends with lag days.

 5   And there's some note in between that says, start counting lag

 6   day after last day.  It goes on to say, always seven lag eight

 7   week.  If new dates would become due in current quarter, you

 8   have to turn them again.

 9   Q.  Now, let's pull out.  And can we blow up the bottom part of

10   the document.  Could you read for us the part above the line?

11   A.  It says, use last week in trade dates, highest vol, selling

12   eighth to a quarter below high by eighth to a quarter above

13   low.

14   Q.  And can you read the bottom portion too?

15   A.  It says, one million running 22 weeks at two.  I think it

16   says, two and a quarter.  Profit needed equals one million

17   times two and a quarter times 22 divided by four, and then

18   there's a figure of 123,750.

19   Q.  Now, we can take that down.  Now, was Mr. Chais connected

20   with or did he have a relationship with any other employee at

21   Madoff Securities going back in time?

22   A.  Sure.  He was roommates at Syracuse University to Marty

23   Joel.

24   Q.  And Mr. Joel was the individual that you learned options

25   trading from, right?

```
 1   A.  Correct.

 2   Q.  Now, did there come a time that you were assigned

 3   responsibilities with connections to Mr. Chais' accounts?

 4   A.  Yes.

 5   Q.  When was that?

 6   A.  In the '90s.

 7   Q.  And what were you tasked with doing?

 8   A.  To create a strategy for him that would be hedged using

 9   stocks and individual stock options for five of his accounts,

10   three of which were funds that he managed and one was an

11   offshore or foreign philanthropy trust and the other was a

12   trust for one of his children.

13   Q.  And as part of your involvement with Mr. Chais' accounts,

14   did you learn about requirements he had for the trading in his

15   accounts?

16   A.  For the accounts that I managed?

17   Q.  Yes.

18   A.  He was never allowed to take a loss.

19   Q.  How did you learn that his requirement was that he was

20   never allowed to take a loss?

21   A.  Because after Bernie explained to him what the strategy

22   would look like, because the money that we were going to

23   utilize the strategy for had come from convertible bond and

24   convertible preferred hedge and arbitrage investments.  But

25   Bernie was unwinding those and moving funds from that arena
```

1   into this new product that I had developed with Bernie called

2   the split strike.  The split-strike strategy involves buying

3   the stock, buying the put to hedge the stock, and shorting the

4   call.  It's a three-legged animal.  And you have a defined

5   downside risk and a defined upside potential.

6           When -- after Mr. Chais became agreeable with Bernie

7   that this was okay to do, they moved the credit from his old

8   arbitrage or hedge account into a similar account number that

9   was in my domain.  I set up a bunch of this work the way I had

10  been told to do it, and we sent them the tickets and he called

11  up like a lunatic and said that this is all wrong, that you

12  can't do this because he wasn't getting down the concept that

13  you can make two points on the stock and lose a point and a

14  half on the hedge and still be a net half point winner.

15          He wanted to make either break even or make money on

16  all three legs, which was insane.  So Bernie, you know,

17  switched gears, and he could not put him back in this

18  arbitrage, but Stan claimed he couldn't -- didn't know how to

19  account for a loss, wouldn't be able to explain to his

20  accountant what a loss was all about.  Losses were just not

21  part of his universe.  So he forced Bernie to redirect the

22  trading strategy within the same strategy but never write a

23  ticket that has a loss.  It was insanity.

24          MR. BRESLIN:  Your Honor, objection, and move to

25  strike the entire answer.

1    THE COURT:  Will you consult, please.

2         (Counsel conferring)

3         MR. BRESLIN:  Your Honor, I'm sorry, we need a ruling.

4         THE COURT:  All right.  What we'll do is start the

5    afternoon break for the jury, and we can have a discussion out

6    here.  So, ladies and gentlemen, please be ready in the jury

7    room at 3:30 and continue to keep your thoughts to yourselves

8    and enjoy your break.  All rise.  Ms. Ng will escort the jury

9    out.

10        (Jury exits)

11        THE COURT:  And, Mr. DiPascali, you may step down.

12   Thank you.

13        THE WITNESS:  Thank you, your Honor.

14        THE COURT:  Mr. Breslin?  Okay.  Now we're ready.

15        MR. BRESLIN:  Your Honor, the question was, how did

16   you know Mr. Chais was never to take a loss.  We got, instead,

17   a long answer that was utterly nonresponsive, that had folded

18   into it statements apparently from Mr. Chais, although no

19   foundation was laid for any of those, to Mr. Madoff, although

20   again it's not clear exactly who the witness was talking to

21   when Mr. Chais' preferences were conveyed to a middleman.  I

22   mean, it's gibberish, I mean, and it doesn't belong on this

23   record.

