# Exhibit 2

DC5PBON1                          Trial

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA

 4              v.                        10 Cr. 228 (LTS)

 5    DANIEL BONVENTRE,
      JEROME O'HARA,
 6    GEORGE PEREZ,
      ANNETTE BONGIORNO,
 7    JOANN CRUPI,
                                         Jury Trial
 8              Defendants.

 9    ------------------------------x
                                         New York, N.Y.
10                                       December 5, 2013
                                         9:10 a.m.
11
      Before:
12
              HON. LAURA TAYLOR SWAIN
13
                                         District Judge
14

15
              APPEARANCES
16

17    PREET BHARARA
          United States Attorney for the
18        Southern District of New York
      MATTHEW L. SCHWARTZ
19    RANDALL W. JACKSON
      JOHN T. ZACH
20        Assistant United States Attorneys

21
      GORDON MEHLER
22    SARAH LUM
          Attorneys for Defendant O'Hara
23

24    LARRY H. KRANTZ
      KIMBERLY A. YUHAS
25        Attorneys for Defendant Perez
```

DC5PBON1                              Trial

1              APPEARANCES

2

3    ANDREW J. FRISCH
     GARY VILLANUEVA
     AMANDA BASSEN
4         Attorney for Defendant Bonventre

5

6    ROLAND G. RIOPELLE
          Attorneys for Defendant Bongiorno

7

8    ERIC R. BRESLIN
     MELISSA S. GELLER
          Attorneys for Defendant Crupi

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Please be seated.

3          (Case called) (Appearances noted)

4          THE COURT:  So I understand, Mr. Krantz, there's an

5    issue?

6          MR. KRANTZ:  Yes, your Honor.  I just wanted to go

7    back to two separate things relating to the "fake" issue, and I

8    don't mean to beat it to a pulp but, obviously, it's an issue

9    that's been troubling for us, and I want to say two things, two

10   separate things, on behalf of all defendants because we have

11   conferred on this.

12          First of all, in the past we've already been

13   describing trades as fake and DTC documents as fake and, to

14   some degree, the horse is sort of out of the barn on that, and

15   I understand that.  But there is a new type of document that I

16   believe is going to start being introduced today which relates

17   to documents produced for the audits in 2004 to 2006, and those

18   are Madoff documents which, according to the government, are

19   false, meaning they contain false entries.  And the charges

20   are, of course, falsification of books and records of a

21   broker-dealer.  They are not fake in the sense of the other

22   documents that we've been talking about.

23          You know, if you look up "fake," it's sort of a

24   counterfeit, a forgery, something like that.  I understand the

25   government's theory in the case as to the DTC documents is that

1    they really were a kind of allegedly a counterfeit of what they

2    should have been, but the Madoff documents, to me, are in a

3    different category.  They appear to be part of the books and

4    records of the company and, in fact, they're charged as being

5    part of the books and records of the company, or else they

6    couldn't support the statutory charges.

7            So the claim is falsity, and the jury's determination

8    is going to have to be are the documents false and did the

9    defendants know they were false.  So I believe that, as to

10   those documents, the correct terminology for the document

11   itself is false.  Now, it may contain reference to trades that

12   they contend are fake, but the document is false or not false.

13   And the question for the jury, to me, is was what's the

14   defendant's knowledge of that.

15           I believe if they're referred to in questioning -- and

16   I understand we can't control the witness' answers, the witness

17   can use whatever words naturally come to the witness' mind, but

18   in terms of the questions, I believe the questioning should be

19   falsity as to those documents because that's the statute that

20   they're charged with violating.  That's what the documents

21   allegedly are, and it makes it much easier, I believe, for the

22   jury to understand and frame the real issue in the case, which

23   is knowledge of the falsity.  So that's first application.

24   Maybe I'll stop there before I get to the second.

25           THE COURT:  Thank you.  Mr. Zach?

1          MR. ZACH:  Your Honor, the government disagrees.

2     These documents that are used in connection with the audits are

3     trade blotters, stock records that change over time.  So the

4     first iteration of them is, itself, made as far as the -- those

5     documents are completely redone to reflect completely different

6     scenarios from what was done in the first SEC production.  And

7     then when the SEC comes back, they're redone again to reverse

8     back.  These are, in fact, fake documents.

9          The government uses -- There's no 403 problem using

10    the word fake.  It accurately describes them, and it is the

11    simplest way to discuss them.  I don't think there's any sort

12    of 403 problem with it, and it's odd to have defense attorneys

13    control the language of a witness' questions if there's not a

14    403 problem.  I think it accurately describes it.  It gets at

15    the heart of what these documents are.

16         THE COURT:  Is it your thesis that to the extent

17    holdings attributable to the IA business were reflected on the

18    first generation of some of these documents, at least the stock

19    record, confirms, that sort of thing, those documents contained

20    false information but were not fake, but the later iterations

21    contained different false information and, therefore, were fake

22    so the original documents that contain false information?

23         MR. ZACH:  Yes, that's one way of looking at it.  To

24    explain a little bit further, in the background, prior to these

25    audits, there were false records being generated.  They were

1    continually making blotters and stock records in the background

2    in anticipation of having to shows these to someone in the

3    future.  Obviously, those blotters and stock records contain

4    fake trades.  Nothing on them is real.

5          I think those are fake documents as well, but as to

6    your Honor's point, once you hit the SEC audit, there's a whole

7    new set of documents made, instead of the things that are

8    running in the background, to specifically deceive the SEC.  So

9    they are, I guess, a fake version of the fake records that were

10   running in the background.

11         As Mr. Jackson is pointing out, the allegation here is

12   that they are all, all these defendants, are charged in a

13   conspiracy to produce these fake records, and to be involved in

14   this securities fraud, so describing it as fake, you know, is

15   consistent with the government's allegations, even the initial

16   ones.

17         THE COURT:  It's consistent with the government's

18   allegations, but as Mr. Krantz and other defendants have

19   brought up, it subsumes a key element of the charge, which is

20   intent to defraud and intentional faking by somebody else.  So

21   to the extent your witness says, oh, yeah, I knew these were

22   false and I intended it to be fake and is talking about the

23   witness' own conduct and that's clear, I mean, fake is fair

24   game.

25         To the extent of the witness' saying that person over

1    there gave me a document that I know included false

2    information -- the witness wouldn't, of course, be saying it in

3    these words, but in essence, if that is the witness' knowledge,

4    I think it's important for the jury to be able to follow the

5    conceptual train, and also for 403 purposes, that you talk

6    about the document with the false information or the different

7    false information or the replacement false information created

8    for the regulator or whatever.

9              MR. ZACH:  A couple of things.  The first thing, your

10   Honor, is they're using the word fake in, I think, a bit more

11   sinister way than the word fake I think is generally

12   understood.  If I had a fake $20 bill and I gave it to

13   Mr. Krantz, I'm still giving him a fake $20 bill.  I don't

14   think it impugns on me that I've done something wrong.  That's

15   why we haven't --

16             THE COURT:  If you made it in your basement, it would

17   certainly impugn on you that you did something wrong, and

18   that's the charge here.

19             MR. ZACH:  But we're not using the word, I've given

20   him a fraudulent dollar bill or I've given -- or a word that

21   gets at the mental state.  These are, in fact, fake documents.

22   Mr. DiPascali, from his perspective, as he's testified about

23   it, understands them all to be fake documents.  And so when he

24   discusses them, that's what these things mean to him.

25             THE COURT:  And he's perfectly free to talk about what

```
 1    his conduct meant to him and what it means to him to have your

 2    $20 bill in his pocket that he's going to, you know, use to get

 3    the $20 worth of merchandise at a cost to nobody, except for

 4    your printing it.  But the whole context of this case is that

 5    this fakery is not only sinister, but it's illegal, and these

 6    five defendants are at various levels and in various ways and

 7    in various counts of the indictment, charged with the sinister

 8    version of fakery.

 9              And so the use of the "fake" nomenclature in the

10    context of the proof of this case is loaded and, therefore,

11    care and precision are warranted, in the view of this judge

12    who's presiding over the proceedings and has ultimately the

13    authority over the order and context of the presentation of

14    proof.  I don't do this lightly, and I don't do this in order

15    to try to hobble the government's case or anything, but I do it

16    to make sure that information is presented clearly, accurately,

17    in a conceptually consistent way and in a way that does not

18    unnecessarily load a legitimate and important factual

19    presentation with a legal argument that goes to a key point

20    that has to be proven in the government's ultimate carriage of

21    its burden of proof beyond a reasonable doubt.

22              So to sum it back up, Mr. DiPascali is free to say I

23    know that we made the -- that I participated in or I directed

24    the faking of documents or further fakes of our books and

25    records that were always fake; yes, this is the fake book and
```

1    record that I talked about.  But your question to him as to

2    things that were prepared by other people should come out of

3    the box as, is this the version of -- and you'll think of a

4    much more elegant way to do it, but, is this the version of the

5    trade blotter that was created six months later with a

6    different set of false entries.

7                MR. ZACH:  Do you want me to adopt, as Mr. Krantz

8    suggested, this is the false version, these are the false

9    records?

10               THE COURT:  Yes.  You can call them false version or

11   false records, or if you don't want to blur any more of the

12   lines between your fake concept and the word false, you can

13   talk about false underlying information, if that's more

14   consistent with what you wanted to do conceptually.

15               MR. ZACH:  And we have certain different categories of

16   documents that we're talking about; so I just want to make sure

17   that we're clear.  With respect to the trading, the word fake

18   is sort of what's been used and what's out there.  We're

19   permitted to still refer to it as the fake trade; is that fair?

20               THE COURT:  Yes.

21               MR. ZACH:  With the DTC report, the word that I have

22   to use is fabricated we were using yesterday, and with --

23               THE COURT:  We'll have a glossary by the end of the

24   day.

25               MR. ZACH:  Someone is going to raise a sign; so I --

1    and with respect to these internal Madoff records, false is now

2    the word that needs to be used?  Unless it's something from --

3              THE COURT:  Unless you're talking about that witness'

4    conduct.

5              MR. SCHWARTZ:  Let me just ask one further question

6    because this is going to be an ongoing issue, particularly as

7    we get into, with this witness and the future witnesses,

8    talking about the audits where there are documents.  I think

9    every single document created, almost without exception at

10   Madoff Securities was false.  The trade blotters for the market

11   making business, even though they were real trades, were false

12   because they omitted the investment advisory business.

13             There were false documents even if something in them

14   had the accurate information.  Where we start getting into

15   multiple iterations of the same document and a witness

16   describes it as fake, to avoid confusing the jury, can we adopt

17   that shorthand?  Let me give you an example.  I think

18   Mr. Jackson did this very clearly with Mr. Friehling and his

19   testimony.  This was the first sort of example where we had two

20   versions, both of which were false but one of which was extra

21   fake, which were general ledgers.  So he had the original false

22   general ledger, and then you had the second version of the

23   false general ledger that was prepared for the tax audits.  And

24   I think Mr. Jackson established with Mr. Friehling, and

25   Mr. Friehling understood that the second one was the fake

Case 10-03226-2-S   Document 98   Filed 03/24/19   Page 115 of 150

DC5PBON1          Trial

1   version of the original, and then that was used as a shorthand

2   to distinguish between the two.  Once the witness testifies to

3   that, at least with respect to that witness, can we adopt that

4   shorthand to make this comprehensible to the jury?

5           MR. KRANTZ:  Judge, can I just ask that -- I didn't

6   follow what the shorthand was.  I apologize.  Can Mr. Schwartz

7   just state it again?

8           MR. SCHWARTZ:  I just said once the witness describes

9   something as fake or whatever the word is, can we adopt that

10  word in our questioning because the witness has testified that

11  is his or her personal knowledge or personal understanding.

12          MR. MEHLER:  Your Honor, I would argue against that,

13  and I'm not trying to revisit the ruling you made before.  Any

14  young lawyer knows not to do that.  I just wanted to oppose

15  what Mr. Schwartz is asking for, and to clarify something that

16  Mr. Krantz said.

17          We were dealing yesterday with DTC and when we were

18  back there, I think we were all struggling for alternative

19  words, and a very easy one that didn't occur to me at the time

20  was internally created DTC report.  Language is important, and

21  I think that's what the Court's ruling is.  If the Court were

22  to adopt Mr. Schwartz's view, Mr. DiPascali, who has a flair

23  for the dramatic, ups it one and uses the word forgery, under

24  Mr. Schwartz's logic.  He would then adopt the word and use the

25  word forged.

Case 1:10-cv-02228-S   Document 33   Entered 03/24/19   Page 315 of 150   4867
DC5PBON1                              Trial

1           Language is important, and in an issue, and I think

2      this is what the Court is saying.  In a case where intent is

3      delegate, it's a gossamer-thin concept, having language that's

4      as neutral as possible is crucial to fairness.  That's my only

5      point.

6           THE COURT:  Quickly, Mr. Breslin.  Did you want to

7      speak, Mr. Breslin?

8           MR. BRESLIN:  I did, your Honor.  I think that what

9      Mr. Schwartz is proposing would be an exception that would

10     basically swallow the rule that your Honor just referenced.

11          THE COURT:  I get that, and once you let me speak,

12     I'll talk about that.  Anybody else want to tell me what I

13     already know?  Okay.  We can't go with the general rule that

14     let's the witness drive the nomenclature because, Mr. DiPascali

15     being Exhibit A is going to say fake, false, whatever and

16     that's in their minds and also these cooperating witnesses,

17     their goal is to be as -- you know, be and appear consistent

18     with their cooperation agreements, as truthful as they can

19     possibly be and call what are, in their views, spades spades

20     and everything else.  So they're always going to use the most

21     inflammatory language.

22          And if Miss Cotellessa-Pitz says, I created the fake

23     FOCUS report by writing the fake numbers in them, you can have

24     at it with her on her fake FOCUS report.  If Mr. DiPascali says

25     I wanted a fake -- well, let's go back to the DTC things or a

| | |
|---|---|
| 1 | fake computer run, and so I told Mr. O'Hara to prepare it, your |
| 2 | follow-up question cannot come back, and so Mr. O'Hara came |
| 3 | into your office and gave you the fake DTC report? |
| 4 | The answer, whether it goes through your clarification |
| 5 | that, you know, that's the one with the false information in |
| 6 | it, but the question to Mr. DiPascali has to come back |
| 7 | essentially defining the fake DTC run that was referred to in |
| 8 | the context of Mr. O'Hara as a document or a run or a program |
| 9 | that inputted information that was false or fabricated or |
| 10 | something other than fake. |
| 11 | MR. ZACH:  Just, do you want me to, regardless of what |
| 12 | his answer is, to utilize the agreed-upon language that we've |
| 13 | just discussed? |
| 14 | THE COURT:  As long as you're talking about the |
| 15 | conduct of someone other than the witness. |
| 16 | MR. ZACH:  Got it. |
| 17 | THE COURT:  That's as far as I'm going with you, but |
| 18 | it's an important point, and that's how I'm addressing it. |
| 19 | MR. KRANTZ:  Thank you, your Honor.  And just the |
| 20 | second issue I was going to bring up, which is a request for an |
| 21 | instruction on this subject, and it's an instruction that can |
| 22 | be given at any appropriate time, it doesn't need to be now. |
| 23 | But given what's gone on with the "fake" issue and the |
| 24 | like, at some point, on behalf of all the defendants, we think |
| 25 | the jury needs an instruction that whenever a witness uses |

1    words like "fake" or "forgery," that they're describing their

2    own state of mind about the documents and that, at the end of

3    the case, it will be up to the jury to determine the state of

4    mind and the knowledge of any particular defendant.  And so

5    when a witness uses words like that, they're describing their

6    own state of mind.

7             Of course, that assumes -- it would be different if

8    they were to express conversation where the word was used with

9    a defendant, but I don't think that's ever going to happen in

10   this case, so it's strictly when they're describing their state

11   of mind.

12            THE COURT:  I invite you to draft, singly or

13   collectively, a proposed instruction.  Discuss it with the

14   government, and once any controversy is really refined in that

15   way, I'm happy to hear you on it.

16            MR. KRANTZ:  Perfect.

17            MR. JACKSON:  And, your Honor, we would like, when

18   they draft that, time to respond because we think that's wildly

19   inappropriate.  We will set out all the reasons that that is

20   inappropriate in response to your Honor after they draft that.

21            MR. KRANTZ:  We'll cross that bridge.

22            THE COURT:  I would expect nothing less.

23            MR. RIOPELLE:  I think we can probably use as a model

24   the standard instruction that's given in every case, that a

25   witness' guilty plea is no evidence of anybody else's mental

DC5PBON1                                    Trial

1   state, or why don't we just use that and change the words?

2           THE COURT:  All right.  Well, bring that thought into

3   your drafting session and before the letter writing starts, I

4   do want both sides to have seen the draft.  And to the extent

5   certain concerns can be addressed on sort of a major conceptual

6   level by toning down the language that we're arguing about in

7   the draft of the letters, I'd be grateful for that.

8           Now, I just had a couple of housekeeping things.

9   Before the Thanksgiving holiday I had offered to you all a

10  framework for the use of exhibits with the jury in the context

11  of deliberations and, in summary, that's the parties have to be

12  prepared with four copies of any documents that are

13  specifically mentioned in their closings.

14          And the government has represented that it will have

15  at least one copy of all other non-voluminous documentary

16  exhibits, exhibits that are voluminous but have been shown only

17  in excerpt versions that haven't been marked separately as

18  excerpt versions, can be prepared as the displayed pages with

19  the legend on it that says this is an excerpt from a more

20  voluminous document, which we can provide to you or show to

21  you, so on and so forth.  And the jury will have to request

22  exhibits.

23          So I need by, I'll call it Monday, a definitive yes,

24  no or here's my specific objection to that framework from both

25  sides so that we know where we're going, and that also included

Case 1:10-cv-02285-S   Document 98   Filed 03/14/19   Page 365 of 150
DC5PBON1                           Trial

```
1    the creation, with consultation as necessary back and forth

2    between the sides, of an exhibit list that's a little bit less

3    cryptic than the form of exhibit list that we've been working

4    with.  So just let me know by Monday on that.

5           And we are scheduled to come back from the Christmas

6    and New Year's holiday break on Monday, the 6th of January.  I

7    just found out yesterday I have to be out of town on Monday,

8    the 6th of January, and so we'll start back on Tuesday the 7th

9    of January.  And I propose to inform the jury of that when I

10   remind them at the beginning of next week of the holiday break.

11   So that's my news.

12           Is there anything else that we should discuss

13   together?  Ms. Ng, are all the jurors here?

14           THE DEPUTY CLERK:  Yes -- oh, there were three

15   missing.

16           THE COURT:  Would you see if they're here, and if

17   they're here, give them a two-minute warning, and if they're

18   not here, come out and tell us.

19           THE DEPUTY CLERK:  Okay, will do.

20           MR. BRESLIN:  One tiny point, your Honor?

21           THE COURT:  Yes.

22           MR. BRESLIN:  I think it's reasonable that

23   Mr. DiPascali is going to go into next week, late into next

24   week, but in the event that he doesn't, in order to avoid the

25   kind of document logjam that we had on Monday, we would ask the
```

Case 1:10-cv-02296-S   Document 98   Filed 03/14/19   Page 315 of 150   4872

DC5PBON1                         Trial

1    government for maybe one other witness and their document list

2    on Friday anyway so that, in the event that Mr. DiPascali

3    finishes in the middle of next week, we're not caught

4    flatfooted and have to waste the Court's time for an hour as we

5    figure out the documents.

6           THE COURT:  Mr. Schwartz.

7           MR. SCHWARTZ:  That's fine, your Honor.  In fact, I'm

8    prepared to identify that person and also make an application

9    in that respect.  We have a witness Paul Crawley, who is a

10   revenue agent with the IRS.  Because of various scheduling

11   things, he is only available on the 12th.  We expect him to be

12   a relatively short witness; so we'll designate him for next

13   week.  In the event that Mr. DiPascali is still on on Thursday,

14   we would ask for leave to interrupt for the hour or so that it

15   would take to present Mr. Crawley's testimony to put him on at

16   some point during the day next Thursday.

17          THE COURT:  It seems reasonable to me.  Is there any

18   objection to that?

19          MR. RIOPELLE:  No, your Honor.

20          THE COURT:  Okay.  So Mr. Crawley is designated as

21   next up.  Ms. Ng, what's the status of the jury?

22          THE DEPUTY CLERK:  We're still missing one juror.  I'm

23   about to give her a call.

24          THE COURT:  All right, then.  I will go in the robing

25   room until all the jurors are present, and Ms. Ng will give us

```
 1   all the two-minute warning.

 2              MR. KRANTZ:  Thank you, your Honor.

 3              (Recess)

 4              THE COURT:  Good morning, again.  Please be seated.

 5   Good morning, Mr. DiPascali.

 6              THE WITNESS:  Good morning, your Honor.

 7              THE COURT:  Ms. Ng, would you bring the jury in.

 8              (Jury enters)

 9              Good morning, members of the jury.  Please take your

10   seats.  Please be seated, everyone.  Mr. Zach.

11              MR. ZACH:  Thank you, your Honor.

12    FRANK DIPASCALI,

13        called as a witness by the Government,

14        having been previously duly sworn, testified as follows:

15   DIRECT EXAMINATION (Resumed)

16   BY MR. ZACH:

17   Q.  Ms. Baskin, can we pull up Government Exhibit 105-C162.

18   Now, Mr. DiPascali when we broke for the evening last night, we

19   were -- you were testifying about these trade confirmation

20   tickets; do you recall that?

21   A.  Yes, I do.

22   Q.  And what was the reason that Madoff Securities retained

23   these various versions of documents that went out over the

24   years?

