**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Keith R. Murphy
Marco Molina
Andrew M. Serrao

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and the*
*Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>      Defendant. | SIPA LIQUIDATION<br><br>Adv. Pro. No. 08-01789 (SMB)<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>      Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff,<br><br>    Plaintiff,<br><br>  v.<br><br>SONJA KOHN, INFOVALEUR, INC., and TECNO DEVELOPMENT & RESEARCH LTD.,<br><br>     Defendants. | Adv. Pro. No. 10-05411 (SMB)<br><br>**[PROPOSED] THIRD AMENDED COMPLAINT** |

I.      NATURE OF THE PROCEEDING ..................................................................................1

II.     JURISDICTION AND VENUE .......................................................................................4

III.    BACKGROUND, THE TRUSTEE, AND STANDING .................................................5

IV.     BLMIS AND THE PONZI SCHEME ............................................................................8

        A.      BLMIS ..................................................................................................................8

        B.      The Ponzi Scheme ...............................................................................................9

                1.      Madoff's Investment Strategy ....................................................................10

                2.      BLMIS's Fee Structure ...............................................................................12

                3.      BLMIS's Purported Market Timing ............................................................12

                4.      The Collapse of the Ponzi Scheme .............................................................14

V.      THE DEFENDANTS.....................................................................................................14

        A.      Kohn.....................................................................................................................14

        B.      Infovaleur ............................................................................................................15

        C.      Tecno Gibraltar ...................................................................................................15

VI.     THE ENTITY DEFENDANTS ARE KOHN'S ALTER EGOS....................................16

        A.      Kohn Dominated and Controlled Infovaleur .......................................................16

        B.      Kohn Dominated and Controlled Tecno Gibraltar...............................................16

VII.    BLMIS MADE THE INITIAL TRANSFERS WITH THE INTENT TO FURTHER
        ITS PONZI SCHEME....................................................................................................17

        A.      The Entity Defendants Did Not Provide BLMIS with Reasonably Equivalent
                Value or Fair Consideration in Exchange for the Initial Transfers........................18

                1.      Infovaleur's Plagiarized Research ................................................................18

                2.      Tecno Gibraltar's Plagiarized Research........................................................19

        B.      The Initial Transfers Were Commission Payments for Referrals to the Ponzi
                Scheme.................................................................................................................20

## TABLE OF CONTENTS
(continued)

**Page**

C.    Kohn Masked the Commissions as Fees for Research and Consulting Because She Was on Notice that BLMIS Was Operating Fraudulently ...............22

D.    Kohn Continued to Hide the True Nature of the Initial Transfers After Madoff's Fraud Unraveled ......................................................................................24

VIII.   THE TRANSFERS ..........................................................................................27

COUNT ONE:  FRAUDULENT TRANSFERS – BANKRUPTCY CODE §§ 105(a), 548(a)(1)(A), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3) .........................................29

COUNT TWO: FRAUDULENT TRANSFERS – BANKRUPTCY CODE §§ 105(a), 548(a)(1)(B), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)..........................................30

COUNT THREE: FRAUDULENT TRANSFERS – DCL §§ 276, 276-a, 278 AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)....................................................................................................................31

COUNT FOUR: FRAUDULENT TRANSFERS – DCL §§ 273 AND 278 AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)....................................................................................................................32

COUNT FIVE: FRAUDULENT TRANSFERS – DCL §§ 274, 278, AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)....................................................................................................................33

COUNT SIX: FRAUDULENT TRANSFERS – DCL §§ 275, 278 AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)....................................................................................................................34

COUNT SEVEN: RECOVERY OF SUBSEQUENT TRANSFERS – DCL §§ 276-a and 278, BANKRUPTCY CODE §§ 105(a) AND 550(a) AND SIPA § 78fff-2(c)(3) ..........35

IX.   PRAYERS FOR RELIEF ...............................................................................36

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"),[1] under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"),[2] and the substantively consolidated estate of Bernard L. Madoff, under 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), by and through the Trustee's undersigned counsel, for his Third Amended Complaint against Sonja Kohn, Infovaleur, Inc. ("Infovaleur"), and Tecno Development & Research Ltd. ("Tecno Gibraltar," and with Infovaleur, the "Entity Defendants," and with Kohn, collectively, the "Defendants"), states:

## I.    NATURE OF THE PROCEEDING

1.    This action arises from a fraudulent scheme in which BLMIS paid invoices using customer property for purported research materials prepared by the Entity Defendants that had no value to BLMIS other than to assist Kohn conceal the true nature of the payments as commissions in return for steering new investors to BLMIS.

2.    From December 11, 2002 to December 11, 2008 (the "Relevant Period"), BLMIS fraudulently transferred $23,125,000 from its JPMorgan Chase bank account number xxxxxxxxxxxx703 (the "703 Account") to the Entity Defendants (the "Initial Transfers").

3.    The Trustee seeks to avoid the Initial Transfers pursuant to sections 548(a)(1)(A) and (a)(1)(B), 544(b), 550 and 551 of the Bankruptcy Code and sections 273-279, as applicable, of the N.Y. Debtor and Creditor Law ("DCL").

4.    The Entity Defendants, which Kohn created, controlled, and operated as her alter egos, were not BLMIS customers, did not directly or indirectly invest with BLMIS, and did not receive the Initial Transfers as settlement payments in connection with any securities contract with BLMIS.

---

[1] "BLMIS" includes the predecessor to Bernard L. Madoff Investment Securities LLC.

[2] Hereinafter, "SIPA" shall replace "15 U.S.C."

5.    Instead, the Entity Defendants received the Initial Transfers in payment of invoices they sent to BLMIS in amounts ranging between $750,000 and $875,000 per quarter during the Relevant Period.  The invoices sought payment for purported research the Entity Defendants provided to BLMIS.

6.    In reality, the Initial Transfers to the Entity Defendants were not for genuine research done by them.  The Entity Defendants copied and plagiarized work product of others.  The Entity Defendants then assembled that material into packets after deleting any reference to the original authors before periodically forwarding it to BLMIS and invoicing BLMIS for the materials.

7.    BLMIS had no use for the purported research, which was not substantively relevant to, or useful in, BLMIS's investment advisory business.  For example, some research covered topics such as gambling and space tourism, while other so-called research consisted only of a title page, table of contents, or screenshots of a third party's website.

8.    Indeed, BLMIS's internal records demonstrated that the invoiced amounts did not correspond to any value offered by this plagiarized research.  Rather, the invoiced amounts that BLMIS paid through the Initial Transfers represented the exact amount of commissions for investor referrals to BLMIS due to another of Kohn's companies, non-defendant Eurovaleur, Inc. ("Eurovaleur").  BLMIS, therefore, internally ascribed no value for the so-called research packets it received from the Entity Defendants.

