# Exhibit A

**REVOLVING CREDIT AND SECURITY AGREEMENT**

among

AMERICAN MASTERS BROAD MARKET PRIME FUND, L.P.,
as Borrower

TREMONT PARTNERS, INC.,
as General Partner

CAFCO, LLC,
as Conduit Lender

CITIBANK, N.A.,
as Secondary Lender

and

CITICORP NORTH AMERICA, INC.,
as Agent

Dated as of June 15, 2005

[Type VII-C]

13620.0256 #565349

# TABLE OF CONTENTS

Page

## REVOLVING CREDIT AND SECURITY AGREEMENT

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

SECTION 1.01. Definitions................................................................... 1

SECTION 1.02. Rules of Construction...............................................................

SECTION 1.03. Computation of Time Periods. .......................................... 20

## ARTICLE II
## ADVANCES TO THE BORROWER

SECTION 2.01. Advance Facility. ............................................... 20

SECTION 2.02. Making of Advances. ........................................... 21

SECTION 2.03. Noteless Agreement; Evidence of Indebtedness. ............... 21

SECTION 2.04. Maturity of the Advances................................... 22

SECTION 2.05. Prepayment of the Advances............................... 22

SECTION 2.06. Yield......................................................... 23

SECTION 2.07. Increased Costs. ................................................ 24

SECTION 2.08. Compensation.................................................... 24

SECTION 2.09. Additional Yield on LIBOR Advances. ..................... 24

SECTION 2.10. Termination or Reduction of the Total Commitment. ....... 25

SECTION 2.11. Rescission or Return of Payment. ........................... 26

SECTION 2.12. Fees Payable by Borrower. .................................. 26

SECTION 2.13. Post Default Interest........................................... 26

SECTION 2.14. Payments....................................................... 26

SECTION 2.15. Ratable Payments.............................................. 27

SECTION 2.16. Obligations Absolute.......................................... 27

## ARTICLE III
## CONDITIONS PRECEDENT

SECTION 3.01. Conditions Precedent to the Effectiveness of this Agreement........................... 27

SECTION 3.02. Conditions Precedent to All Advances. ............................................................ 29

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

SECTION 4.01. Representations and Warranties.......................................................................... 30

## ARTICLE V
## COVENANTS

SECTION 5.01. Affirmative Covenants........................................................................................ 34

SECTION 5.02. Negative Covenants. .......................................................................................... 39

## ARTICLE VI
## EVENTS OF DEFAULT

SECTION 6.01. Events of Default. .............................................................................................. 41

## ARTICLE VII
## PLEDGE OF ASSIGNED COLLATERAL;
## RIGHTS OF THE AGENT

SECTION 7.01. Security Interests................................................................................................ 44

SECTION 7.02. Substitution of Collateral and Release of Security Interest. .............................. 45

SECTION 7.03. Application of Proceeds. .................................................................................... 46

SECTION 7.04. Rights and Remedies upon Event of Default..................................................... 47

SECTION 7.05. Remedies Cumulative. ....................................................................................... 47

SECTION 7.06. Enforcement of Certain Other Remedies. ......................................................... 48

## ARTICLE VIII
## THE AGENT

SECTION 8.01. Authorization and Action.................................................................................... 48

SECTION 8.02. Delegation of Duties. ......................................................................................... 48

SECTION 8.03. Agent's Reliance, Etc. ....................................................................................... 49

SECTION 8.04. Indemnification. ................................................................................................ 49

SECTION 8.05. Successor Agent. ............................................................................................... 50

## ARTICLE IX
## MISCELLANEOUS

SECTION 9.01. No Waiver; Modifications in Writing. ................................................................ 50

SECTION 9.02. Notices, Etc. ...................................................................................................... 50

SECTION 9.03. Taxes. ................................................................................................................. 52

SECTION 9.04. Costs and Expenses; Indemnification. .............................................................. 53

SECTION 9.05. Execution in Counterparts. ............................................................................... 54

SECTION 9.06. Assignability. ..................................................................................................... 54

SECTION 9.07. Governing Law. ................................................................................................. 55

SECTION 9.08. Severability of Provisions. ................................................................................ 56

SECTION 9.09. Confidentiality. .................................................................................................. 56

SECTION 9.10. Claims Against the General Partner. ................................................................. 56

SECTION 9.11. Merger. ............................................................................................................... 58

SECTION 9.12. No Proceedings; No Recourse. ......................................................................... 58

SECTION 9.13. Survival of Representations and Warranties. ..................................................... 59

SECTION 9.14. Submission to Jurisdiction; Waivers; Etc. ........................................................ 59

SECTION 9.15. E-Mail Reports. ................................................................................................. 60

SECTION 9.16. Waiver of Jury Trial. ......................................................................................... 60

SECTION 9.17. Several Obligations. .......................................................................................... 60

SECTION 9.18. Certain Waivers. ................................................................................................ 61

## SCHEDULES

Schedule I              Advance Rates
Schedule II             Form of Investor Report
Schedule III            Form of Weekly Report
Schedule IV             List of Industry Classifications

## EXHIBITS

EXHIBIT A              Form of Advance Note
EXHIBIT B              Form of Notice of Borrowing
EXHIBIT C              Form of Notice of Prepayment
EXHIBIT D              Form of Assignment and Acceptance
EXHIBIT E              Form of Control Agreement
EXHIBIT F              Form of Summary of Terms

13620.0256 #565349

# REVOLVING CREDIT AND SECURITY AGREEMENT

REVOLVING CREDIT AND SECURITY AGREEMENT, dated as of June 15, 2005 among AMERICAN MASTERS BROAD MARKET PRIME FUND, L.P. (together with its permitted successors and assigns, the "Borrower"), TREMONT PARTNERS, INC. (together with its permitted successors and assigns, the "General Partner"), CAFCO, LLC, CITIBANK, N.A. and the other Secondary Lenders (as hereinafter defined) from time to time parties hereto, CITICORP NORTH AMERICA, INC., as agent for the Secured Parties (as hereinafter defined) (in such capacity, together with its successors and assigns, the "Agent").

W I T N E S S E T H:

WHEREAS, the Borrower desires that the Conduit Lender (as hereinafter defined) and the Secondary Lenders from time to time make advances to the Borrower on the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the Conduit Lender and the Secondary Lenders are willing to make such advances to the Borrower for such purposes on the terms and subject to the conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto agree as follows:

ARTICLE I
DEFINITIONS AND RULES OF CONSTRUCTION

SECTION 1.01.  Definitions.

As used in this Agreement, the following terms shall have the meanings indicated:

"Accounting Based Consolidation Event" means the consolidation, for financial and/or regulatory accounting purposes, of all or any portion of the assets and liabilities of the Conduit Lender that are the subject of this Agreement, the Asset Purchase Agreement or any other Program Document with all or any portion of the assets and liabilities of Citibank or the Agent or any of their affiliates as the result of the occurrence of any change in, accounting standards or the issuance, after the date hereof of any pronouncement, interpretation or release, by any accounting body or any other body charged with the promulgation or administration of accounting standards, including, without limitation, the Financial Accounting Standards Board, the International Accounting Standards Board, the American Institute of Certified Public Accountants, the Federal Reserve Board of Governors and the Securities and Exchange Commission, and shall occur as of the date that such consolidation (i) shall have occurred with respect to the financial statements of Citibank or the Agent or any of their affiliates, or (ii) shall have been required to have occurred, regardless of whether such financial statements were prepared as of such date.

"Account Documents" means the Customer Agreement and the Option Agreement.

"Account Manager" means the entity set forth in the Side Letter as the Account Manager, together with any successors or assigns which have been consented to in writing by the Agent.

"Adjusted Asset Value" means in respect of a Borrowing Base Eligible Asset, an amount equal to the product of (i) the Asset Value of such Borrowing Base Eligible Asset, and (ii) the applicable Advance Rate for such Borrowing Base Eligible Asset.

"Advance" means each borrowing by the Borrower pursuant to Article II, provided, that if the Conduit Lender assigns a portion of any Advance made by it pursuant to an Asset Purchase Agreement or otherwise or any Secondary Lender assigns a portion of any outstanding Advance made by it pursuant to an Assignment and Acceptance, the portion of such Advance retained by the Conduit Lender or such Secondary Lender, as the case may be, and the portion of such Advance acquired by such assignee shall each be deemed to constitute a separate Advance for purposes of this Agreement.

"Advance Note" means each promissory note, if any, issued by the Borrower to the Conduit Lender or a Secondary Lender in accordance with the provisions of Section 2.03, substantially in the form of Exhibit A hereto, as the same may from time to time be amended, supplemented, waived or modified.

"Advance Rate" means in respect of any Asset, the percentage corresponding to such Asset as set forth on Schedule I hereto.

"Adverse Claim" means any Lien or other right, claim, encumbrance or any other type of preferential arrangement in, of or on any Person's assets or properties in favor of any other Person, other than in the case of the Borrower, Permitted Liens.

"Affected Person" means each Lender, each Secondary Lender, any other entity which enters into a commitment to make or purchase any Advance or any interest therein or to provide any liquidity or credit enhancement to the Conduit Lender, including any participant of any Lender or any Secondary Lender.

"Affiliate" means, in respect of a referenced Person, (a) another Person controlling, controlled by or under common control with such referenced Person (which in the case of the Conduit Lender and the Agent shall also include any entity which is a special purpose entity that issues promissory notes and has a relationship to the Agent comparable to that of the Conduit Lender) or (b) any officer (exclusive of a "ministerial officer" with no authority to bind a Person), director of or partner in the referenced Person. The terms "control," "controlling," "controlled" and the like mean the direct or indirect possession of the power to direct or cause the direction of the management or policies of a Person or the disposition of its assets or properties, whether through ownership, by contract, arrangement or understanding, or otherwise.

"Agency Security" means a FHLMC Security, a FNMA Security or a SLMA Security.

"<u>Agent</u>" shall have the meaning assigned to such term in the introduction to this Agreement.

"<u>Agent's Account</u>" means the special account (account number 40636695, ABA No. 021000089) of the Agent maintained at the office of Citibank at its Principal Office or to such other account as the Agent shall designate in writing to the General Partner.

"<u>Agreement</u>" means this Agreement, as the same may from time to time be amended, supplemented, waived or modified.

"<u>Alternate Base Rate</u>" means a fluctuating interest rate per annum as shall be in effect from time to time, which rate shall be at all times equal to the sum of the Base Rate <u>plus</u> the Applicable Margin.

"<u>Applicable Law</u>" means any Law of any Authority, including, without limitation, all Federal and state banking or securities laws, to which the Person in question is subject or by which it or any of its assets or properties are bound.

"<u>Applicable Margin</u>" means, with respect to LIBOR, 1.00% per annum and with respect to the Alternate Base Rate 0% per annum; <u>provided</u>, <u>however</u>, that during the continuance of any Event of Default the "Applicable Margin" shall mean with respect to LIBOR, 2.50% per annum and with respect to the Alternate Base Rate, 1.50% per annum; <u>provided</u>, <u>further</u>, that during any period that Yield in respect of any Advance is computed by reference to the Post Default Rate, the "Applicable Margin" applicable to such Advance during such period shall be deemed to be zero.

"<u>Asset Purchase Agreement</u>" means the Asset Purchase Agreement or similar agreement entered into by a Secondary Lender pursuant to which, subject to the terms and conditions thereof, such Secondary Lender is obligated to purchase interest in the Advances funded by the Conduit Lender.

"<u>Assets</u>" means a collective reference to all items which would be classified as an "asset" on the balance sheet of the Borrower in accordance with GAAP.

"<u>Asset Value</u>" means in respect of any Asset, as of any day of determination (a) in respect of cash, the amount of such cash, and (b) in respect of any other Asset, the fair market value of such Asset computed in good faith by the Borrower or the General Partner in accordance with the Constituent Documents and the Offering Materials of the Borrower as in effect on the Closing Date, and otherwise consistent with the methodologies and practices in use in respect of the Borrower on the Closing Date; <u>provided</u>, that the Asset Value of any Asset shall be net of the Borrower's liabilities relating thereto (other than the Credits Outstanding of the Borrower), including without limitation all of the Borrower's obligations to pay any unpaid portion of the purchase price therefor; <u>provided</u>, <u>further</u>, that if the fair market value of an Asset as determined in the manner set forth above has not been determined based upon independent reliable market sources, the "Asset Value" of such Asset shall be zero for purposes of this definition.

"Assigned Collateral" shall have the meaning assigned to such term in Section 7.01.

"Assignee Rate" means in respect of any Advance for any Settlement Period an interest rate per annum equal to the sum of the Applicable Margin plus LIBOR for such Settlement Period; provided, however, that in the case of:

(i)    any Settlement Period on or prior to the first day on which a Lender or Secondary Lender shall have notified the Agent that the introduction of or any change in or in the interpretation of any law or regulation makes it unlawful, or any central bank or other governmental authority asserts that it is unlawful, for such Lender or Secondary Lender to fund such Advance at the Assignee Rate set forth above (and such Lender or such Secondary Lender shall not have subsequently notified the Agent that such circumstances no longer exist),

(ii)    any Settlement Period of one to (and including) 27 days,

(iii)    any Settlement Period as to which the Agent does not receive notice, by no later than 12:00 noon (New York City time) on the second Business Day preceding the first day of such Settlement Period, that such Advance will not be funded by issuance of commercial paper, or

(iv)    any Settlement Period for which the aggregate principal amount of the outstanding Advances is less than $1,000,000,

the "Assignee Rate" for such Settlement Period shall be an interest rate per annum equal to the Alternate Base Rate in effect on the first day of such Settlement Period.

"Assignment and Acceptance" means the Assignment and Acceptance, in substantially the form of Exhibit D hereto, entered into by a Secondary Lender, an Eligible Assignee, the Agent and, if applicable, the Borrower, pursuant to which such Eligible Assignee became a party to this Agreement.

"Authority" means any governmental or quasi-governmental authority (including the NASD, the Commodities Future Trading Commission, the stock exchanges and the SEC), whether executive, legislative, judicial, administrative or other, or any combination thereof, including, without limitation, any Federal, state, territorial, county, municipal or other government or governmental or quasi-governmental agency.

"Base Rate" means the rate of interest from time to time announced publicly by Citibank at its Principal Office as its base rate.  The Base Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer of Citibank.

"Benefit Arrangement" means an employee benefit plan within the meaning of Section 3(3) of ERISA which is subject to the provisions of Title I of ERISA and is not a Plan or a Multiemployer Plan.

"Borrower" shall have the meaning assigned to such term in the introduction to this Agreement.

"Borrower Obligations" means all indebtedness, whether absolute, fixed or contingent, at any time or from time to time owing by the Borrower or the General Partner to any Secured Party or any Affected Person under or in connection with this Agreement, the Advance Notes, the Control Agreement, any Cash Account Control Agreement, the Fee Letter or any other Program Document, including without limitation, all amounts payable by the Borrower or the General Partner in respect of the Advances, with interest thereon, and the amounts payable under Sections 2.05, 2.06, 2.07, 2.11, 2.12, 2.13, 2.14, 7.04(b), 9.03 and 9.04 of this Agreement.

"Borrowing Base" means, as of any date any determination thereof is made, an amount equal to (i) the aggregate Adjusted Asset Value of all Eligible Collateral of the Borrower as of such date of determination in which the Agent has a valid and perfected first priority security interest free and clear of Adverse Claims, minus (ii) the Borrowing Base Excess Amount as of such date of determination.

"Borrowing Base Eligible Asset" means cash deposited in the Brokerage Account or any Cash Account, any Eligible Commercial Paper, any U.S. Government Security, any Agency Security, any Eligible Money Market Investment or any Eligible Equity Security or any other eligible assets, which are consented to in writing by the Agent; provided, that this Agreement is amended in a manner which the Agent deems reasonably necessary or appropriate to reflect such additional eligible assets, in each case which the Borrower is permitted to purchase in accordance with its Investment Policies and Restrictions and which are free and clear of all Adverse Claims; provided, that such Asset does not constitute (i) an Excluded Foreign Asset, a Citigroup Asset or a Restricted Security, (ii) an Asset which is pledged for margin requirements on options, calls or other Derivatives Transactions or which is otherwise subject to a Derivatives Transaction (other than an Equity Security pledged as security for calls written by the Borrower and expressly contemplated by the Summary of Terms), or (iii) any cash or other Asset which is not deposited in or credited to the Brokerage Account or a Cash Account.

"Borrowing Base Excess Amount" means as of any date any determination thereof is made, an amount equal to the sum (without duplication) of:

> (i)    the amount by which the aggregate Adjusted Asset Value of all Eligible Collateral of the Borrower (other than cash and U.S. Government Securities) issued or Guaranteed by or owing from any Person (together with all Affiliates of such Person) other than the three Persons (together with all Affiliates of each such Person) that have the three highest amounts of the Adjusted Asset Value of all Eligible Collateral attributed to them (the "Three Largest Obligors"), exceeds five percent (5%) of the aggregate Adjusted Asset Value of all Eligible Collateral;

> (ii)    the amount by which the aggregate Adjusted Asset Value of all Eligible Collateral of the Borrower (other than cash and U.S. Government Securities) issued or Guaranteed by or owing from

5

any Person that constitutes one of the Three Largest Obligors,
exceeds ten percent (10%) of the aggregate Adjusted Asset Value
of all Eligible Collateral; and

(iii)    the amount by which the aggregate Adjusted Asset Value
of all Eligible Collateral (other than cash, U.S. Government
Securities and Agency Securities) issued or Guaranteed by Persons
in a single Industry Class, exceeds fifteen percent (15%) of the
aggregate Adjusted Asset Value of all Eligible Collateral.

Notwithstanding the foregoing, the Agent may upon the reasonable request of the
Borrower in its reasonable discretion designate in writing to the Borrower a percentage which is
higher than the relevant percentage set forth in clauses (i), (ii) or (iii) above (each such
percentage, a "Special Concentration Percentage"); provided, that the Agent in its sole discretion
may cancel any such Special Concentration Percentage upon twenty (20) Business Days' notice
to the Borrower.

"Borrowing Base Test" means, (i) as of any date of determination for purposes of
any Investor Report, the Borrowing Base shall be equal to or greater than Credits Outstanding as
of the last Business Day of the calendar month to which such Investor Report relates, and (ii) as
of any Compliance Determination Date, the Borrowing Base as is required to be reported in the
Weekly Report to be delivered on such the immediately succeeding Business Day shall be equal
to or greater than Credits Outstanding.

"Borrowing Date" shall have the meaning assigned to such term in Section 2.02.

"Brokerage Account" means a collective reference to all accounts carried or
maintained by the Account Manager or by any of its affiliates, for or on behalf of the Borrower,
as specified in the Control Agreement, as supplemented and modified in accordance with Section
5.02 (e) and the Control Agreement.

