# Exhibit C

5/26/05

## **TRANSACTION MEMO**

### GCIB Capital Markets Approval Committee
### New Product and Activity and Complex Transaction Description Guidelines

| | |
|---|---|
| **Trading Desk/Business Area:** | Global Securitized Markets ("GSM") |
| **Preliminary Approval by Business Manager:** | Yes - Paul Donlin, Managing Director |
| **Business Sponsor:** | Bruce Clark, Managing Director / Marc Adelman, Director |
| **Global Banking – Client Coverage Banker** | Matthew Nicholls |
| **Global Banking – Portfolio Manager** | Thomas Fontana |
| **Product / Transaction:** | Leveraged Funds Facility pursuant to GSM Product Program and Leveraged Funds PRAC / American Masters Broad Market Prime Fund, L.P. |
| **Legal Booking Entities:** | Citibank, N.A. |
| **Legal Vehicle Policy Approval Required: (Y/N)** | No |
| **Covered Transaction under the Structured Finance Policy: (Y/N)** | No |
| **Tax Standards for Tax Sensitive Products or Strategies Applicable (Y/N). If yes, attach approval from Tax:** | No |
| **Approval under OTC Derivatives and Structured Product Marketing and Sales Practices Policy Required: (Y/N)** | No |
| **Firm Investment Policy Applicable: (Y/N)** | No |
| **Date:** | May 31, 2005 |

### **Business Manager Endorsement:**

In submitting this Transaction Memo to the GCIB Capital Markets Approval Committee ("CMAC") the Business Manager has made a preliminary determination that the proposed transaction:

- has sufficient importance and economic viability from the Business's perspective to pursue and to warrant the allocation of Firm resources, and

- is appropriate for GCIB and does not involve unacceptable or inappropriate risks, including reputation and franchise risks.

## I.    Brief Description:

Pursuant to GSM's Product Program and, specifically, the Leveraged Funds PRAC (the "Program"), multi-seller asset backed commercial paper conduits (each, a "Conduit") administered by Citicorp North America, Inc. ("CNAI") provide loans to funds managed by Asset Manager clients of Citigroup. Conduit-funded facilities to these funds are secured by defined eligible assets and are based on specific advance rates and diversification requirements in accordance with rating agency criteria. The facilities are generally structured to "AAA" (S&P) and "Aaa" (Moody's) standards, but actual ratings are not obtained.

The $300 million loan facility under consideration (the "Facility") for American Masters Broad Market Prime Fund L.P. (the "Fund"), a Delaware Limited Partnership with a net asset value of approximately $600 million, will be structured to be consistent with Program standards. Proceeds of the loans, which will be limited to no more than 33.33% of the Fund's gross asset value (i.e., 3 to 1 asset coverage), will be invested in a manner consistent with the Fund's Investment Strategy (defined below) in order to capitalize on the expected positive arbitrage between the return on the assets purchased with such proceeds and the expected cost of borrowing under the Facility.

CMAC approval is requested to pursue the Facility due to the unique circumstances of how the assets of the Fund will be held, and the corresponding reliance on indemnities provided by Tremont Partners, Inc. (the "General Partner" of the Fund) for the payment of the obligations of the Fund. With the exception relating to the Fund's failure to repay advances under the Facility due to a decline in the fair market value of the assets purchased in adherence to the Investment Strategy, the payment obligations of the General Partner will be supported by a Parent Guarantee to be provided by Tremont Capital Management, Inc. ("TCM" and collectively with the General Partner to be referred to as "Tremont"), as set forth in more detail in Section VI. TCM has been assigned as obligor risk rating of 4 and is a wholly owned subsidiary of Oppenheimer Acquisition Corp., the parent company of OppenheimerFunds, Inc. (collectively, "OFI"), which is not publicly rated but has an obligor risk rating of 2. Tremont raises capital for deployment in various alternative investment strategies managed by third-party investment managers and advisors, and is considered the "preeminent capital allocator" in the alternative investment space. *(See Appendix A – For additional details on Tremont and TCM obligor risk rating).*

Since inception of the Fund in 1997, the General Partner has appointed Bernard L. Madoff Investment Securities LLC (the "Investment Advisor") to manage the assets of the Fund on a fully discretionary basis, in accordance with a narrowly defined investment strategy (the "Investment Strategy"). Although the Investment Advisor is not contractually required to adhere to the Investment Strategy, failure to do so would result in an event of default under the Facility documents and, if such failure were material, would likely result in a full redemption by the General Partner. Given its historical track record of maintaining the Investment Strategy since inception of the Fund, it appears remote that the Investment Advisor would deviate from the Investment Strategy. The Investment Advisor, which maintains a $64 million PSE Line with Citigroup and has an obligor risk rating of 4-, is a privately held company formed in 1960 and has more than $500 million in capital, ranking it among the top 1% of US Securities firms in terms of capital. It is registered as a broker-dealer with the NASD, and is subject to many onerous regulatory reporting requirements. Because the Investment Advisor has full discretion over the Brokerage Account, the potential risk, while remote, of fraud by the Investment Advisor is introduced. *(See Appendix B – For additional details on the Investment Advisor).*

The Investment Strategy consists of purchasing a diversified portfolio of individual equities securities (the "Equities"), generally in the range of 30 – 40, that are all components of the Standard & Poor's 100 Index (the "OEX"), and in the opinion of the Investment Advisor, are expected to most closely mirror the performance of the OEX for a given period. Concurrently with the purchase of Equities, the Investment Advisor hedges its long position with respect thereto by constructing a collar by purchasing OEX put options (the "Puts") and selling out-of-the-money OEX call options (the "Calls"), each at an exercise value approximating the current market value of the underlying Equities. The Investment Advisor may, from time to time depending on market conditions, move out of the Investment Strategy into a basket of alternative investments, which are limited under the Facility to certain U.S. government securities, highly rated

commercial paper and cash equivalents. The Investment Strategy has historically delivered stable and consistent returns since the Fund's inception.

