**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                    :
SECURITIES INVESTOR PROTECTION                                      :
CORPORATION,                                                        :
                                                                    :
          Plaintiff-Applicant,                               :
                                                                    :
     v.                                                         :
                                                                    :   SIPA Liquidation
BERNARD L. MADOFF INVESTMENT                                        :
SECURITIES LLC,                                                    :   No. 08-01789 (SMB)
                                                                    :
          Defendant.                                         :   (Substantively Consolidated)
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re                                                               :
                                                                    :
BERNARD L. MADOFF,                                                 :
                                                                    :
          Debtor.                                            :
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
IRVING H. PICARD, Trustee for the Liquidation                      :
of Bernard L. Madoff Investment Securities LLC,                    :
                                                                    :
          Plaintiff,                                         :
                                                                    :   Adv. Pro. No. 10-05345 (SMB)
     v.                                                         :
                                                                    :
CITIBANK, N.A., CITIBANK NORTH                                      :
AMERICA, INC., AND CITIGROUP GLOBAL                                 :
MARKETS LIMITED,                                                   :
                                                                    :
          Defendants.                                        :
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S MOTION FOR LEAVE**
**TO FILE AN AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 3

    A.    The Prime Fund Credit Facility ............................................................. 4

    B.    Non-Defendant Citi Entities' Other Alleged Madoff-Related Activities .................... 8

    C.    The Trustee Recovers Over $1 Billion, The Full Amount Of Transfers Made Two Years Prior To The Madoff Bankruptcy............................................................. 11

ARGUMENT .................................................................................................................... 12

POINT I THE SECTION 550(d) "SINGLE SATISFACTION RULE" BARS THE TRUSTEE FROM RECOVERING ALL OF THE TRANSFERS ............................................. 13

POINT II THE TRUSTEE CANNOT AVOID CERTAIN ALLEGED TRANSFERS BECAUSE THE TRANSFERS DID NOT DEPLETE THE BLMIS ESTATE .......................... 16

POINT III SECTION 550(b) BARS THE TRUSTEE'S CLAIMS ............................................. 19

    A.    The Trustee Has Not Pleaded That Citibank Subjectively Believed That There Was A High Probability That Madoff Was Operating A Ponzi Scheme.................... 19

    B.    Citibank Did Not Turn A Blind Eye Towards The Madoff Fraud ............................ 23

    C.    The Trustee's Other Attempts To Impute Knowledge To Citibank Fail .................. 26

    D.    Citibank Gave Value For All The Transfers It Allegedly Received.......................... 33

POINT IV SECTION 546(e) BARS ALL CLAIMS  OTHER THAN THOSE UNDER SECTION 548(a)(1)(A) ............................................................................................... 34

CONCLUSION.................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 101(22)(A) ................................................................................................................34

11 U.S.C. § 546(e) .......................................................................................................................34

11 U.S.C. § 550(a) .......................................................................................................................19

11 U.S.C. § 550(b)(1) ..............................................................................................................19, 33

11 U.S.C. § 550(d) .......................................................................................................................13

Fed. R. Bankr. P. 7012 ................................................................................................................12

Fed. R. Bankr. P. 7015 ................................................................................................................12

**Cases**

*Adelphia Recovery Tr. v. Bank of America, N.A.*,
    390 B.R. 80 (S.D.N.Y. 2008), *aff'd*, 379 F. App'x 10 (2d Cir. 2010) ...................................15

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010) .................................................................................27

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................12, 15

*Bear, Stearns Sec. Corp. v. Gredd*,
    275 B.R. 190 (S.D.N.Y. 2002) ........................................................................................17, 18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................................................................12-13

*Bonded Fin. Servs., Inc. v. Eur. Am. Bank*,
    838 F.2d 890 (7th Cir. 1988) ..............................................................................................33

*Breeden v. Kirkpatrick & Lockhart, LLP*,
    268 B.R. 704 (S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003) .........................................8

*Buchwald v. Di Lido Beach Resort, Ltd. (In re McCann, Inc.)*,
    318 B.R. 276 (Bankr. S.D.N.Y. 2004) .............................................................................16-17

**Page(s)**

*Devon Mobile Commc'ns Liquidating Tr. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*,
No. 02-41729 (REG), 2006 WL 687153 (Bankr. S.D.N.Y Mar. 6, 2006) ....................... 17-18

*Dozier v. Deutsche Bank Tr. Co. Americas*,
No. 09 CIV. 9865 (LMM), 2011 WL 4058100 (S.D.N.Y. Sept. 1, 2011) .......................... 4, 25

*Dzikowski v. N. Tr. Bank of Fla., N.A. (In re Prudential of Florida Leasing, Inc.)*,
478 F.3d 1291 (11th Cir. 2007) ...................................................................................... 15-16

*Elendow Fund, LLC v. Rye Select Broad Market XL Fund (In re Tremont Sec. Law, State Law, & Ins. Litig.)*,
No. 10 Civ. 9061, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013), *aff'd sub nom. Elendow Fund, LLC v. Rye Inv. Mgmt.*, 588 F. App'x 27 (2d Cir. 2014) .............35, 36, 39, 40

*Ferrari v. Cty. of Suffolk*,
790 F. Supp. 2d 34 (E.D.N.Y. 2011) ....................................................................................8

*Goldstein v. S.E.C.*,
451 F.3d 873 (D.C. Cir. 2006) .............................................................................................30

*In re Harris*,
464 F.3d 263 (2d Cir. 2006) (Sotomayor, J.) ......................................................................16

*In re Irving H. Picard*,
No. 17-2992(L), 2019 WL 903978 (2d Cir. Feb. 25, 2019) ..................................................9

*In re Merrill Lynch & Co., Inc.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ..................................................................................................5

*In re WRT Energy Sec. Litig.*,
No. 96 CIV. 3610 (JFK), 1999 WL 178749 (S.D.N.Y. Mar. 31, 1999) ...........................27, 32

*Intercontinental Metals Corp. v. Erlanger & Co., Inc.*,
902 F.2d 1565 (Table), No. 89-2626, 1990 WL 64805 (4th Cir. May 1, 1990) ............... 18-19

*Ivey v. First-Citizens Bank & Tr. Co. (In re Whitley)*,
No. 10-10426, 2014 WL 6910837 (Bankr. M.D.N.C. Dec. 8, 2014), *aff'd*, 539 B.R.
77 (M.D.N.C. 2015), *aff'd*, 848 F.3d 205 (4th Cir. 2017),
*cert denied*, 138 S. Ct. 314 (2017) .....................................................................................17

*Jean-Laurent v. Lawrence*,
No. 12 CIV. 1502 (JPO) (SN), 2013 WL 1129813 (S.D.N.Y. Mar. 19, 2013) ......................26

*Kapila v. SunTrust Mortg., Inc. (In re Pearlman)*,
515 B.R. 887 (Bankr. M.D. Fla. 2014) ..................................................................14

*Liquidation Tr. v. Daimler AG (In re Old CarCo LLC)*,
454 B.R. 38 (Bankr. S.D.N.Y. 2011), *aff'd*, No. 11 Civ. 5039 (DLC), 2011 WL
5865193 (S.D.N.Y. Nov. 22, 2011), *aff'd*, 509 F. App'x 77 (2d Cir. 2013) ..........................13

*Lucente v. Int'l Bus. Machs. Corp.*,
310 F.3d 243 (2d Cir. 2002)...................................................................................12

*Lustig v. Weisz & Assocs., Inc. (In re Unified Commercial Capital, Inc.)*,
260 B.R. 343 (Bankr. W.D.N.Y. 2001), *aff'd*, Nos. 01–MBK–6004L,
01–MBK–6005L, 2002 WL 32500567 (W.D.N.Y. June 21, 2002) ................................. 33-34

*Meridian Horizon Fund LP v. KPMG (Cayman) (In re Tremont Sec. Law,
State Law and Ins. Litig.)*,
487 F. App'x 636 (2d Cir. 2012) ............................................................................21

*Midfirst Bank, SSB v. C.W. Haynes & Co.*,
893 F. Supp. 1304 (D.S.C. 1994), *aff'd*, 87 F.3d 1304 (4th Cir.1996) .............................. 27-28

*Negrete v. Citibank, N.A.*,
237 F. Supp. 3d 112 (S.D.N.Y. 2017), *aff'd*, No. 17-2783-CV, 2019 WL 80773 (2d
Cir. Jan. 3, 2019).................................................................................................26

*Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*,
500 B.R. 371 (Bankr. S.D.N.Y. 2013)....................................................................18

*Picard v. BNP Paribas S.A. (In re Bernard L. Madoff)*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018).......................................................... *passim*

*Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec. LLC)*,
No. 08-99000 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug. 11, 2015) .......................38

*Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*,
773 F.3d 411 (2d Cir 2014), *cert denied*, 135 S.Ct. 2858 (2015)
*and* 135 S.Ct. 2859 (2015) .....................................................................................34

**Page(s)**

*Picard v. Katz,*
  462 B.R. 447 (S.D.N.Y. 2011), *abrogated on other grounds by Sec. Inv'r
  Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),*
  513 B.R. 437 (S.D.N.Y. 2014) ......................................................................16, 20

*Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC),*
  548 B.R. 13 (Bankr. S.D.N.Y. 2016) ............................................. *passim*

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),*
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) ........................................... *passim*

*Pioneer Liquidating Corp. v. San Diego Tr. & Savings Bank (In re Consolidated Pioneer
  Mortg. Entities),*
  211 B.R. 704 (S.D. Cal. 1997), *aff'd in part, rev'd on other grounds*, 166 F.3d 342
  (Table), No. 97-56238, 1999 WL 23156 (9th Cir. Jan. 13, 1999) ..........................................17

*Sanders v. Grenadier Realty, Inc.,*
  367 F. App'x 173 (2d Cir. 2010) ..........................................................13

*Scheidelman v. Henderson (In re Henderson),*
  423 B.R. 598 (Bankr. N.D.N.Y. 2010) .................................................13

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff),*
  590 B.R. 200 (Bankr. S.D.N.Y. 2018) .................................................13

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff),*
  No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016),
  *vacated*, No. 17-2992(L), 2019 WL 903978 (2d Cir. Feb. 25, 2019)........................................9

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),*
  501 B.R. 26 (S.D.N.Y. 2013) ................................................................14

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),*
  505 B.R. 135 (S.D.N.Y. 2013)......................................................16, 34

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),*
  516 B.R. 18 (S.D.N.Y. 2014)........................................................19, 20

*Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),*
  No. 12 MC 115(JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ..................34, 35, 37, 38

**Page(s)**

*Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005).................................................................................................33

*Sims v. DeArmond (In re Lendvest Mortg., Inc.)*,
    42 F.3d 1181 (9th Cir. 1994) ...........................................................................................15

*Vaughn v. Strickland*,
    No. 12 CIV. 2696 JPO, 2013 WL 3481413 (S.D.N.Y. July 11, 2013)...................................25

**Other Authorities**

14A N.Y. Jur. 2d Business Relationships § 682 (2d ed. 2019) ...................................................27

Press Release, Irving H. Picard, Madoff Trustee Reaches Recovery Agreement of $140
    Million with Feeder Fund Plaza Investments International & Notz, Stucki
    Management (Bermuda) Limited (June 19, 2015),
    https://www.madofftrustee.com/document/news/000595-sipa-trustee-and-sipc-press-
    release-on-plaza-settlement.pdf ..........................................................................................16

Press Release, Offices of Irving H. Picard & Stephen P. Harbeck, Madoff Trustee
    Reaches Recovery Agreement with Ascot Partners, Ascot Fund, J. Ezra Merkin, and
    Gabriel Capital Corporation (June 13, 2018),
    https://www.madofftrustee.com/document/news/000853-final-merkin-settlement-
    press-release.pdf................................................................................................................11

Defendants Citibank, N.A. and Citicorp North America, Inc. ("Citicorp") (together, "Citibank") respectfully submit this memorandum of law in opposition to the Motion for Leave to File an Amended Complaint (the "Motion") filed in this proceeding (the "Action") by Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"). Mem. of Law in Supp. of Trustee's Mot. for Leave to File Am. Compl., *Picard v. Citibank, N.A.*, Adv. Pro. No. 10-05345 (SMB) (Bankr. S.D.N.Y. Dec. 14, 2018), ECF No. 149. The proposed amended complaint seeks to recover alleged subsequent transfers to Citibank from Rye Select Broad Market Prime Fund, L.P. ("Prime Fund"). Decl. of Seanna R. Brown in Supp. of Trustee's Mot. for Leave to File Am. Compl., Ex. A, *Picard v. Citibank, N.A.*, Adv. Pro. No. 10-05345 (SMB) (Bankr. S.D.N.Y. Dec. 14, 2018), ECF No. 150-1 (the "Proposed Amended Complaint" or "PAC").

