**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Plaintiff Irving H. Picard, Trustee for*
*the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                         Plaintiff,<br><br>        v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                      Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                      Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff,<br><br>                      Plaintiff,<br><br>        v.<br><br>SQUARE ONE FUND LTD.,<br><br>                      Defendant. | Adv. Pro. No. 10-04330 (SMB) |

**TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS .....................................................................................2

I.    Square One..................................................................................................2

II.    Estenne Is a Sophisticated Investment Professional and Self-Proclaimed Expert at Detecting Investment Fraud ..................................................3

III.    The Estenne Study: Estenne Began to Suspect BLMIS Was Not Trading Securities..................................................................................4

IV.    Estenne Abandoned His Investment Principles Only with Respect to BLMIS .........................................................................7

V.    The Diligence Officer Confronted Estenne with Concerns that BLMIS's Returns Were Not Possible ..................................................7

VI.    Estenne Eliminated His Personal Exposure to BLMIS........................8

VII.    Estenne Prevented Others from Analyzing Square One's BLMIS Investment...........................................................................9

LEGAL STANDARDS ...........................................................................10

I.    General Standards on a Motion to Dismiss.........................................10

II.    Actual Knowledge and Lack of Good Faith .....................................11

III.    Square One Misstates the Willful Blindness Standard ......................12

ARGUMENT ...........................................................................15

I.    Estenne Stood Sentry for Square One and Promised to Keep a Sharp Lookout for Fraud................................................................15

II.    The Trustee Sufficiently Alleges Estenne Knew about BLMIS's Fraud.....17

    A.    Section 546(e) Does Not Protect the Transfers at Issue Here...........17

    B.    Square One's Arguments to the Contrary Are Unavailing ..................20

III.    The Trustee Has Met and Exceeded the Willful Blindness Standard................23

    A.    The Trustee Sufficiently Pleaded that Estenne Believed BLMIS Was a Fraud ...........................................................23

i

B.      Estenne Deliberately Avoided Confirming His Suspicions about
BLMIS ...............................................................................................................26

IV.    This Court Should Not Dismiss the Trustee's Requested Remedies ................................29

CONCLUSION..............................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ................................................................................11

*Anwar v. Fairfield Greenwich Ltd.*,
   728 F. Supp. 2d 372 (S.D.N.Y. 2010) ................................................................11

*Apollo Fuel Oil v. United States*,
   195 F.3d 74 (2d Cir. 1999) ................................................................................15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................10

*In re Beacon Assocs. Litig.*,
   745 F. Supp. 2d 386 (S.D.N.Y. 2010) ................................................................25

*Burkina Wear, Inc. v. Campagnolo, S.R.L.*,
   No. 07 Civ. 3610, 2008 WL 1007634 (S.D.N.Y. Apr. 9, 2008) ............................29

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ................................................................................29

*DeLollis v. Friedberg, Smith & Co., P.C.*,
   600 F. App'x 792 (2d Cir. 2015) ........................................................................17

*Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured
Prods., Inc.*,
   958 F. Supp. 2d 488 (S.D.N.Y. 2013) ................................................................30

*Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011) ..........................................................10, 14

*Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP)*,
   462 B.R. 474 (Bankr. S.D.N.Y. 2011) ................................................................14

*Huddleston v. United States*,
   485 U.S. 681 (1988) ................................................................................17

*In re J.P. Jeanneret Assoc., Inc.*,
   769 F. Supp. 2d 340 (S.D.N.Y. 2011) ................................................................11

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ................................................................................22

*Picard v. Avellino (In re BLMIS)*,
   557 B.R. 89 (Bankr. S.D.N.Y. 2016) ....................................................................29

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
   594 B.R. 167 (Bankr. S.D.N.Y. 2018) ...........................................................21, 22

*Picard v. Ceretti (In re BLMIS)*,
   Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749 (Bankr. S.D.N.Y. Aug.
   11, 2015) ...........................................................................................18, 19, 20, 22

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
   454 B.R. 317 (Bankr. S.D.N.Y. 2011) ..................................................................10

*Picard v. Greiff (In re Madoff Sec.)*,
   476 B.R. 715 (S.D.N.Y. 2012) ...............................................................................12

*Picard v. Katz*,
   462 B.R. 447 (S.D.N.Y. 2011) ...............................................................................13

*Picard v. Legacy Capital Ltd. (In re BLMIS)*,
   548 B.R. 13 (Bankr. S.D.N.Y. 2016) ...............................................13, 18, 26, 28

*Picard v. Merkin (In re BLMIS)*,
   563 B.R. 737 (Bankr. S.D.N.Y. 2017) ...........................................................24, 25

*Picard v. Merkin (In re BLMIS)*,
   440 B.R. 243 (Bankr. S.D.N.Y. 2010) ..................................................................10

*Picard v. Merkin (In re BLMIS)*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ........................................................... *passim*

*Sec. & Exch. Comm'n v. Cavanagh*,
   445 F.3d 105 (2d Cir. 2006) ...................................................................................30

*SIPC v. BLMIS (In re Madoff Sec.)*,
   516 B.R. 18 (S.D.N.Y. 2014) .....................................................................12, 13, 26

*SIPC v. BLMIS (In re Madoff Sec.)*,
   No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ........11, 12, 13

*SIPC v. Stratton Oakmont, Inc.*,
   234 B.R. 293 (Bankr. S.D.N.Y. 1999) ..................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................11

*United States v. Bailey*,
   955 F.2d 28 (8th Cir. 1992) ....................................................................................14

iv

*United States v. Joly*,
   493 F.2d 672 (2d Cir. 1974)..................................................................................14

*United States v. Nektalov*,
   461 F.3d 309 (2d Cir. 2006)..................................................................................14

*Zutty v. Rye Select Broad Mkt. Prime Fund, L.P.*,
   33 Misc. 3d 1226(A), (N.Y. Sup. Ct. 2011) ........................................................14

**Statutes**

11 U.S.C. § 546(e) ............................................................................11, 13, 15, 17

11 U.S.C. § 548(a)(1)(A) ...........................................................................11, 12

11 U.S.C. § 548(c) ......................................................................................12, 13

15 U.S.C. §§ 78aaa *et seq.* ...............................................................................1

**Rules**

Fed. R. Civ. P. 8(a)(2)...........................................................................................10

Fed. R. Civ. P. 12(b)(6)....................................................................................11, 29

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*, and the estate of Bernard L. Madoff, respectfully submits this memorandum of law in opposition to the motion brought by defendant Square One Fund, Ltd. ("Square One") (ECF No. 170) to dismiss the Trustee's amended complaint (the "Complaint" or "Compl.") (ECF No. 167).

## PRELIMINARY STATEMENT

This case is about Luc Estenne. Estenne founded Square One and served as its director and manager. He held himself out to his investors as an expert at conducting investment due diligence and detecting fraud. He wrote a book chapter and gave numerous talks on how to spot fraud. He warned investors that it is "paramount" to assess the investment adviser's "ethics" and that if the investment adviser "will not tell you what he is doing, you have to question what you are doing investing with him." And he was so confident in his savvy at spotting fraud that he promised to "put [his] money where [his] mouth is" by personally investing in the funds he selected for his clients, including Square One.

But in 2003 Estenne took his money out of Square One. He did so after years of seeing and appreciating at BLMIS precisely the same indicia of fraud he publicly and contemporaneously counseled others to avoid when selecting an investment adviser. BLMIS lied about its purported investment strategy, posted implausible returns, required exclusive custody of Square One's assets, refused to identify the counterparties to trades, and insisted that Estenne hide its involvement from Square One's investors. This period culminated with Estenne's diligence officer warning him that BLMIS's purported returns were not possible and that trusted colleagues categorically refused to invest with BLMIS because of concerns about its legitimacy.

1

From that point, Estenne blacklisted BLMIS from the portfolio in which he invested and marketed through his firm and corporate brand, Partners Advisers.  But Estenne kept directing other people's money to BLMIS through Square One, while pocketing the substantial management fees those doomed investments generated.  Estenne then undertook to hide from others what he already knew: BLMIS was not trading securities.  He prevented his diligence officer from conducting diligence on Square One and financial institutions from monitoring BLMIS's purported custody of Square One's assets.  And, to prevent the Trustee from obtaining discovery related to his due diligence on BLMIS, Estenne directed Square One to withdraw its $25 million customer claim.