24        And, yes, I know, as Mr. Zach reminded me, I'm the one

25   who said he should be allowed to run, and I stand by that, but

1 that doesn't mean that he's allowed to -- you know, to put on

2 the record answers that are simply not competent testimony.

3          THE COURT:  Mr. Zach?

4          MR. ZACH:  Your Honor, I thought the answer was clear.

5 He described what his conversations were with Mr. Madoff and

6 his understanding of Mr. Chais' requirements, and it made

7 sense.  Both Mr. Madoff and Mr. Chais are names that were

8 disclosed in the government's letter of co-conspirators, and I

9 thought the answer made sense and should not be stricken.

10         THE COURT:  The answer made sense in its own little

11 internal universe to me, and since the government's allegation

12 proffers that they are co-conspirator statements, we don't have

13 the hearsay exclusion problem.  So the request to strike is

14 denied.

15         MR. BRESLIN:  Thank you, your Honor.

16         THE COURT:  Have a good break, everybody.  See you at

17 3:30.

18         MR. JACKSON:  Excuse me, Judge, I'm sorry.

19         THE COURT:  Hold on a second, everybody.

20         MR. JACKSON:  I just have one issue I just wanted to

21 clarify, your Honor.  Earlier when your Honor granted two

22 motions to strike, I just want to clarify, because I think it's

23 going to be our obligation to redact the transcript

24 appropriately, those were only granted as to the portions of

25 the answers which speculated about another person's thoughts?

1    That was our understanding.

2         THE COURT:  Yes, I'm thinking back, but I believe that

3    the motion to strike, at the point, was directed to the

4    portions of the answers that said so and so intended to do this

5    or so and so was thinking that.  And, Mr. Breslin, did you want

6    to say something?

7         MR. BRESLIN:  I will wait to hear what your Honor was

8    going to say.  I was just standing up to stretch.

9         THE COURT:  All right.  So does anyone have an

10   inconsistent recollection of their intent to moving to strike?

11        MR. KRANTZ:  Your Honor, I would just suggest that if

12   there's going to be some discretionary striking, that we should

13   probably just consult before it's done because if it's

14   discretionary, there might be room for disagreement.  So I

15   suggest government -- if the government is going to strike some

16   portion, they should let us know what portion so we can

17   acknowledge we agree or don't agree.

18        MR. JACKSON:  At the end of the day, your Honor, any

19   transcript that went back to the jury would be, obviously,

20   reviewed by defense counsel.  I just wanted to be clear on the

21   record that that was our understanding of what the application

22   was that was granted so that, to the extent that we look --

23   we're looking at it in the future, the record is clear that

24   that was the motion to strike, it was based on the witness'

25   speculation about what others were thinking, and it was only

1    that portion of the answers that needed to be stricken.

2           THE COURT:  Yes, that was my understanding of the

3    motion to strike, and that was what I intended to grant.  And

4    to the extent there is to be any redaction of transcript to go

5    into the jury, I would certainly require and expect that the

6    parties consult on and agree to the particular redactions

7    before the redacted transcript is sent back.

8           MR. KRANTZ:  Fair enough.  Thank you, Judge.

9           MR. JACKSON:  Thank you, your Honor.

10          THE COURT:  Okay.

11          (Recess)

12          THE COURT:  Good afternoon.  Please be seated.  Is

13    everyone here?  I think everybody is here.  Ms. Ng, would you

14    please bring the jury in.

15          (Jury enters)

16          Good afternoon, again, members of the jury.  Please

17    take your seats.  Please be seated, everyone.  Mr. Zach.

18          MR. ZACH:  Thank you, your Honor.

19    DIRECT EXAMINATION (RESUMED)

20    BY MR. ZACH:

21    Q.  Mr. DiPascali, before the break, you were testifying about

22    certain investment accounts by an individual named Stan Chais;

23    do you recall that?

24    A.  Yes, I do.

25    Q.  Now, did Mr. Chais have one or more than one accounts with

 1  Madoff Securities?

 2  A.  He had many.

 3  Q.  And were those accounts all of a personal nature, or did he

 4  also have accounts that included other investors' money?

 5  A.  Both.

 6  Q.  On his personal accounts, who at Madoff Securities was

 7  responsible for overseeing them?

 8  A.  Annette.

 9  Q.  And for the accounts that had other people's -- had other

10  investor's money in them, who was responsible for dealing with

11  those?

12  A.  Ultimately, I was and Jodi was.

13  Q.  Now, after the conversation you testified about in which

14  Mr. Chais said his accounts were not permitted to lose money,

15  was a new trading strategy implemented in which there would

16  never be a loss for any of his accounts?

17  A.  What Bernie decided to do was to -- in order to ensure that

18  the strategy would never result in a loss, he stopped charging

19  him commissions because there was one time where we actually

20  put on a strategy and took it off and the net of the three legs

21  was zero, and Stanley still complained that he lost money.