25   A.  Well, in the event that Bernie instructed someone to do a
```

1   backdated trade that was beyond the scope of a reasonable

2   amount of time, back a year or two or three or ten, one needed

3   to make perfectly sure that you were printing that very dated

4   trade on the appropriate stationery that was in place at the

5   time.

6   Q.  And for what reason did you need to make sure you were

7   putting it on the right type of stationery?

8   A.  So that it wouldn't throw out a red flag indicating that it

9   was a fictitious ticket.

10  Q.  So I'd like to take that down, and Ms. Baskin, can we go to

11  what's already in evidence as Government Exhibit 105-B465, and

12  I'd like to go to Page 2.

13          Now, looking at this document, Mr. DiPascali, do you

14  recognize any of the handwriting?

15  A.  I do.

16  Q.  Whose handwriting do you recognize on this document?

17  A.  Jodi Crupi's.

18  Q.  And what portion of this is Jodi Crupi's, or is all of it

19  hers?

20  A.  All of it.

21  Q.  Okay.  And looking at the cursive part -- can we highlight

22  that, Ms. Baskin -- what does that say there?

23  A.  Different comp.

24  Q.  And what's a comp?

25  A.  It's a slang term for comparison or confirmation.  It's the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC5PBON1                    DiPascali - direct

1   shortened version of comparison, which is an interchangeable

2   term to confirmation.  It's a trade ticket.

3            MR. BRESLIN:  Objection, your Honor.

4            THE COURT:  Please consult.

5            (counsel conferring)

6            THE COURT:  Let's not have the highlighting for now

7   until they...

8   Q.  And, Mr. DiPascali, was the term comp frequently used at

9   Madoff Securities?

10  A.  Yes.

11  Q.  Now, I'd like to turn to two different documents on the

12  split screen, if we can.  First, Miss Baskin, can we put on top

13  Page 12 of this same document.  It's 105-B465.  Page 12, yes.

14  And on the bottom can we put Page 11.

15           Now, Mr. DiPascali, are these comps?

16  A.  Yes.

17  Q.  I'd like to direct your attention first to the document at

18  the top.  What is the trade date on this comp?

19  A.  January 31st, 1990.

20  Q.  Can we highlight that, Miss Baskin.  And what is the

21  settlement date on this comp?

22  A.  February 7th, 1990.

23  Q.  And whose account is this for?

24  A.  Daniel and Barbara Bonventre.

25  Q.  Now, looking at the comp below it, what is the trade date

DC5PBON1                              DiPascali - direct

1  ‖ on that?

2  ‖ A.  September 26th, 2002.

3  ‖ Q.  And what is the settlement date?

4  ‖ A.  October 1st, 2002.

5  ‖ Q.  And whose account is that for?

6  ‖ A.  Daniel and Barbara Bonventre.

7  ‖ Q.  And the document below, what is the security that's being

8  ‖ traded?

9  ‖ A.  Big Lots, Incorporated.

10 ‖ Q.  Now, Mr. DiPascali, are there differences between the comp

11 ‖ version at the top, by which I'm referring to the stationery,

12 ‖ and the comp version at the bottom?

13 ‖ A.  Yes.

14 ‖ Q.  What's the first difference that you can identify?

15 ‖ A.  In the title block of the firm on the top version, Bernard

16 ‖ L. Madoff Investment Securities is stated.  On the bottom

17 ‖ version, it says, Bernard L. Madoff Investment Securities, LLC.

18 ‖ Q.  Ms. Baskin, can we highlight the Bernard L. Madoff logo at

19 ‖ the top of the first one, and at the second one.  So on the top

20 ‖ one, there's no LLC, and at the bottom one, there is an LLC?

21 ‖ A.  That is correct.

22 ‖ Q.  What does LLC mean?

23 ‖ A.  Limited liability corporation, I believe.

24 ‖ Q.  And when did Madoff Securities become an LLC?

25 ‖ A.  Early 2000s.

Case 1:10-cv-02227-S   Document 38   Filed 03/24/   Page 23 of 150   4877

DC5PBON1                          DiPascali - direct

1   Q.  And let's -- What's the second difference that you can

2   identify?

3   A.  On the top right of each document there's the address and a

4   series of phone numbers.  The top one includes a telex number

5   and the bottom one does not.

6   Q.  Okay.  And can we highlight those, Ms. Baskin.  And what do

7   you observe next that's different between the two?

8   A.  Some of the membership organizations on the top comp are

9   listed at the bottom.

10  Q.  Okay.  Ms. Baskin, can you highlight that.  And what are

11  those trade organizations?

12  A.  The top comp is the NASD, which is the National Association

13  of Securities Dealers.  Then it says CSE, which is the

14  Cincinnati Stock Exchange.  Then there is SIPC, it's the

15  Securities Industry Protection Corporation.  NSCC is National

16  Securities Clearing Corp.  DTC is the Depository Trust Company,

17  and I don't know what ISCC stands for.

18  Q.  And where do you see at least some of those organizations

19  on the bottom comp?

20  A.  On the top of the confirmation.

21  Q.  And can we highlight that.  Now, I'd like to turn your

22  attention to the account number on the top of the ticket.  Is

23  that -- is that -- what kind of account number is that?

24  A.  It's an alphanumeric account number.

25  Q.  And what year was this trade purportedly put through?

1   A.  In 1990.

2   Q.  Was that account number used back in 1990?

3   A.  I don't think so.

4   Q.  What kind of account numbers were used in 1990?

5   A.  Strictly a numerical number.

6   Q.  But in looking at the account at the bottom, do you see the

7   account number there?

8   A.  I do.

9   Q.  Is that the same account number that you see on the top one

10  from 1990?

11  A.  Yes.

12  Q.  Now, as you worked at Madoff Securities, did you see,

13  observe instances where various versions of these historical

14  documents were saved over time?

15  A.  Yes.

16  Q.  And where the relevant time period was in the past, would

17  employees at Madoff Securities seek out the corresponding

18  historical document that had been used by Madoff Securities?

19  A.  Yes.

20          MR. ZACH:  Your Honor, may I -- I have the originals

21  of the trade confirmations.  May I pass them around to the

22  jury?

23          THE COURT:  Yes.

24          MR. ZACH:  You can take those down, Miss Baskin.

25  Q.  Now I'd like to go back to Government Exhibit 105-C115, and

Case 1:10-cv-02221-PS   Document 96   Entered 03/14   Page 345 of 150   4879

DC5PBON1                        DiPascali - direct

1   can we go to Page 7 and blow that up.  Now, we looked at this

2   document briefly yesterday.  Again, whose handwriting is on

3   there?

4   A.   Jodi Crupi's.

5   Q.   And what is the calendar date that this is written on?

6   A.   December 27th, 1999.

7   Q.   Okay.  And you see the first piece of the writing says,

8   Stan?

9   A.   I do.

10  Q.   Do you know who Stan was?

11  A.   Stanley Chais.

12  Q.   And looking -- can you read now the next two entries and

13  the date that are on this?

14  A.   It says buy T bills 12/13, issue of and the symbol for Sun

15  Micro System.

16  Q.   Okay.  And there's the date 12-13?

17  A.   There is.

18  Q.   Now, I'd like to go -- can we take that down, Ms. Baskin.

19  And I'd like to go to Government Exhibit 101-11 -- sorry,

20  101-122, which is already in evidence, and if we can go to Page

21  8 and blow that up.  Looking at the account heading, what's the

22  name of the company there?

23  A.   The Popham Company.

24  Q.   And who is the Popham Company associated with?

25  A.   It's an entity controlled by Stanley Chais.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-03225-RS   Document 38   Filed 03/24/14   Page 35 of 150   4880

DC5PBON1                        DiPascali - direct

1    Q.  And looking at this document where the date 12-13 is

2    indicated, do you see that?

3    A.  I do.

4    Q.  Can we highlight that, Ms. Baskin.  What securities do you

5    see listed on this account statement on 12-13?

6    A.  Sun Micro Systems and the United States treasury bill.

7    Q.  And do you see under the -- can you highlight that,

8    Ms. Baskin, please.  Do you see under the Sun Micro Systems,

9    there is the letters D-I-V and a date?  Do you know what that

10   means?

11   A.  It's a dividend, and I believe the record date and the

12   payment date of same.

13   Q.  What is a dividend?

14   A.  It's a distribution of the -- by the company in either cash

15   or securities back to the stockholders.

16   Q.  So does this reflect as a credit or a debit on this account

17   statement?

18   A.  It's a -- this particular dividend is a stock split that

19   occurred.  The line item there is referencing the credit of

20   shares to the customer's account because the stock split, and

21   the payment date was on 12-13.  So shares were put into the

22   customer's account on 12-13 to reflect the issuance of shares

23   that the company issued to its stockholders.

24   Q.  And do you also see on this same date a reference to a U.S.

25   treasury bill?

DC5PBON1                        DiPascali - direct

1    A.  I do.

2    Q.  And where do you see that?

3    A.  On 12-13.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:10-cv-02225-JS Document 458 Entered 03/22/19 Page 28 of 150   4882

Dc5rbon2                          DiPascali - direct

1   Q.  Let's go back to Government Exhibit 105-C105 page 7, Ms.

2   Baskin.

3           Again you see 12/13 T-bills and the Sun Microsystems

4   ticker symbol?

5   A.  Yes.

6   Q.  Do those two things match up with what we just saw on the

7   statement?

8   A.  Yes.

9   Q.  But this calendar page says December 27th, not December 13,

10  right?

11  A.  It does.

12  Q.  The bottom piece, where it says "sell for wires of 12/15,"

13  do you see that?

14  A.  I do.

15  Q.  Can we go back, Ms. Baskin, to 101-122 page 8 again, and

16  can we blow that up.

17          I want you to look at the entries for 12/15.  Do you

18  see those?

19  A.  I do.

20  Q.  Do you see any sort of wire on 12/15?

21  A.  Yes.

22  Q.  What do you see that?

23  A.  Reference under 12/15 there is an entry called check wire,

24  a code representing capital withdrawal, and a figure in the

25  debit column of $3 million.

Dc5rbon2                          DiPascali - direct

1   Q.  Can you highlight that, Ms. Baskin, please.  This is again

2   for the Stanley Chais associated Popham Company?

3   A.  It is.

4   Q.  Ms. Baskin, can we go back one more time to 105-C115

5   page 7.

6           Looking at the bottom, where it says "sell for wire of

7   12/15," does that match up with what we just looked at on the

8   account statement?

9   A.  Yes.

10  Q.  This calendar date is December 27th, not December 15th,

11  right?

12  A.  That is correct.

13  Q.  Now, Mr. DiPascali, I would like to go to a different

14  document.  Can we bring up 105-C121.  Mr. DiPascali, first let

15  me ask you, do you recognize the handwriting on these

16  documents?

17  A.  I do.

18  Q.  Whose handwriting is it?

19  A.  Jodi Crupi's.

20  Q.  Have you seen these documents before?

21  A.  Yes.

22  Q.  Where have you seen them before?

23  A.  I think when the FBI was interviewing me and showing me

24  various documents.

25  Q.  Do you know where these documents were from at Madoff

Case 1:10-cv-02228-S   Document 98   Entered 03/22/19   Page 395 of 150   Exhibit 2   4884

Dc5rbon2                              DiPascali – direct

1   Securities?

2   A.  No.

3   Q.  I'd like to direct your attention to the bottom sticker.

4   Blow that up.  Can you read what that says.

5   A.  "When BLM buys stock, use 60-20 3 cent commission."

6   Q.  Whose handwriting is that?

7   A.  Jodi's.

8   Q.  Are you familiar with what 60-20 means?

9   A.  Yes.

10  Q.  What does the 60-20 refer to?

11  A.  It is an account code that is utilized to house securities

12  that are either sent in by the customer or actually purchased

13  in the marketplace and placed in that account.

14  Q.  The 60-20 account was used for real securities?

15  A.  Most of the time, yes.

16  Q.  What types of occasions did that 60-20 account have to be

17  used?

18  A.  When a client sent securities into the account or when

19  Bernie bought securities and instructed us to book the entry

20  into the client's account because he bought securities.

21  Q.  From time to time when real securities came in, would this

22  account have been utilized?

23  A.  Yes.

24  Q.  How did that compare to the accounts where the fake trading

25  would occur?

1   A.  Typically, the fake trading occurred in codes like 10-30,

2   40, 50, 70.  The 60 and the 20 were earmarked for a specific

3   purpose.

4   Q.  That specific purpose was to store real securities?

5   A.  That's correct.

6   Q.  Let's take that down.  Now I want to step back for a moment

7   and talk about the IA account trading that was going on with

8   respect to the split strike strategy.  OK?

9   A.  Sure.

10  Q.  As part of that component of the business, were certain

11  accounts promised a rate of return?

12  A.  Yes.

13  Q.  How was that rate of return determined?

14  A.  By Bernie.

15  Q.  What is that rate of return conveyed to you?

16  A.  Yes.

17  Q.  Did you convey that to other people that you worked with?

18  A.  Yes.

19  Q.  Who were some of the people that you conveyed that to?

20  A.  Jodi.

21  Q.  How did you come to learn that certain of these accounts

22  had a rate of return that was targeted?

23  A.  As it pertained to me in the basket split strike strategy?

24  Q.  Yes.

25  A.  I was called into a meeting that was about to break up

1   between Bernie and Frank Avellino.

2   Q.  Can we step back.  Frank Avellino, was that the Avellino of

3   Avellino & Bienes?

4   A.  Yes.

5   Q.  When, approximately, did this occur?

6   A.  The winter of '93.

7   Q.  What happened in that meeting?

8   A.  Bernie introduced me to Frank Avellino, who I don't think I

9   had met him up to that point.  They basically gave me a quick

10  synopsis of what their meeting was about and handed me a

11  document that had figures on it that illustrated the meat and

12  potatoes of their meeting.

13  Q.  What was your understanding of the figures that were on

14  there?

15  A.  It was funds that needed to be put into various client

16  accounts that had split strike strategy as a method of paying

17  these individuals for bringing in money.

18  Q.  Who were some of the individuals that were going to get

19  this credit?

20  A.  Stephen Mendelow, Ed Glantz, Richard Glantz, a trust for

21  Aaron Levy controlled by his son Joel.  That's all I can

22  remember off the top of my head.

23  Q.  These accounts were of individuals that were bringing

24  additional customers in to Madoff Securities?

25  A.  Yes.

Dc5rbon2                          DiPascali - direct

```
 1   Q.  As part of bringing in new customers, what was given to
 2   them?
 3   A.  In essence, a commission.
 4   Q.  The commission for bringing in those customers?
 5   A.  Correct.
 6   Q.  Now I would like to show you what's in evidence as
 7   government 105-C51.  Looking at this cover page, do you
 8   recognize the handwriting?
 9   A.  It's mine.
10   Q.  What does it say?
11   A.  It says, "I need to shtup."
12   Q.  What did you mean by "shtup"?
13   A.  To put funds into clients' accounts.
14   Q.  Can we turn to page 3 of this document.  Do you recognize
15   that document?
16   A.  I do.
17   Q.  What is it?
18   A.  The typewritten information on the document is what was
19   given to me at the tail end of the Bernie Madoff-Frank Avellino
20   meeting explaining who and in what quantities we were going to
21   quote-unquote shtup these accounts, put funds into these
22   accounts.
23   Q.  Is that the credit for bringing in the clients that you
24   just discussed?
25   A.  It is.
```

Case 1:10-cv-02221-S   Document 68   Entered 03/22/19   Page 335 of 150   4888

Dc5rbon2                        DiPascali - direct

1    Q.  Can we blow up the top half of it.  First of all, Mr.

2    DiPascali, when is this dated?

3    A.  February 3, 1994.

4    Q.  Do you see there is a row that says "1993 only"?

5    A.  Correct.

6    Q.  Do you recall what that meant, "1993 only"?

7    A.  Yes.

8    Q.  What did it mean?

9    A.  It meant that there was an arrangement in place between

10   Frank and these clients and then subsequently between Bernie

11   and Frank that because A&B had unwound in late '92 and these

12   individuals were due a payment for '93 that had not yet

13   occurred, and here it is in early '94 that they were addressing

14   this payment, they were instructing me that for '93 only these

15   people would get these amounts, then going forward after '93

16   they would get a different amount.

17   Q.  On the left side you see a list of four underlined names.

18   Are those the folks that were going to get schtupped?

19   A.  Yes.

20   Q.  Did this process continue going forward?

21   A.  Yes.

22   Q.  Stepping back for a moment, A&B had been, we talked about

23   it earlier, shut down by the SEC, right?

24   A.  That is correct.

25   Q.  You and others were involved in the process of bringing

1    those A&B clients back to Madoff Securities, right?

2    A.  That is correct.

3    Q.  Again, who were the people that were speaking to these A&B

4    clients that were coming back in?

5    A.  Bernie, myself, Jodi, Annette, members of Annette's staff.

6    Q.  These people were asking you questions about the trading

7    that was going to occur at Madoff Securities?

8    A.  Yes.

9    Q.  Did you lie to those folks?

10   A.  Yes.

11   Q.  As part of these people coming back in, did folks like we

12   see here bring in additional customers to Madoff Securities?

13   A.  These entities were clients of A&B.  A&B, being closed down

14   by the SEC, had no vehicle to pay them any longer.  The purpose

15   of this was illustrated to me and explained to me that since

16   Frank can't pay these guys anymore for the money they

17   originally brought in to A&B and now those very same clients

18   are going to be transferred, if you will, to Madoff, if you

19   will, and have direct accounts, the only vehicle that Frank and

20   therefore now Bernie would have to pay these managers of other

21   people's money would be to shtup their personal accounts with

22   extra P&L.

23   Q.  Just so the record is clear, when you say Frank, were you

24   referring to Frank Avellino?

25   A.  I was.

1   Q.  This was the process by which to pay these folks money,

2   right?

3   A.  Exactly that.

4   Q.  What were they getting that extra money for?

5   A.  For originally bringing in the clients to A&B and then

6   subsequently those clients became clients of Madoff.

7   Q.  Did those payments continue after this and into the '90s

8   and beyond?

9   A.  Yes.

10  Q.  How were those payments made to these folks?

11  A.  We would design an option transaction, typically an index

12  option, and we would calculate what the payment should be.

13  These numbers over the years changed somewhat.  But once we

14  identified what the number was, then we would write a

15  fictitious buy ticket and a subsequent fictitious sell ticket

16  that would create P&L in their accounts, and the value of their

17  account would therefore increase equal to the amount of

18  theoretical commission Bernie owed them.

19  Q.  These trades that were being put into their accounts to get

20  back credit, were those trades real?

21  A.  No.

22  Q.  Over time did the number of folks that were getting

23  schtupped increase?

24  A.  Yes.

25  Q.  How would folks get added to the shtupping?

Dc5rbon2                    DiPascali - direct

1    A.   A number of ways.

2    Q.   What are some of the ways, Mr. DiPascali?

3    A.   Since this mechanism was in place, we would typically put

4    these transactions through as the last or one of the last

5    orders of business before closing out a year.  We also had a

6    situation from time to time where some of the very small

7    accounts that did not have enough money to justify purchasing a

8    full-blown basket of securities, those accounts would typically

9    sit in a treasury instrument pretty much all year or in some

10   money market fund pretty much all year.  Their rate of return

11   was in the 2 or 3 or 4 percent range when other similar clients

12   that simply had more money were in the 10 and 14 range.

13           In an effort to be equitable, we would put extra P&L

14   into some of these smaller accounts.  I ran a quick Excel

15   program to identify who these people were and how much money

16   would bring them up to some midpoint of a bell curve of all our

17   clients, identified the dollar amount, and then ran a quick

18   program to process a series of tickets that would put that P&L

19   into those accounts using the same format that I used for these

20   accounts.

21   Q.   Did you keep track of these various accounts in a file?

22   A.   Yes.

23   Q.   When in the year did you do most of this activity?

24   A.   Late in the year.

25   Q.   Can you describe the process that you would engage in in

Case 10-04285-JS   Document 50   Entered 03/24/15  Page 37 of 150   4892

Dc5rbon2                          DiPascali – direct

1    doing it late in the year.

2    A.  I typically worked on this between Christmas and New

3    Year's.  By Christmas more than likely the trading for the

4    entire year, the amount of tickets that were going to be posted

5    to all of my accounts were pretty much done, so I could take a

6    preliminary view of where all of these accounts sat in terms of

7    their P&L.

8            I used that information and created a fictitious trade

9    buy side and a fictitious trade sell side, and I set it up into

10   the system as a basket trade.  I ran some rudimentary Excel

11   programs that would take the information and run the tickets

12   against this file.  So we were able to accomplish a couple of

13   tasks with the same process.

14   Q.  Why would you do this at the end of the year?

15   A.  Some of these accounts had almost like a double mandate.

16   For instance, these accounts in particular, it was promised to

17   these guys by Bernie that they would earn 17 percent on their

18   account, pretty much dead-on 17 percent, and on top of that

19   they would receive this exact dollar amount.

20           In order to see where they were vis-a-vis 17 percent

21   at the end of the year, you needed to wait until the end of the

22   year.  You couldn't do that in June.  By Christmas, all the

23   chips had pretty much settled, I had a very close handle on

24   where these accounts were going to wind up.  And then on some

25   of these accounts I looked at them and I first adjusted them to

Case 1:10-cv-02239-2-S    Document 68    Filed 03/24/11    Page 3 of 150    4893

Dc5rbon2                           DiPascali - direct

1    17 and then I added extra P&L on top of that.  That's why it

2    was done at the end of the year.

3    Q.  Who would help you with this process?

4    A.  I pretty much did it on my own, with keypunch help.

5    Q.  You would do this right before New Year's?

6    A.  Usually between Christmas and New Year's, yes.

7    Q.  For how many years did you do that?

8    A.  14 or 15 years.

9    Q.  Were most of the clients that got this extra shtup clients

10   that had brought in at some point new clients to Madoff

11   Securities?

12   A.  A good part of the list was that, yes.

13   Q.  As part of this process, did you engage in activity that

14   helped certain clients with their taxes?

15   A.  Yes.

16   Q.  What sorts of activity did you engage in to help certain

17   clients with their taxes?

18   A.  The concept in general helps all of these clients with

19   their taxes.  If this is in essence a commission payment for

20   bringing in money, you would typically account for that as

21   ordinary income; you would bill and you would receive a payment

22   and you would book it as ordinary income on your income tax

23   return.  By doing in it this format, and using index options in

24   particular as the transaction vehicle, it became treated

25   differently by the IRS because index option profits are

Dc5rbon2                    DiPascali - direct

```
 1   favorably treated by the IRS and it is not ordinary income.  It
 2   is calculated at a different rate.
 3           Everyone who got P&L or received P&L because they were
 4   owed a commission took advantage of the fact that the vehicle
 5   we chose to use to pay that commission was very tax
 6   advantageous.  There was also situations where occasionally a
 7   loss would be put through that would offset other ordinary
 8   income.
 9   Q.  To be clear, these index options that had favorable tax
10   treatment, those trades that were put into the accounts were
11   fake?
12   A.  Absolutely.
13   Q.  The losses that were put in the accounts, those were fake
14   as well?
15   A.  Yes, they were.
16   Q.  They just had the effect of helping people pay less taxes?
17   A.  That's correct.
18   Q.  When you did that, did you know what you were doing was
19   wrong?
20   A.  Sure.
21   Q.  Now let me ask you this.  Did Ms. Crupi have an accounts in
22   the IA business?
23   A.  Yes.
24   Q.  Were those accounts were for her, her friends, and her
25   family?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-02226-S   Document 58   Filed 03/24/11   Page 30 of 150   4895
Dc5rbon2                           DiPascali - direct

1    A.  I believe so.

2    Q.  Did you have conversations with Ms. Crupi about shtupping

3    her accounts?

4    A.  Yes.

5    Q.  Could you describe what types of conversations you had with

6    Ms. Crupi about shtupping her accounts.

7    A.  Going back, one of the purposes of shtupping was to get

8    some of the little people to have a rate of return that was

9    pretty much the average of all people.  I noticed one year that

10   the employees, some of which had small accounts, were on the

11   low side of the bell curve.  I started to do a little study of

12   some of the employee accounts and where they stood because I

13   felt that certainly the employees should attain a rate of

14   return that was the average of all our customers.

15          I started to request from people that I knew had

16   accounts for themselves and their family a list of the account

17   numbers because I wasn't familiar with all of them and I didn't

18   want to miss one.  It was during those discussions with her and

19   other members of my staff that had family accounts that we had

20   these conversations.

21   Q.  Did you have an account or did someone in your family have

22   an account?

23   A.  My mother.

24   Q.  Were other people at the firm that had these type of

25   accounts?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes.

2   Q.  We can take down that down, Ms. Baskin, and put up 105-C51.

3   Can we go to page 42.  I want to direct your attention to the

4   bottom Post-it.  Do you see that?

5   A.  I do.

6   Q.  Whose handwriting is that?

7   A.  Jodi's and mine.

8   Q.  What is yours and what is Jodi's?

9   A.  The part that says "J. Crupi 5,000" crossed out, "option

10  loss see 12/10/40" is Jodi's.  The number 15,000 is mine.

11  Q.  Do you recall what this related to?

12  A.  I do.

13  Q.  Did you have a discussion with Ms. Crupi about what this

14  relates to?

15  A.  We did.

16  Q.  Tell the jury what discussion you had with Ms. Crupi about

17  this Post-it.

18  A.  We discussed the fact that it would have been advantageous

19  for her to take a loss at the end of that particular year.  I

20  asked her to make sure she left a note with her account number

21  and the amount of loss she wanted to take.  Sometime after that

22  there was this sticky on my desk.  Subsequent to seeing the

23  sticky, I just put it in a folder, because we were going to get

24  to that sometime after Christmas.

25          Then, when I was about to do this transaction based on

Case 1:10-cv-04209-LTS   Document 68   Filed 03/14/19   Page 325 of 150   4897

Dc5rbon2                    DiPascali - direct

```
 1   this information, she had changed her mind and requested a loss
 2   of 15,000 and not 5.  So I crossed off the 5 on the sticky and
 3   I wrote 15,000 so I wouldn't forget to do it that way.
 4   Q.  As part of the discussion you had with Ms. Crupi, did she
 5   explain why she wanted to have a loss on her account?
 6   A.  She had other gains in other arenas that she wanted to
 7   offset.
 8   Q.  What was the purpose of offsetting those?
 9   A.  So that you wouldn't pay income tax on those gains.
10   Q.  Now I would like to take this down.  Ms. Baskin, can we put
11   up Government Exhibit 101-124, and can we go to page 3.  We
12   redacted some personal information.  And can we blow up the --
13   exactly.  Thank you, Ms. Baskin.
14           Mr. DiPascali, do you recognize this document?
15   A.  I do.
16   Q.  What is it?
17   A.  It's a screenshot of the account statement of Ms. Crupi's
18   option account.
19   Q.  Can we highlight Ms. Crupi's name.  When was this statement
20   dated?
21   A.  December 31, 2002.
22   Q.  We redacted some other information.  Looking at the account
23   activity, do you see a loss that is being put into the account?
24   A.  Yes.
25   Q.  Who put that loss into the account?
```

1   A.  I did.

2   Q.  Can you explain to the jury what loss you put into the

3   account.

4   A.  I processed this ticket that said that she sold index

5   options at $5.40 for about $9,000 and purchased those same

6   index options for $14.50, for a cost of about $24,000.  The net

7   between the purchase and the sale was a loss of $15,000.

8   Q.  Was any of that real?

9   A.  No.

10  Q.  Who instructed you, who asked you to put this in there?

11  A.  She did.

12  Q.  When you put this in there did you know that what you were

13  doing was wrong?

14  A.  Yes.

15  Q.  Going back to the handwritten note that we just looked at

16  in 105-C51, page 42, is the option loss that we just looked at

17  the same as we looked at in the account, roughly?

18  A.  Is the verbiage of this note what happened in the account?

19  Q.  Yes.

20  A.  Exactly what happened in the account.

21  Q.  One last thing.  Can we go to put this in the split screen

22  and go back to that account, 101-124.  Mr. DiPascali, can you

23  compare the account numbers, the one that was in Ms. Crupi's

24  handwriting asking for the loss, with the one that is in the

25  account.

Dc5rbon2                        DiPascali - direct

1   A.  They are the same.

2   Q.  Can you highlight that, please, Ms. Baskin.

3           This account statement is in December of 2002?

4   A.  It is.

5   Q.  Is this generally the time period that you did the

6   shtupping activity?

7   A.  It is.

8           MR. ZACH:  One moment, your Honor.

9   Q.  While we are looking for that, you put through a loss in

10  this account.  Was there any actual money lost by putting this

11  through?

12  A.  No.

13  Q.  Was there only a tax advantage gained by this?

14  A.  Yes.

15  Q.  When you did that, did you know what you were doing was

16  wrong?

17  A.  Sure.

18  Q.  I would like to take that down, if you can, Ms. Baskin, and

19  move on to what is in evidence as Government Exhibit 105-C116.

20  Can we blow that up.  Do you recognize, Mr. DiPascali, the type

21  of stationery that this is written on?

22  A.  Yes.

23  Q.  What type of stationery is it?

24  A.  It's the standard issued by the company desk calendars.

25  Q.  What is the date on the stationery?

 1   A.  December 31, 2003.

 2   Q.  Do you see there is some handwriting on that?

 3   A.  I do.

 4   Q.  Whose handwriting is that?

 5   A.  Jodi's.

 6   Q.  Can you read what it says.

 7   A.  "Losses my account."

 8   Q.  Now I would like to take that down, please, Mr. Baskin.

 9   Let's go to Government Exhibit 105-C51.  Shtup file again.

10   It's an I need to shtup document, do you see that?

11   A.  I do.

12   Q.  Could you turn to page 40, please.

13           MR. ZACH:  Just one moment.

14   Q.  Do you recognize what we are looking at here?

15   A.  Yes.

16   Q.  What are we looking at?

17   A.  It's an illustration of what needed to be done for 2003.

18   This document was kept in my right-hand desk drawer in the

19   folder called "Shtup."

20   Q.  Whose handwriting is this?

21   A.  All mine.

22   Q.  Is this sort of a chart of the shtupping that you were

23   going to do in 2003?

24   A.  It is.

25   Q.  Let's orient ourselves on this document.  On the left side

1   what were those numbers going down the left side of the

2   document?

3   A.  They were the customer account numbers.

4   Q.  Next to that there is a column that says "Name."

5   A.  The client's name.

6   Q.  Can you briefly describe what each of the subsequent

7   columns are.

8   A.  The column labeled "Units" is how many units of trading I

9   would need to put through the system.  The column called "Need"

10  is the amount in dollars rounded to the nearest thousand.  And

11  the column labeled "Why" is a short note to myself as to why I

12  did that.

13  Q.  Is this fairly representative of the shtupping activity

14  that you would do on a annual basis?

15  A.  There's probably 13 or 14 of these documents in that

16  folder.

17  Q.  This is for the year 2003?

18  A.  Correct.

19  Q.  When you are talking about the need and the thousands of

20  dollars, how were you going to put that into these accounts?

21  A.  By running a fictitious buy ticket and a fictitious sale

22  ticket or series of them that would accomplish that P&L goal

23  equal to need.

24  Q.  Now I would like to direct your attention, if I can, Mr.

25  DiPascali, to an entry -- let me make this a little bit easier

Case 1:10-cv-00228-LTS  Document 33  Filed 03/22/11  Page 23 of 150   4902

Dc5rbon2                              DiPascali - direct

1   to read.  Can we blow up the top third of the document, Ms.

2   Baskin.

3            I want to direct your attention to an account that

4   number is C1210.  Do you see that?

5   A.  I do.

6   Q.  Can we highlight that whole row.  Whose account is that?

7   A.  Jodi's.

8   Q.  Do you see the name next to it that says -- go ahead.

9   A.  It says "JC pers," P-E-R-S.  Stands for personal.

10  Q.  Do you see under "Need" there is a 3 in parens?

11  A.  Correct.

12  Q.  What do those parens signify?

13  A.  It means it's a loss and not a profit.

14  Q.  This is 2003, right?

15  A.  Yes, it is.

16  Q.  Around this time did you have a discussion with Ms. Crupi

17  about putting through a loss in her account?

18  A.  Yes.

19  Q.  Describe what that discussion was about.

20  A.  Under the tax code an individual that year could take up to

21  $3,000 of capital losses as a direct offset to your ordinary

22  income.

23            MR. BRESLIN:  Objection, your Honor.

24            THE COURT:  Please consult.

25            (Counsel conferred.)

1   Q.  Did you discuss the tax reasons for doing this with Ms.

2   Crupi?

3   A.  I did.

4   Q.  What did you discuss about the tax reasons for putting a

5   loss into her account?

6   A.  Since the loss would be a meaningless loss on paper only,

7   it would be tax advantageous to take a $3,000 loss to offset

8   ordinary income.

9   Q.  When you say a meaningless loss on paper, what do you mean

10  by that?

11  A.  In the real world one would put up $3,000 into an account,

12  unfortunately do a trade that loses that money, and whsst, the

13  money was gone.  There was no money involved in this, it was

14  simply done on paper.  There was no out-of-pocket cost

15  associated with this loss.

16  Q.  What was the benefit of putting through this fake loss for

17  Ms. Crupi's taxes that you discussed with her?

18  A.  It would reduce the tax consequence of her ordinary income

19  by $3,000.

20  Q.  Now I would like to go back, Mr. Baskin.  Can we blow this

21  up a little bit more and put it in split screen.  I would like

22  to go back very briefly to Government Exhibit 105-C116.  Can we

23  blow that up.

24         If you recall, at the top, that was your shtup page

25  for 2003, right?

Dc5rbon2                          DiPascali - direct

1     A.  It was.

2     Q.  When would you normally be doing the shtupping in the year?

3     A.  Sometime after Christmas and before we closed the year.

4     Q.  Looking at the calendar page below, what is the date on

5     that?

6     A.  December 31st.

7     Q.  Of what year?

8     A.  2003.

9     Q.  Is that the same year as your list?

10    A.  It is.

11    Q.  What did Ms. Crupi write on the calendar page on December

12    31, 2003?

13    A.  "Losses my account."

14    Q.  Did she tell you to put those losses into her account?

15    A.  She did.

16    Q.  When you did what she asked you to do, did you know what

17    you were doing was wrong?

18    A.  I did.

19    Q.  We can take that down.  I would like to go now to

20    Government Exhibit 105-C154.  On this document I would like to

21    go to page 4, please.  Can we blow that up.  First of all, do

22    you recognize the handwriting on this?

23    A.  It again is Jodi's.

24    Q.  What kind of stationery are we looking at?

25    A.  It's the same type of annually issued desk calendars that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Dc5rbon2                              DiPascali - direct

1   the firm gave us.

2   Q.  The last one we looked at was in 2003.  What year is this

3   one for?