9.    Kohn is an Austrian citizen and sophisticated investment professional.  Kohn founded Eurovaleur in 1990 as a New York boutique investment firm that referred European investors (primarily Austrian investors) to U.S. investment managers.  Kohn headed Eurovaleur during the Relevant Period and used Eurovaleur to steer investors to BLMIS during that same time period in return for commissions.

10.    Eurovaleur did not receive any direct commission payments from BLMIS and did not file any claim in the BLMIS proceeding reflecting any obligation incurred by BLMIS to Eurovaleur, or any

2

unpaid amount due to Eurovaleur.  The Entity Defendants played no role in Eurovaleur's investment business, and never billed BLMIS for commissions for Eurovaleur's referrals to BLMIS.

11.    BLMIS agreed to this roundabout payment scheme to continue receiving referrals from Eurovaleur that eclipsed $9 billion by the Filing Date.

12.    Upon information and belief, Kohn devised this roundabout payment arrangement where the Entity Defendants received the Initial Transfers for "research" and "consulting" services to conceal the fact that Eurovaleur was referring investors to BLMIS, which was engaging in fraudulent activity.

13.    As early as 1995, bank officials at UniCredit Bank Austria AG ("Bank Austria") alerted Kohn on several occasions that BLMIS was illegally trading ahead of the markets, also known as "front running."[3]

14.    When U.S. and European criminal authorities questioned Kohn in April 2009 about the nature of the Initial Transfers, she denied that the Initial Transfers were consideration for investor referrals that either she or Eurovaleur provided to BLMIS.  Instead, Kohn misrepresented to the authorities that the Initial Transfers were for research and consulting services.  She made similar misrepresentations to the media in 2009.

15.    It was not until 2011, following the Trustee's public revelation that BLMIS's records indicated that those payments were commissions in exchange for Eurovaleur's investor referrals to BLMIS, that Kohn admitted for the first time that the Initial Transfers were commissions for Eurovaleur's referrals.

---

[3] These conversations are also the subject of another adversary proceeding, *Picard v. HSBC Bank Plc, et al.*, Adv. Pro No. 09-01364 (SMB) (Bankr. S.D.N.Y. 2009) (the "HSBC Action").  The defendants in the HSBC Action have yet to answer or otherwise respond to these allegations.

16.    The chart below demonstrates the flow of the Initial Transfers BLMIS made to the Entity

Defendants knowing that they performed no services for reasonably equivalent value or fair

consideration to BLMIS (green arrows show Initial Transfers):



17.    The Trustee seeks to avoid and recover the Initial Transfers from the Entity Defendants,

and to recover from Kohn the portion of the Initial Transfers that the Entity Defendants subsequently

transferred to her (the "Subsequent Transfers").

18.    Alternatively, the Trustee seeks to avoid the Initial Transfers to the Entity Defendants and

recover the Initial Transfers from Kohn, because the Entity Defendants were at all relevant times her

corporate alter egos, and/or the Initial Transfers were for her benefit.

## II.    JURISDICTION AND VENUE

19.    This adversary proceeding arises from the pending SIPA proceeding, No. 08-01789 (SMB)

(the "SIPA Proceeding").  The SIPA Proceeding was originally brought in the United States District

Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission*

*v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court

4

Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and (e)(1), and SIPA §§ 78eee(b)(2)(A) and (b)(4).

20.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H), and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

21.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

22.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), Bankruptcy Code §§ 105(a), 544(b), 548(a), 550(a), and 551, DCL §§ 270 *et seq.*, and other applicable law.

## III.    BACKGROUND, THE TRUSTEE, AND STANDING

23.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

24.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

25.    Also on December 15, 2008, Judge Louis L. Stanton granted SIPC's application and entered an order under SIPA, which, in pertinent part:

> (a)    appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

      (b)      appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

      (c)      removed the case to this Court under SIPA § 78eee(b)(4).

26.   By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

27.   On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

28.   At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

29.   At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

30.   At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

31.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn (Jodi) Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business.

32.    As a SIPA trustee, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS and Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

33.    Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA under SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent under SIPA § 78fff(b).

34.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and Bankruptcy Code §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 105(a), 544, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.    BLMIS AND THE PONZI SCHEME

### A.    BLMIS

35.    Madoff founded BLMIS in 1960 as a sole proprietorship.  In 2001, Madoff registered

BLMIS as a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first

as its sole member, and thereafter as its chairman and chief executive.

36.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC rule 15b1-3, and regardless of its

business form, BLMIS operated as a single broker-dealer from 1960 through 2008.  Public records

obtained from the Central Registration Depository ("CRD") of the Financial Industry Regulatory

Authority Inc. reflect BLMIS's continual registration as a securities broker-dealer from January 1, 1960

through December 31, 2008.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership

Management System database also reflects BLMIS's registration with the SEC as a securities broker-

dealer from January 19, 1960 through December 31, 2008.  On December 30, 1970, BLMIS became a

member of SIPC and continued its membership without any change in status until the Filing Date.  SIPC

membership is contingent on registration of the broker-dealer with the SEC.

37.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in

New York City, where Madoff operated three principal business units: a proprietary trading desk, a

broker-dealer operation, and an investment advisory business.

38.    BLMIS's website publicly boasted about the sophistication and success of its proprietary

trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's

website omitted the investment advisory business entirely. BLMIS did not register as an investment

adviser with the SEC until 2006, following an SEC investigation, which forced Madoff to register.

39.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its investment advisory business.

40.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had twenty-three (23) customer accounts with total assets under management of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its investment advisory business still had only twenty-three (23) customer accounts with total assets under management of $17.1 billion.   In reality, Madoff grossly understated these numbers.   In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in assets under management.  At all times, BLMIS's Form ADVs were publicly available.

**B.    The Ponzi Scheme**

41.    At all relevant times, Madoff operated the investment advisory business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  BLMIS's investment advisory business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, Joanne Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

42.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.   It was funded, in part, by money taken from the investment advisory business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from BLMIS's investment advisory business to continue operating.

43.   To provide cover for BLMIS's fraudulent investment advisory business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one employee was an administrative assistant, and one was a semi-retired accountant living in Florida.

44.   On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### 1.      Madoff's Investment Strategy

45.   BLMIS purported to execute two primary investment strategies for investment advisory business customers:  the convertible arbitrage strategy and the split strike conversion strategy (the "SSC Strategy").   For a limited group of investment advisory business customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

46.   The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total

investment advisory business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of investment advisory business accounts.

47.    From 1992 forward, Madoff began telling investment advisory business customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its investment advisory business customers.  All funds received from investment advisory business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers or agents, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

48.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to investment advisory business customers that typically reflected substantial gains on the customers' principal investments.

49.    The SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the Standard & Poor's ("S&P") 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P Index call options.

50.    The put options were to control the downside risk of price changes in the basket of S&P 100 Index securities.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option would entail a loss for BLMIS.