"Business Day" means any day on which (i) banks are not authorized or required
to close in New York, New York and the New York Stock Exchange is not authorized or
required to close, and (ii) if this definition of "Business Day" is utilized in connection with a
LIBOR Advance, dealings are carried out in the London interbank market.

"Cash Account" means any account referred to in a Cash Account Control
Agreement in respect of which the Agent has "control" within the meaning of the UCC,
established by the Borrower in accordance with Section 5.02(e).

"Cash Account Agreement" means each agreement between the Borrower and/or
the General Partner and a Cash Account Bank entered into in connection with the establishment
and maintenance of one or more Cash Accounts, as the same may be from time to time amended,
supplemented, waived or modified in accordance with this Agreement.

"Cash Account Bank" means any account institution other than the Account
Manager which maintains an account of the Borrower.

"Cash Account Control Agreement" means a Cash Account Control Agreement entered into among the Borrower, the Agent and a Cash Account Bank in form, scope and substance reasonably satisfactory to the Agent, as the same may from time to time be amended, supplemented, waived or modified.

"CAFCO" means CAFCO, LLC.

"Citibank" means Citibank, N.A. and its successors.

"Citigroup Assets" means an Asset for which Citigroup or any Affiliate of Citigroup is the issuer or guarantor.

"Class A Eligible Commercial Paper" means a promissory note issued in the commercial paper market by an obligor having its principal office in the United States, having a maturity of not more than 30 days and which is rated at least "A-1" by S&P or at least "P-1" by Moody's.

"Class A Eligible Money Market Investment" means an Eligible Money Market Investment having a maturity of no more than 180 days.

"Class B Eligible Commercial Paper" means a promissory note issued in the commercial paper market by an obligor having its principal office in the United States (other than Class A Eligible Commercial Paper), having a maturity of not more than 180 days and which is rated at least "A-1" by S&P or at least "P-1" by Moody's.

"Class B Eligible Money Market Investment" means an Eligible Money Market Investment other than a Class A Eligible Money Market Investment.

"Closing Date" means the first date on which the conditions precedent specified in Section 3.01 shall have been fully satisfied.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute.

"Compliance Determination Date" means the Business Day immediately preceding each Compliance Report Date on which day the General Partner shall determine the Borrower's compliance with the Borrowing Base Test and the NAV Test.

"Compliance Report Date" means, (i) each Borrowing Date, (ii) the Wednesday of each calendar week, or if such Wednesday is not a Business Day, the immediately succeeding Business Day, and (iii) during the continuance of a Default or an Event of Default, each Business Day which the Agent shall designate as a "Compliance Report Date" (which may be daily).

"Conduit Lender" means CAFCO, together with its permitted successors and assigns that constitute special purpose entities that issue commercial paper notes or other debt securities.

"Constituent Documents" means (i) in respect of the Borrower, the Partnership Agreement and any other agreement, instrument, filing or notice filed or made in connection with the formation or organization of the Borrower, and (ii) in respect of the General Partner, the certificate or articles of organization and other organizational documents and by-laws of the General Partner.

"Control Agreement" means the letter agreement entered into by the Borrower, the Agent and the Account Manager, in substantially the form of Exhibit E hereto, as the same may from time to time be amended, supplemented, waived or modified.

"CP Rate" for each day during a Settlement Period for any Advance means to the extent the Conduit Lender funds such Advance on such day by issuing commercial paper notes, the per annum rate equivalent to the weighted average of the per annum rates paid or payable by the Conduit Lender from time to time as interest on or otherwise (by means of interest rate hedges or otherwise) in respect of those commercial paper notes issued by the Conduit Lender that are allocated, in whole or in part, by the Agent (on behalf of the Conduit Lender) as attributable to the funding or the making or maintenance of such Advance on such day during such Settlement Period as determined by the Agent (on behalf of the Conduit Lender) and reported to the Borrower, which rates shall reflect and give effect to the commissions of placement agents and dealers in respect of such commercial paper notes, to the extent such commissions are allocated, in whole or in part, to such commercial paper notes by the Agent on behalf of the Conduit Lender; provided, however, that if any component of such rate is a discount rate, in calculating the "CP Rate" for such day the Agent shall for such component use the rate resulting from converting such discount rate to an interest bearing equivalent rate per annum.

"Credits Outstanding" means at any time a determination thereof is made, an amount equal to the sum of (i) the outstanding principal amount of all Advances, plus (ii) any unpaid and past due Yield accrued on the outstanding advances and unpaid and past due fees due on the Fee Letter, plus (iii) the Yield that would accrue on the outstanding principal amount of the Advances through the sixty (60) day period following such date of determination, computed by reference to the Assignee Rate (based upon LIBOR) for a thirty (30) day period in effect as of the time of determination, plus (iv) all fees that would accrue under the Fee Letter through the sixty (60) day period following such date of computation, computed as if the outstanding principal amount of the Advances on each day during such period was equal to the Total Commitment, plus (v) the amount of any judgment or the amount of any taxes that give rise to a Permitted Lien on any of the Assets of the Borrower.

"Customer Agreement" means the Customer Agreement between the Borrower and the Account Manager as in effect on the Closing Date, as the same may be from time to time amended, supplemented, waived or modified in accordance with this Agreement.

"Debt" means with respect to any Person, at any date, without duplication, (i) all obligations of such Person for borrowed money or for the deferred purchase price of property or services, including without limitation, all obligations of such Person which are evidenced by letters of credit or letter of credit reimbursement agreements, (ii) all obligations of such Person evidenced by bonds, debentures, notes, acceptances or other similar instruments, (iii) all

obligations of such Person to pay the deferred purchase price of property or services, (iv) all obligations of such Person as lessee which are capitalized in accordance with GAAP, (v) all Debt of others secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person, (vi) all obligations of such Person to make an investment in or to extend credit to another Person, (vii) payment obligations, fixed or contingent, under investment, financial derivative or similar contracts (other than covered short sales) as set forth on the liability side of such Person's balance sheet, (vii) all Debt of others Guaranteed by such Person, (viii) all obligations of such Person to post margin or collateral (howsoever characterized) under any prime brokerage, securities account, option or similar arrangement, and (ix) to the extent not otherwise included, all items which in accordance with GAAP would be included in determining total liabilities as shown on the liabilities side of such Person's balance sheet.

"Default" means any event which, with the passage of time, the giving of notice, or both, would constitute an Event of Default.

"Derivatives Transaction" means any financial futures contract, option, forward contract, warrant, swap, swaption, collar, floor, cap and other agreement, instrument and derivative and other transactions of a similar nature (whether currency linked, index linked, insurance risk linked, credit risk linked or otherwise).

"Determination Date" means (i) each Borrowing Date, (ii) each date any Restricted Payment is made, and (iii) the last day of each Settlement Period.

"Dollars" and "$" mean lawful money of the United States of America.

"Eligible Assignee" means Citicorp North America, Inc., Citibank, any of their respective Affiliates, any Person managed by Citibank, Citicorp North America, Inc. or any of their respective Affiliates, or any financial or other institution acceptable to the Agent.

"Eligible Collateral" means the Assigned Collateral which constitutes Borrowing Base Eligible Assets.

"Eligible Commercial Paper" means Class A Eligible Commercial Paper and Class B Eligible Commercial Paper.

"Eligible Equity Security" means an Equity Security which is a component of the OEX and which has a per share trading price of at least $5.00.

"Eligible Money Market Investment" means an investment in a money market fund having a rating of "AAAm" or "AAAm-g" from S&P or a rating of "P-1" from Moody's and a maturity date of 360 days or less.

"E-Mail Report" shall have the meaning assigned to such term in Section 9.15.

"Equity Securities" means common and preferred stock, warrants, trusts, certificates, real estate investment trust interests, membership interests or partnership interests; provided, that for purposes of this definition the term "Equity Securities" shall not include Eligible Money Market Investments.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Group" means the Borrower or the General Partner and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with the Borrower or the General Partner, as the case may be, are treated as a single employer under Section 414(b), (c), (m) or (n) of the Code.

"Eurocurrency Liabilities" shall have the meaning assigned to such term in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Event of Default" means the occurrence of any of the events, acts or circumstances set forth in Section 6.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC thereunder, all as from time to time in effect, or any successor law, rules or regulations, and any reference to any statutory or regulatory provision shall be deemed to be a reference to any successor statutory or regulatory provision.

"Excluded Foreign Asset" means an Asset, (i) issued or guaranteed by a Person which is organized outside of an OECD Country, or (ii) is denominated or payable in a currency other than Dollars.

"Fee Letter" means that certain letter agreement between the Borrower and the Agent setting forth the fees payable by the Borrower, as the same may from time to time be amended, supplemented, waived or modified.

"FHLMC Security" means a mortgage-backed security issued and guaranteed, with respect to timely payment of interest and ultimate payment of principal, by the Federal Home Loan Mortgage Corporation and backed by a pool of mortgage loans.

"FNMA Security" means a mortgage-backed security issued and guaranteed with respect to timely payments of interest and ultimate payment of principal, by the Federal National Mortgage Association and backed by a pool of mortgage loans.

"GAAP" means generally accepted accounting principles in the United States, in effect from time to time, consistently applied.

"General Partner" means Tremont Partners, Inc., together with its permitted successors and assigns.

"Governmental Authorizations" means all franchises, permits, licenses, approvals, consents and other authorizations of all Authorities.

"Governmental Filings" means all filings, including franchise and similar tax filings, and the payment of all fees, assessments, interests and penalties associated with such filing with all Authorities.

10

"Guarantee" by any Person means (a) any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other monetary obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business, or (b) any Lien on any assets or properties of such Person (determined on an unconsolidated basis) securing any Debt or other obligation of any other Person, whether or not such Debt or other obligation is assumed by such Person.  The amount of any Guarantee referred to in clause (b) shall be deemed to be an amount equal to the lesser of the fair market value of the assets secured and the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made.  The term "Guarantee" used as a verb has a corresponding meaning.

"Industry Class" means any industry class set forth on Schedule IV hereto, as such Schedule IV may be amended and supplemented from time to time with the prior written consent of the Agent.

"Investment Company Act" means the Investment Company Act of 1940, as amended, and the rules and regulations of the SEC thereunder, as modified or interpreted by orders of the SEC, or other interpretative releases or letters issued by the SEC or its staff, all as from time to time in effect, or any successor law, rules or regulations, and any reference to any statutory or regulatory provision shall be deemed to be a reference to any successor statutory or regulatory provision.

"Investment Policies and Restrictions" means the investment strategy of the Borrower which is limited solely to the strategy expressly set forth in the Summary of Terms which permits the Borrower to (i) purchase Eligible Equity Securities, (ii) sell related out-of-the-money call options, and (iii) buy related out-of-the-money or at-the-money put options in the manner set forth therein, together with any other limits and restrictions on investing by the Borrower and the Borrower's borrowing policies set forth in the Constituent Documents and Offering Materials of the Borrower and in the Summary of Terms, provided, that for purposes of this Agreement the term Investment Policies and Restrictions shall also be deemed to include the purchase and sale by or on behalf of the Borrower of U.S. Government Securities, Agency Securities, Eligible Money Market Investments and Eligible Commercial Paper.

"Investor Report" means the Investor Report of the Borrower substantially in the form of Schedule II hereto.

"Law" means any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, promulgation, regulation, requirement, rule, rule of law, rule of public

policy, settlement agreement, statute, or writ, of any Authority, or any particular section, part or provision thereof.

"Lenders" means the Conduit Lender, together with all Persons which acquire or are obligated to acquire any interest in any Advance under the Asset Purchase Agreement or in the case of Citibank, under any similar arrangement, or otherwise.

"LIBOR" means, for any Advance for any Settlement Period, an interest rate per annum equal to the rate per annum at which deposits in Dollars are offered by the principal office of Citibank in London, England to prime banks in the London interbank market at 11:00 A.M. (London time) two (2) Business Days before the first day of such Settlement Period in an amount substantially equal to the outstanding principal amount of such Advance on such first day and for a period substantially equal to such Settlement Period.

"LIBOR Additional Yield" means additional Yield on the outstanding principal of each Advance during the Settlement Period in respect of such Advance in respect of which Yield is computed by reference to LIBOR, for such Settlement Period, at a rate per annum equal at all times during such Settlement Period to the remainder obtained by subtracting (i) LIBOR for such Settlement Period from (ii) the rate obtained by dividing LIBOR referred to in clause (i) above by that percentage equal to one-hundred percent (100%) minus the LIBOR Reserve Percentage of the Lender or Secondary Lender, as the case may be, for such Settlement Period.

"LIBOR Advance" means an Advance the Yield on which is computed with reference to the LIBOR.

"LIBOR Reserve Percentage" for any Settlement Period for any LIBOR Advance means the reserve percentage applicable during such Settlement Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) (or if more than one such percentage shall be applicable, the daily average of such percentages for those days in such Settlement Period during which any such percentage shall be so applicable) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for a Lender or any Secondary Lender with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or any other category of liabilities that includes deposits by reference to which the interest rate on Eurocurrency Liabilities is determined) having a term comparable to such Settlement Period.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien or security interest (statutory or other), or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable law of any jurisdiction).

"Liquidation Fee" means, in respect of any Advance for any Settlement Period which is funded by the Conduit Lender during which the principal on such Advance is repaid by the Borrower in whole or in part prior to the end of said Settlement Period, the amount, if any, by which (i) the additional Yield (calculated without taking into account any Liquidation Fee or any

shortened duration of such Settlement Period) which would have accrued during such Settlement Period on the reduction of the outstanding principal amount of such Advance relating to such Settlement Period had such reductions remained as outstanding principal, exceeds (ii) that income, if any, received by the Conduit Lender's investing the proceeds of such reductions of principal.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Margin Stock Percentage" means, as of any date of determination, the then current percentage of market value assigned by the Board of Governors of the Federal Reserve System under Section 221.7 of Regulation U to Margin Stock (which percentage, as of the Closing Date, is fifty percent (50%)).

"Material Adverse Effect" means (i) a material adverse effect on the ability of the Borrower, the General Partner or the Account Manager, as applicable, to fully perform its obligations under this Agreement or any other Program Document, (ii) an adverse effect on any Secured Party's right, title and interest in the Assigned Collateral or on the rights and remedies of any Secured Party under any Program Document, (iv) an adverse effect on the validity or enforceability of this Agreement or any other Program Document, (v) a material adverse effect on the business, financial position, operations, Assets or properties of the Borrower, the General Partner or the Account Manager, (vi) a material adverse claim on any of the Assets of the Borrower, the General Partner or the Account Manager, or (vii) a Default or Event of Default.

"Maturity Date" means the Termination Date (or if such day is not a Business Day, the Business Day immediately preceding such date).

"Moody's" means Moody's Investors Service, Inc., together with its successors.

"Multiemployer Plan" means an employee pension benefit plan within the meaning of Section 4001(a)(3) of ERISA.

"NASD" means both the National Association of Securities Dealers, Inc. and NASD Regulation, Inc. or any successor entity.

"NAV" means in respect of the Borrower, the net asset value of the Borrower computed in the manner such net asset value is required to be computed by the Borrower in accordance with the Constituent Documents and the Offering Materials of the Borrower and otherwise consistent with the methodology and practices in respect of the Borrower on the Closing Date, determined in good faith in accordance with GAAP and with valuations otherwise based on current market information.

"NAV Test" means (i) as of any date of determination for purposes of any Investor Report, the NAV of the Borrower shall exceed Credits Outstanding by two hundred percent (200%) as of the last Business Day of the calendar month to which such Investor Report relates, and (ii) as of any Compliance Determination Date, that the NAV of the Borrower as is required to be reported in the Weekly Report to be delivered on the immediately succeeding Business Day shall exceed Credits Outstanding by two hundred percent (200%).

"Notice of Exclusive Control" shall have the meaning assigned to such term in the Control Agreement and any Cash Account Control Agreement, respectively.

"OECD Country" means any country which (i) is a member of the Organization for Economic Cooperation and Development or any other country which is approved of in writing by the Agent in its sole discretion, and (ii) has a sovereign credit rating for "foreign currency" of at least "AA-" and "Aa3" from S&P and Moody's, respectively.

"OEX" means the Standard & Poor's 100 Index.

"Offering Materials" means the Amended and Restated Private Placement Memorandum, dated January 1, 2003, as the same may from time to time be amended or modified in accordance with the terms of this Agreement.

"Option Agreement" means the Option Agreement from the Borrower to the Account Manager as in effect on the Closing Date, as the same may be from time to time amended, supplemented, waived or modified in accordance with this Agreement.

"Parent" means Tremont Capital Management, Inc., together with its permitted successors and assigns.

"Partnership Agreement" means the Amended and Restated Limited Partnership Agreement dated January 1, 2003, as the same may be amended or modified in accordance with the terms of this Agreement.

"Percentage" of any Secondary Lender means, (a) with respect to Citibank, the percentage set forth on the signature page to this Agreement, or such amount as reduced by any Assignment and Acceptance entered into with an Eligible Assignee, or (b) with respect to a Secondary Lender that has entered into an Assignment and Acceptance, the percentage set forth therein as such Secondary Lender's Percentage, or such amount as reduced by an Assignment and Acceptance entered into between such Secondary Lender and an Eligible Assignee.

"Permitted Debt" means in respect of the Borrower (i) Debt arising in connection with this Agreement, (ii) accrued expenses and current trade accounts payable incurred in the ordinary course of the Borrower's business which are not overdue for a period of more than sixty (60) days or which are being contested in good faith by appropriate proceedings, (iii) fee and expense obligations payable to the Account Manager, any Cash Account Bank and other similar agents which are providing services in respect of the Borrower's Assets in each case which have arisen in the ordinary course of the Borrower's business, which are not overdue for a period in excess of sixty (60) days, (iv) Debt (other than Debt for borrowed money) arising in connection with transactions in the ordinary course of the Borrower's business in connection with its purchasing of Borrowing Base Eligible Assets, the buying of out-of-the-money or at-the-money put options and the selling of out-of-the-money call options to the extent the purchase of such put options and the selling of such call options are expressly contemplated by the Summary of Terms, and (v) Debt in respect of judgments or awards that have been in force for less than the applicable period for taking an appeal so long as such judgments or awards do not constitute an Event of Default in respect of the Borrower and the Borrower shall at the time in good faith be

diligently prosecuting an appeal or proceeding for review and in respect of which a stay of execution shall have been obtained pending such appeal or review.