The Fund's securities will be maintained in "street name" in an account (the "Brokerage Account") at the Investment Advisor in the name of the Fund, and will be pledged to CNAI as agent for the Conduits. Upon certain events of default, including certain events relating the assets, certain events relating to the Fund and the General Partner, including the General Partner ceasing to be a wholly-owned subsidiary of OFI, and certain events relating to the Investment Advisor including, without limitation, failing to maintain minimum capital requirements, being subject to formal action taken by the SEC to revoke its broker/dealer registration, ceasing to be a registered broker/dealer, or the breach of various covenants under the Facility documents relating to the failure of the Investment Advisor to follow the Investment Strategy, CNAI will have the right under an agreement with the Investment Advisor ("the Control Agreement") to request that the Investment Advisor redeem the assets held in the Brokerage Account to repay any amounts owed under the Facility.  However, the Investment Advisor will maintain control over the assets held in the Brokerage Account at all times, subject to redemption rights of the Fund and CNAI.

Availability under the Facility will be determined based on a weekly report (the "Weekly Report") and monthly report (the "Monthly Report"), under which the General Partner will provide a current market valuation of the assets held in the Brokerage Account. The General Partner will prepare the Weekly Report based on information provided by the Investment Advisor (i.e., trade confirmations) pursuant to the Brokerage Account agreement with the Investment Advisor, which will include an estimated Net Asset Value[1] ("NAV") of the Fund (which will incorporate the current market value of the Puts and Calls). The Monthly Report will be prepared by the General Partner using information provided by the Investment Advisor in the monthly Brokerage Account Statement (including current market prices as of month end) and additional information, such as the Fund's cash account held at Comerica Bank (which is also subject to the "control" of the Secured Parties), used to calculate the final monthly NAV as of the end of each month. Under the Facility documents, CNAI will have inspection rights of all information provided by the Investment Advisor to the General Partner.

In addition to the Investment Advisor's strong industry reputation with over 40 years experience, over $500 million in capital, its responsibilities and obligations as a registered broker-dealer, and its historical relationship with Tremont and, more recently, Citigroup, the primary mitigant of fraud by the Investment Advisor will be an indemnity from the General Partner supported by a Parent Guarantee from TCM. Tremont oversees on an advisory and fully discretionary basis, over $13 billion in assets, and will be required, under the Facility documents, to continue to be, a wholly owned subsidiary of OFI.  OFI is one of the nation's largest mutual fund managers with over $135 billion in assets under management and more than 7 million shareholder accounts.  OFI is a majority owned subsidiary of Massachusetts Mutual Life Insurance Company ("Mass Mutual"), which is rated AAA (S&P) and Aa1 (Moody's).

The business rationale for the Facility, which would be expected to close within 30 days of this review, is to provide competitively priced funding to a GRB target market client. The Facility's return on economic capital of 76.8% will be well above Citigroup hurdle levels.  The following transaction diagram further outlines the structure of the transaction and highlights the funding mechanics of the Facility:

---

[1] The only anticipated variance between the estimated NAV and the actual NAV calculated at month end by the General Partner are expected to be attributable to dividends received by the Fund and the accrual of some minor administrative expenses of the Fund.



The Facility will be funded by a Conduit using its customary commercial paper issuance and other operational procedures, which are handled by CNAI in GSM's Harrison, NY office.  As part of the transaction, Citibank, N.A., ("Citibank") will provide standard 364-day commitments for (i) a backstop liquidity commitment ("APA") to the Conduit and (ii) a direct commitment ("Parallel Purchase Commitment") to the Fund in the event the Conduit were unable or unwilling to fund the Facility.

The Fund will assign and pledge to CNAI, for the benefit of Citibank and the Conduit (together the "Secured Parties"), a first priority perfected security interest in (i) the Fund's "Brokerage Account" maintained with the Investment Advisor, (ii) all other assets of the Fund, and (iii) all rights of the Fund and Tremont, under all agreements with the Investment Advisor (together, the "Assigned Collateral").

## II.  Controllers:

- Balance sheet, funding, regulatory capital impact.
  The Facility will be funded initially by a Conduit.  The 364-day commitment "liquidity" facility provided by Citibank will be recorded in accordance with customary risk-based capital guidelines.

- Application of Legal Vehicle Approval Policy.
  An SPE Approval Form (long-form or short-form vehicle approval) is not required as advances under Facility are made directly to the Fund and not to a client SPE (i.e., there will be no client SPE used in the Facility).

## III.  Treasury Considerations:

- Description of how the product will be funded.
  As discussed in Section I, the Facility will be funded by the Conduit using its customary commercial paper issuance and other operational procedures, which are handled by CNAI in GSM's Harrison, NY office.

- Cash flow funding diagram for the product/transaction.
  See Transaction Diagram in Section I.

- Details of collateral or credit enhancements that Citigroup would need to give to third parties or affiliates and detail how that will fit into existing collateral processes and controls.
  Citigroup will not provide any credit enhancement under the terms and conditions of the transaction. The APA is a "liquidity" facility to support commercial paper issued by the Conduit.

III. **Accounting Policy/ Regulatory Considerations**

▪ <u>Any special accounting treatment for client.</u>
The Fund will record advances under the Facility as debt on its balance sheet. Accordingly, there is no special accounting treatment noted.

▪ <u>Application of the Structured Finance Policy.</u>
The Facility is a "standard securitization" transaction accounted for as secured debt on the Fund's balance sheet. Accordingly, the transaction qualifies as an "Excluded Transaction" for purposes of Citigroup's Structured Finance Initiative Policy Guidelines.

IV. **Market Risk Considerations:**

▪ <u>Key market risk factors, highlighting any factors new to the desk.</u>
Availability under the Facility will be based on a weekly valuation of the assets held in the Brokerage Account. The Facility will be structured in accordance with the Program and "AAA" / "Aaa" rating agency standards. In addition, the puts, which are an integral part of the Investment Strategy, provide protection against major market declines.