## PRELIMINARY STATEMENT

The Trustee seeks to amend his complaint in this Action to "clawback" $343,084,590 in subsequent transfers allegedly made by Prime Fund to Citibank. The approximately $343 million in transfers consists of $300 million in principal that Prime Fund repaid to Citibank when Prime Fund terminated the credit facility and $43 million in alleged fees and interest payments (included for the first time in the PAC) that Citibank received as consideration for the loan.

The Proposed Amended Complaint should be rejected and this case dismissed with prejudice. The Trustee's entire theory of the case against Citibank is both implausible and contradicted by the Trustee's prior pleadings relating to Citibank's alleged knowledge that BLMIS was a Ponzi scheme. In addition, other fundamental deficiencies render his purported claims against Citibank without merit and futile:

*First*, the Trustee has recovered through various settlements over $1 billion—*i.e.*, full

satisfaction (and more) on the transfers at issue—and Section 550(d) prohibits him from getting a second, double recovery from Citibank. Application of Section 546(e) safe harbor means that the Trustee only could have avoided $959 million in alleged two-year initial transfers from BLMIS to the Rye funds (including Prime Fund). Having recovered that amount, and more, he may not "double dip" by demanding hundreds of millions of dollars in additional amounts based on alleged subsequent transfers to Citibank.

*Second*, the vast majority of the amount sought by the Trustee—namely the $300 million repaid to Citibank when Tremont terminated the loan in March 2008—cannot be a fraudulent transfer at all because it did not deplete the BLMIS estate. That is because, as the Trustee well knows, the money borrowed from and paid back to Citibank was immediately replaced with funds from other leverage providers as part of an integrated series of transactions. Accordingly, this transfer cannot be avoided (and, therefore, the alleged corresponding subsequent transfers cannot be recovered from Citibank).

*Third*, the claims against Citibank fail under Section 550(b) because the Trustee has not adequately pleaded that Citibank did not take the alleged subsequent transfers in good faith and the pleadings demonstrate that Citibank took the alleged transfers for value. The Trustee's Proposed Amended Complaint amounts to little more than an attempt to criticize, in hindsight, Citibank's decision to enter into a BLMIS-related loan. There are no well-pleaded factual allegations that Citibank subjectively believed with a high probability that Madoff was operating a Ponzi scheme or that Citibank was willfully blind to Madoff's scheme. Indeed, the many allegations of due diligence by Citibank defeat the assertion. Nor can the Trustee base a plausible inference of willful blindness on a standard indemnity provision in the loan agreement from a Tremont entity whose viability depended on the legitimacy of BLMIS.

*Fourth*, the Section 546(e) safe harbor bars the Trustee from avoiding initial transfers from BLMIS to Prime Fund outside of the two-year look back period. Citibank, as a subsequent transferee, is entitled to raise any defense that would have been available to Prime Fund, the alleged initial transferee. The Trustee has incorporated by reference his complaint against Prime Fund and Tremont and padded the Proposed Amended Complaint with allegations related to Tremont's purported knowledge of Madoff's fraud, though he still falls short of pleading that Tremont actually knew that Madoff was operating a Ponzi scheme. The Trustee's attempts to second-guess Tremont's due diligence efforts plainly do not amount to a showing of actual knowledge, and in fact refute it. Because of the application of the safe harbor, the Trustee may only avoid transfers under Section 548(a)(1)(A). Consequently, the Trustee cannot recover from Citibank any alleged subsequent transfers outside of the two-year period.

At bottom, the Trustee's theory hinges on the implausible contention that despite subjectively believing there was a high probability that BLMIS was a Ponzi scheme, Citibank decided to put hundreds of millions of its dollars at risk. Unfortunately for the Trustee, this Court, as well as other courts charged with assessing the purported knowledge of Madoff's victims, has already rejected this theory as "preposterous." The only plausible explanation is that Citibank, like many other sophisticated financial entities, was fooled by Madoff's scheme.

## STATEMENT OF FACTS

For the purposes of this opposition, the facts set forth below are drawn from the allegations contained in the Proposed Amended Complaint, which Citibank neither admits nor concedes. As explained further below, however, many of the Trustee's allegations are contradicted by documents the Trustee expressly relies on or by the Trustee's own admissions in the initial complaint he filed in this Action. *Picard v. Citibank, N.A. (In re Madoff)*, Adv. Pro.

No. 10-05345 (SMB) (Bankr. S.D.N.Y. Dec. 8, 2010), ECF No. 1-1 (the "Original Complaint").

This Court is not bound by the Trustee's false version of events, and can and should consider the

inconsistencies and contradictions between the Original Complaint and the Proposed Amended

Complaint, as well as full versions of documents the Trustee cites (and often mischaracterizes).[1]

### A. The Prime Fund Credit Facility

On June 15, 2005, Prime Fund, a vehicle for leveraged investments in BLMIS, and its

general partner, Tremont Partners, Inc. ("TPI" or "Tremont Partners"),[2] entered into a renewable

one-year $300 million revolving credit facility agreement with Citibank, N.A., a commercial

bank. Pursuant to the agreement, Citibank, N.A. provided funds that Prime Fund could draw on

to invest in BLMIS (the "Credit Facility"). PAC ¶¶ 31, 176. Citicorp, a non-bank holding

company, served as agent for Citibank, N.A. in connection with the Credit Facility. *Id.* ¶¶ 37-39.

As part of the Credit Facility, Prime Fund also pledged its assets as collateral to Citibank. *Id.*

¶¶ 176, 206. Prime Fund invested all or substantially all of its assets with BLMIS; Tremont's

Madoff investments were the "most profitable part" of Tremont's investments. *See* Tremont

Compl. ¶ 38; PAC ¶ 261 (incorporating allegations of Tremont Complaint). Matthew Nicholls

and Marc Adelman led the negotiations for Citibank for the Credit Facility. PAC ¶ 179.[3]

---

[1]  *Picard v. BNP Paribas S.A. (In re Bernard L. Madoff)* (*BNPP*), 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018) ("court may consider prior iterations of pleadings containing statements inconsistent with the latest version."); *Dozier v. Deutsche Bank Tr. Co. Americas*, No. 09 CIV. 9865 (LMM), 2011 WL 4058100, at *2 (S.D.N.Y. Sept. 1, 2011) (court "need not accept as true allegations that conflict with a plaintiff's prior allegations."); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)* (*Merkin*), 515 B.R. 117, 137 (Bankr. S.D.N.Y. 2014) ("Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss.") (citations omitted).

[2]  TPI is a subsidiary of Tremont Capital Management, Inc. ("TCM" and together with TPI, "Tremont"). Compl. ¶ 46, *Picard v. Tremont Grp. Holdings, Inc. (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 10-05310 (BRL) (Bankr. S.D.N.Y Dec. 7, 2010), ECF No. 1-1 (the "Tremont Complaint").

[3]  In the Original Complaint, Nicholls is alleged to have been a Director in Defendant Citicorp's Financial Institutions Group, Original Compl. ¶ 73, and there were no allegations as to Adelman. While the Trustee now pleads that Citi individuals worked for one monolithic Citi entity—Citigroup Global Markets,

Adelman, a Citicorp employee, executed the loan documents for Citibank. *See* Decl. of Carmine

D. Boccuzzi, Jr., dated March 12, 2019 ("Boccuzzi Decl."), Ex. A (June 15, 2005 Credit Facility)

(unless otherwise stated, "Exhibit" or "Ex." refers to the exhibits to the Boccuzzi Declaration).[4]

The Credit Facility was originally due to expire in mid-2006. On April 12, 2006,

Tremont approached Nicholls about renewing and increasing the facility by an additional $150

million. PAC ¶ 236. Before agreeing to the potential increase, in June 2006, Adelman requested

a meeting with Madoff as part of the due diligence for the transaction. *Id.* ¶ 242. Citibank

provided an almost six-month extension on the Credit Facility through November 30, 2006 to

enable ongoing diligence efforts, including the meeting with Madoff, to take place. *Id.* ¶¶ 232-

38, 241; Original Compl. ¶ 77. Both Adelman and Nicholls wanted to meet with Madoff to

address their remaining due diligence questions and in September and October 2006 renewed

their requests for a meeting. PAC ¶¶ 241-45. In October 2006, Nicholls sent Tremont a

proposed "due diligence agenda" for the requested meeting. *Id.* ¶ 245. The subjects listed

included "[i]nvestment process," "[i]nvestment philosophy," "[p]ortfolio management structure,"

"[i]nvestment portfolio controls and monitoring," "[e]mployees authorized to sign off on trades,"

and numerous themes related to compliance and regulatory requirements. Ex. B at 2 (Due

Diligence Agenda); *see also* PAC ¶ 248.

The meeting with Madoff took place on November 27, 2006 and was attended by Citi

---

Incorporated ("CGMI"), PAC ¶¶ 55-56—those allegations appear to be plucked from thin air and have no
basis in the extensive discovery the Trustee has received. Nor is there any basis for the Trustee's new
allegations that CGMI had anything to do with the Credit Facility.

[4]  For purposes of this opposition the Court may consider, among other things, (1) documents
incorporated into the Proposed Amended Complaint by reference, (2) documents integral to the Proposed
Amended Complaint and relied upon in it even if not attached or incorporated by reference and (3) facts
of which judicial notice may properly be taken, in addition to other sources typically considered on a
motion to dismiss. *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd
sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005); *see also Merkin*, 515 B.R. at 137.

employees Nicholls, Bruce Clark and Thomas Fontana.  PAC ¶ 251.  According to the Trustee,
this long-sought meeting was required by Citibank not as part of its good faith due diligence
efforts, but as a sham designed to fool no one but itself.  *Id.* ¶¶ 241, 248.  However, the Trustee
conceded in his Original Complaint that Citibank had genuine due diligence questions and
sought a meeting with Madoff in an effort to resolve those questions.  Original Compl. ¶ 77
("Citi agreed to extend the [Credit Facility] until November 30, 2006, and to table the issue of
providing at least an additional $100 million funding until it got comfortable that its due
diligence questions were satisfactorily resolved.  *One of those issues was that Citi still wanted a
meeting with Madoff*.") (emphasis added).

On November 30, 2006, immediately after meeting with Madoff, Citibank extended the
Credit Facility until December 29, 2006 and subsequently renewed the facility for another year
until December 13, 2007, this time increasing the limit of the facility from $300 million to $400
million.  PAC ¶ 252.  The Trustee does not allege that Citibank learned anything new about
Madoff after the November 2006 meeting.  In October 2007, when discussions about renewal
came up again, Tremont informed Citibank that it wanted to remove the longstanding
indemnification provision from the Credit Facility.  *Id.* ¶ 254.  Citibank agreed to a temporary
three-month renewal while the parties negotiated the details of a long term deal.  *Id.* ¶¶ 255-57.

In trying to create an inference that Citibank somehow knew that Madoff was running a
Ponzi scheme, the Trustee otherwise puts great weight on the existence of an indemnity
provision in the Credit Facility.  *Id.* ¶ 253.  Under the Credit Facility, Prime Fund and TPI
indemnified Citibank for all losses, liabilities and damages arising out of or in connection with
the lending.  *Id.* ¶ 7; Ex. A, § 9.04 (June 15, 2005 Credit Facility).  The Trustee alleges that this
indemnification was designed specifically to protect Citibank in the event of "fraud" at BLMIS,

6

which he conclusorily claims to be if "BLMIS misappropriated Prime Fund's assets *or was not trading securities as purported*."  PAC ¶ 177 (emphasis added).  But no facts are pleaded that support the italicized portion of the Trustee's allegation (*i.e.*, a purported concern by Citibank that no securities were being traded at all by Madoff), and his previous pleading conceded that Citibank, naturally, sought to protect itself from the perceived "remote" risk of fraud.  Original Compl. ¶ 63 (purpose of indemnity to mitigate "potential risk, *while remote*, of fraud by the Investment Advisor") (emphasis added).  As is clear in the Original Complaint and the May 2005 Memo[5] on which the Trustee relies, Citibank's "remote" concern was that Madoff could run off with the assets because of his physical control of the account, not that there were no assets, or no securities being traded, in the first place.  *Id.*; *see also* Ex. C (May 2005 Memo).  The Trustee's theory thus boils down to the implausible assertion that Citibank's receipt of an indemnity from TPI, whose business model relied almost exclusively on the success of BLMIS, supports a plausible inference that Citibank therefore subjectively believed there was a high probability that BLMIS was a Ponzi scheme.  PAC ¶ 253; Tremont Compl. ¶¶ 47-48.