These are the allegations in the Complaint.  They are sufficient to demonstrate that Estenne had actual knowledge of BLMIS's fraud and that Square One, by virtue of its agency relationship with Estenne, lacked good faith in its receipt of the transfers at issue here.  Square One asks this Court to find that Estenne was a "negligen[t]" and "careless[]" fund manager in an attempt to retroactively re-brand him as a run-of-the-mill investor that BLMIS "fooled."  This theory finds no support in the Complaint.  This Court should instead view the allegations about the indicia of fraud that Estenne saw and appreciated, and his reactions thereafter, through the lens of who Estenne is: a fraud-spotting expert who puts his money where his mouth is.

Square One's motion should be denied.

## STATEMENT OF FACTS

**I.    Square One**

Square One is a British Virgin Islands investment fund that invested exclusively with BLMIS through investment advisory account 1FR048 for almost ten years.  (Compl. ¶¶ 3 and 63-65).  Estenne, a Belgian national and well-known investment management professional, founded Square One following an in-person meeting with BLMIS's Frank DiPascali in 1998.  (*Id.* ¶¶ 4 and

71).  Estenne was Square One's director (*id.* ¶ 72) and investment manager (through his company, Square Asset Management Ltd.) (*id.* ¶ 73).  As Square One's investment manager, Estenne was responsible for conducting due diligence and promised to "control" and "review" BLMIS on Square One's behalf.  (*Id.* ¶¶ 74 and 136).  For these purported services, Estenne charged Square One's investors management fees of 1.25% per year for Class B shares and 2% per year for Class C shares.  (*Id.* ¶ 73).

Square One received $25,852,737 in transfers from BLMIS over the life of its account. (*Id*. ¶¶ 65 and 181).  This includes $24,271,620 in the six years prior to the Filing Date (*id.* ¶ 185) and $6,410,000 in the two years prior to the Filing Date (*id.* ¶ 187).

## II.    Estenne Is a Sophisticated Investment Professional and Self-Proclaimed Expert at Detecting Investment Fraud

Estenne is best known in the investment industry as the founder and CEO of his award-winning Geneva-based investment advisory firm and corporate brand, Partners Advisers.  (*Id.* ¶ 80).  Estenne held himself out to investors as an expert at "spot[ting] fraud" and conducting due diligence. (*Id.* ¶ 82).  Estenne boasts that he "put[s] [his] money where [his] mouth is" by investing his personal money in the fund Partners Advisers offers its investors: the Absolute Return Target Fund (the "ART Fund").  (*Id.* ¶¶ 89 and 161).

In 2000, Estenne authored a chapter titled "Risk Management Issues for the Family Office" in the book "Managing Hedge Fund Risk" that, among other things, teaches investors how to avoid investing in a fraud.  (*Id.* ¶ 84).  In the chapter, Estenne instructs fund managers that it is "paramount" to conduct exhaustive due diligence on investment advisers and their investment strategies.  (*Id.* ¶¶ 5 and 85).  He identifies 30 risk factors that investors must monitor, including many of the risk factors that he saw and appreciated at Square One's helm, such as "Counterparty risk" and "Transparency."  (*Id.* ¶ 85).  To mitigate these risks, Estenne instructs fund managers to

3

conduct periodic in-person diligence visits to ascertain the investment adviser's "ethics." (*Id.* ¶ 86). Estenne also urges fund managers to hire independent custodians that can keep the investment adviser in check and "ensure control of assets, independent [net asset value] calculation and accuracy of financial statements." (*Id.* ¶ 88).

Estenne frequently spoke at industry conferences on topics such as "How to spot fraud?[,]" "Why do funds fail?[,]" "What is the psychology behind manager impropriety?[,] and "What are the structural issues?" (*Id.* ¶¶ 82-83). In March 1998, Estenne spoke at a conference about the importance of transparency when evaluating an investment adviser, calling it one of the "critical issues" and warning investors that "[i]f a fund manager will not tell you what he is doing, you have to question what you are doing investing with him[.]" (*Id.* ¶¶ 83 and 87).

With the ART Fund, Estenne practiced what he preached. Estenne provided the ART Fund's investors cutting-edge diligence services, hired qualified diligence personnel, reconciled the ART Fund's trade confirmations, and reverse-engineered the underlying investment strategies. (*Id.* ¶ 90). He also conducted quarterly in-person diligence visits with investment advisers in New York and elsewhere and set up investment committees that convened monthly to discuss the performance of underlying investments. (*Id.* ¶¶ 91-92). Estenne said during an interview that Partners Advisers' due diligence expertise enabled it to detect risks that caught many by surprise during the 2008 financial crisis, including counterparty risk. (*Id.* ¶ 94). Estenne's comprehensive approach to due diligence worked: Partners Advisers was named Switzerland's "Most Trusted Investment Management Company of the Year." (*Id.* ¶ 80).

## III.    The Estenne Study: Estenne Began to Suspect BLMIS Was Not Trading Securities

In October 1999, Estenne conducted a quantitative analysis that compared BLMIS's purported returns to those of the S&P 500 Index over a 118-month period (the "Estenne Study"). (*Id.* ¶ 100). The Estenne Study also analyzed the risk profile of the split-strike conversion strategy

4

("SSC Strategy") that BLMIS purported to implement. (*Id.* ¶ 120). Estenne fully understood the SSC Strategy. In Square One's June 1999 offering memorandum, Estenne detailed how the SSC Strategy purported to work. He explained that the SSC Strategy would have "a high degree of correlation with the general market" because it involved investing in a basket of S&P 100 Index securities. (*Id.* ¶ 102). He also explained that, under the SSC Strategy, BLMIS promised to exit the market during downturns (by investing in cash and U.S. Treasury bonds) and provide "downside protection" through put options designed to liquidate securities positions in the event "the price [*sic*] of the stocks decline." (*Id.* ¶¶ 98-99). Estenne noted, however, that "the upside potential is limited" because BLMIS financed the put options by selling call options, which capped the potential gains. (*Id.* ¶ 99).

The Estenne Study showed Estenne that BLMIS was not conducting the SSC Strategy and was, thus, lying about how it generated its purported returns. (*Id.* ¶ 101). Notably, the Estenne Study revealed that BLMIS's purported returns did not correlate to those of the S&P 500 Index. (*Id.* ¶¶ 102-04). In the 38 months that the S&P 500 Index posted a negative return, BLMIS posted investment gains 92% of the time. (*Id.* ¶ 105). To illustrate this lack of correlation, the Estenne Study contained a scatterdiagram (pictured below) showing that BLMIS purported to generate positive returns independent of the S&P 500 Index's gyrations. (*Id.* ¶¶ 107-08):



If there were a "high degree of correlation" between the SSC Strategy and the S&P 500 Index, as Estenne said there would be, the scatterdiagram would show a similar distribution of data points above and below the horizontal axis. (*Id.* ¶ 108). Instead, nearly all the data points appear above the horizontal axis. (*Id.*). To underscore this point, the Estenne Study notes the R-Squared coefficient generated by this diagram is 0.05, which means that only 5% of the changes in the SSC Strategy's purported returns could be explained by contemporaneous changes in the S&P 500 Index's returns. (*Id.* ¶¶ 108-10).

The Estenne Study also uncovered that BLMIS was not exiting the market during downturns. During the 38 months in which the S&P 500 Index posted losses during the sample period, BLMIS posted average monthly gains of 1.03%. (*Id.* ¶ 113). Incredibly, BLMIS posted a 5.14% gain in August 1990, when the S&P 500 Index posted a loss of approximately 9.43%. (*Id.* ¶ 106). Estenne understood that because U.S. Treasury bonds offer minimal investment returns and cash yields even less, BLMIS could not have produced these monthly returns during market downturns by investing in either, as BLMIS purported to do. (*Id.* ¶ 113).