22          We, quite frankly, were baffled at where, we don't see

23  it, and it turned out it was the 100 or 200 or $300 in

24  commission on the option transactions that was posted that

25  caused him to go into the red slightly.  So Bernie put down a

```
 1   mandate never charge him a commission, and this way it ensured
 2   that even if you bought stock at 10 and sold stock at 10 or
 3   bought an option at two and sold it at two, where you would on
 4   paper break even, you wouldn't be in the red because you
 5   weren't even charging commissions.
 6   Q.  So when you say Mr. Chais couldn't have a loss in his
 7   account, you mean in any aspect of his account, not in the
 8   overall monthly results?
 9   A.  That is correct, in any aspect of a particular hedged
10   setup.
11   Q.  Now, this new hedged setup, with no commissions at all, was
12   that implemented?
13   A.  Yes.
14   Q.  Now, was that option strategy something that could be
15   implemented in the real world, in the manner it was with
16   Mr. Chais?
17   A.  No.
18   Q.  And was any of the trading in Mr. Chais' account real?
19   A.  No.
20   Q.  Now, did you observe how Ms. Crupi handled the trading in
21   the Chais accounts?
22   A.  Yes.
23   Q.  And did you have discussions with her about the trading in
24   those accounts?
25   A.  Yes.
```

1    Q.   Briefly describe, from a high level, how the fake trading

2    that was going on in the Chais accounts occurred?

3    A.   When I was preparing it or when she was preparing it?

4    Q.   When she was preparing it.

5    A.   She would have a list of securities that were fairly well

6    known stocks that were very volatile, typically.  She

7    maintained that list, and then occasionally when it was

8    necessary to put Mr. Chais' money to work in the five accounts

9    that her and I were responsible for, she would take what's

10   known as a Bloomberg sheet.  Bloomberg is a vendor.

11        When you punch up a security symbol on the screen,

12   there are certain parameters you can request that will give you

13   historical pricing.  I think the first page goes back about 20

14   trading days.  It shows you the high, the low, the last sale,

15   maybe it shows you the opening, but it's historical pricing

16   data of a security.

17        So she would typically look to her list, print out an

18   array of historical stock prices and, based on the level of the

19   stock price, she would choose which option would most likely

20   work.  So she would print a put option, spreadsheet and a call

21   option spreadsheet, and then she would lay them out on the

22   table and look for the pricing movement and the days where the

23   stock was -- had the widest range, and she would literally

24   build a little puzzle.

25        Because if you purchase stock at X and you purchase

1  the put at Y, and you sold short the call at Z, the net of that

2  needed to equal one of the functions of the put.  If it did,

3  mathematically, it guaranteed no loss.  And not all of these

4  little stock put call sheets that she printed would present in

5  any of the 20 days she was looking at that scenario, but when

6  it did, she circled the pricing that she needed and she made

7  certain notations on those Bloomberg sheets.

8       She also had to be cognizant of the dividend income

9  stream of that particular security, when it was going to pay a

10  dividend because she anticipated having these securities bought

11  for a certain time period and held for a certain time period.

12  So if a dividend was going to hit in that anticipated period,

13  she needed to notate that.

14       MR. BRESLIN:  Objection.  Motion to strike as to the

15  testimony as to what Ms. Crupi anticipated or intended.

16       THE COURT:  The motion to strike is granted.  The jury

17  will disregard the portions of the answer relating to what

18  Ms. Crupi allegedly anticipated or intended.

19  Q.  And when these documents were being prepared and reviewed

20  by Ms. Crupi, where did that occur?

21  A.  In our common area.

22  Q.  And were you able to see how she was working on these

23  documents?

24  A.  Initially I taught her how to do it; so I would see every

25  move she made.

1   Q.  And did you review her work with her?

2   A.  Yes.

3   Q.  And did you speak with Ms. Crupi about what trades to put

4   in or how to make this scenario play out correctly?

5   A.  Extensively.

6   Q.  And through those discussions and through those

7   observations, is that how you learned how she was able to

8   implement this strategy?

9   A.  Yes.

10  Q.  So let's look at Government Exhibit 105-C133.  Can we blow

11  up the note.  Do you recognize the handwriting on this

12  document?

13  A.  Yes.

14  Q.  Whose handwriting is it?

15  A.  It's Jodi's.

16  Q.  And you see going down the left-hand side of the note there

17  are a series of names and numbers?