4   A.  2008.

5   Q.  What month are we looking at?

6   A.  September.

7   Q.  Can you read what's written on the calendar page.

8   A.  It says "F. Levy 220,000.  Get option trade for Annette to

9   get Kugel in line and me."

10  Q.  Was there someone named Kugel that worked at the firm?

11  A.  David Kugel.

12  Q.  Who was F. Levy?

13  A.  Francis Levy.

14  Q.  Was there an Annette that worked at the firm?

15  A.  Yes.

16  Q.  Who was that?

17  A.  Annette Bongiorno.

18  Q.  Now I would like to go to Government Exhibit 105-F27.

19  Before we jump ahead, do you recognize the handwriting on this?

20  A.  Not specifically.

21  Q.  Let's go to page 7.  Can we take it down and show it to the

22  judge, defense counsel, and the witness.

23          MR. ZACH:  Your Honor, may we have one moment?

24          THE COURT:  Yes.

25  Q.  Can we go to page 7.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1              THE COURT:  Are we still on the limited view?

 2              MR. ZACH:  Yes, we are on the limited universe right

 3   now.

 4              THE COURT:  This 105-F27 is not in evidence yet?

 5              MR. ZACH:  No.

 6   Q.  Do you recognize what type of document this is?

 7   A.  Yes.

 8   Q.  What type of document is it?

 9   A.  It's a trade sheet used to input data into the AS/400.

10              MR. ZACH:  The government offers 105-F27.

11              THE COURT:  The whole document?

12              MR. ZACH:  Yes, the whole document.

13              THE COURT:  Is there any objection?

14              MR. RIOPELLE:  No objection, your Honor.

15              MR. KRANTZ:  No objection, your Honor.

16              MR. FRISCH:  No objection.

17              MR. MEHLER:  No objection.

18              MR. BRESLIN:  No objection, your Honor.

19              THE COURT:  Mr. Frisch?

20              MR. FRISCH:  No objection, your Honor.

21              THE COURT:  Government Exhibit 105-F27 is admitted in

22   evidence.

23              (Government's Exhibit 105-F27 received in evidence)

24              MR. ZACH:  So the record is clear, we are looking at

25   page 7 of 105-F27.  Can we publish that to the jury, your

Case 1:10-cv-04228-RS   Document 430   Filed 03/14/19   Page 215 of 150   4907

Dc5rbon2                          DiPascali - direct

1    Honor?

2              THE COURT:  Yes, you may.

3              MR. ZACH:  Thank you, your Honor.

4    Q.  What type of document is this, Mr. DiPascali?

5    A.  A trade entry sheet so these entries could get processed

6    into the 400.

7    Q.  Briefly, what is the process for taking information that is

8    on this document and putting it into the AS/400?

9    A.  This document was given to an operator of the 400, and they

10   would type various bits of information found on this sheet into

11   the system.

12   Q.  The trades that you see written on here, were they real?

13   A.  No.

14   Q.  Going down the left-hand side, Mr. DiPascali, do you see

15   there is a series of names?

16   A.  Yes.

17   Q.  Do you recognize those names?

18   A.  Yes.

19   Q.  The first set of those names, who do those relate to?

20   A.  Those were entities owned by Stanley Chais or controlled by

21   Stanley Chais.

22   Q.  The names at the very bottom, whose names do you see there?

23   A.  Ms. Crupi's.

24   Q.  I would like to, if we can, blow up the bottom part of the

25   document.  With respect to the information at the bottom, whose

Dc5rbon2                          DiPascali - direct

```
1    account is that?

2    A.  Ms. Crupi's.

3    Q.  Can we highlight that, Ms. Baskin.

4         Can you walk us through, if you can, what each of

5    those columns means.

6    A.  Sure.

7    Q.  If you have a problem because I cut it off --

8    A.  I know what they mean.  The first column far left is the

9    customer name.  The next column is the customer account number.

10   The column to its right would be an indicator of whether this

11   ticket should be a buy or a sell.  The next column indicates

12   the quantity.

13        The column after that is the symbol for that security.

14   The next column would be the price of that security that should

15   appear on that ticket.  The next two columns are the trade date

16   and the settlement date.  The last column far right is the

17   commission that's going to appear on the ticket.

18   Q.  Can we take this, Ms. Baskin, and put it up on the top in

19   split screen.  On the bottom I would like to bring up 101-142.

20   We can make a redaction.  Now can we blow it up, please.  We

21   just redacted some personal information.

22        Whose account statement is this for?

23   A.  Jodi Crupi.

24   Q.  Can we go to page 20, Mr. Baskin.

25        THE COURT:  Page 20 on the bottom document, which is?
```

 1              MR. ZACH:  101-142.

 2              THE COURT:  Thank you.

 3              MR. ZACH:  Thank you, your Honor.

 4    Q.  Looking at this account statement, is this also related to

 5    Ms. Crupi?

 6    A.  Yes.

 7    Q.  What is the statement dated?

 8    A.  September 30, 2008.

 9    Q.  Can we highlight that date.  Can you compare the account

10    number on the bottom document to what's on the top document in

11    Ms. Crupi's handwriting.

12    A.  They are the same.

13    Q.  Do you recognize any of the transactions listed at the top

14    in Ms. Crupi's handwriting on the statement that is below?

15    A.  The statement below is the computer output results of the

16    information that was inputted above.

17    Q.  What is the effect on the account of inputting the

18    information from above?

19    A.  A profit of 440 some-odd thousand dollars.

20    Q.  Was any of the trading that we are looking at real?

21    A.  No.

22    Q.  Going back, this was all in September of 2008, correct?

23    A.  Yes, it is.

24    Q.  Going back, if we can, to government -- well, stop.  Before

25    we go there, what are the dates of the transactions on the

Case 1:10-cv-02229-S   Document 98   Filed 03/14   Page 355 of 150   4910

Dc5rbon2                    DiPascali - direct

1    bottom?

2    A.   The settlement date of the first transaction is September

3    3rd.  The settlement date of the second is September 19th.

4    Q.   Can we highlight those, Ms. Baskin, so this is clear.

5           Do those dates match up to the dates at the top?

6    A.   They do.

7    Q.   September 3rd and September 19th.  We can take that down.

8    And can we go back to Government Exhibit 105-C154.  Blow that

9    up again.  Turn to page 4 of that.  Again, what does the

10   cursive writing say at the bottom?

11   A.   "Get option trade for Annette to get Kugel in line and me."

12   Q.   Did we just look at an option trade?

13   A.   We did.

14   Q.   That was an option transaction to happen on September 9th

15   and September 19th, according to that statement we just looked

16   at?

17   A.   I think the dates were September 3rd and September 19th.

18   Q.   What is this calendar date?

19   A.   September 29th.

20   Q.   Is September 29, 2008, before or after September 3rd and

21   September 19, 2008?

22   A.   It is -- please rephrase the question or restate the

23   question.

24   Q.   Is September 29 before or after September 3rd?

25   A.   It is after.

Case 1:10-cv-02225-RS  Document 48  Filed 03/24/11  Page 56 of 150  4911

Dc5rbon2                        DiPascali - direct

1    Q.  Is September 29th before or after September 19th?

2    A.  After.

3    Q.  We can take this down.  Now, Mr. DiPascali, I would like to

4    change gears a little bit here.  We discussed previously that

5    there are both split strike clients and certain clients that

6    were managed primarily by Ms. Bongiorno.  Do you recall that?

7    A.  Yes.

8    Q.  Who were, as we get into the '90s and early 2000s, Ms.

9    Bongiorno's clients generally?

10   A.  High-net-worth individuals that were some of Bernie's

11   oldest clients.

12   Q.  How wealthy were many of these clients?

13   A.  Uber wealthy.

14   Q.  What were the names of some of Ms. Bongiorno's major

15   clients?

16   A.  Carl Shapiro and his family, Stanley Chais, Jeffrey

17   Picower, Norman Levy.

18   Q.  Stanley Chais had personal accounts, right?

19   A.  Yes.

20   Q.  He also had other accounts that we have been looking at

21   over the last few days, right?

22   A.  Yes.

23   Q.  Those other accounts, what were those primarily?

24   A.  They were entities that he had established where he raised

25   money from other individuals and those entities had accounts

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-04652-JES  Document 33  Filed 03/22/14  Page 3 of 150   4912

Dc5rbon2                        DiPascali - direct

1     with Madoff.

2     Q.  What types of Stanley Chais accounts did Ms. Bongiorno

3     primarily manage?

4     A.  I believe they were trusts for various children and

5     grandchildren.

6     Q.  Mr. DiPascali, were you aware of instances where some of

7     these individuals that you have just discussed provided Madoff

8     Securities with real assets?

9     A.  Yes.

10    Q.  Do you have an understanding of how those assets were used

11    by Madoff Securities?

12    A.  Yes.

13    Q.  Where did your understanding of how those assets were used

14    come from?

15    A.  Bernie.

16    Q.  What types of assets did some of these customers provide?

17    A.  Government securities, municipal securities, and equity

18    securities, stocks.

19    Q.  Now we are talking about real stocks, real securities?

20    A.  Real stuff.

21    Q.  How, based on what you have just said, were those

22    securities used at the Madoff firm?

23    A.  They were taken in by the customer and processed to two

24    separate locations.  They were processed by our back office,

25    because the real securities were really at DTC being held in a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-02229-S   Document 98   Filed 03/22/19   Page 385 of 150   4913

Dc5rbon2                           DiPascali - direct

1   custody account, and they were simultaneously taken into the IA

2   business and posted to the customer statement.

3   Q.  When you say posted to the customer statement, does that

4   mean that they were reflected as an asset on the customer

5   statement?

6   A.  Yes.

7   Q.  After they were reflected as an asset on the customer

8   statement, how were they used elsewhere?

9   A.  They were delivered in via DTC.  They were received into

10  the business.  The net effect was there was a position stated

11  in our trading inventory, so they would be used as an asset of

12  the firm.

13  Q.  When you say they were used as an asset of the firm, what

14  were some of the different ways that these customer real

15  securities were used?

16  A.  They were often used as collateral to draw down on a bank

17  loan.

18  Q.  When you draw on a bank loan, does that give cash to Madoff

19  Securities?

20  A.  It does.

21  Q.  Where you aware of times when Madoff Securities was running

22  low on money?

23  A.  Yes.

24  Q.  How, if at all, were these loans that were obtained using

25  customer real securities used at those times?

Case 1:10-cr-00228-LTS   Document 458   Filed 03/24/14   Page 89 of 158   4914
Dc5rbon2                          DiPascali - direct

1   A.   The cash from those loans replenished the account that was

2   running low on money.

3   Q.   Were there specific times that you remember that happening?

4   A.   Yes.

5   Q.   What are some of those specific times that you recall that

6   happening?

7   A.   December of '08, during the period that Bernie needed to

8   refund back to the trustee the Avellino & Bienes funds, and

9   other times.

10  Q.   Was Mr. Bonventre involved in any of these loans?

11  A.   Yes.

12  Q.   How do you know Mr. Bonventre was involved?

13  A.   That was his job function.

14  Q.   What was his role?

15  A.   He was the firm's liaison to our banks, the seniormost

16  person that dealt with our banks.

17  Q.   Did you have discussions with Mr. Madoff about how these

18  loans were obtained using customer securities?

19  A.   Yes.

20  Q.   In any of those discussions did Mr. Madoff mention Mr.

21  Bonventre?

22  A.   Yes.

23  Q.   What did Mr. Madoff say about Mr. Bonventre's role in using

24  real customer securities to get loans from banks?

25  A.   Typically, he would just mention to me, I'm getting in

Dc5rbon2                          DiPascali - direct

```
 1   stock or I'm getting in bonds from so-and-so, do me a favor and
 2   stay on the cage's backs, I want to know when they come in.  So
 3   I would occasionally walk in the cage and ask them if the bonds
 4   came in.
 5            In that conversation he would say that he -- he
 6   obviously told Danny the same thing.  He just was playing
 7   double safe, double sure, having two guys do the same thing.
 8   It was kind of like just a conversation as to what the process
 9   Bernie expected was going to be.
10   Q.  In those discussions did Mr. Madoff mention how these loans
11   were going to be utilized on the books and records of the firm?
12   A.  I'm not so sure the loans were reflected on the books and
13   records of the firm.
14   Q.  Did he discuss how these were going to be accounted for in
15   the firm?
16   A.  Not specifically, but I know how they were accounted for.
17            (Continued on next page)
18
19
20
21
22
23
24
25
```

Case 1:10-cv-02286-CS Document 48 Filed 03/22/19 Page 315 of 150 4916

DC5PBON3                           DiPascali - direct

1    Q.  Well, how do you know they were accounted for?

2    A.  Because at one time, I was a trader on that desk and I saw

3    those very same securities that came in from customers,

4    specifically Norman Levy.  And I saw where they put them, which

5    was in a trading account up in that room, and I know that that

6    trading account appears on our books and records as an asset.

7    So I just -- it's logic.

8    Q.  And what is a trading account?

9    A.  It's a subsidiary account of the firm's inventory broken up

10   by each trader responsible for a group of securities; so each

11   group has its own account, but the collective account is the

12   collective firm inventory.

13   Q.  Now, going back to those customers that Ms. Bongiorno

14   managed, were they part of the so-called split-strike strategy?

15   A.  No.

16   Q.  How were their accounts typically traded?

17   A.  In what's known as a long position account.

18   Q.  And what is a long position account?

19   A.  Typically an array of securities of various portfolios,

20   sometimes hedged, sometimes not, but it could be a portfolio of

21   one stock, it could be a portfolio of 40 stocks, depending on

22   the account.

23   Q.  And who was it that was in charge of putting in the trades

24   for Ms. Bongiorno's accounts?

25   A.  She was.

Case 1:10-cv-02296-2 Document 58 Filed 03/14 Page 325 of 150 4917

DC5PBON3                           DiPascali - direct

1   Q.  Were any of those trades real?

2   A.  No.

3   Q.  Now, are you, sir, familiar with a entity called ACF?

4   A.  I am.

5   Q.  What was ACF?

6   A.  It was a pension-type account controlled by Jeffrey

7   Picower.

8   Q.  And who was Mr. Picower?

9   A.  A wealthy investor.

10  Q.  Where did he live?

11  A.  I have no idea.

12  Q.  And what was -- or what is a pension plan?

13  A.  It's a pool of money that has been earmarked to pay the

14  retirement funds of typically employees or something like that.

15  Q.  Now, in the course of working down on the 17th floor, do

16  you recall that there were problems with the ACF account?

17  A.  I do.

18  Q.  How did you learn that there were problems with the ACF

19  account?

20  A.  I observed people talking about it.

21  Q.  Who are some of the folks you observed talking about it?

22  A.  Jodi, Annette and Bernie.

23  Q.  And what did you hear them say about the problems that were

24  being had with the ACF account?

25  A.  ACF was, I believe, a typical long position account that

Case 1:10-cv-04218-LS  Document 98  Filed 03/24/14  Page 65 of 150  4918

DC5PBON3                          DiPascali - direct

1   Mr. Picower's ACF was about to undergo an ERISA audit and that

2   Bernie didn't like the complexion of the account, the way it

3   looked; so it needed to be redone.

4   Q.  So what is an ERISA audit?

5   A.  It's an acronym for a government agency that is responsible

6   for the compliance of retirement plans, basically.  I'm not

7   that well versed in what it is, but it's a government agency.

8   Q.  Okay.

9           THE COURT:  Mr. Zach, I'm sorry, we're going to need

10  to start the break in another minute or two; so would you --

11          MR. ZACH:  I can stop right now, your Honor, if you

12  want.

13          THE COURT:  All right.  Thanks very much.  Ladies and

14  gentlemen, were going to begin our 15-minute morning break now.

15  Jurors, please be ready in the jury room by 11:20.  Thank you

16  for your work so far with us.  Enjoy your break, and continue

17  to keep your thoughts to yourself.  All rise.  Ms. Ng will lead

18  the jury out.

19          (Jury exits)

20          Mr. DiPascali, you may step down.  Thank you.

21          THE WITNESS:  Thank you, your Honor.

22          THE COURT:  We'll reconvene at 11:20, and I'll ask

23  that our student guests hang around.  I'll come down and say

24  hello.

25          (Recess)

Case 1:10-cv-02221-2   Document 48   Filed 03/24/11   Page 845 of 150   4919
DC5PBON3                        DiPascali - direct

```
 1              THE COURT:  Mr. Zach, is there something you wanted to
 2     discuss before we went on?
 3              MR. ZACH:  No.
 4              THE COURT:  Ms. Ng, would you bring the jury in.
 5              MR. KRANTZ:  Your Honor, would you mind if some of us
 6     took off our jackets because it's kind of warm?
 7              THE COURT:  Not at all, and would you like me to make
 8     the take off your jackets announcement.  But I will warn you
 9     that when winter comes it's spontaneous and there's nothing we
10     can do about it.  So do whatever makes you comfortable with
11     that.  All rise.
12              (Jury enters)
13              Welcome back, members of the jury.  Please take your
14     seats.  Please be seated, everyone.  Members of the jury, just
15     before we start, you'll have noticed that the temperature in
16     this room varies wildly and often spontaneously.  So I have
17     told everyone, and I tell you as well, if you feel hot and you
18     want to take your jacket off or something, everybody feel free
19     to do that.  If you feel the need to bundle up, go right ahead.
20     We do our best to try to keep it somewhere in a reasonable
21     range, but that doesn't always happen.  So thanks for
22     understanding.  Mr. Zach?
23              MR. ZACH:  Thank you, your Honor.
24     BY MR. ZACH:
25     Q.  Now, Mr. DiPascali, before we broke for the morning break,
```

Case 1:10-cv-04626-RS  Document 438  Entered 03/22/19  Page 85 of 150  4920

DC5PBON3                          DiPascali - direct

1    you were testifying about ACF, the pension plan associated with

2    Mr. Picower; do you recall that?

3    A.  I do.

4    Q.  And I believe what you said was there were certain problems

5    that you came to learn were happening with that account?

6    A.  That's correct.

7    Q.  And one of the things that you testified before the break

8    was that Mr. DiPascali -- I'm sorry, Mr. Madoff was wrong -- or

9    unhappy with the complexion of those accounts; do you recall

10   saying that?

11   A.  That is correct.

12   Q.  And what did you mean by Mr. Madoff was unhappy with the

13   complexion of the ACF accounts?

14   A.  My understanding was that since it was a long position

15   account, it was invested in an array of stocks.  Bernie

16   recognized that there was an ERISA audit about to begin or had

17   begun, I'm not sure, and that he would have preferred to have

18   that account in an array of treasury securities to give the

19   appearance of greater safety.

20   Q.  Are treasury securities generally thought to be safer than

21   stocks?

22   A.  Yes.

23   Q.  Now, did you come to learn that there was a project to

24   re-do some of the ACF statements?

25   A.  Yes.

 1  Q.  And who was involved in that project to re-do the ACF

 2  statements?

 3  A.  Bernie, Annette and Jodi and, to a certain extent, myself.

 4  Q.  And how did you participate in re-doing the ACF statements?

 5  A.  I provided an array of U.S. treasury notes and researched

 6  historical pricing mechanisms and fed information to Annette.

 7  Q.  And when you say you provided treasury notes, did you go

 8  out and buy real treasuries to put in the ACF accounts?

 9  A.  No.

10  Q.  Are you again speaking of just providing information for

11  fake trades?

12  A.  Correct.

13  Q.  I'd like to show you what has -- what is in evidence as

14  Government Exhibit 105-B17.  Now, do you recognize,

15  Mr. DiPascali, what type of document this is?

16  A.  Yes.

17  Q.  What is it?

18  A.  It's a brokerage statement for the period ending

19  January 31st, '02, for ACF services that has been crossed out.

20  Q.  And who was managing the ACF accounts?

21  A.  Annette.

22  Q.  What year is this account statement from?

23  A.  2002.

24  Q.  Now, I'd like, if we can, Ms. Baskin, to go to Page 121 of

25  this document.  And, Mr. DiPascali, looking at this document,

DC5PBON3                         DiPascali - direct

```
1   is this still the ACF services account?

2   A.  It is.

3   Q.  And what is the date on this account?

4   A.  July 31st, '02.

5   Q.  And looking at this version of the statement, do you see

6   any treasury securities?

7   A.  I don't.

8   Q.  Looking at the top of the document, what do you see?

9   A.  Activity in treasuries.

10  Q.  Okay.  What does that mean?

11  A.  That particular line item is -- appears to be the purchase

12  of 6,970,000 of the 1212 treasury bill.

13  Q.  And what is the date on that?

14  A.  July 31st.

15  Q.  Now, let's -- I want to go maybe two pages back, if we can.

16  This is Page 4 of this statement, right?  Here is Page 3.  What

17  types of securities generally do you see here?

18  A.  I see the purchase of treasury bills and the sale of equity

19  securities, stocks.

20  Q.  So which is the purchase, which is the sale?

21  A.  The treasury bill is the purchase.  The rest of the items

22  are sales.

23  Q.  And let's move forward to Page -- and what are the amounts

24  there?

25  A.  I'm sorry?
```

Case 1:10-cv-02295-PS    Document 38    Filed 03/14/14    Page 285 of 150    4923

DC5PBON3                          DiPascali - direct

```
 1    Q.  What are the amounts?
 2    A.  There's $17 million worth of treasury bills.  And would you
 3    like me to read the amounts of the sales?
 4    Q.  No, just the amount of the treasuries, 17 million.  And can
 5    we go back to Page 1 of the document.  So, I'm sorry,
 6    Ms. Baskin, Page 1 of the January 2000 -- the July 2002
 7    statement, sorry.  Now, let's just start at this page.  So this
 8    is the ACF statement, right?
 9    A.  It is.
10    Q.  And what is it dated?
11    A.  July 31st, 2002.
12    Q.  Look at the securities on this page.  What are they,
13    generally?
14    A.  Sales of stocks and the posting of some dividends.
15    Q.  Let's go to the next page, the very next page.  Do you see
16    a Post-it there?
17    A.  I do.
18    Q.  What does the Post-it say?
19    A.  Old statements.
20    Q.  Do you recognize the handwriting?
21    A.  I don't.
22    Q.  Let's go to the -- one second.  Let's go to the next page,
23    if we can.  And what do we see on this page?
24    A.  Additional sales of stock and the sale of a treasury bill
25    and some dividends.
```

DC5PBON3                          DiPascali - direct

1   Q.  And how much is that treasury bill sold for?

2   A.  I'm sorry, that treasury bill actually was redeemed for

3   16,905,000.

4   Q.  What does it mean for it to be redeemed?

5   A.  The bill matured on July 11th, and you'll notice the

6   posting date is July 11th.  So on July 11th, you would receive

7   back from the government your principal of 16,905,000.

8   Q.  Let's go to Page 3, which we already looked at very

9   briefly.  Page 3 has that $17 million purchase, right?

10  A.  It does.

11  Q.  And let's go to Page 4.  Page 4 has a purchase of around --

12  treasury bill of around almost $7 million; do you see that?

13  A.  I do.

14  Q.  Now, just to be clear, is any of the trading that we're

15  looking at real on these statements?

16  A.  No, it is not.

17  Q.  Let's now go to Page 5.  What types of activity do you see

18  here?

19  A.  Those are the residual positions at the end of the period

20  July '02, all stock positions.

21  Q.  Okay.  So what we just looked at was the activity for the

22  month, and this is what's in the account at the end of the

23  month?

24  A.  That is correct.

25  Q.  So looking at what's in the account at the end of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-02221-FS   Document 58   Filed 03/14   Page 305 of 150   4925

DC5PBON3                         DiPascali - direct

```
 1    month, on Page 4, what do we see?

 2    A.  This isn't Page 4.

 3    Q.  I'm sorry, let's go back to Page 4.  Sorry, Ms. Baskin.

 4    Where does the residual security positions begin?

 5    A.  Around the middle of the page, where it says security

 6    positions as a heading, and the first entry being Daimler

 7    Chrysler.

 8    Q.  And can we highlight that, please.  So everything going

 9    down from here is going to be security positions, right?

10    A.  That is correct.

11    Q.  And are these stocks that we're looking at?

12    A.  Yes.

13    Q.  Let's go to Page 5 now.  And what types of securities are

14    we looking at here?

15    A.  More stocks.

16    Q.  Can we go to Page 6, please, Ms. Baskin.  What are we

17    looking at?

18    A.  More stocks.

19    Q.  And Page 7?

20    A.  And, again, more stocks.

21    Q.  And Page 8?

22    A.  The top part of that schedule is a continuation of the

23    stock positions, and then there's five treasury bill positions,

24    and then the last entry is back to a stock position.

25    Q.  And so for those treasury positions, are these the treasury
```

1   securities that were in the account at the end of the month?

2   A.  Yes, they are.

3   Q.  Okay.  And can you just make an estimate of the amount of

4   treasury securities that we're looking at here?  Ms. Baskin,

5   can you highlight those?

6   A.  50 million?

7   Q.  The one above, I think, as well.  So that's around 50

8   million?

9   A.  Approximately.

10  Q.  And can we go to Page 9.  And what type of securities do we

11  see there?

12  A.  Those are all stocks.

13  Q.  And is that the end of the statement?

14  A.  It is.

15  Q.  So let's take that down, and I'd like to show you --

16          MR. ZACH:  Well, first, at this point, the government

17  would move to offer a subset of what is already in evidence as

18  Government Exhibit 300-4, and what we would seek to offer is

19  something called 300-4A.

20          THE COURT:  Any objection?

21          MR. MEHLER:  No objection.

22          MR. FRISCH:  No objection.

23          MR. BRESLIN:  No objection.

24          MR. KRANTZ:  No objection.

25          MR. RIOPELLE:  No objection.

Case 1:10-cv-02296-2S Document 498 Entered 03/22/19 Page 325 of 150 4927

DC5PBON3                          DiPascali - direct

```
 1            THE COURT:  Government Exhibit 300-4A is admitted in
 2    evidence and may be published to the jury.
 3            MR. ZACH:  Thank you, your Honor.
 4            (Government's Exhibit 300-4A received in evidence)
 5    BY MR. ZACH:
 6    Q.  Can we pull that up?  Now, what are we looking at?  This is
 7    a single page of the -- of a statement, and can you tell us
 8    what account it's for?
 9    A.  For the same account, ACF Services pension plan.
10    Q.  And what is it dated?
11    A.  July 31st, 2002.
12    Q.  And do you see any treasury positions on this statement?
13    A.  I do.
14    Q.  And the last one, approximately how much in treasury bills
15    did we see in the X'd out statement?
16    A.  I believe it was about 50-some-odd million.
17    Q.  Okay.  And can you try and estimate what the amount is on
18    this statement?
19    A.  About 900 million.
20    Q.  Let's -- Can we put this in split screen, Ms. Baskin, with
21    what was Page 9 of Government Exhibit 105-B17.  Thank you very
22    much, Ms. Baskin.  Now, comparing -- Thank you.  Looking at
23    these two documents, I would ask you first, Mr. DiPascali, to
24    look at the account numbers for the top and the bottom?
25    A.  They are the same.
```

Case 1:10-cv-04228-LLS   Document 98   Filed 03/14/19   Page 335 of 150

4928

DC5PBON3                          DiPascali - direct

1    Q.   And can you look at the dates for the top and the bottom?

2    A.   They are the same.

3    Q.   And can you look at the names on the accounts?

4    A.   They are the same.

5    Q.   And how are the treasury positions different from the X'd

6    out version on the bottom from the different version we looked

7    at at the top?

8    A.   The 50 million or so principal amount of treasury bills

9    that were resident on the bottom document are no longer

10   resident on the top.  Neither are any of those securities on

11   that document.  On the top document there is a position of five

12   treasury notes and a treasury bill.

13   Q.   And the $50 million of treasury securities listed on the

14   bottom document, were any of those securities real?

15   A.   No.

16   Q.   And the, you know, 600-million-plus treasury securities on

17   the statement on top, were any of those real?

18   A.   No.

19   Q.   Now, looking -- by changing the amount of the treasury

20   notes, how does that compare to the goal that you heard

21   Mr. Madoff -- or how does that relate to the goal that you

22   heard Mr. Madoff discuss in connection with fixing these ACF

23   accounts?