51.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to outperform the market, because in a rising market, calls would be exercised by the counterparty.

52.    The simultaneous purchase of puts and calls to hedge a securities position is commonly referred to as a "collar."  The purpose of the collar is to limit exposure to volatility in the stock market and flatten out returns on investment.

53.    For the SSC Strategy to be deployed as Madoff claimed, the total value of each of the puts and calls purchased for the basket of S&P 100 Index securities had to equal the notional value of that basket.  For example, to properly implement a collar to hedge the $11.7 billion of assets under management that Madoff publicly reported in 2006 would have required the purchase of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

54.    Moreover, at all times that BLMIS reported its total assets under management, publicly available information about the volume of exchange-traded options showed that the volume of options contracts necessary to form the collar and implement the SSC Strategy exceeded the available options.

## 2.    BLMIS's Fee Structure

55.    BLMIS charged commissions on purportedly executed trades rather than management and performance fees based on the value of assets under management, but by using a commission-based structure, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

## 3.    BLMIS's Purported Market Timing

56.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he achieved market timing by intermittently taking customer funds out of the market.  During those times, Madoff purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.

57.    BLMIS's market timing, as reported on its customer statements, showed an uncanny ability to buy low and sell high, an ability so uncanny, that any sophisticated or professional investor could see it was statistically impossible.    BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every quarter and year end.

58.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.    BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.    But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.    It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win every time.    Yet this is precisely what BLMIS's customer statements reported.

59.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the SSC Strategy, which relied on holding long positions rather than on short-term speculative trading.

60.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.    There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

61.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").

The OCC has no records showing that BLMIS's investment advisory business cleared any trades in any exchange-listed options.

### 4.    The Collapse of the Ponzi Scheme

62.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

63.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the investment advisory business customers' fraudulent statements, and that the investment advisory business operated as a Ponzi scheme.

64.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.    THE DEFENDANTS

### A.    Kohn

65.    This Court has personal jurisdiction over Kohn.  Although Kohn is an Austrian citizen, she resided in New York State from 1983 to 1994.  She and her family have owned a home in Monsey, New York since 1984.  Kohn also periodically traveled to New York City during the Relevant Period, including to meet with Madoff at BLMIS's offices.  Kohn conducted business on behalf of Infovaleur in New York throughout the Relevant Period.

66.    Kohn is a qualified investment professional.  She passed multiple broker examinations, including the General Securities Representative Examination and the General Securities Principal Examination.  In the 1980s, Kohn registered as a broker with six investment companies on Wall Street, including Merrill Lynch, Pierce, Fenner & Smith.

67. Maurice (Sonny) Cohn of Cohmad Securities Corporation ("Cohmad") introduced Kohn to Madoff in or around 1987. Cohmad was a New York company, co-headed by Cohn and Madoff, which referred investors to BLMIS.

68. Kohn has previously testified that she "developed a business relationship with Mr[.] Madoff and became one of the relatively few people who had good access to him."

69. Kohn began referring investors to BLMIS through non-defendant Eurovaleur soon after Cohn introduced her to Madoff.

### B.    Infovaleur

70. Kohn incorporated Infovaleur in New York on February 22, 1996 and controlled it during the Relevant Period.

71. This Court has personal jurisdiction over Infovaleur because Infovaleur was a New York corporation, having a registered address was 767 Fifth Avenue, New York, New York 10153. It also used Kohn's Monsey, New York home as a business address on certain banking records.

72. Infovaleur maintained accounts at JPMorgan Chase Bank in New York.

73. Infovaleur had a few part-time employees, mostly university interns.

74. Starting in July 1998, BLMIS paid Infovaleur and later, Tecno Gibraltar, invoices for plagiarized research.

75. In 2002, Infovaleur was BLMIS's third-highest paid vendor.

76. Infovaleur dissolved on January 26, 2011.

### C.    Tecno Gibraltar

77. Kohn incorporated Tecno Gibraltar in Gibraltar on January 3, 2007 and controlled it through the Filing Date.

78. This Court has personal jurisdiction over Tecno Gibraltar because Tecno Gibraltar derived substantial revenue from U.S. commerce. Tecno Gibraltar conducted business with BLMIS in New

York, sent invoices to BLMIS in New York for services Tecno Gibraltar purportedly rendered to BLMIS in New York, and received payments from BLMIS in New York.

79.    Tecno Gibraltar remains a going concern.

## VI.    THE ENTITY DEFENDANTS ARE KOHN'S ALTER EGOS

80.    Kohn exercised dominion, influence, and control over the Entity Defendants during the Relevant Period in order to send BLMIS plagiarized research and hide the fact that her other company, Eurovaleur, referred billions of dollars of investments to BLMIS, which Bank Austria officials told her multiple times was engaging in fraudulent trading activity before and during the Relevant Period.

### A.    Kohn Dominated and Controlled Infovaleur

81.    Kohn and/or her family owned 100% of Infovaleur's shares throughout the Relevant Period.

82.    Kohn improperly used Infovaleur's funds for her personal benefit and for the benefit of her family.  For example, she used these funds to finance the Monsey home, pay for a swimming pool for her Swiss estate, and purchase Dotzauer Viennese crystal.

83.    Kohn also used Infovaleur's funds to make business payments on behalf of her other companies.  For example, she used these funds to make bonus payments to at least eight individuals who did not provide services to Infovaleur.

84.    Kohn also used these funds to send thousands of dollars to Absolute Portfolio Management, Ltd., a company that sold shares of Kohn-associated feeder funds but had no discernible business relationship with Infovaleur.

85.    Kohn used Infovaleur's funds to transfer $48,000 to Tecno Development & Research S.r.l. and Tecno Gibraltar, which had no discernible business relationships with Infovaleur.

### B.    Kohn Dominated and Controlled Tecno Gibraltar

86.    Kohn and her family own Tecno Gibraltar through a trust.

16

87.    Kohn used Tecno Gibraltar's funds for her personal use and for the benefit of her family. For example, Kohn directed Tecno Gibraltar to pay $100,000 to her son, Robert Kohn, who was not an employee of Tecno Gibraltar and who did not perform any services on its behalf.

88.    Kohn also transferred Tecno Gibraltar's funds to companies she owned that had no relationship with Tecno Gibraltar.  For example, Kohn directed Tecno Gibraltar to send $250,000 to a Liechtenstein insurance company that Kohn owned and that had no discernible business relationship with Tecno Gibraltar.

## VII.    BLMIS MADE THE INITIAL TRANSFERS WITH THE INTENT TO FURTHER ITS PONZI SCHEME

89.    The Entity Defendants are separate legal entities from Eurovaleur, and they had no role in Eurovaleur's referrals to BLMIS.