"Permitted Liens" means in respect of any Asset of the Borrower, (i) Liens of any Secured Party created by or pursuant to this Agreement, (ii) Liens for taxes, assessments or other governmental charges or levies not at the time delinquent or being diligently contested in good faith by appropriate actions and for which adequate reserves in accordance with GAAP shall have been set aside on the Borrower's books, and (iii) Liens in respect of judgments or awards that have been in force for less than the applicable period for taking an appeal so long as such judgments or awards do not constitute an Event of Default and so long as the Borrower shall at the time in good faith be diligently prosecuting an appeal or proceeding for review and in respect of which a stay of execution shall have been obtained pending such appeal or review.

"Person" means an individual or a corporation (including a business trust), partnership, trust, incorporated or unincorporated association, joint stock company, limited liability company, government (or an agency or political subdivision thereof) or other entity of any kind.

"Plan" means an employee pension benefit plan (other than a Multiemployer Plan) which is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code.

"Plan Asset Regulation" means United States Department of Labor Regulation Section 2510.3-101, 20 C.F.R. § 2510.3-101.

"Post-Default Rate" means in respect of all amounts payable by the Borrower or the General Partner to any Secured Party under any Program Document not paid when due (whether at stated maturity, by acceleration or otherwise), including, without limitation, the principal and Yield on any Advance not paid when due, a rate per annum during the period commencing on the due date until such amount is paid in full equal to the applicable Base Rate as in effect from time to time plus 1.50%.

"Principal Office" means the principal office of Citibank presently located at 399 Park Avenue, New York, New York or at such other location as the Agent shall designate in writing to the Borrower.

"Private Authorizations" means all franchises, permits, licenses, approvals, consents and other authorizations of all Persons (other than Authorities) required to be obtained by such Persons including, without limitation, those with respect to trademarks, service marks, trade names, copyrights, computer software programs, technical and other know-how.

"Proceeds" shall have, with reference to any asset or property, the meaning assigned to it under the UCC and, in any event, shall include, but not be limited to, any and all amounts from time to time paid or payable under or in connection with such asset or property.

"Product Information" shall have the meaning assigned to such term in Section 9.09(a).

15

"Program Documents" means this Agreement, the Advance Notes, the Control Agreement, each Cash Account Control Agreement, the Account Documents, each Cash Account Agreement, the Fee Letter, the Side Letter, the Constituent Documents of the Borrower and the General Partner, the Offering Materials, the Summary of Terms and the other agreements, documents and instruments entered into or delivered by the Borrower or the General Partner in connection herewith or therewith.

"Program Termination Date" means the later to occur of (i) the Termination Date, and (ii) the date that all Borrower Obligations have been finally paid in full; provided, however, that if any payment in respect of any Borrower Obligation made to any Secured Party must be rescinded or returned for any reason whatsoever (including the insolvency or bankruptcy of the Borrower or the General Partner) such Borrower Obligation shall be deemed to be reinstated as though such payment had not been made and the Program Termination Date shall be deemed to have not occurred.

"Prohibited Transaction" means a transaction described in Section 406(a) of ERISA and to which Section 406(a) of ERISA applies, that is not exempted by a statutory or administrative or individual exemption pursuant to Section 408 of ERISA.

"Regulation T" means Regulation T of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Regulation U" means Regulation U of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Regulation X" means Regulation X of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Requested Amount" shall have the meaning assigned to such term in Section 2.02.

"Responsible Officer" means in respect of any Person, the president, the executive vice president, the senior vice president, any vice president, the treasurer or any other duly authorized officer of such Person; provided, that the Agent shall have received a manually signed certificate of the Secretary or Assistant Secretary of such Person as to the incumbency of, and bearing a manual specimen signature of, such duly authorized officer.

"Restricted Payments" means (i) the payment or declaration of any distributions in respect of any partnership interest or other interest in the Borrower, (ii) the payment of or the setting apart of assets for the partial or total withdrawal of any partnership interest or other interest in the Borrower, or (iii) the payment of any fees and expenses payable to the General Partner or any Affiliate of the General Partner.

"Restricted Security" shall have the meaning assigned to such term under Rule 144.

"Rule 144" means Rule 144 promulgated by the SEC under the Securities Act, as amended and from time to time in effect, or any successor regulatory provision.

16

"S&P" means Standard & Poor's Ratings Group, together with its successors.

"SEC" means the Securities and Exchange Commission or any other governmental authority of the United States of America at the time administrating the Securities Act, the Investment Company Act or the Exchange Act.

"Secondary Lender Commitment" means (a) with respect to Citibank, an amount equal to the Total Commitment, as such amount shall be adjusted by any Assignment and Acceptance entered into between Citibank and an Eligible Assignee in accordance with Section 9.06(b), or (b) with respect to a Secondary Lender that has entered into an Assignment and Acceptance in accordance with Section 9.06(b), the amount set forth therein as such Secondary Lender's "Secondary Lender Commitment" in each case as such amount may be reduced by an Assignment and Acceptance entered into between such Secondary Lender and an Eligible Assignee, and as may be further reduced (or terminated) pursuant to the next sentence. Any reduction (or termination) of the Total Commitment pursuant to the terms of this Agreement shall reduce ratably (or terminate) each Secondary Lender's Secondary Lender Commitment.

"Secondary Lender Stated Expiration Date" means June 13, 2006; unless, prior to such date (or the date so extended pursuant to this clause), upon the Borrower's request, made not more than sixty (60) days nor less than thirty (30) days prior to the then current Secondary Lender Stated Expiration Date, one or more Secondary Lenders having 100% of the Total Commitment shall in their sole discretion consent, which consent shall be given not less than twenty (20) days prior to the then current Secondary Lender Stated Expiration Date (the date any such consent is given, the "Extension Date"), to the extension of the Secondary Lender Stated Expiration Date to the date occurring 364 days after such Extension Date; provided, however, that any failure of any Secondary Lender to respond to any such request for such extension shall be deemed a denial of such request by such Secondary Lender.

"Secondary Lenders" means Citibank and each Eligible Assignee that becomes a party to this Agreement pursuant to Section 9.06(b).

"Secured Parties" means the Agent, the Lenders, the Secondary Lenders and their respective successors and assigns.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC thereunder, all as from time to time in effect, or any successor law, rules or regulations, and any reference to any statutory or regulatory provisions shall be deemed to be a reference to any successor statutory or regulatory provision.

"Settlement Date" means the date which is two (2) Business Days after the end of each Settlement Period.

"Settlement Period" means in respect of any Advance:

(a)    in the case of any Settlement Period in respect of which Yield in respect of such Advance is computed by reference to the CP Rate, the period beginning on the date such Advance was made and ending on the last day of the calendar month in which such Advance was made and thereafter each successive period commencing on the first day of each calendar month

during the term of this Agreement and ending on the last day of such calendar month during the term of this Agreement; provided, however, that in the case of any Settlement Period for any Advance which commences before the Maturity Date for such Advance and would otherwise end on a date occurring after such Maturity Date, such Settlement Period shall end on such Maturity Date and the duration of each Settlement Period which commences on or after the Maturity Date for such Advance may be any period (including, without limitation, a period of one day) as shall be selected from time to time by the Agent;

(b)    in the case of any Settlement Period in respect of which Yield in respect of such Advance is computed by reference to the Assignee Rate, the period beginning on the date such Advance was made and ending on the last day of the calendar month in which such Advance was made and thereafter each successive period commencing on the first day of each calendar month during the term of this Agreement and ending on the last day of such calendar month during the term of this Agreement; provided, however, that any Settlement Period which is other than the monthly Settlement Period shall be of such duration as shall be selected by the Agent; and

(c)    in the case of any Settlement Period in respect of which Yield is computed by reference to the Alternate Base Rate, such Settlement Period shall be of such duration as shall reasonably be selected by the Agent.

"Side Letter" means that certain letter agreement dated as of the date hereof between the Agent and the Borrower.

"SLMA Security" means security issued and guaranteed with respect to timely payment of interest and ultimate payment of principal, by the Student Loan Marketing Association and backed by a pool of student loans.

"Subsidiary" means, with respect to any Person, at any date, any corporation, partnership, limited liability company or other entity which is directly or indirectly controlled by such Person or in respect of which at least 51% of the outstanding shares of capital stock having ordinary voting power or other equity or partnership interests having ordinary voting power is at the time, directly or indirectly, owned by such Person, including, without limitation, any subsidiaries which are consolidated with such Person in accordance with GAAP or the generally accepted accounting principals of the applicable jurisdiction in effect from time to time.  The terms "control," "controlling," "controlled" and the like mean the direct or indirect possession of the power to direct or cause the direction of the management or policies of a Person or the disposition of its assets or properties, whether through ownership, by contract, arrangement or understanding, or otherwise.

"Summary of Terms" means the American Masters Broad Market Prime Fund, L.P. Summary of Partnership Terms provided to the Agent prior to the Closing Date in the form of Exhibit F attached hereto, as the same may from time to time be amended, supplemented, waived or modified in accordance with this Agreement.

"Taxes" shall have the meaning assigned to such term in Section 9.03(a).

"Termination Date" means the earlier of (i) the Secondary Lender Stated Expiration Date, and (ii) the date that this Agreement shall terminate pursuant to Section 2.10 or Section 6.01.

"Total Commitment" means $300,000,000, as such amount may be reduced pursuant to Section 2.10.  References to the unused portion of the Total Commitment shall mean, at any time, the Total Commitment then in effect, minus the aggregate outstanding principal amount of the Advances.

"UCC" means the Uniform Commercial Code, as from time to time in effect in the applicable jurisdictions.

"U.S. Government Securities" means direct obligations of the United States or of its agencies or instrumentalities that are entitled to the full faith and credit of the United States and that other than treasury bills, provide for the periodic payment of interest and the full payment of principal at maturity or call for redemption and which mature in five (5) years or less.

"Yield" means for each Advance for each Settlement Period:

(i)    for each day during such Settlement Period to the extent such Advance will be funded or maintained on such day by the Conduit Lender through the issuance of commercial paper notes,

$$\frac{CPR \times P}{360} + LF$$

(ii)    for each day during such Settlement Period to the extent such Advance will not be funded or maintained on such day through the issuance of commercial paper notes,

$$\frac{AR \times P}{360} + LF$$

where:

| | | |
|---|---|---|
| AR | = | the Assignee Rate for such Advance for such Settlement Period |
| P | = | the outstanding principal amount of such Advance on such day |
| CPR | = | the CP Rate for such Advance on such day |
| LF | = | the Liquidation Fee, if any, for such Advance for such Settlement Period (expressed as a daily amount); |

provided, further, that Yield for any Advance shall not be considered paid by any distribution to the extent that at any time all or a portion of such distribution is rescinded or must otherwise be returned for any reason.

SECTION 1.02.  Rules of Construction.

For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires (i) singular words shall connote the plural as well as the singular, and vice versa (except as indicated), as may be appropriate, (ii) the words "herein," "hereof" and "hereunder" and other words of similar import used in this Agreement refer to this Agreement as a whole and not to any particular appendix, article, schedule, section, paragraph, clause, exhibit or other subdivision, (iii) the headings, subheadings and table of contents set forth in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect the meaning, construction or effect of any provision hereof, (iv) references in this Agreement to "including" shall mean including without limiting the generality of any description preceding such term, and for purposes hereof the rule of ejusdem generis shall not be applicable to limit a general statement, followed by or referable to an enumeration of specific matters, to matters similar to those specifically mentioned, and (v) each of the parties to this Agreement and its counsel have reviewed and revised, or requested revisions to, this Agreement, and the usual rule of construction that any ambiguities are to be resolved against the drafting party shall be inapplicable in the construction and interpretation of this Agreement.

SECTION 1.03.  Computation of Time Periods.

Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" both mean "to but excluding".

ARTICLE II
ADVANCES TO THE BORROWER
SECTION 2.01.  Advance Facility.

On the terms and conditions hereinafter set forth, including without limitation, Sections 3.01 and 3.02, the Conduit Lender may, in its sole discretion, make Advances to the Borrower on any Borrowing Date from the date hereof to the Termination Date.  To the extent that the Conduit Lender has determined not to make an Advance to the Borrower, on the terms and conditions hereinafter set forth, including without limitation, Sections 3.01 and 3.02 and during the period from the date hereof to the Termination Date, the Secondary Lenders shall make Advances to the Borrower, ratably in accordance with their respective Secondary Lender Commitments.  Under no circumstances shall the Conduit Lender or any Secondary Lender make any Advance, to the extent that after giving effect to the making of such Advance and all other Advances to be made on such date the aggregate principal amount of all outstanding Advances would exceed the Total Commitment.

SECTION 2.02.  Making of Advances.

If the Borrower desires to receive a borrowing under this Agreement it shall give the Agent written notice (which notice shall be irrevocable and effective only upon receipt by the Agent) of each request for an Advance (each such request a "Notice of Borrowing") not later than 12:00 noon (New York City time) on the day which is two (2) Business Days prior to the proposed borrowing date, which notice shall specify (i) the proposed borrowing date therefor (each such date, a "Borrowing Date"), and (ii) the aggregate principal amount of the proposed borrowing (the "Requested Amount").  Any such Notice of Borrowing shall be substantially in the form of Exhibit B hereto, dated the date such request is being made, signed by a Responsible Officer of the Borrower and otherwise appropriately completed.  The Requested Amount specified in any Notice of Borrowing shall be at least $1,000,000 and in integral multiples of $100,000 in excess thereof.  During the period prior to the Termination Date, the Conduit Lender shall promptly notify the Agent whether it has determined to make a proposed Advance and the Agent shall promptly thereafter notify the Borrower whether the Conduit Lender has determined to make such Advance.  If the Conduit Lender has declined to make such proposed Advance, the Agent shall promptly send notice of the proposed borrowing to the Secondary Lenders concurrently by telecopier, telex or cable specifying the Borrowing Date for such borrowing, each Secondary Lender's Percentage multiplied by the principal amount of such Advance and whether the Yield for such Advance is calculated based on LIBOR or the Alternate Base Rate. On each Borrowing Date the Conduit Lender or the Secondary Lenders shall, subject to the terms and conditions of this Agreement, make available to the Borrower at the Borrower's Account the Requested Amount in immediately available funds.  To the extent not covered by Section 2.08, such Borrower shall indemnify the Conduit Lender, each Secondary Lender and the Agent against any loss or expense incurred by them as a result of any failure by the Borrower to accept any Advance requested in a Notice of Borrowing or as a result of the Borrower failing to satisfy any condition precedent to the making of such Advance to be satisfied, including, without limitation, any loss or expense incurred by reason of the liquidation or reemployment of funds acquired or requested to fund such Advance.

SECTION 2.03.  Noteless Agreement; Evidence of Indebtedness.

(a)    Each Lender and Secondary Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to it and resulting from each Advance made to the Borrower, from time to time, including the amounts of principal and Yield thereon and paid to it, from time to time hereunder.

(b)    The Agent shall maintain accounts in which it will record (i) the amount of each Advance made hereunder to the Borrower and the Settlement Period with respect thereto, (ii) the amount of any principal and Yield due and payable or to become due and payable from the Borrower to the each Lender and Secondary Lender hereunder, and (iii) the amount of any sum received by the Agent hereunder from the Borrower and each Lender's and Secondary Lender's share thereof.

(c)    The entries maintained in the accounts maintained pursuant to clauses (a) and (b) of this Section 2.03 shall be rebuttable presumptive evidence of the existence and amounts of the Borrower Obligations therein recorded; provided, however, that the failure of the

Agent, any Lender or any Secondary Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Borrower Obligations in accordance with their terms.

(d)    Any Lender or Secondary Lender may request that its Advances be evidenced by an Advance Note.  In such event, the Borrower shall promptly prepare, execute and deliver to such Lender or Secondary Lender, as applicable, an Advance Note payable to the order of such Lender or Secondary Lender.  Thereafter, the Advances evidenced by such Advance Note and interest thereon shall at all times (including after any assignment pursuant to Section 9.06) be represented by one or more Advance Notes payable to the order of the payee named therein or any assignee pursuant to Section 9.06, except to the extent that such Lender, such Secondary Lender or assignee subsequently returns any such Advance Note for cancellation and requests that such Advance once again be evidenced as described in clauses (a) and (b) of this Section 2.03.  In connection with any assignment pursuant to Section 9.06, if any assigning Lender or Secondary Lender shall have an Advance Note issued to it, such assigning Lender or Secondary Lender shall promptly return its Advance Note to the Agent marked "cancelled".

SECTION 2.04.  <u>Maturity of the Advances</u>.

The principal amount of and the accrued and unpaid Yield to the extent not paid pursuant to Section 2.06 on each outstanding Advance shall be due and payable by the Borrower on the Maturity Date for such Advance.

SECTION 2.05.  <u>Prepayment of the Advances</u>.

(a)    The Borrower shall have the right at any time and from time to time, upon not less than two (2) Business Days' prior written notice in the form of Exhibit C hereto or telephonic notice (in the case of telephonic notice, promptly confirmed in writing in the form of Exhibit C hereto) to the Agent specifying the date and amount of such prepayment, to prepay all or a portion of the outstanding Advances, together with unpaid Yield thereon, on a Business Day; <u>provided</u>, that any such prepayment, if a partial prepayment, shall be at least $1,000,000 and an integral multiples of $100,000 in excess thereof.

(b)    If on any Compliance Determination Date the Borrower is not in full compliance with the NAV Test or the Borrowing Base Test (each a "Borrowing Limit"), the Borrower shall (i) on such Compliance Determination Date notify the Agent of such failure to comply, and (ii) prepay Advances in a principal amount (and pay the Yield thereon) necessary to cause it to be in full compliance with each Borrowing Limit, <u>provided</u>, <u>however</u>, that to the extent the Borrower does not have sufficient available funds to prepay the Advances in an amount sufficient to cure such compliance shortfall on such Compliance Determination Date, then it shall (i) on such Compliance Determination Date prepay outstanding Advances in the amount of its available funds; (ii) no later than the close of business on the sixth Business Day following such Compliance Determination Date cause the Account Manager to sell such portion of its Assets as shall be necessary for it to prepay the Advances in an amount necessary (1) if the affected Borrowing Limit is the NAV Test, to cause the NAV of the Borrower (as determined as of such Compliance Determination Date) to exceed the product of (x) 1.05 and (y) the amount which is 300% above Credits Outstanding (as determined as of such Compliance Determination

Date), and (2) if the affected Borrowing Limit is the Borrowing Base Test, to cause the Borrowing Base to be at least equal to the product of (x) 1.05 and (y) Credits Outstanding (as determined as of such Compliance Determination Date); and (iii) no later than the close of business on the second Business Day following such Compliance Determination Date, deliver to the Agent a certificate, signed by an authorized officer of the Borrower, that (1) certifies the amount of the compliance shortfall, (2) specifies the instruction or redemption requests delivered to the Account Manager in order to satisfy the requirements of clause (ii) of this Section 2.05(b), and (3) certifies that the requirements of this Section 2.05(b) shall be satisfied on or prior to the sixth Business Day following such Compliance Determination Date.