▪ <u>How market risk will be hedged, including liquidity, credit or other considerations.</u>
Borrowing Base compliance (using rating agency standards) will be measured at least weekly, as described above.

V. **Credit Risk Considerations:**

▪ <u>Description of credit risk involved, including any risk mitigants.</u>
The following is a summary of the unusual credit risks that have been identified in evaluating the Facility:

– *<u>Fraud by the Investment Advisor due to physical control of the Brokerage Account and full discretion over account activity</u>* - The Investment Advisor, which is a regulated broker-dealer, has conducted business for over 40 years, is well respected within the industry, and maintains an obligor risk rating of 4-. It has successfully executed the Investment Strategy for the Fund for almost eight years. The Investment Advisor is obligated to maintain the Fund's assets in the Brokerage Account and will acknowledge the Program Agent's exclusive rights to redeem the assets held in exclusive control of the Brokerage Account. As more fully set forth below, the General Partner will be liable for all of the payment obligations of the Fund, which, with the exception relating to the Fund's failure to repay advances under the Facility due to a decline in the fair market value of the assets purchased in adherence to the Investment Strategy, will be supported by a Parent Guarantee from TCM. Thus, each of the General Partner and TCM shall be liable for losses resulting from a breach by the Investment Advisor of its obligations under the Control Agreement or from its failure to adhere to the Investment Strategy under the Facility or for any fraud by the Investment Advisor.

– *<u>Bankruptcy of the Investment Advisor:</u>*
The Investment Advisor, a registered broker-dealer, is subject to the Securities Investment Protection Agreement ("SIPA"). GSM's legal counsel, Seward & Kissel, LLP ("S&K"), has indicated that under SIPA, assets held in a customer account (such as the Brokerage Account) would be treated as "customer property" and would not be subject to the claims of General Creditors of the broker-dealer. Based on Seward & Kissel's review of SIPA Annual Reports they are not aware of any cases where, in a liquidation of a broker dealer, the customer did not receive full repayment of its assets held in a customer account. In the event of a fraud, all "customer property" would be pooled and distributed pro rata to all customers of the broker-dealer. Due to the conservative leverage in the Facility, any fraud committed by the Investment Advisor must be significant and relate to more than 65% of all "customer property" before there would be a risk of loss to the Secured Parties. In the event of such pooling, the Secured Parties would as a result of their perfected security interest in the specific assets in the Brokerage Account, have a perfected security interest in the claim of the Fund to its pro rata share of the customer property, which

5

would remain senior to the claims of the Fund's Limited Partners. In addition, the Facility documents will include various events of default relating to the Investment Advisor including, without limitation, (i) the bankruptcy or insolvency of the Investment Advisor, (ii) breaches by the Investment Advisor of its obligations under the Control Agreement or from its failure to adhere to the Investment Strategy, (iii) the revocation of the Investment Advisor's broker-dealer registration, (iv) the failure of the Investment Advisor to meet its minimum capital requirements prescribed by Rule 15c3-1 of the Exchange Act, and (v) the imposition or commencement of any governmental sanctions or proceedings upon or against the Investment Advisor.

– _Bankruptcy of the General Partner:_
Under the Facility, the direct obligation for repayment is from the Fund. Although the bankruptcy of the General Partner may give the Limited Partners of the Fund and any creditors certain rights, these rights would not have any impact on the priority or perfection of the Secured Parties' security interest in the Assigned Collateral. Further, any material adverse change in the General Partner's financial position or impairment of the General Partner's ability to perform its obligations would be an event of default under which the Secured Parties may terminate the Facility and demand repayment.

These risks have all been described in the credit review.

▪ Status of credit review and approval by control unit
The credit review is ready for circulation. The control unit has given its verbal approval for the Facility.

▪ How credit risk will be captured, measured and reported on independent systems.
The Facility will be reported by GSM's operational office into the Global Risk Review ("GRR") reporting systems in the amount of $270MM. The Global Credit Center and Global Portfolio Management unit will co-approve 10%, $30MM, in Seller Risk to recognize the unique reliance on the General Partner's indemnity and the Parent Guarantee from TCM and, accordingly, will report this amount in GRR.

## VI.    Legal/Compliance Considerations
▪ Legal documentation
Seward & Kissel ("S&K") will prepare the key Facility documents, which will be consistent with those used for other transactions pursuant to the Program. The Fund and Tremont will be represented by Cadwalader, Wickersham & Taft, LLP.

▪ Any unusual legal or regulatory issues for the firm as a whole or for the firm legal entity on which the transaction will be booked.
Discretionary nature of the Brokerage Account supported by an indemnity from Tremont and a Parent Guarantee from TCM, which is the subject of this CMAC approval request.

Pursuant to the Facility's "Credit Agreement", as described above, the Fund will receive advances ("Advances") and will in turn pledge all of its assets to the Secured Parties. The repayment of Advances under the Credit Agreement will be a full recourse obligation of the Borrower, as supported by the Assigned Collateral. Under Section 17-403 of the Delaware Revised Uniform Limited Partnership Act ("RUPA"), the General Partner is jointly and severally liable for all of the indebtedness of the Fund under the Credit Agreement, including the Fund's obligation to repay principal and interest on the Advances, any fees, and any indemnity payments payable under the Credit Agreement. Thus, the General Partner would be liable to repay the outstanding Advances and other payment obligations of the Fund under the Credit Agreement regardless of whether the Fund's failure to make any such payments resulted from market value declines, fraud or other malfeasance by any party, including the Investment Advisor, the failure to comply with the Investment Strategy, or any other reason.