On or about March 12, 2008, *Tremont* informed Citibank that it was terminating the Credit Facility.  PAC ¶¶ 257-59; Tremont Compl. ¶ 198.  As acknowledged by the Trustee, Tremont had been actively seeking out "alternate leverage providers" in case its negotiations with Citibank were unsuccessful.  PAC ¶ 257.  Thus, on the same day, Tremont terminated the Credit Facility and requested a $475 million withdrawal from BLMIS to fund the repayment to Citibank, with monies to be wired to Prime Fund on March 25, 2008, while simultaneously informing BLMIS of a deposit of $575 million to be made into one of its BLMIS accounts on March 28, 2008.  *Id.* ¶ 260; Original Compl. ¶ 84; *see also* Ex. D (March 12, 2008 Fax from

---

[5]  All terms not defined here have the definitions stated in the PAC.

Harry Hodges (TPI) to Frank DiPascali (BLMIS)) (referenced in Original Complaint). Tremont

thus replaced the funding it received from Citibank through a series of transfers initiated with the

$475 million withdrawal from BLMIS and culminating in the deposit of $575 million in one of

its BLMIS accounts on March 28, 2008. Tremont Compl. ¶ 198; *id.*, Ex. B at 3-1T0027 (Rye

Select Broad Market Fund's BLMIS Account); Compl. ¶¶ 115, 119-20, *Picard v. ABN AMRO*

*Bank (Ireland) Ltd. (In re Madoff)*, Adv. Pro. No. 10-05355 (SMB) (Bankr. S.D.N.Y. Dec. 8,

2010), ECF No. 1-1 (the "ABN AMRO Complaint").[6] Prime Fund allegedly transferred $301

million to Citibank on March 26, 2008. PAC ¶ 260.

## B. Non-Defendant Citi Entities' Other Alleged Madoff-Related Activities

Despite the Trustee's extensive discovery, the PAC is by and large devoid of new facts

and instead simply re-characterizes transactions and events already put before the Court in the

Original Complaint. The Trustee also seeks to muddy the waters with allegations about a non-

party entity, previously unmentioned in these proceedings—CGMI. CGMI is alleged to be an

"affiliate and sister entity" of Citibank, N.A. and Citicorp, falling somewhere within the

corporate structure of non-party Citigroup, Inc. PAC ¶¶ 5, 46. The Trustee does not allege that

CGMI was a party to the Credit Facility. Without offering any explanation for why CGMI was

not mentioned in the Original Complaint, the Trustee now alleges that CGMI acted as agent for

both Citibank, N.A. and Citicorp and "performed nearly all material aspects of the Prime Fund

Credit [Facility]," *id.* ¶ 60, an allegation that is cut from whole cloth.

---

[6] "In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice.*" *Ferrari v. Cty. of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011); *see also Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 712 n.6 (S.D.N.Y. 2001) (allegations made by a party in another proceeding are "binding on the [party] unless he persuasively controverts them"), *aff'd*, 336 F.3d 94 (2d Cir. 2003); *BNPP*, 594 B.R. at 195 (considering Trustee's complaint filed in separate proceeding when deciding motion to dismiss).

The Trustee also makes allegations as to Citigroup Global Markets Limited ("CGML"),

an investment banking and securities brokerage company with its principal offices in the United

Kingdom, which was allegedly party to a completely separate Madoff-related transaction that is

the subject of separate claims by the Trustee.[7]   In April 2005, CGML entered into a swap

transaction relating to the Madoff feeder fund Fairfield Sentry Limited ("Fairfield") through

which CGML agreed to provide Auriga International Limited, a foreign hedge fund, with

synthetic exposure to Fairfield (the "Fairfield Deal").  PAC ¶ 106.  To hedge the risk associated

with this deal, CGML invested $280 million in shares of Fairfield.  *Id.*  At the time the Madoff

Ponzi scheme was uncovered, CGML was left with over one hundred million dollars in losses.

Original Compl. ¶ 18 (stating that CGML only redeemed approximately $130 million of its $280

million of shares in Fairfield).

The Trustee does not and cannot allege that anyone who was involved in the Fairfield

Deal had any subjective belief that Madoff was operating a Ponzi scheme, or even shared any

information about BLMIS with anyone who was involved in the Credit Facility at the time of the

execution of that transaction.  Nor does the Trustee allege that anyone who worked on the

negotiations for the Fairfield Deal was involved in the negotiation and execution of the Credit

Facility.[8]  Additionally, the Trustee points to a separate deal that never materialized, which

---

[7]  The Trustee's claims against CGML were dismissed from these proceedings.  *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) ("Extraterritoriality Decision"); Stipulated Final Order Granting in Part and Denying in Part Mot. to Dismiss, *Picard v. Citibank, N.A.*, Adv. Pro. No. 10-05345 (SMB) (Bankr. S.D.N.Y. Mar. 9, 2017), ECF No. 107.  On February 25, 2019, the Second Circuit vacated and remanded the Extraterritoriality Decision.  *In re Irving H. Picard*, No. 17-2992(L), 2019 WL 903978 (2d Cir. Feb. 25, 2019).  The Appellees filed a Petition for Panel Rehearing and Hearing En Banc.  Pet. for Panel Reh'g and Hr'g *En Banc*, *In re Irving H. Picard*, No. 17-2992(L), 2019 WL 903978 (2d Cir. Mar. 11, 2019), ECF No. 1320.

[8]  The evidence on which the Trustee purports to rely (and from which he quotes extensively) for many of his allegations regarding the Fairfield Deal—the Deposition of Samir Mathur—makes clear that Mathur and his team had no role in the Credit Facility and were not aware of the Credit Facility until after it was

would have involved providing to Tremont increased leverage on BLMIS (the "Proposed Tremont Deal"). PAC ¶ 187. The Trustee alleges that in considering the proposed deal, "CGMI" pursued due diligence on BLMIS, including "several conference calls and at least two due diligence sessions" with Tremont. *Id.* ¶¶ 188, 192. Samir Mathur allegedly tried to "make a case" for the Proposed Tremont Deal and sought a meeting with Madoff as part of the due diligence efforts. *Id.* ¶¶ 200-01. The fact that Citi did not increase its exposure to Madoff via this separate transaction, *id.* ¶ 226, does not raise a plausible inference that Citibank subjectively believed with a high probability that Madoff was operating a Ponzi scheme, the more so given that Citibank did not terminate the Credit Facility but instead opted to renew the loan and increase the facility by an additional $100 million after the Proposed Tremont Deal did not proceed. *Id.* ¶ 252.

As a sideshow, the Trustee makes much of the short conversation that a third party, Harry Markopolos, had with another alleged CGMI employee, Leon Gross, "sometime prior to November 7th [2005]," *i.e.*, almost two and a half years prior to the termination of the Credit Facility and the $300 million transfer the Trustee seeks to clawback in this action. *Id.* ¶ 159. The Trustee implausibly alleges that Gross discovered what no one else was able to, *i.e.*, that BLMIS was a Ponzi scheme, just from looking at a "description of BLMIS's SSC strategy." *Id.* ¶¶ 159, 170. The Trustee makes no allegations that Gross was involved in or knew of the Credit Facility or the Fairfield Deal, or had any discussions about Madoff with anyone involved in those transactions.

---

executed. *See* Ex. E 159:22-160:21 (Mathur Dep.). Nor did Mathur ever discuss with Nicholls or Nicholls's group due diligence learned about Madoff as part of the Credit Facility. *Id.* 163:11-24.

### C.  The Trustee Recovers Over $1 Billion, The Full Amount Of Transfers Made Two Years Prior To The Madoff Bankruptcy

On December 7, 2010, the Trustee filed a complaint against various Tremont entities, including Prime Fund and TPI, seeking to avoid $2.1 billion in initial transfers from BLMIS to four Tremont-managed funds (including Prime Fund) invested directly in BLMIS (the "Rye Funds").  Tremont Compl. ¶¶ 41, 264-66.  Of these, $959,632,359 occurred in the two years preceding the BLMIS bankruptcy, and $1,192,891,727 occurred outside the two-year period.  *Id.*, Ex. A.  The two-year transfers sought included Prime Fund's March 2008 $475 million redemption, which Tremont used to repay Citibank and then reinvested with BLMIS.  *Id.*, Ex. B at 2-1C1260 (Prime Fund Transfers).  On September 22, 2011, this Court approved a $1.025 billion settlement agreement between the Trustee and the Tremont Settling Defendants.  PAC ¶¶ 67, 263.  The Trustee did not specify in any of his settlement-related filings how the Tremont Settlement was allocated between the two-year transfers and the older transfers, beyond a bald assertion that the payment would be allocated to permit recovery actions against subsequent transferees.  Mot. to Approve Settlement, Ex. D ¶ 5 (Affidavit of Irving Picard), *Picard v. Tremont Grp. Holdings, Inc. (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 10-05310 (BRL) (Bankr. S.D.N.Y. July 28, 2011), ECF No. 17-7.[9]  In other Madoff-related settlements, the Trustee has regularly asserted that he has recovered 100 percent of relevant two-year transfers, even where he had alleged older transfers as well.[10]

---

[9]  *See also* Mot. to Approve Settlement, Ex. A ¶ 4 (Settlement Agreement Between Trustee and Settling Defendants), *Picard v. Tremont*, Adv. Pro. No. 10-05310 (BRL), ECF No. 17-1.  The Tremont Settlement is incorporated into the Proposed Amended Complaint by reference.  PAC ¶¶ 67, 263.

[10]  *See, e.g.*, Press Release, Offices of Irving H. Picard & Stephen P. Harbeck, Madoff Trustee Reaches Recovery Agreement with Ascot Partners, Ascot Fund, J. Ezra Merkin, and Gabriel Capital Corporation (June 13, 2018), https://www.madofftrustee.com/document/news/000853-final-merkin-settlement-press-release.pdf ("Through this settlement, the SIPA Trustee will recover $280 million for the BLMIS Customer Fund, representing 100 percent of the transfers Ascot Partners received from BLMIS in the two years preceding the commencement of BLMIS's SIPA proceeding.").

Tremont and the Rye Funds asserted in the Tremont Settlement that they took in good

faith.  Mot. to Approve Settlement, Ex. A at 8, *Picard v. Tremont*, Adv. Pro. No. 10-05310

(BRL).  The Tremont Complaint did not plead that Tremont had actual knowledge of the BLMIS

Ponzi scheme, nor do the allegations in the Proposed Amended Complaint meet this high bar.

The Trustee's Tremont allegations:  (i) are a laundry list of red flags, Tremont Compl. ¶¶ 158-

222; PAC ¶ 235; (ii) focus on purported warnings from third parties that do not speak to

Tremont's actual knowledge, PAC ¶¶ 267-78, 300-18; Tremont Compl. ¶¶ 194, 236-50; (iii) are

contradicted by allegations elsewhere—*e.g.*, Tremont allegedly shielded Madoff from third

parties, PAC ¶ 300, despite the fact that it helped arrange meetings between Citi entities and

Madoff and actively participated in Citi's due diligence, *id.* ¶¶ 192, 219, 221-22, 243-44, 249,

252; and (iv) are replete with illustrations of due diligence that Tremont conducted on BLMIS.

Tremont Compl. ¶¶ 223, 228-31, 252.

## ARGUMENT

The Court should deny the Trustee's Motion because amendment would be futile.  "An

amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss

pursuant to Fed. R. Civ. P. 12(b)(6)."  *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d

Cir. 2002).[11]  A complaint must be dismissed under Rule 12(b)(6) unless it "contain[s] sufficient

factual matter . . . to 'state a claim to relief that is plausible on its face'" and provides "more than

a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Twombly*, 550 U.S. at

545 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Furthermore, conclusory statements in a complaint and "formulaic recitation[s] of the elements

---

[11]  Federal Rules of Civil Procedure 12 and 15 are made applicable here by Federal Rules of Bankruptcy
Procedure 7012 and 7015.  Fed. R. Bankr. P. 7012, 7015.

of a cause of action" are not entitled to a presumption of truth, *Twombly*, 550 U.S. at 555, and

allegations contradicted by documents incorporated into the pleadings by reference need not be

accepted as true. *Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 614 (Bankr.