Further, the Estenne Study showed that BLMIS's purported returns were implausibly consistent. BLMIS posted positive monthly returns in 114 of the 118 months in the sample period (roughly 97% of the time). (*Id.* ¶ 116). The Estenne Study contained a regression analysis based on this purported performance, which revealed that BLMIS purported to yield positive monthly returns irrespective of what the market was doing. (*Id.* ¶ 117). The Estenne Study also compared the SSC Strategy's purported returns to those of other indices and concluded the SSC Strategy inconceivably had both the lowest risk profile and the highest average returns during the sample period. (*Id.* ¶¶ 120-22). This conflicted with Estenne's description of the SSC Strategy in Square One's offering materials, which provided that the SSC Strategy had "limited . . . upside potential"

6

due to the options collar that purported to cap potential gains in exchange for "downside protection." (*Id.* ¶¶ 99 and 123-25).

## IV. Estenne Abandoned His Investment Principles Only with Respect to BLMIS

After conducting the Estenne Study, Estenne abandoned his investment principles only for BLMIS. When BLMIS demanded that Estenne delete all references to BLMIS in Square One's offering materials, Estenne acknowledged that he had previously "never been told" to do such a thing but he was nevertheless "ready to correct what [BLMIS] want[ed]." (*Id.* ¶¶ 129-31). Estenne also ceded to BLMIS's refusal to identify counterparties to the over-the-counter options trades BLMIS purported to make for Square One. (*Id.* ¶¶ 134-35). This contravened his principle that transparency is "critical" for investors and that "[i]f a fund manager will not tell you what he is doing, you have to question what you are doing investing with him." (*Id.* ¶ 133).

Despite his belief that it is "paramount" for fund managers to perform periodic and extensive due diligence on an investment adviser, Estenne did not hire any diligence personnel for Square One. (*Id.* ¶¶ 138-39). He did not conduct diligence on BLMIS in-person or otherwise. (*Id.* ¶¶ 140-42). And, in 2000, when Estenne added Square One to the ART Fund's managed portfolio, he exempted Square One from Partners Advisers' diligence procedures. (*Id.* ¶ 143).

## V. The Diligence Officer Confronted Estenne with Concerns that BLMIS's Returns Were Not Possible

In or around 2002, Estenne could no longer ignore his suspicions that BLMIS was not trading securities when a senior officer who co-headed Partners Advisers' diligence operations (the "Diligence Officer") told Estenne that BLMIS's purported performance made no sense. (*Id.* ¶ 9). The Diligence Officer audited presentations by two BLMIS feeder funds at around this time as part of Partners Advisers' initiative to add investments to the ART Fund portfolio that could produce "attractive returns" at a time where the market was in disarray. (*Id.* ¶ 150).

The BLMIS feeder fund representatives were unable to answer the Diligence Officer's basic diligence questions due to BLMIS's lack of transparency. (*Id.* ¶ 152). Nor were they able to explain how BLMIS could produce consistently positive returns when the SSC Strategy was supposed to track the S&P 100 Index, which had suffered significant losses in recent years due to the bursting of the "dotcom bubble" and the 9/11 attacks. (*Id.* ¶ 153). When the Diligence Officer shared his concerns about the legitimacy of BLMIS's purported performance with trusted colleagues, he learned they blacklisted BLMIS due to similar concerns. (*Id.* ¶ at 155). The Diligence Officer shared his concerns with Estenne and recommended that Partners Advisers blacklist all BLMIS-related investments from the ART Fund's investment portfolio. (*Id.* ¶ 157).

Estenne immediately agreed with the Diligence Officer's recommendation and implemented an official policy at Partners Advisers that excluded BLMIS-related investments from the ART Fund's portfolio. (*Id.* ¶ 158). Partners Advisers would neither accept nor return calls from BLMIS feeder fund managers after that point. (*Id.* ¶ 159).

## VI.    Estenne Eliminated His Personal Exposure to BLMIS

Estenne personally invested in the ART Fund since November 2000 as part of Partners Advisers' "alignment of interests" program in which Estenne co-invested with the ART Fund's investors. (*Id.* ¶ 161). Estenne added Square One to the ART Fund's portfolio in or around that time and, by extension, exposed his money to BLMIS. (*Id.* ¶ 162). But shortly after his conversation with the Diligence Officer about BLMIS's impossible returns, Estenne directed the ART Fund to redeem its investments in Square One. (*Id.* ¶ 163). Estenne made this decision in 2003 when the ART Fund was actively seeking investments (like Square One) that outperformed the bear market of the early 2000s. (*Id.* ¶¶ 150 and 165). Square One was one of the few bright spots in the ART Fund's portfolio at the time, which Partners Advisers otherwise described as "disappointing." (*Id.* ¶ 166). By redeeming the ART Fund's investment in Square One, Estenne

8

eliminated his personal exposure, and that of Partners Advisers, to BLMIS.  (*Id.* ¶¶ 163-64).  Yet, he continued to invest other people's money with BLMIS through Square One and take management fees off the top of those doomed investments.  (*Id.* ¶ 167).

## VII.    Estenne Prevented Others from Analyzing Square One's BLMIS Investment

From 2003 on, Estenne routinely prevented others from conducting any meaningful diligence into Square One's investments with BLMIS.  (*Id.* ¶ 168).  Estenne prevented the Diligence Officer from conducting diligence on BLMIS even though Estenne regularly asked Partners Advisers personnel to provide other services for Square One.  (*Id.* ¶¶ 169-70).  The Diligence Officer believes Estenne's decision to exclude him from Square One's business activities was because he previously raised concerns about BLMIS with Estenne.  (*Id.* ¶ 171).

Estenne also directed Square One not to hire a custodian after Bank of Bermuda resigned from this role in 2006.  (*Id.* ¶¶ 172-73).  Estenne's decision ran afoul of his own teaching that independent review of the investment adviser's handling of the assets was essential to prevent their dissipation.  (*Id.* ¶¶ 174-75).  Though other funds that acted in bad faith might have known that their custodians simply turned over the assets to BLMIS, this is the only instance where a fund did not even try to give the appearance that the assets were being independently custodied.  (*Id.* ¶ 176).

Estenne filed a $25 million customer claim on behalf of Square One.  (*Id.* ¶ 177).  Yet he ignored the Trustee's requests for documents and information concerning his dealings with BLMIS as part of the claim-determination process.  (*Id.* ¶ 178).  In July 2010, the Trustee asked him to produce his BLMIS-related diligence in his capacity as Square One's director and manager.  (*Id.* ¶ 179).  Instead of responding to these requests, Estenne directed Square One to voluntarily withdraw its $25 million customer claim weeks later, in August 2010.  (*Id.* ¶ 179-80).

# LEGAL STANDARDS

## I.    General Standards on a Motion to Dismiss

The Trustee's burden is to submit "a short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). His allegations at this stage need only "nudge[]" the claims "across the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (internal quotation marks and citation omitted). A claim is plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Though allegations of fraud are held to a higher pleading standard, that burden for fraudulent transfer claims is met by pleading the fraudulent intent of the transferor—in this case, BLMIS. BLMIS's fraudulent intent is adequately "established as a matter of law by virtue of the 'Ponzi scheme presumption.'" *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 331 (Bankr. S.D.N.Y. 2011) (quoting *Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 435 (Bankr. S.D.N.Y. 2011)); *Picard v. Merkin (In re BLMIS)*, 440 B.R. 243, 257 (Bankr. S.D.N.Y. 2010) ("*Merkin I*").

Courts, including this one, have acknowledged that "'[g]reater liberality in the pleading of fraud is particularly appropriate in bankruptcy cases, because . . . it is often the trustee, a third party outsider to the fraudulent transaction, that must plead the fraud on secondhand knowledge for the benefit of the estate and all of its creditors.'" *Merkin I*, 440 B.R. at 254 (quoting *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999)). Where "'the trustee's lack of personal knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the trustee's handicap increases,' and 'even greater latitude' should be afforded" to his pleading. *Cohmad*, 454 B.R. at 329 (quoting *Stratton Oakmont*, 234 B.R. at 310).