18  A.  Correct.

19  Q.  Can you read out the names for us?

20  A.  Brighton, Chais, Lambeth, Popham, Unicycle.

21  Q.  And do you recognize what those names are?

22  A.  Yes.

23  Q.  And what are those names?

24  A.  Well, Brighton, Lambeth and Popham are funds that Mr. Chais

25  had established, where he was raising money from outside

1   investors, collecting those monies into his fund, and then

2   turning it over to Bernie to manage.  So there were accounts

3   for those three entities of non-Chais money, if you will.

4          The one reference Chais, which is seat 1285, I believe

5   was a trust for one of his kids or some family related entity.

6   And then Unicycle, Bernie explained to me was some Israeli

7   entity that Stanley used to do philanthropy in Israel.

8   Q.  Now, were these the accounts that you had discussions with

9   Miss Crupi about?

10  A.  Yes.

11  Q.  And how -- and were these the accounts in which there could

12  be no loss for Mr. Chais?

13  A.  Yes.

14  Q.  And were these the accounts in which the trades that were

15  put in them were all fake?

16  A.  Yes.

17  Q.  And can you read what it says at the top of the letter?

18  A.  P and L needed.  Trades, P and L needed.

19  Q.  Now, let's take that document down and let's pull up, if we

20  can, Government Exhibit 105-C23.  Now, do you recognize the

21  handwriting on the side of this envelope?

22  A.  Yes.

23  Q.  Whose is it?

24  A.  It's Jodi's.

25  Q.  And what does it say?

1    A.  Stan 2006, second quarter.

2    Q.  And what was Mr. Chais' first name?

3    A.  Stanley.

4    Q.  Let's turn to Page 2.  Do you recognize the handwriting on

5    this page?

6    A.  Yes.

7    Q.  Whose handwriting is it?

8    A.  It's Jodi's.

9    Q.  Have you seen Ms. Crupi prepare this type of document

10   before?

11   A.  Yes.

12   Q.  What instances -- strike that.

13        Under what circumstances did you see Ms. Crupi prepare

14   a document like this?

15   A.  Either before she was starting to do her trading for a

16   particular quarter, or as a recap mechanism of a particular

17   quarter.  She kept notes of exactly what the results of her

18   trading was.  Stan sometimes would call and ask questions, and

19   she would refer to her notes as to rate of return and things of

20   that nature.

21   Q.  So were these accounts that related to Mr. Chais?

22   A.  Yes.

23   Q.  And I want to come back to this page, but can we just

24   quickly go to Page 3 and look at that first.  And looking at

25   Page 3, do you recognize the handwriting on it?

1   A.   Yes.

2   Q.   And whose handwriting is it?

3   A.   It's Jodi's.

4   Q.   And let's go back, if we can, to Page 2.  What are the

5   accounts that are listed on this page?

6   A.   Brighton and Lambeth.

7   Q.   And can we blow up -- and who ultimately was the holder of

8   the Brighton and Lambeth accounts?

9   A.   They were accounts set up by Stan with outside investor

10   monies.

11   Q.   And did you have discussions with Ms. Crupi about the fake

12   trading that was going on in these accounts?

13   A.   Yes.

14   Q.   And can we blow up the first group, please.  Can you walk

15   us through what this document shows, starting with the first

16   line, Brighton with a number, 91 days at nine and a half?

17   A.   Well, in order to establish what one needs to do in this

18   case for the second quarter of 2006, you need to have some sort

19   of a starting point or reference point.  And then from that

20   reference point, you're going to calculate what one's expected

21   return is.  And this looks, to me, like it's a recap of this

22   account for the second quarter.  It starts out with the name

23   and the account number, and it references that there are 91

24   days in the quarter and that the account should earn 19 and a

25   half percent annualized in that period.  Her starting point is

1   the account's value or equity at March 31st, '06, and in this

2   case, it was 299,841,375.40.

3           She identifies that, at that point in time, this

4   account was running $27,149.23 over its expected rate of

5   return, at the end of March of '06. The account then also took

6   a wire or a check out. That's that CW it stands for capital

7   withdrawal, on May 22nd of a million dollars. There was also

8   transfer activity also referenced as a capital withdrawal on

9   May 22 of $2 million.

10          What she's doing in this sheet -- and you don't see

11  the math running because she's running a computer tape to get

12  to some of these numbers -- is she's starting with 299 million.

13  She's adjusting for the fact that she was over coming into the

14  period, and she's running a calculation of what $299 million

15  should earn at 19 percent for a certain amount of days.

16          You'll notice that there's the number 51 written and

17  circled on the right-hand side of the document. That's her

18  calculation of how many days probably until the first

19  withdrawal happened because when you start at 299 and then the

20  gentleman takes a million dollars, you need to adjust your

21  starting point by that million dollars. So you calculate the

22  first 51 days at 19 and a half percent, and then on the 299,

23  and then you go forward from there based on 298 because you

24  need to account for the million dollars that was withdrawn and

25  so on.