24   A.   It basically attained that exact goal.

25   Q.   And can you explain how it attained that exact goal?

Case 1:10-cv-02221-TS    Document 453    Filed 05/11/12    Page 345 of 150    4929
DC5PBON3                              DiPascali – direct

1    A.   This account was no longer in an array of stocks.

2    $50 million worth of the account was in treasuries, and the

3    balance, which was 600-some-odd million, was invested in stocks

4    in the first set of documents.  Those stocks disappeared off

5    the statement, as well as the 50 million worth of treasury

6    bills, and were replaced by a longer term holding in various

7    U.S. treasury notes to the tune of 900 million.

8    Q.   So if an ERISA audit were to occur and the above -- the

9    statement above, with the hundreds of millions of dollars of

10   treasury bills, were to be provided to them, what would that

11   reflect about the state of the ACF account?

12   A.   Holdings in U.S. government securities are typically deemed

13   to be the safest investment.

14   Q.   So it would be safer than having stocks in an account?

15   A.   Yes.

16   Q.   We can take that down.  Thank you very much, Miss Baskin.

17   And who was it that was running up the changing of these

18   statements?

19   A.   Annette Bongiorno.

20   Q.   And who was working with her?

21   A.   Jodi and myself.

22   Q.   And what was your role in it?  I'm sorry.  And what was

23   your role in it?

24   A.   I provided some of the pricing on those treasury notes.

25   Q.   And when you provided the fake treasury note prices, did

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-00228-LS  Document 68  Filed 03/14/  Page 355 of 150

DC5PBON3                          DiPascali - direct

1   you know what you were doing was wrong?

2   A.  Yes.

3   Q.  And when you provided the fake treasury information, did

4   you know that you were committing fraud?

5   A.  Yes.

6   Q.  Now, over the years, did Ms. Bongiorno ask you for treasury

7   bill information?

8   A.  Yes.

9   Q.  How often would she have conversations with you about

10  obtaining treasury bill information?

11  A.  She would have conversations with either me or my staff

12  every month.

13  Q.  And what would -- what, if anything, would she say that she

14  needed that treasury information for?

15  A.  She wouldn't typically say what she needed it for.

16  Q.  What would she say to you?

17  A.  I need a treasury bill for this month.

18  Q.  And how would you go about getting the treasury bill for

19  that month?

20  A.  I'd look at where we are on the calendar.  I'd estimate

21  about how long I wanted to be out in maturity; so if it was

22  December of 2013, I would look at a February or March 2014

23  treasury bill.  I'd go to Bloomberg and ascertain the price and

24  give it to Annette.

25  Q.  And when you would go to Bloomberg, would you look at

Case 1:10-cv-02296-2S   Document 48   Entered 03/24   Page 365 of 150   4931

DC5PBON3                          DiPascali - direct

1   backdated prices?

2   A.  Depending on the date that she asked me that she needed the

3   bill for.

4   Q.  And was any treasury bill ever purchased?

5   A.  Never.

6   Q.  I'll ask you a question.  Did the market making part of

7   Madoff Securities make a market in treasury bills?

8   A.  No.

9   Q.  So could you go to the market making part of the business

10  and get a treasury bill to put in an IA account?

11  A.  No.

12  Q.  From time to time did you get real treasury bills?

13  A.  Yes.

14  Q.  And what were those real treasury bills for?

15  A.  To invest the excess cash in the IA checking account.

16  Q.  And when you say to invest the excess cash in the IA

17  checking account, for what reason did you get a treasury bill

18  to do that?

19  A.  So as to provide safety and an enhanced yield to what the

20  checking account interest rate was.

21  Q.  So it would be fair to say it would be a way of getting

22  interest on the checking account?

23  A.  More or less, yes.

24  Q.  And when you bought those real treasury bills to earn

25  interest on the Madoff checking account, what did you have to

```
 1    do?
 2    A.  I had to call my broker.
 3    Q.  And after you called your broker, was there a process to
 4    going out and buying the treasury bill?
 5    A.  Yeah, I would tell the broker how much dollars I wanted to
 6    commit to treasury bills and typically which one I wanted to
 7    buy, and he would take down that information and call me back
 8    and typically give me a report that I bought X amount of
 9    treasury bills at this price.
10    Q.  And then that would -- you would actually get a real
11    treasury bill?
12    A.  Yeah.
13    Q.  Now, for on the IA side, when you had to provide -- when
14    you would provide the fake information, what would you do
15    there?
16    A.  I'd look at a pricing service of historical prices of
17    treasury bills, ascertain the price on the date that I needed
18    and write a ticket and put it into the AS/400.
19    Q.  And when you would go out and buy the real treasury bills,
20    was Ms. Crupi near you?
21    A.  We worked in the same office.
22    Q.  And when you were talking on the phone buying real treasury
23    bills, was she in the vicinity where she could overhear what
24    you were saying?
25    A.  Yes.
```

Case 1:10-cv-04229-LTS  Document 436  Filed 03/24/14  Page 385 of 150

DC5PBON3                          DiPascali - direct

```
 1    Q.  And would she be able to observe you, how you were on the
 2    phone and what you were doing?
 3    A.  Certainly.
 4    Q.  Now, what was your understanding of what Ms. Bongiorno
 5    would do with the treasury information that you gave to her?
 6    A.  She would put through a buy ticket that was approximately
 7    equal to the cash credit balance reflected in the account she
 8    was working on, and it would produce a confirmation and an
 9    entry on the customer statement that he was now -- owned
10    treasuries.
11    Q.  And as with the other trading that was on those accounts,
12    was any of it real?
13    A.  No.
14    Q.  Now, did Madoff family members have accounts on the IA side
15    of the business?
16    A.  Some.
17    Q.  Who were some of the Madoff family members that had
18    accounts in the investment advisory business?
19    A.  Peter Madoff, Marion Madoff, Ruth Madoff, Andy Madoff, Mark
20    Madoff, Shana Madoff, Charlie Wiener.  I might have missed a
21    nephew somewhere, yeah.
22    Q.  Who, again, was Charlie Wiener?
23    A.  Bernie's nephew.
24    Q.  Now, who managed the accounts for the Madoff family
25    members?
```

Case 1:10-cv-02285-S    Document 43    Filed 03/22/19    Page 315 15    4934

DC5PBON3                            DiPascali - direct

 1   A.  Most of which were managed by Annette.  Ruth Madoff's
 2   account for a time was managed by me.
 3   Q.  Now, did Ms. Bongiorno also manage IA accounts for certain
 4   Madoff Securities employees?
 5   A.  Yes.
 6   Q.  Who were some of the Madoff Securities employees who
 7   Ms. Bongiorno managed account for?
 8   A.  David Kugel, Irwin Lipkin, Dan Bonventre.  I'm drawing a
 9   blank on the rest of the names.
10   Q.  Now, from time to time, did Ms. Bongiorno ask you questions
11   about stocks that could be used in the accounts that she was
12   overseeing?
13   A.  Yes.
14   Q.  What sorts of questions would she ask you?
15   A.  Things like, are there any stocks that you know that are up
16   this month or that are down this month, or what did the market
17   do this month, so she can get an understanding of where the
18   market was vis-a-vis what she needed to do.
19   Q.  And when you say a stock was up this month, would that be a
20   forward-looking analysis or would that be looking at historical
21   information from that?
22   A.  Historically.
23   Q.  And when you were trying to determine if a stock was up in
24   a month, would you look forward or backward?
25   A.  Backwards.

Case 1:10-cv-02256-PS Document 98 Filed 03/14/12 Page 30 of 150 4935

DC5PBON3                          DiPascali - direct

1   Q.  And did you ever hear the phrase story stock?

2   A.  Yes.

3   Q.  Who did you hear that phrase from?

4   A.  Bernie and Annette.

5   Q.  And what was your understanding of what a story stock was?

6   A.  It's a stock that was up because there had been some news

7   published about that stock.

8   Q.  What does that mean, that there had been some news

9   published about that stock?

10  A.  There might have been an announcement of a takeover of that

11  security or a merger of that security or some other corporate

12  event that was -- that sparked a big gap in the price of the

13  stock.  So the stock was trading at, let's say, 12 or 13 and

14  then a news announcement came out regarding a takeover of that

15  security at 22, and the stock would immediately the next day

16  open at maybe 21.  So it would go from 13 to 21 not based on

17  the normal market conditions of supply and demand, but supply

18  and demand caused by a specific news event.  Hence the name

19  story stock.

20  Q.  And how were -- how, if at all, did story stocks play into

21  stocks that were picked or not picked for the IA business?

22  A.  I was never to give Annette story stock when she asked me

23  what stocks were up this month.

24  Q.  And did someone tell you why you were never to give Annette

25  a story stock if stocks were up?

Case 1:10-cv-02296-PKC   Document 98   Filed 03/22/11   Page 81 of 190   Exhibit 2   4936

1    A.  Bernie.

2    Q.  And for what reason were you never to give a story stock as

3    a stock that was up?

4    A.  Because he didn't want to get his customers in trouble for

5    insider information possibly.

6    Q.  Okay.  And can you describe what you mean by that?

7    A.  When someone trades on information that the public doesn't

8    know about and got that information in some notorious way and

9    acted on it and then the story comes out that causes the stock

10   to rise to a higher level, those profits, based on the

11   regulations in this industry, are deemed to be illegally

12   gained.  You basically made money trading on insider

13   information, information that no one else knew about or only a

14   limited amount of people knew about.  It puts all others at a

15   disadvantage.

16        Picture yourself being the guy that sold that stock

17   right before the story came out and it went from 13 to 30.

18   Well, the guy that bought it from you at 13 might or might not

19   have had some inside dope.  If he had inside dope, he acted

20   illegally.  So a story stock was not a particularly good thing

21   to be in a customer position because it could trigger an

22   inquiry.

23   Q.  Mr. DiPascali, in the real world, is inside information

24   known -- does inside information exist before or after the

25   event that the inside information relates to?

Case 1:10-cv-02285-S  Document 88  Entered 03/22/19  Page 82 of 150  4937

DC5PBON3                        DiPascali - direct

```
 1   A.  It happens before.
 2   Q.  And in real life, if you know inside information before the
 3   relevant event happens, is it illegal to trade on that
 4   information?
 5   A.  Yes.
 6   Q.  At Madoff Securities, was the -- when was that information
 7   known?
 8   A.  Well after it happened.
 9   Q.  And it was known after because you were looking at news
10   that had already been announced, right?
11   A.  Sure.
12   Q.  So was the -- what was the concern about picking event
13   stocks based on -- well, strike that.
14           So when you're looking back in history, can you
15   actually be insider trading?
16   A.  No.
17   Q.  But if someone were to look at an account where a stock was
18   picked from the past, could that have the appearance of being
19   insider trading?
20   A.  It would certainly have the appearance of insider trading.
21   That's why he was trying to avoid it.
22   Q.  Now, in addition to all that, was a stock actually even
23   purchased?
24   A.  Never.
25   Q.  It was just on paper?
```

Case 1:10-cv-02285-S   Document 38   Filed 03/22/11   Page 85 of 150   4938

1   A.  Correct.

2   Q.  Now, did you ever hear the phrase deal stock while working?

3   A.  Yeah.

4   Q.  Who did you hear the phrase deal stock from?

5   A.  Bernie, Annette.

6   Q.  And what did you understand Bernie and Annette to mean by

7   deal stock?

8   A.  It was a more specific definition of a story stock.  It was

9   a story that involved a specific deal, like a merger or an

10  acquisition.

11  Q.  And what was your understanding about the use of deal

12  stocks in connection with the IA business trading?

13  A.  They were also prohibited.

14  Q.  And for what reason were you told that they were

15  prohibited?

16  A.  For the exact same reason I gave before, which is, it would

17  give the appearance that the client knew information because

18  he's -- he has a buy ticket or she has a buy ticket on her

19  statement immediately before a major news announcement came out

20  and then possibly a subsequent sale.  And if you looked at that

21  scenario on paper and you were a regulator, it would jump off

22  the page that there's a possibility that this client knew this

23  merger was going to happen illegally and acted on it.

24          So Bernie could not afford to have any one of the

25  clients in Annette's area, which are typically high net worth

Case 1:10-cv-02221-PKC  Document 498  Filed 03/22/19  Page 845 of 150  4939

DC5PBON3                          DiPascali - direct

```
 1    clients with big portfolios of massive dollars, have an entry

 2    on the statement that was going to be something that could open

 3    this box.

 4    Q.  And, again, did any of those clients actually buy the

 5    stocks?

 6    A.  No.

 7    Q.  Stocks were completely fake, right; so there couldn't be

 8    insider trading?

 9    A.  It was physically impossible for it to be insider trading.

10    Let's just say the customer would have skated on the insider

11    trading allegations because the securities never existed, the

12    trade never existed.  It just was a scenario that on paper, if

13    you looked at it, you say, wow, the guy bought it at 10 and the

14    next day it was 40 and he sold it at 41 and five-eighths, the

15    guy had to know something.

16         So since there's a possibility that some of these

17    statements would to get into the hands one day of a regulator,

18    you are never to buy a story or a deal stock for these

19    accounts, my instructions.

20    Q.  Let's change topics.  Let me show the witness, Judge Swain,

21    defense counsel what has been marked for identification as

22    Government Exhibit 105-D28.  Now, first, I'd like to ask you,

23    do you recognize the fax line at the top of this document, yes

24    or no?

25    A.  Yes.
```

Case 1:10-cv-02225-LS    Document 468    Filed 03/22/19    Page 85 of 150    4940
DC5PBON3                                    DiPascali - direct

 1  Q.  Let's go to the next page.  Do you recognize this type of

 2  document?

 3  A.  Yes.

 4  Q.  Do you recognize the handwriting on this document?

 5  A.  It's Annette's.

 6           MR. ZACH:  Your Honor, the government offers 105-D28.

 7           THE COURT:  Any objection?

 8           MR. RIOPELLE:  No objection.

 9           MR. FRISCH:  No objection.

10           MR. BRESLIN:  No objection.

11           MR. KRANTZ:  No objection.

12           THE COURT:  Government Exhibit 105-D28 is admitted in

13  evidence and may be shown.

14           MR. ZACH:  Thank you, your Honor.

15           (Government's Exhibit 105-D28 received in evidence)

16           MR. ZACH:  Can we please publish that to the jury.

17  BY MR. ZACH:

18  Q.  So my first question about this document, Mr. DiPascali, is

19  do you recognize what the fax line at the top is?

20  A.  I do.

21  Q.  What is it?

22  A.  It appears to be coming from a fax machine in Florida

23  belonging to Annette.

24  Q.  And does the words Annette and Rudy appear on there?

25  A.  They do.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DC5PBON3                           DiPascali - direct

```
1    Q.  And who was Rudy?

2    A.  Annette's husband.

3    Q.  What is this document dated?

4    A.  March 21, '07.

5    Q.  And how do you know that this is coming from Florida?

6    A.  It's got a 516 area code.

7    Q.  Is that, to your understanding, a Florida area code?

8    A.  Yes, it is.

9    Q.  Could you please read just the typewritten text that's on

10   this first page?

11   A.  Jerry, please cancel three trades in the Charles and

12   Carolyn Wiener account, 1W001630/70, and correct the 1099B.

13   October 6 sale for Apollo, $1,981,100 in the 30 account.

14   December 6 sale for Abercrombie, $6,666,500 in the 30 account.

15   November 6th sale for Apple, $1,039,500 in the 70 account.

16   Allie, please give -- excuse me.  Allie will give you the

17   copies of these canceled trades for your records.  Also, please

18   fix the 1099 DIVS for this account.  The correct total should

19   be a million five.  Thanks, Jer.  See you soon, Annette.

20   Q.  Okay.  So the first thing I'd like to follow up on is,

21   Ms. Baskin, can you highlight the October 06 sentence.  What

22   does October 06 stand for?

23   A.  In this context?  October 06, 2006.

24   Q.  And you see below that there's a December 06?  What does

25   that stand for?
```

Case 1:10-cv-02221-FS   Document 458   Entered 03/14   Page 3:15 of 150   4942

DC5PBON3                        DiPascali - direct

1    A.  December 6th, 2006.

2    Q.  And November 6?

3    A.  November 6, 2006, or it could be October '06 as a generic

4    terminology for the year.  It's hard to tell.

5    Q.  And when was this fax sent?

6    A.  March 21st, '07.

7    Q.  Now, do you see there's some handwriting on this document,

8    on the top right?

9    A.  It's not legible to me.

10   Q.  Okay.  Can we blow that up.  Can you recognize that

11   handwriting one way or the other?

12   A.  It's Jerry O'Hara's.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:10-cv-00228-LS   Document 98   Entered 03/22/19   Page 285 of 150   4943

Dc5rbon4                        DiPascali - direct

1   Q.  Can we pull back out.  You say Jerry O'Hara's.  Who is this

2   addressed to, this fax?

3   A.  Jerry.

4   Q.  Before we move on on this document, who, again, is Charlie

5   Weiner?

6   A.  Bernie's nephew.

7   Q.  Let's turn to page 4, if we can.  Do you recognize, Mr.

8   DiPascali, what type of document we are looking at here on the

9   fourth page?

10  A.  It's two confirmations.

11  Q.  Why don't we take the first one and blow that up.  Whose

12  account is this referencing?

13  A.  Charlie and Carolyn Weiner.

14  Q.  Do you see the trade date and settlement date?

15  A.  I do.

16  Q.  What are those trade date and settlement date?

17  A.  November 2, '06, and November 7, '06.

18  Q.  These are trade dates that are before the March 2007 that

19  we saw on the fax?

20  A.  They are.

21  Q.  Do you see where it says "cancel" that's been written?

22  A.  Yes.

23  Q.  What does "cancel" indicate to you on the comp ticket?

24  A.  That there was a previous trade that was on a different

25  comp issued in November of '06, and this confirmation is

Case 1:10-cv-02221-S   Document 68   Filed 03/22/19   Page 89 of 150   4944

Dc5rbon4                        DiPascali - direct

1   confirming that that previous trade was canceled.

2   Q.  Now let's go down and highlight that.  Whose account this

3   comp in?

4   A.  Charlie and Carolyn Weiner.

5   Q.  What security is being traded?

6   A.  Apollo Group.

7   Q.  Is that one of the stocks that was referenced in the prior

8   note to Mr. O'Hara?

9   A.  I think it was.

10  Q.  What are the trade dates here?

11  A.  October 26, '06, and the settlement date was October 31,

12  '06.

13  Q.  Do you see the same "cancel" here?

14  A.  I do.

15  Q.  Do you see there is some handwriting?  Can you read what

16  that says?

17  A.  "Record number 1," either a 6 or a zero, 4259.

18  Q.  Do you recognize whose handwriting that is?

19  A.  Jerry's.

20  Q.  What is a record number?

21  A.  It's a string of digits in some digital file that

22  identifies the record by a numeric number.

23  Q.  Is that similar to the number that we looked at with that

24  handwritten sheet in Ms. Bongiorno's handwriting, all those

25  numbers?

Case 1:10-cv-02221-LBS   Document 498   Filed 03/22/11   Page 30 of 150   4945

1   A.   Those were transaction numbers.

2   Q.   How do these two relate, or not at all?

3   A.   In my mind, not at all.

4   Q.   Let's pull out of this.  Can you read what the security is

5   at the top.

6   A.   Apple Computer.

7   Q.   Is that one of the stocks that is referenced in the

8   typewritten letter to Mr. O'Hara from Ms. Bongiorno?

9   A.   I think it was.

10   Q.   Do you see is there a rack number on this as well?

11   A.   There is.

12   Q.   Whose handwriting is that in?

13   A.   Jerry's.

14   Q.   Ms. Baskin, can we now go to page 2.  What are we looking

15   at here?

16   A.   Looking at an IRS form 1099.

17   Q.   What is the purpose generally of that type of form?

18   A.   This form is specifically a 1099/B, and it is a form that a

19   broker is required to issue to its customers that sum totals

20   all the sales that that customer made in securities that year.

21   This document gets mailed to the customer, and there is a total

22   on it which says gross proceeds of sale, which is exactly what

23   it means.  It is the gross or total amount of sales in all

24   securities in that account for the entire year.

25   Q.   Do you see there is an X through a number there?

Case 1:10-cv-02229-PS   Document 38   Filed 03/14/19   Page 315 of 150   4946

Dc5rbon4                    DiPascali - direct

1    A.  Yes.

2    Q.  What is X'd out?

3    A.  I can't read the box.

4    Q.  We can blow it up.

5    A.  I know this document.  It's stocks and bonds.  Stocks,

6    bonds, etc.  That is the total amount of gross proceeds.  You

7    will see that there is a little box X'd out to the right of the

8    figure and it says "gross proceeds."  That number would be

9    4,370,350.  That is the total dollar amount of stocks and bonds

10   that were told in the account that's referenced on this 1099

11   for the year 2006.

12   Q.  That amount is $4,370,350?

13   A.  I can't make out the third digit from the right, but yes.

14   Q.  Can we pull out of that, Ms. Baskin.  Do you see there is a

15   new, a different number written at the bottom?

16   A.  Yes.

17   Q.  Whose handwriting is that?

18   A.  Annette's.

19   Q.  What number is written there?

20   A.  $683,250.

21   Q.  This also has the fax thing of March 21, 2007?

22   A.  It does.

23   Q.  Can we go to page 3.  What is page 3?

24   A.  It's another 1099, this time a 1099/DIV, which stands for

25   dividend.

1    Q.  Is that another form that is sent to the IRS, meant to the

2    sent to the IRS?

3    A.  These forms are meant to be sent to the client.

4    Q.  For the record, we redacted out some personal information.

5    Do you see there is another X?

6    A.  I do.

7    Q.  What is X'd out here?

8    A.  I think it says $6350.

9    Q.  Below the X there is another number that is written out?

10   A.  Yes.

11   Q.  What is that number?

12   A.  $1500.

13   Q.  That's bigger or smaller than the amount that's X'd out?

14   A.  Smaller.

15   Q.  Can we go back to the first page.  On the first page you

16   see it is written to Jerry?

17   A.  Yes.

18   Q.  You said that the handwriting there is Jerry O'Hara?

19   A.  Yes.

20   Q.  Going back here, does that confirm that the X'd out or the

21   canceled confirmation statements were for stocks that are

22   listed on this cover letter to Mr. O'Hara from Ms. Bongiorno?

23   A.  The Apollo and the Apple are there, yes.

24   Q.  Those were from 2006, right?

25   A.  Yes.

Case 1:10-cv-02221-S   Document 95   Filed 03/22/14   Page 335 of 150   4948

Dc5rbon4                         DiPascali – direct

```
 1    Q.  This is dated March of 2007?

 2    A.  Correct.

 3    Q.  You can take that document down.  From time to time, we

 4    talked a little about this before, did IA customers send in

 5    bonds and other securities to the firm?

 6    A.  Yes.

 7    Q.  You previously testified that those bonds and other

 8    securities were used to get loans on occasion?

 9    A.  On occasion.

10    Q.  Was one of the individuals that would provide bonds and

11    other securities Mr. Norman Levy?

12    A.  Yes.

13    Q.  Did you ever hear Mr. Bonventre refer to the accounts that

14    housed Mr. Levy's stocks and bonds?

15    A.  Yes.

16    Q.  What did Mr. Bonventre refer to those accounts as?

17    A.  Levy accounts, Norman's account.

18    Q.  What type of account were they?

19    A.  Trading accounts in the trading room.

20    Q.  Trading room where?

21    A.  In the market-making operation of the trading room.

22    Q.  That's what you talked about earlier?

23    A.  Correct.

24    Q.  What was supposed to be in the trading accounts?

25                MR. FRISCH:  Objection.
```

Case 1:10-cv-04283-LLS   Document 466   Filed 03/22/19   Page 345 of 350   4949

Dc5rbon4                          DiPascali - direct

1           THE COURT:  Please consult.

2           (Counsel conferred.)

3    Q.  Do you have an understanding of whose securities were meant

4    to be in those trading accounts?

5    A.  The firm's positions.

6    Q.  By "the firm's positions," what do you mean?

7    A.  Positions bought by the individuals in the trading room for

8    Bernie.

9    Q.  What was Madoff Securities reflecting as the owner of the

10   stock that was provided by Mr. Levy?

11   A.  They were reflecting that they owned it.

12   Q.  "They" being who?

13   A.  The firm.

14   Q.  Who in fact owned Mr. Levy's securities?

15   A.  Mr. Levy.

16   Q.  Was it accurate to say that the firm owned those

17   securities?

18   A.  It was not.

19   Q.  From time to time did Madoff Securities also receive stocks

20   and other securities from an individual named Carl Shapiro?

21   A.  Yes.

22   Q.  Can you describe how that would occur, generally.

23   A.  Typically, Mr. Shapiro had holdings in other areas away and

24   apart from the Madoff investments.  Very often he had holdings

25   in U.S. government agency securities.  You heard the name

1    Fannie Mae, Freddie Mac, Federal Home Loan.  Those are agency

2    securities.  For this discussion we will refer to them as

3    treasury securities, because they are essentially similar.  He

4    had holdings at other brokerage accounts of treasury

5    securities.

6            In lieu of increasing the holdings at Madoff by wiring

7    to Bernie dollars, Bernie and Mr. Shapiro had an understanding

8    that Mr. Shapiro would send in treasury securities.

9            MR. FRISCH:  Objection.  Move to strike.

10           THE COURT:  Do you want to reformulate or consult?

11           MR. ZACH:  I can lay a foundation.

12   Q.  Where did you gain this understanding from?

13   A.  From Bernie.

14   Q.  Discussions you had with Mr. Madoff?

15   A.  Yes.

16   Q.  Did you gain this understanding from observing how this was

17   actually done in the office?

18   A.  Yes.

19   Q.  Continue describing.

20   A.  Mr. Madoff and Mr. Shapiro had an understanding that in

21   lieu of sending hard dollars into his investment accounts at

22   Madoff, Mr. Madoff was going to permit him to send securities

23   into his Madoff account.  That's done all the time with

24   brokerage firms.  What the securities that enter the brokerage

25   account accomplish is it increases the client's ability to

Dc5rbon4                        DiPascali - direct

4951

1   purchase more securities, in essence the same thing that cash

2   would have done.

3            The client is at an advantage when he does something

4   like that because instead of mailing a check for a million

5   dollars to a broker who is then going to buy stock with

6   that million, he sends in bonds for a million dollars, which

7   the broker will buy stock for that million, and he still

8   collects the interest on the note that he owns.

9            It is a way of enhancing one's return.  It happens all

10  the time, and it's in the best interest of an astute client to

11  do that, depending on interest rates and things like that.  But

12  it's a common practice.

13  Q.  From time to time Mr. Shapiro would send in securities that

14  would be, instead of sending in cash, to increase the value of

15  his account?

16  A.  To increase the buying power of his account, exactly.

17  Q.  Who were some of the people that participated in taking in

18  those securities?

19  A.  The cage, Mr. Bonventre, Annette, Bernie, myself.

20  Q.  Those securities belonged to Mr. Shapiro?

21  A.  Oh, yes.

22  Q.  Once they were at Madoff Securities, they still belonged to

23  Mr. Shapiro?

24  A.  Yes.

25  Q.  Did you have an understanding of how those securities were

Case 1:10-cv-04652-JS  Document 30  Filed 03/13/12  Page 3 of 150  4952

Dc5rbon4                        DiPascali - direct

1    then used by Madoff Securities?

2    A.  After they were posted to Mr. Shapiro's account at Madoff

3    reflecting his holdings at Madoff Securities, those very same

4    securities were left at the clearing organization and they were

5    pledged for bank loans.  They were also booked into the books

6    and records of the business and wound up to be an asset.

7    Q.  When you say they were pledged as bank loans, who was

8    seeking the bank loan?

9    A.  Mr. Bonventre.

10   Q.  On behalf of what institution?

11   A.  Bernie.

12   Q.  Did Madoff Securities actually own those bonds?

13   A.  Not to my knowledge.

14   Q.  Let me bring up what is in evidence as 105-A460.  Do you

15   recognize some of the names on this document?

16   A.  I do.

17   Q.  Do you see there is a fax line across the top?

18   A.  I do.

19   Q.  Who is this fax from?

20   A.  Wellsley Capital Management.

21   Q.  What was Wellsley Capital Management?

22   A.  That was the family office of Carl Shapiro.

23   Q.  Do you see there are some names?

24   A.  I do.

25   Q.  What are the names?

Case 1:10-cv-04652-JS   Document 58   Entered 03/11   Page 385 of 150   4953

Dc5rbon4                          DiPascali – direct

1    A.  Carl Shapiro, Rhonda Siegel, Ellen Jaffe, Linda Strauss,

2    Jennifer Siegel Trust, Jonathan Siegel Trust.

3    Q.  Next to those names do you see account numbers?

4    A.  I do.

5    Q.  What were those account numbers associated with?  Who were

6    those account numbers associated with?