90.    On information and belief, BLMIS was the Entity Defendants' only client.

91.    There was no written contract or agreement between BLMIS and any of the Entity Defendants.

92.    Nevertheless, in the Relevant Period, BLMIS made $23,125,000 in Initial Transfers from its 703 Account to the Entity Defendants pursuant to the Entity Defendants' invoices for purported research and consulting services.

93.    BLMIS internally designated the Entity Defendants' invoices as "BLM Special," which is a term BLMIS used to describe gifts to Madoff's family members, forgiven loans to Madoff's friends, payment of personal expenses, and charitable contributions.

94.    BLMIS's internal records show that BLMIS did not ascribe any value to this plagiarized research.  Instead, these internal records show that BLMIS sent the Initial Transfers as consideration for the investment capital referrals that Kohn made to BLMIS through Eurovaleur.

A.    **The Entity Defendants Did Not Provide BLMIS with Reasonably Equivalent Value or Fair Consideration in Exchange for the Initial Transfers**

95.    Notwithstanding the significant payments for research, Kohn testified in February 2018 to the Vienna Office of the Public Prosecutor that she "personally did hardly any research" and that the Entity Defendants employed "university students" to conduct the bulk of the research.

96.    The university students were not qualified to conduct this research and, in fact, did not conduct any proprietary research.  Instead, at the direction of Kohn and the Entity Defendants, these students plagiarized publicly available research, assembled this plagiarized research into packets that omitted the original source of the research, and quarterly invoiced BLMIS $875,000 for the materials.

### 1.    Infovaleur's Plagiarized Research

97.    Kohn directed Infovaleur's university interns to download publicly available information from the Internet, assemble it into packets without citing the original source, and send the packets to BLMIS.

98.    Infovaleur paid these university interns, who had no research training, approximately $10 per hour.

99.    Jessica Crewe, a former university intern, said that Infovaleur's lone full-time employee, Reuss, told her that creating the research reports was "simple" and only required copying subject matter from the Internet.  If the copied subject matter had information that revealed its actual source, Reuss directed Crewe and other university interns to "crop" it out.

100.    After Crewe compiled the reports, another university intern added a cover page with the notation "prepared for Madoff."

101.    In October 2006, Crewe and Kohn exchanged e-mails to discuss another "research" project regarding Chinese investors.  Crewe sent a draft to Kohn, including sources for certain of the data

included in the report.  Kohn replied, "I really would like not tpo [*sic*] name the 2 sources and merge them so it looks like original work pls [*sic*] reformat[.]"

102.  Kohn also directed another Infovaleur intern to copy the publicly available article "India's Fifty Years of Economic Development" written by Abid Hussain, who had no affiliation with Kohn, Infovaleur, or BLMIS.  This intern created an undated draft containing almost the entire text from the article minus any portion that could reveal the original author or source material.  The intern then bound the draft and inserted an Infovaleur cover page.  Infovaleur sent this research as original work product to BLMIS.

103.  Of the 300-plus reports that the Infovaleur sent to BLMIS in over ten years, almost all were completely irrelevant to BLMIS's operations.

104.  At least fourteen of these reports had no real content—they consisted only of title pages, table of contents pages, or screenshots of a website.

105.  Many of the reports were not related to an investment advisory business at all.  Rather, the reports covered topics such as art and antiques, auctions, gambling, and space tourism.  Certain of these reports are titled "Vimplecom Telecom-Cellular/Diversified Russia Report," "Machine Translation: Concepts of Automated Language Report," "GM Food Safety Report," and "2001 Agricultural Policies Report."

## 2.    Tecno Gibraltar's Plagiarized Research

106.  On information and belief, Tecno Gibraltar employed only one part-time employee, Shlomo (Momy) Amselem, during the Relevant Period.

107.  In January 2008, defendant Tecno Gibraltar began sending plagiarized research to BLMIS.

108.  This research suffered from the same defects as the reports that Infovaleur sent to BLMIS. Tecno Gibraltar compiled these research reports by copying and pasting content from publicly available sources, or merely copied entire research reports that Infovaleur had previously sent to BLMIS.

109.  For example, on one occasion, Tecno Gibraltar's lone employee, Amselem, wrote to Kohn to confirm that he received from her a compact disc containing various research reports that Kohn had already sent to BLMIS through Infovaleur.  In a reply e-mail, dated April 8, 2007, Kohn directed Amselem to "make a completely new cover page with a title that means the same but not identical and different graphic [*sic*] and substitute the old cover."

110.  On another occasion, Reuss sent Kohn an e-mail indicating that Infovaleur would provide Amselem with research reports that Infovaleur previously compiled for BLMIS.

111.  For this recycled research, BLMIS made Initial Transfers of $3 million to Tecno Gibraltar.

### B.    The Initial Transfers Were Commission Payments for Referrals to the Ponzi Scheme

112.  At all relevant times, the Initial Transfers were commission payments that BLMIS made to obtain investment capital in furtherance of its Ponzi scheme.

113.  The Entity Defendants did not provide value to BLMIS in exchange for the Initial Transfers.

114.  Taken together, the amounts of these Initial Transfers ($875,000 per quarter for Infovaleur and $750,000 per quarter for Tecno Gibraltar) equaled $6.5 million per year for an aggregate of more than $23 million in the Relevant Period.  This amount exactly matches the commissions due to Eurovaleur during the Relevant Period.

115.  According to BLMIS's internal records and Kohn's testimony in other proceedings, Madoff and Kohn agreed to this $6.5 million commission figure in or around November 2001.  Prior to this date, Madoff calculated Eurovaleur's commission by taking a percentage of the investment capital

20

that Eurovaleur referred to BLMIS (between 1% and 0.5%).  After Eurovaleur's referred investment

capital eclipsed the billion-dollar mark, Madoff and Kohn agreed to a fixed fee totaling 0.5% of the

investment capital that Eurovaleur had introduced to BLMIS as of that date (approximately $1.3 billion),

or $6.5 million annually.

116.  From November 2001 through the Filing Date, Madoff directed BLMIS to make quarterly

payments totaling $3.5 million from its 703 Account to Infovaleur.

117.  From 2000 through 2007, Madoff directed another company he controlled to pay the

remaining $3 million in commissions through quarterly payments to other companies Kohn controlled.

The Trustee is not addressing or seeking to recover these payments in this adversary proceeding.

118.  Starting in 2008, Madoff directed BLMIS to make quarterly payments totaling $3 million

from its 703 Account to Tecno Gibraltar, in addition to the $3.5 million BLMIS paid to Infovaleur.

119.  None of the more than forty-eight (48) invoices for the approximately 300 research packets

that Kohn and the Entity Defendants sent to BLMIS in the Relevant Period indicated in any way that

the invoiced amounts were for commissions for Eurovaleur's referrals.

120.  This case is the only instance where BLMIS paid its referral agents' commissions in such

a roundabout manner.

121.  BLMIS and the Defendants knowingly participated in this scheme each for its own

advantage.