(c)    If at any time the aggregate credit extended by the Lenders and the Secondary Lenders in connection with this Agreement exceeds the sum of (x) the product of (a) the Margin Stock Percentage multiplied by (b) the current market value (as defined in Regulation U) of all Margin Stock of the Borrower, plus, (y) the good faith loan value (as determined in accordance with Regulation U) of all other Assets of the Borrower, the Borrower shall immediately prepay the outstanding Advances in an amount equal to such excess, together with all accrued and unpaid Yield thereon.

(d)    If at any time OppenheimerFunds, Inc. or the General Partner shall cease to be a wholly-owned direct or indirect subsidiary of Oppenheimer Acquisition Corp. or such other Person that controls Oppenheimer Acquisition Corp. as of the Closing Date, or OppenheimerFunds, Inc. shall cease to be an Affiliate of the General Partner, the Borrower shall on or prior to the date which is thirty (30) days after any such event has occurred, prepay all outstanding Advances, together with all accrued and unpaid Yield thereon.

(e)    Subject to Section 7.03, the amount of each prepayment by the Borrower under this Section 2.05 shall be applied ratably to the Advances provided to the Borrower in the order in which such Advances were made; provided, however, that the amount of such prepayment shall be applied first to any such outstanding Advances in respect of which Yield is computed by reference to the Alternate Base Rate, second to any such outstanding Advances in respect of which Yield is computed by reference to LIBOR, and third to any such outstanding Advances in respect of which Yield is computed by reference to the CP Rate.

SECTION 2.06.  Yield.

The Borrower hereby agrees to pay the Yield computed with reference to the principal amount of each Advance outstanding from time to time.  Yield accruing in respect of any Advance for any Settlement Period shall be due and payable on the Settlement Date immediately succeeding such Settlement Period and as required by Section 2.05.  It is the intention of the parties hereto that the Yield on the Advances shall not exceed the maximum rate permissible under applicable law.  Accordingly, anything herein or in any Advance Note to the contrary notwithstanding, in the event any Yield is charged to, collected from or received from or on behalf of the Borrower by the Conduit Lender or the Secondary Lenders pursuant hereto or thereto in excess of such maximum lawful rate, then the excess of such payment over that maximum shall be applied first to the payment of amounts then due and owing by the Borrower to the Secured Parties under the Program Documents (other than in respect of principal and Yield on Advances) and then to the reduction of the outstanding principal balance of the Advances.

SECTION 2.07.  Increased Costs.

(a)      If, due to either (i) the introduction of or any change (other than any change by way of imposition or increase of reserve requirements reflected in the LIBOR Reserve Percentage) in or in the interpretation of any Applicable Law or (ii) the compliance with any guideline or request from any central bank or other Authority (whether or not having the force of law) issued, made or changed after the Closing Date, there shall be any increase in the cost to any Affected Person of agreeing to make or making, funding or maintaining LIBOR Advances to the Borrower, then the Borrower shall from time to time, upon demand by such Affected Person pay to the Agent for the account of such Affected Person additional amounts sufficient to compensate such Affected Person for such increased cost.  A certificate as to the amount of such increased cost, submitted to the Borrower by an Affected Person as promptly as practicable after it becomes aware of such event or circumstance giving rise to such increased cost, shall be conclusive and binding for all purposes, absent manifest error; provided, that, the Borrower's obligation to compensate any Affected Person for the amount of any increased cost payable under this Section 2.07(a) specified in any such certificate delivered by such Affected Person which has accrued or was incurred prior to the delivery of such certificate, shall be limited to amounts accrued or incurred by such Affected Person during the 90 day period preceding such Affected Persons' delivery of such certificate provided that if the event giving rise to such increased cost or reduction is retroactive, then the 90 day period referred to above shall be extended to include the period of the retroactive effect thereof.

(b)      If an Affected Person reasonably determines that compliance with any Applicable Law after the Closing Date or request after such date from any central bank or other Authority charged with the interpretation or administration thereof (whether or not having the force of law) or the occurrence of any Accounting Based Consolidation Event after the Closing Date (i) affects or would affect the amount of capital required or reasonably expected to be maintained by such Affected Person and that the amount of such capital is increased by or based upon the existence of such Affected Person's commitment under the Program Documents or any Asset Purchase Agreement or upon such Affected Person's making, funding or maintaining Advances, (ii) increases the cost of making or maintaining such commitment under the Program Documents or any Asset Purchase Agreement or making, funding or maintaining such Advances to any Affected Person or (iii) reduces the return of an Affected Person in connection with the Program Documents or any Asset Purchase Agreement, then, upon written demand of such Affected Person (with a copy of such demand to the Agent), the Borrower shall immediately pay to the Agent for the account of such Affected Person, from time to time as specified by such Affected Person, additional amounts sufficient to compensate such Affected Person for such increased cost and/or reduced return in light of such circumstances.  A certificate setting forth in reasonable detail such amounts and the circumstances giving rise thereto submitted to the Borrower by such Affected Person shall be conclusive and binding for all purposes, absent manifest error.

(c)      Upon the occurrence of any event giving rise to the Borrower's obligation to pay additional amounts to any Affected Person pursuant to Sections 2.07(a), 2.07(b) or 9.03, such Affected Person will, if requested by the Borrower, use reasonable efforts with the object of avoiding any future consequences of the event giving rise to the operation of any such Section (subject to overall policy considerations of such Affected Person) to designate a different lending

office; <u>provided</u>, <u>however</u>, that such designation is made on such terms that such Affected Person and its lending office suffer no significant economic, legal or regulatory disadvantage,. If such additional amounts are not eliminated by any such designation and such Affected Person does not waive payment of such additional amounts, the Agent, may at its sole discretion within sixty (60) days, recommend a replacement Affected Person not so affected. If after the sixty (60) day period described in the preceding sentence a replacement for such Affected Person has not been procured in accordance with the preceding sentence, the Borrower may propose a replacement for such Affected Person and, upon approval of the Agent (which approval shall not be unreasonably withheld or delayed), such Affected Person shall assign its interests under the applicable Program Documents to such replacement entity. The parties hereby agree that unless and until the Affected Person to be replaced (i) is paid in full for all amounts due and owing to it hereunder and under any other Program Document, and (ii) enters into assignment documents with the replacement entity which are reasonably satisfactory to such Affected Person, it shall have no obligation to assign any of its rights and interests hereunder. Each such Affected Person agrees to take all actions necessary to permit a replacement entity to succeed to its rights and obligations hereunder and under the other Program Documents. The Borrower agrees to pay all reasonable expenses incurred by any Affected Person in utilizing another lending office of such Affected Person or in assigning its interest pursuant to this Section 2.07(c). Nothing in this Section 2.07(c) shall affect or postpone any of the obligations of the Borrower or the rights of any Secured Party.

    SECTION 2.08.  <u>Compensation,</u>

    Without duplication of any amount due by the Borrower in respect of any Liquidation Fee, the Borrower shall compensate each Affected Person, upon its written request (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including, without limitation, any interest paid by such Affected Person to lenders of funds borrowed by it to make or carry its LIBOR Advances made to the Borrower and any loss sustained by such Affected Person in connection with the re-employment of such funds), which such Affected Person may sustain: (i) if for any reason (other than a default by such Affected Person) a borrowing of any LIBOR Advance by the Borrower does not occur on a date specified therefor in the Notice of Borrowing (whether or not withdrawn), (ii) if any prepayment of any of the Borrower's LIBOR Rate Advances occurs on a date which is not the last day of a Settlement Period applicable thereto, (iii) if any prepayment of any of the Borrower's LIBOR Advances is not made on any date specified in a notice of prepayment given by the Borrower, or (iv) as a consequence of any other default by the Borrower to repay its LIBOR Advances when required by the terms of this Agreement.

    SECTION 2.09.  <u>Additional Yield on LIBOR Advances.</u>

    So long as any Affected Person shall be required under regulations of the Board of Governors of the Federal Reserve System to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency Liabilities, the Borrower shall pay to such Affected Person LIBOR Additional Yield on the principal amount of each outstanding Advance made to the Borrower on each date on which Yield is payable on such Advance. Such LIBOR Additional Yield shall be determined by such Affected Person and notified to the Borrower through the Agent within thirty (30) days after any payment is made with respect to which such

additional Yield is requested.  A certificate as to such LIBOR Additional Yield submitted to the
Borrower and the Agent shall be conclusive and binding for all purposes, absent manifest error.

SECTION 2.10.  Termination or Reduction of the Total Commitment.

The Borrower may at any time, upon ten (10) days prior written notice to the
Agent in its sole and absolute discretion terminate in whole or reduce in part the unused portion
of the Total Commitment; provided, that each such partial reduction of the Total Commitment
shall be in an amount equal to at least $5,000,000 or an integral multiple thereof.

SECTION 2.11.  Rescission or Return of Payment.

The Borrower further agrees that, if at any time all or any part of any payment
theretofore made by it to any Secured Party or their designees is or must be rescinded or returned
for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or
reorganization of the Borrower or any of its affiliates), the obligation of the Borrower to make
such payment to such Secured Party shall, for the purposes of this Agreement, to the extent that
such payment is or must be rescinded or returned, be deemed to have continued in existence and
this Agreement shall continue to be effective or be reinstated, as the case may be, as to such
obligations, all as though such payment had not been made.

SECTION 2.12.  Fees Payable by Borrower.

The Borrower agrees to pay the Agent such fees as are set forth in the Fee Letter.

SECTION 2.13.  Post Default Interest.

The Borrower hereby promises to pay interest on the unpaid principal amount of
each Advance and any other Borrower Obligation payable by it, in each case, which shall not be
paid in full when due, for the period commencing on the due date thereof until but not including
the date the same is paid in full at the Post-Default Rate.  Interest payable at the Post-Default
Rate shall be payable on the Agent's demand.

SECTION 2.14.  Payments.

(a)    All amounts owing and payable to any Secured Party, any Affected Person
or any Indemnified Party, in respect of the Advances and other Borrower Obligations, including,
without limitation, the principal thereof, Yield, fees, indemnities, expenses or other amounts
payable under the Program Documents, shall be paid in Dollars, in immediately available funds
on or prior to 11:00 a.m. (New York City time) on the date due without counterclaim, setoff,
deduction, defense, abatement, suspension or deferment.  Any payment paid after 11:00 a.m.
(New York City time) on any day shall be deemed to have been made on the next Business Day
for all purposes of this Agreement.

(b)    All computations of interest at the Post-Default Rate and all computations
of Yield, fees and other Borrower Obligations shall be made on the basis of a year of 360 days
for the actual number of days elapsed.  Whenever any payment or deposit to be made hereunder
shall be due on a day other than a Business Day, such payment or deposit shall be made on the

next succeeding Business Day and such extension of time shall be included in the computation of such payment or deposit.

(c)    Subject to Section 7.03 and except as otherwise expressly provided in this Agreement, upon receipt of funds deposited into the Agent's Account, the Agent shall distribute such funds, <u>first</u> to the Lenders and the Secondary Lenders in payment in full of all accrued and unpaid Yield owing to the Lenders and Secondary Lenders in respect of the Advances then due and payable, <u>second</u> to the Lenders, the Secondary Lenders or the Agent in payment of any other fees or other amounts owed by the Borrower to the Lenders, the Secondary Lenders and the Agent under this Agreement and the other Program Documents (other than in respect of the principal amount of the Advances) then due and payable, <u>third</u> to the Secured Parties and the Affected Persons on a pro rata basis in accordance with the other amounts (other than amounts payable under clause fourth below) owed to each such Person than due and payable, and <u>fourth</u> to the payment of the principal amount of the Advances.

(d)    During the continuance of an Event of Default all payments in respect of the Borrower Obligations, payable by or on behalf of the Borrower, including all Proceeds resulting from the sale or disposition of the Assigned Collateral shall be remitted to the Agent's Account and applied in accordance with Section 7.03(a).

SECTION 2.15.  <u>Ratable Payments</u>.

If any Secondary Lender or Lender (other than the Conduit Lender), whether by set-off, bankers' lien, counterclaim or otherwise, has payment made to it with respect to any Borrower Obligations owing to it in a greater proportion than that received in respect of such Facility by any other Lender or Secondary Lender entitled to receive a ratable share of such payments, such Lender or Secondary Lender agrees, promptly upon demand, to purchase for cash without recourse or warranty a portion of such unpaid Borrower Obligations held by the other Lenders and Secondary Lenders so that after such purchase each Lender and Secondary Lender will hold its ratable proportion of such unpaid Borrower Obligations; <u>provided</u> that if all or any portion of such excess amount is thereafter recovered from such Secondary Lender or Lender, as the case may be, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

SECTION 2.16.  <u>Obligations Absolute</u>.

Each of the Borrower's and the General Partner's obligations under this Agreement and under the other Program Documents shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms hereof and thereof, under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment which the Borrower, the General Partner or any other Person may have or have had against any Secured Party or any other Person.

ARTICLE III
CONDITIONS PRECEDENT
SECTION 3.01.  <u>Conditions Precedent to the Effectiveness of this Agreement</u>.

The effectiveness of this Agreement and the Conduit Lender's and the Secondary Lenders' obligations hereunder shall be subject to the conditions precedent that the Agent shall have received on or before the initial Borrowing Date two (2) copies of the following, each (unless otherwise indicated) in form and substance reasonably satisfactory to the Agent:

(a)     each of this Agreement, the Control Agreement, the Side Letter and the Fee Letter duly executed and delivered by the parties thereto, which shall be in full force and effect;

(b)     true correct and complete copies of the Offering Materials, the Summary of Terms, the Constituent Documents of the Borrower and the General Partner and the Account Documents, each as in effect on the Closing Date;

(c)     the signed opinions of counsel to each of the Borrower and the General Partner addressed to the Agent, the Conduit Lender and each Secondary Lender as to such matters as the Agent shall have reasonably requested;

(d)     if requested by the Conduit Lender or any Secondary Lender pursuant to Section 2.03 on or prior to the Closing Date, an Advance Note of the Borrower duly executed and completed;

(e)     all Governmental Authorizations, Private Authorizations and Governmental Filings, if any, which may be required in connection with the transactions contemplated by the Program Documents;

(f)     a certificate of a Responsible Officer of the Borrower and the General Partner certifying (i) as to its Constituent Documents or other similar organizational documents, as the case may be, (ii) as to the resolutions of its Board of Directors approving this Agreement and the other Program Documents to which it is a party and the transactions contemplated hereby and thereby, (iii) that its representations and warranties set forth in the Program Documents to which it is a party are true and correct, and (iv) the incumbency and specimen signature of each of its officers authorized to execute the Program Documents to which it is a party and of each of its Responsible Officers for purposes of this Agreement;

(g)     acknowledgment copies or time stamped receipt copies of proper financing statements naming the Borrower, as debtor, and the Agent, as secured party, duly filed on or before the date of such initial borrowing under the UCC in all jurisdictions that the Agent may deem necessary or desirable in order to perfect the interests in the Assigned Collateral contemplated by this Agreement;

(h)     acknowledgment copies or time stamped receipt copies of proper financing statements, if any, necessary to release all security interests and other rights of any Person in the Assigned Collateral previously granted by the Borrower;

(i)     completed requests for information, dated on or before the Closing Date, listing the financing statements referred to in clause (h) above and all other effective financing statements filed in the jurisdictions referred to in subsection (g) above that name the Borrower

(under its present name and any previous name) as debtor, together with copies of such other financing statements (none of which shall cover any Assigned Collateral);

(j)        a pro-forma Investor Report, which shall evidence compliance with the terms of the Program Documents, including the Borrower's compliance with the Borrowing Base Test and the NAV Test, after giving effect to the initial borrowing of Advances under this Agreement;

(k)        the Up-Front Structuring Fee (as such term is defined in the Fee Letter) to be received by it on or prior to the Closing Date under and in accordance with the Fee Letter;

(l)        such other instruments, certificates and documents from the Borrower and the General Partner as the Agent shall have reasonably requested, all in form and substance satisfactory to the Agent; and

The funding of the initial Advance under this Agreement shall conclusively evidence the satisfaction of any of the referenced conditions as a prerequisite for the initial Borrowing Date solely to the extent that such conditions explicitly require the subject matter thereof to be in form and substance satisfactory to the Agent, provided, that, except as expressly set forth herein, unless expressly waived in writing by the Agent, nothing herein shall limit the responsibility of the parties hereto to perform such conditions or such parties' liability for the failure to perform any such condition.

SECTION 3.02.  Conditions Precedent to All Advances.

The obligation of the Conduit Lender and the Secondary Lenders to make any Advance (including the initial Advance) on any Borrowing Date to the Borrower shall be subject to the fulfillment of the following conditions:

(a)        each of the representations and warranties of the Borrower and the General Partner contained in this Agreement and the other Program Documents shall be true and correct as of such date and shall continue to be true and correct immediately after giving effect to such Advance;

(b)        no Default or Event of Default shall have occurred and be continuing at or prior to the time of the making of such Advance or shall result from the making of such Advance;

(c)        the conditions precedent set forth in Section 3.01 shall have been fully satisfied;

(d)        immediately after giving effect to such Advance the Borrower shall be in full compliance with each of the Borrowing Base Test and the NAV Test;

(e)        immediately after the making of any such Advance, the aggregate outstanding principal amount of all Advances shall not exceed the Total Commitment;

(f)    the aggregate credit extended by the Lenders and the Secondary Lenders in connection with this Agreement does not exceed the sum of (x) the Margin Stock Percentage of the current market value (as defined in Regulation U) of all Margin Stock of the Borrower, plus (y) the good faith loan value (as determined in accordance with Regulation U) of all other Assets of the Borrower;

(g)    (i) with respect to the initial Advance to the Borrower, a Form FR G-3 and a Form FR U-1, each duly completed, executed and delivered by the Borrower demonstrating the compliance of such initial borrowing with Regulation U, and (ii) with respect to each Advance to the Borrower other than the initial Advance, an amendment to the Form FR G-3 and the Form FR U-1 previously delivered in accordance with the provisions of Section 221.3(c)(2)(iv) of Regulation U;

(h)    no event giving rise to a prepayment pursuant to Section 2.05(d) shall have occurred at or prior to the time of the making of such Advance; and

(i)    the Agent shall have received from the Borrower and the General Partner such other instruments, certificates and documents as the Agent shall have reasonably requested.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES
SECTION 4.01.  Representations and Warranties.