The ability of the Secured Parties to proceed directly against the General Partner is limited by Section 17-403(d) of RUPA, which provides that a creditor must exhaust its remedies against the limited partnership before proceeding against the general partner.  Further, the Credit Agreement provides that the Secured Parties will not pursue any remedy for payment against the General Partner until the earlier of (i) the date it has exhausted its remedies against the Fund's assets, or (ii) 30 days from the date such payment obligation became due.  As a result, even if the Secured Parties have not exhausted all of their remedies against the assets of the Fund as required by RUPA or if the Secured Parties have not exercised any remedies during that 30-day period, the Credit Agreement would operate as a waiver of this requirement after 30 days have expired and the Secured Parties could proceed directly against the General Partner and TCM under the Parent Guarantee.  It is expected that based on the liquidity of the securities held in the Brokerage Account that the Investment Manager could liquidate the portfolio within a few business days and meet the redemption demand by the Secured Parties promptly.  If the Secured Parties were not fully repaid after the redemption request, the Secured Parties should be able to proceed directly against the General Partner and TCM before the 30-day period expired.

Pursuant to the Credit Agreement, both the Fund and the General Partner will agree to various covenants relating to the composition of the Fund's assets and the business in which the Fund is permitted to engage, including, without limitation, the following:  (i) the Fund shall at all times comply with the very narrow Investment Strategy described above and specifically set forth in the Facility documents, (ii) the Fund shall at all times maintain all of its assets in accounts in respect of which the Secured Parties have "control", and (iii) the Fund shall not engage in any business, except for the purchase of assets as expressly contemplated by the Investment Strategy.  Under the Credit Agreement, the Fund and the General Partner have agreed pursuant to the indemnification provision that they are jointly and severally liable for all losses, liabilities and damages arising out of or in connection with the Facility, including, without limitation (i) any breach or alleged breach of any covenant by the Fund, the General Partner or the Investment Advisor, (ii) any representation or warranty made by the Fund, the General Partner or the Investment Advisor contained in any Facility document or in any certificate, statement or report delivered in connection therewith is, or is alleged to be, false or misleading, and (iii) any action or omission, not expressly authorized by the Facility documents, by the Fund, the General Partner or the Investment Advisor, which has the effect of reducing or impairing the Assigned Collateral or the rights of CNAI or the Secured Parties.

As described above, TCM will provide a Parent Guarantee for the benefit of the Secured Parties in accordance with CNAI's documentation standards for guarantees, including appropriate waivers of defenses.   Under the Parent Guarantee, TCM will guarantee the performance of all obligations of the General Partner under the Facility and the full and timely payment of all payment obligations of the General Partner under the Facility, with the exception of the obligation to support the Fund's failure to repay Advances that resulted from a decline in the fair market value of the assets purchased in adherence to the Investment Strategy.  However, any other event or circumstances in which the General Partner would be obligated to indemnify a Secured Party under the Credit Agreement would be covered by TCM.

- Indicate whether external legal advice was sought or required and include a brief summary of the advice.
  Legal advice provided by S&K, which included general advice provided in structuring the terms of the Facility, preparation of the documents in accordance with documentation standards required under the Program and specific advice regarding the insolvency of a broker-dealer, SIPC, and the registration and legal requirements for broker-dealers.

- Any compliance considerations ("KYC" (Know Your Customer), anti-money laundering, etc.).
  The GRB Relationship Team has preformed the Know Your Customer ("KYC") and Anti-Money Laundering ("AML") review for Tremont and has concluded compliance with these policies.

- <u>Any special bank regulatory issues for the firm as a whole or legal entity on which the transaction will be booked, including impact of bank regulation statutes and regulatory interpretation of such statutes.</u>

  The proceeds of the Advances will be used to purchase and carry margin stock (as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System, in effect from time to time ("Regulation U")). Pursuant to the requirements of Regulation U, under the terms of the Credit Agreement, prior to its receipt of an initial Advance, the Fund is required to provide CNAI with a Form FR G-3 and a Form FR U-1 demonstrating compliance with Regulation U. In addition, pursuant to the requirement set forth in Regulation U that the Form FR G-3 and Form FR U-1 be updated in connection with any new extension of credit, the Fund must provide an updated list of its assets to be attached to the Form FR G-3 and Form FR U-1 previously provided in connection with each Notice of Borrowing delivered pursuant to the Credit Agreement. If at any time the Fund is not in compliance with the requirements of Regulation U, it must immediately prepay the outstanding Advances in an amount necessary to bring the Fund back into compliance.

  In addition, in order to comply with certain requirements under Section 23A of the Federal Reserve Act, all Citigroup securities will be considered ineligible under the Facility and will be excluded from the Borrowing Base. The Fund will still be permitted to own Citigroup securities and hold such securities in the Brokerage Account, however, they would not be considered part of the Borrowing Base Test used for measuring availability under the Facility.

- <u>Application of Anti-Tying Policy</u>

  The Facility is in compliance with the Anti-Tying Policy as it was not made available and no pricing or other terms were varied on the condition that the clients take another product or service.

- <u>Indicate whether the proposed transaction is a permitted activity for the firm legal vehicle(s) in which the transaction will be booked.</u>

  The Facility is a permitted activity.

## VII.    Tax Considerations

The transaction does not constitute a tax-sensitive product under Citigroup's "Tax Standards for Tax-Sensitive Financial Products or Strategies" dated April 2004.

- <u>Any tax motivation/impact on either the client or the firm.</u>

  The Facility does not provide any tax motivation for either the client or Citigroup.

- <u>Application of the Tax Standards for Tax Sensitive Financial Products or Strategies. If the policy applies to this transaction, attach approval from the Tax Department.</u>

  The transaction does not constitute a tax-sensitive product under Citigroup's "Tax Standards for Tax-Sensitive Financial Products or Strategies" dated April 2004.

## VIII.    Operations and Technology

- <u>Systems and processes to be used.</u>

  The Facility would be funded by a Conduit using its customary commercial paper issuance and other operational procedures, which are handled by CNAI in GSM's Harrison, NY office.