N.D.N.Y. 2010).

The Trustee has been given ample opportunity to put his best case forward. Yet after

eight years and extensive discovery, the Trustee has mustered nothing more than "deficient,

conclusory allegations." *Sanders v. Grenadier Realty, Inc.*, 367 F. App'x 173, 176-77 (2d Cir.

2010) (affirming district court's denial of leave to amend and dismissal of the complaint).[12]

Because the Trustee has tried and failed to cure the deficiencies in the Original Complaint, his

motion should be denied and this Action should be dismissed with prejudice. *Liquidation Tr. v.

Daimler AG (In re Old CarCo LLC)*, 454 B.R. 38, 60 (Bankr. S.D.N.Y. 2011) (plaintiff failed to

"cure deficiencies" despite "full and fair opportunity to attempt to present a sustainable

complaint" so second amended complaint dismissed with prejudice), *aff'd*, No. 11 Civ. 5039

(DLC), 2011 WL 5865193 (S.D.N.Y. Nov. 22, 2011), *aff'd*, 509 F. App'x 77 (2d Cir. 2013).

**POINT I**
**THE SECTION 550(d) "SINGLE SATISFACTION RULE"**
**BARS THE TRUSTEE FROM RECOVERING ALL OF THE TRANSFERS**

The Trustee is precluded from recovering any of the transfers from Citibank due to the

bar on double recovery. 11 U.S.C. § 550(d) (Trustee "entitled to only a single satisfaction under

subsection (a) of this section"). As the Court recognized in *Picard v. BNP Paribas*, Section

550(d) is appropriately invoked at the pleadings stage in order to eliminate some or all claims

---

[12] This Court denied the Trustee's motion seeking additional discovery from Citibank relevant to the
issue of Citibank's alleged knowledge of BLMIS's fraud, noting that "[p]resumably, the Trustee had facts
to support [the] allegations" in his original complaint and directing the Trustee to amend his complaint if
permitted. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 590 B.R. 200, 210
(Bankr. S.D.N.Y. 2018).

against a subsequent transferee where the Trustee has reached a settlement for those same claims with the initial transferee and so is barred from further recovery. *See* Order to Show Cause, *Picard v. BNP Paribas S.A. (In re Bernard L. Madoff)* (*BNPP*), 594 B.R. 167 (Bankr. S.D.N.Y. 2018) (Adv. Pro. No. 12-01576 (SMB)), ECF No. 140. The Tremont Settlement prevents the Trustee from recovering funds from Citibank for the same transfers satisfied by that settlement. *See Kapila v. SunTrust Mortg., Inc. (In re Pearlman)*, 515 B.R. 887, 896 (Bankr. M.D. Fla. 2014) (Section 550(d) prevents the "trustee from collecting from multiple parties for the same transfer, i.e., an initial transferee and a subsequent transferee").

The Trustee's claims against Citibank as an alleged "secondary transferee" of Prime Fund arise out of his claims against Tremont, the Rye Funds and other Tremont entities for a total of $2.1 billion in alleged initial transfers from BLMIS to the Rye Funds. Tremont Compl. ¶¶ 41, 264-66. Of these transfers, $959,632,359 were alleged to have occurred in the two years preceding the BLMIS bankruptcy, *id.*, Ex. A., while the Trustee has recovered to date at least $1.025 billion.[13] Given the Trustee does not plead that Tremont had actual knowledge that Madoff was operating a Ponzi scheme, as discussed *infra*, the Section 546(e) safe harbor means only the two-year transfers are avoidable and, as a result, recoverable. *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 501 B.R. 26, 30 (S.D.N.Y. 2013) (court "rejects any suggestion that, if [Section 546(e)] provided a defense to the avoidance of an initial transfer, the Trustee could nonetheless recover from subsequent transferees under § 550(a)").[14]

_____

[13] The Trustee has also separately recovered transfers from other Tremont entities and subsequent transferees. *See, e.g.*, Stipulation and Order Withdrawing Def.'s Mot. to Withdraw Reference, *Picard v. ABN AMRO Bank (Ireland) Ltd. (In re Madoff)*, Adv. Pro. No. 10-05355 (SMB) (Bankr. S.D.N.Y. June 18, 2012), ECF No. 41 (referencing settlement agreement between the Trustee and Rye Select Broad Market XL Portfolio Limited). The Trustee is best placed to inform the Court of the full amount he has recovered in connection with the initial transfers pleaded in the Tremont Complaint.

[14] All of the initial transfers from BLMIS were to the four Rye Funds (including Prime Fund), and the Trustee pleads no allegations specific to any Rye Fund in the Tremont Complaint but rather seeks to

The Trustee has already recovered those transfers (and more), and accordingly, his claims

against Citibank fail.  This Court is not bound by the Trustee's conclusory legal assertion that

this Action is being brought to vindicate his right to be made "whole," PAC ¶ 263, where the

facts before the Court demonstrate he has recovered all that he is entitled to recover.  *Iqbal*, 556

U.S. at 678 (court need not "accept as true a legal conclusion couched as a factual allegation").

    In this Action, there is no doubt as to the necessity of allocation given the Trustee seeks

here to recover some of the same alleged initial transfers covered under the Tremont Settlement.

For reasons of judicial economy, the Court should determine the allocation of the Settlement

now, which is in its discretion to do.[15]  *Dzikowski v. N. Tr. Bank of Fla., N.A. (In re Prudential of*

*Florida Leasing, Inc.)*, 478 F.3d 1291, 1301, 1303 (11th Cir. 2007) (Court should allocate

settlement "if future litigation requires" and is not bound by "self-serving" statements of settling

parties on how to allocate settlement.); *Sims v. DeArmond (In re Lendvest Mortg., Inc.)*, 42 F.3d

1181, 1184 (9th Cir. 1994) (settling parties' allocation determination is "virtually meaningless").

The Court should consider the extraordinarily high bar the Trustee would need to meet (and has

failed to meet) in order to avoid transfers from BLMIS that occurred outside of two years before

the filing date in light of the Section 546(e) safe harbor.  *See In re Prudential*, 478 F.3d at 1302

(in determining settlement allocation, court should look to "the probability of success in

---

impute Tremont's knowledge to the Rye Funds.  It accordingly follows that if the Trustee has failed to
adequately allege that Tremont had actual knowledge then he has also failed to plead actual knowledge
with respect to Prime Fund, and all the Rye Funds.

[15]  The need to allocate the Tremont Settlement is even more acute given that the Trustee is litigating
other actions before this Court that implicate the same alleged initial transfers as in the Tremont
Settlement, and the Court will be expending valuable resources in determining claims under which the
Trustee may ultimately have no right of recovery.  *See, e.g.*, Am. Compl., *Picard v. ABN AMRO Bank
(Ireland) Ltd. (In re Madoff)*, Adv. Pro. No. 10-05355 (SMB) (Bankr. S.D.N.Y. June 18, 2012), ECF No.
42 ("ABN AMRO Amended Complaint"); *cf. Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80,
95 (S.D.N.Y. 2008) (dismissing fraudulent transfer claims on a motion to dismiss where creditors had
received full payment and thus did not stand to benefit from further recovery), *aff'd*, 379 F. App'x 10 (2d
Cir. 2010).

litigation"); s*ee also Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 505 B.R. 135, 142 (S.D.N.Y. 2013) ("546(g) Decision") ("[T]he Court has found that, in the majority of cases, section 546(e) requires the dismissal of the Trustee's avoidance claims, except those brought under section 548(a)(1)(A)."); *Picard v. Katz*, 462 B.R. 447, 454 (S.D.N.Y. 2011) ("[E]ven the Trustee does not appear to undertake the dubious task of plausibly pleading that the defendants knowingly invested in a Ponzi scheme."), *abrogated on other grounds by Sec. Inv'r Prot. Corp. v. Bernard L. Madoff (In re Madoff Sec.)*, 513 B.R. 437 (S.D.N.Y. 2014). Indeed, in most of his settlements the Trustee affirmatively states that he is recovering 100 percent of two-year transfers.[16] Accordingly, if the Tremont (and other) settlement amounts are applied first to all claims within the two-year period, this would cover the vast majority (all but approximately $20 million, which are otherwise barred from recovery by Section 546(e)) of the transfers at issue in this Action, and so the claims against Citibank should be dismissed.

## POINT II
### THE TRUSTEE CANNOT AVOID CERTAIN ALLEGED TRANSFERS BECAUSE THE TRANSFERS DID NOT DEPLETE THE BLMIS ESTATE

The Bankruptcy Code's avoidance provisions, including Section 548, "protect a debtor's estate from depletion to the prejudice of the unsecured creditor." *In re Harris*, 464 F.3d 263, 273 (2d Cir. 2006) (Sotomayor, J.) (citing *In re French*, 440 F.3d 145, 150 (4th Cir. 2006)); *see also Buchwald v. Di Lido Beach Resort, Ltd. (In re McCann, Inc.)*, 318 B.R. 276, 282-83 (Bankr. S.D.N.Y. 2004) ("[C]reditors must actually be harmed in order to avoid a fraudulent transfer

---

[16] *See, e.g.*, Press Release, Irving H. Picard, Madoff Trustee Reaches Recovery Agreement of $140 Million with Feeder Fund Plaza Investments International & Notz, Stucki Management (Bermuda) Limited (June 19, 2015), https://www.madofftrustee.com/document/news/000595-sipa-trustee-and-sipc-press-release-on-plaza-settlement.pdf ("This payment by Plaza represents . . . 100 percent of the preference and transfers from BLMIS to the Plaza defendants that occurred within two years of the BLMIS liquidation filing.").

under [11 U.S.C. § 548].") (alteration in original) (citing *Bear, Stearns Sec. Corp. v. Gredd*, 275

B.R. 190, 196 (S.D.N.Y. 2002)).  Accordingly, courts readily dismiss fraudulent transfer claims

where, as here, the transfers at issue did not actually deplete the estate.  *See, e.g.*, *Bear, Stearns*,

275 B.R at 195 (dismissing claims at motion to dismiss stage where transfers did not deplete

estate because "[a] transfer of property, even if made with fraudulent intent, that does not leave

any creditor in a worse position than he would have been had the transfer never occurred,

obviously does not offend the policy behind § 548(a)(1)(A)"); *Pioneer Liquidating Corp. v. San

Diego Tr. & Savings Bank (In re Consol. Pioneer Mortg. Entities)*, 211 B.R. 704, 717 (S.D. Cal.

1997) (dismissing fraudulent transfer claims where the transfers at issue did not deplete the

debtor's estate), *aff'd in part, rev'd on other grounds*, 166 F.3d 342 (Table), No. 97-56238, 1999

WL 23156 (9th Cir. Jan. 13, 1999); *Ivey v. First-Citizens Bank & Tr. Co. (In re Whitley)*, No. 10-

10426, 2014 WL 6910837, at *1 (Bankr. M.D.N.C. Dec. 8, 2014) (finding as a matter of law that

"the transfers to the Bank in this case . . . were not fraudulent transfers because . . . they did not

diminish the Debtor's estate nor place the funds involved in the transfers beyond the reach of

creditors"), *aff'd*, 539 B.R. 77 (M.D.N.C. 2015), *aff'd*, 848 F.3d 205 (4th Cir. 2017), *cert denied*,

138 S. Ct. 314 (2017).[17]

Because Prime Fund's $475 million redemption from its BLMIS account on March 25,

2008 did not deplete any assets of the BLMIS estate, it was "not [a] fraudulent transfer[]."  *See

Whitley*, 2014 WL 6910837, at *1; *Devon Mobile Commc'ns Liquidating Tr. v. Adelphia

Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, No. 02-41729 (REG), 2006 WL 687153

---

[17] Although many depletion of estate defenses have been asserted in the context of Section 547 claims,
courts have applied the same reasoning to Section 548 claims, including Section 548(a)(1)(A) claims such
as those at issue in the Madoff clawback actions. *See, e.g.*, *Bear, Stearns*, 275 B.R. at 196 (concluding
that "§ 548(a)(1)(A) only permits a trustee to avoid a transfer of an interest of the debtor in property
when, but for the transfer, such property interest would have been available to at least one of the debtor's
creditors").