In determining Square One's motion, this Court must "liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences" in the Trustee's

favor. *In re J.P. Jeanneret Assoc., Inc.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011). And this Court "must consider the complaint in its entirety," meaning that it must consider "whether *all* of the facts alleged, taken collectively," allow for the inference that Square One did not receive the transfers in good faith. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). It is improper for this Court to credit Defendants' version of the facts, as Square One repeatedly invites this Court to do. (*See* Mem. of Law in Supp. of Def.'s Mot. to Dismiss, ECF No. 170-1 ("Def. Br."), at 12-14, 17, 19, 22.) This Court must consider only the fact as alleged by the Trustee in the Complaint. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."). It is also improper for this Court to weigh evidence at this stage, as Square One repeatedly invites this Court to do. (*See, e.g.*, Def. Br. at 16-18). "The task of the court in ruling on a motion to dismiss is to 'assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 403 (S.D.N.Y. 2010) (citation omitted).

## II.    **Actual Knowledge and Lack of Good Faith**

As for the Trustee's claims in Counts II through VII, the issue is whether the safe harbor under Bankruptcy Code section 546(e) applies. The District Court has held that section 546(e)'s safe harbor limits the Trustee's avoidance powers to those provided by Bankruptcy Code section 548(a)(1)(A), unless the Trustee alleges that Square One had "actual knowledge that there were no actual securities transactions being conducted." *SIPC v. BLMIS (In re Madoff Sec.)*, No. 12 MC 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) (the "*Actual Knowledge Decision*"). Finding that the section 546(e) safe harbor aims to protect securities markets and "the reasonable expectations of legitimate participants in these markets," the District Court held the

11

safe harbor does not apply when the customer possessed knowledge defeating any reasonable expectation that BLMIS was engaged in legitimate securities trading on its behalf. *Id.* at *4.

As for the Trustee's claim under section 548(a)(1)(A) in Count I, the issue presented is whether the Trustee has pleaded that Square One lacked "good faith." The District Court imposed on the Trustee a new, heightened burden for pleading that a defendant lacks good faith: "willful blindness." *See SIPC v. BLMIS (In re Madoff Sec.)*, 516 B.R. 18, 22-24 (S.D.N.Y. 2014) (the "*Good Faith Decision*"). Although the District Court acknowledged that good faith is ordinarily an affirmative defense under Bankruptcy Code section 548(c), it held the Trustee must nonetheless plead that a defendant lacked good faith as part of his *prima facie* case. *Id.* at 23-24 (citing *Picard v. Greiff (In re Madoff Sec.)*, 476 B.R. 715, 723 (S.D.N.Y. 2012)). Hence, to defeat a motion to dismiss, the Trustee must demonstrate that Square One willfully blinded itself to circumstances indicating fraud at BLMIS. *Id.* at 24. This can be shown through allegations that Square One (1) possessed strong suspicion but some level of doubt or uncertainty of the existence of fraud at BLMIS, and (2) deliberately acted in a manner to avoid confronting its doubts. *Id.* at 21.[1]

## III.    **Square One Misstates the Willful Blindness Standard**

Square One asserts incorrectly that the Trustee's burden under the first prong of the willful blindness standard is to allege that Square One suspected there was "a high probability that BLMIS was not trading securities." (Def. Br. at 17-18). As shown fully below, the Trustee has met and exceeded even this variation of the willful blindness standard because the Trustee alleges in detail that Square One, through Estenne, knew or at the very least suspected to a high probability that BLMIS was not trading securities. Even so, Square One's iteration of this standard is wrong as a matter of law.

---

[1]    The Trustee maintains that the District Court's imposition of the pleading burdens under the *Actual Knowledge Decision* and the *Good Faith Decision* is wrong as a matter of law and will appeal them at the appropriate time.

The first prong of willful blindness simply requires suspicions of "fraud." *See Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 29 (Bankr. S.D.N.Y. 2016) (the first prong of willful blindness is met when the Trustee pleads the defendant "'subjectively believe[s] that there is a high probability that a fact exists' . . . 'a high probability of fraud") (citation omitted).  Indeed, in *Legacy Capital* this Court found that the Trustee adequately pleaded the first prong of willful blindness notwithstanding the Court's finding that the defendants thought BLMIS may have been trading securities.  *Id.* at 31 and 35 (noting that defendants suspected BLMIS was "cherry picking").  This holding is consistent with the District Court's interpretation in a related adversary proceeding, that the Trustee satisfied the first prong of willful blindness where he alleged "the defendants willfully blinded themselves to the fact that Madoff Securities was involved in some kind of fraud."  *Picard v. Katz*, 462 B.R. 447, 454 (S.D.N.Y. 2011) (emphasis added).

Square One's contention that the alleged suspicions related to willful blindness must concern the absence of securities trading at BLMIS, rather than simply some kind of fraud, conflates the willful blindness and actual knowledge standards.  The District Court fashioned the latter to determine the applicability of the safe harbor under section 546(e), which protects transfers "made in relation to securities trading."  *Actual Knowledge Decision*, 2013 WL 1609154, at *2. In the *Good Faith Decision*, however, the District Court applied the willful blindness standard to a separate and different inquiry: the meaning of "good faith" under section 548(c) in SIPA liquidations.  The District Court held this inquiry is informed by the federal securities law, which in turn focuses on "fraudulent intent."  *Good Faith Decision*, 516 B.R. at 21 (citation omitted). The District Court thus concluded the Trustee can establish the transferee lacked good faith by alleging it "intentionally [chose] to blind [itself] to the 'red flags' that suggest a high probability of fraud" at BLMIS.  *Id. Id.* (quoting *Katz*, 462 B.R. at 455).  Nowhere did the District Court hold

13

that the transferee must have believed that BLMIS was not trading securities to establish willful blindness; the transferee need only suspect that BLMIS was engaged in a fraud.

The District Court's holding is consistent with the Second Circuit's application of willful blindness outside of this bankruptcy case. The Second Circuit has held that "[t]he culpability of the willfully blind defendant lies in his averting his eyes to what he thinks he sees, not in the objective accuracy of his vision." *United States v. Nektalov*, 461 F.3d 309, 315 (2d Cir. 2006); *accord Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP)*, 462 B.R. 474, 490 (Bankr. S.D.N.Y. 2011) (Bernstein, J.). Thus, closing one's eyes to facts suggesting one type of wrongdoing constitutes willful blindness even if another type of wrongdoing was actually taking place. *See, e.g.*, *United States v. Joly*, 493 F.2d 672, 674 (2d Cir. 1974) (finding willful blindness where defendant did not know he was transporting drugs, but only that he thought he was doing something wrong); *United States v. Bailey*, 955 F.2d 28, 29 (8th Cir. 1992) (same).

Common sense also supports this position. The purpose of the "willful blindness" doctrine is to ensure that defendants that suspect illegal activity and turn away in time to avoid confirming their suspicions cannot escape liability. *See Patriot Grp.*, 452 B.R. at 450-51 (Bankr. S.D.N.Y. 2011) (citing cases). Finding that such defendants are not willfully blind because they did not learn <u>more</u> facts about the nature of the suspected illegal activity turns the standard on its head by <u>rewarding</u> those who stick their head in the proverbial sand the moment they suspect illegal activity. Applied here, it could lead to the inequitable result where a defendant could be found to be acting in "good faith" even where he suspected to a high probability that BLMIS was orchestrating some fraud, profited from it, yet turned away before he learned its true nature. This Court should deny Square One's invitation to adopt this interpretation of "good faith" here.[2]

---

[2] This Court should also deny Square One's contention that the willful blindness standard requires a showing that Square One was "desirous of furthering" BLMIS's fraud. (Def. Br. at 14 (quoting *Zutty v. Rye Select Broad Mkt.*

## ARGUMENT

The Trustee has met his pleading burden as to all his claims. Counts II through VII are not subject to section 546(e)'s safe harbor because, through Estenne, Square One had actual knowledge that BLMIS was not trading securities. Even if this Court were to find that the Trustee has not pleaded Square One's actual knowledge, Count I cannot be dismissed because Square One was willfully blind to fraud at BLMIS.