1           After running these tabulations on a calculator, she's

2    established that her expected return or her ER at the end of

3    the second quarter of '06 should be 14,511,785.39.  That

4    number, when you go back to the starting point, you adjust for

5    the overage.  You adjust for the withdrawals that occurred, and

6    you add what that account was expected to earn in the period.

7    Tells you that the equity should be -- EQ should be, SB,

8    311,325.  She makes a record notation here that the equity

9    actually is 311,045.  Therefore, she has now closed the end of

10   the second quarter under by $280,000.

11   Q.  Now --

12           MR. BRESLIN:  Your Honor, objection and move to strike

13   the last answer.

14           THE COURT:  The motion to strike is denied.

15   Q.  Now --

16           THE COURT:  You may continue.

17   Q.  Now, you said that there is an expected rate of return of

18   19 and a half percent, which we see on the top right-hand side?

19   A.  Yes, sir.

20   Q.  What was your understanding of the return -- of what that

21   expected rate of return was?

22   A.  It was an amount that was dictated by Bernie.

23   Q.  So Mr. Madoff decided what the expected rate of return

24   would be?

25   A.  Yes.

1   Q.  And what is an expected rate of return?

2   A.  It's how much money something should earn over a period of

3   time.

4   Q.  So in this case, Mr. Chais' account, this Brighton account,

5   should earn 19 and a half percent.  Do you know over what time

6   period that would be?

7   A.  Annualized for the second quarter for 2006.

8   Q.  So --

9   A.  So it's approximately 5 percent per quarter.

10  Q.  Annualized means over a year --

11  A.  Correct.

12  Q.  -- 19 and a half percent?

13  A.  Right.

14  Q.  So for each quarter, you would make?

15  A.  Just shy of five percent per quarter.

16  Q.  Now, there's reference to -- well, let's pull out of that.

17  And now, let's go to in the same document, Page 9.  Now, do you

18  recognize what type of sheet this is?

19  A.  That's a printout of a screen shot from the Bloomberg

20  terminal I spoke about earlier.

21  Q.  And if you look at the bottom, there is some handwritten

22  notations; do you see those?

23  A.  I do.

24  Q.  And who wrote those?

25  A.  Jodi.

1   Q.  Now, Ms. Baskin, can we blow up -- well, there's

2   handwriting at the top.  Do you recognize whose handwriting

3   that is?

4   A.  Jodi's.

5   Q.  Can we blow up, Ms. Baskin -- correct, starting there, and

6   the rest of the document going down.  Now, can you tell when

7   this Bloomberg sheet was printed out?

8   A.  If you go to Bloomberg's information, which is just above

9   Ms. Crupi's writing, the last thing written on the lower

10  right-hand side under the box says, 20 June '06 at 10:51:40.

11  Actually, the information was accessed from the terminal and

12  then printed at 10:51 in the morning on June 20th, 2006.

13  Q.  Can we highlight that, Ms. Baskin.  And that part is where

14  you looked to see when a Bloomberg printout occurred?

15  A.  Yeah.  If I wanted to know when the screen shot was taken,

16  my eye would look there.  You'll notice it says, open, high,

17  low, closed.  You'll notice the market had not closed yet on

18  June 20th.  It was only 10:51 in the morning; so that closed

19  figure was actually the last trade prior to 10:51:40, and you

20  would need to know that.

21  Q.  Now, Mr. DiPascali, going down the left-hand side, how many

22  days back in the month does this go?

23  A.  Twelve.

24  Q.  And you see in Ms. Crupi's handwriting there are -- on the

25  left-hand side, there's a date.  Can you read what that is?

 1  A.  5-31.

 2  Q.  And on the right-hand side, do you see there's a series of

 3  dates as well.  What are they dated?

 4  A.  6-14.

 5  Q.  And did you see Ms. Crupi with this type of Bloomberg sheet

 6  when you were working with her at Madoff Securities?

 7  A.  Yes.

 8  Q.  And what stock is this for?

 9  A.  It's Google.

10  Q.  Now, if we can, I'd like to go to Page 4 of this same

11  document, and can we blow -- can we blow up the text in this,

12  Ms. Baskin, to see if it can be a little bit easier to read.

13          Now, just generally, do you recognize what type of a

14  document this is?

15  A.  It's an Excel spreadsheet.

16  Q.  And have you observed this type of Excel spreadsheet at

17  Madoff Securities?

18  A.  I created it.

19  Q.  And was this type of Excel spreadsheet utilized in

20  connection with some of the Stanley Chais accounts?

21  A.  Yes.

22  Q.  Who did you observe utilizing this type of spreadsheet?

23  A.  Initially, me and my keypunch operators, and then Jodi and

24  the keypunch operators.