7    A.  Those are not my account numbers.  They are next to each

8    name.  I'll assume they were associated with that name, but

9    those are not Madoff account numbers.

10   Q.  Looking at the top right of the document, do you see there

11   is some handwriting?

12   A.  I do.

13   Q.  Do you know whose handwriting that is?

14   A.  Annette's.

15   Q.  There are three names, can you read those?

16   A.  Bernie, Danny, Frank.

17   Q.  Is the Frank you?

18   A.  Yes.

19   Q.  What are the securities that are on this document?

20   A.  Various treasury instruments.  It looks like all treasury

21   notes.

22   Q.  Do you know who those notes belong to?

23   A.  Yes.

24   Q.  Who do they belong to?

25   A.  Carl Shapiro and the related entities.

Case 1:10-cv-02296-S   Document 48   Entered 03/22/19 Page 385 of 15   4954

Dc5rbon4                        DiPascali - direct

1   Q.  Do you have an understanding of what some of these

2   securities were used to get on behalf of Madoff Securities?

3   A.  I don't understand the question.

4   Q.  Were these the types of securities that were pledged by

5   Madoff Securities to obtain loans?

6   A.  I believe they were.

7   Q.  What was your understanding of why these loans were needed

8   from time to time?

9   A.  To replenish the plans in the IA checking account.

10  Q.  We can take that down.  Now, Mr. DiPascali, I want to turn

11  again to an individual named Norman Levy.  Before we leave Mr.

12  Shapiro, who managed Mr. Shapiro's accounts?

13  A.  Annette.

14  Q.  That was actually Ms. Bongiorno's handwriting that we just

15  saw?

16  A.  Those three names?

17  Q.  Yes.

18  A.  Yes, it was.

19  Q.  Who handled Norman Levy's accounts?

20  A.  Annette.

21  Q.  Did Mr. Levy have any children?

22  A.  Two, I believe.

23  Q.  Do you recall what their names were?

24  A.  Francis and Jean, Francis being a gentleman, Jean being a

25  woman.

Case 1:10-cv-04283-LTS    Document 258    Filed 04/03/14    Page 3305 of 15x

Dc5rbon4                              DiPascali - direct

1    Q.  Did there come a time that you learned there were efforts

2    to make a transfer of wealth from Mr. Levy to his children?

3    A.  Yes.

4    Q.  How did you learn about those efforts?

5    A.  Through Bernie.

6    Q.  When you say through Bernie, do you mean through

7    discussions with Mr. Madoff?

8    A.  Yes.

9    Q.  Did Mr. Madoff describe to you how this transfer was going

10   to be made?

11   A.  Yes.

12   Q.  Could you tell us how this transfer of wealth was going to

13   be made from Norman Levy to his two children.

14   A.  Mr. Levy had various accounts with the firm.  The children

15   also had accounts.  What they were going to do is they were

16   going to create two accounts, one for each of the children

17   going back in time.  They were going to then backdate a

18   transfer from Mr. Levy to the first child and from Mr. Levy to

19   the second child.  At that point each child's new account has

20   been funded.

21        They were going to then research securities that had

22   gone up tremendously in value and they were going to use funds

23   put into each of the children's accounts to put through

24   fictitious tickets to purchase securities that had risen.  At

25   that stage you had children in long positions that have

Case 1:10-cv-04205-JGK   Document 259   Filed 04/03/24   Page 4956 of 191   4956

Dc5rbon4                              DiPascali - direct

1    possibly doubled or even more.

2                    Mr. Levy's account, and I believe they also used a new

3    account backdated, was simply going to show a transfer to each

4    of the children.  Because a simple transfer to the children

5    would still be possibly a taxable event, the children needed to

6    pay their father interest so it could be shown as a loan.  Each

7    statement going forward from this originating point had an

8    interest payment going from the children back to Mr. Levy.

9                    At the end of the day and after time goes on, Mr. Levy

10   is basically -- well, there is one step I missed.  At some

11   point in time the security positions have risen so much in

12   value, they were either sold or they simply transferred money

13   back from the kids to Mr. Levy to pay down the loan.  So he has

14   funded these fictitious accounts backdated and now he has been

15   repaid.  Then there was some ancillary trades that made him

16   whole economically, so he was out of the picture.

17                   The net result was at the end of the day you had these

18   two accounts that had never existed before that were worth

19   hundreds of millions of dollars, in effect saving Mr. Levy the

20   transfer.  If he dies, there is an estate tax.  If he gives the

21   money to the kids, there is a gift tax.  It is a large tax.

22   So, in an effort to not pay that tax, they backdated all of

23   this stuff and made the kids very wealthy, and there was no tax

24   consequence of that effort.

25   Q.  Who was involved in setting up this transfer of wealth to

08-01789-cgm   Doc 18596-2   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 2
Case 1:10-cv-04652-JLS   Document 23-8   Filed 04/05/24   Page 103 of 191

1   these children?

2   A.  Bernie and Annette.

3   Q.  Were the trades that were done to make this transfer of

4   wealth to these children real?

5   A.  Yes.  I'm sorry.  Excuse me.  No.

6   Q.  These trades never actually happened, right?

7   A.  The trades never happened.

8   Q.  Were the trades ones that were plucked from the past?

9   A.  Yes.

10  Q.  Was the net effect of this to make Mr. Levy avoid having to

11  pay taxes or his children pay taxes on the transfer of hundreds

12  of millions of dollars in wealth?

13  A.  I'm not that well versed in the tax code, but it was done

14  to avoid the payment of taxes.  I'm not sure who would be

15  responsible, the giver or the receiver.  But yes.

16  Q.  Did you provide any information in connection with --

17  A.  I did.

18  Q.  What did you provide?

19  A.  I said before there was some kind of balancing act

20  ancillary trades that had to be done for Mr. Levy.  When Mr.

21  Levy did the transfer to his children, it was just a book entry

22  movement of money from place A to place B.  His account then

23  had a debit balance, so the firm charged him interest on that

24  debit balance.  In order to make him whole, I was instructed to

25  write some option tickets that would make up that interest

Case 1:10-cv-04652-JGK   Document 258   Filed 04/03/24   Page 3015 of 190   4958

Dc5rbon4                           DiPascali - direct

1    payment.  At the end of that process, he had virtually no

2    expense of doing this shenanigans.

3    Q.  Those options trades that you generated, were those real?

4    A.  No.

5    Q.  When you generated those to assist with this project, did

6    you know what you were doing was wrong?

7    A.  Yes.

8    Q.  Did you know you were committing fraud when you generated

9    those options?

10   A.  Yes.

11   Q.  Can you remind us who Tony Tiletnick was.

12   A.  Tony Tiletnick was one of the guys in our cage, which was

13   part of our back office.  I guess if he needed a title, he

14   would be like the senior delivery guy.  He was Walter

15   Tiletnick's brother who was our receive guy back in the day.

16   Q.  How long had Tony Tiletnick worked at Madoff Securities as

17   of the late '90s?

18   A.  As of the late '90s, I guess around -- he started before

19   me.  My point of reference is 1975.  He was there when I got

20   there.  So at least 25 years as of the late '90's.

21   Q.  He had been there before you?

22   A.  Yes.

23   Q.  What were some of the responsibilities that Mr. Tony

24   Tiletnick had in the cage?

25   A.  Dealt with the banks, dealt with the clearing

Case 1:10-cr-00228-LTS   Document 858   Filed 04/03/14   Page 304 of 15   4959

Dc5rbon4                          DiPascali - direct

1   organizations, dealt with other brokers.

2   Q.  Sorry?

3   A.  Dealt with other brokers and their back office, and was

4   also in charge or had some role in the stock borrowing stock

5   lending environment.

6   Q.  Who was Mr. Tiletnick's boss?

7   A.  Danny.

8   Q.  Did there come a time that Tony Tiletnick, Mr. Tiletnick,

9   passed away?

10  A.  Yes.

11  Q.  When did he pass away?

12  A.  I think it was like 2000.

13  Q.  How did you learn that Mr. Tiletnick had died?

14  A.  I got a phonecall from Erin Reardon.

15  Q.  After you received that phonecall, did you participate in

16  any meetings?

17  A.  The purpose of the phonecall was to tell me that Tony died

18  and that Bernie wanted to see me immediately.

19  Q.  Did you go and meet with Mr. Madoff?

20  A.  I did.

21  Q.  Who was at the meeting with Mr. Madoff?

22  A.  Mr. Bonventre, because the meeting was in his office.

23  Q.  What was the discussion at this meeting?

24  A.  Tony had a role also in investing the excess funds in the

25  IA checking account.  He had access to those numbers.  He

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-04285-LTS   Document 259   Filed 04/03/14   Page 105 of 190   4960
Dc5rbon4                    DiPascali - direct

```
 1     worked with those numbers.  And for a long period of time he
 2     was working with the bank in determining what balance would be
 3     a comfortable balance to have, and anything over that number
 4     should be put into something that paid an interest rate higher
 5     than the checking account balance.  So he was investing, if you
 6     will, the excess checking account balance in short-term
 7     instruments.
 8             MR. FRISCH:  Your Honor, may I confer with Mr. Zach
 9     for a moment to anticipate an objection?
10             THE COURT:  Yes.
11             (Counsel conferred.)
12             MR. FRISCH:  Your Honor, I think we resolved it.  We
13     will see how it goes.
14             THE COURT:  Thank you.
15     Q.  Mr. DiPascali, at this meeting did Mr. Madoff discuss the
16     types of securities that Mr. Tiletnick had been investing the
17     703 account in to make short-term interest?
18     A.  It was the topic of the meeting.
19     Q.  Did Mr. Madoff have concerns about the securities that Mr.
20     Tiletnick had been investing?
21     A.  My understanding was that Tony was buying some short-term
22     CDs issued by our bank.  However, a lot, if not all, of the
23     paper that was in place at that time when Tony died was in fact
24     not issued by the core banking organization here in New York
25     but by offshore subsidiaries designed for banking purposes.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-02285-LTS   Document 58   Filed 04/03/14   Page 306 of 190   4961

Dc5rbon4                        DiPascali - direct

1    Bernie's feeling was that that was very risky.  He was upset.

2    He claimed he had not known that Tony had been doing this all

3    of these months or years.

4    Q.  Just so we are clear, we are talking about the Chase 703

5    account, right?

6    A.  Correct.

7    Q.  The Chase 703 account was the main checking account for the

8    investment advisory business, right?

9    A.  It was.

10   Q.  The securities that were being purchased by Mr. Tiletnick

11   were a way of earning interest on that checking account, right?

12   A.  It was.

13   Q.  These were real securities that we are talking about?

14   A.  These CDs were issues of offshore entities of our bank.

15   Q.  Did Mr. Madoff propose a solution for how to deal with

16   this?

17   A.  He either already had an account or two open or was about

18   to open a new account or a series of them, I don't recall.  He

19   was basically giving that responsibility to me.  He wanted

20   treasury notes, treasury bills only.  As the CDs would get

21   unwound or, I don't remember, they might have unwound them

22   immediately, I'm not sure, but in short order I managed a group

23   of Bernard L. Madoff brokerage accounts that were held at other

24   brokerage firms for the purpose of purchasing short-term U.S.

25   government securities.

1    Q.  These short-term U.S. securities were real, right?

2    A.  Yes.

3    Q.  This was just a way of getting interest on the real cash

4    that was in the 703 account?

5    A.  Yes.

6    Q.  What were some of the firms that you now had responsibility

7    for that had these brokerage accounts?

8    A.  Bear Stearns, Fidelity, Bank of New York, Morgan Stanley,

9    Lehman Brothers.

10   Q.  We talked a little bit about this earlier, when you were

11   buying these short-term securities, what steps would you have

12   to take to buy these real securities on those brokerage

13   accounts?

14   A.  I typically picked up the phone and called the broker or

15   the representative of each of those organizations and

16   communicated my needs.  Then he typically got or she typically

17   got back to me and told me what I had done.  Sometimes those

18   conversations occurred in the form of faxes.  Most of the time

19   they were on the telephone.

20   Q.  This was different than just looking at historical prices

21   and writing something up for the fake trades, right?

22   A.  Yes.

23   Q.  Prior to taking on this responsibility with respect to the

24   treasuries, had you had much involvement with the Chase 703

25   account?

08-01789-cgm   Doc 18596-2   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 2
Pg 109 of 191

1   A.  No.

2   Q.  Had you, in working there, observed who was responsible for

3   the Chase 703 account?

4   A.  Yes.

5   Q.  Who had you observed was in charge of overseeing the Chase

6   703 account?

7   A.  At what point of time?

8   Q.  How far back do you remember?

9   A.  1975.

10  Q.  Start at 1975.

11  A.  There was no Chase 703 account.  There was a National Bank

12  of North America.  Without going into the gory details, banks

13  started to swallow up each other.  At one point, and I think it

14  was in the '80s, we might have had six or seven banks, and I'm

15  not sure who was in charge of what.  Then eventually Chase,

16  JPMorgan Chase, was the last man standing.  They had swallowed

17  Manny Hanny, they swallowed up Chemical, and so on.

18          The IA checkbook, ever since I was 19, was always

19  referred to Annette's checkbook.  So whatever specific bank

20  account was the IA checkbook, Annette was in control of it.

21  There came a time where Jodi assumed that responsibility and it

22  became Jodi's checkbook.  In the normal, what is the term,

23  colloquialism, it would be Jodi's checkbook.  Some people even

24  still referred to it as Annette's checkbook, but that's who was

25  in charge of it.

Case 1:10-cv-04095-rs    Document 258    Filed 04/03/14    Page 303 of 150    4964

Dc5rbon4                              DiPascali - direct

1    Q.  Who was it that reconciled the checkbook?

2    A.  Ruth Madoff and Dan Bonventre.

3    Q.  In working there at Madoff Securities, did you observe who

4    would get copies of the 703 account checking statements?

5    A.  Dan.

6    Q.  So we are clear, even though it is a big checking account,

7    would those be checking statements just like an individual

8    would get from their bank?

9    A.  Yes, exactly the same.

10   Q.  Did you observe where Mr. Bonventre kept those statements?

11   A.  The canceled checks were enclosed in a rubber band.  They

12   used to wrap the 4, 5, 6, 42 pages of statement around those

13   canceled checks, put on a couple of rubber bands, and they were

14   in the drawer in his credenza behind his desk.

15   Q.  How long do you remember him getting copies of those

16   statements?

17   A.  He wasn't getting the copy.  He had the original.

18   Q.  How far back was he getting them?

19   A.  For as long as I can remember.

20   Q.  This is the Chase 703 account for the IA business?

21   A.  Correct.

22   Q.  Mr. DiPascali, after you started managing the treasury

23   securities for the 703 account, did you get requests from time

24   to time about taking money out of the 703 account and moving it

25   elsewhere in the business?

Case 1:10-cv-04283-LTS   Document 259   Filed 04/03/24   Page 211 of 190   4965

Dc5rbon4                    DiPascali - direct

```
 1    A.  Yes.

 2    Q.  Who would approach you with those requests?

 3    A.  Enrica Cotellessa-Pitz.

 4    Q.  What was Ms. Cotellessa-Pitz's position at the firm?

 5    A.  Controller.

 6    Q.  How often would you get these requests from Ms.

 7    Cotellessa-Pitz?

 8    A.  We would communicate on that topic every month.

 9    Q.  What would those discussions be like?

10    A.  Hey, can you give me money?  Or I'm going to need money

11    this month.  Or Bernie said to do this.  Or I'd like to be able

12    to do that.  Or I just took a look at this and I think I'm

13    going to need.  She was trying to get a feel for whether I had

14    funds available that I could give her.

15    Q.  Where was that 703 money being transferred to?

16    A.  Funds that I event usefully gave her each month or some

17    months?

18    Q.  Yes.

19    A.  Moved to the business.

20    Q.  When you say business, were there some accounts that were

21    associated with the business?

22    A.  Bank of New York operating account was the business

23    account.

24    Q.  Did you have an understanding of the relationship between

25    the 703 account and the BONY account?
```

Case 1:10-cv-04283-LTS   Document 258   Filed 04/03/24   Page 23 of 130   4966

Dc5rbon4                          DiPascali - direct

1    A.  Yes.

2    Q.  How you get that understanding?

3    A.  Through Tony and Bernie and Danny and everyone else who had

4    an understanding of what I understood.

5    Q.  What was your understanding of the relationship between the

6    703 account, the IA business, and the BONY account?

7    A.  They could never talk to each other.

8    Q.  What did you understand it to mean, that they could never

9    talk to each other?

10   A.  We could never have an entry on the statement or avoid at

11   all costs an entry on the business statement that said that

12   money was being transferred into from the IA account checkbook.

13   That would have been a real bad no-no.

14   Q.  What was your understanding of why that would be a real bad

15   no-no?

16   A.  Because he wasn't showing anything that checkbook.

17   Q.  Who wasn't showing anybody?

18   A.  Bernie.

19   Q.  Overtime did you work with others at the firm to develop

20   ways to transfer money from the 703 IA account to the BONY

21   business account that hid those transfers?

22   A.  Yes.

23   Q.  Who did you work with over that time to develop ways of

24   doing that?

25   A.  Bernie, Danny, Enrica, my London office or Bernie's London

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-04652-GFS   Document 358   Filed 04/03/14   Page 23 of 150

Dc5rbon4                         DiPascali - direct

1   office, and I utilized some people on my staff.

2   Q.   When you worked on developing ways to do that, did you know

3   that what you were doing was wrong?

4   A.   Yes.

5   Q.   Did you know that you were committing a fraud?

6   A.   Yes.

7   Q.   Are you familiar with the term "CP adjustment"?

8   A.   Somewhat.

9   Q.   Where did you hear that term being used around the firm?

10  A.   It was a phrase I heard from people in the back office that

11  had access to or were somehow responsible for the books and

12  records of the firm.

13  Q.   Who were some of those people?

14  A.   Danny, Enrica, Irwin Lipkin, Bernie.

15  Q.   Did you have an understanding, Mr. DiPascali, of how Madoff

16  Securities was organized to pay its taxes?

17  A.   Yes.

18  Q.   What did you understand that to be, briefly?

19  A.   For a number of years, I think since its inception, Bernie

20  was a sole proprietor.  Then he became what is known as an LLC.

21  More importantly, he was a single-member LLC.  In effect, he

22  owned the whole shooting match.  I think the way his taxes were

23  handled was the income or the profit or loss of the business,

24  since he owned entirely the whole thing, would simply be a

25  couple of line items on his personal joint tax return.  That

Case 1:10-cv-05256-TG    Document 359    Filed 04/05/14    Page 23 of 150    4968

Dc5rbon4                          DiPascali - direct

1    was my understanding.

2    Q.  Did you learn of any tax audits that were being done from

3    time to time of Mr. Madoff and of the firm?

4    A.  Yes.

5    Q.  When you learned of those, did you ever have discussions

6    with Mr. O'Hara about those tax audits?

7    A.  Yes.

8    Q.  Do you recall when you spoke to Mr. O'Hara about those tax

9    audits?

10   A.  In the 2000s, but I don't recall exactly when.

11   Q.  When these tax audits occurred, what was your understanding

12   of the number of years that the audits were for?

13   A.  I don't remember.

14   Q.  Do you recall where you had the conversation with Mr.

15   O'Hara about the tax audits?

16   A.  His office.

17   Q.  Can you describe how the topic came up.

18   A.  I had given the boys, or Jerry and George, certain things

19   that needed to be done, and I think I was checking on the

20   status of it.  He had gotten sidetracked by having to handle

21   something for Danny, and he explained, I'll get to it when I'm

22   done with this happy crap I'm doing for Danny.

23   Q.  When he said he would get to it, are you talking about the

24   work you wanted to give to him?

25   A.  He was going to get to my work after he finished up

08-01789-cgm   Doc 18596-2   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 2
Pg 115 of 191

1  whatever he was doing for Danny.

2  Q.  Did you have a discussion about what Mr. O'Hara was doing

3  for Mr. Bonventre?

4  A.  Yes.

5  Q.  Were there papers on the desk when that discussion took

6  place?

7  A.  There were always papers on Jerry's desk.

8  Q.  What did Mr. O'Hara say he was doing for Mr. Bonventre in

9  connection with these tax audits?

10 A.  Making adjustments to the general ledger of the business.

11 Q.  For what purpose?

12         MR. MEHLER:  Objection.

13         THE COURT:  Reformulate to specify what, if anything,

14 was said.

15         MR. ZACH:  I can rephrase, your Honor.

16 BY MR. MEHLER:

17 Q.  What did he say that he was doing?

18 A.  He said he was making adjustments to the general ledger for

19 Danny.

20 Q.  Did he show you anything?

21 A.  I don't recall if he showed me the general ledger.

22 Q.  Did you observe any of the documents that were out in front

23 of him?

24 A.  It was the general ledger and there was handwritten notes

25 on it.

1  Q.  Could you read the notes?

2  A.  I don't remember if I read them then.

3  Q.  Could you recognize whose handwriting they were?

4  A.  Could I?

5  Q.  Yes.

6  A.  Sure.

7  Q.  Did you at the time recognize the handwriting?

8  A.  I never made mental note of that's Jerry's handwriting.  I

9  don't know.

10 Q.  Were you involved in the tax audits?

11 A.  No.

12 Q.  Did you have an understanding of some of the folks that

13 were involved in dealing with the tax audits?

14 A.  Yes.

15 Q.  Who were some of those folks?

16 A.  Dan Pennachio was how I found out there was a tax audit

17 occurring.

18 Q.  Who was Dan Pennachio?

19 A.  He was one of the fellows up on the 18th floor that was in

20 charge of accounts payable.

21 Q.  Who did he work for?

22 A.  Dan Bonventre.

23 Q.  Now I would like to turn to a different topic.  In the late

24 1990s and in the early 2000s did Madoff Securities maintain

25 trade blotters and other records for the IA business?

1   A.  Yes.

2   Q.  Could you describe what a trade blotter is.

3   A.  It's a set of books and records that illustrates the

4   specifics of a particular transaction.  The way these blotters

5   were set up, you had information pertaining to a trade:  The

6   trade date, the settlement date, the transaction number, the

7   security name, the CUSIP number.  The price, there might be

8   some other notations on this line item.  Each line item was a

9   separate and distinct trade from the one below it.

10  Q.  Were there other records that were maintained for the IA

11  business that were similar to the trade blotter or the books

12  and records?

13  A.  Yes, there were books and records of the IA.  I don't know

14  if any of them were similar to a trade blotter.

15  Q.  Just generally the types of other documents that were

16  maintained, could you say what they were?

17  A.  There is a customer ledger, which is in essence the

18  information that feeds the customer statement.  Again, there

19  are the trade blotters, there are stock records.  There's all

20  sorts of different edit lists that come in and out so you can

21  balance.

22          For the IA business there was the portfolio management

23  report and the reports that fed that document, and there was a

24  thing called a long position report, which was a pricing

25  mechanism and a way to keep track of who owned what without

Case 1:10-cr-00228-LTS    Document 258    Filed 04/03/14    Page 118 of 191    4972

Dc5rbon4                        DiPascali - direct

 1  actually pulling the statement.

 2  Q.  All of those records of the IA business, were any of the

 3  securities reflected on these documents real?

 4  A.  No.

 5  Q.  Let's look at an example of one of these.  Can we pull up,

 6  Ms. Baskin, Government Exhibit 102-572.  Looking at the top

 7  left of this document, what is the title of it?

 8  A.  Trade date blotters House 17.

 9  Q.  House 17 is what?

10  A.  That's the computer house that the IA business was resident

11  in.

12  Q.  What was the computer house that the market-making and

13  proprietary trading business was resident in?

14  A.  House 05.

15  Q.  Now let's take as an example the first line.  Please blow

16  up the first lines with the titles in place, Ms. Baskin.  Go

17  down.  That's great.  Thank you.

18          Can you tell us what the first date is on the left-

19  hand side.

20  A.  It's the trade date.

21  Q.  That's underneath the T/DZ?

22  A.  That's trade date, yes.

23  Q.  What is the next date?

24  A.  The next date is the settlement date, which is the same

25  because of the security type.

Case 1:10-cv-04283-LTS   Document 358   Filed 04/05/19   Page 118 of 190   4973

Dc5rbon4                        DiPascali - direct

1    Q.  What is the security type listed here?

2    A.  It's a money market instrument of Fidelity.

3    Q.  Do you see there is a similar entry below it?

4    A.  Yes.

5    Q.  Do you see at the top it says "clearing bank"?

6    A.  Yes.

7    Q.  What is a clearing bank?

8    A.  I don't know.

9    Q.  What was your understanding of why the term "clearing bank"

10   was on this document?

11   A.  My understanding is that the computerization of the firm

12   which occurred in the late '70s was the backbone for the

13   computerized records that were produced or the software that

14   was written for the IA business.  In the real world, when a

15   broker does a trade, he records it as what he did.  That would

16   be that top group of information, in this case what you did for

17   a customer.

18          There would be another side to that.  You would see

19   that if you bought 600X, you bought them from Smith Barney, if

20   you sold 500Y, you sold them to Merrill Lynch, there would be

21   the reference of your counterparty, if you will, on your

22   blotter.  Since these blotters were designed for the IA

23   business and since there were no counterparties, because the

24   trades never existed, the term "clearing bank" I believe was

25   just a filler.  It was a place to put something for the

Case 1:10-cv-04652-RS   Document 258   Filed 04/03/24   Page 33 of 150        4974
Dc5rbon4                        DiPascali - direct

1      accounting to balance.

2              These blotters are showing you on the top block that

3      the customer AHT Partners transacted a money market instrument

4      on 12/31.  It is saying the opposite side of that trade, or the

5      counterparty, is this nebulous thing called clearing bank.  I

6      don't know where that term came from.  This was written into

7      software before my time, or when I wasn't paying attention, in

8      the late '70s.

9              THE COURT:  Mr. DiPascali, can you back off the mic

10     just a little bit.  Not too far away.

11             THE WITNESS:  I'm sorry.

12             THE COURT:  Thank you.

13     Q.  Mr. DiPascali, in the real world you would have a trans-

14     action and its counterparty, right?

15     A.  Your counterparty needs to be on your blotter.

16     Q.  Since there is no counterparty here, "clearing bank" was a

17     filler term used for certain versions of these blotters as sort

18     of a placeholder?

19     A.  I believe so.

20     Q.  We can take that down.  Now, over time going into the

21     2000s, did you work to make multiple different versions of

22     these trading blotters?

23     A.  Too many to count.

24     Q.  When you made these different versions, were they meant to

25     sort of satisfy the eyes of various different auditors and

Dc5rbon4                                DiPascali - direct

1    regulators?

2    A.  Yes.

3    Q.  What individuals did you work with to make those multiple

4    different versions of the blotters as you went into the 2000s?

5    A.  Bernie, Jodi, Jerry, George.

6    Q.  When you say Jerry and George, who are you referring to?

7    A.  Jerry O'Hara and George Perez.

8              MR. ZACH:  Your Honor, it is 5 to.  This would be a

9    good stopping place.

10             THE COURT:  Very well.  Thank you.  We will begin our

11   lunch break at this time and we will resume at 2 o'clock for

12   further testimony.  Members of the jury, thank you for your

13   attentive work this morning.  Please continue to keep your

14   thoughts to yourselves and stay away from outside information

15   and enjoy your lunch break.

16             All rise.  Ms. Ng, would you escort the jury out,

17   please.  Mr. DiPascali, you may step down.  Thank you.  See you

18   at 2:00.

19             (Jury not present)

20             THE COURT:  Mr. Jackson.

21             MR. JACKSON:  Judge, I don't have a real application.

22   I just wanted to ask if I could confer with defense counsel

23   before everyone left for lunch for about 45 seconds in the

24   corner after we are dismissed.

25             THE COURT:  Assuming there is no objection from the

08-01789-cgm   Doc 18596-2   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 2
Case 1:10-cv-01285-FS   Document 258   Filed 04/05/14   Page 331 of 1580
Pg 122 of 191
4976

1    defense.

2              MR. KRANTZ:  I don't think he needs Court permission

3    for that, Judge.

4              MR. JACKSON:  I didn't want everyone to run out.  I

5    also thank the Court for its kind words to the students.

6              THE COURT:  In my business it is always wise to tell

7    the truth.

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A F T E R N O O N   S E S S I O N

 2                        2:07 P.M.

 3              THE COURT:  Good afternoon.  Please be seated.

 4    Ms. Ng, would you bring the jury in, please.

 5              MR. BRESLIN:  Is the no-jacket rule still in effect?

 6              THE COURT:  Yes.  It so varies, anytime you need to,

 7    don't worry about asking.

 8              (Jury enters)

 9              Good afternoon, members of the jury.  Please take your

10    seats.  Please be seated, everyone.  Mr. Zach.

11              MR. ZACH:  Thank you, your Honor.

12    BY MR. ZACH:

13    Q.  Mr. DiPascali, we were speaking about blotters right before

14    we broke for lunch, right?

15    A.  Yes, sir.

16    Q.  I want to actually take a quick step back to the discussion

17    that -- the testimony you provided about Norman Levy and the

18    transfers to his to children.  Do you recall that?

19    A.  I do.

20    Q.  And that was a transfer of hundreds of millions of dollars

21    from Mr. Levy to his children in order to avoid paying certain

22    taxes; do you recall testifying about that?

23    A.  Yes, I do.

24    Q.  And you said that you participated by providing certain

25    options and securities to go into that transaction?
```

Case 1:10-cv-04532-LTS   Document 258   Filed 04/03/24   Page 123 of 190   4978

DC5PBON5                          DiPascali - direct

```
 1    A.  I think so, yes.

 2    Q.  I'd like to show you what's in evidence as Government

 3    Exhibit 105-B25.

 4              MR. RIOPELLE:  What was that letter, again?

 5              MR. ZACH:  B, as in boy.

 6    Q.  First, just looking at this document, do you recognize the

 7    handwriting?

 8    A.  I do.

 9    Q.  And whose handwriting is it?

10    A.  Annette's.

11    Q.  And can you read what the names are at the very top of the

12    page?

13    A.  It says M. Levy, 101; Francis Levy, 102; Jean, 103.

14    Q.  And that's in Ms. Bongiorno's handwriting?

15    A.  Correct.

16    Q.  And, Ms. Baskin, can we blow up from the "in February '96"

17    all the way down to the "3."  There we go.  And do you

18    recognize that handwriting?

19    A.  It is also Annette's.

20    Q.  Mr. DiPascali, can you read what Ms. Bongiorno wrote there?

21    A.  In Feb '96, Bernie's -- I think that word would be

22    instruction -- i-n-s-t, Norman will lend F and J 200 million

23    each.  One, open three new accounts January 1, 1995.  Two,

24    transfer 200 million to F and 200 million to J.  Three, kids

25    pay monthly loan interest to N at a half percent higher than
```

08-01789-cgm   Doc 18596-2   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 2
Pg 125 of 191

1    margin on 200 million.  I think that is, constant figure, in

2    brackets.  Norman gets -- or Norman get regular, or reg, margin

3    interest charged to his account.