122.  Upon information and belief, Kohn devised this roundabout payment arrangement to

conceal the fact that Eurovaleur was referring investors to BLMIS, which was engaging in fraudulent

activity.

123.  BLMIS participated in this payment scheme and paid the Entity Defendants' invoices for plagiarized research, which had no value to BLMIS, so that BLMIS could continue receiving investor referrals from Eurovaleur.

124.  As of the Filing Date, Madoff's Ponzi scheme benefited by more than $9 billion from Eurovaleur's referrals.

**C.    Kohn Masked the Commissions as Fees for Research and Consulting Because She Was on Notice that BLMIS Was Operating Fraudulently**

125.  Kohn masked the true nature of the Initial Transfers and employed this round-about invoicing scheme because others had put her on notice that BLMIS was committing fraud.

126.  In 1995, a high-level Bank Austria executive ("BA Executive No. 1") met with Madoff. During the meeting, Madoff explained that he observed the direction of the market based on large trades for his market making clients.  According to Madoff, he capitalized on this information to achieve his returns by trading on such information in advance of the market on behalf of his investment advisory business customers.

127.  On information and belief, after meeting with Madoff, BA Executive No. 1 urged Kohn to refrain from investing with BLMIS because the strategy was improperly based on Madoff's ability to trade ahead of his clients' investments.

128.  As an investment professional, Kohn understood that this practice, commonly known as "front-running," was illegal in the U.S. before, during, and after the Relevant Period.

129.  In 1996, another Bank Austria employee met with Madoff ("BA Executive No. 2"). Madoff told BA Executive No. 2 that BLMIS charged lower fees than its market making competitors, allowing Madoff to attract and keep large investors, see his clients' trades, and then trade in front of his clients' order flow.  Upon his return, BA Executive No. 2 told Kohn he was concerned that Madoff was engaged in illegal trading.

22

130. In 2000, Kohn attended an investor diligence meeting with Bank Austria officials at BLMIS's offices where, according to a memorandum Bank Austria officials prepared, DiPascali told the meeting participants that BLMIS achieved its consistently positive returns by front-running the markets. The memorandum quotes DiPascali as follows:

> [M]aybe we can predict only the next 10 or 15 minutes but we watch the market continuously and if we get an order to buy a large stake of an equity which is quoted currently at 40$ with a limit up to 44$, there can't be anything wrong with buying [sic] same stock for our portfolio at 41$ or 42$.

131. In 2002, a Bank Austria executive, Werner Kretschmer ("Kretschmer"), attempted to replicate Madoff's strategy to determine if it was possible to obtain similar results. Kretschmer was unable to replicate Madoff's results, and his analysis yielded hypothetical returns with significant losses.

132. Upon information and belief, after concluding that Madoff's returns were impossible, Kretschmer approached Kohn with the results of his test. Kohn reassured Kretschmer that even if BLMIS's returns were obtained through front running, Bank Austria should not be concerned because U.S. authorities had not yet detected this fraud. Kretschmer reported these events to another Bank Austria executive who would later work directly for Kohn at a bank Kohn had formed and owned, Bank Medici AG ("BA Executive No. 2").

133. In or around 2002, upon learning of Kretschmer's replication test results, BA Executive No. 2 confronted Kohn with his own suspicions that Madoff could not achieve these results legitimately and that BLMIS could generate such consistent returns only if it was engaged in illegal front running.

134. In 2007, Kohn recruited a retired executive director of a large Austrian bank to work at Bank Medici AG as an unpaid adviser (the "Bank Medici Consultant"). The Bank Medici Consultant questioned Kohn about Madoff and his strategy. Kohn explained to him that BLMIS traded in front of its own market-making clients as a "special favor" to her. The Bank Medici Consultant told Kohn that

23

what she described was considered illegal front running in both Austria and the United States. Kohn acknowledged that Madoff might be engaged in unlawful trading, but that it was not her concern.

135. According to the Bank Medici Consultant, Kohn had two standard responses to inquiries about Madoff's investment strategy. First, Kohn would describe the SSC Strategy. If that failed to satisfy the investor's concerns, Kohn would resort to telling investors that Madoff's secret was his willingness to capitalize on inside information.

136. Despite all the warnings to Kohn that BLMIS was engaged in investment fraud, Kohn never stopped referring investors to BLMIS through Eurovaleur. Kohn, however, never invested her money with BLMIS.

### D.    Kohn Continued to Hide the True Nature of the Initial Transfers After Madoff's Fraud Unraveled

137. Soon after Madoff's arrest, several news articles alleged that Kohn and/or her companies had received commissions, either directly or indirectly, for referring investors to BLMIS.

138. On April 21, 2009, Austrian and U.S. criminal authorities collectively undertook to interview Kohn about this and other aspects of her business relationship with Madoff. In advance of this joint interview, on April 7, 2009, Kohn wrote a letter to the Vienna Office of the Public Prosecutor, stating that:

> *All claims that I personally, or a company in which I used to be or continue to be engaged directly or indirectly, had received any form of commission payments from Bernard Madoff or one of his companies within the framework of my activities for Bank Medici are completely wrong.*

139. At her interview with the Vienna Office of the Public Prosecutor two weeks later, Kohn testified that neither she nor her companies received commissions from BLMIS. Based on the minutes of that interview, Kohn said that the Initial Transfers were for research services.

140.  The minutes from this testimony, which Kohn signed and endorsed as accurate on April 21, 2009, contains the following passages that illustrate Kohn's equivocations regarding her receipt of commissions and the true nature of her companies' relationships with BLMIS:

- Regarding media claims that Kohn received €8.2 million for referring investors to BLMIS: "*I emphasize again that I did not receive those types of amounts, and I don't just mean amounts of that size but these amounts at all.*"

- Regarding the purported research services her companies provided to BLMIS: "*Questioned again on my business relationship with Madoff: During my time in America I did indeed have a research activity [sic] [with BLMIS].*"

- Regarding the substance of her research relationship with BLMIS:  "*My research activity [with BLMIS] mentioned previously encompassed some very diverse market studies; I maintain that I received no money personally.  On questions where then my money came from this time: I wish to make no statement on this—this is a question of my own privacy . . . .*"

- Regarding the corporate activity of Infovaleur:  "*I wish here to consult my documents and not to make any statement at this time.*"

141.  In the wake of Madoff's arrest, Kohn also misrepresented to the media that she never received commissions from Madoff or BLMIS.  For example, a July 3, 2009 Wall Street Journal article titled "Madoff Kickbacks Alleged in Austria" reports that "[a] spokeswoman for Bank Medici said neither Ms. Kohn nor the bank had received kickbacks [from Madoff]."  Similarly, a July 3, 2009 Bloomberg article titled "Medici's Kohn Claims No Personal Payments from Madoff" reports that "Bank Medici AG Chairman Sonja Kohn didn't receive any personal payments from Bernard Madoff, her lawyer Andreas Theiss said."