Each of the Borrower and the General Partner, represents and warrants to each of the Secured Parties on and as of the date it provides such representation and warranty, including on and as of the Closing Date and each Determination Date (and in respect of clause (l) below, each date such information is provided by or on behalf of it), as follows:

(a)    Due Organization. (i) The Borrower is a limited partnership, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, with full power and authority to own and operate its assets and properties, conduct the business in which it is now engaged and to execute and deliver and perform its obligations under this Agreement and the other Program Documents to which it is a party, and (ii) the General Partner is a corporation, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, with full power and authority to own and operate its assets and properties, conduct the business in which it is now engaged, to execute and deliver and perform its obligations under this Agreement and the other Program Documents to which it is a party.

(b)    Due Qualification and Good Standing.  Each of the Borrower and the General Partner is duly qualified to do business and is in good standing in each jurisdiction in which the nature of its business, assets and properties, including, without limitation, the performance of its obligations under this Agreement and the other Program Documents to which it is a party, requires such qualification, except to the extent that the failure to be so qualified in the aggregate could not reasonably be expected to give rise to a Material Adverse Effect.

(c)     Due Authorization; Execution and Delivery; Legal, Valid and Binding; Enforceability.  The execution and delivery by each of the Borrower and the General Partner of, and the performance by each of the Borrower and the General Partner of its obligations under the Program Documents to which it is a party and the other instruments, certificates and agreements contemplated thereby and the borrowing by the Borrower in the manner and for the purposes contemplated by this Agreement are permitted by its Constituent Documents, are within its powers and have been duly authorized by all requisite action by the Borrower and the General Partner and have been duly executed and delivered by the Borrower and the General Partner and constitute the legal, valid and binding obligations of the Borrower and the General Partner enforceable against the Borrower and the General Partner in accordance with their respective terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, receivership or other laws relating to or affecting creditors' rights generally and to general principals of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(d)     Noncontravention.  Neither the execution and delivery by the Borrower or the General Partner of this Agreement, the other Program Documents to which it is a party, or any instrument, certificate or agreement referred to herein or therein, or contemplated hereby or thereby, the borrowings hereunder, nor the consummation of the transactions herein or therein contemplated, nor compliance with the terms, conditions and provisions hereof or thereof by it, will (i) conflict with, or result in a breach or violation of, or constitute a default under its Constituent Documents, (ii) conflict with or contravene (A) any Applicable Law, (B) any indenture, agreement or other contractual restriction binding on or affecting it or any of its Assets, including without limitation the Account Documents, or (C) any order, writ, judgment, award, injunction or decree binding on or affecting it or any of the Borrower's Assets, (iii) result in a breach or violation of, or constitute a default under, or permit the acceleration of any obligation or liability in, or but for any requirement of the giving of notice or the passage of time (or both) would constitute such a conflict with, breach or violation of, or default under, or permit any such acceleration in, any contractual obligation or any agreement or document to which it is a party or by which it or any of its properties is bound (or to which any such obligation, agreement or document relates), or (iv) result in any Adverse Claim upon any of the Borrower's Assets.

(e)     Governmental Authorizations; Private Authorizations; Governmental Filings.  Each of the Borrower and the General Partner has obtained all necessary Governmental Authorizations and Private Authorizations, and made all Governmental Filings necessary for the execution and delivery by it of this Agreement and the other Program Documents, the borrowings by the Borrower under this Agreement, the pledge of the Assigned Collateral, and the performance by it of its obligations under this Agreement, the other Program Documents to which it is a party and the agreements, certificates and instruments contemplated hereby or thereby, and no Governmental Authorization, Private Authorization or Governmental Filing which has not been obtained or made, is required to be obtained or made by it in connection with the execution and delivery by it of any Program Document to which it is a party, the borrowings by the Borrower under this Agreement, the pledge of the Assigned Collateral, or the performance of its obligations under this Agreement and the other Program Documents.

(f)    <u>Security Interest</u>.  This Agreement and the Control Agreement and the actions required to be taken pursuant to the terms hereof and thereof are, and at all times shall be, effective to create and perfect in the Agent and the Agent has for the benefit of the Secured Parties, a first priority perfected security interest in the Assigned Collateral free and clear of all Adverse Claims and no actions, except as have been taken, are necessary or advisable to perfect or protect such security interest free and clear of Adverse Claims.

(g)    <u>Borrowing Base Eligible Assets, Adverse Claims, Etc.</u>  The Borrower owns each Asset pledged by it pursuant to Section 7.01 free and clear of Adverse Claims.

(h)    <u>No Financing Statement</u>.  No effective financing statements or other instruments similar in effect covering any Asset of the Borrower or the General Partner are on file in any recording office, except those filed in favor of the Agent pursuant to this Agreement.

(i)    <u>Principal Office; Organization</u>.  The Borrower's principal place of business and chief executive office is at the addresses referred to in Section 9.02, the Borrower's jurisdiction of organization is Delaware and the Borrower has not transacted any business under any name other than its name set forth on the signature page hereto and "The Broad Market Prime Fund, L.P.".

(j)    <u>Pending Litigation or Other Proceeding</u>.  There are no pending or, to the best of the Borrower's or the General Partner's knowledge, threatened investigations, actions, suits or proceedings involving the Borrower or the General Partner which could reasonably be expected to give rise to a Material Adverse Effect.

(k)    <u>Securities Act; Investment Company Act, Etc</u>.  The partnership interests under the Partnership Agreement are not beneficially owned by more than five hundred United States Persons.  The offering of limited partnership interests by the Borrower pursuant to the Offering Materials is exempt from registration under the Securities Act.  The Borrower is not an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act.

(l)    <u>Information and Reports</u>.  The Offering Materials, each Notice of Borrowing, each Notice of Prepayment, each Investor Report, each Weekly Report and all other written information, reports, certificates and statements provided by the Borrower or the General Partner to any Secured Party for purposes of or in connection with this Agreement, the other Program Documents or the transactions contemplated hereby or thereby is, and all such information hereafter provided by the Borrower or the General Partner to any Secured Party is and will be true, correct and complete in all material respects on the date such information is stated or certified and the Offering Materials do not contain, and will not contain, any material misrepresentation or any omission to state therein matters necessary to make the statements made therein not misleading in any material respect when considered in its entirety, <u>provided</u>, that neither the Borrower nor the General Partner shall be deemed to be in breach of this Section 4.01(l) in respect of any Weekly Report to the extent that the failure of each such Weekly Report to be true, correct and complete relates solely to the fact that such report was based upon the most current information provided to the Borrower by the Account Manager and that the

Borrower may not have the most current information regarding the Assets or liabilities of the Borrower..

(m)    Applicable Law.  Each of the Borrower and the General Partner is in full compliance with all Applicable Law, except where the failure to do so could not reasonably be expected to give rise to a Material Adverse Effect.

(n)    ERISA.  The Borrower is not now nor has during the past five years been a member of an ERISA Group and does not have nor during the past five years had any liability or obligation with respect to any Plan, Multiemployer Plan or Benefit Arrangement.

(o)    No Default or Event of Default.  No Default or Event of Default has occurred and is continuing and on each Borrowing Date and immediately after the making of each Advance each of the conditions precedent to the making of Advances set forth in Section 3.02 are fully satisfied.

(p)    Borrowing Base Test; NAV Test, Etc.  As of each Compliance Determination Date, each of the Borrowing Base Test and the NAV Test is fully satisfied; provided, that if on any date this representation is made (other than a Borrowing Date) the Borrower is in full compliance with the requirements set forth in Section 2.05(b), the Borrower shall be deemed to be in compliance with this clause (p) as of such date.

(q)    Taxes.  The Borrower and the General Partner and each of its Subsidiaries have filed all United States Federal income tax returns and all other tax returns which are required to be filed by it, if any, and has paid all taxes due pursuant to such returns, if any, or pursuant to any assessment received by it, except for any taxes or assessments which are being contested in good faith by appropriate proceedings and with respect thereto adequate reserves have been established in accordance with GAAP and the non-payment of which could otherwise not reasonably be expected to give rise to a Material Adverse Effect and the charges, accruals and reserves on its books in respect of taxes or other governmental charges, if any, are, in its reasonable opinion, adequate.

(r)    Financial Condition.  The statement of assets and liabilities of the Borrower as at December 31, 2004, certified by the independent certified public accountants of the Borrower, fairly present in conformity with GAAP the financial position of the Borrower at such date and since such date there has been no material adverse change in the business, financial position, results of operations or prospects of the Borrower.

(s)    Regulations T, U and X.  Neither the making of any Advance by the Borrower nor the Borrower's use of proceeds thereof will violate or be inconsistent with the provisions of Regulation T, Regulation U or Regulation X.

(t)    Subsidiaries.  The Borrower does not have any subsidiaries, and no equity investment or interests in any Person (other than the Eligible Equity Securities).

(u)    Certain Regulations.  Such Borrower is not subject to regulation under any Federal or State statute or regulation (other than Regulation X of the Board of Governors of the Federal Reserve System and the Investment Company Act) which limits its ability to incur Debt.

(v)     <u>Constituent Documents; Account Documents, etc</u>. Each of the Borrower and the General Partner, as the case may be, has provided to the Agent prior to the Closing Date true, correct and complete copies of the Constituent Documents of the Borrower and the General Partner, the Offering Materials, the Summary of Terms, the Account Documents and the Cash Account Agreements, and since the Closing Date, none of such documents have been amended, except as permitted in accordance with the terms of this Agreement.  Except for the Account Documents and the Summary of Terms there is no other document or agreement which establishes, governs or affects the Account Manager's duties in respect of the Brokerage Account or the Assets of the Borrower deposited in or accredited thereto.

(w)     <u>Plan Assets</u>.  The Assigned Collateral is not deemed to be plan assets by operation of the Plan Assets Regulations and neither the Borrower nor the General Partner has consented to any acquisition, redemption or transfer of an interest in the Borrower that could result in the Assigned Collateral being deemed to be plan assets by operation of the Plan Assets Regulations.

(x)     <u>Custody and Control</u>.  All of the Assets of the Borrower are on deposit in or credited to the Brokerage Account or a Cash Account.

ARTICLE V
COVENANTS

SECTION 5.01.  <u>Affirmative Covenants</u>.

From the Closing Date until the Program Termination Date:

(a)     <u>Compliance with Agreements, Laws, Etc</u>. Each of the Borrower and the General Partner shall (i) duly observe, comply with and conform to all requirements of Applicable Law relative to the conduct of its business or to its Assets, (ii) preserve and keep in full force and effect its legal existence and its rights, privileges, qualifications and franchises, (iii) comply with the terms and conditions of each Program Document to which it is a party, (iv) take any actions required to avoid its Assets from being deemed to be plan assets under the Plan Asset Regulations or the occurrence of any Prohibited Transaction, and (v) obtain, maintain and keep in full force and effect all Governmental Authorizations, Private Authorizations and Governmental Filings which are necessary or appropriate to properly carry out its business and the transactions contemplated to be performed by it under this Agreement and the other Program Documents, except to the extent the failure to comply with the foregoing clauses (i) through (v) could not reasonably be expected to result in a Material Adverse Effect.

(b)     <u>Taxes</u>.  Each of the Borrower and the General Partner shall cause to be computed, paid and discharged when due all taxes, assessments and other governmental charges or levies imposed upon it, or upon any of its income or Assets, prior to the day on which penalties are attached thereto, unless and to the extent that the same shall be contested in good faith by appropriate proceedings and with respect to which adequate reserves have been established on its books in accordance with GAAP.

(c)     <u>Further Assurances</u>.  Each of the Borrower and the General Partner shall promptly, at its expense, execute and deliver such further instruments and take such further

action in order to maintain the Secured Parties' first priority perfected security interest in the Assigned Collateral free and clear of Adverse Claims.  Each of the Borrower and the General Partner shall promptly, as its expense, execute and deliver such further instruments and take such further actions as the Agent may reasonably request in order to (i) establish and protect the rights, interests and remedies created, or intended to be created, in favor of the Secured Parties, (ii) enable the Secured Parties to enforce their rights and remedies under the Program Documents, and (iii) effectuate the intent and purpose of, and to carry out the terms of, the Program Documents.

(d)    Continued Existence.  The Borrower shall keep the jurisdiction designated as its jurisdiction of organization referred to in Section 4.01(a) as its jurisdiction of organization and keep its principal place of business and chief executive office at its address set forth in Section 9.02 or, upon thirty (30) days' prior written notice to the Agent, in any other jurisdiction of organization or at any other locations in jurisdictions where all actions reasonably requested by the Agent to protect and perfect the Agent's first priority perfected security interest in the Assigned Collateral have been taken and completed.

(e)    Financial Statement; Accountants' Reports; Other Information.  Each of the Borrower and the General Partner, as applicable, shall provide to the Agent (with enough additional copies for the Conduit Lender and each Secondary Lender):

(i)    as soon as available, and in any event within one hundred and twenty (120) days after the end of each fiscal year of the Borrower and two hundred and ten (210) days after the end of each fiscal year of the General Partner, a balance sheet of the Borrower and the General Partner, as the case may be, including any notes thereto, as at the end of such fiscal year, a statement of financial position of the Borrower and the General Partner as of the end of such fiscal year, and statements of income and operations and of changes in NAV of the Borrower for such fiscal year, with an audit report thereon issued by its independent certified public accountants, together with the comparable report for the prior fiscal year, all of which have been prepared in accordance with GAAP, consistently applied;

(ii)    as soon as available and in any event within sixty (60) days after the end of each first semi-annual fiscal period of the Borrower and the General Partner, an unaudited balance sheet of the Borrower and the General Partner as at the end of such period, a statement of financial position of the Borrower and the General Partner as of the end of such period, a statement of income and operations and of changes in NAV of the Borrower for such period, all in reasonable detail and stating in comparative form the respective figures for the comparable period in the preceding year, prepared in accordance with GAAP, consistently applied and all certified (subject to normal year-end adjustment) as to fairness of presentation in all material respects by a Responsible Officer of the Borrower or the General Partner, as the case may be;

(iii)    as soon as possible, and in any event within two (2) Business Days of the occurrence of any Default or Event of Default, a certificate of a Responsible Officer of the General Partner setting forth the details thereof and the action which the Borrower is taking or proposes to take with respect thereto;

35

(iv)    immediately upon its becoming aware, written notice of any action by any limited partner of the Borrower to liquidate or dissolve the Borrower, to remove the General Partner or to take any other action that could reasonably be expected to give rise to a Material Adverse Effect;

(v)    promptly upon the mailing thereof to at least a substantial portion of the limited partners or at least a substantial portion of the shareholders, as the case may be, of the Borrower and the General Partner, copies of all financial statements, reports, notices and statements so mailed;

(vi)    promptly upon the filing thereof, without duplication, copies of all regular and periodic reports, and other filings, if any, filed by the Borrower or the General Partner with any Authority, except to extent that such reports or filings filed by the General Partner do not affect the Agent or any Secured Party;

(vii)    on or before the fifteenth (15th) Business Day of each calendar month (or during the continuance of a Default or Event of Default, more frequently as the Agent shall reasonably request (which may be daily)), an Investor Report substantially in the form of Schedule II hereto, for the immediately preceding calendar month (or other relevant period if delivered on a daily or weekly basis), together with a certificate of a Responsible Officer of the Borrower in substantially the form of Annex A to the Investor Report;

(viii)    on each Compliance Report Date, a Weekly Report in substantially the form of Schedule III attached hereto, which shall set forth without limitation (x) all of the Assets of the Borrower as of the immediately preceding Compliance Determination Date, based upon the most current information provided to the Borrower by the Account Manager and the Asset Value of each such Asset as of such Compliance Determination Date, and (y) an estimate of the NAV of the Borrower as of the immediately preceding Compliance Determination Date taking into account information provided to the Borrower by the Account Manager regarding the net aggregate Asset Values of all put options purchased on behalf of the Borrower and all call options sold on behalf of the Borrower;

(ix)    promptly upon its receipt of and contemporaneously with its giving of any notice relating to the termination of any Account Documents, any Cash Account Agreement, the Control Agreement or any Cash Account Control Agreement, copies of any such notice;

(x)    prompt notice of (i) any material amendment or modification to any Account Document, any Cash Account Agreement, its Constituent Documents or the Offering Materials and (ii) any amendment or modification to the Summary of Terms, which notice shall include, in reasonable detail, a description of any such change;

(xi)    from time to time such additional information regarding the financial position or business of the Borrower or the General Partner, in its capacity as general

partner of the Borrower, as the Agent may reasonably request, in its capacity as Agent for the Secured Parties.

(f)    <u>Maintenance of Business</u>.  The Borrower shall continue to engage in business of the same general type as now conducted by it and as contemplated by the Summary of Terms, and each of the Borrower and the General Partner will preserve, renew and keep in full force and effect its existence and rights, privileges and franchises necessary or desirable in the normal conduct of its business, except where the failure to do so could not reasonably be expected to give rise to a Material Adverse Effect.

(g)    <u>Audits</u>.  The Borrower shall annually (or more frequently as the Agent, for itself and as agent for the Secured Parties may require after the occurrence of and during the continuance of a Default or an Event of Default) and at the sole cost and expense of the Borrower (i) cause an independent nationally recognized accounting firm selected by the Borrower and reasonably satisfactory to the Agent, to enter its premises and the premises of any Person to whom it delegates all or any portion of its duties under any Program Document (other than the Account Manager) and examine and audit its and such Person's books, records and accounts relating to its business, financial condition, operations and its and such other Person's performance under the Program Documents, (ii) permit such accounting firm to discuss the Borrower's and such other Person's affairs and finances with the officers, partners, employees and accountants of any of them, (iii) cause such accounting firm to provide to the Agent, for itself and as agent for the Secured Parties, with a certified report in respect of the foregoing, which shall be in form and scope reasonably satisfactory to the Agent, for itself and as agent for the Secured Parties, and (iv) authorize such accounting firm to discuss such affairs, finances and performance with representatives of the Agent and its designees; it being understood that such annual audit and report of such accountants may be coordinated with the Borrower's regular annual audit by its accountants.

(h)    <u>Access to Records</u>.  The Borrower shall permit the Agent or any Person designated by the Agent to, upon reasonable advance notice and during normal hours, visit and inspect at reasonable intervals the Borrower's and any Person to which it delegates any of its duties under the Program Documents (other than the Account Manager) books, records and accounts relating to its business, financial condition, operations, Assets and its performance under the Program Documents and to discuss the foregoing with the Borrower's and such Person's officers, partners, employees and accountants, including, without limitation, all of the information and materials which the independent accountants reviewed in preparing its certified report provided in clause (g) above, all as often as the Agent may reasonably request.