## IX.    Franchise and Other Risks/Other

- <u>Any potential franchise or reputation issues for the client, the firm or others.</u>

  There are no elements of this proposed transaction that we believe could create franchise risk. TCM is a wholly owned subsidiary of OFI, a GRB target market client and subsidiary of MassMutual, also a GRB target market client. Citigroup has PSLE exposure to Bernard L. Madoff Investment Securities LLC, and the credit is monitored by the Global Credit Center (GCC) Broker/Dealer team. Profiles of both Tremont and Bernard L. Madoff Investment Securities LLC, are included, respectively in Appendix A and Appendix B, of this memo which follows immediately.

# APPENDIX A

## Tremont Capital Management, Inc. / Tremont Partners, Inc.

### Tremont

Tremont is an investment advisor that raises capital for deployment in various alternative investment strategies managed by third-party investment managers and advisors. The discretionary nature of the Brokerage Account presents potential fraud risk from the Investment Advisor. That potential risk is mitigated by the financial strength of Tremont.

### TCM Obligor Risk Rating

Further to discussions with both the GCC hedge fund group (Steve Penny) and Risk Architecture's Risk Ratings unit (Steve Boras) it was determined that we should use the approved Investment Advisor risk rating model, which takes into account business scope, financial strength and internal controls at the investment advisor level. The output from that model derives a risk rating of 3+ for TCM. Such score was achieved due to a good AUM base, strong AUM growth, conservative leverage and appropriate operational controls. However, as permitted by risk rating policy, we have downgraded that score to a 4. We applied the downgrades based on Tremont's focus on alternative investments, but feel confident that the credit clearly equates to an investment grade.

### Company Background

Tremont is a wholly owned subsidiary of OFI, which is in turn a majority-owned subsidiary of Mass Mutual, and it is one of the leading and largest fund of hedge fund managers. It is a diversified, global alternative investment manager concentrating on investment fund management and development, consultancy, and database sales and information services. Tremont was established in 1984 and currently advises more than U.S.$13 billion in alternative investments. Clients include public and private pension plans, university endowments, foundations, and financial institutions, as well as high net worth individuals. Tremont also works closely with traditional consulting firms and financial advisers to provide custom and proprietary fund of funds products for institutions, trusts and family offices. One of the firm's key strengths is its adept design and implementation of multi-manager, multi-asset class investment programs for institutional and qualified high net worth investors. Tremont's strategy is to be diversified by asset class, manager and geography with allocations of client money to some 400 different underlying managers across as many as 12 different strategies.

Tremont is also a leader in research and data collection, authoring white papers and other research pieces on important hedge fund and alternative investment industry topics. In 1999 through its London-based subsidiary, Tremont Capital Management Limited, the firm purchased and began strengthening a leading data service (TASS), which reports on the performance of more than 2,500 alternative investment managers and funds. In March 2005, Tremont sold the commercial distribution component of TASS to Lipper, but the firm retains the right to collect and use TASS data for asset management purposes.

Working with CSFB, Tremont created the CSFB/Tremont Hedge Fund Index which is the first asset-weighted hedge fund index and has become the industry standard for hedge fund asset class performance measurement. In 2001, TCM formed an alliance with RiskMetrics Group, Inc. to create HedgePlatform, an industry-leading risk reporting system for hedge fund managers and investors. In that same year, the firm became a wholly owned subsidiary of Oppenheimer Acquisition Corp., the parent corporation of the widely known mutual fund manager, OppenheimerFunds, Inc. ($180BN AUM).

**Financial Overview**

TCM, as a subsidiary of OFI, generates strong cash flows with little need for debt financing. As the balance sheet illustrates below, when the company has required debt, OFI has provided inter-company loans at attractive rates. At the end of 2004, we see the highest debt level ($46mm) over the 3-year period 2002-2004, and the debt was used to take advantage of investment opportunities on a proprietary basis (note the Investments line growing from $26mm in 2003 to $81mm in 2004).

The leverage and coverage ratios indicate a solid investment grade profile. The company reached 2.0x Debt/EBITDA after taking on the inter-company debt in 2004, but interest coverage is exceptionally strong at 65.6x. The company appears on track to continue to generate more than $20mm of EBITDA annually as the fund of hedge fund business continues to grow.

*(See Summary of Financial Key Indicators on the following page)*

| **Tremont Capital Summary Financials** | | | |
|---|---|---|---|
| (000's) | 2002 | 2003 | 2004 |
| **Income Statement** | | | |
| Fee Revenues | 36,815 | 47,352 | 65,238 |
| Investment Revenues | 919 | 2,055 | 1,666 |
| Other Revenues | 4,396 | 6,560 | 8,637 |
| Total Revenues | 42,130 | 55,966 | 75,541 |
| | | | |
| Commissions | 6,579 | 8,326 | 11,055 |
| Compensation | 15,844 | 20,837 | 31,949 |
| Consulting and Professional Fees | 1,166 | 2,516 | 2,424 |
| Other Operating Expenses | 4,062 | 4,845 | 6,674 |
| Total Operating Expenses | 27,651 | 36,524 | 52,102 |
| | | | |
| EBITDA | 14,478 | 19,442 | 23,438 |
| | | | |
| Depreciation & Amortization | 2,817 | 2,617 | 2,699 |
| Interest Expense | 76 | 48 | 357 |
| Pre-Tax Income | 11,585 | 16,778 | 20,382 |
| | | | |
| Tax Expense | 4,807 | 7,548 | 8,036 |
| Net Income | 6,778 | 9,230 | 12,346 |
| | | | |
| **Balance Sheet** | | | |
| Cash | 12,222 | 15,475 | 20,451 |
| Investments | 21,523 | 26,169 | 81,425 |
| Investments in Joint Ventures | 2,450 | 2,450 | 7,293 |
| Furniture, Equipment & Leasehold Improvements, net | 2,926 | 2,698 | 3,851 |
| Deferred Tax Assets | 65 | 14 | 580 |
| Goodwill & Intangibles, net of amortization | 129,627 | 128,536 | 127,382 |
| Other Assets | 10,856 | 18,863 | 15,686 |
| Total Assets | 179,668 | 194,205 | 256,669 |
| | | | |
| Accrued Expenses | 7,802 | 18,026 | 15,764 |
| Intercompany Loans from OFI | 5,000 | - | 46,344 |
| Deferred Taxes | 7,823 | 7,033 | 10,123 |
| Deferred Revenue | 905 | 1,101 | 1,088 |
| Total Liabilities | 21,529 | 26,161 | 73,319 |
| | | | |
| Shareholders' Equity | 158,139 | 168,044 | 183,350 |
| Total Liabilities and Equity | 179,668 | 194,205 | 256,669 |
| | | | |
| **Credit Ratios** | | | |
| Debt/EBITDA | 0.3x | 0.0x | 2.0x |
| EBITDA/Interest Expense | 190.1x | 409.1x | 65.6x |
| Equity/Total Assets | 88% | 87% | 71% |
| Tangible Equity/Tangible Assets | 57% | 60% | 43% |