(Bankr. S.D.N.Y Mar. 6, 2006) ("[T]he relevant inquiry is whether the transfer had a net effect

on the assets or liabilities of [the debtor].") (internal quotation marks and citation omitted). The

$475 million withdrawal was part of an "integrated series of transactions," 546(g) Decision, 505

B.R. at 147, which should be evaluated as a circular transfer that did not deplete the estate. *See*

*Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*, 500 B.R. 371, 379 (Bankr.

S.D.N.Y. 2013) (analyzing transactions as single integrated transaction "compatible with

fraudulent conveyance principles as both emphasize substance over form"). Tremont withdrew

$475 million from Prime Fund's BLMIS account on March 25, 2008 to "fund the repayment to

Defendants," PAC ¶ 260, but replaced the Citibank loan with funds from other leverage

providers through a $575 million deposit into another BLMIS account on March 28, 2008. *See*

*id.* ¶ 257 (Tremont identifying "alternate leverage providers" to Citibank); Original Compl. ¶ 84;

ABN AMRO Compl. ¶¶ 115, 119-20; Ex. D (March 12, 2008 fax from Tremont Partners to

BLMIS simultaneously requesting redemption of $475 million and informing BLMIS of $575

million deposit).[18]  The $301 million payment to Citibank was paid out of the $475 million

withdrawal.  PAC ¶ 260; ABN AMRO Am. Compl. ¶ 57 ($475 million BLMIS redemption was

used to pay Citibank and reinvest in Rye XL); *see also* 546(g) Decision, 505 B.R. at 147

(discussing Tremont Partner's "coordinated scheme to leverage their investments").

     Here, the transfers did "not harm a single [customer]" and in fact increased the amount of

funds available to the BLMIS estate. *Bear, Stearns*, 275 B.R. at 198. Accordingly, the "circular

transfer" is not avoidable. *Intercontinental Metals Corp. v. Erlanger & Co., Inc.*, 902 F.2d 1565

(Table), No. 89-2626, 1990 WL 64805, at *1-2 (4th Cir. May 1, 1990) (upholding decision of the

---

[18]  The Trustee's ABN AMRO Complaint provides a diagram illustrating the transactions described and
the ultimate return of funds to BLMIS.  ABN AMRO Compl. ¶¶ 119-20.  The attached Appendix A
recreates that diagram with the addition of the alleged transfer from Prime Fund to Citibank at issue.

bankruptcy court and affirmance by the district court that "circular transfer" from a now-bankrupt company was not avoidable where the transfer had "no net deleterious effect on the bankruptcy estate"). Because the $475 million transfer to Prime Fund is not avoidable, the Trustee cannot recover the alleged subsequent transfer of $301 million from Prime Fund to Citibank. *See* 11 U.S.C. § 550(a) (Trustee may recover "to the extent a transfer is avoided.").

**POINT III**
**SECTION 550(b) BARS THE TRUSTEE'S CLAIMS**

The Trustee cannot recover subsequent transfers under Section 550(a) of the Bankruptcy Code where the subsequent "transferee . . . takes for value . . . in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). The burden of pleading that a subsequent transferee, such as Citibank in the instant Action, did not take in good faith rests with the Trustee. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 516 B.R. 18, 24 (S.D.N.Y. 2014); *BNPP*, 594 B.R. at 196. To meet this burden, the Trustee must plead specific allegations showing that Citibank actually knew of the BLMIS fraud or was willfully blind to it. *Sec. Inv'r Prot. Corp*, 516 B.R. at 24. To plead willful blindness, the Trustee must allege specific facts demonstrating both that Citibank (i) "subjectively believe[d] that there [was] a high probability" that Madoff was operating a Ponzi scheme and (ii) "t[ook] deliberate actions to avoid learning of" the Ponzi scheme. *BNPP*, 594 B.R. at 197. The Trustee's allegations are plainly insufficient to make this showing. Moreover, even though Citibank bears the burden of showing it took the transfers for value, that burden is satisfied as it is apparent on the face of the complaint that Citibank did so. *See Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*, 548 B.R. 13, 37 (Bankr. S.D.N.Y. 2016).

**A. The Trustee Has Not Pleaded That Citibank Subjectively Believed That There Was A High Probability That Madoff Was Operating A Ponzi Scheme**

*First*, the Trustee alleges that Citibank subjectively believed there was a high probability

19

that BLMIS was a Ponzi scheme because *CGMI* was presented with a number of "red flags"

suggesting that BLMIS's SSC strategy was incapable of producing the returns BLMIS claimed.

In particular, the Trustee alleges that CGMI "identified multiple indicia of fraud," PAC ¶ 107,

including that BLMIS purported to trade a higher volume of index options than the total volume

of S&P, *id.* ¶¶ 112-14, 220, that CGMI could not identify any of the options counterparties, *id.*

¶¶ 117, 165-67, 199-200, and that BLMIS's returns were not correlated with the S&P 100 Index.

*Id.* ¶¶ 139-42, 207.  This laundry list of "red flags" has repeatedly been found insufficient to

allege willful blindness, *Securities Investor Protection Corp.*, 516 B.R. at 21, and simply

"amounts to pleading fraud by hindsight."  *Legacy*, 548 B.R. at 33.  In *BNPP*, this Court found

nearly identical allegations insufficient, specifically rejecting allegations that the defendants

subjectively believed with a high probability that BLMIS was fabricating trades based on the fact

that "BLMIS option volumes were too high," that "returns of BLMIS feeder funds were too

consistent" and that "BLMIS was secretive about identities of counterparties."  *BNPP*, 594 B.R.

at 185, 199.  At most, these allegations amount to the assertion that CGMI "should have known"

that Madoff was operating a Ponzi scheme, but that of course is insufficient to satisfy the

knowledge standard applicable here.  *Katz*, 462 B.R. at 455; *Sec. Inv'r Prot. Corp.*, 516 B.R. at

21 (rejecting "the Trustee's central contention that all these defendants were sophisticated market

participants who . . . failed to act in good faith because they were aware of suspicious

circumstances that should have led them to investigate the possibility of such fraud").

*Second*, the Trustee's allegations related to the indemnity in the Credit Facility fail to

sufficiently plead that Citibank had the requisite subjective belief.  PAC ¶¶ 177, 180-85, 253-59.

The existence of the indemnity from the inception of the Credit Facility hardly supports an

inference that Citibank was willfully blind.  Nor does the fact that Citibank logically identified

the indemnity as a mitigant of the "remote" risk that because BLMIS was both the broker-dealer

and had physical control of the BLMIS account it could *theoretically* take the assets (not, as

mischaracterized by the Trustee, that Madoff was not actually trading securities).  Original

Compl. ¶ 63 ("[R]emote" risk of fraud exists "[b]ecause [Madoff] has full discretion over the

Brokerage Account"); PAC ¶ 177; *id.* ¶ 180 (Capital Markets Approval Committee ("CMAC")

approval of Credit Facility requested because of  "how the assets of the Fund [would] be held").

Madoff's role as sole custodian was yet another well-known so-called red flag.  *See Meridian*

*Horizon Fund LP v. KPMG (Cayman) (In re Tremont Sec. Law, State Law & Ins. Litig.)*, 487 F.

App'x 636, 640-41 (2d Cir. 2012) ("Many of the purported 'red flags' that plaintiffs contend

should have put [defendants] on notice of the Madoff fraud, such as the lack of an independent

third-party custodian, and BLMIS's dual role as both investment manager and administrator,

were . . . disclosed to . . . investors in and auditors of other Madoff feeder funds, and the SEC,

none of whom discovered the Madoff scheme.").  Moreover, the May 2005 Memo shows that in

addition to the indemnity, "the primary mitigant" of this "fraud" risk was Citibank's subjective

belief in Madoff's trustworthiness.  Ex. C (May 2005 Memo) (In addition to indemnity, "primary

mitigant" of fraud is "Investment Advisor's [Madoff's] strong industry reputation with over 40

years experience, over $500 million in capital, its responsibilities and obligations as a registered

broker-dealer, and its historical relationship with Tremont and, more recently, Citigroup.").  A

full reading of the May 2005 Memo, Ex. C, as opposed to the portions the Trustee selectively

quotes or mischaracterizes, *see, e.g.*, PAC ¶¶ 180-84, demonstrates that Citibank identified a

specific and far-flung risk that Citibank thought was adequately mitigated both because of

Madoff's reputation—which would make no sense if Citibank had any suspicion at all that

Madoff was operating a Ponzi scheme—and an indemnity that Citibank would have known was

essentially worthless if it believed with a high probability that Madoff was operating a Ponzi scheme.[19]

The Trustee's argument—that Citibank believed that there was a high probability that BLMIS was a fraud so it obtained an indemnity from an entity whose entire business model depended on BLMIS—is implausible.  PAC ¶ 253; s*ee BNPP*, 594 B.R. at 203-04 (theory that BNPP provided "loans and extensions of credit that ultimately depended on the value of BLMIS accounts" is "preposterous").  Citibank was still putting hundreds of millions of dollars at risk, a fundamentally irrational act if it believed BLMIS to be a fraud.  *BNPP*, 594 B.R. at 203; *Legacy*, 548 B.R. at 32, 34.  The alleged motive for Citibank's illogical behavior is, as in *BNPP*, that Citibank (and CGML) earned fees in connection with these transactions.  *See* PAC ¶ 256 (alleging that in return for a three month renewal of the Credit Facility, "[Tremont] agreed to increase the fees Prime Fund paid to Defendants"); *id.* ¶ 233 (CGML "figured to receive a minimum profit of $8 million" on the Fairfield Deal).  But as was the case in *BNPP*, it is "implausible to suggest that [Citibank] would make loans or engage in the transactions described in the PAC if [it] subjectively believed that there was a high probability that BLMIS was not actually trading securities."  594 B.R. at 204.

Finally, the Trustee's contention that it can be inferred from Citibank allegedly refusing to renew the Credit Facility without the indemnity that Citibank highly suspected Madoff's fraud likewise fails.  PAC ¶ 254.  The Trustee's allegations merely show that Citibank was unwilling to renew the Credit Facility on worse terms than it had originally been entered into (in a worse market), when the identified risk of Madoff's dual custody still remained, Original Compl. ¶ 63, PAC ¶ 180, which does not indicate that Citibank subjectively believed it was highly probable

---

[19]  The Court "may consider other parts of the same document" that the complaint cites or quotes. *Merkin*, 515 B.R. at 137.

that BLMIS was a fraud.  The Credit Facility was renewed twice with the original terms

(including with a $100 million increase) and the Trustee has made no allegations that Citibank

learned of new facts related to Madoff since the last renewal.  PAC ¶¶ 252, 256.  In any event, it

was *Tremont*, not Citibank, that terminated the Credit Facility after Tremont sought (and

received) other funding.  *Id.* ¶ 259; Tremont Compl. ¶ 198.

Taken as a whole, the Trustee's entire theory of the case is implausible.  The "crux of the

Trustee's argument is that [Citibank] engaged in the leverage business while entertaining a belief

that there was a high probability that BLMIS was not actually trading securities," that its

"collateral was therefore fictitious" and the indemnity had no value, in order to earn fees.  *BNPP*,

594 B.R. at 202.  This theory "requires an inference that is highly implausible, bordering on the

absurd."  *Id*. at 203.  Accordingly, the Trustee has failed to meet his burden of pleading that

Citibank believed with a high probability that BLMIS was a Ponzi scheme.

**B.  Citibank Did Not Turn A Blind Eye Towards The Madoff Fraud**

The Trustee has also failed to plead sufficient facts demonstrating that Citibank took

"deliberate actions to avoid learning" that BLMIS was a fraud.  *Legacy*, 548 B.R. at 29.  As this

Court has held, the Trustee cannot meet his burden of pleading that a defendant deliberately

"turned a blind eye" to the Madoff fraud if the defendant took steps to conduct due diligence on

BLMIS or BLMIS feeder funds.  *See id.* at 35.  Just as in *BNPP*, "[t]he Trustee's pleadings are

replete with allegations that [Citibank] performed due diligence when dealing with Madoff,

BLMIS, [or] BLMIS feeder funds."  594 B.R. at 204.  In fact, the Trustee does not allege that

Citibank deviated in any way from its standard due diligence process, but rather pleads that the

transactions went through the internal CMAC approval process, in addition to continuous due

diligence being performed throughout the lifetime of the transactions.  PAC ¶¶ 180, 206, 211,

237-40, 242-245, 251-52.  Accordingly, the Trustee's own allegations demonstrate that Citibank

conducted sufficient due diligence to preclude a finding that Citibank "turned a blind eye."