## I.    Estenne Stood Sentry for Square One and Promised to Keep a Sharp Lookout for Fraud

The Trustee's satisfaction of either standard—actual knowledge or willful blindness—turns on the allegations of what Estenne, as Square One's agent, knew or suspected about BLMIS. An agent's knowledge or suspicion of fraud can be imputed to his principal. *See, e.g.*, *Apollo Fuel Oil v. United States*, 195 F.3d 74, 76 (2d Cir. 1999) ("In general, when an agent is employed to perform certain duties for his principal and acquires knowledge material to those duties, the agent's knowledge is imputed to the principal."). Square One does not dispute that the Trustee adequately alleges an agency relationship between Estenne and Square One, or that his knowledge or suspicions of fraud at BLMIS can be imputed to Square One. Nor could it. As Square One's director and manager, Estenne conducted the Estenne Study, communicated with BLMIS, drafted offering materials, marketed Square One, and hired Square One's service providers. (Compl. ¶¶ 74-78). His recognition and appreciation of indicia of fraud at BLMIS in the course of these activities are, therefore, imputed to Square One. *See Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 146 (Bankr. S.D.N.Y. 2014) ("*Merkin II*") (imputing fund manager's knowledge of indicia of fraud at BLMIS to fund).

---

*Prime Fund, L.P.*, 33 Misc. 3d 1226(A), at *12 (N.Y. Sup. Ct. 2011)). The unreported opinion from a state trial court applying New York common law has no applicability here and is inconsistent with how the District Court and this Court have interpreted the willful blindness standard in this liquidation.

Because actual knowledge and willful blindness are subjective standards, this Court should assess the allegations of Estenne's knowledge or suspicions of BLMIS's fraud in the context of his experience, sophistication, and expertise in identifying investment fraud. As this Court put it, the "visibility of 'red flags' depends on who is standing sentry[.]" *Merkin II*, 515 B.R. at 145. Here, the Trustee alleges that Estenne is a highly sophisticated investment professional who held himself out to investors as an expert at "spot[ting] fraud" and conducting investment due diligence. (Compl. ¶¶ 79-88). Estenne spoke at industry conferences about how it was "critical" for investors to have full transparency from their investment advisers, recommending that "[i]f a fund manager will not tell you what he is doing, you have to question what you are doing investing with him[.]" (*Id.* ¶ 87). He authored a book chapter instructing fund managers that: (i) it is "paramount" to conduct extensive pre- and post-investment due diligence on the investment strategy to avoid investing in a fraud (*id.* ¶ 85); (ii) the custodian of an investment fund should be "independent" from the investment adviser to maintain the security of the assets and "ensure" they are valued accurately (*id.* ¶ 88); and (iii) investors should conduct periodic in-person diligence visits to obtain "a vote of confidence on the ethics" of the investment adviser (*id.* ¶ 86). His chapter also identified 30 investment risk factors investors should examine as part of their diligence of investment advisers. (*Id.* ¶ 85). And, confident in his own expertise in conducting due diligence expertise and spotting fraud, he pledged to invest alongside his clients in the investments he marketed. (*Id.* ¶ 89).

These allegations foreclose Square One's attempts to re-brand Estenne as a run-of-the-mill BLMIS investor who was "careless[,]" "foolish[,]" or "negligen[t]" in his diligence of BLMIS on behalf of Square One. (Def. Br. 21). Nor can Square One rely on the fact that Madoff "fooled" others. (*Id.* at 18). In this case, the Court must examine the Trustee's allegations through the lens

of Estenne—an expert who touted his ability to detect fraud in instances where others failed. *See Merkin II*, 515 B.R. at 145 (rejecting argument that because others were fooled about BLMIS so, too, was the defendant, given, *inter alia*, the defendant's promise to "keep a sharp lookout for fraud").[3]

## II.    The Trustee Sufficiently Alleges Estenne Knew about BLMIS's Fraud

The Trustee sufficiently alleges that Estenne knew BLMIS was not trading securities. This inference is evident from how Estenne treated Square One, exempting it from the rigorous due diligence standards he touted publicly and proudly applied to Partners Advisers and the ART Fund. He deviated from his standards after seeing and appreciating numerous indicia of fraud at BLMIS that culminated with the Diligence Officer warning him that BLMIS's purported returns were not possible. Estenne then took his money out of Square One, blacklisted BLMIS from the portfolio in which he personally invested and undertook to prevent others from reviewing Square One's BLMIS investment. The most plausible inference to be drawn from these circumstances is that Estenne knew BLMIS was not trading securities. *See generally Huddleston v. United States*, 485 U.S. 681, 685 (1988) (a defendant's "state of mind" may be ascertained by "drawing inferences from [his] conduct"). Accordingly, and as argued more fully below, this Court should deny Square One's motion to dismiss Counts II through VII.

### A.    Section 546(e) Does Not Protect the Transfers at Issue Here

Square One cannot seek refuge under section 546(e)'s safe harbor. This Court previously determined that the safe harbor is unavailable to a fund investor where, as here, the totality of the

---

[3]    Similarly, Square One's reliance on *DeLollis v. Friedberg, Smith & Co., P.C.*, 600 F. App'x 792 (2d Cir. 2015) for the proposition that Estenne's sophistication gave him "no edge" to uncover the fraud is misplaced. (Def. Br. at 19). That case concerned auditors who owed no duty to the fund to conduct diligence on investment advisers and strategies, *DeLollis*, 600 F. App'x at 795-96, whereas, here, Estenne owed a duty to Square One to monitor BLMIS and its purported investment strategy. *See Merkin II*, 515 B.R. at 145 (defendant who managed BLMIS feeder funds "owed a separate duty of care in selecting their outside money-managers and their investments").

17

allegations plausibly demonstrate that sophisticated financial professionals in control of the fund knew the trading results reported by BLMIS were impossible and "took steps to prevent any inquiry." *See Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-01161 (SMB), 2015 WL 4734749, at *13-15 (Bankr. S.D.N.Y. Aug. 11, 2015) ("*Kingate*"). Specifically, in *Kingate*, this Court found the Trustee adequately pleaded actual knowledge based on allegations that the fund's agents encountered numerous indicia of fraud at BLMIS reflecting that what it reported was false and received warnings that adequate due diligence could not be performed. *Id.* at *13-14. The Court then held that the efforts these professionals took to "deflect inquiries directed at Madoff" allowed for the inference that they had actual knowledge of BLMIS's fraud.

As in *Kingate*, the Trustee has alleged Square One's actual knowledge based on a combination of factors, including myriad indicia of fraud at BLMIS, which the fund's manager saw and appreciated, and fraud warnings about BLMIS and a recommendation from a diligence officer to blacklist BLMIS. Estenne's knowledge, imputable to Square One, is demonstrated by his conduct to eliminate his personal investments with BLMIS in 2003. (Compl. ¶¶ 160-67). Indeed, this Court has concluded that divesting investments with BLMIS is pivotal to assessing actual knowledge. *Cf. Legacy Capital*, 548 B.R. at 32 ("If the Meritage Committee actually believed that BLMIS was a Ponzi scheme, it is implausible that they would have divested only half of Meritage's BLMIS investment and held on to the other half for several months."). Unlike the defendants in *Legacy Capital*, Estenne completely divested his exposure to BLMIS when he blacklisted Square One from the ART Fund's portfolio (Compl. ¶¶ 158 and 163-64), and never reconsidered (*id.* ¶¶ 159 and 164).