25  Q.  And can you explain what the purpose of this spreadsheet

1  is?

2  A.  So that the young ladies in the computer room could input

3  the trades.  It is, in essence, a trade ticket.  You have on

4  this spreadsheet all the information that the keypunch

5  operators would key into the system to produce a confirmation

6  and to have a security appear in a customer statement.

7          There's also some calculations being done here.  The

8  purpose of the spreadsheet was to, in an orderly fashion, put

9  certain information on the sheet and guide you along in the

10  process of putting together a quarter's worth of work for

11  Mr. Chais.  When you were done and everything meshed the way it

12  needed to, certain columns on this sheet were just simply

13  hidden on Excel, and then the columns that were left were used

14  as just printed and used to give to the keypunch operators so

15  that they could input the information to the system.

16          So you'll see down the left-hand column it says buy,

17  buy, sell; buy, buy, sell, all the way down, and then there's a

18  unit quantity, but that unit quantity never went into the

19  computer room.  The next column never went into the computer

20  room.  However, the fourth column did, so did the fifth and so

21  did the sixth column, and the trade date and the settlement

22  date.  Then there was the next one didn't.  The closeout did.

23  The trade date and the settlement date did and the last one and

24  the little tiny numbers didn't.

25          So this had two purposes, to allow you to, on Excel,

1    set up the architecture of what you needed to do and then cover

2    up, hide or delete certain information that's extraneous to the

3    computer punching operation, print a copy of what's left over

4    and give it to the young ladies to punch.

5    Q.   Now, Mr. DiPascali, you said that you prepared this

6    spreadsheet?

7    A.   Yes.

8    Q.   The format for the spreadsheet, at least?

9    A.   I prepared this exact spreadsheet.

10   Q.   And with this spreadsheet, there are certain totals that

11   are summed up, right?

12   A.   Yes.

13   Q.   Are you able to put in or take out transactions to adjust

14   those totals?

15   A.   What's happening in the spreadsheet is in the background,

16   Excel is running some very simple math.  Certain of these

17   columns are fixed columns, and what you're doing is you're

18   adjusting those columns by quantity so that you could hit to a

19   particular total that Excel is telling you all of the above has

20   now calculated to.  It goes back to trying to hit to a specific

21   rate of return.

22          What you're seeing on this spreadsheet, by the way,

23   are not just the buy side tickets of going into the market,

24   that this is going into the market and coming out of the

25   market.  So by the time this spreadsheet is created, it's a

 1   finite done deal.  So if you just keep playing with the

 2   numbers, you will hit to the point you want to be because there

 3   is no more variables.  Everything is fixed, and you're just

 4   changing how much of this I should do to accommodate that exact

 5   number I'm trying to hit to.

 6   Q.  So stepping back, Mr. Chais expected a predetermined rate

 7   of return?

 8   A.  Correct.

 9         (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:10-cv-02285-JCS   Document 559-1   Filed 04/03/14   Page 23 of 173

```
 1   Q.  Does the spreadsheet allow you to adjust the amount of a

 2   share that is purportedly purchased to try and target that

 3   amount?

 4   A.  It's designed to do exactly that.

 5   Q.  Does all of the purported trading on the spreadsheet have

 6   historical stock information on it?

 7   A.  Yes.

 8   Q.  Was any of the stock that's reflected on this sheet

 9   actually purchased?

10   A.  No.

11   Q.  Does this allow to insert, to calibrate the fake trades

12   that need to be put in to Mr. Chais's account to achieve the

13   target rate?

14           MR. BRESLIN:  Objection, your Honor.

15           THE COURT:  Do you want to consult?

16           MR. BRESLIN:  Yes.

17           (Counsel conferred.)

18           MR. BRESLIN:  Mr. Zach will rephrase, your Honor.

19           THE COURT:  Thank you.

20   Q.  By being able to pick and choose the amount of the fake

21   trade, how does that help you reach the target?

22   A.  The information regarding the pricing structure of each

23   option and stock was derived from the historical prices, so

24   that's a fixed given.  Let's say, for instance, a particular

25   three-legged set-up is going to make two points, just for
```

1  argument's sake.  Naturally, if you did 200 of those, you would

2  make $400.  If you did 800 of those, you would make $1600.  If

3  you know you need to make $1600, you would key in 800 and then

4  give it to the operators to print.

5       You previously had determined how much you need to

6  make in dollars.  That's a number that is sitting on a pad next

7  to you.  The P&L per unit that you see dead center in the

8  bottom of this spreadsheet has been determined by randomly

9  going into the fixed quantity field, which is your security

10  positions, and adjusting them until you get the desired result.