4    Q.  So stopping there, what were the initials of Mr. Levy's two

5    children?

6    A.  F and J.

7    Q.  Do you see initials like that on this document?

8    A.  I do.

9    Q.  Is that where it says Norman will lend F and J 200 million

10   each?

11   A.  That's correct.

12   Q.  Ms. Baskin, can we pull out and now blow up the bottom part

13   of this.  Mr. DiPascali, you see there is more writing next to

14   the four, five and six?

15   A.  Yes.

16   Q.  Whose handwriting is that?

17   A.  Annette's.

18   Q.  And can you read what Ms. Bongiorno wrote there?

19   A.  Kids make enough gains to cover loan interest by -- I can't

20   make out that next work -- some positions near year end, in

21   brackets.  Five, kids pay Norman back full loan 12-31-95 and

22   end up with a debit balance.  Frank does option gains to offset

23   margin interest for kids and option loss to offset loan

24   interest for Norman.

25   Q.  Now, pulling out of that, can we go to the next page.  Do

DC5PBON5                          DiPascali – direct

1  you recognize generally whose handwriting is on there?

2  A.  It's Annette's.

3  Q.  And going back to the first page, having read those points,

4  how does that relate to what your understanding was of this

5  transaction?

6  A.  It's virtually identical.

7  Q.  For the "Frank does options gains," did you, in fact, put

8  those through as part of this process?

9  A.  I think I did.

10  Q.  And who did you give them to?

11  A.  Annette.

12  Q.  And were those fake trades?

13  A.  Yes.

14  Q.  And the rest of this description, does this match up with

15  your recollection of how this transfer of wealth through fake

16  trading was discussed among Mr. Madoff, Ms. Bongiorno and

17  yourself at this time?

18  A.  Yes.

19  Q.  We can take that down.  Now, returning to discussion of

20  blotters, in the early 2000s did you have conversations with

21  Mr. Madoff about the need to produce new -- or to produce

22  blotters that reflected the activities of the investment

23  advisory?

24  A.  Yes.

25  Q.  When did you have those discussions?

Case 1:10-cv-04285-JPO   Document 258   Filed 04/03/24   Page 136 of 150                    4981
DC5PBON5                        DiPascali - direct

1    A.  In the early 2000s.

2    Q.  And what was the substance of those discussions?

3    A.  Bernie was very uncomfortable with the formatting of the

4    blotters that were historically produced.  Trade blotters were

5    produced automatically in our system every time a fictitious

6    ticket went through and you processed the trading of that

7    ticket, certain support documents were created.  Trade blotters

8    being one of them.

9         The trade blotters that were -- the software for the

10   trade blotter production that was in the system prior to the

11   early 2000s was not in a format anywhere near what he could

12   ever show someone because it had those entries on it, as we saw

13   before, called clearing banks which would, obviously, bode the

14   question, who is clearing bank?  And there's no answer to that.

15        So he was starting to get really anxious about having

16   me create support documentation in case someone came in the

17   door, where he could show a set of books and records that were

18   believable, and instructed me to start looking into what we

19   should start to do.

20   Q.  And as -- based on those discussions, did you set about

21   working on different sets of blotters to meet that request?

22   A.  Yes.

23   Q.  Who did you work with on that?

24   A.  George Perez and Jerry O'Hara.

25   Q.  So let's start with -- let's call back up 102-572,

Case 1:10-cr-00228-LTS    Document 358    Filed 04/03/14    Page 121 of 191    4982

DC5PBON5                          DiPascali - direct

 1  Ms. Baskin.  And can we kind of do what we did last time, where
 2  we're blowing up maybe the first three or so?  That's great.
 3  Thank you.  So this is what we looked at before lunch, right?
 4  A.  That is correct.
 5  Q.  And what's the year on this version?
 6  A.  2006.
 7  Q.  Now, I'd like to show -- and does this have that clearing
 8  bank that you've been discussing?
 9  A.  It does.
10  Q.  Ms. Baskin, can we highlight the clearing bank.  Now, I'd
11  like to pull up what's in evidence as Government
12  Exhibit 102-570.  Now, do you recognize what this document is?
13  A.  Yes.
14  Q.  What is it?
15  A.  It's another version of a trade blotter.
16  Q.  Can we do the same thing that we'd done with the prior one,
17  and blow up the first -- maybe one more down.  So first, when
18  is this blotter dated?
19  A.  It's dated 5-27-03.
20  Q.  And as we discussed about this, did you guys have multiple
21  versions of the blotters running all the time?
22  A.  Too many to remember.
23  Q.  So you didn't just stick with one blotter, you had a whole
24  different series of versions that were being produced?
25  A.  There were multiple versions being produced at the same

08-01789-cgm   Doc 18596-2   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 2
Case 1:10-cv-04652-GBD   Document 259   Filed 04/03/14   Page 131 of 191   Pg 4983

DC5PBON5                          DiPascali - direct

 1  || time, and over the years, there were many different versions of

 2  || those multiple versions.

 3  || Q.  So let's spend a little while looking at 102-570.  This one

 4  || is dated what, sir?

 5  || A.  5-27-03.

 6  || Q.  Can we highlight that, Ms. Baskin.  Now, let's look at the

 7  || first entry on this blotter.  Do you see the entry numbered

 8  || 6928?

 9  || A.  I do.

10  || Q.  What -- and that's going across the first row, right?

11  || A.  That's correct.

12  || Q.  What does this -- well, let's start at the very left.  What

13  || does the 5/27 represent?

14  || A.  The trade date of May 27th, 2003.

15  || Q.  And after that, is there a settlement date?

16  || A.  Yes.

17  || Q.  And what is the settlement date?

18  || A.  May 30th, 2003.

19  || Q.  And what type of purchase does this reflect?

20  || A.  Which entry, the top one?

21  || Q.  Yeah, the -- well, who's the -- what individual's named

22  || there or what is the name there?

23  || A.  James Cable and Company.

24  || Q.  And what is that?

25  || A.  It's a dealer in London, I believe.

Case 1:10-cr-00228-LTS    Document 858    Filed 04/03/14    Page 130 of 191    4984

DC5PBON5                              DiPascali – direct

```
 1   Q.  And if you look, what kind of security has been purchased?
 2   A.  Oracle Corporation.
 3   Q.  Now, this is not a real purchase, right?
 4   A.  No.
 5   Q.  It's just for purposes of being listed on here?  It's a
 6   false entry on this document?
 7   A.  That's correct.
 8   Q.  Now, previously, we saw the counterparty was a clearing
 9   bank, right?
10   A.  That's correct.
11   Q.  What is the counterparty listed on this version?
12   A.  On this version what you're looking at, where you see James
13   Cable, and what you see Burns Frye, the fourth entry down, they
14   are the theoretical counterparties.  The two entries, which
15   would be No. 2 and No. 4, say M-S-I-L, slash, M-a-d-o-f-f.
16   Those would be the primary broker-dealer business.
17   Q.  So can you describe first how the counterparties -- where
18   those counterparties come from?
19   A.  They came from a list of dealers that we were dealing with
20   in London and other dealers that Bernie liked the name of.  He
21   gave me a list of people when we got to the point of assigning
22   counterparties randomly to my blotters, and we worked off his
23   list.  Some of which came from some Lotus notes database in
24   London, some of it came from his phone book directory, some of
25   it came from names that he had just know -- that he knew did
```

Case 1:10-cv-04299-LTS   Document 258   Filed 04/05/14   Page 130 of 190   4985

DC5PBON5                          DiPascali - direct

 1  business of the nature that we were trying to present in

 2  London.

 3  Q.  Okay.  And so how is it that these count -- so let's

 4  highlight those names if we can, Ms. Baskin.  The James -- how

 5  do you say that?

 6  A.  Cable.

 7  Q.  And another counterparty is Burns Fry, LTD, London?

 8  A.  That is correct.

 9  Q.  And what does the MSIL/Madoff represent?

10  A.  Well, it can represent anything you want it to represent.

11  It could be Madoff Securities International in London, it could

12  be Madoff in New York, or it could be some bizarre combination

13  of both.

14  Q.  And how was it that the foreign counterparties, the Cable

15  and the Burns Fry, how is it that they are -- how are they

16  entered onto this document?

17  A.  Randomly.

18  Q.  When you say randomly, what randomly inserts it into there?

19  A.  A software program designed to pick out of a barrel a list

20  of names we gave it that had account numbers associated with

21  it.

22  Q.  And who wrote the programs to randomly put in those

23  counterparties?

24  A.  I believe George did.

25  Q.  When you say George, you're referring to Mr. Perez?

Case 1:10-cr-00228-LTS   Document 258   Filed 04/03/14   Page 4331 of 150   4986

DC5PBON5                          DiPascali - direct

1   A.  Correct.

2   Q.  Now, in the real world, if the stock was really being

3   purchased, there would be a transaction between Madoff and a

4   real entity in the world, right?

5   A.  Sure.

6   Q.  And on a real record, that real transaction would work its

7   way -- they're matched together because the transaction

8   actually happened, right?

9   A.  You would have the finite data at the point the trade was

10  done.

11  Q.  And did you have -- Because these trades were all fake, was

12  that available?

13  A.  No.

14  Q.  So what had to be instituted instead?

15  A.  You needed to create it.  You needed to pick at random a

16  counterparty that you were going to place on the blotter to

17  give the impression that the trade actually existed.

18  Q.  Now, I'd like to take this down.  Well, keep that up,

19  actually.  I just want to compare this to -- and split screen,

20  Ms. Baskin -- to 102-572, if we can.

21        So Mr. DiPascali, just taking the transaction 6928 at

22  the top and transaction 16732 at the bottom --

23  A.  Mmm, hmm.

24  Q.  -- can you just explain to us how they're different?

25  A.  Well, on the bottom document, AHT Partners is a client of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-04652-CM   Document 258   Filed 04/03/24   Page 181 of 190    4987
DC5PBON5                        DiPascali - direct

1   Madoff.  We put through a fictitious ticket where he transacted

2   or this entity transacted 16,732 shares of Fidelity; so that's

3   the line item that you see there in that block of information

4   for AHT partners.  It shows the money and it shows the trade

5   date.

6            Automatically, in our system when that is entered, the

7   computer was taught to simply create another side, and that's

8   the entry called clearing banks.  You'll notice that AHT

9   Partners has a typical alphanumeric Madoff account number

10  beginning 1A, and clearing bank will always have 290000-3.

11  It's the account number they assigned to the term clearing bank

12  because when trades were manually entered into the system back

13  in the day, I believe the screen asked the clerk for the

14  counterparty, and she or he was instructed to simply type in

15  2-000-3, and the name counterparty would come up on all the

16  records there for.

17           So what you're looking at on the bottom is a very

18  rudimentary set of blotters that were created because blotters

19  needed to be created when the original software programs that

20  were designed to do the bookkeeping for House 05 were then

21  piggybacked to do the bookkeeping for House 17, and again,

22  since there were no counterparties because there were no

23  trades, that was the mechanism they used to apply the blotter

24  logic.

25  Q.  Pausing for a second, Ms. Baskin, can you highlight, first

Case 1:10-cv-04285-LTS   Document 259   Filed 04/03/14   Page 4381 of 150   4988

DC5PBON5                          DiPascali - direct

 1   of all, the -- looking at the lower one, the 29-003, next to

 2   the clearing bank.  And, Mr. DiPascali, that's the number you

 3   said was given to this sort of meaningless concept of a

 4   clearing bank for purposes of the blotters, right?

 5   A.  Exactly.

 6   Q.  And above that, Ms. Baskin, can you highlight the 1-A3013

 7   and the AHT Partners.  Now, Mr. DiPascali, that 1-A number,

 8   that is a actual Madoff Securities account number, right?

 9   A.  That is correct.

10   Q.  And AHT Partners was a real client, right?

11   A.  Yes, they were.

12   Q.  Now, again, all of these tradings -- all of this trading is

13   fake, but this is -- this blotter shows a version of -- a false

14   version of how it might exist, right?

15   A.  Yes.

16   Q.  Now, going up to the different version, where there is the

17   MSIL/Madoff, do we see that 29-0003 number again?

18   A.  You do.

19   Q.  And where do we see that?

20   A.  On the second and the fourth entries.

21   Q.  Can you highlight the first one of that, Ms. Baskin,

22   please.  Now, what is the 29-000-3 number meant to represent on

23   this version of the blotter?

24   A.  In this version, what literally happened was that we went

25   into the customer maintenance file, the computer file, and told

Case 1:10-cv-04652-SAS  Document 159  Filed 04/03/14  Page 4984 of 15X  4989

DC5PBON5                          DiPascali - direct

1    the machine, for the specific purpose of creating this version

2    of blotters, to override clearing banks, literally write over

3    in the system with the words MSIL/Madoff.  So that when the

4    normal process of a fictitious trade going through the blotter

5    cycle automatically creating a 29 account number, which used to

6    be clearing bank, will now say MSIL/Madoff.

7    Q.  And who was it that went in and made that change from

8    something that had been clearing banks to something completely

9    different called MSIL/Madoff?

10   A.  Probably one of the operators.

11   Q.  Now, looking up the James Cable, do you see there's a

12   number there?

13   A.  I do.

14   Q.  What number does that represent?

15   A.  FN378 was not a live account in the Madoff customer base

16   because -- well, when Bernie gave us this list of

17   counterparties he wanted to use for blotter purposes, machines

18   understand numbers; so the data entry for James Cable and

19   Company needed an account number.  So we assigned FN numbers to

20   the various parties on the counterparty list that Bernie gave

21   us.  So that account is not an account in our system anywhere.

22   It is just a -- it's a counterparty designed to fill space on a

23   fictitious blotter.

24   Q.  Now, stepping back, we'll get into more detail on this.

25   Who helped you -- who was it that picked some of these foreign

Case 1:10-cv-00258-LTS   Document 258   Filed 04/03/14   Page 135 of 150

4990

DC5PBON5                              DiPascali - direct

1   counterparties to be used randomly in this version, the names

2   of these foreign accounts?

3   A.  I'm not quite certain which version this is.  This could be

4   the version where Bernie gave me all the names.  I can't

5   identify the version; so I can't tell you who picked the names

6   for this version.

7   Q.  Were there different versions with different sets of random

8   counterparties over time?

9   A.  Yes.

10  Q.  Taking all of the different versions, with all of the

11  different sets of random counterparties, who were the folks

12  that helped you select all of the random different

13  counterparties?

14  A.  Primarily Bernie with information he had gotten from

15  various sources, including our London office.  There was one

16  version of counterparties where I went to Mark Madoff and David

17  Kugel and got counterparties.

18  Q.  Now, sort of wrapping this up, I'm going to go back to the

19  bottom version.  The bottom version shows a Madoff customer

20  with this meaningless concept called a clearing bank for the

21  two sides of the transaction, right?

22  A.  Yes, sir.

23  Q.  And the version at the top shows something completely

24  different, right?

25  A.  It does.

Case 1:10-cv-04652-CS   Document 235   Filed 04/03/14   Page 138 of 159   4991
DC5PBON5                          DiPascali - direct

1    Q.  And the version at the top shows a randomly selected

2    foreign counterparty with either Madoff Securities or MSIL for

3    Madoff London office?

4    A.  Yes, it does.

5    Q.  Let's take this -- these down, and let's go to Government

6    Exhibit 102-571.  Looking at this version, can we blow up the

7    top four entries again, Ms. Baskin.  Mr. DiPascali, what is

8    this one showing?

9    A.  It's a different version of a trade blotter.

10   Q.  And what is this one dated?

11   A.  5-1-03.

12   Q.  And how is this one different than the ones that we've

13   looked at before?

14   A.  In this version there are two differences.  The first entry

15   of Pictet et Cie is a foreign counterparty picked by Bernie and

16   randomly placed on the document carrying an account number of

17   FN486, which does not exist in my system except for this

18   purpose.  The 2930 bank used to say clearing banks, then it

19   said MSIL/Madoff.  Now it simply says MSIL.

20           There is, on this document, a customer account, FN92,

21   a bona fide customer in the Madoff system which was Bank of

22   Bermuda in Luxembourg.  So there are the two differences

23   between what we saw before and this is -- Madoff is no longer

24   resident here as a 2930 entity.  And on this same cluster of

25   trades there's actually a Madoff customer which was not on that

Case 1:10-cv-04652-LTS   Document 259   Filed 04/03/14   Page 2317 of 150   4992
DC5PBON5                          DiPascali - direct

1   first one you showed me because you cut the page off.

2   Q.  Oh, okay.

3   A.  These things get very, very complicated.

4   Q.  Let's first highlight the MSIL and let's highlight the

5   2900-3, and is that what you're referring to in terms of the

6   29003 going from MSIL/Madoff to just MSIL?

7   A.  Yes.

8   Q.  And looking at the Pictet et Cie?

9   A.  Pictet.

10  Q.  Can we highlight that?  And now what did you say was the

11  nature of the number on the left of that?

12  A.  It's not a viable account number in our system.  It was

13  simply assigned that account number for blotter purposes only.

14  Q.  And can we expand this document a little bit more,

15  Ms. Baskin.  I'm sorry, can we back out and instead of blowing

16  up just the first four entries, can we blow up maybe the first

17  ten.

18        Now, Mr. DiPascali, going down the right-hand side of

19  each of these -- of this document, do you see there is an

20  amount on the second-to-the-right column?

21  A.  I do.

22  Q.  What is that amount?

23  A.  It's the net monies on the trade.

24  Q.  So for the first one there is a -- what is the amount on

25  the first one?

Case 1:10-cv-04119-JSR   Document 233   Filed 04/03/14   Page 138 of 190   4993

1   A.  37,372.02.

2   Q.  Was that a positive or a negative?

3   A.  It shows negative.

4   Q.  And what's the next one?

5   A.  37,372.02 positive.

6   Q.  So how were those two numbers related to one another?

7   A.  Well, everything has two sides.  So if you were a buyer of

8   this quantity at that price for a cost of 37,372.02, the

9   counterparty would have been a seller for that amount at that

10  price for the money.  It's perfectly logical that they agree.

11  Q.  So in the first example, does this reflect MSIL and -- I'm

12  going to say it --

13  A.  Pictet et Cie.

14  Q.  -- as both sides of the transaction?

15  A.  That is what it's showing, yes.

16  Q.  And Pictet, the number for Pictet is made up, right?

17  A.  It's a made-up number, yes.

18  Q.  Now, going to the second transaction, let's look at both of

19  the amounts for that.

20  A.  The second transaction or the second grouping?

21  Q.  For the second grouping?

22  A.  The one beginning with FN92?

23  Q.  Yes.

24  A.  It's a viable customer account transacting 6675 United

25  Technologies for 411,847.50.

Case 1:10-cv-04652-LTS   Document 258   Filed 04/03/14   Page 339 of 15    4994

DC5PBON5                          DiPascali - direct

1    Q.  With who?

2    A.  With MSIL.

3    Q.  We can take that down.  Now, I would like to show you what

4    has been marked as Government Exhibit 102-286.  So as of now

5    we've looked at three versions of the blotters, right?

6    A.  Yes.

7    Q.  Looking at 102-286, what are we looking at here?

8    A.  You're looking at a trade blotter that is specific to

9    options.

10   Q.  And what is it dated?

11   A.  January 5, 2006.

12   Q.  So I want to give you a moment so you can just look at it

13   and review the entries on the first page and then I will turn

14   to the second page.  So tell me when you've had the opportunity

15   to review it and I'll change the pages.

16   A.  I'm good.

17   Q.  Can we go to Page 2, Ms. Baskin.

18   A.  I'm good again.

19   Q.  Okay.  So going back to Page 1, Mr. DiPascali, can you

20   describe for the jury generally what this version of the Madoff

21   Securities blotter shows?

22   A.  This version, quite frankly, might have been tied to one of

23   the versions that we previously saw, but it needed to be

24   treated differently because these are option transactions.  Or

25   this version may be tied to a completely different fourth

Case 1:10-cv-04652-PGG   Document 259   Filed 04/03/14   Page 140 of 190   4995

DC5PBON5                        DiPascali - direct

1   version that we have not yet seen.

2           That being said, what you're seeing here is if you

3   focus in on, let's say, the account numbers, for instance,

4   10P736 being the first one and so on and so on and so on, down

5   the line, they're all going to be 10P numbers.  They're

6   entirely made up.  The counterparties assigned to those account

7   numbers are simply a list of dealers that could conceivably do

8   index options overseas in an over-the-counter environment, a

9   list Bernie Madoff gave me.

10  Q.  Now, pausing for a moment.  Ms. Baskin, can you highlight

11  the first account number.  And is that the OP number that you

12  were referencing?

13  A.  Yes.

14  Q.  And are these all S's?

15  A.  They are, indeed.

16  Q.  What does the S mean?

17  A.  Sold.

18  Q.  And, Ms. Baskin, turning to the next page, can you

19  highlight the first account number with the OP.  Is that also

20  an OP?

21  A.  It is.

22  Q.  And that's an S?

23  A.  Correct.

24  Q.  And then do we hit a buy or a B?

25  A.  Yes, you do.

Case 1:10-cv-00258-rs Document 258 Filed 04/03/14 Page 3315 of 159    4996
DC5PBON5                              DiPascali - direct

1   Q.  What's the difference -- can we highlight the whole -- the

2   whole second transaction, Ms. Baskin.  What does the B mean?

3   A.  It's a purchase or bought.

4   Q.  And what do all the S's mean?

5   A.  Sold.

6   Q.  And in the -- in this example, who was it that bought the

7   options?

8   A.  The transaction referenced with the B is for a bona fide

9   Madoff client which would -- C1260, which was the American

10  Masters Broad Market Fund, a Tremont family fund.

11  Q.  So would this be a fake trade that would be in the account

12  of that client?

13  A.  This was a fake trade that was really booked into the

14  system, yes.

15  Q.  And all of the S's, starting with the one just above that

16  and on that whole entire page, how are those S's filled in in

17  this blotter?

18  A.  You want a brief description of how the blotter was built,

19  specifically speaking about that block of trades?

20  Q.  Yes, if we could.

21  A.  The system knew, because we told it so, that American

22  Masters Broad Market, a bona fide Madoff client, under account

23  number C1260 had already processed a fictitious trade.  That's

24  what the machine understood.  So it had that record in it.  It

25  also, when it understood that, created that clearing bank

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cv-04095-LTS   Document 39   Filed 04/03/14   Page 23 of 150   4997

DC5PBON5                            DiPascali - direct

1   record because it needed that balancing act we spoke about.

2          What they did was they took the clearing bank record,

3   which is the flip side of the customer record, and they sliced

4   it and diced it randomly.  They spliced the quantity randomly.

5   They then spliced how many times they were going to splice it

6   randomly, and they created a bunch of theoretical counterparty

7   transactions to fill up the space on a blotter.  And then they

8   went back and they filled in the blanks.  They assigned

9   randomly random account numbers, which then were tied to

10  randomly picked names, and it started filling in the data.

11         Keeping in mind that all they were doing was taking

12  this core thing that the system already knew, and they were

13  breaking it into little pieces.  If one took the 3668 American

14  Masters Broad Market prime transaction that the system already

15  knew, and that's the quantity it did, and it went back and

16  looked at all the little pieces that are the flip side on this

17  report of that trade, it would add up to 3668.

18         What was -- The objective of that was to have a

19  document that had a record of a customer ticket.  That's a

20  given.  That customer ticket is in the public domain.  Clearly,

21  the customer has it.  It's on his statement.  He's gotten a

22  confirmation.  There's a potential that a regulator may see

23  that ticket and ask the core originator of the ticket a

24  question.  You need to go to a blotter to give the answer.  The

25  question is typically going to be, who is the counterparty on

Case 1:10-cr-00228-LTS   Document 258   Filed 04/03/14   Page 4998 of 15X   4998
DC5PBON5                                   DiPascali - direct

1   that ticket?

2           Now, you already told American Masters they transacted

3   3668, and the logical question that someone is going to want to

4   ask potentially is, who did you do it with?  This document

5   creates the who you did it with scenario.  It basically says

6   3668 was done as a matter of record.  Now, splice that into 12

7   pieces that add up to 3668, ran that math randomly so none of

8   those two pieces have the same quantity because that's unlikely

9   in the real world that you transact all the same quantity with

10  different dealers.  Then assign random dealers to all of those

11  random quantities.

12          And when you're all done, print it.  And what you get

13  is that first block of fictitious trades being then presented

14  as if there were a real counterparty on -- or series of real

15  counterparties on the other side.  This document is what's

16  available in the real world.  We didn't have it.  We built it.

17  Q.  Now, Mr. DiPascali, who was it that programmed the process

18  that made this -- these random entries possible?

19  A.  George Perez was primarily responsible for it.

20  Q.  Now, stepping back, we've looked at all these different

21  versions of the blotters, and we're going to get into it some

22  more, but you said earlier that generating these false blotters

23  that you were piggybacking off of the blotters that were done

24  in House 5.  Do you recall testifying to that?

25  A.  I do.

Case 1:10-cr-00228-LTS   Document 258   Filed 04/03/14   Page 2345 of 150   4999

DC5PBON5                         DiPascali - direct

1    Q.  So before -- What was House 5?

2    A.  The trading room operation of the business.

3    Q.  And that's where the real trading in the business took

4    place?