142.  Madoff also undertook to conceal from outsiders the true nature of his payment relationship with the Entity Defendants.  According to his former secretary Belle Jones, Madoff directed her not to tell anyone inside or outside of BLMIS that the Initial Transfers were commissions for Eurovaleur's referrals to BLMIS.  Madoff also directed his secretary not to mail the checks to the Entity Defendants, but rather to have Kohn or one of her family members collect these checks at BLMIS's offices.

25

143.  Starting in 2011, Kohn changed her public stance as to whether she received commissions from BLMIS for referring investors to its investment advisory business.  Specifically, she submitted a written affidavit in a separate proceeding in the U.K. that stated that the payments her companies received from BLMIS were commissions, not research fees.

144.  Kohn made this about-face because of the Trustee's pleadings against her in December 2010 that made plain that BLMIS internally ascribed no value to the Entity Defendants' research and instead considered the Initial Transfers commissions to Kohn's Eurovaleur.

145.  In February 2018, the Vienna Office of the Public Prosecutor confronted Kohn about her misleading public stance on BLMIS commissions.  She told the Vienna Office of the Public Prosecutor that she did not deceive them in her 2009 interview when asked about whether BLMIS paid her commissions for investor referrals.  Specifically, Kohn posited that because her response was that she *personally* did not receive any commissions she had told the truth because the Entity Defendants received those commissions.

146.  Kohn's characterization of her 2009 testimony does not hold up when compared to her April 7, 2009 letter to the Vienna Office of the Public Prosecutor.  As explained above, Kohn wrote in this letter that she never received commissions from BLMIS either "personally . . . or [through] a company in which I used to be or continue to be engaged directly or indirectly . . . ."  That testimony is inconsistent and contrary to Kohn's more recent position and demonstrates her lack of good faith with respect to her receipt of the Initial Transfers through the Entity Defendants.

147.  Kohn's February 2018 testimony to the Vienna Office of the Public Prosecutor was also inconsistent as to the nature of the Initial Transfers.  Kohn first testified that she believed the Initial Transfers consisted of commissions for referrals and, to a lesser degree, fees for research and consulting.  But, when pressed, Kohn testified that she knew as early as 2000 that the Initial Transfers consisted

26

*entirely* of commissions for referrals. She, therefore, corroborated BLMIS records that show that Madoff paid Kohn, through the Entity Defendants, commissions of 1% of the assets she referred to BLMIS through Eurovaleur and that, over time, BLMIS decreased these commissions to 0.5% of the assets she referred to BLMIS.

148. Also in that February 2018 testimony, Kohn testified that, in the year 2000, Madoff told her that he would pay her a lump sum based on the assets under management that she referred to BLMIS at that time. In other words, Kohn understood during the Relevant Period that the Initial Transfers only compensated her referral services (which she conducted through Eurovaleur) and did not in any way compensate her purported research and consulting services (which she conducted through the Entity Defendants).

149. Kohn's admission that she understood that the Initial Transfers consist entirely of commissions for her referral business underscores that she (and, by extension, the Entity Defendants) understood that BLMIS did not value the Entity Defendants' "research and consulting" at all. And it underscores that Kohn (and, by extension, the Entity Defendants) did not act in good faith, because she directed the Entity Defendants to assemble plagiarized research packets and invoice *only* for this research (not for commissions) even though she understood that BLMIS exclusively paid the Initial Transfers to the Entity Defendants as consideration for the referral business from Eurovaleur in which the Entity Defendants took no part.

## VIII. THE TRANSFERS

150. In the Relevant Period, BLMIS was insolvent in that: (i) its debts exceeded the value of its property by billions of dollars; (ii) it could not meet its obligations as they came due; and (iii) at the time BLMIS made the Initial Transfers, BLMIS was left with insufficient capital.

151. The Initial Transfers are customer property and the Trustee may avoid and recover the Initial Transfers under Bankruptcy Code §§ 105(a), 544, 548, 550, and 551, DCL §§ 273–279, and SIPA § 78fff-2(c)(3).

152. During the six years preceding the Filing Date, BLMIS collectively paid $23,125,000 of the Initial Transfers to the Entity Defendants. Of this amount, BLMIS paid $20,125,000 to Infovaleur, and $3 million to Tecno Gibraltar.

153. During the two years preceding the Filing Date, BLMIS collectively paid Initial Transfers of $9,125,000 to the Entity Defendants (the "Two-Year Transfers"). Of this amount, BLMIS paid $6,125,000 to Infovaleur and $3 million to Tecno Gibraltar.

154. Kohn was an immediate or mediate transferee of a portion of the Initial Transfers. Specifically, at this point the Trustee is aware that Kohn received Subsequent Transfers of at least $800,000 from Infovaleur. Infovaleur effected the Subsequent Transfers to Kohn via two checks, totaling $400,000 each, on December 20, 2006 and December 25, 2006. Because the Initial Transfers are avoidable, the Trustee may recover the Subsequent Transfers under Bankruptcy Code §§ 105(a) and 550(a) and SIPA § 78fff-2(c)(3).

155. The Trustee pleads in the alternative that BLMIS made the Initial Transfers to Kohn, or for her benefit, because the Entity Defendants operated as Kohn's corporate alter egos during the Relevant Period. If so, the Trustee may avoid and recover from either the Entity Defendants and/or Kohn, personally, the Initial Transfers under Bankruptcy Code §§ 105(a), 544, 548, 550, and 551, SIPA § 78fff-2(c)(3), and DCL §§ 273–279.

156. The Trustee's investigation is ongoing and the Trustee reserves the right to: (i) supplement the information on the Initial Transfers and Subsequent Transfers, and any additional transfers; and (ii) seek avoidance and recovery of such additional transfers.

## COUNT ONE:  FRAUDULENT TRANSFERS – BANKRUPTCY CODE §§ 105(a), 548(a)(1)(A), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

### (*Against the Defendants*)

157.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

158.   Each of the Two-Year Transfers was made on or within two years before the Filing Date.

159.   Each of the Two-Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of Bankruptcy Code §§ 101(54) and 548(a), and SIPA § 78fff-2(c)(3).

160.   BLMIS made each of the Two-Year Transfers with the actual intent to hinder, delay, or defraud some or all of BLMIS's then-existing or future creditors.  BLMIS made the Two-Year Transfers to the Entity Defendants in furtherance of a fraudulent investment scheme.

161.   Each of the Two-Year Transfers constitutes a fraudulent transfer that the Trustee may avoid under Bankruptcy Code §§ 548(a)(1)(A), and recover from the Entity Defendants and/or Kohn, under Bankruptcy Code § 550(a) and SIPA § 78fff-(2)(c)(3).