(i)    <u>Investment Policies and Restrictions</u>.  Each of the Borrower and the General Partner shall (i) at all times be in compliance with its Constituent Documents, except where the failure to do so could not reasonably be expected to give rise to a Material Adverse Effect, and (ii) at all times be in compliance with Investment Policies and Restrictions.

(j)    <u>Defense of Secured Parties' Interest</u>.  Each of the Borrower and the General Partner shall warrant and defend each of the Secured Parties' right and interest in, to and under the Assigned Collateral against all Adverse Claims of all Persons whomsoever.

(k)     Custody and Control.  The Borrower shall at all times cause all of its Assets to be on deposit in or credited to the Brokerage Account, other than any cash and securities deposited in or credited to a Cash Account in respect of which a Cash Account Control Agreement shall be in full force and effect.

(l)     Notice of Litigation or Other Proceedings.  Each of the Borrower and the General Partner shall promptly give notice in writing to the Agent of all litigation, arbitration proceedings and regulatory proceedings affecting it or its Assets, except such proceedings which if adversely determined could not reasonably be expected to give rise to a Material Adverse Effect.

(m)     Maintenance of Books of Record and Account.  Each of the Borrower and the General Partner shall keep proper books of record and account in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving its Assets and business and maintain such books of record and account in material conformity with all applicable requirements of any Authority having regulatory jurisdiction over it or its Assets.  The Borrower and the General Partner shall cause the Borrower's books and records to reflect the Secured Parties' lien on, and security interest in, and charge over the Assigned Collateral.

(n)     Proceeds of Assigned Collateral.  Each of the Borrower and the General Partner shall following an Event of Default cause all cash Proceeds of the Assigned Collateral to be remitted to the Agent's Account.

(o)     Use of Proceeds.  The proceeds of the Advances shall be utilized by the Borrower for general working capital purposes (including the maintenance of liquidity by providing funds for the redemption of interests issued by the Borrower and the purchase of investments as permitted by the Investment Policies and Restrictions).  Without limiting the foregoing, the Borrower shall use the net proceeds of each Advance in a manner that does not, directly or indirectly, violate any provision of the Summary of Terms, its Constituent Documents, the Offering Materials or any Applicable Law.

(p)     Account Manager.  Except as consented to in writing by the Agent, each of the Borrower and the General Partner shall at all times maintain the Account Manager as the sole Person acting as its investment manager and prime broker.

(q)     Borrowing Limits.  The Borrower shall at all times comply with the Borrowing Base Test and the NAV Test and the restrictions on its indebtedness set forth in its Constituent Documents and the Offering Materials; provided, that the Borrower shall not be deemed to be in breach of this Section 5.01(q) if it is in full compliance with Section 2.05.

(r)     Cash Account Bank.  The Borrower shall, as promptly as practicable after it has actual knowledge that any event of the type set forth in Section 6.01(f) shall have occurred and be continuing in respect of any Cash Account Bank (and in any event within thirty (30) days thereafter), replace such Cash Account Bank with a successor cash account bank, reasonably satisfactory to the Agent and cause a Cash Account Control Agreement to be executed by the

Borrower and such cash account bank in form, scope and substance reasonably satisfactory to the Agent.

(s)     Account Manager Reports.  The Borrower shall cause the Account Manager to provide the Borrower with written notice of all assets sold, disposed of or acquired by or for the account of the Borrower as promptly as possible and in any event within one week after each such asset was sold, disposed of or acquired.

(t)     Mergers; Sale of Assets.  The Borrower and the General Partner shall obtain the written consent of the Agent prior to (i) adopting or carrying out or suffering to exist, with respect to itself or each other, any plan of liquidation, partial liquidation, reorganization, incorporation, recapitalization, merger or consolidation (or suffering any liquidation or dissolution) or (ii) selling, transferring or otherwise disposing of all or any substantial portion of its assets or properties (whether in one transaction or a series of transactions), except in respect of clauses (i) and (ii) where such sale, transfer or disposition could not reasonably be expected to give rise to a Material Adverse Effect and provided that immediately after giving effect to such sale, transfer or disposition the Borrower will be in full compliance with the Borrowing Base Test and the NAV Test (determined as if such date of determination were a Compliance Determination Date).

(u)     Changes to Fiscal Year, Accounting Methods.  The Borrower and the General Partner shall have provided written notice to the Agent prior to changing (x) its fiscal year or (y) its method of accounting as in effect on the Closing Date.

(v)     Transfer of General Partner's Interest.  The General Partner shall obtain the prior written consent of the Agent prior to voluntarily or involuntarily by operation of law or otherwise transferring all or any part of its general partner interest in the Borrower.

SECTION 5.02.  Negative Covenants.

From the Closing Date until the program Termination Date:

(a)     Impairment of Rights.  Neither the Borrower nor the General Partner shall enter into any material agreement containing any provision which would be violated or breached by the performance of any of its obligations under any Program Document.

(b)     Limitation on Business and Investment Policies and Restrictions.  The Borrower shall not purchase any Assets or engage in any line of business, except for the purchase of Borrowing Base Eligible Assets, the sale of out-of-the-money call options and the purchase of out-of-the-money and at-the-money put options to the extent expressly contemplated by the Investment Policies and Restrictions in effect on the Closing Date as modified in accordance with this Agreement.

(c)     Creation of Debt.  The Borrower shall not create, assume or suffer to exist any Debt or any Guarantee, except for Permitted Debt.

(d)     Advances and Extensions of Credit.  The Borrower shall not without the prior written consent of the Agent (which consent shall not be unreasonably withheld) make any

(i) payment except in the ordinary course of its business and as expressly contemplated by its Constituent Documents, the Offering Materials or the Investment Policies and Restrictions, or (ii) advance or other extension of credit to any Person.

(e)     Account Documents and Cash Account Agreement.  Neither the Borrower nor the General Partner shall without the prior written consent of the Agent (i) terminate the Account Manager (or a successor entity which has been consented to in writing by the Agent) as the investment manager or prime broker for the Borrower or terminate any Account Document or the Brokerage Account or appoint any additional manager or prime broker, (ii) amend or modify in any material respect or waive or terminate any Account Document or consent to any such amendment, modification, waiver or termination, or (iii) enter into any agreement with the Account Manager other than the Account Documents, which govern or affect the Brokerage Account, the assets deposited therein or to the credit thereof, or the Account Manager's performance of its duties with respect thereto.  The Borrower shall not change any account carried or maintained by the Account Manager pursuant to the Account Documents from those specified in the Control Agreement, unless the Agent has received prior written notice of such change and the Control Agreement has been modified to reflect such change.  Neither the Borrower nor the General Partner shall maintain any account in respect of which the cash of the Borrower is credited except for the Brokerage Account and the Cash Accounts.

(f)     Amendments to Constituent Documents, etc..  Without the prior written consent of the Agent (which consent shall not be unreasonably withheld), (i) the Borrower  shall not (x) amend, supplement or otherwise modify in any material respect its Constituent Documents, or (y) amend, supplement or otherwise modify in any material respect its Offering Materials, except where such amendment, supplement or modification could not reasonably be expected to give rise to a Material Adverse Effect, and (ii) the General Partner shall not (x) amend, supplement or otherwise modify in any material respect its Constituent Documents or its Offering Materials, except where such amendment, supplement or modification could not reasonably be expected to give rise to a Material Adverse Effect.

(g)     ERISA.  The Borrower shall not become a member of an ERISA Group or incur any liability or obligation with respect to Plan, Multiemployer Plan or any Benefit Arrangement.

(h)     Investment Policies and Restrictions; Industry Classes.  Neither the Borrower nor the General Partner shall (i) permit any change in its Investment Policies and Restrictions in effect on the Closing Date without the prior written consent of the Agent, or (ii) make or permit any change in any Industry Class set forth on Schedule IV hereto without the prior written consent of the Agent (which consent shall not be unreasonably withheld).

(i)     Liens.  The Borrower shall not create, assume or suffer to exist any Adverse Claim on any of its Assets now owned or hereafter acquired by it.

(j)     Margin Requirements.  The Borrower shall not extend credit to others for the purpose of buying or carrying any "margin stock" in such a manner as to violate Regulation T, Regulation U or Regulation X or use the proceeds of any Advance in violation of Regulation T, Regulation U or Regulation X.

(k)    Restricted Payments.  The Borrower shall not make any Restricted
Payment (i) if any Default or Event of Default shall be continuing or shall result therefrom, (ii) if
immediately after giving effect to such payment the Borrower will not be in full compliance with
the Borrowing Base Test or the NAV Test (determined as if such date of determination were a
Compliance Determination Date), or (iii) at any time after the Agent shall have delivered a
Notice of Exclusive Control to the Account Manager or any Cash Account Bank in accordance
with the terms of the Control Agreement or any Cash Account Control Agreement (unless such
Notice of Exclusive Control has been revoked in writing by the Agent).

(l)    Name Change.  The Borrower shall not change its name (i) without giving
the Agent at least thirty (30) days prior written notice, and (ii) unless all actions necessary and
appropriate to protect and perfect the Secured Parties' first priority perfected security interest in
the Assigned Collateral have been taken and completed.

(m)    Assigned Collateral; Notice of Exclusive Control.  After the Borrower or
the General Partner has received written notice of delivery by the Agent to the Account Manager
or the Cash Account Bank of a Notice of Exclusive Control in accordance with the terms of
Section 7.04, unless such Notice of Exclusive Control is revoked in writing by the Agent, give
any entitlement orders or other instructions to the Account Manager or to any Cash Account
Bank in respect of the Assigned Collateral without the prior written consent of the Agent.

(n)    Subsidiaries.  The Borrower shall not establish any subsidiaries without
the prior written consent of the Agent.

(o)    Investment Company Restriction.  The Borrower shall not become an
"investment company", or a company "controlled" by an "investment company", within the
meaning of the Investment Company Act.

(p)    Dissolution of Borrower.  The General Partner shall at any time prior to
the Program Termination Date not take any action or omit to take any action which could result
in the dissolution or liquidation of the Borrower.

(q)    Plan Assets.  Neither the Borrower nor the General Partner shall take or
omit to take any action which would result in any of the Assigned Collateral being deemed to be
plan assets under the Plan Asset Regulations or the occurrence of any Prohibited Transaction.

ARTICLE VI
EVENTS OF DEFAULT

SECTION 6.01.  Events of Default.

If any of the following events shall occur after the Closing Date:

(a)    the Borrower or the General Partner shall fail to make or cause to be made
in the manner and when due any payment or deposit to be made or to be caused to be made by it
under this Agreement, any of the other Program Documents to which it is a party and such
failure shall continue for (i) in the case of any principal payments on any Advance (other than
the failure to comply with Section 2.05 in which no grace period or requirement of notice shall

apply), one (1) Business Day, and (ii) in the case of all other payments (other than the failure to comply with Section 2.05 in which no grace period or requirement of notice shall apply), three (3) Business Days; or

(b)    the Borrower or the General Partner shall fail to comply with Section 2.05, clauses (f) or (t) of Section 5.01 or clauses (a), (b), (c), (d), (e), (f), (g), (h), (j) or (k) of Section 5.02, as applicable; or

(c)    the Borrower, the General Partner or the Account Manager shall fail to perform or observe any other term, covenant or agreement on its part to be performed or observed under this Agreement or any other Program Document and such failure shall continue for ten (10) days after it has knowledge of such failure; or

(d)    after the Closing Date, any material representation or warranty made or deemed made by the Borrower or the General Partner under or in connection with this Agreement, any other Program Document or any other certificate, information or report delivered by or on behalf of the Borrower or the General Partner shall be deemed to have been false or incorrect when made or deemed made or delivered; or

(e)    the Agent shall for any reason cease to have a valid and perfected first priority security interest in the Assigned Collateral pledged by the Borrower free and clear of all Adverse Claims; or

(f)    after the Closing Date, the Borrower, the General Partner, the Parent, Oppenheimer Acquisition Corp. or the Account Manager shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower, the General Partner, the Parent, Oppenheimer Acquisition Corp. or the Account Manager seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of sixty (60) days, or any of the actions sought in such proceeding (including an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or for any substantial part of its property) shall occur; or the Borrower, the General Partner, the Parent, Oppenheimer Acquisition Corp. or the Account Manager shall take any corporate action to authorize any of the actions set forth above in this subsection; provided, that, if any such event of the type specified in this Section 6.01(f) in respect of Oppenheimer Acquisition Corp. could not reasonably be expected to give rise to a Material Adverse Effect, then such event shall not constitute an Event of Default until the day which is sixty (60) days after the occurrence of such event; or

(g)    after the Closing Date, any material provision of any Program Document to which the Borrower or the General Partner is a party shall cease to be a legal, valid and binding obligation of any of the parties purported to be bound thereby, enforceable in accordance

with its respective terms or the Borrower, the General Partner, the Account Manager or any Cash Account Bank shall so assert in writing; or

(h)     any judgment or order, or any series of judgments or orders, shall have been entered after the Closing Date against the Borrower, the General Partner, the Parent or the Account Manager, provided that (i) such judgments or orders shall aggregate in respect of each entity to $1,000,000 or more, and (ii) enforcement actions have been commenced with respect thereto and have not been dismissed or stayed pending appeal for thirty (30) days or more; or

(i)     the Account Manager shall cease to act as the sole account manager and prime broker for the Borrower or the Account Manager shall have delivered a notice of its termination of any Account Document; or

(j)     any event or condition shall occur after the Closing Date which results in the acceleration of the maturity of any Debt of the Borrower, the General Partner or the Account Manager, which Debt in the aggregate is at least $1,000,000 or enables (or, with the giving of notice or lapse of time or both would enable) the holder of such Debt or any Person acting on such holder's behalf to accelerate the maturity thereof; or

(k)     any change in Law shall be enacted, promulgated or proposed which would limit the ability of the Agent, or any Secured Party to foreclose upon its interest in, or in the event of such foreclosure to dispose of, the Assigned Collateral or to be granted the security interest in such Assigned Collateral as contemplated by the Program Documents; or

(l)     the Account Manager or the General Partner shall sell or otherwise dispose of all or a substantial portion of its assets (other than sales or dispositions of assets which the Account Manager or the General Partner, as the case may be, obtain other assets therefor with a fair market value substantially equivalent to the fair market value of the assets sold or disposed )or consolidate with or merge into any other entity unless it is the survivor, or acquire all or substantially all of the assets of another Person, unless the assets acquired are less than twenty-five percent (25%) of its assets, unless in each case the Agent has consented to the same in writing (which consent shall not be unreasonably withheld) or with respect to the General Partner, such sale, disposal or acquisition is within the ordinary course of its business; or

(m)     Tremont Partners, Inc. (or another entity which has been consented to in writing by the Agent) is not the sole general partner of the Borrower; or

(n)     there shall have occurred after the Closing Date (i) any material adverse change in, or material adverse effect upon, the business, financial position, operations, assets or properties of the General Partner, (ii) any material impairment of the ability of the General Partner to perform its obligations under any Program Document, or (iii) any proceeding shall have been commenced by any Authority in respect of the General Partner which would reasonably be expected to have a Material Adverse Effect; or

(o)     the Side Letter in effect of the Closing Date shall be amended, waived, terminated or otherwise modified without the prior written consent of the Agent; or

(p)      the SEC shall have revoked or shall have taken any formal action to revoke the broker/dealer registration of the Account Manager; or

(q)      the Account Manager shall cease to be registered as a broker/dealer under the Exchange Act and with the NASD; or

(r)      the Account Manager shall have failed to meet the minimum capital requirements prescribed from time to time by Rule 15c3-1 under the Exchange Act; or

(s)      the occurrence of any event that could reasonably be expected to cause dissolution or liquidation of the Borrower, including without limitation the receipt by the General Partner of a notice from the constituent partners of the Borrower of their affirmative vote to dissolve the Borrower; or

(t)      any Authority shall have imposed any sanction upon the Account Manager involving the suspension of a material line of business of the Account Manager, or any indictment, enforcement action, or other proceeding shall have been commenced by any Authority against the Account Manager which in any case could have a Material Adverse Effect;

then, and in any such event, in addition to all rights and remedies specified in this Agreement, including without limitation, Article VII, and the rights and remedies of a secured party under Applicable Law including, without limitation the UCC, the Agent may, by notice to the Borrower or the General Partner, declare the Termination Date to have occurred and declare the outstanding Advances to be due and payable (in which case the Termination Date and the Maturity Date in respect of the Advances shall be deemed to have occurred); provided, that, upon the occurrence of any event (without any requirement for the passage of time or the giving of notice, or both) described in subsection (f) of this Section 6.01, the Termination Date and Maturity Date shall be deemed to have automatically occurred.

ARTICLE VII
PLEDGE OF ASSIGNED COLLATERAL;
RIGHTS OF THE AGENT

SECTION 7.01.  Security Interests.

The Borrower in consideration of the Lenders and the Secondary Lenders making and maintaining the Advances, and as collateral security for the prompt, complete and unconditional payment and performance of all of the Borrower Obligations, hereby pledges, hypothecates, transfers, sets over, delivers and grants to the Agent for the benefit of the Secured Parties a continuing Lien upon and security interest in all of the Borrower's right, title and interest in, to and under, all accounts, contract rights, general intangibles, chattel paper, instruments, documents, money, deposit accounts, security entitlements, certificates of deposit, goods, letters of credit, advances of credit, certificated securities, uncertificated securities, financial assets and investment property now owned or existing or hereafter arising or acquired and wheresoever located including, without limitation, the following:

(i)      all of the Borrower's cash, Equity Securities, call options, put options and other investments and property from time to time on deposit in or to the credit of the

Brokerage Account and each Cash Account, and all security entitlements with respect to the Brokerage Account;

(ii)    the Brokerage Account and each Cash Account;

(iii)    all interest, dividends, stock dividends, stock splits, distributions and other money or property of any kind distributed in respect of the Assets, investments, property and security entitlements described above;

(iv)    all rights and remedies of the Borrower under the Account Documents and each Cash Account Agreement;

(v)    all security interests, liens, collateral, property, guaranties, supporting obligations, insurance and other agreements or arrangements of whatever character from time to time supporting or securing payment of the assets, investments, property and security entitlements described above;

(vi)    all books, records and other information (including, without limitation, computer programs, tapes, discs, punch cards, data processing software and related property and rights) relating to the assets, investments, property and security entitlements described above; and

(vii)    all Proceeds of any and all of the foregoing.

The Assets, properties and interests of the Borrower referred to in this Section 7.01 are hereinafter collectively referred to as the "Assigned Collateral".

SECTION 7.02.  Substitution of Collateral and Release of Security Interest.