**Fund Management**

Tremont, like many of the top fund of hedge fund managers, has seen tremendous growth over the last two years. The company's single-manager funds have grown relatively slowly from $3.3bn in 2002 to $3.7bn at 1Q05. The fund of hedge fund business, over the same period, has growth from $4.6bn to $9.6bn. At 6/30/04, Global Investor Magazine ranked Tremont as the 9th largest fund of hedge fund manager globally.

| | **FUND OF HEDGE FUNDS MANAGERS** Global Investor Magazine--6/30/2004 | |
|---|---|---|
| | **Manager** | **AUM ($, bn)** |
| 1 | **Man Investments** | 21,400 |
| 2 | Permal Asset Mgmt | 11,100 |
| 3 | **Union Bancaire Privee** | 10,691 |
| 4 | Ivy Asset Mgmt Corp. | 9,800 |
| 5 | **Goldman Sachs Asset Mgmt** | 8,311 |
| 6 | Financial Risk Mgmt | 7,940 |
| 7 | Grosvenor Capital Mgmt | 7,800 |
| 8 | Blackstone Alt. Asset Mgmt | 6,655 |
| 9 | **Tremont Capital Mgmt** | 6,000 |
| 10 | **Credit Suisse Asset Mgmt** | 4,737 |

Managers in bold are GRB target market clients

### TREMONT CAPITAL ASSETS UNDER MANAGEMENT



### Diversification

Viewed across all asset classes, Tremont's aggregate assets are highly diversified by strategy.

**TREMONT AGGREGATE ASSETS UNDER MANAGEMENT BY STRATEGY**



Further diversification is achieved through the use of a large number of managers. The chart below indicates the total number of underlying funds in each strategy across all Tremont assets.

**TREMONT AGGREGATE UNDERLYING FUNDS BY STRATEGY**



**Fund Investors**

Tremont's investor base is weighted toward institutions with 65% of the fund of hedge fund investments. Public pensions, insurance portfolios and retail also represent significant portions of their investor base.



**TREMONT FUND OF HEDGE FUND INVESTORS (3/31/05)**

**Fund Performance**

As an illustration of the company's performance, one of Tremont's largest strategies, the Tremont Core Diversified Composite is detailed below. The target return for this strategy (representing $1.9bn of the $9.6bn in total fund of hedge fund assets) is LIBOR plus 500 to 700 basis points over a full market cycle, with 4-6% annualized standard deviation. The portfolio includes a mix of relative value and directional strategies with global macro, distressed, and net long/short equities managers included.



**CORE DIVERSIFIED COMPOSITE UNDERLYING STRATEGIES**

The strategy's performance has been impressive with only four down quarters in the last 10 years, and only one year with negative returns (0.55% in 1998, a notably challenging year considering the Russian debt default and LTCM collapse). On average the fund has had an annualized return of 11.43% over the course of its life.

**Core Diversified Composite Quarterly Returns**

| Year | Q1 | Q2 | Q3 | Q4 | YTD |
|------|------|------|------|------|------|
| 1995 | 1.03 | 6.14 | 4.12 | 1.53 | 16.72 |
| 1996 | 6.3 | 5.2 | 3.11 | 2.02 | 17.63 |
| 1997 | 3.59 | 4.62 | 5.57 | 1.89 | 16.56 |
| 1998 | 4.32 | 1.42 | -6.01 | 0.01 | -0.55 |
| 1999 | 4.88 | 7.35 | 2.44 | 9.37 | 26.15 |
| 2000 | 8.46 | 2.32 | 3.66 | 0.86 | 16.03 |
| 2001 | 3.29 | 2.05 | -0.03 | 2.57 | 8.09 |
| 2002 | 0.77 | 0.66 | -0.43 | 1.37 | 2.38 |
| 2003 | 2.1 | 2.93 | 1.99 | 2.24 | 9.58 |
| 2004 | 1.96 | -0.03 | 0.21 | 4.21 | 6.3 |
| 2005 | 0.91 | | | | 0.91 |

Overall, the Core Diversified Composite strategy has underperformed by S&P 500 slightly (11.43 versus 11.52) over the life of the fund, but its standard deviation has been about one quarter that of the broad index.

**Core Diversified Composite Statistical Measure (01/95-03/05)**

| | Core Diversified Composite | S&P 500 | CSFB/Tremont Index |
|---|---|---|---|
| Annualized Return (net) | 11.43 | 11.52 | 12.42 |
| Standard Deviation | 3.96 | 15.51 | 8.05 |
| Sharpe Ratio | 1.84 | 0.48 | 1.03 |
| No. of Positive Months | 105 | 79 | 90 |
| No. of Negative Months | 18 | 44 | 33 |
| R2 | 0.24 | 1 | 0.23 |

# KEY MANAGEMENT

**Robert I. Schulman**
**Chief Executive Officer**

Robert Schulman joined Tremont in 1994 and currently serves as Co-Chief Executive Officer. Mr. Schulman's efforts are focused on the firm's joint venture, insurance and Canadian activities and overall strategic planning. He is a member of the Investment Committee where he participates in the determination of Tremont's strategy outlooks and manager selection. Mr. Schulman's Wall Street career spans more than 30 years with Smith Barney Inc. and predecessor firms, including Shearson Lehman Brothers, Inc. and E.F. Hutton & Company. Before joining Tremont, he was responsible for Smith Barney's $60 billion Consulting Services Division and Retail New Product Development. He was also involved in all aspects of investment management and manager selection processes.