*BNPP*, 594 B.R. at 205.

*First*, the Trustee devotes much of the Proposed Amended Complaint to pleading

Citibank's consistent due diligence efforts.  As the Trustee repeatedly points out, Citibank's

internal approval committee, CMAC, which was "responsible for ensuring that relevant risks

were identified and understood and could be measured, managed and reported in accordance

with applicable business policies," PAC ¶ 130, reviewed and approved the Credit Facility,

including after reviewing the May 2005 Memo.  *Id.* ¶ 180.  The Proposed Amended Complaint

also pleads that Citibank attended due diligence meetings at Tremont, *id.* ¶ 211, required reports

from KPMG on Prime Fund's activity, *id.* ¶ 206, and repeatedly sought (and ultimately obtained)

a meeting with Madoff.  *Id.* ¶ 251.  These allegations, in addition to the other due diligence

activities that the Trustee pleads, paint a picture of due diligence and internal procedures being

applied to the Madoff-related transactions—the very opposite of willful blindness.  *BNPP*, 594

B.R. at 205 ("affirmative allegations of due diligence" demonstrated defendants did not turn a

blind eye); *cf. Merkin*, 515 B.R. at 141-42 (Merkin declined to apply checklist designed to flag

fund managers for further investigation for fraud to BLMIS).  By the Trustee's own account,

Citibank did everything it was supposed to do—subjecting the Credit Facility to its regular

internal risk assessment processes, appropriately mitigating identified risks and conducting due

diligence—but the Trustee implausibly alleges that this amounts to willful blindness because of

Citibank's decision to have a business relationship with Prime Fund.

*Second*, the Trustee's allegations related to meetings with Madoff are illogical and fail to

show that Citibank turned a blind eye.  It is plainly illogical to suggest, as the Trustee does, that

Nicholls cancelled the April 2006 meeting with Madoff because the meeting might "confirm

[his] suspicions of fraud at BLMIS were true" or "because it could upset or spook Madoff," PAC ¶ 231, but then "expressed renewed interest in meeting with Madoff" a mere few months later. *Id.* ¶ 241. Of course, in his Original Complaint the Trustee conceded that Tremont cancelled the April 2006 meeting upon hearing that the separate Proposed Tremont Deal was unlikely to go through and that Citibank insisted on the November meeting because it was seeking answers to its due diligence questions regarding Madoff that it wanted to address prior to renewing and increasing the Credit Facility (which it did). Original Compl. ¶¶ 76-77; *see Dozier v. Deutsche Bank Tr. Co. Americas*, No. 09 CIV. 9865 (LMM), 2011 WL 4058100, at *2 (S.D.N.Y. Sept. 1, 2011) (court "need not accept as true allegations that conflict with a plaintiff's prior allegations").[20] Regardless, the cancellation of a meeting does not imply turning a blind eye when the meeting actually took place shortly after. Once again, the Trustee is changing his facts to support new theories, but his implausible and inconsistent allegations related to the Madoff meetings only further underscore the weakness of his claims.

The Credit Facility was in fact renewed and increased after this meeting with Madoff, from which the only plausible inference is that the meeting with Madoff raised no red flags. PAC ¶ 252. "If [Citibank's meeting with Madoff] actually confirmed that Madoff was [not actually trading securities], why would [Citibank] remain invested in BLMIS and increase its investment?" *Legacy*, 548 B.R. at 34.[21] The Trustee instead asks that this Court make the implausible inference that that very meeting was an act of turning a blind eye, because Nicholls

---

[20] *See also Vaughn v. Strickland*, No. 12 CIV. 2696 (JPO), 2013 WL 3481413, at *6 (S.D.N.Y. July 11, 2013) (finding proposed allegations to be "directly contradictory to those advanced in [Plaintiff's] original Complaint" and, accordingly, striking "the changed and inconsistent factual allegations as false and sham").

[21] The Trustee's flimsy allegations (pleaded on "information and belief" without identifying any basis for the belief) that the individuals who attended the November 2006 meeting with Madoff had a financial incentive to renew the Credit Facility are plainly insufficient to show that those individuals deliberately avoided confirming their alleged suspicions that Madoff was operating a Ponzi scheme.

set it up as a sham meeting and deliberately decided not to ask the "right" questions at the meeting. *See* PAC ¶ 248. This makes no sense. Moreover, the proposed agenda included far more topics than the few the Trustee selectively quotes—in fact it covered items such as Madoff's "investment process," BLMIS's "investment portfolio controls and monitoring," and even which "employees [were] authorized to sign off on trades." Ex. B (Due Diligence Agenda). Nevertheless, even if Citibank did not ask the "right" questions at the meeting, such an allegation is insufficient to show that it intentionally turned a blind eye to its suspicions. *See, e.g.*, *BNPP*, 594 B.R. at 205 (allegations of deviations from typical due diligence practices "do not undercut the affirmative allegations of due diligence"); *Legacy*, 548 B.R. at 35 (allegations of due diligence show Legacy did not turn a blind eye to its suspicions); *cf. Merkin*, 515 B.R. at 141 (Merkin did not question Madoff, "stating, 'I don't really care, because I've made my peace with Bernie.'"). Accordingly, the Trustee's allegations fail to plausibly plead that Citibank took deliberate actions to avoid learning that Madoff was operating a Ponzi scheme.

### C. The Trustee's Other Attempts To Impute Knowledge To Citibank Fail

The Court should reject the Trustee's apparent strategy of characterizing all Citi individuals with any touchpoint to Madoff, no matter how remote, as working for CGMI. *See Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112, 129 (S.D.N.Y. 2017) ("A party [] cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version.") (alteration in original), *aff'd*, No. 17-2783-CV, 2019 WL 80773 (2d Cir. Jan. 3, 2019).[22]

*First*, the Trustee has failed to show that an agency relationship exists between CGMI

---

[22] *See also Jean-Laurent v. Lawrence*, No. 12 CIV. 1502 (JPO) (SN), 2013 WL 1129813, at *7 (S.D.N.Y. Mar. 19, 2013) (court "well within its discretion to strike 'the changed and inconsistent factual allegations as false and sham'") (quoting *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1326 (9th Cir. 1998)).

and Citibank because he has not alleged any facts indicating that Citibank manifested "intent to grant authority" to CGMI and that CGMI agreed to take on that authority. *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 435 (S.D.N.Y. 2010). This is not surprising, as the Trustee also alleges that Citicorp acted as agent for Citibank, N.A. in connection with the Credit Facility. PAC ¶ 39. Notably, the Original Complaint claimed that Nicholls, who is alleged to have led negotiations on the Credit Facility, was an employee of Citicorp. Original Compl. ¶ 73. *Citicorp* and not CGMI acted as agent for Citibank, N.A. in connection with the Credit Facility, despite the Trustee's attempt to fictionalize CGMI's role in the Credit Facility.[23]

*Second*, even if an agency relationship did exist between CGMI and Citibank, only the purported knowledge of the individuals who are alleged to have worked on the transaction at issue (the Credit Facility) could be imputed to Citibank because only that transaction was within the scope of their alleged agency. *See In re WRT Energy Sec. Litig.*, No. 96 CIV. 3610 (JFK), 1999 WL 178749, at *11 (S.D.N.Y. Mar. 31, 1999) ("[A]n employee's knowledge may be imputed to a corporation only if such knowledge . . . relates to a matter to which the employee's authority extends."); *see also* 14A N.Y. Jur. 2d Business Relationships § 682 (2d ed. 2019) ("[A] corporation is not chargeable with knowledge of all that its agents know, but only with what knowledge they have or what comes to them while acting for the corporation within the scope of their agency, where it is their duty to report their knowledge to the general officers or agents of the company and it may be presumed that they have told the principal what they know."); *Midfirst Bank, SSB v. C.W. Haynes & Co.*, 893 F. Supp. 1304, 1316 (D.S.C. 1994) ("The fact that an employee in one department of a bank has knowledge of the facts does not cause that

---

[23] In fact, the Trustee is well aware from the documents in his possession that Citicorp, not CGMI, signed the Credit Facility transaction documents as agent, contrary to the Trustee's allegations. Ex. A (June 15, 2005 Credit Facility); *cf.* PAC ¶ 57.

knowledge to be imputed to another department where there was no evidence that there was a

pattern or duty of communicating between the different departments."), *aff'd*, 87 F.3d 1304 (4th

Cir. 1996). Indeed, the Trustee's implication that CGMI (which was not actually Citibank's

agent in connection with the Credit Facility) uncovered certain red flags as part of their due

diligence on these unrelated transactions (the Fairfield Deal and the Proposed Tremont Deal) and

shared that information with Citibank simply amounts to "pleading by innuendo," which is

wholly insufficient to establish *Citibank's* subjective belief that there was a high probability that

Madoff was not actually trading securities. *BNPP*, 594 B.R. at 201. The Proposed Amended

Complaint does not allege that the "affiliates communicated these concerns to [Citibank]," *id.*, or

that from any such communication Citibank formed the requisite subjective belief. Nor does the

Proposed Amended Complaint "allege that [Citibank was] privy to the diligence performed . . .

or the red flags [the affiliates] identified." *Id*.

Accordingly, the Trustee's allegations as to the purported knowledge of CGMI

employees who worked on the Fairfield Deal and not the Credit Facility are wholly irrelevant

and cannot be imputed to Citibank. The Trustee fails to allege that Mathur—who worked on the

separate swap agreement with Fairfield—"actually communicated" to Nicholls or anyone

involved in the Credit Facility any information derived from the Fairfield Deal, *Midfirst Bank*,

893 F. Supp. at 1316, and in fact, Mathur's testimony on which the Trustee relies directly

contradicts this proposition. Ex. E 159:22-160:21 (Mathur Dep.). Though the Trustee makes

much of CGMI's decision not to go through with the Proposed Tremont Deal and not "increase

further Citi's sheer exposure to Madoff," PAC ¶ 226,[24] this says nothing about Citibank's

separate decision shortly thereafter to renew and increase the funding in the Credit Facility after

---

[24] In fact, per the Original Complaint, CGML entered into a new, revised swap in 2007 in connection with
the Fairfield Deal, after the Proposed Tremont Deal. Original Compl. ¶ 113.

Citibank went through its own due diligence processes, including meeting with Madoff. PAC

¶¶ 236-46, 251. Despite the Trustee's artful pleading, the majority of his allegations involve

only CGMI's purported knowledge and do not pertain to Citibank or the transfers at issue in this

Action, and in any event are insufficient to demonstrate willful blindness.

The Trustee otherwise tries to replay in the context of the Fairfield Deal and the Proposed

Tremont Deal the "remote" risk that Citibank identified as being mitigated by the indemnity. *Id.*

¶ 118 (Fairfield Deal concerns were "primarily credit concerns as opposed to performance risk

concerns. i.e. *could the money disappear from the account in any one day*"); *id.* ¶ 120 (CGMI

allegedly communicated the "*theoretical* fraud risk given that Madoff is the custodian of the

assets" to Fairfield) (emphasis added); *id.* ¶ 190 (CGMI allegedly concerned about "BLMIS's

lack of an independent custodian" in connection with Proposed Tremont Deal) *id.* ¶ 226 (CGMI

allegedly refused to participate in the Proposed Tremont Deal in part because "custody of the

trading account is with Madoff and not with a 3rd party"); see also *id*. ¶ 154. This, of course, is

the same concern about Madoff being custodian of the assets, discussed *supra*, which does not

amount to a showing that CGMI subjectively believed with a high probability that BLMIS was a

Ponzi scheme.