Context is everything. And, here, the context in which Estenne divested his Square One investment and blacklisted BLMIS supports the inference that he knew BLMIS was not trading

18

securities.  First, the timing did not make economic sense.  During the bear market of the early
2000s, Partners Advisers had been "disappoint[ed]" with the ART Fund's performance and was
looking for an investment that could produce "attractive returns."  (*Id.* ¶¶ 150 and 166).  Square
One was significantly outperforming the other investments in the ART Fund's portfolio and the
S&P 100 Index.  (*Id.* ¶ 165-66).  Second, the divestment and blacklist occurred shortly after the
Diligence Officer confronted Estenne with concerns that BLMIS's purported returns were not
possible, particularly during a time when the market was reeling due to the bursting of the "dotcom
bubble" and the 9/11 attacks.  (*Id.* ¶¶ 150-57).  Third, by 2003, Estenne had already recognized
and appreciated other indicia of fraud at BLMIS, including that: (i) BLMIS's purported returns
were virtually impossible (*id.* ¶¶ 116-19); (ii) BLMIS's purported performance did not correlate
to the market, as it should have (*id.* ¶¶ 102-11); (iii) BLMIS did not exit the market during
downturns, as it should have (*id.* ¶¶ 112-15); (iv) BLMIS's purported performance did not comport
with its risk/return profile (*id.* ¶¶ 120-22); (v) BLMIS ordered Estenne to delete all references to
BLMIS in Square One's offering materials (*id.* ¶¶ 129-33); (vi) BLMIS required exclusive custody
of Square One's assets (*id.* ¶¶ 145-48); and (vii) BLMIS refused to identify counterparties in over-
the-counter options trades (*id.* ¶¶ 134-35).  *See Kingate*, 2015 WL 4734749, at \*14 (the Trustee
adequately pleaded actual knowledge where he alleged defendants saw and appreciated trading
impossibilities, BLMIS's lack of transparency, and BLMIS's failure to identify counterparties to
options trades, and received warnings from a diligence officer about indicia of fraud at BLMIS).

Critically, after Estenne divested his investments in BLMIS and blacklisted all BLMIS-
related investments from the ART Fund, he prevented others from conducting any inquiry into
Square One's BLMIS investment.  First, Estenne hid Square One's BLMIS investment from the
Diligence Officer given the BLMIS-related diligence concerns they previously discussed.  (Compl.

¶¶ 169-71).  Second, Estenne chose to not appoint an independent third-party custodian to check

BLMIS's custody of Square One's assets after Bank of Bermuda resigned from this post in 2006,

notwithstanding Estenne's contemporaneous teaching that independent custody was essential "to

ensure control of assets, independent [net asset value] calculation and accuracy of financial

statements."  (*Id.* ¶¶ 172-75).  Notably, this is the <u>only known instance</u> where a BLMIS feeder

fund refused to use an independent third-party custodian to purportedly check BLMIS's sub-

custody of the investment assets.  (*Id.* ¶ 176).  Third, when the Trustee requested information

concerning Square One's BLMIS investment to determine its customer claim, Estenne refused to

provide this information and instead withdrew Square One's claim.  (*Id.* ¶¶ 177-80).  The foregoing

allegations are like those this Court credited in *Kingate*, where the fund manager "took steps to

deflect inquiries" concerning the funds' BLMIS investments.  2015 WL 4734749, at *15.  This

Court should similarly find these allegations, assessed in their totality, sufficient to meet the actual

knowledge standard.

### B.    Square One's Arguments to the Contrary Are Unavailing

Square One contends that the Trustee's allegations do not support the inference that

Estenne took his money out because he knew BLMIS was a fraud.  (Def. Br. at 15-16).  Square

One is wrong.  As argued above, the context in which Estenne eliminated his exposure to BLMIS

supports the inference that he knew it was not trading securities.  Next, Square One posits that the

"more compelling inference" from the allegation that Estenne prevented the Diligence Officer

from reviewing Square One is that Square One had enough diligence support.  (*Id.* at 16).  But that

inference is unfounded.  Estenne did not conduct any diligence on behalf of Square One after he

divested his BLMIS investment, nor did he hire anyone else to conduct this diligence.  (Compl. ¶¶

138-43).  Moreover, given that one of Estenne's key investment principles was that ongoing

20

diligence is "paramount," it is implausible that Estenne found it unnecessary to conduct ongoing

diligence on BLMIS.  (*Id.* ¶¶ 85 and 144).

Square One argues that withdrawing an investment does not suggest the BLMIS investor

knew or suspected fraud, citing this Court's recent *BNP Paribas* decision.  (Def. Br. at 16) (citing

*Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 198-202 (Bankr. S.D.N.Y. 2018)).  But

this Court never reached this issue in *BNP Paribas*.  Unlike here, the Trustee did not allege that

the defendants in that case withdrew their proprietary investment due to concerns of fraud at

BLMIS.[4]  To the contrary, this Court dismissed the claims in that case because the defendants

remained invested in BLMIS.  *BNP Paribas*, 594 B.R. at 202-204 (finding it "implausible" that

defendants would invest billions of dollars in BLMIS feeder funds while simultaneously

suspecting BLMIS was a fraud).

Similarly, Square One erroneously contends that if the Court finds the Diligence Officer

did not know that BLMIS was not trading securities, it must reach the same conclusion as to

Estenne.  (Def. Br. at 15).  As an initial matter, the Trustee's actual knowledge allegations can

only be viewed through the lens of Estenne, a self-proclaimed expert at spotting investment fraud.

*See Merkin II*, 515 B.R. at 145 (the "visibility of 'red flags' depends on who is standing sentry").

Moreover, the Trustee does not allege that Estenne's actual knowledge resulted only from the

Diligence Officer's warnings, but rather alleges these warnings occurred after Estenne saw and

appreciated numerous indicia of fraud at BLMIS, including those uncovered by the Estenne

Study.[5]  Estenne's actual knowledge of BLMIS's fraud after receiving these warnings must be

---

[4]   To the extent Square One refers to the allegations in *BNP Paribas* that the defendants shut down the Oreades fund
out of concerns of fraud at BLMIS, this misses the mark.  The defendants were not alleged to have invested in
Oreades; they acted as Oreades' service providers.  *BNP Paribas*, 594 B.R. at 178-79.

[5]   Notably, Square One does not challenge the alleged conclusions that Estenne drew from the Estenne Study, and
even concedes that knowing of "impossibly consistent returns over many years, including years when the markets
were down," and "review[ing] BLMIS account statements that were inconsistent with Madoff's purported

assessed on the "totality" of all such allegations, not just those concerning the Diligence Officer. *See Kingate*, 2015 WL 4734749, at *14-15.[6]

Square One also unconvincingly argues that Estenne's failure to hire a replacement custodian "does not differ in substance" from other cases in which it was "widely known" that BLMIS self-custodied investment assets. (Def. Br. at 17 (citing *BNP Paribas*, 594 B.R. at 178, 199).) That it was "widely known" BLMIS self-custodied assets is irrelevant here. What matters is that Estenne understood that BLMIS's self-custody was problematic (Compl. ¶ 88). *See Merkin II*, 515 B.R. at 145 ("[T]he fact that the Government and other investors missed the same red flags does not mean that Merkin did too."). Moreover, the Trustee alleges, and Square One ignores, that Square One is the only known feeder fund that refused to use an independent custodian to monitor BLMIS's custody of the investment assets. (Compl. ¶ 176). Accordingly, not only does this case "differ in substance" from other cases, it is, in fact, completely unique in this regard and suggests Estenne was afraid of what a diligent, independent third-party custodian would discover about BLMIS.

Finally, as to the allegations concerning its refusal to turn over diligence-related documents and the subsequent withdrawal of its customer claim (*id.* ¶¶ 177-80), Square One argues "the more compelling inference" is that Square One frustrated the Trustee's claim-determination process to avoid the "expense, distraction, and annoyance of discovery." (Def. Br. at 17). It strains credulity,

---

strategy," are important factors that show actual knowledge. (Def. Br. at 10 (citing *Kingate*, 2015 WL 4734749, at *3-9)).

[6] Square One also repeatedly describes the Diligence Officer as "unnamed," implying that the Court should not credit the Trustee's allegations without knowing the name of the source. (*See* Def. Br. at 5-6, 15-17, 20). This is contrary to settled law. *See Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000) ("[T]here is nothing in the case law of this circuit that requires plaintiffs to reveal confidential sources at the pleading stage."). The Trustee has not disclosed the Diligence Officer's identity at this stage of the litigation only as a courtesy to the Diligence Officer but has otherwise alleged sufficient facts for this Court to credit the allegations pertaining to the Diligence Officer's communications with Estenne. In any event, if the Court requires, the Trustee is willing to disclose the name of the Diligence Officer *in camera*.

however, to suggest that Square One walked away from a $25 million claim simply to avoid the cost and inconvenience of making a modest production of documents.  (*See* Compl. ¶ 177 and 180).  Based on the totality of the allegations against Square One, the more compelling inference is that Square One did not want the Trustee to discover that Square One had long known about BLMIS's fraud.