11       That first entry of 1100 could have, quite frankly,

12  started at 300, but the result wasn't high enough, so it went

13  to 400.  Then it went to 500, and so on and so on, until,

14  bingo, 1100 is what's necessary to get the desired result.  At

15  that point you eliminate all the extraneous information and you

16  just print the symbol, price, date, settlement date, buy or

17  sell, and give it to the girls to punch.

18  Q.  When you give it to the folks to punch, what is turned out

19  in terms of paperwork?

20  A.  The trade confirmation and then subsequently the statement.

21  Q.  None of that trading was real?

22  A.  No.

23  Q.  Did you observe Ms. Crupi utilizing the spreadsheet that

24  you created?

25  A.  Yes, I did.

1   Q.  Did you teach her how to use it?

2   A.  Yes, I did.

3   Q.  Let's take that down and let's look at Government Exhibit

4   105-C115.  Can we turn to page 7.  Can we please, Mr. Baskin,

5   blow up page 7.

6        Mr. DiPascali, do you recognize the handwriting on

7   this document?

8   A.  It's Jodi's.

9   Q.  What kind of document are we looking at?

10  A.  The firm issued these little desk calendars to all the

11  employees every year.  That's December 27th of her desk

12  calendar.

13  Q.  Can you tell what year it is?

14  A.  1999.

15  Q.  And what the date is?

16  A.  December 27th.

17  Q.  Can you read what Ms. Crupi wrote on this.

18  A.  "Stan, buy T-bills 12/13.  Issue of SUNW," which I believe

19  is Sun Microsystems, a stock, "sell for wires of 12/15".

20  Q.  Next to the "buy T-bills" there is a date 12/13.  Do you

21  see that?

22  A.  Correct.

23  Q.  Is that before or after December 27th?

24  A.  It's before.

25  Q.  You see there is a "sell for wires of 12/15."  Is December

1  15th before or after December 27th?

2  A.  It's before.

3  Q.  Let us go now to Government Exhibit 101-122.  Can we, Ms.

4  Baskin, make this readable.

5       Mr. DiPascali, do you recognize what type of document

6  this is?

7  A.  It's probably a customer ledger.

8  Q.  Let's flip through some of the pages.

9  A.  I know exactly what it is.  It is the digital format of the

10  Madoff statement, but it is not printed on statement paper.

11  Q.  What is this document dated?

12  A.  12/31/99.

13  Q.  For what account is this?

14  A.  Popham.

15  Q.  What type of account was Popham?  Strike that.  Who was the

16  ultimate holder of the Popham account?

17  A.  Again, Mr. Chais set up an entity called Popham, and the

18  funds that funded Popham were investors' moneys.

19  Q.  Can we turn, Ms. Baskin, to page 7 of this document.  Can

20  we blow that up as well, please.

21       Do you recognize what this is?

22  A.  12/31/99 statement for, again, Popham, but it's a different

23  account.

24  Q.  Again, Popham is a Stan Chais related account?

25  A.  Yes.

```
 1  Q.  Looking at this document, what is it dated?

 2  A.  12/31/99.

 3  Q.  Do you see on this document any transactions in treasury

 4  bills?

 5  A.  Yes.

 6  Q.  Where do you see that?

 7  A.  There is the purchase of the December 9, '99 bill at 99.90

 8  on the 1st.  There is the sale of part of that bill on the 2nd.

 9  There is the redemption of the rest of that bill, another part

10  of it, on the 9th.

11  Q.  Thank you.  Can we take this document down.  Now I would

12  like to show you what is in evidence as Government Exhibit

13  105-C163.

14          THE COURT:  Mr. Zach, we have about seven minutes left

15  to the end of the day.

16          MR. ZACH:  OK, your Honor.  I think I have a little

17  bit that I can do in the next few minutes.

18          THE COURT:  Thank you.

19  Q.  Do you recognize generally what type of document this is?

20  A.  It's a Madoff customer confirmation.

21  Q.  Do you recognize the handwriting on this document?

22  A.  Yes.

23  Q.  Whose handwriting is that?

24  A.  I believe it's Jodi's.

25  Q.  Did the preprinted forms at Madoff change over time?
```

1   A.  Yes.

2   Q.  As you worked there, did you know that they were changing

3   over time?

4   A.  Yes.

5   Q.  Did the fact that these documents changed over time present

6   any problems or difficulties to you?

7   A.  Yes.

8   Q.  What were the difficulties that those changes caused you?

9   A.  Every time Bernie changed some format of the preprinted

10  form, we needed to be very careful, based on his instructions,

11  to retain the old copies.  When you are going back in time, you

12  can't use a form from 2004 and put through a confirmation of

13  trade dated 1999, as an illustration.