5    A.  Correct.

6    Q.  And did the real part of the business have blotters?

7    A.  Sure.

8    Q.  And did those blotters reflect real stock transactions?

9    A.  Yes.

10   Q.  And real counterparties?

11   A.  Yes.

12   Q.  And real actual securities?

13   A.  Yes.

14   Q.  How was it that those blotters were used generally in

15   creating these false blotters in House 17?

16   A.  Those blotters were created before I had any decent level

17   of knowledge about how the machine was programmed, but I came

18   to learn and it was explained to me that when Bernie handed me

19   the, we need customized blotter project in the late '90s, early

20   2000s, that Liz has out there a set of blotters that always run

21   in the background.

22           I didn't have any great access to these documents.  I

23   don't even remember that I ever saw one for House 17 prior to

24   Bernie giving me the project, and if I did, I only glanced at

25   it.  So I knew, because Bernie told me, that Liz has things out

Case 1:10-cv-04285-JSR    Document 59    Filed 04/03/14    Page 3345 of 15000
DC5PBON5                                DiPascali - direct

1   there that are trade blotters.  Before you start to re-invent

2   the wheel, speak to her and see if she could help you or at

3   least put you on the right track as to how you should start

4   this project because part of it, and in Bernie's mind maybe a

5   lot of it, is already done; we just have to tweak it.  He had

6   no idea, and neither did I, the magnitude of what he was asking

7   me to do.

8           So I went to Liz and I said, Bernie wants me to build

9   blotters for my special accounts.  He also wants me to build

10  new blotters for all the accounts, and I didn't have a great

11  handle on the scope of what we were dealing with, but I was

12  looking to her as someone who understood what was built in the

13  '70s to see if there was anything out there to help me.  And

14  she said, yeah, we have trade blotters.  And I don't know who

15  she arranged to get me a sample copy of what they looked like

16  or whatever, but in relatively short order I started to

17  understand, okay, this is what they built when they

18  computerized the House 17.

19          And Liz was very clear to tell me that this was -- you

20  know, House 17 was a subset function of what they had built for

21  House 05.  You know, so I started there, and it sounded like a

22  logical place to start because the head of my IT department,

23  who was involved in the original build back in the '70s, is

24  telling me, yeah, don't re-invent the wheel, take what we have

25  and just hang things on it, and that's what we attempted to do.

Case 1:10-cv-04652-LTS   Document 259   Filed 04/03/24   Page 348 of 15x 5001

1   And this is one of those versions of hanging things on

2   something the firm already had.

3   Q.  And who did you then enlist to help you make these new

4   versions of the blotters?

5   A.  George Perez and Jerry O'Hara.

6   Q.  Now, I want to switch gears, slight.  Did there come a time

7   that you learned that the SEC was looking at Madoff Securities?

8   A.  Yes.

9   Q.  And how did you learn that the SEC was looking at Madoff

10  Securities?

11  A.  Bernie told me.

12  Q.  And when was this approximately that you learned it?

13  A.  Early 2004.

14  Q.  What did Mr. Madoff say to you about the inquiry that the

15  SEC had started?

16  A.  He gave me the impression he wasn't overly worried about it

17  because it was coming out of Washington, and he went off on

18  this whole, you know, rant about how Washington doesn't, you

19  know, run things, New York runs things, and he wasn't all that

20  concerned because he had some friends in Washington and he

21  would quickly come back with some sort of a -- he'll find out

22  what this is all about.  I've got to make some phone calls.

23  Q.  And did you have follow-up conversations with Mr. Madoff

24  about this SEC inquiry?

25  A.  Yes.

Case 1:10-cv-00286-LTS   Document 53   Filed 04/03/14   Page 341 of 191 5002

DC5PBON5                          DiPascali - direct

1   Q.  In those subsequent conversations, what did you learn from

2   Mr. Madoff?

3   A.  He told me he spoke to Lori Richards, the head of OC, which

4   is the Office of Compliance Inspections and Examinations in

5   Washington, which is a friend of his, or he said, and this was

6   no big deal.  This guy Eric Swanson was in charge of it.  Eric

7   works for Lori Richards, and we should -- we have to respond to

8   it.  That was his soft shoe version of telling me not to worry.

9   My gut told me when there's a letter that comes from the

10  Securities and Exchange Commission, whether he thinks so or

11  not, I'm worried.

12  Q.  And did you eventually see the letter that had come from

13  the Securities and Exchange Commission?

14  A.  Yes.

15  Q.  Well, let me show you what is in evidence as Government

16  Exhibit 632, and can we just sort of page through this slowly

17  and then go back to the beginning, Ms. Baskin.  Do you see that

18  someone signed this letter?

19  A.  Yes, sir.

20  Q.  Who signed it?

21  A.  Eric Swanson.

22  Q.  And where did Mr. Swanson work as of January 6th, 2004?

23  A.  He was a SEC employee in the Office of Examinations --

24  Compliance Examinations and Inspections, or something like

25  that, in Washington.

Case 1:10-cv-04652-LTS   Document 259   Filed 04/03/14   Page 348 of 150   5003
DC5PBON5                           DiPascali - direct

1    Q.  Can we go back to the first page.  I mean, who is this

2    letter addressed to?

3    A.  Peter Madoff.

4    Q.  And was this a letter that was sent in connection with this

5    SEC audit that you learned about in 2004?

6    A.  That's correct.

7    Q.  What, generally, was the SEC asking to look at at this

8    time?

9    A.  They were trying to get a feel for the scope of our

10   business in many different arenas.

11   Q.  What types of documents were they looking to get?

12   A.  They were looking for P and L spreadsheets, it said.  They

13   wanted responses as to who our customers were.  They wanted

14   responses as to what our schedules of commissions were, who

15   owned our firm, things of that nature.  I can't remember from

16   memory.  I'm literally reading it off the letter.

17   Q.  Okay.  But after this letter was received, were there

18   discussions at Madoff Securities about how to respond to it?

19   A.  Many.

20   Q.  Who was involved in the discussions about how to respond to

21   it?

22   A.  Myself, Jodi, Danny, Enrica, Bernie.

23   Q.  And in those discussions, what were some of the concerns

24   that were raised about this investigation?

25   A.  There were a lot of holes in the picture.  You know, if you

Case 1:10-cv-04285-LTS   Document 253   Filed 04/03/14   Page 345 of 15004
DC5PBON5                          DiPascali - direct

1   lifted the hatch on that manhole, you didn't know what you were

2   going to find, literally.  He was not prepared for something

3   like this.  There were not a lot of things that could be easily

4   explained if the Commission recognized that we had custody of

5   securities or we're at least purporting to have custody is one

6   big issue.

7           He had huge holes in that in his opinion, and he was

8   dissecting every word, every comma, every period of this letter

9   to craft his response so that no one would -- at the

10  Commission, certainly Eric Swanson, follow up and dig deeper.

11  Q.  And was that expressed in these discussions that were had

12  amongst the Madoff Securities employees that you described?

13  A.  Maybe not that graphically, but yes.

14  Q.  Now, what -- as these discussions progressed, did a

15  strategy develop -- you can take the document down -- did a

16  strategy develop as to how to respond to this request?

17  A.  Yes.

18  Q.  And who worked to craft that strategy?

19  A.  Bernie came up with the idea.

20  Q.  And what idea did he come up with?

21  A.  He decided that he was not going to display a picture to

22  Eric Swanson on paper that we held customer securities at all

23  or that we held or controlled customer cash at all.  It was a

24  very bizarre conversation when he first dropped this on me

25  because how does one do that?

Case 1:10-cv-04285-LTS  Document 258  Filed 04/03/17  Page 150 of 190

DC5PBON5                          DiPascali - direct                          5005

 1    Q.  Now, before getting into how does one do that, I think it
 2    makes sense to step back.  At this time, did Madoff Securities
 3    advertise or promote the fact that it had this large IA
 4    business?
 5    A.  Not at all.
 6    Q.  What did Madoff -- what was being done with that business
 7    in terms of letting the public know about it?
 8    A.  The objective was not to let the public know about it.
 9    Q.  And at that time, were efforts made to -- like previously
10    we looked at getting rid of A and A transactions in the A and B
11    statements; do you recall that?
12    A.  I do.
13    Q.  And was the purpose of making those changes to hide the
14    scope of the IA business?
15    A.  Absolutely.
16    Q.  And as time went by, did -- were similar efforts made to
17    hide the scope of the IA business?
18    A.  Yes.
19    Q.  And to be clear, were there any real securities in the IA
20    business?
21    A.  No.
22    Q.  Was there any real trading going on --
23    A.  No.
24    Q.  -- in the IA business?  But had the IA business told
25    customers and clients that, in fact, it was doing trades for

Case 1:10-cr-00228-LTS   Document 658   Filed 04/03/14   Page 151 of 190
DC5PBON5                            DiPascali - direct

1   them and that it, in fact, had their securities?

2   A.   That's correct.

3   Q.   And those conversations were had by Madoff Securities over

4   the phone; isn't that right?

5   A.   Correct.

6   Q.   And who were some of the people that would talk to

7   customers about the trading in their account over the years

8   leading up to this SEC investigation?

9   A.   Bernie, myself, Annette, Jodi, Annette's staff and my

10   staff.

11   Q.   And in any of the time, did you ever tell the clients that

12   their trading was not real?

13   A.   No.

14   Q.   Did you ever hear Annette tell the clients that the trading

15   wasn't real?

16   A.   No.

17   Q.   Did you ever hear Ms. Crupi tell the clients that the

18   trading was not real?

19   A.   No.

20   Q.   So now coming back to the SEC investigation, how was it

21   that Mr. Madoff proposed to make it appear that he did not have

22   custody of the client's securities or cash?

23   A.   There's two types, basically, of a brokerage account

24   structure, what's known as a cash account and what's known as

25   an RVP DVP account.  A cash account is what you're used to

Case 1:10-cv-02285-JS    Document 268    Filed 04/03/14    Page 153 of 191    5007
DC5PBON5                        DiPascali - direct

1    seeing when you have displayed these various customer

2    statements.  There's an incoming amount of cash.  That cash

3    gets adjusted for every transaction down the line

4    chronologically, and then there's a closing balance of cash.

5    And when you print that on a statement, it is implied and you

6    are confirming to your customer that you control that cash for

7    them.  Then there's a list of securities, and it is implied and

8    understood that you control those security holdings.  You are

9    holding them for a customer, which is why you reported that to

10   them on their statement.  That's a cash account.

11          An RVP DVP account is an account where a customer buys

12   a security, pays for it, and the broker then, with that money,

13   pays the counterparty but then he delivers the security to the

14   client's bank.  If you think about it for a second, what's left

15   in the brokerage account after that transaction is consummated?

16   Zero.  Because the customer sent in $100,000, you bought

17   $100,000 worth of stock.  When you used the customer's money to

18   pay for that stock with the counterparty, the 100,000 leaves

19   the customer's account.  The stock shows up in the customer's

20   account and, at that point, that's all that's in the account,

21   and then you send that stock to that customer's bank.  At the

22   end of the day, you have no cash.  You have no security

23   positions.

24          That is the structure of a received versus payment,

25   deliver versus payment architecture.  And, again, compared to a

Case 1:10-cv-04095-LTS   Document 259   Filed 04/03/14   Page 1315 of 190   5008

DC5PBON5                         DiPascali - direct

1    cash account, they're radically different because the cash

2    account is holding cash, the cash account is holding

3    securities, the RVP DVP account is holding no cash at the end

4    of the period and holding no securities.

5         What Bernie elected to do for Eric Swanson purposes in

6    the winter of '04 was to tell Washington he did not operate any

7    of his customer accounts, which they apparently knew about

8    because they asked him about customer accounts in the letter,

9    and he didn't know the scope of what they knew about; so he was

10   reluctant to answer.  So he was going to dodge the entire

11   question of customer cash, customer securities by giving the

12   SEC in Washington a fictitious set of statements in the format

13   of RVP DVP, which I found out when he made that decision had

14   already been running in the background of the computer designed

15   by Liz Weintraub 20 years earlier, never distributed to anyone.

16   They were kind of like a safety valve in case he needed it, and

17   now he needed it.

18        And that's where we progressed -- we took that frame

19   of mind and said, okay, we are now an RVP DVP situation.  And I

20   had to, in a very short order, educate myself as to what that

21   situation is because I had learned about it for the first time,

22   and then we proceeded to prepare the documents that Eric

23   Swanson in Washington needed.  So that first response to

24   Swanson there were -- was a twofold trick:  A, we weren't going

25   to give him the format that we actually had distributed to our

Case 1:10-cv-01285-JFS   Document 208   Filed 04/03/14   Page 154 of 190   5009

DC5PBON5                      DiPascali - direct

1   clients; B, we weren't going to tell him our client list.  We

2   were going to shrink it down to have a very workable number of

3   clients and their money and see where the chips landed.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:10-cv-04091-JSR   Document 259   Filed 04/03/14   Page 155 of 190   5010

Dc5rbon6                          DiPascali - direct

1    Q.  Mr. DiPascali, I want to unpack some of what you just said.

2    First, you said that under this RVP-DVP scenario, the

3    investment adviser doesn't keep custody of the securities,

4    right?

5    A.  Correct.

6    Q.  The investment adviser doesn't maintain an account that

7    would have cash or other assets of the client?

8    A.  Correct.

9    Q.  The investment adviser picks the securities but then

10   deposits them in that client's own bank?

11   A.  He acts as the broker to acquire the securities from

12   somewhere else, and then he delivers those same securities to

13   the client's bank.  He now has no securities in his possession.

14   Q.  Prior to making this decision, where had Madoff Securities

15   been telling its clients that their securities were custodied?

16   A.  At DTC and other global depositories.

17   Q.  By Madoff Securities?

18   A.  Yes.

19   Q.  This is completely contrary to what had been being told to

20   the clients?

21   A.  This is a 180 from everything.

22   Q.  Just to keep perspective, all of the trading is just fake,

23   right?

24           MR. KRANTZ:  Objection, your Honor.

25           THE COURT:  Overruled you may answer.

Case 1:10-cv-04285-LTS   Document 59-3   Filed 04/03/24   Page 158 of 192

5011

Dc5rbon6                          DiPascali - direct

1   A.  Yes, all the trading is fake.

2   Q.  Mr. Madoff and Madoff Securities had been telling its

3   clients that those fake trades it maintained custody of itself?

4   A.  We processed fake trades to clients.  We needed to generate

5   backup support information.  Those fake trades in one scenario

6   could conceivably, and we had the books and records to back it

7   up, be at DTC.  That's why the DTC report we spoke about the

8   other day was created.

9         Those same fictitious trades, if the question is asked

10  a little differently by a regulator, an auditor, or somebody he

11  doesn't like, we don't hold securities at all, we transact our

12  business purely on an RVP-DVP basis, we are purely an executing

13  broker is what Bernie used to say, I don't hold money, I don't

14  hold securities, and here is the statement to prove it.  We had

15  that set of phony books and records backing up that scenario

16  for the fictitious trading.  He had many routes he could take

17  depending on who was asking the question.

18  Q.  You said that there were these documents that were being

19  generated in the background.  Do you recall that?

20  A.  Yes.

21  Q.  When you went to retrieve those documents, were things not

22  right for the scenario that you wanted to depict to the SEC?

23  A.  When I went to retrieve it, what we tried to do is print a

24  statement of account for the select few customers Bernie was

25  going to disclose to Eric Swanson.  When he first told me about

Case 1:10-cv-01288-CJS    Document 259    Filed 04/03/14    Page 1571 of 191    5012
Dc5rbon6                          DiPascali - direct

1  this and this was how he was going to tackle it and I found out

2  that Liz Weintraub had already created all of these books and

3  records and they were resident somewhere in our system or maybe

4  even physically on paper in the warehouse or downstairs, I was

5  ecstatic.  He's going to on his own pick a bunch of random

6  clients that he is comfortable with disclosing to the

7  commission and we are going to get somebody from records or the

8  computer department to print the RVP-DVP statements, staple

9  them, put them in an envelope, and mail them to D.C.

10         So I did exactly that.  I don't remember if I had to

11  reprint the statements from digital records or actually pull

12  the original RVP-DVP statements from paper archives.  I gave

13  him what he wanted, which was the RVP-DVP formatted statements

14  for a select few accounts, and he immediately came back and

15  said this is no damn good.

16  Q.  Why was it no damn good?

17  A.  Because the title block on these accounts was wrong, in his

18  opinion.

19  Q.  When you say title block, what is it that you are referring

20  to?

21  A.  The name of the client.

22  Q.  Why don't we pull one up.

23         THE COURT:  You have about five minutes to break, Mr.

24  Zach.

25         MR. ZACH:  OK, your Honor.  Thank you very much.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cr-00228-LTS   Document 259   Filed 04/05/11   Page 1535 of 150   5013
Dc5rbon6
DiPascali - direct

1          I am going to introduce a subset of what is already in

2    evidence as Government Exhibit 101-57.  That subset is 101-57H.

3          THE COURT:  H as in Harold?

4          MR. ZACH:  Yes, your Honor.

5          THE COURT:  Any objection to 101-57H?

6          MR. KRANTZ:  No objection.

7          MR. MEHLER:  No objection.

8          MR. FRISCH:  No objection.

9          MR. BRESLIN:  No objection.

10          MR. RIOPELLE:  No objection.

11          THE COURT:  Government Exhibit 101-57H is admitted in

12    evidence.

13          (Government's Exhibit 101-57H received in evidence)

14          MR. ZACH:  May I publish it?

15          THE COURT:  Yes, you may.

16          MR. ZACH:  Can we make this so it is readable.

17    Q.  Do you recognize what kind of document this is?

18    A.  It's either a screenshot of a statement or a customer

19    ledger.

20    Q.  What would the title block be on this document?

21    A.  Upper left-hand corner, says Kesagami Limited, 16/F Silver

22    something Plaza, 1 Kelsington Street possibly, Central Hong

23    Kong.  That's the title block.  The title would be Kesagami

24    Limited, and it goes on to express the address of that entity.

25    That is a title block.

Case 1:10-cv-04652-GFS   Document 258   Filed 04/03/14   Page 159 of 15   5014

Dc5rbon6                          DiPascali - direct

1            MR. ZACH:  I think I can read it a little bit better

2       here.  K-E-S-A-G-A-M-I.

3       Q.  Mr. DiPascali, was this similar to the type of title block

4       that Mr. Madoff thought was wrong?

5       A.  Yes.

6       Q.  What did he say was wrong with it?

7       A.  In an RVP-DVP scenario, once again you get in funds from

8       your client, you buy stock with that money, and you deliver

9       those stocks to a custodian bank that represents that client,

10      an outside bank that's going to hold the securities in their

11      vault for that client.

12           When the RVP-DVP formatted statement for Kesagami and

13      others was retrieved by myself and given to Bernie, the title

14      block looked like this, which was the existing title block of

15      the account.  He started throwing himself around that it

16      doesn't reference the bank, there should be a title like

17      "Citicorp for the Exclusive Benefit of Kesagami," which would

18      indicate that we are transacting business for Kesagami by

19      delivering securities for Citicorp for Kesagami's benefit.

20           The title blocks of RVP-DVP type accounts, he

21      explained to me, should have a bank on the top line and then

22      some verbiage that said this bank is operating for the benefit

23      of, and then the client.  These title blocks simply had the

24      client's name, with no reference to a custodial bank, and he

25      didn't think they were worth sending out.  He was very

Case 1:10-cv-04652-LTS    Document 55    Filed 04/03/14    Page 5 of 15    5015

Dc5rbon6                          DiPascali - direct

1    perturbed:  I can't send something like this out, it's a very

2    big red flag?

3    Q.   Who was present when Mr. Madoff was saying these things

4    about the title blocks?

5    A.   Everyone in my office.

6    Q.   Did this include Ms. Crupi?

7    A.   Yes.

8    Q.   Then was there a project to find banks to insert in the

9    title blocks?

10   A.   Yes.

11   Q.   Who was it that helped pick those banks?

12   A.   Myself and Jodi.

13   Q.   Did you observe how Ms. Crupi was able to find those banks

14   to insert on these statements?

15   A.   Yes.

16   Q.   How did she do it?

17   A.   She locked up companies on the Internet that had some

18   remote synergism to the name of the stock, the name of the

19   client.  Bernie was saying, well, when he brought this to my

20   attention that these are no damn good, he was insisting banks

21   have to be part of this title, we have to have a bank to

22   deliver the securities to, the bank should be holding

23   securities for the benefit of the customer.

24           My response was, where the hell do I get these banks

25   from?  His response was, well, just make 'em up.  How are we

Case 1:10-cv-04652-RS   Document 259   Filed 04/03/14   Page 161 of 190   5016

1    going to do that?  Well, and he started rambling off the names

2    of major international banks.  You could put Chase, you could

3    put BankAmerica, you could put JPMorgan, you could put this,

4    you could put that.  He then, as he was speaking, preferred to

5    put foreign banks because he's going to deliver the stuff to

6    Washington.

7            A lot of these projects with Bernie Madoff were very,

8    very fluid.  He would change his mind as he thought things out

9    loud.  One of the things he thought of out loud was, well, if

10   I'm going to put Citibank to be the custodian of Kesagami, that

11   doesn't make a whole lot of sense, because Washington could

12   just call Citibank and maybe there is somebody at Citibank or

13   maybe there is someone in Washington that knows someone in the

14   custody department of Citibank, and they are obviously not

15   going to know this customer.

16           But if I give them a foreign bank, there is much less

17   likelihood that Eric Swanson at the commission is going to call

18   someplace in Hong Kong or Tokyo or Luxembourg.  It is just not

19   in his pay grade.  He is probably not allowed to make an

20   international call.  He is a government SEC employee.  So we

21   will get over by bearding this with a foreign bank.

22           During that discussion, hearing that he is simply

23   willing to randomly put foreign banks in the title block of

24   Madoff consumers to produce an RVP-DVP formatted statement, we

25   started rattling off foreign banks that had some relationship

Case 1:10-cv-02285-RF5    Document 23B    Filed 04/05/14    Page 3531 of 150    5017

Dc5rbon6                        DiPascali - direct

1    to the existing title block.  There was research done quickly

2    on Google and on the Internet and names were popping up in the

3    room.  Those names eventually became part of the title block of

4    our customers.

5            MR. ZACH:  I think that is a good place to break, your

6    Honor.

7            THE COURT:  Thank you.  We will begin our afternoon

8    break now of 15 minutes.  Members of the jury, please be ready

9    in the jury room shortly after 3:30.  Enjoy your break.

10   Continue to keep your thoughts to yourselves.  All rise.  Ms.

11   Ng will escort the jury out.  Mr. DiPascali, you may step down.

12           (Recess)

13           THE COURT:  Mr. Zach.

14           MR. ZACH:  Thank you, your Honor.

15   BY MR. ZACH:

16   Q.  Mr. DiPascali, before the break you were testifying about

17   how you and Ms. Crupi picked banks using the Internet.  Do you

18   recall that?

19   A.  Yes.

20   Q.  Did Mr. Madoff instruct you all as to how to match up a

21   given bank with a given account title?

22   A.  Yes.

23   Q.  What sort of instruction was given to you and Ms. Crupi?

24   A.  It had to make sense.  For instance, if the customer that

25   he had chosen to be part of his special list of customers was

Case 1:10-cv-00258-rs  Document 258  Filed 04/03/14  Page 163 of 190  5018

Dc5rbon6                        DiPascali - direct

1   domiciled in a particular country, it would make sense to have

2   a bank from that country, was one of his instructions.

3          Some of the clients on the list -- Fairfield, for

4   example, was on the list, a big New York City-based hedge fund.

5   But Fairfield used a custody agent in Amsterdam to handle some

6   of its business.  Their title block had already said Citco,

7   which is this bank in Amsterdam, financial service company, it

8   says "Citco for the Benefit of Fairfield."

9          So he decided to structure the other titles of the

10  other accounts that did not have these custody banks in the

11  title block similarly to the way Fairfield was.  If it was a

12  domestic entity, we would use a domestic bank.  If it was a

13  foreign entity, we would use a foreign bank, and more

14  specifically a bank domiciled in that country.  Then we

15  proceeded from there.

16  Q.  Were you and Ms. Crupi able to amass banks to put on these

17  statements using the Internet?

18  A.  And other sources.

19  Q.  Let me now show you what is in evidence as government

20  600-10.  And can we go to page 67.  Thank you, Ms. Baskin.

21          Now, Mr. DiPascali, can you tell us what we are

22  looking at here.

23  A.  I don't know if your screen is jumping the way mine is, but

24  it is difficult to read.

25          THE COURT:  Do you think it would help if he turned

Case 1:10-cv-04285-JFK   Document 259   Filed 04/03/14   Page 3645 of 15X   5019

Dc5rbon6                     DiPascali - direct

1    his screen on and off?

2              THE WITNESS:  It's just flashing.

3    A.  What was the question again?  Sorry.

4    Q.  Do you recognize the document that we are looking at here?

5    A.  I do.

6    Q.  What are we looking at?

7    A.  You're looking at a RVP-DVP structured statement.

8    Q.  We previously looked at a statement for Kesagami.  Do you

9    recall that?

10   A.  I do.

11   Q.  What is different between the statement that we looked at

12   earlier and this statement.

13   A.  Again, this is in RVP-DVP format but the title block has

14   now been altered.

15   Q.  Ms. Baskin, on the PDF can we highlight?  That's fine.  Can

16   we move the cursor to where the title block is, maybe a little

17   bit above.

18             Ms. Baskin has just highlighted part of the document.

19   Is that the title block?

20   A.  It is.

21   Q.  What indicates to you that this is in an RVP-DVP statement?

22   A.  There is a bunch of stuff.  In the body of the transaction

23   portion, there is no balance forward.  I think if you looked at

24   the other statement, you would find an incoming money balance,

25   cash balance.  The rest of the information, at least on this

08-01789-cgm   Doc 18596-2   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 2

Dc5rbon6                           DiPascali - direct

1   page, is probably similar because it represents the

2   transactions for the month of June, which were consistent on

3   both statements.  The title block has been changed, as we

4   mentioned.  That would pretty much do it on this page.

5   Q.  Can you describe what is different about the title block

6   here.

7   A.  Kesagami had the name on top and their address in Hong

8   Kong.  Now this title block reflects that HSBC Bank of

9   Lichtenstein is the custodian for Kesagami, which is absolutely

10  not true.  They have probably never heard of Kesagami.

11  Q.  Previously you said the reason for taking the RVP-DVP

12  format was because it makes it look like the securities are

13  kept at the client's bank.  Do you recall that testimony?

14  A.  I do.

15  Q.  Does this title block have that effect to someone that

16  would be observing it?

17  A.  Yes.

18  Q.  What is the name of the bank again?

19  A.  HSBC.

20  Q.  When the says custodian, does that mean that HSBC has

21  custody of or suggest that HSBC has custody of the securities

22  listed on this statement?

23  A.  It doesn't suggest it.  It says it.  They are the custodian

24  for the benefit of Kesagami.

25  Q.  You pointed out on the first line, where it says "balance

08-01789-cgm   Doc 18596-2   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 2
Pg 167 of 191

1    forward," that there is no balance forward there?

2    A.  That's correct.

3    Q.  I may be pressing my luck, but can we highlight that?  Is

4    that the area that you are talking about?

5    A.  Yes.

6    Q.  I'm sorry, Ms. Baskin.  Can we take this down for a second

7    and bring up 101-57H, which we looked at earlier.  Blow it up.

8            Looking at the top left, this is what we looked at

9    earlier, right, Mr. DiPascali?

10   A.  Yes, it is.

11   Q.  This just says "Kesagami Limited" and has the address,

12   right?

13   A.  That's correct.

14   Q.  Do you see there is a balance forward there?

15   A.  Yes, I do.

16   Q.  Is there a balance forward in the Kesagami Limited

17   statement that is not in the RVP-DVP format?

18   A.  That would be this one, and there is a balance.

19   Q.  How much is that balance?

20   A.  1,029,257.50.

21   Q.  Can you explain to the jury why there is a balance forward

22   on the account statement we see here, the type that went to the

23   client, and there is not a balance forward statement on the

24   revised statement that was sent to the SEC?