162.   As a result of the foregoing, under Bankruptcy Code §§ 105(a), 548(a)(1)(A), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside; (c) recovering the Two-Year Transfers, or the value thereof, from the Entity Defendants and/or Kohn, for the benefit of the BLMIS estate; (d) directing the Entity Defendants and/or Kohn, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all commissions, or other compensation and/or remuneration received by the Entity Defendants and/or Kohn, related to, arising from, or concerning the Two-Year Transfers; and (e) awarding any other relief the Court deems just and appropriate.

## COUNT TWO: FRAUDULENT TRANSFERS – BANKRUPTCY CODE §§ 105(a), 548(a)(1)(B), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

### (*Against the Defendants*)

163.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

164.    Each of the Two-Year Transfers was made on or within two years before the Filing Date.

165.    Each of the Two-Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of Bankruptcy Code §§ 101(54) and 548(a), and SIPA § 78fff-2(c)(3).

166.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two-Year Transfers.

167.    At the time of each of the Two-Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two-Year Transfers.

168.    At the time of each of the Two-Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with BLMIS was an unreasonably small capital.

169.    At the time of each of the Two-Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

170.    Each of the Two-Year Transfers constitutes a fraudulent transfer that the Trustee may avoid under Bankruptcy Code §§ 105(a) and 548(a)(1)(B) and recover from the Entity Defendants and/or Kohn, under Bankruptcy Code § 550(a) and SIPA § 78fff-(2)(c)(3).

171.    As a result of the foregoing, under Bankruptcy Code §§ 105(a), 548(a)(1)(B), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two-Year Transfers; (b) directing that the Two-Year Transfers be set aside; (c) recovering the Two-Year Transfers, or the value thereof, from the Entity Defendants and/or Kohn, for the benefit of the

BLMIS estate; (d) directing the Entity Defendants and/or Kohn, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all commissions, or other compensation and/or remuneration received by the Entity Defendants and/or Kohn, related to, arising from, or concerning the Two-Year Transfers; and (e) awarding any other relief the Court deems just and appropriate.

## COUNT THREE: FRAUDULENT TRANSFERS – DCL §§ 276, 276-a, 278 AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

### (*Against the Defendants*)

172.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Third Amended Complaint as if fully rewritten herein.

173.   At all times relevant to the Initial Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under Bankruptcy Code § 502 or that are not allowable only under Bankruptcy Code § 502(e).

174.   Each of the Initial Transfers constituted a conveyance by BLMIS as defined under DCL § 270.

175.   Each of the Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then-existing or future creditors.  BLMIS made the Initial Transfers to the Entity Defendants in furtherance of a fraudulent investment scheme.

176.   Each of the Initial Transfers was received by the Entity Defendants and/or Kohn, with actual intent to hinder, delay, or defraud creditors of BLMIS at the time of each of the Initial Transfers, and/or future creditors of BLMIS.

177.   As a result of the foregoing, under DCL §§ 276, 276-a, 278 and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from the Entity Defendants and/or Kohn, for the

benefit of the estate of BLMIS; (d) directing the Entity Defendants and/or Kohn, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all commissions, or other compensation and/or remuneration received by the Entity Defendants and/or Kohn, related to, arising from, or concerning the Initial Transfers; (e) awarding attorneys' fees and costs from the Entity Defendants and/or Kohn; and (f) awarding any other relief the Court deems just and appropriate.

### COUNT FOUR: FRAUDULENT TRANSFERS – DCL §§ 273 AND 278 AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

#### (*Against the Defendants*)

178.  The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Third Amended Complaint as if fully rewritten herein.

179.  At all times relevant to the Initial Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under Bankruptcy Code § 502 or that are not allowable only under Bankruptcy Code § 502(e).

180.  Each of the Initial Transfers constituted a conveyance by BLMIS as defined under DCL § 270.

181.  BLMIS did not receive fair consideration for the Initial Transfers.

182.  BLMIS was insolvent at the time it made each of the Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Initial Transfers.

183.  As a result of the foregoing, under DCL §§ 273, 278 and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; and (c) recovering the Initial Transfers, or the value thereof, from the Entity Defendants and/or Kohn, for the benefit of the estate of BLMIS; (d) directing the Entity Defendants and/or Kohn, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all commissions, or other

compensation and/or remuneration received by the Entity Defendants and/or Kohn, related to, arising from, or concerning the Initial Transfers; and (e) awarding any other relief the Court deems just and appropriate.

### COUNT FIVE: FRAUDULENT TRANSFERS – DCL §§ 274, 278, AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

#### (*Against the Defendants*)

184.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Third Amended Complaint as if fully rewritten herein.

185.   At all times relevant to the Initial Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under Bankruptcy Code § 502 or that are not allowable only under Bankruptcy Code § 502(e).

186.   Each of the Initial Transfers constituted a conveyance by BLMIS as defined under DCL § 270.

187.   BLMIS did not receive fair consideration for the Initial Transfers.

188.   At the time BLMIS made each of the Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Initial Transfers was an unreasonably small capital.

189.   As a result of the foregoing, under DCL §§ 274, 278 and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, from the Entity Defendants and/or Kohn, for the benefit of the estate of BLMIS; (d) directing the Entity Defendants and/or Kohn, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all commissions, or other compensation

and/or remuneration received by the Entity Defendants and/or Kohn, related to, arising from, or concerning the Initial Transfers; and (e) awarding any other relief the Court deems just and appropriate.

## COUNT SIX: FRAUDULENT TRANSFERS – DCL §§ 275, 278 AND/OR 279, BANKRUPTCY CODE §§ 105(a), 544(b), 550(a), AND 551, AND SIPA § 78fff-(2)(c)(3)

### (*Against the Defendants*)

190.  The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Third Amended Complaint as if fully rewritten herein.

191.  At all times relevant to the Initial Transfers, there have been one or more creditors holding matured or unmatured unsecured claims against BLMIS that are allowable under Bankruptcy Code § 502 or that are not allowable only under Bankruptcy Code § 502(e).

192.  Each of the Initial Transfers constituted a conveyance by BLMIS as defined under DCL § 270.

193.  BLMIS did not receive fair consideration for the Initial Transfers.

194.  At the time BLMIS made each of the Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

195.  As a result of the foregoing, under DCL §§ 275, 278 and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; and (c) recovering the Initial Transfers, or the value thereof, from the Entity Defendants and/or Kohn, for the benefit of the estate of BLMIS; (d) directing the Entity Defendants and/or Kohn, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all commissions, or other compensation and/or remuneration received by the Entity Defendants and/or Kohn, related to, arising from, or concerning the Initial Transfers; and (e) awarding any other relief the Court deems appropriate.