(a)    So long as no Event of Default shall have occurred and be continuing or would occur as a consequence of such sale or disposition and the Borrowing Base Test (determined as if such date of determination were a Compliance Determination Date) shall be fully satisfied immediately following such sale or disposition, the Borrower or the General Partner may originate entitlement orders and other instructions with respect to the Brokerage Account and the Cash Accounts and may sell or dispose of or cause the Account Manager or any Cash Account Bank to sell or dispose of Assigned Collateral in accordance with the terms of this Agreement, the Account Documents and the Cash Account Agreements.

(b)    After the Program Termination Date, the Agent at the request of the Borrower shall execute, deliver and file such instruments as the Borrower shall reasonably request in order to reassign, release or terminate its security interest in the Assigned Collateral and to terminate the Control Agreement and each Cash Account Control Agreement.  Any and all actions under this Section 7.02 in respect of the Assigned Collateral shall be without any recourse to, or representation or warranty by, the Agent or any Secured Party and shall be at the sole cost and expense of the Borrower and the General Partner.  The obligation of the Borrower and the General Partner to reimburse the Agent and the other Secured Parties pursuant to this Section 7.02(b) shall survive the termination of this Agreement.

SECTION 7.03.  Application of Proceeds.

(a)    After the occurrence and during the continuance of an Event of Default, all amounts remitted to the Agent's Account in respect of the Borrower Obligations, including without limitation all Proceeds resulting from the sale or other disposition of the Assigned Collateral shall be applied by the Agent in the following order and priority:

First, to the payment of all amounts advanced or expended by the Agent and all costs and expenses incurred by the Agent in connection with the enforcement of the Secured Parties' rights and remedies;

Second, to the extent funds are remaining after the above application, to the Lenders and the Secondary Lenders for the payment of all accrued and unpaid Yield on all outstanding Advances on a pro-rata basis according to the amount of such accrued Yield owing to each Lender and each Secondary Lender;

Third, to the extent funds are remaining after the above applications, to the Secured Parties for the payment of all fees payable under the Fee Letter on a pro rata basis according to the amount of such fees owing to each Secured Party;

Fourth, to the extent funds are remaining after the above applications, to the Lenders and the Secondary Lenders for the payment of the principal amount of each outstanding Advance on a pro-rata basis according to the amount of such principal owing to each Lender and each Secondary Lender; and

Fifth, to the extent funds are remaining after the above applications, to the Secured Parties, any Affected Person and any Indemnified Party for the payment of all other Borrower Obligations owing to the Secured Parties, the Affected Persons and the Indemnified Parties pursuant to this Agreement and the other Program Documents on a pro rata basis according to such amounts owed to each Person.

The Agent shall, after the Termination Date and the final payment in full of all Advances and all other Borrower Obligations, remit the remaining excess Proceeds which it had received from the sale or disposition of the Assigned Collateral to the Borrower's Account.

(b)    For purposes of determining the application to be made of such monies and other cash proceeds by the Agent to the Lenders and the Secondary Lenders pursuant to this Section 7.03, the Agent may rely exclusively upon a certificate or other statement of the Lenders or such Secondary Lender, as the case may be, setting forth in reasonable detail the amount then owing to such Lender and such Secondary Lender, as the case may be.  The Agent shall not be liable for any application of funds in accordance with any certificate or direction delivered pursuant to this Section 7.03; provided, however, that no application of funds in accordance with any certificate delivered pursuant to this Section 7.03 shall be deemed to restrict or limit the right of any party to contest with the purported obligee its respective liability in respect of the amount set forth in such certificate.

SECTION 7.04.  Rights and Remedies upon Event of Default.

(a)    The Agent (for itself and on behalf of the other Secured Parties) shall have all of the rights and remedies of a secured party under the UCC and other Applicable Law. Upon the occurrence and during the continuance of an Event of Default, the Agent or its designees may (i) deliver a Notice of Exclusive Control to the Account Manager and each Cash Account Bank; (ii) give all instructions and entitlement orders to the Account Manager regarding the Assigned Collateral, the Brokerage Account and the Account Documents in accordance with the Control Agreement; (iii) cause the Account Manager to sell or otherwise dispose of the Assigned Collateral, all without judicial process or proceedings; (iv) take control of the Proceeds of any such Assigned Collateral; (v) exercise any consensual or voting rights in respect of the Assigned Collateral; (vi) release, make extensions, discharges, exchanges or substitutions for, or surrender all or any part of the Assigned Collateral; (vii) exercise the Borrower's and the General Partner's rights and remedies under the Account Documents, including without limitation the right to cause the Account Manager to liquidate all of the Assigned Collateral and to terminate the Brokerage Account and the Account Documents; (viii) institute and prosecute legal and equitable proceedings to enforce collection of, or realize upon, any of the Assigned Collateral; (ix) cause the Account Manager to remit all proceeds of the Assigned Collateral to the Agent's Account; (x) remove from the Borrower's, the General Partner's and their respective agents' place of business all books, records and documents relating to the Assigned Collateral unless copies thereof shall have been provided to the Agent which copies of such books and records shall thereafter be deemed to be originals thereof; and (xi) endorse the name of the Borrower or the General Partner upon any items of payment relating to the Assigned Collateral of or upon any proof of claim in bankruptcy against an account debtor. For purposes of taking the actions described in clauses (i) through (xi) of this Section 7.04(a) each of the Borrower and the General Partner hereby irrevocably appoints the Agent as its attorney-in-fact (which appointment being coupled with an interest is irrevocable while any of the Borrower Obligations remain unpaid) in respect of the matters contained herein, with power of substitution, in the name of the Agent or in the name of the Borrower, the General Partner or otherwise, for the use and benefit of the Agent, but at the cost and expense of the Borrower or the General Partner and without notice to the Borrower or the General Partner.

(b)    All sums paid or advanced by the Agent in connection with the foregoing and all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection therewith, together with interest thereon at the Post-Default Rate from the date of payment until repaid in full, shall be paid by the Borrower to the Agent on demand and shall constitute and become a part of the Borrower Obligations secured hereby.

SECTION 7.05.  Remedies Cumulative.

Each right, power, and remedy of the Agent and the other Secured Parties, or any of them, as provided for in this Agreement or in the other Program Documents or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in this Agreement or in the other Program Documents or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by the Agent or any other Secured Party of any one or more of such rights, powers, or remedies shall not preclude the

47

simultaneous or later exercise by such Persons of any or all such other rights, powers, or remedies.

SECTION 7.06.  <u>Enforcement of Certain Other Remedies.</u>

Each of the Borrower and the General Partner agrees that it shall upon the request of the Agent (and at the Borrower's or the General Partner's own expense) diligently enforce the rights and remedies under the Account Documents and at law or equity against the Account Manager for the breach by the Account Manager of any term, covenant or agreement under the Account Documents or the Control Agreement.

ARTICLE VIII
THE AGENT
SECTION 8.01.  <u>Authorization and Action.</u>

Each Lender and each of the Secondary Lenders hereby irrevocably appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under this Agreement, the other Program Documents and the Asset Purchase Agreement as are delegated to the Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto. The Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Program Documents, or any fiduciary relationship with any Secured Party, and no implied covenants, functions, responsibilities, duties or obligations or liabilities on the part of the Agent shall be read into this Agreement, any other Program Document or the Asset Purchase Agreement or otherwise exist for the Agent.  As to any matters not expressly provided for by this Agreement, the other Program Documents or the Asset Purchase Agreement, the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Lenders or the Secondary Lenders; <u>provided</u>, <u>however</u>, that the Agent shall not be required to take any action which exposes the Agent to personal liability or which is contrary to this Agreement, the other Program Documents, the Asset Purchase Agreement or Applicable Law.  Each Lender and each Secondary Lender agrees that in any instance in which the Program Documents provide that the Agent's consent may not be unreasonably withheld, provide for the exercise of the Agent's reasonable discretion, or provide to a similar effect, it shall not in its instructions to the Agent withhold its consent or exercise its discretion in an unreasonable manner.

SECTION 8.02.  <u>Delegation of Duties</u>.

The Agent may execute any of its duties under this Agreement, each other Program Document and the Asset Purchase Agreement by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

SECTION 8.03.  Agent's Reliance, Etc.

Neither the Agent nor any of its directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement, any of the other Program Documents or the Asset Purchase Agreement, except for its or their own gross negligence or willful misconduct.  Without limiting the generality of the foregoing, the Agent:  (i) may consult with legal counsel (including counsel for the Borrower, the General Partner, the Account Manager or any Cash Account Bank) and independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in accordance with the advice of such counsel, accountants or experts; (ii) makes no warranty or representation to any Secured Party or any other Person and shall not be responsible to any Secured Party or any Person for any statements, warranties or representations (whether written or oral) made in or in connection with this Agreement, the other Program Documents or the Asset Purchase Agreement; (iii) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement, the other Program Documents or the Asset Purchase Agreement on the part of the Borrower, the General Partner, the Account Manager, any Cash Account Bank or any other Person or to inspect the property (including the books and records) of the Borrower, the General Partner, the Account Manager or any Cash Account Bank; (iv) shall not be responsible to any Secured Party or any other Person for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, the other Program Documents, the Asset Purchase Agreement or any other instrument or document furnished pursuant hereto or thereto; and (v) shall incur no liability under or in respect of this Agreement, any other Program Document or the Asset Purchase Agreement by acting upon any notice, consent, certificate or other instrument or writing (which may be delivered by telecopier, telegram, cable or telex) believed by it to be genuine and signed or sent by the proper party or parties.

SECTION 8.04.  Indemnification.

Each of the Lenders and the Secondary Lenders agrees to indemnify and hold the Agent harmless (to the extent not reimbursed by or on behalf of the Borrower or the General Partner) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Agreement, any other Program Document or any Asset Purchase Agreement or any action taken or omitted by the Agent under this Agreement, any other Program Document or any Asset Purchase Agreement; provided, that no Secured Party shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or willful misconduct.  Without limitation of the foregoing, each of the Lenders and the Secondary Lenders agrees to reimburse the Agent promptly upon demand for any out-of-pocket expenses (including reasonable counsel fees) incurred by the Agent in connection with the administration or enforcement (whether through negotiations, legal proceedings or otherwise) or legal advice in respect of rights or responsibilities under this Agreement, any other Program Document or any Asset Purchase Agreement, to the extent that the Agent is not reimbursed for such expenses by or on behalf of the Borrower or the General Partner.  Each Lender or Secondary Lender shall be obligated to pay its proportionate share of all amounts payable to the Agent under this Section 8.04.  As used in

this Section 8.04, the term "proportionate share" in respect of any Lender and each Secondary Lender means the fraction, expressed as a percentage, the numerator of which is the Secondary Lender Commitment of such Secondary Lender and the denominator of which is the Total Commitment.

SECTION 8.05.  Successor Agent.

The Agent may, upon thirty (30) days' notice to the Lenders and the Secondary Lenders, resign as Agent.  If the Agent shall resign, then the Lenders during such thirty (30) day period shall appoint from among the Secondary Lenders a successor agent.  If for any reason a successor agent is not so appointed and does not accept such appointment during such thirty (30) day period, the Agent may appoint a successor agent.  Any resignation of the Agent shall be effective upon the appointment of a successor agent pursuant to this Section 8.05 and the acceptance of such appointment by such successor.  After the effectiveness of any retiring Agent's resignation hereunder as Agent, the retiring Agent shall be discharged from its duties and obligations hereunder, under the other Program Documents and under any Asset Purchase Agreement and the provisions of this Article VIII and Section 9.04 shall continue in effect for its benefit with respect to any actions taken or omitted to be taken by it while it was Agent under this Agreement, any Program Document and any Asset Purchase Agreement.

ARTICLE IX
MISCELLANEOUS
SECTION 9.01.  No Waiver; Modifications in Writing.

No failure or delay on the part of any Secured Party exercising any right, power or remedy hereunder or with respect to the Advances shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  No amendment, modification or supplement of this Agreement shall be effective unless signed by the Agent, the Borrower and the General Partner.  Any waiver of any provision of this Agreement, and any consent to any departure by the Borrower or the General Partner from the terms of any provision of this Agreement, shall be effective only in the specific instance and for the specific purpose for which given.  No notice to or demand on the Borrower or the General Partner in any case shall entitle the Borrower or the General Partner to any other or further notice or demand in similar or other circumstances.

SECTION 9.02.  Notices, Etc.

Except where telephonic instructions are authorized herein to be given, all notices, demands, instructions and other communications required or permitted to be given to or made upon any party hereto shall be in writing and shall be personally delivered or sent by registered, certified or express mail, postage prepaid, or by prepaid telegram (with messenger delivery specified in the case of a telegram), or by confirmed facsimile transmission, or by prepaid courier service, and shall be deemed to be given for purposes of this Agreement on the day that such writing is received by the intended recipient thereof in accordance with the provisions of this Section 9.02.  Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this Section 9.02, notices, demands, instructions and

other communications in writing shall be given to or made upon the respective parties hereto at their respective addresses (or to their respective facsimile numbers) indicated below, and, in the case of telephonic instructions or notices, by calling the telephone number or numbers indicated for such party below:

If to CAFCO:                CAFCO, LLC
                            c/o Citicorp North America, Inc.
                            450 Mamaroneck Avenue
                            Harrison, New York  10528
                            Attention:  U.S. Securitization
                            Telephone No.:  (914) 899-7138
                            Facsimile No.:  (914) 899-7903

If to the Agent:            Citicorp North America, Inc.
                            U.S. Securitization
                            450 Mamaroneck Avenue
                            Harrison, New York  10528
                            Attention:  U.S. Securitization
                            Telephone No.:  (914) 899-7138
                            Facsimile No.:  (914) 899-7903

If to Citibank:             Citibank, N.A.
                            388 Greenwich Street, 19th Floor
                            New York, New York  10013
                            Attention:  Portfolio Management
                            Telephone No.:  (212) 816-0556
                            Facsimile No.:  (212) 816-0262

If to the Borrower:         American Masters Broad Market Prime Fund, L.P.
                            c/o Tremont Partners, Inc.
                            555 Theodore Fremd Avenue, Suite C-300
                            Rye, New York 10580
                            Attention:  Suzanne Hammond, Senior Vice President
                            Telephone No.:  (914) 925-1187
                            Facsimile No.:  (914) 925-1137

If to the General Partner:  Tremont Partners, Inc.
                            555 Theodore Fremd Avenue, Suite C-300
                            Rye, New York 10580
                            Attention:  Suzanne Hammond, Senior Vice President
                            Telephone No.:  (914) 925-1187
                            Facsimile No.:  (914) 925-1137

SECTION 9.03.  Taxes.

(a)      Any and all payments by the Borrower under this Agreement, the Advance Notes or any other Program Document shall be made, in accordance with this Agreement, free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding, in the case of the Secured Parties, (i) United States federal withholding taxes and (ii) income and franchise taxes imposed on it by any taxing Authority in any jurisdiction which asserts jurisdiction to impose such taxes on the basis of contacts which the Secured Party in question maintains with such jurisdiction other than contacts arising out of the execution, delivery or performance of the Program Documents or the transactions contemplated thereby (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes").  If the Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable by it hereunder, under any Advance Note or under any other Program Document to any Secured Party, (i) the sum payable by the Borrower shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 9.03) such Secured Party receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with Applicable Law.

(b)      In addition, the Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made by the Borrower hereunder, under the Advance Notes or under any other Program Document or from the execution, delivery or registration of, or otherwise with respect to, this Agreement, the Advance Notes or under any other Program Document (hereinafter referred to as "Other Taxes").

(c)      The Borrower will indemnify each of the Secured Parties for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 9.03) paid by any Secured Party and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within thirty (30) days from the date the Secured Party makes written demand therefor to the Borrower.

(d)      Within thirty (30) days after the date of any payment of Taxes or Other Taxes, the Borrower will furnish to the Agent the original or a certified copy of a receipt evidencing payment thereof.

(e)      Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreement and obligations of the Borrower contained in this Section 9.03 shall survive the termination of this Agreement and the payment in full of principal and Yield hereunder and under the Advance Notes.

SECTION 9.04.  <u>Costs and Expenses; Indemnification</u>.

(a)    Each of the Borrower and the General Partner jointly and severally agrees to promptly pay on demand all costs and expenses of each of the Secured Parties (including, without limitation, the fees and disbursements of counsel (whether through negotiations, legal proceedings or otherwise)), in connection with the preparation, review, negotiation, reproduction, execution, delivery, administration, modification, amendment and enforcement of this Agreement, the Advance Notes, any other Asset Purchase Agreement,  or any Asset Purchase Agreement, including, without limitation, the reasonable fees and disbursements of counsel for the Secured Parties with respect thereto and with respect to advising the Secured Parties, as to its rights, remedies and responsibilities under this Agreement, the other Program Documents and any Asset Purchase Agreement, all actuarial fees, UCC filing fees, periodic auditing expenses and all other related fees and expenses; <u>provided</u>, <u>however</u>, that neither the Borrower nor the General Partner shall be obligated to pay any cost or expense in connection with the preparation, review, negotiation, reproduction, execution or delivery by any Lender or Secondary Lender of any of the documentation which is required in order to effect a participation.

(b)    Each of the Borrower and the General Partner jointly and severally agrees to indemnify and hold harmless each Secured Party and each of their Affiliates and the respective officers, directors, employees, agents, managers of, and any Person controlling any of, the foregoing (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities, obligations, expenses, penalties, actions, suits, judgments and disbursements of any kind or nature whatsoever, (including, without limitation, the reasonable fees and disbursements of counsel) (collectively the "Liabilities") that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of the execution, delivery, enforcement, performance, administration of or otherwise arising out of or incurred in connection with this Agreement, any other Program Document or any Asset Purchase Agreement or any transaction contemplated hereby or thereby (and regardless of whether or not any such transactions are consummated), including, without limitation any such Liability that is incurred or arises out of or in connection with, or by reason of any one or more of the following:  (i) preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with this Agreement, any other Program Document or any Asset Purchase Agreement or any of the transactions contemplated hereby or thereby; (ii) any breach or alleged breach of any covenant by the Borrower, the General Partner or the Account Manager contained in any Program Document (other than as alleged by a Secured Party); (iii) any representation or warranty made or deemed made by the Borrower, the General Partner or the Account Manager contained in any Program Document or in any certificate, statement or report delivered in connection therewith is, or is alleged to be, false or misleading (other than as alleged by a Secured Party); (iv) any failure by the Borrower, the General Partner or the Account Manager to comply with any Applicable Law or contractual obligation binding upon it; (v) any failure to vest, or delay in vesting, in the Secured Parties a first priority perfected security interest in all of the Assigned Collateral; (vi) any action or omission, not expressly authorized by the Program Documents, by the Borrower, the General Partner or the Account Manager which has the effect of reducing or impairing the Assigned Collateral or the rights of the Agent or the Secured Parties with respect thereto; (vii) any Default or Event of Default; and (viii) any transactions related to the funding, carrying or repayment of the outstanding principal

amount of the Advances in connection with the Program Documents; except to the extent any such Liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

(c)     Without prejudice to the survival of any other agreement of the Borrower or the General Partner hereunder, the agreements and obligations of the Borrower and the General Partner contained in this Section 9.04 shall survive the termination of this Agreement and the payment in full of principal and Yield on the Advances.