Mr. Schulman founded the Leveraged Product Division at E.F. Hutton in 1982 and was responsible for the development of various derivative products as well as growth index and financial futures and options trading. In 1986, he assumed responsibility for all retail products offered at E.F. Hutton.

Mr. Schulman is a graduate of New York University and received a Master of Business Administration degree in Finance from the Lubin School of Business.


**Barry Colvin**
**President and Chief Investment Officer**

Barry Colvin is responsible for the overall activities of the firm and leads its research and investment management activities as Chief Investment Officer and Chairman of the Investment Committee. In this role, he oversees the Investment Management Department, which works to maintain a comprehensive due diligence process on investment managers, selects and recommends top-tier managers across all strategies, and coordinates the firm's unique insight regarding establishment of client investment objectives and ongoing asset allocation.

Mr. Colvin joined Tremont in 1999 as Director of Research and was instrumental in creating the firm's current focus on strategy specialists, as well as its top-down/bottom-up value-added processes. He also worked closely to build Tremont's due diligence approach, which has added significant value to clients' portfolios. Mr. Colvin served in the role of Chief Operating Officer from late 2000 until February 2002 to help build Tremont's operational infrastructure. Over this period he retained his Investment Committee responsibilities and re-instituted his role as Chief Investment Officer in February 2002, as well as being named President of Tremont.

Prior to joining Tremont, Mr. Colvin spent three years as Head of Alternative Investments and Director of Research for Asset Consulting Group, Inc. of St. Louis, Missouri, where he oversaw the research effort for clients whose assets totaled over $24 billion. Prior to Asset Consulting Group, he spent a number of years as a fixed-income trader and, later, as a private deal analyst for a major insurance company headquartered out of the Midwest.

His experience includes over 15 years in the investment industry with expertise in trading and hedge fund analysis, as well as venture capital and private equity advisement.

Mr. Colvin holds a Bachelor of Arts degree in Economics from the University of Missouri and is a holder of the Chartered Financial Analyst designation.

# APPENDIX B

## Bernard L. Madoff Investment Securities LLC
*[Information below is from the GCC annual review of the company completed August 2004.]*

Bernard L. Madoff Investment Securities LLC ("Madoff") is a leading international market maker. The firm has been providing execution services for broker-dealers, banks, and financial institutions since its inception in 1960. During this time, Madoff has compiled an uninterrupted record of growth, which has enabled the firm to continually build its financial resources. With $504 million in firm capital, Madoff currently ranks among the top 1% of US Securities firms. Madoff Securities' customers include scores of leading securities firms and banks from across the United States and around the world. The firm is a leading market maker in all of the S&P 500 stocks as well as over 200 NASDAQ issues and is known for its competitive pricing as well as its ability to execute most orders in seconds.

Madoff is underpinned by the personal commitment of founder Bernard L. Madoff, his brother Peter B. Madoff, who is the senior managing director and head of trading, and Madoff Securities' team of 250 employees. Madoff Securities is a registered US broker dealer regulated by the Securities and Exchange Commission and the National Association of Securities Dealers. Madoff Securities International Ltd., established in 1983, is regulated by the Financial Services Authority and is a member of the London Stock Exchange and NASDAQ Europe.  Madoff Securities International is an affiliate (not subsidiary) of Madoff. Bernard L. Madoff Securities LLC was conducted as a sole proprietorship under the name Bernard L. Madoff prior to January 2001.

**Description of credit facilities:**

| Approving unit | Extending unit | Product | Limit type | FRR | Risk amount | Notional | Max. term (days) |
|---|---|---|---|---|---|---|---|
| NACC BD | NACC BD | Equity | PSEL | 4- | 54,000 | 550,000 | 7 |
| NACC BD | NACC BD | Stock Loan | PSEL | 4- | 10,000 | 100,000 | 7 |
| | | TOTAL | | | 64,000 | | |

**Financial Highlights:**
**Accountant:** Friehling & Horowitz, CPAs                    **Fiscal YE Date:** October 30

| Statement Type | Date | Total Capital (in $000) | Total Assets (in $000) |
|---|---|---|---|
| Focus | 6/30/04 | $504,384 | $947,036 |
| Focus | 10/31/03 | $478,000 | $904,375 |
| Audited Financials | 10/31/02 | $438,000 | $858,941 |

| Key Success Factors | Prior KSF | Weak | Below Average | Average | Strong | Excellent |
|---|---|---|---|---|---|---|
| Capital | S | | | | X | |
| Financial Flexibility | A | | | | X | |
| Profitability | S | | X | | | |
| Strategic Positioning | A | | | X | | |
| Management | S | | | | X | |

**Outlook:**  Despite a slowly recovering economic and a competitive trading environment, Madoff has managed to improve its financial wherewithal over the past four years as well as maintain a respectable

double-digit ROE.   The company is a global leader in trading U.S. equities.  Madoff claims to provide the best prices at the fastest execution, which has enabled the firm to become a leader in the U.S. third market, which trades away from the exchange floor.  A change in the market structure or regulation of the NYSE would have an impact on Madoff.