While the Trustee makes much of the allegations that CGMI did not know the identities

of the counterparties to the BLMIS option trades and requested this information from Fairfield

throughout the term of the Fairfield Deal, *id.* ¶¶ 117, 134, 199, 203, 204—an entirely separate

transaction from the Credit Facility—these allegations merely show that CGMI continued to seek

information related to BLMIS, not that CGMI subjectively believed that there was a high

probability that Madoff was running a Ponzi scheme. CGMI's lack of knowledge of BLMIS's

counterparties does not support an inference that CGMI subjectively believed that there was a

high probability that BLMIS was a Ponzi scheme and is merely another attempt to "plead [] in

hindsight." *BNPP*, 594 B.R. at 198, 199, 185 (rejecting "'red flag' allegations" that "BLMIS

option volumes were too high" and "BLMIS was secretive about identities of counterparties" as

insufficient to show requisite subjective belief).  It is highly implausible that CGMI would have

consummated the Fairfield Deal and risked losing hundreds of millions of dollars for fees if the

lack of identification of option counterparties had caused CGMI to highly suspect that Madoff

was operating a Ponzi scheme.  *Id.* at 202 (finding it implausible that "BNP Bank made billions

of dollars of risky and possibly uncollectible loans to those investing with BLMIS or BLMIS

feeder funds in order to make tens of millions of dollars in fees").  Rather, the allegations amount

to a showing that CGMI was interested in knowing who the counterparties were but made a

legitimate business decision that it was willing to accept Madoff's secretiveness, not an

uncommon phenomenon in the secretive hedge fund industry.  *See Goldstein v. S.E.C.*, 451 F.3d

873, 875 (D.C. Cir. 2006) ("[H]edge funds typically remain secretive about their positions and

strategies, even to their own investors.").[25]

Likewise, the Trustee's allegations related to the alleged "quantitative analysis" of

Fairfield returns performed by CGMI in connection with the Fairfield Deal are without merit.

Though the Trustee conclusorily alleges that the analysis showed that Madoff could not have

obtained his purported returns using the SSC strategy, the analysis did no more than show that

Madoff out-performed the S&P 100 Index.  PAC ¶¶ 136-54.  This fact was well known (and

indeed was the most attractive feature of a BLMIS investment), and it is not plausible to infer

that CGMI suspected that BLMIS was not actually trading securities based on its profitable

---

[25]  Mathur also testified that the inability to identify the options counterparties was not a "show-stopper"
for the Fairfield Deal because it was no surprise that a hedge fund like Madoff would be unwilling to
share this information.  Ex. E 112:3-9 (Mathur Dep.); *see also id.* 74:20-79:12.

returns. *Legacy*, 548 B.R. at 29 (rejecting the theory that defendants knew BLMIS's returns

were impossible because they outperformed the S&P 100 Index); *cf. BNPP*, 594 B.R. at 198

("The Court has previously rejected the Trustee's attempt to plead, in hindsight, a defendant's

subjective knowledge by showing trading impossibilities in BLMIS account statements."). The

Trustee does not allege that CGMI actually tried to replicate Madoff's strategy,[26] and the red

flags CGMI is alleged to have uncovered do not rise to the level this Court has found to

constitute the requisite subjective belief. *See, e.g.*, *Legacy*, 548 B.R. at 33 ("[M]any red flags are

no more than pale pink."); *see also Merkin*, 563 B.R. at 749.

Regardless, the Trustee cannot show that CGMI turned a blind eye because he repeatedly

pleads that CGMI conducted due diligence in connection with the Fairfield Deal and the

Proposed Tremont Deal, including preparing the March 10, 2005 Memo and the March 30, 2005

Memo, PAC ¶¶ 111-12, 131-33, attending due diligence meetings at Fairfield, *id.* ¶ 211,

requesting BLMIS auditor reports, *id.* ¶ 196, reaching out to PwC with questions, *id.* ¶ 215,

requesting the identity of the options counterparties and reviewing trade confirmations, *id.*

¶¶ 107, 202, and repeatedly seeking a meeting with Madoff. *Id.* ¶ 251. In fact, the Trustee

pleads that CGMI made a meeting with Madoff a "prerequisite" to any new deals involving

Tremont. *Id.* ¶ 217. These due diligence exercises and requests cannot support a showing that

CGMI deliberately avoided learning BLMIS was a fraud. *Legacy*, 548 B.R. at 35.

Finally, the Trustee's reliance on an alleged conversation between Gross and Markopolos

is irrelevant and misleading. The Trustee does not—and cannot—allege that Gross was in any

way involved in either the Credit Facility or the Fairfield Deal or that Gross ever communicated

---

[26]  The Trustee previously alleged that "Citi never conducted any independent quantitative analysis of
Madoff's claimed returns, never performed any back-testing of the SSC Strategy, and never performed
any other meaningful analysis of Madoff's trading results." Original Compl. ¶ 112. Moreover, Mathur
testified that he did not conduct any "back-testing." Ex. E 57:4-20 (Mathur Dep.).

his own alleged skepticism or Markopolos's alleged warning to anyone involved in either transaction.  PAC ¶ 167.  Moreover, the deposition testimony of Gross, on which the Trustee relies, refutes any innuendo that Gross knew of any Citi-related transactions with Madoff.  Ex. F 60:19-63:7, 116:23-118:7, 121:5-123:25 (Gross Dep.).  Thus, the Trustee cannot impute Gross' alleged knowledge to individuals at CGMI or Citibank who in fact worked on these transactions.  *See In re WRT Energy Sec. Litig.*, 1999 WL 178749, at \*11.  Furthermore, the Trustee's allegations are plainly insufficient to show that Gross subjectively believed BLMIS to be a fraud.  The Trustee's allegations that Gross "conducted his own analysis of BLMIS's SSC strategy" and "concluded that 'either the returns are not the returns or the strategy is not the strategy' or there was something else going on," PAC ¶ 155,[27] without more, are not enough to suggest that Gross subjectively believed there was a high probability that no securities were being traded.  *BNPP*, 594 B.R. at 198 ("[T]he red flag theory of *scienter* has been rejected in Madoff-related securities fraud litigation by numerous courts in the Second Circuit.") (internal quotations and citation omitted).[28]  In fact, Gross testified that he thought "if someone were to pick stocks very well and short the S&P against it," it would be possible to get "a return series that looked like [Madoff's]," but that in that case he would have expected to see a description of how the stocks were picked on the website.  Ex. F 50:19-51:12 (Gross Dep.).  Accordingly, the allegations related to Gross are without merit and cannot be imputed to Citibank.

---

[27]  The Trustee's deposition of Gross, on which the Trustee purports to rely for these allegations, plainly shows that Gross never came to the conclusion that BLMIS was a Ponzi scheme.  Ex. F 36:3-48:14, 54:22-24 (Gross Dep.) (Gross was "skeptical that that strategy *as described* could generate those returns" but hypothesized that "the returns [may be] coming from the market making activities") (emphasis added).

[28] The Trustee also alleges that during the conversation with Markopolos, Gross inquired to his group about any Citi activity with Madoff, and was told they were aware of none.  PAC ¶ 165.  These allegations defeat any claim that Gross "turned a blind eye."  *BNPP*, 594 B.R. at 204.

### D.  Citibank Gave Value For All The Transfers It Allegedly Received

Under Section 550(b), the "value" that a subsequent transferee must provide is "merely

consideration sufficient to support a simple contract, analogous to the 'value' required under

state law to achieve the status of a bona fide purchaser for value." *Legacy*, 548 B.R. at 37;

*BNPP*, 594 B.R. at 206; 11 U.S.C. § 550(b)(1) (value "include[s] satisfaction or securing of a

present or antecedent debt").  Because it is evident from the Trustee's allegations that the alleged

transfers from Prime Fund to Citibank were in satisfaction of a debt and sufficient consideration

to support the contract between Citibank and Prime Fund, this Court may properly find that

Citibank took the transfers for value.  *BNPP*, 594 B.R. at 206 ("Even where the pleading burden

rests with the defendant, the Court may dismiss for failure to state a claim when the defense is

apparent on the face of the complaint.").

The Trustee has pleaded facts showing Citibank gave value for the transfers it allegedly

received.  The Trustee has alleged that under the loan contract, "[Citibank] provided Prime Fund

with a $300 million line of credit . . . and, in return, Prime Fund paid [Citibank] fees and

interest."  PAC ¶ 176.  Prime Fund transferred $301 million to Citibank as repayment of the loan

Citibank made to Prime Fund, along with interest and fees associated with that loan.  *Id.* ¶¶ 3,

260.  A payment received by a transferee to repay a loan (including the payment of interest and

fees under the loan contract) previously extended to the transferor satisfies the "value" prong of

the good faith and value test.  *See Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l

Corp.)*, 403 F.3d 43, 53-54 (2d Cir. 2005) (repayment of loan constitutes "fair consideration"

under the New York Debtor Creditor Law); *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d

890, 891, 897 (7th Cir. 1988) (receipt of $200,000 loan repayment by subsequent transferee bank

constitutes value); *Lustig v. Weisz & Assocs., Inc. (In re Unified Commercial Capital, Inc.)*, 260

B.R. 343 (Bankr. W.D.N.Y. 2001), *aff'd*, Nos. 01–MBK–6004L, 01–MBK–6005L, 2002 WL

32500567 (W.D.N.Y. June 21, 2002).  Accordingly, Section 550(b) bars the Trustee's claims.

**POINT IV**
**SECTION 546(e) BARS ALL CLAIMS**
**OTHER THAN THOSE UNDER SECTION 548(a)(1)(A)**

11 U.S.C. § 546(e) provides a safe harbor for the avoidance of initial transfers.  *BNPP*,

594 B.R. at 197; *Picard v. Ida Fishman Revocable Tr. (In re Bernard L. Madoff Inv. Sec. LLC)*,

773 F.3d 411, 418-19, 422-23 (2d Cir 2014), *cert denied*, 135 S.Ct. 2858 (2015) *and* 135 S.Ct.

2859 (2015).  Citibank may raise a Section 546(e) defense against the avoidability of the

transfers from BLMIS to Prime Fund, notwithstanding any settlement between the Trustee and

Prime Fund.  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*

(*Cohmad*), No. 12 MC 115(JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013).  Because

the Trustee does not plead that Tremont or Citibank[29] had "actual knowledge" of Madoff's Ponzi

scheme, *Legacy*, 548 B.R. at 28, the existence of the Section 546(e) safe harbor means:  (i) the

Trustee has already fully recovered any transfers subject to avoidance, *i.e.*, the transfers from

BLMIS to the Rye Funds during the two year period, *see supra*, and (ii) he is barred from

recovering $19,972,148 in transfers from Citibank, which are alleged to have been transferred

from Prime Fund to Citibank more than two years before the Filing Date.[30]

*First*, the Trustee's "red flag" allegations fall far short of the standard required to plead

---

[29] The Trustee fails to plead that Citibank was willfully blind to (discussed *supra*), let alone had actual knowledge of, Madoff's Ponzi scheme.  *See, e.g.*, *Cohmad*, 2013 WL 1609154, at *4 n.2 (stating willful blindness is not a substitute for actual knowledge in the context of Madoff's Ponzi scheme).

[30] Section 546(e) protects transfers "made by or to (or for the benefit of)" a "financial institution."  *See* 11 U.S.C. § 546(e); 11 U.S.C. § 101(22)(A) (defining a "financial institution" as "a Federal reserve bank, or an entity that is a commercial or savings bank").  The Proposed Amended Complaint expressly alleges that "Citibank is a commercial bank" for whose benefit the initial transfers were made.  PAC ¶¶ 29, 260. Because the credit facility qualifies as a "securities contract" within the broad meaning ascribed to that term, the initial transfers made for the benefit of Citibank to make payments in connection with the credit facility were "in connection with" a securities contract and accordingly are also protected by the Section 546(e) safe harbor.  The fact of the existence of the credit facility is not in dispute and so the knowledge of the transferees of Madoff's fraud is irrelevant.  *Accord* 546(g) Decision, 505 B.R. at 142 n.6.

actual knowledge of Madoff's fraud.  As the District Court held in dismissing fraud claims

alleged against the Tremont entities, "[d]espite the complaint's extensive and detailed allegations

regarding all the red flags that Tremont allegedly saw, [n]owhere does the complaint specifically

and plausibly allege that Tremont actually knew that Madoff's operation was a fraud." *Elendow*

*Fund, LLC v. Rye Select Broad Market XL Fund (In re Tremont Sec. Law, State Law, & Ins.*

*Litig.)* (*Elendow Fund*), No. 10 Civ. 9061, 2013 WL 5179064, at *5 (S.D.N.Y. Sept. 16, 2013),

*aff'd sub nom. Elendow Fund, LLC v. Rye Inv. Mgmt.*, 588 F. App'x 27 (2d Cir. 2014);  *see also*

*Legacy*, 548 B.R. at 35 ("Rule 9(b) of the Federal Rules of Civil Procedure governs the portion

of a claim to avoid an initial intentional fraudulent transfer.").[31]  These allegations, including the

consistency of Madoff's returns, the impossibility of Madoff's trading volumes and transaction

pricing, his unknown auditor and other related concerns implicating Madoff's lack of

transparency and the risks associated with the structure of BLMIS, *see* Tremont Compl. ¶¶ 158-

222; PAC ¶ 235, amount to "pleading . . . by hindsight" and are insufficient to show actual

knowledge.  *Legacy*, 548 B.R. at 33.  These allegations are a far cry from those in *Cohmad*,

where Cohmad Securities kept a database of customer accounts that showed the value of those

accounts "*without considering the fictitious profits*" and a Cohmad executive "directed Madoff to

'execute' backdated trades in order to provide [the executive] with 'fictitious gains and losses.'"