For the foregoing reasons, this Court should deny Square One's motion to dismiss Counts II through VII.

## III.    The Trustee Has Met and Exceeded the Willful Blindness Standard

Although the Trustee pleaded Square One's actual knowledge, if this Court were to find otherwise, the Trustee has sufficiently alleged that Square One was willfully blind to Madoff's fraud.  This is evident not just from the myriad indicia of fraud at BLMIS that Square One, through Estenne, saw and appreciated, but also from the many instances where Estenne abandoned his own investment principles with respect to BLMIS.  Square One contends that because the Trustee does not allege that Estenne outwardly "expressed worries or suspicions" about BLMIS, he has not shown that Estenne was willfully blind. (Def. Br. at 17).  But this is not the standard.  The Trustee can satisfy the first prong of the willful blindness inquiry through allegations that Estenne "saw" and "understood" indicia of fraud at BLMIS "and purposely ignored them."  *See Merkin II*, 515 B.R. at 144.  As argued fully below, the Trustee has met his burden and, thus, Square One's motion to dismiss Count I should be denied.

### A.    The Trustee Sufficiently Pleaded that Estenne Believed BLMIS Was a Fraud

The facts highlighted in the preceding section are sufficient to satisfy the first prong of willful blindness.  The Trustee must allege facts that, viewed in their totality, plausibly show that Square One, through Estenne, suspected BLMIS was a fraud.  *Merkin II*, 515 B.R. at 139-40.  The Trustee alleges that Estenne began suspecting fraud at BLMIS when he conducted the Estenne

23

Study in October 1999, which demonstrated that BLMIS's purported returns were not possible and BLMIS was not employing the SSC Strategy. (Compl. ¶¶ 6 and 100-01). Square One downplays the Estenne Study as merely an amalgamation of "publicly available information" (Def. Br. at 4), but this Court recently held that an almost identical study in a related adversary proceeding raised strong suspicions that BLMIS was a fraud. *See Picard v. Merkin (In re BLMIS)*, 563 B.R. 737, 746 (Bankr. S.D.N.Y. 2017) ("*Merkin III*"). There, a BLMIS feeder fund manager reviewed a third-party report "that compared the performance of the S&P 500 with the performance of" BLMIS over six years. *Id.* This report showed that BLMIS "achieve[d] consistent results, whether the S&P 500 trend[ed] up or down" and the "performance of [BLMIS was] to a large degree independent of the gyrations of the S&P 500." *Id.* (internal quotation marks and citation omitted). It is nearly identical to the Estenne Study, which principally concludes that BLMIS purported to generate positive returns "independent of the S&P 500 Index's gyrations." (Compl. ¶¶ 102-11). Indeed, the Estenne Study employed an assortment of tables, charts, and coefficients to demonstrate that only "5% of the changes in BLMIS's purported returns can be explained by contemporaneous changes in the S&P 500 Index's returns" and, astonishingly, that in the 38 months the S&P 500 Index suffered losses, BLMIS posted a positive return 92% of the time. (*Id.* ¶¶ 105-10). The Trustee alleges that Estenne appreciated the import of the Estenne Study's conclusions, given that he had previously represented to Square One's investors that BLMIS's purported strategy promised to have "a high degree of correlation with the general market." (*Id.* ¶ 102).

The Estenne Study goes further than the report this Court credited in *Merkin III*. It covers four more years of data and reaches other conclusions that show Estenne's suspicions that BLMIS was not trading securities. For example, the Estenne Study demonstrated that BLMIS purported

24

to achieve monthly gains of 1.03% in the months the S&P 500 Index reported losses, an impossible feat given that BLMIS represented to Estenne that it "remain[ed] in cash" and U.S. Treasury bonds during market downturns.  (*Id.* ¶¶ 98 and 113).  The Estenne Study also demonstrated that BLMIS posted gains in 114 of the 118 months in the sample period (roughly 97% of the time) and that BLMIS's t-statistic of 13.15 meant that BLMIS was virtually certain to yield its average positive monthly returns from the sample period irrespective of what the market was doing.  (*Id.* ¶¶ 116-17).  And the Estenne Study graphically demonstrated that BLMIS purported to earn higher returns with less risk than other indices, which ran counter to the investment principle that risk and returns are directly proportional.  (*Id.* ¶¶ 120-22).  As an expert in investment due diligence and detecting fraud, Estenne knew these conclusions indicated that, at bottom, BLMIS lied about the investment strategy it purported to use, or worse, fabricated its returns.  *See Merkin II*, 515 B.R. at 144-45 ("Where the complaint alleges facts showing that the defendant was aware of the 'red flags' and the probability that Madoff was running a fraudulent scheme, it sufficiently pleads *scienter*."); *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 405 (S.D.N.Y. 2010) (allegations of scienter sufficient where the complaint alleged that defendants knew of red flags indicating that BLMIS was a fraud).[7]

Estenne encountered additional indicia of BLMIS's fraud soon after conducting the Estenne Study, including that BLMIS: (i) ordered Estenne to delete all references to BLMIS in Square One's offering materials (Compl. ¶¶ 129-33); (ii) refused to identify the counterparties to BLMIS's purported over-the-counter options trades on behalf of Square One (*id.* ¶¶ 134-35); and

---

[7]  For this reason, Square One's reliance on case law that found that similar red flags were insufficient to show the defendants believed BLMIS was a fraud misses the mark.  (Def. Br. at 18 (citing cases)).  As Square One concedes, willful blindness is a subjective standard and its satisfaction depends on the expertise and know-how of the individual who is alleged to have seen and appreciated the indicia of fraud.  *See Merkin II*, 515 B.R. at 145.  Here, Estenne is alleged to have conducted the Estenne Study and had the acumen to appreciate the impossibilities it revealed about BLMIS's purported performance.

(iii) demanded exclusive custody of Square One's assets (*id.* ¶¶ 145-48). The Trustee does not merely allege that Estenne "should" have seen these indicia of fraud, as Square One contends. (Def. Br. at 5 and 18-19). Rather, the Trustee alleges that Estenne saw them and appreciated their import in real time. Indeed, Estenne was contemporaneously warning investors that a lack of investment transparency, failure to identify counterparties, and self-custody of assets are each hallmarks of investment fraud. This is dispositive. *See Merkin II*, 515 B.R. at 142 (allegations that a fund manager advised others how to spot fraud demonstrated that he appreciated the indicia of fraud that he saw with respect to BLMIS).

Notably, Square One concedes that the indicia of fraud alleged here are sufficient to support an inference of willful blindness (Def. Br. at 13) but argues that this Court may ignore these allegations because Estenne "invested" in BLMIS and, hence, the more compelling inference is that BLMIS "fooled" him, as it fooled others (*id.* at 18-19). But an investor can stay invested in BLMIS while simultaneously harboring strong suspicions that BLMIS is a fraud. *See Legacy Capital*, 548 B.R. at 35 (the Trustee "allege[s] the first prong of willful blindness" although investor remained invested in BLMIS after "strongly suspect[ing]" it was a fraud). In any event, the Trustee alleges that Estenne took his money out and blacklisted BLMIS from the managed portfolio through which he personally invested. (Compl. ¶¶ 160-67). These allegations meet and exceed the Trustee's burden under the first prong of the willful blindness inquiry.