14          There were many changes to his confirmation.  Some

15  involved some of the legal jargon that was on the back of the

16  confirmation, the small print, if you will.  Some involved a

17  complete different heading.  When he became an LLC after he was

18  a sole proprietor, the letters LLC suddenly appeared on the

19  Madoff comps.  There were changes to our commission schedule on

20  options and on the dealer markup of equity securities that was

21  referenced on the legend in the back of the comp.

22          So yes, there were many changes to a form like this,

23  six, seven over the years that I witnessed the changes.

24  Q.  Did you keep track of those changes?

25  A.  You had to.

 1   Q.  Can we blow up the confirm here and put it in the split

 2   screen, Ms. Baskin, please.  And can we pull up Government

 3   Exhibit 105-C162 at the bottom.  Can we blow that up.  Can we

 4   go to the next page of that document and blow that up.  And can

 5   we go to the top one and below that one up, too.  Next page,

 6   please.  Sorry.

 7        I think you said that one of the things that changed

 8   over time were commissions.

 9   A.  That's correct.

10   Q.  Looking at the top, which is the document with the

11   handwriting on it, what does it say the commission was?

12   A.  In the second paragraph it says "customer transactions"

13   blah blah blah blah blah.  It discusses a dealer markup or

14   markdown of a fraction of 1/16 per share in the case of

15   equities and a half a point per bond.  Our commission was what

16   is called a commission equivalent, and it was 6 1/4 cents.

17   Q.  What does the commission say on the bottom?

18   A.  It says, "Unless otherwise stated, the trade price of your

19   transaction is an average price and includes a commission

20   equivalent of 4 cents."

21   Q.  As you worked to send out these trade confirmations for the

22   fake trades, did you have concerns about making sure this

23   documentation was correct?

24   A.  Sure.

25   Q.  What was your concern as to whether or not you used the

1   wrong document from the time that it was actually used at

2   Madoff Securities?

3   A.  It was more Bernie's concern than anything else.  He was

4   very, very, very careful on a point like this, that we needed

5   to maintain blank copies of the legend that said a 16th of a

6   share in storage marked perfectly so that once we changed to 4

7   cents a share, the new print jobs were taking confirmations out

8   in the mail going forward.  If you ever needed to go back to a

9   point in time when the commission schedule was a 16th of a

10  share, we would send one of the kids down to the warehouse or

11  down to the basement and pick up a box of the old paper, and

12  then he would run that trade or Annette would run the trade on

13  the old paper.

14  Q.  What was the point of using the backdated trade on the old

15  paper?

16  A.  You couldn't use a backdated trade on the new paper.

17  Q.  Why?

18  A.  Because 4 cents a share went into effect on a particular

19  date, and any date of a trade prior to that date would be an

20  obvious indication of fraud.

21          MR. ZACH:  Your Honor, I think this is a good place to

22  stop.

23          THE COURT:  Very well.  Ladies and gentlemen, this

24  concludes our presentation of evidence for the day.  We will

25  begin again tomorrow morning.  Members of the jury, please be

1  ready in the jury room for 9:15.  Mr. DiPascali, please be

2  ready for 9:15 as well.

3          Members of the jury, your afternoon instructions.

4  Please continue to keep your minds open for the evidence that

5  is being presented here in court.  Please continue to keep your

6  minds closed to all outside information, including news reports

7  and the opinions of others, and separate yourself from people

8  who may be discussing the case.  Please continue to keep your

9  thoughts to yourselves and do not do any research or

10  investigation on your own.

11          You must leave your notes in the jury room in the

12  envelopes provided and leave your access cards with Ms. Ng and

13  sign for them.  Thank you for your dedicated and attentive work

14  with us today.  Have a safe trip home and safe return.

15          Ms. Ng, would you please escort the jury out.  All

16  rise.  Good evening.  Mr. DiPascali, you may step down.  Thank

17  you.  See you tomorrow.

18          We will reconvene at 9:00 tomorrow morning.  Have a

19  good evening, everyone.

20          (Adjourned to 9:00 a.m., December 5, 2013)

21

22

23

24

25

Case 1:10-cv-04095-JS    Document 258    Filed 04/03/14    Page 23 of 179    4815

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    FRANK DIPASCALI

 4    Direct By Mr. Zach . . . . . . . . . . . . . .4680

 5                     GOVERNMENT EXHIBITS

 6    Exhibit No.                              Received

 7     105-A374    . . . . . . . . . . . . . . . .4705

 8     105-C117    . . . . . . . . . . . . . . . .4736

 9     105-D77  . . . . . . . . . . . . . . . . .4746

10     105-D85  . . . . . . . . . . . . . . . . .4751

11     105-D70  . . . . . . . . . . . . . . . . .4753

12     105-D65A    . . . . . . . . . . . . . . . .4754

13     4000-F4  . . . . . . . . . . . . . . . . .4809

14

15

16

17

18

19

20

21

22

23

24

25
```