25   A.  Because the RVP-DVP style of statement indicates that the

Case 1:10-cv-04285-PGG   Document 153   Filed 04/05/14   Page 231 of 191   5022

Dc5rbon6                          DiPascali - direct

1    broker carries no cash for the customer, nor does he carry any

2    security positions in custody for the customer.  It is designed

3    to reflect a trade the customer did.  You saw on that first

4    statement of RVP-DVP format there were a list of trades.  But

5    it will go on to show that the stock purchased was delivered

6    out.

7            That stock purchase was funded with the customer

8    money.  Again, $100,000 comes into the account and pays for

9    $100,000 worth of securities; therefore, the balance with that

10   customer on that statement would be zero.  Then those

11   securities get delivered to that customer's custodian bank, in

12   this scenario HSBC.  You will naturally not find any closing

13   cash balance on an RVP type statement, and therefore you would

14   have no incoming balance, because your incoming balance is

15   simply a repetition of what your closing balance was the prior

16   month.

17   Q.  Ms. Baskin, can we go back to 600-10, and can we go to the

18   next page.

19           Looking briefly at this page, Mr. DiPascali, what

20   types of securities do you see here?

21   A.  All stocks.

22   Q.  Can we go to the next page.  At the end, at the very

23   bottom, do you see where it says "new balance"?

24   A.  That is correct.

25   Q.  What is the new balance?

Case 1:10-cv-04511-LTS   Document 258   Filed 04/03/14   Page 2 of 1 5023

Dc5rbon6                        DiPascali - direct

1   A.   Zero.

2   Q.   Why is the new balance in the RVP-DVP statement zero?

3   A.   Because in this format it is understood the broker carries

4   no money for the client.  It's the same explanation I just gave

5   why there was no opening balance.  There is activity in

6   between, all of which has been accounted for and netted to

7   zero, and therefore your new balance after that activity would

8   again be zero.

9   Q.   Ms. Baskin, can we go back to 101-57H.  Can we skip ahead

10  four pages, please.  Blow that up.

11          This is the prior Kesagami Limited statement.  Do you

12  see where it says "new balance" here?

13  A.   I do.

14  Q.   Is there a new balance moving forward?

15  A.   There is.

16  Q.   Is there a balance here for the same reasons that you have

17  been talking about?

18  A.   Exactly.

19  Q.   Can we highlight those, Ms. Baskin.

20          I have one more question to ask you.  Do you see right

21  above the new balance where it says Fidelity Spartan?

22  A.   Yes.

23  Q.   What is Fidelity Spartan?

24  A.   It is a money market instrument issued by Fidelity.

25  Q.   What purpose did it serve -- let me ask this.  Is that a

Case 1:10-cv-00258-LTS   Document 58   Filed 04/03/14   Page 169 of 191   5024

Dc5rbon6                          DiPascali - direct

1   real security?  Is that an actual Fidelity Spartan security in

2   this account?

3   A.  No.

4   Q.  This is fictitious as well, right?

5   A.  Yes.

6   Q.  But in the real world, putting aside the Madoff statements,

7   what is Fidelity Spartan?

8   A.  It's a money market instrument of the Fidelity Corporation.

9   Q.  For what reason was Fidelity Spartan included in account

10  statements in the IA accounts?

11  A.  To reduce the available cash balance of the accounts at the

12  end of a particular period.  In this case you will see that

13  trade went through on June 30th, the end of the June 30th, '03

14  period.  It was used as a balancing act for cash.

15  Q.  Would that money market, in theory or real, earn some

16  interest?

17  A.  It would.

18  Q.  Would we find Fidelity money market shares on the RVP-DVP

19  statements?

20  A.  No.

21  Q.  Let's go back to 600-10.  You see the new balance at zero,

22  and above it we don't see any Fidelity Spartan, do we?

23  A.  You won't.

24  Q.  Can you explain why that is.

25  A.  Because it is illogical in an RVP-DVP for a broker to

Case 1:10-cv-04285-LTS    Document 69    Filed 04/03/14    Page 23 of 150    5025

Dc5rbon6                        DiPascali - direct

1    transact in a money market instrument of another brokerage

2    firm.  It doesn't happen in the real world, so it couldn't

3    happen on our fake statements that were intended to present the

4    scenario as if it was the real world.

5          Bernie recognized that you couldn't have certain

6    things on an RVP-DVP formatted statement.  For instance, you

7    couldn't have dividends, either, because dividends are

8    collected by the broker that's holding the stock.  We just

9    painted a picture that we are not holding the stock, HSBC is

10    holding the stock.  So it would be very irregular for Madoff to

11    credit the customer the dividend.  The dividend is going to get

12    mailed to HSBC because they are holding the stock.

13          In an RVP-DVP environment there are certain

14    transactions that are resident on a cash statement that can't

15    possibly be resident in the real world on an RVP-DVP statement,

16    so you don't put them there.  If you did, you would be tipping

17    your hand that that is not a real document.

18    Q.  Was part of the process in preparing these statements to go

19    to the SEC to remove things like that Fidelity money market

20    share that we saw?

21    A.  There were certain things, I don't know if Fidelity was one

22    of them, that might have been removed in the original

23    architecture of Liz Weintraub's RVP-DVP.  I don't remember

24    which items were removed.  But there were items that were not

25    removed in the original Liz Weintraub version of that document

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cr-00228-LTS   Document 358   Filed 04/03/14   Page 23 of 150   5026
Dc5rbon6                    DiPascali - direct

1    that needed to be removed, yes.

2    Q.  Did you have discussions with Mr. Madoff about the fact

3    that things like the Fidelity money market needed to be

4    removed?

5    A.  He told me.

6    Q.  You can take that down, Ms. Baskin.

7          Another aspect of this SEC preparation that was being

8    done at Madoff you said was to limit the number of customers

9    that was disclosed to Mr. Swanson and the SEC, is that right?

10   A.  That is correct.

11   Q.  Stepping back for a moment, at this point in 2004

12   approximately how many customers did Madoff Securities have in

13   its investment advisory business?

14   A.  Thousands.

15   Q.  How many were ultimately disclosed to Mr. Swanson,

16   approximately?

17   A.  Couple of dozen at best.

18   Q.  What was the purpose of keeping from the SEC the fact that

19   you had these thousands of clients?

20   A.  He couldn't disclose to the SEC the scope of his customer

21   business.

22   Q.  Were there discussions about which clients to provide to

23   the SEC?

24   A.  Yes.

25   Q.  Who was involved in those discussions about picking and

Case 1:10-cv-04652-JGK    Document 258    Filed 04/03/14    Page 23 of 15

Dc5rbon6                              DiPascali - direct

1    choosing these clients?

2    A.  He spearheaded that effort.  He stated that there were

3    certain clients that everyone knows we trade for, Fairfield for

4    instance, a huge Greenwich-New York based hedge fund that had

5    previously issued an offering circular to its shareholders or

6    their potential shareholders, and, if not mentioned him by

7    name, gave a description of the money manager that was going to

8    run the funds that was so close to Bernie Madoff that they

9    might as well have mentioned his name.

10        He always, when constructing a special group of

11   accounts to show anyone, included Fairfield, because he was

12   confident that the intelligent immediate world knew that he was

13   doing that business anyway, so how could he leave it off.  So

14   Fairfield was the first account that had to be there.

15        If Fairfield is there, then their New York subsidiary

16   hedge fund, Greenwich Century, had to be there as well.  And

17   there were discussions about who had to be on this list.

18   Q.  Who was present for those discussions?

19   A.  Everyone in my area.

20   Q.  Was Ms. Crupi present?

21   A.  Yes.

22   Q.  Were you present?

23   A.  Yes.

24   Q.  Who were some of the other people that were present?

25   A.  Eric Lipkin, Robert Cardille, Rick Flores, Erin, obviously

Case 1:10-cv-05287-LTS  Document 258  Filed 04/03/14  Page 23 of 159
5028
Dc5rbon6                      DiPascali - direct

1    myself, and Jodi Crupi.

2    Q.  These were discussions about which clients to pick to put

3    on the SEC disclosure, right?

4    A.  That's correct.

5    Q.  Were there discussions about who the world or the public at

6    large knew Madoff did business with?  Was that part of those

7    discussions as well?

8    A.  Yes.  A lot of these discussions he was having with himself

9    out loud.

10   Q.  What do you mean by that?

11   A.  He did that all the time.  He would come in and throw

12   something at me and then talk about --

13   Q.  You mean literally throw something at you?

14   A.  No.  He would throw an idea or thought or bounce something

15   off me:  Hey, I've been thinking about this.  He was never,

16   ever, ever, except on few occasions, private about it.  It was

17   not let's call Frank into a meeting, light a cigar, close the

18   door, and go on to commit this crime.  It was an open

19   environment.  And at times he didn't know when to shut the hell

20   up, in my opinion.

21   Q.  What do you mean by he didn't know when to shut the hell

22   up, in your opinion?

23   A.  There were times where I cringed over things that came out

24   of his mouth regarding this fraud, things that I know that

25   people that I believed had no clue there was a fraud would now

Case 1:10-cr-00228-LTS    Document 258    Filed 04/05/12    Page 23 of 130    5029

Dc5rbon6                        DiPascali - direct

1    be tipped off that there possibly was.  I literally told him

2    shut up or walked him out in the hallway and said, would you

3    just please stop, you cannot continue to talk out loud like

4    this, this is not right.  And he'd go, oh, OK, OK, I got you, I

5    got you, but I need you to do this, this, and this.  He was a

6    frantic lunatic sometimes.

7            There were many times where he would debate in his own

8    head out loud as to which plan of attack he was going to take

9    and occasionally turn for input or put someone on a project

10   over here that was gathering some information for him and then

11   turn and talk to me about something and then go back and forth.

12   It was a big room with a six-man desk, and he worked the room

13   and he talked out loud a lot.

14   Q.  That sort of talking occurred here?

15   A.  Exactly that.

16   Q.  Based on those conversations and your discussions with Ms.

17   Crupi, you and Ms. Crupi went and looked on the Internet to

18   find some of these banks, right?

19   A.  That's correct.

20   Q.  As part of this process, did you require the assistance of

21   Mr. Perez and Mr. O'Hara?

22   A.  Yes.

23   Q.  What did you need their help with?

24   A.  If I remember right, we already had like some special

25   blotters that were being produced in the background but not for

Case 1:10-cv-04652-PGG    Document 258    Filed 04/03/14    Page 23 of 130  5030
Dc5rbon6                              DiPascali - direct

 1    a specific purpose.  They were for everyone.  Every time any

 2    client in this whole client list did any transaction, a blotter

 3    was created, a blotter in a format that was created by Liz

 4    Weintraub and then in an alternative format.  The MSIL thing we

 5    saw might have been part of that format at that time.  But that

 6    was for everyone.

 7             A blotter is in a binder, so you can't -- if you're

 8    going to only give the SEC a couple of dozen accounts and say

 9    here, here is my client list, if they ask for a blotter, you

10    can't open up this 3,000-page binder and just rip off the

11    clients that they are looking at.  You need to print a new

12    binder, in essence.

13             The first order of business when he started to go with

14    this RVP-DVP format, he needed to have internal books and

15    records that now for the first time were specific to this

16    specific list of special clients.  I needed new blotters.  I

17    don't remember if I needed blotters in the same configuration,

18    I'm not sure.  But we certainly needed blotters that were

19    specific to this special group, so they had to be run.

20    Q.  Stepping back, the blotters that you said had been being

21    run sort of in the background had all of or many of the Madoff

22    clients in the paperwork, is that fair?

23    A.  Correct.

24             (Continued on next page)

25

Case 1:10-cr-00228-LTS   Document 258   Filed 04/03/14   Page 23 of 15   5031

DC5PBON7                          DiPascali - direct

1    Q.  And the blotters that you needed had to be just of that

2    limited subset that was decided to be provided to the SEC,

3    right?

4    A.  That is correct as well.

5    Q.  Now, when you enlisted the help of Mr. Perez and Mr. O'Hara

6    in connection with making these blotters, did you tell them the

7    full truth about what you were doing?

8    A.  No.

9    Q.  Now, with respect to the number of accounts that you needed

10   to provide data for, what did you tell them needed to be

11   provided?

12   A.  I told them it was standard practice in the industry that

13   when the SEC asks a group of specific questions about a

14   specific group of clients, you basically give them what they're

15   asking for and you don't need to give them anything more.

16   Q.  And you told them that the SEC only requested information

17   for these specific clients?

18   A.  Yes.

19   Q.  Now, with respect to the trading data that was going to be

20   put on those blotters, what did you tell them about that?

21   A.  In what regard?  Because there were many, many, many

22   discussions about how those blotters were eventually going to

23   be put together.

24   Q.  But what are some of the things that you told them about

25   what information was going to -- where the information was

1    going to come from to be put on the blotters?

2              MR. MEHLER:  Objection, your Honor.  May I confer with

3    Mr. Zach?

4              THE COURT:  Yes, please.

5              (Counsel conferring)

6              THE COURT:  You may continue.

7              MR. ZACH:  Could you read back my question, please.

8              (Record read)

9    A.  What had to be done was once we established the -- who

10   these special customers are, I think a set of blotters was

11   produced with those special customers, which I then delivered

12   to Bernie for his review.  And they were nowhere near what he

13   had envisioned we should be doing.  So he explained to me that

14   no, no, no, no, these blotters had to have counterparties on

15   them that I'm transacting with in London or in Europe.

16             And the way an RVP and DVP scenario works is we're

17   going to say that MSIL buys stock from Credit Suisse, and then

18   MSIL flips it to Madoff and Madoff flips it to the customer.

19   When I say flip, a transaction has occurred so that Credit

20   Suisse is the counterparty that sells to London.  London then

21   flips it to New York.  New York flips it to the client.  So the

22   eventual Fairfield ownership of stock, if you go to the root of

23   the trade, the seller was Credit Suisse, a foreign

24   counterparty.

25             Once I understood the concept, we adjusted how the

Case 1:10-cr-00228-LTS   Document 358   Filed 04/03/14   Page 23 of 150   5033
DC5PBON7            DiPascali - direct

1  blotters were displayed and tweaked them along the way, and the

2  conclusion I came up with was just to try to get it as random

3  as possible.  So I think the question was what methods were

4  used or --

5  Q.  My question was what -- what did you -- or where did you

6  tell Mr. Perez and Mr. O'Hara that the trades were coming from?

7  A.  I implied that they were being done in Europe.

8  Q.  And in terms of constructing -- and in terms of

9  constructing the blotters, what did you tell them was the way

10 that this should be produced?

11 A.  I represented a scenario that, look, these trades are being

12 done in Europe.  London's got all of this information.  I'm new

13 at this game.  I can't -- I don't like the guys in London.  I

14 don't like dealing with the guys in London.  I don't know what

15 system they have.  I don't even know where to get this

16 information, but the blotters that we have in-house now for

17 this purpose are not complete.

18         They don't know the full picture, and we got to show

19 the full picture.  And I can't deal with London, and I don't

20 know what format they have their information in.  I don't want

21 to start a whole process here.  He has to respond.  So what I'm

22 going to do is we're just going to fudge it.

23         We're just going to use a bunch of brokers that we

24 typically deal with in London and, quote, call them our

25 counterparty and lay them out there in a file somewhere.  And

Case 1:10-cr-00228-LTS   Document 258   Filed 04/03/14   Page 23 of 150   5034

DC5PBON7                       DiPascali - direct

1   then we're going to take the root trade that Fairfield has on

2   their statement and we're going to reverse engineer that trade

3   by slicing it and dicing it a bazillion ways so that it

4   displays that the root sale occurred by various brokers in

5   London that we typically do business with anyway.  You've got

6   to throw that in if you're trying to fool your computer guy.

7            So I led them to believe that these shares were all

8   being transacted in some other platform, but for ease of

9   purpose, because we're under the gun and because Bernie was,

10  you know, climbing all over me to get this document right so he

11  could deliver it to the SEC, we're going to fudge it.  We were

12  just going to give them a set of documents that is made up but,

13  in essence, is what we do anyway.

14  Q.  So to be clear, did you tell them that the SEC was looking

15  for documents related to Madoff Securities?

16  A.  Yeah, they knew that.

17  Q.  And did you tell them that these documents that you,

18  Mr. Perez and Mr. O'Hara were working on might ultimately be

19  provided to the SEC?

20  A.  That was the intent of printing the documents.

21  Q.  And the scenario of the trading that you presented to them

22  was that the trading was happening in Europe --

23  A.  Correct.

24  Q.  -- fair?  But instead of actually getting the trading stuff

25  in Europe, you guys were just going to make up random trades to

Case 1:10-cv-04285-JFK    Document 258    Filed 04/03/14    Page 3805 of 15x    5035
DC5PBON7                        DiPascali - direct

```
 1 │ put in these blotters?
 2 │          MR. MEHLER:  Objection.
 3 │          MR. KRANTZ:  Objection.
 4 │          MR. MEHLER:  Leading.
 5 │          THE COURT:  Sustained.
 6 │          MR. ZACH:  I can rephrase.
 7 │          THE COURT:  As you should.  Yes, please.
 8 │ BY MR. ZACH:
 9 │ Q.  So what -- instead of getting the information from London,
10 │ what did you tell them, or what did you do to provide the
11 │ trading information that was -- could ultimately go to the SEC?
12 │          MR. KRANTZ:  Objection, your Honor.  Could I consult?
13 │          THE COURT:  Yes, please.
14 │          (Counsel conferring)
15 │          MR. KRANTZ:  Your Honor, perhaps instead of going into
16 │ the robing room, I could state my objection in three words.
17 │          THE COURT:  Yes.
18 │          MR. KRANTZ:  Asked and answered.
19 │          THE COURT:  I -- That is sustained, but a further
20 │ problem is it's compound, and so I will let Mr. Zach
21 │ reformulate with a non-compound question.
22 │          MR. ZACH:  Thank you.
23 │ Q.  What did you discuss with them about the nature of the
24 │ information that was going to be on these blotters that were
25 │ ultimately perhaps going to go to the SEC?
```

Case 1:10-cr-00228-LTS   Document 358   Filed 04/05/11   Page 181 of 191   5036
DC5PBON7
DiPascali - direct

1    A.  I inferred that the trades were happening --

2            MR. KRANTZ:  Same objection, your Honor.  Sorry.

3            THE COURT:  Asked and answered is overruled.  You may

4    answer that question.

5    A.  I inferred that the trades were happening, but that we were

6    going to create a set of books and records to satisfy the SEC's

7    request from basically, approximately, almost accurate data of

8    counterparties that we were trading with, and then we were

9    going to shuffle all of that up and produce a report that would

10   maybe be close to what we actually do, maybe not.  But what it

11   would be is a blotter that illustrates that we trade with

12   foreign counterparties.

13           THE COURT:  We have about four minutes until the end

14   of the day.

15           MR. ZACH:  Sure.  Thank you, your Honor.

16   Q.  So keeping with what you told Mr. Perez and Mr. O'Hara the

17   records that were ultimately going to go to the SEC would be,

18   was that your understanding that those type of records were

19   improper?

20           MR. KRANTZ:  Objection.

21           MR. MEHLER:  Objection.

22           THE COURT:  Sustained.

23   Q.  Did you think -- Mr. DiPascali, was it your understanding

24   that you could create blotters using random information and

25   provide that to the SEC?

Case 1:10-cr-00228-LTS   Document 358   Filed 04/03/14   Page 181 of 190    5037

DC5PBON7                          DiPascali - direct

1              MR. KRANTZ:  Objection.

2              MR. MEHLER:  Objection.

3              THE COURT:  Overruled.  You may answer.

4    A.  Are you asking me if I could create a document that

5    randomizes what I already know to be fictitious junk?  Yes.

6    Q.  I'm asking you a different question.  The question I'm

7    asking you is, the SEC provided a document request to Madoff

8    Securities?

9    A.  They did.

10   Q.  Right?

11   A.  Yes.

12   Q.  And the response that -- the version of -- setting aside

13   that all of this was fictitious, the version of the documents

14   that were being created that might go to the SEC were being

15   made using random assignment of trades and parties --

16   understand that?

17   A.  I do.

18   Q.  So providing that random -- what was your understanding of

19   whether or not providing that random, manufactured information

20   to the SEC, whether that was wrong?

21             MR. KRANTZ:  Objection, your Honor.  Could --

22             THE COURT:  Sustained as to form.

23   Q.  Did you think you could provide the type of information

24   that you described to Mr. Perez and Mr. O'Hara to the SEC?

25             MR. KRANTZ:  Objection, your Honor.

Case 1:10-cv-04285-JGK   Document 258   Filed 04/03/14   Page 184 of 191

DC5PBON7                        DiPascali – direct                              5038

```
 1              MR. MEHLER:  Objection.

 2              MR. KRANTZ:  Could we be heard, your Honor?

 3              THE COURT:  We have two minutes.  So bear with us for

 4     five minutes, members of the jury.  Come to the back, counsel.

 5              (Continued on next page)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:10-cv-04290-LTS   Document 59   Filed 04/03/14   Page 2384 of 15X   5039
DC5PBON7                          DiPascali – direct

1            (In robing room)

2            MR. KRANTZ:  Sorry, your Honor.

3            THE COURT:  It's all right.

4            MR. KRANTZ:  Your Honor, respectfully, what's relevant

5    is what Mr. Perez and O'Hara thought was true or false or could

6    be submitted to the SEC or couldn't be submitted to the SEC.

7            Mr. DiPascali is wholly differently situated from

8    Mr. Perez and Mr. O'Hara.  He has knowledge of the entire scam,

9    and so his internal view of whether what he was giving to the

10   SEC was proper or not has no relevance to whether Mr. Perez and

11   O'Hara shared a similar view.  He's so dissimilarly situated.

12           THE COURT:  I understand the argument.

13           MR. MEHLER:  And it's an unnecessary question,

14   completely unnecessary.  It's a submission.

15           THE COURT:  I understand the argument.

16           MR. ZACH:  Your Honor?

17           THE COURT:  You can respond.

18           MR. ZACH:  Sure.  The question that I'm trying to ask

19   that in the scenario that he painted, even that scenario,

20   whether or not those documents, if they were submitted to the

21   SEC, if it was Mr. DiPascali, that that still would have been

22   wrong?  Granted, I did a bad job of articulating, but that was

23   the simple question I was trying too ask.

24           THE COURT:  I will permit a question that specifically

25   asks whether Mr. DiPascali himself believed that the submission

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:10-cr-00228-LTS    Document 259    Filed 04/03/14    Page 186 of 191    5040
DC5PBON7                          DiPascali - direct

1    of those sorts of documents was legal or compliant with the

2    law.  And it is not directly probative of the charges as

3    against Mr. O'Hara and Mr. Perez, but we have issues here of

4    the credibility of this witness and the consistency with other

5    testimony and that sort of thing; so I will permit it.

6              MR. KRANTZ:  Your Honor, I would then just ask for an

7    appropriate instruction that that's being admitted on the issue

8    of Mr. DiPascali's credit.  It is not being admitted for the

9    purpose of inferring the state of mind of Mr. Perez or

10   Mr. O'Hara.

11             MR. MEHLER:  That's my request, as well, your Honor.

12             THE COURT:  The request for a specific instruction to

13   that respect is denied, but once again, Mr. Zach, you have to

14   make very clear in your question as you ask it, that you are

15   asking only what was in Mr. DiPascali's mind.

16             MR. ZACH:  So as not to get anything thrown at me, why

17   don't I articulate the question that I intend to ask when we go

18   back out there?

19             MR. KRANTZ:  Good idea.

20             MR. ZACH:  I'm going to ask, given the scenario

21   described -- Let me strike that.  What was your understanding

22   of whether or not the documents you were going to provide to

23   the SEC was wrong?

24             THE COURT:  How about, did you personally believe that

25   supplying documents to the SEC with randomly generated, fudged

Case 1:10-cv-00255-TS    Document 253    Filed 04/03/14    Page 336 of 150

5041

DC5PBON7                          DiPascali - direct

1    information was legal?

2              MR. ZACH:  Perfect.

3              THE COURT:  Okay.  You can ask that question.

4              MR. ZACH:  Thank you, Judge.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:10-cv-04652-LTS   Document 259   Filed 04/03/14   Page 3871 of 150   5042
DC5PBON7                              DiPascali - direct

```
 1                  (In open court)
 2                  THE COURT:  You may continue.
 3                  MR. ZACH:  Thank you, your Honor.
 4       BY MR. ZACH:
 5       Q.  Mr. DiPascali, did you personally think that supplying the
 6       SEC with blotters that were fudged and who had randomly created
 7       information was legal?
 8       A.  No.
 9                  THE COURT:  Thank you.  Ladies and gentlemen, this
10       concludes our presentation of evidence for this week.  Thank
11       you so very much for your dedicated and careful work with us
12       this week.  We will resume on Monday morning, and so we will
13       need you ready in the jury room at 9:15 on Monday morning.
14                  Here are your end-of-the-day instructions,
15       end-of-the-week instructions.  Do not speak or communicate in
16       any way, in person, telephonically or electronically, with
17       anyone else about the case or anything or anyone having
18       anything to do with it.
19                  Do not read or listen to any media coverage or
20       anything anyone writes or says outside of this courtroom about
21       the case or anything or anyone having anything to do with it.
22                  If anyone is speaking about these matters in your
23       presence, politely move away, and if anyone tries to speak to
24       you about the case, politely tell them that I have instructed
25       you not to do so.
```

1          Do not do any research or investigation on your own.

2     And I repeat these instructions every day because, as you know,

3     they are crucially important to your ability to perform your

4     job well, and we are grateful for the way that you are doing

5     your job.

6          You must leave your notes in the jury room in the

7     envelopes provided.  You must leave your access cards with

8     Ms. Ng and sign for them.  And as I said, please be ready in

9     the jury room Monday morning at 9:15.  Have a good weekend.

10    Get some rest, and we'll look forward to seeing you on Monday.

11    All rise.  Ms. Ng will escort the jury out.

12          (Jury exits)

13          THE COURT:  Mr. DiPascali, you may step down.  We'll

14    see you Monday.

15          THE WITNESS:  Thank you, your Honor.  Enjoy your

16    weekend.

17          (Witness temporarily excused)

18          THE COURT:  Monday at 9:00 it is.  Actually, I have

19    one question.  Have you figured out timing on the letters

20    regarding the additional exhibits yet?  I need to figure out

21    what my next couple of weeks is like.

22          MR. FRISCH:  Your Honor, with regard to the portion

23    that we're responding to, we have a draft that we're working

24    on.  I expect to get that to your Honor on or before Monday.

25          MS. LUM:  Your Honor, we also have a draft of the

08-01789-cgm  Doc 18596-2   Filed 03/22/19   Entered 03/22/19 14:23:15   Exhibit 2
Case 1:10-cv-04155-GBD   Document 259   Filed 04/03/24   Page 189 of 191   Pg 5044

```
 1    portion that we're responding to, and I don't know when, early

 2    next week?

 3              MR. KRANTZ:  One second, your Honor.

 4              THE COURT:  How many letters am I getting back?

 5              MR. BRESLIN:  I think the thrust is, we don't have an

 6    interest in the remaining exhibits.  The ones we had an

 7    interest in have been resolved.

 8              MR. RIOPELLE:  That's the same for us, your Honor.

 9              THE COURT:  Okay.  So there will be two letters, and

10    they'll come by early next week?

11              MR. FRISCH:  Yes.

12              THE COURT:  And when they come, the government will

13    let me know when the government's -- let's see, wait a minute.

14    You started; so yes, I imagine you'll want to make a reply and

15    so you'll let me know?

16              MR. SCHWARTZ:  Yes, I'll take a look at the letters

17    and see if a reply is necessary.

18              THE COURT:  All right.  Thank you all very much.  Keep

19    well.  See you on Monday.

20              (Adjourned to December 9, 2013, at 9:00 a.m.)

21

22

23

24

25
```

Case 1:10-cv-04652-PGG    Document 253    Filed 04/03/14    Page 305 of 150    5045

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   FRANK DIPASCALI

 4   Direct By Mr. Zach . . . . . . . . . . . . . .4873

 5                     GOVERNMENT EXHIBITS

 6   Exhibit No.                            Received

 7    101-57H   . . . . . . . . . . . . . . . .5013

 8    105-F27   . . . . . . . . . . . . . . . .4906

 9    105-D28   . . . . . . . . . . . . . . . .4940

10    300-4A   . . . . . . . . . . . . . . . .4927

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300