## COUNT SEVEN: RECOVERY OF SUBSEQUENT TRANSFERS – DCL §§ 276-a and 278, BANKRUPTCY CODE §§ 105(a) AND 550(a) AND SIPA § 78fff-2(c)(3)

### (*Against Kohn*)

196.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

197.   To the extent that BLMIS did not make the Initial Transfers directly to Kohn, or for her benefit, Kohn was an immediate or mediate transferee of a portion of the Initial Transfers.

198.   Each of the Subsequent Transfers is recoverable from Kohn under Bankruptcy Code § 550 and SIPA § 78fff-2(c)(3).

199.   Each of the Subsequent Transfers was made to Kohn.

200.   Kohn was the immediate or mediate transferee of the Subsequent Transfers.

201.   As a result of the foregoing, under DCL §§ 276-a and 278, Bankruptcy Code §§ 105(a) and 550(a) and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) recovering the Subsequent Transfers, or the value thereof, from Kohn for the benefit of the estate of BLMIS; (b) directing Kohn, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by Kohn related to or arising from, or concerning the Subsequent Transfers; (c) imposing a constructive trust over the Subsequent Transfers, or their proceeds, product or offspring, in favor of the Trustee; (d) awarding attorneys' fees, costs, prejudgment interest, and (e) any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

202.   The Trustee's discovery and investigation is ongoing and the Trustee reserves the right to: (i) supplement the information on the Initial and Subsequent Transfers, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

## IX.    PRAYERS FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in favor of

the Trustee and against the Defendants as follows:

A.     On the First Claim for Relief, under Bankruptcy Code §§ 105(a), 548(a)(1)(A),

550(a), and 551, and SIPA § 78fff-2(c)(3):  (a) avoiding and preserving the Two-Year Transfers;

(b) directing that the Two-Year Transfers be set aside; (c) recovering the Two-Year Transfers, or

the value thereof, from the Entity Defendants and/or Kohn, for the benefit of the BLMIS estate;

(d) directing the Entity Defendants and/or Kohn, to the extent allowable by law, to disgorge to the

Trustee all profits, including any and all commissions, or other compensation and/or remuneration

received by the Entity Defendants and/or Kohn, related to, arising from, or concerning the Two-

Year Transfers; and (e) awarding any other relief the Court deems just and appropriate.

B.     On the Second Claim for Relief, under Bankruptcy Code §§ 105(a), 548(a)(1)(B),

550(a), and 551, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Two-Year Transfers;

(b) directing that the Two-Year Transfers be set aside; (c) recovering the Two-Year Transfers, or

the value thereof, from the Entity Defendants and/or Kohn, for the benefit of the BLMIS estate;

(d) directing the Entity Defendants and/or Kohn, to the extent allowable by law, to disgorge to the

Trustee all profits, including any and all commissions, or other compensation and/or remuneration

received by the Entity Defendants and/or Kohn, related to, arising from, or concerning the Two-

Year Transfers; and (e) awarding any other relief the Court deems just and appropriate.

C.     On the Third Claim for Relief, under DCL §§ 276, 276-a, 278 and/or 279,

Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3):  (a) avoiding and

preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering

the Initial Transfers, or the value thereof, from the Entity Defendants and/or Kohn, for the benefit

of the estate of BLMIS; (d) directing the Entity Defendants and/or Kohn, to the extent allowable

by law, to disgorge to the Trustee all profits, including any and all commissions, or other

compensation and/or remuneration received by the Entity Defendants and/or Kohn, related to,

arising from, or concerning the Initial Transfers; (e) awarding attorneys' fees and costs from the

Entity Defendants and/or Kohn; and (f) awarding any other relief the Court deems just and

appropriate.

D.     On the Fourth Claim for Relief, under DCL §§ 273, 278 and/or 279, Bankruptcy

Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving

the Initial Transfers; (b) directing that the Initial Transfers be set aside; and (c) recovering the

Initial Transfers, or the value thereof, from the Entity Defendants and/or Kohn, for the benefit of

the estate of BLMIS; (d) directing the Entity Defendants and/or Kohn, to the extent allowable by

law, to disgorge to the Trustee all profits, including any and all commissions, or other

compensation and/or remuneration received by the Entity Defendants and/or Kohn, related to,

arising from, or concerning the Initial Transfers; and (e) awarding any other relief the Court deems

just and appropriate.

E.     On Fifth Claim for Relief, under DCL §§ 274, 278 and/or 279, Bankruptcy Code

§§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the

Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial

Transfers, or the value thereof, from the Entity Defendants and/or Kohn, for the benefit of the

estate of BLMIS; (d) directing the Entity Defendants and/or Kohn, to the extent allowable by law,

to disgorge to the Trustee all profits, including any and all commissions, or other compensation

and/or remuneration received by the Entity Defendants and/or Kohn, related to, arising from, or

concerning the Initial Transfers; and (e) awarding any other relief the Court deems just and appropriate.

F.      On the Sixth Claim for Relief, under DCL §§ 275, 278 and/or 279, Bankruptcy Code §§ 105(a), 544(b), 550(a), and 551, and SIPA § 78fff-2(c)(3): (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; and (c) recovering the Initial Transfers, or the value thereof, from the Entity Defendants and/or Kohn, for the benefit of the estate of BLMIS; (d) directing the Entity Defendants and/or Kohn, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all commissions, or other compensation and/or remuneration received by the Entity Defendants and/or Kohn, related to, arising from, or concerning the Initial Transfers; and (e) awarding any other relief the Court deems appropriate.

G.      On the Seventh Claim for Relief, under DCL §§ 276-a and 278, Bankruptcy Code §§ 105(a) and 550(a) and SIPA § 78fff-2(c)(3): (a) recovering the Subsequent Transfers, or the value thereof, from Kohn for the benefit of the estate of BLMIS; (b) directing Kohn, to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees, or other compensation and/or remuneration received by Kohn related to or arising from, or concerning the Subsequent Transfers; (c) imposing a constructive trust over the Subsequent Transfers, or their proceeds, product or offspring, in favor of the Trustee; (d) awarding attorneys' fees, costs, prejudgment interest, and (e) any other relief, including attorneys' fees and costs, the Court deems just and appropriate.

Dated: _____, 2019                    */s/ Keith R. Murphy* _____
          New York, New York               **Baker & Hostetler LLP**
                                           45 Rockefeller Plaza
                                           New York, New York 10111
                                           Telephone: (212) 589-4200
                                           Facsimile: (212) 589-4201
                                           David J. Sheehan
                                           dsheehan@bakerlaw.com
                                           Keith R. Murphy
                                           kmurphy@bakerlaw.com
                                           Marco Molina
                                           mmolina@bakerlaw.com
                                           Andrew M. Serrao
                                           aserrao@bakerlaw.com

                                           *Attorneys for Irving H. Picard, Trustee for the*
                                           *Substantively Consolidated SIPA Liquidation*
                                           *of Bernard L. Madoff Investment Securities*
                                           *LLC and the Estate of Bernard L. Madoff*