SECTION 9.05.  Execution in Counterparts.

This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Agreement.

SECTION 9.06.  Assignability.

(a)     This Agreement and the Conduit Lender's rights and obligations herein (including the outstanding Advances) shall be assignable by the Conduit Lender and its successors and assigns to an Eligible Assignee; provided, that without the prior written consent of the Borrower (which consent shall not be unreasonably withheld or delayed and which consent shall, in any event not be required if an Event of Default shall have occurred and be continuing in respect of the Borrower) the Conduit Lender shall not assign its rights and obligations under this Agreement to any Person other than to a special purpose entity that issues commercial paper notes which is a U.S. Affiliate of the Agent.  Each such assignor shall notify the Agent and the Borrower of any such assignment. Each such assignor may, in connection with the assignment or participation, disclose to the assignee or participant any information relating to the Borrower, including the Assigned Collateral of the Borrower, furnished to such assignor by or on behalf of the Borrower or by the Agent; provided that, prior to any such disclosure, the assignee or participant agrees to preserve the confidentiality of any confidential information relating to the Borrower received by it from any of the foregoing entities.  Notwithstanding the foregoing, without the consent of the Borrower or the General Partner, the Conduit Lender may, pursuant to the Asset Purchase Agreement or otherwise, sell, assign, transfer and convey all or any portion of the Advances maintained by it, together with all rights hereunder, under the other Program Documents and under any Asset Purchase Agreement in respect thereof, to Citibank and any other bank or financial institution which is also a Secondary Lender.

(b)     Each Secondary Lender may, with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed and which consent shall, in any event, not be required if an Event of Default shall have occurred and be continuing in respect of the Borrower), assign to any Eligible Assignee or to any other Secondary Lender all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Secondary Lender Commitment and the outstanding Advances or interests therein owned by it); provided, that the Borrower's consent to any such assignment shall not be required if the assignee is an existing Secondary Lender.  The parties to each such assignment shall execute and deliver to the Agent an Assignment and Acceptance. Notwithstanding any other provision of this

54

Section 9.06, any Secondary Lender may at any time pledge or grant a security interest in all or any portion of its rights (including, without limitation, rights to payment of principal and Yield) under this Agreement to secure obligations of such Secondary Lender to a Federal Reserve Bank, without notice to or consent of the Borrower, the General Partner or the Agent; provided that no such pledge or grant of a security interest shall release such Secondary Lender from any of its obligations hereunder or substitute any such pledgee or grantee for such Secondary Lender as a party hereto.

(c)     This Agreement and the rights and obligations of the Agent herein shall be assignable by the Agent and its successors and assigns.

(d)     Neither the Borrower nor the General Partner may assign its rights or obligations hereunder or any interest herein without the prior written consent of the Agent.

(e)     Each of the Borrower and the General Partner acknowledges and agrees that the Secondary Lender's source of funds may derive in part from its participants. Accordingly, references in Sections 2.06, 2.07, 2.10, 9.03 and 9.04 and the other terms and provisions of this Agreement, the other Program Documents and any Asset Purchase Agreement to rates, determinations, reserve and capital adequacy requirements, expenses, increased costs, reduced receipts and the like as they pertain to the Secondary Lenders shall be deemed also to include those of each of its participants; provided, that no participant shall be entitled to any amount under any such Sections or provisions, which is greater than the amount the related Lender or Secondary Lender, as the case may be, would have been entitled to under any such Sections or provisions if the applicable participation had not occurred.

(f)     The Agent shall maintain at its address specified in Section 9.02 or such other address as the Agent shall designate in writing to the Lenders and Secondary Lenders, a copy of this Agreement and each signature page hereto and each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders, the Secondary Lender Commitments of the Secondary Lenders, effective dates and Secondary Lender Stated Expiration Date, and the aggregate outstanding principal amount of the outstanding Advances maintained by each Lender and Secondary Lender under this Agreement. The entries in the Register shall be conclusive and binding for all purposes subject to Section 2.03(c) and absent manifest error, and the Borrower, the General Partner, the Agent, the Lenders and the Secondary Lenders may treat each person whose name is recorded in the Register as a Lender or Secondary Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower, the General Partner or any Lender or Secondary Lender at any reasonable time and from time to time upon reasonable prior notice.

SECTION 9.07.  Governing Law.

**THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT MADE UNDER THE LAWS OF THE STATE OF NEW YORK, AND FOR ALL PURPOSES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF SAID STATE.**

SECTION 9.08.  Severability of Provisions.

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 9.09.  Confidentiality.

(a)    Each of the Borrower and the General Partner agrees that it shall and shall cause each of its Affiliates (i) to keep this Agreement, the Control Agreement, each Cash Account Control Agreement, the Fee Letter, the Side Letter, the proposal relating to the structure of the facility contemplated by this Agreement and the other Program Documents, (the "Program"), any analyses, computer models, information or document prepared by the Agent, Citibank or any of their respective Affiliates in connection with the Program, the Agent's or its Affiliate's written reports to the Borrower, the General Partner or any of their respective Affiliates and any related written information (collectively, the "Product Information") confidential and to disclose Product Information only to those of its officers, employees, agents, accountants, legal counsel and other representatives (collectively, the "Borrower Representatives") who have a need to know such Product Information for the purpose of assisting in the negotiation, completion and administration of the Program; (ii) to use the Product Information only in connection with the Program and not for any other purpose; and (iii) to cause the Borrower Representatives to comply with the provisions of this Section 9.09 and to be responsible for any failure of any Borrower Representative to so comply.  The Borrower nor the General Partner shall disclose Product Information to any third-party for the purpose of enabling such third-party to provide senior debt to the Borrower.

The provisions of this Section 9.09(a) shall not apply to any Product Information that is a matter of general public knowledge or that has heretofore been made available to the public by any Person other than the Borrower, the General Partner, any of their respective Affiliates or any Borrower Representative or that is required to be disclosed by applicable law or regulation or is requested by any Authority with jurisdiction over the Borrower, the General Partner, any Borrower Representative or any of their respective Affiliates, it being understood that any such disclosure or filing shall not relieve the Borrower, the General Partner,  any of their respective Affiliates or any Borrower Representative of any of its obligations under this Section 9.09(a).  Each of the Borrower and the General Partner agree that if any Product Information is required by applicable law or regulation to be included by it in any filing with the SEC or any other Authority it shall, in consultation with the Agent, use its reasonable best efforts to "black-out" all information which is not necessary under applicable law or regulation to be included in such filing which the Agent deems is of a sensitive nature and in no event shall the Fee Letter, the Investor Report or any Weekly Report be disclosed in any such filing.

(b)    Each of the Secured Parties agrees (i) to keep all non-public information with respect to the Borrower, the General Partner, the Parent and their respective Affiliates which such Secured Party receives pursuant to or in connection with the Program Documents or in anticipation of entering into the Program Documents, including without limitation, (i) all documents which are prepared by the Borrower, the General Partner, the Parent, any Affiliate of

the General Partner or the Parent or any of their respective directors, officers, employees or agents, including all correspondence, memoranda, notes, questionnaires, summaries, analyses, studies, models, extracts of an documents and records reflecting, based upon or derived from any such proprietary information, and (ii) the whole or part of any proprietary information regarding the design and implementation of the Borrower's, the General Partner's and the Parent's computer models or systems and the processes and techniques it utilizes in its business, research and trading activities that is considered to be a "trade secret" as that term is defined under applicable law, (collectively, the "Borrower Information") confidential and to disclose Borrower Information only to those of its officers, employees, agents, accountants, legal counsel and other representatives of the Secured Parties (collectively, the "Secured Party Representatives"), to providers of program-wide credit enhancement for the Conduit Lender, to any actual or potential subordinated investor in the Conduit Lender, liquidity provider or credit enhancer if such investor, liquidity provider or credit enhancer, as the case may be, has signed a confidentiality agreement on the terms of this Section 9.09(b) and the Agent has provided notice to the Borrower prior to disclosing any Borrower Information to any such investor, liquidity provider or credit enhancer, and to S&P, Moody's and any other rating agency that rates the promissory notes of the Conduit Lender, provided that the Agent shall provide notice to the Borrower prior to disclosing any Borrower Information to any such rating agency, which, in each case, may have a need to know or review such Borrower Information for the purpose of assisting in the negotiation, completion, administration and evaluation of the Program; (ii) to use the Borrower Information only in connection with the Program and not for any other purpose; and (iii) to cause its related Secured Party Representatives to comply with the provisions of this Section 9.09(b) and to be responsible for any failure of any Secured Party Representative to so comply.

The provisions of this Section 9.09(b) shall not apply to any Borrower Information that is a matter of general public knowledge or that has heretofore been made available to the public by any Person other than any Secured Party or any Secured Party Representative or that is required to be disclosed by applicable law or regulation or is requested by any Authority with jurisdiction over any Secured Party or Secured Party Representative or any of its Affiliates, it being understood that any such disclosure or filing shall not relieve such Secured Party, Secured Party Representative or any of their respective Affiliates of any of its obligations under this Section 9.09(b). In the event that a Secured Party or a Secured Party Representative is requested or required (by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands or similar processes) to disclose any Borrower Information, it is agreed that such Secured Party or Secured Party Representative will consult with the Borrower, as appropriate as to the advisability of taking legally available steps to resist or narrow such request. It is further agreed that, if such Secured Party or Secured Party Representative is nonetheless compelled to disclose any Borrower Information to any tribunal, such Secured Party or Secured Party Representative may disclose such Borrower Information to such tribunal without liability hereunder; provided, however, that such Secured Party or Secured Party Representative shall give the Borrower prompt written notice of the Borrower Information to be so disclosed as far in advance of its disclosure as is practicable and shall in good faith attempt to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the information required to be disclosed as the Borrower, as appropriate designates.

Notwithstanding the foregoing, the Borrower Information may be disclosed by any Secured Party Representative to permitted assignees and participants and potential assignees and participants in the Program to the extent such disclosure is made pursuant to a written agreement of confidentiality substantially similar to this Section 9.09(b).

(c)    Notwithstanding anything in this Section 9.09 to the contrary, each of the Borrower, the General Partner and the Borrower Representatives may disclose to any and all persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the Program and all materials of any kind (including opinions or other tax analyses) that are provided to it, relating to such U.S. tax treatment and U.S. tax structure of the Program, other than any information for which nondisclosure is reasonably necessary in order to comply with applicable securities laws.

SECTION 9.10.    Claims Against the General Partner.

Subject to the immediately succeeding sentence, the General Partner hereby acknowledges and agrees that it shall be liable for all of the Borrower Obligations.  The Agent, each Lender and each Secondary Lender hereby agree that it shall not pursue any remedy against the General Partner for the payment of any unpaid fee, cost, expense or other Borrower Obligation owed by the Borrower or the General Partner under this Agreement (including without limitation in respect of principal and Yield on the outstanding Advances but excluding amounts payable in connection with clause (viii) of Section 9.04(b) until the earlier to occur of (i) the day on which the Agent on behalf of the Secured Parties) has exhausted all remedies available to it in respect of the Assigned Collateral, and (ii) the day which is thirty (30) days from the day on which such fee, cost, expense or other Borrower Obligation became due and payable.

SECTION 9.11.    Merger.

The Program Documents taken as a whole incorporate the entire agreement between the parties thereto concerning the subject matter thereof.  The Program Documents supersede any prior agreements among the parties relating to the subject matter thereof, including without limitation the Confidentiality Agreement dated as of April 5, 2005 between Citibank and the Parent.

SECTION 9.12.    No Proceedings; No Recourse.

(a)  Each of the Borrower, the General Partner, the Agent, the Secondary Lenders and each assignee of an Advance or any interest therein and each entity which enters into a commitment to make Advances hereunder hereby agrees that it will not institute against the Conduit Lender any proceeding of the type referred to in Section 6.01(f) so long as any promissory note or other senior indebtedness issued by the Conduit Lender shall be outstanding or there shall not have elapsed one year plus one day since the last day on which any such promissory note or other senior indebtedness shall have been outstanding.

(b)  The obligations of the Conduit Lender under and in connection with this Agreement and the other Program Documents are solely the obligations of the Conduit Lender. It is expressly agreed that no recourse shall be had for the payment of any amount owing in

respect of this Agreement or any other Program Document or for any other obligation or claim arising out of or based upon this Agreement or any other Program Document, against any member, stockholder, employee, officer, manager, director, organizer or incorporator of the Conduit Lender or against any member, stockholder, employee, officer, manager, director, organizer or incorporator of any such member, stockholder or manager.

SECTION 9.13.  Survival of Representations and Warranties.

All representations and warranties made hereunder, in the other Program Documents and in any document, certificate or statement delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery of this Agreement and the making of the Advances hereunder.  The agreements in Sections 2.07, 2.10, 2.11, 2.15, 9.03, 9.04, 9.09, 9.10 and 9.12 shall survive the termination of this Agreement in whole or in part and the payment in full of the principal and Yield on the advances.

SECTION 9.14.  Submission to Jurisdiction; Waivers; Etc.

Each of the Borrower and the General Partner hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement or the other Program Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and the appellate courts of any of them;

(b)    consents that any such action or proceeding may be brought in any of such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to it at its address set forth in Section 9.02 or at such other address as may be permitted thereunder;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction or court;

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding against any Secured Party arising out of or relating to this Agreement or any other Program Document any special, exemplary, punitive or consequential damages; and

(f)    acknowledges and agrees that in addition to any right of setoff, banker's lien or counterclaim a Secured Party may otherwise have, each Secured Party shall be entitled, at its option, to set-off any amount owing by it to the Borrower or the General Partner or any

balances held by it for the account of the Borrower or the General Partner against any Borrower Obligations then outstanding.

SECTION 9.15.  <u>E-Mail Reports</u>.

Subject to the following terms and conditions the Borrower and the General Partner may, unless otherwise notified to the contrary by the Agent, transmit Investor Reports and Weekly Reports to the Agent by electronic mail (each an "E-Mail Report").  Each E-Mail Report shall be formatted as the Agent may designate from time to time.  Each E-Mail Report shall be sent to the Agent at an electronic mail address designated by the Agent, and the executed "summary sheet" for each E-Mail Report shall be transmitted via facsimile transmission to the Agent at the facsimile numbers specified for the Agent in Section 9.02.

SECTION 9.16.  <u>Waiver of Jury Trial</u>.

**EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER PROGRAM DOCUMENT OR FOR ANY COUNTERCLAIM THEREIN OR RELATING THERETO.**

SECTION 9.17.  <u>Several Obligations</u>.

Except for the commitment of the Secondary Lenders to make Advances if the Conduit Lender has declined to make an Advance to the extent expressly required by Section 2.02, no Lender or Secondary Lender shall be responsible for the failure of any other Lender or Secondary Lender to make any Advance or to perform any obligation on this Agreement, any Asset Purchase Agreement or any other Program Document.  The Agent shall not have any liability to the Borrower, the General Partner, any Lender or any Secondary Lender for the Borrower's, the General Partner's, any Lender's or any Secondary Lender's, as the case may be, performance of, or failure to perform, any of their respective obligations and duties under this Agreement, any Asset Purchase Agreement or any other Program Document. The Agent shall not have any liability to the Borrower, the General Partner, any Lender or any Secondary Lender for the Borrower's, the General Partner's, any Lender's or any Secondary Lender's, as the case may be, performance of, or failure to perform, any of their respective obligations and duties under this Agreement, any Asset Purchase Agreement or any other Program Document.

SECTION 9.18.  <u>Certain Waivers.</u>

(a)      The parties hereto acknowledge and agree that, the Borrower shall not be deemed to be in breach of Sections 4.01(x), 5.01(k) or 5.02(e) solely as a result of its existing accounts with Comerica Bank, if the Borrower (i) on or prior to June 30, 2005 shall have (x) established new accounts with Citibank, N.A. or another account institution which is reasonably satisfactory to the Agent, (y) shall have caused such account institution to enter into a Cash Account Control Agreement with the Agent and the Borrower in form, scope and substance reasonably satisfactory to the Agent and (z) caused to be delivered to the Agent such opinions of counsel as the Agent shall have reasonably requested all in form, scope and substance reasonably

satisfactory to the Agent, and (ii) on or prior to August 31, 2005 shall have terminated all of its accounts with Comerica Bank.

        (b)     The Borrower agrees to cause an opinion of counsel to the Borrower addressed to the Agent, the Conduit Lender, each Secondary Lender and the relevant rating agencies in form and scope reasonably satisfactory to the Agent to be provided on or prior to June 30, 2005, that the Borrower is not required to be registered under the Investment Company Act.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

AMERICAN MASTERS BROAD MARKET
PRIME FUND, L.P.,
  as Borrower

By: Tremont Partners, Inc.,
    its sole General Partner

By: _____
    Name: _____
    Title: President

TREMONT PARTNER, INC.,
  as General Partner

By: _____
    Name: _____
    Title: President

CAFCO, LLC,
  as Conduit Lender

By: Citicorp North America, Inc.,
    as Attorney-in-Fact

By: _____
    Name:
    Title:

CITICORP NORTH AMERICA, INC.,
  as Agent

By: _____
    Name:
    Title:

CITIBANK, N.A.,
  as Secondary Lender

By: _____
    Name:
    Title:
    Percentage: 100%

13620.0256 #565349

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

AMERICAN MASTERS BROAD MARKET
PRIME FUND, L.P.,
as Borrower

By: Tremont Partners, Inc.,
    its sole General Partner

By:_____
    Name:
    Title:

TREMONT PARTNER, INC.,
as General Partner

By:_____
    Name:
    Title:

CAFCO, LLC,
    as Conduit Lender

By: Citicorp North America, Inc.,
    as Attorney-in-Fact

By:___Marc B. Adel_____
    Name: Marc B. Adelman
    Title: Vice President

CITICORP NORTH AMERICA, INC.,
as Agent

By:___Marc B. Adel_____
    Name: Marc B. Adelman
    Title: Vice President

CITIBANK, N.A.,
    as Secondary Lender

By:___Marc B. Adel_____
    Name: Marc B. Adelman
    Title: Vice President
    Percentage: 100%

13620.0256 #565349