**Key Risks & Mitigants:**
- Madoff provides a single product business, which can make its earnings less than stable as market conditions fluctuate.
- The concentration risk is mitigated by the fact that Madoff is a leading market maker in all 500 S&P stocks as well as over 200 NASDAQ.
- Company has been in existence for 44 years and has operated successfully though numerous economic, business and market cycles.
- Sophisticated computers are integral to every aspect of the firm's activities.  There is risk if a catastrophic event would happen.  The firm has a disaster recovery facility in Queens that is tested on a regular basis as staff members are rotated through and work in the facility.

**Capitalization:**
Total capital grew 5.6% to $504.3mm at 6/30/04 from $478mm at FY10/31/03. Total equity /total assets ratio is very strong at 53% as of 6/30/04.  The strength of Madoff's capital base is further underscored by the regulatory capital/total capital ratio of 78% as net capital of $393.3mm was calculated at 6/30/04.  Non-allowable assets accounted for only 1% of total assets.    The firm scored average on the total capital test, which improved from below average on last year's review.  However, the high degree of balance sheet liquidity as evidenced by Capital/Haircuts is strong at 7.13x, which results in an overall strong assessment of capital.

**Asset quality and liquidity:**
Total assets were $947mm as of 6/30/04, consisting mainly of securities $460.9mm, securities borrowed $342.5mm and cash equivalents $89.5mm.   Securities inventory of $460.9mm consisted of equities $339.8mm, US Government securities $67.9mm and options $53.2mm. Haircuts were $94mm or 21% of inventory due to the concentration of equities held for market-making purposes and options. Balance sheet liquidity is strong with liquid assets  representing 99% of total assets.

**Leverage:**
Madoff does not rely on bank borrowings or repos for funding.  Madoff's funding sources are its retained earnings (capital) and securities sold short, which represented 94% of total liabilities as of 6/30/04. Assets to liabilities is a modest 2.1x.

**Profitability:**
Madoff does not provide earnings statements.  Significant growth in capital suggests that the company has been consistently profitable, particularly for the years we examined for this review.  Madoff confirmed that capital growth is solely due to retained earnings (net of any drawings by Bernard Madoff himself).  He also stated that the ROE for 2003 was 10% after draws. He is also comfortable with a 10% ROE projection for 2004. Decimalization, which has reduced effective spreads, has contracted profit margins experienced in prior years. Madoff stressed that its style of trading is much more conservative that other market makers in that it hedges all of its positions.  The difference between its long and short positions are small with a risk factor of no more than 5%. This makes its earnings less volatile than other firms.

**Strategic positioning / industry outlook:**
As mentioned previously, the size of Madoff's capital base puts in within the top 1% of securities firms.  Its closest competitors are mainly other market makers / floor specialists such as Spear Leeds, Knight Securities, and LaBranche.  The company emphasized that it makes a market in the top 800 listed securities. Its style and business model has enabled the company to stay independent for over 44 years despite the consolidation the industry has experienced particularly over the last decade.  Madoff's sophisticated proprietary automation and unparalled customer service delivers enhanced execution which is virtually unmatched in the industry.  Of important note is Madoff's ownership in *The Primex Auction System* that

was adopted by the NASDAQ in December 2001 as another tool to achieve best execution.  Madoff along with other owners such as Merrill Lynch, Citigroup, Goldman Sachs, and Morgan Stanley were the developers of this auction style system.

**Management Assessment:**
Bernard Madoff, President and CEO, runs the entire business along with its international affiliate.  Peter Madoff, Bernard's brother and senior managing director, is head of trading and technology.  Bernard's two sons (ages 38 and 40) run Madoff's entire trading operation. Bernard's niece is the company's general counsel.  The controller is Enrica Cotellessa-Pitz and she has been with the firm for approximately seven years. The company is very private and our interaction with the management team has been limited to conference calls a few times a year. It is clear the management team has been stable with succession planned for Mr. Madoff's two sons in the event he is no longer able to work or retires. Given the longevity of the company, its consistent profitability and continued capital growth, we feel that management is strong.

**Risk Management Environment & Off-balance sheet activities:** Madoff Securities utilizes its computers to seek out opportunities for hedging its inventory of securities. The firm uses a variety of futures, options, and other instruments to hedge its positions and limit its risks. While these hedging strategies are important tools in protecting the firm's financial position, ultimately, these prudent risk management policies protect the interests of clients as well.

**Citigroup Franchise Risk**
Structured Finance: There are no structured transactions or off-balance sheet transactions with Citigroup or any of its subsidiaries.

Anti-tying: Compliance with Citigroup's Anti-Tying rules require that we ensure that any extensions of credit (loans) to clients not be conditioned on the client being required to accept any product or service offered by Citibank or any Citibank affiliate.  To the best of my knowledge no such condition has been made.  Madoff only executes capital markets activities with us and there are no committed loans.

Other Franchise Issues:  There are no additional relationship elements that could create franchise risk, including underwriting activities, conflict management, litigation, or client-specific corporate governance or accounting issues

**Regulatory:** Nothing negative was disclosed through the NASD.

**Clearing arrangements (if applicable):**
Madoff Securities is a full clearing firm and a member of all US clearing corporations and depositories. The firm's automated clearing and settlement systems interface with the Depository Trust Company, the Options Clearing Corporation, and the National Securities Clearing Corporation, of which Bernard Madoff is a past chairman. The firm's systems also interface fully with the systems of all major global custodians.

**Recommendation:**
We therefore recommend the $64mm PSE limit be renewed for another year based on a stable financial profile, strong and stable management team, low leverage and solid capital base.  Furthermore, the trading exposure is mitigated the minimal risk associated with the trades as they are ultimately cleared through and guaranteed by the NSCC.

**GCIB credit policy deviation:**
None

**Obligor Limit and/or RAC Exceptions:**
Yes.  As discussed previously, profitability is considered below average with an ROE of 10% for 2003.

**Obligor Risk Rating:**

ORR is 4- reflecting a steady increase in capital, the high degree of balance sheet liquidity, and an overall stable financial profile. Madoff remains nonetheless, a single product/service business, which can make its earnings less than stable as market conditions fluctuate