*Cohmad*, 2013 WL 1609154, at *6 (emphasis added).  Allegations that Tremont "would have or

should have" identified red flags likewise fail.  *See Merkin*, 515 B.R. at 144; *see also, e.g.*,

Tremont Compl. ¶¶ 15, 155, 160, 164-66, 174, 180, 218, 222, 254; PAC ¶ 284.  Although the

Trustee has supplemented his insufficient red flag allegations in the Tremont Complaint with

---

[31] Although *Elendow Fund*, 2013 WL 5179064, was in the context of federal securities litigation, the standard of proof that the Trustee must meet to allege actual knowledge in this Action is "no less rigorous."  *See Legacy*, 548 B.R. at 34.

additional allegations in the PAC suggesting Tremont was aware of certain differences between the prices from BLMIS and the prices reported by Bloomberg, such allegations are similarly insufficient. *See* PAC ¶ 282; *Legacy*, 548 B.R. at 33-34 (explaining that even if defendant undertook a comparison between information from BLMIS and market information, "many red flags are no more than pale pink especially when they crop up infrequently over a long period").

*Second*, while the Trustee makes much of the fact that Tremont supposedly "received warnings of BLMIS's fraudulent operations" from third parties, such allegations amount to nothing more than "pleading by innuendo." PAC ¶¶ 267-78, 300-18; *BNPP*, 594 B.R. at 201; PAC ¶¶ 267-78, 300-18; Tremont Compl. ¶¶ 236-50. The Trustee fails to allege that Tremont shared the concerns of these third parties and instead has alleged that Tremont interpreted these concerns as "misconceptions." Tremont Compl. ¶ 194; *see also Elendow Fund*, 2013 WL 5179064, at *5 (allegations Tremont viewed concerns as "misconceptions" do not show Tremont actually knew of Madoff's fraud but instead "strongly support the opposite inference"). Moreover, "even if these concerns raised a suspicion that Madoff might be engaged in fraudulent activities, they did not imply" that Tremont believed Madoff was not actually trading securities. *BNPP*, 594 B.R. at 202. Instead, when "peppered . . . with numerous questions regarding . . . anomalies" as well as questions regarding "whether BLMIS was a fraud and whether it could be a Ponzi scheme," Tremont pointed to facts that supported its understanding that this concern was a misconception. *See* PAC ¶¶ 273-74. Tremont's disagreement with the concerns of third parties regarding the legitimacy of BLMIS stands in stark contrast to the Trustee's otherwise insufficient allegations to show actual knowledge in *Merkin*, where Merkin allegedly conceded that Madoff appeared to be running a Ponzi scheme and warned investors against investing with BLMIS for the long term. *See Merkin*, 515 B.R. at 140-41. Therefore, the Trustee's

36

significantly weaker allegations as to Tremont must also fail.[32]

Third, the Trustee's allegations that Tremont shielded Madoff from third parties and limited who could correspond with Madoff and the types of information those individuals were allowed to solicit merely reflects Tremont's understanding, along with the rest of the world, that Madoff exercised an "unprecedented level[] of secrecy." See Tremont Compl. ¶¶ 89, 90, 191, 216; PAC ¶¶ 287, 300, 302; cf. Cohmad, 2013 WL 1609154, at *5 (finding Cohmad had actual knowledge where it "shared office space, a computer network, and utilities with Madoff Securities" and "had access to Madoff Securities' seventeenth floor office, where the fraudulent investment advisory business was located"). Moreover, the Trustee's allegations are inconsistent with allegations pleaded elsewhere in the Proposed Amended Complaint in relation to the actual transfers at issue, where it is clear that rather than deflecting investor inquiries and shielding Madoff from third parties, Tremont helped arrange two meetings between Citi entities and Madoff and actively participated in Citi's diligence. PAC ¶¶ 219, 221-22, 243-44, 249. Tremont hardly would have arranged multiple due diligence meetings between Citi and Madoff if it actually knew Madoff was not trading securities. See BNPP, 594 at 197; Legacy, 548 B.R. at 33. The Trustee's allegations of Tremont's due diligence on Madoff and its efforts to facilitate meetings between Madoff and investors differ significantly from those alleged in the Trustee's Kingate action, where the Kingate feeder funds allegedly failed to conduct due diligence on Madoff and "deflected inquiries directed at Madoff, intimidated, attacked and threatened analysts

---

[32] In Merkin, the difficulty of meeting this high burden in the context of Madoff's fraud was made apparent. See Merkin, 515 B.R. at 140-41. Merkin was alleged to have "openly admitted that Madoff appeared to be operating a Ponzi scheme," conveyed that "Madoff's scheme was bigger than Ponzi," admitted "that he was unable to adequately investigate BLMIS' legitimacy" and possessed a folder of documents "noting the lack of correlation between the performances of BLMIS' investments and the S & P 500." Id. Yet even these allegations "fail[ed] to plausibly allege that Merkin had actual knowledge of Madoff's Ponzi scheme." Id. at 141.

who raised questions about Madoff." *Legacy*, 548 B.R. at 35; *see Picard v. Ceretti (In re Bernard L. Madoff Inv. Sec. LLC)* (*Kingate*), No. 08-99000 (SMB), 2015 WL 4734749, at *14 (Bankr. S.D.N.Y. Aug. 11, 2015). The Trustee's attempt to impute the knowledge of the foreign Kingate fund to the unrelated Tremont funds through a tenuous link to a separate Bermuda entity, Tremont (Bermuda) Ltd. ("Tremont Bermuda"), PAC ¶¶ 324-28, is also without merit. The Trustee only pleads nominal allegations related to Tremont Bermuda in *Kingate* (none sufficient to show that Tremont Bermuda actually knew that Madoff was a Ponzi Scheme), and Tremont Bermuda is not alleged to have any connection to Prime Fund or the transfers at issue in this Action. *See* Fourth Am. Compl. ¶¶ 94, 95, 106, 107, 111, 113, *Kingate*, Adv. Pro. No. 09-1161 (SMB) (Bankr. S.D.N.Y. Mar. 17, 2014), ECF No. 100 (allegations related to Tremont).[33]

*Fourth*, the Trustee's attempt to show the insufficiency of Tremont's due diligence on Madoff misses the mark. "[I]f Tremont believed that Madoff was a fraud, it would not have bothered to conduct due diligence." *Legacy*, 548 B.R. at 33 (citing approvingly the District Court's conclusion in *Elendow Fund* that Tremont's due diligence on Madoff supported the implausibility of allegations that Tremont believed Madoff was a fraud). The Trustee describes specific due diligence efforts undertaken by Tremont in order to gain a better understanding of BLMIS, a fund otherwise shrouded in secrecy. *See* Tremont Compl. ¶¶ 223, 228. Though the Trustee pleads that Tremont's due diligence "noted a number of issues and concerns" that Madoff's investment advisory business was not necessarily observing best industry practices, *id.* ¶¶ 229-30, these allegations do not undercut the affirmative allegations of diligence. *BNPP*, 594

---

[33] Nor is the relationship alleged between Madoff and Tremont executives Sandra Manzke or Robert Schulman comparable to the close relationships with Madoff alleged in *Cohmad, Merkin* and *Kingate*. *Compare Cohmad*, 2013 WL 1609154, at *4 (describing access to Madoff), *Merkin*, 515 B.R. at 128 (describing close personal relationship) and *Kingate*, 2015 WL 4734749, at *3 (describing Kingate founders as part of "Madoff's inner circle"); *with* Tremont Compl. ¶¶ 58-59, 85, 88-89 (describing Tremont executives' business relationship with Madoff).

B.R. at 205.  In any event, these allegations are belied by other allegations that Tremont was

assured "that Madoff [was] not falsifying any activity" due to "Tremont's longstanding

relationship with Madoff," Madoff's lack of significant regulatory issues from its inception in

1960 and Tremont's belief that "the NASD is regularly verifying that the trades that Madoff is

placing on Tremont's behalf are valid."  Tremont Compl. ¶ 231.  It is simply impossible to

reconcile Tremont's actions with the allegation that Tremont actually knew Madoff was running

a Ponzi scheme, as it would then be rather "peculiar" for Tremont "to continue discussing ways

of gaining greater transparency into Madoff's operations and to continue sending Madoff due-

diligence questionnaires."  *Elendow Fund*, 2013 WL 5179064, at *5; *see Legacy*, 548 B.R. at 34;

PAC ¶¶ 219, 221-22, 243-44, 249, 308; Tremont Compl. ¶¶ 223, 228.  Instead, the Trustee's

allegations as to Tremont "present[] a picture . . . of a firm continually striving to better

understand Madoff's business, despite Madoff's obstructions."  *Elendow Fund*, 2013 WL

5179064, at *5.  The only plausible conclusion, then, is that Tremont did not actually know that

Madoff was running a Ponzi scheme.

Finally, it is implausible that Tremont, which owed fiduciary duties to its investors,

would knowingly "entrust its own investors' money with someone it knew was not trading

securities."  *Legacy*, 548 B.R. at 34.  Moreover, it is implausible and "bordering on the absurd"

that Tremont would continue to invest money in what it knew was a Ponzi scheme (including by

replacing the $475 million transfer to Prime Fund at issue in this Action with another $575

million investment in BLMIS in March 2008), given that it is "common knowledge (undoubtedly

more common among sophisticated financial professionals) that a Ponzi scheme will inevitably

collapse."  *Id.* at 32.  Tremont's continued investments with Madoff subsequent to its due

diligence efforts further support the inference that, "like mostly everyone else," Tremont simply

39

"missed" discovering Madoff's Ponzi scheme.  *Id.* at 34.

Because "the more compelling inference is that Tremont recognized that an investment with Madoff presented a combination of risks and benefits and genuinely chose to continue its relationship with Madoff," the Trustee has failed to sufficiently plead that Tremont had actual knowledge that BLMIS was a Ponzi scheme.  *Elendow Fund*, 2013 WL 5179064, at * 6; *see also Legacy*, 548 B.R. at 46 (actual knowledge allegations must "give rise to a 'strong' inference that is 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'") (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that the Court deny the Trustee's Motion and dismiss the Action with prejudice.

Dated: March 12, 2019
      New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: /s/ Carmine D. Boccuzzi, Jr.
      Carmine D. Boccuzzi, Jr.
      (cboccuzzi@cgsh.com)
      Pascale Bibi
      (pbibi@cgsh.com)
      One Liberty Plaza
      New York, New York  10006
      T: 212-225-2000
      F: 212-225-3999

*Attorneys for Citibank, N.A. and Citicorp North America, Inc.*

**Appendix A**

**Diagram Illustrating Circular Flow of Funds In and Out of BLMIS**

    This diagram shows that there was no depletion of the BLMIS estate in connection with the $475 million withdrawal in March 2008, because as illustrated below, that money (and more) was returned to BLMIS. Tremont used a portion of the withdrawal to repay Citibank and also simultaneously received replacement funding for its BLMIS investments and thereby returned the withdrawn funds to BLMIS.





**KEY**

The text in black is directly from the Trustee's ABN AMRO complaint. Compl. ¶¶ 119-20, *Picard v. ABN AMRO Bank (Ireland) Ltd. (In re Madoff)*, Adv. Pro. No. 10-05355 (SMB) (Bankr. S.D.N.Y. Dec. 8, 2010), ECF No. 1-1.

The text in blue is based on the Trustee's allegations in the PAC and his ABN AMRO pleadings. PAC ¶ 260; Am. Compl., *Picard v. ABN AMRO Bank (Ireland) Ltd. (In re Madoff)*, Adv. Pro. No. 10-05355 (SMB) (Bankr. S.D.N.Y. June 18, 2012), ECF No. 42.