**B.    Estenne Deliberately Avoided Confirming His Suspicions about BLMIS**

The Trustee maintains that Estenne knew about BLMIS's fraud. But, at best, he took deliberate steps to avoid confirming his suspicions that BLMIS was a fraud. This is sufficient to satisfy the Trustee's burden under the second prong of the willful blindness test, which requires a showing that Estenne "intentionally [chose] to blind himself to the 'red flags' that suggest a high probability of fraud" at BLMIS. *Good Faith Decision*, 516 B.R. at 21 (internal quotation marks

26

and citation omitted).  The Trustee alleges that, after seeing and appreciating indicia of fraud at BLMIS, Estenne abandoned his contemporaneous principles.  For example, Estenne deliberately failed to conduct any ongoing diligence on Square One's BLMIS investment or in-person diligence visits to BLMIS.  (Compl. ¶¶ 136-44).  This is contrary to Estenne's principles that it is "paramount" for a fund manager to conduct thorough ongoing diligence on the investment adviser and that periodic in-person diligence visits were crucial to assess "the ethics" of the investment adviser.  (*Id.* ¶¶ 85-86).  Similarly, Estenne succumbed to BLMIS's demand to remove all references to BLMIS from Square One's offering materials, abandoning his principle that transparency is "critical."  (*Id.* ¶ 133).  And Estenne yielded to BLMIS's demand to have full custody of Square One's assets and ignored BLMIS's failure to identify counterparties, notwithstanding that Estenne specifically identified these practices as hallmarks of fraud.  (*Id.* ¶¶ 134-35 and 146-47).  Where, as here, a fund manager "fail[s] to follow his own advice and press a secretive Madoff" by abandoning principles he insisted others follow, the second prong of willful blindness is met.  *See Merkin*, 515 B.R. at 145.

If that were somehow not enough, the Trustee alleges that after the Diligence Officer confronted Estenne with concerns that BLMIS's performance was impossible, Estenne eliminated his personal exposure to BLMIS and took deliberate steps to ensure the Diligence Officer never reviewed Square One's BLMIS investment.  (Compl. ¶¶ 169-71).  And when Bank of Bermuda resigned as Square One's custodian, Estenne allowed BLMIS to have unchecked custody of Square One's assets for more than two years rather than hire an independent custodian to monitor BLMIS.  (*Id.* ¶¶ 172-76).  These are not allegations that Estenne "should have been more diligent" or acted with "negligence, carelessness, or foolishness," as Square One contends.  (Def. Br. at 21-22 (internal quotation marks and citation omitted)).  Estenne knew what he was doing, as evidenced

by his contemporaneous teachings on these topics that he applied to the ART Fund but conspicuously ignored with respect to BLMIS.  (*Compare* Compl. ¶¶ 89-96 *with* ¶¶ 129-148).

Square One's other arguments are similarly unfounded.

First, Square One argues that Estenne did not look the other way because he is alleged to have conducted the Estenne Study.  (Def. Br. at 20).  But Estenne conducted the Estenne Study in October 1999 just as he began forming his strong suspicions that BLMIS was not trading securities and before his deliberate actions to look the other way.  (Compl. ¶¶ 6 and 100).  And Estenne did not conduct any meaningful diligence on BLMIS after the Estenne Study.  (*Id.* ¶¶ 136-44).  For these reasons, the allegations here are different than those in *Legacy Capital*, where this Court held there was no willful blindness because the defendants continued to investigate BLMIS after forming their suspicions that BLMIS was a fraud.  548 B.R. at 33.

Second, Square One argues that Estenne's failure to confront BLMIS after listening to the Diligence Officer's concerns is of no moment because investors do not have an affirmative duty to investigate their broker.  (Def. Br. at 20 (citing cases)).  As an initial matter, this contention is undercut by Estenne's representation to investors that he had a duty to "control" and "review" BLMIS's execution of the investment strategy.  (Compl. ¶ 136).  In any event, the Trustee's willful blindness theory against Estenne is not borne out of what a reasonable investor would do, but rather what Estenne did.  The Trustee alleges Estenne taught investors aggressive due diligence techniques to root out investment fraud but abandoned these teachings only for BLMIS.

Third, Square One argues it is implausible that Estenne risked his money and reputation by personally investing, and causing others to invest, in BLMIS.  (Def. Br. at 22).  The Trustee alleges, however, that Estenne took his money out of BLMIS well before the Ponzi scheme collapsed.  He maintained Square One's investment in BLMIS to pocket the sizable management fees BLMIS

28

inexplicably abandoned, leverage his connection to BLMIS to increase his profile in the European

investment management industry, and in the hopes that he would grow Square One into a multi-

billion-dollar BLMIS feeder fund.  (Compl. ¶¶ 8 and 127).  This Court has found similar allegations

sufficient at the pleading stage.  *See Merkin II*, 515 B.R. at 143.  As for his reputation, Estenne

protected his corporate brand, Partners Advisers, by blacklisting BLMIS from the ART Fund's

portfolio, thereby keeping his reputation as an expert at spotting investment fraud intact.  (Compl.

¶¶ 158-59).  Notably, after BLMIS's fraud unraveled, Partners Advisers was named Switzerland's

"Most Trusted Investment Management Company."  (*Id.* ¶ 80).

In sum, the Trustee has more than adequately alleged willful blindness as to Estenne.  This

Court should deny Square One's motion to dismiss Count I.

IV.    **This Court Should Not Dismiss the Trustee's Requested Remedies**

This Court should also deny Square One's motion to "dismiss" the Trustee's "remedies of

disgorgement of profits and constructive trust[.]"  (Def. Br. at 22-25).  The only question before

this Court is whether the Trustee has stated the elements of his claims against Square One.  *See*

Fed. R. Civ. P. 12(b)(6).  The pleading stage is not the proper juncture for this Court to assess what

relief is owed to the Trustee.  *See Burkina Wear, Inc. v. Campagnolo, S.R.L.*, No. 07 Civ. 3610,

2008 WL 1007634, at *3 (S.D.N.Y. Apr. 9, 2008) ("[T]he question whether a plaintiff has stated

a claim turns not on whether he has asked for the proper remedy but whether he is entitled to any

remedy") (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 130 (1983) (Marshall, J. dissenting)).

Nothing Square One cites is to the contrary.  It relies on cases where the question decided

was whether constructive trust was properly stated as a <u>claim</u>, not as a <u>remedy</u>.  (Def. Br. at 24-

25).  Whereas, here, the Trustee seeks constructive trust as a remedy, not as a claim.  *See Picard*

*v. Avellino (In re BLMIS)*, 557 B.R. 89, 122 (Bankr. S.D.N.Y. 2016) (refusing to consider case law

concerning veil-piercing claim where the Trustee only sought to pierce the corporate veil as a

remedy).  Square One also asks this Court to "dismiss" the Trustee's request for disgorgement of profits because this remedy is typically used in securities cases.  (Def. Br. at 23-24 (citing cases)).  But none of these cases stand for the proposition that a court should "dismiss" a request for disgorgement of profits at the pleading stage.  And they do not stand for the proposition that disgorgement of profits can never be used in bankruptcy cases, as Square One suggests.  Nor could they.  Disgorgement of profits is an equitable remedy that federal courts may apply as appropriate.  *See Sec. & Exch. Comm'n v. Cavanagh*, 445 F.3d 105, 116-17 (2d Cir. 2006).

Square One also argues that it should not have to disgorge "fees paid by Square One's customers" because these fees "do not constitute property transferred from BLMIS to Square One and are therefore not subject to avoidance."  (Def. Br. at 23).  But this is a factual question that has not yet been decided and will turn on whether Square One took its fees from the transfers that Square One received from BLMIS.  This Court may not consider it at this time.  *See Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc.*, 958 F. Supp. 2d 488, 506 (S.D.N.Y. 2013) (whether a plaintiff is entitled to equitable remedies "requires the Court to make factual determinations for which there is no support in the record at [the pleading] stage").

Square One's motion to dismiss the Trustee's requested relief should be denied.

## CONCLUSION

For the foregoing reasons, the Trustee requests that this Court deny Defendant's motion in its entirety.

Date:  April 1, 2019
       New York, New York

By: */s/ Marco Molina*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Marco Molina
Email:  mmolina@bakerlaw.com
Matthew D. Feil
Email:  mfeil@bakerlaw.com
Andrew M. Serrao
Email:  aserrao@bakerlaw.com
Victoria L. Stork
Email:  vstork@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC and
the Estate of Bernard L. Madoff*